**EXHIBIT C TO PLAINTIFF'S
RESPONSE TO MOTION TO QUASH
AND CROSSMOTION TO EXPAND
SCOPE OF DISCOVERY
THIS EHIBIT IS MARKED AS
CONFIDENTIAL IN ACCORDANCE
WITH PTO #12 ENTERED IN MDL 1968**

Confidential - Subject to Further Confidentiality Review

Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF WEST VIRGINIA

3                     -   -   -

4    IN RE:  DIGITEK PRODUCTS  : MDL

5    LIABILITY LITIGATION      : 1968

6

7        (This document relates to all cases.)

8                     -   -   -

9        CONFIDENTIAL - SUBJECT TO FURTHER

10               CONFIDENTIALITY REVIEW

11                    -   -   -

12                 ANTHONY DELICATO

13               New York, New York

14              Thursday, May 28, 2009

15                    -   -   -

16    REPORTED BY:  DANA N. SREBRENICK, CRR CLR

17                    -   -   -

18

19

20         GOLKOW TECHNOLOGIES, INC.

21      23 877.370.3377 ph | 917.591.5672 fax

22            24 deps@golkow.com

23

24   JOB NO. 15697

Confidential - Subject to Further Confidentiality Review

Page 2

 1              Transcript of the deposition of

 2     ANTHONY DELICATO, called for Oral Examination

 3     in the above-captioned matter, said

 4     deposition taken pursuant to Superior Court

 5     Rules of Practice and Procedure by and before

 6     DANA N. SREBRENICK, a Federally-Approved

 7     Certified Realtime and Livenote Reporter, and

 8     Notary Public for the State of New York, at

 9     the offices of HARRIS BEACH PLLC, 100 Wall

10     Street, 23rd Floor, New York, New York,

11     commencing at 9:15 a.m.

12

13                    -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1   APPEARANCES:
             MOTLEY RICE LLC
 2           BY:  FRED THOMPSON III, ESQUIRE
                  MEGHAN JOHNSON CARTER, ESQUIRE
 3           28 Bridgeside Boulevard
             Mt. Pleasant, South Carolina  29464
 4           (843) 216-9118
             fthompson@motleyrice.com
 5           Counsel for MDL Plaintiffs' Steering
             Committee
 6
             FRANKOVITCH, ANETAKIS,
 7           COLANTONIO & SIMON
             BY:  CARL N. FRANKOVITCH, ESQUIRE
 8           337 Penco Road
             Weirton, West Virginia  26062
 9           (304) 732-4400
             carl@facslaw.com
10           Counsel for MDL Plaintiffs' Steering
             Committee and West Virginia
11           Plaintiffs
12           LEVIN, FISHBEIN, SEDRAN & BERMAN
             BY:  MICHAEL M. WEINKOWITZ, ESQUIRE
13           510 Walnut Street, Suite 500
             Philadelphia, PA  10106-3697
14           (215) 592-1500
             mweinkowitz@lfsblaw.com
15           Counsel for New Jersey and
             Pennsylvania Plaintiffs
16
             THE MILLER FIRM LLC
17           BY:  PETER A. MILLER, ESQUIRE
             108 Railroad Avenue
18           Orange, Virginia  22960
             (540) 672-4224
19           pmiller@doctoratlaw.com
             Counsel for Pennsylvania Plaintiffs
20
             ALLEN GUTHRIE & THOMAS, PLLC
21           BY:  ZACKARY B. MAZEY, ESQUIRE
             500 Lee Street East, Suite 800
22           Charleston, West Virginia  25301
             (304) 720-4226
23           zbmazey@agmtlaw.com
             Counsel for West Virginia Actavis
24           Defendants
```

Confidential - Subject to Further Confidentiality Review

Page 4

