IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

----------------------------x
                            :
IN RE:  DIGITEK PRODUCT     :         CIVIL ACTION
LIABILITY LITIGATION        :         NO. 2:08-MD-01968
                            :
                            :         July 22, 2009
----------------------------x

MOTIONS HEARING


BEFORE THE HONORABLE JOSEPH R. GOODWIN
CHIEF UNITED STATES DISTRICT JUDGE
AND
THE HONORABLE MARY E. STANLEY
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:          MR. FRED THOMPSON, III
                             Motley Rice, LLC
                             P.O. Box 1792
                             Mt. Pleasant, SC  29464

                             MR. CARL N. FRANKOVITCH
                             Frankovitch, Anetakis,
                             Colantonio & Simon
                             337 Penco Road
                             Weirton, WV  26062

                             MR. HARRY F. BELL, JR.
                             Bell & Bands PLLC
                             P.O. Box 1723
                             Charleston, WV  25326

APPEARANCES (Continued):


For the Defendants:          MR. MATTHEW P. MORIARTY
                             MR. RICHARD A. DEAN
                             Tucker, Ellis & West LLP
                             1150 Huntington Building
                             925 Euclid Avenue
                             Cleveland, Ohio  44115


                             MS. MADELEINE M. MCDONOUGH
                             Shook, Hardy & Bacon, LLP
                             2555 Grand Blvd.
                             Kansas City, Missouri 64108


Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR


Proceedings recorded by mechanical stenography; transcript
produced by computer.

1                   P R O C E E D I N G S

2          JUDGE GOODWIN:  Good morning.

3      Could you note your appearances for the record, please.

4          MR. THOMPSON:  Your Honor, Fred Thompson of Motley

5   Rice for the plaintiffs' steering committee.

6          MR. FRANKOVITCH:  Carl Frankovitch for the

7   plaintiffs.

8          MR. BELL:  Harry Bell for the plaintiffs.

9          MR. DEAN:  Richard Dean on behalf of the Actavis

10  defendants.

11         MR. MORIARTY:  Matthew Moriarty also on behalf of

12  the Actavis defendants.  And if I may, Your Honor, I'd like

13  to introduce two new people.  You've met Madeleine McDonough

14  over the telephone.  She's here today.

15         MS. MCDONOUGH:  Good morning.

16         JUDGE GOODWIN:  Welcome.  It's good to see you.

17         MR. MORIARTY:  Behind the rail is Erica James who

18  is a summer associate in our office and is also a licensed

19  and board certified family practice physician.

20         JUDGE GOODWIN:  We always like to have doctors in

21  these cases, particularly when the lawyers kind of get into

22  a real big tussle.  Have you had any trauma experience?

23         MS. JAMES:  A little bit.

24         JUDGE GOODWIN:  Welcome, Ms. James.  We're glad to

25  have you.

1       I've read your submissions as is set forth in Pre-Trial

2   Order Number 16.  I'll be choosing in the coming days a list

3   of no more than 20 cases.  The other deadlines in the case

4   will follow on from there.

5       One of the things that is kind of an elephant in the

6   room is still the issue of venue.  We're picking cases to

7   try, and we still have, in almost all of them that you've

8   selected, a venue problem.  It will be resolved either by

9   you or by me.  I would prefer, for a number of reasons which

10  I'll tell you about, that we do trials here.  I think you'll

11  find it more convenient.

12      Judge Fred Motz of the District of Maryland is still,

13  or will be for a while longer on the multi-district

14  litigation panel.  As a happy coincidence, he is also the

15  new chair of the intercircuit judge assignment panel.  As a

16  consequence, I think we'll be able to facilitate my

17  assignment to any district that is required better.

18      That being said, I would rather choose these cases

19  without considering where they are.  But if I have to be

20  traveling to all these places, I'm going to be considering

21  where they are in choosing the cases.

22      Moreover, when you make arrangements with another court

23  to use their courtroom and get help from a court reporter,

24  or if I take my own court reporter, we would still need to

25  get a courtroom deputy.  It is not as easy to change things

1    because you are, of necessity, taking some other judge's

2    courtroom.  So, we would become inflexible if we are taking

3    trials to other jurisdictions.

4        We would get the date, and that date would remain and

5    not go away under any circumstances, save a tragedy.  So, I

6    would urge you to carefully consider, before I have to make

7    my decision on these cases, whether or not as to the cases

8    that I'll be selecting in the first 20 you can agree on a

9    venue waiver.  I don't know if you've even talked about that

10   yet.  We talked about it early in the, in the process.

11       Make no mistake, I will pack up and go wherever I have

12   to go to try the cases.  I somewhat enjoy that process.  But

13   it does take away the flexibility that lawyers like in

14   cases, and I'm well aware of that.

15       Are there any changes -- one proposed change was made

16   by the plaintiffs, and the defendants have objected to that

17   change.  Does anybody propose any other change to the case

18   list?

19            MR. THOMPSON:  Judge, not a change, but a change

20   in order.  We have one that's listed as number 14.  We'd

21   like to -- to the extent that the Court use these in terms

22   of a, of a preference by the plaintiffs, we would like to

23   move the 14 to a higher position if, if that's okay.

24            JUDGE GOODWIN:  Hang on a second until I get the

25   plaintiffs' list.  Where do you want to move it to?

1           MR. THOMPSON:  Number 10.

2           JUDGE GOODWIN:  There it is.  So, I take it on

3    both sides you have -- both parties have listed the cases in

4    order of priority in terms of your desires.  That is, if you

5    listed it case number one, that's the one you want to try

6    first.

7           MR. THOMPSON:  Judge, for the plaintiffs, we --

8    the answer to that is "yes."  Not -- there's not a giant

9    hierarchy.  It's not as though, oh, my heavens, we've got to

10   have number one.  But we made an effort to list them from

11   top to bottom.

12      With a little bit of thought, perhaps one of the ways

13   to respond to the defendant's objection as to Williams would

14   be to put 14 into the spot that was occupied by Williams.

15      But, here again, what I want to indicate to the Court

16   is that we would view the, the case 14 as one that we would

17   like to be, to be higher on the priority list.  That's --

18           JUDGE GOODWIN:  I would think by the time we get

19   down to case number 14, period, in trial that we'll be so

20   good at it that it will move rather rapidly after that.

21      Mr. Moriarty, are yours in order of preference?

22           MR. MORIARTY:  They actually are not, Your Honor.

23   And we're not inclined to sit and try to parse out which is

24   the priorities.  So, we're going to leave it to your

25   discretion after this presentation.

1          JUDGE GOODWIN:  Let me ask you another question to

2     both sides.  We'll start with you since you're already

3     there.

4          MR. MORIARTY:  I'm getting my exercise.

5          JUDGE GOODWIN:  Since the -- since you've had the

6     opportunity to review the list the plaintiffs elected, have

7     you seen anything on their list that strikes you as

8     interesting in terms of trying?

9          MR. MORIARTY:  Let me answer that in the negative

10    in that we find somewhere between five and ten cases that we

11    believe are inappropriate selections for reasons that Ms.

12    McDonough will address later.

13         JUDGE GOODWIN:  All right.

14         MR. MORIARTY:  They either came with 20 pages of

15    medical records, or they came yesterday while I was in the

16    car driving to Charleston, or they came with no PFS, no

17    medical records, no authorizations.  So, --

18         JUDGE GOODWIN:  What about the other 10?

19         MR. MORIARTY:  There are -- we have charts that

20    we'll show you.  There are certain ones that we have no

21    procedural objections to.

22         JUDGE GOODWIN:  All right.  Have you taken a look

23    at the defendant's?

24         MR. THOMPSON:  Judge, only the, the -- yes, sir,

25    yes, we have.

1          JUDGE GOODWIN:  All right.  Do you find any of

2     those of interest to be tried from your perspective?

3          MR. THOMPSON:  Judge, we have --

4          JUDGE GOODWIN:  What I'm saying is, are there any

5     cases that you can agree on that should be tried?

6          MR. THOMPSON:  Judge, we have plenty of criticisms

7     for the defense cases.  There is actually a very interesting

8     bright line as to the diagnosis of digoxin toxicity, which I

9     think we'll all get into later.  And I don't want to

10    suddenly grab the floor and pull forth with my criticisms.

11    So, let me just say that --

12         JUDGE GOODWIN:  I'll wait and hear -- I guess what

13    you're telling me is, from both sides, I should wait and

14    hear what you have to say, and I'll do that.

15         MR. THOMPSON:  Yes, sir.

16         JUDGE GOODWIN:  The other thing is Judge Stanley,

17    who doesn't run down the hall and tattle on you, but we had

18    a chance to talk briefly before this hearing.  I won't speak

19    for her except that I get the impression she's not very

20    happy with some of the things that she's been seeing.

21        I would hope that since I have before me a group of

22    lawyers who have wonderful reputations that you would live

23    up to them.  I'll just leave it at that.

24        Let me start with the plaintiff.  Let me let you

25    address your selection of the cases.

1          MR. THOMPSON:  Yes, Your Honor.  Thank you.

2     Judge, we --

3          JUDGE GOODWIN:  And to the extent you feel

4     necessary, address theirs.

5          MR. THOMPSON:  Yes.

6     Your Honor, I'm not going to address these in a great

7     deal of detail.  I will immediately respond to your

8     suggestion with regard to the siting of the trial of these

9     cases.

10         As you recall, at an early point we suggested that a

11    direct filing into the MDL was an appropriate way of having

12    a proper venue.  And we also have noted that Judge Fallon

13    very successfully tried a series of cases in the Eastern

14    District of Louisiana and, in fact, dragged those cases to

15    the western, the Southern District of Texas in Houston after

16    the hurricane and tried a substantial number of cases, five

17    of them.

18         And we think that certainly there are large advantages

19    to having the MDL judge in his familiar surroundings for the

20    trial of the case.  So, that certainly is going to be our

21    continuing position, as it has been all along.

22         The first case that we've nominated is a case, Mimi

23    Rivera-Vega which is a case from Houston, Texas.  The case

24    lawyer is a very well regarded, a very strong advocate, and

25    who can be counted upon to give a, a strong work-up of the

1   case.

2        JUDGE GOODWIN:  Who is that?

3        MR. THOMPSON:  Mr. Williamson.  John O'Quinn has

4   been associated with that case.  It's not clear that he'll

5   be the trial counsel, but Mr. Williamson has a reputation in

6   his own right.  And Shelly Sanford is also associated with

7   that case.  And, so, that will be the first one.

