```
1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                           AT CHARLESTON

3                     TRANSCRIPT OF PROCEEDINGS

4


5
      ----------------------------x
6                                 :
      IN RE:  DIGITEK PRODUCT      :        CIVIL ACTION
7     LIABILITY LITIGATION         :        NO. 2:08-MD-01968
                                   :
8                                  :        August 11, 2009
      ----------------------------x
9


10                          MOTIONS HEARING

11


12

                 BEFORE THE HONORABLE MARY E. STANLEY
13                 UNITED STATES MAGISTRATE JUDGE


14


15
      APPEARANCES:
16
      For the Plaintiffs:          MS. MEGHAN JOHNSON CARTER
17                                 Motley Rice, LLC
                                   P.O. Box 1792
18                                 Mt. Pleasant, SC  29464

19                                 MR. CARL N. FRANKOVITCH
                                   Frankovitch, Anetakis,
20                                 Colantonio & Simon
                                   337 Penco Road
21                                 Weirton, WV  26062

22                                 MR. HARRY F. BELL, JR.
                                   Bell & Bands PLLC
23                                 P.O. Box 1723
                                   Charleston, WV  25326

24


25
```

```
 1   APPEARANCES (Continued):

 2

 3   For the Defendants:          MR. MATTHEW P. MORIARTY
                                  Tucker, Ellis & West LLP
 4                                1150 Huntington Building
                                  925 Euclid Avenue
 5                                Cleveland, Ohio  44115

 6

 7                                MS. REBECCA A. BETTS
                                  Allen, Guthrie and Thomas, PLLC
 8                                P.O. Box 3394
                                  Charleston, WV  25333-3394
 9

10                                MR. HARVEY L. KAPLAN
                                  Shook, Hardy and Bacon, LLP
11                                2555 Grand Blvd.
                                  Kansas City, MO  64108
12

13

14

15

16

17

18

19

20

21

22   Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

23
     Proceedings recorded by mechanical stenography; transcript
24   produced by computer.

25
```

1                    P R O C E E D I N G S

2          THE COURT:  Good morning again.

3      This is *In Re: Digitek Product Liability*, Case Number

4  2:08-MD-1968.

5      Will the attorneys please note their appearances for

6  the record.

7          MR. FRANKOVITCH:  For the Plaintiffs' Steering

8  Committee, Carl Frankovitch.

9          MR. BELL:  For the Plaintiffs' Steering Committee,

10  Harry Bell.

11          MS. CARTER:  For the plaintiffs, Meghan Carter.

12          MR. MORIARTY:  Matthew Moriarty for the Actavis

13  defendants.

14          MS. BETTS:  Rebecca Betts, defendants' liaison

15  counsel.

16          MR. KAPLAN:  Harvey Kaplan for the defendant,

17  Mylan defendants.

18          THE COURT:  Thank you.

19      The, the Court scheduled oral argument concerning the

20  defendant's motion to determine the sufficiency of the

21  objections to the Requests for Admission which the defense

22  wishes, and I take it it's all defendants, wish to serve on

23  some not yet identified plaintiffs' attorneys.

24      Now, the first assertion made by the plaintiffs is that

25  this kind of discovery is not timely under Pre-Trial Order

1    16.

2         Is there -- now, who's going to be addressing all this

3    for the plaintiffs?

4              MR. FRANKOVITCH:  I can, Your Honor.

5              THE COURT:  All right, Mr. Frankovitch.  The -- do

6    you agree, Mr. Frankovitch, that there is nothing in the

7    Pre-Trial Order 16 that prohibits this discovery?

8              MR. FRANKOVITCH:  Your Honor, our position was, is

9    that the whole concept of the MDL was to bring these cases

10   together and to do the, the, what I'll call the generic

11   discovery for all of the cases which would then be remanded

12   back to the, to the respective districts for trial, and that

13   the whole concept is that individual discovery on the cases,

14   except for those that are selected in the trial pool here,

15   would be deferred until such time as the, the MDL completed

16   its work here.

