```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT CHARLESTON

 3                   TRANSCRIPT OF PROCEEDINGS

 4

 5
       ----------------------------x
 6                                 :
       IN RE:  DIGITEK PRODUCT      :       CIVIL ACTION
 7     LIABILITY LITIGATION         :       NO. 2:08-MD-01968
                                    :
 8                                  :       November 20, 2009
       ----------------------------x
 9

10
                        MOTIONS HEARING
11

12
             BEFORE THE HONORABLE JOSEPH R. GOODWIN
13            CHIEF UNITED STATES DISTRICT JUDGE
                              AND
14             THE HONORABLE MARY E. STANLEY
               UNITED STATES MAGISTRATE JUDGE
15

16     APPEARANCES:

17     For the Plaintiffs:         MR. FRED THOMPSON, III
                                   MS. MEGHAN JOHNSON CARTER
18                                 Motley Rice, LLC
                                   P.O. Box 1792
19                                 Mt. Pleasant, SC  29464

20                                 MR. DAVID WILHARM
                                   Frankovitch, Anetakis,
21                                 Colantonio & Simon
                                   337 Penco Road
22                                 Weirton, WV  26062

23                                 MR. HARRY F. BELL, JR.
                                   Bell & Bands PLLC
24                                 P.O. Box 1723
                                   Charleston, WV  25326
25
```

```
 1    APPEARANCES (Continued):

 2

 3    For the Plaintiffs:          MR. JIMMY WILLIAMSON
                                   Williamson & Rusnak
 4                                 4310 Yoakum Boulevard
                                   Houston, TX  77006
 5

 6                                 MR. EDWARD F. BLIZZARD
                                   Blizzard, McCarthy & Nabers
 7                                 Suite 1710
                                   The Lyric Centre Building
 8                                 440 Louisiana Street
                                   Houston, TX  77002
 9

10                                 MR. SHAMUS B. MULDERIG
                                   Hissey Kientz, LLP
11                                 9442 Capital of Texas Highway N
                                   Suite 400
12                                 Austin, TX  78759

13

14                                 MR. DON K. LEDGARD
                                   Capretz & Associates
15                                 Suite 2500
                                   5000 Birch Street
16                                 Newport Beach, CA  92660

17

18    For the Defendants:         MR. MATTHEW P. MORIARTY
                                   MR. RICHARD A. DEAN
19                                 Tucker, Ellis & West LLP
                                   1150 Huntington Building
20                                 925 Euclid Avenue
                                   Cleveland, Ohio  44115
21

22                                 MS. MADELEINE M. MCDONOUGH
                                   Shook, Hardy & Bacon, LLP
23                                 2555 Grand Blvd.
                                   Kansas City, Missouri 64108
24

25
```

```
 1    APPEARANCES (Continued):

 2

 3    For the Defendants:          MS. REBECCA A. BETTS
                                   MR. DAVID B. THOMAS
 4                                 Allen, Guthrie & Thomas, PLLC
                                   P.O. Box 3394
 5                                 Charleston, WV  25333-3394

 6

 7

 8    Present Telephonically:      MR. DON A. ERNST
                                   Ernst & Mattison
 9                                 1020 Palm Street
                                   San Luis Obispo, CA  93401
10

11                                 MR. MICHAEL J. WILLIAMS
                                   Cellino & Barnes
12                                 2500 Main Place Tower
                                   350 Main Street
13                                 Buffalo, NY  14202-3725

14

15

16

17

18

19

20

21

22    Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

23

      Proceedings recorded by mechanical stenography; transcript
24    produced by computer.

25
```

```
 1                    P R O C E E D I N G S

 2          JUDGE STANLEY:  Good morning, everyone.  I

 3   understand that we have not been able to reach the gentleman

 4   who wished to participate with respect to the Kathy

 5   McCornack case.  I understand he had requested, or was

 6   interested in participating, Mr. Thompson.

 7          MR. THOMPSON:  Yes, Your Honor.  He does not have

 8   an active motion to be argued this morning, although he has

 9   discovery issues that may be coming down the pike.  So, he

10   was interested.  I appreciate the Court's indulgence in

11   attempting to hook him up, but I think they've gone the

12   extra mile and have not been able to do that.

13       So, we're prepared to go forward and we'll just report

14   to Mr. Ernst.  I think he'll probably call in on the

15   official number for the status hearing at 10:00, but I don't

16   think that we should give him another thought right now.

17          JUDGE STANLEY:  Okay.  I would be willing for

18   somebody to, you know, go out in the public space and keep

19   trying him and to interrupt the hearing if they want.  But,

20   you know, since his motion is not ripe, I'm certainly

21   prepared to go forward.

22       All right.  So, -- I'm sorry.  Go ahead.

23          MR. THOMPSON:  Judge, I don't mean to jump the

24   gun, but I did want to introduce Mr. Williamson when you're

25   ready.
```

1          JUDGE STANLEY:  And I'm ready right now.

2          MR. THOMPSON:  Your Honor, I -- Jimmy Williamson

3    is the case attorney.  He has the motion to compel.  I

4    introduce him to the Court.  This is his first time in this,

5    in this courtroom.  He's from Houston, Texas.

6          JUDGE STANLEY:  Well, we're very pleased to have

7    you, and I hope you like our accommodations and we're always

8    pleased to have visiting attorneys.

9          MR. WILLIAMSON:  Thank you, Your Honor.  Yes,

10   you've been very gracious, you and your staff.

11         JUDGE STANLEY:  Excellent.  All right.  And we

12   have the usual suspects for the defense.  Okay.

13      Now, I have read your materials and considered them,

14   and my first question, I guess -- and I'll direct this to

15   you, Mr. Williamson -- it would appear to me that your

16   requested depositions of the defense witnesses in this

17   particular, relating to this particular motion are tied in

18   to what you perceive as your burden of proof to establish

19   the elements of the cause of action.  Is that correct?

20         MR. WILLIAMSON:  That's correct, Your Honor.

21         JUDGE STANLEY:  All right.  Now, assuming that you

22   have to show causation and a chain and the wrongful conduct,

23   I, I have some difficulty understanding the significance of

24   topic 6 which is the business and financial arrangements,

25   agreements, and relationships that existed between Actavis

1    and Mylan relating to Digitek during 2006, 2007, and 2008.

2         If, if we are focusing on the quality of the product,

3    Digitek, I don't understand what Actavis and Mylan's

4    relationships relating to the product itself, what impact

5    that would have on your case.

6         MR. WILLIAMSON:  My individual case, Your Honor,

7    number one, I was trying to inquire with that -- there's

8    actually a couple questions like that where I'm trying to

9    inquire about what financial arrange- -- my client, Mimi

10   Vega, received Digitek and has prescription records and

11   hospital records with all product ID.

12        She was in the hospital when she got a high digitalis

13   reading.  And we have a board certified cardiologist who's

14   testified that her condition -- she had congenital heart

15   failure secondary to pregnancy.  She had developed a heart

16   condition as a result of having a child, and she was stable

17   and doing well.

18        She went in the hospital and she kind of went off the

19   cliff, for lack of a better word.  Her clinical course

20   deteriorated -- that was January, '08.  Her clinical course

21   deteriorated so much she had to have an artificial pump put

22   in.

23        She was put on a heart transplant list.  She eventually

24   had both her legs amputated.  And she eventually dies in

25   September, '08, precipitated by her clinical course going

1    downhill in January, '08.

2        Her -- there's three sources of Digitek pills that she

3    was subject to.  One of them was from St. Luke's Hospital

4    which is where she literally was an in-patient when she had

5    the high digitalis reading in January, '08.

6        And, so -- St. Luke's Hospital in Houston, Texas, is a

7    2000-bed hospital probably, or bigger, and it houses the

8    Texas Heart Institute which is the world's leading, one of

9    the word's leading centers.  I think they've done more heart

10   transplants than anyone in the world.  So, it's a place

11   where people with congenital heart failure are.  There's

12   lots of heart cardiac patients in that facility.

13       To answer your -- now, with that preface, to answer

14   your question, I was trying to figure out what relationship

15   Mylan or Actavis had in terms of how those pills got to

16   Houston, Texas, in St. Luke's Hospital.

17       The Court is correct in saying that it's probably my

18   burden of proof to bring you that when -- but, by the way,

19   this is a trial case.  It's on the trial docket.  I am

20   hopeful Judge Goodwin or Judge Goodwin and you will make the

21   decision on what cases go.

22            JUDGE STANLEY:  He will.

23            MR. WILLIAMSON:  I'm hopeful this is -- if not the

24   first, I'm hopeful it is one of the first cases teed up.

25   So, it's not merely academic that I need to get this proved.

1    I was thinking one way to demonstrate how these pills

2  got to St. Luke's was to try to figure out -- follow the

3  money.  What financial arrangements exist with St. Luke's,

4  what are the financial arrangements in terms of existing

5  with hospitals, how were they marketed to hospitals.

6    I, I will say this.  If an error concession helps or

7  hurts me, I mean, I'm happy to forego the financial

8  arrangements, put that burden on Mr. Thompson and the PSC.

9  I'm afraid they might not do it for Texas or St. Luke's or,

10  or, or the Wal-Mart stores in Texas, which was another

11  source of my pills.  I'm afraid they may be concentrated on

12  the national or global picture.  My burden may be more, more

13  direct in Texas or St. Luke's or Houston.  So -- or, or

14  Wal-Mart.

15    So, that was my, one avenue is to ask for the records.

16  One avenue is to follow the money.  That's my rationale.

17    JUDGE STANLEY:  Well, have you pursued asking the

18  defense for a stipulation as to who produced the pills that

19  she took?  I mean, it's not clear to me what records there

20  would be as you follow the pills from the plant to the

21  patient; in other words, whether the batch numbers are

22  recorded in the pharmacy at the hospital, whether the batch

23  numbers are actually reported on the patient chart.

24    So, I -- you, I am sure, know far more about this than

25  I do, but --

1          MR. WILLIAMSON:  I think -- I didn't mean to

2   interrupt the Court.

3          JUDGE STANLEY:  You can see where I'm going.

4          MR. WILLIAMSON:  I think I can.

5          JUDGE STANLEY:  You have the right to discover and

6   to prove -- I mean, you must prove that, --

7          MR. WILLIAMSON:  These are their pills.

8          JUDGE STANLEY:  -- that they made the pills that

9   hurt your client.  And I'm trying to figure out --

10          MR. WILLIAMSON:  And I have to also prove that

11   there's something wrong with those pills, --

12          JUDGE STANLEY:  Right.

13          MR. WILLIAMSON:  -- which means I -- I mean, some

14   defect in the law.

15          JUDGE STANLEY:  Right.

16          MR. WILLIAMSON:  Okay.  And the Court's correct.

17   And to do that, I need to identify -- my chain kind of

18   stops.  My medical records do reflect Digitek, but they do

19   not reflect it -- I'm sorry.  The St. Luke's Hospital

20   records do reflect Digitek, but they don't reflect

21   particular batch numbers or lot numbers.

22          The pharmacy records from Walgreens and Wal-Mart that I

23   have do reflect certain identification numbers.  Okay?  But

24   they don't give me further information.

25          Upon informal discussion with defense counsel, they

1    said, "Well, there's really no way to take that number,

2    Mr. Williamson, that you have in your possession and link it

3    up to any given batch."  And I said, "Or at least not from

4    the information I --"  I'll phrase it this way so I'll make

5    sure I'm being accurate with the Court because I don't want

6    to overstate something, especially on my first visit here.

7    I don't want to overstate it ever, especially on the first

8    visit.

9         But there's no way I can match my identification

10    numbers that I have on pharmacy records or hospital records

11    to, to take that back into Actavis batches.  And as the

12    Court probably, I'm sure, is aware, Mylan takes the position

13    they didn't know anything about anything about any defect in

14    manufacturing.  And, so -- and Actavis takes the position

15    they did not market to anybody other than Mylan, which we

16    can argue about how those defenses play later.  But in my

17    case, I've got to start getting my pills back to an Actavis

18    batch that have problems.

19         JUDGE STANLEY:  Right.  Surely they must be able

20    to provide that information because otherwise you couldn't

21    have a recall letter, could you?

22         MR. WILLIAMSON:  By the way, your actual pre-trial

23    order number 27 requires me to do what I just said and what

24    you just said; namely, that it's the Court's intention that

25    such plaintiffs should be able to trace backwards the lot

1  number of his prescription to the manufacturer of those

2  tablets.  That's your order.  Okay.

3          JUDGE STANLEY:  And a well written one.

4          MR. WILLIAMSON:  Absolutely.  The -- and, so, I

5  personally think, and still think today, after looking at

6  all the paper, depositions is going to be the most efficient

7  way for me to figure out how to do this.  Written discovery

8  is, has the potential to have carefully crafted legal

9  answers that are somewhat evasive, which is their job.

