# In Re:
*Digitek*

---

*Paul Galea*

*December 9, 2009*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File pg120909.txt

Min-U-Script®

**EXHIBIT B**

Paul Galea

Confidential – Subject to Further Confidentiality Review

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


- - -


IN RE:  DIGITEK® PRODUCTS        MDL NO. 1968
LIABILITY LITIGATION


THIS DOCUMENT RELATES TO
ALL CASES


CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

Wednesday, December 9, 2009

- - -


Videotaped deposition of PAUL
GALEA, held at HARRIS BEACH, PLLC, 100 Wall
Street, New York, New York, commencing at
approximately 9:50 a.m., before Rosemary
Locklear, a Registered Professional Reporter,
Certified Realtime Reporter, Certified Court
Reporter (NJ) and Notary Public.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 971.591.5672  Fax
deps@golkow.com

Paul Galea
Confidential – Subject to Further Confidentiality Review

2

1    APPEARANCES:

2

3         BLIZZARD McCARTHY & NABERS, LLP
          BY:  EDWARD F. BLIZZARD, ESQUIRE
4         eblizzard@blizzardlaw.com
          BY:  HOLLY W. GIBSON, ESQUIRE
5         hgibson@blizzardlaw.com
          Lyric Centre, Suite 1710
6         440 Louisiana
          Houston, Texas 77002-1689
7         (713) 581-8451
          Appearing on behalf of Plaintiffs
8

9

10        THE MILLER FIRM, LLC
          BY:  PETER A. MILLER, ESQUIRE
          pmiller@doctoratlaw.com
11        The Sherman Building
          108 Railroad Avenue
12        Orange, Virginia 22960
          (540) 672-4224
13        Appearing on behalf of Plaintiffs in
          Pennsylvania
14

15

16        MOTLEY RICE, LLC
          BY:  MEGHAN JOHNSON CARTER, ESQUIRE
17        mjohnson@motleyrice.com
          28 Bridgeside Boulevard
18        Mount Pleasant, South Carolina 29464
          (843) 216-9000
          Co-Lead Counsel for the Plaintiffs' Steering
19        Committee

20

21        SANFORD BARLOW, LLP
          BY:  ANTHONY COVENY, ESQUIRE
22        (via telephone)
          1500 McGowen Street, Suite 250
23        Houston, Texas 77004
          (713) 524-6677
24        Appearing on behalf of the Plaintiffs

Paul Galea
Confidential – Subject to Further Confidentiality Review

3

```
 1      APPEARANCES:   (Continued)

 2


 3          TUCKER ELLIS & WEST, LLP
            BY:   MICHAEL ANDERTON, ESQUIRE
 4          manderton@tuckerellis.com
            BY:   EDWARD E. TABER, ESQUIRE
 5          etaber@tuckerellis.com
            1150 Huntington Building
 6          925 Euclid Avenue
            Cleveland, Ohio 44115-1475
 7          (216) 592-5000
            Appearing on behalf of the Defendant Actavis
 8


 9
            ALLEN GUTHRIE & THOMAS, PLLC
10          BY:   ZACKARY B. MAZEY, ESQUIRE
            zbmazey@agmtlaw.com
11          500 Lee Street, East, Suite 800
            Charleston, West Virginia 25301
12          (304) 345-7250
            Appearing on behalf of the Defendant Mylan
13          Actavis in West Virginia

14


15          SHOOK, HARDY & BACON, LLP
            BY:   SEAN LEE, ESQUIRE
16          slee@shb.com
            1155 F Street, N.W., Suite 200
17          Washington, DC 20004-1305
            (202) 783-8400
18          Appearing on behalf of the Defendant Mylan
            Pharmaceuticals
19

20
            ALSO PRESENT:
21

22          CATHERINE SMALFUS, Video Operator

23

24
```

Paul Galea
Confidential – Subject to Further Confidentiality Review

```
                                                              4

 1                          I N D E X

 2

 3     WITNESS                                        PAGE

 4

 5     PAUL GALEA

 6

 7              By Mr. Miller                      10, 274

 8              By Mr. Blizzard                       150

 9

10                           -  -  -

11

12                      EXHIBIT INDEX

13
       MAR
14     55      1-page copy of E-mail dated            94
               11/12/07 to Elina Novikov from
15             Paul Galea, plus attachments,
               ACTAV000337084-ACTAV000337085
16
       56      2-page copy of document dated         100
17             5/16/07 entitled "Interoffice
               Memorandum," ACTAV000378817
18
       57      3-page copy of document entitled      110
19             "2007 Complaint Report,"
               ACTAV000335330
20
       58      1-page copy of E-mail dated           117
21             5/29/07 to Scott Talbot from Paul
               Galea, ACTAV000342737
22
       59      1-page copy of E-mail dated           123
23             3/10/08, ACTAV000333379

24
```

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

11

1   noise on the phone, I just want to let you know

2   ahead of time that I will stop and have that

3   person identify themselves.

