# Exhibit O

Dale Campbell

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: DIGITEK PRODUCT LIABILITY  MDL NO. 1968
LITIGATION,

--------------------------------------------------

MICHAEL PASKEN, et al.,
    Plaintiffs,    MDL No. 2:08-1075
    vs.
ACTAVIS GROUP HF, et al.,
    Defendants.    *EXCERPTS*
-----

DEPOSITION OF: DALE CAMPBELL

-----

TRANSCRIPT MARKED CONFIDENTIAL PURSUANT TO THE TERMS
OF THE PROTECTIVE ORDER

DEPOSITION DATE:
July 31, 2009
Friday, 10:05 a.m.

LOCATION:
AKF REPORTERS, INC.
436 Boulevard of the Allies
Pittsburgh, PA  15219

TAKEN BY:
Defendant Mylan

REPORTED BY:
Pamela L. Beck
Notary Public
AKF Reference No. PB14096

---

**Page 2**

1     DEPOSITION OF DALE CAMPBELL,
2 a witness, called by the Defendant Mylan for
examination, in accordance with the Federal Rules of
3 Civil Procedure, taken by and before Pamela L. Beck,
a Court Reporter and Notary Public in and for the
4 Commonwealth of Pennsylvania, at AKF Reporters,
Inc., 436 Boulevard of the Allies, Pittsburgh,
5 Pennsylvania, on July 31, 2009, commencing at
10:05 a.m.
6
7     APPEARANCES:
8     FOR THE PLAINTIFFS:
    Patricia I. Avery, Esq.
    pavery@wolfpopper.com
9     WOLF POPPER, LLP
    835 Third Avenue
10     New York, N.Y. 10022
    p 212-759-4600
11     f 212-486-2093
12
    FOR THE DEFENDANT MYLAN:
13     Ericka Downie, Esq.
    edownie@shb.com
14     SHOOK HARDY & BACON, L.L.P.
    2555 Grand Boulevard
15     Kansas City, MO  64108
    p 816-559-2214
16     f 816-421-5547
17
    FOR THE DEFENDANTS ACTAVIS GROUP, HF,
18     ACTAVIS TOTOWA, LLC, ACTAVIS, INC., ACTAVIS
    ELIZABETH, LLC, ACTAVIS US:
19     John T. Doheny, Esq.
    john.doheny@tuckerellis.com
20     TUCKER ELLIS & WEST, LLP
    1150 Huntington Building
21     925 Euclid Avenue
    Cleveland, OH  44115-1414
22     p 216.696.2845
    f 216.592.5009
23
24
25

---

**Page 3**

EXAMINATION INDEX

DALE CAMPBELL
    BY MS. DOWNIE . . . . . . . . . .  5
    BY MR. DOHENY . . . . . . . . . .  112

CERTIFICATE OF COURT REPORTER . . . . . .  116
ERRATA SHEET . . . . . . . . . . . . . .  117
NOTICE OF NON-WAIVER OF SIGNATURE . . . .  118

EXHIBIT INDEX
    MAR
CAMPBELL
1     13
2     13
3     36

---

**Page 4**

1     DALE CAMPBELL,
2     having been duly sworn,
3     was examined and testified as follows:
4
5     EXAMINATION
6
    BY MS. DOWNIE:
7
8     Q.  Mr. Campbell, my name is Erica Downie.  I'm
9 going to be taking your deposition today in
10 connection with a lawsuit that you filed
11 regarding Digitek.
12     Can you first give your name and
13 address, please.
14     A.  Dale Campbell.
    *REDACTED*
15
    MS. AVERY:  Before -- sorry for
16 interrupting.  Before we start, I do want to
17 note for the record that we're designating the
18 transcript as confidential pursuant to the
19 terms of the protective order.
20     MS. DOWNIE:  Very well.
21
    BY MS. DOWNIE:
22
23     Q.  Have you ever been deposed before?  Have you
24 ever had your deposition taken like we're
25 doing today?
    A.  Yes.

---

1 (Pages 1 to 4)

Dale Campbell

---

Page 13

1  Q.  Have you ever been a defendant in any other
2      lawsuits?
3  A.  No.
4          MS. DOWNIE:  We're going to go ahead
5      and we will mark as Exhibit No. 1 Plaintiff
6      Fact Sheet.
7          - - - -
8          (Deposition Exhibit No. 1 was
9      marked for identification.)
10         - - - -
11         MS. DOWNIE:  Off the record.
12         - - - -
13         (Deposition Exhibit No. 2 was
14     marked for identification.)
15         - - - -
16  BY MS. DOWNIE:
17  Q.  Sir, I've given you what we've marked as
18      Campbell Exhibit No. 1, which is Plaintiff
19      Fact Sheet.  If you could first off, turn to
20      the back page, which is page 18.  Can you
21      verify that that is your signature.
22  A.  Yes.
23  Q.  And before signing this document, did you have
24      an opportunity to review it for the
25      information that was contained within?

---

Page 14

1  A.  Yes.
2  Q.  And you understood that when you signed this,
3      you were verifying that this information was
4      true and correct to the best of your
5      knowledge; is that correct?
6  A.  Yes.
7          MS. AVERY:  Objection to form.
8  Q.  Is there anything to your knowledge that needs
9      to be changed or corrected that is within this
10     document?
11         MS. AVERY:  Why don't you go through
12     it and see, then.
13  Q.  Please do.
14         - - - -
15     (The witness reviewed the document.)
16         - - - -
17  A.  Yeah, where it said here on d --
18  Q.  Why don't you tell me which page you're
19      looking at.
20  A.  Page 3.
21  Q.  And that's under claim information, and you're
22      looking at 3d?
23  A.  Yes.
24  Q.  And the question is:  Did you see a doctor,
25      clinic, or healthcare provider for the bodily

---

Page 15

1      injuries or illness listed above.
2  A.  Yes, I actually didn't see the doctor, but I
3      talked to the doctor.
4  Q.  And the doctor is Dr. Gustov Ellis?
5  A.  Yes.
6  Q.  So, when did you talk to the doctor?
7  A.  The day I received a recall.
8  Q.  So, just to be clear, what you're saying is
9      you didn't see a physician in connection with
10     the injuries that you allege you suffered as a
11     result of ingestion of Digitek?
12         MS. AVERY:  Objection to form.
13  Q.  But that you talked to a doctor at some point
14      thereafter about those symptoms?
15  A.  Yes.
16  Q.  Okay.
17  A.  Yes, on page 4h.
18  Q.  Hold on one moment.  On page 4, that's still
19      under II, Claim Information, and No. 4 is what
20      harm -- I'm sorry, h is what harm or
21      consequence, including physical limitations,
22      do you claim you suffered as a result of the
23      bodily injury above, excluding any mental or
24      emotional damages, lost wages or out-of-pocket
25      expenses listed below.

---

Page 16

1          And you currently have a response
2      there that states:  Bradycardia, fatigue,
3      weakness, dizziness, vertigo, lightheadedness,
4      fainting, shortness of breath, chest
5      discomfort, palpitations.
6  A.  I also had nausea.
7          MS. AVERY:  This is one thing that
8      I'm not sure the client even realizes this or
9      knows this, but on page 6, paragraph 6b,
10     there's a reference to 16 pills.  I gave the
11     bottle to --
12         MR. DOHENY:  I guess we can --
13         MS. AVERY:  Yeah, as I look at it,
14     it doesn't look like 16.  I don't know --
15         MR. DOHENY:  It looks like seven.
16         MS. AVERY:  I don't know whether I
17     just grabbed the wrong bottle or what, but I
18     will find out the answer and let you know.
19         MR. DOHENY:  This one has seven in
20     it.
21  BY MS. DOWNIE:
22  Q.  Mr. Campbell, do you have any information
23      regarding, if you're looking at page 6, 6b
24      asks how many tablets are in your or your
25      attorney's possession.  And as we've noted,

---

4  (Pages 13 to 16)

Dale Campbell

Page 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

Page 20

| | |
|---|---|
| 1 | this bottle, as well as the tablets that you |
| 2 | sent Ms. Madoff that we've discussed, are you |
| 3 | in possession of any other tablets, Digitek |
| 4 | tablets? |
| 5 | MS. AVERY:  Just off the record for |
| 6 | a second. |
| 7 | - - - - |
| 8 | (There was a discussion off the |
| 9 | record.) |
| 10 | - - - - |
| 11 | BY MS. DOWNIE: |
| 12 | Q.  Mr. Campbell, when did you first learn that |
| 13 | you might have a claim regarding Digitek? |
| 14 | MS. AVERY:  Objection to form. |
| 15 | A.  When I received the recall. |
| 16 | Q.  So you received a recall letter? |
| 17 | A.  Yes. |
| 18 | Q.  Do you recall when you received that? |
| 19 | A.  Not the exact date, no. |
| 20 | Q.  I'm going to ask you to keep your fact sheet |
| 21 | in front of you, because it may be that you'll |
| 22 | want to refer to it throughout the deposition. |
| 23 | A.  Okay. |
| 24 | Q.  If you turn to page 7, it indicates that you |
| 25 | became aware of the recall in early May of |

