Exhibit Q

Peter J. Konek

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
CIVIL DEPARTMENT

PETER J. KONEK, individually
and on behalf of all others
similarly situated,
                    Plaintiffs,
vs.          No. 6:08-CV-1145-MLB-KMH
ACTAVIS, INC., et al.;
                    Defendants.

DEPOSITION OF PETER J. KONEK TAKEN ON BEHALF OF
DEFENDANTS.

JULY 27, 2009

---

Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT
 2              DISTRICT OF KANSAS
 3               CIVIL DEPARTMENT
 4
 5      PETER J. KONEK, individually
        and on behalf of all others
 6      similarly situated,
                            Plaintiffs,
 7
        vs.          No. 6:08-CV-1145-MLB-KMH
 8
 9      ACTAVIS, INC., et al.
                            Defendants.
10
11
12
13
14
15          DEPOSITION OF PETER J. KONEK
        produced, sworn and examined on JULY 27, 2009,
16      between the hours of eight o'clock in the
        forenoon and six o'clock in the afternoon of
17      that day, at the offices of Hutton & Hutton,
        8100 East 22nd Street North, Building 1200,
18      Wichita, Kansas 67226 before Kristi A. Bissell,
        a Certified Shorthand Reporter, Certified Court
19      Reporter within and for the States of Kansas and
        Missouri, in a certain cause now pending in the
20      United States District Court, District of
        Kansas, in re: Konek v. Actavis, et al.
21
22
23
24
25
```

---

Page 2

```
 1                    INDEX
 2      QUESTIONS BY:              PAGE NO.
 3      Ms. Smith              5
 4      Mr. Doheny             90
 5      Ms. McIlhenny         104
 6      Ms. Smith             108
 7
 8                  EXHIBITS
 9
10      EXHIBIT NO.    DESCRIPTION    PAGE MKD.
11      A - Plaintiff Fact Sheet       14
12      B - Class action complaint       17
13      C - Pharmacy records         28
14      D - Humana records           29
15      E - Amended Notice of deposition     58
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1                  APPEARANCES
        For the Plaintiffs:
 2
           Ms. Deborah B. McIlhenny
 3         HUTTON & HUTTON
           8100 E. 22nd Street North
 4         Building 1200
           Wichita, Kansas 67226-2312
 5
        For the Defendant/Mylan:
 6
           Ms. Holly Pauling Smith
 7         SHOOK HARDY & BACON
           2555 Grand Boulevard
 8         Kansas City, Missouri 64108
 9
        For the Defendant/Actavis, Inc., Actavis Totowa:
10
           Mr. John T. Doheny
11         TUCKER ELLIS & WEST
           1150 Huntington Building
12         925 Euclid Avenue
           Cleveland, Ohio 44115-1414
13
14      Reported By:
15         Kristi A. Bissell, CSR (KS), CCR (MO)
           Midwest Litigation Services
16         711 North Eleventh Street
           St. Louis, Missouri 63104
17         314/644-2191
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Peter J. Konek

Page 5

1    IT IS HEREBY STIPULATED AND AGREED by and
2    between counsel for the Plaintiffs and counsel
3    for the Defendants that this deposition may be
4    taken in shorthand by Kristi A. Bissell, CSR,
5    CCR, and afterwards transcribed into printing,
6    and signature by the witness expressly reserved.
7         * * * * *
8    (The deposition commenced at 9:50 a.m.)
9         PETER J. KONEK,
10   Of lawful age, produced, sworn, and examined on
11   behalf of Defendants, deposes and says:
12        EXAMINATION
13   QUESTIONS BY MS. SMITH:
14   Q.   Good morning, Mr. Konek. My name is
15   Holly Smith. We met shortly before this
16   deposition started. For the record, let me
17   state that the day is July 27, 2009, and we are
18   taking your deposition in the litigation called
19   "In Re: Digitek Product Liability Litigation."
20   A.   Is that D-I-G-I-T-E-K?
21   Q.   Yes. And specifically this deposition
22   relates to the case filed by you, Peter J.
23   Konek, versus Actavis, Incorporated, et al.
24   That case number is 6, colon, 08CV1145.
25        Mr. Konek, if you could, please state

Page 6

1    your full name for the record.
2    A.   Peter, P-E-T-E-R, John, J-O-H-N, Konek.
3    Q.   And could you please state your address
4    for the record.
5    A.   [redacted]
6
7    Q.   Have you ever been deposed before?
8    A.   What's that mean?
9    Q.   Have you ever had your deposition taken
10   like today?
11   A.   No.
12   Q.   Have you ever testified under oath
13   before?
14   A.   No.
15   Q.   Let me explain to you that today is
16   basically as though we were before the judge.
17   What you say today, you have an obligation to be
18   truthful and complete with your answers. Do you
19   understand that?
20   A.   I sure do.
21   Q.   Also, because we have a court reporter
22   here today, it's important that we don't talk
23   over each other and, also, that instead of doing
24   head nods or head shakes that all of your
25   responses are verbal. Do you understand that?

Page 7

1    A.   I sure do and I know she's keeping a
2    record of me and I better watch out.
3    Q.   Also, my questions today are not
4    intended to trick you in any way so if you don't
5    understand something that I'm asking, please ask
6    me to rephrase it and I will.
7    A.   Okay.
8    Q.   Also, because, again, she's taking down
9    our words it's important we don't talk over one
10   another. I'll do my best to wait for you to
11   complete your answers and likewise please wait
12   for me to finish my questions, all right?
13   A.   Sure.
14   Q.   And is there any reason today that you
15   can't go forward with your deposition?
16   A.   I would say no. No reason.
17   Q.   Are there any medications you're taking
18   today that would impair your ability to
19   understand a question?
20   A.   No.
21   Q.   Any medications you're taking today
22   that would impair your ability to remember
23   events?
24   A.   No.
25   Q.   Or to testify truthfully?

Page 8

1    A.   No.
2    Q.   Finally, if you need to take a break at
3    any point in time to get a drink, go to the
4    restroom because you're cold, want to put your
5    sweater on for whatever reason, just say the
6    word and at the end of a question we can take a
7    break, all right?
8    A.   Sure.
9    Q.   Earlier you said you had not had your
10   deposition taken before. Have you ever been a
11   party to a case before?
12   A.   No.
13   Q.   Have you ever -- so you've never filed
14   a case or been sued in a case, correct?
15   A.   Never been sued in a case, no.
16   Q.   And you've never filed one against
17   somebody else?
18   A.   No. Not that I can remember.
19   Q.   [redacted]
20        [redacted]
21   A.   [redacted]
22   Q.   [redacted]
23   A.   [redacted]
24   Q.   [redacted]
25   A.   [redacted]

2 (Pages 5 to 8)

Peter J. Konek

Page 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Q.  (By Ms. Smith)  In advance of your
25  deposition, did you meet with anybody to prepare

Page 10

1  for your deposition?
2      A.  (Indicating) Deb.
3      Q.  You can say that you met with your
4  attorney.
5      A.  I met with my A-No. 1 attorney, and my
6  good-looking attorney, by the way.
7          MS. SMITH:  That's on the record
8  and that makes it official.
9      Q.  (By Ms. Smith)  When was this meeting?
10  When did you meet with your attorney?
11     A.  If you need the date, I can't give it
12  to you.
13     Q.  In the past week?
14     A.  No.  It's been more than that.
15     Q.  Past month?
16     A.  I can't -- if I say it, I would be
17  lying to you.  I don't know the date.
18     Q.  Was it just one meeting?
19     A.  No.
20     Q.  How many meetings?
21     A.  Oh, boy, same thing.  I don't remember.
22     Q.  Are you able to ballpark at all like a
23  dozen times, less than a dozen?
24     A.  I might be able to, but I'm not going
25  to because I took an oath and I'm going to try

Page 11

1  to stick to it if I can.
2      Q.  Right.  And just to clarify, you can
3  also qualify and say "approximately."  Not every
4  answer has to be absolutely 100 percent a
5  conviction.  You can always qualify it by
6  explaining that to the best of your recollection
7  or approximations and so forth, all right?
8      A.  That's all right, but unless I know I'm
9  not going to tell you, and I don't know.  I
10  don't remember.  Of course there is a lot of
11  things I don't remember, but I'm going to do my
12  best to remember.
13     Q.  When you met with Ms. McIlhenny, was
14  anybody else present?
15     A.  Yeah, I think there was.
16         THE WITNESS:  Who was with us?
17     A.  Can I ask her?
18     Q.  (By Ms. Smith)  No.  Actually, that's
19  another one of the rules of the deposition is
20  you aren't allowed to ask questions.
21     A.  Yeah.  There was two of them and he
22  just left the room here a minute ago.
23     Q.  So somebody associated with her office?
24     A.  Well, yeah.
25     Q.  And how long were these meetings?

Page 12

1      A.  The first one was not what you call
2  very long.  This one after we got to where we
3  decided we were going to do something, it took a
4  little bit of time and they weren't as
5  interesting as this is.
6      Q.  Approximately, would you say more than
7  or less than 25 hours that you met with your
8  attorney?
9      A.  Less.
10     Q.  Did you review any documents in
11  preparation for your deposition here today?
12     A.  Documents?  I've got to think about
13  that.  Yeah.  I think we did.  I wish I could
14  think of what they were now.  I can't ask for
15  help?
16     Q.  No, but you can take as much time as
17  you need to.
18     A.  She's gone over a lot of things with
19  me.  Let's put it that way.  She really has.
20     Q.  Did you review any medical records in
21  preparation for your deposition today?
22     A.  No.
23     Q.  Pharmacy records?
24     A.  No.  No.
25     Q.  Pleadings from the case, maybe, things

3  (Pages 9 to 12)

Peter J. Konek

| | Page 13 |
|---|---|
| 1 | that would have the caption on it such as the |
| 2 | complaint or discovery responses? |
| 3 | A. Say that again. |
| 4 | Q. Sure. In reviewing documents in |
| 5 | advance of your deposition, did you read |
| 6 | documents related to filings in this case such |
| 7 | at your complaint that was filed or any other |
| 8 | papers filed in this action? |
| 9 | A. Well, yeah. |
| 10 | Q. And beyond those do you have any |
| 11 | specific recollection of any other documents |
| 12 | that you reviewed? |
| 13 | A. No. |
| 14 | Q. Do you have a website or a blog? |
| 15 | A. No. I don't have a computer even. |
| 16 | Q. So it's fair to say you don't post |
| 17 | stuff on the Internet? |
| 18 | A. Oh, no. |
| 19 | Q. Have you ever gone to the library to do |
| 20 | Internet research? |
| 21 | A. I've gone with someone that does that a |
| 22 | lot of times but, no. My wife does that a lot. |
| 23 | Q. Has your wife ever done research, to |
| 24 | your knowledge, on Digitek? |
| 25 | A. No. |

| | Page 14 |
|---|---|
| 1 | Q. Anything related to this litigation? |
| 2 | A. No. No. No. No. No. I have not |
| 3 | even talked to her about it. |
| 4 | Q. Have you talked to anybody about this |
| 5 | lawsuit? |
| 6 | A. No. |
| 7 | Q. Any reason? |
| 8 | A. Any reason? I was told not to by my |
| 9 | attorney. And when she tells you something, you |
| 10 | better pay attention. |
| 11 | (Exhibit A was marked for |
| 12 | identification by the court reporter.) |
| 13 | Q. (By Ms. Smith) I'm handing you what's |
| 14 | been marked Exhibit A. |
| 15 | MS. SMITH: For the record, this |
| 16 | is a copy of the amended Digitek Plaintiff Fact |
| 17 | Sheet completed by Peter J. Konek. |
| 18 | Q. (By Ms. Smith) do you recall seeing |
| 19 | this document before? |
| 20 | A. I do. |
| 21 | Q. And do you recall completing this |
| 22 | document in April of this year? |
| 23 | A. I do. |
| 24 | Q. And if we flip back to page 17, which |
| 25 | is the very final page -- |

| | Page 15 |
|---|---|
| 1 | A. This is where things change from the "I |
| 2 | dos." 17? |
| 3 | MS. MCILHENNY: For the record, |
| 4 | page 17 is not actually marked. |
| 5 | Q. (By Ms. Smith) I apologize. It |
| 6 | follows page 16 and it's unnumbered. |
| 7 | On this page that says "verification" |
| 8 | at the top, is this your signature? |
| 9 | A. Yes, it is. |
| 10 | Q. Here you're saying that all of the |
| 11 | information you provided was true and correct to |
| 12 | the best of your knowledge? |
| 13 | A. In this? All this? I would say yes. |
| 14 | Q. And you've supplied all documents |
| 15 | requested that were in your possession, custody, |
| 16 | or control? |
| 17 | A. Yeah. |
| 18 | Q. And, also, this verification states |
| 19 | that you would supplement your response if you |
| 20 | learned any of your responses were materially |
| 21 | incomplete or incorrect? |
| 22 | A. Don't understand the question. Go |
| 23 | again. |
| 24 | Q. In signing this you're "also" signing |
| 25 | that you would on the second paragraph further |

| | Page 16 |
|---|---|
| 1 | acknowledge that you have an obligation to |
| 2 | supplement the above responses if you learned |
| 3 | that they are in any material respects |
| 4 | incomplete or incorrect? |
| 5 | A. Okay. Let me read this myself. |
| 6 | Q. Sure. |
| 7 | A. I would say yes. |
| 8 | Q. Well, now is a good time to let me know |
| 9 | if you have anything that you need to supplement |
| 10 | or revise with respect to this so if you want to |
| 11 | take an opportunity, look over it and see if |
| 12 | there is anything you'd like to add today. |
| 13 | Please take your time and do so. |
| 14 | A. Well, I think maybe I might have the |
| 15 | wrong -- everything in the -- everything in here |
| 16 | is the best I could have done it at the time I |
| 17 | did it. I don't remember hardly anything that |
| 18 | was in here. I can't go through there and tell |
| 19 | you each one of those whether that is exactly |
| 20 | what I said or not. That's it. |
| 21 | Q. Could you please take a moment and see |
| 22 | if there is anything that you |
| 23 | you might add to the best of your knowledge as |
| 24 | we sit here today. |
| 25 | A. I would say that everything got written |

4  (Pages 13 to 16)

Peter J. Konek

Page 17

1   down there ought to be pretty well the way it's
2   supposed to be.
3       Q.  Thank you.  And my intent here today is
4   to not repeat questions that you answered in
5   your Plaintiff Fact Sheet since you've already
6   testified as to those matters under oath by
7   signing that form.  I do, however, have some
8   related follow-up questions that we'll talk
9   about here today.
10          (Exhibit B was marked for
11   identification by the court reporter.)
12      Q.  (By Ms. Smith)  Mr. Konek, I'm handing
13   you what's been marked as Exhibit B.  This is
14   the complaint that you filed in this case.  Take
15   a minute and look it over if you want.
16          Have you seen this document before?
17      A.  I don't remember.
18      Q.  Do you recall whether you would --
19          MS. SMITH:  You might take that
20   strip sheet off.
21      A.  Oh, okay.  Yeah.
22      Q.  (By Ms. Smith)  Did you approve this
23   document before it was filed?
24      A.  I would say yes.
25      Q.  Are you aware that it costs money to

Page 18

1   file a lawsuit?
2       A.  Yes.
3       Q.  And did you pay the fee yourself in
4   this case?
5       A.  Did I do what now?
6       Q.  Did you pay the filing fee to file your
7   lawsuit?
8       A.  No.
9       Q.  Do you know how much it cost?
10      A.  No idea.
11      Q.  Do you understand that your complaint
12   here is your formal statement to the Court and
13   to the Defendants as to what you're alleging in
14   this case?
15      A.  I've got to read it.  I would say yes.
16      Q.  If you could, tell me in your own words
17   what you believe the Defendants did wrong with
18   as much detail as possible.
19      A.  What the Defendants did wrong?  I'll
20   give it to you just as clear as I can be.
21          Let's see, I bought and paid for a
22   prescription called Digitek.  I used it for a
23   while.  And then I get two letters; one from
24   Wal-Mart and one from Humana and these two
25   letters both listed that they were taking

Page 19

1   Digitek off the market.  Now, they gave some
2   reasons, but there was nothing that, you know, a
3   person could do unless they had a complete
4   physical a couple weeks or three weeks before
5   that until after that, so -- where are we?
6       So after I got the word on that, the
7   first thing I did is I called my doctor and his
8   nurse answered like she normally does.  I gave
9   her the information.  She told me that she would
10  have another prescription for me within either
11  that evening or the next day.  So I got my other
12  prescription.  I was sitting around the house,
13  just, you know -- I read this thing two or three
14  times and it kind of made me hot that they would
15  have something like that on the market.
16      How something could get away like that.
17  It had a few things in there that possibly could
18  result like in any medicine you take.  There is
19  always some things that help you and there is
20  always some things that might not and I just
21  decided I was going to do something about it.
22  So I contacted a friend of mine and he turned me
23  over to Deb, and that's it.  We got to work.
24      Q.  You mentioned that like any medicine
25  some things can help you and some things cannot?

