# Exhibit R

William Lange

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: DIGITEK PRODUCT LIABILITY LITIGATION

WILLIAM E. LANGE, ET AL., )
    PLAINTIFFS, )
V. ) MDL NO. 1968
ACTAVIS TOTOWA, LLC, ET AL., )
    DEFENDANTS. )

DEPOSITION OF WILLIAM E. LANGE, PRODUCED, SWORN AND EXAMINED ON THE 6TH DAY OF OCTOBER, 2009, BETWEEN THE HOURS OF 9:00 A.M. AND 10:20 A.M., AT THE OFFICES OF THOMPSON, MILLER & SIMPSON, 600 WEST MAIN STREET, LOUISVILLE, JEFFERSON COUNTY, KENTUCKY, BEFORE LISA MIGLIORE, CERTIFIED COURT REPORTER--KENTUCKY AND NOTARY PUBLIC WITHIN AND FOR THE STATE OF KENTUCKY.

## Page 2

```
                *** *** ***
                 APPEARANCES

FOR THE PLAINTIFFS:
CARL FRANKOVITCH, ESQ.
MEGHAN JOHNSON CARTER, ESQ.
MOTLEY RICE
28 BRIDGESIDE BOULEVARD
MT. PLEASANT, SOUTH CAROLINA 29464

FOR THE DEFENDANTS:
ERICKA DOWNIE, ESQ.
SHOOK, HARDY & BACON
2555 GRAND BOULEVARD
KANSAS CITY, MISSOURI 64108
APPEARING ON BEHALF OF MYLAN PHARMACEUTICALS INC.,
MYLAN BERTEK PHARMACEUTICALS INC., AND UDL
LABORATORIES

JOHN A. SIMON, ESQ.
TUCKER, ELLIS & WEST
1150 HUNTINGTON BOULEVARD
925 EUCLID AVENUE
CLEVELAND, OHIO 44115
APPEARING ON BEHALF OF ACTAVIS TOTOWA LLC, ACTAVIS
INC., AND ACTAVIS ELIZABETH LLC

JAMES S. ARNOLD, ESQ.
ALLEN GUTHRIE & THOMAS
P.O. BOX 3394
CHARLESTOWN, WEST VIRGINIA 25333
APPEARING ON BEHALF OF THE WEST VIRGINIA
DEFENDANTS
```

## Page 3

INDEX TO EXAMINATION
               PAGE
EXAMINATION BY MS. DOWNIE    4
EXAMINATION BY MR. SIMON    57
CERTIFICATE    68


INDEX TO EXHIBITS
NONE

## Page 4

WILLIAM E. LANGE, AFTER BEING FIRST DULY SWORN, WAS EXAMINED AND DEPOSED AS FOLLOWS:

EXAMINATION

BY MS. DOWNIE:

Q. Mr. Lange, my name is Ericka Downie. I'm going to be taking your deposition today in connection with a class action lawsuit filed on your behalf.

I'm going to be asking you a series of questions, and the court reporter is going to take down your responses. It's very important that you give verbal answers rather than shaking or nodding your head, and also if we try not to talk at the same time, we'll make our court reporter's job a whole lot easier.

If you need a break at any time, let me know and we'll be happy to accommodate.

And if you don't understand a question that I ask, let me know. Otherwise, I'm going to assume that you have understood the questions as I have asked them. Okay?

A. Sure.

Q. Is there any reason why today you won't

William Lange

Page 5

1  be able to testify truthfully and completely in
2  response to my questions?
3      A.   No.
4      Q.   Are you on any medications that affect
5  your memory?
6      A.   No.
7      Q.   Okay. What is your name and address,
8  sir?
9      A.   My name is William E. Lange, L-A-N-G-E,
10 and my address is ▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓.
13     Q.   And your birth date and Social Security
14 number?
15     A.   Birthday is         .
16     Q.   Uh-huh.
17     A.   And Social Security        .
18     Q.   Have you ever had your deposition taken
19 before like what we're doing today?
20     A.   No, ma'am.
21     Q.   Have you ever testified at a trial or a
22 hearing of any nature?
23     A.   I'm not sure. I was -- I was a deputy
24 in a courtroom.
25     Q.   Okay.

Page 6

1      A.   And I might have had to say something
2  here or there. I'm not sure.
3      Q.   But nothing in connection with a
4  claim --
5      A.   No.
6      Q.   -- on your behalf or against you?
7      A.   No.
8      Q.   Have you ever had any previous lawsuits
9  other than the lawsuit in which you're involved in
10 today?
11     A.   No.
12     Q.   Now, you're married; is that correct,
13 sir?
14     A.   Yes, ma'am.
15     Q.   And your wife's name is ▓▓▓▓▓▓▓
16     A.   Yes.
17     Q.   And were you married on ▓▓▓▓▓▓▓
18     A.   Yes, ma'am.
19     Q.   And you have four children?
20     A.   Yes, ma'am.
21     Q.   Do you have any other children other
22 than that?
23     A.   No.
24     Q.   And had you been married at all previous
25 to Patricia?

Page 7

1      A.   No.
2      Q.   Okay. And your four children, their
3  names are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5      A.   Yes.
6      Q.   Can you tell us a little bit about your
7  education background, sir?
8      A.   Well, I graduated from Flaget High
9  School here in Louisville.
10     Q.   Okay.
11     A.   And I went to the University of
12 Louisville on a football scholarship one year, and
13 they beat me to death, so I didn't return.
14     Q.   Okay.
15     A.   And I -- I've -- I've been to several
16 beer seminars in Milwaukee, and that's about the
17 extent of it.
18     Q.   Okay. And the beer seminars, what are
19 those?
20     A.   Miller sent you to Milwaukee for a
21 three-day seminar concerning how beer is made, and
22 Pabst did the same thing. I worked for a beer
23 distributor with multiple brands.
24     Q.   Okay. All right. Well, why don't we
25 get to that.

Page 8

1  Are you currently retired, sir?
2      A.   Yes, ma'am.
3      Q.   And when did you retire?
4      A.   Oh, eight and a half years ago, June
5  of '01.
6      Q.   June of '01.
7  And where were you working at the time that you
8  retired?
9      A.   Jefferson County Sheriff's Office.
10     Q.   And what was your position there?
11     A.   I was a bailiff. I was a deputy in the
12 courtroom.
13     Q.   And how long did you hold that position?
14     A.   Well, I started out in -- in auto
15 inspection.
16     Q.   Okay.
17     A.   And I was there about three years, and I
18 spent my last four and a half years in the
19 courtroom.
20     Q.   Okay. So you were there approximately
21 seven and a half years total?
22     A.   Seven and a half years.
23     Q.   What did you do prior to that?
24     A.   I sold -- I was in the beer business
25 most of my life.

William Lange

Page 9

1  Q. Okay.
2  A. But when I moved back from Florida to
3 Louisville, I sold for wholesalers: cigarettes,
4 tobacco, candy, paper products.
5  Q. Okay. Approximately how long would you
6 say you worked for beer distributors or similar type
7 positions?
8  A. 20 -- 22 years.
9  Q. Okay. Now, when did you move back from
10 Florida to Louisville?
11  A. In November of 1985.
12  Q. And where did you live when you lived in
13 Florida?
14  A. Well, I went down there originally to
15 Tallahassee.
16  Q. Uh-huh.
17  A. And then after 11 months, we moved to
18 St. Petersburg.
19  Q. Okay. How long did you live in Florida?
20  A. A total of three and a half years.
21  Q. Okay. Other than Louisville and
22 Florida, have you lived anywhere else?
23  A. No.
24  Q. Okay. Now, when you retired, was that a
25 retirement based on your age, or was there some

Page 10

1 other reason for your retirement?
2  A. It was based on my age.
3  Q. Have you ever served in the military?
4  A. Yes, ma'am.
5  Q. When did you serve in the military?
6  A. United States Army Reserve. I went
7 active duty in 1958 for -- back then, it was six
8 months active duty, and then you came back home and
9 you were in the Reserves for seven years.
10  Q. Okay. Were you discharged from the
11 service?
12  A. Honorably.
13  Q. Okay. I'm going to show you a document
14 and see if you recognize this. Bear with me one
15 moment.
16     I'm showing you a plaintiff's fact sheet. Do
17 you recall having seen this document before?
18  A. Yes.
19  Q. Okay. And there's handwriting on that
20 document. Is that handwriting yours?
21  A. Yes, ma'am.
22  Q. So did you fill that out yourself?
23  A. Yes.
24  Q. And did anybody assist you in filling
25 that out?

