VIDEO OPERATOR:  We are now on the

record.

                    My name is Catherine Smalfus, I am

the videographer for Golkow Technologies.

Today's date is December 9th, 2009 and the time

is 9:51 a.m.

                    This video deposition is being held

in New York, New York, In Re: Digitek Products

Liability Litigation, for the United States

District Court for the Southern District of West

Virginia.  The deponent is Paul Galea.

                    Will counsel please identify

themselves.

                    MR. MILLER:  Pete Miller, and I

represent plaintiffs filed in Pennsylvania.

                    MS. CARTER:  Meghan Carter from

Motley Rice representing the plaintiffs.

                    MR. BLIZZARD:  Ed blizzard from

Houston.  I represent the plaintiffs.

                    MS. GIBSON:  Holly Gibson,

representing the plaintiffs.

                    MR. LEE:  Sean Lee from Shook,

Hardy & Bacon, representing Mylan.

                    MR. MAZEY:  Zack Mazey with Allen

ROUGH - Paul Galea

Page 12

1    the manufacturing role and gone back into

2    the world of QA?

3        A.    That can be termed as correct.

4        Q.    And what are you valid can

5    dating as a validation officer?

6        A.    As a validation officer, there

7    were various projects going on so I was

8    taking care of cleaning validation and

9    facilities, our -- and equipment

10   validation.

11       Q.    And that was at the accident

12   vision Totowa plant.

13       A.    No.  That has still been Malta

14   at Actavis, Limited.

15       Q.    Okay.  What year did you

16   transfer from Malta to Actavis, Totowa,

17   physically?

18       A.    21st October, 2007.

19       Q.    Was that at the request of the

20   company or had you been requesting to

21   transfer to the U.S.?

22       A.    It -- it was a bit of both, I

23   could say.

24       Q.    What was -- as you were

Page 13

1    informed, what was the reason that the

2    company requested it, that you transfer to

3    Actavis Totowa?

4        A.    The initial reason I was doing

5    an assessment and helping out in the the

6    harmonization of the group's corporate

7    manual and that was basically the main

8    reason.

9        Q.    All right.  Well, let's break

10   that into two parts.  What was the

11   assessment that you believe that you were

12   -- that you came here to work on?

13   Assessment of what?

14       A.    Basically, I came to make an

15   assessment of Actavis Totowa, L.L.C.

16       Q.    Overall assessment of the QA

17   Department?

18       A.    No.  In general of the company

19   from -- from a GMP perspective.

20       Q.    Would you agree with me that

21   there was some serious GMP issues in

22   October of '07 at Actavis Totowa?

23              MR. ANDERTON:  Objection.

24              You may answer.

ROUGH - Paul Galea

Page 15

1        A.      At this point it was me.

2        Q.      Arrivinging in October of 2007

3    to do an assessment of the GMP, who were

4    you reporting to?

5        A.      I was still reporting to -- to

6    Actavis, Limited.

7        Q.      Okay.   We have -- excuse me,

8    sir.

9                MR. MILLER:   We have someone just

10   checked in on the phone line.   If that is

11   correct, would you please identify yourself?

12               [Him him] see [S-EUG] company with

13   Shelly Sanford's office.

14               MR. MILLER:   Okay.   Well, we've

15   gotten started.   If you would, please, put it on

16   mute.

17               Thank you much.

18   BY MR. MILLER:

19       Q.      So are arrived for two

20   functions, assessment and harmonization if

21   I said that right.   The first was

22   assessment of the GMP and you were

23   reporting to who?

24       A.      At this point now I report --

ROUGH - Paul Galea

Page 16

1    in October of 2007, I report to Scott

2    Talbot.

3        Q.    And what was his title?

4        A.    At that point he was the site

5    head of quality at Actavis Totowa, L.L.C.

6        Q.    GMP, it's good manufacturing

7    procedures?  Is that --

8        A.    Practice.

9        Q.    Good manufacturing practice.

10   Is that used in Malta?

11       A.    Yes.

12       Q.    Is it identical to the GMP that

13   we use here in the United States?

14       A.    The governing bodies are

15   different but it's I would say the spirit

16   is similar.

17       Q.    Do you agree that the GMP is in

18   place in order to have a pharmaceutical

19   company produce a safe product?

20       A.    I believe that is the intent.

21       Q.    How did you summarize the

22   status of the GMP in -- after your arrival

23   in October of 2007 to Scott Talbot?

24            MR. ANDERTON:  Objection.

ROUGH - Paul Galea

Page 17

1           I instruct the witness not to

2     answer.

3              MR. MILLER:  Why?

4              MR. ANDERTON:  Self-critical

5     analysis privilege.

6     BY MR. MILLER:

7        Q.   In what state did you find the

8     GMP of Actavis Totowa in October of 2007?

9              MR. ANDERTON:  Objection.  I

10    instruct the witness not to answer.

11             MR. MILLER:  Same grounds?

12             MR. ANDERTON:  Yeah.

13    BY MR. MILLER:

14       Q.   How long did you continue your

15    assessment of GMP at Actavis Totowa?

16       A.   I was there for initial

17    assessment, which was around a week, and

18    then there were subsequent visits to do

19    further assessments.

20       Q.   Did your assessment include

21    actual inspection and review of the

22    quality control labs within Actavis?

