Page 1

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                    CHARLESTON DIVISION

3
    IN RE:  DIGITEK PRODUCT LIABILITY LITIGATION
4                    MDL NO. 1968

5   CARLA YORK, ET AL.,              )

6           PLAINTIFFS,              )

7   V.                              ) MDL NO.
                                      2:09-CV-00544
8   ACTAVIS TOTOWA, LLC, ET AL.,    )

9           DEFENDANTS.              )

10

11

12

13

14

15       DEPOSITION OF ████████████ PRODUCED, SWORN

16  AND EXAMINED ON THE 11TH DAY OF DECEMBER, 2009,

17  BETWEEN THE HOURS OF 9:00 A.M. AND 11:59 A.M., AT

18  THE OFFICES OF DINSMORE & SHOHL, 500 WEST JEFFERSON

19  STREET, SUITE 1400, LOUISVILLE, JEFFERSON COUNTY,

20  KENTUCKY, BEFORE LISA MIGLIORE BLACK, CERTIFIED

21  COURT REPORTER--KENTUCKY AND NOTARY PUBLIC WITHIN

22  AND FOR THE STATE OF KENTUCKY.

23

24

25

**Amended Exh. K**

```
 1                    ***    ***    ***

 2                      APPEARANCES

 3

 4   FOR THE PLAINTIFFS:
     LAWRENCE L. JONES, II, ESQ.
 5   LAWRENCE JONES, II, ESQ.
     BAHE, COOK, CANTLEY & JONES
 6   KENTUCKY HOME LIFE BUILDING
     239 SOUTH FIFTH STREET
 7   SUITE 700
     LOUISVILLE, KENTUCKY  40202
 8
     FOR THE DEFENDANTS:
 9   HOLLY SMITH, ESQ.
     SHOOK, HARDY & BACON
10   2555 GRAND BOULEVARD
     KANSAS CITY, MISSOURI  64108
11   APPEARING VIA SPEAKERPHONE ON BEHALF OF MYLAN
     PHARMACEUTICALS INC., MYLAN BERTEK PHARMACEUTICALS
12   INC., AND UDL LABORATORIES

13   LESLIE E. CRISWELL, ESQ.
     TUCKER, ELLIS & WEST
14   515 SOUTH FLOWER STREET
     FORTY-SECOND FLOOR
15   LOS ANGELES, CALIFORNIA  90071
     APPEARING ON BEHALF OF ACTAVIS TOTOWA LLC, ACTAVIS
16   INC., AND ACTAVIS ELIZABETH LLC

17

18

19

20

21

22

23

24

25
```

```
 1                INDEX TO EXAMINATION

 2                                          PAGE

 3    EXAMINATION BY MS. CRISWELL            4

 4    EXAMINATION BY MS. SMITH              111

 5    EXAMINATION BY MS. CRISWELL           136

 6    CERTIFICATE                           144

 7

 8

 9                INDEX TO EXHIBITS

10    EXHIBIT 1, COMPLAINT                   64

11    EXHIBIT 2, PLAINTIFF FACT SHEET        84

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 8

```
 1   affirmatively.)

 2   BY MS. CRISWELL:

 3        Q.     Any reason we can't go ahead with your

 4   deposition today?

 5        A.     No.

 6        Q.     You're feeling good?

 7        A.     Yes.

 8        Q.     Okay.  All right.  So let me ask you --

 9   let me sort of get organized here.

10        Have you ever -- have you ever been a party to

11   a lawsuit before this case?

12        A.     No.

13        Q.     Okay.  So no one has never sued you, and

14   you've never sued anybody?

15        A.     No.

16        Q.     Okay.  Have you ever served on a jury?

17        A.     No.

18        Q.     Okay.  How did you learn about the

19   lawsuit or a lawsuit?

20        A.     Well, actually, I didn't.  When I got

21   the recall, I had a friend go online and see if

22   anybody was representing them after I went and got

23   all my mom's medical records.

