Dale Campbell

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION

 3

   IN RE:  DIGITEK PRODUCT LIABILITY  MDL NO. 1968
 4          LITIGATION,

 5  -----------------------------------------------------

 6  MICHAEL PASKEN, et al.,

 7          Plaintiffs,      MDL No. 2:08-1075

 8          vs.

 9  ACTAVIS GROUP HF, et al.,

10          Defendants.

11                  - - - -

12          DEPOSITION OF: DALE CAMPBELL

13                  - - - -

14  TRANSCRIPT MARKED CONFIDENTIAL PURSUANT TO THE TERMS
                  OF THE PROTECTIVE ORDER
15

16                  DEPOSITION DATE:
                    July 31, 2009
17                  Friday, 10:05 a.m.

18

19                  LOCATION:
                    AKF REPORTERS, INC.
                    436 Boulevard of the Allies
20                  Pittsburgh, PA  15219

21

22                  TAKEN BY:
                    Defendant Mylan

23

24                  REPORTED BY:
                    Pamela L. Beck
                    Notary Public
25                  AKF Reference No. PB14096
```

**Amended Exh. O**

Dale Campbell

Page 2

```
 1              DEPOSITION OF DALE CAMPBELL,
    a witness, called by the Defendant Mylan for
 2  examination, in accordance with the Federal Rules of
    Civil Procedure, taken by and before Pamela L. Beck,
 3  a Court Reporter and Notary Public in and for the
    Commonwealth of Pennsylvania, at AKF Reporters,
 4  Inc., 436 Boulevard of the Allies, Pittsburgh,
    Pennsylvania, on July 31, 2009, commencing at
 5  10:05 a.m.
 6
    APPEARANCES:
 7
            FOR THE PLAINTIFFS:
 8  Patricia I. Avery, Esq.
    pavery@wolfpopper.com
 9  WOLF POPPER, LLP
    835 Third Avenue
10  New York, N.Y. 10022
    p 212-759-4600
11  f 212-486-2093
12
            FOR THE DEFENDANT MYLAN:
13  Ericka Downie, Esq.
    edownie@shb.com
14  SHOOK HARDY & BACON, L.L.P.
    2555 Grand Boulevard
15  Kansas City, MO  64108
    p 816-559-2214
16  f 816-421-5547
17
            FOR THE DEFENDANTS ACTAVIS GROUP, HF,
18           ACTAVIS TOTOWA, LLC, ACTAVIS, INC., ACTAVIS
             ELIZABETH, LLC, ACTAVIS US:
19  John T. Doheny, Esq.
    john.doheny@tuckerellis.com
20  TUCKER ELLIS & WEST, LLP
    1150 Huntington Building
21  925 Euclid Avenue
    Cleveland, OH  44115-1414
22  p 216.696.2845
    f 216.592.5009
23
24
25
```

Dale Campbell

Page 3

1

2                        EXAMINATION INDEX

3

    DALE CAMPBELL
4         BY MS. DOWNIE . . . . . . . . .    5
          BY MR. DOHENY . . . . . . . . .  112
5

6

7

    CERTIFICATE OF COURT REPORTER . . . . . .  116
8   ERRATA SHEET  . . . . . . . . . . . . .  117
    NOTICE OF NON-WAIVER OF SIGNATURE . . . .  118
9

10

11                       EXHIBIT INDEX

12                                               MAR

    CAMPBELL
13    1                                        13

14    2                                        13

15    3                                        36

16

17

18

19

20

21

22

23

24

25

Dale Campbell

Page 22

```
 1   A.    About it?

 2   Q.    About the recall.

 3   A.    Actually, I think I talked to his associate as

 4         well.

 5   Q.    Do you recall who the associate is?

 6   A.    No, I'm not sure what her name was.

 7   Q.    Other than telling you to stop taking the

 8         Digitek, did Dr. Ellis tell you or give you

 9         any further instruction?

10   A.    He just told me to stop taking it immediately.

11   Q.    Did you speak to the pharmacist at Rite Aid

12         regarding the recall?

13   A.    No, I did not.

14   Q.    Do you recall whether or not the recall letter

15         instructed you to do anything with the

16         tablets; in other words, to destroy them,

17         throw them away or return them?

18   A.    They asked to return them, they would replace

19         them with new ones.

20   Q.    And did you do that?

21   A.    No.

22   Q.    Why not?

23   A.    My doctor told me to quit taking them

24         immediately.

