Alan W. Chambers

Page 1

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION

 3

 4

 5   IN RE:  DIGITEK PRODUCT LIABILITY
             LITIGATION
 6

 7   ALAN CHAMBERS,
         Plaintiff
 8
         V                        MDL NO. 2:08-1175
 9
     ACTAVIS TOTOWA, LLC, et al,
10       Defendants

11

12

13

14           Oral deposition of ALAN W.

15   CHAMBERS, taken at the law offices of

16   Locks Law Firm, 457 Haddonfield Road,

17   Suite 500, Cherry Hill, New Jersey, on

18   Tuesday, September 22, 2009, commencing

19   at approximately 10:20 a.m., before

20   Maureen E. Broderick, a Registered

21   Professional Reporter and Notary Public,

22   pursuant to notice.

23

24

25
```

**Amended Exh. Q**

Alan W. Chambers

Page 2

```
 1    APPEARANCES:

 2    LOCKS LAW FIRM
      BY:  JAMES J. PETTIT, ESQUIRE
 3         Jpettit@lockslaw.com
           457 Haddonfield Road, Suite 500
 4         Cherry Hill, NJ 08002
           856.663.8200
 5         Counsel for Plaintiff

 6    TUCKER ELLIS & WEST LLP
      BY:  JOHN A. SIMON, ESQUIRE
 7         John.simon@tuckerellis.com
           1150 Huntington Building
 8         925 Euclid Avenue
           Cleveland, OH 44115-1414
 9         216.592.5000
           Counsel for Actavis Defendants
10

      ALLEN GUTHRIE & THOMAS, PLLC
11    BY:  ZACKARY B. MAZEY, ESQUIRE
           Zbmazey@agmtlaw.com
12         PO Box 3394
           500 Lee Street, East, Suite 800
13         Charleston, WV 25301
           304.720.4226
14         Counsel for Mylan and Actavis Defendants

15    SHOOK, HARDY & BACON, LLP
      BY:  M. KEVIN UNDERHILL, ESQUIRE
16         Kunderhill@shb.com
           333 Bush Street, Suite 600
17         San Francisco, CA 94104-2828
           415.544.1900
18         Counsel for Mylan Defendants

19                   EXAMINATION INDEX

20    Alan W. Chambers
           BY MR. SIMON                         3
21         BY MR. UNDERHILL                   112
           BY MR. SIMON                       118
22         BY MR. PETTIT                      120

23                   EXHIBIT INDEX

24    Chambers                              MARKED
        1     Plaintiff Fact Sheet            42
25
```

Alan W. Chambers

Page 13

1   whatever.

2   Q.   What did the technician tell you

3   about the recall?

4   A.   Basically, they told me that the

5   dosage was improper.  She was very

6   limited as to her information.  The

7   dosage, you know, was improper

8   specifications.  So that was the reason

9   for the recall.

10   Q.   Did you ask her any questions

11   about the recall?

12   A.   I just asked her why was it

13   recalled and that's basically what she

14   told me.

15   Q.   And you don't recall speaking to

16   the pharmacist about the recall?

17   A.   No.  No.

18   Q.   What did you do once you found out

19   about the recall?

20   A.   Well, I was out of it, so I didn't

21   take it.  I waited for a short period of

22   time to have somebody call me, which

23   never happened.

24   Q.   So what did you personally do once

25   you found out about the recall with

Alan W. Chambers

Page 14

1   respect to your Digitek?

2   A.   I had a routine -- I had a visit

3   to my -- my cardiologist, I see him

4   every three months.  And in, I believe,

5   it was June I went to see him.

6            I more or less left it up to

7   my doctor to inform me as to any

8   alternative or whatever, which didn't

9   happen, basically.

10  Q.   What did your doctor say to you

11  about the Digitek recall when you saw

12  him, you believe, in June?

13  A.   I saw him in March, which was

14  before the recall.  I told him --

15            MR. PETTIT:  Hang on.  Just

16  make sure you're answering the right

17  question.

18            You can answer however you

19  want, just answer his question after the

20  recall.

21            THE WITNESS:  Can you repeat

22  the question.  I forget what the --

23  BY MR. SIMON:

24  Q.   Well, you were telling me that you

25  saw your doctor before you found out

Alan W. Chambers

Page 15

1    about the recall in March of 2008,

2    correct?

3    A.    Yes.  It was a routine visit, yes.

4    Q.    And did you discuss Digitek at all

5    at that visit?

6    A.    I mentioned to him that I was

7    experiencing contractions and he said he

8    felt it was the device.  I have an

9    implanted defibrillator and he mentioned

10   that he thought it was the device

11   causing that, the contractions, not the

12   medication.

13   Q.    And did you specifically ask him

14   about the medication Digitek you were

15   taking?

16   A.    Yes, I did.  Because I wasn't sure

17   what was causing the severe

18   contractions.  I wasn't getting them all

19   the time, but I was getting them.  And

20   they're different from palpitations.

21           I'm used to getting

22   palpitations with my condition.  These

23   were strong contractions I was getting,

24   which was different.

25           And he said -- that's when he

Alan W. Chambers

Page 23

