**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**IN RE DIGITEK®**
**PRODUCTS LIABILITY LITIGATION**            **MDL NO. 1968**

_____

**THIS ACTION RELATES TO:**

Campbell v. Actavis, 2:08-cv-01075;
Chambers v. Actavis Totowa, LLC, 2:08-cv-01175;
Konek v. Actavis, Inc., 2:08-cv-1053;
Lange v. Actavis Totowa, LLC, 2:09-cv-00448;
Wilburn v. Actavis Group hf, 2:08-cv-01017;
York v. Actavis Totowa, LLC, 2:09-cv-00544

_____


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   THE DRUG - DIGITEK® (DIGOXIN TABLETS, USP) AND THE CLASS I
           NATIONWIDE RECALL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   THE REMAINING CLASS ACTION COMPLAINTS . . . . . . . . . . . . . . . . . . . 4

      C.   THE CLASS PLAINTIFFS ARE APPROPRIATE CLASS
           REPRESENTATIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.   PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(a) . . . . . . . . . . . 16

           1.   Plaintiffs have identified common issues . . . . . . . . . . . . . . . . . . . . . . . 17

           2.   Plaintiffs' claims are typical of the putative class members . . . . . . . . . 18

           3.   The class representatives will fairly and adequately represent
                the interests of the putative class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      B.   PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(b)(3)
           PREDOMINANCE AND SUPERIORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           1.   Plaintiffs have established that common issues of fact and law do
                predominate as the application of New Jersey law to all putative class
                members' claims is appropriate and constitutionally permissible . . . . . . 21

           2.   Single State Class Certification in the Cases Presently Before This Court
                is a Viable Alternative to Certification of a National Class Should the
                Court Disagree That New Jersey Law Can Be Applied to All Putative
                Class Members' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

           3.   Plaintiffs have Sufficiently Established Superiority . . . . . . . . . . . . . . . 37

                a.   Class Members' Interests In Individually Controlling Their Suit  38

                b.   The Extent of Existing Litigation . . . . . . . . . . . . . . . . . . . . . . . . 39

Doc. 167022

      c.     This Forum Is Appropriate To Adjudicate This Controversy . . . 40

      d.     Plaintiffs' Proposed Class Is Manageable . . . . . . . . . . . . . . . . . 41

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## CASES

*Adamson v. Bowen,*
  855 F.2d 668 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re A.H. Robins Co., Inc.,*
  880 F. 2d 709 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In Re Baycol Products Litig.,*
  218 F.R.D. 197 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.,*
  2006 U.S. Dist. LEXIS 64264 (D.N.J. Sept. 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . 40

*Benedict v. Altria Group, Inc.*
  241 F.R.D. 668 (D.Kan. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Benjamin H. v. Ohl,*
  1999 U.S. Dist. LEXIS 22454 (S.D. W. Va. Oct. 8, 1999) . . . . . . . . . . . . . . . . . . . . 18

*Berg Chilling Sys., Inc., v. Hull Corp.,*
  435 F.3d 455 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Black v. Rhone-Poulenc, Inc.,*
  173 F.R.D. 156 (S.D. W. Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blackie v. Barrack,*
  524 F.2d 891(9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Bogosian v. Gulf Oil Corp.,*
  561 F.2d 434 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,*
  288 F.3d 1012 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brown v. Cameron-Brown Co.,*
  92 F.R.D. 32 (E.D. Va. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cimino v. Raymark Indus.,*
  751 F. Supp. 649 (E.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Doc. 167022

*David B. Lilly Co. v. Fisher*,
    18 F.3d 1112 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Deposit Guaranty Nat'l Bank v. Roper*,
    445 U.S. 326 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Elias v. Ungar's Food Prods., Inc.*,
    252 F.R.D. 233 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Estate of Marcos Human Rights Litig.*,
    910 F. Supp. 1460 (D. Haw. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Ford Ignition Switch Litig.*,
    174 F.R.D. 332 (D.N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Franchise Tax Board v. Hyatt*,
    538 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29

*Gennari v. Weichert Co. Realtors*,
    691 A.2d 350 (N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gold Strike Stamp Co. v. Christensen*,
    436 F.2d 791 (10th Cir.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Gunnells v. Healthplan Servs., Inc.*,
    348 F. 3d 417 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 34

*Joseph v. General Motors Corp.*,
    109 F.R.D. 635 (D. Colo. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kleinman v. Merck & Co.*,
    2009 WL 2481925 (N.J.  Super. L. Aug. 13, 2009) . . . . . . . . . . . . . . . . . . . . 25, 26, 35

*La Fata v. Raytheon Co.*,
    207 F.R.D. 35 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    256 F.R.D. 586 (N.D. Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    257 F.R.D. 46 (D.N.J. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 24, 26, 27, 28

*Nafar v. Hollywood Tanning Sys., Inc*,
    339 F. App'x 216 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Nevada v. Hall*,
    440 U.S. 410 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Norflet v. John Hancock Life Ins. Co.*,
    2007 U.S. Dist. LEXIS 65793 (D. Conn. Sept. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . 38

*Paramount Aviation Corp. v. Gruppo Agusta*,
    288 F.3d 67 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People Express Airlines, Inc. v. Consolidated Rail Corp.*,
    495 A. 2d 107 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

*In re Prempro*,
    230 F.R.D. 555 (E.D. Ark. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Propulsid Prods. Liab. Litig.*,
    208 F.R.D. 133 (E.D.La.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

*Rhodes v. E.I. Du Pont de Nemours & Co.*,
    253 F.R.D. 365 (S.D. W. Va. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Static Random Access Memory Antitrust Litig.*,
    2009 U.S. Dist. LEXIS 110407 (N.D. Cal. Nov. 25, 2009) . . . . . . . . . . . . . . . . . . . . . 39

*Summerfield v. Equifax Info. Servs. LLC*,
    2009 WL 3234191 (D.N.J. Sept. 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. S.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Tri-State Crematory Litig.*,
   215 F.R.D. 660 (N.D. Ga. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
   219 F.R.D. 661 (D. Kan. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 37

*Varacallo v. Mass. Mut. Life Ins. Co.*,
   752 A.2d 807 (N.J. App. Div. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Vioxx Prods. Liab. Litig.*,
   239 F.R.D. 450 (E.D. La. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## OTHER AUTHORITIES

Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547 (1996) . . . . . . . 42

5 James Wm. Moore, *Moore's Federal Practice* § 23.46[2][a] (3d ed. 1997 & Supp. 2006) . . . 33

1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (3d ed. 1992) . . . . . . . 18

## STATUTES AND RULES

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kansas Consumer Protection Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

New Jersey Consumer Fraud Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## I.    PRELIMINARY STATEMENT

Defendants distort the facts, the record, and Plaintiffs' motion in their efforts to avoid responsibility for the economic losses their conduct imposed – and Defendants knew would be imposed – on thousands of class members.  Defendants' arguments against class certification are largely directed to classes that Plaintiffs did not and do not seek to have certified.  Defendants' remaining arguments are misdirections and red herrings.  Indeed, conspicuously absent in Defendants' response brief is any remark about their express and tacit admissions in this litigation that certain recall-related economic losses were anticipated by them and that Defendants' have readily acknowledged the real losses that the class Plaintiffs seek to certify suffered. (See Pltfs' Memo at p. 25).[1]

Plaintiffs here seek certification of a nationwide class of persons who have suffered an economic loss due to the Class I nationwide recall of all strengths of Digitek® (Digoxin Tablets, USP) tablets for oral use ("Recalled Digitek®").  The nationwide recall was due to mistakes made emanating from Actavis Totowa's facilities in New Jersey[2] causing the Recalled Digitek® to be sold in the United States.  Plaintiffs are *not* pursuing personal injury claims on behalf of the class.    In fact, unlike the cases cited by Defendants, Plaintiffs here do *not* seek certification of personal injury, medical monitoring or even blanket refund classes.

In short, Plaintiffs assert a narrowly defined economic loss class action to recover economic damages as a result of the product recall instituted due to Defendants' poor manufacturing practices.  Specifically, Plaintiffs ask this Court to certify a class with economic

---

[1]  Citations to "Pltfs' Memo" are to Plaintiffs' opening memorandum in this motion; citations to "Defts' Brief" are to Defendants' Brief Opposing Class Certification.

[2]  Defendants admit that the Recalled Digitek® was manufactured by Actavis Totowa LLC which has its principal place of business in New Jersey.  *See* Defts' Brief p. 5.

loss claims under the New Jersey Consumer Fraud Act, unjust enrichment and breach of warranty, both implied and express.[3]

## II.      FACTUAL BACKGROUND

### A.      THE DRUG - DIGITEK® (DIGOXIN TABLETS, USP) AND THE CLASS I NATIONWIDE RECALL

Defendants admit that Digitek® has "a narrow therapeutic/toxic ratio," meaning that "there can be a fine line between sub-therapeutic, therapeutic, and toxic doses." *See* Defts' Brief p. 3. Therefore, when Defendants discovered "non-conforming tablets" in a manufacturing lot they determined that it was necessary to issue a nationwide Class I recall. *See* Young Aff., ¶ 4. While Defendants claim that the recall was initiated on "the theoretical possibility that such tablets might have been released" (Defts' Brief p. 17), whether or not the non-conforming tablets actually reached the market is irrelevant to the claims of the proposed Class. It was the recall based on the mere possibility of release of non-conforming tablets alone which led to the economic damages suffered by the proposed Class.[4] Further, by issuing the nationwide Class I recall, Defendants rendered all Recalled Digitek® unmerchantable thus violating the express warranty of merchantability, one of the claims for economic loss which Plaintiffs here seek to certify.

---

[3] Defendants deliberately misconstrue the claims being sought for certification by putting forth facts and issues that are not relevant to the claims Plaintiffs seek to certify, or this motion for class certification.

[4] Plaintiffs, however, do not concede that there were no non-conforming tablets released. On the contrary Plaintiffs have reason believe that these tablets actually reached the public. In fact, contrary to Defendants' irrelevant argument, during the course of discovery Plaintiffs have already found at least one reference to a pharmacy discovery of a non-conforming tablet. *See* Exhibit A attached hereto, an email referencing a non-conforming pill found in the market. Nevertheless, for purposes of the present motion for class certification, it is irrelevant whether any particular class member was in possession of a non-conforming tablet. Furthermore, it a merits-based question more appropriate for trial.

