Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE: DIGITEK PRODUCTS    :   MDL NO.
LIABILITY LITIGATION       :   1968

(This document relates to all cases.)

- - -

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -

Wayne, New Jersey
Monday, January 18, 2010

- - -

Videotaped Deposition of PHYLLIS A.
LAMBRIDIS, held at Ramada Inn, 334 US Rt. 46,
on the above date, beginning at 9:06 a.m.,
before Kimberly A. Overwise, a Certified
Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

**EXHIBIT B**

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  DIGITEK PRODUCTS  :  MDL NO.
LIABILITY LITIGATION      :  1968


(This document relates to all cases.)

- - -

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -

Wayne, New Jersey
Monday, January 18, 2010

- - -


Videotaped Deposition of PHYLLIS A.

LAMBRIDIS, held at Ramada Inn, 334 US Rt. 46,

on the above date, beginning at 9:06 a.m.,

before Kimberly A. Overwise, a Certified

Realtime Reporter and Notary Public.

- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

```
                                                          2

 1      APPEARANCES:

 2
            BLIZZARD, McCARTHY & NABERS, LLP
 3          BY:  EDWARD F. BLIZZARD, ESQ.
                 SOFIA BRUERA, ESQ.
 4          Lyric Centre
            440 Louisiana, Suite 1710
 5          Houston, TX  77002-1689
            713-844-3750
 6          eblizzard@blizzardlaw.com
            sbruera@blizzardlaw.com
 7          Counsel for Plaintiffs

 8

 9          MOTLEY RICE LLC
            BY:  MEGHAN JOHNSON CARTER, ESQ.
10          28 Bridgeside Boulevard
            Mt. Pleasant, SC  29464
11          843-216-9118
            mjohnson@motleyrice.com
12          Counsel for Plaintiffs

13

14          THE MILLER FIRM LLC
            BY:  PETER A. MILLER, ESQ.
15          The Sherman Building
            108 Railroad Avenue
16          Orange, VA  22960
            540-672-4224
17          pmiller@doctoratlaw.com
            Counsel for Plaintiffs
18

19
            LOCKS LAW FIRM LLC
20          BY:  JAMES J. PETTIT, ESQ.
            457 Haddonfield Road, Suite 500
21          Cherry Hill, NJ  08002
            856-663-8200
22          jpettit@lockslaw.com
            Counsel for Plaintiffs
23

24
```

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

3

1     APPEARANCES:   (Continued)

2

3          BAILEY PERRIN BAILEY
          BY:  FLETCH TRAMMELL, ESQ.
4          The Lyric Centre
          440 Louisiana, Suite 2100
5          Houston, TX  77002
          713-425-7100
6          Counsel for Plaintiffs

7

8          LEVIN, FISHBEIN, SEDRAN & BERMAN
          BY:  MICHAEL M. WEINKOWITZ, ESQ.
9               (via telephone)
          510 Walnut Street, Suite 500
10          Philadelphia, PA  19106-3697
          215-592-1500
11          mweinkowitz@lfsblaw.com
          Counsel for Plaintiffs

12

13          TUCKER ELLIS & WEST LLP
          BY:  RICHARD A. DEAN, ESQ.
14               MICHAEL ANDERTON, ESQ.
          1150 Huntington Building
15          925 Euclid Avenue
          Cleveland, OH  44115-1414
16          216-696-2276
          rdean@tuckerellis.com
17          michael.anderton@tuckerellis.com
          Counsel for Actavis Defendants

18

19

20          SHOOK, HARDY & BACON, LLP
          BY:  HUNTER K. AHERN, ESQ.
21          JPMorgan Chase Tower
          600 Travis Street, Suite 1600
22          Houston, TX  77002-2992
          713-227-8008
23          hahern@shb.com
          Counsel for Mylan Defendants

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

4

1    APPEARANCES:   (Continued)

2

3          ALLEN GUTHRIE & THOMAS, PLLC
           BY:  ZACKARY B. MAZEY, ESQ.
           500 Lee Street, East, Suite 800
4          Charleston, WV  25301
           304-720-4226
5          zbmazey@agmtlaw.com
           Actavis Liaison Counsel in the MDL
6

7

8
     ALSO PRESENT:
9
     Catherine Smalfus, videographer
10   Golkow Technologies, Inc.

11   Mike Kauffmann

12

13

14

15

16

17

18

19

20

21

22

23

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

48

1    "Recalls have not been issued."

2             Do you know what that relates to?

3      A     As I look at this, it looks like

4    it's a recap of some of the concerns expressed

5    over the course of the investigation.  So it

6    doesn't necessarily reflect the state of

7    affairs at that point in time.

8      Q     Okay.  So the bullet point that says

9    "Recalls have not been issued," are you saying

10   that that doesn't really reflect the state of

11   affairs as of May 20th?

12     A     Correct.

13     Q     Okay.  The next bullet says:

14   "Health hazards related to recalls are

15   delinquent."

16             What does that mean?

17     A     When you -- when there's a recall or

18   you're considering a recall or you are -- you

19   have a product that may be -- may potentially

20   be a recall, the company typically would look

21   for expert opinion, which they call a health

22   hazard assessment, as to the nature of what

23   the severity of the issue might be.  And in

24   some cases, the health hazard assessment

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

49

1    will -- might even tell you that there is no

2    issue.  And it helps you to justify to FDA why

3    you may not do a recall.

4              In this particular case, we also --

5    companies would also do this because FDA is

6    the final -- makes the final determination on

7    the level of a recall, but a company would

8    typically do their own health hazard

9    assessment to try to work with FDA to minimize

10   the impact of what level of -- you know, to

11   determine what level, to talk with them and

12   get their own personal assessment.

13             So in this particular case, we had

14   done health hazard assessments on several of

15   the products that were the subject of recalls

16   that were in process; and they weren't

17   satisfied with all of the content, or some of

18   them were not timely.

19        Q    Okay.  So do you know whether one

20   was done for Digitek?

21        A    I honestly don't recall.

22        Q    Do you know who did the health

23   hazard analysis for Digitek if it was done?

24        A    If it was done, it would have been

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

51

1          Q    Yes.

2          A    I don't recall.

3          Q    Then the next bullet says:  "That

4     you put effective Quality Systems in place."

5               Do you see that?

6          A    Yes.

7          Q    And do you agree that as of May of

8     2008, there weren't effective quality systems

9     in place for Actavis Totowa?

10                    MR. DEAN:  Object to the form.

11                    Go ahead.

12                    THE WITNESS:  That was Erin's

13          statement.

14    BY MR. BLIZZARD:

15          Q    Okay.  Did you agree with FDA on

16    that issue?

17          A    Not necessarily, no.

18          Q    Did you agree with it at all?

19          A    I agreed that that was her view and,

20    based on what she had seen, that she had come

21    to that conclusion.

22          Q    And she was acting on behalf of FDA

23    in coming to that conclusion; correct?

24          A    Yes.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

52

1          Q    Do you see the next bullet says:

2     "Get very nervous when you tell us that you

3     are releasing product using the current

4     Quality Systems (open issues remain)."

5               Do you see that?

6          A    Yes.

7          Q    Were you nervous -- well, let me

8     stop you there.

