**In Re:**

*Digitek*

---

*Daniel W. Bitler*

*January 22, 2010*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File dw012210.txt

**Min-U-Script®**

**EXHIBIT C-1**

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  DIGITEK PRODUCTS   :   MDL NO.
LIABILITY LITIGATION       :   1968


(This document relates to all cases.)

- - -

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -

Fairfield, New Jersey
Friday, January 22, 2010

- - -


Videotaped Deposition of DANIEL W.

BITLER held at Crowne Plaza, 690 Highway 46,

on the above date, beginning at 9:09 a.m.,

before Kimberly A. Overwise, a Certified

Realtime Reporter and Notary Public.

- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

2

1    APPEARANCES:

2

3        BLIZZARD, McCARTHY & NABERS, LLP
         BY:   EDWARD F. BLIZZARD, ESQ.
4              HOLLY W. GIBSON, ESQ.
         Lyric Centre Building
5        440 Louisiana, Suite 1710
         Houston, TX  77002-1689
6        713-844-3750
         eblizzard@blizzardlaw.com
7        hgibson@blizzardlaw.com
         Counsel for Plaintiffs
8

9

         LOCKS LAW FIRM LLC
10       BY:   JAMES J. PETTIT, ESQ.
         457 Haddonfield Road, Suite 500
11       Cherry Hill, NJ  08002
         856-663-8200
12       jpettit@lockslaw.com
         Counsel for Plaintiffs
13

14

         TUCKER ELLIS & WEST LLP
15       BY:   MATTHEW P. MORIARTY, ESQ.
               MICHAEL ANDERTON, ESQ.
16       1150 Huntington Building
         925 Euclid Avenue
17       Cleveland, OH  44115-1414
         216-696-2276
18       matthew.moriarty@tuckerellis.com
         michael.anderton@tuckerellis.com
19       Counsel for Actavis Defendants

20

21

22

23

24

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

3

1    APPEARANCES:   (Continued)

2

3          SHOOK, HARDY & BACON, LLP
           BY:  HUNTER K. AHERN, ESQ.
4          JPMorgan Chase Tower
           600 Travis Street, Suite 1600
5          Houston, TX  77002-2992
           713-227-8008
6          hahern@shb.com
           Counsel for Mylan Defendants

7

8

9    ALSO PRESENT:

10   Catherine Smalfus, videographer
     Golkow Technologies, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

43

1        A     No.  It was a formalized annualized
2    session.
3        Q     And did it take 20 minutes?  Did it
4    take an hour?  Did it take two hours?  Did it
5    take all day?
6        A     I believe it was approximately an
7    hour.
8        Q     Would you characterize it as a
9    refresher course or was there an attempt to
10    teach you new things?
11        A     The annual program was more of a
12    refresher course.
13        Q     Do good manufacturing practices
14    apply to Digitek?
15        A     Yes.
16        Q     And you understand that good
17    manufacturing practices are set forth in
18    federal regulations?
19        A     Yes.
20        Q     Do you understand that good
21    manufacturing practices are minimum standards?
22                 MR. MORIARTY:  Objection.
23    BY MR. PETTIT:
24        Q     Can you answer that?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

44

1          A     Good manufacturing practices are the

2     requirement as put forth in the CFR.

3          Q     Can a company exceed them and do a

4     better job than the minimum standards set

5     forth in the federal regulations?

6                    MR. MORIARTY:  Objection.

7                    THE WITNESS:  Companies can do

8          what they need to do for their given

9          operation or organization.

10    BY MR. PETTIT:

11         Q     So they can't dip below the federal

12    regulations for good manufacturing practices,

13    but they can meet them or do better; correct?

14                   MR. MORIARTY:  Objection.

15                   THE WITNESS:  I would say yes.

16    BY MR. PETTIT:

17         Q     Is it your understanding that

18    failure to comply with good manufacturing

19    products -- excuse me.

20               Is it your understanding that

21    failure to comply with good manufacturing

22    practices would render a product being, quote,

23    adulterated, unquote?

24         A     No.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

46

1    subject a person or a company to regulatory

2    action?

3         A    Could you say the question again,

4    please?

5         Q    Sure.  Is it your understanding that

6    failure to comply with good manufacturing

7    practices as set forth in the federal

8    regulations could subject a company or person

9    to regulatory action?

10        A    Could?  Yes.

11                   (Plaintiff's Exhibit No. 127

12             was marked for identification.)

13                   MR. MORIARTY:  Jim, could

14             either you or you, Ms. court reporter,

15             just tell me what these exhibits are so I

16             don't have to reach over and grab his?

17                   MR. PETTIT:  Sure.  The

18             LinkedIn resume was 126.  And the current

19             document which on the top says Actavis

20             Totowa LLC standard operating procedure

21             06696, five pages, is Exhibit 127.

22    BY MR. PETTIT:

23         Q    So that's the first page of a

24    five-page document.  And have you seen -- and

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

48

1          Q     Yes, sir.

2          A     SOP means standard operating

3     procedure.

4          Q     What does that mean?

5          A     It's a description of procedures

6     that are followed as part of the normal

7     operations.

8          Q     Does Actavis -- strike that.

9                Did Actavis create its own standard

10    operating procedures for quality unit

11    responsibilities?

12         A     Yes.

13         Q     And were you involved in drafting it

14    or in commenting on it as it was being

15    drafted?

16         A     Yes.

17         Q     Did you draft it?

18         A     I approved it.

19         Q     Who drafted it?

20         A     I -- it says Bernard Glover so I

21    would have to say Bernie, Prepared by.

22         Q     Does it apply to Digitek?

23         A     Yes.

24         Q     I'm not going to spend a lot of time

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

50

1        Q      What does out of specification mean
2    as used in that sentence?
3        A      Out of specification would be a
4    laboratory testing result that did not meet
5    acceptance criteria.
6        Q      Is the acceptance criteria a
7    document that is in writing?
8        A      Yes.
9        Q      Is the document that is in writing,
10   does that apply to Digitek?
11       A      There would be one for Digitek, yes.
12       Q      Is there a separate one for Digitek?
13       A      Yes.
14       Q      What is that document called?
15       A      This is a laboratory document.  I
16   don't know what the exact title of that would
17   have been.
18       Q      Can you remember a word or a phrase
19   or what you might even informally call it?
20       A      There were testing specifications.
21   I don't remember what the title was that the
22   lab had for their different documents.
23       Q      And suspect test result, STR, what
24   does that mean?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

51

1    A    Suspect test results, I believe --
2 again, I'm not a laboratory expert -- was
3 results that were not out of spec but appeared
4 to be varying from what had been seen in
5 previous testing.
6    Q    Is there a written document at
7 Actavis that would distinguish an out of spec,
8 OOS, from a suspect test result, STR?
9    A    Yes, I believe there was.
10    Q    What is that?
11    A    Again, it's another procedural
12 document from the laboratory.  I don't know
13 the title.
14    Q    And in your career at Actavis, I'm
15 assuming you did a lot of investigations of
16 OOS?
17    A    I did not conduct investigations of
18 OOS.
19    Q    Who did that?
20    A    The laboratory.
21    Q    And the same with suspect test
22 results?
23    A    That's correct.
24    Q    And at a point -- and we're going to

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

65

1    inspection?

2         A    Could you repeat the question again?

3         Q    Sure.  Were you involved in any

4    corrective action plan that Actavis developed,

5    which would be directed at correcting

6    something that was observed in the 483 which

7    arose out of the January-February 2006

8    inspection?

9                   MR. MORIARTY:  Objection.

10                  Go ahead.

11                  THE WITNESS:  Can you define

12        what you mean by "involved"?  I'm not

13        sure what you're trying to ask.

14   BY MR. PETTIT:

15        Q    I'm trying to find out if you had

16   any involvement so I can ask you more

17   questions about it.

18        A    Yes, I would have had some

19   involvement.

20        Q    What was that?  Was that just

21   talking to people about coming up with

22   corrective actions, was that sitting and

23   drafting documents, or something else?

24        A    It could have been either one.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

69

1        A    Again, I would need to see that

2    specific.   I'm not sure if I was for that or

3    not.

4                    MR. PETTIT:  All right.  Can we

5        take a break now?

6                    MR. MORIARTY:  Sure.

7                    THE VIDEOGRAPHER:  We are now

8        going off the record.  This is the end of

9        Videotape No. 1.  The time is 10:25.

10                   (Short recess.)

11                   THE VIDEOGRAPHER:  We are now

12       back on the record.  This is the

13       beginning of Videotape No. 2.  The time

14       is 10:35.

