# In Re:

*Digitek*

---

## Scott Talbot

*January 25, 2010*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File st012510.txt

**Min-U-Script®**

**EXHIBIT C-3**

Scott Talbot
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


In re:  DIGITEK
        PRODUCTS LIABILITY LITIGATION

                        MDL No. 1968
---------------------------------------x

    (This document relates to all cases.)


        CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW


        VIDEOTAPED ORAL DEPOSITION OF
                SCOTT TALBOT
                DAVIE, FLORIDA
              January 25, 2010
                 9:17 a.m.


        Videotaped oral deposition of SCOTT TALBOT,
    pursuant to notice, taken by Plaintiffs,
    at the offices of Morgan & Morgan, LLP,
    6824 Griffin Road, Suite 230, Davie,
    Florida, before Kelli Ann Willis, a
    Registered Professional Reporter, Certified
    Realtime Reporter and Notary Public within and
    for the State of Florida.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

2

1      A P P E A R A N C E S:

2      For Plaintiffs:

3      THE MILLER FIRM, LLC
       BY:  PETER MILLER, ESQ.
4      The Sherman Building
       108 Railroad Avenue
5      Orange, Virginia  22960
       540-672-4224    Fax 540-672-3055
6      E-mail:  pmiller@doctoratlaw.com

7      For Actavis:

8      TUCKER ELLIS & WEST, LLP
       BY:  MICHAEL ANDERTON, ESQ. and
9      JULIE A. CALLSEN, ESQ.
       925 Euclid Avenue
10     1150 Huntington Building
       Cleveland, Ohio  44115-1414
11     216-696-2286    Fax 216-592-5009
       manderton@tuckerellis.com
12     julie.callsen@tuckerellis.com

13     For Mylan:

14     SHOOK HARDY & BACON, LLP
       BY:  SARAH E. DREWES, ESQ.
15     2555 Grand Boulevard
       Kansas City, Missouri  64108-2613
16     816-474-2613    Fax 816-421-5547
       sdrewes@shb.com

17

18     ALSO PRESENT:

19     Sylvanus F. Holley, Video Operator

20

21

22

23

24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

26

1    to in this letter.

2         Q.   Well, they help us out with that.  They

3    actually, if you go to -- give me one second here.

4              If you go to the second page, Actavis

5    436183, the second sentence says -- starts out with,

6    "We have."

7              Have you got it?  Okay.

8              "We have included OOT results and

9    deviations from prescribed processing steps" --

10   actually, no.  Strike that.  That's not what I want

11   to read.  It would help if I would have highlighted

12   the right spot.

13             Take a look at the Actavis 0436185, the

14   first page of what is titled, "Actavis Totowa

15   Released Batches Associated with an OOS."

16             I'm correct in saying that OOS is out of

17   specification?

18        A.   Yes.

19        Q.   You were aware that there were issues with

20   out-of-specification products during this timeframe?

21        A.   Yes.

22        Q.   And, unfortunately, we can't read the

23   lists, the first page or the second page, but we get

24   to the -- not the third page, but the fourth, there

Scott Talbot
Confidential – Subject to Further Confidentiality Review

28

1          Having seen this list, does it refresh
2     your recollection if out-of-specification test
3     results were a concern with Actavis in early
4     January 2007?
5          A.   Yes.
6          Q.   And does it refresh your recollection as
7     if you were briefed on this particular issue by the
8     president of Actavis in January of 2007?
9          A.   I don't know.
10          Q.   You don't remember or you don't know?
11          A.   I don't know if it was the president that
12     would be briefing me on these particular OOSs.
13          Q.   Were you briefed by anyone on this issue
14     at Actavis in this time frame?
15          A.   I don't know.
16          Q.   You don't remember or you don't know?
17          A.   I can't recall for sure if I was briefed
18     specifically by one person or by an individual
19     telling me about these OOSs.
20          Q.   So is it fair to say you do remember
21     having the conversation; you don't know if it
22     was one person or more?
23          A.   I don't recall having the conversation.
24          Q.   You don't recall having the conversation.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

29

1          Did out-of-specification test results

2      become a concern with you throughout the year or

3      throughout your time at Actavis, as site quality

4      head or site head for quality -- let me strike that

5      and rephrase it.

6          As site head for quality at the Totowa

7      facilities, did out-of-specification test results

8      ever become a primary focus for you?

9          A.   Yes.

10         Q.   And when did that take place?

11         A.   As the site head of quality, OOSs are

12     always something that you monitor.  So it is not

13     specific to Actavis Totowa.  It would be specific to

14     any company that I worked for.

15         Q.   And it is also something that an FDA

16     inspector, during a GMP inspection, would look at

17     and observe; is that correct?

18         A.   Yes.

19         Q.   And you would agree that if during the

20     course of that inspection, if there were no issues

21     with out-of-specification results, then there would

22     be no write-up on out-of-specification results?

23         MR. ANDERTON:   Objection.

24         You may answer.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

30

1          THE WITNESS:   Yes.

2     BY MR. MILLER:

3          Q.   So my focus is or my question is, did it

4     become a concern of yours as site head of quality at

5     Actavis due to observations by the FDA?

6          A.   No.

7          Q.   Start with the paragraph that starts with,

8     "Your letter also," and it's on Actavis 0436183.

9          A.   Yes.

10          Q.   "Your letter also requests that we provide

11     a listing of released lots of drug products that

12     remain within expiration, that were associated with

13     any OOS test results when manufactured, and

14     explanations of actions taken to ensure they are

15     suitable for use.

16               "This list is enclosed as attachment A and

17     identifies 38 released lots, provides expiry

18     date information for them, and identifies OOS

19     results associated with them."

20               Did I read that correct?

21          A.   Yes.

22          Q.   And do you agree that that is the list

23     that we looked at two pages back?

24          A.   Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

32

1          Q.   So you're familiar with the fact that

2     production was shut down for 65 products?

3          A.   Yes.

4          Q.   Am I correct in saying there were 65

5     products?

6          A.   I don't know.

7          Q.   Okay.  Do you have experience with any of

8     these former companies in which every product line

9     was shut down?

10          A.   Yes.

11          Q.   Which company?

12          A.   The IVAX plant that was in Puerto Rico,

13     which is formerly IVAX, the TEVA facility in Puerto

14     Rico.

15          Q.   There came a time production was ceased?

16          A.   Yes.

17          Q.   That was due to an FDA inspection?

18          A.   Yes.

19          Q.   And how many products were being produced

20     at IVAX in Puerto Rico?

21          A.   I don't know.

22          Q.   More than 10?

23          A.   Yes.

24          Q.   More than 50?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

34

1          Have you got that?

2      A.   Yes.

3      Q.   "We also have focused on the structure and

4  leadership of the Quality organization and have

5  restructured it.  Henceforth, there will be five

6  senior management positions: Site Head of Quality,

7  Quality Assurance Director, Quality Control

8  Director, Quality Systems Director and Validation

9  Director.  Scott Talbot has been hired as the new

10 Site Head of Quality.  His credentials are provided

11 in Attachment B."

12          Did I read that correctly?

13     A.   Yes.

14     Q.   Did you know that you were specifically

15 hired to fill a position that hadn't been filled in

16 the past?

17     A.   Yes.

18     Q.   Did anyone ever tell you that your

19 credentials were provided to the FDA?

20     A.   I don't remember.

21     Q.   You don't recall being asked for a copy to

22 include in this letter?

23     A.   No.

24     Q.   It goes on to say, "Suffice it to say that

Scott Talbot
Confidential – Subject to Further Confidentiality Review

35

1    Mr. Talbot already has proven himself to be

2    dedicated to quality systems improvements, including

3    laboratory practices.

4            "He has the knowledge of FDA requirements

5    and guidances, industry standards and critical

6    thinking skills to elevate our standards and cGMP

7    awareness to a higher level that assures compliance.

8            "We continue recruitment efforts for the

9    open positions."

10           When you were hired, did you feel that the

11   GMP awareness and standards needed to be elevated?

12   Let me ask that in a better way.

13           Was elevating the GMP standards at Actavis

14   a primary focus for you when you were hired?

15       A.   Can you define "elevated"?

16       Q.   Certainly.

17           Were there GMP violations that needed to

18   be addressed when you were hired?

19       A.   There was always room for improvement.  I

20   don't know if "violations" is a word that I would

21   agree with.

22       Q.   If there is a -- well, you've seen 483s.

23   We already talked about you reviewed the '07 one.

24       A.   Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

36

1      Q.    Are you familiar that there were two of

2   FDA inspections resulting in 483s in 2006?

3      A.    Yes.

4      Q.    Did you ever have an opportunity to review

5   those?

6      A.    The August inspection.

7      Q.    Did you review the August '06 inspection

8   in the ordinary course of your work as site head of

9   quality?

10      A.    Yes.

11      Q.    And do you recall there being several

12   observations in that 483?

13      A.    Yes.

14      Q.    Typically, when there is an observation

15   and it is spelled out, like observation 10 gives you

16   information, would you agree that those are

17   typically addressing a violation of a GMP?

18      A.    You would have to go back and look at

19   exactly what the investigator was looking at before

20   you can make a determination.

21      Q.    Okay.   And if we go back to the EIR, the

22   inspection report, would that typically explain what

23   the investigator was looking at?

24      A.    Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

37

1      Q.    Well, when you, now going back, when you
2   went back and reviewed the second FDA 483 from 2006,
3   did you feel that there were violations of GMPs that
4   needed to be addressed?
5      A.    There was room for improvement, yes.
6      Q.    Does your "yes" mean that there were
7   violations?   Room for improvement doesn't really
8   answer the question.
9          My question is, were there GMP violations
10   that you needed to address from the two thousand --
11      A.    I don't recall.
12      Q.    All right.
13          MR. MILLER:   I would like to mark as
14      Exhibit 150.
15          (Thereupon, the referred-to document was
16      marked by the court reporter for Identification
17      as Deposition Exhibit 150.)
18          THE WITNESS:   Thank you.
19   BY MR. MILLER:
20      Q.    Sir, I will represent to you this is the
21   attachment.
22          MR. ANDERTON:   What is it?
23          MR. MILLER:   This is 150, yes.
24          MR. ANDERTON:   Okay.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

41

1    obviously?  Is that correct?

2         A.   Yes.

3         Q.   The quality in the lab, does that come

4    from the quality systems director or the quality

5    control?

