# In Re:

*Digitek*

---

*Paul Galea*

*December 9, 2009*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File pg120909.txt

**Min-U-Script®**

**EXHIBIT C-4**

Paul Galea
Confidential – Subject to Further Confidentiality Review

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


- - -


IN RE:  DIGITEK® PRODUCTS      MDL NO. 1968
LIABILITY LITIGATION


THIS DOCUMENT RELATES TO
ALL CASES


CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

Wednesday, December 9, 2009

- - -


Videotaped deposition of PAUL

GALEA, held at HARRIS BEACH, PLLC, 100 Wall

Street, New York, New York, commencing at

approximately 9:50 a.m., before Rosemary

Locklear, a Registered Professional Reporter,

Certified Realtime Reporter, Certified Court

Reporter (NJ) and Notary Public.


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph │ 971.591.5672  Fax
deps@golkow.com

Paul Galea
Confidential – Subject to Further Confidentiality Review

2

1     APPEARANCES:

2

3          BLIZZARD McCARTHY & NABERS, LLP
           BY:  EDWARD F. BLIZZARD, ESQUIRE
4          eblizzard@blizzardlaw.com
           BY:  HOLLY W. GIBSON, ESQUIRE
5          hgibson@blizzardlaw.com
           Lyric Centre, Suite 1710
6          440 Louisiana
           Houston, Texas 77002-1689
7          (713) 581-8451
           Appearing on behalf of Plaintiffs
8

9
           THE MILLER FIRM, LLC
10         BY:  PETER A. MILLER, ESQUIRE
           pmiller@doctoratlaw.com
11         The Sherman Building
           108 Railroad Avenue
12         Orange, Virginia 22960
           (540) 672-4224
13         Appearing on behalf of Plaintiffs in
           Pennsylvania
14

15
           MOTLEY RICE, LLC
16         BY:  MEGHAN JOHNSON CARTER, ESQUIRE
           mjohnson@motleyrice.com
17         28 Bridgeside Boulevard
           Mount Pleasant, South Carolina 29464
18         (843) 216-9000
           Co-Lead Counsel for the Plaintiffs' Steering
19         Committee

20

21         SANFORD BARLOW, LLP
           BY:  ANTHONY COVENY, ESQUIRE
22         (via telephone)
           1500 McGowen Street, Suite 250
23         Houston, Texas 77004
           (713) 524-6677
24         Appearing on behalf of the Plaintiffs

Paul Galea
Confidential – Subject to Further Confidentiality Review

3

1    APPEARANCES:   (Continued)

2

3         TUCKER ELLIS & WEST, LLP
          BY:  MICHAEL ANDERTON, ESQUIRE
4         manderton@tuckerellis.com
          BY:  EDWARD E. TABER, ESQUIRE
5         etaber@tuckerellis.com
          1150 Huntington Building
6         925 Euclid Avenue
          Cleveland, Ohio 44115-1475
7         (216) 592-5000
          Appearing on behalf of the Defendant Actavis
8

9
          ALLEN GUTHRIE & THOMAS, PLLC
10        BY:  ZACKARY B. MAZEY, ESQUIRE
          zbmazey@agmtlaw.com
11        500 Lee Street, East, Suite 800
          Charleston, West Virginia 25301
12        (304) 345-7250
          Appearing on behalf of the Defendant Mylan
13        Actavis in West Virginia

14

15        SHOOK, HARDY & BACON, LLP
          BY:  SEAN LEE, ESQUIRE
16        slee@shb.com
          1155 F Street, N.W., Suite 200
17        Washington, DC 20004-1305
          (202) 783-8400
18        Appearing on behalf of the Defendant Mylan
          Pharmaceuticals
19

20
          ALSO PRESENT:
21

22        CATHERINE SMALFUS, Video Operator

23

24

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

19

1      Q.     Was that at the request of the
2  company or had you been requesting to
3  transfer to the U.S.?
4      A.     It -- it was a bit of both, I
5  could say.
6      Q.     What was -- as you were
7  informed, what was the reason that the
8  company requested it, that you transfer to
9  Actavis Totowa?
10      A.     The initial reason, I was doing
11  an assessment and helping out in the
12  harmonization of the group's corporate
13  manual, and that was basically the main
14  reason.
15      Q.     All right.  Well, let's break
16  that into two parts.
17              What was the assessment that you
18  believe that you were -- that you came here to
19  work on?  Assessment of what?
20      A.     Basically, I came to make an
21  assessment of Actavis Totowa, L.L.C.
22      Q.     Overall assessment of the QA
23  Department?
24      A.     No.   In general of the company

Paul Galea
Confidential – Subject to Further Confidentiality Review

20

1    from a -- from a GMP perspective.

2        Q.    Would you agree with me that

3    there was some serious GMP issues in

4    October of '07 at Actavis Totowa?

5                MR. ANDERTON:  Objection.

6                You may answer.

7                THE WITNESS:  How do you define

8    serious?

9    BY MR. MILLER:

10       Q.    Serious?  Well, there could

11   have been some GMP problems that would

12   have been, gosh, this is minor, we either

13   need to fix it or we don't need to fix it,

14   or there are some issues where if we don't

15   fix it, then we might be shut down or

16   someone might get hurt.

17               MR. ANDERTON:  Objection.

18   BY MR. MILLER:

19       Q.    It's okay to answer.

20               MR. ANDERTON:  You may answer.

21               THE WITNESS:  When I first went

22   there, that was not really the scope of my

23   assessment.  My assessment was to look at the

24   company and -- and, basically, have a look at

Paul Galea
Confidential – Subject to Further Confidentiality Review

21

1    the operation.

2    BY MR. MILLER:

3         Q.    Have a look at the operation,

4    but through the lens of GMP and what the

5    status of the company applying and using

6    GMP.  Is that fair?

7         A.    Yes, that is fair to say.

8         Q.    Who else was on the assessment

9    team, or was it just you?

10        A.    At this point it was me.

11        Q.    Arriving in October of 2007 to

12   do an assessment of the GMP, who were you

13   reporting to?

14        A.    I was still reporting to -- to

15   Actavis, Limited.

16        Q.    Okay.  We have -- excuse me,

17   sir.

18             MR. MILLER:  We have someone just

19   checked in on the phone line.  If that is

20   correct, would you please identify yourself.

21             MR. COVENY:  Anthony Coveny with

22   Shelly Sanford's office.

23             MR. MILLER:  Okay.  Well, we've

24   gotten started.  If you would, please, put it on

Paul Galea
Confidential – Subject to Further Confidentiality Review

27

1          Q.     Just got a call in Malta and

2     said go to Actavis Totowa and make an

3     assessment of their GMP program?

4          A.     Yes.  I would say that is

5     correct.

6          Q.     You agreed with me earlier that

7     there are serious issues at the -- with

8     GMP at Actavis Totowa.

9               Did you have that understanding

10    prior to your assessment?

11                  MR. ANDERTON:  Objection.

12               That totally mischaracterizes the

13    witness's testimony.

14                  MR. MILLER:  Well --

15                  THE WITNESS:  I -- I did not agree

16    that there were serious issues.

17    BY MR. MILLER:

18         Q.     Okay.   I'll ask -- all right.

19               Let me ask this:  Do you believe

20    there were serious issues with the GMP

21    procedures at Actavis Totowa prior to your

22    arrival in October of 2007?

23                  MR. ANDERTON:  Objection.

24               I instruct the witness not to

Paul Galea
Confidential – Subject to Further Confidentiality Review

29

1              MR. ANDERTON:  Okay.

2       BY MR. MILLER:

3            Q.     What was your mental

4       understanding of the status of the GMP

5       protocol procedures at Actavis Totowa

6       prior to your arrival in October of 2007?

7            A.     I had no real understanding of

8       what I was going to be assessing.

9            Q.     Did you have a mental

10      understanding prior to October of 2007 of

11      things are going really good, I'm going

12      there to learn how to do GMP right?

13           A.     As I already said, I had no

14      understanding of the company before the

15      time I went there.

16           Q.     How long did your GMP

17      assessment last after your arrival?  How

18      long did you continue in that role?

19           A.     I was there from -- the initial

20      visit was from the 2nd of February, I

21      think, to around about the 9th.  A week in

22      total.

23           Q.     So you continued an assessment

24      from October of '07 until February of '09.

Paul Galea
Confidential – Subject to Further Confidentiality Review

33

1       Q.      Phone?

2               And what did she inform you on that

3       phone call that your mission was going to be on

4       your trip?

5               MR. ANDERTON:  Objection.

6               You may answer.

7               THE WITNESS:  She asked me if I

8       would be willing to go over to the U.S. to make

9       an assessment of Actavis Totowa, L.L.C.

10      BY MR. MILLER:

11      Q.      And did she indicate one way or

12      the other what she thought you were going

13      to find when you arrived?

14              MR. ANDERTON:  Objection.

15              You may answer.

16              THE WITNESS:  No.

17      BY MR. MILLER:

18      Q.      Was any communication between

19      you and her done in -- via E-mail or

20      writing or any other form?

21      A.      We communicated by phone.

22      Q.      Did you communicate with Scott

23      Talbot prior to your arrival?

24      A.      No.

Paul Galea
Confidential – Subject to Further Confidentiality Review

54

1      A.    I cannot say that it is there

2   until today.  Today there could be just

3   computer logs.

4      Q.    Who is the keeper of the

5   logbook for contacts?

6      A.    There isn't an actual contact

7   logbook.  It's a complaint logbook.  And

8   they would make comments if they did

9   actually manage to contact the -- the

10   person making the complaint.

11      Q.    Okay.  That logbook, where was

12   it physically held back when you

13   maintained this title in 2007?

14      A.    We keep those in a

15   documentation room.

16      Q.    Okay.  And then how often would

17   you review the logbook or the computer

18   spreadsheets?

