

Narrative of Crivella West Incorporated Work Performance
For Digitek Products Liability Litigation (MDL No. 1968)

Crivella West Incorporated (Crivella West) is a Knowledge Discovery Company providing advanced computerized analytic services, with related database and document management capabilities, for the investigation, interpretation, retrieval and utilization of critical information contained within large document collections.  To these ends, Crivella West has developed proprietary methods, processes and software which are implemented by a team of lawyers, linguists, engineers and technologists who work collaboratively with trial counsel to:

- develop a discovery production strategy;
- request and negotiation the form and format of electronic discovery requests;
- understand the quality and completeness of the produced materials received; and
- timely investigate and locate critical information necessary for trial counsel to advance the case.

In May of 2009, Crivella West was retained by the Plaintiff Steering Committee for the Digitek Products Liability Litigation (MDL No. 1968) and commenced providing services in connection with this engagement.  The terms of this engagement are incorporated in the attached Letter of Engagement, see Exhibit "A", which envisions a project duration of 24 months, a gigabyte charge for analytic/document hosting services, and a labor hour charged for specialized expert reports.  Four (4) levels of analytic/hosting services are offered, the cost dependent upon the level of analytical services requested.

For this engagement, Crivella West received 99 submissions containing 161,399 documents / 3,320,693 pages, which were processed, organized and published to two distinct online collaborative kiosks; the "Digitek PSC Collaborative Center" providing restricted access of the produced documents and attorney work product to the PSC, and the "Digitek PA Collaborative Center" providing restricted access to the produced documents for state court actions.

For the Digitek PA Collaborative Center, Crivella West provided Level 2 services throughout this engagement.  With respect to the Digitek PSC Collaborative Center, Crivella West provided Level 2 services from May through December 2009.  Beginning in January 2010, at the PSC's request, Crivella West commenced providing Level 4 services.  This request was made to allow the PSC to take advantage of analytical services that would help organize, focus and thereby speed the review of documents and preparation for depositions.  The services requested include Comprehensive Custodial Sets and Custodial Special Collections, described below.

Attached hereto as Exhibits "B" and "C" are the "Accrued and Forecast Charges for Digitek PA Collaborative Center" and the "Accrued and Forecast Charges for Digitek PSC Collaborative Center".  These reports detail the volume of materials (GB), corresponding service level and cumulative charges.  The total charge due for the Digitek PA Collaborative Center is $79,772. The total charge due for the Digitek PSC Collaborative Center is $193,214.

Services provided by Crivella West, and included in these charges, are:

DUPLICATE DOCUMENTS: Crivella West identified duplicative and highly similar documents to provide client with the opportunity to consider document drafts, versions and emails chains at one time, in an organized and coherent fashion.

COMPREHENSIVE CUSTODIAL SETS:  Crivella West created thirty (30) Comprehensive Custodial Sets, a list of which is attached hereto as Exhibit "D".  Drawing from the entire documents collection, Crivella West created specialized document sets designed to reconstruct, and therefore to encompass, all available documents related to identified deposition witnesses. Rather than rely on the completeness and timeliness of the defendants' collection and/or production schedules, and when no documents were produced for a deposition witness, the Plaintiffs litigation team was prepared to meet the compressed deposition schedule.  With respect to the deposition witnesses listed in Exhibit D, custodian documents were not produced for Nasrat Hakim or Sandipkumar Patel.  For Nasrat Hakim, Crivella West was able to identify 4,145 documents that we drafted by, received by or in some way related to this witness. With respect to Sandipkumar, 19 documents were identified.  An example of the usefulness of the Comprehensive Custodial Sets is further illustrated with respect to custodian Robert Dowling. 271 documents were produced for this witness; Crivella West was able to identify 5,182 documents that related to this witness.

CUSTODIAN SPECIAL COLLECTIONS:  Crivella West created twenty-three (23) Custodian Special Collections, a list of which is attached hereto as Exhibit "E".  Special collections are document sets created to focus on identified lines of inquiry and are designed to provide the litigation team with manageable numbers of documents for organized review resulting in a rapid identification of important documents for deposition preparation and general case knowledge. The Digitek document collection consists of 161,399 documents / 3,320,693 pages.  Through use of the Special Collection process, Crivella West reduced the number of documents the litigation team considered to 25,704 documents / 368,027 pages, a considerable reduction.  The Special Collection process is a collaborative effort between the litigation team and Crivella West involving an extensive examination of the collection by Crivella West using propriety analytical systems to ascertain substantive content, which is presented to the litigation, followed by a number of meetings with litigation counsel wherein case themes are developed, supporting documents considered and analysis refined to target and identify important case documents.  As described previously, witness Nasrat Hakin had no produced documents, Crivella West identified 4,145 related to this witness; of those documents 129 were identified for review in his Special Collections.  With respect to witness Robert Dowling 271 documents were produced, 5,182 documents were identified as being related to this witness and 1,120 were identified for review in his Special Collections.

PRIVILEGE ANLAYZERS:  Crivella West assisted in the implementation of the claw back.

ATTENDANCE AT COURT PROCEEDINGS AND DEPOSITIONS:  Crivella West appointed project manager/analyst supported Digitek PSC trial team by attending a court proceeding and deposition.

PROJECT MANAGEMENT:  Crivella West appointed an attorney who functions as a single point of contact project manager for this engagement.  This project manager coordinates the communications between the litigation team and the various working groups within Crivella West, as well as performs services to ensure the litigation team has the information it needs to advance the case.  Critical to this function is an understanding of the subject matter of the litigation, the goals of the litigation team and an ongoing knowledge of the status of the litigation.  To these ends, the project manager and members of the necessary working groups within Crivella West reviewed pleadings and other documentation provided by the litigation team, educated and trained the litigation team with respect to Crivella West methods, processes and technology, conducted and participated in client status meetings, worked collaboratively with the litigation team to recommend and develop information critical to the advancement of the Digitek Litigation.  Ultimately, the services, technology, guidance and support provided by Crivella West prepared the litigation team to conduct necessary depositions, effectively manage a document collection of in excess of three million pages and negotiate a settlement of this important matter.



**CRIVELLA WEST**
INCORPORATED

May 8, 2009

*VIA ELECTRONIC MAIL*

Arthur R. Crivella
CRIVELLA WEST INCORPORATED
400 Lydia Street
Carnegie, Pennsylvania 15106

Fred Thompson, Esquire
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464

Harry Bell, Esquire
BELL and BANDS, PLLC
30 Capitol Street
Charleston, West Virginia 25326

Carl Frankovitch, Esquire
FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, West Virginia 26062-3828

> **Re: Letter of Engagement for Provision of Services (the "Engagement Letter") with respect to**
> ***Digitek Products Liability Litigation*, MDL No. 1968, JPMDL.; No. 08-md-1968, S.D. W.Va. (the**
> **"Litigation")**

Dear Gentlemen:

Crivella West Incorporated ("Crivella West") is pleased to assist Frankovitch, Anetakis,
Colantonio & Simon ("Frankovitch"), Motley Rice LLC, Bell and Bands, PLLC and any other
law firm included in the plaintiff law firm group (collectively "Customer"), by providing
consulting and technology services (collectively the "Services") to support this Litigation.

This Letter of Engagement describes the compensation model for Crivella West Services and
certain agreements regarding billing and payment for those Services. Customer hereby engages
Crivella West to perform the Services, and Crivella West agrees to perform the Services, on the
terms set forth in this Letter of Engagement, including Exhibits A and B. In the event of any

*EXHIBIT "A"*

Fred Thompson, Esquire
Harry Bell, Esquire
Carl Frankovitch, Esquire
May 8, 2009
Page 2

inconsistency between the terms of this Letter of Engagement and those of Exhibit A or B, the terms of this Letter of Engagement shall prevail.

