```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          AT CHARLESTON

 3               TRANSCRIPT OF PROCEEDINGS

 4


 5
          ----------------------------x
 6                                    :
          IN RE:  DIGITEK PRODUCT     :       CIVIL ACTION
 7        LIABILITY LITIGATION        :       NO. 2:08-MD-01968
                                      :
 8                                    :       October 10, 2008
          ----------------------------x
 9


10                       INITIAL CONFERENCE

11


12
                BEFORE THE HONORABLE JOSEPH R. GOODWIN
13             CHIEF UNITED STATES DISTRICT JUDGE
                              AND
14             THE HONORABLE MARY E. STANLEY
               UNITED STATES MAGISTRATE JUDGE

15

16        APPEARANCES:

17        For the Plaintiffs:      MR. FRED THOMPSON, III
                                   Motley Rice, LLC
18                                 P.O. Box 1792
                                   Mt. Pleasant, SC  29464
19
                                   MR. CARL N. FRANKOVITCH
20                                 Frankovitch, Anetakis,
                                   Colantonio & Simon
21                                 337 Penco Road
                                   Weirton, WV  26062
22
                                   MR. HARRY F. BELL, JR.
23                                 Bell & Bands PLLC
                                   P.O. Box 1723
24                                 Charleston, WV  25326

25
```

```
 1   APPEARANCES (Continued):

 2

 3   For the Plaintiffs:        MR. DANIEL E. BECNEL, JR.
                                Becnel Law Firm
 4                              P.O. Drawer H
                                Reserve, LA  70084
 5

 6                              MS. JANET G. ABARAY
                                Burg, Simpson, Eldredge, Hersh
 7                              & Jardine
                                312 Walnut Street
 8                              Suite 2090
                                Cincinnati, OH  45202
 9

10

11   For the Defendants:        MR. MATTHEW P. MORIARTY
                                Tucker, Ellis & West LLP
12                              1150 Huntington Building
                                925 Euclid Avenue
13                              Cleveland, Ohio  44115

14

15                              MS. REBECCA A. BETTS
                                Allen, Guthrie & Thomas
16                              P.O. Box 3394
                                Charleston, WV  25333-3394
17

18

19

20

21

22

23

24

25
```

1    ADDITIONAL COUNSEL PRESENT:

2

3    K. Camp Bailey; John R. Climaco; G. Rick DiGiorgio; Brian

4    Kriesler; David Kuttles; Hirlye R. Lutz, III; Richard D.

5    Meadow; Karen Barth Menzies; Peter A. Miller; Ashley L.

6    Ownby; Shelley A. Sanford; Richard W. Schulte; Carmen Scott;

7    J. Paul Sizemore; William W. Sweetnam; David B. Thomas;

8    Teresa C. Toriseva; Diane K. Zink; Kimberley R. Fields;

9    Lauren M. DeLong; Michael A. Anderson; Karren Schaeffer;

10   Robert Blanchard; Stacy Hauer; Michelle Kranz; Randall G.

11   Phillips; Andy Alonso; G. Erick Rosemond.

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

23

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

25

P R O C E E D I N G S

CHIEF JUDGE GOODWIN:  Good morning.

THE CLERK:  The matter before the Court is *In Re:*
*Digitek Product Liability Litigation*, Civil Action Number
2:08-MD-1968.

CHIEF JUDGE GOODWIN:  I think we can draw a fine
jury from this group, good-looking jury panel.

I'm Judge Goodwin.  To my right is Magistrate Judge
Mary Stanley.  My courtroom deputy is Robin Clark.  My court
reporter is Lisa Cook.  To my left is Judge Stanley's law
clerk, Kate Fife.  To my right is my senior law clerk, Angie
Volk.  I hope during this process that you will find my
staff and the staff of the Clerk's Office very friendly.

I think you may have already met her, but I'll just
introduce our clerk, Terry Deppner.  She looks like she's
only 25 years old, but she's been with us longer than that.
She is one of the most experienced and capable federal
district clerks in the country and recognized as such.
You'll find her and her staff very helpful.

If you have any question and get bogged down on
anything, call the Clerk's Office or call someone on my
staff and we'll do our best to help you.  Knowing
Ms. Deppner, I assume that she's already offered you the
opportunity to go downstairs after the hearing today.  And
for those of you who are not proficient in CM/ECF electronic

1    case filing, she has tutoring arranged, or can arrange it.

2        Am I right about that?

3            MS. DEPPNER:  Yes.

4            CHIEF JUDGE GOODWIN:  Or you can arrange it with

5    her at some later time.

6        Well, as I said, I don't know how many years ago when I

7    started the *Serzone* litigation and looked out upon the

8    lawyers -- I assume most of you by now have gotten the book

9    on me.  You've asked people about me.  You've got

10   information and impressions, and maybe a misimpression or

11   two.

12       Let me give you my side of it.  I graduated from law

13   school in 1970.  I was a trial lawyer back when lawyers

14   tried cases.  I tried cases for 25 years.  I tried dog

15   bites, drunk driving cases, murder, car wrecks, products

16   cases, securities cases, commercial cases and, to my

17   everlasting regret, even a few boundary disputes.

18       I loved most of those years and I loved trying

19   lawsuits.  But a little more than 13 years ago, I guess it's

20   14 years ago, I got a weird phone call from Senator Byrd's

21   office.  And the young lady who was his state director who's

22   now running for Congress called me and said, "Senator Byrd

23   would like to come over to your office to visit with you."

24       So, he came over.  We had a very brief discussion about

25   world affairs, politics, such things.  And he looked at me

1    and says, "I want to make you a federal judge."  Well, I

2    didn't faint, but it was close.  And I only thought about it

3    for about 24 hours.  Then, like today, it was not a

4    financially attractive offer.  But, on the other hand, it

5    was something that I had always thought about but had, long

6    before that time, put out of my mind.

7        I have never looked back with regret.  I have enjoyed

8    every moment of these past 13 years.  I'll tell you, quite

9    frankly, at that time I was growing tired of some of the

10   practices that were current in our profession, some of which

11   still exist and some of which are getting worse.

12       I became exasperated with unpredictable schedules and

13   an increasing deficit in common courtesy among the members

14   of my profession, even common decency sometimes.  I yearned

15   for the good old days of handshake settlements, agreed-to

16   scheduling, and just plain good humor.

17       I remember with fondness traveling to depositions and

18   drinking until 2:00 in the mornings, smoking at least two

19   packs of cigarettes in depositions where you couldn't see

20   the witness that cigarette smoke was so heavy.  I'm sure

21   that all affected my life expectancy, along with the steaks

22   I ate on those trips.

23       But this is not all just nostalgia.  I was revolted at

24   that time, and still am, by Rambo lawyering.  I didn't want

25   to open another letter from a lawyer with whom I had had a

1   phone conversation the day before who then misrepresented

2   boldly and blatantly what had been said in the phone

3   conversation and sent a copy of the letter to the judge.

4   Little did I know, since I had never been a judge at that

5   time, judges hate that stuff.

6        This is all by way of leading up to the point that I

7   recognize that lawyers have gotten to a point where there is

8   some considerable disagreement and difficulty in getting

9   along one with the other.  But that's not going to happen in

10  my little corner of the world.  We're going to get along.

11  Everybody's going to be happy.

12       I am -- well, I am, by my own estimation, easy to get

13  along with as a judge.  It is not my case.  I don't intend

14  to interfere in the development of the case.  I don't intend

15  to interfere with how you go about your practice of law

16  except to the extent that I learn you're being mean to each

17  other or discourteous to any other lawyer or to this Court.

18  And then I am not as easy to get along with as I'm

19  purporting to be.

20       I will not tolerate -- and I'm looking at people that I

21  don't need to be giving this lecture to.  But I just won't

22  put up with it.  If you think -- and you can pass this along

23  to people around here that you think might be trouble.  If

24  you think that you have heard of large sanctions for

25  misbehavior, you haven't seen the sanctions I can impose.

1    I recognize that a one-hundred-dollar sanction or a

2    five-hundred-dollar sanction or a thousand-dollar sanction

3    is fairly meaningless to a lot of people, and I intend to

4    have meaningful sanctions if necessary.  Now, what I intend,

5    of course, is that we have none.  And I don't think we will.

6        I think Mr. Frankovitch who's in the back there can

7    tell you during the *Serzone* MDL we never once had a

8    disagreement among lawyers that in any way bubbled up to my

9    level.  And I talked with Judge Stanley and she, likewise,

10   had no such problems.  So, that's the model we expect from

11   this bar.  And I see a lot of the same faces.  So, I hope

12   that's the case.

13       This litigation is only complicated in the sense that

14   there are a large number of cases.  It is only difficult to

15   the extent you make it difficult.  Judge Stanley is an

16   extremely experienced Magistrate Court Judge.

17       How many years?

18            MAGISTRATE JUDGE STANLEY:  Sixteen.

19            CHIEF JUDGE GOODWIN:  Sixteen years.  And before

20   that, she was an Assistant United States Attorney.  She

21   knows how to help you with your discovery.  She knows how to

22   stage discovery.  And I think you'll find her extremely

23   helpful as we begin this process.

24       Let me go off on a tangent.  This happens frequently.

25   I recognize we have a number of suits that have been filed

1    in West Virginia, a number of suits that have been filed in

2    State Court in New Jersey, and the MDL cases that are coming

3    in and keep coming in.  And we have a few, very few outlier

4    suits.

