IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  DIGITEK PRODUCT LIABILITY
       LITIGATION

MDL NO. 1968

THIS DOCUMENT RELATES TO ALL CASES

HEARING REQUESTED

**BRIEF IN OPPOSITION TO PSC'S APPLICATION FOR FEES AND EXPENSES**

The fee petitions are marvels of misplaced ingenuity and thoroughness, rehearsing in great detail basic principles well known to the district court, and reinforcing our impression that lawyers litigate fee issues with greater energy and enthusiasm than they litigate any other type of issue. *Ustrak v. Fairman,* 851 F.2d 983, 988 (7th Cir. 1988) (J. Posner).

I.      **Summary of Argument**

The Plaintiffs' Steering Committee's petition for fees and expenses ("the Petition") should be denied because no exception justifies a departure from the American Rule, which provides that parties must bear their own attorneys' fees and expenses.  In short, the Petition has no basis in law or contract.

One exception to the American Rule is when a contract provides for fee-shifting.  The Settlement Agreement here does not confer on the PSC a right to be paid by the Defendants for their fees or expenses.  The agreement does no more than allow the PSC to apply for fees and expenses under the procedure set forth in Rule 23, even though a class was never certified.  Another exception is when a statute authorizes fee-shifting, but none apply here.  And the PSC makes no claim to an award under the Settlement Agreement or a fee-shifting statute.

Rather, the Petition relies on a misguided version of the "common fund" theory.  That theory permits class counsel to be compensated by unrepresented class members from a common

fund created for the benefit of the class. The rationale supporting the common fund theory is that class members who benefit from the work of class counsel should pay their share of the attorneys' fees and expenses, even though they are not individually represented. In acknowledging that class members are parties who should pay for the benefit received in litigation, the common fund theory is consistent with the American Rule.

But the common fund theory does not apply here. The Petition does not seek payment by Plaintiffs from the common fund of $10,000,000, but from Defendants in addition to, and separate from, the common fund. Nor does the rationale behind the common fund theory support an award against Defendants – Defendants have not received a benefit from the work of the PSC for which they ought to pay. And this situation is distinct from one in which a class of unrepresented plaintiffs receives a benefit for which they have not paid. Here, the PSC could have taken steps to assure they would be paid by the Plaintiffs, but chose not to do so. So this Court should deny the Petition as without any basis.

If the Court should somehow conclude that there is a basis for the Petition, any award should be extremely small. The result achieved by the PSC is not "great" or "outstanding." It is a settlement based upon nuisance value. It reflects the fact that Plaintiffs never produced evidence that they possessed or ingested defective Digitek®, and that their experts candidly conceded that there was no basis to conclude that defective Digitek® reached consumers.

## II. There Is No Basis For An Award That Departs From The American Rule.

There is a presumption that, win or lose, parties cannot shift their attorneys' fees and costs to other parties. Under the American Rule, "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart,* 461 U.S. 424, 429 (1983), citing *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 247 (1975); *Brzonkala v. Morrison,* 272 F.3d 688, 690 (4th Cir. 2001). "[T]he

2

American Rule applies not only to attorney's fees but also other costs of litigation..." *Kansas v. Colorado,* 129 S.Ct. 1294, 1298 (2009), citing generally *Alyeska,* 421 U.S. 240. The fee applicant bears the burden of establishing entitlement to an award. *Hensley,* 461 U.S. at 437. Because the PSC cannot overcome this default rule, the Petition should be denied.

   A.   No Fee-Shifting Statute Applies In This Litigation.

An oft-cited exception to the American Rule is where Congress, "while fully recognizing and accepting the general rule, [has made] specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights." *Alyeska,* 421 U.S. at 260-61 (citing fee-shifting statutes in footnote 33).

Here, no fee-shifting statute permits the PSC to obtain an award from the Defendants. The PSC has not argued that any fee-shifting statute applies, and Defendants do not know of any. Indeed, there is no federal right that would be advanced by fee-shifting and, as described below, no societal need to encourage this type of litigation. Thus, the PSC has neither asked for nor established entitlement to an award under any fee-shifting statute.

