# EXHIBIT E

Karen A. Frank, M.D.        Videotaped              June 30, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:   DIGITEK PRODUCT
         LIABILITY LITIGATION

                              MDL NO. 1968


          Videotaped deposition of KAREN A. FRANK,

M.D., taken at the law offices of SEGAL McCAMBRIDGE

SINGER & MAHONEY, LTD., 1818 Market Street, Suite

2600, Philadelphia, Pennsylvania, on Wednesday,

June 30, 2010, commencing at 9:10 a.m., before Dianna

R. Pugliese, a Registered Merit Reporter, Certified

Realtime Reporter, Certified Shorthand Reporter (NJ

& DE), and Notary Public, pursuant to notice.

Karen A. Frank, M.D.        Videotaped        June 30, 2010

## Page 2

1  APPEARANCES
2  FOR THE PLAINTIFF:
3   Mr. Fred Thompson, III
    Motley Rice LLC
4   28 Bridgeside Boulevard
    Mount Pleasant, South Carolina 29464
5   843-216-9118
6
7  FOR THE DEFENDANTS:
8   Mr. Richard A. Dean
    Tucker Ellis & West LLP
9   1150 Huntington Building
    925 Euclid Avenue
10  Cleveland, Ohio 44115-1475
    216-696-2137
11
12  Ms. Monee A. Takla
    Tucker Ellis & West LLP
13  515 South Flower Street, 42nd Floor
    Los Angeles, California 90071
14  213-430-3378
15
    Mr. Harvey L. Kaplan
16  Shook, Hardy & Bacon, LLP
    255 Grand Boulevard
17  Kansas City, Missouri 64108
    816-474-6550
18
19 ALSO PRESENT:
    David Williams, Video Operator
20
        EXAMINATION INDEX
21
    KAREN A. FRANK, M.D.
22    BY MR. DEAN . . . . . . . . . .  5
      BY MR. KAPLAN . . . . . . . . .  247
23    BY MR. THOMPSON . . . . . . . .  268
      BY MR. KAPLAN . . . . . . . . .  286
24    BY MR. DEAN . . . . . . . . . .  297
      BY MR. KAPLAN . . . . . . . . .  302
25

## Page 3

1        EXHIBIT INDEX
2                MARKED
    D
3
    250  Digitek Expert Table of Contents with   45
4        18 items listed
5    251  Table of Contents with 11 items        45
         listed
6
    252  Handwritten notes by Dr. Frank, four    47
7        pages
8    253  Handwritten notes by Dr. Frank, 24     47
         pages
9
    254  Handwritten notes by Dr. Frank, one     47
10       page
11   255  Index titled Documents Sent to Karen   53
         Frank, two pages
12
    256  Handwritten notes of Karen Frank, one   55
13       page
14   257  Engagement Agreement with Smart        58
         Consulting Group, LLC, six pages
15
    258  Digitek Case Overview, 11 pages         59
16
    259  Handwritten notes by Dr. Frank, one     60
17       page
18   260  Handwritten notes by Dr. Frank, one    60
         page
19
    261  Color photocopy of Dr. Frank's report   69
20       titled Digitek Recall, Assessment of
         Pharmacovigilance Systems and Risk
21       Communication, Background, Analysis
         and Conclusions, 6/15/2010
22
23
24
25

## Page 4

1        COURT REPORTER:  Are there any
2  stipulations for the record?
3        MR. DEAN:  No.
4        VIDEO OPERATOR:  We're now on the video
5  record.
6        This is the videotape deposition of
7  Karen A. Frank, M.D., taken by the Defendant, In Re:
8  Digitek Product Liability Litigation, in the United
9  States District Court for the Southern District of
10 West Virginia, Charleston Division, held at the
11 offices of Segal McCambridge Singer & Mahoney, Ltd.,
12 1818 Market Street, Philadelphia, Pennsylvania, on
13 Wednesday, June 30, 2010.
14       The time is 9:10 a.m.
15       I am David Williams, the videographer.
16 The court reporter is Dianna Pugliese.  We are from
17 the firm of Rennillo Court Reporting in Cleveland,
18 Ohio.
19       Counsel, will you now please introduce
20 yourselves.
21       MR. DEAN:  My name is Richard Dean.  I
22 represent the Actavis defendants.
23       MS. TAKLA:  Monee Takla for the Actavis
24 defendants.
25       MR. KAPLAN:  Harvey Kaplan, Shook, Hardy

## Page 5

1  & Bacon, for Mylan.
2        MR. THOMPSON:  Fred Thompson, Motley
3  Rice, for Plaintiffs.
4        VIDEO OPERATOR:  The reporter will now
5  swear in the witness.
6        KAREN A. FRANK, M.D., having been duly
7  sworn, was examined and testified as follows:
8             EXAMINATION
9  BY MR. DEAN:
10     Q.    Good morning.
11     A.    Good morning.
12     Q.    Would you state your full name for the
13 record, please?
14     A.    Karen Ann Frank.
15     Q.    And it's Dr. Frank; correct?
16     A.    Yes.
17     Q.    Dr. Frank, we met before, but my name is
18 Richard Dean.
19        Have you ever had your deposition taken
20 before?
21     A.    No.
22     Q.    So this is your very first deposition
23 ever; correct?
24     A.    Yes.
25     Q.    Have you ever testified in a court in

Karen A. Frank, M.D.        Videotaped              June 30, 2010

---

Page 6

1    front of a jury before?
2        A.    No.
3        Q.    Has Mr. Thompson or someone else on
4    behalf of the plaintiffs had a chance to tell you
5    about the deposition process a little bit?
6        A.    Yes.
7        Q.    Okay.  Well, let me just go over a few
8    ground rules.
9            I'm going to be asking you some
10   questions today, so it's very important that the two
11   of us communicate.  So if I ask you a question that
12   you do not understand, will you tell me that?
13       A.    Yes.
14       Q.    Your responses have to be verbal, out
15   loud.  We can't -- this court reporter, at least,
16   can't take the shaking or nodding of the head in a
17   particular direction.
18           So will you speak up and use whatever
19   words you want to use, but please speak up and give
20   your answer verbally?
21       A.    Yes.
22       Q.    And I understand you're not -- you're a
23   little bit under the weather today?
24       A.    Yes.
25       Q.    At any point if you need a break for any

---

Page 7

1    reason, just let us know and we'll take a break.
2    Okay.
3        A.    Uh-huh.
4        Q.    Yes?
5        A.    Yes.
6        Q.    What have you done to prepare for the
7    deposition today?
8        A.    I was sent a set of volumes of printed
9    material.  I went through them generally, and then I
10   went through them looking for white space or blanks
11   with information that I thought should be there that
12   was not there.
13           I met with Pete Miller and Megan Carter
14   over lunch, and I presented them with a list of
15   documents that I would liked to have seen, and they
16   referenced it against what was available in discovery
17   and they sent me two more printed volumes, electronic
18   copies of everything I had electronic copies of.
19           And then one final Establishment
20   Inspection Report.
21           MR. KAPLAN:  One final what?
22           THE WITNESS:  Establishment Inspection
23   Report.
24   BY MR. DEAN:
25       Q.    My question was, what you did to get --

---

Page 8

1    not to write the report, but to get ready for the
2    deposition.
3            What is it that you did to get ready for
4    the deposition today?
5        A.    I reread these two documents yesterday.
6        Q.    And by these two documents, for the
7    record, you are referring to what I've marked already
8    as Defendant's Exhibits 49 and 50; is that correct?
9        A.    Yes.  I went back and reviewed to
10   refresh my memory.
11       Q.    Well, actually, 40 -- just so we're
12   clear, 49 is a copy of your resume; correct?
13       A.    No.
14       Q.    No?
15       A.    This -- what I reviewed was a copy of
16   the Conclusion.
17       Q.    Right.
18       A.    And I went through this document.  I
19   can't say that I went through it a hundred percent.  I
20   went through key sections where I wanted to refresh my
21   memory.
22       Q.    And for the record, what you have is the
23   long document we've marked as Exhibit 50 to this
24   deposition; is that correct?
25       A.    Yes.

---

Page 9

1        Q.    And I compared them before.  Your
2    document has 70 pages and Exhibit 50 also has 70
3    pages, so they are the same.
4        A.    There should be no alterations between
5    what you received and what I printed.
6        Q.    So what you did in preparation for the
7    deposition was to review what we marked as Exhibit 50;
8    correct?
9        A.    I don't know why this is not marked as
10   an exhibit, because this is the key opinion.  This was
11   at one point one document.  And at the request of Pete
12   Miller, it was split.  So he asked me to address two
13   separate issues --
14       Q.    Let me just interrupt.  I won't do that
15   often, but I want to make sure we get this exhibit
16   marked correctly.
17           The shorter document that you have in
18   front of you is -- are you telling me that's not
19   included in Exhibit 50?
20       A.    Yes.  It is not included in Exhibit 50.
21       Q.    Okay.  Can I see it, please?
22       A.    Yes.  (Document provided.)
23       Q.    Dr. Frank, I have just reviewed the
24   first 11 pages of Exhibit 50 and it -- it would --
25   those first set of pages would appear to be exactly

---

3  (Pages 6 to 9)

Karen A. Frank, M.D.        Videotaped            June 30, 2010

Page 10

1    what is in the shorter document.
2        A.    Okay.
3        Q.    Is there a difference?
4        A.    Well, these were sent to Pete Miller as
5    two separate documents.  It may be that he combined
6    it.  He asked me to separate them.  I actually started
7    with an assessment of the pharmacovigilance system, an
8    assessment of the risk communication.
9              He asked me to combine them all, the
10   opinions, as a conclusion.
11             Then he said, this is too long.  We want
12   to take out this supporting document where I
13   documented verbatim things from the FDA inspections
14   and my comments that served as the basis for the
15   opinion.
16             And this short document became the
17   opinion and this longer document became the supporting
18   evidence.
19             He may have, in the process of
20   submitting it electronically, been forced to recombine
21   them so that they were in this order.
22       Q.    Just so we're -- just so the record is
23   clear --
24             MR. THOMPSON:  Yeah.  Let's --
25   BY MR. DEAN:

Page 11

1        Q.    Could you look at -- could you,
2    yourself --
3              MR. THOMPSON:  Yeah, could I -- let me
4    just make a short statement, and that is, everything
5    Dr. Frank has said is true and accurate.
6              Everything you said is true and
7    accurate.  That she submitted a -- the lengthy
8    document.
9              We determined and we believe that for
10   the ease of having a report and a supplement, that the
11   thing to do would be to have it as a separate with a
12   supplement.
13             But in terms of the report, the
14   connection or disconnection is irrelevant.
15             And so what you have, I believe, is what
16   Dr. Frank has as the report with, immediately
17   following it, this lengthy discussion item by item as
18   sort of a supplement or a supporting information.
19             So I think that it's tempest in a
20   teapot.  In Dr. Frank's mind, she separated them.  In
21   submission, they were submitted --
22             MR. DEAN:  Together.
23             MR. THOMPSON:  -- as a report with
24   supplement, so...
25             THE WITNESS:  Electronically on this

Page 12

1    there is the one combined document and then the two
2    separate documents that were sent to Pete Miller by
3    e-mail.
4              And there are copies, exact copies of
5    this flash drive, two made, if you need to verify
6    that.
7    BY MR. DEAN:
8        Q.    So I want to get back to what you did to
9    prepare for the deposition besides read -- read what
10   we've marked as Exhibit 50, or the first 11 pages of
11   Exhibit 50.
12       A.    Well, actually, it was -- it was the
13   great deal of this.  I didn't read all the verbatim
14   quotes.  I went mostly through my comments in this
15   document.  But, no, I did not go back to the original
16   binders yesterday.
17       Q.    Okay.
18       A.    I only went through the original binders
19   to extrapolate this, because I anticipated that this
20   would ground my statements very carefully.  The --
21   what actually happened over the course of several
22   years at this company is somewhat complex.
23             And in the course of preparing this
24   document, I laid out a timeline of events and the
25   observations of the inspectors.

Page 13

1              Because most of what I was presented was
2    the 483s and the Establishment Inspection Reports were
3    the paucity of what you might call primary.
4              MR. THOMPSON:  Doctor, let me do some
5    impermissible coaching, and that is, if I thought that
6    it would shorten the deposition, I would let you go
7    forward with those explanations.
8              But I'm afraid that we're going to get
9    back to that --
10             MR. DEAN:  Right.
11             MR. THOMPSON:  -- over the course of the
12   day.
13             THE WITNESS:  Okay.
14             MR. THOMPSON:  Right now, I think what
15   he wants to know is simply what was done to prepare
16   for this deposition, and he probably wants to know
17   about our meeting last night and our meeting this
18   morning.
19             THE WITNESS:  Okay.
20             MR. THOMPSON:  And the review of the
21   exhibit from the deposition, and I don't recall the
22   exhibit number, but it was the FDA document, the fact
23   sheet.
24             And I think that once we say that, that
25   will be exhaustive.

4  (Pages 10 to 13)

Karen A. Frank, M.D.       Videotaped        June 30, 2010

Page 14

1       THE WITNESS: Okay. I'm sorry.
2       MR. DEAN: Thank you, Mr. Thompson.
3   BY MR. DEAN:
4       Q.    Go ahead.
5       A.    Do I give him the details of the meeting
6   last night?
7       Q.    Well, let's just do it this way. Let me
8   ask a question, I'll try to have a focused question,
9   you give a focused answer.
10      Mr. Thompson is right, we'll get back to
11  the substance of your opinions much later -- or later
12  this morning. But for right now, let's just -- I'll
13  give you a very short question, you try to give me a
14  direct answer to the question. Okay?
15      A.    Okay.
16      Q.    So I take it, in the last few days, you
17  have met with Mr. Thompson; is that correct?
18      A.    Yes.
19      Q.    Did you meet with any other attorneys
20  for the plaintiffs in the last few days?
21      A.    On the phone were Megan Carter and Pete
22  Miller.
23      Q.    And when did -- and was Mr. Thompson on
24  that call?
25      A.    Yes. He was chairing the call.

Page 15

1       Q.    And when was that?
2       A.    That was last evening.
3       Q.    Was that -- within the last week, was
4   that the first time you met with any attorney
5   representing the plaintiffs?
6       A.    Yes.
7       Q.    How long did that call last?
8       A.    Approximately two hours. It was
9   intermittent. It was interrupted. It was scheduled
10  to last from 5:30 to 7:30.
11      I was down in the lobby at 6:30
12  expecting Mr. Miller to meet me, and at quarter of
13  6:00 I called him on his phone and he had expected me
14  to call him when I arrived. So we started late and I
15  believe we went about 15 minutes late.
16      Q.    What subjects did you discuss?
17      A.    I discussed some general opinions that I
18  had about the situation and some specific issues that
19  came from the evidence here. They presented me with
20  the issues that had come up in the depositions.
21      And we talked about how I would stick to
22  the scope of my engagement, how I would respond if the
23  questioning started to go outside of the scope of my
24  engagement.
25      They made me aware of some additional

Page 16

1   documents that I was not sent, that -- there was
2   suggestion that I review them last night or sometime
3   in the future to further expand the analysis.
4       There was discussion of some general FDA
5   press releases on generic drugs and their implications
6   that they may be presented to me today.
7       And there was -- there was just some
8   general coaching in how to give appropriate opinions.
9   And I believe they were very, very careful to stay
10  within bounds with coaching the witness.
11      My only other presentations such as this
12  are before FDA advisory committees, which are largely
13  data driven. They were internal, closed-door
14  presentations. And they were very carefully reviewed
15  up front. So --
16      Q.    Excuse me. I missed that. They were
17  very carefully what --
18      A.    Reviewed up front with FDA supervisors.
19      Q.    Okay.
20      A.    So this is the first time I've sat at
21  deposition. I will make a statement that I've been
22  approached about doing this work previously, maybe
23  eight years ago. People recommended --
24      MR. THOMPSON: Dr. Frank, let me ask you
25  to be responsive to Mr. Dean.

Page 17

1       THE WITNESS: Okay.
2       MR. THOMPSON: I think he has now
3   exhausted the -- maybe he hasn't exhausted, but we're
4   on the preparation for this deposition.
5       THE WITNESS: Okay.
6   BY MR. DEAN:
7       Q.    All right. Thank you for that answer,
8   which I think was responsive, but I want to go back
9   and ask you some follow-ups on specific things that
10  you said in that answer.
11      You said, first of all, that they --
12  "they" being the lawyers -- presented you with issues
13  that had come up in the depositions, by that I mean --
14  I'm assuming you meant depositions that have occurred
15  in the last few days?
16      A.    Yes.
17      Q.    What issues did they present you with?
18      A.    The one that really struck me was the
19  fact that the -- there was a repeated line of
20  questioning about specific information on Digitek.
21      And I responded to them that if you were
22  to look at the volumes that I reviewed several weeks
23  ago to write this document, you will see in my notes
24  in the margin, Digitek question, Digitek question.
25      Because there's not a lot of specific

5 (Pages 14 to 17)

Karen A. Frank, M.D.      Videotaped        June 30, 2010

Page 18

1  information given on the systems that allow specific
2  analysis of the subset of data on Digitek.
3        And so I understood why your line of
4  questioning went in that direction, and we prepared me
5  to answer. And I think I can -- I've produced a
6  document that can -- is an accurate basis for any
7  answer to that.
8     Q.    I don't -- I want to follow up. You
9  said they presented you with the issue that there was
10 not much specific information on Digitek.
11       Could you be more specific about what
12 the issue was they were talking to you about?
13    A.    They didn't state that there was no
14 specific issue on Digitek. They said that your line
15 of questioning repeatedly was to ask the witnesses do
16 you have anything specific on Digitek.
17       My extrapolation was my reaction to what
18 I was given is that I was unable to subset out
19 information on the systems specifically for Digitek.
20       So when the FDA looks at noncompliance
21 with 15-day reporting, they have a sampling that
22 includes Digitek cases and non-Digitek cases.
23       I don't know how that extrapolates.
24 Nobody presented me with data from the database that
25 shows X Digitek cases over X years, the adverse event

Page 19

1  codes.
2        So I can't say that the analysis of the
3  databases or the systems was specific for Digitek. It
4  was analysis of the Actavis systems that handled all
5  of the products. Nothing was specific to Digitek.
6     MR. THOMPSON: You know, let me just
7  interrupt here. Certainly you have a right to ask
8  questions and certainly Dr. Frank has shown that she's
9  going to be meticulously responsive.
10       But if we're going to go through all
11 this again and you're going to ask the question that
12 we told her that you were probably going to ask, I'm
13 just not -- I just hate to sit through it twice.
14 BY MR. DEAN:
15    Q.    What other issues did they present you
16 with besides the one you just spoke to us about?
17    A.    I'm having trouble recalling
18 specifically. We talked a lot about my staying within
19 the scope of my engagement because --
20    Q.    I don't need to go there. I understand
21 that.
22       I just want to know, I'm interested in
23 what issues they flagged for you last night. You've
24 told me about one issue.
25       Are there any others they flagged for

Page 20

1  you?
2     A.    I need to -- I wrote notes, but I don't
3  think I have written them all down, and I don't --
4     Q.    Did you make notes at that meeting,
5  ma'am?
6     A.    Nothing -- only my to-do list for last
7  night.
8     MR. KAPLAN: Can we get a copy of that?
9     MR. DEAN: Well, let me look at it
10 first. I'm not sure we want it.
11    MR. THOMPSON: Why don't you look at it
12 before you say that.
13 BY MR. DEAN:
14    Q.  ·  For Mr. Kaplan's benefit, could you just
15 read what's on here so -- I don't think we're going to
16 need a copy of that.
17    A.    It says, Two flash drives, check
18 e-mail. And I don't know -- I don't know what the
19 other one says.
20       What I wanted to make sure is that I had
21 all of the required evidence that you wanted for the
22 deposition.
23    Q.    Now, let's -- thank you.
24       Now, I want to make sure you've answered
25 my question, though. I just want a listing of the

Page 21

1  issues they presented to you. You've given me one
2  issue.
3        Are there any other issues?
4     A.    They talked to me about how to respond
5  to questions that had multiple questions in one
6  question, to ask for it to be subdivided. They --
7     Q.    Excuse me. I'm not interested in their
8  instructions about how to respond to questions.
9        What I'm interested in are simply this.
10 Are there substantive issues at the beginning of the
11 meeting that they flagged for you as issues that might
12 come up in the deposition? That's all I want to know.
13    A.    At the moment, I can't remember any
14 more.
15    Q.    Okay. Thank you.
16       Now --
17    A.    I think -- I'm sorry I'm so nervous, but
18 I'm -- actually, I can't remember the specifics.
19    Q.    You'll get more -- I know at the
20 beginning this is -- you're going to be nervous.
21 You'll get comfortable.
22       And if you think of those issues later,
23 if they come back to you, we'll give you an
24 opportunity.
25    A.    Yes.

6 (Pages 18 to 21)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

Page 22

1       MR. THOMPSON: I hate to -- I hate to
2   interrupt again, but I do believe Dr. Frank did
3   mention that we read to her the FDA Generic Drug
4   Advisory.
5       MR. DEAN: I've got the list here.
6       MR. THOMPSON: Okay.
7       MR. DEAN: I'm getting there.
8       MR. THOMPSON: Okay.
9   BY MR. DEAN:
10      Q.   The next thing you mentioned when you
11  were giving me the list of what happened last night
12  was that they gave you additional documents that had
13  not been sent to you.
14       What documents did they give to you that
15  had not been sent?
16      A.   They were unable to access the server.
17  The only way to obtain some of the documents was
18  through the Citrix portal on his laptop, and that was
19  not functioning. They were unable to download the
20  documents and send them to me by e-mail.
21       Your line of questioning along specific
22  issues for Digitek brought up issues that were already
23  of concern to me.
24       So a lot of what happened last night
25  was, I expressed my concerns and they responded to

Page 23

1   prepare me to address my concerns this morning.
2        And in coaching me to stay within the
3   scope of my work, there were a number of documents
4   that were not sent to me, but were sent to the other
5   witnesses, the cardiologist who looked at the medical
6   issues.
7        Even though I'm a medical doctor, I was
8   not sent a lot of these.
9        So we talked about that. We talked
10  about my concerns with the process of discovery in
11  this case.
12      Q.   Now, let me just stop you. You've gone
13  beyond my question. I'm going to give you a chance to
14  tell me whatever you want to tell me, but I'd like to
15  do it in a question-and-answer fashion.
16       Did you look at any additional documents
17  last night or were you foiled by technology from being
18  able to look at additional documents?
19      A.   We were foiled by technology, except for
20  one document.
21      Q.   And what is that, ma'am?
22      A.   Which is a generic press release by the
23  FDA talking about the generics industry where they
24  read to me specific points and warned me that it may
25  be presented to me today.

Page 24

1       Q.   Okay. And did you look at any
2   additional documents this morning?
3       A.   I read these this morning.
4       Q.   Read what this morning?
5        Oh, no. I meant -- I meant additional
6   -- additional evidentiary documents, exhibits.
7       A.   No.
8       Q.   Okay. So the only additional document
9   that you looked at in the last two days was that --
10  what you referred to as a generic press release; is
11  that correct?
12      A.   Yes. Now --
13      Q.   Is that correct?
14      A.   Yes. You --
15      Q.   You've answered. Okay? It was a very
16  simple question.
17       Let's -- let me go on and frame another
18  one for you.
19      A.   Okay.
20      Q.   I believe in your original answer to me
21  you mentioned that you discussed some FDA statements.
22       Was that just the generic statement we
23  just spoke about?
24      A.   Yes.
25      Q.   Yes?

Page 25

1       A.   I didn't see anything else in writing.
2       Q.   Now, about three minutes ago you said
3   that this morning you expressed your concerns about
4   some issues.
5       A.   Well, last night and this morning.
6       Q.   Okay. And what concerns did you express
7   about issues?
8       A.   Well, I wanted to be certain that I
9   didn't violate any of my existing confidentiality
10  agreements.
11       A lot of the background I draw from has
12  to do with -- has to do with issues that I addressed
13  in pharma companies or where I had been provided
14  information from my FDA mentors about drug
15  withdrawals.
16       I know a lot about the investigations
17  that went on in some of these and they coached me how
18  to comment on this evidence without bringing in
19  evidence from other cases that would not be
20  appropriate for this deposition.
21       I expressed my other concern that when I
22  was given these documents, I went through them, I then
23  made a list of documents that I would like to have
24  seen to completely analyze what happened in the
25  company, and I pointed to Pete Miller, and they were

7  (Pages 22 to 25)

## Page 26

1    concerned that the process of discovery was complete
2    and those documents were not available.
3         I did not go back and do the subsequent
4    gap analysis when they sent me the second round of
5    documents.
6         But in this document I prepared for
7    myself this morning, I tried to clearly lay out
8    what I -- what was provided to me very accurately, and
9    things that were not provided to me, like any of the
10   MHRA inspections or the responses.
11        So my view inside Actavis, from 1992,
12   from the first consent decree, to now, is mostly
13   through the eyes of the FDA inspectors and their
14   observations.
15        And my opinions can only be based on
16   what I actually saw or read.  These are secondary
17   sources.
18        I haven't seen the primary sources.  I
19   haven't seen any individual MedWatch forms.  I haven't
20   seen any PSURs.
21        I have not seen the company internal
22   document that was provided to Dr. Leikin at the time
23   of his Health Hazard Assessment.  I have not seen the
24   Quality System Improvement Plan.  I have not seen any
25   CAPAs, any CAPA trackers.

## Page 27

1         MR. KAPLAN:  Any what?
2         THE WITNESS:  CAPA trackers.  When
3    companies have CAPAs, they usually track their
4    compliance with the CAPAs with some sort of a tool.
5    Some are more robust than others.  Some can be as
6    simple as an Excel spreadsheet.
7         But if they have an inspection and
8    they're anticipating a repeat two-year inspection,
9    they're documenting their remediation program on the
10   original inspection and what are their vulnerabilities
11   for the repeat inspection.
12        If they're working with a consulting
13   firm on business processes, they usually provide this
14   information to the consulting firm for the business
15   analysts and the modelers to use in assisting them in
16   building more robust business processes and improving
17   their compliance.
18        MR. THOMPSON:  Let me -- here again, let
19   me -- this is not even an objection, is if I thought
20   that this was actually covering this information for
21   the whole day, I would allow Dr. -- I would say go,
22   continue, Dr. Frank.
23        She's clearly trying her best to give
24   full and responsive answers, but I'm concerned that
25   we're going to just repeat this same material and

## Page 28

1    we're going to hear it twice.
2         So it's my hope that we can -- it's my
3    hope that she'll tell you that we told her to tell the
4    truth at some point, but even if she doesn't --
5         MR. DEAN:  She's left that out so far,
6    Fred.
7         MR. THOMPSON:  Yeah.  I think we've --
8    anyway...
9    BY MR. DEAN:
10   Q.   For Mr. Thompson's sake, did
11   Mr. Thompson tell you to tell the truth today?
12   A.   Yes.
13   Q.   Good.
14   A.   Do you think I'm not telling the truth?
15        MR. THOMPSON:  No.  That's a lawyer joke
16   between the two of us.  I apologize.
17        THE WITNESS:  I have a concern that the
18   complexity of this -- I've been involved with
19   companies that have had implosions like this, and in
20   trying to correct it inside the company, the
21   exhaustion that occurs in trying to sort out what
22   happened and what needs to be corrected, how to
23   correct it and document the correction can be
24   prohibitive.
25        And in trying to sort out what really

## Page 29

1    happened here very, very accurately, I don't want to
2    come in and make general statements that sound like
3    opinions.
4         There's -- there's a lot of evidence
5    here as to what happened, what was not reported, what
6    the inspectors found, what the companies promised to
7    do, what they did do in the remediation.
8         But there's white space that I have not
9    seen.  It's not -- it may or may not be in the process
10   of discovery.  It may have been that in limiting the
11   scope of my opinion it was not provided to me, it was
12   provided to someone else.
13   BY MR. DEAN:
14   Q.   Okay.  Let me hand you what I have
15   marked as Exhibit 90.
16        MR. DEAN:  Fred.  Harvey.
17   BY MR. DEAN:
18   Q.   Exhibit 90 is a Notice for this
19   deposition asking you to bring certain documents with
20   you.
21        Have you seen this before?
22   A.   Yes.  I went over this with them last
23   night.
24   Q.   Okay.  Let's go through it.
25        Item number one, we already have your

8  (Pages 26 to 29)

Karen A. Frank, M.D.       Videotaped        June 30, 2010

Page 30

1    curriculum vitae.
2         Item number two was correspondence
3    between you and any attorney acting on behalf of the
4    plaintiffs in the Digitek litigation.
5         Did you bring that with you?
6         A.   I have everything. I asked specifically
7    twice whether I was to print e-mails. I was told no.
8    I do not have any e-mails corresponding to the case.
9         I asked them not to send any documents
10   by e-mail. Everything was sent by FedEx either in
11   paper or electronic format.
12        Q.   And did you bring items responsive to
13   number two with you today?
14        A.   Yes.
15        Q.   And could I see that, please.
16        A.   I believe that I did print some SOPs,
17   but I did not make comments on them. So what I know
18   about document retention, I didn't alter the paper
19   copy, and there is an electronic copy. It's
20   equivalent.
21        So I don't think I have all of the SOPs
22   that I printed, but I have the electronic equivalents
23   and there were no marks made on these.
24        Q.   Dr. Frank, you have given me four
25   notebooks, some loose pages of paper and two CDs;

Page 31

1    correct?
2         A.   Yes.
3         Q.   What is on the CDs?
4         A.   As many of the documents in these
5    notebooks and that stack as were available
6    electronically.
7         Q.   Okay. So these, the CDs, would not
8    comprise everything that's in hard copy here?
9         A.   No. And I went back and asked, and I
10   don't think all of them were available
11   electronically. There were some that were to be
12   delivered.
13        That -- see that sheet there? That is
14   the listing of at least one of the CDs. And the
15   checks, I don't recall having received electronically
16   the two documents there.
17        Q.   Well, if I was interested -- I'm not
18   interested in hauling all this paper with me, but --
19   or having it marked as exhibits if I can avoid it.
20        There's a document here that says
21   Documents sent to Karen Frank; correct?
22        A.   Yes.
23        Q.   Does it -- does this summarize some of
24   these notebooks?
25        A.   Yes. Now, what I did not do --

Page 32

1         Q.   Excuse me. Which notebooks would it
2    summarize, Dr. Frank?
3         A.   I think the first two that were sent to
4    me.
5         Q.   So -- and which would those be?
6         A.   Okay. That would be that one there
7    (indicating).
8         Q.   Okay.
9         A.   And I specifically did not take time to
10   categorize this. I called them and said, I don't have
11   all the documents electronically for which I want to
12   write this document. But I did not take the time to
13   verify those disks against the binders.
14        Q.   Did you --
15        A.   And there could be variation, is what
16   I'm saying.
17        Q.   I want to move through this as quickly
18   as we can.
19        But what I'm interested in is what you
20   were -- what you were provided and then what you asked
21   for, is -- in follow-up, is all of that here in front
22   of us now?
23        A.   Yes.
24        Q.   Is there anything that's responsive --
25   strike that.

Page 33

1         Is there anything else you brought with
2    you today other than what we have on the table?
3         A.   No. The directions to the hotel last
4    night and my Notice.
5         Q.   Those I don't need.
6         A.   And this you have in electronic format,
7    all of this.
8         MR. THOMPSON: Let me interrupt. She
9    brought these two thumb drives, which are two copies
10   of the same thing. Maybe she needs to summarize
11   what's on the thumb drives.
12        MR. DEAN: Yes. Thank you, Fred.
13   BY MR. DEAN:
14        Q.   Could you do that, please?
15        A.   When I started the review, the
16   consulting firm that I worked for had me talk to
17   somebody else who was doing expert witness work. And
18   he said that he did individual reports of every
19   document he reviewed. So I started that.
20        But you will not find a whole lot of
21   comments expressed in those documents because I held
22   back very carefully. So there weren't frivolous
23   comments made. Become -- what I did was --
24        Q.   All I want to know is, what's on the
25   thumb drives?

9  (Pages 30 to 33)

Karen A. Frank, M.D.      Videotaped         June 30, 2010

Page 34

1    A.    Those draft documents are here.
2          Then what I did is, I became concerned
3    about the complexity of what had happened and the
4    amount of white space, and I started putting my own
5    document together that is as close as I can track to
6    verbatim quotes from the FDA inspections and the
7    documents that I received.
8          And after I put that together, I started
9    going back and making substantive comments on that.
10   And from the substantive comments, I drew the
11   conclusions.
12         It was a step-wise process that involved
13   stopping the individual reports on the individual
14   documents.
15         That became out of scope, unauthorized
16   work, and it was rolled into one review document with
17   substantive comments and the conclusion.
18   Q.    Let's go back to Exhibit 90, please.
19         MR. THOMPSON: I think what she was
20   saying was that the various draft iterations of the
21   final document --
22         THE WITNESS: Right.
23         MR. THOMPSON: -- are contained on the
24   thumb drive.
25         Is that right?

Page 35

1          THE WITNESS: Yes.
2          MR. THOMPSON: Okay.
3          THE WITNESS: This whole process,
4    including the truncated short reports.
5          MR. THOMPSON: Okay.
6          THE WITNESS: Which you're welcome to
7    review, which should not have -- they will have
8    comments, they won't be substantive. They were very,
9    very lightweight comments.
10         The heavy comments were, for the most
11   part, restricted to this document and very carefully
12   tracked to the verbatim evidence.
13         MR. THOMPSON: Okay.
14   BY MR. DEAN:
15   Q.    What I'm -- thank you.
16         What I'm trying to get at now -- and I
17   appreciate your answer. What I'm trying to get at now
18   is the documents that are called for in the -- in the
19   Notice, which is Exhibit Number 90.
20         And so all the correspondence and
21   communications you would have would be in what we have
22   in front of us right now; correct?
23         Would be somewhere in here; correct?
24   A.    Yeah.
25   Q.    All right. Where, in terms of

Page 36

1    correspondence and communication, were there -- are
2    there letters in here?
3    A.    No.
4    Q.    So did you -- did you ever exchange
5    letters with one of the plaintiffs' lawyers?
6    A.    I received cover letters for each of
7    these binders that I did not retain.
8    Q.    So the cover letter would have -- it
9    would have just had a listing of what was in the -- in
10   the materials; is that right?
11   A.    It didn't even have a listing. It
12   looked like their generic cover letter.
13   Q.    Enclosed please find?
14   A.    Yeah.
15   Q.    Okay. All right.
16   A.    And the other thing that may be missing
17   is, when I -- when they -- they coached me through the
18   preparation of a nice document for you. Not for a
19   client that's in trouble that needs to remediate.
20         So there may be a few phone calls where
21   I had a pad in my hand and I scribbled notes to
22   myself. They were translated into this. Those notes
23   probably --
24   Q.    Translated into what, ma'am?
25   A.    The documents that they were part of.

Page 37

1    Q.    Would they -- if you took notes, would
2    they be on a piece of paper that would be somewhere in
3    the stack in front of us?
4    A.    Some of them are.
5    Q.    Okay.
6    A.    There may be -- there may be stray notes
7    that were lost.
8    Q.    Would it be -- would it be fair for me
9    to assume that if there are such notes, they would be
10   in this stack of paper right here?
11   A.    Yes.
12   Q.    Could you -- could you --
13   A.    The -- the --
14   Q.    Well, hang on. I can make it even
15   easier.
16         Because Plaintiff's Exhibit 91 is in
17   here; correct?
18   A.    Yes.
19   Q.    So --
20   A.    I can tell you what I think is missing.
21   Q.    Well, let's stay on -- let's stay on
22   task here.
23   A.    Okay.
24   Q.    We're on number two. Is there -- in
25   what you've brought with you today, is there any

10 (Pages 34 to 37)

## Page 38

1  correspondence between you and the plaintiffs'
2  lawyers?
3      A.   Nothing of substance.
4      Q.   Is there anything?  In what we have
5  here, is there any correspondence?
6      A.   No.  They're only documents.  The
7  letters were all these generic cover letters.
8      Q.   All right.  Fine.
9           Then number three, it says, all other
10  documents prepared by attorneys for the plaintiff and
11  sent to the witness.
12          Would they all be in front of us here?
13      A.   Can you repeat the question?
14      Q.   Yes.  I'm on number three, Dr. Frank.
15          We asked you to bring all other
16  documents prepared by attorneys for the plaintiffs and
17  sent to the witness.
18          Would they all be in front of us?
19      A.   Yes.
20      Q.   Okay.  It says, all documents including
21  documents and deposition transcripts which you have
22  received from any source.
23          Now, you didn't -- are the -- if I
24  remember right, you reviewed the deposition of Sarita
25  Thapar and Misbah Sherwani; correct?

## Page 39

1      A.   Yes.  They're in these binders.
2      Q.   Okay.  Do you --
3      A.   May I ask a question?
4      Q.   Do you know -- in a minute.
5           Do you know which binder they're in,
6  Dr. Frank?
7      A.   Right here and here (indicating).
8      Q.   Well, we're making progress, Dr. Frank.
9           One of these notebooks, which says 1 of
10  1 --
11      A.   Yeah.
12      Q.   -- contains the deposition of Misbah
13  Sherwani and all of her exhibits to her deposition;
14  correct?
15      A.   Uh-huh.
16      Q.   Is that right?  Yes?
17      A.   Yes.
18      Q.   So we're going to get that notebook off
19  the table.  I'll put it back over with your material
20  later.  I just don't want to unhook from my --
21      A.   Yes.
22      Q.   And then another notebook, which says 1
23  of 1, says Deposition of Sarita Thapar; correct?
24      A.   Yes.
25      Q.   And contained within it is her

## Page 40

1  deposition and the exhibits to her deposition;
2  correct?
3      A.   Yes.
4      Q.   So we're going to get that one off the
5  table.
6      A.   Now, that had --
7      Q.   Now, you said "that," we have two
8  notebooks.  Let me -- which one did you want to refer
9  to, Dr. Frank?
10      A.   The one where I removed the cover sheet,
11  which I should not have done.  I apologize.
12      Q.   So this is the smaller notebook you were
13  talking about?
14      A.   It's the later.  The one where I removed
15  the cover was the first.  There were cover sheets,
16  similar cover sheets.
17      Q.   I have two notebooks.  They each do have
18  a Table of Contents; correct?
19      A.   Yes.  Yes.
20      Q.   And did these both come at the same time
21  or did they come at different times?
22      A.   Came at different times.
23      Q.   Which one came first, Dr. Frank?
24      A.   The one where I removed the cover.
25      Q.   Is that the larger one, the larger

## Page 41

1  notebook?
2           And this notebook --
3           MR. KAPLAN:  You have to say yes or no.
4           THE WITNESS:  Yes.
5  BY MR. DEAN:
6      Q.   It may not be relevant for our purposes
7  later on, but this notebook has no markings on the
8  outside.  But it does have a Table of Contents on the
9  inside, which we will -- which we will mark as an
10  exhibit.
11           MR. DEAN:  And can you just give me an
12  arbitrary exhibit number?  Should we do something,
13  start at -- call it 250, do you think?
14           MS. TAKLA:  Sure.
15           MR. DEAN:  Why don't we -- we will mark
16  this later as Exhibit 250 so we don't have to go off
17  camera right now.
18           Make a note of that, please.
19  BY MR. DEAN:
20      Q.   This notebook says, Digitek Expert Table
21  of   Contents.  It has 18 items; correct?
22      A.   Yes.
23      Q.   Okay.  And when -- and this was the
24  first information you received; is that correct?
25      A.   Yes.

11 (Pages 38 to 41)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

Page 42

1    Q.    Do you recall approximately when you
2    received this notebook?
3        A.    Sometime in the beginning of May.
4        Q.    And then what is the second, smaller
5    notebook?
6        A.    That contains some of the additional
7    documents that I requested.
8        Q.    So this has a document -- this has a
9    Table of Contents that has 11 items; correct?
10       A.    May I say something?
11       Q.    Of course.
12       A.    I'm actually concerned that there's one
13   more binder. But I moved these to the side of the
14   office and stacked them specifically several weeks
15   ago.
16           There's a problem in that I cleaned out
17   my closet with all of my old binders from my
18   fellowship at the FDA, and I can't imagine that I
19   mixed these binders in the stack with my old binders
20   at the FDA, but I need to make you aware of that.
21           Because I recall that I got more
22   binders, and --
23       Q.    I'm sorry, you said you recall you got
24   more binders?
25           I want to make sure I heard you

---

Page 43

1    correctly. Did you say more?
2        A.    I'm trying to remember whether there was
3    a fifth binder and I'm a little bit embarrassed.
4        Q.    Well --
5           MR. THOMPSON: Let me say --
6    BY MR. DEAN:
7        Q.    We'll come -- let me -- let me finish
8    the questioning on this and we'll come back to that.
9    Okay.
10          So this one that says -- it has 11
11   items, and we're going to mark this as Number 251, the
12   Table of Contents. You said that it represents
13   documents that you requested; is that correct?
14       A.    Yes.
15       Q.    Okay. And when did you make the -- when
16   did you make that request?
17       A.    At a lunch meeting with Pete Miller, and
18   I can check the date in my date book. Do you need the
19   exact date?
20       Q.    Well, I would like to get an approximate
21   -- yes, I would like -- yes, I would like to know when
22   you made the request. Yes.
23          If you've got a note on that, rather
24   than guesstimating, that would be good.
25       A.    It was Wednesday, June 2nd. I met Pete

---

Page 44

1    Miller and Megan Carter at the Philadelphia Airport at
2    either 12 o'clock or 1:00 p.m.
3        Q.    Doesn't matter what time you met.
4           So that's the day you requested these
5    documents; is that right?
6        A.    Yes.
7        Q.    Now, when you requested, did you -- did
8    you hand them a list? Did you give them -- did you
9    send them an e-mail?
10          How did you convey the information to
11   them?
12       A.    I had made a list for myself, and I
13   believe that list is in here.
14       Q.    Okay. And then how shortly after that
15   meeting did you receive the smaller notebook?
16       A.    It took a while. I think they were sent
17   by FedEx ground, rather than FedEx overnight, because
18   I called them twice concerned that there was a delay.
19          MR. DEAN: Actually, you have exhibit
20   stickers I see, don't you?
21          Why don't you go ahead and we'll -- is
22   it all right if I mark the original with the exhibit
23   sticker?
24          MR. THOMPSON: That's fine with me. I
25   don't know the terms with this law firm. Can we make

---

Page 45

1    a copy here?
2           MR. DEAN: Yes. We can get copies. I
3    just want to get it marked so that --
4           MR. THOMPSON: Yes, that would be --
5    that's actually a good idea.
6           MR. DEAN: Yes. If you'll give me an
7    exhibit sticker, I'll go ahead and mark this so we
8    don't get confused later on.
9           (Exhibits D-250 and D-251 were marked
10   for identification.)
11   BY MR. DEAN:
12       Q.    And, Dr. Frank, we'll get copies for
13   everyone later. But the larger notebook, the Table of
14   Contents, I've marked as Exhibit 250.
15          Do you see that?
16       A.    Yeah.
17       Q.    And that was the one you received
18   initially; correct?
19       A.    Yes, in its entirety.
20       Q.    And then Exhibit 251 is the notebook you
21   received after your meeting with Mr. Miller and
22   Ms. Johnson; right?
23       A.    Yeah.
24       Q.    And then you said, I think you were just
25   telling me, that somewhere in this other stack of

---

12 (Pages 42 to 45)

Page 46

1  papers would be a list where you request -- you made
2  the request for follow-up documents; is that right?
3       Could you look and see if you could find
4  that for me.
5     A.    These were the documents where I started
6  listing what I did and did not have to review and
7  tried to define what you might call the white space in
8  the dossiers. They're not --
9     Q.    First of all, let me pause here. Let's
10 stay on the question.
11      Is there a document either which you
12 handed to me or that you still have with you that
13 represents a listing of the documents that are in the
14 smaller notebook?
15    A.    No. I did not request those
16 specifically. I talked to them about my concerns
17 about what I called the white space or the absent
18 documents in what I was sent, and they made the
19 decision what additional documents to send me.
20    Q.    Okay. So then what is represented in
21 the smaller notebook that's got Exhibit Number, on the
22 Table of Contents, 251, is a selection of documents
23 that Mr. Miller and Ms. Johnson sent to you after
24 hearing general concerns about white space; correct?
25    A.    Yes. But I --

Page 47

1     Q.    You -- just so we're clear, you did not
2  give them this list?
3       They made this selection based upon what
4  you -- some concerns you had expressed; is that fair?
5     A.    Yes.
6     Q.    Okay.
7     A.    About those lists that I started to --
8     Q.    Hang on. I'll get to these. Okay?
9     A.    Okay.
10    Q.    We're just going to try to -- I'll try
11 to ask a focused question, you try and give me an
12 answer and stop, and then I'll ask you another
13 question. Okay?
14    A.    Okay.
15    Q.    All right. Now, you have handed to
16 me -- from the loose documents, you've handed to me
17 looks like three different documents; is that correct?
18    A.    Uh-huh.
19    Q.    Yes?
20    A.    These were prepared --
21    Q.    Hold on.
22      MR. DEAN: Let me mark these so we're
23 clear so we don't get --
24      (Exhibits D-252 through D-254 were
25 marked for identification.)

Page 48

1  BY MR. DEAN:
2     Q.    All right. Let me hand you first what I
3  marked as Number 252.
4       Could you tell us what that is, please.
5     A.
6       These were notes to myself --
7     Q.    Please keep your voice up, too.
8     A.    These were notes to myself as I tried to
9  define what was sent to me as far as the sequential
10 FDA Establishment Inspection Reports, warning letters,
11 the company responses and CAPAs, so that I was
12 defining what I was going to be basing my opinions on.
13    Q.    Is that kind of a summary of the -- not
14 of every document, but the kinds of material that you
15 had received?
16    A.    Well, I got frustrated and concerned
17 that I was being asked to render an opinion on what
18 happened in a company, and I had only selected
19 documents over the period.
20      So I don't have the -- a lot of company
21 responses and CAPAs. I don't know many things about
22 the adequacy of their remediation plans.
23      And then I actually -- this is a
24 preliminary list. I didn't expect to give it to you.
25 But I then started to sort out when I did this in my

Page 49

1  comment document, the company's responses.
2       How many letters went back and forth to
3  -- between the health authorities and the company and
4  what were the comments, the substantive issues in
5  those.
6       I did not go from here to here and say,
7  oh, I found this warning letter. There could be
8  inaccuracies in this. This was my preliminary list.
9     Q.    Could I just see that briefly, please.
10    A.    (Witness complies.)
11    Q.    Could you tell me briefly what 253 is.
12    A.    This -- these are notes that I took in
13 writing the very early individual reports. And there
14 are a lot of very close notes or verbatim transcripts
15 of the documents as I went through them in
16 excruciating detail.
17      And then what I wanted -- what I should
18 have done is asked for them up front electronically.
19 But this became the basis of this report here.
20    Q.    So Exhibit 253 is a document you used
21 when you were writing what we marked as Exhibit 50;
22 correct?
23    A.    This could be considered an early draft
24 of Exhibit 50.
25    Q.    Okay. Very good. Thank you.

13 (Pages 46 to 49)

Page 50

1       And for the record, what is 254?
2       A.    More notes to myself.
3       Q.    Do you remember what -- what do they
4    generally represent?
5       A.    I believe these are my notes from the
6    meeting with Mr. Miller and Ms. Carter on June 2nd.
7       Q.    Could you read for me this particular
8    entry, it starts out documents, I think.  And you
9    write pretty well, but I'm just having trouble reading
10   that.
11      A.    Well, this is not that good.  I wish
12   that -- if I had known that these were going to be
13   given to you, I would have notated them much more
14   carefully.
15      Q.    Just try to, as best you can, read that
16   one sentence for me.
17      A.    It says, preponderance of the evidence,
18   civil.
19      Q.    Excuse me.
20      A.    Right above that?
21      Q.    Yes.  That one right there.
22      A.    Document for withholding.
23      Q.    Do you know what thought you were trying
24   to capture there?  And if you don't, just tell me.
25      A.    I think it's the time that I decided --

Page 51

1    this may have been to myself -- that this situation
2    was so convoluted, I wanted a document that would
3    allow me to carefully track the absence of information
4    on specific ADE's complaints or investigations.
5       Because of this type of situation and
6    the complexity of what happened in the company, the
7    intermittent evidence that was presented, the fact
8    that there's things that I would have liked to have
9    seen that we couldn't obtain, that I wanted to
10   carefully track that for this very situation, so I
11   could present to you what I had, what I did not have,
12   and track the opinions very, very closely to what I
13   was able to see.
14      Q.    Did you ever submit to the plaintiffs a
15   listing of documents you thought were missing that
16   you specifically wanted them to provide to you?
17      A.    I gave Pete Miller some notes from the
18   meeting as I was talking in generalities.  I don't
19   remember that was -- if that was on the back of the
20   list.  I don't -- I did not type up a specific list.
21   I believe I showed him these.
22      Q.    These being what?  Which exhibit number?
23      A.    These preliminary assessments of the
24   white space.
25      Q.    Being Number 252?

Page 52

1       A.    Yes.
2       Q.    Okay.  Let me go back to my question
3    because my question I think was focused.  I think
4    you've come close to answering it.
5       But did you give a specific list of
6    documents to Mr. Miller to fill -- which, in your
7    mind, would fill out what you are calling the white
8    space that you wanted to be provided?
9       A.    I think I had the list in front of me
10   and I read down it.  I may have translated a few of
11   those to another paper, but he responded to my going
12   down the list what was and was not available at that
13   point in discovery.
14      The fact that discovery was complete and
15   then there was discussion of there may be another
16   round of discovery and the possibility of obtaining
17   those documents.
18      But I did not type up a list or write up
19   a specific list that I handed to him.  And I can't
20   recall the specifics of the exchange.  A lot of this
21   was my asking questions of them.
22      How do I prepare these documents for
23   expert witness and can I get any of these?
24      I would have these if I was an FDA
25   medical officer.  I would have some of this

Page 53

1    information if I was inside the company and helping
2    with the remediation.
3       Can you get this for me now so my
4    opinion can be based on a broader and more complete
5    compilation of the evidence?
6       Q.    Can we agree, then, that you never gave
7    Mr. Miller or any plaintiff's lawyer a specific list
8    of documents that you wanted to look at?
9       Can we agree on that?
10      A.    Yes.  And next time I will very
11   carefully.
12      MR. THOMPSON:  Dick, I can put an
13   exhibit right here.  That's the -- you got that;
14   right?
15      MR. DEAN:  Right.
16      MR. THOMPSON:  Okay.
17      (Exhibit D-255 was marked for
18   identification.)
19   BY MR. DEAN:
20      Q.    I'm handing you what I've marked as
21   Defendant Exhibit 255, which is entitled Documents
22   sent to Karen Frank, and it has 29 items listed on it.
23      And I see that 250 and 251, one has 18
24   and one has 11, so that would be 29.
25      Is life so good for Mr. Thompson and me

14  (Pages 50 to 53)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 54

1  that Exhibit 255 is simply a compilation of the Table
2  of Contents of these other two notebooks?
3      A.   I believe so. I called their admins to
4  ask about these, and I think about this one.
5      Q.   First of all, you --
6      A.   Yes.
7      Q.   I want to give you the opportunity, but
8  do you -- if you need to look at it, but is 255 simply
9  a compilation of what we have on the Table of Contents
10  on 250 and 251?
11      A.   I believe so, but I specifically did not
12  check. I did not bill them for time verifying this
13  against either of those binders or against the
14  electronic.
15      Q.   When was 250 -- did you prepare 255 or
16  did someone else?
17      A.   Someone else did.
18      Q.   Do you know who did?
19      A.   One of the admins or paralegals at the
20  Miller firm.
21      Q.   Okay. Why don't you let me have that
22  one back.
23      A.   (Witness complies.)
24      Q.   Now, you just pointed out that there's
25  some handwriting in red ink on here. Is that your

Page 55

1  handwriting?
2      A.   No. That's from the admins at the firm.
3      Q.   Okay.
4          (Exhibit D-256 was marked for
5  identification.)
6  BY MR. DEAN:
7      Q.   What is 256?
8      A.   That is my notes from a discussion with
9  Smart Consulting about the way another expert
10  consultant approached review of the cases.
11      Q.   And that consultant would be Mr. Farley?
12      A.   Yes.
13      Q.   When -- is this in your handwriting?
14      A.   Yes.
15      Q.   And who did you speak to?
16      A.   On the telecon were Denise Smart, Nigel
17  Smart, and Jim Farley.
18      Q.   And what was the occasion for the four
19  of you to speak to each other?
20      A.   Remember earlier I said that I had been
21  approached about doing this kind of work in the past?
22      Q.   Yes.
23      A.   Well, I had declined it. And Smart
24  Consulting approached me about doing this expert
25  witness work.

Page 56

1      I was a little loathed to move in to
2  litigation. And this was the first time I had done
3  any expert witness work. I was not certain how to
4  prepare the documents, how to format the documents.
5      I prepared FDA reviews, I prepared
6  things to go to the health authorities, but I was
7  asking him questions about being an expert witness and
8  trying to determine if I was going to tactfully
9  decline this engagement and simply not undertake
10  expert witness work.
11      And I had discussions with Mr. Miller
12  and with Megan Carter in sorting out, you know, how to
13  proceed with the work. So there was coaching and
14  advice as I began to develop a way to develop these
15  documents.
16      I asked them for copies of Jim Farley's
17  documents so I could format them appropriately. And
18  they did not want to do that because they were in
19  draft.
20      So they gave me indications of how they
21  wanted the documents formatted.
22      So what you're seeing is indication of
23  somebody who had not previously done expert witness
24  work taking on assignment and being rather transparent
25  with the consulting firm and the attorneys as to my

Page 57

1  present state of experience with this and getting
2  advice on how to proceed.
3      Q.   Did Smart -- are you working through
4  Smart Consulting in this litigation?
5      A.   Yes.
6      Q.   Did they recruit you for this
7  assignment?
8      A.   Yes.
9      Q.   Had they already recruited Mr. Farley?
10      A.   Yes.
11      Q.   Was Smart Consulting the first company
12  that approached you about taking on this assignment?
13      A.   Yes.
14      Q.   And when was that?
15      A.   I don't recall the date, but I do have a
16  signed copy of the Consulting Agreement.
17      Q.   Is that in the documents we have here?
18      A.   Yes. I scanned it with my date of
19  signature.
20      Q.   Where is it? Is it in one of --
21      A.   You have a scanned electronic copy of
22  this document. That was the one that was faxed to
23  Smart Consulting.
24      You need that copy?
25      MR. DEAN: Yes.

15 (Pages 54 to 57)

Karen A. Frank, M.D.     Videotaped          June 30, 2010

Page 58

1    MR. THOMPSON: Well, that's your
2  original?
3         THE WITNESS: It's my original.
4         MR. DEAN: Well, you're going to get it
5  back, just with an exhibit sticker on it. Is that
6  okay?
7         THE WITNESS: Yes. Whatever you need.
8         (Exhibit D-257 was marked for
9  identification.)
10  BY MR. DEAN:
11    Q.   So 257 is a copy of that agreement;
12  correct?
13    A.   Yes.
14    Q.   Had you ever -- before this agreement,
15  had you ever done anything with Smart Consulting?
16    A.   I provided them with some business
17  processes for a proposal in 2009 on product
18  complaints.
19         I believe I was recruited to be on a
20  proposal for another consulting assignment, and for
21  confidentiality, I don't think I can tell you what the
22  client was.
23         But I did not provide any information to
24  Smart. They had two spots that I could possibly fit
25  in and there was a phone conversation as to how I

Page 59

1  would fit best into that engagement.
2         And then I did some work on a REMS
3  proposal for them back probably in March of 2010 where
4  we did not win the engagement.
5         And it was on the basis of those
6  interactions that they approached me about being an
7  expert witness on this case.
8         And Nigel Smart was very adamant that
9  based on his interaction with me that he thought that
10  my background was completely adequate to make
11  substantive comment on what would be sent to me and
12  that it was an appropriate assignment.
13    Q.   Is Nigel Smart an attorney?
14    A.   No. He's a Ph.D. who has done this
15  work.
16         (Exhibit D-258 was marked for
17  identification.)
18  BY MR. DEAN:
19    Q.   What's Defense Exhibit 258?
20    A.   That was part of the background that was
21  submitted in the first binder.
22    Q.   So this is a document prepared by one of
23  the plaintiffs' attorneys and would have been
24  contained within the notebook where we have the
25  Exhibit Number 250 is the Table of Contents?

Page 60

1    A.   Yes.
2    Q.   Is there some reason why it was removed
3  from the notebook?
4    A.   It wasn't deliberate. What I have are
5  the loose documents in a stack and the notebooks. But
6  there -- no, there was no -- I did not cite that or
7  the injunction or the consent decrees in my reports.
8         It was reviewed initially, possibly
9  reviewed twice, but I did not use it as evidence.
10    Q.   Are these separate pages or are these
11  one document?
12    A.   They're separate.
13         (Exhibits D-259 and D-260 were marked
14  for identification.)
15  BY MR. DEAN:
16    Q.   What is Defendant 259?
17    A.   I was trying to sort out what was the
18  business process in the company for evaluation of out
19  of spec results, product complaints.
20         There was no evidence provided to me
21  that the work that I did in industry of doing routine
22  Health Hazard Assessments was being done, and I wasn't
23  certain whether it was just that I didn't receive the
24  documents.
25         But when I've done work for clients

Page 61

1  who've been inside companies and there is a
2  manufacturing deviation, particularly if it's released
3  in the market, I would usually get a copy of an
4  investigation where if they had a sample of the
5  product, they would bring it back in-house and do
6  analytics.
7         If they needed to, they would check it
8  for bacteriology. They would then go back and do an
9  investigation in the plant, you know, a real root
10  cause analysis.
11         I would be provided with an
12  investigation report that would define the batches at
13  risk for a single drug or even if multiple drugs had
14  been through that piece of malfunctioning equipment.
15    Q.   This would be a product complaint you're
16  talking about?
17    A.   Yes, in another company.
18    Q.   Right.
19         And just so I'm clear, you're talking
20  about in other companies you work for where there was
21  a product complaint, would be a system in place
22  where a complaint form would be generated and
23  processed through the system; is that correct?
24    A.   Yes.
25    Q.   Okay.

16 (Pages 58 to 61)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 62

1      A.     And --
2      Q.     And did you -- did you make any inquiry
3   in this case as to whether there were product
4   complaint forms that you could look at and see how
5   they were processed?
6           Did you ask the plaintiffs' lawyers for
7   that type of information?
8      A.     Yes, I did.  I commented on June 2nd on
9   the absence of this information, and --
10     Q.     Let me just ask you, did the plaintiffs'
11  lawyers ever provide to you any product complaints on
12  Digitek?
13     A.     Yes.  But I believe they were after the
14  recall.  What I did receive was the investigation
15  report of the double-thick tablet of Digitek.  The
16  complaint registered by a pharmacist in Bellingham,
17  Washington, in July of 2004.
18     Q.     I'll get back to that.  I don't want to
19  -- heeding Mr. Thompson's admonition, I don't want to
20  repeat myself.
21          But let me just ask you:  As I
22  understood it, you asked for product complaints on
23  Digitek before the recall, also, didn't you?
24     A.     They were not on my list.  I didn't say
25  product complaints that I can recall specifically.

Page 63

1      Q.     So you did not -- so just so I'm clear,
2   you did not ask the plaintiffs' lawyers to provide
3   product complaints on Digitek prior to the recall; is
4   that correct?
5      A.     I believe they were volunteered.  What I
6   was looking for was investigation reports of product
7   complaints and realtime Health Hazard Assessments,
8   which would have been generated from those product
9   complaint reports.
10     Q.     Did you ask for product complaints on
11  Digitek prior to the recall?  Yes or no?
12     A.     I would have to say no, unless you would
13  consider it implied in asking for evidence that would
14  confirm that those business processes were in place
15  and in use during this period.
16     Q.     Okay.  So -- but you didn't specifically
17  ask for them; correct?
18     A.     No.
19     Q.     Okay.  Fine.
20     A.     May I?
21     Q.     You can go ahead and say whatever you'd
22  like to say.
23     A.     It may be a result of my naivete, and I
24  assumed that these were manufacturing issues and they
25  were going to another consultant whose expertise was

Page 64

1   in the investigation of product complaints, which I've
2   never done.
3           I received the results to write the
4   Health Hazard Assessments.  So my absence of asking
5   for them may have been my assumption of where they
6   were to be directed.
7           MR. DEAN:  Okay.  Let's take a break.
8           Our tape needs to be changed.  We'll get
9   some copies of exhibits and we can all stand up and
10  walk around a little bit.
11          Let's go off the record.
12          THE WITNESS:  Okay.
13          VIDEO OPERATOR:  Going off the video
14  record.
15          This is the end of Tape 1.
16          The time is 10:27 a.m.
17          (A recess was taken from 10:27 a.m. to
18  10:43 a.m.)
19          VIDEO OPERATOR:  We're now back on the
20  video record.
21          This is the start of Tape 2.
22          The time is 10:43 a.m.
23  BY MR. DEAN:
24     Q.     Dr. Frank, I think we just have a couple
25  more documents to mark and have you identify and then

Page 65

1   we'll get into the substance of this.
2           I don't think I've asked you what Number
3   260 is.
4      A.     This is more notes.
5      Q.     And do you know what day you took those
6   notes, what the occasion was for taking those notes?
7      A.     I'm trying to remember whether I made
8   them before or after the meeting with Pete Miller on
9   the 2nd.
10          As I said, I was coached somewhat into
11  how to leverage my FDA experience, my industry
12  experience, to produce work products for attorneys as
13  an expert witness.
14          And I actually started this project with
15  my, what I'll say, my modus operandi as an FDA medical
16  officer.
17          And then I started to tease out what I
18  could about what was going on inside these companies,
19  what business processes were in place and in use.
20          And I brought some of these notes to the
21  meeting with Mr. Miller and Ms. Carter, and there were
22  some that I made.
23          And I started to explain to them my
24  concerns that I couldn't piece together things from
25  the FDA inspections.  And then they provided me more

17 (Pages 62 to 65)

Page 66

1    documents where the FDA clearly documented things.
2         And that's the basis of this large
3    document, it's finding the answers to these questions
4    or any information that elucidated how -- are these
5    business processes in place. So these are my notes to
6    myself.
7         Q.    Taken at a meeting with Mr. Miller; is
8    that right?
9         A.    Or sketched at a meeting with Mr. Miller
10   to say these are things that typically occur in a
11   company and what -- while I'm looking at inspection
12   reports that are samplings of compliance with SOPs, I
13   don't have any SOPs or work flows and I'm trying to
14   piece together what was in place and in use from the
15   FDA reports and the warning letters.
16        And that's when I asked for more
17   information to start to give myself a clearer picture.
18        Q.    Okay. You also brought with you a copy
19   of Plaintiff's Exhibit 91, which is a 2008 IDR.
20        You also brought a -- in your papers was
21   a February 28, 2006 letter from Amide to the FDA;
22   correct?
23        A.    Yes. Now --
24        Q.    No, no. That's -- that was -- that's --
25   you've answered the question.

Page 67

1         A.    All right.
2         Q.    And then you brought a three-page
3    document, which is a Actavis document, that bears the
4    Bates label 65400 through 65402; is that correct?
5         A.    Yes.
6         Q.    And is it fair to say that we have now
7    reviewed all the documents that you brought with you
8    today?
9         A.    Yes.
10        Q.    But?
11        A.    I believe this document may have been
12   taken from a binder and not been appropriately
13   reinserted because it is a punched document.
14        Q.    Correct. So that's the February 28,
15   2006 document.
16        So you're suggesting it may actually go
17   in one of the notebooks that we looked at previously;
18   correct?
19        A.    Yes.
20        Q.    Okay. Now, is it fair to say, having
21   gone through all of these documents, that you have
22   brought -- that the items we've just gone over would
23   be all the information that you would have in response
24   to Exhibit 90, which is the Notice for Video
25   Deposition Duces Tecum?

Page 68

1         A.    Yes. I said something earlier about
2    possibly having five binders. I think this was my
3    fifth. This was the last thing delivered, and --
4         Q.    By this, you are holding up Exhibit 91;
5    correct?
6         A.    Yes. This was the last thing that Pete
7    Miller sent to me by FedEx. I'm not sure why it
8    wasn't in the others, but this is a very key
9    inspection report to piecing together what happened
10   and it was the last piece of information to arrive.
11        MR. THOMPSON: Let me see if I can
12   satisfy the defendants with regard to the fifth
13   binder. My understanding is that you think there may
14   be a fifth binder. You're not certain.
15        If I can just simply say, we will go and
16   make a diligent search, and if we uncover a fifth
17   binder that's been placed in another binder, we will
18   make that available to the defense and we will
19   certainly give you an opportunity to question her
20   either by telephone or by reconvening the deposition.
21        Is that --
22        MR. DEAN: That's acceptable. Thank
23   you.
24        MR. THOMPSON: All right.
25   BY MR. DEAN:

Page 69

1         Q.    And as I understand it, as you sit here
2    today, you're not sure whether there was another
3    binder or not?
4         A.    I'm embarrassing myself that I didn't
5    keep a clear catalog. But I -- when I finished this
6    report, I gathered everything up and I put it over to
7    the side. And I, for some reason, am really -- it's
8    just bothering me.
9         And so I'm willing to embarrass myself
10   and say, you know, I had this idea there were five,
11   but, to my knowledge, everything that I used for this
12   report is in front of us.
13        But I would sure appreciate to make sure
14   that I didn't accidentally file this with something
15   else.
16        MR. THOMPSON: All right.
17        MR. DEAN: We'll ask you to follow up on
18   that and if you find something, and Mr. Thompson will
19   look at his records, and if there is a fifth notebook,
20   it's my understanding that the defendants will be
21   informed of that.
22        THE WITNESS: Yes.
23        MR. DEAN: So we can go ahead.
24        (Exhibit D-261 was marked for
25   identification.)

18  (Pages 66 to 69)

Karen A. Frank, M.D.       Videotaped       June 30, 2010

Page 70

1  BY MR. DEAN:
2      Q.    And just out of the -- for the sake of
3  caution, we have marked as Exhibit 261 the color copy
4  of your report, and I have a copy for Mr. Thompson and
5  for Mr. Kaplan because it may assist us as we proceed
6  here this afternoon.
7      A.    Okay.
8          MR. DEAN:  Harvey.
9  BY MR. DEAN:
10     Q.    Okay.  What do you conceive your role to
11  be as an expert witness in this case?
12     A.    I was asked to comment on two things:
13  The adequacy of the pharmacovigilance processes and
14  the impact on any signal detection in regard to the
15  Digitek case.
16          It was -- I was asked only on the
17  systems.  I was not provided any information on the
18  content, the MedWatch, the PSURs, that would allow me
19  to actually do the signal detection or the trending.
20  The scope of my work was limited.
21          I was also asked to comment on changes
22  in the risk communication that occurred between the
23  Health Hazard Assessment of Dr. Leikin, the letter to
24  the Dear Customer, the business-to-business letter to
25  Mylan and UDL, and then the public press release.

Page 71

1          I could not find any evidence of Dear
2  Doctor or Dear Patient letters.
3          So when I was asked to look at the
4  changes in those communications, I documented that
5  absence and said, I am going from Health Hazard
6  Assessment to a business-to-business Dear Customer
7  letter, and then the communication to the health care
8  community and the patients is restricted to the press
9  release.
10         There is not additional communication in
11  the form of Dear Doctor and Dear Patient letters.  My
12  comments are restricted to those two spheres and then
13  merged into one document with the supporting evidence.
14     Q.    Does Exhibit 261 contain all of your
15  opinions in this case?
16     A.    This is the conclusion.  There are
17  comments in the supporting document that are also
18  expressions of opinions.  It is possible that all of
19  the comments in the supporting document have not been
20  completely abstracted to the conclusion.
21         Because my original intent was to
22  provide this document with this conclusion following
23  this, so that you would go through this seeing the
24  timeline that also notes some of the absences of
25  information, and then the information that I read and

Page 72

1  evaluated.
2          And then when you read the conclusions,
3  that would be the final.  And I cannot guarantee you
4  that every single comment in this document has been
5  extracted into the conclusion.
6      Q.    Dr. Frank, are all of your conclusions
7  in Exhibit 261?
8      A.    Yes.
9      Q.    And all of your observations about this
10  case would be included in either Exhibit 50 and
11  Exhibit 261; correct?
12     A.    Yes.
13     Q.    Thank you.
14     A.    Now, please -- yes or no?  Okay.
15         MR. THOMPSON:  Just let Dick ask you a
16  question.
17  BY MR. DEAN:
18     Q.    So we can agree that you did not look at
19  the underlying -- any underlying AER reports on
20  Digitek; correct?
21     A.    I did not receive any MedWatch forms or
22  CIOMS forms.  I did not receive any PSURs, any U.S.
23  Periodic Reports, or any other aggregate reports to
24  any health authority.
25         MR. KAPLAN:  I can't hear you.

Page 73

1          THE WITNESS:  I did not receive any
2  MedWatch forms, any CIOMS forms, any PSURs, ICH PSURs,
3  no U.S. Periodic Reports, or any other form of
4  aggregate reporting to the health authorities.
5          The only information that I received was
6  Dr. Leikin's final health assessment, Health Hazard
7  Assessment, and FDA -- FDA inspection 483s,
8  Establishment Inspection Reports, and the resultant
9  letters between the FDA and Actavis or Amide.
10  BY MR. DEAN:
11     Q.    And I don't want to harp on this, but I
12  asked -- this is for furtherance of our proceedings
13  today, I simply asked whether you had received the
14  MedWatch, the AERs and the MedWatch reports.
15         You told me no.  And then you went on
16  and gave me a whole other list of things.
17         I would simply ask that, as we go along
18  today, you listen to my question and answer my
19  question.  Is that agreeable?
20     A.    Yes.
21     Q.    Okay.  Thank you.
22         And so since you did not have the
23  MedWatch forms in regard to Digitek, you would have
24  necessarily been unable to engage in any signal
25  detection analysis; correct?

19  (Pages 70 to 73)

Page 74

1      MR. THOMPSON: Object to the form.
2  BY MR. DEAN:
3      Q.   Go ahead, Doctor.  You can answer the
4  question.
5      A.   I'm going to say yes, it precludes
6  definitive assessment.  The reason I went on too long
7  with your original question is to list all of the
8  documents that I could recall that contain any
9  information abstracted from the MedWatches.
10      What I received, and I did discuss this
11  with them last night, was abstracted information that
12  was usually the coding, the ADR coding, that really
13  precluded definitive assessment of any single case and
14  really any aggregate analysis.
15      Q.   So you didn't have the information to do
16  that, did you?
17      A.   No.  The only thing I had provided to me
18  was Dr. Leikin's Health Hazard Assessment where I
19  could use the information that he provided in that to
20  assess his conclusions.
21      But I felt that report did not contain
22  enough detail to allow me to make a full, independent
23  assessment, in that he included only a table of the
24  events and I was not given as an appendix to that the
25  company internal signal detection report that he was

Page 75

1  provided.
2      Q.   You said a minute ago that you had seen
3  some coding on the MedWatch reports.
4      What coding did you see and in what
5  document did you see it?
6      A.   The coding would be in the table of
7  Dr. Leikin's Health Hazard Assessments where he has
8  the events.  My assumption is that the events listed
9  were events coded.
10      I do not know that he did not go to the
11  narrative and take out events that were not coded.  I
12  am making an assumption.  There are similar
13  abstractions in the --
14      Q.   Excuse me.  Let me just stop you.
15      So the only coding -- I want to -- focus
16  on my question.
17      The only coding was what is in the
18  Health Hazard Evaluation form that Dr. Leikin did;
19  whatever codes appear there are the only codes you've
20  seen on MedWatch reports; is that correct?
21      A.   No.
22      Q.   Okay.  What else have you seen?
23      A.   The FDA inspectors, when they go back
24  through the cases, and this is in the supporting
25  documents, when they cite the cases that were not

Page 76

1  submitted to the FDA, they list events.
2      The assumption is that when the FDA is
3  talking about adverse events, whether they be 15-day
4  reports that are not submitted or adverse events that
5  -- where they did not like the adequate -- the
6  adequacy of the narrative quality or the follow-up,
7  when they list the event, the date, the drug, and the
8  -- I'm sorry -- the case number, the date and the drug
9  and then the events that follow, the assumption is
10  that that is the coding that was done on the
11  narrative, the events associated with the MedWatch.
12      They do comment that there were problems
13  with the events being left out of the appropriate box
14  of the MedWatch.
15      Q.   Is what you have described, does it
16  contain actual coding or does it contain -- or is it
17  -- are they documents from which you've assumed a
18  coding?
19      A.   It is an assumption on my part.  I
20  have --
21      Q.   So -- so the only -- let's get back to
22  my original question.
23      The only coding on MedWatches that you
24  have seen is what is contained in the Health Hazard
25  Evaluation form; is that correct?

Page 77

1      A.   And I am --
2      Q.   Is that correct?
3      A.   I have to clarify the yes or no because
4  you --
5      Q.   Well, could you answer first before you
6  clarify?
7      This is very simple.  Have you seen any
8  coding on a MedWatch report on Digitek other than what
9  may be contained in that Health Hazard Evaluation
10  form?
11      A.   I have not seen any MedWatch forms with
12  coding.  I made the assumption that Dr. Leikin
13  constructed the table in the Health Hazard Assessments
14  from the coding on the cases.
15      But I was not able to verify that table
16  against the coding on the MedWatch forms.
17      MR. DEAN: Excuse me.  There's one with
18  just the Health Hazard Evaluation, the document.
19  BY MR. DEAN:
20      Q.   Dr. Frank, I have -- I hand you --
21      VIDEO OPERATOR:  Your microphone.
22  BY MR. DEAN:
23      Q.   I hand you what we've marked as Exhibit
24  220, and it contains the Health Hazard Evaluation
25  form; correct?

20  (Pages 74 to 77)

Page 78

1    A.    Yes.
2    Q.    And the -- you've been talking about
3  coding. Are you referring to the chart?
4    A.    When you look at the table here -- well,
5  actually, what I'm really referring to is the table.
6          The column that says, Adverse Events,
7  and they list these, my assumption is that these
8  events will map to the adverse events on the CIOMS or
9  the MedWatch forms and the coding in the database.
10    Q.    And so that's what you meant before by
11  seeing information about coding, you are referencing
12  to this table in Exhibit 220; correct?
13    A.    That, and the FDA inspector's similar
14  abstractions of events that most likely will map to
15  coding on the MedWatch forms and coding in the adverse
16  event databases.
17    Q.    Okay. Let's go on.
18          How much are you being paid for your
19  services in this matter?
20    A.    $150 an hour.
21    Q.    How much time have you spent on this
22  matter?
23    A.    Initially, I worked to like -- the first
24  week I worked about 35 hours and then I spoke to Smart
25  Consulting about how much time they were expecting.

Page 79

1  And they said there was no cap.
2          And I said, well, the convention on --
3  is either a 40-hour cap, a 50-hour cap or a 60-hour
4  cap. And they instructed me to work to a 60-hour cap.
5          At the end, I was provided these
6  additional -- the additional documents in a short time
7  frame, and I worked extra hours.
8          And then I talked to Smart Consulting
9  about whether I should bill over the cap, and they
10  instructed me to bill it.
11    Q.    So as you --
12          MR. KAPLAN:  Instructed you to what?  I
13  can't hear you. I'm sorry.
14          THE WITNESS:  I billed over the 60-hour
15  cap.
16          MR. KAPLAN:  How many?
17  BY MR. DEAN:
18    Q.    So, as you sit here today, how much time
19  have you billed to this matter?
20    A.    I did not do an aggregate analysis of
21  the time. It is included on this, all of the time
22  sheets.
23    Q.    So when we take one of these with us
24  today, when Mr. Thompson and I each take one, we'll
25  have that information; is that correct?

Page 80

1    A.    Yes.
2    Q.    Well, I -- a few minutes ago I asked you
3  about the scope, your understanding about what your
4  assignment was, and you told me the two topics that
5  you were asked to address.
6          What do you understand your role to be
7  in this case as far as how you present the
8  information?
9          Do you view yourself as an advocate on
10  behalf of the plaintiffs or do you view yourself as an
11  impartial truth seeker?
12          MR. THOMPSON:  Object to the form.
13  BY MR. DEAN:
14    Q.    Go ahead.
15    A.    I have particular concern, because this
16  is the first time I've been an expert witness, that my
17  opinions are based on very, very accurate and very,
18  very complete evidence.
19          I became very, very uncomfortable with
20  the lack of detail in the evidence and the absence of
21  information to -- that I was provided to completely
22  evaluate the systems in the company.
23          And what I decided to do to make this
24  initial assessment as accurate as possible was to
25  track very, very closely with FDA inspectors'

Page 81

1  observations that were made by looking at primary
2  documents that I was not provided.
3          And what I have been hired by the
4  plaintiffs, I want to make sure that my opinions are
5  as accurate as possible.
6          It's been a little bit embarrassing when
7  you asked me questions and you see that I'm doing --
8  sketching notes to myself.  I don't write out official
9  lists and hand them to the attorneys.
10          I want as little, I want to say,
11  embarrassment as possible, that will result from my
12  handling what I see as somewhat of a difficult case.
13          And this being the first time that I've
14  done this, I don't have experience in having done this
15  before.  And I have concerns about the incompleteness
16  of the information.
17          There's a fair amount of additional
18  information, such as MHRA inspections, which are very
19  vigorous inspections on compliance, maybe more
20  vigorous than FDA, and there's at least one of them.
21          But I think that I made a comment that
22  there were more MHRA inspections.
23          So there's -- I start to catalog
24  inspection one, inspection two, inspection three,
25  through the timeline, identify them as MHRA or FDA,

21 (Pages 78 to 81)

## Page 82

1  identify the site, try to specify whether they were
2  actually looking at the pharmacovigilance systems and
3  then map out -- since I don't know what happened from
4  the time the first consent decree was lifted to the
5  first inspections to really put down the facts and
6  start to build a picture of what happened, what
7  failed, what was corrected, what was adequately
8  corrected, what was inadequately corrected, and what
9  was found on the repeat FDA inspection of 2008.
10      The more that I can get an accurate
11  assessment the course of events, it will allow an
12  accurate assessment of what happened inside the
13  company and any potential impact on signal detection
14  for either Digitek or any of the other products that
15  were dependent on those business processes during that
16  period.
17      Q.    But you've already told us that there's
18  a substantial amount of underlying company documents
19  you have not looked at; correct?  Correct?
20      A.    I have -- I'm going to have to say a
21  simple yes.
22      Q.    Right.  And then I wanted to get back to
23  my original question.
24      And I thank you for your answer.
25      But my original question was how you

## Page 83

1  viewed your role as an expert witness, whether you
2  viewed yourself as an advocate on behalf of the
3  plaintiffs or whether you viewed yourself as an
4  impartial observer relating comments about documents
5  that you had reviewed.
6      Which is -- which role do you see
7  yourself in, Dr. Frank?
8      MR. THOMPSON:  Object to the form.
9  BY MR. DEAN:
10      Q.    Go ahead.
11      A.    How do I respond to his objection?
12      Q.    He's made that for the record.  You can
13  go ahead and give your answer.
14      A.    Okay.  I was hired by the plaintiffs to
15  address very specific issues, to look how these
16  systems potentially impacted signal detection during
17  Digitek recall.
18      I needed to do -- I'm going to use a
19  legal term -- due diligence in the scope of work that
20  they asked me to meet.
21      In doing that, I became concerned about
22  the completeness of the information that I was seeing
23  and the fact that my opinion based on that information
24  could be vulnerable if this information that I don't
25  have was brought forward.

## Page 84

1      And I started to function more like a
2  truth seeker.  And I don't know how to completely
3  explain.
4      I'm extremely concerned that the
5  information gathered in the assessment is accurate and
6  complete and can reflect on the signal detection.
7      And I spoke with them last night, and I
8  will need to talk to Dr. Miller if you need me to give
9  you further detail on my concerns.
10      Q.    But as you sit here, in spite of the
11  questions --
12      MR. KAPLAN:  Mr. Miller?  Did you say
13  Dr. Miller?
14      THE WITNESS:  It's mister.
15      MR. KAPLAN:  Pete Miller; correct?
16      THE WITNESS:  No, I'm sorry.
17  Mr. Thompson.  Mr. Thompson.
18  BY MR. DEAN:
19      Q.    So as of today, you have made your
20  concerns about lack of information known to the
21  plaintiffs' counsel and you've done that in the past.
22  I understand that, too.
23      But you did it again last night;
24  correct?
25      A.    Yes.

## Page 85

1      Q.    And you have those concerns, as you sit
2  here today, that you don't have a full and complete
3  information base on which to give your opinion; is
4  that correct?
5      A.    I am privy to some of the information
6  that was obtained in due diligence on drug
7  withdrawals.  I'm talking market withdrawals, not
8  recall of the lots.
9      And the information obtained in the
10  discovery of this case was not as extensive in those
11  cases.  And I started to ask about the discovery.
12      Is this the discovery you would expect
13  to see in a case like this or are the absence of the
14  MHRA inspections?  The absence of the company internal
15  signal document, are those issues?
16      But there apparently was not a further
17  investigation done, and I was told not to start to
18  talk into that direction.
19      Q.    As recently as last night, Dr. Frank,
20  you expressed an opinion to the plaintiffs' counsel
21  that you had inadequate information and concerns about
22  the adequacy of the information to testify today; is
23  that correct?
24      A.    Yes.
25      Q.    Okay.  Now, you talked about the

22  (Pages 82 to 85)

Karen A. Frank, M.D.          Videotaped                 June 30, 2010

Page 86

1  adequacy of signal detection. I want to, in the
2  context of Digitek -- and you understand that product
3  was recalled; correct?
4      A.    Yes.
5      Q.    In the context of Digitek, would -- let
6  me strike that.
7           Your -- one of your expertises is
8  pharmacovigilance; correct?
9      A.    Yes. I've worked in the field for
10 several years.
11     Q.    Correct.
12          And, typically, in the field of
13 pharmacovigilance, representatives of pharmaceutical
14 companies are looking at a vast array of information
15 to see if new and different adverse reactions are
16 arising from their drugs.
17          Is that a fair summary?
18     A.    Yes.
19     Q.    And in this case, you -- this case being
20 the Digitek case, you understand that there is a
21 question about a manufacturing defect in the product?
22          You understand that, don't you?
23     A.    Yes.
24     Q.    And that is -- would you agree with me
25 that's -- it's unusual to address a manufacturing

Page 87

1  defect through signal detection?
2           I'm not saying it can't be done, but I'm
3  saying it's not the usual thing you do in
4  pharmacovigilance; is that correct?
5      A.    Classically, signal detection is looking
6  for new events.
7      Q.    All right.
8      A.    But this clustering of cases where the
9  FDA was concerned that they didn't see all of them,
10 any clustering of single cases should alert them to a
11 potential batch issue.
12          It could be an issue with a site, but it
13 also could be -- could map to an issue with a
14 distributed batch.
15          And that should have -- be covered by an
16 SOP in the company that will require either a case
17 series or some form of analysis for that cluster of
18 events.
19     Q.    So what you are looking for, what you
20 would be looking for here in terms of signal detection
21 in a manufacturing defect case, is whether -- whether
22 the MedWatch reports were providing information to the
23 company that there might be a manufacturing defect;
24 correct?
25     A.    Yes.

Page 88

1      Q.    Okay. And -- is there a qualifier? Is
2  that, indeed, what you're looking for, what you would
3  be looking for in terms of a manufacturing defect
4  case?
5      A.    With product complaint cases, I was
6  explaining to you that there are often routine Health
7  Hazard Assessments where the pharmacovigilance
8  physician receives work products from quality for the
9  product complaint and the investigation and the
10 analytics.
11          And then there are Health Hazard
12 Assessments done in realtime where the company
13 pharmacovigilance database is data mined for any cases
14 that could indicate that that manufacturing detect was
15 leading to adverse events that were reported, either
16 globally or particularly in the market of
17 distribution.
18          Some companies will look at the medical
19 literature, and some companies will go as far as to
20 data mine the AERS database in Washington, which has
21 -- which contains all the MedWatch forms submitted to
22 the FDA, or the WHO database in Uppsala, Sweden, that
23 contains all of the CIOMS forms submitted to EMEA.
24          But there is typically, for these
25 manufacturing defects that may have gone to market, an

Page 89

1  assessment of the extent of the exposure, what batches
2  could have been affected, what is the market
3  distribution of those batches, and then is there any
4  evidence that there are adverse events that are
5  resulting in response to the market exposure of those.
6      Q.    So one of the key things that you want
7  to do is to look at the Adverse Event Reports to see
8  if they suggest a defect in manufacture in affected
9  batches; correct?
10     A.    Yes.
11     Q.    And the other thing you mentioned in
12 your prior answer was product complaints.
13          And so is it also fair to say that if
14 one -- if a company was concerned about a
15 manufacturing defect, they could look to their product
16 complaints on returned product and see -- and make an
17 inquiry to see whether those resulted in any adverse
18 experience reports?
19          Is that something that companies do?
20     A.    You are correct. The work products fed
21 to pharmacovigilance usually contain an assessment of
22 are there any similar product complaint reports. And
23 that in turn determines the scope of the batches that
24 are potentially affected.
25     Q.    I don't want to interrupt, but I do want

                           23  (Pages 86 to 89)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

## Page 90

1    to move this along.
2        What you are looking for -- strike that.
3        What many companies have is a process by
4    which there's communication between the folks on the
5    signal detection side and folks on the product
6    complaint side where they exchange information to see
7    if it can be useful to the other side; is that
8    correct?
9        A.   Yes.
10       Q.   Is that -- now, did you review the
11   deposition of Sarita Thapar?
12       A.   Yes.
13       Q.   Didn't she, indeed, say that Actavis had
14   such a communication process?
15       A.   Yes.
16       Q.   You have not reviewed the product
17   complaints on Digitek prior to the recall, have you?
18       A.   No.
19       Q.   You have not reviewed the MedWatch
20   reports prior to the recall, have you?
21       A.   No.
22       Q.   So you don't know whether there were any
23   MedWatch reports which even gave off a signal of a
24   manufacturing defect, do you?
25       A.   I went --

## Page 91

1        Q.   Would you answer that question, please.
2        A.   The answer is no.
3        Q.   And you don't know whether there were
4    any product complaints prior to the recall that
5    suggested there was a manufacturing defect, do you?
6        A.   I do know about the one from 2004 that
7    led to an investigation.  I did not receive the Health
8    Hazard Assessment in association with that 2004
9    investigation.
10       Q.   Beyond that 2004 incident, which you've
11   talked -- which you just mentioned, have you reviewed
12   any product complaints about Digitek prior to the
13   recall?
14       A.   No.  I believe all the ones I saw were
15   post.
16       Q.   So -- right.
17       So you don't know whether there was --
18   at the end of the day, you don't know whether there
19   was anything as to Digitek and the manufacturing
20   defect with Digitek to be communicated between the
21   product complaint section and the signal detection
22   section, do you?
23       A.   I went looking to assess what was done,
24   and I couldn't find anything.  And then --
25       Q.   Could you -- I'll let you answer however

## Page 92

1    you want to answer, but you didn't -- you did not --
2    you could not form any opinion as to whether there was
3    communication between the product complaint side and
4    the signal detection side on Digitek as relates to a
5    manufacturing defect because you were not provided
6    with those records, were you?
7        A.   My opinion is not based on the records.
8    When I inquired on the June 2nd meeting and expressed
9    my concerns, I was not given enough to document that
10   process.
11       But I found in the FDA inspections of
12   2008 specific statements they were upset about the
13   lack of Health Hazard Assessments.
14       So what I did in trying to assess
15   whether there was an adequacy, realtime Health Hazard
16   Assessments, because I was not -- I was not provided
17   all of the information that you talked about, even on
18   questioning.
19       I said, the only thing that I can find
20   that says that there is perhaps something in place,
21   but not in use, was the FDA observation.
22       And that's documented in here with my
23   comment about concern of lack of ongoing Health Hazard
24   Assessments.
25       Q.   And that's the opinion of one

## Page 93

1    investigator; correct?
2        A.   And I --
3        Q.   Is that correct?
4        MR. THOMPSON:  Object to the form.
5    BY MR. DEAN:
6        Q.   What you just referenced is the opinion
7    of one investigator; correct?
8        A.   Possibly two, but, yes, one.  It's one
9    inspection, probably one investigator, possibly two.
10       Q.   Let me go back.  Let me go back.  And I
11   want to get an answer to my other question, just so
12   we're clear.
13       You do not have an opinion as to the
14   actual -- strike that.
15       You have not had an opportunity to
16   review the information exchanged between -- gathered
17   by the product complaint section and the signal
18   detection section as to -- as to the possibility of
19   manufacturing -- strike that.
20       You have not reviewed the information
21   obtained by the product complaint section and the
22   signal detection section prior to the time of the
23   recall to determine the adequacy of the information
24   exchanged between the two groups, have you?
25       A.   I have concern that there is an absence

24  (Pages 90 to 93)

Karen A. Frank, M.D.      Videotaped          June 30, 2010

Page 94

1  of information provided to me at this point in time on
2  which I can base an opinion.
3      Q.   You haven't reviewed that information at
4  this point, have you?
5      A.   No.
6      Q.   Correct?  Is that correct?
7      A.   The information that I --
8      MR. KAPLAN:  Is that correct?
9      THE WITNESS:  No, I have not been
10  provided that information.
11  BY MR. DEAN:
12      Q.   Thank you.
13          Could you tell us, and I don't want to
14  -- I hope we don't spend much time on this, but I
15  would just like for you to give us a brief overview of
16  your job duties at the FDA, what you did when you were
17  at the FDA.
18          Could you do that for us, please?
19      A.   I spent two years at the FDA as a fellow
20  in the division of cardio-renal drug products.
21          And when I finished my fellowship, I was
22  brought on as a GS-14 expert level reviewer in anti-
23  infectives for the small molecules for sepsis and
24  septic shock that had been moved from cardio-renal to
25  anti-infectives.

Page 95

1          They needed cardiovascular expertise.
2          I also reviewed things in anti-infective
3  products.  I --
4      Q.   When you say "reviewed things," what
5  were you doing?
6      A.   I did IND reviews.
7      Q.   Okay.
8      A.   NDA reviews.  I did updated class
9  labeling.
10          There was a -- an innovative product
11  that had been lax in updating their drug label, and a
12  me-too drug came along, and they approached the FDA
13  about leveling the playing field for competitive
14  marketing by forcing the innovator to update their
15  drug label.
16          And I was the person who wrote the
17  initial draft of the updated drug label based on all
18  information on the two drugs.  And I provided that to
19  FDA supervisory.
20          I then received -- I also did a workup
21  on an FDA advisory panel recommendation for black box
22  warnings on a class of drug for antimicrobial
23  resistance.
24          And one of the companies decided to
25  challenge the fact that their drug should be subjected

Page 96

1  to class black box labelings, and they put together a
2  labeling review and sent it in to the FDA, and I was
3  assigned it and I started on it.
4      Q.   Let me interrupt and see if I can speed
5  this along.
6          Would it be fair to say that when you
7  were at the FDA, you basically did medical review of
8  INDs, NDAs, and addressed labeling issues?
9          Is that a fair summary?
10      MR. THOMPSON:  Object to the form.
11      THE WITNESS:  I did.  I also did some
12  review of --
13  BY MR. DEAN:
14      Q.   Just give me the other broad areas that
15  you might -- I don't need the detail, but just a broad
16  area.
17      A.   I did some peer review of -- or I did
18  some review of peer-reviewed literature that came into
19  the FDA for FDA review prior to publication, because
20  there had been disputes between peer-reviewed
21  publications and the FDA in that the peer-reviewed
22  publications were talking too much about off-label
23  use.
24      Q.   Okay.  Go ahead.  Anything else?
25      A.   I assisted on the placebo hypertension

Page 97

1  project where they pooled placebo data on hypertension
2  trials to justify the use of placebo groups in short-
3  term Phase II trials demonstrating pharmacodynamic
4  efficacy of hypertensive agents.
5      Q.   At any time when you were with the FDA,
6  did you do an inspection of a manufacturing facility?
7      A.   No.  I was not in the -- in that
8  office.  I was in the review divisions.
9      Q.   All right.  Now, would I also -- from my
10  review of your resume, you are not an expert on
11  manufacturing of drugs, are you?
12      A.   No.
13      Q.   You are not an expert on quality control
14  procedures in regard to the manufacturing of drugs,
15  are you?
16      A.   No.
17      Q.   You are not an expert on quality
18  assurance issues in regard to the manufacturing of
19  drugs, are you?
20      A.   No.
21      Q.   Okay.  Have you -- when you were with
22  the FDA, did you have any experience with recalls?
23      A.   FDA, not that I'm aware of.  The only
24  thing that I recall are clinical holds on clinical
25  trials.

                    25  (Pages 94 to 97)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

**Page 98**

1    Q.    When you were in --
2    A.    There was -- I was made aware of that,
3  but I was not involved with it. I take that back.
4    Q.    I know that you have a work history in
5  private industry as well.
6         During your time in private industry,
7  did have any experience with pharmaceutical recalls?
8    A.    I did not implement the recalls. I did
9  the Health Hazard Assessments for them.
10    Q.    So that would -- the extent of your
11  involvement with a recall would be to do the Health
12  Hazard Evaluation; correct?
13    A.    Yes.
14    Q.    Okay. Isn't it true that the FDA can
15  ask that a product be recalled for any reason?
16    A.    I will say yes.
17    Q.    Okay. And there is no legal requirement
18  that a product be defective before it's subject to a
19  recall, is there?
20    A.    I do not know the answer to that
21  question. I cannot think of that -- where that is
22  stipulated in the CFR.
23    Q.    Has any company that you've ever worked
24  for received a 483?
25    A.    Yes.

**Page 99**

1    Q.    Has any company you've ever worked for
2  received a warning letter?
3    A.    Yes.
4         May I ask a clarifying question?
5    Q.    No.
6    A.    Okay.
7    Q.    What is a 483?
8    A.    A 483 is an FDA form in which the
9  inspectors report their initial observations of the
10  inspection.
11    Q.    Is it a final agency action?
12    A.    It is taken back into the FDA and it
13  produces a warning letter.
14    Q.    Is it a final agency action?
15    A.    I do not know the answer to that
16  question. In legal terms, if it's -- if it -- what
17  constitutes a final agency action. I never --
18    Q.    Did you review any of the 483s in this
19  case?
20    A.    Yes.
21    Q.    Did you -- do you have any recollection
22  of observing on the 483s whether it speaks to that
23  issue that I just asked you about?
24    A.    Yes. It says that it is not a final.
25    Q.    Does it -- do you remember that?

**Page 100**

1    A.    Yes.
2    Q.    Okay. So you do have some knowledge on
3  that, don't you?
4    A.    Yes.
5    Q.    And you would agree with me that the 483
6  form itself says it's not a final agency action;
7  correct?
8    A.    Yes.
9    Q.    I take it, you're not -- going from your
10  report, you're not going to testify about issues of
11  adulteration; is that correct?
12    A.    No. They've asked me to be very
13  specific in testifying on issues of these systems and
14  not to go out of scope into issues that would be
15  covered by the cardiologists.
16    Q.    Well, just so I'm clear, you're not
17  going to say that because a drug is adulterated, it's
18  defective? You're not going to offer an opinion like
19  that, are you?
20    A.    No.
21    Q.    Okay. And you're not going to be
22  offering any medical opinions on individual cases;
23  correct?
24    A.    No.
25    Q.    I'm correct, you're not?

**Page 101**

1    A.    Correct. I am not.
2    Q.    Okay. Thank you.
3         Would you agree that if the FDA, in its
4  dealings with a company, has concerns about data
5  integrity, it will take aggressive action vis-a-vis
6  that company?
7         MR. THOMPSON: Object to the form.
8         THE WITNESS: Please repeat the
9  question.
10  BY MR. DEAN:
11    Q.    In your experience, if the FDA has
12  questions about data integrity within a company, will
13  it take aggressive actions to follow up with that
14  company?
15    A.    Yes.
16    Q.    In your review of the documents you've
17  been provided, you didn't see any indication that the
18  FDA had any such concerns; correct?
19    A.    There were no explicit statements on
20  data integrity. There were, however, inspection
21  observations of inaccuracies and incompleteness of
22  narratives and coding on MedWatch forms.
23         Incomplete coding on MedWatch forms can
24  mean incomplete data retrieval on case series and
25  aggregate signal detection.

26 (Pages 98 to 101)

## Page 102

1    I have not seen any coding conventions
2  from Actavis, and I have not seen any primary
3  documents that would allow me to make any further
4  statement of the impact of coding issues on signal
5  detection.
6    But the FDA inspector's observation
7  raised concerns about quality issues in the safety
8  database, coding and the case retrieval for signal
9  detection. I can't comment on the extent.
10    Q.    Would you agree that in the context of
11  the AERs that you're testing -- testifying about, the
12  FDA never raised a specific question in regard to data
13  integrity?
14    Do you agree with that?
15    A.    That term was not in any of the
16  documents that I reviewed.
17    Q.    Do you have any knowledge as to whether
18  a double-thick tablet of Digitek ever reached the
19  market?
20    Do you have any specific knowledge of
21  that?
22    A.    The only evidence I have that a double-
23  thick tablet reached the market is the 2004 inspection
24  report where a double-thick tablet was returned to the
25  company from a pharmacist in Bellingham, Washington.

## Page 103

1    I cannot recall from the product
2  complaints that I reviewed if there's specific
3  evidence in those. I would have to re-review them and
4  report back to you.
5    But I have no MedWatches, CIOMS forms,
6  or aggregate reports, or any information on the recall
7  product that was incinerated, that would allow me to
8  make any assessment of how many or the percentage of
9  any batch of double-thick tablets that reached the
10  markets.
11    Q.    Is the only one that you are aware of
12  the one you referenced in 2004?
13    A.    There has been reference to a 2008, but
14  I cannot recall that I was provided any documents on
15  that case in 2008.
16    Q.    Do you know whether -- what's your
17  understanding as to double-thick tablets in 2008, if
18  you have any?
19    A.    Something was mentioned this morning.
20  But what I have are the inspection reports and the
21  recall package to finding the batches at risk.
22    I cannot picture in any documents sent
23  to me any sentence that says X tablet reached the
24  market, X tablet was ingested by a patient or X tablet
25  was returned to the company.

## Page 104

1    Q.    Is the only information that you would
2  have in response to my question what would be
3  contained in an FDA document? Is that fair?
4    A.    Unless there is something in -- I was
5  sent sample product complaints toward the end, and I
6  did not loop them in as evidence. They are on the
7  flash drive.
8    I cannot recall any specifics right now
9  of those. But there may be on those product
10  complaints statements that I do not recall about
11  double-thick tablets. I cannot recall them.
12    So I have to say no. The only thing
13  that I am absolutely certain that I have seen is 2004.
14    Q.    Okay. And let me ask you a few follow-
15  up questions in regard to that.
16    MR. DEAN:  Why don't we go off the
17  record for just a minute while I find this document.
18    VIDEO OPERATOR:  Going off the video
19  record.
20    The time is 11:38 a.m.
21    (Discussion off the record.)
22    VIDEO OPERATOR:  We're now back on the
23  video record.
24    The time is 11:40 a.m.
25  BY MR. DEAN:

## Page 105

1    Q.    In your report, which we marked, you
2  reference that 2004 --
3    A.    Yes.
4    Q.    -- double thick observation. But you
5  did not reference any follow-up by the FDA.
6    Did you inquire as to the plaintiffs'
7  lawyers whether the FDA itself did any follow-up on
8  the 2004 double thick observation?
9    A.    No.
10    Q.    Do you know whether the company reported
11  it to the FDA?
12    A.    No.
13    Q.    Would you have expected the company to
14  report it to the FDA?
15    A.    I'm going to say yes, it should have
16  generated a field alert. But I must qualify that,
17  that it's not my area of expertise.
18    Q.    Would this -- would the FDA follow --
19  would the possibility of an FDA follow-up to this 2004
20  observation be within one of the white spaces you
21  mentioned before?
22    A.    Yes.
23    Q.    Let me show you Exhibit 20. And I'm
24  going to -- eventually I'm going to direct your
25  attention to a specific page, but generally do you

27 (Pages 102 to 105)

Karen A. Frank, M.D.      Videotaped           June 30, 2010

Page 106

1   recognize what kind of a document this is?
2       A.    This is an inspection. It's a CGMP
3   inspection.
4       Q.    And was it prepared by -- it was
5   prepared by the FDA; correct?
6            Look at the back of it.
7       A.    Yes.
8       Q.    And on the front page, on the bottom
9   under Administrative Procedures, it says, We,
10  Investigators Erin McCaffrey and Robert Horan, issued
11  a 482 Notice of Inspection; correct?
12      A.    Yes.
13      Q.    So this is the FDA inspectors inspecting
14  Actavis in 2004; correct?
15      A.    Yes.
16      Q.    In December of 2004; correct?
17      A.    12/1/04, yes.
18      Q.    Okay. Now, let me direct you -- your
19  attention to Page 6 of this report.
20           Do you see where it says, Field Alert
21  Reporting?
22      A.    Yes.
23      Q.    Before I ask you the next series of
24  questions, could you just take a minute and read that
25  paragraph, please.

Page 107

1       A.    Yes.
2            (Witness reviews document.) Okay.
3       Q.    So, first of all, we can agree that the
4   -- in the first two sentences it says that the -- a
5   Field Alert was issued and it was submitted to the New
6   Jersey District Office; correct?
7       A.    Yes.
8       Q.    So Actavis submitted this as a Field
9   Alert to the District Office; correct?
10      A.    Uh-huh.
11      Q.    Yes?
12      A.    Yes.
13      Q.    And then the FDA, when they were there
14  during this inspection, did follow-up on that;
15  correct?
16      A.    Yes.
17      Q.    And the FDA noted that, besides this one
18  tablet, no additional complaints or reports of thick
19  tablets have been received for this high-volume
20  product; correct?
21      A.    Yes.
22      Q.    And they further concluded the event was
23  considered an isolated incident and corrective actions
24  were put in place to prevent its reoccurrence;
25  correct?

Page 108

1       A.    Yes.
2       Q.    And then it says, corrective actions
3   were verified during the inspection; correct?
4       A.    Yes.
5       Q.    And you have no reason to disagree with
6   any of the conclusions reached by the FDA in this
7   Field Alert in regard to the 2004 double thick
8   observation, do you?
9       A.    No.
10      Q.    Okay. Now, is this the kind of document
11  that you would have liked to have seen when you were
12  compiling your report, at least a part of it, in
13  regard to the 2004 double thick issue?
14      A.    Yes. It would have assisted in this
15  timeline, and of documenting corrective actions and
16  adequacy of corrective actions over this period.
17      Q.    Because that's one thing you're looking
18  for; right?
19      A.    Yes.
20      Q.    And here they did -- Actavis did exactly
21  that, they reported it, they took corrective actions,
22  and the FDA was satisfied with those corrective
23  actions; correct?
24      A.    Yes. In December of 2001, it is clearly
25  documented --

Page 109

1       Q.    I'm sorry, December 2004.
2       A.    2004. In December 2004, this document
3   clearly states that the Field Alert was issued. There
4   was inspection follow-up.
5            My reading of this paragraph includes
6   that the FDA is actually confirming some of the
7   conclusions of the report that I received. We can
8   verify that point by point if we need to.
9            And they are saying at that time they
10  consider the corrective actions to be verified. And
11  my assumption is verification means adequate.
12      Q.    Okay. Thank you. Let me get that out
13  of your way.
14           Have you ever taught or published about
15  pharmacovigilance?
16      A.    I gave internal seminars inside CSC.
17      Q.    Inside what?
18      A.    Inside one of the consulting firms that
19  I worked for. The -- they had approached me about
20  talking at national conventions, but I did not. And,
21  no, I have no publications on pharmacovigilance.
22      Q.    And you've never taught in -- outside of
23  the context in which you just mentioned; right?
24      A.    No. I have never done independent
25  workshops, and I cannot recall ever having done the

28 (Pages 106 to 109)

Page 110

1  official company SOP training on pharmacovigilance.
2      Q.   Now, can we agree that MedWatch reports
3  -- the information in MedWatch reports that's received
4  does not mean that a drug caused a specific adverse
5  event that may be described in the report?
6      A.   Yes.
7      Q.   It doesn't even try to do that, does
8  it? A MedWatch report does not even attempt to do
9  that; correct?
10     A.   The MedWatch form does not, but the
11 CIOMS reports contain CIOMS comments.
12         So in the database, there can be CIOMS
13 comments that will map if the database prints to a
14 CIOMS form, and I do not believe they will map to the
15 FDA 3500, the MedWatch.
16         But there can be assessments of
17 reporters and company on the MedWatch and the CIOMS,
18 and CIOMS companies assessing all of that information
19 in light of the narrative on the CIOMS and in the
20 database.
21         Because one of the very important things
22 in a company when you have the databases, there is a
23 reporter's field for causality or relatedness --
24 relatedness, and there's a company field.
25         And you want those two to be in parallel

Page 111

1  and transparent.
2          Occasionally you hear stories of
3  companies who say we only need one field and the
4  company can overwrite the reporters.
5          But it is extremely important to
6  maintain two transparent fields with a reporter
7  assessment of relatedness, a company assessment of
8  relatedness.
9          The company assessment of relatedness
10 may be based on a probabilistic analysis, such as the
11 Naranjo algorithm, and all of that is typically put
12 into a CIOMS comment that also resides in the
13 database.
14     Q.   Let's go back. First of all, a MedWatch
15 report itself does not even attempt to get at the
16 issue of causation; correct?
17     A.   Yes.
18     Q.   Now, you mentioned a CIOMS report. I
19 want to ask you about that. I -- in one of my past
20 lives, I actually knew what those initials stood for,
21 but you're going to have to refresh my recollection.
22         If you first give me the initials and
23 then tell me what they stand for.
24     A.   I think it was my past lifetime, too.
25     Q.   First, do you remember the initials?

Page 112

1  And if you don't, that's fine.
2      A.   No. It's a working committee within the
3  WHO that repeatedly analyzes pharmacovigilance
4  practices and publishes recommendations that are
5  available through the WHO in Geneva, but I'm blanking
6  on the actual acronym.
7      Q.   And that's fine. So --
8          MR. KAPLAN: I think it's S-C-I-O-M-S.
9          THE WITNESS: It's C-I-O-M-S.
10         MR. KAPLAN: It's S-C.
11         THE WITNESS: It's C. Charlie, Ingrid,
12 Oliver, Mark, Sam.
13         MR. KAPLAN: See what I know? Not very
14 much.
15 BY MR. DEAN:
16     Q.   And is this a group that takes a number
17 of MedWatches and tries to analyze or synthesize them
18 and issue a report?
19         What is it that they do? I wasn't quite
20 sure what you were saying that they did.
21     A.   No. They actually do higher level work
22 that actually translates into recommended --
23 recommendations for best practices in
24 pharmacovigilance.
25     Q.   But they don't take an individual

Page 113

1  MedWatch report and try to tease out causality from an
2  individual MedWatch report, do they?
3      A.   No. But the CIOMS form is the XUS
4  equivalent of the FDA 3500.
5      Q.   Okay.
6      A.   And when these databases are
7  constructed, the fields are in the databases and
8  there's -- there's a menu that allows the company to
9  print out the FDA form, the CIOMS form for the EMEA,
10 the specific form that goes to the BfArM in Germany,
11 on and on and on.
12         The same fields in the databases are
13 mapping to country-specific forms. They can submit
14 the CIOMS form to the FDA in lieu of the 483.
15     Q.   In lieu of the AER?
16     A.   In lieu of the MedWatch --
17     Q.   Right.
18     A.   -- 350.
19     Q.   Yes.
20     A.   So there are companies that don't do
21 CIOMS comments because they just submit 350s.
22     Q.   But if a company was to submit the CIOMS
23 report as opposed to the MedWatch 350, that would
24 contain basically the same information that's on the
25 MedWatch, just on another form; correct?

29 (Pages 110 to 113)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

---

Page 114

1   A.   Yes.  Now --
2   Q.   Is that correct?
3   A.   Yes.
4   Q.   And then if it -- so if it contains the
5   same information, it would not attempt to get at
6   causality, either, would it?
7   A.   They do not have a hundred percent
8   concordance.
9        The CIOMS forms contain CIOMS comments,
10  which are typically a statement of causality, based on
11  the reporter's causality, the medical judgment on the
12  narrative, plus or minus a quantitative probabilistic
13  algorithm on causality, such as the Naranjo.
14  Q.   But you have a number of reviewers that
15  are looking at a particular report; correct?
16  A.   Yes.  And there could be discordance in
17  their assessments.  And that's why I made the point of
18  the importance of the transparency of the reporter's
19  assessment of causality and the company's assessment
20  of causality.
21       Those are to be considered independent
22  and recorded in parallel and transparent.  And if the
23  company wishes to refute the reporter, they can do so,
24  but they cannot overwrite or obliterate the reporter's
25  causality.

---

Page 115

1   Q.   Do you have any evidence -- for the
2   purposes of this question, I want to put aside the
3   double thick issue.
4   A.   Okay.
5   Q.   Do you have any evidence that any normal
6   size Digitek tablet reached the market which was out
7   of specification prior to the time of the recall?
8   A.   No.
9   Q.   Okay.  Do you -- are you aware that --
10  are you aware of something called an FDA 484?
11  A.   Would you clarify?
12  Q.   Are you aware that sometimes the FDA
13  will, unbeknownst to a particular company, go out and
14  obtain product from the market and test it to see if
15  it meets specifications?
16  A.   I have heard of that procedure.  I have
17  not been formally trained on it, nor have I been
18  formally involved in it.  And I was not the recipient
19  of the reports from that procedure when I was at the
20  FDA.
21  Q.   Have you been informed in this case that
22  the FDA indeed went out and tested Digitek that was on
23  the market prior to the time of the recall?
24  A.   No.  I have not been informed verbally
25  or in writing.

---

Page 116

1   Q.   Have you been informed that a company
2   called UDL did -- I'm sorry.
3        Have you been informed that a company
4   called Celsius did testing on Digitek that was on the
5   market prior to the time of the recall?
6   A.   No.  However, I did not, nor did I ask
7   for this.  My assumption is that these documents would
8   have routed to an expert witness who was actually
9   expert in that area.
10  Q.   And that's outside your area of
11  expertise, product -- product manufacture and testing;
12  correct?
13  A.   Yes.
14  Q.   Did either Mr. Miller, Ms. Johnson or
15  Mr. Thompson tell you that the plaintiffs' lawyers in
16  this litigation had publicly abandoned the theory of
17  double-thick tablets?
18  A.   No.
19  Q.   Would that surprise you to learn about
20  that?
21       MR. THOMPSON:  Object to the form.
22  BY MR. DEAN:
23  Q.   Would it surprise you to know that
24  Mr. Thompson has filed papers with the court that says
25  the whole issue of double-thick tablets is a red

---

Page 117

1   herring?
2        MR. THOMPSON:  Object to the form.
3        THE WITNESS:  I was not informed of
4   that.  I -- I was aware that they were going to pursue
5   the batch uniformity issue, but I was not aware the
6   double-thick tablet issue had been abandoned.
7   BY MR. DEAN:
8   Q.   Would you have bothered to put any
9   reference to double-thick tablets in your report if
10  you had known that the theory had been abandoned and
11  that plaintiffs were referring to it as a red herring?
12       MR. THOMPSON:  Object to the form.
13       THE WITNESS:  No.
14       I was asked specifically to evaluate the
15  systems and the impact on the signal detection in the
16  Digitek case, and they were discussing the double-
17  thick tablet and the blend issue, but I was not told
18  the double-thick tablet had been abandoned.
19       I was not shown the FDA press release
20  stating that there was no risk to public health in the
21  Digitek recall.  And I have no information that allows
22  me to quantify the statistical probability of the
23  impact of the blend issue.
24       These were maintained as abstract risks,
25  and most of the information that I would have needed

---

30 (Pages 114 to 117)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 118

1    to determine any probability was redacted out of what
2    I received.
3         In other words, how many tablets were
4    actually in a batch, what was the likelihood that
5    those batches -- those tablets all ended up in one
6    bottle and ingested by one patient or evenly
7    distributed throughout a -- throughout bottles, one
8    tablet per bottle, which is a different risk.
9         One double-thick tablet in a bottle is
10   the medical equivalent of a patient accidentally
11   taking a double daily dose.
12   BY MR. DEAN:
13        Q.    Would you --
14        A.    I have no information on these
15   statistical probabilities or on either plaintiffs' or
16   defendants' assessment of those issues.
17        Q.    Would you agree it would be a waste of
18   time to do signal detection for something that is
19   admittedly a red herring?
20        MR. THOMPSON: Object to the form.
21        THE WITNESS: When was it determined to
22   be a red herring?
23   BY MR. DEAN:
24        Q.    Well, sometime within the last year.
25        A.    If, indeed, it was a red herring, I

Page 119

1    would agree with you. But the -- there is generally a
2    compulsive nature -- there is generally a compulsive
3    nature to evaluating potential risk.
4         I have no information on potential
5    versus actual risk, and I do not know at which time
6    potential risk was abandoned.
7         The investigation of the double-thick
8    tablet from 2004 did not include analytics to allow
9    assessment of suprapotency or subpotent dose of
10   Digoxin. I was also not provided the routine Health
11   Hazard Assessment with that finding.
12        And let me be careful with this one,
13   I've been trying to assess over the course of this
14   period if there's documentation of recurrence, what
15   percentage of the batch, how is it distributed into
16   the bottles, and all of that information has not been
17   provided to me.
18        I cannot say based on what's been
19   provided to me that there was no risk.
20        I -- I really need to be very careful
21   because there's -- there's an absence of information
22   provided to me to be -- that I can independently
23   substantiate the risk of the double-thick tablets or
24   the blend issue, the period of time associated with
25   the risk or the magnitude of the risk.

Page 120

1         Q.    And when you say that, establish a risk
2    from double thick or a blend issue, you don't mean by
3    looking at manufacturing records, you mean by looking
4    at records within your area of expertise; right?
5         A.    Well, as an FDA medical reviewer, we
6    have classes on a lot of this. We don't become
7    expert. But I started to ask questions of the risk of
8    population exposure. Is this one tablet per batch or
9    is it 50 percent of the batch?
10        There were -- and I'm not an expert on
11   this, but they did a visual inspection of a batch of
12   3.4 million tablets and pulled out a couple dozen.
13        I have no idea -- I'm starting to say,
14   what's the risk to a patient population of what the
15   percentage of that batch was that could have
16   potentially been double thick?
17        Because, to my assessment, the entire
18   batch was not submitted to a validated screening for
19   those double-thick tablets.
20        Q.    You already admitted that you're not an
21   expert in quality assurance or quality control;
22   correct?
23        A.    Yes, but I would have liked them to have
24   sent me something that was quantitative. But there
25   was nothing.

Page 121

1         Q.    So you have an absence of information on
2    that issue; correct?
3         A.    Yes.
4         MR. DEAN: Okay. Our videotape is
5    almost expired.
6         Let's go off the record.
7         VIDEO OPERATOR: Going off the video
8    record.
9         This is the end of Tape 2.
10        The time is 12:03 p.m.
11        (A luncheon recess was taken from
12   12:03 p.m. to 1:05 p.m.)
13        VIDEO OPERATOR: We're now back on the
14   video record.
15        This is the start of Tape 3.
16        The time is 1:05 p.m.
17   BY MR. DEAN:
18        Q.    You understand you're still under oath,
19   Dr. Frank?
20        A.    Yes.
21        Q.    Dr. Frank, do you understand that the --
22   that in this litigation a number of people are trying
23   to recover money as the result of the injuries they
24   allege they received from taking Digitek tablets?
25        Do you understand that to be the

31 (Pages 118 to 121)

Page 122

1    underlying purpose of the litigation?
2        A.    Yes.
3        Q.    Okay.  And do you understand -- do you
4    have an understanding as to whether the FDA has spoken
5    on the issue of whether there was likely harm to
6    consumers from Digitek?
7        A.    Last night, Mr. Thompson read the press
8    release to me.  I am not privy to the FDA procedures
9    or the extent of the data mining that went on in order
10   to support that statement that there was no risk to
11   public health.
12           My assumption, having been in the FDA,
13   is that that statement would have been based on all of
14   the existing available data at that time.
15           But having never worked in that division
16   of the FDA and having not been exposed to those
17   procedures, I cannot comment any further than to say I
18   was read that press release.
19       Q.    Was that -- the answer you just gave me,
20   was that the answer that you were instructed to give
21   last night by the plaintiffs' counsel?
22       A.    No.  In fact, I brought it up.  And they
23   had asked me to be extremely cautious probing into
24   data mining issues.
25       Q.    Did you -- was that your first notice

Page 123

1    about that FDA statement, last night?
2        A.    Yes.  I was kept relatively agnostic as
3    to the present assessment of the actual risk.
4           Most -- I think that's why I'm somewhat
5    -- I'll use the word "anxious" about my opinions
6    because I've been looking at systems for potential of
7    risk that I've not seen any data that I can
8    independently assess.
9           And I'm looking at systems where I know
10   what probably the industry standard would be to
11   document due diligence in assessing risk.
12           And so I'm responding on FDA
13   observations in the absence of some of the supporting
14   data.  And having been provided very little data on
15   the actual risk.
16           So the fact that you are repeatedly
17   presenting me with new information, I expected.  I am
18   concentrating on reacting as analytically as I can and
19   as accurately I can in responding as you present me
20   with this new information.
21       Q.    Now, at any point during your work on
22   behalf of the plaintiffs, did you do any independent
23   research yourself on Digitek?
24       A.    No.  I was tempted to look at the
25   Congressional investigation, I was tempted to do a

Page 124

1    Google search, I was tempted to search the FDA web
2    site.  I did not.
3           I left no Internet footprint of my
4    involvement in this case, other than the e-mail trail
5    that the Miller firm and Motley Rice left.
6        Q.    So you did no independent research on
7    your own, outside of that which you were provided, by
8    the plaintiffs' counsel; correct?
9        A.    No.  I left nothing on the Google
10   server.
11       Q.    And so let me hand you -- we've been
12   talking about the FDA statement.  It's what we marked
13   as Plaintiff's Exhibit 38; correct?
14       A.    Yes.
15       Q.    And this was issued in July of 2009;
16   correct?
17       A.    Yes.
18       Q.    And so this would have been available
19   for -- to you if you had done what you refer to as a
20   Google search.  If you had wanted to find this
21   document, you could have easily found it.  It's on the
22   FDA web site; correct?
23       A.    Yes.  But given the privacy issues of
24   the Google server, I did not do any research on
25   Google.

Page 125

1        Q.    Given the privacy issues?
2        A.    I watch commentary TV occasionally, and
3    I was as affected by one particular documentary on
4    Google that aired in the last few months.
5        Q.    I don't understand the answer.  What do
6    you mean?
7        A.    Well, you're asking me if I did an
8    independent search for this.
9        Q.    Right.
10       A.    I could have done it, and if I had been
11   instructed to do it, I would have done it.  But if I
12   do a search on Google, I leave a footprint.
13           And right now you probably know enough
14   about the privacy issues surrounding the aggregate
15   data on these search engines.
16           So if I'm an expert witness and I'm
17   going out looking for information, I'm creating an
18   electronic trail that right now the legal community is
19   questioning the privacy issues on that server.
20           So I specifically maintained silence
21   unless I was instructed to go out and do so.
22           Am I making sense?
23       Q.    I don't understand your answer, but I'm
24   not sure that's important.
25       A.    Every search that I do on Google is

32  (Pages 122 to 125)

Karen A. Frank, M.D.      Videotaped          June 30, 2010

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  there for eternity and they data mine that aggregate
2  data.
3      Q.   Who does?
4      A.   Google.
5      Q.   And what will they do with -- you were
6  afraid of what Google would do with it if you did an
7  Internet search?  Is that what you're telling me?
8      A.   People can come to Google and get that
9  data right now.
10      Q.   And were you afraid of what they might
11  do to you if you -- somebody might do to you if you
12  did an Internet search on an FDA web site?  Is that
13  what you're telling me?
14      A.   I made an extremely conservative
15  assumption that I was going to maintain electrical
16  silence on this case for the most part.
17          I think the only thing I did was pull
18  up -- here I need to qualify this, I do remember
19  pulling up Digoxin label.  But I did not search
20  Digitek.
21      Q.   Did the plaintiffs' lawyers instruct you
22  not to go on the FDA web site to find relevant
23  information about Digitek?
24      A.   No.  I talked to them --
25          MR. THOMPSON:  Object to the form.

**Page 127**

1          THE WITNESS:  I talked to them about the
2  electrical silence.  I asked them not to send me
3  documents by e-mail.  And I believe I told them
4  exactly what I was telling you.
5          And maybe it is completely irrelevant,
6  but I had no idea of the impact.  And I have to say,
7  I'll modify it, I do remember going on for one drug
8  label.  But I -- no, I made a deliberate decision not
9  to do independent research.
10  BY MR. DEAN:
11      Q.   You --
12      A.   Even though I knew these documents
13  existed.  And if I need to act otherwise in the
14  future, I will.  But they were aware of this.
15      Q.   So to retrace my steps before we get
16  back to this document, you are aware that the
17  litigation that we're talking about are people who are
18  alleging injuries from defective Digitek; correct?
19      A.   I know this is a liability case, that
20  they consolidate all of the state-level cases into one
21  federal case.  They will be taking deposition on a --
22  of a panel that will include a couple of federal
23  judges.
24      Q.   But you're aware that the basic
25  allegation is that there was defective Digitek that

**Page 128**

1  injured people; correct?
2      A.   Yes.
3      Q.   Okay.  And so one key question would be
4  did anyone ingest defectively manufactured Digitek,
5  that would be important in the litigation; correct?
6      A.   Yes.
7      Q.   Okay.  And if they did, how much and
8  over what period of time, that would be another
9  relevant question; right?
10      A.   Yes.
11      Q.   Okay.
12      A.   Wait.  No, I hope I gave you the right
13  information about my electrical silence.
14      Q.   Now --
15      A.   I think it's irrelevant, but okay.
16      Q.   Now, the --
17          MR. THOMPSON:  It's the most -- that's
18  the most eloquent opinion of big pharma that I've ever
19  heard.
20          THE WITNESS:  It's of Google, actually.
21  BY MR. DEAN:
22      Q.   Now, you've had a chance to review
23  Exhibit 38 last night, I believe; correct?
24      A.   Mr. Thompson read sections of it to me.
25      Q.   Oh, you have -- so you have just -- you

**Page 129**

1  haven't read the whole document then?
2      A.   No.  I was told that I would probably be
3  presented with this today.
4      Q.   What sections did Mr. Thompson read to
5  you?
6          You don't have to read the words.  Just
7  tell me the section.
8      A.   I can't find them.
9      Q.   Let me direct your attention and see if
10  I can guess correctly.
11          On Page 2, that paragraph, was that --
12  the paragraph that starts Since the detection of the
13  manufacturing problem, did he read that paragraph to
14  you?
15      A.   That may have been one of them.  The --
16  the thing that I remember most clearly about that is a
17  discussion -- we started to talk about my knowledge of
18  the bioequivalence of generics.  And, yes, I -- I see
19  that.
20          I can't remember that specifically
21  because I halted and I started to entrain my own
22  thoughts when they started talking about the
23  bioequivalence and the reliability of generic drugs.
24          Because I know about all the
25  requirements for bioequivalence and the requirements

33 (Pages 126 to 129)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 130

1   for 505(b).
2         But I'm also aware of cases where
3   generic manufacturing has been of variable quality and
4   it has impacted clinical outcomes.
5      Q.   Let me stop you. I want you to, if you
6   can, answer my question.
7         And that is, what -- what parts of
8   Exhibit 38 did Mr. Thompson call to your attention
9   last night?
10        Did you see it last night or did he just
11  read parts of it to you?
12     A.   He read it. And when he read me, I was
13  actually worrying about certain things I was going to
14  say today. So if he said something and it would
15  trigger thoughts and I had lapses of attention while
16  he was reading.
17     Q.   Well, sometimes that happens to
18  Mr. Thompson.
19     A.   No. It happens to me a lot because if
20  you say something to me and it kicks off a trigger
21  thought, I will follow it and then I'll come back, and
22  that's why I have you clarify points.
23     Q.   Seriously, you said he made reference to
24  a couple points.
25        Have you ever read this document before

Page 131

1   now?
2      A.   No.
3      Q.   Before right now?
4      A.   No.
5      Q.   So this, as you're sitting here right
6   now, is the first time you've actually seen Exhibit
7   38; is that correct?
8      A.   Yes.
9      Q.   Okay. Now, I want to direct your
10  attention to Page 2 of that document. And the
11  paragraph that's about a third of the way down, which
12  I directed to you before, where it says Since the
13  detection of the manufacturing problem.
14     A.   Since the detection --
15     Q.   Do you see that paragraph?
16     A.   Yes.
17     Q.   Okay. Now, let me ask you some
18  questions about that.
19        Well, the first sentence says, Since the
20  detection of the manufacturing problems, FDA has been
21  actively engaged with this company to ensure that all
22  potentially affected lots of Digitek tablets have been
23  recalled.
24        You have no reason to doubt the accuracy
25  of the FDA's statement there, do you?

Page 132

1      A.   I would think they would be extremely
2   cautious in their public statements given the fact
3   that, my understanding, there was a Congressional
4   inquiry on this. I think that these statements have
5   probably been very carefully worded.
6      Q.   So you have no basis -- my question is,
7   you have no basis to disagree with that sentence, do
8   you?
9      A.   No.
10     Q.   Then the next sentence says, In our best
11  judgment, given the very small number of defective
12  tablets that may have reached the market and the lack
13  of reported adverse events before the recall, harm to
14  patients was very unlikely.
15        Did I read that correctly?
16     A.   Yes.
17     Q.   Do you have any basis to disagree with
18  the FDA's public statement in that sentence?
19     A.   No. I do recall this being read. At
20  the time we were trying to access the other documents
21  on his computer. That's what distracted me.
22        I'm trying to remember how this occurred
23  because we were trying to bring in other documents all
24  at one time. And I made the statement that, yes, they
25  said harm to patients would be very unlikely.

Page 133

1         And that's where I brought up that you
2   would assume that they would have examined all
3   available data at the time they made that statement.
4         Because to have made that statement
5   without examining all available data would have left
6   them open to criticism had they been called before
7   Congress.
8      Q.   So you assume that they did examine that
9   data; correct?
10     A.   Yes. But I have -- I have no way to
11  substantiate that.
12     Q.   But it is your assumption; correct?
13     A.   Yes.
14     Q.   Because you worked with the FDA and you
15  know how cautious they are about making public
16  statements, don't you?
17        MR. THOMPSON: Object to the form.
18  BY MR. DEAN:
19     Q.   Go ahead.
20     A.   I have no direct experience with this
21  type of procedure in the FDA.
22        I'm extrapolating from my experience as
23  an FDA reviewer when we would issue clinical hold
24  letters, and what they required of me in reviewing
25  data before I brought forward issues and they would

34 (Pages 130 to 133)

Karen A. Frank, M.D.      Videotaped            June 30, 2010

---

Page 134

1    issue a clinical hold letter.
2         So I'm extrapolating from my experience
3    and I'm making assumptions that they would be engaging
4    caution because of the events of the last half a
5    decade where I've come under increasing scrutiny.
6    Q.    And one of the things it's clear that
7    they looked at before they made this statement was the
8    reported Adverse Event Reports before the recall;
9    correct?
10   A.    That's the data that I'm assuming they
11   data mined from the AERS database.
12   Q.    So they had access to information that
13   you've already told us you did not have access to;
14   correct?
15   A.    Yes.
16   Q.    Okay. So this document, you would
17   agree, was posted on July 9th of 2009 on their web
18   site?
19   A.    Where's the post date?
20        MR. THOMPSON: I object to the form of
21   that question. I'm not sure how we know that.
22        THE WITNESS: I can't find the posting
23   date.
24   BY MR. DEAN:
25   Q.    Do you know -- do have any knowledge as

---

Page 135

1    to when this was posted?
2    A.    Not unless it is on this -- I can't -- I
3    can't see the official date on this posting --
4    Q.    Okay.
5    A.    -- like you would have on a press
6    release. No, I can't find it. It might be in my
7    notes.
8    Q.    Do you know whether it's still on their
9    web site?
10   A.    Well, the date it was printed was June
11   15th of 2010.
12   Q.    So you assume it's still there;
13   correct? Yes?
14   A.    Yes. Uh-huh.
15        Are you waiting for my response?
16   Q.    No. I'm waiting for me -- myself. I'm
17   waiting to formulate a question. So don't feel
18   compelled to answer any more on my last one.
19        Would you agree this information about
20   the FDA looking at Adverse Event Reports on Digitek
21   before the recall would have been relevant information
22   to you in reaching issues of signal -- in commenting
23   upon issues of signal detection?
24        MR. THOMPSON: Object to the form.
25        THE WITNESS: Yes. Any information on

---

Page 136

1    the signal would have been valuable. I think there is
2    a question of the scope of my work versus the scope of
3    the cardiologist's work.
4         My fixation on the signal has to do with
5    the assessment of the actual risk or any potential
6    risk during this period. But I didn't do the medical
7    evaluation or signal detection.
8         I'm formulating this because in
9    addressing the issues I was asked to address, I would
10   like to know -- I still think like a medical officer
11   at the FDA. So these became disconcerting issues to
12   me.
13        And the fact that I was not given
14   documents that someone else may have and I didn't have
15   a fuller picture, and also the fact that the
16   definitive evidence of the recalled drug was
17   incinerated, so there's really no way to ever really
18   know how much of those lots was affected, it left a
19   big void.
20        So that it became theoretical detection
21   of risk. Did they look? Did they have procedures in
22   place and in use? Were they documented? Were they
23   affected by coding issues?
24        Because I had no idea what was actually
25   out there to be detected or the things that had been

---

Page 137

1    written and been provided to Dr. Leikin or to the
2    other expert witnesses.
3    BY MR. DEAN:
4    Q.    Let's go back.
5         You would agree that in the statement
6    that we just read, it's clear that the FDA looked at
7    adverse event information with regard to Digitek;
8    correct?
9    A.    The assumption is that there was a data
10   analysis behind that statement.
11   Q.    Which would have permitted the FDA, at
12   least -- they relied, at least in part, on that
13   assessment in reaching their conclusion; correct?
14   A.    Yes.
15        MR. THOMPSON: I object to the form of
16   that question.
17   BY MR. DEAN:
18   Q.    Now, this sentence contained within this
19   document would have provided relevant information to
20   you in regard to formulating your pharmacovigilance
21   opinions, wouldn't it?
22   A.    Yes. And --
23   Q.    And the plaintiffs' lawyers did not
24   provide you with a relevant statement from the FDA
25   that is directly relevant to the pharmacovigilance

---

35 (Pages 134 to 137)

Page 138

1  charge that you were given to answer, did they?
2      MR. THOMPSON: Object to the form.
3      THE WITNESS: I was not provided any of
4  the documentation that you are referring to.
5  BY MR. DEAN:
6      Q.   And you were not provided with Exhibit
7  38, were you?
8      A.   No. And I did not independently look
9  for it, and I hope that I was not lapse -- lax in
10 trying to seek it independently.
11     Q.   Is this the kind of information in
12 Exhibit 38 that you referred to before as white space?
13     A.   It's a little bit out of the white
14 space, but it is white space for me now that you
15 brought it in. The truth of the matter is, the fact
16 that I did not put this in context by going out and
17 looking, I allowed that white space to occur.
18         And I did it after discussing -- I
19 believe that I discussed this Google issue over lunch
20 with them.
21         I don't know whether it was seen as
22 important, but we sort of agreed that the best way to
23 transfer information was either in paper or
24 electronically.
25         And they never asked me to go out and

Page 139

1  look for additional information. They provided it to
2  me. So I'm giving you the best of my recollection how
3  this occurred.
4      Q.   The FDA did not say in here that the
5  adverse event reporting procedures of Actavis were
6  inadequate for them to form an opinion about the
7  likelihood of injury to consumers, did they?
8      MR. THOMPSON: Object to the form of
9  that question. I believe it misstates the document.
10 BY MR. DEAN:
11     Q.   Go ahead.
12     A.   They report on the lack of reported
13 adverse events before the recall. That is probably
14 valid.
15         One of the things that I have discussed
16 is that these systemic issues are samplings across
17 multiple drugs, of which one or two out of any
18 samplings are Digitek.
19         They do contain cases that could be
20 digitoxicity, they could be lack of efficacy. I don't
21 know whether it was digitalis toxicity at normal
22 digitalis levels, supratherapeutic digitalis levels,
23 or in the face of renal failure.
24         So I can't say anything about the cases
25 I know and I can't say anything about the impact of

Page 140

1  those two stray cases on the total signal detection.
2      The FDA says the lack of reported
3  events. These older drugs that have had long market
4  exposure and very little novel adverse events often
5  have underreporting.
6      And when you do the signal detection,
7  you actually do it on the generic version, even when
8  you're doing it on the branded compound, because
9  people just report the drug.
10     Q.   If you -- let me interrupt you.
11         If you were doing signal detection for a
12 manufacturing defect, you'd only do it on the product
13 that was manufactured by a given manufacturer;
14 correct?
15     A.   But the reports are often silent from
16 that and that has to be taken into account very
17 carefully, because you don't want to do an inadequate
18 document to be presented in this type of scenario.
19     Q.   Would you agree if you're trying to do
20 signal detection to spot a manufacturing defect, you
21 would look to the product manufactured by that
22 particular manufacturer?
23     A.   When you have the information. But if
24 the reports were silent, the default is to include
25 them rather than to omit them.

Page 141

1      Q.   There's no question pending.
2      A.   There was another point I wanted to
3  make.
4      Q.   Why don't you let me formulate another
5  question.
6      A.   Okay.
7      Q.   Does Exhibit 38 help you fill the void
8  of missing information in this case?
9      A.   Yes. There's -- assuming that the FDA
10 had rigorous review processes before making the
11 statement, in light of the fact that this could end up
12 in a court of law or in a testimony before Congress,
13 this is an important piece of information.
14         The lack of reported events is impacted
15 by the low reporting rate of generic drugs until it's
16 stimulated by an event such as a recall.
17     Q.   Doesn't this suggest to you, though,
18 strongly suggest to you, that the FDA was satisfied
19 with the adverse event reporting procedures in regard
20 to Digitek before the recall?
21     MR. THOMPSON: Object to the form.
22     THE WITNESS: I'm going to be very
23 careful with what I say. Because I don't know if
24 they're required to be silent on certain things.
25         In other words, they probably did not

36 (Pages 138 to 141)

Karen A. Frank, M.D.        Videotaped            June 30, 2010

Page 142

1   make an explicit statement of the impact. I'm sure
2   they were very careful about the wording.
3          But I have no information that would
4   tell me -- I may need to talk to Mr. Thompson before I
5   completely elucidate this, because I told him -- he
6   asked me not to digress into this area, that it was
7   outside of my scope.
8          And either I should be silent or I
9   should speak to him before I completely comment on --
10  on this.
11  BY MR. DEAN:
12      Q.    Well, that's not --
13      A.    It's not permissible?
14      Q.    With the background you've given us, I
15  don't think that's an appropriate conversation for --
16  to be had at this point. I think you need to answer
17  my question.
18      A.    Okay. I have not been provided any
19  information that says that there was an investigation
20  after the consent decree where anyone went in and data
21  mined the Actavis database.
22         There's two ways to look at it, what
23  events are coded.
24         Because at the time of the 2008
25  inspection, there's still investigator observations of

Page 143

1   unreported serious cases and there's a statement made
2   by one of the employees about submitting cases from
3   2006.
4          Now, the remediation is outlined in the
5   correspondence, including the PSURs for aggregate
6   reporting. And the comment by the company employee
7   talked about how far back they would go.
8          In other words, they didn't want to go
9   back before the acquisition. And I have no way to
10  completely put that in context.
11         So there's no data mining -- there's two
12  ways to data mine. One is the coded cases and the
13  other is to say the coding is defective, we're going
14  to text search the narratives.
15         And what if the narratives are only 50
16  percent coded? There could be undetected signal.
17         And in this case, it's unlike some of
18  the other cases I've heard of where they have done
19  those investigations. So I don't know how to comment
20  to you.
21      Q.    Do you think the FDA would have issued
22  this statement unless they were satisfied with the
23  reporting procedures of Actavis in regard to Digitek?
24  Yes or no?
25      A.    I think the answer is yes, but --

Page 144

1          MR. DEAN: Excuse me. Could -- could
2   you just read back my question and the answer.
3          (The court reporter read back the
4   following:
5          "QUESTION: Do you think the FDA would
6   have issued this statement unless they were satisfied
7   with the reporting procedures of Actavis in regard to
8   Digitek? Yes or no?"
9          "ANSWER: I think the answer is yes,
10  but --")
11         THE WITNESS: I believe that the FDA was
12  very, very careful to take into account the impact of
13  compliance with reporting procedures by Actavis at the
14  time they issued that statement.
15  BY MR. DEAN:
16      Q.    And would you agree that if they had
17  been satisfied with those procedures, they would not
18  have issued the statement?
19      A.    I'm going to say yes, but I really don't
20  know.
21      Q.    Okay. Thank you.
22         Now, you -- a few minutes ago, you
23  talked -- you talked -- you mentioned some product
24  that was incinerated. What did you have reference to?
25         MR. THOMPSON: Mr. Dean, are you -- are

Page 145

1   we through with Exhibit 38?
2          MR. DEAN: I think we are, Mr. Thompson.
3          MR. THOMPSON: So you're not going to
4   question her on the other four bullet points under
5   that paragraph; is that right?
6          MR. KAPLAN: Well, I'm going to object
7   to counsel making statements or inquiries here.
8   That's entirely inappropriate.
9          I move that that be stricken.
10         MR. THOMPSON: All right. Well, let me
11  then make --
12         MR. KAPLAN: This is an examination by
13  Mr. Dean. He can ask whatever questions he wants and
14  it's just inappropriate for you to comment.
15         If you do any more commenting, we're
16  going to be talking to Judge Goodwin about that.
17         MR. THOMPSON: All right.
18         Let's talk to Judge Goodwin about the
19  presentation of Defendant's Exhibit to my expert and
20  intimating that this was withheld from her, when, in
21  fact, this is a document that was withheld from us
22  until last week when it was delivered to us from
23  Mr. Anderton, who indicated that he had given it to
24  his expert, but it had not been produced to us.
25         MR. DEAN: This is not a company

37 (Pages 142 to 145)

## Page 146

1  document. We're not -- we can have this discussion --
2      MR. THOMPSON: Well, your testimony --
3  your testimony to her has begun to intimate that the
4  plaintiffs' counsel has done this and done that.
5      And, in fact, I'm looking at a document
6  that you've confronted her with which was never
7  produced to us in regular time and which was never
8  available to be sent to her.
9      MR. DEAN: Never available to be sent to
10  her because it was on the FDA web site?
11  BY MR. DEAN:
12      Q.    Let's go back to the question that I
13  just asked you about.  You, a few minutes ago, used
14  the word "incinerated," I think; is that correct?
15      A.    I will tell you the information, and I
16  don't -- it's probably in here.  It may not be.  But
17  in the recall packet, they have forms to fill out to
18  send the recalled product to Minnesota for
19  destruction.  We can pull that out.
20      My impression, and I am willing to be
21  corrected if I am wrong, is that there was no
22  analytical work done on that recalled product before
23  it was incinerated.
24      Q.    So you're talking about -- when you say
25  "recalled product," you're speaking about the recalled

## Page 147

1  Digitek in 2008; correct?
2      A.    I think it went from June 6, 2006
3  through 2008.
4      Q.    Right.
5      It was announced in 2008, but going back
6  for a couple years.  So that -- that's fair.  So that
7  was the time of -- the product that first went on
8  the market in 2006, some of that was recalled.
9      But your testimony is that when that
10  product got recalled, you believe that product was
11  incinerated; correct?
12      A.    This is why I did this document.  I
13  wanted to be very, very careful.  I have a fixed idea
14  in my mind from reviewing the documents that this
15  occurred.  If I am wrong, I will stand corrected.
16      Q.    Well, what is your understanding as to
17  how much of the product was incinerated?
18      A.    I don't know.  I was -- it may be a
19  white space where I was not provided any information
20  on what was done with that product.
21      But the recall package indicated it
22  would be shipped for destruction, and I was not
23  provided any evidence to say that it was analyzed
24  before it was destroyed.
25      Q.    Okay.  Let's go on.

## Page 148

1      Do you have Exhibit 261 in front of you,
2  Dr. Frank?
3      A.    Yes.
4      Q.    Good.  Let's see if I do.
5      All right.  I'm on Page 4, which is the
6  first page of -- are you with me there?  And it's in
7  the section on Background.
8      A.    Yes.
9      Q.    I want to direct your attention to the
10  second paragraph.
11      A.    Uh-huh.
12      Q.    You reference PSUR preparation; right?
13      A.    Yes.
14      Q.    Here's my question to you, a very simple
15  question:  Does a generic manufacturer who distributes
16  product only in the United States have any duty to
17  submit PSURs?
18      A.    Their legal obligation is U.S. Periodic
19  Reports.  But the FDA accepts PSURs in lieu of the
20  U.S. Periodic Reports for the aggregate reporting.
21      So many companies that operate globally
22  produce one PSUR and then it is modified with
23  appendices for country-specific reporting
24  requirements.
25      Q.    Would you agree that if a -- any drug

## Page 149

1  manufacturer, brand name or generic, only distributes
2  product in the United States, they do not have to
3  submit a PSUR, do they?
4      A.    No.  If it's just U.S., it can be just a
5  U.S. Periodic Report.
6      Q.    Thank you.
7      Now, in the third paragraph, you've got
8  some information regarding the company history, do you
9  not?
10      A.    Yes.
11      Q.    Where did that come from?
12      A.    It was abstracted from the Establishment
13  Inspection Reports and from the company correspondence
14  to the FDA, which is where I found the dates, the
15  consent decrees, the day it was -- the defect was
16  lifted in 2001, the dates of the acquisition.
17      All of this was taken and it should go
18  back to Reference 14, Page 7.
19      Q.    Okay.
20      A.    I tried to annotate every statement in
21  here.  If there's an error in my annotation, I will go
22  back and do the due diligence, because these should
23  all be annotated from the documents I was provided.
24  The way this --
25      Q.    No.  Let me -- just wait for another

38 (Pages 146 to 149)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

Page 150

1    question, please.
2         In the fifth paragraph, the one that
3    starts, There is little or no information, I take it
4    that you were provided no information about either
5    Amide or Actavis -- well, actually, you had the
6    information about the 2004 incident; right?
7         A.    Yes.
8         Q.    So --
9         A.    That was provided -- yeah, that was --
10   I'm not sure when it was -- when I wrote that, but,
11   yes, there was -- the information became more
12   intensive starting with this February 2006 inspection.
13        Q.    So is it fair to say you have no
14   information before February 2006 about what might be
15   termed alleged deficiencies in adverse event
16   reporting? Is that fair?
17        A.    If you look at the timeline, the first
18   inspection I was able to identify where I don't have
19   the 483s or the reports was in Elizabeth, New Jersey,
20   August 11th, '03 to August 14th, '03.
21        It was specifically a post-marketing
22   adverse drug experience inspection, and it was
23   classified as NAI.
24        Q.    And what does that mean?
25        A.    No action indicated.

Page 151

1         Q.    And do you believe that what you've
2    marked as Exhibit -- I'm sorry -- it's what is
3    referenced as Inspection 1 related to a company called
4    Amide or related to another company -- or related to a
5    company that was operating in Elizabeth, New Jersey?
6         A.    No. It came from one of these documents
7    that was either an FDA inspection of Amide or one of
8    the correspondences between Amide activists and the
9    FDA.
10        And so this was within one of the
11   acquired companies, and it was the site. I was -- I
12   was more interested in sites and how pharmacovigilance
13   was moved.
14        There were two things I was trying to
15   answer: What sites were inspected, what sites were
16   inspected for pharmacovigilance and how
17   pharmacovigilance was moved multiple times?
18        And was there anything remaining after
19   the consent decree was lifted? Was this pristine at
20   the time the consent decree was lifted and then there
21   was a decline in function, or was there a -- were
22   there persistent issues?
23        And this was important because it was an
24   NAI inspection in 2003, and it was a very small window
25   of insight, and so I documented it there. And then I

Page 152

1    would -- if I needed, I would ask for more information
2    to cover that period.
3         Q.    And where did you get the information
4    that such an inspection took place?
5         A.    I can find it for you. Because this was
6    a later edition, and I believe, and I might have to go
7    back and verify, that it came out of this, the
8    introduction of this Establishment Inspection Report.
9         Q.    That's Plaintiff's Exhibit 91, for the
10   record.
11        A.    I had to go through the eyes of the FDA
12   inspectors to find things that I was not provided.
13   And there were some very good historical summaries.
14        Q.    Here's my question for you.
15        If you can find it quickly, that's fine,
16   but that's a long document. I'm ready to go on to
17   another question if you can't find it.
18        A.    Okay.
19        Q.    Are you ready to go on?
20        A.    Yes.
21        Q.    Here's my simple question to you: On
22   this, what you've labeled Inspection 1, Elizabeth, New
23   Jersey, in 2003, do you know whether that referred --
24   that that was a inspection relating to Digitek or to
25   totally different product lines?

Page 153

1         Do you know?
2         A.    No.
3         Q.    Okay.
4         A.    Any --
5         Q.    Okay. You don't; right?
6         A.    No.
7         Q.    Let's just leave it at that, I'll go on
8    and ask you another question.
9         A.    I apologize for my lack of annotation on
10   this.
11        Q.    But whether it was Digitek or some other
12   product that was being commented on, it was NAI which
13   would not raise any alarm bells with you, would it?
14        A.    I put that in there as a pertinent
15   negative.
16        Q.    Okay. Thank you.
17        Now, then you talk about the double-
18   thick Digitek in July 2004. We've already spoken
19   about that, so I'm not going to question you any more
20   about that sentence.
21        Then you say, In 2005 there was an MHRA
22   inspection that resulted in an inspection observation
23   on October 25 of inadequate information on transfer of
24   expedited cases.
25        You were never able -- strike that.

39 (Pages 150 to 153)

Karen A. Frank, M.D.        Videotaped                June 30, 2010

Page 154

1    Did you ask for the documentation, the
2  backup on that?  Did you ask for it?
3      A.    I talked to Pete Miller about this on
4  June 2nd.
5      Q.    Did you ask him for it?
6      A.    Yes.
7      Q.    Did you get it?
8      A.    They were not aware of any MHRA
9  inspection reports in the discovery.  I think, if I'm
10  not mistaken, there may have been others.
11      The fact that there was an MHRA
12  inspection in 2005 implies a repeat inspection in a
13  two-year cycle.  But that's an assumption.
14      But, no, I have no information about
15  MHRA inspection findings other than the fact that one
16  of those was detected at the time of the due diligence
17  in the acquisition, and the decision was made to
18  implement the agreement between Amide and the MHRA
19  after the merger in March.
20      And there was FDA inspection findings of
21  this noncompliance that sort of coincided with them.
22      Q.    Did you understand this to be a -- first
23  of all, MHRA is a European regulatory agency; correct?
24      A.    Yes.
25      Q.    Did you understand this -- did you

Page 155

1  understand this reference to the MHRA inspection to
2  deal with a reporting issue as a result of corporate
3  acquisitions?
4      A.    No.  But the MHRA --
5      Q.    You did not; is that right?
6      A.    No.  This was -- this was before the
7  acquisition.
8      It was independent, and it was -- I
9  believe it was a finding of the due diligence at the
10  time of the acquisition, and it's the only information
11  I have on the due diligence in pharmacovigilance.
12      Q.    So you don't know what the eventual
13  outcome of that inspection was, do you?
14      A.    There was an agreement, and I know the
15  date of the implementation and I know that it was
16  communicated to the FDA because of concerns with
17  transfer between Copenhagen and the U.S.
18      Q.    Do you know whether the FDA was
19  satisfied with the conclusion on that?
20      A.    This I believe --
21      Q.    Either you know or you don't.  Which is
22  it?
23      Do you know whether they were satisfied
24  or don't you?
25      A.    May I give you an answer based on my

Page 156

1  best recollection?
2      Q.    First of all, do you know?
3      A.    I believe this came from the Amide
4  response immediately following the 2006 inspection.
5  And the FDA responses reiterated concern with serious
6  underlying systemic issues.
7      But I can't recall the FDA ever
8  responding to this particular MHRA inspection.
9      And I inquired whether Digitek was
10  marketed outside of the U.S. and the potential impact
11  of the MHRA inspection on collection of Digitek cases,
12  per se.
13      And, to my knowledge, and to the
14  knowledge of all the counsel that I had, Digitek is
15  only marketed in the U.S.  And so the transfer of
16  these cases from Copenhagen to the U.S. did not impact
17  compliance with Digitek or signal detection.
18      Q.    Did you put that in your report?
19      You didn't put that in your report, did
20  you?
21      A.    No.  It was verbal communication.
22      Q.    Wouldn't a fair and objective expert
23  witness have noted in a Digitek case that an
24  observation about an MHRA inspection didn't have
25  anything to do with Digitek?

Page 157

1      MR. THOMPSON:  Object to the form.
2      THE WITNESS:  Possibly.  If I do it
3  again, I'll be more careful with the annotation.  I
4  would say --
5  BY MR. DEAN:
6      Q.    But you do agree that, as you understand
7  the facts now, that Digitek would not have been
8  impacted by that particular inspection; correct?
9      A.    No.
10      Q.    Is that correct?
11      A.    We clarified this, and at this point, my
12  understanding is there are Digoxin cases, but they're
13  not Digitek.  That I could assume that all Digitek
14  cases would arise from the U.S.
15      I have nothing other than verbal
16  confirmation.  So I -- yeah, I'll have to say yes.
17  Okay.  This is -- I'm pulling in extraneous
18  information trying to clarify.
19      But it does have impact on the
20  assessment of the systemic issues because they made
21  arbitrary decisions based on this, the implementation
22  of this MHRA agreement, that were upsetting to the FDA
23  and did lead to a 483.
24      Q.    And do you know the final position of
25  the FDA in response -- or in respect to their level of

40 (Pages 154 to 157)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

## Page 158

1  satisfaction with this MHRA inspection?
2         Are you aware of the final word on that
3  from the FDA?
4      A.    The implementation of this agreement
5  with the MHRA was effective on March 1st. And for
6  reasons unknown to me, Copenhagen sent a batch of
7  cases two to three months later, and it's in one of
8  the response letters.
9         They made a decision and wrote a note to
10 the file to call their initial receipt date the day
11 they got these from Copenhagen, rather than the date
12 they were first received in Copenhagen.
13        And the FDA made an observation of that
14 and required the company to make a change, and there's
15 a note to the file of the change in that process.
16        But they made an -- they made a
17 decision, and I don't know who ratified it, who was
18 given the governance, but the ineffective
19 implementation or somehow the delay in this
20 implementation led to further FDA inspection findings.
21        Because the transfer did not occur
22 immediately at March 1st. The first transfer was a
23 batch a couple of months later and led to
24 noncompliance. That's sort of why I left it in.
25     Q.    But my question to you is, do you know

## Page 159

1  the final resolution of this in the eyes of the FDA?
2      A.    It was inspection finding that required
3  remediation, and I do not recall any inspectors
4  assessing the adequacy of the corrective action.
5      Q.    Let's turn to Page 5. The second
6  paragraph on Page 5 you recite the history of the
7  warning letters and the responses.
8         Well, there was a 483 and a response and
9  a warning letter and a response and you recite all
10 that history, do you not?
11     A.    Second paragraph, Page 5?
12     Q.    Page 5.
13     A.    Yes.
14     Q.    And did you -- you've talked before
15 about white spaces. Is there a white space in this
16 paragraph where there is, in all likelihood, a missing
17 document?
18     A.    I documented the missing letters. But
19 it's not -- I don't know that I translated the
20 documented missing letters in here into the
21 conclusion.
22        This -- this paragraph, there were
23 issues with the accuracy of the responses from
24 February 28th and February 8th, and the FDA took
25 issues with those.

## Page 160

1         But they -- the reason this is in there
2  is they warned the company that these specific
3  violations are serious and they may be symptomatic of
4  underlying problems.
5         And I was asked to assess systemic
6  issues. And I wasn't given any Digitek subsets, so I
7  started pulling in a lot of things, like MHRA
8  inspections. But the FDA gave them warning.
9         And I started looking for has anybody
10 given me evidence of the compliance remediation plan,
11 the tracking of it with Metrix, and its adequacy.
12        So this is put in here because the FDA
13 warned that they needed to assess broader systemic
14 issues.
15     Q.    So at this point, as you read this set
16 of correspondence, as a pharmacovigilance expert, you
17 have a concern that they may not have engaged in the
18 right corrective procedures; correct?
19     A.    Or else I was not given the documents.
20 Because they produced a QSIP, and it's huge, and they
21 said they'd send it to me, that I could look at it.
22     Q.    Who said that?
23     A.    Pete Miller did.
24     Q.    But you -- did you request it?
25     A.    Yes.

## Page 161

1      Q.    Did he send it to you?
2      A.    No.
3      Q.    Okay. Now, isn't it -- when you see a
4  history of 483s and warning letters like this, isn't
5  it usual for the FDA at the end of the day, at the end
6  of the sequence, to tell the company whether they've
7  satisfactorily engaged in corrective procedures or
8  whether they're still deficient?
9         Isn't that commonplace?
10     A.    The FDA revised warning letter, I think
11 this was in July, reiterates the findings, talks about
12 the inadequacy of the response, and this is a quote.
13        Now, my question is, did the company
14 engage in any type of root cause analysis or process
15 evaluation to assess broader systemic issues, and did
16 they put in place a remediation program that was
17 adequately implemented and tracked?
18        The bottom line that I came to based on
19 what I could see is they had similar repeat inspection
20 findings in 2008, there was a statement that one of
21 the company -- and it was Mr. Delicato, about cases in
22 2005, which I thought were part of this remediation.
23        And I don't know all the circumstances
24 about this or the negotiations or what would be
25 submitted, but the white spaces, what they did, what

41 (Pages 158 to 161)

Page 162

1  they did in the QSIP, but the outcome was the FDA said
2  there's a total failure for quality systems.
3        There's still repeat pharmacovigilance
4  findings.
5        And then when the recall occurred --
6      Q.   Who said there was a total failure of --
7  a total failure of what?
8      A.   That's a quote, and that might be --
9      Q.   That's a quote from who?
10     A.   An FDA inspector in either the closeout
11  meeting or in this EIR.  And because this is a
12  verbatim --
13     Q.   And, in fairness, that was a quote about
14  total failure of quality control in regard to quality
15  control, not in regard to pharmacovigilance.  Do you
16  agree?
17     A.   I was unable to sort out the quality
18  unit.  It -- for the most part, it was addressing
19  manufacturing issues.
20        But my question is, there's usually
21  quality systems that control pharmacovigilance quality
22  and product complaint and clinical research.
23        There should have been some sort of a
24  quality system for all of these business critical
25  functions.

Page 163

1      Q.   Can we agree that if there is a letter
2  from the FDA to Actavis saying that they were
3  satisfied with the company response to the
4  pharmacovigilance issues contained in the warning
5  letter of August 15, 2006, you've never seen it, have
6  you?
7      A.   No.  I've not -- I did not see -- I did
8  not identify in my review any interim FDA
9  communication that said they were satisfied.  If it's
10  my error, I stand corrected.  There are letters that I
11  was not provided, and I documented that.
12     Q.   Did you -- how did you document what you
13  were not provided?  How would you know how to document
14  it?
15     A.   Oh, boy.  I laid out this timeline for
16  myself.  Inspections I found are in red.  Any
17  information I have on the inspections was there unless
18  there was a full report.
19        In blue were the company's responses.
20  And the black are these intercurrent communications.
21  And here in the timeline is part of my attempt to
22  document things that were not included to me.
23     Q.   Let me hand you what we marked as
24  Defendant's Exhibit 87.
25     A.   All right.

Page 164

1        (Witness reviews document.)  Okay.
2  They --
3      Q.   You've never seen this document before,
4  have you?
5      A.   No.
6      Q.   And we can agree that it is a letter
7  from the FDA to Actavis Totowa dated January 3, 2007;
8  correct?
9      A.   Yes.  And I don't have this in the white
10  space, so I have no indication this letter existed
11  until you just gave this to me.
12     Q.   This is the first time you've even seen
13  it in your life and the first time you're even aware
14  of its existence; correct?
15     A.   Yes.
16     Q.   And we would agree that it says, in the
17  second paragraph, New Jersey District has reviewed
18  your response regarding adverse drug experience
19  reporting deficiencies.  Your corrective action and
20  the revised procedures appear to be satisfactory.
21        That's what it says; correct?
22     A.   Absolutely.
23        MR. THOMPSON:  I object to taking that
24  out of context.
25  BY MR. DEAN:

Page 165

1      Q.   So the -- in your paragraph on Page 5,
2  you referenced the 483s and the warning letters on the
3  pharmacovigilance issues, but you didn't reference
4  Exhibit 87 because you were unaware of it; correct?
5      A.   Yes.  I expressed concerns multiple
6  times about missing information like this that could
7  impact on my --
8      Q.   And it's clear that the FDA was
9  satisfied with that response, wasn't it?
10        MR. THOMPSON:  Object to the form of the
11  question.
12        THE WITNESS:  Well, the FDA is
13  satisfied.  I don't know -- August 15th.  Revised
14  warning letter.
15        Wait a second.
16        We acknowledge dated September 6th, the
17  company responds, the procedures, I don't have October
18  26th.  There is a clear statement that corrective
19  actions and the revised procedures were satisfactory.
20  BY MR. DEAN:
21     Q.   And you don't have any basis to disagree
22  with the FDA position on that, do you?
23     A.   The company --
24        MR. THOMPSON:  I object to the form of
25  the question.

42 (Pages 162 to 165)

Karen A. Frank, M.D.        Videotaped           June 30, 2010

---

Page 166

1          THE WITNESS: I do not believe I've seen
2    the additional revised procedures on October 25th, and
3    so I cannot make an independent determination.
4          And in order to really give you an
5    accurate opinion, I should probably read -- re-read
6    the September 6th.
7          However, I think that in a court of law,
8    this FDA opinion would supersede my opinion unless I
9    could really provide evidence to the contrary.
10   BY MR. DEAN:
11   Q.    Thank you.
12         So as of January 3, 2007, we can agree
13   that the FDA was satisfied it had received all adverse
14   reaction reporting from Amide or for Actavis Totowa
15   that had been raised by the 483 and the warning
16   letter; correct?
17         MR. THOMPSON: I object to the form of
18   the question and I entreat Dr. French (sic) to please
19   read the entire document before she answers a single
20   out-of-context sentence.
21         MR. DEAN: It's Dr. Frank, I believe.
22         MR. THOMPSON: I -- then I've just --
23   I'm probably in the wrong place at the wrong time.
24         THE WITNESS: This is very, very
25   difficult because these corrective actions have a

---

Page 167

1    scope. And I'm reading this out of context in the
2    scope, so I can't track what the corrective actions
3    were or the procedures.
4          And I have no information about the
5    adequacy of the corrective actions during the future
6    inspection because there's both the plan and the
7    implementation of the plan.
8          So this is basically saying they did --
9    they did a corrective action. And the District Office
10   found it satisfactory, and I'm assuming that they
11   could implement it without revision.
12   BY MR. DEAN:
13   Q.    Earlier, much earlier this morning, you
14   told us that what you were relying on this -- in this
15   case was the FDA conclusions and not the underlying
16   documents.
17         Do you remember that?
18   A.    Yes. There is -- I've not -- I don't
19   have a lot -- I just read 483s and established
20   inspection reports and letters.
21   Q.    And so this is no different. This is an
22   FDA document with a final conclusion and you have no
23   basis to disagree with it; correct?
24   A.    Not at present.
25   Q.    Okay. Thank you.

---

Page 168

1          MR. DEAN: Do you want to keep going or
2    do you want to take a short break?
3          MR. THOMPSON: I think we ought to take
4    a break as we go, you know.
5          MR. DEAN: I think we've been going
6    about an hour. Let's take a short break.
7          I don't want to take a long one.
8          MR. THOMPSON: Sure.
9          MR. DEAN: Let's go off the record.
10         VIDEO OPERATOR: Going off the video
11   record.
12         The time is 2:06 p.m.
13         (A recess was taken from 2:06 p.m. to
14   2:16 p.m.)
15         VIDEO OPERATOR: We are now back on the
16   video record.
17         This is the start of Tape 4.
18         The time is 2:16 p.m.
19   BY MR. DEAN:
20   Q.    Dr. Frank, in regard to Exhibit 87,
21   we've -- before we broke, you agreed that this
22   provided relevant information on the status of the
23   adverse event reporting at Actavis; correct?
24         MR. THOMPSON: Object to the form.
25         THE WITNESS: I think it's an important

---

Page 169

1    piece of information that I would have liked to have
2    had when I -- when I came up with the conclusion.
3          I'd like to put it in context with the
4    decision to move pharmacovigilance from Totowa to
5    Elizabeth, because Elizabeth apparently was compliant.
6          Remember I told you about that NAI
7    inspection. It's a very, very important piece of
8    information that could -- it clearly has a material
9    impact on the analysis. I cannot immediately put it
10   in context with the overall picture.
11         I'm assuming that you're going to
12   continue to present me with further information that's
13   extremely important to the assessment. But I do not
14   deny that this is important.
15   BY MR. DEAN:
16   Q.    Well, your first conclusion -- your
17   first basic conclusion, as I understand your summary
18   of your report, was that there were -- it's not clear
19   that there were appropriate pharmacovigilance
20   procedures in place at Actavis Totowa; is that your --
21   a fair summary of one of your primary conclusions?
22   A.    The original assessment in the response
23   letter talked about the inadequacies of the
24   interpretation of the regulations and an
25   implementation of the procedures.

43 (Pages 166 to 169)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

---

Page 170

1   Q.   Now, let me interrupt you. I'm not
2   talking about what was in the letter. I'm talking
3   about the summary you gave me this morning about the
4   two key points you were --
5   A.   Yes.
6   Q.   -- trying to make in your report.
7        And one, I think, was the adequacy of
8   the pharmacovigilance procedures and its impact on
9   signal detection and that you were asked to evaluate
10  the system that was in place; correct?
11  A.   As much as possible, yes.
12  Q.   And would you agree that this document
13  establishes, at least in the eyes of the FDA as of
14  January of 2007, that appropriate procedures were in
15  place?
16       MR. THOMPSON: Object to form. I think
17  it mischaracterizes the document.
18       THE WITNESS: It establishes that
19  appropriate corrective actions were presented to the
20  agency and that the revised procedures were
21  satisfactory.
22       But it does not establish that there
23  were satisfactory procedures in place during the total
24  period affected.
25  BY MR. DEAN:

---

Page 171

1   Q.   Well, your opinion about inappropriate
2   procedures was based upon -- primarily upon the series
3   of 483s and warning letters in regard to
4   pharmacovigilance, wasn't it?
5   A.   Yes. The assessment I made was only on
6   what I was provided in the 483s and Establishment
7   Inspection Reports and responses.
8   Q.   And so the primary -- that was the
9   primary basis. And now you see Exhibit 87 for the
10  first time which gives the FDA's final response to
11  that series of observations and warning letters.
12       And my question to you is --
13       MR. THOMPSON: Object to the form.
14  BY MR. DEAN:
15  Q.   -- would you like to revise your opinion
16  stated in your report about the adequacy of the
17  procedures at Actavis for pharmacovigilance reporting?
18  A.   I think that there were definite issues
19  uncovered during the 2006 inspection. There was a
20  shift from 2003, which was NAI, to 2006. And then
21  there was a response letter talking about
22  inappropriate interpretation.
23       I think -- I think the important thing
24  is to look at the actual wording. But the February
25  8th, 2006 response talks about problems with

---

Page 172

1   interpretation of the regulations.
2        And I believe the specifics were in
3   actually assessing 15-day alerts.
4        I think everything was stamped as a
5   15-day alert and sent in without assessment of
6   seriousness or expectedness. There were issues
7   documented at the inspection and by the response
8   letters that required the corrective actions.
9   Q.   Here's my question. It's a very simple
10  question. Would you like to revise your opinion in
11  light of Exhibit 87?
12  A.   I can't completely because they required
13  corrective actions, which implies deficiencies, either
14  in the procedures or in the compliance with the
15  procedures.
16       So there was an issue that required
17  corrective action and required the revision of the
18  procedure.
19       It's the revised procedures that are
20  satisfactory, not the ones that were revised. Not the
21  baseline.
22       So I have to be very, very careful and
23  think -- I mean, for me to completely revoke
24  everything looking at one letter and not sitting down
25  and carefully analyzing it is a little dangerous.

---

Page 173

1        It's as dangerous as making an opinion
2   on inadequate information.
3        Because this -- the fact that there were
4   corrective actions and procedures that were revised
5   implies that there were problems that required the
6   corrective actions in the revision. The FDA was okay
7   with their plan.
8        We do not know because we don't have the
9   FDA confirmation of the adequacy of the corrective
10  actions in a future inspection.
11       If, indeed, this 2008 inspection that
12  had me concerned correlates to this confirmation, then
13  we have some observations consistent with inadequate
14  implementation of this plan that they approved.
15       So right now, this is very, very
16  important.
17  Q.   This being 87?
18  A.   And potentially would modify it.
19  Q.   Number 87.
20  A.   But I still see that it's a -- it's a --
21  still a complex and confusing chain of events where a
22  company was on consent decree, they came off, they had
23  apparently clean inspection in 2003, and then things
24  started to happen that required corrective action.
25       Do we know that it was corrected, or was

44 (Pages 170 to 173)

Page 174

1   it corrected all by transferring to Elizabeth? I
2   can't answer that at the moment.
3        Q.   Is it fair to say that Exhibit 87 raises
4   significant questions in your mind as to the -- as to
5   your opinion and that you would need more time to
6   think about the issues and look at the underlying
7   documents in order to stay and maintain with your
8   opinion?
9        MR. THOMPSON:  Object to the form.
10       THE WITNESS:  I would like to be able to
11   include all of this new, important evidence in a
12   revised opinion and revise the white space.  Because
13   there could be more vulnerabilities.
14       And I hope that's not too much of a
15   hedge.  But, yes, this should be incorporated into the
16   -- into the opinion, but with very careful analysis.
17   BY MR. DEAN:
18       Q.   Now, is it fair to say that as of
19   January 3, 2007, the actual MedWatch reports that were
20   mentioned in the 483 and the warning letter, isn't it
21   clear that those had been submitted to the
22   satisfaction of the FDA for this letter?
23       A.   This is where I got really --
24       Q.   Isn't that clear to you?
25       A.   It's not clear based on the totality of

Page 175

1   the evidence.  And it might be -- I want to show you
2   why, if I can find quickly.  I can't search this
3   electronically, but it's back in the 2008.
4        I saw their agreement with the FDA for
5   the remediation of the lack of compliance with the
6   U.S. Periodic Reports.  And that was approved, I
7   think, actually by Washington.  I should clarify that.
8        But there's a statement back here, and I
9   think it was the closeout, the minutes of the closeout
10   meeting, where they're going back and talking about
11   submitting reports from 2006.
12       And I went -- that's when I really got
13   worried and I do not yet have a clear picture of the
14   events from 2006 to 2008.
15       Why are they confronting them in 2006 --
16   in 2008 about reports that were to have been submitted
17   as part of the remediation in 2006, and the company is
18   making a statement about not sure how far back they
19   would go.
20       I have no insight to that.
21       I know that they initially did not want
22   to remediate anywhere before they acquired, and I
23   don't have a lot of insight into the regulatory risk
24   decisions that were being made or why they're saying
25   they have to discuss internally what will be

Page 176

1   submitted.
2        I can't tell you based on what I've seen
3   if this initial satisfactory answer does not have to
4   be modified based on what happened in 2007 with the
5   confirmatory inspection.  I'm sorry.
6        Q.   You've told us before, if I'm correct,
7   that it's -- you were uncomfortable in your role in
8   this case because you didn't have full information and
9   that it was -- I think your words were, it was
10   dangerous to make an opinion based upon inadequate
11   information.Do you agree with that?
12       MR. THOMPSON:  Object to the form.
13       THE WITNESS:  I think -- I actually
14   think I said that.  It may have been a mistake to say
15   it.  I think part of it is -- I do.
16   BY MR. DEAN:
17       Q.   You agree that you said that; right?
18       A.   Yes.
19       Q.   And isn't that exactly where we're at
20   here because you're saying that there -- that Exhibit
21   87 raises significant questions, but you have
22   inadequate information to totally evaluate the impact
23   of Exhibit 87?  Is that fair?
24       A.   Yeah, I think --
25       Q.   Is that fair?

Page 177

1        A.   I think at that point I was provided
2   information and I discussed this with counsel.  What
3   if they -- I have all of these questions, and I think
4   there's information out there that they will present
5   to me.
6        What happens -- and I asked this at the
7   June 2nd meeting of Megan Carter.  What happens if I'm
8   provided information that is material and requires me
9   to modify my position?
10       They said, we'll take it and revise the
11   position, but we want a preliminary assessment.
12       Q.   Do you understand that these opinions
13   have been filed with the court?
14       A.   Yes.  I talked to them about this.
15       Q.   Were you concerned about that?
16       A.   Yes.  I expressed that.
17       Q.   And was your concern that you didn't
18   have enough information on which to base an informed
19   opinion?  Was that your concern?
20       A.   I was concerned that I had incomplete
21   information where I would be vulnerable to being
22   presented with further information that could lead me
23   to modify my opinion.
24       Q.   And it turns out that that's happened
25   and that you may well want to modify your opinion; is

45 (Pages 174 to 177)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 178

1  that correct?
2      A.  Possibly.
3      Q.  Okay.
4      A.  But the -- this does not yet explain
5  away the 2008 observations and the statements that the
6  company employee made about persistent nonreporting of
7  cases in 2006.
8          So while it's material, I don't think it
9  can completely negate because --
10     Q.  Let's -- I'm sorry.  You go ahead and
11 finish.  I want to talk about that in a minute, but I
12 want you to finish.
13     A.  What is distilled down was 2006, the
14 remediation program, and persistent observations in
15 2008, and this unexplained comment about submission of
16 cases that apparently were to have been submitted as
17 part of the 2006 remediation.
18         So that is still -- and here I'm coming
19 back to this, I asked them -- I told them this
20 specifically, I said, this would be the basis of my
21 opinion.  And yet, all of this has not been taken into
22 account.  Should I proceed with this?
23         I asked them very seriously what
24 constitutes adequate documentation for the opinion,
25 how much they can provide for me, how can -- how much

Page 179

1  I can request on any further discovery?
2          I asked for a lot of guidance, and I
3  trust that they gave it to me appropriately, is in
4  taking the information they gave to me, what
5  constituted a legitimate opinion before this was
6  filed.
7          This was not done haphazardly.  I
8  actually tried my best to render an opinion based on
9  what I was granted.
10     Q.  But, as we sit here today, you are --
11 the fact of the matter is, you -- at the time you
12 rendered it, you were concerned about inadequate
13 information.
14         And now, as we sit here today, you have
15 an even greater concern about inadequate information
16 being provided to you in order to formulate this
17 report; isn't that true?
18     MR. THOMPSON:  Object to the form.
19     THE WITNESS:  You've provided me exactly
20 what I anticipated might happen and what I raised to
21 the people that hired me and asked me to do this
22 analysis for them.  This is not unexpected.
23         And I asked them how I should handle it
24 and the risk and how I should respond to it when it
25 occurred.  And they said, what you do is you take

Page 180

1  this -- we have to take this and revise the opinion.
2          If I was given advice, please forgive my
3  naivete, but I really made an attempt to deliver a --
4  an adequate expert witness opinion given the
5  circumstances.
6  BY MR. DEAN:
7      Q.  Dr. Frank, isn't it fair to say that you
8  are no longer comfortable in much of the information
9  in your report?
10     MR. THOMPSON:  Object to the form.
11     THE WITNESS:  I think it requires
12 revision based on new evidence.  Yes, I'm -- I -- I
13 think there's some things, such as the point -- time
14 point in 2006 and the time point in 2008, that says
15 there were problems with that.
16         But I still do not have any real insight
17 into the QSIP, and I only have a few observations in
18 2008.
19         And, yes, I think there's a great deal
20 -- I think the -- I think that the comments on
21 individual observations probably refer well back to
22 the individual observations.
23         But the absolute conclusions probably
24 need to be modified based on the evidence that you've
25 provided me.

Page 181

1  BY MR. DEAN:
2      Q.  And while I recognize -- while
3  recognizing that the preparation of a report is an
4  ongoing process, did you -- were you informed that the
5  report that was filed with the Court was supposed to
6  be a final report?
7          Were you ever told that?
8      A.  I was told the deadline and I was told
9  it would be reviewed.  And I asked what I would do in
10 this scenario.  And I did have some discussion of the
11 risk of this occurring.
12         I assumed -- I -- no, I completely
13 anticipated you would do this.
14         This is why I'm receptive to it, and I'm
15 very, very careful to look at it analytically to -- to
16 accept what has to be accepted, but not to be foolish
17 and under a state of anxiety back down when I need to
18 be careful and analytical.
19         I can err in either direction in this
20 setting and I want to be very, very cautious.
21     Q.  Let's go to Page -- go back to Page 5 --
22     A.  Okay.
23     Q.  -- in the one, two -- third paragraph.
24     A.  Yes.
25     Q.  I want to get on to this reference to

46 (Pages 178 to 181)

Page 182

1    Mr. Delicato in 2008 that you've mentioned before and
2    try to get into the right set of documents and ask you
3    some questions on that topic.  Okay?
4        A.    That's fine.
5        Q.    Now, I think it's in the second sentence
6    of that paragraph.
7             It says, In addition, there are
8    implications of the FDA observation that, quote,
9    Mr. Delicato stated that unreported cases from January
10   and February 2006 would be submitted to the FDA.
11            However, Mr. Delicato informed me that
12   they did not have a definitive answer to how far back
13   they would go in reviewing unreported cases.  He said
14   they would include this information in their written
15   response to the New Jersey District.
16            What -- is that a -- so that's from
17   Reference 15; is that right?
18       A.    And it's in quotations and it's very
19   carefully placed there.
20       Q.    Hang on.  Let me see what 15 is.  Okay.
21            So 15 is a May 2000 -- May 21, 2008 FDA
22   inspection report; correct?
23       A.    Yes.
24       Q.    All right.  So let's get that in front
25   of us.

Page 183

1             I am handing you, Dr. Frank, what's
2    been --
3             VIDEO OPERATOR:  Your microphone.
4             MR. DEAN:  Sorry.  Thank you.
5    BY MR. DEAN:
6        Q.    Dr. Frank, I'm handing you what has
7    previously been marked as Defendant's Exhibit 62.
8             And the first page of this is a letter
9    from the FDA to Mr. Delicato, but attached to that is,
10   I believe -- will you agree attached to that is the
11   May 21, 2008 report that you're referencing?
12            Are we talking about the same document?
13       A.    Yes.  May 21, Reference 15.  This is --
14   Reference 15, Page 8.  Well, Reference 15 in my
15   bibliography is an FDA 483.
16       Q.    Oh, I'm sorry.
17       A.    No.  This may be my error and the fact
18   that I had to redo this bibliography in short order
19   because we merged the documents.
20       Q.    I -- well, let's -- this exhibit, we can
21   agree, is the EIR from May 21, 2008 inspection;
22   correct?
23       A.    Yes.
24       Q.    And so you're saying your reference --
25   and, in fairness, Dr. Frank, on the top of Page 3 of

Page 184

1    15 of this document, it says, On May 21, 2008, I
2    issued a Form 483 inspectional observations to
3    Mr. Delicato.
4             So it looks like there was a 483 issued
5    that day, and the Establishment Inspection Report, I
6    don't know when it was prepared, but, obviously, there
7    was an inspection that day that resulted in the 483
8    and the generation of this -- the EIR.
9             Would you agree with me there?
10       A.    Yes.  And there's also May 20th closeout
11   minutes from which they may have been taken.
12       Q.    Now, do you know -- well, first of all,
13   can we find -- I'd like to find where you're quoting
14   Mr. Delicato.
15            Would that be in a 483 or would that --
16       A.    No.  That's why --
17       Q.    That's probably going to be in the EIR,
18   isn't it?
19       A.    Or in the May 20th closeout minutes.
20   They met with management the day before they issued
21   the 483.  There's -- it's May 20th, 2008.  And there
22   was some background in there, and I think there was
23   that statement.
24       Q.    Can you find -- let's see if you and I
25   can find this statement.

Page 185

1        A.    I don't know the background of it,
2    that's why it concerned me.
3             MR. THOMPSON:  Is it important for us to
4    hunt through, or can I point you all on it?
5             MR. DEAN:  Yes, if you've got it.  No,
6    show me.
7             MR. THOMPSON:  It's on Page 8 of 15,
8    right at the end of that long redaction.
9             MR. DEAN:  Thank you, Fred.
10   BY MR. DEAN:
11       Q.    Do you see that now?
12       A.    Yes.  And it was at the closeout meeting
13   that he stated this.  I have no information as to the
14   background of that.
15            But there's apparently still unreported
16   cases from January, February of 2006, which seemed
17   unusual because they did aggregate -- they had -- they
18   had --
19       Q.    Let me stop you.  You're talking about a
20   closeout meeting -- strike that.
21            There was a closeout meeting in regard
22   to Digitek for Actavis Totowa; correct?
23       A.    There was an inspection in Actavis
24   Totowa from April 21st to May 25th, and I believe it
25   covered more than Digitek.

47 (Pages 182 to 185)

Page 186

1    I have no way to know whether these
2 cases, unreported cases, were Digitek or another
3 product or the impact on the Digitek case.
4    There's cases that were supposed to be
5 part of the remediation. Apparently, they're not
6 submitted. I don't know what they are.
7    I don't know whether there was
8 regulatory risk decision taken by the company. But
9 this statement -- am I talking too much?
10   Q.   No, no. I think we're actually getting
11 to the bottom of this. I think we're going to get
12 there in a minute.
13        So you -- you don't -- first of all, on
14 the quote here on the bottom of Page 8, you don't know
15 whether any of those related to Digitek, we can agree
16 on that?
17   A.   No.
18   Q.   Pardon me?
19   A.   Very little of the information --
20   Q.   Can we agree on that?
21   A.   Yes, we agree on that.
22   Q.   And if you turn the page to Page 9 of
23 15, would you agree that there is, again, reference to
24 the Denmark site forwarding reports to the Elizabeth
25 site and for processing submission to the FDA?

Page 187

1        That's what it says, doesn't it?
2    A.   This is the bulk submission from 2000,
3 July and August. That was the implementation of the
4 March 1st MHRA agreement. Yes, that is what that is.
5    Q.   Do you know one way or another whether
6 this exhibit and its observations of AERS, do you
7 know whether it is solely focused on foreign adverse
8 reaction reporting?
9    A.   If you're talking about B here?
10   Q.   I'm talking about Exhibit 62. I'm
11 talking about the EIR, dated May 21, 2008, submitted
12 to Actavis Elizabeth, LLC.
13   A.   No. I do not know whether this is all
14 foreign reporting. I think that --
15   Q.   Let me ask you this, then. Are you
16 aware that there was also, I think, an Establishment
17 Inspection Report on Actavis Totowa dated May 20th?
18        Have you ever seen that?
19   A.   Yes. I have those two inspections that
20 occurred simultaneously, and I spent a fair amount of
21 time sorting between the two of them.
22   Q.   Okay. But the one you quoted from is --
23 the one you quoted from on Page 5 of Mr. Delicato is
24 from the --
25   A.   Yes.

Page 188

1    Q.   -- May 21 inspection of Actavis
2 Elizabeth.
3        We can agree on that; correct?
4    A.   Yes.
5    Q.   And you've already told me you don't
6 know whether the events that are being described in
7 here are simply related to foreign reporting or not,
8 you just don't know one way or another?
9    A.   Well, the foreign reporting they're
10 talking about the July 2006 and August. This is when
11 Denmark sent them a bulk of cases. Probably most of
12 them should have been in March and April. But I can't
13 -- I don't know about the distribution.
14        But then they're going back and talking
15 about late cases. And there's -- the information in
16 here, there may be information in the coding that
17 tells -- the case code that tells whether they're a
18 foreign report.
19        But I don't know enough about the case
20 codes to tell.
21   Q.   And all this -- on Page 8, all this
22 really says is that Mr. Delicato said at the closeout
23 meeting of the Actavis Elizabeth inspection that they
24 did not have a definitive answer as to how far back
25 they would go in reviewing unreported cases.

Page 189

1        It wasn't a submission issue, it was a
2 review issue; is that right? Is that the way you read
3 it?
4    A.   Well --
5    Q.   Take your time. I want to be fair.
6    A.   There was something else that was left
7 outstanding in my mind, and I --
8    Q.   First -- I want to get to that. But,
9 first of all, is it fair to say that this comment
10 reflects that everything had been submitted, but there
11 was just an issue as to how far back they would go in
12 reviewing those cases?
13   A.   The way he stated it, there were still
14 unreported cases outstanding from January and February
15 2006. I don't know whether they're foreign. I don't
16 know whether they're U.S.
17        I don't know whether there were cases
18 that were cited in the inspection report or -- there's
19 no specifics.
20   Q.   Okay. All right.
21   A.   I can't -- I can't state that. And I
22 don't know what the how far back means.
23        I had an outstanding question in my mind
24 that the acquiring company really did not want to put
25 resources into remediation of issues that existed

48 (Pages 186 to 189)

Page 190

1  before the time of the acquisition, and they were
2  attempting to negotiate this with the health
3  authorities.
4        If I did not adequately document that in
5  my report, I stand corrected. But there was still
6  some question in my mind whether they were making
7  calculated regulatory risk decisions.
8        And that, when he said how far they were
9  willing to go back, I can't comment any farther on
10  that.
11     Q.    You don't -- again, this is an area, in
12  your mind, where there's missing information; is that
13  fair to say?
14        Is that yes?
15     A.    Yes.
16     Q.    Now, and you are also -- you are unaware
17  as to whether subsequent to that comment what follow-
18  up there may have been and what the regulatory
19  response may have been in regard to that observation;
20  is that fair?
21     A.    I have not seen any subsequent
22  documentation to give further insight into these --
23  into this.
24     Q.    So that's more missing information;
25  correct?

Page 191

1     A.    Yes.
2     Q.    Okay. Dr. Frank, as of January 3, 2007
3  when Exhibit 87 was issued, are you aware of any
4  unreported MedWatch report on Digitek?
5     A.    There are inspection observations prior
6  to that, 2007.
7     Q.    Listen to my -- listen to my question.
8     A.    Yes.
9     Q.    I know that we've talked about issues
10  that they had in 2006.
11        My question is, as of January 3, 2007,
12  are you aware of an unreported MedWatch report in
13  regard to Digitek?
14     A.    That's a very important question, but
15  there's a couple different ways to interpret it.
16     Q.    Well, are you aware of the existence of
17  such a report?
18     A.    I'm aware of unreported cases in the
19  initial inspection observations. I'm aware of the
20  agreements.
21        But I don't have any kind of
22  documentation that allows me to track the cases in the
23  inspection observations with the remediation and
24  submissions.
25     Q.    So --

Page 192

1     A.    I can't tell you whether the
2  implementation of the -- of the remediation -- and
3  there may be -- there could be blanket statements, and
4  I'm just not -- I'm trying to be really accurate here.
5     Q.    And that's fine.
6     A.    There could be statements that somebody
7  said, yes, it was adequate, but I can't go through
8  here quickly and find them.
9     Q.    And my question is, are these -- I asked
10  you whether you were aware of any set of circumstances
11  which should have been reported as a MedWatch, which
12  wasn't as of this date, and you referenced the later
13  observations in the 2008 inspection; right?
14     A.    They're the ones in which I was
15  concerned about.
16     Q.    If you put those -- if you put those
17  aside for the moment because we just talked about
18  those --
19     A.    Yes.
20     Q.    -- and you already told us you're not
21  sure whether those are Digitek or not; right?
22     A.    Absolutely.
23     Q.    So put -- so we've explored, I think,
24  Exhibit 62.
25        So if you put it aside for the moment,

Page 193

1  are you aware of any unreported set of circumstances
2  that would give rise -- should have given rise to a
3  MedWatch report in regard to Digitek as of January 3,
4  2007?
5     A.    No. The only --
6     Q.    Was that a --
7     A.    That was a no. The only observations we
8  have are the inspection reports, 2006, and the repeat
9  inspection. My information does not allow me to track
10  the actions of Actavis in fulfilling the response
11  letters.
12     Q.    So you can't testify, as of any point of
13  time after January 2007, that there was a set of
14  circumstances that should have been in a MedWatch
15  report that was not reported; you just don't have an
16  appropriate information base to do that, do you?
17     A.    There were specific cases in 2008 in
18  this. They were Digoxin. I don't know whether they
19  were Digitek.
20     Q.    You don't know?
21     A.    It's Digoxin, but I think they have some
22  sort of XUS Digoxin that I'm not to take into account.
23     Q.    You are in --
24        MR. DEAN: For the record, the witness
25  is in Exhibit 62 now.

49 (Pages 190 to 193)

Page 194

1      THE WITNESS: Yes.
2  BY MR. DEAN:
3      Q.    And there's reference on what page to
4  Digoxin?
5      A.    This is Page 9 out of 15, and there's
6  clearly a Digoxin case there.
7      Q.    Right.
8      A.    But it's not brand Digitek. And I don't
9  have any -- I didn't get any written documentation
10  that -- I know they have from the -- from some of the
11  other depositions, they have XUS Digoxin, but it's not
12  Digitek.
13      And I repeatedly clarified whether XUS
14  cases should be brought into this assessment, and I've
15  been told no. Okay.
16      Q.    And just for the purposes of time here,
17  you don't know whether this reference on Page 9 of 15,
18  whether that reference to Digoxin tablets references
19  Digitek or not, do you?
20      A.    No. We need to know this case number.
21  That will code the country of origin of the case.
22      So it is possible to tell whether that's
23  a U.S. case that was just reported as the generic and
24  should be taken into account, or whether it's
25  potentially an XUS case.

Page 195

1      Q.    So, as you sit here today, you're not
2  aware of any -- you don't have any specific facts that
3  there was a set of circumstances in regard to Digitek
4  after January 3, 2007, which was not appropriately
5  reported in a MedWatch; is that correct?
6      A.    The only thing that I have are these
7  inspection reports.
8      Q.    Being --
9      A.    And my answer at this point, my
10  preliminary answer is, no, I cannot identify it from
11  memory.
12      Q.    Let's go on to another topic here.
13      Are you done with that one? Yes, let's
14  get those out of your way.
15      A.    Okay.
16      Q.    One of the topics you address in your
17  report is the -- what I will call the recall
18  communications.
19      A.    I was asked to specifically look at
20  those and the change in the patient population at
21  risk.
22      And I was provided the attorney's
23  initial assessment that from the -- from the Health
24  Hazard Assessment to the letter to the customers to --
25  which are the business customers, which is Mylan, to

Page 196

1  the press releases to the public, there was a change
2  in risk population.
3      I brought up the issue that at least in
4  writing informed consents in clinical trials, we write
5  to a fourth- to fifth-grade comprehension level.
6      And that when they wrote the press
7  release, there may have been that process to modify
8  the communication. I did not put that in my report.
9      But what I did was, I tracked the
10  changes in patient population, which did change from
11  the Health Hazard Assessment to the final
12  communication, and the changes in the patient
13  population at risk, and I commented on that.
14      I was asked to comment, and I thought
15  there was clearly a change and it clearly changed the
16  total patient population that would be warned. And
17  that's pretty carefully documented, those changes with
18  quotes.
19      I did not speculate on why it was done,
20  on any data that would have supported the removal,
21  because I had no access to that.
22      But they did go from a larger patient
23  population at risk to a smaller patient population at
24  risk by the time they released the press release.
25      Q.    Okay. First of all, would you agree in

Page 197

1  terms of the recall communication, it was clear to
2  everyone that the company wanted the product back and
3  off the market and no one should be taking it?
4      A.    Yes.
5      Q.    Okay.
6      A.    A recall is a recall.
7      Q.    Right.
8      So anyone who, whether they were a
9  patient, a pharmacist, a doctor, they would have
10  gotten that message; correct?
11      A.    Yes.
12      Q.    Okay.
13      A.    With patients.
14      Q.    Now -- were you finished?
15      A.    Well, yes. If you hear about a recall
16  drug, it's a recall drug.
17      Q.    All right. Fair enough.
18      A.    The people who are -- a recall drug is a
19  recall drug, but there's a change in the level of
20  alarm. To some patient populations, it was
21  downplayed. It was removed. But a recall is a
22  recall.
23      Q.    All right. So then would you also
24  agree, from your experience with the FDA, that the FDA
25  approved all recall communications before they were

50 (Pages 194 to 197)

Page 198

1  issued?
2       Would you agree with that?
3       A.    The FDA inspectors were very, very
4  concerned about not having received final copies of
5  the recall letters.
6       Q.    Well, my question is, before these
7  letters went out to the various recipients, is it your
8  understanding -- and maybe you don't have an
9  understanding, but my question to you is, is it your
10 understanding that the FDA would have approved the
11 substance, not just the substance, would have approved
12 in its entirety the press release, the communication
13 to pharmacies, the communication -- any communication
14 that was sent out about the recall?
15      Is it your understanding the FDA would
16 have approved that?
17      A.    Yes.
18      Q.    Okay.  Now, you --
19      A.    I hope that that actually did occur in
20 this case, but I can't -- perhaps I should have gone
21 back in a very detailed analysis, but I don't think
22 there is.
23      I think there was a concern about the
24 delay in the recall procedures and the delay in
25 providing final reports.  But, yes, the FDA should

Page 199

1  have approved what was released.
2       (Discussion off the record.)
3       THE WITNESS:  It would be in the May
4  20th meeting closeout.  I'm pretty sure it was the
5  meeting closeout --
6       MR. DEAN:  Thank you.
7       THE WITNESS:  -- because they became --
8       MR. THOMPSON:  This is mine.  You gave
9  this to me.
10      MR. DEAN:  You keep it.
11      MR. THOMPSON:  I'm happy to put it back
12 into play, but I don't want to be accused of
13 swallowing a copy.
14 BY MR. DEAN:
15      Q.    Your criticism on the difference in the
16 communication of information about various groups is
17 set out in your report, is that right, on the recall
18 communication?
19      A.    Yes.
20      Q.    Do you remember the substance of that --
21 of that?
22      A.    It's in this document.  I mean, I was
23 asked specifically to comment on certain issues,
24 particularly the change in renal insufficiency to
25 renal failure.

Page 200

1       And that's where I made the question
2  that that could be an artifact of the review of
3  something being written to a fourth- to fifth-grade
4  level.
5       I don't know about press releases to the
6  general public, whether they have the same
7  requirements as the informed consent to clinical
8  trial.
9       So we talked about that with the renal
10 insufficiency.  We talked about the removal of the
11 once daily dosing.
12      And then I brought up the third change
13 in the -- in the press release, because the Health
14 Hazard Assessment said lack of efficacy with
15 exacerbation, and that was omitted.
16      So there were three changes, daily
17 dosing, renal insufficiency and lack of efficacy were
18 distilled down to renal failure.
19      Yes, you're correct, that could have
20 been done in negotiations with the FDA.  In light --
21 in light of that FDA document that says there was no
22 risk to public health, there may be background to
23 this.
24      But there were three changes.  And it
25 does change the direct communication to the patient

Page 201

1  population at risk.
2       Q.    Let me hand you what we marked as 37.
3       A.    Okay.
4       MR. DEAN:  Fred.
5  BY MR. DEAN:
6       Q.    Have you ever -- have you seen Exhibit
7  37 before?
8       A.    Yes.
9       Q.    Okay.
10      A.    This was -- this was the basis on which
11 I tracked -- I was asked to track the changes and
12 comment whether there were change in the populations
13 described from one communication to the next.
14      Q.    And one of these communications went out
15 on April 25th; is that right?
16      A.    Yes.
17      Q.    And can you direct us to that?
18      A.    That's 28213.  That's the press release.
19      Q.    And is it your understanding that that
20 was issued on April 25?
21      A.    Yes.
22      Q.    And --
23      A.    I cannot comment at this point in time
24 the relationship between this release and the FDA
25 approval or any impact of the FDA review on the

51 (Pages 198 to 201)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

---

Page 202

```
 1    changes.
 2        Q.    Now, your point is, if I understand, the
 3    point -- the basic point in your report is that on
 4    this April 25 press release, it mentioned a renal
 5    failure, and several days later different
 6    communication was conveyed to pharmacies; is that
 7    correct?
 8        A.    Well --
 9        Q.    Is that one of your basic points?
10        A.    I have this packet of communications.
11        Q.    Right.
12        A.    I have nothing else.  When one stops a
13    clinical trial such as the WHI, there are letters that
14    go out to the doctors, the patients, the study
15    coordinators.
16            I do not know whether that is a standard
17    in a drug recall like this.  These are two different
18    situations.
19        Q.    Right.
20        A.    But I don't have any letters directly to
21    patients or directly to doctors.  I have only this.
22        Q.    Okay.
23        A.    I have a Health Hazard Assessment, I
24    have a communication to Mylan, which never, to my
25    knowledge, reached the public except in this exhibit,
```

Page 203

```
 1    and then there's a press release that went out.
 2            So I was asked specifically to comment
 3    on the changes from A to B to C, and what the patients
 4    and the doctors saw as far as the scope of the risk of
 5    the defect.  I agree with you that a recall is a
 6    recall.
 7        Q.    Okay.  So --
 8        A.    But there was granularity omitted from
 9    the press release and the question is why.
10        Q.    Right.
11            And so when you said A to B to C, A
12    would be -- the first thing in the sequence would be
13    the press release on April 25; right?
14            And then what is B and C in terms of
15    your last answer?
16        A.    The press release was on the 28th.  The
17    internal communication to Mylan was on --
18        Q.    Excuse me.  The press -- or the news
19    release --
20        A.    I'm sorry.  The Health Hazard Assessment
21    was the 28th.  Is -- no, the 18th.  The Health Hazard
22    Assessment was the 18th.  I think it was sent over on
23    the 25th.  The cover letter was the 25th.
24        Q.    Okay.
25        A.    The press release was also on the 25th.
```

Page 204

```
 1        Q.    Right.
 2            And then --
 3        A.    And then the internal letter went out
 4    subsequently.  Now, I would have -- I don't know about
 5    the receipt date.  I think the cover letter -- you can
 6    check the cover letter on the Health Hazard
 7    Assessment.
 8        Q.    We will in a minute.
 9            What was the follow-up -- there was a
10    follow-up letter that I think you referenced in your
11    report after the press release.  Was it the Dear
12    Valued Customer letter?
13        A.    That's the 28th.  That's an internal
14    communication.
15        Q.    What's the Bates number page there,
16    Dr. Frank?
17        A.    It's 28208.
18        Q.    So in the April 25 press release, it
19    simply references renal failure.
20            But in the April 28 Dear Valued Customer
21    letter, it talks about patients taking daily doses or
22    patients with renal insufficiency; correct?
23        A.    Yes.
24        Q.    And you believe that's more detailed
25    information that was not contained in the press
```

Page 205

```
 1    release; correct?
 2        A.    Well, it is more detailed.  But it
 3    changes the population at risk.  So the press release
 4    -- and this is where I was -- I was asked to comment
 5    on certain things.
 6            I was asked to analyze evidence to
 7    support two observations when I was asked to do this.
 8            One was the systemic issues of
 9    pharmacovigilance on signal detection and the other
10    are these changes from one to the next.  And that's
11    what I did.
12            I'll admit, this wasn't sequential.
13    This actually was a later date than the press
14    release.  I will -- yes, you're correct on that.
15        Q.    Which is -- which is -- what date is on
16    that?
17        A.    This is the Dear Valued Customer.
18        Q.    Right.
19        A.    And I questioned what the customer was,
20    and I was told that was internal.  That did not go out
21    to the patients, to my knowledge.
22        Q.    And so what you're suggesting is, I
23    think, that the company had information on April 25
24    that it didn't put in the press release that it did
25    put in the April 28 letter; is that correct?
```

52 (Pages 202 to 205)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

Page 206

1    A.    Yes. The internal communications show a
2  broader patient population at risk than the
3  communication to the public.
4    Q.    And you said that while the -- before
5  you mentioned that while the Health Hazard Evaluation
6  report was done on April the 18th, you said it -- I
7  think you said you were right that it was transmitted
8  on April the 25th; correct?
9        Is that your recollection?
10    A.    There should be a cover letter. And, as
11  I recall, it's the 25th, and I went, why did it take
12  so long to transmit something that was written on the
13  18th? But the April 18th is something I reiterated in
14  the document.
15    Q.    Well, your memory is actually very good,
16  Doctor.
17        I'm putting in front of you Exhibit
18  220 --
19    A.    Yes.
20    Q.    -- which is that cover letter from
21  Dr. Leikin's group to Sarita Thapar; correct?
22    A.    Uh-huh.
23    Q.    And it's dated April the 25th; correct?
24    A.    Yes.
25    Q.    And can you -- and for the record, how

Page 207

1  was that letter sent?
2    A.    Overnight Federal Express. So it
3  arrived on the 26th.
4    Q.    So it arrived on the 26th; correct?
5    A.    Yes.
6    Q.    So on April the 25th, when the press
7  release was issued, the information in the Health
8  Hazard Evaluation had not been received, had it?
9    A.    Unless there was an additional faxed
10  copy and this was the follow-up hard copy.
11    Q.    And -- but you -- again, that's an area
12  where you don't have information; correct?
13    A.    No. And I did not -- I knew that letter
14  was the 25th, but I -- I did not connect the fact that
15  the press release went out the day before that would
16  have been received if that was the only copy.
17    Q.    And can we also agree that in the Dear
18  Valued Customer letter, the information in here about
19  the two groups, about the daily dosage group and the
20  renal insufficiency group, that is contained in the
21  Dear Valued Customer letter on the 28th, isn't it?
22    A.    I need to look at this again before I
23  answer.
24    Q.    Sure. Take your time. It's 28208.
25    A.    28208.

Page 208

1        (Witness reviews document.) It has
2  toxicity -- daily doses or renal insufficiency, and it
3  contains the lack of efficacy. Yes, I think this one
4  tracked verbatim to the Health Hazard Assessment.
5    Q.    So this, the Dear Valued Customer
6  letter, tracked the information contained in the
7  Health Hazard Evaluation report that was transmitted
8  to Actavis on April 25 by Federal Express; correct?
9    A.    Yes.
10    Q.    Okay. But you didn't -- when you were
11  doing your review, you didn't link that up in your
12  mind, did you?
13    A.    I think I was operating on the
14  assumption that press release was made after
15  receipt of the Health Hazard Assessment or
16  communication of what was in the Health Hazard
17  Assessment.
18        And that may have been because I made
19  assumptions that I -- when I received this assignment,
20  I was asked to reply on a series. And I did not go
21  back.
22        I looked at these dates and I wondered
23  why that cover letter was dated the 18th, during --
24  the 25th and why the Health Hazard Assessment was the
25  18th, but I didn't go back and verify this. I -- and

Page 209

1  I don't know.
2        They may have issued the press release
3  before they got the Health Hazard Assessment based on
4  some sort of a preliminary analysis. Perhaps that
5  company internal document that I have not seen.
6    Q.    But from what you have seen and what we
7  have in front of us, anyway, today, when they issued
8  the press release on the 25th, they would not have had
9  the Health Hazard Evaluation; correct?
10    A.    Unless there was a copy faxed in
11  followed by the FedEx.
12    Q.    Okay.
13    A.    I actually -- I do not have
14  documentation of what the supporting documents were
15  for that press release.
16        The assumption was that the Health
17  Hazard Assessment from the 18th would have been
18  wrapped up into external communication for just these
19  issues.
20        But that -- that cover letter does beg
21  the question because it would have been received one
22  day after the press release.
23    Q.    At the bottom of Page 6 -- I'm back on
24  Exhibit 261, Dr. Frank.
25        The bottom of Page 6 there is a -- the

53 (Pages 206 to 209)

Karen A. Frank, M.D.      Videotaped           June 30, 2010

### Page 210

1   second sentence says there was a notable absence -- I
2   think you left out the word "of" -- absence of
3   oversight from a centralized headquarters function in
4   Iceland to track local compliance and exchange of
5   information between the U.S. and the EU affiliates.
6        What is the basis for that opinion?
7   A.   Okay.
8   Q.   First of all, what documentary -- what
9   documents do you have that are even relevant to that
10  issue?
11       Let's talk about that first.
12  A.   That's why there's an absence.
13       One of the things the health authorities
14  do in these drug withdrawal cases, for new adverse
15  events, say liver failure or torsade, if the health
16  authority identifies the issue before the company,
17  they go back to the company and say, why are we
18  telling you about a serious safety problem with your
19  drug?
20       The assumption is that the company
21  should have processes in place to identify the issue
22  first, and then go back and tell the health authority
23  it exists, and then the issue starts into a dialogue
24  of whether this drug has to come off the market.
25       This is conventional wisdom.  And I

### Page 211

1   didn't -- I don't want to document the cases where
2   this occurred.
3        But when I've worked at headquarters,
4   these international companies typically are
5   headquarters holding companies, and each country level
6   affiliate is an independent company under the holding
7   company, and they operate in conjunction with local
8   regulations.
9        Headquarters typically tracks compliance
10  at the local level.  But the responsibility is there.
11       But there's a growing movement toward
12  tracking this data, spidering this data from local
13  departments onto dashboards of managers.
14       And so the issue here -- and I talked to
15  them, this is somewhat outside of my expertise, but my
16  question is, I was given no evidence that headquarters
17  identified these noncompliance issues before the FDA
18  2008 inspection.
19       So the remediation was to do new
20  processes, to move things to Elizabeth, to make a
21  provision that Copenhagen would send cases to the U.S.
22       But I have no evidence that headquarters
23  was actually -- had a strong governance function over
24  the individual compliance.
25       They didn't realize that Copenhagen was

### Page 212

1   stockpiling reports and sending them in July and
2   August when the implementation date on that MHRA
3   agreement was March 1st.
4        That could have easily been picked up by
5   tracking those dates, those submission dates.
6        And so the question comes up, and this
7   is -- this is, again, extrapolating from other cases
8   where the authorities come back and say to the
9   company, why are we telling you about these issues?
10  Q.   Well, let's stop.  First of all, it
11  sounds like you raised with the plaintiffs' lawyers
12  the issue as to whether you had expertise to even
13  comment about this issue; is that fair?
14  A.   Well, we talked about scope, and I'm
15  talking about systems.  And this is on the edge of
16  those systems because I have some experience.  I've
17  never done a merger integration.
18       I was involved with Roche headquarters
19  drug safety reorganization, which was clearly a
20  headquarters reorg. where there was centralization of
21  procedures that had been decentralized, gone out of
22  compliance.
23       And it's the centralization and
24  headquarters oversight that has frequently been
25  critical in these multinationals that have compliance

### Page 213

1   issues with safety, not just with Roche, but with
2   other companies.
3   Q.   Did you tell the plaintiffs' counsel in
4   this case this was outside your area of expertise?
5   A.   I asked if they thought it was and
6   whether I should take it out and they were pleased
7   with that being left in the document.
8   Q.   But you, yourself, raised the question
9   as to whether it was outside your area of expertise;
10  correct?
11       That's what I hear you saying.  I want
12  to make sure I understand you correctly.
13  A.   Well, this is my first time as an expert
14  witness, and I'm trying to determine what scope of
15  pharmacovigilance systems is.  This is -- this is
16  technically within the scope of --
17  Q.   I know.  My question was -- I'm sorry.
18  A.   It may be, but I can't give you a
19  definitive answer.
20  Q.   My question was very simple.  Did you
21  tell the plaintiffs' attorneys this was outside your
22  area of expertise?
23  A.   It was possibly.
24  Q.   Okay.  Now, you don't know how Actavis
25  in Iceland was set up structurally to interact with

54 (Pages 210 to 213)

1  Actavis in the United States, do you?
2      A.   No.  We were not given any information
3  as to the headquarters function and overseeing their
4  affiliates or how much headquarters was initially
5  involved with the 2006 inspection, other than to
6  ratify the decision at the time of the acquisition to
7  implement the MHRA agreement between the two.
8      Q.    Is it fair to say you have insufficient
9  information to be able to comment on the oversight
10  responsibilities of headquarters in Iceland in regard
11  to local pharmacovigilance issues?
12      A.    These may have been placed.  I was not
13  given any information to say that there were.  And I
14  don't -- I don't know I do.
15          I know that they wanted -- when they got
16  the first inspection, the initial fix was to move the
17  processes to Actavis.
18          There's not a lot of insight into the
19  process of transfer or any other process changes at
20  the time of the acquisition and the merger of some of
21  these acquisition companies.
22          I guess, there is -- there's an absence
23  of insight into what happened.  There's no assurance.
24      Q.    Do you consider yourself to be an expert
25  in the issue of recall communications?

1      A.    Honestly, no.
2      Q.    Okay.
3      A.    I can't say that I've done a huge number
4  of them.
5      Q.    Okay.  And I think we established before
6  that what you did in regard to recalls was maybe do
7  the Health Hazard Evaluation reports.  But you've
8  never participated in drafting the recall documents
9  themselves; correct?
10      A.    No.  My role has been to draft the
11  assessment -- my role has been to draft the
12  assessments.  And sometimes I sit on the
13  multifunctional team.
14          But once the decision is made to recall
15  or to try to obtain product for analysis, typically,
16  any recall communications go out of a different
17  office.
18          MR. DEAN:  All right.  Let's take a
19  short break.
20          VIDEO OPERATOR:  Going off the video
21  record.
22          The time is 3:19 p.m.
23          (A recess was taken from 3:19 p.m. to
24  3:30 p.m.)
25          VIDEO OPERATOR:  We're now back on the

1  video record.
2          The time is 3:30 p.m.
3  BY MR. DEAN:
4      Q.    Do you have any criticisms of the
5  information gathering process for information that
6  would go into a MedWatch report by Actavis before the
7  time of the recall?
8      A.    There are inspection observations from
9  the inspection of January 2006 that there was
10  inadequate information in the cases and inadequate
11  follow-up, and they cited several cases.
12          So they were looking at the content of
13  information, things that were absent, such as
14  concomitant medications and concurrent diseases, as
15  well as follow-up issues, particularly on a death
16  case.
17      Q.    Are you aware of any -- let me reframe
18  my question in point of time.  Same question, but
19  after January 3, 2007, when the letter that we saw was
20  issued.
21          And so after January 3, 2007, are you
22  aware of any criticism -- and before the recall, in
23  that time frame from January '07 to end of April, '08,
24  are you aware of any criticisms of the information
25  gathering process by which Actavis gathered

1  information to generate MedWatch reports?
2      A.    No.
3      Q.    Okay.  Did you ever say to the
4  plaintiffs' attorneys in this case that I cannot in
5  good conscience give an expert report in this
6  litigation because I am concerned that I don't have
7  all the potentially relevant documents?
8      A.    I said I do not think I can render a
9  definitive opinion.  I can only give opinion on the
10  evidence to which I was -- on which I was presented.
11          And I talked to them about what if I
12  render an opinion that's inadequate based on
13  inadequate evidence?  And they encouraged me to render
14  the best opinion that I could based on the evidence
15  that I was presented.
16          They presented me with some more
17  evidence, and I did the best I could with what I was
18  given.
19          And I knew that there were
20  vulnerabilities that remained based on white space,
21  but there was -- there was -- the original report was
22  written with more statements of no assurances
23  provided, no information is provided.
24          There was more of a statement of the
25  absence.

55 (Pages 214 to 217)

Page 218

1     I was asked to rephrase things to say,
2 my opinion based on reasonable evidence, and I did
3 that on June 15th.
4     So there was a report written that was
5 -- with language where I would be presenting this to a
6 client based on a consulting firm.
7     And I was given some guidance on how to
8 rephrase the report, and I went in and I rephrased the
9 report where I thought there was FDA inspection
10 observations that would fit together as reasonable
11 evidence, such as I keep repeating, the fact that 2008
12 still had inspection findings.
13     It was a question of nonsubmission of
14 cases. There were things like that that became the
15 basis.
16     But I actually trusted them that they
17 were providing me enough information that it was
18 conscionable to form those positions.
19     They reviewed them and they reviewed the
20 final wording, and I trusted their counsel that this
21 report, although preliminary and possibly requiring
22 revision, was suitable for filing.
23     Q.   Now, did you just tell me that there is
24 a -- I guess it would be on one of these thumb
25 drives -- that there is an initial report that you

Page 219

1 wrote and then there's a follow-up report that you
2 wrote after you had expressed concerns to the
3 plaintiffs' counsel about what you'd said in your
4 report?
5     Did I get that correctly?
6     A.   No. I was very, very careful about
7 making too many preliminary comments. I spent an
8 awful lot of time trying to gather and organize the
9 information and track it.
10     I probably started tracking quality
11 information from manufacturing and trying to assess
12 whether the quality systems were impacting
13 pharmacovigilance. I probably went on a tangent.
14     But, no, there was no real preliminary
15 report that I revised. I did the report and I was
16 asked to change the wording to the legal wording
17 required for an expert report.
18     Q.   Now, is the backup to what you just said
19 where you were -- where you made changes in the
20 wording, is that someplace on the thumb drive?
21     A.   I don't know whether I overwrote it. I
22 think there are early drafts.
23     Q.   You used the word "conscionable" a few
24 minutes ago.
25     Were you worried as a matter of your

Page 220

1 conscience that you might be rendering an opinion
2 without appropriate foundation?
3     Was that what you meant to convey by
4 your use of the word "conscionable"?
5     MR. THOMPSON:  Object to the form.
6     THE WITNESS:  I'm completely naive to
7 this. I've avoided this for eight years and I was
8 encouraged to write this report based on people who
9 had worked with me who felt that I was qualified to
10 start to take on this kind of work.
11     I have no way to independently judge my
12 ability to serve as an expert witness. And I don't
13 know whether this is the type of case where you start
14 expert witness.
15     I trusted the attorneys who provided me
16 with information to give me the information that I
17 needed to determine what was going on.
18     I went back to them with questions and I
19 did ask about the process of discovery and why there
20 were all these things that I was not provided and
21 would they be provided to me. And I talked to them
22 about what do I do with this information?
23     And they -- she said -- based on that, I
24 believe that it was okay to render the preliminary
25 report. I did this on advice of counsel and with the

Page 221

1 supervision of counsel.
2     But knowing that there could be further
3 information that may or may not have been already
4 uncovered with discovery.
5     And I was told that it is okay to render
6 this preliminary opinion. If they present you with
7 further evidence, you go back and revise it.
8 BY MR. DEAN:
9     Q.   Is it fair to say that based upon what
10 you've seen today, you are no longer comfortable and
11 you do not stand fully behind this opinion?
12     A.   I would say yes. My preference would be
13 to, as I was told I could do, incorporate new
14 information.
15     But -- but, yes, there -- I -- I think
16 that there has to be -- there should be re-analysis of
17 that opinion based on further information. And maybe
18 even some of the information that's not yet presented.
19     Q.   So is it fair to say that as from your
20 -- with your medical training and your background in
21 the FDA, you, yourself, think that there is an
22 inadequate foundation for your opinion in this report;
23 correct?
24     A.   I don't have an answer to that. I feel
25 -- Mr. Thompson encouraged me at the break to say,

56 (Pages 218 to 221)

Karen A. Frank, M.D.      Videotaped           June 30, 2010

Page 222

1  well, you're as much an expert on this as anyone else.
2       I have no way to compare myself to
3  anyone else. I've never even witnessed court
4  proceedings. I deliberately avoided getting involved
5  with litigation. It's not like I've been aiming at
6  this.
7       This is something that I was approached
8  about doing a couple times and sort of said, no, no,
9  no, I'm not going to be involved with that.
10      And I was approached about taking this
11 assignment and very carefully working on it. I asked
12 about the documentation.
13      And I had to trust the people who had
14 hired me that I was being given correct guidance so
15 that this would be a useful piece of information and a
16 viable one, but I have no way to independently judge
17 that.
18      If -- I should have said, I cannot write
19 this report until I am given all of this, I was given
20 assurance that I'm to render a preliminary opinion
21 based on what was given me.
22      Q.    So it was your understanding that what
23 was submitted to the Court was just a preliminary
24 report, then; is that right?
25      A.    It was my understanding that these

Page 223

1  opinions were to be based on observations that I could
2  make based on the present state of the evidence
3  provided to me. I was asked not to say anything
4  speculative.
5       I asked Pete Miller specifically about
6  this comment about the headquarters oversight, and he
7  liked that comment. He did not ask for it to be
8  written.
9       But I asked, I said, is this -- I don't
10 know -- I can't give you the exact wording, but I
11 wanted to make sure I didn't go out of the scope.
12      But I was extrapolating these
13 pharmacovigilance systems which usually go into a
14 headquarters oversight.
15      And he particularly liked that section
16 of the report, and I was given no indication that the
17 inclusion of those statements would be a problem. He
18 approved them.
19      Q.    So I understand that particular
20 exchange, you raised the question about your expertise
21 to give an opinion in that area, and Mr. Miller's
22 response was, I like that opinion. Let's leave it in.
23      That was the conversation; correct?
24      A.    I don't recall the specifics.
25      Q.    Is that the --

Page 224

1       A.    I don't recall. I don't recall whether
2  I --
3       Q.    Is that the --
4       A.    I don't recall whether I pressed him on
5  how far I should extend out. I know they've
6  encouraged me several times not to go outside of the
7  scope of my assignment in making comments.
8       But that statement was included in the
9  conclusion with Mr. Miller's approval.
10      Q.    How do you think all this impacts on
11 your credibility, Dr. Frank?
12      A.    I think it demonstrates a very
13 legitimate attempt to do a decent job with suboptimal
14 information. If I did not know to refuse to render an
15 opinion, then I wish I had been informed by the
16 counsel.
17      But I think it demonstrates my ability
18 to analyze the quality of the evidence and to define
19 things that could potentially be missing. Some of the
20 things that you presented to me I would not have known
21 to even have asked for.
22      But I raised the issue of whether or not
23 these opinions should be rendered on a series of
24 evidence, and I was given no indication that this was
25 unconscionable or would be seen to jeopardize my

Page 225

1  credibility.
2       It may display a learning curve. It may
3  display a naivete at dealing with certain things. But
4  I was never once given any indication that this was
5  unconscionable or unethical behavior.
6       Even though I questioned, I wanted to
7  make sure that none of this was done, and we discussed
8  it on June 2nd. This is a pretty complex case.
9       There's a lot of stuff that was not --
10 was not -- I don't know -- I don't know whether it
11 should or should not have been prepared for me,
12 whether it was incumbent upon me to go find the
13 additional information.
14      I asked for more. Or whether I should
15 have quietly made a determination on the first
16 dossier.
17      Q.    But we can agree, in your words that you
18 uttered two minutes ago, that the information you had
19 here on which to base your opinion was suboptimal;
20 correct?
21      A.    Yes. It was suboptimal. There's --
22 there was probably a lot more information out there
23 that was not present.
24      Q.    And information which might well lead
25 you to change your opinion; correct?

57 (Pages 222 to 225)

Karen A. Frank, M.D.       Videotaped        June 30, 2010

Page 226

1    A.    Modify the opinion, yes.
2        MR. DEAN:  Let's end this tape.
3        VIDEO OPERATOR:  Going off the video
4    record.
5        This is the end of Tape 4.
6        The time is 3:46 p.m.
7        (A recess was taken from 3:46 p.m. to
8    3:50 p.m.)
9        VIDEO OPERATOR:  We are now back on the
10   video record.
11       This is the start of Tape 5.
12       The time is 3:52 p.m.
13   BY MR. DEAN:
14       Q.    Dr. Frank, do you realize that there's a
15   lot of money at stake in this litigation?
16       A.    Yes.
17       Q.    And do you realize there are
18   Court-imposed deadlines for all of us, expert
19   witnesses and lawyers?
20       Do you realize that?
21       A.    Yes.
22       Q.    Were you led to believe that this report
23   that you were going to -- that you have submitted was
24   only a preliminary report?
25       Was that the indication that you were

Page 227

1    given?
2        A.    I'm afraid so.
3        Not -- the word "preliminary" was not
4    used, but I was led to believe that there would not be
5    any question or problem writing this in this way, and
6    that if I was presented with additional evidence, I
7    was to modify this.
8        And I -- Mr. Thompson is concerned that
9    I've suddenly backed away from my report because I've
10   been presented with two pieces of evidence.
11       I'm sorry, maybe I'm just frightened.  I
12   don't want to do anything wrong.  And maybe I need
13   more assurance than the average person.
14       But, yes, I did realize there was a
15   deadline.  I was a little amazed when I found out that
16   this was actually going to be a big federal case.  I
17   thought it was a rather small assignment.  But he's
18   concerned that I backed down too quickly.
19       I don't know how to gauge accurately
20   what is sufficient information to render -- completely
21   render opinion.
22       I may have -- I asked many people
23   whether I was qualified to do this as an expert
24   witness.  He's asked me to stand by what I said.
25       But, yes, one of the reasons I sit here

Page 228

1    and I examine what you said -- give me very carefully
2    is I realize there's a lot at stake.  And I want to be
3    careful to do the right thing.
4        I was -- I thought that I was being
5    careful enough.  And he wants me to stand by what I've
6    written.
7        Q.    Were you --
8        A.    I'm -- I'm sort of like, this is the
9    first time I've done it, I want to make sure that it's
10   done absolutely correctly.
11       And yet, I can tell you right now that I
12   started going through this and going, well, I mean, I
13   can tell you that there was other information that
14   would have given indication of the compliance.
15       But I said, well, they still had
16   inspection findings in 2008.  That probably indicates
17   inadequate implementation of the plans.
18       So I've been -- I've sort of been
19   encouraged to, even though I may be naive and a little
20   bit insecure in what I'm doing, stand by this.
21       Now, I just -- I just don't want to do
22   anything wrong.  I did the best I could with what I
23   was given, and I worked under the guidance of my
24   client.
25       Q.    Your client being the plaintiffs'

Page 229

1    lawyers; correct?
2        A.    Knowing that you would come with further
3    evidence.  And how I should respond, he said, well,
4    look, you're backing down.  You've been shown two
5    additional pieces of evidence.  Is that enough to sway
6    your whole opinion?
7        I'm sitting here, well, I guess I'd like
8    to do another careful analysis.  But he's encouraging
9    me to stand by my opinion.
10       Q.    What I'm interested in is whether you
11   are willing to stand by it given what you have seen
12   today.
13       And I get the impression that you are --
14   you don't think that there is a sufficient -- I get
15   the impression you think there's not sufficient
16   information base for you to continue to stand by this
17   opinion.
18       Am I correct in that impression?
19       A.    I actually don't know how to answer you.
20       Q.    You can't unequivocally stand behind the
21   opinion that you have written, can you?
22       A.    No.
23       Q.    Okay.
24       A.    But I don't know that it should be
25   discarded.

58 (Pages 226 to 229)

Page 230

1    Q.    You said that --
2    A.    I actually was under the impression that
3    if I was presented additional information, I was to
4    modify the position to accuracy and that there would
5    be no problems whatsoever in taking this course.
6    Q.    You told me a few minutes ago that there
7    was other information that you had that would have led
8    to the conclusion of compliance with appropriate
9    procedures, but you did not put it in your report.
10    Why didn't you put it in your report?
11    A.    Can you tell me what I omitted? Can you
12    give me the specifics of what I said?
13    Q.    I'm just referencing what you said a few
14    minutes ago, that there were -- if necessary, we could
15    have the court reporter read your answer back.
16    But I believe you said that there were
17    -- there's other information that was available that
18    would have aided the defendants -- that's not quite
19    the way you phrased it -- but there's other
20    information that would have led to a different
21    conclusion but you left it out of your report.
22    Do you remember saying that?
23    A.    No. I never deliberately omitted any
24    opinion -- any evidence that would have swayed the
25    opinion in the direction of the defendants. There was

Page 231

1    no attempt to deliberately omit information.
2    I did not put into the report all of the
3    verbal communications, such as the -- all of the
4    Digitek cases would have arisen only in the U.S.
5    Q.    Do you --
6    A.    But I never specifically said I'm not
7    going to put this in because it will change the
8    opinion in favor of the defendants.
9    I never would have done something that
10    could have led to that kind of discredibility or lack
11    of credibility. There was none of that. And that I
12    can give you a definitive answer of no.
13    If I forgot to put something in, it was
14    an error or I did not realize that I was to put in
15    verbal information.
16    I did put information in of inspection
17    findings of compliance with product complaints. I had
18    the interim information for product complaints that
19    you showed me for safety.
20    But it was actually an inspection
21    confirmation, and that's in here. And I put it in
22    because I thought this would be one report with some
23    -- the conclusions to support. But I did not
24    deliberately omit any information.
25    Q.    Could you tell me -- you just referenced

Page 232

1    information about product complaints. Could you tell
2    me what -- if you can find it, what page you're
3    referencing, Dr. Frank.
4    If you can't find it readily, that's
5    okay, just tell me. But if you can find it, I'd like
6    to look at that page. I realize there's a lot of
7    pages.
8    A.    No, I think it's important because I
9    tried to find both. I tried to find as much
10    information as I could.
11    (Witness reviews document.) I saw it a
12    while back.
13    (Witness reviews document.)
14    Q.    Let me do this. Let me see if I
15    properly understood your reference, and if I did,
16    maybe we don't need to find it.
17    I think what you said was there was some
18    information that you picked up and referred to in the
19    observations about product complaint information that
20    was appropriately reported.
21    Is that what you said?
22    A.    It was an inspection finding that said
23    the remediation for product complaints, there was --
24    there were no observations with product complaints.
25    And this was probably in 2008.

Page 233

1    Q.    So, then, that would probably be in the
2    2008 EIR someplace?
3    A.    (Witness reviews document.) Yes. Here.
4    Q.    What page are you on, Doctor? I've got
5    a copy here.
6    A.    28.
7    Q.    Thank you.
8    And can you direct me to where you are?
9    A.    Inspection 5, Little Falls, New Jersey,
10    18th of September to October.
11    And I summarized the only thing I found
12    in that was the Establishment Inspection Report, under
13    the general discussion, complaints were reviewed,
14    there were no deficiencies found.
15    I have no ability to assess the impact
16    of the sampling of the complaints in this inspection
17    and the direct impact on Digitek.
18    There was a supplemental document that
19    showed -- and there was -- there's a comment from the
20    FDA in here, that the compliance with 30-day timeline
21    for product complaints improved over the course of
22    2007 to the point of the inspection.
23    Q.    And we have talked before about the fact
24    that one thing you would like to see is the product --
25    in the course of investigating a product defect, would

59 (Pages 230 to 233)

Page 234

1  be good communication between the product complaint
2  side and the signal detection side.
3      Do you recall that discussion?
4  A.   Yes.
5  Q.   And so what you're saying, I think, is
6  that, at least from this observation on Page 28, that
7  as of 2006, the product complaint side appeared to be
8  functioning appropriately; correct?
9      Is that the appropriate --
10 A.   I don't know what the scope of that is.
11 Complaints review.  Did they just look at the
12 complaint files?
13     I spent some time trying to assess
14 whether every complaint had an accompanying Health
15 Hazard Assessment.
16     And what I ended up putting weight on
17 was the FDA observation, because they had access to
18 the information in 2008.  They were concerned about
19 the lack of ongoing Health Hazard Assessments.
20     And in order to get through all of the,
21 I want to say, lack of evidence and confusion, because
22 I couldn't completely sort that out.
23     And I spoke to them about this, that to
24 base my opinion on the FDA inspector who looked at the
25 primary evidence, even though I did not have the

Page 235

1  access to it.
2      So that's where I can't come -- I can't
3  reconcile that with the FDA inspector's concern in
4  2008 that there were no accompanying Health Hazard
5  Assessments.
6      I don't know what the overlap was,
7  whether they were fine here and then there were a
8  problem.  I can't tell you that.
9  Q.   And this is another manifestation of the
10 fact that you were not provided the underlying
11 documents; correct?
12 A.   I would assume so, yes.
13 Q.   Okay.
14 A.   Or I wasn't given any other Health
15 Hazard Assessment other than the one from Dr. Leikin.
16 I had no documentation of any Health Hazard Assessment
17 in 2004.  I asked for it.  And I looked for them.
18     And I had -- the FDA -- the thing that
19 became the basis of the opinion was that inspector --
20 FDA inspector in 2008 and their concern with the
21 absence of them.
22 Q.   Having heard everything you've heard
23 today in the sense of being shown documents,
24 additional documents today, having gone over all the
25 documents we have in front of us, having gone over

Page 236

1  your report, having, you know, engaged in the dialogue
2  with me today, do you feel that you have been misled
3  by the plaintiffs' lawyers regarding the factual basis
4  for your opinions?
5  A.   I don't know how to comment on that.  I
6  thought that I got a dossier that was not in
7  chronological order.
8      I wasn't sure that I got the full
9  component of the documents.  I wasn't sure that the
10 full components had actually been discovered on part
11 of discovery.
12     I cannot say I was deliberately misled,
13 particularly because -- I don't know how to answer
14 that.
15     I had to assume that if they wanted me
16 to write an expert report to be filed in this case
17 that they would take a lot of care to provide the best
18 documentation possible.
19     I can't rule out bias, but I'm -- I have
20 to say that that's not my point to assess.  Perhaps I
21 should not have made an assessment about the
22 discovery, but I was surprised by the sampling of the
23 evidence.
24     I thought I would get everything so I'd
25 be able to track things out.  That may be my

Page 237

1  misunderstanding on what is adequate evidence.
2  Q.   Are you --
3  A.   And my -- is it my inability to render
4  opinion on what is adequate evidence that is the core
5  of the problem?  Or do I rely on the people who
6  provide it to me to ensure that this is adequate for
7  the opinion that I render?
8  Q.   But you would agree that this is a
9  troubling issue given the lack of information that you
10 had?
11 A.   I think it's a -- yeah, I think it's --
12 I think that -- yes, it does bother me.
13 Q.   And at the end of the day, having,
14 again, looked at all the documents, engaged in all the
15 dialogue that we have, are you still willing to
16 continue to serve as an expert witness on behalf of
17 the plaintiffs in this litigation?
18 A.   My number one concern in this situation
19 is that I don't do anything considered wrong or I
20 don't have problems with the fact that I'm new to this
21 and I will have to learn certain things.
22     But I don't want to do anything that
23 would be considered incorrect.
24     Now, I agreed to do this.  I
25 communicated my concerns.  There's an interest for the

60 (Pages 234 to 237)

Page 238

1  plaintiff in my standing by my opinions.
2          I have little or no interest in going
3  into a public deposition before a panel of judges and
4  finding that -- I have to -- I don't -- I don't want
5  to destroy myself.
6          I asked if I was -- you know, if I was
7  considered too lightweight a witness to hold up this
8  case. I have no way to independently judge that.
9          But it's extremely important that my
10 level of expertise is sufficient to hold the weight.
11 Even if this is an opinion that doesn't support
12 eventually.
13         But I have no -- I have no way to
14 independently judge whether I am truly an expert
15 witness. What does that constitute?
16         Is it a few people saying you are, we
17 want you to do this? We've done it. There may be
18 another expert witness who's asked to critique your
19 work.
20         But I've not been led to believe that,
21 given my present abilities or knowledge, that pursuing
22 this is foolish, unethical. I can't say that I've
23 been led to believe that.
24         And yet, it's my strength of ego to say
25 to you, yes, I will stand by this and I will argue and

Page 239

1  argue.
2          And yet, I have doubts about -- I can't
3  say I've done this five times successfully and,
4  therefore, I've demonstrated my ability. I can say
5  that I've been encouraged to pursue this and to submit
6  this document.
7          And I've made certain, as I'm doing
8  this, by asking for external confirmation that I've
9  not been doing anything foolish or incorrect.
10 Q.     Knowing that there is a lot of money at
11 stake, knowing that there are court rules in place for
12 expert reports, knowing that expert reports have to
13 have appropriate foundations, my question to you is,
14 are you willing to continue as an expert witness in
15 this case?
16 A.     The honest answer is, I never wanted to
17 have to sit expert witness in court. That was not
18 disclosed to me at the time I agreed to do this. I
19 agreed to write a report and sit deposition on the
20 report that I made, on the evidence I was given.
21 Q.     Are you telling me that you weren't told
22 that you might have to testify in court? Is that what
23 you're telling me?
24 A.     That was not disclosed to me when I
25 agreed to do the engagement.

Page 240

1  Q.     So to the extent -- you've now learned
2  that; correct?
3  A.     Yes.
4  Q.     Correct?
5          So to that extent, you were misled;
6  correct?
7  A.     The --
8          MR. THOMPSON: Object to the form.
9          THE WITNESS: The preliminary
10 communication from the consulting firm is they had
11 received a request for somebody to do an expert
12 witness on pharmacovigilance systems.
13         And I asked what that would entail. And
14 they said, you'll be sent evidence and you try to come
15 up with a truthful answer. And you'll have to sit
16 deposition. But --
17 BY MR. DEAN:
18 Q.     Excuse me. Mr. Thompson actually gave a
19 good objection there because -- let me rephrase that
20 question.
21         Do you feel you were misled by Smart
22 Consulting about what your role was going to be in
23 this litigation?
24 A.     I was led to -- the -- what I agreed to
25 do would have stopped at the end of today.

Page 241

1          I did not agree to sit expert witness
2  before a panel of federal judges, and then I found out
3  even later that Pete Miller wanted me to be a witness
4  in the actual litigation in November.
5          These things were sequentially disclosed
6  to me, and my level of comfort with my own
7  inexperience and not knowing how to gauge my
8  preparedness was real.
9  Q.     Is it fair to say that you would have
10 declined this assignment if you had been told at the
11 beginning that you would have to testify in court
12 before a jury?
13 A.     I never really wanted to get into this
14 line of work. I was led to believe this was a very
15 limited assessment. I was not aware at the outset
16 that it was a bunch of state litigation that had been
17 rolled up into a federal case.
18         There was -- there was no up-front
19 communication of the extent of the work or the high-
20 profile nature of the case or -- and I had no
21 assessment of my potential impact on the outcome.
22         I don't know whether I'm a small fish or
23 a big fish in the outcome. I can't say that.
24 Q.     We can agree, though, that you were not
25 told at the outset that you would have to be a

61 (Pages 238 to 241)

Page 242

1   testifying witness in court?
2            You were not told that; correct?
3        A.   No.
4        Q.   You were -- no, you were not told that;
5   correct?
6        A.   No, that was not disclosed at the
7   outset. There was sort of a sequential disclosure of
8   increasing levels of involvement.
9        Q.   When was it that you were finally told
10   that you would be asked to testify in court before a
11   jury?
12       A.   I don't know the exact date, but I
13   believe sort of about the time I had lunch with Pete
14   Miller. It may have been a phone call, it may be at
15   the June 2nd lunch.
16            But -- and I didn't know whether he was
17   making this assessment to bring me further in the case
18   based on his preliminary interactions, whether this
19   was a change in plans, or whether -- or how this all
20   occurred.
21            I can't judge -- I really -- I don't
22   want to judge his motive. I just know there was a
23   sequential expansion of this.
24       Q.   When you -- I said -- before you
25   mentioned that I think you were drafting a report on

Page 243

1   June 15th.
2            As you were drafting on June 15th or
3   thereabouts, at the point where you were writing this
4   long report, did you understand you were going to have
5   to testify in court?
6        A.   Possibly, yes. Yes. Yes.
7        Q.   Possibly or for sure?
8        A.   I -- I was told that, in all likelihood,
9   I would be asked to present at the science day.
10       Q.   At the science day?
11       A.   Which is October.
12       Q.   Were you ever told that you would be --
13   have you ever been told that you would be asked to
14   testify in one of the individual actions?
15            And by that I mean a case in which one
16   of the plaintiffs is suing the defendants to try to
17   obtain a money judgment against the defendants.
18            Have you ever been told that you would
19   be expected to testify in one of those cases?
20       A.   I was told that they may ask me to
21   appear in November, in a November case. In all
22   likelihood, I would be.
23            And -- oh, no, I do understand
24   liability. No. I understand the magnitude of this.
25   I understand what rolling up a bunch of state-level

Page 244

1   litigation is. And I understand -- no, I understand
2   -- I understand what this is.
3            I just wish I had -- this may be a self-
4   confidence issue with me. I don't know how to gauge
5   my preparedness. I may be completely prepared. I may
6   be very good at this, but I can't tell you whether I
7   am or I'm not.
8        Q.   But you do wish that it had been
9   disclosed to you much earlier that you were expected
10   to testify in front of a court or jury; correct?
11       A.   Yes. I would have preferred my first
12   expert witness assignment to be limited in scope so
13   that there was an assurance of the accuracy and the
14   success.
15            That the magnitude of this case and that
16   the questions that I raised about the discovery and
17   what was being sent to me had not arisen. You know,
18   maybe I'm out of line as an expert witness saying what
19   about the discovery?
20            I assumed that all of these blank
21   documents, these white spaces, would be sent to me.
22            When they told me that they weren't sure
23   they already had them and they may be able to obtain
24   them, because there may be one more round of
25   discovery, I just went -- be as -- technically, if I'm

Page 245

1   -- I thought I should have everything to track through
2   the period and maybe track from the consent decree.
3            But I don't -- I can't tell you I'm
4   right or wrong based on experience.
5        Q.   Dr. Frank, is it fair to say that you
6   have significant misgivings about your ability to
7   qualify as an expert witness and you have significant
8   misgivings about the quality of the information that
9   supports the opinion that you have written here?
10            Would that be fair to say?
11       A.   I hate to say significant misgivings
12   because I've been assured that -- I've been given
13   assurance that moving forward with doing this I would
14   not have embarrassment or problems.
15       Q.   And who has assured you that you would
16   not have embarrassment in the future as we move
17   forward in this litigation?
18       A.   The people at Smart Consulting, Nigel
19   Smart and Denise Smart.
20       Q.   And what did he tell you? Tell me what
21   assurance -- how did he articulate this assurance that
22   you would not be embarrassed as we moved forward?
23       A.   Well, he said, really all you have to do
24   is try to get to truth. We're just seeking that. And
25   on the evidence presented to you, you try to sort out

62 (Pages 242 to 245)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 246

1  what truth is.
2        And I got to a situation where I was
3  like, I became concerned that I hadn't been -- I
4  didn't have all of the communications.
5        I didn't have -- I didn't have anything
6  to confirm -- I just got the FDA -- I was asked to
7  make the determination only on the FDA inspections and
8  some letters. The letters say we're going to do this.
9        I don't have the details of what was
10  done or the tracking that showed that it was done.
11        And this is stuff that typically is
12  given to consultants when they go in and assess
13  vulnerabilities to repeat inspections. And I asked
14  about it.
15     Q.   So is it fair -- is what you're saying,
16  there might be a basis for the opinions you've given,
17  but you're not sure because you haven't seen the
18  evidence? Is that what you're saying?
19        Isn't that a fair summary?
20     A.   Yes. I can assure you that I did the
21  best that I could with what I was given. And I based
22  it heavily on a few FDA observations from point to
23  point. But there's interim space where I don't have a
24  lot of insight into what went on.
25        It's the FDA inspection, the

Page 247

1  communications, and the confirmatory inspections.
2        MR. DEAN:  Thank you.
3        Give me just a minute, Fred.
4        VIDEO OPERATOR:  Going off the video
5  record.
6        The time is 4:23 p.m.
7        (Discussion off the record.)
8        VIDEO OPERATOR:  We're now back on the
9  video record.
10        The time is 4:24 p.m.
11        MR. DEAN:  I do not have any more
12  questions on behalf of Actavis.
13        EXAMINATION
14  BY MR. KAPLAN:
15     Q.   Dr. Frank, I'm Harvey Kaplan.
16     A.   Yes.
17     Q.   I've been listening to your testimony
18  here today. I want to ask you a few questions.
19        You've rendered the opinions contained
20  in your report; right?
21     A.   Yes.
22     Q.   And those are all of your opinions?
23     A.   Yes, they are. I reworded them to say
24  it is my opinion based on reasonable evidence, and I
25  did this on June 15th.

Page 248

1        And I looked at it, and I said to
2  myself, I hope that in rewording these statements I
3  actually have -- am making it on what is considered
4  reasonable evidence.
5        That I was provided the reasonable
6  evidence and I can trust that, and that I was able --
7  this is -- I was provided huge amounts of documents
8  about manufacturing and analytical issues.
9        But there was a question in my mind
10  about what was reasonable evidence in this case? Do I
11  have to go through every CAPA tracker?
12        And I do want to make sure before this
13  is actually admitted that I don't want to let my
14  insecurities, which could just be me -- I might have
15  simply done an analytical analysis.
16        But, yes, I -- these opinions were
17  there. I can't see that a lot of things that would
18  typically have been done have been done.
19        I was asked -- I was asked to support
20  certain opinions that counsel wanted supported. And
21  so what I did was took the evidence and I couldn't see
22  anything to the contrary.
23        If I had had a clean inspection in 2008,
24  I would have said, the evidence for adequate
25  remediation is the inspection from 2008. Now, he

Page 249

1  subdivided the inspection.
2        Did you see evidence in 2008 that they
3  did not remediate the quality of the reports? So the
4  -- there may be overgeneralizations. But they may be
5  legitimate on -- for certain grounds.
6     Q.   So you were given direction by
7  plaintiffs' counsel as to certain opinions they wanted
8  you to express?
9     A.   He said I would like to say that there
10  were systemic issues that impacted, and I believe it
11  was the safety signal detection in the Digitek case.
12  I was actually presented an opinion by counsel.
13        I wasn't sent the dossiers without -- I
14  was told the opinion that I was asked to support to
15  the best that I could. And I did attempt, and you see
16  there's things that are included here that really sort
17  out what actually happened.
18     Q.   Plaintiffs' counsel said to you these
19  are the opinions we want you to express?
20     A.   Yeah. They asked me to go through and
21  support certain observations.
22     Q.   And you attempted to support those
23  opinions that you were asked to express by plaintiffs'
24  counsel; right?
25     A.   Yes.

63 (Pages 246 to 249)

Karen A. Frank, M.D.        Videotaped           June 30, 2010

Page 250

1    Q.    And you have expressed all of those
2    opinions in Exhibit 261; right?
3    A.    The answer to that is, I cannot tell you
4    because I thought these two were going to go together.
5    Q.    Okay.  This is your report, Exhibit 261;
6    right?
7    A.    This was split off.  This up until maybe
8    it was mid-afternoon, I'd have to look, on the 15th, I
9    thought I was submitting all of this together.  So
10   that there was a much careful tracking between the
11   observations and my comments.
12        So my concern is that since this was
13   split, I never did an independent assessment of a
14   hundred percent transfer of every single opinion in
15   here to here.  There was just sort of a high-level
16   overview.
17   Q.    And what we have been presented is the
18   report of Karen A. Frank, M.D., dated June 15, 2010,
19   as contained in Exhibit 261, which you have entitled
20   Background, Analysis and Conclusions; correct?
21   A.    Yes.  It was segments --
22   Q.    And Section 3 is called Analysis and
23   Conclusions; right?
24   A.    Yes.
25   Q.    And your conclusions are all expressed

Page 251

1    in Section 3 of Exhibit 261?
2    A.    Yes.
3    Q.    Correct?
4    A.    Yes.
5    Q.    Okay.  And what I'm wondering as I
6    listen to you talk today about evidence that wasn't
7    given to you before you prepared this report by
8    plaintiffs' counsel, and that you have only learned
9    about in the last day, specifically Exhibit 38, the
10   FDA's statements on their web site about Facts and
11   Myths About Generic Drugs, and other evidence has been
12   presented to you today that you have discussed with
13   Mr. Dean, what I'm wondering and what I'm concerned
14   about is, are you still willing to walk into a court
15   of law, raise your right hand and be sworn to tell the
16   truth and to stand by with confidence the opinions
17   that you have expressed in Exhibit 261?
18        MR. THOMPSON:  Object to the form.
19        THE WITNESS:  I'd prefer to have
20   substantially more evidence before I had to do that.
21   You're leading me to believe through your line of
22   questioning that I have formed opinions on what is not
23   considered reasonable evidence.
24        Now, if I led you to believe that,
25   because I'm raising questions, was I remiss in raising

Page 252

1    questions about the process of discovery and what was
2    presented to me?  Have I led you down that path?
3        But you are leading me to believe that
4    what I have is a sampling of documents that I could be
5    asked to determine whether that is reasonable
6    evidence, and I may or may not know the real answer to
7    that.
8    BY MR. KAPLAN:
9    Q.    Here's the bottom line.  You agreed to
10   act as an expert witness in this litigation; right?
11   A.    Yes.
12   Q.    You're being paid for your services;
13   right?
14   A.    Yes.
15   Q.    You've been asked to render opinions;
16   right?
17   A.    Yes.
18   Q.    You have rendered those opinions; right?
19   A.    Yes.
20   Q.    And this is our opportunity to test
21   those opinions.
22   A.    Yes.
23   Q.    To test the basis for those opinions.
24        You understand that?
25   A.    Uh-huh.

Page 253

1    Q.    You have to say --
2    A.    Yes.
3    Q.    And it is our opportunity to determine
4    whether or not there is a reasonable, scientific basis
5    for the opinions which you have expressed.
6        Do you understand that?
7    A.    Yes.
8    Q.    And that's what we are doing.
9    A.    Yes.  There is risk in these opinions
10   because they were based on there is not evidence
11   provided.  So there are opinions that are based on the
12   absence of the evidence.
13   Q.    Which is why I asked.
14   A.    No, I'm not comfortable with that.
15   Q.    Okay.  And that's why I asked you.
16        The next step would be to walk into a
17   courtroom here in Philadelphia with a federal judge
18   heading up the Multi-District Litigation, the judge in
19   charge of the Pennsylvania consolidated litigation,
20   the judge in charge of the West Virginia litigation,
21   the judge in charge of the New Jersey litigation, and
22   the judge in charge of the Texas litigation, and for
23   you to walk into that courtroom, be called as a
24   witness and to get up on the stand and to testify in
25   front of that court of law and render these opinions,

64  (Pages 250 to 253)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 254

1  and say to these judges under oath that you express
2  the opinions that are contained in Exhibit 261 to a
3  reasonable degree of scientific probability that these
4  are correct and that you, as a medical doctor, who has
5  worked for various pharmaceutical companies and for
6  the FDA, can say with confidence that you stand behind
7  those opinions.
8       Are you willing to do that?
9       MR. THOMPSON: Object to the form.
10      THE WITNESS: Should I discuss this with
11  you?
12      MR. KAPLAN: No. Just answer my
13  question.
14      MR. THOMPSON: I think that the question
15  is on the floor.
16      THE WITNESS: I really don't want to,
17  but I'm concerned about the fact that it's just that I
18  only wanted to do the preliminary background work, the
19  supportive work, and end with a private deposition
20  like this.
21      When they told me I had to go to court,
22  I was like, this is a huge issue. I'm completely
23  naive with this, and I don't know how to judge my
24  preparedness.
25      And I most certainly -- the most

Page 255

1  important thing is, I don't want to do anything that
2  would be considered wrong.
3       If I've gotten into something where the
4  work product is inadequate, he's concerned that I'm
5  backing down based on the presentation of two or three
6  pieces of evidence. And I'm at a loss to know the
7  right course of action.
8       I'd prefer not to testify in a high-
9  profile case. If I do, I'd like to make certain that
10  I'm presented everything. I was actually led to
11  believe that if you presented me with more evidence
12  today, this would be revised.
13      And I'm concerned about that, because
14  that would allow me to go through this if they found
15  more information and make sure everything was correct.
16  BY MR. KAPLAN:
17      Q.    This is it. This is our opportunity to
18  examine you on the report that you have given --
19      A.    I know.
20      Q.    -- in the Multi-District Litigation
21  that's pending in Charleston, West Virginia, and in
22  the Pennsylvania consolidated litigation, which is
23  pending here in Philadelphia.
24      There are about a thousand cases that
25  are riding on opinions of expert witnesses here like

Page 256

1  yourself.
2       A.    Yeah.
3       Q.    And what I want to know is, whether
4  you're willing to stand behind these opinions and go
5  into a court of law and to say with confidence, the
6  opinions you've given here today, that you stand by
7  these opinions, as a person of integrity?
8       A.    You have both led me to believe that
9  there's additional evidence that I was not presented,
10  even though I asked for it. And proceeding forward, I
11  could face significant embarrassment, if not
12  questioning, of the opinions.
13      And the whole time I did this, I tried
14  to document very, very carefully. And yet, you're
15  leading me to believe that this is a great
16  embarrassment and that I've done an inadequate job and
17  I can't support what I've done.
18      He doesn't think I should back down.
19  And the only thing I can think of is I don't want to
20  do anything wrong.
21      Q.    What do you think you should do?
22      A.    I would like to -- if I could, I would
23  like to stop with only doing background supportive
24  work.
25      Q.    Well, let me say that that's not the

Page 257

1  option right now.
2       A.    It's one or the other?
3       Q.    Yes. Either you go forward or you back
4  down.
5       A.    What if I choose not to go forward?
6  What are the implications?
7       Q.    That's up to you. You can say, I
8  withdraw as an expert here. I'm not comfortable with
9  it.
10      A.    But what are the implications of that?
11  Will I be in a lot of trouble?
12      Q.    You won't be in trouble. You just won't
13  be an expert in this litigation.
14      MR. THOMPSON: Well, I am going to
15  object and I am going to say that this would be
16  something that I would view as something that would --
17  I would be entitled to confer with the expert witness
18  about is that question about withdrawal.
19      THE WITNESS: Okay.
20      MR. THOMPSON: Certainly you can
21  question her about the report. You can question her
22  about the documents. You can question her about all
23  that.
24      But I believe that I would have an
25  opportunity to confer with her about that issue of

65 (Pages 254 to 257)

Page 258

1    whether she would continue employment or not.
2    BY MR. KAPLAN:
3        Q.    What do you want to do?
4        A.    The right thing.
5        Q.    What do you think that is?
6        A.    The safe thing is to withdraw.  If at
7    this point I can withdraw and there will be no
8    questions that I've done the best I could and there's
9    tremendous -- there may be more risk to everyone if I
10   proceed.
11           You're basically saying that if at this
12   point there's question that putting me on a witness
13   stand can be an embarrassment or jeopardize the
14   litigation, then the right thing to do would be to
15   withdraw.
16           But I hope I could do that without being
17   accused of doing anything wrong.  I would hope that
18   people would say she did the best she could with what
19   she was given and under the guidance she was given.
20           But I have been so frightened -- when I
21   say frightened, since I started this, that I would do
22   something wrong and there would be consequences, that
23   this could just be my fear because I'm naive to this.
24           I've stayed away from it even though
25   people have encouraged me to get into it.

Page 259

1            And I just -- I don't want to do
2    anything wrong where there would be consequences for
3    me, even to question my credibility.  That's my number
4    one concern.
5            And I may have to say that I did
6    something -- I was told -- I keep being told to have
7    self-confidence.  But right now, I don't.  There's
8    significant concern.
9            And, of course, you would want me to not
10   be a witness for the plaintiff.  I guess the fewer
11   there are, I just don't want to do anything wrong.
12   And I'm actually scared to move forward.
13           I can probably put this together and
14   pick through all of the statements.
15           I was able to answer Mr. Dean when he
16   asked me about the 2007 letter and say, well,
17   corrective actions imply there was something wrong
18   that had to be corrected.  I can make the analysis.
19           But you're leaving open to me a question
20   of the wisdom of it and of subjecting my client to
21   unnecessary risk in a court of law because I'm not
22   necessarily strong enough to stand up to it when they
23   feel that I am and a few other people do.
24           So I'm willing to say, well, I've done
25   something, I have learned.

Page 260

1            But at this point, I didn't know that
2    this was such a heavy assignment when I agreed to do
3    it, and I didn't feel that I should withdraw when they
4    told me this when they felt I was strong enough.
5            But now I'm being seriously questioned,
6    and I would have preferred to have this be a limited
7    assignment and to not jump right into a very big case.
8            As you said, there's very, very high
9    risks.  There's no way I can assess the real risk.
10   And all that I can think in my head right now is I
11   just don't want to do the wrong thing.
12           And that's what I did for two to three
13   weeks when I took this assignment.
14           I just don't want to get into anything
15   that's wrong, that I can't do appropriately.  That's
16   my only concern.
17       Q.    Well, my concern and Mr. Dean's concern
18   is that our clients are being accused of wrongdoing.
19       A.    I'm not trying to do that.
20       Q.    And our clients are being accused of
21   selling and distributing --
22       A.    Oh, your clients.  Oh, I'm sorry.
23       Q.    -- defectively manufactured Digitek.
24       A.    I was thinking the law firm.  I trusted
25   their counsel.  I thought you were asking me -- no, I

Page 261

1    take that initial response back.
2        Q.    I want you to understand this is very
3    serious business.
4        A.    It's very serious.
5        Q.    Millions of dollars are being sought
6    from our clients.
7            Do you understand that?
8        A.    Absolutely.
9        Q.    And --
10       A.    I'm not that naive.  I'm not --
11       Q.    Plaintiffs are offering expert
12   testimony, like your testimony, to support their case.
13           Do you understand that?
14       A.    Yes.  I do understand.  I know what this
15   means.  I know what's at stake.
16       Q.    To support their allegations of
17   wrongdoing against our clients.
18           You understand that?
19       A.    Yes.
20       Q.    And that's what you're doing in this
21   case.
22       A.    He asked me earlier whether I was a
23   witness for the plaintiff or a truth seeker.  And what
24   happened when I started asking for more information
25   was, I'm -- I became more of a truth seeker.

66 (Pages 258 to 261)

Page 262

1    I told you this. I don't know how much
2  this all supports directly the Digitek case.
3    I never saw information that subset the
4  direct impact on Digitek. I can only make
5  generalization statements. And I hope they aren't
6  wrong generalizations. There is more evidence to be
7  obtained.
8    Q.    And you certainly never saw any evidence
9  that any person received defectively manufactured
10 Digitek, did you?
11   A.    No.
12        MR. THOMPSON: Objection. Asked and
13 answered.
14 BY MR. KAPLAN:
15   Q.    Did you?
16   A.    Well, I was told this would be asked.
17 Now, what I know is that there were an influx of cases
18 after the recall was announced. I have not been given
19 any of that evidence. That was sent to someone else.
20   Q.    So what I'm saying to you is --
21   A.    I haven't.
22   Q.    -- you've never seen any evidence --
23   A.    No.
24   Q.    -- to support an allegation that any
25 consumer ever ingested defectively manufactured

Page 263

1  Digitek, have you?
2    A.    No, I've not been provided that. I've
3  been provided evidence -- evidence that says that it's
4  worth being investigated further. But I've not really
5  been able to investigate it further.
6    Q.    And you're a person who worked for and
7  was trained by the FDA?
8    A.    Yes.
9    Q.    You had good training at the FDA?
10   A.    I thought it was very, very good.
11   Q.    Quality, competent people?
12   A.    Yes.
13   Q.    You have faith and confidence in the
14 FDA?
15   A.    Yes. I'm -- I'm -- I do understand all
16 of the issues with other litigation. It's not my
17 point to comment here.
18        This issue of how far I was to comment
19 on this assessment has come up. I was told that
20 leaving this comment in about the headquarters
21 oversight was okay.
22   Q.    Just follow me. Follow me here for a
23 little bit.
24        And being a person who worked for the
25 FDA, who was trained by qualified and competent people

Page 264

1  at the FDA, and who places great reliance on the
2  integrity of the FDA --
3    A.    Yes.
4    Q.    -- you do that, don't you?
5    A.    Yes.
6    Q.    And you have testified that in the
7  opinions you've rendered, you relied upon FDA
8  inspection reports --
9    A.    Yes.
10   Q.    -- and what the FDA inspectors have
11 said?
12   A.    Yes. Solely. I am relying on their
13 assessment of the primary data.
14   Q.    And so, after all is said and done,
15 after all of these inspections and after all of your
16 reliance on what the FDA inspectors have said with
17 regard to the primary data and after the recall, we
18 come full circle, do we not, to Plaintiffs' Exhibit
19 38, which you were shown today?
20   A.    Yeah.
21   Q.    Right?
22   A.    Uh-huh. Yes.
23   Q.    Okay. And that's entitled Facts and
24 Myths About Generic Drugs; right?
25   A.    Yes.

Page 265

1    Q.    And that's a statement of the FDA;
2  right? Correct?
3    A.    Yes.
4    Q.    And it's a very important statement of
5  the FDA, isn't it?
6    A.    Yes.
7    Q.    It speaks directly to the Digitek
8  recall, doesn't it?
9    A.    Yes.
10   Q.    And it is a statement to the public
11 about the Digitek recall; right?
12   A.    Yes.
13   Q.    The myth, as expressed by the FDA on
14 Page 2, is that there are quality problems with
15 generic drug manufacturing. They characterize that as
16 a myth; right?
17   A.    Yes.
18   Q.    And they further say, as to the myth, A
19 recent recall of generic Digoxin (called Digitek)
20 shows that generic drugs put patients at risk.
21        The FDA says that's a myth; correct?
22   A.    Yes.
23   Q.    And under Facts, the FDA says, In our
24 best judgment, given the very small number of
25 defective tablets that may have reached the market and

67 (Pages 262 to 265)

Page 266

1  the lack of reported adverse events before the recall,
2  harm to patients was very unlikely.
3      That's what the FDA says is a fact;
4  correct?
5      MR. THOMPSON:  Object to the form.
6      THE WITNESS:  That was my concern when I
7  started asking questions of is there any information
8  that I can have that would tell me how -- what is the
9  percentage of any given batch affected, and what is
10  the chances that multiple pills ended up in one
11  bottle?
12  BY MR. KAPLAN:
13     Q.    And now you have seen the FDA's
14  statement as to this Digitek recall, haven't you?
15     A.    Yes.
16     Q.    And the FDA continues to stand by that
17  statement, don't they?
18     A.    Yes.
19     Q.    They haven't changed it since the
20  recall, have they?
21     A.    No, not -- not on June 15th.
22     Q.    And so we come full circle; correct?
23     A.    Well, at this point, I have no
24  information on Digitek, per se, of any safety signal
25  detection.  I can't tell you, and I have -- I raised

Page 267

1  this, and that's actually in my comments.
2      The issues with the pharmacovigilance
3  system are broad.  There was an absence of signal
4  detection during the 2004 to 2006.
5      If the FDA looked into that and there is
6  nothing else that would refute this statement, I will
7  never be able to refute it even if given the evidence.
8      And if you say that the FDA has already
9  done that, and said that, then, you know, I can sit
10  here with the evidence.  I will just be confirming
11  this.
12     Q.    This is the FDA's bottom line statement
13  as to Digitek, isn't it?
14     MR. THOMPSON:  Object to the form.
15     THE WITNESS:  Yes.
16  BY MR. KAPLAN:
17     Q.    You believe the FDA, don't you?
18     A.    Yes.
19     Q.    And this is the information -- this is
20  part of the information that was never disclosed to
21  you by plaintiffs' lawyers, isn't it?
22     A.    And I did not seek it independently.
23     Q.    This information, Exhibit 38, the FDA's
24  statement --
25     A.    No.

Page 268

1      Q.    -- as to Facts and Myths About Generic
2  Drugs, and their specific statements about Digitek,
3  were never revealed to you by plaintiffs' lawyers,
4  were they?
5      A.    No.  And I will say --
6      Q.    Were they?
7      A.    No.  I did confirm when I took this case
8  that all that I was required to do is to seek to come
9  to truth.  And that's all that I had to do.
10     Q.    And do you believe that the FDA's
11  statement in Exhibit 38, statements that I just read
12  to you, are the truth?
13     A.    Yes.
14     MR. KAPLAN:  Thank you very much.
15     MR. THOMPSON:  I'm going to have some
16  questions.  I understand Mr. Moriarty objects to my
17  asking questions, or at least he did the other day.
18     MR. KAPLAN:  Well, Mr. Moriarty isn't
19  here.
20     MR. THOMPSON:  Well, I'm going to ask a
21  few questions.
22         EXAMINATION
23  BY MR. THOMPSON:
24     Q.    Doctor, let me ask you to look at
25  Defendant's 38.

Page 269

1      Do you have that in front of you?
2      A.    Yes.
3      Q.    You have been asked and your attention
4  has been directed to one sentence in paragraph four of
5  five bullet items.
6      Do you see that?
7      A.    This right there (indicating)?
8      Q.    Yes.
9      A.    Okay.
10     Q.    Do you see that each time you've been
11  asked about this document, your attention has been
12  directed to the second sentence of bullet line item
13  number four?
14     A.    Yes.
15     Q.    Let's go back up and ask you to read the
16  entire bullet item of number three, bullet item number
17  three.
18     A.    Although Actavis attempted to remove the
19  affected Digitek tablets through visual inspection,
20  FDA determined that this method of removal was
21  inadequate to assess the product's quality and
22  consistency, in accordance with GMP regulations, good
23  manufacturing -- current good manufacturing practice,
24  parenthesis, CGMP regulations.
25     Q.    Now, read the entire bullet point number

68 (Pages 266 to 269)

Karen A. Frank, M.D.      Videotaped        June 30, 2010

Page 270

1  four for me.
2      A.    Since the detection of the manufacturing
3  problem, FDA has been actively engaged with this
4  company to ensure that all potentially infected lots
5  have been recalled.
6          In our best judgment, given the very
7  small number of defective tablets that may have
8  reached the market and the lack of reported adverse
9  events before the recall, harm to the patients was
10 very likely (sic).
11     Q.    Now, do you believe that the FDA's
12 judgment with regard to its determination of violation
13 of good manufacturing practice would be as
14 authoritative as that that you just answered
15 Mr. Kaplan?
16         MR. DEAN:  Objection to form, and also
17 lack of expertise on inspection procedures, which
18 she's already testified to.
19         MR. KAPLAN:  I join that objection.
20         THE WITNESS:  No.  I had no way to come
21 up with this conclusion that the FDA came up with
22 because I had no information.
23         It was redacted out of the documents and
24 I wasn't provided access to any information on
25 analysis of the batches.  I still think a lot was

Page 271

1  incinerated.
2          And there was no data mining of the
3  database.  We're assuming that when the FDA read this,
4  that they were satisfied with the case reporting.
5  They did not go back and re-data mine that database.
6  BY MR. THOMPSON:
7      Q.    Did you --
8      A.    But I don't know.  I have an absence of
9  information.
10         And it's affecting -- it's clearly
11 affecting my security at standing here and saying yes
12 or no, because what I've been asked to render is very
13 generalized, and I would prefer to have access to the
14 remainder of that information.
15     Q.    All right.
16     A.    If, indeed, this is the bottom line,
17 then I'm concerned that even if I asked for all the
18 information, I won't come up with a different answer.
19         If this above there says, well, nobody
20 ever looked at the lots before they ended up on the
21 market and, therefore, this unlikely is based on,
22 well, we never looked at the lots, that's what he's
23 implying, that there is some uncertainty to that.
24         And now the question is, can I actually
25 say -- because I'm not a GMP expert and I know nothing

Page 272

1  about how to quantitate abnormal pills and lots, I
2  can't tell you what procedure they should use.
3      Q.    Doctor, let me ask you a couple
4  questions.
5          Do you know what period of Digitek drugs
6  were recalled, for what time period?
7      A.    It started June 6th, 2006, and I believe
8  went for two years, up until the May -- or the April
9  -- the date of the release of the recall.  But I did
10 look at that.
11         And I tried to sort it out because it
12 had to do with -- it wasn't manufacture date, it was
13 market release date.
14     Q.    All right.
15     A.    And I did take time to sort that out and
16 then I was sort of out of scope.
17     Q.    All right.  Well, let me ask this:  When
18 this FDA facts and myths document was posted, was
19 Digitek being made available to consumers in the
20 United States?
21     A.    When this was posted, I don't know what
22 date it was posted.  And I don't know whether Digitek
23 was still in the market.  I can't answer that.  I was
24 unable to find the date when he asked me for it.
25     Q.    Well, if, assuming that the bullet point

Page 273

1  says lack of reported adverse events before the
2  recall, can you date this as to when it was vis-a-vis
3  the recall?
4      A.    The recall package was dated April 25th,
5  2008.  So it was up until that point.  It was -- it
6  was -- the press release was the 25th of April.
7          So you can say that up until public
8  awareness of the recall on the 25th that there was no
9  impact of the recall on the reporting rates.
10         So that the reporting rates up until the
11 recall were not induced reporting rates.  That as soon
12 as that press release went out, the increase in
13 reporting rates was significantly influenced by the
14 knowledge of the recall.
15         And I cannot comment because I haven't
16 looked at the cases.  This is someone else.
17     Q.    All right.
18     A.    How many of those were potentially
19 frivolous cases and how much were concerning -- how
20 many cases do we have of documented supratherapeutic
21 digitalis levels, how many cases took the tablet.
22         I do know that you can see digitalis
23 toxicity at therapeutic doses.  You don't have to be
24 supratherapeutic to have the toxicity.
25         So it makes it very, very difficult to

69 (Pages 270 to 273)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 274

1  sort out based on clinical symptoms whether you're
2  dealing with supratherapeutic digitalis.
3          And I was very thankful that I did not
4  have to render an expert opinion on that, that you
5  probably took doctors who were experts in digitalis.
6      Q.   All right.  That actually raises a
7  question.
8          Is an adverse event report, is that
9  voluntary or mandatory at the clinician's level?
10     A.   In the U.S., it's voluntary.
11     Q.   If a practicing physician had a patient
12 who showed symptoms of Digoxin toxicity, would that,
13 as a common practice, generate an adverse event
14 report?
15     MR. KAPLAN:  Objection.  Calls for
16 hearsay.
17     THE WITNESS:  Well, that's difficult to
18 say.
19         With a drug that's as old as Digoxin and
20 as established, I can tell you right now that there
21 are hospital admissions for digitalis toxicity.  That
22 when I was a resident I was not aware of MedWatches.
23 BY MR. THOMPSON:
24     Q.   All right.
25     A.   The issue when you're in a drug company

Page 275

1  is that a post-marketing report in most companies
2  defaults to possible.
3          By virtue of the fact that the person
4  had a clinical suspicion, when it's reported to the
5  company, when you do that relatedness assessment
6  inside the company, many big pharma SOPs default to
7  possible by virtue of the fact that the person who is
8  not subject to mandatory reporting reported the case.
9          So they default to submission to the
10 FDA.  There is some variability, but my understanding
11 is the industry standard for post-marketing, when it's
12 unsolicited, defaults to possible.
13     Q.   All right.  Let me ask you to look at
14 Defendant's Number 20.  I think it's on your -- it
15 should be on your stack there.
16         No?  It should be --
17     MR. DEAN:  This is a stack here, I was
18 trying to get it organized.  Let me find it for her.
19         Here you go.
20 BY MR. THOMPSON:
21     Q.   All right.  You were shown -- I'm going
22 to hand you Defendant's 20.  You were shown this
23 summary of findings of the CGMP inspection.
24         Do you recall?
25     A.   Yes.

Page 276

1      Q.   You recall -- I think your testimony was
2  you had not seen this before?
3      A.   No.
4      Q.   Okay.  Now, what's the date of the CGMP
5  inspection?
6      A.   December 1st, 2004.
7      Q.   All right.  Is there any date, is there
8  any operative date, that's been involved in any
9  question that you've been asked that includes
10 12/1/2004?
11     A.   No.  However, the investigation report
12 for the double-thick Digitek tablet was July 2004.
13     Q.   All right.
14     A.   I'm not sure what date.  But it was five
15 to six months before this repeat inspection.
16     Q.   All right.  And do you know the date of
17 production of this document to the plaintiffs in this
18 case?
19     A.   No.  I do not know whether this was
20 inadvertently omitted from my packet, whether it was
21 in the millions of pages, some -- and not sent to me
22 or whether it was sent to the plaintiffs late, and,
23 therefore, we have evidence after I was submitted my
24 dossiers --
25     Q.   All right.

Page 277

1      A.   -- that I should be allowed to consider
2  as later evidence.
3          Again, this is -- I keep saying my
4  naivete and maybe it's just my foolishness to say my
5  naivete.  But there may be issues with this.  There
6  may be late discovery that I would be permitted to
7  review without any embarrassment.
8      Q.   All right.  Now, let me ask you to pull
9  out the big -- the attachment to your report.
10     MR. DEAN:  Excuse me.
11         If we're done with that, let me get that
12 one back in the stack of exhibits so it doesn't get
13 misplaced.
14     MR. THOMPSON:  Thank you.
15     THE WITNESS:  I did ask --
16 BY MR. THOMPSON:
17     Q.   The big appendix.  The big appendix.
18     A.   Yes.  I did ask if there was going to be
19 more discovery, if discovery was complete, if all of
20 these documents had been obtained, and if I could
21 request these missing documents in discovery, and they
22 said there may be that chance.
23     Q.   All right.
24     A.   And I was led to believe that it was
25 permissible to proceed in such a manner, that as a

70 (Pages 274 to 277)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

## Page 278

1  witness, I was allowed to question this and ask for
2  more information.
3          And that if I was provided it, that I
4  could modify my report based on the submission of new
5  evidence to me.
6          That filing that report would not
7  embarrass me, the Miller form, or Motley Rice, if
8  another round of discovery would produce new evidence.
9      Q.   Okay.  Let's go to Page 20 and 21 of
10 that attachment.
11     A.   Okay.
12     Q.   Now, there in the middle of the page of
13 Page 20 there is a lengthy quotation.
14     A.   Yes.
15     Q.   You see that?  What is that quotation
16 from?
17     A.   It's from Reference 4 on Page 2.  And
18 Reference 4 is the August 15th warning letter based on
19 the company response of February 28th.
20     Q.   And what day is that?
21         MR. DEAN:  What year?
22         MR. THOMPSON:  Yes.
23 BY MR. THOMPSON:
24     Q.   What's the date?
25     A.   August 15th, 2006 warning letter based

## Page 279

1  on the company response dated February 28th, 2006.
2          So what happened with the 2006
3  inspection is the company sent a response on February
4  28th to the 483, and then again on February 28th.  And
5  the FDA sent a revised warning letter and had
6  concerns.
7      Q.   All right.
8      A.   Yes.
9      Q.   Now, let's go to Page 21.
10     A.   Okay.
11     Q.   And you have a comment on the following
12 page --
13     A.   All right.
14     Q.   -- where you relate the -- and maybe I
15 should just get you to read it.  If we go down one,
16 two -- the sentence that begins In light of.
17         Do you see that?
18     A.   Yes.  Should I read the entire
19 paragraph?
20     Q.   Just read out loud the sentence that
21 begins with In light of.
22     A.   In light of the FDA 483 inspection
23 observations from May 20th, 2008, it is my opinion
24 based on reasonable degree of evidence that the
25 compliance remediation in 2006 was not adequate either

## Page 280

1  in content or in implementation to remediate the
2  inspection findings of delinquent expedited reporting,
3  inadequate case follow-up, or the quality of reports.
4      Q.   Okay.  Now, if I hand you Defendant's
5  Exhibit 87, which you saw for the first time today
6  during the -- and I'll just hand you my copy of it,
7  which you saw for the first time today, and you
8  indicated that was one of the three documents that
9  caused you to worry about your -- the quality of your
10 opinions.
11         Do you see that?
12     A.   Yes.
13     Q.   And you agree that that's the letter
14 that caused you to question that; is that right?
15     A.   Yes.
16     Q.   Okay.  Read me the two sentences back to
17 back.
18         Well, read me the entire second
19 paragraph.
20     A.   New Jersey District has reviewed your
21 response regarding the Adverse Drug Experience
22 reporting deficiencies.  Your corrective actions and
23 the revised procedures appear to be satisfactory.
24         We will, however, confirm the adequacy
25 of your corrective actions and assess the overall ADE

## Page 281

1  reporting system during a future inspection.
2      Q.   Okay.  Now, what do you think the last
3  sentence of that paragraph means?
4      A.   They will confirm the implementation,
5  the adequacy of the implementation.  At this point it
6  appears they're okay with the content.
7          They will confirm the adequacy of the
8  implementation and they will expand the confirmation,
9  not just to the adequacy of the directed corrective
10 actions to the observations in 2006 --
11     Q.   Okay.
12     A.   -- but they will expand this to include
13 the adequacy of the entire ADE system.
14     Q.   All right.  Now --
15     A.   This --
16     Q.   Let me ask you a question.
17     A.   Okay.
18     Q.   I want to go back to your comment at
19 Page 21.  Okay.
20         Now, do you stand by your opinion that
21 was expressed on Page 21 that taking the findings of
22 the 2006 inspection and taking the findings of the
23 2008 inspection that the compliance remediation was
24 not adequate either in content or implementation to
25 remediate the inspection findings?

71 (Pages 278 to 281)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

Page 282

1      MR. DEAN: Objection.
2      MR. KAPLAN: I'm going to object and ask
3  for some clarification. I was told, I thought it was
4  her sworn testimony, that Exhibit 261, that all of her
5  opinions were contained in Section 3 entitled Analysis
6  and Conclusions of Exhibit 261?
7      THE WITNESS: But I also stated that
8  this document was split in a very short time frame and
9  there was a chance that not all of them were
10  completely transferred. I believe this is in 261.
11      MR. KAPLAN: Well, I'd like to have the
12  reference to it because I'm trying to -- what I was
13  trying to do is figure out what are your opinions.
14      And I looked in the analysis section,
15  and I'll just tell you that I looked for words such as
16  it is my opinion that or it is my opinion based on the
17  evidence that.
18      And I counted, starting on Page 5, going
19  through Page 9, seven -- seven opinions that you
20  expressed in there. And so I did the best I could.
21      Following that, I asked you the question
22  are all your opinions contained in 261. Your answer
23  was, yes, you relied upon that.
24      So I just don't understand what it is
25  we're being asked to do here to try to suck out

Page 283

1  opinions from another document that in your opinion --
2      MR. THOMPSON: This entire document was
3  produced timely. It's been in your possession. I'm
4  sure you've had people analyzing it. And the words
5  have been in your possession for --
6      MR. KAPLAN: So you're telling me that
7  not all of her opinions are in Exhibit 261 --
8      THE WITNESS: I modified this.
9      MR. KAPLAN: -- the June 15, 2010
10  document prepared by Dr. Karen A. Frank, entitled
11  Background, Analysis and Conclusions, that's not all
12  of her opinions?
13      We have to go searching beyond that; is
14  that right?
15      MR. THOMPSON: I don't know that you
16  have to search. All you have to do is read it.
17      MR. KAPLAN: Well, I've read this and
18  I've tried to sort out her opinions, and whenever she
19  expresses an opinion she says it is my opinion that
20  and I've relied upon that.
21      And that's where I get seven opinions,
22  so I don't understand where else. This is not a game.
23      THE WITNESS: I have this -- I have this
24  on Page 5, paragraph three, the last sentence.
25      These observations, taken in their

Page 284

1  entirety, provide evidence that the pharmacovigilance
2  system and the accompanying quality systems remain
3  inadequate to ensure compliance with regulatory
4  reporting or requirements of the compliance
5  remediation, either from the MHRA inspection of 2005
6  or the FDA inspections in the first quarter of 2006.
7      I did not go into the specifics of the
8  single-case reporting or the narrative quality. I
9  would have to go back and verify that.
10      But the -- when this really became a
11  pressured situation to make a determination, I relied
12  very, very heavily on this 2008 inspection to show
13  that there were persistent observations that were not
14  remediated.
15      I couldn't say whether it was the
16  content of the plan because I wasn't provided that, or
17  the implementation. Because it could be a bad plan
18  with good implementation or it could be a good plan
19  with bad implementation.
20      MR. KAPLAN: If there were remediation
21  problems, do you think the FDA would have said in
22  Exhibit 38 that there was a very -- it's very unlikely
23  that anybody was harmed as the result of defective
24  Digitek?
25      MR. THOMPSON: Let me interrupt. It

Page 285

1  sounds as though we're going to go a little more than
2  five minutes and he -- I think we're running out of
3  tape.
4      VIDEO OPERATOR: We have one left.
5      MR. KAPLAN: Will you answer that
6  question?
7      MR. THOMPSON: Have I passed the chair
8  to you?
9      No, wait. Go ahead. Go ahead. Go
10  ahead.
11      MR. KAPLAN: Okay.
12      MR. THOMPSON: Go ahead.
13      MR. DEAN: First, we need to change the
14  tape.
15      VIDEO OPERATOR: Going off the
16  videotape.
17      This is the end of Tape 5.
18      The time is 5:11 p.m.
19      (Discussion off the record.)
20      (The court reporter read back the
21  following:
22      "QUESTION: If there were remediation
23  problems, do you think the FDA would have said in
24  Exhibit 38 that there was a very -- it's very unlikely
25  that anybody was harmed as the result of defective

72 (Pages 282 to 285)

Page 286

1  Digitek?")
2      VIDEO OPERATOR: We're now back on the
3  videotape.
4          This is the start of Tape 6.
5          The time is 5:15 p.m.
6          THE WITNESS: Okay. I do not know what
7  evidence the FDA considered in reaching the opinion
8  that there was no risk to public health, whether that
9  was only based on the evidence in the AERS database
10  and the probability of this being a high-frequency
11  event with pills on the market.
12          There was enough concern to draw the
13  pills from the market. I have no idea whether it was
14  one pill, a hundred. There is no, at this point. But
15  you have to rely that there was some sort of an FDA
16  analysis.
17          Whether or not it includes the
18  remediation plan or an assessment of the system that
19  produced the data, I don't know the answer to that.
20  If --
21          EXAMINATION
22  BY MR. KAPLAN:
23      Q.    You have a high degree of confidence in
24  the FDA?
25      A.    Yes. If --

Page 287

1      Q.    And you don't believe that the FDA would
2  make such a statement lightly, do you?
3      A.    My opinion is that they felt these
4  remediation processes were so serious that there could
5  be a bunch of cases in the Actavis database
6  unreported, they would have gone in and looked.
7          They would have pulled up the coded
8  cases and text search.
9          Because my understanding, based upon
10  only on verbal communications, the kind of, you know,
11  afternoon coffee conversations, is that those are the
12  kind of things they do when they have a market
13  withdrawal.
14          But I do not know if that is standard in
15  a recall of generic drugs.
16          I can't comment on the adequacy of their
17  response. And I don't know whether it was done or
18  not.
19      Q.    All right.
20      A.    But the idea that they issued a release
21  and they let it out on the web site unmodified means
22  at this point they don't believe there's a risk.
23  That's their position.
24          The FDA is maintaining their position
25  based upon present data. I do not know what that is.

Page 288

1  It includes this Establishment Inspection Report.
2          So the Establishment Inspection Report
3  that I base my opinion on was available to them at the
4  time they rendered that opinion and they are
5  differing. They are saying it doesn't impact Digitek.
6          I am making a generalization of saying
7  these defective systems may have impacted signal
8  detection because there's a lot of evidence that these
9  things weren't done.
10          The FDA inspectors are concerned with
11  Health Hazard Assessments that aren't done in
12  realtime.
13          There's concern that there's still lack
14  of single-case reporting, which means the FDA may or
15  may not have seen them all. They're saying at this
16  point, based on what they know, this is okay.
17          You're presenting me with evidence that
18  may, indeed, negate my opinion.
19          And I'm starting to feel more
20  comfortable now with the process of being a witness in
21  deposition that I am to modify my position truthfully
22  based on new evidence, that this is what I've been
23  hired to do.
24          If I had had all of this, my opinions
25  would probably have been more specific, definitely

Page 289

1  more defensible on deposition. But they would not
2  have been subject to this new information.
3          And I'm trying to couch my response to
4  you to give diligence to all parties in the attempt to
5  handle this situation in realtime with the deadline
6  correctly. I don't want to be seen as accusing the
7  Miller firm or Motley Rice.
8          I think there was issues with how the
9  data was gathered in discovery and maybe disseminated.
10          There may be the opinion that the
11  discovery was completely adequate on this case or my
12  request for further information may have been
13  honored. But I was told to try to come to truth based
14  on the evidence that I was provided.
15          So the evidence that you provided to
16  me is that the FDA may have completely overruled my
17  opinion, and that based on their knowledge of
18  compliance and the adequacy of the single-case reports
19  that still led me to say there could be vulnerability,
20  these are defective processes, the FDA was willing to
21  admit that statement.
22          And the strength of the FDA and their
23  access to information I don't have can completely
24  negate my opinion based on these -- this subset of
25  evidence.

73 (Pages 286 to 289)

Page 290

1        MR. KAPLAN:  Thank you.
2        MR. THOMPSON:  I don't have anything
3    else.
4        MR. KAPLAN:  I appreciate your candor.
5    I appreciate you --
6        THE WITNESS:  I was asked how to handle
7    this.  I was told to try to seek truth.
8        MR. KAPLAN:  And that's what we're
9    trying to seek here.
10        THE WITNESS:  And I just -- I want to be
11    certain the fact that I still don't have all the
12    information, that what the FDA had really is
13    sufficient to overturn mine.  That's the question at
14    hand here.
15        And if there is any other question of
16    the adequacy of that -- of the information on the FDA
17    statement, if they -- if they did not have sort of
18    this linear timeline that I have, then there probably
19    should be more expert witness testimony.
20        Perhaps I should be replaced by someone
21    stronger.
22        But if we have found that this FDA
23    evidence will, in October, in front of a panel of
24    federal judges, lead to the same conclusion, is there
25    any value with my sitting there and coming up with the

Page 291

1    same conclusion?
2        I think the evidence issue is still
3    open.  But it appears that if we're making the
4    assumptions that the FDA had all of this evidence and
5    they will overrule this, this situation will probably
6    repeat itself in October.
7        And right now, I have to be very careful
8    because I can't think of a way to rebut your
9    presenting me with the FDA looked at this and came up
10    with a different conclusion and they had the evidence
11    you didn't have.
12        I can't immediately contradict that.
13    BY MR. KAPLAN:
14        Q.    Nor would you want to, would you?
15        A.    Not if it's foolish and untrue.
16        Q.    And you believe in the FDA?  You believe
17    they told the truth?
18        They're telling the truth; right?
19        A.    Yes.  I don't know whether there's
20    potentially other information they did not have.
21        I'd hate to be embarrassed by people --
22    him replacing me with another expert witness and more
23    evidence that shows that that FDA statement was not
24    supported by all of this evidence that we don't now
25    have that I haven't seen.

Page 292

1    That would be an even greater
2    embarrassment.
3        But at this point with what you're
4    presenting me on the assumption that that FDA
5    statement is backed by evidence and data, data that
6    was generated by these inadequate systems, by
7    voluntary reporting with an old drug, I believe a
8    federal judge would discard my expert opinion in light
9    of a stronger expert opinion.
10        MR. KAPLAN:  Thank you very much for
11    your candor.
12        THE WITNESS:  That -- my -- what I want
13    to make sure is my response is appropriate because I
14    don't help anybody.
15        MR. THOMPSON:  Let's just wait until
16    there's a question on the table.  Okay?
17        THE WITNESS:  I'm sorry.
18    BY MR. KAPLAN:
19        Q.    Go ahead.  I didn't want to interrupt
20    you.  Go ahead.
21        A.    No.  My main concern in taking this
22    assignment was that I was adequately prepared by
23    experience and seniority to be truly an expert
24    witness.  I did not realize the magnitude of the case.
25        If you're going to start to do new work,

Page 293

1    it is generally advisable to do it in a circumscribed
2    setting where there is no question of one's adequacy
3    for the magnitude of the litigation.
4        If there's any question of that with me,
5    I would have liked to have known it because I would
6    not have proceeded.
7        Now, that being said, I was asked to
8    render opinion in a short time frame based on a given
9    amount of evidence, and I asked for further evidence
10    and I reviewed what was provided.
11        I did not pull in some of the statements
12    from the depositions.  That was a deliberate
13    statement, not to comment on the personnel in the
14    depositions, but to stick with the evidence from the
15    FDA.
16        But at this point, I have been told I
17    was adequate to do this job.  The point to do it was
18    to seek truth based on the evidence.
19        And I had nothing to worry about with
20    anybody accusing me of wrongdoing, either by going
21    into something where I was not adequately prepared or
22    -- or otherwise.
23        So if you're presenting me with this
24    evidence that the FDA had all of this evidence that I
25    wanted, and there was no risk to public health, and

74  (Pages 290 to 293)

Page 294

1  the probability is that that would be confirmed by
2  these federal judges on October 8th, then we have hit
3  truth.
4        We have hit an expert witness that is
5  stronger than I am who has seen all of the data. We
6  need to be sure they've seen all of the data.
7        But for me to go in with the
8  inexperience in expert witness, a report based on a
9  sampling of data that may need to be modified and
10 revisions may not serve anyone. And there may be --
11       MR. THOMPSON: Doctor, you have said
12 this many times.
13       THE WITNESS: I'm sorry.
14       MR. THOMPSON: I think we're -- I think
15 we've got it.
16       THE WITNESS: I'm more worried about me.
17 And I wanted --
18       MR. THOMPSON: That's a given.
19       THE WITNESS: Yes.
20 BY MR. KAPLAN:
21    Q.   You want to be vindicated. You want to
22 go out with a --
23    A.   I want to be vindicated.
24    Q.   -- good feeling that you've arrived at
25 the truth?

Page 295

1     A.   Yes. But these people offered me the
2  opportunity to do something new and they trusted me to
3  act on their behalf to really look at this. And under
4  no way do I want to malign them or do them wrong.
5        But what we're seeing is the process of
6  discovery was more extensive than we realized. There
7  may be more.
8        But it looks like I was overruled by the
9  FDA. And it would be foolish for me to go into a
10 Federal Court and challenge that. There are people
11 who do that.
12    Q.   But you're not one of them?
13    A.   I know attorneys who do that.
14    Q.   You're not one of them?
15    A.   It may be some day. But I think at this
16 point in time, that I'm probably not the person to be
17 doing that. That's my honest opinion.
18       There are people that might be able to
19 say to me tomorrow, Karen, we want you to do that.
20 But I don't support the kind of litigation where
21 people go in and challenge the FDA. I don't think I
22 would have taken that.
23       I know it's done. I know it's done
24 successfully. And the people that do it, I agree with
25 how they did it. I don't know that I should do that

Page 296

1  in this case. That -- I leave that up to you, really.
2        MR. THOMPSON: Thank you.
3        THE WITNESS: I don't -- I'm talking too
4  much.
5        MR. THOMPSON: Thank you.
6        Dick, I think you've got some questions.
7  BY MR. KAPLAN:
8     Q.   Well, if you have anything else that you
9  want to say, anything, you know, this is your
10 opportunity to go ahead and make any statements you
11 want to make.
12    A.   Well, my concern in doing something new
13 was to not -- I don't want to put the integrity of the
14 litigation in jeopardy either way because of my
15 inexperience.
16       And so my going into a court as a
17 lightweight does not serve these people. The question
18 is, am I? But that's their decision.
19       It's very clear right now that there's a
20 certain -- that I am being entrained by whoever's
21 questioning me.
22       And my concern not to do anything wrong
23 and vindicate myself, that may or may not be evidence
24 of my inexperience with -- if I was a really heavy-
25 weight expert witness, I might hit back. I'm not

Page 297

1  ready right now to hit back.
2        But I'm very concerned by the fact that
3  you're showing me evidence the FDA looked at this and
4  said there's no risk to public health and that there
5  was a Congressional inquiry.
6        So there was a -- this is already, you
7  know, under a lot of scrutiny and has a high degree of
8  certainty. I have to modify my opinion.
9        MR. KAPLAN: Thank you very much.
10       Thank you so much for your candor.
11       EXAMINATION
12 BY MR. DEAN:
13    Q.   I just have a few questions, but they're
14 medical questions, they're factual questions. I want
15 to -- I'd ask that you listen to the question. I
16 think you'll be able to give short answers.
17       They arise from a question that
18 Mr. Thompson asked you or at least an answer that you
19 gave to one of Mr. Thompson's questions.
20       And that was about the information that
21 went into gathering MedWatch reports in hard cases, in
22 cases involving digitalis.
23       So my question to you is this: Would
24 you agree that people who are taking Digitek -- strike
25 that.

75 (Pages 294 to 297)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 298

1    Would you agree that people who are not
2  taking Digitek, who have been prescribed it for an
3  underlying heart condition, that they can have higher
4  than normal levels with perfectly acceptable normal
5  tablets?
6    A.   Yes.  Digitalis toxicity is well
7  documented to occur with no concomitant abnormality in
8  the tablets.
9    Q.   And it can occur for a variety of
10  medical reasons, such as renal failure, which develops
11  or gets worse than it was in the past; correct?
12    A.   Yes.  Intercurrent events, such as renal
13  failure, can precipitate digitalis toxicity.
14    Q.   And a number of other medical events can
15  also lead to digitalis toxicity on perfectly normal
16  tablets; agreed?
17    A.   Yes.
18    Q.   And does -- and so what I was leading up
19  to, doesn't that make it extraordinarily difficult to
20  recognize through a safety signal analysis whether
21  there is a -- safety signal is throwing off or is
22  giving a signal of a defective tablet?
23    A.   Yes.  The statement from the consumer
24  group makes the point that -- I don't know whether we
25  should cite it verbatim, but it's very, very difficult

Page 299

1  to list causality to the Digitek tablets to any given
2  case.
3    And I made a note in the margin that at
4  this point I have no evidence to refute that
5  statement.
6    And I found when I looked up the drug
7  label, I told you I did go on the Internet, that it
8  confirmed that digitalis toxicity, clinical digitalis
9  toxicity, can be seen at normal -- normal therapeutic
10  levels.
11    So the person does not -- this is
12  extremely complicated.
13    However, one more thing, what I'm saying
14  right now is technically outside of the scope of my
15  review.
16    Q.   Doesn't that make -- doesn't the fact,
17  though, that you just articulated from the consumer
18  group and the fact that you -- the facts that you've
19  testified to a few minutes ago that you can have high
20  levels with normal tablets, doesn't that make it
21  impossible to apply any recognized scientific
22  methodology to look at adverse events on Digitek and
23  conclude they were due to a tablet defect?
24    A.   I know that this argument has been used
25  in prior litigation.  I have specifically stayed out

Page 300

1  of those issues, even in conversations over lunch or
2  dinner, casual conversations.
3    I avoid, for the most part, commenting
4  on some of these high-profile cases.
5    I do know that some of these pro --
6  high-profile cases that have used that argument have
7  been forced to settle.  I cannot tell you --
8    Q.   Let me -- excuse me.
9    A.   -- that I know --
10    Q.   I'm not asking you about other cases.
11  This is the only case involving Digitek that I'm aware
12  of.  I don't know what other high-profile cases you're
13  talking about.
14    All of us would like to get out of here
15  in the not too distant future.  My question was a very
16  focused question.
17    Are you aware of a recognized scientific
18  methodology by which a safety signal could be arrived
19  at to ascertain the defective Digitek was on the
20  market given the inherent difficulties we've spoken
21  about here in the last few minutes?
22    A.   There is a -- boy, this is -- I have to
23  say this right.  There is a significant possibility.
24  I was going to say high likelihood.  I don't know how
25  to express this.  But the lower the event rate, the

Page 301

1  harder it is to demonstrate.
2    For example, it's very difficult in
3  pesticides to show differences in cancer rates for
4  very, very low event rate cancers.
5    The lower the event rate, the harder it
6  is to find a vigorous scientific method to demonstrate
7  it and the larger the sample size you need to
8  demonstrate it.
9    It's -- there's increasing evidence that
10  this is a very, very low frequency event.  But there's
11  a paucity of real hard evidence on what was the event
12  rate.  That's where I started asking these questions.
13    The FDA has sort of confirmed that it's
14  a low event rate.  Based on that, it becomes
15  increasingly difficult to scientifically demonstrate
16  in any given case.  And that's what the consumer group
17  says.
18    And right now, I don't have the
19  information and I probably don't have the expertise to
20  refute that.  You need somebody who carries a Ph.D. in
21  epidemiology.
22    Q.   As we sit here today, you cannot cite to
23  me a recognized scientific methodology by which one
24  could discern a safety signal for defective Digitek
25  from looking at a set of medical records, can you?

76 (Pages 298 to 301)

Karen A. Frank, M.D.        Videotaped                June 30, 2010

---

Page 302

1      That's a very focused question. Can you
2  cite me a recognized scientific methodology by which
3  that can be done?
4      A.   I know the methodologies. I am not
5  expert enough to render an opinion on their scientific
6  validity for the low frequency events of the Digitek
7  tablets.
8      Q.   Thank you.
9      A.   I know them generally for doing adverse
10 event rates. I cannot comment on their implementation
11 in this particular case.
12      MR. DEAN:  Thank you.
13      I have no further questions.
14          EXAMINATION
15 BY MR. KAPLAN:
16      Q.   Would you be sad if we said we're at the
17 conclusion of your deposition or would you be glad?
18      A.   Well, I would be glad.
19      I do hope that if the Miller firm and
20 Motley Rice feel that there is more evidence and they
21 want to fight this FDA observation, that they will
22 feel free to do it even if it's not wise to have me on
23 the witness stand under questioning.
24      I would hope that the fact that I have
25 come to the point where I'd say this FDA press release

---

Page 303

1  and the fact that they probably have the documentation
2  that I didn't have might negate any further analysis
3  by me negligible.
4      If there are people who can get that
5  evidence and continue this, where it may not be wise
6  for me to do it, under no circumstances do I want my
7  present testimony to inhibit their further pursuit of
8  truth if there is evidence that the FDA opinion should
9  be contradicted.
10      Right now, I have not been presented
11 any. But I do want to go on record that these people
12 hired me, and I'm in a very difficult situation right
13 now.
14      And under no circumstances do I want to
15 undermine their position if they want to continue this
16 course of litigation.
17      I think it -- I'm pretty comfortable
18 with where I've had to come based on what I've
19 presented, and I guess --
20      MR. THOMPSON:  Okay.
21      THE WITNESS:  -- I have to stop talking.
22      MR. DEAN:  Let's go off the record.
23      We're finished.
24 BY MR. KAPLAN:
25      Q.   You don't have to. I mean, I want you

---

Page 304

1  to be able to say whatever you want to say because
2  this is your last opportunity to do so, maybe. It's
3  your testimony under oath.
4      So if there's any other statement you
5  want to make or any concern you want to express --
6      A.   I want assurance that my insecurity
7  because I'm new to this expert witness game has not
8  led me to abandon an opinion and fail my client.
9      But I have difficulty arguing with that
10 statement of the FDA, if it's based on the data that I
11 wanted to see, because I'm afraid there are other
12 people that would weigh the FDA more than me.
13      Q.   I just want you to understand this.
14 This is not an expert witness game.
15      A.   Oh, I know this.
16      Q.   It's not a game. This is a real-life,
17 serious situation in which plaintiffs are asking for
18 millions of dollars, millions and millions of dollars,
19 from our clients.
20      They're accusing our clients of
21 wrongdoing. We're doing our best to defend our
22 clients.
23      You understand that?
24      A.   I understand the implications. And I've
25 used words about myself that may or may not be

---

Page 305

1  appropriate descriptors.
2      This is a very big case, and I expressed
3  concern from the outset that my role, particularly as
4  things started to be disclosed that this was more than
5  I had originally agreed to do, would not jeopardize
6  the correct outcome of the case.
7      There is a chance that there's -- my
8  insecurity with my inexperience at this that's causing
9  the problem. And I don't want to hurt anybody.
10      I want this to actually -- people said
11 just seek to come to truth. And that's what they're
12 asking you to do.
13      Q.   And that's what you've done today to the
14 best of your ability, to seek the truth, to seek to
15 testify to the truth; correct?
16      A.   I believe that. I do have some fears
17 that there could be people who would want to fight the
18 FDA. I know there's people who do this.
19      And there's a chance that that's what
20 this case will evolve into. But at this point, you've
21 presented me with a witness that I believe overrules
22 me.
23      MR. DEAN:  Thank you.
24      MR. KAPLAN:  All right. Thank you.
25      MR. DEAN:  Let's go off the record.

77 (Pages 302 to 305)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 306

1          VIDEO OPERATOR:  Any more questions?
2     MR. DEAN:  No more questions.
3          VIDEO OPERATOR:  We are now going off
4     the video record.
5          This is the end of Tape 6 and concludes
6     the videotaped deposition of Karen A. Frank, M.D., on
7     June 30th, 2010.
8          The time is 5:39 p.m.
9          (Witness excused.)
10          (The deposition concluded at 5:39 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 307

1          WITNESS CERTIFICATION
2
3
4
5          I hereby certify that I have read
6     the foregoing transcript of my deposition testimony,
7     and that my answers to the questions propounded, with
8     the attached corrections or changes, if any, are true
9     and correct.
10
11
12
13
14
15     _____     _____
       DATE               KAREN A. FRANK, M.D.
16
17
18
19     _____
       PRINTED NAME
20
21
22
23
24
25

78  (Pages 306 to 307)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 308

**A**

abandon 304:8
abandoned 116:16
  117:6,10,18 119:6
abilities 238:21
ability 220:12
  224:17 233:15
  239:4 245:6
  305:14
able 23:18 51:13
  77:15 150:18
  153:25 174:10
  214:9 236:25
  244:23 248:6
  259:15 263:5
  267:7 295:18
  297:16 304:1
abnormal 272:1
abnormality 298:7
absence 51:3 62:9
  64:4 71:5 80:20
  85:13,14 93:25
  119:21 121:1
  123:13 210:1,2,12
  214:22 217:25
  235:21 253:12
  267:3 271:8
absences 71:24
absent 46:17
  216:13
absolute 180:23
absolutely 104:13
  164:22 192:22
  228:10 261:8
abstract 117:24
abstracted 71:20
  74:9,11 149:12
abstractions 75:13
  78:14
accept 181:16
acceptable 68:22
  298:4
accepted 181:16
accepts 148:19
access 22:16 132:20

134:12,13 196:21
  234:17 235:1
  270:24 271:13
  289:23
accidentally 69:14
  118:10
accompanying
  234:14 235:4
  284:2
account 140:16
  144:12 178:22
  193:22 194:24
accuracy 131:24
  159:23 230:4
  244:13
accurate 11:5,7
  18:6 80:17,24
  81:5 82:10,12
  84:5 166:5 192:4
accurately 26:8
  29:1 123:19
  227:19
accused 199:12
  258:17 260:18,20
accusing 289:6
  293:20 304:20
acknowledge
  165:16
acquired 151:11
  175:22
acquiring 189:24
acquisition 143:9
  149:16 154:17
  155:7,10 190:1
  214:6,20,21
acquisitions 155:3
acronym 112:6
act 127:13 252:10
  295:3
Actavis 4:22,23
  19:4 26:11 67:3
  73:9 90:13 102:2
  106:14 107:8
  108:20 139:5
  142:21 143:23

144:7,13 150:5
  163:2 164:7
  166:14 168:23
  169:20 171:17
  185:22,23 187:12
  187:17 188:1,23
  193:10 208:8
  213:24 214:1,17
  216:6,25 247:12
  269:18 287:5
acting 30:3
action 99:11,14,17
  100:6 101:5
  150:25 159:4
  164:19 167:9
  172:17 173:24
  255:7
actions 101:13
  107:23 108:2,15
  108:16,21,23
  109:10 165:19
  166:25 167:2,5
  170:19 172:8,13
  173:4,6,10 193:10
  243:14 259:17
  280:22,25 281:10
actively 131:21
  270:3
activists 151:8
actual 76:16 93:14
  112:6 119:5 123:3
  123:15 136:5
  171:24 174:19
  241:4
adamant 59:8
addition 182:7
additional 15:25
  22:12 23:16,18
  24:2,5,6,8 42:6
  46:19 71:10 79:6
  79:6 81:17 107:18
  139:1 166:2 207:9
  225:13 227:6
  229:5 230:3
  235:24 256:9

address 9:12 23:1
  80:5 83:15 86:25
  136:9 195:16
addressed 25:12
  96:8
addressing 136:9
  162:18
ADE 280:25 281:13
adequacy 48:22
  70:13 76:6 85:22
  86:1 92:15 93:23
  108:16 159:4
  160:11 167:5
  170:7 171:16
  173:9 280:24
  281:5,7,9,13
  287:16 289:18
  290:16 293:2
adequate 59:10
  76:5 109:11
  178:24 180:4
  192:7 237:1,4,6
  248:24 279:25
  281:24 289:11
  293:17
adequately 82:7
  161:17 190:4
  292:22 293:21
ADE's 51:4
Administrative
  106:9
admins 54:3,19
  55:2
admissions 274:21
admit 205:12
  289:21
admitted 120:20
  248:13
admittedly 118:19
admonition 62:19
ADR 74:12
adulterated 100:17
adulteration
  100:11
adverse 18:25 76:3

76:4 78:6,8,15
  86:15 88:15 89:4
  89:7,17 110:4
  132:13 134:8
  135:20 137:7
  139:5,13 140:4
  141:19 150:15,22
  164:18 166:13
  168:23 187:7
  210:14 266:1
  270:8 273:1 274:8
  274:13 280:21
  299:22 302:9
advice 56:14 57:2
  180:2 220:25
advisable 293:1
advisory 16:12
  22:4 95:21
advocate 80:9 83:2
AER 72:19 113:15
AERs 73:14 88:20
  102:11 134:11
  187:6 286:9
affiliate 211:6
affiliates 210:5
  214:4
afraid 13:8 126:6
  126:10 227:2
  304:11
afternoon 70:6
  287:11
agency 99:11,14,17
  100:6 154:23
  170:20
agents 97:4
aggregate 72:23
  73:4 74:14 79:20
  101:25 103:6
  125:14 126:1
  143:5 148:20
  185:17
aggressive 101:5,13
agnostic 123:2
ago 16:23 17:23
  25:2 42:15 75:2

Karen A. Frank, M.D.                    Videotaped                    June 30, 2010

Page 309

80:2 144:22
146:13 219:24
225:18 230:6,14
299:19
**agree** 53:6,9 72:18
86:24 100:5 101:3
102:10,14 107:3
110:2 118:17
119:1 134:17
135:19 137:5
140:19 144:16
148:25 157:6
162:16 163:1
164:6,16 166:12
170:12 176:11,17
183:10,21 184:9
186:15,20,21,23
188:3 196:25
197:24 198:2
203:5 207:17
225:17 237:8
241:1,24 280:13
295:24 297:24
298:1
**agreeable** 73:19
**agreed** 138:22
168:21 237:24
239:18,19,25
240:24 252:9
260:2 298:16
305:5
**agreement** 3:14
57:16 58:11,14
154:18 155:14
157:22 158:4
175:4 187:4 212:3
214:7
**agreements** 25:10
191:20
**ahead** 14:4 44:21
45:7 63:21 69:23
74:3 80:14 83:10
83:13 96:24
133:19 139:11
178:10 285:9,9,10

285:12 292:19,20
296:10
**aided** 230:18
**aiming** 222:5
**aired** 125:4
**Airport** 44:1
**alarm** 153:13
197:20
**alert** 87:10 105:16
106:20 107:5,9
108:7 109:3 172:5
**alerts** 172:3
**algorithm** 111:11
114:13
**allegation** 127:25
262:24
**allegations** 261:16
**allege** 121:24
**alleged** 150:15
**alleging** 127:18
**allow** 18:1 27:21
51:3 70:18 74:22
82:11 102:3 103:7
119:8 193:9
255:14
**allowed** 138:17
277:1 278:1
**allows** 113:8
117:21 191:22
**alter** 30:18
**alterations** 9:4
**amazed** 227:15
**Amide** 66:21 73:9
150:5 151:4,7,8
154:18 156:3
166:14
**amount** 34:4 81:17
82:18 187:20
293:9
**amounts** 248:7
**analysis** 3:21 16:3
18:2 19:2,4 26:4
61:10 73:25 74:14
79:20 87:17
111:10 137:10

161:14 169:9
174:16 179:22
198:21 209:4
215:15 229:8
248:15 250:20,22
259:18 270:25
282:5,14 283:11
286:16 298:20
303:2
**analysts** 27:15
**analytical** 146:22
181:18 248:8,15
**analytically** 123:18
181:15
**analytics** 61:6
88:10 119:8
**analyze** 25:24
112:17 205:6
224:18
**analyzed** 147:23
**analyzes** 112:3
**analyzing** 172:25
283:4
**Anderton** 145:23
**Angeles** 2:13
**Ann** 5:14
**annotate** 149:20
**annotated** 149:23
**annotation** 149:21
153:9 157:3
**announced** 147:5
262:18
**answer** 6:20 14:9
14:14 17:7,10
18:5,7 24:20
35:17 47:12 73:18
74:3 77:5 82:24
83:13 89:12 91:1
91:2,25 92:1
93:11 98:20 99:15
122:19,20 125:5
125:23 130:6
135:18 138:1
142:16 143:25
144:2,9,9 151:15

155:25 174:2
176:3 182:12
188:24 195:9,10
203:15 207:23
213:19 221:24
229:19 230:15
231:12 236:13
239:16 240:15
250:3 252:6
254:12 259:15
271:18 272:23
282:22 285:5
286:19 297:18
**answered** 20:24
24:15 66:25
262:13 270:14
**answering** 52:4
**answers** 27:24 66:3
166:19 297:16
307:7
**anti** 94:22
**anticipated** 12:19
179:20 181:13
**anticipating** 27:8
**antimicrobial**
95:22
**anti-infective** 95:2
**anti-infectives**
94:25
**anxiety** 181:17
**anxious** 123:5
**anybody** 160:9
284:23 285:25
292:14 293:20
305:9
**anyway** 28:8 209:7
**apologize** 28:16
40:11 153:9
**apparently** 85:16
169:5 173:23
178:16 185:15
186:5
**appear** 9:25 75:19
164:20 243:21
280:23

**APPEARANCES**
2:1
**appeared** 234:7
**appears** 281:6
291:3
**appendices** 148:23
**appendix** 74:24
277:17,17
**apply** 299:21
**appreciate** 35:17
69:13 290:4,5
**approached** 16:22
55:10,21,24 57:12
59:6 95:12 109:19
222:7,10
**appropriate** 16:8
25:20 59:12 76:13
142:15 169:19
170:14,19 193:16
220:2 230:8 234:9
239:13 292:13
305:1
**appropriately**
56:17 67:12 179:3
195:4 232:20
234:8 260:15
**approval** 201:25
224:9
**approved** 173:14
175:6 197:25
198:10,11,16
199:1 223:18
**approximate** 43:20
**approximately**
15:8 42:1
**April** 185:24
188:12 201:15,20
202:4 203:13
204:18,20 205:23
205:25 206:6,8,13
206:23 207:6
208:8 216:23
272:8 273:4,6
**arbitrary** 41:12
157:21

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 310

**area** 96:16 105:17
116:9,10 120:4
142:6 190:11
207:11 213:4,9,22
223:21
**areas** 96:14
**argue** 238:25 239:1
**arguing** 304:9
**argument** 299:24
300:6
**arisen** 231:4 244:17
**arising** 86:16
**array** 86:14
**arrive** 68:10
**arrived** 15:14
207:3,4 294:24
300:18
**articulate** 245:21
**articulated** 299:17
**artifact** 200:2
**ascertain** 300:19
**aside** 115:2 192:17
192:25
**asked** 9:12 10:6,9
30:6,9 31:9 32:20
38:15 48:17 49:18
56:16 62:22 65:2
66:16 70:12,16,21
71:3 73:12,13
80:2,5 81:7 83:20
99:23 100:12
117:14 122:23
127:2 136:9
138:25 142:6
146:13 160:5
170:9 177:6
178:19,23 179:2
179:21,23 181:9
192:9 195:19
196:14 199:23
201:11 203:2
205:4,6,7 208:20
213:5 218:1
219:16 222:11
223:3,5,9 224:21

225:14 227:22,24
235:17 238:6,18
240:13 242:10
243:9,13 246:6,13
248:19,19 249:14
249:20,23 252:5
252:15 253:13,15
256:10 259:16
261:22 262:12,16
269:3,11 271:12
271:17 272:24
276:9 282:21,25
290:6 293:7,9
297:18
**asking** 6:9 29:19
52:21 56:7 63:13
64:4 125:7 239:8
260:25 261:24
266:7 268:17
300:10 301:12
304:17 305:12
**assess** 74:20 91:23
92:14 119:13
123:8 160:5,13
161:15 219:11
233:15 234:13
236:20 246:12
260:9 269:21
280:25
**assessing** 110:18
123:11 159:4
172:3
**assessment** 3:20
10:7,8 26:23
70:23 71:6 73:6,7
74:6,13,18,23
80:24 82:11,12
84:5 89:1,21 91:8
103:8 111:7,7,9
114:19,19 118:16
119:9,11 120:17
123:3 136:5
137:13 157:20
169:13,22 171:5
172:5 177:11

194:14 195:23,24
196:11 200:14
202:23 203:20,22
204:7 208:4,15,17
208:24 209:3,17
215:11 234:15
235:15,16 236:21
241:15,21 242:17
250:13 263:19
264:13 275:5
286:18
**assessments** 51:23
60:22 63:7 64:4
75:7 77:13 88:7
88:12 92:13,16,24
98:9 110:16
114:17 215:12
234:19 235:5
288:11
**assigned** 96:3
**assignment** 56:24
57:7,12 58:20
59:12 80:4 208:19
222:11 224:7
227:17 241:10
244:12 260:2,7,13
292:22
**assist** 70:5
**assisted** 96:25
108:14
**assisting** 27:15
**associated** 76:11
119:24
**association** 91:8
**assume** 37:9 133:2
133:8 135:12
157:13 235:12
236:15
**assumed** 63:24
76:17 181:12
244:20
**assuming** 17:14
134:10 141:9
167:10 169:11
271:3 272:25

**assumption** 64:5
75:8,12 76:2,9,19
77:12 78:7 109:11
116:7 122:12
126:15 133:12
137:9 154:13
208:14 209:16
210:20 292:4
**assumptions** 134:3
208:19 291:4
**assurance** 97:18
120:21 214:23
222:20 227:13
244:13 245:13,21
245:21 304:6
**assurances** 217:22
**assure** 246:20
**assured** 245:12,15
**attached** 183:9,10
307:8
**attachment** 277:9
278:10
**attempt** 110:8
111:15 114:5
163:21 180:3
224:13 231:1
249:15 289:4
**attempted** 249:22
269:18
**attempting** 190:2
**attention** 105:25
106:19 129:9
130:8,15 131:10
148:9 269:3,11
**attorney** 15:4 30:3
59:13
**attorneys** 14:19
38:10,16 56:25
59:23 65:12 81:9
213:21 217:4
220:15 295:13
**attorney's** 195:22
**August** 150:20,20
163:5 165:13
187:3 188:10

212:2 278:18,25
**authoritative**
270:14
**authorities** 49:3
56:6 73:4 190:3
210:13 212:8
**authority** 72:24
210:16,22
**available** 7:16 26:2
31:5,10 52:12
68:18 112:5
122:14 124:18
133:3,5 146:8,9
230:17 272:19
288:3
**Avenue** 2:9
**average** 227:13
**avoid** 31:19 300:3
**avoided** 220:7
222:4
**aware** 15:25 42:20
97:23 98:2 103:11
115:9,10,12 117:4
117:5 127:14,16
127:24 130:2
154:8 158:2
164:13 187:16
191:3,12,16,18,19
192:10 193:1
195:2 216:17,22
216:24 241:15
274:22 300:11,17
**awareness** 273:8
**awful** 219:8
**a.m** 1:14 4:14 64:16
64:17,18,22
104:20,24

---

**B**

**B** 187:9 203:3,11
203:14
**back** 8:9 12:8,15
13:9 14:10 17:8
21:23 26:3 31:9
33:22 34:9,18

Karen A. Frank, M.D.                Videotaped                June 30, 2010

Page 311

39:19 43:8 49:2
51:19 52:2 54:22
58:5 59:3 61:5,8
62:18 64:19 75:23
76:21 82:22 93:10
93:10 98:3 99:12
103:4 104:22
106:6 111:14
121:13 127:16
130:21 137:4
143:7,9 144:2,3
146:12 147:5
149:18,22 152:7
168:15 175:3,8,10
175:18 178:19
180:21 181:17,21
182:12 188:14,24
189:11,22 190:9
197:2 198:21
199:11 208:21,25
209:23 210:17,22
212:8 215:25
220:18 221:7
226:9 230:15
232:12 247:8
256:18 257:3
261:1 269:15
271:5 277:12
280:16,17 281:18
284:9 285:20
286:2 296:25
297:1
**backed** 227:9,18
292:5
**background** 3:21
25:11 59:10,20
142:14 148:7
184:22 185:1,14
200:22 221:20
250:20 254:18
256:23 283:11
**backing** 229:4
255:5
**backup** 154:2
219:18

**Bacon** 2:16 5:1
**bacteriology** 61:8
**bad** 284:17,19
**base** 85:3 94:2
177:18 193:16
225:19 229:16
234:24 288:3
**based** 26:15 47:3
53:4 59:9 80:17
83:23 92:7 95:17
111:10 114:10
119:18 122:13
155:25 157:21
161:18 171:2
174:25 176:2,4,10
179:8 180:12,24
209:3 217:12,14
217:20 218:2,6
220:8,23 221:9,17
222:21 223:1,2
242:18 245:4
246:21 247:24
253:10,11 255:5
271:21 274:1
278:4,18,25
279:24 282:16
286:9 287:9,25
288:16,22 289:13
289:17,24 293:8
293:18 294:8
301:14 303:18
304:10
**baseline** 172:21
**basic** 127:24
169:17 202:3,9
**basically** 96:7
113:24 167:8
258:11
**basing** 48:12
**basis** 10:14 18:6
49:19 59:5 66:2
132:6,7,17 165:21
167:23 171:9
178:20 201:10
210:6 218:15

235:19 236:3
246:16 252:23
253:4
**batch** 87:11,14
103:9 117:5 118:4
119:15 120:8,9,11
120:15,18 158:6
158:23 266:9
**batches** 61:12 89:1
89:3,9,23 103:21
118:5 270:25
**Bates** 67:4 204:15
**bears** 67:3
**beg** 209:20
**began** 56:14
**beginning** 21:10,20
42:3 241:11
**begins** 279:16,21
**begun** 146:3
**behalf** 6:4 30:3
80:10 83:2 123:22
237:16 247:12
295:3
**behavior** 225:5
**believe** 11:9,15
15:15 16:9 22:2
24:20 30:16 44:13
50:5 51:21 54:3
54:11 58:19 62:13
63:5 67:11 91:14
110:14 127:3
128:23 138:19
139:9 144:11
147:10 151:1
152:6 155:9,20
156:3 166:1,21
172:2 183:10
185:24 204:24
220:24 226:22
227:4 230:16
238:20,23 241:14
242:13 249:10
251:21,24 252:3
255:11 256:8,15
257:24 267:17

268:10 270:11
272:7 277:24
282:10 287:1,22
291:16,16 292:7
305:16,21
**Bellingham** 62:16
102:25
**bells** 153:13
**benefit** 20:14
**best** 27:23 50:15
59:1 112:23
132:10 138:22
139:2 156:1 179:8
217:14,17 228:22
236:17 246:21
249:15 258:8,18
265:24 270:6
282:20 304:21
305:14
**beyond** 23:13 91:10
283:13
**BfArM** 113:10
**bias** 236:19
**bibliography**
183:15,18
**big** 128:18 136:19
227:16 241:23
260:7 275:6 277:9
277:17,17 305:2
**bill** 54:12 79:9,10
**billed** 79:14,19
**binder** 39:5 42:13
43:3 59:21 67:12
68:13,14,17,17
69:3
**binders** 12:16,18
32:13 36:7 39:1
42:17,19,19,22,24
54:13 68:2
**bioequivalence**
129:18,23,25
**bit** 6:5,23 43:3
64:10 81:6 138:13
228:20 263:23
**black** 95:21 96:1

163:20
**blank** 244:20
**blanket** 192:3
**blanking** 112:5
**blanks** 7:10
**blend** 117:17,23
119:24 120:2
**blue** 163:19
**book** 43:18
**bother** 237:12
**bothered** 117:8
**bothering** 69:8
**bottle** 118:6,8,9
266:11
**bottles** 118:7
119:16
**bottom** 106:8
161:18 186:11,14
209:23,25 252:9
267:12 271:16
**Boulevard** 2:4,16
**bounds** 16:10
**box** 76:13 95:21
96:1
**boy** 163:15 300:22
**brand** 149:1 194:8
**branded** 140:8
**break** 6:25 7:1 64:7
168:2,4,6 215:19
221:25
**Bridgeside** 2:4
**brief** 94:15
**briefly** 49:9,11
**bring** 29:19 30:5,12
38:15 61:5 132:23
242:17
**bringing** 25:18
**broad** 96:14,15
267:3
**broader** 53:4
160:13 161:15
206:2
**broke** 168:21
**brought** 22:22 33:1
33:9 37:25 65:20

66:18,20 67:2,7
67:22 83:25 94:22
122:22 133:1,25
138:15 194:14
196:3 200:12
**build** 82:6
**building** 2:9 27:16
**bulk** 187:2 188:11
**bullet** 145:4 269:5
269:12,16,16,25
272:25
**bunch** 241:16
243:25 287:5
**business** 27:13,14
27:16 58:16 60:18
63:14 65:19 66:5
82:15 162:24
195:25 261:3
**business-to-busi...**
70:24 71:6

---

**C**

**C** 112:11 203:3,11
203:14
**calculated** 190:7
**California** 2:13
**call** 13:3 14:24,25
15:7,14 41:13
46:7 130:8 158:10
195:17 242:14
**called** 15:13 32:10
35:18 44:18 46:17
54:3 115:10 116:2
116:4 133:6 151:3
250:22 253:23
265:19
**calling** 52:7
**calls** 36:20 274:15
**camera** 41:17
**cancer** 301:3
**cancers** 301:4
**candor** 290:4
292:11 297:10
**cap** 79:1,3,3,4,4,9
79:15

**CAPA** 26:25 27:2
248:11
**CAPAs** 26:25 27:3
27:4 48:11,21
**capture** 50:24
**cardiologist** 23:5
**cardiologists**
100:15
**cardiologist's**
136:3
**cardiovascular**
95:1
**cardio-renal** 94:20
94:24
**care** 71:7 236:17
**careful** 16:9 119:12
119:20 141:23
142:2 144:12
147:13 157:3
172:22 174:16
181:15,18 219:6
228:3,5 229:8
250:10 291:7
**carefully** 12:20
16:14,17 33:22
35:11 50:14 51:3
51:10 53:11 132:5
140:17 172:25
182:19 196:17
222:11 228:1
256:14
**Carolina** 2:4
**carries** 301:20
**Carter** 7:13 14:21
44:1 50:6 56:12
65:21 177:7
**case** 3:15 23:11
30:8 59:7 62:3
70:11,15 71:15
72:10 74:13 76:8
80:7 81:12 85:10
85:13 86:19,19,20
87:16,21 88:4
99:19 101:24
102:8 103:15

115:21 117:16
124:4 126:16
127:19,21 141:8
143:17 156:23
167:15 176:8
186:3 188:17,19
194:6,20,21,23,25
198:20 213:4
216:16 217:4
220:13 225:8
227:16 236:16
238:8 239:15
241:17,20 242:17
243:15,21 244:15
248:10 249:11
255:9 260:7
261:12,21 262:2
268:7 271:4 275:8
276:18 280:3
289:11 292:24
296:1 299:2
300:11 301:16
302:11 305:2,6,20
**cases** 18:22,22,25
25:19 55:10 75:24
75:25 77:14 85:11
87:8,10 88:5,13
100:22 127:20
130:2 139:19,24
140:1 143:1,2,12
143:18 153:24
156:11,16 157:12
157:14 158:7
161:21 178:7,16
182:9,13 185:16
186:2,2,4 188:11
188:15,25 189:12
189:14,17 191:18
191:22 193:17
194:14 210:14
211:1,21 212:7
216:10,11 218:14
231:4 243:19
255:24 262:17
273:16,19,20,21

287:5,8 297:21,22
300:4,6,10,12
**casual** 300:2
**catalog** 69:5 81:23
**categorize** 32:10
**causality** 110:23
113:1 114:6,10,11
114:13,19,20,25
299:1
**causation** 111:16
**cause** 61:10 161:14
**caused** 110:4 280:9
280:14
**causing** 305:8
**caution** 70:3 134:4
**cautious** 122:23
132:2 133:15
181:20
**CDs** 30:25 31:3,7
31:14
**Celsius** 116:4
**centralization**
212:20,23
**centralized** 210:3
**certain** 25:8 29:19
56:3 60:23 68:14
104:13 130:13
141:24 199:23
205:5 225:3
237:21 239:7
248:20 249:5,7,21
255:9 290:11
296:20
**certainly** 19:7,8
68:19 254:25
257:20 262:8
**certainty** 297:8
**CERTIFICATI...**
307:1
**Certified** 1:15,16
**certify** 307:5
**CFR** 98:22
**CGMP** 106:2
269:24 275:23
276:4

**chain** 173:21
**chair** 285:7
**chairing** 14:25
**challenge** 95:25
295:10,21
**chance** 6:4 23:13
128:22 277:22
282:9 305:7,19
**chances** 266:10
**change** 158:14,15
195:20 196:1,10
196:15 197:19
199:24 200:12,25
201:12 219:16
225:25 231:7
242:19 285:13
**changed** 64:8
196:15 266:19
**changes** 70:21 71:4
196:10,12,17
200:16,24 201:11
202:1 203:3 205:3
205:10 214:19
219:19 307:8
**characterize**
265:15
**charge** 138:1
253:19,20,21,22
**Charleston** 1:2
4:10 255:21
**Charlie** 112:11
**chart** 78:3
**check** 20:17 43:18
54:12 61:7 204:6
**checks** 31:15
**choose** 257:5
**chronological**
236:7
**CIOMS** 72:22 73:2
78:8 88:23 103:5
110:11,11,12,14
110:17,18,19
111:12,18 113:3,9
113:14,21,22
114:9,9

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 313

| | | | | |
|---|---|---|---|---|
| circle 264:18 266:22 | client 36:19 58:22 218:6 228:24,25 259:20 304:8 | collection 156:11 color 3:19 70:3 column 78:6 | commentary 125:2 commented 62:8 153:12 196:13 | community 71:8 125:18 companies 25:13 |

circle 264:18
266:22
circumscribed
293:1
circumstances
161:23 180:5
192:10 193:1,14
195:3 303:6,14
cite 60:6 75:25
298:25 301:22
302:2
cited 189:18 216:11
Citrix 22:18
City 2:17
civil 50:18
clarification 282:3
clarified 157:11
194:13
clarify 77:3,6
115:11 130:22
157:18 175:7
clarifying 99:4
class 95:8,22 96:1
classes 120:6
Classically 87:5
classified 150:23
clean 173:23
248:23
cleaned 42:16
clear 8:12 10:23
47:1,23 61:19
63:1 69:5 93:12
100:16 134:6
137:6 165:8,18
169:18 174:21,24
174:25 175:13
197:1 296:19
clearer 66:17
clearly 26:7 27:23
66:1 108:24 109:3
129:16 169:8
194:6 196:15,15
212:19 271:10
Cleveland 2:10
4:17

client 36:19 58:22
218:6 228:24,25
259:20 304:8
clients 60:25
260:18,20,22
261:6,17 304:19
304:20,22
clinical 97:24,24
130:4 133:23
134:1 162:22
196:4 200:7
202:13 274:1
275:4 299:8
clinician's 274:9
close 34:5 49:14
52:4
closed-door 16:13
closely 51:12 80:25
closeout 162:10
175:9,9 184:10,19
185:12,20,21
188:22 199:4,5
closet 42:17
cluster 87:17
clustering 87:8,10
coached 25:17
36:17 65:10
coaching 13:5 16:8
16:10 23:2 56:13
code 188:17 194:21
coded 75:9,11
142:23 143:12,16
287:7
codes 19:1 75:19,19
188:20
coding 74:12,12
75:3,4,6,15,17
76:10,16,18,23
77:8,12,14,16
78:3,9,11,15,15
101:22,23 102:1,4
102:8 136:23
143:13 188:16
coffee 287:11
coincided 154:21

collection 156:11
color 3:19 70:3
column 78:6
combine 10:9
combined 10:5
12:1
come 15:20 17:13
21:12,23 29:2
40:20,21 43:7,8
52:4 126:8 130:21
134:5 149:11
210:24 212:8
229:2 235:2
240:14 263:19
264:18 266:22
268:8 270:20
271:18 289:13
302:25 303:18
305:11
comes 212:6
comfort 241:6
comfortable 21:21
180:8 221:10
253:14 257:8
288:20 303:17
coming 178:18
290:25
commencing 1:14
comment 25:18
49:1 59:11 70:12
70:21 72:4 76:12
81:21 92:23 102:9
111:12 122:17
142:9 143:6,19
145:14 178:15
189:9 190:9,17
196:14 199:23
201:12,23 203:2
205:4 212:13
214:9 223:6,7
233:19 236:5
263:17,18,20
273:15 279:11
281:18 287:16
293:13 302:10

commentary 125:2
commented 62:8
153:12 196:13
commenting
135:22 145:15
300:3
comments 10:14
12:14 30:17 33:21
33:23 34:9,10,17
35:8,9,10 49:4
71:12,17,19 83:4
110:11,13 113:21
114:9 180:20
219:7 224:7
250:11 267:1
committee 112:2
committees 16:12
common 274:13
commonplace
161:9
communicate 6:11
communicated
91:20 155:16
237:25
communication
3:21 10:8 36:1
70:22 71:7,10
90:4,14 92:3
156:21 163:9
196:8,12 197:1
198:12,13,13
199:16,18 200:25
201:13 202:6,24
203:17 204:14
206:3 208:16
209:18 234:1
240:10 241:19
communications
35:21 71:4 163:20
195:18 197:25
201:14 202:10
206:1 214:25
215:16 231:3
246:4 247:1
287:10

community 71:8
125:18
companies 25:13
27:3 28:19 29:6
61:1,20 65:18
86:14 88:18,19
89:19 90:3 95:24
110:18 111:3
113:20 148:21
151:11 211:4,5
213:2 214:21
254:5 275:1
company 12:22
25:25 26:21 28:20
48:11,18,20 49:3
51:6 53:1 57:11
60:18 61:17 66:11
74:25 80:22 82:13
82:18 85:14 87:16
87:23 88:12 89:14
98:23 99:1 101:4
101:6,12,14
102:25 103:25
105:10,13 110:1
110:17,22,24
111:4,7,9 113:8
113:22 114:23
115:13 116:1,3
131:21 143:6
145:25 149:8,13
151:3,4,5 158:14
160:2 161:6,13,21
163:3 165:17,23
173:22 175:17
178:6 186:8
189:24 197:2
205:23 209:5
210:16,17,20
211:6,7 212:9
270:4 274:25
275:5,6 278:19
279:1,3
company's 49:1
114:19 163:19
compare 222:2

compared 9:1
compelled 135:18
competent 263:11
  263:25
competitive 95:13
compilation 53:5
  54:1,9
compiling 108:12
complaint 61:15,21
  61:22 62:4,16
  63:9 88:5,9 89:22
  90:6 91:21 92:3
  93:17,21 162:22
  232:19 234:1,7,12
  234:14
complaints 51:4
  58:18 60:19 62:11
  62:22,25 63:3,7
  63:10 64:1 89:12
  89:16 90:17 91:4
  91:12 103:2 104:5
  104:10 107:18
  231:17,18 232:1
  232:23,24 233:13
  233:16,21 234:11
complete 26:1
  52:14 53:4 80:18
  84:6 85:2 277:19
completely 25:24
  59:10 71:20 80:21
  84:2 127:5 142:5
  142:9 143:10
  172:12,23 178:9
  181:12 220:6
  227:20 234:22
  244:5 254:22
  282:10 289:11,16
  289:23
completeness 83:22
complex 12:22
  173:21 225:8
complexity 28:18
  34:3 51:6
compliance 27:4,17
  66:12 81:19

144:13 156:17
160:10 172:14
175:5 210:4 211:9
211:24 212:22,25
228:14 230:8
231:17 233:20
279:25 281:23
284:3,4 289:18
compliant 169:5
complicated 299:12
complies 49:10
  54:23
component 236:9
components 236:10
compound 140:8
comprehension
  196:5
comprise 31:8
compulsive 119:2,2
computer 132:21
conceive 70:10
concentrating
  123:18
concern 22:23
  25:21 28:17 80:15
  92:23 93:25 156:5
  160:17 177:17,19
  179:15 198:23
  235:3,20 237:18
  250:12 259:4,8
  260:16,17,17
  266:6 286:12
  288:13 292:21
  296:12,22 304:5
  305:3
concerned 26:1
  27:24 34:2 42:12
  44:18 48:16 83:21
  84:4 87:9 89:14
  173:12 177:15,20
  179:12 185:2
  192:15 198:4
  217:6 227:8,18
  234:18 246:3
  251:13 254:17

255:4,13 271:17
288:10 297:2
concerning 273:19
concerns 22:25
  23:1,10 25:3,6
  46:16,24 47:4
  65:24 81:15 84:9
  84:20 85:1,21
  92:9 101:4,18
  102:7 155:16
  165:5 219:2
  237:25 279:6
conclude 299:23
concluded 107:22
  306:10
concludes 306:5
conclusion 8:16
  10:10 34:17 71:16
  71:20,22 72:5
  137:13 155:19
  159:21 167:22
  169:2,16,17 224:9
  230:8,21 270:21
  290:24 291:1,10
  302:17
conclusions 3:21
  34:11 72:2,6
  74:20 108:6 109:7
  167:15 169:21
  180:23 231:23
  250:20,23,25
  282:6 283:11
concomitant
  216:14 298:7
concordance 114:8
concurrent 216:14
condition 298:3
confer 257:17,25
confidence 244:4
  251:16 254:6
  256:5 263:13
  286:23
confidentiality
  25:9 58:21
confirm 63:14

246:6 268:7
280:24 281:4,7
confirmation
  157:16 173:9,12
  231:21 239:8
  281:8
confirmatory 176:5
  247:1
confirmed 294:1
  299:8 301:13
confirming 109:6
  267:10
confronted 146:6
confronting 175:15
confused 45:8
confusing 173:21
confusion 234:21
Congress 133:7
  141:12
Congressional
  123:25 132:3
  297:5
conjunction 211:7
connect 207:14
connection 11:14
conscience 217:5
  220:1
conscionable
  218:18 219:23
  220:4
consent 26:12 60:7
  82:4 142:20
  149:15 151:19,20
  173:22 200:7
  245:2
consents 196:4
consequences
  258:22 259:2
conservative
  126:14
consider 63:13
  109:10 214:24
  277:1
considered 49:23
  107:23 114:21

237:19,23 238:7
248:3 251:23
255:2 286:7
consistency 269:22
consistent 173:13
consolidate 127:20
consolidated
  253:19 255:22
constitute 238:15
constituted 179:5
constitutes 99:17
  178:24
constructed 77:13
  113:7
consultant 55:10
  55:11 63:25
consultants 246:12
consulting 3:14
  27:12,14 33:16
  55:9,24 56:25
  57:4,11,16,23
  58:15,20 78:25
  79:8 109:18 218:6
  240:10,22 245:18
consumer 262:25
  298:23 299:17
  301:16
consumers 122:6
  139:7 272:19
contain 71:14 74:8
  74:21 76:16,16
  89:21 110:11
  113:24 114:9
  139:19
contained 34:23
  39:25 59:24 76:24
  77:9 104:3 137:18
  163:4 204:25
  207:20 208:6
  247:19 250:19
  254:2 282:5,22
contains 39:12 42:6
  77:24 88:21,23
  114:4 208:3
content 70:18

216:12 280:1
281:6,24 284:16
**Contents** 3:3,5
40:18 41:8,21
42:9 43:12 45:14
46:22 54:2,9
59:25
**context** 86:2,5
102:10 109:23
138:16 143:10
164:24 167:1
169:3,10
**continue** 27:22
169:12 229:16
237:16 239:14
258:1 303:5,15
**continues** 266:16
**contradict** 291:12
**contradicted** 303:9
**contrary** 166:9
248:22
**control** 97:13
120:21 162:14,15
162:21
**convention** 79:2
**conventional**
210:25
**conventions** 102:1
109:20
**conversation** 58:25
142:15 223:23
**conversations**
287:11 300:1,2
**convey** 44:10 220:3
**conveyed** 202:6
**convoluted** 51:2
**coordinators**
202:15
**Copenhagen**
155:17 156:16
158:6,11,12
211:21,25
**copies** 7:18,18 12:4
12:4 33:9 45:2,12
56:16 64:9 198:4

**copy** 8:12,15 20:8
20:16 30:19,19
31:8 45:1 57:16
57:21,24 58:11
61:3 66:18 70:3,4
199:13 207:10,10
207:16 209:10
233:5 280:6
**core** 237:4
**corporate** 155:2
**correct** 5:15,23 8:8
8:12,24 9:8 14:17
24:11,13 28:20,23
31:1,21 35:22,23
37:17 38:25 39:14
39:23 40:2,18
41:21,24 42:9
43:13 45:18 46:24
47:17 49:22 58:12
61:23 63:4,17
66:22 67:4,14,18
68:5 72:11,20
73:25 75:20 76:25
77:2,25 78:12
79:25 82:19,19
84:15,24 85:4,23
86:3,8,11 87:4,24
89:9,20 90:8 93:1
93:3,7 94:6,6,8
98:12 100:7,11,23
100:25 101:1,18
106:5,11,14,16
107:6,9,15,20,25
108:3,23 110:9
111:16 113:25
114:2,15 116:12
120:22 121:2
124:8,13,16,22
127:18 128:1,5,23
131:7 133:9,12
134:9,14 135:13
137:8,13 140:14
146:14 147:1,11
154:23 157:8,10
160:18 164:8,14

164:21 165:4
166:16 167:23
168:23 170:10
176:6 178:1
182:22 183:22
185:22 188:3
190:25 195:5
197:10 200:19
202:7 204:22
205:1,14,25 206:8
206:21,23 207:4
207:12 208:8
209:9 213:10
215:9 221:23
222:14 223:23
225:20,25 229:1
229:18 234:8
235:11 240:2,4,6
242:2,5 244:10
250:20 251:3
254:4 255:15
265:2,21 266:4,22
298:11 305:6,15
307:1
**corrected** 28:22
82:7,8,8 146:21
147:15 163:10
173:25 174:1
190:5 259:18
**correction** 28:23
**corrections** 307:8
**corrective** 107:23
108:2,15,16,21,22
109:10 159:4
160:18 161:7
164:19 165:18
166:25 167:2,5,9
170:19 172:8,13
172:17 173:4,6,9
173:24 259:17
280:22,25 281:9
**correctly** 9:16 43:1
129:10 132:15
213:12 219:5
228:10 289:6

**correlates** 173:12
**correspondence**
30:2 35:20 36:1
38:1,5 143:5
149:13 160:16
**correspondences**
151:8
**corresponding**
30:8
**couch** 289:3
**counsel** 4:19 84:21
85:20 122:21
124:8 145:7 146:4
156:14 177:2
213:3 218:20
219:3 220:25
221:1 224:16
248:20 249:7,12
249:18,24 251:8
260:25
**counted** 282:18
**country** 194:21
211:5
**country-specific**
113:13 148:23
**couple** 64:24
120:12 127:22
130:24 147:6
158:23 191:15
222:8 272:3
**course** 12:21,23
13:11 42:11 82:11
119:13 230:5
233:21,25 255:7
259:9 303:16
**court** 1:1 4:1,9,16
4:17 5:25 6:15
116:24 141:12
144:3 166:7
177:13 181:5
222:3,23 230:15
239:11,17,22
241:11 242:1,10
243:5 244:10
251:14 253:25

254:21 256:5
259:21 285:20
295:10 296:16
**courtroom** 253:17
253:23
**Court-imposed**
226:18
**cover** 36:6,8,12
38:7 40:10,15,15
40:16,24 152:2
203:23 204:5,6
206:10,20 208:23
209:20
**covered** 87:15
100:15 185:25
**covering** 27:20
**creating** 125:17
**credibility** 224:11
225:1 231:11
259:3
**critical** 162:24
212:25
**criticism** 133:6
199:15 216:22
**criticisms** 216:4,24
**critique** 238:18
**CSC** 109:16
**current** 269:23
**curriculum** 30:1
**curve** 225:2
**customer** 70:24
71:6 204:12,20
205:17,19 207:18
207:21 208:5
**customers** 195:24
195:25
**cycle** 154:13
**C-I-O-M-S** 112:9

---
                **D**
---
**D** 3:2
**daily** 118:11 200:11
200:16 204:21
207:19 208:2
**dangerous** 172:25

Karen A. Frank, M.D.　　　　Videotaped　　　　June 30, 2010

Page 316

173:1 176:10
**dashboards** 211:13
**data** 16:13 18:2,24
　88:13,20 97:1
　101:4,12,20,24
　102:12 122:9,14
　122:24 123:7,14
　123:14 125:15
　126:1,2,9 133:3,5
　133:9,25 134:10
　134:11 137:9
　142:20 143:11,12
　196:20 211:11,12
　264:13,17 271:2
　286:19 287:25
　289:9 292:5,5
　294:5,6,9 304:10
**database** 18:24
　78:9 88:13,20,22
　102:8 110:12,13
　110:20 111:13
　134:11 142:21
　271:3,5 286:9
　287:5
**databases** 19:3
　78:16 110:22
　113:6,7,12
**date** 43:18,18,19
　57:15,18 76:7,8
　134:19,23 135:3
　135:10 155:15
　158:10,11 192:12
　204:5 205:13,15
　212:2 242:12
　272:9,12,13,22,24
　273:2 276:4,7,8
　276:14,16 278:24
　307:15
**dated** 164:7 165:16
　187:11,17 206:23
　208:23 250:18
　273:4 279:1
**dates** 149:14,16
　208:22 212:5,5
**David** 2:19 4:15

**day** 13:12 27:21
　44:4 65:5 91:18
　149:15 158:10
　161:5 184:5,7,20
　207:15 209:22
　237:13 243:9,10
　251:9 268:17
　278:20 295:15
**days** 14:16,20
　17:15 24:9 202:5
**DE** 1:17
**deadline** 181:8
　227:15 289:5
**deadlines** 226:18
**deal** 12:13 155:2
　180:19
**dealing** 225:3 274:2
**dealings** 101:4
**Dean** 2:8,22,24 4:3
　4:21,21 5:9,18
　7:24 10:25 11:22
　12:7 13:10 14:2,3
　16:25 17:6 19:14
　20:9,13 22:5,7,9
　28:5,9 29:13,16
　29:17 33:12,13
　35:14 41:5,11,15
　41:19 43:6 44:19
　45:2,6,11 47:22
　48:1 53:15,19
　55:6 57:25 58:4
　58:10 59:18 60:15
　64:7,23 68:22,25
　69:17,23 70:1,8,9
　72:17 73:10 74:2
　77:17,19,22 79:17
　80:13 83:9 84:18
　93:5 94:11 96:13
　101:10 104:16,25
　112:15 116:22
　117:7 118:12,23
　121:4,17 127:10
　128:21 133:18
　134:24 137:3,17
　138:5 139:10

142:11 144:1,15
　144:25 145:2,13
　145:25 146:9,11
　157:5 164:25
　165:20 166:10,21
　167:12 168:1,5,9
　168:19 169:15
　170:25 171:14
　174:17 176:16
　180:6 181:1 183:4
　183:5 185:5,9,10
　193:24 194:2
　199:6,10,14 201:4
　201:5 215:18
　216:3 221:8 226:2
　226:13 240:17
　247:2,11 251:13
　259:15 270:16
　275:17 277:10
　278:21 282:1
　285:13 297:12
　302:12 303:22
　305:23,25 306:2
**Dean's** 260:17
**Dear** 70:24 71:1,2,6
　71:11,11 204:11
　204:20 205:17
　207:17,21 208:5
**death** 216:15
**decade** 134:5
**December** 106:16
　108:24 109:1,2
　276:6
**decent** 224:13
**decentralized**
　212:21
**decided** 50:25
　80:23 95:24
**decision** 46:19
　127:8 154:17
　158:9,17 169:4
　186:8 214:6
　215:14 296:18
**decisions** 157:21
　175:24 190:7

**decline** 56:9 151:21
**declined** 55:23
　241:10
**decree** 26:12 82:4
　142:20 151:19,20
　173:22 245:2
**decrees** 60:7
　149:15
**default** 140:24
　275:6,9
**defaults** 275:2,12
**defect** 86:21 87:1
　87:21,23 88:3
　89:8,15 90:24
　91:5,20 92:5
　140:12,20 149:15
　203:5 233:25
　299:23
**defective** 98:18
　100:18 127:18,25
　132:11 143:13
　265:25 270:7
　284:23 285:25
　288:7 289:20
　298:22 300:19
　301:24
**defectively** 128:4
　260:23 262:9,25
**defects** 88:25
**defend** 304:21
**Defendant** 4:7
　53:21 60:16
**defendants** 2:7
　4:22,24 68:12
　69:20 118:16
　230:18,25 231:8
　243:16,17
**Defendant's** 8:8
　145:19 163:24
　183:7 268:25
　275:14,22 280:4
**defense** 59:19
　68:18
**defensible** 289:1
**deficiencies** 150:15

164:19 172:13
　233:14 280:22
**deficient** 161:8
**define** 46:7 48:9
　61:12 224:18
**defining** 48:12
**definite** 171:18
**definitely** 288:25
**definitive** 74:6,13
　136:16 182:12
　188:24 213:19
　217:9 231:12
**degree** 254:3
　279:24 286:23
　297:7
**delay** 44:18 158:19
　198:24,24
**deliberate** 60:4
　127:8 293:12
**deliberately** 222:4
　230:23 231:1,24
　236:12
**Delicato** 161:21
　182:1,9,11 183:9
　184:3,14 187:23
　188:22
**delinquent** 280:2
**deliver** 180:3
**delivered** 31:12
　68:3 145:22
**demonstrate** 301:1
　301:6,8,15
**demonstrated**
　239:4
**demonstrates**
　224:12,17
**demonstrating**
　97:3
**Denise** 55:16
　245:19
**Denmark** 186:24
　188:11
**deny** 169:14
**departments**
　211:13

**dependent** 82:15
**deposition** 1:10 4:6
5:19,22 6:5 7:7
8:2,4,24 9:7 12:9
13:6,16,21 16:21
17:4 20:22 21:12
25:20 29:19 38:21
38:24 39:12,13,23
40:1,1 67:25
68:20 90:11
127:21 238:3
239:19 240:16
254:19 288:21
289:1 302:17
306:6,10 307:6
**depositions** 15:20
17:13,14 194:11
293:12,14
**described** 76:15
110:5 188:6
201:13
**descriptors** 305:1
**destroy** 238:5
**destroyed** 147:24
**destruction** 146:19
147:22
**detail** 49:16 74:22
80:20 84:9 96:15
**detailed** 198:21
204:24 205:2
**details** 14:5 246:9
**detect** 88:14
**detected** 136:25
154:16
**detection** 70:14,19
73:25 74:25 82:13
83:16 84:6 86:1
87:1,5,20 90:5
91:21 92:4 93:18
93:22 101:25
102:5,9 117:15
118:18 129:12
131:13,14,20
135:23 136:7,20
140:1,6,11,20

156:17 170:9
205:9 234:2
249:11 266:25
267:4 270:2 288:8
**determination**
166:3 225:15
246:7 270:12
284:11
**determine** 56:8
93:23 118:1
213:14 220:17
252:5 253:3
**determined** 11:9
118:21 269:20
**determines** 89:23
**develop** 56:14,14
**develops** 298:10
**deviation** 61:2
**dialogue** 210:23
236:1 237:15
**Dianna** 1:14 4:16
**Dick** 53:12 72:15
296:6
**difference** 10:3
199:15
**differences** 301:3
**different** 40:21,22
47:17 86:15 118:8
152:25 167:21
191:15 202:5,17
215:16 230:20
271:18 291:10
**differing** 288:5
**difficult** 81:12
166:25 273:25
274:17 298:19,25
301:2,15 303:12
**difficulties** 300:20
**difficulty** 304:9
**digitalis** 139:21,22
139:22 273:21,22
274:2,5,21 297:22
298:6,13,15 299:8
299:8
**Digitek** 1:5 3:3,15

3:20 4:8 17:20,24
17:24 18:2,10,14
18:16,19,22,25
19:3,5 22:22 30:4
41:20 62:12,15,23
63:3,11 70:15
72:20 73:23 77:8
82:14 83:17 86:2
86:5,20 90:17
91:12,19,20 92:4
102:18 115:6,22
116:4 117:16,21
121:24 122:6
123:23 126:20,23
127:18,25 128:4
131:22 135:20
137:7 139:18
141:20 143:23
144:8 147:1
152:24 153:11,18
156:9,11,14,17,23
156:25 157:7,13
157:13 160:6
185:22,25 186:2,3
186:15 191:4,13
192:21 193:3,19
194:8,12,19 195:3
231:4 233:17
249:11 260:23
262:2,4,10 263:1
265:7,11,19
266:14,24 267:13
268:2 269:19
272:5,19,22
276:12 284:24
286:1 288:5
297:24 298:2
299:1,22 300:11
300:19 301:24
302:6
**digitoxicity** 139:20
**Digoxin** 119:10
126:19 157:12
193:18,21,22
194:4,6,11,18

265:19 274:12,19
**digress** 142:6
**diligence** 83:19
85:6 123:11
149:22 154:16
155:9,11 289:4
**diligent** 68:16
**dinner** 300:2
**direct** 14:14 105:24
106:18 129:9
131:9 133:20
148:9 200:25
201:17 233:8,17
262:4
**directed** 64:6
131:12 269:4,12
281:9
**direction** 6:17 18:4
85:18 181:19
230:25 249:6
**directions** 33:3
**directly** 137:25
202:20,21 262:2
265:7
**disagree** 108:5
132:7,17 165:21
167:23
**discard** 292:8
**discarded** 229:25
**discern** 301:24
**disclosed** 239:18,24
241:5 242:6 244:9
267:20 305:4
**disclosure** 242:7
**disconcerting**
136:11
**disconnection**
11:14
**discordance** 114:16
**discovered** 236:10
**discovery** 7:16
23:10 26:1 29:10
52:13,14,16 85:10
85:11,12 154:9
179:1 220:19

221:4 236:11,22
244:16,19,25
252:1 277:6,19,19
277:21 278:8
289:9,11 295:6
**discredibility**
231:10
**discuss** 15:16 74:10
175:25 254:10
**discussed** 15:17
24:21 138:19
139:15 177:2
225:7 251:12
**discussing** 117:16
138:18
**discussion** 11:17
16:4 52:15 55:8
104:21 129:17
146:1 181:10
199:2 233:13
234:3 247:7
285:19
**discussions** 56:11
**diseases** 216:14
**disks** 32:13
**display** 225:2,3
**disputes** 96:20
**disseminated** 289:9
**distant** 300:15
**distilled** 178:13
200:18
**distracted** 132:21
**distributed** 87:14
118:7 119:15
**distributes** 148:15
149:1
**distributing** 260:21
**distribution** 88:17
89:3 188:13
**District** 1:1,1 4:9,9
107:6,9 164:17
167:9 182:15
280:20
**division** 1:2 4:10
94:20 122:15

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 318

**divisions** 97:8
**doctor** 13:4 23:7
  71:2,11 74:3
  197:9 206:16
  233:4 254:4
  268:24 272:3
  294:11
**doctors** 202:14,21
  203:4 274:5
**document** 8:18,23
  9:2,11,17,22 10:1
  10:12,16,17 11:8
  12:1,15,24 13:22
  17:23 18:6 23:20
  24:8 26:6,22
  28:23 30:18 31:20
  32:12 33:19 34:5
  34:16,21 35:11
  36:18 42:8 46:11
  48:14 49:1,20
  50:22 51:2 57:22
  59:22 60:11 66:3
  67:3,3,11,13,15
  71:13,17,19,22
  72:4 75:5 77:18
  85:15 92:9 104:3
  104:17 106:1
  107:2 108:10
  109:2 123:11
  124:21 127:16
  129:1 130:25
  131:10 134:16
  137:19 139:9
  140:18 145:21
  146:1,5 147:12
  152:16 159:17
  163:12,13,22
  164:1,3 166:19
  167:22 170:12,17
  183:12 184:1
  190:4 199:22
  200:21 206:14
  208:1 209:5 211:1
  213:7 232:11,13
  233:3,18 239:6

  256:14 269:11
  272:18 276:17
  282:8 283:1,2,10
**documentary** 125:3
  210:8
**documentation**
  119:14 138:4
  154:1 178:24
  190:22 191:22
  194:9 209:14
  222:12 235:16
  236:18 303:1
**documented** 10:13
  66:1 71:4 92:22
  108:25 136:22
  151:25 159:18,20
  163:11 172:7
  196:17 273:20
  298:7
**documenting** 27:9
  108:15
**documents** 3:11
  7:15 8:5,6 10:5
  12:2 16:1 22:12
  22:14,17,20 23:3
  23:16,18 24:2,6
  25:22,23 26:2,5
  29:19 30:9 31:4
  31:16,21 32:11
  33:21 34:1,7,14
  35:18 36:25 38:6
  38:10,16,20,21
  42:7 43:13 44:5
  46:2,5,13,18,19
  46:22 47:16,17
  48:19 49:15 50:8
  51:15 52:6,17,22
  53:8,21 56:4,4,15
  56:17,21 57:17
  60:5,24 64:25
  66:1 67:7,21 74:8
  75:25 76:17 79:6
  81:2 82:18 83:4
  101:16 102:3,16
  103:14,22 116:7

  127:3,12 132:20
  132:23 136:14
  147:14 149:23
  151:6 160:19
  167:16 174:7
  182:2 183:19
  209:14 210:9
  215:8 217:7
  235:11,23,24,25
  236:9 237:14
  244:21 248:7
  252:4 257:22
  270:23 277:20,21
  280:8
**doing** 16:22 33:17
  55:21,24 60:21
  81:7 83:21 95:5
  140:8,11 208:11
  222:8 228:20
  239:7,9 245:13
  253:8 256:23
  258:17 261:20
  295:17 296:12
  302:9 304:21
**dollars** 261:5
  304:18,18
**dosage** 207:19
**dose** 118:11 119:9
**doses** 204:21 208:2
  273:23
**dosing** 200:11,17
**dossier** 225:16
  236:6
**dossiers** 46:8
  249:13 276:24
**double** 102:22
  105:4,8 108:7,13
  115:3 117:16
  118:11 120:2,16
  153:17
**double-thick** 62:15
  102:18,24 103:9
  103:17 104:11
  116:17,25 117:6,9
  117:18 118:9

  119:7,23 120:19
  276:12
**doubt** 131:24
**doubts** 239:2
**download** 22:19
**downplayed**
  197:21
**dozen** 120:12
**Dr** 3:6,8,9,16,18,19
  5:15,17 9:23 11:5
  11:16,20 16:24
  19:8 22:2 26:22
  27:21,22 30:24
  32:2 38:14 39:6,8
  40:9,23 45:12
  64:24 70:23 72:6
  73:6 74:18 75:7
  75:18 77:12,20
  83:7 84:8,13
  85:19 121:19,21
  137:1 148:2
  166:18,21 168:20
  180:7 183:1,6,25
  191:2 204:16
  206:21 209:24
  224:11 226:14
  232:3 235:15
  245:5 247:15
  283:10
**draft** 34:1,20 49:23
  56:19 95:17
  215:10,11
**drafting** 215:8
  242:25 243:2
**drafts** 219:22
**draw** 25:11 286:12
**drew** 34:10
**drive** 12:5 34:24
  104:7 219:20
**driven** 16:13
**drives** 20:17 33:9
  33:11,25 218:25
**drug** 22:3 25:14
  61:13 76:7,8 85:6
  94:20 95:11,12,15

  95:17,22,25
  100:17 110:4
  127:7 136:16
  140:9 148:25
  150:22 164:18
  197:16,16,18,19
  202:17 210:14,19
  210:24 212:19
  265:15 274:19,25
  280:21 292:7
  299:6
**drugs** 16:5 61:13
  86:16 95:18 97:11
  97:14,19 129:23
  139:17 140:3
  141:15 251:11
  264:24 265:20
  268:2 272:5
  287:15
**Duces** 67:25
**due** 83:19 85:6
  123:11 149:22
  154:16 155:9,11
  299:23
**duly** 5:6
**duties** 94:16
**duty** 148:16
**D-250** 45:9
**D-251** 45:9
**D-252** 47:24
**D-254** 47:24
**D-255** 53:17
**D-256** 55:4
**D-257** 58:8
**D-258** 59:16
**D-259** 60:13
**D-260** 60:13
**D-261** 69:24

---
          **E**
**earlier** 55:20 68:1
  167:13,13 244:9
  261:22
**early** 49:13,23
  219:22

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 319

ease 11:10
easier 37:15
easily 124:21 212:4
edge 212:15
edition 152:6
effective 158:5
efficacy 97:4
    139:20 200:14,17
    208:3
ego 238:24
eight 16:23 220:7
EIR 162:11 183:21
    184:8,17 187:11
    233:2
either 30:10 44:2
    46:11 54:13 68:20
    72:10 79:3 82:14
    87:16 88:15 114:6
    116:14 118:15
    138:23 142:8
    150:4 151:7
    155:21 162:10
    172:13 181:19
    257:3 279:25
    281:24 284:5
    293:20 296:14
electrical 126:15
    127:2 128:13
electronic 7:17,18
    30:11,19,22 33:6
    54:14 57:21
    125:18
electronically
    10:20 11:25 31:6
    31:11,15 32:11
    49:18 138:24
    175:3
Elizabeth 150:19
    151:5 152:22
    169:5,5 174:1
    186:24 187:12
    188:2,23 211:20
Ellis 2:8,12
eloquent 128:18
elucidate 142:5

elucidated 66:4
embarrass 69:9
    278:7
embarrassed 43:3
    245:22 291:21
embarrassing 69:4
    81:6
embarrassment
    81:11 245:14,16
    256:11,16 258:13
    277:7 292:2
EMEA 88:23 113:9
employee 143:6
    178:6
employees 143:2
employment 258:1
Enclosed 36:13
encouraged 217:13
    220:8 221:25
    224:6 228:19
    239:5 258:25
encouraging 229:8
ended 118:5 234:16
    266:10 271:20
engage 73:24
    161:14
engaged 131:21
    160:17 161:7
    236:1 237:14
    270:3
engagement 3:14
    15:22,24 19:19
    56:9 59:1,4
    239:25
engaging 134:3
engines 125:15
ensure 131:21
    237:6 270:4 284:3
entail 240:13
entire 120:17
    166:19 269:16,25
    279:18 280:18
    281:13 283:2
entirely 145:8
entirety 45:19

198:12 284:1
entitled 53:21
    250:19 257:17
    264:23 282:5
    283:10
entrain 129:21
entrained 296:20
entreat 166:18
entry 50:8
epidemiology
    301:21
equipment 61:14
equivalent 30:20
    113:4 118:10
equivalents 30:22
Erin 106:10
err 181:19
error 149:21
    163:10 183:17
    231:14
establish 120:1
    170:22
established 167:19
    215:5 274:20
establishes 170:13
    170:18
Establishment 7:19
    7:22 13:2 48:10
    73:8 149:12 152:8
    171:6 184:5
    187:16 233:12
    288:1,2
eternity 126:1
EU 210:5
Euclid 2:9
European 154:23
evaluate 80:22
    117:14 170:9
    176:22
evaluated 72:1
evaluating 119:3
evaluation 60:18
    75:18 76:25 77:9
    77:18,24 98:12
    136:7 161:15

206:5 207:8 208:7
    209:9 215:7
evening 15:2
evenly 118:6
event 18:25 76:7
    78:16 89:7 107:22
    110:5 134:8
    135:20 137:7
    139:5 141:16,19
    150:15 168:23
    274:8,13 286:11
    300:25 301:4,5,10
    301:11,14 302:10
events 12:24 74:24
    75:8,8,9,11 76:1,3
    76:4,9,11,13 78:6
    78:8,8,14 82:11
    87:6,18 88:15
    89:4 132:13 134:4
    139:13 140:3,4
    141:14 142:23
    173:21 175:14
    188:6 210:15
    266:1 270:9 273:1
    298:12,14 299:22
    302:6
eventual 155:12
eventually 105:24
    238:12
evidence 10:18
    15:19 20:21 25:18
    25:19 29:4 35:12
    50:17 51:7 53:5
    60:9,20 63:13
    71:1,13 80:18,20
    89:4 102:22 103:3
    104:6 115:1,5
    136:16 147:23
    160:10 166:9
    174:11 175:1
    180:12,24 205:6
    211:16,22 217:10
    217:13,14,17
    218:2,11 221:7
    223:2 224:18,24

227:6,10 229:3,5
    230:24 234:21,25
    236:23 237:1,4
    239:20 240:14
    245:25 246:18
    247:24 248:4,6,10
    248:21,24 249:2
    251:6,11,20,23
    252:6 253:10,12
    255:6,11 256:9
    262:6,8,19,22
    263:3,3 267:7,10
    276:23 277:2
    278:5,8 279:24
    282:17 284:1
    286:7,9 288:8,17
    288:22 289:14,15
    289:25 290:23
    291:2,4,10,23,24
    292:5 293:9,9,14
    293:18,24,24
    296:23 297:3
    299:4 301:9,11
    302:20 303:5,8
evidentiary 24:6
evolve 305:20
exacerbation
    200:15
exact 12:4 43:19
    223:10 242:12
exactly 9:25 108:20
    127:4 176:19
    179:19
examination 2:20
    5:8 145:12 247:13
    268:22 286:21
    297:11 302:14
examine 133:8
    228:1 255:18
examined 5:7 133:2
examining 133:5
example 301:2
Excel 27:6
exchange 36:4
    52:20 90:6 210:4

Karen A. Frank, M.D.                    Videotaped                    June 30, 2010

223:20
**exchanged** 93:16
93:24
**excruciating** 49:16
**excuse** 16:16 21:7
32:1 50:19 75:14
77:17 144:1
203:18 240:18
277:10 300:8
**excused** 306:9
**exhausted** 17:3,3
**exhaustion** 28:21
**exhaustive** 13:25
**exhibit** 3:1 8:23 9:2
9:7,10,15,19,20
9:24 12:10,11
13:21,22 29:15,18
34:18 35:19 37:16
41:10,12,16 44:19
44:22 45:7,14,20
46:21 49:20,21,24
51:22 53:13,17,21
54:1 55:4 58:5,8
59:16,19,25 66:19
67:24 68:4 69:24
70:3 71:14 72:7
72:10,11 77:23
78:12 105:23
124:13 128:23
130:8 131:6 138:6
138:12 141:7
145:1,19 148:1
151:2 152:9
163:24 165:4
168:20 171:9
172:11 174:3
176:20,23 183:7
183:20 187:6,10
191:3 192:24
193:25 201:6
202:25 206:17
209:24 250:2,5,19
251:1,9,17 254:2
264:18 267:23
268:11 280:5

282:4,6 283:7
284:22 285:24
**exhibits** 8:8 24:6
31:19 39:13 40:1
45:9 47:24 60:13
64:9 277:12
**existed** 127:13
164:10 189:25
**existence** 164:14
191:16
**existing** 25:9
122:14
**exists** 210:23
**expand** 16:3 281:8
281:12
**expansion** 242:23
**expect** 48:24 85:12
**expected** 15:13
105:13 123:17
243:19 244:9
**expectedness** 172:6
**expecting** 15:12
78:25
**expedited** 153:24
280:2
**experience** 57:1
65:11,12 81:14
89:18 97:22 98:7
101:11 133:20,22
134:2 150:22
164:18 197:24
212:16 245:4
280:21 292:23
**expert** 3:3 33:17
41:20 52:23 55:9
55:24 56:3,7,10
56:23 59:7 65:13
70:11 80:16 83:1
94:22 97:10,13,17
116:8,9 120:7,10
120:21 125:16
137:2 145:19,24
156:22 160:16
180:4 213:13
214:24 217:5

219:17 220:12,14
222:1 226:18
227:23 236:16
237:16 238:14,18
239:12,12,14,17
240:11 241:1
244:12,18 245:7
252:10 255:25
257:8,13,17
261:11 271:25
274:4 290:19
291:22 292:8,9,23
294:4,8 296:25
302:5 304:7,14
**expertise** 63:25
95:1 105:17
116:11 120:4
211:15 212:12
213:4,9,22 223:20
238:10 270:17
301:19
**expertises** 86:7
**experts** 274:5
**expired** 121:5
**explain** 65:23 84:3
178:4
**explaining** 88:6
**explanations** 13:7
**explicit** 101:19
142:1
**explored** 192:23
**exposed** 122:16
**exposure** 89:1,5
120:8 140:4
**express** 25:6 207:2
208:8 249:8,19,23
254:1 300:25
304:5
**expressed** 22:25
25:3,21 33:21
47:4 85:20 92:8
165:5 177:16
219:2 250:1,25
251:17 253:5
265:13 281:21

282:20 305:2
**expresses** 283:19
**expressions** 71:18
**extend** 224:5
**extensive** 85:10
295:6
**extent** 89:1 98:10
102:9 122:9 240:1
240:5 241:19
**external** 209:18
239:8
**extra** 79:7
**extracted** 72:5
**extraneous** 157:17
**extraordinarily**
298:19
**extrapolate** 12:19
**extrapolates** 18:23
**extrapolating**
133:22 134:2
212:7 223:12
**extrapolation**
18:17
**extremely** 84:4
111:5 122:23
126:14 132:1
169:13 238:9
299:12
**eyes** 26:13 152:11
159:1 170:13
**e-mail** 12:3 20:18
22:20 30:10 44:9
124:4 127:3
**e-mails** 30:7,8

**F**
**face** 139:23 256:11
**facility** 97:6
**fact** 13:22 17:19
51:7 52:14 83:23
95:25 122:22
123:16 132:2
136:13,15 138:15
141:11 145:21
146:5 154:11,15

173:3 179:11
183:17 207:14
218:11 233:23
235:10 237:20
254:17 266:3
275:3,7 290:11
297:2 299:16,18
302:24 303:1
**facts** 82:5 157:7
195:2 251:10
264:23 265:23
268:1 272:18
299:18
**factual** 236:3
297:14
**fail** 304:8
**failed** 82:7
**failure** 139:23
162:2,6,7,14
199:25 200:18
202:5 204:19
210:15 298:10,13
**fair** 37:8 47:4 67:6
67:20 81:17 86:17
89:13 96:6,9
104:3 147:6
150:13,16 156:22
169:21 174:3,18
176:23,25 180:7
187:20 189:5,9
190:13,20 197:17
212:13 214:8
221:9,19 241:9
245:5,10 246:15
246:19
**fairness** 162:13
183:25
**faith** 263:13
**Falls** 233:9
**far** 28:5 48:9 80:7
88:19 143:7
175:18 182:12
188:24 189:11,22
190:8 203:4 224:5
263:18

**Farley** 55:11,17
  57:9
**Farley's** 56:16
**farther** 190:9
**fashion** 23:15
**favor** 231:8
**faxed** 57:22 207:9
  209:10
**FDA** 10:13 13:22
  16:4,12,18 18:20
  22:3 23:23 24:21
  25:14 26:13 34:6
  42:18,20 48:10
  52:24 56:5 65:11
  65:15,25 66:1,15
  66:21 73:7,7,9
  75:23 76:1,2
  78:13 80:25 81:20
  81:25 82:9 87:9
  88:22 92:11,21
  94:16,17,19 95:12
  95:19,21 96:2,7
  96:19,19,21 97:5
  97:22,23 98:14
  99:8,12 101:3,11
  101:18 102:6,12
  104:3 105:5,7,11
  105:14,18,19
  106:5,13 107:13
  107:17 108:6,22
  109:6 110:15
  113:4,9,14 115:10
  115:12,20,22
  117:19 120:5
  122:4,8,12,16
  123:1,12 124:1,12
  124:22 126:12,22
  131:20 133:14,21
  133:23 135:20
  136:11 137:6,11
  137:24 139:4
  140:2 141:9,18
  143:21 144:5,11
  146:10 148:19
  149:14 151:7,9

152:11 154:20
155:16,18 156:5,7
157:22,25 158:3
158:13,20 159:1
159:24 160:8,12
161:5,10 162:1,10
163:2,8 164:7
165:8,12,22 166:8
166:13 167:15,22
170:13 173:6,9
174:22 175:4
182:8,10,21 183:9
183:15 186:25
197:24,24 198:3
198:10,15,25
200:20,21 201:24
201:25 211:17
218:9 221:21
233:20 234:17,24
235:3,18,20 246:6
246:7,22,25 254:6
263:7,9,14,25
264:1,2,7,10,16
265:1,5,13,21,23
266:3,16 267:5,8
267:17 269:20
270:3,21 271:3
272:18 275:10
279:5,22 284:6,21
285:23 286:7,15
286:24 287:1,24
288:10,14 289:16
289:20,22 290:12
290:16,22 291:4,9
291:16,23 292:4
293:15,24 295:9
295:21 297:3
301:13 302:21,25
303:8 304:10,12
305:18
**FDA's** 131:25
  132:18 171:10
  251:10 266:13
  267:12,23 268:10
  270:11

**fear** 258:23
**fears** 305:16
**February** 66:21
  67:14 150:12,14
  159:24,24 171:24
  182:10 185:16
  189:14 278:19
  279:1,3,4
**fed** 89:20
**federal** 127:21,22
  207:2 208:8
  227:16 241:2,17
  253:17 290:24
  292:8 294:2
  295:10
**FedEx** 30:10 44:17
  44:17 68:7 209:11
**feel** 135:17 221:24
  236:2 240:21
  259:23 260:3
  288:19 302:20,22
**feeling** 294:24
**fellow** 94:19
**fellowship** 42:18
  94:21
**felt** 74:21 220:9
  260:4 287:3
**fewer** 259:10
**field** 86:9,12 95:13
  105:16 106:20
  107:5,8 108:7
  109:3 110:23,24
  111:3
**fields** 111:6 113:7
  113:12
**fifth** 43:3 68:3,12
  68:14,16 69:19
  150:2
**fifth-grade** 196:5
  200:3
**fight** 302:21 305:17
**figure** 282:13
**file** 69:14 158:10,15
**filed** 116:24 177:13
  179:6 181:5

236:16
**files** 234:12
**filing** 218:22 278:6
**fill** 52:6,7 141:7
  146:17
**final** 7:19,21 34:21
  72:3 73:6 99:11
  99:14,17,24 100:6
  157:24 158:2
  159:1 167:22
  171:10 181:6
  196:11 198:4,25
  218:20
**finally** 242:9
**find** 33:20 36:13
  46:3 69:18 71:1
  91:24 92:19
  104:17 124:20
  126:22 129:8
  134:22 135:6
  152:5,12,15,17
  175:2 184:13,13
  184:24,25 192:8
  225:12 232:2,4,5
  232:9,9,16 272:24
  275:18 301:6
**finding** 66:3 103:21
  119:11 155:9
  159:2 232:22
  238:4
**findings** 154:15,20
  158:20 161:11,20
  162:4 218:12
  228:16 231:17
  275:23 280:2
  281:21,22,25
**fine** 38:8 44:24
  63:19 112:1,7
  152:15 182:4
  192:5 235:7
**finish** 43:7 178:11
  178:12
**finished** 69:5 94:21
  197:14 303:23
**firm** 4:17 27:13,14

33:16 44:25 54:20
55:2 56:25 124:5
218:6 240:10
260:24 289:7
302:19
**firms** 109:18
**first** 5:22 9:24,25
  12:10 15:4 16:20
  17:11 20:10 26:12
  32:3 40:15,23
  41:24 46:9 48:2
  54:5 56:2 57:11
  59:21 77:5 78:23
  80:16 81:13 82:4
  82:5 107:3,4
  111:14,22,25
  122:25 131:6,19
  147:7 148:6
  150:17 154:22
  156:2 158:12,22
  164:12,13 169:16
  169:17 171:10
  183:8 184:12
  186:13 189:8,9
  196:25 203:12
  210:8,11,22
  212:10 213:13
  214:16 225:15
  228:9 244:11
  280:5,7 284:6
  285:13
**fish** 241:22,23
**fit** 58:24 59:1
  218:10
**five** 68:2 69:10
  239:3 269:5
  276:14 285:2
**fix** 214:16
**fixation** 136:4
**fixed** 147:13
**flagged** 19:23,25
  21:11
**flash** 12:5 20:17
  104:7
**floor** 2:13 254:15

Karen A. Frank, M.D.          Videotaped          June 30, 2010

**Flower** 2:13
**flows** 66:13
**focus** 75:15
**focused** 14:8,9
　47:11 52:3 187:7
　300:16 302:1
**foiled** 23:17,19
**folks** 90:4,5
**follow** 18:8 69:17
　76:9 101:13
　104:14 105:18
　130:21 190:17
　263:22,22
**followed** 209:11
**following** 11:7
　71:22 144:4 156:4
　279:11 282:21
　285:21
**follows** 5:7
**follow-up** 32:21
　46:2 76:6 105:5,7
　105:19 107:14
　109:4 204:9,10
　207:10 216:11,15
　219:1 280:3
**follow-ups** 17:9
**foolish** 181:16
　238:22 239:9
　291:15 295:9
**foolishness** 277:4
**footprint** 124:3
　125:12
**forced** 10:20 300:7
**forcing** 95:14
**foregoing** 307:6
**foreign** 187:7,14
　188:7,9,18 189:15
**forgive** 180:2
**forgot** 231:13
**form** 61:22 71:11
　73:3 74:1 75:18
　76:25 77:10,25
　80:12 83:8 87:17
　92:2 93:4 96:10
　99:8 100:6 101:7

110:10,14 113:3,9
113:9,10,14,25
116:21 117:2,12
118:20 126:25
133:17 134:20
135:24 137:15
138:2 139:6,8
141:21 157:1
165:10,24 166:17
168:24 170:16
171:13 174:9
176:12 179:18
180:10 184:2
218:18 220:5
240:8 251:18
254:9 266:5
267:14 270:16
278:7
**formally** 115:17,18
**format** 30:11 33:6
　56:4,17
**formatted** 56:21
**formed** 251:22
**forms** 26:19 62:4
　72:21,22 73:2,2
　73:23 77:11,16
　78:9,15 88:21,23
　101:22,23 103:5
　113:13 114:9
　146:17
**formulate** 135:17
　141:4 179:16
**formulating** 136:8
　137:20
**forth** 49:2
**forward** 13:7 83:25
　133:25 245:13,17
　245:22 256:10
　257:3,5 259:12
**forwarding** 186:24
**found** 29:6 49:7
　82:9 92:11 124:21
　149:14 163:16
　167:10 227:15
　233:11,14 241:2

255:14 290:22
299:6
**foundation** 220:2
221:22
**foundations** 239:13
**four** 3:6 30:24
　55:18 145:4 269:4
　269:13 270:1
**fourth** 196:5 200:3
**frame** 24:17 79:7
　216:23 282:8
　293:8
**Frank** 1:10 2:21
　3:6,8,9,11,12,16
　3:18 4:7 5:6,14,15
　5:17 9:23 11:5,16
　16:24 19:8 22:2
　27:22 30:24 31:21
　32:3 38:14 39:6,8
　40:9,23 45:12
　53:22 64:24 72:6
　77:20 83:7 85:19
　121:19,21 148:2
　166:21 168:20
　180:7 183:1,6,25
　191:2 204:16
　209:24 224:11
　226:14 232:3
　245:5 247:15
　250:18 283:10
　306:6 307:15
**Frank's** 3:19 11:20
**Fred** 2:3 5:2 28:6
　29:16 33:12 185:9
　201:4 247:3
**free** 302:22
**French** 166:18
**frequency** 301:10
　302:6
**frequently** 212:24
**frightened** 227:11
　258:20,21
**frivolous** 33:22
　273:19
**front** 6:1 9:18

16:15,18 32:21
35:22 37:3 38:12
38:18 49:18 52:9
69:12 106:8 148:1
182:24 206:17
209:7 235:25
244:10 253:25
269:1 290:23
**frustrated** 48:16
**fulfilling** 193:10
**full** 5:12 27:24
　74:22 85:2 163:18
　176:8 236:8,10
　264:18 266:22
**fuller** 136:15
**fully** 221:11
**function** 84:1
　151:21 210:3
　211:23 214:3
**functioning** 22:19
　234:8
**functions** 162:25
**further** 16:3 84:9
　85:16 102:3
　107:22 122:17
　158:20 169:12
　177:22 179:1
　190:22 221:2,7,17
　229:2 242:17
　263:4,5 265:18
　289:12 293:9
　302:13 303:2,7
**furtherance** 73:12
**future** 16:3 127:14
　167:5 173:10
　245:16 281:1
　300:15

━━━ **G** ━━━

**game** 283:22 304:7
　304:14,16
**gap** 26:4
**gather** 219:8
**gathered** 69:6 84:5
　93:16 216:25

289:9
**gathering** 216:5,25
297:21
**gauge** 227:19 241:7
244:4
**general** 15:17 16:4
　16:8 29:2 46:24
　200:6 233:13
**generalities** 51:18
**generalization**
　262:5 288:6
**generalizations**
　262:6
**generalized** 271:13
**generally** 7:9 50:4
　105:25 119:1,2
　293:1 302:9
**generate** 217:1
　274:13
**generated** 61:22
　63:8 105:16 292:6
**generation** 184:8
**generic** 16:5 22:3
　23:22 24:10,22
　36:12 38:7 129:23
　130:3 140:7
　141:15 148:15
　149:1 194:23
　251:11 264:24
　265:15,19,20
　268:1 287:15
**generics** 23:23
　129:18
**Geneva** 112:5
**Germany** 113:10
**getting** 22:7 57:1
　186:10 222:4
**give** 6:19 14:5,9,13
　14:13 16:8 21:23
　22:14 23:13 27:23
　41:11 44:8 45:6
　47:2,11 48:24
　52:5 54:7 66:17
　68:19 83:13 84:8
　85:3 94:15 96:14

Karen A. Frank, M.D.                    Videotaped                    June 30, 2010

| | | | | |
|---|---|---|---|---|
| 111:22 122:20 | 26:3 27:21 29:24 | **going** 6:9 13:8 19:9 | 125:12,25 126:4,6 | **handed** 46:12 |
| 155:25 166:4 | 34:18 41:16 44:21 | 19:10,11,12 20:15 | 126:8 128:20 | 47:15,16 52:19 |
| 190:22 193:2 | 45:7 49:6 52:2 | 21:20 23:13 27:25 | 138:19 | **handing** 53:20 |
| 213:18 217:5,9 | 56:6 61:8 63:21 | 28:1 34:9 39:18 | **gotten** 197:10 | 183:1,6 |
| 220:16 223:10,21 | 64:11 67:16 68:15 | 40:4 43:11 47:10 | 255:3 | **handle** 179:23 |
| 228:1 230:12 | 69:23 71:23 73:17 | 48:12 50:12 52:11 | **governance** 158:18 | 289:5 290:6 |
| 231:12 247:3 | 74:3 75:10,23 | 56:8 58:4 63:25 | 211:23 | **handled** 19:4 |
| 289:4 297:16 | 78:17 80:14 83:10 | 64:13 65:18 71:5 | **Grand** 2:16 | **handling** 81:12 |
| **given** 18:1,18 21:1 | 83:13 88:19 93:10 | 74:5 82:20 83:18 | **granted** 179:9 | **handwriting** 54:25 |
| 25:22 30:24 50:13 | 93:10 96:24 | 100:9,10,17,18,21 | **granularity** 203:8 | 55:1,13 |
| 74:24 92:9 124:23 | 100:14 104:16 | 104:18 105:15,24 | **great** 12:13 180:19 | **Handwritten** 3:6,8 |
| 125:1 132:2,11 | 111:14 115:13 | 105:24 111:21 | 256:15 264:1 | 3:9,12,16,18 |
| 136:13 138:1 | 121:6 125:21 | 117:4 121:7 | **greater** 179:15 | **hang** 37:14 47:8 |
| 140:13 142:14 | 126:22 133:19 | 125:17 126:15 | 292:1 | 182:20 |
| 145:23 158:18 | 137:4 138:25 | 127:7 130:13 | **ground** 6:8 12:20 | **haphazardly** 179:7 |
| 160:6,10,19 180:2 | 139:11 143:7,8 | 138:16 141:22 | 44:17 | **happen** 173:24 |
| 180:4 193:2 | 146:12 147:25 | 143:13 144:19 | **grounds** 249:5 | 179:20 |
| 211:16 214:2,13 | 149:17,21 152:6 | 145:3,6,16 147:5 | **group** 3:14 112:16 | **happened** 12:21 |
| 217:18 218:7 | 152:11,16,19 | 153:19 168:1,5,10 | 206:21 207:19,20 | 22:11,24 25:24 |
| 222:14,19,19,21 | 153:7 168:4,9 | 169:11 175:10 | 298:24 299:18 | 28:22 29:1,5 34:3 |
| 223:16 224:24 | 175:19 178:10 | 184:17 186:11 | 301:16 | 48:18 51:6 68:9 |
| 225:4 227:1 | 181:21,21 182:13 | 188:14 215:20 | **groups** 93:24 97:2 | 82:3,6,12 176:4 |
| 228:14,23 229:11 | 188:25 189:11 | 220:17 222:9 | 199:16 207:19 | 177:24 214:23 |
| 235:14 237:9 | 190:9 192:7 | 226:3,23 227:16 | **growing** 211:11 | 249:17 261:24 |
| 238:21 239:20 | 195:12 196:22 | 228:12,12 231:7 | **GS-14** 94:22 | 279:2 |
| 245:12 246:12,16 | 202:14 205:20 | 238:2 240:22 | **guarantee** 72:3 | **happens** 130:17,19 |
| 246:21 249:6 | 208:20,25 210:17 | 243:4 246:8 247:4 | **guess** 129:10 | 177:6,7 |
| 251:7 255:18 | 210:22 215:16 | 250:4 257:14,15 | 214:22 218:24 | **happy** 199:11 |
| 256:6 258:19,19 | 216:6 221:7 | 268:15,20 275:21 | 229:7 259:10 | **hard** 31:8 207:10 |
| 262:18 265:24 | 223:11,13 224:6 | 277:18 282:2,18 | 303:19 | 297:21 301:11 |
| 266:9 267:7 270:6 | 225:12 246:12 | 285:1,15 292:25 | **guesstimating** | **harder** 301:1,5 |
| 293:8 294:18 | 248:11 249:20 | 293:20 296:16 | 43:24 | **Hardy** 2:16 4:25 |
| 299:1 300:20 | 250:4 254:21 | 300:24 306:3 | **guidance** 179:2 | 29:16 70:8 247:15 |
| 301:16 | 255:14 256:4 | **good** 5:10,11 28:13 | 218:7 222:14 | **harm** 122:5 132:13 |
| **gives** 171:10 | 257:3,5 269:15 | 43:24 45:5 49:25 | 228:23 258:19 | 132:25 266:2 |
| **giving** 22:11 139:2 | 271:5 275:19 | 50:11 53:25 148:4 | | 270:9 |
| 298:22 | 278:9 279:9,15 | 152:13 206:15 | **H** | **harmed** 284:23 |
| **glad** 302:17,18 | 281:18 283:13 | 217:5 234:1 | **half** 134:4 | 285:25 |
| **globally** 88:16 | 284:7,9 285:1,9,9 | 240:19 244:6 | **halted** 129:21 | **harp** 73:11 |
| 148:21 | 285:9,12 292:19 | 263:9,10 269:22 | **hand** 29:14 36:21 | **Harvey** 2:15 4:25 |
| **GMP** 269:22 | 292:20 294:7,22 | 269:23 270:13 | 44:8 48:2 77:20 | 29:16 70:8 247:15 |
| 271:25 | 295:9,21 296:10 | 284:18,18 294:24 | 77:23 81:9 124:11 | **hate** 19:13 22:1,1 |
| **go** 6:7 12:15 13:6 | 299:7 303:11,22 | **Goodwin** 145:16,18 | 163:23 201:2 | 245:11 291:21 |
| 14:4 15:23 17:8 | 305:25 | **Google** 124:1,9,20 | 251:15 275:22 | **hauling** 31:18 |
| 19:10,20 24:17 | **goes** 113:10 | 124:24,25 125:4 | 280:4,6 290:14 | **Hazard** 26:23 |
| | | | | 60:22 63:7 64:4 |

Karen A. Frank, M.D.          Videotaped                  June 30, 2010

70:23 71:5 73:6
74:18 75:7,18
76:24 77:9,13,18
77:24 88:7,11
91:8 92:13,15,23
98:9,12 119:11
195:24 196:11
200:14 202:23
203:20,21 204:6
206:5 207:8 208:4
208:7,15,16,24
209:3,9,17 215:7
234:15,19 235:4
235:15,16 288:11
**head** 6:16 260:10
**heading** 253:18
**headquarters**
210:3 211:3,5,9
211:16,22 212:18
212:20,24 214:3,4
214:10 223:6,14
263:20
**health** 26:23 49:3
56:6 60:22 63:7
64:4 70:23 71:5,7
72:24 73:4,6,6
74:18 75:7,18
76:24 77:9,13,18
77:24 88:6,11
91:7 92:13,15,23
98:9,11 117:20
119:10 122:11
190:2 195:23
196:11 200:13,22
202:23 203:20,21
204:6 206:5 207:7
208:4,7,15,16,24
209:3,9,16 210:13
210:15,22 215:7
234:14,19 235:4
235:14,16 286:8
288:11 293:25
297:4
**hear** 28:1 72:25
79:13 111:2

197:15 213:11
**heard** 42:25 115:16
128:19 143:18
235:22,22
**hearing** 46:24
**hearsay** 274:16
**heart** 298:3
**heavily** 246:22
284:12
**heavy** 35:10 260:2
296:24
**hedge** 174:15
**heeding** 62:19
**held** 4:10 33:21
**help** 141:7 292:14
**helping** 53:1
**herring** 117:1,11
118:19,22,25
**high** 241:19 255:8
260:8 286:23
297:7 299:19
300:24
**higher** 112:21
298:3
**high-frequency**
286:10
**high-level** 250:15
**high-profile** 300:4
300:6,12
**high-volume**
107:19
**hired** 81:3 83:14
179:21 222:14
288:23 303:12
**historical** 152:13
**history** 98:4 149:8
159:6,10 161:4
**hit** 294:2,4 296:25
297:1
**hold** 47:21 133:23
134:1 238:7,10
**holding** 68:4 211:5
211:6
**holds** 97:24
**honest** 239:16

295:17
**Honestly** 215:1
**honored** 289:13
**hope** 28:2,3 94:14
128:12 138:9
174:14 198:19
248:2 258:16,17
262:5 302:19,24
**Horan** 106:10
**hospital** 274:21
**hotel** 33:3
**hour** 78:20 168:6
**hours** 15:8 78:24
79:7
**huge** 160:20 215:3
248:7 254:22
**hundred** 8:19
114:7 250:14
286:14
**hunt** 185:4
**Huntington** 2:9
**hurt** 305:9
**hypertension** 96:25
97:1
**hypertensive** 97:4

------

**I**

**Iceland** 210:4
213:25 214:10
**ICH** 73:2
**idea** 45:5 69:10
120:13 127:6
136:24 147:13
286:13 287:20
**identification**
45:10 47:25 53:18
55:5 58:9 59:17
60:14 69:25
**identified** 211:17
**identifies** 210:16
**identify** 64:25
81:25 82:1 150:18
163:8 195:10
210:21
**IDR** 66:19

**II** 97:3
**III** 2:3
**imagine** 42:18
**immediately** 11:16
156:4 158:22
169:9 291:12
**impact** 70:14 82:13
102:4 117:15,23
127:6 139:25
142:1 144:12
156:10,16 157:19
165:7 169:9 170:8
176:22 186:3
201:25 233:15,17
241:21 262:4
273:9 288:5
**impacted** 83:16
130:4 141:14
157:8 249:10
288:7
**impacting** 219:12
**impacts** 224:10
**impartial** 80:11
83:4
**impermissible** 13:5
**implement** 98:8
154:18 167:11
214:7
**implementation**
155:15 157:21
158:4,19,20 167:7
169:25 173:14
187:3 192:2 212:2
228:17 280:1
281:4,5,8,24
284:17,18,19
302:10
**implemented**
161:17
**implications** 16:5
182:8 257:6,10
304:24
**implied** 63:13
**implies** 154:12
172:13 173:5

**implosions** 28:19
**imply** 259:17
**implying** 271:23
**importance** 114:18
**important** 6:10
110:21 111:5
125:24 128:5
138:22 141:13
151:23 168:25
169:7,13,14
171:23 173:16
174:11 185:3
191:14 232:8
238:9 255:1 265:4
**impossible** 299:21
**impression** 146:20
229:13,15,18
230:2
**improved** 233:21
**Improvement**
26:24
**improving** 27:16
**inability** 237:3
**inaccuracies** 49:8
101:21
**inadequacies**
169:23
**inadequacy** 161:12
**inadequate** 85:21
139:6 140:17
153:23 173:2,13
176:10,22 179:12
179:15 216:10,10
217:12,13 221:22
228:17 255:4
256:16 269:21
280:3 284:3 292:6
**inadequately** 82:8
**inadvertently**
276:20
**inappropriate**
145:8,14 171:1,22
**incident** 91:10
107:23 150:6
**incinerated** 103:7

Karen A. Frank, M.D.                Videotaped                June 30, 2010

Page 325

include 119:8
  127:22 140:24
  174:11 182:14
  281:12
included 9:19,20
  72:10 74:23 79:21
  163:22 224:8
  249:16
includes 18:22
  109:5 276:9
  286:17 288:1
including 35:4
  38:20 143:5
inclusion 223:17
incomplete 101:23
  101:24 177:20
incompleteness
  81:15 101:21
incorporate 221:13
incorporated
  174:15
incorrect 237:23
  239:9
increase 273:12
increasing 134:5
  242:8 301:9
increasingly
  301:15
incumbent 225:12
IND 95:6
independent 74:22
  109:24 114:21
  123:22 124:6
  125:8 127:9 155:8
  166:3 211:6
  250:13
independently
  119:22 123:8
  138:8,10 220:11
  222:16 238:8,14
  267:22
Index 2:20 3:1,11

indicate 88:14
indicated 145:23
  147:21 150:25
  280:8
indicates 228:16
indicating 32:7
  39:7 269:7
indication 56:22
  101:17 164:10
  223:16 224:24
  225:4 226:25
  228:14
indications 56:20
individual 26:19
  33:18 34:13,13
  49:13 100:22
  112:25 113:2
  180:21,22 211:24
  243:14
INDs 96:8
induced 273:11
industry 23:23
  60:21 65:11 98:5
  98:6 123:10
  275:11
ineffective 158:18
inexperience 241:7
  294:8 296:15,24
  305:8
infected 270:4
infectives 94:23
influenced 273:13
influx 262:17
information 7:11
  11:18 17:20 18:1
  18:10,19 25:14
  27:14,20 41:24
  44:10 51:3 53:1
  58:23 62:7,9 66:4
  66:17 67:23 68:10
  70:17 71:25,25
  73:5 74:9,11,15
  74:19 78:11 79:25
  80:8,21 81:16,18
  83:22,23,24 84:5

84:20 85:3,5,9,21
  85:22 86:14 87:22
  90:6 92:17 93:16
  93:20,23 94:1,3,7
  94:10 95:18 103:6
  104:1 110:3,18
  113:24 114:5
  117:21,25 118:14
  119:4,16,21 121:1
  123:17,20 125:17
  126:23 128:13
  134:12 135:19,21
  135:25 137:7,19
  138:11,23 139:1
  140:23 141:8,13
  142:3,19 146:15
  147:19 149:8
  150:3,4,6,11,14
  152:1,3 153:23
  154:14 155:10
  157:18 163:17
  165:6 167:4
  168:22 169:1,8,12
  173:2 176:8,22
  177:2,4,8,18,21
  177:22 179:4,13
  179:15 180:8
  182:14 185:13
  186:19 188:15,16
  190:12,24 193:9
  193:16 199:16
  204:25 205:23
  207:7,12,18 208:6
  210:5 214:2,9,13
  216:5,5,10,13,24
  217:1,23 218:17
  219:9,11 220:16
  220:16,22 221:3
  221:14,17,18
  222:15 224:14
  225:13,18,22,24
  227:20 228:13
  229:16 230:3,7,17
  230:20 231:1,15
  231:16,18,24

232:1,10,18,19
  234:18 237:9
  245:8 255:15
  261:24 262:3
  266:7,24 267:19
  267:20,23 270:22
  270:24 271:9,14
  271:18 278:2
  289:2,12,23
  290:12,16 291:20
  297:20 301:19
information.Do
  176:11
informed 69:21
  115:21,24 116:1,3
  117:3 177:18
  181:4 182:11
  196:4 200:7
  224:15
ingest 128:4
ingested 103:24
  118:6 262:25
Ingrid 112:11
inherent 300:20
inhibit 303:7
initial 80:24 95:17
  99:9 158:10 176:3
  191:19 195:23
  214:16 218:25
  261:1
initially 45:18 60:8
  78:23 175:21
  214:4
initials 111:20,22
  111:25
injunction 60:7
injured 128:1
injuries 121:23
  127:18
injury 139:7
ink 54:25
innovative 95:10
innovator 95:14
inquire 105:6
inquired 92:8

156:9
inquiries 145:7
inquiry 62:2 89:17
  132:4 297:5
insecure 228:20
insecurities 248:14
insecurity 304:6
  305:8
inside 26:11 28:20
  41:9 53:1 61:1
  65:18 82:12
  109:16,17,18
  275:6
insight 151:25
  175:20,23 180:16
  190:22 214:18,23
  246:24
inspected 151:15
  151:16
inspecting 106:13
inspection 7:20,22
  13:2 27:7,8,10,11
  48:10 66:11 68:9
  73:7,8 81:24,24
  81:24 82:9 93:9
  97:6 99:10 101:20
  102:23 103:20
  106:2,3,11 107:14
  108:3 109:4
  120:11 142:25
  149:13 150:12,18
  150:22 151:3,7,24
  152:4,8,22,24
  153:22,22 154:9
  154:12,12,15,20
  155:1,13 156:4,8
  156:11,24 157:8
  158:1,20 159:2
  161:19 167:6,20
  169:7 171:7,19
  172:7 173:10,11
  173:23 176:5
  182:22 183:21
  184:5,7 185:23
  187:17 188:1,23

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 326

189:18 191:5,19
191:23 192:13
193:8,9 195:7
211:18 214:5,16
216:8,9 218:9,12
228:16 231:16,20
232:22 233:9,12
233:16,22 246:25
248:23,25 249:1
264:8 269:19
270:17 275:23
276:5,15 279:3,22
280:2 281:1,22,23
281:25 284:5,12
288:1,2
**inspectional** 184:2
**inspections** 10:13
26:10 34:6 65:25
81:18,19,22 82:5
85:14 92:11 160:8
163:16,17 187:19
246:7,13 247:1
264:15 284:6
**inspector** 162:10
234:24 235:19,20
**inspectors** 12:25
26:13 29:6 75:23
80:25 99:9 106:13
152:12 159:3
198:3 264:10,16
288:10
**inspector's** 78:13
102:6 235:3
**instruct** 126:21
**instructed** 79:4,10
79:12 122:20
125:11,21
**instructions** 21:8
**insufficiency**
199:24 200:10,17
204:22 207:20
208:2
**insufficient** 214:8
**integration** 212:17
**integrity** 101:5,12

101:20 102:13
256:7 264:2
296:13
**intensive** 150:12
**intent** 71:21
**interact** 213:25
**interaction** 59:9
**interactions** 59:6
242:18
**intercurrent**
163:20 298:12
**interest** 237:25
238:2
**interested** 19:22
21:7,9 31:17,18
32:19 151:12
229:10
**interim** 163:8
231:18 246:23
**intermittent** 15:9
51:7
**internal** 16:13
26:21 74:25 85:14
109:16 203:17
204:3,13 205:20
206:1 209:5
**internally** 175:25
**international** 211:4
**Internet** 124:3
126:7,12 299:7
**interpret** 191:15
**interpretation**
169:24 171:22
172:1
**interrupt** 9:14 19:7
22:2 33:8 89:25
96:4 140:10 170:1
284:25 292:19
**interrupted** 15:9
**intimate** 146:3
**intimating** 145:20
**introduce** 4:19
**introduction** 152:8
**investigate** 263:5
**investigated** 263:4

**investigating**
233:25
**investigation** 61:4
61:9,12 62:14
63:6 64:1 85:17
88:9 91:7,9 119:7
123:25 142:19
276:11
**investigations**
25:16 51:4 143:19
**investigator** 93:1,7
93:9 142:25
**Investigators**
106:10
**involved** 28:18
34:12 98:3 115:18
212:18 214:5
222:4,9 276:8
**involvement** 98:11
124:4 242:8
**involving** 297:22
300:11
**in-house** 61:5
**irrelevant** 11:14
127:5 128:15
**isolated** 107:23
**issue** 18:9,12,14
19:24 21:2 87:11
87:12,13 99:23
108:13 111:16
112:18 115:3
116:25 117:5,6,17
117:23 119:24
120:2 121:2 122:5
133:23 134:1
138:19 155:2
172:16 189:1,2,11
196:3 210:10,16
210:21,23 211:14
212:12,13 214:25
224:22 237:9
244:4 254:22
257:25 263:18
274:25 291:2
**issued** 106:10 107:5

109:3 124:15
143:21 144:6,14
144:18 184:2,4,20
191:3 198:1
201:20 207:7
209:2,7 216:20
287:20
**issues** 9:13 15:18
15:20 17:12,17
19:15,23 21:1,3
21:10,11,22 22:22
22:22 23:6 25:4,7
25:12 49:4 63:24
83:15 85:15 96:8
97:18 100:10,13
100:14 102:4,7
118:16 122:24
124:23 125:1,14
125:19 133:25
135:22,23 136:9
136:11,23 139:16
151:22 156:6
157:20 159:23,25
160:6,14 161:15
162:19 163:4
165:3 171:18
172:6 174:6
189:25 191:9
199:23 205:8
209:19 211:17
212:9 213:1
214:11 216:15
248:8 249:10
263:16 267:2
277:5 289:8 300:1
**item** 11:17,17 29:25
30:2 269:12,16,16
**items** 3:4,5 30:12
41:21 42:9 43:11
53:22 67:22 269:5
**iterations** 34:20

———— **J** ————

**January** 164:7
166:12 170:14

174:19 182:9
185:16 189:14
191:2,11 193:3,13
195:4 216:9,19,21
216:23
**jeopardize** 224:25
258:13 305:5
**jeopardy** 296:14
**Jersey** 107:6
150:19 151:5
152:23 164:17
182:15 233:9
253:21 280:20
**Jim** 55:17 56:16
**job** 94:16 224:13
256:16 293:17
**Johnson** 45:22
46:23 116:14
**join** 270:19
**joke** 28:15
**judge** 145:16,18
220:11 222:16
238:8,14 242:21
242:22 253:17,18
253:20,21,22
254:23 292:8
**judges** 127:23
238:3 241:2 254:1
290:24 294:2
**judgment** 114:11
132:11 243:17
265:24 270:6,12
**July** 62:17 124:15
134:17 153:18
161:11 187:3
188:10 212:1
276:12
**jump** 260:7
**June** 1:14 4:13
43:25 50:6 62:8
92:8 135:10 147:2
154:4 177:7 218:3
225:8 242:15
243:1,2 247:25
250:18 266:21

Karen A. Frank, M.D.          Videotaped          June 30, 2010

272:7 283:9 306:7
**jury** 6:1 241:12
242:11 244:10
**justify** 97:2

_____

**K**

**Kansas** 2:17
**Kaplan** 2:15,22,23
2:24 4:25,25 7:21
20:8 27:1 41:3
70:5 72:25 79:12
79:16 84:12,15
94:8 112:8,10,13
145:6,12 247:14
247:15 252:8
254:12 255:16
258:2 262:14
266:12 267:16
268:14,18 270:15
270:19 274:15
282:2,11 283:6,9
283:17 284:20
285:5,11 286:22
290:1,4,8 291:13
292:10,18 294:20
296:7 297:9
302:15 303:24
305:24
**Kaplan's** 20:14
**Karen** 1:10 2:21
3:11,12 4:7 5:6,14
31:21 53:22
250:18 283:10
295:19 306:6
307:15
**keep** 48:7 69:5
168:1 199:10
218:11 259:6
277:3
**kept** 123:2
**key** 8:20 9:10 68:8
89:6 128:3 170:4
**kicks** 130:20
**kind** 48:13 55:21
106:1 108:10

138:11 191:21
220:10 231:10
287:10,12 295:20
**kinds** 48:14
**knew** 111:20
127:12 207:13
217:19
**know** 7:1 9:9 13:15
13:16 18:23 19:6
19:22 20:18,18
21:12,19 25:16
30:17 33:24 39:4
39:5 43:21 44:25
48:21 50:23 54:18
56:12 61:9 65:5
69:10 75:10 82:3
84:2 90:22 91:3,6
91:17,18 98:4,20
99:15 103:16
105:10 112:13
116:23 119:5
123:9 125:13
127:19 129:24
133:15 134:21,25
135:8 136:10,18
138:21 139:21,25
141:23 143:19
144:20 147:18
152:23 153:1
155:12,14,15,18
155:21,23 156:2
157:24 158:17,25
159:19 161:23
163:13 165:13
168:4 173:8,25
175:21 184:6,12
185:1 186:1,6,7
186:14 187:5,7,13
188:6,8,13,19
189:15,16,17,22
191:9 193:18,20
194:10,17,20
200:5 202:16
204:4 209:1
213:17,24 214:14

214:15 219:21
220:13 223:10
224:5,14 225:10
225:10 227:19
229:19,24 234:10
235:6 236:1,5,13
238:6 241:22
242:12,16,22
244:4,17 252:6
254:23 255:6,19
256:3 260:1
261:14,15 262:1
262:17 267:9
271:8,25 272:5,21
272:22 273:22
276:16,19 283:15
286:6,19 287:10
287:14,17,25
288:16 291:19
295:13,23,23,25
296:9 297:7
298:24 299:24
300:5,9,12,24
302:4,9 304:15
305:18
**knowing** 221:2
229:2 239:10,11
239:12 241:7
**knowledge** 69:11
100:2 102:17,20
129:17 134:25
156:13,14 202:25
205:21 238:21
273:14 289:17
**known** 50:12 84:20
117:10 224:20
293:5

_____

**L**

**L** 2:15
**label** 67:4 95:11,15
95:17 126:19
127:8 299:7
**labeled** 152:22
**labeling** 95:9 96:2

96:8
**labelings** 96:1
**lack** 80:20 84:20
92:13,23 132:12
139:12,20 140:2
141:14 153:9
175:5 200:14,17
208:3 231:10
234:19,21 237:9
266:1 270:8,17
273:1 288:13
**laid** 12:24 163:15
**language** 218:5
**lapse** 138:9
**lapses** 130:15
**laptop** 22:18
**large** 66:2
**largely** 16:12
**larger** 40:25,25
45:13 196:22
301:7
**late** 15:14,15
188:15 276:22
277:6
**law** 1:11 44:25
141:12 166:7
251:15 253:25
256:5 259:21
260:24
**lawyer** 28:15 53:7
**lawyers** 17:12 36:5
38:2 62:6,11 63:2
105:7 116:15
126:21 137:23
212:11 226:19
229:1 236:3
267:21 268:3
**lax** 95:11 138:9
**lay** 26:7
**lead** 157:23 177:22
225:24 290:24
298:15
**leading** 88:15
251:21 252:3
256:15 298:18

**learn** 116:19
237:21
**learned** 240:1
251:8 259:25
**learning** 225:2
**leave** 125:12 153:7
223:22 296:1
**leaving** 259:19
263:20
**led** 91:7 158:20,23
226:22 227:4
230:7,20 231:10
238:20,23 240:24
241:14 251:24
252:2 255:10
256:8 277:24
289:19 304:8
**left** 28:5 76:13
124:3,5,9 133:5
136:18 158:24
189:6 210:2 213:7
230:21 285:4
287:21
**legal** 83:19 98:17
99:16 125:18
148:18 219:16
**legitimate** 179:5
224:13 249:5
**Leikin** 26:22 70:23
75:18 77:12 137:1
235:15
**Leikin's** 73:6 74:18
75:7 206:21
**lengthy** 11:7,17
278:13
**letter** 36:8,12 49:7
66:21 70:23,24
71:7 99:2,13
134:1 159:9
161:10 163:1,5
164:6,10 165:14
166:16 169:23
170:2 171:21
172:24 174:20,23
183:8 195:24

Karen A. Frank, M.D.          Videotaped          June 30, 2010

203:23 204:3,5,6
204:10,12,21
205:25 206:10,20
207:1,13,18,21
208:6,23 209:20
216:19 259:16
278:18,25 279:5
280:13
**letters** 36:2,5,6
38:7,7 48:10 49:2
66:15 71:2,11
73:9 133:24 158:8
159:7,18,20 161:4
163:10 165:2
167:20 171:3,11
172:8 193:11
198:5,7 202:13,20
246:8,8
**let's** 10:24 14:7,12
20:23 24:17 29:24
34:18 37:21,21
46:9 64:7,11
76:21 78:17
111:14 121:6
137:4 145:18
146:12 147:25
148:4 153:7 159:5
168:6,9 178:10
181:21 182:24
183:20 184:24
195:12,13 210:11
212:10 215:18
223:22 226:2
269:15 278:9
279:9 292:15
303:22 305:25
**level** 94:22 112:21
157:25 196:5
197:19 200:4
211:5,10 238:10
241:6 274:9
**leveling** 95:13
**levels** 139:22,22
242:8 273:21
298:4 299:10,20

**leverage** 65:11
**liability** 1:5 4:8
127:19 243:24
**lieu** 113:14,15,16
148:19
**life** 53:25 164:13
**lifetime** 111:24
**lifted** 82:4 149:16
151:19,20
**light** 110:19 141:11
172:11 200:20,21
279:16,21,22
292:8
**lightly** 287:2
**lightweight** 35:9
238:7 296:17
**liked** 7:15 51:8
108:11 120:23
169:1 223:7,15
293:5
**likelihood** 118:4
139:7 159:16
243:8,22 300:24
**limited** 70:20
241:15 244:12
260:6
**limiting** 29:10
**line** 17:19 18:3,14
22:21 161:18
241:14 244:18
251:21 252:9
267:12 269:12
271:16
**linear** 290:18
**lines** 152:25
**link** 208:11
**list** 7:14 20:6 22:5
22:11 25:23 44:8
44:12,13 46:1
47:2 48:24 49:8
51:20,20 52:5,9
52:12,18,19 53:7
62:24 73:16 74:7
76:1,7 78:7 299:1
**listed** 3:4,5 53:22

75:8
**listen** 73:18 191:7,7
251:6 297:15
**listening** 247:17
**listing** 20:25 31:14
36:9,11 46:6,13
51:15
**lists** 47:7 81:9
**literature** 88:19
96:18
**litigation** 1:5 4:8
30:4 56:2 57:4
116:16 121:22
122:1 127:17
128:5 217:6 222:5
226:15 237:17
240:23 241:4,16
244:1 245:17
252:10 253:18,19
253:20,21,22
255:20,22 257:13
258:14 263:16
293:3 295:20
296:14 299:25
303:16
**little** 6:5,23 43:3
56:1 64:10 81:6
81:10 123:14
138:13 140:4
150:3 172:25
186:19 227:15
228:19 233:9
238:2 263:23
285:1
**liver** 210:15
**lives** 111:20
**LLC** 2:3 3:14
187:12
**LLP** 2:8,12,16
**loathed** 56:1
**lobby** 15:11
**local** 210:4 211:7
211:10,12 214:11
**long** 8:23 10:11
15:7 74:6 140:3

152:16 168:7
185:8 206:12
243:4
**longer** 10:17 180:8
221:10
**look** 11:1 17:22
20:9,11 23:16,18
24:1 46:3 53:8
54:8 62:4 69:19
71:3 72:18 78:4
83:15 88:18 89:7
89:15 106:6
123:24 136:21
138:8 139:1
140:21 142:22
150:17 160:21
171:24 174:6
181:15 195:19
207:22 229:4
232:6 234:11
250:8 268:24
272:10 275:13
295:3 299:22
**looked** 23:5 24:9
36:12 67:17 82:19
134:7 137:6
208:22 234:24
235:17 237:14
248:1 267:5
271:20,22 273:16
282:14,15 287:6
291:9 297:3 299:6
**looking** 7:10 63:6
66:11 81:1 82:2
86:14 87:5,19,20
88:2,3 90:2 91:23
108:17 114:15
120:3,3 123:6,9
125:17 135:20
138:17 146:5
160:9 172:24
216:12 301:25
**looks** 18:20 47:17
184:4 295:8
**loop** 104:6

**loose** 30:25 47:16
60:5
**Los** 2:13
**loss** 255:6
**lost** 37:7
**lot** 17:25 19:18
22:24 23:8 25:11
25:16 29:4 33:20
48:20 49:14 52:20
120:6 130:19
160:7 167:19
175:23 179:2
214:18 219:8
225:9,22 226:15
228:2 232:6
236:17 239:10
246:24 248:17
257:11 270:25
288:8 297:7
**lots** 85:8 131:22
136:18 270:4
271:20,22 272:1
**loud** 6:15 279:20
**low** 141:15 301:4
301:10,14 302:6
**lower** 300:25 301:5
**lunch** 7:14 43:17
138:19 242:13,15
300:1
**luncheon** 121:11

---
**M**

**magnitude** 119:25
243:24 244:15
292:24 293:3
**Mahoney** 1:12 4:11
**main** 292:21
**maintain** 111:6
126:15 174:7
**maintained** 117:24
125:20
**maintaining**
287:24
**making** 34:9 39:8
75:12 125:22

Karen A. Frank, M.D.　　　　Videotaped　　　　June 30, 2010

Page 329

133:15 134:3
141:10 145:7
173:1 175:18
190:6 219:7 224:7
242:17 248:3
288:6 291:3
**malfunctioning**
61:14
**malign** 295:4
**management**
184:20
**managers** 211:13
**mandatory** 274:9
275:8
**manifestation**
235:9
**manner** 277:25
**manufacture** 89:8
116:11 272:12
**manufactured**
128:4 140:13,21
260:23 262:9,25
**manufacturer**
140:13,22 148:15
149:1
**manufacturing**
61:2 63:24 86:21
86:25 87:21,23
88:3,14,25 89:15
90:24 91:5,19
92:5 93:19 97:6
97:11,14,18 120:3
129:13 130:3
131:13,20 140:12
140:20 162:19
219:11 248:8
265:15 269:23,23
270:2,13
**map** 78:8,14 82:3
87:13 110:13,14
**mapping** 113:13
**March** 59:3 154:19
158:5,22 187:4
188:12 212:3
**margin** 17:24 299:3

**mark** 41:9,15 43:11
44:22 45:7 47:22
64:25 112:12
**marked** 3:2 8:7,23
9:7,9,16 12:10
29:15 31:19 45:3
45:9,14 47:25
48:3 49:21 53:17
53:20 55:4 58:8
59:16 60:13 69:24
70:3 77:23 105:1
124:12 151:2
163:23 183:7
201:2
**market** 1:12 4:12
61:3 85:7 88:16
88:25 89:2,5
102:19,23 103:24
115:6,14,23 116:5
132:12 140:3
147:8 197:3
210:24 265:25
270:8 271:21
272:13,23 286:11
286:13 287:12
300:20
**marketed** 156:10
156:15
**marketing** 95:14
**markets** 103:10
**markings** 41:7
**marks** 30:23
**material** 7:9 27:25
39:19 48:14 169:8
177:8 178:8
**materials** 36:10
**matter** 44:3 78:19
78:22 79:19
138:15 179:11
219:25
**ma'am** 20:5 23:21
36:24
**McCaffrey** 106:10
**McCAMBRIDGE**
1:11 4:11

**MDL** 1:6
**mean** 17:13 101:24
110:4 120:2,3
125:6 150:24
172:23 199:22
228:12 243:15
303:25
**means** 109:11
189:22 261:15
281:3 287:21
288:14
**meant** 17:14 24:5,5
78:10 220:3
**medical** 23:5,7
52:25 65:15 88:18
96:7 100:22
114:11 118:10
120:5 136:6,10
221:20 254:4
297:14 298:10,14
301:25
**medications** 216:14
**MedWatch** 26:19
70:18 72:21 73:2
73:14,14,23 75:3
75:20 76:11,14
77:8,11,16 78:9
78:15 87:22 88:21
90:19,23 101:22
101:23 110:2,3,8
110:10,15,17
111:14 113:1,2,16
113:23,25 174:19
191:4,12 192:11
193:3,14 195:5
216:6 217:1
297:21
**MedWatches** 74:9
76:23 103:5
112:17 274:22
**meet** 14:19 15:12
83:20
**meeting** 13:17,17
14:5 20:4 21:11
43:17 44:15 45:21

50:6 51:18 65:8
65:21 66:7,9 92:8
162:11 175:10
177:7 185:12,20
185:21 188:23
199:4,5
**meets** 115:15
**Megan** 7:13 14:21
44:1 56:12 177:7
**memory** 8:10,21
195:11 206:15
**mention** 22:3
**mentioned** 22:10
24:21 89:11 91:11
103:19 105:21
109:23 111:18
144:23 174:20
182:1 202:4 206:5
242:25
**mentors** 25:14
**menu** 113:8
**merged** 71:13
183:19
**merger** 154:19
212:17 214:20
**Merit** 1:15
**message** 197:10
**met** 5:17 7:13 14:17
15:4 43:25 44:3
184:20
**method** 269:20
301:6
**methodologies**
302:4
**methodology**
299:22 300:18
301:23 302:2
**meticulously** 19:9
**Metrix** 160:11
**me-too** 95:12
**MHRA** 26:10
81:18,22,25 85:14
153:21 154:8,11
154:15,18,23
155:1,4 156:8,11

156:24 157:22
158:1,5 160:7
187:4 212:2 214:7
284:5
**microphone** 77:21
183:3
**middle** 278:12
**mid-afternoon**
250:8
**Miller** 7:13 9:12
10:4 12:2 14:22
15:12 25:25 43:17
44:1 45:21 46:23
50:6 51:17 52:6
53:7 54:20 56:11
65:8,21 66:7,9
68:7 84:8,12,13
84:15 116:14
124:5 154:3
160:23 223:5
241:3 242:14
278:7 289:7
302:19
**Miller's** 223:21
224:9
**million** 120:12
**millions** 261:5
276:21 304:18,18
304:18
**mind** 11:20 52:7
147:14 174:4
189:7,23 190:6,12
208:12 248:9
**mine** 88:20 126:1
143:12 199:8
271:5 290:13
**mined** 88:13
134:11 142:21
**mining** 122:9,24
143:11 271:2
**Minnesota** 146:18
**minus** 114:12
**minute** 39:4 75:2
104:17 106:24
178:11 186:12

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 330

204:8 247:3
**minutes** 15:15 25:2
  80:2 144:22
  146:13 175:9
  184:11,19 219:24
  225:18 230:6,14
  285:2 299:19
  300:21
**Misbah** 38:25
  39:12
**mischaracterizes**
  170:17
**misgivings** 245:6,8
  245:11
**misled** 236:2,12
  240:5,21
**misplaced** 277:13
**missed** 16:16
**missing** 36:16
  37:20 51:15 141:8
  159:16,18,20
  165:6 190:12,24
  224:19 277:21
**Missouri** 2:17
**misstates** 139:9
**mistake** 176:14
**mistaken** 154:10
**mister** 84:14
**misunderstanding**
  237:1
**mixed** 42:19
**modelers** 27:15
**modified** 148:22
  176:4 180:24
  283:8 294:9
**modify** 127:7
  173:18 177:9,23
  177:25 196:7
  226:1 227:7 230:4
  278:4 288:21
  297:8
**modus** 65:15
**molecules** 94:23
**moment** 21:13
  174:2 192:17,25

**Monee** 2:12 4:23
**money** 121:23
  226:15 239:10
  243:17
**months** 125:4
  158:7,23 276:15
**Moriarty** 268:16
  268:18
**morning** 5:10,11
  13:18 14:12 23:1
  24:2,3,4 25:3,5
  26:7 103:19
  167:13 170:3
**motive** 242:22
**Motley** 2:3 5:2
  124:5 278:7 289:7
  302:20
**Mount** 2:4
**move** 32:17 56:1
  90:1 145:9 169:4
  211:20 214:16
  245:16 259:12
**moved** 42:13 94:24
  151:13,17 245:22
**movement** 211:11
**moving** 245:13
**multifunctional**
  215:13
**multinationals**
  212:25
**multiple** 21:5 61:13
  139:17 151:17
  165:5 266:10
**Multi-District**
  253:18 255:20
**Mylan** 5:1 70:25
  195:25 202:24
  203:17
**myth** 265:13,16,18
  265:21
**myths** 251:11
  264:24 268:1
  272:18
**M.D** 1:11 2:21 4:7
  5:6 250:18 306:6

307:15

**N**

**NAI** 150:23 151:24
  153:12 169:6
  171:20
**naive** 220:6 228:19
  254:23 258:23
  261:10
**naivete** 63:23 180:3
  225:3 277:4,5
**name** 4:21 5:12,17
  149:1 307:19
**Naranjo** 111:11
  114:13
**narrative** 75:11
  76:6,11 110:19
  114:12 284:8
**narratives** 101:22
  143:14,15
**national** 109:20
**nature** 119:2,3
  241:20
**NDA** 95:8
**NDAs** 96:8
**necessarily** 73:24
  259:22
**necessary** 230:14
**need** 6:25 12:5
  19:20 20:2,16
  33:5 42:20 43:18
  54:8 57:24 58:7
  84:8,8 96:15
  109:8 111:3
  119:20 126:18
  127:13 142:4,16
  174:5 180:24
  181:17 194:20
  207:22 227:12
  232:16 285:13
  294:6,9 301:7,20
**needed** 61:7 83:18
  95:1 117:25 152:1
  160:13 220:17
**needs** 28:22 33:10

36:19 64:8
**negate** 178:9
  288:18 289:24
  303:2
**negative** 153:15
**negligible** 303:3
**negotiate** 190:2
**negotiations**
  161:24 200:20
**nervous** 21:17,20
**never** 53:6 64:2
  99:17 102:12
  109:22,24 122:15
  138:25 146:6,7,9
  153:25 163:5
  164:3 202:24
  212:17 215:8
  222:3 225:4
  230:23 231:6,9
  239:16 241:13
  250:13 262:3,8,22
  267:7,20 268:3
  271:22
**new** 86:15 87:6
  107:5 123:17,20
  150:19 151:5
  152:22 164:17
  174:11 180:12
  182:15 210:14
  211:19 221:13
  233:9 237:20
  253:21 278:4,8
  280:20 288:22
  289:2 292:25
  295:2 296:12
  304:7
**news** 203:18
**nice** 36:18
**Nigel** 55:16 59:8,13
  245:18
**night** 13:17 14:6
  16:2 19:23 20:7
  22:11,24 23:17
  25:5 29:23 33:4
  74:11 84:7,23

85:19 122:7,21
  123:1 128:23
  130:9,10
**NJ** 1:16
**nodding** 6:16
**noncompliance**
  18:20 154:21
  158:24 211:17
**nonreporting**
  178:6
**nonsubmission**
  218:13
**non-Digitek** 18:22
**normal** 115:5
  139:21 298:4,4,15
  299:9,9,20
**notable** 210:1
**Notary** 1:17
**notated** 50:13
**note** 41:18 43:23
  158:9,15 299:3
**notebook** 39:18,22
  40:12 41:1,2,7,20
  42:2,5 44:15
  45:13,20 46:14,21
  59:24 60:3 69:19
**notebooks** 30:25
  31:5,24 32:1 39:9
  40:8,17 54:2 60:5
  67:17
**noted** 107:17
  156:23
**notes** 3:6,8,9,12,16
  3:18 17:23 20:2,4
  36:21,22 37:1,6,9
  48:6,8 49:12,14
  50:2,5 51:17 55:8
  65:4,6,6,20 66:5
  71:24 81:8 135:7
**notice** 1:17 29:18
  33:4 35:19 67:24
  106:11 122:25
**novel** 140:4
**November** 241:4
  243:21,21

number 13:22 23:3
29:25 30:2,13
35:19 37:24 38:9
38:14 41:12 43:11
46:21 48:3 51:22
51:25 59:25 65:2
76:8 112:16
114:14 121:22
132:11 173:19
194:20 204:15
215:3 237:18
259:3 265:24
269:13,16,16,25
270:7 275:14
298:14

**O**

oath 121:18 254:1
304:3
object 74:1 80:12
83:8 93:4 96:10
101:7 116:21
117:2,12 118:20
126:25 133:17
134:20 135:24
137:15 138:2
139:8 141:21
145:6 157:1
164:23 165:10,24
166:17 168:24
170:16 171:13
174:9 176:12
179:18 180:10
220:5 240:8
251:18 254:9
257:15 266:5
267:14 282:2
objection 27:19
83:11 240:19
262:12 270:16,19
274:15 282:1
objective 156:22
objects 268:16
obligation 148:18
obliterate 114:24

observation 92:21
102:6 105:4,8,20
108:8 153:22
156:24 158:13
182:8 190:19
234:6,17 302:21
observations 12:25
26:14 72:9 81:1
99:9 101:21
123:13 142:25
171:11 173:13
178:5,14 180:17
180:21,22 184:2
187:6 191:5,19,23
192:13 193:7
205:7 216:8
218:10 223:1
232:19,24 246:22
249:21 250:11
279:23 281:10
283:25 284:13
observer 83:4
observing 99:22
obtain 22:17 51:9
115:14 215:15
243:17 244:23
obtained 85:6,9
93:21 262:7
277:20
obtaining 52:16
obviously 184:6
occasion 55:18 65:6
occasionally 111:2
125:2
occur 66:10 138:17
158:21 198:19
298:7,9
occurred 17:14
70:22 132:22
139:3 147:15
162:5 179:25
187:20 211:2
242:20
occurring 181:11
occurs 28:21

October 153:23
165:17 166:2
233:10 243:11
290:23 291:6
294:2
offer 100:18
offered 295:1
offering 100:22
261:11
office 42:14 97:8
107:6,9 167:9
215:17
officer 52:25 65:16
136:10
offices 1:11 4:11
official 81:8 110:1
135:3
off-label 96:22
oh 24:5 49:7 128:25
163:15 183:16
243:23 260:22,22
304:15
Ohio 2:10 4:18
okay 6:7 7:2 9:21
10:2 12:17 13:13
13:19 14:1,14,15
16:19 17:1,5
21:15 22:6,8 24:1
24:8,15,19 25:6
29:14,24 31:7
32:6,8 35:2,5,13
36:15 37:5,23
38:20 39:2 41:23
43:9,15 44:14
46:20 47:6,8,9,13
47:14 49:25 52:2
53:16 54:21 55:3
58:6 61:25 63:16
63:19 64:7,12
66:18 67:20 70:7
70:10 72:14 73:21
75:22 78:17 83:14
85:25 88:1 95:7
96:24 97:21 98:14
98:17 99:6 100:2

100:21 101:2
104:14 106:18
107:2 108:10
109:12 113:5
115:4,9 121:4
122:3 128:3,7,11
128:15 131:9,17
134:16 135:4
141:6 142:18
144:21 147:25
149:19 152:18
153:3,5,16 157:17
161:3 164:1
167:25 173:6
178:3 181:22
182:3,20 187:22
189:20 191:2
194:15 195:15
196:25 197:5,12
198:18 201:3,9
202:22 203:7,24
208:10 209:12
210:7 213:24
215:2,5 217:3
220:24 221:5
229:23 232:5
235:13 250:5
251:5 253:15
257:19 263:21
264:23 269:9
276:4 278:9,11
279:10 280:4,16
281:2,6,11,17,19
285:11 286:6
288:16 292:16
303:20
old 42:17,19 274:19
292:7
older 140:3
Oliver 112:12
omit 140:25 231:1
231:24
omitted 200:15
203:8 230:11,23
276:20

once 13:24 200:11
215:14 225:4
ones 91:14 172:20
192:14
one's 293:2
ongoing 92:23
181:4 234:19
open 133:6 259:19
291:3
operandi 65:15
operate 148:21
211:7
operating 151:5
208:13
operative 276:8
Operator 2:19 4:4
5:4 64:13,19
77:21 104:18,22
121:7,13 168:10
168:15 183:3
215:20,25 226:3,9
247:4,8 285:4,15
286:2 306:1,3
opinion 9:10 10:15
10:17 29:11 48:17
53:4 83:23 85:3
85:20 92:2,7,25
93:6,13 94:2
100:18 128:16
139:6 166:5,8,8
171:1,15 172:10
173:1 174:5,8,12
174:16 176:10
177:19,23,25
178:21,24 179:5,8
180:1,4 210:6
217:9,9,12,14
218:2 220:1 221:6
221:11,17,22
222:20 223:21,22
224:15 225:19,25
226:1 227:21
229:6,9,17,21
230:24,25 231:8
234:24 235:19

Karen A. Frank, M.D.          Videotaped          June 30, 2010

237:4,7 238:11
245:9 247:24
249:12,14 250:14
274:4 279:23
281:20 282:16,16
283:1,19,19 286:7
287:3 288:3,4,18
289:10,17,24
292:8,9 293:8
295:17 297:8
302:5 303:8 304:8
**opinions** 10:10
14:11 15:17 16:8
26:15 29:3 48:12
51:12 71:15,18
80:17 81:4 100:22
123:5 137:21
177:12 223:1
224:23 236:4
238:1 246:16
247:19,22 248:16
248:20 249:7,19
249:23 250:2
251:16,22 252:15
252:18,21,23
253:5,9,11,25
254:2,7 255:25
256:4,6,7,12
264:7 280:10
282:5,13,19,22
283:1,7,12,18,21
288:24
**opportunity** 21:24
54:7 68:19 93:15
252:20 253:3
255:17 257:25
295:2 296:10
304:2
**opposed** 113:23
**option** 257:1
**order** 10:21 122:9
166:4 174:7
179:16 183:18
234:20 236:7
**organize** 219:8

**organized** 275:18
**origin** 194:21
**original** 12:15,18
24:20 27:10 44:22
58:2,3 71:21 74:7
76:22 82:23,25
169:22 217:21
**originally** 305:5
**ought** 168:3
**outcome** 155:13
162:1 241:21,23
305:6
**outcomes** 130:4
**outlined** 143:4
**outset** 241:15,25
242:7 305:3
**outside** 15:23 41:8
109:22 116:10
124:7 142:7
156:10 211:15
213:4,9,21 224:6
299:14
**outstanding** 189:7
189:14,23
**out-of-context**
166:20
**overall** 169:10
280:25
**overgeneralizati...**
249:4
**overlap** 235:6
**overnight** 44:17
207:2
**overrule** 291:5
**overruled** 289:16
295:8
**overrules** 305:21
**overseeing** 214:3
**oversight** 210:3
212:24 214:9
223:6,14 263:21
**overturn** 290:13
**overview** 3:15
94:15 250:16
**overwrite** 111:4

114:24
**overwrote** 219:21
**o'clock** 44:2

**P**

**package** 103:21
147:21 273:4
**packet** 146:17
202:10 276:20
**pad** 36:21
**page** 3:10,13,17,18
105:25 106:8,19
129:11 131:10
148:5,6 149:18
159:5,6,11,12
165:1 181:21,21
183:8,14,25 185:7
186:14,22,22
187:23 188:21
194:3,5,17 204:15
209:23,25 232:2,6
233:4 234:6
265:14 278:9,12
278:13,17 279:9
279:12 281:19,21
282:18,19 283:24
**pages** 3:7,8,11,14
3:15 9:2,3,24,25
12:10 30:25 60:10
232:7 276:21
**paid** 78:18 252:12
**panel** 95:21 127:22
238:3 241:2
290:23
**paper** 30:11,18,25
31:18 37:2,10
52:11 138:23
**papers** 46:1 66:20
116:24
**paragraph** 106:25
109:5 129:11,12
129:13 131:11,15
145:5 148:10
149:7 150:2 159:6
159:11,16,22

164:17 165:1
181:23 182:6
269:4 279:19
280:19 281:3
283:24
**paralegals** 54:19
**parallel** 110:25
114:22
**Pardon** 186:18
**parenthesis** 269:24
**part** 35:11 36:25
59:20 76:19
108:12 126:16
137:12 161:22
162:18 163:21
175:17 176:15
178:17 186:5
236:10 267:20
300:3
**participated** 215:8
**particular** 6:17
50:7 80:15 114:15
115:13 125:3
140:22 156:8
157:8 223:19
302:11
**particularly** 61:2
88:16 199:24
216:15 223:15
236:13 305:3
**parties** 289:4
**parts** 130:7,11
**passed** 285:7
**path** 252:2
**patient** 71:2,11
103:24 118:6,10
120:14 195:20
196:10,12,16,22
196:23 197:9,20
200:25 206:2
274:11
**patients** 71:8
132:14,25 197:13
202:14,21 203:3
204:21,22 205:21

265:20 266:2
270:9
**paucity** 13:3
301:11
**pause** 46:9
**peer** 96:17
**peer-reviewed**
96:18,20,21
**pending** 141:1
255:21,23
**Pennsylvania** 1:13
4:12 253:19
255:22
**people** 16:23
121:22 126:8
127:17 128:1
140:9 179:21
197:18 220:8
222:13 227:22
237:5 238:16
245:18 258:18,25
259:23 263:11,25
283:4 291:21
295:1,10,18,21,24
296:17 297:24
298:1 303:4,11
304:12 305:10,17
305:18
**percent** 8:19 114:7
120:9 143:16
250:14
**percentage** 103:8
119:15 120:15
266:9
**perfectly** 298:4,15
**period** 48:19 63:15
82:16 108:16
119:14,24 128:8
136:6 152:2
170:24 245:2
272:5,6
**Periodic** 72:23 73:3
148:18,20 149:5
175:6
**permissible** 142:13

Karen A. Frank, M.D.                    Videotaped                    June 30, 2010

Page 333

277:25
**permitted** 137:11
277:6
**persistent** 151:22
178:6,14 284:13
**person** 95:16
227:13 256:7
262:9 263:6,24
275:3,7 295:16
299:11
**personnel** 293:13
**pertinent** 153:14
**pesticides** 301:3
**Pete** 7:13 9:11 10:4
12:2 14:21 25:25
43:17,25 51:17
65:8 68:6 84:15
154:3 160:23
223:5 241:3
242:13
**pharma** 25:13
128:18 275:6
**pharmaceutical**
86:13 98:7 254:5
**pharmacies** 198:13
202:6
**pharmacist** 62:16
102:25 197:9
**pharmacodynamic**
97:3
**pharmacovigilance**
3:20 10:7 70:13
82:2 86:8,13 87:4
88:7,13 89:21
109:15,21 110:1
112:3,24 137:20
137:25 151:12,16
151:17 155:11
160:16 162:3,15
162:21 163:4
165:3 169:4,19
170:8 171:4,17
205:9 213:15
214:11 219:13
223:13 240:12

**persistent** 267:2 284:1
**Phase** 97:3
**Philadelphia** 1:13
4:12 44:1 253:17
255:23
**phone** 14:21 15:13
36:20 58:25
242:14
**photocopy** 3:19
**phrased** 230:19
**physician** 88:8
274:11
**Ph.D** 59:14 301:20
**pick** 259:14
**picked** 212:4
232:18
**picture** 66:17 82:6
103:22 136:15
169:10 175:13
**piece** 37:2 61:14
65:24 66:14 68:10
141:13 169:1,7
222:15
**pieces** 227:10 229:5
255:6
**piecing** 68:9
**pill** 286:14
**pills** 266:10 272:1
286:11,13
**place** 61:21 63:14
65:19 66:5,14
92:20 107:24
136:22 152:4
161:16 166:23
169:20 170:10,15
170:23 210:21
239:11
**placebo** 96:25 97:1
97:2
**placed** 68:17
182:19 214:12
**places** 264:1
**plaintiff** 2:2 38:10
238:1 259:10
261:23

**plaintiffs** 5:3 6:4
14:20 15:5 30:4
36:5 38:1,16
51:14 59:23 62:6
62:10 63:2 80:10
81:4 83:3,14
84:21 85:20 105:6
116:15 117:11
118:15 123:22
124:8 126:21
137:23 146:4
212:11 213:3,21
217:4 219:3
228:25 236:3
237:17 243:16
249:7,18,23 251:8
261:11 264:18
267:21 268:3
276:17,22 304:17
**plaintiff's** 37:16
53:7 66:19 122:21
124:13 152:9
**plan** 26:24 160:10
167:6,7 173:7,14
284:16,17,18
286:18
**plans** 48:22 228:17
242:19
**plant** 61:9
**play** 199:12
**playing** 95:13
**Pleasant** 2:4
**please** 4:19 5:13
6:19 9:21 30:15
33:14 34:18 36:13
41:18 48:4,7 49:9
72:14 91:1 94:18
101:8 106:25
150:1 166:18
180:2
**pleased** 213:6
**plus** 114:12
**point** 6:25 9:11
28:4 52:13 94:1,4
109:8,8 114:17

123:21 141:2
142:16 157:11
160:15 177:1
180:13,14,14
185:4 193:12
195:9 201:23
202:2,3,3 216:18
233:22 236:20
243:3 246:22,23
258:7,12 260:1
263:17 266:23
269:25 272:25
273:5 281:5
286:14 287:22
288:16 292:3
293:16,17 295:16
298:24 299:4
302:25 305:20
**pointed** 54:24
**points** 23:24 130:24
145:4 170:4 202:9
**pooled** 97:1
**population** 120:8
120:14 195:20
196:2,10,13,16,23
196:23 201:1
205:3 206:2
**populations** 197:20
201:12
**portal** 22:18
**position** 157:24
165:22 177:9,11
230:4 287:23,24
288:21 303:15
**positions** 218:18
**possession** 283:3,5
**possibility** 52:16
93:18 105:19
300:23
**possible** 71:18
80:24 81:5,11
170:11 194:22
236:18 275:2,7,12
**possibly** 58:24 60:8
68:2 93:8,9 157:2

178:2 213:23
218:21 243:6,7
**post** 91:15 134:19
**posted** 134:17
135:1 272:18,21
272:22
**posting** 134:22
135:3
**post-marketing**
150:21 275:1,11
**potential** 82:13
87:11 119:3,4,6
123:6 136:5
156:10 241:21
**potentially** 83:16
89:24 120:16
131:22 173:18
194:25 217:7
224:19 270:4
273:18 291:20
**practice** 269:23
270:13 274:13
**practices** 112:4,23
**practicing** 274:11
**precipitate** 298:13
**precluded** 74:13
**precludes** 74:5
**prefer** 251:19
255:8 271:13
**preference** 221:12
**preferred** 244:11
260:6
**preliminary** 48:24
49:8 51:23 177:11
195:10 209:4
218:21 219:7,14
220:24 221:6
222:20,23 226:24
227:3 240:9
242:18 254:18
**preparation** 9:6
17:4 36:18 148:12
181:3
**prepare** 7:6 12:9
13:15 23:1 52:22

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 334

| | | | | |
|---|---|---|---|---|
| 54:15 56:4 | **press** 16:5 23:22 | **probabilities** | 170:14,20,23 | 89:12,15,16,22 |
| **prepared** 18:4 26:6 | 24:10 70:25 71:8 | 118:15 | 171:2,17 172:14 | 90:5,16 91:4,12 |
| 38:10,16 47:20 | 117:19 122:7,18 | **probability** 117:22 | 172:15,19 173:4 | 91:21 92:3 93:17 |
| 56:5,5 59:22 | 135:5 196:1,6,24 | 118:1 254:3 | 198:24 212:21 | 93:21 95:10 98:15 |
| 106:4,5 184:6 | 198:12 200:5,13 | 286:10 294:1 | 230:9 270:17 | 98:18 103:1,7 |
| 225:11 244:5 | 201:18 202:4 | **probably** 13:16 | 280:23 | 104:5,9 107:20 |
| 251:7 283:10 | 203:1,9,13,16,18 | 19:12 36:23 59:3 | **proceed** 56:13 57:2 | 115:14 116:11,11 |
| 292:22 293:21 | 203:25 204:11,18 | 93:9 123:10 | 70:5 178:22 | 140:12,21 144:23 |
| **preparedness** | 204:25 205:3,13 | 125:13 129:2 | 258:10 277:25 | 146:18,22,25 |
| 241:8 244:5 | 205:24 207:6,15 | 132:5 139:13 | **proceeded** 293:6 | 147:7,10,10,17,20 |
| 254:24 | 208:14 209:2,8,15 | 141:25 146:16 | **proceeding** 256:10 | 148:16 149:2 |
| **preparing** 12:23 | 209:22 273:6,12 | 166:5,23 180:21 | **proceedings** 73:12 | 152:25 153:12 |
| **preponderance** | 302:25 | 180:23 184:17 | 222:4 | 162:22 186:3 |
| 50:17 | **pressed** 224:4 | 188:11 219:10,13 | **process** 6:5 10:19 | 197:2 215:15 |
| **prescribed** 298:2 | **pressured** 284:11 | 225:22 228:16 | 23:10 26:1 29:9 | 231:17,18 232:1 |
| **present** 2:19 17:17 | **pretty** 50:9 196:17 | 232:25 233:1 | 34:12 35:3 60:18 | 232:19,23,24 |
| 19:15 51:11 57:1 | 199:4 225:8 | 259:13 274:5 | 90:3,14 92:10 | 233:21,24,25 |
| 80:7 123:3,19 | 303:17 | 288:25 290:18 | 158:15 161:14 | 234:1,7 255:4 |
| 167:24 169:12 | **prevent** 107:24 | 291:5 295:16 | 181:4 196:7 | **production** 276:17 |
| 177:4 221:6 223:2 | **previously** 16:22 | 301:19 303:1 | 214:19,19 216:5 | **products** 19:5 |
| 225:23 238:21 | 56:23 67:17 183:7 | **probing** 122:23 | 216:25 220:19 | 65:12 82:14 88:8 |
| 243:9 287:25 | **primarily** 171:2 | **problem** 42:16 | 252:1 288:20 | 89:20 94:20 95:3 |
| 303:7 | **primary** 13:3 26:18 | 129:13 131:13 | 295:5 | **product's** 269:21 |
| **presentation** | 81:1 102:2 169:21 | 210:18 223:17 | **processed** 61:23 | **profile** 241:20 |
| 145:19 255:5 | 171:8,9 234:25 | 227:5 235:8 237:5 | 62:5 | 255:9 |
| **presentations** | 264:13,17 | 270:3 305:9 | **processes** 27:13,16 | **program** 27:9 |
| 16:11,14 | **print** 30:7,16 113:9 | **problems** 76:12 | 58:17 63:14 65:19 | 161:16 178:14 |
| **presented** 7:14 | **printed** 7:8,17 9:5 | 131:20 160:4 | 66:5 70:13 82:15 | **progress** 39:8 |
| 13:1 15:19 16:6 | 30:22 135:10 | 171:25 173:5 | 141:10 210:21 | **prohibitive** 28:24 |
| 17:12 18:9,24 | 307:19 | 180:15 230:5 | 211:20 214:17 | **project** 65:14 97:1 |
| 21:1 23:25 25:25 | **prints** 110:13 | 237:20 245:14 | 287:4 289:20 | **promised** 29:6 |
| 51:7 129:3 140:18 | **prior** 63:3,11 89:12 | 265:14 284:21 | **processing** 186:25 | **properly** 232:15 |
| 170:19 177:22 | 90:17,20 91:4,12 | 285:23 | **produce** 65:12 | **proposal** 58:17,20 |
| 217:10,15,16 | 93:22 96:19 115:7 | **procedure** 115:16 | 148:22 278:8 | 59:3 |
| 221:18 224:20 | 115:23 116:5 | 115:19 133:21 | **produced** 18:5 | **propounded** 307:7 |
| 227:6,10 230:3 | 191:5 299:25 | 172:18 272:2 | 145:24 146:7 | **provide** 27:13 |
| 245:25 249:12 | **pristine** 151:19 | **procedures** 97:14 | 160:20 283:3 | 51:16 58:23 62:11 |
| 250:17 251:12 | **privacy** 124:23 | 106:9 122:8,17 | 286:19 | 63:2 71:22 137:24 |
| 252:2 255:10,11 | 125:1,14,19 | 136:21 139:5 | **produces** 99:13 | 166:9 178:25 |
| 256:9 303:10,19 | **private** 98:5,6 | 141:19 143:23 | **product** 1:5 4:8 | 236:17 237:6 |
| 305:21 | 254:19 | 144:7,13,17 | 58:17 60:19 61:5 | 284:1 |
| **presenting** 123:17 | **privy** 85:5 122:8 | 160:18 161:7 | 61:15,21 62:3,11 | **provided** 9:22 |
| 218:5 288:17 | **pro** 300:5 | 164:20 165:17,19 | 62:22,25 63:3,6,8 | 25:13 26:8,9,22 |
| 291:9 292:4 | **probabilistic** | 166:2 167:3 | 63:10 64:1 86:2 | 29:11,12 32:20 |
| 293:23 | 111:10 114:12 | 169:20,25 170:8 | 86:21 88:5,9 | 52:8 58:16 60:20 |

Karen A. Frank, M.D.                  Videotaped                    June 30, 2010

61:11 65:25 70:17
74:17,19 75:1
79:5 80:21 81:2
92:5,16 94:1,10
95:18 101:17
103:14 119:10,17
119:19,22 123:14
124:7 137:1,19
138:3,6 139:1
142:18 147:19,23
149:23 150:4,9
152:12 163:11,13
168:22 171:6
177:1,8 179:16,19
180:25 195:22
217:23,23 220:15
220:20,21 223:3
235:10 248:5,7
253:11 263:2,3
270:24 278:3
284:16 289:14,15
293:10
**providing** 87:22
198:25 218:17
**provision** 211:21
**PSUR** 148:12,22
149:3
**PSURs** 26:20 70:18
72:22 73:2,2
143:5 148:17,19
**public** 1:17 70:25
117:20 122:11
132:2,18 133:15
196:1 200:6,22
202:25 206:3
238:3 265:10
273:7 286:8
293:25 297:4
**publication** 96:19
**publications** 96:21
96:22 109:21
**publicly** 116:16
**published** 109:14
**publishes** 112:4
**Pugliese** 1:15 4:16

**pull** 126:17 146:19
277:8 293:11
**pulled** 120:12
287:7
**pulling** 126:19
157:17 160:7
**punched** 67:13
**purpose** 122:1
**purposes** 41:6
115:2 194:16
**pursuant** 1:17
**pursue** 117:4 239:5
**pursuing** 238:21
**pursuit** 303:7
**put** 34:8 39:19
53:12 69:6 82:5
96:1 107:24
111:11 115:2
117:8 138:16
143:10 153:14
156:18,19 160:12
161:16 169:3,9
189:24 192:16,16
192:23,25 196:8
199:11 205:24,25
230:9,10 231:2,7
231:13,14,16,21
259:13 265:20
296:13
**putting** 34:4 206:17
234:16 258:12
**p.m** 44:2 121:10,12
121:12,16 168:12
168:13,14,18
215:22,23,24
216:2 226:6,7,8
226:12 247:6,10
285:18 286:5
306:8,10

**Q**

**QSIP** 160:20 162:1
180:17
**qualified** 220:9
227:23 263:25

**qualifier** 88:1
**qualify** 105:16
126:18 245:7
**quality** 26:24 76:6
88:8 97:13,17
102:7 120:21,21
130:3 162:2,14,14
162:17,21,21,24
219:10,12 224:18
245:8 249:3
263:11 265:14
269:21 280:3,9
284:2,8
**quantify** 117:22
**quantitate** 272:1
**quantitative**
114:12 120:24
**quarter** 15:12
284:6
**question** 6:11 7:25
14:8,8,13,14
17:24,24 19:11
20:25 21:6 23:13
24:16 38:13 39:3
46:10 47:11,13
52:2,3 66:25
68:19 72:16 73:18
73:19 74:4,7
75:16 76:22 82:23
82:25 86:21 91:1
93:11 98:21 99:4
99:16 101:9
102:12 104:2
115:2 128:3,9
130:6 132:6
134:21 135:17
136:2 137:16
139:9 141:1,5
142:17 144:2,5
145:4 146:12
148:14,15 150:1
152:14,17,21
153:8,19 158:25
161:13 162:20
165:11,25 166:18

171:12 172:9,10
189:23 190:6
191:7,11,14 192:9
198:6,9 200:1
203:9 209:21
211:16 212:6
213:8,17,20
216:18,18 218:13
223:20 227:5
239:13 240:20
248:9 254:13,14
257:18,21,21,22
258:12 259:3,19
271:24 274:7
276:9 278:1
280:14 281:16
282:21 285:6,22
290:13,15 292:16
293:2,4 296:17
297:15,17,23
300:15,16 302:1
**questioned** 205:19
225:6 260:5
**questioning** 15:23
17:20 18:4,15
22:21 43:8 92:18
125:19 251:22
256:12 296:21
302:23
**questions** 6:10 19:8
21:5,5,8 52:21
56:7 66:3 81:7
84:11 101:12
104:15 106:24
120:7 131:18
145:13 174:4
176:21 177:3
182:3 220:18
244:16 247:12,18
251:25 252:1
258:8 266:7
268:16,17,21
272:4 296:6
297:13,14,14,19
301:12 302:13

306:1,2 307:7
**question-and-ans...**
23:15
**quickly** 32:17
152:15 175:2
192:8 227:18
**quietly** 225:15
**quite** 112:19
230:18
**quotation** 278:13
278:15
**quotations** 182:18
**quote** 161:12 162:8
162:9,13 182:8
186:14
**quoted** 187:22,23
**quotes** 12:14 34:6
196:18
**quoting** 184:13

**R**

**R** 1:15
**raise** 153:13 251:15
**raised** 102:7,12
166:15 179:20
212:11 213:8
223:20 224:22
244:16 266:25
**raises** 174:3 176:21
274:6
**raising** 251:25,25
**rate** 141:15 300:25
301:4,5,12,14
**rates** 273:9,10,11
273:13 301:3
302:10
**ratified** 158:17
**ratify** 214:6
**reached** 102:18,23
103:9,23 108:6
115:6 132:12
202:25 265:25
270:8
**reaching** 135:22
137:13 286:7

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

**reacting** 123:18
**reaction** 18:17
    166:14 187:8
**reactions** 86:15
**read** 12:9,9,13
    20:15 22:3 23:24
    24:3,4 26:16 50:7
    50:15 52:10 71:25
    72:2 106:24 122:7
    122:18 128:24
    129:1,4,6,13
    130:11,12,12,25
    132:15,19 137:6
    144:2,3 160:15
    166:5,19 167:19
    189:2 230:15
    268:11 269:15,25
    271:3 279:15,18
    279:20 280:16,18
    283:16,17 285:20
    307:5
**readily** 232:4
**reading** 50:9 109:5
    130:16 167:1
**ready** 8:1,3 152:16
    152:19 297:1
**real** 61:9 180:16
    219:14 241:8
    252:6 260:9
    301:11
**realize** 211:25
    226:14,17,20
    227:14 228:2
    231:14 232:6
    292:24
**realized** 295:6
**really** 17:18 28:25
    69:7 74:12,14
    78:5 82:5 119:20
    136:17,17 144:19
    166:4,9 174:23
    175:12 180:3
    188:22 189:24
    192:4 241:13
    242:21 245:23

249:16 254:16
263:4 284:10
290:12 295:3
296:1,24
**realtime** 1:16 63:7
    88:12 92:15
    288:12 289:5
**real-life** 304:16
**reason** 7:1 60:2
    69:7 74:6 98:15
    108:5 131:24
    160:1
**reasonable** 218:2
    218:10 247:24
    248:4,5,10 251:23
    252:5 253:4 254:3
    279:24
**reasons** 158:6
    227:25 298:10
**rebut** 291:8
**recall** 3:20 13:21
    31:15 42:1,21,23
    52:20 57:15 62:14
    62:23,25 63:3,11
    74:8 83:17 85:8
    90:17,20 91:4,13
    93:23 97:24 98:11
    98:19 103:1,6,14
    103:21 104:8,10
    104:11 109:25
    115:7,23 116:5
    117:21 132:13,19
    134:8 135:21
    139:13 141:16,20
    146:17 147:21
    156:7 159:3 162:5
    195:17 197:1,6,6
    197:15,16,18,19
    197:21,22,25
    198:5,14,24
    199:17 202:17
    203:5,6 206:11
    214:25 215:8,14
    215:16 216:7,22
    223:24 224:1,1,4

234:3 262:18
264:17 265:8,11
265:19 266:1,14
266:20 270:9
272:9 273:2,3,4,8
273:9,11,14
275:24 276:1
287:15
**recalled** 86:3 98:15
    131:23 136:16
    146:18,22,25,25
    147:8,10 270:5
    272:6
**recalling** 19:17
**recalls** 97:22 98:7,8
    215:6
**receipt** 158:10
    204:5 208:15
**receive** 44:15 60:23
    62:14 72:21,22
    73:1 91:7
**received** 9:5 31:15
    34:7 36:6 38:22
    41:24 42:2 45:17
    45:21 48:15 64:3
    73:5,13 74:10
    95:20 98:24 99:2
    107:19 109:7
    110:3 118:2
    121:24 158:12
    166:13 198:4
    207:8,16 208:19
    209:21 240:11
    262:9
**receives** 88:8
**receptive** 181:14
**recess** 64:17 121:11
    168:13 215:23
    226:7
**recipient** 115:18
**recipients** 198:7
**recite** 159:6,9
**recognize** 106:1
    181:2 298:20
**recognized** 299:21

300:17 301:23
302:2
**recognizing** 181:3
**recollection** 99:21
    111:21 139:2
    156:1 206:9
**recombine** 10:20
**recommendation**
    95:21
**recommendations**
    112:4,23
**recommended**
    16:23 112:22
**reconcile** 235:3
**reconvening** 68:20
**record** 4:2,5 5:13
    8:7,22 10:22 50:1
    64:11,14,20 83:12
    104:17,19,21,23
    121:6,8,14 152:10
    168:9,11,16
    193:24 199:2
    206:25 215:21
    216:1 226:4,10
    247:5,7,9 285:19
    303:11,22 305:25
    306:4
**recorded** 114:22
**records** 69:19 92:6
    92:7 120:3,4
    301:25
**recover** 121:23
**recruit** 57:6
**recruited** 57:9
    58:19
**recurrence** 119:14
**red** 54:25 116:25
    117:11 118:19,22
    118:25 163:16
**redacted** 118:1
    270:23
**redaction** 185:8
**redo** 183:18
**refer** 40:8 124:19
    180:21

**reference** 103:13
    105:2,5 117:9
    130:23 144:24
    148:12 149:18
    155:1 165:3
    181:25 182:17
    183:13,14,14,24
    186:23 194:3,17
    194:18 232:15
    278:17,18 282:12
**referenced** 7:16
    93:6 103:12 151:3
    165:2 192:12
    204:10 231:25
**references** 194:18
    204:19
**referencing** 78:11
    183:11 230:13
    232:3
**referred** 24:10
    138:12 152:23
    232:18
**referring** 8:7 78:3
    78:5 117:11 138:4
**reflect** 84:6
**reflects** 189:10
**reframe** 216:17
**refresh** 8:10,20
    111:21
**refuse** 224:14
**refute** 114:23 267:6
    267:7 299:4
    301:20
**regard** 68:12 70:14
    73:23 97:14,18
    102:12 104:15
    108:7,13 137:7,20
    141:19 143:23
    144:7 162:14,15
    168:20 171:3
    185:21 190:19
    191:13 193:3
    195:3 214:10
    215:6 264:17
    270:12

Karen A. Frank, M.D.          Videotaped          June 30, 2010

**regarding** 149:8
  164:18 236:3
  280:21
**registered** 1:15
  62:16
**regular** 146:7
**regulations** 169:24
  172:1 211:8
  269:22,24
**regulatory** 154:23
  175:23 186:8
  190:7,18 284:3
**reinserted** 67:13
**reiterated** 156:5
  206:13
**reiterates** 161:11
**relate** 279:14
**related** 151:3,4,4
  186:15 188:7
**relatedness** 110:23
  110:24 111:7,8,9
  275:5
**relates** 92:4
**relating** 83:4
  152:24
**relationship** 201:24
**relatively** 123:2
**release** 23:22 24:10
  70:25 71:9 117:19
  122:8,18 135:6
  196:7,24 198:12
  200:13 201:18,24
  202:4 203:1,9,13
  203:16,19,25
  204:11,18 205:1,3
  205:14,24 207:7
  207:15 208:14
  209:2,8,15,22
  272:9,13 273:6,12
  287:20 302:25
**released** 61:2
  196:24 199:1
**releases** 16:5 196:1
  200:5
**relevant** 41:6

126:22 128:9
  135:21 137:19,24
  137:25 168:22
  210:9 217:7
**reliability** 129:23
**reliance** 264:1,16
**relied** 137:12 264:7
  282:23 283:20
  284:11
**rely** 237:5 286:15
**relying** 167:14
  264:12
**remain** 284:2
**remainder** 271:14
**remained** 217:20
**remaining** 151:18
**remediate** 36:19
  175:22 249:3
  280:1 281:25
**remediated** 284:14
**remediation** 27:9
  29:7 48:22 53:2
  143:4 159:3
  160:10 161:16,22
  175:5,17 178:14
  178:17 186:5
  189:25 191:23
  192:2 211:19
  232:23 248:25
  279:25 281:23
  284:5,20 285:22
  286:18 287:4
**remember** 21:13,18
  38:24 43:2 50:3
  51:19 55:20 65:7
  99:25 111:25
  126:18 127:7
  129:16,20 132:22
  167:17 169:6
  199:20 230:22
**remiss** 251:25
**removal** 196:20
  200:10 269:20
**remove** 269:18
**removed** 40:10,14

40:24 60:2 197:21
**REMS** 59:2
**renal** 139:23
  199:24,25 200:9
  200:17,18 202:4
  204:19,22 207:20
  208:2 298:10,12
**render** 48:17 179:8
  217:8,12,13
  220:24 221:5
  222:20 224:14
  227:20,21 237:3,7
  252:15 253:25
  271:12 274:4
  293:8 302:5
**rendered** 179:12
  224:23 247:19
  252:18 264:7
  288:4
**rendering** 220:1
**Rennillo** 4:17
**reoccurrence**
  107:24
**reorg** 212:20
**reorganization**
  212:19
**repeat** 27:8,11,25
  38:13 62:20 82:9
  101:8 154:12
  161:19 162:3
  193:8 246:13
  276:15 291:6
**repeated** 17:19
**repeatedly** 18:15
  112:3 123:16
  194:13
**repeating** 218:11
**rephrase** 218:1,8
  240:19
**rephrased** 218:8
**replaced** 290:20
**replacing** 291:22
**reply** 208:20
**report** 3:19 7:20,23
  8:1 11:10,13,16

11:23 49:19 61:12
  62:15 68:9 69:6
  69:12 70:4 74:21
  74:25 77:8 99:9
  100:10 102:24
  103:4 105:1,14
  106:19 108:12
  109:7 110:5,8
  111:15,18 112:18
  113:1,2,23 114:15
  117:9 139:12
  140:9 149:5 152:8
  156:18,19 163:18
  169:18 170:6
  171:16 179:17
  180:9 181:3,5,6
  182:22 183:11
  184:5 187:17
  188:18 189:18
  190:5 191:4,12,17
  193:3,15 195:17
  196:8 199:17
  202:3 204:11
  206:6 208:7 216:6
  217:5,21 218:4,8
  218:9,21,25 219:1
  219:4,15,15,17
  220:8,25 221:22
  222:19,24 223:16
  226:22,24 227:9
  230:9,10,21 231:2
  231:22 233:12
  236:1,16 239:19
  239:20 242:25
  243:4 247:20
  250:5,18 251:7
  255:18 257:21
  274:8,14 275:1
  276:11 277:9
  278:4,6 288:1,2
  294:8
**reported** 29:5
  88:15 105:10
  108:21 132:13
  134:8 139:12

140:2 141:14
  192:11 193:15
  194:23 195:5
  232:20 266:1
  270:8 273:1 275:4
  275:8
**reporter** 1:15,16,16
  4:1,16 5:4 6:15
  111:6 114:23
  144:3 230:15
  285:20
**reporters** 110:17
  111:4
**reporter's** 110:23
  114:11,18,24
**reporting** 4:17
  18:21 73:4 106:21
  139:5 141:15,19
  143:6,23 144:7,13
  148:20,23 150:16
  155:2 164:19
  166:14 168:23
  171:17 187:8,14
  188:7,9 271:4
  273:9,10,11,13
  275:8 280:2,22
  281:1 284:4,8
  288:14 292:7
**reports** 13:2 33:18
  34:13 35:4 48:10
  49:13 60:7 63:6,9
  66:12,15 72:19,23
  72:23 73:3,8,14
  75:3,20 76:4
  87:22 89:7,18,22
  90:20,23 103:6,20
  107:18 110:2,3,11
  115:19 134:8
  135:20 140:15,24
  148:19,20 149:13
  150:19 154:9
  167:20 171:7
  174:19 175:6,11
  175:16 186:24
  193:8 195:7

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 338

198:25 212:1
215:7 217:1
239:12,12 249:3
264:8 280:3
289:18 297:21
**represent** 4:22 50:4
**representatives**
86:13
**represented** 46:20
**representing** 15:5
**represents** 43:12
46:13
**request** 9:11 43:16
43:22 46:1,2,15
160:24 179:1
240:11 277:21
289:12
**requested** 42:7
43:13 44:4,7
**require** 87:16
**required** 20:21
133:24 141:24
158:14 159:2
172:8,12,16,17
173:5,24 219:17
268:8
**requirement** 98:17
**requirements**
129:25,25 148:24
200:7 284:4
**requires** 177:8
180:11
**requiring** 218:21
**reread** 8:5
**research** 123:23
124:6,24 127:9
162:22
**resident** 274:22
**resides** 111:12
**resistance** 95:23
**resolution** 159:1
**resources** 189:25
**respect** 157:25
**respond** 15:22 21:4
21:8 83:11 179:24

229:3
**responded** 17:21
22:25 52:11
**responding** 123:12
123:19 156:8
**responds** 165:17
**response** 67:23
89:5 104:2 135:15
156:4 157:25
158:8 159:8,9
161:12 163:3
164:18 165:9
169:22 171:10,21
171:25 172:7
182:15 190:19
193:10 223:22
261:1 278:19
279:1,3 280:21
287:17 289:3
292:13
**responses** 6:14
26:10 48:11,21
49:1 156:5 159:7
159:23 163:19
171:7
**responsibilities**
214:10
**responsibility**
211:10
**responsive** 16:25
17:8 19:9 27:24
30:12 32:24
**restricted** 35:11
71:8,12
**result** 63:23 81:11
121:23 155:2
284:23 285:25
**resultant** 73:8
**resulted** 89:17
153:22 184:7
**resulting** 89:5
**results** 60:19 64:3
**resume** 8:12 97:10
**retain** 36:7
**retention** 30:18

**retrace** 127:15
**retrieval** 101:24
102:8
**returned** 89:16
102:24 103:25
**revealed** 268:3
**review** 9:7 13:20
16:2 33:15 34:16
35:7 46:6 55:10
90:10 93:16 96:2
96:7,12,17,18,19
97:8,10 99:18
101:16 128:22
141:10 163:8
189:2 200:2
201:25 208:11
234:11 277:7
299:15
**reviewed** 8:9,15
9:23 16:14,18
17:22 33:19 38:24
60:8,9 67:7 83:5
90:16,19 91:11
93:20 94:3 95:2,4
102:16 103:2
164:17 181:9
218:19,19 233:13
280:20 293:10
**reviewer** 94:22
120:5 133:23
**reviewers** 114:14
**reviewing** 133:24
147:14 182:13
188:25 189:12
**reviews** 56:5 95:6,8
107:2 164:1 208:1
232:11,13 233:3
**revise** 171:15
172:10 174:12
177:10 180:1
221:7
**revised** 161:10
164:20 165:13,19
166:2 170:20
172:19,20 173:4

174:12 219:15
255:12 279:5
280:23
**revision** 167:11
172:17 173:6
180:12 218:22
**revisions** 294:10
**revoke** 172:23
**reworded** 247:23
**rewording** 248:2
**re-analysis** 221:16
**re-data** 271:5
**re-read** 166:5
**re-review** 103:3
**Rice** 2:3 5:3 124:5
278:7 289:7
302:20
**Richard** 2:8 4:21
5:18
**riding** 255:25
**right** 8:17 13:10,14
14:10,12 17:7
19:7 34:22,25
35:22,25 36:10,15
37:10 38:8,24
39:7,16 41:17
44:5,22 45:22
46:2 47:15 48:2
50:20,21 53:13,14
53:15 61:18 66:8
67:1 68:24 69:16
82:22 87:7 91:16
97:9 104:8 108:18
109:23 113:17
120:4 125:9,13,18
126:9 128:9,12
131:3,5 145:5,10
145:17 147:4
148:5,12 150:6
153:5 155:5
160:18 163:25
173:15 176:17
182:2,17,24 185:8
189:2,20 192:13
192:21 194:7

197:7,17,23
199:17 201:15
202:11,19 203:10
203:13 204:1
205:18 206:7
215:18 222:24
228:3,11 245:4
247:20 249:24
250:2,6,23 251:15
252:10,13,16,18
255:7 257:1 258:4
258:14 259:7
260:7,10 264:21
264:24 265:2,11
265:16 269:7
271:15 272:14,17
273:17 274:6,20
274:24 275:13,21
276:7,13,16,25
277:8,23 279:7,13
280:14 281:14
283:14 287:19
291:7,18 296:19
297:1 299:14
300:23 301:18
303:10,12 305:24
**rigorous** 141:10
**rise** 193:2,2
**risk** 3:20 10:8
61:13 70:22
103:21 117:20
118:8 119:3,5,6
119:19,23,25,25
120:1,7,14 122:10
123:3,7,11,15
136:5,6,21 175:23
179:24 181:11
186:8 190:7
195:21 196:2,13
196:23,24 200:22
201:1 203:4 205:3
206:2 253:9 258:9
259:21 260:9
265:20 286:8
287:22 293:25

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 339

297:4
risks 117:24 260:9
Robert 106:10
robust 27:5,16
Roche 212:18
   213:1
role 70:10 80:6
   83:1,6 176:7
   215:10,11 240:22
   305:3
rolled 34:16 241:17
rolling 243:25
root 61:9 161:14
round 26:4 52:16
   244:24 278:8
routed 116:8
routine 60:21 88:6
   119:10
rule 236:19
rules 6:8 239:11
running 285:2

────── S ──────
sad 302:16
safe 258:6
safety 102:7 210:18
   212:19 213:1
   231:19 249:11
   266:24 298:20,21
   300:18 301:24
sake 28:10 70:2
Sam 112:12
sample 61:4 104:5
   301:7
sampling 18:21
   233:16 236:22
   252:4 294:9
samplings 66:12
   139:16,18
Sarita 38:24 39:23
   90:11 206:21
sat 16:20
satisfaction 158:1
   174:22
satisfactorily 161:7

satisfactory 164:20
   165:19 167:10
   170:21,23 172:20
   176:3 280:23
satisfied 108:22
   141:18 143:22
   144:6,17 155:19
   155:23 163:3,9
   165:9,13 166:13
   271:4
satisfy 68:12
saw 26:16 91:14
   175:4 203:4
   216:19 232:11
   262:3,8 280:5,7
saying 32:16 34:20
   87:2,3 109:9
   112:20 163:2
   167:8 175:24
   176:20 183:24
   213:11 230:22
   234:5 238:16
   244:18 246:15,18
   258:11 262:20
   271:11 277:3
   288:5,6,15 299:13
says 20:17,19 31:20
   38:9,20 39:9,22
   39:23 41:20 43:10
   50:17 78:6 92:20
   99:24 100:6
   103:23 106:9,20
   107:4 108:2
   116:24 131:12,19
   132:10 140:2
   142:19 164:16,21
   180:14 182:7
   184:1 187:1
   188:22 200:21
   210:1 263:3
   265:21,23 266:3
   271:19 273:1
   283:19 301:17
scanned 57:18,21
scared 259:12

scenario 140:18
   181:10
scheduled 15:9
science 243:9,10
scientific 253:4
   254:3 299:21
   300:17 301:6,23
   302:2,5
scientifically
   301:15
scope 15:22,23
   19:19 23:3 29:11
   34:15 70:20 80:3
   83:19 89:23
   100:14 136:2,2
   142:7 167:1,2
   203:4 212:14
   213:14,16 223:11
   224:7 234:10
   244:12 272:16
   299:14
screening 120:18
scribbled 36:21
scrutiny 134:5
   297:7
se 156:12 266:24
search 68:16 124:1
   124:1,20 125:8,12
   125:15,25 126:7
   126:12,19 143:14
   175:2 283:16
   287:8
searching 283:13
second 26:4 42:4
   148:10 159:5,11
   164:17 165:15
   182:5 210:1
   269:12 280:18
secondary 26:16
section 91:21,22
   93:17,18,21,22
   129:7 148:7
   223:15 250:22
   251:1 282:5,14
sections 8:20

128:24 129:4
security 271:11
see 9:21 17:23 25:1
   30:15 31:13 44:20
   45:15 46:3 49:9
   51:13 53:23 62:4
   68:11 75:4,5 81:7
   81:12 83:6 85:13
   86:15 87:9 89:7
   89:16,17 90:6
   96:4 101:17
   106:20 112:13
   115:14 129:9,18
   130:10 131:15
   135:3 148:4 161:3
   161:19 163:7
   171:9 173:20
   182:20 184:24
   185:11 232:14
   233:24 248:17,21
   249:2,15 269:6,10
   273:22 278:15
   279:17 280:11
   304:11
seeing 56:22 71:23
   78:11 83:22 295:5
seek 138:10 267:22
   268:8 290:7,9
   293:18 305:11,14
   305:14
seeker 80:11 84:2
   261:23,25
seeking 245:24
seen 7:15 25:24
   26:18,19,20,21,23
   26:24 29:9,21
   51:9 75:2,20,22
   76:24 77:7,11
   102:1,2 104:13
   108:11 123:7
   131:6 138:21
   163:5 164:3,12
   166:1 176:2
   187:18 190:21
   201:6 209:5,6

221:10 224:25
   229:11 246:17
   262:22 266:13
   276:2 288:15
   289:6 291:25
   294:5,6 299:9
Segal 1:11 4:11
segments 250:21
selected 48:18
selection 46:22
   47:3
self 244:3
self-confidence
   259:7
selling 260:21
seminars 109:16
send 22:20 30:9
   44:9 46:19 127:2
   146:18 160:21
   161:1 211:21
sending 212:1
seniority 292:23
sense 125:22
   235:23
sent 3:11 7:8,17
   10:4 12:2 16:1
   22:13,15 23:4,4,8
   26:4 30:10 31:21
   32:3 38:11,17
   44:16 46:18,23
   48:9 53:22 59:11
   68:7 96:2 103:22
   104:5 120:24
   146:8,9 158:6
   172:5 188:11
   198:14 203:22
   207:1 240:14
   244:17,21 249:13
   262:19 276:21,22
   279:3,5
sentence 50:16
   103:23 131:19
   132:7,10,18
   137:18 153:20
   166:20 182:5

Karen A. Frank, M.D.          Videotaped          June 30, 2010

210:1 269:4,12
279:16,20 281:3
283:24
**sentences** 107:4
280:16
**separate** 9:13 10:5
10:6 1:11 11:2
60:10,12
**separated** 11:20
**sepsis** 94:23
**September** 165:16
166:6 233:10
**septic** 94:24
**sequence** 161:6
203:12
**sequential** 48:9
205:12 242:7,23
**sequentially** 241:5
**series** 87:17 101:24
106:23 171:2,11
208:20 224:23
**serious** 143:1 156:5
160:3 210:18
261:3,4 287:4
304:17
**seriously** 130:23
178:23 260:5
**seriousness** 172:6
**serve** 220:12
237:16 294:10
296:17
**served** 10:14
**server** 22:16
124:10,24 125:19
**services** 78:19
252:12
**set** 7:8 9:25 160:15
182:2 192:10
193:1,13 195:3
199:17 213:25
301:25
**setting** 181:20
293:2
**settle** 300:7
**seven** 282:19,19

283:21
**shaking** 6:16
**sheet** 13:23 31:13
40:10
**sheets** 40:15,16
79:22
**Sherwani** 38:25
39:13
**she'll** 28:3
**shift** 171:20
**shipped** 147:22
**shock** 94:24
**Shook** 2:16 4:25
**short** 10:16 11:4
14:13 35:4 79:6
97:2 168:2,6
183:18 215:19
282:8 293:8
297:16
**shorten** 13:6
**shorter** 9:17 10:1
**Shorthand** 1:16
**shortly** 44:14
**show** 105:23 175:1
185:6 206:1
284:12 301:3
**showed** 51:21
231:19 233:19
246:10 274:12
**showing** 297:3
**shown** 19:8 117:19
229:4 235:23
264:19 275:21,22
**shows** 18:25 265:20
291:23
**sic** 166:18 270:10
**side** 42:13 69:7
90:5,6,7 92:3,4
234:2,2,7
**signal** 70:14,19
73:24 74:25 82:13
83:16 84:6 85:15
86:1 87:1,5,20
90:5,23 91:21
92:4 93:17,22

101:25 102:4,8
117:15 118:18
135:22,23 136:1,4
136:7 140:1,6,11
140:20 143:16
156:17 170:9
205:9 234:2
249:11 266:24
267:3 288:7
298:20,21,22
300:18 301:24
**signature** 57:19
**signed** 57:16
**significant** 174:4
176:21 245:6,7,11
256:11 259:8
300:23
**significantly**
273:13
**silence** 125:20
126:16 127:2
128:13
**silent** 140:15,24
141:24 142:8
**similar** 40:16 75:12
78:13 89:22
161:19
**simple** 24:16 27:6
77:7 82:21 148:14
152:21 172:9
213:20
**simply** 13:15 21:9
54:1,8 56:9 68:15
73:13,17 188:7
204:19 248:15
**simultaneously**
187:20
**Singer** 1:12 4:11
**single** 61:13 72:4
74:13 87:10
166:19 250:14
**single-case** 284:8
288:14 289:18
**sit** 19:13 69:1 79:18
84:10 85:1 179:10

179:14 195:1
215:12 227:25
239:17,19 240:15
241:1 267:9
301:22
**site** 82:1 87:12
124:2,22 126:12
126:22 134:18
135:9 146:10
151:11 186:24,25
251:10 287:21
**sites** 151:12,15,15
**sitting** 131:5
172:24 229:7
290:25
**situation** 15:18
51:1,5,10 237:18
246:2 284:11
289:5 291:5
303:12 304:17
**situations** 202:18
**six** 3:14 276:15
**size** 115:6 301:7
**sketched** 66:9
**sketching** 81:8
**small** 94:23 132:11
151:24 227:17
241:22 265:24
270:7
**smaller** 40:12 42:4
44:15 46:14,21
196:23
**Smart** 3:14 55:9,16
55:17,23 57:3,4
57:11,23 58:15,24
59:8,13 78:24
245:18,19,19
**solely** 187:7 264:12
**somebody** 33:17
56:23 126:11
192:6 240:11
301:20
**someplace** 219:20
233:2

**somewhat** 12:22
65:10 81:12 123:4
211:15
**soon** 273:11
**SOP** 87:16 110:1
**SOPs** 30:16,21
66:12,13 275:6
**sorry** 14:1 21:17
42:23 76:8 79:13
84:16 109:1 116:2
151:2 176:5
178:10 183:4,16
203:20 213:17
227:11 260:22
292:17 294:13
**sort** 11:18 27:4
28:21,25 48:25
60:17 138:22
154:21 158:24
162:17,23 193:22
209:4 222:8 228:8
228:18 234:22
242:7,13 245:25
249:16 250:15
272:11,15,16
274:1 283:18
286:15 290:17
301:13
**sorting** 56:12
187:21
**sought** 261:5
**sound** 29:2
**sounds** 212:11
285:1
**source** 38:22
**sources** 26:17,18
**South** 2:4,13
**Southern** 1:1 4:9
**space** 7:10 29:8
34:4 46:7,17,24
51:24 52:8 138:12
138:14,14,17
147:19 159:15
164:10 174:12
217:20 246:23

Karen A. Frank, M.D.          Videotaped          June 30, 2010

spaces 105:20
  159:15 161:25
  244:21
speak 6:18,19
  55:15,19 142:9
speaking 146:25
speaks 99:22 265:7
spec 60:19
specific 15:18 17:9
  17:20,25 18:1,10
  18:11,14,16 19:3
  19:5 22:21 23:24
  51:4,20 52:5,19
  53:7 83:15 92:12
  100:13 102:12,20
  103:2 105:25
  110:4 113:10
  160:2 193:17
  195:2 268:2
  288:25
specifically 18:19
  19:18 30:6 32:9
  42:14 46:16 51:16
  54:11 62:25 63:16
  117:14 125:20
  129:20 150:21
  178:20 195:19
  199:23 203:2
  223:5 231:6 251:9
  299:25
specification 115:7
specifications
  115:15
specifics 21:18
  52:20 104:8 172:2
  189:19 223:24
  230:12 284:7
specify 82:1
speculate 196:19
speculative 223:4
speed 96:4
spend 94:14
spent 78:21 94:19
  187:20 219:7
  234:13

spheres 71:12
spidering 211:12
spite 84:10
split 9:12 250:7,13
  282:8
spoke 19:16 24:23
  78:24 84:7 234:23
spoken 122:4
  153:18 300:20
spot 140:20
spots 58:24
spreadsheet 27:6
stack 31:5 37:3,10
  42:19 45:25 60:5
  275:15,17 277:12
stacked 42:14
stake 226:15 228:2
  239:11 261:15
stamped 172:4
stand 64:9 111:23
  147:15 163:10
  190:5 221:11
  227:24 228:5,20
  229:9,11,16,20
  238:25 251:16
  253:24 254:6
  256:4,6 258:13
  259:22 266:16
  281:20 302:23
standard 123:10
  202:16 275:11
  287:14
standing 238:1
  271:11
start 41:13 64:21
  66:17 81:23 82:6
  85:17 121:15
  168:17 220:10,13
  226:11 286:4
  292:25
started 10:6 15:14
  15:23 33:15,19
  34:4,8 46:5 47:7
  48:25 65:14,17,23
  84:1 85:11 96:3

120:7 129:17,21
129:22 160:7,9
173:24 219:10
228:12 258:21
261:24 266:7
272:7 301:12
305:4
starting 120:13
  150:12 282:18
  288:19
starts 50:8 129:12
  150:3 210:23
state 5:12 18:13
  57:1 181:17
  189:21 223:2
  241:16
stated 171:16 182:9
  185:13 189:13
  282:7
statement 11:4
  16:21 24:22 102:4
  114:10 122:10,13
  123:1 124:12
  131:25 132:18,24
  133:3,4 134:7
  137:5,10,24
  141:11 142:1
  143:1,22 144:6,14
  144:18 149:20
  161:20 165:18
  175:8,18 184:23
  184:25 186:9
  217:24 224:8
  265:1,4,10 266:14
  266:17 267:6,12
  267:24 268:11
  287:2 289:21
  290:17 291:23
  292:5 293:13
  298:23 299:5
  304:4,10
statements 12:20
  24:21 29:2 92:12
  101:19 104:10
  132:2,4 133:16

145:7 178:5 192:3
192:6 217:22
223:17 248:2
251:10 259:14
262:5 268:2,11
293:11 296:10
states 1:1 4:9 109:3
  148:16 149:2
  214:1 272:20
state-level 127:20
  243:25
stating 117:20
statistical 117:22
  118:15
status 168:22
stay 16:9 23:2
  37:21,21 46:10
  174:7
stayed 258:24
  299:25
staying 19:18
step 253:16
steps 127:15
step-wise 34:12
stick 15:21 293:14
sticker 44:23 45:7
  58:5
stickers 44:20
stimulated 141:16
stipulated 98:22
stipulations 4:2
stockpiling 212:1
stood 111:20
stop 23:12 47:12
  75:14 130:5
  185:19 212:10
  256:23 303:21
stopped 240:25
stopping 34:13
stops 202:12
stories 111:2
stray 37:6 140:1
Street 1:12 2:13
  4:12
strength 238:24

289:22
stricken 145:9
strike 32:25 86:6
  90:2 93:14,19
  153:25 185:20
  297:24
strong 211:23
  259:22 260:4
stronger 290:21
  292:9 294:5
strongly 141:18
struck 17:18
structurally 213:25
study 202:14
stuff 225:9 246:11
subdivided 21:6
  249:1
subject 98:18 275:8
  289:2
subjected 95:25
subjecting 259:20
subjects 15:16
submission 11:21
  178:15 186:25
  187:2 189:1 212:5
  275:9 278:4
submissions 191:24
submit 51:14
  113:13,21,22
  148:17 149:3
  239:5
submitted 11:7,21
  59:21 76:1,4
  88:21,23 107:5,8
  120:18 161:25
  174:21 175:16
  176:1 178:16
  182:10 186:6
  187:11 189:10
  222:23 226:23
  276:23
submitting 10:20
  143:2 175:11
  250:9
suboptimal 224:13

Karen A. Frank, M.D.              Videotaped              June 30, 2010

Page 342

225:19,21
subpotent 119:9
subsequent 26:3
  190:17,21
subsequently 204:4
subset 18:2,18
  262:3 289:24
subsets 160:6
substance 14:11
  38:3 65:1 198:11
  198:11 199:20
substantial 82:18
substantially
  251:20
substantiate
  119:23 133:11
substantive 21:10
  34:9,10,17 35:8
  49:4 59:11
success 244:14
successfully 239:3
  295:24
suck 282:25
suddenly 227:9
sufficient 227:20
  229:14,15 238:10
  290:13
suggest 89:8 141:17
  141:18
suggested 91:5
suggesting 67:16
  205:22
suggestion 16:2
suing 243:16
suitable 218:22
Suite 1:12
summaries 152:13
summarize 31:23
  32:2 33:10
summarized
  233:11
summary 48:13
  86:17 96:9 169:17
  169:21 170:3
  246:19 275:23

supersede 166:8
supervision 221:1
supervisors 16:18
supervisory 95:19
supplement 11:10
  11:12,18,24
supplemental
  233:18
support 122:10
  205:7 231:23
  238:11 248:19
  249:14,21,22
  256:17 261:12,16
  262:24 295:20
supported 196:20
  248:20 291:24
supporting 10:12
  10:17 11:18 71:13
  71:17,19 75:24
  123:13 209:14
supportive 254:19
  256:23
supports 245:9
  262:2
supposed 181:5
  186:4
suprapotency
  119:9
supratherapeutic
  139:22 273:20,24
  274:2
sure 9:15 20:10,20
  20:24 41:14 42:25
  68:7 69:2,13,13
  81:4 112:20
  125:24 134:21
  142:1 150:10
  168:8 175:18
  192:21 199:4
  207:24 213:12
  223:11 225:7
  228:9 236:8,9
  243:7 244:22
  246:17 248:12
  255:15 276:14

283:4 292:13
  294:6
surprise 116:19,23
surprised 236:22
surrounding
  125:14
suspicion 275:4
swallowing 199:13
sway 229:5
swayed 230:24
swear 5:5
Sweden 88:22
sworn 5:7 251:15
  282:4
symptomatic 160:3
symptoms 274:1,12
synthesize 112:17
system 10:7 26:24
  61:21,23 162:24
  170:10 267:3
  281:1,13 284:2
  286:18
systemic 139:16
  156:6 157:20
  160:5,13 161:15
  205:8 249:10
systems 3:20 18:1
  18:19 19:3,4
  70:17 80:22 82:2
  83:16 100:13
  117:15 123:6,9
  162:2,21 212:15
  212:16 213:15
  219:12 223:13
  240:12 284:2
  288:7 292:6
S-C 112:10
S-C-I-O-M-S 112:8

T

table 3:3,5 33:2
  39:19 40:5,18
  41:8,20 42:9
  43:12 45:13 46:22
  54:1,9 59:25

74:23 75:6 77:13
  77:15 78:4,5,12
  292:16
tablet 62:15 102:18
  102:23,24 103:23
  103:24,24 107:18
  115:6 117:6,17,18
  118:8,9 119:8
  120:8 273:21
  276:12 298:22
  299:23
tablets 103:9,17
  104:11 107:19
  116:17,25 117:9
  118:3,5 119:23
  120:12,19 121:24
  131:22 132:12
  194:18 265:25
  269:19 270:7
  298:5,8,16 299:1
  299:20 302:7
tactfully 56:8
take 6:16 7:1 10:12
  14:16 32:9,12
  64:7 75:11 79:23
  79:24 98:3 100:9
  101:5,13 106:24
  112:25 144:12
  150:3 168:2,3,6,7
  177:10 179:25
  180:1 189:5
  193:22 206:11
  207:24 213:6
  215:18 220:10
  236:17 261:1
  272:15
taken 1:11 4:7 5:19
  64:17 66:7 67:12
  99:12 121:11
  140:16 149:17
  168:13 178:21
  184:11 186:8
  194:24 215:23
  226:7 283:25
  295:22

takes 112:16
Takla 2:12 4:23,23
  41:14
talk 33:16 84:8
  85:18 129:17
  142:4 145:18
  153:17 178:11
  210:11 251:6
talked 15:21 19:18
  21:4 23:9,9 46:16
  79:8 85:25 91:11
  92:17 126:24
  127:1 143:7
  144:23,23 154:3
  159:14 169:23
  177:14 191:9
  192:17 200:9,10
  211:14 212:14
  217:11 220:21
  233:23
talking 18:12 23:23
  40:13 51:18 61:16
  61:19 76:3 78:2
  85:7 96:22 109:20
  124:12 127:17
  129:22 145:16
  146:24 170:2,2
  171:21 175:10
  183:12 185:19
  186:9 187:9,10,11
  188:10,14 212:15
  296:3 300:13
  303:21
talks 161:11 171:25
  204:21
tangent 219:13
tape 64:8,15,21
  121:9,15 168:17
  226:2,5,11 285:3
  285:14,17 286:4
  306:5
task 37:22
taught 109:14,22
team 215:13
teapot 11:20

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 343

**tease** 65:17 113:1
**technically** 213:16
  244:25 299:14
**technology** 23:17
  23:19
**Tecum** 67:25
**telecon** 55:16
**telephone** 68:20
**tell** 6:4,12 23:14,14
  28:3,3,11,11
  37:20 48:4 49:11
  50:24 58:21 94:13
  111:23 116:15
  129:7 142:4
  146:15 161:6
  176:2 188:20
  192:1 194:22
  210:22 213:3,21
  218:23 228:11,13
  230:11 231:25
  232:1,5 235:8
  244:6 245:3,20,20
  250:3 251:15
  266:8,25 272:2
  274:20 282:15
  300:7
**telling** 9:18 28:14
  45:25 126:7,13
  127:4 210:18
  212:9 239:21,23
  283:6 291:18
**tells** 188:17,17
**tempest** 11:19
**tempted** 123:24,25
  124:1
**term** 83:19 97:3
  102:15
**termed** 150:15
**terms** 11:13 35:25
  44:25 87:20 88:3
  99:16 197:1
  203:14
**test** 115:14 252:20
  252:23
**tested** 115:22

**testified** 5:7,25
  264:6 270:18
  299:19
**testify** 85:22 100:10
  193:12 239:22
  241:11 242:10
  243:5,14,19
  244:10 253:24
  255:8 305:15
**testifying** 100:13
  102:11 242:1
**testimony** 141:12
  146:2,3 147:9
  247:17 261:12,12
  276:1 282:4
  290:19 303:7
  304:3 307:6
**testing** 102:11
  116:4,11
**Texas** 253:22
**text** 143:14 287:8
**thank** 14:2 17:7
  20:23 21:15 33:12
  35:15 49:25 68:22
  72:13 73:21 82:24
  94:12 101:2
  109:12 144:21
  149:6 153:16
  166:11 167:25
  183:4 185:9 199:6
  233:7 247:2
  268:14 277:14
  290:1 292:10
  296:2,5 297:9,10
  302:8,12 305:23
  305:24
**thankful** 274:3
**Thapar** 38:25
  39:23 90:11
  206:21
**theoretical** 136:20
**theory** 116:16
  117:10
**therapeutic** 273:23
  299:9

**thereabouts** 243:3
**they'd** 160:21
**thick** 102:23 105:4
  105:8 107:18
  108:7,13 115:3
  117:17 120:2,16
  153:18
**thing** 11:11 22:10
  33:10 36:16 68:3
  68:6 74:17 87:3
  89:11 92:19 97:24
  104:12 108:17
  126:17 129:16
  171:23 195:6
  203:12 228:3
  233:11,24 235:18
  255:1 256:19
  258:4,6,14 260:11
  299:13
**things** 10:13 17:9
  26:9 48:21 51:8
  56:6 65:24 66:1
  66:10 70:12 73:16
  89:6 95:2,4
  110:21 130:13,22
  134:6 136:25
  139:15 141:24
  151:14 152:12
  160:7 163:22
  173:23 180:13
  205:5 210:13
  211:20 216:13
  218:1,14 220:20
  224:19,20 225:3
  236:25 237:21
  241:5 248:17
  249:16 287:12
  288:9 305:4
**think** 11:19 13:14
  13:24 17:2,8 18:5
  20:3,15 21:17,22
  28:7,14 30:21
  31:10 32:3 34:19
  37:20 41:13 44:16
  45:24 50:8,25

52:3,3,9 54:4
58:21 64:24 65:2
68:2,13 81:21
98:21 111:24
112:8 123:4
126:17 128:15
132:1,4 136:1,10
142:15,16 143:21
143:25 144:5,9
145:2 146:14
147:2 154:9
161:10 166:7
168:3,5,25 170:7
170:16 171:18,23
171:23 172:4,23
174:6 175:7,9
176:9,13,14,15,24
177:1,3 178:8
180:11,13,19,20
180:20 182:5
184:22 186:10,11
187:14,16 192:23
193:21 198:21,23
203:22 204:5,10
205:23 206:7
208:3,13 210:2
215:5 217:8
219:22 221:15,21
224:10,12,17
229:14,15 232:8
232:17 234:5
237:11,11,12
242:25 254:14
256:18,19,21
258:5 260:10
270:25 275:14
276:1 281:2
284:21 285:2,23
289:8 291:2,8
294:14,14 295:15
295:21 296:6
297:16 303:17
**thinking** 260:24
**third** 131:11 149:7
  181:23 200:12

**Thompson** 2:3,23
  5:2,2 6:3 10:24
  11:3,23 13:4,11
  13:14,20 14:2,10
  14:17,23 16:24
  17:2 19:6 20:11
  22:1,6,8 27:18
  28:7,11,15 33:8
  34:19,23 35:2,5
  35:13 43:5 44:24
  45:4 53:12,16,25
  58:1 68:11,24
  69:16,18 70:4
  72:15 74:1 79:24
  80:12 83:8 84:17
  84:17 93:4 96:10
  101:7 116:15,21
  116:24 117:2,12
  118:20 122:7
  126:25 128:17,24
  129:4 130:8,18
  133:17 134:20
  135:24 137:15
  138:2 139:8
  141:21 142:4
  144:25 145:2,3,10
  145:17 146:2
  157:1 164:23
  165:10,24 166:17
  166:22 168:3,8,24
  170:16 171:13
  174:9 176:12
  179:18 180:10
  185:3,7 199:8,11
  220:5 221:25
  227:8 240:8,18
  251:18 254:9,14
  257:14,20 262:12
  266:5 267:14
  268:15,20,23
  271:6 274:23
  275:20 277:14,16
  278:22,23 283:2
  283:15 284:25
  285:7,12 290:2

Karen A. Frank, M.D.            Videotaped            June 30, 2010

| | | | | |
|---|---|---|---|---|
| 292:15 294:11,14 | 151:20 154:16 | 301:22 305:13 | 193:9 201:11 | 272:11 283:18 |
| 294:18 296:2,5 | 155:10 164:12,13 | **told** 19:12,24 28:3 | 210:4 219:9 | **tries** 112:17 |
| 297:18 303:20 | 166:23 168:12,18 | 30:7 73:15 80:4 | 236:25 245:1,2 | **trigger** 130:15,20 |
| **Thompson's** 28:10 | 171:10 174:5 | 82:17 85:17 | **tracked** 35:12 | **trouble** 19:17 36:19 |
| 62:19 297:19 | 179:11 180:13,14 | 117:17 127:3 | 161:17 196:9 | 50:9 257:11,12 |
| **thought** 7:11 13:5 | 187:21 189:5 | 129:2 134:13 | 201:11 208:4,6 | **troubling** 237:9 |
| 27:19 50:23 51:15 | 190:1 193:13 | 142:5 167:14 | **tracker** 248:11 | **true** 11:5,6 98:14 |
| 59:9 130:21 | 194:16 196:24 | 169:6 176:6 | **trackers** 26:25 27:2 | 179:17 307:8 |
| 161:22 196:14 | 201:23 207:24 | 178:19 181:7,8,8 | **tracking** 160:11 | **truly** 238:14 292:23 |
| 213:5 218:9 | 213:13 214:6,20 | 188:5 192:20 | 211:12 212:5 | **truncated** 35:4 |
| 227:17 228:4 | 215:22 216:2,7,18 | 194:15 205:20 | 219:10 246:10 | **trust** 179:3 222:13 |
| 231:22 236:6,24 | 216:23 219:8 | 221:5,13 230:6 | 250:10 | 248:6 |
| 245:1 250:4,9 | 226:6,12 228:9 | 239:21 241:10,25 | **tracks** 211:9 | **trusted** 218:16,20 |
| 260:25 263:10 | 234:13 239:18 | 242:2,4,9 243:8 | **trail** 124:4 125:18 | 220:15 260:24 |
| 282:3 | 242:13 247:6,10 | 243:12,13,18,20 | **trained** 115:17 | 295:2 |
| **thoughts** 129:22 | 256:13 269:10 | 244:22 249:14 | 263:7,25 | **truth** 28:4,11,14 |
| 130:15 | 272:6,15 280:5,7 | 254:21 259:6,6 | **training** 110:1 | 80:11 84:2 138:15 |
| **thousand** 255:24 | 282:8 285:18 | 260:4 262:1,16 | 221:20 263:9 | 245:24 246:1 |
| **three** 25:2 38:9,14 | 286:5 288:4 293:8 | 263:19 282:3 | **transcript** 307:6 | 251:16 261:23,25 |
| 47:17 81:24 158:7 | 295:16 306:8 | 289:13 290:7 | **transcripts** 38:21 | 268:9,12 289:13 |
| 200:16,24 255:5 | **timeline** 12:24 | 291:17 293:16 | 49:14 | 290:7 291:17,18 |
| 260:12 269:16,17 | 71:24 81:25 | 299:7 | **transfer** 138:23 | 293:18 294:3,25 |
| 280:8 283:24 | 108:15 150:17 | **tomorrow** 295:19 | 153:23 155:17 | 303:8 305:11,14 |
| **three-page** 67:2 | 163:15,21 233:20 | **tool** 27:4 | 156:15 158:21,22 | 305:15 |
| **throwing** 298:21 | 290:18 | **top** 183:25 | 214:19 250:14 | **truthful** 240:15 |
| **thumb** 33:9,11,25 | **timely** 283:3 | **topic** 182:3 195:12 | **transferred** 282:10 | **truthfully** 288:21 |
| 34:24 218:24 | **times** 40:21,22 | **topics** 80:4 195:16 | **transferring** 174:1 | **try** 14:8,13 47:10 |
| 219:20 | 151:17 165:6 | **torsade** 210:15 | **translated** 36:22,24 | 47:10,11 50:15 |
| **time** 4:14 15:4 | 222:8 224:6 239:3 | **total** 140:1 162:2,6 | 52:10 159:19 | 82:1 110:7 113:1 |
| 16:20 26:22 32:9 | 294:12 | 162:7,14 170:23 | **translates** 112:22 | 182:2 215:15 |
| 32:12 40:20 44:3 | **titled** 3:11,20 | 196:16 | **transmit** 206:12 | 240:14 243:16 |
| 50:25 53:10 54:12 | **today** 6:10,23 7:7 | **totality** 174:25 | **transmitted** 206:7 | 245:24,25 282:25 |
| 56:2 64:16,22 | 8:4 16:6 23:25 | **totally** 152:25 | 208:7 | 289:13 290:7 |
| 78:21,25 79:6,18 | 28:11 30:13 33:2 | 176:22 | **transparency** | **trying** 27:23 28:20 |
| 79:21,21 80:16 | 37:25 67:8 69:2 | **Totowa** 164:7 | 114:18 | 28:21,25 35:16,17 |
| 81:13 82:4 93:22 | 73:13,18 79:18,24 | 166:14 169:4,20 | **transparent** 56:24 | 43:2 50:23 56:8 |
| 94:1,14 97:5 98:6 | 84:19 85:2,22 | 185:22,24 187:17 | 111:1,6 114:22 | 60:17 65:7 66:13 |
| 104:20,24 109:9 | 129:3 130:14 | **toxicity** 139:21 | **tremendous** 258:9 | 92:14 119:13 |
| 115:7,23 116:5 | 179:10,14 195:1 | 208:2 273:23,24 | **trending** 70:19 | 121:22 132:20,22 |
| 118:18 119:5,24 | 209:7 221:10 | 274:12,21 298:6 | **trial** 200:8 202:13 | 132:23 138:10 |
| 121:10,16 122:14 | 229:12 235:23,24 | 298:13,15 299:8,9 | **trials** 97:2,3,25 | 140:19 151:14 |
| 128:8 131:6 | 236:2 240:25 | **to-do** 20:6 | 196:4 | 157:18 170:6 |
| 132:20,24 133:3 | 247:18 251:6,12 | **track** 27:3 34:5 | **tried** 26:7 46:7 48:8 | 192:4 213:14 |
| 142:24 144:14 | 255:12 256:6 | 51:3,10,12 80:25 | 149:20 179:8 | 219:8,11 234:13 |
| 146:7 147:7 | 264:19 280:5,7 | 167:2 191:22 | 232:9,9 256:13 | 260:19 275:18 |

Karen A. Frank, M.D.          Videotaped          June 30, 2010

282:12,13 289:3 290:9
**Tucker** 2:8,12
**turn** 89:23 159:5 186:22
**turns** 177:24
**TV** 125:2
**twice** 19:13 28:1 30:7 44:18 60:9
**two** 3:11 6:10 7:17 8:5,6 9:12 10:5 12:1,5 15:8 20:17 24:9 28:16 30:2 30:13,25 31:16 32:3 33:9,9 37:24 40:7,17 54:2 58:24 70:12 71:12 80:4 81:24 93:8,9 93:24 94:19 95:18 107:4 110:25 111:6 139:17 140:1 142:22 143:11 151:14 158:7 170:4 181:23 187:19,21 202:17 205:7 207:19 214:7 225:18 227:10 229:4 250:4 255:5 260:12 272:8 279:16 280:16
**two-year** 27:8 154:13
**type** 51:5,20 52:18 62:7 133:21 140:18 161:14 220:13
**typically** 66:10 86:12 88:24 111:11 114:10 211:4,9 215:15 246:11 248:18

**U**

**UDL** 70:25 116:2

**Uh-huh** 7:3 39:15 47:18 107:10 135:14 148:11 206:22 252:25 264:22
**unable** 18:18 22:16 22:19 73:24 162:17 272:24
**unauthorized** 34:15
**unaware** 165:4 190:16
**unbeknownst** 115:13
**uncertainty** 271:23
**uncomfortable** 80:19 176:7
**unconscionable** 224:25 225:5
**uncover** 68:16
**uncovered** 171:19 221:4
**underlying** 72:19 72:19 82:18 122:1 156:6 160:4 167:15 174:6 235:10 298:3
**undermine** 303:15
**underreporting** 140:5
**understand** 6:12,22 19:20 69:1 80:6 84:22 86:2,20,22 121:18,21,25 122:3 125:5,23 154:22,25 155:1 157:6 169:17 177:12 202:2 213:12 223:19 243:4,23,24,25 244:1,1,2 252:24 253:6 261:2,7,13 261:14,18 263:15 268:16 282:24 283:22 304:13,23

304:24
**understanding** 68:13 69:20 80:3 103:17 122:4 132:3 147:16 157:12 198:8,9,10 198:15 201:19 222:22,25 275:10 287:9
**understood** 18:3 62:22 232:15
**undertake** 56:9
**undetected** 143:16
**unequivocally** 229:20
**unethical** 225:5 238:22
**unexpected** 179:22
**unexplained** 178:15
**unhook** 39:20
**uniformity** 117:5
**unit** 162:18
**United** 1:1 4:8 148:16 149:2 214:1 272:20
**unknown** 158:6
**unmodified** 287:21
**unnecessary** 259:21
**unreported** 143:1 182:9,13 185:15 186:2 188:25 189:14 191:4,12 191:18 193:1 287:6
**unsolicited** 275:12
**untrue** 291:15
**unusual** 86:25 185:17
**update** 95:14
**updated** 95:8,17
**updating** 95:11
**Uppsala** 88:22
**upset** 92:12

**upsetting** 157:22
**up-front** 241:18
**use** 6:18,19 27:15 60:9 63:15 65:19 66:14 74:19 83:18 92:21 96:23 97:2 123:5 136:22 220:4 272:2
**useful** 90:7 222:15
**usual** 87:3 161:5
**usually** 27:3,13 61:3 74:12 89:21 162:20 223:13
**uttered** 225:18
**U.S** 72:22 73:3 148:18,20 149:4,5 155:17 156:10,15 156:16 157:14 175:6 189:16 194:23 210:5 211:21 231:4 274:10

**V**

**valid** 139:14
**validated** 120:18
**validity** 302:6
**valuable** 136:1
**value** 290:25
**Valued** 204:12,20 205:17 207:18,21 208:5
**variability** 275:10
**variable** 130:3
**variation** 32:15
**variety** 298:9
**various** 34:20 198:7 199:16 254:5
**vast** 86:14
**verbal** 6:14 156:21 157:15 231:3,15 287:10
**verbally** 6:20 115:24

**verbatim** 10:13 12:13 34:6 35:12 49:14 162:12 208:4 298:25
**verification** 109:11
**verified** 108:3 109:10
**verify** 12:5 32:13 77:15 109:8 152:7 208:25 284:9
**verifying** 54:12
**version** 140:7
**versus** 119:5 136:2
**viable** 222:16
**video** 2:19 4:4,4 5:4 64:13,13,19,20 67:24 77:21 104:18,18,22,23 121:7,7,13,14 168:10,10,15,16 183:3 215:20,20 215:25 216:1 226:3,3,9,10 247:4,4,8,9 285:4 285:15 286:2 306:1,3,4
**videographer** 4:15
**videotape** 4:6 121:4 285:16 286:3
**videotaped** 1:10 306:6
**view** 26:11 80:9,10 257:16
**viewed** 83:1,2,3
**vigorous** 81:19,20 301:6
**vindicate** 296:23
**vindicated** 294:21 294:23
**violate** 25:9
**violation** 270:12
**violations** 160:3
**Virginia** 1:1 4:10 253:20 255:21
**virtue** 275:3,7

**visual** 120:11 269:19
**vis-a-vis** 101:5 273:2
**vitae** 30:1
**voice** 48:7
**void** 136:19 141:7
**volumes** 7:8,17 17:22
**voluntary** 274:9,10 292:7
**volunteered** 63:5
**vulnerabilities** 27:10 174:13 217:20 246:13
**vulnerability** 289:19
**vulnerable** 83:24 177:21

---

**W**

**wait** 128:12 149:25 165:15 285:9 292:15
**waiting** 135:15,16 135:17
**walk** 64:10 251:14 253:16,23
**want** 6:19 9:15 10:11 12:8 17:8 18:8 19:22 20:10 20:24,25 21:12 23:14 29:1 32:11 32:17 33:24 39:20 40:8 42:25 45:3 54:7 56:18 62:18 62:19 73:11 75:15 81:4,10,10 86:1 89:6,25,25 92:1 93:11 94:13 110:25 111:19 115:2 130:5 131:9 140:17 143:8 148:9 168:1,2,7 175:1,21 177:11

177:25 178:11,12 181:20,25 189:5,8 189:24 199:12 211:1 213:11 227:12 228:2,9,21 234:21 237:22 238:4,17 242:22 247:18 248:12,13 249:19 254:16 255:1 256:3,19 258:3 259:1,9,11 260:11,14 261:2 281:18 289:6 290:10 291:14 292:12,19 294:21 294:21,23 295:4 295:19 296:9,11 296:13 297:14 302:21 303:6,11 303:14,15,25 304:1,5,5,6,13 305:9,10,17
**wanted** 8:20 20:20 20:21 25:8 49:17 51:2,9,16 52:8 53:8 56:21 82:22 124:20 141:2 147:13 197:2 214:15 223:11 225:6 236:15 239:16 241:3,13 248:20 249:7 254:18 293:25 294:17 304:11
**wants** 13:15,16 145:13 228:5
**warned** 23:24 160:2,13 196:16
**warning** 48:10 49:7 66:15 99:2,13 159:7,9 160:8 161:4,10 163:4 165:2,14 166:15 171:3,11 174:20 278:18,25 279:5

**warnings** 95:22
**Washington** 62:17 88:20 102:25 175:7
**wasn't** 60:4,22 68:8 112:19 160:6 165:9 171:4 189:1 192:12 205:12 235:14 236:8,9 249:13 251:6 270:24 272:12 284:16
**waste** 118:17
**watch** 125:2
**way** 14:7 22:17 55:9 56:14 109:13 131:11 133:10 136:17 138:22 143:9 149:24 186:1 187:5 188:8 189:2,13 195:14 220:11 222:2,16 227:5 230:19 238:8,13 260:9 270:20 291:8 295:4 296:14
**ways** 142:22 143:12 191:15
**weather** 6:23
**web** 124:1,22 126:12,22 134:17 135:9 146:10 251:10 287:21
**Wednesday** 1:13 4:13 43:25
**week** 15:3 78:24 145:22
**weeks** 17:22 42:14 260:13
**weigh** 304:12
**weight** 234:16 238:10 296:25
**welcome** 35:6
**went** 7:9,10 8:9,18 8:19,20 12:14,18

15:15 18:4 25:17 25:22 29:22 31:9 49:2,15 73:15 74:6 90:25 91:23 115:22 122:9 142:20 147:2,7 175:12 198:7 201:14 203:1 204:3 206:11 207:15 218:8 219:13 220:18 244:25 246:24 272:8 273:12 297:21
**weren't** 33:22 239:21 244:22 288:9
**West** 1:1 2:8,12 4:10 253:20 255:21
**we'll** 7:1 14:10 21:23 43:7,8 44:21 45:12 64:8 65:1 69:17 79:24 177:10
**we're** 4:4 8:11 10:22 13:8 17:3 19:10 20:15 27:25 28:1 37:24 39:8 39:18 40:4 43:11 47:1,10,22 64:19 93:12 104:22 121:13 127:17 143:13 145:15 146:1 176:19 186:10,11 215:25 245:24 246:8 247:8 271:3 277:11 282:25 285:1,2 286:2 290:8 291:3 294:14 295:5 302:16 303:23 304:21
**we've** 8:23 12:10

28:7 67:22 77:23 124:11 153:18 168:5,21 191:9 192:23 238:17 294:15 300:20
**whatsoever** 230:5
**WHI** 202:13
**white** 7:10 29:8 34:4 46:7,17,24 51:24 52:7 105:20 138:12,13,14,17 147:19 159:15,15 161:25 164:9 174:12 217:20 244:21
**whoever's** 296:20
**who've** 61:1
**Williams** 2:19 4:15
**willing** 69:9 146:20 190:9 229:11 237:15 239:14 251:14 254:8 256:4 259:24 289:20
**win** 59:4
**window** 151:24
**wisdom** 210:25 259:20
**wise** 302:22 303:5
**wish** 50:11 224:15 244:3,8
**wishes** 114:23
**withdraw** 257:8 258:6,7,15 260:3
**withdrawal** 210:14 257:18 287:13
**withdrawals** 25:15 85:7,7
**withheld** 145:20,21
**withholding** 50:22
**witness** 5:5 7:22 11:25 13:13,19 14:1 16:10 17:1,5 27:2 28:17 33:17 34:22 35:1,3,6

38:11,17 41:4
49:10 52:23 54:23
55:25 56:3,7,10
56:23 58:3,7 59:7
64:12 65:13 69:22
70:11 73:1 79:14
80:16 83:1 84:14
84:16 94:9 96:11
101:8 107:2 112:9
112:11 116:8
117:3,13 118:21
125:16 127:1
128:20 134:22
135:25 138:3
141:22 144:11
156:23 157:2
164:1 165:12
166:1,24 168:25
170:18 174:10
176:13 179:19
180:4,11 193:24
194:1 199:3,7
208:1 213:14
220:6,12,14
227:24 232:11,13
233:3 237:16
238:7,15,18
239:14,17 240:9
240:12 241:1,3
242:1 244:12,18
245:7 251:19
252:10 253:24
254:10,16 257:17
257:19 258:12
259:10 261:23
266:6 267:15
270:20 274:17
277:15 278:1
282:7 283:8,23
286:6 288:20
290:6,10,19
291:22 292:12,17
292:24 294:4,8,13
294:16,19 296:3
296:25 302:23

303:21 304:7,14
305:21 306:9
307:1
**witnessed** 222:3
**witnesses** 18:15
  23:5 137:2 226:19
  255:25
**wondered** 208:22
**wondering** 251:5
  251:13
**word** 123:5 146:14
  158:2 210:2
  219:23 220:4
  227:3
**worded** 132:5
**wording** 142:2
  171:24 218:20
  219:16,16,20
  223:10
**words** 6:19 118:3
  129:6 141:25
  143:8 176:9
  225:17 282:15
  283:4 304:25
**work** 16:22 23:3
  33:17 34:16 55:21
  55:25 56:3,10,13
  56:24 59:2,15
  60:21,25 61:20
  65:12 66:13 70:20
  79:4 83:19 88:8
  89:20 98:4 112:21
  123:21 136:2,3
  146:22 220:10
  238:19 241:14,19
  254:18,19 255:4
  256:24 292:25
**worked** 33:16
  78:23,24 79:7
  86:9 98:23 99:1
  109:19 122:15
  133:14 211:3
  220:9 228:23
  254:5 263:6,24
**working** 27:12 57:3

112:2 222:11
**workshops** 109:25
**workup** 95:20
**worried** 175:13
  219:25 294:16
**worry** 280:9 293:19
**worrying** 130:13
**worse** 298:11
**worth** 263:4
**wouldn't** 137:21
  156:22
**wrapped** 209:18
**write** 8:1 17:23
  32:12 50:9 52:18
  64:3 81:8 196:4
  220:8 222:18
  236:16 239:19
**writing** 25:1 49:13
  49:21 115:25
  196:4 227:5 243:3
**written** 20:3 137:1
  182:14 194:9
  200:3 206:12
  217:22 218:4
  223:8 228:6
  229:21 245:9
**wrong** 146:21
  147:15 166:23,23
  227:12 228:22
  237:19 245:4
  255:2 256:20
  258:17,22 259:2
  259:11,17 260:11
  260:15 262:6
  295:4 296:22
**wrongdoing** 260:18
  261:17 293:20
  304:21
**wrote** 20:2 95:16
  150:10 158:9
  196:6 219:1,2

---

**X**

**X** 18:25,25 103:23
  103:24,24

---

**XUS** 113:3 193:22
  194:11,13,25

---

**Y**

**yeah** 10:24 11:3
  28:7 35:24 36:14
  39:11 45:16,23
  150:9 157:16
  176:24 237:11
  249:20 256:2
  264:20
**year** 118:24 278:21
**years** 12:22 16:23
  18:25 86:10 94:19
  147:6 220:7 272:8
**yesterday** 8:5 12:16

---

**$**

**$150** 78:20

---

**0**

**03** 150:20,20
**07** 216:23
**08** 216:23

---

**1**

**1** 39:9,10,22,23
  64:15 151:3
  152:22
**1st** 158:5,22 187:4
  212:3 276:6
**1:00** 44:2
**1:05** 121:12,16
**10:27** 64:16,17
**10:43** 64:18,22
**11** 3:5,15 9:24
  12:10 42:9 43:10
  53:24
**11th** 150:20
**11:38** 104:20
**11:40** 104:24
**1150** 2:9
**12** 44:2
**12/1/04** 106:17
**12/1/2004** 276:10
**12:03** 121:10,12

14 149:18
**14th** 150:20
**15** 15:15 163:5
  182:17,20,21
  183:13,14,14
  184:1 185:7
  186:23 194:5,17
  250:18 283:9
**15th** 135:11 165:13
  218:3 243:1,2
  247:25 250:8
  266:21 278:18,25
**15-day** 18:21 76:3
  172:3,5
**18** 3:4 41:21 53:23
**18th** 203:21,22
  206:6,13,13
  208:23,25 209:17
  233:10
**1818** 1:12 4:12
**1968** 1:6
**1992** 26:11

---

**2**

**2** 64:21 121:9
  129:11 131:10
  265:14 278:17
**2nd** 43:25 50:6
  62:8 65:9 92:8
  154:4 177:7 225:8
  242:15
**2:06** 168:12,13
**2:16** 168:14,18
**20** 105:23 275:14
  275:22 278:9,13
**20th** 184:10,19,21
  187:17 199:4
  279:23
**2000** 182:21 187:2
**2001** 108:24 149:16
**2003** 151:24 152:23
  171:20 173:23
**2004** 62:17 91:6,8
  91:10 102:23
  103:12 104:13

Karen A. Frank, M.D.　　　　Videotaped　　　　　　June 30, 2010

105:2,8,19 106:14
106:16 108:7,13
109:1,2,2 119:8
150:6 153:18
235:17 267:4
276:6,12
**2005** 153:21 154:12
161:22 284:5
**2006** 66:21 67:15
143:3 147:2,8
150:12,14 156:4
163:5 171:19,20
171:25 175:11,14
175:15,17 178:7
178:13,17 180:14
182:10 185:16
188:10 189:15
191:10 193:8
214:5 216:9 234:7
267:4 272:7
278:25 279:1,2,25
281:10,22 284:6
**2007** 164:7 166:12
170:14 174:19
176:4 191:2,6,11
193:4,13 195:4
216:19,21 233:22
259:16
**2008** 66:19 82:9
92:12 103:13,15
103:17 142:24
147:1,3,5 161:20
173:11 175:3,14
175:16 178:5,15
180:14,18 182:1
182:21 183:11,21
184:1,21 187:11
192:13 193:17
211:18 218:11
228:16 232:25
233:2 234:18
235:4,20 248:23
248:25 249:2
273:5 279:23
281:23 284:12

**2009** 58:17 124:15
134:17
**2010** 1:14 4:13 59:3
135:11 250:18
283:9 306:7
**21** 182:21 183:11
183:13,21 184:1
187:11 188:1
278:9 279:9
281:19,21
**21st** 185:24
**213-430-3378** 2:14
**216-696-2137** 2:10
**220** 77:24 78:12
206:18
**24** 3:8
**247** 2:22
**25** 153:23 201:20
202:4 203:13
204:18 205:23
208:8
**25th** 166:2 185:24
201:15 203:23,23
203:25 206:8,11
206:23 207:6,14
208:24 209:8
273:4,6,8
**250** 3:3 41:13,16
45:14 53:23 54:10
54:15 59:25
**251** 3:5 43:11 45:20
46:22 53:23 54:10
**252** 3:6 48:3 51:25
**253** 3:8 49:11,20
**254** 3:9 50:1
**255** 2:16 3:11 53:21
54:1,8,15
**256** 3:12 55:7
**257** 3:14 58:11
**258** 3:15 59:19
**259** 3:16 60:16
**26th** 165:18 207:3
207:4
**260** 3:18 65:3
**2600** 1:13

**261** 3:19 70:3 71:14
72:7,11 148:1
209:24 250:2,5,19
251:1,17 254:2
282:4,6,10,22
283:7
**268** 2:23
**28** 2:4 66:21 67:14
204:20 205:25
233:6 234:6
**28th** 159:24 203:16
203:21 204:13
207:21 278:19
279:1,4,4
**28208** 204:17
207:24,25
**28213** 201:18
**286** 2:23
**29** 53:22,24
**29464** 2:4
**297** 2:24

---

### 3

**3** 121:15 164:7
166:12 174:19
183:25 191:2,11
193:3 195:4
216:19,21 250:22
251:1 282:5
**3.4** 120:12
**3:19** 215:22,23
**3:30** 215:24 216:2
**3:46** 226:6,7
**3:50** 226:8
**3:52** 226:12
**30** 1:14 4:13
**30th** 306:7
**30-day** 233:20
**302** 2:24
**35** 78:24
**350** 113:18,23
**350s** 113:21
**3500** 110:15 113:4
**37** 201:2,7
**38** 124:13 128:23

130:8 131:7 138:7
138:12 141:7
145:1 251:9
264:19 267:23
268:11,25 284:22
285:24

---

### 4

**4** 148:5 168:17
226:5 278:17,18
**4:23** 247:6
**4:24** 247:10
**40** 8:11
**40-hour** 79:3
**42nd** 2:13
**44115-1475** 2:10
**45** 3:3,5
**47** 3:6,8,9
**482** 106:11
**483** 98:24 99:7,8
100:5 113:14
157:23 159:8
166:15 174:20
183:15 184:2,4,7
184:15,21 279:4
279:22
**483s** 13:2 73:7
99:18,22 150:19
161:4 165:2
167:19 171:3,6
**484** 115:10
**49** 8:8,12

---

### 5

**5** 2:22 159:5,6,11
159:12 165:1
181:21 187:23
226:11 233:9
282:18 283:24
285:17
**5:11** 285:18
**5:15** 286:5
**5:30** 15:10
**5:39** 306:8,10
**50** 8:8,23 9:2,7,19

9:20,24 12:10,11
49:21,24 72:10
120:9 143:15
**50-hour** 79:3
**505(b)** 130:1
**515** 2:13
**53** 3:11
**55** 3:12
**58** 3:14
**59** 3:15

---

### 6

**6** 106:19 147:2
209:23,25 286:4
306:5
**6th** 165:16 166:6
272:7
**6/15/2010** 3:21
**6:00** 15:13
**6:30** 15:11
**60** 3:16,18
**60-hour** 79:3,4,14
**62** 183:7 187:10
192:24 193:25
**64108** 2:17
**65400** 67:4
**65402** 67:4
**69** 3:19

---

### 7

**7** 149:18
**7:30** 15:10
**70** 9:2,2

---

### 8

**8** 183:14 185:7
186:14 188:21
**8th** 159:24 171:25
294:2
**816-474-6550** 2:17
**843-216-9118** 2:5
**87** 163:24 165:4
168:20 171:9
172:11 173:17,19
174:3 176:21,23
191:3 280:5

Karen A. Frank, M.D.          Videotaped                    June 30, 2010

Page 349

| 9 |
|---|
| **9** 186:22 194:5,17 |
| 282:19 |
| **9th** 134:17 |
| **9:10** 1:14 4:14 |
| **90** 29:15,18 34:18 |
| 35:19 67:24 |
| **90071** 2:13 |
| **91** 37:16 66:19 68:4 |
| 152:9 |
| **925** 2:9 |