IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  DIGITEK PRODUCT LIABILITY
LITIGATION                                    MDL NO. 1968

THIS DOCUMENT RELATES TO ALL CASES

### AFFIDAVIT OF MATTHEW P. MORIARTY

STATE OF OHIO                    :

COUNTY OF CUYAHOGA, to wit:

Being first duly sworn, Mr. Matthew P. Moriarty states:

1. I am a lawyer licensed to practice in West Virginia, Ohio, and Florida. I am co-lead counsel for the Actavis defendants in the Digitek MDL. This affidavit is based on my memory and a review of pertinent documents.

2. The Plaintiffs' settlement position early on was based on our client's remaining insurance limits, at the outset $100,000,000. Their demand for remaining limits continued through at least December 1, 2009 in a letter from Harry Bell, and into the spring of 2010, albeit at lower figures as the coverage was eroded by fees and costs.

3. By the beginning of 2010, many company witness depositions had been taken. The PSC originally produced the reports of six general liability experts and two general causation experts. Not one of the general liability experts' reports ever said that defective, out-of-specification Digitek® made it into the hands of consumers. The reports focused completely upon whether Actavis complied with current good manufacturing practices (cGMPs) and, hence,

whether its products were "adulterated" as that term is statutorily defined in the Food, Drug, and Cosmetic Act.

4.  The PSC was still demanding about $10,000,000 in fees and expenses, and indemnity figures over $50,000,000 as we approached the two weeks in which their experts were to be deposed. The defense had made no dollar offers.

5.  On June 22, 2010, I deposed E. Don Nelson, a Ph.D. toxicologist and general causation witness. On June 23, 2010, I deposed Dr. Mark Semigren, a cardiologist and general causation expert. (On June 25, 2010, Ed Taber deposed Dr. Butterly, Plaintiff's specific cardiology expert in one of the lead trial cases – *Luce*, for whom the Plaintiff's lawyer was Fred Thompson). All of these depositions revealed on the record what the defense already knew about the medicine and specific causation issues of these cases. Patients can develop digoxin toxicity for many reasons, most having nothing to do with defective tablets.

6.  The week of June 28, 2010 was key. We deposed four of the PSC's general liability experts. On June 28, 2010, Michael Anderton deposed Mr. Farley. On June 29, I deposed Mark Kenney. On June 30, Dick Dean deposed Karen Frank. And on July 1, I deposed Russ Soma. After those four depositions, the situation was fairly clear.

7.  One witness collapsed completely, Karen Frank. (A summary of some of her key testimony is in Exhibit E.) All of the witnesses conceded factually what we already knew from either the FDA's own website, or the case law: that recalls do not mean a drug is defective; a finding of "adulteration" does not mean a drug is defective; and the experts had no direct proof that out-of-specification Digitek® ever made it into the hands of consumers. At the same time,

2

the defense had extensive testing evidence of the product, all showing it to be within the specifications.

8. The PSC must have realized that these depositions had not gone well for them, and that they would have an extremely difficult time proving product defect if they survived a dispositive motion. On Friday, July 2, 2010, Dick Dean, Fred Thompson, and I spoke. The settlement discussions started anew, and the parties agreed to push for a stay of the litigation.

9. The negotiations over money took only one to two days. We made our first offer on July 7, 2010. On July 8, 2010, PSC negotiators accepted $10,000,000, plus a cap of $2,000,000 for the Special Master's fees, but with no guaranty that the PSC had a legal right to fees and expenses from Defendants.

10. Originally, approximately 834 MDL lawsuits, 2,262 tolled claims, and 120 state cases went into the settlement grid, and others were dismissed. All told, the original settlements eliminated about 3,230 matters.

11. I have been practicing as a tort defense lawyer for almost 30 years. In my opinion, this is not a great result for Plaintiffs. The average resolution for the 3,230 matters was about $3,100 per case, a very small amount for personal injury or wrongful death cases in pharmaceutical products liability cases. The PSC did not trumpet this settlement to any major news organizations, and word of it barely leaked out - behaviors inconsistent with plaintiffs' lawyers who believe their result to be "great," or even good.

12. The class action threats had no effect on settlement negotiations. We never offered money until after the claims for class certification were denied by the Court. No class claims were settled, and we told the PSC we would not settle class claims.

13.  Dick Dean and I reviewed the PSC's affidavits of individual submissions for fees and expenses. Based on our review, I compiled the Summary of Objections to Plaintiffs' Steering Committee's Individual Submissions, Fees, and Expenses, attached as Exhibit G.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MATTHEW P. MORIARTY

SWORN TO AND SUBSCRIBED in my presence this 25th day of March, 2011.

_____
NOTARY PUBLIC
HUGH M. STANLEY, JR., Attorney
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

073021.000031.1222215