# EXHIBIT G

## Summary of Objections to Plaintiffs' Steering Committee's
## Individual Submissions, Fees, and Expenses

1. **Camp Bailey**

   - His August 8, 2008 entry discusses finding a laboratory for analysis of Digitek®. To our knowledge, the PSC only used NMS labs in Philadelphia, and all tablets tested were within the specifications.

   - Mr. Bailey's May 2009, June 2009, July 2009, January 2010, and April 2010 entries include work on his firm's Texas Digitek® cases. That is not an MDL common fund fee or expense.

   - In 9/10, Mr. Bailey has an entry for his travel to and attendance at a hearing before Judge Moss in the Pennsylvania litigation. This had to do with his state-specific Pennsylvania cases, not a common fund MDL fee or expense.

2. **Robert Binstock**

   - This firm does not itemize what work they did, when they did it, or how it added to the overall MDL effort.

   - They charged 32 hours of travel for each of them at high rates. Defense firms would be required to indicate that work was performed during the travel, as opposed to napping, reading the *USA Today* or a novel while sitting on an airplane.

3. **Rhoda Nast**

   - This firm has at least six pages of a submission, but it only discusses the qualifications of their lawyers. There is nothing about their hours or the work they performed. Defense counsel had to request the detail.

   - Diane Nast's hourly rate, $650 per hour, is too high.

   - A lawyer named Joann Matusko attended a settlement conference in Philadelphia on August 19, 2010. That is not MDL work. That likely pertains to the Pennsylvania State cases.

   - Page 3, paragraph 6 of the submission refers to a protocol for the inspection and testing of the recalled Digitek®. No such protocol was ever agreed to, implemented, or executed.

   - On page 4, paragraph 8, Jennifer Snyder participated in research regarding notice to class members. Not only was class certification unsuccessful, to the best of our knowledge, there was no notice to class members ever promulgated.

- The submission indicates that they are charging for time through November 30, 2010. The section of the Settlement Agreement that authorizes them to even apply for fees and expenses only allows them through October 15, 2010. The individual fee sheets do have entries for time between October 16 and the end of November, 2010. Many of the entries are vague. For example, on October 14, 2008, DMN had a conference lasting 0.7 of an hour and the only description is "call from R. Russell." We don't know who R. Russell is, or what the call was about.

- Their travel charges suffer from the same flaw as all the other plaintiffs' lawyers – they say nothing about work performed during the travel itself. If, while riding to the airport or on a plane itself, they were not working on the Digitek matters, the time should not be compensable. For all we know, they could have been working on other matters or spending personal time.

- Pages 3, 4, and 5 of the detailed submission obtained by defense counsel by specific request shows how much time was devoted to "organizational meetings, and 'committee assignments'." Not all administrative duties are compensable MDL prosecutorial fees or expenses. All of their travel entries throughout the detailed submission suffer from the same lack of detail.

- Some of the individual entries are for class work. See June 26, 2009, July 1, 2009, August 12, 2009, August 13, 2009, September 16, 2009, and October 19, 2009.

- There are many entries throughout containing emails about "MDL case filing," and conditional transfer orders. That most likely pertains to individually filed cases, not common MDL work.

- Similarly vague entries, like November 24, 2009, "Multiple notices of deposition." Did they draft them? Did they read them? How did this contribute to the overall MDL effort? A person named DNG has a number of these entries between May 1, 2010 and May 24, 2010. There are more of them spread throughout the entire submission.

- At page 21, someone named JSS has a June 26, 2009 entry clearly referring to class action work. This person's entries are similarly vague.

4.  **Wolf Popper (Lester Levy)**

- In the submission (page 4, paragraph 13), there is a reference to PTO No. 4 giving them entitlement to reimbursement for fees and costs. That is not what PTO No. 4 says. That section of PTO No. 4 says: "Reimbursement for costs and fees for services of the Steering Committee will be set at a time and in a manner established by the court after due notice to all counsel and after a hearing." It does not entitle them to anything and certainly does not say Defendants should pay.

2

- All of their work pertained to class certification issues, except a small amount of time addressing the subject of testing Digitek® samples. As we commented in the Camp Bailey submission, only one lab was used to the best of our knowledge, NMS in Philadelphia, and all tablets tested were within the specifications. And those tests were conducted in individual cases, not by the PSC.

- At page 9, in paragraphs 20 and 29, they describe the work of an investigator who pulled various FDA documents. Apparently, he either did not find the FDA Form 483s or did not turn them over to the PSC to turn over to their experts. (These were key documents of FDA's testing of Digitek®.)

