# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MDL No. 1968


IN RE:                          VIDEOTAPED

DIGITEK PRODUCT                 DEPOSITION OF:

LIABILITY LITIGATION            MARK G. KENNY

                                VOLUME I

- - - - - - - - - - - -


       TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before CAROL ANN SHEPARD, a Certified Court Reporter of the State of New Jersey, held at the MARRIOTT NEWARK AIRPORT HOTEL, 1 Hotel Road, Newark, New Jersey, on Tuesday, June 29, 2010, commencing at 8:30 in the forenoon.

1   his question.

2       Q.      It's a very specific question.

3               Do you have an opinion, to a reasonable
4   degree of probability, as to whether any consumer
5   received a Digitek -- recalled Digitek tablet that
6   was normal in size but outside its USP
7   specifications?

8       A.      Not within a reasonable probability.

9       Q.      All right. Are you a -- do you have
10  any expertise in statistics?

11      A.      I have knowledge of it.

12      Q.      Do you have expertise in it?

13      A.      No. I would not say I'm an expert.

14      Q.      Do you know anything about statistical
15  significance?

16      A.      I have some knowledge of it.

17      Q.      All right. Do you have an opinion as
18  to whether 4 1/2 percent -- let me rephrase that
19  question.

20              FDA tested 7 of the 152 recalled
21  batches --

22      A.      Okay.

23      Q.      -- independently in these 484s that I
24  have had marked as exhibits.

25              By my math, that's 4.6 percent.

1   consumers?

2        Q.    Returned samples from consumers or
3   tests that consumers have of samples that they kept
4   or tests done by the FDA or anybody else to indicate
5   that there are normal-sized tablets outside the
6   specification --
7        A.    I haven't seen any tests.
8        Q.    Okay.
9        A.    So I can't see any tests that are out.
10       Q.    All right.  So do you have any evidence
11   at all that Digitek, outside its labeled
12   specifications, reached consumers in this
13   litigation?
14       A.    Please, this is an important question.
15   Repeat it.
16             MR. MORIARTY:  Read that one back,
17   please.
18             (Requested portion is read.)
19       A.    I have no evidence.
20       Q.    Do you know what a red herring is?
21       A.    I think I do.
22       Q.    Do you know plaintiffs' lawyers in this
23   litigation said, in court and in court documents,
24   that the double-thick theory is a red herring?
25             MR. MILLER:  Object to form.

Russell Somma, Ph.D.                                      July 1, 2010

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:   DIGITEK PRODUCT LIABILITY LITIGATION

| | |
|---|---|
| BOBBY R. MILLIGAN, et al., | ) MDL Case No. |
|  | ) 2:09-cv-121 |
| Plaintiffs, | ) |
|  | ) |
| -vs- | ) VIDEOTAPED |
|  | ) DEPOSITION OF: |
| ACTAVIS GROUP HF, et al., | ) RUSSELL F. |
|  | ) SOMMA, PH.D. |
| Defendants. | ) |
|  | ) |
|  | ) |
| _____ | ) |

TRANSCRIPT of testimony as taken by and before MARK SCHAFFER, a Certified Shorthand Reporter and Notary Public of the States of New Jersey and New York, at the Marriott Hotel, Newark Liberty International Airport, Newark, New Jersey, on Thursday, July 1, 2010, commencing at 8:31 in the forenoon.

Rennillo Deposition & Discovery
216.523.1313        www.rennillo.com   888.391.3376 (Depo)

1    Tape Number 5.
2    Q.    Dr. Somma, I was asking you some questions
3    about your report.
4    A.    Yes, sir.
5    Q.    So let's go to Page 8.
6    A.    Yes, sir.
7    Q.    Now, so far as Batch 70924A is concerned, you
8    are aware that my client, when it finished all of its
9    inspections on that batch, found a total of 20
10   double-thick tablets.  Is that right?
11   A.    That's my understanding, yes, sir.
12   Q.    Okay.  Do you have an opinion to a reasonable
13   degree of probability as to whether or not my client,
14   in its inspection of that batch, failed to detect any
15   other extra-thick tablets?
16   A.    In my experience, we never relied on a visual
17   inspection to release a batch.
18   Q.    Sir.
19   A.    I didn't answer the question.
20   Q.    You didn't.
21   A.    No.
22         MR. MORIARTY:  Can you read that question
23   back, please?
24   Q.    It was a very specific question.
25         (The question is read.)

