# AMENDED EXHIBIT E

## Part 1

## Summary of Key Karen Frank Testimony

Karen Frank was the PSC's expert on pharmacovigilance. That is the specialty of evaluating complaints made by hospitals, doctors, and patients about a drug (adverse event reports) to assess whether they signal a problem with the product. Her role was to comment on the adequacy of Actavis' pharmacovigilance process and any signal detection for Digitek®. (K. Frank dep. @ 70).

As a starting place, the FDA has never found that there was a signal of problems with Digitek®. Despite Form 483s and warning letters on other regulatory issues, there are none on this topic. In 2009, on its website, the FDA specifically discussed the Digitek® recall and said:

> Since the detection of the manufacturing problem, FDA has been actively engaged with this company to ensure that **ALL** potentially affected amounts of Digitek® tablets have been recalled. In our best judgment, given the very small number of defective tablets that may have reached the market and the lack of reported adverse events before the recall, harm to patients was very unlikely.

See "Facts and Myths About Generic Drugs," July 9, 2009, FDA website, available at http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/Understa ndingGenericDrugs/ucm167991.htm, attached hereto.

If Actavis produced substantial quantities of defective Digitek®, there would have been an unusual number of cases of digoxin toxicity somewhere in the United States. The Plaintiffs' general causation expert, Dr. Semigran, was unaware of any reported literature from any source saying there was. See M. Semigran dep. @ 23; see also D. Bliesner dep. @ 207-208; J. Farley dep. @ 368-369; M. Kenny dep. @180; D. Nelson @ 29, 54.

So, did Karen Frank find some hidden signal in the adverse event reporting data that Actavis supposedly ignored? No.

First, she did not even come up with her own opinions.  The PSC told her what they wanted, and she tried to support it.  (K. Frank dep. @ 247-250).  Second, despite being asked about signal detection, the PSC did not give her any information that would allow her to perform such an analysis.  (K. Frank dep. @ 70, 72-74).  Third, in her view, while the PSC spent "lots" of time in deposition with Actavis company witnesses on general regulatory compliance issues, there was little specific to Digitek®.  She was, therefore, "unable to subset out information on the systems specifically for Digitek®."  (K. Frank dep. @ 17-20).  Fourth, because of the first three issues, Dr. Frank became very concerned about whether her "opinions" were even supported by sufficient data.  (K. Frank dep. @ 83-85).  Finally, as a result, she did not even fully stand by her report.  (K. Frank dep. @ 219-221).

Imanage\073021.00003 1\1224323.1-MOR



# FDA U.S. Food and Drug Administration

Home> Drugs> Resources for You> Information for Consumers (Drugs)

## Drugs

### Facts and Myths about Generic Drugs

Today, 7 in 10 prescriptions filled in the United States are for generic drugs. This fact sheet explains how generic drugs are made and approved and debunks some common myths about these products.

**FACT: FDA requires generic drugs to have the same quality and performance as the brand name drugs.**

- When a generic drug product is approved, it has met rigorous standards established by the FDA with respect to identity, strength, quality, purity and potency. Some variability can and does occur during manufacturing, for both brand name and generic drugs. When a drug, generic or brand name, is mass produced, very small variations in purity, size, strength and other parameters are permitted. FDA puts limits on how much variability in composition or performance of a drug is acceptable.
- Generic drugs are required to have the same active ingredient, strength, dosage form, and route of administration as the brand name (or reference) product. Generic drugs do not need to contain the same inactive ingredients as the brand product.
- Through review of bioequivalence data, FDA assures that the generic product will perform the same as its respective brand name (or reference product. This standard applies to all generic drugs, whether immediate or controlled release.
- A generic drug must be shown to be bioequivalent to the reference drug; that is, it must be shown to give blood levels that are very similar to those of the reference product. If blood levels are the same, the therapeutic effect will be the same. In that case, there is no need to carry ou a clinical effectiveness study and they are not required.
- All generic manufacturing, packaging and testing sites must pass the same quality standards as those of brand name drugs and the generic products must meet the same exacting specifications as any innovator brand name product. In fact, many generic drugs are made in the same plants as innovator brand name drug products.
- If an innovator of a brand name drug switches drug production to an alternative manufacturing site, or they change formulation of their brand name drug, these companies are held to the same rigorous manufacturing requirements as those that apply to generic drug companies.

**FACT: Research shows that generics work just as well as brand name drugs.**

- A recent study evaluated the results of 38 published clinical trials that compared cardiovascular generic drugs to their brand-name counterparts. There was no evidence that brand-name heart drugs worked any better than generic heart drugs. [Kesselheim et al. Clinical equivalence of generic and brand-name drugs used in cardiovascular disease: a systematic review and meta-analysis. JAMA. 2008;300(21) 2514-2526].

**FACT: When it comes to price, there is a big difference between generic and brand name drugs. On average, the cost of a generic drug is 80 to 85% lower than the brand name product.**

- An IMS National Prescription Audit shows that a typical formulary now charges $6 for generic medications, $29 for preferred branded drugs, and $40 or more for non-preferred branded drugs. [Aitken et al. Prescription drug spending trends in the United States: looking beyond the turning point. Health Aff (Millwood). 2009;28(1):w151-60].
- Independent research has shown that total prescription drug expenditures in the United States only increased by 4.0% from 2006 to 2007, wit total spending rising from $276 billion to $287 billion. This is a sharp decrease from the 8.9% growth rate observed in prescription drug expenditures in 2006. One factor cited as a reason for the slowdown is an increase in availability and use of generic drugs [Hoffman et al. Projecting future drug expenditures--2009. Am J Health Syst Pharm. 2009;66(3):237-57].

**Recently, some misinformation has raised concerns over generic drugs. Below are some common myths in circulation.**

**MYTH: FDA lets generic drugs differ from the brand name counterpart by up to 45 percent.**

**FACT: This claim is false. Anyone who repeats this myth does not understand how FDA reviews and approves generic drugs.**

- FDA recently evaluated 2,070 human studies conducted between 1996 and 2007. These studies compared the absorption of brand name and generic drugs into a person's body. These studies were submitted to FDA to support approval of generics. The average difference in absorption into the body between the generic and the brand name was **only 3.5 percent** [Davit et al. Comparing generic and innovator drugs: a review o 12 years of bioequivalence data from the United States Food and Drug Administration. Ann Pharmacother. 2009;43(10):1583-97]. Some generics were absorbed slightly more, some slightly less. This amount of difference would be expected and acceptable, whether for one batch of brand name drug tested against another batch of the same brand, or for a generic tested against a brand name. In fact, there have been studies in which branded drugs were compared with themselves as well as with a generic. As a rule, the difference for the generic-to-brand comparison was about the same as the brand-to-brand comparison.
- Any generic drug modeled after a single, brand name drug (the reference) must perform approximately the same in the body as the brand name drug. There will always be a slight, but not medically important, level of natural variability – just as there is for one batch of brand name drug to the next.

**MYTH: People who are switched to a generic drug are risking treatment failure.**

**FACT: There is no evidence for this claim. Treatment failures can and do occur when taking generic or brand name drugs. If someone is switched to a generic drug around the time they are relapsing, they may attribute the problem to the switch.**

- Many people who have recovered from major depression have a relapse despite continued treatment. These relapses have been shown in trials of long-term therapy. [Byrne and Rothschild. Loss of antidepressant efficacy during maintenance therapy: possible mechanisms and treatments. J Clin Psychiatry. 1998;59(6):279-88].
- Many people who are on a seizure medications re-experience a seizure despite continued treatment. [Randomised study of antiepileptic drug withdrawal in patients in remission. Medical Research Council Antiepileptic Drug Withdrawal Study Group. Lancet. 1991;337(8751):1175-80].
- A percentage of people will re-experience gastric ulcers, despite an initial, positive response to and continued treatment with prescription strength antacids (cimetidine tablets; http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=8131#nlm34067-[1]g).

**MYTH: Generic drugs cost less because they are inferior to brand name drugs.**

**FACT: Generic manufacturers are able to sell their products for lower prices, not because the products are of lesser quality, but becaus generic manufacturers generally do not engage in costly advertising, marketing and promotion, or significant research and development.**

- When a brand name drug comes off patent and generic drugs are permitted to compete with the brand name drug, the generic products compete by offering lower prices. Unlike the manufacturers of brand name drugs, generic drug companies do not have significant expenses to recoup for advertising, marketing and promotion, or research and development activities.

**MYTH: There are quality problems with generic drug manufacturing. A recent recall of generic digoxin (called Digitek) shows that generic drugs put patients at risk.**

**FACT: FDA's aggressive action in this case demonstrates the high standards to which all prescription drugs – generic and brand name - are held.**

- In March 2008, FDA performed a scheduled inspection of the Actavis production facility and identified products that were not manufactured to required specifications over a period of time extending back to the year 2006. Included in this list of products was one particular lot of Digitek.
- Actavis detected a very small number of oversized tablets in this lot (specifically, 20 double-sized tablets in a sample of approximately 4.8 million tablets).
- Although Actavis attempted to remove the affected Digitek tablets through visual inspection, FDA determined that this method of removal was inadequate to assure the product's quality and consistency in accordance with the current Good Manufacturing Practice (cGMP) regulations.
- Since the detection of the manufacturing problem, FDA has been actively engaged with this company to ensure that **ALL** potentially affected lots of Digitek tablets have been recalled. In our best judgment, given the very small number of defective tablets that may have reached the market and the lack of reported adverse events before the recall, harm to patients was very unlikely.
- FDA takes action whenever we find that a drug manufacturer is not following cGMPs. Over the last ten years, FDA has taken enforcement action against many brand name and generic firms for failing to meet FDA manufacturing quality standards.

**MYTH: FDA's enforcement action against the generic drug company Ranbaxy demonstrates quality problems with imported generic drugs.**

**FACT: FDA's action demonstrates FDA's commitment to safe generic drugs.**

- FDA has taken several regulatory actions against the generic drug manufacturer Ranbaxy, on the basis of problems at two of Ranbaxy's manufacturing facilities. Ranbaxy is one of many non-U.S. based generic and brand drug manufacturers.
- On Sept. 2008, the FDA issued two warning letters and instituted an Import Alert barring the entry of all finished drug products and active pharmaceutical ingredients from Ranbaxy's Dewas, Paonta Sahib and Batamandi Unit facilities due to violations of U.S. cGMP requirements. That action barred the commercial importation of 30 different generic drugs into the United States and remains in effect today (http://www.fda.gov/NewsEvents/NewsRoom/PressAnnouncements/ucm149532.htm[2]).
- Subsequent FDA investigations also revealed a pattern of questionable data raising significant questions regarding the reliability of certain generic drug applications from Ranbaxy.
- To address the allegedly falsified data, the FDA has invoked its Application Integrity Policy (AIP) against the Paonta Sahib facility. When the AIP is implemented, the FDA stops all substantive scientific review of any new or pending drug approval applications that contain data generated by the Paonta Sahib facility. This AIP covers applications that rely on data generated by the Paonta Sahib facility only.
- In the fiscal year 2008, FDA performed 2,221 drug-related inspections. FDA takes many different enforcement actions, not just against generic drug manufacturers. For a list of enforcement actions in the fiscal year 2008, see http://www.fda.gov/downloads/ICECI/EnforcementActions/EnforcementStory/UCM129812.pdf[3]. It is FDA's responsibility to ensure that the drugs people use, generic or brand name, are safe and effective.

**MYTH: Brand name drugs are safer than generic drugs.**

**FACT: FDA receives very few reports of adverse events about specific generic drugs. Most reports of adverse events are related to side effects of the drug ingredient itself.**

- The monitoring of postmarket adverse events for all drug products, including generic drugs, is one aspect of the overall FDA effort to evaluate the safety of drugs after approval. In most cases, reports of adverse events generally describe a **known reaction** to the active drug ingredient.

**MYTH: FDA does not care about concerns over generic drugs.**

**FACT: FDA is actively engaged in making all regulated products – including generic drugs – safer.**

- We are aware that there are reports noting that some people may experience an undesired effect when switching from brand name drug to a generic formulation or from one generic drug to another generic drug. Evidence indicates that if problems with interchangeability of drug formulations occur, they occur only for a very small subset of people.
- FDA is encouraging the generic industry to investigate whether, and under what circumstances, such problems occur. The Agency does not have the resources to perform independent clinical studies, and lacks the regulatory authority to require industry to conduct such studies. FDA will continue to investigate these reports to ensure that it has all the facts about these treatment failures and will make recommendations to healthcare professionals and the public if the need arises.

Links on this page:

1. http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=8131#nlm34067-
2. http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2009/ucm149532.htm
3. http://www.fda.gov/downloads/ICECI/EnforcementActions/EnforcementStory/UCM129812.pdf

Marc J. Semigran, M.D.                          June 23, 2010

Page 1

Volume: I

Pages: 1-132

Exhibits: See Index

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MDL CASE NO. 2:09-cv-121

MDL 1968

IN RE: DIGITEK PRODUCT LIABILITY LITIGATION

* * * * * * * * * * * * * * * * * *

BOBBY R. MILLIGAN, ET AL.,                    :

　　　　　PLAINTIFFS                            :

                                              :

　v.                                          :

                                              :

ACTAVIS GROUP HF, ET AL.,                     :

　　　　　DEFENDANTS                            :

* * * * * * * * * * * * * * * * * *


DEPOSITION OF MARC J. SEMIGRAN, M.D., a witness
called on behalf of the Defendant, Actavis Group, HF,
pursuant to the provisions of the Federal Rules of
Civil Procedure, before Lisa McDonald Valdario, (CSR
#130093), a Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, held at the Holiday Inn Boston at
Beacon Hill, 5 Blossom Street, Boston, Massachusetts
02114, on Wednesday, June 23, 2010, commencing at
10:04 a.m.

1      with some number of people, right?

2  A   Correct.

3  Q   Did you ever do any study of the Mass. General

4      statistics to see if there was any spike in

5      diagnoses of digoxin toxicity in 2005, 6, 7 or 8?

6  A   Did not.

7  Q   Are there people at Mass. General who watch for

8      trends like that?

9  A   There is a quality assurance program.  I am not

10     sure.  I do not know if that's one of their

11     charges.

12 Q   Well, given your administrative positions and your

13     clinical positions, if there had been some spike

14     in the diagnoses of digoxin toxicity in those

15     years, do you think that's something that would

16     have come to your attention?

17 A   I can only say possibly.  It's a large

18     organization, and often times there are things I

19     think should have come to my attention earlier

20     than they do, that I eventually find out about,

21     so.

22         There are probably things that I might think

23     should come to my attention that do not.

24 Q   Your CV, because of its length, was a bit much to

25     get through all the publications.  Have you ever

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

MDL NO: 1968


IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION,
_____/


                    100 N. Tampa Street
                    Suite 2900
                    Tampa, FL 33602
                    February 18, 2011
                    at 8:15 a.m.



     VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.



     Taken on behalf of the Defendants before

PHILIP RYAN, RPR, Court Reporter, Notary Public in

and for the State of Florida at Large, pursuant to

Defendant's Notice of Taking Deposition in the

above cause.

Page 207

1  a specific problem?  I'm sorry a specific                    01:52

2  product.                                                     01:52

3      A.    Well, I don't work for the FDA and I'm             01:52

4  not going to speak for the FDA, but if they                  01:52

5  find -- go back look at the EIRs and see that                01:52

6  there are all kinds of problems with respect to              01:52

7  manufacturing records and lack of manufacturing              01:52

8  records, validated processes and things like                 01:52

9  that.  So that's what they do.                               01:52

10     They put -- if the question as to the                    01:52

11 integrity of the manufactured product, then, you             01:52

12 know, they take action.                                      01:52

13     Q.    What question were you just answering?             01:52

14 I move to strike that as completely                           01:52

15 non-responsive.                                               01:52

16     Were you talking about Activis or their                  01:52

17 records somehow?                                              01:52

18     A.    I'm talking about the records that the            01:52

19 FDA reviewed and their systems and places that               01:52

20 will show up on the establishment inspection                 01:52

21 report.                                                      01:52

22     Q.    Are you an expert in GMP compliance or            01:52

23 not?                                                          01:53

24     A.    Am I am, sir.                                      01:53

25     Q.    Okay.  I'm asking you a question about            01:53

Page 208

1   FDA practice that ought to be right down the                01:53

2   middle of that expertise.  I don't know why you             01:53

3   don't want to answer it, but -- I know exactly why          01:53

4   you don't want to answer it but I'm going to keep           01:53

5   asking it until you do.                                     01:53

6          MR. KERENSKY:  Objection, form.                      01:53

7   BY MR. ANDERTON:                                            01:53

8      Q.    Okay.  How would the FDA -- let's                   01:53

9   assume, Dr. Bliesner, that the FDA was doing an             01:53

10  inspection and uncovered a GMP practice that they           01:53

11  believed was deficient.                                     01:53

12     A.    Okay.                                               01:53

13     Q.    That happens; right?                                01:53

14     A.    Yes, it does.                                       01:53

15     Q.    That's what you charge your clients to              01:53

16  assess; right?                                               01:53

17     A.    Yes.                                                01:53

18     Q.    If the FDA wanted to determine whether             01:53

19  that GMP deficiency impacted a particular product,          01:53

20  how would they do that?                                     01:53

21     A.    They may or may not start looking at all           01:54

22  of the quality systems that are in there.  I'm              01:54

23  just telling you how they do it.  They could stop           01:54

24  when they see significant deficiencies and there            01:54

25  is doubt in their mind they just stop.  That's              01:54

Page 327

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT LIABILITY

LITIGATION

MDL NO. 1968

_____


VOLUME II


The continued videotaped deposition of JAMES J.
FARLEY taken by counsel for the Defendants, Actavis
Totowa, LLC, Actavis, Inc., and Actavis Elizabeth, LLC,
pursuant to notice and by agreement of counsel, reported
by Angela S. Garrett, CSR, RPR, B-2407, at the Embassy
Suites, 145 Mulberry Boulevard, Savannah, Georgia, on
January 19, 2011, commencing at 9:03 a.m.

Page 368

1          Q    How about 483s?

2          A    Yes.

3          Q    Warning letters?

4          A    Yes.

5          Q    Recalls?

6          A    Yes.

7          Q    Have you seen any -- have you -- I'm

8    sorry.  Let me rephrase that.

9          Have you been provided with any scientific

10   information whatsoever that there was a spike in Digoxin

11   toxicity at hospitals, nursing homes, poison control

12   centers or outpatient facilities in -- at any point

13   between 2005 and 2008?

14         A    I'm not sure what you mean by Digoxin

15   toxicity.

16         Q    Do you have any idea what that means?

17         A    You mean OD, overdosing, or too much

18   strength?  I mean, Digoxin when used properly is not

19   toxic.  And to say Digoxin toxicity, if you mean

20   over-strength tablets -- I'm not -- let me not put

21   words -- please tell me again.

22         Q    Digoxin toxicity simply for the purpose of

23   my question is somebody who has a toxic reaction to

24   Digoxin, whether the -- regardless of what the dose is.

25   Okay?

Page 369

1        What I'm asking you is whether you've been

2    provided with any scientific proof that there was a

3    spike in Digoxin toxicity at any sort of medical

4    facility in the United States between 2005 and 2008.

5            A    No.

6                MR. ERNST:  I'm going to object, vague,

7        ambiguous, calls for speculation.

8                MR. KERENSKY:  When you get to a breaking

9        point I'd like to take a break.

10               MR. ERNST:  Scientific proof is not a

11       standard.

12               MR. MORIARTY:  Now is fine.

13               THE VIDEOGRAPHER:  Okay.  We're going off

14       the --

15               MR. MORIARTY:  Mike wants to take a

16       break, Don.  So we're going to do that.

17               THE VIDEOGRAPHER:  Going off record.

18       This is the end of Tape No. 1.  9:55.

19           (A brief recess was taken.)

20               THE VIDEOGRAPHER:  Okay.  We're back on

21       record.  It's 10:11 and this is the beginning of

22       Media Unit No. 2.

23    BY MR. MORIARTY:

24           Q    Mr. Farley, this is Exhibit 57 from your

25    first deposition.  This is a Form 483, is it not?

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MDL No. 1968


IN RE:                          VIDEOTAPED

DIGITEK PRODUCT                 DEPOSITION OF:

LIABILITY LITIGATION            MARK G. KENNY

                                VOLUME I

- - - - - - - - - - -


        TRANSCRIPT of the stenographic notes of
the proceedings in the above-entitled matter, as
taken by and before CAROL ANN SHEPARD, a Certified
Court Reporter of the State of New Jersey, held at
the MARRIOTT NEWARK AIRPORT HOTEL, 1 Hotel Road,
Newark, New Jersey, on Tuesday, June 29, 2010,
commencing at 8:30 in the forenoon.

Page 180

1    do with the information.

2         Q.    Have you read the depositions of any

3    doctors --

4         A.    No.

5         Q.    -- who have been taken in this case?

6         A.    No.  I have no interest.

7         Q.    Do you know from any independent

8    research whether any hospital reported an increased

9    incidence of Digoxin toxicity in the years 2005,

10   '06, '07 or '08?

11        A.    I did no investigation of any sort, so

12   the answer is I know of nothing, because I didn't do

13   anything.

14             Does that make sense?

15        Q.    All right.  Let me get back to some

16   statistics that I was asking you about before.

17             Of this 688.2 million tablets that were

18   part of the recall, do you have any opinion, to a

19   reasonable probability, as to what percentage of

20   them were outside the USP specifications on the low

21   side?

22        A.    On the low side?

23             I have no way of knowing that.

24        Q.    Do you have any opinion, to a

25   probability, of what percentage of those tablets

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

*   *   *

IN RE: DIGITEK PRODUCT LIABILITY

LITIGATION                        MDL NO. 1968

*   *   *

Deposition of EJORN D. NELSON, PHARM.D.,
Witness herein, called by the Defendants for
cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Mary Jo Stevens, a
Notary Public in and for the State of Ohio, at the
Doubletree Cincinnati Airport, 2826 Terminal
Drive, Hebron, Kentucky, on Tuesday, the 22nd day
of June, 2010, at 8:22 a.m.

*   *   *

Ejorn D. Nelson, PHARM.D                              June 22, 2010

Page 29

1    thing as official consulting privileges.   What

2    I know is that since 1972 physicians from that

3    hospital and other hospitals routinely ask for

4    and receive a consultation and advice from me

5    and other specialists in toxicology at the

6    poison center.

7              Q.   Do you officially take call at any

8    hospitals?

9              A.   No.

10             Q.   Have you ever studied any of the

11   University of Cincinnati Medical Center

12   statistics to see if there was a spike in

13   complaints about digoxin any time between 2005

14   and the first half of 2008?

15             A.   No.

16             Q.   In looking at Exhibit 41, your CV,

17   I did not see that any of the articles that you

18   published were directly about digoxin.   Were

19   there any?

20             A.   Yes.

21             Q.   Tell me which ones are directly

22   about digoxin.

23             A.   Okay.   Page nine, number three.

24             Q.   Let's stop there for a second.

25   Does that just have a section about digoxin --

Page 54

1    reactions.  If you give a drug and something

2    peculiar happens at the same time, you have a

3    high index of suspicion that giving the

4    medication might have had something to do with

5    it.  It is a complex judgment-heavy area of

6    undertaking and it requires some experience and

7    knowledge of the patient's pathophysiologic

8    condition and the effects of the medication --

9    of medications that the patient is taking.

10            Q.    And you certainly want to rule out

11   other potential factors of the adverse event,

12   correct?

13            A.    If possible, yes.

14            Q.    I asked you before whether you had

15   studied the University of Cincinnati's

16   statistics and whether they had had a spike of

17   digoxin.  Did you do any study like that at the

18   poison center?

19            A.    No.

20            Q.    Do you know how many calls the

21   poison center received after the April 25th

22   recall regarding Digitek?

23            A.    I do not.

24            Q.    Do you know how many calls the

25   poison center received prior to April 25th,

Karen A. Frank, M.D.       Videotaped              June 30, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE:   DIGITEK PRODUCT
         LIABILITY LITIGATION

                              MDL NO. 1968



            Videotaped deposition of KAREN A. FRANK,

M.D., taken at the law offices of SEGAL McCAMBRIDGE

SINGER & MAHONEY, LTD., 1818 Market Street, Suite

2600, Philadelphia, Pennsylvania, on Wednesday,

June 30, 2010, commencing at 9:10 a.m., before Dianna

R. Pugliese, a Registered Merit Reporter, Certified

Realtime Reporter, Certified Shorthand Reporter (NJ

& DE), and Notary Public, pursuant to notice.

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

**Page 2**

```
 1   APPEARANCES
 2   FOR THE PLAINTIFF:
 3     Mr. Fred Thompson, III
       Motley Rice LLC
 4     28 Bridgeside Boulevard
       Mount Pleasant, South Carolina 29464
 5     843-216-9118
 6
 7   FOR THE DEFENDANTS:
 8     Mr. Richard A. Dean
       Tucker Ellis & West LLP
 9     1150 Huntington Building
       925 Euclid Avenue
10     Cleveland, Ohio  44115-1475
       216-696-2137
11
12     Ms. Monee A. Takla
       Tucker Ellis & West LLP
13     515 South Flower Street, 42nd Floor
       Los Angeles, California  90071
14     213-430-3378
15
       Mr. Harvey L. Kaplan
16     Shook, Hardy & Bacon, LLP
       255 Grand Boulevard
17     Kansas City, Missouri  64108
       816-474-6550
18
19   ALSO PRESENT:
       David Williams, Video Operator
20
           EXAMINATION INDEX
21
     KAREN A. FRANK, M.D.
22     BY MR. DEAN . . . . . . . . . .   5
       BY MR. KAPLAN . . . . . . . . .  247
23     BY MR. THOMPSON . . . . . . . .  268
       BY MR. KAPLAN . . . . . . . . .  286
24     BY MR. DEAN . . . . . . . . . .  297
       BY MR. KAPLAN . . . . . . . . .  302
25
```

**Page 3**

```
 1            EXHIBIT INDEX
 2                                MARKED
     D
 3
     250  Digitek Expert Table of Contents with   45
 4       18 items listed
 5   251  Table of Contents with 11 items         45
         listed
 6
     252  Handwritten notes by Dr. Frank, four    47
 7       pages
 8   253  Handwritten notes by Dr. Frank, 24      47
         pages
 9
     254  Handwritten notes by Dr. Frank, one     47
10       page
11   255  Index titled Documents Sent to Karen    53
         Frank, two pages
12
     256  Handwritten notes of Karen Frank, one   55
13       page
14   257  Engagement Agreement with Smart         58
         Consulting Group, LLC, six pages
15
     258  Digitek Case Overview, 11 pages         59
16
     259  Handwritten notes by Dr. Frank, one     60
17       page
18   260  Handwritten notes by Dr. Frank, one     60
         page
19
     261  Color photocopy of Dr. Frank's report   69
20       titled Digitek Recall, Assessment of
         Pharmacovigilance Systems and Risk
21       Communication, Background, Analysis
         and Conclusions, 6/15/2010
22
23
24
25
```

**Page 4**

```
 1        COURT REPORTER:  Are there any
 2   stipulations for the record?
 3        MR. DEAN:  No.
 4        VIDEO OPERATOR:  We're now on the video
 5   record.
 6        This is the videotape deposition of
 7   Karen A. Frank, M.D., taken by the Defendant, In Re:
 8   Digitek Product Liability Litigation, in the United
 9   States District Court for the Southern District of
10   West Virginia, Charleston Division, held at the
11   offices of Segal McCambridge Singer & Mahoney, Ltd.,
12   1818 Market Street, Philadelphia, Pennsylvania, on
13   Wednesday, June 30, 2010.
14        The time is 9:10 a.m.
15        I am David Williams, the videographer.
16   The court reporter is Dianna Pugliese.  We are from
17   the firm of Rennillo Court Reporting in Cleveland,
18   Ohio.
19        Counsel, will you now please introduce
20   yourselves.
21        MR. DEAN:  My name is Richard Dean.  I
22   represent the Actavis defendants.
23        MS. TAKLA:  Monee Takla for the Actavis
24   defendants.
25        MR. KAPLAN:  Harvey Kaplan, Shook, Hardy
```

**Page 5**

```
 1   & Bacon, for Mylan.
 2        MR. THOMPSON:  Fred Thompson, Motley
 3   Rice, for Plaintiffs.
 4        VIDEO OPERATOR:  The reporter will now
 5   swear in the witness.
 6        KAREN A. FRANK, M.D., having been duly
 7   sworn, was examined and testified as follows:
 8            EXAMINATION
 9   BY MR. DEAN:
10     Q.    Good morning.
11     A.    Good morning.
12     Q.    Would you state your full name for the
13   record, please?
14     A.    Karen Ann Frank.
15     Q.    And it's Dr. Frank; correct?
16     A.    Yes.
17     Q.    Dr. Frank, we met before, but my name is
18   Richard Dean.
19        Have you ever had your deposition taken
20   before?
21     A.    No.
22     Q.    So this is your very first deposition
23   ever; correct?
24     A.    Yes.
25     Q.    Have you ever testified in a court in
```

2 (Pages 2 to 5)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

---

Page 6

1   front of a jury before?
2      A.   No.
3      Q.   Has Mr. Thompson or someone else on
4   behalf of the plaintiffs had a chance to tell you
5   about the deposition process a little bit?
6      A.   Yes.
7      Q.   Okay.  Well, let me just go over a few
8   ground rules.
9           I'm going to be asking you some
10  questions today, so it's very important that the two
11  of us communicate.  So if I ask you a question that
12  you do not understand, will you tell me that?
13     A.   Yes.
14     Q.   Your responses have to be verbal, out
15  loud.  We can't -- this court reporter, at least,
16  can't take the shaking or nodding of the head in a
17  particular direction.
18          So will you speak up and use whatever
19  words you want to use, but please speak up and give
20  your answer verbally?
21     A.   Yes.
22     Q.   And I understand you're not -- you're a
23  little bit under the weather today?
24     A.   Yes.
25     Q.   At any point if you need a break for any

Page 7

1   reason, just let us know and we'll take a break.
2   Okay.
3      A.   Uh-huh.
4      Q.   Yes?
5      A.   Yes.
6      Q.   What have you done to prepare for the
7   deposition today?
8      A.   I was sent a set of volumes of printed
9   material.  I went through them generally, and then I
10  went through them looking for white space or blanks
11  with information that I thought should be there that
12  was not there.
13          I met with Pete Miller and Megan Carter
14  over lunch, and I presented them with a list of
15  documents that I would liked to have seen, and they
16  referenced it against what was available in discovery
17  and they sent me two more printed volumes, electronic
18  copies of everything I had electronic copies of.
19          And then one final Establishment
20  Inspection Report.
21          MR. KAPLAN:  One final what?
22          THE WITNESS:  Establishment Inspection
23  Report.
24  BY MR. DEAN:
25     Q.   My question was, what you did to get --

Page 8

1   not to write the report, but to get ready for the
2   deposition.
3           What is it that you did to get ready for
4   the deposition today?
5      A.   I reread these two documents yesterday.
6      Q.   And by these two documents, for the
7   record, you are referring to what I've marked already
8   as Defendant's Exhibits 49 and 50; is that correct?
9      A.   Yes.  I went back and reviewed to
10  refresh my memory.
11     Q.   Well, actually, 40 -- just so we're
12  clear, 49 is a copy of your resume; correct?
13     A.   No.
14     Q.   No?
15     A.   This -- what I reviewed was a copy of
16  the Conclusion.
17     Q.   Right.
18     A.   And I went through this document.  I
19  can't say that I went through it a hundred percent.  I
20  went through key sections where I wanted to refresh my
21  memory.
22     Q.   And for the record, what you have is the
23  long document we've marked as Exhibit 50 to this
24  deposition; is that correct?
25     A.   Yes.

Page 9

1      Q.   And I compared them before.  Your
2   document has 70 pages and Exhibit 50 also has 70
3   pages, so they are the same.
4      A.   There should be no alterations between
5   what you received and what I printed.
6      Q.   So what you did in preparation for the
7   deposition was to review what we marked as Exhibit 50;
8   correct?
9      A.   I don't know why this is not marked as
10  an exhibit, because this is the key opinion.  This was
11  at one point one document.  And at the request of Pete
12  Miller, it was split.  So he asked me to address two
13  separate issues --
14     Q.   Let me just interrupt.  I won't do that
15  often, but I want to make sure we get this exhibit
16  marked correctly.
17          The shorter document that you have in
18  front of you is -- are you telling me that's not
19  included in Exhibit 50?
20     A.   Yes.  It is not included in Exhibit 50.
21     Q.   Okay.  Can I see it, please?
22     A.   Yes.  (Document provided.)
23     Q.   Dr. Frank, I have just reviewed the
24  first 11 pages of Exhibit 50 and it -- it would --
25  those first set of pages would appear to be exactly

3 (Pages 6 to 9)

Karen A. Frank, M.D.      Videotaped        June 30, 2010

---

Page 10

1    what is in the shorter document.
2        A.    Okay.
3        Q.    Is there a difference?
4        A.    Well, these were sent to Pete Miller as
5    two separate documents.  It may be that he combined
6    it.  He asked me to separate them.  I actually started
7    with an assessment of the pharmacovigilance system, an
8    assessment of the risk communication.
9            He asked me to combine them all, the
10   opinions, as a conclusion.
11           Then he said, this is too long.  We want
12   to take out this supporting document where I
13   documented verbatim things from the FDA inspections
14   and my comments that served as the basis for the
15   opinion.
16           And this short document became the
17   opinion and this longer document became the supporting
18   evidence.
19           He may have, in the process of
20   submitting it electronically, been forced to recombine
21   them so that they were in this order.
22       Q.    Just so we're -- just so the record is
23   clear --
24           MR. THOMPSON:  Yeah.  Let's --
25   BY MR. DEAN:

---

Page 11

1        Q.    Could you look at -- could you,
2    yourself --
3            MR. THOMPSON:  Yeah, could I -- let me
4    just make a short statement, and that is, everything
5    Dr. Frank has said is true and accurate.
6            Everything you said is true and
7    accurate.  That she submitted a -- the lengthy
8    document.
9            We determined and we believe that for
10   the ease of having a report and a supplement, that the
11   thing to do would be to have it as a separate with a
12   supplement.
13           But in terms of the report, the
14   connection or disconnection is irrelevant.
15           And so what you have, I believe, is what
16   Dr. Frank has as the report with, immediately
17   following it, this lengthy discussion item by item as
18   sort of a supplement or a supporting information.
19           So I think that it's tempest in a
20   teapot.  In Dr. Frank's mind, she separated them.  In
21   submission, they were submitted --
22           MR. DEAN:  Together.
23           MR. THOMPSON:  -- as a report with
24   supplement, so...
25           THE WITNESS:  Electronically on this

---

Page 12

1    there is the one combined document and then the two
2    separate documents that were sent to Pete Miller by
3    e-mail.
4            And there are copies, exact copies of
5    this flash drive, two made, if you need to verify
6    that.
7    BY MR. DEAN:
8        Q.    So I want to get back to what you did to
9    prepare for the deposition besides read -- read what
10   we've marked as Exhibit 50, or the first 11 pages of
11   Exhibit 50.
12       A.    Well, actually, it was -- it was the
13   great deal of this.  I didn't read all the verbatim
14   quotes.  I went mostly through my comments in this
15   document.  But, no, I did not go back to the original
16   binders yesterday.
17       Q.    Okay.
18       A.    I only went through the original binders
19   to extrapolate this, because I anticipated that this
20   would ground my statements very carefully.  The --
21   what actually happened over the course of several
22   years at this company is somewhat complex.
23           And in the course of preparing this
24   document, I laid out a timeline of events and the
25   observations of the inspectors.

---

Page 13

1            Because most of what I was presented was
2    the 483s and the Establishment Inspection Reports were
3    the paucity of what you might call primary.
4            MR. THOMPSON:  Doctor, let me do some
5    impermissible coaching, and that is, if I thought that
6    it would shorten the deposition, I would let you go
7    forward with those explanations.
8            But I'm afraid that we're going to get
9    back to that --
10           MR. DEAN:  Right.
11           MR. THOMPSON:  -- over the course of the
12   day.
13           THE WITNESS:  Okay.
14           MR. THOMPSON:  Right now, I think what
15   he wants to know is simply what was done to prepare
16   for this deposition, and he probably wants to know
17   about our meeting last night and our meeting this
18   morning.
19           THE WITNESS:  Okay.
20           MR. THOMPSON:  And the review of the
21   exhibit from the deposition, and I don't recall the
22   exhibit number, but it was the FDA document, the fact
23   sheet.
24           And I think that once we say that, that
25   will be exhaustive.

4 (Pages 10 to 13)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

**Page 14**

1    THE WITNESS: Okay. I'm sorry.
2    MR. DEAN: Thank you, Mr. Thompson.
3    BY MR. DEAN:
4    Q.   Go ahead.
5    A.   Do I give him the details of the meeting
6    last night?
7    Q.   Well, let's just do it this way. Let me
8    ask a question, I'll try to have a focused question,
9    you give a focused answer.
10       Mr. Thompson is right, we'll get back to
11   the substance of your opinions much later -- or later
12   this morning. But for right now, let's just -- I'll
13   give you a very short question, you try to give me a
14   direct answer to the question. Okay?
15   A.   Okay.
16   Q.   So I take it, in the last few days, you
17   have met with Mr. Thompson; is that correct?
18   A.   Yes.
19   Q.   Did you meet with any other attorneys
20   for the plaintiffs in the last few days?
21   A.   On the phone were Megan Carter and Pete
22   Miller.
23   Q.   And when did -- and was Mr. Thompson on
24   that call?
25   A.   Yes. He was chairing the call.

