IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  DIGITEK PRODUCT LIABILITY
          LITIGATION                                                   MDL NO. 1968

**THIS DOCUMENT RELATES TO ALL CASES**

### BRIEF ON PAROL EVIDENCE OF THE PARTIES' INTENT AS TO THE PSC'S ENTITLEMENT TO FEES AND EXPENSES ON BEHALF OF THE ACTAVIS DEFENDANTS

**I.  Introduction**

The Settlement Agreement is not ambiguous.  It reflects an intent by the parties to let the law decide the disputed issue of the PSC's entitlement to fees and expenses after a settlement was reached on the other terms.  Despite the PSC's many demands for fees and expenses, Defendants never made an offer on that issue, and the parties never reached an agreement about what, if anything, the PSC might be entitled to.  The parties wished to settle the underlying litigation expeditiously and avoid a delay of the settlement for inability to agree either on entitlement to, or an amount of, fees and expenses for the PSC.  In exchange for the PSC's consent to the other terms of the agreement, the Defendants agreed to two concessions: 1) that the PSC could apply to the Court for their fees and expenses using a vehicle not otherwise open to them – the procedure set forth under Rule 23; and 2) that the Defendants would not appeal the Court's order.  While the Defendants did not agree that the PSC was entitled to have Defendants pay their fees and expenses and reserved the right to object to the PSC's request for an award, Defendants left open the possibility that the Court might find in favor of the PSC, which was then armed with the procedure under Rule 23.  Thus, the parties' agreement was to proceed with the settlement and to fight about the PSC's fees and expenses another day.

## II. Facts

### A. March – April 2010: Early Discussions About Fees And Expenses

The PSC made explicit demands for fees and expenses early in the negotiations. The parties had discussed settlement in the summer of 2009 continuing through early 2010. (Affidavit of Richard A. Dean ("Dean Aff."), Ex. A, ¶2 .) In March 2010, settlement discussions began with purpose. On March 24, 2010, the PSC made a high/low demand for $30 million to $55 million for the Plaintiffs and $15 million for themselves in what they themselves called "common fund fees." (Undated Settlement Proposal Outline, Ex. B; Affidavit of Matthew P. Moriarty ("Moriarty Aff."), Ex. C, ¶3.) Defendants responded that the proposed figures were "far too high" for a litigation in which there was "no evidence that any plaintiff actually received defective Digitek®." (Moriarty Aff., Ex. C, ¶ 4; March 30, 2010 Moriarty letter, Ex. D; April 14, 2010 Moriarty letter, Ex. E.) A letter sent April 14, 2010 summarized the weaknesses in Plaintiffs' case and concluded that "this is an economic settlement to spare both sides further losses. This is not about substantial rewards to the PSC or any claimants just because our clients had regulatory difficulties." (April 14, 2010 Moriarty letter, Ex. E.) The Defendants did not make an offer to the PSC on the fees and expenses branch of their demand.

### B. May 2010: Possibility Of A Common Fund

This is not to say that Defendants never contemplated the possibility that the PSC would be paid for their time. Indeed, the PSC's demands forced Defendants to consider how the PSC's fees and expenses would fit into a settlement and whether to make an offer. Funding for the PSC's fees and expenses was listed as an agenda item for a meeting of lead counsel on May 5, 2010, and attorneys' fees and expenses were discussed at that meeting. (May 5, 2010 Agenda, Ex. F; Moriarty Aff., Ex. C, ¶ 5.) Defendants' hope was that they could depose PSC's experts

effectively and weaken the PSC's position. (Moriarty Aff., Ex. C, ¶ 5; May 6, 2010 Moriarty memorandum, Ex. G.)

But, importantly, at that point in time, the parties believed that the PSC's fees and expenses would be paid from a common fund. (See Undated Settlement Proposal Outline, Ex. B.) A memorandum documenting the discussion at the May 5, 2010 meeting of lead counsel states that "Fred [Thompson] thinks that the PSC should have substantial discretion in distributing the common fee fund [to PSC members]. [Counsel for c]lass action cases have a typical percentage in relationship to the ultimate settlement, and they would try to stay within those relationship numbers." (May 6, 2010 Moriarty memorandum, Ex. G.) A second memorandum states, "There was a good deal of discussion about fee levels and Fred said that he would be flexible here but there needed to be a reasonable relationship to the overall settlement amount and that usually the attorneys fees were within 12-24% of the class settlement." (May 5, 2010 Dean memorandum, Ex. H.)

