**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

IN RE: DIGITEK® PRODUCTS LIABILITY
    LITIGATION

_____     MDL NO. 1968

THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER #77**
(Memorandum Opinion and Order re Petition for Award of Attorneys' Fees and Expense Reimbursements)

Pending is the joint fee applicants' petition for an award of attorney fees and expense reimbursements relating to common benefit work [Docket 448]. Petitioning members of the Plaintiffs' Steering Committee ("PSC"), including Lead Counsel, seek an award of $4,400,041.75 in attorney fees and $1,338,260.91 in out-of-pocket expenses. They seek two other sums as well. First, "an amount to be determined by the Court's discretion" for Crivella West, a document depository. Second, fees and costs of $347,921.89 for the lawyers who worked on the unsuccessful class certification request.

**I. BACKGROUND**

The cases in this MDL arise out of the April 25, 2008, recall of Digitek®, a prescription drug used to treat various heart conditions. Actavis Totowa LLC, the manufacturer, initiated the voluntary recall due to the fact double-thickness Digitek® may have been commercially released. Lawsuits in state and federal courts all over the country soon followed. Adverse

health consequences were alleged, including deaths, resulting from defective Digitek®.[1] On August 13, 2008, the Judicial Panel on Multidistrict Litigation consolidated all of the federal cases here for coordinated management.

On November 5, 2008, PTO #4 named 22 attorneys to the PSC. They were responsible for "initiating, coordinating and conducting all pretrial discovery on behalf of plaintiffs who file[d] civil actions which . . . [were] consolidated" in the MDL[2]. On May 29, 2009, I entered PTO #23. It added 3 additional members to the PSC, substituted an attorney in one of the original positions and removed one original member, leaving a 24-member PSC.[3] The fee petition says members participated on various sub-committees led by Lead Counsel.

Two years of litigation followed. On September 1, 2010, a negotiated settlement was reached. The cornerstone of the agreement is the creation of a $10,000,000.00 settlement fund ("Fund") from the Actavis defendants or their insurers. The Fund only compensates eligible

---

[1]Defendants in some or all of the cases are Actavis Totowa, LLC ("Actavis Totowa"), Mylan Bertek Pharmaceuticals, Inc., UDL Laboratories, Inc., Actavis, Inc., and Actavis Elizabeth, Inc. Plaintiffs allege these defendants manufactured, marketed, tested, promoted, sold and/or distributed Digitek®. Two other defendants, Mylan, Inc. and Mylan Pharmaceuticals, Inc., are alleged to have marketed, promoted, sold and/or distributed Digitek®. Mylan Pharmaceuticals, Inc., is also alleged to have distributed Digitek® through Mylan Bertek Pharmaceuticals, Inc. and UDL Laboratories, Inc..

[2]Harry F. Bell, Jr., Carl N. Frankovitch, and Fred Thompson, III, were appointed as Lead Counsel for the plaintiffs. They served on the PSC as well. I also appointed as additional members of the PSC Andres F. Alonso, K. Camp Bailey, Robert J. Binstock, Robert Blanchard, Lester L. Levy, Peter A. Miller, Ashley L. Ownby, David M. Peterson, Frank Mario Pitre, Ed Blizzard, John R. Climaco, C. Brooks Cutter, Daniel N. Gallucci, G. Erick Rosemond, Shelly A. Sanford, J. Paul Sizemore, Teresa Toriseva, Stacy K Hauer, and Scott Wm. Weinstein.

[3]W. Mark Lanier, John O'Quinn, and James J. Pettit were added as PSC members, Erick Rosemond was replaced with Shamus Mulderig, and Ms. Teresa Toriseva resigned.

2

claimants participating in the settlement program. The Actavis defendants will also pay settlement administration expenses.

Article XI of the Settlement Agreement covers "Attorneys' Fees and Expenses." The material portions read as follows:

> **Section 11.01** The Plaintiffs' Steering Committee ("PSC") and anyone who believes they have prepared work that was approved by PSC and is eligible for common fund work may make an application to the MDL Court using the procedure set forth in FED. R. CIV. P. 23(h) for an award of attorneys' fees and expenses. Any motion shall be filed no later than January 1, 2011[4] for common fund fees and expenses incurred prior to 11:59 p.m. on October 15, 2010. Any objection to the motion may be filed thirty (30) calendar days after the filing of the motion and any response to objections may be filed ten (l0) calendar days thereafter. Either PSC or Defendants may request the MDL Court convene a hearing on the motion for attorneys' fees and expenses prior to making a decision on the motion. The MDL Court's decision is final and non-appealable.
>
> **Section 11.02** PSC may submit a supplemental application to the MDL Court for fees and expenses resulting from work processing Claim Packages and administration of this Agreement after October 15, 2010. PSC must use the procedures set forth in FED. R. CIV. P. 23(h) for an award of attorneys' fees and expenses. Any objections to the motion may be filed thirty (30) calendar days after the filing of the motion and any response to objections may be filed ten (10) calendar days thereafter. Either PSC or Defendants may request the MDL Court convene a hearing on any motion for attorneys' fees and expenses prior to making a decision on the motion. The MDL Court's decision is final and non-appealable.

