# EXHIBIT 6

Digitek-
Amide



Confidential Subject to Protective Order

MLYN 000032383

ATTORNEY-CLIENT PRIVILEGED

Confidential Subject to Protective Order

MLYN 000032384

*Digitek*

# SUPPLY AND DISTRIBUTION AGREEMENT

This Supply and Distribution Agreement ("Agreement") is entered into this 5th day of August, 1999 by and between:

>  Mylan Laboratories, Inc.
>  a Pennsylvania Corporation with an office located at 781
>  Chestnut Ridge Road
>  Morgantown, West Virginia 26505
>
>  and
>
>  Bertek Pharmaceuticals Inc.
>  a Texas Corporation,
>  (hereinafter collectively referred to as
>  "BERTEK") with offices located at
>  3711 Collins Ferry Road
>  Morgantown, West Virginia 26505
>
>  and
>
>  Amide Pharmaceuticals, Inc.
>  a New Jersey corporation,
>  (hereinafter referred to as
>  "AMIDE") with offices located at
>  101 East Main Street
>  Little Falls, New Jersey 07424

WHEREAS, BERTEK develops, manufactures, markets, sells, and distributes pharmaceutical products; and

WHEREAS, AMIDE develops, manufactures, markets, sells and distributes pharmaceutical products; and

WHEREAS, AMIDE wishes to enter into an agreement under which it will exclusively deliver the Products (as hereinafter defined) to BERTEK, for marketing, sale and distribution, and to provide other such rights as may be necessary and desirable to effectuate the purposes of this

{000249 - / 00036817.BKD;2.3} 1

C1D-000262

Confidential Subject to Protective Order

MLYN 000032385

Agreement; and

WHEREAS, BERTEK wishes to enter into such an agreement with AMIDE under which BERTEK will market, sell, and distribute the Products for AMIDE, on an exclusive basis.

WITNESSETH THEREFORE that in consideration of the premises set forth and covenants exchanged herein and for other good and valuable consideration, the sufficiency and receipt of all of which are hereby acknowledged, BERTEK and AMIDE intending to be legally bound agree as follows:

## I.    DEFINITIONS

1.1    "Affiliate(s)" shall mean any corporation, association, company, organization or other entity which directly or indirectly controls, is controlled by or under common control with BERTEK or AMIDE, as the case may be.  For purposes of this definition, control means the ability, directly or indirectly, through ownership of securities, by agreement, or by any other method, to direct more than fifty percent (50%) of the outstanding equity votes of any entity, whether or not represented by securities, or to otherwise control the management decisions of any entity.

1.2    "ANDA(s)" shall mean an abbreviated new drug application for the Products which has been submitted to or approved by the FDA, and which is owned by AMIDE.

1.3    "Bad Debt" shall mean such unrecovered payments for products sold, distributed or delivered by BERTEK, after BERTEK has used its "Commercially Reasonable Efforts" (as hereinafter defined) to collect any and all payments for such Products.

1.4    "BERTEK" as used in this Agreement shall mean BERTEK, Mylan Laboratories, Inc.  and all affiliates and subsidiaries of any related company or entity.

{000249 - / 00036817.BKD;2.3}2

Confidential Subject to Protective Order

MLYN 000032386

1.5 "cGMPs" shall mean Current Good Manufacturing Practices as defined in 21 CFR § 210 et seq., as amended from time to time.

1.6 "Calendar Quarter" shall mean those three (3) month periods beginning on January 1, April 1, July 1, and October 1.

1.7 "Commencement Date" shall mean the date first hereinabove entered.

1.8 "Commercially Reasonable Efforts" shall mean that degree of effort, expertise and resources which a person of ordinary skill, ability and experience in the matters addressed herein would utilize and otherwise apply with respect to fulfilling the obligations assumed hereunder.

1.9 "FDA" shall mean the Food and Drug Administration of the United States.

1.10 "FFDCA" shall mean the Federal Food, Drug and Cosmetic Act, as amended, 21 U.S.C. §301 et seq., and any related federal and/or state law or regulation pertaining to the safety, effectiveness, adulteration, mishandling, packaging, labeling or storage of pharmaceutical ingredients, finished pharmaceutical products, and/or medical devices that may be applicable to the Products during the term of this Agreement.

1.11 "Gross Margin" shall mean Net Sales of the Products less the Manufacturing Cost.

1.12 "Intellectual Property" shall mean patent applications, continuations-in part, divisionals, trade names, trademarks, and trade dress.

1.13 "Law" shall mean any local, state or federal rule, regulation, statute or law relevant to the manufacture, distribution and/or sale of the Products, and to any other matters set forth herein.

1.14 "Losses" shall mean any liabilities, damages, costs or expenses, including reasonable

{000249 - / 00036817.BKD;2.3}3

Confidential Subject to Protective Order

MLYN 000032387

attorneys' fees, incurred by either Party which arise from any claim, lawsuit or other action by a third party.

1.15    "Manufacturing Cost" shall mean AMIDE's actual cost of Raw Material (as hereinafter defined), direct labor and direct overhead.

1.16    "Reduced Residual Due" shall mean the amount of money calculated to be owed by BERTEK to AMIDE which shall equal ten (10%) percent of Net Sales as defined and set forth in 1.17.

1.17    "Net Sales" shall mean:

(a)    with respect to commercial sales of the Products by BERTEK, its agents and Affiliates, the gross amount invoiced therefore, less

(i)    quantity and/or normal and customary cash discounts allowed or taken;

(ii)    freight, postage and insurance related to such sales;

(iii)    credits, rebates and/or adjustments allowed or given by reason of Products expiration dating, rejections or returns, shelf-stock adjustments, retroactive price reductions or programs with wholesalers or other distributors or resellers according to which they are entitled to chargeback rebates, credits or adjustments;

(iv)    rebates, administrative fees, reimbursements or similar payments to or for Medicaid or any other government programs (whether mandated or voluntary), hospitals, health maintenance organizations, insurance carriers, buying groups or other entities in connection with the purchase or utilization of Products; and

{000249 - / 00036817.BKD;2.3}4

Confidential Subject to Protective Order

MLYN 000032388

(v)     Bad Debt (as defined hereinabove).

1.18    "Party" or "Parties" shall mean BERTEK or AMIDE, or both, depending upon the context in which either word may appear.

1.19    "Product" or "Products" whenever used herein shall mean the pharmaceutical product or products either brand or generic identified in Exhibit A.  Each dosage strength shall be considered a separate Product.

1.20    "Raw Material" shall mean  bulk active ingredient digoxin, USP.

1.21    "Reporting Period" shall mean a three-month period.

1.22    "Specifications" shall mean all regulatory, manufacturing, quality control, and quality assurance procedures, processes, practices, standards, instructions and specifications comprising AMIDE's FFDCA approval applicable to the manufacture and packaging of Products as set forth in the ANDA, and such other FDA and/or other regulatory requirements as may be applicable.

1.23    "Territory" shall mean the United States of America, its Territories, Commonwealths and Possessions.

1.24    "Transfer Price" shall mean the prices at which AMIDE sells the Products to BERTEK as set forth in Exhibit B, and such prices shall be equal to AMIDE's Manufacturing Cost.

II.    SCOPE OF AGREEMENT

2.1    Pursuant to the term and conditions set forth herein, AMIDE hereby grants to BERTEK the exclusive right to market, sell, promote and distribute the Products in the Territory. BERTEK shall purchase exclusively from AMIDE any and all such quantities of Products as BERTEK may require to market, sell, promote, and distribute the Products.

2.2    BERTEK shall use its Commercially Reasonable Efforts to market, sell, promote and

{00249 - / 00036817.BKD;2.3} 5

Confidential Subject to Protective Order

MLYN 000032389

distribute the Products (hereinafter collectively "Commercialize") and to implement

programs for such Commercialization in the Territory. Provided however, that BERTEK

shall not be deemed to have failed to abide by or have failed to perform in accordance with

its Commercialization effort if BERTEK is prevented from performing or is hindered in its

performance of any such Commercialization effort by any act or omission of AMIDE or as

permitted under this Agreement.

2.3     BERTEK shall not Commercialize the Products outside the Territory or to any purchaser

or distributee that BERTEK anticipates, or reasonably should anticipate, intends to utilize,

resell or redistribute the Products outside the Territory, without the prior written approval

of AMIDE.

2.4     In the event BERTEK learns or is advised that Products are being utilized, resold or

distributed outside the Territory ("Non-Territorial Use"), BERTEK shall use its

Commercially Reasonable Efforts to identify such third party(ies) responsible for such

Non-Territorial Use. If Bertek identifies such third party(ies) within three (3) business days

of the discovery of such third parties, it shall:

    a.  advise AMIDE of the identity of such third party(ies) in writing; and

    b.  advise such third party(ies) in writing to stop such Non-Territorial Use and

       provide AMIDE a copy of such notification.

2.5     BERTEK shall have the duty to sell Products with BERTEK's Label to Amide's existing

Customer ████████████████ and such continued sales shall not be a breach of

this Agreement. AMIDE may direct and BERTEK shall deliver all Products with

BERTEK's Label to ██████ at the rates in accordance with any contract, agreement or

Confidential Subject to Protective Order

MLYN 000032390

purchase order that may be in existence as of the Commencement Date with ███ a copy

of which is attached hereto as Exhibit D. Amide shall assist BERTEK in negotiations with

███ to establish terms which are consistent with BERTEK's other contract customers.

## III.    FORECASTS AND SUPPLY

3.1    (a)    Both Parties agree to work together closely in order to ensure that sufficient

quantities of the Products are available for Commercialization on and after

BERTEK's receipt of FDA approved, saleable Products from AMIDE.  As soon as

is reasonably practical, but in no case later than thirty (30) days after ANDA

approval, BERTEK shall provide AMIDE with purchase orders setting forth

BERTEK's requirements for the Products to be sold during the first ninety (90)

days of the Product Launch (the "Launch Projection").  Thereafter, but in no case

later than ninety (90) days after ANDA approval, BERTEK shall provide AMIDE

with its second ninety (90) day projection ("2nd Projection") for Products.  AMIDE

shall manufacture one hundred percent (100%) of both BERTEK's Launch

Projection and 2nd Projection.

(b)    As soon as BERTEK can establish a buying pattern, but in no event later than

ninety (90) days after the approval of the ANDA, BERTEK shall provide AMIDE

by the fifteenth (15th) day of every month thereafter for the term of this Agreement

with a twelve (12) month rolling forecast setting forth BERTEK's best estimate of

its requirements of the Products.

(c)    BERTEK shall be required to submit purchase orders equal to and AMIDE shall be

required to produce and supply not less than seventy-five percent (75%) and not

(000249 - / 00036817.BKD;2.3)7

MLYN 000032391

more than one hundred twenty-five percent (125%) of the quantities set forth in purchase orders for any and all Product after the Launch Projection and 2nd Projection.  AMIDE shall use its Commercially Reasonable Efforts, but is not required, to accommodate any increase in the quantity of the Products that BERTEK shall request under new purchase orders.

3.2   In the event of a sudden and unexpected material increase or decrease in the demand for the Products in the marketplace, the Parties shall negotiate in good faith the terms and conditions of any requested increase or decrease by BERTEK in the quantities of Products set forth in BERTEK's most recent purchase orders and its forecasts of its estimated requirements.  For the purposes of this section, a material increase or decrease shall be any change in a particular month's quantity of Product of more than ten percent (10%).

3.3   AMIDE shall not be deemed to be in violation of this Agreement if it cannot obtain Raw Material in sufficient quantities to meet BERTEK's Launch Projection or other purchase orders provided AMIDE has ordered sufficient amounts of Raw Materials to meet BERTEK's Launch Projections, 2nd Projection and other purchase orders.

**IV.   PAYMENTS AND REPORTS**

4.1   (a)   BERTEK shall pay AMIDE the Transfer Price as set forth in Exhibit B for shipments of Products sent by AMIDE to BERTEK, within thirty (30) days from the date of receipt of such Products by BERTEK.  Each shipment shall be accompanied by a certificate of analysis ("COA")  and a packing list and shall be followed within three (3) business days by an invoice which shall reflect the Transfer Price on the date of shipment by AMIDE for each order of the Products.

{000249 - / 00036817.BKD;2.3}8

Confidential Subject to Protective Order

MLYN 000032392

(b)    BERTEK shall remit payment of the Residual Due (as hereinafter defined) within forty-five (45) days after the end of a Calendar Quarter.

