# EXHIBIT 14

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


MDL NO: 1968


IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION,
_____/


                    100 N. Tampa Street
                    Suite 2900
                    Tampa, FL 33602
                    January 25, 2011
                    at 9:08 a.m.



    VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.



    Taken on behalf of the Defendants before

PHILIP RYAN, RPR, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Defendant's Notice of Taking

Deposition in the above cause.



David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
 1   APPEARANCES:

 2   MIKE KERENSKY, ESQUIRE
     Williamson & Rusnak
 3   4310 Yoakum Boulevard
     Houston, TX 77006-5818
 4   (713)223-3330

 5   TERRY J. KILPATRICK, ESQUIRE
     Ernst & Mattison
 6   1020 Palm Street
     San Luis Obispo, CA 93401
 7   (805)541-0300

 8   MEGHAN JOHNSON CARTER, ESQUIRE
     Motley Rice, LLC
 9   28 Bridgeside Boulevard
     Mt. Pleasant, SC 29464
10   (843)216-9383

11            Attorneys for Plaintiffs

12   MATTHEW P. MORIARTY, ESQUIRE
     MICHAEL ANDERTON, ESQUIRE
13   Tucker, Ellis & West, LLP
     1150 Huntington Building
14   925 Euclid Avenue
     Cleveland, OH 44115
15   (216)592-5000

16            Attorney for Defendant Actavis Totowa,
              LLC, Actavis, Inc.,
17            and Actavis Elizabeth, LLC

18   ALICIA J. DONAHUE, ESQUIRE
     Shook, Hardy & Bacon, LLP
19   333 Bush Street
     Suite 600
20   San Francisco, CA 94014-2828
     (415)544-1900
21
              Attorney for Mylan Pharmaceuticals,
22            Inc., Mylan Inc., Mylan Bertek
              Pharmaceuticals, Inc., and UDL Labs
23
     ALSO PRESENT:
24            Alan Pokotilow, videographer

25
```

David Bliesner, Ph.D.         Videotaped              January 25, 2011

```
                                                              Page 3

 1

 2                        * * * * * *
                             INDEX
 3
                                              PAGE
 4   DIRECT EXAMINATION:
     BY MR. MORIARTY                            5
 5   BY MS. DONAHUE                            231
                    EXHIBIT INDEX
 6
                                           MAR
 7   Exhibit
     Exhibit 106   Notice of taking video deposition   226
 8           duces tecum.

 9   Exhibit 107   Handwritten notes, re Mylan          45
             deposition exhibits.
10
     Exhibit 108   Handwritten notes re. Plaintiffs'    45
11           Exhibits 1 to 263.

12   Exhibit 109   Handwritten notes taken during the  240
             deposition.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 4

```
 1            THE VIDEOGRAPHER:  My name is Alan          09:08
 2     Pokotilow with Veritext.  The date today is       09:08
 3     January 25 of 2011.  The time is                  09:08
 4     approximately 9:08 a.m.                           09:08
 5          This deposition is being held at the         09:08
 6     office of Shook, Hardy & Bacon, located at 100    09:08
 7     North Tampa in Tampa, Florida.                    09:08
 8          The caption of the case is in regards to     09:08
 9     Digitek product liability litigation, MDL         09:08
10     number 168, to be heard in United States          09:08
11     District Court of the Southern District of        09:08
12     West Virginia, Charleston Division.               09:08
13          The name of the witness is Dr. David         09:08
14     Bliesner.                                         09:08
15          At this time the attorneys will please       09:08
16     identify themselves and the parties they          09:08
17     represent, after which then our court reporter    09:08
18     Phil Ryan of Veritext will swear the witness      09:08
19     and we can proceed.                               09:08
20        MR. MORIARTY:  My name is Matt                 09:09
21     Moriarty, and I represent the Actavis             09:09
22     Defendants.                                       09:09
23        MR. ANDERTON:  Michael Anderton also on        09:09
24     behalf of the Actavis defendants.                 09:09
25        MS. DONAHUE:  Alicia Donahue, Shook            09:09
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 5

```
 1      Hardy & Bacon on behalf of the Mylan          09:09
 2      Defendants and UDL Laboratories.              09:09
 3          MR. KERENSKY:  And for the Plaintiffs     09:09
 4      we have Mike Kerensky, Terry Fitzpatrick,     09:09
 5      and Meghan Johnson Carter.                    09:09
 6          THE VIDEOGRAPHER:  Would the court        09:09
 7      reporter please swear the witness.            09:09
 8   The Deponent herein,                             09:09
 9          DAVID BLIESNER, Ph.D.,                    09:09
10   being first duly sworn to tell the truth, the   09:09
11   whole truth, and nothing but the truth, was     09:09
12   examined and testified as follows:              09:09
13              DIRECT EXAMINATION                    09:09
14   BY MR. MORIARTY:                                 09:09
15      Q.    Tell us your name.                      09:09
16      A.    David Bliesner.                         09:09
17      Q.    Okay.  Have you ever given testimony in 09:09
18   court before?                                    09:09
19      A.    When you say "testimony"?               09:09
20      Q.    Gone into court, been sworn and         09:09
21   testified.                                       09:09
22      A.    In court?                               09:09
23      Q.    In court.                               09:09
24      A.    No.                                     09:09
25      Q.    How about in an arbitration             09:09
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 6

```
 1   proceeding?                                          09:09

 2        A.    Yes.                                      09:09

 3        Q.    What kind of arbitration proceeding       09:10

 4   was that?                                            09:10

 5        A.    It was an HR arbitration.                 09:10

 6        Q.    Does that stand for human resources?      09:10

 7        A.    Yes.                                       09:10

 8        Q.    All right.  So this was some sort of      09:10

 9   employment dispute at one of your jobs or your       09:10

10   consulting arrangements?                             09:10

11        A.    It wasn't employment dispute, no.         09:10

12        Q.    All right.  Were you just a witness or    09:10

13   had you been sued in the case or were you suing      09:10

14   somebody else?                                       09:10

15        A.    I was a witness.                          09:10

16        Q.    Have you only testified in one            09:10

17   arbitration proceeding?                              09:10

18        A.    Just one arbitration, yes.                09:10

19        Q.    Have you ever given a deposition such as  09:10

20   we're about to do today?                             09:10

21        A.    Yes.                                       09:10

22        Q.    How many times have you done that?        09:10

23        A.    One time.                                 09:10

24        Q.    What sort of case was it?                 09:10

25        A.    Probate.                                   09:10
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 7

```
 1      Q.    All right.  So you have never testified      09:11
 2   in a pharmaceutical products liability case in       09:11
 3   deposition?                                           09:11
 4      A.    No.                                          09:11
 5      Q.    How many times have you been retained as     09:11
 6   an expert witness in a pharmaceutical products       09:11
 7   liability case?                                       09:11
 8      A.    One time.                                    09:11
 9      Q.    Just this time?                              09:11
10      A.    Yes.                                         09:11
11      Q.    All right.  Now, do you know who Pete        09:11
12   Miller is?                                            09:11
13      A.    Yes.                                         09:11
14      Q.    He's one of the Plaintiffs' lawyers in      09:11
15   this Digitek litigation; correct?                    09:11
16      A.    Yes.                                         09:11
17      Q.    When was the last time you met Pete         09:11
18   Miller in person?                                     09:11
19      A.    Yesterday.                                   09:11
20      Q.    Where was that?                              09:11
21      A.    At the Sheraton.                             09:11
22      Q.    And how long did you spend with Pete        09:11
23   Miller?                                               09:11
24      A.    Several hours.                               09:11
25      Q.    Mr. Kerensky was just here a second         09:12
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 8

| | | |
|---|---|---|
| 1 | ago.  When did you first meet him in person? | 09:12 |
| 2 | A.    Yesterday. | 09:12 |
| 3 | Q.    How long did you spend with him? | 09:12 |
| 4 | A.    A couple of hours. | 09:12 |
| 5 | Q.    All right.  When did you first meet | 09:12 |
| 6 | Mr. Fitzpatrick? | 09:12 |
| 7 | A.    Yesterday. | 09:12 |
| 8 | Q.    How long did you spend with him? | 09:12 |
| 9 | A.    Several hours. | 09:12 |
| 10 | Q.    And you've met Meghan before; correct? | 09:12 |
| 11 | A.    Correct. | 09:12 |
| 12 | Q.    Are there any other lawyers for the | 09:12 |
| 13 | Plaintiffs in the Digitek litigation with whom you | 09:12 |
| 14 | have met either in person or by telephone? | 09:12 |
| 15 | A.    I'm not good with legal terms.  So | 09:12 |
| 16 | Plaintiff, please? | 09:12 |
| 17 | Q.    The people who are suing the | 09:12 |
| 18 | pharmaceutical companies. | 09:12 |
| 19 | A.    Could you ask the question again, | 09:12 |
| 20 | please? | 09:12 |
| 21 | Q.    Sure.  Other than the people I've just | 09:12 |
| 22 | named, have you met with -- either in person or by | 09:12 |
| 23 | phone -- any other Plaintiffs' lawyers in the | 09:12 |
| 24 | Digitek litigation? | 09:12 |
| 25 | A.    By phone, yes. | 09:12 |

David Bliesner, Ph.D.            Videotaped              January 25, 2011

                                                            Page 9

1       Q.      Who?                                        09:12

2       A.      I don't recall who was on the              09:12

3    teleconference.                                        09:13

4       Q.      How many people were on the                09:13

5    teleconference?                                        09:13

6       A.      I don't know the exact number.             09:13

7       Q.      And when was that telephone conference?    09:13

8       A.      I believe it was in January of last        09:13

9    year.                                                 09:13

10      Q.      Now, I'll get in -- later into more        09:13

11   detail about what you did to prepare for today,       09:13

12   but do you know who Russ Soma is?                     09:13

13      A.      No.                                         09:13

14      Q.      How about Mr. Kenny?                        09:13

15      A.      No.                                         09:13

16      Q.      Jim Farley?                                 09:13

17      A.      No.                                         09:13

18      Q.      Karen Frank?                                09:13

19      A.      No.                                         09:13

20      Q.      Each one of those people were hired by     09:13

21   the Plaintiffs' lawyers and wrote reports much        09:13

22   like you wrote here with your opinions about this     09:13

23   Digitek situation.                                    09:14

24      Have you ever read any of those reports?          09:14

25      A.      Not to my knowledge, no.                   09:14

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 10

| | | |
|---|---|---|
| 1 | Q.    Did any of the Plaintiffs' lawyers read | 09:14 |
| 2 | to you from those reports? | 09:14 |
| 3 | A.    No. | 09:14 |
| 4 | Q.    Recently in December of 2010 we produced | 09:14 |
| 5 | to the other side reports of our experts -- Lou | 09:14 |
| 6 | Amsel, Martha Bennett, several other people. | 09:14 |
| 7 | Have you seen any of those reports? | 09:14 |
| 8 | A.    Not that I recall. | 09:14 |
| 9 | Q.    To the best of your knowledge, have any | 09:14 |
| 10 | of the Plaintiffs' lawyers read to you from those | 09:14 |
| 11 | reports? | 09:14 |
| 12 | A.    Not that I recall. | 09:14 |
| 13 | Q.    Have they told you in general what those | 09:15 |
| 14 | reports contain and what their conclusions were? | 09:15 |
| 15 | A.    No. | 09:15 |
| 16 | Q.    Last June and then even last week I took | 09:15 |
| 17 | and Mr. Anderton took and a Mr. Dean from my | 09:15 |
| 18 | office took testimony from Russ Soma, Mr. Kenny, | 09:15 |
| 19 | Karen Frank and Jim Farley; okay? | 09:15 |
| 20 | Have you seen any of those deposition | 09:15 |
| 21 | transcripts? | 09:15 |
| 22 | A.    Who are those individuals again? | 09:15 |
| 23 | Q.    They are experts hired by the same | 09:15 |
| 24 | people who hired you. | 09:15 |
| 25 | A.    I don't recognize those names. | 09:15 |

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 11

| | | |
|---|---|---|
| 1 | Q.    But have you read any of their | 09:15 |
| 2 | deposition testimony? | 09:16 |
| 3 | A.    Not that I recall. | 09:16 |
| 4 | Q.    Did the Plaintiffs' lawyers read to you | 09:16 |
| 5 | any excerpts from their transcripts? | 09:16 |
| 6 | A.    No. | 09:16 |
| 7 | Q.    When you met with these lawyers | 09:16 |
| 8 | yesterday to get ready for today, did they tell | 09:16 |
| 9 | you any of the kind of questions that you could | 09:16 |
| 10 | expect from me? | 09:16 |
| 11 | A.    Yes. | 09:16 |
| 12 | Q.    All right.  I assume that since you have | 09:16 |
| 13 | both a college degree from a very reputable | 09:16 |
| 14 | institution and a Ph.D., that you have had to | 09:16 |
| 15 | study for and take examinations in your career; is | 09:16 |
| 16 | that correct? | 09:16 |
| 17 | A.    Yes. | 09:16 |
| 18 | Q.    Did you ever have an occasion in your | 09:16 |
| 19 | academic career when you studied real hard for a | 09:16 |
| 20 | test but did poorly? | 09:16 |
| 21 | A.    Specifically I don't recall. | 09:17 |
| 22 | Q.    Did you ever have an occasion where you | 09:17 |
| 23 | didn't study too hard at all but you did rather | 09:17 |
| 24 | well? | 09:17 |
| 25 | A.    Specifically I don't recall. | 09:17 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 12

| | | |
|---|---|---|
| 1 | Q.    All right.  Generally do you recall? | 09:17 |
| 2 | A.    Vaguely. | 09:17 |
| 3 | Q.    And is it your vague recollection that | 09:17 |
| 4 | those two things probably happened at some point | 09:17 |
| 5 | in your academic career? | 09:17 |
| 6 | A.    Perhaps. | 09:17 |
| 7 | Q.    All right.  So if perhaps that happened, | 09:17 |
| 8 | you would agree with me logically that the amount | 09:17 |
| 9 | of work put in the process of studying did not | 09:17 |
| 10 | always necessarily correlate with the outcome; | 09:18 |
| 11 | right? | 09:18 |
| 12 | A.    Could you say that again, please. | 09:18 |
| 13 | MR. MORIARTY:  Can you read that back? | 09:18 |
| 14 | (Whereupon, the testimony was read | 09:18 |
| 15 | back by the court reporter, as recorded above) | 09:18 |
| 16 | THE WITNESS:  I wouldn't agree with you | 09:18 |
| 17 | on that statement. | 09:18 |
| 18 | BY MR. MORIARTY: | 09:18 |
| 19 | Q.    All right.  Are you a golf fan? | 09:18 |
| 20 | A.    No. | 09:18 |
| 21 | Q.    Do you still shoot and skeet or trap | 09:18 |
| 22 | tournaments competitively? | 09:18 |
| 23 | A.    No. | 09:18 |
| 24 | Q.    Did you ever do that? | 09:18 |
| 25 | A.    No. | 09:18 |

David Bliesner, Ph.D.           Videotaped              January 25, 2011

                                                              Page 13

 1      Q.    Do you still coach?                        09:18

 2      A.    I don't know if I understand what you      09:19

 3   mean by "coach."                                    09:19

 4      Q.    Well, you have a website that talks        09:19

 5   about your online shotgun classes.  I think it      09:19

 6   even says the word "coach."                         09:19

 7      Do you still do that?                            09:19

 8      A.    I don't know if I understand what you      09:19

 9   mean by "coach."                                    09:19

10      Q.    Did you ever play any sports in high       09:19

11   school or --                                        09:19

12      A.    Yes.                                       09:19

13      Q.    -- college?                                09:19

14      A.    Yes.                                       09:19

15      Q.    Did you have coaches?                      09:19

16      A.    Yes.                                       09:19

17      Q.    Elders, those with more experience who     09:19

18   taught you how to block or tackle or do freestyle   09:19

19   better?                                             09:19

20      A.    Whatever sport.                            09:19

21      Q.    Okay.  So you do have a website that       09:19

22   talks about you being the online coach?             09:19

23      A.    No, it does not talk about me being the    09:19

24   online coach.                                       09:19

25      Q.    Okay.  I want to make sure I'm not         09:19

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 14

| | | |
|---|---|---|
| 1 | misquoting anything.  Is the name of the website | 09:20 |
| 2 | still claycoachonline.com? | 09:20 |
| 3 | A.    It is. | 09:20 |
| 4 | Q.    So the word "coach" is in the title of | 09:20 |
| 5 | the website; correct? | 09:20 |
| 6 | A.    It is, correct. | 09:20 |
| 7 | Q.    All right. | 09:20 |
| 8 | So what is it? | 09:20 |
| 9 | A.    It's what it says on the web page there. | 09:20 |
| 10 | Q.    Yeah, but what is it?  Is it just a | 09:20 |
| 11 | video system that you sell? | 09:21 |
| 12 | A.    It's more than a video system. | 09:21 |
| 13 | Q.    But you don't do one-on-one coaching | 09:21 |
| 14 | with people; right? | 09:21 |
| 15 | A.    Again, how do you define "coaching"? | 09:21 |
| 16 | Q.    Teaching, encouraging, helping them | 09:21 |
| 17 | improve, trying to tell them about their | 09:21 |
| 18 | technique. | 09:21 |
| 19 | A.    Professionally, for a fee? | 09:21 |
| 20 | Q.    I didn't ask that.  Do you do that at | 09:21 |
| 21 | all, whether for free or for a fee? | 09:21 |
| 22 | A.    Coaching again, you know, I have | 09:21 |
| 23 | children.  I coach all the time. | 09:21 |
| 24 | Q.    Okay.  Do you know the difference | 09:21 |
| 25 | between probability and possibility? | 09:21 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 15

| | | | |
|---|---|---|---|
| 1 | A. | From a legal term? | 09:21 |
| 2 | Q. | Do you know the difference between | 09:21 |
| 3 | probability and possibility? | | 09:22 |
| 4 | A. | In what context? | 09:22 |
| 5 | Q. | Any context. | 09:22 |
| 6 | A. | No. | 09:22 |
| 7 | Q. | So in your work as -- in the | 09:22 |

7      Q.    So in your work as -- in the          09:22
8   pharmaceutical business and then as a          09:22
9   pharmaceutical consultant, you've never understood   09:22
10   the distinction between possibility and          09:22
11   probability?                            09:22
12      A.    I don't recall whether I've ever sat   09:23
13   down and thought about the difference between the   09:23
14   two.                                   09:23
15      Q.    Okay.  Do -- does adherence with GMPs   09:23
16   absolutely guarantee that a drug product will be   09:23
17   within its specifications all the time?        09:23
18      A.    Could you say that again, please.      09:23
19         MR. MORIARTY:  Would you read that back,   09:23
20      please?                              09:23
21         (Whereupon, the testimony was read       09:23
22   back by the court reporter, as recorded above)   09:23
23         THE WITNESS:  When you say GMPs, what    09:23
24      specifically are you talking about?         09:24
25   BY MR. MORIARTY:                         09:24

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 16

| | | | |
|---|---|---|---|
| 1 | Q. | Do you go by Dr. or Mr.? | 09:24 |
| 2 | A. | Doctor. | 09:24 |
| 3 | Q. | Okay.  Dr. Bliesner, it has been | 09:24 |

```
 4    represented to me in your resume, in your website,      09:24
 5    and in this lengthy report that you authored in         09:24
 6    the Digitek case, that you are an expert in GMPs        09:24
 7    for the pharmaceutical industry.                        09:24
 8        A.    That is true.                                 09:24
 9        Q.    So why are you asking me what I mean by       09:24
10    GMPs?                                                   09:24
11        A.    I'm not sure if you understand the           09:24
12    definition of GMPs in some context.  Some people       09:24
13    don't.                                                  09:24
14        Q.    Well, I do.                                   09:24
15        A.    Okay.                                         09:24
16        Q.    Okay.  So can you answer my question?        09:24
17        A.    Are we talking about 21 CFR 210 and          09:24
18    211?                                                    09:24
19        Q.    You got other GMPs for the                   09:24
20    pharmaceutical industry?                                09:24
21        A.    There's currently industry practices         09:24
22    that sometimes people --                                09:24
23        Q.    No, GMPs.                                     09:24
24        A.    21 CFR 210, 211?                              09:24
25        Q.    Yes, sir.                                     09:24
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                      Page 17

 1      A.    Okay.  And your question again, please.      09:24

 2      Q.    Does adherence with GMPs guarantee to        09:24

 3  100 percent certainty that a drug product will         09:25

 4  always meet its specifications as set forth in the     09:25

 5  United States pharmacopeia?                            09:25

 6      A.    Following the GMPs; right?  I just want      09:25

 7  to make sure I understand what your question is.       09:25

 8  That you're saying if you follow the GMPs, then        09:25

 9  there's a 100 percent guarantee that those             09:25

10  products will be -- what was the term?                 09:25

11      Q.    Within their specs.                          09:25

12      A.    Within their specs.  There's no              09:25

13  guarantee, 100 percent guarantee.                      09:25

14      Q.    Okay.  So you would agree with me that       09:25

15  adherence with GMPs increases the chances that         09:25

16  they will be within the specs; is that right?          09:25

17      A.    Could you say that again, please?            09:26

18          MR. MORIARTY:  Can you read it back,           09:26

19      please.                                            09:26

20             (Whereupon, the testimony was read          09:26

21  back by the court reporter, as recorded above)         09:26

22          THE WITNESS:  The GMPs are a minimum           09:26

23      standard that's laid out by the federal            09:26

24      government.                                         09:26

25  BY MORIARTY:                                           09:26

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 18
 1      Q.    That wasn't my question.  My question is      09:26
 2   whether in your opinion adherence to the GMPs          09:26
 3   increases the chances that a drug product will         09:26
 4   meet its USP specs.                                    09:26
 5      A.    Possibly.                                     09:26
 6      Q.    Now you used the word "possibly."             09:26
 7      A.    Uh-huh.                                       09:26
 8      Q.    You told me earlier you don't know the        09:26
 9   difference between possibility and probability.        09:26
10   So tell me what you mean by possibility or             09:26
11   possibly in that answer.                               09:26
12      A.    Previously I actually said I've never         09:27
13   sat down and thought about the difference between      09:27
14   possibility and possibility.  In this case you're      09:27
15   asking me what I mean by possibly.                     09:27
16      Q.    Yeah, what do you mean by possibly in         09:27
17   that answer?                                           09:27
18      A.    Again, the GMPs are a minimum set of          09:27
19   standards.  They're designed to provide operating      09:27
20   space if you will, to produce drugs that are safe      09:27
21   and effective.  And just because you follow them       09:27
22   doesn't guarantee that everything you make falls       09:27
23   into those categories.                                 09:27
24      Q.    Okay.  But if you adhere to them, does        09:27
25   it increase the chances that you will meet the         09:27

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 19

 1  ANDA or NDA or USP specs for that drug?                    09:27

 2      A.    I don't think that you can say just              09:28

 3  because you follow the law it makes your product           09:28

 4  going to be better.                                        09:28

 5      Q.    Okay.  Have you ever heard of the                09:28

 6  scientific method?                                         09:28

 7      A.    Yes.                                             09:28

 8      Q.    What is it?                                      09:28

 9      A.    Scientific method is a systematic means          09:28

10  of developing a hypothesis, collecting data.               09:28

11  After doing experiments, analyzing the data,               09:28

12  drawing conclusions to try to support or detract           09:28

13  from your hypothesis.                                      09:28

14      Q.    Is the scientific method best achieved           09:28

15  when you actually look at the underlying data as           09:28

16  opposed to somebody's interpretation of the data?          09:29

17      A.    The scientific method is an approach to          09:29

18  collecting data.                                           09:29

19      Q.    Okay.  But in order to reach                     09:29

20  scientifically valid conclusions, should you look          09:29

21  at the actual data as opposed to somebody's                09:29

22  interpretation of the data?                                09:29

23      A.    I don't know if I understand exactly             09:29

24  your question.                                             09:29

25      Q.    Well, in your -- in your reading to              09:29

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 20

```
 1   prepare opinions in this case, you read this      09:29
 2   article by Jerry Bauman and Robert Didomenico and 09:29
 3   William Galanter about Digoxin; correct?          09:30
 4       A.    May I see it?                            09:30
 5       Q.    Sure.  That Post-It may even say what    09:30
 6   the reference was in your report.                  09:30
 7       A.    May I take a moment and confirm that     09:30
 8   that is the article that I read?                   09:30
 9       Q.    If you don't trust me, go ahead.         09:30
10       A.    Okay.  I need to step over here and grab 09:30
11   a --                                               09:30
12       Q.    Go ahead.  Be careful with your          09:30
13   microphone cord.                                   09:30
14          MR. KERENSKY:  Yeah, take it off.           09:30
15          THE WITNESS:  I did review that             09:32
16       document.                                      09:32
17   BY MR. MORIARTY:                                   09:32
18       Q.    The document is an article from the      09:32
19   medical literature, is it not?                     09:32
20       A.    Yes.                                     09:32
21       Q.    Do you commonly read medical literature? 09:32
22       A.    How do you define commonly?              09:32
23       Q.    Well, how many articles have you read    09:32
24   about Digoxin in the past two years?               09:32
25       A.    I don't recall.                          09:32
```

David Bliesner, Ph.D.          Videotaped               January 25, 2011

Page 21

```
 1      Q.    Do you subscribe to any medical          09:32
 2   journals?                                         09:32
 3      A.    When you say subscribe, permanent        09:32
 4   subscription?                                     09:33
 5      Q.    Well, I don't expect that any            09:33
 6   subscription is permanent, but people subscribe to  09:33
 7   magazines for several years, maybe a year, maybe  09:33
 8   two, maybe for their entire career.               09:33
 9      Do you subscribe to any medical journals?      09:33
10      A.    I buy access to online medical journals, 09:33
11   sites, and articles.                              09:33
12      Q.    And what sites are those?                09:33
13      A.    I'd have to go back and look it up.       09:33
14      Q.    But the bottom line is that this article 09:33
15   doesn't just contain data.  It contains analysis  09:33
16   of data and editorial information about the data;  09:33
17   correct?                                          09:33
18      A.    What do you mean by editorial?           09:33
19      Q.    Well, did you -- when did you last read   09:33
20   that article?                                     09:34
21      A.    Bless you.  I don't recall.  I guess      09:34
22   probably early on when Miller firm contacted me    09:34
23   somewhere in January.                             09:34
24      Q.    Do you read the newspaper?               09:34
25      A.    Occasionally.                            09:34
```

David Bliesner, Ph.D.          Videotaped               January 25, 2011

```
                                                          Page 22
 1      Q.     Does it have an editorial section?       09:34
 2      A.     Yes.                                      09:34
 3      Q.     Do you know the editorial section from   09:34
 4  the rest of the newspaper?                           09:34
 5      A.     Yes.                                      09:34
 6      Q.     So you have some idea what editorial     09:34
 7  means, don't you?                                    09:34
 8      A.     Yes.                                      09:34
 9      Q.     I'm handing you what has been marked as  09:34
10  Exhibit 78A.                                         09:35
11      Have you ever seen that before?                  09:35
12      A.     Do you mind if I check my notes?          09:35
13      Q.     Oh, by all means.  Let me ask you this   09:35
14  first:  Do you have -- in this report that you       09:35
15  drafted, do you repeatedly refer to 21 United        09:35
16  States Code, Section 351, the section that defines   09:35
17  adulteration?                                         09:35
18      A.     Repeatedly.                                09:36
19      Q.     Yeah.                                      09:36
20      A.     Can I see the report?                      09:36
21      Q.     Do you ever refer to it?  I'm not going   09:36
22  to quibble about the quantification.  Do you ever    09:36
23  refer to this report?                                09:36
24      A.     What's the number of that document?       09:36
25      Q.     21 United States Code, Section 351.       09:36
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

                                                              Page 23

```
 1     A.    May I see the report, please?           09:36

 2     Q.    You have your own copy?                 09:36

 3     A.    I do.                                   09:36

 4     Q.    See if you ever refer to the section    09:36

 5   that defines what adulterated drug product is -- 09:36

 6     A.    Say again the code that you are         09:36

 7   specifically citing.                            09:36

 8     Q.    351 --                                  09:36

 9     A.    21 CFR, 351?                            09:36

10     Q.    Yeah.  While you're looking, tell me how 09:36

11   long again you took to prepare for today's     09:36

12   deposition --                                  09:36

13          MR. KERENSKY:  Oh, my.  Let's not get    09:36

14       testy.  It's his first deposition.  He's    09:36

15       taking his time.  Let's not get testy.      09:36

16          MR. MORIARTY:  Okay.  I'll withdraw that  09:36

17       question.  See if you ever refer to this code 09:36

18       provision in your report.                   09:36

19          THE WITNESS:  On page 9, difficulty in   09:37

20       manufacture of Digoxin tablets have been known 09:37

21       for some time and the concern to FDA --     09:37

22          THE COURT REPORTER:  Sir, slow down.     09:37

23          THE WITNESS:  Oh, I'm sorry.             09:37

24   BY MR. MORIARTY:                                09:37

25     Q.    You don't have to read all that.  Just  09:37
```

David Bliesner, Ph.D.            Videotaped              January 25, 2011

                                                          Page 24

```
 1   tell me do you refer to it in the report, yes or      09:37
 2   no?                                                   09:37
 3       A.     21 CFR, Part 310.500?                      09:37
 4       Q.     351 United States Code.  Not the code of   09:37
 5   Federal regulations, the United States code, 21       09:37
 6   USC 351.  It defines adulteration.  Do you refer      09:37
 7   to that in your report?  What page are you on?        09:37
 8       A.     Fifteen.                                   09:39
 9       Q.     Let's -- let me withdraw the question      09:39
10   and ask you another question.                         09:39
11       A.     Okay.                                      09:39
12       Q.     Do you use the word "adulterated" in      09:39
13   your report?  Without looking, do you remember off    09:39
14   the top of your head whether you used the word        09:39
15   "adulterated" in your report?                         09:39
16       A.     Okay.                                      09:40
17       Q.     Do you know what it means?                 09:40
18       A.     Yes.                                       09:40
19       Q.     Okay.  Let's look back at 78A, which is    09:40
20   the statutory definition of adulteration; okay?       09:40
21   Have you ever seen this before?                       09:40
22       A.     This document, 78A?                        09:40
23       Q.     Have you ever seen 21 USC Section 351,     09:40
24   the definition of adulteration?                       09:40
25       A.     I have reviewed the Federal Food, Drug     09:41
```

David Bliesner, Ph.D.              Videotaped                    January 25, 2011

Page 25

```
 1  and Cosmetic Act.                                      09:41
 2       Q.    Okay.                                        09:41
 3       A.    Online.                                      09:41
 4       Q.    So --                                        09:41
 5       A.    But I do not commit the numbers to          09:41
 6  memory.                                                 09:41
 7       Q.    Okay.  But you have seen this statute        09:41
 8  before, whether you saw it on a piece of paper or      09:41
 9  online; correct?                                        09:41
10       A.    I'm not sure whether the document you       09:41
11  have in front of me is what I reviewed online.         09:41
12       Q.    What does that mean?  Do you think you      09:41
13  looked at a different version of the United States     09:41
14  code or a different provision of the code?             09:42
15       A.    Possibly.  Whatever version this was        09:42
16  that's on the website for the Government printing      09:42
17  office.                                                 09:42
18       Q.    Okay.  Well, do you have a copy of this     09:42
19  in your own material that you printed and relied       09:42
20  on for purposes of your opinions in this case?         09:42
21       A.    78A?                                         09:42
22       Q.    Mr. Bliesner, 21 United States Code,        09:42
23  section 351, whether it's marked as an exhibit or      09:42
24  not.                                                    09:42
25       A.    Let me check.                                09:42
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 26

| | | |
|---|---|---|
| 1 | MR. MORIARTY:  Go off the record, | 09:42 |
| 2 | please. | 09:42 |
| 3 | THE VIDEOGRAPHER:  The time is now | 09:42 |
| 4 | 9:43 a.m. and we're going off the record | 09:42 |
| 5 | briefly. | 09:42 |
| 6 | (Short break) | 09:57 |
| 7 | THE VIDEOGRAPHER:  The time is 9:58 a.m. | 09:57 |
| 8 | We're back on the record. | 09:57 |
| 9 | BY MR. MORIARTY: | 09:57 |
| 10 | Q.    In the time that you did spend looking | 09:57 |
| 11 | in materials, you didn't find either 21 USC | 09:58 |
| 12 | section 351 or 21, Code of Federal Regulations, | 09:58 |
| 13 | Section 351, did you? | 09:58 |
| 14 | A.    In my stuff? | 09:58 |
| 15 | Q.    Correct. | 09:58 |
| 16 | A.    No, I did not. | 09:58 |
| 17 | Q.    But because the word adulteration is in | 09:58 |
| 18 | your written report, presumably you know what that | 09:58 |
| 19 | means; correct? | 09:58 |
| 20 | A.    Yes. | 09:58 |
| 21 | Q.    So what I've placed before you is | 09:58 |
| 22 | Exhibit 78A.  It is the United States Code | 09:58 |
| 23 | definition of adulteration. | 09:58 |
| 24 | A.    Okay. | 09:58 |
| 25 | Q.    And I'm going to refer to Section A2(b) | 09:58 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 27

```
 1   okay.  And A2(b) is -- see A right here?              09:58

 2        A.    Yes.                                       09:58

 3        Q.    And then there's one?                      09:58

 4        A.    Yes.                                       09:58

 5        Q.    And then there's two and then there's      09:58

 6   2(b) down here; okay?                                 09:58

 7        A.    2(b).                                       09:58

 8        Q.    2(b).  I would like you to read A2(b) to   09:58

 9   yourself.                                             09:59

10           MR. KERENSKY:  I can't even find A2(b).       09:59

11           MR. MORIARTY:  The first page, Mike.          09:59

12           THE WITNESS:  Just to be clear, please.       09:59

13        It's the one that starts off, "if it is."        09:59

14   BY MR. MORIARTY:                                      09:59

15        Q.    If it is a drug --                         09:59

16        A.    Yes.                                       09:59

17        Q.    -- and the methods used in.                09:59

18        A.    Okay.                                      09:59

19        Q.    You see that?                              09:59

20        A.    Yes.                                       09:59

21        Q.    Read that to yourself, please.             09:59

22        Have you read it?                                09:59

23        A.    Yes.                                       09:59

24        Q.    Is that the definition of adulterated      09:59

25   with which you are familiar under circumstances       10:00
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                    Page 28

1    when GMPs are not complied with?                  10:00

2        A.    Yes.                                     10:00

3        Q.    All right.  Now, does that section A2(b) 10:00

4    say anything about drugs actually being outside    10:00

5    their specifications?                              10:00

6        A.    The word specification is not here.      10:00

7        Q.    Does it say anything about drugs being   10:00

8    dangerous to consumers?                            10:00

9        A.    It applies safety.                        10:00

10       Q.    Where does the word --                   10:01

11       A.    "As to safety and has the identity and   10:01

12   strength."                                         10:01

13       Q.    I'm asking whether it says anything      10:01

14   about danger to consumers.                         10:01

15       A.    It does not say anything in that         10:01

16   sentence.                                          10:01

17       Q.    Does it use the word -- does A2(b) use   10:01

18   the word defective?                                10:01

19       A.    The word defective is not here.          10:01

20       Q.    Does A2(b) say anything about whether    10:01

21   these adulterated products are possibly or likely  10:01

22   defective or out of specification?  Does that      10:01

23   phrase or wording appear anywhere in the statute?  10:02

24       A.    Could you say that again, please.        10:02

25             MR. MORIARTY:  Can you read that back?   10:02

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 29

| | | |
|---|---|---|
| 1 | (Whereupon, the testimony was read | 10:02 |
| 2 | back by the court reporter, as recorded above) | 10:02 |
| 3 | THE WITNESS:  Not right here in this | 10:02 |
| 4 | sentence, no. | 10:02 |
| 5 | BY MR. MORIARTY: | 10:02 |
| 6 | Q.    To the best of your knowledge, does that | 10:02 |
| 7 | phrase or wording appear in the Code of Federal | 10:02 |
| 8 | Regulations that mirrors this statutory | 10:02 |
| 9 | definition? | 10:02 |
| 10 | A.    I couldn't say because this regulation | 10:02 |
| 11 | is not one that we refer to in the industry.  We | 10:02 |
| 12 | stay with the GMPs.  This is the higher-level | 10:02 |
| 13 | document and the lawyers are concerned with this. | 10:02 |
| 14 | We are not, at the operational level. | 10:03 |
| 15 | Q.    And when you say the GMPs, are you | 10:03 |
| 16 | talking about Code of Federal Regulations, Title | 10:03 |
| 17 | 21, Section 210? | 10:03 |
| 18 | A.    210 and 211. | 10:03 |
| 19 | Q.    Okay.  So I'm handing you what's Exhibit | 10:03 |
| 20 | 75. | 10:03 |
| 21 | A.    Yes. | 10:04 |
| 22 | Q.    You've seen that before; correct? | 10:04 |
| 23 | A.    I have. | 10:04 |
| 24 | Q.    All right.  So -- | 10:04 |
| 25 | A.    Not this particular exhibit, but I have | 10:04 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                            Page 30
 1   seen 21 CFR 210 and 211.                          10:04
 2       Q.    So when we look at 210.1(b), it says,   10:04
 3       "The failure to comply with any regulations   10:04
 4   set forth in this part and in parts 211 through   10:04
 5   226 of this chapter, in the manufacture,          10:04
 6   processing, packing and folding of a drug, shall  10:04
 7   render such drug to be adulterated under section  10:04
 8   501 A(2)(b) of the Act, and such drug as well as  10:04
 9   the person who is responsible for the failure to  10:05
10   comply shall be subject to regulatory action."    10:05
11       Did I read that correctly?                    10:05
12       A.    Yes, sir.                               10:05
13       Q.    Now, is it -- is it your understanding  10:05
14   that this lawsuit is not a regulatory action?     10:05
15       A.    Regulatory action on the part of the    10:05
16   Government, is that -- is that what you're talking 10:05
17   about?                                            10:05
18       Q.    No, I'm asking is this lawsuit -- is it 10:05
19   your understanding that this lawsuit is or is not 10:05
20   a regulatory action?                              10:05
21       A.    It is not a regulatory action by the    10:05
22   Federal Government as I understand it.            10:05
23       Q.    Okay.  And that's what you understand   10:05
24   Exhibit 75, section 210.1(b) to mean, is a        10:05
25   regulatory action by the Federal Government;      10:06

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 31

```
 1   correct?                                           10:06
 2       A.    That's how I interpret it, yes.          10:06
 3       Q.    Now, does anything in 210.1(b) refer to  10:06
 4   out of specification, dangerous, or defective --   10:06
 5   by the way, please don't write on the exhibits.    10:06
 6       A.    Sorry.                                    10:06
 7       Q.    You really don't need your pen.          10:06
 8       MR. KERENSKY:  No, he can use his pen to       10:06
 9    help him find it, but he will not write on it.    10:06
10       MR. MORIARTY:  Put the cap on.                 10:06
11       THE WITNESS:  I won't write on your            10:06
12    documents.  Sorry.                                10:06
13       MR. MORIARTY:  They're not mine anymore.       10:06
14    Once I give them to you, they're not mine.        10:06
15       THE WITNESS:  I'm sorry.                        10:06
16   BY MR. MORIARTY:                                    10:06
17       Q.    The question is does 210.1(b) say        10:06
18   anything about out of specification, dangerous, or 10:06
19   defective?                                          10:06
20       A.    It does not say out of specification,    10:07
21   dangerous, or defective in here.                    10:07
22       Q.    Does Section A say those words?          10:07
23       A.    It's dangerous specifications and --     10:07
24       Q.    Dangerous, out of specification, or      10:07
25   defective.                                          10:07
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 32

| 1  | A.   No. | 10:07 |
| 2  | Q.   All right.  May have that Exhibit 75? | 10:07 |
| 3  | A.   Sure.  Can I have yours? | 10:07 |
| 4  | MR. KERENSKY:  Sure. | 10:07 |
| 5  | BY MR. MORIARTY: | 10:07 |
| 6  | Q.   Did you -- you wrote on that one, too. | 10:07 |
| 7  | Terry, can I have your 78(a)? | 10:07 |
| 8  | A.   Sorry. | 10:07 |
| 9  | Q.   All right.  So at some point last | 10:07 |
| 10 | winter, last spring, the Plaintiffs' lawyers sent | 10:08 |
| 11 | you material to review; correct? | 10:08 |
| 12 | A.   Yes. | 10:08 |
| 13 | Q.   Did you review it carefully? | 10:08 |
| 14 | A.   Yes. | 10:08 |
| 15 | Q.   Did you talk to them before you wrote | 10:08 |
| 16 | this report? | 10:08 |
| 17 | A.   In relation to the documents I was | 10:08 |
| 18 | getting, those types of things, yes. | 10:08 |
| 19 | Q.   Yeah.  And by the way, when we talk | 10:08 |
| 20 | about your report, we're talking about Exhibit 92, | 10:08 |
| 21 | are we not? | 10:08 |
| 22 | A.   I'm not sure because the page numbers | 10:09 |
| 23 | don't match up in content. | 10:09 |
| 24 | Q.   Did you write two versions of the | 10:09 |
| 25 | report? | 10:09 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 33

     1    A.    No.                                            10:09

     2    Q.    Are you sure?                                  10:09

     3    A.    Yeah.                                          10:09

     4    Q.    Well, does Exhibit 94 match the one you        10:09

     5   have with you?                                        10:09

     6    A.    No, the page numbers are off, which may        10:09

     7   be a matter of printing possibly.                     10:09

     8    Q.    Okay.  Do 92 and 94 appear to be your          10:09

     9   report, even though the page numbers may be off in    10:09

    10   some way?                                             10:10

    11    A.    They appear to be my report.                   10:10

    12    Q.    Okay.  So in the process, you reviewed         10:10

    13   material, you spoke with the lawyers who retained     10:10

    14   you and then ultimately you drafted a report;         10:10

    15   correct?                                              10:10

    16    A.    Yes.                                           10:10

    17    Q.    And were you aware that in this process        10:10

    18   of drafting the report, what you were doing was       10:10

    19   putting lawyers like me who represent the             10:10

    20   pharmaceutical manufacturer on notice of what your    10:10

    21   opinions were in this case?                           10:10

    22    A.    Can you say that again, please?                10:10

    23    Q.    As you went through this process, did          10:10

    24   you realize that the purpose of the report was not    10:10

    25   only to organize your thoughts but it was to put      10:10

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 34

```
 1   people like me on notice of what your opinions        10:10
 2   were?                                                 10:10
 3       A.    On notice I'm assuming is reporting the     10:10
 4   information that I saw and the conclusions I came     10:10
 5   to, yes.                                              10:10
 6       Q.    Yeah, put me on notice so that when I       10:11
 7   came to question you, I would have some idea as a     10:11
 8   starting point what your thoughts were; right?        10:11
 9       A.    I'm actually having difficulty here.  On    10:11
10   notice means different things to me than it may       10:11
11   mean to you.                                          10:11
12       Q.    Well, in some way you were communicating    10:11
13   to readers -- including people like me -- what        10:11
14   your opinions were; right?                            10:11
15       A.    Yes.                                        10:11
16       Q.    And you tried to do the best you could      10:11
17   to make your report thorough so that you would        10:11
18   remember in an organized fashion what your            10:11
19   opinions were; correct?                               10:11
20       A.    Correct.                                    10:11
21       Q.    And these lawyers like Fred Thompson,       10:11
22   and Meghan and Mike would know what your opinions     10:11
23   were; right?                                          10:11
24       A.    Correct.                                    10:11
25       Q.    And the court presumably, if it read        10:11
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 35

```
 1   your report, would know what your opinions are; is     10:11
 2   that right?                                            10:11
 3        A.    Correct, yes.                               10:11
 4        Q.    Now, let's go to page 6.  And what are      10:11
 5   you --                                                 10:11
 6        A.    Which version would you like me to use?     10:11
 7        Q.    Well, pick 92 or 94.  Let's see if          10:12
 8   they're the same.                                      10:12
 9        A.    Okay.  I'll look at 92.                      10:12
10        Q.    Sure.  Page 6.                              10:12
11        A.    Page 6?                                     10:12
12        Q.    Lower right hand corner.  Look at the       10:12
13   top.  Is paragraph four the first thing on the         10:12
14   page?                                                  10:12
15        A.    Review of Amide/Actavis Status of           10:12
16   Compliance with cGMPs:  My approach?                   10:12
17        Q.    Yes.                                        10:12
18        A.    Yes.                                        10:12
19        Q.    All right.  By the way, is that the same    10:12
20   in 94?                                                 10:12
21        A.    Let's take a look.  It is.                  10:12
22        Q.    And the same as the version you brought     10:12
23   with you?                                              10:12
24        A.    No.                                         10:12
25        Q.    Can I see the one you brought with you?     10:12
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 36

 1     A.    Yeah.  It appears to be a formatting      10:12
 2  page thing.                                        10:13
 3     Q.    Okay.  So it says here:  "In order to     10:13
 4  accurately evaluate the status of Amide/Actavis's  10:13
 5  status of compliance with the CGMPs, I took the    10:13
 6  following approach."                               10:13
 7     Did I read that correctly?                      10:13
 8     A.    You did.                                  10:13
 9     Q.    Now did the lawyers who retained you in   10:13
10  this litigation tell you that your charge or your  10:13
11  job in this case was to evaluate the status of my  10:13
12  client's compliance with the GMPs?                 10:13
13     A.    Yes.                                      10:14
14     Q.    And they did not tell you that your       10:14
15  charge or your task in this case was to help them  10:14
16  determine if out of specification Digitek actually 10:14
17  reached the hands of consumers; correct?           10:14
18     A.    My guidance from them was fairly          10:14
19  general, included evaluate, in your opinion, the   10:14
20  status of compliance with GMPs and how that may    10:14
21  have affected a product that was potentially       10:14
22  dangerous getting to market, Digitek being the     10:14
23  one.                                               10:14
24     Q.    Potentially dangerous?                    10:14
25     A.    Uh-huh.                                   10:14

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 37

| | | | |
|---|---|---|---|
| 1 | Q. | Right? | 10:15 |
| 2 | A. | Uh-huh. | 10:15 |
| 3 | Q. | You have to answer out loud. | 10:15 |
| 4 | A. | Yes, I'm sorry, yes. | 10:15 |
| 5 | Q. | Phil doesn't understand uh-huh, huh-uh, | 10:15 |

5   Q.   Phil doesn't understand uh-huh, huh-uh,   10:15
6 and shakes and nods; okay?   10:15
7   A.   Yes, sir.   10:15
8   Q.   So in bullet point number one, you   10:15
9 assumed that Amide and Actavis was a new   10:15
10 consulting client needing assistance with   10:15
11 determining their level of compliance with the   10:15
12 GMPs.  Is that what it says there?   10:15
13   A.   It does.   10:15
14   Q.   And you performed a paper audit of the   10:15
15 facility to determine past and current status of   10:15
16 compliance; right?   10:15
17   A.   That is correct.   10:15
18   Q.   And then you list what your audit   10:15
19 included; is that right?   10:15
20   A.   That's correct.   10:15
21   Q.   Now, how long have you been in the   10:15
22 consulting business in the pharmaceutical   10:15
23 industry?   10:15
24   A.   About 12, almost 13 years.   10:15
25   Q.   In those 12 to 13 years, how many times   10:15

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 38

| | | |
|---|---|---|
| 1 | have you actually been engaged by a pharmaceutical | 10:15 |
| 2 | company to do a project? | 10:16 |
| 3 |     A.    A project?  Any type of project? | 10:16 |
| 4 |     Q.    Any type of project. | 10:16 |
| 5 |     A.    How many times? | 10:16 |
| 6 |     Q.    Yeah. | 10:16 |
| 7 |     A.    It's numerous.  I'd have to really sit | 10:16 |
| 8 | down and think about it. | 10:16 |
| 9 |     Q.    How many times have you been asked by a | 10:16 |
| 10 | consulting client in those 12 to 13 years to | 10:16 |
| 11 | assess their status of compliance with GMPs? | 10:16 |
| 12 |     A.    At least five. | 10:16 |
| 13 |     Q.    In general, in the five times that you | 10:16 |
| 14 | were retained by a pharmaceutical client to assess | 10:16 |
| 15 | their GMP status, how many times in those five did | 10:16 |
| 16 | you look at batch records? | 10:17 |
| 17 |     A.    It's tough to say.  Numerous. | 10:17 |
| 18 |     Q.    Okay.  And when you did, did you look at | 10:17 |
| 19 | a lot of batch records? | 10:17 |
| 20 |     A.    Depends on how you're going to define "a | 10:17 |
| 21 | lot." | 10:17 |
| 22 |     Q.    Did you look at more than one batch | 10:17 |
| 23 | record? | 10:17 |
| 24 |     A.    Yes. | 10:17 |
| 25 |     Q.    Did you look at more than two? | 10:17 |

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 39

```
 1     A.    Yes.                                      10:17
 2     Q.    Did you look at annual reports or annual  10:17
 3  data reviews in these five times when you were    10:17
 4  asked by pharmaceutical companies to assess their 10:17
 5  compliance?                                        10:17
 6     A.    Yes.                                      10:17
 7     Q.    Did you look at FDA 484 testing if it     10:17
 8  was available?                                     10:18
 9     A.    No.                                       10:18
10           THE VIDEOGRAPHER:  We have five minutes   10:18
11     left on the tape.                               10:18
12  BY MR. MORIARTY:                                   10:18
13     Q.    Do you know what US or FDA 484 testing    10:18
14  is?                                                10:18
15     A.    Generally.                                10:18
16     Q.    Okay.  If the pharmaceutical clients      10:18
17  that you hired had hired other companies to help   10:18
18  them remediate 483s and warning letters, did you   10:18
19  look at those remediation documents?               10:18
20     A.    Yes.                                      10:18
21     Q.    Did you look at any sort of independent   10:18
22  testing of the product if it was available to you? 10:18
23     A.    Yes.                                      10:18
24     Q.    And just to wrap up this segment before   10:18
25  the tape expires, I assume that you, when you      10:18
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 40

| | | |
|---|---|---|
| 1 | looked at things like batch records and annual | 10:18 |
| 2 | reports and annual data reviews, you would have | 10:18 |
| 3 | been looking at finished product test results for | 10:18 |
| 4 | various products; is that true? | 10:19 |
| 5 | A.    Yes, and active pharmaceutical | 10:19 |
| 6 | ingredients as well. | 10:19 |
| 7 | MR. MORIARTY:  Let's take our tape | 10:19 |
| 8 | break. | 10:19 |
| 9 | THE VIDEOGRAPHER:  The time is | 10:19 |
| 10 | a.m.  We're going off the record | 10:19 |
| 11 | briefly. | 10:19 |
| 12 | (Short break) | 10:22 |
| 13 | THE VIDEOGRAPHER:  The time is now | 10:22 |
| 14 | 10:23 a.m.  We are back on record.  This is | 10:22 |
| 15 | the beginning of tape two. | 10:22 |
| 16 | BY MR. MORIARTY: | 10:22 |
| 17 | Q.    So getting back to how you did this | 10:22 |
| 18 | paper audit, another thing that I forgot to ask | 10:22 |
| 19 | you about is when you have checked GMP compliance | 10:22 |
| 20 | for some of your pharmaceutical clients, do you | 10:23 |
| 21 | look at process validation studies? | 10:23 |
| 22 | A.    I have, yes. | 10:23 |
| 23 | Q.    All right.  So in this litigation, how | 10:23 |
| 24 | many process validation studies for Digitek did | 10:23 |
| 25 | you look at? | 10:23 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 41

 1     A.    None were made available to me that I          10:23

 2   recall.                                                 10:23

 3     Q.    Did the Plaintiffs' lawyers make                10:23

 4   available to you an online repository of                10:23

 5   documents?                                              10:23

 6     A.    Yes.                                            10:23

 7     Q.    Did you look through there to see what          10:23

 8   was in there?                                           10:23

 9     A.    Yes.                                            10:23

10     Q.    And --                                          10:23

11     A.    In detail.                                      10:23

12     Q.    And process validation studies were not        10:23

13   there?                                                  10:23

14     A.    At the time I reviewed it, not to my            10:23

15   knowledge.                                              10:23

16     Q.    All right.  Now this is Exhibit 1.  It's        10:23

17   the Amide process validation report for Digitek,        10:23

18   .125, at the batch size of 1,600,000 tablets.           10:24

19         Have you ever seen that before?                   10:24

20     A.    May I check my documents?  It may have          10:24

21   been associated with an investigation.                  10:24

22     Q.    Do you have a list so that we don't have        10:24

23   to watch you thumb through the boxes?  I mean you        10:24

24   told me a minute ago you don't recall seeing             10:24

25   them.  I'm just trying to verify whether you've          10:24

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                        Page 42

 1    seen this or not.                                  10:24

 2        A.    It could have been part of the ANDA that 10:24

 3    I looked at and I don't recall.  It might have     10:24

 4    been part of the investigation.  So it would have  10:24

 5    been part of a document associated with this.  As  10:24

 6    far as a specific, stand-alone process validation, 10:25

 7    I don't believe I ever saw one.                    10:25

 8        Q.    Here is Exhibit 1(a), which is the       10:25

 9    validation study for Digitek when they ramped the  10:25

10    .125 dose strength up to 4.8 million tablet batch   10:25

11    sizes.                                             10:25

12        Do you recall whether you've seen that         10:25

13    before?                                            10:25

14        A.    I don't recall seeing this document.     10:25

15        Q.    I'm showing you Exhibit 1(b).  I believe 10:25

16    this is the process validation when they were      10:25

17    still at the batch size of 1.6 million, but at a   10:25

18    different press speed.                             10:25

19        Have you ever seen that?                       10:26

20        A.    Let me check my documents, please.       10:26

21        Q.    Go ahead.  Look for every process        10:26

22    validation that you had because I have two more.   10:26

23    Look at the index or something.  Are you on or     10:26

24    off?                                               10:26

25            THE VIDEOGRAPHER:  On.  Would you like me  10:26

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 43

| | | |
|---|---|---|
| 1 | to go off? | 10:26 |
| 2 | MR. MORIARTY:  Sure. | 10:27 |
| 3 | THE VIDEOGRAPHER:  The time is | 10:27 |
| 4 | a.m.  We're going off the record | 10:27 |
| 5 | briefly. | 10:27 |
| 6 | (Short break) | 10:30 |
| 7 | THE VIDEOGRAPHER:  The time is | 10:30 |
| 8 | a.m.  We are back on the record. | 10:30 |
| 9 | BY MR. MORIARTY: | 10:30 |
| 10 | Q.   So, so far, we've talked about 1, 1(a) | 10:30 |
| 11 | and 1(b).  The question is are those in your | 10:30 |
| 12 | documents that you reviewed to formulate opinions | 10:30 |
| 13 | in this case? | 10:30 |
| 14 | A.   Just so you know, this is a list of | 10:30 |
| 15 | every document I reviewed online.  I just want to | 10:32 |
| 16 | make sure that I'm not misspeaking, so... | 10:32 |
| 17 | Q.   Did you print everything you reviewed | 10:32 |
| 18 | online? | 10:32 |
| 19 | A.   No, there's just too much.  It does not | 10:32 |
| 20 | appear that I had access nor reviewed process | 10:33 |
| 21 | validation. | 10:33 |
| 22 | Q.   Okay.  So Exhibit 2, just for | 10:33 |
| 23 | completeness, this is the process validation for | 10:33 |
| 24 | the 4.2 million tablet batch sizes for .25 | 10:33 |
| 25 | Digoxin.  You haven't seen this document? | 10:34 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 44

```
 1     A.    No.                                        10:34

 2     Q.    And Exhibit 3, did you know that           10:34

 3  Digitek, like other Digoxin products, used to be    10:34

 4  made in .5 milligrams?                              10:34

 5     A.    I don't recall that fact.                  10:34

 6     Q.    No?  This is Exhibit 3.                    10:34

 7     A.    Uh-huh.                                    10:34

 8     Q.    This is the process validation for the     10:34

 9  .5 milligram Digitek.  Have you ever seen that      10:34

10  document?                                           10:34

11     A.    No.                                        10:34

12     Q.    May I see that compendium of documents     10:34

13  you reviewed online but you did not print or put    10:34

14  in your boxes?                                      10:34

15     A.    Sure.                                      10:34

16     Q.    I'm going to put an exhibit sticker on     10:34

17  this.                                               10:34

18     A.    Sure.                                      10:34

19     Q.    These go together, these two?             10:34

20     A.    Yes.                                        10:34

21     Q.    Okay.                                      10:34

22     A.    One's for Mylan documents and others       10:34

23  were a Plaintiffs' exhibit, if I'm not mistaken.    10:34

24     Q.    Okay.  So.  I am going --                 10:35

25     A.    They were organized differently on the     10:35
```

David Bliesner, Ph.D.              Videotaped                    January 25, 2011

                                                                    Page 45

     1   website.                                                    10:35

     2        Q.    I'm going to put Exhibit 107 on the list         10:35

     3   you made of the Mylan documents and 108 on the              10:35

     4   Plaintiffs' exhibits; okay?                                 10:35

     5        (Whereupon, Exhibits 107 and 108 were marked           10:35

     6   for identification)                                         10:35

     7        A.    Okay.                                            10:35

     8        Q.    I partially obscured your e-mail address         10:35

     9   for this one; okay.                                         10:35

    10        Tell us all in general what process validation        10:35

    11   is briefly.                                                 10:35

    12        A.    Briefly, process validation is just the         10:35

    13   process of following a protocol, delineating those          10:35

    14   critical components in the manufacturing process            10:35

    15   that need to be varied and see the observing                10:35

    16   effect on the product you have.                             10:36

    17        Q.    Once a pharmaceutical company has                10:36

    18   validated a process in manufacturing a                      10:36

    19   pharmaceutical --                                           10:36

    20        A.    Uh-huh.                                          10:36

    21        Q.    -- does that in essence mean that they           10:36

    22   have shown that they can make the drug within its           10:36

    23   specifications consistently?                                10:36

    24        A.    That is the purpose of process                   10:36

    25   validation in general.  However, I will tell you            10:36

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 46

1   this:  I am not a process validation expert.  I          10:36
2   support process validation from a laboratory,            10:36
3   cross-functional standpoint, including reviewing         10:36
4   the protocols and looking at the samples that are        10:36
5   to be tested and how they are to be tested.              10:36
6       Q.    Okay.  So you have been involved in            10:36
7   process validation from the what I would call QC         10:36
8   or lab perspective; right?                               10:36
9       A.    No, analytical R&D.                            10:36
10      Q.    Okay.                                          10:36
11      A.    Which is different than a QC.                  10:36
12      Q.    Not even finished product testing?             10:36
13      A.    No, that's not true.  I've done both.          10:36
14      Q.    Okay.  But the fact is that when you           10:37
15  have a process validation for the manufacturer of        10:37
16  a pharmaceutical, it includes the equipment you're       10:37
17  going to use to blend it, press it, package it,          10:37
18  and all the steps you're going to take to test it        10:37
19  to assure as best you can that you consistently          10:37
20  produce the product within its ANDA or NDA or USP        10:37
21  specs; correct?                                          10:37
22      A.    In general I'd say that's a fair               10:37
23  assessment.                                              10:37
24      Q.    And when the FDA approved the ANDA for         10:37
25  Digitek, at least at some point the FDA was              10:37

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 47

 1    satisfied that the processes to make that drug had      10:37

 2    been validated; correct?                               10:37

 3        A.    By review of the application, what was        10:38

 4    in the application and what was associated with         10:38

 5    the process validation, yes, at that time.              10:38

 6        Q.    Okay.  Now have you been in the               10:38

 7    pharmaceutical business long enough to know what        10:38

 8    the batch certification program was?                    10:38

 9        A.    After reviewing the documents related to      10:38

10    this case, yes.                                         10:38

11        Q.    All right.  And batch certification was       10:38

12    when you actually had to submit samples of product      10:38

13    to the FDA from a batch before you could ship it        10:38

14    to market; correct?                                     10:38

15        A.    All I know is what I'm familiar with,         10:38

16    with this case, that Digitek was part of that.  As      10:38

17    far as other drugs, I couldn't say.                     10:38

18        Q.    All right.  So, for example, have you         10:38

19    ever seen Exhibit 4, which was a letter from FDA        10:38

20    to what later became my client verified or             10:38

21    certifying that these batches could be                 10:39

22    distributed?                                            10:39

23        Have you ever seen that letter?                    10:39

24        A.    Possibly.                                     10:39

25        Q.    Have you ever seen Exhibit 5?  Please        10:39

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                         Page 48

 1   take a look at Exhibit 5.                             10:39

 2        A.    Uh-huh.                                    10:39

 3        Q.    I will tell you that it's a letter from    10:39

 4   July 1995 from the FDA to Amide exempting it from     10:39

 5   the batch certification process.                      10:39

 6        Have you ever seen that?                         10:39

 7        A.    I don't recall.                            10:39

 8        Q.    At least --                                10:40

 9        A.    It's possible it could be part of the      10:40

10   ANDA package and I may have seen it, but I'm not      10:40

11   sure.                                                 10:40

12        Q.    At least as of that time --                10:40

13        A.    Uh-huh.                                    10:40

14        Q.    -- FDA was satisfied that Actavis was      10:40

15   making this product within its specifications         10:40

16   consistently so that it didn't need the advance       10:40

17   approval to ship product to market.  Is that          10:40

18   essentially what that says?                           10:40

19        A.    Let me take a look at this.  As I          10:40

20   understand the batch certification process back in    10:40

21   1995, from what I have reviewed from these case       10:40

22   documents, I'd say that statement is accurate.        10:40

23        Q.    All right.  Now have you heard the         10:40

24   phrase in the pharmaceutical business a process       10:40

25   that is in control?                                   10:40

David Bliesner, Ph.D.          Videotaped               January 25, 2011

Page 49

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 10:40 |
| 2 | Q. | So part of process validation is to | 10:40 |
| 3 | assure that your process is in control; correct? | | 10:41 |
| 4 | A. | Correct. | 10:41 |
| 5 | Q. | Now, let's get back to your report and | 10:41 |
| 6 | whether you look at -- | | 10:41 |
| 7 | A. | Whatever copy, yeah. | 10:41 |
| 8 | Q. | And just so you know, I think one | 10:41 |
| 9 | version was produced in the Philadelphia | | 10:41 |
| 10 | litigation and the other was produced in the MDL. | | 10:41 |
| 11 | I think that's what the difference is. | | 10:41 |
| 12 | A. | Okay. | 10:41 |
| 13 | Q. | So you'll notice that the one on your | 10:41 |
| 14 | right, 94 -- | | 10:41 |
| 15 | A. | Yes. | 10:41 |
| 16 | Q. | -- has a Philadelphia caption on it; | 10:41 |
| 17 | okay?  See that up top? | | 10:41 |
| 18 | A. | Yes. | 10:41 |
| 19 | Q. | So look at 92, which was your MDL | 10:41 |
| 20 | report.  Now in the first paragraph, where you say | | 10:41 |
| 21 | purpose. | | 10:41 |
| 22 | A. | Uh-huh. | 10:41 |
| 23 | Q. | In the last sentence you talk about a | 10:41 |
| 24 | high likelihood that adulterated drug product made | | 10:41 |
| 25 | it to the marketplace. | | 10:42 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                   Page 50

 1      Do you see that?                           10:42

 2      A.    Yes.                                 10:42

 3      Q.    And then if you go all the way back to   10:42

 4   your conclusion at page 21, you talk about    10:42

 5   adulterated product making it to the marketplace.   10:42

 6      Do you see that?                           10:42

 7      A.    Yes, I do.                           10:42

 8      Q.    Now, I reviewed your report pretty   10:42

 9   carefully.                                    10:42

10      A.    Uh-huh.                              10:42

11      Q.    Nowhere do I see you make any statement   10:42

12   in this 21 page report that Digitek which was   10:42

13   actually out of its specifications made it to the   10:42

14   hands of consumers.                           10:42

15      Am I correct about that?                   10:42

16      A.    In this report?                      10:42

17      Q.    Yes, sir.                            10:42

18      A.    I don't know if I agree with that.   10:42

19      Q.    Let me ask that a different way.     10:43

20      A.    Uh-huh.                              10:43

21      Q.    In the opinions section of your report   10:43

22   --                                            10:43

23      A.    Uh-huh.                              10:43

24      Q.    -- anywhere do you say that out of   10:43

25   specification Digitek made it to the hands of   10:43

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 51

```
 1   consumers or to the marketplace?                    10:43
 2        A.     Those specific words, out of             10:43
 3   specification?                                       10:43
 4        Q.     Yes, sir.                                10:43
 5        A.     I don't believe I used the term "out of  10:44
 6   specification."  However, if you look at 22, we      10:45
 7   have an instance it goes back to my references       10:45
 8   that there was a pharmacist in Bellingham,           10:45
 9   Washington, who found double-thick tablets which     10:45
10   would be out of specification.                       10:45
11        Q.     Okay.  I'm asking in your opinions       10:45
12   section in your report, that would be a fact upon    10:45
13   which you would rely.  I'm asking if in any          10:45
14   opinion section?                                     10:45
15        A.     Used the word specification?            10:45
16        Q.     Yeah.  No, out of specification.        10:45
17        A.     Not that I recall.                       10:45
18        Q.     Is there anywhere in the opinions        10:45
19   section in your report where you render an opinion   10:45
20   that dangerous Digitek made it to the marketplace    10:45
21   or into the hands of consumers?                      10:45
22        A.     I did not use the word dangerous;        10:45
23   however, you know it's --                            10:45
24        Q.     Is there any place?                      10:45
25             MR. KERENSKY:  Wait.  He just said         10:45
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 52

```
 1       "however."                                       10:45
 2           MR. MORIARTY:  I don't.  I want answers       10:45
 3       to my questions.                                  10:45
 4           MR. KERENSKY:  No, he gets to say             10:45
 5       "however", if he wants to say "however."          10:46
 6           MR. MORIARTY:  Go ahead with your             10:46
 7       however.                                          10:46
 8           THE WITNESS:  However, you look through       10:46
 9       the literature that was available to me, it's     10:46
10       obvious that Digitek which was out of             10:46
11       specification -- thick, thin, whatever -- has     10:46
12       showed up several times in the marketplace.       10:46
13   BY MR. MORIARTY:                                      10:46
14       Q.    We'll get to that.                          10:46
15       A.    Okay.                                       10:46
16       Q.    Is there anywhere in your report where      10:46
17   you render an opinion that defective Digitek made     10:46
18   it to the marketplace?                                10:46
19       A.    I don't believe I used the word            10:46
20   "defective."                                          10:46
21       Q.    Your conclusion in the both the            10:46
22   beginning and end is that it was adulterated;         10:46
23   correct?                                              10:46
24       A.    Digitek that was not manufactured to its   10:46
25   specifications made it to the market; therefore,      10:46
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 53

 1   by definition, it would be adulterated.            10:46

 2        Q.    Can you identify a single Plaintiff in   10:46

 3   this litigation who received out-of-specification  10:46

 4   Digitek?                                            10:47

 5        A.    An individual per se?                    10:47

 6        Q.    Yeah.                                    10:47

 7        A.    I'm not familiar with the individuals   10:47

 8   who found the cases.                                10:47

 9        Q.    Now, you know what a -- in general what  10:47

10   a double-thick tablet is, do you not?              10:47

11        A.    As described in the documents that I    10:47

12   reviewed, I'd say yes.  I've personally never seen  10:47

13   any double-thick tablet.                           10:47

14        Q.    Not even in this litigation, nobody has  10:47

15   ever shown you one; right?                          10:47

16        A.    From what I understand, nobody retained  10:47

17   any of the double-thick tablets.                    10:47

18        Q.    Do you have some understanding that      10:47

19   somebody actually had one and threw it away?        10:47

20        A.    I wouldn't say that I know they threw it 10:47

21   away.  I know they had them.                        10:47

22        Q.    Oh, tell me who had one.                 10:47

23        A.    Well, first the pharmacist had one.      10:47

24        Q.    In 2003 or 4?                            10:48

25        A.    I will take a look and see what date     10:48

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 54

| | |
|---|---|
| 1 that was. | 10:48 |
| 2      Q.    Trust me.  It was 2003 or 2004 if you're | 10:48 |
| 3 talking about the Bellingham, Washington | 10:48 |
| 4 incident. | 10:48 |
| 5      A.    All right. | 10:48 |
| 6      Q.    Okay.  So was 2003 Digitek recalled? | 10:48 |
| 7      A.    I don't recall. | 10:48 |
| 8      Q.    When was the first batch of recalled | 10:48 |
| 9 Digitek manufactured? | 10:48 |
| 10     A.    I have to look. | 10:48 |
| 11     Q.    Do you remember what the FDA said about | 10:48 |
| 12 the 2004 incident? | 10:48 |
| 13     A.    No. | 10:48 |
| 14     Q.    Do you know what an establishment | 10:48 |
| 15 inspection report is? | 10:48 |
| 16     A.    I do. | 10:48 |
| 17     Q.    Let me make sure I didn't write on | 10:48 |
| 18 this.  This is the EIR from the fall of 2004. | 10:48 |
| 19     A.    Uh-huh. | 10:49 |
| 20     Q.    First of all, you know that that | 10:49 |
| 21 double-thick tablet incident was investigated by | 10:49 |
| 22 Amide; correct? | 10:49 |
| 23     A.    Investigated as part of a manufacturing | 10:49 |
| 24 investigation? | 10:49 |
| 25     Q.    Yes. | 10:49 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 55

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 10:49 |
| 2 | Q. | And you know that it was reported to the | 10:49 |
| 3 | FDA in a field alert; correct? | | 10:49 |
| 4 | A. | I've never seen a field alert. | 10:49 |
| 5 | Q. | They didn't make that available to you? | 10:49 |
| 6 | A. | Not that I recall.  It may have been on | 10:49 |
| 7 | the list, but I do not specifically require seeing | | 10:49 |
| 8 | a field alert. | | 10:50 |
| 9 | MR. FITZPATRICK:  And could you pass | | 10:50 |
| 10 | Exhibit 5? | | 10:50 |
| 11 | MR. MORIARTY:  Yeah, but I need my copy | | 10:50 |
| 12 | for a second, if you don't mind. | | 10:50 |
| 13 | BY MR. MORIARTY: | | 10:50 |
| 14 | Q. | Turn to page 6 of the 2004 EIR. | 10:50 |
| 15 | A. | Exhibit 20? | 10:50 |
| 16 | Q. | Yes, sir.  And first of all, I don't | 10:50 |
| 17 | remember.  Have you seen this EIR as part of your | | 10:50 |
| 18 | review? | | 10:50 |
| 19 | A. | No, this is for a preapproval inspection | 10:50 |
| 20 | for another product. | | 10:50 |
| 21 | Q. | Well, look at page 6.  You see the bold, | 10:50 |
| 22 | centered, in all cap, field alert reporting? | | 10:50 |
| 23 | A. | I do. | 10:51 |
| 24 | Q. | All right.  It describes this report | 10:51 |
| 25 | from a pharmacist of a quote "thick tablet." | | 10:51 |

David Bliesner, Ph.D.              Videotaped                January 25, 2011

Page 56

| | | |
|---|---|---|
| 1 | Do you see that? | 10:51 |
| 2 | A.    I do. | 10:51 |
| 3 | Q.    From lot 3611(a), with an expiration in | 10:51 |
| 4 | December of '04. | 10:51 |
| 5 | Do you see that? | 10:51 |
| 6 | A.    I do. | 10:51 |
| 7 | Q.    Now, certainly -- withdraw that. | 10:51 |
| 8 | New Jersey District Compliance Branch was | 10:51 |
| 9 | notified by the site and the investigation was | 10:51 |
| 10 | completed at the time of inspection; correct? | 10:51 |
| 11 | A.    That's what it says. | 10:51 |
| 12 | Q.    In other words, the company told FDA | 10:51 |
| 13 | about this incident; right? | 10:51 |
| 14 | A.    Uh-huh. | 10:51 |
| 15 | Q.    That's a yes? | 10:51 |
| 16 | A.    At the time of the inspection, yes. | 10:51 |
| 17 | Q.    All right.  And the field alert report | 10:51 |
| 18 | noted quote, "The most probable cause of the thick | 10:51 |
| 19 | tablet was a set up problem"; correct?  Is that | 10:51 |
| 20 | what it says? | 10:52 |
| 21 | A.    It says manufacturing set up problem. | 10:52 |
| 22 | Set up, yes. | 10:52 |
| 23 | Q.    And then it talks about procedural | 10:52 |
| 24 | enhancements and training, does it not? | 10:52 |
| 25 | A.    Yes. | 10:52 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 57

```
 1     Q.    And then it says, "No additional          10:52
 2  complaints or reports of thick tablets have been    10:52
 3  received for this high volume product.  The event   10:52
 4  was considered an isolated incident and corrective  10:52
 5  actions were put in place to prevent its            10:52
 6  reoccurrence.  Corrective actions were verified     10:52
 7  during the inspection."                             10:52
 8     Did I read that correctly?                        10:52
 9     A.    Corrective actions, procedural             10:52
10  enhancements, review of complaint files were        10:52
11  verified during inspection.                          10:52
12     Q.    Correct?                                    10:52
13     A.    Yes, that's what it says.                   10:52
14     Q.    Do you have some reason to disagree with   10:52
15  the FDA that this event was an isolated incident?   10:52
16     A.    Yes, I do.                                  10:52
17     Q.    Okay.  Show me any evidence that you        10:52
18  have that any extra thick tablet made it into the   10:52
19  hands of a pharmacist or consumer after 2004.       10:52
20        MR. FITZPATRICK:  Let me interpose an         10:53
21     objection as to form.                            10:53
22  BY MR. MORIARTY:                                     10:53
23     Q.    What are you looking for?                   10:53
24     A.    I'm looking for an e-mail chain that       10:53
25  shows a pharmacist somewhere in Massachusetts       10:53
```

David Bliesner, Ph.D.          Videotaped                 January 25, 2011

                                                          Page 58

 1   found double-thick tablets in a card.                10:53

 2       Q.    Excellent.   Here it is.   Okay.   I'm      10:53

 3   showing you Exhibit 59.   Is that the document that   10:54

 4   you are looking at from your own file?               10:54

 5       A.    No, it's not.                               10:55

 6       Q.    Yeah, it's not because my staff didn't      10:55

 7   copy the second page.   Let me see that, please.     10:55

 8       A.    Sure.   The yellow tab is the specific      10:55

 9   reference to it.                                      10:55

10       Q.    Okay.   That is supposed to be Exhibit      10:55

11   59.                                                   10:55

12       A.    Okay.                                       10:55

13       Q.    My staff did not copy the part at the       10:55

14   back; okay?                                           10:55

15       A.    Okay.                                       10:55

16       Q.    So let me ask you some questions about      10:55

17   that.                                                 10:55

18       It's in an e-mail; correct?                       10:55

19       A.    It is.                                      10:55

20       Q.    Have you seen any evidence that that        10:55

21   tablet or card of tablets was returned to Actavis    10:55

22   or Mylan for analysis?                                10:56

23       A.    I have not seen any documentation that      10:56

24   shows that any chemical testing has been done on     10:56

25   any of the thick, thin, or whatever tablets.         10:56

David Bliesner, Ph.D.          Videotaped                January 25, 2011

                                                              Page 59

 1      Q.    I didn't ask about chemical testing.        10:56
 2   All I did was ask if you've seen any documents to     10:56
 3   indicate that that tablet or card of tablets was      10:56
 4   returned to Actavis or Mylan.                         10:56
 5      A.    This is the only reference that I've         10:56
 6   seen with respect to these.                           10:56
 7      Q.    And it contains no statement that the        10:56
 8   tablet or tablets were returned to Actavis or         10:57
 9   Mylan; correct?                                       10:57
10      A.    This e-mail does not say that it was         10:57
11   returned.                                             10:57
12      Q.    Was it in a blister pack?                    10:57
13      A.    It says the card had four tablets.           10:57
14      Q.    Do you take that to mean blister pack?       10:58
15      A.    I'm not sure.  I'm not sure what it          10:58
16   means.                                                10:58
17      Q.    Was it removed from the card or blister      10:58
18   pack?                                                 10:58
19      A.    It says here just that the remaining        10:58
20   tablets are in a blister pack -- not a blister        10:58
21   pack but a card.  That's it.  That's all that it      10:58
22   says.                                                 10:58
23      Q.    Do you know anything about the               10:58
24   manufacturer specifications of the card or blister    10:58
25   pack in which those tablets were?                     10:58

David Bliesner, Ph.D.            Videotaped            January 25, 2011

                                                              Page 60

     1      A.    No, I don't know anything about those.        10:58

     2      Q.    So you don't know whether a blister pack       10:58

     3   would even accommodate an extra thick tablet, do      10:58

     4   you?                                                  10:58

     5      A.    I'd have to go look at the documentation     10:59

     6   because some of the documents I reviewed with         10:59

     7   respect to UDL talks about that issue.                10:59

     8      Q.    And if this blister pack or card had         10:59

     9   been made by UDL, a double-thick tablet couldn't      10:59

    10   fit in it, could it?                                  10:59

    11      A.    I couldn't say.                              10:59

    12      Q.    Do you remember what the specs were?         10:59

    13      A.    I don't remember the specs.                  10:59

    14      Q.    Would a wise and prudent manufacturer        10:59

    15   use so much raw materials of plastic and tinfoil      10:59

    16   to accommodate more space than they needed in the    10:59

    17   blister pack?                                         10:59

    18      A.    Could you say that again?                    10:59

    19      Q.    Would a prudent manufacturer use more        10:59

    20   plastic and tinfoil than needed to package the        10:59

    21   tablets in a blister pack?                            10:59

    22      A.    I don't think you can draw the               10:59

    23   conclusion that a double tablet would not fit in a    10:59

    24   blister pack.  You just don't have enough             10:59

    25   information to do that.                               10:59

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 61

| | | |
|---|---|---|
| 1 | Q.    You don't. | 10:59 |
| 2 | A.    No.  I don't think anybody does from the | 10:59 |
| 3 | literature I've read. | 11:00 |
| 4 | Q.    Okay.  Did anybody in that e-mail remove | 11:00 |
| 5 | a tablet and measure it with a micrometer? | 11:00 |
| 6 | A.    Not according to this e-mail.  And | 11:00 |
| 7 | that's a really interesting point out of all of | 11:00 |
| 8 | this that's very striking when you look at all the | 11:00 |
| 9 | data. | 11:00 |
| 10 | Q.    You have to answer my question. | 11:00 |
| 11 | MR. KERENSKY:  He just said he did. | 11:00 |
| 12 | MR. MORIARTY:  I don't want a speech, | 11:00 |
| 13 | Mike.  I want to know whether anybody | 11:00 |
| 14 | indicates that they removed it and measured it | 11:00 |
| 15 | with a micrometer, yes or no? | 11:00 |
| 16 | THE WITNESS:  In this e-mail, no. | 11:00 |
| 17 | MR. KERENSKY:  Wait a minute.  Wait a | 11:00 |
| 18 | minute. | 11:00 |
| 19 | MR. MORIARTY:  I'm going to let him make | 11:00 |
| 20 | his speech in minute; okay? | 11:00 |
| 21 | MR. KERENSKY:  Let him finish his answer. | 11:00 |
| 22 | MR. MORIARTY:  I want to ask my | 11:00 |
| 23 | questions. | 11:00 |
| 24 | MR. KERENSKY:  Let him finish his | 11:00 |
| 25 | answer.  Right now. | 11:00 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                    Page 62
 1          MR. MORIARTY:  He did.  He said correct.    11:00
 2          MR. KERENSKY:  He did not.  You            11:00
 3     interrupted him right in the middle?            11:00
 4     Q.    Now if you --                             11:00
 5          MR. KERENSKY:  Stop.  The deposition is    11:00
 6     stopped.                                        11:00
 7          MR. MORIARTY:  You think you have the      11:00
 8     authority to do that under PTL 22?              11:00
 9          MR. KERENSKY:  I think I do.  I'll take    11:00
10     the chance.  Are you going to let him finish    11:00
11     his answer?                                     11:00
12  BY MR. MORIARTY:                                   11:00
13     Q.    Go ahead and finish your speech.          11:00
14     A.    Speech?                                   11:00
15     Q.    Yeah, go ahead.                           11:00
16     A.    I -- to tell you the truth -- because of  11:00
17  that exchange, I don't know where the question     11:00
18  was.                                               11:01
19          MR. KERENSKY:  Okay.  Let's go back up     11:01
20     and pick up where he interrupted you and then   11:01
21     you can finish your thought.  You have the      11:01
22     right to do that.                               11:01
23          (Whereupon, the testimony was read         11:01
24  back by the court reporter, as recorded above)     11:01
25          MR. KERENSKY:  Finish your thought and     11:01

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 63

| | | |
|---|---|---|
| 1 | then move on. | 11:01 |
| 2 | THE WITNESS:  Yeah, it's been | 11:01 |
| 3 | demonstrated that a significant number -- when | 11:01 |
| 4 | you look at FDA findings and reports or | 11:01 |
| 5 | whatever -- of double-thick tablets that were | 11:01 |
| 6 | produced, nobody ever performed any testing on | 11:01 |
| 7 | those, according to the record that I can | 11:01 |
| 8 | find.  Which is really unusual because we | 11:01 |
| 9 | don't know whether it's out of spec or in | 11:01 |
| 10 | spec, all the points that you are going to, | 11:01 |
| 11 | you just don't know because nobody apparently | 11:02 |
| 12 | did it.  Or if they did it, they didn't report | 11:02 |
| 13 | it. | 11:02 |
| 14 | BY MR. MORIARTY: | 11:02 |
| 15 | Q.    Are you done? | 11:02 |
| 16 | A.    Yes, sir. | 11:02 |
| 17 | Q.    So according to this e-mail, whatever | 11:02 |
| 18 | tablet or tablets those were -- first of all, it | 11:02 |
| 19 | only refers to one tablet doesn't it, in the | 11:02 |
| 20 | card?  It doesn't say all four were double; right? | 11:02 |
| 21 | A.    It says please be advised that Lynne | 11:02 |
| 22 | Farrell of CSC reports finding a card of Digoxin | 11:02 |
| 23 | with one double thick tablet at GL-Gloucester. | 11:02 |
| 24 | Q.    What a CSC? | 11:02 |
| 25 | A.    I don't know. | 11:02 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 64

```
 1     Q.    So you don't know anything about the      11:02
 2  reliability of this person who supposedly found    11:02
 3  this; correct?                                     11:02
 4     A.    It's an e-mail.  It would be difficult    11:02
 5  to do that.                                        11:02
 6     Q.    All right.  And certainly this was not    11:02
 7  in the hands or mouth of a consumer; correct?      11:02
 8     A.    This particular one right here?           11:02
 9     Q.    Right.                                    11:02
10     A.    From the e-mail, that's the conclusion    11:02
11  you could probably draw.                           11:02
12     Q.    If you were using the scientific method   11:02
13  to figure out -- you're called in as a consultant  11:02
14  to find out if double-thick tablets have actually  11:03
15  made it to the hands of consumers and you're using 11:03
16  the scientific method with data, this e-mail is    11:03
17  not a particularly reliable report, is it?         11:03
18         MR. FITZPATRICK:  Object to the form.       11:03
19         THE WITNESS:  I wouldn't consider this a    11:03
20      report.  It's a statement in an e-mail.        11:03
21  BY MR. MORIARTY:                                   11:03
22     Q.    So it's not reliable data for you as a    11:03
23  scientist to conclude that that was in fact a      11:03
24  double-thick tablet; is that correct?              11:03
25     A.    I don't think that's correct.  It's      11:03
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 65

| | | |
|---|---|---|
| 1 | something that starts a formal investigation. | 11:03 |
| 2 | It's a piece of data. | 11:03 |
| 3 |    Q.    With no measurement and no removal from | 11:03 |
| 4 | its packaging; correct? | 11:03 |
| 5 |    A.    Correct.  But observation is one of the | 11:04 |
| 6 | critical components to scientific experiment.  And | 11:04 |
| 7 | observations such as this are critical when you're | 11:04 |
| 8 | conducting investigations. | 11:04 |
| 9 |    Q.    Have you ever tried to observe the | 11:04 |
| 10 | thickness down to the millimeter of a tablet in a | 11:04 |
| 11 | blister pack? | 11:04 |
| 12 |    A.    In a blister pack? | 11:04 |
| 13 |    Q.    Yeah. | 11:04 |
| 14 |    A.    Down to the millimeter? | 11:04 |
| 15 |    Q.    Yes, sir.  That's how thin these tablets | 11:04 |
| 16 | are, isn't it? | 11:04 |
| 17 |    A.    I forget what the spec is for | 11:04 |
| 18 | thickness.  Me, personally, looking a blister pack | 11:04 |
| 19 | -- | 11:04 |
| 20 |    Q.    Yes. | 11:04 |
| 21 |    A.    -- and trying to estimate what the | 11:04 |
| 22 | thickness would be, no, I had no -- would have no | 11:04 |
| 23 | desire or need to do that.  You wouldn't estimate | 11:04 |
| 24 | if you're trying to come up with a spec.  You'd | 11:04 |
| 25 | measure it. | 11:04 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 66

1     Q.    So we started this line of questions          11:04

2  with you know what a double-thick tablet is or an      11:04

3  oversized tablet; correct?                             11:04

4     A.    As they're referring to it in this            11:04

5  deposition, yes.                                        11:05

6     Q.    In any context in the pharmaceutical          11:05

7  industry if somebody said to you we have oversized      11:05

8  tablets or double-thick tablets, you know what         11:05

9  that is; right?                                         11:05

10    A.    This is the first time that I've heard        11:05

11  reference in the industry to a double-thick           11:05

12  tablet.  It's that unique a situation.                11:05

13    Q.    Okay.  Do you know how many recalls           11:05

14  there have been in the last 36 months for extra       11:05

15  thick tablets in the pharmaceutical industry?         11:05

16    A.    I do not.                                      11:05

17    Q.    And you know what a normal tablet with        11:05

18  too much active pharmaceutical ingredient is,         11:05

19  don't you?                                             11:05

20    A.    I don't know if I understand the              11:05

21  question.  You can't just look at a tablet and        11:05

22  know how much ingredient is in it.                    11:05

23    Q.    I didn't imply or ask you if you could.       11:05

24  But a normal-sized tablet could have too much         11:05

25  active pharmaceutical ingredient; correct?            11:05

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 67

 1      A.    Yes.                                        11:05

 2      Q.    You could assay or content uniformity       11:05

 3  test that tablet to determine that; correct?          11:05

 4      A.    Yes.                                         11:05

 5      Q.    Do you know enough about the                11:06

 6  manufacturing process to say whether the root         11:06

 7  cause of an extra thick is typically different        11:06

 8  than the root cause of a normal size with too much    11:06

 9  active pharmaceutical ingredient?                     11:06

10      A.    Say that again.                             11:06

11            (Whereupon, the testimony was read back     11:06

12  by the court reporter, as recorded above)             11:06

13            THE WITNESS:  Based on the information       11:06

14      and the data that I have here, Actavis            11:06

15      specifically indicated that there were            11:06

16      problems in the manufacturing of this product     11:06

17      very early on.  It was very difficult.  In        11:06

18      19-- whatever, 2000.  And it took them a lot       11:06

19      to do it.  And as they moved forward and they     11:07

20      had problems, they had problems with blend        11:07

21      uniformity and then obviously with                11:07

22      manufacturing the tablet and, therefore, it is    11:07

23      possible -- based on the information I looked      11:07

24      at -- that you could have both of those           11:07

25      problems because of difficulties with blend       11:07

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 68

| | | |
|---|---|---|
| 1 | uniformity and with tableting.  It's possible. | 11:07 |
| 2 | MR. MORIARTY:  Motion to strike.  It was | 11:07 |
| 3 | completely non-responsive to my question. | 11:07 |
| 4 | MR. KERENSKY:  He has to do that for the | 11:07 |
| 5 | judge. | 11:07 |
| 6 | THE WITNESS:  I understand. | 11:07 |
| 7 | MR. KERENSKY:  That's fine. | 11:07 |
| 8 | BY MR. MORIARTY: | 11:07 |
| 9 | Q.    I'm talking about manufacturing tablets | 11:07 |
| 10 | and whether you have any knowledge of whether | 11:07 |
| 11 | those two distinct problems in manufacturing have | 11:07 |
| 12 | different root causes. | 11:07 |
| 13 | A.    In general? | 11:07 |
| 14 | Q.    Yes. | 11:07 |
| 15 | A.    Say that again, please. | 11:08 |
| 16 | Q.    Okay. | 11:08 |
| 17 | A.    Because it's a very broad statement. | 11:08 |
| 18 | Q.    Let's get back to basics. | 11:08 |
| 19 | A.    Okay. | 11:08 |
| 20 | Q.    If somebody says you have extra thick or | 11:08 |
| 21 | double-thick tablets, that's a reference to size; | 11:08 |
| 22 | correct? | 11:08 |
| 23 | A.    I would assume so, yes. | 11:08 |
| 24 | Q.    All right.  And that size could be | 11:08 |
| 25 | caused by too much active pharmaceutical | 11:08 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                            Page 69

 1   ingredient, too much excipient, inadequate          11:08
 2   compression making a fluffy tablet, double          11:08
 3   compression, could be caused by any number of       11:08
 4   things; correct?                                    11:08
 5       A.    That's -- there are many things it could  11:08
 6   be, yes.                                            11:08
 7       Q.    All right.  So a normal-sized tablet      11:08
 8   with too much active pharmaceutical ingredient is   11:08
 9   a different problem in the pharmaceutical           11:08
10   manufacturing process, isn't it?                    11:08
11       A.    I don't think you can say that            11:09
12   exclusively.  I think that, you know, it's a        11:09
13   manufacturing train, it's a process.  And if you    11:09
14   don't have control of your process, it's possible   11:09
15   to have those two events as a failure in the        11:09
16   process.                                            11:09
17       Q.    I'm not asking whether you can only have  11:09
18   one or the other.  I'm asking whether they're       11:09
19   different.  And if a tablet is normal-sized, by     11:09
20   definition it's not extra-thick or double-thick;    11:09
21   correct?                                            11:09
22       A.    Yes.                                      11:09
23       Q.    So a normal-sized tablet with too much    11:09
24   ABI, the problem is the amount of active            11:09
25   pharmaceutical ingredient; correct?                 11:09

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 70

```
 1      A.    I'm not trying to be difficult.  I'm        11:09
 2   just trying to understand the question here.  I     11:09
 3   apologize.                                           11:09
 4      Q.    If I said to you --                         11:09
 5      A.    Uh-huh.                                     11:09
 6      Q.    -- Mr. Bliesner, I want you to come in      11:09
 7   and consult with my pharmaceutical manufacturing    11:10
 8   company.                                             11:10
 9      A.    Uh-huh.                                     11:10
10      Q.    Our tablets are double-thick.              11:10
11      A.    Uh-huh.                                     11:10
12      Q.    And I tell you nothing more.               11:10
13      A.    Uh-huh.                                     11:10
14      Q.    The problem is a size problem to start      11:10
15   with; correct?                                       11:10
16      A.    Uh-huh.                                     11:10
17      Q.    Is that a yes?                             11:10
18      A.    Double-thick, yes.                         11:10
19      Q.    All right.  At some point you'd get to      11:10
20   the issue of what the active pharmaceutical          11:10
21   content of those tablets is if you were doing an     11:10
22   investigation; correct?                              11:10
23      A.    Yes, it would be one of the first things   11:10
24   you'd do.                                            11:10
25      Q.    But if I told you that my problem was       11:10
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 71

```
 1   normal-sized tablets with too much API, the        11:10
 2   investigation process would be different, correct,  11:10
 3   because the problem is different.                   11:10
 4        A.    Actually, no.                            11:10
 5        Q.    All right.  Well, the focus would be on  11:10
 6   why is there too much API; right?                   11:10
 7        A.    I don't think you'd look at those things 11:10
 8   mutually exclusively.                               11:10
 9        Q.    Do you think the FDA knows the           11:10
10   difference between extra-thick tablets and tablets  11:10
11   of normal size but too much Digoxin?                11:10
12        A.    I'm sure they do.                        11:11
13        Q.    Have you seen the FDA approved press     11:11
14   release for this recall?                            11:11
15        A.    I'm not sure.                            11:11
16        Q.    There you go.  Exhibit 36.  Have you     11:11
17   seen this?                                          11:11
18        A.    Yes, I have.                             11:12
19        Q.    Okay.  It says:                          11:12
20        "The voluntary all-out recall is due to the   11:12
21   possibility that tablets with double the           11:12
22   appropriate thickness may have been commercially   11:12
23   released."                                          11:12
24        A.    It does say that.                        11:12
25        Q.    And in this sentence, the words         11:12
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 72

1    "possibility" and "may" are different than          11:12

2    "probability" "likely" and "certainty"; correct?     11:12

3          MR. KERENSKY:  Objection, vague.               11:12

4    BY MR. MORIARTY:                                      11:12

5        Q.    Is that right?                              11:12

6        A.    Again, we're back to the definition of     11:12

7    "probable" and "possible."                            11:12

8        Q.    Which you don't know the difference;        11:12

9    right?                                                 11:12

10       A.    In the context in this industry, as        11:12

11   having sat down and thought about it, like I said    11:12

12   before, no.                                           11:12

13       Q.    Well, at least the sentence "FDA           11:12

14   approved" doesn't say that we know for a fact that   11:13

15   double-thick tablets were commercially released;     11:13

16   right?  It doesn't say that.                          11:13

17       A.    It does not say that.  However, I have     11:13

18   never seen a recall notice that says absolutely.     11:13

19   This is the way they're stated.                       11:13

20       Q.    And then it says these tablets may         11:13

21   contain twice the approved level of active           11:13

22   ingredient than is appropriate; correct?             11:13

23       A.    It does say that.                          11:13

24       Q.    Have you seen any FDA document which       11:13

25   says that this recall was for normal-sized tablets   11:13

David Bliesner, Ph.D.            Videotaped               January 25, 2011

                                                                 Page 73

 1   with too much active pharmaceutical ingredient?        11:13

 2        A.    Recall document?                            11:13

 3        Q.    Any document.  Any --                       11:13

 4        A.    Any document?                               11:13

 5        Q.    Any document from the FDA.                  11:13

 6        A.    Say it again.  Again --                     11:13

 7        Q.    Have you seen any --                        11:13

 8        A.    -- I'm not trying to be difficult.  I       11:13

 9   just want to make sure I answer your question          11:13

10   correctly.                                             11:13

11        Q.    Have you seen any document from the         11:13

12   FDA -- whether it's a paper they promulgated, a        11:14

13   report, or a 483 warning letter, anything -- or        11:14

14   even their website -- to indicate that this recall     11:14

15   was for normal-sized tablets with too much             11:14

16   Digoxin.                                               11:14

17        A.    Not that I recall.                          11:14

18        Q.    To your recollection, did the FDA ever      11:14

19   cite, warn, or observe that Digitek with normal        11:14

20   size but too much active pharmaceutical ingredient     11:14

21   had reached the marketplace?                           11:14

22        A.    Can I take a look real quick at my          11:15

23   report?                                                11:15

24        Q.    Sure.                                       11:15

25        A.    My notes and my report, I don't have any    11:18

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 74

```
 1   record of the FDA making a statement like that.        11:18
 2       Q.    Please look at Exhibit 38.  Terry, I'll      11:18
 3   give you a copy.                                        11:18
 4       Do you know if you've ever seen this before,        11:18
 5   Mr. Bliesner?                                           11:18
 6       A.    I think I may have.                           11:18
 7       Q.    All right.  Exhibit 38 is a printout          11:18
 8   from the FDA's website.  I believe this was posted      11:18
 9   in July of 2009, a year and a quarter after the         11:18
10   recall.                                                 11:18
11       Go to the second page, please.                      11:19
12       A.    Uh-huh.                                       11:19
13       Q.    First of all, this is called Facts and        11:19
14   Myths About Generic Drugs; right?                       11:19
15       A.    Yes.                                          11:19
16       Q.    And on the second page it says, "Myth,        11:19
17   there are quality problems with generic drug            11:19
18   manufacturing.  A recent recall of generic              11:19
19   Digoxin -- called Digitek -- shows that generic         11:19
20   drugs put patients at risk."                            11:19
21       Did I read that correctly?                          11:19
22       A.    Yes.                                          11:19
23       Q.    And then it says, "Fact.  FDA's               11:19
24   aggressive action in this case demonstrates the         11:19
25   high standards to which all prescription drugs --       11:19
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 75

```
 1   generic and brand name -- are held"; correct?        11:19

 2       A.    Correct.                                    11:19

 3       Q.    All right.  Let's go down to the third      11:19

 4   bullet point.                                         11:19

 5       A.    Yes.                                         11:19

 6       Q.    Well, actually, let's go to the second      11:19

 7   bullet point.  Well, I'm sorry.  Withdraw that.       11:20

 8       Look at the first three bullet points.            11:20

 9       A.    Okay.                                        11:20

10       Q.    All right.  What they are describing in     11:20

11   the first three bullet points is the incident in      11:20

12   November, December, January 2007 to 2008 regarding    11:20

13   batch 70924 with the 20 double-thick tablets;         11:20

14   correct?                                              11:20

15       A.    I don't know if that's the specific         11:20

16   batch.  I'd have to go back and look it up.           11:20

17       Q.    Trust me.                                    11:20

18       A.    Yeah.                                        11:20

19       Q.    Okay.  That's that they're talking          11:20

20   about; right?                                          11:20

21       A.    It appears.                                  11:20

22       Q.    All right.  So in the third bullet point    11:20

23   it says:                                               11:20

24       "Although Actavis attempted to remove the         11:20

25   affected Digitek through visual inspection, FDA       11:20
```

David Bliesner, Ph.D.          Videotaped            January 25, 2011

Page 76

| | | |
|---|---|---|
| 1 | determined that this method of removal was | 11:20 |
| 2 | inadequate to assure the product quality and | 11:20 |
| 3 | consistency in accordance with the current good | 11:21 |
| 4 | manufacturing practice regulations"; correct? | 11:21 |
| 5 | A.    Sure. | 11:21 |
| 6 | Q.    So what they're referring to is an | 11:21 |
| 7 | inspection issue; is that right? | 11:21 |
| 8 | A.    A visual inspection. | 11:21 |
| 9 | Q.    Yes. | 11:21 |
| 10 | A.    Correct. | 11:21 |
| 11 | Q.    Bullet point 4, second sentence: | 11:21 |
| 12 | "In our best judgment, given the very small | 11:21 |
| 13 | number of defective tablets that may have reached | 11:21 |
| 14 | the market and the lack of reported adverse events | 11:21 |
| 15 | before the recall, harm to patients was very | 11:21 |
| 16 | unlikely." | 11:21 |
| 17 | First of all, did I read it correctly? | 11:21 |
| 18 | A.    You read it as written. | 11:21 |
| 19 | Q.    Do you have some reason to disagree with | 11:21 |
| 20 | the FDA's findings in this regard? | 11:21 |
| 21 | A.    Absolutely. | 11:21 |
| 22 | Q.    What's the basis for your disagreement | 11:21 |
| 23 | with FDA? | 11:21 |
| 24 | A.    My disagreement with FDA, first of all, | 11:21 |
| 25 | there's political overtones that are always | 11:21 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 77

```
 1   associated with these statements reporting to the     11:21
 2   press at the FDA.  And if you go back and look at      11:22
 3   the FDA's record over the course of, you know, the     11:22
 4   last 20 years if you will, approximately, go back      11:22
 5   and look at the timeline, the FDA has repeatedly       11:22
 6   found this company to be in significant violation      11:22
 7   of the GMPs.  To my knowledge, this is only            11:22
 8   company that's ever been under consent decree          11:22
 9   twice.                                                 11:22
10        Q.    Are you done with your answer?              11:22
11        A.    For now, yes.                               11:22
12        Q.    Okay.  Can you explain to us all,           11:22
13   please, what expertise you have in the political       11:22
14   analysis of the FDA?                                   11:22
15        Can you explain that to me, please, what          11:23
16   expertise you have from your background, training,     11:23
17   and experience, that you can assess the political      11:23
18   overtones or motivations of this statement on the      11:23
19   website?                                               11:23
20        A.    In my experience, recent experience, I      11:23
21   see serious discussions that go on between two         11:23
22   major branches within the FDA that are often in        11:23
23   conflict with one another.  Drug shortage, for         11:23
24   instance, and compliance.  And they are very           11:23
25   politically motivated and their purpose is that        11:23
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 78

```
 1   their ends are -- end missions are different.        11:23
 2   That's my experience of it.                          11:24
 3       Q.    Is that a scientific opinion?              11:24
 4       A.    We're talking about politics.              11:24
 5       Q.    Okay.  So what would be the political      11:24
 6   motivation a year and a quarter after a recall for   11:24
 7   them to say this about the number of defective       11:24
 8   tablets that may have reached the market and the     11:24
 9   level of risk to consumers?                          11:24
10       A.    Why would they say that?                   11:24
11       Q.    Yeah.  What data do you have to say that   11:24
12   this is somehow politically motivated?  What's       11:24
13   your -- what's your underlying data?                 11:24
14       A.    The underlying data is their              11:24
15   documentation in the establishment inspection        11:24
16   reports that shows gross violation of the GMPs       11:24
17   throughout the history of this company and that      11:24
18   they approved them after the first consent decree    11:24
19   as being okay and they ended up right back in the    11:24
20   same place.  So I would be hard pressed to want to   11:24
21   admit in public that they may have potentially not   11:24
22   served their mission correctly after the first       11:25
23   consent decree.                                      11:25
24       Q.    So if I understand what you're saying,     11:25
25   the FDA soft-pedaled this statement about the        11:25
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 79

| | | |
|---|---|---|
| 1 | Digitek recall to deflect attention from their | 11:25 |
| 2 | lack of oversight for the company; is that right? | 11:25 |
| 3 | A.    Politically it's a possibility. | 11:25 |
| 4 | Q.    Is it a probability? | 11:25 |
| 5 | A.    I don't -- I don't agree with that | 11:25 |
| 6 | statement. | 11:25 |
| 7 | Q.    Is it a probability? | 11:25 |
| 8 | A.    I couldn't go anywhere back to | 11:25 |
| 9 | possibility, probability either. | 11:25 |
| 10 | Q.    Is it a certainty? | 11:25 |
| 11 | A.    I don't know.  We're talking politics | 11:25 |
| 12 | here, we're not talking science.  We shifted from | 11:25 |
| 13 | science to politics. | 11:25 |
| 14 | Q.    I didn't; you did.  I'm asking whether | 11:25 |
| 15 | you have some data to support the opinion you're | 11:25 |
| 16 | now giving. | 11:25 |
| 17 | A.    It's my opinion and it's a political | 11:25 |
| 18 | one.  And there are no direct data other than the | 11:25 |
| 19 | FDA's voluminous EIR 483 inspections, warning | 11:25 |
| 20 | letters. | 11:25 |
| 21 | THE VIDEOGRAPHER:  The time is      .  We | 11:26 |
| 22 | are going off the record briefly. | 11:26 |
| 23 | (Short break) | 11:31 |
| 24 | THE VIDEOGRAPHER:  The time is now | 11:31 |
| 25 | 11:32 a.m.  We are back on the record.  This | 11:31 |

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313          www.rennillo.com          888.391.3376 (Depo)

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                      Page 80

 1       is the beginning of tape three.              11:31

 2   BY MR. MORIARTY:                                 11:31

 3       Q.    Mr. Bliesner, the -- or Dr. Bliesner I'm   11:31

 4   sorry -- the -- I haven't asked you this in any  11:32

 5   detail.  I will get to it later.                 11:32

 6       I assume that your opinions in this case about  11:32

 7   adulterated product are based on 483s; is that   11:32

 8   correct?                                          11:32

 9       A.    Partially.                             11:32

10       Q.    And warning letters?                   11:32

11       A.    Partially.                             11:32

12       Q.    And establishment inspection reports?  11:32

13       A.    Partially.                             11:32

14       Q.    Those are all FDA documents; correct?  11:32

15       A.    Correct.                               11:32

16       Q.    And are they based on the fact that    11:32

17   there have been two consent decrees?             11:32

18       A.    What's based on two consent?           11:32

19       Q.    Your opinions.                         11:32

20       A.    Partially.                             11:32

21       Q.    Okay.  And those are, although not FDA 11:32

22   documents, they're negotiated with the FDA; is  11:33

23   that correct?                                    11:33

24       A.    Consent decree?                        11:33

25       Q.    Yeah.                                  11:33

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 81

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 11:33 |
| 2 | Q. | Okay.  So what other documents besides | 11:33 |

3  FDA documents are your opinions based on that my          11:33

4  client made adulterated Digitek, in general?             11:33

5       A.     In general?                                  11:33

6       Q.     Yeah.                                        11:33

7       A.     E-mail communications within the             11:33

8  company.  Responses to 483 warning letters.             11:33

9       Q.     Anything else?                               11:33

10       A.     Investigations.                             11:33

11       Q.     Those are by the FDA; correct?              11:33

12       A.     A.     No, internal investigations.         11:33

13                     (Interruption)                       11:34

14            MR. MORIARTY:  We can go off the record.      11:34

15            THE VIDEOGRAPHER:  The time is now            11:34

16     11:33 a.m.  We are going off the record.            11:34

17                     (Short break)                        11:35

18            THE VIDEOGRAPHER:  The time is now            11:35

19            a.m.  We are back on the record.              11:35

20            THE WITNESS:  The Marine Corps kicked in      11:35

21      there for a second.                                 11:35

22  BY MR. MORIARTY:                                        11:35

23       Q.     Have any of the companies that you          11:35

24  worked for in the pharmaceutical business or with       11:35

25  which you've consulted had recalls?                     11:35

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 82

```
 1     A.    Yes.                                    11:35
 2     Q.    Have there been recalls in your         11:35
 3  experience where there was no actual proof that  11:35
 4  there was out of specification, dangerous product 11:35
 5  in the market?                                    11:35
 6     A.    I'm sorry.  Still a bit distracted.     11:35
 7  Please.                                           11:35
 8     Q.    Okay.  In your experience, have there   11:35
 9  been recalls of pharmaceutical product to the    11:35
10  consumer level where there was no actual proof   11:35
11  that there was out of specification, dangerous   11:36
12  product in the hands of consumers?               11:36
13     A.    I can't think of a specific example.    11:36
14     Q.    In general have there been?             11:36
15     A.    Possibly.                               11:36
16     Q.    Okay.  So, for example, there could be a 11:36
17  recall of a drug product because of a packaging  11:36
18  issue.  The label might be on upside down; is that 11:36
19  right?                                            11:36
20     A.    Correct.                                11:36
21     Q.    So the mere fact that there's a recall  11:36
22  does not in and of itself mean that the product is 11:36
23  out of spec and dangerous to the consumer; right? 11:36
24     A.    That's correct.                         11:36
25     Q.    You want to know more about that if     11:36
```

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 83

```
 1    you're going to -- if you're going to determine      11:36
 2    whether it's actually out of spec and dangerous to   11:36
 3    consumers, you want to know more than just the       11:36
 4    fact that there was a recall; right?                 11:36
 5         A.    Yes.                                       11:36
 6         Q.    Okay.  Now, if the FDA says in effect      11:36
 7    that a product is adulterated, does that always      11:37
 8    lead to a recall?                                     11:37
 9         A.    No.                                        11:37
10         Q.    Why not?                                   11:37
11         A.    Numerous reasons it could be that way.     11:37
12         Q.    Give me some, please.                      11:37
13         A.    Hasn't shipped is the first thing that     11:37
14    comes to mind.                                        11:37
15         Q.    Okay.                                      11:37
16         A.    That would be the primary one.             11:37
17         Q.    Any others?                                11:37
18         A.    No.  But, I'm not an expert in recalls.    11:37
19         Q.    Okay.  Well, the FDA could determine       11:37
20    that there is adulterated product and have a         11:37
21    recall not to the consumer level also; correct?      11:37
22         A.    As I understand, yes.                      11:38
23         Q.    In other words, the FDA in effect is       11:38
24    making a determination that whatever product is      11:38
25    being recalled isn't necessarily dangerous to the    11:38
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                       Page 84
 1   consumers; right?                                 11:38
 2       A.    A recall can be of something that isn't 11:38
 3   necessarily an immediate danger as I understand   11:38
 4   it, not being an expert in recalls.               11:38
 5       Q.    Okay.  So I'm showing you Exhibit 39.    11:38
 6   Have you ever seen that before?                    11:38
 7       A.    I don't think so.                         11:39
 8       Q.    All right.  This is a printout from the  11:39
 9   FDA's website.                                     11:39
10       A.    Uh-huh.                                  11:39
11       Q.    And it's entitled "Facts About Current  11:39
12   Good Manufacturing Practices"; correct?            11:39
13       A.    It is titled that, yes.                  11:39
14       Q.    And the fourth bold section down, says:  11:39
15       "If a manufacturer is not following cGMPs, are 11:39
16   drug product safe for use; correct"?               11:39
17       A.    It is.                                    11:39
18       Q.    The first sentence reads, "If the        11:39
19   company is not complying with cGMP regulations,    11:39
20   any drug it makes is considered adulterated under  11:39
21   the law."                                          11:39
22       Did I read it correctly?                       11:39
23       A.    You did.                                  11:39
24       Q.    Do you agree with it?                     11:39
25       A.    By definition, I would agree with that. 11:39
```

David Bliesner, Ph.D.             Videotaped              January 25, 2011

```
                                                           Page 85
  1      Q.    The next sentence says:                      11:39
  2      "This kind of adulteration means that the          11:39
  3   drugs was not manufactured under conditions that      11:40
  4   complied with GMP, cGMP."                             11:40
  5      Did I read it correctly?                           11:40
  6      A.    You did.                                     11:40
  7      Q.    Do you agree with that?                      11:40
  8      A.    By definition, yes.                          11:40
  9      Q.    The next sentence says:                      11:40
 10      "It does not mean that there is necessarily        11:40
 11   something wrong with the drug."                       11:40
 12      Did I read it correctly?                           11:40
 13      A.    You did.                                     11:40
 14      Q.    Do you agree with it?                        11:40
 15      A.    Something wrong with the drug?  It's a       11:40
 16   broad statement; but as it's written, I would        11:40
 17   agree.                                                11:40
 18      Q.    All right.  So in other words, the fact      11:40
 19   that a drug may be considered adulterated does not    11:40
 20   necessarily mean that it is outside its               11:40
 21   specifications; right?                                11:40
 22      A.    Yes.                                         11:40
 23      Q.    Because a drug could be adulterated for      11:40
 24   a lot of different reasons having nothing to do       11:40
 25   with the potency of the drug; right?                  11:40
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                      Page 86

 1      A.    Correct.                                 11:40

 2      Q.    Do you know how many batches of Digitek   11:41

 3  were involved in the recall in 2008?               11:41

 4      A.    Off the top of my head, no.              11:41

 5      Q.    How many batch records did you look at?   11:41

 6      A.    For?                                      11:41

 7      Q.    Digitek.                                  11:41

 8      A.    I looked at the batch records during the  11:41

 9  ANDA, and I don't recall the number that were in    11:41

10  there.                                              11:42

11      Q.    Is that all?                              11:42

12      A.    I'd have to check.  Do you want me to     11:42

13  take the time to do that?                           11:42

14      Q.    Well, let me ask you this:  Did you look  11:42

15  at the batch that was involved in the double-thick  11:42

16  investigation in 2007 and 8?  Did you look at the   11:42

17  batch record, I should say.                         11:42

18      A.    I looked -- I'm pretty sure I've looked   11:42

19  at the investigation.  And how much the batch       11:42

20  record was part of that, I'm not sure.  I'm pretty  11:42

21  sure I looked at that investigation.                11:42

22      Q.    But you're not sure if you've ever        11:42

23  looked at that entire batch record?                 11:42

24      A.    No.                                       11:42

25      Q.    And other than --                         11:42
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                            Page 87

```
 1      A.     No.                                          11:42

 2      Q.     -- what was in the ANDA, you can't tell      11:42

 3   me that you looked at any other Digitek batch          11:42

 4   records?                                               11:43

 5      A.     No, I haven't.                               11:43

 6      Q.     All right.  Do you know how many tablets     11:43

 7   would have been involved in the Digitek recall?        11:43

 8      A.     Since I don't know how many batches          11:43

 9   there were and what the exact number without           11:43

10   looking at it is, I couldn't tell you.                 11:43

11      Q.     All right.  Do you know how many other       11:43

12   recall batches were of the dose level of .125?         11:43

13      A.     Again, the same answer.  I don't             11:43

14   remember the batches there were without                11:43

15   referring -- knowing how many tablets per batch,       11:43

16   what they would be.                                    11:43

17      Q.     Do you have an opinion to a reasonable       11:43

18   degree of probability -- in other words, more          11:43

19   likely than not.                                       11:43

20      A.     Probability more likely than not?            11:43

21      Q.     How many of the Digitek tablets that         11:43

22   were recalled were outside their size                  11:43

23   specifications?                                        11:44

24      A.     Okay.                                        11:44

25      Q.     Are you writing on an Exhibit?               11:44
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 88

```
 1    A.    Oh.                                        11:44

 2    Q.    A marked Exhibit?                          11:44

 3    A.    Yes.  I'm sorry.  That's my notes.         11:44

 4         MR. KERENSKY:  Maybe we should put the      11:44

 5    pen away.                                        11:44

 6         THE WITNESS:  Take them away from me.       11:44

 7    Sorry.                                           11:44

 8         MR. MORIARTY:  Kind of like guns.  The      11:44

 9    problem is the pen, not the paper; okay.         11:44

10  BY MR. MORIARTY:                                   11:44

11    Q.    Do you remember my question?  Do you       11:44

12  remember my question?                              11:44

13    A.    No, I don't remember.                      11:44

14    Q.    Do you have an opinion to a reasonable     11:44

15  degree of probability how many of the recalled    11:44

16  Digitek tablets were outside their size            11:44

17  specifications?                                    11:44

18    A.    The recalled batches in the total          11:44

19  number?                                            11:44

20    Q.    Yeah.                                      11:44

21    A.    Since I don't know how many are out        11:44

22  there, there's no way in the world that I could    11:44

23  estimate that.                                     11:44

24    Q.    Do you have an opinion to a probability    11:44

25  of how many recalled Digitek tablets were outside  11:44
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 89

```
 1   their United States pharmacopeia specifications      11:45
 2   for active pharmaceutical ingredient?               11:45
 3       A.    In my opinion, I don't think there's      11:45
 4   enough information for anybody to determine that.   11:45
 5       Q.    Now, have you ever seen a report of a     11:45
 6   Digitek tablet from a Plaintiff in this litigation  11:45
 7   that was outside its size specifications?           11:45
 8       A.    Say that again, please.                   11:45
 9       Q.    Sure.  In the course of your work --      11:45
10       A.    Yes.                                      11:45
11       Q.    -- to prepare for this report --          11:45
12       A.    Yes.                                      11:45
13       Q.    -- for today's deposition --              11:45
14       A.    Yes.                                      11:46
15       Q.    -- have you seen either a tablet or the   11:46
16   report of a tablet from a Plaintiff in the          11:46
17   litigation that says that that tablet was outside   11:46
18   its size specifications?                            11:46
19       A.    I would need to check the report again    11:46
20   to make sure.                                       11:46
21       Q.    You can, but I guarantee you there was    11:46
22   no discussion of such thing in your report.  But    11:46
23   if you'd like to check, you go right ahead.         11:46
24       A.    I would.                                  11:46
25       Q.    While you're looking, I want you to also  11:46
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

                                                                    Page 90

 1    look to see whether you have any report from a          11:46

 2    Plaintiff in this litigation of a Digitek tablet        11:46

 3    that was normal in size but had too much active         11:46

 4    pharmaceutical ingredient; okay?                        11:46

 5         A.    Uh-huh.  Sure.                                11:46

 6         Q.    Are you done?                                 11:50

 7         A.    Yes.  Plaintiff, again, is the people        11:50

 8    bringing the lawsuit?                                    11:50

 9         Q.    Yeah.                                         11:50

10         A.    No, I don't have any reference in any        11:50

11    report.                                                  11:50

12         Q.    Okay.  How often do you look at the          11:50

13    FDA's website in your work?                              11:50

14         A.    Daily.                                        11:50

15         Q.    What would be a common source of             11:50

16    reference for you?                                       11:50

17         A.    The source of references has to do with      11:50

18    recall notice, Cedar newsletter, 483 reading, that      11:50

19    kind of thing.                                           11:51

20         Q.    So you rely on the information in the        11:51

21    FDA website for part of your day-to-day work in         11:51

22    your consulting business?                                11:51

23         A.    I rely on it to see what the trends are      11:51

24    with respect to compliance enforcement and to use       11:51

25    examples for my clients of what not to do.              11:51

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                    Page 91

 1      Q.    If a company was consistently          11:51

 2  manufacturing a drug with too much active        11:51

 3  pharmaceutical ingredient in it; okay?           11:51

 4      A.    Okay.                                   11:51

 5      Q.    Would that likely be reflected in the  11:51

 6  inventory usage cards?                           11:51

 7      A.    When you say inventory usage cards, what 11:51

 8  are you calling inventory usage cards?           11:51

 9      Q.    Do you know what inventory usage cards 11:52

10  are?                                             11:52

11      A.    I've never heard that term.            11:52

12      Q.    In your experience do your clients and 11:52

13  did the companies for which you worked keep      11:52

14  documentation of their inventory of raw materials? 11:52

15      A.    Oh, absolutely, yes.                   11:52

16      Q.    So they could calculate how often they 11:52

17  needed to buy new material; correct?            11:52

18      A.    That's true.                           11:52

19      Q.    And whether their usage of those raw   11:52

20  materials was consistent with the number of     11:52

21  batches that they were producing; right?        11:52

22      A.    That's correct.  It's part of the      11:52

23  control of the materials.                        11:52

24      Q.    So if a company hypothetically was     11:52

25  consistently producing a drug with too much active 11:52

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 92

 1    pharmaceutical ingredient, would it likely be          11:52

 2    somehow reflected in the inventory documentation       11:52

 3    for the active pharmaceutical ingredient at that       11:52

 4    company?                                               11:52

 5         A.    Not necessarily.                            11:52

 6         Q.    Why not?                                    11:53

 7         A.    If you have blend uniformity problems       11:53

 8    for instance, you could be making sub-potent and       11:53

 9    super-potent tablets all at the same time and that     11:53

10    would never reflect in an actual reconciliation        11:53

11    with your raw materials.  There wouldn't be a          11:53

12    difference.                                            11:53

13         Q.    Did FDA ever cite, warn, or observe that    11:53

14    Actavis was making Digitek with batches that had       11:53

15    super- and sub-potent tablets in it?                   11:53

16         A.    Did they ever -- say that again, please.    11:53

17         Q.    Cite, warn, observe.  In other words,       11:53

18    did you see a warning letter, an EIR, or a 483,        11:53

19    some statement from FDA that Digitek had batches       11:53

20    with super- and sub-potent Digitek in it?              11:53

21         A.    They make reference to thick and thin       11:53

22    tablets, but I don't recall specifically if            11:53

23    they -- that's associated with super or                11:53

24    sub-potent.                                            11:54

25         Q.    Okay.  If a company was consistently        11:54

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 93

```
 1   manufacturing tablets with too much active        11:54
 2   pharmaceutical ingredients, is it likely that that 11:54
 3   would be detected at the blend uniformity stage?   11:54
 4        A.    If you've got problems with blend       11:54
 5   uniformity, it's going to be picked up on testing. 11:54
 6        Q.    Okay.  Now -- and if a company was      11:54
 7   consistently manufacturing a pharmaceutical        11:54
 8   product with too much active pharmaceutical        11:54
 9   ingredient, isn't it likely that that would be     11:54
10   detected on finished product testing?              11:54
11        A.    Yes.                                     11:54
12        Q.    Can you show me anything in a batch     11:54
13   record or an FDA record to indicate that there was 11:54
14   a problem with Digitek having finished product     11:54
15   testing of out of spec Digitek with too much       11:54
16   active pharmaceutical ingredient in it?            11:55
17        A.    FDA or Actavis both?                    11:55
18        Q.    Let's start with FDA.                   11:55
19        A.    Okay.  There's reference to difficulties 11:55
20   on content uniformity testing.                     11:55
21        Q.    With Digitek?                           11:55
22        A.    Content uniformity in general if I'm not 11:55
23   mistaken, yes.                                     11:55
24        Q.    I want to know about Digitek.           11:55
25        A.    Uh-huh.                                 11:55
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 94

| | | |
|---|---|---|
| 1 | Q.    We're here about Digitek.   These people | 11:55 |
| 2 | represent people who took Digitek. | 11:55 |
| 3 | A.    Uh-huh.   There are documents with | 11:55 |
| 4 | respect to content uniformity issues. | 11:55 |
| 5 | Q.    Show me a document from the FDA or quite | 11:55 |
| 6 | frankly even from Actavis to indicate that there | 11:55 |
| 7 | were content uniformity problems with Digitek in | 11:55 |
| 8 | 2005, 6, 7 or 8. | 11:55 |
| 9 | A.    This could take a while just so you | 11:56 |
| 10 | know. | 11:56 |
| 11 | Q.    Well -- | 11:56 |
| 12 | A.    I've looked at thousands and thousands | 11:56 |
| 13 | of pages of information.   And to answer a specific | 11:56 |
| 14 | question accurately and precisely, it's a | 11:56 |
| 15 | non-trivial thing. | 11:56 |
| 16 | Q.    Okay.   Take your time.   I want to know | 11:56 |
| 17 | what documents you have in all this material to | 11:56 |
| 18 | indicate that FDA or Actavis was having an | 11:56 |
| 19 | out-of-specification finished product testing with | 11:56 |
| 20 | Digitek in 2005, 6, 7 or 8? | 11:56 |
| 21 | A.    Content uniformity, yes, with respect to | 11:56 |
| 22 | blend. | 11:56 |
| 23 | Q.    Or assay.   I'm talking about finished | 11:56 |
| 24 | product -- | 11:56 |
| 25 | A.    Finished product. | 11:56 |

David Bliesner, Ph.D.         Videotaped              January 25, 2011

                                                        Page 95

 1      Q.     -- testing?                               11:57

 2      A.     No.  In finished product, no.  I'm        11:57

 3   sorry.  I misunderstood you because there are       11:57

 4   issues with respect to blend uniformity; okay.      11:57

 5      Nobody has ever tested the tablets that were     11:57

 6   in question.  Nobody that I know of.                11:57

 7      Q.     Nobody that you know of?                  11:57

 8      A.     Not that I know of.                       11:57

 9      Q.     Okay.                                     11:57

10      A.     Which is strange in itself.               11:57

11      Q.     Wouldn't it be required that Actavis      11:57

12   test every batch for assay, content uniformity,     11:57

13   dissolution, and then later certain batches tested  11:57

14   on stability?                                       11:57

15      A.     Absolutely.  And they would also be       11:57

16   expected to test those tablets that were found to   11:57

17   be double.                                          11:57

18      Q.     I'm not asking you that.                  11:57

19      A.     Okay.                                     11:57

20      Q.     So let's assume there were 152 recalled   11:57

21   batches, okay, that made it to market.              11:57

22      A.     Uh-huh.                                   11:57

23      Q.     Isn't it reasonable to assume that the    11:57

24   batch records for those 152 batches have finished   11:57

25   product testing data in them?                       11:57

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 96

| | | | |
|---|---|---|---|
| 1 | A. | That is true. | 11:58 |
| 2 | Q. | Which you have not read; correct? | 11:58 |
| 3 | A. | Finished product testing for it? | 11:58 |
| 4 | Q. | Right; correct? | 11:58 |
| 5 | A. | I -- I can't say for sure I have not | 11:58 |

6  seen some of the finished product testing results.      11:58

| 7 | Q. | Well -- | 11:58 |
| 8 | A. | Because I have looked at some notebooks | 11:58 |

9  and I don't recall whether they are specifically        11:58

10  related to finished product testing.                    11:58

| 11 | Q. | Do you know as you sit here today | 11:58 |

12  whether Actavis had out-of-spec finished product        11:58

13  test results with Digitek for any of the 152            11:58

14  recalled batches?                                       11:58

| 15 | A. | I have not seen any released testing | 11:59 |

16  data --                                                 11:59

| 17 | Q. | Okay. | 11:59 |
| 18 | A. | -- that supports that. | 11:59 |
| 19 | Q. | Do you know how many of the Plaintiffs | 11:59 |

20  in this litigation have had their tablets tested        11:59

21  by independent labs?                                    11:59

| 22 | A. | No idea. | 11:59 |
| 23 | Q. | Do you know of any out-of-spec tested by | 11:59 |

24  Plaintiffs?                                             11:59

| 25 | A. | I have no idea. | 11:59 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

                                                                  Page 97

1      Q.     Did Mr. --                                    11:59
2      A.     I haven't been involved with the              11:59
3  Plaintiff.                                               11:59
4      Q.     Did Mr. Kilpatrick who was here with you      11:59
5  yesterday and today tell you that they tested some       11:59
6  of their clients' tablets at NMS labs in                 11:59
7  Philadelphia and they were within spec?                  11:59
8      A.     No.                                           11:59
9      Q.     Do you know how many tablets were tested      11:59
10 by FDA under the 484 program with Digitek?               11:59
11     A.     The number, no.                               11:59
12     Q.     Or how many batches?                          11:59
13     A.     Not off the top of my head, no.               11:59
14     Q.     So when you said nobody tested, that's        11:59
15 not correct.                                             11:59
16     A.     Right.  I disagree with that statement.       11:59
17 Nobody tested the known double-thick that came up        11:59
18 during investigations.                                   11:59
19     Q.     The 20.                                       12:00
20     A.     No, the 1,300 and others that were            12:00
21 identified throughout the course of                      12:00
22 manufacturing.  It's been found several times that       12:00
23 the double-thick has showed up.                          12:00
24     Q.     Yeah, but did they ever make it to            12:00
25 consumers?                                               12:00

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 98

1      A.    Not that I know of, but they were never      12:00

2    tested as part of the investigation.                 12:00

3      Q.    I understand.                                 12:00

4      A.    Okay.                                         12:00

5      Q.    But from time to time pharmaceutical          12:00

6    companies are going to reject batches; is that       12:00

7    right?                                                12:00

8      A.    That's correct.                               12:00

9      Q.    Or parts of batches because they're out      12:00

10   of spec in some way; right?                           12:00

11     A.    Parts of batches if they have a               12:00

12   pre-approved protocol that allows for stuff like      12:00

13   that.                                                 12:00

14     Q.    So Actavis could make a batch of              12:00

15   Digitek, find that all or part of them were out of    12:00

16   spec, and reject the batch; correct?                  12:00

17     A.    They could, yes.                              12:00

18     Q.    That's the way it's supposed to work;         12:00

19   right?                                                12:00

20     A.    Yes, it is.                                   12:00

21     Q.    So let's talk about -- oh, by the way,        12:00

22   while we're talking about testing, do most            12:01

23   pharmaceutical manufacturers conduct in-process       12:01

24   testing of size, weight, and hardness?                12:01

25     A.    Tableting?                                    12:01

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                           Page 99

1     Q.    Yes, in tableting.                             12:01

2     A.    In my experience, yes.                         12:01

3     Q.    So when they are checking, do they also        12:01

4   perform visual inspections for color and black         12:01

5   dots and anything else?                                12:01

6     A.    For in-process?                                12:01

7     Q.    Yeah.                                           12:01

8     A.    I think that depends on the individual         12:01

9   process being manufactured.                            12:01

10    Q.    Well, to some degree when you're looking       12:01

11  at --                                                  12:01

12    A.    Finished product, yes.                         12:01

13    Q.    Okay.  When you're looking at in-process       12:01

14  pharmaceutical, some of that involves power of         12:01

15  observation; correct?                                  12:01

16    A.    Yes.                                           12:01

17    Q.    Now, if -- oh, by the way, a minute ago        12:01

18  you said something about 1,300 extra thick.  What      12:02

19  batches, what documents, what are you talking          12:02

20  about?  Where do you get that number?                  12:02

21    A.    I may have misspoke on exactly that, but       12:02

22  there is a citation in one of the EIRs with            12:02

23  respect to sampling of 1,300.                          12:02

24    Q.    Do you know which EIR?                          12:02

25    A.    I'm looking at the 483s.                        12:02

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 100

```
 1      Q.    I'll tell you what.  Why don't we go on      12:03
 2   to a different topic?  At the lunch break, I would    12:03
 3   like you to find the EIR or 483 that refers to        12:03
 4   that?                                                 12:03
 5      A.    That refers to 1,300?                         12:03
 6      Q.    Yes.                                           12:03
 7      A.    Sure.                                          12:03
 8      Q.    I'll write a note for you.                    12:03
 9      A.    Okay.                                          12:04
10      Q.    Okay.  Let's assume that a customer           12:04
11   called you in for a consulting arrangement and        12:04
12   they told you that they wanted to find out            12:04
13   whether -- they had made some double-thick tablets    12:04
14   and they were interested in trying to figure out      12:04
15   whether they had actually made it out of the plant    12:04
16   to the distributor and all the way down to the        12:04
17   consumer level; okay?                                 12:04
18      A.    Okay.                                          12:04
19      Q.    Now, in order to figure that out --          12:04
20      A.    Yes.                                           12:04
21      Q.    -- would you want to look at finished        12:04
22   product test data?                                     12:04
23      A.    If I was going to solve that problem, I      12:04
24   would.                                                 12:05
25      Q.    No, please listen.  I'm not asking you       12:05
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 101

| | | |
|---|---|---|
| 1 | to solve a manufacturing problem of double-thick | 12:05 |
| 2 | tablets. | 12:05 |
| 3 | A.    Right. | 12:05 |
| 4 | Q.    The inquiry is we just don't know -- | 12:05 |
| 5 | A.    Right. | 12:05 |
| 6 | Q.    -- and don't have the time to figure out | 12:05 |
| 7 | whether -- | 12:05 |
| 8 | A.    Right. | 12:05 |
| 9 | Q.    -- these actually got to consumers. | 12:05 |
| 10 | A.    Right, right.  My point being is that as | 12:05 |
| 11 | I said before, I'm not a recall expert.  So I | 12:05 |
| 12 | would source somebody in my consulting chain who | 12:05 |
| 13 | is an expert in investigating products on the | 12:05 |
| 14 | market that may be adulterated and has done | 12:05 |
| 15 | recalls.  I would not do -- undertake that | 12:05 |
| 16 | myself.  It's not my expertise.  It's a different | 12:05 |
| 17 | area altogether. | 12:05 |
| 18 | Q.    Why is it a different area altogether? | 12:05 |
| 19 | A.    It -- the whole concept of recall is | 12:05 |
| 20 | very complex and involves all kinds of different | 12:05 |
| 21 | outside agencies and coordinations.  In fact, | 12:05 |
| 22 | these companies actually hire people to do recalls | 12:05 |
| 23 | themselves.  Not themselves.  They hire these | 12:05 |
| 24 | places.  Stericycle I believe is the one that was | 12:06 |
| 25 | involved in helping out with this one.  They go to | 12:06 |

David Bliesner, Ph.D.         Videotaped              January 25, 2011

```
                                                    Page 102
 1   the outside.  It's a unique set of skills.        12:06
 2       Q.    Okay.  But the company that's consulting  12:06
 3   here isn't necessarily conducting a recall.       12:06
 4   They're just trying to figure out --              12:06
 5       A.    Whether --                              12:06
 6       Q.    -- whether it's a problem and maybe     12:06
 7   whether they should recall.  Do you still farm    12:06
 8   that out?  Sorry for the colloquialism.  Do you   12:06
 9   still subcontract that to somebody else in your   12:06
10   consulting chain?                                 12:06
11       A.    Again, if it's specifically looking at  12:06
12   the impact, is stuff out on the market?           12:06
13       Q.    Yeah.                                   12:06
14       A.    Yeah, I would seek additional expertise.  12:06
15       Q.    Okay.  And why is that not part of your  12:06
16   expertise?                                        12:06
17       A.    The -- as you know from the readings,   12:06
18   the whole concept of GMPs and quality systems     12:06
19   encompass several major categories, and I don't   12:07
20   know of anybody personally that understands all of  12:07
21   those main quality system elements, and that has a  12:07
22   tendency quite honestly to fall to a regulatory,  12:07
23   which is even outside the main quality systems.   12:07
24       Q.    So as part of your investigation in this  12:07
25   case and your opinions in this case, in order to  12:07
```

David Bliesner, Ph.D.         Videotaped              January 25, 2011

Page 103

| | | |
|---|---|---|
| 1 | be consistent with your expertise, you would leave | 12:07 |
| 2 | it to other experts to determine if | 12:07 |
| 3 | out-of-specification Digitek made it to the | 12:07 |
| 4 | market, and if so, how much; is that right? | 12:07 |
| 5 | A.    If it made it to the market and how | 12:08 |
| 6 | much.  It wouldn't be binary -- you do it on or | 12:08 |
| 7 | off if you will; okay?  Hand it off.  It would be | 12:08 |
| 8 | something that I would be involved with from here | 12:08 |
| 9 | are the data that suggests or show that | 12:08 |
| 10 | adulterated product. | 12:08 |
| 11 | Q.    Was made? | 12:08 |
| 12 | A.    Was made. | 12:08 |
| 13 | Q.    Right. | 12:08 |
| 14 | A.    And could have potentially made it to | 12:08 |
| 15 | the market.  Then you do the handoff to the people | 12:08 |
| 16 | that go out and try to assess that. | 12:08 |
| 17 | Q.    Okay.  So what you're really -- the core | 12:08 |
| 18 | of your expertise and the core of your report is | 12:08 |
| 19 | to analyze whether adulterated product was made -- | 12:08 |
| 20 | the first half of the equation you just talked | 12:09 |
| 21 | about; right? | 12:09 |
| 22 | A.    And potentially made it to market. | 12:09 |
| 23 | Q.    Right. | 12:09 |
| 24 | A.    Uh-huh. | 12:09 |
| 25 | Q.    Potentially, possibly. | 12:09 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 104

| 1 | A. | Uh-huh. | 12:09 |

 1     A.    Uh-huh.                                    12:09

 2     Q.    Right?  Am I right?                        12:09

 3     A.    Uh-huh.                                    12:09

 4     Q.    That's a yes?                              12:09

 5     A.    Yes, I'm sorry.  I keep forgetting it's    12:09

 6  not just you and I having the conversation.        12:09

 7     Q.    Look at page 7 of your report, please.     12:09

 8  And I think we're using 92, Exhibit 92.            12:09

 9     A.    Got you.                                   12:09

10     Q.    Got it?                                    12:09

11     A.    Yeah.                                      12:09

12     Q.    In the product recall section, on the     12:09

13  right-hand side, the third one down says 2008      12:10

14  Class I Digoxin, double-thick or super-potent;     12:10

15  okay?                                              12:10

16     A.    Yes.                                       12:10

17     Q.    Are you saying there normal size but too  12:10

18  much active pharmaceutical ingredient?  Is that    12:10

19  what you mean by super-potent?                     12:10

20     A.    Yes.                                       12:10

21     Q.    All right.  So where in the FDA           12:10

22  documents does it say anything about the April     12:10

23  2008 recall being about normal size but too much   12:11

24  active pharmaceutical ingredient, super-potent     12:11

25  Digitek?                                           12:11

David Bliesner, Ph.D.              Videotaped                January 25, 2011

Page 105

| | | | |
|---|---|---|---|
| 1 | A. | In the FDA documentation? | 12:11 |
| 2 | Q. | Correct, correct. | 12:11 |
| 3 | A. | I don't believe there is anything in the | 12:11 |

4   FDA documentation after we talked about it.      12:11

5        Q.    All right.                             12:11

6        A.    There is a statement in one of the     12:11

7   original responses or drafts of the recall notice,   12:11

8   if I remember, that they referred to overweight    12:11

9   tablets which would imply super-potent.           12:11

10       Q.    Overweight is a size issue, isn't it?   12:11

11  Could have too many excipients in it, overweight?   12:11

12       A.    It could be super-potent or sub-potent.   12:11

13       Q.    Either one.                             12:11

14       A.    Because of blend uniformity issues that   12:11

15  we talked about.                                   12:11

16       Q.    It could be overweight and still have   12:11

17  the right balance of pharmaceutical -- active      12:11

18  pharmaceutical ingredient, couldn't it?           12:12

19       A.    Balance?  What do you mean by balance?   12:12

20       Q.    Ratio.  I mean in other words it could   12:12

21  still be within the API specs and be overweight    12:12

22  for some reason; right?                            12:12

23       A.    A dosage form is specific -- as you know   12:12

24  is composed of actives and excipients and those    12:12

25  ratios are very important.  And not having that    12:12

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 106

| | | |
|---|---|---|
| 1 | proper ratio and dosage form can cause | 12:12 |
| 2 | difficulties. | 12:12 |
| 3 | Q.    Okay -- | 12:12 |
| 4 | A.    In my experience. | 12:12 |
| 5 | MR. MORIARTY:  Mike, Meghan, Terry, | 12:12 |
| 6 | whoever, I'm going to start using my favorite | 12:13 |
| 7 | documents, the 484s; okay?  These are the ones | 12:13 |
| 8 | I told you I was not bringing an extra set of | 12:13 |
| 9 | because I had given them to everybody last | 12:13 |
| 10 | week; okay? | 12:13 |
| 11 | MR. KERENSKY:  Sure. | 12:13 |
| 12 | BY MR. MORIARTY: | 12:13 |
| 13 | Q.    I'm showing you Exhibit 24.  I'll | 12:13 |
| 14 | represent to you that that is an FDA form 484 for | 12:13 |
| 15 | Digitek. | 12:13 |
| 16 | A.    Uh-huh. | 12:13 |
| 17 | Q.    Have you ever seen it? | 12:13 |
| 18 | A.    Miss Johnson gave me some documents the | 12:13 |
| 19 | other day with respect to this type of thing.  I | 12:13 |
| 20 | could have looked at this. | 12:13 |
| 21 | Q.    Is that the first time you had seen the | 12:13 |
| 22 | 484s? | 12:13 |
| 23 | A.    Yes. | 12:13 |
| 24 | Q.    So did you have a chance to go through | 12:14 |
| 25 | all of them? | 12:14 |

David Bliesner, Ph.D.                Videotaped                    January 25, 2011

Page 107

| 1  | A.  | I did scan through them. | 12:14 |
| 2  | Q.  | All right. | 12:14 |
| 3  | A.  | Yes. | 12:14 |
| 4  | Q.  | So, for example, Exhibit 24 was Digitek | 12:14 |

5   collected in February of 2007 by the FDA.                    12:14

| 6  | A.  | Uh-huh. | 12:14 |
| 7  | Q.  | Is that right?  I mean that's who | 12:14 |

8   collected 484 samples; right?                                 12:14

9       A.   I'll tell you I'm not an expert in the         12:14

10  FDA's 484 and monitoring system.  In fact I know              12:14

11  very few people who really are experts in that.               12:14

12  So this is my first exposure to the 484 program.              12:14

13      Q.   Let me represent to you in February of         12:15

14  2007, FDA collected 200 count bottles of Digitek.             12:15

| 15 | A.  | Uh-huh. | 12:15 |
| 16 | Q.  | It had to -- it came from batch | 12:15 |

17  70078(a)(1).                                                  12:15

| 18 | A.  | Uh-huh. | 12:15 |
| 19 | Q.  | And FDA ran the tests that are described | 12:15 |

20  in Exhibit 24 and the Digitek passed all the tests            12:15

21  to which it was subjected; okay?                              12:15

| 22 | A.  | Met the specification. | 12:15 |
| 23 | Q.  | Yes, met the specs. | 12:15 |

24      First of all, do you have any reason to           12:15

25  disagree with me on that?                                     12:15

David Bliesner, Ph.D.          Videotaped               January 25, 2011

```
                                                      Page 108
  1      A.    No.                                      12:15
  2      Q.    Okay.  Is it significant to you at all?  12:15
  3      A.    Significant?                             12:15
  4      Q.    Yeah, is it significant in your analysis 12:15
  5  of these cases that the FDA came in, tested the    12:15
  6  product, sampled the product --                    12:16
  7      A.    Right.                                   12:16
  8      Q.    -- tested it.                            12:16
  9      A.    Right.                                   12:16
 10      Q.    And it passed?                           12:16
 11      A.    Right.  I will tell you this:  When I    12:16
 12  first looked through here, I went oh, Jeez they    12:16
 13  passed all the specs except for a few things in    12:16
 14  here that are bit odd that I'm surprised nobody     12:16
 15  picked up.  For instance, some chromatography is    12:16
 16  particularly ugly, which would lend problems.      12:16
 17  Dissolution is a strange method that it's always   12:16
 18  higher than the assay, which is problematic from a 12:16
 19  scientific standpoint.                             12:16
 20      But in the end, when you look at the values,   12:16
 21  it appears that they ran the assays and they met   12:16
 22  the spec.  Then when I stopped and thought about   12:16
 23  it, it's like it doesn't really mean anything      12:16
 24  because nobody is testing products that were       12:16
 25  double-thick.  You would expect to get decent      12:16
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                      Page 109
 1   readings, results, for the most part.           12:16

 2       Q.   Why would you expect to get decent     12:16

 3   results for the most part?                       12:16

 4       A.   Well, the link being that, you know,   12:16

 5   overweight or large tablets would imply that    12:16

 6   there's -- there's something wrong with the dosage  12:16

 7   and it would show up on assay, but nobody ever  12:17

 8   analyzed any of those.                           12:17

 9       Q.   Okay.  So -- so did you conclude that if  12:17

10   the tablets weren't double-thick, they would most  12:17

11   likely meet their specifications if tested like  12:17

12   this?                                            12:17

13          MR. KERENSKY:  Object as to form.        12:17

14          THE WITNESS:  As talked about before,    12:17

15       it's a possibility that you could have a     12:17

16       tablet that isn't double-thick or super-potent  12:17

17       because of blend uniformity problems.  All you  12:17

18       can say is that the product that they tested  12:17

19       here in the surveillance passed the spec.    12:17

20       That's all -- that's all you can conclude out  12:17

21       of it.                                       12:17

22   BY MR. MORIARTY:                                 12:17

23       Q.   All right?                              12:17

24       A.   Nothing more.                           12:17

25       Q.   And they had the opportunity to test as  12:17
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 110

```
 1   much as they wanted at that time; correct?          12:17

 2        A.    I don't know if that's a fair statement, 12:17

 3   as much as they wanted.  They did random            12:17

 4   sampling.  From what I understand, again I've just  12:18

 5   recently been exposed to this program that it's a   12:18

 6   random sampling, statistical sampling, and it is    12:18

 7   in a lot of product.                                12:18

 8        Q.    Well, they could have -- they could have 12:18

 9   tested all 200 of the tablets that they secured;    12:18

10   correct?                                            12:18

11        A.    They could have, but they didn't.        12:18

12        Q.    Right.                                    12:18

13        A.    Which is problematic if you're looking   12:18

14   for specific things, so...                          12:18

15        Q.    Do you assume that the FDA visually      12:18

16   inspected the 200 tablets that they did take        12:18

17   before they chose the ones to chemically test?      12:18

18        A.    If their methods say they did, then they 12:18

19   did.  I'm not sure what's in here as far as the     12:18

20   method goes.  You realize that an analytical        12:18

21   method, if it's for assay, people if they're in a   12:18

22   hurry in particular don't necessarily take a look   12:18

23   at the dosage forms.                                 12:18

24        If the spec says, visual -- you know, I forget 12:18

25   the term right off the top of my head now, you      12:19
```

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 111

| | | |
|---|---|---|
| 1 | know, description.  Then they sit down and they'll | 12:19 |
| 2 | do a description and purposely look at it. | 12:19 |
| 3 | It's a problem when you're in a high-volume | 12:19 |
| 4 | laboratory of people not actually looking at the | 12:19 |
| 5 | dosage form and doing the test.  I've had problems | 12:19 |
| 6 | with it in my own people. | 12:19 |
| 7 | Q.    Do you know anything about how | 12:19 |
| 8 | high-volume the 484 program is? | 12:19 |
| 9 | A.    No. | 12:19 |
| 10 | Q.    And you don't know how carefully they | 12:19 |
| 11 | looked at these tablets for size, weight, overall | 12:19 |
| 12 | -- | 12:19 |
| 13 | A.    I don't have -- | 12:19 |
| 14 | Q.    -- aside from the ones they tested. | 12:19 |
| 15 | A.    I don't have their methods, I don't have | 12:19 |
| 16 | their notebooks, and I'm not in their facility. | 12:19 |
| 17 | Q.    All right. | 12:19 |
| 18 | So Exhibit 25, had you ever seen this 484 | 12:19 |
| 19 | before the other day? | 12:19 |
| 20 | A.    I didn't see any 484-related | 12:19 |
| 21 | documentations prior to the other day. | 12:19 |
| 22 | Q.    All right.  So this is another instance | 12:19 |
| 23 | where the FDA went out, sampled Digitek, tested it | 12:19 |
| 24 | in whatever manner they did, and found it to be | 12:20 |
| 25 | within compliance with the specs. | 12:20 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 112

1      Do you have any reason to disagree with that?    12:20
2      A.    If that's what the document says, I --     12:20
3  no.                                                  12:20
4      Q.    Okay.  Do you think it's significant       12:20
5  that FDA once again found Digitek within specs       12:20
6  when they tested it?                                 12:20
7      A.    No, I don't.  When you look at the sheer   12:20
8  number of tablets that have been produced here, a    12:20
9  random sampling of certain lots at certain times     12:20
10 doesn't necessarily show you that there's bad        12:20
11 product out or not bad product out on the market.    12:20
12     Q.    And it doesn't show you that there is;     12:20
13 correct?                                             12:20
14     A.    I agree.                                   12:20
15     Q.    All right.  Had you seen Exhibit 26        12:20
16 before the other day?                                12:20
17     A.    Same thing.  This is part of a 484.        12:20
18     Q.    So once again it's FDA testing of          12:20
19 Digitek, finding it to be within compliance.  Do     12:20
20 you think that's significant?                        12:20
21     A.    Finding the samples they tested to be      12:20
22 within compliance?                                   12:20
23     Q.    Correct.                                   12:20
24     A.    Uh-huh.                                    12:20
25     Q.    Is it significant?                         12:20

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 113

```
 1    A.    Again, the point being if this is not       12:21
 2  a -- nobody's ever tested -- we wouldn't even be    12:21
 3  having this conversation if somebody had taken the  12:21
 4  tablets that they found that were thick or thin     12:21
 5  and tested them and proved it wasn't a problem      12:21
 6  because then you'd know for sure that that -- that  12:21
 7  it's a problem.  And nobody's done that.  That's    12:21
 8  what really nagged at me through this whole thing.  12:21
 9    Q.    Does it nag at you at all that nobody in    12:21
10  the course of your engagement in this has shown     12:21
11  you a double-thick tablet that was actually in the  12:21
12  hands of a consumer?                                12:21
13    A.    Yeah, I'm not sure --                       12:21
14        MR. MORIARTY:  Read that back.                12:21
15        THE WITNESS:  Yes, please.                    12:21
16        (Whereupon, the testimony was read back       12:22
17  by the court reporter, as recorded above)           12:22
18        THE WITNESS:  Not as much, no.                12:22
19  BY MR. MORIARTY:                                    12:22
20    Q.    So --                                       12:22
21    A.    It's --                                     12:22
22    Q.    Go ahead.  Mike will get mad at me if I     12:22
23  cut you off.                                        12:22
24        MR. KERENSKY:  That's right.                  12:22
25        THE WITNESS:  I'm not an MD.  From what       12:22
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

                                                              Page 114

```
 1        I've read in this case, this medication is        12:22

 2        frequently given to people who have heart          12:22

 3        problems and therefore are older.  In my           12:22

 4        experience working with the generic industry,      12:22

 5        one of the things that they try to do is to        12:22

 6        make a dosage form very distinct and stand out     12:22

 7        as much as possible so elderly people won't        12:22

 8        confuse medication.                                12:22

 9            So I think it's very probable that an          12:22

10        elderly person could have taken a double-thick     12:22

11        tablet and not know about it.  There's such        12:22

12        trust in this country for what you buy from a      12:23

13        prescription pharmaceutical.  You put it in        12:23

14        your mouth, you don't even think about it.         12:23

15            Heck, my wife is only 52 years old and         12:23

16        she looks at her medicine case and she can't       12:23

17        tell what she's taking if she doesn't have her     12:23

18        glasses on.                                        12:23

19            So if it got out there -- and we know          12:23

20        stuff's been out there -- and it was in            12:23

21        somebody's medicine cabinet in their house,        12:23

22        and they took it and not seen it, I think          12:23

23        that's probable if it was there.                   12:23

24   BY MR. MORIARTY:                                        12:23

25        Q.   Okay.  Probable.  In other words more         12:23
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 115

 1    likely than not?                                  12:23

 2        A.    I think that it's more likely than not  12:23

 3    if they had a double-thick tablet that somebody   12:23

 4    has taken them.                                   12:23

 5        Q.    If they had a double-thick tablet.      12:23

 6        A.    We know --                              12:23

 7        Q.    But you don't know whether it's probable 12:23

 8    that anybody got one; right?                      12:23

 9        A.    I don't agree with that statement.      12:23

10        Q.    Okay, then show me the data.  We have   12:23

11    thousands of lawsuits, dozens and dozens of       12:23

12    lawyers, TV advertising, nationwide recall,       12:23

13    everybody's focusing on Digitek.  They could pour 12:23

14    them out on table in their lawyers' offices, but  12:24

15    no one has shown you one; okay?                    12:24

16        Are you telling me that they ate them all by  12:24

17    coincidence?  Is that what you're going to tell a 12:24

18    jury, yes or no?                                  12:24

19        A.    That they ate them all?                 12:24

20        Q.    Consumed them all.                      12:24

21        A.    I don't think they necessarily consumed 12:24

22    them all.  I think they might have been thrown out 12:24

23    or disposed on top of it all.                     12:24

24        Q.    Might have been; okay.                  12:24

25        Are you going to tell a jury -- are you going 12:24

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 116

| | | |
|---|---|---|
| 1 | to tell a jury in this case that it is sheer | 12:24 |
| 2 | coincidence that my client made enough | 12:24 |
| 3 | double-thick Digitek to harm consumers but that | 12:24 |
| 4 | that could not have been detected by Actavis, | 12:24 |
| 5 | Mylan, UDL, pharmacists, or consumers.  Is that | 12:25 |
| 6 | what you're going to tell the jury? | 12:25 |
| 7 |      A.    I think that there's enough evidence | 12:25 |
| 8 | here based on failures, systemic chronic failures | 12:25 |
| 9 | of the quality system that product made it to | 12:25 |
| 10 | market -- and we know that it did in at least a | 12:25 |
| 11 | couple of circumstances with respect to | 12:25 |
| 12 | pharmacists' reports.  And that out of sheer | 12:25 |
| 13 | volume of tablets produced that it got to the | 12:25 |
| 14 | consumer and somebody took it and got hurt. | 12:25 |
| 15 |      Q.    All right.  So you have one tablet in | 12:25 |
| 16 | 2004 and one -- if you believe that report in | 12:25 |
| 17 | 2008 -- out of somewhere close to a billion | 12:25 |
| 18 | Digitek tablets; right?  That's all that you know | 12:25 |
| 19 | about; is that right?  Yes or no. | 12:25 |
| 20 |      A.    Say that again, please. | 12:26 |
| 21 |      Q.    You have one report of a tablet in 2004 | 12:26 |
| 22 | that was actually measured.  You have a report | 12:26 |
| 23 | maybe by somebody with the initials CSC after | 12:26 |
| 24 | their name, looking at a blister pack, seeing a | 12:26 |
| 25 | tablet in there that might have been | 12:26 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 117

| | | |
|---|---|---|
| 1 | double-thick.  That's two tablets between 2004 and | 12:26 |
| 2 | 2008 out of close to a billion that were made and | 12:26 |
| 3 | distributed. | 12:26 |
| 4 | Is that all the evidence that you have that | 12:26 |
| 5 | double-thick Digitek made it to the hands of | 12:26 |
| 6 | pharmacists or consumers? | 12:26 |
| 7 | A.    With the data I've reviewed to this | 12:26 |
| 8 | point, yes. | 12:26 |
| 9 | Q.    Okay.  So let me ask my question again. | 12:26 |
| 10 | A.    Okay. | 12:26 |
| 11 | Q.    Are you going to tell a jury that it is | 12:26 |
| 12 | a -- that my client made enough | 12:26 |
| 13 | out-of-specification Digitek to harm consumers but | 12:26 |
| 14 | not enough to be detected by in-process, finished | 12:27 |
| 15 | process testing at Actavis, any testing that | 12:27 |
| 16 | Mylan, UDL did, and also escaped the detection of | 12:27 |
| 17 | pharmacists and the FDA and the consumers | 12:27 |
| 18 | themselves? | 12:27 |
| 19 | Is that what you're going to tell the jury, | 12:27 |
| 20 | yes or no? | 12:27 |
| 21 | A.    Yes.  But I think there's enough | 12:27 |
| 22 | information here to throw substantial doubt.  I'll | 12:27 |
| 23 | answer this question, too.  I've been in this | 12:27 |
| 24 | industry since 1992 and consulting for about 12 | 12:27 |
| 25 | years now and at about day two in reviewing these | 12:27 |

David Bliesner, Ph.D.           Videotaped              January 25, 2011

                                                        Page 118

 1    documents, especially with respect to the EIRs,        12:27
 2    this is the first time I went up to my medicine        12:27
 3    cabinet and I looked for anything that had an          12:28
 4    Actavis label on it and flushed it down the toilet    12:28
 5    because it is that gross in terms of what I was        12:28
 6    seeing.                                                12:28
 7            MS. DONAHUE:  Objection.  Move to             12:28
 8       strike.  Non-responsive.                            12:28
 9            MR. MORIARTY:  Are you done?                  12:28
10            THE VIDEOGRAPHER:  Five minutes.             12:28
11    BY MR. MORIARTY:                                       12:28
12       Q.   Are you done with that answer?                12:28
13       A.   For now, yes.                                 12:28
14            MR. MORIARTY:  Move to strike.               12:28
15    BY MR. MORIARTY:                                       12:28
16       Q.   Here's Exhibit 27.  Did you ever see it      12:28
17    before the other day?                                  12:28
18       A.   No, and I'm not sure if I saw this one       12:28
19    for sure.  I just -- I said before, the 484 stuff     12:28
20    I have never saw before.                               12:28
21       Q.   Have you ever seen 28 before today --        12:28
22    before the other day, excuse me -- Exhibit 28?        12:28
23       A.   No.                                           12:28
24       Q.   Have you ever seen Exhibit 29 before the     12:28
25    other day?                                             12:28

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 119

| | | |
|---|---|---|
| 1 | A.    Before the other day, no, that I know | 12:28 |
| 2 | of. | 12:28 |
| 3 | Q.    Have you ever seen Exhibit 30 before the | 12:28 |
| 4 | other day? | 12:29 |
| 5 | A.    No. | 12:29 |
| 6 | Q.    Have you ever seen Exhibit 31 before the | 12:29 |
| 7 | other day? | 12:29 |
| 8 | A.    As I said before, anything related to | 12:29 |
| 9 | the 484 program I didn't have until yesterday. | 12:29 |
| 10 | Q.    So then I assume the answer is the same | 12:29 |
| 11 | to 32, 33, and 34, all of which are additional | 12:29 |
| 12 | 484s done by the FDA, testing my client's product | 12:29 |
| 13 | and finding it to be within its specifications. | 12:29 |
| 14 | A.    For these particular lots and these | 12:29 |
| 15 | particular samples. | 12:29 |
| 16 | Q.    Have you ever seen an FDA report where | 12:29 |
| 17 | they verified that a double-thick tablet made it | 12:29 |
| 18 | to the marketplace in 2005, 6, 7, or 8? | 12:29 |
| 19 | A.    In the documents I reviewed, no. | 12:30 |
| 20 | MR. MORIARTY:  How many minutes? | 12:30 |
| 21 | THE VIDEOGRAPHER:  We have three. | 12:30 |
| 22 | MR. MORIARTY:  Let's just take our lunch | 12:30 |
| 23 | break now. | 12:30 |
| 24 | THE VIDEOGRAPHER:  The time is | 12:30 |
| 25 | 12:31 p.m.  We're going off the record | 12:30 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                  Page 120
 1      briefly.                                    12:30

 2                   (Lunch break)                  01:09

 3           THE VIDEOGRAPHER:  The time is now      01:09

 4      1:12 p.m.  We are back on record.  This is the  01:10

 5      beginning of tape four.                     01:10

 6   BY MR. MORIARTY:                               01:10

 7      Q.    One of the things that you were going to  01:10

 8   do at the lunch break is find the reference to the  01:10

 9   1,300 extra thick tablets.  Did you find it?   01:10

10      A.    Meghan found it and she left.  So...  01:10

11           MR. KERENSKY:  Let me call her.        01:10

12           MR. MORIARTY:  She found it and didn't  01:10

13      give it to you?                             01:10

14           MR. KERENSKY:  She said she had it in  01:10

15      hand.                                       01:10

16           MR. MORIARTY:  Okay.                   01:10

17           MR. KERENSKY:  Let's keep going and I  01:10

18      will see if I have --                       01:10

19           MR. FITZPATRICK:  Here is what Meghan was  01:10

20      talking about.  It's in your report.  This is  01:10

21      what she's talking about.                   01:10

22           THE WITNESS:  Right.  A-11, yeah.      01:10

23           MR. MORIARTY:  Can somebody clue me in?  01:10

24           THE WITNESS:  A-11.                    01:10

25           MR. FITZPATRICK:  No.                  01:10
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 121

```
 1    BY MR. MORIARTY:                                    01:11
 2        Q.    A-11 is the reference which in your       01:11
 3    index says FDA form 483, observation from           01:11
 4    inspections spanning October 29 to November 2001;   01:11
 5    correct?                                             01:11
 6        A.    That's what it says in the report, yes.   01:11
 7        Q.    And it has to do with --                  01:11
 8        A.    Here we go.                                01:11
 9        Q.    And it has to do with thin tablets        01:11
10    observed by packaging personnel and they visually   01:11
11    inspected and rejected 1,600 tablets; is that       01:11
12    right?                                              01:11
13        A.    During packaging, 1,600 tablets, yes.     01:11
14        Q.    Thin?                                     01:11
15        A.    Thin, short weight.                       01:11
16        Q.    Well, first of all, I know we covered     01:11
17    this earlier, but these aren't tablets that were    01:11
18    even close to the recall period; correct?           01:12
19        A.    The recall was in?                        01:12
20        Q.    The recall was in April of '08.           01:12
21        A.    Okay.                                     01:12
22        Q.    For tablets going back about two years.   01:12
23        A.    Yes.                                      01:12
24        Q.    So this isn't even close to the recall    01:12
25    period; right?                                      01:12
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 122

```
 1     A.    No.                                      01:12

 2     Q.    And this isn't -- this 483 that you're   01:12

 3   referring to -- your A-11 -- reference, isn't    01:12

 4   about thin tablets that made it out of the plant 01:12

 5   and to consumers; correct?                       01:12

 6     A.    This specifically has to do with their   01:12

 7   process and procedure for detecting these types of 01:12

 8   tablets.                                         01:12

 9     Q.    Which --                                 01:12

10     A.    The observation.                         01:12

11     Q.    Which they detected and rejected;        01:12

12   correct?                                         01:12

13     A.    Those specific ones, but as the          01:12

14   observation says here, there's no assurance that 01:12

15   this was taken care of properly and it could have 01:12

16   expanded.                                        01:13

17     Q.    Did you ever see any report from any     01:13

18   document -- FDA or a company -- to indicate that 01:13

19   there were thin tablets in the hands of          01:13

20   pharmacists or consumers in 2001 or 2002?        01:13

21     A.    Perhaps.                                 01:13

22         MR. MORIARTY:  Go off the video record,    01:13

23     please.                                        01:13

24         THE VIDEOGRAPHER:  The time is now         01:13

25     1:16 p.m. and we're going off the record       01:13
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 123

| | | |
|---|---|---|
| 1 | briefly. | 01:13 |
| 2 | (Short break) | 01:14 |
| 3 | (The following questions are not on the video | 01:14 |
| 4 | record but were recorded by the court reporter) | 01:14 |
| 5 | THE WITNESS:  Comes back to a recall in | 01:14 |
| 6 | 1990 Class II, due to thickness. | 01:14 |
| 7 | BY MR. M0ORIARTY: | 01:14 |
| 8 | Q.    Dr. Bliesner, I'm asking about your A-11 | 01:14 |
| 9 | reference, the rejection of 1,600 thin tablets in | 01:14 |
| 10 | 2001. | 01:14 |
| 11 | A.    Yes | 01:14 |
| 12 | Q.    And my question was, was there any | 01:14 |
| 13 | evidence that thin tablets made it to pharmacists | 01:14 |
| 14 | or consumers in 2001 or 2002? | 01:14 |
| 15 | A.    In 2002?  I'm sorry.  I didn't hear the | 01:14 |
| 16 | dates on it.  I thought you said ever.  And ever | 01:14 |
| 17 | was is that, yes, there was a recall for thin | 01:14 |
| 18 | tablets back in 1990 for the same company that's | 01:14 |
| 19 | making this stuff now. | 01:14 |
| 20 | Q.    My question was have you got any | 01:14 |
| 21 | evidence that thin tablets were in the hands of | 01:14 |
| 22 | consumers in 2001 or 2002 as a follow-up to this | 01:14 |
| 23 | 483 that you referred to as A-11? | 01:15 |
| 24 | A.    I haven't seen a documentation for 2002, | 01:15 |
| 25 | just this one. | 01:15 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 124

 1     Q.    Do you have some documentation that thin      01:15
 2   tablets were in the hands of pharmacists and          01:15
 3   consumers when they did that recall in 1990 that      01:15
 4   you were just talking about?                          01:15
 5     A.    I don't have any documents to support         01:15
 6   that.  Just what was given to me.                     01:15
 7     Q.    So you don't have some reference to           01:15
 8   1,300 super- or double-thick tablets anywhere?        01:15
 9     A.    I misspoke.  It was the 1,600.                01:15
10     Q.    All right.  No, but I'm talking about 13      01:15
11   or 1,600 extra-thick tablets in '05, '06, '07 or      01:15
12   '08.                                                  01:16
13     A.    No.                                           01:16
14     Q.    Okay.  This is Exhibit 35.  Have you          01:16
15   seen this?  Did you see this ever -- and if so,       01:16
16   when?                                                 01:16
17     A.    This may be part of the document set          01:16
18   that was given to me yesterday along with the 484     01:16
19   stuff.                                                01:16
20     Q.    Well, did you look at it?                     01:16
21     A.    If it's part of that set -- which I can       01:16
22   check -- the answer would be yes.  I'll check.        01:16
23     Q.    Watch out.  The screen is on the back of      01:17
24   your chair.  Are you looking for the document         01:17
25   itself or a list?                                     01:17

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                        Page 125

```
 1     A.    No, the document itself.              01:17

 2     Q.    Bring them all over.                  01:17

 3     A.    All right.                            01:17

 4     Q.    Because I've got plenty to ask you    01:17

 5   about.                                        01:17

 6     A.    Okay.                                 01:17

 7          THE VIDEOGRAPHER:  Just so we're clear, 01:17

 8     we're still off the video record.           01:17

 9          MR. MORIARTY:  You mean I asked him that 01:17

10     whole sequence of questions about the 1,300 01:17

11     tablets and I wasn't on the video?          01:17

12          THE VIDEOGRAPHER:  Yes.                01:18

13          MR. MORIARTY:  You got it?             01:18

14          THE COURT REPORTER:  Yes, I did.       01:18

15          (Back on the video record)            01:18

16   BY MR. MORIARTY:                              01:18

17     Q.    Okay.  And this is -- UDL or Mylan    01:18

18   subcontracted with Celsis Analytical Services to 01:18

19   test three samples from three batches of Digitek; 01:18

20   correct?                                      01:18

21     A.    Yes, there's Digitek 250, Digitek 250, 01:18

22   Digitek 125.                                  01:18

23     Q.    And did you read --                   01:18

24     A.    Different ones.                       01:18

25     Q.    Did you read in here that the Digitek 01:18
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 126

```
 1   samples that they tested passed all the tests to      01:19
 2   which they subjected it?  Would you like the Bates     01:19
 3   page numbers?  The first one, 11687.  Do you see       01:19
 4   that?                                                  01:19
 5       A.    Assay and dissolution; right?  Are you       01:19
 6   speaking to me?                                        01:19
 7       Q.    Yes.                                          01:19
 8       A.    I'm looking at the document.                 01:19
 9       Q.    I'm giving you the page number to look       01:19
10   at.                                                    01:19
11       A.    I'm sorry.  I didn't understand that.        01:19
12       Q.    11687.                                        01:19
13       A.    11687; okay.                                  01:19
14       Q.    And it -- this particular batch, they        01:19
15   ran it assay and a dissolution; correct?              01:19
16       A.    Right.                                        01:19
17       Q.    And it conformed to both.                     01:19
18       A.    Right.  I was looking at the results         01:19
19   over here with respect to the certificate of          01:19
20   analysis, which has a summary of it all on the        01:20
21   previous page.                                         01:20
22       Q.    Next page, 11719.  Are you there?            01:20
23       A.    No, I'm not.  And this is the one with       01:20
24   the ugly chromatography.  Makes you kind of            01:20
25   question the results a little bit.                     01:20
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                  Page 127

 1    Q.    So you have --                        01:20

 2          MS. DONAHUE:  Move to strike.         01:20

 3  BY MR. MORIARTY:                              01:20

 4    Q.    You have a problem with the           01:20

 5  chromatography from both Celsis and FDA?      01:20

 6    A.    I don't recall.                       01:20

 7    Q.    Because we were talking about FDA     01:20

 8  before.                                       01:20

 9    A.    Before, yes.  This -- just looking at 01:20

10  this, the chromatography is a little bit suspect. 01:20

11    Q.    So you have suspect chromatography from 01:20

12  FDA and Celsis?                               01:20

13    A.    I didn't say that about the FDA.      01:20

14    Q.    Yes, you did.  That's what we were    01:20

15  talking about was a 484 from FDA.             01:20

16    A.    Right.  And we didn't specifically talk 01:20

17  about chromatography.                         01:20

18    Q.    Okay.  The record will say what the   01:20

19  record says.                                  01:20

20    A.    Okay.                                 01:20

21    Q.    C11719.  This batch tested for again  01:20

22  assay and dissolution.  It conformed to both. 01:21

23    A.    I'm actually looking at the certificates 01:21

24  of analysis, which are a better summary, which is 01:21

25  in the pages before.                          01:21
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                      Page 128

 1      Q.    But the certificate of analysis comes      01:21
 2   from Actavis, does it not?                          01:21
 3      A.    No, I'm pretty sure that this is a         01:21
 4   summary of the certificate of analysis from --     01:21
 5   perhaps not.  Let's see.                            01:21
 6      Q.    What page are you looking at?              01:21
 7      A.    The previous page.  11718.                 01:21
 8      Q.    Doesn't it says Actavis Totowa, LLC,       01:21
 9   right at the top?                                   01:21
10      A.    Yeah.  That doesn't necessarily mean       01:21
11   that that's Actavis's data.  Let's see.  Is it     01:21
12   their C of A.?  You can't just assume it.          01:21
13   Sometimes labs put the client's name at the top of 01:21
14   the documents, so...                               01:21
15      Q.    Look at 11719, which is Celsis' report    01:21
16   of analysis.                                        01:22
17      A.    Okay.                                      01:22
18      Q.    Did the Digitek conform to the two tests  01:22
19   to which they subjected it?                         01:22
20      A.    Let's see.  Conforms, yes, for assay and  01:22
21   dissolution.                                        01:22
22      Q.    Let's go to page 11748, the report of     01:22
23   analysis from the third batch that they tested.    01:22
24   Did it pass assay and dissolution?                 01:22
25      A.    Yes, for the samples they tested.         01:22

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                       Page 129

 1      Q.    Was Exhibit 69 among the materials that      01:22
 2   the Plaintiffs' lawyers supplied you the other        01:23
 3   day.  Does it look familiar?                          01:23
 4      A.    I -- to tell you truth, I can't -- I'm       01:23
 5   looking at so many different documents.  To make a    01:23
 6   statement that I've looked at this, it's just not     01:23
 7   possible.  And many of these documents I looked at    01:23
 8   six months ago, didn't even come close to            01:23
 9   reviewing it until two days ago.  So you'll have      01:23
10   to bear with me.  I apologize.  Yes.                 01:23
11      Q.    So you had it to review?                     01:24
12      A.    I did.                                       01:24
13      Q.    And they received this Digitek in April     01:24
14   of 2008 right before the recall; correct?  First     01:24
15   page, right at the top.  Date received.              01:24
16      Do you see that?                                   01:24
17      A.    I do.  I'm looking at the receiving         01:24
18   inspection form instead, which I trust more than     01:24
19   the electronic printout.  Okay.  They inspected it   01:24
20   in April 2008, yes.                                  01:24
21      Q.    And if you go back to page 7655?            01:24
22      A.    Uh-huh.                                      01:24
23      Q.    They measured 20 Digitek tablets, didn't    01:24
24   they?                                                01:25
25      A.    Uh-huh.                                      01:25

David Bliesner, Ph.D.              Videotaped                    January 25, 2011

Page 130

```
 1      Q.    And they were all within the specs,        01:25
 2   weren't they?                                        01:25
 3      A.    For the 20 they measured, yes.              01:25
 4      Q.    Does it appear to you that they             01:25
 5   subjected it to any additional analysis?             01:25
 6      A.    Based on what document?                     01:25
 7      Q.    Well, the one in front of you, Exhibit      01:25
 8   69.                                                  01:25
 9      A.    Okay.                                       01:25
10      Q.    It doesn't appear to you that they did      01:26
11   assay or dissolution; correct?                       01:26
12      A.    I'm looking.                                01:26
13      Q.    Just from skimming through, do you see      01:27
14   any assay?                                           01:27
15      A.    Yeah, I do.  That's why I'm taking my       01:27
16   time.  Because it look like they're making an        01:27
17   assay.                                               01:27
18      Q.    Are you looking at the certificate of       01:27
19   analysis or --                                       01:27
20      A.    No, I'm not.  I'm looking at this letter    01:27
21   here and I'm trying to determine.  It's very         01:27
22   difficult to look at somebody else's testing and     01:27
23   control documents because they're not all the        01:27
24   same.                                                01:27
25      Q.    And what page are you looking at?           01:27
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 131

```
 1      A.    I'm looking at 7656, the Mylan quality       01:27
 2   assurance assay result.  We acknowledge the assay     01:27
 3   result is outside UDL's parameter, which is           01:27
 4   interesting.  So UDL tested it and it was out --       01:27
 5   for assay and it was outside their parameters.        01:27
 6      Q.    Was it outside the ANDA FDA-approved         01:27
 7   United States pharmacopeia specifications?            01:27
 8      A.    I don't know.                                01:27
 9      Q.    Do you know what the USP specs are?          01:27
10      A.    I don't have the USP in front of me,         01:27
11   yes.                                                  01:27
12      Q.    If you assume that it was 90 to 105          01:27
13   percent, then this would be within the specs;         01:27
14   correct?                                              01:28
15      A.    I'm not going to assume anything.            01:28
16          MR. KERENSKY:  He's allowed to ask you         01:28
17      that type of question.                             01:28
18          THE WITNESS:  Yeah, but...                     01:28
19          MR. KERENSKY:  If that's the true spec.        01:28
20      Is that what they found?                           01:28
21          THE WITNESS:  What did you say was the         01:28
22      true spec to be?                                   01:28
23   BY MR. MORIARTY:                                      01:28
24      Q.    90 to 105 percent?                           01:28
25      A.    90 to 105?  If that assay limit is 97.4,     01:28
```

David Bliesner, Ph.D.            Videotaped              January 25, 2011

Page 132

```
 1   then it does fall within that -- if that's the      01:28
 2   case.  But it doesn't fit UDL's one.                 01:28
 3       Q.   Do you know whether people have             01:28
 4   testified in this case that UDL's specs are          01:28
 5   tighter than the ANDA FDA-approved USP specs?        01:28
 6   Simple question.  Do you know anybody who            01:28
 7   testified to that?                                   01:28
 8       A.   I know it's a simple question.  I'm just    01:28
 9   trying to remember the documents that I reviewed,    01:28
10   as to whether in fact there is a statement to the    01:28
11   effect that there is a tighter spec.  As far as      01:28
12   testifying goes, not that I know of.                 01:28
13           MR. KERENSKY:  Very good.  That's all        01:29
14       he's asking you.                                 01:29
15           THE WITNESS:  Okay, okay.                    01:29
16           MR. MORIARTY:  Exhibit 70.  This is a UDL    01:29
17       analysis documents for another batch of          01:29
18       Digitek they received in February of 2008.       01:29
19           THE WITNESS:  Okay.  Assuming the date       01:29
20       format 3/5/08 is February, yes.  Or March        01:29
21       rather.                                          01:29
22   BY MR. MORIARTY:                                     01:29
23       Q.   So at page 7671, did they measure 20        01:29
24   more Digitek tablets?                                01:29
25       A.   It appears they did, yes.                   01:29
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                    Page 133
   1      Q.    And were they all within the specs as      01:29
   2   far as you know?                                     01:29
   3      A.    It's a good point.  I don't know if I       01:30
   4   have the written specs here to do that, but         01:30
   5   assuming that the range is appropriate as stated     01:30
   6   on here, then, yes.  I don't have the spec sheet.    01:30
   7   I don't think it's here, is it?  C of A.  Let's      01:30
   8   see.  No.  It's a good point.  What spec are they    01:30
   9   using?                                              01:30
  10      Q.    Well, the ANDA -- the FDA would have        01:30
  11   approved a thickness range in the ANDA; correct?    01:30
  12      A.    Correct.  And but the key being here is,    01:30
  13   is that we don't know what UDL specs they're         01:30
  14   referring to, what the spec is.                      01:30
  15      Q.    My question is whether it's passing the     01:30
  16   FDA-approved USP specs.                              01:30
  17      A.    I don't know.                               01:31
  18      Q.    Okay.                                       01:31
  19      A.    It's not here.                              01:31
  20      Q.    So now I've asked you about a number of     01:31
  21   FDA 484s and I've started to ask you about these     01:31
  22   UDL and Celsis lab documents.  Do you know how       01:31
  23   many of the batches that have been tested in the     01:31
  24   documents that I've asked you about so far are       01:31
  25   among the recalled batches?                          01:31
```

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 134

| | | |
|---|---|---|
| 1 | A.    No, I don't know that number. | 01:31 |
| 2 | Q.    This is Exhibit 71.  Was it among the | 01:31 |
| 3 | materials that you reviewed in the last few days? | 01:31 |
| 4 | A.    Yes. | 01:31 |
| 5 | Q.    At page -- this is a Digitek batch | 01:31 |
| 6 | received at UDL in January in January of 2008; | 01:31 |
| 7 | correct? | 01:32 |
| 8 | A.    Yes. | 01:32 |
| 9 | Q.    And at page 7688 did they measure 20 | 01:32 |
| 10 | more? | 01:32 |
| 11 | A.    Yes. | 01:32 |
| 12 | Q.    Is there any indication in this document | 01:32 |
| 13 | at all that any of them were outside the | 01:32 |
| 14 | FDA-approved specifications? | 01:32 |
| 15 | A.    Again, I'm not trying to be difficult. | 01:32 |
| 16 | I don't know what the FDA specifications are.  I | 01:32 |
| 17 | have to assume that that's what they're measuring | 01:32 |
| 18 | them against.  There's no spec sheet, there's no | 01:32 |
| 19 | method, there's no nothing. | 01:32 |
| 20 | Q.    All right. | 01:32 |
| 21 | A.    Chances are if what you're saying is | 01:32 |
| 22 | correct that that UDL has -- you implied that UDL | 01:32 |
| 23 | has a tougher standard, this may be tougher or may | 01:33 |
| 24 | be wider.  I don't know. | 01:33 |
| 25 | Q.    Okay. | 01:33 |

David Bliesner, Ph.D.          Videotaped               January 25, 2011

Page 135

```
 1      A.    I see the assay was low again, too.        01:33

 2      Q.    Is that assay outside the US FDA -- the    01:33

 3  United States Food and Drug Administration's         01:33

 4  approved specs for this product?                     01:33

 5      A.    If we go with your statement, what was     01:33

 6  it 98 to?                                            01:33

 7      Q.    90 to 105 percent.                         01:33

 8      A.    90 to 105, yes, then it would fall in      01:33

 9  that spec.                                           01:33

10      Q.    This is Exhibit 72.  Is this a Digitek     01:33

11  batch received by UDL in June of 2007?  You can      01:33

12  just look at the one I gave you.  You don't need     01:34

13  to pull out your own.                                01:34

14      A.    All right.                                 01:34

15      Q.    Is that what this is?                       01:34

16      A.    June.                                      01:34

17      Q.    2007?                                      01:34

18      A.    Yes.                                       01:34

19      Q.    Okay.  And at page 5815 I believe it is,   01:34

20  did they measure 20 more?                            01:34

21      A.    They did.                                  01:34

22      Q.    Any indication that any of them are        01:34

23  outside the FDA-approved specs?                      01:34

24      A.    Unlike the assay -- perhaps, you know.     01:34

25  Do you know what the thickness that the filed spec   01:34
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 136

```
 1   is?  Because they do point out that it failed        01:35
 2   UDL's thickness, and we don't know whether it's       01:35
 3   tighter or wider than --                              01:35
 4       Q.    We do know because there's been             01:35
 5   testimony.  Their specs are tighter than the FDA's    01:35
 6   approved specs.                                       01:35
 7       A.    Okay.  Because those --                     01:35
 8       Q.    Those all passed.                           01:35
 9       A.    They did fail -- four tabs failed           01:35
10   thickness here, but the spec that UDL has, they're    01:35
11   measuring this right here, that -- that is -- the     01:35
12   question here is that is the filed spec, do we        01:35
13   know that?                                            01:35
14       Q.    What page?                                  01:35
15       A.    The one you had me look at, 5815 is it?     01:35
16       Q.    There is no spec on that page.              01:35
17       A.    No.                                         01:35
18       Q.    So my question is just is there any         01:35
19   indication in the document that any of the tablets    01:35
20   were outside the FDA's approved specs for the         01:35
21   product?                                              01:36
22       A.    We can't say that one way or the other      01:36
23   because we don't have the USP spec for thickness      01:36
24   or the file spec.                                     01:36
25       Q.    You don't know the answer to the            01:36
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 137

```
 1   question.                                          01:36
 2        A.    I'd know the answer to the question if I 01:36
 3   had the spec from the ANDA.  It's not here.        01:36
 4        Q.    I'm showing you what has been marked as  01:36
 5   Exhibit 73; okay.                                  01:36
 6        A.    Would you like me to check these and see 01:36
 7   if I had this before?                              01:36
 8        Q.    No, sir.  Look at the second page and -- 01:36
 9        A.    478969?                                 01:37
10        Q.    Yes.  Okay.  Do you see the specs for   01:37
11   Actavis and UDL at the top?                        01:37
12        A.    I'm looking.                            01:37
13        Q.    Do you see that?                        01:37
14        A.    I see that.                             01:37
15        Q.    Aren't the UDL specs tighter than the   01:37
16   Actavis specs?                                     01:37
17        A.    The reason I'm hesitating is I'm seeing 01:37
18   how it's written, and I'm trying to make sure that 01:37
19   I got it in the right order.  So please bear with  01:38
20   me.  Actavis has -- on the 250 microgram tablet,   01:38
21   Actavis has narrower limit than UDL has.  On the   01:38
22   upper end, they do as well.  So they're different  01:38
23   and -- tighter is not --                           01:38
24        Q.    Okay.  Let's go back to basic math      01:38
25   here.                                              01:38
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 138

| | | | |
|---|---|---|---|
| 1 | A. | Yeah. | 01:38 |
| 2 | Q. | If the FDA-approved range for .250 | 01:38 |
| 3 | microgram Digitek is 2.7 millimeters to 3.7. | | 01:39 |
| 4 | A. | Right. | 01:39 |
| 5 | Q. | 3.15 to 3.29 -- the UDL spec -- is | 01:39 |
| 6 | tighter? | | 01:39 |
| 7 | A. | Broader; right. | 01:39 |
| 8 | Q. | No, actually it's tighter. | 01:39 |
| 9 | A. | The UDL? | 01:39 |
| 10 | Q. | It's narrower.  Isn't 3.15 larger than | 01:39 |
| 11 | 2.7? | | 01:39 |
| 12 | A. | Yeah. | 01:39 |
| 13 | Q. | And isn't 3.29 less than 3.7? | 01:39 |
| 14 | A. | The way this is written -- | 01:39 |
| 15 | Q. | Yes or no.  Is -- | 01:39 |
| 16 | A. | No, no, no, no. | 01:39 |
| 17 | Q. | Is 3.29 less than 3.7? | 01:39 |
| 18 | A. | On that one, yes. | 01:39 |
| 19 | Q. | Okay. | 01:39 |
| 20 | A. | But on the other end, it's not. | 01:39 |
| 21 | Q. | 3.15 is -- | 01:39 |
| 22 | A. | Is broader.  You've got a broader range | 01:39 |
| 23 | between those two specs than you do for Actavis. | | 01:39 |
| 24 | Q. | Okay.  Tell you what.  Let's look at the | 01:39 |
| 25 | sentence: | | 01:39 |

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                        Page 139

 1          "It should be noted that UDL's tolerances for        01:39

 2     creation of blister cavity size are tighter than          01:40

 3     the manufacturer's tolerances for thickness and           01:40

 4     UDL's maximum tolerance is used during the                01:40

 5     creation of blister tubing."                              01:40

 6          Are you writing on that too?"                         01:40

 7     A.     No, I'm not.                                        01:40

 8     Q.     Did I read that correctly?                          01:40

 9     A.     Yes.                                                01:40

10     Q.     Are you telling me that UDL is wrong?               01:40

11     A.     Okay.  The thickness variance between              01:40

12     3.7 and 2.7 is 1.0; okay?  If you go 3.29 to              01:40

13     3.15.  All right.  Okay.  .14.  You're right.  I          01:40

14     just want to make sure.                                   01:40

15     Q.     Okay.  So, the Actavis specs are --                01:40

16     FDA-approved that Actavis specs are wider than            01:40

17     UDL's for both doses.                                     01:40

18     A.     Yes.                                                01:40

19     Q.     Okay.                                               01:40

20     A.     Just the range is different.                       01:41

21     Q.     Okay.  I'm handing you what has been               01:41

22     marked as Exhibit 83.  This is a correspondence           01:41

23     between UDL and Celsis, is it not, about Digitek          01:41

24     tablets?                                                  01:41

25     A.     This is a report -- what was the                  01:42

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                        Page 140
 1   question again?                                      01:42
 2       Q.    Is this a communication between UDL and    01:42
 3   Celsis about three batches of Digitek that they      01:42
 4   were testing for stability.  It's more than three    01:42
 5   batches.  Is this what this is about is stability    01:42
 6   testing and Digitek?                                 01:42
 7       A.    It appears to be about stability           01:42
 8   testing, and I think there is more -- you're         01:42
 9   correct on that.                                     01:42
10       Q.    When you run stability testing, do you     01:42
11   also run assay?                                      01:42
12       A.    Yes.                                       01:42
13       Q.    Did the Digitek that they tested in        01:42
14   Exhibit 83 pass all the specs?  Why don't you go     01:43
15   off the video record while we --                     01:44
16           THE VIDEOGRAPHER:  The time is now           01:44
17       1:47 p.m.  We are going off the video record     01:44
18       briefly.                                         01:44
19               (Short break.)                           01:47
20           THE VIDEOGRAPHER:  The time is now           01:48
21       1:51 p.m.  We are back on record.                01:49
22   BY MR. MORIARTY:                                     01:49
23       Q.    Did it pass all the tests to which         01:49
24   Celsis and UDL subjected it for stability and        01:49
25   assay?                                               01:49
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 141

```
 1      A.    Yes, but it goes to Stage II to          01:49
 2   dissolution on a couple, and there's no upper-end  01:49
 3   spec on dissolution.  And there's some numbers in  01:49
 4   here that if I was running the lab, that I would   01:49
 5   question.                                          01:49
 6      Q.    Okay.  So we've now gone through -- and   01:49
 7   you didn't look at the batch records to see        01:49
 8   Actavis's finished product test results.  And      01:49
 9   we've now gone through the 484s and testing done   01:49
10   by other companies outside Actavis; okay?          01:49
11      Do you have any test data to indicate that      01:49
12   Digitek in 2005, 6, 7 or 8 was outside its         01:49
13   specifications test data?                          01:50
14      A.    Test data?  I have not seen any testing   01:50
15   data, but nobody had ever tested the double-thick  01:50
16   tablet.                                            01:50
17      Q.    So can I make the assumption,             01:50
18   Dr. Bliesner, that you are reaching your           01:50
19   conclusions in this case based on FDA 483s,        01:50
20   warning letters, FDA documents like that, as       01:50
21   opposed to actual test data of product?            01:50
22      A.    I'm basing my conclusions not only on     01:50
23   FDA-related documentation but also e-mails,        01:50
24   process validation, blend uniformity results and  01:50
25   reports and investigations that the company did as 01:50
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                    Page 142
 1    well, which are problematic with respect to the    01:50

 2    manufacturing of Digitek in my opinion.            01:50

 3       Q.    Show me a document anywhere that --       01:51

 4    where the FDA questions the process validation of  01:51

 5    Digitek.                                            01:51

 6       A.    Within a specific time frame or --        01:51

 7       Q.    2005, 6, 7 or 8.  I mean do you have any  01:51

 8    evidence that people in this litigation took       01:51

 9    tablets from the 90s or the early 2000s?           01:51

10       A.    I have no idea.  I doubt it.              01:51

11       Q.    Do you know what the expiration is on     01:51

12    this product?                                       01:51

13       A.    I do not.                                 01:51

14       Q.    So?                                       01:51

15       A.    It's reasonable to be assumed that no.    01:51

16       Q.    What I want to know is if you have some   01:51

17    data from FDA from 2006, 7, or 8 to indicate that  01:51

18    Actavis's process validation on the manufacture    01:51

19    and testing of Digitek was a problem.              01:52

20       Go off the record again.                        01:52

21           THE VIDEOGRAPHER:  The time is 1:55 p.m.    01:52

22       We're going off the record briefly.             01:52

23                 (Short break)                         01:55

24           THE VIDEOGRAPHER:  The time is now          01:55

25       1:58 p.m.  We are back on the record.           01:56
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                         Page 143

1          THE WITNESS:  If you look at the warning          01:56

2     letter that was issued in February 2007, one          01:56

3     of the findings by the FDA is no procedures          01:56

4     for conducting bulk hold time studies.  In my          01:56

5     opinion and experience that, again, back to          01:56

6     this warning letter, it says procedures for          01:56

7     conducting bulk holding time studies.  That          01:56

8     falls into the purview of process validation.          01:56

9       So the answer would be yes, based on that          01:56

10    warning letter.          01:56

11         MR. ANDERTON:  What page of the report          01:56

12    are you referring to?          01:56

13         THE WITNESS:  I'm going through my          01:56

14    document.          01:56

15         MR. ANDERTON:  I understand.  What page?          01:56

16         THE WITNESS:  I would need to pull out          01:56

17    the --          01:56

18         MR. KERENSKY:  What page of the report?          01:56

19         MR. ANDERTON:  What page of the report          01:56

20    are you looking at?          01:56

21         THE WITNESS:  I'm sorry.  41.  41, 42.          01:56

22    Goes over to 42.          01:56

23  BY MR. MORIARTY:          01:57

24    Q.   From a February 2007 warning letter;          01:57

25  right?          01:57

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                     Page 144
 1      A.    Correct.                                 01:57

 2      Q.    Actually doesn't say anything about      01:57

 3   process validation, does it?                      01:57

 4      A.    Bulk holding time would be part of the   01:57

 5   process validation in my experience.              01:57

 6      Q.    That's nice.  I'm asking whether the     01:57

 7   warning letter says something about the process   01:57

 8   validation or whether it just refers to bulk      01:57

 9   holding times.                                    01:57

10      A.    I'll have to go back to the EIR to look  01:57

11   specifically at that section.                     01:57

12      Q.    Well, what is -- first of all, did it    01:57

13   relate to Digitek?                                01:57

14      A.    Unless I go back and look at the report, 01:57

15   I can't answer that question.                     01:57

16      Q.    So you can't identify for me right now   01:57

17   --                                                01:57

18      A.    In this document.                        01:57

19      Q.    -- whether there's anything specific to  01:57

20   Digitek?                                          01:57

21      A.    No, I'm going back to the FDA document.  01:57

22      Q.    Do you know whether that observation is  01:58

23   remediated and whether the FDA was satisfied with 01:58

24   the company's actions in that regard for whatever 01:58

25   product that was?                                 01:58
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 145

```
 1      A.    Specifically, no.  However, considering    01:58
 2    they went to consent decree, I doubt if they did.  01:58
 3      Q.    Okay.  Let me just make clear while         01:58
 4    we -- see if we can find that.  As you sit here     01:59
 5    right now, you don't know if that was a finding     01:59
 6    specific to Digitek; correct?                       01:59
 7      A.    Correct.                                     01:59
 8      Q.    And you don't know as you sit here now       01:59
 9    whether it was remediated to the satisfaction of    01:59
10    FDA; correct?                                        01:59
11      A.    That's a fair statement.                     01:59
12      Q.    Right.                                        01:59
13      A.    The fact that it relates to Digitek or       01:59
14    not is an interesting question in itself because    01:59
15    if you are not doing those kind of things, it is a  01:59
16    failure of your quality system in general and       01:59
17    manufacturing controls.                              01:59
18      Q.    But as you, as a consultant, would you       01:59
19    want to know what specific drug products that       01:59
20    impacts?                                             01:59
21      A.    Sure.  But in a bigger picture you'd         01:59
22    want to make sure that it's not impacting -- you    02:00
23    don't have the system in place that's going to      02:00
24    impact everything.                                   02:00
25      Q.    Okay.  I'm handing you Exhibit 63.  Have     02:00
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 146

1   you ever seen this section of the regulatory            02:00

2   procedure manual?  First of all, did you ever read      02:00

3   the regulatory proceduring manual from the FDA?         02:00

4        A.    If you can find it.  Because the links       02:00

5   change frequently and it's often difficult to find      02:00

6   these kinds of things.                                  02:00

7        Q.    But you do consult with it from time to      02:00

8   time?                                                    02:01

9        A.    Rarely.                                       02:01

10       Q.    Okay.                                         02:01

11       A.    Maybe once or twice.                          02:01

12       Q.    Let's go to page -- the second page.          02:01

13       A.    Uh-huh.                                        02:01

14       Q.    Page 4-2?                                      02:01

15       A.    Uh-huh.                                        02:01

16       Q.    Fourth full paragraph.                        02:01

17       A.    Okay.                                          02:01

18       Q.    The first sentence says:                      02:01

19       "A warning letter is informal and advisory."        02:01

20   Do you agree with the FDA on that statement about       02:01

21   their own documents?                                    02:01

22       A.    Informal and advisory.  I've obviously        02:01

23   never read this section before.  It's what it           02:01

24   says.                                                    02:01

25       Q.    Okay.  Well, it's the FDA commenting on       02:01

David Bliesner, Ph.D.          Videotaped                January 25, 2011

```
                                                      Page 147
 1   the force and effect of its own documents.  Do you    02:01
 2   have some reason to disagree with the FDA in that     02:01
 3   regard?                                               02:01
 4       A.    In my experience, the answer to that,       02:01
 5   yes.  Because in my experience a warning letter is    02:01
 6   taken with great seriousness and remediation          02:01
 7   actions spin-off of it.  I'm in a major consulting    02:02
 8   project right now, responding to a warning            02:02
 9   letter -- as numerous companies are in the            02:02
10   industry.  You don't just take it as informal.        02:02
11   You address it.  It's standard industry practice.     02:02
12       Q.    Well, you're looking at it from the         02:02
13   perspective of the company when you just answered     02:02
14   that question are you not?                            02:02
15       A.    I would I'm looking at it from the          02:02
16   perspective of the agency, too.  The agency           02:02
17   expects you to respond to a warning letter pretty     02:02
18   seriously as well.  That's why it goes to the CEO.    02:02
19       Q.    The FDA has a regulatory procedures         02:02
20   manual, and in it, it says that a warning letter      02:02
21   is informal and advisory.  And you disagree with      02:02
22   the FDA on an announcement that they make in their    02:02
23   own publication; am I correct?                        02:02
24       A.    I'm not disputing what it says here, but    02:02
25   the reality on the ground is that warning letters     02:02
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 148

 1   by the agency and -- all companies is taken with        02:02

 2   great seriousness, and they surely are not              02:03

 3   addressed in an informal and advisory fashion.          02:03

 4        Q.    Okay.                                         02:03

 5        A.    That's my professional opinion.              02:03

 6        Q.    Third sentence of that paragraph:           02:03

 7        "FDA does not consider warning letters to be      02:03

 8   final agency action on which it can be sued."          02:03

 9        Do you agree with that or disagree with that?     02:03

10        A.    "FDA does not consider warning letters      02:03

11   to be final agency action on which it can be           02:03

12   sued."                                                  02:03

13        I was under the impression that you can't sue     02:03

14   the FDA.  Maybe I'm wrong.                              02:03

15        Q.    Do you disagree with the statement or       02:03

16   not?                                                    02:03

17        A.    It's not final agency action by any         02:03

18   stretch of the imagination.                             02:03

19        Q.    Okay.  Thank you.                            02:03

20        Next page, 4-3, under the first paragraph.  At    02:03

21   the margin it says "in certain situations."  Do        02:04

22   you see that?  Item number 4 under that uses the       02:04

23   word super-potency.  Is that a -- is that term in      02:04

24   the industry that you understand?                       02:04

25        A.    Sub-potent or super potent?                  02:04

David Bliesner, Ph.D.          Videotaped              January 25, 2011

```
                                                       Page 149
  1      Q.    It says super-potency; right there?      02:04

  2      A.    Yes.                                      02:04

  3      Q.    That's a term you understand.             02:04

  4      A.    Sub-potent, super-potent, yes.            02:04

  5      Q.    I'm showing you Exhibit 64.  This is a    02:04

  6 different chapter in the regulatory procedures       02:04

  7 manual.  I would like you to go to page 10-6.        02:04

  8      A.    Okay.                                     02:05

  9      Q.    Section 10-2-3.  It says:                 02:05

 10      "When it is consistent with the public          02:05

 11 protection responsibilities of the agency and if a  02:05

 12 violative situation does not present a danger to     02:05

 13 health or does not constitute intentional, gross,    02:05

 14 or flagrant violations, it is FDA's policy to        02:05

 15 afford individuals and firms an opportunity to       02:05

 16 voluntarily take appropriate and prompt corrective   02:05

 17 action prior to the initiation of an enforcement     02:05

 18 action."                                             02:05

 19      Is that consistent with your experience?        02:05

 20      A.    Yes.  In that voluntary can mean a        02:06

 21 consent decree, as you pointed out earlier.          02:06

 22      Q.    Okay.  Let's go to the next page, 10-7.   02:06

 23 Under 10-2-4, procedures:                             02:06

 24      "Warning letters are the principal means by      02:06

 25 which the agency provides prior notice of            02:06
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 150

```
 1   violations and of achieving voluntary        02:06

 2   compliance."                                  02:06

 3        Did I read that correctly?              02:06

 4        A.    That's what it says.              02:06

 5        Q.    Is that consistent with your experience?  02:06

 6        A.    No.  It's always been my understanding  02:06

 7   that the 483 was the first documentation of lack  02:06

 8   of compliance.                                02:06

 9        Q.    Okay.  Well, later -- but a warning  02:06

10   letter is a means of getting voluntary compliance,  02:06

11   whether it comes first or second.  That's the  02:06

12   point of it; right?                           02:07

13        A.    It is a step up in the ladder with  02:07

14   respect to seriousness of lack of compliance.  02:07

15   That's what it is.                            02:07

16        Q.    At the end of paragraph I was reading  02:07

17   from it says:                                 02:07

18        "Other less formal ways include the     02:07

19   following."  And item two is the 483; correct?  Is  02:07

20   that what it says?                            02:07

21        A.    I --                               02:07

22        Q.    Is that what's there?             02:07

23        A.    This is -- this is what it says.  But I  02:07

24   can tell you 483s are not informal by any stretch  02:07

25   of the imagination.                           02:07
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

```
                                                         Page 151
  1      Q.    Well, FDA says they are; correct?          02:07
  2      A.    In their documents manual that's what      02:07
  3   they do.                                            02:07
  4      Q.    Okay.                                       02:07
  5      A.    But in reality in the world, 483s are      02:07
  6   not informal.                                       02:07
  7      Q.    All right.  So if a warning letter is      02:07
  8   not a final agency action, and a 483 is considered  02:07
  9   by FDA less formal than a warning letter, you       02:07
 10   would agree that FDA doesn't consider 483s to be    02:08
 11   final agency action; is that true?                  02:08
 12      A.    Say that again, please.                    02:08
 13      Q.    In your opinion is a 483 a final agency    02:08
 14   action?                                             02:08
 15      A.    A final agency action?  No.                02:08
 16      Q.    It even says that right on the 483s        02:08
 17   itself, that it's not a final agency action;        02:08
 18   correct?                                            02:08
 19      A.    I'd have to go back and look if I may.     02:08
 20      Q.    You don't want to trust me on that?        02:08
 21      A.    No.                                        02:08
 22      Q.    Find a 483.                                02:08
 23      A.    Okay.                                       02:08
 24      Q.    You must have several in your stack.       02:08
 25            THE VIDEOGRAPHER:  Would you like me to    02:08
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 152

| | | |
|---|---|---|
| 1 | go off the record? | 02:08 |
| 2 | THE WITNESS:  I got one right here. | 02:08 |
| 3 | BY MR. MORIARTY: | 02:08 |
| 4 | Q.    You've given me out of your stack | 02:08 |
| 5 | Exhibit -- Plaintiffs' Exhibit 26, which is a 483 | 02:08 |
| 6 | from March through May of 2008; correct? | 02:08 |
| 7 | A.    Yes. | 02:08 |
| 8 | Q.    And in the very top it says they are | 02:08 |
| 9 | inspectional observations and do not represent a | 02:09 |
| 10 | final agency determination regarding your | 02:09 |
| 11 | compliance.  Does it say that right in the top box | 02:09 |
| 12 | of the document? | 02:09 |
| 13 | A.    Yes.  Put it on your stack. | 02:09 |
| 14 | MR. MORIARTY:  Okay.  How much time on | 02:09 |
| 15 | the tape? | 02:09 |
| 16 | THE VIDEOGRAPHER:  13 minutes. | 02:09 |
| 17 | MR. MORIARTY:  Okay. | 02:09 |
| 18 | BY MR. MORIARTY: | 02:09 |
| 19 | Q.    Let's talk about just background stuff | 02:09 |
| 20 | for a bit.  Have you ever been sued? | 02:09 |
| 21 | A.    Yes. | 02:09 |
| 22 | Q.    What was the suit about? | 02:09 |
| 23 | A.    Landlord-tenant. | 02:09 |
| 24 | Q.    Any other suits? | 02:09 |
| 25 | A.    Yes. | 02:10 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 153

| | | | |
|---|---|---|---|
| 1 | Q. | What? | 02:10 |
| 2 | A. | Probate. | 02:10 |
| 3 | Q. | You were sued?  A probate case? | 02:10 |
| 4 | A. | Yes. | 02:10 |
| 5 | Q. | Okay.  Anything else? | 02:10 |
| 6 | A. | No. | 02:10 |

7      Q.    What was the probate -- when in -- the      02:10
8  landlord-tenant case, were you the landlord?      02:10

9      A.    I was.      02:10

10      Q.    And in the probate case, just give me      02:10
11  the briefest description of what that was about.      02:10

12      A.    I was made administrator of my father's      02:10
13  estate who died without a will.      02:10

14      Q.    Got it.  Okay.      02:10

15      So you have not been a Defendant in any other      02:10
16  cases.  Have you ever been a Plaintiff in any      02:10
17  lawsuits?      02:10

18      A.    No.      02:10

19      Q.    Your report has appendices that list the      02:10
20  things that you reviewed; correct?      02:10

21      A.    Correct.      02:10

22      Q.    Then in addition to that, you brought      02:10
23  with you today Exhibits 107 and 108 which are      02:10
24  lists of things you reviewed online but did not      02:11
25  printout; correct?      02:11

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 154

| | | | |
|---|---|---|---|
| 1 | A. | Correct. | 02:11 |
| 2 | Q. | Other than what is listed in your report | 02:11 |
| 3 | and 107 and 108, and the 484s and the Celsis | | 02:11 |
| 4 | documents that we reviewed today and you told me | | 02:11 |
| 5 | you just got, is there anything else you reviewed? | | 02:11 |
| 6 | A. | There may be some additional documents | 02:11 |
| 7 | in these folders over here. | | 02:11 |
| 8 | Q. | Are they in one discrete place so you | 02:11 |
| 9 | know what those additional documents are? | | 02:11 |
| 10 | A. | No. | 02:11 |
| 11 | Q. | Did you review any deposition testimony | 02:11 |
| 12 | of any Actavis company witnesses? | | 02:11 |
| 13 | A. | Yes. | 02:11 |
| 14 | Q. | Do you know which ones? | 02:11 |
| 15 | A. | Hum. | 02:11 |
| 16 | Q. | Are they listed somewhere? | 02:11 |
| 17 | A. | They are listed. | 02:12 |
| 18 | Q. | Are they listed in the report or in the | 02:12 |
| 19 | 107, 108? | | 02:12 |
| 20 | A. | Probably both. | 02:12 |
| 21 | Q. | Okay.  Have you read the deposition | 02:12 |
| 22 | testimony of Dr. Semigran who is a cardiologist in | | 02:12 |
| 23 | Boston I questioned him. | | 02:12 |
| 24 | A. | I don't recall. | 02:12 |
| 25 | Q. | Did you read the deposition of a Ph.D. | 02:12 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 155

1    by the name of Nelson.  He's in Cincinnati.  I          02:12

2    questioned him.                                          02:12

3        A.    I don't recall.  I don't think so.            02:12

4        Q.    All right.                                     02:12

5        A.    Those two names don't ring a bell.  I          02:12

6    can check.                                               02:12

7        Q.    Have you consulted with any other              02:12

8    pharmaceutical experts in your work on this              02:12

9    case -- subcontractors, in other words?                  02:12

10       A.    Expert witness?                                02:13

11       Q.    Yeah.                                          02:13

12       A.    No.                                            02:13

13       Q.    This is Exhibit 93.  This is the resume        02:13

14   of yours that we were supplied by the Plaintiffs'        02:13

15   lawyers.  Is it current and up-to-date?                  02:13

16       A.    I have a current copy that I can compare       02:13

17   it against.  Would you like me to do that?               02:13

18       Q.    As quickly as you can.                         02:13

19       A.    Okay.  Excuse me.  I'll just scan              02:13

20   through it, save time.                                   02:14

21           THE VIDEOGRAPHER:  While we are doing            02:14

22       that, we can change the tape.                        02:14

23           The time is 2:17 p.m.  We're going off           02:14

24       the record.                                          02:14

25                 (Short break)                              02:18

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 156

```
 1        THE VIDEOGRAPHER:  The time is now        02:18
 2     2:22 p.m.  We are back on the record.  This is    02:18
 3     the beginning of tape five.                 02:19
 4  BY MR. MORIARTY:                               02:19
 5     Q.    Okay.  So the question was does it look   02:19
 6  like your CV is up-to-date?                     02:19
 7     A.    There are few things here that are     02:19
 8  different.                                       02:19
 9     Q.    Such as?                               02:19
10     A.    Such as if I recall right here, there's   02:19
11  a couple of committees that I -- there's a       02:19
12  committee that I don't sit on anymore.          02:19
13     Q.    Okay.                                  02:19
14     A.    And --                                 02:19
15     Q.    Is there anything significant that you   02:19
16  do or have done or have published that is not on   02:19
17  there?                                           02:19
18     A.    Yeah, I've actually been hired as an   02:19
19  adjunct Professor at St. Leo to do online       02:19
20  education.                                       02:19
21     Q.    Not a classroom?                       02:19
22     A.    No.  Distance learning.               02:19
23     Q.    What's the topic?                      02:20
24     A.    It's general science.                  02:20
25     Q.    Okay.  Does Delphi have offices in North   02:20
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 157

1    Carolina?                                         02:20

2        A.    No.                                     02:20

3        Q.    Do you just spend the summers up there? 02:20

4    Was that why we were planning on doing this in    02:20

5    North Carolina in June?                           02:20

6        A.    Yeah, I'm engaged in a large consulting 02:20

7    project right now.                                02:20

8        Q.    Got it.  How many employees does Delphi 02:20

9    have?                                             02:20

10       A.    Two.                                    02:20

11       Q.    Who are they?                           02:20

12       A.    Myself and my wife.  Permanent.         02:20

13       Q.    What's your wife's undergraduate degree 02:20

14   in?  I promise I won't show her the tape.         02:20

15       A.    Something like modern foreign languages. 02:20

16       Q.    Okay.  Does she have a graduate degree  02:20

17   in anything?                                      02:21

18       A.    No.                                     02:21

19       Q.    Have you ever consulted with Actavis,   02:21

20   Mylan, UDL, or Amide?                             02:21

21       A.    Consulted?                              02:21

22       Q.    Yes, consulted.                         02:21

23       A.    No.                                     02:21

24       Q.    The Delphi web page indicates that your 02:21

25   business is woman-owned.  I assume that's your    02:21

David Bliesner, Ph.D.          Videotaped               January 25, 2011

Page 158

```
 1   wife?                                              02:21
 2        A.    It is.                                  02:21
 3        Q.    And what is her job with the company?   02:21
 4        A.    On a functional basis -- I would have to 02:21
 5   go back and look at the sub-S form filing in order 02:21
 6   to see what her real title is in that paperwork,   02:21
 7   but the functional, she is the bookkeeper.         02:21
 8        Q.    And did she have independent resources, 02:21
 9   if you will, that she contributed to start and run 02:21
10   the business?                                      02:21
11        A.    Could you explain that a little more?   02:22
12        Q.    Sure.  I mean she owns at least 51      02:22
13   percent of the business; correct?                  02:22
14        A.    That's correct.                         02:22
15        Q.    And what was the contribution that led  02:22
16   her to that ownership?  Was it cash, was it a car, 02:22
17   was it office equipment, what was it?              02:22
18        A.    She and I formed the corporation        02:22
19   together and we made it 51 percent her in order to 02:22
20   take advantage of small business loans if they     02:22
21   became available.                                  02:22
22        Q.    All right.  Now you list your clients or 02:22
23   some of them at page 5 to 6 of this exhibit.       02:22
24        A.    Uh-huh.                                 02:22
25        Q.    Did any of those consultations have to  02:22
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 159

1    do with extra-thick tablets?                          02:22

2        A.    Because of confidentiality agreements, I    02:22

3    am not at liberty the discuss anything about          02:22

4    clients.                                              02:22

5        Q.    I didn't ask which client and which         02:22

6    product.  So I need to know whether any of those      02:22

7    had to do with extra-thick tablets.                   02:22

8        A.    No.                                         02:22

9        Q.    Did any of them have to do with             02:22

10   normal-sized tablets with too much active             02:22

11   pharmaceutical ingredient?                            02:23

12       A.    From a consultant standpoint?               02:23

13       Q.    Yes, sir.                                   02:23

14       A.    Perhaps.                                    02:23

15       Q.    In March of 2009, Watson had a recall       02:23

16   for a drug called Propafenone HCL that had too        02:23

17   much active pharmaceutical ingredient in it.  Did     02:24

18   you consult with them on that project?                02:24

19       A.    No.                                         02:24

20       Q.    Now, what did Laboratory Management         02:24

21   Systems, Inc. do?  What did they make?                02:24

22       A.    They were a services company that           02:24

23   provided maintenance calibration -- IQ, OQ, PQ        02:24

24   services to the pharmaceutical industry in            02:24

25   addition to compliance concerns.                      02:24

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 160

```
 1      Q.    So you did not -- whatever role you had       02:24
 2  there did not involve the manufacture of any           02:24
 3  pharmaceutical dose form; correct?                     02:24
 4      A.    I consulted in the field.                     02:24
 5      Q.    I'm asking whether LMSI didn't                02:25
 6  manufacture pharmaceutical --                          02:25
 7      A.    No, they did not manufacture, no.             02:25
 8      Q.    What did Restek Corporation do when you       02:25
 9  worked for them?                                        02:25
10      A.    Restek's core business is GC and HPLC         02:25
11  column technology.  I designed, built, staffed,        02:25
12  qualified after writing a business plan, the           02:25
13  contract analytical laboratory for them.               02:25
14      Q.    They did not manufacture any dose form        02:25
15  of pharmaceutical products; is that correct?           02:25
16      A.    That's correct.                               02:25
17      Q.    What did Somerset Pharmaceuticals do          02:25
18  when you worked with them in '95 and '97?              02:25
19      A.    We were a small pharmaceutical company        02:25
20  that was doing research and development and            02:26
21  supporting, when necessary, manufacturing of           02:26
22  certain products.                                       02:26
23      Q.    Did Somerset actually manufacture for         02:26
24  sale and distribution solid oral dose                  02:26
25  pharmaceutical products?                                02:26
```

David Bliesner, Ph.D.              Videotaped              January 25, 2011

Page 161

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 02:26 |
| 2 | Q. | What products? | 02:26 |
| 3 | A. | Primarily Eldepryl, Selegiline | 02:26 |

4  hydrochloride, Parkinson, Alzheimer's.  And we did    02:26

5  a lot of R&D with respect to those forms.            02:26

6      Q.    So what was your role specifically        02:26

7  regarding the manufacture, the assembling of raw     02:26

8  material, its blending, its tableting, its           02:26

9  in-process testing, what was your role?              02:26

10     A.    Our role was --                            02:26

11     Q.    No.  Your role.                             02:26

12     A.    My role?  I was supervising the            02:26

13  analytical laboratory, R&D laboratory, and quality  02:26

14  control laboratory.                                  02:27

15     Q.    So you would have supervised the QC lab    02:27

16  that did finished product testing on that drug?     02:27

17     A.    In support of application developments     02:27

18  like ANDA.  The QC lab that did release testing     02:27

19  was not at that facility.                            02:27

20     Q.    All right.  And not under your             02:27

21  supervision.                                         02:27

22     A.    Not for release testing, no.               02:27

23     Q.    What did you do for UDL?                    02:27

24     A.    I was --                                    02:27

25     Q.    In 1994 and the first month of 1995.       02:27

David Bliesner, Ph.D.         Videotaped              January 25, 2011

Page 162

```
 1      A.    I was an analytical research chemist.        02:27
 2      Q.    So did you do finished product testing       02:27
 3   on solid oral dose pharmaceutical products?           02:27
 4      A.    Yes.                                          02:28
 5      Q.    What products?                                02:28
 6      A.    It's been such a long time, I can't          02:28
 7   recall specifics without guessing.                    02:28
 8      Q.    Well, did you do any testing on              02:28
 9   Digitek?                                               02:28
10      A.    No.                                           02:28
11      Q.    Did you have anything to do with the         02:28
12   design or formulation of blister packs?               02:28
13      A.    No.                                           02:28
14      Q.    Who was your supervisor with UDL?            02:28
15      A.    My last supervisor was Anita Runyon.         02:28
16      Q.    Do you know if she's still with UDL?         02:28
17      A.    UDL, no.                                      02:28
18      Q.    Does UDL still have facilities in Largo,     02:28
19   Florida, to your knowledge?                            02:28
20      A.    To my knowledge, no.                          02:28
21      Q.    Do you have any special training in or       02:29
22   expertise in pharmacovigilance?                        02:29
23      A.    No.                                           02:29
24      Q.    Have you worked in pharmacovigilance for     02:29
25   a pharmaceutical company?                              02:29
```

David Bliesner, Ph.D.              Videotaped              January 25, 2011

```
                                                        Page 163
  1      A.    No.                                        02:29
  2      Q.    When you are called upon to consult in     02:29
  3 the pharmaceutical industry, do you consult on        02:29
  4 pharmacovigilance issues?                             02:29
  5      A.    No.                                         02:29
  6      Q.    Do you ever -- do you have any special     02:29
  7 training or expertise in FDA regulatory affairs?      02:29
  8      A.    No.                                         02:29
  9      Q.    Have you ever worked directly in the       02:29
 10 quality assurance of the manufacturing side of the   02:29
 11 production of a solid oral dose pharmaceutical        02:29
 12 product?                                              02:29
 13      A.    As a permanent employee?                   02:29
 14      Q.    Yes.                                        02:30
 15      A.    No.                                         02:30
 16      Q.    Have you been consulted on the QA          02:30
 17 manufacturing side of solid oral dose                02:30
 18 pharmaceutical production?                            02:30
 19      A.    I have been involved in those             02:30
 20 discussions with QA personnel, yes.                   02:30
 21      Q.    And is this in your consulting role?       02:30
 22      A.    It is.                                      02:30
 23      Q.    How many times do you think you've done    02:30
 24 that particular role over the years?                  02:30
 25      A.    Interacting with QA?                       02:30
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 164

```
 1    Q.    Directly involved with QA on the          02:30
 2  manufacturing side as opposed to the QC on the    02:30
 3  analytical chem side.                             02:30
 4    A.    From a consulting standpoint?             02:30
 5    Q.    Yes.                                       02:30
 6    A.    The real number I couldn't give you an    02:30
 7  exact number, but most consulting tasks that I've 02:30
 8  done, you end up interacting with QA almost on a  02:31
 9  daily basis.                                       02:31
10    Q.    Okay.  When you've done your consulting,  02:31
11  and when you were an employee in pharmaceutical   02:31
12  businesses, was most of your GMP work regarding   02:31
13  lab and lab equipment issues as opposed to        02:31
14  manufacturing side issues?                         02:31
15    A.    A lot of my specialty is in the           02:31
16  laboratory.  In most cases the laboratory is --   02:31
17  ends up involved in manufacturing-related issues. 02:31
18  They are usually discovered or potentially        02:31
19  discovered in the laboratory first in my          02:31
20  experience.                                        02:31
21    Q.    Okay.  I think my question was whether    02:31
22  the bulk of your work either as a consultant or --02:31
23  in the pharmaceutical business was on the lab side 02:31
24  of GMPs as opposed to the manufacturing side, not 02:32
25  whether there is some spillover.  Is the bulk the 02:32
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                        Page 165
 1   lab side?                                              02:32
 2       A.    There's a lot of overlap, but, yes, the     02:32
 3   bulk is in the lab.                                    02:32
 4       Q.    Have you ever had any publications about     02:32
 5   extra-thick tablets?                                   02:32
 6       A.    No.                                          02:32
 7       Q.    Have you had any publications about          02:32
 8   tablets of normal size but varying active              02:32
 9   pharmaceutical ingredient?                             02:32
10       A.    Could you say that again, please.            02:32
11       Q.    Have you had any publications --             02:32
12       A.    Yes.                                         02:32
13       Q.    -- about tablets of normal size but          02:32
14   varying active pharmaceutical ingredient?              02:32
15       A.    I have a publication with respect to TLC     02:32
16   analysis of -- if I recall correctly; it's been a     02:32
17   long time -- API and tablets, that look at            02:32
18   different ingredients in there.                        02:33
19       Q.    But that's the lab analysis of tablets;     02:33
20   correct?                                               02:33
21       A.    That's correct, yes.                         02:33
22       Q.    Not about the root cause of the problem      02:33
23   to begin with?                                         02:33
24       A.    Actually, there's -- it does expand into     02:33
25   that.                                                  02:33
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 166

```
 1     Q.    Okay.                                      02:33
 2     A.    As I said, invariably things start out    02:33
 3  in the lab and end up spilling over into the       02:33
 4  manufacturing quality system.                      02:33
 5     Q.    Are you a member of any organizations,    02:33
 6  professional organizations?                        02:33
 7     A.    I am.                                      02:33
 8     Q.    And which ones?                            02:33
 9     A.    I have them listed here.  Curiously        02:33
10  enough, I don't.                                   02:33
11     Q.    So?                                        02:33
12     A.    I --                                       02:33
13     Q.    What are you a member of?                  02:33
14     A.    I am a member of -- if my memory is not   02:33
15  complete, I apologize, but I have been a member of 02:33
16  the ACS.                                           02:34
17     Q.    No, now.                                   02:34
18     A.    Now I'm a member of the ACS.  I have      02:34
19  been a member for a long time.                     02:34
20     Q.    The American Chemical Society?             02:34
21     A.    It is.  American Association of            02:34
22  Pharmaceutical Scientists, also American Society   02:34
23  of Quality.                                        02:34
24     Q.    Do you know whether any of those          02:34
25  organizations have ethical guidelines regarding    02:34
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

|    |                                                        | Page 167 |
|----|--------------------------------------------------------|----------|
| 1  | testimony in court cases?                              | 02:34    |
| 2  |    A.    I don't know.                                  | 02:34    |
| 3  |    Q.    Does your website have a section about         | 02:34    |
| 4  | your core competencies?                                | 02:34    |
| 5  |    A.    I'd have to go back and pull up the            | 02:34    |
| 6  | page.  It's been a while.                              | 02:34    |
| 7  |    Q.    I wrote that in quotes so I may have           | 02:34    |
| 8  | quoted it directly.                                    | 02:34    |
| 9  |    A.    Okay.                                          | 02:34    |
| 10 |    Q.    If that --                                     | 02:34    |
| 11 |    A.    One doesn't normally visit your own           | 02:34    |
| 12 | website.                                               | 02:34    |
| 13 |    Q.    One should.                                   | 02:34    |
| 14 |    A.    Yeah.                                          | 02:34    |
| 15 |    Q.    If one -- if there is a section on core        | 02:34    |
| 16 | competencies, does it say anything about               | 02:34    |
| 17 | manufacturing in there?                                | 02:34    |
| 18 |    A.    I don't recall.                                | 02:35    |
| 19 |    Q.    All right.  Now, you have written a book       | 02:35    |
| 20 | apparently about validating chromatographic            | 02:35    |
| 21 | methods; is that right?                                | 02:35    |
| 22 |    A.    That's correct.                                | 02:35    |
| 23 |    Q.    Is that book still available?                  | 02:35    |
| 24 |    A.    It is.                                         | 02:35    |
| 25 |    Q.    It was published in '06; is that right?        | 02:35    |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 168

```
 1      A.    If that's what it says here on the        02:35
 2   resume, that would be the year.                    02:35
 3      Q.    Have they asked you to do a second         02:35
 4   edition?                                            02:35
 5      A.    Not yet.                                    02:35
 6      Q.    Is it universally accepted that methods     02:35
 7   used in forensic work have to undergo validation?   02:35
 8      A.    Forensic work?                              02:35
 9      Q.    Yeah.                                        02:35
10      A.    I'm a not familiar with forensic           02:35
11   analysis.                                            02:35
12      Q.    Is it universally accepted in the          02:35
13   pharmaceutical business that the test methods for   02:35
14   things like finished product testing have to go     02:35
15   through validation?                                 02:35
16      A.    Absolutely.                                 02:35
17      Q.    Have you ever done assay or content        02:36
18   uniformity testing on Digoxin?                       02:36
19      A.    No.                                         02:36
20      Q.    Have you ever developed an assay or        02:36
21   content uniformity method for testing any solid     02:36
22   oral dose pharmaceutical product?                    02:36
23      A.    Say that again.  I'm sorry.  I lost        02:36
24   you.  I was still thinking about the last           02:36
25   question.                                            02:36
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 169

| | | |
|---|---|---|
| 1 | Q.   Have you ever developed and validated a | 02:36 |
| 2 | method to test for the potency of any solid oral | 02:36 |
| 3 | dose pharmaceutical product? | 02:36 |
| 4 | A.   I have been involved in that. | 02:36 |
| 5 | Q.   How many times? | 02:36 |
| 6 | A.   Solid oral doses? | 02:36 |
| 7 | Q.   Yeah. | 02:36 |
| 8 | A.   About three or four I would say. | 02:36 |
| 9 | Q.   If you assume that you were going to | 02:37 |
| 10 | develop a method to test the potency of a tablet, | 02:37 |
| 11 | and you had never done that before -- | 02:37 |
| 12 | A.   Uh-huh. | 02:37 |
| 13 | Q.   -- okay, how long do you think it would | 02:37 |
| 14 | take you to develop and validate the method? | 02:37 |
| 15 | A.   From scratch? | 02:37 |
| 16 | Q.   From scratch. | 02:37 |
| 17 | A.   A new chemical entity? | 02:37 |
| 18 | Q.   No, a common chemical entity but you've | 02:37 |
| 19 | never done it before. | 02:37 |
| 20 | A.   It really depends on the chemistry of | 02:37 |
| 21 | the molecule. | 02:37 |
| 22 | Q.   Give me the short side. | 02:37 |
| 23 | A.   Short side? | 02:38 |
| 24 | Q.   Yeah. | 02:38 |
| 25 | A.   Develop a method? | 02:38 |

David Bliesner, Ph.D.            Videotaped            January 25, 2011

```
                                                        Page 170
 1      Q.      Yeah.                                    02:38
 2      A.      And validate it?                         02:38
 3      Q.      Yeah.                                    02:38
 4      A.      This is when I go back and look at my    02:38
 5    book.  Approximately, from scratch?               02:38
 6      Q.      Yes, sir.                                02:38
 7      A.      Approximately six to nine months from   02:38
 8    scratch.                                           02:38
 9      Q.      So if somebody came to you and said this 02:38
10    is a test that from the time of starting the      02:38
11    validation, running the standards, the blanks, and 02:38
12    the sample that you were going to test, total of  02:38
13    two hours, that would be inconsistent with your   02:38
14    experience?                                        02:38
15      A.      Validation?                              02:38
16      Q.      Yes, sir.                                02:38
17      A.      That's not a validation.                 02:38
18      Q.      Okay.  When you talked earlier, you were 02:38
19    referring to something about chromatography.  Is  02:38
20    the -- is the -- what does it mean if the results 02:39
21    of the test exceed the range of your standard?    02:39
22    What does it do to the validity of your test?     02:39
23      A.      Please bear with me on this.             02:39
24      Q.      Yeah.                                    02:39
25      A.      I'm not sure I understand what you're    02:39
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

```
                                                      Page 171
 1   asking.                                             02:39
 2       Q.    Well, I'm not an analytical chemist so    02:39
 3   I'm doing the best I can from memory.  When you     02:39
 4   run the standard, you get a range, don't you?       02:39
 5       A.    A range?                                  02:39
 6       Q.    Yeah, a range for what the results ought  02:39
 7   to be on the standards?                             02:39
 8       A.    Now, in the pharmaceutical industry with  02:39
 9   respect to assay, you don't do a set of             02:39
10   standards.  You do one standard.                    02:39
11       Q.    Okay.                                     02:39
12       A.    And you come up with an acceptance        02:39
13   criteria up-front, through establishing             02:39
14   suitability of the methodology and the equipment    02:39
15   and then you confirm in most cases whether the      02:39
16   standards that you have in there are suitable for   02:40
17   intended use as the run is established.             02:40
18       Q.    And aren't your results supposed to be    02:40
19   within the range of your standards?                 02:40
20       A.    Yeah, I am using term range --            02:40
21       Q.    Results of the actual test.               02:40
22       A.    The standard is used to determine the     02:40
23   amount in the sample that you're analyzing, if      02:40
24   that's what you mean.                               02:40
25       Q.    Then if you test the sample and it        02:40
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 172

```
 1   exceeds the range of your standard, what does it        02:40
 2   do with the validity?                                   02:40
 3        A.    It exceeds the amount?                        02:40
 4        Q.    Yeah.                                          02:40
 5        A.    Then the -- the result initially is           02:40
 6   suspect.                                                 02:40
 7        Q.    Okay.                                          02:40
 8        A.    And then it requires an investigation.        02:40
 9        Q.    All right.                                     02:40
10             THE WITNESS:  Can we take a break,             02:40
11   please?                                                  02:40
12             MR. MORIARTY:  Sure.                           02:40
13             THE VIDEOGRAPHER:  The time is 2:43 p.m.       02:40
14   We're going off the record briefly.                     02:41
15                  (Short break)                            02:46
16             THE VIDEOGRAPHER:  The time is now            02:46
17   2:50 p.m.  We are back on the record.                   02:47
18   BY MR. MORIARTY:                                         02:47
19        Q.    Earlier we were talking about process         02:47
20   validation and you mentioned something about bulk       02:47
21   stability hold time studies; okay?                      02:47
22        A.    Uh-huh.                                       02:47
23        Q.    Now, I don't have the 438 regarding that     02:48
24   but I have the Exhibit 171, November 9th, 2007,         02:48
25   EIR from FDA; okay?                                      02:48
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 173

```
 1    A.   Okay.                                    02:48
 2         MR. FITZPATRICK:  I'm sorry.  What was   02:48
 3    the date?                                     02:48
 4         MR. MORIARTY:  The letter I have is      02:48
 5    September -- November 9th.  November 9th,     02:48
 6    2007; okay?  And it says:                     02:48
 7         "We are enclosing a copy of the          02:48
 8    establishment inspection report for the      02:48
 9    inspection conducted at your premises at      02:48
10    location on September 5th, 2007, et al.," and 02:48
11    then in here it addresses some earlier 483s;  02:48
12    okay?                                         02:48
13         THE WITNESS:  Okay.                       02:48
14 BY MR. MORIARTY:                                  02:48
15    Q.   I want you to look at observation number 02:48
16    7 --                                          02:49
17    A.   Okay.                                    02:49
18    Q.   -- in this EIR.                          02:49
19    A.   Okay.                                    02:49
20    Q.   Does that -- does observation seven      02:49
21    correlate with what you were talking about before 02:49
22    about this bulk stability hold time issue?    02:49
23    A.   To save time, do you recall what my A    02:49
24    number was that went with it when I looked at 02:49
25    this?                                         02:49
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 174

| | | |
|---|---|---|
| 1 | MR. ANDERTON:  Yeah, A25. | 02:49 |
| 2 | THE WITNESS:  25? | 02:50 |
| 3 | MR. ANDERTON:  Yes, page 41 of your | 02:50 |
| 4 | report. | 02:50 |
| 5 | THE WITNESS:  Great.  Thank you. | 02:50 |
| 6 | MR. ANDERTON:  Actually, the comment is | 02:50 |
| 7 | on page 42. | 02:50 |
| 8 | THE WITNESS:  Got you.  Thank you. | 02:50 |
| 9 | I believe my information came directly | 02:50 |
| 10 | from the warning label. | 02:50 |
| 11 | BY MR. MORIARTY: | 02:50 |
| 12 | Q.   I'm asking you if this EIR discussion | 02:50 |
| 13 | observation seven correlates to that warning | 02:50 |
| 14 | letter. | 02:50 |
| 15 | A.   I don't think so.  I think that that was | 02:51 |
| 16 | another observation from the previous inspection | 02:51 |
| 17 | that was in 17 November, 2006, from what it | 02:51 |
| 18 | looks. | 02:51 |
| 19 | If we go to my reference where I talk about -- | 02:51 |
| 20 | hold on a second -- let's see.  Oh, one page | 02:51 |
| 21 | down.  Excuse me.  I misspoke.  I was one line off | 02:51 |
| 22 | in my own paper.  Warning letter was issued 10 | 02:51 |
| 23 | July for the August 2006 inspection of Little | 02:51 |
| 24 | Falls.  So my reference here is with respect to a | 02:51 |
| 25 | warning letter for an inspection that was 10 July | 02:51 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 175

```
1   to 10 August 2006.  And this is 5 September to 28      02:52
2   September, 2007.  So those are two different            02:52
3   things.                                                 02:52
4        So this is an additional observation with         02:52
5   respect to problems potentially with bulk hold          02:52
6   times.                                                  02:52
7        Q.    Go back to page 25 of 40 in Exhibit          02:52
8   171.  It bears Bates page 505285.                       02:52
9        A.    Okay.  All right.  Page 25 of 40.            02:52
10       Q.    Go to the top.  It says "voluntary           02:52
11  corrections."  Do you see that?                         02:52
12       A.    I do see that.                               02:52
13       Q.    "Corrections to the previous FDA 483         02:52
14  were reviewed with Wanda Eng, director of               02:52
15  corporate compliance for Actavis U.S.  The              02:52
16  previous 483 observations and the associated            02:52
17  corrections, included below."                           02:52
18       A.    Okay.                                        02:52
19       Q.    Do you see that?                             02:52
20       A.    I do see that.                               02:52
21       Q.    All right.  So this observation seven is     02:52
22  at least referring to the bulk stability data;          02:53
23  correct?                                                02:53
24       A.    I'm not sure.  I'm not trying to be          02:53
25  difficult here.  I'm just not sure.                     02:53
```

David Bliesner, Ph.D.            Videotaped                  January 25, 2011

                                                              Page 176

    1       Q.      Page 31 of 40, observation seven says        02:53

    2    the stability data recorded as that of bulk             02:53

    3    stability hold time studies are actually obtained       02:53

    4    from the testing of the following packaged              02:53

    5    finished products.                                      02:53

    6       Do you see that?                                     02:53

    7       A.      I do.                                         02:53

    8       Q.      Okay.                                         02:53

    9       A.      I'm just trying to make sure we're           02:53

   10    talking about the same one, or is this an               02:53

   11    additional observation from the -- this current         02:53

   12    inspection?                                             02:53

   13       Q.      Well, let's talk about this one.             02:53

   14       A.      Okay.  "This one" being this observation     02:53

   15    right here?                                             02:53

   16       Q.      Right here.  Observation seven.              02:53

   17       A.      Okay, okay.                                  02:53

   18       Q.      Digitek isn't mentioned, is it?             02:53

   19       A.      The corrections here would indicate that     02:53

   20    "All of the bulk hold time studies have been            02:54

   21    repeated on each of the above-listed products at        02:54

   22    time points beyond three months as immediate           02:54

   23    corrective action."                                     02:54

   24       So based on that statement, it appears that          02:54

   25    that bulk hold time stability study -- for              02:54

David Bliesner, Ph.D.          Videotaped            January 25, 2011

```
                                                       Page 177
 1   whatever reason it's blacked out, which we don't      02:54
 2   know what it is, and I'm not sure why it's blacked    02:54
 3   out.  Do we know?                                     02:54
 4        Q.    Let's deal with one question at a time.    02:54
 5        A.    Okay.  That --                             02:54
 6        Q.    It was remediated and resolved to the      02:54
 7   satisfaction of FDA, was it not?                      02:54
 8        A.    For these three products.                  02:55
 9        Q.    Yes; right.                                02:55
10        A.    For these three products, yes.             02:55
11        Q.    And Digitek is not even mentioned in       02:55
12   observation seven, is it?                             02:55
13        A.    Unless it was blacked out.                 02:55
14        Q.    Well, we don't black out Digitek in the    02:55
15   Digitek litigation; okay?                             02:55
16        A.    Okay, okay.                                02:55
17        Q.    So Digitek isn't mentioned?                02:55
18        A.    It is not, no.                             02:55
19        Q.    Do you subscribe to or regularly review    02:55
20   any journals in the pharmaceutical industry?          02:55
21        A.    And, again, I'm not trying to be           02:55
22   difficult.  How are you -- journals.  What do you     02:55
23   mean by a journal?                                    02:55
24        Q.    Like any journal whether it's online or    02:55
25   not.  A scholarly collection of publications by --    02:56
```

David Bliesner, Ph.D.               Videotaped                    January 25, 2011

                                                                        Page 178

```
 1      A.    Peer-reviewed journal?                          02:56

 2      Q.    Yes.                                            02:56

 3      A.    I will pull up articles that are                02:56

 4   pertinent but as far as reading a journal, no.           02:56

 5      Q.    Well, how do you know there are articles        02:56

 6   out there that are pertinent?                            02:56

 7      A.    FDA notices from their websites and my          02:56

 8   trade magazines have references to articles, and I       02:56

 9   keep current by my trade publications that come          02:56

10   out sometimes every two weeks that funnel you back       02:56

11   to the things that are important.                        02:56

12      Q.    What trade publications do you get?             02:56

13      A.    The AAPS magazine, CEN news.                    02:56

14      Q.    What is AAPS?                                   02:56

15      A.    That's the American Association of              02:56

16   Pharmaceutical Scientists.                               02:56

17      Q.    Okay.  And are there any other ones you         02:56

18   get?                                                     02:56

19      A.    Chemical and Engineering News, which is         02:56

20   a publication of the American Chemical Society.          02:56

21      Q.    Anything else?                                  02:56

22      A.    American Society Quality periodically           02:56

23   puts out notices with respect to compliance              02:56

24   issues.  They also have a magazine that comes out        02:57

25   like once a month, too, that references that.  And       02:57
```

David Bliesner, Ph.D.                Videotaped                January 25, 2011

Page 179

```
 1    I read books.                                        02:57
 2        Q.    Do you know what the FDA's application     02:57
 3    integrity policy is?                                 02:57
 4        A.    Never heard of it.                          02:57
 5        Q.    In your experience, are FDA inspectors     02:57
 6    regularly on the lookout for falsified data in       02:57
 7    submissions like NDAs and ANDAs as well as routine   02:57
 8    reporting?                                            02:57
 9        A.    I think that's one of the things they      02:57
10    are cognizant of.                                     02:57
11        Q.    Are the -- if FDA detects document         02:57
12    integrity problems, is their response typically      02:57
13    swift and severe?                                     02:58
14        A.    Swift no doubt.  It depends on the         02:58
15    document problem.  Obviously there are different     02:58
16    flavors of documentation problems.                   02:58
17        Q.    Do you have experience with this topic?    02:58
18        A.    Yeah.                                        02:58
19        Q.    Do you consider yourself an expert in      02:58
20    it?                                                   02:58
21        A.    In FDA addressing documentation issues?    02:58
22        Q.    Right.                                       02:58
23        A.    Yes.                                         02:58
24        Q.    I mean where they suspect that the         02:58
25    documents are falsified, do you have experience in   02:58
```

David Bliesner, Ph.D.          Videotaped                January 25, 2011

```
                                                      Page 180
 1   that?                                              02:58
 2       A.    I have had direct experience of that in  02:58
 3   the last eight months.                             02:58
 4       Q.    All right.  Now nowhere in your report   02:58
 5   did I see you render any opinion that Actavis's    02:58
 6   documents were falsified or had questionable       02:58
 7   integrity.                                         02:58
 8       Am I correct about that?                       02:58
 9       A.    I don't believe there is any statement   02:59
10   to that effect in the report.                      02:59
11       Q.    And can you point me to any FDA 483      02:59
12   warning letter or other regulatory document that   02:59
13   cites Actavis for having suspicious or falsified   02:59
14   documentation?                                     02:59
15       A.    If I'm not mistaken -- and we have to go 02:59
16   back and look -- but there should be several       02:59
17   notations with respect not documenting things as   02:59
18   they occur, which would be considered a            02:59
19   documentation issue.                               02:59
20       Q.    I'm talking about falsifying.            02:59
21       A.    Falsifying?  Falsifying, no.             02:59
22       Q.    That's what I'm asking about.            02:59
23       A.    Falsifying is very difficult to assess   02:59
24   unless you're at the facility as well, so...       02:59
25       Q.    Well, FDA was at the facility on several 02:59
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

```
                                                      Page 181
 1   occasions in '06, '07 and '08, were they not?      02:59
 2       A.    Yes.                                      03:00
 3       Q.    Does an ANDA contain a -- let me          03:00
 4   withdraw that.                                      03:00
 5       How much are you charging for your time to      03:00
 6   review materials in this consulting work?           03:00
 7       A.    As strange as it sounds, my bookkeeper    03:00
 8   does the billing.  I can't honestly answer that     03:00
 9   question what the billing rate is.  We negotiated   03:00
10   a rate, it's in an e-mail, there was some           03:00
11   additional discussions, but I don't know what's     03:00
12   going on in the invoice to be honest with you.      03:00
13       Q.    What's the rate?                          03:00
14       A.    Again, as strange as it sounds, I have    03:00
15   to go back and look at the specific e-mail.         03:01
16       Q.    You don't want me hauling your wife down  03:01
17   here to talk about this.                            03:01
18       A.    Oh, no, no.                               03:01
19       Q.    Do you know what the total amount billed  03:01
20   and received for your company to date is on this    03:01
21   consulting arrangement?                             03:01
22       A.    Not off the top of my head, no.           03:01
23       Q.    Is it over $20,000?                        03:01
24       A.    I would say that's a fair assessment.     03:01
25       Q.    Is it over $35,000?                        03:01
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 182

| | | |
|---|---|---|
| 1 | A.    I'd say that's a fair assessment. | 03:01 |
| 2 | Q.    I would like you to find out what your | 03:01 |
| 3 | rate is and what the billings and receipts are to | 03:01 |
| 4 | date; okay? | 03:01 |
| 5 | A.    Okay. | 03:01 |
| 6 | Q.    Because we're not going to finish | 03:01 |
| 7 | today.  So somebody gets to come back and question | 03:01 |
| 8 | you on another day about those things; okay? | 03:01 |
| 9 | A.    Okay. | 03:01 |
| 10 | Q.    Now, when a company is on consent | 03:01 |
| 11 | decree, isn't it required that they comply with | 03:01 |
| 12 | GMPs? | 03:02 |
| 13 | A.    If a company gets placed under a consent | 03:02 |
| 14 | decree, if it's with respect -- because there are | 03:02 |
| 15 | several different types of consent decrees that go | 03:02 |
| 16 | outside the GMPs -- the company goes into the | 03:02 |
| 17 | voluntary agreement of consent decree if they've | 03:02 |
| 18 | had chronic and sustained problems with respect to | 03:02 |
| 19 | compliance with the GMPs, in my experience. | 03:02 |
| 20 | Q.    Are you done with your answer? | 03:02 |
| 21 | A.    Yes, sir. | 03:02 |
| 22 | MR. MORIARTY:  That wasn't my question. | 03:02 |
| 23 | THE WITNESS:  I'm sorry. | 03:02 |
| 24 | BY MR. MORIARTY: | 03:02 |
| 25 | Q.    My question was when you're on consent | 03:02 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 183

```
 1    decree, aren't you required to comply with GMPs?        03:02

 2        A.     You are required to comply with GMPs         03:02

 3    whether you are on consent decree or not.               03:02

 4        Q.     Well, what does the FDA do when you are      03:02

 5    on consent and you are found not to be in               03:02

 6    compliance with GMPs?                                   03:02

 7        A.     Even if you are under consent decree,        03:02

 8    the agency continues to audit and make findings         03:03

 9    and they continue on outside of that agreement,         03:03

10    just like they would normally.                          03:03

11        Q.     All right.  So you know that when Amide      03:03

12    came off consent decree in 2000, 2002, somewhere        03:03

13    in there, it was because of sustained compliance        03:03

14    with GMPs; correct?                                     03:03

15        A.     They had demonstrated they had fulfilled     03:03

16    the obligations of the consent decree.                  03:03

17        Q.     I would like you to look at Exhibit 22,      03:04

18    please.  Do you know whether you have seen this         03:04

19    letter before?  It's a warning letter dated            03:04

20    January 9th, 2007.                                       03:04

21        A.     Okay.                                         03:05

22        Q.     Do you know whether you've seen it           03:05

23    before?                                                 03:05

24        A.     Not without looking at my list, no.          03:05

25        Q.     Okay.                                         03:05
```

David Bliesner, Ph.D.              Videotaped                January 25, 2011

Page 184

| | | |
|---|---|---|
| 1 | A.    Some warning letters weren't available. | 03:05 |
| 2 | Q.    I want you to go to the second to last | 03:05 |
| 3 | page of this document.  The Bates numbers are a | 03:05 |
| 4 | little bit cut off, but it's 2883 something. | 03:05 |
| 5 | A.    Something, got you. | 03:05 |
| 6 | Q.    Do you see that? | 03:05 |
| 7 | A.    I do, sir. | 03:05 |
| 8 | Q.    In the last paragraph -- | 03:05 |
| 9 | A.    Uh-huh. | 03:05 |
| 10 | Q.    -- the FDA said: | 03:05 |
| 11 | "We feel that to provide such assurance, your | 03:05 |
| 12 | firm should promptly initiate an audit program by | 03:05 |
| 13 | a third-party having appropriate cGMP expertise to | 03:05 |
| 14 | provide assurance that all marketed lots of drug | 03:06 |
| 15 | products that remain within expiration have their | 03:06 |
| 16 | appropriate identity, strength, quality and | 03:06 |
| 17 | purity." | 03:06 |
| 18 | Do you see that? | 03:06 |
| 19 | A.     Where is that?  I missed it. | 03:06 |
| 20 | MR. KERENSKY:  It's last sentence of the | 03:06 |
| 21 | paragraph. | 03:06 |
| 22 | THE WITNESS:  The last sentence of the? | 03:06 |
| 23 | MR. KERENSKY:  Last paragraph. | 03:06 |
| 24 | THE WITNESS:  Last paragraph; okay.  I'm | 03:06 |
| 25 | sorry.  "We feel that to provide such | 03:06 |

David Bliesner, Ph.D.              Videotaped              January 25, 2011

                                                              Page 185

 1      assurance, your firm should promptly          03:06

 2      initiate" -- yes, I see that.                 03:06

 3   BY MR. MORIARTY:                                 03:06

 4      Q.    Okay.                                   03:06

 5      A.    Yes.                                     03:06

 6      Q.    Do you know what Actavis did in response   03:06

 7   to Exhibit 22?                                   03:06

 8      A.    Specifically, no.  However, I know that   03:06

 9   consulting firms were involved at some point.    03:06

10      Q.    Do you know what consulting firms?      03:07

11      A.    With respect to this specific warning   03:07

12   letter?                                          03:07

13      Q.    Yeah.                                   03:07

14      A.    I can't tell you that.                  03:07

15      Q.    Do you know anything about Quantic      03:07

16   Regulatory Services?                             03:07

17      A.    I do.                                   03:07

18      Q.    What do you know about them?            03:07

19      A.    I have worked as subcontractor for them.   03:07

20      Q.    Are they considered to be a reliable    03:07

21   firm in the pharmaceutical field?               03:07

22      A.    They are to me, yes.                    03:07

23      Q.    Well, FDA is specifically saying your   03:07

24   firm should initiate an audit program by a      03:07

25   third-party having appropriate cGMP expertise.  Is   03:07

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 186

```
 1   Quantic Regulatory Services considered to have        03:07
 2   appropriate cGMP expertise?                           03:07
 3        A.    Yes.                                        03:07
 4        Q.    Okay.  Have you ever seen Exhibit 23?       03:07
 5        A.    Yes.                                        03:08
 6        Q.    All right.  Exhibit 23 is a letter dated    03:08
 7   December 24th, 2007, to FDA from Actavis; correct?     03:08
 8        A.    Yes.                                        03:08
 9        Q.    Enclosing reports from Quantic; is that     03:08
10   right?                                                 03:08
11        A.    Right, that appears to be.                  03:09
12        Q.    Okay.  Now, I assume you didn't work for    03:09
13   Quantic on this project, did you?                      03:09
14        A.    No, sir.                                    03:09
15        Q.    So if we go to -- do you know how many      03:09
16   Digitek batches Quantic looked at?  Batch records      03:09
17   I should say.                                          03:09
18        A.    No.                                         03:09
19        Q.    Now, Quantic specifically found in its      03:09
20   batch review at page 1867209.                          03:10
21        A.    I have that page.                           03:10
22        Q.    All right.  If you look sort of right in    03:10
23   the middle of the page they say:                       03:10
24        "Based upon this review, it is QRS's opinion      03:10
25   that except as set forth below, the batch records      03:10
```

David Bliesner, Ph.D.               Videotaped                   January 25, 2011

                                                                    Page 187

```
 1   reviewed did not contain non-conformances or        03:10
 2   deficiencies that are likely to have had a          03:10
 3   material, adverse impact on the identity,           03:11
 4   strength, quality or purity of such other           03:11
 5   batches."                                           03:11
 6       Okay?                                            03:11
 7       Now do you have any data available to you on    03:11
 8   which you could conclude that you disagree with     03:11
 9   QRS about the batch records that they reviewed?     03:11
10       A.    The batch records they reviewed?          03:11
11       Q.    Correct.                                  03:11
12       A.    No.                                       03:11
13       Q.    Do you know how many of the Digitek       03:11
14   batches that they reviewed -- the Digitek batch     03:11
15   records that they reviewed were recalled Digitek    03:11
16   batches?                                            03:11
17       A.    I'm sorry.  Say that again.               03:11
18       Q.    Do you know how many of them were         03:11
19   recalled Digitek batches?                           03:11
20       A.    No.                                       03:11
21       Q.    If just assuming that QRS's conclusion    03:11
22   was correct that they have reliably confirmed the   03:12
23   identity, strength, quality, and purity of the      03:12
24   batch records that reviewed; okay?                  03:12
25       A.    That they reviewed.                       03:12
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 188

1      Q.    That they reviewed, that would mean that        03:12

2   those batches were not even adulterated; is that        03:12

3   correct?                                                 03:12

4      A.    What they reviewed was, correct.  That's        03:12

5   what you can say.  The batch record.  And               03:12

6   apparently here laboratory testing represents part      03:12

7   of that, which may or may not show the product's        03:12

8   adulterated.                                             03:12

9      Q.    So one way that the FDA -- well, do you         03:12

10   have any evidence that the FDA accepted or              03:12

11   rejected this remediation of that part of the           03:13

12   January 2007 warning letter?                            03:13

13      A.    Yesterday was the first time I saw this,       03:13

14   so I have nothing other than this.                      03:13

15      Q.    All right.  Well, would it be correct --       03:13

16   I would I be correct in assuming that batch             03:13

17   records -- batch record reviews when conducted as       03:13

18   QRS did would be one way to determine if batches        03:13

19   are adulterated?                                        03:13

20      A.    It's -- it is a measure to take and to         03:13

21   go back to try to determine, potentially.               03:13

22      Q.    Okay.  Is there some reason why you            03:13

23   didn't review batch records?  Let's assume you          03:13

24   reviewed one or two.                                    03:13

25      A.    Reviewed the ones in the ANDA.                 03:13

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 189

```
 1      Q.    Because you don't remember.  Is there        03:13
 2   some reason why you didn't review batch records       03:13
 3   from '06, '07, and '08?                                03:13
 4      A.    I reviewed the documentation that I was       03:13
 5   requested to review and provided to me in addition     03:14
 6   to the ones I was asking for.  That's it.              03:14
 7      Q.    I understand that.                             03:14
 8      A.    Yeah.                                          03:14
 9      Q.    But you had access to an online               03:14
10   repository.  Yet all these documents --                03:14
11      A.    I did not have access to all the              03:14
12   documents.  They were selectively provided me in a     03:14
13   folder.                                                 03:14
14      Q.    Did you ask to review batch records?          03:14
15      A.    I provided a list of things that I            03:14
16   asked.  I'd have to look at that to determine          03:14
17   whether I asked for batch records.                      03:14
18      Q.    Do you have that list here?  Because we       03:14
19   asked in the notice of deposition -- well, we'll       03:14
20   get into that at some point.                            03:14
21      A.    Right.                                          03:14
22      Q.    That you bring all your correspondence?       03:14
23      A.    Yes, I got -- I have it on a hard             03:14
24   drive.  All my e-mail communications is on a hard      03:14
25   drive.                                                   03:14
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                            Page 190

```
 1      Q.    So you believe that in an e-mail you        03:14
 2   corresponded to some Plaintiffs' lawyers, Fred,      03:14
 3   Meghan, whoever it happened to be --                 03:14
 4      A.    Uh-huh.                                      03:15
 5      Q.    -- that you that you wanted to see           03:15
 6   documents.                                            03:15
 7      A.    Yes.                                          03:15
 8      Q.    And do you remember now whether they        03:15
 9   supplied all the documents you asked for?            03:15
10      A.    I'm not sure.  I'd have to look at the      03:15
11   list to see what was provided.                       03:15
12      Q.    Do you remember now whether batch           03:15
13   records was some of things that you asked for?       03:15
14      A.    I can't tell you with certainty, no, I      03:15
15   can't.                                                03:15
16      Q.    And do you have that hard drive with        03:15
17   you?                                                  03:15
18      A.    I do.                                        03:15
19      Q.    But it's on your laptop or did you --       03:15
20      A.    It's external.                               03:15
21      Q.    Put it on a thumb drive?                     03:15
22      A.    It's an external drive.                      03:15
23      Q.    Is it like a little thumb drive?            03:15
24      A.    A Passport hard drive.                       03:15
25      Q.    Is that a copy of the hard drive or is      03:15
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 191

1    that the hard drive?                                03:15

2         A.    That is the hard drive.  When I first    03:15

3    started doing the work, since I've never done it    03:15

4    before, their recommendation was that everything    03:15

5    with respect to this go on that hard drive.         03:15

6         Q.    Okay.  Certainly -- I mean we're going   03:16

7    to need at some point access to that hard drive;    03:16

8    okay?                                               03:16

9         A.    Sure.                                    03:16

10        Q.    So don't delete anything.                03:16

11        A.    Oh, no, no.                              03:16

12        Q.    We'll just have to figure out            03:16

13   logistically how we can do that.                    03:16

14        A.    Okay.                                    03:16

15        Q.    How many times have you worked with      03:16

16   Quantic Regulatory Services?                        03:16

17        A.    As far as consulting jobs go?            03:16

18        Q.    Yes, sir.                                03:16

19        A.    Let's see.  I have worked on the Wyeth   03:16

20   consent decree, the Schering Plough consent         03:16

21   decree, and I believe one other.  To the best of    03:16

22   my knowledge three.                                 03:16

23        Q.    Have you worked with QRS in some other   03:17

24   capacity besides consulting?                        03:17

25        A.    No.                                      03:17

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 192

```
 1      Q.     When you have worked as a consultant for      03:17

 2   Quantic Regulatory Services, have you done batch        03:17

 3   record reviews for them or for other companies and      03:17

 4   other products?                                         03:17

 5      A.     No.  And if I could, please, when you         03:17

 6   say Quantic Regulatory Services, there's -- if I'm      03:17

 7   not mistaken there's like three entities of             03:17

 8   Quantic.  One is the regulatory services, one           03:17

 9   Quantic, and there's another one, depending on          03:17

10   what the job is covered by.                             03:17

11      So to answer that question accurately, I'm not       03:17

12   sure which one we're referring to, which one of         03:17

13   those business entities, just to be clear.              03:17

14      Q.     How many companies -- how many other          03:18

15   companies that you worked for in the                    03:18

16   pharmaceutical industry were at one point on            03:18

17   consent decree?                                         03:18

18      A.     As a permanent employee worked for?           03:18

19      Q.     Yeah.                                         03:18

20      A.     At one point?                                 03:18

21      Q.     Yeah.                                         03:18

22      A.     To my knowledge, none of the companies.       03:18

23      Q.     What about in your consulting                 03:18

24   arrangements?  How many of the companies have been      03:18

25   on consent decree at some point?                        03:18
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

Page 193

| | | | |
|---|---|---|---|
| 1 | A. | That I know of? | 03:18 |
| 2 | Q. | Yeah. | 03:18 |
| 3 | A. | Two. | 03:18 |

4     Q.    And Wyeth was one.  Are you able to tell     03:18
5    me who the other one is?                            03:18

6     A.    Schering Plough.                              03:18

7     Q.    When you were working with those            03:18
8    companies regarding consent decrees, did you tell   03:18
9    them that a consent decree was because of a         03:19
10   repeated and persistent non-compliance with the    03:19
11   law?                                                03:19

12    A.    That was not my function to tell the        03:19
13   companies that.  So me personally, no.              03:19

14    Q.    Did you believe when you were consulting    03:19
15   with them that they were on consent decree because  03:19
16   of repeated, persistent non-compliance with the    03:19
17   law?                                                03:19

18         MR. KERENSKY:  Wait a minute.  I want to      03:19
19      caution you there.                               03:19

20         THE WITNESS:  Yeah.                           03:19

21         MR. KERENSKY:  We're on the same page.        03:19
22      Because you're now asking him to say            03:19
23      something, a conclusion he drew based on stuff   03:19
24      he knew about while working there and working    03:19
25      with them, which may be covered by the          03:19

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 194

| | | |
|---|---|---|
| 1 | confidentiality agreements he has. | 03:19 |
| 2 | THE WITNESS:  All I know, if I could, is | 03:19 |
| 3 | that these companies all post the consent | 03:19 |
| 4 | decree and the letter by quality assurance and | 03:19 |
| 5 | management on bulletin boards so everybody can | 03:20 |
| 6 | see what it's all about.  That's part of the | 03:20 |
| 7 | function. | 03:20 |
| 8 | BY MR. MORIARTY: | 03:20 |
| 9 | Q.    I understand that.  But do you -- I mean | 03:20 |
| 10 | you have said that my client or pharmaceutical | 03:20 |
| 11 | companies in general go on consent decree for | 03:20 |
| 12 | repeated, persistent non-compliance with the law, | 03:20 |
| 13 | and I'm trying to find out whether that is a | 03:20 |
| 14 | phrase that you're applying only to Actavis or | 03:20 |
| 15 | whether you also apply it to companies that you | 03:20 |
| 16 | consult with in the non-litigation world. | 03:20 |
| 17 | A.    Again, I'm not -- | 03:20 |
| 18 | THE VIDEOGRAPHER:  Five minutes. | 03:20 |
| 19 | THE WITNESS:  Again, I'm not sure I | 03:20 |
| 20 | really understand the gist of the question.  I | 03:20 |
| 21 | apologize. | 03:20 |
| 22 | BY MR. MORIARTY: | 03:21 |
| 23 | Q.    Okay.  At page 8 of your report. | 03:21 |
| 24 | A.    Okay. | 03:21 |
| 25 | Q.    It says: | 03:21 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 195

 1          "It should be noted in my experience consent        03:21

 2     decrees are not common and mostly occur when a           03:21

 3     company has shown repeated and persistent                03:21

 4     non-compliance with the law."                            03:21

 5          Do you see that?                                     03:21

 6          A.    Yes, I do.                                     03:21

 7          Q.    All right.  What I'm trying to find out        03:21

 8     about, Dr. Bliesner, is whether you are just             03:21

 9     making a comment about my client or whether that         03:21

10     is your opinion about pharmaceutical companies and       03:21

11     the consent decree generally.                            03:21

12          A.    Yes.                                           03:21

13          Q.    Yes which?                                     03:21

14          A.    They -- that it takes an awful lot to         03:21

15     get a consent decree.  It's a progress of numerous       03:21

16     483s, warning letters in most circumstances.             03:21

17     Sometimes they go directly to it.  There's              03:21

18     numerous 483s, warning letters, and then it gets         03:21

19     to the point where the agency says we don't have         03:21

20     enough resources anymore to manage this.  Let's go       03:21

21     into an agreement.                                        03:22

22          Q.    And have you ever consulted with a            03:22

23     pharmaceutical company about a product that was in       03:22

24     litigation, product liability litigation?                03:22

25          A.    Consulted specifically about the product      03:22

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 196

1    liability?                                        03:22

2         Q.    Yeah.                                  03:22

3         A.    No.                                    03:22

4         Q.    Does the ANDA for any product, including    03:22

5    Digitek, contain the formula for the active      03:22

6    ingredients and how they are to be blended?       03:22

7         A.    The formula, yeah.  The combination of  03:22

8    excipients and active.                            03:22

9         Q.    Yes.                                    03:22

10        A.    In my experience they do contain that.  03:22

11        Q.    And presumably they have to be mixed in  03:22

12   appropriate proportions in order to comply with   03:22

13   the formula; correct?                             03:22

14        A.    They need to follow their manufacturing  03:23

15   steps in order to -- to come up with a proper     03:23

16   dosage for them, whether it involved mixing or    03:23

17   whatever.                                         03:23

18        Q.    And those steps are approved by the FDA;  03:23

19   correct?                                          03:23

20        A.    Those steps are in the application.  If  03:23

21   the application is approved and the FDA has found  03:23

22   the information in the application acceptable.     03:23

23             THE VIDEOGRAPHER:  We should definitely  03:23

24        change tapes.                                03:23

25             The time is 3:26 p.m.  We're going off   03:23

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 197

| | | |
|---|---|---|
| 1 | the record. | 03:23 |
| 2 | THE VIDEOGRAPHER:  The time is now | 03:34 |
| 3 | 3:37 p.m.  We are back on the record.  This is | 03:34 |
| 4 | the beginning of tape six. | 03:34 |
| 5 | BY MR. MORIARTY: | 03:34 |
| 6 | Q.    Okay.  We were asking before the break | 03:34 |
| 7 | about formulas; okay?  Have you seen any 483 or a | 03:34 |
| 8 | warning letter, any sort of citation or sanction | 03:35 |
| 9 | by the FDA on Actavis for any problem with the | 03:35 |
| 10 | actual mixing of the ingredients?  In other words, | 03:35 |
| 11 | using inappropriate proportions of ingredients? | 03:35 |
| 12 | A.    Proportions? | 03:35 |
| 13 | Q.    Yes. | 03:35 |
| 14 | A.    Not that I recall. | 03:35 |
| 15 | Q.    So you don't have any evidence that any | 03:35 |
| 16 | Digitek batch started with too much active | 03:35 |
| 17 | pharmaceutical raw ingredient? | 03:35 |
| 18 | A.    I don't have any evidence. | 03:35 |
| 19 | Q.    You are aware that Actavis tests every | 03:36 |
| 20 | batch at the blend stage. | 03:36 |
| 21 | A.    Every batch at the blend stage? | 03:36 |
| 22 | Q.    Yeah. | 03:36 |
| 23 | A.    I don't have information that I've seen | 03:36 |
| 24 | that confirms or denies that. | 03:36 |
| 25 | Q.    Okay. | 03:36 |

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                              Page 198

| | | |
|---|---|---|
| 1 | In your work in the pharmaceutical industry -- | 03:36 |
| 2 | not in your consulting work -- how much contact | 03:36 |
| 3 | did you have with blend uniformity sampling or | 03:36 |
| 4 | testing? | 03:36 |
| 5 | A.    Testing. | 03:36 |
| 6 | Q.    So not sampling? | 03:36 |
| 7 | A.    No. | 03:36 |
| 8 | Q.    Not the core sampling? | 03:36 |
| 9 | A.    No. | 03:36 |
| 10 | Q.    But you did have some with testing? | 03:36 |
| 11 | A.    Yes. | 03:36 |
| 12 | Q.    And typically when a company does blend | 03:36 |
| 13 | sampling from a dry blend batch, how many core | 03:36 |
| 14 | samples do they take and submit to a QC lab for | 03:37 |
| 15 | analysis? | 03:37 |
| 16 | A.    That varies.  It's not a set thing. | 03:37 |
| 17 | Q.    From your reading -- | 03:37 |
| 18 | A.    And it's always a battle. | 03:37 |
| 19 | Q.    Why is it a battle? | 03:37 |
| 20 | A.    Because the lab always wants less | 03:37 |
| 21 | samples and the validation people want more | 03:37 |
| 22 | samples, and they go back and forth to try to | 03:37 |
| 23 | determine number of samples to be sent to be | 03:37 |
| 24 | analyzed.  It's a very big challenge. | 03:37 |
| 25 | Q.    Why does the lab want less samples? | 03:37 |

David Bliesner, Ph.D.            Videotaped            January 25, 2011

                                                        Page 199

```
 1      A.    Because usually you're doing their        03:37
 2  release testing on top of process validation, so    03:37
 3  it's doubling their workload.                        03:37
 4      Q.    From your reading in pharmaceutical        03:37
 5  publications over time, have you found that blend    03:37
 6  uniformity sampling and testing in general is a      03:37
 7  controversial subject?                               03:37
 8      A.    Controversial?                             03:37
 9      Q.    Yes, sir.                                  03:37
10      A.    I wouldn't use the word controversial.     03:38
11      Q.    Have there been efforts by                 03:38
12  pharmaceutical companies to have the FDA eliminate   03:38
13  the requirement of blend uniformity sampling         03:38
14  because it's notoriously difficult to do and         03:38
15  control well?                                        03:38
16      A.    I know that Actavis in some of their       03:38
17  documentation make reference to try to stop blend    03:38
18  uniformity testing.                                  03:38
19      Q.    Do you know about any other company?       03:38
20      A.    Specifically that I've been involved       03:38
21  with?                                                03:38
22      Q.    Actually I mean generally.                 03:38
23      A.    Generally.                                 03:38
24      Q.    Your general knowledge of the industry.    03:38
25      A.    Blend uniformity as I said is always a     03:38
```

David Bliesner, Ph.D.          Videotaped            January 25, 2011

```
                                                    Page 200
 1    challenge anyway, so...                          03:38
 2        Q.    Okay.  So can you point to me any      03:38
 3    document where the FDA cited or warned the company  03:38
 4    because an actual batch had out-of-specification  03:38
 5    blend uniformity samples?                        03:39
 6        A.    The FDA cited?                          03:39
 7        Q.    Yeah, which then went on uncorrected or  03:39
 8    the tests weren't repeated?                      03:39
 9        A.    It would -- there are references to    03:39
10    blend -- if I'm not mistaken there are references  03:39
11    in 483s and/or potentially EIRs with respect to  03:39
12    blend if I recall.  I'd have to go back and dig  03:39
13    through and look at it specifically.             03:39
14        Q.    Yeah, but do you know whether that had  03:39
15    to do with the way they investigated and the     03:39
16    number of samples -- and the number of samples   03:39
17    they took or whether it was actual blend          03:39
18    uniformity failures that were not addressed?     03:39
19        A.    As I said, I would have to go back and  03:39
20    look specifically as what those discussions were.  03:39
21    It's been a while.                               03:40
22        Q.    Is it important to your opinions in this  03:40
23    case?                                           03:40
24        A.    I think so, yes.                       03:40
25        Q.    Is there a difference between an actual  03:40
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

                                                          Page 201

 1    blend uniformity failure that might require batch        03:40

 2    rejection and some technical need to either             03:40

 3    investigate differently or the way you did your          03:40

 4    backup testing?                                          03:40

 5         A.    I don't understand that question.            03:40

 6         Q.    All right.  It wasn't a very good            03:40

 7    question.  You'll find that late in the day with        03:40

 8    this stuff, you can mess up the questions.               03:40

 9         A.    This is hard work.                           03:40

10         Q.    All right.  So let's just assume that a      03:40

11    company takes ten core samples from various             03:40

12    sections of the blender for the blend uniformity        03:40

13    sampling; okay?                                          03:40

14         A.    Yes.                                          03:40

15         Q.    Now, let's assume that one of the ten is     03:40

16    out of specification.                                    03:40

17         A.    Yes.                                          03:41

18         Q.    Okay.                                         03:41

19         A.    Uh-huh.                                       03:41

20         Q.    A company is entitled to retest either a     03:41

21    portion of that sample or take a new sample from        03:41

22    that part of the blender, aren't they?                  03:41

23         A.    Retest, resample.  You have to be very       03:41

24    careful on how you're defining those terms.             03:41

25         Q.    Well, let's go back.  Let's assume that      03:41

David Bliesner, Ph.D.          Videotaped              January 25, 2011

Page 202

1    the core sampling device, the sample thief.          03:41

2        A.    Yes.                                       03:41

3        Q.    Let's just assume for the sake of         03:41

4    argument --                                          03:41

5        A.    Uh-huh.                                    03:41

6        Q.    -- that it is the length and diameter of  03:41

7    my pen --                                            03:41

8        A.    Okay.                                      03:41

9        Q.    -- that I'm holding in front of the       03:41

10   camera; okay?                                        03:41

11       A.    Uh-huh.                                    03:41

12       Q.    So you put that in and you fill it with   03:41

13   blend.  Actually, I think the sampling techniques   03:41

14   require a lot less than the length and diameter of  03:41

15   my pen.  But let's assume you have enough to test,  03:42

16   okay, and you have some left over; all right?       03:42

17       A.    Yes.                                       03:42

18       Q.    Is there any FDA reg -- GMP or            03:42

19   otherwise -- that if the first test on the sample   03:42

20   is out of spec, it says that you have to reject     03:42

21   the batch and that you cannot test the remaining    03:42

22   sample in this sample field?                        03:42

23       A.    Well, there's a whole process that gets   03:42

24   to that, the resampling stage.  If you have a       03:42

25   failure of an analysis in the laboratory, it        03:42

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 203

1    requires a laboratory investigation to determine          03:42

2    whether that result is valid or not.          03:42

3        Q.    Okay.  But the question is, is there a          03:42

4    FDA reg that prevents you from testing more of the          03:42

5    sample that you took?          03:42

6        A.    Not to my knowledge.          03:42

7        Q.    Is there an FDA reg that prevents you          03:42

8    from resampling from that part of the blender and          03:43

9    then testing that material?          03:43

10       A.    Not to my knowledge.          03:43

11       Q.    Is there any FDA reg -- including GMP          03:43

12   regs -- that require companies to reject a batch          03:43

13   based on one out of say ten blend uniformity          03:43

14   tests?          03:43

15       A.    Regulations?          03:43

16       Q.    Yeah.          03:43

17       A.    Not to my knowledge.          03:43

18       Q.    So if we were to look at the Actavis          03:43

19   batch records and find that, for example, that on          03:43

20   initial testing, one sample was out of spec, and          03:43

21   the company did an investigation and retested and          03:43

22   it was not out of spec on retesting, you're not          03:44

23   saying that Actavis had to reject that batch for          03:44

24   blend uniformity failure, are you?  Just answer my          03:44

25   question.          03:44

David Bliesner, Ph.D.          Videotaped              January 25, 2011

                                                                Page 204

     1     A.    Yeah.  Say it again, please.  These are        03:44
     2   very difficult issues.                                 03:44
     3     Q.    Sure.                                           03:44
     4     A.    Very difficult issues and they happened         03:44
     5   frequently.                                             03:44
     6     Q.    All right.  So if you go into the              03:44
     7   records --                                              03:44
     8     A.    Yes.                                            03:44
     9     Q.    -- you've had, all this paper, and you          03:44
    10   find that there was a blend uniformity out of spec     03:44
    11   result --                                               03:44
    12     A.    Yes.                                            03:44
    13     Q.    -- for one out of ten samples for a             03:44
    14   particular batch; okay?                                 03:44
    15     A.    Uh-huh.                                         03:44
    16     Q.    Are you with me so far?                         03:44
    17     A.    I am.                                           03:44
    18     Q.    And they retested it and it was within         03:44
    19   the specs and hence passed blend uniformity and        03:44
    20   was sent on for packaging, is it your opinion that     03:44
    21   that one out of spec result would have -- would        03:44
    22   have required rejection of the batch?                  03:45
    23     A.    Perhaps.  If you have a failure like           03:45
    24   this and you can't find a root cause for it and        03:45
    25   your investigation doesn't lead to anything, then      03:45

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 205

```
 1   there are some very serious discussions that need      03:45
 2   to be made with respect to the disposition of that     03:45
 3   batch.                                                  03:45
 4       Q.    All right.  But that doesn't                  03:45
 5   automatically require a batch --                        03:45
 6       A.     Automatically --                             03:45
 7       Q.     -- rejection.                                03:45
 8       A.     Automatically, knee jerk, no.                03:45
 9       Q.     You're supposed to -- the regs require       03:45
10   that you do an investigation; correct?                  03:45
11       A.     Specifically I'd have to go back and         03:45
12   look at the GMPs to see where they say -- excuse        03:45
13   me -- say exactly that you must reject.  It is          03:45
14   expected in the industry that manufacturing            03:45
15   investigations are investigated very thoroughly to     03:45
16   determine a root cause.                                 03:45
17       Q.     Okay.  And it could be a manufacturing       03:45
18   investigation or a lab investigation under these       03:46
19   circumstances we're talking about with blend          03:46
20   uniformity, couldn't it?                                03:46
21       A.     Yes, the lab in most cases is involved      03:46
22   even if it is a manufacturing investigation            03:46
23   because the laboratory people have a tendency to       03:46
24   be some of the more technically trained folks on       03:46
25   the staff and they usually are cross-functional        03:46
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 206

```
 1   teams when these types of issues come up.  So you        03:46
 2   can solve the problem with the best information we       03:46
 3   have.                                                    03:46
 4       Q.    So if there is a circumstance in the           03:46
 5   documents where this has occurred, FDA could go          03:46
 6   back and say we don't like the way you conducted         03:46
 7   the investigation and write up an observation and        03:46
 8   a 483 just about the way the investigation was           03:46
 9   done; correct?                                           03:46
10       A.    That is correct.                               03:46
11       Q.    But not necessarily go the next step and       03:46
12   say you should have rejected the batch.                  03:46
13       A.    It could; it could not.                        03:47
14       Q.    Right.                                         03:47
15       A.    Uh-huh.                                        03:47
16       Q.    But it doesn't follow as night does day       03:47
17   that they would say you have to reject the batch.        03:47
18       A.    Not to sound redundant, these are very        03:47
19   complex issues and each one is separate and             03:47
20   unique.                                                  03:47
21       Q.    And each one needs to be studied in this      03:47
22   much detail; correct?                                    03:47
23       A.    Absolutely.                                    03:47
24       Q.    Now sitting here off the top of your          03:47
25   head, without having to dive into these boxes, do       03:47
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 207

1   you know exactly what the blend uniformity issues      03:47
2   were that FDA addressed in 483s regarding Digitek?     03:47
3       A.    Without going back and diving into my        03:47
4   boxes, I can't tell you exactly what happened.         03:47
5       Q.    Do you know off of top of your head          03:47
6   whether FDA ever cited, warned, sanctioned Actavis     03:47
7   for passing a batch at the blend uniformity stage      03:47
8   that FDA says should have been rejected?               03:47
9       A.    There were discussions, if I recall, in      03:48
10  EIRs and 483s with respect to blend uniformity.        03:48
11      Q.    That wasn't my question.                      03:48
12      A.    Okay.  What was your question?                03:48
13          MR. MORIARTY:  Read it back, Phil,             03:48
14      please.                                             03:48
15              (Whereupon, the testimony was read         03:48
16  back by the court reporter, as recorded above)         03:48
17          THE WITNESS:  I can't off top of my head       03:48
18      answer that question.                               03:48
19  BY MR. MORIARTY:                                        03:48
20      Q.    If a pharmaceutical -- let me withdraw       03:48
21  that because I talked with you about that before.      03:49
22      Have you been shown any information whatsoever     03:49
23  to indicate that there was an outbreak of Digoxin      03:49
24  toxicity in 2006, 2007, or 2008 at any hospital,       03:49
25  nursing home, clinic, or outpatient facility in        03:49

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 208

```
 1   the United States?                                    03:49
 2        A.    When you say "outbreak" you mean?          03:49
 3        Q.    Up-tick, increase.                         03:49
 4        A.    I know there's a document in here that     03:49
 5   looks at adverse events and the numbers of them,      03:49
 6   but that's all -- I would have to look at that and    03:49
 7   speak to it.                                          03:49
 8        Q.    And you're not a pharmacovigilance         03:49
 9   expert?                                               03:49
10        A.    I am not.                                  03:49
11        Q.    And do you know even know whether          03:49
12   adverse event reporting is considered by FDA to be    03:49
13   a causal connection?                                  03:49
14        A.    Causal connection?                         03:50
15        Q.    Whether adverse event reporting is         03:50
16   necessarily caused by adulterated or out of spec      03:50
17   product?                                              03:50
18        A.    It can be a flag, obviously.               03:50
19        Q.    I understand that.                         03:50
20        A.    Yeah.                                      03:50
21        Q.    For them to look that?                     03:50
22        A.    Yes.                                       03:50
23        Q.    But if it did, it's not somebody makes     03:50
24   an adverse event report and you automatically         03:50
25   conclude that you have a problem with your            03:50
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 209

1   manufacturing; right?  Am I right about that?          03:50
2       A.    Say that again, please.  And it's late      03:50
3   in the day for me, too, so...                          03:50
4       Q.    Okay.  Let's take a step back.  These        03:50
5   lawyers hired a pharmacovigilance expert.              03:50
6       A.    Okay.                                        03:50
7       Q.    From Philadelphia, Karen Frank.              03:50
8       A.    Okay.                                        03:50
9       Q.    Would you defer to her on these             03:50
10  pharmacovigilance issues?                              03:50
11      A.    Yes.                                         03:50
12      Q.    So, what I was trying to -- oh, never        03:51
13  mind.  Other than what you said, about AERs, which     03:51
14  you would defer to somebody else, you haven't seen     03:51
15  evidence in medical literature or scientific           03:51
16  publications that there was some increase in           03:51
17  Digoxin toxicity in two or three years before this     03:51
18  recall, have you?                                      03:51
19      A.    I have not specifically gone out and         03:51
20  looked for that in the literature.                     03:51
21      Q.    Have you talked to any cardiologists         03:51
22  about this case, informally or otherwise?              03:51
23      A.    In doctor-client privilege, I had            03:51
24  discussion.                                            03:51
25            MR. KERENSKY:  That's interesting, isn't     03:51

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 210

1      it?                                          03:51

2            MR. MORIARTY:  Yeah, this will be fun.  03:51

3      BY MR. MORIARTY:                              03:51

4        Q.    Do you take Digoxin?                  03:51

5        A.    I do not.                             03:51

6        Q.    And presumably you were not consulting a  03:51

7      doctor about a prescription for yourself --   03:51

8        A.    No.                                   03:51

9        Q.    -- when you were talking about Digoxin;  03:51

10     correct?                                      03:51

11       A.    That's correct.                       03:51

12       Q.    And was the party to this conversation  03:52

13     your primary care physician?                  03:52

14       A.    Yes.                                  03:52

15       Q.    Is he or she a cardiologist?          03:52

16       A.    Yes.                                  03:52

17       Q.    Okay.  But the discussion had to do with  03:52

18     Digitek or Digoxin?                           03:52

19       A.    Where do we really fall on this?  I'm  03:52

20     not really comfortable talking about what I talked  03:52

21     about with my doctor regarding this.          03:52

22       Q.    Well, if you were talking about your own  03:52

23     medical care, then it's privileged and I'm going  03:52

24     somewhere else.  If you were talking hey, buddy,  03:52

25     I'm consulting on this Digitek litigation.  What  03:52

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 211

| | | |
|---|---|---|
| 1 | do you know about it, what do you think about it, | 03:52 |
| 2 | that's not privileged because you weren't talking | 03:52 |
| 3 | to him about your own medical -- | 03:52 |
| 4 | A.   I was not specifically asking him about | 03:52 |
| 5 | that. | 03:52 |
| 6 | MR. KERENSKY:  Yeah, we don't | 03:52 |
| 7 | necessarily -- I don't necessary agree with | 03:52 |
| 8 | your characterization of where the line is on | 03:53 |
| 9 | what's privileged.  And so there's an argument | 03:53 |
| 10 | just like he made and I made that the line is | 03:53 |
| 11 | here.  There's an argument that everything you | 03:53 |
| 12 | talk to your doctor about in your doctor's | 03:53 |
| 13 | office is privileged; okay?  I'm sure that's | 03:53 |
| 14 | what the doctor would say under HIPAA. | 03:53 |
| 15 | So it's your call whether or not you want | 03:53 |
| 16 | to share this with him. | 03:53 |
| 17 | THE WITNESS:  I prefer not to talk about | 03:53 |
| 18 | it. | 03:53 |
| 19 | MR. KERENSKY:  And if you guys want to | 03:53 |
| 20 | press it, just take it up with the Judge; | 03:53 |
| 21 | okay. | 03:53 |
| 22 | BY MR. MORIARTY: | 03:53 |
| 23 | Q.   Did you show this doctor any documents | 03:53 |
| 24 | from the Digitek litigation? | 03:53 |
| 25 | A.   I didn't think we were going to talk | 03:53 |

David Bliesner, Ph.D.              Videotaped                January 25, 2011

Page 212

1    about this anymore.                                        03:53

2        Q.    That's a different question.                    03:53

3        A.    No.                                              03:53

4        Q.    Dr. Bliesner, you are aware that Digitek         03:54

5    has a theoretical batch yield, are you not?               03:54

6        A.    Yes.                                             03:54

7        Q.    So if you put the ingredients in                03:54

8    appropriately, if you're making .125 Digitek, you         03:54

9    should get 4.8 million Digitek tablets or                 03:54

10   thereabouts; right?                                        03:54

11       A.    Say that again.                                  03:54

12       Q.    If you put the appropriate ingredients          03:54

13   into according to the formula, you should get 4.8         03:54

14   million tablets before waste, sampling, retained          03:54

15   samples, things of nature?                                03:54

16       A.    Without having gone back to look at it,         03:54

17   I'll trust you have the number and that's                 03:54

18   accurate.                                                  03:54

19       Q.    Is there always at least some loss or           03:54

20   waste in the manufacturing process?                       03:54

21       A.    Invariably, yes.                                 03:55

22       Q.    If a company consistently made                  03:55

23   double-sized tablets, would the actual batch              03:55

24   production outcomes come close to the theoretical         03:55

25   yield numbers?                                             03:55

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 213

    1      A.    I'm sorry.  Say that again.                    03:55

    2      Q.    If the company consistently made               03:55

    3   double-sized the tablets --                             03:55

    4      A.    Uh-huh                                         03:55

    5      Q.    -- would the actual batch production           03:55

    6   numbers come close to the theoretical yield             03:55

    7   numbers?                                                03:55

    8      A.    I don't know.  I would have to think           03:55

    9   about that a little more.  I don't think there's a      03:55

   10   one-to-one correlation between theoretical yield        03:55

   11   and this potential double-thick tablet.  I             03:55

   12   don't -- I would not speak definitively on that.        03:55

   13   I have to really think about it.                        03:55

   14      Q.    Well, if you made an entire batch              03:55

   15   somehow of double-thick tablets --                      03:55

   16      A.    Uh-huh.                                        03:55

   17      Q.    -- are you going to get 4.8 million?           03:55

   18      A.    An entire batch?                               03:55

   19      Q.    Yes, sir.                                      03:56

   20      A.    I would say that's probably not going to       03:56

   21   get 4.8 million.                                        03:56

   22      Q.    If you made one quarter of the tablets         03:56

   23   double thick, you wouldn't get close to 4.8             03:56

   24   million either, would you?                              03:56

   25      A.    No, I think you have to be very careful        03:56

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                      Page 214

 1   in trying to make those kinds of assessments        03:56

 2   because we don't know double-thick tablet again      03:56

 3   was ever testified.  So we don't know what the       03:56

 4   weight is, we don't know what the total              03:56

 5   excipients, we don't know what the active is.  We    03:56

 6   have no idea of being able to just off the top of    03:56

 7   your head, back of envelope calculation say how      03:56

 8   much it would be up short.  I just don't think       03:56

 9   it's possible.                                       03:56

10       Q.    Did you ever see any evidence in any       03:56

11   company documents to indicate that there was some    03:56

12   adverse trend in Digitek yield production?           03:56

13       A.    If I recall, early on there was some       03:57

14   discussions -- and it may have been with the         03:57

15   FDA -- with respect to yield difficulties.           03:57

16       Q.    What years are you talking about?          03:57

17       A.    I don't know.  Again, I'd have to go       03:57

18   back and dig through the documents and look at       03:57

19   them.                                                03:57

20       Q.    Did any of that occur in 2005, 6, 7 or     03:57

21   8?                                                   03:57

22       A.    I can't tell that you without going back   03:57

23   and looking through them.                            03:57

24       Q.    Why, in general, do you think some         03:57

25   problem that occurred in 1995, for example, is       03:57

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 215

```
 1   evidence that defective Digitek got into the hands      03:57

 2   of consumers in 2007 or 2008?                           03:57

 3        A.    It's actually fairly straightforward.        03:57

 4   As I said in the report, primary difficulties in        03:57

 5   situations like this, in my experience and my           03:57

 6   opinion is lack of leadership.  It's the number         03:57

 7   one.  The people who were running the company back      03:58

 8   then when they had problems with first consent          03:58

 9   decree up until just before the second consent          03:58

10   decree are same people who are running people the       03:58

11   same people on regulatory force, the same people        03:58

12   in quality, the same people that caused all the         03:58

13   initial problems were still there.                      03:58

14        Q.    Is that some scientific theory?              03:58

15        A.    It's a -- it's a statement of fact.          03:58

16        Q.    So, in other words essentially what          03:58

17   you're saying is because they were sloppy in '95        03:58

18   means they must have been sloppy in '06 and '07?        03:58

19        A.    I think the information that I've            03:58

20   reviewed pretty consistently shows they got out         03:58

21   from underneath the consent decree, they became         03:58

22   recidivistic, and they moved right back into            03:58

23   another situation with many of these same               03:58

24   problems.  That reflects on leadership.                 03:58

25        Q.    But not one thing that you just told me      03:58
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 216

1    is scientific evidence of defective tablets        03:58

2    getting into the hands of consumers.  Are you      03:59

3    talking about FDA documents?                       03:59

4        A.    It's a failure of quality which impacts   03:59

5    the quality of the product going out the door.     03:59

6        Q.    Well, if the quality was so bad from '95  03:59

7    through 2008 -- let's just pick that period of     03:59

8    time, those 13 years -- shouldn't there be some    03:59

9    evidence of defective Digitek getting into the     03:59

10   hands of consumers?                                03:59

11       A.    There are evidence.  The pharmacy         03:59

12   individuals.                                       03:59

13       Q.    One tablet out of a billion.  Got        03:59

14   anything else?                                     03:59

15       A.    As far as scientific data specifically   03:59

16   showing that it was in the hands of the            03:59

17   individual?                                        03:59

18       Q.    Yes.                                     03:59

19       A.    There was nothing in the record.         03:59

20   However, you know, you have a billion tablets      03:59

21   let's say.  It's the number everybody's throwing   03:59

22   around.  Start doing the math, say it's .00001     03:59

23   percent, you know, how many tablets is that?       03:59

24   There's a lot of tablets in the market and you may 03:59

25   never seen it.  They could hurt the people.        04:00

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 217

| 1 | Q. | You may never see it; right? | 04:00 |

1    Q.    You may never see it; right?                    04:00

2    A.    That exists.                                    04:00

3    Q.    Okay.  So the one tablet that was found         04:00

4    in 2003 or 4 was found by a pharmacist, wasn't it?   04:00

5    A.    I believe that's what we said earlier.          04:00

6    Q.    Have you ever worked in a pharmacy?             04:00

7    A.    I have not.                                     04:00

8    Q.    Do you have any expertise in pharmacy?          04:00

9    A.    A pharmacist?  No, sir.                         04:00

10    Q.    Well, if the one tablet we know about in       04:00

11    2004 could be detected by a pharmacist, isn't it    04:00

12    reasonable to conclude that other extra-thick       04:00

13    tablets, if they existed, would be detected by      04:00

14    pharmacists?                                         04:00

15    A.    Could be.                                      04:00

16    Q.    But that is the only one you know             04:00

17    about.                                               04:00

18    A.    Those two specific instances and the          04:00

19    documents I've reviewed.                             04:00

20    Q.    Let's talk about sampling rates.  Are         04:01

21    you an expert in the design and implementation of   04:01

22    sampling plans for in-process pharmaceutical        04:01

23    testing?                                             04:01

24    A.    I am not.                                      04:01

25    Q.    Do you at least know that in-process          04:01

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 218

```
 1   sampling plans are FDA approved?                    04:01
 2       A.     In the application?  Is that what you're 04:01
 3   asking?                                             04:01
 4       Q.     Initially in the AMDA; correct.          04:01
 5       A.     I'm not sure whether that specific       04:02
 6   sample plan exists in the AMDA.  I would have to    04:02
 7   take a look.  I know procedures, internal guidance  04:02
 8   and SOPs companies have with respect to sampling,   04:02
 9   and they are pretty unique.                         04:02
10       Q.     Are you aware of any 483 or warning      04:02
11   letter comment at any point from 2005 to 2008,      04:02
12   which observed problems with Digitek in-process     04:02
13   sampling, meaning weight, thickness?                04:02
14       A.     Specific physical testing?               04:02
15       Q.     Hardness.                                04:02
16       A.     I have not seen any that I recall.       04:02
17       Q.     And I assume that this sort of           04:02
18   in-process testing in general is supposed to tell   04:02
19   you something about the consistency of the tablets  04:02
20   that are coming off the presses; is that right?     04:02
21       A.     At various stages within the process.    04:03
22   It's not like you just grab a hold and spot.        04:03
23   In-process testing involves -- as you said, you've  04:03
24   already said -- blend uniformity at certain steps   04:03
25   along the way.                                      04:03
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 219

```
 1      Q.    Well, right now I'm just talking about    04:03
 2   the thickness, hardness, the color, weight.        04:03
 3      A.    That's kind of -- as far as in-process    04:03
 4   goes?                                              04:03
 5      Q.    Yeah.                                      04:03
 6      A.    I'm not -- okay, I don't recall what      04:03
 7   their in-process tests were for this particular    04:03
 8   product.                                            04:03
 9      Q.    But you've not seen any FDA citations or  04:03
10   warning implicating those processes?               04:03
11      A.    Not that I recall.                         04:03
12      Q.    But I am correct that what you do in      04:03
13   there when QA comes in and the actual press        04:03
14   operator is checking, is to see at least visually  04:03
15   and by measurement whether the tablets are         04:03
16   consistent in size, weight, hardness, things of    04:03
17   that nature; correct?                               04:03
18      A.    It's a limited testing in process to see  04:03
19   where you are, how it's progressing.               04:04
20      Q.    But that's what it's designed to tell     04:04
21   you, limited as it may be?                          04:04
22      A.    Yes.                                        04:04
23      Q.    So let's talk about finished product      04:04
24   testing, which is within your bailiwick.  Did the  04:04
25   AMDA have description of the methods that would be 04:04
```

David Bliesner, Ph.D.          Videotaped              January 25, 2011

```
                                                    Page 220
 1   used to assay content uniformity and dissolution    04:04

 2   tests Digitek at the finished product stage?         04:04

 3       A.    Not specifically looking at the ANDA.  I   04:04

 4   remember -- I'm pretty sure the methods would be     04:04

 5   in there.  They should be.                           04:04

 6       Q.    Are they also --                           04:05

 7       A.    I need to interject here that I'm not      04:05

 8   sure that I had an opportunity to review all of      04:05

 9   the sections of the ANDA when they were up on the    04:05

10   website for me.  So I got to be careful here.  I'm   04:05

11   not sure if I had the whole package                  04:05

12       Q.    Have you looked at the method operating    04:05

13   instructions or anything else regarding the          04:05

14   testing methods?                                     04:05

15       A.    I have looked at some methods.  I would    04:05

16   have to go back and look and see what specific       04:05

17   methods there were.                                  04:05

18       Q.    I didn't see any criticism in your        04:05

19   report of Actavis's method for finished process      04:05

20   testing Digitek.  Am I correct about that?           04:05

21       A.    There is nothing in the report.           04:05

22   However, I was not pointed specifically to look at   04:05

23   methods in particular.  I did not do a wholesale,    04:05

24   soup to nuts -- as I normally do -- review of the    04:05

25   laboratory control system.                           04:05
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 221

```
 1      Q.    When you say as you normally do in a lab    04:05
 2   control system, you mean for a consulting            04:05
 3   non-litigation project; right?                       04:06
 4      A.    Yes.                                         04:06
 5      Q.    Well, certainly if the Plaintiffs'          04:06
 6   lawyers were concerned about the finished product    04:06
 7   methods, they would have probably pointed you in     04:06
 8   that direction; correct?                             04:06
 9      A.    I wouldn't make that conclusion.  We ran    04:06
10   out of time as much as anything else.                04:06
11      Q.    And excuse me if I asked you this           04:06
12   before, but you have not seen in any 483 or          04:06
13   warning letter any sort of statement by FDA that     04:06
14   Actavis's finished product testing of Digitek was    04:06
15   in some way deficient; correct?                      04:06
16      A.    No, we did not talk about that.  And I      04:06
17   vaguely recall that there are discussions with       04:06
18   respect to analytical methods not being sufficient   04:06
19   for their intended use and/or validated in some of   04:06
20   these documents that the FDA has generated.  I       04:06
21   have to go back and look at them.                     04:07
22      Q.    For Digitek?                                 04:07
23      A.    I can't say for certain, but I know that    04:07
24   there are discussions through 483s and warnings      04:07
25   letters with respect to the laboratory records and   04:07
```

David Bliesner, Ph.D.           Videotaped                January 25, 2011

Page 222

```
 1   methods.                                                04:07
 2        Q.    Did FDA ever say that there was a batch      04:07
 3   that had out-of-spec results that should have been      04:07
 4   rejected because the methods or even the                04:07
 5   investigations were inadequate?                         04:07
 6        A.    Methods?                                     04:07
 7        Q.    Or investigations?                           04:07
 8        A.    Or investigations.  Again, I'd have to       04:07
 9   go back and look at it because there are                04:07
10   discussions with respect to methods, methods            04:07
11   validation and testing that come up throughout          04:07
12   these FDA documents.                                    04:07
13        Q.    But my question is very specific.            04:07
14        A.    Okay.                                        04:08
15        Q.    Do you remember any statements in any        04:08
16   FDA documents to the effect that Digitek batches        04:08
17   should have been rejected because analytical            04:08
18   methods were inadequate or investigations were          04:08
19   inadequate?                                             04:08
20        A.    I can't say that off the top of my           04:08
21   head.  I really can't.  Analytical methodology is       04:08
22   invariably one of the observations the FDA makes        04:08
23   for companies in trouble.                               04:08
24        Q.    Let's go to page 7 of your report.           04:08
25             MR. KERENSKY:  Can we take a stretch           04:09
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 223

| | | |
|---|---|---|
| 1 | break after you finish this thing, this little | 04:09 |
| 2 | subject? | 04:10 |
| 3 |     MR. MORIARTY:  How long on the tape? | 04:10 |
| 4 |     THE VIDEOGRAPHER:  25 minutes. | 04:10 |
| 5 |     MR. MORIARTY:  Yeah. | 04:10 |
| 6 | BY MR. MORIARTY: | 04:10 |
| 7 |     Q.    Okay.  Page 7. | 04:10 |
| 8 |     A.    Yes. | 04:10 |
| 9 |     Q.    It says product recalls. | 04:10 |
| 10 |     A.    Yes. | 04:10 |
| 11 |     Q.    The first one is in 1990.  Was that | 04:10 |
| 12 | Digitek? | 04:10 |
| 13 |     A.    I don't know. | 04:10 |
| 14 |     Q.    What would you have to look at to figure | 04:10 |
| 15 | it out? | 04:10 |
| 16 |     A.    It was just a -- if I recall, it was a | 04:10 |
| 17 | business summary that was presented by one of the | 04:10 |
| 18 | CEOs and it just said there was a product recall. | 04:10 |
| 19 | If I -- I'm pulling this off my memory, which I | 04:10 |
| 20 | hesitate to do that. | 04:10 |
| 21 |     Q.    In 1995, Class III? | 04:10 |
| 22 |     A.    Uh-huh. | 04:10 |
| 23 |     Q.    That's not recalled at the consumer | 04:10 |
| 24 | level; correct? | 04:10 |
| 25 |     A.    Uh-huh. | 04:10 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 224

| | | |
|---|---|---|
| 1 | Q.    Is that right? | 04:10 |
| 2 | A.    That's correct. | 04:10 |
| 3 | Q.    Because of incorrect package insert. | 04:10 |
| 4 | Which is, in your words, a failure of packaging | 04:11 |
| 5 | and labeling portions of the cGMPs; correct? | 04:11 |
| 6 | A.    Correct. | 04:11 |
| 7 | Q.    Was it Digitek? | 04:11 |
| 8 | A.    I'd have to look.  That may be one of | 04:11 |
| 9 | those things as well that was just stated as. | 04:11 |
| 10 | Q.    And certainly FDA or Amide at the time | 04:11 |
| 11 | didn't consider this as a patient safety issue | 04:11 |
| 12 | because it was a Class III recall; correct? | 04:11 |
| 13 | A.    Correct.  An immediate threat. | 04:11 |
| 14 | Q.    And the 2008 August total product | 04:11 |
| 15 | recall, which is the last one that you list -- | 04:11 |
| 16 | A.    Yes. | 04:11 |
| 17 | Q.    -- that was a Class III recall, wasn't | 04:11 |
| 18 | it? | 04:11 |
| 19 | A.    I don't recall. | 04:11 |
| 20 | Q.    Well, that's important to know, isn't | 04:11 |
| 21 | it? | 04:11 |
| 22 | A.    Let's take a look. | 04:11 |
| 23 | MR. MORIARTY:  Let me make sure we're on | 04:12 |
| 24 | the same page. | 04:12 |
| 25 | THE WITNESS:  Okay. | 04:12 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                    Page 225
  1   BY MR. MORIARTY:                              04:12
  2       Q.    Was the 2008 August recall to the   04:12
  3   consumer level?                               04:12
  4       A.    What page were we on again back in the  04:12
  5   document?                                     04:12
  6       Q.    Seven.                              04:12
  7       A.    Seven?                              04:12
  8       Q.    But you don't have a reference?     04:12
  9       A.    Seven, the August recall?           04:12
 10       Q.    Yeah, I guess you would be looking at  04:12
 11   A49, A55, 63.  That's what your table says    04:12
 12       A.    25 April, 2008?                     04:13
 13       Q.    No, sir.  August 2008.  It would be your  04:13
 14   reference A63.                                04:13
 15       A.    63.                                 04:13
 16       Q.    And on page 61 of your report you say  04:13
 17   that it was recalled at the retail level.     04:13
 18       A.    Where in the report?                04:13
 19       Q.    Page 61.                            04:13
 20       A.    Yeah.  61, reference A63?           04:13
 21       Q.    Yes, sir.                           04:14
 22       A.    Recall from press release, FDA website  04:14
 23   "Actavis auto announces voluntary recall at retail  04:14
 24   level of all drugs manufactured."  Then that's  04:14
 25   what that was.                                04:14
```

David Bliesner, Ph.D.            Videotaped            January 25, 2011

                                                                Page 226

    1      Q.    All right.  So even though FDA may have      04:14

    2   been concerned about good manufacturing practice      04:14

    3   violations in 2008 or 2007, there was not a recall    04:14

    4   of these other products to the consumer level;        04:14

    5   correct?                                              04:14

    6      A.    According to that.                           04:14

    7         MR. MORIARTY:  Okay.  You want to take a         04:14

    8   stretch break?  Let's go off the record for --        04:14

    9         MR. KERENSKY:  Thank you for remembering.        04:15

   10         MR. MORIARTY:  For five minutes.                04:15

   11         THE VIDEOGRAPHER:  The time is 4:17 p.m.         04:15

   12   We're going off the record.                           04:15

   13         THE VIDEOGRAPHER:  The time is now              04:25

   14   4:28 p.m.  We are back on the record.                 04:25

   15            (Whereupon, Exhibit 106 was marked           04:26

   16   for identification)                                   04:26

   17   BY MR. MORIARTY:                                      04:26

   18      Q.    Okay.  I'm going to show you what has        04:26

   19   been marked as Exhibit 106; okay?  This is a          04:26

   20   notice of your deposition for today; all right?       04:26

   21      A.    Okay.                                        04:26

   22      Q.    Have you seen that before?                   04:26

   23      A.    I have.                                      04:26

   24      Q.    All right.  And it tells you to bring a      04:26

   25   lot of stuff; right?                                  04:26

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                     Page 227
  1      A.    Yes.                                   04:26
  2      Q.    So when this is going to be restarted on   04:26
  3  the 18th, there will be a new notice that goes    04:26
  4  out.  You will have to bring your stuff and       04:26
  5  somehow the lawyers will figure out a way to get  04:26
  6  this hard drive duplicated so we can find these   04:26
  7  other things; okay?                               04:26
  8      A.    Okay.                                   04:26
  9      Q.    So it's possible you'll have to be in   04:26
 10  communication with people between now and then --  04:26
 11      A.    Yes.                                   04:26
 12      Q.    -- to facilitate that; all right.       04:26
 13  Okay.  Fair enough.                               04:27
 14          MR. ANDERTON:  We should plan to start    04:27
 15      perhaps as early at 8 o'clock on the 18th?    04:27
 16          THE WITNESS:  That's fine.                04:27
 17  BY MR. MORIARTY:                                  04:27
 18      Q.    Let's go to page 8 of your report.  Do  04:27
 19  you see in the middle of the page where you have  04:27
 20  the three bullet points?                          04:27
 21      A.    Yes.                                   04:27
 22      Q.    Does it gives the three addresses?      04:27
 23      A.    Yes.                                   04:27
 24      Q.    All right.  Do you know that Taft Road  04:27
 25  was only a packaging facility for Digitek?        04:27
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 228

 1      A.     I knew that it was in limited            04:27
 2  operations.  Specifically packaging, I don't know   04:27
 3  if I could -- I could say that definitively         04:27
 4  without going back and looking at the EIR.          04:27
 5      Q.     Do you remember anything in a 483 or a   04:27
 6  warning letter or an EIR to the effect that there   04:28
 7  was a problem in any facility of Taft Road that     04:28
 8  affected the potency of Digitek that made it to     04:28
 9  consumers?                                          04:28
10      A.     I can't say without going back.  It gets 04:28
11  pretty complex on what the facilities are and how   04:28
12  they are, what's going on at them.  It's kind of a  04:28
13  mess just breaking out what the three were.  So     04:28
14  I -- I can't definitively answer that, sorry.       04:28
15      Q.     And do you know what was going on at 990 04:28
16  Riverview Drive?                                    04:28
17      A.     Again, it's the same thing.  Very        04:28
18  confusing reviewing documents what specific         04:28
19  operations were going on at these individual        04:28
20  facilities.                                         04:28
21      Q.     Well --                                  04:28
22      A.     And how they impacted or didn't.         04:28
23      Q.     Hypothetically I want to you assume that 04:28
24  all that was going on at Riverview was -- from a    04:29
25  production standpoint was the attempt to validate,  04:29

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 229

| | | |
|---|---|---|
| 1 | process validate a new location with different | 04:29 |
| 2 | equipment to manufacture Digitek; okay? | 04:29 |
| 3 | A.    Theoretically; okay. | 04:29 |
| 4 | Q.    No. | 04:29 |
| 5 | A.    That's what you're saying. | 04:29 |
| 6 | Q.    No, I'm asking you to assume that. | 04:29 |
| 7 | A.    Hypothetically. | 04:29 |
| 8 | Q.    And that no product from Riverview was | 04:29 |
| 9 | ever released to market at all; okay. | 04:29 |
| 10 | A.    If that's what you say hypothetically, | 04:29 |
| 11 | yeah. | 04:29 |
| 12 | Q.    So if, for example, they had a problem | 04:29 |
| 13 | some day with an oil leak on a tableting machine | 04:29 |
| 14 | and tablets got oily but were, you know, rejected | 04:29 |
| 15 | because they were not going to market anyway, that | 04:29 |
| 16 | wouldn't affect the potency of Digitek that | 04:29 |
| 17 | actually was made at Little Falls and shipped to | 04:29 |
| 18 | consumers, would it? | 04:30 |
| 19 | A.    What facility are we talking about? | 04:30 |
| 20 | Q.    Riverview. | 04:30 |
| 21 | A.    Riverview.  Okay.  And you're saying | 04:30 |
| 22 | that hypothetically if there was problem at | 04:30 |
| 23 | Riverview where they're only doing process | 04:30 |
| 24 | validation; is that correct? | 04:30 |
| 25 | Q.    Yeah. | 04:30 |

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 230

```
 1      A.     That that action would not influence      04:30

 2   what was going on at the Little Falls facility.      04:30

 3   Is that what you're saying?                          04:30

 4      Q.     Yes.                                        04:30

 5      A.     Yes, hypothetically, yes.                   04:30

 6      Q.     Okay.  Well, do you have any evidence       04:30

 7   that any Digitek that was made at Riverview was      04:30

 8   released to consumers?                                04:30

 9      A.     Other than going back and digging          04:30

10   through documents, I can't say that explicitly.      04:30

11   I -- it's just -- it's too much to go back and       04:30

12   piece together.                                       04:30

13      Q.     Okay.  Miss Donahue represents Mylan.      04:31

14   Do you know who Mylan is?                             04:31

15      A.     I do.                                        04:31

16      Q.     Do you know that they were only a          04:31

17   distributor not a manufacturer of Digitek?           04:31

18      A.     Is that a totally accurate statement       04:31

19   because I don't know if I understand the             04:31

20   relationship, UDL, Bertek, how they fall into        04:31

21   that.                                                 04:31

22      Q.     Do you know whether Digitek was ever       04:31

23   manufactured by anyone other than Amide or           04:31

24   Actavis?                                              04:31

25      A.     I don't know that definitively because I   04:31
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 231

| | | |
|---|---|---|
| 1 | know there was discussion that Mylan was going to | 04:31 |
| 2 | take it over via UDL or Bertek, so I don't know. | 04:31 |
| 3 | Q.    Well, have you seen any documents to | 04:31 |
| 4 | indicate that Mylan or UDL ever manufactured | 04:31 |
| 5 | tablets of Digitek? | 04:32 |
| 6 | A.    I don't believe that they did. | 04:32 |
| 7 | MR. MORIARTY:   Okay.   The bottom line is | 04:32 |
| 8 | she has a couple of questions that she wants | 04:32 |
| 9 | to get out of the way during session one.   So | 04:32 |
| 10 | I'm going to let her ask those questions and | 04:32 |
| 11 | then if there's time left on my tape, I'll get | 04:32 |
| 12 | back to you; okay? | 04:32 |
| 13 | THE WITNESS:   Okay. | 04:32 |
| 14 | DIRECT EXAMINATION | 04:32 |
| 15 | BY MS. DONAHUE: | 04:32 |
| 16 | Q.    Good afternoon, Dr. Bliesner. | 04:32 |
| 17 | A.    Hello. | 04:32 |
| 18 | Q.    I have reviewed your -- first, let me | 04:32 |
| 19 | start by asking you this. | 04:32 |
| 20 | A.    Yes. | 04:32 |
| 21 | Q.    You are not an expert in pharmaceutical | 04:32 |
| 22 | distribution, are you? | 04:33 |
| 23 | A.    Distribution, no. | 04:33 |
| 24 | Q.    And you're not an expert on the industry | 04:33 |
| 25 | practices related to pharmaceutical distribution? | 04:33 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                     Page 232
 1     A.     Distribution, no.                         04:33
 2     Q.     You're not expert on the FDA regulations  04:33
 3  applicable to pharmaceutical distribution?          04:33
 4     A.     I have not -- I mean don't even know      04:33
 5  what specifically the regulations would relate to   04:33
 6  distribution, so, no.                               04:33
 7     Q.     So you're not expert?                      04:33
 8     A.     No.                                        04:33
 9     Q.     And you've never published any articles,   04:33
10  textbooks, treatises on pharmaceutical              04:33
11  distribution practices?                             04:33
12     A.     I have not.                                04:33
13     Q.     Now, I reviewed your 21-plus attachment    04:33
14  page report before coming here today.               04:33
15     A.     Yes.                                       04:33
16     Q.     And the purpose of that report is set      04:33
17  forth on page 1 of your report; correct?            04:33
18     A.     Correct.                                   04:33
19     Q.     And can you read that purpose out loud,    04:33
20  please, for the record?                             04:34
21     A.     Sure.  Purpose:  "This report is a         04:34
22  thorough, detailed, independent review of the       04:34
23  facts related to Digitek product litigation.  In    04:34
24  particular, this review is specifically conducted   04:34
25  to determine if Amide Pharmaceutical, Inc. which    04:34
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 233

| | | |
|---|---|---|
| 1 | later became Actavis Totowa, LLC and referred to | 04:34 |
| 2 | as Amide/Actavis within this report, demonstrated | 04:34 |
| 3 | a systematic failure to implement quality systems | 04:34 |
| 4 | which in turn created a high likelihood that | 04:34 |
| 5 | adulterated product made it to the marketplace." | 04:34 |
| 6 | Q.    Thank you.  And is that an accurate | 04:34 |
| 7 | statement of the purpose of your report? | 04:34 |
| 8 | A.    Yes. | 04:34 |
| 9 | Q.    And I think you told me -- you told us | 04:34 |
| 10 | earlier in response to Mr. Moriarty's questions, | 04:34 |
| 11 | that -- let's see.  When you first were contacted | 04:34 |
| 12 | by Plaintiffs' counsel in these cases, your task | 04:34 |
| 13 | or the guidance they gave you was to evaluate the | 04:34 |
| 14 | status of Actavis's or Amide's compliance with | 04:34 |
| 15 | GMPs; is that correct? | 04:34 |
| 16 | A.    Yes, that's correct. | 04:34 |
| 17 | Q.    If we turn to page -- the bottom of page | 04:35 |
| 18 | 20 of your report under the heading root causes | 04:35 |
| 19 | for Amide Pharmaceutical and Actavis's failure to | 04:35 |
| 20 | comply with GMPs which led to release of | 04:35 |
| 21 | adulterated product to market. | 04:35 |
| 22 | A.    Yes. | 04:35 |
| 23 | Q.    You see that there? | 04:35 |
| 24 | A.    I do. | 04:35 |
| 25 | Q.    And then you have list of the root | 04:35 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 234

| | | |
|---|---|---|
| 1 | causes; right? | 04:35 |
| 2 | A.    Yes. | 04:35 |
| 3 | Q.    And nowhere among the one, two, three, | 04:35 |
| 4 | four, five root causes that you've identified in | 04:35 |
| 5 | your report is there mention of any conduct on | 04:35 |
| 6 | behalf of -- or on the part of Mylan or UDL as a | 04:35 |
| 7 | root cause; is that correct? | 04:35 |
| 8 | A.    Specifically, "yes, but."  Mylan was | 04:36 |
| 9 | contracted to have amide then or Actavis | 04:36 |
| 10 | manufacture the tablets, and there was no quality | 04:36 |
| 11 | agreement that was in place that I saw in the | 04:36 |
| 12 | record. | 04:36 |
| 13 | So lack of quality assurance oversight | 04:36 |
| 14 | overlaps into that because the innovator, as I | 04:36 |
| 15 | understand, or the head of the contract -- Mylan | 04:36 |
| 16 | in this case as I understand as I read it -- is | 04:36 |
| 17 | responsible for the product as well and making | 04:36 |
| 18 | sure that their contractors, contract | 04:36 |
| 19 | manufacturers, whatever, follow the GMPs. | 04:36 |
| 20 | Q.    Have you been asked in this case by | 04:36 |
| 21 | Plaintiffs' counsel to provide an opinion as to | 04:36 |
| 22 | Mylan's alleged liability? | 04:36 |
| 23 | A.    Formally, prior to this? | 04:36 |
| 24 | Q.    Yes. | 04:36 |
| 25 | A.    Prior to this session? | 04:37 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 235

 1      Q.    Yes.                                        04:37

 2      A.    No.                                         04:37

 3      Q.    Prior to authoring your report, were you   04:37

 4  asked by Plaintiffs' counsel to render a report as   04:37

 5  to Mylan's liability in these cases?                 04:37

 6      A.    I recall the discussion with the Miller    04:37

 7  law firm regarding Mylan and asked for guidance.     04:37

 8  This is from memory, so it's not written down.       04:37

 9  It's a bit vague.  And they -- their guidance was,   04:37

10  you know, however they fit into this, put it in      04:37

11  your report as you see fit.                          04:37

12      Q.    And you saw fit not to mention Mylan       04:37

13  specifically or any specific Mylan conduct in the    04:37

14  report that you've stated was -- was written for     04:37

15  the purpose of advising counsel as to what your      04:37

16  opinions are in this case.                           04:37

17      A.    There are references in the attachment     04:37

18  section to discussions with Mylan that talk about    04:38

19  quality issues they were concerned with for some     04:38

20  time.                                                04:38

21      Q.    Okay.  Can you please point to me --       04:38

22      A.    Sure.                                       04:38

23      Q.    -- in your attachments every reference     04:38

24  to Mylan.                                            04:38

25      A.    Okay.                                       04:38

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 236

| | | |
|---|---|---|
| 1 | MR. MORIARTY:  I think this is going to | 04:38 |
| 2 | take a couple of minutes.  You might want to | 04:38 |
| 3 | go off the video record. | 04:38 |
| 4 | THE VIDEOGRAPHER:  The time is 4:41 p.m. | 04:38 |
| 5 | We're going off the record briefly. | 04:38 |
| 6 | (Short break) | 04:39 |
| 7 | THE VIDEOGRAPHER:  The time is now | 04:39 |
| 8 | 4:49 p.m.  We are back on the record. | 04:46 |
| 9 | BY MS. DONAHUE: | 04:46 |
| 10 | Q.    All right.  Dr. Bliesner, off the record | 04:46 |
| 11 | you were reviewing your report -- | 04:46 |
| 12 | A.    Yes. | 04:46 |
| 13 | Q.    -- in order to answer my question which | 04:46 |
| 14 | was where -- will you please point out every | 04:46 |
| 15 | reference in your report to a Mylan document. | 04:46 |
| 16 | A.    Yes.  The other question I have, are you | 04:46 |
| 17 | considering UDL Bertek to be part of the Mylan | 04:47 |
| 18 | umbrella? | 04:47 |
| 19 | Q.    Sure. | 04:47 |
| 20 | A.    Okay.  Page 15, number 33. | 04:47 |
| 21 | Q.    Uh-huh.  Yes.  Thank you.  We have | 04:47 |
| 22 | number page 15, number 33? | 04:47 |
| 23 | A.    Yes. | 04:47 |
| 24 | Q.    Yes. | 04:47 |
| 25 | A.    Page 18, number 46. | 04:47 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 237

```
 1      Q.    Yes.                                    04:47

 2      A.    And number 49.  Page 19, number 54.    04:47

 3      Q.    Any others?                             04:47

 4      A.    Yes.  Page 41, number A24; page 43, A28;  04:47

 5   page 46, A33; page 47, A36; page 54, A44; page 56   04:48

 6   A 49; page 57 A52; page 58, A53.                 04:49

 7        There is a reference to Bertek UDL in A55 on   04:50

 8   page 59, embedded in the press release, and on   04:50

 9   page 60, A59.  And I believe with that quick     04:50

10   review of the report, that should be most all of   04:50

11   them.                                            04:50

12      Q.    Thank you.                              04:50

13      A.    Uh-huh.                                 04:50

14      Q.    Now each of those references that you've   04:50

15   just given us to Mylan documents, are just that;   04:50

16   correct?  They are references to Mylan documents   04:50

17   and in some instances quotations from the         04:50

18   documents; is that correct?                       04:50

19      A.    For e-mails, yes.                       04:50

20      Q.    And nowhere in the course of those      04:50

21   references have you rendered an opinion in regard   04:50

22   to Mylan or UDL's conduct in distributing Digitek?   04:50

23      A.    In this report?                         04:51

24      Q.    Yes.                                    04:51

25      A.    I have not written it in the report.  I   04:51
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 238

1    do have an opinion, but I have not written it in          04:51

2    the report.                                               04:51

3        Q.    Did you have an understanding as you            04:51

4    came here today that your report was to contain           04:51

5    the totality of your opinions that you intend to          04:51

6    render at trial in this case?                             04:51

7        A.    With respect to the guidance that I got,        04:51

8    thought and think and do believe that I put the           04:51

9    information that was desired specifically related         04:51

10   to Digitek, Actavis Totowa.  That was my guidance.        04:51

11          MR. MORIARTY:  You have 60 seconds.                04:51

12   BY MS. DONAHUE:                                           04:51

13       Q.    As you sit here today, what is your             04:52

14   opinion with regard to Mylan's conduct in the             04:52

15   distributing Digitek in the case, Mylan and UDL?          04:52

16       A.    Just based upon the documents that I            04:52

17   reviewed and, again, not concentrating on Mylan's         04:52

18   position in this thing, I found it odd and not            04:52

19   customary that no quality agreement was in place.         04:52

20       Q.    You would agree, would you not, that            04:52

21   quality agreements are not required by the FDA            04:52

22   regulations?                                              04:52

23       A.    By regulations?  Specifically in 21 CFR         04:52

24   210 and 211, not to my knowledge is there a               04:52

25   requirement for a quality agreement.  It is               04:52

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                    Page 239

 1    standard industry practice.                    04:52

 2        Q.    That's a relatively new standard     04:52

 3    industry practice, would you agree with that?  04:52

 4        A.    Relatively new?  I'm not sure how you 04:52

 5    define relatively new.                          04:52

 6        Q.    In your opinion, when did it become   04:53

 7    standard industry practice?                     04:53

 8        A.    Well, let's see.  For the last -- at  04:53

 9    least the last three to five years in my        04:53

10    consulting endeavors I've expected and seen     04:53

11    quality agreement with contractors.             04:53

12        Q.    Do you understand that as you sit here 04:53

13    today, Dr. Bliesner, that Mylan or -- neither   04:53

14    Mylan or UDL was the innovator in regard to     04:53

15    Digitek?  In other words, neither one of them held 04:53

16    the ANDA?                                       04:53

17        A.    That is correct.  I understand that.  04:53

18             MS. DONAHUE:  Since we're almost out of 04:53

19        tape, I'm going to stop questioning now, but I 04:53

20        reserve the right to come back.             04:53

21             Oh, yeah.  Before we go off the record, 04:53

22        let me finish my sentence.  I reserve the   04:53

23        right to come back and continue my          04:53

24        questioning.  And you've been, I think, taking 04:53

25        some notes during the deposition and we would 04:53

David Bliesner, Ph.D.          Videotaped                January 25, 2011

Page 240

1      like to get those marked as an exhibit,              04:54

2      please.                                              04:54

3          THE WITNESS:  Okay.                              04:54

4          MS. DONAHUE:  Let's wait.  Before we go          04:54

5      off the record, let's mark them.                     04:54

6          MR. KERENSKY:  You didn't write anything         04:54

7      down about Mr. Anderton's tie, did you?              04:54

8          THE WITNESS:  No, it was noted though.           04:54

9          MR. KERENSKY:  Okay.                             04:54

10         MR. ANDERTON:  I will accept the                 04:54

11     compliment.                                          04:54

12             (Whereupon, Exhibit 109 was marked           04:54

13   for identification)                                    04:54

14         THE VIDEOGRAPHER:  The time is now               04:54

15     4:57 p.m.  We're going off the record.               04:54

16

17      (THEREUPON, the taking of the deposition
     was concluded at 4:57 p.m.)
18

19

20

21

22

23

24

25

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 241

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6                    I, the undersigned authority,

7    certify that David Bliesner, Ph.D., personally

8    appeared before me and was duly sworn by me.

9                    WITNESS my hand and official

10   seal, this 3rd day of February, 2011.

11

12

13

     _____
14   PHILIP RYAN, RPR
     NOTARY PUBLIC - STATE OF FLORIDA
15   COMMISSION # DD 988415
     MY COMMISSION EXPIRES:  JUNE 28, 2014
16

17

18

19

20

21

22

23

24

25

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 242

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA

3     COUNTY OF HILLSBOROUGH

4                    I, PHILIP RYAN, RPR, certify that I

5     was authorized to and did stenographically

6     report the foregoing deposition; and that the

7     foregoing transcript is a true record of the

8     testimony given by the witness.

9                    I further certify that I am not a

10    relative, employee, attorney, or counsel of any

11    of the parties, nor am I a relative or employee

12    of any of the parties' attorneys or counsel

13    connected with the action, nor am I financially

14    interested in the action.

15

16                   DATED this 3rd day of February,

17    2011.

18

19

20

21    _____

22    PHILIP RYAN, RPR

23

24

25

Page 243

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

MDL NO: 1968

IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION,
_____/

100 N. Tampa Street
  Suite 2900
  Tampa, FL 33602
  February 18, 2011
  at 8:15 a.m.

VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.

Taken on behalf of the Defendants before

PHILIP RYAN, RPR, Court Reporter, Notary Public in

and for the State of Florida at Large, pursuant to

Defendant's Notice of Taking Deposition in the

above cause.

Page 244

```
 1   APPEARANCES:
 2   MIKE KERENSKY, ESQUIRE
     Williamson & Rusnak
 3   4310 Yoakum Boulevard
     Houston, TX 77006-5818
 4   (713)223-3330
     (via telephone)
 5
             Attorney for Plaintiffs
 6
     MICHAEL ANDERTON, ESQUIRE
 7   Tucker, Ellis & West, LLP
     1150 Huntington Building
 8   925 Euclid Avenue
     Cleveland, OH 44115
 9   (216)592-5000
10           Attorney for Defendant Activis Totowa,
             LLC, Activis, Inc.,
11           and Activis Elizabeth, LLC
12   SARAH E. DREWES, ESQUIRE
     Shook, Hardy & Bacon, LLP
13   2555 Grand Boulevard
     Kansas City, Missouri 64108
14   (816)474-6550
15           Attorney for Mylan Pharmaceuticals,
             Inc., Mylan Inc., Mylan Bertek
16           Pharmaceuticals, Inc., and UDL Labs
17   ALSO PRESENT:
             Alan Pokotilow, videographer
18
                      INDEX
19                                       PAGE
     DIRECT EXAMINATION:
20   BY MR. ANDERTON                         5
21
22
23
24
25
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 245

1                      EXHIBIT INDEX

2                                                      MAR
         Exhibit
3        Exhibit 145    Invoices.                        94

4        Exhibit 146    E-mail.                          99

5        Exhibit 147    Binder.                          117

6        Exhibit 148    Binder.                          117

7        Exhibit 149    Binder.                          117

8        Exhibit 150    Binder.                          117

9        Exhibit 151    Notice.                          122

10       Exhibit 152    Notes.                           123

11       Exhibit 153    Notes.                           123

12       Exhibit 154    Binder.                          161

13       Exhibit 155    Binder.                          337

14       Exhibit 156    Binder.                          337

15

16

17

18

19

20

21

22

23

24

25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 246

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We're on the | 08:15 |
| 2 | record at 8:15 a.m.  The date today is | 08:15 |
| 3 | February 18th of 2011.  This is the videotape | 08:15 |
| 4 | deposition of Dr. David M. Bliesner in regard | 08:15 |
| 5 | to the Digitek product liability litigation, | 08:16 |
| 6 | civil action MDL 1968. | 08:16 |
| 7 | This videotape deposition is being held | 08:16 |
| 8 | at 100 North Tampa, within suite 2900.  The | 08:16 |
| 9 | deposition was noticed by attorney Matt | 08:16 |
| 10 | Moriarty, I believe. | 08:16 |
| 11 | MR. ANDERTON:  Richard Dean, actually. | 08:16 |
| 12 | THE VIDEOGRAPHER:  Okay.  The | 08:16 |
| 13 | videographer is Alan Pokotilow and the court | 08:16 |
| 14 | reporter is Philip Ryan.  At the time of | 08:16 |
| 15 | transcript, the tape will be archived at | 08:16 |
| 16 | Renillo Deposition and Discovery. | 08:16 |
| 17 | Counsel, please state your name and | 08:16 |
| 18 | affiliation for the record, after which our | 08:16 |
| 19 | court reporter will swear the witness and we | 08:16 |
| 20 | can proceed. | 08:16 |
| 21 | MR. ANDERTON:  Michael Anderton with | 08:16 |
| 22 | Tucker Ellis & West on behalf of the Activis | 08:16 |
| 23 | Defendants. | 08:16 |
| 24 | MS. DREWES:  Sarah Drewes, with Shook, | 08:16 |
| 25 | Hardy & Bacon on behalf of the Mylan | 08:16 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 247

1    Defendants.                                           08:16

2        MR. KERENSKY:  Mike Kerensky for the              08:16

3    Plaintiff Mimi Vega.                                  08:16

4        MR. ANDERTON:  And just so the record is          08:16

5    clear, Mr. Kerensky is participating by               08:17

6    telephone.                                            08:17

7        MR. KERENSKY:  Correct.                           08:17

8    The Deponent herein,                                  08:17

9            DAVID BLIESNER, Ph.D.,                        08:17

10   Being first duly sworn to tell the truth, the         08:17

11   whole truth, and nothing but the truth, was           08:17

12   examined and testified as follows:                    08:17

13           DIRECT EXAMINATION                            08:17

14   BY MR. ANDERTON:                                      08:17

15       Q.   Good morning, Dr. Bliesner.                  08:17

16       A.   Good morning, sir.                           08:17

17       Q.   How are you?                                 08:17

18       A.   Okay.                                        08:17

19       Q.   Thanks for accommodating the early start     08:17

20   time.                                                 08:17

21       A.   Sure.                                         08:17

22       Q.   I know it's an early day, but if we're       08:17

23   going to get everybody home to spend time with        08:17

24   their families this weekend, I thought 8 o'clock      08:17

25   was the best time to start.  So thank you.            08:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                    Page 248

 1       A.    You're welcome.                              08:17

 2       Q.    Some ground rules.  I know you -- we did     08:17

 3  this about two or three weeks ago now, a little         08:17

 4  more than three weeks ago so you're familiar with       08:17

 5  the process, but I just want to repeat some ground      08:17

 6  rules.  And if you have any questions about them,       08:17

 7  kind of let me know; okay?                              08:17

 8       A.    Okay.                                        08:17

 9       Q.    As you know, I'm going to ask questions,     08:17

10  you're going to answer my questions.  If you don't      08:17

11  understand a question, I would ask that you tell        08:17

12  me that and ask me to rephrase it or to state it        08:18

13  differently; is that fair?                              08:18

14       A.    That is fair.                                08:18

15       Q.    All right.  And if I ask a question and      08:18

16  you answer it without asking me to rephrase or          08:18

17  restate it somehow, I will assume that you              08:18

18  understood it.                                          08:18

19       Is that all right?                                 08:18

20       A.    Okay.                                        08:18

21       Q.    You need to keep your voice up probably      08:18

22  just a little.  I know you're mic'd and I know          08:18

23  from the last time that you're -- at times at           08:18

24  least are probably fairly soft-spoken.  So just         08:18

25  try to make sure that your voice stays elevated so      08:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 249

1    at least the mic hears it because as you know, the          08:18

2    proceedings are being recording by video camera            08:18

3    and audio as well; all right?                              08:18

4         A.    Okay.                                           08:18

5         Q.    Now, Dr. Bliesner, one more kind of key         08:18

6    point.  You know, I attended the last session and         08:18

7    I noticed as I did that, that there were what I           08:18

8    felt were a fair amount of occasions where you            08:19

9    didn't really respond to the questions that               08:19

10   Mr. Moriarty had asked you.  And it's obvious from        08:19

11   your credentials and from your -- just -- just            08:19

12   dealing with you in the last deposition that              08:19

13   you're a very intelligent, very capable listener.         08:19

14   We know that you've been told by Plaintiffs'              08:19

15   counsel to listen very carefully.  So I would ask         08:19

16   that you really do me the favor of listening and          08:19

17   making sure that when you answer a question,              08:19

18   you're actually answering the question that I ask;        08:19

19   okay?                                                      08:19

20        A.    Okay.                                           08:19

21        Q.    I want to talk for a moment about your         08:19

22   credentials.  Do you have a copy of your CV with          08:19

23   you?                                                       08:19

24        A.    Let me check.                                   08:19

25        Q.    Please.  And if you don't, I have an           08:19

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                 February 18, 2011

Page 250

1   extra one.                                                    08:19

2       A.    I do not.                                           08:19

3       Q.    Okay.  Well, I'm going to hand you a                08:20

4   copy.                                                         08:20

5       A.    Okay.                                               08:20

6       Q.    Mike, this is Exhibit 93.                           08:20

7       Dr. Bliesner, I have handed you a document                08:20

8   that has been marked as Exhibit 93.  Have you seen            08:20

9   that document before?                                         08:20

10      A.    Yes.                                                08:20

11      Q.    It's a copy of your CV, your resume;                08:20

12  correct?                                                      08:20

13      A.    It is.                                              08:20

14      Q.    You prepared it?                                    08:20

15      A.    I did.                                              08:20

16      Q.    Is it accurate and current?                        08:20

17      A.    No.                                                 08:21

18      Q.    And last time you were asked -- I think            08:21

19  that you gave some testimony that there were a                08:21

20  couple of board memberships that had kind of                 08:21

21  changed and there were some minor changes.  But as           08:21

22  concerns your education and work experience, is              08:21

23  that CV accurate and current?                                08:21

24      A.    No.                                                 08:21

25      Q.    What is not accurate or current about              08:21

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 251

1    your work experience or education as reflected on        08:21

2    that CV?                                                 08:21

3         A.    Yesterday I presented a guest lecture at      08:21

4    the University of South Florida College of              08:21

5    Medicine.                                                08:21

6         Q.    What was the topic of that lecture?           08:21

7         A.    The topic was something to the effect         08:21

8    "Consumer Health and GMPs."                              08:21

9         Q.    Tell me generally the substance of           08:21

10   the -- of the lecture, the subject of the lecture       08:21

11   that you gave yesterday at you said South Florida?       08:21

12        A.    University South Florida.                     08:21

13        Q.    University of South Florida.                  08:21

14        A.    Yes.                                          08:21

15        Q.    Can you give me a little more detail          08:21

16   than just the topic you just described?                 08:21

17        A.    Other than pulling up the course outline     08:22

18   and taking a look at it, in general it was an           08:22

19   overview of the drug development process and where      08:22

20   GMPs become pertinent in the drug development           08:22

21   process and an introduction to people who had not       08:22

22   been exposed to the concepts of the GMPs, and some      08:22

23   examples of enforcement and where they could go to      08:22

24   review the GMPs themselves.                             08:22

25        Q.    Drug development.  Does that mean --          08:22

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 252

1    well, you tell me what that means.  What do you          08:22

2    mean by drug development?                                08:22

3        A.    Drug development is the process of             08:22

4    discovering an entity that may have                      08:22

5    pharmacological activity and moving it to a final        08:22

6    product.                                                 08:22

7        Q.    What would you characterize as the             08:22

8    primary target audience for that lecture?                08:22

9        A.    The students in the class were getting a       08:22

10   masters in biotechnology.                                08:22

11       Q.    And when you talk about introduction to        08:23

12   GMPs in the course or in the context of that             08:23

13   lecture that you gave yesterday, tell me in more         08:23

14   detail about the types of concepts that you              08:23

15   presented with respect to the introduction to           08:23

16   GMPs.                                                    08:23

17       A.    I would have to go back and pull up the        08:23

18   course outline to talk explicitly about it.             08:23

19       Q.    Well, you just did it yesterday, right,        08:23

20   Dr. Bliesner?                                            08:23

21       A.    Uh-huh.                                        08:23

22       Q.    You're a very smart man; right?                08:23

23           MR. KERENSKY:  Michael, that's not               08:23

24       necessary.                                           08:23

25           MR. ANDERTON:  Mike.                             08:23

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 253

1        MR. KERENSKY:  I object to the form of          08:23
2     the question.                                      08:23
3        MR. ANDERTON:  You can object and I             08:23
4     appreciate your objection and you make your        08:23
5     record obviously, but I asked him what he          08:23
6     talked about yesterday.  Certainly he can          08:23
7     remember that.                                     08:23
8        MR. KERENSKY:  Well, you certainly need         08:23
9     to be professional and not say things like         08:23
10    "You're smart man; right?"  That's what I'm        08:23
11    scolding you about.                                08:23
12       MR. ANDERTON:  Your scolding is noted,          08:23
13    Mike.                                              08:23
14       MR. KERENSKY:  Thank you very much.             08:23
15  BY MR. ANDERTON:                                     08:23
16    Q.   Dr. Bliesner, please tell me when you         08:23
17  described a few moments ago that you gave an         08:24
18  introduction to GMPs --                              08:24
19    A.   Yes.                                          08:24
20    Q.   -- as part of a presentation you made         08:24
21  yesterday.                                           08:24
22    A.   Yes.                                          08:24
23    Q.   Please give me a description of the           08:24
24  types of concept that you presented on with          08:24
25  respect to introduction to GMPs?                     08:24

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 254

1      A.    I gave a brief overview of the drug      08:24

2  development process, I indicated at what point      08:24

3  GMPs become applicable, talked about the hierarchy  08:24

4  of the law in a very general sense and where the    08:24

5  GMPs come into play.  I talked about the guidance   08:24

6  documents and compliance program guidance manuals   08:24

7  that are available online on the FDA website,       08:24

8  what's contained generally in those documents, the  08:25

9  quality systems that are associated with that, and  08:25

10 the hierarchy with respect to enforcement of        08:25

11 compliance of the GMPs.  Much of the course was     08:25

12 left as attachments for the students to go and      08:25

13 look in detail if they sought to.                   08:25

14     Q.    When you used term -- just to be clear,   08:25

15 when you used the term GMP as you did in the        08:25

16 description and the ones you gave before, that is   08:25

17 an acronym for good manufacturing practices;        08:25

18 correct?                                            08:25

19     A.    It is.                                    08:25

20     Q.    And that is a subject or a topic that     08:25

21 emanates from the code of federal regulations       08:25

22 under the United States code; correct?              08:25

23     A.    The GMPs are part of the code of federal  08:25

24 regulations.                                        08:25

25     Q.    You said that you discussed -- that one   08:26

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 255

```
 1    of the things you discussed was at what point GMPs         08:26
 2    become relevant to the drug development process.           08:26
 3        A.    (The witness nodded).                            08:26
 4        Q.    What is that point in your mind?                 08:26
 5        A.    In my opinion?                                   08:26
 6        Q.    Yes.                                             08:26
 7        A.    The point at which the GMPs become               08:26
 8    applicable is when you start testing the product           08:26
 9    or active in people.                                       08:26
10        Q.    In people you said?                              08:26
11        A.    Yes.                                             08:26
12        Q.    Does that mean when you are                      08:26
13    participating in some sort of clinical trial?              08:26
14        A.    Yes.                                             08:26
15        Q.    So GMPs in your mind aren't applicable           08:26
16    if you're merely doing animal or other lab                 08:26
17    studies; is that correct?                                  08:26
18        A.    That is correct.                                 08:26
19        Q.    And when you used the term "drug                 08:26
20    development process," I assume that you're                 08:26
21    talking -- and correct me if my assumption is             08:27
22    wrong -- I assume that you're talking about a drug         08:27
23    or an entity as you used that term that has not            08:27
24    yet been approved for market sale by the FDA.              08:27
25        A.    Not necessarily.                                 08:27
```

Page 256

1       Q.    Under what circumstances can a drug that        08:27
2   hasn't been developed be approved by the FDA?            08:27
3       A.    I don't know if I understand exactly the       08:27
4   question you're asking.                                  08:27
5       Q.    Well, you described -- you used the term        08:27
6   "drug development process" and then you clarified        08:27
7   and added substance to that term by indicating           08:27
8   that it was the -- the process of taking an entity       08:27
9   from concept to production and marketing; correct?       08:27
10      A.    Correct.                                        08:28
11      Q.    If your -- that process begins before          08:28
12  FDA approval; correct?                                   08:28
13      A.    Drug development process is very complex        08:28
14  and it's not, does not fit to one specific case.         08:28
15  For instance, if you have a generic drug you have        08:28
16  to do drug development as well but it's already on       08:28
17  a product that has been approved for market.  So         08:28
18  that could be considered drug development as well,       08:28
19  as opposed to discovering a new entity and moving        08:28
20  it forward.                                              08:28
21      Q.    Well, even a generic drug --                   08:28
22      A.    Uh-huh.                                         08:28
23      Q.    -- isn't actually -- the brand name is         08:28
24  approved for marketing; correct?                         08:28
25      A.    Correct.                                        08:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                                    Page 257

  1        Q.    Even the generic drug must go through a        08:28
  2   drug development process and must be submitted to         08:28
  3   the FDA before it can be marketed using an ANDA           08:28
  4   rather than an NDA; correct?                              08:28
  5        A.    Correct.                                       08:28
  6        Q.    So this course that you or this                08:28
  7   presentation that you gave yesterday, how long did        08:29
  8   it last?                                                  08:29
  9        A.    An hour and a half approximately.              08:29
 10        Q.    How long did you prepare for that              08:29
 11   presentation?                                             08:29
 12        A.    Several hours.                                 08:29
 13        Q.    What did you do to prepare for that            08:29
 14   presentation?                                             08:29
 15        A.    I took my course that I teach routinely        08:29
 16   at client sites, my book, and a course that I also        08:29
 17   teach at conferences routinely, looked at that           08:29
 18   core value that was there, based on input from the        08:29
 19   professor who invited me, trying to target what           08:30
 20   she thought might be useful for the students to be        08:30
 21   exposed in a general sense.                               08:30
 22        Q.    And I -- I understand from your prior          08:30
 23   answer that you distributed some sort of materials        08:30
 24   at that presentation yesterday.                           08:30
 25        A.    I did via Internet link.                       08:30

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 258

1       Q.    Describe how that works.  I haven't been       08:30

2   in college in a long time, so what is the current        08:30

3   practice with respect to distributing course             08:30

4   materials or even a seminar like this?  How do you        08:30

5   distribute via Internet link?                             08:30

6       A.    To answer your first question, I don't          08:30

7   know if there is a general way to do it.                  08:30

8       Q.    How did you do it?                               08:30

9       A.    How did I do it?  I took the                     08:30

10  presentation -- as I told you -- from my basic            08:30

11  course material, targeted it to the needs of the          08:30

12  professor, put in a Power Point presentation,             08:30

13  converted it to a PDF file so it's secure.  I             08:30

14  created a folder up on one of my websites that was        08:30

15  blind, I uploaded it and provided a link to the           08:30

16  professor and said that the students could access         08:31

17  it if they'd like.                                        08:31

18      Q.    Okay.  And then did you -- I assume then        08:31

19  that you repeated the web address for that link           08:31

20  during the presentation?                                  08:31

21      A.    No.                                              08:31

22      Q.    Okay.  So they got it from the professor        08:31

23  and chose to go get it or not?                            08:31

24      A.    Correct.                                         08:31

25      Q.    Other than -- well, did you bring any of        08:31

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 259

1   the materials that you used in yesterday's                08:31

2   presentation with you?                                    08:31

3       A.    No.                                             08:31

4       Q.    During the presentation during this             08:31

5   hour, what -- how much of that was spent on               08:31

6   manufacturing processes, if any?                          08:31

7       A.    Could you explain to me what you mean by        08:31

8   "manufacturing processes"?                                08:31

9       Q.    Certainly.  The drug development                08:31

10  process -- well, let me back that up.  Let me             08:32

11  start over.                                               08:32

12      The drug production process involves several          08:32

13  different components.  Developing a drug and              08:32

14  getting it ready to be manufactured and then              08:32

15  actually going forward and physically producing           08:32

16  the product I will characterize as two separate           08:32

17  components of that process.                                08:32

18      Did you discuss during your presentation              08:32

19  yesterday, that second component, the acts                08:32

20  associated with physically manufacturing and              08:32

21  producing a drug product?                                 08:32

22      A.    No because the students -- it was an            08:32

23  open lecture and the students were allowed to             08:32

24  drive it where they wanted to go and many of their        08:33

25  questions were not related to manufacturing.              08:33

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 260

1    Q.    Were you planning to discuss that if          08:33

2    they drove the discussion -- to use your term --    08:33

3    in that direction?                                  08:33

4    A.    Brief overview, yes.                           08:33

5    Q.    Do you know the or can you tell us the         08:33

6    link, the address for the link to the presentation  08:33

7    materials for yesterday?                             08:33

8    A.    Actually, I can't off the top of my           08:33

9    head.                                               08:33

10   Q.    Can you tell us generally how one might       08:33

11   get to that link?  Is it available through Delphi,   08:33

12   is it available from claycoachonline?                08:33

13   A.    It's available through Delphi in a blind      08:33

14   web link.                                           08:33

15   Q.    What do you mean by blind web link?            08:33

16   A.    The students and the instructor is the        08:33

17   only ones that have it.                             08:33

18   Q.    So they need some sort of password or         08:33

19   invitation?                                          08:33

20   A.    Just the right link to get to the page.       08:33

21   Q.    I mean it's not available to anybody who      08:33

22   happens to go to the Delphi website?                 08:33

23   A.    No, sir.                                       08:33

24   Q.    When we get a break sometime today, will      08:34

25   you see what you can do about figuring out how to    08:34

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 261

```
 1   provide me and defense counsel with access to that    08:34
 2   link, please?                                          08:34
 3       A.    Sure.                                        08:34
 4       Q.    Thank you.                                   08:34
 5       A.    Uh-huh.                                       08:34
 6       Q.    Now other than -- I'll let you make your     08:34
 7   note.                                                  08:34
 8       Other than this presentation that you gave         08:34
 9   yesterday, is the document that is in front of you     08:34
10   and that is marked as Exhibit 93 current with          08:34
11   respect to your education and experience?              08:34
12       A.    No.                                          08:35
13       Q.    What else is not on that version of your     08:35
14   CV that relates to your education and experience?      08:35
15       A.    I am on a major consulting project right     08:35
16   now, and that's not on the list.                       08:35
17       Q.    Okay.  What's that consulting project?       08:35
18       A.    I'm not at liberty to share that with        08:35
19   you because I'm under a confidentiality agreement.      08:35
20       Q.    Well, is it going to go on your CV at        08:35
21   some point?                                            08:35
22       A.    Perhaps.                                      08:35
23       Q.    What is the -- without revealing the         08:35
24   client, what is the nature generally of that           08:35
25   consulting project?                                    08:36
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 262

1        A.    The general nature of the consulting          08:36

2   project is to support laboratory and manufacturing       08:36

3   investigation review as a third-party independent.       08:36

4        Q.    When did that start?                           08:36

5        A.    June last year.                                08:36

6        Q.    Of 2010?                                       08:36

7        A.    Yes, sir.                                       08:36

8        Q.    Does that mean that this CV hasn't been        08:36

9   updated since June 2010 or perhaps before then?          08:36

10       A.    I don't know.  I'd have to go back and         08:36

11  look and see when it was last updated.                    08:36

12       Q.    Other than the consulting project and          08:36

13  the presentation you gave yesterday, what -- is           08:36

14  there anything else that's not on this CV that            08:36

15  relates to your experience or your education?             08:36

16       A.    Without going through it line by line, I       08:36

17  do not see my assistant -- excuse me associate            08:37

18  professorship at St. Leo University.                      08:37

19       Q.    Is that a current position?                    08:37

20       A.    It is.                                          08:37

21       Q.    When did it start?                             08:37

22       A.    Sometime I want to say approximately           08:37

23  late spring, early summer of last year.                   08:37

24       Q.    That's St. Leo University?                      08:37

25       A.    Yes, sir.                                       08:38

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 263

1    Q.    And it's associate professor?                    08:38

2    A.    Yes.                                              08:38

3    Q.    What general --                                   08:38

4    A.    Non-tenured track.                                08:38

5    Q.    Okay.  Describe that generally.  What do          08:38

6    you do, what are your responsibilities as an            08:38

7    associate, non-tenured professor at St. Leo             08:38

8    University?                                             08:38

9    A.    I was one of the distance learning               08:38

10   instructors.                                            08:38

11   Q.    What is distance learning?                        08:38

12   A.    Online education.                                 08:38

13   Q.    So what is your role and what are your            08:38

14   responsibilities?  What do you do?                      08:38

15   A.    I oversaw and taught via Internet                08:38

16   learning packages provided by the university,           08:38

17   introductory to science class.                          08:38

18   Q.    Any direct interaction with students in           08:38

19   that role?                                              08:38

20   A.    How would you define "direct"?                    08:38

21   Q.    Well, did you deal with students                  08:38

22   face-to-face or in a classroom setting?                 08:38

23   A.    No.                                               08:38

24   Q.    Did you deal with them exclusively via            08:38

25   online contact?                                         08:38

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

                                                                    Page 264

1        A.    No.                                              08:38

2        Q.    How did you interact with your students?         08:38

3        A.    Online in the course, e-mail and                08:38

4    telephone.                                                 08:39

5        Q.    And telephone.                                   08:39

6        You used or you spoke in the past tense when           08:39

7    you described that position.  Is it ongoing?               08:39

8        A.    I am -- do have that position within the         08:39

9    organization.  I'm not currently teaching a course         08:39

10   because of additional workload.                            08:39

11       Q.    Is it your expectation that you will             08:39

12   teach it again in the future?                              08:39

13       A.    Yes.                                             08:39

14       Q.    Do you believe that the university               08:39

15   shares that expectation?                                   08:39

16       A.    I couldn't say.                                  08:39

17       Q.    Are you being paid by St. Leo University         08:39

18   for -- in any way at the moment?                           08:39

19       A.    At the current moment?                           08:39

20       Q.    Yes.                                             08:39

21       A.    No.                                              08:39

22       Q.    When did you stop receiving compensation         08:39

23   from St. Leo University?                                   08:39

24       A.    When the semester ended.                         08:39

25       Q.    Last spring?                                     08:39

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 265

1      A.    Whenever it was.  I'd have to go back                08:39
2   and look at that.                                             08:39
3      Q.    Well, there's two semesters in an                    08:39
4   academic year.                                                08:39
5      A.    There are several actually, depends,                 08:40
6   distant learning, stuff like that.  I would have             08:40
7   to go back and look it up.                                    08:40
8      Q.    Give me your best estimate on when that             08:40
9   semester commenced and ended.                                 08:40
10     A.    I really can't tell you when it                      08:40
11  started.  When it ended it was I think somewhere             08:40
12  in June.                                                      08:40
13     Q.    Of 2010?                                             08:40
14     A.    Yes.                                                 08:40
15     Q.    Okay.  Now, as I look at your CV, I want            08:40
16  to go through that a little bit with you.  I see             08:40
17  that your first work experience after you left the           08:40
18  University of Vermont, graduated from the                    08:40
19  University of Vermont is with Zeneca; is that                08:40
20  right?                                                        08:41
21     A.    Yes.                                                 08:41
22     Q.    As an analytical research chemist?                  08:41
23     A.    That is correct.                                    08:41
24     Q.    And according to your CV, in that role             08:41
25  you developed and validated analytical methods;             08:41

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 266

1    right?                                                    08:41

2         A.    That is correct.                               08:41

3         Q.    Analytical methods describe -- am I            08:41

4    correct that that generally means the method by           08:41

5    which laboratory testing is conducted on some             08:41

6    material that is part of the pharmaceutical --            08:41

7    part of a pharmaceutical manufacturing process?           08:41

8         A.    Can you restate that, please?                  08:41

9         Q.    Sure.  When you use the term "analytical       08:41

10   method," am I correct in my understanding that            08:41

11   that means or is used generally to describe the           08:41

12   method by which laboratory testing is conducted on        08:41

13   something, some entity that is part of a                  08:41

14   pharmaceutical manufacturing process -- whether           08:42

15   it's finished product or in-process material or           08:42

16   raw material or --                                        08:42

17        A.    Packaging material.                            08:42

18        Q.    Okay.  So analytical method is                 08:42

19   developing a testing method; correct?                     08:42

20        A.    I'd say that's accurate.                       08:42

21        Q.    So your role with Zeneca was entirely in       08:42

22   the laboratory; correct?                                  08:42

23        A.    When you say "entirely in the                  08:42

24   laboratory," could you define that, please?               08:42

25        Q.    Well did you do any -- you didn't do           08:42

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

                                                              Page 267

1    anything it looks like other than perform job            08:42

2    functions related to and around developing,              08:42

3    validating analytical methods; is that accurate?         08:42

4        A.   I don't think that's an accurate                08:42

5    statement, no.                                            08:42

6        Q.   Well what else did you do other than            08:42

7    work with developing and validating analytical           08:42

8    methods as your CV says?                                 08:42

9        A.   As it says here, worked closely with           08:43

10   formulation specialists, designed testing                08:43

11   protocols and methods for new dosage forms.              08:43

12       Q.   Okay.  And that is a -- does that have           08:43

13   anything to do with product manufacturing, the           08:43

14   actual physical manufacturing process?                   08:43

15       A.   It does.                                         08:43

16       Q.   How?                                             08:43

17       A.   There is actually quite of bit of               08:43

18   extensive formulation development and interaction        08:43

19   with the formulators in the initial dosage form          08:43

20   manufacturing.                                            08:43

21       Q.   Well, what does that have --                     08:43

22       A.   Report it back.                                  08:43

23       Q.   What does that have to do with tablet or        08:43

24   product manufacturing?                                    08:43

25       A.   This lays all the basis because this is         08:43

Page 268

```
 1    the initial work that's done to get to the final          08:43
 2    validated process in product.                             08:43
 3         Q.    Well, but you're not -- I mean                 08:43
 4    Dr. Bliesner your resume says "developing                 08:43
 5    analytical methods," not validating manufacturing         08:43
 6    processes.                                                08:43
 7         A.    As part of that process you are                08:43
 8    interacting very closely with the formulators and         08:43
 9    the manufacturing folks to test their products and        08:44
10    be involved in those cross-functional meetings to         08:44
11    make sure that they're hitting what they're               08:44
12    supposed to be hitting and when they have problems        08:44
13    that, you know -- when they're developing                 08:44
14    processes, that you are there to provide                  08:44
15    additional input and feedback with respect to how         08:44
16    your analyses are reflecting on what they're              08:44
17    doing.                                                    08:44
18         Q.    What type of products did Zeneca make          08:44
19    while you were in that job?  Solid oral dose,             08:44
20    liquids, gels?                                            08:44
21         A.    As a company at large?                         08:44
22         Q.    Yeah.                                          08:44
23         A.    Specifically I couldn't -- I'd have to         08:44
24    go back and look, but it covered the broad lanes          08:44
25    of product types and formulations.                        08:44
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 269

```
 1        Q.     And do you believe it included solid      08:44

 2   oral dose?                                            08:44

 3        A.     That, it did.                             08:44

 4        Q.     Okay.  So they were -- were you involved  08:44

 5   in developing and validating analytical methods       08:44

 6   for tablets?                                          08:44

 7        A.     Yes, sir.                                 08:44

 8        Q.     For Digoxin tablets?                      08:44

 9        A.     No, sir.                                  08:44

10        Q.     Have you ever been involved with any      08:45

11   sort of method development or validation with         08:45

12   respect to Digoxin in any form?                       08:45

13        A.     No, sir.                                  08:45

14        Q.     Your next job with UDL, you described it  08:45

15   as a principal chemist.  And again you indicate --    08:45

16   hold on one moment.  My apologies, Dr. Bliesner,      08:45

17   for the interruption.                                 08:45

18        A.     It's okay.                                08:45

19        Q.     You indicate that you are responsible     08:45

20   for developing and validating analytical methods.     08:45

21   Tell me what that means.                              08:45

22        A.     As we just talked about being part of a   08:45

23   cross-functional team that supports product           08:45

24   development to determine the best analytical          08:46

25   technique to support the required testing and --      08:46
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 270

```
 1        Q.    Well -- I'm sorry.  Go ahead.           08:46

 2        A.    And once the method is developed to a   08:46

 3   point where it appears to be validatable, a        08:46

 4   validation program protocol is developed and then  08:46

 5   validated to prove in fact the method works for    08:46

 6   its intended use.                                   08:46

 7        Q.    And according to resume, your primary   08:46

 8   emphasis was on HPLC method development; is that   08:46

 9   right?                                              08:46

10        A.    That's correct.                         08:46

11        Q.    And HPLC stands for high performance    08:46

12   liquid chromatography; am I correct about that?    08:46

13        A.    Yes, and it also stands for high        08:46

14   pressure liquid chromatography.  It's a term that  08:46

15   is cross-confused sometimes.  It's now becoming    08:46

16   more popular again.                                 08:46

17        Q.    On your resume --                        08:46

18        A.    Yes.                                      08:46

19        Q.    -- what does it mean?                     08:46

20        A.    High performance liquid chromatography. 08:47

21        Q.    And that's a method by which a chemical 08:47

22   analysis is performed on some entity; correct?     08:47

23        A.    How would you define "chemical          08:47

24   analysis"?                                          08:47

25        Q.    Well, let me --                          08:47
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                          Page 271

1        A.    Uh-huh.                                            08:47

2        Q.    -- ask you, Dr. Bliesner.  What is high            08:47

3   performance liquid chromatography?                           08:47

4        A.    It's a separation technique.                      08:47

5        Q.    Separation of what?                                08:47

6        A.    Components and mixtures.                           08:47

7        Q.    So it is a technique to analyze                   08:47

8   components and mixtures of various drug entities;            08:47

9   correct?                                                     08:47

10       A.    Drug products and also to look for                08:47

11  impurities if you will in actives and drug                   08:47

12  products.                                                    08:47

13       Q.    All right.  So it's a lab-based                   08:47

14  function, am I correct?                                      08:47

15       A.    That's correct.                                   08:47

16       Q.    Your next -- the next work experience on          08:47

17  your resume is again for UDL and you're listed as            08:48

18  analytical group leader.  Do you see that on page            08:48

19  3?                                                           08:48

20       A.    I do.                                             08:48

21       Q.    And in that role, you indicate you are            08:48

22  responsible for supervising research chemists.               08:48

23       A.    Yes.                                              08:48

24       Q.    Do you see that?                                  08:48

25       Tell me what you did there.                             08:48

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 272

1      A.    I was responsible for the people who          08:48

2   were doing method development and validation and       08:48

3   testing.                                               08:48

4      Q.    Again, a lab-based function?                  08:48

5      A.    Yes, and we also interacted with product      08:48

6   development teams and manufacturing.                   08:48

7      Q.    Okay.  But your primary responsibilities      08:48

8   were in the lab overseeing research chemists who       08:48

9   were doing the -- performing the tasks you just        08:48

10  described; correct?                                    08:48

11     A.    The primary function, yes.                    08:48

12     Q.    The next position you have listed here        08:48

13  is analytical laboratory manager.                      08:49

14     A.    Yes.                                          08:49

15     Q.    You indicate in that role you supervised      08:49

16  day-to-day operation of lab -- analytical lab          08:49

17  personnel in various tasks that you list there.        08:49

18     Do you see that?                                    08:49

19     A.    Including methods validation, routine         08:49

20  analysis, equipment qualification and calibration,     08:49

21  stability and experimental protocol, yes.              08:49

22     Q.    Right.  And again that's a lab-based          08:49

23  position.                                              08:49

24     A.    It is.                                        08:49

25     Q.    And was while you occupied it.                08:49

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 273

1      A.    Yes.                                            08:49

2      Q.    The next one, Somerset Pharmaceuticals,         08:49

3   director of analytical research and                     08:49

4   development/quality control.  You characterize it       08:49

5   as a senior analytical laboratory supervisor.           08:49

6      Is that also a lab-based position?                    08:49

7      A.    It is, in addition to interacting              08:49

8   extensively with product development people who --       08:50

9   some of whom reported to me, clinical trial             08:50

10  material manufacturing, dosage formula                  08:50

11  manufacturing, some of who reported to me.              08:50

12  Various different -- it was a small company and         08:50

13  everybody wore a lot of hats.  In this particular       08:50

14  case we did the whole development bailiwick.            08:50

15     Q.    Okay.  But your position was so you            08:50

16  interacted with the product development people.         08:50

17     A.    Some of who reported to me too.               08:50

18     Q.    Okay.  Those are also lab-based               08:50

19  positions; correct?                                     08:50

20     A.    Not all of them, no.                           08:50

21     Q.    What people -- well, did you have any QA       08:50

22  responsibilities?                                        08:50

23     A.    No.  QA was a separate function outside        08:50

24  the lab.                                                 08:50

25     Q.    And I guess I should go back.  Let's go        08:50

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 274

1    back to Zeneca.                                              08:50

2         A.    Okay.                                            08:50

3         Q.    As an analytical research chemist, any           08:50

4    QA responsibilities?                                        08:51

5         A.    No, QA is a separate function.                   08:51

6         Q.    Okay.                                            08:51

7         A.    Distinct and clear separate function or          08:51

8    should be.                                                  08:51

9         Q.    And I understand that.                           08:51

10        A.    Uh-huh.                                          08:51

11        Q.    But I need to -- I hope you understand,          08:51

12   Dr. Bliesner, I need to establish certain things            08:51

13   for the record.                                             08:51

14        A.    Absolutely.                                      08:51

15        Q.    So with Zeneca -- because as you said QA         08:51

16   is a separate and distinct function from the lab            08:51

17   operations --                                               08:51

18        A.    Uh-huh.                                          08:51

19        Q.    -- which are typically referred to as            08:51

20   quality control; correct?                                   08:51

21        A.    No.                                              08:51

22        Q.    Well --                                          08:51

23        A.    Quality control and quality assurance            08:51

24   are two different functions.                                08:51

25        Q.    That's what I meant.                             08:51

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 275

1      A.    Yes.                                          08:51

2      Q.    Maybe I didn't say that very clearly.         08:51

3      A.    Uh-huh.                                       08:51

4      Q.    Lab functions are typically within the        08:51

5   industry referred to as quality control; is that      08:51

6   correct?                                               08:51

7      A.    That's a fair statement.                      08:51

8      Q.    Okay.  And quality assurance -- or QA as      08:51

9   I've been using that term and as I believe you         08:51

10   understood when I used that term --                   08:51

11      A.    Uh-huh.                                       08:51

12      Q.    -- is as you described a separate and         08:51

13   distinct function totally separate from lab            08:51

14   testing and quality control; correct?                 08:51

15      A.    As an oversight function.  Quality           08:52

16   assurance itself is integrated into everything,        08:52

17   including the lab functions you know, review the       08:52

18   data, integrity of data, method development            08:52

19   validation.  As far as the title as an oversight,      08:52

20   as a final signoff and a separate pair of eyes         08:52

21   with a different reporting structure, that is the      08:52

22   QA function.                                           08:52

23      Q.    Okay.  At Zeneca --                          08:52

24      A.    Uh-huh.                                       08:52

25      Q.    -- you had no QA responsibilities;           08:52

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 276

1   correct?                                                          08:52

2       A.    No, but GMP responsibilities that are                  08:52

3   oversight by QA.                                                  08:52

4       Q.    Dr. Bliesner.                                           08:52

5       A.    Yes.                                                    08:52

6       Q.    This is what I'm talking about.  I asked               08:52

7   you very succinctly whether you had QA                           08:52

8   responsibilities.  If you would answer that                      08:52

9   question and only that question, I would                         08:52

10  appreciate it; okay?                                             08:52

11      Did you have QA responsibilities?                            08:52

12      A.    As we define QA -- you and I understand                08:52

13  -- quality assurance, separate function,                         08:52

14  oversight, no.                                                   08:52

15      Q.    Same question with respect to the next                 08:52

16  position you have listed, UDL Laboratories and                   08:52

17  principal chemist.  Did you have any QA                          08:52

18  responsibilities?                                                08:52

19      A.    As we've defined it, no.                               08:53

20      Q.    Same question with respect to the next                 08:53

21  UDL position you have as analytical group leader                 08:53

22  on your CV.  As we've defined QA responsibilities,               08:53

23  did you have any of those QA responsibilities in                 08:53

24  that position?                                                   08:53

25      A.    No.                                                    08:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 277

1      Q.    As an analytical laboratory manager for        08:53

2    Somerset Pharmaceuticals, did you have any QA          08:53

3    responsibilities?                                      08:53

4      A.    In the formal sense, as QA as we've            08:53

5    defined it, no.                                        08:53

6      Q.    As the director of analytical research         08:53

7    and development/quality control for Somerset           08:53

8    Pharmaceuticals, any QA responsibilities?              08:53

9      A.    No.                                            08:53

10     Q.    Moving to the next entry in your CV,            08:53

11   HPLC, product marketing manager for Restek             08:54

12   Corporation aPparently at Penn State University.       08:54

13   Tell me about that position.                           08:54

14     A.    It was not at Penn State.  It's a state        08:54

15   college.                                               08:54

16     Q.    Is that different?                             08:54

17     A.    Yes.                                           08:54

18     Q.    Is that not Penn State?                        08:54

19     A.    Yes.                                           08:54

20     Q.    My apologies.                                  08:54

21   Tell me about that position.  What did you do?         08:54

22     A.    Initially, I stepped into a business           08:54

23   role, business development role, to assist them in     08:54

24   finding ways to increase their sales of HPLC           08:54

25   products.                                              08:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 278

1      Q.    Okay.  And do I understand then that          08:54

2   when you took this position with Restek, you          08:54

3   stepped outside the laboratory and the technical      08:54

4   aspect of the pharmaceutical business and             08:55

5   transitioned to a more business and marketing         08:55

6   role?                                                 08:55

7      A.    I don't think that's an accurate            08:55

8   assessment.                                           08:55

9      Q.    Well, why is it not accurate?               08:55

10     A.    Because the technical aspects all came       08:55

11  with it in addition to business still.                08:55

12     Q.    I understand.  But your title is product     08:55

13  marketing manager.  And as you described your         08:55

14  responsibilities, you were hired to and did assist    08:55

15  them with trying to increase sales of HPLC            08:55

16  columns; right?                                       08:55

17     A.    I did for a brief period of time.            08:55

18     Q.    And your -- what do you mean by a brief      08:55

19  period of time?  Does that mean you were only         08:55

20  there for five months, is that what you mean?         08:55

21     A.    I only served in that position for five      08:55

22  months.                                               08:55

23     Q.    And then you transitioned to director of     08:55

24  Restek analytical services?                           08:55

25     A.    I created the position and the title.        08:55

Page 279

1    Q.    Okay.  And backing up to your product          08:55
2    marketing manager position.                          08:56
3    A.    Uh-huh.                                         08:56
4    Q.    Did you have any QA responsibilities in         08:56
5    that role?                                            08:56
6    A.    Yes.                                            08:56
7    Q.    Really?                                         08:56
8    A.    For HPLC column manufacturing.                  08:56
9    Q.    You had actual oversight responsibility         08:56
10   for checking the compliance of product               08:56
11   manufacturing with specifications?                   08:56
12   A.    For HPLC columns.                               08:56
13   Q.    What do you mean by that?  Tell me what         08:56
14   distinction you're making.                            08:56
15   A.    HPLC column is a major component of high        08:56
16   performance liquid chromatography.                    08:56
17   Q.    I understand.                                   08:56
18   A.    We manufactured HPLC columns at Restek.         08:56
19   Q.    Did Restek manufacture any drug                 08:56
20   products?                                             08:56
21   A.    No.                                             08:56
22   Q.    So as director of analytical services,          08:56
23   that position has -- again is not associated with     08:56
24   manufacturing drug products, am I correct?            08:57
25   A.    We did not manufacture products on site.        08:57

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                 February 18, 2011

Page 280

1    Q.    Did you have any role or responsibility        08:57

2   for manufacturing -- for any aspect of               08:57

3   manufacturing any drug product when you were         08:57

4   employed by Restek?                                  08:57

5    A.    I can't say for sure because we               08:57

6   consulted to the industry as well and we may have   08:57

7   performed some consultation with respect to drug     08:57

8   product manufacturers.                               08:57

9    Q.    Dr. Bliesner, I asked what your               08:57

10  experience was, not the company as a whole.          08:57

11   A.    No, no.  I would have been the one that       08:57

12  would have been providing that consulting to the     08:57

13  manufacturing of drug product.  I don't recall       08:57

14  whether we did or not, but we did provide            08:58

15  consultation in addition to the lab services as      08:58

16  well.  So I can't say definitively that I did or     08:58

17  did not have input into the drug manufacturing       08:58

18  process.                                             08:58

19   Q.    What consultation did you yourself            08:58

20  provide while you were employed by Restek to -- to   08:58

21  drug product manufacturers?                          08:58

22   A.    We were in constant contact with them        08:58

23  because they were our customers for the columns      08:58

24  and the lab services.  So we provided consultation   08:58

25  on many aspects of the drug development process,     08:58

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 281

1    production, manufacturing.                              08:58

2       Q.    Are you telling me that you were              08:58

3    involved with developing drug products for other       08:58

4    companies while you were employed by Restek?           08:58

5       A.    They were our clients.  We consulted          08:58

6    with them if they needed things.                       08:58

7       Q.    You consulted with them with respect to       08:58

8    various functionality issues of your HPLC columns;     08:58

9    correct?                                               08:58

10      A.    No, not necessarily.  We did contract         08:58

11   work, analytical work and product development work     08:58

12   for them as part of the mission.                       08:58

13      Q.    Well, as part of the mission, as I read       08:58

14   your CV, Dr. Bliesner, that you prepared, it lists     08:59

15   only business functions.  It doesn't say anything      08:59

16   about being involved in drug development               08:59

17   processes, does it?                                    08:59

18      A.    If you look at the director of Restek         08:59

19   Analytical Services, it offers analytical method      08:59

20   development, validation, HPLC, GC, education,          08:59

21   training, customer stationary phase design, CGMP      08:59

22   regulatory services and support.  That's where        08:59

23   that would fall into.                                  08:59

24      Q.    And your testimony is that you performed      08:59

25   those functions while you were at Restek?              08:59

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                      Page 282

1        A.    Some of them, yes.                          08:59

2        Q.    What do you mean by some of them?           08:59

3        A.    I interacted primarily with the client      08:59

4    as the first line.                                     08:59

5        Q.    You mean you were the first line -- you      09:00

6    were Restek's front line person interacting with       09:00

7    the client.  Is that what you mean by that?            09:00

8        A.    Yes, sir.  For this division, Restek         09:00

9    Analytical Services.                                   09:00

10       Q.    Well, your job duties and                    09:00

11   responsibilities as you described them included        09:00

12   market research, drafting a business plan, and         09:00

13   obtaining funding and approval from Restek.            09:00

14       You go on to describe what Restek does, but        09:00

15   you don't say anything about your -- about you         09:00

16   being involved in any of the analytical method         09:00

17   development consultation, do you?                      09:00

18       A.    If I was to list this here, the document     09:00

19   would be about 25 pages long for all the different     09:00

20   jobs that I've had.                                    09:00

21       Q.    Dr. Bliesner, I'm merely pointing out        09:00

22   that you described your job duties and                 09:00

23   responsibilities strictly in a business capacity;      09:00

24   is that right?                                          09:00

25       A.    No, that's not correct.                      09:00

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 283

1     Q.    Your statement on here says that you            09:01

2   were responsible for conception, design, building,     09:01

3   staffing, and qualification of Restek Analytical        09:01

4   Services.                                                09:01

5     A.    That is correct.                                 09:01

6     Q.    And you go on to say that included               09:01

7   conducting market research, drafting a business         09:01

8   plan, and obtaining funding.                             09:01

9     A.    That is correct.                                 09:01

10     Q.    You don't say anything about interacting       09:01

11   with clients on assisting with development of           09:01

12   analytical methods.                                     09:01

13     A.    As I said, if I put everything down I          09:01

14   did here, the document would be 25 pages long.         09:01

15   This is a summary resume to send out to people.        09:01

16     Could I interrupt for a second, please?              09:01

17     Q.    Would you like to take a break?                09:01

18     A.    Yes, please.                                    09:01

19         MR. ANDERTON:  Absolutely.                        09:01

20         THE VIDEOGRAPHER:  The time is 9:01 a.m.          09:01

21   We're going off the record briefly.                    09:01

22             (Short break)                                 09:12

23         THE VIDEOGRAPHER:  The time is 9:12 a.m.          09:12

24   We're back on the record.  This is the                  09:13

25   beginning of tape two.                                  09:13

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 284

```
 1   BY MR. ANDERTON:                                    09:13

 2       Q.   Dr. Bliesner, -- hey Mike.  Mike?          09:13

 3           MR. KERENSKY:  Yes.                          09:13

 4           MR. ANDERTON:  If you're going to be         09:13

 5       typing --                                        09:13

 6           MR. KERENSKY:  All right.  I'll put it       09:13

 7       back on mute.  Happens all the time.  I'm        09:13

 8       sorry.                                           09:13

 9           MR. ANDERTON:  That's all right.             09:13

10   BY MR. ANDERTON:                                    09:13

11       Q.   All right.  Dr. Bliesner, we were          09:13

12   discussing various things on your resume and we     09:13

13   left off -- or your CV.  We left off with director  09:13

14   of analytical services for Restek.                  09:13

15       A.   Restek, yes.                               09:13

16       Q.   Restek.  Sorry.  And the State College     09:13

17   of Pennsylvania.  The next -- well, let me let me   09:13

18   ask one final question about that position.         09:13

19       The consultation that you described being       09:14

20   involved with in that position was primarily        09:14

21   consultation -- well, was exclusively consultation  09:14

22   related to lab-based activities; correct?           09:14

23       A.   No, I don't think you'd say that           09:14

24   exclusively.  We went into a lot of different       09:14

25   client sites, interacted with groups of folks at    09:14
```

Page 285

1    the client sites which included, you know, product          09:14

2    development, manufacturing types, lab types,                09:14

3    usually looking for a source of additional                  09:14

4    information in addition to solving problems.                09:14

5         Q.    Primarily lab-based activities that you          09:14

6    were giving consultation on?                                09:14

7         A.    I wouldn't say primarily.                        09:14

8         Q.    Well, you sold --                                09:14

9         A.    It was very broad-based in our approach          09:14

10   in how we were trying to line up customers.                 09:14

11        Q.    Well, you sold HPLC columns; right?              09:14

12        A.    And services.                                    09:15

13        Q.    And what type of services?  What do you          09:15

14   mean by services?                                           09:15

15        A.    That's what Restek Analytical Services           09:15

16   was all about.  It wasn't just about selling HPLC           09:15

17   columns.  It was about selling contract analytical          09:15

18   services and providing consulting services -- GMP           09:15

19   training, those types of things -- to the industry          09:15

20   so they could partner with us and be interested in          09:15

21   buying the columns and we would validate the                09:15

22   methods.                                                    09:15

23        Q.    Analytical services again relates to lab         09:15

24   functions; right?                                           09:15

25        A.    It wasn't necessarily all analytical             09:15

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 286

1    services because there was formulation development       09:15

2    discussions that went on in there as well.              09:15

3        Q.    When you left Restek and went to work --       09:15

4    the next position listed on your CV is                  09:15

5    vice-president of operations for Laboratory             09:15

6    Management Systems in New Castle, Delaware.             09:15

7        A.    That's correct.                               09:15

8        Q.    According to your CV, you created and         09:16

9    drove sales and marketing plans; is that right?         09:16

10       A.    As one part of my responsibilities, yes.      09:16

11       Q.    What else did you do?                         09:16

12       A.    Primary responsibility took up the            09:16

13   lion's share of the time as I was an active             09:16

14   consultant with the Wyeth and Schering Plough           09:16

15   consent decrees.                                        09:16

16       Q.    Doing what?                                   09:16

17       A.    Being part of the FDA-mandated                09:16

18   third-party expert contingent consult, where we         09:16

19   went in and did very detailed, thorough                 09:16

20   assessments, documented the findings, developed         09:16

21   corrective actions and went back in and did             09:16

22   verification and then backed the actions that had       09:16

23   been put into place that were stable -- were            09:16

24   verifiable and sustainable from a quality systems       09:16

25   standpoint.                                             09:16

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 287

1        Q.     Wyeth and who else?                              09:16

2        A.     Schering Plough.                                 09:16

3        Q.     Schering Plough.  Both were under               09:16

4   consent decrees?                                            09:16

5        A.     They were.                                       09:17

6        Q.     Did you visit both of those companies           09:17

7   while you were employed by Laboratory Management            09:17

8   Systems?                                                    09:17

9        A.     When you say "visit," they're very large        09:17

10  organizations that have many different sites.               09:17

11       Q.     Did you visit any of them?                       09:17

12       A.     Yes, sir.                                        09:17

13       Q.     For both companies?                              09:17

14       A.     Yes, sir.                                        09:17

15       Q.     And --                                           09:17

16       A.     The visit actually was on site                  09:17

17  extensively for some of them.                               09:17

18       Q.     And so you were part of what I'll               09:17

19  characterize as the remediation activities for             09:17

20  both of those companies?                                    09:17

21       A.     I wouldn't characterize it as such.             09:17

22       Q.     What's wrong with my term remediation           09:17

23  activities?                                                 09:17

24       A.     Remediation assumes that you've already         09:17

25  found everything that was wrong.                            09:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 288

1    Q.    Okay.  But there were certainly          09:17
2    remediation activities.                        09:17
3    A.    That followed, yes.                       09:17
4    Q.    Well, if you're under a consent decree,   09:17
5    there are certain things that have already been 09:17
6    identified; right?                              09:17
7    A.    The FDA would have found and documented   09:17
8    through 483s, warning letters, and presented an 09:17
9    EIR, continuing deficiencies, yes.              09:18
10   Q.    And tell me about the process that        09:18
11   you -- and let's ask first about Wyeth.         09:18
12   A.    Uh-huh.                                    09:18
13   Q.    Tell me about the process that you        09:18
14   followed as you provided consulting services to 09:18
15   them to help them address the issues that were  09:18
16   raised by the consent decree and the underlying 09:18
17   regulatory activities that resulted in that     09:18
18   consent decree.                                 09:18
19   A.    Okay.                                      09:18
20   Q.    What process did you follow?              09:18
21   A.    As a global?                               09:18
22   Q.    Yeah, generally.                           09:18
23   A.    Generally.                                 09:18
24   Q.    And then I'll ask more specific           09:18
25   questions based on your response.                09:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 289

1      A.    First of all, each consent decree as I'm        09:18
2  sure you know is an individually negotiated plan.         09:18
3      Q.    Understood.                                      09:18
4      A.    In the Wyeth consent decree, we first           09:18
5  came in and did very detailed assessments of the          09:18
6  major quality system elements.                            09:18
7      Q.    Which involved what?                             09:18
8      A.    Going into individual departments --            09:19
9  laboratories, manufacturing areas, packaging              09:19
10 areas -- usually in teams of two people and asking        09:19
11 questions, performing interviews, looking at data,        09:19
12 looking at protocols, the whole plethora of               09:19
13 activities for each one of the quality system            09:19
14 elements.  Document them.                                 09:19
15     Q.    Looking at data and looking at                  09:19
16 protocols, two things that you identified in that         09:19
17 response.  What do each of those mean?  Looking at        09:19
18 what type of data, looking at what type of                09:19
19 protocols?                                                09:19
20     A.    It really depended because it was a huge        09:19
21 organization and addressed many different                 09:19
22 components.  So you would be assigned a department        09:19
23 for instance that you could go in on for a                09:19
24 particular week and you would determine their work       09:19
25 flow, how they conducted business, how they               09:19

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 290

1    documented things, how data was collected, and you         09:19

2    would go soup to nuts, systematic approach,                09:19

3    looking through to see if they, in fact, had               09:19

4    quality systems or any systems in place, whether           09:20

5    they had procedures in place, whether people were          09:20

6    trained and just in a laboratory notebook document         09:20

7    all these findings and go back and write them up           09:20

8    as findings from the assessment, very similar to           09:20

9    what the FDA would do on a 483.  A very extensive,          09:20

10   heavy-duty process.                                         09:20

11       That was only the first part.                           09:20

12       Q.   What was the second part?                          09:20

13       A.   The second part was a compilation of all           09:20

14   of the findings into a report.                              09:20

15       Q.   The findings meaning your analysis of              09:20

16   the data as you described it and protocols that             09:20

17   you reviewed and all the other information that             09:20

18   you reviewed.                                               09:20

19       A.   Systems in general; okay?  Quality                 09:20

20   system, laboratory control system, product system,         09:20

21   packaging, labeling, all of those different                09:20

22   things.  You know, it was a detailed assessment            09:20

23   and that would include reviewing training records          09:20

24   for instance for the individuals that are there,           09:20

25   looking at, you know, production records.                   09:20

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 291

1   Everything you would imagine that constitutes a              09:21

2   modern pharmaceutical manufacturing system -- down            09:21

3   to excruciating details.                                      09:21

4       Q.    That was all part of your consulting?              09:21

5       A.    Yes.  We had a 150 people team initially            09:21

6   on the one site with Wyeth.                                   09:21

7       Q.    How long did that process take?                    09:21

8       A.    The initial assessment?                            09:21

9       Q.    Yes.                                                09:21

10      A.    The initial site where we started --              09:21

11  it's been a long time.  The assessment ran                    09:21

12  somewhere in the neighborhood of approximately                09:21

13  three months.                                                 09:21

14      Q.    With 150 people on site for three                  09:21

15  months?                                                       09:21

16      A.    Absolutely.                                        09:21

17      Q.    150 laboratory management systems                  09:21

18  employees on Wyeth's site for three months?                   09:21

19      A.    We were subcontractors as part of a                09:21

20  team.                                                         09:22

21      Q.    Okay.  As you performed that                       09:22

22  assessment.                                                   09:22

23      A.    Uh-huh.                                            09:22

24      Q.    That's a correct term?                             09:22

25      A.    Yes.                                                09:22

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 292

```
 1        Q.    Is that the same thing as an audit?        09:22
 2        A.    I don't think I would define it like       09:22
 3   that, but...                                          09:22
 4        Q.    Well --                                    09:22
 5        A.    It's the same process, yeah.               09:22
 6        Q.    Okay.  So if I describe the process that   09:22
 7   you just described.                                   09:22
 8        A.    Uh-huh.                                     09:22
 9        Q.    150 people on site for three months,       09:22
10   soup to nuts, virtually everything you can think      09:22
11   of with respect to a manufacturing and production     09:22
12   process.                                              09:22
13        A.    Uh-huh.                                     09:22
14        Q.    That's an accurate description of what     09:22
15   you guys -- the activity you undertook.               09:22
16        A.    Everything.  All of the components of      09:22
17   the quality systems that constituted that.            09:22
18        Q.    So if I described that process as an       09:22
19   audit, would that be an accurate or a fair            09:22
20   characterization?                                     09:22
21        A.    Perhaps.  There's confusion in the         09:23
22   industry in general about what's an assessment,       09:23
23   what's a self-assessment, what's an audit, what's     09:23
24   an inspection, so...                                  09:23
25        Q.    I understand.                              09:23
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 293

1      A.    Yes.                                            09:23

2      Q.    I'm asking you.                                 09:23

3      A.    To me, personally?                              09:23

4      Q.    Yes.                                            09:23

5      A.    An audit is a like the agency coming in         09:23

6    and doing something from the outside.  It's not         09:23

7    necessarily open and collaborative.  This               09:23

8    assessment was full disclosure from all employees       09:23

9    and everything.  You know, sit down, tell us            09:23

10   what's wrong, tell us everything that's there, you      09:23

11   know, everybody volunteering information.  I            09:23

12   consider that to be different than an audit.            09:23

13     Q.    Well, when you -- so you then used the          09:23

14   term audit and believe it is best used only to          09:23

15   apply to a --  a -- I guess I'll characterize that      09:23

16   as third-party or just the FDA?  I mean I'm not         09:24

17   sure I understand the distinction.                      09:24

18     A.    And to be perfectly honest with you,            09:24

19   there's confusion in the industry too.  So I don't      09:24

20   know if your statement is the best description of       09:24

21   it.                                                     09:24

22     Q.    Well, then I mean what is -- what is the        09:24

23   difference between an audit and the assessment          09:24

24   that you just described?                                09:24

25     A.    An audit, in my experience, they usually        09:24

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 294

1    come in the form of a corporate entity, quality          09:24

2    assurance coming down to a specific site and             09:24

3    performing a compliance assessment that's an audit       09:24

4    to try to determine stuff.                               09:24

5        When corporate comes down to a site, it isn't        09:24

6    necessarily a free and open sharing of things with       09:24

7    individuals because it's corporate.  So that is          09:24

8    how audits work per se.                                  09:24

9        An assessment is when -- I've actually just          09:24

10   recently finished a very extensive one where we          09:24

11   would sit down and it's full, open, and honest           09:24

12   disclosure, everybody is laying things out because       09:24

13   you really want to get to the root cause during an       09:24

14   assessment, self-assessment, to find out what's          09:25

15   broken and what potential corrective actions may         09:25

16   be and how to implement corrective and preventive        09:25

17   actions and verify the actions, collecting these         09:25

18   data, all the things we've described.                    09:25

19       Q.    So then as you understand and use, as          09:25

20   you used the term audit, does that mean you don't        09:25

21   think it's -- that there's as much disclosure and        09:25

22   openness when an audit is being conducted?               09:25

23       A.    I would say that's a fair assessment,          09:25

24   yes.  Because people volunteer information during        09:25

25   an assessment, but if the FDA comes in to do an          09:25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 295

1    audit, people don't volunteer information.                    09:25

2        Q.    Well, if corporate comes in to do an               09:25

3    audit, they volunteer information don't they,                09:25

4    typically?                                                   09:25

5        A.    It's restrained in my experience.                  09:25

6        Q.    Do you feel that the people who are the            09:25

7    subject of either an assessment or an audit make             09:25

8    that type of distinction or do they kind of look             09:25

9    at it as though it's corporate or the FDA or a               09:25

10   third party asking questions about what they do             09:26

11   and how they do it?                                          09:26

12       A.    I don't know if I really understand the            09:26

13   question.                                                    09:26

14          MR. ANDERTON:  Can you read that back,                09:26

15      Phil.                                                     09:26

16          THE WITNESS:  I think there's a couple of             09:26

17      questions in there.  I think people in                    09:26

18      general -- again, confusion on terms.  We'll              09:26

19      use my definition audit, a third party coming             09:26

20      in or a corporate entity, something like that,            09:26

21      as opposed to assessment, being                           09:26

22      self-assessment you want to uncover                       09:26

23      everything.  Those two distinctions.  I think             09:26

24      people respond to audits and assessments,                 09:26

25      self-assessments differently, yes.  And the               09:26

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 296

1        reason for that is that audits -- corporate,          09:26

2        FDA or whatever -- obviously carry tremendous          09:27

3        consequences.          09:27

4    BY MR. ANDERTON:          09:27

5        Q.    Okay.  When you performed this          09:27

6    assessment of Wyeth with 150 people on site for          09:27

7    three months.          09:27

8        A.    About three months.          09:27

9        Q.    Okay.  Fair enough.          09:27

10       A.    And there are several other sites that          09:27

11   were involved as well.          09:27

12       Q.    Fair enough.  Well, when your team          09:27

13   performed this assessment that lasted          09:27

14   approximately three months at various locations of          09:27

15   Wyeth and you did your soup to nuts review, did          09:27

16   you have access to any information that you          09:27

17   wanted?          09:27

18       A.    By agreement and communication with the          09:27

19   company, the official position was yes, we were to          09:27

20   have access to any information we wished.          09:27

21       Q.    And by that you mean that was a          09:27

22   condition of you doing the assessment because it's          09:27

23   necessary to do it properly?          09:27

24       A.    That's correct.          09:28

25       Q.    And that's typical when you do that type          09:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 297

1   of assessment; correct?  You need to have full          09:28

2   access to whatever documents you think are              09:28

3   necessary and appropriate in order to properly          09:28

4   perform an assessment as you've described; is that      09:28

5   right?                                                  09:28

6       A.    "Typical" is a very broad term.  I don't      09:28

7   know if I'd necessarily use it.  Because, again,        09:28

8   each consent decree as you know is negotiated           09:28

9   differently and may involve certain departments         09:28

10  within the larger company that may or may not           09:28

11  necessarily be involved with the consent decree or      09:28

12  initially involved in the consent decree for            09:28

13  example.                                                09:28

14      Q.    The consent decree --                         09:28

15      A.    Yes.                                          09:28

16      Q.    -- or if it's another regulatory              09:28

17  document is a starting point for the assessment;        09:28

18  correct?                                                09:28

19      A.    When you say "another regulatory              09:28

20  document."                                              09:28

21      Q.    Might be a 483, might be a warning            09:28

22  letter.  You've done consulting engagements where      09:28

23  the company wasn't involved in a negotiated             09:29

24  consent decree; correct?                                09:29

25      A.    That's correct.                               09:29

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                        Page 298

1      Q.    And sometimes you're doing an assessment      09:29

2   based on an FDA warning letter; correct?              09:29

3      A.    Or a preparation for a preapproval           09:29

4   inspection for FDA, another example.                 09:29

5      Q.    But to answer my question, it's true         09:29

6   that you've done assessments where a company          09:29

7   receives a warning letter, they hire you or people    09:29

8   that you work with and for and they ask you to do     09:29

9   what you've described as an assessment on the         09:29

10  basis of that warning letter; is that true?          09:29

11     A.    That is correct, yes.                        09:29

12     Q.    All right.  And have you also done           09:29

13  assessments on the basis of FDA 483s?                09:29

14     A.    Specifically 483s?                           09:29

15     Q.    Yeah.                                        09:29

16     A.    No.                                          09:29

17     Q.    Okay.  When you -- when you do those --      09:29

18  and I believe last time you testified that you've     09:29

19  done about five -- and I think the term that you     09:29

20  used was audit rather than assessment, you've done    09:30

21  about five GMP compliance audits in your career.     09:30

22  Does that sound about right?                          09:30

23     A.    Let me think about it for a second.         09:30

24     Q.    Take your time.                              09:30

25     A.    Yeah, about five or six.                     09:30

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 299

```
 1        Q.    Back to the assessments that you said        09:31
 2   you've done for or on the basis of an FDA warning       09:31
 3   letter.  When you undertook those engagements, was      09:31
 4   it also a condition of your engagement that you         09:31
 5   would have access to the documents you and your         09:31
 6   team felt were necessary to review in order to          09:31
 7   conduct the assessment?                                 09:31
 8        A.    In the circumstance where it was just a      09:31
 9   warning letter, the project did not start out as        09:31
10   we're bringing you in to do an assessment.  It          09:31
11   evolved into that.                                      09:31
12        Q.    And when it did --                           09:31
13        A.    Yes.                                         09:31
14        Q.    -- did you insist on having full access      09:31
15   to the documents you deemed necessary to properly       09:32
16   conduct your assessment?                                09:32
17        A.    We didn't insist.  We just expected          09:32
18   because it was the next evolution for the client        09:32
19   to ask for it that we would have what we needed.        09:32
20        Q.    Would you do an assessment if a              09:32
21   potential client said no, we're not going to give       09:32
22   you access to certain documents?  Production            09:32
23   records for example.                                    09:32
24        A.    Would we do the assessment?                  09:32
25        Q.    Yeah.                                        09:32
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 300

1     A.    Depends on what the client wants out of          09:32
2     the assessment.                                        09:32
3     Q.    Well, if a client hired you to assess            09:32
4     GMP compliance.                                        09:32
5     A.    Okay.  In general.                               09:32
6     Q.    Yes.                                             09:32
7     A.    Uh-huh.                                          09:32
8     Q.    And said I'm not going to -- I want you          09:32
9     to do it without looking at production records,        09:32
10    would you do that?                                     09:32
11    A.    If it was to be a comprehensive review           09:32
12    of compliance with the GMPs using a quality            09:32
13    systems based approach, we would inform the client     09:32
14    that unless we had access to those records, that       09:32
15    they wouldn't be getting what they were asking         09:33
16    for.                                                   09:33
17    Q.    So they wouldn't be getting a                    09:33
18    comprehensive, accurate assessment of GMP              09:33
19    compliance?                                            09:33
20    A.    Any my opinion, if they did not give             09:33
21    open access to the records, yes.                       09:33
22    Q.    To the production records.  That's the           09:33
23    records I was talking about.                           09:33
24    A.    Well, specifically -- it depends what            09:33
25    the client wants; okay?  If the client wants the       09:33

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 301

1   whole thing, then access to production records          09:33

2   would probably be something you would want to have      09:33

3   access to.                                              09:33

4       Q.   And I want -- I guess I want to make           09:33

5   sure this is clear because I was talking about          09:33

6   production records.                                     09:33

7       A.   Okay.  I misunderstood you.                    09:33

8       Q.   I said it -- I thought I said it pretty        09:33

9   clearly.                                                09:33

10      A.   Sorry.                                         09:33

11      Q.   If a client hired you to assess its            09:33

12  general GMP compliance.                                 09:33

13      A.   Right.                                         09:33

14      Q.   And said, I don't want to give you -- I,       09:33

15  client, don't want to give you access to the            09:33

16  production records, you can do it from other            09:33

17  records, could you properly do that?                    09:33

18      A.   If it was a -- included an assessment of       09:33

19  the production system?                                  09:33

20      Q.   Yes.                                           09:33

21      A.   No, you couldn't.                              09:34

22      Q.   Couldn't do it?                                09:34

23      A.   In my opinion, no.                             09:34

24      Q.   Okay.  In your work experience, have you       09:34

25  ever worked in manufacturing?                           09:34

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 302

1      A.    On the floor in manufacturing?              09:34

2      Q.    Yes.                                        09:34

3      A.    During product development, yes.            09:34

4      Q.    What did you do?                            09:34

5      A.    Helped troubleshoot a fluid bed dryer.      09:34

6      Q.    Tell me more about that.                    09:34

7      A.    I was, had one of my individuals at the     09:34

8   Somerset facility.  He was working with a Glatt,     09:34

9   G-L-A-T-T.  It's a fluid bed coater if you will.     09:34

10  And he was having a lot of problems with it and      09:34

11  everything else and asked me if I would come in      09:35

12  and watch him go through the process and if I        09:35

13  could offer any suggestions on how to correct it.    09:35

14     Q.    Okay.  Have you ever actually -- other      09:35

15  than a support functionality as, you know, since     09:35

16  it's troubleshooting like that --                    09:35

17     A.    Uh-huh.                                     09:35

18     Q.    -- have you ever actually had daily         09:35

19  responsibilities in the manufacturing context?       09:35

20     A.    No.                                         09:35

21     Q.    In a packaging context?                     09:35

22     A.    As in a production environment package?     09:35

23     Q.    Yes.                                        09:35

24     A.    No.                                         09:35

25     Q.    In a QA context.  Have you ever been        09:35

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 303

1    directly in the QA operation or functionality?          09:35

2        A.    As we defined it for QA?                       09:35

3        Q.    Yes.                                            09:35

4        A.    Separate oversight?                             09:35

5        Q.    Yeah.                                           09:35

6        A.    No.                                             09:35

7        Q.    Do you have a copy of your report,             09:36

8    Dr. Bliesner?                                            09:36

9        A.    I do.                                           09:36

10       Q.    All right.  Why don't you get it in            09:36

11   front of you --                                          09:36

12       A.    Okay.                                           09:36

13       Q.    -- please.  And, Mike, this is Exhibit         09:36

14   92.  I believe is the version we were looking at         09:36

15   last time.                                               09:36

16       A.    Now, this is my personal version so I          09:36

17   don't have a copy of the 92 that you're working          09:36

18   off of.                                                  09:36

19       Q.    Well, let's make sure, then.                   09:36

20       A.    I know there was a couple of page              09:36

21   discrepancies before.                                    09:36

22       Q.    I understand.  So we're going to hand          09:36

23   you a copy of Exhibit 92.                                09:36

24       A.    Okay.                                          09:36

25       Q.    Turn to page -- well, what is my page.         09:36

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 304

1     A.    It's 92.  We should be okay now.                    09:37

2     Q.    Okay.  Fair enough.  Yeah, these should            09:37

3   be the same actually.                                       09:37

4     A.    Yes.                                                09:37

5     Q.    So.                                                 09:37

6     A.    It was just there was two different               09:37

7   exhibits before and they were a page off because          09:37

8   of formatting or something like that.                      09:37

9     Q.    Okay.                                               09:37

10     A.    With respect to my format.                         09:37

11     Q.    So turn to page 21.                                09:37

12     A.    Okay.                                              09:37

13     Q.    And paragraph number 8 on page 21 which           09:37

14   has the heading "conclusions."                             09:37

15     Do you see that?                                         09:37

16     A.    Yes.                                               09:37

17     Q.    And in that paragraph, you issue, I              09:37

18   guess, your opinion in this case; is that                 09:37

19   accurate?                                                  09:37

20     A.    It is my opinion based on the documents          09:37

21   I reviewed.                                                09:37

22     Q.    Okay.  And your opinion is that                    09:37

23   adulterated drug product made it to the                    09:38

24   marketplace.                                               09:38

25     Is that a fair characterization of your                 09:38

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                        Page 305

1    opinion?                                          09:38

2        A.   We know it did because the pharmacist    09:38

3    found product that was double-thick.              09:38

4        Q.   Well, when you give that response, are   09:38

5    you talking about the 2004 circumstances where a  09:38

6    pharmacist reported a double-thick tablet?        09:38

7        A.   I'd have to go back through and take a    09:38

8    look.                                             09:38

9        Q.   Please do.                               09:38

10       A.   Do you have a sticky by chance?          09:40

11       Q.   Yes.  I don't but?                        09:40

12            MS. DREWES:  I do.                        09:40

13            THE WITNESS:  Can I have?                 09:40

14            MS. DREWES:  Sure.                        09:40

15            THE WITNESS:  Bunches of them, please.    09:40

16            MS. DREWES:  Here.                        09:40

17            THE WITNESS:  Just to make sure.  Else    09:40

18       you know me, I'll be writing all over this    09:40

19       thing.                                         09:40

20   BY MR. ANDERTON:                                   09:46

21       Q.   Dr. Bliesner, are you re-reading your    09:46

22   report?                                           09:46

23       A.   No, I'm just being careful, make sure    09:46

24   that I pull out the information that you wanted.   09:46

25       Q.   Well, I asked you what you were          09:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 306

1    referring to when you said "we know."                        09:46
2        A.    Uh-huh.                                             09:46
3        Q.    "Product made it to market."                       09:46
4        A.    Uh-huh.  And you asked me to identify               09:46
5    all those circumstances in the report so that's              09:46
6    what I'm doing.  Would you like me to stop?                  09:46
7        Q.    Well, how many do you think there are?             09:46
8        A.    I'm going to finish reviewing the report           09:46
9    and then I'll tell you.                                      09:46
10       Q.    Answer my question.  How many do you               09:46
11   think there are?                                             09:46
12       A.    I'm not going to say off the top of my             09:46
13   head.                                                        09:46
14       Q.    Did you -- did you prepare for this                09:46
15   deposition, Dr. Bliesner?                                    09:46
16       A.    Today?                                             09:46
17       Q.    Yes.                                               09:46
18           MR. KERENSKY:  Mike, that's an                       09:46
19   unnecessary question.  You don't have to                     09:46
20   answer that, Mr. Bliesner.                                   09:46
21           MR. ANDERTON:  Are you instructing him               09:46
22   not to answer that, Mike?                                    09:46
23           MR. KERENSKY:  He's not because that's an            09:46
24   unprofessional question.                                     09:46
25           MR. ANDERTON:  Are you instructing him               09:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 307

1    not to answer?                                      09:46

2         MR. KERENSKY:  Yes.  What you're doing --      09:46

3         MR. ANDERTON:  On what basis?                  09:46

4         MR. KERENSKY:  Change the question, Mike.      09:46

5         MR. ANDERTON:  On what basis are you           09:47

6    instructing him not to answer?                      09:47

7         MR. KERENSKY:  Because it's harassing.         09:47

8         MR. ANDERTON:  I'm not harassing him.          09:47

9    I'm asking him -- I'm going to get into this        09:47

10   line of questioning whether at this moment or       09:47

11   some other time.  I'm allowed to inquire what       09:47

12   he did to prepare.                                  09:47

13        MR. KERENSKY:  All right.  Maybe a later       09:47

14   time when you're actually asking those              09:47

15   questions we'll answer that question.               09:47

16        MR. ANDERTON:  No, Mike, you cannot            09:47

17   instruct a witness not to answer because you        09:47

18   don't like the timing of the question.              09:47

19        MR. KERENSKY:  Yes, I can.                     09:47

20        MR. ANDERTON:  No, you cannot.                 09:47

21        MR. KERENSKY:  Let him finish answering        09:47

22   the question you've asked.                          09:47

23        MR. ANDERTON:  I'm asking a different          09:47

24   question now.  Dr. Bliesner --                      09:47

25        THE WITNESS:  Can I get some water?            09:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 308

1          MR. ANDERTON:  Yes, you may get some          09:47

2      water.  Let's go off the record for a moment.     09:47

3          THE VIDEOGRAPHER:  The time is 9:47 a.m.       09:47

4      We're going off the record briefly.               09:47

5              (Short break)                              09:48

6          THE VIDEOGRAPHER:  The name is 9:48 a.m.       09:48

7      We are back on the record.                         09:48

8  BY MR. ANDERTON:                                       09:48

9      Q.   Dr. Bliesner, I'm going to let you           09:48

10  continue your review, but I'm going to briefly ask   09:48

11  you a few questions.                                  09:48

12     Did you prepare for this deposition today?        09:48

13     A.    Some.                                        09:48

14     Q.    What did you do to prepare?                  09:48

15     A.    At Mike's suggestion I took all of the      09:48

16  boxes and stuff that were disorganized from the      09:48

17  last deposition -- but I did nothing with them --    09:48

18  and put them in order.                               09:48

19     Q.    Did you do anything else besides            09:48

20  organize your boxes?                                  09:48

21     A.    Reviewed the report.                         09:48

22     Q.    You did review the report?                   09:48

23     A.    Uh-huh.                                       09:49

24     Q.    When did you do that?                         09:49

25     A.    This morning.                                09:49

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 309

1    Q.    This morning?                                    09:49

2    A.    Uh-huh.                                          09:49

3    Q.    When you got here at 7:30 or so?                 09:49

4    A.    Uh-huh.                                          09:49

5    Q.    What time did you get up to review your          09:49

6  report this morning?                                    09:49

7    A.    I woke up at 3:30 this morning.                  09:49

8    Q.    Do you typically wake up at 3:30?                09:49

9    A.    Unfortunately I have to say this, but            09:49

10  yes, I do.                                             09:49

11   Q.    It is unfortunate.                               09:49

12   A.    Middle age.                                      09:49

13   Q.    Did you -- did you review the entire             09:49

14  report this morning?                                   09:49

15   A.    No.                                              09:49

16   Q.    Well, what parts of it did you review            09:49

17  and what the purpose of your reviewing the report      09:49

18  this morning, what were you looking for?               09:49

19   A.    Just glancing through, familiarize              09:49

20  myself with some of the attachments.                   09:49

21   Q.    Before organizing -- other than                 09:49

22  organizing your boxes and reading your report this     09:49

23  morning, what else did you do to prepare for this      09:49

24  deposition today?                                      09:49

25   A.    Preparation, that was it.  I didn't do           09:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 310

1    much at all.                                                09:50

2        Q.    Didn't do much at all.  Did you meet             09:50

3    with any of the lawyers for the Plaintiffs in this         09:50

4    litigation Mr. Kerensky, Miss Johnson, any of              09:50

5    those lawyers?                                             09:50

6        A.    When you say "meet."                             09:50

7        Q.    Did you meet with them in person?                09:50

8        A.    No.                                              09:50

9        Q.    Did you speak to them on the telephone?          09:50

10       A.    I spoke with them but it didn't have             09:50

11   much to do with prep.                                      09:50

12       Q.    Did you speak to them on the telephone?          09:50

13       A.    I did speak with Miss Johnson.                   09:50

14       Q.    Miss Johnson?                                    09:50

15       A.    Yeah, briefly, and confirmed with               09:50

16   Mike -- I can never pronounce.                             09:50

17       Q.    Kerensky.                                        09:50

18       A.    Kerensky, yeah.                                  09:50

19           MR. ANDERTON:  I got your back, Mike.              09:50

20           MR. KERENSKY:  Got it.                             09:50

21   BY MR. ANDERTON:                                           09:50

22       Q.    You spoke with Miss Johnson how many            09:50

23   times?                                                     09:50

24       A.    Once.                                            09:50

25       Q.    How long did that conversation last?            09:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 311

1      A.    About a minute and a half.                    09:51

2      Q.    That was -- that was since January 25th,       09:51

3  between January 25th and today?                          09:51

4      A.    No.  You asked yesterday in preparation         09:51

5  for this.                                                 09:51

6      Q.    No, I said before this deposition.  I          09:51

7  was not limiting my question to yesterday.               09:51

8      A.    Okay.  Before this deposition?                  09:51

9      Q.    Yeah.  So let's break this down, okay,          09:51

10  Dr. Bliesner.                                            09:51

11      A.    Uh-huh.                                         09:51

12      Q.    I need you to listen very carefully,           09:51

13  please.                                                   09:51

14      A.    Right.  I am.                                   09:51

15      Q.    Since you were -- since we began this         09:51

16  deposition and opened the record on January 25th         09:51

17  and up to today --                                        09:51

18      A.    Okay.                                           09:51

19      Q.    -- what did you do -- what have you done       09:51

20  to prepare for today's session?                          09:51

21      A.    What I said already.  I organized my          09:51

22  papers and I reviewed the report.  Preparation, if       09:51

23  that's what you want to call it, for the -- with          09:51

24  Miss Johnson and Mr. Kerensky was just a matter of        09:51

25  just show up and your organize your papers.  I           09:51

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 312

1    don't think you need to do much else.  And you          09:51

2    just do what you did last time.                         09:52

3        Miss Johnson didn't provide any guidance            09:52

4    whatsoever.  She was in the process of looking up        09:52

5    some additional documentation, but I never looked        09:52

6    at it.                                                   09:52

7        Q.    How many times have you -- did you speak       09:52

8    with Miss Johnson between January 25th and today?        09:52

9        A.    Specifically a number, I don't know.          09:52

10       Q.    More than once?                                09:52

11       A.    Once, maybe.                                   09:52

12       Q.    Twice?                                         09:52

13       A.    Maybe.  I don't think it was more than         09:52

14   two.                                                     09:52

15       Q.    Did you speak to her?                          09:52

16       A.    Yesterday, yes, for sure.                      09:52

17       Q.    Any time before yesterday and since            09:52

18   January 25th?                                            09:52

19       A.    I don't recall.                                09:52

20       Q.    How about Mr. Kerensky?  Did you speak         09:52

21   to him between January 25th and today?                   09:52

22       A.    Well, yesterday, coordinated to get           09:52

23   here.                                                    09:52

24       Q.    Other than yesterday, have you spoken to       09:52

25   Mr. Kerensky since January 25th?                         09:52

Page 313

| | | | |
|---|---|---|---|
| 1 | A. | Perhaps once. | 09:52 |
| 2 | Q. | When? | 09:53 |
| 3 | A. | I don't recall specifically. | 09:53 |
| 4 | Q. | Was that a telephone conversation? | 09:53 |
| 5 | A. | I -- I don't recall specifically.  It | 09:53 |

6    was not what you would consider prep.  It was just        09:53

7    coordination.                                              09:53

8        Q.    Dr. Bliesner, you need to answer my              09:53

9    questions.                                                 09:53

10       A.    Uh-huh.  I'm answering your questions.           09:53

11       Q.    No, you're not.  I asked you if you              09:53

12   spoke to Mr. Kerensky.  I didn't ask you to               09:53

13   characterize the phone call yet.                           09:53

14       Have you spoken to Mr. Kerensky since January         09:53

15   25th?                                                      09:53

16       A.    Yes.                                             09:53

17       Q.    Was it a telephone conversation?                09:53

18       A.    Yes.                                             09:53

19       Q.    Have you met with Mr. Kerensky in person        09:53

20   since January 25th?                                        09:53

21       A.    No.                                              09:53

22       Q.    I mean we're only talking about three           09:53

23   weeks.                                                     09:53

24       A.    Yeah, I didn't.                                  09:53

25       Q.    Okay.                                            09:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 314

1      A.    I know this was prep per se.  It's not          09:53

2    like we sat down and spent hours going back and        09:53

3    forth and discussing how I'm supposed to respond       09:53

4    to your questions or anything like that.  It was       09:54

5    just like are we on?  Just organize your paper.        09:54

6    That stuff.  Nothing detailed.                          09:54

7      Q.    So you didn't have any discussion with          09:54

8    Mr. Kerensky since January 25th about what             09:54

9    happened on January 25th and what you might expect     09:54

10    to happen during this session?                         09:54

11      A.    Between January 25th and this morning?        09:54

12      Q.    Yes.                                            09:54

13      A.    Interestingly enough, I don't think I          09:54

14    heard anything from him following the whole thing.     09:54

15      Q.    Well, how many times did you speak to          09:54

16    him?                                                    09:54

17      A.    I said yesterday I know for sure.  Maybe       09:54

18    one other time to coordinate the schedule and that    09:54

19    was it.                                                 09:54

20      Q.    Well, he told you to organize your             09:54

21    papers.  That's not coordinating the schedule, is     09:54

22    it?                                                     09:54

23      A.    It's -- it's what he told me to do.  He        09:54

24    says don't worry necessarily about preps, words to    09:54

25    that effect.  Just organize your papers so you        09:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 315

1   don't flounder around and waste people's time.          09:54

2       Q.    And how long was your conversation with       09:55

3   Mr. Kerensky?                                            09:55

4       A.    That particular one?                           09:55

5       Q.    Yeah.                                          09:55

6       A.    Maybe a minute or two.                         09:55

7       Q.    Were there other conversations before         09:55

8   yesterday and since January 25th besides that           09:55

9   minute or two conversation?                              09:55

10      A.    There may have been one other, but it          09:55

11  was nothing extensive.                                   09:55

12      Q.    How long was it?                               09:55

13      A.    If there was one, is was e-mail or             09:55

14  whatever.  Similar thing.  Maybe a minute and a          09:55

15  half.                                                    09:55

16      Q.    Well, was it a conversation or was it          09:55

17  e-mail communication.  Because I haven't asked           09:55

18  about e-mails communications.  I asked you about         09:55

19  conversations.                                           09:55

20      A.    I don't know.  I'd have to go pull them        09:55

21  out and look at them.  All I know is none of these       09:55

22  conversations were substantive in terms of              09:55

23  guidance or anything like that.                          09:55

24      Q.    Dr. Bliesner, I am entitled to find out        09:55

25  how many there were, then we'll talk about the           09:55

Page 316

1    substance of them; okay?                              09:55

2        A.    I cannot tell you with certainty how        09:55

3    many telephone conversations or e-mails I had with    09:55

4    them.  I know that it was not a large number.         09:55

5        Q.    Okay.  So you know that it was more than     09:56

6    one, though; correct?                                 09:56

7        A.    I can't say that with certainty.  I          09:56

8    really don't.  My life is busy.  I'm working 70,      09:56

9    80 hours a week on another consulting job.  This      09:56

10   is minor in terms of coordination, get things         09:56

11   done.  I don't know.  I can't say it explicitly.      09:56

12   I'm not going to make stuff up to make you happy.     09:56

13       Q.    I'm not asking you to make me happy.         09:56

14   I'm merely asking you to answer my questions          09:56

15   truthfully.                                           09:56

16       As we said earlier, you're a very intelligent     09:56

17   man and we're only talking about a three-week         09:56

18   period here.                                          09:56

19            MR. KERENSKY:  I think I need a break.        09:56

20            MR. ANDERTON:  Why do you need a break?       09:56

21            MR. KERENSKY:  I have to go to the            09:56

22       bathroom.                                         09:56

23            MR. ANDERTON:  All right.  All right.         09:56

24       Let's go off the record.                          09:56

25            THE VIDEOGRAPHER:  The time is                09:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 317

1       9:56 p.m. -- we're going -- or a.m.  We're          09:56

2       going off the record.                               09:56

3                   (Short break)                            10:08

4           THE VIDEOGRAPHER:  The time is     .  We         10:08

5       are back on the record.  This is the beginning      10:08

6       of tape three.                                       10:08

7           MR. ANDERTON:  Mike, are you with us?            10:09

8           MR. KERENSKY:  I am.                             10:09

9   BY MR. ANDERTON:                                         10:09

10      Q.    All right.  Dr. Bliesner, before              10:09

11  Mr. Kerensky's break or requested break, we were        10:09

12  discussing what you've done to prepare for today's      10:09

13  session and I just want to remind you of something      10:09

14  we agreed earlier in the day and that is that you       10:09

15  would focus very hard on the questions that I ask       10:09

16  and do your best to actually answer those               10:09

17  questions.                                              10:09

18      A.    I understand.                                 10:09

19      Q.    Okay.  So I'm going to go back into some      10:09

20  of that subject.                                        10:09

21      A.    Okay.                                         10:09

22      Q.    How many times have you spoken to            10:09

23  Mr. Kerensky on the telephone since January 25th?       10:09

24      A.    I really honestly don't know.                10:09

25      Q.    Is it more than just yesterday?              10:09

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 318

1      A.    I really honestly don't know.                    10:09

2      Q.    Dr. Bliesner, we're talking about a              10:09

3  three-week period and you're -- as I've said --           10:09

4  obviously a very intelligent, very organized              10:10

5  individual.  Prepared a very extensive report in          10:10

6  this case, reviewed thousands of pages of                 10:10

7  documents.  I'm merely asking you how many times          10:10

8  you've spoken on the telephone to Mr. Kerensky in         10:10

9  the last three weeks.                                     10:10

10     A.    I honestly cannot tell you for sure.            10:10

11     Q.    Have you spoken to any lawyers other            10:10

12  than Mr. Kerensky and Ms Johnson in the last three       10:10

13  weeks?                                                    10:10

14     A.    Yes.                                            10:10

15     Q.    Who?                                            10:10

16     A.    A gentleman out of Oklahoma.                    10:10

17     Q.    Brad Miller?                                    10:10

18     A.    Yes.                                            10:10

19     Q.    When did you speak to Brad Miller?              10:10

20     A.    Yesterday.                                      10:10

21     Q.    What prompted that phone conversation           10:10

22  with Mr. Miller?                                          10:10

23     A.    Apparently he had the opportunity to            10:10

24  review my report.                                         10:10

25     Q.    And tell me about that conversation with        10:10

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 319

1    Mr. Miller.                                                10:10

2        A.    He was just curious of -- my involvement         10:11

3    in the -- in this case.                                    10:11

4        Q.    How long did the phone conversation last         10:11

5    with Mr. Miller, yesterday?                                10:11

6        A.    Maybe a half an hour.                            10:11

7        Q.    So what did you discuss with Mr. Miller          10:11

8    during that 30-minute or so phone conversation?           10:11

9        A.    What I did for a living primarily.               10:11

10       Q.    Yeah.                                            10:11

11       A.    And a few things about the report.               10:11

12       Q.    Such as?   Mike?  Mike?  Mike?                   10:11

13           MR. KERENSKY:  Yes, sorry, sorry, sorry.           10:11

14   BY MR. ANDERTON:                                           10:12

15       Q.    A few things about the report,                   10:12

16   Dr. Bliesner.  Such as what?                               10:12

17       A.    The conclusions that were in there.              10:12

18   That was it primarily.                                     10:12

19       Q.    Well tell me about that discussion with          10:12

20   Mr. Miller about the conclusions that were in              10:12

21   there.                                                     10:12

22       A.    Just what's written in the report.  My          10:12

23   conclusions with respect to compliance and those          10:12

24   kinds of things.  It wasn't a very specific                10:12

25   discussion.  It was more about my work background,        10:12

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 320

1    what I'd done, what I do now, things like that.          10:12

2        Q.    Well, I want to know what you discussed       10:12

3    with him with respect to the conclusion in your         10:12

4    report.  Tell me about that conversation.  It was       10:12

5    just yesterday.                                          10:12

6        A.    Yes.                                           10:12

7        Q.    So tell me about that conversation.           10:12

8        A.    Basically said you have the report, the       10:12

9    conclusions that I have come to in the report are       10:12

10   supported by the documents that are in the              10:12

11   attachment.  That's how I did the review.               10:12

12       Q.    What kind of questions did Mr. Miller         10:12

13   ask you with respect to the conclusions in your         10:12

14   report yesterday?                                        10:12

15       A.    I think he asked me if I reviewed any         10:13

16   additional documents since I wrote the report.          10:13

17       Q.    What did you tell him?                         10:13

18       A.    I said additional documents, no.  It was      10:13

19   just like I told you.  I just prepared for this         10:13

20   and then organized them, so...                          10:13

21       Q.    Well, you didn't tell me that you             10:13

22   prepared for this.                                       10:13

23       A.    Well, what I did to get ready for this        10:13

24   was organize my mass of documents after the last        10:13

25   thing so I wouldn't waste time.                          10:13

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                    Page 321

1       Q.    Okay.  And so he asked you what          10:13

2    additional documents or whether you had reviewed   10:13

3    any additional documents.  You told Mr. Miller you 10:13

4    had not reviewed any additional documents since    10:13

5    you wrote the report?                               10:13

6       A.    I'm pretty sure that's what I told him.   10:13

7       Q.    Well, let me ask you --                    10:13

8       A.    Uh-huh.                                    10:13

9       Q.    -- have you reviewed any additional       10:13

10   documents since you wrote the report?              10:14

11      A.    Other than what was already present --    10:14

12   what I did the last time, no, I have not.          10:14

13      Q.    What do you mean by other than what you   10:14

14   did the last time.                                 10:14

15      A.    This stuff.  All of these documents that  10:14

16   are in here.                                       10:14

17      Q.    The documents that are in there -- and    10:14

18   so that we're clear, Dr. Bliesner, you're pointing 10:14

19   to boxes that you brought with you; correct?       10:14

20      A.    Uh-huh.                                    10:14

21      Q.    Those are documents you had reviewed as   10:14

22   you wrote the report or as you were in the process 10:14

23   of writing the report; is that correct?            10:14

24      A.    Yes.  The supporting data for this.       10:14

25      Q.    "The supporting data for this" meaning    10:14

Page 322

1   your report?                                              10:14

2       A.    Yes.                                            10:14

3       Q.    Are the documents in these boxes that           10:14

4   you read and reviewed after you wrote and                 10:14

5   submitted the report -- the date of your report is        10:14

6   June 15, 2010.                                            10:14

7       A.    This would be the only one.  This is the        10:14

8   deposition.                                               10:14

9       Q.    Of?                                             10:14

10      A.    Of last time we met.  It was sent to me,        10:14

11  but I need to review.  I haven't gotten all the           10:15

12  way through it.                                           10:15

13      Q.    So the transcript of January 25th?              10:15

14      A.    Yes.                                            10:15

15      Q.    Your deposition proceedings?                    10:15

16      A.    Yes.                                            10:15

17      Q.    Is that the only document that you have         10:15

18  reviewed that relates to this litigation and to           10:15

19  your report since you wrote the report?                   10:15

20      A.    No.  Because you also asked me to get           10:15

21  what my hourly rate was and the billing records.          10:15

22      Q.    Okay.                                           10:15

23      A.    So those are the things.                        10:15

24      Q.    Other than your billing records and the         10:15

25  transcript of the January 25th session, are there         10:15

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 323

1    any other documents that you've reviewed that          10:15

2    relate to this litigation and to the report issued     10:15

3    in this litigation since June 15, 2010?                10:15

4         A.    Since June 15th?                            10:15

5         Q.    Since you submitted your report.            10:15

6         A.    Uh-huh.  I can't recall if there were       10:15

7    any specific additional documents.  I don't            10:16

8    believe there were.  Because when the report was       10:16

9    done, I was pretty much checked out and                10:16

10   concentrating on a current client.                     10:16

11        Q.    When Mr. Miller asked you that question      10:16

12   yesterday, is that what you told him as well, that     10:16

13   you can't recall?                                      10:16

14        A.    He didn't explicitly ask the question       10:16

15   like you did.                                          10:16

16        Q.    What did he ask?                            10:16

17        A.    He said have you reviewed any additional     10:16

18   documentation.                                         10:16

19        Q.    And what did you say?                       10:16

20        A.    I said not that I remember.                 10:16

21        Q.    What else did Mr. Miller ask you?           10:16

22        A.    That was about it.                          10:16

23        Q.    Well, it was a 30-minute conversation,      10:16

24   Dr. Bliesner.  And it doesn't take 30 minutes to       10:16

25   ask you if you reviewed additional documents and       10:16

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 324

1    to talk about the background of the work that you          10:16

2    do.  So what else did Mr. Miller ask you yesterday         10:16

3    when you spoke with him?                                   10:16

4        A.    We talked about -- just to get                   10:16

5    acquainted, talked about my other two companies.           10:16

6        Q.    Did you talk about your deposition               10:17

7    today?                                                     10:17

8        A.    I did mention to him that I went through         10:17

9    it.                                                        10:17

10       Q.    That you were?                                   10:17

11       A.    Today's?                                         10:17

12       Q.    Yes.                                             10:17

13       A.    No, no.  But the one before, yeah.               10:17

14       Q.    Did you talk about your January 25th             10:17

15   session with him?                                          10:17

16       A.    A little, yes.                                   10:17

17       Q.    What did you talk about with him with            10:17

18   respect to the January 25th deposition session?           10:17

19       A.    How difficult it was because I've never         10:17

20   done anything like this before.                            10:17

21       Q.    Why do you think it's difficult?                 10:17

22       A.    It's just a different way of doing              10:17

23   business than anything I've ever seen before.             10:17

24       Q.    In what way?                                     10:17

25       A.    That's a good question.                          10:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 325

1      Q.    Every so often I try to come up with a          10:17
2   good one.                                                 10:17
3      A.    I'm used to collaborative conversations          10:17
4   not combative conversations.                              10:17
5      Q.    I don't intend for this to be a                  10:18
6   combative conversation.  Do you intend for this to        10:18
7   be a combative conversation?                              10:18
8      A.    Absolutely not.                                  10:18
9      Q.    Do you think this is a combative                 10:18
10  conversation?                                             10:18
11     A.    It's not fun.  I can tell you that.              10:18
12     Q.    Well, just because it's not fun doesn't          10:18
13  mean it's combative, does it?                             10:18
14     A.    I suppose not.                                   10:18
15     Q.    Do you think this is a combative                 10:18
16  conversation or a combative process?                      10:18
17         MR. KERENSKY:  I think you can be that            10:18
18      way, Mike.  But let's try and ask some real           10:18
19      questions about the case.                             10:18
20  BY MR. ANDERTON:                                          10:18
21     Q.    I'm waiting for an answer, Dr. Bliesner.         10:18
22     A.    I don't know if combative is the right          10:18
23  word for it, but it's not the give and take,              10:18
24  casual problem-solving in an open environment that        10:18
25  I'm used to in my workplaces.                             10:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 326

1       Q.    And were you told to make it so when you          10:19

2    prepared for your first deposition session?               10:19

3       A.    Told what, sir?                                   10:19

4       Q.    Well, I'm going to hand you -- and I              10:19

5    don't have a stapler so this isn't stapled.               10:19

6       A.    Uh-huh.                                           10:19

7       Q.    We marked this last time as --                   10:19

8       A.    Yes.                                              10:19

9       Q.    -- Exhibit 109.                                  10:19

10      A.    Yes.                                              10:19

11      Q.    Do you see that, Dr. Bliesner?                   10:19

12      A.    I do.                                             10:19

13      Q.    Tell me what it is.  Mike.  Typing.              10:19

14           MR. KERENSKY:  I'm sorry.                         10:19

15           THE WITNESS:  This is my notes of 25             10:19

16      January.  Yeah, outlines a condensation of             10:19

17      points that are listed in the report, some             10:19

18      scratching with respect to calculation that we         10:20

19      were talking about.                                    10:20

20   BY MR. ANDERTON:                                          10:20

21      Q.    And you actually made the body notes on          10:20

22   page 1 during your last deposition; right?                10:20

23      A.    Bottom one, yes, yes.  Yeah, that was            10:20

24   the thickness discussion if I recall properly.            10:20

25      Q.    All right.                                       10:20

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised              February 18, 2011

                                                    Page 327

1      A.    Uh-huh.                                        10:20

2      Q.    So, let's go to page 2.                        10:20

3      A.    Okay.                                          10:20

4      Q.    What are those?                                10:20

5      A.    Guidance from Mr. Kerensky on how things       10:20

6  would go generally in a deposition because I've          10:20

7  never been in one like this, so...                       10:20

8      Q.    These are notes that you made --               10:20

9      A.    Uh-huh.                                        10:20

10     Q.    -- of a conversation?  You have to             10:20

11 answer yes or no, Doctor.                                 10:20

12     A.    Oh, I'm sorry.  Yes.                           10:20

13     Q.    Of a conversation you had with                 10:20

14 Mr. Kerensky?                                             10:20

15     A.    And Mr. Miller and the other gentleman         10:20

16 that was with them, the other attorney.                   10:20

17     Q.    Mr. Thompson, Fred Thompson?                   10:20

18     A.    No, no, no.  This was the day before           10:20

19 the --                                                    10:21

20         MR. KERENSKY:  I think it was Terry              10:21

21     Kilpatrick.                                           10:21

22         MR. ANDERTON:  Terry Kilpatrick?                 10:21

23         THE WITNESS:  Yeah.                              10:21

24         MR. KERENSKY:  Meghan was there, too.           10:21

25         THE WITNESS:  Meghan, yeah, was there           10:21

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 328

1      too.                                          10:21

2    BY MR. ANDERTON:                                10:21

3      Q.    So there were four lawyers there:       10:21

4    Mr. Kerensky, Mr. Miller, Ms Johnson, and       10:21

5    Mr. Kilpatrick.                                 10:21

6      A.    Yes.                                     10:21

7      Q.    Who told you to answer questions as     10:21

8    briefly as possible, to give no more or no less 10:21

9    than is needed?                                 10:21

10     A.    I believe that they -- all of the people 10:21

11   in that room gave that guidance if I recall.    10:21

12     Q.    One of your notes here says, "saying no  10:21

13   closes the door."  What does that mean?  Well,  10:21

14   what does it mean?                               10:21

15     A.    If there is additional information that  10:21

16   needs to come out that would clarify the        10:21

17   situation, you can just go no.  Then you're not 10:21

18   going to have that conversation again.  So -- as I 10:21

19   understood the guidance.                         10:22

20     Q.    Who -- well, whose term is "closes the   10:22

21   door."  Who said that to you?                    10:22

22     A.    I don't know which one specifically.     10:22

23   This is a whole new process for me at this stage 10:22

24   of the game so I was just listening.             10:22

25     Q.    What does it mean, "keep doors open."    10:22

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 329

1    What does that mean?                                    10:22

2        A.    If there's line of questions that would      10:22

3    add clarification to the conversation, I want to        10:22

4    make sure that they stay open.  Just saying no, it      10:22

5    stops conversation potentially in the future.           10:22

6        Q.    And your notes say "yes, but" and what I      10:22

7    will call ellipses and "no, but" with another          10:22

8    ellipses.  What do those notes mean?                    10:22

9        A.    Those are with respect to, for instance,     10:22

10   if you would ask a question that was very narrow        10:22

11   that didn't necessarily include the additional         10:22

12   information that I felt would be appropriate to         10:22

13   explain the situation, "but" let's me continue on       10:22

14   to give the additional information to clarify the       10:22

15   point.                                                  10:23

16       Q.    So you don't believe in answering --          10:23

17   they told you not to answer a narrowly crafted          10:23

18   question with a narrow answer; is that right?           10:23

19       A.    I don't think I got that specific            10:23

20   guidance.                                               10:23

21       Q.    Well, I was merely following up on your      10:23

22   response a moment ago, Dr. Bliesner.                    10:23

23       These notes are from a meeting that occurred        10:23

24   when?                                                   10:23

25       A.    That was the day before we had the first     10:23

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 330

1    deposition.                                          10:23

2        Q.    So January 24th.                           10:23

3        A.    I believe that was the date, yes.          10:23

4        Q.    Did you meet with the lawyers for the      10:23

5    Plaintiffs in person to prepare for the January      10:23

6    25th deposition other than on January 24?            10:23

7        A.    To prepare for the deposition?             10:23

8        Q.    Yes.                                        10:23

9        A.    No.                                         10:23

10       Q.    Did you talk to them on the telephone,     10:23

11   any of them, to prepare for the deposition other     10:23

12   than on January 24th?                                10:24

13       A.    I can't recall specifically.               10:24

14       Q.    You don't remember whether you even had    10:24

15   a conversation with them?                            10:24

16       A.    No, I don't.  I have conversations with    10:24

17   people day in and day out and this is just one       10:24

18   small part of it.  I can't recall.                   10:24

19       Q.    Well, you had to make arrangements to      10:24

20   meet with them on the 24th; correct?                 10:24

21       A.    Yes.                                        10:24

22       Q.    So you had to have some communication.     10:24

23   Do you think that was by telephone?                  10:24

24       A.    Perhaps and perhaps e-mail.  I have to     10:24

25   go back and look at them.                            10:24

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 331

```
 1      Q.    Well, would you have those e-mails with      10:24
 2   you?                                                  10:24
 3      A.    I believe I gave all of those to Miss        10:24
 4   Johnson.  We copied them over off of an external      10:24
 5   hard drive and she has them.                          10:25
 6      Q.    She has them?                                10:25
 7      A.    Huh-huh.                                     10:25
 8      Q.    Do you have them?                            10:25
 9      A.    No.                                          10:25
10      Q.    Do you have the hard drive with you?         10:25
11      A.    Yes.                                         10:25
12      Q.    May I see it, please?                        10:25
13      A.    Sure.                                        10:25
14      Q.    Let's go back to your conversation           10:25
15   yesterday with Brad Miller.                           10:25
16      A.    Okay.                                        10:25
17      Q.    How did he come to have your contact         10:25
18   information, do you know?                             10:25
19      A.    I believe he said Pete Miller and he had     10:25
20   interacted.  I believe that's what he said.           10:25
21      Q.    Did -- did Mr. Miller -- Brad Miller,        10:25
22   since we now have two Millers -- did Brad Miller      10:25
23   yesterday -- did you and he discuss the               10:25
24   possibility of him retaining you as an expert in      10:26
25   his case?                                             10:26
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 332

1      A.    We did have that conversation.                    10:26

2      Q.    And tell me about that conversation.              10:26

3      A.    He asked me, you know, whether I was              10:26

4   interested potentially in doing it.                        10:26

5          MR. KERENSKY:  I need to interrupt for a            10:26

6      second.  We may be treading into a violation            10:26

7      of the consulting expert privilege.                     10:26

8          MR. ANDERTON:  Well, okay.                          10:26

9          MR. KERENSKY:  Because I don't know if              10:26

10     Brad hired him or not hired him.  At this               10:26

11     point, I think that would make him a                    10:26

12     consulting expert.  Since I'm here not for --           10:26

13     I'm here for Miss Vega, but I think the                 10:26

14     witness should be advised that conversations           10:26

15     prior to being retained by a Plaintiff's                10:26

16     lawyer are confidential and protected and               10:26

17     privileged under what we call the consulting            10:26

18     expert rule.  And until you're retained and             10:26

19     disclosed as a testifying expert, those                 10:26

20     conversations are privileged.  And I guess I            10:27

21     will assert that privilege on behalf of Mr. --          10:27

22     is it Miller, Brad Miller?                               10:27

23         THE WITNESS:  Yes.                                  10:27

24         MR. KERENSKY:  Okay.                                10:27

25         MR. ANDERTON:  Well, Mike, I'm not sure I           10:27

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 333

1      agree with your characterization of the              10:27

2      privilege and I hope that you're not making a        10:27

3      representation of Oklahoma law with respect to       10:27

4      expert privileges, are you?                          10:27

5          MR. KERENSKY:  Oh, I think it's in the           10:27

6      federal rules, consulting experts.                   10:27

7          MR. ANDERTON:  Well, you are aware               10:27

8      Mr. Kerensky of course that the case                 10:27

9      Mr. Miller is discussing with Dr. Bliesner --        10:27

10     with Dr. Bliesner is not a federal case;             10:27

11     right.                                               10:27

12         MR. KERENSKY:  Well, I'm guessing that           10:27

13     Oklahoma law probably has the same privileges        10:27

14     as every other state I've been in.  So no            10:28

15     doubt I'm guessing but I want to make sure           10:28

16     that I assert the privilege to the extent it         10:28

17     exists.  During the case I'm sure you've             10:28

18     updated yourself on the rules and know one way       10:28

19     or the other whether it exists.  And I just          10:28

20     think I owe it to him to assert it at this           10:28

21     time.                                                10:28

22         MR. ANDERTON:  Okay.                             10:28

23   BY MR. ANDERTON:                                       10:28

24     Q.   Have you been retained by Brad Miller?          10:28

25     A.   No.                                             10:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 334

1      Q.    Do you anticipate that you're going to          10:28

2    talk to him again?                                       10:28

3      A.    Perhaps.                                          10:28

4      Q.    Let's go back to what you did to                 10:28

5    prepare.                                                  10:29

6      The -- before January 25th, we know that you           10:29

7    met with Mr. Kerensky and several other folks to         10:29

8    prepare for the session the next day.  How long          10:29

9    did that meeting on January 24th last?                   10:29

10     A.    I think last time I said it was                  10:29

11   something in the neighborhood of four, five hours,       10:29

12   something like that.                                     10:29

13     Q.    Did you --                                        10:29

14     A.    That I recall.                                    10:29

15     Q.    I asked you a moment ago if you met with         10:29

16   any of those Plaintiffs' lawyers in person other         10:29

17   than on January 24th.  Your testimony was no, you        10:29

18   did not; correct?                                         10:29

19     A.    For preparation with the deposition.            10:29

20     Q.    You met with them in person as you               10:29

21   prepared your report?                                     10:29

22     A.    Yes, one time.                                    10:29

23     Q.    Where was that?                                   10:30

24     A.    In Indian Rocks Beach.                            10:30

25     Q.    They came to see you?                             10:30

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 335

| | | |
|---|---|---|
| 1 | A. Uh-huh. | 10:30 |
| 2 | Q. Yes or no? | 10:30 |
| 3 | A. They came to see me.  Yes.  Sorry. | 10:30 |
| 4 | Q. That's all right. | 10:30 |
| 5 | A. Sorry. | 10:30 |
| 6 | Q. I'm just trying to make sure that the. | 10:30 |
| 7 | A. Yes. | 10:30 |
| 8 | Q. Videographer and court reporter -- | 10:30 |
| 9 | A. It actually wasn't in preparation of | 10:30 |
| 10 | the -- well, it wasn't writing the report.  They | 10:30 |
| 11 | just delivered more documents to me. | 10:30 |
| 12 | Q. In person? | 10:30 |
| 13 | A. Uh-huh. | 10:30 |
| 14 | Q. That's awfully nice of them. | 10:30 |
| 15 | A. Uh-huh. | 10:30 |
| 16 | Q. Who did that? | 10:30 |
| 17 | A. Who was there? | 10:30 |
| 18 | Q. Yeah, who delivered the documents? | 10:30 |
| 19 | A. It was Pete Miller and Meghan Johnson | 10:30 |
| 20 | Carter. | 10:30 |
| 21 | Q. How long -- did you have a meeting with | 10:30 |
| 22 | them when they delivered more documents? | 10:30 |
| 23 | A. They actually came over to my home | 10:30 |
| 24 | office. | 10:30 |
| 25 | Q. So did you have a meeting with them? | 10:30 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 336

1      A.    If you'd call it a meeting, yes.          10:30

2      Q.    How long?                                  10:30

3      A.    I honestly have to go back and look it     10:30

4   up.                                                 10:30

5      Q.    Did you bring your billing and time        10:30

6   records with you?                                   10:30

7      A.    Yes, I did.                                10:30

8      Q.    May I see them?                            10:30

9      A.    Sure.                                      10:30

10      Q.    Phil, you want to mark those, please?     10:31

11   Let's call it 145 please.                          10:31

12      (Whereupon, Exhibit 145 was marked for          10:31

13   identification)                                    10:31

14      Dr. Bliesner, I'm looking at a document that    10:31

15   has been marked as Exhibit 145.                    10:31

16      A.    Uh-huh.                                   10:31

17      Q.    And it is a stack of invoices that you    10:31

18   just handed me; is that correct?                   10:31

19      A.    I guess it is.                            10:32

20      Q.    Is this all of the invoices that you      10:32

21   have submitted to Plaintiffs' counsel for your     10:32

22   services as an expert witness?  Dr. Bliesner, you  10:32

23   just handed -- I asked you if you had --           10:32

24      A.    Yes.                                      10:32

25      Q.    -- your billing records.                  10:32

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 337

1        A.    I don't do the billing so I don't know        10:32

2    if these are all of the invoices.  I was looking        10:32

3    for the last date on here.                              10:32

4        Q.    You were asked to bring them with you.        10:32

5        A.    Yes.                                          10:32

6        Q.    I just asked you if you brought them.         10:32

7    You said yes.                                           10:32

8        A.    Yes, sir.                                     10:32

9        Q.    In response I said may I see them and         10:32

10   you said yes.                                           10:32

11       A.    Yes.                                          10:32

12       Q.    And then you handed me a stack of             10:32

13   documents.                                              10:32

14       A.    Yes, sir.                                     10:32

15       Q.    Are you now looking at them as though         10:32

16   you're not sure whether you actually brought the        10:32

17   right records with you?  What are you doing?            10:32

18       A.    Well, you said "all records"; okay.           10:32

19       Q.    I said are they all of the invoices.          10:32

20       A.    All the invoices.  I Am not sure because      10:32

21   I prepared this stack immediately after the last        10:32

22   deposition at your request.  I'm not sure whether       10:32

23   that deposition invoice was included in this            10:33

24   stack.  See what I'm saying?                            10:33

25       Q.    Okay.                                         10:33

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 338

1      A.    That's all I'm trying to do.                    10:33

2      Q.    You were asked to bring them with you           10:33

3    today.  Did you not double check to make sure you       10:33

4    had all the records you were supposed to bring?         10:33

5      A.    I forwarded them via e-mail to                  10:33

6    Mr. Miller and Mr. -- Miss Johnson before.  So I        10:33

7    made the assumption that they forwarded them to         10:33

8    you.                                                    10:33

9      Q.    They did not.                                   10:33

10     A.    Okay                                            10:33

11     Q.    And you know that you were asked to             10:33

12   bring them with you today; right?                       10:33

13     A.    Yes, yes.                                        10:33

14     Q.    So --                                           10:33

15     A.    I brought a copy because I thought that         10:33

16   you got them all.                                       10:33

17     Q.    I have got nothing.                             10:33

18     A.    Okay.                                           10:33

19     Q.    From any of the lawyers and Plaintiffs.         10:33

20     A.    Okay.                                           10:33

21     Q.    Or any of the Plaintiffs' lawyers.              10:33

22     A.    Okay.                                           10:33

23     Q.    That's why we asked you to bring them.          10:33

24     A.    Okay.                                           10:33

25     Q.    You understood that you were supposed to        10:33

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 339

1   bring all of your billing records today; correct?          10:33

2       A.    Not specifically because I'd already            10:33

3   provided them.  I just brought this because this          10:33

4   is the hard copy that I had I scanned in e-mail,           10:33

5   so...                                                      10:34

6       Q.    When did you provide them to Plaintiffs'        10:34

7   counsel?  After January 25th?                             10:34

8       A.    Yes.  At your request.                          10:34

9       Q.    Okay.  I guess then you have to look            10:34

10  through that stack of documents and take up more          10:34

11  of our time looking at something that you should          10:34

12  know because you should have been prepared to             10:34

13  bring them with you today, but if you need to,            10:34

14  please do.                                                10:34

15          MR. KERENSKY:  Objection, form.                   10:34

16          MR. ANDERTON:  Proceed, Dr. Bliesner.             10:34

17          THE WITNESS:  This does not include last,         10:35

18      the 25th's billing.                                   10:35

19  BY MR. ANDERTON:                                          10:35

20      Q.    Have you invoiced Plaintiffs' counsel           10:35

21  for that -- for the time that you spent preparing         10:35

22  for and participating in the January 25th                 10:35

23  deposition?                                               10:35

24      A.    I don't know because I don't do it.             10:35

25      Q.    Dr. Bliesner, I see -- did you review           10:35

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 340

1    these documents before you came here today?          10:35

2        A.    That stack?                                10:35

3        Q.    Yes.                                        10:35

4        A.    No.                                         10:35

5        Q.    The first invoice indicates a rate of      10:35

6    $350.  It's dated January 16, 2010, $350 per         10:35

7    hour.  And the next invoice dated a week later,      10:35

8    January 23rd, indicates a rate of $550 per hour.     10:35

9    Did your rate go up?                                 10:35

10       A.    There was a misunderstanding on the rate   10:35

11   to begin with.                                       10:36

12       Q.    Whose misunderstanding?                    10:36

13       A.    The Miller Law Firm.                        10:36

14       Q.    You sent the invoice out.                  10:36

15       A.    Yes.                                        10:36

16       Q.    So whose misunderstanding?                 10:36

17       A.    This was the additional -- I thought       10:36

18   that you received that as well but apparently not.   10:36

19       Q.    As I've said, I've not received anything   10:36

20   from Plaintiffs about --                             10:36

21       A.    Uh-huh.                                     10:36

22       Q.    -- your communications with them --        10:36

23       A.    Uh-huh.                                     10:36

24       Q.    -- your billing records --                 10:36

25       A.    Uh-huh.                                     10:36

Page 341

1    Q.    -- anything.                                    10:36

2    A.    Uh-huh.                                         10:36

3    Q.    So you just handed me a document that           10:36

4  Phil is going to mark as Exhibit 146.                   10:36

5    A.    Uh-huh.                                         10:36

6    Q.    Please, Phil.  Thank you, sir.                  10:36

7    A.    And this was prior to being retained            10:37

8  obviously.                                              10:37

9    Q.    Prior to being retained.                        10:37

10   A.    Yes.                                            10:37

11     (Whereupon, Exhibit 146 was marked for              10:37

12  identification)                                        10:37

13   Q.    So I'm reading a letter that says --            10:37

14  well, tell me what this is, 146.  Is it an e-mail,     10:37

15  is it a letter, what is it?                            10:37

16   A.    This is -- I believe it is a Word               10:37

17  document that I cut and paste into e-mail.  So I       10:37

18  can -- I design a document first.                      10:37

19   Q.    Okay.                                           10:37

20   A.    And I put it in an e-mail.  So this is          10:37

21  what that is.                                          10:37

22   Q.    That's just a Word document?                    10:37

23   A.    I'm thinking it is.                             10:37

24   Q.    You're thinking it is?                          10:37

25   A.    Yeah.  I'm not sure; okay?  Because it          10:37

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 342

1   doesn't have the headers on it or not so I can't          10:37

2   say definitively.  On something like this normally       10:37

3   for a business transaction -- because I would like       10:37

4   to be accurate in an e-mail -- I create a Word           10:37

5   document first, do spell check and everything else       10:37

6   and I cut and paste it in an e-mail.                     10:37

7       Q.    So you copy the text?                          10:38

8       A.    Yes.                                           10:38

9       Q.    And paste it into an e-mail?                   10:38

10      A.    Yes, sir.                                       10:38

11      Q.    So that means that -- well, did you send       10:38

12  this -- the contents of the document that is             10:38

13  marked as 146 to Mr. Miller?                             10:38

14      A.    I did.                                          10:38

15      Q.    In what form?                                  10:38

16      A.    In e-mail.                                      10:38

17      Q.    Do you have that e-mail with you?              10:38

18      A.    I do not.                                       10:38

19      Q.    Why not?                                       10:38

20      A.    Because I gave all the e-mails to Miss         10:38

21  Johnson Carter.                                          10:38

22      Q.    May I see that, please?                        10:38

23      A.    Sure.                                          10:38

24      Q.    So you sent an e-mail to Mr. Miller            10:38

25  somewhere around January 4, 2010, with the               10:38

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 343

1    following text or that includes the following          10:38

2    text.  As discussed, my rates are, and then you        10:38

3    list your rates.                                        10:38

4        A.    Uh-huh.                                       10:38

5        Q.    $350 an hour for standard document            10:38

6    review, on-site time, consultations, etc.               10:38

7        A.    Uh-huh.                                       10:38

8        Q.    $450 an hour for testimonies or               10:38

9    depositions?                                            10:38

10       A.    Uh-huh.                                        10:39

11       Q.    Is that right?  Is that correct?              10:39

12       A.    Is that what it says there?  Yes.             10:39

13       Q.    And $550 involving for any cases              10:39

14   involving capital crimes.                               10:39

15       A.    Uh-huh.                                        10:39

16       Q.    You have to say yes or no.                    10:39

17       A.    Yes, sorry.                                   10:39

18       Q.    That's all right.                             10:39

19       A.    I'll get this some day.                       10:39

20       Q.    So the first invoice you submitted was        10:39

21   at the $350 per hour rate?                              10:39

22       A.    Yes.                                          10:39

23       Q.    And every invoice thereafter was at the       10:39

24   $550 per hour rate.                                      10:39

25       A.    Yes.                                          10:39

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 344

1        Q.    Does this case involve a capital crime?       10:39

2        A.    Well, it involved a death potentially.        10:39

3    So that wasn't necessarily explained to me when I       10:39

4    was doing the initial consultation.                     10:39

5        Q.    So you quoted your rate as $550 per hour       10:39

6    for a case involving a capital crime?                   10:39

7        A.    A death, potentially.  A capital crime,        10:39

8    I don't know the legal term.  So that's the term I      10:39

9    used.                                                   10:39

10       Q.    Oh, you used capital crime to indicate a       10:39

11   death?                                                  10:39

12       A.    Anything that involved potentially a          10:39

13   death, yes.  I'm not a lawyer.  It's just a term        10:39

14   that I came up with.                                    10:39

15       Q.    Had you ever been involved -- you've          10:39

16   never been an expert witness before.                   10:40

17       A.    No, absolutely not.  This is all brand        10:40

18   new stuff for me.  So there was confusion on that       10:40

19   and it turns out that there was potentially             10:40

20   somebody that was hurt, so the rate was increased       10:40

21   to 550.                                                 10:40

22       Q.    You misunderstood that there was              10:40

23   potentially somebody who was hurt?                      10:40

24       A.    It was never specifically told to me          10:40

25   that, you know, it was put to me we've got a case       10:40

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 345

1    going on, something like this.  I do have a                10:40

2    question, though, you know?  This is falling into           10:40

3    pre, you know, retainer and stuff like that.  Do I          10:40

4    have the same right not to discuss the details              10:40

5    here?                                                       10:40

6         MR. ANDERTON:  Well, Mr. Kerensky -- like              10:40

7    I said, I disagree with Mr. Kerensky's                      10:40

8    characterization of the scope of that                       10:40

9    privilege.                                                  10:40

10        THE WITNESS:  Right.                                   10:40

11        MR. ANDERTON:  So...                                   10:40

12        THE WITNESS:  I'm not particularly                     10:40

13   comfortable talking about negotiations that I               10:40

14   had with somebody prior to being put on                     10:40

15   retainer.                                                   10:40

16        MR. ANDERTON:  I mean no disrespect,                   10:40

17   Dr. Bliesner.  Whether you're comfortable or                10:40

18   not, it's something I'm allowed to inquire                  10:40

19   into.                                                       10:40

20        MR. KERENSKY:  Wait a minute.  We're                   10:40

21   talking about -- I lost track of you guys.                  10:41

22   You're not talking back again about another                 10:41

23   case other than --                                          10:41

24        MR. ANDERTON:  No, no.  We're talking                  10:41

25   about his retention.                                        10:41

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 346

1          THE WITNESS:  Prior to the retention.          10:41

2    BY MR. ANDERTON:                                      10:41

3      Q.    You have now been disclosed --               10:41

4      A.    Uh-huh.                                       10:41

5      Q.    -- as a testifying expert.                    10:41

6      A.    Uh-huh.                                       10:41

7      Q.    So even if Mr. Kerensky's                     10:41

8    characterization of the privilege is accurate, all   10:41

9    communications you've had with counsel for           10:41

10   Plaintiffs are open to my examination.                10:41

11     A.    Okay.                                         10:41

12     Q.    Okay.                                         10:41

13     A.    Okay.                                         10:41

14         MR. KERENSKY:  If it is about cases that        10:41

15     you've been retained, if there is a file you        10:41

16     have been retained on, he's right.  Everything      10:41

17     you talked to the PSC about or anything like        10:41

18     that, that's fair game.                             10:41

19         MR. ANDERTON:  And that's what we're            10:41

20     discussing, Mike.  You'll see when you see          10:41

21     Exhibit 146 that it is communication between        10:41

22     Dr. Bliesner and Pete Miller.                       10:41

23         MR. KERENSKY:  Okay.  That's great.             10:41

24         THE WITNESS:  Okay.                             10:41

25   BY MR. ANDERTON:                                      10:41

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 347

```
 1      Q.    So -- and why aren't you comfortable        10:41
 2   discussing negotiations you had?                     10:41
 3      A.    It's just bad business to talk to other     10:41
 4   people about negotiations in business with your      10:42
 5   clients.                                             10:42
 6      Q.    Well, this isn't business,                  10:42
 7   Dr. Bliesner.  This is testimony in a legal          10:42
 8   proceeding.  You understand that; right?             10:42
 9      A.    I agree of course, but it's a               10:42
10   transaction.                                         10:42
11      Q.    Dr. Bliesner, did you receive a notice      10:42
12   of today's proceeding?                               10:42
13      A.    Today's proceeding?                         10:42
14      Q.    Yes.                                         10:42
15      A.    I received a notice for the one on the      10:42
16   25th, but one specifically for today?               10:42
17      Q.    Yeah.                                        10:42
18      A.    Not that I recall.                          10:42
19      Q.    Not that you recall.                        10:42
20      Did you look at the one that you received         10:42
21   prior to coming on January 25th?                     10:42
22      A.    For today?                                  10:43
23      Q.    No, before you came on January 25th.        10:43
24      A.    Yes.                                        10:43
25      Q.    And did you review that notice to           10:43
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 348

1    identify documents and other materials that you          10:43

2    were supposed to bring with you on January 25th?          10:43

3        A.    For the 25th one?                               10:43

4        Q.    Yes.                                            10:43

5        A.    Yeah.                                           10:43

6        Q.    One second, getting a drink.                   10:43

7        A.    May I do the same?                             10:43

8        Q.    Uh-huh, yes you may.  Yes, you may.            10:43

9    We'll stay on the record.                                 10:43

10       Are you ready?                                        10:43

11       A.    Yes, sir.                                       10:44

12       Q.    So Dr. Bliesner, you did not receive any        10:44

13   notice of today's deposition?                             10:44

14       A.    Not that I recall, no.                         10:44

15       Q.    Before you came on January 25th --             10:44

16       A.    Uh-huh.                                         10:44

17       Q.    -- to the first session of your                10:44

18   deposition, did you review the notice that you            10:44

19   received for the 25th and collect all of the              10:44

20   information, documents, and materials that were           10:44

21   identified in the notice to bring with you?               10:44

22       A.    I did.                                          10:44

23       Q.    And did you bring them with you on that         10:44

24   day?                                                      10:44

25       A.    I did.                                          10:44

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 349

1       Q.    Did you bring them with you again today?       10:44

2       A.    I did.                                          10:44

3       Q.    Same materials?                                 10:44

4       A.    Yes.                                            10:44

5       Q.    Is there anything that you brought with         10:44

6  you on the 25th that isn't here today?                    10:44

7       A.    No.                                             10:44

8       Q.    You went through and organized them per         10:44

9  the --                                                     10:44

10      A.    Uh-huh.                                         10:44

11      Q.    -- suggestion of Mr. Kerensky?                  10:44

12      A.    Uh-huh.                                         10:44

13      Q.    But you brought the same materials with         10:44

14  you?                                                      10:44

15      A.    Uh-huh.                                         10:44

16      Q.    I'll represent to you, Dr. Bliesner,            10:44

17  that this notice is identical to the prior notice         10:44

18  except for the date and time.  Mr. Kerensky will          10:44

19  speak up and tell me if I'm wrong.  But item              10:45

20  number 2 --                                               10:45

21      A.    Uh-huh.                                         10:45

22      Q.    -- requests that you bring all                  10:45

23  correspondence and communication between the             10:45

24  witness -- that's you -- and anyone acting on the         10:45

25  witness's behalf.  So anyone acting on your               10:45

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 350

1    behalf.                                                          10:45

2        A.    Uh-huh.                                                10:45

3        Q.    And attorneys representing the                        10:45

4    Plaintiffs in this litigation.                                  10:45

5        A.    Uh-huh.                                                10:45

6        Q.    Do you understand that request?                       10:45

7        A.    Yes.                                                   10:45

8        Q.    Did you bring those materials with you?               10:45

9    Do you have all correspondence and communication               10:45

10   between yourself or your wife as a --                           10:45

11       A.    Uh-huh.                                               10:45

12       Q.    -- representative of Delphi?                          10:45

13       A.    Uh-huh.                                               10:45

14       Q.    Or -- these invoices are under Delphi.               10:45

15   Do you have all correspondence between you, your                10:45

16   wife, or anyone at Delphi and any of the                        10:45

17   Plaintiffs' lawyers with you today?                             10:45

18       A.    The original e-mails were copied off the             10:45

19   hard drive and Miss Johnson has them.  So to                    10:46

20   answer your question, that set of e-mails I do not             10:46

21   have with me.  It's not on the hard drive.                      10:46

22       Q.    Not on the hard drive?                               10:46

23       A.    I have e-mails since that time that the              10:46

24   communications are on that hard drive.                          10:46

25       Q.    So the original e-mails were copied off             10:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II Videotaped - Revised                    February 18, 2011

Page 351

1    of that same hard drive that you brought with you        10:46

2    today?                                                   10:46

3        A.    Yes, sir.                                      10:46

4        Q.    Given -- printed off of that?                  10:46

5        A.    No, they were just copied as file.             10:46

6        Q.    When did that happen?                          10:46

7        A.    The 24th, I believe.  That was the day         10:46

8    before.                                                  10:46

9        Q.    So you brought them on that same hard          10:46

10   drive on January 24th to your meeting with               10:46

11   Plaintiffs' counsel?                                     10:46

12       A.    Yes.                                           10:46

13       Q.    And in that meeting, somebody copied           10:46

14   them off of that hard drive onto some media that         10:46

15   they brought with them?                                  10:46

16       A.    Yes.                                           10:46

17       Q.    Who was that?                                  10:46

18       A.    It was Miss Johnson.                           10:46

19       Q.    What was the media she copied it onto,         10:46

20   do you know?                                             10:46

21       A.    I don't recall.                                10:46

22       Q.    And then after that meeting --                 10:46

23       A.    Uh-huh.                                        10:47

24       Q.    -- did you bring that -- did you have          10:47

25   that hard drive with you on the 25th?                    10:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                     February 18, 2011

Page 352

1     A.    Yes.                                              10:47

2     Q.    Were the e-mails between you and                 10:47

3  Plaintiffs' counsel still on the hard drive at            10:47

4  that time?                                                10:47

5     A.    No.                                              10:47

6     Q.    So you went home on the 24th and you             10:47

7  removed them?                                             10:47

8     A.    No, no.  She copied them off.                    10:47

9     Q.    Well, when you copy, you don't remove.           10:47

10    A.    She removed them.  She copied -- cut the         10:47

11  whole folder and dropped it over onto her                10:47

12  computer.                                                10:47

13    Q.    So you had that hard drive with you on           10:47

14  the 25th but you didn't have the e-mails with you.       10:47

15    A.    No, she he did.                                  10:47

16    Q.    She did?                                         10:47

17    A.    Yeah.                                            10:47

18       MR. ANDERTON:  You see that we have a               10:47

19    problem here, Mr. Kerensky?  Mike?                     10:47

20       MR. KERENSKY:  Sorry, I was on mute.  I             10:47

21    don't think -- I'm pretty sure Meghan sent             10:47

22    those to me and I was supposed to bring them.          10:47

23    I am looking for an e-mail.  Why don't you             10:47

24    move to another subject and I'll see if I can          10:47

25    solve it in a minute.                                  10:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 353

1    BY MR. ANDERTON:                                        10:47

2        Q.    Okay.  So back to -- well, I'm going to       10:48

3    stay on this subject for a minute.  She copied          10:48

4    them onto some media that she had.                      10:48

5        A.    Yeah, I believe it was her computer.          10:48

6        Q.    Okay.                                          10:48

7        A.    That she was going to share with              10:48

8    everybody.                                               10:48

9        Q.    And then you removed them from your hard      10:48

10   drive?                                                   10:48

11       A.    No, no, no.  She took them off.               10:48

12   Everything that I've done with respect to                10:48

13   electronic records and everything else,                 10:48

14   communication, has been on that external hard           10:48

15   drive.                                                   10:48

16       Q.    This one you brought you?                     10:48

17       A.    This exact reason.  It could be shared        10:48

18   with people.                                             10:48

19       Q.    Okay.                                          10:48

20       A.    So when we met on the 24th.                   10:48

21       Q.    Correct.                                       10:48

22       A.    Right?  They said so do you have any          10:48

23   e-mails?  And I said yeah, I did what you told.         10:48

24   Here they are on the external hard drive and Miss       10:48

25   Johnson plugged it in I believe it was her              10:48

Page 354

1    computer, and she goes -- there's e-mail and                10:48

2    communications back and forth here.  You got to             10:48

3    figure out -- words to this effect, you know -- a           10:48

4    good way to distribute them so we're not passing            10:48

5    the hard drive around.  She goes so I'm going to            10:48

6    cut them off and then I'll make sure they're                10:48

7    available to people.                                        10:49

8        Q.    Okay.  She removed them from your hard            10:49

9    drive.                                                      10:49

10       A.    Yes.                                              10:49

11       Q.    And you don't have them here today.              10:49

12       A.    No.  You have e-mails since that time of          10:49

13   communication.                                             10:49

14       Q.    On this hard drive.                               10:49

15       A.    Yes.                                              10:49

16       Q.    All e-mails, all correspondence between           10:49

17   you and Plaintiffs' counsel?                                10:49

18       A.    There should be, yes.  I'm pretty                 10:49

19   meticulous about when I get that, I make sure it           10:49

20   goes onto the hard drive.                                   10:49

21       Q.    So you're pretty meticulous that you             10:49

22   preserve and maintain a complete set of records?           10:49

23       A.    Yes.                                              10:49

24       Q.    The documents that Mr. Miller and Ms             10:49

25   Johnson delivered in person to you at your home,           10:49

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 355

1    what were they?                                        10:49

2        A.    I could show you.                            10:49

3        Q.    Please do.                                    10:50

4        A.    We're talking just about that visit at       10:50

5    the home office.                                        10:50

6        Q.    Well, were there other visits where they     10:50

7    delivered documents to you?                             10:50

8        A.    No.                                           10:50

9        Q.    Just one?                                     10:50

10       A.    Yes.                                          10:50

11       Q.    Okay.  Is that it?                            10:50

12       A.    The first set, they did not deliver.  I       10:51

13   apologize for that.                                     10:51

14       Q.    The first set?                                10:51

15       A.    That's stuff I had mailed to me               10:51

16   originally.                                             10:51

17       Q.    Okay.                                         10:51

18       A.    So on that particular day, it would have     10:51

19   been the second set I'm pretty sure.                    10:51

20       Q.    These two binders labeled second set?         10:51

21       A.    Yeah.  There may have been some               10:51

22   additional documents mailed to me prior to that         10:51

23   day, but they're all in here.                           10:51

24       Q.    All right.  You can sit back down.            10:52

25       A.    Sure.                                         10:52

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 356

1     Q.    That's all right.                           10:52

2     A.    Uh-huh.                                      10:52

3     Q.    The other documents -- well, are there       10:52

4   other documents that you have received from          10:52

5   Plaintiffs' counsel as part of your engagement?      10:52

6     A.    I've reviewed through this Crivella West      10:52

7   site.                                                10:52

8     Q.    Okay.                                         10:52

9     A.    Some of which I printed out to review,        10:52

10  others which I just left online because they were    10:52

11  too big.                                              10:52

12    Q.    Okay.  Are these the only documents that      10:52

13  you've actually received from Plaintiffs' counsel?    10:52

14    A.    No.                                           10:52

15    Q.    What else have you received from              10:53

16  Plaintiffs' counsel?                                  10:53

17    A.    Yesterday evening, late, I believe I got      10:53

18  one or two reports from process development or        10:53

19  something like that.  I didn't review them.          10:53

20    Q.    Process validation?                           10:53

21    A.    I'm trying -- I don't recall because I        10:53

22  didn't look at them.                                  10:53

23    Q.    Okay.                                         10:53

24    A.    I got a document.  I know that and I          10:53

25  just didn't look at it.                              10:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                    Page 357

1      Q.    Who did you get that from?               10:53

2      A.    Miss Johnson.                            10:53

3      Q.    Yesterday?                               10:53

4      A.    Evening, yes.                            10:53

5      Q.    Mail?  Electronic?  How did you get it?  10:53

6      A.    It was electronic.                       10:53

7      Q.    By e-mail?                               10:53

8      A.    Yes.                                     10:53

9      Q.    Is the e-mail --                         10:53

10     A.    Should be on there, yes.                 10:53

11     Q.    Is that on the hard drive?               10:53

12     A.    Yeah, should be there.                   10:53

13     Q.    The -- other than the documents you      10:53

14   received yesterday electronically from           10:53

15   Ms. Johnson, are there any other documents in    10:53

16   addition to the ones that you've handed me today 10:53

17   that you actually received from Plaintiffs'      10:53

18   counsel?                                         10:53

19     A.    Not that I recall.  I think this is      10:53

20   pretty much it, yeah.  It's a lot of stuff so to 10:53

21   say definitively everything I've got is here.    10:53

22     Q.    You just said you're a pretty meticulous 10:54

23   --                                               10:54

24     A.    Right.                                   10:54

25     Q.    -- detailed guy.                         10:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

                                                        Page 358

1        A.    Right, right.                              10:54

2        Q.    That's the military background; right?      10:54

3        A.    Or just anal retentiveness as a human       10:54

4   being.                                                 10:54

5        Q.    Okay.                                       10:54

6        A.    The reason I'm not saying absolutely        10:54

7   yes, this is it, is that I'd have to go back and       10:54

8   look at the electronic records to make sure that       10:54

9   there was one attached that I didn't review or I       10:54

10  forgot about that would be there.                      10:54

11       Q.    But those would be included among e-mail    10:54

12  communications?                                        10:54

13       A.    Yes.                                        10:54

14       Q.    That Miss Johnson --                        10:54

15       A.    Yes.                                        10:54

16       Q.    -- took from you and hasn't produced to     10:54

17  us.                                                    10:54

18       A.    If she hasn't produced them, yes.           10:54

19       Q.    Okay.  Are there any other documents at     10:54

20  your home that you did not bring with you today        10:54

21  that you have received from Plaintiffs' counsel?       10:54

22       A.    No.                                         10:54

23            MR. ANDERTON:  Phil, we're going to mark     10:54

24       these.  There are four of them.  We're marking    10:54

25       documents Mike.  Just show you know, there's a    10:55

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

                                                                   Page 359

 1      stack and three binders.  We'll make              10:55

 2      arrangements to get them copied and back to        10:55

 3      Dr. Bliesner.                                      10:55

 4          MR. KERENSKY:  No problem.  Who is going       10:55

 5      to do the copying?                                 10:55

 6          MR. ANDERTON:  We will figure that out         10:55

 7      before we leave today.                             10:55

 8          MR. KERENSKY:  Very good.                      10:55

 9          THE WITNESS:  Now, there are an                10:55

10      additional documents that support the report,     10:55

11      the attachments.                                   10:55

12              (Whereupon, Exhibits 147, 148, 149,        10:55

13  150 were marked for identification)                    10:55

14  BY MR. ANDERTON:                                       10:55

15      Q.    Uh-huh.                                      10:55

16      A.    Do you want those as well?                   10:55

17      Q.    Well, we'll get there.                       10:55

18      A.    Okay.                                         10:55

19      Q.    I take it those are documents that you       10:55

20  reviewed and printed from the Crivella West?           10:55

21      A.    They could have been provided at some        10:55

22  point through this document delivery that you've       10:56

23  talked about.  They e-mailed me some, they mailed      10:56

24  me some, and then they delivered some personally.      10:56

25  So they're all weaved together.                        10:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 360

1      Q.    But I asked you, Dr. Bliesner, if there          10:56

2   are any other documents that you've received from        10:56

3   Plaintiffs' counsel.  I didn't specify personal           10:56

4   delivery.                                                 10:56

5      A.    Well.                                             10:56

6      Q.    That's what you gave me when you gave me          10:56

7   these things.                                             10:56

8      A.    I'm sorry.  I misunderstood you because          10:56

9   I thought you said just for that visit at the home        10:56

10  office.  I'm sorry.                                        10:56

11     Q.    Okay.                                             10:56

12     A.    Uh-huh.                                           10:56

13     Q.    So let's make sure.                               10:56

14     A.    Okay.                                             10:56

15     Q.    It's imperative --                                10:56

16     A.    Uh-huh.                                           10:56

17     Q.    -- Dr. Bliesner that you listen very             10:56

18  carefully to the questions that I ask.                     10:56

19     A.    I understand.                                     10:56

20     Q.    Are there any other documents that you           10:56

21  have received from Plaintiffs' counsel --                  10:56

22     A.    Uh-huh, yes.  Sorry.                              10:56

23     Q.    -- that you have with you today?                  10:56

24     A.    Yes.                                              10:56

25     Q.    We're going to mark them.  You've handed         10:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 361

| | | |
|---|---|---|
| 1 | me two more binders. | 10:57 |
| 2 | A.    Yes, sir. | 10:57 |
| 3 | Q.    They have post-it notes on the key | 10:57 |
| 4 | documents A1 to A30 and A31 to A63? | 10:57 |
| 5 | A.    Yes, sir. | 10:57 |
| 6 | Q.    Who designated them key documents? | 10:57 |
| 7 | A.    Me. | 10:57 |
| 8 | Q.    Okay.  I've got another stack of | 10:57 |
| 9 | documents with a post it on it that says last | 10:58 |
| 10 | supplemental set; right? | 10:58 |
| 11 | A.    Yes. | 10:58 |
| 12 | Q.    What is that? | 10:58 |
| 13 | A.    Those were -- if I recall those were | 10:58 |
| 14 | printouts of e-mails that I received from one of | 10:58 |
| 15 | the attorneys prior to the 25th. | 10:58 |
| 16 | Q.    Okay. | 10:58 |
| 17 | A.    I believe that we reviewed those.  You | 10:58 |
| 18 | have them as well and we've reviewed them. | 10:58 |
| 19 | Q.    Okay. | 10:58 |
| 20 | A.    Uh-huh. | 10:58 |
| 21 | Q.    So these appear to be all or largely the | 10:58 |
| 22 | records relating to the FDA 484 sampling program. | 10:58 |
| 23 | You can stay right there. | 10:58 |
| 24 | A.    Okay.  It looks like there's an | 10:58 |
| 25 | additional set there too.  So to answer your | 10:59 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 362

1    question, it appears to be that and some more.          10:59

2       Q.    Okay.  But you received those prior         10:59

3    to -- somewhat close in proximity to the last        10:59

4    deposition session.                                  10:59

5       A.    Yeah.                                        10:59

6       Q.    As I look at these binders that have        10:59

7    been marked as 148, 149 and 150.                     10:59

8       A.    Uh-huh.                                      10:59

9       Q.    I see highlighting on various               10:59

10   documents.  Who did the highlighting?                10:59

11      A.    Let's see.                                   10:59

12      Q.    In particular, I'm looking at --            10:59

13      A.    Oh.                                          10:59

14      Q.    -- the third set of supplemental            10:59

15   documents.                                           10:59

16      Who did the highlighting?                          10:59

17      A.    Me.                                          10:59

18      Q.    Is it true that any highlighting that I     10:59

19   will encounter on these documents was done by you?   10:59

20      A.    I believe so, yes.                           10:59

21      Q.    Okay.                                        10:59

22      A.    I -- nobody pointed out anything            10:59

23   specifically for me to...                            11:00

24      Q.    You can have that stack back and you can    11:00

25   put it away.                                          11:00

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 363

 1       A.    Okay.                                        11:00

 2       Q.    We're not going to copy that or mark         11:00

 3    it.                                                   11:00

 4       A.    Okay.                                        11:00

 5       Q.    Now, you've handed me another binder of      11:00

 6    deposition transcripts.                               11:00

 7       A.    Yeah.  Those were printed out off of         11:00

 8    Crivella.                                             11:00

 9       Q.    You can have that back.  We're not going     11:00

10    to mark that.                                         11:00

11       A.    Okay.                                        11:00

12       Q.    Are there any other documents,              11:00

13    Dr. Bliesner, that you have received from             11:01

14    Plaintiffs' counsel that you brought with you         11:01

15    today?                                                11:01

16       A.    Other than the electronic ones that I        11:01

17    could not account for, not to my knowledge, no.       11:01

18       Q.    Okay.                                        11:01

19       A.    Uh-huh.                                      11:01

20       Q.    What else is in the boxes that you           11:01

21    brought with you today?                               11:01

22       A.    Today?                                       11:01

23       Q.    Just describe it.                            11:01

24       A.    Describe it?  Textbook, the transcript       11:01

25    of the last deposition that I need to review.         11:01

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 364

1    Q.    What else?                                       11:01

2    A.    I think I've got some notes from -- the          11:01

3  stuff like this.                                          11:01

4    Q.    Some notes like that or --                       11:01

5    A.    Would you like me to look?                        11:01

6    Q.    Sure.                                             11:01

7    A.    Because I'm not sure whether you have            11:01

8  copies of this or not.                                    11:01

9    Q.    Well, let me see the notes.                       11:01

10   A.    Sure.  That's it.  Did you want to --            11:01

11   Q.    No.                                               11:01

12   A.    Okay.                                             11:01

13       MR. ANDERTON:  While -- Phil, while we're          11:02

14     at it, we may as well mark the notice.  Mike,        11:02

15     I'm marking the notice as 151.                        11:02

16         (Whereupon, Exhibit 151 was marked              11:02

17  for identification)                                       11:02

18  BY MR. ANDERTON:                                          11:02

19   Q.    Do you have any other notes with you?           11:02

20   A.    No.                                               11:02

21   Q.    Okay.  You described -- you said you had        11:02

22  your textbook, you said you had your deposition          11:02

23  transcript, you said you had these additional            11:03

24  notes that we're about to mark.                           11:03

25   A.    Uh-huh.                                           11:03

Page 365

1      Q.    Do you have anything else with you in                11:03

2    the boxes that you brought today?                             11:03

3      A.    No.                                                   11:03

4            MR. ANDERTON:  Phil, would you mark these             11:03

5      as 152 and 3?  Mike, these are additional sets              11:03

6      of notes.                                                   11:03

7              (Whereupon, Exhibits 152 and 153                    11:03

8    were marked for identification)                               11:03

9            THE VIDEOGRAPHER:  The time is                        11:03

10             a.m.  We're going off the record.                   11:03

11               (Short break)                                     11:14

12           THE VIDEOGRAPHER:  The time is                        11:14

13     11:14 a.m.  We're back on the record.  This is              11:15

14     the beginning of tape four.                                 11:15

15   BY MR. ANDERTON:                                              11:15

16     Q.    Dr. Bliesner, I'm going to hand you a                 11:15

17   document that has been marked as Exhibit 152.                 11:15

18     A.    Yes.                                                  11:15

19     Q.    Tell me what that is.                                 11:15

20     A.    That's my handwritten notes I believe it             11:15

21   was for the day when I met before the first                   11:15

22   deposition with the attorneys.                                11:15

23     Q.    Your handwritten notes.  Okay.  Well, we             11:15

24   had some testimony earlier about a document that's            11:15

25   marked as 109.                                                11:15

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 366

| | | |
|---|---|---|
| 1 | A.    Yes. | 11:15 |
| 2 | Q.    Do you remember that? | 11:15 |
| 3 | A.    Yes, uh-huh. | 11:15 |
| 4 | Q.    You described those as your handwritten | 11:16 |
| 5 | notes.  Did you take two sets of notes that day? | 11:16 |
| 6 | A.    I cleaned them up so I could read them. | 11:16 |
| 7 | Q.    When did you do that? | 11:16 |
| 8 | A.    I don't recall, but I think it was at | 11:16 |
| 9 | the same time, like at the end of the day. | 11:16 |
| 10 | Q.    Okay.  So the document that is 109, is | 11:16 |
| 11 | that the uncleaned up version or is it the cleaned | 11:16 |
| 12 | up version? | 11:16 |
| 13 | A.    This one right here? | 11:16 |
| 14 | Q.    109. | 11:16 |
| 15 | A.    Yeah, I think that's just the summary at | 11:16 |
| 16 | the end of the -- this and the other notes that | 11:16 |
| 17 | were there. | 11:16 |
| 18 | Q.    So the document that's 152 -- | 11:16 |
| 19 | A.    Uh-huh. | 11:16 |
| 20 | Q.    -- let's get them both in front you. | 11:16 |
| 21 | A.    Okay. | 11:16 |
| 22 | Q.    I'm also handling you a document that is | 11:16 |
| 23 | marked 153. | 11:16 |
| 24 | A.    Uh-huh. | 11:16 |
| 25 | Q.    What is that? | 11:16 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                              Page 367

1        A.    153 looks like notes from a conversation          11:16

2    I had.                                                      11:16

3        Q.    With?                                             11:16

4        A.    It looks like -- specifically, I'm not            11:16

5    sure who called me.  It was either Pete or Meghan           11:17

6    to tell me a time.                                          11:17

7        Q.    To tell you a time?                               11:17

8        A.    Yeah, hold on.  That's not right.  10 --          11:17

9    oh, I'd have to look at the calendar.  We did our           11:17

10   deposition on what day of the week?                         11:17

11       Q.    Tuesday.                                          11:17

12       A.    Tuesday, yes.  So this was notes with             11:17

13   respect to them, to meet me on the Monday before.           11:17

14       Q.    And by "this," you mean Exhibit 153?              11:17

15       A.    Yes.                                              11:17

16       Q.    But this is notes of a phone                      11:17

17   conversation that obviously occurred before Monday          11:17

18   24th; right?                                                11:17

19       A.    I suppose that's -- that's the case,              11:17

20   yes.                                                        11:17

21       Q.    You suppose?                                      11:17

22       A.    It doesn't have a date on it.  I don't            11:17

23   have a time so I can't tell you definitively what           11:17

24   day.                                                        11:17

25       Q.    Are these notes that you took during              11:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 368

1    that meeting with the lawyers?                          11:18

2        A.    No.                                           11:18

3        Q.    And it references a meeting time and          11:18

4    place, 10 a.m., 10, Monday, 100 North Tampa.            11:18

5        A.    Right.  So chances are it's the               11:18

6    telephone record.                                       11:18

7        Q.    You mean record of notes during a             11:18

8    telephone conversation?                                 11:18

9        A.    When they called up and said, you know,       11:18

10   we want to get together on the 24th, the day            11:18

11   before.                                                 11:18

12       Q.    Well, this is a lot more than we want to      11:18

13   get together on 24th, isn't it, Dr. Bliesner?           11:18

14       A.    This sheet is.  The rest of them, I'm         11:18

15   not sure where -- if that was part of the day           11:18

16   that -- on the day before the deposition or not.        11:18

17   I -- I really -- because I don't have a date and a      11:18

18   time on it here.  Just -- I think that this --          11:18

19   this page 2 here of 153.                                11:18

20       Q.    Yeah.                                         11:18

21       A.    If I had to offer a suggestion, I think       11:18

22   that those pages probably went with this, the           11:18

23   preparation day.                                        11:19

24       Q.    So you think these are notes that you         11:19

25   made when you met with them on the 24th?                11:19

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 369

| | | |
|---|---|---|
| 1 | A. Yes. | 11:19 |
| 2 | Q. And you think 152 are notes that you | 11:19 |
| 3 | made when you met with them on the 24th? | 11:19 |
| 4 | A. 152. | 11:19 |
| 5 | Q. Yes. | 11:19 |
| 6 | A. Yes. | 11:19 |
| 7 | Q. And you think that 109 is a clean up of | 11:19 |
| 8 | notes you made when you met with them on the 24th | 11:19 |
| 9 | and made them later that day? | 11:19 |
| 10 | A. Yes. | 11:19 |
| 11 | Q. Three sets of notes, Dr. Bliesner. | 11:19 |
| 12 | Really? | 11:19 |
| 13 | A. Three set pages. | 11:19 |
| 14 | Q. In the same day? | 11:19 |
| 15 | A. This is the telephone conversation. | 11:19 |
| 16 | Q. The first page of Exhibit 153. | 11:19 |
| 17 | A. 153. | 11:19 |
| 18 | Q. Your testimony is that what remains in | 11:19 |
| 19 | 153 -- and just so we're clear -- | 11:19 |
| 20 | A. Uh-huh. | 11:19 |
| 21 | Q. -- you handed me the document that we've | 11:19 |
| 22 | marked as Exhibit 153 -- | 11:19 |
| 23 | A. Yes. | 11:19 |
| 24 | Q. -- as a single group of notes; right? | 11:19 |
| 25 | A. I -- if that's how it's -- you | 11:19 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 370

1    interpreted it, it's -- that's not an accurate          11:19

2    statement.  It's just notes that I had.  I just         11:19

3    gave you my notes.  Now what days they were on          11:19

4    specifically, that's what we're trying to               11:19

5    determine right now.                                    11:20

6        Q.    And you're unable to do that.                 11:20

7        A.    Considering I didn't put a date at the        11:20

8    top, yeah.                                              11:20

9        Q.    So let's look at Exhibit 152 --               11:20

10       A.    Okay.                                          11:20

11       Q.    -- first; okay?                                11:20

12       A.    Okay.                                          11:20

13       Q.    The top says "90 percent."  What does         11:20

14   that mean?                                              11:21

15       A.    I'm not really sure.  I'm thinking that       11:21

16   it was a reference to listening to the question         11:21

17   like you've said and thinking about what's really       11:21

18   been said as opposed to jumping in and trying to        11:21

19   answer without really understanding the question.       11:21

20   So 90 percent of the effort would be sitting down,      11:21

21   listening to the question, and making sure that         11:21

22   you're answering in a way that's accurate.              11:21

23       Q.    Under there it says, "defending turf."        11:21

24   What does that mean?                                    11:21

25       A.    I believe that was guidance, since I          11:21

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 371

1   have never done this before, that, you know, don't          11:21

2   allow yourself to be headed down a direction that           11:22

3   isn't the truth.  So, again, I as said before,              11:22

4   this is such -- so different than the                       11:22

5   collaborative stuff that -- that I've done in the           11:22

6   past that obviously I need a little instruction on          11:22

7   how to do this.                                             11:22

8       Q.   Well, it would be great if this was               11:22

9   collaborative.  You're obviously getting guidance           11:22

10  on how to make it combative; right?                         11:22

11          MR. KERENSKY:  Objection, form.                     11:22

12  BY MR. ANDERTON:                                            11:22

13      Q.   You may answer.                                    11:22

14      A.   Could you say the question again?                  11:22

15          MR. ANDERTON:  Read it back, please,                11:22

16      Phil.                                                   11:22

17              (Whereupon, the testimony was read             11:22

18  back by the court reporter, as recorded above)              11:22

19          THE WITNESS:  I wouldn't agree with that.           11:22

20  BY MR. ANDERTON:                                            11:22

21      Q.   You don't think that somebody telling              11:22

22  you to defend your turf isn't a guidance on how to          11:22

23  make a process combative?                                   11:22

24      A.   Absolutely not.                                    11:22

25      Q.   Okay.  In the next line there's a                  11:22

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313        www.rennillo.com  888.391.3376 (Depo)

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 372

1   bracketed phrase that says "easier said than                11:23

2   done."  Is that what it says?                               11:23

3       A.    Where are we at again?                            11:23

4       Q.    The first page of Exhibit 152, top of             11:23

5   the page.                                                   11:23

6       A.    Easier said than done, yes.                       11:23

7       Q.    What does that mean?                              11:23

8       A.    To listen very carefully, things are in          11:23

9   the box.  To listen to the questions.  Don't guess          11:23

10  or propose a hypothesis and then the third and             11:23

11  fourth thing.  So that's what it is.  It's very            11:23

12  simple guidance, but it's, as I'm discovering, not         11:23

13  real easy.                                                  11:23

14      Q.    What do you mean by that?                         11:23

15      A.    It's just hard work.                              11:23

16      Q.    I think you're making it harder than it          11:23

17  actually is, Dr. Bliesner, but that's just my              11:23

18  humble opinion.                                             11:23

19      The next page of Exhibit 152 says "write these         11:24

20  down."                                                      11:24

21      A.    Uh-huh.                                           11:24

22      Q.    Why did you make that note?                       11:24

23      A.    I believe the conversation went to this          11:24

24  effect, you know?  How do you -- in your report,           11:24

25  what are the things that come to mind off the top          11:24

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 373

1    of your head that line up in some entry position          11:24

2    outside of the report.  So I went (witness makes          11:24

3    noise) right off the top of my head.                      11:24

4         Q.    So in essence what are the documents           11:24

5    that support the conclusions in your report?              11:24

6         A.    Yeah.                                          11:24

7         Q.    And so they are the AERs, adverse event        11:24

8    reports; right?                                           11:24

9         A.    Uh-huh.                                        11:24

10        Q.    The FDA documents; right?                      11:24

11        A.    Yes.                                           11:24

12        Q.    Pharmacy complaints; right?                    11:24

13        A.    Yes.                                           11:24

14        Q.    Deposition testimony?                          11:24

15        A.    Yes.                                           11:24

16        Q.    Company responses to FDA inspections?          11:24

17        A.    Yes.                                           11:25

18        Q.    Company internal                               11:25

19    document/investigations?                                 11:25

20        A.    Yes.                                           11:25

21        Q.    Recall documents?                              11:25

22        A.    Yes.                                           11:25

23        Q.    Mylan documents?                               11:25

24        A.    Yes.                                           11:25

25        Q.    Deviation from standard industry               11:25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 374

1   practices?                                                    11:25

2       A.     Yes.                                               11:25

3       Q.     Who created that list?                             11:25

4       A.     Me.                                                11:25

5       Q.     In the moment in that meeting with                 11:25

6   Plaintiffs' lawyers?                                          11:25

7       A.     Yeah.                                              11:25

8       Q.     Did they make suggestions on -- as to              11:25

9   what ought to be on the list?                                 11:25

10      A.     Not really.                                        11:25

11      Q.     Batch records isn't on that list, is it?           11:25

12      A.     Specifically, no.                                  11:25

13      Q.     "The big yes but tell me everything."              11:25

14  That notation can be seen on this page 2 of the               11:25

15  Exhibit 152; is that right?                                   11:25

16      A.     Yes.                                               11:25

17      Q.     What does that mean?                               11:25

18      A.     To tell you the truth, I have no idea.             11:25

19      Q.     Your notes.                                        11:25

20      A.     I know it's my notes, but I have no idea           11:25

21  what that means.  I really don't.                             11:25

22      Q.     What does the bottom note say "and                 11:25

23  that's dangerous"?                                            11:25

24      A.     Yeah.                                              11:26

25      Q.     What does that mean?                               11:26

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 375

1        A.     To tell you the truth, I don't remember        11:26

2    in this conversation.                                     11:26

3        Q.     Let's go look at Exhibit 153.                  11:26

4        A.     Okay.                                          11:26

5        Q.     And let's look at the second page of           11:26

6    Exhibit 153.                                              11:26

7        A.     Okay.                                          11:26

8        Q.     What is that list of six things?              11:26

9        A.     Looks like references to documents that        11:26

10   are included in the report.                               11:26

11       Q.     Who made the list?                             11:26

12       A.     Well, I wrote the list.                        11:26

13       Q.     Why?  What's the intention of making the       11:26

14   list?                                                     11:26

15       A.     I'm trying to -- trying to remember.           11:26

16       Q.     Please do.                                     11:26

17       A.     Uh-huh.  As we said before I'm pretty          11:26

18   sure these are pages that went with the -- this           11:27

19   set, the notes.  I'm not sure when these notes            11:27

20   were made, if it was with this or if it was this          11:27

21   conversation because I don't have a time and a            11:27

22   date on it, but it was some suggestions that if I         11:27

23   wanted to -- in preparation for the deposition            11:28

24   that the -- I go back and look at them since they         11:28

25   were in my report -- by one of the attorneys.             11:28

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 376

1       Q.    So one of the attorneys -- the list on       11:28

2    the second page of Exhibit 153 is a list of           11:28

3    suggestions made by one of the lawyers for the        11:28

4    Plaintiffs on things that you should go review        11:28

5    prior to your deposition?                             11:28

6       A.    As I recall, yeah, they were                 11:28

7    suggestions.  Just if I wanted to go back and look    11:28

8    at it, yeah, I could, so...                           11:28

9       Q.    And somebody advised you to look for         11:28

10   specific failures which resulted in blend             11:28

11   uniformity; right?                                     11:28

12      A.    No, I already had.  They were just           11:28

13   saying, you know, if I wanted to go back and          11:28

14   review it, that they would suggest that.              11:28

15      Q.    To look for specific failures which          11:28

16   resulted in blend uniformity?                         11:28

17      A.    Right, which is in the report.               11:28

18      Q.    What does that mean "look for specific       11:28

19   failures which resulted in blend uniformity"?         11:28

20   What I've just read is a quote from your notes.       11:28

21   What does it mean?                                    11:28

22      A.    It's not a quote.  It's just my notes.       11:29

23      Q.    I've read it.                                11:29

24      A.    I don't recall specifically what the        11:29

25   guidance was on that.  They made suggestions.  If     11:29

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 377

1    I want to review the documents, I did.  I can tell      11:29

2    you this:  Is that this list that is listed here         11:29

3    it was suggestions.  I didn't go back and review          11:29

4    those documents.  I just reviewed the report.            11:29

5        Q.    I see on the right side about halfway          11:29

6    down that page.                                          11:29

7        A.    Uh-huh.                                        11:29

8        Q.    An underlined term "gross negligence."         11:29

9    Is that what it says?                                    11:29

10       A.    It is.                                         11:29

11       Q.    What does that mean?                           11:29

12       A.    Apparently that's a definition that one        11:29

13   of the attorneys gave me because I'd never heard         11:29

14   the term before.  Somebody was talking about it          11:29

15   and I go what's that?  So I jotted it down.  Never       11:29

16   heard it before.                                         11:29

17       Q.    Which attorney?                                11:29

18       A.    I don't know.                                  11:29

19       Q.    What does it say underneath it.  I can't       11:29

20   read that.  Can you please read that for me?             11:29

21       A.    I think it's supposed to be consequences       11:30

22   indifferent from -- I don't know those three             11:30

23   words.  And welfare of persons involved in the           11:30

24   action with involved risk, suicide, injury, or           11:30

25   death.  I just jotted it down quickly.                   11:30

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                      Page 378

1        Q.    The consequences indifferent for the --        11:30

2    what's that word after "the"?                            11:30

3        A.    I don't know.                                   11:30

4        Q.    For the health, perhaps?                        11:30

5        A.    I don't know.                                   11:30

6        Q.    And welfare of the person involved?             11:30

7        A.    I -- I can't tell you.                          11:30

8        Q.    You can't read your own writing?                11:30

9        A.    No, I can't.                                     11:30

10       Q.    One of the lawyers --                            11:30

11       A.    It was a term that came up and I go              11:30

12   what's that?  I never heard it before.  So I just         11:30

13   jotted it down.                                            11:30

14       Q.    Did they tell you to work it into one of        11:30

15   your answers?                                              11:30

16       A.    No.                                               11:30

17       Q.    Did they tell you that it's a topic and         11:30

18   a concept you should be familiar with as you              11:30

19   responded to questions?                                    11:31

20       A.    Gross negligence?                                11:31

21       Q.    Yes.                                              11:31

22       A.    No.                                               11:31

23       Q.    Did you use that term in your report            11:31

24   ever?                                                       11:31

25       A.    I would have to go back and review it.          11:31

                                              3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 379

1    I don't think so.                                             11:31

2        Q.    Well, Dr. Bliesner --                               11:31

3        A.    Uh-huh.  Because I've never heard it,               11:31

4    so...                                                         11:31

5        Q.    Dr. Bliesner, this is why this process              11:31

6    takes so long.                                                11:31

7        A.    Okay.                                               11:31

8        Q.    You tell me you've never heard the term             11:31

9    before this meeting which would have occurred long            11:31

10   after your report was prepared.                               11:31

11       A.    Uh-huh.                                             11:31

12       Q.    Do you really have to go back and look              11:31

13   at your report to tell me whether that term is in             11:31

14   your report if you had never heard it before?  Now            11:31

15   I understand that you prepared and were told to be            11:31

16   cautious in answering questions, but this process             11:31

17   takes as long as it does because of your                      11:31

18   deliberately being difficult like that.                       11:31

19           MR. KERENSKY:  We don't need this kind of             11:31

20       speech, Mike.                                             11:31

21           MR. ANDERTON:  What I need, Mike, is a                11:31

22       witness who will answer the questions that are            11:31

23       put to him.                                               11:31

24           MR. KERENSKY:  Well, I think he's doing a             11:31

25       great job of that.  And we don't need your                11:32

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 380

1     speech.  And really this is out of bounds.              11:32
2     You ask all questions you want, but making              11:32
3     speeches like this is highly objectionable.             11:32
4     You're just trying to intimidate the witness,           11:32
5     which will not work.                                    11:32
6          MR. ANDERTON:  I'm not trying to --                11:32
7          MR. KERENSKY:  He's not intimidated and            11:32
8     neither am I.                                            11:32
9          MR. ANDERTON:  I'm not trying to --                11:32
10         MR. KERENSKY:  So why don't you just ask            11:32
11    questions.                                               11:32
12         MR. ANDERTON:  Are you done, Mike?                  11:32
13         MR. KERENSKY:  I'm done.                            11:32
14         MR. ANDERTON:  I'm not trying to                    11:32
15    intimidate anyone.  I'm merely trying to get             11:32
16    this process to move forward.  What we're                11:32
17    going to see as we make our way through these            11:32
18    notes is that Dr. Bliesner is holding very               11:32
19    firmly to certain concepts he was -- that were          11:32
20    given to him by the lawyers in this case and             11:32
21    is deliberately being non-responsive.                    11:32
22         MR. KERENSKY:  That's a total                       11:32
23    mischaracterization of what's going on here.            11:32
24  BY MR. ANDERTON:                                           11:32
25       Q.   Dr. Bliesner, does the term gross               11:32

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                    Page 381

1    negligence appear in your report?                          11:32

2        A.    Not that I recall.                               11:32

3        Q.    The next page of Exhibit 153.                    11:33

4        A.    Okay.                                            11:33

5        Q.    Among other things is that same list            11:33

6    that we saw in Exhibit -- well, yeah.  This                11:33

7    appears to be the same or a similar list that we           11:33

8    saw in Exhibit 152.                                        11:33

9        Do you see that?                                       11:33

10       A.    This down here at the bottom?                    11:33

11       Q.    Yeah.                                            11:33

12       A.    No.                                              11:33

13       Q.    About the same list, isn't it?                   11:33

14       A.    Yeah, it looks like it.  This would be a         11:33

15   transcript of this that was more readable.                 11:33

16       Q.    Okay.                                            11:33

17       A.    Uh-huh.                                          11:33

18       Q.    On the middle of the right side of this          11:33

19   page it says, "my top list."  What does that mean?         11:33

20       A.    I'm sorry.  Where are we talking about?          11:34

21       Q.    The middle of that page.  It's the third         11:34

22   page of Exhibit 153.                                       11:34

23       A.    The third page?                                  11:34

24       Q.    Middle right side, about halfway down,           11:34

25   right edge, it says "my top list."  What does that         11:34

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II Videotaped - Revised                    February 18, 2011

Page 382

1    mean?                                                    11:34

2       A.    That was the list that I came up with          11:34

3    off the top of my head.                                  11:34

4       Q.    The next page of that same Exhibit 153          11:34

5    is note that says, "are you aware of the fact that       11:34

6    FDA" and then a semi-colon.   What does that mean?       11:34

7       A.    I have no idea.                                 11:34

8       Q.    The next item, number two, says                 11:34

9    "possible equals we loose."  I assume that you           11:34

10   meant to say "we lose."                                  11:34

11      A.    I believe that's what it was intended to        11:34

12   be.                                                      11:34

13      Q.    So "loose" is a misspelling of "lose"?          11:34

14      A.    I would assume that's correct, yes.             11:34

15      Q.    "Possible equals we lose."  What does           11:34

16   that mean?                                               11:35

17      A.    I believe it was one of the attorneys           11:35

18   talking about trying to define for me "possible"         11:35

19   and "probable" because I didn't understand it.           11:35

20      Q.    So you then -- well, so you discussed           11:35

21   with Plaintiffs' counsel the difference between          11:35

22   "possible" and "probable," right?                        11:35

23      A.    Yes.                                            11:35

24      Q.    And you didn't understand it before that        11:35

25   conversation; right?                                     11:35

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                    Page 383

1        A.    That's correct.  In legal terms.          11:35

2        Q.    Did you understand it after that          11:35

3    conversation?                                       11:35

4        A.    I still think I had difficulty with it    11:35

5    up until the deposition because Mr. -- what was     11:35

6    the other gentleman's name?  Moriarty?              11:35

7        Q.    Yeah, Moriarty.                           11:35

8        A.    Yeah.  We went back and forth on it so I  11:35

9    was still a little bit cloudy at that stage of the  11:35

10   game.                                               11:36

11       Q.    Okay.  A little bit cloudy?  You said     11:36

12   you had no idea.                                     11:36

13       A.    No.  Gross negligence.                    11:36

14       Q.    No.  When you were being examined by      11:36

15   Mr. Moriarty, you said you had no notion of the     11:36

16   difference between probable and possible.           11:36

17       A.    I don't recall being that definitive.     11:36

18   We could look it up in the transcript.              11:36

19       Q.    Well, we can.  The record will show what  11:36

20   it shows.                                           11:36

21       A.    Okay.                                     11:36

22       Q.    But what you're now saying is you         11:36

23   actually discussed that distinction with           11:36

24   Plaintiffs' counsel the day before you were        11:36

25   deposed.                                            11:36

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 384

1     A.    Yes.                                              11:36

2     Q.    And they did such a great job in that            11:36

3  discussion that you came to that deposition still          11:36

4  having no idea.                                            11:36

5     A.    Apparently they didn't prepare me very            11:36

6  well, did they?                                            11:36

7        MR. KERENSKY:  Oh, sorry.                            11:36

8  BY MR. ANDERTON:                                           11:36

9     Q.    Now back to the substance of this                11:36

10  comment.  "Possible equals we lose."  You've told          11:36

11  me that that jars your recollection that you were          11:36

12  discussing the difference between probability and          11:36

13  possibility with Plaintiffs' counsel.                      11:36

14     Now tell me what that means.                           11:36

15     A.    Probable, according to my notes and as I         11:37

16  understand it now, probable means there's a                11:37

17  reasonable degree of a certainty.                          11:37

18     Q.    Dr. Bliesner?                                    11:37

19     A.    Yes.                                             11:37

20     Q.    Pay attention to my question and answer          11:37

21  my question or we're going to be here all day, and         11:37

22  we're going to be back for a third session.                11:37

23     A.    Okay.                                            11:37

24     Q.    Tell me what your note, "possible equals         11:37

25  we lose" means.  I didn't ask you to define                11:37

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 385

1  probable versus possible.  I ask you now for the          11:37

2  third time to tell me what your note means.              11:37

3      A.    I'm thinking about it because it was --         11:37

4      Q.    Take as much time as you need to think          11:37

5  about it, but answer that question.                       11:37

6      A.    I will.  Can I get some more water,             11:37

7  please?                                                   11:37

8      Q.    Yes, you may.                                   11:37

9      A.    Thank you.                                      11:37

10        MR. ANDERTON:  Let's go off the record.            11:38

11        THE VIDEOGRAPHER:  The time is 11:37 a.m.          11:38

12     We're going off the record.                           11:38

13        (Short break)                                      11:38

14        THE VIDEOGRAPHER:  Time is      ; we're            11:38

15     back on the record.                                   11:38

16        MR. ANDERTON:  Phil, will you read that            11:39

17     last question back, please?                           11:39

18           (Whereupon, the testimony was read             11:39

19  back by the court reporter, as recorded above)           11:39

20        THE WITNESS:  From what I recall in the            11:39

21     conversation, possible leaves room for doubt;         11:39

22     probable does not.  And "may" leaves doubt.           11:39

23     So from protecting, what do they call them,           11:39

24     the client, that from a legal opinion, they           11:39

25     were trying to describe to me they thought            11:39

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 386

1        that the cases would not stand up if it was          11:39

2        possible or may.                                      11:39

3    BY MR. ANDERTON:                                          11:39

4        Q.    So if you -- so you were told by the            11:39

5    Plaintiffs' counsel that if you acknowledged              11:39

6    something was only possible, Plaintiffs would             11:39

7    lose?                                                     11:39

8        A.    The conversation as I recall in this            11:39

9    discussion was I need to determine in my mind             11:39

10   based on my report and the data that I looked at          11:39

11   those three things.                                       11:40

12       Q.    I understand that.                              11:40

13       A.    Yes.                                            11:40

14       Q.    But you were told that if you answer a          11:40

15   question and acknowledge something was possible,          11:40

16   Plaintiffs would lose; right?                             11:40

17       A.    Yes.                                            11:40

18       Q.    And if you answered a question and              11:40

19   acknowledged that something -- if you said may?           11:40

20       A.    Yes.                                            11:40

21       Q.    Instead of probable, Plaintiffs would           11:40

22   lose.                                                     11:40

23       A.    Yes.                                            11:40

24       Q.    So you were told not to answer questions        11:40

25   as possible or may, if possible; right?                   11:40

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 387

1     A.    No, that's not true at all.                    11:40

2     Q.    It isn't?                                       11:40

3     A.    I was told specifically these are the           11:40

4   conditions that may lead to "lose," if you will;        11:40

5   all right?  And that I needed to make sure where I      11:40

6   was comfortable with respect to my report on those     11:40

7   definitions, and it was up to me.                       11:40

8     Q.    And how does -- how does your comfort           11:40

9   with respect to your report factor into whether         11:40

10  the Plaintiffs are going to lose or not?  That's        11:40

11  not something you considered in drafting your          11:40

12  report, is it?                                          11:40

13    A.    Could you say that again, please?  I'm          11:40

14  not being a pain.  I'm just trying to.                  11:40

15         MR. ANDERTON:  Phil would be happy to            11:40

16     read that back to you.                               11:40

17         (Whereupon, the testimony was read               11:40

18  back by the court reporter, as recorded above)          11:40

19         THE WITNESS:  No, not at all.  I didn't          11:41

20     consider win or loss or anything.  I reviewed        11:41

21     the data, I put together a report, I drew            11:41

22     conclusions based on the documents that I had        11:41

23     reviewed, and that was it.                           11:41

24  BY MR. ANDERTON:                                        11:41

25     Q.    And as you prepared for the deposition         11:41

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 388

1    and to be asked questions about the analysis and        11:41

2    conclusions reached, you were told to consider         11:41

3    whether Plaintiffs would lose.                          11:41

4         A.    They said words to the effect, if I         11:41

5    recall, be aware that if you use these words this       11:41

6    is what it means from a legal term.  Because            11:41

7    apparently I didn't understand the difference           11:41

8    between probable and possible.  That's what they        11:41

9    said.                                                   11:41

10        Q.    So you were told that if you said            11:41

11   possible rather than probable, it would mean            11:42

12   Plaintiffs would lose?                                  11:42

13        A.    Potentially, yes.  But I was not             11:42

14   directed to specifically use those words or not         11:42

15   use those words.  It was me.                            11:42

16        Q.    I understand.  And were you also told if     11:42

17   you say "may" rather than "probable," Plaintiffs        11:42

18   would lose?                                             11:42

19        A.    According to my notes, yes.                  11:42

20        Q.    I want you to tell me if that's what you     11:42

21   were told, Dr. Bliesner.                                11:42

22        A.    I was told that, yes.                        11:42

23        Q.    Okay.  Below that --                         11:42

24        A.    Uh-huh.                                      11:42

25        Q.    -- there's a bracketed or kind of like      11:42

1    an almost box.  It says "problem could be with."        11:42

2    That's W/sub potent for blend uniformity.  What         11:42

3    does that mean?                                          11:42

4         A.    I think one of the attorneys asked me        11:42

5    that question so I just jotted it down.                  11:42

6         Q.    Who asked you?                                11:43

7         A.    I don't recall.                               11:43

8         Q.    You just jotted down the question they        11:43

9    asked you?                                               11:43

10        A.    I did, yeah.  There was points where          11:43

11   they asked think about this.  Okay.  So I jotted         11:43

12   it down.                                                 11:43

13        Q.    So they told you that -- they told you        11:43

14   that as you answered -- listened to and answered         11:43

15   questions, you should -- you should remember that        11:43

16   the problem -- I assume that means with Digitek --       11:43

17   could be with a blend uniformity or a sub-potent         11:43

18   product; right?                                          11:43

19        A.    No, I don't think that's the case             11:43

20   necessarily.  There was instruction going on here        11:43

21   with attorneys on top of it all.  So some of this        11:43

22   was, you know, go back, make a note of it, go back       11:43

23   and explain to them my interpretation because they       11:43

24   hadn't been exposed to any of this stuff before.         11:43

25        Q.    "They" who?                                   11:43

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised        February 18, 2011

Page 390

1       A.    The attorneys.  They don't understand        11:43

2    some of the subtleties in the manufacturing arena.    11:43

3       Q.    So your testimony is that on the day         11:43

4    before your deposition, almost three years into       11:43

5    this litigation, you felt that the Plaintiffs'        11:44

6    lawyers you were working with needed guidance on      11:44

7    something as basic as whether something was           11:44

8    sub-potent or whether there was a blend uniformity    11:44

9    issue?                                                11:44

10      A.    I can't state to that fact.  I know          11:44

11   there were two new people in the room -- mike and     11:44

12   what was the other gentleman's name? -- and they      11:44

13   asked me questions so I jotted them down.             11:44

14      Q.    Well, Dr. Bliesner --                        11:44

15      A.    Uh-huh.                                      11:44

16      Q.    -- this is one of those situations where     11:44

17   it seems to me like you kind of want to have it       11:44

18   both ways.  When I ask you a specific question and    11:44

19   said -- and asked whether this is what that means,    11:44

20   you said no, that's not what it means.  When I ask    11:44

21   you generally what it means, you respond by saying    11:44

22   "I don't know."                                       11:44

23       MR. KERENSKY:  Objection, form.                   11:44

24   BY MR. ANDERTON:                                      11:44

25      Q.    So, I mean --                                11:44

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 391

1      A.    I cannot definitively tell you where          11:44

2   this statement fits into this conversation.  I        11:44

3   just cannot.                                           11:44

4      Q.    Okay.  The next -- below that on the          11:44

5   left side there's like a phrase that says              11:44

6   "conscious indifference."  "Gross negligence."         11:45

7   Do you see that?                                       11:45

8      A.    Yes.                                          11:45

9      Q.    Why did you write that?                       11:45

10      A.    Because they were terms that they were       11:45

11   throwing around.  So I jotted them down so I could    11:45

12   try to figure out what it meant.                      11:45

13      Q.    On the very bottom right corner -- don't     11:45

14   turn the page just yet, Dr. Bliesner.                 11:45

15      A.    Sorry.                                       11:45

16      Q.    There's another bracketed phrase that        11:45

17   says, "what is the likelihood of blend uniformity     11:45

18   causing these super of sub-potent."  I assume         11:45

19   that's supposed to be super or sub potent?            11:45

20      A.    I'm thinking that's probably what it was     11:45

21   supposed to be.                                       11:45

22      Q.    All right.  So why did you make that         11:45

23   note?                                                 11:45

24      A.    I don't know.  I don't recall why I made     11:45

25   that note.  Again, it might have been a question      11:45

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 392

1    from one of the attorneys or.                              11:45

2       Q.   Did you discuss with the Plaintiffs'              11:45

3    counsel on the 24th the notion of the difference          11:45

4    between double-thick tablets and tablets that were        11:45

5    either super or sub-potent?                               11:45

6       A.   The difference between?                           11:46

7       Q.   Yeah.                                             11:46

8       A.   I don't recall that conversation, the            11:46

9    difference between.                                       11:46

10      Q.   Did they tell you to make sure that you          11:46

11   kept the door open -- to use your terminology --          11:46

12   to give testimony that there were either super            11:46

13   potent or sub-potent tablets produced?                    11:46

14      A.   Do we need to read this back?                     11:46

15      Q.   We do, please.                                    11:46

16      A.   Okay.                                             11:46

17           (Whereupon, the testimony was read back           11:46

18   by the court reporter, as recorded above)                 11:46

19       THE WITNESS:  I don't recall being               11:46

20       specifically asked to leave the door open or      11:46

21       that issue in particular with respect to super    11:46

22       or sub-potent.                                     11:46

23       MR. ANDERTON:  Okay.  I need to go off          11:46

24       the record for about 30 seconds.  Mike, stay     11:47

25       close.                                            11:47

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 393

1          THE VIDEOGRAPHER:  The time is                11:47

2     11:46 a.m.  We're going off the record            11:47

3     briefly.                                           11:47

4               (Short break)                            11:47

5          THE VIDEOGRAPHER:  The time is                11:47

6          a.m.  We're back on the record.              11:47

7  BY MR. ANDERTON:                                      11:47

8     Q.    All right.  So turn to the next page of     11:47

9  Exhibit 153, Dr. Bliesner.                            11:47

10    A.    Yes.                                         11:47

11    Q.    On the top it says, the second line of      11:47

12 that next page it says "think:"                       11:47

13    A.    Uh-huh.                                      11:47

14    Q.    "Can I ask this question?"  What does       11:47

15 that mean?                                            11:48

16    A.    I think I had a question can I ask -- as    11:48

17 I'm being deposed, can I ask questions back of the    11:48

18 people who are asking me questions.                   11:48

19    Q.    What did they tell you?                      11:48

20    A.    They said no, you're pretty much            11:48

21 supposed to sit there and answer questions, if I     11:48

22 remember right.                                       11:48

23    Q.    Okay.                                        11:48

24    A.    Uh-huh.                                      11:48

25    Q.    Next a little bit below that it says        11:48

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 394

1    "tell me all" with an extended ellipses, and then       11:48
2    it says, "give them roman numerals."  What does         11:48
3    that mean?                                              11:48
4         A.    That's the lists that we came up with.       11:48
5         Q.    Okay.  "We" came up with?                    11:48
6         A.    Well, I gave it.  Somebody wrote it on       11:48
7    the board as I was saying it.                           11:48
8         Q.    Oh, you had a white board?                   11:48
9         A.    Uh-huh.                                      11:48
10        Q.    Where was this?                              11:48
11        A.    The conference room.                         11:48
12        Q.    Where?                                       11:48
13        A.    In the hotel next door.                      11:48
14        Q.    At the Hyatt?                                11:48
15        A.    What was it?  Sheraton, I believe.           11:48
16        Q.    Okay.                                        11:48
17        A.    Uh-huh.                                      11:48
18        Q.    Who was writing on the board?                11:48
19        A.    At that time?  I think it was Mike.          11:48
20        Q.    Mike Kerensky?                               11:49
21        A.    Yes.                                         11:49
22        Q.    I'm sorry I missed that.                     11:49
23        So what -- help me out here with context,          11:49
24    then.  You were collectively generating a list and     11:49
25    the list that is set forth in Roman numerals in        11:49

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 395

1    Exhibit 152?                                          11:49

2        A.    Yes.                                        11:49

3        Q.    And then you wrote them down as you         11:49

4    collectively generated that list?                    11:49

5        A.    As I was pontificating, somebody said       11:49

6    oh, okay.  I believe it was, if I recall, Mike        11:49

7    just writing it down.  It was all off the top of      11:49

8    my head.                                              11:49

9        Q.    Well, but -- okay.                          11:49

10       A.    Uh-huh.                                      11:49

11       Q.    Go to the next page.  The very last page     11:50

12   of Exhibit 153.                                        11:50

13       A.    Last page?                                   11:50

14       Q.    Yeah.  And let me ask you this:              11:50

15       A.    Uh-huh.                                      11:50

16       Q.    Have you given a copy of these notes to      11:50

17   the lawyers?                                           11:50

18       A.    I don't know.  I really don't know if       11:50

19   they've got a copy of it.                              11:50

20       Q.    You would have made the copies; right,       11:50

21   Dr. Bliesner?                                          11:50

22       A.    Not necessarily.                             11:50

23       Q.    Your wife would have made them for you?      11:50

24       A.    The notes were done in the conference        11:50

25   room when we prepped the day before.                  11:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 396

1       Q.    And you think the lawyers maybe took          11:50
2    them and made copies of them?                          11:50
3       A.    I have no idea.  They perhaps could            11:50
4    have.                                                   11:50
5       Q.    On that last page --                           11:50
6       A.    Uh-huh.                                         11:50
7       Q.    -- number two says NTI.  I take it             11:51
8    that's supposed to mean narrow therapeutic index?       11:51
9       A.    I don't know.                                   11:51
10      Q.    You don't know?                                 11:51
11      A.    I really don't.                                 11:51
12      Q.    Bracket references the EIR 2008, "95            11:51
13   pages.  Will ask."  What does that mean?                 11:51
14      A.    I don't know.                                   11:51
15      Q.    At the very bottom it says, "Pills             11:51
16   probably got out there."                                 11:51
17      Do you see that?                                       11:51
18      A.    I do.                                            11:51
19      Q.    You wrote that; right?                           11:51
20      A.    I did write that.                                11:51
21      Q.    What's it mean?                                  11:51
22      A.    It means at the end of the day, after          11:51
23   looking at my report again and having these              11:51
24   discussions that I was convinced that it was             11:51
25   probable that more than just two or three or             11:52

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 397

1    whatever, double-thick or whatever, thin tablets          11:52
2    that were out there got out there.  I was                 11:52
3    convinced with the data.                                  11:52
4       Q.    Which brings us back to the underlying           11:52
5    question that prompted all of this.                       11:52
6       A.    Uh-huh.                                          11:52
7       Q.    Your opinion indicates that you believe          11:52
8    adulterated product reached the market.                   11:52
9       A.    Well, we know it reached the market.  We         11:52
10   have a couple of circumstances where we know that         11:52
11   it did.                                                   11:52
12      Q.    Okay.  And when you say a couple of              11:52
13   circumstances, you're talking about the 2004              11:52
14   circumstance and the 2008 allegations that                11:52
15   double-thick tablets reached the market.                  11:52
16      Am I correct about that?                               11:52
17      A.    Not necessarily because we stopped              11:52
18   sometime back going through, picking out to make          11:52
19   sure that there was other points other than what          11:52
20   you're pointing out right there.                          11:53
21      Q.    Are you aware of any other circumstances         11:53
22   that suggest to you that we -- that you know               11:53
23   double-thick tablets reached the market?                  11:53
24      A.    In your original question --                    11:53
25      Q.    I'm asking you that question now.                11:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 398

```
1       A.    Unless I finish reviewing this report, I      11:53

2   can't answer that question.                             11:53

3         MR. ANDERTON:  Let's go off the record            11:53

4     and allow you to do that.                             11:53

5         THE VIDEOGRAPHER:  The time is now                11:53

6         a.m.  We're going off the record                  11:53

7     briefly.                                               11:53

8               (Short break)                                12:01

9         THE VIDEOGRAPHER:  The time is                     12:01

10        p.m.  We are back on record.                       12:01

11  BY MR. ANDERTON:                                         12:01

12      Q.    Dr. Bliesner, I asked you a question or       12:01

13  I started to ask you a question about your              12:01

14  opinions in this case.                                   12:01

15      A.    Uh-huh, yes.                                   12:01

16      Q.    And in response you said "we know".           12:01

17  Know --                                                  12:02

18      A.    Uh-huh.                                        12:02

19      Q.    -- adulterated product reached the            12:02

20  market.                                                  12:02

21      A.    Yes.                                           12:02

22      Q.    I then asked you the basis for your           12:02

23  testimony that we know adulterated product reached      12:02

24  the market and you said -- you asked to review          12:02

25  your report which you just did; right?                  12:02
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 399

1      A.    Yes.                                              12:02

2      Q.    Have you reviewed your report and are             12:02

3   you able to answer my questions on how we know or          12:02

4   you think you know adulterated product reached the         12:02

5   market?                                                    12:02

6      A.    I have a -- general idea is to go back            12:02

7   and specifically look at the wording, I would have         12:02

8   to go to the appendices, but I can give you the            12:02

9   references.                                                12:02

10     Q.    You've got a 90-some page document in             12:02

11  front of you.                                              12:02

12     A.    Yes.                                              12:02

13     Q.    You need to go outside that 90-page               12:02

14  document to answer my question about how we -- how         12:02

15  you think you know adulterated product reached the         12:02

16  market?                                                    12:02

17     A.    Yeah, I want to make sure I'm answering           12:02

18  the question completely.                                   12:02

19     Q.    Well, tell me what you know from                  12:03

20  reviewing the report.                                      12:03

21     A.    From reviewing the report on page 79,             12:03

22  number 12, that there was a Class II recall                12:03

23  initiated through variation in tablet size                 12:03

24  resulting in sub or super potent drug product,             12:03

25  according to reference attachment D5.                      12:03

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 400

1    Q.    Was that Digitek?                                      12:03

2    A.    I don't recall.  I'd have to look it up.               12:03

3    Q.    What was the year of that?                             12:03

4    A.    1990.                                                  12:03

5    Q.    1990?                                                  12:03

6    A.    Uh-huh.                                                12:03

7    Q.    21 years ago?                                          12:03

8    A.    Yes.                                                   12:03

9    Q.    Okay.  What else do you know from                      12:03

10  reviewing your report?                                        12:03

11   A.    Page 81, June 2004, complaint received                 12:03

12  from a pharmacist in Bellingham, Washington,                  12:03

13  regarding thick Digoxin tablet.  MI confirms                  12:03

14  thickness.  No definitive root cause found.                   12:04

15   Q.    2004, a single tablet; right?                          12:04

16   A.    I would have to look at the reference to               12:04

17  determine whether it was one tablet or not.                   12:04

18   Q.    Dr. Bliesner, this is your report;                     12:04

19  right?                                                        12:04

20   A.    It is my report, yes, sir.                             12:04

21   Q.    Now this is why this takes so long.  Is                12:04

22  it more than a single tablet?                                 12:04

23        MR. KERENSKY:  He doesn't need be                       12:04

24     lectured about how long it takes.  We need you             12:04

25     to ask questions.                                          12:04

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 401

1      MR. ANDERTON:  I need him to answer          12:04

2   questions, Mike.                               12:04

3      MR. KERENSKY:  He's answering them.          12:04

4      MR. ANDERTON:  No, he's not.                 12:04

5      MR. KERENSKY:  Well, when you ask a real     12:04

6   broad question about tell me everything you     12:04

7   know, it's going to take time, bro?             12:04

8      MR. ANDERTON:  Bro?                          12:04

9      MR. KERENSKY:  Bro.                          12:04

10  BY MR. ANDERTON:                                12:04

11     Q.   Dr. Bliesner.                           12:04

12     A.   Yes.                                    12:04

13     Q.   Your report on page 81 refers to a      12:04

14  single thick tablet; right?                     12:04

15     A.   Unless I go back and pull up those      12:05

16  reference, I can't tell you whether it's one or  12:05

17  more.                                           12:05

18     Q.   You can't?                              12:05

19     A.   No, definitively.  I would be guessing  12:05

20  unless I go back to that primary reference.     12:05

21     Q.   All right.  Moving on.                  12:05

22     What else from your report supports your     12:05

23  conclusion that adulterated Digitek reached the  12:05

24  market?                                         12:05

25     A.   On page 87.                             12:05

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 402

1      Q.    Yeah?                                        12:05

2      A.    And this is where I would have to go         12:05

3   back and specifically look because I'm not sure       12:05

4   whether these are returned products or not, but       12:05

5   overweight tablets were found during packaging;       12:05

6   okay?  That one I'm...                                12:05

7      Q.    What number are you referring to?            12:05

8      A.    47, 47.                                       12:05

9      Q.    47?                                           12:05

10     A.    Yeah.  A39 reference.  That's why I          12:05

11  wanted to look at it because I'm not sure whether      12:05

12  that has to do with stuff that made it to the          12:05

13  market or they caught it within the facility.          12:06

14     Q.    Would reference number 47, your              12:06

15  reference number 47 tell you that?                     12:06

16     A.    A39.                                          12:06

17     Q.    I'm sorry.  Would that tell you whether      12:06

18  it made it to market?                                  12:06

19     A.    More than likely whether this was done       12:06

20  internally and it wasn't returned.                     12:06

21     Q.    Okay.  What else from your report?           12:06

22     A.    Number 49 on page 84, Mylan acknowledges     12:06

23  pharmacist identifying double-thick product in         12:06

24  marketplace.                                           12:06

25     Q.    Okay.                                         12:06

Page 403

1   A.    A58.                                            12:06

2   Q.    Anything else?                                  12:06

3   A.    From what I can see, no.                        12:06

4   Q.    Okay.  Now, this binder -- oh, Phil             12:06

5   would you mark this, please?                          12:06

6      (Whereupon, Exhibit 154 was marked for             12:07

7   identification)                                       12:07

8      Dr. Bliesner, will you look at the binder          12:07

9   that's marked as Exhibit 154 and find your            12:07

10  reference attachment A36, please.  I'm sorry.  I      12:07

11  misspoke.  A39, please.                               12:07

12     Did you find A36?                                  12:08

13     A.    I'm just double checking here.  Does not     12:08

14  appear to be the direct reference that I thought      12:08

15  it was going to.                                      12:08

16     Q.    I'm sorry.  A39.  I misspoke again.  Did     12:08

17  you find A39?                                         12:08

18     A.    I did find A39, but it does not appear       12:08

19  to me to be the reference that I referenced           12:08

20  here -- A39.                                          12:08

21     Q.    What is A39, Doctor?                         12:09

22     A.    A39 is response to the FDA 483 issued to     12:09

23  Activis on 5/20/2008.                                 12:10

24     Q.    Let's not take our common sense hats         12:10

25  off; okay?  Let's think about this logically.         12:10

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 404

```
 1      A.    Okay.                                    12:10

 2      Q.    Your paragraph 47 on page 87 of your     12:10

 3  report refers to an investigation of Digoxin       12:10

 4  tablets, lot 8022881.                              12:10

 5      A.    Uh-huh.                                  12:10

 6      Q.    For overweight tablets --                12:10

 7      A.    Uh-huh.                                  12:10

 8      Q.    -- which were found during packaging     12:10

 9  right?                                             12:10

10      A.    Uh-huh.                                  12:10

11      Q.    You have to say yes or no, please.       12:10

12      A.    Yes, I'm sorry.                          12:10

13      Q.    Okay.                                    12:10

14      A.    I'm sorry.                               12:10

15      Q.    Do you cite that as support in your      12:10

16  report, in the body of your conclusion that        12:10

17  product actually made it to market?                12:10

18      A.    What I was asked to review, I was asked  12:10

19  to pick out things and I'm not sure whether these  12:10

20  were picked up in site or they were returned       12:10

21  products or something like that.                   12:10

22      Q.    Now answer my question.                  12:10

23      A.    Okay.                                    12:10

24      Q.    Do you cite that batch and the           12:10

25  circumstances -- and any circumstances relating to 12:10
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 405

1    that batch in the body of your report as an          12:11

2    indication that product -- defective product or      12:11

3    adulterated product made it to market?               12:11

4        A.    This is the citation.  Criminal            12:11

5    investigation, QA hold pending.                      12:11

6        Q.    Dr. Bliesner.                               12:11

7        A.    I'm trying to answer your question, sir.   12:11

8        Q.    I asked you if you cite it in your         12:11

9    report.  You're now looking at something other       12:11

10   than your report.                                     12:11

11       A.    Right, because I've got to go back --       12:11

12       Q.    How do you determine --                     12:11

13       A.    Because I want to see where the             12:11

14   investigation is, if it's cited in the reference      12:11

15   to make sure that the reference is correct.           12:11

16       Q.    Okay.                                        12:12

17       A.    Okay?                                        12:12

18       Q.    Okay.                                        12:12

19       A.    I'm not messing with you.                   12:12

20       Q.    You actually are.                            12:12

21       A.    I'm just trying to get the right            12:12

22   answer.  No, sir, I'm not.                            12:12

23       That reference does not support the statement    12:15

24   that product made it to market.  That specific       12:15

25   reference does not.                                   12:15

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 406

1       Q.    Okay.                                    12:15

2       A.    Okay.                                    12:15

3       Q.    So -- well, suffice to say,              12:15

4  Dr. Bliesner, that there's ample information out    12:16

5  there in the record making very clear that that     12:16

6  batch was in fact rejected and never went to        12:16

7  market.                                             12:16

8       You don't have any information that            12:16

9  contradicts that, do you?                           12:16

10      A.    Not to my knowledge, no.                 12:16

11      Q.    Okay.  So, if that batch was rejected    12:16

12  that -- that -- the circumstances relating to or   12:16

13  set forth in your paragraph 47 on page 18 of your  12:16

14  report do not constitute any evidence that         12:16

15  defective or adulterated Digitek -- I want to make 12:16

16  this clear.  That adulterated Digitek actually     12:16

17  made it to market, did they?                       12:16

18      A.    That is correct.                         12:16

19      Q.    Okay.  You also referred to -- and so    12:16

20  that we're clear, you also made reference to that  12:16

21  batch 8022801 from paragraph 47 on page 87.  So    12:17

22  your prior testimony about that possibly           12:17

23  supporting a statement that we know adulterated    12:17

24  product made it to market, that's not accurate     12:17

25  with respect to any circumstances relating to      12:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 407

1    batch 8022801, is there?                               12:17

2        A.    What page was that?                          12:17

3        Q.    87.                                          12:17

4        A.    No, it's the same -- same statement.         12:17

5    It's just information put in a different place.        12:17

6        Q.    Okay.                                        12:17

7        A.    Uh-huh.                                      12:17

8        Q.    All right.                                   12:17

9        A.    We were going to check on number 49.         12:17

10       Q.    We'll get there.                             12:17

11       A.    Okay.                                        12:17

12       Q.    The -- Dr. Bliesner, so we've eliminated     12:17

13   batch 80228.  The circumstances in 2004 where a        12:18

14   pharmacist found a tablet in the market, was that      12:18

15   part of the recalled product?                          12:18

16       A.    Which recall?                                12:18

17       Q.    The 2008 recall of Digitek.                  12:18

18       A.    The product for the?                         12:18

19       Q.    The tablet that was found in the market      12:18

20   in 2004, was that part of the recalled product?        12:18

21       A.    Not to my knowledge.                         12:18

22       Q.    The expiration period for this product       12:18

23   is two years.  Are you aware of that?                  12:18

24       A.    I am not.                                    12:18

25       Q.    Okay.  You'll take my word for it?           12:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 408

1      A.    I'll take your word for it.                    12:18

2      Q.    So if a tablet was found in the market         12:18

3   in 2004 and was manufactured no later than 2004        12:18

4   and therefore was no longer in the market and          12:18

5   within expiration as of 2008; correct?                 12:18

6      A.    2004, two years I would say yes, that's        12:18

7   fair.                                                   12:18

8      Q.    Okay.  And again, there's plenty of            12:19

9   evidence out there that speaks to what or was not      12:19

10  part of the recall product.                            12:19

11     Which leaves us -- and the 1990 circumstances        12:19

12  certainly have nothing, no -- none of the product      12:19

13  that was involved in the circumstances you cited       12:19

14  in 1990 were part of the 2008 recall; correct?         12:19

15     A.    Not part of the 2008 recall, no.              12:19

16     Q.    Okay.  All right.                             12:19

17     A.    It may have impacted the product,             12:19

18  though.                                                 12:19

19          THE VIDEOGRAPHER:  We've got five minutes       12:19

20     left on the tape.                                    12:19

21  BY MR. ANDERTON:                                        12:19

22     Q.    Okay.  It may have impacted what              12:19

23  product?                                                12:19

24     A.    We're not sure because the reference is       12:19

25  just for a recall for double-thick, double thin.       12:19

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                 February 18, 2011

Page 409

1    The information I was provided doesn't          12:19

2    specifically say what the product is.           12:19

3         Q.    Okay.                                12:19

4         A.    There was indications that they've had    12:19

5    problems with double-thick, double thin or thin or    12:19

6    thick tablets in days gone by in the manufacturing    12:19

7    process.                                        12:19

8         Q.    And so you're willing to infer that    12:19

9    something that happened in 1990 was still         12:19

10   occurring in 199-- or in 2008, 18 years later?    12:19

11        A.    I think it's fair to say that the     12:20

12   information that's there in documents that I       12:20

13   reviewed showed that the same people who were in    12:20

14   charge of the quality and manufacturing back then    12:20

15   are the same people that were there later down the    12:20

16   road.  The same processes -- I'm trying to think    12:20

17   when the ANDAs were, the equipment was.  So if      12:20

18   people and equipment were in place and obviously    12:20

19   they had problems with quality systems difficulty,    12:20

20   else they wouldn't have had all the problems with    12:20

21   the FDA.                                         12:20

22        So there were documented problems with the    12:20

23   quality systems, same people and mostly like the    12:20

24   same equipment on the stuff that occurred later     12:20

25   on.                                             12:20

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 410

```
 1      Q.    Okay.  Who was the director of          12:20
 2  manufacturing in 2008, do you know?              12:20
 3      A.    I'd have to go back.                    12:20
 4      Q.    I'm sorry.  In 2007.                    12:20
 5      A.    I'd have to go back and look at that.   12:20
 6      Q.    It was Rick Dowling.                    12:20
 7      A.    Okay.                                   12:20
 8      Q.    You'll take my word for that?           12:20
 9      A.    Sure.                                   12:20
10      Q.    When was Rick Dowling hired?            12:20
11      A.    I'd have to go back and look that up.   12:20
12      Q.    Was he employed in 1990?               12:20
13      A.    I'd have to go back and look it up.     12:20
14      Q.    Because Activis in 1990 was Amide;      12:21
15  correct?                                          12:21
16      A.    I believe it was.                       12:21
17      Q.    Were they making Digitek as of 1990?   12:21
18      A.    I'd have to look that up, but it's a    12:21
19  possibility they were.                            12:21
20      Q.    It is?                                  12:21
21      A.    Yes.                                    12:21
22      Q.    Their ANDA was approved when?           12:21
23      A.    They were releasing product by the batch  12:21
24  release certification process back then.  So they  12:21
25  submitted and sold product based on that and not   12:21
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 411

1    the ANDA.                                              12:21

2         Q.    If it's true --                            12:21

3         A.    Uh-huh.                                     12:21

4         Q.    -- that Activis -- or Amide rather --       12:21

5    wasn't making Digoxin until 1995, then the 1990        12:21

6    circumstances have no bearing on your conclusion       12:21

7    that adulterated Digitek -- that your supposed         12:21

8    conclusion that we know adulterated Digitek made       12:21

9    it to market; correct?                                 12:21

10        A.    I don't know if I understand that           12:21

11   question.                                              12:21

12        Q.    You don't understand it because it was a    12:21

13   very poorly worded question.  So I'm going to          12:21

14   start that one over.                                   12:22

15        If it's true that Amide didn't start              12:22

16   manufacturing Digitek until 1995, then the             12:22

17   circumstances you refer to about a 1990 recall         12:22

18   have nothing to do with your conclusion in your        12:22

19   report that we know adulterated Digitek reached        12:22

20   the market; correct?                                   12:22

21        A.    I don't think you can say that.             12:22

22        Q.    They weren't making it.                     12:22

23        A.    They were making Digoxin very early on.     12:22

24        Q.    Dr. Bliesner, if they didn't start          12:22

25   making it until 1995, they couldn't -- the recall      12:22

Page 412

1    in 1990 could not have been Digoxin; correct?        12:22

2        A.    I'm not sure without going back and        12:22

3    reviewing the record when they actually started      12:22

4    making Digoxin tablets.                              12:22

5        Q.    Now answer my question.                    12:22

6        A.    Okay.                                       12:22

7        Q.    If they didn't start making it until       12:22

8    1995, the 1990 recall circumstances could not have   12:22

9    been a recall of Digoxin; correct?                   12:23

10       A.    If they did not, that's correct.           12:23

11       Q.    Okay.                                       12:23

12       A.    If.  But we don't know for sure.           12:23

13       Q.    But we do, Dr. Bliesner.                   12:23

14       A.    We do?                                      12:23

15       Q.    Okay.                                       12:23

16       A.    Yes.                                        12:23

17       Q.    We do.                                      12:23

18            THE VIDEOGRAPHER:  You have about two       12:23

19    minutes left.                                        12:23

20            MR. ANDERTON:  Let's break for lunch.       12:23

21            THE VIDEOGRAPHER:  The time is              12:23

22    12:22 p.m.  We're going off the record.             12:23

23            (Short break for lunch)                     12:52

24            THE VIDEOGRAPHER:  The time is now          12:52

25    12:52 p.m.  We are back on the record.  This        12:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 413

1      is the beginning of tape five.                    12:53

2  BY MR. ANDERTON:                                      12:53

3      Q.    Dr. Bliesner, would you look at page 9      12:53

4  of your report, please?                               12:53

5      A.    Sure, yes.                                  12:53

6      Q.    You see paragraph four on page 9?           12:53

7      A.    Yes.                                         12:53

8      Q.    That indicates that in June of 1995 the     12:53

9  FDA issued a certification to Amide which allowed     12:53

10 Amide to manufacture and sell Digoxin under the       12:53

11 batch certification program; right?                   12:53

12     A.    Correct.                                    12:53

13     Q.    Does that refresh your recollection as      12:54

14 to when Amide began manufacturing and distributing    12:54

15 Digitek and whether it was as far back as 1990?       12:54

16     A.    Yes.                                         12:54

17     Q.    Okay.  What we know now is that the 1990    12:54

18 recall was not Digitek or Digoxin; correct?           12:54

19     A.    Most likely.                                12:54

20     Q.    And so then as I understand it, you         12:54

21 agree that the 2004 tablet was not part of the        12:54

22 recalled Digitek; right?                              12:54

23     A.    Based on expiration date and the fact       12:54

24 that it was two years and then later on, yes.         12:54

25     Q.    The 1990 recall was not Digitek; right?     12:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                 February 18, 2011

Page 414

1    A.    Most likely, yes.                            12:54

2    Q.    And the 2008 batch 80228 was rejected        12:54

3  and never made it to market.  That leaves the        12:54

4  tablet referenced in --                              12:55

5    A.    Well, that was that -- just that one lot      12:55

6  that we talked about that was rejected.              12:55

7    Q.    I understand.                                 12:55

8    A.    Okay.                                         12:55

9    Q.    But you've identified for me -- I gave        12:55

10  you a considerable amount of time.                   12:55

11   A.    Uh-huh.                                        12:55

12   Q.    Let's back this up, Dr. Bliesner.             12:55

13   I asked you about your conclusion in this          12:55

14  case.                                                12:55

15   A.    Uh-huh.                                        12:55

16   Q.    And about the conclusion that                 12:55

17  adulterated Digitek was released to market and you   12:55

18  said very clearly "we know that adulterated defect   12:55

19  made it to market."                                  12:55

20   A.    Yes.                                          12:55

21   Q.    I gave you almost a half hour to review       12:55

22  your report and other related documents to come up   12:55

23  with evidence which you believe indicates that you   12:55

24  know adulterated Digitek made it to market.          12:55

25   A.    Uh-huh.                                        12:55

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 415

1      Q.    And you identified all of those                12:55
2   instances and circumstances; right?                     12:55
3      A.    With the information I have reviewed,           12:55
4   yes.                                                     12:55
5      Q.    Okay.  And you've identified everything         12:55
6   that you're aware of; correct?                           12:56
7      A.    In the documents that I was -- reviewed,        12:56
8   yes.                                                     12:56
9      Q.    Dr. Bliesner.                                   12:56
10     A.    Yes.                                            12:56
11     Q.    Have you identified every instance that         12:56
12  you are aware of where you believe adulterated           12:56
13  Digitek made it to market?                               12:56
14     A.    In the documents I reviewed, yes.               12:56
15     Q.    Doctor --                                       12:56
16     A.    There may be other documents out there          12:56
17  that would support the --                                12:56
18     Q.    Are you aware of those?                         12:56
19     A.    I haven't reviewed everything that's on         12:56
20  there, been put out.  So I can't -- I can't say          12:56
21  whether I'm aware of it or not.                          12:56
22     Q.    If you haven't reviewed it, can you be          12:56
23  aware of what's in it?  Is that possible?                12:56
24     A.    No, that's what I'm saying.  There are          12:56
25  additional documents and reports and things like        12:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 416

1    that I'm sure have since become available and I          12:56

2    have not reviewed it.  The documents that I              12:56

3    reviewed, the statement is correct.                      12:56

4        Q.    We're going to stay here all afternoon         12:57

5    until you answer my question.                            12:57

6        A.    That's fine.                                   12:57

7        Q.    Are you aware -- do you know of any            12:57

8    circumstances you haven't identified that you            12:57

9    believe indicate adulterated Digitek made it to          12:57

10   market?                                                  12:57

11       A.    You see, I still don't understand when         12:57

12   you say "any and all" and "aware."  The documents        12:57

13   I've reviewed, that I was told to review and, you        12:57

14   know, looked at and reviewed are the ones that           12:57

15   I've built my report off of, and that's the              12:57

16   circumstances where I found it.                          12:57

17       I can't make a statement as broad as aware or        12:57

18   whatever because there may be others out there.  I       12:57

19   don't know.                                              12:57

20       Q.    You can't tell me what you know?               12:57

21       A.    I'm telling you --                             12:57

22       Q.    My question --                                 12:57

23       A.    -- what I know based on this, sir.             12:57

24       Q.    My question was do you know of any other       12:57

25   circumstances?                                           12:57

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 417

1      A.    Not to the documents I've reviewed.          12:57

2      Q.    Dr. Bliesner, do you know of any other       12:57

3   circumstances that indicate defective Digitek --      12:57

4   adulterated -- let me ask this correctly.             12:58

5      Do you know, do you have knowledge from any        12:58

6   source other than those that you've identified?       12:58

7      A.    Other than those that I've reviewed.         12:58

8      Q.    No.  Other than that you've identified,      12:58

9   do you personally have knowledge as we sit here       12:58

10  today of any circumstances indicating adulterated     12:58

11  Digitek made it to market other than those you've     12:58

12  identified?                                            12:58

13     A.    The two references, no.                      12:58

14     Q.    Other than those you've identified,          12:58

15  you're not aware of any other circumstances           12:58

16  indicating that defective -- I keep saying that --    12:58

17  that adulterated Digitek was released to market;      12:58

18  is that correct?                                       12:58

19     A.    To this point, no, that is correct.          12:58

20        MR. ANDERTON:  Okay.  I want this to be          12:58

21     clear.  You keep injecting all this extra          12:58

22     stuff.  So, Phil, I'm going to ask you to read     12:58

23     my last question back and I want you to answer     12:58

24     it very clearly, okay, without injecting all       12:59

25     kinds of additional stuff.                         12:59

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page  418

1          THE WITNESS:  I don't understand when you        12:59

2    say "injecting."                                       12:59

3          MR. ANDERTON:  You think because of your         12:59

4    prep sessions with counsel that you're                 12:59

5    absolutely required to qualify everything you          12:59

6    say to leave doors open, as your notes say.            12:59

7    This is a concise --                                   12:59

8          THE WITNESS:  That's not true.                   12:59

9          MR. ANDERTON:  It's absolutely true.             12:59

10         THE WITNESS:  It is not true.                     12:59

11         MR. ANDERTON:  You wait till you watch            12:59

12    the video.  This is a very concise, very              12:59

13    direct question.  Phil, would you read it             12:59

14    back?                                                  12:59

15          (Whereupon, the testimony was read              12:59

16   back by the court reporter, as recorded above)         12:59

17         THE WITNESS:  Other than what I've               12:59

18    reviewed -- which you state in there -- no.           01:00

19   BY MR. ANDERTON:                                        01:00

20    Q.    Other than what you've identified.  Stop        01:00

21   injecting what you've reviewed into this.  I'm         01:00

22   asking you what you know, Dr. Bliesner.  And we're     01:00

23   going to ask this for hours until you answer my        01:00

24   question.                                               01:00

25    You have identified certain circumstances that        01:00

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 419

1   you believe indicate adulterated Digitek was                01:00

2   released to market; is that correct?                        01:00

3       A.    Yes, yes.                                         01:00

4       Q.    Other than the ones you've identified,           01:00

5   are you aware of any other circumstances that you          01:00

6   believe indicate adulterated Digitek was released          01:00

7   to market?                                                 01:00

8       A.    No.                                              01:00

9       Q.    Thank you.                                       01:00

10      So what we have haven't discussed then is the          01:00

11  single tablet that is referenced in -- can you             01:00

12  turn to your report at page 87.  Let me know when          01:00

13  you are there.                                             01:01

14      A.    I am on page 87, sir.                            01:01

15      Q.    All right.  Do you see paragraphs 46 and         01:01

16  49?                                                        01:01

17      A.    46, yes.                                         01:01

18      Q.    Okay.                                            01:01

19      A.    49, yes.                                         01:01

20      Q.    All right.  So to be clear, we talked           01:01

21  about the 1990 circumstances and we now know that          01:01

22  that had nothing to do with Digitek; right?                01:01

23      A.    Most likely no.                                  01:01

24      Q.    We talked about the 2004 circumstances           01:01

25  and we now know that that was not product that was         01:01

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 420

1    part of the Digitek recall; right?                        01:01

2        A.    That is correct.                                01:01

3        Q.    And we talked about -- or we talked             01:01

4    about the 2008 batch 80228, which is part of              01:01

5    paragraph 47 here, and we know that because that          01:02

6    batch was rejected, it also doesn't show anything         01:02

7    about product making it to market.                        01:02

8        A.    With that batch, no.                            01:02

9        Q.    Correct?                                        01:02

10       A.    Yes.                                            01:02

11       Q.    Talking only about that paragraph,              01:02

12   Dr. Bliesner.                                             01:02

13       A.    Okay, okay.                                     01:02

14       Q.    Part of the issue here is that                 01:02

15   Plaintiffs' lawyers have told you never to trust a        01:02

16   single word that comes out of my mouth, so...             01:02

17       A.    That's not true.  They've never made a         01:02

18   statement even remotely related to that.                  01:02

19       Q.    Do you want me to find it in your              01:02

20   notes?                                                    01:02

21       Dr. Bliesner, what do you know about the             01:02

22   circumstances referred to in paragraphs 46 and 49        01:02

23   from memory?                                              01:02

24       A.    From memory, I couldn't tell you whether       01:03

25   they were e-mails or they were reports.  That's          01:03

Page 421

 1    what I can tell you from memory.                        01:03

 2        Q.    Okay.  And does that mean that you also       01:03

 3    don't remember the -- kind of the underlying            01:03

 4    circumstances, regardless of whether you remember       01:03

 5    the source?                                             01:03

 6        A.    Underlying circumstances?                     01:03

 7        Q.    Yeah.                                          01:03

 8        A.    46 and 49?                                     01:03

 9        Q.    Yeah.                                          01:03

10        A.    No, I'd have to go back and look at the       01:03

11    records.                                                01:03

12           MR. ANDERTON:  All right.  Well, just           01:03

13        give me one moment.  Let's go off the record        01:03

14        for a minute.                                       01:04

15           THE VIDEOGRAPHER:  The time is now              01:04

16        1:03 p.m.  We're going off the record briefly.      01:04

17               (Short break)                                01:06

18           THE VIDEOGRAPHER:  The time is now              01:06

19        1:06 p.m.  We are back on the record.               01:06

20    BY MR. ANDERTON:                                        01:06

21        Q.    Dr. Bliesner, I'm handing you a document      01:06

22    that has been marked as Exhibit 59A.  Just take a       01:06

23    moment and look at that document, please.               01:06

24        A.    Sure.  It trails off.  It's not a             01:06

25    complete --                                             01:09

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 422

```
 1     Q.    I understand.                                    01:09
 2     A.    Okay.                                            01:09
 3     Q.    Have you seen that document before?              01:09
 4     A.    I believe I have, yes.                           01:09
 5     Q.    Okay.  Turn to page 60 of your report,           01:09
 6  please.                                                   01:09
 7     A.    Okay.                                            01:09
 8     Q.    In fact this document is what you list           01:09
 9  as your reference A58; isn't that right?                  01:09
10     A.    No.                                              01:10
11     Q.    No?                                              01:10
12     A.    It's got a different control number on           01:10
13  it than the one that I referenced, according to my        01:10
14  report.  This is Mylan 000932683.                         01:10
15     Q.    Look at the next page, Doctor.                   01:10
16     A.    Okay.  There we go.                              01:10
17     Q.    So there's an extra page on our Exhibit          01:10
18  59A about, but what you refer to as A58, the              01:10
19  precise page is exactly your -- is the second page        01:10
20  of our 59A; is that correct?                              01:10
21     A.    It looks like it.                                01:10
22     Q.    And are you -- do you have any reason to         01:10
23  believe that the --                                       01:10
24     A.    Excuse me for just a second.  Yes.  It's         01:10
25  the same, yes.                                            01:11
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page  423

1      Q.    All right.  So this is an e-mail thread          01:11

2   between somebody at Mylan and somebody with an            01:11

3   e-mail extension indicated as goldenliving.com,           01:11

4   correct?                                                  01:11

5      A.    At the top level, yes.                           01:11

6      Q.    What's goldenliving.com, do you know?            01:11

7      A.    I have no idea.                                  01:11

8      Q.    Is it a pharmacist?                              01:11

9      A.    I have no idea.                                  01:11

10     Q.    Yet on page 87 you characterize this as          01:11

11  a pharmacist identifying a double-thick product           01:11

12  from the marketplace; right?                              01:11

13     A.    I say that based on the -- Pharm America         01:11

14  brought the statement in here, so...                      01:11

15     Q.    Is Pharm America a pharmacist?                   01:11

16     A.    I couldn't say for sure.                         01:11

17     Q.    You don't know?                                  01:11

18     A.    No.                                              01:12

19     Q.    And you don't know if golden living is a         01:12

20  pharmacist?                                               01:12

21     A.    I could not say, no.                             01:12

22     Q.    Okay.  But you were happy to write in            01:12

23  your report that Mylan acknowledged a pharmacist          01:12

24  identifying a double-thick product in the market;         01:12

25  right?  Look at page 87 of the report.                    01:12

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 424

1      A.    Yes, yes.  Thank you.  I do use the word        01:12

2    pharmacist.  And based on this e-mail alone, I          01:12

3    couldn't definitively say in fact that was a            01:12

4    pharmacist.                                             01:12

5      Q.    Okay.  So that doesn't appear to be an          01:12

6    accurate characterization in your paragraph 49,         01:12

7    does it?                                                01:12

8      A.    I'm sorry?                                       01:12

9      Q.    It doesn't appear to be an accurate             01:12

10   characterization in your 49, does it?                   01:13

11     A.    It does not appear --                           01:13

12     Q.    Okay.                                           01:13

13     A.    -- to be.  I'm sorry.  I heard                  01:13

14   inaccurate, so.                                         01:13

15     Q.    Well, I didn't say inaccurate.  I said          01:13

16   "an accurate," and I apologize if I spoke too           01:13

17   quickly.                                                01:13

18      Turn to then the page that you actually refer        01:13

19   to as A58.  Now, is this the -- am I correct that       01:13

20   this document is the basis for your concluding          01:13

21   that adulterated Digitek that was part of the           01:13

22   recall made it to market?                               01:13

23     A.    One of the two.                                 01:13

24     Q.    What's the other one?                           01:13

25     A.    The other one was the pharmacist found a        01:13

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 425

1    double-thick tablet, 47, what we talked about.          01:13

2        Q.    But we know that wasn't part of the 2008     01:13

3    recall.                                                  01:13

4        A.    No, it was not part of the recall.            01:13

5        Q.    All right.  So this is the sole piece of      01:13

6    information that you have that provides any              01:13

7    indication that adulterated Digitek that was part       01:13

8    of the 2008 recall made it to market.                   01:13

9        A.    This is the only document I have              01:14

10   reviewed thus far, that...                               01:14

11       Q.    You're not aware of anything else.            01:14

12   You're not aware of any other document.                  01:14

13       A.    I have not reviewed any documents.            01:14

14       Q.    That say that; right?                          01:14

15       A.    No.                                            01:14

16       Q.    Okay.  Let's look at this.                     01:14

17       A.    Uh-huh.                                        01:14

18       Q.    Particularly the page -- and we touched       01:14

19   on this a little bit last time, but I want to talk       01:14

20   about it a little bit more thoroughly; okay?             01:14

21       A.    Sure.                                          01:14

22       Q.    A card of Digoxin with one                     01:14

23   double-thickness tablet.                                 01:14

24       A.    Uh-huh.                                        01:14

25       Q.    So it's in a blister pack; right?             01:14

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 426

| | | |
|---|---|---|
| 1 | A.    I assume that's what the card is. | 01:14 |
| 2 | Q.    Are you an expert on blister packs? | 01:14 |
| 3 | A.    No. | 01:14 |
| 4 | Q.    Packaging? | 01:14 |
| 5 | A.    Packaging, no. | 01:14 |
| 6 | Q.    Okay.  Do you know whether this blister | 01:14 |
| 7 | pack was opaque on one side, like a lot of them | 01:14 |
| 8 | are? | 01:14 |
| 9 | A.    I've never seen a description of a | 01:14 |
| 10 | blister pack with respect to this. | 01:14 |
| 11 | Q.    You don't know anything about this | 01:14 |
| 12 | blister pack. | 01:14 |
| 13 | A.    This one here? | 01:14 |
| 14 | Q.    Yeah? | 01:14 |
| 15 | A.    I -- there's not enough information to | 01:14 |
| 16 | say. | 01:14 |
| 17 | Q.    Okay.  And you don't know -- well, we | 01:14 |
| 18 | know that the tablet wasn't taken out of the | 01:14 |
| 19 | blister pack and measured, don't we? | 01:15 |
| 20 | A.    This particular one? | 01:15 |
| 21 | Q.    Yeah. | 01:15 |
| 22 | A.    It says please advise that -- and, | 01:15 |
| 23 | again, I'm just -- this is all data we got here. | 01:15 |
| 24 | Q.    I understand. | 01:15 |
| 25 | A.    "Please be advised that Lynn Carol, CSC, | 01:15 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 427

1    reports finding a card of Digoxin with one double        01:15

2    thickness tablet at GL" Gloucester.  Whatever GL          01:15

3    is.  I guess maybe that's their --                        01:15

4        Q.    An acronym for -- I can never say that.         01:15

5    Gloucester?                                               01:15

6        A.    Gloucester, yeah.  "The card has four           01:15

7    tablets remaining, one of which she reported was          01:15

8    obviously double-thick."                                  01:15

9        So there were four tablets remaining in the           01:15

10   blister pack, one of which was identified as             01:15

11   double-thick.                                             01:15

12       Q.    Which she believed was double-thick.            01:15

13       A.    She believed was double-thick, yes.             01:15

14       Q.    Did you do anything to try to verify            01:15

15   whether this report was accurate or could be              01:15

16   accurate?                                                 01:16

17       A.    No.                                             01:16

18       Q.    You just accepted it at face value?             01:16

19       A.    I accepted it as data that supported            01:16

20   double packaging.                                         01:16

21       Q.    At face value?                                  01:16

22       A.    Yes, sir.                                        01:16

23       Q.    You get paid for your analytical skills;        01:16

24   right?                                                    01:16

25       A.    I do, sir.                                      01:16

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page  428

1      Q.    And you hold yourself out to out as an        01:16

2    individual possessing a high level of analytical      01:16

3    skills; correct?                                       01:16

4      A.    I would say that's a fair assessment.          01:16

5      Q.    550 an hour, that's a pretty talented          01:16

6    analysis I would hope.  And yet you didn't feel        01:16

7    like this warranted any further analysis?              01:16

8      A.    I don't think that's a fair statement.        01:16

9      Q.    You didn't do any further analysis.           01:16

10     A.    I didn't have -- first of all, I was           01:16

11   asked to review certain sets of documents --           01:17

12     Q.    Right.                                          01:17

13     A.    -- that were available to me at that           01:17

14   time.                                                  01:17

15     Q.    Right.                                          01:17

16     A.    And I reviewed those documents and             01:17

17   extracted out of, you know, the thousands of pages     01:17

18   that I reviewed, those things that were                01:17

19   pertinent.  I identified, as you saw, that lended      01:17

20   support to the fact that there were difficulties.      01:17

21     Q.    Okay.                                           01:17

22     A.    And by the time that rolled around,            01:17

23   there was no additional time to do any more            01:17

24   detailed investigation other than what I had           01:17

25   looked at.                                              01:17

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 429

 1      Q.    Well, in fact -- and so you didn't do          01:17

 2   any more detailed investigation other than looking      01:17

 3   it with the Plaintiffs' attorneys.                      01:17

 4      A.    With respect to this particular case?          01:17

 5      Q.    Right.                                          01:17

 6      A.    No.                                             01:17

 7      Q.    Well, but you actually reviewed a              01:17

 8   document that directly refutes the possibility of       01:17

 9   this being accurate, didn't you?                        01:17

10      A.    What was that?                                 01:17

11      Q.    I mean you certainly wouldn't have            01:17

12   ignored information that made it clear that this        01:17

13   woman couldn't be correct, would you?                   01:17

14      A.    I'm sorry.  I didn't understand that          01:17

15   statement.                                              01:17

16      Q.    If you had seen information that made it      01:17

17   clear that this report couldn't be correct, you         01:18

18   wouldn't have ignored that, would you?                  01:18

19      A.    If I had seen information that               01:18

20   corroborated that?                                      01:18

21      Q.    No, that contradicted it and made it         01:18

22   very clear that this observation couldn't be            01:18

23   correct, you wouldn't have ignored that, would          01:18

24   you?                                                    01:18

25      A.    Oh, absolutely not, no.                       01:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 430

1    Q.    I wouldn't think so.  Not for 550 an          01:18

2  hour.                                                 01:18

3    Dr. Bliesner, I'm going to hand you a document      01:18

4  that has been marked as Defendant's Exhibit 73,       01:18

5  although it doesn't have a sticker on it.             01:18

6    A.    Okay.                                         01:18

7    Q.    Phil, would you mind putting a sticker        01:18

8  on this one?  Just says Exhibit 73.                   01:18

9    Have you seen that -- well, Dr. Bliesner, take      01:19

10 a moment to look at that document, please.            01:19

11   A.    Uh-huh.                                       01:19

12   Q.    Have you reviewed Exhibit 73?                 01:23

13   A.    I have, sir.                                  01:23

14   Q.    Have you see that document before?            01:23

15   A.    That's a good question.                       01:23

16   Q.    Well, why don't you turn to page 47 of        01:23

17 your report.                                          01:23

18   A.    Okay.                                         01:23

19   Q.    We'll make short work of that good            01:23

20 question.                                             01:23

21   A.    Okay.                                         01:23

22   Q.    And for the record, that's two today.         01:23

23   A.    I'm sorry?                                    01:23

24   Q.    That's two good questions today.              01:23

25   Are you on page 47?                                 01:23

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 431

```
 1     A.    I am.                                      01:23

 2     Q.    Do you see Exhibit -- or reference A36?    01:23

 3     A.    I do.                                      01:23

 4     Q.    Do you see that you described that as      01:23

 5   being Plaintiffs' Exhibit M69?                     01:23

 6     A.    I do.                                      01:23

 7     Q.    Do you see the front of our Exhibit 63,    01:23

 8   indicating that that's M69?                        01:23

 9     A.    It is.                                     01:23

10     Q.    And you see that that is a UDL internal    01:23

11   investigation record?                              01:23

12     A.    Yes.                                       01:23

13     Q.    From Digitek tablets?  So what you're      01:23

14   looking at as Defendant's 73 --                    01:23

15     A.    Yes.                                       01:23

16     Q.    -- is in fact your A36 reference;          01:23

17   correct?                                           01:23

18     A.    Yes.                                       01:23

19     Q.    So you looked at this document?            01:23

20     A.    Yes, sir.                                  01:24

21     Q.    In fact you made a point of highlighting   01:24

22   in your report information which you thought was   01:24

23   negative and adverse with respect to Activis.  You 01:24

24   made a point of indicating that there was a        01:24

25   complaint about some tablets; right?               01:24
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 432

1     A.    Yes.                                              01:24

2     Q.    Can you turn to page 2 of Exhibit 73?             01:24

3     A.    Yes.                                              01:24

4     Q.    Do you see the heading that says                 01:24

5  "Examination of Retained Samples"?                         01:24

6     A.    Yes.                                              01:24

7     Q.    Read that paragraph please for me out            01:24

8  loud.                                                      01:24

9     A.    Sure.  "Examination of retained                  01:24

10  samples.  On 4/3/08, a visual examination of             01:24

11  retains for both strengths of Digitek were               01:24

12  completed.  Upon evaluating the fit of the tablets       01:24

13  within the blister cavity, it was observed that          01:24

14  both blister cavity sizes have minimal head space        01:24

15  that would prevent tablets to be packaged with           01:25

16  double the thickness.  If the tablet thickness           01:25

17  were to exceed the blister cavity size during            01:25

18  packaging, visible damage to the blister package         01:25

19  would occur and the -- excuse me -- the equipment        01:25

20  would experience a seal station overload, jamming        01:25

21  within the seal station, that would result in a          01:25

22  shutdown of the equipment.                               01:25

23     This type of occurrence is documented on the          01:25

24  inspection record and the batch record.  As stated       01:25

25  above, there is no documentation in the batch            01:25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 433

1    record of a machine- or inspection-related issues       01:25

2    involving tablet thickness."                            01:25

3        Q.    Did you read that document before you          01:25

4    prepared your report.  You obviously did; right?        01:25

5        A.    Yes sir.                                       01:25

6        Q.    You read that language?                        01:25

7        A.    Yes, sir.                                       01:25

8        Q.    It makes it clear that the woman who           01:25

9    thought she saw a double-thick tablet in a blister      01:25

10   pack couldn't have been correct, doesn't it?            01:25

11       A.    I don't think you can say that                01:25

12   definitively.  This is an internal investigation        01:25

13   report.  This is what they report.  There's --          01:25

14   it's opinion based on their experience and              01:25

15   observation.                                            01:26

16       Q.    But it's not opinion.  It's a very            01:26

17   specific statement about the technical                  01:26

18   specifications and capabilities of their packaging      01:26

19   equipment, isn't it?                                    01:26

20       A.    Perhaps.                                       01:26

21       Q.    What do you mean "perhaps"?                    01:26

22       A.    It's an investigation summary.                01:26

23   Investigation summaries don't necessarily report       01:26

24   all of the information in an accurate fashion on        01:26

25   what happened in the investigation.                     01:26

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 434

1        Q.    Do you have any reason to believe that          01:26

2    the information in this paragraph that you just           01:26

3    read is inaccurate?                                       01:26

4        A.    Any reason?                                     01:26

5        Q.    Yes.                                            01:26

6        A.    Based on my experience, unless I                01:26

7    actually review an investigation report, I always        01:26

8    wonder if the summary is -- how accurate it is,           01:26

9    based on my experience.                                   01:26

10       Q.    Do you have any reason to believe that          01:26

11   this paragraph and the information in this                01:26

12   paragraph is inaccurate?                                  01:26

13       A.    Based on the comment from the person who        01:26

14   saw it, I would say that there was a possibility          01:26

15   that there was a double-thick tablet in that             01:26

16   blister pack.                                             01:27

17       Q.    So you're going to reject the                   01:27

18   information of the packaging entity that says             01:27

19   their equipment would not allow packaging of              01:27

20   double-thick tablet in favor of an unreliable,            01:27

21   uncorroborated, unverified account of a woman in a        01:27

22   nursing home that you characterized as a                  01:27

23   pharmacist.                                               01:27

24          MR. KERENSKY:  Excuse me.  Form.                    01:27

25   BY MR. ANDERTON:                                          01:27

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313         www.rennillo.com  888.391.3376 (Depo)

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 435

1     Q.    Is that what you're going to do?              01:27

2     A.    What was his question.  I'm sorry.            01:27

3     Q.    His question was form.  That means you        01:27

4  get to answer my question.  Phil, would you please    01:27

5  read that back.                                        01:27

6          MR. KERENSKY:  That's correct.                 01:27

7             (Whereupon, the testimony was read          01:28

8  back by the court reporter, as recorded above)         01:28

9          THE WITNESS:  Okay.                            01:28

10            I am not rejecting this information.         01:28

11        It's part of the data.  As far as the           01:28

12        characterization of a pharmacist, I don't have  01:28

13        any way to prove in fact it was a pharmacist    01:28

14        the way it's written in there.  So this is      01:28

15        just additional data to -- that was discovered  01:28

16        during my review.                               01:28

17 BY MR. ANDERTON:                                       01:28

18    Q.    You have given sworn testimony today --       01:28

19    A.    Yes.                                          01:28

20    Q.    -- that her report, the information in        01:28

21 our Exhibit 59A allows you to say we know              01:29

22 adulterated Digitek was released to market.            01:29

23 That's your sworn testimony.                           01:29

24    A.    My sworn testimony is we know that            01:29

25 there -- based on that pharmacist report in            01:29

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 436

1    Bellingham, Washington, that that is true.                    01:29

2         Q.    Dr. Bliesner?                                      01:29

3         A.    Yes, sir.                                          01:29

4         Q.    I'm talking strictly about this 2008              01:29

5    situation and I want you to stay focused on that             01:29

6    for me; okay?                                                 01:29

7         A.    Okay.                                              01:29

8         Q.    You've given sworn testimony here today           01:29

9    that says that this report of the woman who works            01:29

10   for goldenliving.com is the evidence that allows             01:29

11   you to conclude in your expert witness report that           01:29

12   you know adulterated Digitek that was part of the            01:29

13   recall --                                                    01:29

14        A.    That's --                                         01:29

15        Q.    -- made it to market.                             01:30

16        A.    That's -- that's a misunderstanding of            01:30

17   what I said.  We know that adulterated Digitek               01:30

18   made it to market because of the pharmacist's                01:30

19   discovery here.  I have not definitively made a              01:30

20   statement this is a piece of evidence that                   01:30

21   somebody potentially found a double-thick tablet             01:30

22   in the market characterized as a pharmacist.                 01:30

23        Q.    So then if I understand what you're               01:30

24   doing right now, Dr. Bliesner, you're backing away           01:30

25   from this report.                                            01:30

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 437

    1       A.    No, I'm not backing away.                    01:30

    2       Q.    Let's get it clear.                          01:30

    3       A.    Okay.                                        01:30

    4       Q.    Does this -- do you believe this allows      01:30

    5    to you conclude that --                               01:30

    6       A.    With the recalled lot?                       01:30

    7       Q.    That part that of -- that -- I'm talking     01:30

    8    only about this situation.                            01:30

    9       A.    Okay.                                        01:30

   10       Q.    Do not --                                    01:30

   11       A.    That situation.                              01:30

   12       Q.    Do not inject any additional                 01:30

   13    circumstances into your answer; okay?                 01:30

   14       A.    Okay.                                        01:30

   15       Q.    Are we clear on that?                        01:30

   16       A.    Yes, sir.                                    01:30

   17       Q.    Are you sure?                                01:31

   18       A.    Yes, sir.                                    01:31

   19       Q.    I'm talking about this report that is in     01:31

   20    Defense Exhibit 59A.                                  01:31

   21       A.    Yes.                                         01:31

   22       Q.    Do you conclude from this report that        01:31

   23    adulterated Digitek made it to market?                01:31

   24       A.    Based on that one report and the fact        01:31

   25    that I may have mischaracterized them as a            01:31

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 438

1    pharmacist, I can't come to a firm conclusion on        01:31

2    that.                                                   01:31

3         Q.    You can't come to a firm conclusion on       01:31

4    that?                                                   01:31

5         A.    That's correct.                              01:31

6         Q.    So when you said earlier --                  01:31

7         A.    Uh-huh.                                       01:31

8         Q.    -- we know --                                01:31

9         A.    Yes.                                          01:31

10        Q.    -- which is definitive.  Am I correct --     01:31

11        A.    Yes.                                          01:31

12        Q.    -- that adulterated Digitek was released     01:31

13   to market, the only thing you have to support that     01:31

14   definitive statement is the 2004 circumstances?        01:31

15        A.    In the documents I have already             01:31

16   reviewed; correct.                                      01:31

17        Q.    Okay.  The only thing you're aware of --    01:31

18   no matter what you've reviewed -- is the 2004          01:31

19   circumstances; correct?                                 01:31

20        A.    That's the specific one, yes.                01:32

21             THE WITNESS:  I hate to do this to you.      01:32

22        I need a bathroom break.                           01:32

23             MR. ANDERTON:  You certainly may.            01:32

24             THE VIDEOGRAPHER:  The time is 1:31 p.m.     01:32

25        We're going off the record briefly.               01:32

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 439

```
 1                    (Short break)                      01:40

 2          THE VIDEOGRAPHER:  The time is 1:42 p.m.     01:40

 3      We're back on the record.                        01:40

 4   BY MR. ANDERTON:                                    01:40

 5      Q.   Dr. Bliesner, you just took a break.        01:40

 6   Did you speak with Mr. Kerensky during that break?  01:40

 7      A.   Yes, I did.                                 01:40

 8      Q.   Who called who?                             01:40

 9      A.   He called me.                               01:40

10      Q.   He did?                                     01:40

11      A.   Yes.                                        01:40

12      Q.   What did you talk about?                    01:40

13      A.   He wanted to ask me how I felt things       01:40

14   were going, how I felt.                             01:41

15      Q.   What did you tell him?                       01:41

16      A.   I said it's tiring, hard work.  I didn't    01:41

17   get to the point where I said I don't know how you  01:41

18   people do this for a living, but that's what I was  01:41

19   thinking then he offered some advice.               01:41

20      Q.   What was his advice?                        01:41

21      A.   His advice was you realize the report       01:41

22   that you wrote is not based on just one or two      01:41

23   observations of the adulterated product in the      01:41

24   market.  The basis -- the majority of the basis of  01:41

25   the report is this total lack of compliance over    01:41
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 440

1    the course of years.  I said okay.                          01:41

2        Q.    Okay.  So he told you to say that?               01:41

3        A.    No, he didn't tell me to say that.  He           01:41

4    said just remember.                                        01:41

5        Q.    That's his words though, not yours.              01:41

6        A.    No, it's -- yeah it's his words in               01:41

7    general.                                                   01:41

8        Q.    His words?                                       01:41

9        A.    Yeah.  But it is the basis of the                01:41

10   report.  It's true.  That's how it was written.           01:41

11       Q.    But let's call that what it is.                  01:41

12       A.    Uh-huh.                                          01:41

13       Q.    The basis of the report is inferences;          01:41

14   right?                                                     01:41

15       A.    Inferences?                                      01:41

16       Q.    Sure.                                            01:41

17       A.    How are you defining inferences?                01:41

18       Q.    Well, you have either direct proof --           01:42

19       A.    Uh-huh.                                          01:42

20       Q.    -- or inferential proof.  You understand        01:42

21   the difference between the two; right?                     01:42

22       A.    I do not.                                        01:42

23       Q.    Direct proof is something that proves a         01:42

24   proposition to be true.  Something follows -- A           01:42

25   follows from B.                                            01:42

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 441

1      A.    Okay.                                              01:42

2      Q.    Inferential proof is something that               01:42

3   doesn't necessarily prove something is true but            01:42

4   suggests it's true.                                        01:42

5      Do you understand the difference?                       01:42

6      A.    I think in those terms, yes.                      01:42

7      Q.    You know what an inference is; right?             01:42

8      A.    Yes.                                              01:42

9      Q.    You know what I mean?  Dr. Bliesner, I'm          01:42

10   a little bit befuddled by your claimed lack of            01:42

11   understanding of some of these very basic terms           01:42

12   when you spend your life charging people $500 an          01:42

13   hour or more to do highly technical analytical --         01:42

14   to provide highly technical analytical services.          01:43

15   How do you not know the difference off the top of         01:43

16   your head between direct and inferential?                 01:43

17         MR. KERENSKY:  Objection, form.                     01:43

18   BY MR. ANDERTON:                                          01:43

19      Q.    You may answer.                                  01:43

20      A.    I never been in a deposition with the            01:43

21   legal implication of some words.  It's like the           01:43

22   definition of "is," is with Clinton.                      01:43

23      Q.    Do you know the difference between               01:43

24   direct proof and inferential proof in the ordinary        01:43

25   course of your FDA GMP consulting career?                 01:43

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 442

1    A.    We never use the term infer.                    01:43

2    Q.    Okay.  You've got --                            01:43

3    A.    In my experience.                               01:43

4    Q.    So your conclusion in your report which         01:43

5  is set forth at page 21, you say it is my opinion       01:43

6  to a reasonable degree of certainty that the            01:44

7  systemic failure to implement quality systems and       01:44

8  to comply with regulations -- with the                  01:44

9  regulations -- resulted in adulterated drug             01:44

10  products making it to the marketplace.                 01:44

11    Did I read that correctly?                           01:44

12    A.    Yes, you did.                                  01:44

13    Q.    As concerns the product, the Digitek           01:44

14  product that was part of the recall, you don't         01:44

15  have any direct proof of that, do you?                 01:44

16    A.    I have proof that they were in               01:44

17  substantial state of discompliance and that those      01:44

18  tablets were manufactured under the quality            01:44

19  systems or lack of quality systems therein and         01:45

20  therefore were at risk.                                01:45

21    Q.    So what you have proof of is the               01:45

22  possibility that adulterated Digitek was               01:45

23  manufactured; correct?                                 01:45

24    A.    The likelihood that it could have been         01:45

25  manufactured.                                          01:45

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 443

    1      Q.    Which is a possibility.                    01:45

    2      A.    It's probable.                             01:45

    3      Q.    Oh, now you know the difference between    01:45

    4  possibility and probability.                         01:45

    5      A.    We talked about it earlier today           01:45

    6  remember?                                            01:45

    7      Q.    I see.  You're a quick study.  That's      01:45

    8  good to know.                                        01:45

    9      So in your mind it's probable but still you      01:45

   10  have no proof; right?                                01:45

   11      A.    With respect to the recalled lot?          01:45

   12      Q.    Correct.  Lots.                            01:45

   13      A.    Lots.                                      01:45

   14      Q.    Correct.  With respect to the recalled     01:45

   15  lots.                                                01:45

   16      A.    In what I've reviewed, no.                 01:45

   17      Q.    All right.  And so if you assert as a      01:45

   18  conclusion that adulterated Digitek that was part    01:45

   19  of the recalled lots made it to marketplace, the     01:46

   20  only way you do that is by inference; right?         01:46

   21      A.    The only way?                              01:46

   22      Q.    You don't have any direct proof.           01:46

   23      A.    For the recalled lots.                     01:46

   24      Q.    Correct.  And so the only way to reach     01:46

   25  that conclusion is by inference; right?              01:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 444

1       A.    The chronic systemic failure of the          01:46

2    quality system and the FDA actions, including two      01:46

3    consent decrees and anything like that, if you're      01:46

4    defining that as an inference, then the answer         01:46

5    would be yes.                                          01:46

6       Q.    Well, we know you didn't look at any          01:46

7    Digitek production records; right?                     01:46

8       A.    That's not necessarily true.                  01:46

9       Q.    You looked at a portion of one batch          01:46

10   record; right?                                         01:46

11      A.    I can't remember specifically.  I know I      01:46

12   reviewed the ANDA that had batch records in it and     01:46

13   I have probably read another document or two.          01:46

14      Q.    Okay.  There were 152 batches that were       01:46

15   recalled.                                              01:47

16      A.    Okay.                                         01:47

17      Q.    You didn't review any of the batch            01:47

18   records for those 152 batches except for a partial     01:47

19   review of the batch where some double-thick            01:47

20   tablets were found during manufacturing that were      01:47

21   inspected out of the batch before it was               01:47

22   released.  And the only reason you read that is        01:47

23   because you read the investigation report for that     01:47

24   batch; correct?                                        01:47

25      A.    I don't recall which batch record I           01:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 445

1    looked at.  I tell you that right now.                01:47

2        Q.    Okay.  You gave testimony about it last     01:47

3    time.                                                 01:47

4        A.    Okay.                                        01:47

5        Q.    The record will show what it shows.          01:47

6        A.    Okay.                                        01:47

7        Q.    But you certainly didn't review any of       01:47

8    the batch records beyond that single batch with        01:47

9    respect to the recalled batches; correct?              01:47

10       A.    I don't believe so.                          01:47

11       Q.    Okay.  So you conducted a paper audit?       01:47

12       A.    Yes, sir.                                     01:47

13       Q.    Without reviewing production records?         01:47

14       A.    Yes.                                          01:47

15       Q.    And from that paper audit of                 01:48

16   non-production records, primarily FDA regulatory        01:48

17   documentation, you conclude there is a possibility      01:48

18   that adulterated Digitek was produced and              01:48

19   therefore there is a possibility that adulterated       01:48

20   Digitek was released; correct?                         01:48

21       A.    No, it probably was released to market.       01:48

22   If you go back and you look at the FDA reports and      01:48

23   the findings, first of all, batch record is not         01:48

24   the end all be all for documenting whether things       01:48

25   are good or bad.  In fact as we know from reading       01:48

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 446

```
 1    the documentation here is that there are numbers        01:48
 2    of people in the facility that don't even read          01:48
 3    English.  So are they going to document anything        01:48
 4    bad on a batch record?  It brings that into             01:48
 5    question.                                               01:48
 6        So, you know, the reality is, is if people          01:49
 7    make mistakes and they don't read English, are          01:49
 8    they going to document them on a batch record?          01:49
 9    That's a good question and I can't answer it.  But      01:49
10    it brings into question the batch records doesn't       01:49
11    necessarily show you anything definitive.               01:49
12        Q.    You can't answer it because you didn't        01:49
13    care enough to ask for or even attempt to review        01:49
14    the batch records.  You can't give any testimony        01:49
15    about the information in the batch records for the      01:49
16    recalled batches, can you?                              01:49
17        A.    In the batch records?                         01:49
18        Q.    Correct.                                      01:49
19        A.    Again, I have to go back.  But if I take      01:49
20    you at your word, then -- and that from the             01:49
21    previous testimony I reviewed a small portion of        01:49
22    the batch record, then the answer is I reviewed a       01:49
23    small portion of the batch record.                      01:49
24        Q.    From one lot.                                 01:49
25        A.    If that's what's in the testimony             01:49
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 447

```
 1   previously, I'll say yes.                            01:49

 2        Q.    And as concerns all of the other 151      01:49

 3   lots at four-plus million tablets each that were     01:49

 4   part of the recall, you can't give any testimony     01:49

 5   about those batch records, can you?                  01:50

 6        A.    Specifically the batch records?           01:50

 7        Q.    Yeah.                                      01:50

 8        A.    No.                                        01:50

 9        Q.    So you can't say anything one way or the  01:50

10   other about whether they're accurate not accurate,   01:50

11   whether there appears to be some sort of mistake     01:50

12   in them, you can't give any testimony about them,    01:50

13   can you?                                             01:50

14        A.    That's not true.  If you have a           01:50

15   substantial quality system failures as documented   01:50

16   by the FDA, you're going to have problems.           01:50

17        Q.    How would the FDA determine whether a     01:50

18   quality system deficiency impacted a specific        01:50

19   product?  How would the FDA do it?                   01:50

20        A.    How would they determine?                 01:50

21        Q.    Yeah.                                      01:50

22        A.    They don't have to.  They see quality     01:50

23   system failure, they write you up.                   01:50

24        Q.    They write you up.                         01:50

25        How would they determine whether a specific     01:50
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                  February 18, 2011

Page 448

1    product was impacted?                                          01:50

2        A.    If it would not fall under the GMPs and             01:51

3    there was doubt, that's how they determine.                   01:51

4        Q.    That would create a possibility that                01:51

5    some deficiency impacted some product; right?                 01:51

6        A.    Say that again, or should I have him                01:51

7    read it back?  Because I don't know if I                      01:51

8    understand that.                                              01:51

9            MR. ANDERTON:  Please, Phil, read it                  01:51

10       back.                                                     01:51

11           (Whereupon, the testimony was read                    01:51

12   back by the court reporter, as recorded above)                01:51

13           THE WITNESS:  Possibility that some                   01:51

14       deficiency could potentially impact.  The FDA             01:51

15       does not need the probable definition.  All               01:51

16       they have to go in and see that there are                 01:51

17       deficiencies with respect to the quality                  01:51

18       systems.  They do whatever they want and take             01:51

19       action on it.                                             01:51

20   BY MR. ANDERTON:                                              01:51

21       Q.    I understand that.                                  01:51

22       A.    Uh-huh.                                             01:51

23       Q.    I asked you a question and I would like             01:51

24   you to answer now.  How would the FDA determine               01:51

25   whether a specific GMP systems deficiency impacted            01:51

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 449

1    a specific problem?  I'm sorry a specific          01:52

2    product.                                           01:52

3         A.    Well, I don't work for the FDA and I'm  01:52

4    not going to speak for the FDA, but if they        01:52

5    find -- go back look at the EIRs and see that      01:52

6    there are all kinds of problems with respect to    01:52

7    manufacturing records and lack of manufacturing    01:52

8    records, validated processes and things like       01:52

9    that.  So that's what they do.                     01:52

10        They put -- if the question as to the         01:52

11   integrity of the manufactured product, then, you   01:52

12   know, they take action.                            01:52

13        Q.    What question were you just answering?  01:52

14   I move to strike that as completely                01:52

15   non-responsive.                                    01:52

16        Were you talking about Activis or their       01:52

17   records somehow?                                   01:52

18        A.    I'm talking about the records that the  01:52

19   FDA reviewed and their systems and places that     01:52

20   will show up on the establishment inspection       01:52

21   report.                                            01:52

22        Q.    Are you an expert in GMP compliance or  01:52

23   not?                                               01:53

24        A.    Am I am, sir.                           01:53

25        Q.    Okay.  I'm asking you a question about  01:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised         February 18, 2011

Page 450

1    FDA practice that ought to be right down the              01:53

2    middle of that expertise.  I don't know why you          01:53

3    don't want to answer it, but -- I know exactly why       01:53

4    you don't want to answer it but I'm going to keep        01:53

5    asking it until you do.                                  01:53

6          MR. KERENSKY:  Objection, form.                    01:53

7    BY MR. ANDERTON:                                         01:53

8        Q.    Okay.  How would the FDA -- let's              01:53

9    assume, Dr. Bliesner, that the FDA was doing an          01:53

10   inspection and uncovered a GMP practice that they        01:53

11   believed was deficient.                                  01:53

12       A.    Okay.                                          01:53

13       Q.    That happens; right?                           01:53

14       A.    Yes, it does.                                  01:53

15       Q.    That's what you charge your clients to         01:53

16   assess; right?                                           01:53

17       A.    Yes.                                           01:53

18       Q.    If the FDA wanted to determine whether         01:53

19   that GMP deficiency impacted a particular product,       01:53

20   how would they do that?                                  01:53

21       A.    They may or may not start looking at all       01:54

22   of the quality systems that are in there.  I'm           01:54

23   just telling you how they do it.  They could stop        01:54

24   when they see significant deficiencies and there         01:54

25   is doubt in their mind they just stop.  That's           01:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 451

1    what they do.                                          01:54

2        Q.    Why don't you want to ask answer that        01:54

3    question?  I know the answer.  I know why you          01:54

4    don't want to.                                         01:54

5        A.    Well, what's the answer?                     01:54

6        Q.    Dr. Bliesner, how would the FDA              01:54

7    determine whether a specific GMP deficiency            01:54

8    impacted a specific product?  What would they do?      01:54

9            MR. KERENSKY:  Objection, form, prior to       01:54

10       the word "how?"                                    01:54

11   BY MR. ANDERTON:                                       01:54

12       Q.    You may answer.                              01:54

13       A.    Again, please.                               01:54

14       Q.    I'll ask it again.                           01:54

15       A.    Okay.                                        01:54

16       Q.    And we're going to set up the whole          01:54

17   situation again; okay?                                 01:54

18       A.    Okay.                                        01:54

19       Q.    So that I understand -- so that I know       01:54

20   you're clear in what we're talking about.              01:54

21       A.    Okay.                                        01:55

22       Q.    The FDA can -- the FDA conducts              01:55

23   inspections; right?                                    01:55

24       A.    That's correct.                              01:55

25       Q.    If they notice a condition which they        01:55

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II Videotaped - Revised                February 18, 2011

Page 452

1    believe is a violation of good manufacturing              01:55

2    practices --                                              01:55

3        A.    Yes.                                            01:55

4        Q.    -- they make a note or a record of that         01:55

5    somehow; correct?                                         01:55

6        A.    Yes, they do.                                   01:55

7        Q.    If that GMP violation or deficiency             01:55

8    related to a specific -- or to a quality system,          01:55

9    they'd make a note of that; right?                        01:55

10       A.    Yes, they do                                    01:55

11       Q.    And they notify the company of that             01:55

12   quality system GMP deficiency; right?                     01:55

13       A.    Typically, yes.                                 01:55

14       Q.    All right.  In the ordinary course,             01:55

15   that's what they would do?                                01:55

16       A.    Yes.                                            01:55

17       Q.    They are not in the business of ignoring        01:55

18   or overlooking deficiencies that they find, are           01:55

19   they?                                                     01:55

20       A.    No, not at all.  Not at all.                    01:55

21       Q.    I don't know why you felt compelled to          01:55

22   say typically in that situation.  But Dr. Bliesner        01:55

23   in that situation, if the FDA found a GMP                 01:55

24   deficiency in the quality systems and wanted then         01:56

25   to inquire or determine whether that deficiency           01:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 453

 1    had any impact on a specific product --                    01:56

 2         A.    Yes.                                             01:56

 3         Q.    -- what would they do?                           01:56

 4              MR. KERENSKY:  Form.  Objection, form.            01:56

 5              THE WITNESS:  It depends, you know, what          01:56

 6         deficiency it is in quality systems; all              01:56

 7         right?  For instance, let's say they go in the         01:56

 8         laboratory, they pull up some data, they look          01:56

 9         at chromatograms --                                    01:56

10    BY MR. ANDERTON:                                            01:56

11         Q.    Stop.  Data and chromatograms for what?          01:56

12    For the product?                                            01:56

13         A.    Yes.                                             01:56

14         Q.    Sounds to me like they're reviewing              01:56

15    production records for that product.                        01:56

16         A.    They will review batch records as well.          01:56

17         Q.    Okay.                                            01:56

18         A.    Chromatographic data and reports aren't          01:56

19    necessarily -- you know, they're included with the         01:56

20    reported results, included in batch record, but            01:57

21    the raw data and the stuff is not.                          01:57

22         Q.    You don't think that's part of the batch         01:57

23    record?                                                     01:57

24         A.    The data is reported results, but                01:57

25    chromatograms in my experience traditionally are           01:57

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                 February 18, 2011

                                                              Page 454

 1    not.  Electronic data are traditionally not.              01:57

 2        Q.    But the data is?                                01:57

 3        A.    The final results.                              01:57

 4        Q.    The data that the chromatogram generates        01:57

 5    or reflects is part of the batch record; right?           01:57

 6        A.    We're talking about -- I'm -- please            01:57

 7    don't take this wrong.  Your understanding of raw          01:57

 8    data as opposed to a result, they're different            01:57

 9    things.                                                    01:57

10        Q.    Okay.                                            01:57

11        A.    Okay.                                            01:57

12        Q.    But the bottom line is the FDA if they          01:57

13    wanted to determine whether a quality systems             01:57

14    deficiency impacted a specific product, they'd go         01:57

15    look at the records, some portion of the records         01:57

16    for that specific product, wouldn't they?                01:57

17        A.    They'll look at the records that               01:57

18    indicate where the difficulties are.  For                01:57

19    instance, if they think there's problems with an         01:58

20    analytical method, they'll go in and they'll start       01:58

21    pulling up chromatographic data, look at the             01:58

22    results that come out there, look at peaks, look         01:58

23    how they're innovated, pull up the development           01:58

24    report, pull up the validation report, things like       01:58

25    that.                                                      01:58

Page 455

1      If they think there are discrepancies with          01:58

2   respect to improper documentation or execution of       01:58

3   batch records, then they can pull the batch             01:58

4   records and take a look at it.                          01:58

5      Q.    So what you've just described is a             01:58

6   process whereby the FDA would look at some              01:58

7   variation, some component -- some or all of the         01:58

8   production records for the product.  The only way       01:58

9   they could conclude that a quality system               01:58

10  deficiency actually impacted a specific product is      01:58

11  to go look at the records that relate to that           01:58

12  product; correct?                                       01:58

13     A.    The raw data in the records, the reports       01:58

14  that come out of it.                                    01:58

15     Q.    Right.                                          01:58

16     A.    That's correct.                                 01:58

17     Q.    Couldn't reach that to product -- strike       01:58

18  that.                                                    01:58

19         MR. ANDERTON:  We're going to change the         01:59

20     tape.                                                 01:59

21         THE VIDEOGRAPHER:  It's 2:01 p.m.  We're          01:59

22     going off the record.                                 01:59

23             (Short break)                                 02:00

24         THE VIDEOGRAPHER:  The time is 2:03 p.m.          02:00

25     We are back on record.  This is the beginning        02:02

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 456

1        of tape six.                                            02:02

2    BY MR. ANDERTON:                                            02:02

3        Q.    Dr. Bliesner, in the paper audit that            02:02

4    you conducted, you placed heavy emphasis on the            02:02

5    FDA regulatory documents, didn't you?                      02:02

6        A.    Yes, sir, I did.                                 02:02

7        Q.    They carry great weight with you, don't          02:02

8    they?                                                      02:02

9        A.    Yes, they do.                                    02:02

10       Q.    Dr. Bliesner, I'm handing you a document         02:02

11   that has been marked as -- previously marked by           02:03

12   the Plaintiffs as Exhibit 68.  As you can see by          02:03

13   the sticker, they used it in a deposition on              02:03

14   December 9, 2009.                                          02:03

15       A.    Okay.                                            02:03

16       Q.    Will you just look at that document for          02:03

17   a moment?  I don't want you to read it.                    02:03

18       A.    Okay.                                            02:03

19       Q.    I just want you to skim through it and           02:03

20   satisfy yourself of what it is.                            02:03

21            MR. KERENSKY:  I can't hear what                  02:03

22       exhibit.  I'm sorry.                                   02:03

23            MR. ANDERTON:  68, Mike.                          02:03

24            MR. KERENSKY:  Okay.                              02:04

25            MR. ANDERTON:  And it's Plaintiffs'               02:04

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 457

1    Exhibit 68.  You got that part; right?                02:04

2         MR. KERENSKY:  I did not.  Thank you.            02:04

3    That's why I couldn't find it.                        02:04

4         MR. ANDERTON:  Right.  I'm here to help,         02:04

5    Mike.                                                 02:04

6  BY MR. ANDERTON:                                        02:05

7    Q.   Have you seen that document before?             02:05

8    A.   I believe I have seen it either as part         02:05

9  of an EIR or stand-alone or both.                       02:05

10   Q.   I'll take that as a yes.  It's a 2006            02:05

11 483 -- it's a 483 form issued in August of 2006 by     02:05

12 the FDA, following an inspection of the Activis         02:05

13 Totowa Little Falls facility; correct?                  02:05

14   A.   Yes.                                             02:05

15   Q.   Dates of inspection July 10, 2006, to           02:05

16 August 10, 2006; correct?                               02:05

17   A.   Correct.                                         02:05

18   Q.   All right.  And are you familiar enough          02:05

19 with the document, Dr. Bliesner, to -- to say that     02:05

20 this document relates to various GMP circumstances     02:06

21 of Activis Totowa, as reflected in this inspection     02:06

22 report?                                                 02:06

23   A.   GMP circumstances?                               02:06

24   Q.   Yeah.                                            02:06

25   A.   Failure of compliance?  Failure of              02:06

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 458

1    compliance I would say, yes.                              02:06

2        Q.    For GMP issues?                                 02:06

3        A.    Yes.                                            02:06

4        Q.    Look at page 5.                                 02:06

5        A.    Uh-huh.                                         02:06

6        Q.    Observation seven.  Do you see that?           02:06

7        A.    Yes.                                            02:06

8        Q.    That is an observation that relates to         02:06

9    the bulk stability hold times studies.                   02:06

10        Do you see that?                                     02:06

11       A.    Yes.  Just, if I may, I may not --             02:06

12       Q.    Dr. Bliesner.                                   02:06

13       A.    -- have seen some of this stuff because        02:07

14   a lot of the copies we had were redacted, just so        02:07

15   you know.                                                02:07

16       Q.    Well, nothing like hiding something from       02:07

17   yourself.                                                02:07

18       Well, let's just do it.  You see observation         02:08

19   five on there or observation seven there on page         02:08

20   5?                                                       02:08

21       A.    Yes.                                            02:08

22       Q.    All right.  Do you remember the                02:08

23   testimony that you gave on January 25th about bulk       02:08

24   stability hold time studies?                             02:08

25       A.    No.                                             02:08

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 459

1      Q.    You don't; okay.                                    02:08

2      Do you remember telling Mr. Moriarty that you             02:08

3  questioned whether the Activis -- whether the                 02:08

4  Digitek process validation -- whether the FDA had             02:08

5  any issues with the Digitek process validation                02:08

6  because you had seen a reference to bulk stability            02:08

7  hold times in this 483, and you thought that that            02:08

8  related to process validation?                                02:08

9      A.    I don't recall that, that statement.                02:08

10     Q.    Do you -- do you --                                 02:08

11     A.    I --                                                02:08

12     Q.    -- stand by that testimony?  Does bulk             02:08

13  stability hold time studies have anything to do             02:09

14  with process validation?                                     02:09

15     A.    I'm not clear what they're meaning by               02:09

16  bulk stability hold here.                                    02:09

17     Q.    You gave the testimony, Dr. Bliesner, I            02:09

18  didn't.  I'm asking you a question.  Does bulk              02:09

19  stability hold time studies have anything to do             02:09

20  with process validation?                                     02:09

21         MR. KERENSKY:  Objection, form.                       02:09

22         MR. ANDERTON:  What's wrong with that                 02:09

23     form, Mike?  I would like to correct it if you            02:09

24     will allow.                                               02:09

25         MR. KERENSKY:  It's a sidebar.  You gave              02:09

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised        February 18, 2011

Page 460

1     him the answer, I didn't.  I doubt you will.       02:09

2          MR. ANDERTON:  Say that one more time.        02:09

3     What's wrong with the form?                         02:09

4          MR. KERENSKY:  It is a sidebar of you          02:09

5     gave the testimony, I didn't.  That kind of         02:09

6     comment prior to the question is objectionable      02:09

7     where I practice law.                               02:09

8          MR. ANDERTON:  Oh, okay.                       02:09

9  BY MR. ANDERTON:                                       02:09

10     Q.    So my question, Dr. Bliesner, absent any     02:09

11  preface comment is do bulk stability hold time        02:10

12  studies have anything to do with process              02:10

13  validation?                                           02:10

14     A.    They can, yes.                               02:10

15     Q.    As you read this observation 7, does it?     02:10

16     A.    With respect to these products.              02:10

17     Q.    It does?                                      02:10

18     A.    Bulk stability -- we're talking about        02:10

19  final blend or are we talking about manufactured      02:10

20  tablets?  In this particular case it's               02:10

21  particularly clear.                                   02:10

22     Q.    Okay.  What's really clear, however --       02:10

23     A.    Uh-huh.                                       02:10

24     Q.    -- is that Digitek --                         02:10

25     A.    Uh-huh.                                       02:10

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 461

1      Q.    -- is not mentioned as one of the              02:10

2   products that the FDA cited in this observation;       02:10

3   correct?                                                02:10

4      A.    In the copy I'm looking at, yes.              02:10

5      Q.    Do you think that I'm looking at a            02:10

6   different copy?                                         02:10

7      A.    I was specifically told don't look at         02:10

8   anything that has to do with any other product          02:10

9   other than Digitek.  So if I had this copy with no      02:10

10  Digitek on there, I'm pretty sure I would not have      02:11

11  made a comment on it.                                   02:11

12     Q.    Well, Dr. Bliesner, again, the last time      02:11

13  you were here --                                        02:11

14     A.    Okay.                                          02:11

15     Q.    -- you identified this observation as a       02:11

16  reason why you questioned the validity of the           02:11

17  Digitek process validation.  I'm sorry.  Let me         02:11

18  strike that.                                            02:11

19     You cited to this observation as a basis for         02:11

20  wondering whether the FDA questioned the process        02:11

21  validation for Digitek.  So does this have              02:11

22  anything to do with the process validation for          02:11

23  Digitek?                                                02:11

24     A.    In this particular case, it does not          02:11

25  look so.                                                02:11

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 462

1      Q.    It does not?                              02:11

2      A.    Yes, uh-huh.                              02:11

3      Q.    Okay.  Are you aware of any other         02:11

4    evidence that you have reviewed that calls into   02:11

5    question the validity of the Digitek process      02:11

6    validation?                                       02:12

7      A.    Yes.                                       02:12

8      Q.    What?                                      02:12

9      A.    There were internal studies and           02:12

10   investigations with respect to process validation, 02:12

11   blend uniformity.                                 02:12

12     Q.    Okay.  So there were investigations --    02:12

13     A.    I misspoke.  With respect to process      02:12

14   validation, no.                                   02:12

15     Q.    Okay.                                      02:12

16     A.    With respect to blend uniformity.  I'm    02:12

17   sorry.                                            02:12

18          MR. ANDERTON:  Phil, would you please      02:12

19      read back my question very slowly and very     02:12

20      deliberately.  Dr. Bliesner, would you please  02:12

21      answer my question?                            02:12

22          THE WITNESS:  Yes, sir.                    02:13

23          (Whereupon, the testimony was read         02:13

24   back by the court reporter, as recorded above)    02:13

25          THE WITNESS:  I have to go back through    02:13

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 463

1      my report and take a look.                          02:13

2  BY MR. ANDERTON:                                        02:13

3      Q.   You're really desperate not to do             02:13

4  anything you can to undermine Activis, aren't           02:13

5  you?  You already testified about this last time,       02:13

6  Dr. Bliesner, and you identified only the bulk          02:13

7  stability hold time studies.                            02:13

8           MR. KERENSKY:  Form.                           02:13

9  BY MR. ANDERTON:                                        02:13

10     Q.   Now you have reviewed your report             02:13

11 forwards and backwards many times today and many        02:13

12 times last time.  Are you aware --                      02:13

13          MR. KERENSKY:  The witness is allowed to       02:13

14     review his report as much as he can to give         02:13

15     accurate testimony, and I think you probably        02:13

16     know that.                                          02:13

17          MR. ANDERTON:  I do know that.  I also         02:13

18     know that he's now contradicting his own prior      02:13

19     testimony whether he realizes it or not.  So        02:13

20     if he wants to go back through his report, he       02:13

21     certainly may.                                      02:13

22 BY MR. ANDERTON:                                        02:14

23     Q.   But my question is are you aware of any       02:14

24 other evidence that calls into question the             02:14

25 validity of the process validation for Digitek?         02:14

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                   February 18, 2011

                                                              Page 464

1        A.    Any other information?  Again, I need to          02:14

2    go back through my report and see what references           02:14

3    I reviewed with respect to process validation.              02:14

4        Q.    You didn't say anything about the                 02:14

5    Digitek process validation in your report, not a            02:14

6    word about it being unreliable, and you testified           02:14

7    last time that you didn't review the process                02:14

8    validations.                                                02:14

9        Out of a desperate attempt to create some               02:14

10   negative inference with respect to Activis, you             02:14

11   tried to identify this bulk stability hold time             02:14

12   reference in this 483 as evidence.                          02:14

13         MR. KERENSKY:  Is that a question or a                02:14

14     speech?  In either case, I object as to form.             02:14

15   BY MR. ANDERTON:                                            02:14

16     Q.    So, Dr. Bliesner, what -- if you didn't             02:14

17   say anything in your report about process                   02:14

18   validation, what would you be looking for?                  02:15

19         MR. KERENSKY:  Objection, form.  Assumes              02:15

20     facts not in evidence.                                    02:15

21   BY MR. ANDERTON:                                            02:15

22     Q.    You may -- you may answer.                          02:15

23     A.    Ask it again, please.                               02:15

24     Q.    If you didn't say anything about the                02:15

25   Digitek process validation in your report --                02:15

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 465

1      A.    That's correct.                                    02:15

2      Q.    -- what would you be looking for?                  02:15

3      A.    If I didn't?                                       02:15

4      Q.    Yeah.                                              02:15

5      A.    Chances are I didn't have documents that           02:15

6   would support that.                                        02:15

7      Q.    So --                                              02:15

8      A.    Chances are.                                       02:15

9      Q.    So you wouldn't have any evidence?                 02:15

10      A.    None of the documents were not given to            02:15

11   me to review.                                              02:15

12      Q.    Oh, you assume they're out there, you              02:15

13   just didn't get them?                                      02:15

14      A.    I know they're out there.                         02:15

15      Q.    You know there's documents out there               02:15

16   that call the process validation into question?           02:15

17      A.    No, I don't have a question on the                 02:15

18   documents with respect to process validation.            02:15

19      Q.    And by the way, you most certainly were           02:15

20   given them if you reviewed all of Plaintiffs'             02:15

21   exhibits.                                                  02:15

22      A.    I did not review all of Plaintiffs'               02:15

23   Exhibits in detail.                                        02:15

24      Q.    Didn't you tell me that last night from           02:15

25   Plaintiffs' counsel you received process                  02:16

Page 466

1   validation?                                              02:16

2      A.   Yes, and that's when I told you I got            02:16

3   that document last night and I didn't review it.         02:16

4      Q.   Okay.                                            02:16

5      A.   That's -- I got it late.                         02:16

6      Q.   Well, Dr. Bliesner, you've already given         02:16

7   this testimony last time.  With respect to               02:16

8   observation 7 --                                         02:16

9      A.   Uh-huh.                                          02:16

10     Q.   -- on the 2006, 483 --                           02:16

11     A.   Uh-huh.                                          02:16

12     Q.   -- does that have anything to do with            02:16

13  the Digitek process validation?                          02:16

14     A.   No, this is just related to these                02:16

15  products here.                                           02:16

16     Q.   Okay.                                            02:16

17     A.   According to this document.                      02:16

18     Q.   Can't resist, can you?                           02:16

19     A.   Resist what?  I'm sorry.                         02:16

20     Q.   Your -- your solicited, gratuitous,              02:16

21  editorial comments at the end of every answer to         02:16

22  make sure you follow Plaintiffs' counsels'               02:16

23  directive to keep the door open.                         02:16

24     MR. KERENSKY:  Objection to form.  You                02:16

25     know, speaking objections go for both sides of        02:16

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

                                                              Page 467

1        the table.                                              02:16

2             MR. ANDERTON:  I'm sorry, Mike.  I'm not           02:16

3        sure I understand.                                      02:17

4             MR. KERENSKY:  You know when you give a            02:17

5        speech like that, admonishing the witness and          02:17

6        trying to intimidate the witness, that's just          02:17

7        like a speaking objection, trying to coach the         02:17

8        witness.                                                02:17

9             MR. ANDERTON:  I'm merely trying to get           02:17

10       him to answer the questions that are asked of          02:17

11       him.  We've been down this road all day.               02:17

12            MR. KERENSKY:  I think you should stick           02:17

13       to questions and not speeches.                          02:17

14            MR. ANDERTON:  Okay.                               02:17

15            MR. KERENSKY:  Save speeches for the              02:17

16       judge and the jury would be my recommendation.         02:17

17            MR. ANDERTON:  I appreciate your                   02:17

18       recommendation, Mike.                                   02:17

19            MR. KERENSKY:  Thank you.                          02:17

20     BY MR. ANDERTON:                                          02:17

21       Q.    So Dr. Bliesner, I'm now going to hand           02:17

22     you a document that has been marked as --                02:17

23     previously marked as Plaintiffs' Exhibit 25.  Take       02:17

24     a moment and look at that document, please.              02:17

25     Actually, may I see that back?                            02:18

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 468

```
 1      A.    Sure.                                    02:18

 2      Q.    I may have given you the wrong           02:18

 3  document.  No.                                     02:18

 4          THE WITNESS:  This is going to look like   02:18

 5      delaying tactics, but I've got to go to the    02:18

 6      bathroom.                                      02:18

 7          MR. ANDERTON:  Okay.                       02:18

 8          THE VIDEOGRAPHER:  The time is 2:19 p.m.   02:18

 9      We're going off the record.                    02:18

10               (Short break)                         02:25

11          THE VIDEOGRAPHER:  The time is 2:27 p.m.   02:25

12      We are back on the record.                     02:25

13          MR. ANDERTON:  We're going to make a       02:25

14      record of that before we close down, Mike, if  02:25

15      that's all right.                              02:25

16          MR. KERENSKY:  Yes, that's fine.           02:25

17  BY MR. ANDERTON:                                   02:25

18      Q.    Dr. Bliesner, I'm going to hand you what 02:25

19  has previously been marked as Plaintiffs' Exhibit  02:25

20  25.                                                02:25

21      A.    Okay.                                    02:25

22      Q.    Have you seen that document before?      02:25

23      A.    I believe I have, but there was an       02:26

24  original one and there was a revised one, and I'm  02:26

25  not sure which one I had the ability to review.    02:26
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 469

1        Q.    You don't know whether you got to review      02:26
2   the revised warning letter?  If you don't know          02:26
3   that, how do you know there was one?                    02:26
4        A.    There was -- if I recall, correctly          02:26
5   there was a warning letter and then there was a         02:27
6   revised warning letter.                                 02:27
7        Q.    Yeah, what's this document say on top?        02:27
8        A.    This one is the revised warning letter.       02:27
9   I'm not sure which one I looked at.                     02:27
10       Q.    Did you only look at one of those two?        02:27
11       A.    I don't recall.  Let's see.                   02:27
12       Q.    All right.  Dr. Bliesner, look at page        02:27
13  41 of your report.                                      02:27
14       A.    Okay.  Okay.  And that would be it?          02:27
15       Q.    Have you seen that document before?           02:27
16       A.    Yes.                                          02:27
17       Q.    In fact you reviewed it preparing your        02:27
18  report; right?                                          02:28
19       A.    Yes.                                          02:28
20       Q.    And according to your description of          02:28
21  content, I'll use your words not mine, this             02:28
22  warning letter -- this is -- starts on page 41 and      02:28
23  continues on to page 42.                                02:28
24       A.    Yes.                                          02:28
25       Q.    This warning letter is -- relates            02:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 470

1    directly to the 483 that we discussed a moment          02:28

2    ago, that is Plaintiffs' Exhibit 68; correct?          02:28

3         A.    I'm sorry.  Say that again.  I was          02:28

4    looking at the contents.                                02:28

5         Q.    This warning letter --                       02:28

6         A.    Yes.                                          02:28

7         Q.    -- relates directly to the 483 that is       02:28

8    Plaintiffs' Exhibit 68; correct?                        02:28

9         A.    I don't know.  The warning letter?  Yes.     02:28

10        Q.    Okay.  So you have an inspection in July     02:28

11   and August of 2006 resulting a 483; right?             02:28

12        A.    Uh-huh.                                       02:28

13        Q.    You have to say or no?                       02:28

14        A.    Yes, I'm sorry.                              02:29

15        Q.    About six months later, a warning letter    02:29

16   was issued by the FDA; right?                          02:29

17        A.    That's correct, uh-huh.                     02:29

18        Q.    Okay.  All right.  Dr. Bliesner, I'm         02:29

19   handing you a document that has been marked as          02:29

20   Plaintiffs' Exhibit 171.                                02:29

21        A.    Okay.                                        02:29

22        Q.    And this document was actually marked        02:29

23   twice but go to page 44 of your report, please.         02:29

24        A.    I'm sorry 44 of the?                         02:30

25        Q.    Of your report.                              02:30

Page 471

| | | |
|---|---|---|
| 1 | A.    My report; okay.  A little punchy. | 02:30 |
| 2 | Sorry. | 02:30 |
| 3 | Q.    Do you see reference A29? | 02:30 |
| 4 | A.    I do. | 02:30 |
| 5 | Q.    Is your reference A29 -- notwithstanding | 02:30 |
| 6 | the discrepancy in the exhibit numbers as I told | 02:30 |
| 7 | you, this document was marked twice at two | 02:30 |
| 8 | depositions, one says 158, one says 171. | 02:30 |
| 9 | Nevertheless, please look at your reference A29 | 02:30 |
| 10 | and tell me whether that is the same thing as what | 02:30 |
| 11 | you've now been given, which is in front of you as | 02:30 |
| 12 | Exhibit 171. | 02:30 |
| 13 | A.    A29.  And your statement again was? | 02:31 |
| 14 | Q.    Is that the same as your reference A29? | 02:31 |
| 15 | A.    Let me double check.  My A29 doesn't | 02:31 |
| 16 | have the cover letter. | 02:31 |
| 17 | Q.    Doesn't have the cover letter, but | 02:31 |
| 18 | otherwise is it the exact same EIR? | 02:31 |
| 19 | A.    It is, but there's redactions | 02:32 |
| 20 | Q.    In which one? | 02:32 |
| 21 | A.    This one you just handed me as opposed | 02:32 |
| 22 | to this one. | 02:32 |
| 23 | Q.    Okay. | 02:32 |
| 24 | A.    So there -- | 02:32 |
| 25 | Q.    That's fine. | 02:32 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 472

1      A.    Uh-huh.                                             02:32

2      Q.    Now, let's look at -- and again working            02:32

3   from the one I handed you as 171.                           02:32

4      A.    Okay.                                              02:32

5      Q.    Turn to page 11.                                   02:32

6      A.    11 of 40?                                          02:33

7      Q.    Correct.                                           02:33

8      A.    Okay.                                              02:33

9      Q.    Actually, let's go to page 2 of 40.               02:33

10   Do you see the summary?                                    02:33

11     A.    Yes, sir.                                          02:33

12     Q.    The first sentence of the summary                  02:33

13   indicates that this inspection was conducted as a          02:33

14   follow-up to warning letter 07-NWJ-06.                     02:33

15     A.    Okay.                                              02:33

16     Q.    Is that the same warning letter that is           02:33

17   Plaintiffs' Exhibit 25 that you just looked at a           02:33

18   moment ago?                                                02:33

19     A.    25 you said; correct?                             02:33

20     Q.    Uh-huh.                                            02:34

21     A.    Okay.  It does appear to be, yes.                 02:34

22     Q.    Okay.  Is it or not?                              02:34

23     A.    Yes, according to the code, yeah.                 02:34

24     Q.    Okay.  And -- and so you know from your           02:34

25   experience that when a warning letter is issued           02:34

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 473

1     oftentimes -- maybe not perhaps all of the time --       02:34

2     the FDA will come back and ask to see verification        02:34

3     of remedial activities and corrective activities          02:34

4     performed by the manufacturer to the items set            02:34

5     forth in the warning letter; correct?                     02:34

6          A.    That is common, yes.                           02:34

7          Q.    Okay.  You've assisted clients with --          02:34

8     with exactly those types of inspections, haven't          02:34

9     you?                                                      02:34

10          A.    Inspections or the remediation.                02:34

11          Q.    Well, remediation and then the follow-up       02:34

12     inspections.                                              02:34

13          A.    Yes.                                           02:34

14          Q.    You've assisted with both.                     02:34

15          A.    Yes.                                           02:34

16          Q.    Right?                                         02:34

17          A.    Yes.                                           02:34

18          Q.    Okay.  So this inspection then that was        02:34

19     conducted in 2007 --                                      02:35

20          A.    Okay.                                          02:35

21          Q.    -- from September 5 to September 28 --         02:35

22     do I have those dates right?                              02:35

23          A.    Yes.                                           02:35

24          Q.    It was a follow-up inspection to the           02:35

25     warning letter that was -- the revised warning           02:35

Page 474

1    letter that was issued February 1, 2007, which was          02:35

2    issued after an inspection in July and August of           02:35

3    2006; correct?                                              02:35

4        A.    The original inspection July, August,             02:35

5    2006, yes.  Follow-up inspection off the issued            02:35

6    warning letter September, yes.                              02:35

7        Q.    Okay.                                             02:35

8        A.    Uh-huh.                                           02:35

9        Q.    So the items that are set forth in the           02:35

10   warning letter --                                           02:35

11       A.    Uh-huh.                                           02:35

12       Q.    -- of February 1, 2007 --                         02:35

13       A.    Uh-huh.                                           02:35

14       Q.    -- are the items that are also set forth         02:35

15   in the 483 issued in August of 2006 following the          02:35

16   inspection; right?                                          02:36

17       A.    Correct.                                          02:36

18       Q.    Now -- now we can go to -- well,                  02:36

19   actually go to page 5 of 60.                                02:36

20       A.    5 of 60?                                          02:36

21       Q.    On the EIR for the 2007 inspection.              02:36

22       A.    Okay.                                             02:36

23       Q.    Do you see the first paragraph there?           02:36

24       A.    The compliance status?                            02:36

25       Q.    Yes.                                              02:36

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 475

1     A.    Yes.                                          02:36

2     Q.    What's a compliance hold?                     02:36

3     A.    A compliance hold is where they may put       02:36

4   a hold on manufacturing and shipping of certain       02:36

5   products, depending on the impact in the EIR.         02:36

6     Q.    Okay.  And might they also put a hold on      02:36

7   new product approvals?                                02:37

8     A.    Not necessarily.                              02:37

9     Q.    Might they?                                    02:37

10    A.    They could.                                    02:37

11    Q.    Could?                                         02:37

12    A.    Uh-huh.                                        02:37

13    Q.    Is it -- is it uncommon for a                  02:37

14  manufacturer who is -- who is, to use the term        02:37

15  quote "under" a warning letter, to have new           02:37

16  product approvals stayed until the warning letter     02:37

17  is lifted?                                             02:37

18         MR. ANDERTON:  Phil, would you read it          02:38

19    back, please?                                        02:38

20         THE VIDEOGRAPHER:  The time is 2:40 p.m         02:38

21    going off the record.                                02:38

22               (Short break)                             02:40

23         THE VIDEOGRAPHER:  The time is 2:42 p.m.        02:40

24    We're back on the record.                            02:40

25         MR. ANDERTON:  Phil, would you please           02:40

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 476

1        slowly read back that question?                        02:40
2                 (Whereupon, the testimony was read            02:40
3    back by the court reporter, as recorded above)             02:40
4            THE WITNESS:  In my experience, companies          02:40
5        that are under regulatory action like a                02:40
6        warning letter or consent decree in my                 02:40
7        experience is that they are allowed to                 02:41
8        continue new product development and have              02:41
9        regular inspections by the FDA as it                   02:41
10       progresses.                                            02:41
11   BY MR. ANDERTON:                                           02:41
12       Q.    Okay.  But a compliance hold is -- is            02:41
13   some restriction on the company's activities?              02:41
14       A.    Yes.                                             02:41
15       Q.    Defined by the circumstances, I                  02:41
16   suppose.                                                   02:41
17       A.    Yes.                                             02:41
18       Q.    Now, after this -- well, let's go to             02:41
19   page 11 of 40.                                             02:41
20       Do you see the inspection coverage heading?            02:41
21       A.    Yes.                                             02:41
22       Q.    According to that page, the quality              02:41
23   production laboratory control materials and                02:41
24   facilities and equipment systems were covered              02:41
25   during this inspection.  That is five of the six           02:41

Page 477

1    systems typically inspected by the FDA; correct?        02:42

2        A.    Yes.                                          02:42

3        Q.    The only one not covered is packaging.        02:42

4        A.    Packaging and labeling.                       02:42

5        Q.    Sorry packaging and labeling.  And you        02:42

6    know packaging and labeling was in a different          02:42

7    facility from all of these other operations;            02:42

8    right?                                                   02:42

9        A.    I didn't know if it was exclusive, but I      02:42

10   know there was packaging and labeling going on in       02:42

11   another facility.                                        02:42

12       Q.    Okay.  Well, you know that it wasn't at       02:42

13   the Little Falls facility; right?                        02:42

14       A.    I didn't know whether there was some or      02:42

15   not.  I didn't specifically look at that.                02:42

16       Q.    I see.  Okay.  So what you didn't know       02:42

17   is whether there was packaging in another facility      02:42

18   and also at the Little Falls facility.                   02:42

19       A.    That's correct.                               02:42

20       Q.    Okay.  Would you look at -- well, after      02:42

21   this inspection, another a 483 was issued.  Do you      02:42

22   remember that?                                           02:42

23       A.    Specifically, no.                             02:42

24       Q.    All right.  Well, look at page 44 of         02:43

25   your report.                                             02:43

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 478

1      A.    Okay.  All right.  Yes.  It would          02:43

2   reflect -- you can go back and at the 483s, it        02:43

3   would be there.                                       02:43

4      Q.    So my question is, Dr. Bliesner, after       02:43

5   the inspection that is reflected in the EIR, that     02:43

6   is Plaintiffs' or, yeah, Plaintiffs' Exhibit 171,     02:43

7   a 483 was issued; correct?                            02:43

8      A.    171.  Okay.  I just want to make sure        02:44

9   because we've got several different layers here.      02:44

10  Yes.                                                  02:44

11     Q.    All right.  You say so in your report.       02:44

12     A.    Yes, yes.  I'm just confused because we      02:44

13  have different versions and different numbers and     02:44

14  stuff.  I wanted to be sure.                          02:44

15     Q.    Okay.  And in that 483, there were three     02:44

16  observations; right?                                  02:44

17     A.    Yes, according to this.                      02:44

18     Q.    You lay those out on page 44 of your         02:44

19  report and they are also set forth in this EIR;       02:44

20  isn't that right?                                     02:44

21     A.    Yes.                                         02:44

22     Q.    And in among those three observations,       02:44

23  none of them have anything do with Digitek,          02:44

24  correct?                                              02:44

25     A.    The general observations and supporting      02:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 479

1    data, the general observations indicate there is          02:46

2    nothing referred back to Digitek.                          02:46

3        Q.    Okay.                                            02:46

4        A.    Uh-huh.                                          02:46

5        Q.    And do you know that the outcome of this         02:46

6    inspection was what is referred to as V -- as in           02:46

7    victory -- VAI?                                            02:46

8        A.    Voluntary action indicated?                      02:46

9        Q.    Yes.                                             02:46

10       A.    I don't recall.                                 02:46

11       Q.    Do you have any reason to believe it was         02:46

12   VAI?                                                       02:46

13       A.    No.                                             02:47

14       Q.    Okay.  I mean I could put the 2008 EIR          02:47

15   in front of you that explicitly says that.                 02:47

16       A.    Yeah.                                           02:47

17       Q.    Okay.                                            02:47

18       A.    Yeah.                                           02:47

19       Q.    So VAI is a reasonable outcome for an           02:47

20   FDA inspection; correct?                                   02:47

21       A.    It's reasonable in that they're not             02:47

22   forcing you to do something specifically, that            02:47

23   it's up to you to do it, yes.                              02:47

24       Q.    Everybody would love to have NAI for all        02:47

25   --                                                         02:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 480

```
 1      A.    Absolutely.                                    02:47
 2      Q.    -- for all inspections; right?                 02:47
 3      A.    Absolutely.                                    02:47
 4      Q.    But VAI with three modest observations,        02:47
 5   that's a favorable outcome for an inspection,           02:47
 6   wouldn't you agree?                                     02:47
 7      A.    I wouldn't necessarily agree that it's a       02:47
 8   modest observation.                                     02:47
 9      Q.    Well, after --                                 02:47
10      A.    It's better to have -- as you said, you        02:48
11   know, the real goal is no action indicated.  And        02:48
12   the next step up is voluntary action indicated.         02:48
13      Q.    If they weren't modest or not major at         02:48
14   least, there would have been an OAI outcome;            02:48
15   right?                                                  02:48
16      A.    Potentially.  It's one of those gray           02:48
17   areas in the industry.  If the agency sees you're       02:48
18   progressing and even though there are some              02:48
19   significant failures and you're implementing a          02:48
20   corrective action, then they'll go okay, VAI.           02:48
21      Q.    Okay.  But a VAI is a reasonable               02:48
22   outcome?                                                02:48
23      A.    It's reasonable.                               02:48
24      Q.    Okay.  A lot of companies never get            02:48
25   anything but VAI outcomes; right?                       02:48
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 481

1      A.    I don't know lots.  I mean, you know,        02:48

2   that's a broad term.                                  02:48

3      Q.    Okay.  Now continuing on this in EIR,         02:48

4   Dr. Bliesner, turn to page 25 of 40.                  02:48

5      Are you there?                                      02:49

6      A.    I'm double checking.                          02:49

7      Q.    Dr. Bliesner, we've already established       02:49

8   that it's the same document.                          02:49

9      A.    I agree.                                       02:49

10      Q.    Okay.  Then you don't need to be looking     02:49

11   at both documents.                                    02:49

12      A.    I'm more comfortable if I do; okay.          02:49

13   What was the question please?                          02:49

14      Q.    I didn't ask a question.  I merely           02:49

15   wanted you to turn to page 25.  I asked -- the        02:49

16   question?  Are you at page 25?                         02:49

17      A.    I am.                                          02:49

18      Q.    Okay.  Look at Exhibit 171.  Okay,           02:49

19   Dr. Bliesner, you've already conceded --              02:49

20      A.    Uh-huh.                                        02:49

21      Q.    -- that is the same EIR.  There's no         02:49

22   reason to keep referring back and forth between      02:49

23   the two documents; all right?  Now --                02:49

24      MR. KERENSKY:  And, Dr. Bliesner, if you          02:49

25      feel more comfortable referring back and          02:49

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 482

1      forth, of course you are free to.                        02:49

2           THE WITNESS:  I do because I want to make           02:49

3      sure the redactions don't interrupt with the             02:49

4      current version we're looking at.                        02:50

5           MR. KERENSKY:  Fair enough.                         02:50

6   BY MR. ANDERTON:                                            02:50

7      Q.    What do you mean interrupt?                        02:50

8      A.    Well, I wrote my report based on this              02:50

9   document that has redactions into it and this               02:50

10  doesn't.  So I want would make sure that there's            02:50

11  no gaps.  That's all it is.                                 02:50

12     Q.    Okay.  Gaps?  What do you mean gaps?               02:50

13     A.    Specifically, I don't know.  I just want          02:50

14  to make sure.  This is the one I reviewed                   02:50

15  specifically, the second document.  I'm just more           02:50

16  comfortable doing that.                                     02:50

17     Q.    Okay.  Dr. Bliesner, under the heading            02:50

18  voluntary corrections on page 25 --                         02:50

19     A.    Yes.                                               02:50

20     Q.    -- the FDA indicates that during this             02:50

21  inspection, corrections to the previous FDA 483             02:50

22  were reviewed with Ms. Ang.  Do you see that?               02:50

23     A.    I do, sir.                                         02:50

24     Q.    So that would be the 483 that was issued          02:50

25  in August 2006 that resulted in a warning letter           02:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 483

1    in February of 2007; right?                                02:50

2         A.    Yes.                                            02:50

3         Q.    And the observation -- the EIR then goes        02:50

4    on to list all of the observations that were in           02:51

5    that prior 483.  Do you see that?  Starting at            02:51

6    page 25 and going all the way through, oh, all the         02:51

7    way to page 39 of the EIR; right?                          02:51

8         A.    So the question is, these are the              02:51

9    observations from the previous inspection that            02:51

10   happened?  I'm sorry.  What date?  I'm confused.          02:51

11   The one in 2006?                                           02:51

12        Q.    Correct.                                        02:52

13        A.    Okay.                                           02:52

14        Q.    Right.                                          02:52

15        A.    It looks like it, yes.  483 to the EIR.        02:52

16        Q.    Okay.                                           02:52

17        A.    Yes.                                            02:52

18        Q.    And so --                                       02:52

19        A.    And there were -- how many did we have         02:52

20   here?  They had 13 and they went back through all         02:52

21   13, yes.                                                   02:52

22        Q.    Okay.                                           02:52

23        A.    Uh-huh.                                         02:52

24        Q.    So at this point during this 2007              02:52

25   inspection, as you might expect from -- as you            02:52

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 484

1    indicated you might expect in the ordinary course,        02:52

2    the FDA reviewed the corrective actions taken by          02:52

3    Activis and assessed them or evaluated them;              02:52

4    correct?                                                  02:52

5        A.    According to the EIR, yes.                      02:52

6        Q.    You place great weight on FDA documents,        02:52

7    don't you, Dr. Bliesner?                                  02:52

8        A.    I do.                                           02:52

9        Q.    Okay.  This EIR is no different than all        02:53

10   the other FDA document you give significant weight        02:53

11   to, is it?                                                02:53

12       A.    No.                                             02:53

13       Q.    Okay.  It gets the same level of                02:53

14   credibility --                                            02:53

15       A.    I'm sorry.  I don't know if I understand        02:53

16   your consternation there.                                 02:53

17       Q.    Don't worry about it.                           02:53

18       A.    Okay, okay.                                     02:53

19       Q.    Dr. Bliesner, did you review this               02:53

20   section of this EIR when you looked at it as you          02:53

21   compiled your report?                                     02:53

22       A.    Yes.                                            02:53

23       Q.    You did?                                        02:53

24       A.    I did.                                          02:53

25       Q.    So you must have known then in the eyes         02:53

Page 485

1   of the FDA, all of the GMP deficiencies that were        02:53

2   part of the 2006 483 and the 2007 warning letter        02:53

3   were remediated to the FDA's satisfaction; right?       02:53

4        A.    I can't say all definitively.  They have     02:54

5   made progress and their observations were -- are        02:54

6   here.  I have to go back and look and say all is a      02:54

7   broad term.  They addressed them, yes.                  02:54

8        Q.    And the document speaks for itself.  It      02:54

9   will show --                                            02:54

10       A.    Okay.                                        02:54

11       Q.    -- whether the FDA believed there was        02:54

12  any unresolved corrective actions; right?               02:54

13       A.    If the document -- I haven't reviewed it     02:54

14  in a while.  If it says that, then it's true.           02:54

15       Q.    So as you look -- as I look at your          02:54

16  report on pages 15 and 16 --                            02:54

17       A.    Uh-huh.                                      02:54

18       Q.    -- in chronological progression, you         02:55

19  refer to this EIR or to the inspection that is          02:55

20  reflected in this 2007 EIR, and you make a point        02:55

21  to identify the three observations that the FDA         02:55

22  issued following that inspection.  Do you see that      02:55

23  beginning at the top of page -- I'm sorry, the          02:55

24  bottom of page 15 and continuing on to 16,              02:55

25  paragraph 37?                                           02:55

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 486

1      A.    Yes.                                          02:55

2      Q.    So you made a point of noting the             02:55

3   observations that the FDA issued after that            02:55

4   inspection; right?                                     02:55

5      A.    That's correct.                               02:55

6      Q.    You didn't note the corrective actions.       02:55

7      A.    That was not my intent to do a search         02:55

8   and review the documentations to look for              02:55

9   corrective actions.                                    02:56

10     Q.    A search.  You didn't have to search.         02:56

11  You read it.                                           02:56

12     A.    Yes.                                           02:56

13     Q.    You knew they did the corrective action       02:56

14  if you read the documents.  You chose not to           02:56

15  include that positive fact in your report; right?      02:56

16     A.    I suppose so, yes.                            02:56

17     Q.    Okay.  It seems awfully selective,            02:56

18  Dr. Bliesner, don't you think so?                      02:56

19     A.    No, not at all.                               02:56

20     Q.    Okay.                                          02:56

21     A.    I was looking for patterns of lack of         02:56

22  compliance which continued all the way up to the       02:56

23  second consent decree.                                 02:56

24     Q.    Except that in the eyes of the FDA, all       02:56

25  prior GMP deficiencies had been corrected as of        02:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 487

1    the time this inspection occurred, except for          02:56

2    those three new observations.                          02:56

3        A.    Of the original observations, yes.           02:56

4        Q.    So as of the time that inspection was         02:56

5    completed, in the eyes of the FDA, the GMP             02:56

6    deficiencies that existed at Activis Totowa were       02:56

7    those three observations?                              02:56

8        A.    At that point, yes.                          02:56

9        Q.    Okay.  So when you say in a broad,           02:56

10   sweeping fashion that they continued right up          02:57

11   through the second consent decree, that's not         02:57

12   accurate, is it?                                        02:57

13       A.    I disagree.  You can correct actions and      02:57

14   put them in place but still not change the             02:57

15   fundamental systems.  You can correct the             02:57

16   procedures but you didn't necessarily change the       02:57

17   system, and that was shown when they got a second      02:57

18   consent decree after this.                             02:57

19       Q.    The FDA audited all of those systems;        02:57

20   right?                                                  02:57

21       A.    If this was done under the compliance        02:57

22   program guidance manual where they look at quality     02:57

23   systems base, there was a turn in here.  Let me        02:57

24   just check because the agency hasn't always looked     02:57

25   at it from a quality systems standpoint.               02:57

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 488

1      Q.    Well, Dr. Bliesner, you already                02:58
2   acknowledged that the FDA conducted an inspection       02:58
3   of five of the six major systems.  The only one         02:58
4   not there is packaging and labeling; right?             02:58
5      A.    That's correct.                                02:58
6      Q.    So the FDA issued its written opinion          02:58
7   that the company had corrected all outstanding          02:58
8   previously identified GMP deficiencies except for       02:59
9   the three new ones that they identified as of the       02:59
10  time they conducted this inspection; is that            02:59
11  right?                                                  02:59
12     A.    They corrected the actions that they had       02:59
13  made the observations on.                               02:59
14     Q.    Okay.  So --                                   02:59
15     A.    That doesn't mean it was a systems-based       02:59
16  correction.  It was a correction of those specific      02:59
17  actions.                                                02:59
18     Q.    Do you want go through each one,               02:59
19  Dr. Bliesner?  You're so insistent on qualifying        02:59
20  your responses -- again to keep doors open as           02:59
21  you've been coached to do -- that you can't             02:59
22  concede the FDA -- the viability of this FDA            02:59
23  document.  You can't have it both ways.                 02:59
24     Do you understand that?                              02:59
25        MR. KERENSKY:  Objection, form.                   02:59

Page 489

1   BY MR. ANDERTON:                                           02:59

2       Q.    If you want to give credit to FDA               02:59

3   documents --                                              02:59

4       A.    Yes.                                            02:59

5       Q.    -- as a substantial basis for your              02:59

6   opinion --                                                02:59

7       A.    Yes.                                            02:59

8       Q.    -- you must credit the documents that           02:59

9   don't necessarily align with your opinion.  You           02:59

10  understand that; right?                                   02:59

11        MR. KERENSKY:  Objection form.  Not a                02:59

12     true statement.                                        03:00

13        THE WITNESS:  I would disagree with that.            03:00

14  BY MR. ANDERTON:                                           03:00

15      Q.    You can pick and choose?                        03:00

16      A.    I'm not picking and choosing.  It's just        03:00

17  that there's been a progression with the FDA's            03:00

18  inspection procedures over the years.                     03:00

19      Q.    Right.                                          03:00

20      A.    Where they would go in and look at these        03:00

21  major components; right?  But they wouldn't               03:00

22  necessarily look at their internal document that          03:00

23  says how you do an inspection by a quality                03:00

24  systems-based approach.  That didn't happen until         03:00

25  later on.                                                 03:00

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 490

1       Looking at this cover document right now, I'm          03:00

2   not sure whether they implemented the new quality          03:00

3   systems-based approach further.                            03:00

4       Q.    Do you have any reason to believe they           03:00

5   didn't?                                                    03:00

6       A.    Potentially, yes.                                03:00

7       Q.    What's that?                                     03:00

8       A.    Because if I'm not mistaken -- and we            03:00

9   can look it up -- the next inspection which                03:00

10  resulted in the consent decree, they specifically          03:00

11  say this inspection was conducted using the FDA            03:00

12  compliance program guidance manual and the number.         03:00

13      Q.    Okay.  So --                                     03:00

14      A.    And I don't see that they did that               03:00

15  here.  That's why I'm bringing up the point.  I'm          03:00

16  not trying to be difficult.  I just -- again, the          03:00

17  agency's made significant progress over the course         03:00

18  since like 2002 when they adopted the quality              03:01

19  systems-based approach and they didn't necessarily         03:01

20  implement it in full force all the way out.                03:01

21  That's all it is.                                          03:01

22      Q.    So you're going to, as I said, that's a          03:01

23  long-winded way of saying you're going to                  03:01

24  discredit this FDA document and give some limited          03:01

25  weight to others.                                          03:01

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                        Page 491

1        A.    I'm not discrediting it all; okay?  As a       03:01

2    matter of fact, all right, we're back on Exhibit         03:01

3    171.  I missed when we went first through.               03:01

4        Q.    And look at that --                            03:01

5        A.    Inspection.                                    03:01

6        Q.    Inspectional guidance was afforded --          03:01

7        A.    Through compliance program and guidance        03:01

8    manuals.  73506002.  So with that being said, yes,       03:01

9    they would use the newest guidance documents to          03:01

10   look at it from a quality systems-based approach.        03:01

11       Q.    So does that change your earlier               03:01

12   testimony or allow you to accept the fact that as        03:01

13   of the date, this inspection was concluded in the        03:01

14   eyes of the FDA?                                         03:01

15       A.    Uh-huh.                                        03:01

16       Q.    Activis had corrected all prior GMP            03:01

17   deficiencies and the only GMP deficiencies the FDA       03:02

18   identified were the three new ones that are set          03:02

19   forth in that -- after this inspection.                  03:02

20       A.    They corrected all of the findings that       03:02

21   came up with the 483.  I wouldn't -- I'm not             03:02

22   disputing that at all.                                   03:02

23       Q.    Okay.                                          03:02

24       A.    All right.                                     03:02

25       Q.    And after --                                   03:02

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 492

 1      A.    And they were recidivistic though          03:02

 2    because obviously they went back to their old      03:02

 3    ways.  That's why they got a consent decree.       03:02

 4    That's the real problem with companies ending up   03:02

 5    in consent decree.  They will get through warning  03:02

 6    letters, you know --                               03:02

 7      Q.    Dr. Bliesner, there's no question          03:02

 8    pending.                                           03:02

 9      A.    Oh, I'm sorry.                             03:02

10         MR. KERENSKY:  No, I'm sorry.  He can say     03:02

11    whatever in his question and you can't stop        03:02

12    him.                                               03:02

13         MR. ANDERTON:  No, he can't, Mike.  There     03:02

14    was no --                                          03:02

15         MR. KERENSKY:  Non-responsive, that's         03:02

16    your remedy.                                       03:02

17         MR. ANDERTON:  There was no question          03:02

18    pending.                                           03:02

19         MR. KERENSKY:  He was still answering the     03:02

20    last question.                                     03:02

21         MR. ANDERTON:  No, he wasn't.                 03:02

22         MR. KERENSKY:  Do not interrupt the           03:02

23    witness.                                           03:02

24         MR. ANDERTON:  He just started talking        03:02

25    gratuitously.                                      03:02

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 493

1          MR. KERENSKY:  That is not true.                03:02

2          MR. ANDERTON:  It is true.  There's no          03:02

3     question pending.                                    03:03

4          MR. KERENSKY:  Are you refusing to let          03:03

5     the witness continue his answer?                     03:03

6          MR. ANDERTON:  There is no answer, Mike.        03:03

7          MR. KERENSKY:  Are you refusing to let          03:03

8     the witness finish his answer?                       03:03

9          MR. ANDERTON:  He finished his answer and       03:03

10    then just started talking again without a            03:03

11    question being posed to him.                         03:03

12         MR. KERENSKY:  Are you refusing to let          03:03

13    the witness finish his answer?                       03:03

14         MR. ANDERTON:  Mike, you can't instruct         03:03

15    him to talk.  There's no question pending.           03:03

16         MR. KERENSKY:  I'm not -- there is a            03:03

17    question pending.                                    03:03

18         MR. ANDERTON:  No, there is not.                03:03

19         MR. KERENSKY:  You interrupted him.  Are        03:03

20    you refusing to let him finish his answer?           03:03

21         THE WITNESS:  He's finished his answer.         03:03

22    I'm not refusing anything.                           03:03

23         MR. KERENSKY:  I'm sorry.  The record is        03:03

24    real clear.  You interrupted him and told him        03:03

25    to stop because you thought he was answering         03:03

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 494

1       something other than what you asked him.            03:03

2             MR. ANDERTON:  No, because --                 03:03

3             MR. KERENSKY:  Your objection is              03:03

4       unresponsive, not to stop him from talking and      03:03

5       tell him he's just -- he's not answering.           03:03

6             MR. ANDERTON:  Mike, if you want to clean      03:03

7       this up with questions, you certainly may.          03:03

8       We're going to move on.                             03:03

9             MR. KERENSKY:  I'm sorry.  We're going to     03:03

10      stop the deposition until he finishes his           03:03

11      answer.                                             03:03

12            MR. ANDERTON:  No we're not --  there is      03:03

13      no question pending, Mike.                          03:03

14            MR. KERENSKY:  There is.                      03:03

15            MR. ANDERTON:  No, there isn't.  He           03:03

16      answered my question.                               03:03

17            MR. KERENSKY:  Tell you what.  Let's have     03:04

18      the court reporter go back and read it.             03:04

19            MR. ANDERTON:  Mike, if you --                03:04

20            MR. KERENSKY:  Read the question and the      03:04

21      answer, please.  And the answer and                 03:04

22      Mr. Anderton's interruption.                        03:04

23            MR. ANDERTON:  If you keep obstructing        03:04

24      this deposition and instructing the witness         03:04

25      what to say, we're going to call the court.         03:04

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 495

```
 1          MR. KERENSKY:  I think it's a good time     03:04
 2     to call the court.                               03:04
 3          MR. ANDERTON:  I mean he was done and had   03:04
 4     moved on, and I was about to ask another         03:04
 5     question, and he just started talking.           03:04
 6          MR. KERENSKY:  I accept your invitation     03:04
 7     to call the court so he can hear the last        03:04
 8     question, the last answer, your interruption.    03:04
 9          MR. ANDERTON:  There is no interruption.    03:04
10     I interrupted something that he was saying in    03:04
11     response to no question.                         03:04
12          MR. KERENSKY:  That is not my take on it,   03:04
13     but your remedy if you think that, is to say     03:04
14     unresponsive.                                    03:04
15          MR. ANDERTON:  Your remedy is to clear it   03:04
16     up if you think there's something here was       03:04
17     answering in response to one of my questions.    03:04
18     You have that right.  Now we're moving on.       03:04
19          MR. KERENSKY:  I do not think that.  And    03:04
20     no, he's not going to ask answer any more        03:04
21     questions until you let him finish his           03:05
22     answer.                                          03:05
23          MR. ANDERTON:  What's the basis for you     03:05
24     instructing him not to answer?                   03:05
25          MR. KERENSKY:  Because you interrupted      03:05
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 496

1    him.                                                    03:05

2        MR. ANDERTON:  There was no question               03:05

3    pending.                                                03:05

4        MR. KERENSKY:  I'm sorry.  There was.              03:05

5        MR. ANDERTON:  There wasn't, Mike.  Now,           03:05

6    I'm not going to argue with you anymore.  This          03:05

7    is ridiculous.                                          03:05

8        MR. KERENSKY:  Okay.  Well, Dr. Bliesner,          03:05

9    start packing up.                                       03:05

10       MR. ANDERTON:  You cannot instruct him to          03:05

11   stop the deposition, Mike.                              03:05

12       MR. KERENSKY:  Sure I can.                          03:05

13       MR. ANDERTON:  No, you can't.                       03:05

14       MR. KERENSKY:  I just did.  Until he               03:05

15   finishes that answer, we're not going to do             03:05

16   any more, or we can call the judge.                     03:05

17       MR. ANDERTON:  Read the question back,             03:05

18   Phil.                                                   03:05

19       MR. KERENSKY:  There you go.  And the              03:05

20   answer and the interruption, please, Phil.              03:05

21           (Whereupon, the testimony was read            03:07

22   back by the court reporter, as recorded above)          03:07

23       MR. ANDERTON:  So what that shows, Mike,           03:07

24   is that in fact --                                      03:07

25       MR. KERENSKY:  I am not done listening,            03:07

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 497

1    Michael.                                          03:07

2         MR. ANDERTON:  Listen carefully, Mike,       03:07

3    because what you'll see that in fact              03:07

4    Dr. Bliesner interrupted my question.             03:07

5         MR. KERENSKY:  That's an interesting          03:07

6    interpretation.                                    03:07

7         MR. ANDERTON:  Read it back, Phil.            03:07

8         (Whereupon, the testimony was read           03:07

9    back by the court reporter, as recorded above)    03:07

10        MR. KERENSKY:  Your question obviously        03:07

11   interrupted his answer inadvertently that time    03:07

12   and then the second time intentionally.           03:07

13        MR. ANDERTON:  Mike, not true.  Read it       03:07

14   back.                                              03:07

15        MR. KERENSKY:  That's my take on it.          03:07

16        MR. ANDERTON:  Read it back, Phil.            03:07

17        MR. KERENSKY:  I'm telling you I'm not        03:07

18   going to let you do this.  I'm not going to       03:07

19   let you do it.  Call the judge now.  It's real    03:07

20   simple.  We can call the judge now, we can        03:07

21   stop the deposition, or you can stop, let him     03:07

22   say what he wants to say, and to finish this      03:07

23   question to talk about recidivism.                03:07

24        MR. ANDERTON:  There was no question          03:07

25   about that.                                        03:07

Page 498

1        MR. KERENSKY:  And then you can object.    03:07

2        MR. ANDERTON:  And I object to you to    03:07

3    your speaking --    03:07

4        MR. KERENSKY:  There are three choices    03:07

5    you've got right now.  Pick one.    03:07

6        MR. ANDERTON:  I'm sorry.  Are you --    03:07

7        THE WITNESS:  Can I take a break?    03:08

8        MR. KERENSKY:  Yeah, go ahead Dave.    03:08

9        MR. ANDERTON:  Wait a minute.  I'm sorry,    03:08

10    Mike.  Do you get to decide now?    03:08

11        MR. KERENSKY:  Yeah.    03:08

12        MR. ANDERTON:  This witness is stopping    03:08

13    this deposition every 30 minutes.  Why are we    03:08

14    doing that?    03:08

15        MR. KERENSKY:  Because I don't know.    03:08

16    It's a very grueling deposition.  You're one    03:08

17    of the toughest guys I've been around in a    03:08

18    long time.  It's very difficult.    03:08

19        MR. ANDERTON:  Mike, stop.  Why are we    03:08

20    stopping every 30 minutes?    03:08

21        THE WITNESS:  Because I got to go to the    03:08

22    bathroom.    03:08

23        MR. ANDERTON:  Then go to the restroom.    03:08

24        THE VIDEOGRAPHER:  The time is 3:10 p.m.    03:08

25    We are going off the record.    03:08

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 499

```
 1                    (Short break)                        03:17

 2            THE VIDEOGRAPHER:  The time is 3:19 p.m.      03:17

 3       We are back on the record.  This is the           03:17

 4       beginning of tape seven.                          03:17

 5            MR. KERENSKY:  I would like the court         03:17

 6       reporter to finish reading the witness's last     03:17

 7       answer and I ask he be allowed to finish that     03:17

 8       answer.                                           03:17

 9            MR. ANDERTON:  Go head, Phil.                 03:18

10            (Whereupon, the testimony was read           03:18

11   back by the court reporter, as recorded above)        03:18

12            MR. KERENSKY:  That's a good place to         03:18

13       stop.  Dr. Bliesner, do you need to add to        03:18

14       that answer?                                      03:18

15            THE WITNESS:  Read the last part of that      03:18

16       again, please.  Just the -- not the whole         03:18

17       thing, just the last sentence.                    03:18

18            (Whereupon, the testimony was read           03:18

19   back by the court reporter, as recorded above)        03:18

20            And try to implement corrective actions.     03:18

21       And when they do so, they're not                  03:18

22       systems-based, quality systems-based and they     03:18

23       go right back to it because it's a culture        03:19

24       that comes along with it.  And it's not a true    03:19

25       corrective action that stands up to scrutiny.     03:19
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 500

1        MR. ANDERTON:  Move to strike that entire        03:19

2     speech as utterly non-responsive.  Responsive      03:19

3     to no pending question.                             03:19

4  BY MR. ANDERTON:                                       03:19

5     Q.   The -- you testified last time               03:19

6  Dr. Bliesner that -- and I want to read it because    03:19

7  I think it is interesting and because I'd like to     03:19

8  be accurate.                                           03:20

9     Mr. Moriarty asked you a question at page 117      03:20

10  and carrying over on to page 118.  You gave a         03:20

11  response and during that response you said, and I     03:20

12  quote:  "This is the first time I went up to my       03:20

13  medicine cabinet and I looked for anything that       03:20

14  had an Activis label on it and flushed it down the    03:20

15  toilet because it was that gross in terms of what     03:20

16  I was seeing."                                         03:20

17     Do you remember that testimony?                    03:20

18     A.   I do.                                          03:20

19     Q.   What did you flush down the toilet?           03:20

20     A.   Products that had Activis's name on it.       03:21

21     Q.   Such as?                                       03:21

22     A.   I don't recall specifically.                  03:21

23     Q.   Did you have products that had Activis's      03:21

24  name on it?                                            03:21

25     A.   I did.                                         03:21

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 501

1    Q.    How many?                                      03:21

2    A.    I don't recall.  I think one bottle.          03:21

3    Q.    One bottle.  Was it for you or for            03:21

4  another family member?                                03:21

5    A.    It was for me.                                03:21

6    Q.    So you don't even know what you flushed       03:21

7  down the toilet.                                      03:21

8    A.    I don't recall.  It was a such a gross        03:21

9  failure of compliance I didn't want to be putting     03:21

10  it in my body.                                       03:21

11    Q.    Well, you had to go out and replace it;      03:21

12  right?  It was a prescription medication?            03:21

13    A.    Yes.                                         03:21

14    Q.    So what did you go replace?                  03:21

15    A.    You'll find somebody else that              03:21

16  manufactures.  You ask the pharmacist to give you    03:21

17  a different replacement.                             03:21

18    Q.    What was it?  What did you replace?          03:21

19    A.    I don't recall what I replaced             03:21

20    Q.    Well, it was sometime in the last 12         03:21

21  months.  You don't remember?                         03:21

22    A.    No.                                          03:21

23    Q.    That seems like a pretty striking            03:21

24  event.  You ran up to your medicine cabinet.         03:21

25    A.    Yes, sir.                                    03:21

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 502

1      Q.    You threw open the door and you flushed          03:21
2  medicine down the toilet.                                  03:21
3      A.    I did.                                           03:21
4      Q.    Was that medicine manufactured by               03:21
5  Activis Elizabeth or Activis Totowa?                       03:21
6      A.    I wouldn't know.  It didn't say on the           03:22
7  bottle.                                                    03:22
8      Q.    You didn't even check, did you?                  03:22
9      A.    I don't believe that the bottle tells            03:22
10 you where it's manufactured.                               03:22
11     Q.    You didn't check, did you?                       03:22
12     A.    I didn't have to.                                03:22
13     Q.    Sure you did.  What do you mean you              03:22
14 didn't have to?                                            03:22
15     A.    Because of the failure in the quality            03:22
16 systems that I had seen in reviewing the document,         03:22
17 I didn't want to take any of the company's                 03:22
18 product.                                                   03:22
19     Q.    Well, do you know anything about the             03:22
20 distinction between Activis Totowa and Activis             03:22
21 Elizabeth?                                                 03:22
22     A.    From a business standpoint, not                  03:22
23 specifically.                                              03:22
24     Q.    Do you know who manufactured what                03:22
25 products?                                                  03:22

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 503

1      A.    If I go back and review, I can piece          03:22

2   together a list.                                       03:22

3      Q.    Well, you shouldn't --                         03:22

4      A.    I can't right off the top of my head.          03:22

5      Q.    You shouldn't have any information about       03:22

6   Activis Elizabeth.  They're not party to this          03:22

7   lawsuit.  Do you know that Activis Elizabeth and       03:22

8   Activis Totowa work out of two totally different       03:22

9   facilities?                                            03:22

10     A.    I know they are two different locations,       03:22

11  yes.                                                   03:22

12     Q.    And you know they have two totally             03:22

13  different quality systems?                             03:22

14     A.    No, I don't.                                  03:22

15     Q.    Different leadership?                          03:22

16     A.    No, I don't.                                  03:22

17     Q.    Different personnel?                           03:22

18     A.    No, I don't.                                  03:22

19     Q.    Didn't bother to try to find out, did         03:22

20  you?                                                   03:22

21     A.    I was told not to review them.                03:22

22     Q.    I'm talking about when you were in such       03:23

23  a hurry to flush your medicine down the toilet,        03:23

24  you didn't bother to try to find out whether that      03:23

25  product came from Activis Totowa or from Activis       03:23

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised            February 18, 2011

Page 504

1    Elizabeth or from another Activis entity.                03:23

2        A.    No, I didn't.                                  03:23

3        Q.    Is that a logical, reasoned reaction to        03:23

4    anything?                                                03:23

5        A.    Yes.                                           03:23

6        Q.    You said last time that -- you made           03:23

7    reference to your belief or you indicated -- I          03:23

8    shouldn't say may reference to -- you indicated         03:23

9    your belief that the FDA puts things on its             03:23

10   website that are pure politics.                         03:23

11       Do you remember that testimony?                     03:23

12       A.    I did not make that blanket statement         03:23

13   that I recall.                                           03:24

14       Q.    Well, let me ask you this.                    03:24

15       A.    Okay.                                          03:24

16       Q.    When you conducted an analysis that you       03:24

17   did to issue your opinion in this case --               03:24

18       A.    Yes.                                           03:24

19       Q.    -- did you do a political analysis or         03:24

20   some other type of analysis?                            03:24

21       A.    I reviewed the documentation as I would       03:24

22   if I was a client in the facility looking for data      03:24

23   to support whatever conclusions come up.                03:24

24       Q.    Is that a political analysis?                 03:24

25       A.    No.                                           03:24

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 505

1      Q.    Did politics enter into your analysis at          03:24
2  all?                                                         03:24
3      A.    No.                                                03:24
4      Q.    Are you an expert in politics?                     03:24
5      A.    No.                                                03:24
6      Q.    Do you have anything to support your               03:24
7  testimony that things the FDA puts on its website            03:24
8  result from politics?                                        03:24
9      A.    In my experience, there are sometimes              03:25
10 competing opinions against different branches                03:25
11 within FDA which appear to be -- appear to be                03:25
12 politically motivated.                                       03:25
13     Q.    Appear to be politically motivated?                03:25
14     A.    Yes.                                               03:25
15     Q.    Bliesner on politics?  Is that the                 03:25
16 source for that, Bliesner on politics?                       03:25
17     A.    No, it's not Bliesner on politics.                 03:25
18     Q.    What observation -- what supports that             03:25
19 observation?                                                 03:25
20     A.    My experience.                                     03:25
21     Q.    Do you have any political experience?              03:25
22     A.    Political?                                         03:25
23     Q.    Yes.                                               03:25
24     A.    Like in formal office or running for               03:25
25 anything like that?                                          03:25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 506

| 1 | Q. | Yes. | 03:25 |

1   Q.   Yes.                                          03:25

2   A.   No.                                           03:25

3   Q.   Did you ever work for the FDA?                03:25

4   A.   No.                                           03:25

5   Q.   Did you ever spend any time inside            03:25

6   either one of the various branches?  Well not     03:25

7   either one.  Any of the various branches of the   03:26

8   FDA?                                               03:26

9   A.   No.                                           03:26

10   Q.   So you believe that when one branch          03:26

11   issues something that isn't necessarily consistent  03:26

12   with something issued by another branch, it's    03:26

13   strictly politics?                                03:26

14   A.   Not strictly.  There are components to       03:26

15   it that do arise.  For instance, drug shortage    03:26

16   often has serious discussions with compliance     03:26

17   group because they have different missions        03:26

18   Q.   Have you ever been party to any of those     03:26

19   discussions?                                      03:26

20   A.   Directly, no.                                03:26

21   Q.   So you have no idea what is said in          03:26

22   those discussions between -- I'm sorry drug       03:26

23   shortage and compliance; right?                   03:26

24   A.   Meaning the folks that are in charge of      03:26

25   making sure they're supplied to market and the    03:26

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 507

1    compliance people.                                        03:26

2        Q.    You have no idea what's ever been said          03:26

3    in any of those conversations; right?                     03:26

4        A.    That's not true.                                03:26

5        Q.    Have you ever been --                           03:26

6        A.    I've not sat in meetings.  I have               03:26

7    clients convey it.                                        03:26

8        Q.    Clients who sat in the meetings?                03:26

9        A.    Yes.                                            03:27

10       Q.    So you're getting it at least third             03:27

11   hand?                                                     03:27

12       A.    Second-hand.                                    03:27

13       Q.    Second-hand?                                    03:27

14       A.    Yes.                                            03:27

15       Q.    Ever do anything to verify that?                03:27

16       A.    Specifically, no.                               03:27

17       Q.    I want to talk about --                         03:27

18       A.    Can you adjust the air-conditioning in          03:27

19   here?  I'm starting to get to the same point.             03:27

20           MS. DREWES:  I will.  But I tried earlier          03:27

21       and she turned it down as much as she could.          03:27

22       Apparently it's an issue especially later in          03:27

23       the day when the sun comes around.                    03:27

24           MR. ANDERTON:  Comes around this side of           03:27

25       the building.                                         03:27

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 508

1        MR. KERENSKY:  It's getting hot in here,        03:28

2    too.  It must be coming right over the phone.        03:28

3        MR. ANDERTON:  Yeah.                             03:28

4  BY MR. ANDERTON:                                       03:28

5    Q.    You produced today invoices that you           03:28

6  have submitted to the Plaintiffs' counsel for          03:28

7  payment; right?                                        03:28

8    A.    Yes.                                           03:28

9    Q.    You said there's least one that's              03:28

10  outstanding; right?                                   03:28

11    A.    Yes.                                          03:28

12    Q.    I don't -- there is no detail on those        03:28

13  invoices.  Do you have detailed time records that     03:28

14  show what you did and how many hours you spent        03:28

15  besides a general summary as is set forth in these    03:28

16  invoices?                                             03:28

17    A.    I just have a spreadsheet where I did         03:28

18  the work, I put the hour in and then I send that      03:28

19  to the bookkeeper.                                    03:28

20    Q.    Okay.  So you do have records?                03:28

21    A.    Uh-huh.                                       03:28

22    Q.    Do you provide any description of what        03:28

23  you did during the --                                 03:28

24    A.    On those records?                             03:28

25    Q.    Yes.                                          03:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 509

1     A.    I don't believe so.  There may be a word       03:28
2  or two.                                                 03:28
3     Q.    Services rendered.  Is that the --             03:28
4     A.    I'd have to look at -- I'm fairly              03:28
5  certain that I provided those sheets.                   03:29
6     Q.    On?                                            03:29
7     A.    The hard drive, I think.                       03:29
8     Q.    Oh, in the hard drive?                         03:29
9     A.    I think so.                                     03:29
10    Q.    Okay.                                           03:29
11    A.    If not, I can get them for you.                 03:29
12    Q.    Do you know how much money you have            03:29
13 billed and been paid from this engagement?              03:29
14    A.    To this point?                                  03:29
15    Q.    Yes.                                            03:29
16    A.    No.                                             03:29
17    Q.    Is there only one invoice that's               03:29
18 outstanding beyond this one?                            03:29
19    A.    I'm fairly certain yes, there is.              03:29
20    Q.    Rough estimate puts it somewhere north         03:29
21 of $140,000.  Does that sound right?                    03:29
22    A.    If you add it up and that's what the          03:30
23 number is, then it is.  I really don't know.            03:30
24    Q.    How many other engagements did you have       03:30
25 in 2010?                                                 03:30

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 510

1        A.    Engagements, you mean consulting          03:30

2    projects?                                           03:30

3        Q.    Uh-huh.                                    03:30

4        A.    One for sure.  It's still ongoing.  And    03:30

5    I may have had one other just briefly.              03:30

6        Q.    Any of them as big as this one?           03:30

7        A.    And when you say "big," what do you mean   03:30

8    by big?                                             03:30

9        Q.    Well $140,000, that's a reasonable        03:30

10   amount of revenue wouldn't you say?                 03:30

11       A.    It is.                                     03:30

12       Q.    I mean even at 550 an hour, that's 700    03:30

13   hours; right?  No, that's wrong.                    03:30

14       A.    I can tell you this.  I've been fully     03:31

15   engaged with a client since June.                   03:31

16       Q.    In addition to this engagement?           03:31

17       A.    Yes.  This is on the side.                03:31

18       Q.    Oh, this is on the side?                  03:31

19       A.    Prior to -- it started prior to and then  03:31

20   this -- this has been done on weekends.             03:31

21       Q.    Okay.                                     03:31

22       A.    I do anything about 60 to 90 hours a      03:31

23   week at that current client site.  I have been      03:31

24   since June.                                         03:31

25       Q.    Okay.  Will you pick up Exhibit 109?      03:31

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 511

 1        A.    Sure, if I can find it.  Which one is        03:31

 2   that, sir?                                              03:31

 3        Q.    It's one of the sets of notes that you       03:31

 4   produced that we took last time.                        03:32

 5        A.    Yes, got it.                                 03:32

 6        Q.    I'm looking at the first page of 109.        03:32

 7   Are you with me?                                        03:32

 8        A.    I am.                                        03:32

 9        Q.    Roman numeral I -- on 109, the first         03:32

10   page is as I read the heading, "Collective Proof        03:32

11   of Adulterated Digitek Making it to Market."            03:32

12        A.    Yes.                                         03:32

13        Q.    The first item Roman numeral I is            03:32

14   Adverse Event Reports; right?                           03:32

15        A.    Yes.                                         03:32

16        Q.    You are not a pharmacovigilence expert,      03:32

17   are you?                                                03:32

18        A.    I am not.                                    03:32

19        Q.    You don't know -- you're not able to         03:32

20   give any expert opinion about the reliability of        03:32

21   the facts and circumstances in adverse event            03:32

22   reports, are you?                                       03:33

23        A.    No, this was based on observation that       03:33

24   was in one of the EIRs.  I'd have to look.              03:33

25        Q.    Okay.  What you mean by that?                03:33

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised               February 18, 2011

                                                        Page 512

     1        A.    There was a -- in reviewing, if I'm not          03:33

     2   mistaken an EIR or 483, that this is one of the             03:33

     3   items the agency found specifically.                        03:33

     4        There was a death within a certain period of           03:33

     5   time or whatever, so...                                     03:33

     6        Q.    That was the report?                             03:33

     7        A.    Yes.                                              03:33

     8        Q.    That wasn't a finding of the EIR.                03:33

     9        A.    It was a report.                                 03:33

    10        Q.    Yeah.                                             03:33

    11        A.    That there was a death from an adverse           03:33

    12   event and it was not reported to the FDA.                   03:33

    13        Q.    So agency, to be clear --                        03:33

    14        A.    Uh-huh.                                          03:33

    15        Q.    -- the agency, the FDA didn't find that          03:33

    16   there was a death within several hours of taking            03:33

    17   the product.                                                03:33

    18        A.    They found there was an adverse event            03:33

    19   that had not been reported to them that stated              03:33

    20   that there was a death within a certain short               03:33

    21   period of time, yeah.                                       03:33

    22        Q.    And, again, you're not qualified to              03:33

    23   assess the reliability of the facts and                     03:33

    24   circumstances that are set forth in or were set             03:34

    25   forth in that adverse event, are you?                       03:34

Page 513

1       A.    No, but it triggered my eye because it          03:34

2   was a short period of time for an immediate dose          03:34

3   of product, and it was like maybe there's                 03:34

4   something.  That was actually the first thing that        03:34

5   got me started on this -- this review.                    03:34

6       Q.    Well, Dr. Bliesner, I'm a little bit            03:34

7   confused.                                                 03:34

8       A.    Uh-huh.                                         03:34

9       Q.    You say -- when you make that statement         03:34

10  --                                                        03:34

11      A.    Uh-huh.                                         03:34

12      Q.    -- you're presuming the accuracy or --          03:34

13  I'm sorry.  You're presuming the cause and effect         03:34

14  relationship between taking a product and the             03:34

15  event set forth in the adverse event report,              03:34

16  aren't you?                                               03:34

17      A.    Say that again specifically.                    03:34

18          MR. ANDERTON:  Phil, would you please             03:35

19      read that back?                                       03:35

20          (Whereupon, the testimony was read               03:35

21  back by the court reporter, as recorded above)            03:35

22          THE WITNESS:  There is a potential cause          03:35

23      and effect there.                                     03:35

24  BY MR. ANDERTON:                                          03:35

25      Q.    Potential?                                      03:35

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 514

1      A.    Yes.                                      03:35

2      Q.    Which you've said you're not qualified    03:35

3  to evaluate.                                        03:35

4      A.    No, that's correct.                       03:35

5      Q.    Okay.                                     03:35

6      A.    But the potential was there, which        03:35

7  from -- would you like me to continue or stop?  I  03:35

8  don't want to...                                    03:35

9      Q.    You were answering.                       03:35

10     A.    Okay.  From a, you know, compliance       03:35

11 standpoint, you look at that and you say to         03:35

12 yourself, jeez, if there was an adverse event, a    03:35

13 person potentially passed away in two and a half    03:35

14 hours, you sit back and go okay, from a product     03:35

15 standpoint, me working for this company again,      03:35

16 from a product standpoint, jeez, could that have    03:35

17 been product-related?                               03:35

18    So you go look and you see it's immediate        03:35

19 dosage form, and you try to pull up the PK lead     03:35

20 out of an ANDA.  And if the PK says it's like six   03:35

21 hours or whatever, you don't worry about it.  You   03:35

22 move on.  It's not related to that.  That's how     03:35

23 the logic went on that.                             03:35

24     Q.    Okay.  And so is that proof that          03:35

25 adulterated Digitek made it to market?              03:35

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 515

1     A.    No, it's not proof.                          03:35

2     Q.    Okay.  You characterize it as such in        03:35

3   this document.  That's just why I'm --               03:36

4     A.    My notes --                                  03:36

5     Q.    Okay.                                        03:36

6     A.    Proof is --                                  03:36

7     Q.    So it's not proof?                           03:36

8     A.    No, it's not.  It's a piece of data that     03:36

9   was the start of a potential pattern that was the    03:36

10  first thing -- quite honestly that was first thing   03:36

11  that caught my eye so I just started digging.        03:36

12    Q.    I'm merely asking about your                 03:36

13  characterization in your document.                   03:36

14    A.    Yes.                                         03:36

15    Q.    So it's not proof.                           03:36

16    A.    No.                                          03:36

17    Q.    And look at Roman numeral VI.                03:36

18    A.    Okay.                                        03:36

19    Q.    Company internal documents and              03:36

20  investigations.                                      03:36

21    A.    Uh-huh.                                      03:36

22    Q.    You see your reference to purchase          03:36

23  presses.                                             03:36

24    A.    Yes.                                         03:36

25    Q.    How is that proof that adulterated          03:36

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 516

1    Digitek made it to market?                              03:36

2         A.    There were a couple of circumstances as      03:36

3    I recall where they had reasonable suspect that         03:36

4    they had problems with tablet presses.  So they         03:37

5    committed -- if I'm not mistaken without taking         03:37

6    more time and going back and looking at the             03:37

7    document -- they would purchase new presses with        03:37

8    weight controls or whatever and they never did.         03:37

9    And that happened over the course of a -- if I'm        03:37

10   not mistaken, going back to look at the book, a         03:37

11   year or two.                                            03:37

12        Q.    Okay.  So you work with companies all        03:37

13   the time on GMP compliance; right?                      03:37

14        A.    That's correct.                              03:37

15        Q.    And one of the things I'm sure you tell      03:37

16   them is that they ought to be constantly                03:37

17   evaluating and reevaluating their quality systems;      03:37

18   right?                                                  03:37

19        A.    Absolutely.  CGMP current today, not         03:37

20   yesterday.                                              03:37

21        Q.    Exactly.  And so it's an evolutionary        03:37

22   process.                                                03:37

23        A.    Absolutely.                                  03:37

24        Q.    Never stops evolving.                        03:37

25        A.    No, it doesn't.                              03:37

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 517

1      Q.    So upgrading presses or purchasing new          03:37

2   presses --                                               03:37

3      A.    Uh-huh.                                          03:37

4      Q.    -- doesn't say anything about whether            03:37

5   adulterated product was produced or made it to           03:38

6   market, does it?                                          03:38

7      A.    It doesn't say anything about whether            03:38

8   adulterated products have made it to the market.         03:38

9      Q.    That's right.                                    03:38

10     A.    I wouldn't agree with that statement.            03:38

11  It -- it shows they had problems.                         03:38

12     Q.    It does?                                         03:38

13     A.    It shows they had problems with the             03:38

14  presses because they said they had problems with         03:38

15  the presses.                                              03:38

16     Q.    They didn't say they had problems.  They        03:38

17  said they wanted to purchase new presses                 03:38

18     A.    With weight control, if I remember              03:38

19  correctly.                                               03:38

20     Q.    Okay.  So that doesn't mean they're             03:38

21  having problems; it means they're looking at a           03:38

22  different technology.                                     03:38

23     A.    Uh-huh.                                          03:38

24     Q.    Right?                                          03:38

25     A.    Yes, an upgrade if you will.                    03:38

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 518

1     Q.    Well, let's call it an upgrade.              03:38

2     A.    Uh-huh.                                      03:38

3     Q.    Doesn't mean you had problems before;        03:38

4  right?                                                03:38

5     A.    But they committed to the FDA and they       03:38

6  didn't purchase them, as I recall.                    03:38

7     Q.    You just changed the subject,                03:38

8  Dr. Bliesner.                                         03:38

9     A.    I did?                                        03:38

10    Q.    Yeah?                                         03:38

11    A.    I'm sorry.                                    03:38

12    Q.    I asked you if the mere act of upgrading      03:38

13 presses means that they had problems.                 03:38

14    A.    Not specifically, no.                         03:39

15    Q.    And so purchasing presses doesn't            03:39

16 constitute proof that there is adulterated Digitek    03:39

17 in the market, does it?                               03:39

18    A.    Not necessarily, no.                          03:39

19    Q.    But you characterize it on that              03:39

20 document.                                             03:39

21    A.    It's my notes, uh-huh.                        03:39

22    Q.    You understand, Dr. Bliesner?                03:39

23    A.    I do sir.                                      03:39

24    Q.    That we get these documents.                 03:39

25    A.    Uh-huh.                                       03:39

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 519

1      Q.    And we get your report?                          03:39

2      A.    Uh-huh.                                          03:39

3      Q.    And we are -- we have to try to figure           03:39

4   out --                                                    03:39

5      A.    Uh-huh.                                          03:39

6      Q.    -- how you reached the conclusions that          03:39

7   you reached.                                              03:39

8      A.    Correct.                                         03:39

9      Q.    That's what we're doing today.                   03:39

10     A.    I understand.                                    03:39

11     Q.    So I understand that this is your notes.         03:39

12     A.    Uh-huh.                                          03:39

13     Q.    You're the one who characterized this as         03:39

14   proof --                                                 03:39

15     A.    Uh-huh.                                          03:39

16     Q.    -- that adulterated Digitek was in the           03:39

17   market.                                                  03:39

18     A.    Uh-huh.                                          03:39

19     Q.    I'm just inquiring about some of these           03:39

20   things.                                                  03:39

21     A.    Understood.                                      03:39

22     Q.    Excuse me?                                       03:40

23     A.    Uh-huh.                                          03:40

24     Q.    Dr. Bliesner, would you now find Exhibit         03:40

25   107.  It's another set of notes that we collected       03:40

Page 520

1    from you last time.                                         03:40

2        A.    May I see the top of?                             03:40

3        Q.    You may.  It the thicker one.  It's the           03:40

4    Mylan deposition exhibits.                                  03:40

5        A.    I have it here.                                   03:40

6        Q.    Okay.  You see on the first page there            03:40

7    it says probably equals more likely than not?              03:40

8        A.    Uh-huh.                                           03:40

9        Q.    When did you write that?                          03:40

10       A.    I don't recall specifically, but I'm --          03:40

11   my suspect is it was the preparation meeting                03:40

12   before the first deposition.                                03:40

13       Q.    Okay.  And --                                     03:40

14       A.    Because I was still struggling with that          03:40

15   whole concept of possible and probable.                     03:40

16       Q.    Well, you understand what probably                03:41

17   meant; right?                                               03:41

18       A.    If I'm not mistaken I was told that's             03:41

19   what it was.  It was a definition.  These were              03:41

20   my -- my documents that I had laid out as an                03:41

21   indices in the discussion, and it was the first            03:41

22   thing I wrote on, so...                                     03:41

23       Q.    Okay.  So you wrote in your discussions           03:41

24   with Plaintiffs' counsel, that probably equals             03:41

25   more likely than not; right?                                03:41

Page 521

| | | |
|---|---|---|
| 1 | A.    I'm fairly confident that's what they | 03:41 |
| 2 | mentioned to me as the definition. | 03:41 |
| 3 | Q.    Okay.  And the very next day -- | 03:41 |
| 4 | A.    Uh-huh | 03:41 |
| 5 | Q.    -- you testified that you did not know | 03:41 |
| 6 | the difference between possibility and | 03:41 |
| 7 | probability? | 03:41 |
| 8 | A.    Obviously I was still confused with | 03:41 |
| 9 | that. | 03:41 |
| 10 | Q.    And in the same meeting where you wrote | 03:41 |
| 11 | probably equals more likely than not -- well, | 03:41 |
| 12 | strike that. | 03:41 |
| 13 | A.    I -- | 03:41 |
| 14 | Q.    Strike that. | 03:41 |
| 15 | A.    Okay, okay. | 03:41 |
| 16 | Q.    Look at the second page of Exhibit 107, | 03:41 |
| 17 | please. | 03:41 |
| 18 | A.    Sure. | 03:41 |
| 19 | Q.    You made a note about Exhibit M09? | 03:42 |
| 20 | A.    Yes. | 03:42 |
| 21 | Q.    You see that? | 03:42 |
| 22 | A.    Yes. | 03:42 |
| 23 | Q.    And you indicated outside of spec 98 to | 03:42 |
| 24 | 103 percent.  And then you parenthetically | 03:42 |
| 25 | indicated 97.1 percent. | 03:42 |

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 522

1      Do you see that?                                    03:42

2      A.    I do.                                         03:42

3      Q.    97.1 is well within specification for         03:42

4  Digitek as approved by the FDA in the ANDA, isn't       03:42

5  it?                                                     03:42

6      A.    I don't know.  I'd have to go back and        03:42

7  look at it.                                             03:42

8      Q.    Well, didn't you -- I mean if you made a      03:42

9  note that something was out of spec.                    03:42

10      A.    Somebody made a statement somewhere in       03:42

11  this document whatever M09 was apparently.  I'm        03:42

12  not going back and looking at it.                      03:42

13      Q.    I understand.                                03:42

14      A.    That somebody made a statement you           03:42

15  realize that what this is, is not a detailed           03:42

16  reading of these documents because the search          03:42

17  capabilities of that Crivella West I think is the      03:42

18  name of it, is abysmal, so you can't find              03:43

19  anything.  So I just basically went in and said,       03:43

20  pulled up 01, skimmed it.  If I saw something, you     03:43

21  know -- well, I tried to do a thumbnail summary on     03:43

22  there so later on if I needed to go pull it up, I      03:43

23  would.  So --                                          03:43

24      Q.    Okay.                                        03:43

25      A.    Obviously -- or maybe not obviously --       03:43

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                              Page 523

1      it looks as if I probably printed that one and          03:43

2      it's somewhere in the stack.                            03:43

3          Q.    And you acknowledge of course that --         03:43

4      that the fact that it might -- that UDL might have       03:43

5      or Mylan might have a tighter specification says         03:43

6      nothing about whether the product is actually out       03:43

7      of specification; correct?                              03:43

8          A.    That's correct.                               03:43

9          Q.    At the end of the day, the operative          03:43

10     number with respect to whether something is in or       03:43

11     out of specification is the number the number for       03:43

12     any particular attribute set forth in the ANDA; is      03:43

13     that right?                                             03:44

14         A.    The approved application; that's              03:44

15     correct.                                                03:44

16         Q.    Okay.  So if you make a product and it's      03:44

17     distributed by somebody else and they, the             03:44

18     distributor prefers tighter specifications, that       03:44

19     doesn't have any bearing on whether the product        03:44

20     you make is actually out of specification, does        03:44

21     it?                                                    03:44

22         A.    Tighter specs are always around.            03:44

23         Q.    Okay.                                        03:44

24         A.    It's an additional level of control.        03:44

25         Q.    And if they had tighter specs and the       03:44

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 524

1    product doesn't meet them but still falls within        03:44

2    the ANDA specifications, that product is within         03:44

3    specification; right?                                   03:44

4        A.    For the manufacturing service.                03:44

5        Q.    Yes.                                           03:44

6        A.    In this particular case.  UDL probably        03:44

7    would have rejected it because that's their spec.       03:44

8        Q.    Fair enough, but with respect to that --      03:44

9        A.    The original ap., yes.                         03:44

10       Q.    And with respect to whether it is out of      03:44

11   spec, out of specification in the eyes of the FDA,      03:44

12   it is not out of specification; correct?                03:44

13       A.    I would say that's a fair statement,          03:44

14   yes.                                                    03:44

15       Q.    Okay.  Can you look at the page that          03:44

16   refers to Exhibit M44, please?                          03:45

17       A.    Sure, yes.                                    03:45

18       Q.    Did you -- do you recall enough about         03:45

19   M44 from looking at this document to know whether       03:45

20   you read it or not?                                     03:46

21       A.    I don't.                                      03:46

22       Q.    Okay.  Your thumbnail sketch as you           03:46

23   described it indicates this is an e-mail from Sue       03:46

24   Powers to Chuck Kuhn, regarding the recall costs        03:46

25   for UDL.                                                03:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 525

1     Do you see that?                                03:46

2     A.    I do.                                     03:46

3     Q.    You wrote that; right?                    03:46

4     A.    Yes.                                       03:46

5     Q.    All right.  So that's some brief          03:46

6  characterization of what you saw when you read     03:46

7  that document?                                     03:46

8     A.    I scanned it.  I didn't read it, I        03:46

9  scanned it.                                        03:46

10    Q.    Do the costs of a recall have anything    03:46

11  to do with whether there's adulterated or out of  03:46

12  specification product in the market?              03:46

13    A.    I don't believe so.                        03:46

14    Q.    Look at the page of Exhibit 107 that      03:46

15  refers to M56, please.                            03:47

16    A.    56?                                        03:47

17    Q.    Yes, please.                               03:47

18    A.    Uh-huh.                                    03:47

19    Q.    Do you see your handwritten note about    03:47

20  that?                                              03:47

21    A.    I do.                                      03:47

22    Q.    And it says that UDL to file from Lee     03:47

23  Roedke, 16 September, 2006, Activis warning       03:47

24  letter, Little Falls, New Jersey.  Did I read that 03:47

25  correctly so far?                                 03:47

Page 526

1    A.    What did you say?                          03:47

2    Q.    UDL to file from Lee Roedke, 16            03:47

3  September, abbreviated, 2006?                      03:47

4    A.    Uh-huh.                                    03:47

5    Q.    Activis warning letter, Little Falls,      03:47

6  New Jersey.  Did I read that correctly so far?     03:47

7    A.    Yes.                                       03:47

8    Q.    It goes on to say not addressing FDA ADE   03:47

9  concerns.  Did I read that correctly?             03:47

10   A.    Yes.                                       03:47

11   Q.    And ADE concerns in that context is an     03:47

12 acronym for adverse drug events; correct?          03:48

13   A.    Without specifically pulling it up, I      03:48

14 would say yes, that's true.                        03:48

15   Q.    Okay.  Do you use ADE for any other        03:48

16 purpose in the context of performing your GMP      03:48

17 compliance consulting services?                    03:48

18   A.    No.  But like you said, I'm not an         03:48

19 adverse drug event person.                         03:48

20   Q.    This is your terminology.                  03:48

21   A.    This is a summary.                         03:48

22   Q.    I understand.                              03:48

23   A.    And, again, unless we pull it up, that     03:48

24 may be what they refer to it as in the e-mail.     03:48

25 Chances are that's what it is.                     03:48

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 527

1      Q.    But you made the note.                        03:48

2      A.    Yes.                                          03:48

3      Q.    Do you mean to use the term ADE to stand      03:48

4    for adverse drug event?                               03:48

5      A.    More than likely, yes.                        03:48

6      Q.    Okay.                                         03:48

7      A.    Uh-huh.                                       03:48

8      Q.    I'm handing you, Dr. Bliesner, a              03:48

9    document that has been marked as Defendant's          03:48

10   Exhibit 87.                                           03:48

11     A.    Okay.                                         03:48

12     Q.    Take a moment please and review that          03:48

13   document very briefly.                                03:48

14     A.    Uh-huh.                                       03:48

15     Q.    Let me know when you have reviewed it.        03:48

16     A.    Sure.  Okay.                                  03:49

17     Q.    Have you seen that document before?           03:49

18     A.    I'm not sure.                                 03:49

19     Q.    All right.  Well you see that -- that it      03:49

20   is referencing a warning letter --                   03:49

21     A.    Uh-huh.                                       03:49

22     Q.    -- issued to Activis in August of 2006.       03:49

23     A.    Uh-huh.                                       03:49

24     Q.    That relates to adverse drug                  03:49

25   experiences.  Do you see that?                        03:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 528

1      A.    I do.                                            03:50

2      Q.    And this is the warning letter that you          03:50

3   referred to earlier when you were talking about          03:50

4   the reports and the ADE, and we talked for a             03:50

5   moment about the connection, whether there's             03:50

6   reliability in ADE reporting, and all that.  It's        03:50

7   the same point.                                          03:50

8      A.    I'll take your word.                            03:50

9      Q.    So in this letter, the FDA accepts the          03:50

10  corrective actions Activis has proposed and              03:50

11  implemented with respect to that warning letter;         03:50

12  right?                                                   03:50

13     A.    Correct.                                         03:50

14     Q.    Okay.  So when you wrote in response to         03:50

15  or in connection with Exhibit M56 that Activis           03:50

16  wasn't addressing the ADE concerns, is that             03:50

17  accurate?                                                03:50

18     A.    It's what's in the e-mail more than            03:50

19  likely -- or memo, whatever it is.                       03:50

20     Q.    Okay.                                            03:50

21     A.    It's somebody, whoever that individual         03:50

22  was.                                                     03:50

23     Q.    Lee Roedke.                                      03:50

24     A.    Apparently that's who it was.  Again           03:50

25  this is a snapshot summary, glancing it at this.         03:51

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

                                                            Page 529

 1    Whether it's an e-mail, memo or whatever.              03:51

 2         Q.    Okay.                                       03:51

 3         A.    That's their concern I'm assuming, not      03:51

 4    going back and pulling it out.                         03:51

 5         Q.    Okay.  Well --                              03:51

 6         A.    Knee deep in paper.                         03:51

 7         Q.    Yeah.  Unfortunately that's a necessary     03:51

 8    part of this process, Dr. Bliesner.  All right.        03:51

 9    Find 108, please.                                      03:51

10         A.    Which one are we on, sir?                   03:51

11         Q.    Exhibit 108.                                03:51

12         A.    Exhibit 108.  Yes, sir.                     03:51

13         Q.    What do you mean when you use the term      03:52

14    "blend uniformity failure."  To you, what does         03:52

15    that mean?                                             03:52

16         A.    Blend uniformity failure?                   03:52

17         Q.    Yeah.                                        03:52

18         A.    It means that blend gets sampled and        03:52

19    tested wouldn't necessarily, does not have the,        03:52

20    you know, assay value that it was supposed to          03:52

21    have.                                                  03:52

22         Q.    At what point of the sampling and           03:52

23    testing process does something become a blend          03:52

24    uniformity failure?                                    03:52

25         A.    Well, there's a spec for blend              03:52

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 530

1    uniformity test.                                              03:52

2        Q.    So by that you mean that you take a                 03:52

3    sample of the blend, you conduct a chemical test              03:52

4    on it to determine the assay of that sample, and              03:53

5    then you apply the specifications to determine                03:53

6    whether that sample -- whether the assay value for            03:53

7    that sample is within those specifications;                   03:53

8    correct?                                                      03:53

9        A.    That's a fair assessment.                           03:53

10       Q.    And so when you sample blends for                   03:53

11   testing to determine whether it is uniformly                  03:53

12   distributed -- excuse me -- most manufacturers                03:53

13   take samples of blend in duplicate or triplicate;             03:53

14   correct?                                                      03:53

15       A.    Most manufacturers?  I don't know if I              03:53

16   can speak to most manufacturers, but there's more             03:53

17   than one.                                                     03:53

18       Q.    Okay.  So it's not uncommon for a                   03:53

19   pharmaceutical manufacturer to take blend samples             03:53

20   in duplicate or triplicate; right?                            03:53

21       A.    I would say that's fair.                            03:53

22       Q.    And that is an acceptable practice so               03:53

23   long as you, the manufacturer, have an                        03:54

24   appropriately drafted SOP?                                    03:54

25       A.    Manufacturer, during process validation            03:54

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 531

1    will come up with a sampling plan, and a sampling          03:54

2    approach.  Manufacturing does the sampling and            03:54

3    delivers the sample for you.                               03:54

4        Q.    So it is acceptable to draft a sampling          03:54

5    plan with respect to blend sampling that calls for         03:54

6    blend samples to be taken in duplicate or                  03:54

7    triplicate; right?                                         03:54

8        A.    At least, yes.                                   03:54

9        Q.    And it is acceptable to draft a testing          03:54

10   plan.                                                      03:54

11       A.    Yes.                                             03:54

12       Q.    For blend samples that allows for                03:54

13   testing the second or third sample from a given            03:54

14   location under appropriate circumstances; right?           03:54

15       A.    Content uniformity, yeah, under                  03:54

16   appropriate circumstances.                                 03:54

17       Q.    Well, so -- so it is -- you've seen and          03:55

18   it is okay to have a sampling plan that says you           03:55

19   take blend samples in triplicate, for example.            03:55

20       A.    Uh-huh.                                          03:55

21       Q.    You test the first sample from each              03:55

22   location and in appropriate circumstances if -- if         03:55

23   one of those samples is not tested within                  03:55

24   specification, you may test the second sample from         03:55

25   that location.                                             03:55

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 532

1     A.    Same location.  I would say it's a fair        03:55

2  statement if it's in the protocol.                      03:55

3     Q.    If it's in the protocol.                        03:55

4     A.    Yes.                                             03:55

5     Q.    And you have to have the circumstances          03:55

6  that are called for by the protocol and that allow       03:55

7  you to test that second sample; right?                   03:55

8     A.    Yes                                              03:55

9     Q.    And you have to do an appropriate               03:55

10  inspection or investigation and try to determine         03:55

11  why the first sample tested out of specification;        03:56

12  correct?                                                 03:56

13     A.    Correct.  Just for content uniformity          03:56

14  for finished products, yes.                              03:56

15     Q.    If you have an initial sample of the           03:56

16  triplicate sample that tests out of specification,       03:56

17  do you call that a blend failure?                        03:56

18     A.    Do you want to say that again?                  03:56

19         MR. ANDERTON:  Phil, would you read it           03:56

20     back?                                                 03:56

21           (Whereupon, the testimony was read            03:56

22  back by the court reporter, as recorded above)           03:56

23         THE WITNESS:  Potentially.                        03:56

24  BY MR. ANDERTON:                                          03:56

25     Q.    Potentially.                                    03:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 533

1      A.    Yes.                                         03:56

2      Q.    But if you have a protocol that allows       03:56

3   you to test the second or third sample after          03:56

4   conducting an appropriate investigation and after     03:56

5   following the protocol properly --                    03:56

6      A.    Uh-huh.                                       03:56

7      Q.    -- that first out of specification            03:56

8   result is not a blend failure, am I correct?           03:56

9      A.    If it meets the protocol, that is             03:56

10   correct.                                              03:56

11      Q.    Okay.  So you wouldn't call it a blend       03:56

12   failure until you've run all the way to the end of    03:57

13   the protocol --                                       03:57

14      A.    Huh-huh.                                     03:57

15      Q.    -- is the way I'll describe that to you;     03:57

16   is that correct?                                      03:57

17      A.    That's a fair way to put it.                 03:57

18      Q.    Okay.  Which might mean in certain           03:57

19   circumstances until you've tested the third of the    03:57

20   triplicate samples from one or more locations;        03:57

21   right?                                                03:57

22      A.    Yes.                                         03:57

23      Q.    When you use the term -- and looking at      03:57

24   Exhibit 108.                                          03:57

25      A.    Yes.                                         03:57

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 534

1     Q.    Well, hold on one second.                          03:57

2          MS. DREWES:  I don't want to interrupt,             03:57

3     but on that hard drive that you -- that the             03:57

4     witness gave, is it okay with everyone if we            03:57

5     give everyone a CD attached with the documents          03:57

6     rather than a hard copy?  Because apparently            03:57

7     you can't read them when they were printing.            03:57

8          MR. ANDERTON:  Yeah, that's acceptable to          03:58

9     me.  Mike, are you all right with that?                 03:58

10         MR. KERENSKY:  Your voice was too faint            03:58

11    for to me to hear your comment, ma'am.                  03:58

12         MS. DREWES:  Would the hard drive that             03:58

13    Dr. Bliesner gave us earlier, today, the -- we          03:58

14    can print the -- we can print the documents             03:58

15    but they are not legible, some of them, when            03:58

16    we print them.  For some reason they come out           03:58

17    really dark is what I'm told.                           03:58

18         So if we can just give everyone a disc if          03:58

19    that's agreeable to you.                                03:58

20         MR. ANDERTON:  Are you okay with that,             03:58

21    Mike?                                                   03:58

22         MS. DREWES:  Apparently you can read it            03:58

23    on the disc or on the computer screen.                  03:58

24         MR. KERENSKY:  Just as long as a general,         03:58

25    average, normal, everyday computer will open           03:58

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 535

1       it, I'm happy.                                           03:58

2           MR. ANDERTON:  Well, that's just                     03:58

3       described my unit, so.                                   03:58

4   BY MR. ANDERTON:                                             03:58

5       Q.    And then Dr. Bliesner, continuing on               03:58

6   with this line of questioning, if you -- again if            03:58

7   your protocol is appropriately drafted and you               03:59

8   follow that factual progression that I just                  03:59

9   described, where you take samples of a blend and             03:59

10  you test the first sample from a location and it             03:59

11  is out of specification, then you follow the                 03:59

12  protocol and that results in you testing then the            03:59

13  second sample from that location and it is within            03:59

14  specification, it's okay to release that batch;              03:59

15  right?                                                       03:59

16      A.    If you're meeting your protocol.                   03:59

17      Q.    If you have a protocol that allows for             03:59

18  all of that, specifies it, and if you comply with            03:59

19  it along the way; correct?                                   03:59

20      A.    That's a reasonable statement.                     03:59

21      Q.    It's okay to release that batch?                   03:59

22      A.    That blend, sure.                                  03:59

23      Q.    That --                                            03:59

24      A.    Final blend in this case.                          03:59

25      Q.    That initial I guess then -- correct.              03:59

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 536

1   So let me ask it another way.                                03:59

2       That initial out-of-specification result                04:00

3   doesn't require that the entire blend and                    04:00

4   therefore the entire batch be rejected.                      04:00

5       A.    Not necessarily.                                   04:00

6       Q.    Okay.                                              04:00

7       A.    It may be, you know, extraordinary                 04:00

8   circumstances where it comes in at 25 percent of             04:00

9   assay or whatever, then it's a whole different               04:00

10  bailiwick.                                                   04:00

11      Q.    Then your -- well, then your                       04:00

12  investigation your protocol provides for probably            04:00

13  is going to reveal something other than just a               04:00

14  single out-of-specification result?                          04:00

15      A.    More than likely, yes.                             04:00

16      Q.    Okay.                                              04:00

17          MR. KERENSKY:  Are you guys still there?             04:00

18          MR. ANDERTON:  Yeah, we are here.                    04:00

19          MR. KERENSKY:  Man, you got quiet.  I                04:00

20      thought you hung up on me.                               04:00

21  BY MR. ANDERTON:                                             04:00

22      Q.    Dr. Bliesner, when you did your paper              04:00

23  audit of -- of this -- of Activis to prepare your           04:00

24  report -- paper audit is your term not mine -- did          04:01

25  you ask for and did you receive the SOP of Activis          04:01

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 537

1    Totowa that provides the protocol for testing          04:01

2    blend samples and retesting second or third           04:01

3    samples if you have an initial                        04:01

4    out-of-specification result?                          04:01

5         A.    I don't think I specifically asked for     04:01

6    that SOP.  I remember reviewing an investigation      04:01

7    having to do with blend uniformity failure.           04:01

8         Q.    If you didn't ask for it, does that mean   04:01

9    you didn't review it either?                          04:01

10        A.    I don't know if I could say that.  I'd     04:01

11   have to go back and look at the paper at I            04:01

12   reviewed.                                             04:01

13        Q.    Okay.                                      04:01

14        A.    With respect to that investigation.        04:01

15        Q.    The documents -- well, the documents       04:01

16   that you reviewed --                                  04:02

17        A.    Uh-huh.                                    04:02

18        Q.    -- are set forth in your report; right?    04:02

19        A.    They should be, yes.                       04:02

20        Q.    So if you reviewed it, our review of       04:02

21   those documents will reveal that you reviewed it?     04:02

22        A.    That I reviewed it, yes.                   04:02

23        Q.    Right.                                     04:02

24        A.    That's a fair statement.                   04:02

25        Q.    So if it's not listed among the            04:02

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 538

1  documents that you reviewed -- if it's not listed          04:02

2  in your report, it's not something you reviewed?           04:02

3      A.    Not necessarily.                                 04:02

4      Q.    Pardon?                                           04:02

5      A.    They're not mutually exclusive, most of          04:02

6  it because of all the volume of documents here.            04:02

7  It obviously didn't include every single one that          04:02

8  I reviewed, just ones that I felt had pertinent            04:02

9  points with respect to this.                               04:02

10     Q.    If it's not listed in your report --             04:02

11     A.    Yes.                                              04:02

12     Q.    -- is it fair to say that you didn't             04:02

13 place any significance on it and didn't rely on it         04:02

14 in drafting your report?                                   04:02

15     A.    I didn't rely on it.  I don't know if            04:02

16 significance is a word that I would use.                   04:02

17     Q.    How are we to know or to identify if I           04:03

18 asked you right now whether you reviewed this SOP          04:03

19 --                                                         04:03

20     A.    Uh-huh                                           04:03

21     Q.    -- and it's not listed in your report --         04:03

22     A.    That's right.                                    04:03

23     Q.    -- how would you know?                           04:03

24     A.    It's not listed in the report.  I'd go          04:03

25 through this index and see if I popped it up.              04:03

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 539

1       Q.    And if it's not in this index?                04:03

2       A.    And it's not in the supplemental              04:03

3   documents that were sent to me by -- then chances       04:03

4   are I didn't review it.                                 04:03

5       Q.    Okay.                                         04:03

6       I'm going to hand you a document that has been      04:03

7   marked as -- well, what's it say on there?              04:03

8       A.    58.                                           04:03

9       Q.    58?                                           04:04

10      A.    Yeah.                                          04:04

11          MR. ANDERTON:  Plaintiffs' Exhibit 58.          04:04

12      Plaintiffs', Mike.                                   04:04

13          MR. KERENSKY:  Got it.                           04:04

14   BY MR. ANDERTON:                                        04:04

15      Q.    Have you seen that before, Dr. Bliesner?      04:04

16      A.    Isn't this one that we -- the 483s that       04:04

17   were included before?  Can I take a look at the        04:04

18   report?  I'm pretty sure that I have, but I just       04:04

19   want to make sure.                                      04:04

20      Q.    Well, if you didn't look at this, you         04:04

21   don't have a report.                                    04:04

22      A.    Okay.                                         04:04

23      Q.    But you may do whatever you like to           04:04

24   satisfy yourself, but I guess I can shortcircuit       04:04

25   that.                                                   04:04

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 540

```
1      A.    Okay.  Please.                              04:04

2      Q.    Well, I'm here to help, Dr. Bliesner.       04:04

3  Sarah will tell you I'm a giver.                      04:05

4          MS. DREWES:  Oh, yeah.  Big time.             04:05

5          MR. KERENSKY:  Note the snickers on the       04:05

6      phone.                                            04:05

7          MR. ANDERTON:  I'm sorry.  Defense            04:05

8      Exhibit 58, Mike.  I misspoke earlier.            04:05

9          MR. KERENSKY:  About you being a giving       04:05

10      person?                                          04:05

11          MS. DREWES:  Yeah, but got also about the    04:05

12      exhibit.                                         04:05

13          MR. KERENSKY:  That you are here to          04:05

14      help?  You're not with the IRS.                  04:05

15          MR. ANDERTON:  It's Defendant's Exhibit      04:05

16      58.                                              04:05

17          MR. KERENSKY:  Thank you.                    04:05

18          MR. ANDERTON:  It's Plaintiffs' Exhibit      04:05

19      90, I believe.  No.  Not true.                   04:05

20  BY MR. ANDERTON:                                     04:05

21      Q.    Dr. Bliesner, did you review this or       04:05

22  not.  What do you think?                             04:06

23      A.    Yes.                                       04:09

24      Q.    What page of your report are you looking   04:09

25  at?                                                  04:09
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 541

1     A.    47.                                              04:09

2     Q.    What reference?                                  04:09

3     A.    A37.                                             04:09

4     Q.    Well?                                            04:09

5     A.    By the look of it.                               04:09

6     Q.    That's an EIR, not a 483.                        04:09

7     A.    It is the EIR that had the 483s in               04:09

8  them.  I misspoke.  I'm sorry.                            04:09

9     Q.    So you didn't review this apparently?            04:09

10    A.    The 483s stand-alone?                            04:09

11    Q.    Yes.                                             04:09

12    A.    No, it would be the EIR.                         04:09

13    Q.    So that's Exhibit 91.  You agree with            04:09

14 that; right?                                              04:10

15    A.    Yes.                                             04:10

16    Q.    All right.  I'm going to hand you a copy         04:10

17 of Exhibit 91.                                            04:10

18    A.    Okay.                                            04:10

19    Q.    So that we do this and keep you as               04:10

20 comfortable as you need to be.  I'm here for your         04:10

21 comfort.                                                 04:10

22     I would like you to first look at the document        04:10

23 I just handed you and tell me if you reviewed that        04:10

24 document.                                                 04:10

25    A.    91.  Plaintiffs' Exhibit 91, yes, sir.           04:10

Page 542

```
 1      Q.    Okay.  Turn to page 43 of that document.      04:10
 2      A.    May have a second, please?  I want to         04:10
 3   make sure that I -- because there were some of         04:10
 4   these reports that didn't necessarily have all of      04:11
 5   the pages that came with them, the EIR.  There was     04:11
 6   one circumstance that I recall that didn't.  So I      04:11
 7   want to make sure that what I've got over here is      04:11
 8   the same and inclusive.                                04:11
 9      Q.    Okay.                                          04:11
10      A.    Okay.  Is that fair?                           04:11
11      Q.    Well, I guess I would hope that you           04:11
12   would have noted in your report when you reviewed      04:11
13   a document that was incomplete, but you didn't do      04:11
14   that with respect to this document.                    04:11
15      A.    I just want to look at it.                     04:11
16      Q.    Of course you do.                              04:11
17          THE VIDEOGRAPHER:  While he's doing that,       04:11
18   you have five minutes left on the tape.                04:11
19          MR. ANDERTON:  Let's go off the record          04:11
20   and change the tape.                                   04:11
21          THE WITNESS:  The time is 4:13 p.m.             04:11
22   We're going off the record.                            04:11
23               (Short break)                              04:21
24          THE VIDEOGRAPHER:  The time is 4:24 p.m.        04:21
25   We are on the record.  This is the beginning           04:22
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 543

```
 1       of tape eight.                                 04:22

 2   BY MR. ANDERTON:                                    04:22

 3       Q.    Dr. Bliesner, are you all set?            04:22

 4       A.    Yes, sir.                                 04:22

 5       Q.    Okay.  I want to ask you --               04:22

 6   Dr. Bliesner, I'm going to go away from that        04:23

 7   document for just a moment and ask you a general    04:23

 8   question.                                           04:23

 9       A.    Okay.                                     04:23

10       Q.    You are a chemist by trade; right?        04:23

11       A.    I am a Ph.D. and analytical chemist by    04:23

12   training.                                           04:23

13       Q.    Does that mean the answer to my question  04:23

14   is yes?                                             04:23

15       A.    Chemist?  Yes.  Sorry.  There are many    04:23

16   flavors of chemists.  That's why.                   04:24

17       Q.    I understand, but above all else as a     04:24

18   matter of fact you call yourself a chemist?         04:24

19       A.    A research chemist, yes, I do.            04:24

20       Q.    When testing a tablet and particularly a  04:24

21   solid oral dose tablet for potency --               04:24

22       A.    Uh-huh.                                   04:24

23       Q.    -- what method would you use if you       04:24

24   could use any method you wanted?                    04:24

25       A.    Not to sound cryptic, but it depends on   04:24
```

Page 544

1    the dosage form and what the characteristics are        04:24

2    and what it's amenable to as far as analysis            04:24

3    goes.                                                   04:24

4        Q.    What do you mean by that?                     04:24

5        A.    Well, it turns out that certain               04:24

6    compounds might not be appropriately soluble let's      04:24

7    say and therefore easily dissolved and injected         04:24

8    into an HPLC system let's say.                          04:24

9        Q.    Did you review the ANDA for Digoxin and       04:24

10   particularly for the Digitek version of Digoxin         04:25

11   tablets manufactured by Amide and then Activis          04:25

12   sufficiently to allow you to have an opinion about      04:25

13   which methods could be used to examine the potency      04:25

14   of a tablet -- of one of those tablets?                 04:25

15       A.    I'm sorry.  Go again.                         04:25

16          MR. ANDERTON:  Phil, can you get that?  I        04:25

17       did it very methodically.  I would like             04:25

18       Dr. Bliesner to hear that.  I think I got it        04:25

19       right.                                              04:25

20          THE WITNESS:  If I recall, I didn't get          04:26

21       an opportunity to read all of the ANDA              04:26

22       sections because I think that they were all         04:26

23       available to me at the time of review.  Just        04:26

24       to put that in perspective.                         04:26

25          As far as being able to assess whether --        04:26

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 545

1      I guess the question is assess whether the           04:26

2      methods are appropriate for use?                     04:26

3  BY MR. ANDERTON:                                          04:26

4      Q.    No.  Do you have an opinion about --            04:26

5  about which of those -- which of the available           04:26

6  methods to test a tablet for potency could be            04:26

7  used?                                                     04:26

8      A.    Could be used with -- HPLC is a method          04:26

9  of choice.                                                04:26

10     Q.    Okay.                                           04:26

11     A.    If I'm not mistaken, having looking at          04:26

12 the 484 stuff, those were HPLC methods for assays         04:26

13 and related compounds.                                    04:26

14     Q.    And the Activis analytical method was           04:26

15 also HPLC methods; correct?                               04:26

16     A.    I'm pretty sure yes, yes.                       04:27

17     Q.    So unless nobody knew what they were            04:27

18 doing, HPLC was an acceptable method to test this         04:27

19 compound; correct?                                        04:27

20     A.    For assay.                                      04:27

21     Q.    For assay.                                      04:27

22     A.    Correct.                                        04:27

23     Q.    Well, and to go back to the term I used,        04:27

24 for potency.                                              04:27

25     A.    Yes.  Assay, potency, same thing.               04:27

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 546

1      Q.    Okay.  What about single point UV?  How          04:27
2    does that compare to HPLC as a test method to test        04:27
3    the potency of a tablet and specifically of one of        04:27
4    these Digitek Digoxin tablets?                            04:27
5      A.    Single point UV?                                  04:27
6      Q.    Yes.                                              04:27
7      A.    How would it compare?  It depends               04:27
8    because LC is a separations technique that              04:27
9    separates out any potential interference from the        04:27
10   main component so you get an assay.  An HPLC            04:27
11   system essentially a UV system at the end.  The         04:27
12   detector for HPLC is just a UV.  But in this case        04:28
13   it is has, if you will, as an analogy, the HPLC is       04:28
14   a means of preparing the sample so you're looking        04:28
15   at a single component when it goes into the UV           04:28
16   detector; okay?  If you have -- it is possible          04:28
17   with a product to develop and validate a method,         04:28
18   single point UV method if there are no                  04:28
19   interferences.                                          04:28
20     Q.    If somebody sent you a sample --                04:28
21     A.    Uh-huh.                                          04:28
22     Q.    -- and said Dr. Bliesner, chemist --            04:28
23   Ph.D. Chemist Bliesner, we'd like you to examine        04:28
24   this tablet for potency.                                04:28
25     A.    Uh-huh.                                          04:28

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 547

1      Q.    How would you compare the reliability of      04:28

2   results of a test conducted using single point UV      04:28

3   versus a test using HPLC?                              04:29

4      A.    How would you compare?                         04:29

5      Q.    How would you compare?  Not literally          04:29

6   how would you put them side by side and compare.        04:29

7   How would you characterize the differences between      04:29

8   results reached using single point UV versus the        04:29

9   results reached using HPLC.  Is one more reliable       04:29

10  than the other?                                          04:29

11     A.    Not necessarily.  It depends on whether         04:29

12  there are interference issues.  You've got to            04:29

13  realize that HPLC with a UV detector is a single         04:29

14  point UV detection, just like you put it into a UV       04:29

15  spectrometer.  Same thing.  It's only a single          04:29

16  point.                                                   04:29

17     Q.    So you need to know more about the              04:29

18  circumstances before you would be able to --            04:29

19     A.    Absolutely.  Sure.                              04:29

20     Q.    Be able to compare the reliability of           04:29

21  outcomes for --                                          04:29

22     A.    Right.                                          04:29

23     Q.    -- those two tests.                             04:29

24     A.    For instance, they do dissolution              04:29

25  testing.  And the dissolution method is UV, but         04:29

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 548

1    there is a whole -- if I recall correctly, pulling        04:29

2    off memory -- there is a derivatization and things        04:30

3    that like that with respect to the UV because that        04:30

4    would suggest that there are potential                    04:30

5    interferences.  And derivatization and looking at         04:30

6    it in the means that they did would suggest -- not        04:30

7    having looked at the validation -- that they were         04:30

8    able to get around interferences in that fashion.         04:30

9        Q.   Just to be clear with respect to                 04:30

10   Activis, are the entirety of your opinions in this        04:30

11   case set forth in the report you've issued?  Do           04:31

12   you have any supplemental or additional opinions          04:31

13   with respect to Activis?                                  04:31

14       A.   I don't believe so.                              04:31

15       Q.   Well, you don't believe so or you don't?         04:31

16       A.   It's a broad statement.                          04:31

17       Q.   I need this question to be answered              04:31

18   definitively, Dr. Bliesner.  It's a very important        04:31

19   question.                                                 04:31

20       A.   Additional, post-the-report?                     04:31

21       Q.   Yes.                                             04:31

22       A.   In the report?                                   04:31

23       Q.   Yeah, you have issued a report in this          04:31

24   case --                                                   04:31

25       A.   Yes.                                             04:31

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 549

```
 1      Q.    -- that we've been told contains your        04:31

 2  opinions --                                            04:31

 3      A.    Yes.                                          04:31

 4      Q.    -- about Activis.  And there was some         04:31

 5  exchange last time about whether you had an            04:31

 6  opinion about Mylan or didn't have an opinion and      04:31

 7  we got a representation from Plaintiffs' counsel        04:31

 8  about that, and that issue is done and resolved as     04:31

 9  far as we're concerned.                                04:31

10      A.    Okay.                                         04:31

11      Q.    So I'm asking you now strictly about          04:31

12  Activis and the opinions that are set forth in         04:32

13  your June 15, 2010, report.                            04:32

14      A.    Yes.                                          04:32

15      Q.    About Activis.                                04:32

16      A.    Yes.                                          04:32

17      Q.    Do they -- do they comprise the entirety     04:32

18  of your opinions about Activis in this case?           04:32

19      A.    That's a fair statement, yes.                 04:32

20      Q.    Yes, they do?                                 04:32

21      A.    Uh-huh.                                       04:32

22      Q.    You need to say that.                         04:32

23      A.    Yes, they do.                                 04:32

24      Q.    Okay.  So there are no supplemental           04:32

25  opinions about Activis that are not contained in       04:32
```

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

                                                        Page 550

 1   your report?                                          04:32

 2       A.    I've not reviewed any documentation or      04:32

 3   anything else that would supplement what I've         04:32

 4   written in the report.                                04:32

 5       Q.    So again need this answered my way.  You    04:32

 6   don't have any supplemental opinions about Activis    04:32

 7   that are not contained in this report; is that a      04:32

 8   correct statement?                                    04:32

 9       A.    That is a correct statement.                04:33

10       Q.    Thank you.                                  04:33

11       So the process -- well, you -- the product        04:33

12   that was in the market and subject to recall you      04:33

13   know was .125 and .25 milligram Digitek.  You are     04:33

14   aware of that; right?                                 04:33

15       A.    Yes, sir.                                   04:33

16       Q.    Two dose strengths; right?                  04:33

17       A.    Yes, sir.                                   04:33

18       Q.    And both processes were validated;          04:33

19   correct?                                              04:33

20       A.    I have not seen the process validation      04:33

21   reports so I can't say definitively, but because      04:34

22   they're in the application and it was approved,       04:34

23   one would extrapolate that they were validated.       04:34

24       Q.    Any reason to believe that either           04:34

25   process was not validated?                            04:34

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 551

| | | |
|---|---|---|
| 1 | A.    No. | 04:34 |
| 2 | Q.    And I believe you testified last time | 04:34 |
| 3 | that you're not an expert in process validation | 04:34 |
| 4 | but that you certainly support -- I believe those | 04:34 |
| 5 | were your words. | 04:34 |
| 6 | A.    Yes. | 04:34 |
| 7 | Q.    From an -- I forget what perspective you | 04:34 |
| 8 | said. | 04:34 |
| 9 | A.    Cross-functional and analytical | 04:34 |
| 10 | development testing, troubleshooting. | 04:34 |
| 11 | Q.    That's a fancy way of saying you | 04:34 |
| 12 | recognize the value and importance of process | 04:34 |
| 13 | validation. | 04:34 |
| 14 | A.    I absolutely, yeah. | 04:34 |
| 15 | Q.    Okay. | 04:34 |
| 16 | A.    It's a very critical component to the | 04:34 |
| 17 | whole application development. | 04:34 |
| 18 | Q.    It's kind of a jumping off point for | 04:34 |
| 19 | everything, isn't it? | 04:34 |
| 20 | A.    Process validation? | 04:34 |
| 21 | Q.    Yes. | 04:34 |
| 22 | A.    Jumping off point? | 04:34 |
| 23 | Q.    Well, with respect actually producing | 04:34 |
| 24 | and manufacturing a drug product. | 04:34 |
| 25 | A.    Uh-huh. | 04:34 |

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 552

1      Q.    You must first develop and validate a          04:34

2   process for doing that; correct?                        04:35

3      A.    If you need to develop and validate --         04:35

4   develop a dosage form, a formulation and then to a       04:35

5   small scale move it into process validation,            04:35

6   that's correct.                                          04:35

7      Q.    Okay.  So once you have a formulation          04:35

8   developed --                                             04:35

9      A.    Yes.                                            04:35

10     Q.    -- the next step is to develop and             04:35

11  validate the process; right?                            04:35

12     A.    Scale up first and then validate.              04:35

13     Q.    Okay.  So let's make that the not the          04:35

14  next immediate step after developing the                 04:35

15  formulation but two steps later is a process            04:35

16  validation.  And you cannot go forward with             04:35

17  manufacturing any drug product without a validated       04:35

18  process; is that correct?                                04:35

19     A.    That's correct.                                04:35

20     Q.    The FDA would not approve either an NDA        04:35

21  or an ANDA without demonstration of a validated          04:35

22  process; correct?                                        04:35

23     A.    And the demonstration would be for             04:35

24  instance in the ANDA III production run.                04:35

25     Q.    Understood.                                     04:35

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 553

1      A.    That's the output of process validation        04:35

2   specifically requiring, you know, a validation,         04:36

3   reported development on the application, that            04:36

4   isn't necessarily the case.                              04:36

5      Q.    In whatever form, you must prove to the         04:36

6   FDA --                                                   04:36

7      A.    Uh-huh.                                         04:36

8      Q.    -- that you have developed and validated        04:36

9   your process before they will approve your               04:36

10  application.                                             04:36

11     A.    Yes.                                            04:36

12     Q.    Is that correct?                                04:36

13     A.    That is correct.                                04:36

14     Q.    All right.  And a process validation            04:36

15  tells you that you have developed a process that         04:36

16  allows you to consistently manufacture product           04:36

17  within specification; right?                             04:36

18     A.    Within the operating parameters of the          04:36

19  equipment; correct.                                      04:36

20     Q.    Understood.                                     04:36

21     A.    Uh-huh.                                         04:36

22     Q.    And as you move forward from your               04:36

23  process validation, there are various things that        04:36

24  speak to or that confirm the conclusions reached         04:36

25  in your process validation study, one of which is        04:36

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

                                                                    Page 554

1    manufacturing product within specification over        04:37

2    time; correct?                                          04:37

3         A.    That's one aspect; correct.  You also        04:37

4    monitor complaints, returns, you know,                  04:37

5    investigations, that come up during the course of       04:37

6    the manufacturing.  Lots of different things.           04:37

7         Q.    Understood.                                  04:37

8         You continue to monitor the things that might      04:37

9    call into question the validation of your process;      04:37

10   right?                                                  04:37

11        A.    That's correct.  Because in my               04:37

12   experience when you go from scale up to                 04:37

13   manufacturing, invariably as you gain experience        04:37

14   with the product there, you'll find things that         04:37

15   are potentially difficult.                              04:37

16        Q.    And finding things that are potential        04:37

17   difficulties, to use your words?                        04:37

18        A.    Uh-huh.                                      04:37

19        Q.    That doesn't mean your process is            04:37

20   invalidated.  It means you need to investigate and      04:37

21   determine whether they require an adjustment of         04:37

22   your process; right?                                    04:38

23        A.    That's open to interpretation.  It           04:38

24   really is.  And the agency, you know, in one            04:38

25   circumstance may say your process is out of             04:38

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 555

1    control, it's invalidated, but in another                    04:38

2    circumstance the same people within the same                  04:38

3    division may say, you know, it's okay.  You need              04:38

4    to put in some additional controls.  So it's open             04:38

5    to interpretation.                                            04:38

6        Q.    What weight do you give -- in validating            04:38

7    as you're undertaking a consulting engagement --              04:38

8        A.    Uh-huh.                                             04:38

9        Q.    -- and evaluating whether your client               04:38

10   has or is achieving GMP compliance?                           04:38

11       A.    Uh-huh.                                             04:38

12       Q.    What weight do you give to the fact that            04:38

13   the client has a validated process followed by                04:38

14   years and years and production of literally                   04:38

15   billions and billions of tablets that were within            04:38

16   specification?                                                04:39

17       A.    I'm sorry.  It was a long one, so --                04:39

18           MR. ANDERTON:  Please read it back.                   04:39

19             (Whereupon, the testimony was read                  04:39

20   back by the court reporter, as recorded above)                04:39

21           THE WITNESS:  That's obviously an                     04:39

22       important part of the picture.                            04:39

23   BY MR. ANDERTON:                                              04:39

24       Q.    Okay.                                               04:39

25       A.    Supporting process validation and                   04:39

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 556

1    showing you're in control.                          04:39

2        Q.    Okay.  So that is a significant fact       04:39

3    that -- as you did an evaluation of circumstances    04:39

4    that met those -- that description, that would be    04:39

5    one piece of information that you put in, in the     04:39

6    bucket if you will, suggesting GMP compliance.       04:39

7        A.    One piece.  Manufacturing investigations   04:39

8    would go hand and hand with that in particular.      04:39

9        Q.    Understood.  But that fact that I've       04:39

10   described --                                         04:40

11       A.    Uh-huh.                                     04:40

12       Q.    -- validated process and years of          04:40

13   in-specification production covering billions of     04:40

14   tablets, that would go certainly go in the --        04:40

15       A.    It would.  We're assuming that the data    04:40

16   reporting capture and all that stuff is accurate.    04:40

17       Q.    Understood.                                04:40

18       A.    Okay.  That's a big assumption because     04:40

19   it isn't necessarily the case in a lot of            04:40

20   facilities.                                          04:40

21       Q.    Okay.                                      04:40

22       A.    Uh-huh.                                    04:40

23       Q.    But you would only be able to determine    04:40

24   whether it was accurate if you looked at the         04:40

25   data.                                                04:40

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 557

1        A.    You'd have to look at the data and then          04:40

2    confirm with individuals that are doing entry into        04:40

3    the system, or validation of the system and               04:40

4    whatever.                                                  04:40

5        Q.    Understood.                                      04:40

6        A.    That they would hold up.  I'm sorry.            04:40

7    No.  Would hold up.                                        04:40

8        Q.    But inherent in what you've just said --        04:40

9        A.    Uh-huh.                                          04:40

10       Q.    -- is that you must look at the data in         04:40

11   order to challenge it; correct?                            04:40

12       A.    The data in a broad sense.                       04:40

13       Q.    You used that term, Dr. Bliesner.               04:40

14       A.    Yes, I know.  But if we are talking             04:40

15   specific process validation, methods validation,          04:41

16   data in general because the data can be -- I'm             04:41

17   sorry.                                                     04:41

18       Q.    As you used the term?                            04:41

19       A.    Yes.                                             04:41

20       Q.    I was merely trying to ask you questions        04:41

21   about how you --                                           04:41

22       A.    Okay.                                            04:41

23       Q.    -- used the term?                                04:41

24       A.    Okay.                                            04:41

25       Q.    Now, you can't use it and then say --           04:41

                                                      Page 558

    1      A.    No.                                           04:41

    2      Q.    -- what the heck are you talking about?       04:41

    3      A.    I understand.                                 04:41

    4      Q.    Okay.                                         04:41

    5      A.    I just want to make sure that we're on        04:41

    6   all on the same page here.  It's late in the day      04:41

    7   and I'm not trying to be evasive.                      04:41

    8      Q.    I understand but as I understood your         04:41

    9   answer, if you were going to question or challenge     04:41

   10   the data -- you said assuming the data.                04:41

   11      A.    Are valid.                                    04:41

   12      Q.    Valid.                                        04:41

   13      A.    Your reflection of what's reality.            04:41

   14      Q.    Exactly.                                      04:41

   15      A.    Uh-huh.                                       04:41

   16      Q.    The only way you could determine whether      04:41

   17   the data are valid is to start by looking at the       04:41

   18   data.  There would be other steps you perform, but     04:41

   19   the first step you'd have to do is look at the         04:41

   20   data, am I correct?                                    04:41

   21      A.    That's correct.                               04:41

   22      Q.    Look at page 16 of your report, please.       04:42

   23      A.    Yes.                                          04:42

   24      Q.    Give me one second.                           04:42

   25      A.    Sure.                                         04:42

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 559

1        Q.    Dr. Bliesner, paragraph 39 on page 16.        04:43

2   Do you see that?                                          04:43

3        A.    Yes, sir.  I do.                               04:43

4        Q.    There you discuss investigation into --       04:43

5   well, you don't identify the lot number, but --          04:43

6        A.    No, sir.                                       04:43

7        Q.    But the lot that had some defectively         04:43

8   thick tablets discovered during manufacturing.           04:43

9   And the second to last sentence says:                    04:43

10       "Product is released to market without               04:43

11  conclusive evidence of what caused the                    04:43

12  double-thick problem on 5 December, 2007."                04:43

13       That's not accurate is it?                           04:43

14       A.    I'd have to go back and pull up the            04:43

15  reference to be sure.                                     04:43

16       Q.    Okay.  Well you --                             04:43

17       A.    Because it's very -- the investigation,       04:43

18  if I recall how it's done and how it's written,           04:43

19  anything like that, it was stuff to pull dates            04:43

20  together so I can't definitively say that that's          04:43

21  an incorrect date.                                        04:43

22       Q.    Well there's -- if you read the               04:43

23  investigation record, there's plenty of documents         04:43

24  in the investigation report indicating activities         04:44

25  occurring.  In fact the 100 percent visual                04:44

Page 560

1   inspection very clearly didn't occur until January          04:44

2   2008.                                                        04:44

3        A.    Okay.                                             04:44

4        Q.    So did you just misread that                      04:44

5   investigation?                                               04:44

6        A.    Incident report.  I'm sorry.  What is             04:44

7   the question?                                                04:44

8        Q.    Did you just misread that investigative           04:44

9   report?                                                      04:44

10       A.    I don't think so.  Like I said, I have            04:44

11  to go back and look at it and reconstruct it again           04:44

12  to determine if that -- your claim that that's an            04:44

13  incorrect date is incorrect.                                 04:44

14       Q.  You made comment earlier about operators            04:44

15  or employees being unable to read or speak English           04:45

16  or cannot read English.                                      04:45

17       A.    Uh-huh.                                           04:45

18       Q.    What did you do to verify the accuracy            04:46

19  of that statement?                                           04:46

20       A.    I -- if I'm not mistaken, it was in an            04:46

21  e-mail and I read the e-mail.                                04:46

22       Q.    So you just read the e-mail and that was          04:46

23  enough for you?                                              04:46

24       A.    Yes.                                              04:46

25       Q.    Okay.  So you didn't do anything beyond           04:46

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 561

1   that?                                                   04:46

2        A.    I'm not sure what I could have done          04:46

3   beyond that, quite honestly.                            04:46

4        Q.    Dr. Bliesner, do you understand the          04:46

5   nature of litigation?  You've never been an expert      04:46

6   witness before.                                         04:46

7        A.    I have not.                                  04:46

8        Q.    Do you understand the general nature of      04:46

9   litigation?                                             04:46

10       A.    The general nature of litigation?            04:46

11       Q.    Yeah.                                         04:46

12       A.    How you would define it and how I define     04:46

13   it, probably different things.                          04:46

14       Q.    Well, do you understand that Plaintiffs      04:46

15   are the ones who bring lawsuits and they make          04:47

16   allegations against Defendants.  They allege that      04:47

17   certain things happened and in this context --         04:47

18   pharmaceutical product liability context --            04:47

19   Plaintiffs allege that they were harmed by             04:47

20   products; right?                                       04:47

21       A.    That's correct, yes.                          04:47

22       Q.    And you understand that the lawyers for      04:47

23   the Plaintiffs are required to or are attempting       04:47

24   to prove those allegations.                            04:47

25       A.    That's correct, as I understand it.          04:47

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 562

1      Q.    Okay.  And you understand, then, that      04:47
2  the lawyers for the Plaintiffs as part of          04:47
3  performing their job are going to go out and find   04:47
4  documents that they believe support their          04:47
5  position.                                           04:47
6      A.    I would say that's a fair statement.  It  04:48
7  would make sense.                                   04:48
8      Q.    Reasonably self-evident; right?           04:48
9      A.    Yeah, it makes sense.                     04:48
10     Q.    Okay.  And when you got the documents      04:48
11  from Plaintiffs' counsel in this case, I see two   04:48
12  primary lists of documents that you got.  One is   04:48
13  Plaintiffs' exhibits.                              04:48
14     A.    Uh-huh.                                    04:48
15     Q.    And the other Mylan exhibits.             04:48
16     A.    Uh-huh.                                    04:48
17     Q.    Did it trouble you at all that you were    04:48
18  looking only at the documents that Plaintiffs'     04:48
19  counsel wanted to you see?                          04:48
20     A.    I don't think that's necessarily the way  04:48
21  it was.  In particular I asked at the start of the 04:48
22  project for a list of -- again, go back to my      04:48
23  report.  I was serving as a consultant, and they   04:48
24  asked me to evaluate the status of, you know, the  04:48
25  facility in terms of manufacturing restricted to   04:48

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 563

```
 1   Digitek, restricted to Amide, Activis, or        04:49
 2   whatever, and then they then asked me if there   04:49
 3   were documents that I thought would be useful for 04:49
 4   my review so I created the list and gave it to   04:49
 5   them.                                             04:49
 6        Q.    You did?                               04:49
 7        A.    Yes.                                    04:49
 8        Q.    Do we have that list?                   04:49
 9        A.    It was given the last go around.  I    04:49
10   handed it out, or it was on the disc, one of the  04:49
11   two.                                              04:49
12        Q.    Well, the only thing you gave last go  04:49
13   around was Exhibits -- you have them there in     04:49
14   front of you, 107, 108?                           04:49
15        A.    Uh-huh.  It may be on that hard drive. 04:49
16   It was provided.                                  04:49
17        Q.    Okay.  And when did you prepare that   04:49
18   list that you gave to Plaintiffs?                 04:49
19        A.    Very early on in the process.          04:49
20        Q.    Did you get the documents that were on 04:49
21   that list?                                        04:49
22        A.    Not all of then, no.                   04:49
23        Q.    Did that trouble you at all?           04:49
24        A.    Trouble is not a word.  It was a little 04:49
25   frustrating for me.                               04:50
```

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 564

1      Q.    What didn't you get?                           04:50

2      A.    I would have to look at the list               04:50

3   specifically.  I think like we talked about, I got       04:50

4   late yesterday evening -- was it process                04:50

5   validation report, you know, those kinds of             04:50

6   things.  I know there were difficulties with the        04:50

7   system from my understanding.                           04:50

8      Q.    Okay.                                           04:50

9      A.    In getting documents and they're not all       04:50

10  loaded up and that kind of stuff.                       04:50

11     Q.    Okay.                                           04:50

12     A.    So.                                             04:50

13     Q.    Well, so what didn't you get?                  04:50

14     A.    I would have to pull up the list.              04:50

15     Q.    But there were things that you asked for       04:50

16  and didn't get.                                         04:50

17     A.    That's correct.                                04:50

18     Q.    You definitely got all of the                 04:50

19  Plaintiffs' exhibits, though; right?                    04:50

20     A.    I -- I can't say whether I got all the         04:50

21  Plaintiffs' exhibits.                                   04:50

22     Q.    Well?                                          04:50

23     A.    If they are all of them, I, then, yes.         04:50

24  But I don't know if that's all of them.  Because        04:50

25  we -- they created as I understand -- excuse me.        04:50

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 565

    1    They created folders that individuals could look        04:50
    2    at.                                                      04:50
    3        Q.    Individual whos?  I mean.                      04:50
    4        A.    People like myself that were reviewing         04:51
    5    documents.                                               04:51
    6        Q.    Okay.                                          04:51
    7        A.    And those documents that they wished me        04:51
    8    to review were placed in folders on their                04:51
    9    electronic system or they delivered them, sent,         04:51
   10    e-mail -- e-mailed them.                                 04:51
   11        Q.    Okay.                                          04:51
   12        A.    Uh-huh.                                        04:51
   13        Q.    And did you understand as you conducted        04:51
   14    your paper audit that the Plaintiffs' exhibits          04:51
   15    were the documents the Plaintiffs' lawyers              04:51
   16    believed helped them?                                    04:51
   17        A.    Actually I didn't give it any                  04:51
   18    consideration.  I was just doing an audit.              04:51
   19        Q.    Never occurred to you?                         04:51
   20        A.    Actually, it did not.                          04:51
   21        Q.    Well, you weren't necessarily doing an         04:51
   22    audit.  You were looking at the documents they          04:51
   23    selected to give you.                                    04:51
   24        A.    I don't think that's a -- that's fair          04:51
   25    statement.                                               04:51

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 566

1      Q.    Is it not fair wholly or is it not fair          04:51

2    just partially.  I mean you got all the documents        04:51

3    they wanted you to have but did not get the              04:51

4    documents, all of the documents you asked for.           04:51

5      A.    That's a true statement.                         04:51

6      Q.    Okay.                                            04:51

7      A.    And why that happened, I'm not sure.             04:52

8    Other than it was --                                     04:52

9      Q.    Got a guess?                                     04:52

10     A.    No.  Remember rule number one, don't             04:52

11   guess.                                                   04:52

12     Q.    I understand.  I understand.                     04:52

13     A.    And that's what so much of this has been         04:52

14   today is that I'm trying to make sure that I'm not       04:52

15   guessing.                                                04:52

16     Q.    I don't want you to guess.                       04:52

17     A.    Yes.                                             04:52

18     Q.    But you're a sharp guy.  I'm sure you            04:52

19   can figure out why it is that you got what they          04:52

20   wanted you to have but didn't get everything you         04:52

21   asked for.                                               04:52

22     A.    I wouldn't comment on that.                      04:52

23     Q.    Does it trouble you at all Dr. Bliesner          04:52

24   that nobody has produced a single double-thick           04:53

25   tablet from the market from the recalled batches?        04:53

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 567

1      A.    Trouble?                                          04:53

2      Q.    You're a GMP compliance expert.  You've           04:53

3   conducted $140,000's worth of analysis here,              04:54

4   reaching the conclusion that you think adulterated        04:54

5   product reached the market, yet no one has               04:54

6   produced a double-thick tablet from the recalled         04:54

7   batches in almost three years since the recall.          04:54

8      A.    They have not.  That's a fact.                   04:54

9      Q.    That's a fact?                                    04:54

10     A.    Okay.  I take you at your word.                  04:54

11     Q.    That's a fact.  Does that trouble you?           04:54

12     A.    Trouble is not a word that I would use;          04:54

13   okay?                                                     04:54

14     Q.    Does it have any impact on the way you           04:54

15   think about your engagement or about on the              04:54

16   conclusions that you you've reached?                     04:54

17     A.    No, not necessarily.  Even though again          04:54

18   we've established I'm not a recall expert.               04:54

19   Recalls are not a science -- let's put it that           04:54

20   way -- and we've already established that there          04:54

21   are a large number.                                      04:55

22     Q.    680 million.                                      04:55

23     A.    Billion I think is what Mr. Moriarty             04:55

24   said last go around.                                      04:55

25     Q.    Subject to the recall, 680 million.  In          04:55

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 568

1    fact Plaintiff told you that in your meeting                04:55

2    before your deposition.                                     04:55

3         A.    Yes, sir.  That --                               04:55

4         Q.    And --                                           04:55

5         A.    -- a small number of a large number is           04:55

6    still substantial in my mind.                               04:55

7         Q.    Zero is not substantial, is it?                  04:55

8         A.    Just because you haven't seen anything           04:55

9    doesn't mean it's not there, especially when you            04:55

10   look at the lack of controls within that facility.          04:55

11        Q.    You're relying on inferences again;              04:55

12   right?                                                      04:55

13        A.    I don't think it's inferences.                   04:55

14        Q.    You don't have any direct proof so it            04:55

15   must be an inference; right?                                04:55

16        A.    I don't think an inference.  It's a mass         04:55

17   of data.  I think that the thing that troubles me           04:55

18   more than anything -- I'm sorry.  I'm done.                 04:56

19        Q.    It's a mass of data that create an               04:56

20   inference.                                                  04:56

21           MR. KERENSKY:  There you go again, Mike.            04:56

22           MR. ANDERTON:  Mike, he stopped his                 04:56

23        answer and said I'm done.                              04:56

24           MR. KERENSKY:  He took a breath.                    04:56

25           MR. ANDERTON:  He said --                           04:56

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 569

1          MR. KERENSKY:  And you jumped on him.          04:56

2     Let him finish.                                     04:56

3          MR. ANDERTON:  Mike, he said I'm done.          04:56

4          MR KERENSKY:  Read it back.  If you are          04:56

5     right, I'll take it back.                            04:56

6               (Whereupon, the testimony was read          04:56

7     back by the court reporter, as recorded above)       04:56

8     Q.    Are you done, Dr. Bliesner?                    04:56

9     A.    On which point here?                           04:56

10    Q.    Exactly.                                       04:56

11         MR. KERENSKY:  Let's read back what he          04:56

12    was saying when you jumped on his sentence           04:56

13    there.                                               04:56

14         MR. ANDERTON:  And I think the record           04:56

15    clearly showed earlier that he interrupted           04:56

16    me.  I let that go.  Go ahead, Phil.                 04:56

17         MR. KERENSKY:  I think his last word was        04:57

18    "and."                                               04:57

19         MR. ANDERTON:  No, it wasn't.                   04:57

20         MR. KERENSKY:  What was the last word           04:57

21    before you said no, no.  I couldn't quite hear       04:57

22    Phil.  He was fairly far away.                       04:57

23         MR. ANDERTON:  The thing that tells me          04:57

24    more than anything.                                  04:57

25         MR. KERENSKY:  You don't end a sentence         04:57

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 570

1    in anything.                                         04:57

2         MR. ANDERTON:  Mike, the problem is, he         04:57

3    answered my question.  He recognized --              04:57

4         MR. KERENSKY:  There's just disagreement.       04:57

5         MR. ANDERTON:  He recognized -- Mike, he        04:57

6    recognized and stopped himself when he was           04:57

7    answering a question that hadn't been asked.         04:57

8    He did it.                                            04:57

9         MR. KERENSKY:  Well, I don't how he could       04:57

10   be doing both, Mike.  He was still talking and       04:57

11   you interrupted him.  That's all there is to         04:57

12   it.                                                   04:57

13        MR. ANDERTON:  I didn't interrupt him,          04:57

14   Mike.  Now, I really don't appreciate this --        04:57

15   I mean you are telling him what to do, Mike.         04:57

16   It's inappropriate.                                   04:57

17        MR. KERENSKY:  I'm telling you what to          04:57

18   do.  Don't interrupt him.                            04:58

19        MR. ANDERTON:  Dr. Bliesner, are you            04:58

20   done?                                                 04:58

21        MR. KERENSKY:  Read that whole answer           04:58

22   back before Mike started talking again and           04:58

23   then ask him that question and we'll move on.        04:58

24        MR. ANDERTON:  I asked him the question.        04:58

25   He stopped himself, Mike.  You're not here.          04:58

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 571

1    He put his hands up and said "I'm sorry."  And          04:58

2    he stopped and said --                                  04:58

3         MR. KERENSKY:  And you started to               04:58

4    interrupt him.                                          04:58

5         MR. ANDERTON:  Not true.  Dr. Bliesner,         04:58

6    do you have anything to add to that answer?             04:58

7         MR. KERENSKY:  If you need to hear it           04:58

8    read back to you, Dr. Bliesner, you may ask             04:58

9    for that.                                               04:58

10        THE WITNESS:  Read it back one more time,       04:58

11   please.                                                 04:58

12        (Whereupon, the testimony was read back        04:59

13  by the court reporter, as recorded above)                04:59

14        THE WITNESS:  Was the fact that nobody         04:59

15   ever tested double-thick tablets they found in         04:59

16   the facility.  That's what I find troubling.            04:59

17  BY MR. ANDERTON:                                         04:59

18   Q.   Okay.  But is that more --                         04:59

19        MR. KERENSKY:  Make your objection, Mike.      04:59

20  BY MR. ANDERTON:                                         04:59

21   Q.   Is that more troubling to you,                     04:59

22  Dr. Bliesner, than the fact that out of 680              04:59

23  million tablets, in three years nobody has               04:59

24  presented a single double-thick tablet?                  04:59

25   A.   Absolutely because not testing on a                04:59

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised            February 18, 2011

Page 572

1   product that's clearly failed and identified had        04:59

2   failed is -- it really raises eyebrows.  All kinds      04:59

3   of questions come up.  Why didn't they?  Is             04:59

4   somebody hiding something?  Have found things           04:59

5   before?  Are they dumping it?  These are just           04:59

6   questions that come to mind.  I'm not suggesting        04:59

7   --                                                      04:59

8       Q.   All of --                                      04:59

9       A.   -- all of these things.  Just a whole          04:59

10  plethora of questions come into play when you           04:59

11  don't see -- it's happened several times as we          04:59

12  both recognize.                                          05:00

13      Q.   And the way to answer those questions          05:00

14  would be to take them and dive into the                 05:00

15  manufacturing and production records for that           05:00

16  product.                                                05:00

17      A.   No, that's not true.                           05:00

18      Q.   Or for any other product.                      05:00

19      A.   That's not true.  They didn't collect          05:00

20  the samples and test them.                              05:00

21      Q.   The way --                                     05:00

22      A.   In my experience -- in my experience           05:00

23  with respect to batch records, okay, personal           05:00

24  experience, recent personal experience, batch           05:00

25  records don't necessarily reflect reality.  I've        05:00

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 573

1    had a client in the last year that manufactures          05:00

2    product and doesn't even look at the batch record        05:00

3    because it isn't written where you can follow it.        05:00

4    They just go out there and wing it on the floor.         05:00

5    So just because you got a batch record doesn't           05:00

6    mean that that's gospel what's happening on the          05:00

7    floor.  That's my personal experience.                   05:00

8        Q.    Did you throw your medicine from that          05:00

9    manufacturer away?  They're not following their          05:00

10   batch records.  Did you go run up to your medicine       05:00

11   cabinet and throw that away?                             05:00

12       A.    It's not appropriate.                          05:00

13       Q.    What do you mean it's not appropriate?         05:01

14       A.    Because it's not a solid oral dosage for       05:01

15   me.                                                      05:01

16       Q.    Dr. Bliesner, last time you talked            05:01

17   about, you gave some testimony about conversation        05:01

18   you had with your doctor regarding this subject,         05:01

19   the subject of this litigation.  And I wasn't            05:01

20   satisfied that we established whether the                05:01

21   conversation was in fact protected by a                  05:01

22   physician-patient privilege.  So I am going to ask       05:01

23   some questions to develop the details surrounding        05:01

24   that conversation that will tell us that.                05:01

25       A.    And I'm not going to answer those             05:01

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 574

1    questions.                                                        05:01

2       Q.    You don't have right to refuse to answer                 05:01

3    that unless you -- unless it is truly privileged.                 05:01

4    Do you understand that?                                           05:01

5       A.    I believe it's truly privileged between                  05:01

6    my doctor.  Because I specifically asked that                     05:01

7    because he asked me.                                              05:01

8       Q.    Were you seeking medical advice when you                 05:01

9    asked him these questions?                                        05:01

10      A.    I was in for an appointment yes.                         05:01

11      Q.    Were you seeking medical advice when you                 05:01

12   asked him questions about Digoxin?                                05:01

13      A.    When I asked him questions about it?  I                  05:02

14   didn't ask him questions.  He volunteered.                        05:02

15      Q.    How did he come to volunteer?                            05:02

16      A.    I'm not comfortable talking about this.                  05:02

17      Q.    I'm not asking for the substance                         05:02

18      A.    I'm not comfortable talking about it.                    05:02

19      Q.    You don't have a choice.                                 05:02

20         MR. KERENSKY.  Mike, maybe I can settle                     05:02

21      this.  No one is going to ask this witness to                  05:02

22      tell any jury what his doctor said about                       05:02

23      Digitek.  I will stipulate to that right now.                  05:02

24         MR. ANDERTON:  Well, we're going to ask                     05:02

25      this witness what his doctor told him so we                    05:02

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 575

1      know whether it formed part of the basis for        05:02

2      his expert opinion in this case.                     05:02

3            THE WITNESS:  It was after the fact.  I         05:02

4      will tell you that.                                  05:02

5  BY MR. ANDERTON:                                         05:02

6      Q.    You are still subject to testifying,           05:02

7  Dr. Bliesner.                                            05:02

8            MR. KERENSKY:  You have a right to             05:02

9      protect your conversations between you and           05:02

10      your doctor.  And you've got two                     05:02

11      countervailing opinions from two lawyers,            05:02

12      neither of which represent you.  You got to          05:02

13      make the call, doctor.                               05:02

14  BY MR. ANDERTON:                                        05:03

15      Q.    Dr. Bliesner, you know what you're doing       05:03

16  here.  You're setting yourself up to be brought         05:03

17  back for another session of deposition.                 05:03

18      A.    So be it.  I am not comfortable sharing        05:03

19  that information with you.                               05:03

20      Q.    I'm allowed to ask the parameters of the       05:03

21  conversation.  I'm not asking for the substance.        05:03

22  I'm allowed to ask the details of the                   05:03

23  conversations that surround the conversation so         05:03

24  that I can evaluate whether I think it's a               05:03

25  privileged communication or not.                        05:03

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised            February 18, 2011

Page 576

1       A.    I'm not going to answer your                05:03

2    questions.                                           05:03

3       Q.    I'm going to make my record.                05:03

4       Did you talk to your doctor about Digoxin.        05:03

5    Have you spoken to your doctor about Digoxin in      05:03

6    the last 12 months?                                  05:03

7       A.    I'm not going to answer these              05:03

8    questions.                                           05:03

9       Q.    You're refusing to answer that             05:03

10   question?                                            05:03

11      A.    I am.                                        05:03

12      Q.    Have you spoken to your doctor about        05:03

13   this litigation in the last 12 months?               05:03

14      A.    I'm not going to answer the question.        05:03

15      Q.    Have you spoken to your doctor about        05:03

16   your engagement as an expert witness in the last     05:03

17   12 months?                                           05:03

18      A.    I'm not going to answer any                 05:03

19   questions.  It was within confidentiality with       05:03

20   my doctor.                                            05:03

21      Q.    Your engagement as an expert witness?       05:03

22      A.    I'm not going to answer the question.        05:04

23      Q.    Have you spoken to your doctor about        05:04

24   the effects of Digoxin and its uses?                 05:04

25      A.    I'm not going to answer the question.        05:04

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised          February 18, 2011

Page 577

1      Q.    Do you take Digoxin, Dr. Bliesner?          05:04

2      A.    I do not.                                    05:04

3      Q.    Do you take any heart medications?          05:04

4      A.    What do you mean by heart                    05:04

5   medications?                                          05:04

6      Q.    Dr. Bliesner, do you take any               05:04

7   medications for heart conditions?                     05:04

8      A.    Is blood pressure a heart condition in       05:04

9   your mind?                                            05:04

10     Q.    If you think it is, say yes.                 05:04

11     A.    I've never really considered it a            05:04

12  heart condition.  I considered it high blood          05:04

13  pressure.                                              05:04

14     Q.    Other than your blood pressure               05:04

15  medication, do you take any medications for           05:04

16  heart conditions?                                      05:04

17     A.    No.                                           05:04

18     Q.    Does anyone in your family take any          05:04

19  medications for heart conditions?                      05:04

20     A.    No.                                           05:04

21          MR. ANDERTON:  Off the record.                05:04

22          THE VIDEOGRAPHER:  The time is                05:04

23  5:06 p.m. We're going off the record                  05:04

24  briefly.                                               05:05

25              (Short break)                             05:06

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                February 18, 2011

Page 578

1        THE VIDEOGRAPHER:  The time is 5:07.         05:06

2   We are back on the record.                        05:06

3        MR. ANDERTON:  Dr. Bliesner, I have no        05:06

4   further questions at this time.                    05:06

5   Unfortunately because we haven't had a             05:06

6   chance to review all the documents that you        05:06

7   produced because we have the outstanding --        05:06

8   some outstanding issues, as much as I would        05:06

9   like to tell you that this is the final            05:06

10  session of this deposition, I can't give you       05:06

11  that guarantee.                                    05:06

12       THE WITNESS:  I understand.                    05:06

13       MR. ANDERTON:  So if it is not, we will       05:06

14  in touch with counsel for the Plaintiffs to        05:06

15  make arrangements and they will be in              05:06

16  contact with you.                                  05:06

17       THE WITNESS:  I understand.                    05:06

18       MR. ANDERTON:  We are going to keep           05:06

19  these binders.  Phil, will you mark both of        05:06

20  these binders as the next exhibits as well?        05:06

21  And then here are the others.  And they are        05:06

22  going to stay -- all of these document are         05:06

23  going to stay with Shook, Hardy,                    05:06

24  Dr. Bliesner.  And pursuant to agreement           05:06

25  with Mr. Kerensky, we are going to have them       05:06

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 579

1    make copies and you're going to get back the          05:07

2    originals.  And then we will get a copy.              05:07

3         THE WITNESS:  Okay.                              05:07

4         MR. ANDERTON:  Okay.  The court                  05:07

5    reporter can keep a copy and then make a              05:07

6    copy.  I'm sorry.  The court reporter will            05:07

7    get a copy.                                           05:07

8         THE WITNESS:  Okay.                              05:07

9         MR. ANDERTON:  And then we will get              05:07

10   copies as they provide us copies of the               05:07

11   transcript.                                           05:07

12        THE WITNESS:  Okay.                              05:07

13        MR. ANDERTON:  Okay.  Thank you very             05:07

14   much for your patience.  It was a long day,           05:07

15   a long process.  Thank you very much.                 05:07

16        THE WITNESS:  Same to you.                       05:07

17        MR. ANDERTON:  Mr. Kerensky.  We're off          05:07

18   the record now.                                       05:07

19        THE VIDEOGRAPHER:  The time is 5:09 p.m.         05:07

20   This concludes the videotape deposition of            05:07

21   Dr. Bliesner.  We are off the record.                 05:07

22             (Whereupon, Exhibits 155 and 156

23   were marked for identification)

24      (THEREUPON, the taking of the deposition
     was concluded at 5:09.)
25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

Page 580

 1                     CERTIFICATE OF OATH

 2

 3      STATE OF FLORIDA

 4      COUNTY OF HILLSBOROUGH

 5

 6                      I, the undersigned authority,

 7      certify that DAVID M. BLIESNER, Ph.D.,

 8      personally appeared before me and was duly sworn

 9      by me.

10                      WITNESS my hand and official

11      seal, this 2nd day of MARCH, 2011.

12

13

14      _____

15      PHILIP RYAN, RPR
        NOTARY PUBLIC - STATE OF FLORIDA
16      COMMISSION # DD 988415
        MY COMMISSION EXPIRES:  JUNE 28, 2014
17

18

19

20

21

22

23

24

25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9

David M. Bliesner, Ph.D., Volume II  Videotaped - Revised                    February 18, 2011

Page 581

 1              CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF HILLSBOROUGH

 4              I, PHILIP RYAN, RPR, certify that I

 5    was authorized to and did stenographically

 6    report the foregoing deposition; and that the

 7    foregoing transcript is a true record of the

 8    testimony given by the witness.

 9              I further certify that I am not a

10    relative, employee, attorney, or counsel of any

11    of the parties, nor am I a relative or employee

12    of any of the parties' attorneys or counsel

13    connected with the action, nor am I financially

14    interested in the action.

15

16              DATED this 2nd day of March, 2011.

17

18

19

20
      _____
21    PHILIP RYAN, RPR

22

23

24

25

3f47e2b1-27f8-41cb-a79a-5510c9144cc9