```
 1   APPEARANCES:
 2            TUCKER ELLIS & WEST, LLP
             BY:  MATTHEW P. MORIARTY, ESQUIRE
 3                JULIE A. CALLSEN, ESQUIRE
             1150 Huntington Building
 4           925 Euclid Avenue
             Cleveland, Ohio  44115-1414
 5           (216) 696-2276
             matthew.moriarty@tuckerellis.com
 6           julie.callsen@tuckerellis.com
             Counsel For Actavis Defendants
 7
             HARRIS BEACH, PLLC
 8           BY:  STEVEN A. STADTMAUER, ESQUIRE
             100 Wall Street
 9           New York, New York 10005
             (212) 687-0100
10           sstadtmauer@harrisbeach.com
             Counsel for New York and New Jersey
11           Actavis and Mylan Defendants
12           SHOOK, HARDY & BACON
             BY:  ERICKA DOWNIE, ESQUIRE
13           1155 F Street, NW, Suite 200
             Washington DC  20004
14           (202) 662-4864
             edownie@shb.com
15           Counsel for Mylan Defendants
16   THE VIDEOGRAPHER:
17           Robert McDonald
18                    -  -  -
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 28

1    to the -- it looks as though there's a

2    reverse chronology of prior experience --

3         A.    That's correct.

4         Q.    -- that starts with

5    Wyman-Gordon and then proceeds up to

6    employment at Alpharma Inc. Purepac.

7              Do you see that?

8         A.    Yes.

9         Q.    Can we rely on that information

10   as being accurate?

11        A.    The information on this resumé

12   is accurate, yes.

13        Q.    What you're telling me, that up

14   to the date of the drafting of this resumé,

15   the employment history and the various skills

16   and the various positions that are restated

17   under each employment location are accurate?

18        A.    Yes.

19        Q.    So if we look at this, at the

20   time this resumé was produced, you were in a

21   position entitled "site director quality

22   assurance" at -- and you call it Actavis

23   (Alpharma/Purepac), Elizabeth, New Jersey.

24        A.    That's correct.

Confidential - Subject to Further Confidentiality Review

Page 29

1        Q.      That's the position you were

2    in?

3        A.      Yes.

4        Q.      And is that your current

5    position?

6        A.      No.

7        Q.      Matt always teaches me about

8    precision in questioning, so let me make sure

9    I don't jump something.

10                What is the next position that

11   you went to following being the site

12   director-quality assurance?

13       A.      I was quality assurance

14   director for New Jersey solid oral dose

15   operations.

16       Q.      Now, you have identified a --

17   you've called it New Jersey.  And, of course,

18   New Jersey does not appear as any entity in

19   the list of Actavis entities.

20                Do you agree with that?

21       A.      Yes.

22       Q.      So tell me who you worked for

23   in that position.

24       A.      I was employed by Actavis

Confidential - Subject to Further Confidentiality Review

Page 30

1    Elizabeth LLC.

2         Q.     Uh-huh.

3         A.     I had responsibilities both at

4    the Elizabeth plant and the Totowa facility.

5         Q.     Do you recall the date that you

6    went to that job?

7         A.     May of 2008.

8         Q.     Prior to May of 2008, did you

9    have any responsibility for Actavis Totowa?

10        A.     No, I did not.

11        Q.     Prior to May of 2008, did you

12   have occasion to perform any job duty at the

13   Little Falls plant for Actavis Totowa?

14        A.     No, I did not.

15        Q.     Prior to May of 2008, were you

16   in any chain of command that people at the

17   Little Falls plant would report through in

18   the fulfillment of their responsibilities for

19   quality control/quality assurance?

20        A.     That they would report to me?

21        Q.     Yes, sir.

22        A.     No, I did not.

23        Q.     Prior to May of 2008, did you

24   receive briefings, memos, or any other

Confidential - Subject to Further Confidentiality Review

Page 35

1        Q.      Well, there was you; that's
2    one.
3        A.      Okay.
4        Q.      Mr. Washington is two;
5    Ms. Lambridis is three.
6        A.      Okay.
7        Q.      Maybe I should count you as the
8    origin, so two steps.
9        A.      That's correct then.
10       Q.      Let me ask you a summary
11   question and then we'll move on.
12               Mr. Delicato, prior to May of
13   2008, what are the sources of your
14   information as regards quality assurance and
15   quality -- and compliance at the Little Falls
16   plant of Actavis Totowa LLC?
17               MR. MORIARTY:  Objection to
18       form.
19               Go ahead and answer.
20       A.      It was limited to conversations
21   and communications from Phyllis Lambridis.
22       Q.      Did you ever physically visit
23   this plant prior to May of 2008?  And when I
24   say "this plant," I mean the Little Falls

Confidential - Subject to Further Confidentiality Review

Page 36

1    plant.