8        This is a young woman.  She had a complex cardiac

9   history prior to her, her death from the digoxin.  But I

10  want to point out -- you'll see this in every single case.

11  It's a definitional aspect.  You do not get digoxin unless

12  you have a rhythm or a congestive heart failure problem.

13       And, so, we'll see a complicated medical history and

14  we'll see a confounding element in every single case that we

15  talk about today.  So, we don't view that of itself as

16  anything special.  And, in fact, that's going to give us

17  what we're looking for with these -- I don't want to use the

18  term bellwether cases, but they certainly are the first

19  cases, and they certainly are the cases whose work-up is

20  going to give insight into how these issues play out.

21       And we think that this is a case -- it's a young woman.

22  She had very strong treating physicians from a renown heart

23  clinic who are going to provide causation testimony with

24  regard to the role of digoxin.  We think that the proof is

25  there.

1          And this is a case -- frankly, the first two cases --

2    and let me just say this.  These are cases that have enough

3    of a damage element to make them - how else do I say - that

4    makes them worth spending the Court's resources of three to

5    four weeks of trying a case to support the, to support that

6    effort.  So, that's our, our first selection.

7          There is a hepatic overlay with the case.  But, here

8    again, as I say, this is a case where the medical testimony

9    will be by very strong Denton Cooley type, clinic type

10   cardiologists.

11         The second case that we nominate is Kathy McCornack who

12   is the executor of Daniel McCornack who is a 45-year-old man

13   who had a death, who died.  Let me put it that way.  He was

14   a long-term stable on digoxin, and then had a sudden

15   unraveling.

16         This is one of the cases, I believe, that Mr. Moriarty

17   referred to as a latecomer that was just filed recently.  It

18   was direct filed.  In fact, he's absolutely correct about

19   this.

20         If you'll recall at our last meeting, I asked for an

21   additional 30 days.  It was for the purpose of allowing

22   Mr. Ernst the opportunity to file this case directly and

23   have it in the pool so that the cases could be, it could be

24   included for consideration in this case of Mr. Ernst.

25         He is the former president of the California Trial

1    Lawyers Association.  He's very -- he's a strong, although

2    sole, practitioner.  We think that he has the ability to do

3    a spirited and a complete work-up.  And it will give a case

4    that gives us a real opportunity to see what the issues are

5    and how they, how they, how they unfold.

6         This was direct filed, but the plaintiff's venue would

7    either be the Southern or Central District of California if

8    you're going by the plaintiff's domicile.

9         The third, Jacqueline Fox, is a -- here again, this

10   begins to try -- what we've tried to do is to select a range

11   of cases ranging from death cases, ranging from a serious

12   and sudden onset with a young person.

13        This would be a case where you have a sort of very

14   typical presentation of a 76-year-old.  She was -- in April

15   of '08 just prior to the recall, she was found unconscious,

16   had a very high digoxin level.  She had renal problems that

17   led to her death.  And she -- so, that will be the third.

18        The attorneys for that case are not quite so

19   accomplished, but we do think they would do an appropriate

20   job of proving up, of addressing the issues of that case.

21             JUDGE GOODWIN:  You know what.  Let me, let me

22   suggest at this point, Mr. Thompson, that -- I'm starting to

23   think how long this might get.  Why don't we move -- instead

24   of going through your entire list which you have also

25   provided some explanation of --

1          MR. THOMPSON:  Yes, sir.

2          JUDGE GOODWIN:  -- why don't we go to the

3    criteria -- well, let me hear what you think about the

4    suitability of the cases the defendants selected.  I don't

5    mean to interrupt your train of thought, but I just think

6    that might be easier.

7          MR. THOMPSON:  Judge, I do want to say that the

8    Fox case is my case.

9          JUDGE GOODWIN:  Okay.

10         MR. THOMPSON:  I did want to finish that thought.

11         Judge, the, the defendants -- and just let me say this

12    by overview.  It's not criticism.  It's them playing their

13    side of the net, and playing an aggressive side of the net.

14         They've chosen this opportunity to put before the Court

15    cases that they believe are going to demonstrate their point

16    to the Court that many of these cases are, have deep

17    difficulties, many of these cases have a failure of a, --

18    there's not a lab test that shows digoxin toxicity, and that

19    there are confounders.

20         What they've done by taking that opportunity to, to put

21    forward, in essence, symbolic cases is to put forward a

22    series of cases that really cannot be tried.  Many of these

23    cases are going to have to be dismissed at some point during

24    the discovery period.  And that's no great, no great

25    surprise.

1          What we're dealing with here, because of our PTO 16,

2     we're dealing with a universe of maybe 260 to 280 cases

3     which are early filers.  There was a, a substantial number

4     of cases that have not been brought that are being

5     assembled, being looked at.  But these are the cases that

6     are being, that have been brought forward.

7          And we do think there are enough cases from which we

8     can pick and go forward with good cases that are going to

9     lay out the substantial differences of opinion and either

10    meet some causation legal threshold that will be decided by

11    the Court, or will present a jury issue of persuasion with

12    regard to the strength of proof of defect or proof of, of

13    some bad pill in commerce and some health effect from the

14    adulterated pill.  We do think there are enough cases to do

15    that.

16         But our general criticism of the defense cases is that

17    they have picked a substantial number of cases that cannot,

18    that will not move through until the end of the -- and

19    present those kinds of trial cases that are worthy of the

20    Court's expenditure of labor and time.

21         The only reason to try the initial set of cases is to

22    provide insight -- I don't mean to say only.  But a, a large

23    reason for these early cases is to allow the plaintiffs to

24    be tempered in their enthusiasm by reality, and maybe have

25    the defendants be tempered in their enthusiasm by reality.

1          It's, it's, it's an opportunity to test the positions

2     with regard to circumstantial proof of, of adulterated

3     pills, of the causation issues, and of the, particularly the

4     issue of confounding underlying health conditions.

5          We don't view the confounding health conditions as, as

6     an obstacle at all.  As we said at the outset, it's

7     definitional.  People don't take this drug unless they have

8     a heart condition.  People with heart conditions have kidney

9     problems.  People with heart conditions have obstructive

10    pulmonary disease.  Elderly people have a whole host of

11    systemic problems.

12         That's all, of course, well-known to makers of digoxin.

13    And certainly it provides them with a heightened notice that

14    variability in dosage is much more important to people who

15    are, by nature, brittle.

16         So, those cases, we think that rather than a sort of a

17    default position where the Court would call upon 10 and 10

18    and pick 10 plaintiffs' picks and 10 defense picks, our sort

19    of blanket criticism is that in this case, given the number

20    of cases that really just don't register, that the Court

21    might contemplate going and looking at the plaintiffs' picks

22    in its desire to pick out cases that will provide insight

23    into the, into the, the final trial, the final issues of the

24    case.  That's the general criticism.

25         The second criticism --

1          JUDGE GOODWIN:  Mr. Thompson, let me interrupt you

2     for just a second.

3          MR. THOMPSON:  Yes, sir.

4          JUDGE GOODWIN:  Do I understand you to be saying

5     that the plaintiffs know which cases are their weak cases

6     and that there's no real point in trying those?  Is that

7     what you're telling me?

8          MR. THOMPSON:  Judge, I -- no, that's, that's more

9     than, than I can say today.

10         JUDGE GOODWIN:  More than you would say on the

11    record.

12         MR. THOMPSON:  I can say that of the 15 picks that

13    have been put forward by the defendants, that in the --

14    that, that a substantial number of those cases, given the

15    weakness of the medical records, and not just given the

16    weakness of the medical records, but in certain cases given

17    the transient nature of the claimed illness, those are cases

18    that cannot be or should not be profitably pursued.

19         For example, if you have a transient injury or need to

20    ledger $300,000 in work-up expenses where the up side of

21    that case for that client might be $60,000 is a terrible

22    disservice to that client.  That client really shouldn't be

23    saddled with the burden of the entire litigation.  That's,

24    that's one of my points.

25         As far as, as individual cases, I think we could go

1   through the descriptions that have been provided by the

2   defendants and pick those out line by line, but I do think

3   the descriptions are quite, quite clear.

4       I will say one final thing.  As you read the

5   defendant's descriptions, I do think that the, there is a

6   difference between having a digoxin level which is read as

7   being within standard parameters and there not being a

8   digoxin test at the time of the illness.

9       It's our strong position, and will be our position in

10  future proceedings, that circumstantial evidence and

11  symptomology are sufficient for a reviewing physician to

12  find a, a digoxin implication in, in the presentation of the

13  health problem.

14      The reason that we see that is that when you're dealing

15  with an elderly population with underlying heart problems

16  and someone dies of a heart problem, the first impulse is

17  not suspicion.  The first impulse is, oh, Fred had a pretty

18  good run and it's too bad that he's gone.

19      Only by careful review and only by careful parsing out,

20  and certainly only by finding out and seeing the, the

21  ingestion of the, of the recalled product could a, a

22  physician on sufficient alert go back and make that opinion.

23  That's going to be our future position.  So, --

24          JUDGE GOODWIN:  Let me talk to you more generally

25  about the, what the plaintiffs' steering committee, the

1  defense steering committee, and the Court might hope to gain

2  by selecting, doing discovery, and then trying, for lack of

3  a better word, bellwether cases.

4       It is apparent to me that if I put cases on the list

5  for trial which the parties, the party selecting it or the

6  party on the opposite side of the case, believe to be a case

7  that's going to go away on summary judgment or one that is

8  appropriate for serious consideration on summary judgment,

9  is that what we, is that what we want on that list?  Is that

10  what we're looking for?

11       The one thing that you said that gives me great concern

12  is I recognize in these cases how expensive it is to prepare

13  a particular case for trial and take it to trial.  I think

14  the Vioxx cases were a million eight or something like that

15  per trial.  And that was with Judge Fallon limiting all the

16  cases to three weeks, I believe, of trial.

17       So, I understand that.  And I would understand that we

18  need cases that are going to teach the parties something and

19  the Court something about the cases.

20       Now, that doesn't mean that we should select the

21  plaintiffs' best cases for trial.  Otherwise, I'd just let

22  you choose them.  It, it does mean that we take cases where

23  there are serious claims and serious defenses and the record

24  can be fully developed factually and legally in those cases.