17             THE COURT:  So, you're saying it violates the

18   spirit, not the letter, of the Pre-Trial Order 16.

19             MR. FRANKOVITCH:  Correct, yes.

20             THE COURT:  Let me direct your attention to

21   Pre-Trial Order 22.

22             MR. FRANKOVITCH:  Okay, Your Honor.

23             THE COURT:  Page 13, Section R.

24             MR. FRANKOVITCH:  Yes, Your Honor.  The --

25             THE COURT:  Would you address whether that

1    effectively answers that, --

2              MR. FRANKOVITCH:  I don't think it does --

3              THE COURT:  -- that argument?

4              MR. FRANKOVITCH:  -- because I don't think it's

5    contemplated by either party that any of the individual

6    defendants, the individual plaintiffs could initiate

7    discovery on their own behalf to make any type of discovery

8    of the defendants.  It would all have to be done through the

9    PSC at this juncture.

10             THE COURT:  So, you're saying what's good for the

11   goose is what's good for the gander, or whatever the cliché

12   is.

13             MR. FRANKOVITCH:  Whether it's explicit or not,

14   the understanding is -- my understanding, at least, when the

15   cases go to the MDL, they're, they're set there, they're

16   sent there for the purposes of discovery and to coordinate

17   the discovery generically, and then for the cases to be

18   remanded back to their districts so that there isn't this

19   individual discovery going on and the defendants are not

20   inundated with 400 sets of interrogatories or 400 Requests

21   for Admissions on their part.

22             THE COURT:  Right.

23             MR. FRANKOVITCH:  And that's, that's the whole

24   idea of getting here.  And to start the discovery

25   individually defeats the purpose.

1          THE COURT:  But isn't there a theme underlying

2     your argument that Rule 11 doesn't apply in mass tort

3     litigation?

4          MR. FRANKOVITCH:  Well, I don't know that it

5     doesn't apply.  It doesn't, it doesn't get triggered at this

6     stage of the litigation.  Even if the, if the Court were to

7     order that you admit that you didn't have the medical

8     records before you filed the suit, you still would have

9     collateral issues that would have to be, go through

10    discovery to flesh out whether there was other information

11    that they had and other reasons that the case was filed.

12      So, I don't think it's dispositive just because it's 11

13    because I think 11 opens up another host of discovery.  It's

14    another collateral issue that has to be discovered in each

15    individual case.  And it's really premature because you

16    could have, in this instance, somebody who didn't have a

17    medical record when they filed and they have a perfectly

18    good case.

19          THE COURT:  Well, presumably the best argument

20    that can be made for such an attorney is that they had to

21    file at the last minute because of the statute of

22    limitations.  And perhaps even before service was

23    accomplished, they then had the evidentiary support for

24    their claim.  Is that fair?

25          MR. FRANKOVITCH:  That, that's fair too.  The

1    other aspect of this is the, the plaintiffs asked for a

2    tolling agreement.  And the defendants' position was, "File

3    it.  We don't want to do a tolling agreement."  A tolling

4    agreement -- just put everything on the side with the

5    understanding that they would answer plaintiff fact sheets.

6    We said, "Just go ahead and file them," which people did.

7    Many filed before that discussion even took place

8    conceivably.

9         So, it really -- I don't think that it, it adversely

10   affects the, the light in which the plaintiff's attorney

11   acted, the fact that they didn't have the record at the

12   time because you have -- we were talking --  you could

13   have an instance where a plaintiff said, comes in and

14   said -- aside from the statute problem, which the statute

15   problem I think is clearly an exception by itself on an

16   individual case basis.  But they could have other

17   evidence besides the medical records which can establish a

18   case.

19        So, I don't, I don't think that it's -- and then once

20   you start down that path, you're, you're opening up each

21   individual case for those kind of issues, and it becomes

22   separate discovery very early on as to whether you have a

23   viable case.

24             THE COURT:  Well, so far we have before the Court

25   three Requests for Admissions that are supposed to go to

1    less, fewer than 40.  It's actually fewer than 40 cases.  We

2    don't know how many attorneys are involved, do we?