10  Please do not accept that as an attack on counsel.  Counsel

11  is eminently qualified.  But that's their job to be a

12  zealous advocate.

13          JUDGE STANLEY:  Well, about the only thing I can

14  imagine in the way of written discovery that probably would

15  suffice would be an admission to a request for admissions

16  that basically is the same as a stipulation that they say,

17  "Yeah, they were our pills.  We produced them.  And they're

18  in this batch."

19          MR. WILLIAMSON:  I'd have to -- I'm not being

20  difficult.  I'd have to think about the wording of that to

21  make sure I've got what I need.  But that might work, Your

22  Honor.  But the Court does know I did send them

23  interrogatories and asked this question.

24          JUDGE STANLEY:  Uh-huh.

25          MR. WILLIAMSON:  I said, "Okay.  What's your

1    arrangement with Wal-Mart stores?"  They refused to answer.

2    "What's your arrangement with St. Luke's?"  They say, "We

3    didn't sell directly to St. Luke's."  I say, "Who did you

4    sell to?" so I can figure out what they told St. Luke's.

5              JUDGE STANLEY:  Exactly.  You can --

6              MR. WILLIAMSON:  And they said -- and they refused

7    to answer.

8              JUDGE STANLEY:  Okay.

9              MR. WILLIAMSON:  And then when I asked for

10   marketing materials to St. Luke's Hospital, they say, "We

11   have none from January 1, '06, forward."

12       As I know the Court knows because you've been involved

13   in this litigation, digoxin is a generic drug that's been on

14   the market for many, many years.  So, they could have

15   marketing materials that are directly relevant that pre-date

16   January 1st, 2006.

17             JUDGE STANLEY:  Let me ask you this.  Assuming

18   that we learn the other cases that are going to trial this

19   week, isn't every other plaintiff attorney who's got one of

20   those cases that's going to trial have the exact same

21   problem that you have?

22             MR. WILLIAMSON:  We were discussing that this

23   morning.  And it's my belief that, yes, they're going to

24   have the same burden.  They're obviously going to have the

25   same burden of proof I have.  But I think they're also going

1   to have some of these same issues that I'm raising with Your

2   Honor.

3           JUDGE STANLEY:  Okay.  So, is it fair to, for the

4   Court to think that, well, that these depositions should

5   relate to the trial cases and be done at one sitting with

6   all those plaintiffs' attorneys participating?

7           MR. WILLIAMSON:  The, the answer to that, Your

8   Honor, is you're partially correct.  Okay?  It is -- it may

9   be true -- I don't know -- since I don't have access to

10  defense witnesses, I don't know the exact person who dealt

11  with St. Luke's Hospital and how my pills got to St. Luke's.

12      So, I'm somewhat at a loss to answer your question

13  because I don't have the information.  It is possible that

14  that person may also be a person that the PSC is interested

15  in, and maybe even probable.

16          JUDGE STANLEY:  Well, I'm not sure that it's a

17  question of the PSC.  I mean, I'm talking about the actual

18  cases going to trial.  I'm trying to differentiate between

19  the specific needs of a trial case --

20          MR. WILLIAMSON:  Uh-huh.

21          JUDGE STANLEY:  -- of showing the chain of the

22  pills from manufacturer to patient.  And I'm also trying to

23  understand what plaintiffs in general need to know.  It

24  strikes me that they could be different.

25          MR. WILLIAMSON:  They -- the -- I'm not trying to

1    interrupt Fred, but -- Mr. Thompson.  The -- what I need to

2    know, Your Honor, is not only do I need to prove that my

3    pill came out of this batch, I need the proof over what is

4    wrong.

5         And there are documents in my chain that may not apply

6    to all chains.  I mean, now, since I don't have the benefit

7    of the information, I'm obviously seeking that discovery

8    literally.  But, but -- so, the documents that relate to

9    Wal-Mart and the quality control problems that were related

10   to pills that were given to Wal-Mart, which is a huge retail

11   chain, obviously, and Walgreens and St. Luke's Hospital in

12   Houston, Texas, which are my three sources, may not apply,

13   and actually don't apply to all cases.

14        So -- but you're correct.  There's going to be that

15   thread -- the thread that exists for me is also a specific

16   thread that is going to exist for each of the cases that

17   Judge Goodwin puts on the accelerated trial docket, you

18   know, the cases he advances for trial.

19             JUDGE STANLEY:  Okay.

20        Now, Mr. Thompson, what did you want to say?

21             MR. THOMPSON:  Your Honor, I was going to say this

22   will recur in any case that's brought forward to be tried,

23   but that recurring requirement does not make it a PSC

24   generalized inquiry.  There's no way that I as a PSC would

25   probably ever track down the path of pills to St. Luke's

1   Hospital in Houston.  It may well be that a single person or

2   a single 30(b)(6) would be sufficient.

3      I had a trial case and my client was in Bay City,

4   Michigan.  There's another in San Luis Obispo, California.

5   It may be that a single person can provide that tracking

6   information, but I doubt it.

7      And, so, I believe this is simply going to be trial

8   specific discovery.  There are only seven cases that are set

9   right now.  And, so, this is -- I mean, this is the breaks.

10  This is, this is what lawsuits are.  And I do think that the

11  theme that, that I want to make sure that we have in our

12  minds, and that is reciprocity.

13     We have been tendering our clients, our treating

14  physicians for depositions to prepare these cases to go

15  forward, and what we're seeking is limited and very direct

16  discovery on path, proof of usage, and the path of

17  distribution of these pills.

18     We have gotten a series of what I would call peekaboo

19  responses, one of which is:  "Your questions are too late.

20  They should have been asked in June and they weren't."  The

21  second one is:  "Your questions are too early.  They're

22  premature."  The third is:  "We don't know, we don't know

23  the path that the pills took.  We can't answer that

24  question."

25     You know, the first two I don't think we need to worry

1  about because we're dealing with trial specific issues and,

2  of course, this is the time to do it.  The last is something

3  that really does require an inquiry because if the answer of

4  the defendants is, "We don't know," or, "We can't tell you,"

5  then we really need to track that down.

6      There are some statutory requirements.  There are

7  regulatory requirements.  There are company requirements as

8  to tracing batches and lots.  And if what they're really

9  saying is, "We don't know," well, that's a very important

10  part of liability that we need to track down as well.

11      But I do think that these all emanate from trial

12  specific needs and they're tailored narrowly to, to get

13  what's needed.

14          JUDGE STANLEY:  Mr. Thompson, is -- if you look at

15  the seven topics that were in the notice, are any of these

16  topics things that, matters that the Plaintiffs' Steering

17  Committee wish to pursue as to every case?

18      I mean, I completely follow your argument with respect

19  to the chain of, and tracing of pills on trial specific

20  cases.  But I'm wondering if there are topics that, about

21  the, the whole distribution system, the business and

22  financial relationships, the marketing, that the Plaintiffs'

23  Steering Committee wishes to pursue for all cases.

24          MR. THOMPSON:  Judge, we -- the answer to that --

25  do you want me to go item by item?

1           JUDGE STANLEY:  Yes.

2           MR. THOMPSON:  But as a general response to your

3    question, I would certainly say that with regard to topic

4    number 2, with regard to topic number 3, adverse event

5    reports not limited to Ms. Vega --

6           JUDGE STANLEY:  Well, of course.

7           MR. THOMPSON:  -- are clearly already

8    contemplated, --

9           JUDGE STANLEY:  Right.

10          MR. THOMPSON:  -- and certainly topic number 5.  I

11   believe that those are areas that are within the general

12   inquiry of the, of the PSC, yes, ma'am.

13          JUDGE STANLEY:  Well, in other words, you're

14   saying in every single case every plaintiff wants to know

15   about marketing, sale, supply, adverse event reports, and

16   batch records.  Is that what you're saying?

17          MR. THOMPSON:  The -- topic 5 I think are the

18   business and financial arrangements.  We already have access

19   to batch records.

20          JUDGE STANLEY:  Yeah.  Topic 6 is business and

21   financial arrangements.  You may be looking at --

22          MR. THOMPSON:  I'm looking at a different one.

23   I'm looking at one that has six topics.

24          JUDGE STANLEY:  I'm looking at one with seven

25   topics.

1          MR. THOMPSON:  The secret topic.

2          MR. WILLIAMSON:  I think the seventh was the

3    financial arrangements if memory serves me.

4          JUDGE STANLEY:  No.  Topic 7 was the Actavis sales

5    representative with the most knowledge regarding Actavis'

6    sale, supply, marketing in or distribution of Digitek to

7    Mylan.

8          MR. WILLIAMSON:  Correct.

9          JUDGE STANLEY:  So, I am looking at the notice for

10   the 30(b)(6) deposition to Actavis which is --

11         MR. WILLIAMSON:  I'm sorry, Your Honor.  I was

12   looking at the one in Mylan.

13         JUDGE STANLEY:  -- document number 24.  Yeah,

14   Mr. Thompson is talking about Mylan.  And, so, what I'm

15   trying to figure out is, are there overarching topics for a

16   30(b)(6) witness that are not individual trial specific?

17         MR. THOMPSON:  Yes, Your Honor.  In fact, we had

18   discussed that this morning that -- amongst the trial

19   counsel that a 30(b)(6) of the batch identification and the,

20   the procedures and the requirements that a 30(b)(6) was

21   needed, and that we were going to be moving for that both

22   for Actavis and for Mylan.  So, yes, that specific topic is

23   one of generalized application.

24         JUDGE STANLEY:  What other ones are?

25         MR. THOMPSON:  Well, Judge, I think that the

1  distributors and purchasers, the --

2        JUDGE STANLEY:  Let's go by topic numbers on the

3  Actavis one.  Topic 1 is the distributors and purchasers in

4  general you said?

5        MR. THOMPSON:  Yeah, in general.  But, here again,

6  to the extent that that 30(b)(6) person is knowledgeable

7  about the individual facts, well, then, yes, the individual

8  case lawyers would want to participate in that as well.  So,

9  "yes" on number one.

10       JUDGE STANLEY:  Well, let me hear from the defense

11  for a while, but I may come back to you to see how we can

12  work this out.

13       Is it going to be Mr. Moriarty?

14       MR. MORIARTY:  It is, Your Honor.  Do you want me

15  to make a presentation or just answer your questions?

16       JUDGE STANLEY:  Well, I'm sure you recognize that

17  the plaintiffs who are going to trial have the burden of

18  proof to establish that you've made a defective product that

19  got into their plant.  How can that not be discoverable?

20       MR. MORIARTY:  Okay.  That's not the dispute here.

21  What we have told these lawyers in answers to

22  interrogatories more than once, and what I have told these

23  lawyers over the telephone, is that they are essentially

24  going about this the wrong way.

25       Actavis sells every last tablet of Digitek to Mylan.

1    Actavis has answered interrogatories and is prepared to put

2    up the company witnesses that Mr. Thompson has listed that

3    the PSC has asked for who will say that pursuant to the

4    supply and distribution agreement that has been produced,

5    that they sell every last Digitek tablet to Mylan.  It's a

6    generic manufacturer.

7        They do not track tablets to Wal-Mart, to Texas, to

8    Houston, Texas, to a particular place in Houston, Texas.

9    Okay?  We've told them that.  So, Actavis has no witnesses,

10   has no documents.  And that, that -- we answered those

11   interrogatories.

12       JUDGE STANLEY:  So, you'll stipulate that you are

13   the producer of every Digitek tablet that came from Mylan.

14       MR. MORIARTY:  If it's a Digitek tablet, yes.

15       So, the next phase is an inquiry to Mylan.  What can

16   Mylan say about the distribution to Wal-Mart, to Texas, to

17   Houston, Texas, and to various stores?

18       I'm not going to speak for Mylan, but I will, I will

19   just turn this about.  As I've told all these lawyers, the

20   place to start is at the bottom of the chain.  Okay?

21       So, for example, in the Vega case that we're here about

22   right now, I have told Mr. Williamson and I have written to

23   Mr. Williamson saying we would like to take the deposition

24   of the hospital pharmacy at St. Luke's.  We might find out

25   where they got their Digitek from, what distributor, what

1   sub distributor, what buying consortium.  And then you can

2   trace it back eventually to, hopefully to a specific batch.

3         In the case of Mimi Rivera-Vega's out-patient tablets

4   which she got, I believe, at a Wal-Mart Pharmacy, it doesn't

5   matter.  Substitute the name.  For every one of these

6   lawyers, the inquiry will be the same.  For Mr. Blizzard it

7   would be whatever Bonnie Kelch took.

8         We've got to go to her pharmacy, or you've got to go to

9   CVS or Wal-Mart and find out about their distribution

10  systems because all, all Mylan does is sell this to

11  Wal-Mart, for example, and deliver it to a Wal-Mart

12  distribution center.