4        A.    That's fine.

5        Q.    Sir, we met just a moment ago,

6   but would you please state your full name.

7        A.    Paul Galea.

8        Q.    Yes, sir.

9              And where are you currently

10  employed?

11       A.    Actavis Totowa, L.L.C.

12       Q.    And when were you first hired

13  by Actavis?

14       A.    By Actavis Totowa, L.L.C., or

15  Actavis as a group?

16       Q.    Let's go Actavis as a group.

17       A.    Actavis became an entity in

18  2004, I believe, so I guess it's around

19  about that time.

20       Q.    And then when would you

21  identify that you no longer worked for

22  Actavis Group, but you now became an

23  employee of Actavis Totowa, L.L.C.?

24       A.    I still believe that I work as

Paul Galea
Confidential – Subject to Further Confidentiality Review

12

1      an employee of Actavis in general.

2           Q.    Okay.  So my understanding,

3      then, is, you don't consider yourself an

4      employee of Actavis Totowa, L.L.C., you

5      consider yourself an employee of Actavis

6      Group.

7           A.    I'm being paid by Actavis

8      Totowa, L.L.C., so I guess that would make

9      -- make me a current employee of Actavis

10     Totowa, L.L.C.

11          Q.    Okay.  So then, prior to 2004,

12     you were paid by Actavis Group?

13          A.    Actavis, Limited, which is a

14     subsidiary of Actavis Group.

15          Q.    I'll just tell you, I'd like to

16     go over a couple of rules before we go any

17     further.

18               Have you been deposed before in the

19     past?

20          A.    No.

21          Q.    I'm going to be asking a series

22     of questions, and if I ask a question and

23     you don't understand it, would you ask me

24     to rephrase the question?

Paul Galea

Confidential – Subject to Further Confidentiality Review

18

1    A.    If I remember correctly, around

2  about that time I was validation officer,

3  and then within the same year I moved into

4  the role of assistant QA manager.

5    Q.    Is it fair to say that as a

6  validation officer, you have come out of

7  the manufacturing role and gone back into

8  the world of QA?

9    A.    That can be termed as correct.

10    Q.    And what are you validating as

11  a validation officer?

12    A.    As a validation officer, there

13  were various projects going on, so I was

14  taking care of cleaning validation and

15  facilities, our -- and equipment

16  validation.

17    Q.    And that was at the Actavis

18  Totowa plant.

19    A.    No.    That has still been Malta

20  at Actavis, Limited.

21    Q.    Okay.    What year did you

22  transfer from Malta to Actavis Totowa

23  physically?

24    A.    21st October, 2007.

Case 2:08-md-01968  Document 273-2  Filed 01/12/10  Page 9 of 25 PageID #: 2308
Paul Galea
Confidential – Subject to Further Confidentiality Review

19

1          Q.    Was that at the request of the

2     company or had you been requesting to

3     transfer to the U.S.?

4          A.    It -- it was a bit of both, I

5     could say.

6          Q.    What was -- as you were

7     informed, what was the reason that the

8     company requested it, that you transfer to

9     Actavis Totowa?

10         A.    The initial reason, I was doing

11    an assessment and helping out in the

12    harmonization of the group's corporate

13    manual, and that was basically the main

14    reason.

15         Q.    All right.  Well, let's break

16    that into two parts.

17              What was the assessment that you

18    believe that you were -- that you came here to

19    work on?  Assessment of what?

20         A.    Basically, I came to make an

21    assessment of Actavis Totowa, L.L.C.

22         Q.    Overall assessment of the QA

23    Department?

24         A.    No.  In general of the company

Paul Galea

Confidential – Subject to Further Confidentiality Review

20

```
 1      from a -- from a GMP perspective.
 2           Q.    Would you agree with me that
 3      there was some serious GMP issues in
 4      October of '07 at Actavis Totowa?
 5                 MR. ANDERTON:  Objection.
 6                 You may answer.
 7                 THE WITNESS:  How do you define
 8      serious?
 9      BY MR. MILLER:
10           Q.    Serious?  Well, there could
11      have been some GMP problems that would
12      have been, gosh, this is minor, we either
13      need to fix it or we don't need to fix it,
14      or there are some issues where if we don't
15      fix it, then we might be shut down or
16      someone might get hurt.
17                 MR. ANDERTON:  Objection.
18      BY MR. MILLER:
19           Q.    It's okay to answer.
20                 MR. ANDERTON:  You may answer.
21                 THE WITNESS:  When I first went
22      there, that was not really the scope of my
23      assessment.  My assessment was to look at the
24      company and -- and, basically, have a look at
```

Paul Galea
Confidential – Subject to Further Confidentiality Review

24

1    assessment of GMP at Actavis Totowa?