5  (Pages 17 to 20)

Dale Campbell

| | |
|---|---|
| **Page 21** | **Page 23** |

**Page 21**

```
1        2008.
2              Is that consistent with your memory,
3     or do you have a different memory regarding
4     when you may have received that letter?
5  A.  It's consistent; I just have a bad memory.
6  Q.  Fair enough.  Do you recall who sent that
7     letter?
8  A.  I believe it was Rite Aid.
9  Q.  Did you keep a copy of it?
10 A.  I think I do have it, yes, at home.
11 Q.  If you could take a look for that and produce
12    that to your attorney, because I don't think
13    we've seen a recall letter in this case.
14            MS. AVERY:  I'll double check.
15 Q.  Do you recall what the recall letter said?
16 A.  No, ma'am, I don't.
17 Q.  What did you do, if anything, after receiving
18    the recall letter?
19 A.  I called my heart doctor, and he told me to
20    quit taking the pills immediately.
21 Q.  And who was your heart doctor at that time?
22 A.  Dr. Ellis.
23 Q.  And that was Dr. Gustov Ellis?
24 A.  Yes.
25 Q.  Did you talk to anybody else?
```

**Page 22**

```
1  A.  About it?
2  Q.  About the recall.
3  A.  Actually, I think I talked to his associate as
4     well.
5  Q.  Do you recall who the associate is?
6  A.  No, I'm not sure what her name was.
7  Q.  Other than telling you to stop taking the
8     Digitek, did Dr. Ellis tell you or give you
9     any further instruction?
10 A.  He just told me to stop taking it immediately.
11 Q.  Did you speak to the pharmacist at Rite Aid
12    regarding the recall?
13 A.  No, I did not.
14 Q.  Do you recall whether or not the recall letter
15    instructed you to do anything with the
16    tablets; in other words, to destroy them,
17    throw them away or return them?
18 A.  They asked to return them, they would replace
19    them with new ones.
20 Q.  And did you do that?
21 A.  No.
22 Q.  Why not?
23 A.  My doctor told me to quit taking them
24    immediately.
25 Q.  Right.  But you understood that you could
```

**Page 23**

```
1     return them, the tablets to Rite Aid?
2  A.  Yes.
3  Q.  And I'm sorry, why didn't you do that?
4  A.  My doctor told me to quit taking them, so why
5     would I return them?  I mean, I didn't need
6     them anymore.
7  Q.  Do you understand that if you return them, you
8     might be entitled to a refund?
9            MS. AVERY:  Objection to form.
10 Q.  I'm sorry?
11 A.  No, they were going to replace them.
12 Q.  That's what the letter said.
13 A.  The letter said they would replace the pills.
14 Q.  Do you recall seeing any reference in the
15    recall letter to a company called Stericycle?
16 A.  No.
17 Q.  When you stopped taking them, you just kept
18    the tablets?
19 A.  I just left them, yes, left them in my pill
20    bag.
21 Q.  Why was it that you didn't throw them away?
22 A.  I just didn't really think about it.  I just
23    left them in there.
24 Q.  When did you determine that you were going to
25    contact an attorney regarding your ingestion
```

**Page 24**

```
1     of Digitek?
2  A.  I got more letters, I think, and that's when I
3     contacted the attorneys.
4  Q.  More letters from whom?
5  A.  I guess your company or whoever.  I don't know
6     who exactly it was.  There was more letters
7     that came about the recall.
8  Q.  Do you remember what they said?
9  A.  No, ma'am, I don't.
10 Q.  Do you remember how many letters?
11 A.  No, I don't.
12 Q.  So when did contact an attorney?
13 A.  I'm not sure of the date.  It was awhile after
14    I received the letter.
15 Q.  And why is it that you decided to contact an
16    attorney?
17 A.  To recover my, what do you call it, my co-pays
18    for buying this medicine.
19 Q.  Was that your primary concern at that time, to
20    recover the co-pays?
21            MS. AVERY:  Objection to form.
22 A.  Pretty much.
23 Q.  And what attorney did you contact?
24 A.  I can't remember her name.
25 Q.  Was it the same firm that is currently
```

Dale Campbell

| Page 25 | Page 27 |
|---|---|
| 1      representing you? | 1      injuries that they're claiming? |
| 2   A.   No. | 2   A.   No, ma'am. |
| 3   Q.   How is it that you found the attorneys that | 3         MS. AVERY: Objection to form. |
| 4      are currently representing you? | 4   Q.   Do you have any information as who how you |
| 5   A.   The person I talked to referred me to them. | 5      were selected to be class representative? |
| 6   Q.   Had you seen any advertisements in newspapers | 6         MS. AVERY: Objection to form, |
| 7      or anything of that nature, magazines, on TV | 7      mischaracterizes the testimony. |
| 8      regarding litigation involving Digitek? | 8   A.   Repeat that. |
| 9   A.   Not that I remember, no. | 9   Q.   Do you know why you are a class |
| 10   Q.   And you don't remember what was in the letters | 10      representative? |
| 11      that you received? | 11   A.   I had medicine. |
| 12   A.   No. | 12   Q.   Do you understand that there are certain |
| 13   Q.   Did you retain copies of those? | 13      obligations that a class representative has as |
| 14   A.   I might have. I'm not sure if I have them or | 14      opposed to a member of a class action? |
| 15      not, to be honest with you. | 15   A.   No. |
| 16   Q.   Again, if you could take a look at them and | 16   Q.   So, you don't understand what the difference |
| 17      provide them to your attorney. | 17      in those obligations are? |
| 18         MS. AVERY: We'll take it under | 18         MS. AVERY: Objection to form. |
| 19      advisement. | 19   A.   Well, what do you mean? |
| 20   Q.   Do you understand that this lawsuit that | 20   Q.   I'm trying to find out what you mean. Do you |
| 21      you're involved in is a class action? | 21      understand what obligations a class |
| 22   A.   Yes, ma'am. | 22      representative has? |
| 23   Q.   Do you know what that means? | 23         MS. AVERY: Objection to form, calls |
| 24         MS. AVERY: Objection to form. | 24      for a legal conclusion. |
| 25   A.   Yeah, I'm representing the other people that | 25   A.   That I'm representing the other people that |

| Page 26 | Page 28 |
|---|---|
| 1      was taking this medicine as well. | 1      maybe got injured by this medicine. |
| 2   Q.   Do you understand that your obligations are as | 2   Q.   So, there are class representatives and then |
| 3      a class representative? | 3      there are class members. Do you understand |
| 4         MS. AVERY: Objection to form. | 4      that difference? |
| 5   A.   To try and recover the losses they had as | 5   A.   Yes. |
| 6      well. | 6         MS. AVERY: Objection to form. |
| 7   Q.   Do you understand that you could have filed a | 7   Q.   Do you know why or how you were chosen to be a |
| 8      lawsuit simply on your own behalf, in other | 8      class representative rather than a class |
| 9      words, not be part of a class action? | 9      member? |
| 10   A.   I'm sure I could have, yes. | 10         MS. AVERY: Objection to form. |
| 11   Q.   Why is it that you decided you wanted to | 11   A.   No. |
| 12      pursue this as a class action and be the | 12   Q.   Have you been promised anything other than |
| 13      representative? | 13      recovery as a member of the class? |
| 14   A.   To help the other people that took a loss as | 14   A.   No. |
| 15      well. | 15   Q.   What is it that you're hoping to recover in |
| 16   Q.   Have you met or spoken to any other members of | 16      this lawsuit? |
| 17      this class? | 17   A.   My co-pay for all the medicine and the co-pay |
| 18   A.   No, ma'am. | 18      for all of the people in the class action |
| 19   Q.   Do you know any of their names or any of | 19      suit. |
| 20      their -- | 20   Q.   Now, as I understand it, you are bringing |
| 21   A.   No, ma'am. | 21      claims alleging that you were physically |
| 22   Q.   Do you know where they live or any of that | 22      harmed by Digitek? |
| 23      information? | 23   A.   I was very sick, yes. |
| 24   A.   No. | 24   Q.   And you're also claiming a financial injury; |
| 25   Q.   Do you have any information regarding the | 25      is that correct? |

7 (Pages 25 to 28)