Page 20

1       A.  There is a lot of them.
2       Q.  Were you explained any risks with
3   respect to Digitek when you were prescribed
4   Digitek?
5       A.  There is a sheet -- anytime you get a
6   prescription, I don't care who it is, when they
7   give you the prescription they give you a sheet
8   giving everything that this thing does to help
9   you and not to help you.  So some things that
10  this medicine's for will help this, but with
11  other people it may not so it's specific.
12      Like Digitek, I mean, that's for
13  keeping control of your heart and pace and, of
14  course, that's important, I mean, really
15  important.  And that's another reason why it
16  gave -- made me hot, that I was taking something
17  -- was or wasn't taking something because I
18  don't know exactly whether I took it.  When they
19  made the mistake or before they made the
20  mistake, there is no way for me to know that.
21  They increased the amount and that's what caused
22  the fact that they had to take it off the
23  market, I'm almost positive of that.  Do you
24  guys know anything about that?
25      Q.  Remember that you can't ask me

5  (Pages 17 to 20)

Peter J. Konek

**Page 21**

1 questions here today.
2     A. Well, how am I going to find out
3 anything if I don't ask questions?
4     MS. MCILHENNY: It would be best,
5 Mr. Konek, if you just answer her questions.
6 You can ask the questions of me later.
7     THE WITNESS: Okay.
8     A. Well, what else do you want to know?
9     Q. (By Ms. Smith) We'll probably -- I
10 know we'll talk later more about the Digitek
11 prescriptions and the information sheet that you
12 were given and the effect it had for you when
13 you took it. I want to turn our attention back
14 to this Exhibit B and if you could, turn to
15 paragraph No. 20.
16     I'm going to read this paragraph into
17 the record. The paragraph 20 states "Digitek
18 toxicity can lead to serious or life threatening
19 injuries, including death, abnormally slow
20 heartbeat, brachycardia, heart palpitations,
21 irregular pulse, cardiac instability, low blood
22 pressure, loss of appetite, confusion,
23 dizziness, diarrhea, vomiting, nausea, vision
24 changes, and in paren, halo, slash, light rings,
25 blind spots, blurred sight, closed paren,

**Page 22**

1 overall swelling, decreased consciousness and
2 breathing difficulty."
3     That's a long list of ailments. Did
4 you personally experience any of these taking
5 Digitek?
6     A. The only one on there would be
7 dizziness. That's possible. The rest of those,
8 I can't remember any of the rest of those being
9 -- but it's quite possible that I had some
10 dizziness from it, but there is no way -- I
11 mean, I'm not going to swear to it. I --
12     Q. Do you have a specific recollection of
13 an event where you experienced dizziness while
14 taking Digitek?
15     A. No, I can't.
16     Q. So is it fair to say that you don't
17 have a specific date or time frame in mind?
18     A. Right.
19     Q. And your complaint by listing all these
20 you allege, though, that even if you didn't
21 experience all of these other conditions, that
22 other people may have?
23     A. Probably, they could.
24     Q. Even death?
25     A. I would say so.

**Page 23**

1     Q. And in your lawsuit if somebody did
2 take Digitek and they experienced any of those
3 injuries, are you seeking to recover for that in
4 your action here today?
5     A. Say that again.
6     Q. If somebody in your proposed Class
7 action took Digitek and experienced one or more
8 of these conditions and they believe it was
9 caused by Digitek, are you in your lawsuit suing
10 to recover on their behalf for those physical
11 injuries?
12     A. Yes.
13     Q. Turn to paragraph 85. I'll read this
14 as well. "Plaintiff and the proposed nationwide
15 Class members did not receive the material
16 benefit of safe, appropriately-dosed Digitek
17 heart medication." Do you believe that all
18 Digitek ever manufactured was defectively-dosed?
19     A. I believe that all of it wasn't. It
20 was just. . .
21     Q. So some was and some was not?
22     A. Well, yeah. I mean, that's a
23 ridiculous question.
24     Q. So how do you understand that you would
25 know whether a pill was misdosed or not

**Page 24**

1 misdosed?
2     A. It wouldn't be on the market.
3     Q. Do you believe there were ever misdosed
4 pills or tablets on the market; Digitek pills?
5     A. I have no idea. I know that they took
6 them off. There had to have been a reason and
7 the reason that I read was that it would have
8 been an overdose. That's not good.
9     Q. And your understanding of the reason
10 they came off the market was that all pills or
11 some pills were inaccurately-dosed?
12     A. That, I don't know.
13     Q. Do you agree you need to look at the
14 specific pills to find out whether it was a
15 correct dose or not a correct dose?
16     A. That would be the only way I know.
17     Q. If you turn to paragraph 88 it says,
18 "Defendants' misleading and exploitive conduct
19 put Plaintiff and the proposed nationwide Class
20 members at risk for greater physical harm and
21 denied them the material facts as to the unsafe,
22 life-threatening characteristics of defective
23 Digitek in contrast to the medically-beneficial
24 Digitek with FDA-approved appropriate doses."
25 Are you asserting claims of anxiety by taking

Peter J. Konek

Page 25

1  inappropriately-dosed Digitek?
2      A.  I need help. I'm confused.
3      Q.  Sure. How can I help?
4      A.  Not you. Her (indicating).
5          MS. MCILHENNY: Mr. Konek, I
6  can't help you with the questions and answers.
7          THE WITNESS: You told me that
8  before, haven't you, and I keep trying, don't I?
9          MS. MCILHENNY: Yes, you do.
10         THE WITNESS: And I will keep
11 trying.
12     A.  I don't understand what you're asking
13 me to tell you the honest truth.
14     Q.  (By Ms. Smith) Let's step away from
15 this allegation and not worry about how it's
16 worded here and let me ask you, do you believe
17 that because you alleged some Digitek may have
18 been on the market that was misdosed, that
19 people became anxious about the Digitek they
20 took?
21     A.  Possibly, yes.
22     Q.  Did you personally experience any
23 anxiety based on the Digitek you took?
24     A.  No.
25     Q.  And in your lawsuit to the extent some

Page 26

1  people did experience anxiety, are you seeking
2  to recover in this lawsuit for their anxiety for
3  them?
4      A.  True.
5      Q.  In your Plaintiff Fact Sheet, which
6  we've marked as Exhibit A, you stated that you
7  are not seeking to recover any sort of lost
8  wages?
9      A.  Right.
10     Q.  That means --
11     A.  Would be pretty hard to do.
12     Q.  Well, that will definitely probably cut
13 short my questions.
14     A.  Since I've been retired for about 25
15 years. It's going to be difficulty.
16     Q.  That was going to be my next question.
17 What was your last job and what did you do
18 there?
19     A.  I was a real estate broker and how long
20 ago has it been since I retired? I can't
21 remember.
22     Q.  Do you understand that some people who
23 took Digitek may allege that as a result of
24 taking Digitek, they had to miss work and
25 therefore have lost wage claims?

Page 27

1      A.  Right. I think so.
2      Q.  And in your lawsuit are you seeking on
3  their behalf to recover those claims?
4      A.  For them?
5      Q.  For them.
6      A.  And me, no.
7      Q.  For you you've already answered, I
8  believe, which is you don't currently work, so
9  for them?
10         THE WITNESS: I've got a question
11 for you John, I tell you.
12         MS. MCILHENNY: Let's save your
13 questions for later.
14         THE WITNESS: Okay.
15     Q.  (By Ms. Smith) Are you seeking in your
16 lawsuit to recover lost wages on behalf of the
17 people in your proposed Class?
18     A.  No.
19     Q.  Do you agree that to the extent
20 somebody in your proposed Class experienced any
21 sort of medical injuries, that I would need to
22 talk to them to understand the specifics of
23 their injuries?
24     A.  Say again. I think I know what you
25 mean.

Page 28

1      Q.  Sure. To the extent anybody in your
2  proposed Class action, in other words, people
3  within the nation who took Digitek, to the
4  extent any of those people experienced medical
5  problems that they believe resulted from taking
6  Digitek --
7      A.  They may have.
8      Q.  -- do you agree that I would need to
9  talk to them to find out about their injuries?
10     A.  Definitely.
11     Q.  And I would need to talk to them about
12 any pain and suffering they experienced?
13     A.  Definitely.
14     Q.  And as to if they had a lost wage
15 claim, I would need to talk to them to
16 understand what exactly they were alleging? Do
17 you agree?
18     A.  I agree.
19     Q.  Now, in connection with your case I
20 have received some records that came from
21 Wal-Mart primarily in your insurance company
22 Humana. I will --
23         (Exhibit C was marked for
24 identification by the court reporter.)
25     Q.  (By Ms. Smith) I'll mark this as

7 (Pages 25 to 28)

Peter J. Konek

Page 29

1    Exhibit C and represent this is a full set of
2    what we were given in this case.
3            MS. MCILHENNY:  And you're
4    referencing the materials that we submitted with
5    the PFS?
6            MS. SMITH:  Yes.  And I'm going
7    to mark as Exhibit D some documents that were
8    handed this morning when we walked in --
9            (Exhibit D was marked for
10   identification by the court reporter.)
11           MS. SMITH:  -- which based on my
12   review this morning appeared to be duplicative,
13   five duplicative copies of what's called a
14   "Smart Summary Prescription" from Humana.
15           MS. MCILHENNY:  Off the record
16   just a second, please.
17           (Off the record.)
18       Q.  (By Ms. Smith)  All right.  We have
19   Exhibit C which is the records that we were
20   given in this case prior to today that related
21   to your purchase and use of Digitek and we've
22   marked as Exhibit D some records that we were
23   provided this morning that, also, relate to your
24   medication usage and it appears as though since
25   January 1, 2009, to later in the year 2009?

Page 30

1            MR. DOHENY:  April 30, 2009?
2            MS. SMITH:  April 30, 2009.  And
3    I'll state for the record an agreement we have
4    with Plaintiffs' counsel there has been no
5    redaction of personal information in these
6    documents.  To the extent they would ever become
7    part of the public record, Social Security
8    number and personal identification -- sensitive
9    personal identification information would be
10   redacted.
11           MR. DOHENY:  It goes through May
12   31, 2009.
13           MS. MCILHENNY:  Agreed.
14           MR. DOHENY:  But I don't have one
15   for February.
16           MS. MCILHENNY:  That's correct,
17   you do not.  There isn't one for February.
18           MR. DOHENY:  All right.
19       Q.  (By Ms. Smith)  Among the records that
20   we were previously given, so within Exhibit C,
21   you'll find a document that at the top says -- I
22   guess the top-most thing says "page 10 of 13,
23   Connexus Pharmacy System Wal-Mart Pharmacy
24   Medical Expenses Summary."  My question is did
25   you ever purchase Digitek from any pharmacy

Page 31

1    other than Wal-Mart?
2        A.  No.
3        Q.  And what is the name of the doctor who
4    prescribed your Digitek to you?
5        A.  Shaheen.
6        Q.  How do you spell that?
7        A.  Let's see, S-H-A-H-E-E-N.
8        Q.  And what --
9        A.  Do you want his first name?
10   W-A-S-S-I-N.
11       Q.  Where is Dr. Shaheen Wassin's office?
12       A.  Okay, let's see, right off of Central
13   and Hillside.  It's the building where they --
14   where they all work out, fourth floor.  I don't
15   know the address.  I can just take you right to
16   it, though.  There is a building right there on
17   the corner where everybody works out and they're
18   on the 4th floor.
19       Q.  What were the cross streets?
20       A.  Hillside and Central.  Central and
21   Hillside.  I don't know the address.
22       Q.  If I look at this Wal-Mart Pharmacy
23   Medical Expense Summary, it appears that the
24   first Digitek prescription took place on
25   November 20, 2007.  Do you recall if you ever

Page 32

1    took Digitek prior to that time?
2        A.  I can't remember, but I don't think I
3    did.  I'm not sure.
4        Q.  Okay.
5        A.  I'm not sure.
6        Q.  It, also, reflects that the dosage was
7    0.125 milligrams.  Is that your recollection of
8    the dosage that you took of Digitek.
9        A.  I don't remember.  I mean, I know that
10   -- I know the medicines I take, but I don't know
11   what the dosage is.  I don't even look at it.
12       Q.  And that's fine.  Just to the best of
13   your ability tell me your recollections.
14       A.  I would say that's it, then.
15       Q.  And do you recall whether the dosage
16   ever changed for your Digitek while you were
17   taking it?
18       A.  Huh-uh.  No.
19       Q.  And what led you to be prescribed
20   Digitek in November of 2007?
21           THE WITNESS:  Can I tell them?
22           MS. MCILHENNY:  Uh-huh.
23       A.  I had a quadruple bypass.
24       Q.  (By Ms. Smith)  And when was that?
25       A.  2007, somewhere like March, 2007.  And

8  (Pages 29 to 32)

Peter J. Konek

## Page 33

1  they prescribed it to keep my heart rhythm.
2  They gave me two pills for that. I can't
3  remember the other one.
4      Q.  And I would appreciate it if it comes
5  to you later even if the question isn't before
6  you, if you could let me know what that was.
7      A.  I didn't know -- I didn't know that we
8  were going to do anything with my medical
9  history or I could bring you -- I would have. I
10  could have give you from 50 years ago until now,
11  but this is -- you caught me off guard. I don't
12  know what the deal is here.
13      MS. SMITH:  Well, we had a
14  conference this morning with the Court and so,
15  for the record, I'll state that the judge ruled
16  that we may inquire as to your medical history
17  from January 1st of 2006 until 120 days after
18  the recall of Digitek, which I believe takes us
19  to late August, 2008. And so there as part of
20  your Plaintiff Fact Sheet you were asked to
21  produce records. Now that we have the scope of
22  limitations, I would ask your counsel to go
23  ahead and produce the records within that time
24  frame. My hope today is to go ahead and go off
25  your memory as best as we can and fairly

## Page 34

1  comprehensively discuss your medical history
2  during that time frame. There may, though, be a
3  need for follow up. I note this for the record,
4  once we see the medical records, we'll follow up
5  with your counsel if that's the case.
6      MS. MCILHENNY:  For the record,
7  as I had explained to Christian and even John
8  may be aware of this fact as well, we have not
9  received any medical records, therefore we're
10  having to go through the process to get them?
11      MS. SMITH:  Okay.
12      Q.  (By Ms. Smith)  So in March of 2007 --
13      A.  Why do they need that?
14      Q.  That's a question you may ask your
15  counsel at break.
16      MS. MCILHENNY:  We can discuss
17  this later.
18      Q.  (By Ms. Smith)  Mr. Konek, I think
19  maybe you would have been a good attorney.
20  You're good at asking questions.
21      A.  That's the problem. I've got too good
22  attorney, no lead way.
23      Q.  Returning back to the events it sounds
24  like you had a very memorable surgery in March
25  of 2007?