Page 11

1  A. No.
2  Q. Was anybody with you while you were
3 filling that out?
4  A. No, ma'am.
5  Q. Your wife or anybody of that nature?
6  A. No.
7  Q. Did you consult any information,
8 documents, records, in preparing the answers for
9 that document?
10  A. No.
11  Q. Okay. Did you look at any prescription
12 records, for example, or medical records?
13  A. No.
14  Q. To your knowledge, did you fill that out
15 as truthfully and accurately as you could?
16  A. Yes.
17  Q. If you want to take a moment, or if you
18 know -- but take a moment to look through it -- is
19 there anything in that document that you believe
20 needs to be changed or updated?
21     MR. FRANKOVITCH: Go through each...
22  A. The atrial fibrillation at least once a
23 month --
24  Q. Okay.
25  A. -- I'm on a new medication now, and I

Page 12

1 haven't been in a-fib since May.
2  Q. Well, that's good news.
3  A. Yes.
4  Q. And what is that new medication?
5  A. Amerone (phonetic), Pacerone, Amerone or
6 (inaudible).
7     (INQUIRY BY THE COURT REPORTER.)
8  A. It's called the generic Pacerone,
9 P-A-C-E-R-O-N-E, I believe.
10  Q. Okay. So the a-fib that you were
11 experiencing on a monthly basis has stopped; is that
12 correct?
13  A. Since I switched cardiologists, yes.
14     (WITNESS CONFERRED WITH COUNSEL OUTSIDE
15 OF THE HEARING OF THE REPORTER.)
16  A. Okay. Yeah. Okay. The two heart
17 attacks --
18  Q. Okay.
19  A. -- I have, and talking to my doctor and
20 myself, I have decided that Digitek did not cause
21 these.
22  Q. Okay. So currently, just to clarify for
23 the record, the fact sheet indicates that the
24 injuries that you were claiming included two heart
25 attacks that occurred, and the fact sheet indicates

William Lange

### Page 13

1  that you linked those injuries or those heart
2  attacks to your ingestion of Digitek.
3      A.   Without knowing any better.
4      Q.   Okay. And if I'm understanding you
5  correctly, you now understand that those heart
6  attacks were not connected to your ingestion of
7  Digitek?
8      A.   Yes.
9          MR. FRANKOVITCH: You want him to go
10 through each item here or...
11         MS. DOWNIE: Again, just if he wants to
12 take a moment just to look through it to make sure
13 that there are no other changes, if he knows of
14 anything in particular.
15         MR. FRANKOVITCH: Okay. To the extent
16 that his answers reflect a personal injury claim,
17 he's withdrawn that. So...
18         MS. DOWNIE: Okay. So the personal
19 injury claim in its entirety is being withdrawn?
20         MR. FRANKOVITCH: Correct.
21         MS. DOWNIE: Okay.
22         (WITNESS CONFERRED WITH COUNSEL OUTSIDE
23 OF THE HEARING OF THE REPORTER.)
24         THE WITNESS: That's true (indicating).
25 BY MS. DOWNIE:

### Page 14

1      Q.   Okay.
2      A.   Yes.
3      Q.   So everything else is correct in the
4  fact sheet other than withdrawing your personal
5  injury claim; is that correct?
6      A.   Everything except on the last page, my
7  cardiologist.
8      Q.   Okay.
9      A.   I have a new cardiologist.
10     Q.   Who is your new cardiologist?
11     A.   I seen him twice. Dr....
12     Q.   He left quite an impression.
13     A.   Yeah, he stopped my a-fib. I should
14 know his name. Stidam.
15     Q.   Stidam?
16     A.   S-T-I-D-A-M.
17     Q.   And your previous cardiologist, that was
18 Dr. McMartin; is that correct?
19     A.   Yes, ma'am.
20     Q.   Okay. All right. Why is it that you
21 decided to file this lawsuit?
22     A.   Just -- everything that happened when
23 all this -- when all this happened, the trips back
24 and forth to the pharmacy, a trip to the doctor,
25 just everything that went along with it.

### Page 15

1      Q.   When you say, "when all of this
2  happened," can you be more specific with me?
3      A.   When they -- they sent me a letter
4  and -- Kroger did, and they said something about
5  this product had been pulled off the market and I
6  needed to come -- I went in -- I went to Kroger, and
7  there was a young girl at the counter. She didn't
8  know anything about it. She asked the pharmacist.
9  He didn't know about it. I went home.
10     Two or three days later, I get a phone call
11 from Kroger. They said, "Bring your pills in, and
12 we'll trade them out for you. Digitek has been
13 pulled off the market."
14     So I took the pills in. They gave me some new
15 pills. I made an appointment with my cardiologist.
16 I went down to him and talked it over, and just that
17 was about the extent of it.
18     Q.   Okay. The letter that you received from
19 Kroger, do you still have that in your possession?
20     A.   No, I don't.
21     Q.   Do you have any records in your
22 possession regarding your prescription for Digitek?
23     A.   No.
24     Q.   Do you have any bottles that the
25 prescription came in for Digitek?

### Page 16

1      A.   No, Kroger took that back when they...
2      Q.   Okay. How about any tablets? Do you
3  have any actual tablets in your possession?
4      A.   No.
5      Q.   And did you return all tablets that were
6  in your possession at the time that you received the
7  letter from Kroger to Kroger?
8      A.   Yes.
9      Q.   Okay. Do you recall approximately how
10 many tablets you had at that time?
11     A.   I don't know. Maybe -- I was getting a
12 90-day supply, maybe 35, 36.
13     Q.   Okay. So you may have gone through
14 approximately two months' worth of Digitek at the
15 time that you received the phone call?
16     A.   Yes.
17     Q.   The new pills that you were given when
18 you returned them --
19     A.   Yes.
20     Q.   -- do you know what they were?
21     A.   Yes.
22     Q.   What were they?
23     A.   Digoxin.
24     Q.   And you indicated that shortly after
25 receiving the new pills, you then went to see your

4 (Pages 13 to 16)

William Lange

## Page 17

1  cardiologist; is that correct?
2  A.  Uh-huh.
3  Q.  Was that Dr. McMartin?
4  A.  Yes, ma'am.
5  Q.  And what was your discussion with
6  Dr. McMartin regarding the recall?
7  A.  I had been dealing with Dr. McMartin for
8  like 19 years.
9  Q.  Right.
10  A.  And he and I were pretty close. I snuck
11  in. He was getting ready to retire, and he only saw
12  patients on Monday.
13  Q.  Uh-huh.
14  A.  And I got there about 8:30, and I said,
15  "Look, I got this medicine change. What's this all
16  about?"
17  He said, "Well, your Digitek was generic. Now
18  they've put you on the real thing or something, and
19  there's no big deal."
20  Q.  Okay. Did you ask him any questions
21  regarding why the recall had occurred or anything of
22  that nature?
23  A.  No.
24  Q.  Did the -- did you have any other
25  discussions at the pharmacy about the recalled

## Page 18

1  product?
2  A.  I think -- I think the pharmacist said
3  that -- something about -- it was -- the pill had
4  too little or too much or -- they weren't sure.
5  Q.  Do you recall who it was that you spoke
6  to at Kroger?
7  A.  No.
8  Q.  Is that the pharmacy that you've been --
9  well, let me back up.
10  Do you still go to Kroger pharmacy?
11  A.  Yes.
12  Q.  How long had you been filling your
13  prescriptions at Kroger?
14  A.  I guess maybe 10 or 11 years.
15  Q.  Were there any times when you would
16  utilize any other pharmacy other than Kroger to fill
17  your prescriptions?
18  A.  No.
19  Q.  Do you recall the contents of the letter
20  that was sent to you from Kroger? In other words,
21  do you recall what it said?
22  A.  No, I think it just had some bold
23  letters, Digitek, and it was like a form letter that
24  you get when they send you a letter concerning one
25  of your prescription drugs.