23             MR. ANDERTON:  Objection.

24             You may answer.

ROUGH - Paul Galea

Page 18

1              THE WITNESS:  Yes.

2   BY MR. MILLER:

3       Q.    What all did you physically

4   review or inspect in order to make an

5   assessment of the -- of the GMP systems in

6   Actavis?

7              MR. ANDERTON:  Objection.

8              I'm going to instruct the witness

9   to -- to answer but not to reveal any of the

10  findings or evaluations or substantive

11  evaluations that you did.  You may answer his

12  question but in answering don't reveal any of

13  your conclusions or findings.

14             THE WITNESS:  The assessment was

15  more of a general assessment, which -- which is

16  -- which you would typically do when you're

17  visiting for a short period of time.

18  BY MR. MILLER:

19      Q.    So you went inside the QA lab.

20             MR. ANDERTON:  Objection.

21  BY MR. MILLER:

22      Q.    You can answer.

23      A.    QC lab.

24      Q.    I'm sorry.  So you went inside

ROUGH - Paul Galea

Page 19

1    the QC lab.  Did you interview any lab

2    techs there?

3         A.    Not really.

4         Q.    No?

5         A.    Not really.

6         Q.    What does not really mean?

7         A.    I didn't interview anyone.

8         Q.    Okay.  Did you review lab

9    analyst's logbooks?

10                  MR. ANDERTON:  Objection.

11                  I instruct the witness not to

12   answer.  I mean, you're getting into the -- the

13   content and the evaluation and the analysis.

14   That's what's protected by the privilege.

15                  MR. MILLER:  I don't think if he

16   looked at a logbook or not is protected by the

17   privilege.  I'm merely asking him what he looked

18   at.  I'm not asking him to reveal what he found

19   in the logbook.  Just what did he look at.

20                  MR. ANDERTON:  Ask your question

21   again.

22   BY MR. MILLER:

23        Q.    Did you review any lab logbooks

24   in your assessment of the GMP procedures

ROUGH - Paul Galea

Page 20

1    at Actavis?

2              MR. ANDERTON:  Objection.

3              You may answer.

4              THE WITNESS:  I did not

5    specifically review but I can say that I looked

6    at logbooks.

7    BY MR. MILLER:

8        Q.    What were you informed of were

9    -- were the issues with GMP prior to your

10   assessment?

11       A.    I was not informed of any GMP

12   issues.

13       Q.    Just got a call in Malta and

14   said go to Actavis Totowa and make an

15   assessment of their GMP program?

16       A.    Yes, I would say that is

17   correct.

18       Q.    You agreed with me earlier that

19   there are serious issues at the -- with

20   GMP at Actavis Totowa.  Did you have that

21   understanding prior to your assessment?

22              MR. ANDERTON:  Objection.

23              That totally mischaracterizes the

24   witness's testimony.

ROUGH - Paul Galea

Page 21

1              MR. MILLER:  Well --

2              THE WITNESS:  I -- I did not agree

3    that there were serious issues.

4              MR. MILLER:  Okay.  I'll ask -- all

5    right.  Let me ask this:  Do you believe there

6    were serious issues with the GMP procedures at

7    Actavis Totowa prior to your arrival in October

8    of 2007.

9              MR. ANDERTON:  Objection.

10             I instruct the witness not to

11   answer.

12             MR. MILLER:  Why are you asking him

13   not to answer that?

14             MR. ANDERTON:  Because again,

15   that's his -- that's the conclusion that he's

16   reached as he's conducting this analysis.

17             MR. MILLER:  I'm back it up.  I'm

18   asking before he ever got there.  There's no

19   conclusion because he hasn't done an assessment.

20             MR. ANDERTON:  He also told you

21   that he didn't have any knowledge about the

22   operations before he got there.  You're asking

23   him -- you didn't ask him about before he got

24   there.

ROUGH - Paul Galea

Page 22

1          MR. MILLER:  I'm asking him what

2    his understanding was, what his mental

3    understanding was, before he got there and I'm

4    entitled to that.

5          MR. ANDERTON:  All right.  Then I

6    would ask you to make sure that that aspect is

7    incorporated in your question because it wasn't

8    as you phrased it then.

9          MR. MILLER:  All right.  I'll

10   rephrase it.

11         MR. ANDERTON:  Okay.

12   BY MR. MILLER:

13     Q.    What was your mental

14   understanding of the status of the GMP

15   protocol procedures at Actavis Totowa

16   prior to your arrival in October of 2007?

17     A.    I had no real understanding of

18   what I was going to be assessing.

19     Q.    Did you have a mental

20   understanding prior to October of 2007 of

21   things are going really good, I'm going

22   there to learn how to do GMP right?

23     A.    As I already said, I had no

24   understanding of the company before the

ROUGH - Paul Galea

Page 23

1    time I went there.

2        Q.    How long did your GMP

3    assessment last after your arrival?  How

4    long did you continue in that role?

5        A.    I was there from the initial

6    visit was from the second of February, I

7    think, to around about the 9th.  A week in

8    total.

9        Q.    So you continued an assessment

10   from October of '07 until February of '09.

11       A.    No.  No.  That is incorrect.

12   What I am saying is my initial assessment

13   was February 2nd, 2007, until February

14   9th, around about, 2007.

15       Q.    Okay.  Well, I'm sorry.  I

16   thought you originally arrived 25 October,

17   2007.

18       A.    No.  My answer to your question

19   was, I started as an employee to Actavis

20   Totowa on the 21st of October 2007.  My

21   first visit was in February of 2007.

22       Q.    And that visit for for roughly

23   a week.