24        Q.     Okay.  Let me ask you, did you get the

25   recall notice, or did your mom get it?
```

Page 10

1   never actually lived with my mother.

2        Q.     Okay.  All right. ███████ is your

3   mom?

4        A.     Yes.

5        Q.     Was your mom -- is your mom?

6        Was she your birth mother?

7        A.     Yes.

8        Q.     So you lived with her as a child?

9        A.     No.

10       Q.     No?

11       A.     My father raised me.

12       Q.     I see.

13       Okay.  And your dad's name is...

14       A.     ██████████

15       Q.     Okay.  So that's where the name ██████

16  came in?

17       A.     Exactly.

18       Q.     Okay.  I got it.

19       So you were raised by your dad all the way

20  until you were an adult and went on about your life?

21       A.     Yes.

22       Q.     Okay.  And is he still alive?

23       A.     No.

24       Q.     When did he pass?

25       A.     1997.

Page 11

```
 1        Q.      Okay.  Why did you never live with your
 2   mom?
 3        A.      I don't know.
 4        Q.      Was there ever any discussion about why
 5   you weren't living with her as a child?
 6        A.      I just know my daddy had custody of us
 7   because my grandmother was able to take care of us
 8   because my mom got a job, was working, and she
 9   couldn't.
10        Q.      You have a sister?
11        A.      Yes.
12        Q.      What is her name?
13        A.      ████████████████████████████
14        Q.      ████████████████████████████
15        A.      ████████████████████████████
16        Q.      Yeah.  Did she also live with you and
17   your dad --
18        A.      Yes.
19        Q.      -- and not with your mom?
20        A.      Right.
21        Q.      And was ████████████  her mom also?
22        A.      Yes.
23        Q.      So growing up, even though you were
24   living with your dad because your dad had custody,
25   did you see your mom?
```

Page 12

```
 1        A.      Oh, yes.
 2        Q.      Okay.  How often?
 3        A.      Every weekend.
 4        Q.      Okay.  During the last five years of her
 5    life, how often did you see her?
 6        A.      Quite often.  We became close.
 7        Q.      Okay.  When did you become close?
 8        A.      Probably when I was about 18, 19 years
 9    old.
10        Q.      Was there some event that happened that
11    caused that to occur or what?
12        A.      No.  We just -- I don't know.  I guess
13    it was like -- I don't know.  I really can't explain
14    that one.
15        Q.      Okay.  All right.  So -- and you're how
16    old now?
17        A.      ████
18        Q.      Okay.  So during the last -- let's talk
19    about the last 10 years of your mom's life.  How
20    often would you say you actually saw her?
21        A.      The last what?  Excuse me?
22        Q.      10 years.
23        A.      10 years?  Well, I called her every day,
24    but as far as seeing her, I would go up and see her
25    on weekends when I had a chance.
```

1        Q.      Okay.  How far away was her home from

2    yours?

3        A.      About a 45-minute drive.

4        Q.      Okay.  All right.  So it's not just

5    around the corner?

6        A.      Right.

7        Q.      Okay.  Well, let's talk about the last

8    five years of her life.

9        Can you give me an idea, then, as to how often

10   you actually saw her?

11       A.      Well, I would go up there on weekends

12   when I didn't have to work.  Or holidays, we all got

13   together and stuff.  I called her every day.

14       Q.      Okay.  Give me -- give me an average, if

15   you can -- if you can't, that's okay, but if you can

16   give me an average, in an average month, how often

17   would you see your mom in the last five years of her

18   life?

19       A.      Probably twice a month, except when she

20   started getting really sick, and then I was up there

21   a lot.

22       Q.      And at what point in time did she start

23   getting really sick?

24       A.      She got really bad -- in February

25   2007 --

Page 14