25   Q.    Right.  But you understood that you could
```

Dale Campbell

Page 23

```
 1        return them, the tablets to Rite Aid?
 2   A.   Yes.
 3   Q.   And I'm sorry, why didn't you do that?
 4   A.   My doctor told me to quit taking them, so why
 5        would I return them?  I mean, I didn't need
 6        them anymore.
 7   Q.   Do you understand that if you return them, you
 8        might be entitled to a refund?
 9             MS. AVERY:  Objection to form.
10   Q.   I'm sorry?
11   A.   No, they were going to replace them.
12   Q.   That's what the letter said?
13   A.   The letter said they would replace the pills.
14   Q.   Do you recall seeing any reference in the
15        recall letter to a company called Stericycle?
16   A.   No.
17   Q.   When you stopped taking them, you just kept
18        the tablets?
19   A.   I just left them, yes, left them in my pill
20        bag.
21   Q.   Why was it that you didn't throw them away?
22   A.   I just didn't really think about it.  I just
23        left them in there.
24   Q.   When did you determine that you were going to
25        contact an attorney regarding your ingestion
```

Dale Campbell

Page 24

```
 1        of Digitek?
 2   A.   I got more letters, I think, and that's when I
 3        contacted the attorneys.
 4   Q.   More letters from whom?
 5   A.   I guess your company or whoever.  I don't know
 6        who exactly it was.  There was more letters
 7        that came about the recall.
 8   Q.   Do you remember what they said?
 9   A.   No, ma'am, I don't.
10   Q.   Do you remember how many letters?
11   A.   No, I don't.
12   Q.   So when did contact an attorney?
13   A.   I'm not sure of the date.  It was awhile after
14        I received the letter.
15   Q.   And why is it that you decided to contact an
16        attorney?
17   A.   To recover my, what do you call it, my co-pays
18        for buying this medicine.
19   Q.   Was that your primary concern at that time, to
20        recover the co-pays?
21             MS. AVERY:  Objection to form.
22   A.   Pretty much.
23   Q.   And what attorney did you contact?
24   A.   I can't remember her name.
25   Q.   Was it the same firm that is currently
```

Dale Campbell

Page 26

```
 1        was taking this medicine as well.

 2   Q.   Do you understand what your obligations are as

 3        a class representative?

 4             MS. AVERY:  Objection to form.

 5   A.   To try and recover the losses they had as

 6        well.

 7   Q.   Do you understand that you could have filed a

 8        lawsuit simply on your own behalf, in other

 9        words, not be part of a class action?

10   A.   I'm sure I could have, yes.

11   Q.   Why is it that you decided you wanted to

12        pursue this as a class action and be the

13        representative?

14   A.   To help the other people that took a loss as

15        well.

16   Q.   Have you met or spoken to any other members of

17        this class?

18   A.   No, ma'am.

19   Q.   Do you know any of their names or any of

20        their --

21   A.   No, ma'am.

22   Q.   Do you know where they live or any of that

23        information?

24   A.   No.

25   Q.   Do you have any information regarding the
```

Dale Campbell

Page 27

```
 1        injuries that they're claiming?

 2   A.   No, ma'am.

 3              MS. AVERY:  Objection to form.

 4   Q.   Do you have any information as who how you

 5        were selected to be class representative?

 6              MS. AVERY:  Objection to form,

 7        mischaracterizes the testimony.

 8   A.   Repeat that.

 9   Q.   Do you know why you are a class

10        representative?

11   A.   I had medicine.

12   Q.   Do you understand that there are certain

13        obligations that a class representative has as

14        opposed to a member of a class action?

15   A.   No.

16   Q.   So, you don't understand what the difference

17        in those obligations are?

18              MS. AVERY:  Objection to form.

19   A.   Well, what do you mean?

20   Q.   I'm trying to find out what you mean.  Do you

21        understand what obligations a class

22        representative has?

23              MS. AVERY:  Objection to form, calls

24        for a legal conclusion.