```
 1    discussion with Dr. McDermet about your

 2    contractions in August --

 3    A.    That is correct.

 4    Q.    -- of 2008.

 5            You have to wait until I

 6    finish my question.

 7    A.    Okay.

 8    Q.    And that's what prompted your

 9    discussion with Dr. McDermet about the

10    contractions you were having in July and

11    August of 2008.

12    A.    Yes.  That's correct.

13    Q.    And the contractions you were

14    having in July and August of 2008, were

15    they similar to the contractions you

16    were having back in March of 2008?

17    A.    Yes.  As far as I can recall, yes.

18    Q.    Now, you indicated earlier that

19    you routinely have what you described as

20    palpitations, correct?

21    A.    Yes.

22    Q.    Describe for me what you mean by

23    "palpitations."

24    A.    It's been described by others,

25    I've read, that there's a -- it feels
```

Alan W. Chambers

Page 31

1    that they incurred.

2    Q.   Did you incur any expenses for

3    doctor visits as a result of your use of

4    Digitek?

5    A.   I have one doctor's visit in June,

6    which was my doctor visit.  That's

7    basically a routine doctor visit.

8    Q.   Are you seeking to recover for the

9    expenses for that June office visit?

10   A.   Yes.  Yes.

11   Q.   Was that a regularly scheduled

12   three-month interval office visit?

13   A.   Yes.

14   Q.   And the June of 2008 office visit

15   for which you seek to recover expenses

16   would have occurred even if you weren't

17   taking Digitek.

18   A.   That's correct.

19   Q.   Did you undergo any testing as a

20   result of your use of Digitek?

21   A.   No.

22   Q.   Are you seeking to recover for any

23   testing that you underwent?

24   A.   No.

25   Q.   Have your physicians suggested to

Alan W. Chambers

Page 33

```
1    and continue to have them periodically

2    on an ongoing basis?

3    A.   That's correct.

4    Q.   Why did you want to become

5    involved in this lawsuit?

6    A.   My feelings are that being that

7    the product was recalled, that people,

8    like myself, that were taking the

9    product, the medication, are entitled to

10   reimbursement of expenses that may have

11   been -- that was, you know, directly

12   responsible from the recalled Digitek;

13   testing, doctors' visits, medication,

14   whatever.

15   Q.   What expenses are you claiming

16   were directly caused by your use of the

17   recalled Digitek?

18   A.   It would have been the expense of

19   the medication itself.

20   Q.   How much were you paying for your

21   Digitek?

22   A.   I pay $5 copay each time I take

23   out a prescription.