166928-1                                    - 2 -

Additionally, Defendants' post-hoc attempt to clarify their statement made during the recall instructing customers to "contact their healthcare professional with questions" regarding the recall does not lessen the fact that Defendants expected proposed class members to incur costs. *See* Defts' Brief p. 17. Contacting a healthcare professional comes at a cost and it is certainly foreseeable that the healthcare professional would (a) recommend an immediate appointment with the physician, (b) recommend running tests for digoxin toxicity whether or not the patient actually ingested a non-conforming tablet, and/or (c) issue a new prescription replacing the prescription for the Recalled Digitek®. All of these possibilities would subject class members to having to make payments they would not have had to otherwise make if Defendants had not manufactured and produced non-conforming tablets ultimately causing them to issue the nationwide Class I recall, and none of these clearly foreseeable possibilities is contingent on members of the Class actually ingesting and/or being physically harmed by such ingestion.

Defendants attempt to obfuscate the true nature of Plaintiffs' class certification by raising individual issues that relate only to personal injury claims. Plaintiffs here only seek recovery of the economic damages the class has already suffered and are ***not*** seeking to certify any personal injury or products liability claims which might require any individual proofs of personal injury. Thus, the Court does not need to delve into whether the class members or any of the proposed class representatives actually suffered from digoxin toxicity.[5] Rather, the pertinent facts in determining who are members of the class are merely whether the person was prescribed, purchased, and incurred expenses as a result of the nationwide recall.

---

[5] Defendants attempt to make this an issue by submitting the Affidavit of Walter M. Kernan, M.D. However, his opinion does not relate to any of the class certification issues now before the Court and should be disregarded.

166928-1                                    - 3 -

### B.      THE DISCONTINUED CLASS ACTION COMPLAINTS

Defendants disingenuously suggest that the voluntary dismissals of other class action complaints somehow undermine the force and appropriateness of the cases that remain.  As one can only speculate as to the reasons why any of those claims were dismissed, the fact of such dismissals is of no probative or substantive value on the merits of class certification.  Moreover, what Defendants fail to disclose to the court, however, is that many of these dismissals came as a result of Defendants' tactical campaign of intimidation.  Defendants have failed to share with the Court the content of their letters to the plaintiffs in many of these now-dismissed cases threatening them with sanctions and thousands of dollars of attorney fees if they would not dismiss their cases.  *See* Exhibit B attached hereto, the July 22, 2009 letter to plaintiffs' counsel regarding the dismissal of class claims.  That many capitulated in the face of these threats is unsurprising given that they have very small individual claims (indeed, precisely the kind of small claims for which the class action device was designed) and are often left with little choice but to discontinue the pursuit of their claims – or face financial ruin for trying to stand up for their rights.

### C.      THE CLASS PLAINTIFFS ARE APPROPRIATE CLASS
###          REPRESENTATIVES

Defendants attempt to portray the remaining named plaintiffs as having highly individualized issues and seeking different claims than the claims sought to be certified in this motion.  However, it is entirely inconsequential that some of the proposed representatives expressed their personal sentiment that they would like to recover emotional distress damages on behalf of the class or to "punish" the pharmaceutical companies for the class or even to help the class members recover for their personal injury claims.  Each of the proposed representatives is a lay person, each is anything but sophisticated (indeed, some are very unsophisticated) about the remedies available to the class, but each indicated a strong desire to recover whatever damages

are available to the class.  This is a determination to be made by the Court as a matter of law; however, a lay person expressing his or her concern should not disqualify these non-lawyers from serving as class representatives.

Further, Defendants take the low road in attacking and disparaging persons who withdrew their lawsuits against Defendants months ago.  Neither Bobby Milligan nor Michael Pasken ever even filed a motion to be appointed as class representatives, thus any attack on these men should be completely disregarded.  Further, to the extent they may have claims additional to the claims Plaintiffs seek to certify here, that should not prevent this Court from certifying this narrow class which is attempting to provide some recovery to the vast number of individuals who may have suffered economic loss.[6]

**Lorena Ard [7]**

Since Defendants found no legitimate basis under Fed. R. Civ. P. 23 to challenge Ms. Ard, Defendants instead have insulted her by making an unnecessary, unwarranted, and outrageous personal attack on Ms. Ard.  Rather than focusing on the relevant legal issue (whether Ms. Ard is a suitable class representative), Defendants instead question her professionalism as a nurse.  *See* Defts' Brief at p. 12 ("Although Ard, who is a nurse, claims the Digitek® she took posed health risks, she cared for a patient who was taking Digitek® but did not tell the patient about this lawsuit.")  Ms. Ard has been a nurse for over 40 years.  *See* Ard

---

[6] Defendants attempt to make potential personal injury claims an issue by submitting the Affidavit of Walter M. Kernan, M.D.  However, his opinion is entirely irrelevant and does not relate to any of the economic loss issues before the Court now in this motion for class certification and should be disregarded and stricken.

[7] Cited pages of the transcript of the deposition of Ms. Ard and Ms. Ard's Amended Digitek Plaintiff Fact Sheet ("PFS") are attached as Ex. N to the Thomspon Decl. filed with the motion seeking class certification.  Various portions of the transcripts of the Plaintiffs' depositions and fact sheets are redacted as Confidential.

Deposition at 7:17-18.  Since 1997, she has been a psychiatric nurse.  *Id.* 7:21-22.  Rather than being derelict in her duties as a nurse, Mr. Ard acted entirely appropriately by not discussing a "lawsuit" with a psychiatric patient —after the recall of the bad batch of pills had been completed.  Defendants' attempts to suggest that Ms. Ard placed one of her patients in danger have no place in this litigation.  Ms. Ard's relevant qualifications as a class representative who will zealously pursue the class claims stand unopposed.

## Dale Campbell [8]

Plaintiff Dale Campbell was prescribed and purchased the Recalled Digitek®.  Defendants' discussion of Mr. Campbell's failure to have a doctor determine whether symptoms he experienced were caused by digoxin toxicity is irrelevant.  *See* Defts' Brief p. 12-13.  His claim lies not with whether or not he received and ingested non-conforming tablets, but whether he was prescribed and purchased the Recalled Digitek®.  He is not seeking class certification of personal injury claims; rather he is seeking to recover his economic damages from having purchased a product that was later recalled.

Defendants falsely claim that Mr. Campbell does not understand the obligations of a class representative.  *See* Defts' Brief p. 13.  For a lay person, and not an attorney with expertise under Fed. R. Civ. P. 23, Mr. Campbell's understanding of his obligations is excellent:

> Q.     Do you understand that this lawsuit that you're involved in is a class action?
> A.     Yes, ma'am.
> Q.     Do you know what that means?
>                     *              *              *              *

---

[8] Cited pages of the transcript of the deposition of Mr. Campbell, Errata Sheet to the Transcript, and Mr. Campbell's PFS are attached as Ex. O to the Thompson Decl. filed with the motion seeking class certification.  Mr. Campbell's transcript had been designated as Confidential.  For purposes of this motion, Plaintiff is submitting selected excerpts of his transcript on a non-confidential basis.  The remainder (as well as redacted portions on these excerpted pages) remains Confidential.

A.      Yeah, I'm representing the other people that was taking this medicine as well.

Q.      Do you understand what your obligations are as a class representative?

                    *                    *                    *

A.      To try and recover the losses they had as well.

Q.      Do you understand that you could have filed a lawsuit simply on your own behalf, in other words, not be part of a class action?

A.      I'm sure I could have, yes.

Q.      Why is it that you decided you wanted to pursue this as a class action and be the representative?

A.      To help the other people that took a loss as well.

                    *                    *                    *

Q.      So, there are class representatives and then there are class members.  Do you understand that difference?

A.      Yes.

                    *                    *                    *

Q.      What is it that you're hoping to recover in this lawsuit?

A.      My co-pay for all the medicine and the co-pay for all of the people in the class action suit.

See Campbell Trans. 25:20-26:15; 28:2-5; 28:15-19

Thus, upon a fair reading of Mr. Campbell's transcript it is clear that he understands that there is a difference between being a member of the class and representing the class, and that he is representing other persons who had been prescribed the Recalled Digitek®.  *See* Campbell Trans. 27:20 – 28:5.  Further, Mr. Campbell clearly expressed his willingness to represent the proposed class to recover "the co-pay and anything else the court allows for all of the people in the class action suit."  *See* Campbell Errata Sheet, Thompson Decl. Exh. O.

**Alan Chambers [9]**

Defendants impugn Plaintiff Alan Chambers on a number of irrelevant grounds.  First, Defendants claim he is atypical and cannot seek recompense for his first doctor's visit after the recall because he had already scheduled the appointment before the recall was announced.  Defendants miss the point, however, that Mr. Chambers discussed the recall with his doctor during this visit and testified that he would have made an appointment to do so had one not

---

[9] Cited pages of the transcript of the deposition of Mr. Chambers are attached as Ex. P to the Thompson Decl. filed with the motion seeking class certification.

already been scheduled.  *See* Chambers Trans. at 121:2-8.  As mentioned previously, Defendants themselves urged putative class members to "contact" their doctor following the recall.  *See* Defts' Brief p. 17.   Defendants cannot now be heard to complain when those who followed their advice, such as Mr. Chambers, seek compensation for the amounts that advice cost them.  In a transparent *post-hoc* rationalization, Defendants seem to suggest that by "consult" they meant merely "call," but such a narrow view of the Defendants' advice is unwarranted.  Where such a call results in the physician requesting an office visit, the cost of the visit should properly be reimbursed by Defendants.

Defendants also erroneously suggest that Mr. Chambers is an inadequate class representative because he allegedly seeks to recover for personal injuries.  In strained support of this misguided argument, Defendants state that Chambers "claims" the Recalled Digitek® caused him to have contractions.  *See* Defts' Brief p.13 citing Chambers Trans. at 15.  In reality, he never made such a claim, and neither he nor the other movants seek classwide relief for personal injury, emotional distress, wage loss or medical monitoring.  *Id.*  Mr. Chambers understands his role (as far as a layperson can) and understands the relief sought includes the cost of the doctor visit(s)/tests and the cost of the pills.  *See* Chambers Trans. at 30-31; 33; 104-106.