9               Was there product still being

10    released by the Little Falls plant at this

11    period of time?

12          A    As you pointed out earlier, the

13    PAREXEL consultants were engaged the end of

14    April.  And at that point in time, we stopped

15    shipping product, end of April.  But after

16    PAREXEL came in, they were reviewing product

17    by product.  And some additional products

18    started to be released again based on the

19    PAREXEL review.

20          Q    And this -- sorry.  Go ahead.

21          A    I believe her statement here, she

22    was referring to herself --

23          Q    Right.

24          A    -- that she gets nervous that we are

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

53

1    still releasing product.

2         Q    And she's charged with making sure

3    that US citizens receive safe drugs; correct?

4                   MR. DEAN:  Objection; calls for

5         a legal conclusion.

6                   Go ahead.

7                   THE WITNESS:  She's part of the

8         organization that does that.

9    BY MR. BLIZZARD:

10        Q    Right.

11        A    As a consumer safety officer, yes,

12   that's her job.

13        Q    And then the next one, bullet point

14   says:  "Do not fix broken Systems - get new

15   Systems.  (I can't tell you what to do but

16   start from scratch)."

17             Do you see that?

18        A    Yes.

19        Q    So you agreed with her that the

20   system was broken and needed to be fixed?

21        A    That's a very general statement.  I

22   think there were definitely systems that

23   required some improvement.  And there were

24   still systems, I think, in place that were

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

54

1    working.   So I would have to say I would agree

2    perhaps on some of the issues and disagree on

3    others.   It would have to be more specific.

4         Q    Which parts of the quality system,

5    both quality assurance and quality control,

6    did you think were broken and needed to be

7    fixed?

8         A    There were SOPs, I believe, that

9    needed to be perhaps put into more detail

10   regarding investigations and other things that

11   she had noted that were obviously not the ones

12   that weren't closed, et cetera, and some other

13   areas.

14            I would have to go back and really

15   look, but not -- when you referred to systems,

16   FDA's view is there's six systems; and she's,

17   I think, here not referring to the whole

18   entire company.   She's referring to the

19   systems that she's looked at.

20        Q    Right.   And she's saying that

21   they're broken and need to be fixed and you

22   should start from scratch; right?

23        A    That's her opinion, yes.

24        Q    Right.   And essentially did the

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

79

1     Q     And were there any other Patels that
2     were involved -- any family members of the
3     Patel family who stayed on after the
4     acquisition of Amide Pharmaceuticals and
5     worked for Actavis?
6     A     I cannot recall her first name in
7     both cases.  There was a sister with a
8     different last name -- she had a married name.
9     I can't remember what it was -- employed in
10    the legal department.  And his mom, I think it
11    was Nila Patel.  I'm not sure.  She was
12    employed at the Little Falls facility in more
13    of an office manager's role.
14    Q     Now, following the FDA inspection
15    and through the time that you worked at the
16    company, did any of these, the Patel family
17    members, stay on with the company?
18    A     Up until I left, I believe the only
19    person that was still employed was the sister.
20    Q     That was in the legal department?
21    A     Correct.
22    Q     Okay.  Now, back at the time that
23    this inspection was going on in April of 2007,
24    did you communicate with Divya Patel about

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

80

1    what products should be fixed in what order?

2          A     We talked about what products needed

3    to be addressed in terms of reintroduction

4    because we were discontinuing product as a

5    result of some of the activities.

6                We had some discussion about the

7    recalled products and what needed to be done

8    to enable us to market them.  Again, that was

9    the initial part of that discussion.

10         Q     And was Digitek among the recalled

11   products?

12         A     Yes.  Well, the first recall didn't

13   involve -- the first group of products that

14   were recalled, Digitek was not -- Digitek

15   stood alone.  It was handled in a different

16   manner because we did not market that product.

17   It was marketed by another company.

18         Q     Okay.  And that other company was

19   Mylan?

20         A     Correct.

21         Q     So the recall that was done for

22   Digitek was handled separately because of

23   Mylan's involvement; correct?

24         A     And because we had already committed

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

85

1          A     Can you say that again, just repeat

2     it?

3          Q     Let me ask a different question.

4                Do you see where it says "For the

5     products that we want to stop and fix" -- do

6     you see that?

7          A     Yes.

8          Q     -- "can you give me a first pass on

9     the order of priority that you would like them

10    assessed."

11               So were you asking these management

12    people to give you some idea of the priority

13    order for reassessing these products that you

14    were going to stop and fix?

15          A     Yes.  I can explain if I can just

16    put it into context.

17          Q     Sure.

18          A     At this point in time, there were,

19    as I had mentioned before, a group of products

20    that we were recalling.  There were several

21    things going on.  If you refer back to this

22    memo --

23                     MR. DEAN:  "This" being 107?

24                     THE WITNESS:  -- 107 exhibit,

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

86

1          we made some commitments to FDA to recall

2          product.  And that was outlined in a memo

3          that was given to the Agency.

4                    In addition to that, we

5          agreed -- because those recalls were full

6          recalls, so they involved taking all of

7          the product for those products off of the

8          market, they were affectionately known as

9          the stop-and-fix products.

10                   So the plan at the time was

11         to -- at least we had stopped obviously

12         manufacturing and shipping them.  And the

13         plan at the time was to evaluate them to

14         determine whether they would be

15         reintroduced and what would be needed

16         before they could be reintroduced.

17                   And the reason for that is

18         because in some cases there were

19         method-related issues or issues that

20         could improve the product that may --

21         would require a lot of resources or FDA

22         review that would be a lengthy review.

23         So it was a business decision as to

24         whether they were worth spending the time

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

87

1        as opposed to spending that time and

2        resource elsewhere.

3                So that's the context of what's

4        there.  So one of the things that we

5        presented to FDA, again back to the

6        Exhibit 107, on April 9th, the memo

7        that's referred to here, this FDA memo,

8        we committed to recalls of those

9        products; but we also were doing this

10        rationalization.

11                So that list consisted of the

12        products, these stop-and-fix products,

13        and then other products that we were, for

14        business reasons, most likely going to

15        discontinue, and then the products that

16        would remain.

17    BY MR. BLIZZARD:

18        Q     Okay.  I think I understand.  So

19    what you're saying is there were these

20    products that the company was -- we're calling

21    stop-and-fix products, and digoxin was not a

22    stop-and-fix product?

23        A     No.

24        Q     But if you look at Exhibit -- if we

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

109

1    mentioned earlier, was a new building that we

2    were planning to move into.

3              So the context of that inspection

4    was to come in and give a preapproval of that

5    facility so that we could move into it.  So

6    that's the preapproval part of it.  And as

7    part of any preapproval inspection, they also

8    do a GMP inspection.

9         Q    Okay.  So what this was

10   originally -- was this originally a

11   preapproval inspection, but it turned into a

12   GMP inspection?

13        A    It was originally a preapproval

14   inspection which would have included GMP, but

15   we -- she started doing the GMP portion of it,

16   and we never got to the preapproval portion of

17   it.

18        Q    If you look over on the next page,

19   Page 2, you see where it says beginning on

20   the -- I guess it's the first full sentence on

21   that page, "The previous inspection"?