15   BY MR. PETTIT:

16       Q    Mr. Bitler, I want to ask you some

17   similar questions on another inspection.  Are

18   you familiar, just in general terms, are you

19   familiar with an FDA inspection at Little

20   Falls in September 2007?

21       A    Yes.

22       Q    Did you attend that, again, meaning,

23   did you formally accompany and speak with the

24   FDA people?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

70

1      A     No.

2      Q     Did you read any of the documents

3   authored by the FDA regarding the September

4   2007 inspection?

5      A     The 483.

6      Q     Did you contribute any documents to

7   people at Actavis to assist in serving a

8   formal response to the FDA?

9      A     I was asked for input, yes.

10     Q     Did you do it?  Did you give

11   documents?

12     A     I provided some draft information,

13   yes.

14     Q     So drafting parts of the response or

15   providing actual physical photocopies or both?

16     A     Both.

17     Q     And for the September 2007

18   inspection, to whom did you give the drafts

19   and the documents?

20     A     The response was being compiled

21   by -- Scott Talbot and Phyllis Lambridis were

22   in charge of compiling and formalizing the

23   response.

24     Q     Were you involved in drafting any

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

71

1   corrective action plans or providing any

2   documents to help somebody else create a

3   corrective action plan?

4        A    Yes.

5        Q    Which, drafting or documents, or

6   both?

7        A    2007.  I believe that would have

8   been just providing documentation.

9        Q    Are you generally familiar with

10   there being an FDA inspection in March, April,

11   and May of 2008?

12        A    Yes.

13        Q    Did you attend that inspection?

14        A    I was introduced.

15        Q    Did you formally walk around and

16   formally answer any questions that the FDA

17   people had?

18        A    No, sir.

19        Q    Did you read any of the documents

20   authored by the FDA arising from that

21   inspection?

22        A    No, sir.

23        Q    Did you draft any language for

24   someone else to use in developing a formal

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

75

1    A    Yes.

2    Q    So my question then is:  Are these

3    67 pages the sum total of Daniel Bitler's

4    investigation report 07-093?

5    A    This would be the final version of

6    the investigation report.

7    Q    And is it the complete version of

8    the final investigation report 07-093?

9    A    Without any other potentially

10   referenced information, yes.

11   Q    I have to ask you what that meant.

12   A    I don't recall what's in all the

13   text or in all the lab documents or in all the

14   batch records that are copied here.  There may

15   be other things that are referenced in this

16   document.  I don't recall.  But from this

17   investigation report, this is the copy of the

18   final report.

19   Q    Is there a policy at Actavis -- was

20   there a policy at Actavis in the end of 2007,

21   beginning of 2008 on how to write an

22   investigation report when there's a situation

23   like this where out-of-spec tablets are found?

24   A    We had a standard operating

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

76

1    procedure for how to conduct investigations.

2         Q    And I think I saw the number for

3    that in some document, but do you remember off

4    the top of your head?

5         A    No, sir.  I'm sorry.

6         Q    But it's a specific SOP for doing

7    this kind of investigation report; correct?

8         A    For --

9              MR. MORIARTY:  Objection.

10             Go ahead.

11             THE WITNESS:  For conducting an

12        investigation.

13   BY MR. PETTIT:

14        Q    And at the end of this kind of an

15   investigation, you have to do an investigation

16   report; correct?

17        A    That's true, yes.

18        Q    And if a vice president at Actavis

19   said, Dan, where is your complete

20   investigation report 07-093, would you say

21   here it is, these 67 pages, or would you say

22   you've got to look at a lot of other things?

23        A    This would be the final report.

24        Q    Do you have a recollection of this

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

136

1     document then.  Going back to P-16 on Page 4:

2     "Following the 100% inspection, the QA team

3     conducted a 'Tightened' AQL inspection to

4     ensure that the defect tablets have been

5     removed from the batch.  The tightened AQL

6     inspection would require a rejection of the

7     batch if as few as 2 tablets were found to

8     have double tablet thickness."

9              So in Actavis, in a situation like

10    this when you're looking at out-of-spec

11    tablets, is there a policy that describes what

12    decisions you should make, what procedures you

13    should follow to decide whether you should

14    reject or accept the batch if you find an

15    additional one or two or three tablets?

16                   MR. MORIARTY:  Objection.

17                   Go ahead.

18                   THE WITNESS:  Again, I'm sorry.

19    I'm a little bit not certain as to the

20    question.  There is no procedure that

21    encompasses all potential scenarios that

22    you will encounter during the

23    investigation process.  There is a

24    procedure for conducting investigations.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

137

1    And based off that data and that

2    evaluation, you come to a conclusion.

3    But there is no procedure that says

4    necessarily if this, then this, if this,

5    then this, and go down the line through

6    all the possible permutations that you

7    might uncover.  So I'm -- there isn't

8    something that specifically says in the

9    way of an Actavis policy that I'm aware

10    of -- I can't speak now.  We're talking

11    about then.

12  BY MR. PETTIT:

13    Q   We're only talking about then.

14         THE WITNESS:  -- that would

15    discuss AQL or how to handle AQL.

16  BY MR. PETTIT:

17    Q   Do you know who drafted the sentence

18  I just read:  "The tightened AQL inspection

19  would require a rejection of the batch if as

20  few as 2 tablets were found to have double

21  tablet thickness"?

22    A   Again, as we said earlier, this

23  portion of the investigation was drafted by

24  Mike Ponzo.  Now, again, there may have been

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

138

1    involvement in discussion of what was worded,

2    but this was drafted by Mike.

3         Q    Did Mike and you discuss whether

4    there was a requirement to reject the batch if

5    two tablets, two additional tablets were found

6    to have double the thickness?

7         A    Well, I believe that was based off

8    the protocol.

9         Q    Did you have a discussion with Mike?

10   -- is my question.

11        A    I don't recall if we did or not.

12   This information here is being taken from the

13   requirements of the protocol, I believe.

14        Q    Tell me as precisely as you can

15   where that requirement is drawn from.

16        A    That requirement was drawn from

17   military standard 105.

18        Q    Anywhere else?

19        A    No.  Well, that's where the -- let

20   me -- that's where the information that we

21   used comes from, military standard 105.  The

22   document, if you will, it's more in the form

23   of a type of a slide rule, is a sampling and

24   inspection instrument that was put together by

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

139

1    ASQ.

2         Q    Which is what?

3         A    American Society of Quality.  And

4    Scott Talbot had one of these ASQ slide rules.

5    It's hard to -- that's the best term I can

6    give you.  It's not really a slide rule.  It's

7    two documents, two pieces inside each other,

8    and there's windows.  And you move the slide

9    depending upon various pieces of the puzzle

10   that you have to answer.  And it comes up with

11   for a given inspection level what your accept

12   and reject requirements would be.

13        Q    What is it physically that you're

14   describing?  Is it a book?

15        A    No.  Like I said, it's more of a

16   slide rule.  You have a sleeve which has some

17   windows cut out.

18        Q    Oh, I getcha.

19        A    And there's another piece inside.

20   And you're able to slide that through the

21   process depending upon which numbers you want

22   to choose that match your situation.  And as

23   you work through that process, it provides you

24   with the accept/reject criteria.  But I can

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

140

1    tell you that that tool is based on military
2    standard 105.
3        Q    Does that ASQ -- I apologize.  I
4    scribbled.  ASQ stands for?
5        A    American Society of Quality.
6        Q    Does the ASQ tool specifically as
7    you slide these windows around say one tablet
8    or two tablets or three tablets should be
9    released --
10        A    Yes, it does.
11        Q    -- if there's a combination of
12    sliding?
13        A    Yes.  It gives you an accept on
14    blank, reject on blank.  And that's based off
15    whether it's tightened, whether it's normal,
16    whether it's reduced.  It's based off batch
17    sizes.  So there's a variety of things you use
18    to come to that determination.
19        Q    Going back to that decision whether
20    the AQL inspection should be reduced, normal,
21    or tightened, is there something in writing
22    that you use to make that decision?
23        A    There was not.  Again, I don't know
24    if there is now, but there was not.  We chose

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

141

1    the tightest inspection criteria available on

2    that tool.

3         Q    Now, we're going to get to some

4    pages that talk about 1,330 pills being tested

5    and 40 in a bucket.  So we're going to get to

6    that and ask specific questions and get

7    answers.  But for those sorts of things -- and

8    if you want to wait, we'll wait.  But just

9    generally for those sorts of decisions, is

10   there a policy for those decisions that while

11   you're doing the AQL inspection, you would

12   pick a certain number of total tablets to do

13   in the tightened AQL inspection?