6         A.   The quality control director from the

7    quality control laboratory.

8         Q.   Well, the quality control laboratory would

9    report to the quality control director; correct?

10        A.   Yes.

11        Q.   As the site head of quality for Totowa --

12   when I say "Totowa," I'm encompassing Little Falls,

13   Taft.  Is that correct, it's all under the title

14   of Totowa?

15        A.   Yes.

16        Q.   As the site head of quality for Totowa, do

17   you have the authority, if it's known to you -- if

18   it's known to you that there's a GMP violation

19   issued, do you have the authority, as site head of

20   quality, to discontinue or not release a product?

21        A.   Yes.

22        Q.   Do you recall exercising that authority

23   while you were the site head of quality?

24        A.   Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

42

1      Q.    On how many occasions would you have
2   exercised that authority?
3      A.    I don't know.
4      Q.    More than 10?
5            MR. ANDERTON:   Objection.   I'm going to
6      caution you to limit your answers to Digitek
7      only, please.
8            THE WITNESS:   I don't know.
9   BY MR. MILLER:
10     Q.    Do you know if you ever exercised your
11  authority, as site head of quality, to not release a
12  Digitek lot or batch?
13     A.    I don't remember.
14     Q.    I'm going to hand to you what was
15  previously marked as Plaintiff's Exhibit 49.
16           (Thereupon, a discussion was held off the
17      record, after which the following proceedings
18      were held:)
19  BY MR. MILLER:
20     Q.    You are familiar with the current good
21  manufacturing practices?
22     A.    Yes.
23     Q.    You're familiar with them being referred
24  to as the CFR Chapter 210 and 211?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

45

1        Q.    All right.   Then I guess my question would
2    be this:   Packaging material, would you, as a site
3    head of quality, be in a position where you could
4    approve or reject packaging material?
5        A.    Yes.
6        Q.    Is it true for all of these, if I go down
7    the line, labeling drug products?
8        A.    Yes.
9        Q.    I guess my thought there is, there's no
10   separate quality for manufacturing; if there's a
11   manufacturing issue, you're still the site head for
12   that quality as well?
13       A.    Yes.
14       Q.    Like even if a machine caught on fire,
15   does that fall under your quality care and control?
16       A.    Only if it impacts product.
17       Q.    Okay.   Fair enough.
18            So there's no quality assurance -- and I'm
19   beating this to death.
20            MS. CALLSEN:   I'm picturing Scott running
21            in with a fire hose.
22   BY MR. MILLER:
23       Q.    For equipment, there's no quality
24   assurance separate and apart to the equipment that

Scott Talbot
Confidential – Subject to Further Confidentiality Review

46

1    wouldn't ultimately report to you?

2         A.    Can you ask the question again?

3         Q.    Certainly.

4         A.    I don't think I understand it.

5         Q.    I hate to beat this to death, but there's

6    no quality assurance in the production side of the

7    house, away from the lab or the packaging or

8    labeling, that would not ultimately report to you?

9         A.    No.    I'm not sure if I answered that

10   question correctly.    Can you ask it again?    It seems

11   like there's a double negative in there.

12        Q.    Every aspect of quality, like if there's a

13   quality assurance department at Totowa, say, for a

14   particular piece of machinery, ultimately any

15   document or report coming from that quality

16   assurance would make its way to you, as the site

17   head of quality?

18        A.    Yes.

19        Q.    I'm going to hand you what I'm going to

20   mark as Exhibit 151.

21

22             (Thereupon, the referred-to document was

23        marked by the court reporter for Identification

24        as Deposition Exhibit 151.)

Scott Talbot
Confidential – Subject to Further Confidentiality Review

48

1    this case?

2         A.    It was part of a follow-up to previous

3    letters that had been written to the FDA.

4         Q.    Follow-up to what previous letters?

5         A.    To provide updates to the compliance

6    officer on the improvements that were being made to

7    the Totowa site.

8         Q.    And those improvements were as a result of

9    observations found during FDA inspections; is that

10   correct?

11        A.    The improvements that we were conveying to

12   the FDA were specific to the observations.

13        Q.    The second paragraph starts out with

14   "QSIP."  Do you see it?

15        A.    Yes.

16        Q.    "The QSIP program is based on reviewing

17   individual quality systems and determining if a

18   remediation is required."

19              You're familiar with the term CAPA,

20   correct?

21        A.    Yes.

22        Q.    Isn't it -- correct me if I'm wrong, but

23   if there is an FDA observation, CAPA is corrective

24   and preventative actions?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

49

1          A.   No.

2          Q.   What is CAPA?

3          A.   Corrective Action, Preventive Action.

4          Q.   Is that a standard program in place that

5    is used to address issues found during FDA

6    inspections?

7               MR. ANDERTON:   Objection.

8               THE WITNESS:   No.

9               MR. ANDERTON:   You may answer.

10   BY MR. MILLER:

11         Q.   What is CAPA?

12         A.   CAPA is a standard program within the

13   quality systems to address any type of issue that

14   may require corrective and preventive actions.   It

15   is not specific to the FDA.

16         Q.   Okay.   You would agree with me that -- did

17   you, as the site head of quality for Totowa, utilize

18   the CAPA program when addressing any FDA 483

19   observations?

20              MR. ANDERTON:   Objection.

21   BY MR. MILLER:

22         Q.   No?

23              MR. ANDERTON:   Form.   You may answer.

24              THE WITNESS:   No.

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

50

1      BY MR. MILLER:

2          Q.    What is the difference between -- well,

3      what is QSIP?

4          A.    Quality System Improvement Plan.

5          Q.    And how would you differentiate CAPA from

6      QSIP?

7          A.    QSIP is an overall program.  It's a tool

8      to keep management informed of improvements that are

9      being made to the entire quality system.

10         Q.    Fair enough.

11               Were you involved also in CAPA while you

12     were the site head of quality at Actavis?

13         A.    Yes.

14         Q.    And then what is CAP?

15         A.    I don't know.

16         Q.    I have seen -- I have read, I believe,

17     it's Corrective Action Plan.

18               Would you consider Corrective Action Plan

19     and Corrective Action Preventive Action to be the

20     same thing, if you know?

21         A.    I don't know.

22         Q.    Okay.  Do you know if out-of-specification

23     findings were one of the issues addressed in the

24     QSIP plan?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

51

1    A.   I would have to answer the way you -- no.

2    Q.   Explain.

3    A.   The QSIP program was addressing on how

4    we handled OOSs, not specific to one or existing

5    OOSs.  It was providing a system formalizing the

6    handling of OOSs.

7    Q.   So it wasn't drug-specific; it was

8    across-the-board?

9    A.   Yes.

10   Q.   Is there at Actavis, or while you were

11   site head for quality, was there a standard

12   operating procedure written for how

13   out-of-specification results were handled?

14   A.   Yes.

15   Q.   And was it one document that addressed how

16   all products were handled or was an SOP for each

17   product?

18   A.   One SOP.

19   Q.   And were you aware of any, at the time,

20   violations noted of that SOP?

21   A.   No.

22   Q.   Was there an SOP in place when you began

23   your work at Actavis in January of '08, if you

24   recall?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

54

1        Q.    Would you, in your ordinary course of work

2    at Actavis as a site quality head, would you have

3    gone back and read this?

4        A.    Yes.

5        Q.    And why would it be important for the site

6    head of quality to go back in time and read a 483

7    from the previous year?

8        A.    To assure that our systems are being

9    improved and to avoid future 483s.

10       Q.    We go to -- well, observation one states:

11   "The quality control unit lacks authority to fully

12   investigate errors that have occurred."

13            Now, that's an observation from an FDA

14   representative who was personally at the facility;

15   is that correct?

16       A.    Yes.

17       Q.    And as written, is that a violation of a

18   GMP?

19            MR. ANDERTON:   Objection.

20            You may answer.

21            THE WITNESS:   As written, yes.

22   BY MR. MILLER:

23       Q.    Would failure to investigate an

24   out-of-specification result fall under that, if the

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

55

1     quality control unit lacks authority to fully

2     investigate errors that have occurred, or is this a

3     separate problem?

4          A.    Yes.

5          Q.    So OOS would fall under this?

6          A.    Yes.

7          Q.    And in reviewing this document, taking

8     over as quality site head, is this one of the issues

9     that -- or is this one of the findings that lead you

10    to have someone or yourself rewrite the SOP on

11    out-of-specification issues?

12              MR. ANDERTON:   Objection, you may answer.

13              THE WITNESS:   No.

14    BY MR. MILLER:

15         Q.    All right.  In reading this, as a site

16    quality head, would you have taken any action from

17    these specific findings about observation 1?

18         A.    Possibly.

19         Q.    Take a look at Observation 4.

20              It says, "Observation 4:  Written records

21    are not always made of investigations into the

22    failure of a batch or any of its components to meet

23    specifications."

24              Did I read that correctly?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

56

1       A.   Yes.

2       Q.   Do you recall reviewing this in the

3  ordinary course of work, as the site head of quality

4  for Actavis?

5       A.   I don't recall.

6       Q.   It goes on to say, "Specifically,

7  investigations were not conducted when

8  out-of-specification results were generated, samples

9  were retested, and the original results were not

10  invalidated."

11       This observation, as I read it, would you

12  agree, as written, that it's a violation of GMP?

13       A.   Possibly.

14       Q.   Why possibly?

15       A.   I would need to review each of the

16  specifics that the FDA investigator looked at and

17  determine whether it was the way that the --

18  presentation of the data or was it the way that the

19  investigator interpreted the data.

20       Q.   Okay.  But would you agree that as a

21  result of their observations that improvement or

22  changes needed to be made?

23       MR. ANDERTON:  Objection.

24       You may answer.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

57

1          THE WITNESS:  Possibly.

2     BY MR. MILLER:

3          Q.    As written, is this a violation of the

4     then current SOP at Actavis?

5          A.    I don't know.

6          Q.    You'd agree with me that in a pharma-

7     ceutical lab, out-of-specification findings are

8     going to happen, correct?  You wouldn't expect

9     to produce products for years and not have an

10    out-of-specification finding; is that fair?

11         A.    Possibly.

12         Q.    And then you would also agree that there

13    are procedures in place to ensure that the batch

14    meets the purity, strength, quality that it's

15    supposed to have; is that correct?