19      A.    Can you rephrase that?

20      Q.    Certainly.

21         What would be, as your title of

22   quality system director, what would be your

23   involvement of the complaints?

24         Once Bernard or Barbara had

Paul Galea
Confidential – Subject to Further Confidentiality Review

55

1    contacted the customers that had initiated the

2    complaint, what involvement, if any, did you

3    have in the complaints?

4          A.    My involvement would be to --

5    to look at basically the information that

6    they had gathered and any reports they

7    would have subsequently made in view of

8    that information with respect to the

9    particular complaint.

10         Q.    Okay.   And then would you

11   condense that information or would you put

12   it in some other format to present to

13   someone else inside the company?

14         A.    No.

15         Q.    So the -- your -- felt like

16   your job title as quality systems

17   director, then, was to have the complaints

18   maintained in a logbook and a computer,

19   but they didn't go anywhere from there?

20         A.    Can you rephrase that?

21         Q.    Did you have any obligation to

22   pass that information on to anyone else

23   outside of your department?

24         A.    That information was open to

Paul Galea
Confidential – Subject to Further Confidentiality Review

56

1     the site head of quality and to the QA

2     director.

3         Q.     All right.   Open to me means

4     that he can go grab that logbook and look

5     at it if he wants to or he can open up

6     that computer spreadsheet and read that if

7     he wants to.

8              But my question is, was there any

9     obligation on your part to take that information

10    and physically move it forward to some other

11    entity besides your department, quality systems,

12    at that time in 2007?

13        A.     We definitely would notify the

14    site head of quality and the QA director

15    of complaints that we received.

16        Q.     How did you notify them?

17        A.     Verbally, most of the time,

18    because they were, you know, in the same

19    office area, basically.

20        Q.     So it was just a matter of

21    saying, hey, I've got this complaint and

22    this is what the person said, you would

23    inform them of that, but there was no

24    written report that you would put together

Paul Galea
Confidential – Subject to Further Confidentiality Review

57

1    of complaints.

2         A.    Yes.   There are written

3    reports.   And, typically, you are

4    contacting -- contacting these people

5    because the QA director would be involved

6    in resolving that complaint.

7         Q.    But did your office generate

8    any of those reports?

9         A.    My people would generate those

10   reports.

11        Q.    What would those reports be

12   called?

13        A.    Complaint report.   The report

14   is more of like a -- typically a form --

15        Q.    Okay.

16        A.    -- with the various information

17   to it.

18        Q.    And was there an SOP that

19   governed how often that report had to be

20   generated or who that report went to?

21        A.    Definitely the SOP governed

22   that a report would be generated with each

23   complaint.   Whether conclusive or

24   inconclusive or whatever information we

Paul Galea
Confidential – Subject to Further Confidentiality Review

58

1    had.

2              And the second part of the question

3    was?

4         Q.    Gosh, I forgot myself.   The

5    second part -- I guess, we'll make a new

6    second part.

7              Who would those reports go to?   Did

8    the SOP indicate who the report went to?

9         A.    That I cannot remember.

10        Q.    Well, I'm not asking you to

11   remember specifically by name or title who

12   it went to, but did the SOP direct that

13   there was a particular receiver, someone

14   who was going to get that report?

15        A.    The report would be viewed, as

16   far as I can recall, by either the site

17   head of quality or the QA director.   They

18   had access to all those reports also.

19        Q.    So October of '07 you're

20   quality systems director.   How long did

21   you maintain that title?

22        A.    I maintained that title until

23   around about June of 2008.

24        Q.    And what's your title in June

Paul Galea
Confidential – Subject to Further Confidentiality Review

75

1    as a result there is no assurance that

2    many drug products manufactured and

3    released into interstate commerce by your

4    firm have the identity, strength, quality

5    and purity that they purport to possess."

6        Q.    Okay.  And, sir, would you

7    agree with me that that is very specific,

8    that it's not a manufacturing problem, but

9    it's a quality control, GMP problem?

10                MR. ANDERTON:  Objection.

11   BY MR. MILLER:

12       Q.    It's okay to answer.

13                MR. ANDERTON:  You may answer.

14                THE WITNESS:  From what it is

15   written here, they are saying quality control

16   unit, so I do agree that they mentioned quality

17   control --

18   BY MR. MILLER:

19       Q.    Okay.

20       A.    -- in this context.

21       Q.    Thank you very much.

22                And then let's turn the page to

23   Number 2 of the revised warning letter.  And all

24   I need you to do is read the first sentence,

Paul Galea
Confidential – Subject to Further Confidentiality Review

76

1      sir, if you would, of Number 2.

2                MR. ANDERTON:  Do you want to just

3      indicate a Bates page number, Pete, for the

4      record, please.

5                MR. MILLER:  Certainly.

6                This is Page 2 of the warning

7      letter, which is Actavis 0028243.

8                THE WITNESS:  "Our investigators

9      observed that laboratory notebooks did not

10     include all raw test data generated during

11     testing and that analysts do not always document

12     the preparation and testing of samples in their

13     notebooks at the time they are done."

14     BY MR. MILLER:

15          Q.   So you would agree with me

16     that's a violation of the cGMP; correct?

17                MR. ANDERTON:  Objection.

18                You may answer.

19                THE WITNESS:  This is what the

20     auditor report.  I do not know if or what the

21     company or the firm actually responded back to

22     this.

23     BY MR. MILLER:

24          Q.   Well, I'm not asking what they

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

77

1      responded back.   I'm just -- as someone

2      who's there to do an assessment of a

3      pharmaceutical lab's GMP procedures, you

4      would agree that if the FDA writes you up

5      for the investigators observed that

6      laboratory notebooks did not include all

7      raw test data -- I won't continue to read

8      the whole thing -- but you would agree

9      that they were writing up a violation of

10     GMP?

11                    MR. ANDERTON:   Objection.

12     BY MR. MILLER:

13         Q.     It's okay to answer.

14                    MR. ANDERTON:   You may answer.

15                    THE WITNESS:   If you look at that

16     statement as written, yes, I would agree with

17     you.

18     BY MR. MILLER:

19         Q.     Okay.  And you agree that

20     that's not on the manufacturing side of

21     the house, that's a quality control side

22     of the house.

23         A.     Once again, it's the lab, which

24     is mentioned.

Paul Galea
Confidential – Subject to Further Confidentiality Review

78

1     Q.    Okay.  Let's take a look at

2  Finding Number 3.

3           And if you would be so kind, this

4  is Actavis 008244, Page 3 of the FDA warning

5  letter, would you read the first sentence of

6  Number 3, please, sir.

7     A.    "There was a failure to check

8  for accuracy the inputs to and outputs

9  from the 'Total Chrom Data Acquisition

10 System,' which is used to run your firm's

11 HPLC instruments during analysis of drug

12 products."

13    Q.    And as that is written by the

14 FDA in the warning letter, you would agree

15 that that's a violation of the cGMP?

16           MR. ANDERTON:  Objection.

17           You may answer.

18           THE WITNESS:  As that is written,

19 yes.

20 BY MR. MILLER:

21    Q.    And you would agree that that's

22 a quality-control side of the house and

23 not the manufacturing side of the house.

24           MR. ANDERTON:  Objection.

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

79

1                     You may answer.

2                     THE WITNESS:  Yes.

3     BY MR. MILLER:

4          Q.    Okay.  Let's take a look at

5     Number 4.  And this is same page, if you

6     would read, first sentence of Finding

7     Number 4, sir.

8          A.    "Our investigators observed

9     numerous instances where your firm's

10    quality control unit either ignored or

11    failed to recognize that some tablets did

12    not meet in-process specifications."

13         Q.    And you would agree with me

14    that that -- the way that's written,

15    that's a violation of the GMP.

16                    MR. ANDERTON:  Objection.

17                    You may answer.

18                    THE WITNESS:  As written, yes.

19    Again, I state that I do not know what the firm

20    answered back.

21    BY MR. MILLER:

22         Q.    And you would agree that there

23    -- this is not the manufacturing side of

24    the pharmaceutical industry, this is the

Paul Galea
Confidential – Subject to Further Confidentiality Review

80

1    quality-control side.

2        A.    That's exactly what is written.

3        Q.    Okay.  Thank you.

4              Let's take a look at Finding Number

5    5.  Would you read the first line of Finding

6    Number 5, Actavis 0028245, please, sir.

7        A.    5?

8        Q.    Yes.

9        A.    Okay.  "Your firm lacked

10   adequate procedures for conducting bulk

11   product holding time studies."

12       Q.    Okay.  Now, would you agree

13   with me this is a quality-control issue

14   and not a manufacturing aspect?

15             MR. ANDERTON:  Objection.

16   Objection.  Sorry, Pete.

17             You may answer.

18             THE WITNESS:  I believe that bulk

19   product holding time studies are more of a QA

20   than a QC issue.  QC is responsible for testing.

21   BY MR. MILLER:

22       Q.    Okay.  QC is involved with

23   testing.  And QA is involved with what?

24       A.    QA is more looking that GMPs

Paul Galea
Confidential – Subject to Further Confidentiality Review

81

1    are being followed.

2         Q.    Okay.  Don't GMPs need to be

3    followed in testing as well?

4         A.    Definitely.

5         Q.    Definitely.  Okay.

6              Well, then if we're doing -- GMPs

7    are applied in both QC and QA, how would you

8    distinguish QA from QC?

9         A.    I would distinguish because,

10   typically, it would be QA who would set up

11   a program for bulk holding time studies,

12   and QC would be performing tests --

13        Q.    Okay.

14        A.    -- on those materials that

15   resulted from the study.

16        Q.    But all involve the GMP.

17        A.    Definitely.

18        Q.    Okay.  So let's take a look at

19   Number 6, if you would be so kind.

20        A.    "Your firm failed to identify

21   and control rejected in-process materials

22   to prevent their use in manufacturing or

23   processing operations."