Exhibit B provides a tiered schedule for Document Hosting and a menu of related services with the associated fees.  Based on discussions, Crivella West agrees to provide Level 2 tier Document Hosting services to Customer.   The cost at this level assuming 2 million produced pages would be $117,600, which if paid over the course of twenty-four (24) months would be $4,900 per month. The actual cost may vary depending on when productions are made and the number of documents hosted at any given time.

In a meeting held on May 6, 2009, between Crivella West and Carl Frankovitch, Esquire, it was agreed that immediately upon execution of this Letter of Engagement, Crivella West will launch the Digitek Litigation Collaborative Center.  This includes customization to meet case material review requirements, and loading of the initial production of approximately 3,300 documents. These documents will be used to facilitate training in the use of the Digitek Litigation Collaborative Center.

At any time, Customer may choose to have its data and documents backed up and stored on tape at no additional charge.  Data and documents can be restored at Customer's request for a fee based upon our standard hourly rate.

At this time, both the volume and timing of additional productions is uncertain.  Crivella West agrees to meet with Customer on a quarterly basis to review and re-estimate the page volume, and adjust the monthly fee, as appropriate.  Crivella West also agrees to defer the start of monthly payments for Services for 3 months from the date of execution of this Engagement Letter.  In addition, Crivella West agrees that the initial monthly fee will be set at $3,000 (Three thousand dollars), which will begin 4 (four) months from the date of execution of this Letter of Engagement.  This monthly fee will be in effect for 3 consecutive months.  Thereafter, the monthly fee will be based on revised volume estimates, which will be determined at the regular quarterly review meetings.  Further, Customer can, at any time, opt to upgrade Services to a higher level tier; at which time Crivella West will revise the monthly fee per the attached Exhibit B.

In addition to the Level 2 tier Document Hosting, Crivella West offers a higher level of services including specialized analytical reports. Descriptions and pricing for these services are also included on the attached Exhibit B. These reports include the Production Quality and Defect Study, the Production Omissions and Key Findings Study and the Issue, Timeline and Custodian Dossiers.

With respect to Customer's responsibility to provide access to the document collection, or a portion thereof, to state court attorneys, Crivella West believes that either the Level 1 or Level 2 tiers of Services would be suitable depending upon the anticipated use. Crivella West will work

Fred Thompson, Esquire
Harry Bell, Esquire
Carl Frankovitch, Esquire
May 8, 2009
Page 3

with Customer to establish separate, appropriate Agreements for Services to fulfill this obligation.

Crivella West is looking forward to the opportunity to work with your team.  We believe that the pricing/payment approach described herein will enable your firms to take full advantage of the best consultative litigation services in a cost effect manner.  Once you have had an opportunity to review the terms, please sign where indicated below and return to me.

As always, please do not hesitate to contact me if you have any questions or concerns.

Sincerely,


Arthur R. Crivella

cc: Wayne West
    Debra Pfeifer
    Mary Geever
    Nancy Egan

Fred Thompson, Esquire
Harry Bell, Esquire
Carl Frankovitch, Esquire
May 8, 2009
Page 4


**APPROVED AND AGREED AS OF THE DATE FIRST WRITTEN ABOVE:**

Crivella West Incorporated

By: _____ _Esq._

Name: _Mary B. Geever_

Title: _Manager, Investigation / Advisory Group_


Frankovich, Anetakis, Colantonio & Simon

By: _____

Name: Carl Frankovitch, Esquire
Title:   Lead Co-Counsel and Customer's "Point of Contact" for the purpose of this
         CONTRACT

Re:  *Digitek Products Liability Litigation*, MDL No. 1968, JPMDL.; No. 08-md-1968, S.D. W.Va.

**CRIVELLA WEST INCORPORATED**
**Exhibit A**
**GENERAL TERMS AND CONDITIONS (May 2009)**

1. **CONTRACT.**  The Contract consists of the preceding Letter of Engagement, this Exhibit A, the attached Exhibit B ("Price Schedule") and any other attached additional exhibits (collectively referred to as the "CONTRACT"). In the event of any inconsistency between the general provisions of this Exhibit A and a specific provision in any other part of the CONTRACT, the specific provision in the other part shall control. The CONTRACT is the final and complete expression of the parties' agreement, superseding all prior or simultaneous written or oral communications or agreements, regardless of whether they are consistent or inconsistent with the CONTRACT. The CONTRACT shall not be modified except by a writing signed by all parties, and any attempt to modify the CONTRACT by other means, including any prior, contemporaneous or subsequent confirmation or purchase order form issued by CUSTOMER, shall be ineffective. The EFFECTIVE DATE of the CONTRACT shall be the earlier of CUSTOMER's signing and dispatching for delivery to CRIVELLA WEST an executed copy of the foregoing Letter of Engagement or CRIVELLA WEST's commencing, at CUSTOMER'S direction, to provide services pursuant to the CONTRACT. The CONTRACT shall be deemed for all purposes to be made and performed in the Commonwealth of Pennsylvania. CRIVELLA WEST does not assume, and owes no, duty to any person or entity other than CUSTOMER.

2. **DEFINITIONS**.   As used in the CONTRACT, the following terms shall have the following meanings:

"**CRIVELLA WEST**" means Crivella West Incorporated. a Pennsylvania Corporation, its successors, affiliates and assigns.

"**CRIVELLA WEST INDEMNIFIED PARTIES**" shall mean CRIVELLA WEST, Areté Legal, Inc. and ASE Edge, Inc. and their past and present directors, affiliates, partners, principals, officers, employees and agents, and their heirs, successors or assigns.

"**CRIVELLA WEST INTELLECTUAL PROPERTY**" means any and all present or future tangible and intangible (i) rights associated with works of authorship, including but not limited to copyrights, moral rights, and mask-works, (ii) trademark and trade name rights and similar rights, (iii) trade secret rights, (iv) patents, designs, algorithms, and other related property rights, (v) all other intellectual and industrial property rights (of every kind and nature throughout the universe and however designated) (including logos, "rental" rights and rights to remuneration), whether arising by operation of law, contract, license, or otherwise, and (vi) all registrations, initial applications, renewals, extensions, continuations, divisions, or reissues hereof now or hereafter in force (including any rights in any of the foregoing). CRIVELLA WEST INTELLECTUAL PROPERTY also includes: Angelic Processing; LinguaLex; and all linguistic, expert systems and other processes, rules, rules sets, methods, techniques, analyses, and any and all work product related to the linguistic, expert systems or other rules sets or the result of those rules sets, including, without limitation, numerical, linguistic or other forms of indices including those derived from the CASE MATERIALS. Intellectual property or property rights shall be deemed to be CRIVELLA WEST INTELLECTUAL PROPERTY regardless of whether CRIVELLA WEST owns the property or property rights or holds the property or property rights under license from ASE Edge, Inc. or other third parties.

"**AUTHORIZED USERS**" means those individuals that have been appointed by CUSTOMER to (i) have access to the KNOWLEDGE KIOSK®, in accordance with the procedures chosen by CUSTOMER,

1

and (ii) use the licenses granted to CUSTOMER. Authorized Users agree to fully comply with the terms of this Agreement. With respect to all acts, omissions and events relating to the KNOWLEDGE KIOSK®, Authorized Users agree to fully comply with the terms of this Agreement to the same extent CUSTOMER is bound and limited by this Agreement.