5         It is my intention to coordinate and deal with all of

6    the discovery in all of the cases to the extent I am able to

7    be persuasive with the judges in the other courts.  I've had

8    pretty good luck with that in the past in some matters.  I

9    expect that -- I feel pretty confident about it in terms of

10   the West Virginia cases.  I feel really confident about it

11   in the case of West Virginia cases.  I don't know who the

12   judge is in New Jersey, but I'll try to be sweet and nice

13   and persuasive.  Very few state judges mind it when somebody

14   says, "Judge, I'll take that discovery problem off your

15   hands.  I'll help you through that."

16        Now, I understand that issues of class certification

17   cannot be dealt with early in a matter like this,

18   particularly where there are State Court cases and Federal

19   Court cases and different jurisdictions.  I know that -- I

20   expect that there will probably be one lawsuit filed in this

21   court at some point that is more of a master complaint, for

22   lack of a better word, and that will be very helpful for

23   management.

24        But, in any event, I'm getting ahead of myself.  The

25   bottom line is I'm going to do what I can to help the

1   lawyers on both sides of this case move the case forward

2   without disrupting your lives.  It is one of my sincere

3   regrets that I scheduled this hearing today on a Jewish

4   holiday.  I didn't know.  And I will try to accommodate

5   people that -- the lawyers that called me, I was very

6   regretful and told them they did not have to attend.

7        We will have a website which will keep everybody

8   up-to-date.  The process for the selection of the

9   plaintiffs' steering committee is set forth in the order.  I

10  ask you to get together and try to make it a representative

11  steering committee.  And I will be flexible about the number

12  of people that I put on that steering committee, as flexible

13  as your degree of agreement is.

14       The more you agree, the more likely it is I'm going to

15  follow your guidance.  The more you disagree, the more

16  likely it is I'm just going to have to strike out on my own

17  and make this sausage blindfolded.  I don't want to do that.

18  I had to do that a little bit with the appointment of

19  liaison counsel because there wasn't complete agreement.

20       We have a few items to talk about today, but I see a

21  number of lawyers here.  And to the extent that any of you

22  would like to make some preliminary remarks before we start

23  on a more formal agenda, I'll be glad to hear from any of

24  you who would have something to say.

25       I'm sorry.  It is my commitment to you that it will not

1  just be liaison or lead counsel that I think about when I

2  deal with these cases.  I'll be thinking about each and

3  every one of you and your clients.  That's what this is all

4  about.

5       Yes, sir.

6       MR. BECNEL:  May it please the Court, Daniel

7  Becnel from Louisiana.  I think one of the cases --

8       CHIEF JUDGE GOODWIN:  Yes, sir.

9       MR. BECNEL:  I think some of the cases that

10  haven't been addressed yet in any of the pleadings that I've

11  seen so far is some of the cases that will be filed very

12  shortly, and I wanted to make the Court aware of those.

13       When people got a recall notice, the first step you had

14  to do was go to your physician to get a substitute

15  medication for the one in the recall notice.

16       In addition to that, you had to incur costs from the

17  physician who would then take blood tests sometimes and do

18  stress tests and so on and so forth to give you a medicated

19  dose of another medication to do the same thing that Digitek

20  did, a digitalis type product.

21       So, you're going to have either a state-by-state class

22  action based on 50 state laws to deal with those issues not

23  only on third party cases, but for individuals who may not

24  have met -- let's say I have a great plan, but I haven't

25  been sick at all this year or I didn't meet my,

1    quote/unquote, deductible.  Then it's coming out of my

2    pocket.

3        So, those are class actions I believe that the Court

4    should be aware are coming.  Some states allow them.  Some

5    states don't.  And this is not medical monitoring because I

6    believe all of us agree this is not truly a medical

7    monitoring case after a few weeks.

8        So, I wanted to make the Court aware that that's a big,

9    big issue.  And in dealing with the State Court judges, you

10   know, I think maybe some of those cases will be placed in

11   those.

12       And in many instances, what I have seen work is that

13   the state judges and the federal judges, as Mr. Climaco and

14   others have, as we did in the Serzone case and the welding

15   rod case, they hold joint hearings between the state judges

16   and the federal judges doing things such as a science day

17   where you kind of learn the defendant's side of the case and

18   the plaintiff's side of the case and what it's all about.

19       And I think something that Judge Pointer did for us

20   years ago -- he recently died, just tragic.  But Judge

21   Pointer would go around because sometimes -- and some of the

22   judges -- Judge Katz recently did it.  He actually went to

23   New Jersey and sat, and that is a good thing.

24       And, you know, I'm married to a state judge and every

25   night I have to say, "Your Honor, may I approach the bed?"

1    And I'm just kind of getting tired of that.  But problems

2    between state judges and federal judges exist where they

3    don't need to exist.  And, so, I would suggest some of those

4    things that Pointer did long ago and he would actually go

5    around the country.

6         Judge Davis did the same thing in *Baycol*.  He left

7    Minnesota and went to New Orleans and invited Judge Fallon

8    and some of the other judges to participate.  And I can

9    assure the Court that those are the types of things that

10   make these big mass cases work and get them overwith

11   quickly.

12        Thank you, sir.

13             CHIEF JUDGE GOODWIN:  Thank you, Mr. Becnel.  I

14   appreciate that, particularly the suggestions you had at the

15   end.  Your experience in these kind of matters is well-known

16   and I very much appreciate it.  I promise you I'll do my

17   best to adopt some of those practices, particularly in

18   dealing with state judges.

19        I've often been accused of believing that I still have

20   to run for this job.  So, it's my inclination to reach out

21   to my colleagues in State Court.  And your ideas are good

22   and I will do that.  That's my plan.

23        How is my friend Judge Fallon?

24             MR. BECNEL:  Judge Fallon is wonderful.  He had,

25   as you said, a very -- I flew here from Germany 27 hours to

1   get here and left yesterday.  But he wrote a 53-page opinion

2   that I read while I was in Europe on attorney's fees where

3   there were disagreements between the attorney's fees in a

4   330-million-dollar case.  And I've served with Judge Fallon

5   on probably five or six major cases over the years prior to

6   this.

7           CHIEF JUDGE GOODWIN:  Is Vioxx still going on?

8           MR. BECNEL:  Pardon?

9           CHIEF JUDGE GOODWIN:  Is the Vioxx still going on?

10          MR. BECNEL:  It's settled, but I will say this

11  since you brought it up.  He did something that Judge Katz

12  did.  You know, a lot of federal judges shove things off to

13  the magistrate in terms of settlement so they don't pollute

14  their minds.  He --

15          CHIEF JUDGE GOODWIN:  That's not a risk,

16  Mr. Becnel.  I'm polluted.

17          MR. BECNEL:  Okay.  He actually got involved for a

18  year and half without anybody knowing it in negotiations

19  with a team that he appointed, as well as the state judges

20  from around the country.  And then when they jelled the

21  settlement, they all met together, worked together,

22  appointed their own special masters for their states, et

23  cetera.  It worked beautifully.

24      And a lot of people have already got their checks,

25  which is unheard of in an MDL.  I mean, I've been in MDLs

1   that have lasted 10, 15 years.  In breast implants we're

2   still dealing with some of the ramifications.

3          CHIEF JUDGE GOODWIN:  Well, there's a very good

4   reason for that.  The MDL conference each year where we get

5   together and discuss matters is held at the Breakers in Palm

6   Beach.  And if you don't have an MDL, you don't get to go.

7   So, I think that's why they last that long.

8          MR. BECNEL:  I think that's why so many judges --

9   I seem to be one of the heroes of the MDLs because I start

10  so many of them.  And many judges say, "What's wrong?  You

11  mad at me?"

12     But, Judge, I think that's another thing you ought to

13  be thinking about.  In *Serzone* you didn't have to deal with

14  that, but a process whereby if there is a recovery, how do

15  we deal with it on the front end?  And I've seen it go sour

16  more in the last five years than in my first 35 years of

17  practicing law and trying cases.

18     And I think you ought to establish two things.  One, an

19  audit committee right off the bat.  And within your

20  committee you appoint a method by which if -- let's say Fred

21  and Danny are attending this hearing today and Mr. Bell.

22  And Mr. Bell has one hour, Fred has two hours, and I have

23  three hours, and we know we were only here for an hour and a

24  half.  Then you nip it in the bud rather than what a lot of

25  lawyers tend to do.  They tend to triple bill, overbill.

1     And at the end of the case, Mr. Bell who actually put

2  his time down for an hour's worth of expected pay doesn't

3  have to compete with Becnel who's fudged a little bit and

4  put three hours down.

5     So, when you look at it -- and there's a special master

6  who has no clue about what's going on.  That way, there's

7  two people that know about it.  You know what's being billed

8  every month or every quarter and the audit committee knows.

9     And if Becnel is doing something not so good, that

10  audit committee through Fred -- Fred comes to Danny and he

11  says, "Hey, Danny, you're kind of overbilling."  That's

12  critical to what you're trying to do.

13     What you're trying to do is have lawyers do things the

14  way my father did them when he was a lawyer.  It was all

15  handshakes.  It was all the word is your bond.  It was all

16  you didn't need to have 20-page contracts to deal with it.

17     There's an old adage, Judge -- and I've been at this

18  for 40 years and, you know, and usually trying cases at

19  least three to four months a year -- you can sheer a sheep

20  every year, but you can't kill him but one time.  And if we

21  kill him that one time with you, then that's the end.

22     And when you go to those MDL conferences, you're going

23  to say, "That Becnel guy, he ain't any good.  Don't appoint

24  him to anything in the future."  And I have killed the

25  sheep.  So, good luck to you.