   B.   The Settlement Agreement Does Not Entitle The PSC To Be Paid By Defendants.

The Settlement Agreement explicitly provides for two payments from Defendants, neither of which entitles the PSC to its fees and expenses. First, Section 2.01 provides for the Settlement Funds, $10,000,000. (There were optional additions under Section 2.02, but Plaintiffs did not meet the participation targets to trigger those payments.) Settlement Agmt., Ex. A. Section 2.05 then provides that Defendants will pay a capped amount to an Administrative Fund for the Special Master's fees and costs. *Id.*

The Settlement Agreement also permits the PSC to apply for attorneys' fees and expenses pursuant to Section 11.01, which states, in pertinent part:

> **Section 11.01** The Plaintiffs' Steering Committee ("PSC") and
> anyone who believes they have prepared work that was approved

3

> by PSC and is eligible for common fund work may make an
> application to the MDL Court using the procedure set forth in FED.
> R. CIV. P. 23(h) for an award of attorneys' fees and expenses.
> ......Any objection to the motion may be filed thirty (30) calendar
> days after the filing of the motion and any response to objections
> may be filed ten (10) calendar days thereafter. Either PSC or
> Defendants may request the MDL Court convene a hearing on the
> motion for attorneys' fees and expenses prior to making a decision
> on the motion. The MDL Court's decision is final and
> nonappealable.

The agreement does not say that there is any legal entitlement to an award of fees and expenses from Defendants. It does not say that the Defendants agree an award should be made, leaving only the amount in question. It does not say whether the PSC must ask for their "common fund" fees to be paid by their colleagues, by the common fund Plaintiffs from their awards, or by the Defendants. Rather, the agreement reflects that Defendants reserved the right to oppose the Petition and have this Court decide the issue. Thus, while the parties contemplated the Petition and agreed to procedures, the agreement does not create any new right or entitlement to attorneys' fees and costs from Defendants.

Allowing the PSC to apply for fees and expenses using Rule 23 is not the same as explicitly agreeing to pay the PSC's fees and expenses. Rule 23(h) "does not undertake to create new grounds for an award of attorney fees or nontaxable costs." Fed. R. Civ. Proc. 23(h) advisory committee's note. Rather, it acknowledges that "counsel **may** obtain an award of fees under the 'common fund' theory that applies in many class actions, and is used in many fee-shifting statutes." *Id.* (emphasis added).

That is the reason the Petition does not refer to a specific provision of the Settlement Agreement entitling the PSC to an award of fees and expenses. Indeed, the PSC's Petition acknowledges by omission that there is no such allocation. The Petition correctly states that "Plaintiffs' Counsel are entitled to **pursue** their legal fees and reimbursement of expenses..." Petition, p. 1 (emphasis added). The Petition does **not** state that the agreement expressly entitles

4

the PSC to fees and expenses from Defendants.  The PSC has not made, and thus has waived, any argument that the Settlement Agreement requires an award of fees and expenses from Defendants.

    C.   <u>The Common Fund Theory Is Inconsistent With the Facts of This Case.</u>

The principle underlying the "common fund" theory of recovery does not apply here because: 1) the PSC is seeking its fees and expenses from Defendants, rather than the beneficiaries of the Settlement Funds; and 2) the PSC could have prevented any unjust enrichment without relying on relief from the Court.  While the PSC admittedly did far more work than lawyers who simply watched from afar, no precedent entitles them to have Defendants pay for that work.  They volunteered for their roles and apparently took the risk that they would not be compensated.

The "common fund theory" is a "recognized exception to the American Rule...  [that] 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.'"  *Camden I Condominium Assoc., Inc.,* 946 F.2d 768, 771 (11th Cir. 1991) quoting *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).  The common fund theory holds that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee **from the fund** as a whole."  *Van Gemert,* 444 U.S. at 478 (citations omitted) (emphasis added).  That is not what the PSC is trying to do here.

    1.   <u>The PSC Is Seeking Fees And Expenses From Defendants, Not Plaintiffs.</u>

Though the Petition relies extensively on common fund principles and cases, the PSC ironically admit from the start that they are not seeking their award from the common fund.  See Petition, p. 1.  Yet the source of the award is critical to the proper application of the common fund theory.  "A key element of the [common] fund case is that the fees are not assessed against

5

the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading)..."  Third Circuit Task Force Report, 108 F.R.D. 237, 250 (3rd Cir. 1986). Though courts have called the common fund theory an exception, its application is "entirely consistent with the American [R]ule...," *Van Gemert,* 444 U.S. at 481, because the award comes from the fund itself.  See *id.* at 477-78 (affirming judgment that an award of attorneys' fees made from the unclaimed portion of a common fund, which was ultimately to be returned to defendant, was not improper fee-shifting because class counsel "would receive their fees from the amount for which [defendant] has **already** been held liable.  There is no 'surcharge' on the defeated litigant.").

The common fund theory does not apply in this case because the PSC is not seeking the kind of relief that it provides.  The PSC's argument turns the common fund theory on its head. First, the PSC cites *Van Gemert* for the proposition that the common fund theory "rests on the perception that persons who obtained the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  Petition, p. 7.  Then, the Petition argues that, "[g]iven this logic, ...it is axiomatic[] that Plaintiffs' counsel should be entitled to reasonable fees and expenses where the common fund will not be disturbed by their award." Petition, p. 8.  This "logic" would have the Defendants pay for something that the Plaintiffs received.  The Plaintiffs would still be unjustly enriched, but at the Defendants' expense instead of the class representative's.  Thus, application of the common fund theory here does not accomplish the intended purpose of preventing unjust enrichment.  It would be a misapplication and is not legally supportable.