- They claim that the class certification work was an integral part of the litigation effort to achieve a successful settlement. As the affidavit of Matthew Moriarty attests, class certification had no part in the settlement discussions. No one from Wolf Popper was a negotiator of the settlement, and we expect that Mr. Thompson or the other negotiating lawyers would confirm Mr. Moriarty's affidavit in which we refused consistently to discuss settlement with the class issues.

- None of their work is itemized.

5. **John Malkinson**

    - Mr. Malkinson's submission of paragraph 3 says that his work was wholly contingent, and refers to class action work.

    - Many of the time charges appear to relate to a specific case, not the overall MDL or PSC.

    - Why are they charging two hours for work on a draft press release? That is not legal work, and we do not know what the press release was or if it was finalized.

    - On May 19, 2008, they charged 1.5 hours for searching for experts, but never tell us whether those experts panned out. If they are the names mentioned, Lambert and Oslander, those are not experts who were ever identified by the PSC.

    - On July 29, 2008, they had a phone conference with the client's treating physician. On June 9, 2009, other correspondence had to do with a PFS in their individual case. On August 8, 2009, they met with a client to prepare for deposition. This is either individual, case-specific work, or has to do with a class action representative, neither of which contributed to the MDL PSC effort.

6. **Harry Bell**

    - A substantial number of Mr. Bell's charges are vague. For example, they refer to "various phone calls," or "review various e-mails."

3

- In a November 22, 2008 e-mail, they talk about "leadership issues." Back then, there were people either vying for MDL leadership or bickering because Theresa Toriseva had been appointed. It is not reasonable to charge for the internal bickering.

- In September and October 2008, they try to charge for phone calls regarding hotel reservations. In October 2010, there are a number of entries relating to "continue updating billing submissions." Although we do not know what those are, they do not sound like they advanced the PSC's efforts to prosecute the litigation. They are not lawyer or paralegal-level work.

7. **Ed Blizzard**

- Exhibit B to his submission is a petition for time in the *Kelch* case. That was a separately settled case, not part of the overall MDL settlement. Presumably, he had a fee agreement with the Kelch family regarding that, and it was not a common fund fee or expense.

8. **James Petitt**

- 145 of Mr. Petitt's hours were spent on MDL class action work.

- His time charges are sparse and contain very little detail.

9. **Brooks Cutter**

- He has time charges for trial preparation and trial. His firm did not have a trial case, and no cases have either been tried or come close to trial.

- $8,000 of his time is for traveling to Chicago for a meeting. No one says what the meeting was, who attended, or how it helped the overall PSC prosecutorial effort.

10. **Morgan & Morgan (Scott Weinstein and others)**

- He was appointed by the PSC to serve as co-chair of the class action sub-committee. To the best of our knowledge, all of his work had to do with the class action, which was unsuccessful.

- Mr. Weinstein's detailed list of work suffers from some of the same flaws as in other submissions – travel entries do not specify whether work was performed during the travel period. A March 10, 2009 entry of ten hours for a PSC meeting has no details. A January 30, 2009 PSC telephone conference has no details.

- A substantial amount of his entries pertain to class action work. See, e.g., January 20, 2009, May 18, 2009, June 8, 2009, June 10, 2009, June 15, 2009, June 26, 2009, August 31, 2009, September 10, 2009, October 2, 2009, December 22, 2009, December 29, 2009, January 6, 2010, February 1, 2010 through March 3, 2010, May 25, 2010, and June 3, 2010.

- Mr. Weinstein charges for a lot of "receipt and review," without any analysis of why or how it aided the overall effort of the PSC. See, e.g., September 21, 2009 through April 26, 2010.

- The time for Mr. Goetz, one of Mr. Weinstein's partners, had to do with settlement, not the advancement of the litigation, and there is no specificity about any work performed during the travel itself.

- The time for Mr. Meyer is refreshingly detailed, but a careful review of his time reveals that almost all of it has to do with class action work.

- Almost all the time of Tamara Givens has to do with class action issues.

- The time for Rachel Soffin almost all has to do with class action issues.

11. **Shelley Sanford**

    - Close inspection of Ms. Sanford's time entries reveals charges for a specific case, *Vega*, which is not time devoted to the common effort.

12. **Motley Rice**

    - Carmen Scott reports 323 hours, but it appears that 225 of them are for a specific trial case (*Luce*), not for general issues.

    - 42 of Megan Johnson Carter's 3,534 hours are also devoted to a trial case (*Luce*).

    - Motley Rice wants $12,634 in expenses for their trial case (*Luce*) on the theory that it further developed the MDL as a whole. But that is not the purpose of this application; the application is for common work. Anyone could make the argument that their individual case helped advance the litigation as a whole.