1          MR. MILLER: Objection. Asked and answered.
2     A.   Okay. I don't -- the probability is they did
3  not detect all of them.
4     Q.   Do you have an opinion to a probability as to
5  how many were made that were extra thick that were not
6  detected?
7     A.   I don't have a hard and fast rule, but my
8  rule of thumb was if you see 20, you got a thousand.
9  That's just Russ Somma's rule. Opinion, that's all.
10    Q.   And Russ Somma's rule, is it based on
11 controlled trials where you tried visual inspections
12 and tried to see how many were caught or missed?
13    A.   It's based on my experience in scale-up of
14 processing. It has never been confirmed by taking
15 them out and measuring if my rule is correct.
16    Q.   Is it based on peer-reviewed literature?
17    A.   No.
18         (A discussion is held off the record.)
19    Q.   So it's not based on actual scientific
20 studies where you compared visual inspections'
21 accuracy to actual defect rates?
22    A.   No, Matt, it's not.
23    Q.   So I want to get back to my question.
24         Do you have an opinion to a probability as to
25 how many extra-thick tablets were made but not caught

1    A.    No, sir.

2    Q.    Okay.  So do you see what I'm trying to drive

3  at here?  Your level of -- your not being thoroughly

4  convinced that the investigation revealed problems

5  with that one batch does not prove that there was

6  out-of-spec Digitek in the hands of consumers; does

7  it?

8           MR. MILLER:  Object to form.

9    A.    And, again, what I have to point to is that

10  all of the parts have to move and have to work

11  properly.  And there's certainly information that says

12  in general, the quality systems here were not

13  functioning properly.

14    Q.    Give me all the affirmative, scientific

15  evidence that you have that any consumers got

16  out-of-specification Digitek in their prescription

17  vials?

18    A.    And, again, if all we rely upon is the

19  specifications, we wouldn't be having this

20  conversation.  The answer is:  There's got to be

21  another dimension to it, and that dimension is the way

22  in which they manufactured the product, and that is

23  the point I keep trying to make.

24           I haven't seen anything beyond:  They meet

25  specs.  If you live by the specs, you die by the

```
 1   specs.  It's as simple as that.  That's a
 2   narrow-minded approach.  And I agree with you, they
 3   all met spec.
 4           MR. MORIARTY:  I'm going to pass the witness to
 5      Ms. Downie.
 6
 7   CROSS EXAMINATION BY MS. DOWNIE:
 8      Q.   Dr. Somma, I have just a few questions for
 9   you.
10           You testified earlier today that you were
11   contacted initially by Spyglass, Mr. Kenny's
12   organization.  Is that correct?
13      A.   That's correct.
14      Q.   And when were you first contacted by Mr.
15   Kenney?
16      A.   In March.
17      Q.   How many times have you spoken with him
18   regarding this litigation?
19      A.   Two -- three times.
20      Q.   And when he first contacted you, what did he
21   tell you he expected your role to be in this
22   litigation?
23      A.   To be the technical opinion.
24      Q.   And did he provide to you details regarding
25   what the litigation was about?
```

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

IN RE:   DIGITEK PRODUCT LIABILITY

        LITIGATION

                              MDL NO. 1968

    The videotaped deposition of JAMES J. FARLEY taken by counsel for the Defendants, Actavis Totowa, LLC, Actavis, Inc., and Actavis Elizabeth, LLC, pursuant to notice and by agreement of counsel, reported by Angela S. Garrett, CSR, RPR, B-2407, at the Embassy Suites, 145 Mulberry Boulevard, Savannah, Georgia, on June 28, 2010, commencing at 9:10 a.m.