**Page 15**

1    Q.   And when was that?
2    A.   That was last evening.
3    Q.   Was that -- within the last week, was
4    that the first time you met with any attorney
5    representing the plaintiffs?
6    A.   Yes.
7    Q.   How long did that call last?
8    A.   Approximately two hours. It was
9    intermittent. It was interrupted. It was scheduled
10   to last from 5:30 to 7:30.
11       I was down in the lobby at 6:30
12   expecting Mr. Miller to meet me, and at quarter of
13   6:00 I called him on his phone and he had expected me
14   to call him when I arrived. So we started late and I
15   believe we went about 15 minutes late.
16   Q.   What subjects did you discuss?
17   A.   I discussed some general opinions that I
18   had about the situation and some specific issues that
19   came from the evidence here. They presented me with
20   the issues that had come up in the depositions.
21       And we talked about how I would stick to
22   the scope of my engagement, how I would respond if the
23   questioning started to go outside of the scope of my
24   engagement.
25       They made me aware of some additional

**Page 16**

1    documents that I was not sent, that -- there was
2    suggestion that I review them last night or sometime
3    in the future to further expand the analysis.
4        There was discussion of some general FDA
5    press releases on generic drugs and their implications
6    that they may be presented to me today.
7        And there was -- there was just some
8    general coaching in how to give appropriate opinions.
9    And I believe they were very, very careful to stay
10   within bounds with coaching the witness.
11       My only other presentations such as this
12   are before FDA advisory committees, which are largely
13   data driven. They were internal, closed-door
14   presentations. And they were very carefully reviewed
15   up front. So --
16   Q.   Excuse me. I missed that. They were
17   very carefully what --
18   A.   Reviewed up front with FDA supervisors.
19   Q.   Okay.
20   A.   So this is the first time I've sat at
21   deposition. I will make a statement that I've been
22   approached about doing this work previously, maybe
23   eight years ago. People recommended --
24       MR. THOMPSON: Dr. Frank, let me ask you
25   to be responsive to Mr. Dean.

**Page 17**

1    THE WITNESS: Okay.
2    MR. THOMPSON: I think he has now
3    exhausted the -- maybe he hasn't exhausted, but we're
4    on the preparation for this deposition.
5    THE WITNESS: Okay.
6    BY MR. DEAN:
7    Q.   All right. Thank you for that answer,
8    which I think was responsive, but I want to go back
9    and ask you some follow-ups on specific things that
10   you said in that answer.
11       You said, first of all, that they --
12   "they" being the lawyers -- presented you with issues
13   that had come up in the depositions, by that I mean --
14   I'm assuming you meant depositions that have occurred
15   in the last few days?
16   A.   Yes.
17   Q.   What issues did they present you with?
18   A.   The one that really struck me was the
19   fact that the -- there was a repeated line of
20   questioning about specific information on Digitek.
21       And I responded to them that if you were
22   to look at the volumes that I reviewed several weeks
23   ago to write this document, you will see in my notes
24   in the margin, Digitek question, Digitek question.
25   Because there's not a lot of specific

5 (Pages 14 to 17)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

Page 18

1  information given on the systems that allow specific
2  analysis of the subset of data on Digitek.
3          And so I understood why your line of
4  questioning went in that direction, and we prepared me
5  to answer. And I think I can -- I've produced a
6  document that can -- is an accurate basis for any
7  answer to that.
8      Q.   I don't -- I want to follow up. You
9  said they presented you with the issue that there was
10 not much specific information on Digitek.
11         Could you be more specific about what
12 the issue was they were talking to you about?
13     A.   They didn't state that there was no
14 specific issue on Digitek. They said that your line
15 of questioning repeatedly was to ask the witnesses do
16 you have anything specific on Digitek.
17         My extrapolation was my reaction to what
18 I was given is that I was unable to subset out
19 information on the systems specifically for Digitek.
20         So when the FDA looks at noncompliance
21 with 15-day reporting, they have a sampling that
22 includes Digitek cases and non-Digitek cases.
23         I don't know how that extrapolates.
24 Nobody presented me with data from the database that
25 shows X Digitek cases over X years, the adverse event

Page 19

1  codes.
2          So I can't say that the analysis of the
3  databases or the systems was specific for Digitek. It
4  was analysis of the Actavis systems that handled all
5  of the products. Nothing was specific to Digitek.
6      MR. THOMPSON: You know, let me just
7  interrupt here. Certainly you have a right to ask
8  questions and certainly Dr. Frank has shown that she's
9  going to be meticulously responsive.
10         But if we're going to go through all
11 this again and you're going to ask the question that
12 we told her that you were probably going to ask, I'm
13 just not -- I just hate to sit through it twice.
14 BY MR. DEAN:
15     Q.   What other issues did they present you
16 with besides the one you just spoke to us about?
17     A.   I'm having trouble recalling
18 specifically. We talked a lot about my staying within
19 the scope of my engagement because --
20     Q.   I don't need to go there. I understand
21 that.
22         I just want to know, I'm interested in
23 what issues they flagged for you last night. You've
24 told me about one issue.
25         Are there any others they flagged for

Page 20

1  you?
2      A.   I need to -- I wrote notes, but I don't
3  think I have written them all down, and I don't --
4      Q.   Did you make notes at that meeting,
5  ma'am?
6      A.   Nothing -- only my to-do list for last
7  night.
8      MR. KAPLAN: Can we get a copy of that?
9      MR. DEAN: Well, let me look at it
10 first. I'm not sure we want it.
11     MR. THOMPSON: Why don't you look at it
12 before you say that.
13 BY MR. DEAN:
14     Q.  · For Mr. Kaplan's benefit, could you just
15 read what's on here so -- I don't think we're going to
16 need a copy of that.
17     A.   It says, Two flash drives, check
18 e-mail. And I don't know -- I don't know what the
19 other one says.
20         What I wanted to make sure is that I had
21 all of the required evidence that you wanted for the
22 deposition.
23     Q.   Now, let's -- thank you.
24         Now, I want to make sure you've answered
25 my question, though. I just want a listing of the

Page 21

1  issues they presented to you. You've given me one
2  issue.
3          Are there any other issues?
4      A.   They talked to me about how to respond
5  to questions that had multiple questions in one
6  question, to ask for it to be subdivided. They --
7      Q.   Excuse me. I'm not interested in their
8  instructions about how to respond to questions.
9          What I'm interested in are simply this.
10 Are there substantive issues at the beginning of the
11 meeting that they flagged for you as issues that might
12 come up in the deposition? That's all I want to know.
13     A.   At the moment, I can't remember any
14 more.
15     Q.   Okay. Thank you.
16         Now --
17     A.   I think -- I'm sorry I'm so nervous, but
18 I'm -- actually, I can't remember the specifics.
19     Q.   You'll get more -- I know at the
20 beginning this is -- you're going to be nervous.
21 You'll get comfortable.
22         And if you think of those issues later,
23 if they come back to you, we'll give you an
24 opportunity.
25     A.   Yes.

6 (Pages 18 to 21)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

Page 22

1         MR. THOMPSON: I hate to -- I hate to
2    interrupt again, but I do believe Dr. Frank did
3    mention that we read to her the FDA Generic Drug
4    Advisory.
5         MR. DEAN: I've got the list here.
6         MR. THOMPSON: Okay.
7         MR. DEAN: I'm getting there.
8         MR. THOMPSON: Okay.
9    BY MR. DEAN:
10        Q.    The next thing you mentioned when you
11   were giving me the list of what happened last night
12   was that they gave you additional documents that had
13   not been sent to you.
14            What documents did they give to you that
15   had not been sent?
16        A.    They were unable to access the server.
17   The only way to obtain some of the documents was
18   through the Citrix portal on his laptop, and that was
19   not functioning.  They were unable to download the
20   documents and send them to me by e-mail.
21            Your line of questioning along specific
22   issues for Digitek brought up issues that were already
23   of concern to me.
24            So a lot of what happened last night
25   was, I expressed my concerns and they responded to

---

Page 23

1    prepare me to address my concerns this morning.
2            And in coaching me to stay within the
3    scope of my work, there were a number of documents
4    that were not sent to me, but were sent to the other
5    witnesses, the cardiologist who looked at the medical
6    issues.
7            Even though I'm a medical doctor, I was
8    not sent a lot of these.
9            So we talked about that.  We talked
10   about my concerns with the process of discovery in
11   this case.
12        Q.    Now, let me just stop you.  You've gone
13   beyond my question.  I'm going to give you a chance to
14   tell me whatever you want to tell me, but I'd like to
15   do it in a question-and-answer fashion.
16            Did you look at any additional documents
17   last night or were you foiled by technology from being
18   able to look at additional documents?
19        A.    We were foiled by technology, except for
20   one document.
21        Q.    And what is that, ma'am?
22        A.    Which is a generic press release by the
23   FDA talking about the generics industry where they
24   read to me specific points and warned me that it may
25   be presented to me today.

---

Page 24

1         Q.    Okay.  And did you look at any
2    additional documents this morning?
3         A.    I read these this morning.
4         Q.    Read what this morning?
5            Oh, no.  I meant -- I meant additional
6    -- additional evidentiary documents, exhibits.
7         A.    No.
8         Q.    Okay.  So the only additional document
9    that you looked at in the last two days was that --
10   what you referred to as a generic press release; is
11   that correct?
12        A.    Yes.  Now --
13        Q.    Is that correct?
14        A.    Yes.  You --
15        Q.    You've answered.  Okay?  It was a very
16   simple question.
17            Let's -- let me go on and frame another
18   one for you.
19        A.    Okay.
20        Q.    I believe in your original answer to me
21   you mentioned that you discussed some FDA statements.
22            Was that just the generic statement we
23   just spoke about?
24        A.    Yes.
25        Q.    Yes?

---

Page 25

1         A.    I didn't see anything else in writing.
2         Q.    Now, about three minutes ago you said
3    that this morning you expressed your concerns about
4    some issues.
5         A.    Well, last night and this morning.
6         Q.    Okay.  And what concerns did you express
7    about issues?
8         A.    Well, I wanted to be certain that I
9    didn't violate any of my existing confidentiality
10   agreements.
11            A lot of the background I draw from has
12   to do with -- has to do with issues that I addressed
13   in pharma companies or where I had been provided
14   information from my FDA mentors about drug
15   withdrawals.
16            I know a lot about the investigations
17   that went on in some of these and they coached me how
18   to comment on this evidence without bringing in
19   evidence from other cases that would not be
20   appropriate for this deposition.
21            I expressed my other concern that when I
22   was given these documents, I went through them, I then
23   made a list of documents that I would like to have
24   seen to completely analyze what happened in the
25   company, and I turned to Pete Miller, and they were

---

7 (Pages 22 to 25)

Karen A. Frank, M.D.         Videotaped           June 30, 2010

---

### Page 26

1    concerned that the process of discovery was complete
2    and those documents were not available.
3           I did not go back and do the subsequent
4    gap analysis when they sent me the second round of
5    documents.
6           But in this document I prepared for
7    myself this morning, I tried to clearly lay out
8    what I -- what was provided to me very accurately, and
9    things that were not provided to me, like any of the
10   MHRA inspections or the responses.
11          So my view inside Actavis, from 1992,
12   from the first consent decree, to now, is mostly
13   through the eyes of the FDA inspectors and their
14   observations.
15          And my opinions can only be based on
16   what I actually saw or read.  These are secondary
17   sources.
18          I haven't seen the primary sources.  I
19   haven't seen any individual MedWatch forms.  I haven't
20   seen any PSURs.
21          I have not seen the company internal
22   document that was provided to Dr. Leikin at the time
23   of his Health Hazard Assessment.  I have not seen the
24   Quality System Improvement Plan.  I have not seen any
25   CAPAs, any CAPA trackers.

---

### Page 27

1           MR. KAPLAN:  Any what?
2           THE WITNESS:  CAPA trackers.  When
3    companies have CAPAs, they usually track their
4    compliance with the CAPAs with some sort of a tool.
5    Some are more robust than others.  Some can be as
6    simple as an Excel spreadsheet.
7           But if they have an inspection and
8    they're anticipating a repeat two-year inspection,
9    they're documenting their remediation program on the
10   original inspection and what are their vulnerabilities
11   for the repeat inspection.
12          If they're working with a consulting
13   firm on business processes, they usually provide this
14   information to the consulting firm for the business
15   analysts and the modelers to use in assisting them in
16   building more robust business processes and improving
17   their compliance.
18          MR. THOMPSON:  Let me -- here again, let
19   me -- this is not even an objection, is if I thought
20   that this was actually covering this information for
21   the whole day, I would allow Dr. -- I would say go,
22   continue, Dr. Frank.
23          She's clearly trying her best to give
24   full and responsive answers, but I'm concerned that
25   we're going to just repeat this same material and

---

### Page 28

1    we're going to hear it twice.
2           So it's my hope that we can -- it's my
3    hope that she'll tell you that we told her to tell the
4    truth at some point, but even if she doesn't --
5           MR. DEAN:  She's left that out so far,
6    Fred.
7           MR. THOMPSON:  Yeah.  I think we've --
8    anyway...
9    BY MR. DEAN:
10     Q.     For Mr. Thompson's sake, did
11   Mr. Thompson tell you to tell the truth today?
12     A.     Yes.
13     Q.     Good.
14     A.     Do you think I'm not telling the truth?
15          MR. THOMPSON:  No.  That's a lawyer joke
16   between the two of us.  I apologize.
17          THE WITNESS:  I have a concern that the
18   complexity of this -- I've been involved with
19   companies that have had implosions like this, and in
20   trying to correct it inside the company, the
21   exhaustion that occurs in trying to sort out what
22   happened and what needs to be corrected, how to
23   correct it and document the correction can be
24   prohibitive.
25          And in trying to sort out what really

---

### Page 29

1    happened here very, very accurately, I don't want to
2    come in and make general statements that sound like
3    opinions.
4           There's -- there's a lot of evidence
5    here as to what happened, what was not reported, what
6    the inspectors found, what the companies promised to
7    do, what they did do in the remediation.
8           But there's white space that I have not
9    seen.  It's not -- it may or may not be in the process
10   of discovery.  It may have been that in limiting the
11   scope of my opinion it was not provided to me, it was
12   provided to someone else.
13   BY MR. DEAN:
14     Q.     Okay.  Let me hand you what I have
15   marked as Exhibit 90.
16          MR. DEAN:  Fred.  Harvey.
17   BY MR. DEAN:
18     Q.     Exhibit 90 is a Notice for this
19   deposition asking you to bring certain documents with
20   you.
21          Have you seen this before?
22     A.     Yes.  I went over this with them last
23   night.
24     Q.     Okay.  Let's go through it.
25          Item number one, we already have your

---

8  (Pages 26 to 29)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

---

Page 30

1  curriculum vitae.
2       Item number two was correspondence
3  between you and any attorney acting on behalf of the
4  plaintiffs in the Digitek litigation.
5       Did you bring that with you?
6       A.   I have everything. I asked specifically
7  twice whether I was to print e-mails. I was told no.
8  I do not have any e-mails corresponding to the case.
9       I asked them not to send any documents
10 by e-mail. Everything was sent by FedEx either in
11 paper or electronic format.
12      Q.   And did you bring items responsive to
13 number two with you today?
14      A.   Yes.
15      Q.   And could I see that, please.
16      A.   I believe that I did print some SOPs,
17 but I did not make comments on them. So what I know
18 about document retention, I didn't alter the paper
19 copy, and there is an electronic copy. It's
20 equivalent.
21      So I don't think I have all of the SOPs
22 that I printed, but I have the electronic equivalents
23 and there were no marks made on these.
24      Q.   Dr. Frank, you have given me four
25 notebooks, some loose pages of paper and two CDs;

---

Page 31

1  correct?
2       A.   Yes.
3       Q.   What is on the CDs?
4       A.   As many of the documents in these
5  notebooks and that stack as were available
6  electronically.
7       Q.   Okay. So these, the CDs, would not
8  comprise everything that's in hard copy here?
9       A.   No. And I went back and asked, and I
10 don't think all of them were available
11 electronically. There were some that were to be
12 delivered.
13      That -- see that sheet there? That is
14 the listing of at least one of the CDs. And the
15 checks, I don't recall having received electronically
16 the two documents there.
17      Q.   Well, if I was interested -- I'm not
18 interested in hauling all this paper with me, but --
19 or having it marked as exhibits if I can avoid it.
20      There's a document here that says
21 Documents sent to Karen Frank; correct?
22      A.   Yes.
23      Q.   Does it -- does this summarize some of
24 these notebooks?
25      A.   Yes. Now, what I did not do --

---

Page 32

1       Q.   Excuse me. Which notebooks would it
2  summarize, Dr. Frank?
3       A.   I think the first two that were sent to
4  me.
5       Q.   So -- and which would those be?
6       A.   Okay. That would be that one there
7  (indicating).
8       Q.   Okay.
9       A.   And I specifically did not take time to
10 categorize this. I called them and said, I don't have
11 all the documents electronically for which I want to
12 write this document. But I did not take the time to
13 verify those disks against the binders.
14      Q.   Did you --
15      A.   And there could be variation, is what
16 I'm saying.
17      Q.   I want to move through this as quickly
18 as we can.
19      But what I'm interested in is what you
20 were -- what you were provided and then what you asked
21 for, is -- in follow-up, is all of that here in front
22 of us now?
23      A.   Yes.
24      Q.   Is there anything that's responsive --
25 strike that.

---

Page 33

1       Is there anything else you brought with
2  you today other than what we have on the table?
3       A.   No. The directions to the hotel last
4  night and my Notice.
5       Q.   Those I don't need.
6       A.   And this you have in electronic format,
7  all of this.
8       MR. THOMPSON: Let me interrupt. She
9  brought these two thumb drives, which are two copies
10 of the same thing. Maybe she needs to summarize
11 what's on the thumb drives.
12      MR. DEAN: Yes. Thank you, Fred.
13 BY MR. DEAN:
14      Q.   Could you do that, please?
15      A.   When I started the review, the
16 consulting firm that I worked for had me talk to
17 somebody else who was doing expert witness work. And
18 he said that he did individual reports of every
19 document he reviewed. So I started that.
20      But you will not find a whole lot of
21 comments expressed in those documents because I held
22 back very carefully. So there weren't frivolous
23 comments made. Become -- what I did was --
24      Q.   All I want to know is, what's on the
25 thumb drives?

9 (Pages 30 to 33)

Karen A. Frank, M.D.        Videotaped                June 30, 2010

---

Page 34

1     A.     Those draft documents are here.
2           Then what I did is, I became concerned
3     about the complexity of what had happened and the
4     amount of white space, and I started putting my own
5     document together that is as close as I can track to
6     verbatim quotes from the FDA inspections and the
7     documents that I received.
8           And after I put that together, I started
9     going back and making substantive comments on that.
10    And from the substantive comments, I drew the
11    conclusions.
12          It was a step-wise process that involved
13    stopping the individual reports on the individual
14    documents.
15          That became out of scope, unauthorized
16    work, and it was rolled into one review document with
17    substantive comments and the conclusion.
18    Q.     Let's go back to Exhibit 90, please.
19          MR. THOMPSON: I think what she was
20    saying was that the various draft iterations of the
21    final document --
22          THE WITNESS: Right.
23          MR. THOMPSON:  -- are contained on the
24    thumb drive.
25          Is that right?

Page 35

1           THE WITNESS: Yes.
2           MR. THOMPSON: Okay.
3           THE WITNESS: This whole process,
4     including the truncated short reports.
5           MR. THOMPSON: Okay.
6           THE WITNESS: Which you're welcome to
7     review, which should not have -- they will have
8     comments, they won't be substantive. They were very,
9     very lightweight comments.
10          The heavy comments were, for the most
11    part, restricted to this document and very carefully
12    tracked to the verbatim evidence.
13          MR. THOMPSON: Okay.
14    BY MR. DEAN:
15    Q.     What I'm -- thank you.
16          What I'm trying to get at now -- and I
17    appreciate your answer. What I'm trying to get at now
18    is the documents that are called for in the -- in the
19    Notice, which is Exhibit Number 90.
20          And so all the correspondence and
21    communications you would have would be in what we have
22    in front of us right now; correct?
23          Would be somewhere in here; correct?
24    A.     Yeah.
25    Q.     All right. Where, in terms of

Page 36

1     correspondence and communication, were there -- are
2     there letters in here?
3     A.     No.
4     Q.     So did you -- did you ever exchange
5     letters with one of the plaintiffs' lawyers?
6     A.     I received cover letters for each of
7     these binders that I did not retain.
8     Q.     So the cover letter would have -- it
9     would have just had a listing of what was in the -- in
10    the materials; is that right?
11    A.     It didn't even have a listing. It
12    looked like their generic cover letter.
13    Q.     Enclosed please find?
14    A.     Yeah.
15    Q.     Okay. All right.
16    A.     And the other thing that may be missing
17    is, when I -- when they -- they coached me through the
18    preparation of a nice document for you. Not for a
19    client that's in trouble that needs to remediate.
20          So there may be a few phone calls where
21    I had a pad in my hand and I scribbled notes to
22    myself. They were translated into this. Those notes
23    probably --
24    Q.     Translated into what, ma'am?
25    A.     The documents that they were part of.

Page 37

1     Q.     Would they -- if you took notes, would
2     they be on a piece of paper that would be somewhere in
3     the stack in front of us?
4     A.     Some of them are.
5     Q.     Okay.
6     A.     There may be -- there may be stray notes
7     that were lost.
8     Q.     Would it be -- would it be fair for me
9     to assume that if there are such notes, they would be
10    in this stack of paper right here?
11    A.     Yes.
12    Q.     Could you -- could you --
13    A.     The -- the --
14    Q.     Well, hang on. I can make it even
15    easier.
16          Because Plaintiff's Exhibit 91 is in
17    here; correct?
18    A.     Yes.
19    Q.     So --
20    A.     I can tell you what I think is missing.
21    Q.     Well, let's stay on -- let's stay on
22    task here.
23    A.     Okay.
24    Q.     We're on number two. Is there -- in
25    what you've brought with you today, is there any

10 (Pages 34 to 37)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

Page 38

1  correspondence between you and the plaintiffs'
2  lawyers?
3       A.   Nothing of substance.
4       Q.   Is there anything?  In what we have
5  here, is there any correspondence?
6       A.   No.  They're only documents.  The
7  letters were all these generic cover letters.
8       Q.   All right.  Fine.
9            Then number three, it says, all other
10  documents prepared by attorneys for the plaintiff and
11  sent to the witness.
12            Would they all be in front of us here?
13       A.   Can you repeat the question?
14       Q.   Yes.  I'm on number three, Dr. Frank.
15            We asked you to bring all other
16  documents prepared by attorneys for the plaintiffs and
17  sent to the witness.
18            Would they all be in front of us?
19       A.   Yes.
20       Q.   Okay.  It says, all documents including
21  documents and deposition transcripts which you have
22  received from any source.
23            Now, you didn't -- are the -- if I
24  remember right, you reviewed the deposition of Sarita
25  Thapar and Misbah Sherwani; correct?

Page 39

1       A.   Yes.  They're in these binders.
2       Q.   Okay.  Do you --
3       A.   May I ask a question?
4       Q.   Do you know -- in a minute.
5            Do you know which binder they're in,
6  Dr. Frank?
7       A.   Right here and here (indicating).
8       Q.   Well, we're making progress, Dr. Frank.
9            One of these notebooks, which says 1 of
10  1 --
11       A.   Yeah.
12       Q.   -- contains the deposition of Misbah
13  Sherwani and all of her exhibits to her deposition;
14  correct?
15       A.   Uh-huh.
16       Q.   Is that right?  Yes?
17       A.   Yes.
18       Q.   So we're going to get that notebook off
19  the table.  I'll put it back over with your material
20  later.  I just don't want to unhook from my --
21       A.   Yes.
22       Q.   And then another notebook, which says 1
23  of 1, says Deposition of Sarita Thapar; correct?
24       A.   Yes.
25       Q.   And contained within it is her

Page 40

1  deposition and the exhibits to her deposition;
2  correct?
3       A.   Yes.
4       Q.   So we're going to get that one off the
5  table.
6       A.   Now, that had --
7       Q.   Now, you said "that," we have two
8  notebooks.  Let me -- which one did you want to refer
9  to, Dr. Frank?
10       A.   The one where I removed the cover sheet,
11  which I should not have done.  I apologize.
12       Q.   So this is the smaller notebook you were
13  talking about?
14       A.   It's the later.  The one where I removed
15  the cover was the first.  There were cover sheets,
16  similar cover sheets.
17       Q.   I have two notebooks.  They each do have
18  a Table of Contents; correct?
19       A.   Yes.  Yes.
20       Q.   And did these both come at the same time
21  or did they come at different times?
22       A.   Came at different times.
23       Q.   Which one came first, Dr. Frank?
24       A.   The one where I removed the cover.
25       Q.   Is that the larger one, the larger

Page 41

1  notebook?
2            And this notebook --
3            MR. KAPLAN:  You have to say yes or no.
4            THE WITNESS:  Yes.
5  BY MR. DEAN:
6       Q.   It may not be relevant for our purposes
7  later on, but this notebook has no markings on the
8  outside.  But it does have a Table of Contents on the
9  inside, which we will -- which we will mark as an
10  exhibit.
11            MR. DEAN:  And can you just give me an
12  arbitrary exhibit number?  Should we do something,
13  start at -- call it 250, do you think?
14            MS. TAKLA:  Sure.
15            MR. DEAN:  Why don't we -- we will mark
16  this later as Exhibit 250 so we don't have to go off
17  camera right now.
18            Make a note of that, please.
19  BY MR. DEAN:
20       Q.   This notebook says, Digitek Expert Table
21  of    Contents.  It has 18 items; correct?
22       A.   Yes.
23       Q.   Okay.  And when -- and this was the
24  first information you received; is that correct?
25       A.   Yes.

11 (Pages 38 to 41)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

---

Page 42

1    Q.    Do you recall approximately when you
2  received this notebook?
3    A.    Sometime in the beginning of May.
4    Q.    And then what is the second, smaller
5  notebook?
6    A.    That contains some of the additional
7  documents that I requested.
8    Q.    So this has a document -- this has a
9  Table of Contents that has 11 items; correct?
10   A.    May I say something?
11   Q.    Of course.
12   A.    I'm actually concerned that there's one
13 more binder. But I moved these to the side of the
14 office and stacked them specifically several weeks
15 ago.
16         There's a problem in that I cleaned out
17 my closet with all of my old binders from my
18 fellowship at the FDA, and I can't imagine that I
19 mixed these binders in the stack with my old binders
20 at the FDA, but I need to make you aware of that.
21         Because I recall that I got more
22 binders, and --
23   Q.    I'm sorry, you said you recall you got
24 more binders?
25         I want to make sure I heard you

---

Page 43

1  correctly. Did you say more?
2    A.    I'm trying to remember whether there was
3  a fifth binder and I'm a little bit embarrassed.
4    Q.    Well --
5          MR. THOMPSON:  Let me say --
6  BY MR. DEAN:
7    Q.    We'll come -- let me -- let me finish
8  the questioning on this and we'll come back to that.
9  Okay.
10         So this one that says -- it has 11
11 items, and we're going to mark this as Number 251, the
12 Table of Contents. You said that it represents
13 documents that you requested; is that correct?
14   A.    Yes.
15   Q.    Okay. And when did you make the -- when
16 did you make that request?
17   A.    At a lunch meeting with Pete Miller, and
18 I can check the date in my date book. Do you need the
19 exact date?
20   Q.    Well, I would like to get an approximate
21 -- yes, I would like -- yes, I would like to know when
22 you made the request. Yes.
23         If you've got a note on that, rather
24 than guesstimating, that would be good.
25   A.    It was Wednesday, June 2nd. I met Pete

---

Page 44

1  Miller and Megan Carter at the Philadelphia Airport at
2  either 12 o'clock or 1:00 p.m.
3    Q.    Doesn't matter what time you met.
4          So that's the day you requested these
5  documents; is that right?
6    A.    Yes.
7    Q.    Now, when you requested, did you -- did
8  you hand them a list?  Did you give them -- did you
9  send them an e-mail?
10         How did you convey the information to
11 them?
12   A.    I had made a list for myself, and I
13 believe that list is in here.
14   Q.    Okay. And then how shortly after that
15 meeting did you receive the smaller notebook?
16   A.    It took a while. I think they were sent
17 by FedEx ground, rather than FedEx overnight, because
18 I called them twice concerned that there was a delay.
19         MR. DEAN:  Actually, you have exhibit
20 stickers I see, don't you?
21         Why don't you go ahead and we'll -- is
22 it all right if I mark the original with the exhibit
23 sticker?
24         MR. THOMPSON:  That's fine with me. I
25 don't know the terms with this law firm. Can we make

---

Page 45

1  a copy here?
2          MR. DEAN:  Yes. We can get copies. I
3  just want to get it marked so that --
4          MR. THOMPSON:  Yes, that would be --
5  that's actually a good idea.
6          MR. DEAN:  Yes. If you'll give me an
7  exhibit sticker, I'll go ahead and mark this so we
8  don't get confused later on.
9          (Exhibits D-250 and D-251 were marked
10 for identification.)
11 BY MR. DEAN:
12   Q.    And, Dr. Frank, we'll get copies for
13 everyone later. But the larger notebook, the Table of
14 Contents, I've marked as Exhibit 250.
15         Do you see that?
16   A.    Yeah.
17   Q.    And that was the one you received
18 initially; correct?
19   A.    Yes, in its entirety.
20   Q.    And then Exhibit 251 is the notebook you
21 received after your meeting with Mr. Miller and
22 Ms. Johnson; right?
23   A.    Yeah.
24   Q.    And then you said, I think you were just
25 telling me, that somewhere in this other stack of

---

12  (Pages 42 to 45)

Karen A. Frank, M.D.        Videotaped            June 30, 2010

Page 46

1  papers would be a list where you request -- you made
2  the request for follow-up documents; is that right?
3         Could you look and see if you could find
4  that for me.
5      A.    These were the documents where I started
6  listing what I did and did not have to review and
7  tried to define what you might call the white space in
8  the dossiers. They're not --
9      Q.    First of all, let me pause here. Let's
10 stay on the question.
11        Is there a document either which you
12 handed to me or that you still have with you that
13 represents a listing of the documents that are in the
14 smaller notebook?
15     A.    No. I did not request those
16 specifically. I talked to them about my concerns
17 about what I called the white space or the absent
18 documents in what I was sent, and they made the
19 decision what additional documents to send me.
20     Q.    Okay. So then what is represented in
21 the smaller notebook that's got Exhibit Number, on the
22 Table of Contents, 251, is a selection of documents
23 that Mr. Miller and Ms. Johnson sent to you after
24 hearing general concerns about white space; correct?
25     A.    Yes. But I --

Page 47

1      Q.    You -- just so we're clear, you did not
2  give them this list?
3         They made this selection based upon what
4  you -- some concerns you had expressed; is that fair?
5      A.    Yes.
6      Q.    Okay.
7      A.    About those lists that I started to --
8      Q.    Hang on. I'll get to these. Okay?
9      A.    Okay.
10     Q.    We're just going to try to -- I'll try
11 to ask a focused question, you try and give me an
12 answer and stop, and then I'll ask you another
13 question. Okay?
14     A.    Okay.
15     Q.    All right. Now, you have handed to
16 me -- from the loose documents, you've handed to me
17 looks like three different documents; is that correct?
18     A.    Uh-huh.
19     Q.    Yes?
20     A.    These were prepared --
21     Q.    Hold on.
22        MR. DEAN: Let me mark these so we're
23 clear so we don't get --
24        (Exhibits D-252 through D-254 were
25 marked for identification.)

Page 48

1  BY MR. DEAN:
2      Q.    All right. Let me hand you first what I
3  marked as Number 252.
4         Could you tell us what that is, please.
5      A.
6         These were notes to myself --
7      Q.    Please keep your voice up, too.
8      A.    These were notes to myself as I tried to
9  define what was sent to me as far as the sequential
10 FDA Establishment Inspection Reports, warning letters,
11 the company responses and CAPAs, so that I was
12 defining what I was going to be basing my opinions on.
13     Q.    Is that kind of a summary of the -- not
14 of every document, but the kinds of material that you
15 had received?
16     A.    Well, I got frustrated and concerned
17 that I was being asked to render an opinion on what
18 happened in a company, and I had only selected
19 documents over the period.
20        So I don't have the -- a lot of company
21 responses and CAPAs. I don't know many things about
22 the adequacy of their remediation plans.
23        And then I actually -- this is a
24 preliminary list. I didn't expect to give it to you.
25 But I then started to sort out when I did this in my

Page 49

1  comment document, the company's responses.
2         How many letters went back and forth to
3  -- between the health authorities and the company and
4  what were the comments, the substantive issues in
5  those.
6         I did not go from here to here and say,
7  oh, I found this warning letter. There could be
8  inaccuracies in this. This was my preliminary list.
9      Q.    Could I just see that briefly, please.
10     A.    (Witness complies.)
11     Q.    Could you tell me briefly what 253 is.
12     A.    This -- these are notes that I took in
13 writing the very early individual reports. And there
14 are a lot of very close notes or verbatim transcripts
15 of the documents as I went through them in
16 excruciating detail.
17        And then what I wanted -- what I should
18 have done is asked for them up front electronically.
19 But this became the basis of this report here.
20     Q.    So Exhibit 253 is a document you used
21 when you were writing what we marked as Exhibit 50;
22 correct?
23     A.    This could be considered an early draft
24 of Exhibit 50.
25     Q.    Okay. Very good. Thank you.

                      13 (Pages 46 to 49)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 50

1          And for the record, what is 254?
2      A.    More notes to myself.
3      Q.    Do you remember what -- what do they
4  generally represent?
5      A.    I believe these are my notes from the
6  meeting with Mr. Miller and Ms. Carter on June 2nd.
7      Q.    Could you read for me this particular
8  entry, it starts out documents, I think.  And you
9  write pretty well, but I'm just having trouble reading
10 that.
11     A.    Well, this is not that good.  I wish
12 that -- if I had known that these were going to be
13 given to you, I would have notated them much more
14 carefully.
15     Q.    Just try to, as best you can, read that
16 one sentence for me.
17     A.    It says, preponderance of the evidence,
18 civil.
19     Q.    Excuse me.
20     A.    Right above that?
21     Q.    Yes.  That one right there.
22     A.    Document for withholding.
23     Q.    Do you know what thought you were trying
24 to capture there?  And if you don't, just tell me.
25     A.    I think it's the time that I decided --

Page 51

1  this may have been to myself -- that this situation
2  was so convoluted, I wanted a document that would
3  allow me to carefully track the absence of information
4  on specific ADE's complaints or investigations.
5          Because of this type of situation and
6  the complexity of what happened in the company, the
7  intermittent evidence that was presented, the fact
8  that there's things that I would have liked to have
9  seen that we couldn't obtain, that I wanted to
10 carefully track that for this very situation, so I
11 could present to you what I had, what I did not have,
12 and track the opinions very, very closely to what I
13 was able to see.
14     Q.    Did you ever submit to the plaintiffs a
15 listing of documents you thought were missing that
16 you specifically wanted them to provide to you?
17     A.    I gave Pete Miller some notes from the
18 meeting as I was talking in generalities.  I don't
19 remember that was -- if that was on the back of the
20 list.  I don't -- I did not type up a specific list.
21 I believe I showed him these.
22     Q.    These being what?  Which exhibit number?
23     A.    These preliminary assessments of the
24 white space.
25     Q.    Being Number 252?

Page 52

1      A.    Yes.
2      Q.    Okay.  Let me go back to my question
3  because my question I think was focused.  I think
4  you've come close to answering it.
5          But did you give a specific list of
6  documents to Mr. Miller to fill -- which, in your
7  mind, would fill out what you are calling the white
8  space that you wanted to be provided?
9      A.    I think I had the list in front of me
10 and I read down it.  I may have translated a few of
11 those to another paper, but he responded to my going
12 down the list what was and was not available at that
13 point in discovery.
14         The fact that discovery was complete and
15 then there was discussion of there may be another
16 round of discovery and the possibility of obtaining
17 those documents.
18         But I did not type up a list or write up
19 a specific list that I handed to him.  And I can't
20 recall the specifics of the exchange.  A lot of this
21 was my asking questions of them.
22         How do I prepare these documents for
23 expert witness and can I get any of these?
24         I would have these if I was an FDA
25 medical officer.  I would have some of this

Page 53

1  information if I was inside the company and helping
2  with the remediation.
3          Can you get this for me now so my
4  opinion can be based on a broader and more complete
5  compilation of the evidence?
6      Q.    Can we agree, then, that you never gave
7  Mr. Miller or any plaintiff's lawyer a specific list
8  of documents that you wanted to look at?
9          Can we agree on that?
10     A.    Yes.  And next time I will very
11 carefully.
12         MR. THOMPSON:  Dick, I can put an
13 exhibit right here.  That's the -- you got that;
14 right?
15         MR. DEAN:  Right.
16         MR. THOMPSON:  Okay.
17         (Exhibit D-255 was marked for
18 identification.)
19 BY MR. DEAN:
20     Q.    I'm handing you what I've marked as
21 Defendant Exhibit 255, which is entitled Documents
22 sent to Karen Frank, and it has 29 items listed on it.
23         And I see that 250 and 251, one has 18
24 and one has 11, so that would be 29.
25         Is life so good for Mr. Thompson and me

14  (Pages 50 to 53)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 54

1    that Exhibit 255 is simply a compilation of the Table
2    of Contents of these other two notebooks?
3        A.    I believe so. I called their admins to
4    ask about these, and I think about this one.
5        Q.    First of all, you --
6        A.    Yes.
7        Q.    I want to give you the opportunity, but
8    do you -- if you need to look at it, but is 255 simply
9    a compilation of what we have on the Table of Contents
10   on 250 and 251?
11       A.    I believe so, but I specifically did not
12   check. I did not bill them for time verifying this
13   against either of those binders or against the
14   electronic.
15       Q.    When was 250 -- did you prepare 255 or
16   did someone else?
17       A.    Someone else did.
18       Q.    Do you know who did?
19       A.    One of the admins or paralegals at the
20   Miller firm.
21       Q.    Okay. Why don't you let me have that
22   one back.
23       A.    (Witness complies.)
24       Q.    Now, you just pointed out that there's
25   some handwriting in red ink on here.  Is that your

Page 55

1    handwriting?
2        A.    No. That's from the admins at the firm.
3        Q.    Okay.
4             (Exhibit D-256 was marked for
5    identification.)
6    BY MR. DEAN:
7        Q.    What is 256?
8        A.    That is my notes from a discussion with
9    Smart Consulting about the way another expert
10   consultant approached review of the cases.
11       Q.    And that consultant would be Mr. Farley?
12       A.    Yes.
13       Q.    When -- is this in your handwriting?
14       A.    Yes.
15       Q.    And who did you speak to?
16       A.    On the telecon were Denise Smart, Nigel
17   Smart, and Jim Farley.
18       Q.    And what was the occasion for the four
19   of you to speak to each other?
20       A.    Remember earlier I said that I had been
21   approached about doing this kind of work in the past?
22       Q.    Yes.
23       A.    Well, I had declined it.  And Smart
24   Consulting approached me about doing this expert
25   witness work.