Even though the parties believed at that point that the PSC's fees and expenses might be paid from the amount they negotiated for the Plaintiffs, the parties could not come to an agreement about what that amount would be or if it would be paid at all. No offers of any kind had been made by the Defendants. (Moriarty Aff., Ex. C, ¶ 6.)

C. June – July 2010: Change In Bargaining Position

The parties' negotiations changed substantially after the Plaintiffs' experts were deposed at the end of June 2010 because the PSC was much more motivated to settle. Defendants were aware that the PSC was conscious of the expense of pursuing the litigation. (See May 11, 2010 Thompson letter, Ex. I.)

3

> This promises to be an expensive summer of labor and out of pocket expense on all fronts – individual case preparation, liability information, including site inspections, privilege and scope of discovery disputes, continuing depositions, as well as disclosure and deposition of the first round of case experts.

*Id.* Then, at least from the Defendants' perspective, the June depositions confirmed the Defendants' earlier position about the weaknesses in the Plaintiffs' case, which is more fully discussed in Defendants' Opposition to the PSC's Petition. (See April 14, 2010 Moriarty letter, Ex. E; Dean Aff., Ex. A, ¶ 3; Doc. 478.) Mr. Moriarty made this point to the PSC on the morning of July 2, 2010. (Moriarty Aff., Ex. C, ¶ 7; July 2, 2010 Moriarty email, Ex. J.) The imminence of the summer's costs and the weakness of Plaintiffs' case exposed by the expert depositions caused a shift in the parties' respective bargaining positions.

Defendants' counsel noted this shift after speaking with the PSC's Fred Thompson on July 2, 2010. (July 4, 2010 Dean email, Ex. K; Dean Aff., Ex. A, ¶ 3.) From that discussion, Defendants' counsel concluded that "[Fred] realizes how devastating the depos[itions] of his experts have been. He is talking about a settlement for 'defense costs' – whatever that means in his mind. He is to get us a number on Tuesday." (July 4, 2010 Dean email, Ex. K.) Defendants' counsel noted that the PSC was "becoming very realistic in light of [the] depos[itions] last week. …[T]hey are very anxious to settle." (July 7, 2010 Dean email, Ex. L; see Dean Aff., Ex. A; ¶ 3.) After the parties had come to a basic agreement, Defendants' counsel concluded that "Fred wants out in the worst way." (July 9, 2010 Dean email, Ex. M; see Dean Aff., Ex. A, ¶ 3.)

1. July 2, 2010: The PSC Scheduled A Meeting With Defendants

On Friday, July 2, 2010, the day after Defendants had completed the fourth deposition of Plaintiffs' experts, Mr. Thompson approached Defendants' counsel about the possibility of a settlement. (Dean Aff., Ex. A, ¶ 3.) Mr. Thompson indicated that he would provide Defendants

4

with a demand on Tuesday, July 6, 2010. (July 4, 2010 Dean email, Ex. K.) The parties agreed that they would meet to discuss a settlement after the holiday weekend, on Wednesday, July 7, 2010. (July 2, 2010 Moriarty email, Ex. J; Moriarty Aff., Ex. C, ¶ 7.)

> 2. July 7, 2010: Parties Met, Discussed Settlement Terms, And Proposed To Ask The Court To Resolve The Issue Of Fees And Expenses At A Later Date.

In preparation for the July 7, 2010 meeting, Defendants contemplated how to address, among other demands, the issue of the PSC's fees and expenses. Defendants realized that with offers as low as they contemplated making, not providing in some way for the PSC might stall the entire deal (especially if those fees were to come out of a common fund). (See July 7, 2010 Moriarty email, Ex. N.) Defendants' counsel prepared talking points for the meeting (*Id.*) The last item addressed the PSC's fees and expenses. (*Id.*; Moriarty Aff., Ex. C, ¶¶ 8 and 9.) It states,

> Under law we owe no obligation to pay fees and expenses. However, we recognize that ignoring the PSC's time and effort, and compensation for same, could be a stumbling block to settlement. Therefore, PSC may apply to the Court for an award of fees and expenses. After a hearing we would pay what the Court ordered. We will entertain demands to negotiate the amount, but you would have to make disclosures to us of data about time and expenses.