(Sett. Agmt. at Art. XI, §§ 11.01, 11.02). The Settlement Agreement also includes the following language in Article II: "[t]he Settlement Funds represent the total amount Defendants shall be obligated to pay under this Agreement with the exception of . . . attorneys' fees or costs that may be ordered by the MDL Court pursuant to Article XI . . . ." (*Id.* Art. II, § 2.01(C)).

---

[4] This date and all other subsequent deadlines were extended by mutual agreement of the parties.

Lead Counsel and the PSC say this language stipulates a fee and cost award if I approve. The defendants would then pay the award and no appeal would follow. The defendants sharply disagree. In their March 15, 2011, brief in opposition, they say that neither the Settlement Agreement nor any other source provides a right to a fee award. It is their position that "no exception justifies a departure from the American Rule," primarily because "[t]he Settlement Agreement here does not confer on the PSC a right to be paid by the Defendants for their fees or expenses." (Br. in Oppos. at 1; *see also* Defs.' Br. on Parol Evid. at 11, 17 ("Article XI sets forth the procedure by which the issue of the PSC's fees and expenses may be resolved, but provides no substantive right to payment by Defendants. . . . Unfair as it may seem to the PSC, a zero award is factually appropriate and legally sound.")). They offer two "competing interpretations" of the Settlement Agreement, the first representing their view and the second attributed to Lead Counsel and the PSC:

1) that the Court will determine whether the PSC is entitled to fees and expenses from Defendants and, if so, how much; or

2) that the PSC is entitled to fees and expenses from Defendants, and the Court will determine how much.

So the question is whether the Settlement Agreement contemplates a voluntary contractual fee-and-cost shift. (Defs.' Parol Evid. Br. at 9 ("To rule on the PSC's Petition for fees and expenses, the Court must now determine whether the Settlement Agreement is ambiguous with respect to the PSC's entitlement to fees and expenses and, if so, what the parties intended by the ambiguous provision.")). That inquiry begins, and perhaps ends, with (1) the bargained-for language hammered out by the parties, and (2) the settled principles for contract interpretation and construction. In the next section, I determine (1) the applicable law for

resolving the dispute, (2) the contract interpretation and construction principles that may apply, and (3) the meaning of the Settlement Agreement language set out earlier.

## II. DISCUSSION

### A. *Applicable Law*

The Supreme Court has observed that, "[e]xcept as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply." *Lauritzen v. Larsen*, 345 U.S. 571, 588-89 (1953). Our court of appeals has recognized the same principle on multiple occasions. *See, e.g., Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 413 (4th Cir. 2009); *Barnes Group, Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1029 n. 10 (4th Cir. 1983) (noting that "parties enjoy full autonomy to choose controlling law with regard to matters within their contractual capacity.") (citing *Restatement (Second) of Conflicts* § 187(1) (1971); *see generally* 16 Am. Jur. 2d *Conflict of Laws* § 78 (2d ed. 2011)).

The Settlement Agreement includes a choice-of-law provision. It states that "The provisions of this Agreement . . . shall be interpreted in accordance with, and governed by, the laws of the State of West Virginia without regard to its conflict of laws principles." (Sett. Agmt. Art. XII, § 12.03). Neither party identifies any reason why their choice of West Virginia law should not be honored. The litigation has an obvious connection with this State. The settlement also does not appear to contravene any public policy. So I will honor the parties' election. In applying or interpreting the Settlement Agreement I will use contract interpretation and constructions principles as applied by the Supreme Court of Appeals of West Virginia.

### B.     *Principles of Interpretation and Construction*

A court may not "alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or . . . make a new or different contract for them." Syl. Pt. 5, *Dan's Carworld, LLC v. Serian*, 223 W. Va. 478, 677 S.E.2d 914 (2009) (citations omitted). "Where the terms of a contract are clear and unambiguous, they must be applied and not construed." *Perrine v. E.I. du Pont de Nemours and Co.*, 225 W. Va. 482, 507, 694 S.E.2d 815, 840 (2010) (internal quotation marks omitted) (quoting Syl. Pt. 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969), and Syl. Pt. 2, *Orteza v. Monongalia County General Hosp.*, 173 W. Va. 461, 318 S.E.2d 40 (1984)).