(c)    BERTEK shall keep such records as are accurate to determine the payments due AMIDE. Such records shall be retained by BERTEK and shall be made available for reasonable review or audit upon reasonable notice of at least ten (10) business days, at AMIDE's request and expense, by a representative appointed by AMIDE for the purpose of verifying BERTEK's calculation of Residual Due hereunder and of determining the correctness of such calculation and the payments due AMIDE. Such records shall be retained for three (3) years from the date of their origin, or one (1) year after the date of termination of this Agreement, whichever occurs first, but need not be retained more than three (3) years from the date of their origin or more than one (1) year after the date of the termination of this Agreement, whichever is appropriate, or as otherwise required by law. If AMIDE requests an audit, such records shall be retained for one (1) year but need not be retained more than one (1) year after the completion of any audit thereof requested by AMIDE.

4.2    In addition to the Transfer Price, BERTEK shall pay AMIDE thirty five (35%)percent of BERTEK's Gross Margin on the Products. The calculation of Gross Margin and AMIDE's thirty five (35%) percent of the Gross Margin (hereinafter the "Residual Due") shall be paid to AMIDE within forty-five (45) days after the end of a Calendar Quarter. A summary of the calculation of the Residual Due to AMIDE will include Gross Sales of the Products less a summary by category of all returns, credits, rebates, allowances and other debits and credits relevant to the calculation of Gross Margin, actually granted to

{000249 - / 00036817.BKD;2.3}9

Confidential Subject to Protective Order

MLYN 000032393

customers during the period to which the payment relates, or any prior period to the extent

not previously accounted for. Exhibit C, attached hereto, shows an example of the above

calculation for illustration purposes only.

4.3     The Manufacturing Cost will be adjusted when AMIDE's Raw Material cost varies by

more than ten percent (10%) from the cost currently used in the calculation of the

Manufacturing Cost. AMIDE will notify BERTEK of any change in the Manufacturing

Cost, the reason for such change, and provide documentation reflecting such change.

4.4     Notwithstanding section 4.3 hereof AMIDE reserves the right on reasonable notice to

BERTEK to adjust Manufacturing Costs once every twelve (12) months based on changes

to any and all labor, excipients, Raw Material and related component and packaging costs

for Products.

4.5     All payments required to be made to AMIDE under this Agreement shall be made in

United States dollars and may be made by either wire or paper transfer on the due date to

the following address:

> Amide Pharmaceutical, Inc.
> 101 East Main Street
> Little Falls, New Jersey  07424
> Attention: ACCOUNTS RECEIVABLE

or to any other address that AMIDE may advise in writing.

## V.     SHIPPING

5.1     All shipments of Products from AMIDE to BERTEK will be shipped to the destination

specified by BERTEK and will be in accordance with the reasonable instructions for

shipping and packing set forth in the relevant BERTEK purchase order. Delivery shall be

made F.O.B. Destination. Title and risk of loss or damage to the Products shall remain

{000249 - / 00036817.BKD;2.3} 10

MLYN 000032394

with AMIDE until Products are delivered by AMIDE to the destination specified by BERTEK in its purchase order.

**VI.    PRODUCTS TESTING/INSPECTION; MANUFACTURING**

6.1    BERTEK and AMIDE agree to establish standard operating procedures in accordance with the FFDCA and other FDA rules and regulations for the final release of the Products manufactured by AMIDE. Upon reasonable notice by BERTEK to AMIDE, AMIDE shall make available at AMIDE's offices lot history records, testing results, and other documentation created by AMIDE during its usual and customary manufacturing processes, as may be reasonably requested by BERTEK to document compliance with the release specifications, or for quality control or quality assurance purposes.

6.2    AMIDE shall perform quality assurance testing with respect to the Products sold hereunder, including stability testing, so that the Products conform with the Specifications. AMIDE shall provide the results thereof to BERTEK in the form of a Certificate of Analysis (hereinafter "COA"). AMIDE will also assist BERTEK to produce Material Safety Data Sheets (hereinafter "MSDS") as required for the Products, and updates of same as necessary. BERTEK will permit AMIDE's personnel, upon reasonable notice, to visit at reasonable intervals, and for reasonable durations during regular business hours, any BERTEK facility used for the storage, packaging and distribution of the Products and will allow such personnel to review any relevant records in connection therewith. AMIDE will permit BERTEK's personnel, upon reasonable notice of at least ten (10) days, to visit at reasonable intervals, and for reasonable durations during regular business hours, any AMIDE facility used for the manufacture, packaging or storage of the Products and

{00249 - / 00036817.BKD;2.3} 11

Confidential Subject to Protective Order

MLYN 000032395

will allow such personnel to review any relevant records in connection therewith.

6.3     BERTEK shall have a period of thirty (30) days from the later of (a) the date of BERTEK's

receipt of the Products at the BERTEK facility designated in the purchase order, or (b) the

date of BERTEK's receipt of the COA's applicable to such Products, to inspect any

shipment of Products to determine whether such shipment conforms to the Specifications.

If BERTEK determines that the Products do not conform to the Specifications, it shall

notify AMIDE in writing within forty-eight (48) hours of discovery and identify the

alleged non-conformity (hereinafter, "Alleged Non-Conforming Products").  BERTEK's

failure to notify AMIDE within the stipulated period will be deemed, for purposes of this

Agreement, as BERTEK's acceptance of such shipment and shall constitute a waiver of

any claims BERTEK may have against AMIDE with respect to such shipment subject,

however, to BERTEK's right to reject Products for latent defects discovered by BERTEK

or BERTEK's customer(s) after such stipulated period has expired, and also subject to

claims for any Product which is the subject of a recall. BERTEK shall quarantine the

Alleged Non-Conforming Products and AMIDE will have thirty (30) business days to

examine such Alleged Non-Conforming Products.  BERTEK shall thereafter return the

Alleged Non-Conforming Products to AMIDE, at a location designated by AMIDE and at

AMIDE's  expense ("Return Costs"), unless at some point thereafter the Alleged Non-

Conforming Products are determined to be conforming to Specifications pursuant to the

procedures set forth hereinbelow, in which case the Return Costs shall be paid by

BERTEK or credited to AMIDE if AMIDE has already paid the Return Costs.  AMIDE

shall use its Commercially Reasonable Efforts to replace any Alleged Non-Conforming

{000249 - / 00036817.BKD;2.3} 12

Confidential Subject to Protective Order

MLYN 000032396

Products within the shortest possible time. BERTEK shall have no responsibility to AMIDE for the Transfer Prices of non-conforming Products but shall pay AMIDE the Transfer Prices for the replacement Products.

6.4    (a)    In the event AMIDE does not agree with BERTEK's determination that the Products fail to meet Specifications, the Parties shall, in good faith, attempt to resolve such dispute. In the event the Parties cannot resolve said dispute among themselves they shall submit the matter to an independent third party testing laboratory agreeable to both BERTEK and AMIDE for a binding determination, which determination shall be non-appealable by the Parties (the "Final Determination"). The expenses of obtaining the determination shall be paid by the Party whose determination as to the Products was incorrect. If either Party cannot agree to an independent third party testing laboratory the Parties shall each submit three independent laboratories to Lachman Consultant Group of Westbury, New York for the selection of such independent third party laboratory.

(b)    In the event the Final Determination proves the allegedly non-conforming Products are conforming and BERTEK elects not to sell such Products such election shall be made with written notice to AMIDE of such election within ten (10) days after the Final Determination. BERTEK shall pay AMIDE three (3) times the Transfer Price of all rejected Product which BERTEK elects not to sell.

6.5    AMIDE will manufacture, package, label, store, and ship the Products in accordance with Specifications set forth in the ANDA and as such ANDA may be amended from time to time. BERTEK shall be promptly and fully advised of any new instructions or

{000249 - / 00036817.BKD;2.3} 13

MLYN 000032397

specifications required by the FDA or the FFDCA. BERTEK's Quality Control personnel, upon reasonable prior notice to AMIDE, shall be permitted to observe the manufacture of Products being manufactured by AMIDE for BERTEK. In the event that AMIDE cannot manufacture Products in accordance with instructions and Specifications, AMIDE shall promptly so advise BERTEK. AMIDE shall not change any ANDA or Specification without the prior written consent of BERTEK.

6.6     AMIDE will package and label the Products under the BERTEK name and AMIDE shall provide all finished labeling for the Products in accordance with any applicable FDA or other regulatory labeling requirements. With the exception of FDA requirements, BERTEK shall have sole discretion over the format and content of the labeling, and shall provide AMIDE with artwork for such labeling. AMIDE shall be responsible for any required reporting to the FDA or required approvals from the FDA related to the use of the BERTEK name on the labeling.

6.7     (a)     BERTEK and AMIDE agree that it is their intent that AMIDE shall be the manufacturer of Products and that BERTEK or an Affiliate of BERTEK be designated the "Primary Alternate Manufacturers", assuming BERTEK or an affiliate of BERTEK is able to qualify as a manufacturer of Product under FDA rules and regulations ("Qualification"). AMIDE may in its sole and exclusive discretion and at its sole and exclusive costs simultaneously select other alternate manufacturers for the manufacture of Products (hereinafter "Secondary Manufacturers"). However, a Secondary Manufacturer shall only be permitted to manufacture Products in the event that Primary Manufacturer is unable to obtain

{000249 - / 00036817.BKD;2.3}14

Confidential Subject to Protective Order                                                                 MLYN 000032398

Qualification or Primary Manufacturer otherwise is unable or unwilling to manufacture Product.

(b) Within a reasonable period of time following approval of the ANDA, BERTEK and AMIDE agree to begin the process of qualifying BERTEK as the Primary Alternate Manufacturer under the ANDA. AMIDE will be responsible for making any necessary regulatory filings, and BERTEK will provide AMIDE with such reasonable assistance which may be necessary in order to obtain FDA approval. AMIDE agrees to diligently pursue the designation of BERTEK or an Affiliate of BERTEK, as an alternate manufacturing site, and will keep BERTEK apprised of the status of same. BERTEK shall use its Commercially Reasonable Efforts to obtain Qualification.

(c) In the event AMIDE is willing but unable to Manufacture Product due to circumstances, beyond its control, including by way of example and not limitation, a Force Majeure event or unavailability of Raw Material except as set forth in 3.3 hereof (hereinafter "Scenario A"), then in such event, assuming BERTEK has been certified by the FDA as an alternative manufacturer of products, BERTEK shall have the sole and exclusive right to manufacture Products. Notwithstanding Scenario A, BERTEK shall continue to pay AMIDE the Residual Due through the end of the Scenario A event or twelve (12) months, whichever is shorter. Thereafter BERTEK shall pay AMIDE the Reduced Residual Due on any and all Product sold by BERTEK through the termination of expiration of this Agreement, or the extensions hereof, whichever event occurs last. At any time during the first

{000249 - / 00036817.BKD;2.3} 15

MLYN 000032399

twelve (12) months of AMIDE's inability to manufacture Product (the "12 Month Period") AMIDE is able to manufacture Products, AMIDE shall commence manufacturing Products and BERTEK shall cease manufacturing Products. After the "12 Month Period" and in the event AMIDE is able or reasonably anticipates it will be able to manufacture Products within ten (10) months, AMIDE shall give ten (10) months written notice of AMIDE's intent to begin manufacturing Products again. Upon the expiration of the ten (10) month notice period, unless sooner agreed to by BERTEK and AMIDE, AMIDE shall recommence manufacturing Products and BERTEK shall cease manufacturing Products, and the terms of this Agreement shall continue in full force and effect.  If AMIDE commences manufacture of the Products pursuant to this 6.7(c), AMIDE must purchase from BERTEK, at BERTEK's cost, all Raw Materials and components that were purchased by BERTEK for use in the Manufacture of the Products.

(d)    In the event BERTEK or its Affiliate has not obtained Qualification and AMIDE has designated and obtained Qualification for a Secondary Alternate Manufacturer such Secondary Alternate Manufacturer shall immediately commence and continue manufacturing Products for BERTEK until Scenario A is over and AMIDE is able to manufacture Product.  During this Scenario A event and so long as a Secondary Alternate Manufacturer other than BERTEK or its Affiliate is manufacturing Product, BERTEK shall pay AMIDE the Residual Due.