2           A.      Yes.   I had one or two meetings

3    at that facility.

4           Q.      And did you ever tour the plant

5    floor, the production floor?

6           A.      No, I did not.

7           Q.      In order -- and you understand

8    that we're concerned in our questions with

9    the period that really commences about 2004

10   into 2008 as far as organizations.

11                  What is your source of

12   information with regard to the personnel,

13   with regard to the processes and procedures

14   for quality assurance at the Little Falls

15   plant of Actavis Totowa that you're prepared

16   to speak to today as the 30(b)(6)

17   representative of Actavis?

18          A.      My source is understanding

19   those structures are from organizational

20   charts, and also communications with existing

21   employees during my transition when I began

22   at that site.

23          Q.      Anything else?

24          A.      No.

Confidential - Subject to Further Confidentiality Review

1    to talk about.  But this one is Actavis

2    Totowa Manufacturing Operations.

3                    Do you see that?

4         A.     Yes.

5         Q.     Now, this gets me back to

6    something that I talked with Mr. Fitzpatrick

7    about.  And that is that there is -- in these

8    organizational charts, there's no breakdown

9    along product lines, is there?

10        A.     No, there's not.

11        Q.     So when I see the various

12   supervisors, and I see the various operators

13   in these columns -- do you see that?

14        A.     Yes.

15        Q.     These supervisors would be

16   supervising whatever solid medication was on

17   the production list for the production

18   schedule for that production period; is that

19   right?

20        A.     Yes.  They would be working on

21   a given product that was scheduled for a

22   given day, yes.

23        Q.     So, on day 1 -- let me find the

24   supervisor, that I can not butcher his name.

Confidential - Subject to Further Confidentiality Review

Page 50

1    Let's say Mr. -- Canberra?  Is that -- I'm

2    having trouble reading this.

3              Well, there -- is it Mr. Patel?

4    A supervisor?  The second guy over.  Do you

5    see what I'm saying?

6         A.    Yes.

7         Q.    Mr. Patel.  He's a supervisor;

8    is that right?

9         A.    That's correct.

10        Q.    On day 1 through day 5,

11   Mr. Patel may be in charge of a production of

12   medication A.  And on day 6 to day 10, he may

13   be a supervisor in charge of medication B.

14   And on day 11 through 15, he may be on

15   medication C.

16              Is that right?

17        A.    Yes, to an extent.

18        Q.    Okay.

19        A.    On a given day, they would be

20   in charge of multiple products.

21        Q.    Okay.

22        A.    So it's not -- it could be two

23   products; it could be five products.  It's

24   whatever the schedule required and the

Confidential - Subject to Further Confidentiality Review

Page 51

1    availability of the equipment.

2         Q.      Now, where does the schedule

3    come from?

4         A.      The schedule comes from the

5    supply chain organization, scheduling group.

6         Q.      All right.  The scheduling

7    group.

8                 Is that an informal name that

9    you have for the scheduling group or is that

10   actually the name of the people who write the

11   schedule?

12        A.      It's more of a -- a name of a

13   function.  On this particular organizational

14   chart, it's referred to as materials

15   management.

16        Q.      Is there anything about this

17   chart that lets us know when it was drafted,

18   when it was effected?

19                MR. MORIARTY:  You're referring

20          still to page -- Bates-stamped page

21          09?

22                MR. THOMPSON:  Yes, sir.

23                MR. MORIARTY:  All right.

24        A.      Again, the only thing I can say

Confidential - Subject to Further Confidentiality Review

Page 54

1   So if I ask you some really stupid questions,

2   just bear with me.

3         What you'd said earlier was

4   that if I look at the manufacturing

5   operations, that the supervisor is going to

6   receive some form of schedule that's going to

7   tell him the drug that's going to be produced

8   and the quantity; is that right?

9        A.    That's correct.

10        Q.    Is the schedule going to tell

11   him which people to use?

12        A.    No.

13        Q.    He'll decide that for himself?

14        A.    That's correct.

15        Q.    Is the schedule that he

16   receives going to tell him which machines to

17   use?

18        A.    Yes, it will.

19        Q.    And how would that come to him?

20   Will it give him a specific machine or just

21   tell him a type of machine, or what form

22   would that come to him?

23        A.    It would indicate a specific

24   machine.