25       The development of those cases that we -- the way we've

1    structured our pre-trial order also gives the parties a, a

2    view of the case before we would get to these trial dates.

3    And that is -- another goal is which, which ones of these

4    two hundred and some cases do we want to look at closely to

5    evaluate what kinds of claims these are, what kinds of

6    defenses do we have, and then if we get to the bellwether

7    trials, what are they worth, and how will they go down

8    before a jury?

9         So, I'm not saying anything you haven't thought about.

10   I'm simply saying that I'm not -- I'm looking for cases that

11   are representative on some level of the 245 or how many ever

12   cases there are now.  They keep coming.

13        The -- obviously, I have an interest in trying a

14   serious case, one of the best cases the plaintiffs have.  I

15   want to see what it's worth.  Obviously, I want to see a

16   case that exemplifies the best defenses that the defendants

17   have in a case.

18        If it -- and now I'm talking without information, which

19   always gets me in trouble, but I'll simply say this.  If

20   there is little or no evidence of digoxin toxicity and no or

21   little evidence of ingestion of this drug and no or little

22   evidence of a causal connection between the physical

23   condition or damages suffered by the patient and the

24   ingestion of hard drugs, well, you know, I don't know what

25   that tells us.  It just tells us it's not a very good case.

1   It doesn't really -- I mean, I don't need all of the

2   defendant's experts to try two or three cases to say to me,

3   "Judge, they didn't have any proof."

4        What I need is ones where the defendant's experts are

5   able to deal with issues of the variable toxicity of the

6   drug, for example, under different circumstances.

7        I don't know exactly, and don't pretend to know, much

8   about this drug.  And I expect I'll, by the time I'm

9   finished, I'll know more than I ever wanted to know about

10  it, and you'll teach me.  But we're looking for cases where

11  we could all learn something.

12       Now, the plaintiffs, more so than the defendants, have

13  competing values or interests.  The plaintiffs' steering

14  committee represents a very large number of lawyers with a

15  very large group of cases.  Each of those lawyers has an

16  interest in seeing that their case, and many of them will

17  think their case is the only case worthy of trial, is dealt

18  with and given priority.

19       Sometimes, I would suspect, the individual lawyer's

20  evaluation of the case and its importance in the scheme of

21  things may vary from what the plaintiffs' steering committee

22  thinks.  I don't know that, but I suppose that could happen.

23       So, as we continue your remarks -- and I know Mr.

24  Moriarty has a slide show for me -- I want you to keep in

25  mind and emphasize for me for my consideration why a

1    particular case is one which will benefit all of us in the

2    regard or in the respect that I've outlined here.

3          You had something.  Yes, sir.

4          MR. THOMPSON:  Judge, I do want to correct one

5    impression.  I sometimes -- I know this is going to be

6    shocking to the Court, but sometimes I'm guilty of

7    hyperbole.

8          The -- when I suggested that a case might be low value

9    and that it would be a hardship in that particular case, I

10   want to assure the Court that it's the plaintiffs' steering

11   committee's intention and full undertaking that any case

12   selected is going to be fully prepared and, and the product

13   that will be put forward to the Court for decision, there's

14   not going to be that consideration.  We will do what we need

15   to do.

16         JUDGE GOODWIN:  Absolutely I understand that, Mr.

17   Thompson.  And I selected the able counsel that I did for

18   the plaintiffs' steering committee knowing that that would

19   be the case.  So, I don't doubt that.  But a candid look at

20   meeting the goals that I've talked about, and which I'm sure

21   all of you have thought about, will be the most helpful to

22   me.

23         I don't necessarily think it's helpful -- well, I mean,

24   I can read your papers.  On the other hand, I guess what I

25   need is what you started to do.  Just tell me what you think

1    about this situation in more general terms.  And then I'll

2    let Mr. Moriarty talk in more general terms.  And then

3    perhaps I'll be better able to question him.

4         I'm just trying to lead us through a process, and I'm

5    not sure that I didn't get off the trail in my leadership.

6    So, let me go back to Mr. Thompson.

7         Mr. Thompson, just address generally what you hope to,

8    that the Court will do when considering each of these cases

9    for selection.

10        MR. THOMPSON:  Judge, my perspective is that the

11   central issues of these, of this case is going to be the

12   medical causation issue and the proof of an adulterated or a

13   nonconforming pill that participated in that causation.

14        In that regard, it's not necessary, it's not essential

15   that the Court pick cases where there is a diagnosed digoxin

16   toxicity, although you will find it in, I believe, all 15 of

17   our selections.

18        We have gone to that in order to reduce or to have one

19   less confounder in the initial wave because we view the

20   battlefield as showing an adulterated product that could be

21   or was, and is going to have to be most likely in terms of

22   circumstantial evidence, was available to be consumed, was

23   consumed in a way that could produce the health effect.  I

24   think that's going to be -- in the end, that's where we'll

25   all be fighting it out.

1        To the extent that I'm talking about quality assurance,

2   manufacturing, good manufacturing practice, the FDA

3   inspections, the FDA 483 forms, the various responses, I'm

4   just going to have a big smile on my face for that whole

5   time.  To the extent that we're talking about medical

6   causation and we're talking about the, the adulterated,

7   nonconforming pill to the consumer, that's going to be

8   difficult for me.

9        So, if we take cases where there's a digoxin toxicity

10  and we start and we take that off the table, then we have a

11  case where this issue is going to be pretty squarely

12  presented.

13       Let me just take one example.  The Thrasher case that's

14  been nominated by the defendants, they -- within their

15  factual statement they say that Ms. Thrasher was diagnosed

16  with a high level of digoxin.  The doctor's report says that

17  she was taking a double dose a day, that that's charted

18  somewhere in the medical records.

19       Her testimony is that she wasn't doing that.  Her

20  testimony is that the, she was taking the proper dose and

21  that her level was caused by a, a -- it must be the pill.

22  Okay?

23       That is a very interesting factual departure.  And you

24  could easily see that ending up going to the jury on that

25  issue.  Who's telling the truth?  Is it the medical record

1    or is it Ms. -- or is it the, or is it the patient?

2         Unfortunately, however the jury answers that question

3    doesn't push the litigation down the road.  That is a

4    confounding -- that's a side issue that creates a case which

5    is going to be very interesting to try.  But should it be

6    one of the first three trials?

7         We, we think that that's a case that has a substantial

8    and, you know, frankly, fascinating side issue, you know.  I

9    love cases like that.  If you believe me, I win.  If you

10   believe them, then they win.  I love that.  But,

11   unfortunately, that's not going to help value cases.

12        And, so, we think that that is a case that's better

13   coming on in the second wave or a little further behind.

14   That's an example of the confounding issues.

15        To me, a range of ages, a range of health conditions,

16   and even a range of the, the, the pre-existing disease may

17   be helpful.  Certainly, the two things that are needed on

18   these cases are proof of a recalled product and, two, proof

19   of, of some health effect from it.

20        And the easiest way is almost to surrender into Mr.

21   Moriarty's position that I think we've heard many times that

22   digoxin toxicity is a prerequisite for, for these cases.

23        We, in fact, have selected cases where that is in the

24   medical records so we can concentrate on the issue of

25   adulteration and health effect from that, from that product.

1    I do think it's appropriate to have in the first trial

2    group cases in which there is not a lab-tested digoxin

3    toxicity, but one in which there was no test, but there was

4    symptomology because that's going to be an important issue.

5    I believe that that is going to be an appropriate and

6    proper way and a convincing way to prove this case simply

7    because, as I've said before, these cases arise -- there's

8    not a great indicia of suspicion if somebody with a heart

9    condition dies of a heart condition.  You know, sometimes

10   they just call the coroner and you go on down the road.

11   There's not a, "Oh, my heavens, why did this happen to, to,

12   to this?  We've got to do a PM."

13   Oftentimes there, there may be a necessity to prove

14   that by circumstantial evidence.  I believe that.  The

15   defendants believe that digoxin toxicity is a prerequisite

16   to being convincing.

17   So, I think cases that fall into that category are

18   going to be very instructive to both sides.  So, I do think

19   that would be a criteria.

20   I think if I continued to go down my list, I'm going to

21   replow the same ground probably for the third time.  And,

22   so, let me, let me just cede the floor and answer questions.

23             JUDGE GOODWIN:  Thank you, Mr. Thompson.

24   Mr. Moriarty.

25             MR. MORIARTY:  Good morning, Your Honor.

1          JUDGE GOODWIN:  Good morning.

2          MR. MORIARTY:  We have -- the manual on complex

3   litigation addresses in several different places selection

4   of test cases.  We have come here today with a little bit

5   different approach.

6      What we want to do is we submitted our selections well

7   in advance, the descriptions.  So, what we want to do today

8   is two things.

9      I'm going to talk about general principles.  I'm going

10  to talk about medicine.  And I'm going to put this all in

11  context so that we might help the Court see what a

12  representative case might be.

13     We're going to talk a little bit about the drug itself

14  and how these plaintiffs come before you.  And then --

15  that's my job.  And then Ms. McDonough is going to talk

16  about specific cases of the plaintiffs that should not be

17  selected and why.  Okay?

18     So, I have hard copies of our PowerPoint presentation

19  if the two of you wanted to take notes directly on this.

20  I'll give a copy to plaintiffs' counsel if they'd like it.

21  Can you boot up my laptop?

22          JUDGE GOODWIN:  It should be.  All you need to do

23  is push the button on your, on the table there.  It should

24  be -- the plaintiffs' table should be on.

25          MR. MORIARTY:  You need to push the button for the

1    defense table.

2            JUDGE GOODWIN:  Oh, I got it.

3            MR. MORIARTY:  Okay.  So, back in, back in last

4    September, we were asked to submit a statement about what

5    this case was about.  This screen is an excerpt from the

6    statement we filed with Your Honor back then.  And it just

7    tells you again what this drug is about.

8        Now, the people who get digoxin products of any brand,

9    whether it's the name brand Lanoxin, the name of which you

10   will see throughout these medical records, or whether they

11   got the Actavis product Digitek, it doesn't really matter

12   because these are given to very, very sick people for two

13   reasons:  Atrial fibrillation and congestive heart failure.

14   Okay?  And that's what this says.

15       Those diseases themselves are caused by and accompanied

16   by a whole host of other medical problems.  They're

17   typically given to people who are elderly.