3              MR. FRANKOVITCH:  The defendants may know that.

4              THE COURT:  How many attorneys do we have involved

5    in this, Mr. Moriarty?

6              MR. MORIARTY:  I'm sorry, Your Honor, I couldn't

7    tell you that off the top of my head.  There could be 39

8    different ones, or there could be some clusters.  I just

9    don't know.  I could find out for you pretty quickly.

10             THE COURT:  All right.

11         Now -- well, Mr. Frankovitch, I'm trying to understand

12    how the plaintiffs can argue that these Requests for

13    Admissions are not proper discovery.  I have read in the

14    memo that it's not reasonably calculated to lead to

15    discovery of admissible evidence, and that it doesn't lead

16    to evidence of the plaintiffs' claims.

17             MR. FRANKOVITCH:  Right.

18             THE COURT:  Rule 26 defines relevancy for the

19    purpose of discovery as relating to a claim or a defense.

20    And it appears to me that the requests definitely, and

21    perhaps primarily, go to evidence of a defense.  And would

22    you agree that the lack of records --

23             MR. FRANKOVITCH:  No.

24             THE COURT:  -- when filing a complaint goes,

25    certainly is indicative of a potential defense for the

1    defendants?

2          MR. FRANKOVITCH:  I, I don't think so.  I mean, if

3    the records are available, the records would speak for

4    themselves as to whether they support or don't support the

5    claim.  I don't, I don't think it goes to the merits of the

6    claim.  It goes to the merits of a Rule 11 claim --

7          THE COURT:  Uh-huh.

8          MR. FRANKOVITCH:  -- after the case is disposed of

9    and there's a determination as to whether the case should

10   have been filed or not.

11         THE COURT:  Now, the -- so, you're saying that the

12   case has to go through the entire process before we decide

13   whether or not a Rule 11 proceeding is appropriate?

14         MR. FRANKOVITCH:  I, I think you have to make a

15   determination whether it's a frivolous claim.  And the only

16   way you would make that determination is when you complete

17   the case and see that there either is or isn't sufficient

18   evidence for the, for the case.

19         THE COURT:  Frivolousness is typically an issue

20   that is tried to be determined at the beginning so the

21   people don't waste a lot of time and energy on the case.  I

22   don't understand how it makes any sense to decide that

23   something is frivolous at the far end as opposed to the

24   front end.

25         MR. FRANKOVITCH:  Well, I don't know -- I don't

1  think by itself whether you have medical records determines

2  whether a claim is frivolous or not.  You can have a very

3  viable claim without, without having had the medical

4  records.  You know, you may need them at some point in the

5  litigation, but you don't have -- that's not a predicate to

6  filing the case.

7          THE COURT:  Can you describe a case like that to

8  me, please?

9          MR. FRANKOVITCH:  Sure.  You have an instance

10  where a plaintiff comes in, let's say a surviving spouse

11  said, "I took my husband to the emergency room and they told

12  me that he had a high digitalis."  And the attorney says,

13  "Are you sure that's what they said?"  "Yes, I'm sure."

14      And he calls the doctor and says, "Did this person come

15  in and have high digitalis?"  And the doctor says, "Yes, he

16  did."  And he goes ahead and files the case.

17      Now, ultimately you'd expect that he would have the

18  medical records.  And at some stage, you would get the

19  medical records.

20          THE COURT:  Right.  And, of course -- I was

21  wondering if, if you were arguing that there would be a

22  viable case without any medical records at all.

23          MR. FRANKOVITCH:  Probably not.  At some point,

24  you, you would have to have medical records.  You'd probably

25  have to have employment records.  You'd have, you know, the

1    typical stuff that you'd use in a, in proving damages and

2    causation.

3              THE COURT:  Are you seriously pursuing the claim

4    that these Requests for Admission infringe upon the

5    attorney/client privilege or the work product protection?

6              MR. FRANKOVITCH:  I, I hadn't thought about it in

7    that sense.  The bigger position from the PSC was that it

8    defeats the, the purpose and the function of the MDL because

9    it opens up this collateral issue on all the individual

10   cases.