13        The Mylan truck is not running around the 50 states

14  dropping tablets off to pharmacies.  Wal-Mart has their own

15  distribution system.  And how a tablet from a specific batch

16  gets from their loading dock to Mimi Rivera-Vega's hospital

17  tray is not something that these defendants know about, for

18  the most part, and have answered interrogatories to that

19  effect.  So, --

20              JUDGE STANLEY:  Just to reiterate, however, you

21  will stipulate that if Mylan distributed a Digitek tablet,

22  you produced it.

23              MR. MORIARTY:  We manufactured it.

24              JUDGE STANLEY:  Okay.

25              MR. MORIARTY:  So, so, what I tried to do in this

1   whole process, the lead-up to today, which is a motion to

2   compel hearing, was to get the PSC, and Mr. Williamson

3   specifically, to communicate so that as I was trying to

4   communicate to them, the inquiry so far as what these

5   defendants really know is a PSC issue.  They need to ask

6   Actavis or somebody from Mylan, "Okay.  How far can you take

7   us down the chain?"  And Actavis and Mylan -- and that's a

8   common inquiry in every case.  Okay?

9         From there, it is a case specific issue for the lawyers

10  collectively to go through these pharmacy companies.  And if

11  we have to create a new carve-out under PTO 16 specifically

12  for pharmacy chain depositions, we can do it.  But I'm here

13  on a motion to compel hearing that should never have taken

14  place.

15         JUDGE STANLEY:  All right.

16  Who wants to talk about Mylan?

17         MS. MCDONOUGH:  Thank you, Your Honor.

18         Really, everything Mr. Moriarty said is true also of

19  Mylan and UDL.  We were able to confirm, for example, that

20  we did not distribute any tablets directly to St. Luke's

21  Hospital.

22         We do distribute tablets to a national Wal-Mart

23  distribution center, but Mylan and UDL distribute to large

24  wholesalers, distributors, and re-distributors.  And then we

25  don't know where they decide to send those lots and batches

1   from there.

2        And we've given a lot of documents already to the

3   plaintiffs that established that whole chain as far as Mylan

4   and UDL keeps track of that.  But I do agree with Mr.

5   Moriarty that the next step is to find out -- if you know

6   the pharmacies that Ms. Vega went to, you subpoena them or

7   you ask them or have a third party request and say, "What

8   are your batch and lot numbers that would have applied to

9   her prescription?"

10       And then we can work together to see if they match up

11  somewhere on the chain.  They may.  They may not be the

12  right batch and lot numbers, but we can fill in those gaps.

13       But I do believe it's their burden to go from their

14  individual plaintiff up because we've gone from our

15  defendants down as far as we can go on that chain.

16            JUDGE STANLEY:  To what extent has -- I mean, has

17  Mylan provided a list of the wholesalers that you sold

18  Digitek to?

19            MS. MCDONOUGH:  We have.  And we've supplied, you

20  know, batch and lot records as far as we can take them.  And

21  we have confirmed, for example, that we haven't supplied to

22  specific entities that they've identified like St. Luke's.

23  Sometimes there are people farther along the chain that

24  might be supplied to, but that's not one of them.

25       With Wal-Mart we've given the records that show what

1    we've sent to the national Wal-Mart chain.  And the next

2    step would be to ask the Wal-Mart national chain, "Where did

3    those tablets go because we've got a Wal-Mart pharmacy in

4    Houston?  Just show us that."

5         So, I don't think it's a very complicated chain.  But

6    the larger defendants, the producer and first distributor,

7    packager, Mylan, can only go so far on the chain because

8    these large wholesalers and distributors have their own

9    little system that we're not a part of.

10         JUDGE STANLEY:  And are you willing to enter into

11   stipulations on behalf of Mylan establishing that Mylan

12   shipped batch X to a particular center or place?

13         MS. MCDONOUGH:  Yes.  And I think we've actually

14   already produced a pretty large volume of documents that

15   shows that, but we're happy to do that.

16         JUDGE STANLEY:  Okay, all right.

17         MR. WILLIAMSON:  May I respond, Your Honor?

18         JUDGE STANLEY:  Okay.  Now, you're responding just

19   in your individual case.  Right, Mr. Williamson?

20         MR. WILLIAMSON:  Yes, Your Honor.

21         JUDGE STANLEY:  Okay.

22         MR. WILLIAMSON:  First of all, they've said things

23   today they've never said to me.  They literally didn't say

24   those things in interrogatory answers; namely, that they

25   only shipped to -- they refused to give me any information

1    on how they sold to Wal-Mart.

2        And even now with their comment, I still do not know

3    what arrangements they have with Wal-Mart regarding keeping

4    up with lot or batch numbers.  And, quite frankly, it would

5    have been exceptionally easy for me to take two depositions

6    - one of Actavis and one of Mylan - in order to do this,

7    which I would still like to do in order to get that pinned

8    down on how they create their chain for my particular pills.

9        But, secondly, with regard to the St. Luke's pills

10   which happened -- by the way, she was in the hospital when

11   she got this high digitalis reading.  So, she was getting

12   her pills from St. Luke's at that time.

13       They haven't explained how those pills -- they haven't

14   given me their sources of information over how pills ended

15   up in St. Luke's Hospital.  I have no objection if they

16   want -- I've never objected to them going to St. Luke's and

17   starting to take depositions at St. Luke's Hospital in

18   Houston.

19            JUDGE STANLEY:  I don't see it as their obligation

20   to tell you what you have to prove.  I mean --

21            MR. WILLIAMSON:  Right.

22            JUDGE STANLEY:  In other words, you know, you can

23   go to St. Luke's and say, "Give me the batch -- tell me what

24   pills my client got."

25            MR. WILLIAMSON:  Fair.  That's true, Your Honor.

1       And it is also true that since it is my burden, I can

2    ask them what they know.  And I have been -- I have not been

3    able to obtain that information.  I did send written

4    interrogatories on this subject, and I was told they would

5    not answer any of them on an objection.

6       I did request -- for example, in Mylan on September 9th

7    I requested depositions.  They never responded.  They didn't

8    even respond by saying, "We're not going to give you

9    depositions."  Mylan never responded to me on my request for

10   depositions at all.

11      I sent a second letter, and they did not respond to

12   that.  I filed a notice.  They did not respond to that.  I

13   filed the motion.

14      In the meantime, I sent interrogatories.  Quite

15   frankly -- I'm trying to make sure I don't put on my

16   advocacy hat but, quite frankly, I could have made one plane

17   trip, taken two depositions in one day, and avoided a stack

18   of paper about as big as my arm, as well as this hearing.

19      I would still request the right to do it.  I certainly

20   appreciate the Court's efforts at getting a stipulation on

21   the chain of custody.  I'm not being naive.  But I would

22   still request to hear what the defendants say about how

23   their pills got to Houston, Texas.

24          JUDGE STANLEY:  Mr. Thompson, have you given some

25   thought as to plaintiffs in general versus trial plaintiffs?

1          MR. THOMPSON:  Judge, yes, I have.  The -- if we

2     listen to the two entities today, they actually gave you two

3     very different answers.  I believe Actavis said they don't

4     track, or they can't tell you where the batches, the

5     individual batches went, simply that all the pills they made

6     went to Mylan.

7          Mylan says that they know where the batches are, but

8     they have no idea what happened after they sold them.

9     There's certainly information that's available to that.

10          The, the recall letters, the letters that individuals

11     received didn't materialize out of thin air.  The batches

12     are required to be maintained.  The batches are required to

13     be followed, the lot numbers through the path of

14     distribution.

15          And for the defendants simply to say, "We're going

16     to -- we suggest that you try to start climbing this hill

17     from the bottom up and that's the only way to do it," that's

18     not right.

19          The, the batches can be traced from the point of

20     origin.  And the reluctance of the defendants to do that is,

21     is, is a reluctance borne I suggest not of impossibility,

22     but simply of a desire to push the, push, push the discovery

23     burden that is theirs to produce information that's known to

24     them, to simply push that onto the, to the plaintiff to

25     wander around trying to find it out.

1          JUDGE STANLEY:  Why, why would Mylan have

2     information on Wal-Mart's distribution practices?

3          MR. WILLIAMSON:  Because -- may I supplement that,

4     Judge?  I think Mr. Blizzard may be the right person to ask

5     that question to because there are a ton of regulatory

6     requirements about how you trace and keep up with

7     prescription drugs.  And, quite frankly, I think he's more

8     familiar with that aspect of it than I am.

9          JUDGE STANLEY:  Well, it seems to me when you've

10    got an independent third party, then the person with the

11    burden of proof should go to the independent third party to

12    find out what information they have about the case.

13         MR. WILLIAMSON:  But -- may I respectfully

14    supplement that comment, Your Honor, that there's nothing

15    wrong with going to the independent third party, but I

16    should also be able to go directly to the horse's mouth,

17    namely the defendant, and say, "What information do you have

18    about how your pills got to Houston, Texas?"

19         Even -- for that matter, even if their answer is, "We

20    have no information whatsoever," I guess that could be their

21    answer.  I really -- I will say, given the federal

22    regulatory scheme regarding tracking, I find it very

23    difficult to believe that that will be the answer, that, "We

24    have no earthly idea whether our pills end up in Houston,

25    Texas, or not."  I really find that difficult to believe

1    that will be their sworn answer under oath.

2          MR. THOMPSON:  Well, Judge, let me —— I'll just

3    briefly respond.  If that is a complete response to our

4    inquiry —— if the answer is, "We do not know what happened

5    to the pills after they left our control," if that is a

6    complete response and it's forwarded to us in that form,

7    then we will start climbing the mountain from the bottom up.

8          But if it turns out that that information is known to,

9    that that information is known, then we will be back in

10   front of you with that information.

11         MR. WILLIAMSON:  For example, as Mr. Bell just

12   handed me a note suggesting, you know, if there's some

13   agreement in place between Wal—Mart —— what agreements are

14   in place between Little Rock where Wal—Mart's stationed and

15   Mylan in regard to keeping up with that tracking and tracing

16   data?  I don't —— Mylan can answer that question in one

17   deposition for me.

18         Now, my interest is Houston, Texas.  I mean, I'm trying

19   to make sure I stay focused there so I don't intrude upon

20   your province for managing the entire litigation.

21         JUDGE STANLEY:  Right.

22         MR. WILLIAMSON:  But how those pills get to

23   Houston is, is a question they can answer, and how those

24   pills get to Wal—Mart and how they get to St. Luke's.  Even

25   if they didn't directly sell them to St. Luke's, they

1    probably know how they got there.

2           JUDGE STANLEY:  We are past the time for Judge

3    Goodwin to come on the bench.  So, let me find out if the

4    defense has anything more you want to say about this.

5           MR. MORIARTY:  I do.

6       Mr. Williamson has said he could have taken care of

7    this with a couple of depositions.  The problem when you

8    read all the exhibits to this is that these are the very

9    same depositions the PSC has asked for.

10      So, in trying to coordinate the PSC with Mr. Williamson

11   and do what all the foundational orders in this case want,

12   including the *Manual for Complex Litigation* is to avoid

13   duplicate depositions, that's what we were trying to

14   coordinate.  To turn this into a motion to compel is

15   inappropriate.

16      Now, the recall letters -- I would find it stunning if

17   a plaintiff's lawyer could produce to us a recall letter on

18   Mylan or Actavis letterhead.  They would probably notice

19   that their recall letters came on Wal-Mart stationery or CVS

20   Caremark stationery because CVS Caremark knows who their

21   customers are.  Mylan and Actavis do not know who the

22   customers of those pharmacies are.

23      And, finally, Interrogatory Number 1.  Now, maybe Mr.

24   Williamson was not referring to Actavis when he said "they."

25   "Please state whether you sold or supplied any Digitek to

1  St. Luke's from January 1, 2006, through April 25th, 2008,

2  and, if so, the lot, batch, or NDC numbers."

3      Our answer:  "No, Actavis Totowa did not sell or

4  distribute Digitek to health care providers, retailers,

5  hospitals or consumers."

6      I've told this story dozens of times to dozens of

7  plaintiffs' lawyers.

8          MS. MCDONOUGH:  Your Honor, just very briefly, a

9  couple of quick things.

10     The regulatory requirement is that anyone in the supply

11 chain know who their predecessor is and their successor.

12 They do not have an obligation currently under the

13 regulatory scheme to know every successor, successor,

14 successor.

15     So, we do have the records that show we get product

16 from Actavis and who we distribute it to.  And those have

17 been produced.

18     I think the disconnect here is the order and the manner

19 in which the discovery was propounded.  First, we get an

20 informal letter on September 9th asking about this.  And we

21 responded that we do not distribute directly to St. Luke's

22 or to ultimate pharmacies.

23     Then there was written discovery on October 2nd with

24 the interrogatories, requests for admissions, and RFPs.  We

25 responded to those timely, and to this day still have not

1    gotten any response saying there was any deficiency in those

2    productions.  But only a few days after the written

3    discovery was the 30(b)(6) notice filed which was largely

4    duplicative of the documents and responses that we were

5    already preparing for the written discovery.