2        A.    I was there for initial

3    assessment, which was around a week, and

4    then there were subsequent visits to do

5    further assessments.

6        Q.    Did your assessment include

7    actual inspection and review of the

8    quality-control labs within Actavis?

9                MR. ANDERTON:  Objection.

10               You may answer.

11               THE WITNESS:  Yes.

12   BY MR. MILLER:

13       Q.    What all did you physically

14   review or inspect in order to make an

15   assessment of the GMP systems in Actavis?

16               MR. ANDERTON:  Objection.

17               I'm going to instruct the witness

18   to answer, but not to reveal any of the findings

19   or evaluations or substantive evaluations that

20   you did.

21               You may answer his question, but in

22   answering don't reveal any of your conclusions

23   or findings.

24               THE WITNESS:  The assessment was

Paul Galea
Confidential – Subject to Further Confidentiality Review

25

1    more of a general assessment, which -- which is

2    -- which you would typically do when you're

3    visiting for a short period of time.

4    BY MR. MILLER:

5         Q.    So you went inside the QA lab.

6                MR. ANDERTON:  Objection.

7    BY MR. MILLER:

8         Q.    You can answer.

9         A.    QC lab.

10        Q.    I'm sorry.  So you went inside

11   the QC lab.

12                Did you interview any lab techs

13   there?

14        A.    Not really.

15        Q.    No?

16        A.    Not really.

17        Q.    What does not really mean?

18        A.    I didn't interview anyone.

19        Q.    Okay.  Did you review lab

20   analysts' logbooks?

21                MR. ANDERTON:  Objection.

22                I instruct the witness not to

23   answer.

24                I mean, you're getting into the

Paul Galea
Confidential – Subject to Further Confidentiality Review

30

1    A.   No.   No.   That is incorrect.

2    What I am saying is, my initial assessment

3    was February 2nd, 2007, until February

4    9th, around about, 2007.

5    Q.   Okay.   Well, I'm sorry.   I

6    thought you originally arrived 25 October

7    of 2007.

8    A.   No.   My answer to your question

9    was, I started as an employee to Actavis

10   Totowa on the 21st of October 2007.   My

11   first visit was in February of 2007.

12   Q.   And that visit was for roughly

13   a week.

14   A.   Around about.

15   Q.   And was that strictly for

16   assessment or was that for the

17   harmonization of the company as well?

18   A.   It was for the assessment.

19   Q.   Assessment.

20        Did you make any other visits to

21   Totowa prior to you permanently coming here in

22   21 October of 2007?

23   A.   Yes, I did.

24   Q.   And when were the other visits?

Paul Galea
Confidential – Subject to Further Confidentiality Review

31

1          A.     Roughly, I can say that one was

2     in March.

3          Q.     Of '07.

4          A.     Of '07.

5                 I believe one was around about the

6     end of May, another visit was around about June

7     to July, and I believe the final visit was

8     sometime in August.

9          Q.     And were each of these as well

10    for the purpose of assessment of the GMP

11    program?

12         A.     Not really.  The initial visit

13    was more of an assessment.  Subsequently,

14    it was also more to look at harmonization.

15         Q.     So the March visit you agree

16    was assessment and harmonization?

17         A.     Yeah.  They -- they rolled over

18    into each other, more or less.

19         Q.     Okay.  And you say that's true

20    for all, the March, the May, the June and

21    the August?

22         A.     I wouldn't say assessments.  I

23    would say more leaning towards

24    harmonization.

Paul Galea
Confidential – Subject to Further Confidentiality Review

35

1        Q.    Do you recall when that report

2    was?

3        A.    Probably sometime in -- after

4    the February visit.

5        Q.    And would you have sent that to

6    Mr. Talbot?

7        A.    No.

8        Q.    You sent that directly to

9    Mrs. -- I guess her first name is Gudrun;

10   is that right?

11       A.    I probably sent it to the QSD

12   department.  It's the quality systems

13   department, which takes care of internal

14   audits for the group.

15       Q.    And if you would have E-mailed

16   that report, would it have been an

17   attachment to the QSD?