Dale Campbell

**Page 29**

```
 1   A.   A financial injury, financially my co-pay.
 2   Q.   And that's what was going to be my next
 3        question.  So, your financial injury that
 4        you're alleging is your co-pay amount; is that
 5        correct?
 6   A.   Yes.
 7   Q.   And what was your co-pay?
 8   A.   I don't remember.  It's been awhile since I've
 9        taken it.  It's changed.
10   Q.   Can you give me an idea, a range, any idea of
11        what your co-pay was?
12   A.   I'm not really sure.
13   Q.   Do you still have the same health insurance
14        that you had at that time?
15   A.   No, I believe that's changed as well.
16   Q.   What was it at that time?
17   A.   I can't remember.
18   Q.   What is your health insurance now?
19   A.   REDACTED  I believe it is.
20   Q.   Do you have any idea how long you've been with
21        REDACTED
22   A.   No, I don't.
23   Q.   Do you have any idea who any of your prior
24        health insurers may have been?
25   A.   No, ma'am.
```

**Page 30**

```
 1   Q.   What is your current co-pay for medications?
 2   A.   I think it's -- it depends.  I think it's like
 3        $5 or $10.
 4   Q.   Do you have any idea how many times you filled
 5        a prescription for Digitek?
 6   A.   No, ma'am.
 7   Q.   Now, your fact sheet indicates that you are
 8        not claiming any injury for mental or
 9        emotional distress; is that correct?
10   A.   Yeah.
11   Q.   It also indicates that you are not making a
12        lost wage claim; is that correct?
13   A.   Yes.
14   Q.   You are part of a medical monitoring class.
15        Do you understand that?
16   A.   Yes.
17   Q.   What does medical monitoring mean to your
18        knowledge, to your understanding?
19   A.   To monitor me for any type of change in my
20        health.
21        MS. AVERY:  Note an objection with
22        respect to the line of questioning.  Go ahead.
23        MR. DOHENY:  Are you still making a
24        medical monitoring claim?
25        MS. AVERY:  I think Judge Goodwin
```

**Page 31**

```
 1   has made it somewhat clear that he is not
 2   going to certify a class with respect to
 3   medical monitoring, that's my understanding.
 4        MS. DOWNIE:  I think that's clear
 5   too.  I think our dilemma is that the
 6   complaint has not been amended, and it's still
 7   part of Mr. Campbell's --
 8        MS. AVERY:  We can work out some
 9   stipulation with respect to amendments and
10   stuff.
11        MS. DOWNIE:  Are you able to
12   stipulate today that Mr. Campbell is not going
13   to be pursuing a medical monitoring claim on
14   behalf of the class, or to himself?
15        MS. AVERY:  I thought something had
16   been said with respect to that.
17        MS. DOWNIE:  There may have been
18   some E-mail communications, but I haven't seen
19   anything more than that, in letter or again in
20   amendment to the complaint.  If we can have a
21   stipulation on the record, then I won't pursue
22   that.
23        MS. AVERY:  Well, I think I've
24   indicated Judge Goodwin has made it clear that
25   he's not going to certify a class on behalf of
```

**Page 32**

```
 1   medical monitoring.
 2        MS. DOWNIE:  I appreciate that, and
 3   I think you're probably right, but I need to
 4   know that you're not -- that that claim is not
 5   going --
 6        MS. AVERY:  It certainly doesn't
 7   behoove us to file a motion for class
 8   certification on behalf of medical monitoring
 9   class when the Judge has told us he's not
10   going to certify that class.
11        MS. DOWNIE:  I couldn't agree with
12   you more.
13        MS. AVERY:  So why don't we proceed.
14        MS. DOWNIE:  I couldn't agree with
15   you more.  But I do need you to tell me that
16   you aren't pursuing that claim, then,
17   otherwise I need to ask the questions.
18        MS. AVERY:  Why don't we go off the
19   record for a second.
20            - - - -
21        (There was a discussion off the
22   record.)
23            - - - -
24        MS. AVERY:  We'll note for the
25   record in light of Judge Goodwin's comments
```

8  (Pages 29 to 32)

Dale Campbell

---

**Page 33**

1     regarding the medical monitoring, we are not
2     going to proceed with the medical monitoring
3     count.
4        MS. DOWNIE: Thank you.
5   BY MS. DOWNIE:
6   Q.   Mr. Campbell, can you turn to page 14 of your
7     fact sheet. At the top at page 9, it asks you
8     for insurance company, other company, Medicare
9     or Medicaid provided medical coverage to you
10     or paid medical bills on your behalf in the
11     last ten years. And it indicates that the
12     company was
13       And it says dates of service were
14     approximately 2006 to present.
15       Does that refresh your recollection
16     at all regarding who your insurer was or who
17     was paying your medical bills and bills for
18     medications during the time period 2006 to
19     present?
20   A.   Yes.
21   Q.   So that would have been the company to whom
22     you were submitting your bills for payment for
23     medications?
24   A.   Yes, ma'am.
25   Q.   So, it would have been them that collected

---

**Page 34**

1     your co-pay, is that correct, or through --
2   A.   Yes, I understand what you're saying. Yes.
3   Q.   Okay, thank you. Does that refresh your
4     recollection at all any further about what the
5     amount was of that co-pay?
6   A.   No, ma'am, it don't.
7   Q.   In preparing for your deposition today, other
8     than meeting with your attorney, did you meet
9     with anybody else?
10   A.   No, ma'am.
11   Q.   Did you review any documents in preparation
12     for your deposition today?
13   A.   Yes.
14   Q.   What did you review?
15       MS. AVERY: Objection -- well, let
16     me ask you this, you obviously asked the
17     question because you believe it's a proper
18     question to ask; right?
19       MS. DOWNIE: Uh-huh.
20       MS. AVERY: Is that a yes?
21       MS. DOWNIE: That's a yes.
22       MS. AVERY: If we ask that exact
23     same question of your clients or any of the
24     defense witnesses, are you going to allow your
25     clients to answer that question?

---

**Page 35**

1       MS. DOWNIE: I appreciate your
2     question.
3   BY MS. DOWNIE:
4   Q.   Other than documents that you may have
5     reviewed in connection with meeting with an
6     attorney or otherwise, with your attorney, was
7     there anything else that you looked at in
8     preparation for your deposition --
9       MS. AVERY: Well, I'll withdraw the
10     objection, I just want to know if you're
11     willing to have your client answer the same
12     question.
13       MS. DOWNIE: I can't stipulate to
14     that during this deposition, different
15     question, different time, different
16     situation. I'm not going to back myself into
17     a corner on that. I'll ask him the question,
18     you object, we'll move on.
19       MS. AVERY: That's a very typical
20     defense tactic. You can answer the question.
21     Well, why doesn't the court reporter read back
22     the question.
23       - - - -
24      (The record was read back by
25     the Court Reporter.)

---

**Page 36**

1       - - - -
2       MS. AVERY: Just note for the record
3     I'll withdrawal the objection that I stated.
4   A.   Just the papers here.
5   Q.   Your fact sheet?
6   A.   Uh-huh.
7   Q.   Was there anything else that you can think of?
8   A.   No.
9   Q.   Do you maintain, or do you have any records
10     regarding your use of Digitek?
11       MS. AVERY: Objection to form.
12   A.   Can you repeat that.
13   Q.   Do you have any records or documents relating
14     to your use of Digitek? And when I say your
15     use of Digitek, I mean if you have any
16     pharmaceutical records, prescription records
17     or medical records in your possession
18     regarding your use of Digitek?
19   A.   No, ma'am.
20   Q.   We have a document here which we'll go ahead
21     and mark as Exhibit No. 3.
22       - - - -
23      (Deposition Exhibit No. 3 was
24     marked for identification.)
25       - - - -

---

9 (Pages 33 to 36)