## Page 35

1      A.  Yeah. Ever have a quadruple bypass?
2      Q.  I'll let you ask me that one question,
3  and the answer is no.
4      A.  I understand. I'm going to be on the
5  ball here. Just answer the question.
6      Q.  Immediately prior to that or the months
7  preceding that, what was going on with you
8  physically that led you to have that surgery?
9      A.  Nothing, absolutely nothing. Just as
10  healthy and no idea that I was going to have
11  anything like that.
12      Q.  Did you suffer a heart attack?
13      A.  No.
14      Q.  Did you go to your doctor for a checkup
15  and he just admitted you for a quadruple bypass?
16      A.  No.
17      Q.  Explain the in between.
18      A.  Do I have to explain now? Is that
19  okay?
20      Q.  Please.
21      A.  What happened was there was a test they
22  wanted to run on me. The test they wanted to
23  run on me was in the hospital. I can't even
24  think of the name of it. It had something to do
25  with cholesterol. They ran the test and the

## Page 36

1  doctor came out and said," In 48 hours we're
2  going to operate on you." I said, "Why?" He
3  said, "You've got blockage in four valves," so
4  they waited until my blood count got down to
5  where it belonged and they operated.
6      Q.  Do you recall if you were told anything
7  about your heart rhythm and whether your heart
8  was beating at a proper rate or not?
9      A.  No. Believe me when I tell you there
10  was nothing wrong with me when that happened.
11      Q.  You mentioned that you had a
12  cholesterol test. Do you remember, what was
13  that? A blood test?
14      A.  Uh-huh.
15      Q.  Did they run additional tests?
16      A.  No.
17      Q.  No EKG or exercise tests?
18      A.  Nothing. Just sent me in there and cut
19  me open.
20      Q.  And how old were you at the time of
21  your surgery?
22      A.  Well, let's see, that was in 2007 and
23  I'm 89.
24      Q.  79?
25      A.  I mean, 79, so couple years, 77, I

9  (Pages 33 to 36)

Peter J. Konek

Page 37

1    guess; 77, 78, 79.
2        Q.  And then how long were you in the
3    hospital with your surgery?
4        A.  Wow, that's going to be tough because I
5    spent a lot of extra time in there.  I can't
6    remember.  I know I was in longer than what I
7    was supposed to be.  Let's put it that way.
8        Q.  When you had the cholesterol test and
9    they announced you were going to have surgery in
10   48 hours, did you stay continuously in the
11   hospital from the time of that cholesterol test
12   and the date of your discharge?
13       A.  Yes.
14       Q.  And your medical records would reflect
15   your date of discharge?
16       A.  Yes.
17       Q.  Do you recall the time that you were in
18   the hospital, do you recall being given Digitek?
19       A.  I have no idea.
20       Q.  Do you recall being given any Digoxin?
21       A.  No idea.
22       Q.  And we're unsure of your exact
23   discharge time.  Do you recall if it was in the
24   summer, late spring, early fall, anything about
25   the time of year when you were discharged?

Page 38

1        A.  Well, it was in March, of course, March
2    of -- not too -- I probably was in there for
3    ten, 11 days, I don't know.  I can't remember,
4    but I went right back in again.
5        Q.  Tell me about that.
6        A.  Defibrillator.
7        Q.  Was it during a routine checkup post
8    operation that your heartbeat -- they were
9    detecting something to be wrong with your
10   heartbeat?
11       A.  No.
12       Q.  So kind of walk me through the events,
13   if you would, from the discharge after your
14   surgery until going back to the hospital.
15       A.  Walk you through it, right?  Well,
16   right after the surgery if my heart would stop,
17   they put in a defibrillator for it to get going
18   again.  I have a pacemaker combination and it
19   operates all the time, the pacemaker.
20       Q.  Was the pacemaker inserted at the same
21   time as your quadruple bypass?
22       A.  No.
23       Q.  When was it inserted?
24       A.  You're asking me for days I have no
25   idea.  I may have that written down at home

Page 39

1    somewhere, but I can't think of when it was.
2        Q.  Why were you given a pacemaker?
3        A.  To keep my heart -- keep me living.
4    Without my pacemaker I'd be gone.
5        Q.  Did you have a specific event that led
6    you to the doctors to have the pacemaker
7    inserted?
8        A.  Yeah.
9        Q.  Tell me about that.
10       A.  I had a quadruple bypass.
11       Q.  It sounds like the quadruple bypass
12   occurred and after that events lead to a
13   pacemaker being inserted?
14       A.  You got it.
15       Q.  What it sounds like -- let's see, if
16   you were in the hospital approximately two
17   weeks, maybe a little less in March of '07, did
18   you have the second surgery for the pacemaker in
19   the summer or was it still late spring?
20       A.  I had a pacemaker put in before that,
21   before the operation, and during the operation
22   they had to remove it, do the operation, but I
23   still needed the pacemaker while I was being
24   operated on.
25       Q.  Okay.

Page 40

1        A.  And as soon as that was over with they
2    put in a defibrillator, took the old one out and
3    put a new one in.
4        Q.  When was your first pacemaker inserted?
5        A.  Same as always, can't remember.
6        Q.  Had you had it, do you estimate, five
7    years prior to --
8        A.  No.  It wasn't very long before then.
9    Well, it wasn't very long before then because it
10   was -- I think -- I'm almost sure I think the
11   reason why they sent me in there to have all
12   these tests run, or this one test run, was
13   because of the fact I had a pacemaker.  I'm not
14   sure of that.
15       Q.  After your first pacemaker was
16   installed, did you have medication that you were
17   also prescribed to take to correct your heart
18   rhythm?
19       A.  I had pills I was taking, but the
20   pacemaker did the job.
21       Q.  Were the pills related to your heart or
22   other conditions?
23       A.  I didn't get any pills for my heart
24   until after my quadruple bypass.
25       Q.  Earlier you mentioned that you were

10  (Pages 37 to 40)

Peter J. Konek

Page 41

1  given two pills. Has the other name of the pill
2  --
3      A.  I don't know the name of it. I've got
4  all that, like I said, at home. I've got
5  everything written down from -- how long before
6  that did you want the record?
7      Q.  About a year, a little over a year
8  before your quadruple bypass.
9      A.  I can probably give you everything you
10  need to know by the week.
11      Q.  Do you keep a medical journal or diary?
12      A.  I don't. My wife does completely for
13  probably the last 25 years.
14      Q.  Great. We would ask to see that during
15  relevant time frame?
16      MR. DOHENY:  Just from January
17  1st of '06?
18      THE WITNESS:  That's what you
19  need to know?
20      MR. DOHENY:  The Court says
21  that's as far back as you need to go.
22      MS. MCILHENNY:  Pete, please
23  answer the questions when asked and only when
24  asked.
25      Q.  (By Ms. Smith)  So way back to the

Page 42

1  quadruple bypass -- and it sounds like the
2  second pacemaker was inserted very shortly after
3  the surgery for the quadruple bypass, correct?
4      A.  (Witness nods head.)
5      Q.  Which took place in March of 2007. The
6  next date I have before me would be this
7  prescription of Digitek in November of 2007. Do
8  you recall if you were taking Digitek between
9  March of 2007 and November of 2007?
10      A.  No, I don't remember.
11      Q.  And, again, it's in the medical
12  records? You just don't recall as we sit here
13  today, true?
14      A.  True. Uh-huh.
15      MS. MCILHENNY:  And please use
16  words like "yes" or "no."
17      A.  Yes, no.
18      Q.  (By Ms. Smith)  And the answer to that
19  question was which? It's in the medical
20  records, correct?
21      A.  Yes.
22      Q.  Now, I have this Wal-Mart pharmacy
23  sheet and if I look through it, it tells me the
24  prescriptions you had filled at the Wal-Mart
25  pharmacy between November of 2007 and August of

Page 43

1  2008. Going through there -- and take your time
2  and do the same.
3      MR. DOHENY:  It's like a summary
4  sheet?
5      Q.  (By Ms. Smith)  When I flipped through
6  there and looked for references to Digitek, I
7  came up with five.
8      MS. MCILHENNY:  Please restate
9  your question.
10      Q.  (By Ms. Smith)  Sure. Looking through
11  this medical prescription record, I searched for
12  the word "Digitek" to see the number of
13  instances in which Digitek was prescribed and I
14  found five and, again, take your time to look
15  through this as well.
16      A.  Yes, five. Five is right, yes, five.
17      Q.  And the dates I show on the purchase,
18  the first one is November 20, 2007?
19      A.  Gotcha.
20      Q.  The next one I see is December 14,
21  2007?
22      A.  Yes.
23      Q.  The next one is January 23, 2008?
24      A.  Yes.
25      Q.  The next one is March 8th of 2008?

Page 44

1      A.  Yes.
2      Q.  And the next one is April 21st of 2008?
3      A.  Yes.
4      Q.  And if I look at the entries as well in
5  the final column where it says the patient paid
6  and the cash price, I see the abbreviation
7  "HUM." I understand that to be Humana?
8      A.  Right.
9      Q.  And it looks like with insurance on the
10  November 20, 2007, purchase was a $4 charge to
11  you for a medication and that reflects the price
12  of $9.46?
13      A.  Yes.
14      Q.  If I look at the December, 2007,
15  purchase, again, it looks like you paid $4?
16      A.  Yes.
17      Q.  And if I look at the January 23, again,
18  it looks like you paid $4?
19      A.  Yes.
20      Q.  If I look at the March, 2008, again,
21  $4?
22      A.  Yes?
23      Q.  And April, 2008, $4?
24      A.  Yes.
25      Q.  So five $4 purchases totaling $20. Do

11 (Pages 41 to 44)

Peter J. Konek

| Page 45 |
| --- |

1    you recall?
2        A. Yes.
3        Q. Is that the full extent of the
4    out-of-pocket expenses you seek to recover from
5    your lawsuit?
6        A. Yes.
7        Q. So it cost you $20 from November 20,
8    2007, until you stopped taking the prescription
9    that you filled on April 21st of 2008 to treat
10    your heart condition with Digitek?
11        A. Uh-huh. Yes.
12        Q. And with respect to your first four
13    prescriptions of Digitek, the November,
14    December, January, March, did you take all of
15    the tablets?
16        A. Well, yes.
17        Q. And with respect to that last one that
18    was filled on April 21, you state in your
19    Plaintiff Fact Sheet that you have 17 pills left
20    over, correct?
21        A. Right. I didn't take all those.
22        Q. So 30 pills -- it says here there were
23    30 pills in a quantity and you have 17 that are
24    left over, so presumably you took 13 pills from
25    that last prescription?

| Page 46 |
| --- |

1        A. I would say yes.
2        Q. So in terms of the unused Digitek, it
3    would be on a pill basis less than the $4? If
4    you take the $4, divided by the 30 tablets and
5    then get an amount which I calculate to be $0.13
6    a tablet, and I have a calculator if that would
7    help.
8        A. That's fine, yes.
9        Q. So if you take the left over 17 pills
10    times $0.13 a tablet, I show that as being
11    $2.21?
12        A. Yes.
13        Q. Okay. And if we continue looking at
14    this pharmacy record, it appears as though your
15    doctor switched your prescription to Lanoxin
16    after the recall. Is that your recollection?
17        A. Okay. Let me see what we went to. Oh,
18    yeah, we went to Lanoxin.
19        Q. And counting the number of Lanoxin
20    prescriptions that appear on this record, I show
21    that there are four Lanoxin prescriptions; one
22    in May of 2008. Do you see that one?
23        A. I'm looking. Lanoxin, Lanoxin, yeah.
24        Q. The next one I see is in June of 2008?
25        A. Uh-huh.

| Page 47 |
| --- |

1        Q. The third one --
2        A. 8/2?
3        Q. Yeah, 8/2 of 2008 so three, not four.
4    Did I miscount earlier? I misspoke earlier. It
5    appears there are three Lanoxin fills; one in
6    May, one in June, and the next one in August,
7    correct?
8        A. Uh-huh.
9        Q. Do you recall offhand if it cost you
10    more to purchase Lanoxin than it did Digitek?
11        A. In my own personal opinion Lanoxin was
12    much more. It was not a generic and right after
13    that they put me on -- I wrote the name down
14    here, D-I-G-O-X-I-N. That's what I'm taking now
15    and that's a generic.
16        Q. And it's cheaper than the Lanoxin as
17    well?
18        A. Oh, yeah.
19        Q. Do you agree that when you were able to
20    take Digitek since it was a cheaper medication
21    than Lanoxin, you received the benefit of a more
22    affordable medication?
23        A. Say again.
24        Q. Since Digitek cost less than Lanoxin,
25    when you were able to take Digitek did you

| Page 48 |
| --- |

1    receive the benefit of a cheaper medication?
2        A. Yeah.
3        Q. You mentioned that after the Lanoxin
4    you began taking Digoxin?
5        A. That's what I'm taking now.
6        Q. And you continue to take that to the
7    present. Do you know if your dosage has ever
8    changed in the course of taking your Digitek,
9    Lanoxin, or Digoxin?
10        A. I don't think so. I think it's stayed
11    the same; 0.125. I think they were all 0.125.
12        Q. We'll talk a bit more about your switch
13    from medication to medication in a bit. I want
14    to continue talking about some of the documents
15    that I have been provided a copy of from your
16    counsel.
17        One of the things among the records is
18    a sheet, an information sheet, I would describe
19    it, that has your name on the top, Konek, Peter,
20    J. with Digitek 0.125 milligrams tab on the top
21    of it?
22        A. Uh-huh.
23        Q. And this has various statements as to
24    potential risks of the medication. Would you
25    agree?

12  (Pages 45 to 48)

Peter J. Konek

Page 49

1    A.  Yeah.
2    Q.  Is this the document that you were
3  referring to earlier when you talked about when
4  you're prescribed a medicine, you're given
5  information about the benefits and the risks?
6    A.  This is it.
7    Q.  Among other things stated on the sheet,
8  do you see where it says "overdose," second to
9  last paragraph?
10   A.  Uh-huh.
11   Q.  I'll read that into the record.  Says,
12 "Overdose," colon, "if overdose is suspected
13 contact your local poison control center or
14 emergency room immediately.  Symptoms may
15 include changes in vision, loss of appetite,
16 nausea, vomiting, diarrhea, dizziness, weakness,
17 and irregular heartbeat."  Did I read that
18 correctly?
19   A.  Yes.
20   Q.  When you were taking Digitek, did you
21 ever contact the legal poison control center or
22 ER about experiencing any of these symptoms?
23   A.  No.  No.
24   Q.  Apart from calling the ER or poison
25 control center, did you ever experience any of

Page 50

1  these?  I think earlier you may have indicated
2  dizziness?
3    A.  Yeah.  That's about it.
4    Q.  And just to confirm my recollection of
5  what you said, you were not 100 percent positive
6  about the dizziness but it was something you may
7  have experienced?
8    A.  It's quite possible.  I'm taking a lot
9  of medicines that could cause dizziness.
10   Q.  What other medications are you taking
11 that could cause dizziness?
12   A.  Oh, boy, I don't have them written
13 down.
14   Q.  How many pills do you take a day?
15   A.  Four, five.
16   Q.  Do you take vitamins?  Is that
17 separate?
18   A.  Separately.  I take six.
19   Q.  Six a day?
20   A.  I take one -- I take five of them once
21 a day and then I take one of them twice a day.
22   Q.  And what are these for, these
23 medications?
24   A.  One is for my prostate cancer and the
25 others are for my heart.

Page 51

1    Q.  And did you suffer prostate cancer
2  between January 1st of 2006 and August of 2008?
3    A.  No.  Way before that, but it may be
4  coming back.
5    Q.  I'm sorry to hear that.
6    A.  Well, so am I.
7    Q.  Looking, again, at this sheet.
8    A.  Are we done with that?
9    Q.  I'm going to look at another part of
10 this sheet where it says -- let me find it on
11 here, the cautions.  It's the third paragraph
12 down.
13   A.  Uh-huh.
14   Q.  It says, Caution, do not stop taking
15 this medicine without first checking with your
16 doctor."  Do you see that?
17   A.  Yeah.
18   Q.  Did you ever stop taking Digitek while
19 you were taking the medication?  That was a
20 poorly worded question.  Let me rephrase that.
21      When you were taking Digitek as a
22 prescribed-daily medication, did you ever miss a
23 day?
24   A.  I don't think so.
25   Q.  Did you understand that it was

Page 52

1  important to take it every day?
2    A.  Yeah.
3    Q.  Did you take it at a consistent time
4  every day?
5    A.  Pretty close.
6    Q.  Did your doctor explain to you that
7  there might be severe consequences if you didn't
8  take it every day?
9    A.  No.
10   Q.  Did you believe there might be?
11   A.  Well, all I can -- I read the sheet and
12 do what they said.  I don't worry about that.  I
13 just do what they tell me to do.
14   Q.  So when the sheet says "don't stop
15 taking it without calling your doctor," that's
16 exactly what you did?
17   A.  Yeah.  But I -- well, there I go again.
18   Q.  When you were taking Digitek and for
19 that matter Lanoxin and Digoxin, did you receive
20 routine monitoring by your doctor of your serum
21 levels?
22   A.  No.  No.
23   Q.  Did you receive any monitoring of your
24 serum levels?
25   A.  Every six months I get an examination

13  (Pages 49 to 52)

Peter J. Konek

Page 53

1  by my doctor and they run tests like this for
2  about four hours and we find out what they have
3  to do or what they want to change and that's it.
4      Q.  And between the six-month appointments,
5  you don't go in for any other screening or any
6  other tests?
7      A.  If I ever have a reason, all I have to
8  do is call.
9      Q.  So there is no standing test for serum
10  levels every two weeks?
11      A.  Uh-huh.
12      Q.  I'm sorry, you agree there are no
13  regular tests for your serum levels every two
14  weeks or one month?
15      A.  No, but there is something I have to
16  do.
17      Q.  What's that?
18          MS. MCILHENNY:  Well, let's clear
19  up the question preceding.
20      Q.  (By Ms. Smith)  Let me ask it again.
21      You don't get your serum levels tested
22  every two weeks, correct?
23      A.  Correct.
24      Q.  And you don't get your serum levels
25  tested every one month, correct?