## Page 19

1  Q.  Okay.
2  A.  I didn't think it was any more than
3  that, and then something about it was about being
4  taken off the market.
5  Q.  Okay. Now, in what manner do you
6  believe that you've been injured?
7  A.  I don't think I have any injury at all.
8  Q.  Okay. We talked about your personal
9  injury.
10  Do you have any economic injury that you
11  believe you've suffered?
12  A.  Just -- just gasoline and going to and
13  from and...
14  Q.  So that would be the trip to the
15  pharmacy to return your Digitek and receive your new
16  pills and then the trip to your cardiologist?
17  A.  A couple of trips to the pharmacy and
18  then to the cardiologist.
19  Q.  How many trips to the pharmacy?
20  A.  Two.
21  Q.  Two?
22  A.  I went one time, and they weren't sure
23  and didn't know much about it, and then a couple of
24  days later, I went the second time.
25  Q.  Okay. I may have misunderstood. My

## Page 20

1  apologies.
2  When you first got the letter, initially you
3  told me you called them.
4  A.  No.
5  Q.  No, you didn't call them?
6  A.  No, I went -- I went in to see them.
7  Q.  Okay. And what did they say at that
8  time?
9  A.  The young lady that looked like maybe a
10  high school kid worked behind -- she didn't know
11  anything about it.
12  Q.  Okay.
13  A.  The pharmacist, the only one that was on
14  duty, he didn't know anything about it.
15  Q.  Okay.
16  A.  So I went home.
17  Q.  Okay.
18  A.  And I was ready to forget about it. And
19  then a few days later, I got the phone call from
20  them.
21  Q.  Okay.
22  A.  "Get your medicine in here."
23  Q.  So that's when you went back the second
24  time?
25  A.  Yes.

William Lange

### Page 21

1  Q. What medication were you taking between
2  the time that you received the letter and the time
3  that you went back to the pharmacy the second time?
4  A. Concerning the Digitek?
5  Q. That's right.
6  A. One a day.
7  Q. Okay. So you continued to take it until
8  you went back to the pharmacy the second time?
9  A. Yes, ma'am.
10 Q. Okay. All right. So we've talked about
11 the time spent going back and forth to the pharmacy
12 two times and the trip to the cardiologist.
13 A. Yes.
14 Q. Are there any other economic damages
15 that you believe you suffered?
16 A. No.
17 Q. So, for example, you don't have any lost
18 wage claim; is that correct?
19 A. No.
20 Q. And you don't have any claim for
21 out-of-pocket expenses other than the cost of
22 gasoline to and from the pharmacy?
23 A. And the prescription.
24 Q. Which prescription?
25 A. The digoxin or the Digitek, whatever I

### Page 22

1  was taking.
2  Q. Okay.
3  A. And I had a co-pay on that stuff.
4  Q. Okay. How much was your co-pay?
5  A. I think it was a generic, like five
6  bucks.
7  Q. And let's be clear. Was that for the
8  Digitek, or was that for the new prescription or
9  both?
10 A. I think both were generic.
11 Q. So your co-pay for a 90-day supply was
12 $5?
13 A. For 90 days, it was $10.
14 Q. For 90 days, it was $10.
15 And you had already taken approximately 60
16 tablets out of the 90-day supply and had 30 tablets
17 left?
18 A. Yes.
19 Q. Do you recall, when you received the
20 letter from Kroger, if there was any information
21 regarding returning the product and receiving a
22 refund?
23 A. I'm not sure. I'm not sure about the
24 letter. I thought -- I thought it possibly said the
25 same thing that -- that they told me on the phone,

### Page 23

1  "Bring it in and we will replace it with the new
2  drug."
3  Q. If the letter did state that you were
4  eligible for a refund, would you have taken
5  advantage of that?
6  A. A refund or a replacement.
7  Q. Refund for the Digitek that you had not
8  taken, your remaining prescription?
9  A. Sure, I would have taken a refund
10 because I would have had to apply it to the new
11 prescription.
12 Q. Now, do you understand that you are a
13 class action representative in this litigation?
14 A. Yes.
15 Q. What does that mean?
16 A. I feel like it means that I represent a
17 group of people who have the same feelings as I do.
18 Q. And why was it you decided that you
19 would be a class representative rather than just a
20 member of the class?
21 A. I sort of felt like somebody had to do
22 it, and I sort of volunteered.
23 Q. Okay. Have you spoken to any other
24 members of the class --
25 A. No.

### Page 24

1  Q. -- that you represent?
2  Do you know what their injuries are?
3  A. No.
4  Q. Do you know how many of them there are?
5  A. I have no idea.
6  Q. Do you know if they have only economic
7  injuries or if they also have personal injury?
8  A. I think this group has economic injuries
9  only.
10 Q. When did you decide to file this lawsuit
11 or become involved in this lawsuit?
12 A. Whatever the date is on this.
13     THE WITNESS: Do you have a date on
14 this?
15     MR. FRANKOVITCH: I don't remember
16 the --
17     MS. CARTER: The signature page.
18 BY MS. DOWNIE:
19 Q. I believe there's a signature page --
20 A. Whenever I signed it, yeah.
21 Q. -- either page 13 or 18.
22 A. 5/13/09.
23 Q. Okay. So in May of 2009 is when you
24 decided to become involved in this litigation; is
25 that correct?

6 (Pages 21 to 24)

William Lange

### Page 25

1  A. Yes, ma'am.
2  Q. Had you spoken to any attorneys prior to
3  May of 2009 about becoming involved in this
4  litigation?
5  A. No. I filled this out a little bit
6  later. I spoke to Timothy Lange, the attorney --
7  Q. Uh-huh.
8  A. -- before he sent me all this stuff.
9  Q. Is he a relation to you?
10  A. He is my first cousin's son.
11  Q. Okay. Now, how did you first become
12  aware that there was litigation pending involving
13  Digitek?
14  A. I'm not sure. I think through the
15  pharmacy. I think the pharmacist said something to
16  me about it.
17  Q. When was that?
18  A. In May.
19  Q. Of 2009?
20  A. Yes, ma'am.
21  Q. Was this -- which pharmacist was this?
22  A. One of Kroger's pharmacists.
23  Q. Do you recall the name?
24  A. No, they change every week there.
25  Q. How did they know in May of 2009 that

### Page 26

1  you had been taking Digitek?
2  A. When they -- when they changed the
3  pills -- they exchanged the pills --
4  Q. Uh-huh.
5  A. -- the lady said, "With this happening,
6  there could be a class action suit."
7  Q. Uh-huh.
8  A. She said, "You might want to look into
9  it."
10  Q. Do you recall when it was that you
11  received the letter from Kroger?
12  A. No, it would be April. I'm sure it
13  would be in April.
14  Q. Of what year?
15  A. 2009.
16  Q. 2009?
17  A. Yes, ma'am.
18  Q. Are you certain of that?
19  A. Well, not really.
20  Q. Okay. Do you know when the recall was
21  issued?
22  A. No. It was in 2009.
23  MS. DOWNIE: Carl, you've got to let
24  the witness answer.
25  MR. FRANKOVITCH: I mean, there's no

### Page 27

1  use -- it's not a secret.
2  BY MS. DOWNIE:
3  Q. In May of 2009, other than the
4  pharmacist at Kroger, who else did you speak to
5  about this litigation?
6  A. No one except Tim Lange.
7  Q. Other than having a conversation with
8  the pharmacist, was there -- did you -- were you
9  aware of the litigation that was pending in any
10  other way? In other words, did you see anything on
11  the news, read anything?
12  A. No.
13  Q. So without that conversation with the
14  pharmacist, you would not have been aware of this
15  litigation?
16  A. Right.
17  Q. Okay. Did the pharmacist suggest that
18  you should speak to an attorney?
19  A. She just -- no, she just said there's a
20  possible -- could be a possible class action suit.
21  So I assumed that's what I should do.
22  Q. And what did you do to get -- what was
23  your next step then in getting involved in
24  litigation?
25  A. I called Mr. Lange.