24       A.    Around about.

ROUGH - Paul Galea

Page 24

1      Q.     And was that strictly for

2   assessment or was that for the

3   harmonization of the company as well?

4      A.     It was for the assessment.

5      Q.     Assessment.

6             Did you make any other visits to

7   Totowa prior to you permanently coming here in

8   12th October of 2007?

9      A.     Yes, I did.

10     Q.     And when were the other visits?

11     A.     Roughly, I can say that one was

12   in March.

13     Q.     Of '07.

14     A.     Of '07.  I believe one was

15   around about the end of May.  Another

16   visit was around about June to July.  And

17   I believe the final visit was sometime in

18   August.

19     Q.     And were each of these as well

20   for the purpose of assessment of the GMP

21   program?

22     A.     Not really.  The initial visit

23   was more of an assessment.  Subsequently

24   it was also more to look at harmonization.

ROUGH - Paul Galea

Page 25

1     Q.     So the March -- March visit you

2   agree was assessment and harmonization?

3     A.     Yeah.  They -- they rolled over

4   into each other more or less.

5     Q.     Okay.  And you say that's true

6   for all, the March, the May, the June and

7   the August?

8     A.     I wouldn't say assessments.  I

9   would say more leaning towards

10  harmonization.

11    Q.     Who was it in the company, in

12  Actavis, either in Malta or here in the

13  United States or anywhere else, that gave

14  you the orders or sent you to Actavis

15  Totowa for this assessment?

16    A.     The head of quality for Actavis

17  Group contacted me.

18    Q.     And he contacted you prior to

19  your first visit in February of 2007?

20    A.     She.

21    Q.     She.  What was her title?  I'm

22  sorry.  What was her name?

23    A.     Gudrun.

24    Q.     Could you spell that?

ROUGH - Paul Galea

Page 26

```
 1       A.    G-U-D-R-U-N, Eyolfsdottir.  So
 2    E-Y-O-L-F-S-D-O-T-T-I-R.
 3       Q.    Now, would her office be in --
 4    in Iceland?
 5       A.    Yes.
 6       Q.    And did she communicate with
 7    you by phone or letter or E-mail or some
 8    other way in order to give you
 9    instructions for this trip?
10       A.    Phone.
11       Q.    Phone?  And what did she inform
12    you on that phone call that your mission
13    was going to be on your trip?
14             MR. ANDERTON:  Objection.
15             You may answer.
16             THE WITNESS:  She asked me if I
17    would be willing to go over to the U.S. to make
18    an assessment of Actavis Totowa, L.L.C.
19    BY MR. MILLER:
20       Q.    And did she indicate one way or
21    the other what she thought you were going
22    to find when you arrived?
23             MR. ANDERTON:  Objection.
24             You may answer.
```

ROUGH - Paul Galea

```
 1              THE WITNESS:  No.
 2    BY MR. MILLER:
 3        Q.    Was any communication between
 4    you and her done in -- in -- via E-mail or
 5    writing or any other form?
 6        A.    We communicated by phone.
 7        Q.    Did you communicate with Scott
 8    Talbot prior to your arrival?
 9        A.    No.
10        Q.    Once the assessment took place,
11    was there communication between you and
12    Gudrun or Scott Talbot or anyone else
13    regarding the assessment via E-mail or
14    letter?
15        A.    Yes, I believe there was.
16        Q.    There was which?  E-mail or
17    letter or both?
18        A.    E-mail.
19        Q.    How often would you E-mail back
20    and forth with Mrs. Gudrun or Scott --
21    Scott Talbot?
22        A.    Cannot recall.
23        Q.    Once a week?  Twice a week?
24        A.    Probably more on a monthly
```

ROUGH - Paul Galea

Page 28

1    basis, I would say.

2       Q.   Was there any report associated

3    with the E-mails?  Like this is the

4    monthly assessment report?  Was there

5    anything that -- that you kept, a diary, a

6    log, an Excel spreadsheet regarding your

7    assessment?

8       A.   I believe I sent one report

9    alone.

10      Q.   Do you recall when that report

11   was?

12      A.   Probably sometime in -- after

13   the February visit.

14      Q.   And would you have sent that to

15   Mr. Talbot?

16      A.   No.

17      Q.   You sent that directly to

18   Mrs. I guess her first name is Gudrun; is

19   that right?

20      A.   I probably sent it to the q.s.

21   D department.  It's the quality systems

22   department, which takes care of internal

23   audits for the group.

24      Q.   And if you would have E-mailed

ROUGH - Paul Galea

Page 29

```
 1    that report, would it have been an
 2    attachment to the QSD?
 3         A.    Typically, yes.
 4         Q.    And who specifically would you
 5    have written that report to?  Do you
 6    recall?
 7         A.    Specifically, I cannot recall
 8    to whom.
 9         Q.    Would it have been who was in
10    charge of the QSD at that time?
11         A.    Most probably, yes.
12         Q.    But you do agree that there was
13    also E-mail communication between yourself
14    and -- and Gudrun following your -- your
15    assessment or during your assessment?
16         A.    I believe most of the
17    conversations were phone conversations.
18         Q.    But do you recall ever sending
19    Gudrun an E-mail?
20         A.    I cannot exclude it.  On the
21    top of my head, I cannot say yes or no
22    but...
23         Q.    How did the makeup of the
24    assessment change?  You indicated that it
```

ROUGH - Paul Galea

Page 35

1    assessment.

2              MR. MILLER:  Okay.

3    BY MR. MILLER:

4        Q.    That tailing end, did you share

5    any of the information you obtained in the

6    tailing end of the assessment in the March

7    visit with anyone?