```
 1        Q.      Okay.
 2        A.      -- is when she really started going
 3   downhill.
 4        Q.      Okay.  So what was it about her physical
 5   condition or health that changed in about February
 6   of '07, did you say -- '06?
 7        A.      '07.
 8        Q.      '07.
 9        A.      She started getting -- she was weak and
10   tired all the time.  We couldn't get her to do
11   anything.  She didn't feel like doing anything.
12        Q.      And was that something that your mom
13   told you about or you noticed on your own or what?
14        A.      Well, it was pretty obvious, because
15   when I talked to her on the phone, she didn't want
16   to go nowhere.  She didn't want to do nothing.
17        "Well, you don't have to come up here and see
18   me."
19        "Well, I want to."
20        Q.      Okay.  So what was her health like prior
21   to that?
22        A.      Well, let's see.  She liked to go to
23   gambling boat.  She had a puppy that she played with
24   and took for walks.  She went out to eat breakfast
25   just about every morning by herself, and she liked
```

1      A.      I don't know.

2      Q.      Okay.  Do you have any photographs of

3  her?

4      A.      Yes.

5      Q.      Okay.  Was she overweight?  Was she

6  slim?  How would you characterize her during, let's

7  say, the '06, '07 time frame?

8      A.      Well, she wasn't what you call over

9  overweight.  She was a little overweight, I guess,

10 but for her age, I guess that's supposed to be

11 normal, but she wasn't obese or anything like that.

12     Q.      Okay.  How tall was she?

13     A.      5'4".

14     Q.      Okay.  Do you have any idea what she

15 weighed during 2006, 2007?

16     A.      The last time I remember her telling me

17 her weight, she said she weighed 165.

18     Q.      And about when was that?

19     A.      I don't know -- maybe five years ago.

20     Q.      All right.  You mentioned something a

21 minute ago.  Let me just circle back around.

22         You said -- I think you said that the doctors

23 weren't able to tell you what caused her to have her

24 strokes.  Did I get that right?

25     A.      Yes.

Page 34

```
 1        Q.     What doctors did you talk about -- talk
 2   to about that?
 3        A.     Dr. Gatewood.
 4        Q.     Gatewood.
 5        Okay.  And what kind of a doctor is
 6   Dr. Gatewood?
 7        A.     He was her family doctor.
 8        Q.     Is he a general practitioner?
 9        A.     Yes.
10        Q.     And when did you talk to him about what
11   had caused the strokes?
12        A.     Right after she had them.
13        Q.     Okay.  So each time?
14        A.     No.
15        Q.     How many strokes are we talking about?
16        A.     She had two, but we asked him after the
17   first one, and he told us that she was taking enough
18   blood thinner that she should not have had a stroke.
19        Q.     Okay.  And "you" meaning you and your
20   sister?
21        A.     Yes.
22        Q.     Anybody else involved in that
23   conversation?
24        A.     No.
25        Q.     Okay.  So after the first stroke -- do
```

Page 43