25   A.   That I'm representing the other people that
```

Dale Campbell

Page 28

```
 1          maybe got injured by this medicine.
 2    Q.    So, there are class representatives and then
 3          there are class members.  Do you understand
 4          that difference?
 5    A.    Yes.
 6                    MS. AVERY:  Objection to form.
 7    Q.    Do you know why or how you were chosen to be a
 8          class representative rather than a class
 9          member?
10                    MS. AVERY:  Objection to form.
11    A.    No.
12    Q.    Have you been promised anything other than
13          recovery as a member of the class?
14    A.    No.
15    Q.    What is it that you're hoping to recover in
16          this lawsuit?
17    A.    My co-pay for all the medicine and the co-pay
18          for all of the people in the class action
19          suit.
20    Q.    Now, as I understand it, you are bringing
21          claims alleging that you were physically
22          harmed by Digitek?
23    A.    I was very sick, yes.
24    Q.    And you're also claiming a financial injury;
25          is that correct?
```

Dale Campbell

Page 75

```
 1   Q.    Did you do any research regarding Digoxin or
 2         Digitek when you first started taking it?
 3   A.    No, I just -- my doctor told me I needed this
 4         medicine and I took it.  You know, I got faith
 5         in him.  I hate to be this way, but I got to
 6         use the men's room again.
 7   Q.    Oh, that's quite all right.
 8                   - - - -
 9              (There was a recess in the
10         proceedings.)
11                   - - - -
12   BY MS. DOWNIE:
13   Q.    Have you ever known anybody else who took
14         Digitek or Digoxin?
15   A.    No, ma'am.
16   Q.    I understand from your earlier testimony, you
17         haven't spoken to any of your class members
18         about their ingestion; is that right?
19   A.    Yes.
20   Q.    Other than talking to your doctor about
21         Digitek or Digoxin, did you speak to anybody
22         else while you were taking the drug about the
23         drug?
24   A.    No.
25   Q.    Ever talk to your pharmacist about the
```

Dale Campbell

Page 80

```
 1   A.    No, not that I can think of, no.

 2   Q.    Do you know whether or not Dr. Ellis or

 3         Dr. McCaslin has ever testified your serum

 4         Digoxin levels?

 5   A.    I have no clue what they test for, no.

 6   Q.    Have you ever been told that you had an

 7         elevated serum Digoxin level?

 8   A.    No.

 9   Q.    Have you ever talked to anybody from either

10         one of our clients, Actavis or Mylan?

11   A.    Not that I remember, no.

12   Q.    Have you ever had any written contact with

13         anybody from our clients?

14              MS. AVERY:   I assume you mean aside

15         from us obviously?

16              MS. DOWNIE:   Yeah, thank you.

17   A.    No.

18   Q.    Did Dr. Ellis or Dr. McCaslin ever provide you

19         with any samples of Digitek or Digoxin?

20   A.    No.

21   Q.    Do you ever remember seeing any other name on

22         your prescription bottle other than Digitek or

23         Digoxin?

24   A.    No.

25   Q.    When you took your Digitek or Digoxin, when
```

Dale Campbell

Page 86

```
 1          probably had already taken those tablets from
 2          the previous prescription and were only taking
 3          pills out of that bottle?
 4    A.    I would say yes.
 5    Q.    At any time that you were taking Digitek, did
 6          you ever notice anything unusual regarding
 7          their appearance?
 8    A.    No.
 9    Q.    Did you ever notice whether or not any of them
10          looked larger or smaller than you had
11          typically seen them appear?
12    A.    No, ma'am.  All I knew is they were my
13          medicine, I took them, you know.
14    Q.    Now, you claim in your fact sheet that you
15          suffered injuries as a result of taking the
16          Digitek.
17    A.    I was sick.
18    Q.    When did you first begin suffering symptoms?
19    A.    I can't give you an exact date, all I know is
20          I was sick.
21    Q.    Why don't we try this, was it a weekday or on
22          a weekend?
23    A.    I'm not really sure.
24    Q.    Was it in the morning or the afternoon or the
25          evening?
```

Dale Campbell

Page 87

```
 1   A.    I have no clue.

 2   Q.    How long after you took your medication in the

 3         morning did you begin to feel, as you've

 4         termed it, sick?

 5   A.    I have not a clue.  It's been awhile.  I mean,

 6         all I know is I was ill.

 7   Q.    Tell me exactly how you were feeling.

 8   A.    Dizzy, nausea, you know, I had palpitations.

 9         I just wasn't feeling great at all.

10   Q.    Did you throw up?

11   A.    Yes, I did.

12   Q.    How many times?

13   A.    Just once that I know of.

14   Q.    How long did these symptoms last?

15   A.    Quite awhile, that's all I know, is awhile,

16         because my sisters and my niece and that

17         wanted me to go see the doctor because I

18         wasn't feeling good, I wasn't looking good.