24   Q.   Do you pay $5 for all your

25   medications?
```

Alan W. Chambers

Page 41

1    A.    Approximately two hours.

2    Q.    Did you review any documents in

3    preparation for today's deposition?

4    A.    My medical records.

5    Q.    Anything else?

6    A.    No.  Other than that, it was...

7    Q.    What medical records did you

8    review?

9    A.    My visits to my cardiologist in

10   2008.

11   Q.    Did you review any other medical

12   records, besides your cardiologist,

13   cardiology visits, in 2008?

14   A.    No.

15   Q.    Did you take any notes during your

16   deposition preparation session?

17   A.    No.

18   Q.    Did you review any of the legal

19   documents that were filed in this case?

20   A.    No.

21   Q.    Have you ever reviewed the

22   Complaint that was filed in this case?

23   A.    No, I haven't.

24   Q.    Have you ever reviewed what is

25   called a Plaintiff Fact Sheet with a

Alan W. Chambers

1   A.   No.  Other than it was probably

2   just a -- the only time I ever see him

3   is a routine scheduled visit.

4   Q.   Now, Dr. Burke's note indicates

5   that you were doing better and the heart

6   rate was controlled.

7            Is that an accurate

8   assessment of how you were feeling at

9   that time?

10  A.   Yes.  I was feeling better because

11  of the -- I had had the defibrillator

12  done the year before, May of 2007, and

13  overall I was feeling better, yes.  I

14  improved rather significantly.

15  Q.   The next office visit occurred,

16  according to the records, on March 13th

17  of 2008.

18  A.   Yes.

19  Q.   And at that visit it was noted

20  that you self-discontinued digoxin.

21           Does that refresh your

22  recollection or remind you of anything?

23  A.   As far as I can recall, I guess if

24  it records it.

25           I was concerned because I was

Alan W. Chambers

1   Q.   First of all, had you restarted

2   the Digitek as Dr. Burke asked you to do

3   in March?

4   A.   I went to -- I ran out of the

5   Digitek and then I was taking the

6   Digitek through that period.  And when

7   the recall came about, I ran out, I had

8   run out.  So that's why I went in to get

9   it refilled and they informed me about

10  the recall.

11          So it was probably this --

12  within a week or so of that visit.  That

13  would have been, I guess, before the

14  recall, I guess.

15  Q.   Right.

16          But you would have started

17  taking the Digitek again, as Dr. Burke

18  instructed you to do --

19  A.   Yes.  That's correct.

20  Q.   -- in March of 2008.

21  A.   That's correct.  Yes.

22  Q.   Then you came back in April of

23  2008 to get a refill of the Digitek?

24  A.   Either it would have been April or

25  early May, whenever the -- it was within

Alan W. Chambers

Page 98

1   A.   No.

2   Q.   Do you have any of the packaging

3   material or pill vials that your Digitek

4   prescriptions came in?

5   A.   No.

6   Q.   What did you do with those?

7   A.   Tossed them out when I was

8   finished.

9   Q.   Did you have any leftover Digitek

10  tablets?

11  A.   No.

12  Q.   So all the Digitek tablets you had

13  you took.

14  A.   Yes.

15  Q.   What about digoxin tablets; do you

16  have any --

17  A.   Yes.

18  Q.   -- remaining digoxin tablets?

19  A.   Yes.  My attorney has them.

20  Q.   What type of packaging did the

21  digoxin tablets come in?

22  A.   Regular pharmacy, orange,

23  childproof cap type.  Standard pharmacy

24  bottle.

25  Q.   And you gave that to your

Alan W. Chambers

Page 101

```
 1   Q.   Did you notice anything different

 2   about the pills?

 3   A.   No.

 4   Q.   Did you ever take more than one

 5   Digitek pill at a time?

 6   A.   No.

 7   Q.   Would you take your Digitek

 8   medication with a meal?

 9   A.   Yes.

10   Q.   What meal would you take your

11   Digitek with?

12   A.   Depending on what time I took it,

13   in the day, which would be breakfast.

14   Q.   What do you normally have for

15   breakfast?