Next, Defendants attack Mr. Chambers' qualifications on the basis that he took no digoxin after the recall until he saw his doctor.  *See* Defts' Brief p. 14.  This argument is irrelevant to the purely economic loss claims at issue here and is irrelevant to Mr. Chambers' capacity to act as a class representative. Mr. Chambers simply believed his doctor would have reached out to him if digoxin was still needed in that interim period.  *See* Chambers Trans. at 18:6-11. While this may have been a naïve view, this hardly disqualifies him as a class representative.

166928-1                                      - 8 -

Finally, Defendants unfairly try to capitalize on a mistake Mr. Chambers made during his deposition.  That is, Defendants claim Mr. Chambers seeks recovery for more than his first doctor visit after the recall.  (*see* Defts' Brief p. 14, fn 88, citing Chambers Trans. at 107-109).  It is clear from the transcript, however, that Mr. Chambers misunderstood the scope of what post-recall doctor visits and tests he and the class seek to have reimbursed.  When this point was revisited during the deposition, he reiterated earlier testimony that he does not seek to represent them (*see* Chambers Trans. at 108:15-18).  This kind of honest confusion on the part of a lay person does not serve as a legitimate basis to disqualify him.

**Peter J. Konek [10]**

As they do with many of the other individuals seeking to act as class representatives, Defendants attack Mr. Konek's ability to represent the proposed class by pointing to a lack of physical injury.  In actuality, his lack of personal injury makes him an adequate and typical proposed class representative – this class is seeking to represent those persons who were prescribed and purchased the Recalled Digitek® and suffered economic losses as a result.  The proposed class will not represent any personal injury or products liability claims.  Further, as discussed throughout this memorandum, as a proposed class representative, Mr. Konek is not seeking to have a class certified for any personal injury claims, much less anxiety claims, due to ingestion of the Recalled Digitek®.

Defendants claim that Mr. Konek's "goal is only to see the companies 'punished.'" *See* Defts' Brief p. 9.  However, Mr. Konek was merely expressing his strong gut reaction to what he perceived to be a significant sleight-of-hand by Defendants.  Further, Mr. Konek hired counsel in order to pursue his rights against the wrong committed by Defendants.  It is certainly reasonable for an 80 year-old man, who has lived long enough to become distrustful and grew up in a time

---

[10] Cited pages of the transcript of the deposition of Mr. Konek and Mr. Konek's PFS are attached as Ex. Q to the Thompson Decl. filed with the motion seeking class certification.

when bad behaviour was actually punished, to equate seeking justice with some type of penalty. It is also fair to say that Defendants cherry-picked the word "punished" and used it out of context. *See* Konek Trans. 79:9-17.

That Defendants claim that Mr. Konek said that "Digitek 'did its job' for him: . . . ." is irrelevant to the economic loss claims. This action is not dependent upon whether or not during periods of use of the Digitek any class members benefited from their prescription. Instead, it concerns the economic losses incurred from recall-related expenses, including payments for pills and recall-related digoxin blood level test and medical examinations. Moreover, Defendants' argument avoids the fact that Konek takes two drugs for his heart problems (*See* Defts' Brief p. 9 and Konek Trans. 33:2, 41:1, 94:4-15) and has no way to know which of the drugs he takes actually works. He is not a doctor and does not have the expertise to evaluate how effective, if at all, Digitek was. All he knows is that he does not recall suffering any physical injury from having taken Digitek®, except maybe dizziness. *See* Konek Trans. 21:16 - 22:15. These facts have no bearing on the issue now before the court.

As Defendants stated "[a]fter the recall, Konek did not go to his doctor – he simply called his doctor's office and received a replacement prescription the next day." *See* Defts' Brief p. 10. However, because he did not have any specific physical injury that he could recall, he believed he did not need to bother his doctor for a visit, but Mr. Konek did firmly believe he should not stop taking his heart medication and that a call for a new prescription was necessary. *See* Konek Trans. 51:25 - 55:2. Additionally, Defendants attack Mr. Konek for not knowing wither he ever took a non-conforming tablet and whether such tablets were ever in the market, but this is information that is solely in Defendants' control and is irrelevant for the purposes of the present motion.

In yet another mischaracterization of this case as one seeking certification of personal injury claims, Defendants point out Mr. Konek's personal misunderstanding of whether the Court will need to determine if persons are seeking personal injury or economic loss claims. *Id.*

166928-1                                                  - 10 -

However, Mr. Konek is a lay person who would understandably not be clear on the fine line between the claims this class is seeking to represent and the other claims that may possibly exist.

Finally in attacking Mr. Konek's adequacy as a class representative, Defendants claim that "[h]e admitted (in response to a question by his own counsel) that he did not understand his duties or responsibilities as a class representative." *Id.*  This is inaccurate.  Mr. Konek knows that he has duties.  *See* Konek Trans. 84:15 - 85:3, 87:16-18, 104:19 - 105:2.  He was merely unsure about how to meet them. *Id.* at 105:3-5.  But he retained able counsel, which Defendants do not dispute, and realized quickly, after further questioning, that he was doing his duty.  *Id.* at 105:6 - 107:6.  Here, again, he need not be able to write the brief, just willing to zealously pursue the case.

**William E. Lange** [11]

Plaintiff William E. Lange is more than an adequate class representative both for a putative national class and a West Virginia only class. While it is true that Mr. Lange is a resident of Kentucky and that he filed his case directly into the MDL in West Virginia, he was empowered to do so by this Court.  Mr. Lange wishes to represent individuals from around the country who suffered economic loss by virtue of the recall, which losses include all out of pocket expenses related to the recall. Defendants assert multiple irrelevant attacks on Mr. Lange's capacity as a representative plaintiff, none of which, individually or collectively, impact his qualifications to act in that capacity.

Defendants question Mr. Lange's credibility because he proceeded to the pharmacy before contacting his doctor.  *Id*.  The order in which Mr. Lange went to the pharmacy and visited his doctor has no bearing on his economic losses or his qualifications as an adequate class

---

[11] Cited pages of the transcript of the deposition of Mr. Lange are attached as Ex. R to the Thompson Decl. filed with the motion seeking class certification.

representative. Defendants also point out that Mr. Lange was never diagnosed with digoxin toxicity or elevated digoxin levels.  *See* Defts' Brief p. 30.  This is precisely why Mr. Lange withdrew any personal injury allegations included in his fact sheet, a circumstance which confirms his credibility and capacity to act as a class representative.

Defendants also attack Mr. Lange's qualifications in connection with his failure to seek a refund under Defendants' refund program. Mr. Lange testified that he was informed of the availability of replacement pills, but not a refund of the purchase price already paid.  *See* Lange Trans. p. 15-18). Whether or not he would have taken advantage of such program is irrelevant if Mr. Lange was never informed of the refund program. Furthermore, Mr. Lange is not required to take a refund from any of the Defendants when that amount would not compensate him for all of his economic damages.

Defendants also mention Mr. Lange's opinions on the efficacy of Digitek and other brands of digoxin as somehow disqualifying him as a class representative. *Id.*  Regardless of Mr. Lange's opinion, he was instructed to return the pills because of a Class 1 Recall caused by Defendants' conduct. His expenses related to the recall have nothing to do with his personal opinions of the product.

In short, Defendants various attacks on Mr. Lange have nothing to do with the adequacy of Mr. Lange as a class representative.  He incurred economic losses and is qualified to act on behalf of the class.

**Judy Whitaker as Executrix of the Estate of Anna Fight** [12]

Defendants launch several baseless attacks on Judy Whitaker, acting on behalf of her deceased mother, Anna Fight.  First, Defendants argue that it "unclear as to whether [Ms.

---

[12] Cited pages of the PFS of Ms. Whitaker are attached as Ex. S to the Thompson Decl. filed with the motion seeking class certification.

Whitaker's mother, Anna Fight] actually took Digitek." *See* Defts' Brief at p. 10.  From this, Defendants urge later in their opposition brief that "[s]ome representatives are unable to prove they ever took Digitek, as opposed to some other form of digoxin."  *See id.* at p. 37. Yet, it is completely irrelevant to the present class certification motion whether Anna Fight or any putative class member "took" a Recalled Digitek® pill.  The operative question is whether she and any other putative class member possessed Recalled Digitek® and incurred expenses as a result of the recall.

The evidence is crystal clear that Anna Fight possessed Recalled Digitek®.  Defendants actually know that Anna Fight, Ms. Whitaker's mother, had Recalled Digitek® *because they have been provided with actual pictures of Ms. Fight's Digitek® bottle.  See* Photograph of Anna Fight's Digitek® bottle, produced with Ms. Fight's PFS, (Exhibit C attached hereto).  For Defendants to make their irrelevant argument in light of this physical evidence is beyond disingenuous.  Moreover, the PFS itself indicates that Ms. Whitaker possesses the bottle and the remaining pills.

Defendants denigrate Ms. Whitaker's suitability as a class representative by attacking the medical causation of her mother's personal injury and wrongful death claims.  The medical causation of her death is completely irrelevant to the economic damages claim at issue here.

Finally, Defendants inexplicably argue that Ms. Whitaker did not personally suffer any economic loss herself by virtue of the recall.  Without a doubt, Mr. Whitaker did not suffer any economic damages in this regard.  The operative question is whether her mother, Ms. Fight, did and whether Ms. Whitaker is qualified to pursue those claims on behalf of her mother and the class.  While the Defendants never asked Ms. Whitaker at her deposition if her mother suffered any economic loss, the evidence is clear that Ms. Fight did suffer economic loss and that Mrs.

Whitaker is an adequate representative to seek recompense on Ms. Fight's behalf. *See* Whitaker Deposition at 61:8-9 and 76:7-9.