22             Do you see that sentence?

23        A    Yes.

24        Q    The previous inspection of the

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

110

1    Little Falls, New Jersey, facility provided

2    coverage of the quality, production,

3    laboratory control, materials and facilities

4    and equipment systems.  Deficiencies were

5    documented in the areas of field alerts, the

6    stability testing program, and investigations.

7         And then the last sentence says:

8    Corrections were promised for all

9    observations.  The inspection was classified

10   as -- is that a VAI?

11        A    Yes.

12        Q    What is VAI?

13        A    Voluntary action indicated.

14        Q    So that refers to a previous

15   inspection of the same facility; is that true?

16        A    Actually, it's an inspection of the

17   Little Falls facility on Main Street, not the

18   Riverview facility, but it's all Actavis

19   Totowa.

20        Q    Okay.  So it was an inspection of

21   the Little Falls plant?

22        A    Yes.

23        Q    Were you involved at all in that

24   inspection?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

111

1        A      That inspection took place just

2     prior to my arrival, so it was in process when

3     I started with Actavis.  And my only

4     involvement was to attend again the closeout

5     meeting that they held at the completion of

6     that inspection.

7        Q      Did you actually -- were you

8     provided with any of the 483 materials so that

9     you could be familiar with the issues at the

10    plant going forward?

11       A      Yes.

12       Q      So you were familiar with what

13    findings had been made in 2006 regarding the

14    Little Falls facility in the 483 inspection?

15       A      No.  This was 2007.  This inspection

16    that I'm referring to was September of 2007.

17       Q      Okay.  So did you know about an

18    inspection in 2006 of the Little Falls

19    facility?

20       A      Yes.

21       Q      And when did you learn about that?

22       A      Actually, I was aware of it prior to

23    joining the company.

24       Q      How so?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

112

1        A     Because they had been issued a

2    warning letter, and just normal surveillance

3    as part of my job.  I know -- I keep up on

4    what's going on with other companies, and it's

5    in the news --

6        Q     So was it --

7        A     Trade press.

8        Q     I'm sorry.

9        A     Sorry.  That's okay.

10       Q     So that was part of your role as a

11   consultant or while you were working for

12   another company?

13       A     No.  It was just knowledge I had

14   prior to joining.

15       Q     Okay.  So you saw the warning letter

16   that was issued in 2006 to Actavis regarding

17   the Little Falls facility?

18       A     Yes.

19       Q     And that was as an industry

20   observer, I guess?

21       A     Correct.

22       Q     Did you do any further research on

23   that subject when you arrived at the company?

24       A     No.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

118

1          A     Correct.

2          Q     And then if you go down to the

3     middle paragraph that starts on April 9th, do

4     you see that?

5          A     Yes.

6          Q     On April 9th, a written commitment

7     was provided by yourself, and it shows it's

8     Exhibit 12.   And it says in the middle of the

9     paragraph:   "The letter also included a plan

10    to stop and remediate numerous

11    products/processes due to the current cGMP

12    findings."

13               Correct?

14         A     Yes.

15         Q     Is that the stop-and-fix list that

16    you talked about earlier?

17         A     Yes.

18         Q     And then it says at the last

19    sentence:   The District was formally notified

20    of a probable Class I recall of digoxin

21    tablets, .125 milligrams, and then it gives

22    the lot number; correct?

23         A     Correct.

24         Q     Okay.   Now, if you go over to

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

120

1    discuss the upcoming exit meeting; correct?

2        A    Correct.

3        Q    And then if you look at the top of

4    the next page, does it say there:   "Both

5    Ms. Eyjolfsdottir and Ms. Lambridis

6    acknowledged the severity of the cGMP

7    deficiencies and stated the need for

8    corrective actions, restructuring of the

9    Quality Unit, and hiring"?

10            Do you see that?

11       A    Yes.

12       Q    And do you recall making that

13   admission?

14       A    Yes.

15       Q    And it was accurate and correct?

16       A    Based on what was presented to us,

17   yes.

18       Q    Right.  And part of this, these

19   deficiencies involved the drug Digitek;

20   correct?

21       A    Yes.

22       Q    Now, if you'll go over to Page --

23   I'm going to skip a few pages now -- Page 15,

24   do you see there's a paragraph there that

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

157

1    █████████████████████

2        Q    Okay.  Did you subsequently have any

3    conversations with Mr. Wessman or Mr. Olafsson

4    about the commitment to not produce any more

5    digoxin until there was tableting equipment

6    with weight controls?

7        A    I was present during some of the

8    discussions with senior management regarding

9    Digitek.  And the context of this was that

10   they would not produce -- if they were going

11   to move forward with digoxin, that they would

12   want to purchase equipment with weight

13   controls.

14       Q    Okay.  And I take it that there

15   wasn't any existing equipment at the Little

16   Falls or Riverview plant that was a press with

17   weight controls; is that true?

18       A    I'm not sure if there were none, but

19   the presses -- majority of the presses there

20   were not automated.  So there might have been

21   one.  I'm not sure.

22       Q    But there wasn't enough presses that

23   were automated to produce digoxin with presses

24   that were all weight controlled; is that true?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

161



1

2      Q      It says here that Chuck Koon and

3   Becky Pinnell had an informal conversation

4   with Dan Bitler, Actavis quality, regarding

5   the ongoing FDA inspection of the Little Falls

6   facility.   And he's providing a brief summary

7   below; correct?

8      A      Yes.

9

10

11

12      Q      It says:   The company has halted

13   production of all products at the Totowa

14   Little Falls, New Jersey, site.

15              Is that accurate?

16      A      Yes.

17

18

19

20

21

22

23

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

164

1          Q     Did any -- was there any attempt

2     that you're aware of to buy a new press with

3     appropriate weight control during the time

4     that you remained employed by Actavis?

5          A     Not for Digitek.

6          Q     Okay.  Were there other automated

7     presses bought with weight controls that were

8     used to manufacture drugs other than Digitek

9     after the FDA inspection?

10                    MR. DEAN:  Objection.

11                    Go ahead.

12                    THE WITNESS:  I can answer?

13                    MR. DEAN:  You can answer,

14          sure.

15                    THE WITNESS:  We did evaluate

16          that.  I don't recall what was purchased

17          or if anything was purchased.

18     BY MR. BLIZZARD:

19          Q     Okay.  So you don't know one way or

20     the other?

21          A     No.

22          Q     In August of 2008, you were still

23     employed with the company?

24          A     In August, yes.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

165

1          Q     And there were -- the remediation

2     effort or the effort on the corrective action

3     plan, was it still underway at that time?

4          A     Yes.

5          Q     And had some of the items on the

6     corrective action plan actually been

7     completed?

8          A     Yes.

9          Q     Were there others that were

10     incomplete in August of 2008?

11          A     Yes.

12          Q     Were there still significant

13     weaknesses within the quality department and

14     the quality system as of August of 2008?

15          A     We were still in the process of

16     putting together a robust quality system to

17     inspect -- that would hold up to inspection.

18     So I think that there was still a lot of work

19     that needed to be done along those lines.  I

20     don't know that I can say there were

21     weaknesses.

22               (Plaintiff's Exhibit No. 116

23          was marked for identification.)

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

173

1                    That's a miscategorization of

2         that sentence.