14        A    That number is given to you again

15   from that tool.  It tells you sample size as

16   well.

17        Q    Staying with P-16 and now turning if

18   you'd be so kind to Page 6 of 67, I will zoom

19   out for the big picture.  And I'll go into

20   what I want to ask about.

21             Those are your two signatures on

22   that page; correct?

23        A    Those are my signatures, that's

24   correct.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

143

1          A      It would have come from discussions
2     with regulatory affairs.
3          Q      Who did you speak with?
4          A      I do not recall which individual it
5     might have been.
6          Q      Did you speak with someone from
7     regulatory affairs at Actavis about this
8     issue?
9          A      I believe so.
10          Q      Would you have documented that
11     conversation if there were that conversation?
12          A      Not necessarily.  I don't recall if
13     I had.
14          Q      Would there normally be a specific
15     person at regulatory affairs that you would
16     ask this question or have this discussion with
17     even if you can't remember this specific
18     discussion who it was?
19          A      It changed over time.
20          Q      How about in 2007; who likely if you
21     had such a conversation would it be with?
22          A      I can't remember the names.  I'm
23     drawing a blank.  They were in Riverview and I
24     can't recall their names.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

149

1    tool or document other than the AQS to come up

2    with that 1,250?

3         A    The 1,250, right.

4         Q    Or using the rounded up numbers of

5    40?

6              MR. MORIARTY:  Objection.  Are

7    you talking about what they used or

8    what's available?

9              MR. PETTIT:  Well, I've been

10   asking what's available at Actavis.

11             THE WITNESS:  At Actavis, yes.

12   I mean, but you have to remember the ASQ

13   tool is simply a compilation of the

14   information contained in military

15   standard 105.  So military standard 105

16   would be available in its entirety if you

17   wanted to use that.  This tool takes all

18   the information and compiles it into one

19   more usable format.

20   BY MR. PETTIT:

21        Q    If I had the mil standard 105E I

22   think it's called -- right?

23        A    There's D or E, yeah.  It depends

24   which version.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

150

1      Q      That's not a section in your

2  opinion?  Is that a -- never mind.

3           If I had mil standard 105 and I had

4  the AQS sliding window document, is that the

5  entirety of what was available to you in end

6  of 2007, beginning of 2008 to get the

7  procedures for AQL inspection?

8      A      Yes.

9           MR. MORIARTY:  Next major

10      convenient stopping point, we probably

11      ought to go down there.

12           MR. PETTIT:  I will do that.

13  BY MR. PETTIT:

14      Q      Can you look at Page 61?

15      A      Okay.

16      Q      It's really hard to read on the

17  screen.  That is the numerical -- well, tell

18  me what that is.  I'm going to just zoom in.

19      A      Yeah, you can't read the headers,

20  but what it is in the document is simply a

21  table that was used to capture the results of

22  the AQL sampling that was done by quality

23  assurance.

24      Q      Okay.  Now, tell me, if you would,

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

179

1        A    I'm sorry.  I don't remember.  I

2    couldn't tell you.

3        Q    Okay.  But whether you remember the

4    number or not, is there an SOP that deals with

5    this narrow issue, if you find an out-of-spec

6    tablet in the current batch, you must look for

7    history or pattern of prior occurrences of

8    out-of-spec tablets?

9        A    There is not an SOP that is

10   specifically talking about what you do if you

11   find a specific attribute failure.  There is

12   an investigation procedure that tells you how

13   you go about conducting an investigation.

14   That's the procedure you would need to look

15   at.

16       Q    Do you feel, whether or not the FDA

17   said something about it, that it was

18   inappropriate for you as quality assurance

19   director not to look for whether there was

20   prior out-of-spec Digitek tablets before

21   November 30, 2007, having found these 20?

22            MR. MORIARTY:  Objection; form.

23            THE WITNESS:  And, again, I

24       didn't say we did not.  I said there were

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

193



21    Do you know that the FDA investigators were

22    questioning the judgment of some of Actavis'

23    investigations and their outcomes?

24        A    Yes, I was aware of that.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

194

releases?

         MR. MORIARTY:   Objection.

         Go ahead.

BY MR. PETTIT:

    Q   Do you remember in January, February, March, April 2008 whether you were ever told that the FDA was focusing on especially some of the batch releases?

    A   I know they were looking at investigations and the investigation process. But focusing on the batch releases, I do not recall that being a conversation.

    Q   Wouldn't the outcome of an investigation be whether or not there was a batch release?

    A   Not necessarily.   Investigations could be tied to other parts of the operation.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

195

1        Q     But in any event, the FDA -- it's
2    your testimony that you are aware, this e-mail
3    aside, that the FDA was focusing on batch
4    releases in that time period; correct?
5        A     No.  I said I was under the
6    understanding that they were focusing on
7    investigations.  I didn't know about the
8    specific piece of batch releases.
9        Q     Did you know that Divya Patel, the
10   CEO or president, was telling another
11   high-ranking official in the company a comment
12   about Dan Bitler?  Did you know you were being
13   discussed at that high level of the company?
14       A     I know nothing about this
15   information, no.
16       Q     Is this the first time you knew
17   Divya Patel was talking about you in
18   April 2008?
19       A     From my own firsthand experience,
20   this would be the first time that I know, yes.
21       Q     So this e-mail surprises you?
22       A     No.
23       Q     So -- well, let me ask you a
24   specific question about this sentence.  Is it

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

196

1    true that you as the quality assurance

2    individual on-site who has this

3    responsibility, talking about the previous

4    phrase, is no longer releasing batches, is

5    that true at that time, April 2008?

6         A    I can't refer back to the exact

7    date, but the statement that I was not

8    releasing batches was -- is a true statement,

9    yes.  Phyllis did discuss that with me.

10        Q    Okay.  And the parentheses says

11   Phyllis, which is Phyllis Lambridis,

12   immediately put -- I'm paraphrasing -- put Dan

13   Bitler's ability to release batches on hold.

14   So that's what you're talking about?

15        A    Correct.

16        Q    And when did Phyllis have that

17   conversation with you, Phyllis Lambridis?

18        A    I'm sorry.  I can't recall.  I can't

19   recall the dates.

20        Q    Okay.  Was it -- so this e-mail is a

21   couple weeks before the recall of Digitek.

22   Can you answer my question in that fashion,

23   how many weeks or months before the recall she

24   was taking you off -- taking away your ability

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

197

1    to release batches?

2         A    I, again, don't have the dates.  I

3    mean, looking at this document, I would -- I

4    don't want to assume.  I don't know what the

5    dates were.

6         Q    Since the president/CEO, Mr. Patel,

7    was talking in an e-mail to another

8    high-ranking official about Dan Bitler

9    being -- having his ability to release batches

10   removed by the vice president, would that mean

11   to you that the writing was on the wall in

12   terms of your going to be let go soon?

13                MR. MORIARTY:  Objection.

14                THE WITNESS:  I can't answer

15       the intent or what their thoughts were at

16       this particular point in time.

17   BY MR. PETTIT:

18        Q    Does the focus of your ability to

19   release batches being taken away, does that

20   focus in this e-mail being talked about by the

21   president of the company, does that show you

22   the importance to the company of your decision

23   making about your decisions to release

24   batches?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

198

1                    MR. MORIARTY:  Objection.

2                    THE WITNESS:  I'm sorry.  I

3         don't quite understand that question.

4    BY MR. PETTIT:

5         Q    Have you ever prior to five minutes

6    ago known that the highest levels of this

7    company were talking about your ability and

8    whether you should have the ability and

9    whether you had the ability taken away to

10   release batches?

11        A    No, I was not aware.

12        Q    Based on your four or five years at

13   Actavis, does it seem an unusual event that

14   the president of the company would be involved

15   in discussing whether or not your ability to

16   release batches was something important enough

17   to tell Siggi Olafsson about?

18                   MR. MORIARTY:  Objection.

19                   THE WITNESS:  I can't say

20   what's usual or unusual.  I'm sorry.

21                   MR. PETTIT:  I think this is

22        not a preexisting marked exhibit, but I'm

23        not a hundred percent sure.  So I'm going

24        to mark this as 132.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

199

1                    (Plaintiff's Exhibit No. 132

2            was marked for identification.)