16         A.    Yes.

17         Q.    And you would agree with me that simply

18    retesting is -- when it comes to

19    out-of-specification as per the GMP is not enough;

20    is that correct?

21              MR. ANDERTON:  Objection.

22    BY MR. MILLER:

23         Q.    You would have to investigate why there

24    was an out-of-specification?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

58

1           MR. ANDERTON:   You may answer.

2           THE WITNESS:   Most of the time.

3    BY MR. MILLER:

4       Q.   Most of the time?

5       A.   Yes.

6       Q.   Is it true for Digitek?

7       A.   Yes.

8       Q.   Well, that's a tough one.

9            Is it true for Digitek that it's most of

10   the time or is it true for Digitek all the time?

11      A.   That was two questions again.

12      Q.   It was an aura.

13           For the product Digitek, if the laboratory

14   finds an out-of-specification result -- actually,

15   correct that.

16           For the product Digitek, if the quality

17   unit finds or is reported to them that there's an

18   out-of-specification finding, it is important that

19   not only is an additional test done to show

20   in-specification findings, that they have to go

21   beyond and investigate why the out-of-specification

22   happened?

23           MR. ANDERTON:  Objection.

24           You may answer.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

59

1            THE WITNESS:  Most of the time.

2      BY MR. MILLER:

3            Q.   Can you think of an example when you

4      wouldn't have to do that?

5            A.   You're using the term "investigation,"

6      which maybe we don't agree upon.

7            Q.   Okay.  What word would you use?

8            A.   In the OOS system, within the laboratory,

9      a laboratory review occurs first.

10           Q.   Okay.

11           A.   That laboratory review is an internal

12      laboratory document to assure that no errors

13      occurred during the -- or obvious errors occurred

14      during sample preparation or testing.

15           Q.   Okay.

16           A.   For example, a calculation error or an

17      incorrect method was used.

18                If, after going through that scenario,

19      they do not find a root cause, then it goes into a

20      full blown, what I would call an investigation.

21           Q.   I think I can word the question right now.

22                If, for the product Digitek, during the

23      lab review, there is found an out-of-specification

24      finding, and it is not the result of a calculation

Scott Talbot
Confidential – Subject to Further Confidentiality Review

60

1    error or incorrect method, that there is a

2    requirement that additional testing be done to show

3    that it's in-specification, and also there needs to

4    be an investigation that goes into why the

5    out-of-specification happened?

6        A.    Yes.

7        Q.    I have to try to remember all of those

8    words again.

9            Let me ask you this way:   For the product

10   Digitek, if there is an out-of-specification

11   finding, either laboratory or anywhere else, is

12   there a requirement that there is a second testing

13   done to show that it's in-specification, and also an

14   investigation required setting aside if it was a

15   calculation error or an incorrect method?

16           MR. ANDERTON:   Objection, form.

17           You may answer.

18           THE WITNESS:   Yes.

19   BY MR. MILLER:

20       Q.    Okay.

21       A.    That was a long question, but I think I

22   followed you on that.

23       Q.    The same holds true, if there is an

24   out-of-specification finding, that concept holds

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

61

1     true if it's in the lab or somewhere else?

2          A.   If the lab does not find an identified

3     cause laboratory error, then, yes, it goes through a

4     full investigation and retest.

5          Q.   Go to Observation 5 for the August 2006

6     FDA inspection.

7               "Observation 5:   Input to and output from

8     computer are not checked for accuracy."

9               Do you recall reviewing this specific

10    issue when you worked for Actavis?

11         A.   Yes.

12         Q.   Were you involved in improving or did you

13    find that improvement needed to be made in the input

14    to and output from computer such that they were

15    checked for accuracy?

16         A.   I don't recall.

17         Q.   It goes on to say, "Specifically, audits

18    were not conducted of the TotalChrom Data

19    Acquisition System used to run the HPLC instruments

20    during analysis of drug products."

21              Were you involved, as site head for

22    quality, in initiating audits regarding the Total-

23    Chrom Data Acquisition System?

24         A.   Can you define what you mean by "audits"?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

62

1       Q.   Well, did you understand, when you read

2   this document that was prepared by an FDA inspector,

3   what they meant by "audits"?

4       A.   Data review by a second person.

5       Q.   Okay.   Data review by a second person.

6   As the site head for quality, did you ensure that

7   data was reviewed by a second person in quality?

8       A.   Yes.

9       Q.   Did you do it as a result of this

10  write-up?

11      A.   No.

12      Q.   How did you come to find out that data was

13  not being reviewed by a second person?

14          MR. ANDERTON:   Objection.

15          THE WITNESS:   If it wasn't --

16  BY MR. MILLER:

17      Q.   Was there any other source of you being

18  informed that data wasn't reviewed by a second

19  person with the TotalChrom Data Acquisition

20  System?

21          MR. ANDERTON:   Objection.

22          You may answer.

23          THE WITNESS:   Internal review without FDA

24  oversight.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

63

1    BY MR. MILLER:

2         Q.    So your testimony is that internal review

3    lead you to believe that data was not being reviewed

4    by a second person regarding the TotalChrom data;

5    is that correct?

6         A.    Possibly.

7         Q.    So as you sit here, you're not sure?

8         A.    I'm not sure, and I would need to see

9    specifically what the FDA was looking at to write

10   this observation.

11        Q.    You agree that this observation, as

12   written, is not specific to any product?

13        A.    Yes.

14        Q.    And you agree that, as written, it would

15   involve all products that were being tested

16   utilizing the TotalChrom Data Acquisition System?

17        A.    Yes.

18        Q.    It's across-the-board problem for

19   products using the TotalChrom data?

20        A.    Your assumption is that it is a problem.

21        Q.    Your assumption is it is not a problem?

22        A.    I can't answer that question without

23   knowing more specifics about this observation.

24        Q.    Have you ever known observations in FDA

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

64

1    483s to be exemplary remarks or pats on the back?

2    Does the FDA ever use observations to say that you

3    are doing this well?

4         A.   No.

5         Q.   Are observations ever used to say that

6    this meets requirements but it could be better?

7         A.   No.

8         Q.   Are observations used to point out things

9    that are not in compliance with cGMP?

10        A.   Yes.

11        Q.   Let's take a look at Observation No. 8.

12   Again, the FDA findings from their inspection of GMP

13   compliance in August of '06, Observation No. 8

14   reads:  "Examination and testing of samples is not

15   done to ensure that in-process materials conform to

16   specifications."

17             Did I read that correctly?

18        A.   Yes.

19        Q.   Do you recall this issue as something that

20   you would have reviewed or set up procedures to

21   improve when you first read this?

22             MR. ANDERTON:  Objection.

23             THE WITNESS:  I don't recall.

24             MR. ANDERTON:  You may answer.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

65

1          THE WITNESS:  I don't recall.

2     BY MR. MILLER:

3          Q.    It goes on to say, "Specifically, on

4     numerous occasions, quality assurance personnel

5     failed to detect tablets and capsules which did not

6     meet in-process specifications for tablet weight and

7     thickness."

8                As a site head of quality, you also would

9     be the overseer of issues such as tablet weight and

10    thickness?

11         A.    Yes.

12         Q.    Is a tablet that is not the proper weight

13    or thickness, is that out-of-specification?

14         A.    Yes.

15         Q.    So would that -- it goes on to say, SOP

16    016, "Routine tablet press overcheck requires a new

17    set of samples to be taken when out-of-specification

18    results are encountered.  This did not occur."  And

19    then it goes on to give examples.

20                Does that refresh your recollection of --

21    does that help you to recall this might have been an

22    issue that you addressed?

23         A.    No.

24         Q.    The SOP 016, routine tablet press over-

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

66

1      check, that is a different SOP than the SOP for

2      out-of-specification, correct?

3              A.    Yes.

4              Q.    But you would agree -- or tell me if I'm

5      wrong, would a tablet that's not the proper weight

6      and thickness, would that also require review and

7      application of the out-of-specification SOP?

8              A.    No.

9              Q.    Why?

10             A.    The out-of-specification SOP is specific

11     to the laboratory.

12             Q.    So is it your testimony that if there is

13     an out-of-weight or thickness tablet, then there is

14     no requirement or duty of the laboratory to be

15     involved?

16             A.    No.

17             Q.    That's not what you're saying?

18             A.    No.

19             Q.    What is -- if an oversized -- if a tablet

20     of the improper weight or thickness is found, as

21     discussed here in this observation, what

22     responsibilities and/or duties would the laboratory

23     have with that tablet?

24             A.    As part of the investigation, they may be

Scott Talbot
Confidential – Subject to Further Confidentiality Review

67

1    involved in doing additional testing within the

2    laboratory.

3         Q.    And that would be a quality -- that is the

4    responsibility of quality, to determine if that

5    tablet would need to go to the laboratory or that

6    lot or batch would need to go to the laboratory to

7    be tested?

8         A.    Yes.

9         Q.    And that would fall under your title?

10        A.    Under my responsibility.

11        Q.    Your responsibility.   Okay.

12             "Observation 9:   Deviations from written

13   production and process control procedures are not

14   recorded and justified.   Specifically, there is no

15   assurance that all manufacturing deviations are

16   documented," and it goes on to give examples.

17        A.    Okay.

18        Q.    Does this stand out as one of the issues

19   that you would have addressed when taking over as

20   site head of quality in January of '07?

21        A.    No.

22        Q.    Is this an issue that you would have

23   assigned to someone else in quality to take a look

24   at?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

68

1          A.     Possibly.

2          Q.     Early in your employment at Actavis, did

3     you feel it necessary to do an internal audit, did

4     you elect to -- strike that.

5                 Early in your employment at Actavis, did

6     you set up an internal audit?

7          A.     No.

8          Q.     Was an internal audit done as a result of

9     an ordinary scheduling of internal audits?

10         A.     While I was at employed at Actavis Totowa,

11    yes.

12         Q.     Okay.

13                In February of '07, you are letting the

14    FDA know you are filling a spot, site head of

15    quality, that didn't previously exist.  The

16    president of the company is letting the FDA know

17    that you have been hired and you are very proficient

18    in GMPs.

19                Will you agree that GMP compliance was a

20    concern at the company in February of '07?

21                MR. ANDERTON:  Objection.

22                You may answer.

23                THE WITNESS:  Would I agree that GMP

24    compliance was a concern of the company?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

69

1          Possibly.

2      BY MR. MILLER:

3          Q.    Was it a heightened concern, due to the

4      previous FDA 483 reports and the warning letter?