24        Q.    Now, I'm not 100 percent sure,

Paul Galea
Confidential – Subject to Further Confidentiality Review

82

1    but I think this goes to the manufacturing

2    side of the house.

3                MR. ANDERTON:   Objection.

4    BY MR. MILLER:

5        Q.    Do you agree?   Or is this a

6    QA/QC issue?

7                MR. ANDERTON:   Objection.

8                You may answer.

9                THE WITNESS:   I would say this is

10   strictly a QA --

11   BY MR. MILLER:

12       Q.    QA.   Okay.

13       A.    -- function.

14       Q.    And, again, follows the

15   guidelines of the GMP?

16       A.    Yes.

17       Q.    Okay.   Now, read Number 7,

18   please.

19       A.    "Your firm's cleaning

20   validation studies were found to be

21   inadequate and, as a result, there was no

22   assurance that equipment is adequately

23   cleaned between the manufacture of

24   different drug products [21 CFR 211.67],"

Paul Galea
Confidential – Subject to Further Confidentiality Review

83

1    and then there's an example.

2        Q.    Okay.  Now, is that a quality

3    control, quality assurance or

4    manufacturing issue?

5                MR. ANDERTON:  Objection.

6                You may answer.

7                THE WITNESS:  This to me would fall

8    under the umbrella of tech services and QA.

9    BY MR. MILLER:

10       Q.    Okay.  QA.

11               Let's take a look at the next page,

12   Actavis 0028246.  And, specifically, the next

13   finding, which would be Finding Number 8, if you

14   would read that first sentence.

15       A.    "Master and batch production

16   and control records were found to be

17   deficient in that they did not include

18   complete procedures for documenting the

19   collection of samples."

20       Q.    And, now, do you believe that

21   to be a QA, a QC or a manufacturing issue?

22               MR. ANDERTON:  Objection.

23               You may answer.

24               THE WITNESS:  QA.

Paul Galea
Confidential – Subject to Further Confidentiality Review

84

1    BY MR. MILLER:

2        Q.    QA.  Okay.

3              All right.  Only two to go, sir.

4              Let's take a look at the FDA's

5    Finding Number 9 in their warning letter of

6    February '07.

7              Would you read that first sentence,

8    please.

9        A.    "Equipment used in the

10   manufacture of," blanked out, "and other

11   drug products was not adequately

12   qualified."

13       Q.    Now, is qualification of

14   manufacturing equipment, is that a

15   manufacturing issue or is that a QA/QC

16   issue?

17             MR. ANDERTON:   Objection.

18             You may answer.

19             THE WITNESS:   It's a tech

20   services/QA issue.

21   BY MR. MILLER:

22       Q.    All right.  Let's take a look

23   at Number 10.  This is the tenth numbered

24   finding of the warning letter from the

Paul Galea
Confidential – Subject to Further Confidentiality Review

85

1      FDA.

2                   If you would take a look at that

3      and read the first sentence, sir.

4          A.    "There were failures to

5      establish and follow written procedures

6      for maintenance of manufacturing

7      equipment."

8          Q.    Okay.  Now, is this a

9      manufacturing issue specifically or is

10     this QA/QC?

11                   MR. ANDERTON:  Objection.

12                   You may answer.

13                   THE WITNESS:  As the phrase reads,

14     or the observation reads, it is a maintenance

15     issue, not following written procedures.

16     BY MR. MILLER:

17         Q.    Okay.  So that's on the

18     manufacturing side of the house.

19                   MR. ANDERTON:  Objection.

20                   You may answer.

21                   THE WITNESS:  Engineering worked

22     closely together with manufacturing, but they

23     are distinct groups, typically.

24     BY MR. MILLER:

Paul Galea
Confidential – Subject to Further Confidentiality Review

86

1        Q.     But it's not a GMP issue.

2                    MR. ANDERTON:  Objection.

3                    You may answer.

4                    THE WITNESS:  If by GMP you

5    understand quality group, the failure to follow

6    written procedures in this case did not stand

7    from the quality group, but from the maintenance

8    group.

9    BY MR. MILLER:

10       Q.    Okay.  But you did agree that

11   nine of the ten findings fell under the

12   quality group.

13                   MR. ANDERTON:  Objection;

14   mischaracterizes his testimony.

15                   You may answer.

16                   THE WITNESS:  I would say that it

17   was shared responsibility between the quality

18   group and to some extent other groups.

19   BY MR. MILLER:

20       Q.    Okay.  Would you agree that the

21   overall finding from the FDA, albeit you

22   didn't read this letter, but you had a

23   conversation regarding it, is the quality

24   group having issues with GMP?

Paul Galea
Confidential – Subject to Further Confidentiality Review

87

1              MR. ANDERTON:   Objection.

2       BY MR. MILLER:

3          Q.     It's okay to answer.

4              MR. ANDERTON:   You may answer.

5              THE WITNESS:   Yes.   From -- from

6       what this letter says and from the discussions I

7       had, it is clearly indicated that the quality

8       group was responsible for this.

9                  MR. MILLER:   I've been informed we

10      have a few minutes left.   We're going to take a

11      break.

12                  THE WITNESS:   Okay.

13                  VIDEO OPERATOR:   We are now going

14      off the record.

15                  This is the end of Videotape Number

16      1.

17                  The time is 11:10.

18                  (Recess, 11:10-11:30 a.m.)

19                  VIDEO OPERATOR:   We are now back on

20      the record.

21                  This is the beginning of Videotape

22      Number 2.

23                  The time is 11:30.

24                  MR. MILLER:   Before we get started,

Paul Galea
Confidential – Subject to Further Confidentiality Review

91

1              MR. ANDERTON:  Objection.

2                   You may answer.

3              THE WITNESS:  No.

4       BY MR. MILLER:

5          Q.    And, in fact, the GMP at

6       Actavis Totowa, the procedures of GMP as

7       used by the quality group pertained to all

8       drugs, all products that were

9       manufactured.

10             MR. ANDERTON:  Objection.

11                  You may answer.

12             THE WITNESS:  Procedures are not

13      product specific.  Procedures tell you how to

14      perform an operation.

15      BY MR. MILLER:

16         Q.    They're not product specific,

17      therefore, they apply to all products.

18         A.    Procedures do not necessarily

19      apply to a product.

20         Q.    Okay.  Well, my question is,

21      you agree that Actavis had issues with

22      their enforcement or use of GMP in the

23      quality group in 2007.

24             MR. ANDERTON:  Objection.

Paul Galea
Confidential – Subject to Further Confidentiality Review

92

1                    That's not your question and that

2    mischaracterizes his testimony.

3    BY MR. MILLER:

4         Q.      It's okay to answer.

5         A.      Can you rephrase that for me?

6         Q.      Certainly.

7                    There were issues in the quality

8    group of Actavis Totowa in 2007 regarding their

9    use of GMP.

10                   MR. ANDERTON:  Objection.

11   BY MR. MILLER:

12        Q.      It's okay to answer.

13                   MR. ANDERTON:  You may answer.

14                   THE WITNESS:  True.  But I'm going

15   to ask you, what do you mean by issues

16   specifically?

17   BY MR. MILLER:

18        Q.      Well, is -- are lab notebooks

19   that do not include all raw test data

20   generated during testing, something like

21   that, an issue?

22                   MR. ANDERTON:  Objection.

23                   You may answer.

24                   THE WITNESS:  Potentially, that may

Paul Galea
Confidential – Subject to Further Confidentiality Review

93

1    be an issue.  That is true.

2    BY MR. MILLER:

3        Q.    Potentially, and if the FDA had a

4    finding such as that and put it in a warning

5    letter, more likely than not, it's an issue.

6                MR. ANDERTON:  Objection.

7                You may answer.

8                THE WITNESS:  Not necessarily.

9    Depending on the company's response.

10   BY MR. MILLER:

11       Q.    Did GMP issues ultimately

12   result in the shutdown of production of

13   all products in August 2008 at Actavis

14   Totowa?

15               MR. ANDERTON:  Objection.

16               You may answer.

17               Actually, wait.  I instruct you to

18   answer only with respect to Digitek.

19               THE WITNESS:  With respect to

20   Digitek, yes.

21   BY MR. MILLER:

22       Q.    I'm going to hand you what I'm

23   going to mark as Exhibit 55.

24               MR. ANDERTON:  Thank you.

Paul Galea
Confidential – Subject to Further Confidentiality Review

109

1      Q.    For the recall.

2      A.    No.   In -- I would say, in

3   their normal -- they might have helped out

4   for the recall, but nothing beyond their

5   normal duties, because there was a recall

6   coordinator who was taking care of the

7   recall.

8      Q.    Who was the recall coordinator?

9      A.    Initially, I can remember that

10  Misbah Sherwani was preparing the recall

11  packages.

12      Q.    I'm sorry.   What was the name?

13      A.    Misbah Sherwani.

14           MR. ANDERTON:   I'm going to

15  instruct you to answer only with respect to

16  Digitek.

17           THE WITNESS:   With respect to

18  Digitek.

19           MR. ANDERTON:   Okay.

20  BY MR. MILLER:

21      Q.    And then when did the recall

22  coordinator change from Misbah to the next

23  person?

24      A.    I believe that Misbah Sherwani

Paul Galea
Confidential – Subject to Further Confidentiality Review

115

1    system in 2007 or did you have someone in

2    your staff or anyone go back and enter

3    data from previous years?

4         A.    I remember that I started the

5    spreadsheet in 2007.  I cannot confirm

6    today if they went back.

7              They might have, but I'm not 100

8    percent sure two years later if we did actually

9    go back and incorporate data from -- from

10   earlier years.

11        Q.    Does your Access software, the

12   screen, does it have a name, like enter

13   the "blank" system?