**"CASE MATERIALS"** means, without limitation, all paper documents, digital documents and data, electronic communications, video, photographic images, discussion, annotation, commentary and other materials provided or forwarded by, or on behalf of, CUSTOMER to CRIVELLA WEST or communicated to CRIVELLA WEST by, or on behalf of, CUSTOMER, including via the KNOWLEDGE KIOSK®, as well as the digital representations thereof created by CUSTOMER or CRIVELLA WEST. CASE MATERIALS do not include PRODUCTION PIECES (as defined below) or any other creative elements provided by CRIVELLA WEST.

**"CUSTOMER"** means the CUSTOMER of CRIVELLA WEST, as defined in the Letter of Engagement that is part of the CONTRACT.

**"FORCE MAJEURE"** means any failure or delay in CRIVELLA WEST's provision of services caused by any conditions related to, or caused by, any viruses, trojan horses, trap doors, back doors, worms, time bombs, cancelbots or other malicious code, labor dispute (e.g. strike, slowdown or lockout), fire, flood, governmental act or regulation, riot, inability to obtain supplies, power failure, delay or interruption of carriers or service providers, accidents, unauthorized access, acts of God, acts of war, acts of terrorism, necessary third party software updates, risks inherent in the Internet or other causes beyond CRIVELLA WEST's control.

**"KNOWLEDGE KIOSK®"** refers to CRIVELLA WEST's proprietary Internet accessible digital library that includes patented methodologies and other CRIVELLA WEST INTELLECTUAL PROPERTY, including the systems forming the Litigation Collaborative Center. CASE MATERIALS will reside within the KNOWLEDGE KIOSK®. However, as provided in the CONTRACT, CRIVELLA WEST retains all ownership and other rights to the KNOWLEDGE KIOSK®, and CUSTOMER acquires no rights to the KNOWLEDGE KIOSK® other than the limited license to access and use the KNOWLEDGE KIOSK® in accordance with the CONTRACT.

**"PRODUCTION PIECES"** means CRIVELLA WEST's multimedia representations of data, information or testimony including, without limitation, graphical charts and graphs; animated recreations; multimedia exhibits consisting of varying combinations of digitized documents, video testimony, animated sequences or other tangible objects capable of reproduction on video or similar media (including all derivative works, improvements or successive versions) that help CUSTOMER organize, analyze, visualize and present material. The term includes, without limitation, any and all features and functionalities, including CRIVELLA WEST INTELLECTUAL PROPERTY, that are depicted in the process of AUTHORIZED USERS' reviewing CASE MATERIAL on the KNOWLEDGE KIOSK®. As provided in the CONTRACT, CRIVELLA WEST retains ownership of all PRODUCTION PIECES.

**"PROPRIETARY SOFTWARE"** means the underlying technology and all other software and related documentation that is used, licensed or leased by CRIVELLA WEST in connection with CRIVELLA WEST's development, hosting, management and provision of access to the KNOWLEDGE KIOSK® in accordance with CRIVELLA WEST's applicable protocols and all copyrights, trademarks, service marks, trade names, trade dress and similar rights, patents, trade secret rights and other related intellectual and proprietary rights.

3. **PRICES**.  All prices in Exhibit B are subject to change upon 30-days prior written notice by CRIVELLA WEST to CUSTOMER, except that the effective date of any increase in the prices shown in Exhibit B shall not be sooner than two years after the effective date of the CONTRACT.

4. **PAYMENT**.  All payments are due 30 days from the date of invoice. If payment is not made when due, CRIVELLA WEST may, at its discretion, upon 30-days written notice suspend all work under the CONTRACT and suspend CUSTOMER's access to the KNOWLEDGE KIOSK®. If CUSTOMER fails to pay any amount due hereunder, CUSTOMER, shall pay interest at the rate of 1.5% per month (or the maximum allowed by law if less) on such past due amount from the due date thereof until the payment date. CUSTOMER shall reimburse CRIVELLA WEST for any expenses incurred, including interest and reasonable attorney fees, in collecting amounts due CRIVELLA WEST hereunder.

5. **NOTICES**.   All notices as provided herein, including a notice of termination, shall be deemed sufficient if sent by first class United States mail, hand-delivery or other professional delivery service to the following addresses: CRIVELLA WEST – Ryan Crivella, Crivella West Incorporated. 400 Lydia Street, Carnegie, PA 15106. CUSTOMER –  Carl Frankovitch, Esquire, FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON, 337 Penco Road, Weirton, West Virginia 26062-3828.

6. **OWNERSHIP OF CASE MATERIALS**.   CUSTOMER (or where applicable CUSTOMER'S representatives) shall retain the ownership of all CASE MATERIALS it provides to CRIVELLA WEST. CUSTOMER (and where applicable, CUSTOMER'S representatives) grants CRIVELLA WEST a worldwide, fully paid license, for the term of the CONTRACT, to access, copy and use such CASE MATERIALS to the extent necessary to allow CRIVELLA WEST to provide services to CUSTOMER. However, CRIVELLA WEST shall own all PRODUCTION PIECES derived or created from CASE MATERIALS. CRIVELLA WEST also shall own all of its own work product even if it is derived in whole or in part from the CASE MATERIALS. CRIVELLA WEST shall use CASE MATERIALS only in accordance with any applicable protective order or confidentiality agreement.

7. **CRIVELLA WEST INTELLECTUAL PROPERTY**. CRIVELLA WEST retains ownership of all CRIVELLA WEST INTELLECTUAL PROPERTY, and nothing in the CONTRACT shall be construed as providing to any person or entity any rights in that intellectual property other than the revocable, nonexclusive, non-transferable license granted in this section. Subject to the other terms of the CONTRACT, CRIVELLA WEST grants to CUSTOMER and AUTHORIZED USERS a revocable, non-exclusive, nontransferable license to use (i) the PRODUCTION PIECES and (ii) the PROPRIETARY SOFTWARE in hosted mode only and only to the extent necessary for access to the CASE MATERIALS and PRODUCTION PIECES though the KNOWLEDGE KIOSK® or to the extent necessary to enable CUSTOMER and AUTHORIZED USERS to create and save in the KNOWLEDGE KIOSK® data, files and work product resulting from the establishment of, interaction with, or use of the KNOWLEDGE KIOSK®. Except as expressly provided in the CONTRACT, no other rights or licenses, express or implied, are granted in CRIVELLA WEST's PROPRIETARY SOFTWARE including without limitation, object code, source code or interpreted code.

8. **SYSTEM AVAILABILITY**. CRIVELLA WEST will use commercially reasonable efforts to make new CASE MATERIALS available in the KNOWLEDGE KIOSK® in a timely manner. Under expected usage and subject to the restrictions set fort in this Section 8, the KNOWLEDGE KIOSK® will be on-line and available 24 hours a day, seven (7) days a week. CRIVELLA WEST will warrant such online services level availability, subject to FORCE MAJEURE, to a standard of at least 97% of the total time in each month (the "SERVICE AVAILABILITY STANDARD"), as determined through the continuous monitoring by CRIVELLA WEST's automated monitoring system. Notwithstanding any other provision

of the CONTRACT to the contrary, with 24-hours advance notice to CUSTOMER, CRIVELLA WEST may, without incurring any liability, schedule a fixed downtime of two (2) hours, between 7:00 A.M. and 9:00 A.M. Eastern time each Sunday morning (up to a maximum of four (4) Sundays in each month) and, with 24-hours advance notice to CUSTOMER, schedule additional downtime on any day, twice during any month between 12:00 A.M. and 8:00 A.M. Eastern time, each of a duration of no more than eight (8) hours. CRIVELLA WEST's services are based on its standard protocol of operation as such protocol may be changed by CRIVELLA WEST from time-to-time. CRIVELLA WEST may limit access to the KNOWLEDGE KIOSK® immediately as CRIVELLA WEST, in its sole discretion, deems advisable for purposes of security or system integrity.