1    CHIEF JUDGE GOODWIN:  Thank you, Mr. Becnel.

2   That's good advice and I appreciate you sharing it and I

3   think everybody here learned a little something from that.

4   I certainly take it all very seriously as you'll see as we

5   go down the road.  I really do.  And I appreciate it.

6        Anybody else have anything they want to say?

7        (No Response)

8        CHIEF JUDGE GOODWIN:  Well, as you probably

9   guessed, we're going to have to wait until we have a

10   plaintiffs' steering committee and the choice of lead

11   counsel to decide a lot of things, but we can go through a

12   few things today to the extent that you know.  And I'll just

13   address this to liaison counsel and defense counsel.  You

14   may seek the help of your colleagues in the back.

15        How many cases do we expect to be transferred?  Does

16   anybody have any idea?

17        MR. BECNEL:  Judge, I have a couple hundred trial

18   lawyers around the country.  There are not that terribly

19   many cases that you can put your finger on and say, "I can,"

20   with all due respect, "try this case," because whenever you

21   get a population with these problems, as we say, they all

22   have warts.  So, some of them are good.  Some of them are

23   bad.

24        But these MDLs -- Mr. Paul Sizemore with Mr. Girardi's

25   office, they tried one, you know, in Vioxx.  There were 40

1   lawyers who participated in mock trials for two days.

2   Shelley Sanford's firm and her former partner who died was

3   the person that started Vioxx.

4        And as a result of that, the problem is in doing what

5   Judge Fallon did and try five or six cases at an average

6   cost --

7            CHIEF JUDGE GOODWIN:  Millions?

8            MR. BECNEL:  -- of probably three to five million

9   dollars a pop.  Now, Paul knew when he tried that case, he

10  needed a team because the defense had 45 lawyers full-time.

11  They almost took over a hotel just working on motion after

12  motion in the middle of trial.  And he recruited one of the

13  girls from my office that did a lot of the discovery and so

14  on and so forth.  And, so, we had to put a team together.

15       Now, if a case involves -- if it's a

16  six-hundred-thousand-dollar case and you're spending five

17  million dollars and you're trying to make the other side cry

18  uncle or they're trying to make you cry uncle, that's not

19  very wise.

20       Judge Spiegel did something years ago for us in, in

21  Cincinnati.  And what he did was he was going to have -- and

22  I think they teach everybody in your judges' schools now

23  sort of a, quote/unquote, mock trial or summary jury trial

24  where the case was tried.  The judge ordered the check

25  writers from the defendants to be there.  Plaintiffs were

1   trying to prove and pierce the corporate veil, and we had

2   every kind of thing you can imagine in the case.  And then

3   it's not binding.  The judge then allowed both sides to

4   debrief the jury.  And Ms. Abaray who was with Mr. Chesley's

5   office at the time, we debriefed the jury.

6           CHIEF JUDGE GOODWIN:  Where is Mr. Chesley today?

7           MR. BECNEL:  I think --

8       Janet, where is he now?  I haven't seen him for a

9   while.

10          MS. ABARAY:  Janet Abaray.  I used to be with

11  Mr. Chesley's firm and he's still in Cincinnati, not doing

12  as much mass work.

13          MR. BECNEL:  He's kind of semi-retired from what

14  he told me.  He was hoping Hillary would win so he could be

15  Ambassador to Israel.  So, that's -- but we debriefed the

16  jury.  We both found out what our strengths and weaknesses

17  were.  And the next day we settled the case.

18          MR. THOMPSON:  Judge, in response to your question

19  of the universe of cases, we have joined together and put up

20  an exhibit list of the filed cases, and I think there are

21  around 80 that are filed.

22      Right now it would be just a wild guess in my mind, but

23  let me make a guess.  I think that the universe cases being

24  considered are probably around 2,000, the ones that will

25  eventually make it in the suit; or if there is an agreed

1   tolling agreement, I would expect it to be below that.  But

2   that's a wild guess, and I think it's probably on the high

3   side.  But that's -- I don't foresee a Vioxx of 40,000 cases

4   coming down the pike.  This may be something that other

5   people in the room actually have a better estimate than I

6   do, but that would be my response to your question.

7            CHIEF JUDGE GOODWIN:  All right.  Let me, let me

8   ask each of you when you stand up, since we're going to have

9   several people talking, to identify yourselves for the

10  record since Ms. Cook, who is the best court reporter in

11  America, doesn't know any of you yet, but she will.

12           MR. THOMPSON:  Yes, Your Honor.  It's Fred

13  Thompson, Motley Rice, plaintiffs' co-liaison counsel.

14           CHIEF JUDGE GOODWIN:  I know West Virginia has not

15  selected a judge yet to handle the consolidated cases.  Is

16  that correct?

17           MR. THOMPSON:  Yes, sir.

18           CHIEF JUDGE GOODWIN:  Does anybody know who the

19  judges are in New Jersey and how many cases they have?

20           MR. THOMPSON:  Judge, my understanding is that

21  they are also seeking a consolidation, but the judge has not

22  been selected.  I talked with a gentleman yesterday who's

23  more familiar with the New Jersey consolidation.  I believe

24  there are 16 cases filed in Atlantic County which, of

25  course, is Judge Higbee's home county and she is a mass

1  consolidation judge and --

2         CHIEF JUDGE GOODWIN:  Who chooses them in New

3  Jersey?  The Supreme Court?

4         MR. THOMPSON:  I believe that it's a panel of

5  judges under the supervision of the Supreme Court.  I'm not

6  an authority on that, but --

7         MR. BECNEL:  That's right.

8         MR. THOMPSON:  They do not have a consolidation

9  judge as we sit here today.

10         CHIEF JUDGE GOODWIN:  Based on what Mr. Becnel

11  said, it -- and from your statements that both sides

12  submitted, it's unclear to me how the cases actually break

13  down at this point with regard to theory.  It would not be

14  disrespectful, I don't think, to say that in some cases the

15  theories are still developing.  Is that fair?

16         MR. THOMPSON:  Yes, sir, Your Honor.  We're

17  painting a beautiful painting over here, but it's not yet

18  complete.

19         CHIEF JUDGE GOODWIN:  Can we reach any kind of

20  agreement on acceptance of service of process, counsel?

21         MR. MORIARTY:  Your Honor, my name is Matt

22  Moriarty from the law firm of Tucker, Ellis & West.

23      We have had limited discussions about that topic with

24  the plaintiffs' counsel.  We are willing to entertain some

25  acceptance of service of process.  But we have submitted a

1    letter to liaison counsel that lists for them the defendants

2    who have been sued around the country, which ones really are

3    involved in the manufacture or the distribution of Digitek,

4    and which ones really don't belong in the cases.

5         So, we would be accepting potentially service of

6    process for the, for the core entities that are involved.

7              CHIEF JUDGE GOODWIN:  Could you-all go ahead and

8    meet while we're waiting on this plaintiffs' steering

9    committee and work with liaison counsel to see if you can

10   work out a protocol for that?

11             MR. MORIARTY:  We would be happy to do that, Your

12   Honor.

13             CHIEF JUDGE GOODWIN:  Thank you, sir.

14        And I would say the same thing about a tolling

15   agreement.  That might actually have to wait.  I don't know

16   whether or not that can be achieved.

17        The defendants mentioned the status of preservation

18   efforts and suggested the consideration of lifting

19   restrictions on preservation.  At this time, it's my

20   intention to keep Pre-Trial Order Number 1 in place.  As we

21   go down the road, I'll certainly listen to suggestions.

22        Judge Stanley will talk with all of you after I finish

23   about her view of discovery and generally her approach to

24   discovery and her beginning ideas on this case.  And she

25   will be interested, no doubt, to hear what your ideas are.

1    Let me say again that my mind is open on the

2  composition of the plaintiffs' steering committee; that is,

3  in terms of numbers.  What I'm looking for is a working

4  plaintiffs' steering committee that will stay engaged, that

5  will devote the time necessary to meet and confer with lead

6  counsel, will engage in regular conference calls with lead

7  counsel and, where requested, will carry out all the hard

8  work tasks that are a part and parcel of such a job.

9    Some of you or some of your friends now that think they

10  want to be on the plaintiffs' steering committee may never

11  have been on one before.  So, think about it and talk to

12  people like Mr. Becnel who know what's involved before you

13  throw your name in the hat.

14    There's even some times they ask for money.  It looks

15  to me like I have just one firm for the defendants.  Is that

16  correct?  Is that likely to remain?

17    MS. BETTS:  Well, two law firms obviously, Your

18  Honor, but we represent all of the defendants.

19    CHIEF JUDGE GOODWIN:  All right.  I think I'll

20  leave the rest of it for discussion after we have a

21  plaintiffs' steering committee and the selection of lead

22  counsel.

23    Do you have any questions for me?  This is about your

24  only chance to interrogate me.  Again, I'll do what Judge

25  Maxwell, who is now about 85 and a judge in the Northern

1   District of West Virginia, told me is his one piece of

2   advice when I went on the district bench.  He said, "Resist

3   the impulse to cackle on the nest."  So, I'm not going to

4   resist the impulse.  I'm going to cackle on the nest for a

5   minute or two.

6        Judge M. Blane Michael who's on the Fourth Circuit

7   Court of Appeals had been on for about three months.  He

8   went to Richmond to hear argument.  Now I've dropped the

9   name of the Harvard law professor, the liberal.