        2.   <u>The PSC Could Have Prevented Any Enrichment By Plaintiffs, But Did Not.</u>

This case lacks the characteristics of a classic common fund case, in which the successful litigant and class counsel rely on equitable relief as the only way to avoid such unjust enrichment

6

by class members.  The Court never certified a class action, so there is no large group of unknown, unrepresented plaintiffs. Unlike a class action, the individual Plaintiffs here were represented by counsel, presumably had their own individual fee agreements, filed their own individual complaints, and had a chance to participate in discovery.  Because the Plaintiffs and their counsel are identified on the docket, the PSC could have negotiated with their colleagues for their fees and expenses to be paid by the Plaintiffs.

The PSC chose not to take steps to prevent unjust enrichment by the Plaintiffs.  The PSC apparently did not provide early in the litigation for assessments or fee liens upon the cases or lawyers who did little or no work.  The PSC could have provided explicit terms in the Settlement Agreement that its fees and expenses be awarded from the Settlement Funds, but did not.[1]  Then the PSC chose not to seek their fees and expenses out of the Settlement Funds when they filed their Petition.  Defendants assume that the PSC's failure to provide for their fees and expenses out of the Settlement Funds reflects their concerns that such a request would have diminished Plaintiffs' participation in the settlement, despite the weakness of their case, and jeopardized whether it was even adopted by the requisite 85% of MDL cases and 90% of tolled claims.

The PSC are unquestionably bearing a greater amount of the work and cost compared with lawyers who did nothing other than apply for a Special Master award, but that is not unjust under these circumstances or a reason to fee-shift to Defendants.  The PSC volunteered for their roles in this litigation and took calculated risks when they chose not to pursue their fees and expenses from the Settlement Funds.  That does not entitle the PSC to shift this burden to the Defendants instead, without the legal or equitable foundation for such a maneuver.  The Defendants are not responsible for the choices that put the PSC in their present position and

---

[1]   Although the agreement does not include explicit provision for the PSC's fees and costs from the Settlement Funds, and the PSC is not requesting such an award, the agreement states, "...Eligible Claimants will satisfy... and hold Defendants harmless from any and all such claims, liens, and rights to payment, including attorneys' fees. ...Prior to the disbursement of the Final Award to any Eligible Claimant, that Eligible Claimant ...shall certify that all such other liens will be satisfied and repaid by the Eligible Claimant from the Final Award."  *Id.* at sec. 8.03.

7

should not have to pay for them.  The PSC's choices render their position vastly different from that of traditional class counsel.  On these facts, any enrichment by the Plaintiffs is not unjust.  An award from Defendants under the common fund theory is what would be unjust.  The Petition is improper and should be denied.

## III.    Any Award Should Be Commensurate With Plaintiffs' Nuisance-Value Result.

In the unlikely event that the Court determines that a basis for fee-shifting exists, "the court may award **reasonable** attorneys' fees and nontaxable costs..."  Fed. R. Civ. Proc. 23(h) (emphasis added).    There is no precise rule or formula for making a reasonableness determination.  *Hensley,* 461 U.S. at 436.  The court necessarily has discretion in making this equitable judgment.  *Id.*  "[T]he concept of reasonableness...itself implies that the fee calculation is inextricably linked to the facts and circumstances of the underlying litigation."  *Carroll v. Wolpoff & Abramson,* 53 F.3d 626, 628-29 (4th Cir. 1995).  In determining what is reasonable, "the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid."  Fed. R. Civ. Proc. 23(h) advisory committee's note.

### A.    Because Fee-Shifting Is Sought In This Case, The Lodestar Method Is Appropriate.

The courts recognize important differences between awarding attorneys' fees from a common fund and shifting fees to an adversary – and apply different methods accordingly.  See *Blum v. Stenson*, 465 U.S. 886, 900 n.16; *Camden*, 946 F.2d. at 774; *Skelton*, 860 F.2d at 252 ("Because there is a difference between statutory fee-shifting cases and common fund cases with respect, *inter alia*, to who bears the direct burden of compensating plaintiffs' attorneys, different policies may govern the two types of cases.  In circumstances where litigants seek to shift their fees to opposing parties, as here, courts have favored the lodestar method.  *Gisbrecht v. Barnhart,* 535 U.S. 789, 802; see *Hensley,* 461 U.S. at 440 (Burger, C. J., concurring).