13. **Theresa Toriseva**

    - Paragraph 6 of Ms. Toriseva's affidavit talks about how the *Beveridge* case was selected and set for trial, and was helpful in moving the litigation forward. She also included her time and expenses for that case. *Beveridge* was a West Virginia State case, not an MDL case.

    - At the outset of Ms. Toriseva's time itemization she talks about meetings with experts. Of the 15.8 hours, only 3 have to do with an expert that was ultimately identified by the Plaintiffs (Don Nelson).

    - Ms. Toriseva's travel entries, August 25 and 26, 2008 being examples, do not discuss whether she spent the time working, reading a novel, or napping.

- Many of the entries in Ms. Toriseva's section entitled "Organizational/PSC Prep" likely have to do with the internal bickering the PSC experienced in the fall of 2008. Ms. Toriseva was the subject of a substantial amount of that bickering, and it is not a proper fee or expense under these circumstances.

- Ms. Toriseva's entry on December 11, 2008 refers to Chemir Analytical Services. To the best of the Defendant's knowledge, that company was never used to test tablets in the Digitek litigation.

- On May 13, 2009, Ms. Toriseva charged 3 hours to attend Lexis/Nexus training for the West Virginia MLP cases. By that time she was not on the MDL PSC, and this charge pertains to State cases.

- On August 26, 2010, she charged 1.3 hours for a Digitek® conference call when she was no longer on the PSC, and to the best of defense's knowledge, had no MDL cases on file.

14. **Zimmerman Reed (Stacey Hauer)**

- At page 2, Section 2, Ms. Hauer touts her work with "... scientific expert development and preparation, and "contributed to almost every aspect of this successful litigation." Plaintiffs' experts virtually collapsed, and the litigation was not particularly successful.

- At page 3, Ms. Hauer talks about taking the lead in drafting complex issues about the Medicare Secondary Payor Act. This had solely to do with the extent of liens by the government on settled cases, not furthering the litigation itself.

- On August 8, 2008, Ms. Hauer refers to finding a lab for analysis of pills. This appears in many different PSC time charges. However, almost no Plaintiffs admit to having had their tablets tested, and the ones that did were found within specifications.

- Ms. Hauer's itemized billing on travel suffers the same failure as repeated throughout this summary. They do not say whether they actually work during the travel. They also list hourly rates for lawyers at $600 and $550 per hour, without any submission as to who these lawyers are or what their contribution was.

- On November 18, 2008, Ms. Hauer charged 13 hours for "missing" her flight to Charleston and returning to Minnesota. The entry fails to describe any work performed, and missing her flight is hardly a compensable item.

- On June 22, 2009, Ms. Hauer talks about meetings with a statistical expert. The PSC never produced one.

6

15. **Hissey Kientz (Shamus Mulderig)**

- At page 2, paragraph 3(a) – which is the first thing they mention of their work – they refer to their case-specific work in *Young v. Actavis*. That is not common fund work.

- The second thing they mention, at paragraph 3(b), is a Pennsylvania state court action, which is also not common fund work.

- Their specific time entries reflect the work done on their specific case, for which they presumably have a separate fee agreement. See, e.g., time entries for July 6-10, 2009, and August 4, 2009, August 12, 2009, August 25, 2009, September 3, 2009, September 14, 2009, September 20 through 22 2009, October 20, 2009, November 9, 2009, November 11 through 13, 2009, November 17 and 18 2009, December 21, 2009, January 5, 2010, January 7, 2010, January 27, 2010, January 28, 2010, February 27 through March 5, 2010, March 8, 2010, April 16 through May 3, 2010, May 17 through July 15, 2010, July 16 and 17, 2010 (Pennsylvania case), and July 18 through August 10, 2010 (Pennsylvania case).

- Our analysis shows that the value of the time spent on individual cases, described above, is over $57,000. The breakdown is appended hereto.