-----------------------------------------------------------

Page 383

1    Q    Let's go to the very end of page 19.
2    Okay?
3    A    Yes.
4    Q    And you're talking about since the
5    non-compliance problem was systemic all products,
6    including Digitek, were adulterated as defined in
7    Section 501 of the Food, Drug and Cosmetic Act.
8         Do you see that?
9    A    Yes.
10   Q    Okay. Is it your understanding that this
11   litigation is about whether Digitek and other products
12   at Actavis were considered adulterated under its
13   regulatory definition?
14   A    That's part of it. It's my understanding
15   that there was a probability that some material produced
16   by Digitek could harm a consumer.
17   Q    Okay. Is there some statement in any FDA
18   document that there is a probability that
19   out-of-specification Digitek was shipped to the
20   marketplace?
21   A    Specifically as you worded that, no.
22        MR. ERNST:  Objection to form.
23   Q    To your knowledge did FDA say anywhere in
24   a 483 or a warning letter that double thick tablets had
25   in fact made it to the marketplace?

1      A   In a 483?

2      Q   Or a warning letter.

3      A   Warning letter?  No, they did not say it
4  the way you just worded it.

5      Q   Did the FDA anywhere in a 483 or warning
6  letter say that out-of-specification Digitek tablets had
7  made it to the marketplace or in the hands of consumers?

8      MR. ERNST:  Objection to form.

9      A  I'm pausing because they're not going to
10  say that in a 483.  The 483 is going to say what you're
11  doing in the plant, the facility that's being inspected.
12  It's not in the range of a 483 to say whether it's on
13  the marketplace or not.

14      So that's why I'm looking surprised at the
15  wording of the question, because the answer is not --
16  it's like, of course, not, it won't in a 483.

17      Q   Okay.  Were you aware that FDA in the
18  latter half of 2006 asked Actavis to bring in a
19  consultant for some batch record reviews?

20      A   Yes.

21      Q   And the purpose of that in essence was to
22  see according to the batch record reviews whether
23  products were being made in accordance with GMPs,
24  correct?

25      A   Currently or before?

Page 396

1    Q    FDA chooses the sample size for their 484
2    program, don't they?
3    A    Yes.
4    Q    They can take as many samples as they
5    want, couldn't they?
6    A    Yes.
7    Q    So do you have any data anywhere, any
8    scientific data, that shows out-of-specification Digitek
9    in the hands of pharmacists or consumers?
10   A    I don't have scientific data.  However,
11   the purpose of a surveillance, also known as survey
12   sample, is to take a sample not indicative of everything
13   that was produced, but a sample to determine if that
14   sample is good or not.  It does not tell me that there
15   isn't any harmful Digitek out there.  All of this is
16   small.
17   Q    That's nice.  What I'm asking you,
18   Mr. Farley, what data do you have that there is in fact
19   harmful out-of-specification Digitek out there in the
20   hands of consumers?  Okay?  This is what I've got plus
21   more.
22   A    Yes.
23   Q    What have you got?
24   A    If you mean other than the 483s saying it
25   was not made right, you mean analytical data showing

1    A    It sounds to me like you're minimizing the
2    significance of a 483 or a warning letter.
3    Q    No, sir.
4    A    They are serious things.
5    Q    What I'm trying to ask you -- I'm trying
6    to understand your opinions and the support for your
7    opinions.
8    A    Yes.
9    Q    I understand what you relied on, those
10   three categories.  I want to know if there's anything
11   else.  Okay?  You've said warning letters, 483s and a
12   consent decree.  Anything else?
13   A    And the double thick tablets that were
14   found and not analyzed, which is surprising.
15   Q    I'm -- maybe you're missing the question.
16   A    I might be.
17   Q    Okay?  I want to know any documents that
18   indicate to you the likelihood that out-of-spec Digitek
19   made it to the hands of consumers, okay, hands of
20   consumers, not rejected at the plant.
21   A    Separate from my feeling that there was a
22   good possibility that some might, I haven't seen a
23   document that indicated that there was.  But what I'm
24   looking at is not the quantity.
25        You could show me a hundred more analytical