Page 56

1             I was a little loathed to move in to
2    litigation.  And this was the first time I had done
3    any expert witness work. I was not certain how to
4    prepare the documents, how to format the documents.
5             I prepared FDA reviews, I prepared
6    things to go to the health authorities, but I was
7    asking him questions about being an expert witness and
8    trying to determine if I was going to tactfully
9    decline this engagement and simply not undertake
10   expert witness work.
11            And I had discussions with Mr. Miller
12   and with Megan Carter in sorting out, you know, how to
13   proceed with the work.  So there was coaching and
14   advice as I began to develop a way to develop these
15   documents.
16            I asked them for copies of Jim Farley's
17   documents so I could format them appropriately.  And
18   they did not want to do that because they were in
19   draft.
20            So they gave me indications of how they
21   wanted the documents formatted.
22            So what you're seeing is indication of
23   somebody who had not previously done expert witness
24   work taking on assignment and being rather transparent
25   with the consulting firm and the attorneys as to my

Page 57

1    present state of experience with this and getting
2    advice on how to proceed.
3        Q.    Did Smart -- are you working through
4    Smart Consulting in this litigation?
5        A.    Yes.
6        Q.    Did they recruit you for this
7    assignment?
8        A.    Yes.
9        Q.    Had they already recruited Mr. Farley?
10       A.    Yes.
11       Q.    Was Smart Consulting the first company
12   that approached you about taking on this assignment?
13       A.    Yes.
14       Q.    And when was that?
15       A.    I don't recall the date, but I do have a
16   signed copy of the Consulting Agreement.
17       Q.    Is that in the documents we have here?
18       A.    Yes.  I scanned it with my date of
19   signature.
20       Q.    Where is it?  Is it in one of --
21       A.    You have a scanned electronic copy of
22   this document.  That was the one that was faxed to
23   Smart Consulting.
24            You need that copy?
25            MR. DEAN: Yes.

15  (Pages 54 to 57)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 58

1    MR. THOMPSON:  Well, that's your
2  original?
3    THE WITNESS:  It's my original.
4    MR. DEAN:  Well, you're going to get it
5  back, just with an exhibit sticker on it.  Is that
6  okay?
7    THE WITNESS:  Yes.  Whatever you need.
8    (Exhibit D-257 was marked for
9  identification.)
10  BY MR. DEAN:
11    Q.    So 257 is a copy of that agreement;
12  correct?
13    A.    Yes.
14    Q.    Had you ever -- before this agreement,
15  had you ever done anything with Smart Consulting?
16    A.    I provided them with some business
17  processes for a proposal in 2009 on product
18  complaints.
19    I believe I was recruited to be on a
20  proposal for another consulting assignment, and for
21  confidentiality, I don't think I can tell you what the
22  client was.
23    But I did not provide any information to
24  Smart.  They had two spots that I could possibly fit
25  in and there was a phone conversation as to how I

Page 59

1  would fit best into that engagement.
2    And then I did some work on a REMS
3  proposal for them back probably in March of 2010 where
4  we did not win the engagement.
5    And it was on the basis of those
6  interactions that they approached me about being an
7  expert witness on this case.
8    And Nigel Smart was very adamant that
9  based on his interaction with me that he thought that
10  my background was completely adequate to make
11  substantive comment on what would be sent to me and
12  that it was an appropriate assignment.
13    Q.    Is Nigel Smart an attorney?
14    A.    No.  He's a Ph.D. who has done this
15  work.
16    (Exhibit D-258 was marked for
17  identification.)
18  BY MR. DEAN:
19    Q.    What's Defense Exhibit 258?
20    A.    That was part of the background that was
21  submitted in the first binder.
22    Q.    So this is a document prepared by one of
23  the plaintiffs' attorneys and would have been
24  contained within the notebook where we have the
25  Exhibit Number 250 is the Table of Contents?

Page 60

1    A.    Yes.
2    Q.    Is there some reason why it was removed
3  from the notebook?
4    A.    It wasn't deliberate.  What I have are
5  the loose documents in a stack and the notebooks.  But
6  there -- no, there was no -- I did not cite that or
7  the injunction or the consent decrees in my reports.
8    It was reviewed initially, possibly
9  reviewed twice, but I did not use it as evidence.
10    Q.    Are these separate pages or are these
11  one document?
12    A.    They're separate.
13    (Exhibits D-259 and D-260 were marked
14  for identification.)
15  BY MR. DEAN:
16    Q.    What is Defendant 259?
17    A.    I was trying to sort out what was the
18  business process in the company for evaluation of out
19  of spec results, product complaints.
20    There was no evidence provided to me
21  that the work that I did in industry of doing routine
22  Health Hazard Assessments was being done, and I wasn't
23  certain whether it was just that I didn't receive the
24  documents.
25    But when I've done work for clients

Page 61

1  who've been inside companies and there is a
2  manufacturing deviation, particularly if it's released
3  in the market, I would usually get a copy of an
4  investigation where if they had a sample of the
5  product, they would bring it back in-house and do
6  analytics.
7    If they needed to, they would check it
8  for bacteriology.  They would then go back and do an
9  investigation in the plant, you know, a real root
10  cause analysis.
11    I would be provided with an
12  investigation report that would define the batches at
13  risk for a single drug or even if multiple drugs had
14  been through that piece of malfunctioning equipment.
15    Q.    This would be a product complaint you're
16  talking about?
17    A.    Yes, in another company.
18    Q.    Right.
19    And just so I'm clear, you're talking
20  about in other companies you work for where there was
21  a product complaint, would be a system in place
22  where a complaint form would be generated and
23  processed through the system; is that correct?
24    A.    Yes.
25    Q.    Okay.

16  (Pages 58 to 61)

Karen A. Frank, M.D.        Videotaped                June 30, 2010

Page 62

1      A.    And --
2      Q.    And did you -- did you make any inquiry
3   in this case as to whether there were product
4   complaint forms that you could look at and see how
5   they were processed?
6          Did you ask the plaintiffs' lawyers for
7   that type of information?
8      A.    Yes, I did.  I commented on June 2nd on
9   the absence of this information, and --
10     Q.    Let me just ask you, did the plaintiffs'
11  lawyers ever provide to you any product complaints on
12  Digitek?
13     A.    Yes.  But I believe they were after the
14  recall.  What I did receive was the investigation
15  report of the double-thick tablet of Digitek.  The
16  complaint registered by a pharmacist in Bellingham,
17  Washington, in July of 2004.
18     Q.    I'll get back to that.  I don't want to
19  -- heeding Mr. Thompson's admonition, I don't want to
20  repeat myself.
21         But let me just ask you:  As I
22  understood it, you asked for product complaints on
23  Digitek before the recall, also, didn't you?
24     A.    They were not on my list.  I didn't say
25  product complaints that I can recall specifically.

Page 63

1      Q.    So you did not -- so just so I'm clear,
2   you did not ask the plaintiffs' lawyers to provide
3   product complaints on Digitek prior to the recall; is
4   that correct?
5      A.    I believe they were volunteered.  What I
6   was looking for was investigation reports of product
7   complaints and realtime Health Hazard Assessments,
8   which would have been generated from those product
9   complaint reports.
10     Q.    Did you ask for product complaints on
11  Digitek prior to the recall?  Yes or no?
12     A.    I would have to say no, unless you would
13  consider it implied in asking for evidence that would
14  confirm that those business processes were in place
15  and in use during this period.
16     Q.    Okay.  So -- but you didn't specifically
17  ask for them; correct?
18     A.    No.
19     Q.    Okay.  Fine.
20     A.    May I?
21     Q.    You can go ahead and say whatever you'd
22  like to say.
23     A.    It may be a result of my naivete, and I
24  assumed that these were manufacturing issues and they
25  were going to another consultant whose expertise was

Page 64

1   in the investigation of product complaints, which I've
2   never done.
3          I received the results to write the
4   Health Hazard Assessments.  So my absence of asking
5   for them may have been my assumption of where they
6   were to be directed.
7          MR. DEAN:  Okay.  Let's take a break.
8          Our tape needs to be changed.  We'll get
9   some copies of exhibits and we can all stand up and
10  walk around a little bit.
11         Let's go off the record.
12         THE WITNESS:  Okay.
13         VIDEO OPERATOR:  Going off the video
14  record.
15         This is the end of Tape 1.
16         The time is 10:27 a.m.
17         (A recess was taken from 10:27 a.m. to
18  10:43 a.m.)
19         VIDEO OPERATOR:  We're now back on the
20  video record.
21         This is the start of Tape 2.
22         The time is 10:43 a.m.
23  BY MR. DEAN:
24     Q.    Dr. Frank, I think we just have a couple
25  more documents to mark and have you identify and then

Page 65

1   we'll get into the substance of this.
2          I don't think I've asked you what Number
3   260 is.
4      A.    This is more notes.
5      Q.    And do you know what day you took those
6   notes, what the occasion was for taking those notes?
7      A.    I'm trying to remember whether I made
8   them before or after the meeting with Pete Miller on
9   the 2nd.
10         As I said, I was coached somewhat into
11  how to leverage my FDA experience, my industry
12  experience, to produce work products for attorneys as
13  an expert witness.
14         And I actually started this project with
15  my, what I'll say, my modus operandi as an FDA medical
16  officer.
17         And then I started to tease out what I
18  could about what was going on inside these companies,
19  what business processes were in place and in use.
20         And I brought some of these notes to the
21  meeting with Mr. Miller and Ms. Carter, and there were
22  some that I made.
23         And I started to explain to them my
24  concerns that I couldn't piece together things from
25  the FDA inspections.  And then they provided me more

17  (Pages 62 to 65)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

---

Page 66

1   documents where the FDA clearly documented things.
2        And that's the basis of this large
3   document, it's finding the answers to these questions
4   or any information that elucidated how -- are these
5   business processes in place.  So these are my notes to
6   myself.
7        Q.    Taken at a meeting with Mr. Miller; is
8   that right?
9        A.    Or sketched at a meeting with Mr. Miller
10  to say these are things that typically occur in a
11  company and what -- while I'm looking at inspection
12  reports that are samplings of compliance with SOPs, I
13  don't have any SOPs or work flows and I'm trying to
14  piece together what was in place and in use from the
15  FDA reports and the warning letters.
16       And that's when I asked for more
17  information to start to give myself a clearer picture.
18       Q.    Okay.  You also brought with you a copy
19  of Plaintiff's Exhibit 91, which is a 2008 IDR.
20       You also brought a -- in your papers was
21  a February 28, 2006 letter from Amide to the FDA;
22  correct?
23       A.    Yes.  Now --
24       Q.    No, no.  That's -- that was -- that's --
25  you've answered the question.

---

Page 67

1        A.    All right.
2        Q.    And then you brought a three-page
3   document, which is a Actavis document, that bears the
4   Bates label 65400 through 65402; is that correct?
5        A.    Yes.
6        Q.    And is it fair to say that we have now
7   reviewed all the documents that you brought with you
8   today?
9        A.    Yes.
10       Q.    But?
11       A.    I believe this document may have been
12  taken from a binder and not been appropriately
13  reinserted because it is a punched document.
14       Q.    Correct.  So that's the February 28,
15  2006 document.
16       So you're suggesting it may actually go
17  in one of the notebooks that we looked at previously;
18  correct?
19       A.    Yes.
20       Q.    Okay.  Now, is it fair to say, having
21  gone through all of these documents, that you have
22  brought -- that the items we've just gone over would
23  be all the information that you would have in response
24  to Exhibit 90, which is the Notice for Video
25  Deposition Duces Tecum?

---

Page 68

1        A.    Yes.  I said something earlier about
2   possibly having five binders.  I think this was my
3   fifth.  This was the last thing delivered, and --
4        Q.    By this, you are holding up Exhibit 91;
5   correct?
6        A.    Yes.  This was the last thing that Pete
7   Miller sent to me by FedEx.  I'm not sure why it
8   wasn't in the others, but this is a very key
9   inspection report to piecing together what happened
10  and it was the last piece of information to arrive.
11       MR. THOMPSON:  Let me see if I can
12  satisfy the defendants with regard to the fifth
13  binder.  My understanding is that you think there may
14  be a fifth binder.  You're not certain.
15       If I can just simply say, we will go and
16  make a diligent search, and if we uncover a fifth
17  binder that's been placed in another binder, we will
18  make that available to the defense and we will
19  certainly give you an opportunity to question her
20  either by telephone or by reconvening the deposition.
21       Is that --
22       MR. DEAN:  That's acceptable.  Thank
23  you.
24       MR. THOMPSON:  All right.
25  BY MR. DEAN:

---

Page 69

1        Q.    And as I understand it, as you sit here
2   today, you're not sure whether there was another
3   binder or not?
4        A.    I'm embarrassing myself that I didn't
5   keep a clear catalog.  But I -- when I finished this
6   report, I gathered everything up and I put it over to
7   the side.  And I, for some reason, am really -- it's
8   just bothering me.
9        And so I'm willing to embarrass myself
10  and say, you know, I had this idea there were five,
11  but, to my knowledge, everything that I used for this
12  report is in front of us.
13       But I would sure appreciate to make sure
14  that I didn't accidentally file this with something
15  else.
16       MR. THOMPSON:  All right.
17       MR. DEAN:  We'll ask you to follow up on
18  that and if you find something, and Mr. Thompson will
19  look at his records, and if there is a fifth notebook,
20  it's my understanding that the defendants will be
21  informed of that.
22       THE WITNESS:  Yes.
23       MR. DEAN:  So we can go ahead.
24       (Exhibit D-261 was marked for
25  identification.)

18 (Pages 66 to 69)

Karen A. Frank, M.D.         Videotaped              June 30, 2010

---

Page 70

1   BY MR. DEAN:
2       Q.    And just out of the -- for the sake of
3   caution, we have marked as Exhibit 261 the color copy
4   of your report, and I have a copy for Mr. Thompson and
5   for Mr. Kaplan because it may assist us as we proceed
6   here this afternoon.
7       A.    Okay.
8           MR. DEAN: Harvey.
9   BY MR. DEAN:
10      Q.    Okay. What do you conceive your role to
11  be as an expert witness in this case?
12      A.    I was asked to comment on two things:
13  The adequacy of the pharmacovigilance processes and
14  the impact on any signal detection in regard to the
15  Digitek case.
16          It was -- I was asked only on the
17  systems. I was not provided any information on the
18  content, the MedWatch, the PSURs, that would allow me
19  to actually do the signal detection or the trending.
20  The scope of my work was limited.
21          I was also asked to comment on changes
22  in the risk communication that occurred between the
23  Health Hazard Assessment of Dr. Leikin, the letter to
24  the Dear Customer, the business-to-business letter to
25  Mylan and UDL, and then the public press release.

---

Page 71

1           I could not find any evidence of Dear
2   Doctor or Dear Patient letters.
3           So when I was asked to look at the
4   changes in those communications, I documented that
5   absence and said, I am going from Health Hazard
6   Assessment to a business-to-business Dear Customer
7   letter, and then the communication to the health care
8   community and the patients is restricted to the press
9   release.
10          There is not additional communication in
11  the form of Dear Doctor and Dear Patient letters. My
12  comments are restricted to those two spheres and then
13  merged into one document with the supporting evidence.
14      Q.    Does Exhibit 261 contain all of your
15  opinions in this case?
16      A.    This is the conclusion. There are
17  comments in the supporting document that are also
18  expressions of opinions. It is possible that all of
19  the comments in the supporting document have not been
20  completely abstracted to the conclusion.
21          Because my original intent was to
22  provide this document with this conclusion following
23  this, so that you would go through this seeing the
24  timeline that also notes some of the absences of
25  information, and then the information that I read and

---

Page 72

1   evaluated.
2           And then when you read the conclusions,
3   that would be the final. And I cannot guarantee you
4   that every single comment in this document has been
5   extracted into the conclusion.
6       Q.    Dr. Frank, are all of your conclusions
7   in Exhibit 261?
8       A.    Yes.
9       Q.    And all of your observations about this
10  case would be included in either Exhibit 50 and
11  Exhibit 261; correct?
12      A.    Yes.
13      Q.    Thank you.
14      A.    Now, please -- yes or no? Okay.
15          MR. THOMPSON: Just let Dick ask you a
16  question.
17  BY MR. DEAN:
18      Q.    So we can agree that you did not look at
19  the underlying -- any underlying AER reports on
20  Digitek; correct?
21      A.    I did not receive any MedWatch forms or
22  CIOMS forms. I did not receive any PSURs, any U.S.
23  Periodic Reports, or any other aggregate reports to
24  any health authority.
25          MR. KAPLAN: I can't hear you.

---

Page 73

1           THE WITNESS: I did not receive any
2   MedWatch forms, any CIOMS forms, any PSURs, ICH PSURs,
3   no U.S. Periodic Reports, or any other form of
4   aggregate reporting to the health authorities.
5           The only information that I received was
6   Dr. Leikin's final health assessment, Health Hazard
7   Assessment, and FDA -- FDA inspection 483s,
8   Establishment Inspection Reports, and the resultant
9   letters between the FDA and Actavis or Amide.
10  BY MR. DEAN:
11      Q.    And I don't want to harp on this, but I
12  asked -- this is for furtherance of our proceedings
13  today, I simply asked whether you had received the
14  MedWatch, the AERs and the MedWatch reports.
15          You told me no. And then you went on
16  and gave me a whole other list of things.
17          I would simply ask that, as we go along
18  today, you listen to my question and answer my
19  question. Is that agreeable?
20      A.    Yes.
21      Q.    Okay. Thank you.
22          And so since you did not have the
23  MedWatch forms in regard to Digitek, you would have
24  necessarily been unable to engage in any signal
25  detection analysis; correct?

---

19 (Pages 70 to 73)

Page 74

1    MR. THOMPSON:  Object to the form.
2    BY MR. DEAN:
3    Q.    Go ahead, Doctor.  You can answer the
4    question.
5    A.    I'm going to say yes, it precludes
6    definitive assessment.  The reason I went on too long
7    with your original question is to list all of the
8    documents that I could recall that contain any
9    information abstracted from the MedWatches.
10   What I received, and I did discuss this
11   with them last night, was abstracted information that
12   was usually the coding, the ADR coding, that really
13   precluded definitive assessment of any single case and
14   really any aggregate analysis.
15   Q.    So you didn't have the information to do
16   that, did you?
17   A.    No.  The only thing I had provided to me
18   was Dr. Leikin's Health Hazard Assessment where I
19   could use the information that he provided in that to
20   assess his conclusions.
21   But I felt that report did not contain
22   enough detail to allow me to make a full, independent
23   assessment, in that he included only a table of the
24   events and I was not given as an appendix to that the
25   company internal signal detection report that he was

Page 75

1    provided.
2    Q.    You said a minute ago that you had seen
3    some coding on the MedWatch reports.
4    What coding did you see and in what
5    document did you see it?
6    A.    The coding would be in the table of
7    Dr. Leikin's Health Hazard Assessments where he has
8    the events.  My assumption is that the events listed
9    were events coded.
10   I do not know that he did not go to the
11   narrative and take out events that were not coded.  I
12   am making an assumption.  There are similar
13   abstractions in the --
14   Q.    Excuse me.  Let me just stop you.
15   So the only coding -- I want to -- focus
16   on my question.
17   The only coding was what is in the
18   Health Hazard Evaluation form that Dr. Leikin did;
19   whatever codes appear there are the only codes you've
20   seen on MedWatch reports; is that correct?
21   A.    No.
22   Q.    Okay.  What else have you seen?
23   A.    The FDA inspectors, when they go back
24   through the cases, and this is in the supporting
25   documents, when they cite the cases that were not

Page 76

1    submitted to the FDA, they list events.
2    The assumption is that when the FDA is
3    talking about adverse events, whether they be 15-day
4    reports that are not submitted or adverse events that
5    -- where they did not like the adequate -- the
6    adequacy of the narrative quality or the follow-up,
7    when they list the event, the date, the drug, and the
8    -- I'm sorry -- the case number, the date and the drug
9    and then the events that follow, the assumption is
10   that that is the coding that was done on the
11   narrative, the events associated with the MedWatch.
12   They do comment that there were problems
13   with the events being left out of the appropriate box
14   of the MedWatch.
15   Q.    Is what you have described, does it
16   contain actual coding or does it contain -- or is it
17   -- are they documents from which you've assumed a
18   coding?
19   A.    It is an assumption on my part.  I
20   have --
21   Q.    So -- so the only -- let's get back to
22   my original question.
23   The only coding on MedWatches that you
24   have seen is what is contained in the Health Hazard
25   Evaluation form; is that correct?

Page 77

1    A.    And I am --
2    Q.    Is that correct?
3    A.    I have to clarify the yes or no because
4    you --
5    Q.    Well, could you answer first before you
6    clarify?
7    This is very simple.  Have you seen any
8    coding on a MedWatch report on Digitek other than what
9    may be contained in that Health Hazard Evaluation
10   form?
11   A.    I have not seen any MedWatch forms with
12   coding.  I made the assumption that Dr. Leikin
13   constructed the table in the Health Hazard Assessments
14   from the coding on the cases.
15   But I was not able to verify that table
16   against the coding on the MedWatch forms.
17   MR. DEAN:  Excuse me.  There's one with
18   just the Health Hazard Evaluation, the document.
19   BY MR. DEAN:
20   Q.    Dr. Frank, I have -- I hand you --
21   VIDEO OPERATOR:  Your microphone.
22   BY MR. DEAN:
23   Q.    I hand you what we've marked as Exhibit
24   220, and it contains the Health Hazard Evaluation
25   form; correct?

20  (Pages 74 to 77)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 78

1    A.    Yes.
2    Q.    And the -- you've been talking about
3  coding. Are you referring to the chart?
4    A.    When you look at the table here -- well,
5  actually, what I'm really referring is the table.
6          The column that says, Adverse Events,
7  and they list these, my assumption is that these
8  events will map to the adverse events on the CIOMS or
9  the MedWatch forms and the coding in the database.
10   Q.    And so that's what you meant before by
11  seeing information about coding, you are referencing
12  to this table in Exhibit 220; correct?
13   A.    That, and the FDA inspector's similar
14  abstractions of events that most likely will map to
15  coding on the MedWatch forms and coding in the adverse
16  event databases.
17   Q.    Okay. Let's go on.
18          How much are you being paid for your
19  services in this matter?
20   A.    $150 an hour.
21   Q.    How much time have you spent on this
22  matter?
23   A.    Initially, I worked to like -- the first
24  week I worked about 35 hours and then I spoke to Smart
25  Consulting about how much time they were expecting.

Page 79

1  And they said there was no cap.
2          And I said, well, the convention on --
3  is either a 40-hour cap, a 50-hour cap or a 60-hour
4  cap. And they instructed me to work to a 60-hour cap.
5          At the end, I was provided these
6  additional -- the additional documents in a short time
7  frame, and I worked extra hours.
8          And then I talked to Smart Consulting
9  about whether I should bill over the cap, and they
10  instructed me to bill it.
11   Q.    So as you --
12   MR. KAPLAN:  Instructed you to what? I
13  can't hear you. I'm sorry.
14   THE WITNESS:  I billed over the 60-hour
15  cap.
16   MR. KAPLAN:  How many?
17  BY MR. DEAN:
18   Q.    So, as you sit here today, how much time
19  have you billed to this matter?
20   A.    I did not do an aggregate analysis of
21  the time. It is included on this, all of the time
22  sheets.
23   Q.    So when we take one of these with us
24  today, when Mr. Thompson and I each take one, we'll
25  have that information; is that correct?

Page 80

1    A.    Yes.
2    Q.    Well, I -- a few minutes ago I asked you
3  about the scope, your understanding about what your
4  assignment was, and you told me the two topics that
5  you were asked to address.
6          What do you understand your role to be
7  in this case as far as how you present the
8  information?
9          Do you view yourself as an advocate on
10  behalf of the plaintiffs or do you view yourself as an
11  impartial truth seeker?
12   MR. THOMPSON:  Object to the form.
13  BY MR. DEAN:
14   Q.    Go ahead.
15   A.    I have particular concern, because this
16  is the first time I've been an expert witness, that my
17  opinions are based on very, very accurate and very,
18  very complete evidence.
19          I became very, very uncomfortable with
20  the lack of detail in the evidence and the absence of
21  information to -- that I was provided to completely
22  evaluate the systems in the company.
23          And what I decided to do to make this
24  initial assessment as accurate as possible was to
25  track very, very closely with FDA inspectors'

Page 81

1  observations that were made by looking at primary
2  documents that I was not provided.
3          And what I have been hired by the
4  plaintiffs, I want to make sure that my opinions are
5  as accurate as possible.
6          It's been a little bit embarrassing when
7  you asked me questions and you see that I'm doing --
8  sketching notes to myself. I don't write out official
9  lists and hand them to the attorneys.
10          I want as little, I want to say,
11  embarrassment as possible, that will result from my
12  handling what I see as somewhat of a difficult case.
13          And this being the first time that I've
14  done this, I don't have experience in having done this
15  before. And I have concerns about the incompleteness
16  of the information.
17          There's a fair amount of additional
18  information, such as MHRA inspections, which are very
19  vigorous inspections on compliance, maybe more
20  vigorous than FDA, and there's at least one of them.
21          But I think that I made a comment that
22  there were more MHRA inspections.
23          So there's -- I start to catalog
24  inspection one, inspection two, inspection three,
25  through the timeline, identify them as MHRA or FDA,

21 (Pages 78 to 81)

Karen A. Frank, M.D.      Videotaped            June 30, 2010

## Page 82

1    identify the site, try to specify whether they were
2    actually looking at the pharmacovigilance systems and
3    then map out -- since I don't know what happened from
4    the time the first consent decree was lifted to the
5    first inspections to really put down the facts and
6    start to build a picture of what happened, what
7    failed, what was corrected, what was adequately
8    corrected, what was inadequately corrected, and what
9    was found on the repeat FDA inspection of 2008.
10         The more that I can get an accurate
11   assessment the course of events, it will allow an
12   accurate assessment of what happened inside the
13   company and any potential impact on signal detection
14   for either Digitek or any of the other products that
15   were dependent on those business processes during that
16   period.
17        Q.    But you've already told us that there's
18   a substantial amount of underlying company documents
19   you have not looked at; correct?  Correct?
20        A.    I have -- I'm going to have to say a
21   simple yes.
22        Q.    Right.  And then I wanted to get back to
23   my original question.
24             And I thank you for your answer.
25             But my original question was how you

## Page 83

1    viewed your role as an expert witness, whether you
2    viewed yourself as an advocate on behalf of the
3    plaintiffs or whether you viewed yourself as an
4    impartial observer relating comments about documents
5    that you had reviewed.
6             Which is -- which role do you see
7    yourself in, Dr. Frank?
8             MR. THOMPSON:  Object to the form.
9    BY MR. DEAN:
10        Q.    Go ahead.
11        A.    How do I respond to his objection?
12        Q.    He's made that for the record.  You can
13   go ahead and give your answer.
14        A.    Okay.  I was hired by the plaintiffs to
15   address very specific issues, to look how these
16   systems potentially impacted signal detection during
17   Digitek recall.
18             I needed to do -- I'm going to use a
19   legal term -- due diligence in the scope of work that
20   they asked me to meet.
21             In doing that, I became concerned about
22   the completeness of the information that I was seeing
23   and the fact that my opinion based on that information
24   could be vulnerable if this information that I don't
25   have was brought forward.

## Page 84

1             And I started to function more like a
2    truth seeker.  And I don't know how to completely
3    explain.
4             I'm extremely concerned that the
5    information gathered in the assessment is accurate and
6    complete and can reflect on the signal detection.
7             And I spoke with them last night, and I
8    will need to talk to Dr. Miller if you need me to give
9    you further detail on my concerns.
10        Q.    But as you sit here, in spite of the
11   questions --
12             MR. KAPLAN:  Mr. Miller?  Did you say
13   Dr. Miller?
14             THE WITNESS:  It's mister.
15             MR. KAPLAN:  Pete Miller; correct?
16             THE WITNESS:  No, I'm sorry.
17   Mr. Thompson.  Mr. Thompson.
18   BY MR. DEAN:
19        Q.    So as of today, you have made your
20   concerns about lack of information known to the
21   plaintiffs' counsel and you've done that in the past.
22   I understand that, too.
23             But you did it again last night;
24   correct?
25        A.    Yes.

## Page 85

1        Q.    And you have those concerns, as you sit
2    here today, that you don't have a full and complete
3    information base on which to give your opinion; is
4    that correct?
5        A.    I am privy to some of the information
6    that was obtained in due diligence on drug
7    withdrawals.  I'm talking market withdrawals, not
8    recall of the lots.
9             And the information obtained in the
10   discovery of this case was not as extensive in those
11   cases.  And I started to ask about the discovery.
12             Is this the discovery you would expect
13   to see in a case like this or are the absence of the
14   MHRA inspections?  The absence of the company internal
15   signal document, are those issues?
16             But there apparently was not a further
17   investigation done, and I was told not to start to
18   talk into that direction.
19        Q.    As recently as last night, Dr. Frank,
20   you expressed an opinion to the plaintiffs' counsel
21   that you had inadequate information and concerns about
22   the adequacy of the information to testify today; is
23   that correct?
24        A.    Yes.
25        Q.    Okay.  Now, you talked about the

22  (Pages 82 to 85)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 86

1  adequacy of signal detection. I want to, in the
2  context of Digitek -- and you understand that product
3  was recalled; correct?
4      A.    Yes.
5      Q.    In the context of Digitek, would -- let
6  me strike that.
7          Your -- one of your expertises is
8  pharmacovigilance; correct?
9      A.    Yes. I've worked in the field for
10 several years.
11     Q.    Correct.
12         And, typically, in the field of
13 pharmacovigilance, representatives of pharmaceutical
14 companies are looking at a vast array of information
15 to see if new and different adverse reactions are
16 arising from their drugs.
17         Is that a fair summary?
18     A.    Yes.
19     Q.    And in this case, you -- this case being
20 the Digitek case, you understand that there is a
21 question about a manufacturing defect in the product?
22         You understand that, don't you?
23     A.    Yes.
24     Q.    And that is -- would you agree with me
25 that's -- it's unusual to address a manufacturing

Page 87

1  defect through signal detection?
2          I'm not saying it can't be done, but I'm
3  saying it's not the usual thing you do in
4  pharmacovigilance; is that correct?
5      A.    Classically, signal detection is looking
6  for new events.
7      Q.    All right.
8      A.    But this clustering of cases where the
9  FDA was concerned that they didn't see all of them,
10 any clustering of single cases should alert them to a
11 potential batch issue.
12         It could be an issue with a site, but it
13 also could be -- could map to an issue with a
14 distributed batch.
15         And that should have -- be covered by an
16 SOP in the company that will require either a case
17 series or some form of analysis for that cluster of
18 events.
19     Q.    So what you are looking for, what you
20 would be looking for here in terms of signal detection
21 in a manufacturing defect case, is whether -- whether
22 the MedWatch reports were providing information to the
23 company that there might be a manufacturing defect;
24 correct?
25     A.    Yes.

Page 88

1      Q.    Okay. And -- is there a qualifier? Is
2  that, indeed, what you're looking for, what you would
3  be looking for in terms of a manufacturing defect
4  case?
5      A.    With product complaint cases, I was
6  explaining to you that there are often routine Health
7  Hazard Assessments where the pharmacovigilance
8  physician receives work products from quality for the
9  product complaint and the investigation and the
10 analytics.
11         And then there are Health Hazard
12 Assessments done in realtime where the company
13 pharmacovigilance database is data mined for any cases
14 that could indicate that that manufacturing detect was
15 leading to adverse events that were reported, either
16 globally or particularly in the market of
17 distribution.
18         Some companies will look at the medical
19 literature, and some companies will go as far as to
20 data mine the AERS database in Washington, which has
21 -- which contains all the MedWatch forms submitted to
22 the FDA, or the WHO database in Uppsala, Sweden, that
23 contains all of the CIOMS forms submitted to EMEA.
24         But there is typically, for these
25 manufacturing defects that may have gone to market, an

Page 89

1  assessment of the extent of the exposure, what batches
2  could have been affected, what is the market
3  distribution of those batches, and then is there any
4  evidence that there are adverse events that are
5  resulting in response to the market exposure of those.
6      Q.    So one of the key things that you want
7  to do is to look at the Adverse Event Reports to see
8  if they suggest a defect in manufacture in affected
9  batches; correct?
10     A.    Yes.
11     Q.    And the other thing you mentioned in
12 your prior answer was product complaints.
13         And so is it also fair to say that if
14 one -- if a company was concerned about a
15 manufacturing defect, they could look to their product
16 complaints on returned product and see -- and make an
17 inquiry to see whether those resulted in any adverse
18 experience reports?
19         Is that something that companies do?
20     A.    You are correct. The work products fed
21 to pharmacovigilance usually contain an assessment of
22 are there any similar product complaint reports. And
23 that in turn determines the scope of the batches that
24 are potentially affected.
25     Q.    I don't want to interrupt, but I do want

23  (Pages 86 to 89)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

Page 90

1   to move this along.
2        What you are looking for -- strike that.
3        What many companies have is a process by
4   which there's communication between the folks on the
5   signal detection side and folks on the product
6   complaint side where they exchange information to see
7   if it can be useful to the other side; is that
8   correct?
9        A.   Yes.
10       Q.   Is that -- now, did you review the
11  deposition of Sarita Thapar?
12       A.   Yes.
13       Q.   Didn't she, indeed, say that Actavis had
14  such a communication process?
15       A.   Yes.
16       Q.   You have not reviewed the product
17  complaints on Digitek prior to the recall, have you?
18       A.   No.
19       Q.   You have not reviewed the MedWatch
20  reports prior to the recall, have you?
21       A.   No.
22       Q.   So you don't know whether there were any
23  MedWatch reports which even gave off a signal of a
24  manufacturing defect, do you?
25       A.   I went --

Page 91

1        Q.   Would you answer that question, please.
2        A.   The answer is no.
3        Q.   And you don't know whether there were
4   any product complaints prior to the recall that
5   suggested there was a manufacturing defect, do you?
6        A.   I do know about the one from 2004 that
7   led to an investigation.  I did not receive the Health
8   Hazard Assessment in association with that 2004
9   investigation.
10       Q.   Beyond that 2004 incident, which you've
11  talked -- which you just mentioned, have you reviewed
12  any product complaints about Digitek prior to the
13  recall?
14       A.   No.  I believe all the ones I saw were
15  post.
16       Q.   So -- right.
17       So you don't know whether there was --
18  at the end of the day, you don't know whether there
19  was anything as to Digitek and the manufacturing
20  defect with Digitek to be communicated between the
21  product complaint section and the signal detection
22  section, do you?
23       A.   I went looking to assess what was done,
24  and I couldn't find anything.  And then --
25       Q.   Could you -- I'll let you answer however

Page 92

1   you want to answer, but you didn't -- you did not --
2   you could not form any opinion as to whether there was
3   communication between the product complaint side and
4   the signal detection side on Digitek as relates to a
5   manufacturing defect because you were not provided
6   with those records, were you?
7        A.   My opinion is not based on the records.
8   When I inquired on the June 2nd meeting and expressed
9   my concerns, I was not given enough to document that
10  process.
11       But I found in the FDA inspections of
12  2008 specific statements they were upset about the
13  lack of Health Hazard Assessments.
14       So what I did in trying to assess
15  whether there was an adequacy, realtime Health Hazard
16  Assessments, because I was not -- I was not provided
17  all of the information that you talked about, even on
18  questioning.
19       I said, the only thing that I can find
20  that says that there is perhaps something in place,
21  but not in use, was the FDA observation.
22       And that's documented in here with my
23  comment about concern of lack of ongoing Health Hazard
24  Assessments.
25       Q.   And that's the opinion of one

Page 93

1   investigator; correct?
2        A.   And I --
3        Q.   Is that correct?
4        MR. THOMPSON:  Object to the form.
5   BY MR. DEAN:
6        Q.   What you just referenced is the opinion
7   of one investigator; correct?
8        A.   Possibly two, but, yes, one.  It's one
9   inspection, probably one investigator, possibly two.
10       Q.   Let me go back.  Let me go back.  And I
11  want to get an answer to my other question, just so
12  we're clear.
13       You do not have an opinion as to the
14  actual -- strike that.
15       You have not had an opportunity to
16  review the information exchanged between -- gathered
17  by the product complaint section and the signal
18  detection section as to -- as to the possibility of
19  manufacturing -- strike that.
20       You have not reviewed the information
21  obtained by the product complaint section and the
22  signal detection section prior to the time of the
23  recall to determine the adequacy of the information
24  exchanged between the two groups, have you?
25       A.   I have concern that there is an absence

24   (Pages 90 to 93)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

## Page 94

1   of information provided to me at this point in time on
2   which I can base an opinion.
3       Q.   You haven't reviewed that information at
4   this point, have you?
5       A.   No.
6       Q.   Correct?  Is that correct?
7       A.   The information that I --
8           MR. KAPLAN:  Is that correct?
9           THE WITNESS:  No, I have not been
10  provided that information.
11  BY MR. DEAN:
12      Q.   Thank you.
13          Could you tell us, and I don't want to
14  -- I hope we don't spend much time on this, but I
15  would just like for you to give us a brief overview of
16  your job duties at the FDA, what you did when you were
17  at the FDA.
18          Could you do that for us, please?
19      A.   I spent two years at the FDA as a fellow
20  in the division of cardio-renal drug products.
21          And when I finished my fellowship, I was
22  brought on as a GS-14 expert level reviewer in anti-
23  infectives for the small molecules for sepsis and
24  septic shock that had been moved from cardio-renal to
25  anti-infectives.