(July 7, 2010 Moriarty email, Ex. N; Moriarty Aff., Ex. C, ¶ 9.) The position in the talking points reflects what Defendants' counsel said during the July 7, 2010 discussion about the PSC's fees and expenses. (Moriarty Aff., Ex. C, ¶ 10.)

The negotiations reflected the PSC's motivation. Over the course of two phone calls, the parties met for at least an hour on July 7, 2010. (Moriarty Aff., Ex. C, ¶ 10; Soundpath invoice, Ex. O.) The PSC had requested $24 million and the Defendants countered with their very first offer. (Dean Aff., Ex. A, ¶ 3.) By the end of July 7, 2010, the PSC had reduced the demand to

$20 million, and the Defendants' offer for Plaintiffs stood at $7.5 million. (*Id.*) As the talking points indicate, Defendants made no offer for the PSC's fees and expenses. (Dean Aff., Ex. A, ¶ 3; Moriarty Aff., Ex. C, ¶ 10.) Rather, they agreed only that the PSC could apply for an award. (July 7, 2010 Dean email, Ex. L.) At the end of the day, Defendants' counsel recounted to co-counsel that they had had several discussions with the PSC in the last 24 hours, and that "Matt [Moriarty] and I [Richard Dean] have told them we will let Judge Goodwin decide what they should get in fees." (*Id.*)

### 3. July 8, 2010: Parties Came To Basic Agreement On Money For Plaintiffs

Having set the matter of fees and expenses aside for the time being, the parties came to a very basic agreement on July 8, 2010. If the PSC could get 85% of the Plaintiffs to participate in the settlement, Defendants would pay the Plaintiffs $10 million. (Dean Aff., Ex. A, ¶ 3.) Defendants made a separate offer for an administrative fund, but made no dollar offer for the PSC's fees and expenses. (Moriarty Aff., Ex. C, ¶ 11.)

### D. Agreement To Leave PSC's Fees And Expenses An Open Issue

Did the parties contemplate that they might yet settle the issue of the PSC's fees and expenses, without resort to a motion? Yes. For example, on July 7, 2010, Defendants' counsel asked the PSC, "What is your estimate of your PSC's expenses, and the reasonable value of services you would claim (or that you think would be awarded) given the current demand and offer? Our client will want to know the total expected payout for those who opt in." (July 7, 2010 Moriarty email, Ex. P; Dean Aff., Ex. A, ¶ 3.) This question was asked before the parties had agreed on an amount for Plaintiffs on July 8, 2010, so, at the time, it was not clear that the PSC would not be able to get their fees out of the settlement. When Defendants' counsel communicated the basic agreement to their clients, Defendants asked whether the PSC's fees and

expenses had been discussed. (July 9, 2010 Dean email, Ex. Q; Dean Aff., Ex. A, ¶ 3.) Defendants' counsel responded that they "just reiterated [the] basic position we had taken in prior discussion[s] – we were making no offer on those, Judge would decide, but left open [the] door to [a] negotiated solution during that proceeding as a possibility[.]" (July 9, 2010 Dean email, Ex. Q.)

### E. Entitlement Was Rejected In Drafting Of The Settlement Agreement

Defendants nonetheless retained the right to contest the PSC's legal entitlement to fees and costs from Defendants. In drafting the Settlement Agreement, Defendants' counsel researched agreements in other litigations that might be used as models. (Affidavit of Jaclyn Bryk ("Bryk Aff."), Ex. R, ¶ 5.) In a memorandum about those agreements, Defendants' counsel made a handwritten note reading, "PSC can apply to Judge for award of PSC fees & expenses & we reserve right to contest on all legal & factual grounds available … all fee agreements remain intact & are not [a]ffected by agreement." (Bryk Aff., Ex. R, ¶ 7; July 16, 2010 Bryk memorandum, handwritten notes, Ex. S.)

That Defendants did not agree to any entitlement by the PSC was clear before the parties signed the final Settlement Agreement. Mr. Thompson prepared a draft sheet of Settlement Terms for a meeting on July 29, 2010. (Bryk Aff., Ex. R, ¶ 8; Undated Settlement Terms Sheet from Bryk file, Ex. T.) The draft, as prepared by Mr. Thompson, stated, "It is agreed by the parties that the Plaintiffs' Steering Committee shall have the right to submit to the Court time and expenses expended in the pursuit of this action **and by agreement of the parties**." (*Id.* (emphasis added).) Defendants' counsel marked this draft by striking the last six words of the sentence (in bold), noting instead that "[Defendant] has right to contest - - put a hearing." (*Id.*) The subsequent Settlement Terms sheet, redlined and sent back to Mr. Thompson, read:

7

> It is agreed by the parties that the Plaintiffs' Steering Committee shall have the right to submit to the Court time and expenses expended in the pursuit of this action. The Defendants have the right to contest any or all of such requests. The Honorable Judge Joseph Goodwin shall award such fees and costs as he deems appropriate, which amount shall be non-appealable by either party.