"Whether a contract is ambiguous, or how a contract should be interpreted, involves a question of law to be determined by the court." *Isaacs v. Bonner*, 225 W. Va. 460, 465, 694 S.E.2d 302, 307 (2010) (citing *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W. Va. 252, 267, 162 S.E.2d 189, 200 (1968) (The question as to whether a contract is ambiguous is a question of law to be determined by the court.), and *Wood v. Acordia*, 217 W. Va. 406, 411, 618 S.E.2d 415, 420 (2005) (interpretation of contract language is a question of law)).

A disagreement between the parties about the contract's meaning does not necessarily mean an ambiguity is at work -- "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Syl. Pt. 1, *Vitro Corp.*, 152 W. Va. at 267, 162 S.E.2d at 200. Neither does awkward language automatically result in the finding of an ambiguity: "Mere informality in phraseology or clumsiness of expression does not make it ambiguous, if the language imports one meaning or intention with reasonable certainty." *Energy Development*

*Corp. v. Moss*, 214 W. Va. 577, 596, 591 S.E.2d 135, 154 (2003) (quoting *HN Corp. v. Cyprus Kanawha Corp.*, 195 W. Va. 289, 294, 465 S.E.2d 391, 396 (1995) (quoting Syl. Pt. 13, *State v. Harden*, 62 W. Va. 313, 58 S.E. 715 (1907))).

If a contractual provision is found to be ambiguous, a court begins its quest to figure out what the parties intended. *See Coleman v. Sopher*, 201 W. Va. 588, 598, 499 S.E.2d 592, 602 (1997). A number of settled rules of construction may be considered. The preeminent one is to avoid balkanization: the court must "examine the instrument in its entirety . . . " and "give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious." Syl. Pt. *Henderson Dev. Co. v. United Fuel Gas Co.*, 121 W. Va. 284, 3 S.E.2d 217 (1939)*.* With these principles in mind, I turn to the applicable portions of the Settlement Agreement.

*C.     Analysis*

Article XI, Section 11.01 says that the PSC "and anyone who believes they have prepared work that was approved by PSC and is eligible for common fund work *may make an application* to the MDL Court using the procedure set forth in FED. R. CIV. P. 23(h) for an award of attorneys' fees and expenses. Any motion shall be filed no later than January 1, 2011 . . . ." (Sett. Agmt. Art. XI, § 11.01 (emphasis added)). It then says that "[e]ither PSC or Defendants may request the MDL Court convene a hearing on the motion for attorneys' fees and expenses *prior to making a decision on the motion*." (*Id.* (emphasis added)).[5]

---

[5] The court notes that the defendants in fact requested such a hearing in their brief in opposition. I find that the legal and factual contentions are clear enough that a hearing is not required at this juncture.

7

There is no doubt that the fee-and-cost entitlement language could be clearer. It might have said "Lead Counsel and the PSC are entitled to an award for their reasonable fees and costs, as determined by the court, after hearing from all parties." But there are plenty of imperfect, and yet unambiguous, contracts. This is one of them. The question is whether the provisions spelled out above are sufficient to work a fee shift. They are. The natural reading of the language used is that Lead Counsel and the PSC are authorized to seek a fee and cost award by "application" or motion. I am then authorized to "mak[e] a decision on the motion." Those authorizations together leave no doubt on the question of entitlement. In other words, the Settlement Agreement unambiguously authorizes me to make an award if I exercise the discretion to do so.

The defendants' position boils down to divorcing the contractual authority for a fee shift (which they say is absent) from my ability to make one (which they freely admit exists). If Article XI, section 11.01 is insufficient to work a fee shift, there would be nothing for me to decide. At the moment the motion for fees and costs came in the door, I would send it right back out as an unauthorized attempted fee shift. If entitlement could be resolved so easily, there would certainly be no need for the defendants to have the 30 days allowed under the Settlement Agreement language to respond to the fee and cost motion. Why too would there be any need to reserve the ability to request a hearing? And why would Article II, section 2.01(c) so carefully carve out the defendants' obligation to pay "attorneys' fees or costs that may be ordered by the MDL Court pursuant to Article XI" if the matter of entitlement was, in essence, dead on arrival? (*Id.* Art. II, § 2.01(C)). These rhetorical questions answer themselves.