(e)    In the event AMIDE elects for any reason whatever (excluding Scenario A) to not manufacture Products for BERTEK ("Scenario B"),  assuming BERTEK shall have

{000249 - / 00036817.BKD;2.3} 16

Confidential Subject to Protective Order

MLYN 0000324001

been authorized by the FDA to manufacture Product, BERTEK shall have the sole and exclusive right to manufacture Products solely for the purposes set forth herein.  BERTEK shall pay AMIDE the Reduced Residual Due on the sale of any and all Product by BERTEK through the termination or expiration of this Agreement or any renewals hereof, whichever occurs last.

(f)    During Scenario B, BERTEK shall pay AMIDE the Reduced Residual Due of ten (10%) percent and BERTEK shall make all such Reduced Residual Due Payments within forty five (45) days after the end of each Calendar Quarter.

## VII. REGULATORY ISSUES, MEDICAL INQUIRY AND RECALL

7.1    (a)    AMIDE shall remain responsible for maintaining and fulfilling all regulatory requirements in the Territory with respect to the manufacture of Products that are imposed by Law upon AMIDE as the manufacturer of the Products and the holder of the ANDA in connection therewith.  BERTEK shall be responsible for obtaining, maintaining and fulfilling all regulatory requirements in the Territory with respect to the Products that are imposed by Law upon BERTEK in connection with BERTEK's marketing, distribution and sale of the Products.  Each Party will, on a timely basis, provide the other Party with all information that is reasonably necessary and relevant to assist such Party in fulfilling its regulatory obligations.

(b)    BERTEK and AMIDE shall cooperate in the reporting of adverse drug experience information and other post marketing reports as are required to be filed with the FDA or its equivalent.  BERTEK shall refer or submit to AMIDE all adverse drug experience reports and other medical inquiries or quality complaints associated

{000249 - / 00036817.BKD;2.3} 17

Confidential Subject to Protective Order

MLYN 000032401

with the Products within forty-eight (48) hours of BERTEK's receipt of such reports. All telephone calls received shall be referred to AMIDE. AMIDE will be responsible for fulfilling any regulatory requirements with respect to such events, including but not limited to the filing of all Form FD 2253's, contact and follow-up with the patient or reporter of the event, and will make any necessary contact with the FDA regarding the subject matter of same.

7.2 AMIDE shall be responsible for filing and maintaining all documentation and other information as required by each and every state and locality (hereinafter "State") for the purpose of listing the Products on each such State's formulary or other similar authority, and for obtaining such other approvals as may be necessary to sell the Products in the Territory. BERTEK shall provide AMIDE with such assistance as reasonably necessary to obtain such listings. AMIDE shall designate BERTEK its authorized representative solely for the purpose to obtain authorization for Product listing on each State's formulary or other State Authority at BERTEK's sole cost and expense. BERTEK shall permit and AMIDE shall be allowed to assist in and attend State formulary or other State Authority meetings. BERTEK shall indemnify AMIDE for any and all claims arising from any BERTEK statements or representation made to such State's formulary or other State Authorities.

7.3 In the event BERTEK or AMIDE shall be required or requested by any governmental authority (or shall voluntarily decide) to recall any Products because such Products may violate any Laws or for any other reason, the Parties shall cooperate fully with one another in connection with any recall. If a recall is due to AMIDE's negligence, willful misconduct

{000249 - / 00036817.BKD;2.3} 18

Confidential Subject to Protective Order

MLYN 00003240

or breach of this Agreement, AMIDE shall reimburse BERTEK for the Transfer Prices paid by BERTEK for such recalled Products, any monies paid to AMIDE from the Residual Due, Reduced Residual Due and all of the reasonable costs and expenses actually incurred by BERTEK in connection with the recall including, but not limited to, costs of retrieving Products already delivered to customers, costs and expenses BERTEK is required to pay for notification, shipping and handling charges, and such other costs as may be reasonably related to the recall. If a recall is due to BERTEK's negligence, willful misconduct or breach of this Agreement, BERTEK shall remain responsible for the Transfer Prices for such recalled Products and shall reimburse AMIDE for all the reasonable costs and expenses described above actually incurred by AMIDE in connection with such recall including administration of the recall and such other actual costs as may be reasonably related to the recall. If a recall results from a cause other than the negligence, willful misconduct or breach of this Agreement of or by BERTEK or AMIDE, the Parties shall share equally, all of the costs of the recall, including the Transfer Price. Prior to any reimbursements pursuant to this Section, the Party claiming any reimbursement shall provide the other Party with reasonably acceptable documentation of all reimbursable costs and expenses.

7.4    Notwithstanding anything to the contrary set forth in this Agreement, BERTEK shall have the right, without AMIDE's prior approval, and in accordance with any and all FDA requirements to promote and publicize the Products in its customary fashion, and may publicize such information about the Products as it usually and customarily provides for its own Products utilizing its usual and customary channels of communication, and its

Confidential Subject to Protective Order

MLYN 000032403

standard forms, which may be revised from time to time ("Marketing and Promotion Information") BERTEK agrees to provide AMIDE within a reasonable period of time, copies of any and all Marketing and Promotion Information. AMIDE shall not distribute any promotional materials that relate to BERTEK or its products without the prior written consent of BERTEK.

## VIII. TERM AND TERMINATION

8.1    (a)    The initial term of this Agreement shall begin on the Commencement Date and shall end ten (10) years after the date of the FDA approval of AMIDE'S ANDA. BERTEK may renew for a two (2) year extended term upon written notice to AMIDE not more than ninety (90) days prior to the end of the initial term. Thereafter the Agreement shall automatically renew at the end of any extended term for additional two (2) year extensions unless BERTEK provides AMIDE with written notification not more than ninety (90) days prior to the end of any such extended term of its intention not to renew.

        (b)    In the event that AMIDE elects to not manufacture Product as provided for herein, or this Agreement terminates pursuant to Section 8.2(b), assuming BERTEK has been authorized by the FDA to manufacture Products, BERTEK shall have the right to manufacture the Products under AMIDE'S ANDA, as set forth in Section 6.7 through the balance of the initial term and the renewals thereof and BERTEK shall pay AMIDE during such time the Reduced Residual Due on any and all Products.

        (c)    At any time during this Agreement or any renewals hereof BERTEK elects not to

{000249 - / 00036817.BKD;2.3}20

Confidential Subject to Protective Order

MLYN 00003240

renew this Agreement, AMIDE may request and BERTEK shall transfer the Trademark(s) used by BERTEK during this Agreement and pursuant to the terms of the Trademark License Agreement attached hereto as Exhibit E.

8.2    (a)     If either Party shall at any time materially fail to abide by or fail to perform in accordance with any of the material provisions of this Agreement, the other Party shall have the right to terminate this Agreement upon forty-five (45) days' written notice to the allegedly defaulting Party specifying the default complained of (the "Default"), setting forth the underlying reasons for its belief regarding the Default and the remedy the non-defaulting Party demands. The Party allegedly in default may cure the asserted breach or commence litigation pursuant to Article XV within the notice period; provided, however, that before a Party shall commence a lawsuit, the Parties shall meet and in good faith attempt to resolve the dispute. If litigation is commenced, the Agreement shall continue in full force and effect as if the alleged breach had not occurred, pending the outcome of such litigation, unless the Default is relating to a breach by BERTEK of sections 4.1(a), 4.1(b), 11.2(e) or 11.2(f), in which case AMIDE shall have the right to discontinue the manufacture and supply of Products to BERTEK.

   (b)     If either Party (i) institutes or has instituted against it any insolvency, receivership, Chapter 7 bankruptcy or other proceedings for the settlement of that Party's debts, and such proceedings are not dismissed within sixty (60) days, (ii) makes an assignment for the benefit of creditors, or (iii) dissolves or ceases to do business, the other Party may terminate this Agreement without notice.

{000249 - / 00036817.BKD;2.3}21

Confidential Subject to Protective Order

MLYN 000032405

(c)     In the event that AMIDE on more than one (1) instance within a twelve (12) month period fails to manufacture Products within sixty (60) days after such Products are ordered, and AMIDE's failure is not attributable to non-availability of Raw Material or a Force Majeure Event then AMIDE immediately shall cure or transfer the manufacture of Product to the Primary Alternate Manufacturer facility under AMIDE'S ANDA. With the limited exception of the unavailability of Raw Material, while any issue is awaiting determination by Court proceedings, BERTEK shall not be without its required supply of Products.

8.3     Termination of this Agreement for any reason shall be without prejudice to:

(a)     AMIDE's right to receive all payments due from BERTEK, including by way of example and not limitation, Transfer Prices, Residual Due and Reduced Residual Due, as of the last receipt of any sale proceeds from Products by BERTEK;

(b)     BERTEK's right to receive all payments due from AMIDE as of the effective date of such termination;

(c)     BERTEK's right to sell such Products remaining in its inventory and at BERTEK's option, BERTEK may elect to sell Products for which purchase orders have been submitted to AMIDE; and

(d)     Any other legal, equitable, or administrative remedies as to which either Party is or may become entitled.

8.4     In the event of a breach by BERTEK under Sections 4.1(a), 4.1(b), 4.2 and 11.2(f), and after receipt of the required notice of breach from AMIDE, which alleged breach BERTEK fails to cure within the time period and conditions set forth in Section 8.2(a), BERTEK shall immediately undertake any and all actions necessary at BERTEK's sole cost and

{000249 - / 00036817.BKD;2.3}22

MLYN 000032406

expense, to transfer any and all Trademark name(s) used by BERTEK for sale of Products by BERTEK.

8.5 (a) After six months from the date of the execution of this Agreement and thereafter until such time as AMIDE receives approval of the ANDA which must contain an AB Rating to the referenced product Lanoxin®, BERTEK may elect, in its sole discretion, to terminate this Agreement, regardless of the cause for such failure of AMIDE to obtain approval. BERTEK shall advise AMIDE of its election to terminate this Agreement pursuant to this section upon thirty (30) days written notice to AMIDE. This Termination provision shall cease and become of no further effect upon AMIDE's approval as set forth in Section 8.5(a).

(b) Notwithstanding anything to the contrary set forth in this Agreement, in the event BERTEK terminates this Agreement pursuant to Section 8.5(a), it shall not be prevented from developing or otherwise acquiring a digoxin product for manufacture, use and sale both in and outside the Territory. Further, in the event of a termination pursuant to 8.5(a) hereof, BERTEK shall have no obligation to grant to AMIDE any right to the Trademark(s), and AMIDE specifically acknowledges it shall not be entitled to such Trademark(s).

## IX. INDEMNIFICATION, INSURANCE AND TRADEMARK

9.1 BERTEK agrees to indemnify, defend and hold AMIDE harmless from and against any Losses resulting from or arising out of BERTEK's storage, handling, marketing, promotion, distribution, commercialization, and/or delivery of the Products; the execution by BERTEK of this Agreement, the performance or breach by BERTEK of its

{000249 - / 00036817.BKD;2.3} 23

Confidential Subject to Protective Order

MLYN 00003240

representations, warranties or obligations under this Agreement or the negligence or willful misconduct of BERTEK, its employees or its agents (collectively "BERTEK Activities"), except to the extent such Losses result from AMIDE Activities (as defined in Section 9.2).

9.2　AMIDE agrees to indemnify, defend and hold BERTEK harmless from and against any Losses resulting from or arising out of AMIDE's design, manufacturing, testing, packaging, storing, handling, and labeling of the Products, the execution by AMIDE of this Agreement, the performance or breach by AMIDE of its representations, warranties or obligations under this Agreement, (including but not limited to, claims that the sale of the Products in the Territory infringes the Intellectual Property rights of a third party) or the negligence or willful misconduct of AMIDE, its employees or its agents (collectively "AMIDE Activities"), except to the extent such Losses result from BERTEK Activities (as defined in Section 9.1).