Confidential - Subject to Further Confidentiality Review

Page 55

1          Q.      And will it tell him a specific

2     press run -- a specific run, how many pills

3     are going to be needed?

4          A.      No, it will not.

5          Q.      Where does that information --

6     how does that get put into the production?

7          A.      There's -- for each product,

8     there's a defined batch size.  That's part of

9     the master batch record.

10         Q.      Now, let me see if I understand

11    this.  If they decide to produce drug A,

12    there will be a schedule that comes out to

13    produce drug A.

14                 Does that take the form of a

15    written document, the schedule?

16         A.      Yes, it does.

17         Q.      And what's the title of that

18    document?  I mean, how should I identify it?

19    Is it like a form --

20         A.      A production schedule.

21         Q.      And the production schedule,

22    will it designate which supervisor is

23    supposed to produce that product?

24         A.      No.

Confidential - Subject to Further Confidentiality Review

Page 56

1          Q.      Who decides which supervisor is
2     going to be assigned to fulfilling that
3     particular schedule production?
4          A.      Supervisors have defined areas
5     of coverage.
6          Q.      And how do they have defined
7     areas of coverage?
8          A.      It's based on their experience.
9     It's based on what they were hired for and
10    their training.
11         Q.      Now, my understanding is
12    there's like 105 products that were made at
13    the Little Falls plant before it closed in
14    June of 2008?
15         A.      I don't know that number.
16         Q.      Well, do you know that it was a
17    significant number?
18         A.      It was a significant number,
19    yes.
20         Q.      And what are you telling me,
21    that this significant number of pills, or
22    this significant number of drugs, would they
23    be divided permanently among supervisors --
24         A.      No.

Confidential - Subject to Further Confidentiality Review

Page 59

1    right?

2          A.      There's one supervisor in

3    charge of that area, yes.

4          Q.      And so whatever came in to be

5    encapsulated would flow down this chart to

6    the supervisor, and then there looks like

7    there are four dedicated operators; is that

8    right?

9          A.      Yes.

10         Q.      Say, for example, you had a

11   solid pill.  Where would that go?

12         A.      That would go through

13   tableting.

14         Q.      It looks like there's two

15   supervisors there; is that right?

16         A.      Yes.

17         Q.      And it looks like there's a

18   whole series of operators.  1, 2, 3, 4... 15?

19         A.      Yes.

20         Q.      Now, is there any effort to

21   have a dedicated single person and single

22   chain of command for a product line, for a

23   single product?

24         A.      No.

Confidential - Subject to Further Confidentiality Review

Page 70

```
 1          Q.      Is the same machine used to
 2   make different drugs?
 3          A.      Yes.
 4          Q.      And I assume that there's some
 5   procedure for cleaning them out in between.
 6          A.      Yes.
 7          Q.      Does that fall within the area
 8   of quality assurance or where does that
 9   cleaning process fall?
10          A.      What specific part of the
11   cleaning process?
12          Q.      You know, I hadn't thought to
13   separate it out.  I mean, the part where you
14   clean out all the old drug and make sure that
15   it's ready for the new drug.
16          A.      The act of cleaning is governed
17   by manufacturing or operations procedures.
18          Q.      On this chart, who would that
19   be?  Would that just be an operator?
20                  MR. MORIARTY:  Which chart are
21          you referring to?
22                  MR. THOMPSON:  I'm sorry.
23          You're exactly right.
24          Q.      The manufacturing operations
```

Page 96

1          Q.     I guess -- let me go ahead and

2     ask this question:  You notice that there's a

3     director of quality assurance, and there's a

4     director of quality control.  And I think

5     we've talked about how there's been some

6     reorganization since the active date of this

7     chart.  But tell me the difference between

8     those two functions.

9          A.     Quality control is responsible

10    for the analytical testing of raw materials

11    and process materials, finished product and

12    stability.

13               Quality assurance is

14    responsible for documentation, training,

15    quality engineering, which is annual product

16    reviews, batch release, change control, and

17    in-process production support such as

18    auditors or inspectors.

19         Q.     Now, the division that you've

20    just told me, is there an SOP that addresses

21    those responsibilities and their -- how they

22    are -- the job requirements for each?

23         A.     Yes.

24         Q.     Now, let's look at number 22.