18       And this is what we think is representative.  This is a

19   medical record from one of the cases that we designated,

20   Mr. Butts.  This is from one of his admission history and

21   physicals and what they claim in their PFS as a key time

22   period.  And you can see the highlighted portion talks about

23   the medical problems.  He was getting this for

24   cardiomyopathy and congestive heart failure.

25       But the things that are in here are sort of typical of

1  what you would see if you, Your Honor, were to go through

2  the medical records and look at these in detail, which we

3  know you don't have time to do.

4      We actually have a binder of abstracts and medical

5  records from our 15 cases.  If you want us to leave this

6  with you so that you can go through it at your leisure,

7  we're happy to do that.

8      But this is what you will typically see.  We think that

9  this, as Mr. Thompson conceded, is representative because

10  this is sort of the package.  Everybody's going to have

11  different ones.  But within this sort of binder, this is

12  kind of typical.

13      Now, this group of people, the elderly people and these

14  people who are at risk because of their severe heart

15  disease, lung disease, diabetes, et cetera, are going to

16  wind up in the hospital.  They're going to die.  And as Mr.

17  Thompson points out, the question is always going to be:

18  What's the cause?  And he talks about these confounders.

19      Well, that's a very important issue in these cases

20  because this is the detailed patient label.  This is the

21  digoxin label.  It's patterned after the Lanoxin label, all

22  FDA approved labeling.  But because our client's product is

23  a generic, it's essentially the same label.

24      And this gives you a little bit -- and this was

25  produced in discovery already.  This gives you just a little

1    bit of idea of the confounders that are sort of running

2    through the threads of these cases and that we can get into

3    in more detail if we need to.

4         Body weight.  Okay?  Even the beginning says everybody

5    is a little bit different.  They're sensitive, and you have

6    to think about the individual circumstances of these people.

7         Body weight, renal function, which I'll discuss more in

8    a second, patient's age because advanced age is a problem

9    with diminished renal function even in the face of normal

10   laboratory studies, and other disease states or drugs.  And

11   when we say "or drugs," this is from a, a standard

12   cardiology test called Braunwald.

13        And you'll see, if you look in these cases and as we

14   will go through them in discovery, a lot of these patients

15   are on these drugs that affect, one way or another, the

16   pharmacodynamics or the pharmacokinetics of how this drug is

17   metabolized and potentially increase the digoxin level.  So,

18   here's another one of Mr. Thompson's confounders.

19        And then this is another table from the literature that

20   just talks about:  Here are some of the causes of digoxin or

21   digitalis toxicity.  People can take too much for any number

22   of different reasons; reduced volume of distribution –

23   you'll see a lot of this with drug interactions –

24   hypothyroidism; reduced elimination; renal disease.

25        Let me dwell on that for just a second, Your Honor,

1    because when you look through the plaintiffs' summaries, and

2    even the defense summaries, you will see renal issues

3    repeated over and over and over again.

4         The plaintiffs are claiming in their PFS's that digoxin

5    causes renal failure, causes death, hospitalization.  These

6    cases -- some of these cases must be selected because they

7    actually have it backwards.  And those kind of cases are

8    going to be important test cases up front because as you can

9    see from the product labeling and this sort of table, it's

10   not digoxin toxicity causing renal disease.  It's the other

11   way around.

12        And the plaintiffs, in order to weed out some of these

13   cases, those cases have to be put up amongst the mix of the

14   first 20.  And that will be a point of a lot of scientific

15   rigor in these early cases.

16        So, we're talking about toxicity.  That comes up over

17   and over again.  Mr. Thompson makes a point of that.

18        But before I get there, this is the kind of lab result

19   that we're talking about when we're talking about the renal

20   issues.  This is from Mr. Klopping's medical records, a

21   defense presentation case.  And you can see in those

22   highlighted sections, his blood urea nitrogen is

23   substantially elevated.  Creatinine is substantially

24   elevated.  The standards are on the left.  His results are

25   on the right.

1        And then the estimated glomerular filtration rate, the

2    last one of those, a more modern, sensitive test of kidney

3    function, is also substantially diminished.

4        These are the kind of things that will run through

5    almost every one of these cases.  Almost every plaintiff on

6    both sides of the table has substantial renal issues which

7    make digoxin toxicity, regardless of brand, regardless of

8    dose, a distinct possibility.

9        Now, key general principles.  The plaintiffs have to

10   prove exposure which is to a defective product, not just to

11   our product; what that dose is; and what the duration of

12   exposure is.

13       Nothing in their case selections really address this

14   point that's going to be flushed out because to date there's

15   no evidence of it.  They've got one case with a "maybe."

16       This is a drug, regardless of who you are or what your

17   problems are, you can go from therapeutic one day to toxic

18   the next, or subtherapeutic the next.  It's a difficult

19   thing to control because in the elderly, their electrolytes

20   get out of balance.  Their renal conditions are poor.  All

21   kinds of things happen.

22       There are a lot of reasons why people become toxic,

23   which is from those earlier slides.  And the medical

24   literature will show, Your Honor, when we ultimately get to

25   a science day and a *Daubert* hearing that in the medical

1   literature, digoxin is one of the most frequent causes of

2   adverse drug reactions in the elderly.  And these studies

3   have gone on for years and have nothing to do with defective

4   products.

5        Now, when we talk about toxicity, this is what we're

6   talking about.  You will see in our charts and in our tables

7   that we provided you our summaries, digoxin is referred to

8   in two ways, elevated SDC, or serum digoxin concentration,

9   and clinical diagnosis of digoxin toxicity.

10       This is what we're talking about when we talk about an

11  elevated SDC.  This is the lab test in one of the cases.

12  This is Dorothy Robertson, a case out of Maryland.  Her

13  digoxin level is 2.3.  And you can see in that particular

14  hospital, the scale was -- I think that says .8 to 2.2.

15       That is the elevated level we're talking about.  That

16  in and of itself is not digoxin toxicity.  It is just a lab

17  result.  But it is going to be some evidence that both sides

18  use in assessing representative cases.

19            JUDGE GOODWIN:  What -- there is a level at which

20  this drug is toxic in everybody, isn't there?

21            MR. MORIARTY:  There, there probably is such a

22  level, but nobody knows what that level is.  Once you're

23  getting above four, five, six and getting towards

24  life-threatening, that's probably a universal.  But what the

25  medical literature says and what the experts will say is

1    that this may or may not be digoxin toxic.  It could be

2    renal issues that are driving the level up.  It could be all

3    kinds of things.  This is just a lab result.

4        So, then what we look at is the medical records.  And

5    we don't know why in this particular case, Ortra Davis, this

6    doctor diagnosed digoxin toxicity.  We haven't taken

7    depositions yet.

8        It may be based only on a lab result, which we don't

9    think is a proper way to do the diagnosis, or maybe this

10   patient also had a symptom complex that, that could be

11   digoxin toxicity.  It's one or the other, maybe a little of

12   both.

13       But in the tables that we've presented to you and on

14   the summaries, these are certainly key elements.  And we

15   wanted you to understand what they meant so that you can

16   make decisions about whether they're representative.

17       Now, Mr. Thompson said a couple of interesting things.

18   When we get to these cases -- because you will note that the

19   defense cases, many of them have no elevated level and no

20   diagnosis of digoxin toxicity.  On the plaintiffs' side of

21   their list, almost every patient does.

22       But we have heard from Mr. Thompson and his colleagues

23   over and over again that the lack of these things is not

24   that meaningful.  And I've always taken from that that they

25   intend to bring in experts who will say, with the benefit of

1   hindsight, that even though no doctor thought there was

2   digoxin toxicity and the lab levels were normal, this now,

3   we look back retrospectively, and say is digoxin toxicity.

4        So, we can't remove these defense cases en banc because

5   they don't have those pieces of evidence.  They filed the

6   lawsuits on those cases.  They presumably have the

7   confidence that they're good cases.  And, Your Honor, I

8   think you just have to take this on faith from the defense

9   group.

10       As we look at as many cases as we can with records and

11  PFS's, these are representative cases.  There are dozens

12  upon dozens of cases that have no clinical diagnosis and no

13  elevated levels.  And if they're representative and the

14  plaintiffs intend to pursue them, they should be among the

15  selections.

16       And now we find out today, after going through this

17  whole selection process, that the plaintiffs concede that

18  these might be cases that get dismissed somewhere along the

19  way.  Well, it would have been nice if they'd told us that a

20  long time ago because we might have looked at the selection

21  process a little bit differently.

22       But as it stands today, those cases are there.  The

23  plaintiffs' lawyers intend to pursue them.  And they are

24  representative and need to be among the group.

25       Let me just close out my section of this.  You know,

1   this whole litigation came about just about a year ago

2   because of the FDA's recall of Digitek.  Okay?  That's what

3   spurred all this.

4       We think it's important in selection and perspective

5   for you to know what the FDA said about this two weeks ago.

6   This is a very short excerpt of an FDA statement on their

7   website, and we've provided the link for it.

8       "In our best judgment, given the very small number of

9   defective tablets that may have reached the market and the

10  lack of reported adverse events before the recall, harm to

11  patients was very unlikely."

12      That is the context that we are going under as we enter

13  this next phase of litigation.

14      Mr. Thompson talks a lot about circumstantial evidence.

15  They're going to need it because in the overwhelming

16  majority of these cases, they will not be able to present to

17  you any direct evidence of a defective tablet that their

18  clients got which caused their digoxin toxicity.  There will

19  be these confounders in every single case.  But this is

20  important to know as we go forward.

21          JUDGE GOODWIN:  Ms. McDonough.

22          MS. MCDONOUGH:  Thank you, Your Honor.

23      Just kind of jumping right into the cases to kind of

24  get an overview of where we are, here is the status of

25  things as it was July 15th, '09, the day we needed to make

1    our trial selections.  At that point, we had 377 MDL cases.

2    At that time, plaintiff fact sheets that were due totaled

3    280.  We should have had 280 completed plaintiff fact sheets

4    along with the required medical records and pharmacy

5    records.

6        Of the 280, we received 225 plaintiff fact sheets at

7    that point.  And we sent deficiency letters on all the rest,

8    or a few of them are about to go out now.  Many of those

9    came with no records at all, no pharmacy records, no medical

10   records, no authorizations.