11             THE COURT:  Well, I'm glad that you, you raise

12   that because the Court's involvement in mass tort litigation

13   has, has given some sense of a pattern, which is that there

14   is an incident or a recall or black box warning or

15   something.  Cases are filed.

16        My guess is that there are very credible meritorious

17   cases within those cases, but there also are a mass of other

18   cases.  And they end up being grouped together and settled

19   for a nominal amount like $100, less than a filing fee.

20        And I -- it strikes me that if an attorney files a

21   lawsuit without having performed the kind of investigation

22   as to whether a claim has evidentiary support with the

23   expectation that the attorney is assuming that a certain

24   number of the cases filed will simply qualify for a

25   settlement of a hundred bucks, then that, that means that

1   Rule 11 has basically no applicability, no utility in a mass

2   tort context.

3        Nobody in their right mind files a lawsuit with the

4   expectation of $100 unless there is a mechanism for that

5   attorney to actually make a profit because of grouping the

6   plaintiffs together or filing class action and putting a lot

7   of plaintiffs into it.  And I cannot believe that MDL and

8   mass tort litigation intended that result.

9        So, this judicial officer believes that Rule 11 is

10  alive and well and should apply and, to attorneys who are

11  participating in mass tort litigation.

12       Now, I would like to know what's wrong with my

13  reasoning.

14            MR. FRANKOVITCH:  I -- it's hard to disagree with

15  you other than the fact that most, not most, all attorneys

16  wouldn't file with the expectation they're going to get $100

17  when the filing fee costs them more.

18            THE COURT:  Exactly.

19            MR. FRANKOVITCH:  That doesn't -- nobody has that

20  goal in mind when they file their case.  And I guess you

21  have to look at that motivation too, you know, when you're

22  looking at whether there would be sanctions appropriate or

23  not.

24            THE COURT:  Uh-huh.

25            MR. FRANKOVITCH:  But I think, you know, the --

1   and I don't disagree that that occurs.  People just gather

2   up cases and start filing them without regard to whether

3   there's underlying merits to the cases.

4        But as, as the Court knows, I mean, as cases develop,

5   you find cases that are good and cases that are bad, for

6   whatever reason, through the discovery process.

7              THE COURT:  Sure.

8              MR. FRANKOVITCH:  And they weed themselves out.

9   And I'm sure that many of these cases, as this case

10  progresses, will weed out as they go.  That doesn't -- the

11  fundamental problem that I see is getting into this issue at

12  this stage individually with each case.

13             THE COURT:  And what is your thought as to when it

14  should be examined?  I mean -- and let me be very frank with

15  you.  It never got examined in the previous MDL.  And as I

16  explained, and as you well know, I had great frustration

17  because of attorneys --

18             MR. FRANKOVITCH:  Right.

19             THE COURT:  -- who completely abandoned their

20  clients.  And there we are doling out 100-dollar bills under

21  circumstances which it just was not appropriate.  So, you

22  know where I'm coming from.

23             MR. FRANKOVITCH:  Oh, I understand, I understand

24  your frustration.  I, I share in it.  And, and -- but I

25  think the process is people will reflect on what they have

1   and they'll -- I mean, if somebody doesn't have a good case,

2   they're not going to expend a lot of efforts and time of the

3   Court or defense in chasing the case.

4          THE COURT:  Well, so, what -- answer my question

5   now.  When should it be done?  Let me give you a little

6   background.

7          MR. FRANKOVITCH:  Okay.

8          THE COURT:  I mean, every time a case is filed, it

9   involves a lot of resources from the courts.

10          MR. FRANKOVITCH:  Sure.

11          THE COURT:  Every time a case is filed, it

12   involves a lot of resources from the defendants.  And it

13   increases the cost to the Plaintiff Steering Committee and,

14   and all of the resources which are devoted to this.