6         And then only a week after that, the motion to compel

7    was filed without, you know, any deficiencies being noted,

8    again prematurely.

9         So, all of this has kind of come at a strange juncture.

10   But then on October 21st we first got these objections to

11   the notice, and then here we are.

12        But I think what's happened is that this has not gone

13   in the right order.  I suspect many of the answers to these

14   questions are in the documents that have been produced.

15        And I also think this may be inappropriately an attempt

16   to shift their burden of establishing their chain onto us.

17   And we really can't do that, nor would it be proper for us

18   to do that.

19             JUDGE STANLEY:  Thank you.

20             MR. WILLIAMSON:  The timing, Judge, is a result

21   of -- I'm under deadlines to finish my discovery.

22             JUDGE STANLEY:  I know you are.  And, of course,

23   deadlines keep shifting.

24        Are we ready for Judge Goodwin?

25             MR. MORIARTY:  Yes, Your Honor.

1          (Pause)

2          JUDGE GOODWIN:  Good morning, everyone.  Good

3     morning to those who have joined us by conference call.

4     This is Judge Goodwin.  I'm here with Judge Stanley.  We're

5     going to start at the top of the agenda, which is the

6     confirmation of the new deadlines.

7          Do the parties have anything to say about that?

8          I -- yes.

9          MR. THOMPSON:  Judge, I will point out that the

10     one area that we were not able to agree on is actually

11     represented, I believe, by the topic number 6, the class

12     action briefing.  So, the deadlines are comprehensive except

13     for that issue.

14          JUDGE GOODWIN:  The deadlines look fine to me.

15     I'll deal with the class action stuff as a separate agenda

16     item.

17          The -- I would note that Judge Moats, Judge Moss, Judge

18     Martinotti, and Judge Hahn have all been contacted and we're

19     setting up a conference call with them and with Kim Fields

20     and with Judge Stanley within the next 10 days.  Probably

21     it's going to be after Thanksgiving now.  We're going to

22     talk about joint briefing schedules and a joint *Daubert*

23     hearing.

24          If I am correct, and counsel can tell me that if I am,

25     that Judge Moss is the only state judge so far that has

1    issued a detailed scheduling order for discovery and trial.

2          MR. DEAN:  You're absolutely correct, Your Honor.

3    Maybe Mr. Moriarty wants to correct me on that.

4          MR. MORIARTY:  There is one in West Virginia that

5    tracks the MDL, and we are -- I think we're in the

6    process -- I'm sorry, Your Honor.  I've got paper all over

7    my lap.

8          JUDGE GOODWIN:  That's all right.

9          MR. MORIARTY:  We're in the process of submitting

10   a revision of that which tracks, I think it's PTO 45,

11   whatever the new revisions to the MDL dates are.

12         JUDGE GOODWIN:  All right.  Thank you.

13      Anything else on the new deadlines?

14      The trial selection process and some of the ancillary

15   issues, I understood since we were going to talk about this

16   some time ago that we're going to deal with this today and

17   counsel are prepared to go forward on that.  Is that right?

18         MR. THOMPSON:  Your Honor, I have in the courtroom

19   with me, if I could take a moment to introduce several

20   people.

21         JUDGE GOODWIN:  Yes.

22         MR. THOMPSON:  There are several attorneys who

23   have cases on the, for nomination.  And at the appropriate

24   time, if you desire, they're certainly available to answer

25   any questions that the bench may have.

1       Mr. Williamson is here, Jimmy Williamson.  Edward

2   Blizzard is present.

3           MR. BLIZZARD:  Good morning, Your Honor.

4           MR. THOMPSON:  Shamus Mulderig is here.  Don

5   Ledgard is here.  Don Ernst is a California attorney, and my

6   understanding is he's participating by telephone.  I had

7   admonished everybody not to talk.  But, Don, if you're --

8           JUDGE GOODWIN:  Mr. Ernst, are you there?

9           MR. ERNST:  Good morning, Your Honor.  I am.

10          JUDGE GOODWIN:  Nice to have you with us.

11          MR. ERNST:  I wish I could be there in person.  I

12  apologize, Your Honor.

13          JUDGE GOODWIN:  I'm glad to have you here in

14  virtual reality.

15          MR. THOMPSON:  And, of course, we have -- of

16  course, we have a case ourselves at Motley Rice.

17      I believe Cayce Peterson is also on the telephone who

18  has one of the cases to be reviewed.

19      Your Honor, we're certainly at your pleasure as to --

20  we've submitted some information.  I know that the

21  defendants have forwarded some information to the, to the

22  Court.  The -- we're certainly -- it's one of those things

23  where you almost feel as though you should not advocate a

24  batting order.  And, so, we are at your pleasure, any

25  questions that you may have with regard to the cases.

1        I know that I have several attorneys who are ready and

2   eager to be the first case.  If you wanted that information,

3   we could certainly forward that to you.

4        One of the issues that -- I don't know if you're going

5   to address it.  Maybe I should sit back and wait to see if

6   you address it.  But one of the issues, of course, is the

7   *Lexicon* and the trial forum, the physical location of the

8   trial.

9        These cases are four plaintiffs from several different

10   areas in the country.  And certainly our perspective is that

11   if this Court wants to pick a case that, wants to pick a

12   case, we are certainly going to conform to the Court's

13   desire.  If you want us to waive that *Lexicon*, we certainly

14   will.

15        JUDGE GOODWIN:  Well, that will be, that will be

16   something we have to do if we're going to do these benchmark

17   cases.  We're either going to have to waive it or I'm going

18   to have to go to the trouble, which I can do, of getting the

19   chief judges of the circuits to designate me to go down

20   there, get it transferred to me, and go to some other state

21   and hear the case which, which I, which I can do.  And I'd

22   prefer not to travel all over the country to hear these

23   cases.  I prefer to follow Judge Fallon's lead and see if we

24   can't get them here mostly.

25        MR. THOMPSON:  Well, now, Judge, a couple of these

1    cases are in places that when I heard about it, I said, you

2    know, we may have a situation where the judge maybe wants to

3    go.  Apparently, one is a courthouse at Yosemite Valley in

4    California.  When I saw that, I said maybe I should advocate

5    that one.  Anyway, thank you.

6          JUDGE GOODWIN:  In the pre-trial orders I

7    anticipated that you were perfectly entitled to advocate for

8    any particular case out of what was at that time thought to

9    be ten, but now it's seven, and for the order in which you

10   want to try them for that matter.  I am, pursuant to the

11   earlier orders, going to reduce it to five and I will set a

12   trial order.

13        But as I understand it, Mr. Moriarty has a, has a

14   presentation he wishes to make.  But I wanted to give you a

15   chance to go first, if you wanted to, with regard to any

16   preferences and reasons for your preferences.

17         MR. THOMPSON:  Judge, I -- this is one of these

18   times where I should have showed up with plan B and I should

19   have been better prepared.

20         JUDGE GOODWIN:  I have your, I have your letter.

21         MR. THOMPSON:  And we have set out in the letter

22   the basic facts.  If the Court would find it convenient for

23   us to project a trial order and to rank them, I really would

24   request that you give me a short opportunity to confer with

25   my trial counsel to make sure that I have, if not consensus,

1  at least general agreement amongst ourselves.  And I

2  apologize.  That's, like I say, --

3          JUDGE GOODWIN:  I'll be happy to do that.

4  I'm glad, Mr. Thompson, that you were able to get some help

5  today and bring these fine lawyers in to help you.

6          MR. THOMPSON:  Well, as a matter of fact, now that

7  I'm standing here, I should sit down and not say another

8  word.  I should just let these guys come and carry the ball

9  for me.

10         JUDGE GOODWIN:  Thank you.  Actually, I understand

11  we have visual aids.  Is that right?

12         MR. MORIARTY:  We do.

13         JUDGE GOODWIN:  All right.

14         MR. MORIARTY:  If they work.  It's always a

15  challenge.

16     As you said, there are seven cases remaining; five from

17  the plaintiffs, two from us.  The question is whether they

18  are all representative.

19         JUDGE GOODWIN:  Let me interrupt you.  I think

20  there's a problem with that, with them being representative.

21  I do.  With the number of death cases we have, with the

22  product ID, I see the problems involved.  Nevertheless,

23  these are the cases that were selected.

24     To the extent -- and I'm just adding something here.

25  To the extent that defense counsel chose the cases that fell

1   out because they didn't have merit, you proved that point.

2   That is proved just as well as if you took it to trial and

3   got a verdict.  So, to that extent, they're representative

4   of the cases that are no good.

5       I, I'm not, I'm not going to interrupt your

6   presentation anymore.  I'm just telling you I do appreciate

7   the problems that I'm left with with the seven I've got to

8   choose from.

9           MR. MORIARTY:  All right.  I have hard copies of

10  this.  If you wanted to take notes directly on it, I'm happy

11  to give that to you.

12          JUDGE GOODWIN:  To the extent I ever take notes, I

13  will.

14          MR. MORIARTY:  So, let's get to the basic --

15          JUDGE GOODWIN:  One last interruption and then I

16  won't do it anymore.

17      Gentlemen, benches in the courtroom are hard.  You're

18  welcome to come sit in the jury box.

19      Kim, you're welcome to come up and sit in a soft chair

20  as well.  That includes you, Mr. Tiano.  You were a member

21  of the bar last time I checked.

22      All right, I'll try to restrain myself.

23          MR. MORIARTY:  So, we have looked at the *Annotated*

24  *Manual for Complex Litigation*, several cases, and some

25  treatises.  And, and here are some words that jump out.

1          JUDGE GOODWIN:  Go ahead.

2          MR. MORIARTY:  Representative, typical, the case

3    should have an ascertainment function for settlement

4    purposes or to answer troubling questions that are common to

5    a universe, accurately inform future trends, avoid trying

6    anomalous cases, and archetype.  Those are really what the

7    standards are.

8       But I actually kind of like -- I'll get to it in a

9    minute how the plaintiffs feel about this.  These are the

10   four cases --

11         JUDGE GOODWIN:  The people on the phone can't hear

12   the attorneys.  Would you pull that microphone in front of

13   you a little closer.  Is it turned on as well?

14         MR. MORIARTY:  I don't know the answer to this,

15   Your Honor.

16         JUDGE GOODWIN:  Yes, it is.

17         MR. MORIARTY:  Okay.  So, there are four cases

18   that we think among this group of seven are representative

19   and can go in the trial group.

20      One is the Young case from North Carolina; the Luce

21   case, which is Mr. Thompson's case; the Klopping case, which

22   I believe is Mr. Ledgard's case; and the Gilmore case.  And,

23   you know, why.  Geography.  They're diverse.

24      We've got somebody -- you know, you've got the extreme

25   ranges of age here; somebody in their 40s, 60s, 70s, 80s.

1    We've got -- you know, because of the way the group got

2    reduced from ten to seven, we do have sort of an overlay in

3    death.  So, we have a personal injury case in here.

4         And then as far as elevated levels and clinical

5    diagnoses is concerned, those are now things that have

6    started to rise into a higher frequency.

7         Not on this schedule is the diseases that these people

8    had.  We've got Young who was an atrial fibrillation only

9    patient.  You've got Ms. Luce who was a congestive heart

10   failure only patient.  And then Klopping and Gilmore had a

11   little bit of each.  So, you have some disease spread among

12   these.

13        And then:  Is there any special problem with the case

14   that would disqualify it?  And the answer in each is "no."

15        In the Young case, it's sort of typical of the vague

16   comorbidities that a number of people have that I tried to

17   point out on July 22nd when I was here with our

18   presentation.  And it's also a transient injury case,

19   obviously, because it didn't lead to death.

20        So, the patient had an elevated level for a few days,

21   and then moves on and doesn't have long -- at least from our

22   view of the case, doesn't have long-term impact, which is

23   representative of a substantial part of the docket here.

24        The Luce case also has both doses, the .125 and the

25   .250, at different times in her medication history.  And

1    it's an excellent representative example of the renal

2    disease issue that I talked about as predominating

3    throughout the docket back at the July 22nd hearing.

4        The Klopping case also has both doses, the .125 and the

5    .250.  And, of course, he's unlike somebody like Ms.

6    Gilmore.  Mr. Klopping is a substantially younger patient

7    with a lot of comorbidities.

8        And although, you know, there aren't a lot of people in

9    their 40s with as many comorbidities as he has, people in

10   their 50s with those comorbidities, so he's representative

11   of that classification.

12       And then Ms. Gilmore is -- you know, you might think

13   that she's 83.  How many of those are there?  Surprisingly,

14   there are a substantial number of patients in their 80s in

15   the docket.  She's representative of that group, multiple

16   comorbidities.  And she also has the renal disease issue

17   that is very important throughout these cases.