18       A.    Typically, yes.

19       Q.    And who specifically would you

20   have written that report to?  Do you

21   recall?

22       A.    Specifically, I cannot recall

23   to whom.

24       Q.    Would it have been who was in

Paul Galea

Confidential – Subject to Further Confidentiality Review

40

```
 1        the report that would have been done for QSD
 2        after the February visit, or is there some other
 3        report?
 4            A.    It's the same report.
 5            Q.    So after your -- you did an
 6        assessment in March of 2007 and didn't
 7        report any information to anyone?  You
 8        kept it all to yourself?
 9            A.    No.  I did an assessment in
10        February and my -- that was my initial
11        report.
12            Q.    You did an initial report after
13        your February visit?
14            A.    Yes.
15            Q.    Okay.  But you came back and in
16        March you did a second visit that you said
17        was part assessment, part harmonization?
18            A.    Yes.
19            Q.    After that trip, did you share
20        any information with anyone or did you
21        harbor it all to yourself?
22            A.    Going forward from the second
23        trip onwards, I was mainly in the
24        harmonization state and looking, you know,
```

Paul Galea
Confidential – Subject to Further Confidentiality Review

41

1    at the various procedures, so I didn't

2    really have any more things to report.

3    But I was actually working on procedures.

4        Q.    Okay.  So is it fair to say

5    that in March, May, June and August all

6    four of those visits, there was some

7    portion of it was assessment, but it was

8    only for yourself.  You weren't sharing

9    any information with anyone else?

10       A.    Not really.  I would say the

11   assessment ended around about March.

12       Q.    Okay.  But part of March was an

13   assessment?

14               MR. ANDERTON:  Objection.

15               You may answer.

16               THE WITNESS:  I can recall that as

17   being, you know, the tailing end of the initial

18   assessment.

19   BY MR. MILLER:

20       Q.    Okay.  That tailing end, did

21   you share any of the information you

22   obtained in the tailing end of the

23   assessment in the March visit with anyone?

24       A.    Not that I recall.

47

1     and not about other drugs, and you're

2     instructing the witness not to answer questions

3     clearly about GMPs that also apply to the

4     manufacture of Digitek.

5               MR. ANDERTON:   I'm instructing the

6     witness not to answer the substance of an

7     analysis that falls under a privilege protecting

8     that information.

9               MR. BLIZZARD:   I've never heard of

10    the privilege before, but perhaps you'll

11    enlighten us later.

12              MR. ANDERTON:   Ready, Mr. Miller?

13              MR. MILLER:   I am ready.

14    BY MR. MILLER:

15        Q.    Now I want to talk to your

16    second function and your trips in 2007 to

17    Actavis Totowa.

18              Harmonization.   Explain what that

19    means to you.   What was your goal there?

20        A.    Okay.  As the word is a bit of

21    a fancy word, but, basically, a

22    harmonization is to look at the various

23    companies and see that they are working

24    under the same umbrella.

Paul Galea
Confidential – Subject to Further Confidentiality Review

48

1              When you have a big corporation,

2      it's something that you typically would like to

3      do.

4          Q.     And are you harmonizing the GMP

5      aspect of the company or was it more

6      broad?

7          A.     GMP aspect.

8          Q.     Okay.  So you're still working

9      with looking at GMP at Actavis Totowa, but

10     it's gone from an assessment to a how can

11     you work better with the rest of the

12     company?

13         A.     I would say it's more how to

14     streamline operations within the various

15     countries to look as similar as possible.

16         Q.     Under -- wearing your

17     harmonization hat in your visits March

18     through August, who did you report to?

19         A.     Gudrun on those visits.

20         Q.     Did you generate any reports

21     following those four visits to Gudrun?

22         A.     No.

23         Q.     All your communication with her

24     would have been over the phone.

Paul Galea

Confidential – Subject to Further Confidentiality Review

157

```
1          Q.    Okay.  Now, you're not from the
2     United States, you're from Malta; correct?
3          A.    Yes.
4          Q.    And had you ever -- had you
5     visited the United States before February
6     of 2007?
7          A.    No.
8          Q.    And what was your job before
9     you came to the United States for Actavis?
10         A.    I was QA manager at Actavis,
11    Limited.
12         Q.    And Actavis, Limited, was their
13    headquarters in Malta?
14         A.    It is a subsidiary of the
15    headquarters in Iceland.
16         Q.    Okay.  So the group that you
17    worked for in Malta was a subsidiary of
18    the headquarters of Actavis, which is
19    located in Iceland; right?
20         A.    That is correct.
21         Q.    And you were the QA manager?
22         A.    Yes.
23         Q.    And was there anybody in the
24    Malta operation that you reported to in
```

Paul Galea
Confidential – Subject to Further Confidentiality Review

167

1    practices?