Dale Campbell

| Page 37 |
| --- |

1      MS. AVERY: Let me just explain to
2  the witness, because I don't know how many
3  documents you're going to be showing him or
4  anything else.  Lawyers in cases, in order to
5  keep documents straight, put what are called
6  either Bates numbers or document control
7  numbers on documents.  You'll see in the
8  bottom right-hand corner, this has a Campbell,
9  a bunch of zeros and a 1, that's sometimes
10  referred to as a document control number or
11  Bates number.
12      So, if Ericka shows you documents,
13  she'll probably refer to that number.  So,
14  don't be surprised, and you can use that
15  number to describe a particular document.
16  That way it's always clear on the record,
17  because the court reporter doesn't have a
18  photograph of the document in the record,
19  exactly what page it is that's being talked
20  about.  Okay?
21      THE WITNESS: Okay.
22  BY MS. DOWNIE:
23  Q.  I've showed you what we've marked as Exhibit
24     No. 3.  And as I understand it, it a photocopy
25     of the outside of the pill bottle that we have

| Page 38 |
| --- |

1     here with us today for the deposition.
2        Is that your understanding as well?
3  A.  Yes.
4  Q.  Other than this bottle, which indicates a
5     prescription that was filled by you at Rite
6     Aid for Digitek, do you have any other
7     bottles, prescription records or anything of
8     that nature showing your usage of Digitek?
9  A.  No, ma'am, I don't.
10  Q.  And let's just go over this a little bit, what
11     we're looking at right now.  It indicates that
12     the date filled was January 28, 2008; is that
13     correct?
14  A.  Yes.
15        MS. AVERY: The document speaks for
16     itself.
17  Q.  And it is a dosage of 125 microgram tablets;
18     is that right?
19  A.  Yes, ma'am.
20  Q.  And I believe it's Dr. Gustov Ellis; is that
21     right?
22  A.  Yes.
23  Q.  So, was he the doctor who prescribed this for
24     you?
25  A.  Yes, ma'am.

| Page 39 |
| --- |

1  Q.  It indicates that this prescription was filled
2     at Rite Aid; is that correct?
3  A.  Yes, ma'am.
4  Q.  Now, is Rite Aid where you would typically
5     have your prescriptions filled?
6  A.  Yes, ma'am.
7  Q.  To your knowledge, did you have all of your
8     prescriptions for Digoxin and/or Digitek
9     filled at this Rite Aid?
10  A.  To my knowledge, yes.
11  Q.  Would there potentially have been any other
12     pharmacies at which you would have filled a
13     prescription for Digitek?
14  A.  No, not that I can think of.
15  Q.  This indicates that the original prescription
16     date was May 8, 2007.  Do you see that?  It's
17     after the date filled date.
18  A.  Yes.
19        MS. AVERY: You mean where it says
20     original RX date?
21        MS. DOWNIE: That's correct.
22  A.  Yes.
23  Q.  And it also indicates that there were no
24     refills left; is that correct?
25  A.  Yes, ma'am.

| Page 40 |
| --- |

1  Q.  Do you know when you originally received a
2     prescription for Digitek?
3        MS. AVERY: You mean of this series
4     or ever?
5  Q.  Of this series, and then we'll go back.
6  A.  No.
7  Q.  How about ever?
8  A.  No.  I'm not real sure when I started this
9     medication.
10  Q.  When Dr. Ellis would write a prescription for
11     Digitek to you, do you have any memory or
12     recollection regarding how many refills he
13     would typically put on that prescription for
14     Digitek?
15        MS. AVERY: Objection to form.
16  A.  No, I'm not really sure exactly how many
17     refills.
18  Q.  Do you know how many tablets you would receive
19     in each prescription when it was filled?
20  A.  Usually 90.
21  Q.  So, it was usually a prescription for a
22     quantity of 90 tablets?
23  A.  Yes.
24  Q.  Now, this indicates that there were no refills
25     left.  Did you at any time return to Dr. Ellis

Dale Campbell

Page 49

REDACTED

24
25

Page 50

REDACTED

Page 51

Page 52

| | |
|---|---|
| 1 | after I got diagnosed with the heart problem. |
| 2 | So, I try to walk, but with my back, it |
| 3 | depends. |
| 4 | Q. When did you retire, or when did you stop |
| 5 | working rather? |
| 6 | A. It was last year or the year before is when I |
| 7 | was done working. |
| 8 | Q. Was that 2008 or 2007? |
| 9 | A. Yeah, 2007 I believe it was. |
| 10 | Q. Again, just for clarification, you've made |
| 11 | some reference to your work. What kind of |
| 12 | work did you do? |
| 13 | A. I was a painter. |
| 14 | Q. Did you work for a company or were you self- |
| 15 | employed? |
| 16 | A. No, I worked for a company. |
| 17 | Q. What kinds of painting would you do, |
| 18 | commercial, residential? |
| 19 | A. It was truck bodies. |
| 20 | Q. And how long had you done that kind of work? |
| 21 | A. I painted for 20 years. |
| 22 | Q. Do you drink alcohol? |
| 23 | A. No. |
| 24 | Q. Do you smoke? |
| 25 | A. On occasion. |

13 (Pages 49 to 52)

Dale Campbell

Page 69

1    A.   Mr. McCaslin.
2         MS. AVERY:  Do you need to take a
3    break or do you just need to stand?
4         THE WITNESS:  No, I'll just stand.
5    BY MS. DOWNIE:
6    Q.   Other than the medications that we've already
7         talked about, are there any other medications
8         that you're currently taking?
9    A.   No.
10   Q.   To the best of your recollection, were there
11        any other medications that you were taking,
12        other than Digitek, which we'll talk about, in
13        May of 2008?
14   A.   Not that I can think of.
15   Q.   Do you regularly take any over-the-counter
16        medications?
17   A.   Aspirin.
18   Q.   Anything other than that?
19   A.   No.
20   Q.   Do you take any vitamins or herbal
21        supplements?
22   A.   The Vitamin D and calcium tablets.
23   Q.   But nothing other than that?
24   A.   No.
25   Q.   Looking at page 10 of your fact sheet, it asks

Page 70

1         about specific types of cardiovascular
2         diagnostic tests that you've had.  And the
3         first one is a stress test and an EKG and an
4         ultrasound.  And it appears that all of those
5         have been prescribed by Dr. Ellis?
6    A.   Yes.
7    Q.   And that you have those conducted annually; is
8         that correct?
9    A.   Yes, ma'am.
10   Q.   When did you begin having those annual tests
11        performed?
12   A.   When I got diagnosed with the heart problems.
13   Q.   It indicates here that the results of the
14        diagnostic tests is stable?
15   A.   Yes.
16   Q.   To your knowledge, has there ever been any
17        other result of those diagnostic tests other
18        than stable?
19   A.   When I first got diagnosed, yes.
20   Q.   Do you know what those results were?
21   A.   No, I don't.
22   Q.   Do you know, after you were put on medication
23        after that hospitalization, when your results
24        began to -- you began to see stable results on
25        those tests?

Page 71

1    A.   I don't know exact times and dates, no.
2    Q.   When were you first prescribed Digitek?
3    A.   When I first got the heart problems.
4    Q.   Was Dr. Ellis the physician who prescribed
5         that to you?
6    A.   Yes, ma'am.
7    Q.   Nows, the dosage on this bottle is .125
8         milligrams.  To your knowledge, has your
9         dosage always been .125 milligrams, or has it
10        changed over time?
11   A.   No, I started out on a stronger dose.
12   Q.   And what would that dose have been, do you
13        remember?
14   A.   Whatever the next one is up is, I don't know,
15        12-something I think it was -- not 12.  I
16        can't remember exactly, all I know it was a
17        stronger one.
18   Q.   How long were you on the stronger dose?
19   A.   I'm not really sure.
20   Q.   Do you have any recollection as to whether or
21        not it would have been less than a year, less
22        than six months?
23   A.   Yeah, I believe it was less than a year.
24   Q.   And then at some point Dr. Ellis lowered your
25        dosage?

Page 72

1    A.   Yes.
2    Q.   Were there any other changes in your dosage
3         other than that dosage change we just
4         discussed?
5    A.   Not that I can think of.
6    Q.   I believe you indicated that you stopped
7         taking Digitek after you received the recall
8         notice and spoke to Dr. Ellis; is that
9         correct?
10   A.   Yes, he told me to quit taking it
11        immediately.
12   Q.   At any time other than that, did you stop
13        taking Digitek for any period of time, between
14        the time you first started taking it and after
15        you stopped taking it in 2008?
16   A.   No, ma'am.
17   Q.   You indicated that you filled your
18        prescription at Rite Aid; is that correct?
19   A.   Yes.
20   Q.   Now, when Dr. Ellis would write a prescription
21        for your medication, do you know if he wrote a
22        prescription for Digitek or Digoxin?
23   A.   I believe originally I started on Digoxin, was
24        the original dose, or the medicine.
25   Q.   Do you have any knowledge as to when that

18  (Pages 69 to 72)

Dale Campbell

---

**Page 73**

1     changed?
2  A.  Something with the insurance, that's when it
3     changed to Digitek.
4  Q.  Do you know when that was?
5  A.  No, ma'am, I don't.
6  Q.  Would it have been before you filled this
7     prescription in January of 2008?
8  A.  Would what have been?
9  Q.  The change with your insurance.
10  A.  Oh, yeah.
11  Q.  Now, when you first started taking Digoxin,
12     did you have any discussion with Dr. Ellis
13     regarding what the medication was supposed to
14     do for you?
15  A.  No, I didn't. I'm sure he has told me, but,
16     you know, I don't remember exactly.
17  Q.  Do you remember if he discussed with you
18     whether or not there were any risks associated
19     with taking that medication?
20  A.  No, I don't remember.
21  Q.  Did he explain to you any benefits that were
22     associated with taking the medication?
23  A.  He just told me I needed it.
24  Q.  With any of the medications that Dr. Ellis has
25     prescribed for you, has he ever gone through