Page 54

1      A.  Correct.
2      Q.  The only routine testing you receive is
3  every six months?
4      A.  Correct.  Well, it's half correct.
5      Q.  Well, every six months you get some
6  routine tests?
7      A.  Yeah, but that's only half correct.
8      Q.  And in between you may call a doctor
9  with a specific concern?
10      A.  And another thing.
11      Q.  Tell me this other thing.
12      A.  Every morning I have to take my blood
13  pressure and my weight and it passes from my
14  house to the doctor's office through a company
15  that monitors this, so they monitor my weight
16  and blood pressure and whatever goes with the
17  blood pressure every day of the week.
18      Q.  And is this in connection with your
19  pacemaker?
20      A.  With my defibrillator.
21      Q.  So we have the daily testing for your
22  defibrillator, we have the every-six-month
23  checkup where they keep you for four hours and
24  do all sorts of tests?
25      A.  Oh, boy.

Page 55

1      Q.  And in between the only other thing you
2  go to a doctor for would be a specific event
3  that would lead you to call him?
4      A.  True.
5      Q.  To your knowledge, did you ever have a
6  physical reaction to Digitek?
7      A.  No.
8      Q.  Do you believe your doctors would have
9  caught it if you had?
10      A.  They probably would.
11      Q.  As far as you're concerned with respect
12  to the Digitek that you took, did it do its job
13  in helping your heart stay in rhythm?
14      A.  I would say that it did.  Unless I took
15  one when they put the wrong one in the package.
16      Q.  Well, do you have any specific
17  recollection of taking --
18      A.  No, I don't.
19      Q.  And do you have any recollection of
20  having any adverse physical --
21      A.  Huh-uh.
22      Q.  -- effect?
23          MS. MCILHENNY:  Please let her
24  finish her questions before you answer.
25      Q.  (By Ms. Smith)  Do you have any

Page 56

1  specific recollection of an instance where you
2  thought you were experiencing physical symptoms
3  because of the Digitek you took?
4      A.  No.
5      Q.  Do you recall that Digitek, when
6  properly administered, serves an important
7  function in keeping your heart working properly?
8      A.  Yes.
9      Q.  Do you believe that you received that
10  benefit from taking Digitek?
11      A.  Yes.
12      Q.  So the pills that you took between
13  December, 2007, and May of 2008, or it may have
14  been late April, 2008, to the best of your
15  knowledge, those pills functioned properly for
16  you?
17      A.  Yeah.
18      Q.  And you didn't suffer any toxicity as a
19  result of taking those pills?
20      A.  No.
21      Q.  And based on a physical inspection of
22  the Digitek that you took as you were taking it,
23  did you ever notice any pills that were
24  noticeably different than other Digitek pills
25  that you had taken?

14  (Pages 53 to 56)

Peter J. Konek

Page 57

1    A.  Couldn't tell you.
2    Q.  Are you someone who pays close
3  attention to the pills as you take them?
4    A.  No.
5    Q.  Fair to say, then, that you never
6  weighed them?
7    A.  No.
8    Q.  In terms of papers that you might have
9  in possession we talked about the fact that
10 there were going to be some supplemented medical
11 records and entries from your wife's medical
12 journal about your health.  Do you cut out
13 newspaper articles or magazine articles on a
14 routine basis on any topic?
15   A.  No.
16   Q.  So not about Digitek or this
17 litigation?
18   A.  No.
19   Q.  And apart from your wife's journal, are
20 there any other sort of journals, diaries,
21 calendars that might affect your treatment with
22 Digitek?
23   A.  No.
24   Q.  I think now is probably a good time to
25 a short break if that's all right with you.

Page 58

1
2    A.  I can go on.  Let's keep going.
3    Q.  Okay.
4        (Exhibit E was marked for
5  identification by the court reporter.)
6    Q.  (By Ms. Smith) I'm going to hand you
7  what's marked as Exhibit E.  This is a copy of
8  the amended Notice of Deposition in this case
9  along with all of the attachments to it.  Have
10 you seen this before?
11   A.  I tell you what, I don't think so.
12       THE WITNESS:  Have I seen --
13 well, I --
14   Q.  (By Ms. Smith) You may have?  You're
15 not certain?
16       MS. MCILHENNY:  I can represent
17 to you that he has.
18   A.  Okay, I've seen it.
19   Q.  (By Ms. Smith) In this document you
20 were asked to bring with you today the pills
21 that you have remaining in your possession and
22 your counsel is holding those up to say that you
23 have, and we have brought testing paraphernalia
24 to inspect those and we'll go ahead and do that
25 after the deposition and not on the record.  Is

Page 59

1  that all right?
2        MS. MCILHENNY:  That's all right.
3  I may have a question or two about the
4  equipment, not about the actual caliber but
5  about the actual scale.
6        MR. DOHENY:  We can play with it
7  and I'll show you what I've learned.
8        MS. MCILHENNY:  And I might ask
9  you about its age and how long you've had it.
10       MS. SMITH:  We'll take that up at
11 the tail end of the deposition.
12       MR. DOHENY:  We'll calibrate it
13 before we start to make sure it's working.
14       MS. MCILHENNY:  Okay.
15   Q.  (By Ms. Smith) Earlier we talked about
16 Dr. Shaheen.  Any other doctors who have treated
17 you for your heart conditions?
18   A.  No.  Well, Margolis.
19   Q.  And where does Dr. Margolis practice?
20   A.  Dr. Margolis did the -- put my
21 defibrillator in and then he moved to Oklahoma.
22 So I've had -- and he at one time was
23 prescribing my medicine and then it switched
24 over when he left.  Shaheen never done any
25 operating on me but he has taken care of my

Page 60

1  medicine.
2    Q.  So when you went in in March of 2007,
3  you would have gone in to see Dr. Margolis and
4  he kept you 48 hours for the test?
5    A.  He didn't perform the operation on my
6  quadruple bypass.
7    Q.  Which doctor did that?
8    A.  I'm trying to think of it right now.
9  I'll think of it; Fisher.
10   Q.  Do you remember Dr. Fisher's first
11 name?
12   A.  No.
13   Q.  And the hospital?
14   A.  St. Francis.
15   Q.  And that's here in Wichita?
16   A.  Uh-huh.  After he got done, why
17 Margolis took over.
18   Q.  So it sounds like the series of doctors
19 would be Dr. --
20   A.  That's about the only two that had
21 anything to do with my heart.
22       MR. DOHENY:  Dr. Fisher, Margolis
23 and Shaheen.  Fisher did the open heart,
24 Margolis did the defibrillator.
25   A.  And Shaheen does the pills,

15  (Pages 57 to 60)

Peter J. Konek

Page 61

1  prescriptions.
2      Q.  (By Ms. Smith)  And aside from those
3  three, you don't recall any other doctors who
4  have treated you for your heart condition?
5      A.  No.
6      Q.  Did you propose to your doctor that he
7  prescribe Digitek to you?
8      A.  No.
9      Q.  Did you ever see any advertisements for
10 Digitek?
11     A.  No.
12     Q.  Do you recall which doctor first
13 prescribed Digitek for you?  Would it have been
14 Margolis?
15     A.  I think it was Shaheen. I'm not
16 positive.  That's up in the air.
17     Q.  Okay.
18     A.  It was one or the other because
19 Margolis did that and when he left, he turned it
20 all over to Shaheen and I don't know the date.
21     Q.  When you were first prescribed Digitek,
22 did you have a discussion with your doctor about
23 Digitek?
24     A.  No.
25     Q.  You were just given a prescription and

Page 62

1  you went to the pharmacy and filled it?
2      A.  That is correct.
3      Q.  And earlier we talked about the sheet
4  that the pharmacy gave you with your
5  prescription talking about Digitek and the
6  risks, correct?
7      A.  Uh-huh.
8      Q.  Did your doctor give you any separate
9  sheets about the medication that you recall?
10     A.  No.
11     Q.  When you filled the prescription at the
12 pharmacy, did you have any discussions with the
13 pharmacist about Digitek?
14         MS. MCILHENNY:  Object to form.
15     Q.  (By Ms. Smith)  As to when you first
16 fill your first Digitek prescription, did you
17 have any conversations with the pharmacist about
18 Digitek?
19     A.  What they do is what I said they do.
20 You get your pills and they have a sheet of
21 paper and they go over it with you and that's
22 it.
23     Q.  And do you --
24     A.  They tell you exactly what it will do
25 and won't do and, you know, what can happen.

Page 63

1      Q.  And so you remember specifically with
2  Digitek that you had that type of conversation
3  with your pharmacist?
4      A.  Yeah.
5      Q.  And did your pharmacist say anything
6  about the risks or benefits of Digitek that were
7  different on the sheet that we have in your
8  records?
9      A.  No.
10     Q.  And then at any point prior to you
11 receiving the letters about the recall, did you
12 have any discussions with your pharmacist beyond
13 what was on the sheet about Digitek?  Is that
14 confusing?  Let me reword the question.
15         When you first received Digitek, you
16 told me that the doctor gave you the sheet or
17 the pharmacist gave you the sheet and went over
18 it with you, the risks and benefits of the
19 medication.  The next time --
20     A.  We're talking about the sheet that
21 showed that they were taking it off the shelf,
22 right?
23     Q.  No.  This is the sheet that we
24 discussed earlier that is in Exhibit C that
25 looks like this (indicating).  The first time

Page 64

1  you go into your pharmacist.
2      A.  That's what you get.
3      Q.  You get this sheet?
4      A.  Right.
5      Q.  And you told me you didn't discuss
6  anything beyond the sheet with your pharmacist?
7      A.  Right.
8      Q.  Next time a month later when you go
9  back, you get the sheet again?
10     A.  Right.
11     Q.  Do you have a separate discussion, or
12 once you've had it once --
13     A.  Once I had it the first time I don't
14 get it again, but they require it the first
15 time.
16     Q.  So each of your repeat refills, same
17 thing?
18     A.  Same thing.
19     Q.  So up until the point -- let's not talk
20 about the letter yet, up until that point,
21 though, did you ever have any discussion with
22 your pharmacist about Digitek beyond this sheet?
23     A.  No.
24     Q.  And then there came a time when you got
25 the recall letters that you mentioned earlier,

16  (Pages 61 to 64)

Peter J. Konek

Page 65

1  the two; one from the pharmacy and one from your
2  insurance company, correct?
3      A.  Right, Humana.
4      Q.  And I believe those are, also, within
5  Exhibit C.  Did you have a discussion with your
6  pharmacist at that point about Digitek?
7      A.  Well, that's the question I was going
8  to ask you about.  I was telling her that I
9  can't prove to you what was said because, I
10  mean, there is no way to but I ran into the
11  pharmacist, I see him once in awhile, and when I
12  showed it to them he said they got my other
13  prescription ready and I said, "You know what?
14  I think I'm going to do something about that."
15  He said, "I don't blame you," but I cannot prove
16  that, no way.
17      Q.  Is this a pharmacist at Wal-Mart who
18  you would routinely see?
19      A.  No.
20      Q.  Do you recall what this individual
21  looked like?
22      A.  I talked to him, but I can't prove any
23  of this.
24      Q.  Do you --
25      A.  I should have told you not -- like I

Page 66

1  said, I talked to the man.  He cannot remember
2  anything except the fact that I came in with my
3  letter.  That's it.
4      Q.  Let me make sure I'm understanding.
5         When you went and got the letter, you
6  went in and had a conversation with the
7  pharmacist that you described to me that it
8  sounds like you've had a subsequent conversation
9  with him where he's saying he doesn't recall
10  that earlier conversation?
11      A.  Right.
12      Q.  You don't recall this individual's
13  name?
14      A.  No.
15      Q.  Or what he looks like?
16      A.  Oh, boy, I better just say no.
17      Q.  But he does work at Wal-Mart?
18      A.  Yeah.
19      Q.  And he worked at Wal-Mart at the time
20  of the recall?
21      A.  (Witness nods head.)
22      Q.  Anything else about the discussion
23  regardless of what he says today happened or
24  didn't happen in your recollection of that
25  discussion you've had with the pharmacist at the

Page 67

1  time of the recall?  Is there anything else you
2  discussed with him that we haven't already
3  talked about today?
4      A.  No.  Nothing.
5      Q.  And did you have conversations about
6  the recall when you got the letters with anybody
7  besides that pharmacist?
8      A.  No.
9      Q.  Your wife?
10      A.  No.
11      Q.  Your doctor?
12      A.  Doctor's nurse.  I had to call up there
13  to get a new prescription.
14      Q.  What was the extent of that
15  conversation?
16      A.  I told her what happened.  I read it to
17  her.  She said they'll have me a new
18  prescription, just to go back on down to
19  Wal-Mart.
20      Q.  Did you ever discuss Digitek with a
21  representative from a pharmaceutical company?
22      A.  No.
23      Q.  Earlier you mentioned that when you
24  took Digitek, it's possible you experienced
25  dizziness that may have been related to the

Page 68

1  Digitek, correct?
2      A.  Correct.
3      Q.  You also mentioned other medications
4  that --
5      A.  Same possibility.
6      Q.  I now want to ask you, can you remember
7  the names of any of those other medicines?
8      A.  I should have brought the list, but I
9  didn't think we was going to do anything at all
10  about prescriptions or I would have brought the
11  whole list and anything else and I wouldn't be
12  guessing.
13      Q.  I want you to guess.  To the extent
14  your answer is "I don't know offhand," that's a
15  totally fine answer.  And we'll get the records
16  and the records will reflect what medicines you
17  were taking so we can rely on that
18  representation if you're comfortable with that?
19      A.  Good.
20      Q.  Understanding that you weren't coming
21  into today with the mindset of talking about the
22  specifics of those medicines, is there any one
23  of those medicines that comes to mind that you
24  think, huh, maybe it was that one that might
25  have caused the dizziness as opposed to the

17 (Pages 65 to 68)