### Page 28

1  Q. Okay. And how long after your
2  conversation with the pharmacist was it that you
3  called Mr. Lange?
4  A. A week, two weeks.
5  Q. And did you understand that you could
6  have a claim on your own rather than being a class
7  representative in a class action?
8  A. I don't know. I didn't -- I have no
9  idea.
10  Q. Okay. In your own words, what do you
11  believe the defendants did wrong with respect to
12  Digitek -- the Digitek that you were taking?
13  A. I don't know. I don't know.
14  Q. Now, you have -- strike that.
15  When did you first start taking Digitek?
16  A. Probably seven or eight years ago.
17  Q. And what were you prescribed the Digitek
18  for, what condition?
19  A. When I started having my a-fib
20  problems --
21  Q. Uh-huh.
22  A. -- I think that they gave me Digitek
23  just to keep my heart rate in check or slow it down
24  or whatever it does.
25  Q. During that seven- to eight-year time

William Lange

### Page 29

1 period that you were taking Digitek, to your
2 knowledge, did you ever take any other form of
3 Digitek -- or digoxin, rather?
4    A.   No, ma'am.
5    Q.   Did you ever take a drug called Lanoxin?
6    A.   No.
7    Q.   What medications do you currently take?
8    A.   I've got a long piece of paper.
9    Q.   We're ready.
10    A.   I take Pacerone.
11    Q.   Uh-huh.
12    A.   And I take -- I should've brought my
13 list with me, I guess.
14    Q.   Just do the best you can.
15    A.   I take -- I got a whole pocketful of
16 them I need to take right now. They are mostly
17 vitamins. I take a pill that has some nitroglycerin
18 in it to keep a couple of veins open. It's not
19 listed in here, is it?
20        MR. FRANKOVITCH: You're welcome to look
21 at that if it helps refresh your recollection.
22        THE WITNESS: Yeah, there's a few of
23 them listed in this.
24        MR. FRANKOVITCH: These (indicating).
25        THE WITNESS: Yeah, okay.

### Page 30

1    A.   Isosorbide.
2    Q.   Okay.
3    A.   One of these I'm off of. I take the
4 generic for Coumadin, and I'm not sure which one it
5 is here. And I take Vytorin and Procardia and one
6 Prevacid a day.
7    Q.   Is that all you can recall?
8    A.   That's all.
9    Q.   Okay.
10    A.   Several vitamins.
11        MR. FRANKOVITCH: I think he already
12 testified he was taking digoxin also.
13 BY MS. DOWNIE:
14    Q.   Are you still taking digoxin?
15    A.   No.
16        MR. FRANKOVITCH: Oh, okay.
17 BY MS. DOWNIE:
18    Q.   You testified that after you took the
19 Digitek back, you were given a prescription for
20 digoxin; is that correct?
21    A.   Yes, ma'am.
22    Q.   How long did you continue to take the
23 digoxin?
24    A.   Until I had a heart attack.
25    Q.   And when was that?

### Page 31

1    A.   And that was in October of '08, and then
2 they took me off that.
3    Q.   Okay.
4    A.   I haven't taken it since the heart
5 attack.
6    Q.   Was Dr. McMartin still your cardiologist
7 at that time?
8    A.   Yes, ma'am.
9    Q.   And where were you treated for your
10 heart attack?
11    A.   Jewish Hospital.
12    Q.   During the time that you were taking
13 digoxin and between the time that you returned the
14 Digitek in October of 2008, you were receiving
15 digoxin; is that correct?
16    A.   Yes.
17    Q.   Do you know who manufactured the digoxin
18 that you were receiving?
19    A.   No idea.
20    Q.   And do you know why it was that your
21 digoxin was discontinued in October of 2008?
22    A.   It was discontinued because -- and I
23 think -- I think back then I was also taking Plavix.
24    Q.   Uh-huh.
25    A.   So the digoxin and the Plavix was

### Page 32

1 discontinued because I no longer have a right
2 coronary artery. I grew some new veins, and they
3 said I didn't need that anymore.
4    Q.   Okay. Let's turn to your current
5 medical condition.
6 You have high blood pressure; is that right?
7    A.   No.
8    Q.   No.
9 Have you ever been treated for hypertension?
10    A.   For high blood pressure?
11    Q.   Right.
12    A.   Yes.
13    Q.   All right. High cholesterol -- have you
14 been treated for high cholesterol?
15    A.   Yes.
16    Q.   And you had an extensive coronary
17 history; is that fair to say?
18    A.   Yes.
19    Q.   How many heart attacks have you had?
20    A.   Two.
21    Q.   Two.
22 So we have the one in October of 2008?
23    A.   Yes.
24    Q.   And when was the other one?
25    A.   March of '09.

William Lange

### Page 33

1 Q. March '09.
2 Now, you've also undergone some angioplasty --
3 A. Yes.
4 Q. -- procedures; is that correct?
5 How many times have you undergone angioplasty?
6 A. I lost track -- maybe six, seven.
7 Q. Okay. Now, has that been since the
8 mid-1990s? Would that be a fair characterization?
9 A. Yes, ma'am.
10 Q. You've had coronary artery bypass
11 surgery as well; is that correct?
12 A. Yeah.
13 Q. Okay. And how many times have you had
14 that particular --
15 A. One time.
16 Q. -- procedure?
17 And when was that?
18 A. January of '90.
19 Q. And you've also been treated for
20 degenerative joint disease; is that fair?
21 A. No. I have arthritis.
22 Q. Okay.
23 A. And I had a knee replacement.
24 Q. Okay. Fair enough.
25 Have you ever been told that your renal

### Page 34

1 function had been compromised? Were you seen in a
2 renal clinic?
3 A. No.
4 Q. Do you recall that?
5 A. (Witness shakes head negatively.)
6 Q. Do you recall having to be careful about
7 taking aspirin and nonsteroidal antiinflammatories?
8 A. Yeah. The fact is, I went several years
9 ago to a rheumatologist.
10 Q. Uh-huh.
11 A. And she advised me on what to take and
12 what not to take.
13 Q. Okay. Have you also been treated for a
14 stomach ulcer?
15 A. Yes.
16 Q. And at some point in time -- and you're
17 still taking the Coumadin -- you were being seen in
18 a Coumadin clinic; is that correct?
19 A. Yes.
20 Q. Do you still regularly go to the
21 Coumadin clinic?
22 A. Yes.
23 Q. Have you undergone a procedure called
24 cardioversion, where they give you a little electric
25 shock to your heart to correct your rhythm?

### Page 35

1 A. No.
2 Q. You don't recall that?
3 A. (Witness shakes head negatively.)
4 Q. In 2003 at Jewish Hospital, does that
5 refresh your recollection?
6 A. Yes, that was probably an angioplasty.
7 Q. All right. Now, when you -- was it
8 Dr. McMartin that wrote the prescription for you for
9 digoxin?
10 A. Yes.
11 Q. Did you ever receive a prescription for
12 digoxin or Digitek from any other physician other
13 than Dr. McMartin?
14 A. No, ma'am.
15 Q. When he would write the prescription for
16 you, do you know whether or not he wrote it for
17 digoxin or Digitek?
18 A. Digitek.
19 Q. If you received -- if your records
20 indicate that you received another form of digoxin
21 called Lanoxin, do you have any recollection of
22 that?
23 A. No.
24 Q. At one point in time, were you taking
25 Neurontin as well?