8        A.    Not that I recall.

9        Q.    Did your report following the

10   February visit give any recommendations to

11   the company of what you thought needed to

12   be done with the GMP program at Actavis --

13              MR. ANDERTON:  Objection.

14   BY MR. MILLER:

15       Q.    -- Totowa?

16              MR. ANDERTON:  Objection.

17              I instruct the witness to answer

18   without revealing any of the substance of the

19   report?

20              THE WITNESS:  Yes.  There were

21   recommendations.

22   BY MR. MILLER:

23       Q.    Do you recall how many

24   recommendations?

ROUGH - Paul Galea

Page 36

1              MR. ANDERTON:  Objection.

2              I instruct the witness not to

3       answer.

4              MR. MILLER:  How many?  I'm not

5       getting into the specifics of what they are, I'm

6       looking --

7              MR. ANDERTON:  That's -- that's

8       substantive content.

9              MR. BLIZZARD:  Let me state for the

10      record, however, that we believe we're entitled

11      to all of it.  We may be carving around your

12      claimed privilege but we're entitled to this, in

13      our view so we'll be back after we talk to the

14      judge about it.

15             MR. ANDERTON:  Your objection is

16      noted.  I mean, there's -- in the MDL certainly

17      there is a clear order -- first of all, there's

18      the privilege issue protecting this

19      information.  Second of all, in the MDL there's

20      a clear order protecting information relating to

21      drugs other than Digitek.  We believe Mr. Miller

22      identifying himself as a representative of the

23      Pennsylvania litigants while also occupying a

24      seat on the PSC is a clear and direct effort to

Page 37

1    circumvent his obligations as a member of the

2    PSC.  We think it's inappropriate.  We'll

3    tolerate it because at the end of the day he's

4    going to have his right to question the witness

5    anyway and we can't stop that from happening but

6    we think it's a clear breach of your duties as a

7    member of the PSC and an effort to get around

8    the coordination and cooperation provisions

9    imposed on you under PTO 22 and the other MDL

10   PTO orders so, you know, we're asserting our

11   privilege, Mr. Blizzard.  We appreciate your

12   comments but...

13              MR. BLIZZARD:  Well, I just want to

14   make clear that we believe we're entitled to the

15   assessment that was done by this witness.

16   Furthermore, we'd say that the -- the PTO that

17   relates to the order of questioning says that if

18   the -- if the questioning order cannot be agreed

19   upon between the states and the MDL, then this

20   order of questioning shall apply.  Mr. Miller

21   and I have agreed that he would go first in this

22   deposition, I'm going to go first in tomorrow's

23   deposition so it's a sharing that's agreed upon

24   by counsel who represent the states and counsel

ROUGH - Paul Galea

Page 38

1   for the MDL.

2              Secondly, we don't think that there

3   is a clear order that says we can't ask

4   questions that may relate to other drugs.  There

5   is an order but the order pertains to whether

6   you've had to produce documents and it was an

7   essential part of your argument there and is

8   reflected in the order that you would have to

9   spend millions of dollars producing he's

10  documents regarding other drugs so the judge did

11  a balancing sort of assessment of whether or not

12  it was required that you produce those

13  documents.  It did not pertain to questioning of

14  the witnesses and a balancing of the interest

15  here we believe would balance in favor of being

16  able to ask these questions so that's our view.

17              MR. ANDERTON:  And I appreciate --

18              MR. BLIZZARD:  And that view will

19  be expressed to the Court.

20              MR. ANDERTON:  And I appreciate

21  that.  And your characterization of the language

22  of PTO 27 and its limit -- and characterizing it

23  as being limited to the documents and not

24  extending to questioning of witnesses is -- is

ROUGH - Paul Galea

Page 39

1    inconsistent and contrary to our view. The

2    language is clear on its face. Magistrate Judge

3    Stanley very clearly and very expressly

4    characterized her ruling of an expansion of the

5    scope of discovery. A limited expansion of the

6    scope of discovery. And obviously, questioning

7    the witnesses at a deposition constitutes

8    matters that fall within the scope of

9    discovery. So PTO 27 and its corresponding PTO

10   30 or PTO 37. Judge Goodwin affirming the

11   magistrate's ruling clearly set the boundaries

12   of the scope of discovery in the litigation with

13   respect to information relating to other drugs

14   other than digital. We're going to continue to

15   take that position. We appreciate your position

16   and the issue is our mind has been resolved in

17   the MDL. There's a motion pending in the

18   Pennsylvania litigation. That will resolve as

19   it is resolved and we'll go forward from there.

20            MR. BLIZZARD: Okay. Well, in our

21   view, you're obstructing discovery. It's clear

22   from the record today. We're asking about GMP

23   and not about other drugs and you're instructing

24   the witness not to answer questions clearly

ROUGH - Paul Galea

Page 40

1    about GMPs that also apply to the manufacture of

2    Digitek.

3               MR. ANDERTON:  I'm instructing the

4    witness not to answer the substance of an

5    analysis that falls under a privilege protecting

6    that information.

7               MR. BLIZZARD:  I've never heard of

8    the privilege before but perhaps you'll

9    enlighten us later.

10              MR. ANDERTON:  Ready, Mr. Miller?

11              MR. MILLER:  I am ready.

12   BY MR. MILLER:

13      Q.    Now I want to talk to your

14   second function and your trips in 2007 to

15   Actavis Totowa, harmonization.  Explain

16   what that means to you.  What was your

17   goal there?