```
 1    back to you get the recall letter, and then you go
 2    get all of the medical records that you told me
 3    about.  You talked to your sister about medications
 4    that she had removed from the home -- your mom's
 5    home, and you went and retrieved all the
 6    prescription medications.
 7         A.    Yes.
 8         Q.    When did you first consider a lawsuit?
 9         A.    When I got the recall, it got me to
10    thinking about what the doctors had said about there
11    was no reason for her to have had a stroke, and the
12    only explanation they could give us was medications
13    interacting.
14         Q.    Okay.  Now, did you talk with more than
15    just Dr. Gatewood about this?
16         A.    No.
17         Q.    So when you said, "the only explanation
18    they could give us," the "they" is just
19    Dr. Gatewood?
20         A.    Right.
21         Q.    Did you talk with her cardiologist ever
22    about what was causing her health problems?
23         A.    Yes.
24         Q.    What did he say?
25         A.    Well, we originally had tried to get her
```

Page 44

1    off of that at one point in time because it had made

2    her sick, and therefore we did not get along with

3    him well at all.

4         Q.    You tried to get her off of what?

5         A.    Digitek.

6         Q.    When did you do that?

7         A.    I don't remember now.  I went in there

8    with my sister that day because Mom had been getting

9    really nauseous and sick, and we thought that new

10   pill might have had something to do with it, and I

11   know that they did take her off of it for a while.

12        Q.    Give me a time frame, though.  Are we

13   talking about the year that she died --

14        A.    Yes.

15        Q.    -- or are we talking about the three

16   years before?  What are we doing here?

17        A.    The year she died.

18        Q.    Okay.  Where in the year was it that you

19   and your sister went to talk to your mom's

20   cardiologist?

21        A.    I don't know exactly.

22        Q.    Can you give me some idea as to when you

23   had this conversation with respect to when she had

24   her first stroke?

25        A.    At least a month before she had the

Page 45

1    stroke.

2        Q.      Okay.  So she has the stroke in April --

3    April 23, '07, and then we're talking about --

4        A.      It was either February or March, it

5    would have had to have been.

6        Q.      Okay.  And where did you have that

7    conversation?

8        A.      When we took her in for her checkup.

9        Q.      And which cardiologist did you talk to?

10       A.      Dr. Bruce Fisher.

11       Q.      Fisher.

12   Okay.  So tell me everything you can remember

13   about that conversation.

14       A.      Well, my sister kept trying to explain

15   to him that the medicine that he was giving Mom was

16   making her sick and that she needed something

17   besides that because that wasn't working.  So he

18   kind of argued with us for a little bit, and then he

19   says -- then he more or less took her off it after

20   that.

21       Q.      And which medication are we talking

22   about?

23       A.      Digitek.

24       Q.      Did you see anything in the medical

25   records to indicate that your mom was taking Digitek

1    Dr. Gatewood?

2         A.    Yes.

3         Q.    And Dr. Gatewood said, "I don't know

4    what caused the stroke"?

5         A.    Yes.

6         Q.    And what else did he say?

7         A.    That's all he said.  He just -- he said

8    there's no way she should have had a stroke because

9    she was taking the right blood thinners.

10        Q.    Did any medical practitioner ever give

11   you an explanation for either of the strokes?

12        A.    No.

13        Q.    Do you know if any medical practitioner

14   ever gave your sister any explanation for either of

15   the strokes?

16        A.    No.

17        Q.    Did your mom tell you anybody had given

18   her an explanation for either of the strokes?

19        A.    No.

20        Q.    Okay.  Has anybody told you that the

21   strokes were caused by taking Digitek?

22        A.    No.

23        Q.    Okay.  Has anybody told your sister

24   that?

25        A.    No.

Page 60

```
1       Q.    The pill bottle that you located at your
2   sister's that she had taken from your mom's house
3   had two pills left in, right?
4       A.    Yes.
5       Q.    And you believe it had 30 in it when it
6   was first dispensed to your mom?
7       A.    I think it either had 28 or 30 on it.  I
8   really don't know.
9       Q.    Okay.  Do you know where the other pills
10  that were in that bottle went?
11      A.    No.
12      Q.    All right.  Was it your decision to file
13  this lawsuit?
14      A.    Yes.
15      Q.    Okay.  And was it your decision to be a
16  class representative?
17      A.    Mr. Jones asked me to be one.
18      Q.    Okay.  What is a class representative?
19      A.    Representing all the people in the State
20  of Kentucky.
21      Q.    For what?
22      A.    For economic...
23      Q.    Economic?
24      A.    Well, any kind of economic damage that
25  any of them have suffered.
```

Page 61

```
 1        Q.      What would that be?  What would the
 2   category of economic damages be that you understand
 3   you're representing these folks for?
 4        A.      Medical bills, gas, co-payments.
 5        Q.      Anything else?
 6        A.      Whatever kind of economic problems that
 7   they had with it.
 8        Q.      Did you suffer any economic damages?
 9        A.      No.
10        Q.      But you believe other members of the
11   class may have?
12        A.      Yes.
13        Q.      Have you spoken to any members of the
14   class?
15        A.      No.
16        Q.      Do you know any of the names of any of
17   these folks?
18        A.      No.
19        Q.      Have you made any effort to try to
20   figure out who they are?
21        A.      No.
22        Q.      Why not?
23        A.      I honestly wouldn't know how other than
24   talking to Mr. Jones.
25        Q.      And he's been your lawyer for how long?
```

Page 69

```
 1    lawsuit of your own for the wrongful death of your

 2    mother?