19   Q.    When you say quite awhile, that means

20         different things to different people, so.

21   A.    I'm not exactly sure on exact times and dates,

22         but I was sick for awhile.

23   Q.    Was it more than a day or two days?

24   A.    Oh, yeah, definitely.

25   Q.    Was it more than a week?
```

Dale Campbell

Page 88

```
 1   A.   I would say, yes.

 2   Q.   Was it more than two weeks?

 3   A.   Yes, definitely.

 4   Q.   More than three weeks?

 5   A.   It was probably a month anyhow, let's put it

 6        that way.  It might have even been more.

 7   Q.   During that month that you weren't feeling

 8        well, and you've already said you were feeling

 9        dizzy, nauseous and palpitations.  Can you

10        describe for me any other way that you were

11        feeling, any other symptoms that you were

12        having.

13   A.   Chest pains, tired, very tired.  I would just

14        collapse, you know, pass out.  I slept quite a

15        bit.

16   Q.   Did you call the doctor during this time

17        period?

18   A.   No.

19   Q.   Why not?

20   A.   Stubborn, I'm sick of doctors.

21   Q.   I'm guessing you probably didn't go to a

22        hospital or an ER?

23   A.   No, I did not.

24   Q.   Did you speak to anybody in your doctor's

25        office about how you were feeling?
```

Dale Campbell

```
 1        May of 2008?

 2   A.   I don't really think I did.

 3   Q.   Is there any other reason, other than what

 4        you've already told me, as to why you believe

 5        that Digitek caused the illness that you

 6        experienced in May of 2008?

 7   A.   Nothing I can think of, any other reason.

 8   Q.   What is it that you believe that the

 9        defendants did wrong in their production or

10        manufacturer of Digitek?

11   A.   Well, evidently they didn't use the quality

12        control that should have been used.

13   Q.   How so?

14   A.   Well, if there's a recall, what happens?  How

15        does that recall come about?

16   Q.   Why was there a recall?

17   A.   Because the pills were extra strength,

18        according to the paper, extra strength, you

19        know, more medicine in them than there's

20        supposed to be.

21   Q.   Do you know how many pills were found to be

22        extra strength?

23   A.   No, I don't.

24   Q.   Do you know actually if any pills were found

25        to be extra strength?
```

Dale Campbell

Page 102

```
 1   A.    I have not a clue.

 2   Q.    Do you have any evidence yourself, apart from

 3         what your attorneys may or may not have done

 4         on your behalf, that the pills you took were

 5         extra strength?

 6   A.    Do I have any evidence?

 7   Q.    Yeah.

 8   A.    No, ma'am, I don't.

 9   Q.    Do you know what some of the common side

10         effects of Digoxin are?

11               MS. AVERY:  Objection to form.

12   A.    I read the paper, you know, when I started

13         taking them, but no, I'm not exactly sure of

14         all of the side effects, no.

15   Q.    Has anybody ever told you that you experienced

16         Digoxin toxicity?

17   A.    No.

18   Q.    Has anybody ever told you that you experienced

19         an overdose of Digoxin?

20   A.    No.

21   Q.    Do you believe that you're currently suffering

22         any injury or symptoms as a result of your

23         injection of Digitek?

24   A.    Do I believe that I am?

25   Q.    Yeah.
```

Dale Campbell

Page 107

1        speculation.

2                    MS. DOWNIE:  Yeah, it does.

3    Q.   I'm trying to understand specifically when you

4        think you should be reimbursed.

5    A.   For whatever the bad medicine was.  For me

6        specifically you're saying; right?

7    Q.   Uh-huh.

8    A.   Yeah, whatever time frame the bad medicine was

9        there, that's what I feel I should be

10       compensated for.

11   Q.   Are there any other financial injuries that

12       you believe you've suffered other than the

13       co-pay?

14   A.   Financial injuries?

15   Q.   That's correct.

16   A.   No.

17   Q.   Do you believe that you're going to require

18       any future medical treatment?

19                    MS. AVERY:  Okay, you obviously

20       recognize the fault in that, so why don't you

21       try and rephrase it.

22   Q.   Your fact sheet does identify some fact

23       witnesses, and I believe we already probably

24       identified them, but I just want to make sure

25       that we, in fact, know who they are.  And

Dale Campbell

Page 110

```
 1   A.    Yes.

 2   Q.    So you don't have a loss of consortium claim

 3         or anything like that?