16   A.   I have cereal, maybe a glass of

17   orange juice, a piece of toast

18   sometimes.

19   Q.   In 2008 were you taking any

20   non-prescription medications?

21   A.   No.

22   Q.   What about any herbal products or

23   natural remedies?

24   A.   No.

25   Q.   Have any of your physicians or
```

Alan W. Chambers

Page 102

1   healthcare providers told you that you

2   experienced digoxin toxicity?

3   A.    No.

4   Q.    Did any of your physicians or

5   healthcare providers indicate to you

6   that you experienced a Digitek or

7   digoxin overdose?

8   A.    No.

9   Q.    Do you believe that you received a

10  double dose of Digitek?

11  A.    I wouldn't be aware of it as a

12  layman.

13  Q.    Are you claiming that you have or

14  may develop any mental, psychological or

15  emotional conditions as a result of your

16  use of Digitek?

17  A.    No.

18  Q.    Is it accurate to say that you

19  have not had to limit your daily

20  activities in any way because of your

21  use of Digitek?

22  A.    Yes, it's accurate.

23  Q.    Any limitations are due to your

24  underlying heart condition, correct?

25  A.    That's correct.  My heart

Alan W. Chambers

Page 104

1    Q.    They instructed you verbally that

2    there was a recall.

3    A.    Yes.

4    Q.    You understand that this lawsuit

5    is a class action lawsuit, correct?

6    A.    Yes.

7    Q.    What does that mean to you?

8    A.    It's a representation of, in my

9    case, residents of New Jersey to be

10   compensated for financial outgo

11   pertaining to doctors' visits,

12   medication expenses, and any testing

13   involved with Digitek, with the recalled

14   Digitek.

15   Q.    Do you understand that you could

16   have filed an individual claim relating

17   to your purchase of Digitek?

18   A.    I'm not totally aware of that.

19   But I imagine there's other avenues I

20   could pursue, but I didn't.

21   Q.    Do you understand that you have

22   special duties or responsibilities as a

23   class representative?

24   A.    Yes.

25   Q.    What do you understand those

Alan W. Chambers

1   fact that I'm not -- it's not a personal

2   injury case, I don't -- I'm kind of

3   having trouble correlating that with the

4   question you asked me.

5          Like my attorney said, it's

6   kind of a vague -- I don't know.

7   BY MR. SIMON:

8   Q.   Do you need ongoing medical

9   monitoring or testing as a result of

10   your use of Digitek?

11   A.    Not that I'm aware of, no.

12   Q.    Are you representing a class of

13   people who need ongoing medical testing

14   or monitoring?

15   A.    I'm representing simply people, as

16   I stated before, that are to be

17   compensated for expenses that they --

18   when they were under the recalled

19   product, pertaining to doctors' visits

20   or any testing and medication expenses.

21          That's the only understanding

22   I have of what I'm representing.

23   Q.   Do those people who you represent,

24   do their expenses include future medical

25   testing and monitoring as a result of

Alan W. Chambers

1   their use of Digitek?

2   A.   I can't answer that.

3   Q.   Why not?

4   A.   I think if it's a result of the

5   problem with the Digitek and it's

6   related to expenses that they had to

7   incur for periodic testing, I would say

8   whatever test they need to have as a

9   result of the recalled product, that

10  would be covered in compensation.

11  Q.   Do you recognize that there may be

12  some people who believe they were

13  physically or mentally injured because

14  of their use of Digitek?

15  A.   I understand there may be people.

16  In my -- In my situation here, I don't

17  believe I represent them, but I do

18  understand what you're saying there.

19  Q.   And those people would have also

20  paid for their Digitek, correct?

21  A.   Yes.

22  Q.   But you're not seeking to recover

23  anything, other than the purchase price

24  in your lawsuit, correct?

25  A.   Well, I didn't have any testing or

Alan W. Chambers

Page 109

1    anything.  I guess, yeah, that would be

2    the case, yes, in my particular...

3    Q.   Do you understand that it's

4    possible by limiting their claims to a

5    refund claim, that you may prevent them

6    from filing a separate suit about their

7    claimed physical injuries?

8           MR. PETTIT:  Object to the

9    form.

10          THE WITNESS:  I'm not an

11   attorney, obviously.  So I'm not aware

12   of how the legal process proceeds.  I'm

13   here to represent them in this initial

14   case.

15   BY MR. SIMON:

16   Q.   How was it that you were selected

17   as a class representative?

18          MR. PETTIT:  Object to the

19   form.

20          THE WITNESS:  I was asked if

21   I would like to represent the class.

22   BY MR. SIMON:

23   Q.   Why do you want to represent the

24   proposed class?

25          MR. PETTIT:  Objection.

Alan W. Chambers

Page 117

1    A.   Right.   I still have the machine.

2    I don't use it.

3    Q.   What is the total amount that

4    you're claiming in this lawsuit for you

5    personally?

6    A.   I guess my own situation -- my own

7    situation would be for three -- I

8    believe I had three prescriptions.   I

9    might be incorrect with that.

10           My insurance pays -- I pay a

11   copay on my prescriptions.   So my

12   out-of-pocket expense is $5 a

13   prescription.

14   Q.   So a total of $15, obviously.

15   A.   Right.   I didn't have any testing

16   or anything else involved with it, other

17   than my routine visits.

18           I don't believe the -- well,

19   I looked at the digoxin and that wasn't

20   that expensive anyway.   The digoxin one,

21   later on.   I guess it's listed on there.

22   Q.   Did you pay the same amount for

23   those prescriptions?

24   A.   I pay $5 for each.   It's a copay,

25   $5 of my health plan, yes.

Alan W. Chambers

Page 118

1   Q.   By "those prescriptions," I mean

2   the digoxin.

3   A.   These here, yes, they would have

4   been $5, too.  I believe if it's a

5   generic -- or if it's brand name, it's

6   15 or 20, something like that.  But, I

7   guess, this is generic digoxin, I

8   believe.

9          Most likely I would have paid

10   $5.  I don't have my receipts or

11   anything with the Digitek, but it would

12   have probably been $5.

13          MR. UNDERHILL:  I don't think

14   I have anything else, unless you want to

15   follow up.

16          MR. SIMON:  I think so.

17              EXAMINATION

18   BY MR. SIMON:

19   Q.   I think one more question,

20   Mr. Chambers.

21   A.   Sure.

22   Q.   Did you receive the same benefit

23   from the Digitek that you received from

24   taking the digoxin?

25          MR. PETTIT:  Object to the

Alan W. Chambers

Page 119