**Willie Mae Wilburn** [13]

Underscoring plaintiff Wilburn's class representative qualifications, Defendants concede that Ms. Wilburn was prescribed and consumed Digitek® during the relevant period, and that after the recall she incurred expenses in replacing her Digitek®. *See* Defts' Brief, pp. 7,8. Standing unopposed from plaintiffs' class certification brief (Plfts' Memo, pp. 23-24) are the following factors that further, squarely establish her adequacy as an economic loss representative:

• She learned of the recall from her pharmacy and, per their instructions, returned unused portions of her Recalled Digitek, paying to replace them (Wilburn Trans. 14:18-15:9, 72:15-23);

• She testified that she incurred expense in undergoing initial recall-related medical testing and evaluation to ascertain her Digitek level and heart condition following the recall (Wilburn Trans. 92:22-93:12);

• Filing suit was her personal idea, she is informed of the status of the litigation, and maintains contact with her lawyers regarding the action (Wilburn Trans. 94:2-15, 130:25-131:23);

• She testified that she understands her representative role and would reject any personal settlement offer in order to zealously pursue the class claims for all similarly situated individuals (Wilburn Trans. 134:2-23).

---

[13] Cited pages of the transcript of the deposition of Ms. Wilburn are attached as Ex. T to the Thompson Decl. filed with the motion seeking class certification.

Defendants resort to slight-of-hand and mischaracterization when urging that plaintiff Wilburn is not a typical class plaintiff.  As the class claim at bar does not involve or depend upon the suffering of physical injury or the actual ingestion of excessive doses of Digitek®, regaling the court with innuendo regarding the alleged absence of proximate cause between Wilburn's ingestion of Recalled Digitek® and symptoms she testified to, is irrelevant.  So, too, is whether or not she understands refined legal issues, such as the dubious assertion by defense counsel that the class action somehow impedes the rights of individuals who are separately seeking recovery for personal injuries. Ms. Wilburn satisfies all of the requirements of a Rule 23 class representative and  is absolutely a typical and representative plaintiff for the class-wide economic loss claim at bar.

Notably, as with the other proposed class representatives, Defendant's response as to plaintiff Wilburn neither addresses the actual requisite elements for service as a class representative, nor refutes any aspect of Ms. Wilburn's qualifications as were set forth in plaintiffs' Memorandum.  Indeed, Defendants' silence on issues truly relevant to her (and the other proposed representatives') adequacy as a class representative speaks loudly of her qualifications.

Lastly, Defendants assert that on one theory—implied warranty—"[Ms. Wilburn] cannot recover under the Illinois law that governs her own claim." Defts' Brief, p. 22.  Plaintiff Wilburn filed her original complaint in New Jersey where the Recalled Digitek® was manufactured and the culpable events occurred. The New Jersey Supreme Court ruled long ago that New Jersey corporations and defendants can be held liable for purely economic damages.  The court explained:

> "We hold therefore that a defendant owes a duty of care to take reasonable measures to avoid the risk of causing *economic damages*, aside from physical injury, to particular plaintiffs or plaintiffs *comprising an identifiable class* with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A

defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty." (Emphasis added.)

*People Express Airlines, Inc. v. Consolidated Rail Corp.*, 495 A. 2d 107, 116 (N.J. 1985); quoted and cited with approval, *Paramount Aviation Corp. v. Gruppo Augusta*, 288 F.3d 67, 76 (3d Cir. 2002)(ruling that New Jersey law allows claims for purely economic losses). Similarly, New Jersey law does not impose privity requirements on plaintiff's implied warranty claims. *Id.* at 73-74. In choosing to establish business, conduct manufacturing operations, and distribute products in and from New Jersey, New Jersey law is properly applied to Ms. Wilburn's and the class claims.

## III.   ARGUMENT

### A.   PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(a)

As discussed in Plaintiffs' opening memorandum in support of their motion for class certification, the practice in this Circuit is to "'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application [that] will in the particular case best serve the ends of justice for affected parties and promote … judicial efficienc[ies].'" *See Gunnells v. Healthplan Servs. Inc.*, 348 F.3d 417, 424 (4th Cir. 2003), *quoting In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989); *Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156, 159 (S.D. W. Va. 1996). Interestingly, Defendants artfully, and misleadingly craft their interpretation of *Rhodes* implying that courts are required to "probe behind the pleadings" in determining whether a class should be certified, when in fact the Court said "[a] court *may* 'probe behind the pleadings' to determine whether class certification is appropriate." 253 F.R.D. 365, 372 (S.D. W. Va. 2008) (emphasis added). *Rhodes* goes on to say "'[t]he likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper.'" *Id. quoting Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Utilizing thinly-veiled misdirection, Defendants' rely on decisions in drug product liability cases that are wholly inapplicable to the class claims at bar.  Despite their urging to the contrary, the *Baycol*, *Propulsid* and other such litigation cited by Defendants are not relevant to the action at bar.  Those cases variously involved efforts to certify personal injury, medical monitoring or blanket refund classes, none of which are sought in this action. *See, e.g. In Re Baycol Products Litig*, 218 F.R.D. 197, 215 (D. Minn. 2003);  *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133 (E.D. La. 2002).  Defendants' reliance on those cases, and the purported individual issues that precluded certification in those actions, have no bearing on the claims at bar.

### 1.    Plaintiffs have identified common issues

In Plaintiffs opening memorandum supporting class certification, eighteen common issues were identified as being common to all class members.   The majority of these common issues relate directly to Defendants' actions with respect to the design, manufacture, labeling, packaging, dosing, supplying, distribution, release, marketing, and/or sale of the Recalled Digitek®.  *See* Pltfs' Memo p. 40.  These actions were uniform across all the Recalled Digitek® and therefore across the Class.  It is undeniable that the common issues listed as b through n are factual issues that will need to be determined for all members of the Class.  The remaining common issues relate to the determination of whether these uniform actions were a violation of the law, which as discussed in Plaintiffs opening memorandum and further in this memorandum, are common legal issues across the class.  *See* discussion *infra* at 21-28 regarding choice of law. Defendants claim that the identification of these issues is generic, but these are clearly factual issues specific to Defendants' conduct which took place at its facilities in New Jersey, preceding the distribution and sale of a non-conforming tablet which caused Defendants to issue a

nationwide Class I recall.  This set of facts is clearly common to all class members and must be established in order to prove liability in any set of circumstances.

It is well established that only a single common issue is necessary to certify a class.  *See Benjamin H. v. Ohl*, 1999 U.S. Dist. LEXIS 22454 (S.D. W. Va. Oct. 8, 1999) ("To satisfy the commonality requirement, 'there need be only a single issue common to all members of the class.'") *quoting* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (3d ed. 1992).  In determining whether there are common issues, "[t]he determinative question is whether the same issues would necessarily be re-litigated over and over again if plaintiffs were required to bring separate actions."  *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 478 (N.D. Ill. 2009) *citing Joseph v. General Motors Corp.*, 109 F.R.D. 635, 642 (D. Colo. 1986).  In this instance, if all the members of the class and the plaintiffs were required to bring separate claims, each of the issues identified in Plaintiffs' opening memorandum (Pltfs' Memo pp. 40-41) would be litigated over and over for the thousands, possibly hundreds of thousands, of plaintiffs.

As demonstrated above and in Plaintiffs' opening brief, there are numerous common issues justifying the certification of this Class.

### 2.     Plaintiffs' claims are typical of the putative class members

It is important to distinguish here the claims that Plaintiffs are seeking certification – violation of the New Jersey Consumer Fraud Act, unjust enrichment, and breach of warranty. Plaintiffs are merely seeking to certify a class of persons who were prescribed and purchased the Recalled Digitek® and suffered economic losses as a result.  Defendants attempt to interpret this proposed class as one for persons who have experienced a personal injury due to their ingestion of non-conforming tablets.  Plaintiffs here are typical of the proposed class of persons who were prescribed and purchased the Recalled Digitek® as they each were prescribed and did purchase the Recalled Digitek®, and as a result suffered economic damages, either in the form of co-pays,

166928-1                                    - 18 -

or costs for physicians' visits or medical testing and expenses.  While certain proposed class representatives may also be bringing claims individually for the injuries suffered due to the ingestion of the Recalled Digitek®, these proposed class representatives only seek to represent class members in an economic loss class based on distribution and sale of non-conforming tablets.

It is well established that the "'fact situations of class members do not defeat typicality… so long as the claims of the class representative and class members are based on the same legal or remedial theory.'" *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004) *quoting Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir. 1988).  As discussed above and in plaintiffs' opening memorandum, the proposed representatives' claims and the class members' claims are all based on the economic losses resulting from Defendants' production and distribution of Digitek® tablets which were ultimately recalled in a Class I nationwide recall.

Defendants contend that there "is no 'typical' claim."  *See* Defts' Brief p. 21.  However, the claim for which Plaintiffs are seeking certification, economic losses of co-pays, costs of physicians' visits or medical testing and expenses, are certainly typical – anyone who was prescribed and purchased the Recalled Digitek® would have at the very least paid a co-pay and some, if not most, would have incurred the costs of physicians' visits or medical testing and expenses.

### 3.     The class representatives will fairly and adequately represent the interests of the putative class

In attacking the adequacy of the proposed class representatives, Defendants claim that Plaintiffs are seeking to certify an action that cannot be brought under New Jersey law. However, this is just another example of Defendants' deliberate mischaracterization and distortion of Plaintiffs claims into those of personal injury when in fact the claims Plaintiffs seek

to certify are purely consumer claims related to Defendants' misrepresentations about the Recalled Digitek®.  The New Jersey District Court has sustained economic loss claims pursuant to the New Jersey Consumer Fraud Act ("NJCFA") for misrepresentation concerning a product. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009); *Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233 (D.N.J. 2008) (as discussed in Plaintiffs' opening brief both of these opinions certified economic loss class actions involving products under the NJCFA).

Defendants further attack Plaintiffs for "splitting claims," or bringing only economic claims when members of the class may have other personal injury or wrongful death claims. This argument has been explicitly rejected by this Circuit.  *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d at 432 ("a class action, 'of course, is one of the recognized exceptions to the rule against claim-splitting.' . . .Second, Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims [ ] requiring more individualized inquiry."); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill 2009) (*citing Gunnells*).