3    BY MR. BLIZZARD:

4         Q    Does the sentence say:  They -- "The

5    quotes they lifted are in every warning letter

6    and recall press release"?

7         A    Yes.

8         Q    And in the second paragraph, is

9    there a quote there that says:   Actavis said

10   August 1 that it is recalling all 65 products

11   manufactured at the plant following an

12   inspection that, quote, revealed operations

13   which did not meet the FDA's or Actavis'

14   standards for good manufacturing processes?

15             Did I read that correctly?

16        A    Yes.

17        Q    And do you agree that the inspection

18   by FDA did reveal operations which did not

19   meet the FDA or Actavis' standards for good

20   manufacturing practices?

21        A    Yes.  But that is also a standard

22   statement that is in most recall notices.

23        Q    Well, is that something that you

24   think the public should be entitled to know?

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

179

1      1267772.

2              Do you see the first e-mail here is

3      from Tony Delicato to Erislandy Dorado with a

4      carbon copy to you and Chris Young?

5          A    Yes.

6          Q    And it's dated September 16 of 2008;

7      is that right?

8          A    Yes.

9          Q    And then the subject says:  "These

10     are just examples - not all - inclusive."

11             Is that what it says?

12         A    Yes.

13         Q    And it says:  Quality unit

14     responsibilities SOP outdated/not accurate.

15             Do you know what that refers to?

16         A    There was an SOP, a standard

17     operating procedure.  And the one that was in

18     place did not reflect what was -- what we

19     wanted to have going forward, so it needed to

20     be revised.

21         Q    Then it says:  Quality review

22     board - SOP effective but no meetings held as

23     functional areas have not had time to generate

24     metrics.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

272

1    professionals in multiple industries, not just

2    in pharmaceuticals.

3        Q    There is the phrase "visual

4    inspection" in some of these documents, "AQL,"

5    and "tightened AQL."  For this particular

6    investigation, 07-093, of this particular

7    batch, can you tell me, was there a visual

8    inspection, was there an AQL, and was there a

9    tightened AQL?  Were there all three?

10       A    There was a visual inspection and a

11   tightened AQL.  There's typically a normal AQL

12   for the release.  But that was -- I don't -- I

13   didn't review that, so I can't say for sure.

14           But that would typically happen at

15   some point during the manufacture of the batch

16   in order to get that batch through to the

17   point where it would be packaged and released.

18   So it may be in the regular batch

19   documentation, which I don't have in front of

20   me.

21       Q    So now I'm not talking about this

22   particular investigation, but there could be

23   such a thing as a visual inspection and then

24   an AQL and then a tightened AQL?  Is that

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

273

1    possible, generally speaking?

2                       MR. DEAN:  On one batch; right?

3                       MR. PETTIT:  On one batch, yes.

4                       THE WITNESS:  Under normal

5        circumstances, there's an AQL and the

6        batch is released.  Because this batch

7        identified a problem -- in any batch that

8        identifies a problem, it is possible that

9        they would do a visual inspection and

10       then another AQL before they release it.

11   BY MR. PETTIT:

12       Q    So it is possible that you could

13   have a visual and an AQL and a tightened AQL;

14   that's possible?

15       A    Yes, but not in that order.

16       Q    What would the order be?

17       A    It would be AQL, visual inspection,

18   tightened AQL.

19       Q    And the decision to have a tightened

20   AQL would be made by whom, generally, at

21   Actavis in 2007?

22       A    It would typically be done by -- at

23   Actavis it would be done by the director of

24   QA, but it's standard practice.  It should be

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

288

1    that there was a total failure of the quality

2    department at Actavis during the inspection of

3    2008?

4          A    It's a little out of context, but I

5    believe the discussion was whether or not I

6    agreed to it in a conversation with Erin

7    during the closeout -- or during a meeting

8    with Erin.

9          Q    Did you, as the vice president of

10   quality and compliance, during the FDA 483 in

11   2008 believe that there was a total failure of

12   the quality control system at Actavis?  And

13   when I say that, I mean Little Falls and

14   Totowa.

15         A    We didn't present ourselves well to

16   FDA, for sure.  So it was very hard for me to

17   disagree with Erin during our discussions

18   because based on what she had reviewed, there

19   were numerous issues that she was able to

20   raise that, again, needed attention.

21              So, again, based on -- in the

22   context of what we were talking about and

23   based on the issues she presented, it was

24   not -- it was something that I couldn't

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

289

1    refute.

2         Q    Do you believe, as you sit here

3    today, that if all the findings were presented

4    in a different manner, that the production of

5    64 products would not have been discontinued?

6         A    I don't understand the question.

7         Q    Are you telling me that it was the

8    way that the violations were presented or the

9    inspection was presented that would have

10   classified it as a total failure of QC?

11        A    No.    What I'm saying is that she

12   reviewed a group of products that were

13   known -- already known issues that -- and the

14   reason that she focused on those is because we

15   had already informed the Agency that we had a

16   problem.

17             So when you're only looking at a

18   problem, your conclusion -- her conclusion was

19   then broadened to include everything.    And her

20   comments were based on a sampling of the many

21   products that Actavis was making at the time.

22        Q    So it's your belief that because she

23   found issues with certain products, that it

24   didn't carry over to other products?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

290

1          A     Say that again.

2          Q     Well, you were indicating that

3     Actavis stated that there were problems with

4     certain products, and those were the products

5     that they investigated?

6          A     There's a mechanism and a

7     requirement that if you have an issue -- if

8     you do an investigation on a product that's

9     been marketed, that you have an obligation to

10    notify FDA.

11              So there were a number of -- and

12    even without that, every FDA inspection, when

13    they look at the quality system, it typically

14    asks you for documents related to your

15    investigations, your complaints, and so forth.

16    And they use that as a gauge for what they're

17    going to look at.  So they come in, and she

18    was looking at our investigation log and

19    looking at investigations specifically.  So

20    obviously she was going to be looking at

21    problem areas.

22          Q     But you agree with me that it wasn't

23    so much the investigation that led to the

24    violations of GMP but how the investigations

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

291

1    were handled?

2         A     Correct.  She was not happy with how

3    certain ones were handled.  And how we got to

4    it broadening beyond that was the fact that

5    she focused on a certain number of products

6    and then drew her conclusions based on that.

7         Q     At the time of the inspection,

8    Actavis was manufacturing 64 products; is that

9    correct?

10        A     I don't recall the number, but there

11   was at least that.

12        Q     Okay.  And at least that and my list

13   is including the Digitek.  And my question is:

14   You agree that 64 products, including Digitek,

15   were discontinued because the quality control

16   system at Actavis had several failures?

17        A     I'm trying to find a short way to

18   answer that.  One thing led to another is the

19   easiest way for me to say that.  We talked

20   earlier about PAREXEL's review and discussions

21   that occurred with the Agency even prior to

22   the inspection closing.

23             So Erin looked at a number of

24   products that were subject to investigations

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

292

1    and was drawing conclusions and was asking us

2    to prove to her that that wasn't the case with

3    all products.

4              So that was why we had engaged

5    PAREXEL.  That was to get a third-party,

6    unbiased review of these other products so

7    that we could provide that evidence to the

8    Agency to show them that the issue was not

9    widespread.