3                    MR. PETTIT:  For the record,

4            this is a document which I will identify

5            on the front page as being on the

6            letterhead of Actavis dated June 11,

7            2008.  And it's directed to Douglas

8            Ellsworth, District Director New Jersey

9            District for the FDA.  And it's regarding

10           an FDA 483, which was issued to Actavis

11           on May 20, 2008.

12                    Go off the record for one

13           second.

14                    THE VIDEOGRAPHER:  Off tape,

15           2:27.

16                    (Discussion off the record.)

17                    THE VIDEOGRAPHER:  Back on

18           tape, 2:28.

19      BY MR. PETTIT:

20           Q      Sir, can you look at Page 8 of 19?

21           A      Okay.

22           Q      First of all, have you seen this

23      response letter before just now?

24           A      No.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

200

1          Q      Have you seen response letters from

2    Actavis from some other investigation so you

3    at least know what the concept is, they write

4    a response letter after getting a 483?

5          A      I understand the concept, yes.

6          Q      And on Page 8 of 19, they're talking

7    about Observation 4, which would mean

8    Observation 4 of the 483, which was a form

9    from the FDA in May 2008.  And it says:

10   "Determinations of conformance to appropriate

11   written specifications for acceptance are

12   deficient for in-process materials."

13          And without reference to the

14   particular sentence, what are in-process

15   materials?  What's that word mean?

16          A      In-process materials would or could

17   be anything from manipulations of the starting

18   raw materials anywhere through to the point at

19   which you're packaging the final dosage form.

20   You've got different parts of the operation

21   where you will complete a phase, may capture

22   and store material for a period of time before

23   going to the next phase of the manufacturing

24   or packaging operations.  So these are

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

201

1    in-process materials because they're at

2    different steps in the process.

3         Q    Again, this is part of a multipage

4    letter from October advice to the FDA dealing

5    with the FDA's Observation 4.  And it's saying

6    specifically -- now, I'm going to paraphrase

7    and read the sentence, but this is dealing

8    with batches other than the batch we've been

9    talking about.  So this is other than the

10   70924 double-thick batch; correct?  These are

11   all different batch numbers; correct?  And

12   there's three of them:  70148A, 70207A,

13   70707A.  Do you see those numbers?

14        A    Yes.

15        Q    Now I'm going to read the sentence:

16   Although three out-of-specification results

17   were obtained for blend uniformity at the --

18   and there's a redaction -- sample location for

19   digoxin tablets .125 in 70148A, 70207A -- and

20   I'm skipping some letters here but it's on the

21   screen -- and 70770A on February 20, 2007,

22   March 14, 2007, and September 29, 2007, no

23   manufacturing investigations were conducted.

24        Now, you were still quality

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

203

1              to some other conclusion, I wouldn't have

2              been aware of those out-of-specification

3              results.  So what I'm saying, I don't

4              know if there was or there was not.

5       BY MR. PETTIT:

6              Q     Okay.  And that's the same for

7       70207A in March '07 and 70770A in September

8       '07; correct?

9              A     Correct.

10             Q     So if there were -- what does the

11      phrase "manufacturing investigations" mean?

12      In terms of finding an out-of-spec result for

13      Digitek, what would "manufacturing

14      investigation" mean?

15                        MR. MORIARTY:  Objection.

16                        Go ahead.

17                        THE WITNESS:  Every time you

18      have an out-of-specification result does

19      not automatically mean you have a

20      manufacturing investigation to go with

21      that.  If you have an

22      out-of-specification result in the

23      laboratory, the laboratory has written

24      procedures, SOPs, on how to go about

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

204

1      investigating that initial result.  And

2      if upon that investigation a cause is

3      determined and it's found to be

4      laboratory-related, there will not be any

5      manufacturing investigation to go with

6      that result.  So just because you have an

7      OOS doesn't mean you have automatically a

8      manufacturing investigation also.

9   BY MR. PETTIT:

10      Q    Well, I'm sure it wasn't automatic

11   because it wasn't conducted.  So let me ask

12   you:  Is there a policy that determines that

13   if there's a lab result showing out-of-spec

14   Digitek, that there should or should not be a

15   manufacturing investigation conducted?

16      A    There would be --

17            MR. MORIARTY:  Objection.

18            THE WITNESS:  Sorry.

19            MR. MORIARTY:  Go ahead.

20            THE WITNESS:  There would be an

21   investigation SOP in the laboratory that

22   would discuss steps to be taken during

23   the investigation process.

24

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

205

1    BY MR. PETTIT:

2         Q    And could there be a decision to

3    have a manufacturing investigation?  Is that

4    one possibility?

5         A    That is correct.

6         Q    And the laboratories are under

7    quality control?  Is that the setup, the

8    organizational setup?

9         A    That's correct.

10         Q    And do you have any involvement with

11    quality control laboratory testing?

12         A    You have to define "involvement."

13    I'm not sure what you're --

14         Q    Involvement to the level where they

15    would discuss with you whether there should be

16    an investigation because there was out-of-spec

17    Digitek found.

18         A    Not necessarily.  I can't say that

19    they would not call and say, "This is what

20    we're looking at."  But if they follow

21    procedure, there would not necessarily be any

22    need for a manufacturing investigation.

23         Q    Would -- in 2007, would Richard

24    Dowling have been involved in a discussion

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

208

1          A     Correct.

2          Q     There's a column here, the heading

3     is Reviewer and it says R. Haluska.  Do you

4     know who that is?

5          A     It's, I believe, a member of

6     Quantic.

7          Q     What is that?

8          A     An outside consulting firm.

9          Q     What did they do in the spring of

10    2007?

11         A     They were brought in to review a

12    sample of batch records, the 302 sample.

13         Q     What is that?

14         A     It's the number of batches that were

15    taken from a list of batches produced that

16    they were going to sample and review for our

17    organization as part of what was called QSIP.

18         Q     And was QSIP for this particular

19    issue set up after an FDA inspection?

20         A     QSIP was set up after an FDA

21    inspection, that is correct.

22         Q     And it says date question was

23    issued, May 22, '07.  Is that the issue of

24    investigating out-of-spec Digitek?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

209

1      A      No.

2      Q      Do you know what that means?

3      A      That's the date that Mr. Haluska had

4   a question that he wanted to have answered

5   about this particular batch record and

6   provided that question to the appropriate

7   department to have sent somebody over to sit

8   down with them to talk about whatever question

9   he had.

10      Q      Did you have any involvement with

11   this outside group for this project, this

12   task?

13      A      Yes.

14      Q      Did you ascertain that there was an

15   out-of-spec Digitek tablet that was out of

16   spec for weight?

17      A      I --

18                 MR. MORIARTY:  Objection.

19                 Go ahead.

20                 THE WITNESS:  I couldn't say

21   that I was the one who responded to that

22   particular question on this particular

23   batch.  I don't recall.

24

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

211

1      that arose during that review process by this

2      individual consultant.

3            Q     And do you know what the conclusion

4      was?

5            A     I can't say.

6            Q     I'm showing you what was previously

7      marked at an earlier deposition Exhibit 91.

8      And it is a photocopy of an EIR, an

9      Establishment Inspection Report, regarding

10     Actavis Totowa where the start date is

11     March 18, 2008, and the end date is May 20,

12     2008.  Have you ever seen this document

13     before?

14           A     No, sir.

15           Q     Have you ever heard of an EIR?

16           A     Yes.

17           Q     And what is your understanding of

18     what an FDA Establishment Inspection Report is

19     when it's sent to a company?

20           A     At the conclusion of the inspection,

21     they compile all of their information and send

22     it out to the organization as the overview of

23     that inspection that took place.

24           Q     Turning to the second page, Page 2

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

212

1    of 95, when the FDA is talking about the

2    inspection, they say the inspection was

3    limited to coverage of the quality system.

4    And then the sentence goes on.  Please read

5    the whole sentence if you need to.  But was it

6    your understanding that FDA inspection was

7    limited to coverage of the quality system?

8         A    That wasn't my understanding, no.

9         Q    And was it your understanding that

10   an issue for the FDA at that time was the

11   batch that we've been talking about for hours,

12   which is the Digitek Batch 70924A, which they

13   call 70924A2 here?  Did you know that that was

14   a focus of the inspection by the FDA?

15        A    Yes.

16        Q    Did you know that the FDA was

17   critical of the failure of the quality unit to

18   reject products not meeting specifications?

19        A    No.

20        Q    No one ever told you that?

21        A    I never saw the 438 or EIR.  No, I

22   wasn't aware.