5          A.    You are using the word "concern."  I think

6      there was a heightened focus on it.

7          Q.    A heightened focus, that is fine.  A

8      heightened focus.

9              If there's a heightened focus on GMP in

10     2007 and you are the site head of quality and you

11     reviewed this FDA 483, did you use this as a

12     stepping stone to determine what specifically to

13     focus on?

14         A.    As -- in addition to other things.

15         Q.    Okay.  And in addition to what other

16     things?

17         A.    Internal review, not an audit, but an

18     internal review.  As I was hired, I went through

19     procedures and documents, and verified if there were

20     areas for improvement.

21         Q.    Internal review, did you conduct an

22     internal review shortly after taking the position of

23     site head of quality?

24         A.    Continuously.  It wasn't a defined start

Scott Talbot
Confidential – Subject to Further Confidentiality Review

70

1    and stop point.  It was an internal, every document,
2    every system.
3         Q.    You felt your job, your description, your
4    function daily was an internal review?
5         A.    Yes.
6         Q.    Was that due to the heightened focus on
7    GMPs at Actavis, or was that what you considered to
8    be your ordinary duty?
9         A.    Ordinary duty.
10        Q.    You agree that an FDA inspection of GMPs
11   can result in a 483, and we have already stated that
12   that can result in a warning letter, correct?
13        A.    Yes.
14        Q.    What is the next action or one of the next
15   actions that can be taken by the FDA beyond that?
16        A.    Injunction.
17        Q.    Injunction.
18              An injunction, do me favor -- another
19   action, would you agree, is that they can shut down
20   production, or the result can be shut down
21   production of the assembly line or the product line?
22              MR. ANDERTON:  Objection.
23              You may answer.
24              THE WITNESS:  If you're asking if FDA has

Scott Talbot
Confidential – Subject to Further Confidentiality Review

71

1          the authority to shut down production?

2     BY MR. MILLER:

3          Q.   Yes.

4          A.   I don't know.

5          Q.   Okay.  Well, explain to me what you mean

6     by "an injunction."

7          A.   An injunction is where they actually come

8     in and seize all of the products that have been

9     manufactured, and they put locks on the doors to

10    prevent more distribution of the products.

11         Q.   That is one -- that's beyond a warning

12    letter?

13         A.   Yes.

14         Q.   Okay.  Can it come to a point in time that

15    a pharmaceutical company would cease production due

16    to violations of GMPs?

17         A.   Yes.

18         Q.   You would agree that's in between a

19    warning letter and an injunction?

20         A.   Yes.

21         Q.   Well, would you agree that a part of the

22    reason you are having this, a heightened focus on

23    GMPs, is because of the warning letter that was

24    filed in 2007?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

72

1          A.   In addition to.

2          Q.   In addition to other things?

3          A.   Yes.

4          Q.   And is part of that heightened focus also

5     to prevent the next step, which would be the

6     shutdown of production of the plant?

7                MR. ANDERTON:   Objection.

8                You may answer.

9     BY MR. MILLER:

10         Q.   It's okay to answer.

11         A.   Possibly.

12               (Thereupon, a discussion was held off the

13         record, after which the following proceedings

14         were held:)

15               MR. MILLER:  Let's take a break.

16               THE VIDEOGRAPHER:   Going off video record.

17               (Thereupon, a recess was taken, after

18         which the following proceedings were held:)

19               THE VIDEOGRAPHER:   We are back on video

20         record, approximately 10:54, with Tape 2,

21         videotaped deposition of Scott Talbot.

22    BY MR. MILLER:

23         Q.   Before the break, we were taking a look at

24    what had been previously marked as Exhibit 68, and

Scott Talbot
Confidential – Subject to Further Confidentiality Review

73

1    it's the FDA 483, observations from the August '06

2    inspection. If you would, take a look at Observation

3    10.  It's on the lower right, it says Page 7 of 9.

4         A.   Okay.

5         Q.   And Observation 10 is not the one I want

6    you to take a look.  If you turn the page and go to

7    Observation 12, Page 8 of 9.

8         A.   Okay.

9         Q.   Observation 12 says:  "Written procedures

10   are not established and followed for the cleaning

11   and maintenance of equipment, including utensils

12   used in the manufacturing, processing, packaging or

13   holding of a drug product."

14             Sir, as written, is that a violation of

15   GMP?

16        A.   Yes, as written.

17        Q.   Were you aware that there was a response

18   to the FDA from Actavis, that Actavis agreed with

19   the findings of this inspection?

20        A.   I don't recall.

21        Q.   I'm going to hand you what was previously

22   marked as Exhibit 69.

23             MR. ANDERTON:   Thank you.

24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

76

1      BY MR. MILLER:

2          Q.   As written, is this a violation of the

3      GMP?

4          A.   Yes, as written.

5          Q.   And given the fact that the company agrees

6      with the observation, then does that make it a

7      violation of GMP, either as written or not as

8      written -- as written, it is a violation of GMP?

9               MR. ANDERTON:   Objection, form.

10              You may answer.

11              THE WITNESS:   As written, yes.

12     BY MR. MILLER:

13         Q.   And it is a violation of a GMP that the

14     company agreed to?

15         A.   I would say this letter, as written, says

16     that it agrees to this observation.

17         Q.   Did you ever have conversations with

18     Nasrat Hakim regarding her agreeing or not agreeing

19     with the observations on the 483?

20         A.   No.

21         Q.   Are you aware of cleaning and maintenance

22     becoming an issue with the product Digitek during

23     your employment as site head of quality for Actavis?

24         A.   No.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

77

1          Q.    Were you aware of duct tape ever being
2    used on equipment while you were site head of
3    quality?
4          A.    No.
5          Q.    Were you aware that duct tape had been
6    used in the past on equipment?
7          A.    No.
8          Q.    You never addressed a duct tape concern at
9    all while you were employed at Actavis?
10         A.    There was never duct tape on the equipment
11   when I was employed at Actavis.
12         Q.    Fair enough.
13               Did you review the Establishment
14   Inspection Report that went along with this?
15         A.    No.
16         Q.    Are you aware that it is the FDA's
17   practice to send the Establishment Inspection Report
18   to the company to review?
19         A.    Yes.
20         Q.    Were you aware that the Inspection
21   Establishment Report for this particular inspection
22   was sent to Actavis?
23         A.    No.
24         Q.    Would it have helped you, in your role as

Scott Talbot
Confidential – Subject to Further Confidentiality Review

82

1     out-of-specification?

2          A.    Yes.

3          Q.    Given that that is what OOS stands for, do

4     you agree that I read it correctly?

5          A.    Yes.

6          Q.    And does that reflect the findings and the

7     observations, Observations 1 through 15?

8          A.    I don't know.

9          Q.    Would they list on the EIR observations

10    above and beyond those reported in the 483?

11         A.    No.

12         Q.    Deficiencies in so many areas, is that

13    typical for the findings of an 483, in your

14    experience?

15         A.    It is not atypical.

16         Q.    If you were to use the term pass/fail for

17    an inspection, would you say you passed -- not

18    you -- would you say that Actavis passed or failed

19    this 2006 inspection?

20              MR. ANDERTON:  Objection.

21              You may answer.

22              THE WITNESS:  It's hard to say.

23    BY MR. MILLER:

24         Q.    If an FDA inspection of GMP compliance

Scott Talbot
Confidential – Subject to Further Confidentiality Review

85

1          Q.     Was that the sole purpose for the meeting

2     of the team, was it to discuss this letter?

3          A.     Yes.

4          Q.     Would heightened focus on GMPs be one of

5     the issues that was discussed?

6          A.     Again, a heightened focus is always

7     something that we looked into.  But this was

8     specifically to review this warning letter.

9          Q.     Do you recall anyone on the team feeling

10    that the facts of the letter were not accurate?

11         A.     I don't recall.

12         Q.     Was QSIP created as a response to this

13    letter?

14         A.     No.

15         Q.     Was QSIP in response to any particular

16    event?

17         A.     I don't know.

18         Q.     Was the QSIP program in place when you

19    were employed in January of 2007?

20         A.     Yes.

21              MR. MILLER:  I'm going to hand you what

22         I'm going to mark as Plaintiff's Exhibit 154.

23              (Thereupon, the referred-to document was

24         marked by the court reporter for Identification

Scott Talbot
Confidential – Subject to Further Confidentiality Review

86

1           as Deposition Exhibit 154.)

2              MR. ANDERTON:  Thank you.

3     BY MR. MILLER:

4         Q.   I represent to you that this is a document

5     provided in your custodial file from Actavis,

6     entitled Minutes from several dates, QSIP meetings.

7              Have you seen this before?

8         A.   I don't recall.

9         Q.   I did not find any QSIP meeting minutes

10    prior, dated prior to this one.

11             Were you aware of QSIP meetings prior to

12    your employment at Actavis?

13        A.   I don't recall.

14        Q.   Was that something that you would want to

15    review in your role as site quality head?

16        A.   Possibly.

17        Q.   Who would have called for these meetings?

18        A.   The person running the QSIP program.

19        Q.   Who ran the QSIP program in February of

20    '07?

21        A.   I'm not 100 percent sure.

22        Q.   If you take a look at the attendees for

23    subteam on labs, there is a list of names there.

24             Does reading those names help you recall

Scott Talbot
Confidential – Subject to Further Confidentiality Review

87

1    who was running QSIP at the time?

2         A.    Are you referring to the time frame of

3    February '07?

4         Q.    Yes, I am.

5         A.    Before I was employed at Actavis.  Because

6    the previous question you were asking, who ran QSIP

7    before I came -- was employed at Actavis.

8         Q.    Okay.  I didn't catch myself on that.

9              All right.  While you were employed at

10   Actavis, beginning in January of '07, are you aware

11   who was in charge of the QSIP plan?

12        A.    I was.

13        Q.    There you go.

14              Did you call these meetings?

15        A.    Maybe not directly.  I may have assigned

16   someone to schedule the meetings.

17        Q.    If we turn the page, to Page 2 of 6, did

18   you run the meetings?  Were you in charge?

19        A.    I participated in the meetings.

20        Q.    Was anyone in charge?

21        A.    The agenda was what we were following.

22        Q.    And who would conduct the communication in

23   order to achieve the objective of the agenda?