14        A.    I think it was called

15   complaints database.

16        Q.    Okay.  A good name.

17              Is that still what it's called

18   today?

19        A.    I do not know if that database

20   is still in use today.

21        Q.    Was it picked up and used by

22   other entities, besides Actavis Totowa?

23              As a part of your harmonization,

24   did you get other --

Paul Galea
Confidential – Subject to Further Confidentiality Review

116

1     A.    No.

2     Q.    -- plants to use it?

3     A.    No, it was not.

4     Q.    Last question on it:  As you

5  sit here today, you feel certain that you

6  could go back to it now and the data that

7  you entered would still be there today?

8          MR. ANDERTON:  Objection.

9          You may answer.

10        THE WITNESS:  The reason why we

11  kept physical logs is to avoid having to do what

12  you just said, because the physical log is -- is

13  not going to be obliterated in this case.

14         With Excel sheets, you need to

15  validate those appropriately, otherwise, they're

16  not FDA accepted.

17  BY MR. MILLER:

18     Q.    Okay.  My question is, you don't have

19  any reason to believe that the database and the

20  spreadsheets don't exist now.

21     A.    No.

22     Q.    Okay.

23     A.    But I do not know.  I do not

24  have a reason to, but I do not know.

Paul Galea
Confidential – Subject to Further Confidentiality Review

119

1     have been a way for me to know, okay, this

2     is the one that I want to send out with

3     this particular format, because the

4     document would evolve as you're preparing

5     it.

6         Q.    Okay.  And in May of 2007, this

7     is something that would have been part of

8     your visit prior to beginning employment

9     at Actavis Totowa.

10        A.    That is correct.

11        Q.    Okay.  And so, and this would

12    -- meeting, as you stated earlier, was

13    more of a harmonization aspect than an

14    assessment?

15              MR. ANDERTON:  Objection.

16              You may answer.

17              THE WITNESS:  True.

18    BY MR. MILLER:

19        Q.    Okay.  Do you recall

20    Mr. Talbot -- did Mr. Talbot request from

21    you that you put together an investigation

22    log or was an investigation log a typical

23    document that was produced in the ordinary

24    work that you were doing?

Paul Galea
Confidential – Subject to Further Confidentiality Review

120

1       A.      Okay.

2              MR. ANDERTON:   Objection.

3              You may answer.

4              THE WITNESS:   As previously

5   explained, most of the logs are kept manually.

6   Okay.  So it's a book and you have whether it's

7   a complaint, an investigation.   It is a manual

8   log.

9              In this case, again, the

10  spreadsheet was being prepared to make it easier

11  to look at data.

12  BY MR. MILLER:

13      Q.      Oh, okay.  Well, I think you just

14  clarified it for me.

15             I was going down the road that this

16  was an investigation of something going on in

17  the lab at Actavis.  Okay.  So this pertains not

18  to that.  It pertains to complaints from

19  customers.

20      A.      No.  This is an investigation

21  log.  It's not a complaint log.  But it's

22  a similar log to one you would create for

23  complaints.

24      Q.      So it is, then -- it's a QA, QC

Paul Galea
Confidential – Subject to Further Confidentiality Review

121

1    lab type investigation.  This is not a
2    customer complaint issue at all; correct?
3              MR. ANDERTON:  Objection.
4              You may answer.
5              THE WITNESS:  No.  This is not a
6    customer complaint.
7    BY MR. MILLER:
8         Q.    Right.
9         A.    This is a log containing all
10   the investigations that would be issued
11   internally to -- to check events that
12   might occur during the course of
13   manufacturing or testing or whatever.
14        Q.    Okay.  So, by way of example,
15   if you had an out-of-spec finding in the
16   lab, that would be an investigation?
17        A.    Not necessarily.  Investigation
18   -- out of specs are sometimes put in
19   separate logs, depending on which system
20   you use.  An out of -- an out of spec can
21   become at a later stage an investigation.
22              So from this title, I cannot tell
23   you that out of specs were in that particular
24   log.

Paul Galea
Confidential – Subject to Further Confidentiality Review

122

1      Q.     Was there any type of Access

2    database or any other system that was used

3    to track the -- which investigations were

4    open or closed?

5      A.     I think the -- the manual log

6    and potentially this Excel spreadsheet, if

7    I could exactly know what's in it, would

8    be the logs that would be used to track

9    open or closed.

10          But the official book would be the

11   manual logbook, at least at this stage.

12      Q.     And who maintains that manual

13   logbook?

14      A.     That manual logbook was

15   maintained by the QA director.

16      Q.     Okay.  So the entries into the

17   Excel spreadsheet would have been done in

18   a different department than yours and

19   you're just forwarding on a copy of an

20   Excel spreadsheet that you received from

21   the other department.

22      A.     My belief is that my -- that

23   here I was just creating a spreadsheet for

24   them to be able to populate with -- with

Paul Galea
Confidential – Subject to Further Confidentiality Review

139

1    you joined the company in October of 2007?

2         A.    No.  I do not believe it was

3    held similarly to -- to what is written

4    here.

5         Q.    Well, explain that.  Did they

6    have Quality Review Board meetings in

7    2008?

8         A.    Towards late 2008, I believe,

9    we started having Quality Review Boards.

10        Q.    What was the impetus?  What

11   started the Quality Review Board?

12        A.    Our --

13             MR. ANDERTON:  Objection.

14             You may answer.

15   BY MR. MILLER:

16        Q.    It's okay to answer if you

17   know.

18        A.    Part of the harmonization

19   project, as I was explaining before, was

20   to get all sites, you know, to operate in

21   the same way.

22             And one of the -- one of the

23   aspects of the corporate manual is having a

24   Quality Review Board in place, which is carried

Paul Galea
Confidential – Subject to Further Confidentiality Review

140

1    out once a month.

2         Q.    So, going back, dating back to

3    when you were looking at the company and

4    trying to make it function or harmonized

5    much like the other companies, or to get

6    everyone in the same step, I guess, was it

7    your -- was it your recommendation that a

8    QRB board meeting be held every month?

9         A.    I cannot recollect that was one

10   of my recommendations because they did

11   hold meetings, maybe under a different

12   format, but they held meetings.

13        Q.    So before it was titled the

14   Quality Review Board, there were, in fact,

15   some type of quality meeting going on

16   every month?

17        A.    Yes, they would have meetings.

18        Q.    And were there minutes to those

19   meetings?

20        A.    I cannot attest to that, if

21   they had minutes or not at that point in

22   time.

23        Q.    All right.  And then your

24   E-mail to Tony, you've attached the

Paul Galea
Confidential – Subject to Further Confidentiality Review

141

1    minutes from the particular meeting, the

2    one prior to February 2nd of 2009.

3                 Was it your job to keep the

4    minutes?

5        A.    Yes.

6        Q.    Okay.  And how did you do that?

7                 Did you take notes during the

8    meeting or did someone take notes for you?

9        A.    I would take notes during the

10   meeting.

11       Q.    What does CAPA stand for?

12       A.    CAPA is a term used in our

13   industry and it's called Corrective

14   Action/Preventative Action.

15       Q.    And was there a CAPA team?

16                 MR. ANDERTON:  Objection.

17                 You may answer.

18                 THE WITNESS:  At which point in

19   time?

20   BY MR. MILLER:

21       Q.    We'll start with October of

22   2007, when you arrived.

23       A.    Yes, there was a CAPA team.

24       Q.    And was that CAPA team a result

Paul Galea
Confidential – Subject to Further Confidentiality Review

142

1    of your assessment in 2007?

2                         MR. ANDERTON:  Objection.

3                         I instruct the witness not to

4    answer.

5    BY MR. MILLER:

6         Q.    Was the focus of the CAPA team

7    in 2007 to address GMP issues?

8         A.    In general, CAPA is always to

9    address GMP issues.

10        Q.    Okay.  Was the CAPA -- what was

11   the focus, then, of the CAPA team in

12   October of 2007?

13                        MR. ANDERTON:  Objection.

14                        You may answer.

15                        THE WITNESS:  CAPA is used to look

16   at areas which need a potential improvement or

17   as a result of -- of an internal investigation,

18   and the focus would be to make those

19   improvements.

20   BY MR. MILLER:

21        Q.    And when you were a member of

22   the CAPA team, back in 2007, did you have

23   any weekly or monthly meetings?

24                        MR. ANDERTON:  Objection.

Paul Galea
Confidential – Subject to Further Confidentiality Review

143

1                    You may answer.

2                    THE WITNESS:  I believe we had

3    meetings.  I cannot recall specifically if they

4    were weekly, fortnightly or monthly.

5    BY MR. MILLER:

6         Q.    I don't mean --

7         A.    I would -- I would say monthly

8    meetings would be typically what you would

9    have.

10        Q.    Were minutes kept at those?

11        A.    I cannot say that formal

12   minutes, like the ones you have here,

13   would be kept.

14        Q.    Did you maintain notes from

15   your CAPA meetings?

16        A.    I cannot say or I cannot

17   recollect whether it was me or one of my

18   team or --

19        Q.    Or someone --

20        A.    Or if it was done

21   alternatively.  Someone might have kept

22   points, but not specifically minutes like

23   you have here.

24        Q.    I'm going to hand you what's

Paul Galea
Confidential – Subject to Further Confidentiality Review

167

1    practices?

2                  MR. ANDERTON:  Objection.

3                  You may answer.

4                  THE WITNESS:  There's a long list.

5    BY MR. BLIZZARD:

6        Q.    Okay.  I'm not asking you to

7    list them.  I'm asking you to generally

8    describe so that the jury understands what

9    they are.  What are good manufacturing

10   practices?

11       A.    Okay.  They're a set of rules

12   and guidances which direct you in the

13   manufacturing and packaging and testing of

14   your product.