9. **WARRANTY DISCLAIMER**.   EXCEPT AS EXPRESSLY PROVIDED IN THE CONTRACT, ALL SERVICES PROVIDED BY CRIVELLA WEST ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. CRIVELLA WEST DISCLAIMS AND CUSTOMER WAIVES ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR INTENDED USE, ANY WARRANTY OF COMPATIBILITY BETWEEN THE KNOWLEDGE KIOSK® AND CUSTOMER OWNED EQUIPMENT OR SOFTWARE, OR ANY LIABILITY IN TORT, (STRICT LIABILITY OR OTHERWISE), WITH RESPECT TO SERVICES PROVIDED BY CRIVELLA WEST.

10. **LIMITATION OF LIABILITY**.

(a) Except as set forth in Subsection (b) below and except for gross negligence or willful misconduct attributable to CRIVELLA WEST, CRIVELLA WEST shall not be liable for incidental, special, indirect, consequential, punitive or other similar damages, including but not limited to loss of profit or revenues, or damages for loss of use of the services under the CONTRACT. CRIVELLA WEST shall have no liability to anyone other than CUSTOMER, and shall have no responsibility to indemnify, defend or hold harmless CUSTOMER with respect to any claims of third parties. The parties recognize the risks inherent in using the Internet and each party expressly absolves the other from any liability for any loss or damage resulting from a failure or delay in making available CASE MATERIALS or the KNOWLEDGE KIOSK® and/or any failure or delay in CRIVELLA WEST's provision of SERVICES hereunder or CUSTOMER's responsibilities, caused by any condition related to FORCE MAJEURE or other interruptions in CRIVELLA WEST's or CUSTOMER's Internet access caused by reasons beyond CRIVELLA WEST's control.

(b) CUSTOMER's sole and exclusive remedy for CRIVELLA WEST's breach of the SERVICE AVAILABILITY STANDARD set forth in Section 8 (i.e., in any calendar month, a total cumulative loss of on-line availability of more than 20 hours), will be a credit to CUSTOMER's account of an amount equal to the CUSTOMER's User Fees for use of the KNOWLEDGE KIOSK® for the month in which the standard was not met. The remedy set forth in this Subsection (b) is subject to and excluding interruptions in availability caused by FORCE MAJEURE, for which CRIVELLA WEST shall have no liability to CUSTOMER.

11. **LEGAL JUDGMENT**.   In performing services for CUSTOMER, CRIVELLA WEST does not exercise legal judgment on behalf of CUSTOMER and assumes no liability for any errors or omissions in any instructions, data or materials provided by or on behalf of CUSTOMER. It is CUSTOMER's obligation to exercise appropriate legal judgment with respect to all issues involving the maintenance, retention or production of records, the privacy of records, applicable privileges and any other matters that might affect CUSTOMER's rights, obligations or duties with respect to courts, other tribunals or third parties. Although CRIVELLA WEST might offer suggestions to CUSTOMER with respect to the best manner to implement the directions of CUSTOMER or CUSTOMER's legal counsel, CRIVELLA WEST

4

has no duty to question such directions or the underlying legal judgments of CUSTOMER or CUSTOMER'S legal counsel.

12. **CUSTOMER PROVIDED DATA**.  CRIVELLA WEST assumes no liability for any errors or omissions in any instructions, data or materials provided by or on behalf of CUSTOMER or its AUTHORIZED USERS including any errors or omissions made by CRIVELLA WEST in interpreting CUSTOMER's instructions. CRIVELLA WEST assumes no responsibility for ensuring that CUSTOMER has provided the information necessary for CRIVELLA WEST to provide services required under the terms of the CONTRACT. CRIVELLA WEST shall not be responsible or liable for the deletion, correction, destruction, damage, loss or failure to store CUSTOMER's CASE MATERIALS.

13. **PRIVILEGE**.  If the KNOWLEDGE KIOSK® is a "litigation" or "legal" KNOWLEDGE KIOSK®, it is the understanding of the parties that CRIVELLA WEST has been engaged by CUSTOMER (or, if applicable, on behalf of CUSTOMER's client), as CUSTOMER's consultant to provide certain services relating to the CASE MATERIALS, and the KNOWLEDGE KIOSK® and litigation and/or other legal matter. As such, it is the parties' understanding that the CASE MATERIALS and KNOWLEDGE KIOSK® services are attorney work product and/or are subject to the attorney-client privilege and that the CUSTOMER has and will continue to take, and is solely and exclusively responsible for, the undertaking of, such actions and observing such safeguards as may be necessary to preserve such privileges.

14. **CUSTOMER RESPONSIBILITES.**  CUSTOMER is responsible for selecting, obtaining and maintaining at its sole expense such hardware and software as are specified by CRIVELLA WEST to enable CUSTOMER to access the KNOWLEDGE KIOSK®. CUSTOMER shall coordinate with CUSTOMER's internal technology department(s) to make available appropriate Internet access and to open appropriate accesses within infrastructure network (access control entry) for communication with the KNOWLEDGE KIOSK®. CUSTOMER shall maintain the following minimum system requirements for use of the KNOWLEDGE KIOSK®: (1) Windows XP or later version , (2) Internet Explorer 5.5 or later version, (3) Adobe Acrobat Reader 5.0 or later versions, (4) Internet Connection of at least 128 Kbps, (5) 512 MB RAM, except for Window's Vista the minimum requirement is 2 GB RAM, (6) 5 GB free hard disk space, (7) Firewall access opened up to Port 80 and Port 443, and (8) in event documents need to be viewed in native file format, Customer must obtain appropriate software to view such files. .

15. **SECURITY METHOD**.  CRIVELLA WEST shall not have any liability for lapses in security caused by inappropriate utilization of security methods by CUSTOMER or failure of AUTHORIZED USERS to observe security methods (including, but not limited to, failing to restrict the use of a single password, token, digital certificate or other security method selected to a single AUTHORIZED USER; or failing to configure computer work stations to not "remember" and/or automatically enter Security Method information to access the KNOWLEDGE KIOSK®).

16. **NON-INFRINGEMENT**.   CUSTOMER represents, warrants and covenants to CRIVELLA WEST that the provision of any CASE MATERIALS by or on behalf of CUSTOMER or its Affiliates to CRIVELLA WEST for conversion to digital media or storage and display in the KNOWLEDGE KIOSK®: (i) shall not infringe on the Intellectual Property Rights of any third party or any rights of publicity or privacy; (ii) shall not violate any law, statute, ordinance, or regulation (including without limitation the laws and regulations governing export control, unfair competition, anti-discrimination, or false advertising); (iii) shall not contain any viruses, trojan horses, trap doors, back doors, easter eggs, worms, time bombs, cancelbots, or other computer programming routines that are intended to damage,

detrimentally interfere with, surreptitiously intercept, or expropriate any system, data, or personal information; or (iv) is duly authorized by the owner of and all parties having rights in such CASE MATERIALS.