10           MAGISTRATE JUDGE STANLEY:  Charles Tribe.

11           CHIEF JUDGE GOODWIN:  Mr. Tribe was making oral

12   argument and Judge Michael spoke up and asked him a

13   question.  And Laurence Tribe looked back and said, "Well,

14   Judge, let me ask you a question."  And Judge Michael said,

15   "Professor Tribe, I gave that up three months ago."

16        So, do you have any questions?  Any questions about the

17   process?  Don't leave here thinking that there's something

18   you think I should have covered that I didn't cover,

19   something you're wondering about.  Just ask me.

20           MS. BETTS:  Your Honor, since we're here, do you

21   have any idea when you'll schedule the next conference

22   because there are some substantive matters, obviously, we're

23   anxious to get moving on?

24           CHIEF JUDGE GOODWIN:  I will be guided by your

25   suggestions.  If you meet with liaison counsel and make a

1  suggestion or two, I'll follow your suggestion if I possibly

2  can.

3      MR. BECNEL:  Judge, --

4      MR. THOMPSON:  Judge, the only thing that I would

5  like to urge the Court -- and I have not appeared before you

6  before.  But to the extent that telephonic participation in

7  hearings is permitted, the, the air transit system is

8  expensive and I have a terrible feeling that it's about to

9  get a lot more expensive and difficult.  And any

10 opportunities that we have to have routine matters heard by

11 some electronic means would be very welcome I do believe.

12     CHIEF JUDGE GOODWIN:  I recognize the necessity of

13 doing that.  I will be frank to tell you I don't like it.  I

14 have a lot less -- I feel like I have a lot less control

15 when I'm dealing with lawyers sitting with their feet up on

16 their desk in their own office smoking a cigar than I do

17 when they're sitting in my conference room.

18     That being said, I know that I'll have to do it and I

19 will do it as an accommodation.  I also have now a good

20 video conferencing system available and I like that much

21 better than telephones.  So, it's just the kind of thing

22 we'll have to work out as we go along.

23     Charleston, West Virginia, is not the easiest place to

24 get to, but with the TSA there is no easy place to get to

25 anymore.  It's just a horrible hassle to fly.  I will -- and

1    this is part of working together.  I will try my best to

2    accommodate you.  But the people that want to be lead

3    counsel who are on the steering committee and want to

4    attend, those people should be willing to come to

5    Charleston.

6        Mr. Becnel.

7            MR. BECNEL:  Judge, one of the things -- and I

8    call it the Rubin rule if you remember Judge Alvin Rubin.

9            CHIEF JUDGE GOODWIN:  No, I don't.

10           MR. BECNEL:  He was on the District Court and he

11   was on the U.S. Fifth Circuit Court of Appeals.  There's two

12   rules he made that I think to this day most lawyers who ask

13   to be on the plaintiffs' -- a lot of times lawyers ask to be

14   on the plaintiffs' steering committee and you'll see them

15   twice a year, and the rest of the time they send one of

16   their lawyers.

17       The first rule was that you had to commit personally,

18   personally to do this.  Now, if you're in trial in another

19   location or something like that, that was, you got a pass.

20       Secondly, you had to pay your assessment on time.

21   Failure to pay your assessment on time suspended your

22   ability to bill because it's unfair.  And you brought up the

23   money.  We were with the Tucker firm with Judge O'Malley in

24   the welding rod case and it ain't going so good and the

25   assessment was pushing six, seven hundred thousand dollars

1   per individual.  If you don't have the financial wherewithal

2   to accept the financial responsibilities that you're going

3   to have to keep until the end until you get rid of it, you

4   ought to be able to put that in writing and throw me or

5   anybody else off if they don't meet those responsibilities.

6       And the last Rubin rule was, and I thought the most

7   important, was when you get ready, you set the trial -- and

8   he always did it and Judge Fallon and I were trained that

9   way -- within a year of the event.  And everything else

10  works backwards from that date, and that date does not

11  change.

12      And if you've got -- here's what the tragedy sometimes

13  is.  You ought to have three or four backup cases so that if

14  they come to Mr. Bell and say, "Mr. Bell, you are going to

15  trial in December of next year," and they come to him and

16  they don't want to go to trial and they settle his case,

17  then all of a sudden you've got the month set aside for a

18  trial with nothing to try.  And it didn't help the prospect

19  of settlement.

20      So that you have got to have a -- if they're not going

21  to trial, then Fred's case is going or Teresa's case is

22  going or Girardi's case is going or whomever.  So, it's just

23  one -- it's like a bunch of ducks.  You're either going to

24  settle five or six cases, and you prepare every one of them

25  for trial with different trial teams if need be.  That way,

1   you get these cases moving.

2       The worst thing that happens to lawyers today is the

3   disappointment of the clients.  And we're dealing with an

4   aging population.  We see that in case after case after

5   case.  You've got 10, 15, 20 percent of the people in these

6   big cases, if they last four to five years, they die.  And

7   then you're dealing with heirs and successors and estate

8   planners and Social Security issues, et cetera, et cetera.

9   It makes it very difficult.

10      When you and I started practicing law, you had a single

11  client.  Most of these lawyers in here have multiple clients

12  from all over the country with the internet and referrals.

13  You just have to have newsletters out to them and you have

14  to be able to explain -- we start telling them we've got a

15  trial a year from now, and then it settles and their cases

16  are not moving and they're getting sicker.

17          CHIEF JUDGE GOODWIN:  Mr. Becnel, I can tell you

18  this.  You know a lot of judges, but you've never met a

19  judge that likes to try cases anymore than I do.  And if I

20  set a trial date, I'll stack them up enough that I assure

21  you something will go to trial.

22          MR. BECNEL:  Well, and it's just good so that we

23  can tell in the newsletter that the committee sends out to

24  everybody that we've got ten cases set for trial and are

25  prepared for the trial.  It's highly unlikely that all of

1    them will go to trial on that date, but they're going to

2    trial one after another as Judge Fallon did.

3        You know, even during the hurricane he tried one of the

4    darn cases twice, once in Houston and then once in New

5    Orleans when the electricity got turned back on.  And that's

6    what moves cases.  Moving cases is not delay.

7        CHIEF JUDGE GOODWIN:  Some of the lawyers who

8    practice in front of me can tell you that for unknown

9    reasons, truly unknown reasons, my cases move.  I don't know

10   why.  I really don't know why, but they do.

11       Any other requests that we need to take up before I

12   leave this matter to Judge Stanley?

13       Yes, sir.

14       MR. MORIARTY:  Your Honor, may I just say one

15   thing?  I've talked to many of the plaintiffs' lawyers, not

16   just liaison counsel, and they all know how important it is

17   for us to talk about product identification.  It's important

18   to inspect the pills.  It's important to Actavis and Mylan

19   to get their hands around this problem.

20       And although we don't -- Actavis produced about 1.3

21   billion Digitek tablets from 2005 through the end of 2007.

22   They're anxious to get their arms around this.  And although

23   we realize that we're not likely to get a widespread

24   agreement on pill testing or tablet testing at the recall

25   facility, I would encourage the lawyers to consider talking

1    about individual tablet testing for their clients.

2        These cases are about individual plaintiffs who have

3    tablets perhaps still in their possession.  It's about

4    individual people who may or may not have been hurt from

5    this product.  And it's important for the companies, the FDA

6    and I think all these people.  And we had encouraged them to

7    move forward with this even as they're working on their

8    structure so that we can keep this moving and hit the ground

9    running once plaintiffs' lead counsel and their PSC and

10   everything else is actually in place.

11       CHIEF JUDGE GOODWIN:  Well, I've spent the most

12   time looking and talking to the plaintiffs.  I understand

13   your side of the case as well.  I hope you understand that.

14   Your side of the case is more predictable for me.  So, I

15   just haven't spent as much time chatting you up.  Judge

16   Stanley, I think, may have a thought or two about that when

17   she talks to you about that.

18       Yes, ma'am.

19       MS. ABARAY:  Thank you, Your Honor.  Janet Abaray

20   from the --

21       CHIEF JUDGE GOODWIN:  Say your last name again.

22       MS. ABARAY:  Janet Abaray from the Burg Simpson

23   firm of Cincinnati.  And I just wanted to follow up on

24   Mr. Moriarty's point.

25       We had an opportunity to speak about this and I think

1    you've spoken to several of the plaintiffs' attorneys about

2    this.  I also happened to be on the *Heparin* executive

3    committee.  And Ms. Kranz is here from the Zoll law firm,

4    and their firm is the lead counsel in *Heparin*.  It has a lot

5    of the same issues in terms of the manufacturing problems.

6         And one of the things we were able to do in *Heparin* is

7    to have the defendants produce already to the plaintiffs'

8    committee their own test results on the product.  And even

9    though we just served our discovery requests last week, we

10   got from the defendants their test results over a month or

11   two ago.  And it's really helped us in that case narrow the

12   issues and help the plaintiffs select cases, reject cases.

13        So, it's very valuable information and that might be

14   something to consider that would help expedite rather than

15   trying to shift the burden to the plaintiffs to be running

16   around doing a bunch of tests.  It seems to me we should get

17   the defendants' test results first.  I just want to make

18   that suggestion.

19             CHIEF JUDGE GOODWIN:  Thank you.

20        Anything else before I turn this over to Judge Stanley?

21        Well, I want to -- one of the things Mr. Becnel brought

22   up is --

23        Terry, did you speak to the groups before we began?

24             MS. DEPPNER:  No, sir, I did not.

25             CHIEF JUDGE GOODWIN:  There are a number of issues

1     of some significance that arise in these kinds of cases in

2     our Clerk's Office and we want to be of service to you.