8

The Fourth Circuit's application of the lodestar method is well-suited to this case because it incorporates features of the percentage method favored for awards to class counsel. "After establishing the lodestar figure, the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 244 (4th Cir.2009). "...[I]t then awards some **percentage** of the remaining amount, depending on the **degree of success** enjoyed by the plaintiff." *Id.* (internal quotation marks and citation omitted) (emphasis added). The third step in this method, like the percentage method itself, "ties the lawyer's fee directly to the success of the litigation." *Jones v. Dominion Resources Serv., Inc.,* 601 F.Supp.2d 756, 758 (S.D.W.Va. 2009). Thus, the Fourth Circuit's application of the lodestar method, with its mixture of fee-shifting and common fund qualities, is appropriate for use in this case.

B. <u>The PSC's Lodestar Figure Is Excessive.</u>

1. Calculating The Lodestar Figure

Courts calculating an award of attorneys' fees in a fee-shifting case must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. *Robinson*, 560 F.3d at 243; compare *Jones,* 601 F.Supp.2d at 758 (discussing the method for calculating reasonable attorneys' fees in common fund class actions, in which the Fourth Circuit has not announced a preferred method). In determining what constitutes a reasonable number of hours and a reasonable rate, courts consider the following twelve factors identified in *Johnson v. Georgia Highway Express, Inc.*:

(1) the time and labor expended;

(2) the novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the attorney's opportunity costs in pressing the instant litigation;

9

(5) the customary fee for like work;

(6) the attorney's expectations at the outset of the litigation;

(7) the time limitations imposed by the client or circumstances;

(8) **the amount in controversy and the results obtained**;

(9) the experience, reputation and ability of the attorney;

(10) the undesirability of the case within the legal community in which the suit arose;

(11) the nature and length of the professional relationship between attorney and client;

(12) attorneys' fees awards in similar cases.

*Robinson*, 560 F.3d at 243-44 (emphasis added).

2.   The PSC's Hours Are Unreasonable Based On The Facts

(a)   Time And Labor Expended

The Petition cannot establish the reasonableness of the hours expended in the litigation because it cannot change the facts or result of the litigation.  The Court is very familiar with these facts – a recall of Digitek® in April 2008 prompted hundreds of filings and the creation of this MDL.  Though no one back in 2008 had ever actually seen a "double-thick" tablet outside of the Actavis manufacturing facilities, by the end of 2008 over 200 suits had been filed and by December, 2009 almost 600 had been filed.  This feeding frenzy was fueled by Plaintiffs' lawyers' web sites[2] and blogs and their jockeying for what they hoped would be lucrative positions on a Plaintiffs' Steering Committee.[3]  Once the momentum of a litigation like this builds, sometimes truth and reality cannot slow it down.

---

[2] See, e.g., "Digitek 'Horsepills' and Subsequent Class Action Lawsuit," describing anecdotal experience of "William," age 90, of Fort Smith, Alaska (not a single case of an Alaska plaintiff was filed in the Digitek® litigation), available at http://www.lawyersandsettlements.com/articles/digitek-heart-drug-recall/digitek-recall-digoxin-digtek-heart-problems-10870.html.

[3] Over twenty Plaintiffs' lawyers filed applications to be on the PSC.

Defendants challenged Plaintiffs to offer any proof of product defect, from the beginning of this litigation when Plaintiffs were claiming they ingested double-thick tablets, through the present claim that normal-sized Digitek® could have been of varying potency.  But instead of demonstrating any direct proof of product defect, the Plaintiffs attempted to weave their theory out of FDA documents such as 483s and warning letters, claiming that Actavis-produced products were "adulterated." They asked expensive pharmaceutical industry experts to analyze the documents and write reports about Actavis' regulatory misbehavior and "adulterated" products.  See reports of PSC's experts, Exs. 45 (Farley), 48 (Kenny), 50 (Frank), 52 (Somma), and 92 (Bliesner), attached as Ex. B.  Tellingly, nowhere in any of those reports did the experts identify defective or out-of-specification Digitek® in the hands of consumers.  During the week of June 28, 2010, the Defendants deposed four of the PSC's general liability experts.  They were forced to concede what the law says – that adulteration does not equate to product defect, that they had no evidence to contradict the abundant testing evidence of Digitek®, and that they had no evidence to a probability that defective, out-of-specification Digitek® ever even made it into the hands of consumers.  See, e.g., depositions of Dr. Kenny, pp. 110, 134; Dr. Somma, pp. 207-8, 240-41; Dr. Farley, pp. 383-84, 396, 420, Ex. H.  None of the PSC's experts can quantify how many defective tablets were made, or how far outside their specifications the tablets were.  The PSC should have known that, legally, neither recall nor adulteration are proof of defect, should have anticipated the vulnerability of their experts and theories in this regard, and avoided untold hours spent working up this litigation.  If you weave a carpet that no one buys, the weaver should bear that loss.