7

ANALAYSIS OF NON-PSC RELATED CHARGES

HISSEY KIENTZ

| Date | Attorney | Hours | Total per Timekeeper | Hourly Rate | Total Cost |
|---|---|---|---|---|---|
| 3/8/2011 | Friend, D.L. | 1.50 | | | |
| 5/3/2011 | Friend, D.L. | 1.10 | | | |
| 7/14/2011 | Friend, D.L. | 3.50 | | | |
| 7/15/2011 | Friend, D.L. | 4.10 | 10.20 | $350.00 | $3,570.00 |
| 9/3/2010 | McGinn, K | 0.40 | | | |
| 11/9/2010 | McGinn, K | 3.20 | | | |
| 11/11/2010 | McGinn, K | 1.90 | | | |
| 11/12/2010 | McGinn, K | 5.10 | | | |
| 11/13/2010 | McGinn, K | 4.20 | | | |
| 11/17/2010 | McGinn, K | 2.90 | | | |
| 11/18/2010 | McGinn, K | 3.00 | | | |
| 1/7/2011 | McGinn, K | 0.30 | 21.00 | $350.00 | $7,350.00 |
| 9/20/2010 | Mulderig, S | 4.70 | | | |
| 9/21/2010 | Mulderig, S | 4.10 | | | |
| 9/22/2010 | Mulderig, S | 1.10 | | | |
| 9/22/2010 | Mulderig, S | 4.70 | | | |
| 9/22/2010 | Mulderig, S | 1.50 | | | |
| 10/20/2010 | Mulderig, S | 3.70 | | | |
| 10/20/2010 | Mulderig, S | 4.30 | | | |
| 1/27/2011 | Mulderig, S | 3.50 | | | |
| 1/27/2011 | Mulderig, S | 4.50 | | | |
| 1/28/2011 | Mulderig, S | 2.10 | | | |
| 1/28/2011 | Mulderig, S | 3.10 | | | |
| 4/16/2011 | Mulderig, S | 1.70 | | | |
| 5/3/2011 | Mulderig, S | 1.10 | | | |
| 5/3/2011 | Mulderig, S | 1.50 | | | |
| 5/26/2011 | Mulderig, S | 2.10 | | | |
| 7/14/2011 | Mulderig, S | 3.50 | | | |
| 7/14/2011 | Mulderig, S | 4.10 | 51.30 | $350.00 | $17,955.00 |
| 7/6/2010 | Schoen, K.G. | 4.00 | | | |
| 7/7/2010 | Schoen, K.G. | 3.00 | | | |
| 7/8/2010 | Schoen, K.G. | 5.00 | | | |
| 7/9/2010 | Schoen, K.G. | 4.00 | | | |
| 7/10/2010 | Schoen, K.G. | 4.00 | | | |
| 8/12/2010 | Schoen, K.G. | 0.50 | | | |
| 8/14/2010 | Schoen, K.G. | 0.50 | | | |
| 8/25/2010 | Schoen, K.G. | 2.00 | | | |
| 9/14/2010 | Schoen, K.G. | 1.00 | | | |
| 9/20/2010 | Schoen, K.G. | 20.00 | | | |
| 11/9/2010 | Schoen, K.G. | 2.00 | | | |
| 12/21/2010 | Schoen, K.G. | 0.50 | | | |
| 1/5/2011 | Schoen, K.G. | 1.10 | | | |
| 2/27/2011 | Schoen, K.G. | 6.00 | | | |
| 2/28/2011 | Schoen, K.G. | 6.00 | | | |
| 3/1/2011 | Schoen, K.G. | 2.00 | | | |
| 3/3/2011 | Schoen, K.G. | 4.00 | | | |
| 3/4/2011 | Schoen, K.G. | 3.00 | | | |
| 3/5/2011 | Schoen, K.G. | 3.00 | | | |
| 3/8/2011 | Schoen, K.G. | 2.00 | | | |

imanage\1221550.1

ANALAYSIS OF NON-PSC RELATED CHARGES

HISSEY KIENTZ

| Date | Attorney | Hours | Total per Timekeeper | Hourly Rate | Total Cost |
|---|---|---|---|---|---|
| 5/3/2011 | Schoen, K.G. | 1.50 | | | |
| 5/17/2011 | Schoen, K.G. | 2.00 | | | |
| 5/20/2011 | Schoen, K.G. | 4.00 | | | |
| 6/4/2011 | Schoen, K.G. | 1.50 | | | |
| 6/5/2011 | Schoen, K.G. | 3.50 | | | |
| 7/16/2011 | Schoen, K.G. | 8.80 | | | |
| 7/17/2011 | Schoen, K.G. | 4.30 | | | |
| 7/18/2011 | Schoen, K.G. | 2.00 | | | |
| 8/1/2011 | Schoen, K.G. | 1.00 | | | |
| 8/2/2011 | Schoen, K.G. | 1.50 | | | |
| 8/8/2011 | Schoen, K.G. | 1.00 | | | |
| 8/10/2011 | Schoen, K.G. | 1.00 | 105.70 | $275.00 | $29,067.50 |
| | Total | 188.20 | 188.20 | | $57,942.50 |

1221550

imanage\1221550.1