## Page 95

1           They needed cardiovascular expertise.
2           I also reviewed things in anti-infective
3   products.  I --
4       Q.   When you say "reviewed things," what
5   were you doing?
6       A.   I did IND reviews.
7       Q.   Okay.
8       A.   NDA reviews.  I did updated class
9   labeling.
10          There was a -- an innovative product
11  that had been lax in updating their drug label, and a
12  me-too drug came along, and they approached the FDA
13  about leveling the playing field for competitive
14  marketing by forcing the innovator to update their
15  drug label.
16          And I was the person who wrote the
17  initial draft of the updated drug label based on all
18  information on the two drugs.  And I provided that to
19  FDA supervisory.
20          I then received -- I also did a workup
21  on an FDA advisory panel recommendation for black box
22  warnings on a class of drug for antimicrobial
23  resistance.
24          And one of the companies decided to
25  challenge the fact that their drug should be subjected

## Page 96

1   to class black box labelings, and they put together a
2   labeling review and sent it in to the FDA, and I was
3   assigned it and I started on it.
4       Q.   Let me interrupt and see if I can speed
5   this along.
6           Would it be fair to say that when you
7   were at the FDA, you basically did medical review of
8   INDs, NDAs, and addressed labeling issues?
9           Is that a fair summary?
10          MR. THOMPSON:  Object to the form.
11          THE WITNESS:  I did.  I also did some
12  review of --
13  BY MR. DEAN:
14      Q.   Just give me the other broad areas that
15  you might -- I don't need the detail, but just a broad
16  area.
17      A.   I did some peer review of -- or I did
18  some review of peer-reviewed literature that came into
19  the FDA for FDA review prior to publication, because
20  there had been disputes between peer-reviewed
21  publications and the FDA in that the peer-reviewed
22  publications were talking too much about off-label
23  use.
24      Q.   Okay.  Go ahead.  Anything else?
25      A.   I assisted on the placebo hypertension

## Page 97

1   project where they pooled placebo data on hypertension
2   trials to justify the use of placebo groups in short-
3   term Phase II trials demonstrating pharmacodynamic
4   efficacy of hypertensive agents.
5       Q.   At any time when you were with the FDA,
6   did you do an inspection of a manufacturing facility?
7       A.   No.  I was not in the -- in that
8   office.  I was in the review divisions.
9       Q.   All right.  Now, would I also -- from my
10  review of your resume, you are not an expert on
11  manufacturing of drugs, are you?
12      A.   No.
13      Q.   You are not an expert on quality control
14  procedures in regard to the manufacturing of drugs,
15  are you?
16      A.   No.
17      Q.   You are not an expert on quality
18  assurance issues in regard to the manufacturing of
19  drugs, are you?
20      A.   No.
21      Q.   Okay.  Have you -- when you were with
22  the FDA, did you have any experience with recalls?
23      A.   FDA, not that I'm aware of.  The only
24  thing that I recall are clinical holds on clinical
25  trials.

25  (Pages 94 to 97)

Karen A. Frank, M.D.        Videotaped              June 30, 2010

---

Page 98

1    Q.    When you were in --
2    A.    There was -- I was made aware of that,
3  but I was not involved with it.  I take that back.
4    Q.    I know that you have a work history in
5  private industry as well.
6        During your time in private industry,
7  did have any experience with pharmaceutical recalls?
8    A.    I did not implement the recalls.  I did
9  the Health Hazard Assessments for them.
10    Q.    So that would -- the extent of your
11  involvement with a recall would be to do the Health
12  Hazard Evaluation; correct?
13    A.    Yes.
14    Q.    Okay.  Isn't it true that the FDA can
15  ask that a product be recalled for any reason?
16    A.    I will say yes.
17    Q.    Okay.  And there is no legal requirement
18  that a product be defective before it's subject to a
19  recall, is there?
20    A.    I do not know the answer to that
21  question.  I cannot think of that -- where that is
22  stipulated in the CFR.
23    Q.    Has any company that you've ever worked
24  for received a 483?
25    A.    Yes.

Page 99

1    Q.    Has any company you've ever worked for
2  received a warning letter?
3    A.    Yes.
4        May I ask a clarifying question?
5    Q.    No.
6    A.    Okay.
7    Q.    What is a 483?
8    A.    A 483 is an FDA form in which the
9  inspectors report their initial observations of the
10  inspection.
11    Q.    Is it a final agency action?
12    A.    It is taken back into the FDA and it
13  produces a warning letter.
14    Q.    Is it a final agency action?
15    A.    I do not know the answer to that
16  question.  In legal terms, if it's -- if it -- what
17  constitutes a final agency action.  I never --
18    Q.    Did you review any of the 483s in this
19  case?
20    A.    Yes.
21    Q.    Did you -- do you have any recollection
22  of observing on the 483s whether it speaks to that
23  issue that I just asked you about?
24    A.    Yes.  It says that it is not a final.
25    Q.    Does it -- do you remember that?

Page 100

1    A.    Yes.
2    Q.    Okay.  So you do have some knowledge on
3  that, don't you?
4    A.    Yes.
5    Q.    And you would agree with me that the 483
6  form itself says it's not a final agency action;
7  correct?
8    A.    Yes.
9    Q.    I take it, you're not -- going from your
10  report, you're not going to testify about issues of
11  adulteration; is that correct?
12    A.    No.  They've asked me to be very
13  specific in testifying on issues of these systems and
14  not to go out of scope into issues that would be
15  covered by the cardiologists.
16    Q.    Well, just so I'm clear, you're not
17  going to say that because a drug is adulterated, it's
18  defective?  You're not going to offer an opinion like
19  that, are you?
20    A.    No.
21    Q.    Okay.  And you're not going to be
22  offering any medical opinions on individual cases;
23  correct?
24    A.    No.
25    Q.    I'm correct, you're not?

Page 101

1    A.    Correct.  I am not.
2    Q.    Okay.  Thank you.
3        Would you agree that if the FDA, in its
4  dealings with a company, has concerns about data
5  integrity, it will take aggressive action vis-a-vis
6  that company?
7        MR. THOMPSON:  Object to the form.
8        THE WITNESS:  Please repeat the
9  question.
10  BY MR. DEAN:
11    Q.    In your experience, if the FDA has
12  questions about data integrity within a company, will
13  it take aggressive actions to follow up with that
14  company?
15    A.    Yes.
16    Q.    In your review of the documents you've
17  been provided, you didn't see any indication that the
18  FDA had any such concerns; correct?
19    A.    There were no explicit statements on
20  data integrity.  There were, however, inspection
21  observations of inaccuracies and incompleteness of
22  narratives and coding on MedWatch forms.
23        Incomplete coding on MedWatch forms can
24  mean incomplete data retrieval on case series and
25  aggregate signal detection.

26 (Pages 98 to 101)

Karen A. Frank, M.D.      Videotaped                    June 30, 2010

## Page 102

1      I have not seen any coding conventions
2  from Actavis, and I have not seen any primary
3  documents that would allow me to make any further
4  statement of the impact of coding issues on signal
5  detection.
6      But the FDA inspector's observation
7  raised concerns about quality issues in the safety
8  database, coding and the case retrieval for signal
9  detection.  I can't comment on the extent.
10     Q.    Would you agree that in the context of
11 the AERs that you're testing -- testifying about, the
12 FDA never raised a specific question in regard to data
13 integrity?
14     Do you agree with that?
15     A.    That term was not in any of the
16 documents that I reviewed.
17     Q.    Do you have any knowledge as to whether
18 a double-thick tablet of Digitek ever reached the
19 market?
20     Do you have any specific knowledge of
21 that?
22     A.    The only evidence I have that a double-
23 thick tablet reached the market is the 2004 inspection
24 report where a double-thick tablet was returned to the
25 company from a pharmacist in Bellingham, Washington.

## Page 103

1      I cannot recall from the product
2  complaints that I reviewed if there's specific
3  evidence in those.  I would have to re-review them and
4  report back to you.
5      But I have no MedWatches, CIOMS forms,
6  or aggregate reports, or any information on the recall
7  product that was incinerated, that would allow me to
8  make any assessment of how many or the percentage of
9  any batch of double-thick tablets that reached the
10 markets.
11     Q.    Is the only one that you are aware of
12 the one you referenced in 2004?
13     A.    There has been reference to a 2008, but
14 I cannot recall that I was provided any documents on
15 that case in 2008.
16     Q.    Do you know whether -- what's your
17 understanding as to double-thick tablets in 2008, if
18 you have any?
19     A.    Something was mentioned this morning.
20 But what I have are the inspection reports and the
21 recall package to finding the batches at risk.
22     I cannot picture in any documents sent
23 to me any sentence that says X tablet reached the
24 market, X tablet was ingested by a patient or X tablet
25 was returned to the company.

## Page 104

1      Q.    Is the only information that you would
2  have in response to my question what would be
3  contained in an FDA document?  Is that fair?
4      A.    Unless there is something in -- I was
5  sent sample product complaints toward the end, and I
6  did not loop them in as evidence.  They are on the
7  flash drive.
8      I cannot recall any specifics right now
9  of those.  But there may be on those product
10 complaints statements that I do not recall about
11 double-thick tablets.  I cannot recall them.
12     So I have to say no.  The only thing
13 that I am absolutely certain that I have seen is 2004.
14     Q.    Okay.  And let me ask you a few follow-
15 up questions in regard to that.
16     MR. DEAN:  Why don't we go off the
17 record for just a minute while I find this document.
18     VIDEO OPERATOR:  Going off the video
19 record.
20     The time is 11:38 a.m.
21     (Discussion off the record.)
22     VIDEO OPERATOR:  We're now back on the
23 video record.
24     The time is 11:40 a.m.
25 BY MR. DEAN:

## Page 105

1      Q.    In your report, which we marked, you
2  reference that 2004 --
3      A.    Yes.
4      Q.    -- double thick observation.  But you
5  did not reference any follow-up by the FDA.
6      Did you inquire as to the plaintiffs'
7  lawyers whether the FDA itself did any follow-up on
8  the 2004 double thick observation?
9      A.    No.
10     Q.    Do you know whether the company reported
11 it to the FDA?
12     A.    No.
13     Q.    Would you have expected the company to
14 report it to the FDA?
15     A.    I'm going to say yes, it should have
16 generated a field alert.  But I must qualify that,
17 that it's not my area of expertise.
18     Q.    Would this -- would the FDA follow --
19 would the possibility of an FDA follow-up to this 2004
20 observation be within one of the white spaces you
21 mentioned before?
22     A.    Yes.
23     Q.    Let me show you Exhibit 20.  And I'm
24 going to -- eventually I'm going to direct your
25 attention to a specific page, but generally do you

27 (Pages 102 to 105)

Karen A. Frank, M.D.       Videotaped                June 30, 2010

Page 106

1   recognize what kind of a document this is?
2       A.    This is an inspection. It's a CGMP
3   inspection.
4       Q.    And was it prepared by -- it was
5   prepared by the FDA; correct?
6             Look at the back of it.
7       A.    Yes.
8       Q.    And on the front page, on the bottom
9   under Administrative Procedures, it says, We,
10  Investigators Erin McCaffrey and Robert Horan, issued
11  a 482 Notice of Inspection; correct?
12      A.    Yes.
13      Q.    So this is the FDA inspectors inspecting
14  Actavis in 2004; correct?
15      A.    Yes.
16      Q.    In December of 2004; correct?
17      A.    12/1/04, yes.
18      Q.    Okay. Now, let me direct you -- your
19  attention to Page 6 of this report.
20            Do you see where it says, Field Alert
21  Reporting?
22      A.    Yes.
23      Q.    Before I ask you the next series of
24  questions, could you just take a minute and read that
25  paragraph, please.

Page 107

1       A.    Yes.
2             (Witness reviews document.) Okay.
3       Q.    So, first of all, we can agree that the
4   -- in the first two sentences it says that the -- a
5   Field Alert was issued and it was submitted to the New
6   Jersey District Office; correct?
7       A.    Yes.
8       Q.    So Actavis submitted this as a Field
9   Alert to the District Office; correct?
10      A.    Uh-huh.
11      Q.    Yes?
12      A.    Yes.
13      Q.    And then the FDA, when they were there
14  during this inspection, did follow-up on that;
15  correct?
16      A.    Yes.
17      Q.    And the FDA noted that, besides this one
18  tablet, no additional complaints or reports of thick
19  tablets have been received for this high-volume
20  product; correct?
21      A.    Yes.
22      Q.    And they further concluded the event was
23  considered an isolated incident and corrective actions
24  were put in place to prevent its reoccurrence;
25  correct?

Page 108

1       A.    Yes.
2       Q.    And then it says, corrective actions
3   were verified during the inspection; correct?
4       A.    Yes.
5       Q.    And you have no reason to disagree with
6   any of the conclusions reached by the FDA in this
7   Field Alert in regard to the 2004 double thick
8   observation, do you?
9       A.    No.
10      Q.    Okay. Now, is this the kind of document
11  that you would have liked to have seen when you were
12  compiling your report, at least a part of it, in
13  regard to the 2004 double thick issue?
14      A.    Yes. It would have assisted in this
15  timeline, and of documenting corrective actions and
16  adequacy of corrective actions over this period.
17      Q.    Because that's one thing you're looking
18  for; right?
19      A.    Yes.
20      Q.    And here they did -- Actavis did exactly
21  that, they reported it, they took corrective actions,
22  and the FDA was satisfied with those corrective
23  actions; correct?
24      A.    Yes. In December of 2001, it is clearly
25  documented --

Page 109

1       Q.    I'm sorry, December 2004.
2       A.    2004. In December 2004, this document
3   clearly states that the Field Alert was issued. There
4   was inspection follow-up.
5             My reading of this paragraph includes
6   that the FDA is actually confirming some of the
7   conclusions of the report that I received. We can
8   verify that point by point if we need to.
9             And they are saying at that time they
10  consider the corrective actions to be verified. And
11  my assumption is verification means adequate.
12      Q.    Okay. Thank you. Let me get that out
13  of your way.
14            Have you ever taught or published about
15  pharmacovigilance?
16      A.    I gave internal seminars inside CSC.
17      Q.    Inside what?
18      A.    Inside one of the consulting firms that
19  I worked for. The -- they had approached me about
20  talking at national conventions, but I did not. And,
21  no, I have no publications on pharmacovigilance.
22      Q.    And you've never taught in -- outside of
23  the context in which you just mentioned; right?
24      A.    No. I have never done independent
25  workshops, and I cannot recall ever having done the

                          28 (Pages 106 to 109)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

## Page 110

1  official company SOP training on pharmacovigilance.
2      Q.   Now, can we agree that MedWatch reports
3  -- the information in MedWatch reports that's received
4  does not mean that a drug caused a specific adverse
5  event that may be described in the report?
6      A.   Yes.
7      Q.   It doesn't even try to do that, does
8  it?  A MedWatch report does not even attempt to do
9  that; correct?
10     A.   The MedWatch form does not, but the
11 CIOMS reports contain CIOMS comments.
12          So in the database, there can be CIOMS
13 comments that will map if the database prints to a
14 CIOMS form, and I do not believe they will map to the
15 FDA 3500, the MedWatch.
16          But there can be assessments of
17 reporters and company on the MedWatch and the CIOMS,
18 and CIOMS companies assessing all of that information
19 in light of the narrative on the CIOMS and in the
20 database.
21          Because one of the very important things
22 in a company when you have the databases, there is a
23 reporter's field for causality or relatedness --
24 relatedness, and there's a company field.
25          And you want those two to be in parallel

## Page 111

1  and transparent.
2          Occasionally you hear stories of
3  companies who say we only need one field and the
4  company can overwrite the reporters.
5          But it is extremely important to
6  maintain two transparent fields with a reporter
7  assessment of relatedness, a company assessment of
8  relatedness.
9          The company assessment of relatedness
10 may be based on a probabilistic analysis, such as the
11 Naranjo algorithm, and all of that is typically put
12 into a CIOMS comment that also resides in the
13 database.
14     Q.   Let's go back.  First of all, a MedWatch
15 report itself does not even attempt to get at the
16 issue of causation; correct?
17     A.   Yes.
18     Q.   Now, you mentioned a CIOMS report.  I
19 want to ask you about that.  I -- in one of my past
20 lives, I actually knew what those initials stood for,
21 but you're going to have to refresh my recollection.
22          If you first give me the initials and
23 then tell me what they stand for.
24     A.   I think it was my past lifetime, too.
25     Q.   First, do you remember the initials?

## Page 112

1  And if you don't, that's fine.
2      A.   No.  It's a working committee within the
3  WHO that repeatedly analyzes pharmacovigilance
4  practices and publishes recommendations that are
5  available through the WHO in Geneva, but I'm blanking
6  on the actual acronym.
7      Q.   And that's fine.  So --
8          MR. KAPLAN:  I think it's S-C-I-O-M-S.
9          THE WITNESS:  It's C-I-O-M-S.
10         MR. KAPLAN:  It's S-C.
11         THE WITNESS:  It's C.  Charlie, Ingrid,
12 Oliver, Mark, Sam.
13         MR. KAPLAN:  See what I know?  Not very
14 much.
15 BY MR. DEAN:
16     Q.   And is this a group that takes a number
17 of MedWatches and tries to analyze or synthesize them
18 and issue a report?
19          What is it that they do?  I wasn't quite
20 sure what you were saying that they did.
21     A.   No.  They actually do higher level work
22 that actually translates into recommended --
23 recommendations for best practices in
24 pharmacovigilance.
25     Q.   But they don't take an individual

## Page 113

1  MedWatch report and try to tease out causality from an
2  individual MedWatch report, do they?
3      A.   No.  But the CIOMS form is the XUS
4  equivalent of the FDA 3500.
5      Q.   Okay.
6      A.   And when these databases are
7  constructed, the fields are in the databases and
8  there's -- there's a menu that allows the company to
9  print out the FDA form, the CIOMS form for the EMEA,
10 the specific form that goes to the BfArM in Germany,
11 on and on and on.
12          The same fields in the databases are
13 mapping to country-specific forms.  They can submit
14 the CIOMS form to the FDA in lieu of the 483.
15     Q.   In lieu of the AER?
16     A.   In lieu of the MedWatch --
17     Q.   Right.
18     A.   -- 350.
19     Q.   Yes.
20     A.   So there are companies that don't do
21 CIOMS comments because they just submit 350s.
22     Q.   But if a company was to submit the CIOMS
23 report as opposed to the MedWatch 350, that would
24 contain basically the same information that's on the
25 MedWatch, just on another form; correct?

29  (Pages 110 to 113)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

Page 114

1    A.    Yes.  Now --
2    Q.    Is that correct?
3    A.    Yes.
4    Q.    And then if it -- so if it contains the
5    same information, it would not attempt to get at
6    causality, either, would it?
7    A.    They do not have a hundred percent
8    concordance.
9         The CIOMS forms contain CIOMS comments,
10   which are typically a statement of causality, based on
11   the reporter's causality, the medical judgment on the
12   narrative, plus or minus a quantitative probabilistic
13   algorithm on causality, such as the Naranjo.
14   Q.    But you have a number of reviewers that
15   are looking at a particular report; correct?
16   A.    Yes.  And there could be discordance in
17   their assessments.  And that's why I made the point of
18   the importance of the transparency of the reporter's
19   assessment of causality and the company's assessment
20   of causality.
21        Those are to be considered independent
22   and recorded in parallel and transparent.  And if the
23   company wishes to refute the reporter, they can do so,
24   but they cannot overwrite or obliterate the reporter's
25   causality.

Page 115

1    Q.    Do you have any evidence -- for the
2    purposes of this question, I want to put aside the
3    double thick issue.
4    A.    Okay.
5    Q.    Do you have any evidence that any normal
6    size Digitek tablet reached the market which was out
7    of specification prior to the time of the recall?
8    A.    No.
9    Q.    Okay.  Do you -- are you aware that --
10   are you aware of something called an FDA 484?
11   A.    Would you clarify?
12   Q.    Are you aware that sometimes the FDA
13   will, unbeknownst to a particular company, go out and
14   obtain product from the market and test it to see if
15   it meets specifications?
16   A.    I have heard of that procedure.  I have
17   not been formally trained on it, nor have I been
18   formally involved in it.  And I was not the recipient
19   of the reports from that procedure when I was at the
20   FDA.
21   Q.    Have you been informed in this case that
22   the FDA indeed went out and tested Digitek that was on
23   the market prior to the time of the recall?
24   A.    No.  I have not been informed verbally
25   or in writing.

Page 116

1    Q.    Have you been informed that a company
2    called UDL did -- I'm sorry.
3         Have you been informed that a company
4    called Celsius did testing on Digitek that was on the
5    market prior to the time of the recall?
6    A.    No.  However, I did not, nor did I ask
7    for this.  My assumption is that these documents would
8    have routed to an expert witness who was actually
9    expert in that area.
10   Q.    And that's outside your area of
11   expertise, product -- product manufacture and testing;
12   correct?
13   A.    Yes.
14   Q.    Did either Mr. Miller, Ms. Johnson or
15   Mr. Thompson tell you that the plaintiffs' lawyers in
16   this litigation had publicly abandoned the theory of
17   double-thick tablets?
18   A.    No.
19   Q.    Would that surprise you to learn about
20   that?
21        MR. THOMPSON:  Object to the form.
22   BY MR. DEAN:
23   Q.    Would it surprise you to know that
24   Mr. Thompson has filed papers with the court that says
25   the whole issue of double-thick tablets is a red

Page 117

1    herring?
2         MR. THOMPSON:  Object to the form.
3         THE WITNESS:  I was not informed of
4    that.  I -- I was aware that they were going to pursue
5    the batch uniformity issue, but I was not aware the
6    double-thick tablet issue had been abandoned.
7    BY MR. DEAN:
8    Q.    Would you have bothered to put any
9    reference to double-thick tablets in your report if
10   you had known that the theory had been abandoned and
11   that plaintiffs were referring to it as a red herring?
12        MR. THOMPSON:  Object to the form.
13        THE WITNESS:  No.
14        I was asked specifically to evaluate the
15   systems and the impact on the signal detection in the
16   Digitek case, and they were discussing the double-
17   thick tablet and the blend issue, but I was not told
18   the double-thick tablet had been abandoned.
19        I was not shown the FDA press release
20   stating that there was no risk to public health in the
21   Digitek recall.  And I have no information that allows
22   me to quantify the statistical probability of the
23   impact of the blend issue.
24        These were maintained as abstract risks,
25   and most of the information that I would have needed

30 (Pages 114 to 117)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

---

Page 118

1  to determine any probability was redacted out of what
2  I received.
3       In other words, how many tablets were
4  actually in a batch, what was the likelihood that
5  those batches -- those tablets all ended up in one
6  bottle and ingested by one patient or evenly
7  distributed throughout a -- throughout bottles, one
8  tablet per bottle, which is a different risk.
9       One double-thick tablet in a bottle is
10  the medical equivalent of a patient accidentally
11  taking a double daily dose.
12  BY MR. DEAN:
13     Q.    Would you --
14     A.    I have no information on these
15  statistical probabilities or on either plaintiffs' or
16  defendants' assessment of those issues.
17     Q.    Would you agree it would be a waste of
18  time to do signal detection for something that is
19  admittedly a red herring?
20         MR. THOMPSON: Object to the form.
21         THE WITNESS: When was it determined to
22  be a red herring?
23  BY MR. DEAN:
24     Q.    Well, sometime within the last year.
25     A.    If, indeed, it was a red herring, I

---

Page 119

1  would agree with you. But the -- there is generally a
2  compulsive nature -- there is generally a compulsive
3  nature to evaluating potential risk.
4       I have no information on potential
5  versus actual risk, and I do not know at which time
6  potential risk was abandoned.
7       The investigation of the double-thick
8  tablet from 2004 did not include analytics to allow
9  assessment of suprapotency or subpotent dose of
10  Digoxin. I was also not provided the routine Health
11  Hazard Assessment with that finding.
12       And let me be careful with this one,
13  I've been trying to assess over the course of this
14  period if there's documentation of recurrence, what
15  percentage of the batch, how is it distributed into
16  the bottles, and all of that information has not been
17  provided to me.
18       I cannot say based on what's been
19  provided to me that there was no risk.
20       I -- I really need to be very careful
21  because there's -- there's an absence of information
22  provided to me to be -- that I can independently
23  substantiate the risk of the double-thick tablets or
24  the blend issue, the period of time associated with
25  the risk or the magnitude of the risk.

---

Page 120

1  Q.    And when you say that, establish a risk
2  from double thick or a blend issue, you don't mean by
3  looking at manufacturing records, you mean by looking
4  at records within your area of expertise; right?
5     A.    Well, as an FDA medical reviewer, we
6  have classes on a lot of this. We don't become
7  expert. But I started to ask questions of the risk of
8  population exposure. Is this one tablet per batch or
9  is it 50 percent of the batch?
10         There were -- and I'm not an expert on
11  this, but they did a visual inspection of a batch of
12  3.4 million tablets and pulled out a couple dozen.
13         I have no idea -- I'm starting to say,
14  what's the risk to a patient population of what the
15  percentage of that batch was that could have
16  potentially been double thick?
17         Because, to my assessment, the entire
18  batch was not submitted to a validated screening for
19  those double-thick tablets.
20     Q.    You already admitted that you're not an
21  expert in quality assurance or quality control;
22  correct?
23     A.    Yes, but I would have liked them to have
24  sent me something that was quantitative. But there
25  was nothing.

---

Page 121

1  Q.    So you have an absence of information on
2  that issue; correct?
3     A.    Yes.
4         MR. DEAN: Okay. Our videotape is
5  almost expired.
6         Let's go off the record.
7         VIDEO OPERATOR: Going off the video
8  record.
9         This is the end of Tape 2.
10         The time is 12:03 p.m.
11         (A luncheon recess was taken from
12  12:03 p.m. to 1:05 p.m.)
13         VIDEO OPERATOR: We're now back on the
14  video record.
15         This is the start of Tape 3.
16         The time is 1:05 p.m.
17  BY MR. DEAN:
18     Q.    You understand you're still under oath,
19  Dr. Frank?
20     A.    Yes.
21     Q.    Dr. Frank, do you understand that the --
22  that in this litigation a number of people are trying
23  to recover money as the result of the injuries they
24  allege they received from taking Digitek tablets?
25         Do you understand that to be the

---

31 (Pages 118 to 121)

Karen A. Frank, M.D.        Videotaped            June 30, 2010

---

**Page 122**

1    underlying purpose of the litigation?

2        A.    Yes.

3        Q.    Okay. And do you understand -- do you

4    have an understanding as to whether the FDA has spoken

5    on the issue of whether there was likely harm to

6    consumers from Digitek?

7        A.    Last night, Mr. Thompson read the press

8    release to me. I am not privy to the FDA procedures

9    or the extent of the data mining that went on in order

10   to support that statement that there was no risk to

11   public health.

12           My assumption, having been in the FDA,

13   is that that statement would have been based on all of

14   the existing available data at that time.

15           But having never worked in that division

16   of the FDA and having not been exposed to those

17   procedures, I cannot comment any further than to say I

18   was read that press release.

19       Q.    Was that -- the answer you just gave me,

20   was that the answer that you were instructed to give

21   last night by the plaintiff's counsel?

22       A.    No. In fact, I brought it up. And they

23   had asked me to be extremely cautious probing into

24   data mining issues.

25       Q.    Did you -- was that your first notice

---

**Page 123**

1    about that FDA statement, last night?

2        A.    Yes. I was kept relatively agnostic as

3    to the present assessment of the actual risk.

4           Most -- I think that's why I'm somewhat

5    -- I'll use the word "anxious" about my opinions

6    because I've been looking at systems for potential of

7    risk that I've not seen any data that I can

8    independently assess.

9           And I'm looking at systems where I know

10   what probably the industry standard would be to

11   document due diligence in assessing risk.

12           And so I'm responding on FDA

13   observations in the absence of some of the supporting

14   data. And having been provided very little data on

15   the actual risk.

16           So the fact that you are repeatedly

17   presenting me with new information, I expected. I am

18   concentrating on reacting as analytically as I can and

19   as accurately I can in responding as you present me

20   with this new information.

21       Q.    Now, at any point during your work on

22   behalf of the plaintiffs, did you do any independent

23   research yourself on Digitek?

24       A.    No. I was tempted to look at the

25   Congressional investigation, I was tempted to do a

---

**Page 124**

1    Google search, I was tempted to search the FDA web

2    site. I did not.

3           I left no Internet footprint of my

4    involvement in this case, other than the e-mail trail

5    that the Miller firm and Motley Rice left.

6        Q.    So you did no independent research on

7    your own, outside of that which you were provided, by

8    the plaintiffs' counsel; correct?

9        A.    No. I left nothing on the Google

10   server.

11       Q.    And so let me hand you -- we've been

12   talking about the FDA statement. It's what we marked

13   as Plaintiff's Exhibit 38; correct?

14       A.    Yes.

15       Q.    And this was issued in July of 2009;

16   correct?

17       A.    Yes.

18       Q.    And so this would have been available

19   for -- to you if you had done what you refer to as a

20   Google search. If you had wanted to find this

21   document, you could have easily found it. It's on the

22   FDA web site; correct?

23       A.    Yes. But given the privacy issues of

24   the Google server, I did not do any research on

25   Google.

---

**Page 125**

1        Q.    Given the privacy issues?

2        A.    I watch commentary TV occasionally, and

3    I was as affected by one particular documentary on

4    Google that aired in the last few months.

5        Q.    I don't understand the answer. What do

6    you mean?

7        A.    Well, you're asking me if I did an

8    independent search for this.

9        Q.    Right.

10       A.    I could have done it, and if I had been

11   instructed to do it, I would have done it. But if I

12   do a search on Google, I leave a footprint.

13           And right now you probably know enough

14   about the privacy issues surrounding the aggregate

15   data on these search engines.

16           So if I'm an expert witness and I'm

17   going out looking for information, I'm creating an

18   electronic trail that right now the legal community is

19   questioning the privacy issues on that server.

20           So I specifically maintained silence

21   unless I was instructed to go out and do so.

22           Am I making sense?

23       Q.    I don't understand your answer, but I'm

24   not sure that's important.

25       A.    Every search that I do on Google is

---

32 (Pages 122 to 125)

Karen A. Frank, M.D.       Videotaped         June 30, 2010

## Page 126

1   there for eternity and they data mine that aggregate
2   data.
3        Q.   Who does?
4        A.   Google.
5        Q.   And what will they do with -- you were
6   afraid of what Google would do with it if you did an
7   Internet search?  Is that what you're telling me?
8        A.   People can come to Google and get that
9   data right now.
10       Q.   And were you afraid of what they might
11  do to you if you -- somebody might do to you if you
12  did an Internet search on an FDA web site?  Is that
13  what you're telling me?
14       A.   I made an extremely conservative
15  assumption that I was going to maintain electrical
16  silence on this case for the most part.
17            I think the only thing I did was pull
18  up -- here I need to qualify this, I do remember
19  pulling up Digoxin label.  But I did not search
20  Digitek.
21       Q.   Did the plaintiffs' lawyers instruct you
22  not to go on the FDA web site to find relevant
23  information about Digitek?
24       A.   No.  I talked to them --
25            MR. THOMPSON:  Object to the form.

## Page 127

1            THE WITNESS:  I talked to them about the
2   electrical silence.  I asked them not to send me
3   documents by e-mail.  And I believe I told them
4   exactly what I was telling you.
5            And maybe it is completely irrelevant,
6   but I had no idea of the impact.  And I have to say,
7   I'll modify it, I do remember going on for one drug
8   label.  But I -- no, I made a deliberate decision not
9   to do independent research.
10  BY MR. DEAN:
11       Q.   You --
12       A.   Even though I knew these documents
13  existed.  And if I need to act otherwise in the
14  future, I will.  But they were aware of this.
15       Q.   So to retrace my steps before we get
16  back to this document, you are aware that the
17  litigation that we're talking about are people who are
18  alleging injuries from defective Digitek; correct?
19       A.   I know this is a liability case, that
20  they consolidate all of the state-level cases into one
21  federal case.  They will be taking deposition on a --
22  of a panel that will include a couple of federal
23  judges.
24       Q.   But you're aware that the basic
25  allegation is that there was defective Digitek that

## Page 128

1   injured people; correct?
2        A.   Yes.
3        Q.   Okay.  And so one key question would be
4   did anyone ingest defectively manufactured Digitek,
5   that would be important in the litigation; correct?
6        A.   Yes.
7        Q.   Okay.  And if they did, how much and
8   over what period of time, that would be another
9   relevant question; right?
10       A.   Yes.
11       Q.   Okay.
12       A.   Wait.  No, I hope I gave you the right
13  information about my electrical silence.
14       Q.   Now --
15       A.   I think it's irrelevant, but okay.
16       Q.   Now, the --
17            MR. THOMPSON:  It's the most -- that's
18  the most eloquent opinion of big pharma that I've ever
19  heard.
20            THE WITNESS:  It's of Google, actually.
21  BY MR. DEAN:
22       Q.   Now, you've had a chance to review
23  Exhibit 38 last night, I believe; correct?
24       A.   Mr. Thompson read sections of it to me.
25       Q.   Oh, you have -- so you have just -- you

## Page 129

1   haven't read the whole document then?
2        A.   No.  I was told that I would probably be
3   presented with this today.
4        Q.   What sections did Mr. Thompson read to
5   you?
6            You don't have to read the words.  Just
7   tell me the section.
8        A.   I can't find them.
9        Q.   Let me direct your attention and see if
10  I can guess correctly.
11            On Page 2, that paragraph, was that --
12  the paragraph that starts Since the detection of the
13  manufacturing problem, did he read that paragraph to
14  you?
15       A.   That may have been one of them.  The --
16  the thing that I remember most clearly about that is a
17  discussion -- we started to talk about my knowledge of
18  the bioequivalence of generics.  And, yes, I -- I see
19  that.
20            I can't remember that specifically
21  because I halted and I started to entrain my own
22  thoughts when they started talking about the
23  bioequivalence and the reliability of generic drugs.
24            Because I know about all the
25  requirements for bioequivalence and the requirements

                              33 (Pages 126 to 129)

Page 130

1   for 505(b).
2        But I'm also aware of cases where
3   generic manufacturing has been of variable quality and
4   it has impacted clinical outcomes.
5        Q.   Let me stop you. I want you to, if you
6   can, answer my question.
7        And that is, what -- what parts of
8   Exhibit 38 did Mr. Thompson call to your attention
9   last night?
10       Did you see it last night or did he just
11  read parts of it to you?
12       A.   He read it. And when he read me, I was
13  actually worrying about certain things I was going to
14  say today. So if he said something and it would
15  trigger thoughts and I had lapses of attention while
16  he was reading.
17       Q.   Well, sometimes that happens to
18  Mr. Thompson.
19       A.   No. It happens to me a lot because if
20  you say something to me and it kicks off a trigger
21  thought, I will follow it and then I'll come back, and
22  that's why I have you clarify things.
23       Q.   Seriously, you said he made reference to
24  a couple points.
25       Have you ever read this document before

Page 131

1   now?
2        A.   No.
3        Q.   Before right now?
4        A.   No.
5        Q.   So this, as you're sitting here right
6   now, is the first time you've actually seen Exhibit
7   38; is that correct?
8        A.   Yes.
9        Q.   Okay. Now, I want to direct your
10  attention to Page 2 of that document. And the
11  paragraph that's about a third of the way down, which
12  I directed to you before, where it says Since the
13  detection of the manufacturing problem.
14       A.   Since the detection --
15       Q.   Do you see that paragraph?
16       A.   Yes.
17       Q.   Okay. Now, let me ask you some
18  questions about that.
19       Well, the first sentence says, Since the
20  detection of the manufacturing problems, FDA has been
21  actively engaged with this company to ensure that all
22  potentially affected lots of Digitek tablets have been
23  recalled.
24       You have no reason to doubt the accuracy
25  of the FDA's statement there, do you?