(Moriarty Aff., Ex. C, ¶ 13; August 3, 2010 Moriarty email and attachment, Ex. U.) Thus, the Defendants' present position could not possibly be a "bait and switch" because, in drafting the final Settlement Agreement, the PSC proposed an entitlement to fees and expenses, Defendants rejected it, and Plaintiffs assented to the Settlement Agreement anyway.

    F.   <u>The Intention Of The Parties Was Communicated Jointly To The Court</u>

After working on the details of the Settlement Agreement for several weeks, the parties summed up their intentions when they met with the Court on August 5, 2010. Defendants sent a letter on August 4, 2010 outlining the terms, and attaching the negotiated Settlement Terms sheet. (August 4, 2010 Moriarty letter and attachment, Ex. V; Moriarty Aff., Ex. C, ¶ 14.) In the letter, Defendants described the three basic terms of the settlement as: 1) "$10 million …to compensate consumers…; 2) "administrative expenses of the fund up to $2 million [paid by Actavis]"; and 3) "The PSC can apply to the Court for recovery of reasonable fees and expenses… Defendants reserve the right to contest the award **in its entirety**. The parties will live with your decision in that regard with no right of appeal." (*Id.* (emphasis added).) The detailed Settlement Term sheet, originally drafted by Mr. Thompson, revised by the parties, and submitted with Mr. Moriarty's letter to the Court, stated that the PSC

> … shall have the right to submit to the Court time and expenses expended in the pursuit of this action. The Defendants have the right to contest any or **all of such requests**. The Honorable Judge Joseph Goodwin shall award such fees and costs as he deems appropriate, which amount shall be non-appealable by either party.

(*Id.* (emphasis added).) The PSC confirmed during the meeting with the Court that the Defendants had correctly stated the parties' agreement. (Dean Aff., Ex. A, ¶ 5; August 6, 2010 Dean memo, Ex. W; Moriarty Aff., Ex. C, ¶ 15.)

### III. Law and Argument

"It is well-established that settlement agreements are contracts and therefore, are to be construed as any other contract." *Miller v. Liberty Mut. Ins. Co.,* 393 F.Supp.2d 399, 406 (S.D.W.Va. 2005) (quotations omitted), citing *Sanson v. Brandywine Homes, Inc.*, 599 S.E.2d 730, 734 (W.Va. 2004).[1] A meeting of the minds is "sine qua non of all contracts." *Id.,* citing *Burdette v. Burdette Realty Improvement, Inc.*, 590 S.E.2d 641, 645 (W.Va. 2003) and *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450 (1993) ("[i]t is elementary that mutuality of assent is an essential element of all contracts."). The West Virginia Supreme Court of Appeals has stated that:

> In order for this [meeting of the minds] or mutuality to exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other. Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract. That their minds have met may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied.

*Id.* citing *Bailey*, 437 S.E.2d at 450-51.

To rule on the PSC's Petition for fees and expenses, the Court must now determine whether the Settlement Agreement is ambiguous with respect to the PSC's entitlement to fees and expenses and, if so, what the parties intended by the ambiguous provision. Thus, the Court

---

[1] The Settlement Agreement is to be construed under West Virginia law. Settlement Agmt, Sec. 12.03 ("The provisions of this Agreement, appendices, and the individual Releases shall be interpreted in accordance with, and governed by, the laws of the State of West Virginia without regard to its conflict of laws principles.").

9

must ultimately decide between the parties' competing interpretations of the Settlement Agreement – either:

1) that the Court will determine whether the PSC is entitled to fees and expenses from Defendants and, if so, how much; or

2) that the PSC is entitled to fees and expenses from Defendants, and the Court will determine how much.