I would reach the same result even if I found the language ambiguous. Once that ambiguity was discovered, I would be required to examine the entire settlement agreement "give

meaning to every word, phrase and clause and also render all its provisions consistent and harmonious." If the defendants' position were adopted, however, it would be an impossible task. I would first have to take note of the fact that an *entire Article* of the Settlement Agreement is devoted to "Attorneys' Fees and Expenses." (Sett. Agmt. Art. XI). I would then face the detailed provisions in that same Article, including the deadline imposed on Lead Counsel and the PSC to file their fee and cost application -- with the time period covered *down to the minute*. Then, I would have to take note of Article II, section 2.01(c), which obligates the defendants to pay "attorneys' fees or costs that may be ordered by" me pursuant to Article XI. Having taken account of all those fee-impacting provisions, it would be a mighty feat to then say that the Settlement Agreement does not contemplate a fee shift at all. That interpretation would blow a significant hole in the Settlement Agreement with no foundation for doing so.

In the end, this case qualifies for the same observation made by the Supreme Court of Appeals in *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 103, 468 S.E.2d 712, 718 (1996): "The defendants have presented us with an artful reading of the agreement, but that reading belies the plain meaning of the contract as a whole." So there is no basis to assert that the Settlement Agreement does not contemplate a fee and cost award. That ship has sailed.

Two questions remain. The first is whether the plaintiffs should be granted fees and costs based upon their application. I am prepared to rule on that matter right now. Lead Counsel and the PSC performed a lot of work that led to the creation of the Fund. They served as architects for the coordinated litigation. Without their help, the plaintiffs may have received no settlement and no compensation. For these reasons alone, Lead Counsel and the PSC are entitled

to some reasonable compensation for their time and the reimbursement of monies they spent on the case.

The second question is the amount to be awarded. I am still considering that matter. The most recent brief on the subject arrived just days ago. I am inclined to let the parties take the first pass on the issue. I am influenced on that point by something the defendants said in their parol evidence brief:

> If Defendants had agreed that the PSC was entitled to some amount of fees and expenses from them, *they would have negotiated that amount by making an offer for it, thereby maintaining control over the amount of the inevitable payment.* The PSC's argument that the Settlement Agreement's terms entitle them to be paid by Defendants, with the Court to determine only the amount, is tantamount to arguing that *the Defendants wrote the PSC a blank check to be completed by the Court*.

(Def.'s Br. on Parol Evid. at 13 (emphasis added)).

So, in fairness, I am going to allow the parties some time to negotiate a resolution of the amount to be awarded. With expert counsel on both sides, who have skillfully negotiated so many matters in the case, it seems that there are good prospects for agreement. I have started an in-depth review of the parties' submissions on the amount to be awarded, and I would make a few observations. First, Lead Counsel and the PSC are entitled to a significant award for their efforts. While this settlement may strike others as having mere nuisance value, I think otherwise. If the plaintiffs' cases were truly as weak and meritless as the defendants would have me believe, it is a noteworthy achievement to have secured a settlement in the millions. At the same time, the result achieved does not strike me, at this point, as the type of blockbuster award that the PSC doubtless hoped for at the outset of the litigation. The 2003 Committee Notes on Rule 23(h) provide as guidance that the "fundamental focus is the result actually achieved for

class members." Valuation of this settlement is tempered by the fact there will not be a claim pay-out rate of 100% for those participating in the settlement due to the entry criteria into the settlement grid and other factors.

I have also noticed that the defendants make a host of good points in their opposition briefing relating to the amount to be awarded. They offer a number of pointed, accurate, and well-taken observations after scrutinizing and critiquing the individual fee submissions -- vetting admittedly not done by Lead Counsel or perhaps anyone else prior to their submission. Even a cursory review casts doubt on the accuracy and legitimacy of a sizeable portion of the fee requests. Some time entries reflect work done prior to the MDL. Others relate to individual or state cases. There are also the pages of vague time entries devoid of meaningful descriptions.

Taking all of these factors into consideration, this is not a case where the fee and cost award "should be extremely small" as suggested by the defendants. The above considerations, however, along with others that have struck me thus far, would warrant a very substantial reduction in the amount of fees requested by Lead Counsel and the PSC.

I will hold this matter in abeyance until June 5, 2011. In the meantime, counsel are encouraged to discuss in good faith a negotiated resolution of the amount of fees and costs that Lead Counsel and the PSC should receive. I suspect the fee and cost benchmarks found in other MDLs and class actions will provide counsel the guidance necessary to reach an agreed amount. If not, I will do so for them in accord with the Settlement Agreement.

The court DIRECTS the Clerk to file a copy of this order in 2:08-md-1968 and it shall apply to each member Digitek®-related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number

2:11-cv-00274. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at www.wvsd.uscourts.gov.

        ENTER: May 5, 2011

        Joseph R. Goodwin, Chief Judge