9.3　A Party seeking indemnification ("Indemnified Party") shall notify, in writing, the other Party ("Indemnifying Party") within fifteen (15) days of the assertion of any claim or discovery of any fact upon which the Indemnified Party intends to base a claim for indemnification.  An Indemnified Party's failure to so notify the Indemnifying Party shall not, however, relieve such Indemnifying Party from any liability under this Agreement to the Indemnified Party with respect to such claim except to the extent that such Indemnifying Party is actually denied, during the period of delay in notice, the opportunity to remedy or otherwise mitigate the event or activity(ies) giving rise to the claim for indemnification and thereby suffers or otherwise incurs additional liquidated or other

{000249 - / 00036817.BKD;2.3}24

Confidential Subject to Protective Order

MLYN 000032408

readily quantifiable damages as a result of such failure. The Indemnifying Party, while

reserving the right to contest its obligations to indemnify hereunder, shall be responsible

for the defense of any claim, demand, lawsuit or other proceeding in connection with

which the Indemnified Party claims indemnification hereunder. The Indemnified Party

shall have the right at its own expense to participate jointly with the Indemnifying Party in

the defense of any such claim, demand, lawsuit or other proceeding, but with respect to

any issue involved in such claim, demand, lawsuit or other proceeding with respect to

which the Indemnifying Party has acknowledged its obligation to indemnify the

Indemnified Party hereunder, the Indemnifying Party shall have the right to select counsel,

settle, try or otherwise dispose of or handle such claim, demand, lawsuit or other

proceeding on such terms as the Indemnifying Party shall deem appropriate, subject to

prior written approval of the Indemnified Party, which shall not be unreasonably withheld.

9.4   <u>Insurance</u>. Each Party shall, throughout the term of this Agreement, obtain and maintain at

its own cost and expense from a qualified insurance company, comprehensive general

liability insurance, including standard Products liability insurance designating the other

Party as an additional insured. Such policy shall provide protection against any and all

claims, demands and causes of action arising out of any defects, alleged or otherwise, of

the Products or any material used in connection therewith or any use thereof. The amount

of coverage shall be a minimum of Five Million Dollars ($5,000,000.00) combined single

limit coverage, for each occurrence for bodily injury and/or for property damage. Each

Party agrees to furnish the other Party a certificate of insurance evidencing such insurance

upon request and the insured Party shall not at any time manufacture, offer for sale, sell,

{000249 - / 00036817.BKD;2.3}25

Confidential Subject to Protective Order

MLYN 0000324C

ship or distribute Products or otherwise act pursuant to this Agreement unless such insurance is in effect.

9.5    Trademark.  AMIDE acknowledges that BERTEK will market and promote the Products under a trademark, to be selected and owned by BERTEK ("Trademark").  BERTEK shall be responsible for obtaining and maintaining such Trademark registration.  AMIDE shall not use the Trademark or any mark confusingly similar, except in the manner authorized by BERTEK.  AMIDE acknowledges and agrees that nothing in this Agreement is intended to, nor shall it, convey any rights in such Trademark to AMIDE, either in the Territory or elsewhere.

## X.    CONFIDENTIAL INFORMATION

10.1    Confidential Information is defined by and subject to the provisions of that Secrecy Agreement ("S.A.")  entered into between  Mylan Pharmaceuticals, Inc.  and AMIDE on December 15, 1997, which is incorporated herein by reference and attached hereto as Exhibit E, and which shall be amended as follows:

(a)    The Parties of the Confidential Agreement shall be amended to include BERTEK Pharmaceuticals, Inc. and its Affiliates as defined in the Agreement and not the S.A. and Mylan Laboratories, Inc.;

(b)    The term of the S.A. shall run from December 15, 1997 through the expiration or termination of this Agreement plus five (5) years from the latest date on which information (as defined in the S.A.) is disclosed to the other Parties.

(c)    The Governing Law provision in Section XIV shall be eliminated and the provisions in the Agreement shall control.

{000249 - / 00036817.BKD;2.3}26

Confidential Subject to Protective Order

MLYN 000032410

Neither BERTEK nor AMIDE shall issue any press release or public announcement with respect to the Agreement without the prior consent of the other as to the form and content of such release, except as such release or announcement may be required by Law.

10.2 If either Party determines that a release of information concerning this Agreement is required by Law, it shall notify the other in writing at least ten (10) days (or such shorter period where legally required) before the time of the proposed release. Such notice shall include the exact text of the proposed release and the time and manner of the release. At the other Party's request, and before the release, the Party desiring to release further information shall consult with the other Party on the necessity for the disclosure and the text of the proposed further disclosure. In no event shall a release include more information regarding the existence or terms of this Agreement than is required by Law. BERTEK and AMIDE recognize that in addition to the other exceptions set forth herein, disclosure of this Agreement to IRS and other tax authorities is likely to be required, and BERTEK and AMIDE each waives the requirements of this subsection with respect to disclosure to such entities.

## XI.    REPRESENTATIONS AND WARRANTIES

11.1 <u>Representations and Warranties by AMIDE</u>. AMIDE hereby represents and warrants to BERTEK as follows:

   (a)    AMIDE is a corporation duly organized and validly existing under the laws of the State of New Jersey;

   (b)    AMIDE has the requisite corporate authority to execute and deliver this agreement and to perform its obligations hereunder;

{000249 - / 00036817.BKD;2.3}27

Confidential Subject to Protective Order

MLYN 000032411

(c)      Any Products delivered by AMIDE to BERTEK shall, at the time of shipment have

been manufactured, packaged, stored and shipped by AMIDE in conformity with

CGMPs, Specifications, and any other applicable Laws, and shall not be

adulterated, misbranded or otherwise violative of the FFDCA or other applicable

Laws;

(d)      With the exception of AMIDE's current customer ▮▮▮▮▮▮▮▮▮▮▮▮ the

execution and performance of AMIDE's obligations hereunder, are not and will not

be in violation of or in conflict with any obligation, contract or agreement it may

have with any third party, including but not limited to ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

(e)      AMIDE is not debarred and AMIDE has not and will not use in any capacity the

services of any person debarred under subsection 306(a) or (b) of the Generic Drug

Enforcement Act of 1992. If at any time this representation and warranty is no

longer accurate, AMIDE shall immediately notify BERTEK of such fact;

(f)      AMIDE has and will maintain throughout the term of this Agreement all permits,

licenses, registrations and other forms of governmental authorization and approval

as required by Law in order for AMIDE to execute and deliver this Agreement and

to perform its obligations hereunder in accordance with all applicable Laws;

(g)      To the best of AMIDE's knowledge and belief, there are no investigations, adverse

third party allegations or actions, or claims against AMIDE, including any pending

or threatened action against AMIDE in any court or by or before any governmental

body or agency, with respect to the Products, or its obligations set forth herein

{000249 - / 00036817.BKD;2.3}28

Confidential Subject to Protective Order

MLYN 00003241

which may materially adversely affect AMIDE's ability to perform its obligations under this Agreement, except as to a certain FDA Consent Decree dated March 25, 1992, a copy of which has been furnished to Bertek and which Bertek acknowledges receipt; and

(h)     To the best of AMIDE's knowledge, the manufacture, use or sale of the Products in the Territory will not infringe the Intellectual Property rights of any third party.

11.2    Representations and Warranties by BERTEK.  BERTEK hereby represents and warrants to AMIDE as follows:

(a)     BERTEK is a corporation duly organized and in good standing under the laws of the State of Texas;

(b)     BERTEK has the requisite corporate authority to execute and deliver this Agreement and to perform its obligations hereunder;

(c)     The execution and performance of BERTEK's obligations hereunder, are not and will not be in violation of or in conflict with any obligations, contracts or agreements it may have with any third party;

(d)     BERTEK is not debarred and BERTEK has not and will not use in any capacity the services of any person debarred under subsections 306(a) or (b) of the Generic Drug Enforcement Act of 1992.  If at any time this representation and warranty is no longer accurate, BERTEK shall immediately notify AMIDE of such fact; and

(e)     BERTEK has and will maintain throughout the term of this Agreement all federal, state and local permits, licenses, registrations and other forms of governmental authorization and approval as required by Law in order for BERTEK to execute

{000249 - / 00036817.BKD;2.3}29

Confidential Subject to Protective Order

MLYN 000032413

and deliver this Agreement and to perform its obligations hereunder in accordance with all applicable Laws.

(f)    BERTEK shall not during the terms of this Agreement and any renewals hereof and for a period of not less than two (2) years after the termination, non-renewal or natural expiration of this Agreement, file an ANDA for digoxin.

(g)    BERTEK shall not during the term of this Agreement and any renewals thereof and for a period of not less than two years after the termination, non-renewal or natural expiration, pursue the development of, develop, or create an ANDA for Products, or manufacture,   distribute, sell, advertise for sale Products outside of the Territory.

(h)    BERTEK shall share equally in any and all costs and expenses including attorneys fees, and may join in the defense of any actions or intellectual property claims arising from the tradenames selected for the Product and brought by a manufacturer, creator or developer.

11.3    BERTEK and AMIDE, in performing their obligations hereunder shall materially comply with all applicable Laws.  In the event AMIDE receives notice of an inspection or other notification by a governmental entity, including FDA,  relating to the Products, promotional materials or other matters within the scope of this Agreement, AMIDE shall notify BERTEK on the same day such notice or notification is received, and provide to BERTEK, within seventy-two (72) hours, copies of all relevant documents, including FDA Forms 482, 483 warning letters and other correspondence and notifications relating to Products, as BERTEK may reasonably request.  BERTEK and AMIDE agree to cooperate with each other during any inspection, investigation or other inquiry by FDA or any other

{000249 - / 00036817.BKD;2.3}30

MLYN 000032414

governmental entity, including providing information and/or documentation, as requested by FDA or other governmental entity. AMIDE and BERTEK also agree to discuss any response to observations or notifications received and to give the other Party an opportunity to comment on any proposed response before it is made. In the event of disagreement concerning the form or content of such response, however, AMIDE shall be responsible for deciding the appropriate form and content of any response with respect to any of its cited activities and BERTEK shall be responsible for deciding the appropriate form and content of any response with respect to any of its cited activities.

## XII. NOTICES

12.1    Any notices or reports required or permitted under this Agreement shall be deemed to have been given for all purposes if mailed by first class certified or registered mail or transmitted electronically by facsimile with mailed confirmation copy to the following address of either Party:

For BERTEK:       BERTEK Pharmaceuticals Inc.
                  781 Chestnut Ridge Road
                  Morgantown, WV 26505
                  Attn:   William W. Richardson
                          President

For AMIDE:        Amide Pharmaceutical, Inc.
                  101 East Main Street
                  Little Falls, New Jersey 07424
                  Attn:   Chandu Patel
                          President and CEO

or to such other addresses as shall have been subsequently furnished by written notice to the other Party.

## XIII. GOVERNING LAW AND PARTIES BOUND

{000249 - / 00036817.BKD;2.3}31

Confidential Subject to Protective Order

MLYN 00003241

13.1  Parties Bound.  This Agreement shall be binding upon and inure to the benefit of the

Parties and their successors and assigns.  This Agreement and the rights granted herein

may not be assigned by either Party without the prior written consent of the other Party

except to a successor or assignee of all or substantially all of one party's business or assets.

## XIV.  FORCE MAJEURE

14.1  If either Party is prevented from complying, either totally or in part, with any of the terms

or provisions set forth herein, by reason of Force Majeure, including, by way of example

and not of limitation, fire, flood, explosion, storm, strike, lockout or other labor dispute,

riot, war, rebellion, accidents, acts of God, acts of governmental agencies or

instrumentalities (including, but not limited to, lack of a sufficient governmentally-

mandated quota of the Products) or any other cause or externally induced casualty beyond

its reasonable control, whether similar to the foregoing contingencies or not, said Party

shall provide written notice of same to the other Party.  Said notice shall be provided

within five (5) business days of the occurrence of such event and shall identify the

requirements of this Agreement or such of its obligations as may be affected and to the

extent so affected, said obligations shall be suspended during the period of such disability.

The Party prevented from performing hereunder shall use Commercially Reasonable

Efforts to remove such disability, and shall continue performance whenever such causes

are removed.  The Party so affected shall give to the other Party a good faith estimate of

the continuing effect of the Force Majeure condition and the duration of the affected

Party's nonperformance. Upon BERTEK's receipt of the notice of AMIDE pursuant to this

Article, BERTEK may elect to manufacture Products as provided herein and as otherwise

{000249 - / 00036817.BKD;2.3}32

Confidential Subject to Protective Order

MLYN 000032416

set forth in paragraph 6.7(c).

## XV.   NO ORAL MODIFICATIONS

15.1    No change, modification, amendment or waiver of any obligation, term or provision

contained herein shall be valid or enforceable unless same is reduced to writing and signed

by a duly authorized representative of each of the Parties to be bound hereby.

## XVI. INDEPENDENT CONTRACTORS

16.1    This Agreement shall not constitute or give rise to any employer-employee, agency,

partnership or joint venture relationship among or between the Parties, and each Party's

performance hereunder is that of a separate, independent entity.