11       So, we were left ultimately with about 175, 178 cases

12   that at least had some amount of records.  And then we

13   needed to take whatever authorizations we had and work with

14   the RecordTrak people to actually go out and collect records

15   and see what we could learn in the interim.

16       And, so, the later we got plaintiff fact sheets in, the

17   less likely we were to be able to have collected those

18   records and analyze them.

19       So, bottom line, ultimately we've been able to look at

20   128 cases out of the 280 that we had hoped to be able to

21   look at at the time that the selections were due.  That's

22   less than half.  That's —— it's 43 percent of the cases that

23   should have been accompanied with medical records, completed

24   fact sheets, pharmacy records, and authorizations.

25       So, that did make things difficult.  I mean, we were

1    looking for all sorts of things in these medical records

2    and, yet, we had a very incomplete universe from which to

3    designate from, really a fraction of it.

4         Nonetheless, we looked at those.  We looked for things,

5    as Mr. Moriarty said, is there evidence of the actual use of

6    Digitek?  Many of these cases have no records that we've

7    been able to find that say the person actually used Digitek.

8    Many of them actually name a different product like Lanoxin

9    or a different generic name.

10        So, right there we've identified some that don't even

11   appear to have fit the threshold of:  Did they use the

12   product in this case?

13        Then we looked for all of the things that Mr. Moriarty

14   discussed about alternative causes, causation issues, you

15   know, anything that might bear on whether these cases have

16   some potential merit.

17        In looking at that and trying to look at all of the

18   records around, we tried to find cases that were a real

19   diverse spectrum of at least representative cases of the

20   small percentage that we could look at.  We did select death

21   cases.  Ten of our 15 are death cases.  Five are personal

22   injury cases.

23        We selected some that did have digoxin toxicity even if

24   we weren't sure whether it was Digitek or not Digitek.  Of

25   those, we picked four that did have toxicity shown, and we

1  did pick 11 that did not have any evidence of digoxin

2  toxicity.

3      And I do agree with Mr. Moriarty that those are

4  important because if they are cases that should have never

5  been filed or should be dismissed or are going to be

6  continuing in this process, that would send a very strong

7  message to figure out whether some of these cases really

8  ought never have been brought.

9      So -- and they are representative.  There were actually

10 many more cases we could have designated that did not have

11 represented shown digoxin toxicity.  But we also tried to

12 find some that did so that we could look at the issues that

13 Your Honors have mentioned that go to the issue of, you

14 know, a triable case that might have some issues on both

15 sides.

16     Our 15 selections, therefore, were trying to represent

17 geography, which we sort of touched on earlier.  We looked

18 at age.  Ours range in age from 49 to 89.  We looked at

19 different reasons that people might have been on digoxin.

20 Some of them were atrial fibrillation.  Some were congestive

21 heart failure.

22     We looked at durations of use.  Sometimes people had

23 been on digoxin for many years.  That's helpful because if

24 they had been steady for many years and then suddenly were

25 not, maybe that's something that could be explored.  Was it

1    somekind of toxicity or was it a medical condition that

2    changed it, or a concomitant medication that affected their

3    blood levels?  Those things matter.  Other medications and

4    other underlying diseases matter.

5         So, we tried to pick a whole range of things that would

6    show these differences that are going to have to be flushed

7    out by expert testimony most likely.

8         The plaintiffs' case selections.  You know, as an

9    initial matter, even of the 15 that they selected, 10 of

10   them were procedurally deficient in one way or another.

11        And, actually, let's start with the very first cases

12   that they selected.  And I'll go in the order that Mr.

13   Thompson used them today.

14        The first one is the Mimi Rivera-Vega case.  That was

15   one that was not even in group one for possible selection.

16   The plaintiff's fact sheet was not due in that case until

17   August 31st.  But on July 16th, the day after we were

18   supposed to make our proposed case selections, we got that,

19   a set of medical records and a plaintiff fact sheet on that

20   day.

21        So, it really wasn't even within the right group.  But

22   that one came earlier than it should have, but still too

23   late for us to even have considered it for a trial

24   selection.  So, I think because of that procedural

25   difficulty, that really maybe goes in group two, but it's

1    not proper for group one.

2         The second case that he mentioned is the Vivian Adams

3    case.  First of all, the complaint in that case says that

4    the first prescription for that person actually was filled

5    after the recall.  So, I'm not sure that that's going to be

6    representative of anything.

7         But in addition to that, we still don't have a

8    plaintiff's fact sheet in that case.  And this is one that

9    they have designated for trial.  We don't have any medical

10   records.  We don't have any authorizations.

11        In addition, the plaintiff in the case is the named

12   decedent.  There is no representative estate name.  So, it's

13   improper in a multitude of ways and it's just not a proper

14   case.

15        The third one is the Joan Luce case.  In that case, we

16   did actually receive a fact sheet but it came with fewer

17   than 30 pages of --

18             JUDGE GOODWIN:  Which one are you talking about

19   there?

20             MS. MCDONOUGH:  Luce, L-u-c-e.  It's at the bottom

21   of the screen there.

22             JUDGE GOODWIN:  All right.

23             MS. MCDONOUGH:  We did receive a plaintiff fact

24   sheet for that case, but it came with fewer than 30 pages of

25   records, very scant for someone who's had multiple

1    hospitalizations.

2         From just those 30 pages of records, we were able to

3    see that there were 11 additional providers named in those

4    records, but none of those records were supplied us to.  So,

5    we have requested those, but we don't have them yet.

6         So, that is another one.  Maybe it would be proper for

7    group two, but it's not ripe for group one.  We also got no

8    pharmacy records in that case.  So, those are the first ones

9    that Mr. Thompson mentioned.

10         By my count, there are, at most, five cases of the 15

11    that the plaintiffs selected that at least appear to have

12    followed the court deadlines and have provided some records.

13    And maybe it would be helpful to the Court if I just gave

14    you the names of those cases because at least we don't have

15    a procedural objection to those cases.  And that would be

16    Brenna, Little, Young, and Stevens.

17         Another case that Mr. Thompson identified and wants to

18    move up in the priority --

19              JUDGE GOODWIN:  That's only four.

20              MS. MCDONOUGH:  Well, you know, the other one was

21    the Williams case, but now they have removed that one and

22    have proposed the other Williams case.  So, they had

23    initially had Thomas Williams, which at least was

24    procedurally proper, but they're requesting that it be

25    replaced with Wayne Williams.

 1      Just as an example, Wayne Williams did not provide a

 2    plaintiff's fact sheet.  We sent a deficiency letter

 3    advising them of that on June 22nd.  The information we got

 4    was missing whole sections of information.

 5      We got no information on medical records, treatments,

 6    pre-existing conditions, dosages, providers, the reasons for

 7    the medications that he was on, the names of insurance

 8    companies, the reasons for hospitalizations.  We sent a

 9    second deficiency letter on July 15th and have not had a

10    response.

11      So, for the plaintiffs to now designate that and

12    suggest that it be, you know, within this mix and to do so

13    six days after the date for designating trials and getting

14    that information just yesterday afternoon under these

15    circumstances I think is improper.

16      The Pinkos case is one where they have suggested that

17    it be moved up higher on the priority list.  That is a -- if

18    there's one case I know of that's sort of anomalous and not

19    helpful for advancing the litigation as a representative

20    case, it's probably the Pinkos case.  That one involves a

21    spoliation claim against the pharmacy that's involved.  It's

22    a Texas case.

23      And there's also a pending state case- -- I'm sorry,

24    Massachusetts.  I was looking at the wrong state there.  I

25    apologize.  So, there's also a pending state case against

1    the pharmacy, but not against these defendants.

2        So, there's the risk with that case that it could get

3    out ahead of this whole MDL.  And I believe it's the only

4    one of its kind.  So, for that reason, I don't think it's

5    representative or helpful for the process of picking

6    representative cases.

7        So, we could go on, but I think at least there are four

8    that we have no procedural objection to.  Considering, you

9    know, the cases that didn't comply with the deadlines set by

10   the Court, it's not only an issue of fairness and prejudice.

11   I mean, in many regards the plaintiffs have already selected

12   their prioritized cases simply by filing them when they did,

13   and then not complying with the Court's deadlines so that we

14   didn't even have an opportunity to consider over 100 cases

15   for possible prioritization.

16       In a way, that is prioritizing that whole universe of

17   cases.  And it does eliminate any opportunity to make some

18   meaningful suggestions to the Court from the defendant's

19   side.

20       But even apart from the prejudice and the unfairness,

21   it's a manageability problem.  We only have 90 days to

22   complete the discovery on this first group of cases.  And if

23   we're dealing with cases where we don't have a complete fact

24   sheet, medical records, pharmacy records, authorizations,

25   it's going to throw the whole process off even more, and

1    there isn't going to be any way to have efficient management

2    of the cases.

3              JUDGE GOODWIN:  All right.  Let me, let me

4    interrupt you there.  I see that as a major problem as well.

5    I mentioned the discovery business earlier.

6       Mr. Thompson, that is a concern for me.  How can I

7    select cases where there's no fact sheet, no medical

8    records, and they still don't have them and there's only 90

9    days to go for discovery?

10             MR. THOMPSON:  Judge, the -- as I understand it,

11   the Rivera-Vega case, they have received a fact sheet.  I

12   think the claim was that they had gotten it the day after.

13   My information was that it had been transmitted before the

14   deadline.

15             JUDGE GOODWIN:  How about like Vivian Adams?

16             MR. THOMPSON:  Vivian Pearl Adams is actually

17   still alive.  There was -- the first letter saying that she

18   was deceased was improper.  So, there is no need for a

19   personal representative there.  The -- you know, Judge, our

20   position --

21             JUDGE GOODWIN:  There's no fact sheet yet, no

22   records at all according to what the defendants say.

23             MR. THOMPSON:  Judge, the information I have is

24   that it was turned in on Friday.  That doesn't address your

25   concern that it's late.  Our --

1          JUDGE GOODWIN:  I'm concerned -- what I've tried

2     to do and what Judge Stanley has tried to do is, in

3     consultation with counsel for both sides, set schedules that

4     were reasonable and realistic and then try to enforce those

5     schedules.

6          It is unfair for me to suggest that I'm going to hold

7     defendants to a discovery deadline when they don't even have

8     the materials they need to get started.

9          On the other hand, if we start changing discovery

10    deadlines, we can't change them in individual cases or the

11    whole thing's going to blow up.