15      It seems to me that the MDL system and mass tort system

16   is a marvelous procedure for dealing with large numbers of

17   cases which may well have merit.  And it is a -- if we put

18   off the frivolous screening process until somewhere down the

19   road or decide not to do it at all, we've already spent a

20   lot of money on a bunch of cases that shouldn't have been

21   filed in the first place.

22      And there really isn't any accountability to those

23   attorneys that they should have to understand that there is

24   no financial incentive to ever bringing a case as to which

25   they don't have a good faith factual basis to believe it has

1    merit.

2            MR. FRANKOVITCH:  I, I don't disagree with that.

3    I really don't.  And I think the, the process is somewhat

4    designed to flesh that out when you have the plaintiff fact

5    sheets that have to be filled out.  And, and I don't know if

6    these people filed plaintiff fact sheets or not, these 39.

7    But if they had, had not, they would be subject to dismissal

8    and they could be addressed as far as Rule 11 at that time.

9        The same is true with the medical records, on obtaining

10   the medical records.  If they -- ultimately if they, medical

11   records show that there's no case, the case gets disposed of

12   and is subject to Rule 11 sanctions.

13           THE COURT:  But why should RecordTrak and the

14   Plaintiffs' Steering Committee and the defense attorneys

15   spend a bunch of money to do that when it really, under Rule

16   11, is the obligation of the plaintiff's attorney to do it

17   in the first instance and to say, very frankly, to the

18   client, "I don't think you've got a claim."

19           MR. FRANKOVITCH:  That -- an attorney who is doing

20   this that knows what he's doing and doing it economically

21   would do that.  They'd say, "There's no reason to file this

22   claim.  You sit out here and see how this case develops.

23   You don't need to jump in here and file this."  I, I don't

24   disagree with that.

25       I think the, the issue is when you, you make this

1    decision and when you, you do the discovery because it takes

2    discovery to do that because you could have many instances

3    of where people have other, besides the statute of

4    limitations issue, of why the case was filed at the time it

5    was filed.

6            THE COURT:  Anything else you'd like to talk to me

7    about?

8            MR. FRANKOVITCH:  No, I don't think so, Your

9    Honor.

10           THE COURT:  You've made a nice presentation, Mr.

11   Frankovitch.

12       Who wants to speak for the defense?

13           MR. MORIARTY:  I think I can be brief.

14       We don't look at an MDL in the same philosophical light

15   as Plaintiffs' Steering Committee.  The cases are

16   consolidated for discovery, certainly, but not just

17   discovery on bellwether cases, or whatever you wish to call

18   them.  It's done as a vehicle for efficiency, cost

19   containment, and judicial resource conservation.

20       PTO 16 and PTO 22 were negotiated.  Okay?  They had

21   their say in what went in and did not go in.  The defendants

22   have to keep this entire portfolio of cases in mind.  We

23   cannot be myopic.  We can't afford to be myopic and look

24   only at the 10 trial cases for a number of reasons.

25       As you've already pointed out, there are lawyers in

1    Cleveland at Tucker Ellis, in Kansas City at Shook Hardy who

2    have to spend the time to actually look at these things.

3    The stacks of bills on my desk from RecordTrak, it's

4    incredible how much it costs us to go out and obtain medical

5    records on each and every one of these plaintiffs.  So, it's

6    important to contain these things now.

7         And if we can whittle down the portfolio of these cases

8    in the MDL and in the state litigations to the cases that

9    are really meaningful, that's what should be done.  And it

10   should be done now, not later when they are weeded out when

11   money is expended.

12        Your Honor, I can tell you that this is actually the

13   tip of the iceberg because we chose the 39 cases in which

14   the plaintiffs, along with their PFS, gave us nothing,

15   nothing except the authorizations.  Okay?  And they were

16   obligated, if they had things in their possession, to

17   produce them to us.

18        We didn't propound these Requests for Admissions on the

19   people who only sent a death certificate or only a

20   photograph of their tablet file.  Okay?  We'll get to those

21   cases later.

22        This is -- we have to do this now.  It's costing

23   everybody too much time, too much money, and we should be

24   able to focus our time and attention on the cases that

25   matter.