18       So, which three do we think should be knocked out?  Two

19   of them are not representative for various reasons, and one

20   is deficient.  And just so Mr. Blizzard knows, the

21   deficiency is not his problem.  It is a problem beyond the

22   control of the lawyers.  That's the Kelch case.

23       So, here's Mr. Thompson explaining what he thinks in

24   July is what a representative case should be and not be.

25   And he was talking about one of our defense selections at

1    the time, but he made some excellent comments which apply

2    today.  And it was a case with a very sharp credibility

3    dispute between what a doctor said in the records and what

4    the patient was going to testify to.

5         And, so, he uses the language:  "That is a very

6    interesting factual departure.  Who's telling the truth?  Is

7    it the medical record or is it the patient?  However the

8    jury answers that question doesn't push the litigation down

9    the road."

10        It harkens back to the slide I had up earlier with the

11   standards where it's sort of a, you know, an interesting

12   factual question, but doesn't serve to inform future trends.

13   It's a confounder.  It's a side issue.  But, unfortunately,

14   it's not going to help value cases.  And that's what we have

15   here in two of them.

16        This is a slide that I used in July.  This is the exact

17   same slide except I highlighted the McCornack and

18   Rivera-Vega cases in red on this slide because back at

19   pages, you know, a number of pages in the transcript -- I

20   looked these up -- we objected to these two cases for a

21   number of reasons at the time because they were procedurally

22   deficient.  Those have become not procedurally deficient,

23   but they have shown themselves to be not representative.

24        And, in fact, at Pages 10 to 12 of that transcript when

25   Mr. Thompson was urging these cases be brought to the Court,

1    he wasn't urging them as representative cases of the docket.

2    He was singing the praises of the lawyers who I have come to

3    know as quality lawyers.  So, he was singing their praises

4    with the reason for their lawyerly skills, but not for the

5    representation of these cases.

6        So, why, in our view, is the Vega case not typical?

7        As far as this docket is concerned, she is at the

8    extreme end of the young range.  She has a heart disease

9    that is very atypical of this.  As Mr. Williamson mentioned,

10   it's called peripartum cardiomyopathy.  It is pregnancy

11   induced.

12       So, women who get this disease -- and it's very rare.

13   One in 4,000 or more could have it.  It's quite serious and

14   it has a high fatality rate.

15       At the time of the incidents that lead us to this

16   lawsuit, she was in what her doctor calls bridge to

17   transplant therapy.  In other words, he was, through medical

18   management and surgical management, preparing her for a

19   heart transplant.

20       He had counseled her heavily to lose weight.  She

21   couldn't.  So, she had bariatric surgery in order to qualify

22   for the transplant list.  She was on home IV therapy with

23   drugs to control her heart failure, her heart rate.  And

24   then ultimately she gets this LVAD, left ventricular assist

25   device, in the key time period that the case has to do with.

1       The medical records have no contemporaneous recorded

2   suspicion or diagnosis of digoxin toxicity, the records all

3   these famous doctors in Houston wrote at the time, not a

4   single one of them.  And the two key levels were 1.2 which

5   are well within the lab parameters of almost every lab in

6   the country of .8 to 2.  And, in fact, those are the lab

7   parameters at St. Luke's.

8       The death certificate which was written five months

9   after the recall is silent on digoxin issues.  But during

10  his deposition, Mrs. Vega's treating cardiologist

11  retrospectively recognizes some signal arising out of these

12  1.2 levels in a period of time when he recognized no

13  problem, and then blamed defective Digitek for Mrs. Vega's

14  death.

15      Serious, serious credibility issue ringing back to Mr.

16  Thompson's comments, interesting case to try; certainly high

17  stakes because her medical bills probably exceed a million

18  dollars, but not exactly representative on archetype or

19  informing of future trends that would advance this

20  litigation to some resolution beyond slugging them out

21  one-on-one in the courtroom.

22      Then we get to the McCornack case.  This is Mr. Ernst's

23  case.  It's a sudden death case, no medical care for months

24  prior to the death.  Why is that different?  Why is it

25  atypical?

1      Because in almost every case that I've looked at, if

2   not every case, we have medical records in the days and

3   weeks preceding the patient's adverse outcome, whatever that

4   may be, which people can rely on.  This is absolutely

5   sudden, out of the blue, middle of the night, no medical

6   care prior to death.

7      Their entire case, I might say, in our estimation is

8   founded on this post-mortem digoxin blood sample.  I don't

9   need to get into the scientific controversy surrounding

10  post-mortem levels at this point.  It's a very serious

11  issue.  But I can say that there are few, if not any, other

12  cases that I'm aware of in the MDL that have post-mortem

13  blood levels.

14     So, the coroner sent the blood sample to his chosen

15  laboratory within days of Mr. McCornack's death.  He

16  selected that laboratory because they have a heavyweight

17  reputation.  He drafted an autopsy and a death certificate

18  within a month or so of Mr. McCornack's death, and ascribes

19  the whole thing to natural causes, arrhythmia in the middle

20  of the night, and sent the blood sample back in June of 2008

21  with this 3.6 blood level.

22     And what happens after that?  Plaintiff's counsel

23  retains Dr. Mason as an expert witness in May of this year,

24  about a year after the death certificate.  We deposed the

25  NMS laboratories that Dr. Mason thought so highly of, and

1    questioned extensively about the significance and

2    reliability of a 3.6 in predicting backwards what the level

3    was at the time of the death because this is such an

4    important issue.

5         And then days later, virtually went from Philadelphia

6    to San Jose, California, to depose this coroner.  And what

7    am I greeted with when I walk in the door but an amended

8    death certificate and autopsy 18 months after the death, 15

9    months after he's got these results, and he changes the

10   diagnosis to be digoxin related death -- okay -- five

11   minutes before the deposition is to begin.

12        He, when I questioned him, knew nothing about what his

13   own chosen laboratory forensic toxicologist said about the

14   reliability of that level.  And he puts all of his eggs in

15   that particular basket to prove their case.

16        So, serious, serious credibility issues that we don't

17   think inform future trends or mean anything to the overall

18   docket in this case.  This is an anomalous case that should

19   not be in the first group.

20        And then why is, why is Kelch deficient?  There have

21   been a number of delays getting deposition dates, locating

22   witnesses, producing records.  We have found new things all

23   along the way.  And that leads up to a reason to defer this

24   case.

25        And in looking back at the July 22nd transcript, there

1    was an extensive back and forth about whether cases that

2    were then deficient would be brought up to speed, and what

3    would happen to those cases if they weren't ready and we

4    didn't have all the things.  And it was clear from Your

5    Honors that those cases were going to drop off and be put in

6    the second group.

7         Just a few weeks ago there was a deposition where at

8    some point around the time of the deposition they found two

9    new volumes of the Mammoth Hospital charts that had been

10   stored at an off-site facility.

11        They postponed the deposition.  One of my colleagues

12   and Mr. Blizzard were out in California.  They postponed

13   this deposition until January to deal with the fact that

14   they had these new records.

15        Just two days ago we got -- we're trying to compare

16   page by page how many new records.  It's somewhere between

17   529 and 694 new pages just of hospital records in that case

18   two days ago.

19        We are still waiting for depositions of one of the

20   sons, one of the treating pulmonologists, a pharmacist.  A

21   Dr. Prothro is difficult to find.  There are additional

22   physician and billing details.  There is a dispute over the

23   existence of family notes.

24        The plaintiffs -- a doctor said, "I was shown family

25   notes."  Plaintiffs contend there are no such family notes.

1   They think it was an emergency room note.  We think there

2   may be family notes.  So, we're having a tussle over that.

3        We have found new providers.  A recently deposed doctor

4   said, "Oh, yeah, there was another cardiologist in some

5   other city in Nevada or northern California."  We're trying

6   to track those down.

7        And I think when you start adding these things up,

8   every time you get new records, every time you get a new

9   provider, it opens the door for there being even more things

10  to find.

11       This is actually a rather medically perplexing case.

12  So, having all the records and all these depositions is

13  quite important, which leads me back to this slide.

14       Young, Luce.  I think Young is Mr. Mulderig's case if

15  I'm not mistaken.  He's here today.  Luce is Fred's case.

16  Klopping, as I said, is Mr. Ledgard's case.  And the Gilmore

17  case, I'm sorry, I don't recall.

18            MR. LEDGARD:  That is my case, Gilmore.

19            MR. MORIARTY:  Oh, Gilmore is yours and Klopping?

20            MR. LEDGARD:  Not Klopping.

21            MR. MORIARTY:  Okay.  I'm sorry.  I flip-flopped

22  those.

23            MR. ERNST:  Lambert & Nelson represents

24  Mr. Klopping, not Mr. Ledgard.

25            MR. MORIARTY:  Okay.  I'm sorry.  I flip-flopped

1   those.  Mr. Ledgard is the Gilmore case.  These are the

2   cases that we think are the most representative.  I guess if

3   Mr. Thompson advocates for his case to come to the top, it's

4   very hard for me to prioritize these.  I would probably put

5   Klopping ahead of Gilmore.  But as to the plaintiffs' two

6   selections, I'm not even going to try to rank them.  I'm

7   happy to answer any questions about any of these cases or

8   the legal standards for representative.

9          JUDGE GOODWIN:  Just a comment.  I'm going to have

10  Mr. Thompson respond and then go back to you.

11      The entire process was designed to have counsel choose

12  a group of cases which on each side they thought would meet

13  the criteria from the manual and from our earlier

14  discussions.  It really does us no good to try cases that

15  are not meaningful to both sides.  It really does very

16  little good.  All it means is we'll try more cases until we

17  finally get enough tried that somebody gets an idea what's

18  going on.

19      So, what I'm trying to do is try the first batch of

20  five and do as well as I can to inform plaintiffs' counsel

21  throughout the country and defense counsel as to what these

22  cases are about.  And I think that's what we've known all

23  along was the purpose of the exercise.

24      And I emphasize again, I absolutely enjoy trying cases.

25  I'm happy to start and I'll keep trying them as long as you

1   want me to.  And I will, to the best of my ability,

2   encourage and beg, if necessary, that each of the cases be

3   transferred to me, that I be transferred to that district

4   for the purpose of trying a case.  And I'll try it and move

5   on to the next one.

6        And however long it takes, that's how long I'll do it.

7   I have no problem with that.  I like to travel.  I don't

8   mind hotel rooms.  So, whatever it takes, that's what we're

9   going to do.

10       Mr. Thompson.

11            MR. THOMPSON:  Your Honor, just let me start by

12   saying that to the extent that Mr. Moriarty's presentation

13   identified the most dynamic plaintiffs' lawyers, my feelings

14   are hurt that he's forwarded me as the case that probably

15   ought to go first.  So, my feelings are, are actually kind

16   of, kind of hurt.

17       But the -- one of the slides that he produced was the

18   slide from July where we did indicate that one of the

19   factors that should be part of the Court's thought process

20   is the zealous representation.  I would say that certainly

21   the Kelch case with Ed Blizzard, that laundry list of, of

22   deficiencies, if we think through what PTO 16 calls for, we

23   are in the process of something called basic fact discovery

24   which the, the, the PTO actually calls it the plaintiff and

25   treating physicians, which gives us a thumbnail of the case

1    sufficient to pick the active trial cases.  And then at that

2    point, there is anticipated to be a discovery period.  And

3    the trial date for this case is actually January of 2011.

4         So, it's difficult to talk about a case where there's

5    been a little bit of difficulty getting some hospital

6    records impacting a trial date of January of 2011.

7         And let me say that -- certainly, Mr. Blizzard can

8    speak for himself as to, to the, the weight that ought to be

9    given to these deficiencies, but we actually view the Kelch

10   case as a very evocative case.

11        And the reason for that is that really, although the

12   facts from case to case will vary, and although the, the

13   impairments of the person are very important because you

14   don't take Digitek -- you don't take digoxin unless you have

15   an underlying health condition that requires it.

16        And, so, the range of ages -- we embrace the health

17   difficulties that people have because to the extent that you

18   lack a residual reserve, the brittleness of the dosage

19   becomes much more tenuous, and you are impacted by

20   variations much more than somebody who is very vigorous and

21   may have residuals.

22        So, we embrace the age.  We embrace the underlying

23   disease process.  Those are people who use digoxin.  And,

24   so, that's part of the process.

25        I will say that -- and, here again, let me reserve the

1   opportunity to consult with my trial attorneys to make sure

2   that I don't cross them by giving you a proposed order of

3   cases.  But I do believe that three cases that Mr. Moriarty

4   has pointed out, the common thread that they share is that

5   each of those cases has a very vigorous, very highly

6   motivated, and very excellent attorney who is going to put

7   forward the case in the strongest terms.

8        And now I finally remember my point that I got off of.

9   My point is that the key question in this case is:  Can the

10  plaintiff prove that a digoxin pill that varied from, from,

11  that was defective in a legal sense, can they prove that

12  that defective pill reached the plaintiff, and that the

13  defect was of such a quality and nature that it most

14  probably or more probably than not or, or was a substantial

15  contributing factor.