2                    MR. ANDERTON:  Objection.

3                    You may answer.

4                    THE WITNESS:  There's a long list.

5    BY MR. BLIZZARD:

6        Q.    Okay.  I'm not asking you to

7    list them.  I'm asking you to generally

8    describe so that the jury understands what

9    they are.  What are good manufacturing

10   practices?

11       A.    Okay.  They're a set of rules

12   and guidances which direct you in the

13   manufacturing and packaging and testing of

14   your product.

15       Q.    And what is the purpose of

16   these rules and guidances?

17                   MR. ANDERTON:  Objection; asked and

18   answered.

19                   You may answer.

20                   THE WITNESS:  The objective is to

21   manufacture a tablet which is good for human

22   use.

23   BY MR. BLIZZARD:

24       Q.    Okay.  So is it part of the

Paul Galea
Confidential – Subject to Further Confidentiality Review

168

1    good manufacturing practices to assure

2    safety?

3        A.    Yes.

4        Q.    Is it also part of good

5    manufacturing practices to assure that the

6    pills have the appropriate identity,

7    strength and quality and purity?

8                MR. ANDERTON:  Objection.

9                You may answer.

10              THE WITNESS:  Yes.

11   BY MR. BLIZZARD:

12       Q.    Is it the standard of care

13   within the manufacturing of

14   pharmaceuticals industry to follow good

15   manufacturing practices?

16             MR. ANDERTON:  Objection.

17             You may answer.

18             THE WITNESS:  Yes.

19   BY MR. BLIZZARD:

20       Q.    And if a company fails to

21   follow good manufacturing practices, is it

22   in violation of the standard of care?

23             MR. ANDERTON:  Objection.

24             You may answer.

Paul Galea
Confidential – Subject to Further Confidentiality Review

180

```
 1        full-time employee of Actavis Totowa in
 2        October of 2007; correct?
 3            A.    Yes.
 4            Q.    Before that you were employed
 5        by a separate corporation called Actavis,
 6        Limited; correct?
 7            A.    Yes.
 8            Q.    And it was only after October
 9        of 2007 that you came indirectly involved
10        with the Quality Systems Improvement Plan;
11        correct?
12            A.    Yes.
13            Q.    And what was your indirect
14        involvement?
15            A.    The Quality Systems Improvement
16        Plan as it stands is to create actions for
17        improvement or -- or tasks.  So I was
18        given tasks on occasion which my
19        department had to fulfill.
20            Q.    Have you ever heard of the
21        phrase "if it ain't broke, don't fix it"?
22            A.    In America, I've heard that.
23            Q.    Okay.  So was there -- was the
24        quality system broken before this Quality
```

Paul Galea
Confidential – Subject to Further Confidentiality Review

190

1      Q.    Right.

2            But it means the same thing as a

3      corrective action plan; correct?

4      A.    Yes.

5      Q.    And both a corrective action

6      plan and a quality -- Quality Systems

7      Improvement Plan, both are intended to

8      address deficiencies in the quality

9      department, are they not?

10     A.    No, that is not correct.

11     Q.    Okay.  They're both intended to

12     address deficiencies in the company;

13     correct?

14           MR. ANDERTON:  Objection.

15           THE WITNESS:  That is not correct.

16     BY MR. BLIZZARD:

17     Q.    Okay.  So are corrective action

18     plans part of the routine business of the

19     company?

20     A.    Yes.

21     Q.    And is it also a routine part

22     of the company business to do assessments

23     of the company's compliance with GMPs?

24     A.    Yes.

Paul Galea
Confidential – Subject to Further Confidentiality Review

286

1                          CERTIFICATE

2

3

4             I HEREBY CERTIFY that the witness
   was duly sworn by me and that the deposition is
5  a true record of the testimony given by the
   witness.
6

7             It was requested before completion
   of the deposition that the witness, PAUL GALEA,
8  have the opportunity to read and sign the
   deposition transcript.
9

10         *Rosemary Locklear*

11

12         ------------------------------------
           ROSEMARY LOCKLEAR
13         REGISTERED PROFESSIONAL REPORTER
           CERTIFIED COURT REPORTER (NJ)
14         30XI00171000
           CERTIFIED REALTIME REPORTER
15         NOTARY PUBLIC
           Dated:  12/23/09
16

17

18             (The foregoing certification of

19  this transcript does not apply to any

20  reproduction of the same by any means, unless

21  under the direct control and/or supervision of

22  the certifying reporter.)

23

24