---

**Page 74**

1     the process of describing to you what some of
2     the risks and what some of the benefits would
3     be of taking that medication?
4       MS. AVERY: Objection to form.
5  A.  I'm sure he has.
6  Q.  Do you have any specific --
7  A.  No specifics. He's a very, you know, very
8     good doctor. He's very blunt, right to the
9     point.
10  Q.  But you don't have any specific recollection?
11  A.  No, I don't.
12  Q.  When you first filled a prescription for
13     Digoxin, do you recall whether or not when you
14     received the prescription you read any
15     materials, any information or materials that
16     were provided to you at that time?
17  A.  I'm sure I did. I usually like to know what
18     I'm taking. I'm sure I did, but not the
19     specifics. I can't remember.
20  Q.  Do you know or recall whether or not you ever
21     read any of the materials that came with your
22     prescription for Digoxin or Digitek after that
23     first time when you first had it filled, the
24     prescription filled, if that makes sense?
25  A.  No.

---

**Page 75**

1  Q.  Did you do any research regarding Digoxin or
2     Digitek when you first started taking it?
3  A.  No, I just -- my doctor told me I needed this
4     medicine and I took it. You know, I got faith
5     in him. I hate to be this way, but I got to
6     use the men's room again.
7  Q.  Oh, that's quite all right.
8       - - - -
9       (There was a recess in the
10     proceedings.)
11       - - - -
12  BY MS. DOWNIE:
13  Q.  Have you ever known anybody else who took
14     Digitek or Digoxin?
15  A.  No, ma'am.
16  Q.  I understand from your earlier testimony, you
17     haven't spoken to any of your class members
18     about their ingestion; is that right?
19  A.  Yes.
20  Q.  Other than talking to your doctor about
21     Digitek or Digoxin, did you speak to anybody
22     else while you were taking the drug about the
23     drug?
24  A.  No.
25  Q.  Ever talk to your pharmacist about the

---

**Page 76**

1     medications you were taking?
2  A.  No.
3  Q.  Do you know who your pharmacist was? Is there
4     the same person there?
5  A.  No, they're different all the time.
6  Q.  Other than talking to Dr. Ellis, have you
7     talked to Dr. McCaslin about taking Digitek or
8     Digoxin?
9  A.  Not that I can remember.
10  Q.  Have you talked to Dr. McCaslin about the
11     recall?
12  A.  No.
13  Q.  Have you talked to either Dr. McCaslin or
14     Dr. Ellis about this lawsuit?
15  A.  No, not really, not that I can think of.
16  Q.  When was the last time you saw Dr. Ellis?
17  A.  April I believe of this year.
18  Q.  Do you have another scheduled appointment with
19     him?
20  A.  I'm sure I do, I'm just not sure of the date.
21  Q.  How often at this point do you see him
22     regularly?
23  A.  I believe it's annually now.
24  Q.  So, it's an annual visit unless there's a
25     problem that comes up?

---

19 (Pages 73 to 76)

Dale Campbell

| Page 77 |
|---|

1   A.   Yes.
2   Q.   Did you actually see him after you received
3        notice of the recall?
4   A.   No.
5   Q.   You just spoke to him on the phone?
6   A.   Yes.
7   Q.   And as I recall from your earlier testimony,
8        you indicated that he told you to stop taking
9        the Digitek; is that correct?
10  A.   Yes, he said stop taking it immediately.
11  Q.   Did he put you on any other medications at
12       that time?
13  A.   No, ma'am.
14  Q.   Has he put you on any other type of
15       medications since that conversation?
16  A.   The Avalide.
17  Q.   I'm sorry, you may have said this, but when
18       you start taking the Avalide?
19  A.   I'm not exactly sure of the exact date.
20  Q.   When you received your Digitek prescription,
21       did it always come in a bottle like that, a
22       prescription bottle?
23  A.   Yes.
24  Q.   And when you paid for your Digitek, we
25       identified I think your health insurer during

| Page 78 |
|---|

1        that time period.  And I think you also
2        indicated you had a co-pay that you would
3        pay for that medication; is that right?
4   A.   Yes, ma'am.
5   Q.   But you can't recall how much that co-pay was?
6   A.   No, it changed.
7   Q.   Let me ask you, do you have any recollection
8        as to whether or not it would have been more
9        than $10?
10  A.   No.
11  Q.   After you started taking Digitek, do you
12       recall whether or not Dr. Ellis ever indicated
13       that he was going to need to test you on a
14       regular basis, have bloodwork done or any
15       other kind of test to monitor you?
16  A.   They do bloodwork, that's all I know, they do
17       bloodwork on me, Dr. McCaslin and Dr. Ellis.
18  Q.   How often do they do bloodwork on you?
19  A.   Geez, I'm not really sure.  I mean, I just had
20       it done, I know that, but.
21  Q.   Is it annual?
22  A.   Sometimes more often I believe, yes.
23  Q.   As of May of 2008, do you recall when prior to
24       that you had had bloodwork done?
25  A.   No, I don't recall.

| Page 79 |
|---|

1   Q.   In 2008, were you having bloodwork done
2        generally on an annual basis, or was it more
3        often, if you recall?
4   A.   They surprise me, you know, when I go in, hey,
5        we need blood.
6   Q.   How often do you see Dr. McCaslin?
7   A.   Every six months.
8   Q.   And if you would have bloodwork done, where
9        would you go to have that performed?
10  A.   They usually draw it right there.
11  Q.   And how about with Dr. Ellis, would he also
12       draw it right there, or would he send you
13       somewhere?
14  A.   They would send me to the Heritage Valley
15       place to take it.
16  Q.   Sewickley?
17  A.   Well, it's in Moon, but it's Heritage Valley,
18       another.
19  Q.   Got ya.  To your knowledge, has Dr. Ellis or
20       Dr. McCaslin called you, or somebody from
21       their office called you concerned about any of
22       the bloodwork results?
23  A.   When I had the cholesterol medicine, yes, they
24       had called me.
25  Q.   Other than that cholesterol, anything else?

| Page 80 |
|---|

1   A.   No, not that I can think of, no.
2   Q.   Do you know whether or not Dr. Ellis or
3        Dr. McCaslin has ever testified your serum
4        Digoxin levels?
5   A.   I have no clue what they test for, no.
6   Q.   Have you ever been told that you had an
7        elevated serum Digoxin level?
8   A.   No.
9   Q.   Have you ever talked to anybody from either
10       one of our clients, Actavis or Mylan?
11  A.   Not that I remember, no.
12  Q.   Have you ever had any written contact with
13       anybody from our clients?
14            MS. AVERY:  I assume you mean aside
15       from us obviously?
16            MS. DOWNIE:  Yeah, thank you.
17  A.   No.
18  Q.   Did Dr. Ellis or Dr. McCaslin ever provide you
19       with any samples of Digitek or Digoxin?
20  A.   No.
21  Q.   Do you ever remember seeing any other name on
22       your prescription bottle other than Digitek or
23       Digoxin?
24  A.   No.
25  Q.   When you took your Digitek or Digoxin, when

20  (Pages 77 to 80)

Dale Campbell

Page 85

1    them filled for Digitek, were for 90 days; is
2    that correct?
3    A.   Yes.
4    Q.   So, would you sometimes get your prescriptions
5    filled before that 90-day supply would run
6    out?
7    A.   Yes, I believe I did, yes.
8    Q.   And you would just keep those extras?
9    A.   Yeah, I was like ahead of the game, if you
10   want to put it that way.
11   Q.   Do you know how many extras you had at the
12   time that you filled your prescription in
13   January of 2008?
14   A.   No, I wouldn't.
15   Q.   Do you know if it would have been just a few,
16   more than five?
17   A.   I have no clue.
18   Q.   20, 30?
19   A.   No, I'm sure it wasn't that many, but I mean,
20   it was a few extras. I don't know how exactly
21   many extras, but, you know.
22   Q.   Would you typically take those extras before
23   beginning the new bottle?
24   A.   Yes, ma'am.
25   Q.   So, in May of 2008, is it fair to say that you

Page 86

1    probably had already taken those tablets from
2    the previous prescription and were only taking
3    pills out of that bottle?
4    A.   I would say yes.
5    Q.   At any time that you were taking Digitek, did
6    you ever notice anything unusual regarding
7    their appearance?
8    A.   No.
9    Q.   Did you ever notice whether or not any of them
10   looked larger or smaller than you had
11   typically seen them appear?
12   A.   No, ma'am. All I knew is they were my
13   medicine, I took them, you know.
14   Q.   Now, you claim in your fact sheet that you
15   suffered injuries as a result of taking the
16   Digitek.
17   A.   I was sick.
18   Q.   When did you first begin suffering symptoms?
19   A.   I can't give you an exact date, all I know is
20   I was sick.
21   Q.   Why don't we try this, was it a weekday or on
22   a weekend?
23   A.   I'm not really sure.
24   Q.   Was it in the morning or the afternoon or the
25   evening?