Peter J. Konek

| | Page 69 |
|---|---|
| 1 | Digitek? |
| 2 | A. No. If I could get to talk I could |
| 3 | straighten some of this up for you. |
| 4 | Q. Go ahead. |
| 5 | A. It may not even be the pills that cause |
| 6 | the dizziness but when you look at the sheet it |
| 7 | says this pill can cause dizziness. It may be |
| 8 | something else. That's as honest as I can be |
| 9 | about it. |
| 10 | Q. And I appreciate that. If there is |
| 11 | anything more you want to say, go on. |
| 12 | A. Well, they're running tests on me right |
| 13 | now for dizziness. |
| 14 | Q. For dizziness? |
| 15 | A. Yes. |
| 16 | Q. What kind of tests are those? Well, I |
| 17 | guess I need to respect the Court's order. |
| 18 | That's beyond the time frame. |
| 19 | MS. MCILHENNY: Thank you. |
| 20 | Q. (By Ms. Smith) I won't even let your |
| 21 | attorney object. |
| 22 | A. I want to hear her do it. |
| 23 | Q. The dizziness you're experiencing today |
| 24 | I can't ask you about, but were you experiencing |
| 25 | dizziness that your doctors were monitoring as |

| | Page 70 |
|---|---|
| 1 | of the end of last summer? |
| 2 | A. No. |
| 3 | Q. When you called in and talked to the |
| 4 | nurse at your doctor's office, looking at the |
| 5 | prescription records you were switched to |
| 6 | Lanoxin, correct? |
| 7 | A. That came after Digitek, and then after |
| 8 | that came -- |
| 9 | Q. Digoxin? |
| 10 | A. That's it, Digoxin. |
| 11 | Q. And your heart condition, do you feel |
| 12 | that it's been adequately treated by those |
| 13 | medicines since taking them? |
| 14 | A. There is no way I can answer that |
| 15 | question. |
| 16 | Q. You haven't experienced a heart attack, |
| 17 | correct? |
| 18 | A. I hope not, no. |
| 19 | Q. You haven't had to go to the doctor |
| 20 | with specific concerns of palpitations or |
| 21 | irregular heartbeat? |
| 22 | A. No. |
| 23 | Q. So to the best of your knowledge, it |
| 24 | appears to be functioning or performing? |
| 25 | A. I'm here. Yes and no. Yes. |

| | Page 71 |
|---|---|
| 1 | Q. "I'm here" works for that one, too. |
| 2 | THE WITNESS: No smiling, John. |
| 3 | MR. DOHENY: I'm smiling with |
| 4 | you. |
| 5 | Q. (By Ms. Smith) During, you know, every |
| 6 | six months you said you go to the doctor and you |
| 7 | get four hours worth of tests -- |
| 8 | A. They run a ton of tests. |
| 9 | Q. I'm going to list some and tell me if |
| 10 | it's part of the regime during that time period. |
| 11 | A. I couldn't tell you. |
| 12 | Q. Do you know if received an EKG? |
| 13 | A. Probably. |
| 14 | Q. A renal -- |
| 15 | A. I get some of those in between that six |
| 16 | months. |
| 17 | Q. And that's when you have a specific |
| 18 | issue that you call your doctor and he does |
| 19 | tests in connection with that, but it's not a |
| 20 | routine? |
| 21 | A. Well, there is a reason why. Once in |
| 22 | awhile I go in and, like I said, my deal is only |
| 23 | for six months but every once in awhile I slip |
| 24 | in there because -- |
| 25 | THE WITNESS: Am I allowed to |

| | Page 72 |
|---|---|
| 1 | tell them? |
| 2 | Q. (By Ms. Smith) Well, now you kind of |
| 3 | opened up the can of worms. |
| 4 | MS. MCILHENNY: You have no |
| 5 | choice at this point. |
| 6 | A. When I had my defibrillator put in, |
| 7 | there is a lead wire that roams and every once |
| 8 | in awhile it hits my diagram and when it does |
| 9 | that I get (indicating), just like that, just |
| 10 | keeps going like that, and I have to turn in a |
| 11 | separate position to see if I can move that lead |
| 12 | and I do. I mean, I could be sitting here right |
| 13 | now and have all that happen. So when I go in |
| 14 | there, they run, you know, tests on me but |
| 15 | that's nothing. I mean, it's not like the big |
| 16 | tests in six months. |
| 17 | Q. (By Ms. Smith) Since we don't have a |
| 18 | video camera going today, is it fair to say that |
| 19 | what you demonstrated is it looks like your side |
| 20 | throbs in a noticeable fashion? |
| 21 | A. Just like a heavy heartbeat. It's |
| 22 | this. It's the wire hitting the defibrillator. |
| 23 | Q. Have you ever filed a lawsuit in |
| 24 | connection with that? |
| 25 | A. No. |

18 (Pages 69 to 72)

Peter J. Konek

**Page 73**

1     Q.  Do you believe that's associated with
2 the product or the way the product is designed
3 or the placement within you?
4         MS. MCILHENNY: Objection. Calls
5 for speculation. You may answer the question,
6 if you know.
7     A.  I have no idea.
8     Q.  (By Ms. Smith) Okay. I'm going to go
9 ahead and list off a series of tests and tell me
10 "yes, I know I've had it during that time
11 frame," or "no, I know I never did," or "I may
12 have, I just don't know one way or the other."
13 We already talked about an EKG. The next one I
14 have on my list is renal function?
15     A.  No.
16     Q.  Electrocytes?
17     A.  No.
18     Q.  Chest X-ray?
19     A.  Yes.
20     Q.  Exercise test?
21     A.  No, not with them, no.
22     Q.  A stress test?
23     A.  Not with them, no.
24     Q.  Pulmonary function test?
25     A.  Yes.

**Page 74**

1     Q.  Pulmonary angiogram?
2     A.  Don't know.
3     Q.  Lung profusion scan?
4     A.  Don't know.
5     Q.  Pulmonary artery catheterization?
6     A.  Don't know.
7     Q.  Heart catheterization?
8     A.  Don't know.
9     Q.  Echocardiogram?
10     A.  Don't know.
11     Q.  Are there any specific tests that you
12 recall of your heart that I haven't mentioned?
13     A.  No.
14     Q.  Lungs?
15     A.  See, the problem is, I don't know the
16 name of all of those. They run so many tests on
17 me, I tell you what.
18     Q.  And I respect that answer. That's a
19 completely fair answer.
20     A.  Every machine they have in that
21 building you're going to hit.
22     Q.  The only three off that list that you
23 thought you had were an EKG, chest X-rays, and
24 pulmonary function test. To your recollection,
25 anything abnormal detected?

**Page 75**

1     A.  No.
2     Q.  At any point in time did you receive
3 samples of Digitek?
4     A.  No.
5     Q.  And it looks like your counsel has
6 brought your pills here today which we've
7 touched upon a bit today. It looks like they
8 come in a blister pack. Is that the way they
9 always came?
10     A.  Yeah.
11     Q.  Never loose in a bottle?
12     A.  No.
13     Q.  Before you started using Digitek, did
14 you know anybody else who was taking Digitek?
15     A.  No.
16     Q.  After you began taking Digitek, did you
17 talk to anybody who used Digitek about it?
18     A.  No.
19     Q.  In your case you're suing Actavis and
20 Mylan. Have you ever talked to anybody at
21 Actavis or Mylan about Digitek?
22     A.  No.
23     Q.  Have you ever communicated in writing
24 or in person with anybody at Actavis or Mylan
25 about anything?

**Page 76**

1     A.  No.
2         MS. SMITH: Can I hold the
3 tablets?
4     Q.  (By Ms. Smith) They came in a hard
5 shell case that's white and then you pull out
6 the blister pack that appears -- and there is a
7 photocopy of this in the records as well that
8 has a week at the top and then a column of days
9 of the week below that. Some of these are
10 punched out, some are not. If you flip it over,
11 this is something that you cannot tell from the
12 photocopy is the color of the pills which I will
13 represent are the color of a yellow Post-it.
14         MS. SMITH: Would you agree.
15         MS. MCILHENNY: I agree.
16     Q.  (By Ms. Smith) And there are 17 left
17 in the packet and 13 that have been removed.
18 And we have a photocopy in the records of the
19 information on both sides of this prescription
20 and it is a prescription for 0.125 milligrams.
21         MS. MCILHENNY: Thank you.
22         MS. SMITH: Thank you.
23     Q.  (By Ms. Smith) Do you recall what type
24 of day you would take your Digitek tablet?
25     A.  Morning.

19 (Pages 73 to 76)

**Page 77**

1    Q.  Did you take it with a meal?
2    A.  No.
3    Q.  And I believe I asked this earlier and
4  forgive me if I did, but do you have any
5  recollection of ever forgetting to take a dose?
6    A.  No, but if I had I would just skip it.
7    Q.  That was my next question.  Thank you.
8        Was there ever a time that you recall
9  accidentally taking or for any reason taking two
10  tablets in one day?
11    A.  No.
12    Q.  And are there any tablets other than
13  the 17 that are in your counsel's possession
14  that you have left over from Digitek?
15    A.  No.
16    Q.  And we've already talked about the fact
17  that you received a couple letters about the
18  recall of Digitek, correct?
19    A.  Correct.
20    Q.  Did you return or attempt to return
21  those remaining pills to anybody?
22    A.  No.
23    Q.  Were you aware through the recall
24  letters that you could have sent them to
25  Stericycle?  You may refer to the documents.

**Page 78**

1    A.  I didn't call them.
2    Q.  And you didn't -- the letter states
3  that -- well, let me just read it into the
4  record.  It states in bold in the second to last
5  paragraph or third to last paragraph, "If you're
6  currently taking Digitek 0.125 milligrams or
7  0.25 milligram tablets or have a supply on hand
8  you should contact Stericycle customer service
9  at 1-800-276-7177.  Representatives will be
10  available Monday through Friday 8 a.m. to 5 p.m.
11  Eastern Standard time.  Additional information
12  about the voluntarily recall can be found at
13  www.actavis.us."  Did I read that correctly?
14    A.  Uh-huh.
15    Q.  And you did not contact Stericycle?
16    A.  No.
17    Q.  Any reason why you didn't?
18    A.  No reason.
19    Q.  And did you visit www.actavis.us?
20    A.  No.
21    Q.  Any reason?
22    A.  No reason.
23    Q.  Were you aware that you could have
24  received a refund through this recall program?
25    A.  Yes.

**Page 79**

1    Q.  Any reason why you didn't seek that
2  refund?
3    A.  That's what kind of pissed me off.
4  They want to make me a refund on this thing and
5  I just didn't like that.  You know, tell me to
6  go down where you get your things and we'll just
7  give you a few bucks back.  No.  Huh-uh.  No
8  thanks.
9    Q.  What is your understanding of that
10  you're suing for in this suit beyond your few
11  bucks?
12    A.  I just want this company to get
13  punished.  I don't care.  They shouldn't be
14  doing what they did.  They put a prescription on
15  the market -- just a second, I've got that
16  thing.  They put a prescription on the market
17  that had no business being there.
18    Q.  Is it your understanding that this
19  company, this laboratory is still operating
20  today?
21    A.  I guess they are.  I don't know.  I
22  have no idea.
23    Q.  Is it your understanding that the only
24  consequence of this -- the improper tablet
25  thickness issue is that they gave back money for

**Page 80**

1  unused pills and there is nothing else?
2    A.  There was a little deal in here a
3  minute ago that you read.  I've got to find it.
4  That would save a lot of problems here.  I had
5  my finger on it and you kept talking and I took
6  it off.  Here it is.  Think about this.  You
7  read this to me a minute ago.  "Overdose,
8  poisoning may occur in children who accidentally
9  swallow this medicine who receive too much
10  medication.  If overdosed contact" -- I mean,
11  you know, if you can have an overdose of this,
12  my goodness gracious.  That's what would happen
13  if I took one of their pills.
14    Q.  And you took their pills, correct?
15    A.  Well, I don't know whether I took one
16  that they took off the shelf.  I have no idea.
17  You tell me.
18    Q.  Did you experience physical symptoms
19  that made you feel like you had an overdose?
20    A.  No.  I'm just explaining to you that if
21  in fact, I took one, what would happen, if I
22  took an overdose of that.  You just read a piece
23  to me a little a while ago stating that the
24  overdose could do this and it could do that.
25  Well, what would this be if I took a pill almost

20  (Pages 77 to 80)

Peter J. Konek

Page 81

1    twice the size of the one that I had?  You can't
2    take two at a time, can you?  If I took one and
3    didn't remember, I have to take another one.
4    No, we don't do that because that's an overdose
5    and that's exactly why they took it off the
6    market.  Do we understand each other?
7        Q.  I appreciate the emotion you have and I
8    appreciate how tempting it is to have a
9    conversation where you ask me questions and I
10   ask you questions.  Because of the formal
11   preceding today I'm the one who asks the
12   questions and you have to answer.
13       A.  Okay, good enough.
14       Q.  I think now might be a good time, but
15   do you think maybe this is a good opportunity to
16   take a lunch break?
17           MS. MCILHENNY:  Works for me.
18           MS. SMITH:  Does that work for
19   you?
20           (Recess).
21       Q.  (By Ms. Smith)  Back on the record.
22   You're still under oath, so it still carries
23   forward now.  You still have to be truthful with
24   me.
25           Before the lunch break we were talking

Page 82

1    about lots of stuff really, but I had asked you
2    about the information sheet that the pharmacist
3    had given you about Digitek and I may have asked
4    you more broadly did you get any other
5    information about Digitek, but I want to ask you
6    specifically did you ever look up Digitek in a
7    book called the Physicians Desk Reference?
8        A.  No.
9        Q.  Are you familiar with that book?
10       A.  No.
11       Q.  Did you read the package insert that
12   would have been with the medicine in addition to
13   any materials that the pharmacist gave you?
14       A.  No.
15       Q.  Switching gears a little bit I wanted
16   to ask you how you came to get involved in this
17   lawsuit?
18       A.  What did I do?
19       Q.  How did it come to your mind that you
20   might want to bring a lawsuit?
21       A.  I, of course, got the two letters in
22   the mail that they took it off the shelf.  Like
23   I said, I called my doctor, got ahold of the
24   nurse and told her -- read it to her and she
25   said, "We'll have you a new prescription just as

Page 83

1    soon as we get ahold of Wal-Mart," and they did.
2    So I went down to Wal-Mart and like I said, I've
3    talked to this one gentleman down there and he
4    had my prescription ready for me.  I picked it
5    up.  I said, "Boy," you know, "I tell you," you
6    know, I said, "this really just made me hot."  I
7    said, you know, "I might do something about
8    this."  And he said, "I don't blame you."  So
9    after I got through getting home I started
10   reading that over again and I started thinking
11   about it.  I didn't just jump up about it and
12   said I'm going to go -- I took my time about
13   this.  I've got a friend of mine out here,
14   another attorney out here.
15       Q.  By "out here," do you mean Hutton &
16   Hutton Law Firm?
17       A.  Yeah.  So he put me in touch with Deb.
18       Q.  And what is his name, your friend?
19       A.  ██████████
20       Q.  Did you ever see any advertisements
21   about becoming involved in litigation regarding
22   Digitek?
23       A.  No.  So I come out here and talked to
24   him.
25       Q.  Has ████████ represented you in

Page 84

1    other matters?
2        A.  Oh, no.  ██████████
3        Q.  ██████████  Is that his nickname?
4        A.  That's what we give him.
5        Q.  And he's just a personal friend from
6    social circles?
7        A.  Oh, yeah, sure.
8        Q.  When you filed your lawsuit, you could
9    have filed it just as yourself against the
10   Defendants or as a Class action and you chose to
11   file it as a Class action.  Why is it that you
12   wanted to bring it as a Class action?
13       A.  You're asking the wrong person.  My
14   attorney could answer that.
15       Q.  Do you understand that you have special
16   duties and responsibilities as a Class
17   representative?
18       A.  I think I do.
19       Q.  And what do you understand those to be?
20       A.  Well, I'm supposed to be partly
21   responsible for all the whole Class on what I do
22   here today, and I'm doing the best I can.
23       Q.  And in your own understanding, who is
24   the whole Class?
25       A.  That's everybody that's, you know --

21 (Pages 81 to 84)

Peter J. Konek

| | Page 85 |
|---|---|

1  was taking Digitek that got the message that it
2  was coming off the market. I'm just sure that's
3  what it was.
4      Q. And I believe you said earlier that
5  would include people who may have been
6  physically injured by Digitek, correct?
7      A. You know, I don't know how I answered
8  that, but I don't think that has anything --
9  physical has anything to do with this.
10     Q. So if a person took Digitek, they spent
11 money on Digitek and they believe they were
12 physically harmed by Digitek, are they in your
13 Class, or are they not?
14     A. I would say not.
15     Q. And are they, to your understanding,
16 then, they need to bring their own individual
17 lawsuit?
18     A. Well, they'd have to if they're not in
19 my Class.
20     Q. But you do believe that some people
21 were physically harmed by Digitek?
22     A. I have no idea.
23     Q. Do you recognize your testimony after
24 lunch as inconsistent with your testimony
25 earlier today?