### Page 36

1 A. What?
2 Q. A drug called Neurontin? Were you
3 having numbness, what they call peripheral
4 neuropathy?
5 A. Yes.
6 Q. Okay. When was that?
7 A. I still take that.
8 Q. Okay. So you still take Neurontin,
9 then, as well?
10 A. Yes.
11 Q. Now, when we first started out here and
12 you had opportunity to look at your fact sheet and
13 we talked about your personal injury being
14 withdrawn, you said that you had an opportunity to
15 talk to physicians about your two heart attacks.
16 A. Yes.
17 Q. Who did you talk to?
18 A. Dr. McMartin and -- I don't remember.
19 He was a foreigner. He would come in and see me all
20 the time when I was in the hospital.
21 Q. Okay.
22 A. I don't remember his name. He is one of
23 the group at the medical internists -- I mean
24 cardiologists.
25 Q. I'm sorry. So he's with the same group

9 (Pages 33 to 36)

William Lange

Page 37

1 that Dr. McMartin was with?
2  A.  Yes.
3  Q.  And you spoke to both of them about your
4 injuries or claims; is that correct -- or no? Did
5 you talk to both of them about whether or not you
6 had suffered injuries as a result of your ingestion
7 of Digitek?
8  A.  No.
9  Q.  What conversation did you have with
10 them, then?
11  A.  "Am I going to live from this heart
12 attack?" I really -- at that particular time, I
13 never had Digitek on my mind.
14  Q.  Okay. Have you talked to any of your
15 physicians about your lawsuit?
16  A.  No.
17  Q.  What hospitals have you been admitted to
18 over a time -- over the last 10 years, let's say?
19 We know Jewish Hospital.
20  A.  Jewish and St. Mary and Elizabeth.
21  Q.  Who is your current primary care
22 physician?
23  A.  David Britt, B-R-I-T-T.
24  Q.  And how long has Dr. Britt been your
25 primary care physician?

Page 38

1  A.  Since, I guess, maybe December of '89.
2  Q.  Okay. Other than Dr. Britt and your
3 cardiologist, are there any other physicians that
4 you see regularly?
5  A.  Not regularly. I see Dr. Paul Brown,
6 but he's a gastroenterologist -- whatever you call
7 it -- gastro man -- concerning my ulcer every now
8 and then.
9  Q.  So you see him more on an as-needed
10 basis?
11  A.  Yes.
12  Q.  Is there anybody else?
13  A.  No.
14  Q.  Just to confirm, I think -- I don't
15 think I asked this question earlier. You're not
16 making any claim for any kind of mental or emotional
17 injury, are you?
18  A.  No.
19  Q.  Was there ever a time when you took your
20 Digitek that you would skip a day?
21  A.  No.
22  Q.  Would you ever take more than what was
23 prescribed?
24  A.  No.
25  Q.  When did you take your Digitek?

Page 39

1  A.  Every morning.
2  Q.  Would you take it before or after you
3 ate?
4  A.  After breakfast.
5  Q.  Were there times when you were
6 experiencing a-fib that you would alter your
7 medication in any respect?
8  A.  No.
9  Q.  Would you call your physicians and talk
10 to him about whether or not to alter your
11 medication?
12  A.  I did. I called -- I've talked to him,
13 and I never -- I never wanted to go get shocked, and
14 he said, "Just wait it out. It will go away." And
15 it always went away.
16  Q.  Now, if I were to suggest to you that
17 the recall occurred in April of 2008 rather than
18 April of 2009, does that refresh your recollection?
19  A.  Could have been. I'm not sure.
20  Q.  Okay. You testified earlier that you
21 decided to pursue a lawsuit after speaking to the
22 pharmacist, and earlier you testified that you
23 believed that that conversation was sometime in May
24 of 2009. Is that correct? Do you recall that
25 testimony?

Page 40

1  A.  Yes, I'm not good on dates. You tell --
2 if it was -- it could have 2008 rather than 2009.
3 I'm not sure.
4  Q.  Well, I guess what I'm wondering is, if
5 you had the conversation with the pharmacist in
6 April of 2008 when the recall happened, it appears
7 then that you waited a year to pursue a lawsuit, or
8 perhaps you had another conversation in 2009 that
9 you're not recalling?
10  A.  I don't know. I don't know.
11  Q.  Okay. Your recollection is that you had
12 a conversation with the pharmacist when you returned
13 your product; is that correct?
14  A.  Yes.
15  Q.  Was it during that conversation that the
16 pharmacist mentioned to you something about a class
17 action or that you should investigate that?
18  A.  Yes.
19  Q.  Okay.
20  A.  Now, I think -- thinking about it now --
21  Q.  Uh-huh.
22  A.  -- it was 2008 because 2009 was just a
23 few months ago.
24  Q.  Well, we're in 2009.
25  A.  I know it, and it was just a few months

10 (Pages 37 to 40)

William Lange

### Page 41

1 ago. So I don't know when all of this took place,
2 but probably the recall was in 2008.
3 Q. Right.
4 A. I just got my years mixed up.
5 Q. Okay. So initially you testified that
6 after speaking to the pharmacist you called
7 Mr. Lange about two weeks later?
8 A. No. I'm not sure. It seems like it.
9 It seems like two weeks later, but I don't know. I
10 really -- I'm not positive from the time of the
11 recall to the time of my phone call with this
12 attorney what the length of time was.
13 Q. Okay. After your initial phone call
14 with the attorney, how long was it until you filed
15 your lawsuit, if you know?
16 A. I probably -- I talked to Tim Lange, and
17 we had several conversations, and then it was -- it
18 was months before he sent me this stuff.
19 Q. Okay. Okay. Now, do you understand
20 what, if any, obligations you have as a class
21 representative?
22 A. Just to be actually a spokesperson for
23 the rest of these people, whoever is involved.
24 Q. But you haven't spoken to those people,
25 and you don't know how many of them there are?

### Page 42

1 A. I have no idea.
2 Q. You have no idea what their injuries
3 are -- their alleged injuries?
4 A. No.
5 MS. DOWNIE: Why don't we take a break.
6 (A BRIEF RECESS WAS TAKEN.)
7 BY MS. DOWNIE:
8 Q. How far do you live from the pharmacy --
9 Kroger pharmacy? How far of a distance is that?
10 A. About a mile.
11 Q. Okay. So what is your home -- you told
12 us what your home address was.
13 A. Yes.
14 Q. And is that the same address that you
15 were at at the time that the recall occurred?
16 A. Yes.
17 Q. So it was about a mile distance, two
18 miles round trip that you drove?
19 A. Yes.
20 Q. Okay. We've talked about this a little
21 bit before, and I just want to make sure that I'm
22 clear on your testimony.
23 Earlier you testified that you had decided not
24 to pursue your personal injury claims. I just want
25 to make sure that I'm understanding exactly why you

### Page 43

1 changed your mind with those claims?
2 A. Well, after talking to my doctor and Tim
3 Lange --
4 Q. Uh-huh.
5 A. -- we both decided sort of decided or we
6 all sort of decided that Digitek had nothing to do
7 with my heart condition.
8 Q. Okay. And I don't want you to tell me
9 about your conversations with Mr. Lange, but in
10 terms of the conversation you had with your doctor,
11 what conversation was that?
12 A. He said that none of the medications
13 that I was on at that particular time had anything
14 to do with my heart condition.
15 Q. Okay. And which doctor was this?
16 A. McMartin.
17 Q. And when did you have that conversation?
18 A. Shortly after I died -- it was after my
19 heart attack. They told me that one of my -- one of
20 my stents had twisted --
21 Q. Uh-huh.
22 A. -- and shut everything off.
23 Q. I see.
24 Was that your heart attack in October of 2009
25 [sic]?