18      A.    Okay.  As the word is a bit of

19   a fancy word but basically, a

20   harmonization is to look at the various

21   companies and see that they are working

22   under the same umbrella.  When you have a

23   big corporation, it's something that you

24   typically would like to do.

ROUGH - Paul Galea

Page 43

1        A.      I would say no.

2        Q.      Were you ever asked to produce

3    that as part of this case?

4               MR. ANDERTON:  Objection.

5               You may answer.

6               THE WITNESS:  No.

7    BY MR. MILLER:

8        Q.      When was the decision made that

9    you would come here permanently in October

10   by continuing your visits that had been

11   done earlier in 2007?

12              MR. ANDERTON:  Objection.

13              You may answer.

14              THE WITNESS:  I believe the -- the

15   actual decision was made around about September

16   of 2007.

17   BY MR. MILLER:

18       Q.      And what was your title when

19   you arrived 21 October, 2007?

20       A.      Quality systems director.

21       Q.      What is the job function of a

22   quality systems director?

23       A.      I can answer what my job

24   functions were because different companies

ROUGH - Paul Galea

1              THE WITNESS:  The discussion was,

2     if I can recollect, looking at the general

3     systems.

4     BY MR. MILLER:

5         Q.    At the general systems.  So

6     there -- you -- even when you were doing

7     your assessment roughly the same time as

8     this letter came out, you -- you were

9     never given any instruction or guidance to

10    look at GMP as it pertained to any

11    particular products that were being made.

12    Is that correct?

13              MR. ANDERTON:  Objection.

14              You may answer.

15              THE WITNESS:  No.

16    BY MR. MILLER:

17        Q.    And in fact, the GMP at Actavis

18    Totowa, the procedures of GMP as used by

19    the quality group pertained to all drugs,

20    all products that were manufactured.

21              MR. ANDERTON:  Objection.

22              You may answer.

23              THE WITNESS:  Procedures are not

24    product specific.  Procedures tell you how to

ROUGH - Paul Galea

Page 84

1    perform an operation.

2    BY MR. MILLER:

3        Q.    They're -- they're not product

4    specific, therefore, they -- they apply to

5    -- to all products.

6        A.    Procedures do not necessarily

7    apply to a product.

8        Q.    Okay.  Well, my question is,

9    you agree that -- that Actavis had issues

10   with their enforcement or -- or use of GMP

11   in the quality group in 2007.

12              MR. ANDERTON:  Objection.

13              That's not your question and that

14   mischaracterizes his testimony.

15              MR. MILLER:  It's okay to answer?

16              THE WITNESS:  Can you rephrase that

17   for me?

18              MR. MILLER:  Certainly.

19   BY MR. MILLER:

20       Q.    There were issues in the

21   quality group of Actavis Totowa in 2007

22   regarding their use of GMP.

23              MR. ANDERTON:  Objection.

24              MR. MILLER:  It's okay to answer.

ROUGH - Paul Galea

Page 148

```
 1      Q.    When?
 2      A.    Over the course of last week
 3   and this week.
 4      Q.    On how many different days?
 5      A.    Two days.
 6      Q.    How many hours per day?
 7      A.    One day four or five hours.
 8   The other day, a couple of hours.
 9      Q.    Were you shown any documents
10   that you might be asked about in the
11   deposition?
12      A.    No.
13      Q.    Okay.  Now, you're not from the
14   United States, you're from Malta; correct?
15      A.    Yes.
16      Q.    And had -- had you ever -- had
17   you visited the United States before
18   February of 2007?
19      A.    No.
20      Q.    And what was your job before
21   you came to the United States for Actavis?
22      A.    I was QA manager at Actavis,
23   Limited.
24      Q.    And Actavis, Limited, was their
```

ROUGH - Paul Galea

Page 149

1    headquarters in Malta?

2        A.    It is a subsidiary of the

3    headquarters in Iceland.

4        Q.    Okay.  So the group that you

5    worked for in Malta was a subsidiary of

6    the headquarters of Actavis, which is

7    located in Iceland; right?

8        A.    That is correct.

9        Q.    And you were the QA manager?

10       A.    Yes.

11       Q.    And was there anybody in the

12   Malta operation that you reported to in

13   quality?

14       A.    Yes.

15       Q.    Who was that?

16       A.    Mr. Joseph Bondin.

17       Q.    How do you spell that?

18       A.    That's J-O-S-E-P-H, Joseph, and

19   Bondin is B-O-N-D-I-N.

20       Q.    And what was his position?

21       A.    He was QA manager for the

22   division.

23       Q.    And who did he report to?

24       A.    At the group level he reports

ROUGH - Paul Galea

Page 150

1    to Gudrun Eyolfsdottir.

2        Q.    Okay.  So he reports to the

3    person in Iceland who's in charge of

4    quality for the entire organization?

5        A.    Within quality he reports to

6    Gudrun.

7        Q.    Okay.  Now, when did you first

8    find out that you were going to the United

9    States?

10       A.    Around about the end of

11   December of 2006.

12       Q.    Okay.  And you -- you testified

13   about some of this earlier but I want to

14   make sure I'm clear on it.  How were you

15   notified that you were going to the United

16   States?

17       A.    I was asked if I was willing to

18   go and make an assessment at Actavis

19   Totowa, L.L.C.

20       Q.    And who asked you that?

21       A.    Gudrun Eyolfsdottir.

22       Q.    Okay.  So is it -- am I

23   understanding correctly that you received

24   a phone call from Gudrun asking you to do

ROUGH - Paul Galea

Page 154

1      A.    I would say Scott Talbot, Dan

2  Bitler, Jasmine Shah, Elina Novikov,

3  that's what I would say.