 3         A.    Yes.  I don't --

 4               MR. JONES:  You mean other than the

 5    claim she's brought in this lawsuit?

 6               MS. CRISWELL:  The claim in this lawsuit

 7    is for economic damages only.

 8               MR. JONES:  No, that's absolutely not

 9    true.

10               MS. CRISWELL:  Well, that's what we --

11    when I started out this deposition, I asked you --

12               MR. JONES:  The class action is for

13    economic damages only.

14               MS. CRISWELL:  Right.

15               MR. JONES:  The lawsuit clearly says

16    she's making a claim for her mother's death and the

17    hospitalization.  We've absolutely not withdrawn any

18    individual personal injury claims, only the class

19    allegations.  She's not representing a class of

20    folks that are claiming personal injuries.  So I

21    want to make sure the record is very clear on that.

22    BY MS. CRISWELL:

23         Q.    Okay.  So, ██████  are you

24    intending to file a wrongful death lawsuit?

25               MR. JONES:  She's filed a wrongful death
```

Page 70

1    lawsuit.

2              MS. CRISWELL:  Okay.

3              MR. JONES:  That is what is sitting

4    there.

5              MS. CRISWELL:  Are you going to amend

6    the complaint or no?

7              MR. JONES:  For what purpose?

8              MS. CRISWELL:  I thought there was a

9    discussion based upon your representation that this

10   class was only going to deal with economic damages,

11   that you were going to be filing a first amended

12   complaint.

13             MR. JONES:  I believe you guys have

14   requested that I file a first amended complaint.  It

15   will be amended in some form, whether it's a

16   dismissal of part of the allegations.  I haven't

17   exactly decided what procedural approach I'll take

18   to do that now.

19             MS. CRISWELL:  Okay.

20             MR. JONES:  Just so we're clear, we're

21   here today on a class action for economic damages,

22   which is what we talked about before the deposition,

23   which I talked to your colleagues about, that we

24   talked about before the deposition started.

25        Each of the individuals listed on the face of

1          MS. CRISWELL:  Okay.  Let's take five

2    minutes.

3          (A BRIEF RECESS WAS TAKEN.)

4    BY MS. CRISWELL:

5      Q.    Okay.  Let's sort of tie up a couple of

6    loose ends and move on.

7          ████████████  I think what you told me is you

8    didn't suffer any economic damages; is that right?

9      A.    Right, yes.

10     Q.    Okay.  And yet you're representing a

11   class of people who you believe did suffer --

12     A.    Yes.

13     Q.    -- economic damages; is that right?

14     A.    Yes.

15     Q.    Are you comfortable with that?

16     A.    Yes.

17     Q.    Okay.  Now, are you also claiming

18   damages for the death of your mother?

19     A.    Yes.

20     Q.    You are?  Now that we've had this

21   conversation, you're looking over at your lawyer.

22          MR. JONES:  She was confused.  She

23   thought you were asking as a class representative

24   was she claiming --

25          MS. CRISWELL:  No.

Page 94

1      A.      You mean which doctor?

2      Q.      Well, no.  Did those come off a pill

3  bottle too, or did they come out of medical records

4  or what?

5      A.      One of them came from medical records,

6  and one came from the bottle.

7      Q.      Okay.  Which one of the two on page five

8  under Roman numeral three came from a bottle and

9  which came from the medical records?

10     A.      I don't know.  I don't remember.

11     Q.      And I don't see the word "Digitek" for

12  either one of those.  Would you agree with me?

13     A.      Yes.

14     Q.      Okay.  One says 1.25 and doesn't give

15  any further description, right?

16     A.      Right.

17     Q.      And the other one says 0.250 digoxin.

18     A.      Yes.

19     Q.      What is digoxin?

20     A.      I thought it was Digitek --

21     Q.      Okay.

22     A.      -- with a different name.

23     Q.      Are you using the words interchangeably,

24  those two?  You think it's the same thing?

25     A.      Yeah.

1    thought of something like that.

2         Q.    Okay.  And did you ever, or to your

3    knowledge, did your sister ever, at the time that

4    she went into hospice care at the nursing home, ask

5    to see what medicines she was on at that time?

6         A.    No -- well, I don't know if my sister

7    did.  She may have.  I don't know.

8         Q.    (Inaudible).

9              (INQUIRY BY THE COURT REPORTER.)

10             MS. CRISWELL:  Start -- say that again,

11   Holly.

12   BY MS. SMITH:

13        Q.    Is it your opinion that your mother's

14   death resulted solely because she took digoxin or

15   Digitek?

16        A.    Yes.

17        Q.    (Inaudible) believe there are any other

18   contributing factors?

19             (INQUIRY BY THE COURT REPORTER.)

20             (A DISCUSSION WAS HELD OFF THE RECORD.)

21   BY MS. SMITH:

22        Q.    So you do not -- okay.  So you do not

23   believe there are any contributing factors to her

24   death?

25        A.    I don't understand what that means

1      Q.     So is your lawsuit about more

2   than the medication Digitek?

3      A.     No.

4      Q.     So in your lawsuit relating to

5   Digitek, what do you hope will come out of it?

6      A.     So they won't put any more bad stuff on

7   the market that can kill somebody else.

8      Q.     And by "they," again, are you

9   referring to the pharmaceutical industry as a whole?

10     A.     Yes.

11     Q.     So do you agree, then, that

12  you're trying to get relief in your lawsuit against

13  manufacturers who had nothing to do with Digitek?

14     A.     No.

15     Q.     Can you explain to me how you

16  envision your lawsuit changing the pharmaceutical

17  industry as a whole?

18     A.     Well, hopefully the government will step

19  in and be a little bit more aware of what's been

20  produced and shipped out to people.

21     Q.     From that response, then, is it

22  fair to say that you think the government is

23  partially responsible for what you perceive as

24  problems in the pharmaceutical industry?

25              MR. JONES:  Objection to the form of the

1   question.

2        You can answer.

3        A.     Well, somebody has control over it.  You

4   know, whoever has got control over it should have

5   better control than what they got.  I work somewhere

6   that can put out stuff that doesn't kill people.

7        Q.     Do you believe the government,

8   then, is partially responsible for your mother's

9   death?

10            MR. JONES:  Objection to the form of the

11   question.

12        You can answer.

13            MS. SMITH:  You may answer.

14        A.     Well, if you put it that way, I guess it

15   would have to be because they obviously aren't

16   keeping it all under control very well.

17        Q.     In addition to this reform that you hope

18   to achieve, is there anything else that you

19   personally want to obtain as a result of having

20   filed your lawsuit?

21        A.     No.

22        Q.     Do you seek money damages of any

23   sort for anything?

24        A.     I don't know how to answer that,

25   because, to me, it wasn't about money to begin with.

1    It was just trying to make -- trying to get somebody

2    more aware of what's going on.

3         Q.     And you seek to represent a

4    proposed class of all Illinois persons and estates

5    who took Digitek during the time frame of the

6    recall; is that correct?

7              MS. CRISWELL:  It's Kentucky, Holly.

8    BY MS. SMITH:

9         Q.     Kentucky.  I'm sorry.

10        A.     Yes.

11        Q.     And as I understand it, and correct me

12   if I'm wrong, you hope on your behalf to bring a

13   claim for wrongful death, as well as economic

14   damages, but on behalf of the rest of the state,

15   only economic damages; is that correct?

16        A.     No.

17             MR. JONES:  Yes.

18             THE WITNESS:  Yes.

19   BY MS. SMITH:

20        Q.     If you could, in your words, please tell

21   me how you envision your lawsuit functioning.

22             MS. CRISWELL:  I think we should

23   clarify.  She changed her answer, Holly.  After she

24   said, "no," I think she said, "yes."

25             MR. JONES:  Yes.

1    on February 27th and asked that your mother be taken

2    off of the medication, did you -- is it correct that

3    you testified that your reason you gave him at the

4    time was that it was making her sick to her stomach?

5         A.    Yes.

6         Q.    Do you have any reason to believe that

7    Digitek was not working for her heart?

8         A.    No.

9         Q.    So, in fact, it may have been doing its

10   job with respect to her heart, but at the same time,

11   you believe it was making her sick to her stomach,

12   and that's the reason she went off the medicine?

13        A.    Yes.

14        Q.    And to the extent it helped her heart,

15   do you agree that your mother benefitted from

16   Digitek?

17        A.    No.

18        Q.    So if when she was on Digitek and it

19   helped her heart condition, you do not think that

20   helped your mother?

21        A.    No, I don't know.

22        Q.    It may or may not have helped her?

23        A.    Yes.

24              MS. SMITH:  Leslie, I think that's all

25   the questions I have.

Page 143

1    STATE OF KENTUCKY        )
                             )SS:  ERRATA
2    COUNTY OF JEFFERSON      )

3

4        I HAVE READ THE FOREGOING PAGES, AND THE

5    STATEMENTS CONTAINED THEREIN (SUBJECT TO

6    CORRECTIONS, ADDITIONS, AND DELETIONS CONTAINED IN

7    THE ADDENDUM ANNEXED HERETO, IF ANY), AND THEY ARE

8    TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

9

10

11

12

13

14

15        SUBSCRIBED AND SWORN BEFORE ME THIS DAY BY

16            , THIS      DAY OF          2009.

17   MY COMMISSION EXPIRES:

18

19

20                    NOTARY PUBLIC

21

22

23

24

25

Page 144