 4   A.    No.

 5   Q.    Your fact sheet talks about the workers' comp

 6         and Social Security disability claims, and it

 7         looks like that time period says the

 8         application was filed in 2004 or 2005.

 9                    Does that sound right to you?

10   A.    Yeah.

11              MS. DOWNIE:  Why don't we go off the

12         record for a moment or two.

13                    - - - -

14         (There was a discussion off the

15         record.)

16                    - - - -

17              MS. DOWNIE:  Back on the record.

18   BY MS. DOWNIE:

19   Q.    I just want to confirm, with respect to the

20         members of your class, I know you haven't met

21         any of them or talked to any of them, do you

22         have any information at all regarding the

23         nature of their claims?

24              MS. AVERY:  Objection to form.

25   A.    No.
```

Dale Campbell

Page 111

```
 1   Q.    Do you have any information specifically

 2         regarding what medical damages they're

 3         claiming?

 4   A.    No.

 5   Q.    Do you have any information specifically

 6         regarding the financial damages that they are

 7         claiming?

 8   A.    No, I do not.

 9               MS. DOWNIE:  Those are all of the

10         questions that I have.  Thank you.

11                    - - - -

12                    EXAMINATION

13                    - - - -

14   BY MR. DOHENY:

15   Q.    Mr. Campbell?

16   A.    Yes.

17   Q.    John Doheny, I introduced myself previously.

18         I am an attorney for Actavis, which made

19         Digitek for a period of time.

20               You mentioned that you hurt your

21         back carrying a 100-pound sack?

22   A.    Yes, sir.

23   Q.    Do you recall when that was?

24   A.    2000.

25   Q.    Was that before you began with the heart
```

Dale Campbell

Page 116

```
 1   COMMONWEALTH OF PENNSYLVANIA)       CERTIFICATE

 2   COUNTY OF ALLEGHENY          )      SS:

 3        I, Pamela L. Beck, a Court Reporter and Notary

 4   Public in and for the Commonwealth of Pennsylvania,

 5   do hereby certify that the witness, DALE CAMPBELL,

 6   was by me first duly sworn to testify to the truth;

 7   that the foregoing deposition was taken at the time

 8   and place stated herein; and that the said

 9   deposition was recorded stenographically by me and

10   then reduced to printing under my direction, and

11   constitutes a true record of the testimony given by

12   said witness.

13        I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17        I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my

22   hand and affixed my seal of office this 5th day of

23   August, 2009.

24   _____

25   Notary Public
```

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: DIGITEK®<br>PRODUCT LIABILITY LITIGATION | : | MDL DOCKET NO. 1968 |

| | | |
|---|---|---|
| **THIS DOCUMENT APPLIES ONLY TO:**<br>**Michael Pasken, et al.,** | : | NO. 2:08-cv-1075 |
| **Plaintiff,** | : | |
| **v.** | : | |
| **Actavis Group hf, et al.,** | : | |
| **Defendants.** | : | |

**ERRATA SHEET TO DEPOSITION TRANSCRIPT OF DALE CAMPBELL**

| Page:Line(s) | Correction |
|---|---|
| various | There are various medical references and company names (e.g., "Bertech" instead of "Bertek") throughout the transcript. I have not checked the court reporter's spelling to determine if any of them need to be corrected. |
| various | Everyone, myself included, repeatedly misspell my physician's name. I believe that the correct spelling of his name is Gustav Eles. |
| 28:17-9 | The phrase "My co-pay for all the medicine and the co-pay for all of the people in the class action suit" should be corrected to state "My co-pay for all the medicine and the co-pay and anything else the court allows for all of the people in the class action suit." The reason for the change is that as I read |

165228

-1-

that the court has the final say on what is or is not included in a lawsuit.

various          One of my sister's names is typed as "Louie". Her name is "Lou Ellen" and the shortened form is "Lou E".

various          I noticed a number of errors in questions, but since I was not the person saying them, I don't think that I can correct them. For example, on page 55, line 18, the question refers to "abnormal health rhythm" and I believe she said "abnormal heart rhythm".

There may be other spelling, grammatical, or other transcription errors in the transcript. It is possible that I may not have caught and corrected all of those, particularly with respect to comments or statements that were not mine.

I declare under penalty of perjury under the laws of the U.S. that the above corrections are true and correct to the best of my knowledge, information, and belief. Executed this _15_ th day of September, 2009.



Dale Campbell