```
 1   form.
 2            THE WITNESS:  Based on the
 3   problems I had with the contractions, I
 4   don't feel it was a beneficial -- I
 5   don't think it was a benefit.
 6            My own personal experience, I
 7   haven't had the severe contractions
 8   since I stopped taking it, so...
 9   BY MR. SIMON:
10   Q.   Is it fair to say that you
11   received the same lack of benefit from
12   the Digitek that you received from the
13   digoxin?
14            MR. PETTIT:  Object to the
15   form.
16            THE WITNESS:  I don't know
17   how to answer that myself.  Other than a
18   lack of benefit, basically.  Yeah.
19            MR. SIMON:  Can you read the
20   question back to him.  That may help.
21            (The court reporter read back
22   the following:
23            "QUESTION:  Is it fair to say
24   that you received the same lack of
25   benefit from the Digitek that you
```

Alan W. Chambers

1           WITNESS CERTIFICATION

2

3              I hereby certify that I

4      have read the foregoing transcript of my

5      deposition testimony, and that my

6      answers to the questions propounded,

7      with the attached corrections or

8      changes, if any, are true and correct.

9

10

11

12     _____    _____

13     DATE          ALAN W. CHAMBERS

14

15

16

17     _____

18     PRINTED NAME

19

20

21

22

23

24

25