Plaintiffs recognize that some members of the class may have claims outside of the economic loss claims they seek to certify here, but also recognize that there are also members of the class who do not have other claims and are depending on the proposed class representatives to represent their claims before this Court.  In *In re Universal Serv. Fund Tel. Billing Practices Litig.*, the Court noted that "the mere fact that a named plaintiff elects not to pursue one particular claim does not necessarily create such a conflict" in determining that the proposed representatives were adequate despite their decision to not bring common law fraud claims.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. at 670.  The Court went on to say that "the named plaintiffs' decision to abandon the fraud claim appears to have been a choice that advances the named plaintiffs' interests as well as the interests of the absent class members, and

therefore the court is unpersuaded that any impermissible conflict of interest exists." *Id.* Similarly, the proposed representatives here do not have any impermissible conflict of interest by choosing to bring claims that will provide recovery to themselves as well as to more class members than any other claims (as all class members will have a claim for economic loss but not all class members will have claims for personal injury).

### B. PLAINTIFFS MEET THE REQUIREMENTS OF RULE 23(b)(3) PREDOMINANCE AND SUPERIORITY

#### 1. Plaintiffs have established that common issues of fact and law do predominate as the application of New Jersey law to all putative class members' claims is appropriate and constitutionally permissible

Defendants confuse the proper analysis this Court should apply when evaluating whether Plaintiffs have met the requirements of Rule 23(b)(3) with respect to predominance and superiority.  Defendants erroneously claim that this Court cannot certify a national class based upon the application of New Jersey law because of supposed conflicts among the laws of the 50 states.  As Plaintiffs detailed in their opening brief, the contacts this case has with New Jersey are so numerous and significant that this Court can apply New Jersey law to all putative class members claims *despite* any conflicts that may exist between various states' laws.  See Pltfs' memo pp. 28-36.

As Plaintiffs detailed in their opening brief, the United State Supreme Court has made clear that a single state can have significant enough contacts with a particular dispute so as to justify the application of that state's law even in the face of conflicting law from other states. *Phillips Petroleum v. Shutts*, 472 U.S. 97 (1985).  Consistent with *Shutts* and its progeny, the connections between this action and the state of New Jersey are so numerous and significant that the application of New Jersey's laws to support a national class is appropriate and constitutionally permissible.  *See, e.g.*, *Franchise Tax Board v. Hyatt*, 538 U.S. 488 (2003).

For example, as detailed in Plaintiffs' initial brief, the facts involved in the present case show that by far, overwhelming and certainly most significant contacts are with New Jersey, the headquarters for each of the Defendants, and the location of the manufacturing facilities where Recalled Digitek® was manufactured.  See Pltfs' Memo pp. 29-30.  Indeed, a review of the various warning letters from the FDA shows that it was Actavis's New Jersey manufacturing facilities where the failures to follow good manufacturing practices and to comply with FDA reporting requirements occurred.   Id.  Moreover, Defendant Actavis Totowa's responses to Plaintiffs' First and Second set of interrogatories make it abundantly clear that New Jersey is the focus of the conduct at issue in every case.  Id.  All of the Digitek® that was recalled was manufactured at the Actavis Totowa, Little Falls, New Jersey facility.  Id.  All of the Digitek® manufactured by any of the Defendants during the five years preceding May 2009, was manufactured in New Jersey.  Id.  Each and every batch of recalled Digitek® that was distributed by Mylan Pharmaceuticals, Inc., Mylan Bertek Pharmaceuticals, or UDL Laboratories, Inc. came from the Actavis Totowa facilities in Little Falls, New Jersey.  Id.  The facilities inspections by the FDA that resulted in the recall were conducted in New Jersey.  Id.  In short, New Jersey is at the heart of the claims.

Defendants attempt to shift the Court's attention away from these operative facts and instead claim that that each putative class member would have relied upon any fraudulent or misleading statements at the place of their residence and would have suffered damages there. Defendants' argument is specious.  It ignores the unique nature of this particular case where it was the Defendants' violations of good manufacturing practices and failure to implement and carry out appropriate quality control procedures that rendered their statements to consumers false and misleading.  Unlike a typical consumer fraud claim, the present case does not require the Court to delve into the specifics of what statements were made by Defendants.  This is not a case

where Defendants made exaggerated claims of efficacy, claimed their product had some particular features it did not, or failed to disclose some material fact or information about their product. Instead, the misrepresentations at issue here involve Defendants' branding and labeling of a drug as containing a particular dosage of digoxin – a statement that is this little more than a set of numbers on a label. It was the misconduct occurring in New Jersey that rendered these otherwise unremarkable, but nonetheless vitally important, statements false and misleading. That is, had Defendants followed good manufacturing practices and had adequate quality control, the pills it manufactured would not have fallen out of specification to such an extent that a recall was necessary. In this context, looking to the place of a particular class member's residence as the most significant point of contact in this case for choice of law purposes ignores the reality that *all* of the wrongdoing took place in New Jersey.

Along these lines, Defendants include a chart in their brief in support of their argument that even under New Jersey law, the laws of each jurisdiction where putative class members reside would have to be applied to consumer fraud claims. This chart outlines the various factors courts are to examine for consumer fraud claims under New Jersey law. Contrary to the Defendants' arguments, however, these factors support the application of New Jersey law to the claims of all putative class members.

In particular, as the court in *Tele Aid* recognized, the presumptions and weight to be given to these various factors is not the same. "It is well-established that the 'most significant relationship' test is not a mechanical process in which the Court simply tallies up the factors enumerated in the Restatement and applies the law of the jurisdiction supported by the majority of them." *See, e.g. Berg Chilling Sys., Inc., v. Hull Corp.*, 435 F.3d 455, 467 (3d Cir. 2006) (discounting certain factors due to their "minor importance to the issue"); *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir. 1994) ("The factors enumerated in [the Restatement] should

be evaluated on a qualitative rather than a quantitative basis."). Indeed, the *Tele Aid* court concluded that New Jersey law should apply nationwide even though four of the six considerations articulated by Section 148(2) of the Restatement weighed in favor of applying the law of each of the class member's home states. *Tele Aid*, 257 F.R.D. at 67. Just as here, the *Tele Aid* court evaluated where the misrepresentations emanated and the extent of the relationship of New Jersey to the conduct attacked and concluded that the overwhelming weight of them justified application of New Jersey law.

Another major fallacy in Defendants' arguments is that this Court must somehow address what benefits putative class members received from the recalled Digitek. As detailed in both Plaintiffs' opening brief and this reply, Plaintiffs seek only economic injuries that are a direct consequence of Defendants' recall. Whether some class members may have benefitted from taking the drug is irrelevant. Plaintiffs seek recompense for e.g., the costs of having to obtain a replacement prescription, having to consult with a medical provider, and any other out of pocket losses. Thus, there is no need for this Court to inquire into whether any particular class member received medical benefits from recalled Digitek or determine whether any particular plaintiff or class member suffered any physical symptoms from ingesting the drug.

Indeed, this feature of the present case distinguishes it from many of the cases cited by Defendants. For example, Defendants cite a number of pharmaceutical products liability cases such as *Prempro, Baycol* and *Propulsid,* to support their argument that the national class certification is improper. *In re Prempro*, 230 F.R.D. 555 (E.D. Ark. 2005); *In Re Baycol,* 218 F.R.D. at 215; *In re Propulsid Prods.*, 208 F.R.D. at 140-41. Each of these cases involved efforts to certify personal injury, medical monitoring or blanket refund classes, none of which are sought in this action. Defendants also cite several automobile products liability cases for the same proposition, but again, each of these is distinguishable from the present case. In the case of

*In re Bridgestone/Firestone*, cited by Defendants, the court declined to certify a national class on the basis that a single state did not have a significant enough connection to the litigation at hand to justify that application of a single forum's law nationwide.   *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 288 F.3d 1012 (7th Cir. 2002). As is clear here, there is a significant connection with New Jersey to justify application of its laws nationwide.  Moreover, in *Bridgestone/Firestone,* the court seemed troubled that the underlying claims were essentially tort claims disguised as warranty and consumer fraud claims.  288 F.3d at 1017.  Here, however, Plaintiffs have expressly disclaimed any effort to recover for personal injuries on a class basis. In another case cited by Defendants, *Ford Ignition Switch Litig.*, 174 F.R.D. 332 (D.N.J. 1997), the court refused to certify a national class where the question of whether there was even a defect would likely turn on the examination of over 158 models/years.  Here, the question of whether the product is defective is not at issue, as Plaintiffs only seek damages occasioned by virtue of the recall itself.  There are not multiple product lines at issue and the facts establishing liability will be uniform across all putative class members.  Thus, Defendants' reliance on these cases and the purported individual issues that precluded certification in those actions have no bearing on the claims in the present case.

Similarly, *Kleinman v. Merck & Co.*, 2009 WL 2481925 (N.J.  Super. L. Aug. 13, 2009) is distinguishable from the present case.  In denying certification of a class of consumers who paid for the prescription drug Vioxx, the court in *Kleinman* found that the causal nexus requirement of the NJCFA was individualized because "the decision to prescribe a medication is an individualized determination, which includes the other risk factors of the plaintiff and whether other drugs were effective in relieving the plaintiff's pain." Unlike *Kleinman*, where the plaintiff argued that the causal nexus was that "defendant's misrepresentations and omissions allowed Vioxx to remain on the market despite its inherent health dangers," Plaintiffs in the present case

do not argue that there is anything inherently dangerous about Digitek which caused the Plaintiffs' loss. Rather, the causal nexus is the Defendants' failure to follow good manufacturing practices which resulted in the drug containing excessive dosages of digoxin relative to the amount stated on the label. Unlike *Kleinman*, the decision whether Digitek should have been prescribed to each particular plaintiff is simply not relevant.

Defendants' analysis suffers from another fatal flaw in that it views the choice of law issue as requiring the Court to determine at the outset whether the law of each of the four jurisdictions at issue would support certification of a national class. Defendants miss the critical first step in the choice of law analysis, however, in that a multidistrict litigation court must first apply the choice of law rules of each transferor jurisdiction to determine which jurisdiction's laws will apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). In multidistrict litigation proceedings, the transferee court is to apply the law of the state in which the transferor court is located, including the transferor forum's choice of law rules. *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 55; *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006).