10        Q    But ultimately the FDA concluded

11   that the issue was widespread?

12        A    Based on Erin's comments, yes.

13        Q    Based on the FDA inspector's

14   comments?

15        A    Right.

16        Q    And did you find any fault with the

17   FDA inspector's comments?

18        A    I -- there were things that we did

19   disagree on.  But her comments were basically

20   accurate, you know -- yes, her comments were

21   accurate.  What she presented was accurate.

22        Q    As you sit here now, anything -- do

23   you recall anything specifically that you

24   disagreed with the FDA inspector as far as her

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

293

1    findings during the 483?

2         A    Fundamental issues.   I mean, Erin is

3    a very good investigator, very thorough, but

4    she has her own opinions, like anybody does.

5    So she had feelings about things that we

6    implemented that perhaps were given the

7    go-ahead by prior FDA investigators that

8    perhaps she felt differently about.

9              So there were things that were

10   discussed during the course of the

11   investigation that I viewed one way and she

12   viewed another, but that's not unusual.

13        Q    Can you think of any specifics, any

14   issues or topics that she viewed one way and

15   you viewed another?

16             MR. DEAN:   I've been letting --

17        let me just object.   I'll try to be

18        succinct here.   I've been letting the

19        general inquiry about non-Digitek

20        products go at a general level.

21             I don't object to her answering

22        that question as to Digitek specifics.

23        But as to general details -- I'm sorry --

24        as to specific details of discussions she

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

294

1      had with Erin about non-Digitek products,

2      I'm going to instruct her not to answer

3      the question as to details.

4              I might at a general level if

5      you're inquiring about whether there was

6      a concern about quality control; but as

7      to the specifics, I'm going to instruct

8      her not to answer on non-Digitek

9      products.

10   BY MR. MILLER:

11         Q     Were there any specifics that you

12   recall that you disagreed on from the findings

13   of the FDA inspector during the '08 483

14   inspection?

15              MR. DEAN:   Let me just instruct

16      you just to answer that with respect to

17      Digitek.

18   BY MR. MILLER:

19         Q     And I'll point out that you can

20   answer with respect to Digitek or any general

21   GMP violations.   It can be general issues or

22   Digitek.   It doesn't have to be just Digitek.

23              MR. DEAN:   At a general level,

24      I'm fine.   But if you're asking her for

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

295

1          specific comments about non-Digitek

2          drugs, I think that is beyond the scope

3          of what's in PTO-12 and 27.  If you're at

4          a general level, I'm okay with it.  But I

5          think your last question could lead her

6          to go into specifics.  And I'm just

7          instructing her, as to specifics, to

8          limit it to Digitek.

9     BY MR. MILLER:

10         Q     If you understood all those

11    instructions, ma'am, it's okay to answer.

12         A     I think I can answer it.  In the

13    case of Digitek and with some of the other

14    drugs that were recalled, I didn't always see

15    the logic in extending it to all batches.  And

16    that doesn't mean that I didn't execute on all

17    batches because there was -- when you're

18    dealing in a situation as I was in, you get to

19    a point where you just -- in order to advance

20    to the next point and not belabor the point,

21    there's certain concessions that are made.

22            So in the case of some of the other

23    recalls, which based on his instruction, I'm

24    not going to give you the detail, but there

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

296

1    were situations where there was an issue with

2    one batch and, through her interpretation, it

3    implicated all batches.

4            Q    How many -- I'm sorry.

5            A    And I didn't always agree with that.

6            Q    How many of the 64 products, give or

7    take -- I understand your position there --

8    were ultimately recalled?

9            A    All the products were recalled.

10            Q    And was that every batch in every

11    product?

12            A    Yes.

13            Q    So --

14            A    But there were multiple recalls, so

15    you have to distinguish one from the other.

16    There was a set of recalls that was done

17    initially for stability-related issues.  Those

18    are the ones that I'm referring to now when I

19    say that one batch with a problem, even though

20    it was a stability batch, to me did not always

21    mean or based on -- based on the issue --

22    again, I can't go into detail.

23            But her view was that it should have

24    been all batches based on that, and my view

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

297

1    was that I didn't believe that was the case.

2    But I didn't argue that point.  I conceded

3    that point, and we recalled everything.

4              The 65 products that you're

5    referring to is part of the last recall.  And

6    that recall, again, was a concession to remove

7    product from the market in order for Actavis

8    to even have a discussion with the Agency

9    about next steps and getting their site back

10   into a position where they can manufacture

11   product.

12        Q    Okay.  Sixty-five products was the

13   last set?

14        A    Was the last set.

15        Q    How large were the other sets?  I

16   thought 65 was the total universe of products

17   at Actavis, Little Falls, Totowa?

18        A    I don't recall, but I don't think

19   so.  I think 65 was the last set.

20        Q    And, in your mind, Digitek was one

21   product that was recalled on its own set?

22        A    Correct.

23        Q    Okay.  And then there was a -- was

24   the stability recall, was that the group of 65

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

298

1     or was that a subset of the 65?

2          A     The stability group was the first

3     set of recalls around the same time frame as

4     the digoxin recall.  And I don't recall if --

5     I think it was about a dozen products.

6          Q     Was there also an

7     out-of-specification group, an OOS group?

8          A     That's the stability group.

9          Q     That's the stability.  Okay.  Am I

10    correct in saying that if a manufacturing

11    company of pharmaceutical products violates a

12    CGMP, that it's viewed that the lab has

13    violated that CGMP for all products?

14                    MR. DEAN:  Objection to form.

15                    Go ahead.

16                    THE WITNESS:  I don't

17    understand the question.

18    BY MR. MILLER:

19         Q     Have you seen -- I'm going to hand

20    you what's been previously marked, if you

21    bring up, Mike, a copy of Exhibit 82, which

22    was the Complaint for permanent injunction.

23                    Have you seen this document before?

24         A     Yes.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

299

1     Q    And what was the occasion which you
2   had an opportunity to read it?
3                 MR. DEAN:   Let me just instruct
4       the witness she can answer questions at a
5       general level about this document; but,
6       again, given PTO 12 and 27, I don't want
7       her to get into specific discussions of
8       products other than Digitek.   But she can
9       answer your questions at a general level
10       regarding this document.
11                 Go ahead.
12   BY MR. MILLER:
13     Q    Well, this document was filed, if
14   you look at the last page, on November 14th,
15   2008.   And you were in your position as vice
16   president of quality and compliance at Actavis
17   at that time; correct?
18     A    No.   I resigned on the 13th.   This
19   document was filed but not in this form.
20                 This is the final consent decree?
21   Is that what I'm looking at?
22     Q    No, ma'am.   This is the Complaint
23   that led to the consent decree.
24     A    Oh, this is the Complaint.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

302

1    manufactured at this time would be considered

2    adulterated drugs?

3                    MR. DEAN:  Objection to form.

4        Excuse me.  What drugs are you asking

5        about?  I want to be more specific.

6                    MR. MILLER:  Drugs manufactured

7        by Actavis at Little Falls and Totowa.

8                    MR. DEAN:  And your question is

9        what?