23        Q    But putting aside whether you saw

24   the documents, nobody told the quality

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

213

1    assurance director that the FDA was critical

2    of the failure of the quality unit to reject

3    products not meeting specifications?

4                          MR. MORIARTY:  Objection.  This

5            is May 20.  He probably wasn't even there

6            then.

7                          MR. PETTIT:  Please, sir, just

8            object.

9    BY MR. PETTIT:

10           Q     The question was:  No one ever told

11   you that?

12                         MR. MORIARTY:  Objection.

13                         THE WITNESS:  No, because

14           you're talking about in this case the

15           quality unit.  That's not quality

16           assurance by itself.  It's the quality

17           unit.

18   BY MR. PETTIT:

19           Q     What's the quality unit?

20           A     That includes quality control,

21   laboratories.  When you say not meeting

22   specifications, it could be

23   laboratory-related.  It could be --

24   validation's part of the quality unit.  It

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

214

1    could be validation-related.  It could be

2    manufacturing.  The quality unit encompasses

3    all quality systems and all quality members of

4    the organization.  It's not just quality

5    assurance.

6         Q    But it sure could be focused on the

7    release of Digitek tablets Lot 70924A2

8    following a visual inspection, could it not?

9                   MR. MORIARTY:  Objection.

10                  THE WITNESS:  That was a single

11        item that they were looking at was that

12        investigation.

13   BY MR. PETTIT:

14        Q    So out of all of the many, many

15   products Actavis made, they made a point of

16   having an inspection that was focused on

17   something which they spelled out, and they

18   actually spelled out the name of the drug,

19   digoxin tablets, which is Digitek, the lot

20   number, the dosage, the fact that there was a

21   visual inspection.  Did anyone ever tell you

22   that the FDA in this inspection was focusing

23   on your release of Digitek 70924A2 after a

24   visual inspection?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

215

1              MR. MORIARTY:  Objection.

2              THE WITNESS:  Not worded that

3     way, no.  That's not correct.  The FDA

4     did not come in to focus on this batch.

5     They came in for an inspection.  This was

6     an item that was discovered and discussed

7     as part of that inspection process was

8     this particular batch.  They didn't come

9     in for this batch.

10    BY MR. PETTIT:

11        Q    I didn't say in my question this was

12    the only thing they did.  This is a 95-page

13    report.  I'm saying:  Did anyone tell you that

14    they were so interested that they spelled out

15    in the EIR the product, which is Digitek or

16    digoxin tablets, the dosage, the lot number,

17    and the fact that it was released following a

18    visual inspection?  Did anyone tell you that

19    that, in fact, was something that they were

20    looking at with that specificity?

21              MR. MORIARTY:  Objection.

22              THE WITNESS:  No one ever told

23        me about the EIR because I was no longer

24        with the organization when they received

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

220

1    Quality Assurance group, the lack of oversight

2    of decision making and the failure to respond

3    to product quality issues were all observed as

4    continuing problems during the current

5    inspection despite the improvements in the

6    laboratory."

7           Were you ever told that the FDA

8    prior to your being let go was critical of the

9    lack of oversight of decision making in

10   quality assurance?

11                  MR. MORIARTY:  Objection.

12                  Go ahead.

13                  THE WITNESS:  No.

14   BY MR. PETTIT:

15        Q    Do you believe that there was a lack

16   of oversight of decision making in quality

17   assurance?

18        A    No, I do not.

19        Q    Do you believe that there were,

20   quote, limited resources of the quality

21   assurance group, unquote?

22        A    I don't know why the inspectors

23   thought the resources were limited.  I'm not

24   really sure.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

222

1          A     Just felt that we could continue to

2     enhance and improve the operation with more

3     resources.

4          Q     If you turn to Page 12, this is

5     concerning Misbah Sherwani, who we talked

6     about earlier, senior manager quality

7     assurance investigation group; correct?  I

8     mean correct, is that her title?

9          A     Yeah, I think it was.  I think

10    that's correct at the time.  I don't recall

11    but that sounds about right.

12         Q     Apparently she explained to the FDA

13    the efforts to correct the backlog of

14    incomplete QA investigations and stated that

15    she hoped to hire additional resources.

16              Did you know that Misbah Sherwani

17    had explained to the FDA there had been

18    efforts by the company made to correct the

19    backlog of incomplete QA investigations?

20         A     No, sir.

21         Q     Do you agree that there was a

22    backlog of incomplete QA investigations?

23         A     No.

24         Q     Do you think Misbah Sherwani was

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

223

1    wrong in reporting that to the FDA?

2                    MR. MORIARTY:  Objection.

3                    THE WITNESS:  I can't speak to

4        why Misbah said what she said.

5    BY MR. PETTIT:

6        Q    No, I'm not asking for her

7    motivation.  I'm asking if factually you

8    contend she was wrong.

9        A    But you're asking for what I feel is

10   a backlog versus what she feels is a backlog,

11   so it still comes down to something that is

12   opinion, not fact.  And I don't know what her

13   opinion was or why.

14       Q    Wouldn't a backlog be something --

15   an incomplete QA investigation; in other

16   words, QA investigations weren't kept current?

17       A    They were kept current.  But, again,

18   an investigation takes time.  An investigation

19   to be done correctly takes time.

20       Q    Well, she hoped to hire additional

21   resources to correct that problem; correct?

22   Do you agree with that?

23       A    No.  You have to ask her why she

24   said what she said.  I don't know.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

224

1      Q     So you don't know if she hoped to
2   correct the problem by giving you more people
3   in quality assurance?
4      A     This would have been her people.
5   She was in charge of investigations.
6      Q     Okay.  So that would have no impact
7   on the quality assurance, the fact that she
8   would have more people in quality assurance?
9      A     She didn't report in to quality
10  assurance.  She didn't report in to me.  If
11  you read below, she reported to Phyllis.
12     Q     Okay.  So quality assurance in some
13  other sliver of it was trying to get more
14  people to bring their QA investigations more
15  current; would you at least agree with that?
16     A     Based on what is written here,
17  that's what it appears to say.
18     Q     And you just don't believe there was
19  a backlog; is that your testimony?
20     A     In my opinion, I don't know what
21  she's considering to be a backlog or what she
22  is not considering to be a backlog.
23              MR. PETTIT:  I have a minute
24        left on the tape, so I better stop.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

228

1    the quality assurance group looking for

2    whether or not there were any more out-of-spec

3    Digitek tablets, that that part was

4    inconclusive?

5                    MR. MORIARTY:  Objection.

6                    THE WITNESS:  Don't know

7        anything about that.

8    BY MR. PETTIT:

9        Q    Did anyone tell you that the FDA was

10   critical that you did not extend the

11   investigation to all other lots or strengths

12   of digoxin tablets?

13       A    No.

14       Q    And "all" would certainly refer to

15   prior lots and strengths of Digitek; that's

16   your understanding of what "all" would mean,

17   right, all other lots?

18       A    I didn't write this, but it would

19   appear to be the case.

20       Q    Turn to Page 20.   The FDA is saying

21   quality assurance investigations were not

22   documented and/or not completed, reviewed, or

23   approved at the time of the findings.

24                    Did anyone ever tell you that the

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

229

1    FDA was critical about quality assurance

2    investigations in that way?

3                    MR. MORIARTY:  Objection.

4                    THE WITNESS:  No.

5    BY MR. PETTIT:

6        Q    "Additionally, decisions for

7    finished product release were not supported by

8    scientific rationale" -- well, I'll stop there

9    and I'll continue the sentence in a minute.

10              Did anyone ever tell you that the

11   FDA was critical that decisions for finished

12   product release were not supported by

13   scientific rationale?

14                   MR. MORIARTY:  Objection.

15                   THE WITNESS:  No.

16   BY MR. PETTIT:

17       Q    The sentence goes on:  "And

18   investigations of deviations were not reviewed

19   by multiple personnel in the Quality Unit for

20   concurrence."

21              Did anyone ever tell you that the

22   FDA was critical that quality assurance

23   investigations of deviations were not reviewed

24   by multiple personnel in the quality unit for

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

230

1    concurrence?

2                    MR. MORIARTY:  Objection.

3                    THE WITNESS:  At this point in

4        time when this occurred, no.

5    BY MR. PETTIT:

6        Q    Any other time?

7        A    When you told me -- when we

8    discussed this earlier today, the fact that

9    the question had come up when I was with these

10   gentlemen last night at Phyllis' depo, that's

11   the first I'd heard of it.