24        A.    We had a contractor at the time, Fernando.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

88

1    Let's see if his name is on here.

2              If you see the third paragraph down,

3    "Scott Talbot asked Fernando," Fernando was the one

4    that was compiling all of the follow-up activities.

5         Q.    Was Fernando with Quantic, if I'm saying

6    that right?

7         A.    I don't believe so.

8         Q.    What was Quantic?

9         A.    It was a consulting firm.

10        Q.    Were they consulting regarding GMPs?

11        A.    A portion of the GMPs.

12        Q.    Were they on site at Actavis due to the

13   observations of FDA inspections?

14        A.    Yes.

15        Q.    Would Quantic personnel sit in on the QSIP

16   meetings?

17        A.    No.

18        Q.    Where it says, "Scott Talbot asked

19   Fernando to research the following information" --

20   I'm sorry, who was Fernando again?

21        A.    He was a contractor, so a consultant.  I

22   guess you would use that term.

23        Q.    Do you recall what company he was with?

24        A.    I don't recall.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

89

1          Q.    The second item under that says:

2     "Existence of SOPs, DOIs, and definition of what to

3     do if deviations are found."

4               Do you recall that to be with regard to

5     the out-of-specification issues and SOPs that we

6     discussed earlier?

7          A.    I don't recall.

8          Q.    What does "DOI" stand for?

9          A.    Department Operating Instruction.

10         Q.    What is the overall climate, if you will,

11    of the quality department in February/March of 2007?

12    And I guess specifically, is it business as usual or

13    is there more emphasis on the heightened focus of

14    GMPs, because of all of the regulatory issues?

15               MR. ANDERTON:   Objection.

16               You may answer.

17               THE WITNESS:   Because of a new site head

18         of quality, there were a lot of positive

19         attitudes and there was a lot of changes being

20         made.

21    BY MR. MILLER:

22         Q.    And when you say "because of a new site

23    head of quality," would you agree that that new site

24    head of quality was instated due to regulatory

Scott Talbot
Confidential – Subject to Further Confidentiality Review

90

1    issues?

2                MR. ANDERTON:  Objection.

3                You may answer.

4                THE WITNESS:  I don't recall.

5    BY MR. MILLER:

6         Q.    Is there a sense that with regard to

7    regulatory issues, if we don't do this right, the

8    production line is going to be shut down?

9                MR. ANDERTON:  Objection.

10               You may answer.

11               THE WITNESS:  No.

12   BY MR. MILLER:

13        Q.    So in light of multiple FDA inspections,

14   483 observations of which the company agreed, and a

15   warning letter from the FDA, basically you felt it

16   was business as usual?

17               MR. ANDERTON:  Objection.

18               You may answer.

19               THE WITNESS:  No.

20   BY MR. MILLER:

21        Q.    No, you didn't feel like it was business

22   as usual?

23        A.    No.

24        Q.    In your own words, how was it not business

Scott Talbot
Confidential – Subject to Further Confidentiality Review

91

1      as usual?

2                It's a tough one.

3         A.    A lot of changes were being made to

4      improve the process, to improve the systems.

5         Q.    And that's based on regulatory compliance

6      issues in the past?

7                MR. ANDERTON:   Objection.

8                You may answer.

9                THE WITNESS:   No.

10     BY MR. MILLER:

11        Q.    Why were changes being made?

12        A.    It's a continuous improvement process.

13     Any time -- it's not specific to GMP issues, but any

14     time you hire a new head of a department, that

15     person is going to come in and make changes to that

16     department for the better.

17                When I was hired as the site head of

18     quality, and through my review and instructing

19     people on reviewing items, when I felt improvements

20     were needed to those documents or procedures I would

21     instruct the folks how to do those improvements.

22        Q.    Roughly 65 products were made at Actavis

23     at Totowa?

24        A.    I don't know how many products.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

92

1          Q.    Sixty-five, give or take 5?

2          A.    I honestly don't know how many products we

3    made.

4          Q.    As a site quality head, it could have been

5    5, it could have been 100?

6          A.    Well, it's not that broad of a range.

7          Q.    You knew it was roughly 50, 70; is that

8    fair?

9          A.    You need to define the term "products."

10         Q.    Pills in a bottle.  You made

11   pharmaceutical products; is that correct?

12         A.    That's correct.

13         Q.    I don't understand, define products.

14         A.    Different strengths.

15         Q.    If we're going to go to different

16   strengths, you would agree it would be more like a

17   hundred an -- gosh, I think I heard 110 or

18   something.

19         A.    And then differing package sizes.

20         Q.    Then I want to define products.  We will

21   define products as a product, notwithstanding the

22   different packages, different strengths.  Digitek is

23   one product.

24              How many products were made at Actavis

Scott Talbot
Confidential – Subject to Further Confidentiality Review

93

1  Totowa?

2      A.   I don't know.

3      Q.   Do you know that it is more than 200?

4      A.   I don't know.

5      Q.   All right.  I will narrow it down in time.

6           February of '07, you are the quality --

7  site head of quality.

8      A.   Yes.

9      Q.   I don't know why it's being so tough.

10          At that time, did you have any idea how

11 many products were being made?

12     A.   Again, the term "products."

13     Q.   I defined it.

14     A.   Just to get clarity, it's active

15 ingredients.  You are referring to Digitek is a

16 product made with Digoxin, which is an active

17 ingredient.

18     Q.   Yes.

19     A.   So in the pharmaceutical world, compounds,

20 if it is a specific compound.  So we made Digitek in

21 two different strengths.

22     Q.   Yes.

23     A.   And several different package sizes.

24     Q.   Right.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

94

1      A.   But you're defining that as one product.

2      Q.   I am.

3      A.   So one compound.

4      Q.   Yes.

5      A.   It was more than five and less than 100.

6      Q.   But you couldn't narrow it down any more

7   than that?

8      A.   No.

9      Q.   So you wouldn't be surprised if it was six

10   or you wouldn't be surprised if it was 99?

11      A.   I would be surprised if it was six.

12      Q.   Did you know there came a time that

13   production of all products was ceased at Actavis?

14      A.   Yes.

15      Q.   Do you have an understanding of why that

16   happened?

17           MR. ANDERTON:   Objection.   I instruct the

18      witness to answer only with respect to Digitek.

19           THE WITNESS:   Can you ask the question

20      again?

21   BY MR. MILLER:

22      Q.   Why was the production lines at Actavis

23   shut down?

24      A.   I don't know.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

95

1           MR. ANDERTON:  Again, I instruct the

2     witness to restrict your answer to Digitek

3     only, please.

4           THE WITNESS:  I don't know.

5  BY MR. MILLER:

6     Q.   Did you ever attempt to find out?

7     A.   No.  I did not work for Actavis Totowa at

8  that time.

9     Q.   At that time, you were a pharmaceutical

10  manufacturing consultant?

11     A.   No.  I was working for Actavis South

12  Atlantic.

13     Q.   That's right.

14          Why did it come to be that in January of

15  '08, you left Actavis Totowa and went to Actavis

16  South Atlantic?

17     A.   It was family reasons.

18     Q.   And who filled your position at Actavis as

19  site head of quality?

20     A.   I don't believe anyone filled that

21  position.

22     Q.   Were you ever informed why the decision

23  was made not to fill that position?

24     A.   No.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

99

1    BY MR. MILLER:

2        Q.    Take a look at Observation 2.

3              Observation 2 is -- are you there?

4        A.    Yes.

5        Q.    "Laboratory records are deficient in that

6    they do not include a complete record of all data

7    obtained during testing."

8              Now, with that in mind, I want to read the

9    paragraph regarding Ming Li back on Exhibit 155.

10   And it states that Ming Li had indicated that he had

11   received the new notebooks, that he was training on

12   new documentation and data review procedures, and

13   that he expects to finish the deliverable on

14   improving the Little Falls data generation process

15   on March 9th.   He added that by March 5th, he

16   expects to have trained all QC personnel on the new

17   notebooks and on the new procedures.

18             My question is, were these new notebooks

19   and procedures a response to the observations found

20   by the FDA?

21       A.    I don't know.

22       Q.    Are you aware that there were lab notebook

23   issues found during the FDA's inspections?

24       A.    No.

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

100

1          Q.   Take a look at Page 2 of 7 of Exhibit 155,

2     at the bottom, where it starts out, "Scott Talbot."

3     Let me know when you see that.

4          A.   Yes.

5          Q.   It reads, "Scott Talbot indicated that

6     Quantic was finding cases where stability samples

7     had not been tested within 30 days."

8               That Quantic, is that the consultant that

9     we discussed earlier?

10         A.   Yes.

11         Q.   What is meant by -- or do you recall being

12    told that there were cases where stability samples

13    had not been tested within 30 days?

14         A.   Yes.

15         Q.   Is it a requirement that stability samples

16    be tested within 30 days?

17         A.   I don't know.

18         Q.   Do you recall if it was an observation or

19    finding from an FDA 483?

20         A.   I don't know.

21         Q.   Reflecting back on February of '07, after

22    the FDA has been told that you're coming in to take

23    over as site quality head, and you sent a letter to

24    the FDA informing them that you're going to fill

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

101

1    that role, and a warning letter from the FDA in

2    early February, what do you recall, as far as

3    concerns or issues you wanted to tackle as the

4    site head of quality?

5                MR. ANDERTON:   Objection.

6                You may answer.

7                THE WITNESS:   I think it was just more

8        communication and assuring people knew what

9        their roles and responsibilities were.

10   BY MR. MILLER:

11       Q.    Were you ever concerned that if you

12   weren't successful in improving communication and

13   identifying people's roles and responsibilities,

14   that potentially all of the products at Actavis,

15   production lines could be ceased?

16       A.    No.

17       Q.    No?

18       A.    No.

19       Q.    Were you ever -- did the concern ever --

20   strike that.

21                Did anything about your role, as site head

22   of quality for Actavis in '07, lead you to believe

23   that all production lines might be shut down at

24   Actavis?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

102

1       A.   No.

2       Q.   As you look back at it, I know you weren't

3   there when the actual process shut down, was there

4   anything or any incident or particular GMP

5   violations that you thought, well, if this isn't put

6   under control soon, that there might be the risk

7   that all production might cease at Actavis?