15       Q.    And what is the purpose of

16   these rules and guidances?

17                  MR. ANDERTON:  Objection; asked and

18   answered.

19                  You may answer.

20                  THE WITNESS:  The objective is to

21   manufacture a tablet which is good for human

22   use.

23   BY MR. BLIZZARD:

24       Q.    Okay.  So is it part of the

Paul Galea
Confidential – Subject to Further Confidentiality Review

168

1      good manufacturing practices to assure

2      safety?

3          A.    Yes.

4          Q.    Is it also part of good

5      manufacturing practices to assure that the

6      pills have the appropriate identity,

7      strength and quality and purity?

8                  MR. ANDERTON:  Objection.

9                  You may answer.

10                 THE WITNESS:  Yes.

11     BY MR. BLIZZARD:

12         Q.    Is it the standard of care

13     within the manufacturing of

14     pharmaceuticals industry to follow good

15     manufacturing practices?

16                 MR. ANDERTON:  Objection.

17                 You may answer.

18                 THE WITNESS:  Yes.

19     BY MR. BLIZZARD:

20         Q.    And if a company fails to

21     follow good manufacturing practices, is it

22     in violation of the standard of care?

23                 MR. ANDERTON:  Objection.

24                 You may answer.

Paul Galea
Confidential – Subject to Further Confidentiality Review

169

1          THE WITNESS:   Yes.

2     BY MR. BLIZZARD:

3          Q.    Now, you've also mentioned

4     another term earlier today called SOPs,

5     and we use that a lot as shorthand, and I

6     want to make sure the jury understands

7     what an SOP is.

8                So could you explain what an SOP

9     is?

10         A.    It's a standard operating

11    procedure.

12         Q.    And what are standard operating

13    procedures?

14         A.    They are documents which

15    describe how you do something --

16         Q.    Okay.

17         A.    -- in a step-by-step way.

18         Q.    And are standard operating

19    procedures the company's own rules about

20    how the work should be done?

21         A.    Can you repeat the question?

22         Q.    Yes.

23                Are standard operating procedures

24    the company's own internal rules about how

Paul Galea
Confidential – Subject to Further Confidentiality Review

170

1    manufacturing, quality control and quality-

2    assurance work should be done?

3                    MR. ANDERTON:  Objection.

4                    You may answer.

5                    THE WITNESS:  They are not the

6    company's own rules.  They are based on GMPs.

7    BY MR. BLIZZARD:

8        Q.    Okay.  So there are GMPs which

9    are external rules of the FDA; correct?

10       A.    Yes.

11       Q.    And those sort of set the

12   standards for how pharmaceutical companies

13   should operate; correct?

14       A.    Yes.

15       Q.    And then the company adopts

16   standard operating procedures that are

17   consistent with the good manufacturing

18   practices that are those FDA rules;

19   correct?

20       A.    Yes.

21       Q.    Okay.  And should the company

22   violate either their own standard

23   operating procedures or good manufacturing

24   practices?

Paul Galea
Confidential – Subject to Further Confidentiality Review

171

1              MR. ANDERTON:  Objection.

2              You may answer.

3              THE WITNESS:  What is -- that is

4    not a question.

5    BY MR. BLIZZARD:

6        Q.    Yeah.  I said, the question is, should

7    a company violate good manufacturing practices

8    or its own SOPs?

9              MR. ANDERTON:  Objection.

10             You may answer.

11             THE WITNESS:  No.

12   BY MR. BLIZZARD:

13       Q.    Okay.  Is it unreasonable or

14   imprudent for a pharmaceutical company to

15   violate their own standard operating

16   procedures and their -- and the good

17   manufacturing practices?

18             MR. ANDERTON:  Objection.

19             You may answer.

20             THE WITNESS:  Yes.

21   BY MR. BLIZZARD:

22       Q.    Are there potential health

23   risks that can be created if a

24   pharmaceutical company does not follow

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

172

1    good manufacturing practices?

2                      MR. ANDERTON:  Objection.

3                      You may answer.

4                      THE WITNESS:  It depends.

5    BY MR. BLIZZARD:

6         Q.    Okay.  What does it depend on?

7         A.    It depends on where they do not

8    follow good manufacturing practices.

9         Q.    Okay.  If a product is out of

10   spec, can that create a health risk?

11                     MR. ANDERTON:  Objection.

12                     You may answer.

13                     THE WITNESS:  It depends what --

14   what the out of spec is for.

15   BY MR. BLIZZARD:

16        Q.    Okay.  How about if it's for a

17   pharmaceutical product that has a narrow

18   toxicity window?

19                     MR. ANDERTON:  Objection.

20                     You may answer.

21                     THE WITNESS:  Again, it depends

22   what the particular OS is for.

23   BY MR. BLIZZARD:

24        Q.    Okay.  Do you know what Digitek

Paul Galea
Confidential – Subject to Further Confidentiality Review

178

1           Q.    I'm going to show you what I'm
2      going to mark as the next exhibit, if I
3      can find the exhibit stickers.
4                   Before I do that, do you know what
5      the QSIP is?
6           A.    Yes.
7           Q.    And is -- were you involved in
8      the QSIP for Actavis Totowa?
9           A.    At what time?
10          Q.    At any time.
11          A.    Right now, yes, I am.
12          Q.    Okay.  And does QSIP stand for
13     Quality System Improvement Plan?
14          A.    Yes.
15          Q.    And was the Quality System
16     Improvement Plan initiated as a result of
17     an inspection by the FDA in 2006?
18                   MR. ANDERTON:  Objection.
19                   You may answer.
20                   THE WITNESS:  I do not know that.
21     BY MR. BLIZZARD:
22          Q.    Do you know whether the Actavis
23     Totowa committed in 2006 to the FDA,
24     following an inspection of the plant, that

Paul Galea
Confidential – Subject to Further Confidentiality Review

180

1    full-time employee of Actavis Totowa in

2    October of 2007; correct?

3        A.    Yes.

4        Q.    Before that you were employed

5    by a separate corporation called Actavis,

6    Limited; correct?

7        A.    Yes.

8        Q.    And it was only after October

9    of 2007 that you came indirectly involved

10   with the Quality Systems Improvement Plan;

11   correct?

12       A.    Yes.

13       Q.    And what was your indirect

14   involvement?

15       A.    The Quality Systems Improvement

16   Plan as it stands is to create actions for

17   improvement or -- or tasks.  So I was

18   given tasks on occasion which my

19   department had to fulfill.

20       Q.    Have you ever heard of the

21   phrase "if it ain't broke, don't fix it"?

22       A.    In America, I've heard that.

23       Q.    Okay.  So was there -- was the

24   quality system broken before this Quality

Paul Galea
Confidential – Subject to Further Confidentiality Review

181

1    System Improvement Plan was instituted?

2              MR. ANDERTON:  Objection.

3              You may answer.

4              THE WITNESS:  I cannot say that.

5    BY MR. BLIZZARD:

6        Q.    Let me hand you what I'm going

7    to mark as Exhibit 67 to your deposition.

8              MR. BLIZZARD:  I'm sorry.  I did

9    mark it as 67, but I'm going to re-mark it.

10             MR. ANDERTON:  Exhibit 64.  Is

11   there an exhibit goblin here today?

12             MR. BLIZZARD:  There's always an

13   exhibit goblin when I'm involved.

14             (Exhibit 64 was marked for

15   identification.)

16   BY MR. BLIZZARD:

17       Q.    Okay.  This exhibit as goblined

18   has got real tiny print.

19       A.    Uh-huh.

20       Q.    So I'm going to see if I can

21   enlarge it.

22             Okay.  Do you see -- do you know

23   what this document is?

24       A.    It looks like an extract from

Paul Galea
Confidential – Subject to Further Confidentiality Review

182

1      another document.

2          Q.    Okay.  Do you see, at the top,

3      it says, "Actavis, status of QSIP

4      deliverables"?

5          A.    Yes.

6          Q.    And is QSI deliverable, does

7      that stand for the Quality System

8      Improvement Plan?

9          A.    Yes.

10          Q.    Now, you said you think this is

11      an excerpt from another document?  Or what

12      did you say about it?

13          A.    At the bottom I see Page 31 of

14      74.

15          Q.    Okay.

16          A.    That's why I say that.

17          Q.    Yeah.  We picked out the pages

18      that had your name on it so --

19          A.    Okay.

20          Q.    -- that's what I'm going to

21      show you.

22                  Does it show that you've been

23      assigned some deliverables here for the QSIP?

24          A.    Yes.

Paul Galea
Confidential – Subject to Further Confidentiality Review

183

1      Q.    Okay.  And is there a date out

2    to the margin, date open?

3      A.    Yes.

4      Q.    Do you see the date open was

5    11/6/06?

6      A.    Yes.

7      Q.    Do you see that the task is,

8    "Evaluate effectiveness and efficiency of

9    changes"?

10           Do you see that?

11     A.    Yes.

12     Q.    Do you see that you're listed

13   as the responsible party for that?

14     A.    Yes.

15     Q.    Are you the responsible party

16   for that?

17     A.    Yes.

18     Q.    What have you done to evaluate

19   the effectiveness and efficiency of

20   changes?

21     A.    I looked at the procedures that

22   they had in place.

23     Q.    Okay.  When did you do that?

24     A.    I did that around about

Paul Galea
Confidential – Subject to Further Confidentiality Review

184

1    initially when I started.  That was one of

2    the first things I was looking at.

3           Q.    Would that have been October of

4    2007?

5           A.    Around about.

6           Q.    Okay.  Well, it says this was

7    opened in November of '06, doesn't it?

8           A.    That's correct.

9           Q.    Do you know if anybody was

10   assigned this task before you?

11          A.    No.

12          Q.    Okay.  So the task was opened

13   in November of '06, but you didn't start

14   working on that until October of '07?