17. **PROHIBITED CONDUCT**.   CUSTOMER and its AUTHORIZED USERS will use the KNOWLEDGE KIOSK® solely for the purposes and functions and manner contemplated by the CONTRACT and shall refrain from using the KNOWLEDGE KIOSK® for any other purpose. In addition, the following uses are strictly prohibited: failure to preserve privileges; any attempt to access the KNOWLEDGE KIOSK® without appropriate authority; any attempt to circumvent any tracking or access record keeping mechanisms in the KNOWLEDGE KIOSK®; generation of message activity with the KNOWLEDGE KIOSK® of such speed or volume that may lead to malfunctions or degradation of KNOWLEDGE KIOSK® performance; accessing, tampering with or using areas of the KNOWLEDGE KIOSK® or CRIVELLA WEST's computer systems that exceed the scope of authorization for the respective user; tampering with or attempting to access other user accounts or information of other users; attempting to gather and use information available from the KNOWLEDGE KIOSK® to transmit any unsolicited advertising; transmission of any viruses, trojan horses, trap doors, back doors, worms, time bombs, cancelbots or other malicious code or computer programming routines that may be introduced to the KNOWLEDGE KIOSK® or other computer network systems of CRIVELLA WEST as a result of access by CUSTOMER and its AUTHORIZED USERS; or use of the KNOWLEDGE KIOSK® for any illegal, immoral or unethical purpose. In addition to its indemnification obligation under the CONTRACT, CUSTOMER and its AUTHORIZED USERS shall be strictly liable to CRIVELLA WEST for any losses, claims or other damages as a result of such prohibited conduct. Actual or attempted unauthorized or prohibited use of the KNOWLEDGE KIOSK® may result in criminal or civil prosecution. CRIVELLA WEST has the right, but not the obligation, to monitor and record activity on the KNOWLEDGE KIOSK® without prior notice or permission from the CUSTOMER. Any information obtained by monitoring, reviewing, or recording is subject to review by law enforcement organizations in connection with investigation or prosecution of possible criminal activity on the KNOWLEDGE KIOSK®. CRIVELLA WEST may cancel access to the KNOWLEDGE KIOSK® for any user(s) for prohibited or unauthorized conduct.

18. **CONFIDENTIALITY**.

(a) **CONFIDENTIAL INFORMATION.**  As used in this Agreement, "CONFIDENTIAL INFORMATION" shall mean all information concerning or related to the KNOWLEDGE KIOSK® or the CASE MATERIALS, and the related technology, operations, or prospects of each party, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form, and shall specifically include (i) all information regarding CUSTOMERS, suppliers, distributors, sales representatives, business partners, and licensees of each party, whether present or prospective, except for such information regarding such entities which may be disclosed by the owner of such information to the general public in the ordinary course of business, (ii) all inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas, and know how relating to the KNOWLEDGE KIOSK®; and (iii) all financial or business information regarding each party and its affiliates; provided, that the CONFIDENTIAL INFORMATION shall not include information that is or becomes generally known to the public through no act or omission by a party or its affiliates; or information which has been or hereafter is lawfully obtained by a party from a source other than the other party or its affiliates or their respective officers, directors, employees, equity holders, or agents, so long as, in the case of information obtained from a third party, such third party was or is not, directly or indirectly, subject to an obligation of confidentiality owed to the other party or any of its affiliates or their respective officers, directors, employees, equity holders, or agents at the time such CONFIDENTIAL INFORMATION was or is disclosed to the other party.

(b) **NONDISCLOSURE OF CONFIDENTIAL INFORMATION**. Except as otherwise permitted by subsection (c), each recipient of CONFIDENTIAL INFORMATION agrees that it will not, at any time, without the prior written consent of the other party, disclose or use for its own benefit any CONFIDENTIAL INFORMATION of a disclosing party.

(c) **PERMITTED DISCLOSURES**. Each of the parties shall be permitted to: (i) disclose CONFIDENTIAL INFORMATION of the other party to its officers, directors, employees, and agents, but only to the extent reasonably necessary in order for each party to perform its obligations hereunder, and each party shall take all such action as shall be necessary or desirable in order to ensure that each of such persons maintains the confidentiality of any CONFIDENTIAL INFORMATION that is so disclosed; and (ii) disclose CONFIDENTIAL INFORMATION of the other party to the extent, but only to the extent, required by law; provided, that prior to making any disclosure pursuant to this subsection, the party required to make such disclosure (the "DISCLOSING PARTY") shall notify the other party (the "AFFECTED PARTY") of the same, and the AFFECTED PARTY shall have the right to participate with the DISCLOSING PARTY in determining the amount and type of CONFIDENTIAL INFORMATION of the AFFECTED PARTY, if any, which must be disclosed in order to comply with applicable law. CUSTOMER shall pay all costs and expenses, including reasonable attorneys' fees, incurred by CRIVELLA WEST or its affiliates in connection with any subpoena directed to CRIVELLA WEST or its affiliates with respect to the CONFIDENTIAL INFORMATION of CUSTOMER.

(d) **EQUITABLE RELIEF**.   Each party acknowledges and agrees that the other party may be irreparably damaged in the event that the provisions of the CONTRACT relating to CONFIDENTIAL INFORMATION are not performed by each party in accordance with their specific terms or are otherwise breached. Accordingly, notwithstanding the arbitration provisions of the CONTRACT, each party agrees that either party shall be entitled to seek an injunction to prevent any breach of this section of the CONTRACT related to Confidentiality or CONFIDENTIAL INFORMATION. Any such action for an injunction shall be filed in the United States District Court for the Western District of Pennsylvania or in the Court of Common Pleas of Allegheny County. Any damage claims shall be resolved through the arbitration procedures under the CONTRACT.

19. **LEGAL PROCEEDINGS.**   If CRIVELLA WEST is required by court order, subpoena, search warrant, or similar proceeding to produce or divulge any information or data with respect to the CASE MATERIALS, KNOWLEDGE KIOSK® Services or CRIVELLA WEST's performance of its obligations under the CONTRACT, CRIVELLA WEST shall provide prompt notice to CUSTOMER and CRIVELLA WEST shall then comply with such request; provided, however, that upon CUSTOMER's reasonable request, CRIVELLA WEST will make commercially reasonable attempts to cooperate with CUSTOMER in its efforts to resist or limit the scope of such court order, subpoena or search warrant. Where CRIVELLA WEST cooperates with CUSTOMER in resisting or limiting the scope of such a demand to produce or divulge information or data, CUSTOMER shall indemnify, defend and hold harmless CRIVELLA WEST INDEMNIFIED PARTIES from and against all liabilities, damages and expenses, claims for damages, suits, proceedings, recoveries, judgments or executions (including but not limited to litigation costs, expenses, and reasonable attorneys' fees for attorneys appointed by CRIVELLA WEST) which may be suffered by, accrued against, charged to or recoverable from CRIVELLA WEST INDEMNIFIED PARTIES by reason of or in connection with CRIVELLA WEST's cooperation with such CUSTOMER efforts.

20. **TERMINATION WITHOUT CAUSE**.   The CONTRACT may be terminated by CUSTOMER or CRIVELLA WEST for any reason in their respective discretion at the end of the CONTRACT term, herein 24 months, upon giving the other party 60-days written notice in advance of the annual anniversary date on which the contract is to be terminated. If the matter for which CUSTOMER engaged CRIVELLA WEST is still active, then both parties shall use best efforts to negotiate in good faith a mutually agreeable extension of the CONTRACT. Notwithstanding this provision, if CUSTOMER's need for the services under the CONTRACT has been eliminated by reason of settlement or judicial decision, the parties will mutually agree to terminate the CONTRACT. In the event the CONTRACT is terminated pursuant to this paragraph, CUSTOMER shall pay only for services provided prior to the termination date, and regardless of payment schedule, CUSTOMER shall make payment in full for all services provided by CRIVELLA WEST up to termination date.