3          And if you wanted to go over a few of those,

4     Ms. Deppner, that might be helpful.

5               MS. DEPPNER:  Thank you, Your Honor.

6          First of all, I've been with the court 32 years.  So --

7     but I would like to introduce with me today Rebecca Proctor.

8     And Becky is the lady in our office who will enter log-ins

9     and passwords for you and mail those to you so you can file

10    electronically in our CM/ECF system, and also Rowena

11    Stiltner who is our operations manager.

12         They will be giving these cases high priority and high

13    attention.  And as we get the cases that are filed

14    originally in our court, we have established the website in

15    the case of -- the list of cases there and we have assigned

16    a number and it goes up on that list.

17         We ask that you do look at that list because you can

18    sort it by plaintiffs' names or defendants' names or even by

19    the district from which it came.  And I have talked with

20    several of you on the telephone and it seems to be helpful

21    when you did access that list.

22         The other thing that we've established is the attorney

23    listing.  It's an alphabetical listing with your names on

24    there.  We take the information from the documents that are

25    filed in your cases.  Firm names change sometimes.  Lawyers

1    go to different firms.

2         And, so, you really do need to check this listing or

3    have your staff check this listing, and it should address a

4    lot of the questions that you may have.  We tried to learn

5    from our mistakes in the *Serzone* case on trying to keep

6    counsel straight.  It was very difficult because in those

7    days, we were operating off paper and now it's electronic.

8    But we are associating the cases in which your name actually

9    appears on those pleadings.

10        So, if you have a question as to whether we have you

11   represented, it should be on this list of cases that appears

12   on the website.  So, we would ask that you check that for

13   accuracy and, if not, inform Becky Proctor, Rowena, or even

14   myself.  If you encounter any problem, we're pretty

15   accessible and we'll try to get back to you as soon as

16   possible.  And if you have anything that you want the

17   Clerk's Office to do, please don't hesitate to give me a

18   call.

19             CHIEF JUDGE GOODWIN:  I remember one thing that

20   you or Becky or somebody mentioned to me is there is the

21   problem that Mr. Becnel identified.  Sometimes your parties

22   die and we need to know.  We need substitution of parties in

23   accordance with the rules in a timely fashion.  We need to

24   know who are the plaintiffs in the cases and who are the

25   lawyers.  So, if you would make sure to try to keep -- on a

1   regular basis keep your case styles up-to-date.

2            MS. DEPPNER:  We've also posted a couple of forms

3   on our website to try to help you or assist you if we need

4   to notify you about change of counsel.  They're PDF forms

5   and that should assist the process.  But if there's

6   something else that we can develop for you and it's within

7   reason that we can do, we'll be glad to do it if you just

8   give us a call.  Thank you.

9            CHIEF JUDGE GOODWIN:  Anything else?

10        Yes, sir.  Mr. Becnel.

11           MR. BECNEL:  Judge, bringing up what the clerk

12  said, many judges do it differently and Clerk's Offices do

13  it differently.  In New Orleans it was a nightmare when you

14  had 250,000 people filing lawsuits and insurance suits and

15  FEMA trailer suits and what have you.  Some people file in

16  their jurisdiction 20 cases.

17        Let's say I have 20 cases in Louisiana.  I filed 20

18  cases in one lawsuit.  And then it gets over here.  Some

19  judges, like Judge Bechtle with Fen-Phen, then ask you to

20  break them down; or if you have a tolling agreement, then

21  you've basically broke them down already.

22        And what I would suggest is there's two ways to do it.

23  And Fred said he didn't think there would be a ton of cases

24  here, but you just don't know.  There's four states --

25  you're going to find out real quick the four places that

1    have one-year statutes.  But what's important is how the

2    Clerk's Office handles those.

3        And Judge Fallon kind of addressed it with Vioxx.  When

4    we have -- let's say Danny's filed 200 cases under one

5    number and I've found out that some of them don't meet the

6    requirements to be a viable case.  And how do you dismiss

7    them when I've got 200 filed in one lawsuit?

8            CHIEF JUDGE GOODWIN:  Like each suit files under a

9    --

10           MR. BECNEL:  Pardon?

11           CHIEF JUDGE GOODWIN:  Each suit files -- pays a

12   filing fee.  Each suit pays a filing fee.  Each suit has an

13   individual number.

14           MR. BECNEL:  That's right.  I just wanted to make

15   sure because a lot of times what you'll have is people --

16   you won't get it for six months, but they'll be filed.

17       So, what you call that is de-bundling as Judge Bechtle

18   did.  You de-bundle the cases.  And in some cases, what they

19   did in New Orleans was, because of the Clerk's Office about

20   to collapse, is you took that one case that came to you and

21   then you de-bundled them and each one got a different

22   number.

23       And in some cases, there -- because so many of the

24   people were so poor and they lost everything, they couldn't

25   even file, pay a filing fee.  They let them be de-bundled

1    with a number.  But unless the lawyer's willing to put up

2    $350, those people couldn't pay.  And that was what the

3    judges were dealing with, you know, how do we make people

4    pay $350 when they've lost their house, they've lost their

5    business, they've lost their job, and they're living in some

6    other state.

7           CHIEF JUDGE GOODWIN:  We may have a depression in

8    West Virginia, but we're not going to have a flood like

9    that.

10          MR. BECNEL:  Okay.

11          CHIEF JUDGE GOODWIN:  We're too high up.

12       I want to thank all of you who came considerable

13   distances to attend this preliminary meeting.  I know there

14   are several lawyers who have cases who are not here and I

15   understand the reasons.

16       Let me just -- besides all my good wishes and my great

17   affection for all of you, let me leave you with just a

18   couple cautionary notes.

19       Court orders are the law.  I expect court orders to be

20   followed.  Hearings set for 9:00 start at 9:00.  Hearings

21   set for 10:00 start at 10:00.  I will always commit to you

22   that I will be on time, and I expect lawyers to be on time.

23       I will do my best, consistent with getting the rest of

24   my work out like you do, to give you prompt responses as we

25   go down the road.  I will work with you as hard as I can.

1     Again, if you have any troubles procedurally with any

2   issue, the first place to check is with the Clerk's Office.

3   Becky, Rowena, Terry, ask, ask for any of them.  Write their

4   names down.  Ask for any of those people.  They will be able

5   to help you.

6     I look forward to working with each of you.  I hope

7   many of you, the ones on the steering committee and the ones

8   that are not, still stay in touch through the website.  If

9   there's information that does not appear on the website that

10  you're concerned about, call lead counsel or liaison counsel

11  and they'll let us know.

12    We'll try to keep up-to-date and try to stay, try to

13  keep you in a position that you can make your clients happy,

14  that you can keep your clients advised that they feel like

15  you're doing your job for them.  I'm very cognizant of your

16  responsibilities and I'll try to help you as much as I can.

17    It's nice to see all of you, those that I know and

18  those that I'm seeing for the first time.  I look forward to

19  seeing many of you in the future.  And of those cases from

20  West Virginia, if, God forbid, it gets to that point from

21  some people's perspective, I will truly enjoy trying the

22  cases.  I'll leave this to Judge Stanley.

23    (Whereupon, Chief Judge Goodwin retired from the

24  courtroom, after which the following occurred:)

25              MAGISTRATE JUDGE STANLEY:  Please be seated.

1    I appreciate you coming today and I would like to give

2    you a brief overview of how I approach complex cases and

3    what my expectations are.

4    Some of you have had experience with me in the *Serzone*

5    case or perhaps in the *Superfund* case or the *Keystone Bank*

6    case or cases or whatever, but I have had some experience in

7    handling multitudes of parties and claims, and I have

8    developed a protocol which seems to work for me and I -- but

9    I also want you to understand that if what I think is

10   working does not work for you, you need to talk to me.

11   At one point, I set a deposition schedule and it was

12   too arduous.  It was unreasonably arduous and nobody said a

13   word to me and I never knew.  And it was only after the fact

14   that I learned what a terrible strain I had placed on the

15   lawyers.  So, I expect some feedback.

16   Now, I have learned over the course of the years that

17   practicing lawyers do not know or understand the reality of

18   the folks who are actually working in the courthouse day in

19   and day out.  And the most important people in the

20   courthouse after Judge Goodwin are the court reporters and

21   the clerks.

22   And the single most important inanimate object is the

23   clerk's computer because the judges are getting all kinds of

24   reports off the computer and we are looking at the docket

25   sheet on a regular basis.  I continually discover that

1  lawyers never look at their docket sheet.  They serve

2  everybody in the case with a particular document, but they

3  forget to file it with the clerk, even something as

4  important as an answer.

5      The docket sheet in this particular case, as of the 2nd

6  of October, was 75 pages long, but 68 of it has to do with

7  lawyers and parties.  We need to clean this up.  There are a

8  whole bunch of parties in there that as far as I can tell

9  have nothing to do with this case, but I don't know that.

10 They're mostly defense, defendants.

11     And from what I have seen from the papers submitted by

12 the parties, it was a kitchen sink approach to naming

13 defendants.  And, so, all these various entities got named.

14 It's stuff like that that drives the Clerk's Office crazy

15 because they have these mammoth lists and they can't really

16 tell if these people are actually in the case or not or

17 whether they even exist.

18     So, I am going to back up the clerk completely and her

19 plea that you keep your list current; that is, your name and

20 your address, the lawyers who are actually working on the

21 case.  If you have lawyers who are not working on the case

22 but are on this docket sheet, get them off.  And ultimately

23 we will be developing lists, e-mail lists of steering

24 committees and others so that you don't have such lengthy

25 docketing or entries on the docket sheets.