(b) The Results Obtained

The collapse of Plaintiffs' case upon the depositions of their experts was the catalyst for a quick, nuisance-value settlement that cannot support more than a negligible award of attorneys'

fees and expenses, if any.   Of the twelve *Johnson* factors, "'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"   *Farrar v. Hobby,* 506 U.S. 103, 114 (1992), quoting *Hensley,* 461 U.S. at 436; *Kay Co. v. Equitable Production Co.,* No. 2:06-cv-00612, 2010 WL 4501572, at *5 (S.D.W.Va. Nov. 5, 2010).

Here, any award of attorneys' fees should be as nominal as the PSC's success in this litigation.   The Settlement Agreement itself says that this was primarily a settlement to stop spending money on lawyers, experts, court reporters, hotels and airplanes.   The Recitals Section, at H, says:

> H. The "Parties" are entering into this Agreement for economic reasons in an effort to conserve resources on both sides of the litigation. All sums awarded under this Agreement, however, constitute damages on account of personal physical injuries or sickness, within the meaning of §104(a)(2) of the Internal Revenue Code.  There is, however, no guarantee that every person who has made a claim or filed a lawsuit will be compensated under the terms of this Agreement.

The last section of that passage is important.   Contrary to the PSC's statement that the settlement program provides "substantial benefit to the program participants," Petition, p. 2, many Plaintiffs and Claimants participating in the settlement will never receive any benefit from their participation because they cannot meet the entry criteria of the Settlement Agreement. Many Plaintiffs have already dismissed their suits, having realized that they could not submit complete claim forms for lack of medical records documenting an injury.   This is the result of Plaintiffs' counsel hastily filing hundreds of lawsuits with no pre-suit investigation into whether their clients received defective product or whether there was unexplained digoxin toxicity in those clients.   The timing of the settlement and the fact that most Plaintiffs opted to participate in it are indicia of the weakness of Plaintiffs' case and nothing else.

The amount of the settlement, when averaged, reflects the cost-saving theme of the resolution.  By dividing the number of resolved cases and claims (approximately 3,230) into the Settlement Funds of $10,000,000, the settlement will resolve the participants' claims for an

average of approximately $3,100. And these were personal injury and wrongful death claims, not "economic loss" claims. Under the typical contingent fee agreement, the average Plaintiff would only receive $2,000, not accounting for liens or costs of litigation. That is not a "substantial benefit" or "great result." Thus, the large amount of the settlement in the aggregate does not reflect the great quality of the Plaintiffs' cases or their attorneys' efforts – it reflects the large number of claims it was intended to resolve. See *Kay*, 2010 WL 4501572, at *8, *13. This is not the "great" result the PSC now claims.

Further, the aggregate amount of the settlement is one percent (1%) of what Plaintiffs were seeking. The first class lawsuits sought "in excess of the sum of One Billion Dollars ($1,000,000,000.00)." See, e.g., Thrasher Compl., No. 2:08-cv-01007, Doc. 1. And, under the Master Complaint, Plaintiffs sought economic and non-economic damages, compensatory damages, punitive damages, medical monitoring, statutory damages under the Medicare Secondary Payer Act and applicable consumer protection laws, disgorgement of profits, attorneys' fees and costs, and prejudgment interest. Master Compl., Doc. 73. Even a week before the PSC's experts were deposed in June, 2008, the settlement demand was substantially higher than the ultimate settlement figure. See Affidavit of Matthew Moriarty, Ex. F.

Even independent commentators saw this as a cost-saving, nuisance-value resolution. Carl Tobias, a law professor at the University of Richmond in Virginia who teaches classes about mass-tort cases, accurately characterized the Digitek® settlement. "That is not a lot of money, especially when the allegations are that users were seriously harmed by the defective version of this drug," he said. "These amount to nuisance-value settlements." See Businessweek, Dec. 7, 2010, Ex. C.

The PSC's public statements do not match what they now tout as a success. Though the Petition characterizes the settlement as "a great result," Petition, p. 4, Motley Rice has described

it merely as "an opportunity to end a long and difficult litigation that has stretched on for more than two years."  Motley Rice website, Ex. D.  Most tellingly, the PSC has not sought to be paid out of the Settlement Funds.  Plaintiffs' counsel knew that, if they requested their fees and expenses from the Settlement Funds, they could jeopardize their ability to garner sufficient participation for its success.  The PSC has chosen to seek an award from Defendants, despite the lack of grounds to do so, because the Settlement Funds would be unpalatable to the Plaintiffs if shared with the PSC.  Because the result achieved by the PSC is far less than a success, the lodestar figure should be dramatically reduced.