Page 132

1        A.   I would think they would be extremely
2   cautious in their public statements given the fact
3   that, my understanding, there was a Congressional
4   inquiry on this. I think that these statements have
5   probably been very carefully worded.
6        Q.   So you have no basis -- my question is,
7   you have no basis to disagree with that sentence, do
8   you?
9        A.   No.
10       Q.   Then the next sentence says, In our best
11  judgment, given the very small number of defective
12  tablets that may have reached the market and the lack
13  of reported adverse events before the recall, harm to
14  patients was very unlikely.
15       Did I read that correctly?
16       A.   Yes.
17       Q.   Do you have any basis to disagree with
18  the FDA's public statement in that sentence?
19       A.   No. I do recall this being read. At
20  the time we were trying to access the other documents
21  on his computer. That's what distracted me.
22       I'm trying to remember how this occurred
23  because we were trying to bring in other documents all
24  at one time. And I made the statement that, yes, they
25  said harm to patients would be very unlikely.

Page 133

1        And that's where I brought up that you
2   would assume that they would have examined all
3   available data at the time they made that statement.
4        Because to have made that statement
5   without examining all available data would have left
6   them open to criticism had they been called before
7   Congress.
8        Q.   So you assume that they did examine that
9   data; correct?
10       A.   Yes. But I have -- I have no way to
11  substantiate that.
12       Q.   But it is your assumption; correct?
13       A.   Yes.
14       Q.   Because you worked with the FDA and you
15  know how cautious they are about making public
16  statements, don't you?
17       MR. THOMPSON: Object to the form.
18  BY MR. DEAN:
19       Q.   Go ahead.
20       A.   I have no direct experience with this
21  type of procedure in the FDA.
22       I'm extrapolating from my experience as
23  an FDA reviewer when we would issue clinical hold
24  letters, and what they required of me in reviewing
25  data before I brought forward issues and they would

34 (Pages 130 to 133)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

Page 134

1  issue a clinical hold letter.
2       So I'm extrapolating from my experience
3  and I'm making assumptions that they would be engaging
4  caution because of the events of the last half a
5  decade where I've come under increasing scrutiny.
6       Q.   And one of the things it's clear that
7  they looked at before they made this statement was the
8  reported Adverse Event Reports before the recall;
9  correct?
10      A.   That's the data that I'm assuming they
11 data mined from the AERS database.
12      Q.   So they had access to information that
13 you've already told us you did not have access to;
14 correct?
15      A.   Yes.
16      Q.   Okay. So this document, you would
17 agree, was posted on July 9th of 2009 on their web
18 site?
19      A.   Where's the post date?
20           MR. THOMPSON:  I object to the form of
21 that question. I'm not sure how we know that.
22           THE WITNESS:  I can't find the posting
23 date.
24 BY MR. DEAN:
25      Q.   Do you know -- do have any knowledge as

Page 135

1  to when this was posted?
2       A.   Not unless it is on this -- I can't -- I
3  can't see the official date on this posting --
4       Q.   Okay.
5       A.   -- like you would have on a press
6  release. No, I can't find it. It might be in my
7  notes.
8       Q.   Do you know whether it's still on their
9  web site?
10      A.   Well, the date it was printed was June
11 15th of 2010.
12      Q.   So you assume it's still there;
13 correct? Yes?
14      A.   Yes. Uh-huh.
15           Are you waiting for my response?
16      Q.   No. I'm waiting for me -- myself. I'm
17 waiting to formulate a question. So don't feel
18 compelled to answer any more on my last one.
19           Would you agree this information about
20 the FDA looking at Adverse Event Reports on Digitek
21 before the recall would have been relevant information
22 to you in reaching issues of signal -- in commenting
23 upon issues of signal detection?
24           MR. THOMPSON:  Object to the form.
25           THE WITNESS:  Yes. Any information on

Page 136

1  the signal would have been valuable. I think there is
2  a question of the scope of my work versus the scope of
3  the cardiologist's work.
4       My fixation on the signal has to do with
5  the assessment of the actual risk or any potential
6  risk during this period. But I didn't do the medical
7  evaluation or signal detection.
8       I'm formulating this because in
9  addressing the issues I was asked to address, I would
10 like to know -- I still think like a medical officer
11 at the FDA. So these became disconcerting issues to
12 me.
13      And the fact that I was not given
14 documents that someone else may have and I didn't have
15 a fuller picture, and also the fact that the
16 definitive evidence of the recalled drug was
17 incinerated, so there's really no way to ever really
18 know how much of those lots was affected, it left a
19 big void.
20      So that it became theoretical detection
21 of risk. Did they look? Did they have procedures in
22 place and in use? Were they documented? Were they
23 affected by coding issues?
24      Because I had no idea what was actually
25 out there to be detected or the things that had been

Page 137

1  written and been provided to Dr. Leikin or to the
2  other expert witnesses.
3  BY MR. DEAN:
4       Q.   Let's go back.
5       You would agree that in the statement
6  that we just read, it's clear that the FDA looked at
7  adverse event information with regard to Digitek;
8  correct?
9       A.   The assumption is that there was a data
10 analysis behind that statement.
11      Q.   Which would have permitted the FDA, at
12 least -- they relied, at least in part, on that
13 assessment in reaching their conclusion; correct?
14      A.   Yes.
15           MR. THOMPSON:  I object to the form of
16 that question.
17 BY MR. DEAN:
18      Q.   Now, this sentence contained within this
19 document would have provided relevant information to
20 you in regard to formulating your pharmacovigilance
21 opinions, wouldn't it?
22      A.   Yes. And --
23      Q.   And the plaintiffs' lawyers did not
24 provide you with a relevant statement from the FDA
25 that is directly relevant to the pharmacovigilance

35  (Pages 134 to 137)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

Page 138

1  charge that you were given to answer, did they?
2      MR. THOMPSON: Object to the form.
3      THE WITNESS: I was not provided any of
4  the documentation that you are referring to.
5  BY MR. DEAN:
6      Q.   And you were not provided with Exhibit
7  38, were you?
8      A.   No. And I did not independently look
9  for it, and I hope that I was not lapse -- lax in
10  trying to seek it independently.
11      Q.   Is this the kind of information in
12  Exhibit 38 that you referred to before as white space?
13      A.   It's a little bit out of the white
14  space, but it is white space for me now that you
15  brought it in. The truth of the matter is, the fact
16  that I did not put this in context by going out and
17  looking, I allowed that white space to occur.
18      And I did it after discussing -- I
19  believe that I discussed this Google issue over lunch
20  with them.
21      I don't know whether it was seen as
22  important, but we sort of agreed that the best way to
23  transfer information was either in paper or
24  electronically.
25      And they never asked me to go out and

---

Page 139

1  look for additional information. They provided it to
2  me. So I'm giving you the best of my recollection how
3  this occurred.
4      Q.   The FDA did not say in here that the
5  adverse event reporting procedures of Actavis were
6  inadequate for them to form an opinion about the
7  likelihood of injury to consumers, did they?
8      MR. THOMPSON: Object to the form of
9  that question. I believe it misstates the document.
10  BY MR. DEAN:
11      Q.   Go ahead.
12      A.   They report on the lack of reported
13  adverse events before the recall. That is probably
14  valid.
15      One of the things that I have discussed
16  is that these systemic issues are samplings across
17  multiple drugs, of which one or two out of any
18  samplings are Digitek.
19      They do contain cases that could be
20  digitoxicity, they could be lack of efficacy. I don't
21  know whether it was digitalis toxicity at normal
22  digitalis levels, supratherapeutic digitalis levels,
23  or in the face of renal failure.
24      So I can't say anything about the cases
25  I know and I can't say anything about the impact of

---

Page 140

1  those two stray cases on the total signal detection.
2      The FDA says the lack of reported
3  events. These older drugs that have had long market
4  exposure and very little novel adverse events often
5  have underreporting.
6      And when you do the signal detection,
7  you actually do it on the generic version, even when
8  you're doing it on the branded compound, because
9  people just report the drug.
10      Q.   If you -- let me interrupt you.
11      If you were doing signal detection for a
12  manufacturing defect, you'd only do it on the product
13  that was manufactured by a given manufacturer;
14  correct?
15      A.   But the reports are often silent from
16  that and that has to be taken into account very
17  carefully, because you don't want to do an inadequate
18  document to be presented in this type of scenario.
19      Q.   Would you agree if you're trying to do
20  signal detection to spot a manufacturing defect, you
21  would look to the product manufactured by that
22  particular manufacturer?
23      A.   When you have the information. But if
24  the reports were silent, the default is to include
25  them rather than to omit them.

---

Page 141

1      Q.   There's no question pending.
2      A.   There was another point I wanted to
3  make.
4      Q.   Why don't you let me formulate another
5  question.
6      A.   Okay.
7      Q.   Does Exhibit 38 help you fill the void
8  of missing information in this case?
9      A.   Yes. There's -- assuming that the FDA
10  had rigorous review processes before making the
11  statement, in light of the fact that this could end up
12  in a court of law or in a testimony before Congress,
13  this is an important piece of information.
14      The lack of reported events is impacted
15  by the low reporting rate of generic drugs until it's
16  stimulated by an event such as a recall.
17      Q.   Doesn't this suggest to you, though,
18  strongly suggest to you, that the FDA was satisfied
19  with the adverse event reporting procedures in regard
20  to Digitek before the recall?
21      MR. THOMPSON: Object to the form.
22      THE WITNESS: I'm going to be very
23  careful with what I say. Because I don't know if
24  they're required to be silent on certain things.
25      In other words, they probably did not

---

36 (Pages 138 to 141)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

Page 142

1    make an explicit statement of the impact. I'm sure
2    they were very careful about the wording.
3           But I have no information that would
4    tell me -- I may need to talk to Mr. Thompson before I
5    completely elucidate this, because I told him -- he
6    asked me not to digress into this area, that it was
7    outside of my scope.
8           And either I should be silent or I
9    should speak to him before I completely comment on --
10   on this.
11   BY MR. DEAN:
12      Q.    Well, that's not --
13      A.    It's not permissible?
14      Q.    With the background you've given us, I
15   don't think that's an appropriate conversation for --
16   to be had at this point. I think you need to answer
17   my question.
18      A.    Okay. I have not been provided any
19   information that says that there was an investigation
20   after the consent decree where anyone went in and data
21   mined the Actavis database.
22           There's two ways to look at it, what
23   events are coded.
24           Because at the time of the 2008
25   inspection, there's still investigator observations of

Page 143

1    unreported serious cases and there's a statement made
2    by one of the employees about submitting cases from
3    2006.
4           Now, the remediation is outlined in the
5    correspondence, including the PSURs for aggregate
6    reporting. And the comment by the company employee
7    talked about how far back they would go.
8           In other words, they didn't want to go
9    back before the acquisition. And I have no way to
10   completely put that in context.
11          So there's no data mining -- there's two
12   ways to data mine. One is the coded cases and the
13   other is to say the coding is defective, we're going
14   to text search the narratives.
15          And what if the narratives are only 50
16   percent coded? There could be undetected signal.
17          And in this case, it's unlike some of
18   the other cases I've heard of where they have done
19   those investigations. So I don't know how to comment
20   to you.
21      Q.    Do you think the FDA would have issued
22   this statement unless they were satisfied with the
23   reporting procedures of Actavis in regard to Digitek?
24   Yes or no?
25      A.    I think the answer is yes, but --

Page 144

1           MR. DEAN: Excuse me. Could -- could
2    you just read back my question and the answer.
3           (The court reporter read back the
4    following:
5           "QUESTION:  Do you think the FDA would
6    have issued this statement unless they were satisfied
7    with the reporting procedures of Actavis in regard to
8    Digitek?  Yes or no?"
9           "ANSWER:  I think the answer is yes,
10   but --")
11          THE WITNESS:  I believe that the FDA was
12   very, very careful to take into account the impact of
13   compliance with reporting procedures by Actavis at the
14   time they issued that statement.
15   BY MR. DEAN:
16      Q.    And would you agree that if they had
17   been satisfied with those procedures, they would not
18   have issued the statement?
19      A.    I'm going to say yes, but I really don't
20   know.
21      Q.    Okay. Thank you.
22          Now, you -- a few minutes ago, you
23   talked -- you talked -- you mentioned some product
24   that was incinerated. What did you have reference to?
25          MR. THOMPSON:  Mr. Dean, are you -- are

Page 145

1    we through with Exhibit 38?
2           MR. DEAN:  I think we are, Mr. Thompson.
3           MR. THOMPSON:  So you're not going to
4    question her on the other four bullet points under
5    that paragraph; is that right?
6           MR. KAPLAN:  Well, I'm going to object
7    to counsel making statements or inquiries here.
8    That's entirely inappropriate.
9           I move that that be stricken.
10          MR. THOMPSON:  All right. Well, let me
11   then make --
12          MR. KAPLAN:  This is an examination by
13   Mr. Dean. He can ask whatever questions he wants and
14   it's just inappropriate for you to comment.
15          If you do any more commenting, we're
16   going to be talking to Judge Goodwin about that.
17          MR. THOMPSON:  All right.
18          Let's talk to Judge Goodwin about the
19   presentation of Defendant's Exhibit to my expert and
20   intimating that this was withheld from her, when, in
21   fact, this is a document that was withheld from us
22   until last week when it was delivered to us from
23   Mr. Anderton, who indicated that he had given it to
24   his expert, but it had not been produced to us.
25          MR. DEAN:  This is not a company

37 (Pages 142 to 145)

## Page 146

1  document. We're not -- we can have this discussion --
2      MR. THOMPSON: Well, your testimony --
3  your testimony to her has begun to intimate that the
4  plaintiffs' counsel has done this and done that.
5      And, in fact, I'm looking at a document
6  that you've confronted her with which was never
7  produced to us in regular time and which was never
8  available to be sent to her.
9      MR. DEAN: Never available to be sent to
10  her because it was on the FDA web site?
11  BY MR. DEAN:
12      Q.  Let's go back to the question that I
13  just asked you about. You, a few minutes ago, used
14  the word "incinerated," I think; is that correct?
15      A.  I will tell you the information, and I
16  don't -- it's probably in here. It may not be. But
17  in the recall packet, they have forms to fill out to
18  send the recalled product to Minnesota for
19  destruction. We can pull that out.
20      My impression, and I am willing to be
21  corrected if I am wrong, is that there was no
22  analytical work done on that recalled product before
23  it was incinerated.
24      Q.  So you're talking about -- when you say
25  "recalled product," you're speaking about the recalled

## Page 147

1  Digitek in 2008; correct?
2      A.  I think it went from June 6, 2006
3  through 2008.
4      Q.  Right.
5      It was announced in 2008, but going back
6  for a couple years. So that -- that's fair. So that
7  was the time of the -- the product that first went on
8  the market in 2006, some of that was recalled.
9      But your testimony is that when that
10  product got recalled, you believe that product was
11  incinerated; correct?
12      A.  This is why I did this document. I
13  wanted to be very, very careful. I have a fixed idea
14  in my mind from reviewing the documents that this
15  occurred. If I am wrong, I will stand corrected.
16      Q.  Well, what is your understanding as to
17  how much of the product was incinerated?
18      A.  I don't know. I was -- it may be a
19  white space where I was not provided any information
20  on what was done with that product.
21      But the recall package indicated it
22  would be shipped for destruction, and I was not
23  provided any evidence to say that it was analyzed
24  before it was destroyed.
25      Q.  Okay. Let's go on.

## Page 148

1      Do you have Exhibit 261 in front of you,
2  Dr. Frank?
3      A.  Yes.
4      Q.  Good. Let's see if I do.
5      All right. I'm on Page 4, which is the
6  first page of -- are you with me there? And it's in
7  the section on Background.
8      A.  Yes.
9      Q.  I want to direct your attention to the
10  second paragraph.
11      A.  Uh-huh.
12      Q.  You reference PSUR preparation; right?
13      A.  Yes.
14      Q.  Here's my question to you, a very simple
15  question: Does a generic manufacturer who distributes
16  product only in the United States have any duty to
17  submit PSURs?
18      A.  Their legal obligation is U.S. Periodic
19  Reports. But the FDA accepts PSURs in lieu of the
20  U.S. Periodic Reports for the aggregate reporting.
21      So many companies that operate globally
22  produce one PSUR and then it is modified with
23  appendices for country-specific reporting
24  requirements.
25      Q.  Would you agree that if a -- any drug

## Page 149

1  manufacturer, brand name or generic, only distributes
2  product in the United States, they do not have to
3  submit a PSUR, do they?
4      A.  No. If it's just U.S., it can be just a
5  U.S. Periodic Report.
6      Q.  Thank you.
7      Now, in the third paragraph, you've got
8  some information regarding the company history, do you
9  not?
10      A.  Yes.
11      Q.  Where did that come from?
12      A.  It was abstracted from the Establishment
13  Inspection Reports and from the company correspondence
14  to the FDA, which is where I found the dates, the
15  consent decrees, the day it was -- the defect was
16  lifted in 2001, the dates of the acquisition.
17      All of this was taken and it should go
18  back to Reference 14, Page 7.
19      Q.  Okay.
20      A.  I tried to annotate every statement in
21  here. If there's an error in my annotation, I will go
22  back and do the due diligence, because these should
23  all be annotated from the documents I was provided.
24  The way this --
25      Q.  No. Let me -- just wait for another

38 (Pages 146 to 149)

Karen A. Frank, M.D.      Videotaped            June 30, 2010

Page 150

1    question, please.
2         In the fifth paragraph, the one that
3    starts, There is little or no information, I take it
4    that you were provided no information about either
5    Amide or Actavis -- well, actually, you had the
6    information about the 2004 incident; right?
7    A.    Yes.
8    Q.    So --
9    A.    That was provided -- yeah, that was --
10   I'm not sure when it was -- when I wrote that, but,
11   yes, there was -- the information became more
12   intensive starting with this February 2006 inspection.
13   Q.    So is it fair to say you have no
14   information before February 2006 about what might be
15   termed alleged deficiencies in adverse event
16   reporting? Is that fair?
17   A.    If you look at the timeline, the first
18   inspection I was able to identify where I don't have
19   the 483s or the reports was in Elizabeth, New Jersey,
20   August 11th, '03 to August 14th, '03.
21        It was specifically a post-marketing
22   adverse drug experience inspection, and it was
23   classified as NAI.
24   Q.    And what does that mean?
25   A.    No action indicated.

Page 151

1    Q.    And do you believe that what you've
2    marked as Exhibit -- I'm sorry -- it's what is
3    referenced as Inspection 1 related to a company called
4    Amide or related to another company -- or related to a
5    company that was operating in Elizabeth, New Jersey?
6    A.    No. It came from one of these documents
7    that was either an FDA inspection of Amide or one of
8    the correspondences between Amide activists and the
9    FDA.
10        And so this was within one of the
11   acquired companies, and it was the site. I was -- I
12   was more interested in sites and how pharmacovigilance
13   was moved.
14        There were two things I was trying to
15   answer: What sites were inspected, what sites were
16   inspected for pharmacovigilance and how
17   pharmacovigilance was moved multiple times?
18        And was there anything remaining after
19   the consent decree was lifted? Was this pristine at
20   the time the consent decree was lifted and then there
21   was a decline in function, or was there a -- were
22   there persistent issues?
23        And this was important because it was an
24   NAI inspection in 2003, and it was a very small window
25   of insight, and so I documented it there. And then I

Page 152

1    would -- if I needed, I would ask for more information
2    to cover that period.
3    Q.    And where did you get the information
4    that such an inspection took place?
5    A.    I can find it for you. Because this was
6    a later edition, and I believe, and I might have to go
7    back and verify, that it came out of this, the
8    introduction of this Establishment Inspection Report.
9    Q.    That's Plaintiff's Exhibit 91, for the
10   record.
11   A.    I had to go through the eyes of the FDA
12   inspectors to find things that I was not provided.
13   And there were some very good historical summaries.
14   Q.    Here's my question for you.
15        If you can find it quickly, that's fine,
16   but that's a long document. I'm ready to go on to
17   another question if you can't find it.
18   A.    Okay.
19   Q.    Are you ready to go on?
20   A.    Yes.
21   Q.    Here's my simple question to you: On
22   this, what you've labeled Inspection 1, Elizabeth, New
23   Jersey, in 2003, do you know whether that referred --
24   that that was a inspection relating to Digitek or to
25   totally different product lines?

Page 153

1         Do you know?
2    A.    No.
3    Q.    Okay.
4    A.    Any --
5    Q.    Okay. You don't; right?
6    A.    No.
7    Q.    Let's just leave it at that, I'll go on
8    and ask you another question.
9    A.    I apologize for my lack of annotation on
10   this.
11   Q.    But whether it was Digitek or some other
12   product that was being commented on, it was NAI which
13   would not raise any alarm bells with you, would it?
14   A.    I put that in there as a pertinent
15   negative.
16   Q.    Okay. Thank you.
17        Now, then you talk about the double-
18   thick Digitek in July 2004. We've already spoken
19   about that, so I'm not going to question you any more
20   about that sentence.
21        Then you say, In 2005 there was an MHRA
22   inspection that resulted in an inspection observation
23   on October 25 of inadequate information on transfer of
24   expedited cases.
25        You were never able -- strike that.

39 (Pages 150 to 153)

Karen A. Frank, M.D.     Videotaped                June 30, 2010

Page 154

1        Did you ask for the documentation, the
2    backup on that?  Did you ask for it?
3        A.    I talked to Pete Miller about this on
4    June 2nd.
5        Q.    Did you ask him for it?
6        A.    Yes.
7        Q.    Did you get it?
8        A.    They were not aware of any MHRA
9    inspection reports in the discovery.  I think, if I'm
10   not mistaken, there may have been others.
11       The fact that there was an MHRA
12   inspection in 2005 implies a repeat inspection in a
13   two-year cycle.  But that's an assumption.
14       But, no, I have no information about
15   MHRA inspection findings other than the fact that one
16   of those was detected at the time of the due diligence
17   in the acquisition, and the decision was made to
18   implement the agreement between Amide and the MHRA
19   after the merger in March.
20       And there was FDA inspection findings of
21   this noncompliance that sort of coincided with them.
22       Q.    Did you understand this to be a -- first
23   of all, MHRA is a European regulatory agency; correct?
24       A.    Yes.
25       Q.    Did you understand this -- did you

Page 155

1    understand this reference to the MHRA inspection to
2    deal with a reporting issue as a result of corporate
3    acquisitions?
4        A.    No.  But the MHRA --
5        Q.    You did not; is that right?
6        A.    No.  This was -- this was before the
7    acquisition.
8        It was independent, and it was -- I
9    believe it was a finding of the due diligence at the
10   time of the acquisition, and it's the only information
11   I have on the due diligence in pharmacovigilance.
12       Q.    So you don't know what the eventual
13   outcome of that inspection was, do you?
14       A.    There was an agreement, and I know the
15   date of the implementation and I know that it was
16   communicated to the FDA because of concerns with
17   transfer between Copenhagen and the U.S.
18       Q.    Do you know whether the FDA was
19   satisfied with the conclusion on that?
20       A.    This I believe --
21       Q.    Either you know or you don't.  Which is
22   it?
23       Do you know whether they were satisfied
24   or don't you?
25       A.    May I give you an answer based on my

Page 156

1    best recollection?
2        Q.    First of all, do you know?
3        A.    I believe this came from the Amide
4    response immediately following the 2006 inspection.
5    And the FDA responses reiterated concern with serious
6    underlying systemic issues.
7        But I can't recall the FDA ever
8    responding to this particular MHRA inspection.
9        And I inquired whether Digitek was
10   marketed outside of the U.S. and the potential impact
11   of the MHRA inspection on collection of Digitek cases,
12   per se.
13       And, to my knowledge, and to the
14   knowledge of all the counsel that I had, Digitek is
15   only marketed in the U.S.  And so the transfer of
16   these cases from Copenhagen to the U.S. did not impact
17   compliance with Digitek or signal detection.
18       Q.    Did you put that in your report?
19       You didn't put that in your report, did
20   you?
21       A.    No.  It was verbal communication.
22       Q.    Wouldn't a fair and objective expert
23   witness have noted in a Digitek case that an
24   observation about an MHRA inspection didn't have
25   anything to do with Digitek?

Page 157

1        MR. THOMPSON:  Object to the form.
2        THE WITNESS:  Possibly.  If I do it
3    again, I'll be more careful with the annotation.  I
4    would say --
5    BY MR. DEAN:
6        Q.    But you do agree that, as you understand
7    the facts now, that Digitek would not have been
8    impacted by that particular inspection; correct?
9        A.    No.
10       Q.    Is that correct?
11       A.    We clarified this, and at this point, my
12   understanding is there are Digoxin cases, but they're
13   not Digitek.  That I could assume that all Digitek
14   cases would arise from the U.S.
15       I have nothing other than verbal
16   confirmation.  So I --- yeah, I'll have to say yes.
17   Okay.  This is -- I'm pulling in extraneous
18   information trying to clarify.
19       But it does have impact on the
20   assessment of the systemic issues because they made
21   arbitrary decisions based on this, the implementation
22   of this MHRA agreement, that were upsetting to the FDA
23   and did lead to a 483.
24       Q.    And do you know the final position of
25   the FDA in response -- or in respect to their level of

40 (Pages 154 to 157)

Karen A. Frank, M.D.        Videotaped          June 30, 2010

## Page 158

1  satisfaction with this MHRA inspection?
2         Are you aware of the final word on that
3  from the FDA?
4      A.    The implementation of this agreement
5  with the MHRA was effective on March 1st.  And for
6  reasons unknown to me, Copenhagen sent a batch of
7  cases two to three months later, and it's in one of
8  the response letters.
9         They made a decision and wrote a note to
10 the file to call their initial receipt date the day
11 they got these from Copenhagen, rather than the date
12 they were first received in Copenhagen.
13        And the FDA made an observation of that
14 and required the company to make a change, and there's
15 a note to the file of the change in that process.
16        But they made an -- they made a
17 decision, and I don't know who ratified it, who was
18 given the governance, but the ineffective
19 implementation or somehow the delay in this
20 implementation led to further FDA inspection findings.
21        Because the transfer did not occur
22 immediately at March 1st.  The first transfer was a
23 batch a couple of months later and led to
24 noncompliance.  That's sort of why I left it in.
25     Q.    But my question to you is, do you know

## Page 159

1  the final resolution of this in the eyes of the FDA?
2      A.    It was inspection finding that required
3  remediation, and I do not recall any inspectors
4  assessing the adequacy of the corrective action.
5      Q.    Let's turn to Page 5.  The second
6  paragraph on Page 5 you recite the history of the
7  warning letters and the responses.
8         Well, there was a 483 and a response and
9  a warning letter and a response and you recite all
10 that history, do you not?
11     A.    Second paragraph, Page 5?
12     Q.    Page 5.
13     A.    Yes.
14     Q.    And did you -- you've talked before
15 about white spaces.  Is there a white space in this
16 paragraph where there is, in all likelihood, a missing
17 document?
18     A.    I documented the missing letters.  But
19 it's not -- I don't know that I translated the
20 documented missing letters in here into the
21 conclusion.
22        This -- this paragraph, there were
23 issues with the accuracy of the responses from
24 February 28th and February 8th, and the FDA took
25 issues with those.

## Page 160

1         But they -- the reason this is in there
2  is they warned the company that these specific
3  violations are serious and they may be symptomatic of
4  underlying problems.
5         And I was asked to assess systemic
6  issues.  And I wasn't given any Digitek subsets, so I
7  started pulling in a lot of things, like MHRA
8  inspections.  But the FDA gave them warning.
9         And I started looking for has anybody
10 given me evidence of the compliance remediation plan,
11 the tracking of it with Metrix, and its adequacy.
12        So this is put in here because the FDA
13 warned that they needed to assess broader systemic
14 issues.
15     Q.    So at this point, as you read that set
16 of correspondence, as a pharmacovigilance expert, you
17 have a concern that they may not have engaged in the
18 right corrective procedures; correct?
19     A.    Or else I was not given the documents.
20 Because they produced a QSIP, and it's huge, and they
21 said they'd send it to me, that I could look at it.
22     Q.    Who said that?
23     A.    Pete Miller did.
24     Q.    But you -- did you request it?
25     A.    Yes.

## Page 161

1      Q.    Did he send it to you?
2      A.    No.
3      Q.    Okay.  Now, isn't it -- when you see a
4  history of 483s and warning letters like this, isn't
5  it usual for the FDA at the end of the day, at the end
6  of the sequence, to tell the company whether they've
7  satisfactorily engaged in corrective procedures or
8  whether they're still deficient?
9         Isn't that commonplace?
10     A.    The FDA revised warning letter, I think
11 this was in July, reiterates the findings, talks about
12 the inadequacy of the response, and this is a quote.
13        Now, my question is, did the company
14 engage in any type of root cause analysis or process
15 evaluation to assess broader systemic issues, and did
16 they put in place a remediation program that was
17 adequately implemented and tracked?
18        The bottom line that I came to based on
19 what I could see is they had similar repeat inspection
20 findings in 2008, there was a statement that one of
21 the company -- and it was Mr. Delicato, about cases in
22 2005, which I thought were part of this remediation.
23        And I don't know all the circumstances
24 about this or the negotiations or what would be
25 submitted, but the white spaces, what they did, what

41 (Pages 158 to 161)

Karen A. Frank, M.D.        Videotaped                June 30, 2010

## Page 162

1  they did in the QSIP, but the outcome was the FDA said
2  there's a total failure for quality systems.
3        There's still repeat pharmacovigilance
4  findings.
5        And then when the recall occurred --
6     Q.   Who said there was a total failure of --
7  a total failure of what?
8     A.   That's a quote, and that might be --
9     Q.   That's a quote from who?
10    A.   An FDA inspector in either the closeout
11 meeting or in this EIR. And because this is a
12 verbatim --
13    Q.   And, in fairness, that was a quote about
14 total failure of quality control in regard to quality
15 control, not in regard to pharmacovigilance. Do you
16 agree?
17    A.   I was unable to sort out the quality
18 unit. It -- for the most part, it was addressing
19 manufacturing issues.
20        But my question is, there's usually
21 quality systems that control pharmacovigilance quality
22 and product complaint and clinical research.
23        There should have been some sort of a
24 quality system for all of these business critical
25 functions.

## Page 163

1     Q.   Can we agree that if there is a letter
2  from the FDA to Actavis saying that they were
3  satisfied with the company response to the
4  pharmacovigilance issues contained in the warning
5  letter of August 15, 2006, you've never seen it, have
6  you?
7     A.   No. I've not -- I did not see -- I did
8  not identify in my review any interim FDA
9  communication that said they were satisfied. If it's
10 my error, I stand corrected. There are letters that I
11 was not provided, and I documented that.
12    Q.   Did you -- how did you document what you
13 were not provided? How would you know how to document
14 it?
15    A.   Oh, boy. I laid out this timeline for
16 myself. Inspections I found are in red. Any
17 information I have on the inspections was there unless
18 there was a full report.
19        In blue were the company's responses.
20 And the black are these intercurrent communications.
21 And here in the timeline is part of my attempt to
22 document things that were not included to me.
23    Q.   Let me hand you what we marked as
24 Defendant's Exhibit 87.
25    A.   All right.

## Page 164

1        (Witness reviews document.) Okay.
2  They --
3     Q.   You've never seen this document before,
4  have you?
5     A.   No.
6     Q.   And we can agree that it is a letter
7  from the FDA to Actavis Totowa dated January 3, 2007;
8  correct?
9     A.   Yes. And I don't have this in the white
10 space, so I have no indication this letter existed
11 until you just gave this to me.
12    Q.   This is the first time you've ever seen
13 it in your life and the first time you're even aware
14 of its existence; correct?
15    A.   Yes.
16    Q.   And we would agree that it says, in the
17 second paragraph, New Jersey District has reviewed
18 your response regarding adverse drug experience
19 reporting deficiencies. Your corrective action and
20 the revised procedures appear to be satisfactory.
21        That's what it says; correct?
22    A.   Absolutely.
23        MR. THOMPSON: I object to taking that
24 out of context.
25 BY MR. DEAN:

## Page 165

1     Q.   So the -- in your paragraph on Page 5,
2  you referenced the 483s and the warning letters on the
3  pharmacovigilance issues, but you didn't reference
4  Exhibit 87 because you were unaware of it; correct?
5     A.   Yes. I expressed concerns multiple
6  times about missing information like this that could
7  impact on my --
8     Q.   And it's clear that the FDA was
9  satisfied with that response, wasn't it?
10        MR. THOMPSON: Object to the form of the
11 question.
12        THE WITNESS: Well, the FDA is
13 satisfied. I don't know -- August 15th. Revised
14 warning letter.
15        Wait a second.
16        We acknowledge dated September 6th, the
17 company responds, the procedures, I don't have October
18 26th. There is a clear statement that corrective
19 actions and the revised procedures were satisfactory.
20 BY MR. DEAN:
21    Q.   And you don't have any basis to disagree
22 with the FDA position on that, do you?
23    A.   The company --
24        MR. THOMPSON: I object to the form of
25 the question.

42 (Pages 162 to 165)

Karen A. Frank, M.D.      Videotaped      June 30, 2010

Page 166

1        THE WITNESS: I do not believe I've seen
2    the additional revised procedures on October 25th, and
3    so I cannot make an independent determination.
4        And in order to really give you an
5    accurate opinion, I should probably read -- re-read
6    the September 6th.
7        However, I think that in a court of law,
8    this FDA opinion would supersede my opinion unless I
9    could really provide evidence to the contrary.
10   BY MR. DEAN:
11       Q.    Thank you.
12       So as of January 3, 2007, we can agree
13   that the FDA was satisfied it had received all adverse
14   reaction reporting from Amide or for Actavis Totowa
15   that had been raised by the 483 and the warning
16   letter; correct?
17       MR. THOMPSON: I object to the form of
18   the question and I entreat Dr. French (sic) to please
19   read the entire document before she answers a single
20   out-of-context sentence.
21       MR. DEAN: It's Dr. Frank, I believe.
22       MR. THOMPSON: I -- then I've just --
23   I'm probably in the wrong place at the wrong time.
24       THE WITNESS: This is very, very
25   difficult because these corrective actions have a

Page 167

1    scope. And I'm reading this out of context in the
2    scope, so I can't track what the corrective actions
3    were or the procedures.
4        And I have no information about the
5    adequacy of the corrective actions during the future
6    inspection because there's both the plan and the
7    implementation of the plan.
8        So this is basically saying they did --
9    they did a corrective action. And the District Office
10   found it satisfactory, and I'm assuming that they
11   could implement it without revision.
12   BY MR. DEAN:
13       Q.    Earlier, much earlier this morning, you
14   told us that what you were relying on this -- in this
15   case was the FDA conclusions and not the underlying
16   documents.
17       Do you remember that?
18       A.    Yes. There is -- I've not -- I don't
19   have a lot -- I just read 483s and established
20   inspection reports and letters.
21       Q.    And so this is no different. This is an
22   FDA document with a final conclusion and you have no
23   basis to disagree with it; correct?
24       A.    Not at present.
25       Q.    Okay. Thank you.

Page 168

1        MR. DEAN: Do you want to keep going or
2    do you want to take a short break?
3        MR. THOMPSON: I think we ought to take
4    a break as we go, you know.
5        MR. DEAN: I think we've been going
6    about an hour. Let's take a short break.
7        I don't want to take a long one.
8        MR. THOMPSON: Sure.
9        MR. DEAN: Let's go off the record.
10       VIDEO OPERATOR: Going off the video
11   record.
12       The time is 2:06 p.m.
13       (A recess was taken from 2:06 p.m. to
14   2:16 p.m.)
15       VIDEO OPERATOR: We are now back on the
16   video record.
17       This is the start of Tape 4.
18       The time is 2:16 p.m.
19   BY MR. DEAN:
20       Q.    Dr. Frank, in regard to Exhibit 87,
21   we've -- before we broke, you agreed that this
22   provided relevant information on the status of the
23   adverse event reporting at Actavis; correct?
24       MR. THOMPSON: Object to the form.
25       THE WITNESS: I think it's an important

Page 169

1    piece of information that I would have liked to have
2    had when I -- when I came up with the conclusion.
3        I'd like to put it in context with the
4    decision to move pharmacovigilance from Totowa to
5    Elizabeth, because Elizabeth apparently was compliant.
6        Remember I told you about that NAI
7    inspection. It's a very, very important piece of
8    information that could -- it clearly has a material
9    impact on the analysis. I cannot immediately put it
10   in context with the overall picture.
11       I'm assuming that you're going to
12   continue to present me with further information that's
13   extremely important to the assessment. But I do not
14   deny that this is important.
15   BY MR. DEAN:
16       Q.    Well, your first conclusion -- your
17   first basic conclusion, as I understand your summary
18   of your report, was that there were -- it's not clear
19   that there were appropriate pharmacovigilance
20   procedures in place at Actavis Totowa; is that your --
21   a fair summary of one of your primary conclusions?
22       A.    The original assessment in the response
23   letter talked about the inadequacies of the
24   interpretation of the regulations and an
25   implementation of the procedures.