A. <u>The Settlement Agreement Is Not Ambiguous.</u>

Where the language of a contract is clear, the language cannot be construed otherwise and must be given effect, and no interpretation thereof is permissible." *Executive Risk Indem., Inc. v. Charleston Area Medical Center, Inc.*, 681 F.Supp.2d 694, 720 (S.D.W.Va. 2009) citing *Berkeley County Pub. Serv. Dist. v. Vitro Corp.,* 162 S.E.2d 189, 200 (W.Va. 1968). "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous." *Jessee v. Aycoth*, 503 S.E.2d 528, 531 (W.Va. 1998). "Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty." *Id*. "The question as to whether a contract is ambiguous is a question of law to be determined by the court." *Id.*

The Settlement Agreement is not ambiguous – it says exactly what was intended by the parties, and nothing more. An obligation is "a formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp. a duty arising by contract." (<u>Black's Law Dictionary</u> 1104 (8th ed. 1999).) Section 2.01(c) sets forth the limit to what Defendants are **obligated** to pay ($10 million), with three exceptions. Two of those exceptions are made contingent by the words "applicable" and "may," respectively, both of which terms are inconsistent with the concept of a clear, certain obligation. The

attorneys' fees and costs were no more a foregone conclusion than the potential increases set forth in Section 2.02 (which the Plaintiffs ultimately did not achieve).

Article XI sets forth the procedure by which the issue of the PSC's fees and expenses may be resolved, but provides no substantive right to payment by Defendants. The inclusion of Rule 23(h) means that the PSC would have to establish their right to fees and expenses "that are authorized by law or the parties' agreement." Yet the Settlement Agreement does not say that the PSC is entitled to its fees and expenses and that Defendants will only contest the amount. A finding otherwise would be potentially expensive for Defendants and should not be made because the agreement is not explicit on that point. Had the parties intended the Court to determine merely the amount of reasonable fees and expenses, the PSC would have negotiated more explicit provisions detailing their alleged entitlement to fees and expenses. The absence of such explicit provisions is clear. Thus, the language of the agreement unambiguously supports the Defendants' interpretation of the agreement and clearly does not support the PSC's position.

B. <u>Parol Evidence Shows No Abandonment Of An Entitlement Defense.</u>

Alternatively, if the Court should find that the Settlement Agreement is ambiguous, parol evidence shows that the parties intended the Court to determine, based on the law, whether the PSC was even entitled to fees and expenses from Defendants.

A contract is considered ambiguous if it is "reasonably susceptible to more than one meaning **in light of the surrounding circumstances** and after applying the established rules of construction." *Jessee,* 503 S.E.2d at 531. "When… the terms of the written agreement are ambiguous, leaving doubt as to the object or extent of the parties' engagement, parol evidence may be admitted to permit appropriate interpretation of the agreement and to explain uncertain, incomplete, or ambiguous contract terms." *Kelley, Gidley, Blair & Wolfe, Inc. v. City of*

*Parkersburg By and Through Parkersburg Sanitary,* 438 S.E.2d 586, 589 (W.Va. 1993) (quotations omitted); see *Jessee,* 503 S.E.2d at 531 (trial court correctly admitted parol evidence when settlement agreement, whose other terms as to the marital residence were clear, was silent as to when it was to be sold.). If a court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. *Jessee,* 503 S.E.2d at 531. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. *Id.* When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent. *Id.*

> 1. The Only Agreement Was To Let The Law Decide Whether Or Not Defendants Would Pay The PSC's Fees And Expenses (And, If So, How Much).

After the weaknesses in Plaintiffs' case were conceded by their experts, the PSC's demands shrunk. But as their demands diminished, so did the PSC's chances of obtaining sufficient participation to achieve a settlement. Any amounts paid to the PSC out of a common fund would only reduce those chances further. It was clear that obtaining their fees and expenses from a common fund would be a problem for the PSC. The PSC had indicated that their fees and expenses would be a stumbling block to reaching an agreement. Defendants still did not make any monetary offers intended to pay the PSC's fees and expenses.

Defendants agreed that they **might** pay the PSC's fees and expenses, if either 1) the PSC could establish that they were legally entitled to the requested fees and expenses, which would be decided by the Court; or 2) the parties could agree to a settlement on the PSC's fees and expenses. There was no agreement to an entitlement. Defendants' counsel obviously knew that the PSC had performed work and incurred expenses. How then could Defendants contest the

12

"entirety" of an award or "any or all" of an award, unless Defendants believed they had a legal defense to entitlement in the first instance? The language of the July 7, 2010 talking points email, the discussions the parties had, the August 4, 2010 letter to the Court, the Settlement Terms sheets, and then the Settlement Agreement itself did not happen by accident.