## XVII. NO IMPLIED RIGHTS

17.1    Nothing in this Agreement shall be deemed or implied to be the grant by one Party to the

other of any right, title or interest in the Products, Intellectual Property or any other

proprietary right of the other except as is expressly provided for herein.

## XVIII. SEVERABILITY

18.1    To the extent any provision or term set forth herein is or becomes unenforceable by

operation of Law, such unenforceability shall not affect the remaining provisions of this

Agreement.  The Parties agree to renegotiate in good faith any provision or term held to

unenforceable and to be bound by the mutually agreed substitute provision.

## XIX. MODIFICATION BY OPERATION OF LAW

19.1    If any of the terms or provisions of this Agreement are in or come into conflict with any

applicable Law within the Territory, then such term or provision shall be deemed

inoperative to the extent it may conflict therewith and shall be deemed to be modified to

{000249 - / 00036817.BKD;2.3}33

Confidential Subject to Protective Order

MLYN 00003241

conform with such Law unless such modification would render the affected provision inconsistent with or contrary to the intent of the Parties.  However, in the event the terms and conditions of this Agreement are materially altered as a result of this subsection, the Parties shall in good faith attempt to renegotiate said terms and conditions to resolve any disputes related thereto.  Should they be unable to agree on suitable substitute language, the issue shall be referred to arbitration pursuant to Article XV.

## XX.  CAPTIONS

20.1    Article and section headings are provided for convenience only and are not to be used in construing the intent of the Parties.

## XXI.  SURVIVORSHIP

21.1    The provisions of Sections 2.4, IV, 6.1, 6.2, 6.3, 6.4, VII, IX, X, XI, XII, XIII, XV survive any expiration or termination of this Agreement.

## XXII.  ENTIRE AGREEMENT

22.1    This instrument, including the Secrecy Agreement and the Exhibits attached hereto, contains the entire agreement between the Parties and supersedes all prior drafts or understandings.

## XXIII.  WAIVER

23.1    The waiver by either Party to this Agreement of a breach of any provision set forth herein or of any right contained herein shall not operate as or be construed as a continuing waiver or a waiver of any subsequent breach or right granted herein.

## XXIV.  SINGULAR AND PLURAL

{000249 - / 00036817.BKD;2.3}34

Confidential Subject to Protective Order

MLYN 00003241

24.1   The singular form of any noun or pronoun shall include the plural when the context in

which such a word is used is such that it is apparent the singular is intended to include the

plural or vice versa.

## XXV.  COUNTERPARTS

25.1   This Agreement may be executed in two (2) counterparts each of which is to be considered

an original and taken together as one and the same document.

## XXVI.  DOCUMENT PREPARATION

26.1   The Parties acknowledge that this Agreement is a product of negotiations and that no

inference should be drawn regarding the drafting or preparation of this document.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in

duplicate by their duly authorized representatives in the places provided below:

BERTEK PHARMACEUTICALS INC.          AMIDE PHARMACEUTICAL, INC.

By _____          By _____

Title President and CEO                Title  PRESIDENT

Date  August 5, 1999                   Date  8/5/99

MYLAN LABORATORIES INC.

By _____

Title  Senior Vice President

Date  August 5, 1999

{000249 - / 00036817.BKD;2.3}35

Confidential Subject to Protective Order

MLYN 00003241

EXHIBIT A

PRODUCTS

| Product Name | Strength | Bottle Size | NDC No. |
|---|---|---|---|
| Digoxin Tablets, USP | 0.125mg | 100 | 62794-145-01 |
| | | 1,000 | 62794-145-10 |
| | | 5,000 | 62794-145-56 |
| Digoxin Tablets, USP | 0.25mg | 100 | 62794-146-01 |
| | | 1,000 | 62794-146-10 |
| | | 5,000 | 62794-146-56 |

{000249 - 00008 / 00038356.DOC;1}

Confidential Subject to Protective Order

MLYN 000032420

## EXHIBIT B

### TRANSFER PRICE

| Product Name | Strength | Bottle Size | NDC No. | Price |
|---|---|---|---|---|
| Digoxin Tablets, USP | 0.125mg | 100 | 62794-145-01 | $ 1.24 |
| | | 1,000 | 62794-145-10 | $10.51 |
| | | 5,000 | 62794-145-56 | $51.23 |
| Digoxin Tablets, USP | 0.25mg | 100 | 62794-146-01 | $1.40 |
| | | 1,000 | 62794-146-10 | $12.14 |
| | | 5,000 | 62794-146-56 | $59.77 |

{000249 - 00008 / 00038356.DOC;1}

Confidential Subject to Protective Order

MLYN 00003242

## EXHIBIT C
## RESIDUAL DUE CALCULATION

|  | Dollars | Units |
|---|---|---|
| Gross Sales | X | X |
| Less: | | |
| Customer Performance Rebates | X | |
| Chargebacks | X | |
| Other Rebates | X | |
| Government Rebates | X | |
| Sales and Quantity Discounts | X | |
| Other Discounts | X | |
| Physical Returns: | | |
| From customer and returned into inventory | X | X |
| From customer and destroyed | <u>X</u> | <u>X</u> |
| Net Sales | X | X |

|  | |
|---|---|
| Net Sales | X |
| Less Transfer Price | X |
| Gross Margin | X |
| Times ~~30%~~ 35% | X |
| Residual Due | X |

{000249 - 00008 / 00038356.DOC;1}

Confidential Subject to Protective Order

MLYN 000032422

**EXHIBIT D**

{000249 - 00008 / 00038356.DOC;1 }

Confidential Subject to Protective Order

MLYN 000032423

REQUEST FOR QUOTATION - NOT AN ORDER -
FROM: 0555 AMIDE PHARMACEUTICALS INC.

| QUANTITY | DESCRIPTION UNIT | STOCK # | UNIT PRICE | MFR TRADE NAME | CASE LOT |
|----------|------|---------|------------|----------------|----------|
| 2029 | DIGOXIN TABLETS USP 0.25 MG (6) | | | | |
| 70,000 | 100/BT | 42228 | $  3.30 | Digoxin Tab 0.25 mg | 24 X C |
| 30 | 5000/BT | 42240 | $125.50 | | 12 X5M |
| 300 | 100/BX UD | 42261 | $  8.95 | | --- |

* * * Also Available Digoxin Tablets 0.125 mg

Prices:  100's        $   3.30

         1000's       $  26.25

         5000's       $ 125.50

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1/12/96

Additional Quotation

Digoxin Tablets 0.5 mg

Prices:  100's        $   5.25

06/07/99  MON 12:32  [TX/RX NO 7662]

Confidential Subject to Protective Order

MLYN 00003242

DATE; February 16, 1996
REF: Agreement # 0555-99-M-5

Mr. Chandu Patel
President
Amide Pharmaceuticals
101 E. Main St.
Little Falls, NJ 07414

## ADDITION TO AGREEMENT

This is to confirm changes in Agreement as established with Mr. Bharat Patel on January 12, 1996.   Except as specifically modified by this Amendment, all terms and conditions of the existing Agreement shall remain in full force and effect.

EFFECTIVE DATE;                                      EXPIRATION DATE;
March 1, 1996                                         December 31, 1998

| | Digoxin Tablets USP; | | | | Case Size; |
|---|---|---|---|---|---|
| 2027 | 0.125 mg | 100 | $3.30 | #145-02 | 24 |
| | | 1,000 | 26.25 | -05 | 24 |
| | | 5,000 | 125.50 | -06 | 12 |
| 2029 | 0.25 mg | 100 | 3.30 | #146-02 | 24 |
| | | 1,000 | 26.25 | -05 | 24 |
| | | 5,000 | 125.50 | -06 | 12 |
| | | 100UD | 8.95 | -00 | 1 |
| | 0.5 mg | 100 | 5.25 | #147-02 | 24 |

Subject to  approval and product acceptability' per Program Region.



Purchasing Agent

Page 1 of 1

08DOH-65 (1-95)

MLYN 0000324

Confidential Subject to Protective Order

Sent by: AMIDE PHARMACEUTICAL, INC.          973 890 7980;          06/07/99 12:55PM;JetFax_#61; Page 4/14

06/07/99  MON 12:32  [TX/RX NO 7662]

Confidential Subject to Protective Order

MLYN 000032426

Confidential Subject to Protective Order

MLYN 000032427

## INSTRUCTIONS FOR SUBMITTING QUOTATIONS

To facilitate the completion of the documents necessary for submission of a Request for Quotation to the ████████████ ████████████████████ please follow these instructions.

Terms and Conditions:  Our Requests for Quotation identify terms and conditions issues that need to be addressed.  We will consider alternatives but must know the details of any exceptions desired.  Awards and Acceptances will be issued on Program documents to reflect mutually agreeable terms and conditions.

Single & Multi-Source Products:  Requests for Quotation are designated accordingly.
   "Single Source" products may be considered for potential therapeutic interchangeability.  Only those offered on a long term basis will be considered. Decisions on acceptability and interchangeability are reserved to the Program.

   "Multi-Source" products; The Program's intention is to standardize on particular manufacturers' products and commit to purchase  substantially all its requirements reflected by the usage estimates contained in Requests for Quotations or otherwise confirmed during the period of Agreements. Offers of economically advantageous alternatives and quantities are encouraged, including quantity withdrawals, bulk packaging, alternative dosage forms, and different periods of Agreement. Mere price quotations without commitment to supply are of little value.  Awards as primary sources of supply will be limited to proposals with supply commitments.

KPMCP/RFQ INSTR (5/95)                    1

06/07/99  MON 12:32  [TX/RX NO 7862]

Confidential Subject to Protective Order

MLYN 00003242

## Packaging:

"Unit of Use" packaging where particularly desired by the Program is designated with a "(6)" at descriptions for Multi-Source Items. Packaging specifications that differ from the Program's will be considered.

Injectables: Injectables must be identified as ampules of vials, single or multi-dose, lyophilized, or in solution, with diluents and preservatives identified. Multi-Source items where this information is required are designated with a "(1)" at the end of descriptions.

Unit Dose: Controlled Substances: Reverse numbered packaging is preferred if available. Quotations should be identified as "RNP" where applicable.

OTC Labelling: If over the counter labelling is available please specify accordingly.

### FORMAT FOR REPLIES:

ONLY QUOTATIONS SUBMITTED ON THE FORMS WE PROVIDE WILL BE CONSIDERED. Additional material may be included if necessary to supplement responses.

Prices: Price Quotations must be expressed in terms of the units specified on the enclosed forms (not multiples) and entered on the Program documents supplied. Only two places of decimals will be considered operative. Shipping requirements must be signified as quantities of these units in the "Case Lot" column (Example: 12, 24, 144 etc). "Case" quantities will not be considered mandatory for ordering purposes, unless so specified.

Units: Abbreviations used are as follows;

| | | | | | |
|---|---|---|---|---|---|
| /BT | Bottle | /ML | Milliliter | /BX | Box (unit dose) |
| /CS | Case | /DS | Dose | | 1/Gm, or 1/G One Gram |

Product Codes and Stock Numbers: NDC numbers are needed for all items quoted. Price lists that include this information for each stock keeping unit can be supplied as addenda to satisfy this requirement.

Confidential Subject to Protective Order

MLYN 0000324?

Sent by: AMIDE PHARMACEUTICAL, INC.    973 890 7980;    06/07/99 12:57PM; JetFax #61; Page 8/14

<u>Manufacturer Identification</u>: WHERE DIFFERENT FROM THE SUPPLIER SUBMITTING QUOTATIONS, the identity of the manufacturer of the finished dosage form must be shown in the designated column of the Request for Quotation. If Sellers have trade names that apply to Multi-Source quotations offered, include them for each product offered.

<u>Returns</u>:  Suppliers' returns policies and procedures for outdated and other material must be provided as part of quotations and summarized in the Request for Quotation forms if they differ from those we propose.

The preferred arrangement is to return all material that is out of date, or for other reasons unusable,  without formalities or prior authorization (Exceptions: recalls, defective products, ordering or shipping errors). In lieu of credit, check or product exchange,  an annual rebate as a mutually agreed percentage of all purchases is proposed to eliminate or reduce the costs of routine authorization, handling, shipping, review and administration for both the Program and its suppliers.

<u>Forms and Documents</u>:

**Quotations and offers must be entered on the Program's original documents, and signed and dated where indicated on page six of the Request for Quotation form.**    Addenda may be included if necessary to complete  replies.