12         I am concerned, as I suggested last time, Mr. Thompson,

13    and I recognize the awkwardness of your position sometimes,

14    but I am concerned that the Court's orders with regard to

15    fact sheets and so forth have not been followed in a large

16    number of cases.

17         As I pointed out I think in a letter, I hold the

18    individual lawyers responsible.  They still represent these

19    people and they have obligations.  I don't intend to

20    castigate plaintiffs' representative counsel here.  All you

21    can do is cajole, cheer, and do the best you can.  But I

22    realize that there are other lawyers involved and they have

23    to step up to the plate.

24         All I'm saying is I am not going to pick a case where

25    the defendants start out behind the eight-ball.  I'll

1    certainly let you have a chance to address each of the

2    issues raised by Ms. McDonough as to each of these cases.

3    But I'm not inclined to, to pick a case that's in that

4    posture.

5         But in a, but in a larger sense, I also don't want to

6    get stuck picking cases based on a procedural ruling.  I

7    want cases that are going to be meaningful for the purpose

8    of this MDL.

9         It seems to me that it should be possible in a meeting

10   between counsel for the defendant and the plaintiffs to come

11   up with cases that --

12        Do you have your people here?  Have them come on in and

13   watch.

14             MR. THOMPSON:  Judge, could you wait until after

15   you finish yelling at me before you let them in?

16             JUDGE GOODWIN:  Mr. Thompson, I would never yell

17   at you.  I have the highest respect for you.  And I want to

18   compliment you on how you have dealt with the Court in terms

19   of candor, and I am in no way quarreling with you.

20        I do see the defendants have dealt with the Court in an

21   equally fine fashion.  And the points they make this morning

22   with regard to not having materials they need are important.

23        What I'm saying is I don't want these procedural

24   defects as they exist to stand in the way of us selecting –

25   let's be realistic – five or six cases that we're going to

1    try here.

2        We're not going to get to the second series of 20 cases

3    in this trial, in this MDL I don't think.  I mean, we'll

4    keep following the procedure and we'll go on down the line.

5    And, you know, as long as I'm fit to do it, I'll keep trying

6    them until we try all of them as far as I'm concerned.

7        But, as a practical matter, given the quality of

8    representation I've got, I think full discovery, full

9    discovery and five or six trials is going to tell everybody

10   everything they ever wanted to know.  And these cases are

11   then going to be resolved pretty quickly.  That's what I

12   think, but I'm just one lawyer out of a whole room of

13   lawyers and I don't know that for a fact.

14       I've got young people coming in from one of the, two of

15   the firms in town to say hello, and I had hoped that they

16   would get to see you-all in all your glory.  But perhaps

17   this would be a decent time to take a brief -- here they

18   come.  This might be a decent time to take a brief recess

19   and meet one with the other, recognizing what problems the

20   defendants have.

21       And I would ask the defendants to give more careful

22   thought to what we're trying to achieve in selecting cases.

23   We're not trying to select cases that you are necessarily

24   guaranteed to win.  We're meant to select cases that are

25   representative of the universe of cases which, to my

1    surprise, is a lot more than I thought it was the last time

2    I checked.  Somebody's been transferring a lot of cases into

3    the MDL.  We're looking for those cases.

4         And if you can sit down together today and, without

5    regard to procedural default or whatever, agree or try to

6    agree on five or six cases, we'll go that route and I'll go

7    ahead and flesh out the rest of them by whatever means I

8    can, and we'll move on.

9         Does that sound like it's a possibility?

10        MR. THOMPSON:  Judge, my perspective on that has

11   been that while we agreed -- we entered into PTO 16 at the

12   outset, and it actually flows beautifully.  The reality of

13   20 full discoveries with 10 to 12 depositions and, in

14   certain instances -- certainly Mr. Moriarty's pointed out in

15   certain instances there may be 13 or 14 treating physicians.

16   So, you may be talking about as many as 300 depositions over

17   90 days.

18        It was my, my hope and my perspective in discussing

19   this with the defendants that we could get straight to the

20   gritty and get a, a coherent list of, I don't know, five or

21   six, but maybe 10, and from that choose -- because all cases

22   will have problems as you go forward.  There's always the

23   crazy aunt in the closet or the, you know, the thing that

24   nobody knows about.

25        But I do believe that a universe of fewer than 20 from

1    which to select trial cases is, is, is good.  And I would

2    welcome an opportunity to talk with the defendants for just

3    a minute if that's okay.

4            MR. DEAN:  If I could just have one minute, first

5    of all, I would agree -- I think -- at least I'm in

6    agreement - I don't know if my co-counsel are - with less

7    than, with less than 20 cases.

8            But what I wanted to say, I wanted to directly address

9    something you said a couple times, Judge.  And that is what,

10   what would be in it for, for the Court to pick a case that's

11   got no evidence of an elevated level or no evidence of

12   digoxin toxicity.

13           And I will represent to the Court we have looked at

14   these.  And those cases are representative, and they are

15   more than 50 percent.  So, what's in it for you -- and I

16   know we have to select trial cases, but we also need to get

17   control over this docket.

18           And if we were to put a couple of cases in that

19   category that I just mentioned, we could gather some more

20   records.  We could file some motions for summary judgment.

21   You could rule on those motions and set out clear

22   guidelines.  And I would respectfully submit that a lot of

23   cases would disappear from your docket at that point.

24           And I would also tell you that at our last conference

25   we've been talking about the possibility of Rule 11 motions.

1    And the more I've considered that, I think that if I send

2    a -- under Rule 11 if I send a letter to a plaintiff's

3    lawyer, and then I send a proposed motion that I would file

4    21 days later, I'm convinced that these lawyers will dismiss

5    these cases and that you would never get to look at the

6    merits of these.

7         So, for that reason, I have switched course, and I

8    think the preferable course is to go the summary judgment

9    route rather than the Rule 11 route so that you can make a

10   public record as to your view on those, on those cases.

11        So, that would -- I think that would dispense

12   conceivably, you know, depending upon your ruling, dispense

13   with over half of these cases.

14        Now, I agree we've got to pick representative trial

15   cases.  But I also wanted to give you the answer to your

16   question as to why we should put on the list cases that fit

17   in that "no elevated level" category.  I think it's

18   important for you to have a couple of those on the list.

19             JUDGE GOODWIN:  That's a very good point.  I

20   recognize that these are the cases that are getting fully

21   developed, and these are the cases that meaningful,

22   dispositive motions can be filed in.

23        So, you are quite correct that to the extent you

24   believe that that's half of the cases, then it makes sense

25   to have some representatives of that half.

1          This will be fun for counsel.  Why don't you retire to

2     the jury room and consider of your verdict.  I would like --

3     let's, let's take a look at 10 cases total instead of 20 or

4     15 or whatever.  Ten is a manageable number and would allow

5     room for, say, three of your summary judgment type

6     considerations.

7          Mr. Thompson.

8               MR. THOMPSON:  No, sir, I was just waiting to --

9               JUDGE GOODWIN:  Just waiting to escape?

10              MR. THOMPSON:  Judge, I do need to say one thing.

11              JUDGE GOODWIN:  Yes, sir.

12              MR. THOMPSON:  I apologize to Ms. McDonough.

13    The -- when I identified the case as the one that I wanted

14    to move up, I simply identified it as number 14.  She took

15    it as the Pinkos case which I have listed as number 12 on my

16    little list.

17         What -- the case that I wanted to advance is a case

18    that's entitled David Kelch, K-e-l-c-h, as surviving spouse

19    of Bonnie Kelch.  I should have identified it by name when I

20    first went through this.

21              JUDGE GOODWIN:  To save you trouble from having

22    two areas upon which to disagree or to agree, why don't you

23    see if you can agree on 10 cases and I'll put them in order.

24    Does that sound all right?

25         Okay.  Would you show them into the jury room and don't

1    look for notes in the drawers.  Thank you, counsel.

2            MR. DEAN:  Excuse me, Your Honor.  Is there a

3    point in time at which we should come back?

4            JUDGE GOODWIN:  I'll come and get you.  I'll give

5    you about 30 minutes.

6            MR. DEAN:  Okay.  Thank you.

7            JUDGE GOODWIN:  That should be plenty of time.

8        Court stands in recess.

9        The students or interns or associates or otherwise

10   people associated with the legal profession seated in the

11   courtroom are, in the courtroom may be seated.

12       (Recess taken from 10:30 a.m. until 11:20 a.m.)

13           JUDGE GOODWIN:  Please be seated.

14       All right.  Who wants to give me a report?

15       All right, sir.

16           MR. THOMPSON:  Judge, we have, we've met.  We had

17   some disagreement over the plaintiff selections.  And, so,

18   let me go with the defense selections first.

19       And that is that the plaintiffs have no objection to

20   the five cases -- that's the format that we elected to reach

21   an agreement on would be that the two sides would nominate

22   five cases each.  And we -- plaintiffs have no objection to

23   the five cases that have been put forward by the defendants.

24       We do point out that at least one of the cases,

25   defendant, decedent Helen Gillmore, Christine Payne, is a

1   case in which the digoxin level was subtherapeutic.  Instead

2   of being too high, it was too low.  That makes the case a

3   little bit different.  But it -- I have to agree with the

4   defendants that, in fact, one of the positions put forward

5   by the plaintiffs is that there is substantial variability

6   in the active ingredient in these medications.  So, I do --

7   I'm not --

8           JUDGE GOODWIN:  Which one is that?

9           MR. THOMPSON:  It's entitled Christine A. Payne.

10          JUDGE GOODWIN:  All right.

11          MR. THOMPSON:  Decedent Helen Gillmore.  So, we

12  don't object to it, but we do point out that that is a low

13  digoxin as opposed to a high digoxin.

14      With regard to the plaintiffs' selections, Your

15  Honor, --

16      Should I presume to read off all of yours or should I

17  let you do that for yourself?

18          MR. MORIARTY:  Whatever you want.

19          MR. THOMPSON:  Here's the defendant's selections,

20  Judge.

21          JUDGE GOODWIN:  All right.

22          MR. THOMPSON:  Number one is -- and I don't think

23  the order is important, but I, it may be.  Ortra Wayne

24  Davis.

25          JUDGE GOODWIN:  Hang on just a second.  Give it to

1   me based on the number it appears on their thing now, would

2   you.

3          MR. THOMPSON:  Let me pass the ball.  Can I do

4   that?