1    I think in the wake of the recall, the rush to file a

2    flood of lawsuits was there.  It's a feeding frenzy and the

3    plaintiffs' attorneys want to be not only in on the frenzy,

4    but they want to be at the top of the food chain.

5    And I hate to get all philosophical on you, but that's

6    not what our justice system is supposed to be.  Rule 11

7    exists.  It's not suspended in an MDL.  It hasn't been

8    suspended by any negotiated order of this court or any

9    unilateral order of this court.  And it ought to be

10   enforced.

11   And we need the tools, whatever they may be, because we

12   don't have an established screening system, we need whatever

13   tools are available under the Federal Rules of Civil

14   Procedure to get where we need to be so far as weeding them

15   out immediately.

16   The plaintiffs should not be able to file a case and

17   hide it in a crowd hoping that they're not noticed and, as

18   you say, at the end of the day be there with their hand out.

19   That's not, that's not what this is all about.  It's not

20   just, it's not fair, and it's not economical.

21   Thank you.

22          THE COURT:  Mr. Frankovitch.

23          MR. FRANKOVITCH:  Just briefly, Your Honor.

24   Mr. Moriarty is correct.  This was a negotiated item

25   that we talked about where they would go and get these,

1   these medical records.  And that's one of the issues that

2   people relied on because the arrangement was, "If you have

3   medical records, send them in.  If you don't, we'll go get

4   them."  It wasn't like, "We're going to file Rule 11," or

5   anything like that.  "We will go and get it and we'll, you

6   will pay a nominal fee for us having to go get the records."

7        And many people, and I don't know whether it includes

8   these 39 or not, but I know from past experience that if you

9   give them -- I'm saying "them" -- defendants collectively,

10  generically, if you give defendants a medical authorization

11  and you give them medical records, they'll go get the

12  medical records.  They're not going to rely on the ones you

13  give them.  They think plaintiffs edit them before they,

14  they submit them, so they go and get new sets.

15       So, it's not like they were put at a, an undue burden

16  because I'm sure that even the ones, the people that

17  submitted records, they went and, and got those same medical

18  records again.

19            THE COURT:  Well, the plaintiffs' fact sheets and

20  medical records have been front and center in this

21  litigation since the very first hearing, and I expressed my

22  concern about it right then.

23            MR. FRANKOVITCH:  Right.

24            THE COURT:  Whether or not the defendants get the

25  medical records, there certainly are lots of provisions in

1    Pre-Trial Order 16 which put the burden on the plaintiffs to

2    produce everything that they have.  And my understanding of

3    Rule 11 is that there is a burden on the plaintiff's

4    attorney to determine whether there's a factual basis for

5    the claim.

6        After the case is filed and it starts going through

7    discovery and the acquisition of medical records, I

8    certainly understand why the defense, for want of a better

9    term, doesn't trust that the plaintiff will produce

10   absolutely every medical record that's appropriate.

11       I want to go through each and every argument that has

12   been raised to make sure that anything that the parties have

13   to say about this matter has been brought forward.

14       We've certainly discussed timeliness.  Now, the

15   plaintiffs have suggested this is a circumvention of the

16   deficiency process.  I don't read it that way.

17       You know, I believe that this talks -- that this

18   discovery is aimed toward the initiation of the lawsuit and

19   not subsequent deficiency concerns about the plaintiffs'

20   fact sheet.  But I'll be glad to hear anybody's comments

21   about that matter.

22           MR. FRANKOVITCH:  Well, the only thing that I

23   could say on that is it's, it may be ultimately appropriate

24   in looking at something retrospectively Rule 11, but I don't

25   think -- and, well, maybe that will become the new

1   requirement, that nobody can file a case without having

2   medical records first as a prerequisite for litigation, in

3   mass torts at least.

4           THE COURT:  You may be reading my comments too

5   narrowly.  I'm not saying that they absolutely have to have

6   medical records.  As you say, if it's the eve of the

7   expiration of the statute, you may not be able to do that.