16       I mean, we can go from state to state picking out the

17  legal standard, but did that pill contribute to the injury

18  in a, in a legal sense.  And every one of these cases has

19  that issue tied up in it.

20       And my suggestion is that if we're going to take three

21  to four weeks of the Court's time -- well, it's not, but it

22  could be.  If we're going to take two to three weeks of the

23  Court's time to, and the judicial resources to put a case in

24  front of it, it ought to be a case that's worthy of the

25  expenditure of effort.

1      And, so, I don't think that the cases that are being

2   pointed out, particularly the Vega case and the McCornack

3   case, I don't think that those should be ruled out simply

4   because the, the claimant, the plaintiff has a major health

5   defect or a major situation.

6      The cases -- the key question to be answered is:  Can

7   the plaintiff convince the jury that a defective pill was

8   ingested and caused the health defect that we claim.  And

9   that is a common question through all seven of these cases.

10      Now, we do have a pecking order.  I would -- and I

11   don't want to belabor the point.  I would like a short

12   opportunity to -- you know, unlike the defendants, I have a

13   very unruly crowd over here and I need to make sure that I,

14   I'm square with them.

15          JUDGE GOODWIN:  Mr. Thompson, we'll take a

16   15-minute break, allow everybody a chance to relax, and you

17   can confer with your co-counsel.  Then you can finish your

18   remarks.

19      Court will stand in recess for 15 minutes.

20      (Recess taken from 11:05 a.m. until 11:25 a.m.)

21          JUDGE GOODWIN:  All right, Mr. Thompson.

22          MR. THOMPSON:  Just very briefly at the outset,

23   let me respond specifically to your request that we rank

24   our, the seven cases.

25      We rank them, number one, McCornack; number two, Vega;

1   number three, Kelch; number four, Luce; number five,

2   Gilmore; number six, Young; and number seven, Klopping.

3        I have several attorneys who traveled a distance and

4   who are intimately familiar with some of the facts in the

5   case and some of the issues that were raised by Mr. Moriarty

6   in his presentation, and I specifically would like to ask

7   the Court's indulgence to hear briefly from Mr. Blizzard

8   with regard to the Kelch case if that's okay.

9            JUDGE GOODWIN:  That's all right.  Yes, that's

10  okay.  Yes, sir.

11           MR. BLIZZARD:  Good morning, Your Honor.

12           JUDGE GOODWIN:  Good morning.

13           MR. BLIZZARD:  Should I speak from the podium?

14           JUDGE GOODWIN:  If you like, whatever is

15  convenient for you.

16           MR. BLIZZARD:  Your Honor, my name is Ed Blizzard.

17  I'm a lawyer from Houston and --

18           JUDGE GOODWIN:  Do you have any trouble coming to

19  West Virginia to try your case?

20           MR. BLIZZARD:  I do not.  I do not, Your Honor.

21           JUDGE GOODWIN:  All right.

22           MR. BLIZZARD:  And I -- Mr. Thompson has been very

23  kind in his discussion by saying that I'm a zealous

24  advocate, but I'm going to start out by disproving that

25  because --

1          JUDGE GOODWIN:  Can the people on the phones hear

2     the lawyers?

3          MR. ERNST:  Yes, Your Honor.

4          JUDGE GOODWIN:  All right.  Mr. Blizzard, go

5     ahead.

6          MR. BLIZZARD:  I just want to start out with an

7     admission.  Bonnie Kelch's case is not a perfect case.  And,

8     so, the phrase that's rattling around in my head is:  Be

9     careful what you ask for.  They've -- because you might just

10    get it.  You know, they've asked that my case be put off.

11    It's not perfect, but it's a good case and I think it's

12    representative.

13         The Kelch family is who I represent.  Bonnie died

14    February 25th of 2007.  She did -- she lived in Mammoth,

15    California, with her husband who she was married to for 58

16    years, and they have five adult children.

17         She went into the hospital in January of 2007 with a GI

18    bleed.  She had pre-existing atrial fibrillation.  And she

19    was treated while she was in the hospital with digoxin, not

20    Digitek, the Digitek brand, but digoxin.

21         When she was discharged from the hospital, she was

22    stable and her renal function was normal.  She had been

23    treated in the hospital with another drug that can interact

24    with digoxin and raise the digoxin level.  It was called

25    Amiodarone.

 1          JUDGE GOODWIN:  We're having some problems with

 2    noise on the phones.  I don't know if any of the lawyers can

 3    be of assistance to me in that regard.

 4          MR. DEAN:  Your Honor, you might ask them to put

 5    their phones on mute.

 6          JUDGE GOODWIN:  If you could put your phones on

 7    mute so that we can't hear your end of it, I would

 8    appreciate it.

 9       Go ahead, Mr. Blizzard.

10          MR. BLIZZARD:  Okay.  So, however, during the

11    hospitalization, her levels of digoxin were within the

12    therapeutic range, which is from .8 to 2.0.  And, so,

13    everything was normal until she was discharged from the

14    hospital and she began taking Digitek.

15       She began taking Digitek immediately after her

16    discharge from the hospital on February 9th.  And when she

17    returned to the hospital on February 21st, her Digitek level

18    was a staggering 9.6.  And she died two days -- she died on

19    the 25th.  I'm sorry.  I misstated that.  She came back to

20    the hospital on, I believe on the 23rd.  She died two days

21    later from multiple organ failure.

22       Her physicians, the ER physician there and the treating

23    cardiologist have both been deposed.  And both say that they

24    believe that digoxin toxicity was a substantial contributing

25    factor to her death.  That's also confirmed by the medical

1   records that were prepared at the time, as well as the death

2   certificate has digoxin toxicity as a substantial

3   contributing factor to death.

4        Ms. Kelch -- here's some of the imperfections.  She

5   wasn't in perfect health.  She had congestive heart failure.

6   She had coronary artery disease.  She had past experiences

7   with TIAs.  And there are some -- you know, the defense has

8   taken the position that she didn't actually die from digoxin

9   toxicity, but she died from DVT.

10       So, there are defense medical arguments.  We actually

11  have a very good expert, one of the renown, world renown

12  cardiologists, Dr. Zipes, who will be our expert in the

13  case.  And we also have several treating physicians who

14  support our position that Ms. Kelch's death was caused by a

15  bad pill and digoxin toxicity.

16       So, that's a brief summary of our case, Your Honor.  If

17  you have any questions of me, I'd be happy to answer them if

18  I have the information.  And if I don't have the

19  information, I'll be able to get it for the Court.

20            JUDGE GOODWIN:  Thank you, Mr. Blizzard.

21            MR. BLIZZARD:  Thank you.

22            JUDGE STANLEY:  I had one question for Mr.

23  Blizzard.

24            JUDGE GOODWIN:  I'm sorry.

25            JUDGE STANLEY:  The letter on Mr. Thompson's

1    stationery dated November 17th which discusses this case --

2             MR. BLIZZARD:  Yes.

3             JUDGE STANLEY:  -- says that she filled a

4    prescription at Rite-Aid, and that the pharmacy records

5    confirm that that Rite-Aid prescription was part of the

6    recall.

7             MR. BLIZZARD:  Yes.

8             JUDGE STANLEY:  But it's not clear to me whether

9    the Digitek that she took after she got out, is that what

10   you're speaking of?

11            MR. BLIZZARD:  Yes.  She, she went to Rite-Aid

12   following her discharge from the hospital and received

13   Digitek which was part of the national recall.  We have the

14   NDC numbers.

15       Now, we have some of the same tracing issues that were

16   discussed earlier with Your Honor that we've, we've sent

17   interrogatories to them.  And we've had the same discussion

18   with Mr. Moriarty about trying to actually trace it back to

19   a particular batch and lot.

20            JUDGE STANLEY:  So, she got some Digitek in the

21   hospital that was not part of the recall, and she got some

22   digoxin from Rite-Aid that was part of the recall.

23            MR. BLIZZARD:  Actually, Your Honor, not quite.

24   She received some other digoxin.  It wasn't the Digitek

25   brand.  Digoxin is -- or digitalis, as it's sometimes

1    called, is made by several different manufacturers.  She did

2    not receive Digitek made by Actavis and distributed by Mylan

3    until after her discharge from the hospital.

4            JUDGE STANLEY:  Okay.  Thank you.

5            MR. BLIZZARD:  Thank you, Your Honor.

6            JUDGE GOODWIN:  Mr. Thompson.

7        I'm sorry.  Yes, sir.

8            MR. WILLIAMSON:  May it please the Court, I'm

9    Jimmy Williamson.  I have the Vega case.  I'm the lead

10   counsel in Vega.  I would request just a couple of seconds

11   to talk about it.

12           JUDGE GOODWIN:  Absolutely.

13           MR. WILLIAMSON:  Thank you, Your Honor.

14       Your Honor, like Mr. Blizzard, Vega is not a perfect

15   case.  Unlike Mr. Blizzard, I apparently have never had a

16   perfect case.  I guess Mr. Blizzard has.

17       So, Mimi was a wife and a mother.  She led an

18   unremarkable life.  She had one child.  When she got that

19   child, she got postpartum cardiomyopathy and had congestive

20   heart failure.

21       That -- other than the fact that that's very

22   sympathetic, of course, that heart failure doesn't get

23   treated any differently than any other heart failure which,

24   of course, would be true for and representative of many

25   people who take digoxin and many people who took Digitek.

1      She was 35 years old in January of '08.  She is taking

2  Digitek.  We do have a tracking and tracing issue over that

3  issue in terms of where it came from, which is part of the

4  hearing we had this morning.  But sometime in January, '08,

5  she kind of clinically fell off the cliff.

6      Even though Mimi was in line for a heart transplant,

7  her cardiologist has said she merely did not have the

8  reservoir of strength to withstand the insult that she got

9  in January of '08.

10      Her levels of digoxin are, are lower than perhaps some

11  of these others.  For example, I noticed Ed talked about

12  9.6.  And Mimi's levels were lower than that, but I think

13  they're affiliated with increased morbidity and mortality.

14      Her problem was that her reservoir of resilience was

15  pretty small.  And, so, when she got that insult, she went

16  on a downward spiral that was truly horrific.  She

17  eventually had an artificial pump placed in her heart.  She

18  eventually had to have both her legs amputated in order to

19  improve cardiac function.  And she eventually dies in

20  September, '08, from congestive heart failure.

21      But, of course, the question becomes:  What brought on

22  that?  And my cardiologist and the doctors at the Texas

23  Heart Institute in Houston I believe are going to support

24  the fact that it was brought on by the digoxin insult.

25          JUDGE GOODWIN:  Mr. Moriarty makes an issue of the

1  post—mortem levels and says that takes it outside the

2  typical case and doesn't inform, inform as much as to

3  typical issues.

4          MR. WILLIAMSON:  I don't think that applies to my

5  case, Judge, because Mimi actually —— because of the

6  extraordinary efforts of the Heart Institute, she suffered

7  the insult in January, but she doesn't actually die until

8  September.  So ——

9          JUDGE GOODWIN:  So, he was talking about

10  McCornack?

11          MR. WILLIAMSON:  Correct.  I believe that's

12  correct, Your Honor.

13          JUDGE GOODWIN:  Okay.

14          MR. WILLIAMSON:  That's the general gist of it.

15      So, like all cases, she's representative in some ways.

16  She's not representative perfectly in every way.  But

17  certainly we are ready —— we're happy to come to West

18  Virginia and try the case.  And we're happy to defer to the

19  Court's ruling.  And we're happy —— like all plaintiffs, we

20  want to go to trial as soon as we can, but we understand the

21  Court's process.

22          JUDGE GOODWIN:  Anybody else?

23          MR. THOMPSON:  Judge, on behalf of Luce, I'll

24  stand on my, my pleadings.

25          JUDGE GOODWIN:  All right.

1       Mr. Moriarty, you may close.

2           MR. THOMPSON:  Judge, those are the -- those are

3   our proposed order.  Thank you.

4           JUDGE GOODWIN:  All right.

5           MR. MORIARTY:  Your Honor, I don't have any

6   comments about any of the cases.  I've made my points on

7   that.

8           JUDGE GOODWIN:  All right.  Do you want to write

9   briefs or do you want me just to go ahead and tell you what

10  five cases we're going to do in what order?  I know I've got

11  until December 21st, but I can make the decision today.

12          MR. THOMPSON:  Judge, you know, sometimes you'd

13  like to at least get home before the Court rules,

14  particularly where the outcome is in doubt, but certainly

15  we're at your pleasure.

16          JUDGE GOODWIN:  You know, I've worked at a law

17  firm where the partners were known to let associates wait

18  for jury verdicts.  I understand all that.

19          MR. MORIARTY:  And sometimes people traveling home

20  want to have something interesting to talk about.  So, we

21  certainly don't want to file anymore briefs.