Page 87

1    A.   I have no clue.
2    Q.   How long after you took your medication in the
3    morning did you begin to feel, as you've
4    termed it, sick?
5    A.   I have not a clue. It's been awhile. I mean,
6    all I know is I was ill.
7    Q.   Tell me exactly how you were feeling.
8    A.   Dizzy, nausea, you know, I had palpitations.
9    I just wasn't feeling great at all.
10   Q.   Did you throw up?
11   A.   Yes, I did.
12   Q.   How many times?
13   A.   Just once that I know of.
14   Q.   How long did these symptoms last?
15   A.   Quite awhile, that's all I know, is awhile,
16   because my sisters and my niece and that
17   wanted me to go see the doctor because I
18   wasn't feeling good, I wasn't looking good.
19   Q.   When you say quite awhile, that means
20   different things to different people, so.
21   A.   I'm not exactly sure on exact times and dates,
22   but I was sick for awhile.
23   Q.   Was it more than a day or two days?
24   A.   Oh, yeah, definitely.
25   Q.   Was it more than a week?

Page 88

1    A.   I would say, yes.
2    Q.   Was it more than two weeks?
3    A.   Yes, definitely.
4    Q.   More than three weeks?
5    A.   It was probably a month anyhow, let's put it
6    that way. It might have even been more.
7    Q.   During that month that you weren't feeling
8    well, and you've already said you were feeling
9    dizzy, nauseous and palpitations. Can you
10   describe for me any other way that you were
11   feeling, any other symptoms that you were
12   having.
13   A.   Chest pains, tired, very tired. I would just
14   collapse, you know, pass out. I slept quite a
15   bit.
16   Q.   Did you call the doctor during this time
17   period?
18   A.   No.
19   Q.   Why not?
20   A.   Stubborn, I'm sick of doctors.
21   Q.   I'm guessing you probably didn't go to a
22   hospital or an ER?
23   A.   No, I did not.
24   Q.   Did you speak to anybody in your doctor's
25   office about how you were feeling?

22  (Pages 85 to 88)

Dale Campbell

Page 89

1   A.   Nope. I just figured it was my normal heart
2        deal that was making me feel bad, I thought I
3        was going with the program.
4   Q.   You indicated that you received a recall
5        letter sometime in May of 2008; is that
6        correct?
7   A.   Yes.
8   Q.   You also testified that you stopped taking
9        your Digitek per Dr. Ellis' recommendation
10       right away; is that right?
11  A.   Yes.
12  Q.   So, when you were feeling bad in May of 2008,
13       were you feeling -- put that in perspective
14       for me as to when you stopped taking your
15       medication.
16  A.   Excuse me, you lost me.
17  Q.   Fair enough. You've testified that you
18       stopped taking the medication in May of 2008?
19  A.   Yes, ma'am.
20  Q.   And that you also were suffering symptoms
21       related to your ingestion of Digitek in May of
22       2008, and that those symptoms lasted for a
23       month?
24            MS. AVERY: He said approximately.
25  A.   Approximately a month, yes.

Page 90

1   Q.   Okay. So, did you stop taking Digitek before
2        you started feeling these symptoms?
3   A.   Before I started feeling the symptoms?
4   Q.   That you've just testified to.
5   A.   No, I didn't stop taking it.
6   Q.   Did you stop taking Digitek during the time
7        period that you were experiencing the
8        symptoms?
9   A.   No.
10  Q.   How long after the symptoms stopped did you
11       stop taking Digitek?
12  A.   I can't really tell you. I don't know. I'm
13       not really exactly sure how long. I was sick,
14       you know, I'm not really sure how long it took
15       afterwards that I was feeling better.
16            MS. AVERY: Off the record.
17                   - - - -
18            (There was a discussion off the
19       record.)
20                   - - - -
21            (Luncheon recess at 12:03 p.m. At
22       12:49 p.m., the deposition was reconvened as
23       follows):
24                   - - - -
25  BY MS. DOWNIE:

Page 91

1   Q.   We were talking before we took a break about
2        May of 2008 and the injury that you believe
3        that you suffered. And you had described for
4        me some of the symptoms that you felt you
5        suffered, and you had indicated that the
6        symptoms lasted approximately a month.
7            MS. AVERY: I think it's clear for
8        the record he was guestimating, but go ahead.
9            MS. DOWNIE: Yeah, and that's why I
10       said approximate.
11  BY MS. DOWNIE:
12  Q.   How long -- this may have been answered, and I
13       apologize if it was. But how long after you
14       started experiencing symptoms was it until you
15       received the recall letter?
16  A.   Oh, I don't have a clue, I really don't have a
17       clue.
18  Q.   Now, you testified that you were feeling ill
19       for a period of time?
20  A.   Yes.
21  Q.   Tell me who was around you during that time
22       that could testify or would have information
23       regarding how you were feeling during that
24       time period.
25  A.   My sister, my niece and my roommate.

Page 92

1   Q.   What is your sister's name?
2   A.   *REDACTED*
3   Q.   And your niece?
4   A.   *REDACTED*
5   Q.   And your roommate?
6   A.   *REDACTED*
7            MS. AVERY: Just so you're aware,
8        they're identified in the plaintiff fact
9        sheet.
10           MS. DOWNIE: Okay.
11  Q.   And they were around you during the entire
12       time that you were feeling poorly?
13  A.   Cathy was anyway. My sister and my niece,
14       yes, they were in and out.
15  Q.   And I think you previously testified that you
16       did not speak to any physicians during that
17       time about how you were feeling?
18  A.   No.
19  Q.   And you did not go to the hospital to seek
20       medical treatment?
21  A.   No, I did not.
22  Q.   So, did it resolve on its own, or was there --
23       did you do anything, take any kind of
24       medication or treatment?
25  A.   No, it just sort of went away.

23 (Pages 89 to 92)

Dale Campbell

**Page 97**

1  A.  No.
2  Q.  Then why do you believe that it was related to
3      your ingestion of Digitek?
4  A.  It went away after I quit taking it.
5  Q.  Well, when did you quit taking it and when was
6      that related to how you were feeling?
7  A.  I quit taking it when the doctor told me to.
8  Q.  Right.
9  A.  But I wasn't -- a week or two after that, I
10     was feeling better, a couple of weeks after
11     that, and I was feeling sort of back to normal
12     again.  I mean, the nausea, the dizziness and
13     all that sort of tamed down.
14 Q.  Again, I'm just trying to understand timing.
15     So, you're saying that you started to feel
16     better after you stopped taking it?
17 A.  Yeah, not right away, but it took a little
18     while, but yes.
19 Q.  So, were you still feeling ill at the time
20     that you received the recall letter?
21 A.  When I received the recall, oh, yeah, I was
22     definitely ill when I received the recall
23     letter.  I was ill before that.
24 Q.  And you called Dr. Ellis about the recall
25     letter; correct?