| | Page 86 |
|---|---|

1      A. I think so. I talked about that and I
2  was asking -- I think I was confused but then,
3  again, maybe I wasn't. I think I was confused.
4      Q. But you may not have been?
5      A. But I may not have been.
6      Q. Do you understand that you've defined
7  your Class to be all persons who purchased
8  Digitek?
9      A. No. All persons that received the
10 letter stating that they were taking it off the
11 market. Isn't that what I said?
12     Q. I can't answer questions today.
13     A. Oh, okay. Well, that's what I -- yeah,
14 I mean, if they got the letter from their
15 insurance companies or whoever they buy pills
16 from or anything else, I would say that all
17 those people are in the Class action suit.
18     Q. Even if they suffered a physical injury
19 or they believe they did?
20     A. Then they may be switching going some
21 other direction. I have no idea.
22     Q. Would it bother you if a judge said all
23 people who purchased are in this Class and
24 you're going to represent all people who
25 purchased it and some of them had physical

| | Page 87 |
|---|---|

1  injuries but they are going to not be allowed to
2  recover damages for those because you've limited
3  your request for economic damages? Would that
4  bother you to make that decision on behalf of
5  other people?
6      A. I don't think I can answer that.
7      Q. What do you hope to achieve for the
8  proposed Class?
9      A. Well, they'll probably want some sort
10 of a reward for going through this.
11     Q. Who is "they"?
12     A. The Class.
13     Q. Okay.
14     A. Will probably be looking for some sort
15 of reward depending on what I can do and what I
16 can't do. I feel as though I've got to help
17 them and I'm going to do the best I can for
18 them.
19     Q. And tell me everything that you hope to
20 personally recover in your lawsuit.
21     A. I've told you once and I'm telling you
22 again. I don't care. I just want to see this
23 company punished for doing what they did and
24 they deserve it.
25     Q. Have you investigated to see what

| | Page 88 |
|---|---|

1  punishment might have already been imposed on
2  this company?
3      A. No idea.
4      Q. Does it matter to you?
5      A. It would.
6      Q. So if they had already been sanctioned
7  by the Government and shut down their
8  operations, that might impact your decision to
9  continue pursuing this?
10     A. Could.
11     Q. Were you promised anything special in
12 addition to the return price of your medicine
13 for serving as a Class representative?
14     A. No.
15     Q. Are you aware that other people around
16 the nation had also filed Class actions about
17 this medicine?
18     A. I don't know anything about that.
19     Q. So is it fair to say that you're
20 unaware they've been dismissing those cases?
21     A. It's fair to say that.
22     Q. Do you know the name of any other
23 person who is in the Class that you represent?
24     A. I don't know.
25     Q. Do you understand that there is a

22  (Pages 85 to 88)

Peter J. Konek

| Page 89 | Page 91 |
|---|---|
| 1   chance the Court could order you to pay some of | 1    Q. Mr. Konek, we met this morning, did we |
| 2   the Defendants' costs in defending this case if | 2   not. |
| 3   it finds the case without merit? | 3    A. Yes. |
| 4    A. Can I say something? I deal with my | 4    Q. I'm John Doheny for Actavis, the two |
| 5   attorney, but I will never have to write a | 5   companies. Have you ever bought any tablets or |
| 6   check. | 6   pills from Actavis before the Digitek that you |
| 7    Q. So your attorneys have told you or you | 7   took? |
| 8   have an agreement whereby you personally don't | 8    A. You know, I don't think so. |
| 9   have to front any money for this litigation? | 9    Q. Do you know any of the officers, |
| 10    A. Like I said, I won't have to write a | 10   directors, shareholders or employees of Actavis? |
| 11   check. | 11    A. No. |
| 12    Q. We earlier spoke of three different | 12    Q. Do you know any of the predecessor |
| 13   doctors who were involved in prescribing Digitek | 13   companies of Actavis, Inc., or Actavis Totowa, |
| 14   for you and other heart medications as well. | 14   LLC? |
| 15   Are there any other persons within the medical | 15    A. Really, I don't know. Even on my other |
| 16   field who you think would have information about | 16   prescriptions, I have no idea where they come |
| 17   your Digitek prescription? | 17   from. |
| 18    A. No. | 18    Q. You have said you want to see Actavis |
| 19    Q. About your heart condition in general? | 19   punished? |
| 20    A. No. I don't think there is anyone | 20    A. Yeah. |
| 21   else. | 21    Q. But you don't personally know anybody |
| 22    Q. And I believe at the beginning of this | 22   involved in making the Digitek or in marketing |
| 23   deposition you told me you had not spoken with | 23   the Digitek? |
| 24   your wife at all about this litigation? | 24    A. No, I don't. |
| 25    A. Or anyone else. | 25    Q. And as I understand it, you took |

| Page 90 | Page 92 |
|---|---|
| 1    Q. That was my next question. Is there | 1   Digitek five prescriptions. We already went |
| 2   anybody else who might have information about | 2   over them, December through April -- December of |
| 3   this suit? | 3   '07 through April of '08? |
| 4    A. No, and boy is that tough. | 4    A. Well, if that's the dates, then, yeah. |
| 5    Q. Is there any reason you're not talking | 5    Q. Have you ever been, I'll use the word, |
| 6   to them about this suit? | 6   "victim" of a drug recall before? |
| 7       MS. MCILHENNY: Objection. | 7    A. No. |
| 8   That's privileged. | 8    Q. And you're 79 years old now? |
| 9    Q. (By Ms. Smith) Without referring to | 9    A. Right. |
| 10   the specific content of a discussion between | 10    Q. Correct? |
| 11   your attorney -- | 11    A. Uh-huh. |
| 12    A. I'll answer that. My attorney told me | 12    Q. And this is the first time you've ever |
| 13   not to. | 13   filed a lawsuit in your life? |
| 14    Q. And you're comfortable with that? | 14    A. Right. |
| 15    A. She's my attorney. | 15    Q. Okay. Are you aware that the people at |
| 16    Q. Well, I appreciate you coming here | 16   Actavis discovered a mistake with some lots of |
| 17   today and being honest with me and taking the | 17   Digitek? Are you aware of that fact? |
| 18   time out of your schedule to answer my | 18    A. No. |
| 19   questions. My colleague here may have some | 19    Q. Are you aware of the fact that after |
| 20   additional questions for you, but those are the | 20   the discovery was made that they notified the |
| 21   ones that I had for you and following his | 21   authorities and that they caused those letters |
| 22   questioning we'll do the testing off the record | 22   that you got from Humana and from Wal-Mart to be |
| 23   of the pills. | 23   sent? |
| 24       EXAMINATION. | 24    A. Yeah. |
| 25   QUESTIONS BY MR. DOHENY: | 25    Q. Wal-Mart and Humana wouldn't know about |

23 (Pages 89 to 92)

Peter J. Konek

Page 93

| | |
|---|---|
| 1 | these problems unless someone told them? |
| 2 | A. Right. |
| 3 | Q. Okay. Is it fair to say, then, that |
| 4 | the people that told Wal-Mart and Humana about |
| 5 | this problem was Actavis and its employees and |
| 6 | officers, directors, and shareholders? |
| 7 | A. Well, the way I see it they should have |
| 8 | when they made the mistake. |
| 9 | Q. Do you have any belief or any reason to |
| 10 | believe that once the mistake was discovered, |
| 11 | that Actavis did not report this? |
| 12 | A. Say that again. |
| 13 | Q. Do you have any reason to believe that |
| 14 | once Actavis became aware of the problem with |
| 15 | certain doses, that they did not report it? |
| 16 | A. That they did report it? |
| 17 | Q. That is correct. That they |
| 18 | self-reported a mistake and instituted a recall. |
| 19 | Are you aware of that? |
| 20 | A. I am. |
| 21 | Q. Are you aware that they no longer make |
| 22 | this product, Digitek? |
| 23 | A. I hope not. |
| 24 | Q. The Digitek that you took from December |
| 25 | to April, December '07 to April of '08, appeared |

Page 94

| | |
|---|---|
| 1 | to help you with your heart rhythm, did it not? |
| 2 | MS. MCILHENNY: Objection. Calls |
| 3 | for a medical conclusion. |
| 4 | Q. (By Mr. Doheny) As far as you can |
| 5 | tell, was it doing what it were supposed to? |
| 6 | A. That's not the only one I have. I take |
| 7 | the two. |
| 8 | Q. What was the other one? |
| 9 | A. I wish I could tell you. |
| 10 | Q. And we're going to get some follow-up |
| 11 | records that will explain all that? |
| 12 | A. Probably. |
| 13 | Q. Was that a heart rhythm medication, |
| 14 | too? |
| 15 | A. Both of them. |
| 16 | Q. And that was made by a company other |
| 17 | than Actavis? |
| 18 | A. True. |
| 19 | Q. So Actavis reported the problem to the |
| 20 | authorities and the insurance company and the |
| 21 | pharmacy that sells the pills contacted people |
| 22 | like yourself? |
| 23 | A. True. |
| 24 | Q. And then they took it off the market, |
| 25 | right? |

Page 95

| | |
|---|---|
| 1 | A. The companies didn't take it off the |
| 2 | market. |
| 3 | Q. You're saying Actavis didn't take |
| 4 | Digitek off -- |
| 5 | A. They did. That's who took it off the |
| 6 | market, Digitek. |
| 7 | Q. Well, no, Actavis took Digitek, which |
| 8 | is the name of the tablet, off the market? |
| 9 | A. Yeah, but the way I listened to the |
| 10 | question, I was wondering if you were trying to |
| 11 | tell me that Humana or Wal-Mart took it off the |
| 12 | market. |
| 13 | Q. No. Are you aware that Actavis took it |
| 14 | off the market? |
| 15 | A. Yeah. |
| 16 | Q. Are you, also, aware that not all the |
| 17 | pills that were the subject of the recall were |
| 18 | out of spec or double-dosed? |
| 19 | A. Wouldn't have any idea. |
| 20 | Q. But now despite the self-reporting and |
| 21 | the contacting the drug store and the insurance |
| 22 | company, you still want to punish Actavis? |
| 23 | A. True. |
| 24 | Q. For making a mistake? |
| 25 | A. Making the mistake. |

Page 96

| | |
|---|---|
| 1 | Q. And then catching the mistake and then |
| 2 | admitting the mistake? |
| 3 | A. That's fine. |
| 4 | Q. You still want to punish them? |
| 5 | A. That's honorable that they did that and |
| 6 | they still should be punished. There is too |
| 7 | many things that could have happened. |
| 8 | Q. Now, you said that you're standing here |
| 9 | today to be a Class rep for people that took |
| 10 | Digitek; is that right? |
| 11 | A. I think I am. |
| 12 | Q. But you're not standing here -- and you |
| 13 | clarified it this afternoon. You're not |
| 14 | standing to be a proposed Class rep for people |
| 15 | that were actually physically injured? |
| 16 | A. True. |
| 17 | Q. And that's by Digitek? |
| 18 | A. True. |
| 19 | Q. And the reason for that is it didn't |
| 20 | happen to you that you were physically injured |
| 21 | so you wouldn't be that good of a rep for those |
| 22 | people? |
| 23 | MS. MCILHENNY: Objection. |
| 24 | Mischaracterizing testimony and calls for a |
| 25 | legal conclusion. |

24  (Pages 93 to 96)

Peter J. Konek

Page 97

1      A.  I don't know.  I'm confused.
2      Q.  (By Mr. Doheny)  Well, you had no lost
3    wages as a result of --
4      A.  True.
5      Q.  -- the Digitek recall because you're
6    retired?
7      A.  Uh-huh.
8      Q.  Are you proposing to stand as the Class
9    rep for people who did lose wages because of
10   their connection with Digitek?
11     A.  That's who have?  I don't know.
12     Q.  You said that you had no anxiety or
13   emotional disorder treatment for saying as a
14   result of recall of Digitek?
15     A.  True.  Uh-huh.
16     Q.  What you said was you were mad?
17     A.  Well, I really got high after I read it
18   about the third time.  When I first read it, I
19   wasn't hot but right after I did.  I thought
20   that's what I said before.  Did I or didn't I?
21     Q.  You told us this morning you didn't
22   have emotional damages from the Digitek; is that
23   --
24     A.  No.
25     Q.  Okay.  Would it be fair to say that you

Page 98

1    would not be a good Class representative for
2    anybody who might or who does have emotional
3    distress from Digitek?
4           MS. MCILHENNY:  Objection.  Calls
5    for legal conclusion, but you may answer if you
6    know.
7      A.  Don't know.
8      Q.  (By Mr. Doheny)  Let me understand and
9    see if I'm got this and we have restrictions
10   we're not supposed to go into your whole life
11   and it's none of our business, but at some point
12   in your 70's you had a pacemaker?
13     A.  Uh-huh.
14     Q.  Then you had the cholesterol test?
15     A.  Uh-huh.
16     Q.  And your doctor said you needed a
17   bypass right away?
18     A.  Uh-huh.
19     Q.  And after the bypass you got a new
20   pacemaker?
21     A.  Defibrillator.
22     Q.  Is the defibrillator the same as the
23   pacemaker?
24     A.  No.  Combination of two things;
25   pacemaker keep the heart in rhythm and the

Page 99

1    defibrillator if it gets out will shock it back
2    in.
3      Q.  So the replacement has more functions
4    than the original pacemaker?
5      A.  Oh, yeah.  Uh-huh.
6      Q.  Okay.  When is the first time in your
7    life that you can recall going on Digitek or
8    Lanoxin or Digoxin, do you know, the pill, the
9    tablet to keep your heart in rhythm?
10     A.  I can't remember.
11     Q.  Was it a long time ago or the time of
12   the pacemaker?
13     A.  No.  If I could just remember when I
14   had the pacemaker put in, I think it was before.
15   I'm positive.
16     Q.  At the time you did have it put in,
17   whether it's before or after the pacemaker, were
18   you taking anything made by Actavis?
19     A.  No.  Huh-uh.
20     Q.  If you were taking it, it was made by
21   another company?
22     A.  Probably.
23     Q.  Now, you're on Digoxin today?
24     A.  Yeah.
25     Q.  And that's to regulate your heart

Page 100

1    rhythm?
2      A.  Right.
3      Q.  Do you know who makes the Digoxin that
4    you currently take?
5      A.  No.
6      Q.  That's something you checked with your
7    records?
8      A.  I don't think my records would have
9    that.  All my records has is when and what pill
10   I take.  That's it.  There is nothing extra.
11   It's just the very simple -- shows the time, the
12   months that I took one and months that I took
13   another one and whether I still ought to take
14   some of them for a period of time.
15     Q.  Okay.
16     A.  Yeah, I've got pills that I've probably
17   been taking right now for may be a year.
18     Q.  Do you have any kidney problems?
19     A.  No.
20     Q.  Ever have a problem that you talked
21   with or treated for for renal or kidney
22   insufficiency?
23     A.  No.
24     Q.  Now, you mentioned Dr. Margolis.  Is it
25   a he or a she?

25  (Pages 97 to 100)

Peter J. Konek

Page 101

1    A.  He.
2    Q.  Did he put in that first pacemaker?
3    A.  And the second.
4    Q.  Pardon?
5    A.  And the second.
6    Q.  Okay.  Do you know when he left for
7    Oklahoma?
8    A.  Probably -- it probably took six months
9    for me to be able to do anything, so I would say
10   it was approximately six months after I had my
11   quadruple bypass.  If I had that -- the only
12   reason I remember that is he told me I could
13   start raising my arms up because I couldn't do
14   that for months.  Wasn't allowed to.  So I would
15   say probably right about six months.  I don't
16   have all those dates.  I don't remember all of
17   that.
18   Q.  Sure.  I understand.
19       Did you get those two recall letters
20   from Humana and Wal-Mart the same day?
21   A.  I think I did.
22   Q.  Okay.  And you called your doctor and
23   spoke to his nurse?
24   A.  And got a prescription.
25   Q.  And did you get the prescription the

Page 102

1    same day as the letters?
2    A.  It was either that afternoon or the
3    next morning.  I'm not sure.
4    Q.  Did you miss a dose of your heart
5    medication after you got those two letters?
6    A.  I did.
7    Q.  You missed one day?
8    A.  Uh-huh, one dose.
9    Q.  So if the letters came on a Tuesday --
10   A.  I took the first pill on a Wednesday.
11   Q.  Did you take your Tuesday pill before
12   you got the letters on Tuesday?
13   A.  No.  Huh-uh.
14   Q.  So you got the letters --
15   A.  No.  I stopped Digitek immediately,
16   called the nurse when I got the letter that's
17   all.  I'm not going to take another Digitek.
18   Q.  Right.  Right.  I understand that.
19   A.  So I called the nurse.  She put the
20   order in.  It was going to take I don't know how
21   many hours.  I may have got it that evening
22   because they close at nine.  If I got it that
23   day, I missed a day and took it the next
24   morning.
25   Q.  Did you miss a day of heart medication,

Page 103

1    or did you get it all taken care of so you took
2    it one day, you got the letters, and took it the
3    next day --
4    A.  No.  No.  No.
5        MS. MCILHENNY:  Pete, let him
6    finish his question before you answer.
7    A.  No.  The pill that I'm supposed to take
8    I didn't take because I got the letter.
9    Q.  (By Mr. Doheny)  The letters came
10   before that day's time to take it?
11   A.  I would say those letters probably came
12   about -- I'm going to make a guess and this is
13   nothing but a guess but about three or four in
14   the afternoon.
15   Q.  And what time would you usually take
16   your Digitek every day?
17   A.  Morning.
18   Q.  Did you take it the morning the letters
19   came?
20   A.  Exactly, right.
21   Q.  Okay.
22   A.  So now when I got my other medicine it
23   was either that evening before nine o'clock or
24   the first thing in the morning and then I took
25   it the next day.