### Page 44

1 A. That's right.
2 Q. Did you ask him specifically whether or
3 not he believed any of the medication you were on,
4 including Digitek, had anything to do with your
5 heart attack?
6 A. No.
7 Q. Or did you ask him what had caused your
8 heart attack?
9 A. Yes.
10 Q. And that's when he told you what his
11 thoughts were?
12 A. Yes.
13 Q. And then you also had a conversation
14 with your attorney?
15 A. Yes.
16 Q. Okay. You testified that you were on
17 Digitek for approximately seven to eight years until
18 the recall occurred; is that correct?
19 A. Yes.
20 Q. And you don't recall taking any other
21 form of digoxin, whether Lanoxin or anything else?
22 A. No.
23 Q. Okay. After the recall, you were placed
24 on digoxin; is that correct?
25 A. Yes, ma'am.

11 (Pages 41 to 44)

William Lange

## Page 45

1  Q. When you made that switch, did you have
2  a -- did you notice anything different in your
3  condition or how you were feeling?
4  A. No.
5  Q. Okay. And the Digitek that you took for
6  the seven to eight years, was that effective in
7  treating your condition as far as you knew?
8  A. I really don't know. I'm not a doctor,
9  so I -- I did well, I guess.
10 Q. Okay. Bear with me here.
11 A. Sure.
12 Q. I'm going to be skipping around a little
13 bit.
14    What did the Digitek look like; do you recall?
15 A. Just a very small, flat white pill.
16 Q. Do you recall if it had any imprinting
17 on it, any letters on it?
18 A. No.
19 Q. Do you recall what the digoxin looked
20 like?
21 A. Very similar.
22 Q. And, again, do you recall if there was
23 any printing on that?
24 A. No.
25 Q. Do you recall if either one of those

## Page 46

1  pills were cross-scored, in other words, had a line
2  down the center?
3  A. It might have. I'm not sure.
4  Q. Do you keep any diaries regarding your
5  health problems?
6  A. I try not to.
7  Q. I appreciate that, but do you?
8  A. No.
9  Q. Okay. Do you keep any records or
10 diaries regarding medications that you've taken
11 through the years?
12 A. No, I just -- I've got a list at home
13 for when I go to a different doctor or something.
14 Q. A list of what you're currently taking?
15 A. Yes, ma'am.
16 Q. But you don't have any record going back
17 over the years?
18 A. No, no.
19 Q. Did you ever do any Internet research
20 regarding Digitek or digoxin?
21 A. No.
22 Q. Did you ever do any other kind of
23 research, Internet or otherwise, regarding Digitek
24 or digoxin?
25 A. No.

## Page 47

1  Q. Do you recall reading any -- anything in
2  the newspaper or seeing anything on TV regarding
3  Digitek or digoxin?
4  A. No, ma'am.
5  Q. What prognosis have your physicians
6  given you with your heart problems since your heart
7  attack in October of 2009?
8  A. Not much. When my doctor said how lucky
9  I was, he said, "You and the man upstairs grew these
10 two new veins for you that are moving the blood."
11     I said, "How long are they going to last?"
12     And he said, "As long as you want them to."
13     So I don't even worry about it anymore. I
14 don't worry about it.
15     (INQUIRY BY THE COURT REPORTER.)
16 Q. Okay. You had a -- wait a minute.
17 A. A heart attack.
18 Q. 2008. Now you've got me doing it, 2008.
19 Thank you.
20 A. No, no.
21     MR. SIMON: It was this year?
22     MS. DOWNIE: Wait.
23 A. My first heart attack was in October of
24 2007 --
25 Q. Okay.

## Page 48

1  A. -- and then followed by one in March of
2  2008, and I haven't had a heart attack for a year
3  and a half.
4  Q. I had originally written down October
5  2008 and March of 2009. I obviously misspoke just a
6  moment ago. So let's make sure we got this right.
7     First heart attack, when was it?
8  A. October of '07.
9  Q. '07.
10    And the second heart attack?
11 A. March of '08.
12 Q. Of '08. Okay. That makes sense.
13 A. That's where -- that's what threw you
14 off because I know that the Digitek was recalled a
15 couple of months or so after my second heart attack.
16 Q. Okay.
17 A. When we started talking about '09 and --
18 I'm an old man.
19 Q. It has nothing to do with age sometimes.
20 Trust me.
21    Okay. All right. Well, then, let's make sure
22 we're clear for sure.
23    October of 2007 was the first heart attack?
24 A. Yes, ma'am.
25 Q. Followed by the second heart attack in

12 (Pages 45 to 48)

William Lange

**Page 49**

1  March of 2008?
2  A. Yes, ma'am.
3  Q. And let me go back then, a second.
4  Originally you had testified that it was after
5  your second heart attack that you had the
6  conversation with Dr. McMartin regarding what had
7  caused your heart attack; do you recall that?
8  A. After each of them, I had -- yes --
9  Q. Okay.
10 A. -- I had a conversation.
11 Q. So after each of your heart attacks, you
12 had a conversation with Dr. McMartin about what the
13 cause of your heart attacks were?
14 A. Yes, ma'am.
15 Q. And on both occasions, he told you that
16 the heart attacks were not caused by the medications
17 that you were taking; is that correct?
18 A. Not per se, no.
19 Q. Okay.
20 A. He just said that the first one was from
21 a twisted stent.
22 Q. Okay.
23 A. And the second one was from all the
24 stents being clogged.
25 Q. Okay. Then I am even more confused, I'm

**Page 50**

1  afraid.
2  You signed your fact sheet in May of 2009, and
3  at that time, you indicated you believed your two
4  heart attacks were related to your ingestion of
5  Digitek?
6  A. Possibly.
7  Q. Possibly.
8  May of 2009 was well after your last heart
9  attack in March of 2008.
10 A. We're talking about this sheet
11 (indicating)?
12 Q. Yeah.
13 A. That's when I filled it out, in 2009.
14 Q. I appreciate that. And I'm just trying
15 to understand, since we had some previous testimony
16 about when certain things occurred.
17 Earlier you testified that you filled that out
18 and then you subsequently talked to your
19 physicians --
20 MR. FRANKOVITCH: And attorney.
21 BY MS. DOWNIE:
22 Q. -- and attorney who indicated that your
23 heart attacks were not likely caused by your
24 ingestion of a particular medication?
25 A. Yes.

**Page 51**

1  Q. Okay. And you testified earlier that
2  one of those conversations happened with
3  Dr. McMartin after your second heart attack?
4  A. Yes.
5  Q. Okay. And that was in March of 2008?
6  A. Yes.
7  Q. Okay. But then a year later, you filled
8  out the fact sheet indicating that you thought your
9  two heart attacks were actually related to your
10 ingestion of Digitek?
11 A. If that's what it says.
12 Q. Well, you filled it out.
13 A. I guess so. Where does it say that?
14 MS. DOWNIE: Sure. May I?
15 MR. FRANKOVITCH: Yeah, that's fine.
16 MS. DOWNIE: Carl can help you.
17 A. You know, I wrote that in there just, I
18 guess, in case it had something to do with personal
19 injury.
20 Q. Okay. Just in case what had something
21 to do with personal injury?
22 A. My heart attacks. I mean, the question
23 was, "What bodily injury do you (inaudible) --
24 (INQUIRY BY THE COURT REPORTER.)
25 A. -- "What bodily injury do you claim

**Page 52**

1  resulted from your use of Digitek?" And I guess I
2  could have put "none" --
3  Q. Uh-huh.
4  A. -- which would maybe have been more
5  appropriate, but I just wrote that down.
6  Q. Would "none" have been more appropriate
7  in your case?
8  A. "None" would have been more appropriate,
9  yes, ma'am.
10 Q. Okay. And you've subsequently talked to
11 your attorneys; is that correct?
12 A. Yes.
13 Q. So you talked to Dr. McMartin, and you
14 testified that you talked to Mr. Lange as well?
15 A. Yes.
16 MR. FRANKOVITCH: And to me.
17 BY MS. DOWNIE:
18 Q. And to Mr. Frankovitch?
19 A. Yeah.
20 Q. And is it correct that you've never been
21 told that you had suffered from digoxin toxicity or
22 elevated digoxin levels?
23 A. I have not.
24 Q. What insurer did you have during the
25 time period that you were filling your prescriptions