4      Q.    Okay.  Was there a VP of

5  Actavis that was located in the United

6  States in charge of quality?

7              MR. ANDERTON:  Objection.

8              You may answer.

9  BY MR. BLIZZARD:

10     Q.    During the time frame that you

11  first came to the United States in, as you

12  said, early of 2007, was there a VP of

13  quality located here in the United States?

14     A.    Yes.

15     Q.    Who was that VP of quality?

16     A.    Nasrat Hakim.

17     Q.    I'm sorry.  You're going to

18  have to spell that one for me.

19     A.    N-A-S-R-A-T, that's the name.

20  Surname is Hakim, H-A-K-I-M.

21     Q.    Okay.  Now, do you know why you

22  were assigned the responsibility of doing

23  this assessment, this assessment of

24  whether the company was in compliance with

Page 155

1    GMPs rather than Scott Talbot, Dan Bitler,

2    Jasmine Shah, Elina Novikov or Nasrat

3    Hakim?

4              MR. ANDERTON:  Objection;

5    mischaracterizes his testimony.

6              You may answer.

7              THE WITNESS:  I was assigned to do

8    this assessment because I am a corporate or at

9    least I was at the time a corporate auditor for

10   the Actavis Group.

11             MR. BLIZZARD:  Corporate auditor.

12   Okay.

13   BY MR. BLIZZARD:

14   Q.   So who -- by the way, who were

15   you employed by as of the time you were

16   doing this assessment?

17   A.   Actavis, Limited.

18   Q.   Okay.  And that was a separate

19   corporation from Actavis Totowa; correct?

20   A.   Yes.

21   Q.   So you were doing sort of an

22   outside audit of Actavis Totowa, weren't

23   you?

24   A.   Yes.

ROUGH - Paul Galea

Page 158

1      Q.    After -- was there anybody at

2    all who had the function -- same function

3    as your job responsibilities prior to the

4    time you came here?

5      A.    That's a bad question.  Let me

6    ask it a different way.  I think I already

7    have so I'll -- I'll move on to something

8    else.

9            Now, you've talked about GMPs.

10   That's an acronym.  Do you know what an acronym

11   is?

12     A.    Yes.

13     Q.    What is -- what is it an

14   acronym for?

15     A.    Good manufacturing practice.

16     Q.    And what are good manufacturing

17   practices?

18            MR. ANDERTON:  Objection.

19            You may answer,

20            THE WITNESS:  There's a long list.

21            MR. BLIZZARD:  Okay.

22   BY MR. BLIZZARD:

23     Q.    I'm not asking you to list

24   them.  I'm asking you to generally

ROUGH - Paul Galea

Page 159

1    describe so that the jury understands what

2    they are, what are good manufacturing

3    practices?

4        A.    Okay.  They're a set of rules

5    and guidances which direct you in the

6    manufacturing and packaging and testing of

7    your product.

8        Q.    And what is the purpose of

9    these rules and guidances?

10              MR. ANDERTON:  Objection; asked and

11   answered.

12              You may answer.

13              THE WITNESS:  The objective is to

14   manufacture a tablet which is good for human

15   use.

16              MR. BLIZZARD:  Okay.

17   BY MR. BLIZZARD:

18       Q.    So is it part of the good

19   manufacturing practices to assure safety?

20       A.    Yes.

21       Q.    Is it also part of good

22   manufacturing practices to assure that the

23   pills have the appropriate identity,

24   strength and quality and purity?

ROUGH - Paul Galea

Page 160

```
 1               MR. ANDERTON:  Objection.
 2               You may answer.
 3               THE WITNESS:  Yes.
 4   BY MR. BLIZZARD:
 5       Q.    Is it the standard of care
 6   within the manufacturing of
 7   pharmaceuticals industry to follow good
 8   manufacturing practices?
 9               MR. ANDERTON:  Objection.
10               You may answer,
11               THE WITNESS:  Yes.
12   BY MR. BLIZZARD:
13       Q.    And if a company fails to
14   follow good manufacturing practices, is it
15   in violation of the standard of care?
16               MR. ANDERTON:  Objection.
17               You may answer.
18               THE WITNESS:  Yes.
19   BY MR. BLIZZARD:
20       Q.    Now, you've also mentioned
21   another term earlier today called SOPs and
22   we use that a lot as shorthand and I want
23   to make sure the jury understands what an
24   SOP is.  So could you explain what an SOP
```

ROUGH - Paul Galea

Page 171

1    involved in the quality system improvement

2    plan?

3        A.    Right now I have been given

4    that task under my group and that's been

5    for five months, I would say.

6        Q.    Okay.  So you've only been

7    involved since 2009; correct?

8        A.    Yes.  Directly.

9        Q.    Well, were you involved

10   indirectly before that?

11       A.    Yes.

12       Q.    When were you first involved

13   indirectly?

14       A.    After I was hired in 2007.

15       Q.    And when was that?  Exactly you

16   mean after you were hired in October of

17   2007?

18       A.    Yes.

19       Q.    Okay.  So you became a

20   full-time employee of Actavis Totowa in

21   October of 2007; correct?

22       A.    Yes.

23       Q.    Before that you were employed

24   by a separate corporation called Actavis,

ROUGH - Paul Galea

Page 172

1    Limited; correct?

2         A.    Yes.

3         Q.    And it was only after October

4    of 2007 that you came indirectly involved

5    with the quality systems improvement plan;

6    correct?