```
1    COMMONWEALTH OF KENTUCKY )
                              )
2    COUNTY OF JEFFERSON      )

3       I, LISA MIGLIORE BLACK, CCR-KY, A NOTARY PUBLIC,

4    WITHIN AND FOR THE STATE AT LARGE, DO HEREBY CERTIFY

5    THAT THE FOREGOING DEPOSITION OF

6                    ██████████████████

7    WAS TAKEN BEFORE ME AT THE TIME AND PLACE AND FOR

8    THE PURPOSE IN THE CAPTION STATED; THAT THE WITNESS

9    WAS FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE

10   TRUTH, AND NOTHING BUT THE TRUTH; THAT THE

11   DEPOSITION WAS TAKEN BEFORE ME STENOGRAPHICALLY AND

12   AFTERWARDS TRANSCRIBED UNDER MY DIRECTION; THAT THE

13   FOREGOING IS A FULL, TRUE, AND CORRECT TRANSCRIPT OF

14   THE SAID DEPOSITION SO GIVEN; THAT THERE WAS A

15   REQUEST THAT THE WITNESS READ AND SIGN THE

16   TRANSCRIPT; THAT THE APPEARANCES WERE AS STATED IN

17   THE CAPTION.

18      I FURTHER CERTIFY THAT I AM NEITHER OF COUNSEL

19   NOR OF KIN TO ANY OF THE PARTIES TO THIS ACTION, AND

20   AM IN NO WAY INTERESTED IN THE OUTCOME OF SAID

21   ACTION.

22      WITNESS MY SIGNATURE THIS 19TH DAY OF DECEMBER,

23   2009.  MY COMMISSION EXPIRES NOVEMBER 10, 2013.

24

25                      NOTARY PUBLIC
                        STATE AT LARGE, KENTUCKY
```