Accordingly, the Court's first task is to examine the choice of law rules for each transferor jurisdiction and determine what forum's law it should apply. This was the entire point of Plaintiffs' opening brief where Plaintiffs analyzed the law of each of the four transferor jurisdictions and argued that the application of New Jersey law was appropriate under each. It is not until after the Court determines which jurisdiction's law it should apply should it then proceed to the second step of determining whether that jurisdiction's law would support certification of a national class.

Indeed, Plaintiffs were careful to analyze which jurisdiction's substantive law should apply in order to avoid the "bootstrapping" problem criticized by the Court in *Shutts*. Contrary

to the Defendants' arguments, Plaintiffs have not chosen New Jersey's law simply because "a defendant is headquartered there."  *See* Defts' Brief, p. 29.  Rather, Plaintiffs engaged in the choice of law analysis as they were required to do and from that analysis, justified the choice of New Jersey for each of the actions presently pending before this Court.  From that point, Plaintiffs then demonstrate that New Jersey law can be applied nationwide to support certification of a national class.

Defendants are again wrong when they argue that New Jersey law cannot be applied on a national basis.  First, Defendants attack the *Tele-Aid* case cited by Plaintiffs in their opening brief which did in fact apply New Jersey law to claims by consumers nationwide.  Defendants erroneously argue that the continued vitality of *Tele-Aid* is in doubt given the subsequent case of *Nafar v. Hollywood Tanning Sys., Inc*, 339 F. App'x 216 (3d Cir. 2009).  Defendants fail to point out to this Court that in the *Tele-Aid* case itself, however, the Defendants petitioned the Third Circuit for review of the District Court's certification order under Federal Rule of Civil Procedure 23(f).  The Third Circuit refused to review the case.  Importantly, the *Nafar* case is an unpublished opinion from the Third Circuit, it expressly states it is "NOT PRECEDENTIAL" and "NOT … BIND[ING]," and as such lacks precedential value and can have no bearing on the validity of the *Tele-Aid* case.[14]  Even if the *Nafar* case could somehow have any persuasive authority, the case is distinguishable both from *Tele-Aid* and the present case.  In *Nafar*, the defendant argued that individual class members' knowledge of the health risks of indoor tanning resulted in individual issues predominating over common ones.  In the present case, by contrast, liability is solely dependent on an examination of the Defendants' conduct and does not require

---

[14] Pursuant to the Local Rules of the Third Circuit, "[t]he court by tradition does not cite to its not precedential opinions as authority.  Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."  3rd Cir. Internal Operating Proc. 5.7.

any inquiry into the conduct, knowledge or motivation of any class member.  Like the plaintiffs in *Summerfield v. Equifax Info. Servs. LLC*, 2009 WL 3234191, at *1 (D.N.J. Sept. 30, 2009), which the district court distinguished from *Nafar*, the class members in this case are mere recipients of pills subject to Defendants' manufacturing practices and subsequent recall.  There is nothing unique about any class member's behavior or conduct that would impact the outcome of the case.

Perhaps most important is that *Nafar* was remanded for reconsideration of the class certification motion.  In fact, the motion for class certification of a nationwide class is currently *sub judice*.  The Third Circuit did not disagree with the District Court's findings that class certification might be appropriate, it simply identified certain areas for the District Court to consider in properly defining the Class.  Thus, Defendants' reliance on *Nafar* is questionable, at best.

The presence of other Defendants allegedly domiciled outside of New Jersey does not distinguish this case from *Tele-Aid* or otherwise undercut the application of New Jersey law to support national certification.  Defendants argue that since Plaintiffs are pursuing "claims against Defendants based in Illinois, Pennsylvania, West Virginia, and Texas," "multiple states have an interest in the underlying litigation."  *See* Defts' Brief p. 29.  But the fact that these other Defendants may have offices in other jurisdictions does not undercut that all of the operative conduct giving rise to Plaintiffs' claims took place in New Jersey.  The liability of these other Defendants will flow from the misconduct emanating from New Jersey.  The mere fact alone that some Defendants may have offices in other states is not sufficient to overcome New Jersey's interests in applying its own law to corporate misconduct occurring within its boundaries.

Finally, Defendants complain that applying New Jersey law on a national basis could provide remedies to some class members that would not otherwise be available to them under the

laws of their own state.   This argument, however, has been rejected by the Supreme Court.  The

Supreme Court has held that the "Full Faith and Credit Clause does not compel a state to

substitute the statutes of other states for its own statutes dealing with a subject matter concerning

which it is competent to legislate."  *Franchise Tax Bd. v. Hyatt,* 538 U.S. 488, 494  (2003).  *See*

*also, Nevada v. Hall*, 440 U.S. 410, 424 (1979) ("To require California either to surrender

jurisdiction or to limit respondents' recovery to the $25,000 maximum of the Nevada statute

would be obnoxious to its statutorily based policies over nonresident motorists and full recovery.

The Full Faith and Credit clause does not require this result.").

**2.      Single State Class Certification in the Cases Presently Before This
Court is a Viable Alternative to Certification of a National Class
Should the Court Disagree That New Jersey Law Can Be Applied to
All Putative Class Members' Claims**

As detailed in Plaintiffs' opening brief, for all the reasons that this Court is justified in

certifying a national class, so too can the Court certify single state only classes in each of the

cases presently before it should the Court be unwilling to apply New Jersey law to all putative

class members' claims.  It does not take a regurgitation of the same facts and analysis of Rule 23

detailed in Plaintiffs' brief supporting national class certification four additional times - once for

each of the four states at issue - for this point to be clear.

While Defendants disparage the length of Plaintiffs' analysis with respect to single state

classes, Defendants do not actually claim that certification of single state classes would run afoul

of any Rule 23(a) factors.  For instance, Defendants do not dispute that the numerosity

requirements of Rule 23 are met regardless of whether this Court certifies a national class or

instead certifies state only classes in Kansas, Kentucky, New Jersey, and West Virginia.  Given

the volume of pills recalled by Defendants and the number of individuals affected throughout the

country, it cannot be seriously doubted that there are thousands of putative class members in

each of these states.  Indeed, Defendants do not even dispute such obvious facts.

166928-1                                            - 29 -

Similarly, the questions of fact common to the class under Federal Rule of Civil Procedure 23(a)(2) are the same whether this Court certifies a national class or single state only classes.  That is, in either instance the following factual questions will be at issue:

a.    Whether the Recalled Digitek® was and is unsafe for use in humans;

b.    Whether Defendants manufactured, marketed, distributed, and/or sold a defective product;

c.    Whether Defendants' manufacturing and production safety system exists, and if so, was designed and implemented in a reasonable manner;

d.    Whether Defendants designed, manufactured, labeled, packaged, dosed, supplied, distributed, released and sold Digitek® with knowledge that it was a dangerously defective product;

e.    Whether Defendants acted knowingly, recklessly, or negligently in designing, developing, manufacturing, labeling, packaging, inspecting, dosing, supplying, distributing and selling the Recalled Digitek®;

f.    Whether Defendants conducted, either directly or indirectly, adequate dose testing, batch testing or inspections of Digitek®;

g.    Whether Defendants had adequate safeguards in place to ensure that they were manufacturing, dosing, distributing, or selling Digitek® that was safe, not misbranded, or adulterated, and which contained only approved doses of digoxin;

h.    Whether Defendants conducted, either directly or indirectly, adequate quality control, testing and/or inspection in the manufacturing and production of Digitek®;

i.    Whether Defendants failed to give adequate and timely warning of the problems with Digitek®;

j.      When Defendants discovered that Digitek® had a dose of digoxin that was inconsistent with the dose stated in the label;

k.      When the FDA and public were notified and then the recall implemented;

l.      Whether Defendants continued to manufacture, label, package, supply, distribute and/or sell the Recalled Digitek®, notwithstanding knowledge of the drug's misbranding and adulteration;

m.      Whether Defendants improperly monitored, tested and inspected Digitek® such that earlier detection of the Recalled Digitek® could have occurred;

n.      Whether Defendants concealed information about the problems with Digitek® from the FDA, Plaintiffs and the members of the Class;

o.      Whether Defendants under-reported adverse events associated with Digitek®;

p.      Whether Defendants' conduct in manufacturing, distributing, and/or selling Digitek® fell below the duty of care owed by Defendants to Plaintiffs and the members of the Class;

See Pltfs' Memo pp. 40-41.

Indeed, one reason Plaintiffs urge the Court to certify a national class is that it would be duplicative and wasteful for this Court to have to re-address these same factual issues anew for each single state only class it is asked to certify.  In any event, Defendants do not contend that there is an absence of common issues of fact present in single state only classes.

Finally, Defendants do not argue that single state classes would be inappropriate under Rule 23(a)(3) or (a)(4).  Again, for all the reasons advanced in support of national certification, the "claims or defenses of the representative parties [are] typical of the claims or defenses of the class" in the four single state only classes Plaintiffs propose here.  Likewise, "the representative parties will fairly and adequately protect the interests of the class," regardless of whether that

class is a single, national class or four single state only classes comprised of Kansas, Kentucky, New Jersey and West Virginia.

Instead, Defendants appear to oppose certification of single state only classes on the basis of the Rule 23(b)(3) "predominance" prong.  Defendants erroneously posit that there are "highly individualized" factual and legal issues that preclude single state only certification.  A careful analysis of these supposed "individualized" issues shows that they do not undermine the appropriateness of single state class certification.

Defendants begin by listing a series of allegedly "highly individualized factual issues" they erroneously contend preclude class certification.  Many of these alleged "issues" are irrelevant to the present motion because they are premised on Defendants' misreading of what damages Plaintiffs seek to recover.  For instance, no class member need demonstrate that they took Recalled Digitek® as Defendants suggest.  The point of Plaintiffs case is that because of the recall they and class members either could not use, or were required to stop using Digitek® pills already purchased and, as a result, suffered out of pocket losses.  A person who refilled a prescription early and then, due to the recall, destroyed that refill prior to taking any of it would be entitled to recover for any out of pocket loss so occasioned.  Being required to show that the claimant "received" Recalled Digitek®, as set forth in Plaintiffs' proposed class definition is no more an "individualized" issue than is determining membership in the class in any class action.