10   BY MR. MILLER:

11       Q    Would you have considered -- did

12   you, as the vice president of quality and

13   compliance, agree with the Department of

14   Justice that the drugs manufactured were

15   adulterated drugs?

16                   MR. DEAN:  Objection; calls for

17       a legal conclusion.

18                   Go ahead.

19                   Go ahead.

20                   THE WITNESS:  Answer it?

21                   I wouldn't agree that -- no, I

22       don't agree with the Department of

23       Justice.  I believe that there were

24       issues involved with certain batches with

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

303

1          certain products that may have violated

2          GMP and may have had issues, but I don't

3          agree that all the drugs manufactured.

4     BY MR. MILLER:

5          Q     Were GMPs violated in the production

6     of Digitek?

7          A     Technically, no.  They followed

8     standard practices.  They did an

9     investigation.  They did all the necessary

10    things that they should have done.

11            I think it was a judgment call

12    perhaps on the amount of scrutiny that they

13    put that batch through after finding such an

14    issue.  And it's always easy to look at it in

15    hindsight and think of 50 other things you

16    should have done.

17            But there was nothing related to

18    that -- the only thing that I can -- they

19    followed procedures that were in place.  There

20    was a mechanism in place.  It was not done

21    randomly.

22         Q     I understand your answer to go

23    specifically to the double-thick pills.

24         A     Correct.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

304

 1          Q    And I'm more of a broader question.

 2     The production of Digitek, if one were to

 3     review the 483 and all the write-ups, you

 4     agree that there were other write-ups about

 5     digoxin and Digitek other than the

 6     double-thick pills?

 7          A    I don't recall.  I thought the

 8     majority of what was there was related to the

 9     one batch, but I don't know.  Without seeing

10     that, I couldn't comment.

11          Q    All right.  We'll certainly cover

12     that as well.

13               Mike, would you blow up

14     Paragraph 12, please.

15               FDA's inspections establish that the

16     drugs being manufactured and distributed by

17     Defendants are adulterated within the meaning

18     of 21 USC 351, Paragraph (a)(2)(B), in that

19     the methods used in, or the facilities or

20     controls used for, their manufacture,

21     processing, packing, or holding do not conform

22     to or are not operated or administered in

23     conformity with the GMP requirements for

24     drugs.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

305

1              So --

2                   MR. DEAN:  Let me just -- is

3         that just -- you're reading the question,

4         and you're going to ask if you read it

5         right?  Or do you have a question?

6                   MR. MILLER:  You cut me off

7         before I even got a chance to ask a

8         question, Dick.

9                   MR. DEAN:  Go ahead and ask

10        your question.

11   BY MR. MILLER:

12        Q    Did I read that correctly?

13        A    Yes.

14        Q    And it's your testimony here that

15   you disagree with that, or do you agree with

16   that paragraph?

17                  MR. DEAN:  Let me object and

18        reiterate the objection I gave before and

19        instruct her not to answer about details

20        of other non-Digitek drugs.  She can

21        certainly answer about Digitek, and she

22        can answer at a general level.

23                  Go ahead.

24                  THE WITNESS:  To me, this

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

306

1        paragraph just states what FDA does.  FDA

2        inspections establish that.  It doesn't

3        speak specific to Actavis.  It's just

4        stating that.

5   BY MR. MILLER:

6        Q    Well, you're not an attorney;

7   correct?

8        A    I'm not an attorney.

9        Q    If you go to that first page, ma'am,

10  this is a Complaint that the United States of

11  America filed against Actavis Totowa and other

12  defendants.

13       And enumerated Paragraph 12 is:

14  "FDA's inspections establish that the drugs

15  being manufactured and distributed by

16  Defendants are adulterated."

17       It's not what the -- I'll represent

18  to you that it's not what the FDA does.  It's

19  not explaining a duty.  It's explaining a

20  finding that if methods used or facilities or

21  controls used for their manufacture,

22  processing, packing, or holding do not conform

23  to or are not operated or administered in

24  conformity with the CGMP requirements for

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

307

1    drugs, what they've done is defined what an

2    adulterated drug is.

3              Do you understand the paragraph,

4    ma'am?

5              MR. DEAN:  Same objection.  She

6    can answer with regard to Digitek.

7              I instruct you not to answer as

8    to the specifics on other drugs.

9              Go ahead.

10              THE WITNESS:  I'm sorry.  Now

11    that I'm rereading the paragraph, can you

12    ask me the question again?

13   BY MR. MILLER:

14        Q    Certainly.  Do you feel that you

15   understand the paragraph now?

16        A    Now I understand the paragraph, yes.

17        Q    Had you received training in CGMPs

18   as a vice president of quality and compliance?

19        A    Yes.

20        Q    Are you familiar with US -- with

21   21 USC 351 (a)(2)(B)?

22        A    Actually, not specifically.  I

23   couldn't tell you what that reference is in

24   detail.  GMPs are Sections 210 and 211 cited

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

312

1      use to manufacture is how you manufacture

2      that drug.

3              And there's a formulation

4      that's associated with a certain drug.

5      And not all drugs are produced with the

6      same formulation or the same process.

7  BY MR. MILLER:

8      Q    You would disagree with the

9  statement that if a quality control system

10  department of a pharmaceutical lab had a GMP

11  violation in stability, that that general GMP

12  violation doesn't carry over to stability for

13  all products?

14      A    Still, it's not -- it would depend

15  on the case.  You're -- you can have a

16  stability issue or a problem with -- it would

17  vary -- you'd have to be more detailed to

18  that.

19      Q    As we sit here, you're not aware of

20  any GMP violations on Digitek in particular?

21      A    No, I'm not aware of any on Digitek

22  in particular.

23      Q    Let's go to Page 7 of the Complaint,

24  Paragraph 16.

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

313

1          Blow that up, please.

2                 Paragraph 16 states that the FDA's

3     inspection of Actavis Totowa's Little Falls

4     facility from January 10 to February 8, 2006,

5     revealed that the firm failed to comply with

6     GMP requirements in several respects,

7     including, for example, it failed to

8     investigate unexplained out-of-specification

9     testing results for drugs, specifically

10    21 CFR 211.192.

11                And my question is:  Do you agree

12    that failing to investigate unexplained

13    out-of-specification testing is a violation of

14    CGMP?

15                      MR. DEAN:  Objection; calls for

16         a legal conclusion.

17                      Go ahead.

18                      THE WITNESS:  Yes, it is a

19         violation.

20    BY MR. MILLER:

21         Q     If we go to Page 10 and take a look

22    at Paragraph 21, the Complaint by the

23    US Department of Justice goes on to say that

24    from March 18 to May 20th, 2008, FDA inspected

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

314

1    Actavis Totowa's Riverview Drive facility.

2    Throughout the inspection, the FDA

3    investigators advised defendants of the

4    numerous and significant deviations from the

5    CGMP requirements that the investigators

6    observed so the firm could take responsive

7    actions to protect the public health.

8            Ma'am, you would agree that you were

9    part of the conversations in which the FDA

10   investigators advised Actavis of the numerous

11   and significant deviations from CGMP?

12       A    Yes.

13       Q    And do you agree that there were

14   numerous and significant deviations from CGMP

15   during the March 18th to May 20, 2008,

16   inspection?