12       Q    Did anyone ever tell you the FDA was

13   critical of the paper-based systems for

14   documenting laboratory investigations,

15   manufacturing investigations, and quality

16   investigations in that they were not managed,

17   trended, or correlated to determine the

18   comprehensive impact on marketed product?

19                   MR. MORIARTY:  Objection.

20   BY MR. PETTIT:

21       Q    Did anyone ever tell you that?

22       A    Wait a minute.  Where is this at?

23       Q    It's the same paragraph.

24       A    Oh, I'm sorry.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

231

1          No.   And there's no requirement that
2     you can't use paper-based systems.
3          Q     Well, it looks like the criticism is
4     not just that they were paper-based, but they
5     were not managed, they were not trended, and
6     they were not correlated in order to determine
7     the comprehensive impact on marketed product,
8     in other words, how that was used.
9          A     I understand that part of the
10    sentence and the answer to that was no.   I'm
11    just highlighting the fact that there is no
12    requirement you cannot use a paper-based
13    system.
14         Q     No, I wasn't suggesting that.
15               Did anyone ever tell that you the
16    FDA was critical of the fact that written
17    procedures were not followed?   And I'll finish
18    the sentence in a second.
19         A     I'm sorry.   Was that --
20         Q     Yes.   Did anyone ever ask you that?
21         A     I thought you were going to
22    continue.   Can you ask the question again,
23    please?
24         Q     I just wanted to take it a half a

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

232

1    sentence at a time.

2              Did anyone ever tell you that the

3    FDA was critical that written procedures were

4    not followed?

5          A    No, I did not know that was an issue

6    with that inspection.

7          Q    Did anyone ever tell you that the

8    FDA was critical that staffing was

9    insufficient to support the large number of

10   quality investigations required based on

11   laboratory findings?

12         A    I know early in the inspection one

13   of FDA's concerns that they saw was the size

14   of the quality unit.  But as far as this

15   specific item here, investigations required

16   based on laboratory findings, no, that I was

17   not aware of.

18         Q    Could you turn to the next page,

19   Page 21.  This is regarding Observation 2 that

20   the FDA made in the 483, but I just want to

21   talk about the last sentence in the paragraph.

22   There was no documented evaluation of the

23   approximately blank number of -- well,

24   redacted number of lots that remained on the

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

233

1       market at the time of inspection.  And, again,

2       they're dealing with the Digitek batch we were

3       talking about earlier.

4                    Did anyone ever tell you that the

5       FDA was critical that there was no documented

6       evaluation of the other lots of Digitek

7       besides 70924A1 that were on the market at

8       that time?

9            A    I don't know that I would classify

10      it as critical as you're saying.  I know that

11      that was part of their discussion, but that's

12      the only thing that I was made aware of.

13           Q    You think that they're praising you

14      for not having documented evaluation?

15           A    I think they're providing their

16      opinion of what they saw.

17           Q    But it's a critical sentence, is it

18      not?

19                    MR. MORIARTY:  Objection.

20                    THE WITNESS:  It's a sentence.

21      BY MR. PETTIT:

22           Q    That's just a sentence?  The FDA's

23      saying that in an observation in a 483 --

24      would you agree that an observation in a 483

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

234

1    is something they want the company to look at

2    and address?

3         A     That they want us to look at and

4    address?  Yes.

5         Q     Yes.  And so they're not praising

6    the fact that you have no documentation, are

7    they?  They're telling you that's a problem

8    and you should look at it and address it; do

9    you agree with that?

10        A     I agree with the fact they would

11   want us to look at it and address it, yes.

12        Q     So the only part you disagree with

13   is that lack of documentation is a problem; is

14   that your testimony?

15                    MR. MORIARTY:  Objection.

16                    THE WITNESS:  No.  My objection

17        was your use of the word "critical."  You

18        took one sentence out of the whole thing

19        and said this is critical.  I agree with

20        you it is something they would want us to

21        look at and address.

22   BY MR. PETTIT:

23        Q     Can you turn to the next page,

24   please, 22.  They're still talking about that

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

248

1          Q     Okay.  I'm going to show you a

2     document that's previously been marked as

3     Exhibit No. 49.  I think you mentioned earlier

4     the term "good manufacturing practices."

5          A     Yes.

6          Q     What is that term?

7          A     Current good manufacturing

8     practices, GMPs, or CGMPs.

9          Q     And based upon your long experience

10     in quality involving pharmaceuticals, what's

11     the purpose of CGMPs?

12          A     Current good manufacturing practices

13     are basically to set up standardized

14     procedures that will be followed time after

15     time in the running of your operation.

16          Q     Okay.  So one of the things that's

17     being done by having this set of practices

18     called good manufacturing practices is to

19     standardize quality assurance and quality

20     control procedures, and manufacturing

21     procedures across industry?

22          A     That would be correct.

23          Q     Is it also important from a safety

24     standpoint?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

249

1          A     Referring to the safety of the

2     product or --

3          Q     Yes.

4          A     -- safety of the employees?

5          Q     Both.

6          A     It could be for either case, yes.

7          Q     Okay.  So there is a safety

8     component to the good manufacturing practices

9     and the enforcement of those practices?

10          A     Yes.

11          Q     I think you were asked earlier by

12     Mr. Pettit whether these were minimum

13     standards, and I can't remember exactly what

14     your answer was with respect to that.  But if

15     you would take a look at the document that's

16     in front of you that was marked Exhibit 49, do

17     you see that in the first paragraph under Part

18     210, Section 210.1 where it says "Status of

19     current good manufacturing practice

20     regulations," do you see where it says that

21     this chapter contains the minimum current good

22     manufacturing practice for methods to be used

23     in, and the facilities or controls to be used

24     for, the manufacture, processing, packing or

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

250

1    holding of a drug to assure that such drug

2    meets the requirements of the act as to safety

3    and has the identity and strength and meets

4    the quality and purity characteristics that it

5    purports or is represented to possess?

6         A    I see that.

7         Q    Okay.  So does it say essentially in

8    the first paragraph of the regulations that

9    they're minimum standards?

10        A    It does say that, yes.

11        Q    Okay.  And do you see in the second

12   paragraph that it actually says that a failure

13   to comply with these regulations renders the

14   product adulterated?

15        A    Right.

16        Q    Okay.  Now, were these the

17   regulations that you were asked to study and

18   that you had a refresher course on from time

19   to time while you worked for Actavis?

20        A    These were the regulations that we

21   would reference when looking at what the

22   regulations required, yes.

23        Q    And was there -- were there tests

24   administered from time to time at Actavis to

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

251

1    determine whether people were familiar with

2    those regulations?

3          A    Not that I'm aware of.

4          Q    Do you know whether any tests were

5    administered after the FDA inspection in 2008

6    and before you left the company?

7          A    Not that I'm aware of.

8          Q    I'm going to show you next -- this

9    may have been marked as a prior exhibit, but I

10   don't have it on here.  I'm just going to show

11   you pending figuring out whether we have a

12   prior exhibit or we need a new exhibit some

13   additional regulations that I believe

14   specifically apply to quality.

15              Are you familiar with these

16   regulations that begin at Section 211.22 of

17   the 21 CFR?

18         A    Yes, sir.

19         Q    Okay.  And tell me what these

20   regulations apply to generally.

21         A    Well, you're talking about subpart

22   B, which refers to organization and personnel.

23         Q    So this would essentially specify

24   the responsibilities of personnel within

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

252

1    quality control organizations; correct?

2         A    The first section would, yes.

3         Q    Okay.  Do you see where it says

4    there that:  "There shall be a quality control

5    unit that shall have the responsibility and

6    authority to approve or reject all components,

7    drug product containers, closures, in-process

8    materials, packaging material, labeling, and

9    drug products, and the authority to review

10   production records to assure that no errors

11   have occurred or, if errors have occurred,

12   that they have been fully investigated"?

13             Do you see where they like to write

14   long sentences?

15        A    Yeah.

16        Q    Do you understand that paragraph to

17   require that a drug company that produces

18   prescription drugs has to have a quality

19   control unit that has both the responsibility

20   to act and the authority to act?

21        A    Yes.

22        Q    And they should have the authority

23   and responsibility not only to approve but to

24   reject materials; do you see that in the

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

253

1    regulations?

2        A    Yes.

3        Q    Do you see also that over here in

4    the second column, I think it's under

5    Section 211.25, (c) says:  "There shall be an

6    adequate number of qualified personnel to

7    perform and supervise the manufacture,

8    processing, packing, or holding of each drug

9    product"?  Is that what it says?