8           MR. ANDERTON:   Objection.

9           You may answer.

10          THE WITNESS:   No.

11  BY MR. MILLER:

12      Q.   Let's go to Page 5 of 7.

13          In this QSIP meeting minutes from February

14  of '07, it starts out at the top of this page,

15  "Scott Talbot."

16          Do you see the paragraph?

17      A.   Yes.

18      Q.   "Scott Talbot indicated that the Little

19  Falls and Riverview validation master plans had been

20  given to Alan Searles for revision, and that Alan

21  will discuss those documents with other Actavis

22  corporate individuals."

23          Did I read that correctly?

24      A.   Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

103

1       Q.   Do you remember Alan Searles?

2       A.   Yes.

3       Q.   What was this title?

4       A.   I don't know.

5       Q.   Am I correct in saying that the -- is this

6  validation master plan, is it regarding the movement

7  of the facilities from Little Falls to Riverview?

8       A.   Partially.

9       Q.   How so?

10      A.   The validation master plan encompasses all

11  sites, all three Actavis Totowa sites.  Riverview

12  was one portion of that master plan.

13      Q.   Did it ever become an issue, as you

14  recall, or if you recall, with the how the

15  validation master plans were going to be

16  transported, moved from the Little Falls facility to

17  the Totowa facility?

18      A.   You have to ask that question again.

19      Q.   Certainly.

20       While you were the site head of quality

21  for Actavis, was the company undergoing a move from

22  Little Falls to Totowa?

23      A.   Yes.

24      Q.   And was part of the -- from a quality

Scott Talbot
Confidential – Subject to Further Confidentiality Review

104

1    perspective, transferring the validation master plan

2    from one site to the other?

3        A.   No.

4        Q.   Then, doesn't the new site need to be

5    validated?

6        A.   Yes.

7        Q.   Does that fall under the validation master

8    plan?

9        A.   Yes.

10       Q.   It does.

11            Do you recall any issues from the FDA

12   regarding how the validation on the new site was

13   conducted?

14       A.   No.

15       Q.   I'm going to hand you what I'm going to

16   mark as Exhibit 156.

17            (Thereupon, the referred-to document was

18            marked by the court reporter for Identification

19            as Deposition Exhibit 156.)

20   BY MR. MILLER:

21       Q.   Am I correct in saying, sir, that this is

22   also QSIP minutes but for meetings on March 5th,

23   6th, 7th and 8th of '07?

24       A.   It appears, yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

115

1        A.   Yes.

2        Q.   And were you present during that

3   inspection?

4        A.   Yes.

5        Q.   And let's see, the inspector's name is

6   difficult to read, but the signature at the bottom

7   looks like Kristy.

8        Do you recall her?

9        A.   Yes.

10        Q.   Do you recall other inspectors being there

11   as well or just her?

12        A.   No other inspectors.

13        Q.   Observation 1 discusses an FDA -- or a

14   field alert report.  Is that something that falls

15   under your title as site head of quality?

16        A.   Yes.

17        Q.   What is an NDA field alert?

18        A.   It's a form that's completed to notify the

19   FDA of products in the market that may have -- be

20   impacted with compliance issues.

21        Q.   So it's part of your job title and

22   responsibility to keep the FDA informed if there are

23   issues with the product?

24        A.   Product in the market.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

117

1      very difficult to meet.  But five days is a pretty

2      reasonable time frame to notify the FDA, to allow us

3      to do our full investigation, to determine that

4      there are specific lots in the market that may be

5      impacted.

6          Q.   So if I could kind of put it in different

7      words, you agree with the importance of timely

8      notification, the requirements of three days were

9      difficult to meet, you responded within five days

10     and felt that was appropriate?

11         A.   Yes.

12         Q.   But you are not taking anything away from

13     the significance of getting the report out there?

14         A.   The timeliness of the report, yes.

15         Q.   Let's take a look at Observation 3.

16     It says:  "Written production and process control

17     procedures are not followed in the execution of

18     production and process control functions.

19              "Specifically, the Standard Operating

20     Procedures, 'Investigation of Deviations,' SOP No.

21     33, and 'Investigation of Out-of-Specification

22     Results,' DOI No. QC 59, are not followed in that

23     investigations are not initiated when a deviation or

24     out-of-specification result is detected and are not

Scott Talbot
Confidential – Subject to Further Confidentiality Review

118

1    closed within 30 days.

2            "In addition, interim reports are not

3    always written to document justification for

4    investigations to remain open after each 30-day

5    interval."

6            Were you present with the investigator

7    when it was discovered that this information came to

8    the surface?

9        A.    Yes.

10       Q.    And did you agree with these findings?

11       A.    Yes.

12       Q.    And as the site head of quality, how did

13   you handle the fact that SOP No. 33, investigations

14   into deviations, were not followed?

15       A.    We enforced the fact that an interim

16   report needs to be written for investigations that

17   extend beyond 30 days.

18       Q.    Did this bring a heightened focus of

19   awareness of following SOPs, specifically the

20   investigation of deviations?

21       A.    No.

22       Q.    When we talked about the SOP that was on

23   file regarding out-of-specification results, would

24   that be the particular SOP?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

119

1          A.     Yes.

2          Q.     And so there is an SOP regarding

3     out-of-specification results, and there's also a

4     department instruction on out-of-specification

5     results?

6          A.     No.

7          Q.     Then what is the purpose and intent of

8     what they address here as the parenthetical,

9     investigation of out-of-specification results, end

10    of parenthetical, department of --

11         A.     Operating.

12         Q.     Thank you.  Department operating

13    instruction No. QC 59?

14         A.     The FDA was using SOP for both those

15    documents.  Their terminology, SOP, fits both SOP

16    and DOI in the Actavis system.

17         Q.     Is there in fact a department operating

18    instruction QC 59 for the investigation of

19    out-of-specification results?

20         A.     Yes.

21         Q.     And is there an SOP No. 33 for

22    investigation of deviations?

23         A.     Yes.

24         Q.     And you agree that neither one of those

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

120

1    were followed?

2              MR. ANDERTON:  Objection.

3              You may answer.

4          THE WITNESS:  Specific to not closing

5     investigations within 30 days.  Or writing

6     interim reports if they extended beyond 30

7     days.

8    BY MR. MILLER

9         Q.   You recall out-of-specification issues

10   being at the forefront of the letter to the FDA from

11   Divya Patel, the attachment of out-of-specification

12   results?

13             You can take a look at that.  It would be

14   one of the earlier exhibits.  There was an

15   attachment that listed all out-of-specification

16   tablets.

17             That's Exhibit 149.

18        A.   Ask the question again, I'm sorry.

19        Q.   Certainly.

20             Out-of-specification was one of the

21   primary concerns of the letter from the president of

22   Actavis Totowa to the FDA when you began your work

23   as the site head for quality, correct?

24             MR. ANDERTON:  Objection, mischaracterizes

Scott Talbot
Confidential – Subject to Further Confidentiality Review

121

1          the document.

2                You may answer.

3                THE WITNESS:   I want to say that the FDA

4     requested that we send them a list, and I don't

5     think that this was stating a concern with

6     OOSs.   It was providing a list as requested by

7     the FDA.

8     BY MR. MILLER:

9          Q.   And you don't think that request had

10    anything to do with the 483 observations?

11         A.   I don't know.

12         Q.   Was Actavis Totowa found to be in

13    violation of a GMP regarding out-of-specification

14    results during this inspection, September of '07?

15         A.   No.

16         Q.   So, okay.   Is it your testimony that

17    written production and process control procedures

18    not being followed in the execution of production

19    and process control functions, as written, is not a

20    violation of GMP?

21         A.   Can you repeat the question?

22         Q.   Certainly.   Is the Observation 3, as

23    written, a violation of GMP?

24         A.   Yes.

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

122

1        Q.   And you disagree with the observation?

2        A.   Yes.

3        Q.   Did you agree with any of the findings of

4    the FDA in this inspection?

5        A.   I don't recall.

6        Q.   Well, let's take a look at them.  We

7    talked about the first one.  We covered Observation

8    1.

9            Observation 2, the written stability

10   testing program is not followed.

11           Do you recall being with the inspector

12   when that issue arised during the inspection?

13       A.   I don't recall.

14       Q.   Do you, as you sit here today, recall

15   agreeing or not agreeing with that finding?

16       A.   I don't recall.

17       Q.   Those are the only three observations of

18   this FDA inspection.

19           Do you have a sense whether you passed or

20   failed this inspection?

21           MR. ANDERTON:  Objection.

22           You may answer.

23           THE WITNESS:  I don't know either way.

24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

127

1    pre-written statement about that observation?

2        A.   Yes.

3        Q.   And would you agree that those pre-written

4    statements define a violation of a GMP?

5        A.   Yes.

6        Q.   And would you agree that it would take an

7    observation of a violation in order to trigger the

8    inspector selecting an entry from the Turbo 483?

9        A.   Yes.

10       Q.   Would you agree that Observation 3 as

11   written and observations in general relate to the

12   violation of the GMP and aren't specific to any

13   particular product?

14       A.   No.

15       Q.   Was Digitek a product that Actavis was

16   manufacturing in September of 2007?

17       A.   Yes.

18       Q.   The GMP, the standard that is addressed in

19   this observation, written production and process

20   control procedures are not followed in the execution

21   of production and process control functions, would

22   you agree that that pertains to the Digitek product

23   as well?

24            MR. ANDERTON:  Objection.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

130

1        Q.    The Quality, Production Laboratory

2    Control, Materials and Facilities and Equipment

3    Systems were covered during the current inspection

4    and corrections made since the previous inspections

5    were verified.

6              An FDA 483 inspectional observation was

7    issued at the closeout meeting regarding

8    deficiencies in the areas of field alerts, the

9    stability testing program and investigations.

10             Did I read that correctly?

11       A.    Yes.

12       Q.    Then it goes on to say in addition a

13   discussion was held with management regarding

14   additional items not listed on the FDA 483.

15             Do you recall, or were you part of the

16   conversations with management as a result of this

17   inspection?

18       A.    Yes.

19       Q.    Do you recall additional items that were

20   addressed as a result of this inspection that were

21   not listed on the FDA 483?

22       A.    Yes.

23       Q.    And what were some of those additional

24   items?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

131

1        A.   I don't recall.

2        Q.   You recall the fact that there were

3   additional items?

4        A.   Yes.

5        Q.   You don't recall what they were

6   specifically?