15          A.    That is correct.

16          Q.    Was there nobody else in the

17   company that could have done this?

18                 MR. ANDERTON:  Objection.

19                 THE WITNESS:  I cannot answer to

20   that.

21   BY MR. BLIZZARD:

22          Q.    Well, you think a year's delay

23   in doing this kind of work is appropriate?

24                 MR. ANDERTON:  Objection.

Paul Galea
Confidential – Subject to Further Confidentiality Review

185

1          You may answer.

2          THE WITNESS:  No.  Because this is

3    an evaluation of the effectiveness of the

4    current system.

5    BY MR. BLIZZARD:

6       Q.    Right.

7          And, actually, this plan, the

8    Quality System Improvement Plan, assuming it was

9    a commitment to the FDA in 2006, it should be

10   attacked pretty quickly, shouldn't it?

11          MR. ANDERTON:  Objection.

12          THE WITNESS:  I cannot reply to

13   that because I wasn't there at that time.

14   BY MR. BLIZZARD:

15      Q.    Okay.  Did anybody tell you

16   that this QSIP, which you were given some

17   assignments from, was something that was

18   part of a commitment to the Food and Drug

19   Administration here in the United States?

20      A.    Yes.

21      Q.    Who told you that?

22      A.    Scott Talbot.

23      Q.    Okay.  When did he tell you

24   that?

Paul Galea
Confidential – Subject to Further Confidentiality Review

186

1        A.     I do not remember the exact
2     date.
3        Q.     Okay.  Did you do any of this
4     work during your prior visits to the
5     United States?
6        A.     My prior visits, as was
7     initially said, was to assess and down the
8     line to harmonize.  So some of this work
9     might have actually been done prior to
10    this date, but not under this umbrella.
11       Q.     Okay.  So it was work that you
12    would have done under the umbrella of
13    Actavis, Limited; correct?
14       A.     No, that is not correct.
15       Q.     Okay.  So you're saying you
16    didn't do any work on the QSIP or any of
17    these deliverables for the QSIP until you
18    actually went to work for Actavis Totowa;
19    is that correct?
20       A.     Yes.  Because I was not a
21    direct employee at the time.
22       Q.     Okay.  So the first work you
23    could have ever done on any of these
24    assignments under the QSIP would have been

Paul Galea
Confidential – Subject to Further Confidentiality Review

190

1          Q.     Right.

2                 But it means the same thing as a

3     corrective action plan; correct?

4          A.     Yes.

5          Q.     And both a corrective action

6     plan and a quality -- Quality Systems

7     Improvement Plan, both are intended to

8     address deficiencies in the quality

9     department, are they not?

10         A.     No, that is not correct.

11         Q.     Okay.  They're both intended to

12    address deficiencies in the company;

13    correct?

14                MR. ANDERTON:  Objection.

15                THE WITNESS:  That is not correct.

16    BY MR. BLIZZARD:

17         Q.     Okay.  So are corrective action

18    plans part of the routine business of the

19    company?

20         A.     Yes.

21         Q.     And is it also a routine part

22    of the company business to do assessments

23    of the company's compliance with GMPs?

24         A.     Yes.

Paul Galea
Confidential – Subject to Further Confidentiality Review

191

1      Q.     And when you do an assessment
2   of the company's compliance with GMPs,
3   you're not necessarily being critical of
4   every aspect of the company's operations,
5   are you?
6                 MR. ANDERTON:  Objection.
7                 You may answer.
8                 THE WITNESS:  That is correct.
9   BY MR. BLIZZARD:
10      Q.     So the assessment is just
11  objectively going in and trying to
12  document whether or not there's compliance
13  or not compliance; correct?
14                MR. ANDERTON:  Objection.
15                You may answer.
16                THE WITNESS:  Depends on the type
17  of assessment you're making.
18  BY MR. BLIZZARD:
19      Q.     Okay.  The kind of assessments
20  you were making, was that a fact-based
21  assessment?
22                MR. ANDERTON:  Objection.
23                You may answer.
24                THE WITNESS:  What do you mean by a

Paul Galea
Confidential – Subject to Further Confidentiality Review

202

1    single S, I'm not sure, O-N.

2         Q.    Okay.  You're on to the next

3    round of the spelling bee.

4              So this report that you sent to the

5    QSD department, the quality systems department,

6    was it the assessment that is referenced here on

7    this document?

8         A.    In respect to 13.1?

9         Q.    Yes.  Was that part of the

10   assessment?

11        A.    Part of it would have been

12   there.

13        Q.    Yes.

14             And if you look a couple spaces

15   down, is there another listing of an assessment

16   and mod complaint system?

17             Do you see that?

18        A.    One second.  Yes.

19        Q.    Was that part of the report

20   that you sent to the QSD?

21             MR. ANDERTON:  Objection.

22             I'm going to instruct the witness

23   not to answer.

24             MR. BLIZZARD:  Okay.

Paul Galea
Confidential – Subject to Further Confidentiality Review

208

1    to work as an employee of Actavis Totowa?

2        A.    Afterwards.

3        Q.    Okay.  Did anybody do this work

4    before you became a full-time employee of

5    Actavis Totowa, as far as you know?

6        A.    I do not know that.

7        Q.    Okay.  So is this another

8    example of the task being opened in

9    November of '06 and work not being done on

10   it until about a year later?

11               MR. ANDERTON:  Objection.

12               THE WITNESS:  I --

13               MR. ANDERTON:  Mischaracterizes his

14   testimony.

15               You may answer.

16               THE WITNESS:  I cannot say that.  I

17   can say that I started to work at a later date

18   when I was coming over.

19   BY MR. BLIZZARD:

20       Q.    Okay.  Well, what I understood

21   you to say is, you didn't start on it

22   until October of '07; correct?

23       A.    Under the QSIP umbrella, that

24   is correct.

Paul Galea
Confidential – Subject to Further Confidentiality Review

209

1          Q.    And as far as you know, nobody

2     else started working on it before that

3     date; correct?

4                    MR. ANDERTON:  Objection.

5                    That is not what he said.

6     Mischaracterizes his testimony.

7     BY MR. BLIZZARD:

8          Q.    Do you know of anybody who did

9     this work before you?

10         A.    There was a person in charge of

11    compliance, and that person was Leroy

12    Lundner, but I do not know the specifics

13    of his job.

14         Q.    Okay.  Well, this item says,

15    review compliance status of existing

16    vendors.  Do you know whether Mr. --

17         A.    Excuse me.

18         Q.    I'm sorry.

19                    Do you know whether Mr. Lundner did

20    that before you started working, reviewed the

21    compliance status of existing vendors?

22         A.    I do not know that.

23         Q.    Okay.  And then the next item

24    assigned to you on this page, does it say,

Paul Galea
Confidential – Subject to Further Confidentiality Review

210

1    "Develop change control metrics"?

2        A.    Yes.

3        Q.    And that item was actually

4    opened on December 13 of '06; correct?

5        A.    Yes.

6        Q.    Did you -- were you assigned

7    that task at that time?

8        A.    No.

9        Q.    When were you assigned the

10   task?

11       A.    After I started in October '07.

12       Q.    All right.  Do you know of

13   anybody else who did that work before you

14   started in October of '07?

15       A.    I cannot answer that question

16   because I do not know.

17       Q.    Now I'm going to mark Exhibit

18   67 to your deposition.

19             (Exhibit 67 was marked for

20   identification.)

21             MR. ANDERTON:  Thank you.

22   BY MR. BLIZZARD:

23       Q.    Is this another page similar to

24   the ones that we've seen before?

Paul Galea
Confidential – Subject to Further Confidentiality Review

213

1    know what this task -- are you familiar

2    with the task?

3         A.    No.

4         Q.    Doesn't ring any bells with

5    you?

6         A.    No.

7         Q.    Do you know what an open

8    critical CAPA communication is?

9         A.    Yes.

10        Q.    What is it?

11        A.    It is communicating any CAPAs

12   that are critical which have not been

13   completed.

14        Q.    Okay.   So this assignment, as

15   described, would have you distribute

16   critical CAPAs that hadn't already been

17   distributed; correct?

18             MR. ANDERTON:   Objection.

19             You may answer.

20             THE WITNESS:   Incorrect.

21   BY MR. BLIZZARD:

22        Q.    Okay.

23        A.    Completed.

24        Q.    Okay.   Distribute those that

Paul Galea
Confidential – Subject to Further Confidentiality Review

231

1    observation?

2        A.    Yes.

3        Q.    Would that reflect a violation

4    of GMPs?

5                MR. ANDERTON:  Objection.

6                You may answer.

7                THE WITNESS:  As written by the

8    inspector, potentially, it could.  Again, I do

9    not see the response from the company, so I do

10   not know if this is actually true.

11   BY MR. BLIZZARD:

12       Q.    Okay.  Look at Observation

13   Number 3 on the second page.

14                Do you see where it says, "The

15   responsibilities and procedures applicable to

16   the quality control unit are not fully

17   followed"?

18                Do you see that?

19       A.    Yes.

20       Q.    Would that be a violation of

21   good manufacturing practices?

22                MR. ANDERTON:  Objection.

23                You may answer.

24                THE WITNESS:  As written,

Paul Galea
Confidential – Subject to Further Confidentiality Review

232

1    potentially, it could.  I do not see the -- the

2    response from the company, so I cannot say that

3    this statement is true or not.

4    BY MR. BLIZZARD:

5        Q.    Okay.  Let's look at the

6    Observation Number 4.

7            Do you see where it says, "Written

8    records are not always made of investigations

9    into the failure of a batch or any of its

10   components to meet specifications"?

11           Do you see that?

12       A.    Yes.

13       Q.    Would that be a violation of

14   GMPs?

15               MR. ANDERTON:  Objection.

16               You may answer.

17               THE WITNESS:  As written by an

18   inspector, potentially, yes.  But, again, I do

19   not have the response from the company, so I

20   cannot make any comments to that.