21. **TERMINATION BY CUSTOMER FOR CAUSE**. The CONTRACT may be terminated by CUSTOMER (i) upon 30 days prior written notice to CRIVELLA WEST and opportunity to cure within such 30 days' period, in the event CRIVELLA WEST becomes unwilling or unable to provide services to CUSTOMER so as to deprive CUSTOMER entirely of the essential benefits bargained for under the CONTRACT and (ii) upon prior written notice and opportunity to cure and resolve the matter as provided below (the "Internal Mediation Process"), in the event CRIVELLA WEST commits a material breach of the CONTRACT.

The "Internal Mediation Process" referenced in the immediately preceding sentence shall consist of the following: In the event of a material breach committed by either party (the "Breaching Party"), CUSTOMER or CRIVELLA WEST, as the case may be, (the "Non-Breaching Party") shall provide written notice to the Breaching Party of all matters giving rise to claims of such material breach hereunder and shall specify in detail the actions believed necessary by the Non-Breaching Party to cure said breach. Within 5 days after the Breaching Party's receipt of such notice, the representatives selected by each of CUSTOMER and CRIVELLA WEST shall meet to review the Non-Breaching Party's claims of breach and attempt to resolve in good faith all such claims. The Breaching Party shall be provided a period of 60 days after the date of the representatives' meeting within which to cure all areas identified by and agreed to by the respective representatives as areas of the Breaching Party's breach. If, upon expiration of the aforesaid time period, the Breaching Party has not substantially cured all such areas of breach, the Non-Breaching Party may by written notice terminate the CONTRACT.

22. **DUTIES UPON TERMINATION OF CONTRACT**.   Upon termination of the CONTRACT for any reason, all access by the CUSTOMER and its AUTHORIZED USERS to the KNOWLEDGE KIOSK® and to the services under the CONTRACT shall cease immediately. CRIVELLA WEST shall deliver to CUSTOMER, at CUSTOMER's cost and expense, a current machine-readable copy of all CASE MATERIALS in their native format; provided, however, that Meta-Data (i.e. document descriptions, document annotations, document codes, document groups and discussion groups) included in the CASE MATERIALS shall be returned in ASCII delimited format.

23. **GOVERNING LAW AND DISPUTE RESOLUTION:**

(a) **GOVERNING LAW**. The CONTRACT is made under, and for all purposes shall be construed and enforced in accordance with and governed by, the laws of the Commonwealth of Pennsylvania, without regard to conflict of laws provisions.

(b) **ARBITRATION**. Any claim, controversy or dispute between the parties arising under or with respect to the CONTRACT shall be resolved by final and binding arbitration pursuant to provisions of the Federal Arbitration Act. The arbitration shall be held in Allegheny County,

Pennsylvania (or such other forum to which the parties might mutually agree) before a neutral arbitrator to be selected by the parties. The following procedures shall govern any arbitration:

(1) The arbitration process shall be commenced by a party submitting to the other party a letter demanding arbitration and asserting a claim. The nature of the claim, the facts upon which the claim is based and the relief requested shall be stated in the letter.

(2) A party receiving a demand for arbitration and claim shall, within fourteen (14) days, respond, in the form of a letter, stating any disagreement with the assertions of the demand letter, including any disagreements with respect to the facts, any defenses that the responding party might have, the facts upon which those defenses are based, any counter-claim the responding party might have against the demanding party and any relief requested by the responding party.

(3) If the responding party asserts a counter-claim, the party who made the original demand shall respond to the counter-claim within fourteen (14) days, in the manner set forth in Paragraph (2), above.

(4) Within fourteen (14) days after the response (or, if applicable, the response to the counterclaim), the parties shall confer in an effort to negotiate a settlement of the dispute or, if settlement is not possible, agree to the selection of an arbitrator and to other procedures, as set forth below.

(5) The parties shall agree (or if agreement is not possible, the arbitrator shall determine) the procedure to be followed in resolving the claim through arbitration, including, but not limited to: any pre-hearing exchange of information in the form of written discovery, production of records or inspections of equipment or locations; the extent to which formal rules of evidence should govern; and whether the arbitrator should appoint a neutral expert.

(6) Unless the parties otherwise agree, the arbitration shall be concluded by the arbitrator making a decision no later than 180 days after the submission of the response (or response to counterclaim, if applicable) under Paragraph (2) above.

(7) During the course of the proceedings, each party shall be responsible for paying its equal share of the arbitrator's fees and expenses and the expenses of any neutral expert appointed by the arbitrator. The arbitrator's award shall include an award to the prevailing party all fees and expenses of the arbitration, including reasonable counsel fees and reimbursement for any of the arbitrator's or neutral expert's fees or expenses that the prevailing party had paid during the course of the proceedings. In the event that each party prevails in part with respect to its claims, counter-claims or defenses, the arbitrator shall make a reasonable allocation of fees and expenses to each party taking into account the extent to which each party actually prevailed with respect to claims, counter-claims or defenses.

(8) No claim for damages under the CONTRACT shall be asserted after one (1) year from the date the claim arose, except that if the fourteen (14) -day period for the assertion of a counterclaim extends beyond the one (1) year limitation, the time limitation for the assertion of the counter-claim is extended to the due date for the counter-claim.

(9) Any judicial action to enforce or implement the arbitration provisions of the CONTRACT, including any proceedings for judicial review of or to confirm the arbitrator's award, shall be filed only in the United States District Court for the Western District of Pennsylvania or, if there is no basis for federal jurisdiction, in the Court of Common Pleas of Allegheny County, Pennsylvania. Regardless of whether any post-arbitration request for judicial review is filed in the United States District Court or in the Court of Common Pleas, the court shall apply the standards of review applicable under the Federal Arbitration Act.

(c) **EQUITABLE RELIEF**. In addition to the provision allowing a party to seek a judicial injunction to enjoin a breach of the provisions related to CONFIDENTIAL INFORMATION, either party also may seek a judicial injunction to enjoin any misappropriation, misuse or infringement of INTELLECTUAL PROPERTY rights protected under the CONTRACT or otherwise protected by law. Any such action for injunctive relief shall be filed in the United

States District Court for the Western District of Pennsylvania or in the Court of Common Pleas of Allegheny County, Pennsylvania. Any damage claims relating to INTELLECTUAL PROPERTY shall be resolved through the arbitration process, above.

**Crivella West Incorporated List of Services with Pricing**
**(May, 2009)**

I.    **Assumptions**

Pricing is based upon the following Assumptions:
- Total collection of 2 million pages via 4 productions of approximately 500,000 pages;
- Document format of the produced documents and metadata will be sufficient in content and accuracy to enable automated analysis and upload to the Litigation Collaborative Center without improvement; and
- Duration of the project is 24 months.

II.   **Conversion and Upload to the Litigation Collaborative Center**                    **No Charge**

Conversion of documents from TIF files to PDF files and upload to the Litigation Collaborative Center.