1    Now, the court reporter.  Every single person who has

2    spoken out loud today should consider it to be their

3    obligation to give a business card to the court reporter.

4    There's no way that she's able to hear the name of the firm

5    and necessarily link it up with the right person on the

6    docket sheet.  And when it's 68 pages long, it's a

7    challenge.  So, please be sure that whatever, whenever you

8    speak that that court reporter knows who you are.

9    One of the decisions that you-all will need to make is

10   the extent to which you want your meetings with me, which

11   I'll discuss soon, on the record or off the record because a

12   lot of that is going to depend on how they take place.  I'll

13   get to that in a minute.

14   Now, for those of you who have never appeared before

15   me, I suggest that you do a little bit of legal research and

16   read some of the opinions that are out there on Westlaw

17   concerning discovery disputes.

18   As a judge, I have learned the extraordinary efforts

19   that judges and lawyers put into amendments to the rules,

20   and I honor their work and I read the Advisory Committee

21   notes and I understand the spirit in which the amendments to

22   the rules have been made.

23   I am real tired of receiving memoranda from lawyers who

24   seem to think that what is, quote, relevant, unquote, is the

25   subject matter of the party's claims and defenses.  That

1   language in the rule was changed on December 1, 2000.

2   What's relevant now is the party's claims and defenses, not

3   the entire universe of the subject matter.

4        So, if you read my writing, you're going to see that I

5   apply the rules the very best I can and I work real hard at

6   it.  I honor the spirit of the rules.  I am extremely crabby

7   when I start seeing boilerplate objections, interrogatory

8   answers which are not verified, assertions of privilege

9   without privilege log and without any explanation.

10        Having said all that, let me now say that typically in

11  a complex case, at least for the first six months, I throw

12  the rules out the window.  And, so, you say, "Huh?  How does

13  that happen?"

14        And what it is, the procedure that I use is that it is

15  informal discovery.  I am firmly of the belief that each

16  party has the right to discover their case to determine the

17  truth as best they possibly can of the matter at issue to

18  represent their client the very best they can in a collegial

19  and cooperative way without ambushes, without

20  misrepresentation, and with a straight ahead approach.

21        The defense should understand that, of course, they're

22  going to have to turn over a whole lot of stuff.  And the

23  plaintiff should understand that they're going to have to

24  reveal a whole lot of personal health information.  And it's

25  going to be an aggravation and your clients aren't going to

1    want to do it.  They'll just want to come to court and talk

2    about their experience.

3         But the defense has the right to their health

4    information, just as the plaintiffs have the right to a lot

5    of information from the defense.  And, so, once you get used

6    to that, things will go a lot more smoothly.

7         Now, Judge Goodwin took the opportunity to talk a lot

8    about the role of lawyers in the case and I want you to

9    understand that those lawyers with whom I'm going to be

10   working the most closely, I will honor some of your

11   commitments.  I will schedule far in advance.  I will not

12   change meetings at the last moment.  If you have prepaid

13   vacation tickets with your family, I'm going to insist that

14   you go.

15        I am not going to tolerate people scheduling a surprise

16   deposition on the 24th of December.  This is not the most

17   important thing in your life.  Your family is the most

18   important thing in your life.  And I expect all of us to

19   treat, to be respectful of the obligations that we all have

20   outside the courthouse.

21        Now, the first thing that I'm going to do after we get

22   the steering committee named and lead counsel is that I will

23   be meeting with those folks.  My expectation is that we will

24   agree on stage discovery.

25        Now, it's my understanding that the particular facility

1    at issue in Little Falls, New Jersey, is closed.  Is that

2    correct?

3              MR. MORIARTY:  It's not manufacturing.  There are

4    people there working every day, though.

5              MAGISTRATE JUDGE STANLEY:  All right.  This

6    immediately raises issues about the possibility of

7    spoliation or changes in the plant and preservation.

8         Also, given these economic times, we don't know whether

9    the people will be able to continue to work in the facility

10   or whether it will be essential for them to convert the

11   functions of the facility to a different use, or whether the

12   entire entity may be sold and will lose control over that

13   particular building if it's a building.

14        This leads me to believe that first and foremost the

15   number one item on the agenda is to agree on an inspection

16   protocol at that particular premises.  And, so, as you think

17   about this, you should be thinking about when this would

18   take place, who would go, how it will be recorded, whether

19   experts will be there, whether the presence of experts will

20   constitute any kind of identification of that expert

21   necessarily as continuing in the case.

22        But, anyway, if anybody thinks that that's not the

23   first item, I would like to hear it now.  But it just

24   strikes me that just because there's litigation does not

25   mean that we have the right to prevent the economic use of a

1   building or the employment of persons who may or may not

2   have anything to do with this lawsuit.

3       Mr. Thompson.

4       MR. THOMPSON:  Your Honor, Fred Thompson,

5   plaintiffs' liaison counsel.

6       Certainly we would like the opportunity to have an

7   entry to look, and certainly the details we can put forward.

8   But I would ask that there is an official document that's

9   required for any sort of movement of the drug, the

10  production.  It's called a batch record which is a very

11  complete record of the movement from the raw materials

12  through.

13      And I would think that we would really want the

14  opportunity to have that document in our possession prior to

15  and at the time of the entry because that will be so much

16  benefit to our, to our understanding and our experts'

17  understanding of what we were actually physically seeing.

18  So --

19      MAGISTRATE JUDGE STANLEY:  Is it a flood chart of

20  materials going through the plant?

21      MR. THOMPSON:  My understanding -- and I have not

22  seen one, but my understanding is that the batch record is

23  actually a very voluminous record of the raw materials with

24  check-offs and quality assurance as it goes through from the

25  initial raw material through fabrication, and then on

1    through and it follows the finished drug.

2         So, it's not a single page.  It's actually a lengthy

3    document.  But it is a discrete document.  It's not anything

4    anybody has to go and assemble.  It's maintained under a

5    legal obligation to maintain it is my understanding.

6         So, that's the long answer to a short question.  That

7    is, it would be helpful to have that documentary production

8    prior to the entry.  And it seems to me as though we could

9    get that real quickly.

10         MAGISTRATE JUDGE STANLEY:  Let me just say that

11   this is a very good example of what I expect.  In other

12   words, as you were thinking about what you need in order to

13   discover the case, I expect plaintiffs and defendants to say

14   out loud what they're thinking about because, obviously,

15   we're not going to be able to set this up immediately.

16         And, so, therefore, I would expect plaintiffs to be

17   talking with the defense about your request for a batch

18   record and for them to be consulting with you as to what

19   they're willing to produce or what they're not.  And I have

20   no idea what other documents may or may not be relevant

21   which would inform an inspection of the facility.

22         For example, the first thing I can think of is a floor

23   plan and somekind of understanding so that when you walk in

24   that front door, you know where the inactive ingredients are

25   delivered and where things are fabricated or whatever.

1    Anyway, I expect you-all -- that would be, I guess, the

2    various steering committees and others to discuss and to use

3    your collective information and judgment in developing the

4    protocol.

5    And I am going to insist that you work extensively with

6    each other on developing the protocol.  And when there's a

7    problem, I will then be notified.  If you absolutely cannot

8    work it out among yourselves, then you will bring that

9    problem to me and you'll bring it to me by way of a letter.

10   And the letter will, of course, be copied to the other side

11   and there will be very short turnaround periods.  You

12   know --

13   Hold on, Mr. Becnel.

14   It's going to be -- so, for example, if our first

15   meeting has an agenda item of reaching consensus on a

16   protocol for an inspection, then I will be expecting the

17   parties to be working diligently on developing that

18   protocol, coming up with all of those elements which the

19   parties agree upon, and have very specific items as to which

20   you believe you have very good reasons as to why you can't

21   agree because, you know, the stone wall is not going to

22   work.  The defense knows that.

23   And the request for absolutely everything in the world

24   isn't going to work on the plaintiffs.  And you know that.

25   Don't waste my time.  Don't waste each other's time.  Have

1   good reasons for why you want things.  And we will work on

2   them.

3        My commitment to you is that this case is always going

4   to be one of the top things on my desk, and I am going to

5   hit every meeting with you and I'm going to be ruling pretty

6   quickly.

7        If it turns out that we can't reach consensus on

8   something or we actually need briefing, you'll get an order

9   to that effect and there will be a briefing schedule.  My

10  guess is there will be a few times that I will give you as

11  much as two weeks.  That's more going to be in the

12  neighborhood of a couple of days because this case is going

13  to keep rolling and the decisions are going to be made

14  promptly.

15       Now, generally speaking, in these cases, at this

16  particular time I think an inspection is a likely first

17  step.  I also understand there is a recall facility.

18       Can you give me an idea of what that entity is?  You

19  mentioned it, Mr. Moriarty.

20            MR. MORIARTY:  Yes, Your Honor.  There's a company

21  called Stericycle that specializes in pharmaceutical

22  recalls.  So, in the early stages of this before April 25th

23  when Actavis was working out the recall plan with the FDA,

24  it was agreed that Stericycle would actually manage the nuts

25  and bolts of the recall so that pharmacies, hospitals,

1  consumers, everyone who had Digitek in their possession had

2  a contact number right away where they could return the

3  Digitek, get a refund, and it is all stored.

4      I haven't personally been there, but I verified

5  material is stored in the shipping container in which they

6  received it in some manner so that they can find it.  And as

7  of the end of September, there were roughly 30 million

8  tablets at Stericycle.