(c)  Quality, Skill, And Efficiency Of The Attorneys Involved

Defendants do not dispute the skill level of counsel for the PSC, but the Petition incorrectly attributes the resolution of the cases to value Plaintiffs received from the PSC's work when, in fact, the settlement merely reflects the weakness of Plaintiffs' case.  "The achievement of a settlement within a few years of commencing the litigation" does not, as the Petition states, "demonstrate[] efficiency and skill of counsel."  See Petition, p. 13.  After the depositions of Plaintiffs' experts, the situation was fairly clear. One witness collapsed completely, Dr. Karen Frank.[4]  All of the witnesses conceded factually what Defendants already knew – that recalls do not mean a drug is defective; a finding of "adulteration" does not mean a drug is defective; and that Plaintiffs had slim to no proof that out-of-specification Digitek® ever made it into the hands of consumers, while the defense had extensive testing evidence of the product, all showing it to be within the specifications.  The PSC realized that these depositions had not gone well for them and that they would have an extremely difficult time proving product defect.  See Motley Rice

---

[4] Dr. Frank's transcript is attached for the court's review as Exhibit E.  The most revealing testimony is at pages 17-20, 70, 72-74, 83-85, 291-221, and 247-250.  It shows the lack of basis for the suit and that experts selected by Plaintiffs' counsel advised the PSC that they were not appropriate experts, directly testified that they were not supplied appropriate information from which to form a reasoned conclusion, and told Plaintiffs' counsel they questioned whether they should even be advanced as a witness.  In Dr Frank's case, she clearly should not have been.

14

website, Ex. D ("Proof of product defect in specific cases has been a very difficult issue."). Within days, settlement discussions started anew, and the parties agreed to push for a stay of the litigation.  The timing of Plaintiffs' general liability expert depositions and the settlement demonstrate the collapse of a weak case, not the efficiency or skill of the PSC.  As a result, this factor should not be considered by this Court.

### (d)  Risk Of Nonpayment

The risks taken by the PSC in pursuing the Digitek® litigation do not support the reasonableness of the lodestar figure, but rather the opposite.  The Petition acknowledges that "substantial risks were taken by Plaintiffs' counsel in making a financial investment in this matter while facing an uphill factual battle."  Petition, p. 14.  The uphill battle was two components:  1) a lack of evidence of product defect; and 2) serious challenges in specific causation.  While the PSC's statement is true, it merely emphasizes the weakness of Plaintiffs' case and the inequity of requiring Defendants to subsidize a mostly unsuccessful litigation.  See *Skelton*, 860 F.2d at 253 (a common concern with compensation for risk is that it penalizes the parties with the strongest defenses.  The stronger the defense, the higher the risk involved in bringing the suit and the greater the multiplier necessary to compensate plaintiff's attorney for bringing the action.).  Defendants should not have to pay for a risky litigation when what made it so risky was precipitous filings, inadequate pre-filing investigations, and a grievous absence of evidence.  As a result, risk of non-payment should not be a factor considered by the Court.

### (e)  Public Policy

Would fee-shifting here be good public policy?  If an irresponsible person takes calculated or heedless risks, like riding a motorcycle, drunk, with no helmet or health insurance, should he expect someone else to pick up the tab when he wrecks and is hospitalized?  As a matter of public policy, the answer is no.  Here, the PSC went for a risky ride and had a wreck.

15

The factors contributing to the riskiness of the litigation also undercut the PSC's public policy argument. The Digitek® litigation should be "Exhibit A" to much of what is wrong with the tort system. From the beginning it was a litigation chasing a theory as opposed to what litigation should be – facts and law giving rise to a viable theory.

What have these precipitous lawsuits cost everyone involved?

- By filing lawsuits before any defect or causation was even remotely proven or justifiably and reasonably suspected, the lawyers raised the expectations of thousands of people, and used their money for filing fees, depositions, medical record gathering, etc.;

- A number of federal and state courts had to expend precious resources administering the cases;

- Defendants and their insurance carriers were forced to expend over $30 million to defend the cases.

The litigation has had no overall societal benefit for what the law of torts was intended to do – compensate people for damages resulting from the manufacture of defective products. It only rehashed and scrutinized what the FDA and Actavis knew at the beginning – Actavis had troubles, as defined under certain regulatory provisions of the Food, Drug and Cosmetic Act. The fact that there is a settlement admits no fault, and the amounts involved are clearly paid only to end litigation that was costly to both sides. Encouraging attorneys to take on massive fishing expeditions like the Digitek® litigation is not in the interest of the public.