43 (Pages 166 to 169)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 170

1    Q.    Now, let me interrupt you. I'm not
2  talking about what was in the letter. I'm talking
3  about the summary you gave me this morning about the
4  two key points you were --
5    A.    Yes.
6    Q.    -- trying to make in your report.
7          And one, I think, was the adequacy of
8  the pharmacovigilance procedures and its impact on
9  signal detection and that you were asked to evaluate
10 the system that was in place; correct?
11   A.    As much as possible, yes.
12   Q.    And would you agree that this document
13 establishes, at least in the eyes of the FDA as of
14 January of 2007, that appropriate procedures were in
15 place?
16         MR. THOMPSON: Object to form. I think
17 it mischaracterizes the document.
18         THE WITNESS: It establishes that
19 appropriate corrective actions were presented to the
20 agency and that the revised procedures were
21 satisfactory.
22         But it does not establish that there
23 were satisfactory procedures in place during the total
24 period affected.
25 BY MR. DEAN:

Page 171

1    Q.    Well, your opinion about inappropriate
2  procedures was based upon -- primarily upon the series
3  of 483s and warning letters in regard to
4  pharmacovigilance, wasn't it?
5    A.    Yes. The assessment I made was only on
6  what I was provided in the 483s and Establishment
7  Inspection Reports and responses.
8    Q.    And so the primary -- that was the
9  primary basis. And now you see Exhibit 87 for the
10 first time which gives the FDA's final response to
11 that series of observations and warning letters.
12         And my question to you is --
13         MR. THOMPSON: Object to the form.
14 BY MR. DEAN:
15   Q.    -- would you like to revise your opinion
16 stated in your report about the adequacy of the
17 procedures at Actavis for pharmacovigilance reporting?
18   A.    I think that there were definite issues
19 uncovered during the 2006 inspection. There was a
20 shift from 2003, which was NAI, to 2006. And then
21 there was a response letter talking about
22 inappropriate interpretation.
23         I think -- I think the important thing
24 is to look at the actual wording. But the February
25 8th, 2006 response talks about problems with

Page 172

1  interpretation of the regulations.
2          And I believe the specifics were in
3  actually assessing 15-day alerts.
4          I think everything was stamped as a
5  15-day alert and sent in without assessment of
6  seriousness or expectedness. There were issues
7  documented at the inspection and by the response
8  letters that required the corrective actions.
9    Q.    Here's my question. It's a very simple
10 question. Would you like to revise your opinion in
11 light of Exhibit 87?
12   A.    I can't completely because they required
13 corrective actions, which implies deficiencies, either
14 in the procedures or in the compliance with the
15 procedures.
16         So there was an issue that required
17 corrective action and required the revision of the
18 procedure.
19         It's the revised procedures that are
20 satisfactory, not the ones that were revised. Not the
21 baseline.
22         So I have to be very, very careful and
23 think -- I mean, for me to completely revoke
24 everything looking at one letter and not sitting down
25 and carefully analyzing it is a little dangerous.

Page 173

1          It's as dangerous as making an opinion
2  on inadequate information.
3          Because this -- the fact that there were
4  corrective actions and procedures that were revised
5  implies that there were problems that required the
6  corrective actions in the revision. The FDA was okay
7  with their plan.
8          We do not know because we don't have the
9  FDA confirmation of the adequacy of the corrective
10 actions in a future inspection.
11         If, indeed, this 2008 inspection that
12 had me concerned correlates to this confirmation, then
13 we have some observations consistent with inadequate
14 implementation of this plan that they approved.
15         So right now, this is very, very
16 important.
17   Q.    This being 87?
18   A.    And potentially would modify it.
19   Q.    Number 87.
20   A.    But I still see that it's a -- it's a --
21 still a complex and confusing chain of events where a
22 company was on consent decree, they came off, they had
23 apparently clean inspection in 2003, and then things
24 started to happen that required corrective action.
25         Do we know that it was corrected, or was

44 (Pages 170 to 173)

Karen A. Frank, M.D.      Videotaped          June 30, 2010

---

Page 174

1  it corrected all by transferring to Elizabeth?  I
2  can't answer that at the moment.
3       Q.    Is it fair to say that Exhibit 87 raises
4  significant questions in your mind as to the -- as to
5  your opinion and that you would need more time to
6  think about the issues and look at the underlying
7  documents in order to stay and maintain with your
8  opinion?
9            MR. THOMPSON:  Object to the form.
10           THE WITNESS:  I would like to be able to
11  include all of this new, important evidence in a
12  revised opinion and revise the white space.  Because
13  there could be more vulnerabilities.
14           And I hope that's not too much of a
15  hedge.  But, yes, this should be incorporated into the
16  -- into the opinion, but with very careful analysis.
17  BY MR. DEAN:
18      Q.    Now, is it fair to say that as of
19  January 3, 2007, the actual MedWatch reports that were
20  mentioned in the 483 and the warning letter, isn't it
21  clear that those had been submitted to the
22  satisfaction of the FDA for this letter?
23      A.    This is where I got really --
24      Q.    Isn't that clear to you?
25      A.    It's not clear based on the totality of

---

Page 175

1  the evidence.  And it might be -- I want to show you
2  why, if I can find quickly.  I can't search this
3  electronically, but it's back in the 2008.
4           I saw their agreement with the FDA for
5  the remediation of the lack of compliance with the
6  U.S. Periodic Reports.  And that was approved, I
7  think, actually by Washington.  I should clarify that.
8           But there's a statement back here, and I
9  think it was the closeout, the minutes of the closeout
10  meeting, where they're going back and talking about
11  submitting reports from 2006.
12           And I went -- that's when I really got
13  worried and I do not yet have a clear picture of the
14  events from 2006 to 2008.
15           Why are they confronting them in 2006 --
16  in 2008 about reports that were to have been submitted
17  as part of the remediation in 2006, and the company is
18  making a statement about not sure how far back they
19  would go.
20           I have no insight to that.
21           I know that they initially did not want
22  to remediate anywhere before they acquired, and I
23  don't have a lot of insight into the regulatory risk
24  decisions that were being made or why they're saying
25  they have to discuss internally what will be

---

Page 176

1  submitted.
2           I can't tell you based on what I've seen
3  if this initial satisfactory answer does not have to
4  be modified based on what happened in 2007 with the
5  confirmatory inspection.  I'm sorry.
6       Q.    You've told us before, if I'm correct,
7  that it's -- you were uncomfortable in your role in
8  this case because you didn't have full information and
9  that it was -- I think your words were, it was
10  dangerous to make an opinion based upon inadequate
11  information.Do you agree with that?
12           MR. THOMPSON:  Object to the form.
13           THE WITNESS:  I think -- I actually
14  think I said that.  It may have been a mistake to say
15  it.  I think part of it is -- I do.
16  BY MR. DEAN:
17      Q.    You agree that you said that; right?
18      A.    Yes.
19      Q.    And isn't that exactly where we're at
20  here because you're saying that there -- that Exhibit
21  87 raises significant questions, but you have
22  inadequate information to totally evaluate the impact
23  of Exhibit 87?  Is that fair?
24      A.    Yeah, I think --
25      Q.    Is that fair?

---

Page 177

1       A.    I think at that point I was provided
2  information and I discussed this with counsel.  What
3  if they -- I have all of these questions, and I think
4  there's information out there that they will present
5  to me.
6           What happens -- and I asked this at the
7  June 2nd meeting of Megan Carter.  What happens if I'm
8  provided information that is material and requires me
9  to modify my position?
10           They said, we'll take it and revise the
11  position, but we want a preliminary assessment.
12      Q.    Do you understand that these opinions
13  have been filed with the court?
14      A.    Yes.  I talked to them about this.
15      Q.    Were you concerned about that?
16      A.    Yes.  I expressed that.
17      Q.    And was your concern that you didn't
18  have enough information on which to base an informed
19  opinion?  Was that your concern?
20      A.    I was concerned that I had incomplete
21  information where I would be vulnerable to being
22  presented with further information that could lead me
23  to modify my opinion.
24      Q.    And it turns out that that's happened
25  and that you may well want to modify your opinion; is

45  (Pages 174 to 177)

Karen A. Frank, M.D.         Videotaped              June 30, 2010

Page 178

1    that correct?
2         A.   Possibly.
3         Q.   Okay.
4         A.   But the -- this does not yet explain
5    away the 2008 observations and the statements that the
6    company employee made about persistent nonreporting of
7    cases in 2006.
8         So while it's material, I don't think it
9    can completely negate because --
10        Q.   Let's -- I'm sorry.  You go ahead and
11   finish.  I want to talk about that in a minute, but I
12   want you to finish.
13        A.   What is distilled down was 2006, the
14   remediation program, and persistent observations in
15   2008, and this unexplained comment about submission of
16   cases that apparently were to have been submitted as
17   part of the 2006 remediation.
18        So that is still -- and here I'm coming
19   back to this, I asked them -- I told them this
20   specifically, I said, this would be the basis of my
21   opinion.  And yet, all of this has not been taken into
22   account.  Should I proceed with this?
23        I asked them very seriously what
24   constitutes adequate documentation for the opinion,
25   how much they can provide for me, how can -- how much

Page 179

1    I can request on any further discovery?
2         I asked for a lot of guidance, and I
3    trust that they gave it to me appropriately, is in
4    taking the information they gave to me, what
5    constituted a legitimate opinion before this was
6    filed.
7         This was not done haphazardly.  I
8    actually tried my best to render an opinion based on
9    what I was granted.
10        Q.   But, as we sit here today, you are --
11   the fact of the matter is, you -- at the time you
12   rendered it, you were concerned about inadequate
13   information.
14        And now, as we sit here today, you have
15   an even greater concern about inadequate information
16   being provided to you in order to formulate this
17   report; isn't that true?
18        MR. THOMPSON:  Object to the form.
19        THE WITNESS:  You've provided me exactly
20   what I anticipated might happen and what I raised to
21   the people that hired me and asked me to do this
22   analysis for them.  This is not unexpected.
23        And I asked them how I should handle it
24   and the risk and how I should respond to it when it
25   occurred.  And they said, what you do is you take

Page 180

1    this -- we have to take this and revise the opinion.
2         If I was given advice, please forgive my
3    naivete, but I really made an attempt to deliver a --
4    an adequate expert witness opinion given the
5    circumstances.
6    BY MR. DEAN:
7         Q.   Dr. Frank, isn't it fair to say that you
8    are no longer comfortable in much of the information
9    in your report?
10        MR. THOMPSON:  Object to the form.
11        THE WITNESS:  I think it requires
12   revision based on new evidence.  Yes, I'm -- I -- I
13   think there's some things, such as the point -- time
14   point in 2006 and the time point in 2008, that says
15   there were problems with that.
16        But I still do not have any real insight
17   into the QSIP, and I only have a few observations in
18   2008.
19        And, yes, I think there's a great deal
20   -- I think the -- I think that the comments on
21   individual observations probably refer well back to
22   the individual observations.
23        But the absolute conclusions probably
24   need to be modified based on the evidence that you've
25   provided me.

Page 181

1    BY MR. DEAN:
2         Q.   And while I recognize -- while
3    recognizing that the preparation of a report is an
4    ongoing process, did you -- were you informed that the
5    report that was filed with the Court was supposed to
6    be a final report?
7         Were you ever told that?
8         A.   I was told the deadline and I was told
9    it would be reviewed.  And I asked what I would do in
10   this scenario.  And I did have some discussion of the
11   risk of this occurring.
12        I assumed -- I -- no, I completely
13   anticipated you would do this.
14        This is why I'm receptive to it, and I'm
15   very, very careful to look at it analytically to -- to
16   accept what has to be accepted, but not to be foolish
17   and under a state of anxiety back down when I need to
18   be careful and analytical.
19        I can err in either direction in this
20   setting and I want to be very, very cautious.
21        Q.   Let's go to Page -- go back to Page 5 --
22        A.   Okay.
23        Q.   -- in the one, two -- third paragraph.
24        A.   Yes.
25        Q.   I want to get on to this reference to

46 (Pages 178 to 181)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

---

Page 182

1  Mr. Delicato in 2008 that you've mentioned before and
2  try to get into the right set of documents and ask you
3  some questions on that topic.  Okay?
4      A.    That's fine.
5      Q.    Now, I think it's in the second sentence
6  of that paragraph.
7            It says, In addition, there are
8  implications of the FDA observation that, quote,
9  Mr. Delicato stated that unreported cases from January
10 and February 2006 would be submitted to the FDA.
11           However, Mr. Delicato informed me that
12 they did not have a definitive answer to how far back
13 they would go in reviewing unreported cases.  He said
14 they would include this information in their written
15 response to the New Jersey District.
16           What -- is that a -- so that's from
17 Reference 15; is that right?
18     A.    And it's in quotations and it's very
19 carefully placed there.
20     Q.    Hang on.  Let me see what 15 is.  Okay.
21           So 15 is a May 2000 -- May 21, 2008 FDA
22 inspection report; correct?
23     A.    Yes.
24     Q.    All right.  So let's get that in front
25 of us.

Page 183

1            I am handing you, Dr. Frank, what's
2  been --
3            VIDEO OPERATOR:  Your microphone.
4            MR. DEAN:  Sorry.  Thank you.
5  BY MR. DEAN:
6      Q.    Dr. Frank, I'm handing you what has
7  previously been marked as Defendant's Exhibit 62.
8            And the first page of this is a letter
9  from the FDA to Mr. Delicato, but attached to that is,
10 I believe -- will you agree attached to that is the
11 May 21, 2008 report that you're referencing?
12           Are we talking about the same document?
13     A.    Yes.  May 21, Reference 15.  This is --
14 Reference 15, Page 8.  Well, Reference 15 in my
15 bibliography is an FDA 483.
16     Q.    Oh, I'm sorry.
17     A.    No.  This may be my error and the fact
18 that I had to redo this bibliography in short order
19 because we merged the documents.
20     Q.    I -- well, let's -- this exhibit, we can
21 agree, is the EIR from May 21, 2008 inspection;
22 correct?
23     A.    Yes.
24     Q.    And so you're saying your reference --
25 and, in fairness, Dr. Frank, on the top of Page 3 of

Page 184

1  15 of this document, it says, On May 21, 2008, I
2  issued a Form 483 inspectional observations to
3  Mr. Delicato.
4            So it looks like there was a 483 issued
5  that day, and the Establishment Inspection Report, I
6  don't know when it was prepared, but, obviously, there
7  was an inspection that day that resulted in the 483
8  and the generation of this -- the EIR.
9            Would you agree with me there?
10     A.    Yes.  And there's also May 20th closeout
11 minutes from which they may have been taken.
12     Q.    Now, do you know -- well, first of all,
13 can we find -- I'd like to find where you're quoting
14 Mr. Delicato.
15           Would that be in a 483 or would that --
16     A.    No.  That's why --
17     Q.    That's probably going to be in the EIR,
18 isn't it?
19     A.    Or in the May 20th closeout minutes.
20 They met with management the day before they issued
21 the 483.  There's -- it's May 20th, 2008.  And there
22 was some background in there, and I think there was
23 that statement.
24     Q.    Can you find -- let's see if you and I
25 can find this statement.

Page 185

1      A.    I don't know the background of it,
2  that's why it concerned me.
3            MR. THOMPSON:  Is it important for us to
4  hunt through, or can I point you all on it?
5            MR. DEAN:  Yes, if you've got it.  No,
6  show me.
7            MR. THOMPSON:  It's on Page 8 of 15,
8  right at the end of that long redaction.
9            MR. DEAN:  Thank you, Fred.
10 BY MR. DEAN:
11     Q.    Do you see that now?
12     A.    Yes.  And it was at the closeout meeting
13 that he stated this.  I have no information as to the
14 background of that.
15           But there's apparently still unreported
16 cases from January, February of 2006, which seemed
17 unusual because they did aggregate -- they had -- they
18 had --
19     Q.    Let me stop you.  You're talking about a
20 closeout meeting -- strike that.
21           There was a closeout meeting in regard
22 to Digitek for Actavis Totowa; correct?
23     A.    There was an inspection in Actavis
24 Totowa from April 21st to May 25th, and I believe it
25 covered more than Digitek.

47 (Pages 182 to 185)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

## Page 186

1    I have no way to know whether these
2   cases, unreported cases, were Digitek or another
3   product or the impact on the Digitek case.
4        There's cases that were supposed to be
5   part of the remediation. Apparently, they're not
6   submitted. I don't know what they are.
7        I don't know whether there was
8   regulatory risk decision taken by the company. But
9   this statement -- am I talking too much?
10   Q.   No, no. I think we're actually getting
11  to the bottom of this. I think we're going to get
12  there in a minute.
13       So you -- you don't -- first of all, on
14  the quote here on the bottom of Page 8, you don't know
15  whether any of those related to Digitek, we can agree
16  on that?
17   A.   No.
18   Q.   Pardon me?
19   A.   Very little of the information --
20   Q.   Can we agree on that?
21   A.   Yes, we agree on that.
22   Q.   And if you turn the page to Page 9 of
23  15, would you agree that there is, again, reference to
24  the Denmark site forwarding reports to the Elizabeth
25  site and for processing submission to the FDA?

## Page 187

1        That's what it says, doesn't it?
2    A.   This is the bulk submission from 2000,
3   July and August. That was the implementation of the
4   March 1st MHRA agreement. Yes, that is what that is.
5    Q.   Do you know one way or another whether
6   this exhibit and its observations about AERS, do you
7   know whether it is solely focused on foreign adverse
8   reaction reporting?
9    A.   If you're talking about B here?
10   Q.   I'm talking about Exhibit 62. I'm
11  talking about the EIR, dated May 21, 2008, submitted
12  to Actavis Elizabeth, LLC.
13   A.   No. I do not know whether this is all
14  foreign reporting. I think that --
15   Q.   Let me ask you this, then. Are you
16  aware that there was also, I think, an Establishment
17  Inspection Report on Actavis Totowa dated May 20th?
18       Have you ever seen that?
19   A.   Yes. I have those two inspections that
20  occurred simultaneously, and I spent a fair amount of
21  time sorting between the two of them.
22   Q.   Okay. But the one you quoted from is --
23  the one you quoted from on Page 5 of Mr. Delicato is
24  from the --
25   A.   Yes.

## Page 188

1    Q.   -- May 21 inspection of Actavis
2   Elizabeth.
3        We can agree on that; correct?
4    A.   Yes.
5    Q.   And you've already told me you don't
6   know whether the events that are being described in
7   here are simply related to foreign reporting or not,
8   you just don't know one way or another?
9    A.   Well, the foreign reporting they're
10  talking about the July 2006 and August. This is when
11  Denmark sent them a bulk of cases. Probably most of
12  them should have been in March and April. But I can't
13  -- I don't know about the distribution.
14       But then they're going back and talking
15  about late cases. And there's -- the information in
16  here, there may be information in the coding that
17  tells -- the case code that tells whether they're a
18  foreign report.
19       But I don't know enough about the case
20  codes to tell.
21   Q.   And all this -- on Page 8, all this
22  really says is that Mr. Delicato said at the closeout
23  meeting of the Actavis Elizabeth inspection that they
24  did not have a definitive answer as to how far back
25  they would go in reviewing unreported cases.

## Page 189

1        It wasn't a submission issue, it was a
2   review issue; is that right? Is that the way you read
3   it?
4    A.   Well --
5    Q.   Take your time. I want to be fair.
6    A.   There was something else that was left
7   outstanding in my mind, and I --
8    Q.   First -- I want to get to that. But,
9   first of all, is it fair to say that this comment
10  reflects that everything had been submitted, but there
11  was just an issue as to how far back they would go in
12  reviewing those cases?
13   A.   The way he stated it, there were still
14  unreported cases outstanding from January and February
15  2006. I don't know whether they're foreign. I don't
16  know whether they're U.S.
17       I don't know whether they were cases
18  that were cited in the inspection report or -- there's
19  no specifics.
20   Q.   Okay. All right.
21   A.   I can't -- I can't state that. And I
22  don't know what the how far back means.
23       I had an outstanding question in my mind
24  that the acquiring company really did not want to put
25  resources into remediation of issues that existed

48  (Pages 186 to 189)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 190

1  before the time of the acquisition, and they were
2  attempting to negotiate this with the health
3  authorities.
4        If I did not adequately document that in
5  my report, I stand corrected.  But there was still
6  some question in my mind whether they were making
7  calculated regulatory risk decisions.
8        And that, when he said how far they were
9  willing to go back, I can't comment any farther on
10  that.
11       Q.    You don't -- again, this is an area, in
12  your mind, where there's missing information; is that
13  fair to say?
14       Is that yes?
15       A.    Yes.
16       Q.    Now, and you are also -- you are unaware
17  as to whether subsequent to that comment what follow-
18  up there may have been and what the regulatory
19  response may have been in regard to that observation;
20  is that fair?
21       A.    I have not seen any subsequent
22  documentation to give further insight into these --
23  into this.
24       Q.    So that's more missing information;
25  correct?

Page 191

1        A.    Yes.
2        Q.    Okay.  Dr. Frank, as of January 3, 2007
3  when Exhibit 87 was issued, are you aware of any
4  unreported MedWatch report on Digitek?
5        A.    There are inspection observations prior
6  to that, 2007.
7        Q.    Listen to my -- listen to my question.
8        A.    Yes.
9        Q.    I know that we've talked about issues
10  that they had in 2006.
11       My question is, as of January 3, 2007,
12  are you aware of an unreported MedWatch report in
13  regard to Digitek?
14       A.    That's a very important question, but
15  there's a couple different ways to interpret it.
16       Q.    Well, are you aware of the existence of
17  such a report?
18       A.    I'm aware of unreported cases in the
19  initial inspection observations.  I'm aware of the
20  agreements.
21       But I don't have any kind of
22  documentation that allows me to track the cases in the
23  inspection observations with the remediation and
24  submissions.
25       Q.    So --

Page 192

1        A.    I can't tell you whether the
2  implementation of the -- of the remediation -- and
3  there may be -- there could be blanket statements, and
4  I'm just not -- I'm trying to be really accurate here.
5        Q.    And that's fine.
6        A.    There could be statements that somebody
7  said, yes, it was adequate, but I can't go through
8  here quickly and find them.
9        Q.    And my question is, are these -- I asked
10  you whether you were aware of any set of circumstances
11  which should have been reported as a MedWatch, which
12  wasn't as of this date, and you referenced the later
13  observations in the 2008 inspection; right?
14       A.    They're the ones in which I was
15  concerned about.
16       Q.    If you put those -- if you put those
17  aside for the moment because we just talked about
18  those --
19       A.    Yes.
20       Q.    -- and you already told us you're not
21  sure whether those are Digitek or not; right?
22       A.    Absolutely.
23       Q.    So put -- so we've explored, I think,
24  Exhibit 62.
25       So if you put it aside for the moment,

Page 193

1  are you aware of any unreported set of circumstances
2  that would give rise -- should have given rise to a
3  MedWatch report in regard to Digitek as of January 3,
4  2007?
5        A.    No.  The only --
6        Q.    Was that a --
7        A.    That was a no.  The only observations we
8  have are the inspection reports, 2006, and the repeat
9  inspection.  My information does not allow me to track
10  the actions of Actavis in fulfilling the response
11  letters.
12       Q.    So you can't testify, as of any point of
13  time after January 2007, that there was a set of
14  circumstances that should have been in a MedWatch
15  report that was not reported; you just don't have an
16  appropriate information base to do that, do you?
17       A.    There were specific cases in 2008 in
18  this.  They were Digoxin.  I don't know whether they
19  were Digitek.
20       Q.    You don't know?
21       A.    It's Digoxin, but I think they have some
22  sort of XUS Digoxin that I'm not to take into account.
23       Q.    You are in --
24       MR. DEAN:  For the record, the witness
25  is in Exhibit 62 now.

49 (Pages 190 to 193)

Karen A. Frank, M.D.         Videotaped          June 30, 2010

Page 194

1        THE WITNESS: Yes.
2    BY MR. DEAN:
3        Q.   And there's reference on what page to
4    Digoxin?
5        A.   This is Page 9 out of 15, and there's
6    clearly a Digoxin case there.
7        Q.   Right.
8        A.   But it's not brand Digitek. And I don't
9    have any -- I didn't get any written documentation
10   that -- I know they have from the -- from some of the
11   other depositions, they have XUS Digoxin, but it's not
12   Digitek.
13       And I repeatedly clarified whether XUS
14   cases should be brought into this assessment, and I've
15   been told no. Okay.
16       Q.   And just for the purposes of time here,
17   you don't know whether this reference on Page 9 of 15,
18   whether that reference to Digoxin tablets references
19   Digitek or not, do you?
20       A.   No. We need to know this case number.
21   That will code the country of origin of the case.
22       So it is possible to tell whether that's
23   a U.S. case that was just reported as the generic and
24   should be taken into account, or whether it's
25   potentially an XUS case.

Page 195

1        Q.   So, as you sit here today, you're not
2    aware of any -- you don't have any specific facts that
3    there was a set of circumstances in regard to Digitek
4    after January 3, 2007, which was not appropriately
5    reported in a MedWatch; is that correct?
6        A.   The only thing that I have are these
7    inspection reports.
8        Q.   Being --
9        A.   And my answer at this point, my
10   preliminary answer is, no, I cannot identify it from
11   memory.
12       Q.   Let's go on to another topic here.
13       Are you done with that one? Yes, let's
14   get those out of your way.
15       A.   Okay.
16       Q.   One of the topics you address in your
17   report is the -- what I will call the recall
18   communications.
19       A.   I was asked to specifically look at
20   those and the change in the patient population at
21   risk.
22       And I was provided the attorney's
23   initial assessment that from the -- from the Health
24   Hazard Assessment to the letter to the customers to --
25   which are the business customers, which is Mylan, to

Page 196

1    the press releases to the public, there was a change
2    in risk population.
3        I brought up the issue that at least in
4    writing informed consents in clinical trials, we write
5    to a fourth- to fifth-grade comprehension level.
6        And that when they wrote the press
7    release, there may have been that process to modify
8    the communication. I did not put that in my report.
9        But what I did was, I tracked the
10   changes in patient population, which did change from
11   the Health Hazard Assessment to the final
12   communication, and the changes in the patient
13   population at risk, and I commented on that.
14       I was asked to comment, and I thought
15   there was clearly a change and it clearly changed the
16   total patient population that would be warned. And
17   that's pretty carefully documented, those changes with
18   quotes.
19       I did not speculate on why it was done,
20   on any data that would have supported the removal,
21   because I had no access to that.
22       But they did go from a larger patient
23   population at risk to a smaller patient population at
24   risk by the time they released the press release.
25       Q.   Okay. First of all, would you agree in

Page 197

1    terms of the recall communication, it was clear to
2    everyone that the company wanted the product back and
3    off the market and no one should be taking it?
4        A.   Yes.
5        Q.   Okay.
6        A.   A recall is a recall.
7        Q.   Right.
8        So anyone who, whether they were a
9    patient, a pharmacist, a doctor, they would have
10   gotten that message; correct?
11       A.   Yes.
12       Q.   Okay.
13       A.   With patients.
14       Q.   Now -- were you finished?
15       A.   Well, yes. If you hear about a recall
16   drug, it's a recall drug.
17       Q.   All right. Fair enough.
18       A.   The people who are -- a recall drug is a
19   recall drug, but there's a change in the level of
20   alarm. To some patient populations, it was
21   downplayed. It was removed. But a recall is a
22   recall.
23       Q.   All right. So then would you also
24   agree, from your experience with the FDA, that the FDA
25   approved all recall communications before they were

Karen A. Frank, M.D.       Videotaped              June 30, 2010

Page 198

1  issued?
2       Would you agree with that?
3       A.  The FDA inspectors were very, very
4  concerned about not having received final copies of
5  the recall letters.
6       Q.  Well, my question is, before these
7  letters went out to the various recipients, is it your
8  understanding -- and maybe you don't have an
9  understanding, but my question to you is, is it your
10  understanding that the FDA would have approved the
11  substance, not just the substance, would have approved
12  in its entirety the press release, the communication
13  to pharmacies, the communication -- any communication
14  that was sent out about the recall?
15       Is it your understanding the FDA would
16  have approved that?
17       A.  Yes.
18       Q.  Okay.  Now, you --
19       A.  I hope that that actually did occur in
20  this case, but I can't -- perhaps I should have gone
21  back in a very detailed analysis, but I don't think
22  there is.
23       I think there was a concern about the
24  delay in the recall procedures and the delay in
25  providing final reports.  But, yes, the FDA should

Page 199

1  have approved what was released.
2       (Discussion off the record.)
3       THE WITNESS:  It would be in the May
4  20th meeting closeout.  I'm pretty sure it was the
5  meeting closeout --
6       MR. DEAN:  Thank you.
7       THE WITNESS:  -- because they became --
8       MR. THOMPSON:  This is mine.  You gave
9  this to me.
10       MR. DEAN:  You keep it.
11       MR. THOMPSON:  I'm happy to put it back
12  into play, but I don't want to be accused of
13  swallowing a copy.
14  BY MR. DEAN:
15       Q.  Your criticism on the difference in the
16  communication of information about various groups is
17  set out in your report, is that right, on the recall
18  communication?
19       A.  Yes.
20       Q.  Do you remember the substance of that --
21  of that?
22       A.  It's in this document.  I mean, I was
23  asked specifically to comment on certain issues,
24  particularly the change in renal insufficiency to
25  renal failure.

Page 200

1       And that's where I made the question
2  that that could be an artifact of the review of
3  something being written to a fourth- to fifth-grade
4  level.
5       I don't know about press releases to the
6  general public, whether they have the same
7  requirements as the informed consent to clinical
8  trial.
9       So we talked about that with the renal
10  insufficiency.  We talked about the removal of the
11  once daily dosing.
12       And then I brought up the third change
13  in the -- in the press release, because the Health
14  Hazard Assessment said lack of efficacy with
15  exacerbation, and that was omitted.
16       So there were three changes, daily
17  dosing, renal insufficiency and lack of efficacy were
18  distilled down to renal failure.
19       Yes, you're correct, that could have
20  been done in negotiations with the FDA.  In light --
21  in light of that FDA document that says there was no
22  risk to public health, there may be background to
23  this.
24       But there were three changes.  And it
25  does change the direct communication to the patient

Page 201

1  population at risk.
2       Q.  Let me hand you what we marked as 37.
3       A.  Okay.
4       MR. DEAN:  Fred.
5  BY MR. DEAN:
6       Q.  Have you ever -- have you seen Exhibit
7  37 before?
8       A.  Yes.
9       Q.  Okay.
10       A.  This was -- this was the basis on which
11  I tracked -- I was asked to track the changes and
12  comment whether there were change in the populations
13  described from one communication to the next.
14       Q.  And one of these communications went out
15  on April 25th; is that right?
16       A.  Yes.
17       Q.  And can you direct us to that?
18       A.  That's 28213.  That's the press release.
19       Q.  And is it your understanding that that
20  was issued on April 25?
21       A.  Yes.
22       Q.  And --
23       A.  I cannot comment at this point in time
24  the relationship between this release and the FDA
25  approval or any impact of the FDA review on the

51 (Pages 198 to 201)

Karen A. Frank, M.D.      Videotaped           June 30, 2010

Page 202

1  changes.
2      Q.    Now, your point is, if I understand, the
3  point -- the basic point in your report is that on
4  this April 25 press release, it mentioned a renal
5  failure, and several days later different
6  communication was conveyed to pharmacies; is that
7  correct?
8      A.    Well --
9      Q.    Is that one of your basic points?
10     A.    I have this packet of communications.
11     Q.    Right.
12     A.    I have nothing else. When one stops a
13  clinical trial such as the WHI, there are letters that
14  go out to the doctors, the patients, the study
15  coordinators.
16          I do not know whether that is a standard
17  in a drug recall like this. These are two different
18  situations.
19     Q.    Right.
20     A.    But I don't have any letters directly to
21  patients or directly to doctors. I have only this.
22     Q.    Okay.
23     A.    I have a Health Hazard Assessment, I
24  have a communication to Mylan, which never, to my
25  knowledge, reached the public except in this exhibit,

Page 203

1  and then there's a press release that went out.
2          So I was asked specifically to comment
3  on the changes from A to B to C, and what the patients
4  and the doctors saw as far as the scope of the risk of
5  the defect. I agree with you that a recall is a
6  recall.
7      Q.    Okay. So --
8      A.    But there was granularity omitted from
9  the press release and the question is why.
10     Q.    Right.
11          And so when you said A to B to C, A
12  would be -- the first thing in the sequence would be
13  the press release on April 25; right?
14          And then what is B and C in terms of
15  your last answer?
16     A.    The press release was on the 28th. The
17  internal communication to Mylan was on --
18     Q.    Excuse me. The press -- or the news
19  release --
20     A.    I'm sorry. The Health Hazard Assessment
21  was the 28th. Is -- no, the 18th. The Health Hazard
22  Assessment was the 18th. I think it was sent over on
23  the 25th. The cover letter was the 25th.
24     Q.    Okay.
25     A.    The press release was also on the 25th.

Page 204

1      Q.    Right.
2          And then --
3      A.    And then the internal letter went out
4  subsequently. Now, I would have -- I don't know about
5  the receipt date. I think the cover letter -- you can
6  check the cover letter on the Health Hazard
7  Assessment.
8      Q.    We will in a minute.
9          What was the follow-up -- there was a
10  follow-up letter that I think you referenced in your
11  report after the press release. Was it the Dear
12  Valued Customer letter?
13     A.    That's the 28th. That's an internal
14  communication.
15     Q.    What's the Bates number page there,
16  Dr. Frank?
17     A.    It's 28208.
18     Q.    So in the April 25 press release, it
19  simply references renal failure.
20          But in the April 28 Dear Valued Customer
21  letter, it talks about patients taking daily doses or
22  patients with renal insufficiency; correct?
23     A.    Yes.
24     Q.    And you believe that's more detailed
25  information that was not contained in the press

Page 205

1  release; correct?
2      A.    Well, it is more detailed. But it
3  changes the population at risk. So the press release
4  -- and this is where I was -- I was asked to comment
5  on certain things.
6          I was asked to analyze evidence to
7  support two observations when I was asked to do this.
8          One was the systemic issues of
9  pharmacovigilance on signal detection and the other
10  are these changes from one to the next. And that's
11  what I did.
12          I'll admit, this wasn't sequential.
13  This actually was a later date than the press
14  release. I will -- yes, you're correct on that.
15     Q.    Which is -- which is -- what date is on
16  that?
17     A.    This is the Dear Valued Customer.
18     Q.    Right.
19     A.    And I questioned what the customer was,
20  and I was told that was internal. That did not go out
21  to the patients, to my knowledge.
22     Q.    And so what you're suggesting is, I
23  think, that the company had information on April 25
24  that it didn't put in the press release that it did
25  put in the April 28 letter; is that correct?

52 (Pages 202 to 205)

Karen A. Frank, M.D.        Videotaped            June 30, 2010

Page 206

1     A.    Yes.  The internal communications show a
2  broader patient population at risk than the
3  communication to the public.
4     Q.    And you said that while the -- before
5  you mentioned that while the Health Hazard Evaluation
6  report was done on April the 18th, you said it -- I
7  think you said you were right that it was transmitted
8  on April the 25th; correct?
9          Is that your recollection?
10    A.    There should be a cover letter.  And, as
11 I recall, it's the 25th, and I went, why did it take
12 so long to transmit something that was written on the
13 18th?  But the April 18th is something I reiterated in
14 the document.
15    Q.    Well, your memory is actually very good,
16 Doctor.
17         I'm putting in front of you Exhibit
18 220 --
19    A.    Yes.
20    Q.    -- which is that cover letter from
21 Dr. Leikin's group to Sarita Thapar; correct?
22    A.    Uh-huh.
23    Q.    And it's dated April the 25th; correct?
24    A.    Yes.
25    Q.    And can you -- and for the record, how

Page 207

1  was that letter sent?
2     A.    Overnight Federal Express.  So it
3  arrived on the 26th.
4     Q.    So it arrived on the 26th; correct?
5     A.    Yes.
6     Q.    So on April the 25th, when the press
7  release was issued, the information in the Health
8  Hazard Evaluation had not been received, had it?
9     A.    Unless there was an additional faxed
10 copy and this was the follow-up hard copy.
11    Q.    And -- but you -- again, that's an area
12 where you don't have information; correct?
13    A.    No.  And I did not -- I knew that letter
14 was the 25th, but I -- I did not connect the fact that
15 the press release went out the day before that would
16 have been received if that was the only copy.
17    Q.    And can we also agree that in the Dear
18 Valued Customer letter, the information in here about
19 the two groups, about the daily dosage group and the
20 renal insufficiency group, that is contained in the
21 Dear Valued Customer letter on the 28th, isn't it?
22    A.    I need to look at this again before I
23 answer.
24    Q.    Sure.  Take your time.  It's 28208.
25    A.    28208.