In exchange for the risk that Defendants **might not** voluntarily pay the PSC's fees and expenses, the PSC received a procedural right that would put the Court in control and a guaranty that Defendants would not appeal the Court's decision. In exchange for the procedural vehicle that would enable the Court to determine the entitlement and then, if necessary, the amount of fees and expenses to be paid by Defendants, the Defendants retained the right to contest the PSC's request "in its entirety" "on all legal [and] factual grounds available." (August 4, 2010 Moriarty letter, Ex. V; July 16, 2010 Bryk notes, Ex. S.) Thus, the consideration for the procedural right to take their request for fees and expenses to the Court was the risk that the Court would find that the PSC is not entitled to any fees or expenses under the law.

Defendants' actions confirm this intention. If Defendants had agreed that the PSC was entitled to some amount of fees and expenses from them, they would have negotiated that amount by making an offer for it, thereby maintaining control over the amount of the inevitable payment. The PSC's argument that the Settlement Agreement's terms entitle them to be paid by Defendants, with the Court to determine only the amount, is tantamount to arguing that the Defendants wrote the PSC a blank check to be completed by the Court. The PSC's argument that amount is the only issue is illogical because Defendants never made a dollar offer in response to the PSC's demands. And the PSC's position is not borne out by any contemporaneous evidence. (See generally, Moriarty Aff., Ex. C, ¶¶ 17 and 18.)

On the other hand, why would the PSC take the risk that they might not get paid by Defendants, even as their prospects of being paid from a common fund were diminishing? The dollar amount the parties were negotiating for the Plaintiffs was within a range that the PSC knew might jeopardize their ability to be compensated from it. But the PSC took a calculated risk that they might also not be compensated by Defendants because they made a business decision that a settlement was more valuable than obtaining their fees and expenses. A settlement would limit their imminent and continuing costs of litigation and end the opportunity costs of persisting with a fruitless litigation, which they knew would only get more expensive over the summer and fall of 2010. Thus, the PSC's actions were logical, even in light of the risk they were taking.

a) <u>The PSC Knew Defendants Rejected An Entitlement.</u>

The PSC's decision to bear the risk that they might not be compensated need not be logically inferred – it is evident from the Settlement Terms sheets drafted by Mr. Thompson and negotiated by the parties. The PSC proposed what sounded like an entitlement with the sentence, "It is agreed by the parties that the Plaintiffs' Steering Committee shall have the right to submit to the Court time and expenses expended in the pursuit of this action **and by agreement of the parties.**" In striking the last six words of the sentence (in bold) and inserting a term about Defendants' right to contest the PSC's request, Defendants rejected an entitlement. In allowing the subsequent Settlement Terms sheet to be submitted to the Court on August 4, acknowledging its accuracy during the hearing on August 5, and proceeding with the Settlement Agreement on those terms, the PSC agreed that Defendants were not conceding an entitlement.

14

      b) <u>There Is No Evidence Of Entitlement To Fees.</u>

Finally, there is no evidence in contemporaneous writings that Defendants ever agreed to any entitlement to an award of fees and expenses. Indeed, the evidence is to the contrary. The parties agreed, and the Court was informed in the August 4, 2010 letter, that Defendants intended to contest any fees and expenses request "in its entirety." And the Settlement Terms sheet attached to that letter said just that – "The Defendants have the right to contest any or all of such requests."

Even as it has asserted a belated argument of a contractual entitlement to fees and expenses, the PSC to date has offered neither sworn proof nor writings to support that position. The PSC claims that "the clear and binding contractual provision…clearly calls for payment of fees and costs after submission to the court." (Doc. 486, p. 4.) Yet the PSC does not cite the specific contractual provision to which it refers and, importantly, concedes that "it is within [the Court's] authority under the MSA to set **the entitlement and amount** of these fees and expenses." (*Id.* at p. 3.) Likewise, the PSC has stated that the Court may make an award "[s]hould this Court determine that an assessment is called for…" (*Id.* at p. 4.) Instead of evidence, the PSC has pleaded that "it cannot reasonably be argued that Defendants anticipated that the PSC would obtain no fees…" (*Id.* at p. 3-4.) But the PSC has offered nothing of substance to contravene Defendants' contractual reservation to contest the PSC's alleged entitlement to fees and expenses.