---

**To consider proposals, the following documents must be returned to us:**
>    **(a) Our Original Request for Quotation Forms**
>    **(b) The List of products requested for quotation (all pages whether quoted or not)**
>    **(c) Vendor Information Form**
>    **(d) Supplier's Published Price List to Wholesale Distributors**
>    **(e) Attachments and exhibits.**
>    (If FAX is used, hard copies of originals must follow as confirmation)

---

KPMCP/RFQ INSTR (5/95)                    3

Confidential Subject to Protective Order

MLYN 00003243

Sent by: AMIDE PHARMACEUTICAL, INC.    973 890 7980;        06/07/99 12:57PM;JetFax #61; Page 9/14



(Other documents—your Standard Purchase Order Form, Instructions for Bid Submission, List of Regional Purchasing Offices, and Packaging Specifications—are for the information of suppliers and should not be included in your submissions)

Request for Information (Page 7): Detailed information is necessary for processing orders, shipments, inventories, returns, establishment of lead times, and the indemnification process regarding supply commitments. We will rely on lead times set forth in your reponse and will request indemnification for excess acquisition costs if we are forced to purchase replacement material elsewhere because of failures to supply except under circumstances beyond your control.

Dates Due for Return: Responses to Requests for Quotation are due on the date stated on Page One of the Request for Quotation Form  (If more time is needed, please call so that alternate arrangements can be made).

Acknowledgments and Awards: Acceptances and awards will be by written Notice originated by  the Program.



KPMCP/RFQ INSTR (5/95)                    4

MLYN 0000324

Confidential Subject to Protective Order

# PURCHASE ORDER

DATE        PAGE

SHOW THIS NUMBER ON ALL
INVOICES, BILL OF LADING,
PACKAGES AND RELATED
CORRESPONDENCE.

TO:

PLEASE COMPLY WITH THE FOLLOWING INSTRUCTIONS:
1.  ENCLOSE AN ITEMIZED PACKING SLIP SHOWING THE PURCHASE
    ORDER NUMBER WITH EACH SHIPMENT.
2.  SIGN AND RETURN THE ACKNOWLEDGMENT COPY PROMPTLY
    WITH DATE OF SHIPMENT PROVIDED.
3.  DIRECT ANY INQUIRIES TO PHARMACY PURCHASING OFFICE.
4.  COMPLY WITH BILLING INSTRUCTIONS BELOW.

SHIP TO:

ENTER OUR ORDER SUBJECT TO TERMS HEREON AND CONDITIONS ON REVERSE SIDE OF THIS ORDER

| ITEM NO. | STOCK NO. | DESCRIPTION | UNIT | UNIT PRICE | QUANTITY | | | TOTAL AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | | | | | INVOICED | ORDERED | RECEIVED | |
| | | | | | | | | |

ALL ITEMS NON-TAXABLE UNLESS OTHERWISE INDICATED. SALES TAX PERMIT

BILLING INSTRUCTIONS:
SHOW PURCHASE ORDER NUMBERS ON ALL INVOICES, PACKAGES, PACKING
SLIPS, BILLS OF LADING, ETC..
SUBMIT INVOICES IN TRIPLICATE WITH ORIGINAL BILL OF LADING TO:
ACCOUNTS PAYABLE DEPARTMENT
P.O. BOX 12079
OAKLAND, CA. 94604-2079
SUBMIT SEPARATE INVOICES WITH EACH ORDER AND SHIPMENT.

PHARMACY PURCHASING DEPARTMENT

BY_____

MLYN 000032

**In the event Seller's quotation, acknowledgment, confirmation, invoice or other form states terms additional to or different from those set forth herein, this Purchase Order shall be deemed a notification of objection to such additional and/or different terms and a rejection thereof. This Purchase Order constitutes an offer to purchase, and not an acceptance of any offer to sell, the goods and any services described herein which may be accepted only in accordance with its terms and without modification, addition, deletion or alteration. In the absence of written acceptance or other written confirmation hereof by Seller, the commencement of any work by Seller in pursuance of this order or the making of any deliveries by Seller of the goods described herein shall be deemed an acceptance hereof and a contract shall be formed only upon the terms and conditions set forth herein.**

1. **DEFINITIONS.** As used herein, the term "Purchaser" means the party designated as such on the face of this order, and the term "Seller" means the party designated as such on the face of this order.

2. **IMPORTANCE OF THIS FORM.** This form, when properly signed by Purchaser and bearing an order number, is the only authorization which will be recognized by Purchaser for charges to its account.

3. **QUANTITY AND QUALITY.** Neither the quantity nor quality of the goods delivered by Seller to Purchaser shall differ from those specified on the face hereof, nor shall any other modifications of this Purchase Order be effective unless such changed quantity or other modification is first ordered by Purchaser by written change order. Seller shall make no shipment of non-conforming goods, whether as an accommodation or otherwise, unless first authorized in writing by Purchaser.

4. **PACKAGING; NOTICE OF SHIPMENT.** Seller shall properly package all goods for safe shipment to the Purchaser and a notice of shipment shall be sent by Seller to Purchaser at the time the goods described herein are shipped which shall state the number of the order, the kind of goods, the Seller's name and the carrier and route by which the shipment is being made.

5. **TRANSPORTATION COSTS.** Seller agrees that any transportation costs included in the price will not exceed actual transportation costs paid by Seller. If this order calls for payment of any transportation costs by the Purchaser, Purchaser shall in no event be liable or accountable for any amount in excess of the actual costs of transportation. Seller shall be accountable for and pay any excess transportation costs arising from Seller's failure to make delivery to the f.o.b. point or to follow shipping instructions furnished by Purchaser.

6. **TAXES INCLUDED IN PRICE.** Unless otherwise expressly provided on the face of this Purchase Order, all taxes, duties, tolls, fees, import charges and other governmental exactions shall be deemed included in the purchase price of the goods and Purchaser shall have no liability to pay Seller any amount in excess of the purchase price specified herein.

7. **WARRANTIES.** In placing the Purchase Order, Purchaser is relying on Seller's skill and judgment in selecting and providing the proper goods and any applicable services for Purchaser's particular use. Seller warrants to Purchaser and its successors in interest that the goods and any services covered hereby will correspond with the description of the same on the face of this order, will conform to all applicable specifications, will be new and of the best quality unless otherwise specified, will be fit for the purpose for which they are to be used and will conform in all respects both in the manufacture and use thereof with all applicable safety orders or regulations of City, County, and State where the goods are to be used. Seller also warrants that said goods are free and clear of all liens and encumbrances whatsoever and the Seller has a good and marketable title to same, and Seller agrees to hold Purchaser and its successors in interest free and harmless against any and all demands to said goods.

8. **PATENTS, TRADEMARKS, AND COPYRIGHTS.** Seller represents that it has fully investigated all specifications, including any furnished by Purchaser, in connection with the goods, and based on such investigation and its past experience and superior knowledge with respect to such goods, has determined that the production thereof will not infringe any patent, trademark or copyright. Seller warrants to Purchaser and its successors in interest that the manufacture, sale or use of the goods and any services covered by this order, whether manufactured in accordance with Purchaser's specifications or otherwise, do not and will not infringe upon any patent, trademark or copyright and Seller shall indemnify and hold Purchaser and its successors in interest free and harmless from and against any and all claims, demands, costs and liabilities, including legal expenses, arising out of any such infringement or claim of infringement. Purchaser is relying upon the experience, skill and superior knowledge of Seller with respect to the goods and makes no representation that Seller will be safe in manufacturing the goods as required under this order. In no event shall Purchaser or its successors in interest be liable to Seller for any patent, copyright or trademark infringement or claim thereof.

9. **RISK OF LOSS & TITLE.** Notwithstanding the f.o.b. point specified on the face of this order or any shipping instructions, Seller shall assume and pay any and all loss or damage to the goods from any cause whatsoever until Purchaser receives the goods at the point of ultimate destination. Irrespective of the foregoing or any terms of shipment, title to the goods shall pass from Seller to Purchaser when the goods are transferred at the point of origin to rail car, truck, or other transportation facility.

10. **COMPLIANCE WITH LAW.** Seller warrants and agrees that all goods delivered pursuant to this order shall be produced, sold and delivered to Purchaser in compliance with and conforming to all applicable laws and governmental orders, rules and regulations, and that the price for such goods are not in excess of any applicable price established by law or governmental regulation. Seller shall furnish to Purchaser upon request certificates or other evidence showing compliance with this Article.

11. **EQUAL EMPLOYMENT OPPORTUNITY**

The following provisions form a part of this Purchase Order if non-discrimination provisions are required to be applicable by Executive Order 11246 or otherwise by law, order, rule or regulation.

Executive Order 11246 and other applicable federal regulations require Purchaser to include the equal opportunity clause in certain non-exempt Purchase Orders and contracts. By accepting this Purchase Order Seller will obligate itself to comply with the equal opportunity clause requirements. One of these requirements is the filing of an annual Employer Information Report standard Form 100. Seller must file this report if it has at least 50 employees and at least one $50,000 government contract, sub-contract, or Purchase Order (or serve as a depository of United States Government funds in any amount). Should Seller not comply with the above requirements, the United States Government may direct Purchaser to take action to enforce the requirements. This action may include cancellation, termination, or suspension of this contract or any portion of it, and placement on a list debarring the non-complying party from securing further United States Government contracts or subcontracts.

Specifically

During the performance of the Purchase Order, Seller agrees as follows:

"(a) Equal Employment Opportunity. The Seller will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Seller will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. The non-discrimination and affirmative action provisions contained in Executive Order 11246, as amended by Executive Order 11375, relative to equal employment opportunity for all persons without regard to race, color, religion, sex or national origin, and the implementing rules and regulations prescribed by the Secretary of Labor in Title 41, Part 60 of the Code of Federal Regulations are incorporated herein.

(b) Employment of the Handicapped. The Seller will not discriminate against any employee or applicant for employment because of a physical or mental handicap in regard to any position for which the employee or applicant for employment is qualified. The non-discrimination clauses contained in the Rehabilitation Act of 1973, as amended, relative to the employment of qualified handicapped individuals without discrimination based upon their physical or mental handicaps, and the implementing rules and regulations prescribed by the Secretary of Labor in Title 41, Part 60-741 of the Code of Federal Regulations are incorporated herein.

(c) Employment of Disabled Veterans and Veterans of the Vietnam Era. The Seller agrees, in order to provide special emphasis to the employment of qualified disabled veterans and veterans of the Vietnam era, to list employment openings and to comply with the provisions of Title 41, Part 60-250.4 of the Code of Federal Regulations."

Whether or not the foregoing paragraphs number (a) through (c) are applicable to this Purchase Order, as between the Seller and Purchaser, the Seller may not contest against Purchaser any determination or finding made under color or right by the Contracting Officer or by any agency of the United States of America that Seller or any of its suppliers or subcontractors has not complied with the non-discrimination clauses of the Purchase Order, or with any rules, regulations, or orders relating to non-discrimination, and Seller shall not be entitled to make any claim against Purchaser on account of any cancellation, termination or suspension of this Purchase Order which is based on or results from such determination or finding. The Seller shall hold Purchaser harmless from and against loss suffered, whether by way of increased reprocurement costs or by delay damages or otherwise, caused by a cancellation, termination or suspension of this Purchase Order, or of any lower-tier subcontract or order which is based on or results from such determination or finding. The provisions of this paragraph shall not prejudice any right or cause of action of Seller against the United States Government in connection with the subject matter of these provisions relating to non-discrimination in employment.

12. **INSPECTION AND TESTING RIGHTS OF PURCHASER.** Notwithstanding any prior payment therefore, all goods are subject to inspection and testing by Purchaser after arrival at the ultimate destination, and if the goods are to be incorporated into a plant or other operating facility, Purchaser's inspection and testing of the goods may be made under operating conditions after the goods have been installed. If upon inspection or testing such goods or any portion thereof are found to be non-conforming, unsatisfactory, defective, of inferior quality or workmanship or fail to meet any guarantees or operating or other specifications contained herein or any other requirements of this Purchase Order, then without prejudice to any other rights or remedies, Purchaser may return the goods or any part thereof to Seller, and all amounts theretofore paid by Purchaser to Seller on account of the purchase price of such returned goods, together with any costs incurred by Purchaser in connection with the original delivery or return of such goods, shall be repaid to Purchaser by Seller. Neither the inspection nor failure to make inspection nor acceptance of goods shall release Seller from any of the warranties or other provisions of this order nor impair Purchaser's right to reject non-conforming goods. Purchaser reserves the right, even after it has paid for and accepted said goods, to make a claim against Seller on account of any goods which do not prove to be satisfactory or are defective, irrespective of Purchaser's failure to notify Seller of a rejection of non-conforming goods or revocation of acceptance thereof, or to specify with particularity any defect in non-conforming goods after rejection or acceptance thereof.