5          THE COURT:  Sure.

6          MR. MORIARTY:  I'm going off -- do you want me to

7   go off the letter or our case chart?

8          JUDGE GOODWIN:  How about the letter.

9          MR. MORIARTY:  Okay.  In the letter --

10         JUDGE GOODWIN:  It's number 15 that one is.

11         MR. MORIARTY:  Ortra Davis is 15.

12         JUDGE GOODWIN:  All right.

13         MR. MORIARTY:  Jeff Klopping is number five.

14  William Davis is number one.  Alice Maroon is number six on

15  our list.  And Helen Gillmore is number three in the letter.

16         JUDGE GOODWIN:  All right.  As I understand it --

17  are you placing any significance on the order?

18         MR. MORIARTY:  No.

19         THE COURT:  All right.  The plaintiffs?

20         MR. THOMPSON:  Your Honor, we have -- there will

21  be some discussion before you because our selections would

22  include several for which the defendants have pointed out

23  some procedural deficiencies.  And, so, let me list out our

24  selections, and then we're at your pleasure as to how to

25  argue their worthiness.

1      Number one would be Mimi Rivera-Vega which appears as

2  number one also on our cover letter.

3      Number two would be Kathy McCornack which appears as

4  number two.

5      Number three would be Joan Luce which, which appears as

6  number three.

7      Number four would be Bonnie Kelch which appears as

8  number 14 originally, and we had asked that that be moved

9  up.

10     And number five would be William Young which appears as

11  number six on the, on the listing.

12     Judge, it's been pointed out by the defendants that

13  with regard to -- well, let's take number one and number

14  three.  They've pointed out that there are incomplete

15  medical records that have been provided.

16     We can speak as to Ms. Luce.  That's our case.  The

17  plaintiff's fact sheet was provided certainly very timely

18  and within the Court's order.  An initial portion of

19  plaintiff's records were provided, and we had ordered

20  medical records from the agreed upon, in essence, joint

21  vendor RecordTrak and had made those -- in our mind, we had

22  made the documents available.

23     Mr. Moriarty has indicated that those documents have

24  not been made available.  And, in fact, the RecordTrak has

25  taken the position that these records are on order.

1      Judge, while that is a snafu, it's not a procedural

2   defect and it's one that is cured.  It's one that we are in

3   compliance with the Court's directives.  And we don't view

4   this as a mountain, but as a, as a straightforward matter to

5   be addressed, and it should not be an impediment.

6      Likewise, with Rivera-Vega, that plaintiff's fact sheet

7   has been fully filled out.  My understanding from my

8   associate is that we -- not we, but the plaintiff's

9   attorneys, Mr. Williamson and Ms. Sanford, have supplied a

10  substantial number of medical records.

11      Certainly nobody's warranted it's a complete number of

12  medical records, but a substantial number and certainly

13  sufficient for an initial disclosure, and certainly

14  sufficient so that there should be no prejudice to the, to

15  the defendants.  And we believe that that too is in

16  compliance.

17      The real case that I want to speak to, and that is the

18  Kathy McCornack case which was recently direct filed into

19  this jurisdiction, into this MDL, the appropriate domicile

20  is California.

21      Judge, that is a new case.  That is a case in which we

22  have received the plaintiff's fact sheet as -- we have

23  received it, but apparently it has not been served into the

24  system.  That can be cured in real-time.  There is a

25  substantial number of medical records which are on CD by the

1    attorney, Mr. Ernst, which are available and can be

2    transmitted in real-time.

3         My proposal to the Court -- and I understand that

4    you've already admonished the plaintiffs for not complying

5    strictly with procedural rules.  But my, my proposal to the

6    Court in order to alleviate the defendant's concerns about

7    prejudice and about start date is that if I have reference

8    to the PTO 16, I note that this Court is entitled to issue

9    its ruling on the trial selection cases no more than 10 days

10   following today's date.

11        One possibility that I would suggest to the Court would

12   be to require any defects in the filings by the plaintiffs'

13   proposed selections to be cured within that seven- to

14   ten-day period.  And if not, then those cases would not be

15   permitted to be eligible to be selected.

16        But if so, we would ask the Court to permit these cases

17   because we do believe that they are substantial cases.  They

18   address the substantial issues of the case.  And they are

19   going to be litigated by immanently qualified attorneys to

20   ensure the Court that it's going to be the best possible

21   record.  We would ask the Court to give that its

22   consideration.

23        I don't know if I went through the entire list, but I

24   think I did.  Thank you very much, Judge.

25             JUDGE GOODWIN:  All right.  Let me hear from the

1    defendant.

2         MR. MORIARTY:  We have no objection to the Kelch

3    or the William Young cases.  But as Madeleine McDonough so

4    clearly pointed out earlier, the first three of their

5    selections, Rivera-Vega, McCornack, and Luce, suffer from

6    varying degrees of delinquency, total deficiency, lack of

7    record, et cetera.

8         JUDGE GOODWIN:  Are there pending motions before

9    Judge Stanley on these cases where the fact sheets are

10   tardy?

11        MR. MORIARTY:  I don't think on any of these three

12   because, for example -- and, you know, I've got so much data

13   in front of me.  We do have a fact sheet on Luce.  We got

14   that, as Mr. Thompson said, timely.  But we just don't have

15   records.

16      McCornack there is no fact sheet.  My memory is that

17   because this was so recently filed, it's not due till late

18   August or early September.

19        MS. MCDONOUGH:  August 11th.

20        MR. MORIARTY:  So, there would be no way to put a

21   motion on that.  And the same is true of Vega, as a matter

22   of fact.  That fact sheet wasn't due till late August, and

23   they're trying to rush that under the trial docket number

24   one.  So, they sent the fact sheet --

25        JUDGE GOODWIN:  I don't mean to be getting into

1    the -- well, let me address two topics, Mr. Moriarty.

2         One, Judge Stanley, at our first meeting where we

3    discussed all this, emphasized the importance of providing

4    the fact sheets in a timely way and in complying with the

5    rules.  That apparently continues to be an on-going problem

6    in the case.

7         I suspect -- and I would be enthusiastically

8    encouraging of efforts to enforce those deadlines.  I think

9    that they're there for a purpose and they should be

10   enforced.

11        Having said that, I am off on a slightly different tact

12   when I'm looking at picking these cases.  I want to pick

13   representative cases, and I want to pick ones which meet the

14   requirements of the defendant with regard to weeding out the

15   chaff, no offense to the plaintiffs.  At least that's the

16   view of the defendants or the object.

17        So, the proposal that was made by Mr. Thompson to

18   provide some of this documentation that isn't due yet, but

19   to speed it up and get it to you within 10 days, if we

20   modified our thinking in that respect -- and I haven't

21   selected these cases.  But if we modified our thinking in

22   that respect, I don't see any real prejudice for this

23   isolated group of cases.

24        Now, we certainly have prejudice if we think of the

25   order continuing to pick the cases in sequence.  And I can

1  tell you that this is a one-time deal as far as I'm

2  concerned if we do it this way.  I want, I want to reach an

3  accommodation, but I don't want it to be a license to ignore

4  the Court's deadlines in the future.

5      So, my preference would be to ask the defendants to

6  receive the materials within the 10-day window and to

7  develop it as we otherwise would.  And in the future, the

8  Court will absolutely not consider for inclusion on a trial

9  schedule any case where the deadlines of the Court have not

10 been met.

11     Can you live with that, Mr. Moriarty?

12         MR. MORIARTY:  Your Honor, I can live with it.

13         JUDGE GOODWIN:  I know you don't like it, but you

14 can live with it.

15         MR. MORIARTY:  But can I add a couple of

16 qualifiers?

17         JUDGE GOODWIN:  Sure.

18         MR. MORIARTY:  If they don't have that material on

19 a day certain to be decided by you, they're out of the trial

20 group.

21         JUDGE GOODWIN:  That's right.

22         MR. MORIARTY:  And if they decide to dismiss

23 voluntarily any of these cases for some reason in the next X

24 number of days, that we be allowed to substitute no matter

25 who designated the case.  We asked for that in our letter

1    because we thought there was a possibility that when we put

2    some of these cases up that the plaintiffs would voluntarily

3    dismiss them.  So, we want to be able to designate.

4         JUDGE GOODWIN:  Let me take -- let's do the first

5    part and let me keep, keep my options open with regard to

6    the second part, that is, the substitution.

7         I, I think it's clear to all of you that I want this

8    matter to be dealt with amicably and in a spirit of civility

9    and cooperation.  At the same time, I expect the rules of

10   the Court to be obeyed.

11        Now, I hope that lawyers with your years of experience

12   don't sense in me somekind of weakness because I am now

13   suggesting accommodation.  You would be making a serious

14   mistake.

15        So, I want to do, I want to do what Mr. Fred Thompson

16   has suggested with regard to these five cases that he's

17   identified.  And I'll take your five cases as identified and

18   I'll put them in order.  And then from here on out, we'll

19   cooperate by following the rules.  What I think will

20   happen -- and I should confer with my colleague.  Just a

21   minute.

22        (Pause)

23        JUDGE GOODWIN:  No case -- I've talked with Judge

24   Stanley and we're in agreement it will be the order of the

25   Court that no case will be designated as, for a trial group

1    that is not in compliance with the Court's orders.  In other

2    words, if you don't have the fact sheets, you don't have the

3    records that are required for the Court's orders, it will

4    not be included in the trial group at the time except for

5    this first attempt at accommodation.  After this, that's it.

6        Do I need to spell it out anymore than that or does

7    everybody understand?

8        (No Response)

9            JUDGE GOODWIN:  All right.  The second group is

10   coming up when?  It's within how many days?

11           MR. MORIARTY:  About 60 from now I believe.

12           JUDGE GOODWIN:  60 days from now.  I propose --

13   well, I don't propose.  I'm going to modify the order so

14   that I select whatever number of cases I select now.  It

15   says up to 20.  I'll select whatever number I do.  And then

16   the ones I do not select will fall to the next group for

17   possible selection.  That doesn't automatically mean that I

18   will select them in the next group.

19       Is that your understanding of the order as it exists

20   now?

21           MS. MCDONOUGH:  Yes.

22           JUDGE GOODWIN:  Okay.  Now, what else do we need

23   to do today?

24           MR. DEAN:  Your Honor, I had a, just a couple of

25   items I don't think will take very long.  It's the kind of

1    thing that we would typically address in our conference.