8       But if Rule 11 applies, then the issue is what is, what

9   is the expectation of the plaintiff's attorney under the

10  circumstances to establish that they actually have a claim.

11  That's, that's the --

12          MR. FRANKOVITCH:  But don't you think that you

13  have to make that determination after the ultimate

14  disposition of the case?

15          THE COURT:  Well, that means that we've spent an

16  awful lot of money -- if the case turns out to be frivolous,

17  then we've spent an awful lot of money to find out that a

18  case is frivolous.

19          MR. FRANKOVITCH:  Right.

20          THE COURT:  And my point is, shouldn't we have

21  placed the responsibility and the burden on the plaintiff's

22  attorney to determine whether or not the case is frivolous

23  at the front end before everybody else spends a whole lot of

24  money on the case?

25          MR. FRANKOVITCH:  I, I think that's true.  But, as

1    you know, there's, there's cases that at the end of the day

2    you win.  There's, you know, some you lose.

3              THE COURT:  Oh, absolutely.  Even the best lawyers

4    with the best claims sometimes lose.

5              MR. FRANKOVITCH:  Oftentimes.

6              THE COURT:  And it doesn't mean that the, that it

7    wasn't a meritorious case.  And I think we all recognize

8    that, yes.  You wouldn't believe how many guilty people were

9    found innocent by a jury when I was prosecuting.  It's just

10   shocking.

11             MR. FRANKOVITCH:  I'm sure of that.  More, more

12   that way than the other way too I think.  But the, the -- I

13   think from the plaintiffs' perspective, they ought to have

14   an opportunity to reflect on this before the Court does

15   something dramatic and let those that think they have less

16   than meritorious cases an opportunity to get out.

17             THE COURT:  Well, of course, Rule 11 does provide

18   the safe harbor, and I'm sure the defendants would comply

19   with its provisions.

20        Now, we've talked a little bit about satellite

21   litigation.  I have read all of those cases, the Advisory

22   Committee notes, and other scholarly materials.  And I'm

23   sure you've all realized there's not much on this.

24             However, the one -- the famous quote in the 1983

25   Advisory Committee notes about whether or not this should

1    spawn satellite litigation has been referenced in cases in

2    which a Rule 11 motion has already been filed.  In other

3    words, it appears that the conduct occurred.  The, the one

4    side has said, "You've committed a Rule 11 violation.  It

5    appears to be pretty apparent on the record."

6        And then the accuser wants to engage in a whole bunch

7    of discovery about the circumstances of that particular

8    violation, not whether there was a problem in the first

9    instance.

10       And, so, if you have some authority or some good

11   arguments to make which would suggest that my analysis of

12   that particular quotation and that section of the Advisory

13   Committee notes is in error, I would like to hear it.

14             MR. FRANKOVITCH:  No, I don't think it's in error,

15   Your Honor.  It's, it's, it -- on a -- and I think the, the

16   defendants would agree if this was an individual case, I

17   think we'd probably be past this.

18       The issue is whether they should open this up --

19   because it does become a collateral issue that you have to

20   go down to determine what other issues that the plaintiffs

21   knew about when they filed the case.  So, it will, it will

22   open that door, or could open that door to this collateral

23   issue.

24             THE COURT:  Well, thank you.

25       Does the defense wish to add anything?

1          MR. MORIARTY:  Not from the Actavis defendants,

2     Your Honor.

3          MR. KAPLAN:  Your Honor, I think it's been said

4     very appropriately and succinctly, but this really is all

5     about whether there's a good faith basis to file a lawsuit.

6     And now is the time to deal with it in a very short and

7     simple way.

8        We, we're judicious about which cases we filed in.

9     There is a Rule 11 safe harbor, as you noted, Your Honor.

10    And I believe that a ruling that affirms the viability of

11    Rule 11 in the mass tort setting will send a notice to

12    plaintiffs who did not have viable cases or a good faith

13    basis upon which to file them to dismiss those cases.  And I

14    think that's what will occur.

15         THE COURT:  Mr. Frankovitch, do you want to have

16    the last word?