22          JUDGE GOODWIN:  All right.  I'm going to -- these

23  are the five cases in this order:  Kelch number one; Young

24  number two; Luce number three; Klopping number four, Vega

25  number five.  The rest of them will fall to the second

1    group.  I hope that made you both equally unhappy.

2        As I understand it, our first trial is set sometime in

3    January next year.  Is that right?

4            MR. MORIARTY:  I believe it's January, 2011.

5            JUDGE GOODWIN:  2011.  We've got plenty of time to

6    get these cases ready.  That's why I wasn't too concerned

7    about your discovery issues.  And also I'm going to leave

8    that to Judge Stanley.

9        But let me just say this.  And this is more to the

10   plaintiffs than it is to the defendants.  The plaintiffs

11   have the burden of proof.  That means they have the burden

12   of going and digging out the stuff and getting the stuff

13   they need for discovery.

14       The defendants have an obligation under the rules to

15   respond fully and properly, but it is the plaintiffs' burden

16   to prove their case.  That's, I'm sure, something very new.

17   I'll -- let's see what else I had on my schedule.

18       State case coordination.  I talked about that a little

19   bit.  I'm going to have to wait until my conference call to

20   tell you more about that.  Again, I think that with the

21   state judges that we have involved, we're going to be able

22   to stay on a pretty coordinated path.  Everybody's been in

23   the mood to do that up till now.  I haven't seen anything to

24   the contrary.

25       I certainly had a nice long visit, as did Judge

1    Stanley, with Judge Moss.  And even though she's entered a

2    scheduling order that has some dates that are slightly

3    different, I think we can work all of those out.  I will be

4    communicating with them right away to let them know the five

5    cases and the order in which they're to be tried.

6        I'll just have to bring you up-to-date.  When we set

7    the dates for the next series of conferences, I'll try to,

8    by the next conference, be able to bring you up-to-date on

9    our federal-state cooperation.  I expect it to be excellent.

10   It has been so far.

11       Rule 11 motion status and relationship to the Lone Pine

12   issue.  I don't know who put that on the docket, but whoever

13   did can talk about it.

14       MR. DEAN:  I'm guilty, Your Honor.  I put it on

15   the agenda.

16       JUDGE GOODWIN:  All right.

17       MR. DEAN:  And I have a, just a few comments.

18       In PTO 43 the Court said that the plaintiffs -- that

19   the Lone Pine motion is taken under advisement pending

20   completion of the basic fact discovery in the group one

21   cases, which we are nearing that point.

22       And, so, I don't -- I'll not rehash the briefs here.

23   That's not my purpose because I do want to tell you about

24   some things in regard to Rule 11 motions in relation to the

25   Lone Pine issue, some themes that are in the brief and some

1    facts that you would not otherwise be aware of.

2        You will recall the dialogue and the discussion we had

3    about use of Rule 11 or summary judgment motions or Lone

4    Pine orders in order to get rid of cases that were wholly

5    without merit.  We have -- the defendants have filed and

6    submitted under the safe harbor provisions of Rule 11 two

7    Rule 11 motions as to which the time has come and passed.

8        And in one of those cases, the Collier (phonetic) case,

9    the plaintiff's lawyer in that case agreed to dismiss the

10   case, dismissed it with prejudice.

11       And the other case where we submitted a Rule 11 motion

12   where the time has passed is the Hebert case.  And there is

13   a pending, pending motion before the Court in the Hebert

14   case in regard to the conditions of dismissal.

15       The plaintiff's attorney in that case wants the

16   dismissal to be in such a manner as he can refile the case

17   in any court.  And the defendants would like for the

18   dismissal without prejudice to require refiling in this

19   court for all the reasons we've put in our briefs.

20       I think that the plaintiff's response time to the

21   briefs on this issue passed yesterday.  And I -- obviously,

22   I haven't seen what may have been filed this morning.  But I

23   think that's ripe and appropriate for your decision when you

24   get around to looking at it.

25       What I would like to also tell you is that we filed an

1  additional nine Rule 11 motions under the safe harbor

2  provision where the 21 days has not yet expired.  But,

3  frankly, given what's in those motions, I would expect those

4  plaintiffs' lawyers to call up and agree to dismiss those

5  cases.

6      So, does Rule 11 work to get rid of these cases?

7          JUDGE GOODWIN:  Apparently so.

8          MR. DEAN:  The answer is, yes, it does work.  But

9  it's also, Your Honor, true that it is a very costly

10  procedure to undertake because we have to go out and obtain

11  the records and have them reviewed by medical doctors and

12  sign affidavits.

13      So, the defendants are right now in the posture of

14  disproving the allegations about a basic element which is:

15  Is there any evidence of digoxin toxicity that a responsible

16  plaintiff's attorney should satisfy himself or herself of

17  before they even file a lawsuit.

18      Now, in our --

19          JUDGE GOODWIN:  Well, of course, there's -- I'm

20  not going to go too far afield here.  But, of course, that's

21  part of the Rule 11 remedy.  If you have been put to

22  additional expense to have to do this because they've

23  brought a frivolous action, then sanctions can be imposed by

24  the Court.

25          MR. DEAN:  And if they would fight me on the Rule

1  11, I could get that relief.  But they won't fight me on the

2  Rule 11, so I can't get the relief you just suggested.  So,

3  the --

4          JUDGE GOODWIN:  Oh, I'm not so sure of that.

5          MR. DEAN:  Well, I -- well, I'll have my people

6  research more, but that's what they tell me, that if they,

7  if they agree to dismiss, that I'm not entitled to come back

8  and get sanctions against them.  But if you're willing to

9  entertain that motion, I'll research harder.

10          JUDGE GOODWIN:  Well, research harder

11  because I'm of the view that somebody -- let's suppose

12  that there is somebody out there that in bad faith brings

13  a frivolous lawsuit with no foundation in fact whatsoever,

14  and then only when they're caught red-handed, dismisses

15  it.  They should be sanctioned.  So, take a further look at

16  it.

17          MR. DEAN:  Okay.  But I -- we have represented to

18  you in the, in the, in our papers a key fact.  And that key

19  fact has not been disputed in the plaintiffs' opposition

20  papers.

21          And that key fact is that over half of the cases

22  pending on this docket do not have the basic element of any

23  proof at all of digoxin toxicity.  So, what is the most

24  efficient way to deal with that?

25          Do we have to go out and obtain the records in 250

1   cases, look at them, get a doctor to sign an affidavit, file

2   our papers under the safe harbor provision, and then have

3   the cases dismissed, or is it more efficient for you to put

4   out an order simply requiring the plaintiffs' lawyers to

5   prove that there is a good faith basis for them to go

6   forward?

7            JUDGE GOODWIN:  I've looked at your, at your

8   briefs, and the Lone Pine issue is one that I'll write an

9   order, memorandum opinion on.

10      I would note for you that most of the cases that

11   you-all have talked about in this Lone Pine context have

12   been cases where there are multiple defendants and we're

13   trying to sort out who's, who did what to whom.  This isn't

14   such a case.

15      I also have a big thick book on Rule 11 sanctions.  And

16   I think Rule 11 is an under-used rule.  And I think that I

17   have no hesitancy, nor do I believe we would get anywhere

18   near the number of 200 where you could bring such motions

19   and they were justified and I ruled on them.  I don't think

20   you'll get to 200.

21      Anyway, I'm going to look at your briefs and I'll rule

22   on it.

23            MR. DEAN:  Thank you, Your Honor.

24            THE COURT:  Anything else on Rule 11?

25      Yes, sir.

1          MR. THOMPSON:  Your Honor, I do want to respond

2     just briefly.

3          JUDGE GOODWIN:  Sure.

4          MR. THOMPSON:  I know that you've already made

5     your position and your thoughts and your feelings very

6     clear, and we have communicated to the plaintiffs.  I do

7     want to make two points.

8          JUDGE GOODWIN:  I have absolute full confidence

9     that lead counsel for the plaintiffs have communicated the

10    Court's statements faithfully.  And as I made clear in a

11    couple of writings at some point, individual plaintiffs'

12    lawyers still have a very large responsibility.  Just

13    because we have coordination with lead counsel doesn't mean

14    that their responsibilities have ended.

15         MR. THOMPSON:  My only two points are, number one,

16    we do not agree that a finding of digoxin toxicity is an

17    essential element of proving our injury.  And, so, we resist

18    Mr. Dean's statement that that's a requirement.  We think

19    that -- so, I do say that.

20         Secondly -- and, here again, I'm talking about

21    sausage-making to a certain degree.  And, that is, that the

22    decision to file or not to file in a specific court is

23    oftentimes a, a multi-faceted decision.

24         And I would want this court -- as we have proselytized

25    to the plaintiffs' bar, we have worked very hard to make

1  this court the center of the universe on this, in this case.

2  And we've done that with New Jersey.  Many of those cases

3  have been dismissed and have been allowed to be refiled only

4  in this court.  We've gone to various places and

5  proselytized that this court is the proper center of the

6  universe.  And I, I want this -- well, that's --

7          JUDGE GOODWIN:  I understand what you're saying.

8          MR. THOMPSON:  Yes, sir.

9          JUDGE GOODWIN:  And one of the big advantages of

10  Federal Court as opposed to many forums is you have my full

11  attention, and we will move the cases as fast as the lawyers

12  want to move them and they will go to trial.

13      For whatever reason, State Courts are a lot busier

14  generally than Federal Courts, and we can devote more

15  attention.  We have more resources a lot of times that we

16  can devote to cases like this.

17      I don't start out with any -- I actually start out with

18  the presumption that lawyers are ethical, smart, take good

19  cases, and file only those cases they believe have merit.  I

20  start out with that bias in mind.

21      So, I don't start with a view that people are just

22  filing a bunch of frivolous lawsuits to see if they can jump

23  aboard the train.  I don't mean to convey in any way to any

24  of the lawyers that I have any thought like that in my mind.

25      But I do want to emphasize again that each

1    representative of each client has duties to the Court in

2    this case.  And they don't all fall on your shoulders.  I

3    don't, I don't think, I don't think, I don't think there's

4    anything unclear.

5         I'm simply saying we've got to follow the rules.  And

6    if there are Rule 11 violations, I will take appropriate

7    action.  But I don't assume or presume or start out with a

8    mind-set that thinks that way.

9         Let's look at the class action briefing status.  That's

10   kind of got dropped off my radar.  Tell me about that.

11              MR. THOMPSON:  Your Honor, we had several class

12   action attorneys on behalf of the PSC.  There was an

13   allowance for class action certification discovery.

14              JUDGE GOODWIN:  We've had about six weeks since

15   the deadline first went away.

16              MR. THOMPSON:  Yes, sir.  That discovery was

17   propounded.  It was objected to and, in fact, was put before

18   Magistrate Judge Stanley for decision.  We sought a stay of

19   the deadline for class action briefing pending her decision

20   on that.  And our expectation was that we would receive some

21   additional information.

22        Magistrate Stanley issued her ruling, I believe, last

23   Friday – Thursday, Friday.  It was shortly ago.  And at that

24   point, although her order does not dissolve the stay,

25   certainly it, she's ruled.  And, so, we're before you

1    seeking a new date for the class certification briefing.

2         We can file a motion to reset the briefing which, as

3    you recall at the beginning, we, we had reached substantial

4    agreement on every, moving every deadline except for this

5    one.

6         I'm here today to seek the Court's -- I'm here today to

7    ask the Court to set the deadline for times shortly after,

8    after the holiday season.  I would like to have 60 days.

9    And that is for two reasons, one of which is that I am

10   purring a series of cats with the class committee.  We have

11   gone from state to state -- and I think Magistrate Stanley

12   has seen this.  We've gone from state to state and, in

13   essence, counseled many of the personal injury class

14   complaints and gotten them to withdraw the class complaint

15   aspect of it.

16        And, so, we've done a substantial amount of work in, in

17   cleaning that up and creating a situation where we're

18   dealing solely with economic consumer type issues.  But it

19   would be very helpful to us to set that deadline shortly

20   after the holiday season.

21        I know that the defendants have taken the position that

22   they believe this should be moved along and should be

23   forthwith, and I'll let them speak for themselves.  But our

24   position -- our perspective is that we request until just

25   after the holiday season, Your Honor.

1        JUDGE GOODWIN:  I think I understand the

2    defendants' arguments, but I'll hear them.  They've had six

3    weeks.

4        MR. MORIARTY:  If they are telling us all in so

5    many words that they are not appealing Judge Stanley's

6    ruling on the motion to compel, then I think the stay can be

7    immediately lifted.

8        We have no objection to 60 days so that everybody can

9    have a reasonable holiday.  And then whatever time period

10   the defendants are allowed following their deadline is,

11   should be the same as we've already implemented in the

12   previous orders.

13       I would --

14       JUDGE GOODWIN:  Why don't I wait and see if they

15   object to Judge Stanley's order.