**Page 98**

1  A.  I called him when I got the letter, yes.
2  Q.  But you didn't talk to him about how you were
3      feeling?
4  A.  I think I did say something to him about me
5      being sick.
6  Q.  Oh, you did?
7  A.  I might have, yes.
8  Q.  What would you maybe have said?
9  A.  I told him I hadn't been feeling good, and
10     then I had got this letter.  And he was the
11     one that told me to quit taking the pills
12     immediately.
13 Q.  Did he want to have you come in and see him?
14 A.  No, he didn't say that.  He just told me to
15     quit taking the pills immediately.
16 Q.  At the time that you were talking to him, how
17     long had you been feeling bad?
18 A.  A few weeks anyhow, if not a month.  I don't
19     know.
20 Q.  Did you tell him that you had been feeling
21     badly for that length of time?
22 A.  I can't remember what our conversation was
23     exactly about, but I know I told him I hadn't
24     been feeling right, and my sister and my niece
25     and that wanted me to go see the doctor.  And

**Page 99**

1      I'm bullheaded, I went to bed.
2  Q.  But he didn't want to see you?
3  A.  He didn't say that he didn't want to see me,
4      he just told me to quit taking the medicine,
5      and that was it.
6  Q.  When was the next time you spoke to him?
7  A.  This past March when I went to my visit.
8  Q.  Have you seen him since March?
9  A.  No.
10 Q.  Have you talked to him since March?
11 A.  No.
12 Q.  So, just so I'm clear, you spoke to him in May
13     of 2008 when you received the recall letter?
14 A.  Uh-huh.
15 Q.  And then you spoke to him and saw him in March
16     of 2009; is that right?
17 A.  Yep.
18 Q.  And you haven't seen or spoken to him at any
19     other time since May of 2008?
20 A.  Nope.
21 Q.  Since May of 2008, have you spoken to any
22     other physicians about Digitek and/or how you
23     were feeling in May of 2008?
24 A.  No.
25 Q.  Now, you said you think now that you may have

**Page 100**

1      told him in May of 2008 how you were feeling,
2      and that you may have discussed it further
3      with him in March of 2009; is that correct?
4  A.  I might have brought it up or something, how I
5      was feeling and it went away, you know, after
6      I quit taking the medicine.  But I'm not
7      really sure of when it resolved, you know.
8  Q.  When did you decide to file this lawsuit or
9      become involved in this lawsuit?
10 A.  When did I decide to?
11 Q.  Yeah.
12 A.  It was probably a couple of months after I
13     received the letter, I got more letters.
14 Q.  So, at the time that you saw Dr. Ellis in
15     March of 2009, you had already made the
16     decision to proceed with the lawsuit; is that
17     correct?
18 A.  Yes.
19 Q.  Did you tell Dr. Ellis in March of 2009 that
20     you were involved in a lawsuit?
21 A.  I don't know if I told him or not, to be
22     honest with you.
23 Q.  Did you or did you not ask him any opinion
24     about whether or not the Digitek may have
25     caused your illness that you experienced in

25 (Pages 97 to 100)

Dale Campbell

| Page 101 | Page 103 |
|---|---|
| 1    May of 2008? | 1 |
| 2  A.  I don't really think I did. | 2 |
| 3  Q.  Is there any other reason, other than what | 3 |
| 4    you've already told me, as to why you believe | 4 |
| 5    that Digitek caused the illness that you | 5 |
| 6    experienced in May of 2008? | 6 |
| 7  A.  Nothing I can think of, any other reason. | 7 |
| 8  Q.  What is it that you believe that the | 8 |
| 9    defendants did wrong in their production or | 9 |
| 10    manufacturer of Digitek? | 10    *REDACTED* |
| 11  A.  Well, evidently they didn't use the quality | 11 |
| 12    control that should have been used. | 12 |
| 13  Q.  How so? | 13 |
| 14  A.  Well, if there's a recall, what happens?  How | 14 |
| 15    does that recall come about? | 15 |
| 16  Q.  Why was there a recall? | 16 |
| 17  A.  Because the pills were extra strength, | 17 |
| 18    according to the paper, extra strength, you | 18 |
| 19    know, more medicine in them than there's | 19 |
| 20    supposed to be. | 20 |
| 21  Q.  Do you know how many pills were found to be | 21 |
| 22    extra strength? | 22 |
| 23  A.  No, I don't. | 23 |
| 24  Q.  Do you know actually if any pills were found | 24 |
| 25    to be extra strength? | 25 |

| Page 102 | Page 104 |
|---|---|
| *REDACTED* | |

26  (Pages 101 to 104)

Dale Campbell

Page 105

1  Q.  When you say your company, who do you mean?
2  A.  I think it was from Bertech I believe.
3  Q.  And do you recall what that letter said?
4  A.  Not exactly, no.
5  Q.  Do you recall exactly how soon after receiving
6      the Rite Aid letter you received that letter?
7  A.  Not exactly.  It wasn't long.  There was a few
8      of them that come in, like, back to back.
9  Q.  Do you recall whether or not any of the
10     letters that you received contained any
11     additional information or different
12     information than the original recall letter?
13 A.  I don't recollect.
14 Q.  Other than the physical injuries that we've
15     already discussed that you believe you
16     suffered in May of 2008, any there any other
17     physical injuries that you believe you
18     suffered as a result of taking Digitek?
19         MS. AVERY:  Can I have the question
20     read back, please.
21             - - - -
22         (The record was read back by
23     the Court Reporter.)
24             - - - -
25         MS. AVERY:  Just for the record,

Page 106

1      when you keep saying in May of 2008 and he
2      keeps saying, you know, guestimating it was a
3      month, so that May might actually include part
4      of April.  And I think you're assuming that;
5      correct?
6          MS. DOWNIE:  Yeah, I'm saying May of
7      2008 for ease of discussing it.
8          MS. AVERY:  That's fine, I just
9      wanted to make sure that everybody understood
10     that.
11         MS. DOWNIE:  Okay.
12 BY MS. DOWNIE:
13 Q.  Any other physical injuries?
14 A.  None that I know of.
15 Q.  And we've talked about your co-pays for
16     filling your prescription for Digitek.
17 A.  Yes.
18 Q.  What time period do you believe you should be
19     reimbursed for those co-pays?
20 A.  Whenever you found out they were bad.
21 Q.  So, if there was only one lot of Digitek, for
22     example, that was in question, or that part of
23     the lot that you received, or time period?
24     I'm not sure I'm understanding --
25         MS. AVERY:  Objection, calls for

Page 107

1      speculation.
2          MS. DOWNIE:  Yeah, it does.
3  Q.  I'm trying to understand specifically when you
4      think you should be reimbursed.
5  A.  For whatever the bad medicine was.  For me
6      specifically you're saying; right?
7  Q.  Uh-huh.
8  A.  Yeah, whatever time frame the bad medicine was
9      there, that's what I feel I should be
10     compensated for.
11 Q.  Are there any other financial injuries that
12     you believe you've suffered other than the
13     co-pay?
14 A.  Financial injuries?
15 Q.  That's correct.
16 A.  No.
17 Q.  Do you believe that you're going to require
18     any future medical treatment?
19         MS. AVERY:  Okay, you obviously
20     recognize the fault in that, so why don't you
21     try and rephrase it.
22 Q.  Your fact sheet does identify some fact
23     witnesses, and I believe we already probably
24     identified them, but I just want to make sure
25     that we, in fact, know who they are.  And

Page 108

1      that's page 16.
2  A.      REDACTED
3
4
5  Q.  Okay, great.  Anybody else?
6  A.  No.
7  Q.  Other than Dr. Ellis and Dr. McCaslin, are you
8      currently seeing any other physicians?
9  A.  No.
10 Q.  In the fact sheet, it indicates for the
11     injuries that you claim you suffered, that
12     bradycardia is one of the symptoms that you
13     were suffering.
14         Do you know what that is?
15 A.  Not really.  I did when I read it.
16 Q.  Your fact sheet on page 4 indicates that you
17     believe that the Digitek was defective in that
18     the dosage was inconsistent with what was
19     prescribed.
20         And I guess your testimony earlier
21     was that you believe that it was in excess of
22     what it should have been; is that correct?
23 A.  Yes.
24 Q.  If we wanted to find out exactly how many
25     prescriptions you had for Digoxin and/or

27  (Pages 105 to 108)

Dale Campbell

**Page 109**

1       Digitek, the Rite Aid that you've identified
2       and the Rite Aid that's on that bottle would
3       be the pharmacy from which you would have had
4       those filled?
5   A.   Yes.
6   Q.   What, if any, prognosis has Dr. Ellis given to
7       you with respect to your heart problems? In
8       other words, has he talked to you about
9       complications or problems he expects that you
10      might experience in the future?
11   A.   Enlargement of my heart, hardening of the
12      arteries.
13   Q.   You mentioned earlier that you had a cracked
14      rib as a result of an awful coughing fit?
15   A.   Yeah.
16   Q.   It sounds like you were pretty sick at that
17      point. When was that?
18   A.   I'm not exactly sure of the exact time, but I
19      had a bad cold, is what it was.
20   Q.   Was it within the last year or two?
21   A.   Yeah, it was within the last year, yes.
22   Q.   Were you hospitalized at all during that time
23      period?
24   A.   No.
25   Q.   You are currently divorced; is that correct?

**Page 110**

1   A.   Yes.
2   Q.   So you don't have a loss of consortium claim
3      or anything like that?
4   A.   No.
5   Q.   Your fact sheet talks about the workers' comp
6      and Social Security disability claims, and it
7      looks like that time period says the
8      application was filed in 2004 or 2005.
9       Does that sound right to you?
10   A.   Yeah.
11      MS. DOWNIE: Why don't we go off the
12      record for a moment or two.
13       - - - -
14      (There was a discussion off the
15      record.)
16       - - - -
17      MS. DOWNIE: Back on the record.
18 BY MS. DOWNIE:
19   Q.   I just want to confirm, with respect to the
20      members of your class, I know you haven't met
21      any of them or talked to any of them, do you
22      have any information at all regarding the
23      nature of their claims?
24      MS. AVERY: Objection to form.
25   A.   No.