Page 104

1    Q.  So you really didn't miss a day of your
2    heart medication?
3    A.  No, oh, no.  That's confusing, but you
4    understand?
5    Q.  I do.
6        So you needed this for your heart
7    rhythm.  It was kind of inconvenient for you to
8    get those letters and your doctor got right on
9    it and you kept on with your new medicine right
10   away?
11   A.  Right.
12       MR. DOHENY:  Thanks a lot.  I'm
13   done.
14       EXAMINATION
15   QUESTIONS BY MS. MCILHENNY:
16   Q.  Mr. Konek, I have a question or two for
17   you.
18   A.  Okay.
19   Q.  This deals with your duties as a Class
20   representative.
21       Do you know that you have a fiduciary
22   duty to the Class as a whole?
23   A.  I think I do.
24   Q.  Do you believe that you have the
25   responsibility to do what's best for the Class

26  (Pages 101 to 104)

Peter J. Konek

| Page 105 |
|---|
| 1   as a whole? |
| 2     A.  I think so. |
| 3     Q.  Do you have any understanding of how |
| 4   you achieve your duty to the Class? |
| 5     A.  No, I don't. |
| 6     Q.  Do you think that by hiring counsel you |
| 7   do a duty to the Class? |
| 8        MS. SMITH: Objection.  Form. |
| 9     Q.  (By Ms. McIlhenny)  Do you think that |
| 10  it is your duty if you plan to do something on |
| 11  behalf of an entire group of people who are in a |
| 12  similar situation as you and you wish to bring |
| 13  in the form of a lawsuit, that you have the duty |
| 14  to hire counsel to help you with that job? |
| 15       MS. SMITH: Objection.  Leading. |
| 16  You can answer after the objection. |
| 17     A.  Yeah, I think.  Better read it again |
| 18  because. . . |
| 19       MS. MCILHENNY: Can you read that |
| 20  back. |
| 21       (Whereupon, the requested portion |
| 22  of the record was read by the reporter.) |
| 23       MS. SMITH: Objection. |
| 24  Argumentative, too.  Go ahead. |
| 25     A.  I feel like I should hire counsel. |

| Page 106 |
|---|
| 1   That's my answer. |
| 2     Q.  (By Ms. McIlhenny)  Did any attorney |
| 3  come looking for you to lead this lawsuit? |
| 4     A.  Do you mean on this lawsuit?  No. |
| 5     Q.  Do you recall if I ever presented you |
| 6  in conjunction with this lawsuit with what was |
| 7  called a Plaintiff Fact Sheet? |
| 8     A.  Yeah, I think you did. |
| 9     Q.  Did you fill out the answers to the |
| 10  questions in that Plaintiff Fact Sheet? |
| 11     A.  I think I did. |
| 12     Q.  Do you recall receiving from me a |
| 13  notice for your deposition? |
| 14     A.  Yes, I did. |
| 15     Q.  Do you recall giving me dates when that |
| 16  would be possible to do? |
| 17     A.  Yes, I remember you trying to get |
| 18  dates. |
| 19     Q.  Did you agree that you would testify at |
| 20  trial if necessary? |
| 21     A.  I did agree. |
| 22     Q.  Did you, also, agree that you would |
| 23  come to this deposition? |
| 24     A.  I did agree. |
| 25     Q.  Okay.  Do you think that filling out |

| Page 107 |
|---|
| 1   the Plaintiffs' Fact Sheet, testifying here in |
| 2  your deposition and being willing to testify at |
| 3  trial is part of your duties as a Class |
| 4  representative? |
| 5       MS. SMITH: Objection.  Form. |
| 6     A.  I would say yes.  What's that mean when |
| 7  you say that? |
| 8       MS. SMITH: Just attorney talk. |
| 9     Q.  (By Ms. McIlhenny)  Mr. Doheny asked |
| 10  you if you knew if Actavis actually sent the |
| 11  letters? |
| 12       MS. MCILHENNY:  And, Mr. Doheny, |
| 13  I may have understood you when I heard you speak |
| 14  but he answered so quickly I didn't get a chance |
| 15  to make an objection and I'd like to clairify |
| 16  something for the record. |
| 17     Q.  (By Ms. McIlhenny)  I understood Mr. |
| 18  Doheny to ask you if Actavis sent the recall |
| 19  letter and I understood you to say yes.  Do you |
| 20  actually know who sent the recall letters that |
| 21  you received from Wal-Mart and Humana? |
| 22     A.  Oh, no. |
| 23     Q.  Do you actually know if Actavis, |
| 24  Defendant Actavis, reported that there had been |
| 25  a mistake at the manufacturing plant? |

| Page 108 |
|---|
| 1     A.  Don't know. |
| 2     Q.  Do you actually know when Dr. Margolis |
| 3  went to Oklahoma? |
| 4     A.  No. |
| 5     Q.  Do you actually know what day you got |
| 6  the recall letters? |
| 7     A.  No.  They had a date on them, one in |
| 8  the left-hand corner on one of them and one in |
| 9  the right-hand corner on the other one. |
| 10       MS. MCILHENNY:  That's all I |
| 11  have.  Thank you. |
| 12       EXAMINATION |
| 13  QUESTIONS BY MS. SMITH: |
| 14     Q.  I just have a very narrow follow-up. |
| 15  Ms. McIlhenny, when she asked you if any lawyers |
| 16  came to you or any attorneys came looking for |
| 17  you, I think is the expression she used, for |
| 18  this lawsuit and you said "not for this lawsuit" |
| 19  which made me wonder are there any other |
| 20  attorneys that have approached you? |
| 21     A.  Not about a lawsuit.  I have a lot of |
| 22  attorneys that have approached me about playing |
| 23  golf. |
| 24     Q.  So tee times, social things but not for |
| 25  litigation purposes? |

27  (Pages 105 to 108)

Peter J. Konek

## Page 109

1    A.  Yeah.  Nobody put it that way or I
2    would have said no.
3       Q.  Just wanted to make sure I was on the
4    same page.
5       A.  Don't try to get me to lie.  I'm not
6    going to.
7       Q.  We definitely just want the truth.
8    With that being said, I think we're through for
9    the day.  Thank you again.
10      (The deposition concluded at 2:14 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 110

1              CERTIFICATE
2       I, Kristi A. Bissell, CSR, CCR, a
3    Certified Shorthand Reporter of the State of
4    Kansas, do hereby certify that the witness whose
5    testimony appears in the foregoing deposition
6    was duly sworn by me; that the testimony of said
7    witness was taken by me to the best of my
8    ability and thereafter reduced to typewriting
9    under my direction; that I am neither counsel
10   for, related to, nor employed by any of the
11   parties to the action in which this deposition
12   was taken, and further that I am not a relative
13   or employee of any attorney or counsel employed
14   by the parties thereto, nor financially or
15   otherwise interested in the outcome of the
16   action.
17
18
19        Kristi A. Bissell, CSR, CCR
20        Certified Court Reporter
21        For the State of Kansas
22
23
24
25

## Page 111

1              Midwest Litigation Services
                711 North Eleventh Street
2               St. Louis, Missouri 63101
            Phone (314) 644-2191 * Fax (314) 644-1334
3
4
5    July 28, 2009
6
7    Hutton & Hutton
     Attn:  Debs McIlhenny
8    8100 East 22nd Street North
     Building 1200
9    Wichita, Kansas 67226-2312
10   RE:  Konek v. Actavis, et al.
11   Dear Ms. McIlhenny:
12   Please find enclosed your copy of the deposition
     of Peter Konek taken on July 27, 2009, given in
13   the above-referenced case.  Also enclosed is the
     original signature page and errata sheets.
14
     Please have the witness read your copy of the
15   transcript, indicate any changes and/or
     corrections desired on the errata sheets, and
16   sign the signature page before a notary public.
     Please return the errata sheets and notarized
17   signature page to Ms. Holly Pauling Smith for
     filling prior to trial date.
18
     Thank you for your attention to this matter.
19
     Sincerely,
20
21   Kristi A. Bissell, CSR, CCR
     Enclosures
22   cc: Ms. Holly Pauling Smith
         Mr. John Doheny
23
24
25

## Page 112

1
     STATE OF     )
2                 )
     COUNTY OF    )
3
4    I, PETER KONEK, do hereby certify:
         That I have read the foregoing deposition;
5        That I have made such changes in form and/or
     substance to the within deposition as might be
6    necessary to render the same true and correct;
         That having made such changes thereon, I
7    hereby subscribe my name to the deposition.
         I declare under penalty of perjury that the
8    foregoing is true and correct.
9
10   _____
         PETER KONEK
11
12   Executed this ____ day of _____,
13   2009, at _____
14
15
16   Notary Public: _____
17   My Commission Expires: _____
18
     Signature page to:
19
20   Ms. Debs McIlhenny
     Hutton & Hutton
21   8100 East 22nd Street North
     Building 1200
22   Wichita, Kansas 67226-2312
23   PETER KONEK JULY 27, 2009
24   PETER KONEK v. ACTAVIS, et al.
25

28  (Pages 109 to 112)

Peter J. Konek

Page 113

1
2          ERRATA SHEET
3     RE:  PETER KONEK v. ACTAVIS, et al.
4     DEPOSITION OF:  PETER KONEK
5     PG/LN NO.  CORRECTION       REASON FOR CHANGE

6     ___:___:_____:_____:_____
7     ___:___:_____:_____:_____
8     ___:___:_____:_____:_____
9     ___:___:_____:_____:_____
10    ___:___:_____:_____:_____
11    ___:___:_____:_____:_____
12    ___:___:_____:_____:_____
13    ___:___:_____:_____:_____
14    ___:___:_____:_____:_____
15    ___:___:_____:_____:_____
16    ___:___:_____:_____:_____
17    ___:___:_____:_____:_____

18    _____ I certify that I have read my deposition
      in the above case and I request that no changes
      be made.
19    _____ I certify that I have read my deposition
      in the above case and I request that the above
20    changes be made.
21          SIGNATURE OF DEPONENT: _____

22          DATED: _____
23
24
25

29  (Page 113)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE: DIGITEK®                                              Master Docket No.
PRODUCT LIABILITY LITIGATION

MDL No. 1968

**PLAINTIFF:**      Peter J. Konek

### AMENDED DIGITEK® PLAINTIFF FACT SHEET

Please provide the following information for each individual on whose behalf a claim is being made. Please answer every question to the best of your knowledge. In completing this Fact Sheet, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can. You must supplement your responses if you learn that they are incomplete or incorrect in any material respect. If you are completing the Fact Sheet for someone who has died or who cannot complete the Fact Sheet him/herself, please answer as completely as you can for that person.

The Fact Sheet shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order. A completed Fact Sheet shall be considered interrogatory answers pursuant to Fed. R. Civ. P. 33 and as responses to requests for production pursuant to Fed. R. Civ. P. 34 will be governed by the standards applicable to written discovery under Fed. R. Civ. P. 26 through 37. The questions and requests for production contained in the Fact Sheet are non-objectionable and shall be answered without objection.

In filling out this form, please use the following definition: "healthcare provider" means any hospital, clinic, center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical care or advice, and any pharmacy, x-ray department, radiology department, laboratory, physical therapist or physical therapy department, rehabilitation specialist, chiropractor, or other persons or entities involved in the diagnosis, care and/or treatment of you.

In addition, to the extent that the form does not provide enough space to complete your responses or answers, please attach additional sheets as necessary.

### I.      CASE INFORMATION

1.      Please state the following for the civil action that you filed:

     a.      Case caption:  *Peter J. Konek, individually and on behalf of all others similarly situated, v. Actavis, Inc., Actavis Totowa, LLC, Mylan, Inc., Mylan Pharmaceuticals, Inc., Mylan Bertek Pharmaceuticals, Inc., and UDL Laboratories, Inc.*

     b.      Civil Action Number:  08-1145-MLB-KMH

     c.      Court in which action was originally filed:  USDC KS



EXHIBIT
A

      d.     Your attorney:

                Deborah B. McIlhenny
                Hutton & Hutton Law Firm, LLC
                8100 East 22nd Street North
                Building 1200
                Wichita, KS 67226

2.    Name of person completing this form:  Peter J. Konek

3.    Please list any other names you have used or by which you have been known and dates you used those names:  N/A

4.    Your current address:  ███████████████████████

5.    If you are completing this Fact Sheet in a representative capacity (e.g., on behalf of the estate of a deceased person or a minor), please complete the following:  N/A

      a.     Describe the capacity in which you are representing the individual or estate:  _____

      b.     If you were appointed as a representative by a court, state the:

            Court Which Appointed You:  _____

            Date of Appointment:  _____

      c.     What is your relationship to the individual you represent:  _____

      d.     If you represent a decedent's estate, state:

            Decedent's Date of Death:  _____

            Address of Place Where Decedent Died:  _____

      e.     If you are claiming the wrongful death of a family member, identify any and all family members, beneficiaries, heirs or next of kin of that person, including their relationship to Decedent:  _____

**THE REST OF THIS FACT SHEET REQUESTS INFORMATION ABOUT THE PERSON WHO PURCHASED, OR PURCHASED AND USED DIGITEK®.  WHETHER YOU ARE COMPLETING THIS FACT SHEET FOR YOURSELF OR FOR SOMEONE ELSE, PLEASE ASSUME THAT "YOU" MEANS THE DIGITEK® PURCHASER OR PURCHASER AND USER.**

## II.   CLAIM INFORMATION

1.   Name of Digitek® Purchaser/User:  Peter J. Konek

2.   Have you used any other names in the last five (5) years?  Yes _____  No __X__

3.   Do you claim that you suffered bodily injuries as a result of taking Digitek®?

   Yes _____  No __X__  If Yes, please answer the following:

   a.   What bodily injuries do you claim resulted from your use of Digitek®? _____

   b.   When is the first time you saw a health care provider for any of the symptoms you link to your alleged injury? _____

   c.   Are you currently experiencing symptoms related to your alleged injury?

       Yes _____  No _____  If Yes, please describe the symptoms: _____

   d.   Did you see a doctor, clinic or healthcare provider for the bodily injuries or illness listed above?

       Yes _____  No _____  If Yes, who: _____

   e.   Who diagnosed your injury? _____

   f.   Date of diagnosis: _____

   g.   Were you hospitalized?

       Yes _____  No _____  If Yes, please answer the following:

       1)   Date of hospital admission: _____

       2)   Date of discharge: _____

       3)   Hospital name and address: _____

   h.   What harm or consequence including physical limitations, do you claim you suffered as a result of the bodily injury above, excluding any mental or emotional damages, lost wages or out of pocket expenses listed below? _____

   i.   Do you claim that your injury was caused by ingesting defective Digitek® medication?

       Yes _____  No _____  If Yes, please answer the following:

       1)   Describe in detail what you claim the defect to have been in the Digitek® medication that you ingested: _____

       2)   How much of the defective product did you ingest? _____

3) When did you ingest the product? _____

j. Have you had any discussions with any doctor or other healthcare provider about whether Digitek® caused you to suffer any illness or injury?

Yes _____ No _____ If Yes, who: _____

4. Are you claiming mental and/or emotional damages as a result of taking Digitek®?

Yes _____ No __X__

If **Yes**, what mental and/or emotional damages do you claim resulted from your use of Digitek®?

_____

If **Yes**, for each provider (including but not limited to primary care physicians, psychiatrists, psychologists, and/or counselors) from whom you have sought treatment for psychological, psychiatric or emotional problems, state the following:

| NAME | ADDRESS | CONDITION TREATED | DATES TREATED | MEDICATIONS PRESCRIBED |
|------|---------|-------------------|---------------|------------------------|
|      |         |                   |               |                        |

5. Are you making a claim for lost wages or lost earning capacity?

Yes _____ No __X__ If Yes, state the annual gross income you derived from your employment for each of the last five (5) years: _____

6. Have you incurred any out-of-pocket expenses as a result of using Digitek®?

Yes __X__ No _____ If Yes, please identify and itemize all out-of-pocket expenses you have incurred: The cost of prescriptions purchased that were ultimately recalled.
Digitek:
11/20/07           $4.00
12/14/07           $4.00
1/23/08            $4.00
3/8/08             $4.00
4/21/08            $4.00
Lanoxin:
5/10/08            $11.37
6/25/08            $17.36
8/2/08             $1.87
9/24/08            $15.68
Digoxin:
12/23/08           $8.00

7.    What other damages, if any, do you claim you suffered as a result of the purchase or ingestion of Digitek®?

Plaintiff is making a claim for economic injuries only.