13 (Pages 49 to 52)

William Lange

## Page 53

1 for Digitek -- what medical insurer?
2 A. From -- I guess for the past five and a
3 half years -- or five and a half years ago until I
4 quit taking it would have been Medicare.
5 Q. Okay.
6 A. And when I worked for the sheriff --
7 let's see. We didn't have Humana. I'm not sure
8 what insurance company it was.
9 Q. Okay. But for the last five and a half
10 years or so, it's been Medicare?
11 A. Yes, ma'am.
12 Q. Okay. And I think you testified earlier
13 that your co-pay for a 90-day supply was $10?
14 A. Yes.
15 Q. And I may have asked this before and I
16 apologize if I did, but was the co-pay the same when
17 your prescription was changed from Digitek to
18 digoxin?
19 A. Yes.
20 Q. And were you still getting the 90-day
21 supplies with digoxin?
22 A. Yes.
23 Q. At the time that you stopped taking
24 digoxin after your second heart attack, do you
25 recall how many tablets you had left in your

## Page 54

1 prescription at that time?
2 A. I just had it filled, probably 85.
3 Q. Okay. And that was the digoxin, not the
4 Digitek; is that correct?
5 A. Yes.
6 Q. I wanted to make sure I'm clear on this
7 because now I'm confused once again.
8 I think earlier you testified that after your
9 second heart attack, you stopped taking digoxin
10 entirely?
11 A. Yes, yes.
12 Q. Okay. Your second heart attack was in
13 March of 2008?
14 A. Yes.
15 Q. So is your testimony that you stopped
16 taking digoxin entirely in March of 2008 after your
17 second heart attack?
18 A. After my first one. I'm sorry if I
19 confused you.
20 Q. Now I'm even more confused. Okay. All
21 right. Let's take this step by step then.
22 Your first heart attack was in October of 2007?
23 A. Yes.
24 Q. Your second heart attack was in March of
25 2008?

## Page 55

1 A. Yes.
2 Q. Okay. You testified --
3 A. Okay. Wait, wait.
4 Q. Okay.
5 A. Now I just remembered. He -- I took
6 digoxin all the way up to the second heart attack --
7 Q. Okay.
8 A. -- because he cut me off of digoxin and
9 Plavix and a baby aspirin after the -- after the
10 second heart attack because he said, "You don't need
11 it anymore. You don't have an artery to keep open
12 any longer."
13 Q. Okay. And "he" is Dr. McMartin?
14 A. McMartin.
15 Q. When he cut you off that medication,
16 meaning the digoxin, the Plavix, and the baby
17 aspirin, when exactly did he tell you to stop taking
18 those medications? Was it -- go ahead.
19 A. When I went back to see him a week after
20 I got out of the hospital.
21 Q. Okay. So you had your heart attack, you
22 were released from the hospital, and then you went
23 back to see Dr. McMartin a week later; is that
24 correct?
25 A. Yes.

## Page 56

1 Q. And it was at that time he told you you
2 no longer you needed to take the digoxin, Plavix,
3 and baby aspirin?
4 A. Right.
5 Q. How long were you in the hospital when
6 you were admitted in March of 2008 for your second
7 heart attack?
8 A. Six days.
9 Q. And during the time that you were
10 admitted in the hospital, do you know whether or not
11 you were given any digoxin or Digitek?
12 A. I'll say no because I'm not sure.
13 Q. Okay. If you don't recall, that's fine.
14 A. Right.
15 Q. And then when you were released from the
16 hospital after six days, did you, when you went
17 home, start taking the digoxin or Digitek again
18 until you went to see Dr. McMartin?
19 A. Yes.
20 Q. And do you recall at the time what other
21 medications you were on?
22 A. Just about every -- about everything
23 that I've told you before except the isosorbide.
24 Q. Okay.
25 A. They started me on the isosorbide after

William Lange

**Page 57**

1 the second heart attack.
2    Q.  Okay. Other than discontinuing the
3 digoxin, Plavix, and baby aspirin, and beginning the
4 drug you just mentioned, did they change your
5 medications in any other way that you recall?
6    A.  No.
7    Q.  Okay. Do you recall how long after --
8 well, can you put -- your second heart attack was in
9 March of 2008, in relation to that, do you recall
10 when it was that you received the letter from Kroger
11 pharmacy?
12   A.  It wasn't too long. I don't know. I
13 was still taking it. I'm not sure.
14       MS. DOWNIE: Mr. Simon, if you want to
15 go ahead with any questions, I'll look through my
16 notes and see where I need to follow up.
17
18          EXAMINATION
19
20 BY MR. SIMON:
21   Q.  Mr. Lange, we were introduced a little
22 bit ago before your deposition. My name is John
23 Simon. I represent the Actavis defendants in the
24 lawsuit you're bringing, and I have a few follow-up
25 questions. I apologize. I'll probably be skipping

**Page 58**

1 around a little bit because I'm following Ericka's
2 questions.
3    You indicated you have a new cardiologist now.
4 I believe his name was Dr. Stidam.
5    A.  Stidam, Stidam.
6    Q.  Okay. And where is he located?
7    A.  He's at Abraham Flexner, same location
8 as Dr. McMartin.
9    Q.  Is he in the same cardiology group as
10 Dr. McMartin?
11   A.  Yes.
12   Q.  And Dr. McMartin has now retired?
13   A.  He has retired.
14   Q.  So it's the same address for
15 Dr. McMartin and Dr. Stidam?
16   A.  Yes, sir.
17   Q.  Was it Dr. Stidam who changed your
18 medications to include Pacerone?
19   A.  Yes, yes, yeah.
20   Q.  And how long have you been seeing
21 Dr. Stidam as opposed to Dr. McMartin?
22   A.  Since about April '09.
23   Q.  Now, while you were on digoxin or
24 Digitek, were there ever any occasions where you
25 would take two tablets instead of one tablet per

**Page 59**

1 day?
2    A.  No.
3    Q.  What dose of Digitek were you on?
4    A.  I have no idea.
5    Can I -- can I change something?
6    Q.  Sure, absolutely.
7    A.  I think -- I think -- I'm pretty sure
8 that after my second heart attack, McMartin took me
9 off of aspirin and Plavix, and I stayed on Digitek.
10 I'm very certain. Everything has been sort of
11 confusing.
12   Q.  So earlier --
13   A.  And I think --
14   Q.  Oh, I'm sorry. Go ahead.
15   A.  -- Stidam -- Stidam took me off Digitek
16 back in April -- not Digitek -- digoxin when he put
17 me on Pacerone.
18   Q.  Okay. Have you reviewed any of your --
19   A.  You're as confused as I have been.
20   Q.  Okay. Have you reviewed any of your
21 medical records at any point in time?
22   A.  Concerning...
23   Q.  Concerning Digitek primarily, or
24 digoxin.
25   A.  No.