7         A.    Yes.

8         Q.    And what was your indirect

9    involvement?

10        A.    The quality systems improvement

11   plan as it stands is to create actions for

12   improvement or -- or tasks.  So I was

13   given tasks on occasion which my

14   department had to fulfill.

15        Q.    Have you ever heard of the

16   phrase if it ain't broke, don't fix it?

17        A.    In America, I've heard that.

18        Q.    Okay.  So was there -- was the

19   quality system broken before this quality

20   system improvement plan was instituted?

21              MR. ANDERTON:  Objection.

22              You may answer.

23              THE WITNESS:  I cannot say that.

24              MR. BLIZZARD:  Let me hand you what

ROUGH - Paul Galea

Page 182

1    plan and a quality -- quality systems

2    improvement plan, both are intended to

3    address deficiencies in the quality

4    department, are they not?

5        A.    No, that is not correct.

6        Q.    Okay.  They're both intended to

7    address deficiencies in the company;

8    correct?

9             MR. ANDERTON:  Objection.

10            THE WITNESS:  That is not correct.

11            MR. BLIZZARD:  Okay.

12   BY MR. BLIZZARD:

13       Q.    So are corrective action plans

14   part of the routine business of the

15   company?

16       A.    Yes.

17       Q.    And is it also a routine part

18   of the company business to do assessments

19   of the company's compliance with GMPs?

20       A.    Yes.

21       Q.    And when you do a assessment of

22   the company's compliance with GMPs, you're

23   not necessarily being critical of every

24   aspect of the company's operations, are

ROUGH - Paul Galea

Page 184

1    BY MR. BLIZZARD:

2        Q.    Would you characterize your

3    assessment that you did beginning in

4    February of 2007 to be purely subjective

5    evaluation or more of a factually

6    objective assessment whether the company

7    was in compliance with GMPs?

8                MR. ANDERTON:  Objection.

9                I'm going to instruct the witness

10   not to answer.

11   BY MR. BLIZZARD:

12       Q.    Now, well, this -- this

13   question clearly is designed to -- to

14   determine whether or not this claimed

15   privilege you're asserting is a viable

16   privilege so --

17               MR. ANDERTON:  In a the privilege

18   you're E.

19               MR. BLIZZARD:  You're not

20   instructing -- the privilege has been rejected

21   by most jurisdictions, as I understand it, in

22   the quick review that we've done, including the

23   State of Pennsylvania, who has specifically

24   rejected it.

ROUGH - Paul Galea

Page 185

1           MR. ANDERTON:  I'm sorry.  Are you

2    --

3           MR. BLIZZARD:  Yes, I'm saying that

4    the privilege in this case does not exist and

5    I'm just exploring with the witness at this

6    point in time whether or not this was a self

7    critical subjective analysis.

8           MR. ANDERTON:  Well, and in

9    response to your speech, I want to clarify a few

10   points just so that we're clear.  Is this the

11   same privilege you claimed earlier on the record

12   you had never heard of before.

13          MR. BLIZZARD:  Yes, it is.

14          MR. ANDERTON:  First time today

15   you'd heard of it?

16          MR. BLIZZARD:  Correct.  I've never

17   seen it asserted in any single case that I've

18   handled before and I've handled a few.

19          MR. ANDERTON:  You mentioned the

20   viability of this privilege in Pennsylvania.  If

21   I understand correctly, Mr. Blizzard, you're

22   conducting your examination under the auspices

23   of the PSC in the MDL; correct.

24          MR. BLIZZARD:  I am -- I am

ROUGH - Paul Galea

Page 186

1    conducting this examination as a lawyer on

2    behalf of my client and I happen to be a PSC

3    member so yes, I am acting on behalf of the PSC

4    here, as I am on behalf of my client.

5              MR. ANDERTON:  So that we're clear,

6    however, you're not conducting any examination

7    with respect to any cases pending in the

8    Pennsylvania litigation; correct.

9              MR. BLIZZARD:  True, true.

10             MR. ANDERTON:  Is that accurate?

11             MR. BLIZZARD:  True.  Although this

12   deposition may be utilized in that jurisdiction.

13             MR. ANDERTON:  But your examination

14   is not being conducted in the context of the

15   Pennsylvania -- you guys are making a --

16             MR. BLIZZARD:  I'm not here to be

17   cross-examined.  I'm telling you that I'm a

18   lawyer here asking questions and I am a PSC

19   representative here today and I also represent

20   my client and none of my clients have cases

21   pending in Pennsylvania.

22             MR. ANDERTON:  Okay.  So you're not

23   --

24             MR. BLIZZARD:  Do not ask me

ROUGH - Paul Galea

Page 187

1   another question because I'm not answering your

2   specific question.

3              MR. ANDERTON:  You may choose not

4   to answer it but I'm going to make my record,

5   okay?  Because you guys are making a big deal

6   out of whose wearing what has and which order

7   may or may not apply and we are certainly

8   entitled to be clear on the record where you're

9   asking questions, from the platform from which

10  you're asking questions and conducting your

11  examination.  So to be clear, if you choose not

12  to answer, then the record will stand as is,

13  it's true that you're not asking questions in

14  the context of the Pennsylvania litigation;

15  correct?