There are also no "benefit of the bargain" issues present here as Defendants argue because Plaintiffs do not seek recompense for every Digitek® pill they may have taken in the past.  Instead, Plaintiffs seek reimbursement only for the costs incurred as a result of the recall, including, e.g. costs of medical tests and doctors' visits.  These costs were obviously foreseeable and, indeed, flowed from the course of conduct recommended by Defendants to "consult your physician."

Defendants also are wrong in arguing that "existence and extent of economic loss" and "participation in refund program" are "highly individualized factual issues" precluding class certification.  These issues concern damages and the specific amounts each class member will be entitled to recover.[15]  While it is true that the specific dollar amount of each individual's out of pocket losses will differ,  it is well settled that differences in the amount of damages to be awarded to each Class member does not preclude class certification.  *See Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)) ("Where [] common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 798 (10th Cir. 1970); 5 James Wm. Moore, Moore's Federal Practice § 23.46[2][a], at 23-208 & n. 11 (3d ed. 1997 & Supp. 2006) (collecting additional cases); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.")).

Similarly, if a particular individual participated in the Stericycle refund process, then that particular person's damages may have been mitigated to the extent they received replacement pills at no charge.[16]  The damages Plaintiffs seek for themselves and the class are not coextensive

---

[15] Defendants themselves have acknowledged the ease of ascertainability of economic losses in this case.  In their petition to remove one of the Digitek class cases, Defendants stated that "the costs of the equitable and monetary relief sought may be estimated."  Exhibit D, ¶ 22.  They further state that "[t]he costs of the recalled Digitek® and past medical evaluations alone could reach $5,000,000 without the need calculating [sic] any other possible relief.  …  A one-month supply of Digitek® would cost a typical consumer approximately fifty dollars . . .  Even assuming that, at the very least, most consumers purchase a one-month supply at a time, the cost of recalled Digitek® and past medical evaluation could be estimate at between $200 and $700 per class member."  *Id.*

[16] The very existence of the Stericycle program destroys Defendants' manageability arguments. It illustrates that there are easy mechanisms for handling large numbers of claims.

with the Stericycle refund program however, and participation in that program does not automatically exclude someone from membership in the class as they may have incurred additional out of pocket losses as a result of the recall.  Again, the extent to which participation the Stericycle refund program may have ameliorated someone's losses is a damages question and does not render class certification inappropriate here.  *See Gunnells*, 348 F. 3d at 427-28 (recognizing that Rule 23 "explicitly envisions class actions with … individualized damage determinations.");  *Brown v. Cameron-Brown Co*., 92 F.R.D. 32, 46 (E.D. Va. 1981) (predominance satisfied even without common damages methodology where violation and impact elements were susceptible to common proof).

Defendants next outline a number of allegedly "highly individualized legal" issues which do not bear scrutiny.  Defendants divide their argument on this point into separate sections for each of the four states, yet most of their arguments are premised upon false assumptions and fail for the same reasons no matter which state's law is applied.  In particular, Defendants repeatedly argue that class certification cannot be maintained in any of the four states because each would require proof of reliance.  Applying Kansas law, Defendants go so far as to make the unsupported blanket assertion that Kansas Consumer Protection Act ("KCPA") claims cannot be resolved on a classwide basis.  Defendants ostensibly support this bald claim by citing to *Benedict v. Altria Group, Inc.* 241 F.R.D. 668 (D. Kan. 2007).  *Benedict*, however, involved clams by smokers that they were mislead into believing "light" cigarettes were lower in tar and nicotine when in fact they were not.  In *Benedict*, the court refused to certify a class under the KCPA, in part, because it disagreed with plaintiff that she needed only to show *she* relied upon and had been damaged by the Defendants' misrepresentations and others would not need to present such evidence.  Plaintiffs make no such claim in the present case, and to the extent proof of reliance is necessary, Plaintiffs can do so without resort to the kinds of individualized

determinations the court excoriated in *Benedict*.  Indeed, given that the misrepresentations at issue here concern the dosage and safety of a drug, it is difficult to imagine under what circumstances individuals did not rely on those alleged misrepresentations.

In addition, Defendants' argument in this regard impermissibly veers into the merits of Plaintiffs' underlying claims.  Under the KCPA, Plaintiff can recover both for "deceptive acts and practices" as well as for "unconscionable acts and practices." *See* K.S.A. §§ 50-626 and 50-627.  It will be a question for the finder of fact whether Plaintiffs' proof is sufficient to meet these elements for both them individually and on behalf of class members generally.  If Plaintiffs fail to prove that Defendants' misrepresentations were of such a nature that any reasonable consumer would have relied on them, they may yet provide sufficient evidence that Defendants' conduct meet the definition of an unconscionable act or practice, which does not require proof of reliance.  In any event, Defendants' argument that Plaintiffs may need to provide proof of reliance does not preclude class certification.

With respect to New Jersey, Defendants attempt to disguise their reliance argument under the notion that New Jersey law requires each individual to "prove a causal nexus between the alleged misrepresentations and his or her own unique loss."  Defts' Brief p. 42, citing *Kleinman v. Merck & Co., Inc.* 2009 WL 2481925 (N.J. Super. L. Aug. 13, 2009).  To extent this statement means Plaintiffs must show that their losses were attributable the Defendants' conduct, that in no way precludes class treatment of a New Jersey Consumer Fraud Act ("NJCFA") claim.  On the other hand, to the extent Defendants' take this statement to mean Plaintiffs must show reliance on misrepresentations, that interpretation runs afoul of well settled New Jersey law to the contrary and as argued above would not preclude class certification in any event.  *See, e.g., Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 814 (N.J. App. Div. 2000); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997).

Defendants also incorrectly argue that Plaintiffs' claims cannot be certified in any of the four states because the Court will be required to examine what benefits, if any, each individual plaintiff and class member may have received from the Recalled Digitek®. As has been detailed elsewhere in this brief, Plaintiffs are not seeking compensation for Recalled Digitek® pills ingested. They are, however, seeking compensation for out of pocket expenses incurred as a result of the recall, including in obtaining replacement pills. In this case, then, what rendered the Defendants' product valueless was the recall. It is of no significance that any particular person may have had an entire bottle of otherwise safe and effective pills. By virtue of the recall, those pills were declared unsafe and unusable. It will not require impermissible individualized determinations to evaluate whether Plaintiffs have a claim under state consumer protection laws, warranty law, or unjust enrichment principles.

Finally, Defendants assail Plaintiffs' request for this Court to certify a West Virginia state only class because Plaintiffs supposedly "do not even offer a representative arguably entitled to recover under West Virginia law." Defts' Brief p. 43. This argument is again based upon two fallacious assumptions. The first is that a particular claimant's case will be governed by the law where he or she resides. As argued at great length in Plaintiffs' briefs, the resolution of this choice of law question does not hinge simply upon where a particular person resides. Indeed, Mr. Lange[17] was able to file a case in West Virginia because of the direct filing Pretrial Order entered by this Court. *See Pretrial Order #19.* Given that he did so, this Court is to apply the law of the "transferor" court, which in this instance is this Court, located in West Virginia. Moreover, Defendants are wrong in arguing that an out of state resident cannot, under any circumstances, serve as an adequate class representative for residents of a particular state. As the

---

[17] Mr. Lange's complaint outlines a national class. However, he is certainly an adequate class representative for a West Virginia State Class or a Kentucky State Class in the event that a National Class is not certified.

Plaintiffs detail in support of their request for a national class, the named-plaintiffs can serve as adequate representatives for individuals throughout the country.  Likewise, there is no impediment to Mr. Lange serving as an adequate representative for West Virginia residents even though he is currently a resident of Kentucky.

### 3.    Plaintiffs have Sufficiently Established Superiority

Plaintiffs have established that this case satisfies the superiority requirement.  Defendants recalled at least 692.4 million Digitek® pills – each of which potentially caused a relatively small economic loss to a potential plaintiff.  Thus, despite Defendants' arguments to the contrary, without the class action device in this matter, thousands of plaintiffs likely will be denied their day in court.  "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980).

Where, as here, the litigation of individual suits against defendants is the only alternative to class action, courts have found the class action to be the superior method since separately litigating the cases "would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. at 679.  As in *Universal*, the current action has a multitude of class members "dispersed across the country, each with relatively similar claims" and "[i]t can reasonably be anticipated that many of the individual claims will involve relatively insubstantial amounts of money such that a class action is perhaps the only feasible way for plaintiffs to pursue those claims." *Id.*  This Court should similarly determine "that a class action is by far the most superior method for resolving the claims at issue in this lawsuit." *Id.*

a.     **Class Members' Interests In Individually Controlling Their Suit**

Defendants criticize Plaintiffs' reliance on the small size of their claims. This factor, however, is of utmost significance in this case. Where, as here, purchasers of the product at issue "may have been of limited financial means, it stands to reason that it is extremely unlikely that any individual plaintiff could afford to pursue this type of suit on his or her own." *Norflet v. John Hancock Life Ins. Co.*, 2007 U.S. Dist. LEXIS 65793, at *31 (D. Conn. Sept. 6, 2007).

It is reasonable to assume that there are many class members who have not sought out counsel due to the relatively low value of their cases. While neither the FDA nor Defendants have publicly disclosed how long the defective pills were sold in the U.S., Actavis Totowa admits that there were at least 171 batches representing 692.4 million pills, manufactured between April 20, 2006 through February 9, 2008, that were recalled on April 25, 2008.[18] Defendants' argument that certain cases have been dismissed has no bearing on the strength of claims of class members who do not have the time or the resources to pursue individual recovery for economic losses they suffered as a result of having purchased Recalled Digitek®. In fact, the rhetoric leading up to the dismissal of these cases is exactly why a class action is necessary – Defendants have been able to "bully" certain plaintiffs by threatening them with sanctions and thousands of dollars in attorneys' fees if they did not dismiss their claims. It is no wonder that a person with a legitimate claims and small loss would be hesitant to bring an action. Defendants should not be rewarded for this behavior. Defendants are better positioned than Plaintiffs to

---

[18] See Defts' Responses to Second Set of Interrogatories, Interrogatory No. 40 (Thompson Decl., Ex. D):

There were 171 batches of Digitek® subject to the April 25, 2008 recall; 153 of the batches were actually released to the retail or consumer level and then recalled. A theoretical batch of 0.125 mg Digitek® contains 4.8 million tablets. A theoretical batch of 0.250 mg Digitek® contains 4.2 million tablets. 83 batches of 0.125 mg Digitek, theoretically 398,400,000 tablets, were recalled from the retail and consumer level; 70 batches of 0.25 mg Digitek®, theoretically 294,000,000 tablets, were recalled from the retail and consumer level.

know the number and identity of potential class members, and they make no specific argument contesting the validity of absent class member claims.