17       A    Yes, I would have to agree.

18            MR. MILLER:  Would you call up

19       Exhibit 91.

20   BY MR. MILLER:

21       Q    That first page -- we've gone over

22   this document in some detail.  I'm going to

23   make a very good attempt not to ask questions

24   that have already been asked, although I'm

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

316

1     GMP inspection," would they look at good

2     manufacturing practices -- if they look at,

3     say, stability and the amount of time that you

4     have in this field, will they go through and

5     qualify GMP stability for every product or do

6     they qualify stability for one or two

7     products? They wouldn't go through 64

8     products? -- is my question.

9          A     Correct.

10         Q     So there's a general term there

11    where, okay, three or four products or

12    whatever number it might be are approved for

13    GMP for stability, or any other example, then

14    it's approved across the board; is that

15    correct?

16         A     They look at the system itself, and

17    they use a sampling of the products to

18    determine if that system's working.

19         Q     Would you agree with me that when

20    they look at the system, again, they look at

21    stability; they don't look at stability for

22    each and every of the 64 products; is that

23    correct?

24         A     Correct.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

317

1          Q    And does the counterpart hold true?

2    When they come in to inspect, they won't

3    inspect every product's stability testing;

4    they'll inspect a couple and then say you

5    violated the GMP for stability across the

6    board; is that correct?

7                    MR. DEAN:  Objection.

8                    Go ahead.

9                    THE WITNESS:  If it's not

10        specific to a product, yes, then that

11        would be true.  So if they found a

12        problem that was related specifically to

13        one product, then you couldn't make that

14        assumption.  But if they found a general

15        problem, then you could.

16   BY MR. MILLER:

17        Q    Would you describe a general

18   problem?  If they found GMP violations in

19   three or four products out of 64, that then

20   does it become a general problem?

21                   MR. DEAN:  Objection;

22        incomplete hypothetical.

23   BY MR. MILLER:

24        Q    It's okay to answer.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

320

1      before it is an across-the-board, general

2      problem?

3                    MR. DEAN:  Objection to form;

4           vague, ambiguous; lab system's undefined,

5           numerous other terms undefined.  The

6           question is vague and ambiguous.

7      BY MR. MILLER:

8           Q    It's okay to answer.

9                    MR. DEAN:  Go ahead if you can.

10                   THE WITNESS:  I forgot the

11          question.

12     BY MR. MILLER:

13          Q    Using your term, "laboratory

14     system," stability testing falls under

15     laboratory systems, which we have established.

16     And you indicated that one would be a problem

17     with that product, and you also indicated that

18     "multiple" would be an indication of

19     across-the-board problem.

20               My question is:  How many?

21          A    How many?  There's no definitive

22     number.

23               And just to clarify, in this

24     particular case, we had multiple stability

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

321

1  failures that led to recalls and those

2  products were recalled; but they were

3  product-related because, generally speaking,

4  the lab got a clean bill of health in this

5  inspection, for the most part.  That was the

6  area that they praised in terms of labs.  So

7  the fact that the lab found the out-of-specs,

8  I mean, it went to their credit.

9        If you recall, you put something up

10  a few minutes ago that criticized the company

11  from the prior inspection, whereby they were

12  not opening any investigations.  And you asked

13  me if that was a violation of GMP, and it is.

14        So the company had come quite a ways

15  in that they were opening these

16  investigations.  Now, of course, they were now

17  cited for failing to close them in a timely

18  fashion, but it was a new problem.  It was a

19  related problem.

20        But now the company was -- the

21  laboratory was actually given kudos for the

22  fact that it had done well during this

23  inspection, despite the stability failures

24  because they were product-related.  They were

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

322

1    related to either an issue with a product or a

2    batch or a method or something, something

3    else.

4              MR. MILLER:  Let's go to Page 2

5         of 95.  And blow up the last five lines.

6         There's a sentence that begins with

7         "however."

8    BY MR. MILLER:

9         Q    And if you could start, read

10   whatever you need to catch up.  But it begins

11   with "However," the bottom of the page, four

12   or five lines up from the bottom.

13             And it says regarding this

14   inspection:  However, there is no assurance of

15   the strength, quality and purity of the

16   approximately -- redacted number -- of other

17   products that remain on the market, all lots

18   remaining in the two distribution centers, and

19   the in-process products that remain at the

20   firm's Little Falls, New Jersey, and Totowa,

21   New Jersey, locations.  The products were

22   manufactured, tested and released by the same

23   quality system.

24             Now, do you find praise in that --

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

328

```
 1                    Go ahead.
 2                    THE WITNESS:  You asked
 3           something specific to digoxin.
 4                    MR. DEAN:  He changed the
 5           question.
 6                    MR. MILLER:  I did because I
 7           forgot the first one.  You're going to
 8           get me to forget the second one if you
 9           don't give me an answer.
10                    MR. DEAN:  Why don't you try
11           again.
12      BY MR. MILLER:
13           Q    As the vice president of quality and
14      compliance at Actavis for a large area but
15      speaking to Totowa and all the products that
16      manufacturing of was ceased, were all the
17      products terminated because of violations of
18      GMPs?
19                    MR. DEAN:  Objection.
20                    Go ahead.
21                    THE WITNESS:  When we ceased
22           manufacturing?  You're referring to the
23           cease of manufacturing?
24
```

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

329

1    BY MR. MILLER:

2        Q      Yes.

3        A      The products -- we discontinued

4    manufacturing because Erin raised the concern

5    regarding the fact that she couldn't -- she

6    reviewed certain products and she had issues.

7    And she extended that across the board and

8    asked us to provide her with evidence to the

9    contrary.

10            So in the absence of being able to

11   present her now with evidence for every

12   product, that it was -- that a review had been

13   done and that it was good, we ceased

14   manufacturing.  And that's when we called

15   PAREXEL in to do that review so that we could

16   provide that to her.

17       Q      And whether or not double-thick

18   tablets were found in Digitek, production

19   would have ceased on Digitek just the same?

20               MR. DEAN:   Objection; misstates

21       the prior testimony.

22               Go ahead.

23               MR. MILLER:   I'm not stating

24       any prior testimony.

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

330

1    BY MR. MILLER:

2         Q    My question is:  If double-thick

3    tablets had never been discovered in any

4    Digitek lot or batch, would you agree that

5    production line would have stopped just the

6    same?

7         A    It would have been part of that

8    group of products.  Whatever we were

9    manufacturing was stopped.  So Digitek -- even

10   if she never found an issue with Digitek,

11   that's what you're asking?

12        Q    Yes.

13        A    If she never found any issue with

14   Digitek, that would have been stopped with all

15   the others.

16        Q    No.  I'm talking about that specific

17   issue.  There were several issues.  I guess

18   that specific issue of double-thick tablets,

19   had that not been found, the production of

20   Digitek still would have ceased?

21        A    Yes, because we ceased everything.

22   So it would have been included in the whole

23   group.

24        Q    And the whole group ceased because

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

331

1    of significant GMP violations?

2        A    She found CGMP violations with

3    respect to certain things that she had looked

4    at and extended it across the board.  And it

5    was up to -- she was asking us to prove

6    otherwise.  So we had to stop in order to

7    evaluate and provide that information.