10       A    Yes.

11       Q    So they're telling you you have to

12   have enough people to do the job; correct?

13       A    You need that back?

14       Q    Yes.  But before I mark it, maybe an

15   answer to the question.

16            You need enough people to do the

17   job?

18       A    They're saying you need to have

19   adequate staffing, yes.

20       Q    Okay.  And I think you mentioned

21   earlier that you were familiar with the fact

22   during the 2008 inspection that the company --

23   that FDA had concern about the size of the

24   quality unit being too small?

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

254

1          A     I know that was a discussion item,
2     yes.
3          Q     Right.   And you've actually had that
4     concern also, haven't you?
5          A     From time to time, of course.
6     Everyone wants to get more head count.
7          Q     Well, I mean, there were times that
8     you were busier than a one-armed paperhanger
9     with a case of the hives; right?
10         A     I've been busy at times, yes.
11              MR. BLIZZARD:  Let me mark as
12         Exhibit 134 a copy of the regulations
13         relating to the quality control unit that
14         we just talked about.
15              And now I'm going to mark as
16         the next exhibit Exhibit 135.
17              (Plaintiff's Exhibit No. 134
18         was marked for identification.)
19              (Plaintiff's Exhibit No. 135
20         was marked for identification.)
21     BY MR. BLIZZARD:
22         Q     This was an e-mail you wrote in
23     October of 2007; is that right?
24         A     According to the header on this,

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

255

1    yes, that is correct.

2         Q    I've got a couple of questions about

3    this, but I want you to take a look at it long

4    enough to tell me whether you remember writing

5    this e-mail.

6         A    Yes, I believe this is correct.

7         Q    Looks like from reading the e-mail

8    that you wrote this on a Sunday?

9         A    Yes, sir.

10        Q    It says that you had actually --

11   this is paraphrasing -- caught a break and

12   didn't have a lot of requests, people were

13   helping you out while the FDA was at the plant

14   doing an inspection, but then everything broke

15   loose after the FDA left.  And it says I think

16   everybody and their brother was bombarding you

17   with requests; is that right?

18        A    That's what it says.

19        Q    And then you in the third bullet

20   point, it says:  Mike and I completed at least

21   four, maybe five investigations this week.

22             Is that what it said?

23        A    That's what it says.

24        Q    What was a typical number of

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

256

1    investigations that your -- you and Mike had

2    to complete in a week?

3         A    I honestly don't recall.  It's very

4    investigation-specific as to how long it

5    takes.  I really don't recall what that would

6    be.

7         Q    And Mike is Mike Ponzo?

8         A    That would be Mike Ponzo, yes.

9         Q    And were he and you the ones that

10   were principally involved in doing these

11   investigations at this period of time?

12        A    At this point in time.  This is

13   prior to Misbah coming down from Elizabeth.

14   So, yes, this would be Mike and I.

15        Q    So the two of you, Mike Ponzo and

16   yourself, had the responsibility from

17   October 2007 and in that time frame until when

18   Misbah came down?

19        A    I don't recall if she came down

20   before the start of the year or after the

21   start, but it was somewhere end of December

22   and January time period.  I don't recall the

23   exact dates.

24        Q    Okay.  So you added a third person

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

257

1   at that point?

2        A    She was not full time.  She was

3   working in Elizabeth and as an investigations

4   group manager.  So they were using her to come

5   up here for a couple days to assist us and

6   then a couple days in Elizabeth to work with

7   them.

8        Q    Okay.  And also at this time it

9   looks like you were interviewing other

10  candidates to work in the both QA packaging

11  and QA manufacturing; correct?

12       A    We were interviewing for the

13  packaging position.  We had not begun yet.  We

14  only had put a proposal together I think at

15  this point is what we're saying to HR for the

16  manufacturing position.

17       Q    Did these guys get hired?

18       A    You know, I don't believe so.  I

19  don't think they did, no.

20       Q    Okay.  So --

21       A    There's one person that got hired in

22  packaging.  I believe she was before this.  So

23  I don't think so.

24       Q    Okay.  So at least as of October 7

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

267

1        A     Yes.

2        Q     It says:  "Actavis Totowa's

3    laboratory and manufacturing facilities were

4    inspected by the FDA in August 2006 and

5    received 15 observations in the form of an FDA

6    483.  We were provided documentation showing

7    all corrective actions have been completed."

8            Do you see where it says that?

9        A     Yes.

10       Q     Now, you've talked about that

11    inspection by FDA in 2006 earlier today;

12    correct?

13       A     We had a conversation, I believe,

14    yes.

15       Q     Okay.  So there was an inspection in

16    the summer of 2006 by FDA that you're familiar

17    with; right?

18       A     Yes, sir.

19       Q     And then following that inspection,

20    FDA issued a Form 483, which makes

21    observations that they want you to take a look

22    at and reply to and, if necessary, correct; is

23    that right?

24       A     That would be correct.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

270

1          A     Somebody's compilation of status it

2     appears for what has taken place in response

3     to observations.

4          Q     So if you look at the first page,

5     does it say at the top "August 2006 GMP

6     Inspection Totowa?"

7          A     Yes.

8          Q     And was that the same inspection we

9     just referred to from that Mylan audit?

10         A     I believe so, yes.

11         Q     And the first observation from that

12    inspection was failure of the quality unit to

13    fulfill its responsibilities, failure to fully

14    investigate errors; all lab data not included

15    with batch records; manufacturing deviations

16    not always documented?  That was the

17    observation from the FDA inspection; correct?

18         A     I am assuming that what's in here is

19    correct.  I don't know.

20         Q     I'm going to hand you what is

21    previously marked as Exhibit No. 68,

22    Mr. Bitler, if you'll just take a look just so

23    we can be sure of this.  Does Observation No.

24    1 from this document that we're looking at

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

272

1      does it say essentially the same thing,

2      quality unit failed to assure that laboratory

3      notebooks included all data, et cetera?

4           A    It does seem to paraphrase without

5      any of the examples.

6           Q    Okay.  And now if you look at this

7      spreadsheet, there's a section that

8      paraphrases the actual observation by the --

9      or column that paraphrases the observation by

10     the FDA.  There's then a listing of the Totowa

11     action items.  And then there's another column

12     for documentation needed; correct?

13          A    Yes.

14          Q    And then there's a column that says

15     date verified correction; correct?

16          A    Yes.

17          Q    And then there's a column for

18     responsible person and comments.  Do you see

19     that?

20          A    Yes.

21          Q    Okay.  So Observation No. 1, failure

22     of quality unit to fulfill its

23     responsibilities, yada, yada, yada, you look

24     under over here under "Date verified

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

273

1    correction," it says "not corrected"; correct?

2                    MR. MORIARTY:  Objection.

3                    Go ahead.

4                    THE WITNESS:  Well, that's what

5        is on this document.

6    BY MR. BLIZZARD:

7        Q    Right.

8        A    True.

9        Q    And they actually give a date of

10   July 19th of '07; correct?

11       A    That's what's on this document, yes.

12       Q    So if we assume that Mylan was given

13   documentation in December of '06 that all

14   these observations were corrected, that

15   documentation was false, wasn't it?

16                   MR. MORIARTY:  Objection.

17                   THE WITNESS:  I don't know what

18       Mylan received.  I can't speak to that.

19   BY MR. BLIZZARD:

20       Q    Okay.  Well, certainly, at least

21   according to this document, Observation No. 1

22   was not corrected, was it, as of July 19th of

23   '07?

24       A    Again, I don't know who wrote this.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

277

1    remainder of the pages, are most of them

2    showing either corrected or partially

3    corrected?

4            A    It appears so, yes.

5            Q    Okay.  Now, do you know whether this

6    information was ever shared with Mylan?

7            A    I don't even know who put this

8    information together.

9            Q    Okay.  So maybe that's -- I need to

10   make that clear.  Did anybody ever sit down

11   that you can recall and tell you, Mr. Bitler,

12   we haven't completed, we haven't corrected

13   Item No. 1, we need to get busy with that from

14   August 2006 audit?

15           A    We had a plan going forward of

16   correcting the things that were identified in

17   that inspection.  It was called QSIP.

18           Q    You mentioned that earlier.  What is

19   the actual acronym there?  How is the spelling

20   of that acronym?

21           A    Q-S-I-P.

22           Q    So that's the Quality Systems

23   Improvement Plan?

24           A    Correct.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

278

1       Q    And who was in charge of QSIP?

2       A    I believe -- I'm not a hundred

3    percent sure.  It was Nasrat's idea to use the

4    QSIP idea, but I don't recall who was the lead

5    on managing that project.