7        A.   Yes.

8        Q.   Corrections were promised for all

9   observations and discussion items.

10              Were you involved in discussing what the

11   correct -- what corrections were promised?

12       A.   Yes.

13       Q.   Who else would have been -- how did that

14   take place, would it be you sitting down at a

15   meeting with the inspector?

16       A.   Yes.

17       Q.   Who else would be present?

18       A.   It would be a variety of people.  I'm not

19   specific who was there, but it is representatives

20   from the company.

21       Q.   When it came to the issue of

22   investigations, do you recall who would have been

23   present for the meeting discussing the corrections

24   for the issues with investigations?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

140

1           MR. ANDERTON:  Pete, I want to, so we all
2        know where we are.  You say Observation 1.
3        What document?  What --
4           MR. MILLER:  I was in the middle of doing
5        that.  I guess I should have done that first.
6           MR. ANDERTON:  Just so that, as we all sit
7        here and as somebody else listens or reads it
8        later, we know exactly what we are talking
9        about.
10          MR. MILLER:  I'm with you.
11          All right.  Then help me out.  What is the
12       exhibit number that I just marked.
13          MR. ANDERTON:  158.
14   BY MR. MILLER:
15       Q.   Looking at Exhibit 158, the Establishment
16   Inspection Report from September of 2007, Page 25 of
17   40, the voluntary corrections outlined in
18   Observation 1, you would agree, are Observation 1
19   from the 2006 FDA 483?
20       A.   From the inspection that occurred in July
21   and August of 2006.
22       Q.   Okay.  So if I read Observation 1 on
23   Exhibit 68, the August '06 report, and then I look
24   at the Page 25, '07 from the Establishment

Scott Talbot
Confidential – Subject to Further Confidentiality Review

141

1    Inspection Report from September of '07, both

2    observations read the same, you agree, quality

3    control unit lacks authority to fully investigate

4    errors that have occurred?

5         A.    Yes, that sentence reads identical.

6         Q.    Do you agree that that, as written, is a

7    violation of cGMP?

8              MR. ANDERTON:   That is what as written?

9              MR. MILLER:   What I just read?

10        Observation 1.

11             THE WITNESS:   Yes.

12   BY MR. MILLER:

13        Q.    Do you agree that it applies to all

14   products?

15        A.    It --

16             MR. ANDERTON:   Objection.

17             You may answer.

18             THE WITNESS:   It may apply to all

19        products.

20   BY MR. MILLER:

21        Q.    What information would you need for you to

22   believe that it didn't apply to all products?

23        A.    I would need to look at what documents the

24   FDA reviewed during this inspection.  And determine

Scott Talbot
Confidential – Subject to Further Confidentiality Review

146

1                (Thereupon, the referred-to document was

2          marked by the court reporter for Identification

3          as Deposition Exhibit 159.)

4                MR. ANDERTON:  159?

5                MR. MILLER:  159.

6     BY MR. MILLER:

7          Q.   It is a few pages there.  Take a look at

8     it and when you are ready, I will ask you questions.

9          A.   Okay.

10          Q.   The document is titled, "Blend Failure

11     Investigation."

12                Now, have you seen this document before?

13          A.   I don't recall.

14          Q.   Do you recall investigations into blend

15     failures?

16          A.   Yes.

17          Q.   Okay.  And those investigations into blend

18     failures were not, do you agree with me, not product

19     specific?

20          A.   I think this is -- okay.  Blend OOSs, I

21     think we need to kind of distinguish between

22     failures and OOSs.

23          Q.   Certainly.

24          A.   You can have an OOS in the laboratory, and

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

147

1    through additional testing find that the blend did

2    not fail.  That the OOS was caused due to analytical

3    or sampling error.

4              So when -- I would like to just assure we

5    are clear on what a blend failure is versus a blend

6    OOS.

7         Q.    Okay.  So it is your testimony that this

8    concerns blend failures and not OOSs?

9         A.    I'm thinking -- I need to read a little

10   further, but it appears it is covering both OOSs and

11   blend failures, so it is a combination of two.

12        Q.    It was a combination of the two, was it

13   something that was usually addressed at the same

14   time?

15        A.    Yes, an OOS may result in a blend failure.

16   But an OOS may also not result in a blend failure.

17        Q.    Do you have an understanding or memory as

18   to why blend failure would be a specific

19   investigation separate and apart from an out of

20   specification investigation?

21        A.    When we have multiple out of

22   specifications that have a similar theme to them,

23   you would then investigate it as an encompassing one

24   investigation.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

161

1      if a deviation is necessary.

2                "Also the draft protocols need to be

3      modified to reduce the number of samples.  We do not

4      need nearly 200 samples to show the process results

5      in a uniform product."

6                Did I read that correctly?

7           A.   Yes.

8           Q.   And you were addressing, am I accurate in

9      saying, the validation process of the move?

10          A.   The transfer confirmation of lots.

11          Q.   Is the transfer confirmation associated

12     with the validation?

13          A.   I don't believe so.

14          Q.   If I were to go to Exhibit 26, which I

15     just handed to you, and went to observation, I

16     believe it is 5.

17               Observation 5, the first portion of it,

18     laboratory controls do not include the establishment

19     of scientifically sound and appropriate specifi-

20     cations and test procedures designed to assure

21     that components, in process materials and drug

22     products conform to appropriate standards of

23     identity, strength quality and purity."

24               Did I read that correct?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

162

1      A.   Yes.

2      Q.   And it goes on to say, Specifically,

3  analytical method transfers for each method line

4  from the Little Falls, New Jersey quality control

5  laboratory to the new Totowa, New Jersey quality

6  control laboratory were not conducted.  Only two

7  types of analytical methods, HPLC and GC, were used

8  to support the analytical transfer of approximately,

9  redacted, in process, finished product and

10  stability methods.  There were no analytical method

11  transfers for such techniques as dissolution, atomic

12  absorption, loss on drying and blend testing.

13       Did I read that correctly?

14      A.   Yes.

15          MR. ANDERTON:   Objection.

16          You may answer.

17  BY MR. MILLER:

18      Q.   Is there a correlation between this

19  finding and the subject of this e-mail chain that we

20  have discussed as Exhibit 160?

21      A.   No.

22      Q.   Then if you would explain to me what is

23  the difference between -- I'm sorry.  What is the

24  term you use for the topic at issue here, Exhibit

Scott Talbot
Confidential – Subject to Further Confidentiality Review

163

1    160?

2         A.    This is talking specifically on the number

3    of samples to be pulled for testing.

4         Q.    Is that related to the move?   Is it

5    something that has to be done above and beyond what

6    is typically done in the ordinary course of business

7    because of the move?

8         A.    Yes.

9         Q.    And how does the task of this described in

10   Exhibit 160 differ from analytical method transfers?

11        A.    This is a laboratory test method.   So this

12   is the testing of the product in the laboratory.

13   This is sampling of the process in manufacturing.

14        Q.    Going back to Exhibit 26, Observation 5,

15   were you ever aware of the fact, as it is outlined

16   here, regarding analytical method transfer?

17             MR. ANDERTON:   Objection.

18             You may answer.

19             THE WITNESS:   Yes, we had a transfer

20        protocol that we used.

21   BY MR. MILLER:

22        Q.    Did you ever subsequently learn that the

23   FDA had written up an observation regarding that

24   analytical --

Scott Talbot
Confidential – Subject to Further Confidentiality Review

164

1          A.   No.

2          Q.   -- transfer?

3               Do you agree or disagree with the findings

4     I just read for Observation 5?

5               MR. ANDERTON:   Objection.

6               You may answer.

7               THE WITNESS:   I don't know.

8     BY MR. MILLER:

9          Q.   If you would take a look again at Exhibit

10    159 and I want to go to and have it handy, going

11    back to Exhibit 26, the inspection report from May

12    of '08.  Specifically I would like to look at

13    Observation 4, which is Page 6 of 16.

14              Do you see Observation 4?

15         A.   Yes.

16         Q.   It says, "On determinations of conformance

17    to appropriate written specifications for acceptance

18    are deficient for in process materials."

19              Do you see that?

20         A.   Yes.

21         Q.   And it goes on to say specifically,

22    "Although three out-of-specification results were

23    obtained for blend uniformity at the right top

24    sample location for Digoxin tablets, .125 milli-

Scott Talbot
Confidential – Subject to Further Confidentiality Review

166

1        As you sit here, were you aware that lot

2   70148 was not released?

3        A.   I don't know.

4        Q.   Would you be involved, as a site head of

5   quality for Actavis, in the decision to not release

6   a lot?

7        A.   Yes.

8        Q.   How does it typically happen that you are

9   involved in a lot not being released?

10       A.   The investigations that are conducted, all

11   analytical results that are reported come through

12   the site head of quality to be signed off.

13       Q.   Do you recall how often it would come to

14   be in your position that a lot for any product would

15   not be released?  Is this something that would

16   happen daily or weekly?

17       A.   Very infrequent.

18       Q.   Okay.  But this particular one you don't

19   recall?

20       A.   No.

21       Q.   As we sit here today, do you agree or

22   disagree that no manufacturing investigations were

23   conducted regarding these out of specification

24   findings?

Scott Talbot
Confidential – Subject to Further Confidentiality Review

174

1          A.   I don't recall.

2          Q.   Were there any changes to that document as

3    far as you know from the time you started and first

4    generated the document until the time you left in

5    January of 2008?

6          A.   I don't know.

7          Q.   And the responsibilities of quality unit,

8    did you say that is an SOP or DOI?

9          A.   I'm not sure.  But it is SOP or DOI.

10          Q.   Does Dan Bitler have the authority to not

11    release a batch or lot?

12          A.   Yes.

13          Q.   And if Dan Bitler elected to not release a

14    batch or lot, is he required to report that to you?

15          A.   I don't know if he's required, so no.

16          Q.   So he could stop the release of a lot or

17    batch and there is no requirement that he informed

18    you?

19          A.   Not that I'm aware of.

20          Q.   Are you aware if that ever happened while

21    you were acting as site head of quality?

22          A.   No.

23          Q.   The Page 3 of 67, Actavis 003319, it is a

24    description of the, I will call it the incident, if

Scott Talbot
Confidential – Subject to Further Confidentiality Review

181

1          Q.   Were you aware that double thick tablets

2     were found out in the field?