21   BY MR. BLIZZARD:

22       Q.    Okay.  And would the same hold

23   true for the remaining observations here

24   in this document?

Paul Galea
Confidential – Subject to Further Confidentiality Review

233

1              MR. ANDERTON:  Objection.

2     BY MR. BLIZZARD:

3         Q.    That is, you would give the

4     same answer that these are violations of

5     GMPs subject to what the company says

6     about it.

7              MR. ANDERTON:  Objection.

8              I'm not going to allow him to

9     testify about stuff that's not in the record.

10              MR. BLIZZARD:  Okay.

11     BY MR. BLIZZARD:

12         Q.    Let's go to Observation Number

13     5 then.  It says, "Input to and output

14     from the computer are not checked for

15     accuracy."

16              Would that be a violation of GMPs?

17              MR. ANDERTON:  Objection.

18              You may answer.

19              THE WITNESS:  As written,

20     potentially, yes.  I do not have a response, so

21     I cannot make any comments.

22     BY MR. BLIZZARD:

23         Q.    Okay.  If you look at

24     Observation Number 6, do you see where it

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377

Paul Galea
Confidential – Subject to Further Confidentiality Review

234

1     says, "The suitability of all testing

2     methods is not verified under actual

3     conditions of use"?

4                    Would that be a violation of GMPs?

5                    MR. ANDERTON:  Objection.

6                    You may answer.

7                    THE WITNESS:  Potentially, yes, as

8     written.  I do not have a response from the

9     company, so I cannot make any comments to that.

10    BY MR. BLIZZARD:

11       Q.    Look at Observation Number 7.

12                    Do you see where it says, "The

13    written stability testing program is not

14    followed"?

15                    Would that be a violation of GMPs?

16       A.    Potentially, yes, as written.

17    However, again, there's no response which

18    I can look at, so I cannot make any

19    comments.

20       Q.    As written, this reflects

21    pretty shoddy work by the company, doesn't

22    it?

23                    MR. ANDERTON:  Objection.

24                    If you understand whether there's a

Paul Galea
Confidential – Subject to Further Confidentiality Review

235

1     question there, you may answer.

2              THE WITNESS:   What is the exact

3     question?

4     BY MR. BLIZZARD:

5          Q.    Do you know what the word "shoddy"

6     means?

7          A.    Yeah.

8          Q.    So somebody who's worked in

9     quality for years, would you say that the

10    descriptions here of the company's

11    behavior reflects shoddy work?

12              MR. ANDERTON:   Objection.

13              You may answer.

14              THE WITNESS:   The inspector, as he

15    has written these observations, is looking at

16    potential issues.   However, these are not

17    substantiated by a response from the company, so

18    I cannot say if it's shoddy work or not.

19              (Exhibit 69 was marked for

20    identification.)

21    BY MR. BLIZZARD:

22         Q.    Let me show you what I'm going

23    to mark as Exhibit Number 69 to your

24    deposition.

Paul Galea
Confidential – Subject to Further Confidentiality Review

246

1    FDA documents that relates to a product other

2    than Digitek, just so that it's in the record.

3                    MR. BLIZZARD:  Okay.

4                    THE WITNESS:  Okay.

5    BY MR. BLIZZARD:

6         Q.    Would this observation be a

7    violation of good manufacturing practices?

8         A.    As written, potentially, yes.

9    Without seeing the response to see if this

10   is completely true or correct, I cannot

11   make any assumptions.

12        Q.    Okay.  Well, were you ever told

13   what the company's response was to this?

14        A.    Yes.  But I do not remember the

15   content of the response.

16        Q.    Do you know whether the company

17   disagreed with the finding?

18        A.    As I said, I do not remember

19   the content of that response.

20        Q.    How about Observation Number 2

21   where it says, "drug products failing to

22   meet established specifications and

23   quality control criteria are not

24   rejected"; would that be a violation of

Paul Galea
Confidential – Subject to Further Confidentiality Review

247

1      GMPs?

2                      MR. ANDERTON:  Objection.

3                      You may answer.

4                      THE WITNESS:  As written, yes,

5      potentially.  But, again, I need the response to

6      see what exactly is the truth in the statement.

7      BY MR. BLIZZARD:

8          Q.    What happened -- what did the

9      company do after this FDA inspection?

10                     MR. ANDERTON:  Objection.

11                     You may answer.

12                     THE WITNESS:  The company did a

13     voluntary recall of all its products.

14     BY MR. BLIZZARD:

15         Q.    Okay.  Well, would that

16     indicate to you that the company was in

17     agreement with the observations made by

18     FDA?

19                     MR. ANDERTON:  Objection.

20                     THE WITNESS:  I cannot answer for

21     the company or for who took that decision.

22     BY MR. BLIZZARD:

23         Q.    Okay.  Well, I mean, the FDA

24     made these findings, and following that,

Paul Galea
Confidential – Subject to Further Confidentiality Review

248

1    the company voluntarily recalled all of

2    its products; correct?

3        A.    That is correct.

4        Q.    Would you agree with me that

5    that signals, at least somewhat, that the

6    company agreed with the FDA's assessment?

7              MR. ANDERTON:  Objection; asked and

8    answered.

9              You may answer.

10             THE WITNESS:  To me, it would

11   appear that the company is being responsible in

12   ensuring that its products are not on the market

13   in view of this response.

14             I cannot say that -- I do not know

15   why they took that decision because I wasn't

16   part of that decision.

17   BY MR. BLIZZARD:

18       Q.    Were you ever at a meeting

19   where there was a presentation about these

20   very issues?

21       A.    I do not remember.

22             MR. BLIZZARD:  Is the next Exhibit

23   Number 70, I believe?

24             (Exhibit 70 was marked for

Paul Galea
Confidential – Subject to Further Confidentiality Review

255

1        A.    Out of specification.

2        Q.    Okay.   So this commitment to

3    recall multiple batches of 18 product

4    codes occurred before the recall of

5    Digitek; correct?

6                  MR. ANDERTON:   Objection.

7                  You may answer, if you know.

8                  THE WITNESS:   I cannot -- I cannot

9    answer that.

10   BY MR. BLIZZARD:

11       Q.    Okay.   Look over to the next

12   page.   Do you see that there's a date of

13   April 23rd, 2008, there?

14       A.    Yes.

15       Q.    Do you see the third bullet

16   point says, "Decision was made to suspend

17   the manufacturing & distribution of all

18   products manufactured at Actavis Totowa"?

19   Correct?

20       A.    That's what's written.

21       Q.    Okay.   Then also there's a --

22   looks like a name is blacked out.   I think

23   that name is PAREXEL "was retained by

24   counsel to perform assessments of each

Paul Galea
Confidential – Subject to Further Confidentiality Review

256

1      product as a precondition to the

2      resumption of manufacturing and

3      distributing it."

4                  Do you know whether PAREXEL has

5      done any such work on Digitek?

6                  MR. ANDERTON:  Objection.

7                  You may answer.

8                  THE WITNESS:  I do not know.

9      BY MR. BLIZZARD:

10        Q.    Do you see where it says, "On

11     April 24, 2008, at the direction of

12     Counsel," blacked out, "started product

13     and system assessments"?

14                 Do you know whether any third

15     party, such as PAREXEL, did any product and

16     system assessments on Digitek?

17        A.    I do not know.

18        Q.    So this has a date -- this page

19     has a date of April 23, 2008; correct?

20        A.    Yes.

21        Q.    And, according to this page, a

22     decision was made on that date to suspend

23     the manufacture of all products; correct?

24                 MR. ANDERTON:  Objection;

Paul Galea
Confidential – Subject to Further Confidentiality Review

257

1    mischaracterizes the document.

2                    You may answer.

3    BY MR. BLIZZARD:

4        Q.    Isn't that what it says?

5              It says, "Decision was made to

6    suspend the manufacture & distribution of all

7    products manufactured at Actavis Totowa";

8    correct?

9              MR. ANDERTON:  Objection.  Doesn't

10   indicate -- well, mischaracterizes the document.

11             You may answer.

12             THE WITNESS:  I'm not seeing a

13   date.

14   BY MR. BLIZZARD:

15       Q.    Okay.  It's the fourth bullet.

16   Do you see where it says --

17       A.    Yes.

18       Q.    Up at the top there's a date of

19   April 23rd, 2008, isn't there?

20       A.    At the top of the --

21       Q.    Yes.

22       A.    -- page, yes.

23       Q.    Okay.  And does it say, under

24   that fourth bullet, "decision was made to

Paul Galea
Confidential – Subject to Further Confidentiality Review

258

1    suspend the manufacture & distribution of

2    all products manufactured at Actavis

3    Totowa"?

4                    MR. ANDERTON:  Objection.

5                    You may answer.

6                    THE WITNESS:  Yes.  Without

7    specifying a date.

8                    (Exhibit 71 was marked for

9    identification.)

10   BY MR. BLIZZARD:

11        Q.    Take a look at Exhibit 71.

12   Does this appear to be another time line

13   of Actavis Totowa?

14                  Is that what this appears to be, a

15   time line relating to the issues we've just been

16   discussing?

17        A.    Yes.

18        Q.    Okay.  Do you see this date

19   here, April 23rd?

20                  Do you see that?

21        A.    The one on top, yeah.

22        Q.    Yes.

23                  The start date is March 18th, start

24   of FDA inspection of Riverview.

Paul Galea
Confidential – Subject to Further Confidentiality Review

260

1    to recall all lots of Digoxin."

2              Do you see that?

3      A.    Yes.

4      Q.    "Suspended production at Little

5    Falls."

6              Do you see that?

7      A.    Yes.

8      Q.    Were you involved in any of

9    these meetings?