III.  **Document Hosting: Access & Use of Litigation Collaborative Center**       **Estimate 100 Gb**

Customer may select a service level for Document Hosting from the tiered list shown below.  Pricing is per Gigabyte (Gb) of volume per month, based on the total volume of the Collection. All authorized users within the MDL will be provided the same functional service level, and can access the Litigation Collaborative Center.  Standard Disaster Recovery back-up services and Standard Help Desk Support are included. As used herein, "Standard Help Desk Support" includes: a) two (2) – one and one-half hour (1.5 hour) training sessions, b) the provision of advice regarding the use and features of the Litigation Collaborative Center, and c) troubleshooting system inconsistencies and/or errors of the Litigation Collaborative Center features.  All other Help Desk related services, including, but not limited to, re-setting passwords, compiling reports, creating stations and docsets, assigning review sets, assistance with user system related deficiencies, and performing searches, are "Extended Help Desk Support", for which the Customer will be charged separately under "Consulting and Technical Support Services" set forth below.

| Level 1 | Hosting (On-Line Availability of Litigation Documents and Metadata)<br>Basic Search (Documents and Metadata)<br>User Workspace | $ 29/Gb/mo |
|---------|----------------------------------------------------------------------|------------|
| Level 2 | Relevancy Review Coding<br>Document Relevancy Review Management<br>Advanced Boolean Search<br>Privileged Document Review & Redaction<br>Collaboration Toolset – Calendar, Discussions, Set Management, etc. | $ 49/Gb/mo |
| Level 3 | Exact Duplicate Analysis<br>Near Duplicate Analysis<br>Document Similar Identification<br>Document Categorization for Rapid Coding<br>Computer Recommended Coding Pre-fill | $ 98/Gb/mo |
| Level 4 | Crivella West Comprehensive Sets<br>Automated Citation Theme Grid<br>Similar Redaction Locator<br>Find Unredacted Versions<br>Citations<br>Citation Similar Identification<br>Merits Review<br>Hyperlinked Digests<br>Expert Coordination<br>Specialized Subcommittee Coordination<br>Advanced Litigation Document Stations Structure<br>Case Tracking | $ 185/Gb/mo |

## IV.    **Production Quality and Defect Study**

Pricing depends on the volume of the Production being analyzed, and Document Hosting Service Level selected.   Note – at Service Level 4 only labor hours would be charged for this Study, as shown below.

> Service Levels 1 – 3:   **$37,350 - $58,050** per Production Study
> Service Level 4:        **$11,250** per Production Study

Identification of the items listed below will be performed and the findings will be provided in a report form.

> Custodial and Non-Custodial Sources;
> Missing Bates Numbers;
> Duplicate Bates Numbers;
> Corrupt Files;
> Document and Attachment Relationships;
> Duplicates;
> Erroneous/incomplete/inconsistent metadata;
> Erroneous or missing media types and locations;
> Quality of Text;
> Gap Analysis by Date; and
> Gap Analysis by Type.

## V.    **Production Omissions and Key Findings Study**

Pricing depends on the volume of the Production being analyzed, and Document Hosting Service Level selected.   Note – at Service Level 4 only labor hours would be charged for this Study, as shown below.

> Service Levels 1 – 3:   **$37,350 - $58,050** per Production Study
> Service Level 4:        **$11,250** per Production Study

Analysis of the items listed below will be performed and the findings will be provided in a report form.

> Missing High Priority Sources;
> Search Term Impact Analysis;
> Comprehensive Production set per custodian;
> Database Identification Study;
> Production Privilege Document Study;
> Production Redaction Document Study;
> Incongruency between Custodians date, media type, location;
> Organization and Committee Structure Study; and
> Consultants and Third Party Collaborators Study.

## VI.    **Custodial Dossiers**

Pricing depends on the Document Hosting Service Level.  Note – at Service Level 4 only labor hours would be charged for this Study, as shown below.

> Service Levels 1 – 3:   **$38,970 - $43,110** per Custodial Dossier
> Service Level 4:        **$33,750** per Custodial Dossier

Analysis of up to 50,000 pages within the document collection will be performed for each Custodial Dossier and will be provided in a report form.

VII.   **Specialized Dossiers**

Pricing depends on the volume of the documents being analyzed, and the Document Hosting Service Level.  Note – at Service Level 4 only labor hours would be charged for this Study.

Service Levels 1 – 3:  **$44,190 - $52,470** per Specialized Dossier
Service Level 4:        **$33,750** per Specialized Dossier

Analysis of up to 100,000 pages within the document collection will be performed for each Specialized Dossier and will be provided in a report form, selected by Customer from the items listed below.

Issue Dossier
Timeline Dossier

VIII.   **Production Documents File Processing - Special Charge**          **Unit Cost:  $0.12/document**

Except as noted in the following, there will be no "per document" charge for production documents conversion and upload.  However, if customer delivers production documents to Crivella West in any file format other than TIF or PDF (with text layer and single text file per document), a per document fee of $0.12/document will be charged for converting the file type(s) to PDF format.  Additionally, required technical support services will be charged separately at the rate in "Consulting and Technical Support Services", set forth below.

IX.   **Consulting and Technical Support Services - Special Charge**          **Unit Cost:   $225 - $400/per hour**

Consulting services related to special projects or technical services as defined by the Customer's needs during the course of this engagement.  This charge does not apply to the Services listed on this Pricing List to the extent they conform to the Assumptions set forth in Section I.  The actual billable rate depends on the qualifications and role being performed by the Consultant.

CRIVELLA WEST INCORPORATED
ACCRUED AND FORECAST CHARGES FOR DIGITEK PA COLLABORATIVE CENTER

| | | c GigaBytes | | | | | c GigaByte Charges | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | **YR** | **Total GB** | **Level 1 GB** | **Level 2 GB** | **Level 3 GB** | **Level 4 GB** | | **Level 1 $** | | **Level 2 $** | | **Level 3 $** | | **Level 4 $** | | **Cumulative Total** |
| | Rate$/GB | | **29.00** | **49.00** | **98.00** | **185.00** | | \multicolumn{6}{c} Current Month | | | | | | Total |
| May | 2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $ | - | $ | - | $ | - | $ | - | $ | - |
| June | 2009 | 1.95 | 0.00 | 1.95 | 0.00 | 0.00 | $ | - | $ | - | $ | - | $ | - | $ | - |
| July | 2009 | 6.62 | 0.00 | 6.62 | 0.00 | 0.00 | $ | - | $ | - | $ | - | $ | - | $ | - |
| Aug | 2009 | 6.62 | 0.00 | 6.62 | 0.00 | 0.00 | $ | - | $ | - | $ | - | $ | - | $ | - |
| Sept | 2009 | 8.17 | 0.00 | 8.17 | 0.00 | 0.00 | $ | - | $ | 400 | $ | - | $ | - | $ | 400 |
| Oct | 2009 | 26.07 | 0.00 | 26.07 | 0.00 | 0.00 | $ | - | $ | 1,277 | $ | - | $ | - | $ | 1,277 |
| Nov | 2009 | 31.92 | 0.00 | 31.92 | 0.00 | 0.00 | $ | - | $ | 1,564 | $ | - | $ | - | $ | 1,564 |
| Dec | 2009 | 47.08 | 0.00 | 47.08 | 0.00 | 0.00 | $ | - | $ | 2,307 | $ | - | $ | - | $ | 2,307 |
| Jan | 2010 | 90.11 | 0.00 | 90.11 | 0.00 | 0.00 | $ | - | $ | 4,415 | $ | - | $ | - | $ | 4,415 |
| Feb | 2010 | 90.11 | 0.00 | 90.11 | 0.00 | 0.00 | $ | - | $ | 4,415 | $ | - | $ | - | $ | 4,415 |
| Mar | 2010 | 95.12 | 0.00 | 95.12 | 0.00 | 0.00 | $ | - | $ | 4,661 | $ | - | $ | - | $ | 4,661 |
| Apr | 2010 | 95.26 | 0.00 | 95.26 | 0.00 | 0.00 | $ | - | $ | 4,668 | $ | - | $ | - | $ | 4,668 |
| May | 2010 | 95.26 | 0.00 | 95.26 | 0.00 | 0.00 | $ | - | $ | 4,668 | $ | - | $ | - | $ | 4,668 |
| June | 2010 | 95.34 | 0.00 | 95.34 | 0.00 | 0.00 | $ | - | $ | 4,672 | $ | - | $ | - | $ | 4,672 |
| July | 2010 | 95.35 | 0.00 | 95.35 | 0.00 | 0.00 | $ | - | $ | 4,672 | $ | - | $ | - | $ | 4,672 |
| Aug | 2010 | 95.35 | 0.00 | 95.35 | 0.00 | 0.00 | $ | - | $ | 4,672 | $ | - | $ | - | $ | 4,672 |
| Sept | 2010 | 95.35 | 0.00 | 95.35 | 0.00 | 0.00 | $ | - | $ | 4,672 | $ | - | $ | - | $ | 4,672 |
| Oct | 2010 | 95.35 | 0.00 | 95.35 | 0.00 | 0.00 | $ | - | $ | 4,672 | $ | - | $ | - | $ | 4,672 |
| Nov | 2010 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| Dec | 2010 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| Jan | 2011 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| Feb | 2011 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| Mar | 2011 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| Apr | 2011 | 95.36 | 0.00 | 95.36 | 0.00 | 0.00 | $ | - | $ | 4,673 | $ | - | $ | - | $ | 4,673 |
| | **Total** | | | | | | | | | | | | | | $ | 79,772 |