9          MAGISTRATE JUDGE STANLEY:  Do you want anybody

10  who's a plaintiff here to submit any Digitek that they have

11  to that facility?

12          MR. MORIARTY:  Well, Your Honor, we've done a

13  couple things and pushed this point again and again.  We

14  don't want to put the cart before the horse.  Actavis and

15  Mylan do not believe that double thick tablets or

16  non-conforming tablets left the manufacturing facilities or

17  the distribution facilities.  So, we think that the time and

18  money in this case is better spent trying to figure out if

19  there are non-conforming tablets out there.

20      So, we have submitted to liaison counsel three pill

21  test protocols.  They involve -- one involves a formal

22  inspection at Stericycle where both sides would agree on a

23  professional science based company who could facilitate this

24  kind of inspection.  We've offered to inspect pills that the

25  plaintiffs have ourselves with the equipment that's

1    necessary to do that.  And we have offered to them that we

2    can select laboratories around the country and we could

3    jointly submit their individual Digitek tablets to those

4    labs for weighing, measuring, and what's called dose

5    uniformity.  We've offered all of those things.

6        We've had almost no takers.  We think that that is the,

7    the priority is to find out and to get our arms around

8    whether there actually are non-conforming tablets and that

9    the answer to that question will drive this litigation, not

10   the answer to what's in the batch records, which we're happy

11   to produce, but how many batch records is the question.

12       So, we've offered all those things.  The plaintiffs

13   themselves have the choice to either send their Digitek to

14   Stericycle or to keep them themselves.  We can't force them

15   to submit them.  But I think about a third or a fourth of

16   the tablets at Stericycle are from consumers themselves as

17   opposed to a hospital or a pharmacy.

18       So, some, some claimants have.  Other claimants we know

19   did not send their tablets in, but that's really up to them.

20           MAGISTRATE JUDGE STANLEY:  So, the answer is, yes,

21   if they want to.  Yes, you would like plaintiffs to send

22   their tablets to Stericycle if they want to.

23           MR. MORIARTY:  Yes.

24           MAGISTRATE JUDGE STANLEY:  All right.

25           MR. MORIARTY:  And it's actually the FDA's and the

1    company's idea because if these are out there, they don't

2    want somebody reaching into their medicine cabinet and

3    taking it by accident.  So, I would hope that the lawyers

4    here have secured their clients' tablets and put tape around

5    them and, you know, "do not take."  But that's what this is

6    all about.  That's why it's set up that way in the first

7    place.

8              MAGISTRATE JUDGE STANLEY:  Mr. Thompson.

9              MR. THOMPSON:  Judge, you're going to find that we

10   don't disagree that there is a need to have testing and to

11   understand that.  We -- as we understand it, the active

12   ingredients in these tablets have a half-life and they

13   diminish over time.  So, we understand that testing is

14   necessary.

15       We've actually had discussions with regard to what to

16   do with the Stericycle tablets and whether or not we can

17   reach a protocol to have those tablets examined.  I do think

18   that has to be put on the -- not the back burner, but that

19   has to be deferred until lead counsel are appointed who has

20   the responsibility under PTO 2 to conduct the active

21   discovery on behalf of the MDL.

22       I do think that the Stericycle -- I would be surprised

23   if anybody is continuing to send things in.  If there was a

24   wave of recalls, I think that there's, there's a definite

25   break point, and that is those clients who have those in

1   their possession and now within the possession of the

2   plaintiffs' attorneys.

3         The plaintiffs' attorneys, that remains to be seen as

4   to whether or not it's in the interest to have a joint

5   facility or for the plaintiffs to have a separate but agreed

6   upon objective test facility and to determine that.  I

7   really think that that particular issue needs to be deferred

8   until the appointment.

9         But what I do want to, to raise to the Court is that

10  the Stericycle examination is one that I would expect to be

11  agreed upon in a protocol manner.  And if we can't agree, I

12  do think that would be within the power of the Court to, to

13  reconcile that for us.

14        As far as the other testing, that needs to -- we

15  recognize the importance of it, but I do think that the

16  details of that need to wait a couple weeks until after

17  Judge Goodwin appoints --

18              MAGISTRATE JUDGE STANLEY:  I concur that the

19  actual protocol as to testing is appropriate after the

20  steering committee and the lead counsel have been appointed.

21  However, the fact that we're discussing these topics is

22  important.

23        And let me just mention one topic that was a pretty bad

24  experience that we had in the *Serzone* case.  And that is the

25  relationship of some attorneys on the plaintiffs' side with

1   their clients.

2       And all of us are aware that some attorneys are

3   advertising on television concerning Digitek, asking

4   open-ended questions of whether or not a viewer was injured

5   or suffered some adverse effects after taking Digitek.

6       There were similar type advertisements concerning

7   Serzone and some attorneys who recruited, or represented

8   dozens of plaintiffs.  However, there was virtually no

9   follow-up by that attorney with those clients.  And it

10  became -- addresses changed and we couldn't find the

11  plaintiffs.  There was virtually no ability for the case

12  administrator or others to manage claims by these particular

13  plaintiffs because counsel was missing in action.

14      The necessity of counsel staying in contact with the

15  clients, communicating with them about whether or not they

16  have any Digitek, whether the client should give it to their

17  attorney, what they did with it all could be an issue down

18  the road.

19      I just want to put that out there now to state my

20  expectation that counsel will maintain contact with their

21  clients and make sure that they know the importance of

22  either turning in their pills, or perhaps they're already

23  gone, and making notes for future reference as to what their

24  symptoms were or whatever.  But we don't need to go into

25  that further at this point.  Now, --

1    Yes, Mr. Thompson.

2    MR. THOMPSON:  Judge, Fred Thompson.  I, I think

3    that the process of negotiating plaintiffs' fact sheets,

4    that -- all of those issues will be addressed in the process

5    of gathering that information.  And one of the instances in

6    the fact sheet would be either you have samples, you either

7    have the drug or you have an explanation of how it was

8    discarded.

9    Oftentimes in the case of a death case, you'll find

10   that the pills are actively thrown away, that that's part

11   of -- that's actually very common that the pills are no

12   longer in existence.  But that explanation and the, the,

13   where they got them and those types of information, I think

14   we can supply that in a fact sheet context.

15   MAGISTRATE JUDGE STANLEY:  All right.  Yes.

16   MS. ABARAY:  Yes.  Excuse me, Your Honor.  Janet

17   Abaray from Burg Simpson in Cincinnati.

18   There is one other issue that I should have thought of

19   earlier and I'm sorry I didn't bring it up before when Judge

20   Goodwin was here.

21   One of our clients -- actually, more than one of them

22   called and said that they sent their pills back after the

23   recall and they went to Stericycle.  They've now gotten

24   25-dollar checks, I believe, from Stericycle to compensate

25   them for the recall.  And they've called us wanting to know

1    what to do.

2         Obviously, we're concerned there's some attempt here to

3    release claims by sending checks in the mail.  And I don't

4    know if this is something that other people have had come

5    up, but I wanted to bring it to the Court's attention

6    because it's a big concern, and especially when there's some

7    class actions pending regarding costs.  And, then again, I

8    don't know what's on the back of those checks in terms of

9    release language or how it could affect personal injury

10   claims as well.  So, what --

11             MAGISTRATE JUDGE STANLEY:  Have you seen any of

12   the checks?

13             MS. ABARAY:  Not personally.

14             MAGISTRATE JUDGE STANLEY:  Has anybody else?

15             MS. ABARAY:  We've spoken on the phone with our

16   clients and we've told them not to cash the checks at this

17   point.

18             MAGISTRATE JUDGE STANLEY:  Mr. Moriarty or

19   Ms. Betts, do you know anything about this?

20             MR. MORIARTY:  I don't, Your Honor.

21             MAGISTRATE JUDGE STANLEY:  All right.

22             MR. MORIARTY:  All I know is that they were to get

23   a refund for the unused portion of their Digitek.

24   Stericycle is not a defendant and we're not involved in the

25   day-to-day management.

1          MAGISTRATE JUDGE STANLEY:  They certainly don't

2     have any authority to speak for Actavis or Mylan or anyone.

3     If you've got a problem with it, get the check.  But it

4     sounds to me like, you know, they can take the $25 and cash

5     it.

6          MR. THOMPSON:  Ms. Abaray actually answered a

7     question that I had settled in my mind, and that is who owns

8     the pills that Stericycle is holding.  I just assumed they

9     had bought the pills back and that they now belonged to the

10    agent for Actavis.  But it may be that they're simply a

11    fiduciary holding those pills for my clients.  I'm going to

12    have to think that through.  But I think that we'll be able

13    to work out an appropriate protocol to examine those pills.

14         MAGISTRATE JUDGE STANLEY:  Well, I certainly

15    expect that we'll be able to get to them.

16       Mr. Becnel.

17         MR. BECNEL:  Your Honor, in terms of the

18    inspection, there's two or three things we need prior to

19    even thinking about it.

20       One, usually these companies have P&ID drawings and you

21    can follow it through the process.  You have stamping

22    machine manufacturers.  Usually the company itself when

23    they're trying to sell the products have done films that

24    proceed with the process from start to finished product in

25    selling it to the distributors and what have you.

1    If we have those basic P&ID drawings, the manufacturing

2    companies of the various mechanical devices within the plant

3    that mixes it, how long they make it, et cetera, we could be

4    getting in the interim -- while we're waiting for this PSC,

5    we could be going on websites and so on and so forth to see

6    if it's made by a company in Germany, that particular piece

7    of equipment and the P&ID drawings.  That is not going to

8    change.  It's there and it's completed.