(f)  The Court Should Not Consider The Other Factors

Several of the other factors are not useful in this case, either because the PSC has not presented any evidence for the Court to consider or because they simply do not apply on these facts. The PSC has not presented evidence regarding its expectations at the outset of the litigation, the opportunity costs of pressing the litigation, the customary fee for like work, or attorneys' fees awards in similar cases. This litigation did not pose especially novel or difficult questions – the defect at issue being a manufacturing rather than a design defect. Nor were there

16

any unusual time limitations imposed.  The case was hardly undesirable to the Plaintiffs' bar. And the PSC did not have professional relationships with clients in their capacity as lead counsel for the Plaintiffs.  The Court should disregard these factors in determining a reasonable lodestar figure.

Lastly, the lawyers' individual fee submissions must be scrutinized carefully because they range from overreaching, to vague, to clearly inappropriate. Defense counsel has summarized the more egregious instances in Exhibit G.  Examples of clearly inappropriate charges (i.e., S. Mulderig, T. Toriseva, Motley Rice, and E. Blizzard) and the near-absurd (i.e. Brooks Cutter) include time spent on their individual cases – federal or state – for which they already have fee contracts.  Class action work is also inappropriate, but is covered in section C (at p. 18).  Examples of vague to a fault include R. Binstock, H. Bell, and J. Pettit.  A defense or business firm could not get away with billing a client with these superficial descriptions of work. Overreaching includes multiple lawyers charging for the same thing (i.e., the JPML hearing and every PSC strategy conference) and projects that, or experts who, never saw the light of day (mass-testing of Digitek® tablets and numerous consultants who did not pan out as trial witnesses), as well as post-settlement issues about liens (Zimmerman Reed with the Medicare Secondary Payor Act).  Though it is the PSC's burden to establish an entitlement, the Petition undercuts its own request by noting that individual firm affidavits have not even been "critiqued, scrutinized or reviewed by co-lead counsel."  Petition, p. 11, fn. 14.

For the foregoing reasons, the PSC's excessive lodestar figure should be diminished.

C.  <u>An Award Should Not Include Time Spent On Unsuccessful Claims</u>

"After establishing the lodestar figure, the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson*, 560 F.3d at 244.  Plaintiffs have suffered a number of adverse rulings over the course of this litigation, for which the lodestar

figure must be reduced.  Most importantly, Plaintiffs failed to certify a class in the Digitek®

litigation.  See PTO 60, Doc. 355; PTO 66, Doc. 389.  Several class cases were dismissed over

the course of class discovery and after the denial of class certification.  The PSC nonetheless

requests $340,073.50 in fees and $7,848.39 in expenses for class work (e.g., Morgan & Morgan,

Wolf Popper, J. Pettit and Zimerman Reed, Ex. G).  The class action lawyers' submissions say

how important their work was to a settlement, but that is all brag and no fact.  The motion to

certify was denied May 25, 2010, over a month before settlement talks started in earnest.  The

class claims were not settled.  No class action lawyers negotiated the settlement.  And

Defendants' counsel always told the PSC the class claims were not part of the negotiations.  See

Aff. of Matthew Moriarty, Ex. F.  Any lodestar figure should be reduced by at least these

amounts.

> D.  <u>The Lodestar Figure Should Be Reduced Based On The Poor Result</u>

"Finally, once the court has subtracted the fees incurred for unsuccessful, unrelated

claims, it then awards some percentage of the remaining amount, depending on the degree of

success enjoyed by the plaintiff."  *Robinson*, 560 F.3d at 244 (internal quotation marks and

citation omitted).  Where recovery of private damages is the purpose of civil litigation, a district

court, in fixing fees, is obligated to give primary consideration to the amount of damages

awarded as compared to the amount sought.  *Farrar,* 506 U.S. at 114.  If a plaintiff has achieved

only partial or limited success, the product of hours reasonably expended on the litigation as a

whole times a reasonable hourly rate may be an excessive amount.  *Id.,* quoting *Hensley,* 461

U.S. at 436.

Having considered the amount and nature of damages awarded, the court may lawfully

award low fees or no fees without reciting the twelve factors bearing on reasonableness or

multiplying the number of hours reasonably expended by a reasonable hourly rate.  *Id.* ("If ever

there was a plaintiff who deserved no attorney's fees at all, that plaintiff is Joseph Farrar. He filed a lawsuit demanding 17 million dollars from six defendants.  After 10 years of litigation and two trips to the Court of Appeals, he got one dollar from one defendant." (O'Connor, concurring)).  In *Carroll v. Wolpoff & Abramson,* 53 F.3d 626 (4th Cir. 1995), the plaintiff sought actual damages and statutory damages of $1,000, then abandoned her claim for actual damages and was awarded $50 for a technical violation of the Fair Debt Collection Practices Act. Because the Plaintiff's damage award was five percent of what she sought, the district court's award of five percent of the requested attorneys' fees was not an abuse of discretion.