Page 208

1          (Witness reviews document.)  It has
2  toxicity -- daily doses or renal insufficiency, and it
3  contains the lack of efficacy.  Yes, I think this one
4  tracked verbatim to the Health Hazard Assessment.
5     Q.    So this, the Dear Valued Customer
6  letter, tracked the information contained in the
7  Health Hazard Evaluation report that was transmitted
8  to Actavis on April 25 by Federal Express; correct?
9     A.    Yes.
10    Q.    Okay.  But you didn't -- when you were
11 doing your review, you didn't link that up in your
12 mind, did you?
13    A.    I think I was operating on the
14 assumption that press release was made after
15 receipt of the Health Hazard Assessment or
16 communication of what was in the Health Hazard
17 Assessment.
18         And that may have been because I made
19 assumptions that I -- when I received this assignment,
20 I was asked to reply on a series.  And I did not go
21 back.
22         I looked at these dates and I wondered
23 why that cover letter was dated the 18th, during --
24 the 25th and why the Health Hazard Assessment was the
25 18th, but I didn't go back and verify this.  I -- and

Page 209

1  I don't know.
2          They may have issued the press release
3  before they got the Health Hazard Assessment based on
4  some sort of a preliminary analysis.  Perhaps that
5  company internal document that I have not seen.
6     Q.    But from what you have seen and what we
7  have in front of us, anyway, today, when they issued
8  the press release on the 25th, they would not have had
9  the Health Hazard Evaluation; correct?
10    A.    Unless there was a copy faxed in
11 followed by the FedEx.
12    Q.    Okay.
13    A.    I actually -- I do not have
14 documentation of what the supporting documents were
15 for that press release.
16         The assumption was that the Health
17 Hazard Assessment from the 18th would have been
18 wrapped up into external communication for just these
19 issues.
20         But that -- that cover letter does beg
21 the question because it would have been received one
22 day after the press release.
23    Q.    At the bottom of Page 6 -- I'm back on
24 Exhibit 261, Dr. Frank.
25         The bottom of Page 6 there is a -- the

53 (Pages 206 to 209)

Karen A. Frank, M.D.     Videotaped           June 30, 2010

Page 210

1    second sentence says there was a notable absence -- I
2    think you left out the word "of" -- absence of
3    oversight from a centralized headquarters function in
4    Iceland to track local compliance and exchange of
5    information between the U.S. and the EU affiliates.
6            What is the basis for that opinion?
7        A.    Okay.
8        Q.    First of all, what documentary -- what
9    documents do you have that are even relevant to that
10   issue?
11           Let's talk about that first.
12       A.    That's why there's an absence.
13           One of the things the health authorities
14   do in these drug withdrawal cases, for new adverse
15   events, say liver failure or torsade, if the health
16   authority identifies the issue before the company,
17   they go back to the company and say, why are we
18   telling you about a serious safety problem with your
19   drug?
20           The assumption is that the company
21   should have processes in place to identify the issue
22   first, and then go back and tell the health authority
23   it exists, and then the issue starts into a dialogue
24   of whether this drug has to come off the market.
25           This is conventional wisdom.  And I

Page 211

1    didn't -- I don't want to document the cases where
2    this occurred.
3            But when I've worked at headquarters,
4    these international companies typically are
5    headquarters holding companies, and each country level
6    affiliate is an independent company under the holding
7    company, and they operate in conjunction with local
8    regulations.
9            Headquarters typically tracks compliance
10   at the local level.  But the responsibility is there.
11           But there's a growing movement toward
12   tracking this data, spidering this data from local
13   departments onto dashboards of managers.
14           And so the issue here -- and I talked to
15   them, this is somewhat outside of my expertise, but my
16   question is, I was given no evidence that headquarters
17   identified these noncompliance issues before the FDA
18   2008 inspection.
19           So the remediation was to do new
20   processes, to move things to Elizabeth, to make a
21   provision that Copenhagen would send cases to the U.S.
22           But I have no evidence that headquarters
23   was actually -- had a strong governance function over
24   the individual compliance.
25           They didn't realize that Copenhagen was

Page 212

1    stockpiling reports and sending them in July and
2    August when the implementation date on that MHRA
3    agreement was March 1st.
4            That could have easily been picked up by
5    tracking those dates, those submission dates.
6            And so the question comes up, and this
7    is -- this is, again, extrapolating from other cases
8    where the authorities come back and say to the
9    company, why are we telling you about these issues?
10       Q.    Well, let's stop.  First of all, it
11   sounds like you raised with the plaintiffs' lawyers
12   the issue as to whether you had expertise to even
13   comment about this issue; is that fair?
14       A.    Well, we talked about scope, and I'm
15   talking about systems.  And this is on the edge of
16   those systems because I have some experience.  I've
17   never done a merger integration.
18           I was involved with Roche headquarters
19   drug safety reorganization, which was clearly a
20   headquarters reorg. where there was centralization of
21   procedures that had been decentralized, gone out of
22   compliance.
23           And it's the centralization and
24   headquarters oversight that has frequently been
25   critical in these multinationals that have compliance

Page 213

1    issues with safety, not just with Roche, but with
2    other companies.
3        Q.    Did you tell the plaintiffs' counsel in
4    this case this was outside your area of expertise?
5        A.    I asked if they thought it was and
6    whether I should take it out and they were pleased
7    with that being left in the document.
8        Q.    But you, yourself, raised the question
9    as to whether it was outside your area of expertise;
10   correct?
11           That's what I hear you saying.  I want
12   to make sure I understand you correctly.
13       A.    Well, this is my first time as an expert
14   witness, and I'm trying to determine what scope of
15   pharmacovigilance systems is.  This is -- this is
16   technically within the scope of --
17       Q.    I know.  My question was -- I'm sorry.
18       A.    It may be, but I can't give you a
19   definitive answer.
20       Q.    My question was very simple.  Did you
21   tell the plaintiffs' attorneys this was outside your
22   area of expertise?
23       A.    It was possibly.
24       Q.    Okay.  Now, you don't know how Actavis
25   in Iceland was set up structurally to interact with

54 (Pages 210 to 213)

Karen A. Frank, M.D.     Videotaped          June 30, 2010

Page 214

1   Actavis in the United States, do you?
2       A.   No. We were not given any information
3   as to the headquarters function and overseeing their
4   affiliates or how much headquarters was initially
5   involved with the 2006 inspection, other than to
6   ratify the decision at the time of the acquisition to
7   implement the MHRA agreement between the two.
8       Q.   Is it fair to say you have insufficient
9   information to be able to comment on the oversight
10  responsibilities of headquarters in Iceland in regard
11  to local pharmacovigilance issues?
12      A.   These may have been placed. I was not
13  given any information to say that there were. And I
14  don't -- I don't know I do.
15       I know that they wanted -- when they got
16  the first inspection, the initial fix was to move the
17  processes to Actavis.
18       There's not a lot of insight into the
19  process of transfer or any other process changes at
20  the time of the acquisition and the merger of some of
21  these acquisition companies.
22       I guess, there is -- there's an absence
23  of insight into what happened. There's no assurance.
24      Q.   Do you consider yourself to be an expert
25  in the issue of recall communications?

Page 215

1       A.   Honestly, no.
2       Q.   Okay.
3       A.   I can't say that I've done a huge number
4   of them.
5       Q.   Okay. And I think we established before
6   that what you did in regard to recalls was maybe do
7   the Health Hazard Evaluation reports. But you've
8   never participated in drafting the recall documents
9   themselves; correct?
10      A.   No. My role has been to draft the
11  assessment -- my role has been to draft the
12  assessments. And sometimes I sit on the
13  multifunctional team.
14       But once the decision is made to recall
15  or to try to obtain product for analysis, typically,
16  any recall communications go out of a different
17  office.
18       MR. DEAN: All right. Let's take a
19  short break.
20       VIDEO OPERATOR: Going off the video
21  record.
22       The time is 3:19 p.m.
23       (A recess was taken from 3:19 p.m. to
24  3:30 p.m.)
25       VIDEO OPERATOR: We're now back on the

Page 216

1   video record.
2       The time is 3:30 p.m.
3   BY MR. DEAN:
4       Q.   Do you have any criticisms of the
5   information gathering process for information that
6   would go into a MedWatch report by Actavis before the
7   time of the recall?
8       A.   There are inspection observations from
9   the inspection of January 2006 that there was
10  inadequate information in the cases and inadequate
11  follow-up, and they cited several cases.
12       So they were looking at the content of
13  information, things that were absent, such as
14  concomitant medications and concurrent diseases, as
15  well as follow-up issues, particularly on a death
16  case.
17      Q.   Are you aware of any -- let me reframe
18  my question in point of time. Same question, but
19  after January 3, 2007, when the letter that we saw was
20  issued.
21       And so after January 3, 2007, are you
22  aware of any criticism -- and before the recall, in
23  that time frame from January '07 to end of April, '08,
24  are you aware of any criticisms of the information
25  gathering process by which Actavis gathered

Page 217

1   information to generate MedWatch reports?
2       A.   No.
3       Q.   Okay. Did you ever say to the
4   plaintiffs' attorneys in this case that I cannot in
5   good conscience give an expert report in this
6   litigation because I am concerned that I don't have
7   all the potentially relevant documents?
8       A.   I said I do not think I can render a
9   definitive opinion. I can only give opinion on the
10  evidence to which I was -- on which I was presented.
11       And I talked to them about what if I
12  render an opinion that's inadequate based on
13  inadequate evidence? And they encouraged me to render
14  the best opinion that I could based on the evidence
15  that I was presented.
16       They presented me with some more
17  evidence, and I did the best I could with what I was
18  given.
19       And I knew that there were
20  vulnerabilities that remained based on white space,
21  but there was -- there was -- the original report was
22  written with more statements of no assurances
23  provided, no information is provided.
24       There was more of a statement of the
25  absence.

55 (Pages 214 to 217)

Karen A. Frank, M.D.        Videotaped          June 30, 2010

## Page 218

1    I was asked to rephrase things to say,
2  my opinion based on reasonable evidence, and I did
3  that on June 15th.
4        So there was a report written that was
5  -- with language where I would be presenting this to a
6  client based on a consulting firm.
7        And I was given some guidance on how to
8  rephrase the report, and I went in and I rephrased the
9  report where I thought there was FDA inspection
10  observations that would fit together as reasonable
11  evidence, such as I keep repeating, the fact that 2008
12  still had inspection findings.
13        It was a question of nonsubmission of
14  cases. There were things like that that became the
15  basis.
16        But I actually trusted them that they
17  were providing me enough information that it was
18  conscionable to form those positions.
19        They reviewed them and they reviewed the
20  final wording, and I trusted their counsel that this
21  report, although preliminary and possibly requiring
22  revision, was suitable for filing.
23     Q.   Now, did you just tell me that there is
24  a -- I guess it would be on one of these thumb
25  drives -- that there is an initial report that you

## Page 219

1  wrote and then there's a follow-up report that you
2  wrote after you had expressed concerns to the
3  plaintiffs' counsel about what you'd said in your
4  report?
5        Did I get that correctly?
6     A.   No. I was very, very careful about
7  making too many preliminary comments. I spent an
8  awful lot of time trying to gather and organize the
9  information and track it.
10        I probably started tracking quality
11  information from manufacturing and trying to assess
12  whether the quality systems were impacting
13  pharmacovigilance. I probably went on a tangent.
14        But, no, there was no real preliminary
15  report that I revised. I did the report and I was
16  asked to change the wording to the legal wording
17  required for an expert report.
18     Q.   Now, is the backup to what you just said
19  where you were -- where you made changes in the
20  wording, is that someplace on the thumb drive?
21     A.   I don't know whether I overwrote it. I
22  think there are early drafts.
23     Q.   You used the word "conscionable" a few
24  minutes ago.
25        Were you worried as a matter of your

## Page 220

1  conscience that you might be rendering an opinion
2  without appropriate foundation?
3        Was that what you meant to convey by
4  your use of the word "conscionable"?
5        MR. THOMPSON:  Object to the form.
6        THE WITNESS:  I'm completely naive to
7  this. I've avoided this for eight years and I was
8  encouraged to write this report based on people who
9  had worked with me who felt that I was qualified to
10  start to take on this kind of work.
11        I have no way to independently judge my
12  ability to serve as an expert witness. And I don't
13  know whether this is the type of case where you start
14  expert witness.
15        I trusted the attorneys who provided me
16  with information to give me the information that I
17  needed to determine what was going on.
18        I went back to them with questions and I
19  did ask about the process of discovery and why there
20  were all these things that I was not provided and
21  would they be provided to me. And I talked to them
22  about what do I do with this information?
23        And they -- she said -- based on that, I
24  believe that it was okay to render the preliminary
25  report. I did this on advice of counsel and with the

## Page 221

1  supervision of counsel.
2        But knowing that there could be further
3  information that may or may not have been already
4  uncovered with discovery.
5        And I was told that it is okay to render
6  this preliminary opinion. If they present you with
7  further evidence, you go back and revise it.
8  BY MR. DEAN:
9     Q.   Is it fair to say that based upon what
10  you've seen today, you are no longer comfortable and
11  you do not stand fully behind this opinion?
12     A.   I would say yes. My preference would be
13  to, as I was told I could do, incorporate new
14  information.
15        But -- but, yes, there -- I -- I think
16  that there has to be -- there should be re-analysis of
17  that opinion based on further information. And maybe
18  even some of the information that's not yet presented.
19     Q.   So is it fair to say that as from your
20  -- with your medical training and your background in
21  the FDA, you, yourself, think that there is an
22  inadequate foundation for your opinion in this report;
23  correct?
24     A.   I don't have an answer to that. I feel
25  -- Mr. Thompson encouraged me at the break to say,

56 (Pages 218 to 221)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

---

Page 222

1  well, you're as much an expert on this as anyone else.
2  I have no way to compare myself to
3  anyone else. I've never even witnessed court
4  proceedings. I deliberately avoided getting involved
5  with litigation. It's not like I've been aiming at
6  this.
7  This is something that I was approached
8  about doing a couple times and sort of said, no, no,
9  no, I'm not going to be involved with that.
10  And I was approached about taking this
11  assignment and very carefully working on it. I asked
12  about the documentation.
13  And I had to trust the people who had
14  hired me that I was being given correct guidance so
15  that this would be a useful piece of information and a
16  viable one, but I have no way to independently judge
17  that.
18  If -- I should have said, I cannot write
19  this report until I am given all of this, I was given
20  assurance that I'm to render a preliminary opinion
21  based on what was given me.
22  Q.     So it was your understanding that what
23  was submitted to the Court was just a preliminary
24  report, then; is that right?
25  A.     It was my understanding that these

---

Page 223

1  opinions were to be based on observations that I could
2  make based on the present state of the evidence
3  provided to me. I was asked not to say anything
4  speculative.
5  I asked Pete Miller specifically about
6  this comment about the headquarters oversight, and he
7  liked that comment. He did not ask for it to be
8  written.
9  But I asked, I said, is this -- I don't
10  know -- I can't give you the exact wording, but I
11  wanted to make sure I didn't go out of the scope.
12  But I was extrapolating these
13  pharmacovigilance systems which usually go into a
14  headquarters oversight.
15  And he particularly liked that section
16  of the report, and I was given no indication that the
17  inclusion of those statements would be a problem. He
18  approved them.
19  Q.     So I understand that particular
20  exchange, you raised the question about your expertise
21  to give an opinion in that area, and Mr. Miller's
22  response was, I like that opinion. Let's leave it in.
23  That was the conversation; correct?
24  A.     I don't recall the specifics.
25  Q.     Is that the --

---

Page 224

1  A.     I don't recall. I don't recall whether
2  I --
3  Q.     Is that the --
4  A.     I don't recall whether I pressed him on
5  how far I should extend out. I know they've
6  encouraged me several times not to go outside of the
7  scope of my assignment in making comments.
8  But that statement was included in the
9  conclusion with Mr. Miller's approval.
10  Q.     How do you think all this impacts on
11  your credibility, Dr. Frank?
12  A.     I think it demonstrates a very
13  legitimate attempt to do a decent job with suboptimal
14  information. If I did not know to refuse to render an
15  opinion, then I wish I had been informed by the
16  counsel.
17  But I think it demonstrates my ability
18  to analyze the quality of the evidence and to define
19  things that could potentially be missing. Some of the
20  things that you presented to me I would not have known
21  to even have asked for.
22  But I raised the issue of whether or not
23  these opinions should be rendered on a series of
24  evidence, and I was given no indication that this was
25  unconscionable or would be seen to jeopardize my

---

Page 225

1  credibility.
2  It may display a learning curve. It may
3  display a naivete at dealing with certain things. But
4  I was never once given any indication that this was
5  unconscionable or unethical behavior.
6  Even though I questioned, I wanted to
7  make sure that none of this was done, and we discussed
8  it on June 2nd. This is a pretty complex case.
9  There's a lot of stuff that was not --
10  was not -- I don't know -- I don't know whether it
11  should or should not have been prepared for me,
12  whether it was incumbent upon me to go find the
13  additional information.
14  I asked for more. Or whether I should
15  have quietly made a determination on the first
16  dossier.
17  Q.     But we can agree, in your words that you
18  uttered two minutes ago, that the information you had
19  here on which to base your opinion was suboptimal;
20  correct?
21  A.     Yes. It was suboptimal. There's --
22  there was probably a lot more information out there
23  that was not present.
24  Q.     And information which might well lead
25  you to change your opinion; correct?

57 (Pages 222 to 225)

Karen A. Frank, M.D.       Videotaped       June 30, 2010

Page 226

1   A.    Modify the opinion, yes.
2         MR. DEAN:  Let's end this tape.
3         VIDEO OPERATOR:  Going off the video
4   record.
5         This is the end of Tape 4.
6         The time is 3:46 p.m.
7         (A recess was taken from 3:46 p.m. to
8   3:50 p.m.)
9         VIDEO OPERATOR:  We are now back on the
10  video record.
11        This is the start of Tape 5.
12        The time is 3:52 p.m.
13  BY MR. DEAN:
14        Q.    Dr. Frank, do you realize that there's a
15  lot of money at stake in this litigation?
16        A.    Yes.
17        Q.    And do you realize there are
18  Court-imposed deadlines for all of us, expert
19  witnesses and lawyers?
20        Do you realize that?
21        A.    Yes.
22        Q.    Were you led to believe that this report
23  that you were going to -- that you have submitted was
24  only a preliminary report?
25        Was that the indication that you were

Page 227

1   given?
2         A.    I'm afraid so.
3         Not -- the word "preliminary" was not
4   used, but I was led to believe that there would not be
5   any question or problem writing this in this way, and
6   that if I was presented with additional evidence, I
7   was to modify this.
8         And I -- Mr. Thompson is concerned that
9   I've suddenly backed away from my report because I've
10  been presented with two pieces of evidence.
11        I'm sorry, maybe I'm just frightened.  I
12  don't want to do anything wrong.  And maybe I need
13  more assurance than the average person.
14        But, yes, I did realize there was a
15  deadline.  I was a little amazed when I found out that
16  this was actually going to be a big federal case.  I
17  thought it was a rather small assignment.  But he's
18  concerned that I backed down too quickly.
19        I don't know how to gauge accurately
20  what is sufficient information to render -- completely
21  render opinion.
22        I may have -- I asked many people
23  whether I was qualified to do this as an expert
24  witness.  He's asked me to stand by what I said.
25        But, yes, one of the reasons I sit here

Page 228

1   and I examine what you said -- give me very carefully
2   is I realize there's a lot at stake.  And I want to be
3   careful to do the right thing.
4         I was -- I thought that I was being
5   careful enough.  And he wants me to stand by what I've
6   written.
7         Q.    Were you --
8         A.    I'm -- I'm sort of like, this is the
9   first time I've done it, I want to make sure that it's
10  done absolutely correctly.
11        And yet, I can tell you right now that I
12  started going through this and going, well, I mean, I
13  can tell you that there was other information that
14  would have given indication of the compliance.
15        But I said, well, they still had
16  inspection findings in 2008.  That probably indicates
17  inadequate implementation of the plans.
18        So I've been -- I've sort of been
19  encouraged to, even though I may be naive and a little
20  bit insecure in what I'm doing, stand by this.
21        Now, I just -- I just don't want to do
22  anything wrong.  I did the best I could with what I
23  was given, and I worked under the guidance of my
24  client.
25        Q.    Your client being the plaintiffs'

Page 229

1   lawyers; correct?
2         A.    Knowing that you would come with further
3   evidence.  And how I should respond, he said, well,
4   look, you're backing down.  You've been shown two
5   additional pieces of evidence.  Is that enough to sway
6   your whole opinion?
7         I'm sitting here, well, I guess I'd like
8   to do another careful analysis.  But he's encouraging
9   me to stand by my opinion.
10        Q.    What I'm interested in is whether you
11  are willing to stand by it given what you have seen
12  today.
13        And I get the impression that you are --
14  you don't think that there is a sufficient -- I get
15  the impression you think there's not sufficient
16  information base for you to continue to stand by this
17  opinion.
18        Am I correct in that impression?
19        A.    I actually don't know how to answer you.
20        Q.    You can't unequivocally stand behind the
21  opinion that you have written, can you?
22        A.    No.
23        Q.    Okay.
24        A.    But I don't know that it should be
25  discarded.

58 (Pages 226 to 229)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 230

1    Q.    You said that --
2    A.    I actually was under the impression that
3  if I was presented additional information, I was to
4  modify the position to accuracy and that there would
5  be no problems whatsoever in taking this course.
6    Q.    You told me a few minutes ago that there
7  was other information that you had that would have led
8  to the conclusion of compliance with appropriate
9  procedures, but you did not put it in your report.
10   Why didn't you put it in your report?
11   A.    Can you tell me what I omitted?  Can you
12 give me the specifics of what I said?
13   Q.    I'm just referencing what you said a few
14 minutes ago, that there were -- if necessary, we could
15 have the court reporter read your answer back.
16   But I believe you said that there were
17 -- there's other information that was available that
18 would have aided the defendants -- that's not quite
19 the way you phrased it -- but there's other
20 information that would have led to a different
21 conclusion but you left it out of your report.
22   Do you remember saying that?
23   A.    No.  I never deliberately omitted any
24 opinion -- any evidence that would have swayed the
25 opinion in the direction of the defendants.  There was

Page 231

1  no attempt to deliberately omit information.
2    I did not put into the report all of the
3  verbal communications, such as the -- all of the
4  Digitek cases would have arisen only in the U.S.
5    Q.    Do you --
6    A.    But I never specifically said I'm not
7  going to put this in because it will change the
8  opinion in favor of the defendants.
9    I never would have done something that
10 could have led to that kind of discredibility or lack
11 of credibility.  There was none of that.  And that I
12 can give you a definitive answer of no.
13   If I forgot to put something in, it was
14 an error or I did not realize that I was to put in
15 verbal information.
16   I did put information in of inspection
17 findings of compliance with product complaints.  I had
18 the interim information for product complaints that
19 you showed me for safety.
20   But it was actually an inspection
21 confirmation, and that's in here.  And I put it in
22 because I thought this would be one report with some
23 -- the conclusions to support.  But I did not
24 deliberately omit any information.
25   Q.    Could you tell me -- you just referenced

Page 232

1  information about product complaints.  Could you tell
2  me what -- if you can find it, what page you're
3  referencing, Dr. Frank.
4    If you can't find it readily, that's
5  okay, just tell me.  But if you can find it, I'd like
6  to look at that page.  I realize there's a lot of
7  pages.
8    A.    No, I think it's important because I
9  tried to find both.  I tried to find as much
10 information as I could.
11   (Witness reviews document.)  I saw it a
12 while back.
13   (Witness reviews document.)
14   Q.    Let me do this.  Let me see if I
15 properly understood your reference, and if I did,
16 maybe we don't need to find it.
17   I think what you said was there was some
18 information that you picked up and referred to in the
19 observations about product complaint information that
20 was appropriately reported.
21   Is that what you said?
22   A.    It was an inspection finding that said
23 the remediation for product complaints, there was --
24 there were no observations with product complaints.
25 And this was probably in 2008.

Page 233

1    Q.    So, then, that would probably be in the
2  2008 EIR someplace?
3    A.    (Witness reviews document.)  Yes.  Here.
4    Q.    What page are you on, Doctor?  I've got
5  a copy here.
6    A.    28.
7    Q.    Thank you.
8    And can you direct me to where you are?
9    A.    Inspection 5, Little Falls, New Jersey,
10 18th of September to October.
11   And I summarized the only thing I found
12 in that was the Establishment Inspection Report, under
13 the general discussion, complaints were reviewed,
14 there were no deficiencies found.
15   I have no ability to assess the impact
16 of the sampling of the complaints in this inspection
17 and the direct impact on Digitek.
18   There was a supplemental document that
19 showed -- and there was -- there's a comment from the
20 FDA in here, that the compliance with 30-day timeline
21 for product complaints improved over the course of
22 2007 to the point of the inspection.
23   Q.    And we have talked before about the fact
24 that one thing you would like to see is the product --
25 in the course of investigating a product defect, would

59 (Pages 230 to 233)

Karen A. Frank, M.D.      Videotaped          June 30, 2010

## Page 234

1  be good communication between the product complaint
2  side and the signal detection side.
3         Do you recall that discussion?
4     A.    Yes.
5     Q.    And so what you're saying, I think, is
6  that, at least from this observation on Page 28, that
7  as of 2006, the product complaint side appeared to be
8  functioning appropriately; correct?
9         Is that the appropriate --
10    A.    I don't know what the scope of that is.
11 Complaints review.  Did they just look at the
12 complaint files?
13        I spent some time trying to assess
14 whether every complaint had an accompanying Health
15 Hazard Assessment.
16        And what I ended up putting weight on
17 was the FDA observation, because they had access to
18 the information in 2008.  They were concerned about
19 the lack of ongoing Health Hazard Assessments.
20        And in order to get through all of the,
21 I want to say, lack of evidence and confusion, because
22 I couldn't completely sort that out.
23        And I spoke to them about this, that to
24 base my opinion on the FDA inspector who looked at the
25 primary evidence, even though I did not have the

## Page 235

1  access to it.
2         So that's where I can't come -- I can't
3  reconcile that with the FDA inspector's concern in
4  2008 that there were no accompanying Health Hazard
5  Assessments.
6         I don't know what the overlap was,
7  whether they were fine here and then there were a
8  problem.  I can't tell you that.
9     Q.    And this is another manifestation of the
10 fact that you were not provided the underlying
11 documents; correct?
12    A.    I would assume so, yes.
13    Q.    Okay.
14    A.    Or I wasn't given any other Health
15 Hazard Assessment other than the one from Dr. Leikin.
16 I had no documentation of any Health Hazard Assessment
17 in 2004.  I asked for it.  And I looked for them.
18        And I had -- the FDA -- the thing that
19 became the basis of the opinion was that inspector --
20 FDA inspector in 2008 and their concern with the
21 absence of them.
22    Q.    Having heard everything you've heard
23 today in the sense of being shown documents,
24 additional documents today, having gone over all the
25 documents we have in front of us, having gone over

## Page 236

1  your report, having, you know, engaged in the dialogue
2  with me today, do you feel that you have been misled
3  by the plaintiffs' lawyers regarding the factual basis
4  for your opinions?
5     A.    I don't know how to comment on that.  I
6  thought that I got a dossier that was not in
7  chronological order.
8         I wasn't sure that I got the full
9  component of the documents.  I wasn't sure that the
10 full components had actually been discovered on part
11 of discovery.
12        I cannot say I was deliberately misled,
13 particularly because -- I don't know how to answer
14 that.
15        I had to assume that if they wanted me
16 to write an expert report to be filed in this case
17 that they would take a lot of care to provide the best
18 documentation possible.
19        I can't rule out bias, but I'm -- I have
20 to say that that's not my point to assess.  Perhaps I
21 should not have made an assessment about the
22 discovery, but I was surprised by the sampling of the
23 evidence.
24        I thought I would get everything so I'd
25 be able to track things out.  That may be my

## Page 237

1  misunderstanding on what is adequate evidence.
2     Q.    Are you --
3     A.    And my -- is it my inability to render
4  opinion on what is adequate evidence that is the core
5  of the problem?  Or do I rely on the people who
6  provide it to me to ensure that this is adequate for
7  the opinion that I render?
8     Q.    But you would agree that this is a
9  troubling issue given the lack of information that you
10 had?
11    A.    I think it's a -- yeah, I think it's --
12 I think that -- yes, it does bother me.
13    Q.    And at the end of the day, having,
14 again, looked at all the documents, engaged in all the
15 dialogue that we have, are you still willing to
16 continue to serve as an expert witness on behalf of
17 the plaintiffs in this litigation?
18    A.    My number one concern in this situation
19 is that I don't do anything considered wrong or I
20 don't have problems with the fact that I'm new to this
21 and I will have to learn certain things.
22        But I don't want to do anything that
23 would be considered incorrect.
24        Now, I agreed to do this.  I
25 communicated my concerns.  There's an interest for the

60 (Pages 234 to 237)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 238

1  plaintiff in my standing by my opinions.
2        I have little or no interest in going
3  into a public deposition before a panel of judges and
4  finding that -- I have to -- I don't -- I don't want
5  to destroy myself.
6        I asked if I was -- you know, if I was
7  considered too lightweight a witness to hold up this
8  case. I have no way to independently judge that.
9        But it's extremely important that my
10 level of expertise is sufficient to hold the weight.
11 Even if this is an opinion that doesn't support
12 eventually.
13       But I have no -- I have no way to
14 independently judge whether I am truly an expert
15 witness. What does that constitute?
16       Is it a few people saying you are, we
17 want you to do this? We've done it. There may be
18 another expert witness who's asked to critique your
19 work.
20       But I've not been led to believe that,
21 given my present abilities or knowledge, that pursuing
22 this is foolish, unethical. I can't say that I've
23 been led to believe that.
24       And yet, it's my strength of ego to say
25 to you, yes, I will stand by this and I will argue and

Page 239

1  argue.
2        And yet, I have doubts about -- I can't
3  say I've done this five times successfully and,
4  therefore, I've demonstrated my ability. I can say
5  that I've been encouraged to pursue this and to submit
6  this document.
7        And I've made certain, as I'm doing
8  this, by asking for external confirmation that I've
9  not been doing anything foolish or incorrect.
10 Q.    Knowing that there is a lot of money at
11 stake, knowing that there are court rules in place for
12 expert reports, knowing that expert reports have to
13 have appropriate foundations, my question to you is,
14 are you willing to continue as an expert witness in
15 this case?
16 A.    The honest answer is, I never wanted to
17 have to sit expert witness in court. That was not
18 disclosed to me at the time I agreed to do this. I
19 agreed to write a report and sit deposition on the
20 report that I made, on the evidence I was given.
21 Q.    Are you telling me that you weren't told
22 that you might have to testify in court? Is that what
23 you're telling me?
24 A.    That was not disclosed to me when I
25 agreed to do the engagement.

Page 240

1  Q.    So to the extent -- you've now learned
2  that; correct?
3  A.    Yes.
4  Q.    Correct?
5        So to that extent, you were misled;
6  correct?
7  A.    The --
8        MR. THOMPSON: Object to the form.
9        THE WITNESS: The preliminary
10 communication from the consulting firm is they had
11 received a request for somebody to do an expert
12 witness on pharmacovigilance systems.
13       And I asked what that would entail. And
14 they said, you'll be sent evidence and you try to come
15 up with a truthful answer. And you'll have to sit
16 deposition. But --
17 BY MR. DEAN:
18 Q.    Excuse me. Mr. Thompson actually gave a
19 good objection there because -- let me rephrase that
20 question.
21       Do you feel you were misled by Smart
22 Consulting about what your role was going to be in
23 this litigation?
24 A.    I was led to -- the -- what I agreed to
25 do would have stopped at the end of today.

Page 241

1        I did not agree to sit expert witness
2  before a panel of federal judges, and then I found out
3  even later that Pete Miller wanted me to be a witness
4  in the actual litigation in November.
5        These things were sequentially disclosed
6  to me, and my level of comfort with my own
7  inexperience and not knowing how to gauge my
8  preparedness was real.
9  Q.    Is it fair to say that you would have
10 declined this assignment if you had been told at the
11 beginning that you would have to testify in court
12 before a jury?
13 A.    I never really wanted to get into this
14 line of work. I was led to believe this was a very
15 limited assessment. I was not aware at the outset
16 that it was a bunch of state litigation that had been
17 rolled up into a federal case.
18       There was -- there was no up-front
19 communication of the extent of the work or the high-
20 profile nature of the case or -- and I had no
21 assessment of my potential impact on the outcome.
22       I don't know whether I'm a small fish or
23 a big fish in the outcome. I can't say that.
24 Q.    We can agree, though, that you were not
25 told at the outset that you would have to be a

61 (Pages 238 to 241)

Karen A. Frank, M.D.          Videotaped                June 30, 2010

---

**Page 242**

1    testifying witness in court?
2           You were not told that; correct?
3       A.   No.
4       Q.   You were -- no, you were not told that;
5    correct?
6       A.   No, that was not disclosed at the
7    outset. There was sort of a sequential disclosure of
8    increasing levels of involvement.
9       Q.   When was it that you were finally told
10   that you would be asked to testify in court before a
11   jury?
12      A.   I don't know the exact date, but I
13   believe sort of about the time I had lunch with Pete
14   Miller. It may have been a phone call, it may be at
15   the June 2nd lunch.
16          But -- and I didn't know whether he was
17   making this assessment to bring me further in the case
18   based on his preliminary interactions, whether this
19   was a change in plans, or whether -- or how this all
20   occurred.
21          I can't judge -- I really -- I don't
22   want to judge his motive. I just know there was a
23   sequential expansion of this.
24      Q.   When you -- I said -- before you
25   mentioned that I think you were drafting a report on

---

**Page 243**

1    June 15th.
2           As you were drafting on June 15th or
3    thereabouts, at the point where you were writing this
4    long report, did you understand you were going to have
5    to testify in court?
6       A.   Possibly, yes. Yes. Yes.
7       Q.   Possibly or for sure?
8       A.   I -- I was told that, in all likelihood,
9    I would be asked to present at the science day.
10      Q.   At the science day?
11      A.   Which is October.
12      Q.   Were you ever told that you would be --
13   have you ever been told that you would be asked to
14   testify in one of the individual actions?
15          And by that I mean a case in which one
16   of the plaintiffs is suing the defendants to try to
17   obtain a money judgment against the defendants.
18          Have you ever been told that you would
19   be expected to testify in one of those cases?
20      A.   I was told that they may ask me to
21   appear in November, in a November case. In all
22   likelihood, I would be.
23          And -- oh, no, I do understand
24   liability. No. I understand the magnitude of this.
25   I understand what rolling up a bunch of state-level

---

**Page 244**

1    litigation is. And I understand -- no, I understand
2    -- I understand what this is.
3           I just wish I had -- this may be a self-
4    confidence issue with me. I don't know how to gauge
5    my preparedness. I may be completely prepared. I may
6    be very good at this, but I can't tell you whether I
7    am or I'm not.
8       Q.   But you do wish that it had been
9    disclosed to you much earlier that you were expected
10   to testify in front of a court or jury; correct?
11      A.   Yes. I would have preferred my first
12   expert witness assignment to be limited in scope so
13   that there was an assurance of the accuracy and the
14   success.
15          That the magnitude of this case and that
16   the questions that I raised about the discovery and
17   what was being sent to me had not arisen. You know,
18   maybe I'm out of line as an expert witness saying what
19   about the discovery?
20          I assumed that all of these blank
21   documents, these white spaces, would be sent to me.
22          When they told me that they weren't sure
23   they already had them and they may be able to obtain
24   them, because there may be one more round of
25   discovery, I just went -- be as -- technically, if I'm

---

**Page 245**

1    -- I thought I should have everything to track through
2    the period and maybe track from the consent decree.
3           But I don't -- I can't tell you I'm
4    right or wrong based on experience.
5       Q.   Dr. Frank, is it fair to say that you
6    have significant misgivings about your ability to
7    qualify as an expert witness and you have significant
8    misgivings about the quality of the information that
9    supports the opinion that you have written here?
10          Would that be fair to say?
11      A.   I hate to say significant misgivings
12   because I've been assured that -- I've been given
13   assurance that moving forward with doing this I would
14   not have embarrassment or problems.
15      Q.   And who has assured you that you would
16   not have embarrassment in the future as we move
17   forward in this litigation?
18      A.   The people at Smart Consulting, Nigel
19   Smart and Denise Smart.
20      Q.   And what did he tell you? Tell me what
21   assurance -- how did he articulate this assurance that
22   you would not be embarrassed as we moved forward?
23      A.   Well, he said, really all you have to do
24   is try to get to truth. We're just seeking that. And
25   on the evidence presented to you, you try to sort out

62 (Pages 242 to 245)

Karen A. Frank, M.D.      Videotaped                June 30, 2010

---

Page 246

1   what truth is.
2         And I got to a situation where I was
3   like, I became concerned that I hadn't been -- I
4   didn't have all of the communications.
5         I didn't have -- I didn't have anything
6   to confirm -- I just got the FDA -- I was asked to
7   make the determination only on the FDA inspections and
8   some letters. The letters say we're going to do this.
9         I don't have the details of what was
10  done or the tracking that showed that it was done.
11        And this is stuff that typically is
12  given to consultants when they go in and assess
13  vulnerabilities to repeat inspections. And I asked
14  about it.
15     Q.   So is it fair -- is what you're saying,
16  there might be a basis for the opinions you've given,
17  but you're not sure because you haven't seen the
18  evidence? Is that what you're saying?
19        Isn't that a fair summary?
20     A.   Yes. I can assure you that I did the
21  best that I could with what I was given. And I based
22  it heavily on a few FDA observations from point to
23  point. But there's interim space where I don't have a
24  lot of insight into what went on.
25        It's the FDA inspection, the

---

Page 247

1   communications, and the confirmatory inspections.
2         MR. DEAN:  Thank you.
3         Give me just a minute, Fred.
4         VIDEO OPERATOR:  Going off the video
5   record.
6         The time is 4:23 p.m.
7         (Discussion off the record.)
8         VIDEO OPERATOR:  We're now back on the
9   video record.
10        The time is 4:24 p.m.
11        MR. DEAN:  I do not have any more
12  questions on behalf of Actavis.
13              EXAMINATION
14  BY MR. KAPLAN:
15     Q.   Dr. Frank, I'm Harvey Kaplan.
16     A.   Yes.
17     Q.   I've been listening to your testimony
18  here today. I want to ask you a few questions.
19        You've rendered the opinions contained
20  in your report; right?
21     A.   Yes.
22     Q.   And those are all of your opinions?
23     A.   Yes, they are. I reworded them to say
24  it is my opinion based on reasonable evidence, and I
25  did this on June 15th.