      2. <u>This Was An Arm's-Length Settlement Agreement By Experienced Counsel.</u>

A ruling in favor of the Defendants on this issue means the PSC may go uncompensated for common fees and expenses. That may appear to some to be manifestly unfair. The PSC, in

their last brief, went so far as to call this a "bait and switch," implying that Defendants' counsel were dishonest in the negotiations. But that simply is not true.

The PSC volunteered for the job, presumably taking the risks and potential rewards into account. They are experienced MDL personal injury lawyers and, while used to winning and getting paid, must have considered the possibility that the litigation would not bear fruit for them. Contingent fee litigation is inherently risky; there is nothing in the law or equity that guarantees a lawyer compensation. To the extent that the PSC has clients who receive awards, they will get their contingent fee contract amounts.

The PSC had opportunities early on, internally with their colleagues or even in a pre-trial order, to assure that they were not completely without recourse against lawyers who did little to bear the load. They had two years to think about how they were going to get paid and to assure it was going to happen. Defendants can only speculate about why the PSC did not secure their compensation by some other vehicle.

This was an arm's-length settlement between teams of experienced lawyers. The PSC had opportunities to negotiate a solution when the cases were resolved starting on July 8, 2010, and ending with execution of the agreement on September 1, 2010. How do they claim a "bait and switch" in the face of language in meetings, letters, Settlement Terms sheets, and the Settlement Agreement clearly reflecting the Defendants' intent to contest a fee award "in its entirety"? There is an alternative explanation: the PSC did not have sufficient bargaining power to improve their position on this slice of the settlement. In all forms of business, including the risky business of contingent fee litigation, there is the chance that one will lose money on a deal. Perhaps they believed that cutting their losses and moving on to greener pastures had value.

Regardless, it is clear that Defendants never offered a dime in response to the PSC's demands for fees and expenses. It is also clear that Defendants gave the PSC two things to which they were not entitled in this regard - a procedural vehicle under Federal Rule of Civil Procedure 23 and a waiver of appellate rights. Furthermore, neither the Settlement Agreement nor the parol evidence show that the Defendants agreed the PSC was entitled to something, contesting only the amount. Unfair as it may seem to the PSC, a zero award is factually appropriate and legally sound.

## IV. Conclusion

For the foregoing reasons, the Settlement Agreement is not ambiguous, but, should the Court conclude that it is, the parol evidence reflects an intention by the parties that the Court should determine whether or not the PSC is legally entitled to fees and expenses and, if so, how much. To the extent the Court considers parol evidence, it is not possible to conclude the parties agreed on entitlement to fees.

Respectfully submitted,

| ALLEN GUTHRIE & THOMAS, PLLC | TUCKER ELLIS & WEST LLP |
|---|---|
| Rebecca A. Betts, LIAISON COUNSEL<br>500 Lee Street East, Suite 800<br>Charleston, West Virginia 25301<br>Tel:  (304) 345-7250<br>Fax:  (304) 345-9941<br>E-mail:  rabetts@agmtlaw.com<br><br>*Attorney for Defendants* | By: s/*Richard A. Dean*<br>   Richard A. Dean (Ohio Bar #0013165),<br>   CO-LEAD COUNSEL<br>   Matthew P. Moriarty (WV Bar # 4571;<br>   Ohio Bar 0028389), CO-LEAD COUNSEL<br>   925 Euclid Avenue, Suite 1150<br>   Cleveland, Ohio  44115-1414<br>   Tel:  (216) 592-5000<br>   Fax:  (216) 592-5009<br>   E-mail:richard.dean@tuckerellis.com<br>           matthew.moriarty@tuckerellis.com<br><br>*Attorneys for Defendants Actavis Totowa LLC,*<br>*Actavis Inc., and Actavis Elizabeth LLC* |

17

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 22, 2011, I electronically filed the "Brief On Parol Evidence Of The Parties' Intent As To The PSC's Entitlement To Fees And Expenses On Behalf Of The Actavis Defendants" with the Clerk of the Court using the CM/ECF system which will send notification of such filing to CM/ECF participants. Parties may access this filing through the CM/ECF system.

                                                s/*Richard A. Dean*
                                                *One of the Attorneys for Defendants Actavis Totowa LLC, Actavis Inc., and Actavis Elizabeth LLC*

709066