13. **CANCELLATION IN CERTAIN CASES.** Time is of the essence hereof. If Seller shall default in performance hereof or breach any of its obligations hereunder or if Seller becomes insolvent or a receiver or trustee of Seller's business or its assets is appointed by any court or if Seller shall make an assignment for the benefit of creditors, then in any of such events Purchaser may cancel this order in whole or in part by written or telegraphic notice to Seller, and Purchaser shall have no liability or obligation whatsoever to Seller by reason of or resulting from such cancellation, but at Purchaser's sole election it may pay Seller its actual direct out of pocket costs of performance hereunder to the date of such cancellation, as approved by Purchaser, in which event the goods or incomplete portions of the goods shall be the property of Purchaser and Seller shall safely hold the same for a reasonable time subject to receipt of Purchaser's written shipping instructions or other disposition instructions.

14. **CANCELLATION AT WILL OF PURCHASER.** In addition to and without prejudice to the right to cancel under Article 13 Purchaser may terminate this order in accordance with the following provisions:

(a) If this order covers goods manufactured or fabricated to Purchaser's specifications or specifications especially prepared by Seller for Purchaser, then at any time prior to delivery of all goods covered by this order Purchaser may terminate this order in whole or in part by written or telegraphic notice to Seller, and in such event the following provisions shall apply:

(i) Immediately upon receipt of such notice of termination or upon such other date as may be specified in said notice, Seller shall stop all work in connection with this order except as otherwise directed by Purchaser;

(ii) Purchaser shall pay and Seller shall accept as full compensation Seller's actual direct out of pocket costs to the date work is stopped, including Seller's reasonable expenses in connection with termination of any subcontracts, all as approved by Purchaser, plus 6% of such costs, provided, however, that in no event shall the total amount to be paid to Seller upon such termination plus payments previously made exceed that proportion of the aggregate total purchase price specified herein that the work actually performed hereunder to the date work is stopped bears to the entire work to be performed hereunder;

(iii) The goods or uncompleted portions of the goods shall be the property of Purchaser, and Seller shall safely hold the same for a reasonable time, subject to receipt of Purchaser's written shipping or other disposition instructions.

(b) If the goods covered by this order are standard stock merchandise, Purchaser may terminate all or any part of the unshipped portion of this order at any time by written or telegraphic notice to Seller, and in such event Purchaser shall have no further obligation for cancellation charges or otherwise hereunder except to make payment, subject to other applicable terms hereof, for the goods actually shipped and in transit prior to such termination and to make payment for any goods as to which this order is not terminated which are shipped subsequent to such termination.

15. **INDEMNIFICATION.** Seller shall indemnify and save harmless (and, at Purchaser's request, defend) Purchaser and all other persons and organizations cooperating in the conduct of the health care program commonly known as the Kaiser Foundation Medical Care Program, and each of their employees, agents, and partners (each of which persons and organizations are Indemnitees) from and against any and all claims, loss, damages, liabilities, costs, expenses or obligations whatsoever, for or in connection with injury (including death) or damage to any person or property, resulting from or in any way connected with Seller's performance hereunder or any default by Seller or breach of its obligations hereunder. The foregoing indemnity and hold harmless obligation of Seller includes and applies without limitation to any strict liability imposed by law and to injury or damage to Indemnitees, Seller, or third parties, or any or all of them, and their respective property, employees, agents and partners, regardless of how any such injury or damage may be caused or suffered and even if the same be or is alleged to be contributed to or suffered by reason of the concurrent or contributory negligence, whether affirmative or passive, of any Indemnitee. Notwithstanding the foregoing, Seller's liability hereunder shall not include any responsibility for or obligation to indemnify and save any Indemnitee harmless from loss, damage or expense arising from the sole negligence or willful misconduct of any Indemnitee.

16. **ENTIRE AGREEMENT.** This Purchase Order, together with any written documents which may be incorporated by specific reference, constitutes the entire agreement between the parties and supersedes all previous communications between them, either oral or written. All such previous communications are hereby abrogated and withdrawn, and no stipulations, representations or agreements by Purchaser or any of its officers, agents or employees shall be binding on the Purchaser unless contained in this Purchase Order or incorporated herein by reference as above provided.

17. **NO WAIVER.** The waiver by Purchaser of any term, condition or provision herein stated shall not be construed to be a waiver of any other term, condition or provision hereof, nor shall such waiver be deemed a waiver of a subsequent breach of the same term, condition or provision, nor shall it be deemed a waiver of any provisions in any subsequent order.

18. **GOVERNING LAW.** The laws of the State of California shall govern the validity, interpretations and enforcement of purchaser's rights. Purchaser's remedies provided hereunder and by law shall be cumulative.

MLYN 000032

Confidential Subject to Protective Order



## UNIT OF USE PRODUCTS
## PACKAGING SPECIFICATIONS

Packaging specifications described below address the current needs of the █████████████
Exceptions to these specifications may be considered. Acceptance of any packaging variances must be obtained in writing.
All suppliers are encouraged to contact the Pharmacy Materials Manager to discuss packaging requirements.

**A. CONTAINER**

1. Container closure system must have approved child-resistant closures and meet appropriate USP container specifications for the type of product stored in that container.

2. The container must have the minimum dimensions (height, from shoulder to base 2 3/8 inches, circumference 4 inches).

3. Container should be the smallest size possible, with the above minimum dimensions.

4. Tablets or capsules should be packed to prevent powdering or breakage.

**B. PACKAGE INSERTS**

1. Package insert should be supplied loose inside shelf or shipping package and not be inside or attached to the unit-of-use container.

**C. SHELF OR SHIPPING PACKAGES**

1. Unit-of-use containers should be shrink wrapped in units of twelve. Shrink-wrapped packs can be consolidated into larger shipping containers. Shipping containers should be labeled. Label should indicate number of units, unit name, and size.

**D. LABELS** (Example on reverse)

1. Format
   a. 2 part
   b. Size 1 1/2" high by 3 3/8" wide.
   c. Drug name, strength, minimum size 14 points (bold face capitals).
   d. Quantity and dosage form 10 points (bold face capitals).

2. Right Hand Portion of Label
   a. Printing left to right.
   b. Copy meets all regulatory requirements of FDA, DEA, etc.
   c. Size and dosage form at top of label, above drug name.
   d. Drug name and strength, upper half of label.
   e. Different strengths of the same dosage form shall be differentiated by color coding.

3. Left Hand Portion of Label
   a. Non removable
   b. Printing should be perpendicular to the base of the container.
   c. Quantity, dosage form, name, strength, top of label.
   d. Lot number, lower portion of label.
   e. Expiration date, lower portion of label expressed as: "Discard after . . . . . . . . . .".
   f. Storage requirements
   g. Information or appropriate cautions: e.g., refrigerate, dizzy, drowsy caution, etc.
   h. Manufacturer's name.

7 (2-88)

06/07/99 MON 12:32 [TX/RX NO 7662]

Confidential Subject to Protective Order

MLYN 0000324

DATE:  May 26, 1998
REF: Agreement # 0555-99-M-5
* *Revision*

Amide Pharmaceuticals
Mr. Chandu Patel
President
101 E. Main St.
Little Falls, NJ 07414

## EXTENSION OF AGREEMENT

This is to confirm changes in Agreement as established with Ms. Sharon English on
May 26, 1998.  Except as specifically modified by this Amendment, all terms and
conditions of the existing Agreement shall remain in full force and effect.

EFFECTIVE DATE:                                    EXPIRATION DATE:
January 1, 1999                                    December 31, 2000

| | Digoxin Tablets USP | | | #52152- | Case Size: |
|---|---|---|---|---|---|
| 2027 | 0.125 mg | 100 | $3.30 | 0145-02 | 24 |
| | | 1,000 | 26.25 | -05 | 24 |
| | | 5,000 | 125.50 | -06 | 12 |
| 2029 | 0.25 mg | 100 | 3.30 | 0146-02 | 24 |
| | | 1,000 | 26.25 | -05 | 24 |
| | | 5,000 | 125.50 | -06 | 12 |
| | | 100UD | 8.95 | -00 | 1 |
| 2030 | 0.5 mg | 100 | 5.25 | 0147-02 | 24 |

Sincerely,

Purchasing Agent

cc:  Program Regions
     * *Wholesalers*

Confidential Subject to Protective Order

MLYN 0000324



PURCHASE AGREEMENT: EDITION FOR WHOLESALE DISTRIBUTORS. "**CONFIDENTIAL**" NOT AUTHORIZED FOR ANY PURPOSE EXCEPT IMPLEMENTATION OF DEPOT CHARGE-BACKS ON PROGRAM PURCHASE ORDERS.

| Contract # | Manufacturer | Start Date | End Date | NDC# | Description | Unit | Price |
|---|---|---|---|---|---|---|---|
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0145-02 | DIGOXIN TABS 0.125MG | 100 | 3.30 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0145-05 | DIGOXIN TABS 0.125MG | 1000 | 26.25 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0145-06 | DIGOXIN TABS 0.125MG | 5000 | 125.50 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0146-02 | DIGOXIN TABS 0.25MG | 100 | 3.30 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0146-05 | DIGOXIN TABS 0.25MG | 1000 | 26.25 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0146-06 | DIGOXIN TABS 0.25MG | 5000 | 125.50 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0146-00 | DIGOXIN TABS 0.25MG | 100 UD | 8.95 |
| 0555-99-M-5 | AMIDE PHARMACEUTICAL INC. | 1/1/99 | 12/31/00 | 52152-0147-02 | DIGOXIN TABS 0.5MG | 100 | 5.25 |

MLYN 000032

**EXHIBIT E**

{000249 – 00008 / 00038356.DOC;1}

Confidential Subject to Protective Order

MLYN 000032437

## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT ("Agreement") is entered into as of August 5, 1999 ("Effective Date"), between:

> Mylan Laboratories, Inc.
> A Pennsylvania Corporation
> with an office located at
> 781 Chestnut Ridge Road
> Morgantown, West Virginia 26505
> and
> Bertek Pharmaceuticals Inc.
> a Texas Corporation,
> (Hereinafter collectively referred to as
> "BERTEK") with offices located at
> 3711 Collins Ferry Road
> Morgantown, West Virginia 26505

and

> Amide Pharmaceuticals, Inc.
> a New Jersey Corporation,
> (hereinafter referred to as
> "AMIDE") with offices located at
> 101 East Main Street
> Little Falls, New Jersey 07424

WHEREAS, BERTEK and AMIDE have entered into a Supply and Distribution Agreement dated August 5, 1999, hereinafter referred to as "Supply and Distribution Agreement"; and

WHEREAS, the Supply and Distribution Agreement provides for BERTEK to license the Trademark (as defined in the Supply and Distribution Agreement) to AMIDE, only upon the occurrence of certain events as identified in Sections 8.1(c) and 8.4 of the Supply and Distribution Agreement; and

WHEREAS, BERTEK is willing, under the terms and conditions as hereinafter set forth, to permit AMIDE to use BERTEK'S Trademark in connection with the distribution, marketing and sale of the Product (as defined in the Supply and Distribution Agreement); and

WHEREAS, AMIDE desires to acquire the right from BERTEK to use the Trademark, in connection with the distribution, marketing and sale of the Product.

1

Confidential Subject to Protective Order

MLYN 000032438

WITNESSETH THEREFORE that in consideration of the premises set forth and covenants exchanged herein and for other good and valuable consideration, the sufficiency and receipt of all of which are hereby acknowledged, BERTEK and AMIDE intending to be legally bound agree as follows:

ARTICLE I
GRANT

Subject to the terms and conditions of this Agreement, BERTEK hereby grants to AMIDE, and AMIDE hereby accepts, an exclusive right and license, with the right to grant sublicenses on terms subject to and consistent with this Agreement, to use the Trademark during the term of this Agreement in connection with the Commercialization (as defined in the Supply and Distribution Agreement) of the Product throughout the Territory. During the term of this Agreement BERTEK shall not use the Trademark or grant any other person any rights to use the Trademark in the Territory. During the term of this Agreement, AMIDE shall not use the Trademark for any purpose other than in connection with the Commercialization of the Product. AMIDE shall not use the Trademark or authorize any of its Affiliates or sublicensees to use the Trademark outside the Territory.