2    I'm glad to do it on the record or -- let me just tell you

3    what they are.

4              JUDGE GOODWIN:  All right.

5              MR. DEAN:  Number one, I wanted to make sure you

6    were aware that Judge Harris had been promoted to the

7    appellate bench, and apparently a substitution will take

8    place in the New Jersey cases.  That judge has not been

9    designated yet.  We had a conference with the Court

10   scheduled for August 7th.  We've been told that that may or

11   may not go forward.  So, I just wanted to make sure you were

12   aware of that.

13             JUDGE GOODWIN:  I was.  I talked with him.  He

14   told me it was bad news and good news.  And the bad news was

15   that, you know, that he was going to have to bail out.  The

16   good news was that he was sure that whoever replaced him

17   would be even better.  So, I doubt that.  I doubt that.  But

18   he has assured me that he will convey to the incoming judge

19   how wonderfully well we're all working together and

20   encourage them to continue.

21             MR. DEAN:  The second is a report item also.  I

22   will be getting a detailed letter to you between now and our

23   next conference on this, but I wanted to give you the

24   headline.  And that was that most of the plaintiffs who have

25   been advancing class actions on personal injury and medical

1    monitoring have withdrawn those claims.  And a substantial

2    number of claimants who had advanced economic injury class

3    actions have withdrawn those claims.

4        We will, we will get a detailed chart to you reporting

5    on that, but I just wanted to let you know that there will,

6    as best we can tell right now, there will be a handful of

7    plaintiffs going forward with class action claims.  So,

8    we'll get you a very detailed chart on that.

9            JUDGE GOODWIN:  Okay.

10           MR. DEAN:  The third item, again just for your

11   awareness and knowledge, and that is that Judge Moss has

12   indicated that she is going to set trials in the

13   Philadelphia cases starting in September.  I think she plans

14   on trying two cases in September, October, November, and

15   December.  We have a *Daubert* hearing I think in Philadelphia

16   on June 15th.  So, I just wanted you to be aware of her

17   schedule.

18       She is like you where we are going through a selection

19   process.  It's what I would call a first-in/first-out, or

20   first-in/first-scheduled.  So, any cases filed in

21   Philadelphia in 2008 are being set on the trial docket for,

22   beginning in September of 2010.

23       We have a conference with Judge Moss next, on July

24   29th, next Wednesday, which I think more detail will be

25   added to that report.  But that's the quick report on the

1    Philadelphia litigation.

2         And we also have the issue of -- there's been the issue

3    of PTO 16 and we were asked to make some revisions to it in

4    light of the, some of the short continuances you've granted

5    here.

6         We have a revision to present.  I think the plaintiffs

7    are substantially in agreement with what is presented there.

8    But they have -- I think they are in agreement with what's

9    in that because it dealt with the immediate issue we

10   addressed with you two judges last month.

11        But they have some additional issues to address which

12   was in light of the -- they wanted to adjust some of the

13   dates for depositions and witnesses.  And we can maybe talk

14   about that at our August conference.

15        But the larger issue there, I guess, relates to

16   document production and whether the Actavis defendants are

17   going to have to produce the additional documents covered by

18   PTO 27.  We obviously have our objections on file.  So, that

19   may --

20             JUDGE GOODWIN:  You can expect that I will deal

21   with that very shortly.

22             MR. DEAN:  Right.  So, that -- so, I simply wanted

23   to say there may need to be some adjustments to this

24   proposed schedule beyond what we have which immediately

25   addresses the issue you asked us to address.

1        JUDGE GOODWIN:  Okay.

2        MR. DEAN:  So, we have that with us, but

3   plaintiffs do have the larger issue of wanting to move back

4   some other dates.

5        JUDGE GOODWIN:  Why don't we take care of that --

6   would it be all right to take care of that in August?

7        MR. DEAN:  I think that's, I think that's fine,

8   yes.

9        JUDGE GOODWIN:  Does that work out?

10        MR. THOMPSON:  Yes, Judge.  The, the dates that we

11   want to be moving are some internal deadlines with the trial

12   date, but not the trial date itself which will continue to

13   be.  And those dates are all in December, January, February.

14   So, August is plenty ripe enough to take that up.

15        JUDGE GOODWIN:  Fine.  Along the lines that you

16   were talking, counsel, Judge Hahn has been selected in Texas

17   to handle those cases.  And I've been in contact with him,

18   but we haven't gotten to talk.  So, --

19        MR. DEAN:  Those cases are just in the process of

20   literally being transferred from other districts in Texas to

21   him.  He has not asked to see us yet.

22        JUDGE GOODWIN:  And I don't know him and we have

23   not chatted.  So, --

24        MR. DEAN:  The only other thing I had was kind of

25   a, just a footnote on the comment I made right before we

1    broke.  I was talking to you about the fact that I had

2    concluded it made more sense to follow a summary judgment

3    route rather than a Rule 11 route.

4        I do want to note for the record that I reserve the

5    right to file those Rule 11 motions.  And I know clearly

6    beyond my ability to file a Rule 11 motion, the Court can

7    sua sponte raise Rule 11 issues on its own.

8        So, we do have discovery outstanding which goes to some

9    of those Rule 11 issues as to what information plaintiffs

10   would have had at the time they filed the complaint.

11       So, I certainly reserve the right to file those

12   motions, but I simply was trying to indicate to the Court

13   the value of the -- I think it would just advance the

14   litigation much more expeditiously to deal with these issues

15   by way of summary judgment.  But I don't want -- I'm not

16   discarding the possibility of Rule 11.  I just think the

17   other ways are more efficient.

18            JUDGE GOODWIN:  We, we didn't understand you to do

19   that, and we know the two rules have very different purposes

20   and that you may very well use Rule 11 where it's

21   appropriate, and discovery in regard to that will be going

22   forward.

23            MR. DEAN:  Right.  I think that was all I had on

24   my list of housekeeping items.  I don't know if anyone else

25   has any.

1    JUDGE GOODWIN:  Anybody else have anything?

2    MR. THOMPSON:  Judge, on behalf of the plaintiffs'

3  steering committee, it's, it's within our knowledge, and

4  certainly it's been driven home very clearly and deeply

5  today, that the, there is some sloppy work being done on

6  plaintiffs' fact sheets on our side.

7    I want to reassure the Court that we are going to

8  communicate with the entire list, certainly with all the

9  plaintiffs who have filed cases, the, the extent and the

10  gravity of your comments today so that we can bring these

11  into compliance.  Thank you very much, Your Honor.

12    JUDGE GOODWIN:  I would appreciate that very much.

13    MR. DEAN:  I would just like to note finally --

14  and this is a compliment to Mr. Thompson and his group and I

15  put it on the record.  And if some of the constituent

16  members read it, I hope they won't hold it against you

17  gentlemen.

18    But we -- on the class action issue we have been

19  contacting plaintiffs' lawyers to urge them to drop these

20  claims.  They always say, "I want to talk to the plaintiffs'

21  steering committee."  And then shortly afterwards, those

22  claims are dropped.

23    I don't know what exactly they're telling the

24  plaintiffs' lawyers, but I sense a very high level of

25  cooperation here toward an end I think we all wanted to

1   achieve.

2          JUDGE GOODWIN:  You know, I don't appoint anybody

3   to any steering committee that isn't the best lawyer in

4   America.

5          MR. THOMPSON:  Well, now, Judge, given the

6   implication of Mr. Dean, I want to say that when I talk to

7   my plaintiffs' attorneys, I tell them that we have an

8   overwhelmingly powerful case and it may be that in this one

9   instance they may want, for tactical reasons, to take a

10  different tact.  Thank you, Judge.

11         JUDGE GOODWIN:  All right.  The 10 days within

12  which to, that I'm to pick these cases starts today, and the

13  curative efforts need to start today.  So, whatever 10

14  calendar days, excluding the first and including the last

15  is, is when it is.  I can't count on --

16         JUDGE STANLEY:  You're not supposed to include the

17  calendar days.

18         JUDGE GOODWIN:  You're not supposed to include the

19  calendar days?  I don't know.  I'll defer to Judge Stanley.

20         MR. THOMPSON:  I think it's anything you say.

21         MR. DEAN:  Let me just raise --

22         JUDGE STANLEY:  You can say it any way you want

23  to.

24         JUDGE GOODWIN:  I know I can, but -- what's the

25  rule?

1          JUDGE STANLEY:  Because it's under 11, it's

2   business days and you start -- the first day is tomorrow.

3          JUDGE GOODWIN:  First day is tomorrow.  It's

4   business days.

5          MR. DEAN:  Let me just raise this issue.

6          JUDGE STANLEY:  It's all going to change

7   December 1st.

8          MR. DEAN:  You've talked about a cure within 10

9   days.  You've talked to us in the abstract.  I guess I have

10   a question.  What is a cure on some of these cases?  And

11   maybe we should have a -- maybe that would be a good thing

12   for us to discuss.

13          JUDGE STANLEY:  I think you should be liberal.

14          JUDGE GOODWIN:  I want to move these -- I want to

15   move this first group forward.  And absent some actual

16   difficulty on your part, I want to keep moving forward.

17       At the same time, if you perceive that sloppiness or

18   negligence or whatever is occurring on the other side, but

19   if everybody is working in good faith --

20          MR. DEAN:  Right.  That, that's understood.  But I

21   guess I just want to reserve the right 10 days from now if

22   we have 100 pages of medical records or, you know, less than

23   50 --

24          JUDGE GOODWIN:  You can object.

25          MR. DEAN:  I will -- I may want to come back to

1    you.

2           JUDGE GOODWIN:  You may.  Come back to me right

3    away because I want to name these cases.

4        Anything else?

5        (No Response)

6           JUDGE GOODWIN:  Thanks to all of you.  I assume

7    that I'm still correct that setting hearings for the early

8    hours of a morning is still better for everybody.

9           MR. DEAN:  Yes.

10          MR. THOMPSON:  Yes.

11          JUDGE GOODWIN:  Thanks to all of you.  I'll see

12   you in August.

13       (Proceedings concluded at 11:50 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2   States District Court for the Southern District of West

3   Virginia, do hereby certify that the foregoing is a true and

4   correct transcript, to the best of my ability, from the

5   record of proceedings in the above-entitled matter.

6

7

8       s\Lisa A. Cook                    July 29, 2009

9          Reporter                           Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25