17         MR. FRANKOVITCH:  Well, I, I'm trying to see how

18    we might couch this to get the message across whether it's,

19    you know, the Court has an inclination to, to address these

20    in a certain way and give everybody a chance to walk away if

21    that's where they want to go.

22         THE COURT:  Well, Rule 36(a)(6) says that the

23    requesting party may move to determine the sufficiency of an

24    objection, and that unless the Court finds an objection

25    justified, it must order that an answer be served.

1      And I think it's plain to you that I am going to find

2   that the objections are not justified, and I will order that

3   answers be served.  We're in a funny situation because

4   these, the parties who actually got served with the Requests

5   for Admissions aren't the ones who are before the Court I

6   believe.

7          MR. FRANKOVITCH:  That's correct.

8          THE COURT:  And that brings me to another thing.

9   It would be my expectation that the requests would be

10  answered without an objection because we had that.  We're

11  over that.

12     And, so, they filed their response and then, and only

13  then, if the defense believed that the record establishes a

14  Rule 11 violation, then the defense has to file a motion and

15  use the safe harbor provision.

16     If the plaintiffs don't answer the Requests for

17  Admission, then we go over to Rule 37 which, of course,

18  addresses that.

19     So, Judge Goodwin has already indicated to you that we

20  have concerns about attorney accountability.

21     And you've made a fine presentation today, Mr.

22  Frankovitch, given that it really wasn't your dog that was

23  in the fight.  And it's an awkward situation.

24     Let me just say that if there are any instances in

25  which during the course of discovery from here on out that

1  lead counsel for the plaintiffs or for the -- I think it

2  probably doesn't apply to the defendants.  But if any lead

3  counsel for the plaintiffs determines that you are not

4  comfortable and believe that the position that other

5  plaintiffs' attorneys want you to espouse is not

6  substantially justified, then the Court will certainly hear

7  from that attorney who does wish to make that argument.

8      But I will say at this point that I have grumbled about

9  the number of discovery disputes in this case.  Now, perhaps

10  I don't have any idea how many there could have been.  And

11  it may be that you-all have done a fabulous job of working

12  together.  You've certainly done well in producing orders

13  together.

14      However, the defendants' position on the plaintiffs'

15  desire to conduct *ex parte* interviews of former Actavis

16  employees in my view is not substantially justified.  And,

17  in my view, the plaintiffs' position with respect to the

18  sufficiency of the objections to these Requests for

19  Admissions also are not substantially justified.

20      The -- if this was just an individual case, I would

21  have followed Rule 37 and tagged the offending lawyer with

22  costs and fees.  I don't have any problem doing that.  I've

23  been on the bench too long to put up with taking up a lot of

24  my time writing memos when the law is clearly established

25  and the positions, at least in my view, are not

1    substantially justified.

2         So, basically, you've each gotten your first bite.  So,

3    I'm not assessing costs and fees at this point, don't expect

4    to.  But I do want everyone to understand that it's not

5    appropriate to say "no" just because it's the other side

6    that's asking.  And I will -- I'm certainly prepared to use

7    Rule 37 in discovery disputes as needed in the future.

8         Now, I'm trying to figure if I've covered everything.

9         Anybody have anything they want to say?

10    (No Response)

11         THE COURT:  I'm sure that the Court's comments

12    will be distributed and parties will take such action as

13    they deem appropriate under the circumstances.

14         I'm going out of town for a few days.  I don't know if

15    I'll get the order out before I go, but at least you know

16    what the expectation is.

17         Anything further?

18         MR. BELL:  Nothing further, Your Honor.

19         MR. MORIARTY:  Thank you.

20         THE COURT:  Thank you.

21    (Proceedings concluded at 10:40 a.m.)

22

23

24

25

```
1          I, Lisa A. Cook, Official Reporter of the United

2   States District Court for the Southern District of West

3   Virginia, do hereby certify that the foregoing is a true and

4   correct transcript, to the best of my ability, from the

5   record of proceedings in the above-entitled matter.

6

7

8        s\Lisa A. Cook                        August 12, 2009

9           Reporter                               Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```