16       MR. THOMPSON:  I'll tell you the answer to that.

17   Your Honor, quite frankly, we knew that we could simply

18   continue the stay in place by taking exception to the report

19   of Magistrate Stanley, and we elected not to burden the

20   Court with that.

21       We think that the most expeditious way is simply to

22   request the Court give us some time to file a single omnibus

23   brief with individualized sections for the, the

24   individualized actions.  And we thought that that was the

25   most efficient use of the Court's time.

1          So, the answer is, no, we're not going to appeal, or

2     not appeal but object.

3                JUDGE GOODWIN:  Sounds to me like we have

4     agreement.

5          Sixty days from now.  Right, Mr. Thompson?  I'm sorry.

6     How much time do you need after that?

7                MR. THOMPSON:  I'm sorry, Your Honor.

8                JUDGE GOODWIN:  Sixty days from now?  Is that what

9     you want?

10               MR. THOMPSON:  Yes, Your Honor.  Thank you.

11               THE COURT:  Mr. Moriarty.

12               MR. MORIARTY:  My little deadline crib sheet does

13    not have the class action, but I think it was 30 days.  It

14    was 30 days.  That's fine with us.

15               JUDGE GOODWIN:  All right.

16               MS. MCDONOUGH:  No objection from Mylan either.

17               JUDGE GOODWIN:  All right.  Good.  I keep

18    forgetting about you --

19               MS. MCDONOUGH:  Yeah, I know.

20               JUDGE GOODWIN:  -- which is probably a good thing,

21    isn't it.

22               MR. MORIARTY:  I was sent on a very clear mission

23    by our class action people.  I heard Mr. Thompson say a

24    single omnibus brief.  Can we get some direction on page

25    count?  Because a single omnibus brief on the many things --

1          JUDGE GOODWIN:  Write all you -- this is going to

2     just sweeten your holidays.  Write as long as you want.

3     Write all you want.  Knock yourself out.

4          MR. MORIARTY:  Okay.

5          MR. THOMPSON:  Judge, I'm probably going to run

6     out of gas after a few pages, but these guys --

7          JUDGE GOODWIN:  I understand.  I didn't say I was

8     going to read all of it.

9          Can I digress for a moment to tell all these very

10     experienced lawyers what happened when a guy that had been

11     trying lawsuits for 25 years went on the bench and started

12     reading briefs.  I thought and called one of my former

13     partners and said, "Stop.  We've been doing it wrong for 25

14     years."

15          Because, you know, the judges know what the summary

16     judgment standards are.  And they don't like that part at

17     the end where it says "for the foregoing reasons" if we

18     don't know what those are either.  So, if somewhere in the

19     first page or two you could say what you want and why you

20     think you're entitled to it, it's very helpful.  And almost

21     no one does that.  Just put it right up front.

22          And if you can't say in a page what you want, or two

23     pages what you want and why you're entitled to it, you

24     haven't thought it through.  Anyway, that's a digression.

25          I, I don't mean to insult anybody by saying that, but

1    since it apparently hadn't got through my thick skull in 25

2    years of litigating, I thought maybe at least one of you on

3    the phone or somebody here might not have thought that

4    through.

5        The next issue is docket maintenance issues.  There are

6    four class actions.  We've talked about that.  I guess

7    that's all going to be a part of your resolution of this

8    issue.

9        The defendants cancelled depositions on those based on

10   the representation they would be dropped.  So far, nothing

11   has happened.  Am I right on that?

12        MR. MORIARTY:  That's my memory.  And I think

13   we've encouraged certain plaintiffs' lawyers, and I think

14   even the Court has reached out on occasion to get those

15   lawyers to act as promised.  And I'm just -- I'm sorry, I'm

16   not prepared to address the specifics.

17        JUDGE GOODWIN:  All right.  Well, that is my

18   understanding of what was to be done.  If it hasn't been

19   done, somebody file a paper and tell me.

20        I have the Ortra Wayne Davis case.  There's a motion to

21   withdraw in that case.  Is plaintiff's counsel on the line?

22        MR. MULDERIG:  Plaintiff's counsel is here, Shamus

23   Mulderig.

24        JUDGE GOODWIN:  It's nice to have you here.

25        MR. MULDERIG:  Nice to be here.

1          JUDGE GOODWIN:  Would you briefly for the record

2     just give me the background.

3          MR. MULDERIG:  Sure.  Ortra Wayne Davis was our

4     client by retainer contract, and we subsequently filed a

5     complaint on his behalf.

6          After we filed the complaint and in our representing

7     and dealing with Mr. Davis continued, we found that at one

8     point that the relationship between us and Mr. Davis had

9     broken down to such an extent that we could not effectively

10    represent him further in this litigation.

11         We contacted him via several modes of communication; by

12    calling him, by sending him certified letters, by attempting

13    to e-mail relatives, all to, to no end.

14         At this point, since we have made the motion to

15    withdraw, we've not even heard from Mr. Davis despite our

16    attempts as directed by the Court to contact him and to see

17    if he has another lawyer, if he will agree for us to

18    withdraw, or if he wants to proceed pro se.  We simply do

19    not know what his choice is because he refuses to

20    communicate back with us.

21         That being said, we would like to reinforce our motion

22    to withdraw.  And we believe the Court has, has the

23    appropriate paperwork to make a decision on that.

24         JUDGE GOODWIN:  I may have heard from your former

25    client, which I'm going to now grant your motion, since you

1   have.  He has responded to the Court that he will proceed

2   pro se.  And that letter may not have even been filed in the

3   Clerk's Office as yet.

4        He advises the Court in the letter that he doesn't hear

5   well, has a number of health problems, can't talk on the

6   phone.  It probably is going to involve a process whereby --

7   it's going to involve a motion process before something else

8   happens in the case.  But you are relieved.  You're welcome

9   to stick around or you're welcome to catch an early plane.

10       MR. MULDERIG:  I'll stick around considering I

11  represent the Young family as well which was just selected

12  for the trial selection.

13       JUDGE GOODWIN:  All right.

14     Next -- is Mr. Goldstein on the phone?

15       MR. WILLIAMS:  Your Honor, this is Mike Williams

16  in place of Mr. Goldstein.

17       JUDGE GOODWIN:  Okay.  Welcome, Mr. Williams.  How

18  are you?

19       MR. WILLIAMS:  Doing fine, Your Honor.  Yourself?

20       JUDGE GOODWIN:  Fine.  After considerable delay

21  and a lengthy process of deficiency letters, I've received

22  about 22 proposed dismissal orders in the case.  You've --

23  you have filed just recently a belated response in each

24  case.  And by belated, I mean very belated.

25       I could hear argument on this, but what I'm going to do

1    is I'm going to give you five days to correct any

2    deficiencies that there may be – and it's up to you to

3    figure out if there are or not – and file them.  After that

4    time, the defendants may move to dismiss, and I will act on

5    the motions.  It's apparent to me from just looking at it

6    that there may be some deficiencies.

7          You've got five more days, Mr. Williams, and then we'll

8    act on it.  Okay?

9              MR. WILLIAMS:  Yes, Your Honor.  Thank you.

10             JUDGE GOODWIN:  All right.  What's good for a next

11   status conference?  Does counsel for Mylan have a

12   suggestion?

13             MS. MCDONOUGH:  I think I saw some proposed dates,

14   and I don't think it will be a problem.  If I can't cover

15   it, Mr. Kaplan can.  So, I'm willing to go with the

16   consensus.

17             JUDGE GOODWIN:  Okay.

18             MS. MCDONOUGH:  Thanks for asking.

19             JUDGE GOODWIN:  Anybody have a suggestion?

20             MR. BELL:  Judge, we have –– Mr. Frankovitch has a

21   conflict the first of February.  I think other than that,

22   he's available with the consensus, whatever we reach.

23             MR. MORIARTY:  And, Your Honor, ––

24             JUDGE GOODWIN:  Yes, sir.

25             MR. MORIARTY:  –– for what it's worth, I'm

1    supposed to start a trial in State Court in Ohio on

2    February 1st.  So, it can either be set and somebody can

3    cover for me, or we can set it closer to mid February, --

4              JUDGE GOODWIN:  All right, sir.

5              MR. MORIARTY:  -- or the end of January if you

6    think it's necessary.

7              JUDGE GOODWIN:  Early in the week or late in the

8    week?  Any preference?

9              MR. DEAN:  Could we have it later in the week,

10   Your Honor?

11             JUDGE GOODWIN:  Sure.  Mr. Moriarty is suggesting

12   if we go toward mid month, that would relieve him of the

13   conflict.  I see Ms. Betts may be standing up ready to tell

14   me she's got a conflict later.

15             MS. BETTS:  Well, I may have problems late in the

16   week because of other commitments.

17             JUDGE STANLEY:  I was just trying to figure out

18   whether they wanted a Wednesday or Thursday or Friday.  And

19   I couldn't tell if you were saying end of the first week or

20   end of the second week.

21             MR. MORIARTY:  I'm sorry.  I have a trial starting

22   February 1st that I anticipate might take two weeks.  So, if

23   my schedule needs to be taken into account, that's my

24   problem.

25             JUDGE STANLEY:  How likely is it that the trial

1    will take place?

2         MR. MORIARTY:  Given the, given the problems I had

3    trying to start this case about three weeks ago, sitting

4    around a courthouse for two days, I think we're likely to go

5    because we're going to get spun with what we call a visiting

6    judge, which is a retired judge who has no criminal or other

7    docket to conflict with it.  So, I think it's likely.  But

8    we have other lawyers.

9         JUDGE GOODWIN:  9:00 Thursday, February 11th.

10        MR. DEAN:  That's fine, Your Honor.

11        JUDGE GOODWIN:  Is that all right?

12   Any other matters we need to take up or would be useful

13   for us to take up today?

14        MR. DEAN:  Your Honor, could I just have a minute

15   with my colleagues before I respond to that?

16        THE COURT:  Sure.

17        MR. BLIZZARD:  Your Honor, --

18        JUDGE GOODWIN:  Yes, sir.

19        MR. BLIZZARD:  -- I have a quick question.

20        JUDGE GOODWIN:  Yes, sir.

21        MR. BLIZZARD:  I know in the past, status

22   conferences have been limited primarily to leadership of the

23   Plaintiffs' Steering Committee, but I'm feeling the burdens

24   or the pressures of being number one.  So, I wonder if I

25   should plan on attending some of these chamber conferences

1   to make sure that I'm familiar with all the details of

2   what's going on.

3            THE COURT:  We won't throw you out.

4            MR. BLIZZARD:  Thank you, Your Honor.

5            JUDGE GOODWIN:  I rely heavily on the structure as

6   it is.  Nevertheless, if you want to come and sit in the

7   room, we'll be glad to have you, Mr. Blizzard.

8       Yes, sir.

9            MR. MORIARTY:  Two things.  At some point, maybe

10  at the next status conference, we could talk about the

11  frequency with which you think you might try cases so people

12  can plan their spring if these don't immediately result in

13  some overall resolution.

14      The other thing is, we wonder what happens to the

15  non-selected cases such as Gilmore and McCornack.  Should we

16  continue discovery in those cases?  Should we defer that

17  until some agreed upon later time?

18           THE COURT:  Why don't you talk about that.  The --

19  well, I'll let you talk about it.  If you don't work it out,

20  I'll just decide it.

21           MR. MORIARTY:  Okay.

22           JUDGE GOODWIN:  Anything else?

23           MR. THOMPSON:  Judge, I had seen that you had

24  addressed the discovery issues.  I assume that you've

25  addressed that to the extent you want to today.  You don't

1    want to hear any high-pitched whine from me.  So, we'll just

2    consider it as though I have made it on the record.

3              JUDGE GOODWIN:  Thank you, Mr. Thompson.

4              MR. DEAN:  And as though defendants have

5    responded.

6              JUDGE GOODWIN:  Vigorously.  I understand.

7         All right.  Anything further?

8         (No Response)

9              JUDGE GOODWIN:  Thank you all for coming.  I

10   particularly appreciate the input from the other lawyers

11   that had cases.  And, as usual, I'm gratified to have such

12   fine counsel in this multi-district litigation.  It makes my

13   life much easier.

14        I hope that you will appreciate the fact and not be put

15   off by the fact that I am decisive.  You may not always

16   agree, but it will be -- we'll move -- we'll decide and move

17   on.  Talk to you later.  Thank you all.

18        (Proceedings concluded at 12:07 p.m.)

19

20

21

22

23

24

25

```
 1              I, Lisa A. Cook, Official Reporter of the United

 2    States District Court for the Southern District of West

 3    Virginia, do hereby certify that the foregoing is a true and

 4    correct transcript, to the best of my ability, from the

 5    record of proceedings in the above-entitled matter.

 6

 7

 8        s\Lisa A. Cook                    November 30, 2009

 9            Reporter                           Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```