**Page 111**

1   Q.   Do you have any information specifically
2      regarding what medical damages they're
3      claiming?
4   A.   No.
5   Q.   Do you have any information specifically
6      regarding the financial damages that they are
7      claiming?
8   A.   No, I do not.
9      MS. DOWNIE: Those are all of the
10      questions I have. Thank you.
11       - - - -
12        EXAMINATION
13       - - - -
14 BY MR. DOHENY:
15   Q.   Mr. Campbell?
16   A.   Yes.
17   Q.   John Doheny, I introduced myself previously.
18      I am an attorney for Actavis, which made
19      Digitek for a period of time.
20       You mentioned that you hurt your
21      back carrying a 100-pound sack?
22   A.   Yes, sir.
23   Q.   Do you recall when that was?
24   A.   2000.
25   Q.   Was that before you began with the heart

**Page 112**

1      problems or after?
2   A.   That was before.
3   Q.   Are the doctors telling you to get back
4      surgery?
5   A.   They gave me a 50/50 chance it could put me in
6      a wheelchair.
7   Q.   How much Social Security disability do you
8      receive a month?
9   A.   *REDACTED*
10   Q.   Do you have any other sources of income
11      besides that right now?
12   A.   No.
13   Q.   You said your roommate is?
14   A.   *REDACTED*
15   Q.   How do you spell that last name? I know it's
16      in the --
17   A.   *REDACTED*
18      MS. AVERY: She is identified in the
19      plaintiff fact sheet.
20   Q.   Was she your roommate in April of 2008?
21   A.   Yes.
22   Q.   Is that roughly the month you say you were
23      having some problems?
24   A.   Yes.
25   Q.   Which you relate to Digitek?

28 (Pages 109 to 112)

Dale Campbell

| Page 113 |
|---|

1   A.   Yes.
2   Q.   Has anybody else related those problems that
3       you've told us about in April of '08 to
4       Digitek, any other person, doctor, pharmacist?
5   A.   No.
6   Q.   Layperson?
7   A.   No, sir.
8   Q.   Are you taking any heart medication today,
9       which is July 31, 2009?
10   A.   Yes.
11          MS. AVERY: Objection, asked and
12       answered.
13   Q.   And it began with an A, did it, but what is
14       it?
15   A.   Carvedilol and Avalide.
16   Q.   No type of digitalis type of medication?
17   A.   No, sir.
18   Q.   You're not taking Digitek?
19   A.   No.
20   Q.   You're not taking Lenoxin?
21   A.   No.
22   Q.   You're not taking Digoxin?
23   A.   No, sir.
24   Q.   Now, if you become the class rep here, have
25       you ever been a class rep in a class action

| Page 114 |
|---|

1       lawsuit before?
2   A.   No, sir.
3   Q.   Have you been told you will have to put any of
4       your own money into the procedure of being the
5       class rep?
6          MS. AVERY: Objection. I think that
7       you can see that that may or may not impinge
8       on the attorney-client privilege. If you can
9       try and rephrase it, I think you can get the
10       information you're looking for, but I would
11       appreciate it if you can try and rephrase it
12       so as to avoid a possible infringing of a
13       privilege.
14  BY MR. DOHENY:
15   Q.   Are you expecting to put some of your own
16       money into the effort to be the class rep?
17   A.   No, sir.
18          MR. DOHENY: That's it. Thank you.
19          MS. AVERY: We are not waiving
20       reading and signing. Is there anything else
21       that -- I think everything else was covered.
22          MS. DOWNIE: No, I don't think
23       there's anything else that needs to go on the
24       record.
25       - - - -

| Page 115 |
|---|

1          (There was a discussion off the
2     record.)
3       - - - -
4   (The proceedings were concluded at 1:32 p.m.)
5       - - - -

| Page 116 |
|---|

1  COMMONWEALTH OF PENNSYLVANIA)      CERTIFICATE
2  COUNTY OF ALLEGHENY          )   SS:
3      I, Pamela L. Beck, a Court Reporter and Notary
4  Public in and for the Commonwealth of Pennsylvania,
5  do hereby certify that the witness, DALE CAMPBELL,
6  was by me first duly sworn to testify to the truth;
7  that the foregoing deposition was taken at the time
8  and place stated herein; and that the said
9  deposition was recorded stenographically by me and
10  then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13      I further certify that the inspection, reading
14  and signing of said deposition were NOT waived by
15  counsel for the respective parties and by the
16  witness.
17      I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21     IN WITNESS WHEREOF, I have hereunto set my
22  hand and affixed my seal of office this 5th day of
23  August, 2009.
24
25  Notary Public

29 (Pages 113 to 116)

Dale Campbell

---

Page 117

1
COMMONWEALTH OF PENNSYLVANIA  )   E R R A T A
2
COUNTY OF ALLEGHENY          )   S H E E T
3
    I, DALE CAMPBELL, have read the foregoing
  pages of my deposition given on July 31, 2009, and
4
wish to make the following, if any, amendments,
  additions, deletions or corrections:
5
  Pg. No.  Line No.    Change and reason for change:
6
7
8
9
10
11
12
13
14
15
16
17
  In all other respects, the transcript is true and
18
correct.
19

20
   _____
21
       DALE CAMPBELL
  Subscribed and sworn to before me this
22
_____ day of _____, 2009.
23

24
   _____
25
    Notary Public
    Reference No. PB14086

---

Page 118

1
     AKF REPORTERS, INC.
       AKF Building
2
    436 Boulevard of the Allies
     Pittsburgh, PA 15219
3
     (412) 261-2323
4
5
     August 5, 2009
6
7
TO:  Patricia I. Avery, Esq.

8
  RE:  DEPOSITION OF DALE CAMPBELL

   NOTICE OF NON-WAIVER OF SIGNATURE
9
   Please have the deponent read his deposition
10
transcript.  All corrections are to be noted on the
preceding Errata Sheet.
11
   Upon completion of the above, the Deponent must
12
affix his signature on the Errata Sheet, and it is
to then be notarized.
13
   Please forward the signed original of the Errata
14
Sheet to Attorney Downie, for attachment to the
Original Transcript, which is now in her possession.
15
Send a copy of same to all counsel, and also a copy
to me.
16
   Please return the completed Errata Sheet within
17
thirty (30) days of receipt hereof.
18
19
Pamela L. Beck
20
Court Reporter
AKF Reporters, Inc.
21
22
23
24
25

---

30  (Pages 117 to 118)

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: DIGITEK®                          :
PRODUCT LIABILITY LITIGATION             :        MDL DOCKET NO. 1968
                                         :

THIS DOCUMENT APPLIES ONLY TO:
Michael Pasken, et al.,                  :        NO. 2:08-cv-1075
                                         :
            Plaintiff,                   :
                                         :
    v.                                   :
                                         :
Actavis Group hf, et al.,                :
                                         :
            Defendants.                  :

ERRATA SHEET TO DEPOSITION TRANSCRIPT OF DALE CAMPBELL

| Page:Line(s) | Correction |
|---|---|
| various | There are various medical references and company names (e.g., "Bertech" instead of "Bertek") throughout the transcript. I have not checked the court reporter's spelling to determine if any of them need to be corrected. |
| various | Everyone, myself included, repeatedly misspell my physician's name. I believe that the correct spelling of his name is Gustav Eles. |
| 28:17-9 | The phrase "My co-pay for all the medicine and the co-pay for all of the people in the class action suit" should be corrected to state "My co-pay for all the medicine and the co-pay and anything else the court allows for all of the people in the class action suit." The reason for the change is that as I read |

165228                                                                    -1-

that the court has the final say on what is or is not included in a lawsuit.

various    One of my sister's names is typed as "Louie". Her name is "Lou Ellen" and

the shortened form is "Lou E".

various    I noticed a number of errors in questions, but since I was not the person

saying them, I don't think that I can correct them. For example, on page 55,

line 18, the question refers to "abnormal health rhythm" and I believe she

said "abnormal heart rhythm".

There may be other spelling, grammatical, or other transcription errors in the transcript. It

is possible that I may not have caught and corrected all of those, particularly with respect to

comments or statements that were not mine.

I declare under penalty of perjury under the laws of the U.S. that the above corrections are

true and correct to the best of my knowledge, information, and belief. Executed this _15_ th day of

September, 2009.



Dale Campbell