### III.    DIGITEK® PRESCRIPTION INFORMATION

1.    Have you ever used Digitek®? Yes __X__ No _____

2.    If you answered yes to No. 1, identify the following for each period of time during which you took Digitek®:

| DOSAGE (.125 MG OR .250 MG)? | HOW OFTEN PER DAY OR WEEK? | DATE STARTED | DATE STOPPED | NAME OF PRESCRIBER |
|---|---|---|---|---|
| .125 | 5 | 11/20/07 | 5/26/08 | Dr. Wassim Shaheen |

3.    Name(s) and address(es) of pharmacies where prescriptions were filled:  Walmart Pharmacy, 501 East Pawnee, Wichita, KS 67211.

4.    Identify the condition for which you were prescribed Digitek®:  Congestive heart failure, heart rhythm problems.

5.    Did you receive any free samples of Digitek®?

Yes _____ No __X__ If Yes, please state the following:

a.    Who provided the samples? _____

b.    When were samples provided? _____

c.    What was the dosage of the samples? _____

d.    How many samples were provided? _____

6.    Do you have in your possession or does your attorney have the packaging from the Digitek® you allegedly purchased, or purchased and used, and/or any Digitek® tablets?

Yes __X__ No _____

a.    If yes, who currently has custody of the Digitek® packaging and/or tablets?

Deborah B. McIlhenny
Hutton & Hutton Law Firm, LLC
8100 East 22nd Street North
Building 1200
Wichita, KS 67226

b.   If you or your attorney is in possession of tablets, how many do you have?  17

c.   Have you or anyone on your behalf tested the Digitek® tablets in your possession?

Yes _____ No _ X _  If Yes,

1)   Who tested the tablets? _____

2)   What test(s) was performed? _____

3)   How many tablets were tested? _____

4)   When were the tests performed? _____

5)   What were the test results? _____

**(NOTE: In lieu of answering the following Question Nos. 7a and 7b, please attach a clear copy of the product packaging and/or the label on the vial or blister pack of Digitek® in your or your attorney's possession that provides the information sought below.)**

7A.  Do you know the lot number(s) for any of the Digitek® you received?

Yes _ X _ No _____

If Yes, what is/are the lot number(s):
        Digitek:
        62794-0145-01
        51079-0945-66
        51079-0945-63

7B.  Do you know the expiration date for any of the Digitek® you received?

Yes _ X _ No _____

If Yes, when is/was/were the expiration date(s):

        Digitek:
        8/09

8.   Have you had any communication, oral or written, with any of the defendants or their representatives?

Yes _ X _ No _____

If Yes, set forth the date of the communication, the method of communication, the name of the person with whom you communicated, and the substance of the communication between you and any defendants or their representatives:

I received an undated Digitek® Consumer Return Kit, including a List of lot numbers within expiry with NDC number, a Consumer's Certification of Inability to Return Digitek® (digoxin tablets, USP) and return label.

9.     Have you ever used any other digoxin or digitalis product (i.e. Lanoxin)?

Yes __X__ No _____

If Yes, please state:

| DOSAGE (125 MG OR 250 MG) | HOW OFTEN PER DAY OR WEEK? | DATE STARTED | DATE STOPPED | NAME OF PRESCRIBER |
|---|---|---|---|---|
| .125 (Lanoxin) | 5 | 5/10/08 | 10/24/08 | Dr. Wassim Shaheen |
| .125 (Digoxin) | 5 | 12/23/08 | Present | Dr. Wassim Shaheen |

10.    Are you aware that Digitek® was recalled?

Yes __X__ No _____ If Yes, please state the following:

     a.     When you became aware of the recall:  May 2008

     b.     How you became aware of the recall:  I received notices from Walmart and Humana dated May 2008.

11.    Did you discuss the recall with any healthcare provider or pharmacist?

Yes __X__ No _____ If Yes, please state the following:

     a.     When that discussion occurred:  At the time of the first prescription on 11/20/07.

     b.     With whom:  Pharmacist, Walmart Pharmacy, 501 East Pawnee, Wichita, KS 67211

12.    Did you return any Digitek® to Stericycle or any pharmacy?

Yes _____ No __X__ If Yes, please state the following:

     a.     When did you return the product? _____

     b.     Do you have your paperwork regarding the return? Yes _____ No _____

     c.     To whom did you return the product? _____

13.    Have you ever visited a website, chat-room, message board or other electronic forum containing information or discussion about Digitek®?

Yes _____ No __X__ If Yes, please provide the name of the website: _____

### IV.    MEDICAL BACKGROUND

1.    Current Height: _____

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

2.    Current Weight: _____

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

3.    Approximate weight at the time of your injury: _____

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

4A.   To the best of your knowledge, have you, or any blood-relative family member (child, parent, brother, sister, or grandparent), ever experienced or been diagnosed with any of the following conditions?  Please select Yes or No for each condition.  For each condition for which you answer Yes, please identify who suffered the condition, you or a relative, and please provide the relative's name and relationship to you.  If you suffered the condition, please provide the additional information requested in the table following 4(B):

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| CONDITION EXPERIENCED OR DIAGNOSED | YES | NO | WHO SUFFERED CONDITION |
|---|---|---|---|
| Abnormal heart rhythm, atrial fibrillation, atrial flutter, ventricular fibrillation, or heart block | | | |
| Allergic reaction to medication (e.g., skin reaction, rash, or anaphylaxis) | | | |
| Blocked or narrow arteries/plaque buildup/coronary artery disease | | | |
| Cardiomyopathy/enlarged heart | | | |
| Chest pain/angina | | | |
| Congenital heart abnormality | | | |
| Congestive heart failure | | | |
| Heart attack/MI/myocardial infarction | | | |
| High blood pressure/hypertension | | | |
| High cholesterol or triglycerides | | | |
| Kidney disease or condition | | | |
| Stroke/transient ischemic attack/TIA/aneurysm | | | |

4B.  To the best of your knowledge, have you ever experienced or been diagnosed with any of the following conditions?  Please select Yes or No for each condition.  If you suffered the condition, please provide the additional information requested in the table following this chart:

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| CONDITION EXPERIENCED OR DIAGNOSED | YES | NO |
|---|---|---|
| Alcoholism or other substance abuse | | |
| Alzheimer's, senility, confusion | | |
| Arthritis (osteoarthritis or rheumatoid arthritis) | | |
| Autoimmune diseases (e.g., rheumatoid arthritis, lupus, Sjogren's, etc.) | | |
| Bleeding or clotting disorders | | |
| Cancer | | |
| Chronic obstructive pulmonary disease/COPD/chronic lung disease/asthma | | |
| Deep vein thrombosis/DVT | | |
| Depression, anxiety, schizophrenia, bipolar disorder | | |
| Dermatologic diseases or conditions | | |
| Diabetes mellitus | | |
| Electrolyte imbalance | | |
| Enlarged prostate, bladder dysfunction | | |
| Gastrointestinal problems (e.g., ulcers, heartburn, acid reflux, GERD, increased or decreased motility) | | |
| Hardening of the arteries/stenosis/aneurysms | | |
| Heart valve problems (e.g., murmur, leaky valve, prolapse, regurgitation) | | |
| Hormonal replacement therapy | | |
| Hypothyroidism/Thyroid condition | | |
| Immune system disease or dysfunction (including HIV or AIDS) | | |
| Liver disorder or disease (cirrhosis, hepatitis, etc.) | | |
| Multiple sclerosis, myasthenia gravis | | |
| Osteoporosis, bone fractures, calcium deficiency | | |
| Peripheral vascular disease or peripheral arterial disease | | |
| Pulmonary embolism/blood clot to the lungs | | |
| Pulmonary hypertension | | |
| Raynaud's syndrome/phenomenon | | |
| Rheumatic Fever/Scarlet Fever | | |
| Tobacco use or addiction | | |
| Vasculitis | | |

For each condition for which you answered **Yes** in the previous two charts, please provide the information requested below:

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| CONDITION YOU EXPERIENCED | DATE OF ONSET | MEDICATION/ TREATMENT | TREATING PHYSICIAN AND/OR HOSPITAL |
|---|---|---|---|
|  |  |  |  |

5.  Please indicate whether you have ever been the subject of any **cardiovascular surgeries** including, but not limited to, open heart/bypass surgery, CABG, pacemaker or defibrillator implantation, stent placement, vascular surgery, angioplasty, IVC filter placement, carotid (neck) surgery, or valve replacement.

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

Yes _____ No _____ I don't recall _____ If Yes, please specify the following:

| SURGERY | REASON FOR SURGERY | DATE | TREATING PHYSICIAN | HOSPITAL |
|---|---|---|---|---|
|  |  |  |  |  |

6.  Please indicate whether you have ever been the subject of any of the following **cardiovascular diagnostic tests** or interventions and provide the requested information about each: including, but not limited to, stress test C-reactive protein (CRP); chest X-ray; angiogram/catheterization; CT scan; MRI; EKG; echocardiogram; TEE (trans-esophageal echo); endoscopy; lung bronchoscopy; carotid duplex/ultrasound; MRI/MRA of the head/neck; angiogram of the head/neck; CT scan of the head; bubble/microbubble study; and Holter monitor.

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

Yes _____ No _____ I don't recall _____ If Yes, please specify the following:

| DIAGNOSTIC TEST/ INTERVENTION | REASON FOR TEST/ INTERVENTION | DATE | TREATING PHYSICIAN/ HOSPITAL | RESULT OF DIAGNOSTIC TEST/ INTERVENTION |
|---|---|---|---|---|
|  |  |  |  |  |

7.  Do you now or have you ever smoked tobacco products? Yes _____ No _____ If Yes, please specify the following:

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

    a.    How long have/did you smoke? _____

    b.    How much do/did you smoke? _____

8.    Did you drink alcohol (beer, wine, etc.) in the three years before your alleged injury?

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

Yes _____ No _____ If Yes, please specify the following:

    a.    How often did you drink? _____

    b.    How much did you drink? _____

9.    Have you ever used any illicit drugs of any kind within the five (5) years before, or at any time after, your alleged injury?

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

Yes _____ No _____ If Yes, identify the substance(s) and your first and last use: _____

### V. ADDITIONAL MEDICATIONS
### (INCLUDING OTHER DIGOXIN PRODUCTS, SUCH AS LANOXIN®)

1.    For any medications, herbal products or supplements other than Digitek® that you took on a regular basis in the ten (10) years prior to, and at the time of, the incidents described in your Complaint, please provide the information requested below:

N/A. Plaintiff represents himself others and similarly situated for claims of economic loss and not for personal injuries.

| NAME OF MEDICATION USED | DOSAGE | PRESCRIBING PHYSICIAN | DATES OF USE | PURPOSE OF PRESCRIPTION |
|---|---|---|---|---|
|  |  |  |  |  |

2.    Have you ever experienced any side effects while you were taking any of the medications identified in this section in the past ten (10) years?

N/A. Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

Yes _____ No _____ If Yes, please specify the following:

a.    The name of the medication: _____

b.    The side effect(s): _____

c.    The date the side effect was experienced: _____

8.  Have you ever served in the military, including the military reserve or National Guard?

    Yes _____  No __X__

    If **Yes**, were you ever rejected or discharged from military service for any reason relating to your physical condition? Yes _____ No _____

    If **Yes**, state the condition for which you were rejected or discharged: _____

9.  Has any insurance or other company, or Medicare or Medicaid, provided medical coverage to you or paid medical bills on your behalf in the last ten (10) years?

    Yes __X__  No _____  If Yes, please specify the following:

    a.  The name of the company/agency:  Humana/Medicare

    b.  Address:  500 West Main Street, Louisville, KY 40202

    c.  Dates of Service:  See pharmacy records

10. Have you applied for workers' compensation (WC) and/or social security disability (SSI or SSD) benefits in the last ten (10) years?

    Yes _____  No __X__  If Yes, please specify the following:

    a.  Type of claim: _____

    b.  Year application filed: _____

    c.  Agency where application was filed: _____

    d.  Nature of disability: _____

    e.  Time period of disability: _____

11. Have you filed a lawsuit or made a claim in the last ten (10) years, other than in the present suit, relating to any bodily injury?

    Yes _____  No __X__  If Yes, please specify the following:

    a.  Court in which suit/claim filed or made: _____

    b.  Case/Claim Number: _____

    c.  Nature of Claim/Injury: _____

12. As an adult, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty?

    Yes _____  No __X__  If Yes, please set forth where, when and the felony and/or crime: _____

## VII.   HEALTHCARE PROVIDERS AND PHARMACIES

1.   Identify each doctor or other healthcare provider who you have seen for medical care and treatment in the past ten (10) years:

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| NAME AND SPECIALTY | ADDRESS | REASON FOR VISIT | APPROX DATES/YEARS OF VISITS |
|---|---|---|---|
| | | | |

2.   Identify each hospital, clinic, or healthcare facility where you were hospitalized (in-patient, out-patient, or emergency room visit) in the past ten (10) years:

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| NAME | ADDRESS | ADMISSION DATE(S) | REASON FOR ADMISSION |
|---|---|---|---|
| | | | |

3.   Identify each pharmacy that has dispensed medication to you in the past ten (10) years:

N/A.  Plaintiff represents himself and others similarly situated for claims of economic loss and not for personal injuries.

| NAME OF PHARMACY | ADDRESS | APPROX DATES/YEARS YOU USED PHARMACY |
|---|---|---|
| | | |

## VIII.   DECEASED INDIVIDUALS AND AUTOPSY INFORMATION

1.   If you are filling this out on behalf of an individual who is deceased, please state the following from the Death Certificate of the individual:  N/A

**(NOTE: In lieu of the following, please attach a copy of the death certificate.)**

Date of death: _____

Place of death (city, state and county): _____

Facility or location where death occurred: _____

Name of physician who signed death certificate: _____

Cause of death: _____

If you are filling this out on behalf of an individual who is deceased and on whom an autopsy was performed, please fill in the information below pertaining to the autopsy and the autopsy report:

**(NOTE:  In lieu of the following, please attach a copy of the autopsy report.)**

Date: _____

Performed by: _____

Facility where autopsy was performed: _____

Place where autopsy was performed (city, state, county): _____

Describe any and all tissue preserved: _____

## IX.    FACT WITNESSES

1.  Please identify all persons who you believe possess information concerning your injury(ies) and current medical conditions, other than your healthcare providers, and please state their name address and his/her/their relationship to you:

    N/A.  Plaintiff represents himself others similarly situated for claims of economic loss and not for personal injuries.

    Name: _____

    Address: _____

    Relationship to you: _____

## IX.    DOCUMENT DEMANDS

1.  Authorizations:  please sign authorizations that are attached hereto as Exhibit A, for each of the healthcare providers that you have identified above in your Answers to §II, Question Nos. 1-3, and §IV, Question No. 2.

2.  Documents in your possession, including writings on paper or in electronic form:  If you have any of the following materials in your custody or possession, please attach a copy to this Fact Sheet.

    a.  All documents constituting, concerning or relating to product use instructions, product warnings, package inserts, pharmacy handouts or other materials distributed with or provided to you in connection with your use of Digitek®.

        Attached

    b.  Copies of the entire packaging, including the box and label, for Digitek® and any Digitek® tablets (plaintiffs or their counsel must maintain the originals of the items requested in this subpart).

        Attached

    c.  All documents relating to your purchase of Digitek®, including, but not limited to, receipts, prescriptions or records of purchase.

        Attached

    d.  All photographs, drawing, journals, slides, videos, DVDs or any other media relating to your alleged injury.

        N/A

## X.   VERIFICATION

*I declare under penalty of perjury* that all of the information provided in this Plaintiff Fact Sheet is true and correct to the best of my knowledge. I have supplied all the documents requested in Part IX of this declaration, to the extent that such documents are in my possession, custody or control, or in the possession, custody or control of my lawyers, and supplied the authorizations attached to this declaration.

Further, I acknowledge that I have an obligation to supplement the above responses if I learn that they are in any material respects incomplete or incorrect.

Date: 4-27-09                    X _____
                                     Signature

Digitek® Plaintiff Fact Sheet