**Page 60**

1    Q.  What did you do to prepare for today's
2 deposition?
3    A.  Nothing. I had a conversation.
4       MR. FRANKOVITCH: With counsel, he's
5 referring.
6 BY MS. DOWNIE:
7    Q.  Okay. With Mr. Frankovitch, you had a
8 conversation?
9    A.  Frankovitch.
10   Q.  When did the conversation occur?
11   A.  Last evening.
12   Q.  Did you go somewhere and meet with him,
13 or was it by telephone?
14   A.  We just met in the lobby of the
15 Seelbach.
16   Q.  Did you review any sort of documents or
17 anything?
18   A.  Nothing exactly. He just sort of told
19 me to say yes and no --
20       MR. FRANKOVITCH: You can't -- you can't
21 discuss what we talked about.
22       THE WITNESS: Oh.
23 BY MR. SIMON:
24   Q.  Don't tell us what you and he discussed.
25 Just listen to my questions and only respond to the

William Lange

### Page 61

1. question.
2. Q. How long did the meeting last?
3. A. 30 minutes.
4. Q. Did you review the plaintiff fact sheet
5. that we looked at earlier in your deposition?
6. A. No.
7. Q. Since the time you filled out the
8. plaintiff fact sheet in May of 2009, did you speak
9. with any of your doctors about Digitek?
10. A. No.
11. Q. Now, it appears as if you're uncertain
12. when you stopped taking Digitek or digoxin from your
13. testimony today.
14. A. I'm certain --
15. Q. Okay. So can --
16. A. -- because --
17. Q. -- you clarify for that for us? When
18. did you stop taking digoxin, first of all?
19. A. I stopped taking digoxin about April of
20. '09, because I made the statement that Dr. McMartin
21. took me off of three drugs, and he only took me off
22. of Plavix and aspirin. He said, "You no longer need
23. Plavix and aspirin." But because -- he left me on
24. digoxin because I still had an a-fib problem.
25. Q. Do you know when you discontinued

### Page 62

1. Digitek?
2. A. Whenever the Kroger people traded me out
3. prescription drugs there.
4. Q. How did you do with respect to your
5. heart condition once you started taking digoxin?
6. A. I saw no difference than in the past.
7. Q. So is it fair to say that your heart
8. condition was the same while you were on Digitek
9. than it was while you were on digoxin?
10. A. I would think so, yes.
11. Q. Have you been involved in any other
12. lawsuits besides this one?
13. A. None.
14. Q. You live in Louisville.
15. Where does Mr. Lange, the attorney, live?
16. A. I think he also lives here, yes.
17. MR. SIMON: I think that's all the
18. questions I have for you, Mr. Lange. I don't know
19. if Ericka has anything further.
20. MS. DOWNIE: I don't believe I have any
21. follow-up. Mr. Frankovitch may have some questions
22. for you.
23. MR. FRANKOVITCH: Let's take a
24. five-minute break.
25. MS. DOWNIE: That's fine.

### Page 63

1. (A BRIEF RECESS WAS TAKEN.)
2. MR. FRANKOVITCH: We don't have any
3. other questions.
4. MS. DOWNIE: Okay. Thank you very much.
5. MR. FRANKOVITCH: And signature,
6. we'll --
7. MS. CARTER: Review and sign.
8. MR. FRANKOVITCH: We'll review and sign.
9. (A DISCUSSION WAS HELD OFF THE RECORD.)
10. MR. FRANKOVITCH: We received a
11. deficiency notice on his plaintiff fact sheet, and I
12. just want to get some assurance that we don't need
13. to readdress that since you've had an opportunity to
14. depose him.
15. MS. DOWNIE: That I can't say for sure
16. because honestly I haven't reviewed the deficiency
17. notice in detail enough to know that we covered
18. everything that we needed to cover. I suspect we
19. have. So we'll make the commitment to you to go
20. back and look at that deficiency notice and get
21. something out to you indicating whether or not
22. there's --
23. MR. FRANKOVITCH: One of the items that
24. you indicated was his retirement authorization. If
25. you want that, he can execute one.

### Page 64

1. MS. DOWNIE: Okay.
2. MR. FRANKOVITCH: If you have it handy,
3. we can sign it now.
4. MR. SIMON: We don't unfortunately, as a
5. matter of course, I don't recall what the
6. deficiencies were. Do you?
7. MR. FRANKOVITCH: Well, one of the
8. questions was he didn't answer whether he was filing
9. in a representative capacity, which at the time he
10. was not; he was filing in his individual claim.
11. And then the other deficiencies were
12. elaborating on his prior health conditions.
13. MS. DOWNIE: Okay.
14. MR. SIMON: I'll go back --
15. MR. FRANKOVITCH: I mean, take a look
16. and --
17. MR. SIMON: Yes, and I'll send you a
18. follow-up letter delineating what we need.
19. MR. FRANKOVITCH: Okay. And if you have
20. an employment authorization -- we may have one here.
21. MR. SIMON: I know I didn't bring one.
22. MS. DOWNIE: I don't know if there's one
23. still attached to the fact sheet that was not --
24. sir, may I see that a moment? Thank you.
25. Yeah, right here.

16 (Pages 61 to 64)

William Lange

### Page 65

```
 1       MR. FRANKOVITCH: Yeah.
 2       MS. CARTER: Page 20.
 3       MS. DOWNIE: Okay.
 4       MS. CARTER: Employee name,
 5  (inaudible) --
 6       (INQUIRY BY THE COURT REPORTER.)
 7       MR. FRANKOVITCH: I mean, he's willing
 8  to execute it, and if you need it --
 9       MS. DOWNIE: That's great.
10       MR. SIMON: That would be fine.
11       MS. DOWNIE: That solves it, that issue
12  at least.
13       MR. FRANKOVITCH: But I'm going to
14  assume that I'm not under the gun on responding to
15  the deficiencies until I hear back from you people.
16       MS. DOWNIE: We will get back to you
17  within --
18       MR. SIMON: That's fine.
19       MS. DOWNIE: Yeah -- in the next few
20  days and let you know.
21       MR. FRANKOVITCH: Just sign here and
22  date it. What is the date, the 6th, 7th?
23       MS. CARTER: 6th.
24       MR. ARNOLD: 6th.
25       MR. FRANKOVITCH: Okay.
```

### Page 66

```
 1       MS. DOWNIE: Thank you. I'll give it to
 2  you.
 3       MR. SIMON: You want me to take it?
 4  I'll get it in the stream of things.
 5       (DEPOSITION CONCLUDED AT 10:20 A.M.)
```

### Page 67

```
 1  STATE OF KENTUCKY    )
                        )SS: ERRATA
 2  COUNTY OF JEFFERSON  )
 3
 4     I HAVE READ THE FOREGOING PAGES, AND THE
 5  STATEMENTS CONTAINED THEREIN (SUBJECT TO
 6  CORRECTIONS, ADDITIONS, AND DELETIONS CONTAINED IN
 7  THE ADDENDUM ANNEXED HERETO, IF ANY), AND THEY ARE
 8  TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.
 9
10
11
12
13            WILLIAM E. LANGE
14
15     SUBSCRIBED AND SWORN BEFORE ME THIS DAY BY
16          , THIS      DAY OF        2009.
17  MY COMMISSION EXPIRES:
18
19
20            NOTARY PUBLIC
```

### Page 68

```
 1  COMMONWEALTH OF KENTUCKY )
                            )
 2  COUNTY OF JEFFERSON      )
 3     I, LISA M. MIGLIORE, CCR-KY, A NOTARY PUBLIC,
 4  WITHIN AND FOR THE STATE AT LARGE, DO HEREBY CERTIFY
 5  THAT THE FOREGOING DEPOSITION OF
 6            WILLIAM E. LANGE
 7  WAS TAKEN BEFORE ME AT THE TIME AND PLACE AND FOR
 8  THE PURPOSE IN THE CAPTION STATED; THAT THE WITNESS
 9  WAS FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE
10  TRUTH, AND NOTHING BUT THE TRUTH; THAT THE
11  DEPOSITION WAS TAKEN BEFORE ME STENOGRAPHICALLY AND
12  AFTERWARDS TRANSCRIBED UNDER MY DIRECTION; THAT THE
13  FOREGOING IS A FULL, TRUE, AND CORRECT TRANSCRIPT OF
14  THE SAID DEPOSITION SO GIVEN; THAT THERE WAS A
15  REQUEST THAT THE WITNESS READ AND SIGN THE
16  DEPOSITION; THAT THE APPEARANCES WERE AS STATED IN
17  THE CAPTION.
18     I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL
19  NOR OF KIN TO ANY OF THE PARTIES TO THIS ACTION, AND
20  AM IN NO WAY INTERESTED IN THE OUTCOME OF SAID
21  ACTION.
22     WITNESS MY SIGNATURE THIS 11TH DAY OF OCTOBER,
23  2009. MY COMMISSION EXPIRES NOVEMBER 10, 2009.
24
25            NOTARY PUBLIC
              STATE AT LARGE, KENTUCKY
```

17 (Pages 65 to 68)