16             MR. BLIZZARD:  I've made myself

17  clear.  I am here on behalf of my clients, none

18  of whom have cases pending in Pennsylvania and I

19  am here as a member of the PSC to ask questions.

20             MR. ANDERTON:  Okay.

21             MR. BLIZZARD:  All right.  So your

22  -- your instruction for him to not answer the

23  last question remains?  I don't have to re-ask

24  it?

ROUGH - Paul Galea

Page 188

1              MR. ANDERTON:  Can you read that

2      back, please.

3              (The court reporter read the

4      requested portion of the record.)

5              MR. ANDERTON:  My instruction

6      stands.

7              MR. BLIZZARD:  Okay.

8      BY MR. BLIZZARD:

9      Q.    Now, let's talk about this

10     document that has been marked as Exhibit

11     64.

12              Were there other assignments that

13     were made to you for the QSIP that are listed on

14     this document?

15     A.    I see four to my name and three

16     in conjunction with another department.

17     Q.    Okay.  And are these accurate?

18     A.    What do you understand by

19     accurate?

20     Q.    You don't understand the word

21     "accurate"?

22     A.    I understand the word

23     "accurate."

24              MR. ANDERTON:  Objection.

ROUGH - Paul Galea

Page 194

1    this document?

2         A.    In respect to 13.1?

3         Q.    Yes.  Was that part of the

4    assessment?

5         A.    Part of it would have been

6    there.

7         Q.    Yes.  And if you look a couple

8    spaces down is there another listing of an

9    assessment and mod complaint system.  Do

10   you see that?

11        A.    One second.  Yes.

12        Q.    Was that part of the report

13   that you sent to the QSD?

14             MR. ANDERTON:  Objection.

15             I'm going to instruct the witness

16   not to answer.

17             MR. BLIZZARD:  Okay.

18   BY MR. BLIZZARD:

19        Q.    Look at the next or skip a

20   line, another one down there is also

21   assigned to you.  It says assess and mod

22   returned goods and recall system.  Do you

23   see that?

24        A.    Yes.

ROUGH - Paul Galea

Page 195

1        Q.    Was that part of your
2    assignment?
3                MR. ANDERTON:  Objection.
4                I instruct the witness not to
5    answer.
6    BY MR. BLIZZARD:
7        Q.    Was it part of the deliverables
8    that you were given under the QSIP?
9        A.    Yes.
10       Q.    When did you start working on
11   that?
12       A.    On which one of the?
13       Q.    The one that says assess and
14   mod returned goods and recall system.
15       A.    I do not remember when I
16   started working on that.
17       Q.    Do you see a few lines down
18   that you were also assigned assess and mod
19   internal audit system?  That was, you were
20   assigned that along with Eng; correct?
21       A.    Yes.
22       Q.    What's Eng's first name?
23       A.    Wanda.
24       Q.    And when did you first start

ROUGH - Paul Galea

Page 207

1    understand here is that a list needs to be
2    provided biweekly for any CAPAs that are open.
3              MR. BLIZZARD:  Okay.
4    BY MR. BLIZZARD:
5         Q.    And it says CAPA database can
6    be assessed now, accessed now to everyone;
7    correct?
8         A.    That's what the document reads.
9         Q.    Okay.  And who is everyone that
10   can access the CAPA database?
11        A.    I do not know.
12        Q.    Okay.  Do you know if any of
13   this information was provided to FDA?
14        A.    I do not know.
15        Q.    Do you know if any of these
16   assessments that you were working on were
17   provided to Mylan?
18             MR. ANDERTON:  Objection.
19             I'm going to -- let me think.  You
20   may answer the question but I instruct you not
21   to reveal any of the contents of your report or
22   the assessment that we've heard testimony about
23   here today.
24             THE WITNESS:  I do not know.

ROUGH - Paul Galea

Page 217

1    about it?

2         A.    Not specifically.

3         Q.    Did you take any notes?

4         A.    I do not remember taking notes.

5         Q.    Did you try to commit to memory

6    everything that he told you?

7         A.    I cannot say that.

8         Q.    What was the reason he told you

9    about the contents of the warning letter?

10             MR. ANDERTON:  Objection.

11             You may answer.

12             THE WITNESS:  The reason is in the

13   normal course of work.

14             MR. BLIZZARD:  Okay.

15   BY MR. BLIZZARD:

16        Q.    So, so that I'm understanding,

17   you were not told about the contents of

18   the warning letter as part of your

19   assignment to assess and harmonize.  You

20   were instead told about this in the

21   ordinary course of your work as an

22   employee of Actavis Totowa.

23             MR. ANDERTON:  Objection.

24             I instruct you to answer without

ROUGH - Paul Galea

Page 218

1    revealing any of the contents of your

2    assessment.

3              THE WITNESS:  Yes.

4              MR. BLIZZARD:  Okay.  I'm not sure

5    I have a clear answer.

6    BY MR. BLIZZARD:

7         Q.   Yes, you were told this by

8    Mr. Talbot after you started work in the

9    regular course of your business for

10   Actavis Totowa.

11        A.   That is correct.

12        Q.   Okay.  So it wasn't part of the

13   assessment process; correct?

14        A.   No.

15        Q.   Now we have a double negative.

16   Was it a part of the assessment process?

17        A.   No.

18        Q.   Now, I'm going to show you what

19   I'm going to mark as Exhibit 68 to your

20   deposition?

21              (Exhibit [xx] was marked for

22   identification.) 68.)

23              MR. ANDERTON:  Has this been

24   previously marked?