Defendants continue to state that certain plaintiffs have personal injury claims, however, as discussed throughout Plaintiffs' briefing, Plaintiffs are not seeking to certify claims other than those for economic losses.

b.    **<u>The Extent of Existing Litigation</u>**

Pending litigation against Defendants regarding the Class I Recall of Digitek® is consolidated in multidistrict litigation before this Court.  Given the widespread impact of Defendants' alleged misconduct, the existence of more than one related case certainly does not "cut[] against certification," as Defendants attempt to argue.  Courts frequently grant class certification where more than one related case has been filed against defendants.  *See e.g. In re Tri-State Crematory Litig.*, 215 F.R.D. 660 (N.D. Ga. 2003) (certifying class in multidistrict litigation); *In re Static Random Access Memory Antitrust Litig.*, 2009 U.S. Dist. LEXIS 110407 (N.D. Cal. Nov. 25, 2009) (same).

Defendants' also argue that certification "would impinge on Defendants' due process right to individually cross-examine each Plaintiff," however, this argument has been rejected where plaintiffs number in the thousands.  *See e.g. In re Estate of Marcos Human Rights Litig.*, 910 F. Supp. 1460, 1467 (D. Haw. 1995), *citing Cimino v. Raymark Indus.*, 751 F. Supp. 649, 666 (E.D. Tex. 1990).  "Due process is not necessarily limited to the traditional sense as argued by defendants, 'but should also encompass the impact on plaintiffs and even the obvious societal interests involved.'"  *Id.*  (Noting that in *Cimino*, the Court "was concerned that a one-on-one trial for each case [where there were 2,298 cases], assuming the Court could close thirty cases a month, would take six and one-half years.")  This argument is also diminished where, as here,

"testimony of all [] plaintiffs, could well [be] repetitive." *In re Estate of Marcos Human Rights Litig.*, at 1467 (footnote omitted).

c.   <u>**This Forum Is Appropriate To Adjudicate This Controversy**</u>

This Court is the most appropriate forum in which to continue this litigation. Again, almost inconceivably, Defendants dispute whether this is "a particularly appropriate forum for resolving this controversy," based on the residency of the named class representatives. Defendants utterly fail to acknowledge the extensive work this Court has put into this multidistrict litigation that renders it the ***most*** appropriate form in which to continue this litigation and certify claims for economic losses.

In *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 64264, at *33-34 (D.N.J. Sept. 7, 2006), "[a]lthough neither the proposed class nor the alleged harm [was] particularly concentrated in New Jersey," the court focused on the fact that the litigation had been concentrated in the forum for years, and the fact that the "Court [had] already made several rulings in relation to th[e] litigation." *Id.* at *33. The court stated "[i]ndeed, the Court elected to retain supplemental jurisdiction over the common law claims in light of the extensive litigation before this Court," and pointed out that "at no time has Defendant ever argued that this Court should not retain supplemental jurisdiction." *Id.*

In *Bayshore* the court further highlighted the relevance that discovery had been accomplished in the forum and concluded "therefore, for the sake of judicial economy, it is logical to concentrate all claims in this forum rather than concentrating them in a forum unfamiliar with the nature of the litigation and the parties." *Id.* at *33-43, *citing Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (noting the value and economy of concentrating litigation in forum where several rulings were already made).

Certification of the class in this forum will also avoid duplication of effort and inconsistent results.  Defendants' assertions to the contrary simply misconstrue the appropriate analysis.

### d.   **Plaintiffs' Proposed Class Is Manageable**

Defendants incorrectly assert that New Jersey law cannot be applied to Plaintiffs' class claims.  On the contrary, this Court can, and should, certify a nationwide class under New Jersey law for the reasons set forth herein and in Plaintiffs' opening brief.  Throughout their opposition, Defendants misconstrue Plaintiffs' class motion, and incorrectly state that individual issues pose manageability problems for the Court.  As emphasized throughout Plaintiffs' briefing, Plaintiffs seek only to certify a manageable Class on economic loss claims.

Plaintiffs proposed nationwide class is manageable with respect to legal issues because the Court need only apply the law of a single forum – New Jersey – to establish the proof Plaintiffs and Class Members must present to recover.  Plaintiffs proposed class is manageable with respect to the facts because nearly all of elements Plaintiffs and Class Members must meet can be proven through the use of the same set of facts.  Specifically, Plaintiffs and all Class Members can point to the same misconduct emanating from New Jersey to establish liability. The only factual variation between Plaintiffs and Class Members will relate to the specific damages each is entitled to recover.  Factual questions related to damages are manageable, as well, given that Plaintiffs and Class Members seek to recover only actual, out-of-pocket losses. These kinds of damages are able to be established through documents - receipts, bills, statements – that can be submitted in a claims process and evaluated by a third party for sufficiency and for independent calculation of dollar amount.  Plaintiffs are not seeking compensation for more subjective items such as pain and suffering or personal injuries.

The Defendants' own Stericycle voluntary recall program illustrates that nationwide relief is possible and manageable.  The Defendants themselves argue that the Stericycle program has been effective; Plaintiffs do not disagree with respect to manageability.  From a manageability perspective, the present motion for class certification seeks to expand upon the Stericycle program by ensuring it reaches all those economically harmed by Defendants' misconduct and provides full recompense for the economic losses they have suffered.

Finally, if the Court is not inclined to exercise its constitutionally permissible power to apply New Jersey's substantive law to each action, the Court still only needs to apply the law of four states – that of New Jersey, Kansas, Kentucky and West Virginia – because Plaintiffs presently seek the alternative certification of only four single-state class actions.  For all the reasons a national class is manageable, Plaintiffs four proposed single-state only classes are manageable, as well.

With respect to the legal issues, these four proposed class action cases are manageable because there are few differences between the substantive laws of each of these states.  As established throughout Plaintiff's briefing, the substance of each of these states' laws is so similar that the same set facts can be used to establish liability under each.  To extent there are state specific differences, the Court can tailor jury instructions and special verdict forms to address them.  *See La Fata v. Raytheon Co*., 207 F.R.D. 35, 48 (E.D. Pa. 2002) ("Plaintiff's showing that there are, at most, minimal differences between the laws of the different states is a sufficiently credible demonstration that class certification should not be denied due to the possibility that the laws of several states might apply to the claims of [Class] members.").  *See also*, Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. R. 547, 583 (1996) ("There will never be 50 different substantive rules, or even fifteen or ten. States tend to copy

their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations ….").

With respect to the factual issues, there is no meaningful difference between a nationwide class and a small number of single-state only classes.  If anything, the administrative burdens of four single-state only classes would be somewhat lower than those associated with a national class.  The identification of class members and their damages falls within the ambit of what professional claims administrators deal with on a daily basis, and this would be true for both a national class or four single-state only classes.

Finally, Plaintiffs have requested leave to file a supplemental motion for class certification if and when any other class actions are transferred to this Court by the MDL Panel. The fact that Plaintiffs have made this request does not render their present alternative proposal of four single-state only classes unmanageable.  Other class action cases may not be filed; one side or both may wish to settle after the disputed facts have been resolved through the present class certification process; the Court may rule on motions completely changing the complexion of the case.  The salient point is that the present motion presents a manageable alternative to national class certification – certification of four single-state only classes – in a process that would be akin to bellwether trials.

## IV.    CONCLUSION

For the reasons set forth above, in Plaintiffs opening brief. and in the accompanying documents, this Court should certify the class, appoint Ms. Ard, Messrs. Campbell, Chambers, Konek, and Lange, Ms. Whitaker, as Executrix on behalf of the Estate of Anna Fight, and Ms. Wilburn as the class representatives; and appoint the following counsel as class counsel:  Bell Law Firm PLLC; Motley Rice LLC; Frankovitch, Anetakis, Colantonio & Simon, Wolf Popper

LLP; Malkinson & Halpern, P.C; Hutton and Hutton Law Firm LLC; Bahe Cook Cantley &

Jones PLC; Morgan and Morgan, P.A., and the Locks Law Firm LLC.

Dated:  March 8, 2010

Respectfully submitted,

**On Behalf of the Plaintiffs' Steering
Committee**

s/Fred Thompson, III Esq._____
Fred Thompson, III, Esq.
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

*Co- Lead Counsel*

Carl N. Frankovitch, Esq.
**Frankovitch, Anetakis, Colantonio & Simon**
337 Penco Road
Weirton, WV 26062

*Co- Lead Counsel*

Harry F. Bell, Jr., Esq.
**The Bell Law Firm PLLC**
P. O. Box 1723
Charleston, WV 25326

*Co-Lead and Liaison Counsel*


**Wolf Popper LLP**
845 Third Avenue
New York, NY  10022
(212) 759-4600

**Morgan and Morgan, P.A.**
One Tampa City Center
7th Floor
Tampa, FL 33602
813.223.5505 (main)

**Malkinson & Halpern, P.C.**
208 S. LaSalle Street, Suite 1750
Chicago, IL 60604

(312) 427-9600 (phone)

**Hutton and Hutton Law Firm LLC**
P.O.B. 638
Wichita, KS  67201-0638
316.688.1166/686.1077 (f)

**Locks Law Firm LLC**
457 Haddonfield Road, Suite 500
Cherry Hill, NJ 08002
(856) 663-8200

**Bahe Cook Cantley & Jones PLC**
Kentucky Home Life Building
239 South Fifth Street, Suite 700
Louisville, Kentucky 40202
Phone: (502) 587-2002
Facsimile: (502) 587-2006

**Proposed Class Counsel**