8        Q    And her findings came in the way of

9    observations in the 483?

10       A    Yes.

11       Q    And it was those observations in the

12   483 and violations of the GMP written in that

13   document that led to the cease of production

14   of all products; you agree with that?

15       A    Yes, even though we ceased before

16   actually having the official 483.

17       Q    Page 43 of 95, please.

18            And you agree that one group of

19   production recalls were due to stability, but

20   you agree that that was also -- included

21   out-of-specification results; is that correct?

22            MR. DEAN:  Can I have that

23       question again?  I'm sorry.

24            MR. MILLER:  Well, yeah, I

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

337

1          A     Correct.

2          Q     If it was some other product that

3    they make, even if they had said by way of

4    example oxycodone hydrochloride tablets and

5    that was the example, it wouldn't matter

6    because the violation is a general violation

7    that's outlined at the top; right?  So it

8    wouldn't have mattered to you --

9          A     She's pointing out, yeah, what she

10   observed to be a violation.

11         Q     I understand.  And if you take a

12   look at Page 45 of 95, now, this issue, this

13   out-of-specification issue goes to -- am I

14   correct in using the term "blend uniformity"?

15         A     In the last example?

16         Q     Yes.

17         A     Yes.

18         Q     And blend uniformity is where you're

19   testing to see if the amount of active

20   pharmaceutical ingredient has dispersed evenly

21   in the mixture; is that a good way to put it?

22         A     That's a good way to put it.

23         Q     And "out of specification" means

24   that a sample that they took did not have the

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

338

1       proper amount of active pharmaceutical

2       ingredient?

3            A     It could mean that, but there are a

4       lot of -- there's a lot of debate about the

5       sampling technique playing a role in whether

6       you get an accurate result.

7            Q     But as a manufacturer of a product

8       and vice president of quality, you do have

9       limits set high and low of how much active

10      pharmaceutical ingredient can be in a blend

11      uniformity test?

12           A     It has to meet the criteria for the

13      finished dose.

14           Q     Right.  And in this example, it was

15      Digitek that did not have the right amount of

16      digoxin in the test sample; is that correct?

17           A     If I can just look at this one more

18      time.

19           Q     Certainly.

20           A     I don't know all the details here,

21      but -- it's hard to do this with the redacted

22      version.  What was the question again?

23           Q     Certainly.  It discusses a Right-Top

24      sample.  You saw that?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

341

1          A     -- it's a valid result.

2          Q     But ultimately you'd agree that the

3   CGMP violation that the FDA inspector found to

4   summarize all this was determinations of

5   conformance to appropriate written

6   specifications for acceptance are deficient

7   for in-process materials?

8                    MR. DEAN:   Object to the form

9          as to "found."

10                   Go ahead.

11                   THE WITNESS:   Her concern here

12         was that this issue didn't extend to

13         looking at the manufacturing process.

14         She's criticizing the fact that a

15         manufacturing investigation wasn't

16         conducted in this instance and that --

17         but it appears, in looking at the rest of

18         this, that there were -- there was some

19         type of investigation related to the

20         laboratory and additional samples were

21         tested.

22   BY MR. MILLER:

23         Q     Would you --

24         A     As I said, unless I read this whole

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

356



1

2

3

4

5      Q    But as a result of the inspection,

6   you agree that all products were recalled at

7   Totowa?

8      A    Eventually.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

359

1           anything else going on in the inspection
2           except that they were not happy with what
3           they had seen so far.
4                   And so when the Digitek one
5           came along, they took a harsher approach
6           in looking at it and most likely due to
7           the nature of the product, but that's
8           just my opinion.
9      BY MR. MILLER:
10          Q    Did they also take a harder look
11     because of the significant GMP issues that
12     were going on in the laboratory?
13          A    Her -- no, it had nothing to do with
14     the laboratory.
15          Q    I'm sorry.  Strike that.
16          A    This particular observation had
17     absolutely nothing to do with the laboratory.
18          Q    Let me rephrase the question.
19               You agree that there were
20     significant GMP deficiencies found in the
21     quality control system?
22               MR. DEAN:  Objection.  That's
23          been asked and answered about ten times.
24               MR. MILLER:  Well, I'm trying

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

362

1      about --

2           A    Now ask me the question again.

3           Q    I'll start the same way I started

4      last time.

5                The other products, the other 64 or

6      65 products, they were subject to a quality

7      control system that had significant

8      deficiencies with GMPs; correct?  Do you agree

9      with that?

10          A    That was the view that FDA took.

11          Q    What's different about Digitek?  Why

12     is Digitek not lumped in with those other 65

13     products?

14          A    Because of the time frame that

15     you're talking about.  Digitek was in April,

16     and the 65 products was in July.

17          Q    I'm talking about the findings of

18     the 4 --

19               MR. DEAN:  Let her finish.

20               THE WITNESS:  In April, we had

21          no intention of recalling the other 65

22          products.  In April, it was our intention

23          to do the review by PAREXEL of the

24          remaining products and be able to defend

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

364

1    everything back.  That's the story.  I'm

2    sorry.  I get -- I spent ages and ages trying

3    to defend it, and we brought it all back

4    anyway.  So I'm very passionate about this

5    topic.

6    BY MR. MILLER:

7        Q    It is your testimony today that up

8    to April 24th of 2008, the only product that

9    was being discussed to be recalled was

10   Digitek?

11       A    No.  It was Digitek and several of

12   the stability-related out-of-spec products.

13   And there's documentation with dates and

14   commitments.  And I put everything in writing,

15   so it should be here somewhere, the exhibits

16   that are referred to.

17                  MR. MILLER:  That's all the

18         questions I have.

19                  MR. DEAN:  I've got a few

20         questions.

21                  THE VIDEOGRAPHER:  We should

22         probably go off the record, and I'll give

23         you a new clip.

24                  MR. DEAN:  Oh, please.  That

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

394

1

2                          CERTIFICATE

3

4              I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the testimony

7    given by the witness.

8                    It was requested before

9    completion of the deposition that the witness,

10   PHYLLIS A. LAMBRIDIS, have the opportunity to

11   read and sign the deposition transcript.

12

13

14   _____
     KIMBERLY A. OVERWISE
15   Certified Realtime Reporter
     Notary Public
16   Dated:  January 29, 2010

17

18

19                   (The foregoing certification of

20   this transcript does not apply to any

21   reproduction of the same by any means, unless

22   under the direct control and/or supervision of

23   the certifying reporter.)

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

395

1                    INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8                 After doing so, please sign the

9    errata sheet and date it.

10                 You are signing same subject to the

11    changes you have noted on the errata sheet,

12    which will be attached to your deposition.

13               It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the

16    deposition transcript by you.  If you fail to

17    do so, the deposition transcript may be deemed

18    to be accurate and may be used in court.

19

20

21

22

23

24

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

397

ACKNOWLEDGMENT OF DEPONENT

           I, PHYLLIS A. LAMBRIDIS, do
hereby certify that I have read the foregoing
pages, 1-396, and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.


_____        _____
PHYLLIS A. LAMBRIDIS            DATE




Subscribed and sworn
to before me this
_____ day of _____, 2009.

My commission expires:_____


_____
Notary Public