6       Q    When did Nasrat Hakim leave the

7    company?

8       A    I can't recall.  I'm not sure.

9       Q    Was there a period of time where

10   that position was vacant?

11      A    Yes.

12      Q    Do you know how long that period

13   was?

14      A    I know Scott came January-February

15   of 2007.  No.  Wait.  I'm thinking of Phyllis.

16   I'm sorry.  I got the wrong people there.

17   Phyllis came in September of '07.  And I don't

18   recall when during '07 earlier Nasrat left.

19   I'm not sure what the time period was.

20      Q    So the succession of Scott's boss

21   would have been Nasrat and then Phyllis?

22      A    Correct.

23      Q    And there was some gap between

24   Nasrat leaving and Phyllis starting, but

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

298

1    digoxin tablets?

2        A    You'd have to pull the batch cards

3    to get the numbers.  It was only -- it was a

4    limited number that were used.

5        Q    Were those Stokes units also used to

6    manufacture other medications made and sold by

7    Actavis?

8        A    They could be, yes.

9        Q    Okay.  Do you know what rooms were

10   used to manufacture digoxin over at the Little

11   Falls facility?

12       A    They were the same two rooms that

13   were used all the time.  And I'm sorry, I

14   can't remember the numbers.  But they were the

15   same rooms that were used constantly.

16       Q    So there were two rooms and they

17   were used repeatedly --

18       A    Yes.

19       Q    -- for digoxin?

20       A    Correct.

21       Q    Now, over at Riverview, how many

22   different rooms were used?

23       A    I believe they were working on only

24   two at the time, I believe.  I think there was

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

320

1        A    No, sir.

2        Q    Were you ever made aware of metal

3    shavings being found?

4                    MR. MORIARTY:   Objection.   You

5        mean in Digitek?

6    BY MR. BLIZZARD:

7        Q    I'm asking whether you know of any

8    metal shavings being found in pills that are

9    made.

10                   MR. MORIARTY:   Objection.

11       You can answer as to Digitek.

12                   THE WITNESS:   Not that I'm

13       aware of.   I'd have to go back and review

14       the documentation.

15   BY MR. BLIZZARD:

16       Q    Okay.   What does it mean when it

17   says "punches are not measured after each

18   batch"?

19       A    Honestly, I don't know what she's

20   requesting there.   That's not something

21   industry practice that I'm aware of.

22       Q    If you go over to the next page,

23   under the heading of Comments, do you see

24   where it says:  Don't check or replace worn

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

321

1    equipment; no preventive maintenance for

2    tableting punches?

3            Do you see that?

4    A    I see the statement, yes.

5    Q    And then right underneath that it

6    says:  Metal shavings found on tablets.

7            Do you see that?

8    A    I see it's written in here, yes.

9    Q    Screws found with tablets?

10   A    I see that.

11   Q    Are you familiar with screws being

12   found with tablets?

13   A    Yes.

14           MR. MORIARTY:  Objection.

15           Go ahead.

16           THE WITNESS:  Yes.

17   BY MR. BLIZZARD:

18   Q    When did you find out that -- what

19   screws were found with tablets?

20           MR. MORIARTY:  Objection.

21           You can answer -- go ahead and

22   answer.  Don't mention other products.

23           THE WITNESS:  When you say

24   "what screws," what -- can you rephrase

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

322

1          or redefine what you're trying to get?

2     BY MR. BLIZZARD:

3          Q     I'm just trying -- I guess I'm kind

4     of surprised that pills are being produced

5     with screws.  And so I'm wondering what it

6     means where it says under the heading of no

7     preventive maintenance for tableting punches,

8     it says screws found with tablets.

9          A     Right.  And the reason being is that

10    equipment's held together with screws and that

11    occasionally a screw will back out and

12    occasionally you'll find it mixed with the

13    tablets.  And as part of that investigation

14    process, that's taken care of.  And that's why

15    you have metal detectors.

16         Q     Okay.  What's the next bullet point

17    say?

18         A     Digoxin, a toxic product with

19    double, triple, and thin tablets; lots were

20    not rejected; partial lot released -- partial

21    lot releases.

22         Q     Okay.

23         A     Okay.

24         Q     Do you have any experience with

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

325

1          A     No, sir.

2                    MR. BLIZZARD:  We may have to

3          substitute the first page of this exhibit

4          later because I think there's some

5          handwritten notes on here that are added

6          notes.

7                    (Plaintiff's Exhibit No. 147

8          was marked for identification.)

9     BY MR. BLIZZARD:

10         Q     Let me show you what's marked as

11    Exhibit No. 147.  Do you know Jacob Haroon?

12         A     I know who he is, yes.

13         Q     If you look at -- the FDA inspection

14    was concluded I think, according to the

15    records, on May 20th of 2008.  Does that sound

16    about right to you?

17         A     I believe that's about right, yes.

18         Q     And it shows in this exhibit that

19    Phyllis Lambridis sent this e-mail to Jacob

20    Haroon on Friday, May 23rd, 2008, Subject:

21    For your reading pleasure; correct?  Is that

22    what it says?

23         A     Yes, it does.

24         Q     And it says:  You can share with

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

326

1   your group but please do not give out copies.

2   And then it says:  Enjoy, exclamation point.

3        Correct?

4            MR. MORIARTY:  Objection.  Just

5   for the record, the copies that

6   Mr. Bitler and I have don't look like

7   this.

8            MR. BLIZZARD:  Oh, okay.

9            MR. MORIARTY:  There's some

10   handwriting that obscures the words do

11   not give out copies.

12            MR. BLIZZARD:  Okay.  And

13   that's why I said we're going to have to

14   substitute.  I do have -- the one I've

15   highlighted here, which is on the screen,

16   doesn't have those handwritten comments

17   on it, so that's why I know that those

18   are added.  And so we will substitute the

19   original first page.  And I'll let you

20   look at this.

21            MR. MORIARTY:  Why don't you

22   just put that one in as the exhibit.

23            MR. BLIZZARD:  We can do that.

24   It's just highlighted.  We'll just delete

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

330

1        A     Correct.

2        Q     And it says:  "This is all rather

3     sad.  Looks like some very basic GMP knowledge

4     was lacking."

5              Is that what it says?

6        A     That's what it says.

7        Q     Do you agree with that?

8        A     No, sir.

9                   MR. BLIZZARD:  I don't have any

10     additional questions of you at this time.

11                   MR. PETTIT:  I might literally

12     have one.  Let me just ask Ed a question.

13                   THE VIDEOGRAPHER:  Off the

14     record, 5:29.

15                   (Discussion off the record.)

16                   THE VIDEOGRAPHER:  Back on the

17     record, 5:34.

18     BY MR. BLIZZARD:

19        Q     Mr. Bitler, were you the one who was

20     handling Investigation 08-060 on the

21     overweight pills for the quality assurance

22     department or was there someone else?

23        A     Can I --

24        Q     Yes.

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

334

                         CERTIFICATE


1                    I HEREBY CERTIFY that the

witness was duly sworn by me and that the

deposition is a true record of the testimony

given by the witness.

                         It was requested before

completion of the deposition that the witness,

DANIEL W. BITLER, have the opportunity to read

and sign the deposition transcript.

_____
KIMBERLY A. OVERWISE
Certified Realtime Reporter
Notary Public
Dated:  February 6, 2009


                         (The foregoing certification of

this transcript does not apply to any

reproduction of the same by any means, unless

under the direct control and/or supervision of

the certifying reporter.)

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

335

1                    INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8                 After doing so, please sign the

9    errata sheet and date it.

10                You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13                It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the

16   deposition transcript by you.  If you fail to

17   do so, the deposition transcript may be deemed

18   to be accurate and may be used in court.

19

20

21

22

23

24

Daniel W. Bitler
Confidential – Subject to Further Confidentiality Review

337

1

2               ACKNOWLEDGMENT OF DEPONENT

3

4                    I, DANIEL W. BITLER, do hereby

5       certify that I have read the foregoing pages,

6       1-336, and that the same is a correct

7       transcription of the answers given by me to

8       the questions therein propounded, except for

9       the corrections or changes in form or

10      substance, if any, noted in the attached

11      Errata Sheet.

12

13

14      _____        _____

        DANIEL W. BITLER                         DATE

15

16

17

18

19      Subscribed and sworn
        to before me this
20      _____ day of _____, 2009.

21      My commission expires:_____

22      _____
        Notary Public
23

24