3          A.   No.

4               MR. ANDERTON:  Objection.

5               You may answer.

6               THE WITNESS:  No.

7     BY MR. MILLER:

8          Q.   Quality is design -- or quality of a

9     tablet -- do you agree or disagree with this

10    statement, the quality of a tablet is that it has

11    the purported identity, strength, quality that it

12    is supposed to have, correct?

13         A.   Yes.

14         Q.   And that is for other reasons, but for

15    safety?

16         A.   Yes.

17         Q.   And as the site head for quality, one of

18    your job descriptions or duties is to make sure that

19    a tablet that gets out to the consumer is safe?

20              MR. ANDERTON:  Objection.

21              You may answer.

22    BY MR. MILLER:

23         Q.   Do you agree?

24         A.   Yes.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

182

1      Q.   If double thick tablets are found in a

2      lot, is there the potential that double thick

3      tablets are going to make it out to consumers?

4          A.   There is always a potential.

5          Q.   Is it important to know, through testing,

6      what that double thick tablet contains?

7          A.   No.

8          Q.   And this page we are looking at talks

9      about the test being a description test,

10     identification A test, identification B test.

11             Am I reading that correct?

12         A.   Yes.

13         Q.   And we turn the page, we tested for

14     friability, assay by HPLC, uniformity of dosage.

15             These are all the standard tests that

16     are conducted of a typical lot and batch?

17         A.   Yes.

18         Q.   And these are tests that could have been

19     done on a double thick tablet, is that correct?

20             MR. ANDERTON:  Object to the

21             hypothetical.

22             You may answer.

23             THE WITNESS:  Could have been, yes.

24

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

196

1     that correct?

2          A.   Not at 1/25/08, no.

3          Q.   1/25/08 is the date the investigation was

4     signed, is that correct?

5          A.   I don't know.

6          Q.   Do you agree with the findings of this

7     observation?

8          A.   I can't answer.  Because I don't know what

9     this is all referring to.  The investigation may

10    have looked at all of the lots on the market, the 89

11    of the .125 and the 78 of the .25, but not to the

12    satisfaction of the investigator.

13             So I don't know.  I can't answer that

14    question.

15         Q.   So, as you sit here, you are saying

16    possibly it was looked into, all of the other lots?

17         A.   Yes.  Yes.

18         Q.   Let's go to Observation 11, Page 14 of 16.

19             Observation 11, are you there?

20         A.   Yes.

21         Q.   Drug product production and control

22    records are not reviewed and approved by the quality

23    control unit to determine compliance with all

24    established approved written procedures before a

Scott Talbot
Confidential – Subject to Further Confidentiality Review

197

1   batch is released or distributed.

2           Did I read that correctly?

3       A.   Yes.

4       Q.   As written, is that a violation of GMP?

5       A.   Yes.

6       Q.   Okay.  It goes on to say, well, it is, as

7   the site head for quality, are you the one who would

8   sign approving as the quality control unit?

9       A.   No.

10      Q.   Who would?

11      A.   Dan Bitler.

12      Q.   Well, let's read on.  Specifically,

13  investigations of deviation reports require a review

14  of quality assurance and approval by regulatory

15  affairs, quality compliance and an approval of

16  product disposition by the head of quality

17  assurance.  On multiple occasions, these three

18  signatories were completed by the same individual.

19          For example, redacted, regarding double

20  thick, redacted, was signed by the director of

21  quality assurance under the sections designated for

22  quality assurance, regulatory affairs, quality

23  compliance and the head of quality assurance.

24          Were you a part of the discussions when

Scott Talbot
Confidential – Subject to Further Confidentiality Review

202

1              Did I read that correctly?

2         A.   Yes.

3         Q.   Do you agree that while you were site head

4    of quality that no products were being made by

5    Actavis that had Narrow Therapeutic Index?

6         A.   I don't know.

7         Q.   Were any products being made in Actavis as

8    you were site head of quality with the specification

9    95 to 105 percent as you address here at the bottom

10   of the e-mail?

11        A.   I don't know.

12             MR. MILLER:  I'm going to hand you what I

13        will mark as Exhibit 165.

14             (Thereupon, the referred-to document was

15        marked by the court reporter for Identification

16        as Deposition Exhibit 165.)

17             MR. ANDERTON:  Thank you.

18             165.

19             MR. MILLER:  Yes.

20             MR. ANDERTON:  Thank you.

21   BY MR. MILLER:

22        Q.   Do you recall seeing this e-mail in the

23   past?

24        A.   No.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

204

1     moment.  Please talk with the QC Lab."

2              You don't recall the president of Actavis

3     passing that information on to you?

4              MR. ANDERTON:  Objection.

5              Are you talking about Dan Bitler?

6              MR. MILLER:  Oh, I'm sorry.   I stand

7        corrected.

8     BY MR. MILLER:

9        Q.   Dan Bitler, the director, I believe you

10    said, of quality assurance.

11       A.   Yes.  This is from Dan Bitler.

12       Q.   So do you recall the director of quality

13    assurance informing you the information about the

14    assay ranges?

15       A.   No.

16       Q.   Do you know what he means by "assay

17    range"?

18       A.   Yes.  This is the content of drug, the

19    active ingredient in the tablets.

20       Q.   And you agree that these drugs have a

21    tighter range for assay?

22       A.   Define "tighter."

23       Q.   Certainly.

24              Other products have a wider range of

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Scott Talbot
Confidential – Subject to Further Confidentiality Review

205

1    assay?

2              MR. ANDERTON:  Objection.

3    BY MR. MILLER:

4         Q.   Do you understand what I mean by "wider"?

5         A.   These -- these specifications are reviewed

6    and approved by the FDA, so if they want the range

7    to be 95 to 105, we will move that range to be more

8    limited.

9              These aren't -- I mean, you say there are

10   some that we are allowed 90 to 110, so, yes, in some

11   cases, these specifications are more narrow than

12   others.

13        Q.   Narrow.

14             So you agree that Digoxin has a more

15   narrow range for assay?

16        A.   More narrow compared to?

17        Q.   Other products.

18        A.   Well --

19             MR. ANDERTON:  Objection.

20             You may answer, if you understand it.

21             THE WITNESS:  No, because there -- like

22   Quinaretic has 95 to 105.  So Digoxin is

23   not more narrow than other products.

24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

246

1            (Thereupon, a discussion was held off the

2        record, after which the following proceedings

3        were held:)

4            THE VIDEOGRAPHER:  We are back on video

5        record.

6            MR. ANDERTON:  I have no further questions

7        of this witness.

8            MR. MILLER:  Sir, just a couple of follow-

9        ups and we will be done.

10           F U R T H E R   E X A M I N A T I O N

11   BY MR. MILLER:

12       Q.   In reference to the many questions about

13   the corrections that were identified in the

14   establishment investigation report and your

15   testimony that that closes out the observation, you

16   will agree with me that certainly when the FDA comes

17   back to investigate again there is always that risk

18   that they will find similar observations?

19       A.   Yes.

20       Q.   And, in fact, they did come back and

21   investigate in '08 in which you were there to assist

22   the investigators?

23       A.   Yes.

24       Q.   And you would agree that that

Scott Talbot
Confidential – Subject to Further Confidentiality Review

247

1  investigation resulted in having the entire

2  production line at Actavis shut down?

3           MR. ANDERTON:  Objection.

4           You may answer.

5           THE WITNESS:  As a result of the

6      inspection, it was a decision by management to

7      shut down production, yes.

8  BY MR. MILLER:

9      Q.   Would you agree that is the most serious

10 finding or action that can come out of an FDA

11 inspection?

12     A.   No.

13     Q.   What is more serious?

14     A.   The injunction.

15     Q.   An injunction.  Which is the FDA

16 instructing that you shut down?

17     A.   Yes.

18     Q.   When you were asked about launching new

19 products, given that all products, production line

20 for all products was shut down, you would agree that

21 whatever products were launched prior to April of

22 '08, those products had to be shut down as well?

23     A.   Yes.

24           MR. MILLER:  I have no further questions.

Scott Talbot
Confidential – Subject to Further Confidentiality Review

249

1                          AFFIDAVIT

2      STATE OF FLORIDA            )
       COUNTY OF                   )

3

4
            I,                          , being first
5      duly sworn, do hereby acknowledge that I did
       read a true and certified copy of my deposition
6      which was taken in the case of IN RE:  DIGITEK
       PRODUCTS LIABILITY LITIGATION, taken on the
7      25th day of January, 2010, and the corrections
       I desire to make are as indicated on the
8      attached Errata Sheet.

9

10                         CERTIFICATE

11

12     STATE OF FLORIDA            )
       COUNTY OF                   )

13

14
            Before me personally appeared
15     _____,
       to me well known / known to me to be the
16     person described in and who executed the
       foregoing instrument and acknowledged to and
17     before me that he executed the said instrument
       in the capacity and for the purpose therein
18     expressed.

19

20          Witness my hand and official seal, this
       _____ day of _____, _____.

21

22

23                         _____
                                  (Notary Public)
24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

250

1      MY Commission Expires:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Scott Talbot
Confidential – Subject to Further Confidentiality Review

252

1

2                        CERTIFICATE OF OATH

3      STATE OF FLORIDA        )

4      COUNTY OF MIAMI-DADE  )

5

6                 I, the undersigned authority, certify
       that SCOTT TALBOT personally appeared before me
       and was duly sworn.

7                 WITNESS my hand and official seal this
       2nd day of February, 2010.

8

9                          KELLI ANN WILLIS, RPR, CRR

10                         Notary Public, State of Florida
                           My Commission No. DD911443

11                         Expires: 2/16/12

12           + + + + + + + + + + + + + + + + +

13                        CERTIFICATE

14      STATE OF FLORIDA        )

15      COUNTY OF MIAMI-DADE  )

16                 I, KELLI ANN WILLIS, Registered
       Professional Reporter and Certified Realtime

17      Reporter do hereby certify that       I was
       authorized to and did stenographically     report

18      the foregoing deposition of    SCOTT TALBOT;  That
       a review of the transcript  was requested; and

19      that the transcript is a true record of my
       stenographic notes.

20                 I FURTHER CERTIFY that I am not a
       relative, employee, attorney, or counsel of any

21      of the parties, nor am I a relative or employee
       of any of the parties' attorney or counsel

22      connected with the action, nor am I financially
       interested in the action.

23                 Dated this 2nd day of February, 2010.

24