10     A.    No.

11     Q.    Were you involved in any of

12   these decisions?

13     A.    No.

14     Q.    Has anybody to this day

15   communicated anything about these

16   decisions to you?

17     A.    Specifically?  Can you rephrase

18   the question?

19     Q.    Yeah.  Okay.

20              Has anybody communicated to you

21   about why they shut down the plant and recalled

22   all the products made at the plant?

23              MR. ANDERTON:  Objection.

24              I'm going to instruct the witness

Paul Galea
Confidential – Subject to Further Confidentiality Review

261

1    to answer only with respect to Digitek.

2              THE WITNESS:   With respect to

3    Digitek, it was in view of the findings that the

4    FDA found.

5    BY MR. BLIZZARD:

6         Q.     Well, they suspended operations at the

7    entire plant, didn't they?

8         A.     Yes.

9         Q.     Do you know why?

10              MR. ANDERTON:   Objection.

11              THE WITNESS:   I believe they wanted

12   to ensure that they could address the findings

13   from the FDA before resuming any manufacturing.

14   BY MR. BLIZZARD:

15        Q.     Of any drug; correct?

16        A.     If that was with respect to any

17   drug, I cannot say that that decision was

18   made because I wasn't there.

19        Q.     Okay.

20        A.     The outcome is pretty clear.

21        Q.     Okay.  Because of the findings

22   of the FDA, and the involvement in -- of

23   senior management in the discussion with

24   FDA, was it uncertain whether the drugs

Paul Galea
Confidential – Subject to Further Confidentiality Review

262

1    being produced by the plant, any of them,

2    were in compliance with GMPs?

3                MR. ANDERTON:  Objection.

4                I instruct the witness to answer

5    only with respect to Digitek.

6                THE WITNESS:  I do not know if --

7    if there was a -- if they were uncertain or

8    not.  I did not make that decision.

9    BY MR. BLIZZARD:

10         Q.    Okay.  Do you know whether

11   Digitek was produced in accordance with

12   GMPs?

13                MR. ANDERTON:  Objection.

14                You may answer.

15                THE WITNESS:  I was not directly

16   involved in the manufacture or release of

17   Digitek.

18   BY MR. BLIZZARD:

19         Q.    Okay.  Well, from the work that

20   you did, as your job in quality, and the

21   from the assessments you did back in 2007,

22   can you testify under oath that the

23   Digitek that was sold in 2007 and 2008 was

24   in compliance with good manufacturing

Paul Galea
Confidential – Subject to Further Confidentiality Review

263

1    practices?

2              MR. ANDERTON:  Objection.

3              He's just testified he didn't have

4    anything to do with it.

5              THE WITNESS:  I neither --

6              MR. BLIZZARD:  That's not a legal

7    objection.  Please don't make speeches.

8              THE WITNESS:  I neither

9    manufactured nor released those products and my

10   function was strictly documentation, change

11   control and complaints.

12   BY MR. BLIZZARD:

13       Q.   Okay.  Well, you were making

14   just overall assessments, then, of whether

15   the company was in compliance with GMPs;

16   correct?

17       A.   I was sent there to make an

18   assessment.

19       Q.   Okay.  And from the assessment

20   you made overall, could you testify under

21   oath that any drug for sure went out of

22   that plant having been manufactured

23   according to GMP?

24              MR. ANDERTON:  Objection.

Paul Galea
Confidential – Subject to Further Confidentiality Review

264

1              I instruct the witness to answer

2      only with respect to Digitek.

3              THE WITNESS:   Again, being the

4      person who is not really -- who does not release

5      the product, I do not see those documents and,

6      hence, I cannot say that they were or were not

7      in accordance to GMP.

8      BY MR. BLIZZARD:

9          Q.    Okay.  Who were the -- who is

10      the person I should ask that question to?

11          A.    Okay.  The person who releases

12      the product at that point in time was Dan

13      Bitler.

14          Q.    Okay.  So Mr. Bitler is the

15      person who we should ask the question, was

16      Digitek made in accordance with GMPs;

17      correct?

18          A.    I -- I cannot answer that

19      question.  That's not up to me to state

20      who you question or -- or what.

21          Q.    Is he, as far as you know, the

22      person with most knowledge of that

23      subject?

24              MR. ANDERTON:  Objection.

Paul Galea
Confidential – Subject to Further Confidentiality Review

271

1    minute.  You know it's time to end.  So -- or

2    maybe we should say, in a second we'll

3    substitute the minutes.

4                    But, in any event, this refers to a

5    Quality Review Board being formed.  This

6    document here that's dated or has this May 21,

7    2008, date at the top; correct?

8         A.    Yes.

9         Q.    Are you a member of the Quality

10   Review Board?

11        A.    Yes.

12        Q.    And what does the Quality

13   Review Board do?

14        A.    The Quality Review Board is a

15   group of people from different disciplines

16   or different departments and the objective

17   of the Quality Review Board is to look at

18   the various metrics that the company

19   produces.

20        Q.    You said metrics?

21        A.    Yes.

22        Q.    Meaning what?

23        A.    Numbers in general, you look at

24   change control, investigation, batches

Paul Galea
Confidential – Subject to Further Confidentiality Review

272

1    produced, batches released, new filed

2    products, complaints, annual product

3    reviews.

4            Q.      Okay.

5            A.      It's a number of --

6            Q.      So is this looking at actual

7    data from the organization -- quality part

8    of the organization to determine the

9    relative health of that organization?

10                   MR. ANDERTON:   Objection.

11                   You may answer.

12                   THE WITNESS:   You're not looking at

13   actual data.   You're looking at numbers

14   extracted from actual data.

15   BY MR. BLIZZARD:

16           Q.      Okay.

17           A.      To show graphs or whatever.

18           Q.      Right.

19                   So you might show a graph of how

20   many investigations have been closed over

21   certain periods of time, et cetera; correct?

22           A.      Yes, that is correct.

23           Q.      Now, how often does the Quality

24   Review Board meet?

Paul Galea
Confidential – Subject to Further Confidentiality Review

273

1       A.      Once a month.

2       Q.      And who else is on it?

3       A.      We have quality, manufacturing,

4    packaging, regulatory affairs, compliance,

5    and various other groups who may come in

6    occasionally.

7       Q.      Okay.  But the regular members

8    are those that you just mentioned?

9       A.      More or less, I would say yes,

10   they are the regular members.

11      Q.      And are you the representative

12   of quality on the board?

13      A.      I am one of the representatives

14   of quality on the board.

15      Q.      Who else is on the board from

16   the quality group?

17      A.      The head of QC.  The head of

18   New Jersey quality, Mr. Tony Delicato is

19   on that board, and the QA director,

20   Ms. Lynn Kelleher, is on that board.

21      Q.      Okay.  Who's the head of QC?

22      A.      Currently, the person who is

23   managing the lab is Mr. Jisheng Zhu.

24      Q.      That's Z-H-U?

Paul Galea
Confidential – Subject to Further Confidentiality Review

274

1        A.      Yes, that is correct.

2        Q.      And are there regular minutes

3    kept of these board meetings?

4        A.      Yes, there are.

5              MR. BLIZZARD:  I don't have any

6    additional questions.

7              But I do -- to the extent I need to

8    say it, I'm not sure I do, but I'll reserve the

9    right to come back and to ask additional

10   questions depending upon the rulings on the --

11   of the Court on the instructions that have been

12   given to the witness.

13             VIDEO OPERATOR:  Off the record,

14   4:22.

15             (Discussion off the record.)

16             VIDEO OPERATOR:  Back on the

17   record, 4:24.

18                    EXAMINATION

19   BY MR. MILLER:

20       Q.    Only a few questions and we'll

21   wrap this up.

22             I'm going to revisit some exhibits

23   from earlier today that were previously marked

24   as OCRs, I believe, I'm learning about this, but

Paul Galea
Confidential – Subject to Further Confidentiality Review

286

1                          CERTIFICATE

2

3

4              I HEREBY CERTIFY that the witness
     was duly sworn by me and that the deposition is
5    a true record of the testimony given by the
     witness.

6

7              It was requested before completion
     of the deposition that the witness, PAUL GALEA,
8    have the opportunity to read and sign the
     deposition transcript.

9

10

11

12              ------------------------------------
     ROSEMARY LOCKLEAR
13    REGISTERED PROFESSIONAL REPORTER
     CERTIFIED COURT REPORTER (NJ)
14    30XI00171000
     CERTIFIED REALTIME REPORTER
15    NOTARY PUBLIC
     Dated:  12/23/09

16

17

18              (The foregoing certification of

19    this transcript does not apply to any

20    reproduction of the same by any means, unless

21    under the direct control and/or supervision of

22    the certifying reporter.)

23

24

Paul Galea
Confidential – Subject to Further Confidentiality Review

287

1            INSTRUCTIONS TO WITNESS

2

3            Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8                After doing so, please sign the

9    errata sheet and date it.

10                You are signing same subject to the

11   changes you have noted on the Errata Sheet,

12   which will be attached to your deposition.

13                It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt of

16   the deposition transcript by you.  If you fail

17   to do so, the deposition transcript may be

18   deemed to be accurate and may be used in court.

19

20

21

22

23

24

Paul Galea
Confidential – Subject to Further Confidentiality Review

289

1            ACKNOWLEDGEMENT OF DEPONENT

2

3            I, _____, do

4      hereby certify that I have read the foregoing

5      pages, and that the same is a correct

6      transcription of the answers given by me to the

7      questions therein propounded, except for the

8      corrections or changes in form or substance, if

9      any, noted in the attached Errata Sheet.

10

11

12      _____

13      PAUL GALEA                          DATE

14

15

16

17      Subscribed and sworn
        to before me this
18      _____day of _____, 20_____.

19

20      My commission expires:_____

21      _____
22      Notary Public

23

24