**Exhibit B**

CRIVELLA WEST INCORPORATED
ACCRUED AND FORECAST CHARGES FOR DIGITEK PSC COLLABORATIVE CENTER

| | | GigaBytes | | | | GigaByte Charges | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | **Year** | **Total GB** | **Level 1 GB** | **Level 2 GB** | **Level 3 GB** | **Level 4 GB** | **Level 1 $** | **Level 2 $** | **Level 3 $** | **Level 4 $** | **Cumulative Total** |
| | Rate$/GB | | 29.00 | 49.00 | 98.00 | 185.00 | Current Month | | | | Total |
| May | 2009 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $ - | $ - | $ - | $ - | $ - |
| June | 2009 | 2.41 | 0.00 | 2.41 | 0.00 | 0.00 | $ - | $ - | $ - | $ - | $ - |
| July | 2009 | 8.12 | 0.00 | 8.12 | 0.00 | 0.00 | $ - | $ - | $ - | $ - | $ - |
| Aug | 2009 | 8.12 | 0.00 | 8.12 | 0.00 | 0.00 | $ - | $ - | $ - | $ - | $ - |
| Sept | 2009 | 31.96 | 0.00 | 31.96 | 0.00 | 0.00 | $ - | $ 1,566 | $ - | $ - | $ 1,566 |
| Oct | 2009 | 32.02 | 0.00 | 32.02 | 0.00 | 0.00 | $ - | $ 1,569 | $ - | $ - | $ 1,569 |
| Nov | 2009 | 39.40 | 0.00 | 39.40 | 0.00 | 0.00 | $ - | $ 1,931 | $ - | $ - | $ 1,931 |
| Dec | 2009 | 86.40 | 0.00 | 86.40 | 0.00 | 0.00 | $ - | $ 4,234 | $ - | $ - | $ 4,234 |
| Jan | 2010 | 111.22 | 0.00 | 86.41 | 0.00 | 24.82 | $ - | $ 4,234 | $ - | $ 4,591 | $ 8,825 |
| Feb | 2010 | 111.45 | 0.00 | 81.67 | 0.00 | 29.78 | $ - | $ 4,002 | $ - | $ 5,509 | $ 9,511 |
| Mar | 2010 | 117.08 | 0.00 | 77.83 | 0.00 | 39.26 | $ - | $ 3,813 | $ - | $ 7,262 | $ 11,076 |
| April | 2010 | 117.15 | 0.00 | 72.16 | 0.00 | 44.98 | $ - | $ 3,536 | $ - | $ 8,322 | $ 11,858 |
| May | 2010 | 117.15 | 0.00 | 72.16 | 0.00 | 44.98 | $ - | $ 3,536 | $ - | $ 8,322 | $ 11,858 |
| June | 2010 | 117.25 | 0.00 | 72.22 | 0.00 | 45.02 | $ - | $ 3,539 | $ - | $ 8,329 | $ 11,868 |
| July | 2010 | 117.30 | 0.00 | 72.26 | 0.00 | 45.05 | $ - | $ 3,541 | $ - | $ 8,333 | $ 11,874 |
| Aug | 2010 | 117.49 | 0.00 | 72.37 | 0.00 | 45.12 | $ - | $ 3,546 | $ - | $ 8,346 | $ 11,893 |
| Sept | 2010 | 117.49 | 0.00 | 72.37 | 0.00 | 45.12 | $ - | $ 3,546 | $ - | $ 8,346 | $ 11,893 |
| Oct | 2010 | 117.49 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,546 | $ - | $ 8,347 | $ 11,893 |
| Nov | 2010 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| Dec | 2010 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| Jan | 2011 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| Feb | 2011 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| Mar | 2011 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| April | 2011 | 117.50 | 0.00 | 72.38 | 0.00 | 45.12 | $ - | $ 3,547 | $ - | $ 8,347 | $ 11,894 |
| | **Total** | | | | | | | | | | $ 193,214 |

*Exhibit C*

CRIVELLA WEST INCORPORATED
DIGITEK – COMPREHENSIVE CUSTODIAL SETS

Exhibit D

| |
|---|
| Adams, Mike |
| Bird, Cassandra |
| Bitler, Daniel |
| Boothe, Doug |
| Cardona, Eric |
| Dave, Ashesh |
| Dowling, Rick |
| Eng, Wanda |
| Galea, Paul |
| Hakim, Nasrat |
| Koon, Charles |
| Lambridis, Phyllis |
| Latzo, Patricia |
| Nigalaye, Ashok |
| Nizio, Brian |
| Olafsson, Sigurdur |
| Patel, Apurva |
| Patel, Chandubhai |
| Patel, Divya |
| Patel, Sandipkumar |
| Ponzo, Michael |
| Radtke, Liana |
| Rope, Jeffrey |
| Shah, Jasmine |
| Sherwani, Misbah |
| Talbot, Scott |
| Thapar, Sarita |
| Wolfe, Suzanna |
| Young, Chris |
| Zhu, Jisheng |

CRIVELLA WEST INCORPORATED
DIGITEK – CUSTODIAN SPECIAL COLLECTIONS

Exhibit E

**A. Manufacturer specific special collections:**
Actavis:
- Batch 80227
- Emails from Actavis

General:
- Compression
- Deduster
- OOS Digoxin Email

**B. Custodian (General) special collections:**
- FDA Red Flag Emails
- Indemnification
- Inspection Red-Flag Emails
- Manufacturing Red Flag Emails
- Primary Alternative Manufacturer
- QA Testing and Inspection
- Recall
- Recall Red Flag Emails

**C. Custodian (Specific) special collections:**
Bird:
- Mylan November 2006 Audit
Bitler:
- AQL Inspection
- CAPA - Broad
- GMP
- OOS
- QSIP - Broad
- Recall
Lambridis:
- Actavis Meeting Minutes related to FDA
Zhu:
- Weight deviation 2007 – 2008
- Adverse Events Emails