9    One of the interesting things when we've had major

10   recalls in the past like in the *Ford Firestone* case is

11   people did the same thing.  You brought in the tires.  You

12   didn't know whether they were going to fail.  You didn't

13   know what the future was and how you test it.

14   The judge in Indiana who handled that MDL, along with

15   the magistrate who supervised all the testing, there were

16   protocols.  Well, we're going to test every 50th tire or

17   we're going to test every 10th tire.  And you went through a

18   process like that and you logged them in and you knew what

19   you were dealing with.

20   But Fred brought up an interesting point.  In a lot of

21   instances, the people have consumed the pills, some of whom

22   died; or after they died, the families, the first thing you

23   do is get rid of the person's clothing and you get rid of

24   all their, you know -- most of these people had five to six

25   different medications that they're taking.  You throw all of

1   that away and, you know, the family just wants closure on

2   the death.

3        So, it's going to be a difficult thing to say, "Well,

4   you've got a death case, Mr. Becnel, but you don't have the

5   pill."  You might even have the empty bottle and you've got

6   all of the dates in which the pill was given and you've got

7   the doctor saying, "Yeah, if this happened, this could be

8   it."  So, that's one of proof and causation.

9        So, I just wanted to bring those two things up.  But

10  those two judges had some excellent protocols with tires,

11  not drugs, but how to do it randomly because we had

12  statisticians that said if we inspected so many tires, this

13  is what we would probably find.

14       Same thing.  We would have pharmacologists that say if

15  we – and statisticians – if we inspect this many pills,

16  depending on batches, this is what we would probably find,

17  and get a random selection.

18            MAGISTRATE JUDGE STANLEY:  I would expect the

19  attorneys to be discussing these matters after the steering

20  committees are formed.  It would not be my expectation that

21  discovery would be ordered of any documents prior to the

22  formation of the steering committees.

23       Let me just say about –– you have reminded me about the

24  fact that we're going to have substitution of parties just

25  by the very nature of the elderly people who may be involved

1    in this case.

2         If a protocol is developed with respect to substitution

3    of parties which would avoid the filing of motions which

4    have to be ruled on, that could be of considerable

5    assistance I would think.  If this can just be done through

6    the Clerk's Office without the necessity of a judge's ruling

7    or if it is important to have a judge's ruling on

8    substitution of a party, that you have a simple form that's

9    available on the website.  And we would have that available

10   and we would expect all the attorneys to use the form.

11        Now, it will take some monthly meetings in person for

12   us to get to know each other and to develop our

13   understanding of how discovery is going to move along in

14   this case.  Generally speaking, of course, there will be

15   some inspection issues, documents back and forth.

16        And then after there has been an examination of

17   documents, that's when witness statements would be -- such

18   as interrogatories or depositions would be appropriate.  The

19   plaintiffs' fact sheets will be going on simultaneously with

20   the defense production of documents to the extent it's

21   appropriate.  We'll have to work all those things out.

22        It would be my hope that as we develop each other's

23   familiarity with each other's approaches to the case that we

24   would be able to go to video or telephone conference.  If we

25   do a telephone conference, it's virtually impossible to get

1    a court reporter with a record.  People just talk.  It's

2    extremely difficult.

3         So, you always are going to need to decide the extent

4    to which you want a record.  If you want a record, it's

5    probably going to have to be at a minimum video and maybe in

6    person.

7         Now, basically there will be monthly meetings.  They

8    will be set going out for eight months or so.  So that when

9    we have our first meeting with the steering -- after the

10   steering committees and lead counsel are appointed, bring

11   your calendars because that meeting will set the dates.

12        And we also need to be sure that there's a clear

13   understanding of who's going to show up each time, how

14   material from each conference will be distributed to others.

15        I have basically gone through the points that I wanted

16   to mention.  Are there some other matters that you would

17   like to bring up?

18             MR. BECNEL:  How about the documents, Your

19   Honor -- Daniel Becnel again -- the documents that they had

20   to produce to the FDA already for the investigation?  Those

21   shouldn't be -- we can't get them from the FDA.  The FDA,

22   under the statute, won't give them to us.  But it seems to

23   me that those are relevant if they want to know what is a

24   viable case and what is not a viable case.

25        They have produced their inspection records.  They have

1    produced the records that were required and subpoenaed by

2    the FDA.  Those are going to come out whether it's now or

3    six months from now.  But it seems to me it would limit the

4    number -- you say a lot of people are advertising now for

5    these cases.  If we had some indication of what those

6    documents show, you could say, "I'm not going to take this

7    kind of case," or, "I'm going to take this kind of case,"

8    and it might help all parties.

9            MAGISTRATE JUDGE STANLEY:  Does it go without

10   saying that all of this is going to be done electronically?

11           MR. MORIARTY:  When we transfer documents to the

12   plaintiffs, it will be in electronic format.  But things

13   like the batch records that Mr. Thompson mentioned are

14   typically kept in a paper format because that's the nature

15   of having them in the room while a blending process is going

16   on or pill compression process, tablet compression.

17           MAGISTRATE JUDGE STANLEY:  But they can be

18   scanned?

19           MR. MORIARTY:  Oh, yes.  When we turn them over to

20   plaintiffs' lawyers, they are going to be in electronic

21   format.

22           MAGISTRATE JUDGE STANLEY:  Well, there are a

23   couple ways to do this, and one is a dedicated website

24   that's password protected.  And I would certainly ask you to

25   consider that.

1    Another is -- that strikes me as being the simplest

2    approach.  There are other methods like you can use a flash

3    drive with -- you know, presumably everybody could use one

4    of those.

5         MR. BELL:  Judge, Harry Bell, co-liaison counsel.

6    I think one of the issues that might come up is making

7    sure that the documents which are scanned, making sure

8    they're in color if there are different color notations.  I

9    don't know what's on batch records, but I know we get

10   medical records and different entries are made and different

11   color pens may have some significance.

12   Also to the point that anyone needs to go back and look

13   at records, I think on behalf of plaintiffs, we would want

14   to know if any of those documents were going to be destroyed

15   with the only remaining record being electronic records so

16   that if there is some issue, we have to go back and look at

17   the original, but we can do that at some point.

18        MAGISTRATE JUDGE STANLEY:  I would assume that the

19   preservation order would prevent documents from being

20   destroyed.

21        MR. BELL:  Just so we all have that understanding.

22        MAGISTRATE JUDGE STANLEY:  Mr. Thompson.

23        MR. THOMPSON:  Judge, I confess as soon as we

24   start talking about electronic media, it makes me feel very,

25   very old and --

1          MAGISTRATE JUDGE STANLEY:  Too bad.

2          MR. THOMPSON:  There is an area that there is a

3   substantial amount of IT expertise and negotiation in every

4   mass tort that I've been involved with that it will be up to

5   the plaintiffs' steering committee to select an appropriate

6   format to, to receive these documents in a searchable form,

7   and then a negotiation which we may or may not be able to

8   resolve amicably or we may have to bring it to you to

9   resolve those electronic discovery issues.

10          MAGISTRATE JUDGE STANLEY:  And I have such

11   enormous expertise in that.

12          MR. THOMPSON:  Well, but you've got a gavel and

13   that's the great, that's the great thing.

14          MAGISTRATE JUDGE STANLEY:  Well, let me just let

15   you know that my expectation is that the exchange of

16   information will be electronic -- we're not going to kill

17   several forests for this case -- and that it will be focused

18   toward the expertise of younger people.  I myself have

19   difficulty keeping up, but I think it's inappropriate for

20   the level of electronic expertise to be aimed at

21   60-year-olds like me as opposed to 35- and 40-year-olds

22   because you-all can hire those young guys and young women

23   who know how to do all of this.

24          MR. THOMPSON:  Yes, Your Honor.  That was going to

25   be my final point is it's our full intention to have a

1   state-of-the-art electronic repository that is secure and

2   searchable and useful for our, for our plaintiffs.  So --

3   but that is, that's not a small detail.  That's something

4   that's going to be the object of a lot of discussions

5   between the two sides.

6           MAGISTRATE JUDGE STANLEY:  Right.  Sure would be

7   nice if we could also work out authentication of documents

8   as we go along.  Don't want to hit that at the end.

9       All right, we've raised all kinds of issues today.  All

10  of them, I'm sure, will cause you to think of even more.

11  And I urge you to talk to each other.  I am going to require

12  you to talk to each other continually.  E-mail back and

13  forth and problem solve and be creative.  And I look forward

14  to working with all of you to one extent or another.

15      Is there anything else to be covered today before I

16  adjourn this hearing?

17      (No Response)

18          MR. BELL:  Nothing further, Your Honor.

19          MAGISTRATE JUDGE STANLEY:  Okay.  Assuming that

20  counsel is appointed to the -- non-liaison is appointed

21  slash whatever before the end of October, my guess is the

22  first meeting will definitely take place within a week to

23  ten days of those appointments.  So, keep your calendars

24  open if you think that there's a reasonable expectation that

25  you're going to be involved.  Okay?  Thank you.

1          (Proceedings concluded at 10:45 a.m.)

2                          *  *  *  *  *

3

4

5

6          I, Lisa A. Cook, Official Reporter of the United

7    States District Court for the Southern District of West

8    Virginia, do hereby certify that the foregoing is a true and

9    correct transcript, to the best of my ability, from the

10   record of proceedings in the above-entitled matter.

11

12

13        s\Lisa A. Cook                        March 10, 2011

14           Reporter                               Date

15

16

17

18

19

20

21

22

23

24

25