Here, the settlement does not represent a good result for the Plaintiffs, as discussed above.  The aggregate amount of the settlement and the average individual award reflect nuisance values.  An independent commentator, the parties' Settlement Agreement, and the PSC's public statements and actions all say the same thing – that the settlement was "an opportunity to end a long and difficult litigation"[5] that "amount[s] to nuisance-value"[6] in "an effort to conserve resources on both sides of the litigation..."[7] That the PSC has sought an award from Defendants rather than the Settlement Funds, despite the lack of grounds to do so, reflects that the result achieved by the PSC is far less than a success.  An award of fees and expenses to the PSC should be negligible, if any.

## IV.    Conclusion

If Defendants had paid no money to Plaintiffs at all, the PSC would have no fund from which to seek their "common fund" fees from Defendants.  Having volunteered for what work

---

[5]  Motley Rice website, available at http://www.motleyrice.com/news/view/digitek-litigation-resolved-through-private-settlement-agreement-all-mdl-and-tollec-cases-to-be-incl, Ex. D.

[6]  Businessweek, Dec. 7, 2010, available at http://www.businessweek.com/news/2010-12-07/actavis-to-pay-up-to-13-million-to-resolve-digitek-lawsuits.html, Ex. C.

[7]  Settlement Agmt., Recital H, Ex. A.

they did, the PSC had to take the risk of complete loss or do something to ensure that it would not be.  To recover fees from their colleagues, the PSC needed something – an agreement, case law, a statute, or a court order – upon which to base the request.  Likewise, if the PSC expected to get their fees from Defendants, as an exception to the American Rule, they need a basis.  They have none.  Departing from the American Rule when Plaintiffs pursued a litigation based on speculation rather than facts would only reward this behavior and encourage similarly meritless litigation in the future.  The Defendants should not be legally compelled to pay for either the PSC's lack of agreement with their colleagues or for the calculated gamble that there would be a big enough common fund from which to be paid.  Defendants request a hearing on this matter.

Respectfully submitted,

ALLEN GUTHRIE & THOMAS, PLLC

Rebecca A. Betts, LIAISON COUNSEL
500 Lee Street East, Suite 800
Charleston, West Virginia 25301
Tel:      (304) 345-7250
Fax:     (304) 345-9941
E-mail:  rabetts@agmtlaw.com

*Attorney for Defendants*

TUCKER ELLIS & WEST LLP

By: s/*Richard A. Dean*
      Richard A. Dean (Ohio Bar #0013165),
      CO-LEAD COUNSEL
      Matthew P. Moriarty (WV Bar # 4571;
      Ohio Bar 0028389), CO-LEAD COUNSEL
      Kristen L. Mayer (Ohio Bar #0055505)
      925 Euclid Avenue, Suite 1150
      Cleveland, Ohio  44115-1414
      Tel:      (216) 592-5000
      Fax:     (216) 592-5009
      E-mail: richard.dean@tuckerellis.com
                  matthew.moriarty@tuckerellis.com
                  kristen.mayer@tuckerellis.com

      *Attorneys for Defendants Actavis Totowa LLC,*
      *Actavis Inc., and Actavis Elizabeth LLC*

073021/000031/1154259/7

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2011, a copy of the foregoing Brief in Opposition to PSC's Application for Fees and Expenses was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

ALLEN GUTHRIE & THOMAS, PLLC

Rebecca A. Betts, LIAISON COUNSEL
500 Lee Street East, Suite 800
Charleston, West Virginia 25301
Tel:      (304) 345-7250
Fax:     (304) 345-9941
E-mail:   rabetts@agmtlaw.com

*Attorney for Defendants*

TUCKER ELLIS & WEST LLP

By: s/*Richard A. Dean*
      Richard A. Dean (Ohio Bar #0013165),
      CO-LEAD COUNSEL
      Matthew P. Moriarty (WV Bar # 4571;
      Ohio Bar 0028389), CO-LEAD
      COUNSEL
      Kristen L. Mayer (Ohio Bar #0055505)
      925 Euclid Avenue, Suite 1150
      Cleveland, Ohio  44115-1414
      Tel:     (216) 592-5000
      Fax:     (216) 592-5009
E-mail:richard.dean@tuckerellis.com
           matthew.moriarty@tuckerellis.com
           kristen.mayer@tuckerellis.com

*Attorneys for Defendants Actavis Totowa LLC,*
*Actavis Inc., and Actavis Elizabeth LLC*

073021/000031/1154259/7