---

Page 248

1         And I looked at it, and I said to
2   myself, I hope that in rewording these statements I
3   actually have -- am making it on what is considered
4   reasonable evidence.
5         That I was provided the reasonable
6   evidence and I can trust that, and that I was able --
7   this is -- I was provided huge amounts of documents
8   about manufacturing and analytical issues.
9         But there was a question in my mind
10  about what was reasonable evidence in this case?  Do I
11  have to go through every CAPA tracker?
12        And I do want to make sure before this
13  is actually admitted that I don't want to let my
14  insecurities, which could just be me -- I might have
15  simply done an analytical analysis.
16        But, yes, I -- these opinions were
17  there. I can't see that a lot of things that would
18  typically have been done have been done.
19        I was asked -- I was asked to support
20  certain opinions that counsel wanted supported. And
21  so what I did was took the evidence and I couldn't see
22  anything to the contrary.
23        If I had had a clean inspection in 2008,
24  I would have said, the evidence for adequate
25  remediation is the inspection from 2008. Now, he

---

Page 249

1   subdivided the inspection.
2         Did you see evidence in 2008 that they
3   did not remediate the quality of the reports? So the
4   -- there may be overgeneralizations. But they may be
5   legitimate on -- for certain grounds.
6      Q.   So you were given direction by
7   plaintiffs' counsel as to certain opinions they wanted
8   you to express?
9      A.   He said I would like to say that there
10  were systemic issues that impacted, and I believe it
11  was the safety signal detection in the Digitek case.
12  I was actually presented an opinion by counsel.
13        I wasn't sent the dossiers without -- I
14  was told the opinion that I was asked to support to
15  the best that I could. And I did attempt, and you see
16  there's things that are included here that really sort
17  out what actually happened.
18     Q.   Plaintiffs' counsel said to you these
19  are the opinions we want you to express?
20     A.   Yeah. They asked me to go through and
21  support certain observations.
22     Q.   And you attempted to support those
23  opinions that you were asked to express by plaintiffs'
24  counsel; right?
25     A.   Yes.

63 (Pages 246 to 249)

Karen A. Frank, M.D.        Videotaped         June 30, 2010

---

Page 250

1    Q.    And you have expressed all of those
2  opinions in Exhibit 261; right?
3    A.    The answer to that is, I cannot tell you
4  because I thought these two were going to go together.
5    Q.    Okay.  This is your report, Exhibit 261;
6  right?
7    A.    This was split off.  This up until maybe
8  it was mid-afternoon, I'd have to look, on the 15th, I
9  thought I was submitting all of this together.  So
10  that there was a much careful tracking between the
11  observations and my comments.
12          So my concern is that since this was
13  split, I never did an independent assessment of a
14  hundred percent transfer of every single opinion in
15  here to here.  There was just sort of a high-level
16  overview.
17    Q.    And what we have been presented is the
18  report of Karen A. Frank, M.D., dated June 15, 2010,
19  as contained in Exhibit 261, which you have entitled
20  Background, Analysis and Conclusions; correct?
21    A.    Yes.  It was segments --
22    Q.    And Section 3 is called Analysis and
23  Conclusions; right?
24    A.    Yes.
25    Q.    And your conclusions are all expressed

Page 251

1  in Section 3 of Exhibit 261?
2    A.    Yes.
3    Q.    Correct?
4    A.    Yes.
5    Q.    Okay.  And what I'm wondering as I
6  listen to you talk today about evidence that wasn't
7  given to you before you prepared this report by
8  plaintiffs' counsel, and that you have only learned
9  about in the last day, specifically Exhibit 38, the
10  FDA's statements on their web site about Facts and
11  Myths About Generic Drugs, and other evidence has been
12  presented to you today that you have discussed with
13  Mr. Dean, what I'm wondering and what I'm concerned
14  about is, are you still willing to walk into a court
15  of law, raise your right hand and be sworn to tell the
16  truth and to stand by with confidence the opinions
17  that you have expressed in Exhibit 261?
18        MR. THOMPSON:  Object to the form.
19        THE WITNESS:  I'd prefer to have
20  substantially more evidence before I had to do that.
21  You're leading me to believe through your line of
22  questioning that I have formed opinions on what is not
23  considered reasonable evidence.
24        Now, if I led you to believe that,
25  because I'm raising questions, was I remiss in raising

Page 252

1  questions about the process of discovery and what was
2  presented to me?  Have I led you down that path?
3        But you are leading me to believe that
4  what I have is a sampling of documents that I could be
5  asked to determine whether that is reasonable
6  evidence, and I may or may not know the real answer to
7  that.
8  BY MR. KAPLAN:
9    Q.    Here's the bottom line.  You agreed to
10  act as an expert witness in this litigation; right?
11    A.    Yes.
12    Q.    You're being paid for your services;
13  right?
14    A.    Yes.
15    Q.    You've been asked to render opinions;
16  right?
17    A.    Yes.
18    Q.    You have rendered those opinions; right?
19    A.    Yes.
20    Q.    And this is our opportunity to test
21  those opinions.
22    A.    Yes.
23    Q.    To test the basis for those opinions.
24        You understand that?
25    A.    Uh-huh.

Page 253

1    Q.    You have to say --
2    A.    Yes.
3    Q.    And it is our opportunity to determine
4  whether or not there is a reasonable, scientific basis
5  for the opinions which you have expressed.
6        Do you understand that?
7    A.    Yes.
8    Q.    And that's what we are doing.
9    A.    Yes.  There is risk in these opinions
10  because they were based on there is not evidence
11  provided.  So there are opinions that are based on the
12  absence of the evidence.
13    Q.    Which is why I asked.
14    A.    No, I'm not comfortable with that.
15    Q.    Okay.  And that's why I asked you.
16        The next step would be to walk into a
17  courtroom here in Philadelphia with a federal judge
18  heading up the Multi-District Litigation, the judge in
19  charge of the Pennsylvania consolidated litigation,
20  the judge in charge of the West Virginia litigation,
21  the judge in charge of the New Jersey litigation, and
22  the judge in charge of the Texas litigation, and for
23  you to walk into that courtroom, be called as a
24  witness and to get up on the stand and to testify in
25  front of that court of law and render these opinions,

64  (Pages 250 to 253)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 254

1    and say to these judges under oath that you express
2    the opinions that are contained in Exhibit 261 to a
3    reasonable degree of scientific probability that these
4    are correct and that you, as a medical doctor, who has
5    worked for various pharmaceutical companies and for
6    the FDA, can say with confidence that you stand behind
7    those opinions.
8          Are you willing to do that?
9          MR. THOMPSON: Object to the form.
10         THE WITNESS: Should I discuss this with
11   you?
12         MR. KAPLAN: No. Just answer my
13   question.
14         MR. THOMPSON: I think that the question
15   is on the floor.
16         THE WITNESS: I really don't want to,
17   but I'm concerned about the fact that it's just that I
18   only wanted to do the preliminary background work, the
19   supportive work, and end with a private deposition
20   like this.
21         When they told me I had to go to court,
22   I was like, this is a huge issue. I'm completely
23   naive with this, and I don't know how to judge my
24   preparedness.
25         And I most certainly -- the most

Page 255

1    important thing is, I don't want to do anything that
2    would be considered wrong.
3          If I've gotten into something where the
4    work product is inadequate, he's concerned that I'm
5    backing down based on the presentation of two or three
6    pieces of evidence. And I'm at a loss to know the
7    right course of action.
8          I'd prefer not to testify in a high-
9    profile case. If I do, I'd like to make certain that
10   I'm presented everything. I was actually led to
11   believe that if you presented me with more evidence
12   today, this would be revised.
13         And I'm concerned about that, because
14   that would allow me to go through this if they found
15   more information and make sure everything was correct.
16   BY MR. KAPLAN:
17   Q.    This is it. This is our opportunity to
18   examine you on the report that you have given --
19   A.    I know.
20   Q.    -- in the Multi-District Litigation
21   that's pending in Charleston, West Virginia, and in
22   the Pennsylvania consolidated litigation, which is
23   pending here in Philadelphia.
24         There are about a thousand cases that
25   are riding on opinions of expert witnesses here like

Page 256

1    yourself.
2    A.    Yeah.
3    Q.    And what I want to know is, whether
4    you're willing to stand behind these opinions and go
5    into a court of law and to say with confidence, the
6    opinions you've given here today, that you stand by
7    these opinions, as a person of integrity?
8    A.    You have both led me to believe that
9    there's additional evidence that I was not presented,
10   even though I asked for it. And proceeding forward, I
11   could face significant embarrassment, if not
12   questioning, of the opinions.
13         And the whole time I did this, I tried
14   to document very, very carefully. And yet, you're
15   leading me to believe that this is a great
16   embarrassment and that I've done an inadequate job and
17   I can't support what I've done.
18         He doesn't think I should back down.
19   And the only thing I can think of is I don't want to
20   do anything wrong.
21   Q.    What do you think you should do?
22   A.    I would like to -- if I could, I would
23   like to stop with only doing background supportive
24   work.
25   Q.    Well, let me say that that's not the

Page 257

1    option right now.
2    A.    It's one or the other?
3    Q.    Yes. Either you go forward or you back
4    down.
5    A.    What if I choose not to go forward?
6    What are the implications?
7    Q.    That's up to you. You can say, I
8    withdraw as an expert here. I'm not comfortable with
9    it.
10   A.    But what are the implications of that?
11   Will I be in a lot of trouble?
12   Q.    You won't be in trouble. You just won't
13   be an expert in this litigation.
14         MR. THOMPSON: Well, I am going to
15   object and I am going to say that this would be
16   something that I would view as something that would --
17   I would be entitled to confer with the expert witness
18   about is that question about withdrawal.
19         THE WITNESS: Okay.
20         MR. THOMPSON: Certainly you can
21   question her about the report. You can question her
22   about the documents. You can question her about all
23   that.
24         But I believe that I would have an
25   opportunity to confer with her about that issue of

65 (Pages 254 to 257)

Karen A. Frank, M.D.      Videotaped          June 30, 2010

Page 258

1  whether she would continue employment or not.
2  BY MR. KAPLAN:
3      Q.   What do you want to do?
4      A.   The right thing.
5      Q.   What do you think that is?
6      A.   The safe thing is to withdraw.  If at
7  this point I can withdraw and there will be no
8  questions that I've done the best I could and there's
9  tremendous -- there may be more risk to everyone if I
10 proceed.
11          You're basically saying that if at this
12 point there's question that putting me on a witness
13 stand can be an embarrassment or jeopardize the
14 litigation, then the right thing to do would be to
15 withdraw.
16          But I hope I could do that without being
17 accused of doing anything wrong.  I would hope that
18 people would say she did the best she could with what
19 she was given and under the guidance she was given.
20          But I have been so frightened -- when I
21 say frightened, since I started this, that I would do
22 something wrong and there would be consequences, that
23 this could just be my fear because I'm naive to this.
24          I've stayed away from it even though
25 people have encouraged me to get into it.

Page 259

1          And I just -- I don't want to do
2  anything wrong where there would be consequences for
3  me, even to question my credibility.  That's my number
4  one concern.
5          And I may have to say that I did
6  something -- I was told -- I keep being told to have
7  self-confidence.  But right now, I don't.  There's
8  significant concern.
9          And, of course, you would want me to not
10 be a witness for the plaintiff.  I guess the fewer
11 there are, I just don't want to do anything wrong.
12 And I'm actually scared to move forward.
13          I can probably put this together and
14 pick through all of the statements.
15          I was able to answer Mr. Dean when he
16 asked me about the 2007 letter and say, well,
17 corrective actions imply there was something wrong
18 that had to be corrected.  I can make the analysis.
19          But you're leaving open to me a question
20 of the wisdom of it and of subjecting my client to
21 unnecessary risk in a court of law because I'm not
22 necessarily strong enough to stand up to it when they
23 feel that I am and a few other people do.
24          So I'm willing to say, well, I've done
25 something, I have learned.

Page 260

1          But at this point, I didn't know that
2  this was such a heavy assignment when I agreed to do
3  it, and I didn't feel that I should withdraw when they
4  told me this when they felt I was strong enough.
5          But now I'm being seriously questioned,
6  and I would have preferred to have this be a limited
7  assignment and to not jump right into a very big case.
8          As you said, there's very, very high
9  risks.  There's no way I can assess the real risk.
10 And all that I can think in my head right now is I
11 just don't want to do the wrong thing.
12          And that's what I did for two to three
13 weeks when I took this assignment.
14          I just don't want to get into anything
15 that's wrong, that I can't do appropriately.  That's
16 my only concern.
17     Q.   Well, my concern and Mr. Dean's concern
18 is that our clients are being accused of wrongdoing.
19     A.   I'm not trying to do that.
20     Q.   And our clients are being accused of
21 selling and distributing --
22     A.   Oh, your clients.  Oh, I'm sorry.
23     Q.   -- defectively manufactured Digitek.
24     A.   I was thinking the law firm.  I trusted
25 their counsel.  I thought you were asking me -- no, I

Page 261

1  take that initial response back.
2      Q.   I want you to understand this is very
3  serious business.
4      A.   It's very serious.
5      Q.   Millions of dollars are being sought
6  from our clients.
7          Do you understand that?
8      A.   Absolutely.
9      Q.   And --
10     A.   I'm not that naive.  I'm not --
11     Q.   Plaintiffs are offering expert
12 testimony, like your testimony, to support their case.
13          Do you understand that?
14     A.   Yes.  I do understand.  I know what this
15 means.  I know what's at stake.
16     Q.   To support their allegations of
17 wrongdoing against our clients.
18          You understand that?
19     A.   Yes.
20     Q.   And that's what you're doing in this
21 case.
22     A.   He asked me earlier whether I was a
23 witness for the plaintiff or a truth seeker.  And what
24 happened when I started asking for more information
25 was, I'm -- I became more of a truth seeker.

66 (Pages 258 to 261)

Page 262

1          I told you this.  I don't know how much
2   this all supports directly the Digitek case.
3          I never saw information that subset the
4   direct impact on Digitek.  I can only make
5   generalization statements.  And I hope they aren't
6   wrong generalizations.  There is more evidence to be
7   obtained.
8       Q.    And you certainly never saw any evidence
9   that any person received defectively manufactured
10  Digitek, did you?
11      A.    No.
12          MR. THOMPSON:  Objection.  Asked and
13  answered.
14  BY MR. KAPLAN:
15      Q.    Did you?
16      A.    Well, I was told this would be asked.
17  Now, what I know is that there were an influx of cases
18  after the recall was announced.  I have not been given
19  any of that evidence.  That was sent to someone else.
20      Q.    So what I'm saying to you is --
21      A.    I haven't.
22      Q.    -- you've never seen any evidence --
23      A.    No.
24      Q.    -- to support an allegation that any
25  consumer ever ingested defectively manufactured

Page 263

1   Digitek, have you?
2       A.    No, I've not been provided that.  I've
3   been provided evidence -- evidence that says that it's
4   worth being investigated further.  But I've not really
5   been able to investigate it further.
6       Q.    And you're a person who worked for and
7   was trained by the FDA?
8       A.    Yes.
9       Q.    You had good training at the FDA?
10      A.    I thought it was very, very good.
11      Q.    Quality, competent people?
12      A.    Yes.
13      Q.    You have faith and confidence in the
14  FDA?
15      A.    Yes.  I'm -- I'm -- I do understand all
16  of the issues with other litigation.  It's not my
17  point to comment here.
18          This issue of how far I was to comment
19  on this assessment has come up.  I was told that
20  leaving this comment in about the headquarters
21  oversight was okay.
22      Q.    Just follow me.  Follow me here for a
23  little bit.
24          And being a person who worked for the
25  FDA, who was trained by qualified and competent people

Page 264

1   at the FDA, and who places great reliance on the
2   integrity of the FDA --
3       A.    Yes.
4       Q.    -- you do that, don't you?
5       A.    Yes.
6       Q.    And you have testified that in the
7   opinions you've rendered, you relied upon FDA
8   inspection reports --
9       A.    Yes.
10      Q.    -- and what the FDA inspectors have
11  said?
12      A.    Yes.  Solely.  I am relying on their
13  assessment of the primary data.
14      Q.    And so, after all is said and done,
15  after all of these inspections and after all of your
16  reliance on what the FDA inspectors have said with
17  regard to the primary data and after the recall, we
18  come full circle, do we not, to Plaintiffs' Exhibit
19  38, which you were shown today?
20      A.    Yeah.
21      Q.    Right?
22      A.    Uh-huh.  Yes.
23      Q.    Okay.  And that's entitled Facts and
24  Myths About Generic Drugs; right?
25      A.    Yes.

Page 265

1       Q.    And that's a statement of the FDA;
2   right?  Correct?
3       A.    Yes.
4       Q.    And it's a very important statement of
5   the FDA, isn't it?
6       A.    Yes.
7       Q.    It speaks directly to the Digitek
8   recall, doesn't it?
9       A.    Yes.
10      Q.    And it is a statement to the public
11  about the Digitek recall; right?
12      A.    Yes.
13      Q.    The myth, as expressed by the FDA on
14  Page 2, is that there are quality problems with
15  generic drug manufacturing.  They characterize that as
16  a myth; right?
17      A.    Yes.
18      Q.    And they further say, as to the myth, A
19  recent recall of generic Digoxin (called Digitek)
20  shows that generic drugs put patients at risk.
21          The FDA says that's a myth; correct?
22      A.    Yes.
23      Q.    And under Facts, the FDA says, In our
24  best judgment, given the very small number of
25  defective tablets that may have reached the market and

67 (Pages 262 to 265)

Karen A. Frank, M.D.        Videotaped        June 30, 2010

Page 266

1   the lack of reported adverse events before the recall,
2   harm to patients was very unlikely.
3          That's what the FDA says is a fact;
4   correct?
5          MR. THOMPSON:  Object to the form.
6          THE WITNESS:  That was my concern when I
7   started asking questions of is there any information
8   that I can have that would tell me how -- what is the
9   percentage of any given batch affected, and what is
10  the chances that multiple pills ended up in one
11  bottle?
12  BY MR. KAPLAN:
13     Q.    And now you have seen the FDA's
14  statement as to this Digitek recall, haven't you?
15     A.    Yes.
16     Q.    And the FDA continues to stand by that
17  statement, don't they?
18     A.    Yes.
19     Q.    They haven't changed it since the
20  recall, have they?
21     A.    No, not -- not on June 15th.
22     Q.    And so we come full circle; correct?
23     A.    Well, at this point, I have no
24  information on Digitek, per se, of any safety signal
25  detection.  I can't tell you, and I have -- I raised

Page 267

1   this, and that's actually in my comments.
2          The issues with the pharmacovigilance
3   system are broad.  There was an absence of signal
4   detection during the 2004 to 2006.
5          If the FDA looked into that and there is
6   nothing else that would refute this statement, I will
7   never be able to refute it even if given the evidence.
8          And if you say that the FDA has already
9   done that, and said that, then, you know, I can sit
10  here with the evidence.  I will just be confirming
11  this.
12     Q.    This is the FDA's bottom line statement
13  as to Digitek, isn't it?
14         MR. THOMPSON:  Object to the form.
15         THE WITNESS:  Yes.
16  BY MR. KAPLAN:
17     Q.    You believe the FDA, don't you?
18     A.    Yes.
19     Q.    And this is the information -- this is
20  part of the information that was never disclosed to
21  you by plaintiffs' lawyers, isn't it?
22     A.    And I did not seek it independently.
23     Q.    This information, Exhibit 38, the FDA's
24  statement --
25     A.    No.

Page 268

1     Q.    -- as to Facts and Myths About Generic
2   Drugs, and their specific statements about Digitek,
3   were never revealed to you by plaintiffs' lawyers,
4   were they?
5     A.    No.  And I will say --
6     Q.    Were they?
7     A.    No.  I did confirm when I took this case
8   that all that I was required to do is to seek to come
9   to truth.  And that's all that I had to do.
10     Q.    And do you believe that the FDA's
11  statement in Exhibit 38, statements that I just read
12  to you, are the truth?
13     A.    Yes.
14         MR. KAPLAN:  Thank you very much.
15         MR. THOMPSON:  I'm going to have some
16  questions.  I understand Mr. Moriarty objects to my
17  asking questions, or at least he did the other day.
18         MR. KAPLAN:  Well, Mr. Moriarty isn't
19  here.
20         MR. THOMPSON:  Well, I'm going to ask a
21  few questions.
22              EXAMINATION
23  BY MR. THOMPSON:
24     Q.    Doctor, let me ask you to look at
25  Defendant's 38.

Page 269

1          Do you have that in front of you?
2     A.    Yes.
3     Q.    You have been asked and your attention
4   has been directed to one sentence in paragraph four of
5   five bullet items.
6          Do you see that?
7     A.    This right there (indicating)?
8     Q.    Yes.
9     A.    Okay.
10     Q.    Do you see that each time you've been
11  asked about this document, your attention has been
12  directed to the second sentence of bullet line item
13  number four?
14     A.    Yes.
15     Q.    Let's go back up and ask you to read the
16  entire bullet item of number three, bullet item number
17  three.
18     A.    Although Actavis attempted to remove the
19  affected Digitek tablets through visual inspection,
20  FDA determined that this method of removal was
21  inadequate to assess the product's quality and
22  consistency, in accordance with GMP regulations, good
23  manufacturing -- current good manufacturing practice,
24  parenthesis, CGMP regulations.
25     Q.    Now, read the entire bullet point number

68 (Pages 266 to 269)

Karen A. Frank, M.D.        Videotaped               June 30, 2010

Page 270

1  four for me.
2      A.    Since the detection of the manufacturing
3  problem, FDA has been actively engaged with this
4  company to ensure that all potentially infected lots
5  have been recalled.
6          In our best judgment, given the very
7  small number of defective tablets that may have
8  reached the market and the lack of reported adverse
9  events before the recall, harm to the patients was
10 very likely (sic).
11     Q.    Now, do you believe that the FDA's
12 judgment with regard to its determination of violation
13 of good manufacturing practice would be as
14 authoritative as that that you just answered
15 Mr. Kaplan?
16         MR. DEAN:  Objection to form, and also
17 lack of expertise on inspection procedures, which
18 she's already testified to.
19         MR. KAPLAN:  I join that objection.
20         THE WITNESS:  No.  I had no way to come
21 up with this conclusion that the FDA came up with
22 because I had no information.
23         It was redacted out of the documents and
24 I wasn't provided access to any information on
25 analysis of the batches.  I still think a lot was

Page 271

1  incinerated.
2          And there was no data mining of the
3  database.  We're assuming that when the FDA read this,
4  that they were satisfied with the case reporting.
5  They did not go back and re-data mine that database.
6  BY MR. THOMPSON:
7      Q.    Did you --
8      A.    But I don't know.  I have an absence of
9  information.
10         And it's affecting -- it's clearly
11 affecting my security at standing here and saying yes
12 or no, because what I've been asked to render is very
13 generalized, and I would prefer to have access to the
14 remainder of that information.
15     Q.    All right.
16     A.    If, indeed, this is the bottom line,
17 then I'm concerned that even if I asked for all the
18 information, I won't come up with a different answer.
19         If this above there says, well, nobody
20 ever looked at the lots before they ended up on the
21 market and, therefore, this unlikely is based on,
22 well, we never looked at the lots, that's what he's
23 implying, that there is some uncertainty to that.
24         And now the question is, can I actually
25 say -- because I'm not a GMP expert and I know nothing

Page 272

1  about how to quantitate abnormal pills and lots, I
2  can't tell you what procedure they should use.
3      Q.    Doctor, let me ask you a couple
4  questions.
5          Do you know what period of Digitek drugs
6  were recalled, for what time period?
7      A.    It started June 6th, 2006, and I believe
8  went for two years, up until the May -- or the April
9  -- the date of the release of the recall.  But I did
10 look at that.
11         And I tried to sort it out because it
12 had to do with -- it wasn't manufacture date, it was
13 market release date.
14     Q.    All right.
15     A.    And I did take time to sort that out and
16 then I was sort of out of scope.
17     Q.    All right.  Well, let me ask this:  When
18 this FDA facts and myths document was posted, was
19 Digitek being made available to consumers in the
20 United States?
21     A.    When this was posted, I don't know what
22 date it was posted.  And I don't know whether Digitek
23 was still in the market.  I can't answer that.  I was
24 unable to find the date when he asked me for it.
25     Q.    Well, if, assuming that the bullet point

Page 273

1  says lack of reported adverse events before the
2  recall, can you date this as to when it was vis-a-vis
3  the recall?
4      A.    The recall package was dated April 25th,
5  2008.  So it was up until that point.  It was -- it
6  was -- the press release was the 25th of April.
7          So you can say that up until public
8  awareness of the recall on the 25th that there was no
9  impact of the recall on the reporting rates.
10         So that the reporting rates up until the
11 recall were not induced reporting rates.  That as soon
12 as that press release went out, the increase in
13 reporting rates was significantly influenced by the
14 knowledge of the recall.
15         And I cannot comment because I haven't
16 looked at the cases.  This is someone else.
17     Q.    All right.
18     A.    How many of those were potentially
19 frivolous cases and how much were concerning -- how
20 many cases do we have of documented supratherapeutic
21 digitalis levels, how many cases took the tablet.
22         I do know that you can see digitalis
23 toxicity at therapeutic doses.  You don't have to be
24 supratherapeutic to have the toxicity.
25         So it makes it very, very difficult to

69 (Pages 270 to 273)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

Page 274

1    sort out based on clinical symptoms whether you're
2    dealing with supratherapeutic digitalis.
3            And I was very thankful that I did not
4    have to render an expert opinion on that, that you
5    probably took doctors who were experts in digitalis.
6        Q.    All right.  That actually raises a
7    question.
8            Is an adverse event report, is that
9    voluntary or mandatory at the clinician's level?
10       A.    In the U.S., it's voluntary.
11       Q.    If a practicing physician had a patient
12   who showed symptoms of Digoxin toxicity, would that,
13   as a common practice, generate an adverse event
14   report?
15       MR. KAPLAN:  Objection.  Calls for
16   hearsay.
17       THE WITNESS:  Well, that's difficult to
18   say.
19           With a drug that's as old as Digoxin and
20   as established, I can tell you right now that there
21   are hospital admissions for digitalis toxicity.  That
22   when I was a resident I was not aware of MedWatches.
23   BY MR. THOMPSON:
24       Q.    All right.
25       A.    The issue when you're in a drug company

Page 275

1    is that a post-marketing report in most companies
2    defaults to possible.
3            By virtue of the fact that the person
4    had a clinical suspicion, when it's reported to the
5    company, when you do that relatedness assessment
6    inside the company, many big pharma SOPs default to
7    possible by virtue of the fact that the person who is
8    not subject to mandatory reporting reported the case.
9            So they default to submission to the
10   FDA.  There is some variability, but my understanding
11   is the industry standard for post-marketing, when it's
12   unsolicited, defaults to possible.
13       Q.    All right.  Let me ask you to look at
14   Defendant's Number 20.  I think it's on your -- it
15   should be on your stack there.
16           No?  It should be --
17       MR. DEAN:  This is a stack here, I was
18   trying to get it organized.  Let me find it for her.
19           Here you go.
20   BY MR. THOMPSON:
21       Q.    All right.  You were shown -- I'm going
22   to hand you Defendant's 20.  You were shown this
23   summary of findings of the CGMP inspection.
24           Do you recall?
25       A.    Yes.

Page 276

1        Q.    You recall -- I think your testimony was
2    you had not seen this before?
3        A.    No.
4        Q.    Okay.  Now, what's the date of the CGMP
5    inspection?
6        A.    December 1st, 2004.
7        Q.    All right.  Is there any date, is there
8    any operative date, that's been involved in any
9    question that you've been asked that includes
10   12/1/2004?
11       A.    No.  However, the investigation report
12   for the double-thick Digitek tablet was July 2004.
13       Q.    All right.
14       A.    I'm not sure what date.  But it was five
15   to six months before this repeat inspection.
16       Q.    All right.  And do you know the date of
17   production of this document to the plaintiffs in this
18   case?
19       A.    No.  I do not know whether this was
20   inadvertently omitted from my packet, whether it was
21   in the millions of pages, some -- and not sent to me
22   or whether it was sent to the plaintiffs late, and,
23   therefore, we have evidence after I was submitted my
24   dossiers --
25       Q.    All right.

Page 277

1        A.    -- that I should be allowed to consider
2    as later evidence.
3            Again, this is -- I keep saying my
4    naivete and maybe it's just my foolishness to say my
5    naivete.  But there may be issues with this.  There
6    may be late discovery that I would be permitted to
7    review without any embarrassment.
8        Q.    All right.  Now, let me ask you to pull
9    out the big -- the attachment to your report.
10       MR. DEAN:  Excuse me.
11           If we're done with that, let me get that
12   one back in the stack of exhibits so it doesn't get
13   misplaced.
14       MR. THOMPSON:  Thank you.
15       THE WITNESS:  I did ask --
16   BY MR. THOMPSON:
17       Q.    The big appendix.  The big appendix.
18       A.    Yes.  I did ask if there was going to be
19   more discovery, if discovery was complete, if all of
20   these documents had been obtained, and if I could
21   request these missing documents in discovery, and they
22   said there may be that chance.
23       Q.    All right.
24       A.    And I was led to believe that it was
25   permissible to proceed in such a manner, that as a

70 (Pages 274 to 277)

Karen A. Frank, M.D.          Videotaped          June 30, 2010

## Page 278

1   witness, I was allowed to question this and ask for
2   more information.
3           And that if I was provided it, that I
4   could modify my report based on the submission of new
5   evidence to me.
6           That filing that report would not
7   embarrass me, the Miller form, or Motley Rice, if
8   another round of discovery would produce new evidence.
9       Q.   Okay.  Let's go to Page 20 and 21 of
10  that attachment.
11      A.   Okay.
12      Q.   Now, there in the middle of the page of
13  Page 20 there is a lengthy quotation.
14      A.   Yes.
15      Q.   You see that?  What is that quotation
16  from?
17      A.   It's from Reference 4 on Page 2.  And
18  Reference 4 is the August 15th warning letter based on
19  the company response of February 28th.
20      Q.   And what day is that?
21      MR. DEAN:  What year?
22      MR. THOMPSON:  Yes.
23  BY MR. THOMPSON:
24      Q.   What's the date?
25      A.   August 15th, 2006 warning letter based

## Page 279

1   on the company response dated February 28th, 2006.
2           So what happened with the 2006
3   inspection is the company sent a response on February
4   28th to the 483, and then again on February 28th.  And
5   the FDA sent a revised warning letter and had
6   concerns.
7       Q.   All right.
8       A.   Yes.
9       Q.   Now, let's go to Page 21.
10      A.   Okay.
11      Q.   And you have a comment on the following
12  page --
13      A.   All right.
14      Q.   -- where you relate the -- and maybe I
15  should just get you to read it.  If we go down one,
16  two -- the sentence that begins In light of.
17          Do you see that?
18      A.   Yes.  Should I read the entire
19  paragraph?
20      Q.   Just read out loud the sentence that
21  begins with In light of.
22      A.   In light of the FDA 483 inspection
23  observations from May 20th, 2008, it is my opinion
24  based on reasonable degree of evidence that the
25  compliance remediation in 2006 was not adequate either

## Page 280

1   in content or in implementation to remediate the
2   inspection findings of delinquent expedited reporting,
3   inadequate case follow-up, or the quality of reports.
4       Q.   Okay.  Now, if I hand you Defendant's
5   Exhibit 87, which you saw for the first time today
6   during the -- and I'll just hand you my copy of it,
7   which you saw for the first time today, and you
8   indicated that was one of the three documents that
9   caused you to worry about your -- the quality of your
10  opinions.
11          Do you see that?
12      A.   Yes.
13      Q.   And you agree that that's the letter
14  that caused you to question that; is that right?
15      A.   Yes.
16      Q.   Okay.  Read me the two sentences back to
17  back.
18          Well, read me the entire second
19  paragraph.
20      A.   New Jersey District has reviewed your
21  response regarding the Adverse Drug Experience
22  reporting deficiencies.  Your corrective actions and
23  the revised procedures appear to be satisfactory.
24          We will, however, confirm the adequacy
25  of your corrective actions and assess the overall ADE

## Page 281

1   reporting system during a future inspection.
2       Q.   Okay.  Now, what do you think the last
3   sentence of that paragraph means?
4       A.   They will confirm the implementation,
5   the adequacy of the implementation.  At this point it
6   appears they're okay with the content.
7           They will confirm the adequacy of the
8   implementation and they will expand the confirmation,
9   not just to the adequacy of the directed corrective
10  actions to the observations in 2006 --
11      Q.   Okay.
12      A.   -- but they will expand this to include
13  the adequacy of the entire ADE system.
14      Q.   All right.  Now --
15      A.   This --
16      Q.   Let me ask you a question.
17      A.   Okay.
18      Q.   I want to go back to your comment at
19  Page 21.  Okay.
20          Now, do you stand by your opinion that
21  was expressed on Page 21 that taking the findings of
22  the 2006 inspection and taking the findings of the
23  2008 inspection that the compliance remediation was
24  not adequate either in content or implementation to
25  remediate the inspection findings?

71 (Pages 278 to 281)

Karen A. Frank, M.D.       Videotaped       June 30, 2010

---

Page 282

1    MR. DEAN: Objection.
2    MR. KAPLAN: I'm going to object and ask
3  for some clarification. I was told, I thought it was
4  her sworn testimony, that Exhibit 261, that all of her
5  opinions were contained in Section 3 entitled Analysis
6  and Conclusions of Exhibit 261?
7    THE WITNESS: But I also stated that
8  this document was split in a very short time frame and
9  there was a chance that not all of them were
10  completely transferred. I believe this is in 261.
11    MR. KAPLAN: Well, I'd like to have the
12  reference to it because I'm trying to -- what I was
13  trying to do is figure out what are your opinions.
14    And I looked in the analysis section,
15  and I'll just tell you that I looked for words such as
16  it is my opinion that or it is my opinion based on the
17  evidence that.
18    And I counted, starting on Page 5, going
19  through Page 9, seven -- seven opinions that you
20  expressed in there. And so I did the best I could.
21    Following that, I asked you the question
22  are all your opinions contained in 261. Your answer
23  was, yes, you relied upon that.
24    So I just don't understand what it is
25  we're being asked to do here to try to suck out

---

Page 283

1  opinions from another document that in your opinion --
2    MR. THOMPSON: This entire document was
3  produced timely. It's been in your possession. I'm
4  sure you've had people analyzing it. And the words
5  have been in your possession for --
6    MR. KAPLAN: So you're telling me that
7  not all of her opinions are in Exhibit 261 --
8    THE WITNESS: I modified this.
9    MR. KAPLAN: -- the June 15, 2010
10  document prepared by Dr. Karen A. Frank, entitled
11  Background, Analysis and Conclusions, that's not all
12  of her opinions?
13    We have to go searching beyond that; is
14  that right?
15    MR. THOMPSON: I don't know that you
16  have to search. All you have to do is read it.
17    MR. KAPLAN: Well, I've read this and
18  I've tried to sort out her opinions, and whenever she
19  expresses an opinion she says it is my opinion that
20  and I've relied upon that.
21    And that's where I get seven opinions,
22  so I don't understand where else. This is not a game.
23    THE WITNESS: I have this -- I have this
24  on Page 5, paragraph three, the last sentence.
25    These observations, taken in their

---

Page 284

1  entirety, provide evidence that the pharmacovigilance
2  system and the accompanying quality systems remain
3  inadequate to ensure compliance with regulatory
4  reporting or requirements of the compliance
5  remediation, either from the MHRA inspection of 2005
6  or the FDA inspections in the first quarter of 2006.
7    I did not go into the specifics of the
8  single-case reporting or the narrative quality. I
9  would have to go back and verify that.
10    But the -- when this really became a
11  pressured situation to make a determination, I relied
12  very, very heavily on this 2008 inspection to show
13  that there were persistent observations that were not
14  remediated.
15    I couldn't say whether it was the
16  content of the plan because I wasn't provided that, or
17  the implementation. Because it could be a bad plan
18  with good implementation or it could be a good plan
19  with bad implementation.
20    MR. KAPLAN: If there were remediation
21  problems, do you think the FDA would have said in
22  Exhibit 38 that there was a very -- it's very unlikely
23  that anybody was harmed as the result of defective
24  Digitek?
25    MR. THOMPSON: Let me interrupt. It

---

Page 285

1  sounds as though we're going to go a little more than
2  five minutes and he -- I think we're running out of
3  tape.
4    VIDEO OPERATOR: We have one left.
5    MR. KAPLAN: Will you answer that
6  question?
7    MR. THOMPSON: Have I passed the chair
8  to you?
9    No, wait. Go ahead. Go ahead. Go
10  ahead.
11    MR. KAPLAN: Okay.
12    MR. THOMPSON: Go ahead.
13    MR. DEAN: First, we need to change the
14  tape.
15    VIDEO OPERATOR: Going off the
16  videotape.
17    This is the end of Tape 5.
18    The time is 5:11 p.m.
19    (Discussion off the record.)
20    (The court reporter read back the
21  following:
22    "QUESTION: If there were remediation
23  problems, do you think the FDA would have said in
24  Exhibit 38 that there was a very -- it's very unlikely
25  that anybody was harmed as the result of defective

72 (Pages 282 to 285)