For further clarification, the parties specifically acknowledge it is their intention that the license described herein, shall be deemed effective only at such time, if ever, that the events set forth in Sections 8.1(c) and 8.4 of the Supply and Distribution Agreement have occurred.

ARTICLE II
GENERAL TERMS AND CONDITIONS

2.1    Trademark Rights

(1)    Ownership. AMIDE acknowledges that as between BERTEK and AMIDE the Trademark belongs to BERTEK. During the term of this Agreement and thereafter, AMIDE shall not challenge BERTEK' s ownership in or rights to the Trademark, or attempt to register the Trademark in its own name.

(2)    Maintenance. It shall be BERTEK' s responsibility to undertake during the term of this Agreement the maintenance of the Trademark in the Territory. In the event there is an occurrence of the events set forth in Sections 8.1(c) and 8.4 of the Supply and Distribution Agreement, BERTEK will continue to assume responsibility for maintenance of the Trademark, but AMIDE shall be responsible for all expenses related thereto. In connection with BERTEK' s maintenance of the Trademark, AMIDE shall cooperate with BERTEK by executing any necessary documents, supplying BERTEK with specimens and performing other reasonable acts, as requested by BERTEK in writing from time-to-time.

2

Confidential Subject to Protective Order

MLYN 000032439

### (3)      Infringement or Other Actions

(i)  If BERTEK or AMIDE shall become aware of any actual or threatened infringement of the Trademark in the Territory or any actual or threatened unfair competition, disparagement or other tortious act by any third-party in relation to the Trademark, then the party having such knowledge shall give notice to the other within ten (10) days of becoming aware of such actual or threatened infringement, unfair competition, disparagement or other tortious act.

(ii)  AMIDE shall take such action as it deems reasonably necessary to protect and enforce the Trademark in the Territory, including but not limited to bringing an action, suit or other appropriate proceeding to prevent or eliminate the infringement of such Trademark, or the unfair competition, disparagement or other tortious act by any third party in relation to the Trademark in the Territory.  BERTEK agrees to cooperate with AMIDE in any reasonable manner in any such action, suit or proceeding, at AMIDE's expense, including joining as a party to such action, suit or proceeding, if necessary to maintain standing.  If AMIDE elects not to take such action and so notifies BERTEK, or if it fails to take such action within sixty (60) days of becoming aware of actual infringement, unfair competition, disparagement or some other tortious act, BERTEK shall have the right (but not the obligation) to take such action at its expense.  In such event, AMIDE shall cooperate with BERTEK in any reasonable manner in any such action, suit or proceeding, at BERTEK's expense.  Any money recovered by way of damages or otherwise in respect of any such action shall be kept solely by the party that bore the costs of such action.  BERTEK shall have no obligation hereunder or otherwise to protect and enforce the Trademark against any actual threatened infringement, unfair competition, disparagement or other tortious act.

2.2    Third Party Claims.  If BERTEK or AMIDE shall become aware of any action, suit or proceeding or threat of action, suit or proceeding, by a third party alleging that the use of the Trademark in the Territory infringes a trademark or violates any other proprietary right of any third party, the party so aware shall promptly notify the other party of the same and fully disclose the basis therefore.

2.3    Quality Control

(1)     AMIDE and its Affiliates shall not use the Trademark in any manner which will tarnish or disparage the Trademark or otherwise have a material adverse effect upon the Trademark or the goodwill associated therewith.

(2)     The Trademark shall be used in substantially the same form as it was heretofore used by BERTEK in connection with the Product.  In the event AMIDE or any of its Affiliates wishes to use the Trademark in a substantially different form, AMIDE shall submit such different form to BERTEK for approval, which shall not be unreasonably withheld or delayed.

3

Confidential Subject to Protective Order

MLYN 000032440

(3)     The nature and quality (including all packaging and other materials associated therewith) of all Product manufactured by AMIDE or for AMIDE by any third-party, and the advertising of all Product sold by AMIDE or any of its Affiliates, sublicensees or distributors bearing any Trademark shall be of a quality at least as high as the Product heretofore sold under the Trademark by BERTEK and the advertising heretofore associated therewith, as the case may be. AMIDE shall, and shall cause its Affiliates to, comply with applicable federal, state and local laws, rules and regulations in distributing, marketing, promoting, advertising, selling, storing and packaging the Product including without limitation all FDA rules and regulations and all applicable portions of the ANDA approval for the Product.

(4)     BERTEK shall have the following rights to exercise quality control over AMIDE's use of the Trademark to assure AMIDE's adherence to the standards set forth in Section 2.3(a), (b) and (c):

(i)   AMIDE shall upon request by BERTEK, from time to time, submit to BERTEK a reasonable number of samples of any Product and any packaging, advertising and other materials which bear or are used with the Trademark, provided however, that nothing in this Section 2.3 shall be deemed to give BERTEK the right to preapprove, prior to the initial dissemination thereof, the advertising, packaging, and other materials used by AMIDE in connection with the Product; and

(ii)   With respect to any Product, BERTEK shall have the right, during regular business hours, after reasonable advance written notice to AMIDE, to undertake up to two (2) inspections per annum of any facilities used to manufacture or store such Product.

## ARTICLE III
## TERM AND RIGHTS ON EXPIRATION OR TERMINATION

3.1     The term of this Agreement shall commence on the Effective Date and shall continue for as long as AMIDE or one of its Affiliates or sublicensees is continuing to market the Product in the Territory.

3.2     Upon the termination or expiration of this Agreement: (i) all rights granted hereunder to AMIDE with respect to the Trademark shall revert to BERTEK; and (ii) AMIDE shall cease using the Trademark.

## ARTICLE IV
## DEFAULT; REMEDIES

4.1     If BERTEK or AMIDE commits a material breach of this Agreement or materially defaults in the performance or observance of any provision of this Agreement and fails to remedy such breach or default within sixty (60) days after receipt of notice thereof, such occurrence shall

4

Confidential Subject to Protective Order

constitute an "Event of Default" under this Agreement.

4.2     Immediately upon the occurrence of any Event of Default by BERTEK pursuant to Section 4.1 hereof, AMIDE shall have the right to terminate this Agreement, exercisable by delivering written notice thereof to BERTEK, and/or to pursue any and all remedies available to it at law or in equity.

4.3     Immediately upon the occurrence of any Event of Default by AMIDE pursuant to Section 4.1 hereof, BERTEK shall have the right to terminate this Agreement, exercisable by delivering written notice thereof to AMIDE, and/or to pursue any and all remedies available at law or in equity.

4.4     The parties expressly acknowledge that the remedy provisions contained in this Article IV are reasonable, considering the intended nature and scope of this Agreement.

4.5     If BERTEK or AMIDE terminates this Agreement in accordance with the terms herein, the terminating party shall owe no statutory termination penalty or indemnity or other similar payment that might otherwise be due under local law to the terminated party on account of such termination.

4.6     The obligations of BERTEK and AMIDE under this Agreement shall be subject to any delays or non-performance caused by: acts of God, earthquakes, fires, floods, explosion, sabotage, riot, accidents; regulatory, governmental, or military action or inaction; strikes, lockouts or labor trouble; perils of the sea; or failure or delay in performance by third parties, including suppliers and service providers; or any other cause beyond the reasonable control of either party. The party which is not performing its obligations under this Agreement as a result of any such event of force majeure shall use Commercially Reasonable Efforts (as defined in the Supply and Distribution Agreement) to resume compliance with this Agreement as soon as possible.

ARTICLE V
TRADEMARK ROYALTY PAYMENTS

5.1     AMIDE shall pay to BERTEK a Trademark royalty in the amount of ten percent (10%) of AMIDE's Net Sales on the Products. Net Sales shall have the same definition as that in Section 1.17 of the Supply and Distribution Agreement, except that "BERTEK" in said definition shall be changed to "AMIDE".

5.2     The calculation of AMIDE's Net Sales and BERTEK's ten percent (10%) of the Net Sales shall be paid to BERTEK within forty-five (45) days after the end of the Calendar Quarter (as defined in the Supply and Distribution Agreement).

5.3     All payments required to be made to BERTEK under this Agreement shall be made in United States dollars and may be made by either wire or paper transfer on the due date to the following address:

5

Confidential Subject to Protective Order

MLYN 000032442

Bertek Pharmaceuticals Inc.
781 Chestnut Ridge Road
Morgantown, WV 26505
Attn:   William W. Richardson
President, CEO

or to any other address that BERTEK may advise in writing.

## ARTICLE VI
## MISCELLANEOUS

6.1     In making and performing this Agreement, the parties are acting and shall act as independent contractors.  Nothing in this Agreement shall be deemed to create an agency, joint venture or partnership relationship between BERTEK and AMIDE.  No party shall have the authority to obligate the other party in any respect, and no party shall hold itself out as having any such authority.  All personnel of BERTEK shall be solely employees of such party and shall not represent themselves as employees of AMIDE.  All personnel of AMIDE shall be solely employees of AMIDE and shall not represent themselves as employees of BERTEK.

6.2     AMIDE may not assign or otherwise transfer any of its rights or obligations hereunder without prior written consent of BERTEK, which shall not be unreasonably withheld or delayed; provided, however, that no such consent shall be required in the case of an assignment by AMIDE to one of its Affiliates.  No such assignment shall relieve AMIDE of any of its obligations or liabilities under this Agreement. Nothing herein shall be deemed or construed to prohibit AMIDE from sublicensing the Trademark to its Affiliates as permitted herein.

6.3     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Nothing contained herein shall give to any other person any benefit or any legal or equitable right, remedy or claim.

6.4     This agreement may not be modified, amended or supplemented by an instrument in writing executed by BERTEK and AMIDE.

6.5     No term or provision hereof will be considered waived by either party, and no breach excused by either party, unless such waiver or consent is in writing signed on behalf of the party against whom the waiver is asserted.  No consent by either party to, or waiver of, a breach by either party, whether express or implied, will constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either party.

6.6     Any notices or reports required or permitted under this Agreement shall be deemed to have been given for all purposes if mailed by first class certified or registered mail or transmitted electronically be facsimile with mailed confirmation copy to the following address

6

Confidential Subject to Protective Order

MLYN 000032443

of either Party:

For BERTEK:            BERTEK Pharmaceuticals Inc.
                                     781 Chestnut Ridge Road
                                     Morgantown, WV 26505
                                     Attn: William W. Richardson
                                                         President, CEO

For AMIDE:            Amide Pharmaceutical, Inc.
                                     101 East Main Street
                                     Little Falls, New Jersey 07424
                                     Attn: Chandu Patel, President

or to such other addresses as shall have been subsequently furnished by written notice to the other Party.

6.7     This Agreement shall become binding when any one or more counterparts hereof, individually or taken together, shall bear the signatures of each of the parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against the party whose signature appears thereon, but all of which taken together shall constitute but one and the same instruments.

6.8     The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6.9     Any of the provisions of this Agreement which are determined to be invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability in such jurisdiction, without rendering invalid or unenforceable the remaining provisions hereof or affecting the validity or enforceability of any of the provisions of this Agreement in any other jurisdiction.

6.10     This Agreement and the other agreements contemplated hereby or thereby or executed concurrently herewith embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties hereto and their respective Affiliates with respect thereto. There are no agreements, covenants or undertakings with respect to the subject matter of this Agreement and the other agreements contemplated hereby to thereby other than those expressly set forth or referred to herein or therein and no representations or warranties of any other kind or nature whatsoever, express or implied, are made or shall be deemed to be made herein by the parties hereto except those expressly made in this Agreement and the other agreements contemplated hereby or thereby.

7

6.11    Each party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

BERTEK PHARMACEUTICALS INC.

By _____

Title _President & Chief Executive Officer_

Date _August 5, 1999_

AMIDE PHARMACEUTICAL, INC.

By _____

Title ____PRESIDENT____

Date ____8/5/99____

MYLAN LABORATORIES INC.

By _____

Title ___Senior Vice President___

Date ___August 5, 1999___

8

Confidential Subject to Protective Order

MLYN 000032445