# EXHIBIT 15

Russell Somma, Ph.D.                              July 1, 2010

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT LIABILITY LITIGATION

| | |
|---|---|
| BOBBY R. MILLIGAN, et al., | ) MDL Case No. |
| | ) 2:09-cv-121 |
| Plaintiffs, | ) |
| | ) |
| -vs- | ) VIDEOTAPED |
| | ) DEPOSITION OF: |
| ACTAVIS GROUP HF, et al., | ) RUSSELL F. |
| | ) SOMMA, PH.D. |
| Defendants. | ) |
| | ) |
| | ) |
| _____ | ) |


TRANSCRIPT of testimony as taken by and
before MARK SCHAFFER, a Certified Shorthand Reporter
and Notary Public of the States of New Jersey and New
York, at the Marriott Hotel, Newark Liberty
International Airport, Newark, New Jersey, on
Thursday, July 1, 2010, commencing at 8:31 in the
forenoon.



DEFENDANT'S EXHIBIT 15

Russell Somma, Ph.D.                                          July 1, 2010

Page 2

```
 1    A P P E A R A N C E S:

 2

 3         TUCKER, ELLIS & WEST, LLP
           BY:  MATTHEW P. MORIARTY, ESQ.
 4         1150 Huntington Building
           925 Euclid Avenue
 5         Cleveland, Ohio  44115
           216-592-5000
 6         matthew.moriarty@tuckerellis.com
           Attorneys for Actavis Totowa, LLC,
 7         Actavis, Inc., and Actavis Elizabeth, LLC

 8

 9         SHOOK, HARDY & BACON
           BY:  ERICKA L. DOWNIE, ESQ.
10         2555 Grand Boulevard
           Kansas City, Missouri  64108
11         816-474-6550
           edownie@shb.com
12         Attorneys for the Mylan Defendants

13

14         THE MILLER FIRM, LLC
           BY: PETER A. MILLER
15         The Sherman Building
           108 Railroad Avenue
16         Orange, Virginia  22960
           540-672-4224
17         pmiller@doctoratlaw.com
           Attorneys for the Plaintiffs

18

19

20         MOTLEY, RICE, LLC
           BY:  MEGHAN JOHNSON CARTER, ESQ.
21         28 Bridgeside Boulevard
           Mt. Pleasant, South Carolina  29464
22         843-216-9383
           mjjohnson@motleyrice.com
23         Attorneys for the Plaintiffs

24

25         ALSO PRESENT:  ADAM DICOLA, Videographer
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 3

1                    I N D E X

2

3    Description                              Page

4      R U S S E L L   F.   S O M M A          5

5

6    DIRECT EXAMINATION BY MR. MORIARTY        6

7

     CONTINUED DIRECT EXAMINATION BY MR.       55
8    MORIARTY

9

     CONTINUED DIRECT EXAMINATION BY MR.       107
10   MORIARTY

11

     CONTINUED DIRECT EXAMINATION BY MR.       158
12   MORIARTY

13

     CONTINUED DIRECT EXAMINATION BY MR.       206
14   MORIARTY

15

     CONTINUED DIRECT EXAMINATION BY MR.       232
16   MORIARTY

17

     CROSS EXAMINATION BY MS. DOWNIE           241
18

19   REDIRECT EXAMINATION BY MR. MORIARTY      247

20

     RECROSS EXAMINATION BY MR. MILLER         249
21

22   RE-REDIRECT EXAMINATION BY MR. MORIARTY   250

23

24

25

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                          Page 4
   1                   E X H I B I T S

   2

   3    Number               Description                Page

   4
        D-51A            White Box Containing Three      39
   5                     Thumb Drives

   6

   7

   8

   9

  10

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

Russell Somma, Ph.D.                                July 1, 2010

Page 5

```
 1          THE VIDEOGRAPHER: Good morning.  We are now on
 2      the record at 8:31 a.m. The date today is July
 3      1st, 2010.  This is the videotaped deposition of
 4      Dr. Russell F. Somma in the matter of In Re:
 5      Digitek Product Liability Litigation in the United
 6      States District Court for the Southern District of
 7      West Virginia, Charleston Division, MDL Case
 8      Number 2:02-CV-121.
 9          I am the videographer; my name is Adam Dicola
10      of Rennillo Court Reporting.  The court reporter
11      is Mark Schaffer, also with Rennillo Court
12      Reporting.
13          Will counsel please state their appearances
14      for the record?
15          MR. MILLER:  Pete Miller with the Miller firm
16      for plaintiffs.
17          MS. CARTER:  Meghan Carter with Motley, Rice
18      for the plaintiffs.
19          MS. DOWNIE:  Ericka Downie, Shook, Hardy &
20      Bacon, for the Mylan defendants.
21          MR. MORIARTY:  Mathew Moriarty, Tucker Ellis &
22      West, for the Actavis defendants.
23
24  R U S S E L L   F.   S O M M A,
25  Five Shady Lane, Sparta, New Jersey 07871,
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 6

 1   having been duly sworn according to law by the
 2   Officer, testified as follows:
 3
 4   DIRECT EXAMINATION BY MR. MORIARTY:
 5         MR. MILLER:  Matt, before you get started, I
 6      would like to point out something.  I spoke to the
 7      doctor yesterday evening and he saw what he
 8      believes to be something in error in his report
 9      that he'd like to fix.  We can address it now or
10      wait until you discuss the report.
11         MR. MORIARTY:  Let's wait.
12         MR. MILLER:  Okay.
13   Q.   Let me know.
14   A.   Okay.
15   Q.   Good morning.
16   A.   Thanks. Thanks. Good morning to you.
17   Q.   How many times have you had your deposition
18   taken before?
19   A.   Never.
20   Q.   Other than the Digitek litigation, how many
21   times have you been consulted as an expert witness?
22   A.   Never.
23   Q.   I'm sure Mr. Miller or Ms. Carter has given
24   you some information about what's going to happen
25   today.  Okay?  Is that right?

Russell Somma, Ph.D.                                July 1, 2010

                                                         Page 7

 1      A.   Yes, sir.

 2      Q.   We are going to spend all day.  I'm going to

 3   ask you a lot of questions.  And your function is to

 4   just to answer my questions; okay?

 5      A.   Yes, sir.

 6      Q.   If you do not understand my question, please

 7   tell me you don't understand my question.  Okay?

 8      A.   Okay.

 9      Q.   If you answer the question, I'm going to

10   understand -- I'm going to assume that you at least

11   understood it.  Is that okay?

12      A.   Okay.  I will ask.

13      Q.   Okay.

14      A.   No stretching.

15      Q.   And if you need to look at documents, please

16   look at documents.  I don't want you to guess at the

17   answers to any of my questions.  Okay?

18      A.   Okay.

19      Q.   And also sometimes witnesses want to talk and

20   talk and talk and lecture me about good manufacturing

21   practices and various other topics.  I'm going to try

22   to keep my questions quite specific.  Okay?

23      A.   Okay.

24      Q.   So if you can answer my questions, I would

25   appreciate that.  Okay?

Russell Somma, Ph.D.                                    July 1, 2010

Page 8

 1     A.    Okay.  So that would mean that there would

 2   have to be some exchange between us, so I understand

 3   exactly --

 4     Q.    Yes.  I'll give you a chance to explain if I

 5   need something explained, but I would like direct

 6   answers to my questions.  Okay?

 7     A.    Uh-huh, yes, sir.

 8     Q.    This is Exhibit 51.

 9           Is that your resume?

10     A.    Yes, it is.

11     Q.    All right. And while I'm at it, this is

12   Exhibit 52.

13     A.    That's my report, yes.

14     Q.    Is this your report --

15     A.    Yes.

16     Q.    -- in this litigation?

17     A.    Uh-huh, yes, it is.

18     Q.    And at the back of your report in Appendix A,

19   it says, "Materials reviewed."  Right?

20     A.    Yes, sir.

21     Q.    And I assume that at least before writing the

22   report, these are the things that you looked at.   Is

23   that correct?

24     A.    That's correct.

25     Q.    And when were you first consulted in this

Russell Somma, Ph.D.                                    July 1, 2010

Page 9

1    litigation?

2         A.    I was contacted in March.

3         Q.    Of 2010?

4         A.    Of 2010.

5         Q.    So I assume as you received material over

6    time, you have had an opportunity to read it?

7         A.    As I got the material I did read it, yes.

8         Q.    And you had plenty of time to draft this

9    report.  Is that correct?

10        A.    Yes, sir.

11        Q.    I assume that there were drafts to this

12   report?

13        A.    Yes, sir.

14        Q.    Did you save drafts?

15        A.    Yes, I did.

16        Q.    And then I assume that you had some time to

17   talk with members of the plaintiffs' side of this case

18   about those drafts leading to the final version.  Is

19   that right?

20        A.    That's correct, yes.

21        Q.    Okay.  And that's fine.  You have never done

22   this before.  You didn't know anything about it.  They

23   gave you some guidance on things that may need to be

24   in there or not; right?

25        A.    Well, Matt, actually what I did --

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 10

 1              MR. MILLER:  Object to form.

 2         Q.   One rule is you have to let me finish my

 3    questions --

 4         A.   Sorry, sorry.

 5         Q.   Because, Mark, the court reporter, can't take

 6    us both down at the same time.

 7         A.   I got you.

 8         Q.   Okay?

 9         A.   I got you.

10         Q.   Okay.

11         A.   Can I ask my question now?

12         Q.   Well, actually you don't get to ask

13    questions.

14         A.   Oh, okay.

15         Q.   I do.

16              MR. MILLER:  But there is a question pending.

17         You had asked him --

18              MR. MORIARTY:  I asked if he had time to talk

19         with the plaintiffs' side about the report.

20         A.   Right, and I agreed.

21         Q.   Okay.  And there -- there is a mistake in it

22    somewhere and we'll get to that later.

23         A.   Right.

24         Q.   Okay?

25         A.   Uh-huh.

Russell Somma, Ph.D.                                    July 1, 2010

Page 11

1       Q.   Did the plaintiffs' side of the case let you

2    know, the lawyers let you know, that the purpose of

3    this report is to put people like me on notice of what

4    your opinions were in the litigation?

5       A.   Yes, sir.

6       Q.   And you tried to put all your opinions in

7    there?

8       A.   That I came away with after I read what I

9    had, my opinions based on my experience, yes.

10      Q.   Have you read additional material since

11   writing this report?

12      A.   Yes, sir, I have.

13      Q.   We'll get to that later.

14           Okay.  So you were first contacted in March.

15   And who contacted you?

16      A.   An organization by the name of Spyglass.

17   They were looking for somebody to provide expert

18   input, with experience in tableting.

19      Q.   I assume you mean --

20           (A discussion is held off the record.)

21      A.   With experience in tableting. Compression.

22   Sorry.

23      Q.   I assume you mean Mark Kenny?

24      A.   That's correct, right.

25      Q.   And did he make direct contact with you?

Russell Somma, Ph.D.                                    July 1, 2010

Page 12

```
 1      A.    Yes, he did.

 2      Q.    Have you ever met him before?

 3      A.    Not before then, no.

 4      Q.    How did he know about you?

 5      A.    A network of consultants; knows people, and

 6   they worked with another fellow that I worked with at

 7   Novartis.

 8      Q.    What's his name?

 9      A.    Alp Yaman.

10      Q.    I'm sorry?

11      A.    Alp Yaman.

12      Q.    Now, you have a company called Somma Tech

13   Consulting; do you not?

14      A.    That's correct.

15      Q.    Is it a corporation, a partnership?

16      A.    It's an LLC, and my partners are the parent

17   company, IPS.

18      Q.    IPS?

19      A.    Integrated Project Services.

20      Q.    How many employees does Somma Tech Consulting

21   have?

22      A.    We have two.

23      Q.    Who are they?

24      A.    Me and a ten -- excuse me -- I should correct

25   that.  1099 doesn't constitute an employee, so we have
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 13

1    me and a woman that does our transdermal work at the

2    present time.

3        Q.   What do you mean does your "transdermal work

4    at the present time"?

5        A.   She consults in an area of transdermal

6    delivery systems for another firm that we work for.

7        Q.   Okay.  What's her name?

8        A.   Amanda Gotto.

9        Q.   Say that again?

10       A.   Amanda Gotto.

11       Q.   Is Amanda Gotto consulting in any other

12   litigation?

13       A.   No.

14       Q.   Has Amanda Gotto had any input into your

15   analysis or report in the Digitek litigation?

16       A.   No.

17       Q.   And then who is IPS?

18       A.   IPS is a company that Somma Tech is a part

19   of.  It's an engineering project management -- project

20   management firm.

21       Q.   In fields other than pharmaceutical?

22       A.   They are predominantly in pharmaceutical, but

23   they have been known to do work in other areas on the

24   soft side; not heavy industry.

25       Q.   I assume that they are a consulting group?

Russell Somma, Ph.D.                                    July 1, 2010

Page 14

1        A.    That's correct.

2        Q.    Did anyone from IPS have any input into your

3   analysis for the drafting of your report in the

4   Digitek litigation?

5        A.    No, they have not.

6        Q.    I assume that you are charging the

7   plaintiffs' lawyers for the time that you have spent

8   reviewing material and writing your report?

9        A.    Yes, I have. Yes.

10       Q.    Is that right?

11       A.    Yes.

12       Q.    How much are you charging for that?

13       A.    $350 an hour, Matt.

14       Q.    I assume you are charging me for the time we

15   spend all day today with me questioning you about your

16   report.  Is that right?

17       A.    If you would like, yes.

18       Q.    Well, I prefer not, but I assume you are

19   going to.  So why don't you tell me how much I am

20   going to be charged.

21       A.    $350 an hour.

22       Q.    Thank you.

23            Do you have any idea how many bills you have

24   already sent the plaintiffs' lawyers for your review

25   to date?

Russell Somma, Ph.D.                                           July 1, 2010

Page 15

1      A.    Three.

2      Q.    What's the total of those bills?

3      A.    $40,000.

4      Q.    How much do you have in unbilled time up to

5    today?

6      A.    I would say about 30,000.

7      Q.    So, just so I'm clear, you think that the

8    total amount of time that you have put into this

9    review and writing to date is about $70,000?

10     A.    No, no.  In other words, as I can tell -- I

11   have a time management system that we put in our time

12   for.  Based on that time, there is about $40,000 in

13   billing.  Okay?

14     Q.    Okay.

15     A.    And those invoices, we have been paid the

16   first invoice, which was the initial retainer; but

17   since then we have not provided -- we haven't provided

18   the invoices on a more timely basis.

19     Q.    So you believe that the total amount of time,

20   the value of the time you have put into this is about

21   $40,000?

22     A.    That's correct, Matt, yes.  Sorry.

23           Was that too long of an answer, Matt, just so

24   we know going forward?

25     Q.    No.  "Yes" is good.  I really like that.

Russell Somma, Ph.D.                                    July 1, 2010

Page 16

1          You have a Ph.D. in pharmaceutical science
2     from Rutgers; do you not?
3          A.   Yes.
4          Q.   Now in your day-to-day wanderings about the
5     world including your consulting work, are you called
6     "Mister" or "Doctor"?
7          A.   Well, I never really paid much attention to
8     it, but most of my clients refer to me as "Doctor,"
9     you know.
10         Q.   Okay.  Dr. Somma, have you ever --
11         A.   That doesn't include you, by the way.
12         Q.   Okay.  So I can call you Mister?
13         A.   No, "Russ" is good.  But go ahead.
14         Q.   In your industry experience, and I understand
15     that that was primarily at Novartis.  Is that correct?
16         A.   That's right, yes.
17         Q.   Did you ever work on a digoxin product?
18         A.   I worked on a cardiac glycoside, yes, sir.  I
19     worked on Serpasil.  Serpasil is in the same general
20     class.  Is it digoxin?  No, sir.
21         Q.   Is it digitalis?
22         A.   No, sir, it's reserpine.
23         Q.   Is it derived from the "something-lanata"
24     plants that --
25         A.   It's a natural alkaloid.  I can't tell you if

Russell Somma, Ph.D.                                    July 1, 2010

Page 17

1    it's from the same plant, no, sir.

2        Q.    And is Novartis' cardiac glycoside product an

3    IV or a solid oral base?

4        A.    Solid oral dosage form.

5        Q.    And what was your involvement with that?

6        A.    Production support and troubleshooting.

7        Q.    Okay.

8        A.    Just for clarity, it was Ciba at the time.

9        Q.    How did you -- How long did your duties

10   involve that product?

11       A.    These things came up periodically, so your

12   responsibility was the product line.  So reserpine or

13   Serpasil in this case was the hot topic for six, eight

14   months, and then it would go -- you would go onto the

15   next product or problem.  Is that clear?

16       Q.    Yes.  When you were working on -- was it a

17   product that was in full commercial production?

18       A.    Yes, sir, it was.

19       Q.    Did you have any role at all in adverse event

20   reporting analysis for that product?

21       A.    No, sir.

22       Q.    Were you at least aware that the drug is

23   known to have a narrow toxic therapeutic window?

24       A.    When I worked on the drug, the term "narrow

25   therapeutic window" wasn't commonly used.  It was just

Russell Somma, Ph.D.                                    July 1, 2010

Page 18

1   a low dose drug for us, and to me that was the issue

2   in that case.

3       Q.   When you say "low dose drug," are you talking

4   about the actual amount of the active pharmaceutical

5   ingredient in the tablet?

6       A.   That's correct.

7            (A discussion is held off the record.)

8       A.   The amount of active ingredient in the dosage

9   form.  In this case, less than a milligram.

10      Q.   And do you know what the dose strengths were

11  of reserpine when it was -- when you were dealing with

12  it at Ciba?

13      A.   I would have to guess, but point-one as I

14  recall is one of them.

15      Q.   Do you know if they made a 0.5 milligram

16  dose?

17      A.   That I can reasonably say with assurance, no.

18      Q.   When were you involved with reserpine?

19      A.   Reserpine was back in 1976.

20      Q.   Okay.  This is long before the FDA's digoxin

21  regulations?

22      A.   It was around the same time, because I

23  remember a lot of digoxin noise when I was in pharmacy

24  school about, you know, different products; but

25  primarily that wasn't on my radar screen at all.

Russell Somma, Ph.D.                                    July 1, 2010

                                                            Page 19

 1       Q.    Did they ever put in an NDA for reserpine?

 2       A.    Yes, it was; it was an NDA.

 3       Q.    When?

 4       A.    That I don't know, sir.

 5       Q.    Did you ever have anything to do with the

 6   quality control chemistry testing of reserpine?

 7       A.    Chemistry testing, no, sir.

 8       Q.    Do you know what kind of tablet presses they

 9   used?

10       A.    Yes, sir.

11       Q.    What?

12       A.    Manesty Mark II.

13             (A discussion is held off the record.)

14       Q.    The difficulty that Mark, the court reporter,

15   is having is that you are looking at me and it just

16   makes it a little harder for him.  And that's

17   unfortunately the way this room is set up and kind of

18   the way it has to be.  Okay?

19       A.    All right.

20       Q.    Did Manesty Mark II tablet presses have

21   weight control equipment on them?

22       A.    They did, sir, yes.

23       Q.    When they had weight control on them, did

24   they weigh all produced tablets or just random

25   samples?

Russell Somma, Ph.D.                                July 1, 2010

Page 20

 1      A.   Let me -- let me -- let me -- If I may, Matt.

 2   Matt, Manesty Mk II's have weight control on them.  If

 3   your question is is -- if your question is:  Did we use

 4   those to make reserpine?  Is that -- or am I jumping

 5   ahead here?

 6      Q.   Well, I asked you what kind of tablet

 7   presses --

 8      A.   Manesty Mark II's.

 9      Q.   -- presses Ciba used to make reserpine?

10      A.   That's right.

11      Q.   Did the Manesty Mark II's that were used to

12   make reserpine have weight controls?

13      A.   The ones that we owned that made reserpine,

14   no, sir.  Okay? Sorry.  I was thinking of it in a

15   global sense.

16           The answer is:  They do have them.  We didn't

17   have it on that machine.

18           MR. MILLER:  No, that's fine.  You are doing

19      fine.

20      Q.   So the -- So whatever in-process weighing,

21   measuring and hardness testing was done, was done

22   either by a QA employee or -- and/or a press operator.

23   Is that right?

24      A.   That's correct.

25      Q.   Do you have any memory of how often the QA

Russell Somma, Ph.D.                                    July 1, 2010

Page 21

1  person came in to check thickness, hardness and

2  weight?

3      A.   The QA person, I don't recall, sir, no.

4      Q.   Do you know how often the tablet press

5  operator was expected to check samples of thickness,

6  hardness or weight?

7      A.   Every half hour is our custom.

8      Q.   How much of your work in your industry

9  experience was solid oral dose?

10     A.   I would say 98 percent of it, sir.

11     Q.   And you worked essentially from the

12  conclusion of your bachelor's in pharmacy until you

13  left private industry at Novartis or its predecessor

14  companies.  Is that right?

15     A.   That's correct.

16     Q.   Almost 30 years?

17     A.   Almost, sir.

18     Q.   Why did you leave Novartis in June of 2004?

19     A.   I retired -- not retired.  Excuse me.  I

20  resigned.  Sorry about that.  To be clear, I resigned.

21  I resigned.

22          The opportunity came up with people I've

23  worked with at various associations and different

24  professional groups that it seemed to me that owning

25  my own company was going to be an opportunity to

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 22

1    explore and expand and share my background.  I had

2    gotten quite a lot of airplay from work we had done.

3    Bottom line was:  I capitalized on things I had in

4    place, left, and started my own company.  That is why

5    IPS is my partner.

6         Q.   And what are you, about 58 years old?

7         A.   Fifty-nine.

8         Q.   Now, in your industry experience at Novartis

9    and its predecessors, did you have any experience in

10   dealing with the FDA in inspections?

11        A.   Yes, sir.

12        Q.   And I assume that happened over the years,

13   FDA would come in and conduct inspections?

14        A.   Yes, sir, primarily pre-approval inspections

15   for drugs.

16        Q.   Did you ever have any experience in

17   remediating 483s or warning letters that were given to

18   your employer?

19        A.   483s, sir; warning letters, no.

20        Q.   What about establishment inspection reports?

21        A.   I was aware of their existence.

22        Q.   Did you ever have any experience with product

23   recalls when you were in your industry experience?

24        A.   Yes, sir.

25        Q.   What was the product that was recalled?

Russell Somma, Ph.D.                                July 1, 2010

Page 23

```
 1            How many recalls were you involved with?
 2   Let's put it that way.
 3        A.   I would say two, sir.
 4        Q.   Were they solid, oral dose?
 5        A.   Yes, sir.
 6        Q.   What were the reasons for the -- and can you
 7   tell me what the products were?  I assume it's public
 8   knowledge?
 9        A.   Well, I think -- well, one of them was a -- a
10   field action for a carbamazepine.
11        Q.   Okay.
12        A.   Carbamazepine I believe is Tegretol.
13        Q.   Why was carbamazepine recalled?
14        A.   It was I believe -- and, again, the recall
15   was the key; I don't recall if it was a voluntary
16   recall.  The key was that we had found anomalies in
17   the tableting operation.
18        Q.   Okay.
19        A.   And these were in hardness dose
20   specifications.
21        Q.   Was the recall a precautionary recall?
22        A.   Yes, sir.
23        Q.   Was it to the consumer level?
24        A.   That I don't remember, sir.
25        Q.   To the best of your memory, did you ever find
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 24

 1   any car --

 2        A.    Carbamazepine.

 3        Q.    -- carbamazepine tablets actually in the

 4   field that failed your specifications?

 5        A.    From the best of my memory, I don't recall

 6   bringing them back.  Because we primarily would depend

 7   upon our retained samples to assess what's in the

 8   field.

 9        Q.    Okay.

10        A.    Understanding, of course, that what's in the

11   field you have no control where it's been, so we went

12   by retains.

13        Q.    Okay.

14        A.    But when they came back, we tested them.

15        Q.    All right.

16        A.    Right.

17        Q.    What do you mean, "when they came back"?

18        A.    When the samples came back from -- a

19   complaint sample would come back, we would test those.

20        Q.    Yes.  Okay.  And the ones that were tested,

21   were they out of spec?

22        A.    That I don't recall, sir, right now

23   specifically, to be honest.

24        Q.    Well, sometimes in the pharmaceutical

25   industry you do a recall even though the product in

Russell Somma, Ph.D.                                    July 1, 2010

Page 25

1    the field may not actually be out of spec; correct?

2         A.    That's right.  Out of precaution, correct.

3         Q.    Okay.  So what was the second recall that you

4    had anything to do with?

5              (A discussion is held off the record.)

6         Q.    And, again, I told you in the beginning, that

7    if you don't know the answer to my question, I don't

8    want you to guess.

9         A.    No.  I think in that particular case it would

10   take -- it would be a stretch for me to answer the

11   second recall question.

12        Q.    Was it a solid oral dose?

13        A.    Yes, it was.

14        Q.    Do you remember what the problem was?  Or why

15   the --

16        A.    I believe -- I believe it was dissolution, as

17   I recall.  That was -- and I think that's about as

18   best I can do.  I think -- We used to monitor levels,

19   S1, S2 levels.

20        Q.    Okay.  When you were at Novartis and its

21   predecessors, did you ever have -- did you ever reject

22   batches that didn't meet the specifications?

23        A.    I was not in that position, no, sir.

24        Q.    Do you know whether it happened?

25        A.    Rejection of batches?  Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 26

```
 1       Q.    Okay.  And certainly out-of-spec
 2   investigations occurred from time to time?
 3       A.    Absolutely.
 4       Q.    Is that right?
 5       A.    Absolutely.
 6       Q.    Now, what -- Were you in the Manufacturing
 7   Division, the Quality Department --
 8       A.    Research and Development.
 9       Q.    Research and Development.  Did you ever get
10   involved in products that were in full-scale
11   commercial development?
12       A.    Yes, sir.
13       Q.    I'm sorry.  Full-scale commercial production?
14       A.    Yes, sir.
15       Q.    And did you spend most of your career in
16   Research and Development?
17       A.    I was all -- my entire career was in research
18   and development, which included product production at
19   some point.
20       Q.    And I assume that's one of the reasons why
21   one of your particular interests in pharmaceuticals is
22   what's known as scale-up.  Is that correct, sir?
23       A.    That's correct, sir.
24       Q.    And technology transfer?
25       A.    That's correct.
```

Russell Somma, Ph.D.                                      July 1, 2010

Page 27

1      Q.    And in my plain English, the -- the science

2   of going from research and development small batch

3   sizes to full commercial production scale

4   pharmaceutical manufacturing; correct?

5      A.    That's correct.  And even in simpler terms,

6   it's simply moving it from Place A to Place B.

7      Q.    Place A little and Place B big?

8      A.    Or Place A little to Place B little, to

9   minimize problems.  Okay?

10     Q.    At Page 4 of your resume, you have

11  Publications and Presentations.

12     A.    Uh-huh.

13     Q.    Do any of them involve digoxin?

14     A.    No, sir.

15     Q.    Do any of them involve troubleshooting of

16  oversized tablets?

17     A.    To the best of my knowledge no, sir.  I'm

18  checking as we're going, just to make sure I'm giving

19  you the right --

20          MR. MILLER:  That's fine.  If you need to

21      check, go ahead and check.

22     A.    I doubt specifically oversize.

23     Q.    You wrote them.  I didn't.

24     A.    Yeah.

25     Q.    Do any of them have anything to do with the

Russell Somma, Ph.D.                                      July 1, 2010

Page 28

1    appropriate ways to get to a root cause analysis?

2        A.    While none of them speaks to that topic by

3    inference, I think that these types of things are

4    tools that would be used in a root cause analysis, but

5    they are not titled such.

6        Q.    Okay.

7        A.    Okay?

8        Q.    When was the first time you met in person

9    with somebody from the plaintiffs' lawyers group in

10   this case?

11       A.    I think -- I'm guessing -- No, I'm not going

12   to guess.

13              Well, not to waste time, I'm thinking mid --

14   late May, mid May, something like that.

15       Q.    Who has been your primary contact?

16       A.    Meghan Johnson.

17       Q.    I assume you spent some time with plaintiffs'

18   lawyers either this morning or yesterday preparing for

19   your deposition today?

20       A.    Yes, sir.

21       Q.    Who did you meet with with?

22       A.    I met with Meghan and Pete Miller.

23       Q.    And did they tell you anything about the

24   deposition testimony of a Mr. Farley that took place

25   in Savannah, Georgia on Monday?

Russell Somma, Ph.D.                                    July 1, 2010

Page 29

 1      A.   No, sir.

 2      Q.   Did they tell you anything at all about the

 3  deposition testimony of Mark Kenny that took place in

 4  this room on Tuesday?

 5      A.   No, sir.

 6      Q.   Did they tell you anything about the

 7  deposition testimony of a Dr. Frank that took place in

 8  Philadelphia yesterday?

 9      A.   No, sir.

10      Q.   Have you read the reports of any other

11  experts in this case?

12      A.   No, sir.

13      Q.   No Dr. Semigran, no Dr. Nelson?

14      A.   No, sir.

15      Q.   Not Farley, Frank?

16      A.   No.

17      Q.   Etc., etc.?

18      A.   No.  If I had a guide, I probably wouldn't

19  have made the mistake I told you about.  Do you know

20  what I mean?

21      Q.   I --

22      A.   Okay.

23      Q.   Other than Pete Miller and Meghan, who have

24  you talked with about this litigation?

25           (A discussion is held off the record.)

Russell Somma, Ph.D.                                July 1, 2010

                                                      Page 30

 1      A.   That would be the guy at Spyglass, Mark
 2   Kenny.
 3      Q.   Did you talk to him about substance or just
 4   logistics?
 5      A.   I think part of it was -- when you say
 6   "logistics," who is going to do what?
 7      Q.   Who is going to do what, here's who to call,
 8   things like that?
 9      A.   That was partly, partly --
10      Q.   Did you talk about the substance of the
11   litigation, what the claims were?
12      A.   When we first met with them.  Because like I
13   said, we had been contacted and they explained to me
14   what this was about.  So I think in that particular
15   case, there was a substantive amount of discussion,
16   yes, sir.
17      Q.   Did you meet with Mark Kenny in person?
18      A.   Yes, sir.
19      Q.   Where did you meet?
20      A.   In Chester, New Jersey.
21      Q.   Was there anybody else present?
22      A.   As I recall, Sal Romano was present as well.
23      Q.   All right. Did you keep any notes from that
24   meeting?
25      A.   Those I did not sir, no.

Russell Somma, Ph.D.                                    July 1, 2010

Page 31

```
 1      Q.   And I see you have a spiral bound notebook in
 2   front of you.  Is that correct?
 3      A.   That's right.
 4      Q.   Is that notes about substance, or just your
 5   ongoing logistical work in the matter?
 6      A.   Because -- actually, it's everything that
 7   I've done.  If -- in other words, if I've read -- if
 8   I've read a lot of material, I'll make notes in here
 9   rather than try to make a paper copy.  Or if I have a
10   meeting, I'll put the notes in here.
11           I did not start this, because when I talked
12   to the guys at Spyglass -- excuse me -- Mark Kenny, I
13   hadn't been selected to do the job.
14      Q.   All right.  Did you bring a photocopy of
15   your notebook today?
16      A.   No, sir, I did not.
17           MR. MORIARTY: At some point today we will have
18       to mark the notebook and make sure we get copies
19       of the notes.
20           MR. MILLER:  Okay.
21      Q.   So other than Pete and Meghan and Sal and
22   Mark Kenny, have you talked to anybody else about this
23   litigation?
24      A.   Well, we visited Actavis and I talked to
25   Michael Anderton, right?  So I guess that counts too.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 32

1      Q.    Right.  And whoever else was along that day?

2      A.    Was there -- I forget.  There was a -- well,

3   there was Michael and the guys from Actavis.  I didn't

4   talk to them obviously, but --

5      Q.    What I really want to know is:  Did you talk

6   to anybody else about the substance of the litigation?

7      A.    No, sir.

8      Q.    Do you have any military service?

9      A.    No, sir.

10     Q.    Have you ever been a professor at any school?

11     A.    My teaching assignment was limited to my

12   residency for my doctorate.

13     Q.    Do you consider yourself to be an expert in

14   pharmacokinetics?

15     A.    No, sir.

16     Q.    Pharmacology?

17     A.    No, sir.

18     Q.    Pharmacovigilance?

19     A.    No, sir.

20     Q.    Do you consider yourself to be an expert in

21   the regulatory aspect of the pharmaceutical industry?

22     A.    I'm familiar with the regulatory aspect in

23   the amount that it requires me when I do my job,

24   because it's a regulated industry.  Am I an expert?

25   No, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 33

1        Q.    Are you an expert in quality assurance?

2        A.    No, sir.  And, again, where it overlaps into

3    what I do:

4        Q.    Okay.  And I asked you I think a little bit

5    before:  You don't consider yourself to be an expert

6    in quality control chemistry?

7        A.    No, sir.

8        Q.    Have you ever looked at the Digitek detailed

9    patient labeling?

10       A.    Yes, sir.

11       Q.    Have you ever looked at the United States

12   Pharmacopeia monograph regarding digoxin?

13       A.    Yes, sir.

14       Q.    Did you ever look at the USP monograph about

15   digoxin as part of your work in industry?

16       A.    No.

17       Q.    Have you ever looked at at the USP monograph

18   on digoxin before your litigation consulting in this

19   case?

20       A.    There was no reason to.  No, I did not.

21       Q.    Now, let's get back to your report.

22             Exhibit 52, I believe it is, Appendix A.

23   Would it be safe for me to say that a lot of what you

24   relied on for your analysis in this case was FDA Form

25   483s and warning letters?

Russell Somma, Ph.D.                                    July 1, 2010

Page 34

1      A.   I wouldn't say predominantly, no.  I think I

2  looked for more content in technical information,

3  batch records, investigations, internal documents.

4  That's my -- my -- what I -- customarily how I do

5  that.

6      Q.   All right.  In Appendix A, the only batch

7  record I see listed is seven -- it should be 70924A.

8  You actually have a typo here.

9      A.   Yes.

10     Q.   It's the second item from the end.

11     A.   Yeah.

12     Q.   Is that the only batch record you reviewed?

13     A.   No, sir.

14     Q.   What other batch records did you review?

15          And while you are looking for those, are

16  these batch records that you received subsequent to

17  drafting your report?

18     A.   No.

19     Q.   So you reviewed other batch records, but did

20  not put them in Appendix A?

21     A.   That's correct.  I think because -- Well, let

22  me find it first so I understand what you are talking

23  about.

24          71005A.

25     Q.   71005A?

Russell Somma, Ph.D.                                    July 1, 2010

Page 35

 1      A.    5A.

 2      Q.    Okay.  What else?

 3            I'm sorry.  I have a question about that.

 4            Is that the complete batch record?

 5      A.    That I couldn't say.

 6      Q.    Does it have the mixing information?

 7      A.    It has the procedures necessary to make the

 8  blend and the tablets.  The M -- M --

 9      Q.    Well, wait a minute.  Just answer my

10  question.

11      A.    Yeah.

12      Q.    Does it having mixing information with the

13  weighing and measuring of the excipients and the

14  active pharmaceutical ingredient?

15      A.    Yes, sir.

16      Q.    It has the blending information?

17      A.    Yes, sir.

18      Q.    Does it have the chromatography for the blend

19  uniformity samples?

20      A.    It has the results.  It doesn't have the raw

21  data.

22      Q.    All right.  Does it have the in-process

23  tableting data, such as the QA and the operator

24  checks?

25      A.    Yes, it does, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 36

1        Q.    Does it have the results of the quality

2    control testing, such as assay and content uniformity?

3        A.    Yes, it does.

4        Q.    Does it have the packaging information?

5        A.    It looks like it does, sir, yes.

6        Q.    Okay.  What other batch records did you

7    review besides 70924A and 71005A?

8        A.    Those are the only two I looked at before I

9    wrote the report.

10       Q.    Do you know how many batches were included in

11   the recall?

12       A.    I don't recall, sir.

13       Q.    Do you know that we have produced at least

14   152 batch records to the plaintiffs' lawyers in this

15   case?

16       A.    I didn't know that number.  I would imagine

17   the product has a lot of batch records, yeah.

18       Q.    Did you ask to look at any more batch

19   records?

20       A.    Yes, I did.

21       Q.    And what happened with that?

22       A.    I -- subsequent to my request, they put more

23   on the site for me to look at, yes.

24       Q.    They put more on the site?

25       A.    We have a -- there is a database that some of

Russell Somma, Ph.D.                                    July 1, 2010

Page 37

 1  this information be placed on for me to access.  And I

 2  was able to go in there and take a look.

 3      Q.   Did you?

 4      A.   Yes, sir.

 5      Q.   Okay.  My question was:  What other batch

 6  records did you look at besides 70924 and 71005.

 7           So what batch records did you look at on this

 8  site?

 9      A.   I don't remember the numbers, to be honest

10  with you, sir.

11      Q.   How many batch records did you look at?

12      A.   It must have been at least three.

13      Q.   Were 152 batch records available on the site?

14      A.   That I don't know, sir.

15      Q.   What's the web address for the site?

16      A.   It's Crivella.com, the W -- the web address.

17      Q.   That's good.  Is this a website for which you

18  needed a password?

19      A.   Yes, it is.

20      Q.   Did you make note anywhere in your notebook

21  of what other batch records you reviewed on line?

22      A.   No, sir.  You will find these two that we

23  just talked about.

24      Q.   All right.  Other than what's on Exhibit --

25  I'm sorry -- Appendix A, what else have you reviewed?

Russell Somma, Ph.D.                                    July 1, 2010

Page 38

```
 1      A.    I've looked at everything that's on these
 2   drives.
 3      Q.    You are pointing to a little white box that
 4   presumably has a thumb drive in it?
 5      A.    Several thumb drives, sir.
 6      Q.    Are they -- is there different material on
 7   those two thumb drives?
 8      A.    Actually, yeah, there's three.
 9            MR. MILLER:   Three.
10      A.    And there is documents that were pulled from
11   the site and -- on two of them, which are these two.
12            And I'm not clairvoyant.  I have them written
13   on the back.  I see you looking at me.
14            And the third one is e-mails that you have
15   asked to see.
16      Q.    All right.  Now, are those thumb drives
17   duplicates that I can take, or do they have to be
18   duplicated?
19      A.    No, sir, these are -- you requested these and
20   these are for you.
21      Q.    Okay.  Thanks for the little white box, too.
22   I appreciate it.
23      A.    Well, I realize you wanted yes or no, but the
24   answer is:  You'll lose them, believe me.  So I put
25   them in a box.  Sorry.
```

Russell Somma, Ph.D.                                      July 1, 2010

                                                              Page 39

 1      Q.    Could you give them to Mark, please?

 2      A.    Sure.  Mark.

 3      Q.    That Mark.

 4      A.    There you go.

 5            MR. MORIARTY:  Mark, mark it.

 6            (D-51A, White Box Containing Three Thumb

 7      Drives marked for identification.)

 8      Q.    Dr. Somma, is 51 -- Exhibit 51A the little

 9  white box with the three thumb drives on it that we

10  just discussed?

11      A.    Yes, sir.

12      Q.    Okay.  Can I have that?

13      A.    Sure thing.

14      Q.    And just so I make sure I understand what is

15  on it, on those thumb drives, is that material in

16  addition to Appendix A?

17      A.    Yes, sir.  And the drafts.

18      Q.    Drafts of your report?

19      A.    And -- yes.

20      Q.    You are very organized.  I appreciate that.

21      A.    Well, you made a pretty good list, Matt,

22  so...

23      Q.    I see at the end of Exhibit A that you

24  reviewed the depositions of Richard Dowling, Phyllis

25  Lambridis, Dan Bitler and Scott Talbot.  Is that

Russell Somma, Ph.D.                                    July 1, 2010

Page 40

1   correct?

2       A.   Yes, sir.

3       Q.   Did you read the whole deposition?  They're

4   kind of long?

5       A.   They're really long.  I went through them

6   and I got a -- I started skimming stuff, looking for

7   pieces.

8       Q.   Did you make notes anywhere of things that

9   any of those four witnesses said --

10      A.   Yes.

11      Q.   -- that you disagreed with?

12      A.   Disagreed?

13      Q.   Disagreed.

14      A.   I would have to actually look at all my

15  notes.  I made notes about things they said.  Whether

16  I disagreed or agreed, I can't say yes or no.

17      Q.   Okay.  We'll look at your notes later.  If I

18  have time for that, I'll go back to it.

19      A.   Okay.

20      Q.   Did you ever look at the ANDA?

21      A.   Yes, sir, I did.

22      Q.   Is that on Appendix A or --

23      A.   That's on the jump drives.  Excuse me.  Thumb

24  drives.

25      Q.   Now, when you are -- what kind of things is

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 41

 1    SommaTech asked to do in your consulting practice?

 2        A.   Like I -- just to make the connection, when I

 3    left Novartis, my reputation was for scale-up and

 4    fixing production problems.

 5        Q.   Okay.

 6        A.   So as soon as we put the shingle out, we

 7    started fixing people's problems.  My expertise in

 8    several areas, that was people -- the network knew I

 9    was out about; I got contacted.

10        Q.   All right.  Have you ever been consulted as

11    part of SommaTech for an over-thick or overweight

12    tableting problem?

13        A.   Yes, sir.

14        Q.   Go back to your industry experience.  And I'm

15    sorry for jumping around.

16        A.   That's okay.

17        Q.   Did you ever have overweight or over-thick

18    tableting problems at Novartis?

19        A.   Not that I recall.

20        Q.   Are you -- is the identity of your consulting

21    client with the double -- or the overweight or

22    over-thick tableting problem, are you able to discuss

23    that consulting?

24        A.   To be honest, just so -- the way consulting

25    works in our business, because we sign CEAs.

Russell Somma, Ph.D.                                    July 1, 2010

Page 42

1      Q.    Okay.

2      A.    Yeah, so I --

3      Q.    All you have to do is say "No, I can't

4   discuss it."

5      A.    Okay.  I want to try to make sure you know:

6   We are not a mom and pop operation, so --

7      Q.    I understand.  So what was the specific

8   tableting problem that this consulting client had?

9      A.    That tablets which were oversized essentially

10  got into distribution.

11     Q.    All right.  Did you ever figure out how many

12  --

13     A.    No.

14     Q.    -- oversized tablets had gotten into

15  distribution?

16     A.    No, sir.

17     Q.    Is that consulting engagement closed?

18     A.    Absolutely, sir.  In fact, in that particular

19  case, for clarity, we were consulting on a different

20  issue, on a different product, and this came about and

21  we were asked.  Okay?

22     Q.    Okay.  What did you look at once they said,

23  "We have this oversized tableting problem;" what did

24  you do, what documents did you look at, who did you

25  talk with to try to figure out what the problem was?

Russell Somma, Ph.D.                                      July 1, 2010

Page 43

```
 1      A.   We did a -- again, to be clear, our
 2  involvement in this was not heavy.
 3           They asked us to look.  We looked at the
 4  batch records in this particular case, which are
 5  similar to what we looked at in this situation.
 6      Q.   Okay.
 7      A.   And we did not see any anomalous behavior.
 8      Q.   How many -- go ahead.
 9      A.   Excuse me.  I'm fine.
10      Q.   How many batch records did you look at as
11  part of that consulting engagement?
12      A.    In that particular case, I looked at the
13  batch in question or the batch they said they had the
14  problem with, and a previous batch, you know, what was
15  the batch before that and what was the batch after
16  that.  Only because that's my -- my approach to
17  things.
18      Q.   Okay.  And, you know, I don't remember off
19  the top of my head what Batch 71005A was.  Do you
20  remember when it was --
21      A.   I'd have to look.
22      Q.   -- compressed?  I mean, maybe you remember
23  off the top of your head that it was a preceding --
24           (A discussion is held off the record.)
25      Q.   -- or following 70924?
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 44

 1        A.    I could probably give you a better sense of
 2    that as soon as I look at the date.   My --
 3        Q.    If you just tell me the date, that's fine?
 4        A.    The date on this is December 17th, '07.   This
 5    is during the compression sheet.
 6        Q.    Okay.   So it was close in time to 70924?
 7        A.    Yeah, but I wouldn't say that it was like
 8    right next to each other.
 9        Q.    That's fine.   So for that consulting client,
10    they had produced some extra-thick tablets.   Is that
11    right?
12        A.    That's correct.
13        Q.    And some of them, were they verified to have
14    made it out into the marketplace?
15        A.    Yes, sir.
16        Q.    Was there a recall involved?
17        A.    Yes, sir.   Again, as that started to -- just
18    so you got a full disclosure, as that started to
19    gather and evolve, they were aware of it, they were
20    going to take action, and voluntary subsequent to that
21    the thing really took on a life of its own.   Okay?
22        Q.    Okay.
23        A.    We were not involved in that aspect.   Just
24    want to give you a sense of it, so you don't assume I
25    was sitting there at the helm.   Okay?

Russell Somma, Ph.D.                                    July 1, 2010

Page 45

```
 1            Sorry to babble on, but I didn't want you to
 2      waste your time going down that street, you know.
 3        Q.    But when you looked --
 4        A.    Right.
 5        Q.    -- at the batch records --
 6        A.    Right.
 7        Q.    -- you didn't see a problem?
 8        A.    No, sir.
 9        Q.    You didn't see anything like a validated
10      process that was out of control?
11        A.    You see, your first step is:  You look at the
12      batch record.  I didn't see anything.  Customarily the
13      next thing you would do is look at the validation.  I
14      didn't do that.  Okay?  So I don't make that
15      assumption, I don't make that leap until I look at it.
16      Okay?
17        Q.    All right.  I'd like you to look at Exhibit
18      52?
19        A.    Yes, sir.
20        Q.    Third full paragraph.
21        A.    Yes, sir.
22        Q.    Oh, I'm sorry.  The very end of the first
23      full paragraph.  You were an "invited investigator
24      trainer and liaison for the FDA on various projects
25      and initiatives"?
```

Russell Somma, Ph.D.                                      July 1, 2010

Page 46

 1      A.   Yes, sir.

 2      Q.   What projects and initiatives were those?

 3      A.   They had a project to train their field

 4  investigators who were not that knowledgeable in

 5  industry -- common industry practices.

 6           So at the time, it was customary for the

 7  field officers or people in the Compliance branch to

 8  identify people in industry to come in and teach.

 9      Q.   Okay.  And what did you teach?

10      A.   On matrix tablets.

11      Q.   What are matrix tablets?

12      A.   Matrix tablets is a term that's used in the

13  industry to define a timed-release tablet, a sustained

14  release.

15      Q.   Third full paragraph.  You refer to yourself

16  as a "recognized industry subject matter expert."

17           What do you mean, "recognized"?

18      A.   That people come to me and employ my services

19  in technology transfer.

20      Q.   Next full paragraph, you're talking about

21  some publications.  Are you sure that those

22  publications are peer reviewed?

23      A.   Yes, sir.

24      Q.   Okay.

25      A.   I have to change glasses.  Excuse me.

Russell Somma, Ph.D.                                    July 1, 2010

Page 47

1      Q.   Go to Page 2, please.   In the Introduction

2   sentence -- I'm sorry.   In the Introduction section,

3   the first sentence and the last sentence refer to "our

4   review."

5      A.   Right.

6      Q.   Who is "our"?

7      A.   I have to note that when I write things in

8   general, it's my habit to write in the "we, our."

9   Simply because as a firm, I write that.   It should

10  be -- I hope I'm making sense.   It's SommaTech's

11  opinion, the answer is that's how I write things.

12          If it's a mistake -- in this case -- I would

13  say it's a -- it's a grammatical mistake.

14     Q.   That's fine.   This is all your work?

15     A.   This is my work, sir.

16          (A discussion is held off the record.)

17     Q.   Second full paragraph, the last sentence, you

18  are talking about "the final distribution of a batch

19  within which a pharmacist who was dispensing the

20  product in the field reported "double-thick" tablets."

21          Do you see that sentence?

22     A.   Yes, sir.

23     Q.   The next paragraph starts with the reference

24  to Batch 70924.   Do you see that?

25     A.   Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 48

```
 1      Q.   Are you talking about two different batches?

 2      A.   No, sir.  I'm not.

 3      Q.   So do you believe that a pharmacist somewhere

 4  in the United States found a double-thick tablet that

 5  was made as part of Batch 70924 in November of 2007?

 6      A.   That's -- That's my understanding, yes, sir.

 7      Q.   I would like you to dig through whatever

 8  documents you need to dig through to find that for me,

 9  because that would be a revelation.

10           MR. MORIARTY: And, Pete, if you know what he

11      is referring to, by all means help him to speed

12      this up.

13           MR. MILLER: All right, I will.

14           (A discussion is held off the record.)

15      A.   I realize I'm wasting your time.  It's going

16  to take me a bit.  I thought I had it here.

17      Q.   Do you remember what the content of that

18  exhibit is?

19      A.   It was a -- as I recall, it was --

20      Q.   No, wait.  Yes or no.  Do you remember it

21  enough to answer questions about it?

22           Because I know what you are talking about.

23      A.   Okay.

24           MR. MILLER:  I would object to him answering

25      off of memory.
```

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                       Page 49
 1      A.   Yeah, I think --
 2           MR. MORIARTY:  Maybe he has enough memory to
 3      answer it.  That's what I asked him.
 4      A.   Right.
 5           MR. MILLER:  That's what I objected to.
 6      Q.   He objects to your memory.
 7           MR. MILLER:  No.  I object to your question.
 8      Q.   Do you have enough memory of that exhibit to
 9  answer questions about it?
10      A.   Why don't you ask me the question.
11      Q.   Sure.
12      A.   And then you know what?  If I can't
13  accurately answer it, I'll answer yes or no.
14      Q.   Do you know whether that was found by a
15  pharmacist or somebody at a nursing home?
16      A.   As I recall it was a pharmacist.  Whether he
17  was at a nursing home, I don't recall.
18      Q.   Do you know if it was in a blister pack or in
19  a bottle?
20      A.   That I don't recall.
21      Q.   Do you know if it was weighed?
22      A.   That I don't recall either.
23      Q.   Do you know if it was measured?
24      A.   No.
25      Q.   Do you know if it was ever returned to Mylan
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 50

 1   or Actavis?

 2        A.   I believe it was part of a complaint.

 3        Q.   Was it ever returned to Mylan or Actavis?

 4        A.   Not to my knowledge.

 5        Q.   Was the e-mail that you looked at an internal

 6   Mylan e-mail?

 7        A.   I don't remember the format.

 8        Q.   Was there actually correspondence from the

 9   person who supposedly saw this directly to Mylan or

10   Actavis?

11        A.   The person who found it?

12        Q.   Yeah.

13        A.   No, sir.  That's -- that I do remember.

14        Q.   Okay.  Would you agree with me -- you know

15   what a blister pack is; right?

16        A.   Absolutely, sir.

17        Q.   Would you agree with me -- I'm sorry.  Let me

18   ask another question first.

19             Let's assume it was in a blister pack.  Do

20   you know whether the blister pack was ever opened so

21   that they could actually inspect the tablet?

22        A.   I couldn't answer that, because I don't

23   remember it being in a blister pack either.

24        Q.   But if -- if it was in a blister pack and

25   they didn't remove it to weigh or measure it, would

Russell Somma, Ph.D.                                    July 1, 2010

Page 51

1    you agree with me it would be extremely difficult to

2    see through the pack as to what the actual size was?

3                MR. MILLER:  Objection.

4         A.    If you are asking me -- if I was asked to

5    measure the tablet that was inside of a blister pack,

6    my answer to that would be that's impossible to do

7    accurately.

8         Q.    Okay.  If you were asked to do an

9    investigation of an incident where somebody reported

10   that there was a double-thick tablet, wouldn't you try

11   to have some communication with the person who

12   supposedly saw it?

13               Let me go back and ask a different question.

14        A.    Okay.

15        Q.    Okay.  I'll withdraw that question.

16               Let's assume that one of your consulting

17   clients calls you and says, We think we may have

18   released some extra-thick tablets.  We have a report,

19   a third-hand report, of somebody in Massachusetts at a

20   nursing home who may have one.  We want you to look

21   into it."  Okay?  Now, let's go from that premise.

22               Would you try to communicate with the nursing

23   home person in Massachusetts who supposedly saw it?

24               MR. MILLER:  Object to form.

25        Q.    Yes or no?

Russell Somma, Ph.D.                                July 1, 2010

1       A.   I would ask to see the sample first.

2       Q.   Okay.  You'd ask to see the sample?

3       A.   Yes, sir.

4       Q.   And if it was in a blister pack, would you

5    open the blister pack?

6       A.   Yes, sir.

7       Q.   Would you weigh it?  The tablet.

8       A.   Yes, sir.

9       Q.   Would you measure it?

10       A.   Yes, sir.

11       Q.   Would you consider submitting it to a lab for

12    testing for its active pharmaceutical ingredient

13    content?

14       A.   Customarily I would, because that was how I

15    did things, yes, sir.

16            We didn't -- I wouldn't call the guy at the

17    nursing home.  We didn't get that far.

18       Q.   Well, if you couldn't return the sample,

19    would you call the person at the nursing home to find

20    out what they actually did to analyze it?

21       A.   I think, if I understand -- maybe I'm having

22    trouble with understanding the question.  I'm not

23    trying to be stupid.

24            They found it.  They reported it, but they

25    didn't send it back.  Did I get that?  Is that the

Russell Somma, Ph.D.                                    July 1, 2010

Page 53

1    question?

2        Q.    Yeah.    But if it wasn't weighed, wasn't

3    measured, wasn't taken out of the blister pack, we

4    don't even know who this person was, what their

5    qualifications were, whether they're a pharmacist, a

6    nurse or ward secretary, that isn't a very reliable

7    report for you to go on as a pharmaceutical

8    investigator; is it?

9            MR. MILLER:  Object to form.

10       A.    You would have to determine that person's

11   credentials in the building, yes.

12       Q.    Would you agree with my statement that's not

13   a very reliable report if none of that was done?

14           MR. MILLER:  Objection.

15       A.    I would say yes, that you would have to have

16   more reliability.

17       Q.    Dr. Somma, since we are going to be going all

18   day, we do take periodic breaks.  I'm willing to keep

19   going.  But if you need a break now, I'm about to

20   change subjects.  Okay?

21       A.    Okay.  Can I stand up, then?

22       Q.    Sure, you can stand up.

23           MR. MILLER:  All right.  We'll take a break.

24   Is that what we're doing?

25       A.    Is that okay?

Russell Somma, Ph.D.                                      July 1, 2010

                                                              Page 54

1        Q.   I don't need a break.   Do you want to just

2    stretch your legs and sit right back down, or do you

3    want a general break?

4        A.   I was going to hit --

5        Q.   Then let's take a break.

6             THE VIDEOGRAPHER: Stand by.  We are going off

7        the record.  The time is 9:37 a.m.  This is the

8        end of Tape 1.

9             (A discussion is held off the record.)

10            MR. MORIARTY:  This is the first witness that

11       I've deposed who's said that he has seen that

12       document.  If you sent that to your other experts,

13       I need to know.  Because no one else has mentioned

14       that document.

15            I don't need to know today.

16            MR. MILLER:  Right.  Okay.

17            MR. MORIARTY:  I don't want you to guess.

18            MR. MILLER:  Yes.  I need to confirm and get

19       back to you.

20            MR. MORIARTY:  I just need to know before we

21       take any more depositions.

22            MR. MILLER:  Fair enough.  I will get back to

23       you.

24            (A recess is taken.)

25

Russell Somma, Ph.D.                                      July 1, 2010

Page 55

1    CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

2             THE VIDEOGRAPHER: We are back on the record.

3        The time is 9:45 a.m. This is the beginning of

4        Tape Number 2.

5        Q.   Dr. Somma, I'd like you to go to Page 7 of

6    your report, Exhibit 52, please.

7        A.   Okay.

8        Q.   The first full paragraph is referring to

9    dedusters and metal detectors.  Is that right?

10            (A discussion is held off the record.)

11       A.   I'm sorry, Matt.  May I have the question

12   again?

13       Q.   All I asked is:  Are you talking about

14   dedusters and metal detectors --

15       A.   Yes.

16       Q.   -- in that paragraph?

17            Is it routine in the pharmaceutical tableting

18   process to have dedusters and metal detectors?

19       A.   Yes, sir, very common.

20       Q.   Why?

21       A.   The deduster -- the first -- the deduster is

22   to take off, you know, loose powdered material, makes

23   it easier to go through, make a cleaner product in the

24   packaging, less contamination of bottles, cleaner

25   operation.

Russell Somma, Ph.D.                                    July 1, 2010

Page 56

1           Metal detectors are to pick up any metallic
2    material which may come off as a piece of a machine,
3    broken part, small things.  And a metal detector is to
4    assure that that does not happen.
5        Q.    Did they use metal detectors at Novartis in
6    the tableting process?
7        A.    Yes.
8        Q.    Okay.  Now I'd like you to go to the next
9    paragraph.  You're talking about sample frequency.
10           Do you see that?
11       A.    Yes, sir.
12       Q.    I want to ask you about that.
13           Would you agree with me that you cannot
14   chemically test every tablet in a production line,
15   because you would have nothing to sell to the
16   consumers?
17       A.    That's correct, sir.
18       Q.    So it is routine in the pharmacy industry to
19   do a couple of things.  One is in-process sampling of
20   weight, thickness and hardness and appearance.  Is
21   that right?
22       A.    That's right.
23       Q.    And then when you have finished tablets, a
24   certain sample of them are sent to the Quality Control
25   lab for assay and content uniformity testing?

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                       Page 57

 1      A.    That's correct.

 2      Q.    Is that right?

 3      A.    That's correct.

 4      Q.    Now -- And typically does the ANDA contain

 5   information about how many times per half hour, hour,

 6   whatever the sequence is going to be, for the

 7   in-process testing?

 8      A.    Yes, the ANDA does, yes.

 9      Q.    And the ANDA would contain information about

10   the size of the samples of finished tablets that would

11   be sent to QC for assay and content uniformity?

12      A.    Yes, sir.

13            (A discussion is held off the record.)

14      Q.    So the FDA approved the ANDA for this

15   product; did they not?

16      A.    Yes, sir.

17      Q.    As a matter of fact, I hand you Exhibit 6,

18   tell me if you have seen that before?

19      A.    Yes.

20      Q.    First, have you seen it before?

21      A.    Yes, I recall seeing it.

22      Q.    It's the FDA's letter to Amide, the

23   predecessor to Actavis, approving the ANDA; correct?

24      A.    Yes, sir.

25      Q.    And presumably FDA was fully aware from the
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 58

1    contents of the ANDA as to what the sampling plans

2    were?

3              MR. MILLER:   Object to form.

4       A.    The sampling plans were in the ANDA, correct.

5       Q.    All right.  Are you familiar with current

6    Federal Regulations 211.110C about sampling?

7       A.    No, sir.

8       Q.    All right. Do you know of any regulation in

9    the CFR that's part of the pharmaceutical

10   manufacturing guidelines which specifies either the

11   frequency of in-process testing or the number of

12   tablets that are analyzed during production runs?

13      A.    As I recall, I am not an expert in that area,

14   but as -- as I recall, you look to things like the USP

15   for guidance on sampling and testing.

16      Q.    Okay.  Were the Amide and Actavis in-process

17   sampling plans in the batch records?

18      A.    As I recall they were, sir.

19      Q.    Did the FDA have every opportunity to look at

20   those and comment upon them if they wished between

21   2004 and 2008 when they did their inspections?

22      A.    Yes, sir.

23      Q.    And have you seen any warning, observation or

24   other comment by FDA in the 483s or the warning

25   letters to the effect that Actavis' in-process

Russell Somma, Ph.D.                                    July 1, 2010

Page 59

1    sampling plans were inadequate?

2         A.    Can I just refer to one of these?

3               MR. MILLER:   Certainly.

4         A.    What I wanted to check back, to answer your

5    question now, is you asked specifically to FDA input,

6    and I double checked; and to my knowledge -- to my

7    recollection, they had no problem with the sampling

8    frequency.

9         Q.    Okay.  And I skipped.  I didn't ask you about

10   this.  But, you know, certainly the blend uniformity

11   sampling plan:  The number of samples, the type of

12   sampling they used, the locations in the blender,

13   that's all in the ANDA; is it not?

14        A.    That information was in the ANDA.  What I --

15   and it looks like these things have continued to be

16   worked on and progressed at Actavis.

17        Q.    Okay.  And they are in the batch records; are

18   they not?

19        A.    They sure are, as planned deviations, which

20   means it is over and above what they had indicated

21   they wanted to do.

22        Q.    Okay.  All right.  And I don't want to talk

23   about blend uniformity investigations right now.  But

24   as far as the sampling plans are concerned, did you

25   ever see any FDA observation warning letter or 483

Russell Somma, Ph.D.                                    July 1, 2010

Page 60

 1    criticism of the actual blend uniformity sampling plan

 2    itself?

 3         A.   Looking, again, at what I just looked at, I

 4    just -- my -- my answer would be no.

 5         Q.   And then the finished product testing; the

 6    number of finished products they sent for assay or

 7    content uniformity, that was in the ANDA and in all

 8    the batch records.  Is that correct?

 9         A.   That's correct.

10         Q.   And have you seen any FDA warning,

11    observation, criticism, regarding the finished product

12    testing sampling plan?

13         A.   I have not, simply because Actavis very

14    diligently followed USP requirements, which are a

15    minimum standard here.

16         Q.   Now let's go back to your report.

17         A.   Uh-huh.

18              Excuse me, Matt.  Do I need to hand you back

19    these things?

20              MR. MILLER:  No.

21         Q.   No.  Actually, put them on that bigger stack

22    there.

23         A.   Oh, okay.

24         Q.   I'd like you to look at -- What I did is I

25    took your references in your Appendix A of your report

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 61

    1    and I created a binder.  And I did them by the numbers

    2    in order of your appendix.  Okay?

    3         A.    Okay.

    4         Q.    So I'd like you to look at your Reference

    5    Number 4.

    6         A.    Which would be Methods For Drug Substance and

    7    Drug Products From the ANDA?

    8         Q.    Yes.  Was this validated?

    9         A.    All of their methods were validated.

   10         Q.    All right.

   11         A.    Yeah.

   12         Q.    I don't see anything -- Do you see anything

   13    in the FDA regulations that indicates that there is a

   14    mandatory time period in which you need to re validate

   15    a particular process?

   16         A.    That really depends on the firm's approach to

   17    things.  And, again, I'm not trying to be vague.  FDA

   18    gives a firm the ability to operate their business in

   19    their own best interests.  And that has to be done by

   20    an internal review.

   21              So basically I'm answering the question:  FDA

   22    doesn't say you have to do this every year or every

   23    six months.

   24         Q.    Okay.

   25         A.    That's been my experience.

Russell Somma, Ph.D.                                July 1, 2010

Page 62

1      Q.    I didn't see anything in your report to

2   indicate that the test methods contained in Reference

3   4 of your report were no longer valid in 2006, 2007 or

4   2008.

5      A.    No.

6      Q.    Is there anything in your report about that?

7      A.    No, sir.

8      Q.    So I assume you have no opinion to a

9   probability to the effect that these were somehow not

10  valid in 2006, '07 or '08.  Is that right?

11     A.    My opinion in that case is that they were

12  valid, yes, sir.

13     Q.    All right. So let's go back to your report.

14     A.    Yes, sir.

15     Q.    Page 5.  You have a comment here.

16     A.    Yes, sir.

17     Q.    -- in the last paragraph before Packaging, it

18  says, "We did not consider the sample frequency (every

19  hour) used during the compression phase of the

20  manufacturer to be adequate."

21           Do you see that?

22     A.    Yes, sir, and that is the error that I wanted

23  to bring up.

24     Q.    All right.  Well, I'll get there.

25     A.    Okay. You know, Matt, because I know I'm not

Russell Somma, Ph.D.                                    July 1, 2010

Page 63

 1   supposed to ask you questions, but what page are you

 2   on again?

 3      Q.   Seven.

 4      A.   Oh, I'm looking at Five.

 5           MR. MILLER:  You said Five.

 6      Q.   Sorry.  Well, wait a minute.  Wait a minute.

 7   I'll -- I'll fix this.

 8           Let's go back to Five.

 9      A.   Okay.

10      Q.   At the end of the first paragraph on that

11   page, you refer to "These tests are conducted on an

12   hourly basis."

13           Do you see that?  On Page 5.  Last sentence,

14   first paragraph.

15      A.   Yes, sir; yes, sir.

16      Q.   And then at Page 7, you were critical of the

17   sample frequency because it was only every hour;

18   correct?

19      A.   Correct.

20      Q.   All right.  Have you looked back at the

21   records?

22      A.   Yes, sir.

23      Q.   And you recognized that its QA comes in every

24   hour.  Is that right?

25      A.   That's correct, sir.

Russell Somma, Ph.D.                                    July 1, 2010

                                                         Page 64

 1       Q.   And the tablet press operator checks every 30
 2   minutes?
 3       A.   Yes, sir.
 4       Q.   Correct?
 5       A.   Correct.
 6       Q.   So within the space of an hour, there are
 7   actually three checks.  Is that right?
 8       A.   With counting the QA, yes, sir.
 9       Q.   Yes.  All right.  So if we were to dig back
10   into Mr. Bitler's report, that is Plaintiff's Exhibit
11   16, we would find --
12            MR. MILLER:  I don't believe you have handed
13       him that.
14            THE WITNESS:  Oh, okay.
15            MR. MORIARTY:  I haven't.  He has it in his
16       material.
17       Q.   Would you like your own copy of it, or can we
18   refer to --
19       A.   Just to be clear, that's the deposition?
20       Q.   No.   Your Reference 15 -- I'll just hand
21   this to you.
22       A.   Thanks, Matt.
23       Q.   I've even flagged the pages.
24            Your Reference 15 is Dan Bitler's report,
25   which is Plaintiff's Exhibit 16; correct?

Russell Somma, Ph.D.                                    July 1, 2010

Page 65

```
 1      A.   Yes, sir.  Okay.
 2      Q.   And if you go to Page 12, and the page
 3  numbers are handwritten, and I flagged one of them for
 4  you.
 5      A.   Oh, I got you.  Yes, sir.  Go ahead.
 6      Q.   The operator checks for Press 67 are at 7:45,
 7  8:15 and 8:45; correct?
 8      A.   Yeah, I'm still looking for the press number.
 9      Q.   It's on the preceding page, actually.  You
10  see this is Page 2 of 5?
11      A.   Got it.
12      Q.   The press number is on Page 1 of 5.
13      A.   Okay.  I got it.  Okay.
14      Q.   Yes.
15      A.   And yes, 7:45 and 8:15, yes.
16      Q.   Okay.  And then if you go to Page 20, which
17  I've also flagged for you, these are the QA checks,
18  same press, 7:20 and 8:20; right?
19      A.   One hour, at one hour.
20      Q.   So what is the correction that you want to
21  make to your report?
22      A.    Well, the correction is what I had -- my
23  comment was that every half hour I thought was the
24  operator -- every hour was the operator testing.  So
25  it should be every half hour.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 66

1        Q.    All right.  So with a sampling frequency of
2   three times in an hour, you'd agree with me that that
3   is adequate in-process sampling; correct?
4        A.    Three times in an hour is a good level of
5   sampling, yes.
6        Q.    Do you know what the application integrity
7   policy is?
8        A.    No, sir.
9        Q.    Are you generally familiar with any
10  regulations promulgated by FDA regarding what they
11  expect in the way of accuracy and honesty in
12  pharmaceutical records, pharmaceutical manufacturing
13  records?
14       A.    No, sir.  I was -- I always assumed that it
15  was accurate based on our requirements internally.  I
16  didn't realize it was a regulation, no, sir.
17       Q.    Well, what do you think FDA would have done
18  to Novartis, for example, if it found falsified data
19  in a batch record?
20       A.    Falsified?
21       Q.    Falsified.
22       A.    Well, my only experience there was, you know,
23  a contractor we had used.  The answer to your
24  question:  It's severe.
25       Q.    It's severe.  Okay.  In other words, you --

Russell Somma, Ph.D.                                    July 1, 2010

Page 67

1   you assume that these records are supposed to be

2   accurate and reliable and honestly done; correct?

3       A.   Yes, sir.

4       Q.   In all of your review of this material, did

5   you see any FDA Form 483, any FDA warning letter or

6   any comment in the establishment inspection reports

7   that found that the company had falsified any

8   documents or data?

9       A.   No, sir, I did not see anything as far as

10  falsification.

11      Q.   All right.  So I assume that as you reviewed

12  the material, you did not have any reason to question

13  the accuracy of, for example, a batch record --

14      A.   No, sir.

15      Q.   -- or an annual report?

16           THE WITNESS:  Sorry, Mark.

17      A.   No, sir.  When I read this, my understanding

18  was that this was accurate and true.

19      Q.   All right.  Now, in that stack in front of

20  you --

21      A.   Yes, sir?

22      Q.   -- those exhibits were marked the other day,

23  and they are actually in their numeric order.  So if

24  you go towards the bottom of the stack.  I want you to

25  look for Exhibits 63 and 64.  Okay?

Russell Somma, Ph.D.                                    July 1, 2010

Page 68

 1              (A discussion is held off the record.)

 2      A.      Sixty-three, is this correct?

 3      Q.      Yes.  And 64 would be right behind it?

 4      A.      All right. Chapter 10.

 5      Q.      I want you to look at 64 first.

 6      A.      That's Chapter -- I'm sorry?  Correct.

 7      Q.      Yes.  Have you ever seen this before?

 8      A.      Regulatory Procedures Manual, no.  I'm aware

 9   of its existence.  Have I looked at this?  No, sir.

10      Q.      Do you know that this is a document of FDA's?

11      A.      Yes, sir.

12      Q.      I would like you to turn in Exhibit 64 to

13   Page 10-7.

14      A.      Okay.

15      Q.      Section 10-2-4, Procedures.  All right?

16      A.      Yes.

17      Q.      The first sentence there says, "Warning

18   Letters are the principal means by which the agency

19   provides prior notice of violations and of achieving

20   voluntary compliance."

21              Do you see that?

22      A.      Yes, sir.

23      Q.      Do you agree with it?

24      A.      Yes, sir.

25      Q.      Later in that -- in that opening, it says,

Russell Somma, Ph.D.                                    July 1, 2010

Page 69

1    "Prior Notice may be provided by means of a civil

2    suit, administrative action or other less-formal ways,

3    including the following."

4              Number 2 is the issuance of a 483.  Is that

5    right?

6         A.   That's what -- yes.

7         Q.   And Number 3 is "Discussion with management

8    by an FDA investigator, documented in the EIR"?

9         A.   Yes, sir.

10        Q.   Is that right?

11        A.   Right.

12        Q.   So if I'm reading this correctly, and you

13   tell me if you agree, according to FDA's own manual,

14   they consider a 483 and an EIR less formal than a

15   warning letter.  Is that right?

16        A.   My personal -- my personal opinion, yes.  I

17   would agree with that.

18        Q.   All right.  So let's now turn to Exhibit 63.

19        A.   Okay. Chapter 4.

20        Q.   I want to go to the second page, Page 4-2.

21        A.   Okay.

22        Q.   Fourth full paragraph.

23        A.   "FDA is under no," is that it?

24        Q.   Fourth full paragraph.  So it's the next one.

25        A.   Okay.

Russell Somma, Ph.D.                                        July 1, 2010

Page 70

1      Q.    "A warning Letter is informal and advisory."
2            Do you agree with that?
3      A.    Well, I never -- we never dealt with them as
4      an informal thing.  To me it's pretty serious stuff.
5      But if that's their opinion, fine.
6      Q.    Okay.  "It communicates the agency's position
7      on a matter, but it does not commit the FDA to take
8      enforcement action."
9            Do you agree with that?
10     A.    That has been my experience, yes, sir.
11     Q.    All right.  And the last sentence says, "For
12     these reasons, FDA does not consider Warning Letters
13     to be final agency action on which it can be sued."
14           Do you have any reason to disagree with FDA's
15     comment on that?
16     A.    There is no reason for me to disagree, no,
17     sir.
18     Q.    Do you have an expertise on what a "final
19     agency action" means?
20     A.    Only in a limited sense on a particular
21     client that we have now; okay?
22     Q.    You can put those back in the stack.  I'm
23     done asking you about those.
24     A.    Okay. Okay.
25     Q.    I'd like you to go to your Reference 18,

Russell Somma, Ph.D.                                      July 1, 2010

Page 71

1    which is a 483 from the inspection of March 18 through

2    May 20, 2008.

3              MR. MILLER: That's the EIR.  I think he's

4         asking about the 483.

5              (A discussion is held off the record.)

6    A.    3/18/2008 to 5/20/2008; correct, Matt?

7    Q.    Yes, sir.

8    A.    Okay.

9    Q.    Go to Observation 2.

10             Do you know what the FDA's Turbo software is?

11   A.    No, sir, I don't.

12   Q.    If you look at Observation 2, the first thing

13   that it says is "Drug products failing to meet

14   established specifications and quality control

15   criteria are not rejected."

16             Do you see that statement?

17   A.    Yeah, I do, yes, sir.

18   Q.    Is that a restatement of a regulation?

19             MR. MILLER:  Object to form.

20   A.    I don't think that's a restatement.  It

21   sounds like it's an opinion.  But, again, I'm not --

22   I'm not an expert in the verbiage of the regs.  I'm

23   not -- it seems like it's an opinion.

24   Q.    Did you ever read the deposition of a Quality

25   Assurance person in this case by the name of Chuck

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 72

1    Koon?

2        A.   No, sir.

3        Q.   Well, what Mr. Koon said is that the

4    statement I just read to you is essentially spit out

5    of something called the FDA's Turbo software as a

6    regurgitation of a regulation, and that what follows

7    under the phrase specifically is the actual factual

8    observation made by FDA at the time of their

9    inspection.

10            Do you have any reason to disagree with him

11   on that?

12            MR. MILLER:  Object to form.

13       A.   No, sir.

14       Q.   Have you ever looked at the FDA's definition

15   of the term "adulteration"?

16       A.   Yes, sir.

17       Q.   Is it something that you reviewed in your

18   preparations for opinions in this case?

19       A.   I looked at it because -- you know, like I

20   said, I'm not an expert in regulatory stuff, so I made

21   sure at least I had an understanding of it, yes, sir.

22       Q.   All right.  I would like you to look in that

23   stack and see if Exhibit 39 is in it.

24            (A discussion is held off the record.)

25       Q.   Is it there?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 73

 1      A.   Yes, sir.

 2           MR. MORIARTY: Pete, do you still have your own

 3      or do you need an extra?

 4           MR. MILLER:  I've got my own.

 5      Q.   Okay.  Dr. Somma, have you seen this Exhibit

 6   39 before?

 7      A.   I don't -- I don't recall seeing it like

 8   this, sir.  Was this part of something else?

 9      Q.   I'm just asking if you have seen it.

10      A.   Not -- no, sir.

11      Q.   All right.  This is a printout from the FDA's

12   web -- website in a section called "Facts About

13   Current Good Manufacturing Practices."

14           Do you see that at the top?

15      A.   Yes, sir.

16      Q.   All right.  I first want you to go under

17   "What are cGMPs" and go to the second full paragraph.

18      A.   Okay.

19      Q.   It says there "The cGMP requirements were

20   established to be flexible in order to allow each

21   manufacturer to decide individually how to best

22   implement the necessary controls by using

23   scientifically sound design, processing methods and

24   testing procedures."

25           Do you see that?

Russell Somma, Ph.D.                                July 1, 2010

Page 74

 1      A.   Yes, sir.

 2      Q.   Do you agree with that?

 3      A.   Yes, sir.

 4           MR. MILLER:  Objection to form.

 5           I'm sorry.

 6           MR. MORIARTY:  I'm not sure how that can be

 7      objectionable to form, when I say "did you agree

 8      with it."

 9           And by the way, Mark, the court reporter,

10      when I say cPMG the C is small, the G-M-P are all

11      capitalized.

12           THE REPORTER: Thank you.

13      Q.   Let's go to the second section, which says,

14      "Why are cPMG's so important?"  The second  -- I'm

15      sorry. The third sentence says, "In most instances,

16      testing is done on a small sample of a batch (for

17      example, a drug manufacturer may test 100 tablets from

18      a batch that contains 2 million tablets), so that most

19      of the batch can be used by patients rather than be

20      destroyed by testing."

21           Do you agree with that?

22      A.   Absolutely.

23      Q.   Now, let's go down to the fourth section,

24      entitled "If a manufacturer is not following CGMPs,

25      are drug products safe for use?"  And the first two

Russell Somma, Ph.D.                                        July 1, 2010

Page 75

1    sentences there talk about what adulteration means.

2    Is that right?

3         A.   Yes, it does.

4         Q.   And then the third sentence says, "It does

5    not mean that there is necessarily something wrong

6    with the drug."

7              Did I read it correctly?

8         A.   Yes, you did.

9         Q.   Do you agree with it?

10        A.   I think -- in this particular case, I think

11   everything has to be taken in balance, unfortunately.

12   I think you have to look at the whole subject.  This

13   is true on balance if everything else is correct.

14   That's all I'm saying.

15        Q.   So in general, and I'm not referring

16   specifically to Digitek right now.  I'm saying, in

17   general, you agree with the FDA's statement about

18   that?

19        A.   If everything else is in place, yes, sir.

20        Q.   All right.  Go to the next paragraph.  About

21   two-thirds of the way down it says, "The impact of

22   cGMP violations depends on the nature of those

23   violations and on the specific drug involved.  A drug

24   manufactured in violation of cGMP may still meet its

25   labeled specifications and the risk that the drug is

Russell Somma, Ph.D.                                    July 1, 2010

Page 76

1    unsafe or ineffective could be minimal."

2            Do you agree with that?

3        A.    It has been my experience, sir.  That doesn't

4    negate the firm -- or the firm in this case being

5    subject to regulatory scrutiny.  That's also my

6    experience, yeah.  Okay?

7        Q.    So if I understand what the FDA is saying on

8    their own website, essentially "adulteration" does not

9    mean necessarily that the end product that gets to the

10   consumer is defective.  Is that true?

11           MR. MILLER:  Objection to form.

12       A.    That adulteration is a correct statement when

13   all of the other moving parts making a product are

14   correct, yes.

15       Q.    I need you to answer my question.

16       A.    I got you.  Okay.

17       Q.    If I understand what FDA is saying in this

18   website, "adulteration" does not necessarily mean that

19   the end product in the hands of the consumer is

20   defective or out of its specification.  Is that

21   correct?

22       A.    That would be my experience, yes, sir.

23   Sorry.

24           MR. MILLER:  You're fine.

25       Q.    Okay.

Russell Somma, Ph.D.                                    July 1, 2010

Page 77

1       A.   Are you done?

2       Q.   If you could just put it back on the stack or

3   in the stack.  We'll clean up in a few minutes.

4            I'm handing you what's been marked as Exhibit

5   1.  Have you ever seen this process validation report

6   before?

7       A.   I have seen a process validation report, but

8   not for this strength.

9            (A discussion is held off the record.)

10      Q.   All right.  Exhibit 1 is the process

11  validation for the 125 microgram product; correct?

12      A.   Correct.

13      Q.   Do you know which process validation report

14  you saw?

15      A.   0.5 milligram, or 500 microgram.

16      Q.   Do you have any memory of when that ceased to

17  become a commercially produced dose by any

18  manufacturer?

19      A.   No, sir.

20      Q.   Okay.  Here's Exhibit 2.

21      A.   Okay.

22      Q.   This is a process validation report for the

23  250 microgram product.  Have you ever seen this

24  before?

25      A.   No, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 78

1       Q.    Do you have any -- and these would have been
2    the kind of things done in advance of submitting the
3    ANDA to the FDA for approval of the product; correct?
4       A.    No, sir.   Customarily validation is done once
5    submission is made.   Depends on company policy.   There
6    is no requirements.
7       Q.    Okay.
8       A.    My experience.
9       Q.    But these are the validate -- what is
10   validation?
11      A.    Validation is to confirm that everything that
12   has been put in place:   Specifications, systems,
13   quality approach, is going to work once you -- once
14   you make the product, and reliably so.   Customarily
15   validation is done three times.   The current practice
16   is it's through the entire product life cycle.   Okay?
17      Q.    All right.   Would you agree that "Validation
18   is establishing documented evidence which provides a
19   high degree of assurance that a specific process will
20   consistently produce a product meeting its
21   predetermined specifications and quality attributes"?
22      A.    I will agree with that, and further --
23            MR. MILLER:   Go ahead.
24      A.    And further, that today it's assumed that it
25   meets these requirements through its entire product

Russell Somma, Ph.D.                                        July 1, 2010

                                                            Page 79

 1    life cycle.

 2            MR. MILLER:  And Matt, to keep the record

 3        complete:  You were reading from a document.  Can

 4        I ask what document you were reading from?

 5            MR. MORIARTY:  It's my own research document.

 6        A.   Right.  I've heard that statement before.

 7            MR. MORIARTY:  If it was a published source I

 8        would be happy to tell you, but I don't know where

 9        it's from.

10            MR. MILLER:  Got it.

11        A.   Vaguely familiar, though, Matt.  Very good.

12        Q.   Can you see if Exhibit 46 is in that stack?

13        A.   I sure can.

14            (A discussion is held off the record.)

15        A.   Okay.

16        Q.   This is an article coauthored by one of the

17    other plaintiffs' witnesses in this case, Mr. Farley.

18            Have you ever seen this article before?

19        A.   No, sir.

20        Q.   And just so you know, one of the co- -- the

21    coauthor, Mr. Brooks, is a lawyer; okay?

22            Go to the last sentence of the first page,

23    please.

24        A.   Okay.

25        Q.   It says, "The FDA's acceptance of submitted

Russell Somma, Ph.D.                                July 1, 2010

Page 80

1   procedures is evidence, not conclusive proof, of the

2   reasonableness of the company's manufacturing

3   practices and procedures."

4        A.   I'm sorry, Matt.

5        Q.   Do you see that?

6        A.   I'm sorry, Matt.

7        Q.   I'd like you to go to the very bottom.  Let

8   me have it back.  It's possible it didn't copy this.

9             Yeah, right there, the last sentence on that

10  page.

11       A.   Okay. The FDA's regulation?

12       Q.   No.  I'm going to start over.  The last

13  sentence on the page.

14            "The FDA's acceptance of submitted procedures

15  is evidence, not inclusive proof, of the

16  reasonableness of the company's manufacturing

17  practices and procedures."

18            Have I read that clause accurately?

19       A.   Yes, sir.

20       Q.   Do you agree with it?

21       A.   I think, yes, sir; because it aligns with

22  what I said before. In the end, the owner of the

23  product is the custodian of the product.  That's what

24  this says.

25       Q.   Go to Page 3, please.  While I've got this, I

Russell Somma, Ph.D.                                    July 1, 2010

                                                         Page 81

1    may as well ask you everything I need to about it.

2         A.    Yes, sir.

3         Q.    There is a caption called "Pre Filing

4    Investigation."  Do you see that?

5         A.    Yeah.

6         Q.    And it says, "When a client comes to you

7    suspecting that he or she has taken an adulterated

8    drug, you should tell the client to save the drug, the

9    container, and all labeling and packaging

10   information."

11            Do you see that?

12        A.    Yes, sir.

13        Q.    The next sentence says, "A laboratory must

14   analyze the drug to test for its active pharmaceutical

15   ingredient and for strength and purity."

16            Do you see that?

17        A.    Yes.

18            MR. MILLER:  Object to form.

19        Q.    Do you agree with it?

20        A.    Well, actually, I agree with him.  It's what

21   I had said it before, Matt.

22        Q.    Okay.  Go to Page 4.  At the very bottom it

23   should say, "Training records" in bold.

24        A.    Okay.

25        Q.    Have you looked at any training records in

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 82

 1   this case?

 2        A.    No, sir.

 3        Q.    Go to Page 5, please.  The second bolded

 4   section is called "Standard Operating Procedures."

 5        A.    Yes, sir.

 6        Q.    Have you looked at any SOPs of Actavis or

 7   Amide?

 8        A.    Yes, sir.

 9        Q.    How many of them?

10        A.    I looked at -- my guess would be three or

11   four around the specifics that I was looking at,

12   compression.

13        Q.    Do you know, either by number or topic, what

14   those SOPs were?

15        A.    One was compression, using the Stokes

16   machine, and the other was the blending of powders.  I

17   don't remember the numbers.

18        Q.    Okay.

19        A.    I'm sorry.

20        Q.    All right.  I don't have any questions about

21   that.  You can put that back on the stack.

22        A.    Is this -- what is this?  I'm sorry.

23        Q.    All right.  I want to ask you some questions

24   about manufacturing processes for solid oral dose --

25        A.    Yes.

Russell Somma, Ph.D.                                      July 1, 2010

Page 83

1      Q.    -- pharmaceutical products; okay?

2            In the ANDA and in the batch records, is the

3      formula for the product there?

4      A.    Yes, sir.

5      Q.    And the formula has the ingredient and the

6      amount of the ingredient that is supposed to go in;

7      correct?

8      A.    Yes, sir.  It has the dosage form amount as

9      well as the amount that goes into the batch to make

10     the product, yes, sir.

11     Q.    And presumably those ingredients need to be

12     mixed in the appropriate proportions in order to

13     comply with the formula.  Is that right?

14     A.    That's correct.

15     Q.    And typically when the actual mixing is done,

16     one person mixes it and a second person verifies by

17     watching that that is done appropriately.  Is that

18     right?

19     A.    Customarily, yes, in all cGMP environments,

20     one guy does, one guy verifies.

21     Q.    All right. And if we were going to do an

22     investigation of tablets that were normal in size, but

23     somehow out of their finished product specifications

24     and just, for example, let's say on the high side, one

25     place you might look is whether the batch was mixed

Russell Somma, Ph.D.                                    July 1, 2010

Page 84

1   appropriately from the start; correct?

2        A.    Yes, sir, that's the standard review, batch

3   record review.

4        Q.    You would want to know whether they put too

5   much active pharmaceutical ingredient into that batch

6   or other batches; right?

7        A.    Right.  We check by the weight sheets.

8        Q.    Have you seen any FDA citations or warnings

9   in any FDA 483 or warning letter to the effect that

10  Actavis improperly mixed Digitek?

11       A.    No, sir.  Everything that I've reviewed

12  suggests that the process was done according to the

13  way it's written.

14       Q.    Once the ingredients are mixed, do they weigh

15  it?

16       A.    There are steps that they confirm that the

17  material has been put in and removed.  That's

18  customary when you do a process transfer from a

19  blender to a drum to a blender.  Yes, sir, they do do

20  that.

21       Q.    Okay.  Why do they do that?

22       A.    That's to confirm that they haven't had any

23  untoward losses during the manufacturing, okay?  A

24  drop on their shoes.

25       Q.    I guess theoretically you don't want any

Russell Somma, Ph.D.                                    July 1, 2010

Page 85

```
 1    untoward gains either.  Is that right?

 2        A.   Right.  Gains is much worse than loss,

 3    correct.

 4        Q.   And this sort of weighing --

 5        A.   Yes.

 6        Q.   -- at each stage of the process is sort of a

 7    quality check to see whether you have untoward gain or

 8    loss; right?

 9        A.   Absolutely.

10        Q.   And also, if you have validated the process,

11    it gives you a benchmark so you know whether you're

12    meeting targets from your validated processes;

13    correct?

14        A.   Correct.

15        Q.   Do you know what yield calculations are?

16        A.   Yes, sir.

17        Q.   Are you familiar with doing that yourself --

18        A.   Yes.

19        Q.   -- at Novartis?

20        A.   Yes, sir.

21        Q.   In any of the batch records you reviewed, did

22    you see any inappropriate yield calculations?

23        A.   Absolutely not, sir; they were done

24    correctly.

25        Q.   Did you see -- I'm sorry.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 86

1            Did you see any FDA warnings or 483 citations
2   to the effect that the yield calculations were somehow
3   trending inappropriately?
4        A.   That I did not see, sir.
5        Q.   Let's talk about blenders.
6        A.   Okay.
7        Q.   Tell me about your actual experience in
8   operating blenders or conducting blend uniformity
9   sampling.
10        A.   I established the SUPAC equipment guidance of
11   similarity for FDA, the formal industry guides; so my
12   -- my understanding of the blending aspect was key in
13   that case.  Our objective was to determine like versus
14   like.
15            As far as blend uniformity, it's expected in
16   all products prior to launch.  And I've done 21 NDAs.
17        Q.   Okay.
18        A.   Okay.  You asked for background.  Sorry.
19        Q.   At Page 10 of your report --
20        A.   Yeah.
21        Q.   -- you are talking about how at Actavis the
22   final step blender is of a different geometry?
23        A.   Correct.
24        Q.   Do you see that?
25        A.   Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 87

 1      Q.    Okay.  Was this change of geometry -- I'm

 2   sorry.

 3            MR. MORIARTY: Let me withdraw that question.

 4      Q.    Was the blender configuration in the ANDA --

 5      A.    Absolutely, sir.

 6      Q.    -- approved by the FDA?

 7      A.    Yes, sir, it was in there.

 8      Q.    It's in all the batch records?

 9      A.    Yes, sir.

10      Q.    Has FDA ever made a citation or warning or

11   criticism of Actavis or Amide for its blender

12   configuration with Digitek?

13      A.    No, sir.  This is simply my opinion.

14      Q.    Now, you referred at various points in your

15   report to a book called "Pharmaceutical Process

16   Scale-Up."

17      A.    Uh-huh.

18      Q.    Did you not?

19      A.    Yeah.

20      Q.    You brought it with you?

21      A.    I didn't know if you would have a copy.

22      Q.    I just happen to.

23            What edition do you have?

24      A.    It was only the one, Matt, but let me check.

25      Q.    That's okay.  That's fine.  I don't see an

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 88

1    edition on mine either.

2         A.    It wasn't exactly a best seller.

3               I've got a copyright of 2002.  Okay?

4         Q.    Okay.  So at least two of us have looked at

5    this book?

6         A.    Yes, sir.

7         Q.    And the focus of this book, if you go to the

8    preface, the first sentence of the book says,

9    "Pharmaceutical process scale-up deals with a subject

10   both fascinating and vitally important for the

11   pharmaceutical industry, the process of transferring

12   the results of R&D obtained on the laboratory scale to

13   the pilot plant and finally to production scale."

14              Did I read that right?

15        A.    You did.

16        Q.    And essentially that's what this whole book

17   is about; right?

18        A.    That's what it's supposed to be about, yeah.

19        Q.    And if you go to the next page, in the

20   Introduction to the book, it says, "Scale-up is

21   generally defined as the process of increasing the

22   batch size."  Do you see that?

23        A.    Uh-huh, yeah.

24        Q.    Do you agree?

25        A.    Yeah.  Because that's when you talk about
```

Russell Somma, Ph.D.                                          July 1, 2010

Page 89

 1   scale-up, right.

 2        Q.   Okay.

 3        A.   Since this book has been published, just as a

 4   point, you refer to scale-up.  People prefer to just

 5   scale-out.  In other words, they don't change the

 6   scale any more, Matt.  They try to just make more of

 7   it.

 8             (A discussion is held off the record.)

 9        A.   They don't scale up.  They scale out.

10             I'm sorry, Matt, that's that that PhD. ...

11        Q.   What does "scale out" mean?

12        A.   "Scale out" means if you were making it --

13   say you were making 50 kilograms in a process.

14   Independent of what the process is.  Rather than take

15   that and try to make 500 kilograms, you make multiple

16   50 kilogram processes.

17             So rather than take the risk of the scale,

18   you remain small and you leverage your knowledge

19   without taking the risk of scale-up.

20        Q.   Okay.

21        A.   I'm sorry.

22        Q.   Go to Appendix C of the book, Page 415.

23             And while you are looking for that, this is

24   "Pharmaceutical Process Scale-up" edited by Levin,

25   L-e-v-i-n.  Is that right?

Russell Somma, Ph.D.                                        July 1, 2010

Page 90

```
 1      A.   Uh-huh.

 2      Q.   Go to 415, Appendix C.

 3      A.   Yeah.

 4      Q.   Is this called "Guidance For Industry,

 5   SUPAC," dash, "IR/MR, Immediate Release and Modified

 6   Release, Solid Oral Dosage Forms, Manufacturing

 7   Equipment Addendum"?

 8      A.   That's right.

 9      Q.   I would like you to go to Page 422.

10      A.   Uh-huh.

11      Q.   Do you know what kind of blenders Actavis

12   used --

13      A.    Yes, sir.

14      Q.   -- for blending Digitek?

15      A.   Yes, sir.  A V blender and a double cone

16   blender.

17      Q.   Well, they were made by Paterson Kelly;

18   correct?

19      A.   That's correct.

20      Q.   And if you look at Page 422 --

21      A.   Right.

22      Q.   -- Table 3 under diffusion blenders --

23      A.   Right.

24      Q.   -- both V and double cone, Paterson Kelly,

25   are listed there; right?
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                            Page 91

 1      A.   That's right.  That's how we did that.

 2      Q.   And while I got this book out, go to Page

 3   435.

 4      A.   Uh-huh.

 5      Q.   Which is Table 6?

 6      A.   Okay.   We got it.

 7      Q.   This is tablet presses; right?

 8      A.   Right.

 9      Q.   Gravity feed tablet presses, Stokes is on the

10   list; right?

11      A.   Yes, sir; yes, sir.  It's right here. I

12   wasn't -- I'm sorry.

13      Q.   So at Page 10 of your report, you

14   specifically refer to Pages 115 to 132, which is

15   Chapter 5, called "Batch Size Increase in Dry Blending

16   and Mixing."  Do you see that?

17      A.   That's right.

18      Q.   And this is about scale-up, so you are going

19   from one batch size to a bigger batch size.

20           Is that right?

21      A.   That's right.

22      Q.   And this whole chapter's about blender

23   configuration in that situation; right?

24      A.   Correct.

25      Q.   Now, when Digitek was being manufactured in

Russell Somma, Ph.D.                                          July 1, 2010

                                                                Page 92

 1    2004, '5, '6, '7 or '8, they didn't change the size of

 2    the batches; did they?

 3        A.    They did scale it up from their bio pilot

 4    logs, yes, sir.

 5        Q.    Well, not in 2004, '5, '6, '7 or '8; correct?

 6        A.    Oh, I'm sorry.  Yes, sir.  No, sir.

 7        Q.    And the process for the manufacture of

 8    Digitek in those years was a validated process; was it

 9    not?

10        A.    Based on the three batches, yes, sir.

11        Q.    Okay.  So is there anything in this chapter

12    of the book to which you refer that says that the

13    Paterson Kelly blending configuration used for Digitek

14    was somehow against an industry standard or

15    inappropriate?

16        A.    When we put the SUPAC guidance on --

17        Q.    Wait.  Yes or no.

18        A.    Sorry.

19        Q.    Start with yes or no?

20        A.    May I have the question again, please?

21    Sorry.

22        Q.    Is there anything in this chapter of the book

23    to which you refer that says that something like the

24    Paterson Kelly blender configuration used for Digitek

25    was inappropriate or against an industry standard?

Russell Somma, Ph.D.                                    July 1, 2010

Page 93

1       A.   Yes.

2       Q.   Show me where in this chapter it says that?

3       A.   Page 119, bottom.

4       Q.   Exactly where?

5       A.   "Common violations," the last paragraph,

6    Matt. Right here.

7       Q.   I'll get there.  Okay.

8            "Common violations of this approach can

9    immediately cause problems, include (sic) the attempt

10   to scale from one geometry to another."  Did I read

11   that right?

12      A.   That's correct.

13      Q.   And if I understand scaling in the context of

14   this book, you are talking about going from one batch

15   size to another; right?

16      A.   That's correct.

17      Q.   Which didn't happen in 2004 through '8;

18   correct?

19      A.   I think -- that's correct.  I think my

20   comment is in retrospect.

21      Q.   And the FDA, I believe I may have asked you

22   this before, never had any problems with the blender

23   configuration?

24      A.   No, sir, they did not.

25      Q.   In this paragraph in your report at Page 10,

Russell Somma, Ph.D.                                July 1, 2010

Page 94

```
 1   when you are talking about these blenders, you don't
 2   use the word "negligent;" do you?
 3       A.   Absolutely not.
 4       Q.   You don't use the words "against industry
 5   standards:"  Do you?
 6            MR. MILLER:  Object to form.
 7       A.   Can I read it?  I don't recall using those
 8   words, but let me double-check.
 9            I do not see that word here.
10       Q.   Let's go to the next paragraph of Page 10.
11       A.   The evaluation?
12       Q.   "The evaluation of blend uniformity is a
13   difficult task."
14            What does that mean?
15       A.   "Difficult task" means that it requires a --
16   again, what I had indicated, a very rigidly
17   established plan that has to be followed:  How the
18   product is going to be withdrawn, how big the product
19   is going to be, how the samples have to be handled and
20   recovered.
21       Q.   I want to know what you mean by "difficult
22   task"?
23       A.   Because there are so many different things
24   that can contribute to a false positive or a
25   negative -- or a positive false input.
```

Russell Somma, Ph.D.                                          July 1, 2010

Page 95

1      Q.   Do many companies struggle with blend

2  uniformity?

3      A.   I can't speak for all the companies I've

4  worked for; however, I can tell you that many of the

5  products I worked on, it was a struggle, yes, sir.

6      Q.   All right.  And actually -- companies

7  actually don't have that much problem with blend

8  uniformity?  Companies have problems with blend

9  uniformity sampling; right?

10         MR. MILLER:  Object to form.

11     A.   Good point, Matt.  The point is -- the key

12  is:  If you have two wristwatches, what time is it?

13  So is your sample defective or is your blend

14  defective?  That's where the difficulty in task comes

15  in:  Illucidating which is wrong and which is right.

16     Q.   All right.  Now, I can't remember whose

17  principle or law this is; but when you test blend, you

18  change the nature of the blend in the process of

19  testing; do you not?

20     A.   That comes back to sample handling.  Okay?

21  In the correct world, if you are trying -- your point

22  is in a static bed, when you pull the sample, you have

23  disrupted the bed; therefore, the bed is different.

24     Q.   Okay.

25     A.   Right?

Russell Somma, Ph.D.                                    July 1, 2010

Page 96

1      Q.    So am I correct that various pharmaceutical

2   companies have tried to obtain exemption from blend

3   uniformity sampling because it is such a variable and

4   difficult problem?

5      A.    That is correct.

6      Q.    Are there industry groups in the

7   pharmaceutical companies that have petitioned the FDA

8   to do away with blend uniformity sampling because of

9   its difficulty?

10     A.    There has been a great deal of information

11  transmitted on that point, yes.  And I can point to

12  that FDA does give some latitude on high-dose

13  composition.

14     Q.    Now, did FDA ever say in a 483 or warning

15  letter that the process by which we test blend

16  uniformity was inappropriate?

17          I asked you earlier about the sampling plan

18  itself, where and how many, and you said no.  Now I'm

19  asking you about anything else about the actual test

20  process.

21     A.    Matt, I'm just looking here to make sure.

22          MR. MILLER:  Take your time.

23     A.    I've looked at these things.  Let me just

24  look at one more thing, Matt.

25          I dot not recall FDA having a problem with

Russell Somma, Ph.D.                                    July 1, 2010

Page 97

1    the way they tested their samples.

2         Q.    Okay.  Did you review the SOP for blend

3    uniformity sample?  Actavis' blend uniformity sampling

4    SOP for Digitek?

5         A.    I've read all of the procedures.  I don't

6    recall if I actually read that SOP, to be perfectly

7    honest.

8         Q.    Now, you are aware that there is an FDA 483

9    about some blend uniformity investigations.  Is that

10   right?

11        A.    Due to out-of-specifications observations,

12   yes, I am.

13        Q.    Now, how many batches were affected?  How

14   many batches were involved in that 483 citation?

15             MS. CARTER:  Object to form.

16        A.    I don't recall.

17             MR. MORIARTY:  Did you just object?

18             MS. CARTER:  I did.

19        A.    I don't recall, Matt.

20        Q.    Do you know what -- Well, you can look at the

21   483.  My memory is it's three batches.

22        A.    Okay.  Let me look.

23        Q.    I believe it's the May, 2008 483.

24             Am I wrong about that?  I thought it was

25   Observation 3, but --

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 98

1              MR. MILLER:  Maybe it's 4.

2         Q.   Do you see it there?

3         A.   Okay.  Three batches, Matt.  Thank you, yes.

4         Q.   So if we go by the number of recall batches,

5    that's three out-of-spec --

6              Let me start from scratch.

7              Those three investigations had to do with an

8    out-of-spec result in one out of ten samples for each

9    batch; correct?

10             MR. MILLER:  Object to form.

11        A.   As I recall, yeah.  That was -- it was the

12   same location every time.

13        Q.   Okay.

14        A.   Right.

15        Q.   And on retesting, they didn't confirm the

16   out-of-spec result; correct?

17        A.   They ran the replicate samples and did not

18   see the failing result, correct.

19        Q.   When you say "replicate samples," at the time

20   you sample a dry blend like this, you take two or

21   three samples from each site; correct?

22        A.   Absolutely.

23        Q.   So if it calls for ten sites, you are taking

24   20 or 30 samples?

25        A.   Customarily 30, yes.

Russell Somma, Ph.D.                                    July 1, 2010

Page 99

1       Q.   So if the first sample at the right top
2    fails, there are backup samples taken at the same time
3    that you can test; correct?
4       A.   That's correct.
5       Q.   Is it your memory that in each of those three
6    instances, a backup sample passed?
7            MR. MILLER:  Object to form.
8       A.   As I recall, yes.  As I recall, they passed.
9    Because I don't think they had to go much beyond two
10   in one case, yeah.
11      Q.   If you read the -- Well, did you read the
12   actual Actavis investigations of those blend
13   uniformity --
14      A.   Of these particular batches?
15      Q.   Yes, sir.
16      A.   Honestly, I can't say that I read the ones
17   specific to these batch numbers; no, sir.
18      Q.   All right.  Are you aware that in general
19   with those three batches, they increased the sample
20   size for the finished product testing?
21      A.   To 30 tablets, yeah.  That I am aware of.
22      Q.   And all three of those batches actually
23   passed finished product testing; correct?
24      A.   Yes, as I recall.
25      Q.   All right.  Now, do you know how many of

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 100

 1   those three batches were actually released and sent to

 2   the market?

 3        A.   No, sir, I don't recall that.

 4        Q.   And in that 483, isn't the FDA's real focus

 5   of their observation that Actavis did not, in addition

 6   to the QC investigation, conduct a manufacturing

 7   investigation?

 8             MS. CARTER:  Object to form.

 9        A.   Matt, I'm just reading it again.   May I

10   please have the question again?

11        Q.   Yes, sir.  Are you ready for the question

12   again?

13        A.   Yes, I'm going to pay attention this time.

14             MR. MORIARTY:  Mark, can you read that one

15        back, please?

16        A.   Sorry.

17             (The question is read.)

18        A.   Yes.

19        Q.   So let's go back to Page 10 of your report,

20   the second -- well, actually it's the last paragraph.

21        A.   Uh-huh.  The reliability.

22        Q.   Your second sentence starts with the word

23   "Repetitive failures at the same blender location."

24        A.   Uh-huh.

25        Q.   Do you have any other instances of
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 101

1   out-of-spec results besides the three we just talked
2   about?
3       A.   Let me just check one location.
4            For clarity to answer your question, by
5   "repetitive," I think it's the same location failed
6   repeated -- but not repetitively.  I think I misstated
7   it.  It's the same location failed in several of these
8   batches.
9       Q.   Well, my question is:  Do you know of any
10  other batches --
11      A.   Other than these three, no.
12           MR. MILLER:  You have to wait.
13      Q.   And the three that the FDA is referring to
14  are 70148A; right?
15      A.   Uh-huh.
16      Q.   That's a yes?
17      A.   Yes, sir.
18      Q.   70207A?
19      A.   7070A (sic), yes, sir.  And 70207A, yes, sir.
20      Q.   So in the last paragraph of Page 10 of your
21  report, when you talk about the firm "struggling with
22  the procedure and repetitive failures," these are the
23  only three of which you are aware; correct?
24      A.   Those are the three that I'm aware; in
25  addition to my own experience in how difficult this

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 102

1    task can be.

2        Q.    And the last part of your statement says,

3    "Blend sampling program was ineffective and not

4    predictive of final product quality."

5              What's the basis for that statement?

6        A.    My basis for that statement is:  If you

7    cannot isolate that the blend itself is uniform or

8    non-uniform, this gets back to:  Is the sample

9    reliable or not, you cannot assume that the blend is

10   indicative of anything downstream.  It gets back to

11   the continuum of the whole structure.

12             It really gets back to the heart of my first

13   comment, the comment we had about the blend.

14             On -- in balance, this stuff is -- everything

15   seems right.  But if you start to pull things out of

16   context and ask the questions in an investigation, it

17   starts to bring to light a systematic problem that,

18   again, is inferential at best at this stage, Matt, if

19   you know --

20       Q.    But you have to pull it out of context to do

21   that; right?

22       A.    And, again, someone skilled in the art like

23   myself would do that.

24       Q.    So I want to jump ahead just for a moment.

25       A.    Go ahead.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 103

1      Q.   You have looked at all the annual reports
2  which nicely condense and summarize the finished
3  product test data for this product; correct?
4      A.   No, I did not.
5      Q.   You haven't looked at the annual reports?
6      A.   No, sir.
7      Q.   Do you know whether any batch of Digitek,
8  just among the recalled batches, failed finished
9  product testing?
10     A.   I believe one did, sir.
11     Q.   Which one?
12     A.   That I'd have to check.
13     Q.   Just so we are clear.  Do you know of a
14 single batch of Digitek that was submitted to the QC
15 testing for its USP testing that failed those tests?
16          MR. MILLER:  Object to form.
17     Q.   And if you know of one, tell me what batch
18 number it was?
19     A.   I can't tell you what batch number it is.  I
20 only have a picture of a rejected form.  I'd have to
21 go back and dig it out.  I know it's not in this pile.
22     Q.   Okay.  Well, do you know of any batch that
23 was actually sent to market that failed finished
24 product testing at Actavis?
25     A.   If all -- if all of the parts and pieces are

Russell Somma, Ph.D.                                         July 1, 2010

                                                              Page 104

 1   working together, that should never happen, sir.
 2   Right?
 3       Q.   Well, you know that each batch is tested;
 4   correct?
 5       A.   Right, right.
 6       Q.   And that there is actual data available;
 7   correct?
 8       A.   Uh-huh.
 9       Q.   So have you looked at the data to see whether
10   any batches failed finished product testing?
11       A.    In the batches I looked at, no.  Only the
12   batches I looked at.
13       Q.   Well, let's just start with the recall.  Out
14   of the 152 batches that were actually sent through
15   Mylan to pharmacies, did any of them fail final
16   product testing?
17       A.    Not to my knowledge, sir.
18       Q.   And if we tried to do the math, and I haven't
19   done it before today, if we just take the 152 recalled
20   batches, and say that there were 30 blend
21   uniformity -- I'm sorry.
22           MR. MORIARTY: Let me withdraw that question.
23       Q.   We just take the recalled batches and say
24   that there was one blend uniformity battery for the
25   whole batch, that would be ten samples per batch;

Russell Somma, Ph.D.                                    July 1, 2010

Page 105

 1  correct?

 2      A.    Thirty.

 3      Q.    Well, let's just take one set of them, not

 4  three deep.  You are talking about 1,520 blend

 5  samples; correct?

 6      A.    For those batches.

 7      Q.    Yes.  Right?

 8      A.    Right, 152 times ten.

 9      Q.    And there were three that were out of spec;

10  right?

11      A.    Uh-huh.

12      Q.    That's a yes?

13      A.    Yes, sir.

14      Q.    Each of the three that were out of spec

15  weren't confirmed on retesting; correct?

16      A.    That's correct.

17      Q.    And you think even if those batches were

18  included in the recall set, which we are not sure they

19  are, three out of 1,520 constitutes repeated failures

20  that are predicted -- mean that blend uniformity

21  aren't predictive of final product quality?

22      A.    Absolutely.  The reason is because of the

23  uncertainty in doing the sampling.

24      Q.    All right.  Did FDA ever actually say that

25  any Actavis batches of Digitek failed blend uniformity

Russell Somma, Ph.D.                                    July 1, 2010

Page 106

1   testing?

2       A.   They called it out of specification.  They

3   didn't say it failed.

4       Q.   Okay.  Did they ever say that any batches of

5   Digitek failed blend uniformity testing?

6       A.   Not that I recall, other than what's here.

7       Q.   If somebody just colloquially -- colloquially

8   said that those three were blend uniformity failures,

9   that wouldn't technically be correct; would it?

10          MR. MILLER:  Object to form.

11      A.   I want to make sure I -- may I have the

12  question again, please?

13      Q.   If somebody colloquially --

14      A.   Okay.

15      Q.   -- said those three are blend uniformity

16  failures, that would not be technically correct?

17          MR. MILLER:  Object to form.

18      Q.   Am I right?

19      A.   If you do the repeat test and they pass, no.

20          To be clear, there is FDA guidance on doing

21  just that.

22      Q.   We have only got a couple of minutes left on

23  the tape, so we might as well take our break now.

24          THE VIDEOGRAPHER: Please stand by.

25          MR. MORIARTY:  And we're off the record?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 107

1           THE VIDEOGRAPHER: We are going off the record.

2       The time is 11:02 a.m. This is the end of Tape

3       Number 2.

4           (A recess is taken.)

5

6   CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

7           THE VIDEOGRAPHER: We are back on the record.

8       The time is 11:12 a.m.  This is the beginning of

9       Tape Number 3.

10      Q.    Now, Dr. Somma, I touched very briefly

11  earlier on the concept of batch yields; correct?

12      A.    Yes, sir.

13      Q.    And would you agree with me that if you

14  consistently put too much active pharmaceutical

15  ingredient into your solid oral dose, it could be

16  detected at a number of different places; and one

17  might be the inventory of your active pharmaceutical

18  ingredient; correct?

19      A.    Absolutely.

20      Q.    Another could be at the blend uniformity

21  stage.  Is that correct?

22      A.    That is correct, assuming the sampling and

23  the testing is good, sure, yeah.

24      Q.    Another could be your finished product stage?

25      A.    Absolutely.  And at that stage it becomes

Russell Somma, Ph.D.                                    July 1, 2010

Page 108

1    compounded by the blend part and the compression part.

2         Q.    Okay.

3         A.    You can still find it.  I agree with you.

4         Q.    Sure.  And if there was testing done by an

5    outside entity for whatever reason, it could

6    theoretically be picked up there; correct?

7         A.    Theoretically, yes.

8         Q.    All right.  And if you were consistently

9    putting too much adverse -- I mean active

10   pharmaceutical ingredient into your product and it had

11   the potential to harm patients, another potential

12   place to see a problem would be an increase in your

13   adverse event reporting.  Is that true?

14        A.    I would -- I would agree with that, yes.

15        Q.    Okay.

16        A.    It's a true statement.

17        Q.    Now, I think you told me earlier you are not

18   an expert in pharmacovigilance; right?

19        A.    No, sir.

20        Q.    Have you done any study in this case of

21   Actavis' pharmacovigilance or their adverse effect

22   reporting rates?

23        A.    No, sir.

24        Q.    And a pharmacovigilance expert for the

25   plaintiffs, a Dr. Frank, was deposed yesterday, and I

Russell Somma, Ph.D.                                    July 1, 2010

Page 109

1   know you don't know anything about what she said, but

2   would you generally defer to an expert like her in

3   pharmacovigilance on the subject -- on that subject in

4   this case?

5           MR. MILLER:  Object to form.

6       A.   Absolutely, Matt.

7       Q.   Okay.  And to stick with this batch yield

8   concept, if a company consistently made double thick

9   tablets, there would be a number of places you might

10  catch that as well; correct?

11          MR. MILLER:  Object to form.

12      A.   You would expect to catch that at certain

13  places.  I would have to agree with that.

14      Q.   For example, even if we just worked

15  backwards, if you used the appropriate amount of

16  ingredients from the start but made double-thick

17  tablets, you wouldn't have as many tablets; right?

18      A.   If you made all of them double thick. Yeah.

19      Q.   Right.

20      A.   Occasionally one, Matt; really,

21  realistically, you couldn't detect it.

22      Q.   I understand that.  But I'm saying if you

23  made lots of them, you wouldn't have as many tablets;

24  right?

25      A.   You're correct.

Russell Somma, Ph.D.                                    July 1, 2010

Page 110

1        Q.    Okay.

2        A.    You're correct.

3        Q.    Hence, you wouldn't have as many bottles;

4    right?  To fill at the packaging station?

5        A.    You're correct, yeah.

6        Q.    And those sort of things are looked at by

7    companies as further quality checks to see if the

8    processes are following their validated methods;

9    right?

10       A.    Absolutely correct, Matt.  The problem would

11   have to be pretty extreme, though, to pick it up in

12   that manner.

13       Q.    Okay.  Well, it sounded to me like your

14   pharmaceutical consulting engagement where they had

15   extra-thick tablets was an instance where there were

16   just a few among either a batch or several batches;

17   correct?

18       A.    That's right.

19       Q.    Was it one batch?

20       A.    I looked at the batch that the sample was

21   returned from.

22       Q.    Did they only find them in one batch?

23       A.    I don't know what -- to be perfectly honest,

24   I don't know what else they found.  I did not find any

25   indication of them in the batches, before and after, I

Russell Somma, Ph.D.                                    July 1, 2010

Page 111

1   looked at; no, sir.  There were no complaints, no

2   returns, no nothing.

3        Q.   Okay.  And theoretically in order to actually

4   harm patients, for enough of these to get out into a

5   lot of bottles and out through the entire distribution

6   system over years and years, you would have to make a

7   lot of extra-thick tablets; wouldn't you?

8             MR. MILLER:  Object to form.

9        A.   I guess, but it only takes one bad tablet to

10  create a harm, and that's why this complaint was dealt

11  with like this particular company that I worked for,

12  yeah.

13       Q.   Well, I think we established that you are not

14  a pharmacokineticist, a pharmacologist; you are

15  certainly not a physician; correct?

16       A.   Definitely not.

17       Q.   You don't know whether one Digitek tablet

18  that was extra thick would harm a patient or not; do

19  you?

20       A.   No, sir.  And the fact is that we don't even

21  know what the composition of that thick tablet was.

22       Q.   There could be an extra-thick tablet that's

23  just bigger because it wasn't compacted appropriately;

24  right?

25       A.   So that would be -- that is certainly within

Russell Somma, Ph.D.                                    July 1, 2010

Page 112

1    the realm of possibility, yes, sir.

2         Q.    All right.  So if you subjected that tablet

3    to a hardness testing, it might shatter like an egg;

4    correct?

5         A.    If it would survive packaging, yes, sir.

6    Which is what friability and hardness is supposed to

7    prevent, right.

8         Q.    Do you know how many people in the United

9    States were described digoxin between 2006 and 2008?

10        A.    No, sir.

11        Q.    Do you know how many prescriptions were

12   written for digoxin between 2006 and 2008?

13        A.    No.

14        Q.    Do you know how many people were taking

15   Digitek between 2006 and 2008?

16        A.    No, sir.

17        Q.    Do you know how many prescriptions were

18   written for Digitek between 2006 and 2008?

19        A.    No, sir.

20        Q.    Now, do you know the theoretical batch size

21   of a Digitek 125 microgram batch?

22        A.    4.8 million.

23        Q.    And the theoretical size for a 250 microgram

24   is what?

25        A.    I think it was 4.2 million, but that's by

Russell Somma, Ph.D.                                    July 1, 2010

                                                         Page 113

1   memory.

2        Q.   Okay.

3        A.   I don't know if that's correct.

4        Q.   So if you do the math of 152 recalled

5   batches, you're up in the 688.2 million range for

6   tablets; are you not?

7        A.   Yes.

8        Q.   Depending on how many batches of each?

9        A.   How many tablets are made; yes, sir.

10       Q.   All right.

11       A.   It's 152 times 4.8, right, okay.

12       Q.   Do you know how many were recalled in either

13  of the two dose strengths?

14       A.   No, sir.

15       Q.   Of the number of batches that were actually

16  recalled from the market, do you know how many of

17  those tablets never made it to consumers?

18       A.   No, sir.

19            MR. MILLER:   Object to form.

20       A.   No, sir.

21       Q.   You know that there was a recall; correct?

22       A.   From what you told me, 152 batches; yes, sir.

23       Q.   Well -- and tablets were supposed to be sent

24  from pharmacies and hospitals that still had them back

25  to a recall center; correct?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 114

1      A.   Right, I was aware of that, yes, sir.

2      Q.   Do you know how many tablets were returned?

3      A.   No, sir.

4      Q.   So I want you to assume that -- and I just

5   keep referring to the recall batches more for

6   convenience, but if you want to go back to 2004, we

7   can.

8           Do you know whether each batch of Digitek

9   that was made between 2004 and 2008 was subjected to

10  quality control, USP method, finished product testing?

11          MR. MILLER:   Object to form.

12     A.   Based on what I've seen, every batch was

13  tested, yes, sir.

14     Q.   Right.  And you don't know of any that failed

15  that testing; do you?

16     A.   To my knowledge, no, sir.

17     Q.   And you don't have any question or criticism

18  of the sample size or the method they used; correct?

19     A.   No, sir.

20     Q.   Or the integrity of the data?

21     A.   No, sir.

22     Q.   So what I want to ask you is about testing

23  that was done by other people.

24     A.   Okay.

25     Q.   Do you know what the batch certification

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 115

 1   program was?

 2      A.   That they -- as I recall, based on what I've

 3   read, it was samples had to be provided to FDA for

 4   them to confirm at their laboratory that these met

 5   requirements.

 6      Q.   Right.  Was that going on when you worked at

 7   Novartis in the '90s?

 8      A.   I wouldn't know that, sir.  I wouldn't.

 9      Q.   All right.  I want to hand you what actually

10   should be in the stack, Exhibit 4?

11      A.   It was right on the top, yes.

12      Q.   It should be near the top.  I had them in

13   order.

14      A.   It was right here.  I remember looking at it.

15      Q.   Okay.  Do you have Exhibit 4?

16      A.   That's it.

17      Q.   That's a letter to Amide at the time from

18   FDA, is it not?

19      A.   Yes, sir.

20      Q.   Certifying nine batches of Digitek; correct?

21      A.   Uh-huh, yes, sir.

22      Q.   Presumably all tested by FDA itself.  Is that

23   right?

24      A.   That's how I understand that, yes.  And they

25   all met requirements.
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 116

 1      Q.    And Exhibit 5 is in that stack?

 2      A.    Yes, it is.

 3      Q.    Is that a July, 1995 letter from FDA to Amide

 4   exempting them from the batch certification process?

 5      A.    Yes, it is.

 6      Q.    Presumably at that point FDA was confident

 7   that Amide was making the product within its

 8   specifications consistently; correct?

 9            MR. MILLER:  Object to form.

10      A.    As far as I read this, yes.  Everything was

11   as they anticipated it would be.

12      Q.    Do you know what Quantic Regulatory Services

13   is?

14      A.    It's a consulting firm as far as I know, sir.

15      Q.    Do you know anything about them?

16      A.    Other than that their specialty is consent

17   decree remediation.  That's the only thing I know

18   about them.

19      Q.    Do you know if they are reliable?

20      A.    I couldn't say that one way or the other,

21   sir.

22      Q.    Are they well-regarded by FDA?

23            MR. MILLER:  Object to form.

24      A.    I think that they are on the list of people

25   that FDA says to use in consent decree remediation.  I

Russell Somma, Ph.D.                                    July 1, 2010

Page 117

1    would think that says it right there.

2        Q.    Okay.  And I'd like you to look in the

3    exhibit stack for Exhibit 22 and 23.  Do you have 22

4    and 23?

5        A.    Yes, I do, Matt.

6        Q.    All right.  I'm going to have to do this from

7    memory because I can't find my copies of those two

8    exhibits, but 22 should be a warning letter from the

9    FDA.  Is that right?

10       A.    That's what it says, yes, sir.

11       Q.    And -- oh, I found it.

12             At the back, second-to-last page, last

13   paragraph.  They say, "We feel that to provide such

14   assurance, your firm should promptly initiate an audit

15   program by a third party having appropriate cGMP

16   experience to provide assurance that all marketed lots

17   of drug products that remain within expiration have

18   their appropriate identity, strength, quality and

19   purity."

20             Did I read that correctly?

21       A.    Yes, you did.

22       Q.    This is an invitation by the FDA in a warning

23   letter to hire a consultant; correct?

24             MR. MILLER:  Object to form.

25       A.    As I understand it, yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 118

```
 1              MR. MORIARTY:  All right.  What's wrong with
 2       the form of that question?
 3              MR. MILLER:  I object to the term
 4       "invitation."
 5              MR. MORIARTY:  Okay.
 6       Q.   Let's get back to the basic definition of a
 7   warning letter.  A warning letter is not a "you must"
 8   in the eyes of the FDA; correct?
 9       A.   Yes, Matt.  I recall we discussed it and it
10   was informal.
11       Q.   Right.  And it is urging voluntary compliance
12   with the regs; is it not?
13       A.   Yes, sir.  It's -- you don't ignore them,
14   Matt.  Let's put it that way.
15       Q.   I understand from a company perspective you
16   wouldn't want to ignore them, but --
17       A.   Gun to your head?
18       Q.   "Invitation" isn't an inappropriate word
19   when -- in your mind, when I asked you that question;
20   is it?
21       A.   To be honest, I was thinking what -- what
22   they were asking here/ and to me, yeah, well, that
23   means you better get yourself a consultant, period,
24   end of story.
25       Q.   Okay.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 119

1      A.    You know.

2      Q.    All right.

3      A.    What you call it, whatever.

4      Q.    All right.  Let's go to Exhibit 23.

5            Have you ever seen Exhibit 23 before?

6      A.    No, sir.

7      Q.    All right.  Exhibit 23, do you know --

8            MR. MORIARTY: Let me withdraw and start over.

9      Q.    Do you know that in response to Exhibit 22,

10   Actavis went out and hired Quantic Regulatory Services

11   to do the remediation of that warning letter?

12     A.    I did not know that as fact.

13     Q.    Okay.  Well, I want you to assume that my

14   client hired Quantic, and that Quantic looked at

15   batch -- batch records.  Okay?

16           Now, if you look, if you flip through here

17   you will see that obviously pages are redacted with

18   the names of other products, but at Bates Page

19   1867202, 1867202, you see that there are Digitek

20   batches there?

21     A.    Yes, sir.

22     Q.    And then if you flip further back to Bates

23   Page 1867214, and spilling over onto the next page,

24   there are a number of other Digitek batches; correct?

25     A.    Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 120

1      Q.   Do you know what kind of batch record review

2   they performed?

3      A.   No, sir.

4      Q.   You don't know anything about the protocol

5   they used to analyze the batch records?

6      A.   No, Matt, I don't know.

7      Q.   All right.  Do you know how many of these

8   batches wound up being in the recall --

9      A.   No, sir.

10     Q.   -- batches?

11     A.   No, sir.

12     Q.   Let's go back to the cover page.

13     A.   This?

14     Q.   Yes.  It says, "On December 21st, 2007,

15   Quantic provided Actavis with a statement indicating

16   the audit was complete and the manufacturing and

17   laboratory records have reliably confirmed the

18   identity, strength, quality and purity of the marketed

19   products."

20          Do you see that statement?

21     A.   Yes, sir.

22     Q.   If that is in fact was Quantic concluded, do

23   you have any reason to disagree with them?

24     A.   No, sir, I don't, based on what I know and

25   what I've read.

Russell Somma, Ph.D.                                July 1, 2010

Page 121

1        Q.    Do you know whether or not FDA accepted
2    Quantic's analysis and this letter from my client in
3    remediation of the warning letter, or whether they
4    rejected it?
5              MR. MILLER:   Object to form.
6        A.    No, sir.
7        Q.    Okay.  I'm going to go through a number of
8    exhibits in this stack, so --
9        A.    Okay.
10       Q.    Let's go to Exhibit 24.  Do you have 24?
11       A.    Yes, Matt, I do.
12       Q.    Have you ever seen it before?
13       A.    No, sir.
14       Q.    I'm sorry?
15       A.    No, sir.
16       Q.    You didn't see it yesterday when you met with
17   Pete and Meghan?
18       A.    No, sir.
19       Q.    Do you know what a 484 sample is?
20       A.    Yes, sir.  It's a sample collection, sir.
21       Q.    Did FDA ever come to Novartis and collect 484
22   samples of drug products?
23       A.    Yes, sir, but I was not involved.  I just
24   knew of it, sir.
25       Q.    So if you go to the first page of Exhibit 24,

Russell Somma, Ph.D.                                          July 1, 2010

                                                             Page 122

 1   and you and I might have to get a lot closer because I
 2   can run you through these quickly.
 3              But if you look here --
 4   A.   Okay.
 5   Q.   -- this is Sample 377410.
 6   A.   Yes, sir.
 7   Q.   Do you see that?
 8   A.   Yes, sir.
 9   Q.   Down to the left, it was collected February
10   9th of 2007.  Do you see that?
11   A.   Oh, yeah, great.  Right here.  February 26.
12   Q.   I'm pointing to these over here if you want
13   some guidance.  I've highlighted them.
14   A.   I'm sorry.  Okay.  Yeah.  February 9th,
15   right.
16   Q.   And in the middle where I'm pointing with my
17   pinky, it has the manufacturer's batch number as
18   70078A1.  Do you see that?
19   A.   Yes, sir.
20   Q.   Down here it describes the sample, 200 count
21   bottles of digoxin, .125.  Is that correct?
22   A.   Right.
23   Q.   And if you want to flip through all this you
24   can, but I will represent to you that they subjected
25   this to USP method, assay, content uniformity --

Russell Somma, Ph.D.                                      July 1, 2010

Page 123

```
 1      A.   Right.

 2      Q.   -- testing, and all the backup data from the

 3  chromatographs is attached to this.  Okay?

 4           Do you have any reason to disagree with any

 5  of what I just said?

 6      A.   Absolutely not.  Just for clarity, Matt,

 7  these are -- this was done by the FDA laboratory or

 8  somebody; correct?

 9      Q.   They tested it; right?

10      A.   Yeah, fine.

11      Q.   To your knowledge, FDA does have labs that do

12  this; correct?

13      A.   Yes, sir, they do, forensic laboratories.

14      Q.   And if you go to this page, if you can see

15  this page, in the upper right-hand corner where it

16  says, "District or lab," it says, "DEN/DO."

17           They have a lab in Denver; don't they?

18      A.   Uh-huh.

19      Q.   Yes?

20      A.   Yes.

21      Q.   I'm sorry to say that, but Mark needs to hear

22  it.

23      A.   I understand, sir.  It's a bad habit of

24  mine.

25           (A discussion is held off the record.)
```

Russell Somma, Ph.D.                                      July 1, 2010

                                                          Page 124

1      Q.   And to your knowledge, did this sample pass

2   all of the tests to which the FDA subjected it?

3           MR. MILLER:  Object to form.

4      A.   Well, I haven't read through, but my -- based

5   on what's here, meets, yes.

6      Q.   All right.

7      A.   There is no reason to think that it doesn't.

8      Q.   Let's go to Exhibit --

9           Well, do you have any -- have you seen any

10  evidence to indicate that this batch did not meet all

11  of its specifications?

12     A.   Absolutely not.

13     Q.   Let's go to Exhibit 25.  Is this another 484

14  sample report?

15     A.   It's similar format of sample collection,

16  yes.

17     Q.   Up here it says Sample 44881; does it not?

18     A.   Yes, sir.

19     Q.   And down here if you flip through this, you

20  can see that they collected -- if you go to the second

21  page, on December 3rd, 2007 they collected from a

22  Wal-Mart Pharmacy warehouse 200 count bottles of

23  Digitek; right?

24     A.   Uh-huh, yes, sir.

25     Q.   Batch 70298A1; right?

Russell Somma, Ph.D.                                          July 1, 2010

Page 125

```
 1       A.    70298A1, yes, sir.
 2       Q.    And on the first page, if you flip back, they
 3  have a Lab Conclusion near the bottom.  It says, "The
 4  product meets specifications for identification,
 5  dissolution and content uniformity." Is that right?
 6       A.    Yes, it does say that.
 7       Q.    Now, have you seen any evidence in any
 8  documents that you've reviewed that shows that any of
 9  the tablets from this batch were out of specification?
10       A.    No, sir.  But where does it say the product
11  meets specifications on this one?  Did I miss that?
12  I'm sorry.  I don't --
13       Q.    Are you talking about Exhibit 24?
14       A.    I'm sorry.  24, yeah.
15       Q.    Do you want to dig through it?
16       A.    Well, I just -- it's not a headline like this
17  one is.  I can see that.
18       Q.    If you want to review it, go ahead.  If you
19  find that that batch when tested by FDA was out of
20  specs --
21       A.    No.
22       Q.    -- let me know.
23       A.    I'm agreeing it's in spec.  I'm just
24  wondering how come they don't put it in the front on
25  this one.  Go ahead.
```

Russell Somma, Ph.D.                                July 1, 2010

                                                    Page 126

 1      Q.   Let's go to Exhibit 26.   Look at the second

 2   page of that one.   I don't know why it got marked that

 3   way.

 4      A.   Yes, Matt.

 5      Q.   Do you have it?

 6      A.   Yes, sir.

 7      Q.   It's Sample Number -- the shading is so bad.

 8   Oh, Sample 448892.

 9      A.   Yes, sir.   And that meets requirements.

10      Q.   And it was collected in December of 2007 from

11   a Wal-Mart Pharmacy?

12      A.   Yes it was.

13      Q.   And it's Batch 70664A.   Is that right?

14      A.   Yes, it is.

15      Q.   And on the first page of Exhibit 26, "The

16   product meets specifications for identification,

17   dissolution and content uniformity."

18           Do you see that?

19      A.   Yes, sir.

20      Q.   Have you seen any evidence the tablets from

21   this batch were out of specification?

22      A.   Not in anything I reviewed.

23      Q.   Let's go to Exhibit 27.

24      A.   Okay.

25      Q.   Before I ask you about Exhibit 27, when you

Russell Somma, Ph.D.                                      July 1, 2010

                                                          Page 127

 1    worked for Novartis, were you ever made aware after

 2    the fact that FDA had done a 484 sample and passed

 3    your company's products?

 4        A.    Not customarily, Matt, no.

 5        Q.    Okay.  As a consultant when you are doing an

 6    investigation about the integrity of the product in

 7    the field --

 8        A.    Yeah.

 9        Q.    -- would you inquire about 484 samples that

10    may have been tested by FDA itself?

11        A.    In -- when we would interview the client,

12    just to get a sense of what the level of involvement

13    was, yes, sir.

14        Q.    Okay.  Is it interesting and helpful

15    information to know?

16        A.    It's another set of eyes looking at the

17    information in an independent laboratory; always good

18    to have as a backup validation, Matt.

19        Q.    It's -- is it more than a set of eyes?

20    It's -- it's scientific testing of tablets; right?

21        A.    It's scientific testing of tablets.  I

22    apologize for denigrating it to "eyes," but that's

23    what I mean; it's another set of expertise looking at

24    it.  Independent, if it's regulatory or somebody else.

25        Q.    Okay.  And FDA, when they take the samples,

Russell Somma, Ph.D.                                    July 1, 2010

Page 128

1    can take as many as they want; correct?

2         A.   That I don't know, sir.

3         Q.   Can they test as many as they want?

4         A.   Again, I'm ignorant of that fact.  I don't

5    know.

6         Q.   Do you assume that FDA chooses a sample size

7    that they think is statistically significant?

8         A.   Based on uniform --

9              MR. MILLER:  Object to form.

10        A.   I guess that's a reasonable estimate based on

11   batch size.  I would also think that FDA could take

12   whatever they want.

13        Q.   Okay.  So let's go to Exhibit 27.

14        A.   Okay.

15        Q.   This is FDA Sample 453913; correct?

16        A.   453913?

17        Q.   Yes?

18        A.   Yes, sir, it is.

19        Q.   Okay.  Collected February 15, 2008; right?

20             It's up here in the left-hand corner.

21        A.   Sorry.  Yes, sir.

22        Q.   Batch 70737A; correct?

23        A.   Yes, sir, yes, sir.

24        Q.   And it was collected from a warehouse -- I'm

25   not sure where.  But if you go to the third page,

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 129

 1    there's a Lab Conclusion; right?

 2         A.    Yes.

 3         Q.    Did it pass all the tests to which FDA

 4    subjected it?

 5         A.    It says that it meets USP requirements for

 6    identification, CU and dissolution; yes, sir.

 7         Q.    Let's go to Exhibit 28.

 8               Now, I know before today you hadn't seen

 9    these exhibits, but did you know generally that FDA

10    had repeatedly tested Digitek in the field?

11         A.    No, sir.

12         Q.    Do you think for your analysis in this case,

13    it would have been important for you to know that?

14         A.    No, sir.

15         Q.    You don't think statistically significant

16    testing by FDA itself corroborating my client's QC

17    results is significant information?

18               MR. MILLER:  Object to form.

19         A.    I would say based on balance, if a firm comes

20    to me and offers a batch record which they say is

21    approved, I don't need any outside corroboration.  To

22    answer your question specifically, that would have

23    been nice, but I take it at face value what the client

24    has done.

25         Q.    All right.  So Exhibit 28 is FDA Sample
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 130

 1    454866; is it not?

 2         A.    454866, yes.

 3         Q.    And it's another sample of a Digitek batch;

 4    correct?

 5         A.    Yes, sir.

 6         Q.    And if you look way at the back, the third

 7    from the last page, you will see it was collected

 8    February 15th, 2008.  Upper left corner.

 9         A.    Okay, yes, sir.

10         Q.    And it's Batch 70811A; correct?

11         A.    Yes, sir.

12         Q.    It was collected from a McKesson warehouse.

13    Is that right?

14         A.    In Duluth, yes, sir.

15         Q.    And let's go all the way to the front.

16               Is there a Lab Conclusion?  First page.

17         A.    Same as before, Matt:  Meets requirements for

18    dissolution and content uniformity.

19         Q.    Let's go to Exhibit 29, please.  Do you have

20    it?

21         A.    Yes, sir.

22         Q.    Do you see that it is FDA Sample 462746?

23         A.    Correct; yes, sir.

24         Q.    And if you go to the third page, you can see

25    that it's another Digitek sample; correct? Very top in

Russell Somma, Ph.D.                              July 1, 2010

                                                    Page 131

 1   the center?

 2        A.   Right.

 3        Q.   And just below that, they received this

 4   sample in April of 2008; right?

 5        A.   4/3/08; yes, sir.

 6        Q.   And if you go back to the second page -- I'm

 7   sorry.  Well, let's just go to the Lab Conclusion.

 8        A.   Uh-huh.

 9        Q.   Second page.  Did it pass all the tests to

10   which FDA subjected it?

11        A.   Lab Conclusion, it meets specifications; yes,

12   sir.

13        Q.   Was this in a blister pack?

14        A.   I'll have to read it, Matt.

15        Q.   Third page, halfway down in the big "Summary

16   of Analysis" box.  Do you see that?

17        A.   Yeah, I guess I do.

18        Q.   All right.  And I want you to assume that

19   this is Actavis batch 70300A.   Okay?

20        A.   Yes, sir.

21        Q.   Have you seen any information to indicate

22   that that Actavis batch had out-of-specification

23   tablets?

24        A.   No, I did not.  Matt, and to confirm your

25   first question, it is in a blister, based on this

Russell Somma, Ph.D.                                    July 1, 2010

Page 132

 1   description.

 2       Q.   And I didn't ask you that last question on

 3   several of these batch exhibits; but have you seen any

 4   evidence to indicate that any of the batches I've

 5   asked you about with these FDA samples were out of

 6   specification?

 7       A.   Nothing that would -- nothing that would

 8   bring me to that conclusion.

 9       Q.   All right.  So let's go to Exhibit 30.

10            Is it FDA Sample 462753?

11       A.   Yes, it is.

12       Q.   Was it collected in March of 2008?

13       A.   March 21st, 2008; yes, sir.

14       Q.   From a Wal-Mart in California?

15       A.   Right; yes, sir.

16       Q.   And the batch says, "8A 332."

17            Do you see that?

18       A.   Yes, sir.

19       Q.   And that is a UDL batch number, which

20   corresponds to --

21       A.   UDL is?

22       Q.   That's Batch 70834A.

23       A.   I'm sorry.  What is UDL?

24       Q.   You don't know what UDL is?

25       A.   No.

Russell Somma, Ph.D.                                    July 1, 2010

Page 133

1      Q.    Okay.  We'll get to that.

2      A.    Okay.

3      Q.    This is a Digitek sample, is it not?  Exhibit

4   30?  It's right --

5      A.    Digitek, right.  Got it.

6      Q.    And I'd like you to go to the third page of

7   the exhibit.

8      A.    Got it.

9      Q.    Is there a Lab Conclusion?

10     A.    There sure is.

11     Q.    What's the conclusion?

12     A.    That they meet specifications for identity --

13   identification, dissolution and content uniformity.

14     Q.    Do you have any evidence from anything in

15   front of you to indicate that any tablets from this

16   batch were out of specification?

17     A.    No.

18     Q.    Let's go to Exhibit 31, please.

19           And I'll represent to you when you get back

20   to 2002, their records get a lot thinner.

21           Is this another 484 sample?

22     A.    It looks to be.

23     Q.    From March of 2002?

24     A.    Yes.

25     Q.    And the -- for Digitek?

Russell Somma, Ph.D.                                July 1, 2010

                                                      Page 134

 1      A.   Product description; yes, it is.

 2      Q.   Is there a Lab Conclusion in the center of

 3  the page?

 4      A.   It meets USP's uniformity of dosage unit

 5  specifications, but it says nothing about dissolution.

 6      Q.   Well, why don't you go to the very last test

 7  on the page?

 8      A.   There it is.

 9      Q.   What it does it say about dissolution?

10      A.   There it is.  Meets dissolution on -- I

11  didn't read that far.

12      Q.   You don't have any evidence that any of these

13  tablets from that batch were out of spec; do you?

14      A.   No, sir.

15      Q.   Are you aware that at least this testing

16  exceeds the recall parameter dates?

17      A.   Well, this is -- is that based on this date,

18  Matt, '02?

19      Q.   Well, do you know when the recalled batches

20  were first manufactured?

21      A.   I don't know that date, to be honest with

22  you.

23      Q.   All right.  Let's go to Exhibit 32, please.

24           Is this another FDA Form 484 sample?

25      A.   Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 135

  1        Q.    Sample 157504?

  2        A.    Yes, sir.

  3        Q.    For Digitek?

  4        A.    Yes, sir.

  5        Q.    Center of the page, what was the Lab

  6   Conclusion?

  7        A.    USP uniformity of dosage units.  It looks

  8   like it meets.  It also meets USP requirements for

  9   dissolution.

 10        Q.    All right.  Exhibit 33, please.

 11              Is this another FDA 484 Digitek sample?

 12        A.    Yes, it is.

 13        Q.    Sample 178890?

 14        A.    Correct.

 15        Q.    Now, in the Lab section, does it say anything

 16   other than "in compliance"?

 17              Do you see where I'm talking about?

 18        A.    Yeah, yeah, right in the middle there, "in

 19   compliance."  I don't see any other comment.  It says

 20   that in two places.

 21        Q.    Okay.  Would you assume that that's -- that

 22   it passed both content uniformity and dissolution?

 23        A.    I would, simply because this is the same

 24   laboratory that did the prior, and it uses the "in

 25   compliance," and it does note that it meets.

Russell Somma, Ph.D.                                    July 1, 2010

Page 136

 1      Q.    Okay.

 2      A.    Even though it's absent here.

 3      Q.    All right.

 4      A.    Okay?

 5      Q.    So look at Exhibit 34, please.

 6            Is that another FDA Form 484 sample report?

 7      A.    178891, yes, it is.

 8      Q.    And -- for Digitek?

 9      A.    Correct.

10      Q.    And halfway down the page, does it indicate

11   in two different places that the product was in

12   compliance?

13      A.    That's correct.

14      Q.    Now, have you read anything in any of the

15   material that you have seen to indicate to you who UDL

16   was?

17      A.    I have to admit that I cannot remember UDL.

18      Q.    All right.

19      A.    To be perfectly honest, I think I've asked

20   the question.  I just do not remember the answer.

21      Q.    From all the material that you reviewed from

22   Actavis, did Actavis always package its product in

23   bottles?

24      A.    Everything I looked at went into bottles,

25   yes, sir.

Russell Somma, Ph.D.                              July 1, 2010

Page 137

1    Q.   All right.  You know the manufacturing of --
2  and packaging of pharmaceuticals, so at some point
3  what would -- what assumption would you make about how
4  Digitek got into blister packs?
5    A.   They would have had to have gone with a third
6  party contractor to do that, if they didn't have the
7  capability themselves.
8    Q.   Okay.  I want you to assume that that
9  third-party contractor is UDL.  Okay?
10   A.   I got it.
11   Q.   Did Novartis make any product in blister
12 packs?
13   A.   We were a European-based company, Matt. Every
14 product was offered in blisters.
15   Q.   Okay. What did Novartis do --
16        (A discussion is held off the record.)
17   A.   Every product we made was made in blisters.
18 We distributed in Europe.
19   Q.   What did Novartis do to make sure that
20 tablets would fit into blisters?
21        MR. MILLER:  Object to form.
22   A.    We would -- we would design the blisters such
23 that it would fit within a normal range.  What that
24 means, Matt, was:  We didn't custom-make blister
25 tools.  We made sure that our tablets were made to

Russell Somma, Ph.D.                                    July 1, 2010

Page 138

1    engage, that would accommodate blister tooling

2    downstream.

3        Q.    Well, what would happen if by accident,

4    Novartis made some double-thick tablets?  Would they

5    fit into your blisters?

6        A.    This would be more of an opinion, I think,

7    for me.  I would think based on what I've seen in the

8    past, some would, some wouldn't.  I'm not trying to be

9    evasive here.

10       Q.    In pharmaceutical packaging, you want the

11   blister to be relatively tight to the tablet; don't

12   you?

13             And I'll give you two reasons why.  Do you

14   agree with me it should be tight to the tablet,

15   relatively speaking?

16             MS. CARTER:  Object to form.

17       A.    In general I agree with you, Matt.  I'm

18   trying to think -- from my experience, I'm trying to

19   picture some of it.

20       Q.    Well, you don't want a lot of space --

21       A.    No.

22       Q.    -- because the tablet could bounce around and

23   break; right?

24       A.    We both agree to that.  It's not going to

25   rattle like a kid's toy.  Okay?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 139

1        Q.   And if you use too much packaging, you are
2   kind of wasting resources; aren't you?
3        A.   Precisely.
4        Q.   All right.
5        A.   We are in agreement there.
6        Q.   All right.  Do you know anything about what
7   UDL did to check tablet thickness of Digitek before it
8   put it in blister packs?
9        A.   No, sir.
10       Q.   Okay.  Could you look in the stack for
11  Exhibit 35?  It's right there.
12       A.   Sure.  It's right here.
13       Q.   All right.  Look at the first page.  First of
14  all, is this on Celsis Analytical Services letterhead?
15       A.   Yes, Matt, that's what it says.
16       Q.   Do you know who Celsis Analytical Service is?
17       A.   I would just assume is a third-party
18  analytical laboratory.  That's all I can say.  I have
19  not heard of them myself.
20       Q.   In the center, do you see the names of the
21  three samples?
22       A.   Digitek, yes, sir.
23       Q.   Three different batches?
24       A.   Yes, sir.
25       Q.   And at the very bottom, the date is January

Russell Somma, Ph.D.                                        July 1, 2010

                                                           Page 140

1    29th, 2007?

2         A.    Yes, sir.

3         Q.    I want you to flip back to Bates Page

4    UDL011685.  I skipped a few zeros.  It's not very far

5    back.

6         A.    Yeah.  Got it.

7         Q.    Do you see that?  Does it appear to you that

8    this is the certificate of analysis for this product

9    by Actavis?

10        A.    That's what it says; yes, sir.

11        Q.    All right.  And then if you flip back to --

12   further, do you see that Celsis did some independent

13   testing of this?

14        A.    Yes, sir.

15             MR. MILLER:  Now, when you say flip back a

16        little bit further, do you have a specific page?

17             MR. MORIARTY:  There's lots of pages, Pete.

18        Q.    I would start at UDL11687.

19        A.    Yes, sir.

20        Q.    And go back.  All right?

21             Does it appear to you from 11687 that this

22   product passed the tests to which Celsis submitted it?

23             I'm sorry.  That was a bad question.

24             From Page 11687, does it appear to you

25   that -- that the product passed the tests to which

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 141

 1   Celsis subjected it?

 2        A.   Based on these numbers, yes, Matt, it did --

 3        Q.   All right.

 4        A.   -- pass.

 5        Q.   Now let's go back to 11717.

 6        A.   Okay.

 7        Q.   Is that the certificate of analysis for a

 8   different batch than we just discussed?

 9        A.   Sorry, Matt.  I went to the wrong page.  Can

10   we have that page number again, Matt?

11             MR. MILLER:  11717.

12             (A discussion is held off the record.)

13        Q.   11685.  It's Batch 61100.

14             The one I'm now asking you about at 11717 is

15   Batch 61097.  Okay?

16        A.   I got you.

17        Q.   So we're up to a different batch; correct?

18        A.   I got it now, yes, sir.

19        Q.   All right.  And if you go two pages more to

20   11719, does it appear to you that the product passed

21   the tests to which Celsis subjected it?

22        A.   Yes, it does.

23        Q.   Let's go all the way back to 11746.

24        A.   Okay.

25        Q.   Is this the Actavis certificate of analysis

Russell Somma, Ph.D.                                      July 1, 2010

Page 142

1    for yet a third batch, 60992A?

2         A.    Yes, it is, Matt.

3         Q.    And if you go two more pages, does it appear

4    that the product passed all the tests to which Celsis

5    subjected it?

6         A.    Based on the information here, it met every

7    requirement.

8         Q.    Have you seen any evidence in any material

9    that you reviewed to indicate that any of these three

10   batches had out-of-specification testing by anyone?

11        A.    These three batches, no Matt.  I do not.

12        Q.    Let's go to Exhibit 69.  Is 69 in the stack?

13              (A discussion is held off the record.)

14        A.    69, got it.

15        Q.    All right.   Is this a UDL Lab document?

16        A.    Yes, it is.

17        Q.    And if you look a little bit way down, this

18   is regarding Actavis Batch 80111A; correct?

19        A.    Yes, it is.

20        Q.    And if you go to the -- about the middle.

21   It's UDL7655.

22        A.    Yes, sir.

23        Q.    Did they measure Digitek tablets in two

24   dimensions?

25        A.    Yes, they did.

Russell Somma, Ph.D.                                    July 1, 2010

Page 143

1      Q.    Were any of them out of spec?

2      A.    I don't recall the spec off the top.  Is it

3   written here?  I have to go back and look.

4      Q.    It's at the very bottom.

5      A.    There it is, I see it.

6      Q.    Actually, that's not correct.  That may be

7   the range they found.

8      A.    But just for our both's sake, I'll look at

9   the batch record.  Okay?

10     Q.    Sure.

11     A.    Is that okay?

12     Q.    Oh, it's fine.  Oh, yeah. If you think it's

13   in there.

14     A.    It's in the compression sheets.

15           (A discussion is held off the record.)

16     Q.    Okay.  The thickness range for 250 micrograms

17   is 2.7 to 3.7 millimeters.

18     A.    2.7 to 3.7?  So based on that, these fall

19   well within mid range.  Okay?

20     Q.    All right.

21     A.    And just for clarity, Matt, what I was --

22   this was -- I just put down a bunch of numbers because

23   I have trouble remembering specifications.  I just

24   wrote them down on here.  Okay?  It's no big --

25     Q.    Sure.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 144

 1      A.    And I didn't have that either, just to be

 2  clear.

 3      Q.    Okay.  Let's go to Exhibit 70, which I did

 4  not mark the other day.  Here it is.

 5            Is this another UDL Laboratories sheet?

 6      A.    Yes, it is.

 7      Q.    Regarding Digitek Batch 71034A?

 8      A.    Yes, it is.

 9      Q.    And if you go to a similar spot in this

10  document, it's the last one, do you see the product

11  dimension records?

12      A.    Right.

13      Q.    And this is for another 250 microgram batch?

14      A.    I know all fall well within the mid range.

15      Q.    All within spec?

16      A.    All within spec, yes.

17      Q.    Let's go to Exhibit 71.  Here you go.

18      A.    Thanks.

19      Q.    And is this a UDL Laboratories sheet?

20      A.    Yes, it is.

21      Q.    Regarding Actavis Batch 71004A?

22      A.    Yes, it is.

23      Q.    And this is a 125-microgram lot; correct?

24      A.    Correct.

25      Q.    And if you assume that the thickness specs

Russell Somma, Ph.D.                                          July 1, 2010

                                                                Page 145

1    for that product are two to three millimeters, did all

2    these pass?

3         A.   You pulled that right off the batch record,

4    Matt?

5         Q.   I guess you'll just have to trust me.

6         A.   I'm good.

7         Q.   It's in the ANDA.

8         A.   And it's also right here, too.

9         Q.   So --

10        A.   The answer is -- the exhibit here shows that

11   this result of thickness falls within the mid range of

12   their specification thickness.

13        Q.   Okay.  Let's go to Exhibit 72.

14             Is this another UDL document?

15        A.   Yes, it is.

16        Q.   Regarding Batch 70175A?

17        A.   Right.

18        Q.   Please go to the same place. This is a 250

19   microgram batch.

20        A.   Got it.

21        Q.   Did all the 20 tablets that they measured

22   meet the specs?

23        A.   The specs being 2.7 millimeters to 3.7

24   millimeters; this batch falls right in the middle of

25   the range.

Russell Somma, Ph.D.                                          July 1, 2010

Page 146

```
 1      Q.    Okay.  Let's go to Exhibit 73.

 2            Have you ever seen this document before?

 3      A.    No, sir.

 4      Q.    Had you ever seen any of those UDL documents

 5  I just showed you?

 6      A.    No, Matt, I did not.

 7      Q.    Does this say, "UDL Internal Investigation

 8  Record"?

 9      A.    It sure does; yes, sir.

10      Q.    Do you see that this was in -- let me find

11  the date.  On the last page, May of 2008.

12      A.    Right.

13      Q.    And can you tell from the first page of

14  the -- this, that this investigation was done because

15  there was a recall going on?

16      A.    Just give me a minute, Matt.

17            Okay.  "Class 1 drug recall nationwide," got

18  it.  "Is being recalled."

19            (A discussion is held off the record.)

20      A.    Product recall is obvious based on this

21  statement, yes, sir.

22      Q.    And UDL investigated -- at the third page,

23  you can see a complaint history with this product.  Do

24  you see that?

25      A.    Just give me a sec.
```

Russell Somma, Ph.D.                                        July 1, 2010

                                                            Page 147

 1      Q.   Well, I'll tell you what.

 2           MR. MORIARTY: Let me withdraw that question.

 3      Q.   Let's go to the second page.  Do you see that

 4   under "Investigation Summary," they have a section on

 5   receiving inspection records?

 6      A.   Yes.

 7           MR. MILLER:  Wait a minute.  I'm not with you.

 8           MR. MORIARTY:  Second page, top.

 9           MR. MILLER:  Okay.  Got it.

10      Q.   And then there's a section called "Batch

11   Record Documentation"?  Do you see that?

12      A.   Yes, I see it, Matt.

13      Q.   Is there a section called "Examination of

14   Retained Samples"?

15      A.   Right.  The copy starts to get a little fuzzy

16   down there, but I can see that, yes.

17      Q.   And then on the next page at the top,

18   "Complaint History"?  Do you see that?

19      A.   Right.

20      Q.   Now, if you were going to do -- I'm sorry.

21   I'm not --

22           On the last page, it says "Stability records

23   history."  Do you see that?

24      A.   Yes, I do.

25      Q.   If you were going to do an investigation, are

Russell Somma, Ph.D.                                    July 1, 2010

Page 148

1   these the kind of things that you would look at?

2        A.   If I was aware that this was one of the

3   put-ups that I had that was problematic.  I think this

4   would be a substantive piece of information.  It would

5   certainly give me a sense to  -- of the tablet gauge.

6        Q.   Okay.

7        A.   Because certainly downstream packaging,

8   especially in something as -- as punitive as a

9   blister, it's important to know.

10       Q.   Okay.  And go to the last page.  Do you see

11  they have a "Conclusion"?  Just above the signature?

12       A.   Right.

13       Q.   Do you see that?

14       A.   "UDL is continuing a voluntary --"

15       Q.   No, no.  Above that.

16       A.   I'm sorry.

17       Q.   It says, "Conclusion."  Do you see that?

18       A.   Yes.

19       Q.   It says, "Records reviewed, retained sample

20  examination and complaint history for products and

21  lots in question demonstrate no evidence of unusual

22  events that could be related to the packaging of

23  double the thickness tablets in unit dose blisters."

24            Do you see that?

25       A.   I see it; yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                    Page 149

  1      Q.    Okay.  Let's go to number -- Exhibit 83.

  2            Good luck with this one.  I want you to take

  3   a minute to look through that.

  4            First of all, have you ever seen it before?

  5      A.    No, sir.

  6      Q.    All right.  I'm going to walk you through

  7   this.

  8      A.    All right.

  9      Q.    Do you see that this is on UDL Labs

 10   letterhead?

 11      A.    Yes.

 12      Q.    From your own knowledge of the pharmaceutical

 13   industry, would a repackager have an obligation to do

 14   dissolution testing in order to assess whether their

 15   repackaging of the product had any effect on shelf

 16   life or stability?

 17      A.    That would depend on the product.

 18   Customarily you want to make sure that the environment

 19   in which you package the product doesn't affect it.

 20   In other words, it going to be there in bulk.

 21      Q.    Okay.

 22      A.    So in that case, you'd want to do everything

 23   necessary to assure that.  Okay?

 24      Q.    So let's go back to -- let's go back to the

 25   first page, I guess.  Is this a transmittal form?
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 150

 1      A.    Yes, that's what it says.

 2      Q.    And essentially what it is telling us is that

 3   on January 29th, 2007, UDL shipped Celsis Laboratories

 4   three Digitek samples.  Is that right?

 5      A.    Yes, it is.

 6      Q.    And if we flip through the remaining pages,

 7   you see that on various other dates, UDL sent RD

 8   Laboratories in Missouri various other Digitek

 9   samples; is that right?

10      A.    Right, yes.  It looks like these are

11   stability samples.

12      Q.    Okay.  So let's go back to the actual Results

13   sections.

14           Now, I can tell you, Dr. Somma, that I have

15   read this document and I think there are 33 batches of

16   Digitek over the years that UDL sent to either Celsis

17   or RD.  Okay?  You are welcome to count them if you'd

18   like, but I just want to go through a few of them.

19      A.    Okay.

20           MR. MILLER:  What page are you on?

21      Q.    Not all 33 of them.

22           MR. MORIARTY:  I am on UDL11369.

23           MR. MILLER: Okay.

24      Q.    Do you see that this is a stability test

25   result?

Russell Somma, Ph.D.                                    July 1, 2010

Page 151

1      A.    Yeah, yes, sir.

2      Q.    For, on the right-hand side in the corner,

3  Actavis Lot 70834A?  Upper right-hand corner.

4      A.    The other right.  703 -- 70834A, yes, sir.

5      Q.    And the initial testing in October of 2007

6  showed an assay of 97.3 percent; correct?

7      A.    Yeah, yes, sir.

8      Q.    Are you familiar with this kind of stability

9  test reporting?

10     A.    Yes, sir.

11     Q.    Would you assume that the initial October of

12  2007 was what Actavis tested at the time of finished

13  product testing?

14     A.    That -- is this a confirmation -- is this

15  aligned with their results?

16     Q.    I don't know.  I'm just asking what you know

17  about this.  If you don't know, I don't want you to

18  guess.

19     A.    That I couldn't answer, then.

20     Q.    Okay.

21     A.    If they are both working with the same spec

22  and the same method and it's been transferred, it

23  should be right within -- right within experimental

24  error.

25     Q.    Okay.  So let's go to the next page, UDL

Russell Somma, Ph.D.                                    July 1, 2010

Page 152

1    11370, and in the upper right, this is Batch 70386A.

2         A.    Right.

3         Q.    Correct?

4         A.    Uh-huh.

5         Q.    And on this page in May of '07, the assay

6    result was 97.1.  Is that correct?

7         A.    97.1, yes, sir.

8         Q.    Percent?

9         A.    Percent.  Okay.

10        Q.    And if you look at the bottom on the left, it

11   says the manufacturing date of May of '07.

12             Do you see that?

13        A.    Uh-huh.

14        Q.    That's yes?

15        A.    Yes, sir.  And I see --

16        Q.    And a manufacturer's assay of 97.1 percent;

17   correct?

18        A.    Right.

19        Q.    Is it reasonable to conclude, therefore, that

20   this top part where the initial -- it lists the

21   initial assay, is the original Actavis assay when it

22   made the batch?

23             MR. MILLER:  Object to form.

24        A.    In my experience, what happens is your Time

25   Zero is usually not repeated.  That would be -- it

Rennillo Deposition & Discovery
216.523.1313          www.rennillo.com          888.391.3376 (Depo)

Russell Somma, Ph.D.                                          July 1, 2010

Page 153

1    could have been data that was there, and they just

2    used that as Time Zero.

3        Q.    Okay.

4        A.    Okay?  So Matt, that would be why they're the

5    same.

6        Q.    Right.

7        A.    But, again, I wouldn't know that for a fact.

8    That's my experience.

9        Q.    When UDL gets the certificate of analysis

10   from Actavis, it has the assay results with it?

11       A.    Right.  So that would be Time Zero.

12       Q.    Okay.  So the next section says, "Shelf life

13   testing, three months, assay result 97.2."

14             Do you see that?

15       A.    Yes, sir.

16       Q.    And that's within the specifications.  Is

17   that right?

18       A.    It sure is, yes, sir.

19       Q.    Now, if we flip back through every one of

20   these pages, is the format essentially the same, where

21   the Actavis lot is in the upper right-hand corner?

22       A.    Yes.

23       Q.    And the assay results to which either Celsis

24   or RD tested the Digitek are contained in these grid

25   charts.  Is that right?

Russell Somma, Ph.D.                                    July 1, 2010

Page 154

```
 1      A.   Yes, sir.

 2      Q.   All right.   I would like you to flip through

 3   all those pages and tell me if there was ever a

 4   stability failure of Digitek when tested at the

 5   request of UDL?

 6           MS. CARTER:  Object to the form.

 7      A.   On several occasions, Matt, these are

 8   dissolution results at the S2 level.  My experience,

 9   those would precipitate an investigation.  But did

10   they fail?  No.

11           I'm looking at specifically Page 11373.  It

12   notes it as an S2.  That just means that you increase

13   the sampling.

14      Q.   Okay.

15      A.   But, again, not knowing that part of it, that

16   usually precipitates an evaluation.  It is not per se

17   a failure.  Okay?

18           MR. MILLER:  If we're going to leave this

19       document, it might be a good time for lunch.

20           MR. MORIARTY:  Let me finish up.

21      A.   When I'm done --

22           MR. MORIARTY:  Let me finish up my section.  I

23       have another exhibit.  And maybe one or two more

24       questions.

25           MR. MILLER:  Okay.
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 155

1              (A discussion is held off the record.)

2         Q.    Do you see any stability failures?

3         A.    Other than those comments I made about S2,

4    there are no stability failures in here.

5         Q.    And stability testing is doing assay of the

6    product over time; is it not?

7         A.    Yes, it is.

8         Q.    Okay.  I want to hand you what I had marked

9    as Exhibit 84.  This is another UDL document.

10             Have you ever seen this before?

11        A.    No, sir.

12        Q.    Had you ever seen all that stability testing

13   before?

14        A.    This?  I never looked at that.

15        Q.    All right.  This is a memo, is it not, dated

16   May 5th, 2008?

17        A.    That's correct.

18        Q.    And if you go to the second paragraph, third

19   line down, it says, "UDL tests the product for

20   potential and dissolution.  In reviewing the data for

21   both strengths of Digitek, the potency showed no

22   apparent trending."

23             Let me stop there.  Have you seen anything in

24   the documents that I have given you so far to indicate

25   there was any adverse trending to the Digitek data?

Russell Somma, Ph.D.                                    July 1, 2010

Page 156

1          MR. MILLER:  Object to form.

2     A.    To answer it accurately, Matt, I would have

3  to look at all of that information together.  My sense

4  is:  Based on those numbers I looked at, they were all

5  within the mid to high 90s.

6     Q.    All right.  Do you have any reason to

7  disagree with the person from UDL --

8     A.    Absolutely not.

9     Q.    -- who did this?

10    A.    Absolutely not.

11    Q.    The last sentence says, "Overall both

12 strengths of this product have shown no remarkable

13 stability data through the assigned expiration date in

14 the unit dose package."

15          Do you have any reason to disagree with that?

16    A.    Not at all.

17    Q.    Now, I've shown you -- We know that Actavis

18 tested all this and it was within spec when they

19 tested it.  And I've now shown you Quantic batch

20 record review materials.  I've shown you FDA testing

21 of the product.  I've shown you testing done at the

22 request of UDL; correct?

23    A.    Uh-huh; yes, sir.

24    Q.    We've spent about an hour just going over

25 testing of Digitek; right?

Russell Somma, Ph.D.                                        July 1, 2010

                                                            Page 157

 1      A.   Yes, sir.

 2      Q.   Do you have any evidence, any documents, any

 3   test results to indicate that there was Digitek in the

 4   hands of consumers that was outside its labeled

 5   specifications?

 6           MR. MILLER:   Object to form.

 7      A.   Nothing other than the Batch 70924A.

 8      Q.   All right.  Do you have any evidence that any

 9   tablets from --

10           MR. MORIARTY:   Let me withdraw that.

11      Q.   Do you have any evidence that

12   out-of-specification tablets from Batch 70924A made it

13   to the hands of consumers?

14      A.   The batch was tested according to the C of A.

15   According to the certificate of analysis, the batch

16   met requirements.  So the answer is:  That batch met

17   requirements, yes.

18      Q.   Okay.  Well, that batch was -- the

19   investigation of that batch was for double-thick

20   tablets; correct?

21      A.   That's correct, sir.

22      Q.   Not for tablets of normal size with varying

23   potency; right?

24      A.   That's correct.

25      Q.   Do you have any evidence from any document

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 158

1    you have seen, any deposition testimony you have seen,

2    that an oversized tablet from Batch 70924A made it to

3    the hands of a consumer?

4        A.   I would have to say no.

5        Q.   All right.

6             MR. MORIARTY: That's a good time for a lunch

7        break.

8             THE VIDEOGRAPHER: Please stand by.  We are

9        going off the record.  The time is 12:29 p.m. This

10       is the end of Tape Number 3.

11            (The luncheon recess is taken.)

12

13   CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

14            THE VIDEOGRAPHER: We are back on the record.

15       The time is 1:38 p.m. This is the beginning of

16       Tape Number 4.

17       Q.   Dr. Somma, have you ever consulted with my

18   client, Actavis?

19       A.   No, sir.

20       Q.   Have you ever consulted with Mylan?

21       A.   No, sir.

22       Q.   Now, earlier I went through all that 484

23   testing from the FDA, and by my count, seven of the

24   batches that they tested are what wound up being the

25   recall batches.  Okay?  Which is about 4.6 percent.

Russell Somma, Ph.D.                                          July 1, 2010

Page 159

1        A.    Yes, sir.

2        Q.    Do you have an opinion as to whether that is

3    a statistically significant number?

4              MR. MILLER:  Object to form.

5        A.    Is that statistically significant, the

6    batches that were recalled; correct, Matt?

7        Q.    Yes.  Seven out of 152?

8        A.    Whether it is statistically significant or

9    not, it's hard for me to say.  Is it representative of

10   what was made?  I don't think so.

11       Q.    Why isn't it representative of what was made?

12       A.    Well, to get back to what I had said before,

13   bottom line on all of this was:  I have not seen an

14   investigation which resolved the root cause of the

15   things I observed in these other batches, such as some

16   of the blend uniformity issues, things like that.

17             Other than that, based on the merit and the

18   information in front of me, those are -- those batches

19   passed, yes.  And they were confirmed by two -- two

20   sources.

21       Q.    And by my count Celsis, one way or another,

22   tested 11 out of 152 batches, which is about 7.2

23   percent.  Is that statistically significant?

24             MR. MILLER:  Object to form.

25       A.    I would say the same answer again, you know.

Russell Somma, Ph.D.                                July 1, 2010

Page 160

1      Q.   And if you add those two together and take

2   out any duplicates that may have been tested by both

3   Celsis and FDA, it's 16 out of the 152, which is ten

4   and a half percent.

5            Is that statistically significant?

6            MR. MILLER:  Object to form.

7      A.   It's hard for me to answer that question yes

8   or no.

9      Q.   Do you think that FDA's testing seven out of

10  152 recall batches provides a high degree of

11  assurance --

12     A.   No more than any -- I'm sorry.

13     Q.   --  that those seven batches at least met

14  their specifications for identity, purity, and

15  potency?

16           MR. MILLER:  Object to form. .

17     A.   No.  Again, those seven batches -- no more

18  does that testing or Celsis's testing represent the

19  fact that all of the batches in question don't have

20  some problem.  It meant that that sample using those

21  specifications at that time met requirements.

22           It gets back to the point I made earlier:

23  That this is a totality, it's a continuum, it's not

24  just a speck in the results.

25     Q.   All right.  Well, have you seen any FDA

Russell Somma, Ph.D.                                      July 1, 2010

Page 161

```
 1   documents that someone said that there was a total
 2   failure of the quality system?
 3        A.   I believe in this Exhibit 26, Matt, there is
 4   a statement.  I don't know if it says "total failure."
 5             (A discussion is held off the record.)
 6        A.   I'm referring to Exhibit Number 26 in
 7   response to Matt's question.  That was the only --
 8   this is the point that I had seen.  That was a comment
 9   from the FDA, as far as their quality system goes.
10        Q.   Well, if somebody else were to have said
11   there was a total failure of Quality, do you think
12   that's an overstatement, given the fact that UDL and
13   Celsis have independently confirmed that at least
14   those batches, when tested, met the specifications?
15             MR. MILLER:  Object to form.
16        A.   Again, my -- my --
17        Q.   That one's a yes or no.  Do you think it's an
18   overstatement?
19        A.   No.
20        Q.   Explain your answer.
21        A.   I think that statement is based upon what I
22   say the whole picture, not just a series of
23   specifications -- a series of batch results.  This
24   speaks to things in total, and that gets back to my
25   comments about investigations and analysis of other
```

Russell Somma, Ph.D.                                      July 1, 2010

Page 162

```
 1   mitigating circumstances.
 2        Q.    Well, you know there was an all-products
 3   recall a month or two after the Digitek recall;
 4   correct? Do you know that?
 5        A.    All products were recalled, yes, sir.
 6        Q.    And do you know those were not to the
 7   consumer level?
 8        A.    That I didn't know, sir.
 9        Q.    Did you think when you got here today that
10   all the products were recalled to the consumer level?
11        A.    No, no, sir.
12        Q.    You didn't give it any thought one way or
13   another?
14              MR. MILLER:  Object to form.
15        A.    Not that it was pertinent to what I was
16   looking at in this particular case.
17        Q.    Okay.  Did the FDA ever make a specific
18   finding in any document that you've ever seen that
19   Digitek was adulterated?
20              MR. MILLER:  Object to form.
21        A.    Well, getting back to the question -- to the
22   definition of "adulterated," I would say, based on the
23   broad-based comment in Citation 1, that based on their
24   definition, those -- Digitek would be adulterated by
25   their definition.
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 163

     1      Q.    That's not what I asked you.

     2      A.    Okay.  Then please ask again.

     3      Q.    Did they make an explicit statement anywhere

     4   that Digitek was adulterated?

     5      A.    And, again, I just think if it is

     6   noncompliance, by their definition it is adulterated.

     7      Q.    I want you to find me a statement in any of

     8   the paper in front of you that says -- from the FDA,

     9   that Digitek was adulterated.  Explicit statement.

    10   Not you inferring or --

    11      A.    Understood.

    12            MR. MILLER:  I'm going to object to form.

    13      A.    I'm looking at this Exhibit 91, Matt.  And to

    14   answer your question point on about they say it's

    15   adulterated, this is -- in this particular statement

    16   here, it doesn't come right out and say that,

    17   "adulterated," it does not say that.  Okay?

    18      Q.    Okay.  Have you seen any FDA statement at all

    19   specifically finding that there was

    20   out-of-specification Digitek in the hands of a

    21   consumer between 2004 and 2008?

    22      A.    I think the field action that recalled the

    23   batches speak to that point, or not?  Did I

    24   misunderstand that?  By recalling of batches, isn't

    25   that what that means, that they thought that that

Russell Somma, Ph.D.                                    July 1, 2010

Page 164

1    happened?

2        Q.    Sir, I thought you told me a number of hours

3    ago that you could recall batches of pharmaceutical

4    product for a number of different reasons; correct?

5        A.    Yes, you  can, right.

6        Q.    And defective, actual out-of-spec tablets in

7    the hands of consumers may or not be the case; right?

8            MR. MILLER: Object to form.

9        A.    May or may not be the case, correct.

10       Q.    FDA could recall pharmaceutical products

11   because the label was on crooked?

12       A.    That's correct.

13       Q.    Or they didn't like the way the plumbing in

14   the plant was; correct?

15       A.    That's correct.

16       Q.    All right.  So what I'm asking you:  In all

17   the ocean of material that you have reviewed, do you

18   find any explicit statement by the FDA that there was

19   out-of-specification Digitek in the hands of consumers

20   between 2004 and the spring of 2008?

21            MR. MILLER:  Object.

22       A.    And, again, to that, Matt, what I would have

23   to answer is that they found noncompliance to

24   procedures, they found information about blend

25   uniformity.  Nothing that specifically speaks to

Russell Somma, Ph.D.                                    July 1, 2010

Page 165

1    defective tablets being distributed.

2        Q.   And just because there were some blend

3    uniformity out of specs that were the subject of an

4    FDA 483 because of the investigation technique, does

5    not mean there was out-of-spec Digitek in the hands of

6    consumers; does there?

7             MR. MILLER:  Object to form.

8        A.   That's hard to say, Matt, because they never

9    did the investigation as I would have understood it,

10   to be perfectly honest.

11       Q.   All right.  But you have all this information

12   available, and you haven't seen any evidence of

13   out-of-spec Digitek in the hands of a consumer; have

14   you?

15            MR. MILLER:  Object to form.

16       Q.   You told me that before lunch?

17       A.   Right, right.

18       Q.   Every piece of evidence you have seen

19   regarding testing of Digitek has been within

20   compliance?

21       A.   Testing -- Absolutely.

22       Q.   Do you have any idea of what percentage of

23   pharmacies in the United States still count out

24   tablets by hand?

25       A.   Oh, I practiced pharmacy for awhile and every

Russell Somma, Ph.D.                                July 1, 2010

                                                    Page 166

1    one that I worked in, we counted by hand.  So my guess

2    would be -- the big box stores, whatever percentage

3    they are, counting automatically.  That would be my

4    guess.

5         Q.   How does a big box store go from a

6    thousand-count bottle of tablets on a shelf into a

7    vial with an automatic counter?  Or are you talking

8    about mail order pharmacies?

9         A.   No, sir.  They would fill a tablet counter up

10   with a thousand tablets, type in the number they

11   need --

12             (A discussion is held off the record.)

13        A.   Set the counter and then the machine counts

14   the tablets.

15        Q.   And what percentage of pharmacies in the

16   United States use automated versus hand counting?

17             MR. MILLER:  Object to form.

18        A.   That would be a complete guess on my part.

19   It's got to be a small percentage.

20        Q.   You mean it's a small percentage that use

21   automatic?

22        A.   Yes, sir.

23        Q.   So if tablets were out of specification by

24   size, that's what's known in the industry as a visible

25   defect; is it not?

Russell Somma, Ph.D.                                          July 1, 2010

```
                                                         Page 167

 1      A.    Visible -- visual defect, yes.

 2      Q.    And it is at least theoretically possible

 3  that the pharmacy level, when tablets are hand

 4  counted, is a point at which tablets that were extra

 5  thick could be detected; correct?

 6            MR. MILLER:  Object to form.

 7      A.    I would have to agree to an extent; but

 8  saying, based on my pharmacist's background, I was not

 9  looking for thick tablets.  My objective was to make

10  sure that the prescription was filled adequately, that

11  the all -- that all of the paperwork was filled out,

12  and that the clinical profile of the patient was done.

13  And a lot of cases nowadays, it is done by a

14  technician.

15      Q.    All right. Well, some human being was used to

16  counting out tablets; right?

17      A.    Right.

18      Q.    Have you ever actually seen and touched a

19  Digitek tablet?

20      A.    No, sir.

21      Q.    I'm sorry?

22      A.    No, sir.

23      Q.    If a tablet that was supposed to be between

24  two and three millimeters was double thick, so it was

25  somewhere between four and six, is that a visual
```

Russell Somma, Ph.D.                                July 1, 2010

Page 168

1    defect that a reasonable technician or pharmacist

2    would be able to detect when counting out a

3    prescription of 30 to 100 tablets?

4            MR. MILLER:  Object to form.

5       A.   I don't think so, because when you put these

6    into a counting tray, they all lay down flat.  How

7    would you able to determine -- determining height of

8    tablets, Matt, across a bed of tablets is very

9    difficult.  You would actually have -- it would have

10   to be on your side.

11           So my guess is that that's pretty tough to

12   do, just from having done it myself.

13      Q.   Well, if there was one double-thick tablet in

14   there, it would be sticking out like a skyscraper,

15   right?

16      A.   Like a skyscraper, yeah.  That you -- Unless

17   you -- in that case, if it was that thick.   But

18   again, three millimeters, double, six; my guess is you

19   probably would see that.

20      Q.   All right.

21      A.   I'm not saying I would see that.

22      Q.   Did you say earlier you had not reviewed any

23   adverse event reporting data in this case?

24      A.   That's correct.

25      Q.   Do you have any opinions about adverse events

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 169
 1   with Digitek?

 2        A.   No, sir.

 3        Q.   Did you ask Mr. Miller or Ms. Carter how many

 4   of the plaintiffs in this litigation had had their

 5   tablets weighed or measured?

 6        A.   No, sir.  I looked for the information in the

 7   information provided.

 8        Q.   All right.  You didn't see any plaintiffs who

 9   had double-thick tablets; did you?  Or even

10   extra-thick tablets?

11        A.   I didn't see -- I didn't see any information

12   that said that at all.  Okay?

13        Q.   In a piece of litigation like this, and I

14   know you are new to this process, but if they had

15   evidence that their clients had extra-thick tablets

16   that were outside the specifications, do you think

17   it's the kind of material that they would give you to

18   review?

19        A.   I would think so.

20        Q.   Have you seen any reliable reports that an

21   extra-thick tablet was detected by a pharmacist in

22   2005, 2006, 2007 or 2008?

23        A.   We had discussed that before, as I recall.  I

24   thought I did, but I was not able to recover it.

25        Q.   Well, I said reliable report by a pharmacist
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 170

1    of an extra-thick tablet in 2005, '06, '07 or '08.

2            MR. MILLER:  I'll object to form.

3    A.    We just -- I'm going to look again.

4            I read it, Matt, and I cannot find it.

5    Q.    You believe you have a report, a reliable

6    report from a pharmacist that indicates that they

7    found a double-thick tablet in the years I just

8    mentioned, '05 through '08?

9    A.    As I recall, the report was about a

10   pharmacist finding a tablet, and the year I believe

11   was '04.

12   Q.    Is that the one -- Well, wait a minute.  I

13   said '05 through '08 three times.

14           Do you have such a report?

15   A.    That's -- as I'm trying to think through it,

16   I cannot locate it here.

17   Q.    Do you think there is one?  Now, we discussed

18   one this morning about this nursing home, and you told

19   me that it wouldn't be reliable given everything I

20   asked you about it.

21   A.    Right, right.

22   Q.    I'm asking about a different question.  A

23   reliable report from a pharmacist in 2005, '06, '07 or

24   '08 indicating that they had an extra-thick Digitek

25   tablet.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 171

 1           MR. MILLER:  Object to form.

 2      A.   Nothing that I can produce, no, sir.

 3      Q.   Can you look for Exhibit 21 in the stack,

 4   also known as Plaintiff's Exhibit 128?

 5           Have you seen this document before?

 6      A.   Yes, sir.

 7      Q.   This is the extra-thick tablet investigation.

 8   The investigation was conducted in 2004; correct?

 9      A.   Yes, sir.

10      Q.   And you see in here that somehow Actavis or

11   Amide at the time was able to figure out that that

12   came from a batch made in 2003; correct?

13      A.   Yes, sir.

14      Q.   Did the company alert the FDA to this event

15   through what's known as a field alert report?

16      A.   I don't know, Matt.

17      Q.   Okay.  I'd like you to look at Exhibit 20.

18   It should be in that stack.

19           Have you seen that document before?

20      A.   I believe so.

21      Q.   It's an EIR from 2004.  Is that correct?

22      A.   Yes, sir.

23      Q.   I'd like you to go to Page 4, please.

24      A.   Uh-huh.

25      Q.   Now, first of all, in order to be operating

Russell Somma, Ph.D.                                    July 1, 2010

 1   under a consent degree -- decree, do you have to be in

 2   compliance with cGMPs?

 3        A.   Absolutely.  You have to be in compliance

 4   with cPMG's if you make a product that's subject to

 5   human consumption.

 6        Q.   All right.  So in the first paragraph, under

 7   "History of Business Operations" --

 8        A.   Right.

 9        Q.   -- four lines down, there is a sentence that

10   says, "The consent decree was lifted in 2001 following

11   successful demonstration of sustained cGMP

12   compliance."

13             Do you see that?

14        A.   Yes, sir.

15        Q.   Do you have any reason to disagree with the

16   FDA about that?

17        A.   No, sir.

18        Q.   Let's go to Page 6.  Under the Field Alert

19   Reporting section.

20        A.   Uh-huh.

21        Q.   It says, "A final field alert report for NDA

22   40-282, digoxin tablets .25 milligrams was filed

23   during the reporting period."

24             Do you see that?

25        A.   Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 173

1     Q.   And if you read on, what they're referring to

2  is the investigation contained in Exhibit 21.  Is that

3  right?

4          MR. MILLER:  Take your time and read it.

5     A.   Got it.  Okay.

6     Q.   Am I right?

7     A.   Yes, sir.

8     Q.   So go down ten lines from the top of that

9  paragraph.  It says, "No additional complaints or

10  reports of thick tablets have been received for this

11  high volume product."

12         Do you have any reason to disagree with the

13  FDA about that?

14    A.   I don't see why, no.

15    Q.   Okay.  "The event was considered an isolated

16  incident and corrective actions were put in place to

17  prevent its reoccurrence."

18         Do you agree with that?

19    A.   Uh-huh, yes, sir.

20    Q.   Now let's go to Page 9.  In the section

21  called Complaints, the second paragraph.

22         It says, "A larger number of complaints was

23  also noted for digoxin tablets; however, it is the

24  highest volume product according to the list of

25  batches produced per year."

Russell Somma, Ph.D.                                July 1, 2010

Page 174

1          Do you have any reason to disagree with that?

2     A.    No, sir.

3     Q.    "There were also no trends observed for the
4     types of complaints."

5          Any reason to disagree with that?

6     A.    No, not at all.

7     Q.    Was FDA satisfied with the investigation of
8     Exhibit -- that's embodied in Exhibit 21?

9          MR. MILLER:  Object to form.

10    A.    Let me just change my glasses.

11         Based on the data I have in front of me,
12    they're satisfied, yeah.

13    Q.    There was never a 483 or a warning letter
14    about that incident or its investigation; is that
15    correct?

16    A.    I'm just making sure this 483 is not it.
17    This one, I'm just looking at one from May back.  No.
18    The answer is:  There is nothing as a result of this.

19    Q.    All right.  Now, before the lunch break you
20    told me you didn't have any evidence of out-of-spec
21    tablets getting in the hands of consumers.  I want to
22    talk a little bit more about that.  Okay?

23    A.    Yes, sir.

24    Q.    Do you have an opinion --

25         MR. MORIARTY: Withdraw that.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 175

1     Q.   Let me start over.  Let's just talk about the

2  recalled batches, and let's assume there were 688.2

3  million tablets in that grouping; okay?

4     A.   Okay.

5     Q.   Do you have an opinion to a probability as to

6  how many of them were outside their specifications?

7     A.   I think when we discussed, we said that none

8  of those that were released were out of specification,

9  as I recall.  The probability of -- of them being out

10  of specification, which means tablets which were not

11  tested, in other words a batch is made of two million,

12  you test 100.  So the probability of one that is not

13  tested sneaking out is within the realm of

14  possibility, yes.

15     Q.   Okay.  Do you know that -- in your work at

16  Novartis, I assume you talked to scientists, people

17  all the time; right?

18     A.   Right, okay.

19     Q.   You are familiar with the terms "probability"

20  and "possibility;" right?

21     A.   Right, everything is possible, correct.

22     Q.   And probability is more likely than not;

23  correct?

24     A.   It's probable, it's likely.

25     Q.   Okay.  So what I'm trying to find out, and my

Russell Somma, Ph.D.                                    July 1, 2010

Page 176

1    clients are entitled to know, is whether you have an

2    opinion to a reasonable probability as to how many of

3    the 688 million tablets among the recalled group were

4    outside their specifications?  Do you have such an

5    opinion?

6         A.   I have an opinion based on a review of the

7    information I've seen.

8         Q.   Is it an opinion to a probability?

9         A.   To a probability?  Based on the information

10   I've seen, and the lack of investigation and rigor

11   that addressed the problem, that it is highly probable

12   that something was distributed and not caught; caught

13   in the testing sense.

14        Q.   Okay.  How many of the 688 million tablets in

15   the recall group were likely outside their

16   specifications?

17        A.   That's very difficult to say.

18        Q.   You have no opinion to a probability as to a

19   number?

20        A.   I think it's hard to put a number on it, to

21   be perfectly honest, because what we are talking about

22   in this particular case, my opinion is they did not do

23   a rigorous enough evaluation of things to assess that

24   they even had a problem.  In that case, the

25   probability could be as high as 100 percent and could

Russell Somma, Ph.D.                                          July 1, 2010

Page 177

1   be as low as zero.  Without the analysis and the

2   information to make that assessment, Matt, I can't say

3   for sure.

4        Q.   All right.  So you would be speculating to

5   put a number; right?

6        A.   I think that would be a safe bet, yeah.

7        Q.   Okay.  So -- And I can keep -- I'm going to

8   keep asking you these questions, because I need to

9   know, not because I'm trying to be a pain in the neck.

10            But if a tablet was outside its

11  specifications, there are only two possibilities

12  there; one is it's high outside the specs or low

13  outside the specs; correct?

14            MR. MILLER:  Object to form.

15       A.   Correct.  Okay.

16       Q.   Are there any other possibilities besides --

17  if they're outside the specs, are there any other

18  possibilities besides high or low?

19            MR. MILLER:  Object to form.

20       Q.   Answer me as a scientist.

21       A.   As a -- if there were -- they're either

22  outside the spec, high, or low outside the spec,

23  correct, correct.  There's a range.

24       Q.   Okay.  All right.

25            Ignore the man outside the curtain for right

Russell Somma, Ph.D.                                    July 1, 2010

Page 178

1   now.

2           MR. MILLER:  Do not ignore the man outside the

3       curtain.  Disregard that.

4           MR. MORIARTY:  Behind the curtain, I should

5       say.

6       Q.   So do you have any opinion to a probability

7   as to how many of the recalled Digitek tablets were

8   outside the specifications, low?

9       A.   I would have --

10          MR. MILLER:  Excuse me.  I'm going to object

11      to the form.

12      Q.   On the low side?

13      A.   I would -- it's -- again, I'm not trying to

14  be evasive.  It's just difficult to answer that as if

15  on the high side.  The question is -- I can't -- I

16  can't assign a number to that.

17      Q.   All right.  My first question was:  Did you

18  have an opinion as to whether they were outside the

19  specs as all, and we covered that.

20      A.   Yes, we did.

21      Q.   Now I'm getting into the two possibilities.

22      A.   Right.

23      Q.   And if you don't have an opinion to a

24  reasonable probability, that's all you have to tell

25  me.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 179

     1        A.    Okay.

     2        Q.    So you don't have an opinion to a probability

     3   of how many were outside the specifications on the low

     4   side; correct?

     5        A.    No, sir.

     6              MR. MILLER:   Object to form.

     7        Q.    Do you have an opinion to a reasonable

     8   probability how many were outside the specifications

     9   on the high side?

    10        A.    No, sir.

    11        Q.    And it matters how low or how high; correct?

    12              MR. MILLER:   Object to form.

    13        A.    With --

    14        Q.    I'll rephrase my question.

    15              If you were doing an investigation for a

    16   pharmaceutical company --

    17        A.    Right.

    18        Q.    -- whether it was Novartis or one of your

    19   consulting clients, and they had been releasing

    20   product that was outside the specifications, would you

    21   as a scientist want to know how far outside the specs

    22   they were?

    23              MR. MILLER:   Object to form.

    24        A.    Well, I think -- let me make sure I --

    25        Q.    Yes or no.  Would you want to know that?

Russell Somma, Ph.D.                                    July 1, 2010

Page 180

 1      A.   I wouldn't expect them to release anything
 2   outside of spec.
 3      Q.   That's not what I'm asking.  You were called
 4   in as a consultant and somebody says, "We accidentally
 5   made some tablets that were outside the specs."
 6      A.   Oh, okay.
 7      Q.   It's a done deal; okay?
 8      A.   Right.
 9      Q.   You are called in as the consultant to do an
10   investigation.  Do you as a professional want to know
11   how far outside the specs they were?
12      A.   You have to do an analysis for trend, is it
13   high, or is it low, yes.
14      Q.   So do you have an opinion -- if there were by
15   chance any tablets outside the specifications low, do
16   you have any opinion as to how low outside the specs
17   they were?
18           MR. MILLER:  Object to form.
19      Q.   To a probability?
20      A.   Not until I see the information, I guess.
21   It's hard to say, you know.
22      Q.   Okay.  But you haven't seen any such
23   information about tablets outside the specs at all;
24   correct?
25           MR. MILLER:  Object to form.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 181

 1      A.    In this particular case, no.  They have -- in

 2    other words, I have asked for the information.  I

 3    haven't seen any of that information, right.

 4      Q.    On the other side, do you have any opinion to

 5    a probability as to how far outside the specs high any

 6    Digitek tablets might have been, if there were any?

 7            MR. MILLER:  Object to form.

 8      A.    No, for the same reason I couldn't understand

 9    on the low side.

10            MR. MORIARTY:  What's the basis for your form

11        objection?  I want the chance to cure it.

12            MR. MILLER:  It's vague and misleading.

13        Perhaps the expert does, but I don't know what

14        specifications you were asking about.

15      Q.    Outside any specification:  Weight,

16    thickness, active pharmaceutical ingredient.  Did you

17    understand my questions?

18      A.    Yes.

19      Q.    Okay.

20      A.    To be real -- I want to-- that's my -- I

21    understand what you are talking about.  It doesn't

22    matter -- A spec is a spec.  I apologize.

23            Am I supposed to have clarified that?

24      Q.    No.   You and I understood one another

25    perfectly.  Okay.

Russell Somma, Ph.D.                                    July 1, 2010

Page 182

1          Now, I assume, Dr. Somma, from reading your

2    report and listening to what you are saying today that

3    because of some cGMP violations, you have concerns

4    about Digitek production.  Am I correct about that?

5          MR. MILLER:  Object to form.

6    A.    There are -- the concerns I have are the --

7    Q.    Yes or no?

8    A.    Yes.

9    Q.    Do you have concerns?

10   A.    Yes, I do.  Oh, I'm sorry.  Yes, I do.

11   Q.    And from a regulatory standpoint, when you

12   are looking from the cGMP standpoint, there are

13   findings in the FDA -- these FDA documents that lead

14   you to conclude, and led the FDA to conclude, that

15   Digitek may have been adulterated.  Is that correct?

16         MR. MILLER:  Object to form.

17   A.    Yes.

18   Q.    All right.  But as we covered before,

19   "adulterated" does not necessarily mean that the

20   tablets were, in fact, outside their manufacturing

21   specifications.  Is that right?

22         MR. MILLER:  Object to form.

23   A.    "Adulterated" means -- could mean things that

24   are major-major or minor, yes; not outside the

25   specifications.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 183

 1      Q.   So when we get specifically to Digitek, and
 2   I'll talk about the recall in more detail in a minute;
 3   FDA would have every right to ask Actavis to recall
 4   the Digitek within the expiration date just because
 5   they believed the investigation of 70924 was
 6   substandard.  Is that right?
 7           MR. MILLER:  Object to form.
 8      A.   That's certainly within their right, yes.
 9      Q.   Even if there was no proof whatsoever that
10   actually out-of-spec tablets made it to pharmacies and
11   consumers.  Is that right?
12           MR. MILLER:  Object to form.
13      A.   Could we go through that one more time, Matt?
14   I'm not trying to be stupid.
15           THE WITNESS:  Can I have that question again,
16      Mark?
17           MR. MORIARTY:  Mark, you are going to have to
18      read that last one back.
19           (The question is read.)
20      A.   Yes.
21      Q.   So if I ask you a different way, do you have
22   an opinion to a reasonable probability how many
23   Digitek prescriptions were filled which contained as
24   low as one out-of-specification tablet?  Do you have
25   an opinion to a probability on that subject?

Russell Somma, Ph.D.                                    July 1, 2010

Page 184

 1      A.    That would fall -- that falls back into:  Is
 2   it going to be low or is it going to be high.  I guess
 3   my opinion is it's likely that something could be
 4   there.  As far as a percentage, Matt, no.
 5      Q.    Now, wait.
 6      A.    Run it by me again.
 7      Q.    All along you have told me you have no
 8   opinion to a probability, this is what I'm hearing
 9   from you.  Okay?
10      A.    Right.
11      Q.    Maybe Peter hears it differently.
12      A.    Right.
13      Q.    I'm hearing you have no opinion to a
14   probability, a likelihood, that there were defective
15   tablets in the hands of consumers at all?
16      A.    Right.
17            MR. MILLER:  Object to form.  Misstates
18      previous testimony.
19      Q.    So I'm asking it from a different angle to
20   make sure I have it all straight.
21            Do you have an opinion to a probability about
22   how many people received any prescriptions with any
23   defective, outside-of-specification Digitek tablets in
24   them?
25            (A discussion is held off the record.)

Russell Somma, Ph.D.                                    July 1, 2010

Page 185

1        A.    No.  I was still thinking about the spec

2    thing, sorry.

3        Q.    If there were tablets outside the

4    specifications -- Okay? -- and let's just assume for

5    right now that they were extra thick, and that because

6    they were extra thick, they were outside the API specs

7    on the high side.  Okay?  Let's just make that

8    assumption for right now.

9        A.    Okay.

10       Q.    All right?  If that were true and they went

11   out into the marketplace, wouldn't it be likely at

12   some point that collectively a pharmacist, a consumer,

13   UDL, Actavis, FDA, Celsis Labs, a doctor or a hospital

14   would notice something?

15       A.    That's --

16             MR. MILLER:  Object to form.

17             Sorry. Go ahead.

18       A.    That's assuming that those systems are not

19   set up to be challenged to find defects.  Your system

20   itself is supposed to be self-limiting, and your

21   supply chain and distribution aspects are not meant to

22   catch problems.  Pharmacists and professionals in the

23   distribution chain, if you are lucky, they are going

24   to be vigilant and catch it.  Have they been

25   calibrated or are they checked?

Russell Somma, Ph.D.                                    July 1, 2010

Page 186

1              You can't rely on that, is my opinion.

2        Q.    I'm not asking you, Doctor -- or Dr. Somma,

3    if you rely on that prospectively.

4        A.    Right.

5        Q.    I'm asking:  After the fact; okay?  Again,

6    let's get back in.  You are at Novartis and you have

7    been called in --

8        A.    Right.

9        Q.    -- to one of your pharmaceutical clients.

10   And somebody says, "I think we may have released

11   tablets that are too thick, and if they are too thick

12   they may have been outside the API specs;" okay?

13       A.    Right.

14       Q.    There are things to look at once the tablets

15   leave your facility to see if, in fact, there were

16   out-of-specification tablets; right?

17       A.    These are --

18       Q.    Yes or no?  Things you can look at.

19       A.    Things that you can look at, yes.

20       Q.    All right.  So one thing you might look at

21   is:  Did a repackager find any.  Right?

22       A.    Right.

23       Q.    That's one thing you might look at.

24       A.    Right, yes.

25       Q.    And FDA tested tablets.  Did they find any?

Russell Somma, Ph.D.                                    July 1, 2010

Page 187

1       A.    Right.

2             MR. MILLER:  Object to form.

3       Q.    And pharmacists would be counting these out

4   and distributing them; did they find any?  Correct?

5       A.    Correct.

6       Q.    You are continuing your investigation; right?

7       A.    Right.

8       Q.    You are nodding yes?

9       A.    Yes, I'm hearing you.  Sorry.

10      Q.    And then, of course, consumers get them; and

11  they could either notice it because it looked

12  different than other tablets --

13      A.    Yes.

14      Q.    -- or they might get sick; right?

15      A.    Well, we have assumed they would get sick,

16  yes.

17      Q.    But these are things that a reasonable

18  investigator would look at; right?

19      A.    Uh-huh.

20      Q.    Is that yes?

21      A.    I would ask the questions, and to be

22  perfectly honest, I probably wouldn't go beyond asking

23  this Celsis and the packager.  I mean, I'm -- in my

24  opinion -- my personal opinion, that's reaching when

25  you try to rely on pharmacists as I had mentioned

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 188

 1   before.  But I'm okay with you right out into the

 2   packaging part, yeah.

 3        Q.   But if you are desperately seeking

 4   information, any shred of proof, you would want to go

 5   all the way to the consumers; wouldn't you?

 6        A.   Yes, sir.

 7        Q.   You might look at Poison Center statistics to

 8   see if they'd noticed a spike in digoxin toxicity?

 9             MR. MILLER:  Objection to form.

10        Q.   Would you do that?

11        A.   It sounds like a great idea.  I would not

12   have thought to do that, yes.

13             MR. MORIARTY:  What was the matter with the

14        form on that?

15             MR. MILLER:  Scope.  Excuse me.  Objection,

16        scope.

17        Q.   Could you look for Exhibit 37, please?

18             Now, I am missing an exhibit, I think.

19   Somewhere in this should be the recall press release.

20             Have you ever seen the recall press release

21   of Digitek?

22             MR. MILLER:  It's not that document.  He

23        pointed that document out, but that's not the

24        document.

25        Q.   I'll get to this one in a minute.

Russell Somma, Ph.D.                                    July 1, 2010

Page 189

 1          But have you seen the recall press recess of

 2   Digitek?

 3      A.    I don't recall reading it, Matt, no.

 4      Q.    What is your understanding of why Digitek --

 5          I'm sorry.  Let me rephrase that.

 6          What is your understanding of what the FDA

 7   approved recall notice says about why Digitek was

 8   recalled?

 9          MR. MILLER:  Object to form.

10          THE WITNESS: Mark, read that question to me

11      again, would you?  If you don't mind.

12          Is it okay? I'm sorry.

13          (A discussion is held off the record.)

14          (The question is read.)

15          MR. MILLER:  Again, object.

16      A.    I haven't seen it, so I don't -- I can't

17   really say.

18      Q.    Okay.  Here's Exhibit 36.  It's the recall

19   press release.  I want you to take a look at that, and

20   then if you don't mind, hand it back to me.

21      A.    Sure thing.

22      Q.    Because I seem to have coughed up all my

23   copies of it.

24          Are you done reading it?

25      A.    Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 190

1      Q.    May I have that back, please?

2      A.    Sure.   Here you go.

3      Q.    It says here, "The voluntary all-lot recall

4  is due to the --"

5            MR. MILLER:  I was trying to have a copy in

6      front of him so he can read along with you.

7            MR. MORIARTY:  Oh, that's fine.  I appreciate

8      it.

9      Q.    "The voluntary all-lot recall is due to the

10  possibility that tablets with double the appropriate

11  thickness may have been commercially released."

12           Do you see that?

13     A.    Yes, sir.

14     Q.    Do you have any reason to disagree with that

15  FDA-approved press release?

16     A.    No, sir.

17     Q.    And twice in that sentence that I just read,

18  they use words connoting some degree of speculation.

19  Is that right?

20           MR. MILLER:  Object to form.

21     A.    Yeah.  "Possibility," "may have," yeah.

22     Q.    Now, you can take a look at Exhibit 37.

23     A.    Okay.

24     Q.    Go to the third page.  This is the recall

25  package.  Do you know what a recall package is?

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                    Page 191
 1      A.    I'm not familiar with all its content.  I've
 2   heard of it.
 3      Q.    Have you ever seen this document before,
 4   Exhibit 37?
 5      A.    In the -- In the spirit of what I
 6   investigated, Matt, I didn't look at stuff -- this
 7   stuff, like the recall package.  I didn't look at
 8   that.
 9      Q.    Did you look at Exhibit 36, the recall press
10   release?
11      A.    No, sir.
12      Q.    If you go down to "Reason For Recall" in
13   Roman numeral III, it says, "Digoxin tablets exceeded
14   the thickness specifications."
15            Do you see that?
16      A.    Okay.  Yeah.  I got it.
17      Q.    Now, have you seen anywhere at all any
18   indication from FDA or from my client, Actavis, that
19   this recall of Digitek in April of 2008 was for
20   normal-sized tablets with varying amounts of the
21   active pharmaceutical ingredient?
22      A.    This clearly notes "tablet thickness."
23      Q.    Now, I'm done asking you about that.
24            If you were called in as you were with one of
25   your private consulting clients to analyze a thick
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 192

 1   tablet situation --

 2        A.   Yes, sir.

 3        Q.   --  typically you would think that that would

 4   be a tablet press issue.  Is that right?

 5        A.   You'd want to -- you'd want to start at that

 6   point.  It's the most likely.

 7        Q.   Okay.

 8        A.   Yes.

 9        Q.   And when you are looking for the cause of the

10   extra-thick tablets, what you hope to get to is what

11   you in the business call a root cause; right?

12        A.   That's correct.

13        Q.   So for a wild example, it could be a die set

14   inappropriately calibrated; right?

15        A.   Agreed.

16        Q.   Okay.  And that is --

17             Now, a normal-sized tablet with varying

18   active pharmaceutical ingredient is a different or

19   potentially different problem; isn't it?

20        A.   Absolutely.

21        Q.   So when you start looking for a root cause to

22   that kind of problem, you have to go back to the

23   mixing, the blending, the tabletting?  You have to go

24   back to all of it; correct?

25        A.   The non-homogeneity in a tablet, yes, Matt.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 193

 1      Q.   And extra thick tablets and tablets of normal
 2   size with varying potency are really, when you get
 3   down to it, from a professional's end, different kinds
 4   of defects.  Is that right?
 5      A.   I see them -- this is why -- it's not going
 6   to be yes or no.
 7           If the thing was uniform, the thick tablet
 8   and non-uniform tablet, that problem is one and the
 9   same, because that thickness is going to be more
10   potent, let potent.  We don't know that in this
11   particular case.  In this particular case that is
12   thick, but we don't know why or how much.
13           So the answer is -- to answer your question
14   specifically, there are two different cases here.
15      Q.   Okay.  And the FDA would know the difference
16   between those kind of problems; right?
17      A.   You would hope.
18      Q.   You would hope.
19      A.   Okay.
20      Q.   And so when the FDA approved the recall press
21   release and the recall package announcing that this
22   recall was for the possibility that double-thick
23   tablets may have been commercially released, it has a
24   little bit more meaning just beyond those simple
25   words; correct?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 194

 1        A.    Presumably --

 2              MR. MILLER:  Object to the form.

 3              MS. CARTER:  Object to the form.

 4        A.    To me it does, yes.

 5        Q.    Okay.  To you as a professional in the

 6   pharmaceutical industry, it does?

 7        A.    Right.  That's what I'm saying.

 8        Q.    And as far as you can tell from all the

 9   material here, FDA did not cite or warn Actavis about

10   Digitek that was normal in size, but outside its

11   active pharmaceutical ingredients specifications.  Is

12   that right?

13              MR. MILLER:  Object to form.

14        A.    Yeah, Digitek tablets, no.  The only thing

15   was blend stuff that we talked about before.

16        Q.    All right.  Did the FDA ever ask Actavis to

17   recall Digitek for blend uniformity issues?

18        A.    Not to my knowledge, no.

19        Q.    I want to show you what's been marked as

20   Exhibit 38.

21        A.    Okay.

22        Q.    Have you ever seen this before?

23        A.    It doesn't look familiar.

24        Q.    It's a printout from the FDA's website.

25        A.    Okay. I'm not a -- I don't customarily go

Russell Somma, Ph.D.                                    July 1, 2010

Page 195

1    there and read stuff like this.  I'm sorry.  Okay?

2        Q.    Okay.

3        A.    Yeah.

4        Q.    Well, once you were engaged in the Digitek

5    litigation --

6              (A discussion is held off the record.)

7        Q.    Once you were engaged in the Digitek

8    litigation, even though you didn't customarily go to

9    the FDA's website, did you do so to see what they said

10   about the Digitek --

11       A.    No, sir.

12       Q.    -- recall?

13       A.    No, sir.  I went there to make sure that I

14   had as much information as I needed about guidances in

15   the area of uniformity.

16       Q.    Okay.  This is from a section of the FDA

17   website that talks about facts and myths about generic

18   drugs.  Do you see that at the top?

19       A.    Yes, sir.

20       Q.    And then generally it has a fact --

21             MR. MORIARTY: I'm sorry.  I'm going to

22       withdraw that question.

23       Q.    And if you look about halfway down, what FDA

24   does here is they put a myth, and then they follow it

25   up with a fact; correct?

Russell Somma, Ph.D.                                        July 1, 2010

                                                            Page 196

 1        A.    Right.

 2        Q.    Go to the second page, please.  The first

 3   bolded myth at the top says, "There are quality

 4   problems with generic drug manufacturing.  A recent

 5   recall of generic digoxin called Digitek shows that

 6   generic drugs put patients at risk."

 7              Do you see that?

 8        A.    Uh-huh.

 9        Q.    And then the FDA follows up with the fact.

10              "FDA's aggressive action in this case

11   demonstrates the high standards to which all

12   prescription drugs, generic and brand name, are held."

13              Do you see that?

14        A.    Yeah.

15        Q.    Now, let's go down to Bullet Point 4.

16        A.    Right.

17        Q.    The second sentence says, "In our best

18   judgement, given the very small number of defective

19   tablets that may have reached the market and the lack

20   of reported adverse events before the recall, harm to

21   patients was very unlikely."

22              Do you see that?

23        A.    Uh-huh.

24        Q.    That's a yes?

25        A.    Yes, I see it.

Russell Somma, Ph.D.                                    July 1, 2010

Page 197

1       Q.    Do you have any reason to disagree with FDA's

2    statement about this situation?

3       A.    I don't think so.

4             MR. MILLER:   Objection.   Scope.

5             Go ahead.

6       A.    Yeah, I think so.   Otherwise why would we be

7    having this discussion here?

8       Q.    Well, that's a really good question.

9             Did you do a more thorough investigation than

10   the FDA?

11            MS. CARTER:   Object to form.

12      A.    I did an investigation based on the

13   information provided to me for this product, yes.   Did

14   I do more than FDA?   No.

15      Q.    All right.   Well, what's the basis for your

16   disagreement with the FDA's statement on its own

17   website regarding this very situation?

18      A.    Well, I don't think the necessary

19   investigation into the manufacturing -- in the

20   manufacturing area was conducted.   That is still my

21   opinion.

22      Q.    I understand that.

23      A.    Oh, okay.

24      Q.    But FDA doesn't say anything about the

25   investigation of 70924; does it?

Russell Somma, Ph.D.                                    July 1, 2010

Page 198

1          MR. MILLER:  Object to form.

2      Q.    In this document?

3      A.    No, sir, it doesn't.

4      Q.    Okay.  It's commenting on the situation

5    overall?

6      A.    Uh-huh.

7      Q.    And clearly, FDA knew about the investigation

8    of 70924 because they put it in -- in a 483; right?

9      A.    Right.

10     Q.    So let me get back to this and make sure I

11   understand.  It says, "In our best judgement given the

12   very small number of defective tablets that may have

13   reached the market and the lack of reported adverse

14   events before the recall, harm to patients was very

15   unlikely."

16          Do you have any reason to disagree with FDA

17   in that statement?

18          MR. MILLER:  Object to form.  Asked and

19        answered.

20     A.    No.  There is no reason to disagree with

21   this.

22     Q.    Okay.  Is it your opinion that the

23   investigation conducted by Actavis of the double-thick

24   tablets in Batch 70924 was a cGMP failure?

25          MR. MILLER:  I'll object to form.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 199

     1              MR. MORIARTY: Even when I ask you questions in

     2        your favor, you object.

     3        Q.    Go ahead.

     4        A.    I think that it was conducted in a way that

     5     it was aligned with cGMP.  Was it conducted to what I

     6     would consider an adequate level?  No.

     7        Q.    Was it negligent?

     8              MR. MILLER:  Object to form.

     9              MS. CARTER:  Object to form.

    10        A.    Was it negligent?  Insofar as all the

    11     information wasn't there that I was looking for, I

    12     don't think it's negligence, but it certainly was not

    13     with the rigor that I would have expected.

    14        Q.    And that's your opinion?

    15        A.    That is my opinion, yes.

    16        Q.    Okay.  Is there any specific FDA reg that

    17     says you need to -- you are required to analyze the

    18     batch before and the batch after in the course of an

    19     investigation like this?

    20              MR. MILLER:  Object to form.

    21        A.    I think it comes -- what it does, Matt, is

    22     it's customarily done.  Is there a regulation that

    23     says you must do that?  That's where business, science

    24     and regulations cross paths.

    25        Q.    All right.  And the answer is?

Russell Somma, Ph.D.                                           July 1, 2010

Page 200

```
 1      A.   I don't think -- I could sit here and look it
 2   up.  I don't think you would ever find something that
 3   says that specifically.
 4      Q.   All right.  In the course of your
 5   investigation in this litigation, did you look at the
 6   last Digitek batch which precedes -- batch record for
 7   the batch which preceded 70924?
 8      A.   I got a batch record that was close.  That
 9   was the one I had mentioned earlier.  That was the
10   best I could do.
11      Q.   And did you also look at one following close
12   after 70924?
13      A.   Not to date, no, sir.
14      Q.   Have you asked for one?
15      A.   Yes, sir.  I haven't read it.
16      Q.   Okay.  Did you find any problems in the batch
17   record for the batch that preceded 70924?
18      A.   Preceded?  Based on that one?
19      Q.   Yeah.
20      A.   Batch record?  No, no, sir.
21      Q.   So if Actavis would have looked at the batch
22   record for the batch preceding 70924 in the course of
23   the actual investigation, it wouldn't have found
24   anything either; right?
25           MS. CARTER:  Object to form.
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 201

 1       A.   My -- my guess, no.  Because that's all part

 2   of rounding up the information.  That's the first

 3   step.

 4       Q.   I'd like you to go to your report, please,

 5   which is --

 6            MR. MORIARTY:  Is it Exhibit 52?

 7            MR. MILLER:  Yes, it is.

 8       Q.   Your report is 14 pages long; right?

 9       A.   Yeah, yes, it is.

10       Q.   Does the word "negligent" appear anywhere in

11   these 14 pages?

12       A.   Negligent?  No, sir, I don't recall using

13   that.

14       Q.   Does the word "adulterated" appear anywhere

15   in these 14 pages?

16       A.   No, sir.

17       Q.   Does the word "defective" appear anywhere in

18   these 14 pages?

19       A.   I don't recall.

20       Q.   Okay.  Let's go to Page 2.  You comment under

21   "Blending" that this is a dry blend direct compression

22   process; correct?

23       A.   That's right.

24       Q.   Relatively speaking, is that a rather simple,

25   solid oral dose formulation?

Russell Somma, Ph.D.                                    July 1, 2010

Page 202

```
 1      A.   The answer is:  It's simple, but it's risky.

 2  Okay?  I hope that answers -- I'm not trying to be

 3  evasive.

 4      Q.   Go back, at the very end of the Introduction

 5  section.  You are talking about your walk-through at

 6  Actavis --

 7      A.   Right.

 8      Q.   -- this year.  It says, "During this

 9  inspection, all the equipment and related questions as

10  related to the equipment were adequately addressed

11  with no open issues."

12      A.   Right.

13      Q.   What do you mean by "no open issues"?

14      A.   Everything I asked to see, I was able to see.

15  Any questions I had were answered.  Nothing was left

16  open.

17      Q.   Got you.

18      A.   I was satisfied when I walked out.

19      Q.   All right. Let's go to Page 4, please.

20           At the top, underneath the formula for

21  Digitek --

22      A.   Right.

23      Q.   -- you are talking about "the amount of

24  digoxin to be used in the batch is corrected."

25      A.   Uh-huh.
```

Russell Somma, Ph.D.                                        July 1, 2010

                                                                Page 203

1      Q.    Etc., etc.  Do you see that paragraph?

2      A.    Yes.

3      Q.    Are you talking about Batch 70924

4   specifically there?

5      A.    Although 7029 -- 70924 is an example, I found

6   that in the batch records I had, this is a common

7   practice.

8      Q.    All right.  Well, that was a bad question.

9            Because what I really want to ask you about

10  is the last sentence there.   It says, "The blending

11  process did not show any procedural issues or

12  unexpected deviations from the established directions

13  and planned deviations as set in place."

14           Do you see that?

15     A.    Yeah.

16     Q.    In that sentence, are you referring to 70924?

17     A.    Yes, sir.

18     Q.    In short, it appeared appropriately blended?

19     A.    Absolutely, based on the information I

20  reviewed.

21     Q.    All right.  Then in the next paragraph, you

22  are talking about the blend sampling?

23     A.    Yes, sir.

24     Q.    And you talk about how they're withdrawn from

25  the blender using a sampling feed.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 204

 1      A.   Right.

 2      Q.   And you comment on that.   And that's

 3   appropriate; right?

 4      A.   Yeah.

 5           (A discussion is held off the record.)

 6      Q.   "Three sets of samples are taken to assure

 7   material is available should a repeat blend test be

 8   required."

 9           Is that what you wrote?

10      A.   That's exactly what I wrote.

11      Q.   Is it appropriate to do that?

12      A.   As we discussed this morning, yes, Matt, it

13   is.

14      Q.   All right.

15      A.   And it's also in the guidance.

16      Q.   Let's go to the next page.   The question on

17   tabletting.

18      A.   Yes, sir.

19      Q.   I'd say we can skip that.   We covered that

20   before.

21      A.   Yeah.

22      Q.   Let's go to Page 7, please.

23      A.   Right.

24      Q.   Under Investigation Report, the second

25   paragraph.

Russell Somma, Ph.D.                                    July 1, 2010

Page 205

1       A.    Right.

2       Q.    "The investigation report goes on to note

3    that a potential root cause for the occurrence of the

4    thick tablets may be an artifact of the compression

5    machine start-up procedure."

6             Do you see that?

7       A.    Yes, sir.

8       Q.    And then you say, "This is credible."

9             What do you mean by that?

10      A.    That it makes perfect sense to me.

11      Q.    Does that happen in start-up in tabletting?

12      A.    It happens with start-up all the time, Matt;

13   yes, sir.

14      Q.    Is that why you discard the first start-up

15   tablets, because they can be out of spec?

16      A.    That's why you pull away the equipment, you

17   put reject buckets under it to discard it, right.

18      Q.    Now, based on the number of times that my

19   client's press operators went through the start-up

20   process for this particular batch, did you make any

21   attempt to estimate the number of tablets that would

22   be produced during the start-up process?

23      A.    No, I didn't.

24      Q.    And you later comment in the next paragraph

25   that a problem could occur if these oversized tablets

Russell Somma, Ph.D.                                    July 1, 2010

Page 206

 1    made during start-up got hung up in a deduster or

 2    metal detector; right?

 3        A.    That's correct.

 4        Q.    And have you seen that happen in your own --

 5        A.    Yes.

 6        Q.    -- work in the pharmaceutical --

 7        A.    Yes, I have.

 8        Q.    --  business?

 9        A.    And my walk-through assured me that the

10    equipment used by Actavis, the likelihood that that

11    happens is small; very visible, very, very easy to

12    verify.

13        Q.    All right.  All right.

14              We're running out of time on the tape, so as

15    much as I don't like to do it, we need to take a

16    break.

17        A.    Sounds good to me.

18              THE VIDEOGRAPHER: Stand by.  We are going off

19        the record.  The time is 2:54 p.m. This is the end

20        of Tape Number 4.

21              (A recess is taken.)

22

23    CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

24              THE VIDEOGRAPHER: We are back on the record.

25        The time is 3:09 p.m. This is the beginning of

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 207

1          Tape Number 5.

2          Q.   Dr. Somma, I was asking you some questions

3     about your report.

4          A.   Yes, sir.

5          Q.   So let's go to Page 8.

6          A.   Yes, sir.

7          Q.   Now, so far as Batch 70924A is concerned, you

8     are aware that my client, when it finished all of its

9     inspections on that batch, found a total of 20

10    double-thick tablets.  Is that right?

11         A.   That's my understanding, yes, sir.

12         Q.   Okay.  Do you have an opinion to a reasonable

13    degree of probability as to whether or not my client,

14    in its inspection of that batch, failed to detect any

15    other extra-thick tablets?

16         A.    In my experience, we never relied on a visual

17    inspection to release a batch.

18         Q.   Sir.

19         A.   I didn't answer the question.

20         Q.   You didn't.

21         A.   No.

22         MR. MORIARTY:  Can you read that question

23    back, please?

24         Q.   It was a very specific question.

25              (The question is read.)

Russell Somma, Ph.D.                                    July 1, 2010

Page 208

1           MR. MILLER:  Objection.  Asked and answered.

2      A.    Okay.  I don't -- the probability is they did

3  not detect all of them.

4      Q.    Do you have an opinion to a probability as to

5  how many were made that were extra thick that were not

6  detected?

7      A.    I don't have a hard and fast rule, but my

8  rule of thumb was if you see 20, you got a thousand.

9  That's just Russ Somma's rule.  Opinion, that's all.

10     Q.    And Russ Somma's rule, is it based on

11  controlled trials where you tried visual inspections

12  and tried to see how many were caught or missed?

13     A.    It's based on my experience in scale-up of

14  processing.  It has never been confirmed by taking

15  them out and measuring if my rule is correct.

16     Q.    Is it based on peer-reviewed literature?

17     A.    No.

18           (A discussion is held off the record.)

19     Q.    So it's not based on actual scientific

20  studies where you compared visual inspections'

21  accuracy to actual defect rates?

22     A.    No, Matt, it's not.

23     Q.    So I want to get back to my question.

24           Do you have an opinion to a probability as to

25  how many extra-thick tablets were made but not caught

Russell Somma, Ph.D.                                        July 1, 2010

Page 209

 1    during the inspection of 70924?

 2              MR. MILLER:  Objection.  Asked and answered.

 3        A.    It's hard for me to say, so I would have to

 4    say the probability is high that there would be more.

 5        Q.    But you can't give me to a probability a

 6    number?

 7        A.    A number, no, sir.

 8        Q.    So 70924 is then bottled; correct?  Do you

 9    have an opinion to a probability as to whether there

10    were extra-thick tablets in every bottle?

11        A.    That would assume a uniform distribution

12    across the batch.  I can't say yes or no; however, I

13    think the prudent approach was to dump them back and

14    inspect again, which they did, yes.

15        Q.    I understand that.  I'm talking about after

16    the inspection.

17        A.    Oh.

18        Q.    You are saying you think there were still

19    extra-thick tablets that my client did not detect;

20    right?

21        A.    That's right.

22        Q.    And you have no actual basis for that other

23    than your experience --

24        A.    My experience.

25        Q.    -- that visual inspection is not that

Russell Somma, Ph.D.                                          July 1, 2010

                                                              Page 210

 1   accurate; correct?

 2       A.   That's correct, sir.

 3       Q.   Now, my client, after the inspection, 100

 4   percent inspection and after the tight AQL, repackaged

 5   the batch; did it not?

 6       A.   Yes.   They did.

 7       Q.   Into bottles; right?

 8       A.   Yeah, uh-huh.

 9       Q.   Do you have an opinion to a reasonable degree

10   of probability as to whether there were defective

11   tablets in all the bottles?

12       A.   There were certainly defective tablets there

13   that would not be detected.   Would they be in all the

14   bottles?   I don't know.

15       Q.   Do you have any opinion to a probability as

16   to how many of those tablets that may have been

17   defective actually made it into the prescription of a

18   consumer?

19            (A discussion is held off the record.)

20       A.   I didn't look at the field complaints, so I

21   don't know.   You know, that would be how I should have

22   done it.   I did not do that.

23            (A discussion is held off the record.)

24       Q.   Well, the field complaints, unless the

25   consumer got it and said, "this is a double-thick

Russell Somma, Ph.D.                                    July 1, 2010

                                                         Page 211

 1   tablet," the field complaint wouldn't necessarily tell

 2   you anything?

 3        A.    Exactly.

 4             MR. MILLER:  Object to form.

 5        A.    Exactly.

 6        Q.    So it is at least conceivable that if any

 7   extra-thick tablets got out, the number of which we

 8   don't know, it may have been a return to stericycle in

 9   the process of the recall.  Correct?

10        A.    I think that's a reasonable thought, yes.

11        Q.    Do you have any basis at all to say that

12   extra-thick tablets were made in the batch that was

13   made before 70924?

14        A.    No, sir.

15             MS. CARTER:  Object to form.

16        Q.    Do you have any basis in any of the material

17   you have reviewed to say that there were extra-thick

18   tablets made in the batch after 70924?

19             MS. CARTER:  Object to form.

20        A.    I think the only -- my only -- my only basis

21   would be that they did not do a thorough enough

22   investigation on the thick batch itself.  That's the

23   only thing.  Did I see anything else?  No.

24        Q.    Would you concede that it is possible that

25   the 100 percent inspection did get all of the

Russell Somma, Ph.D.                                    July 1, 2010

Page 212

1    extra-thick tablets out of 70924 before it went to

2    market?

3            MR. MILLER:  Object to form.

4        A.    In my opinion, it could not happen.

5        Q.    It's impossible?

6        A.    It's impossible.

7        Q.    Have you got any basis for that?

8        A.    Yeah, human fatigue.  That's why we have

9    vision systems for inspection.  It's a fact.

10       Q.    Well, how many -- how many people performed

11   the 100 percent inspection?

12       A.    Well, customarily you don't do 100 percent

13   inspection unless it's part of your process.

14       Q.    Dr. Somma, there is an actual document that

15   talks about how many people did this inspection and

16   how many days it took them to do it.

17       A.    Right.

18       Q.    How many people did the 100 percent

19   inspection?

20       A.    I don't recall.  I'd have to guess.

21       Q.    How many -- how many days did it take them to

22   do it?

23       A.    I don't recall.

24       Q.    Go to the second paragraph on Page 8.

25       A.    Right.

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                    Page 213

  1      Q.    Is it possible that the extra-thick tablets

  2  were within the API specifications?

  3      A.    It's very probable.  Or very possible.

  4  Excuse me.  It's possible, yes.  We don't know what

  5  they were made out of, so possible.

  6      Q.    Third paragraph.

  7      A.    Right.

  8      Q.    The second sentence.

  9      A.    Right.

 10      Q.    Can you tell me what that means?

 11      A.    "Recorded observations when considered

 12  against the theory that such a tablet would have been

 13  randomly produced during the normal manufacture of

 14  tablets is without merit."

 15           Meaning:  In my opinion that this just

 16  wouldn't happen sporadically based on what I had seen.

 17  The -- you know, simply based on observations

 18  contained in the records.

 19      Q.    So if I understand what you are then saying

 20  --

 21      A.    Right.

 22      Q.    -- after that, it lends credibility to the

 23  theory that the start-up is the more likely time when

 24  double-thick tablets were produced?

 25      A.    I think, based on the evidence that I've
```

Russell Somma, Ph.D.                                            July 1, 2010

Page 214

1   looked at, yes, sir.  It gets back to that.

2       Q.   Is that the most likely cause of what

3   happened, in hindsight?

4       A.   It certainly is one of the things I look to

5   go to after I do an investigation -- a review of the

6   batch records.

7       Q.   Have you formed an opinion to a probability

8   aboutwhat the root cause of the double-thick tablets

9   in 70924 was?

10      A.   My -- my opinion is the probability is about

11  50 percent that that is a result of start-up and

12  shutdown of a piece of equipment.

13      Q.   So it's 50-50?

14      A.   50-50.

15      Q.   That's actually a possibility; correct?

16      A.   A possibility.

17      Q.   What are the other possibilities?

18      A.   We go on to talk about a few of them, where

19  the tablet itself would have adhered to the punch and

20  rode around and back in and re compressed.

21      Q.   Yeah, but you said that was unlikely --

22      A.   Unlikely.

23      Q.   -- in our experience.

24      A.   Right.

25      Q.   So that's not probable?

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 215

  1      A.   That's unlikely.

  2           MR. MILLER:  Object.  Object to form.

  3      Q.   Isn't "unlikely" not probable?

  4           MR. MILLER:  Right, but you are asking for the

  5      remaining 50 percent, so...

  6      Q.   I haven't asked anything about the remaining

  7   50 percent.  This is one question at a time here.

  8           MR. MILLER:  Well, object to form.

  9      A.   My apologies for my selection of words.  I

 10   find that possible, but not probable.

 11      Q.   Okay.

 12      A.   Okay?  Does that help?

 13      Q.   Yes.  That's the recompression?

 14      A.   Right.  The --

 15      Q.   And you -- and you said up here that

 16   "randomly producing them during normal manufacture is

 17   without merit;" correct?

 18      A.   That is correct.

 19      Q.   And would not support random compression?

 20      A.   Right.

 21      Q.   So isn't that unlikely?

 22      A.   That is -- that's unlikely.

 23      Q.   All right.  Do we have any other explanations

 24   that compete with start-up for the likely explanation?

 25      A.   Nothing that I would be able to come up with
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 216

1    other than -- yeah, other than complete speculation.

2        Q.   And certainly in a -- what is this, a

3    45-station tablet press?

4        A.   45 station, double sided, yes.

5        Q.   So it's 90 tablets at start-up per

6    revolution?

7        A.   That's right.

8        Q.   Per press?

9        A.   Right, there's two presses.

10       Q.   So even if they only had one revolution per

11   press at start-up, you are talking about 180 tablets;

12   right?

13            MR. MILLER:  Object to form.

14       A.   Yeah, I -- I'd go with that.

15       Q.   Okay.

16       A.   Matt, I'd even say -- even if it is twice

17   that amount.  Because remember, this thing can move

18   around.  Let's just say it's -- say it's 180 exactly.

19   All right?

20       Q.   Let me just stick with the number of 180

21   tablets --

22       A.   Okay.

23       Q.   -- to keep my life simple here.

24       A.   All right.

25       Q.   Is it likely that my client's inspection

Russell Somma, Ph.D.                                          July 1, 2010

                                                                 Page 217

 1   missed 160 extra-thick tablets in that batch?

 2        A.   It's possible.

 3        Q.   I asked if it was likely.

 4        A.   Likely?

 5        Q.   Yes.

 6        A.   I think it's likely.

 7        Q.   Okay.  Is it likely they missed 360?

 8        A.   Wouldn't possible -- all 360?  I can't -- as

 9   the number grows, I think it becomes more apparent;

10   but --

11        Q.   I'm asking a specific number.  Isn't it

12   unlikely that that many people inspecting over that

13   amount of time with a product they're familiar with

14   would miss that many?

15             MS. CARTER:  Objection to form.

16        A.   As the number grows, it becomes less likely;

17   right.

18        Q.   Well, the number grew from 180 to 360.  It's

19   already unlikely that they missed that many; isn't

20   that right?

21        A.   I would have to agree that they would miss

22   all of them?  No way.

23        Q.   Let's go to Page 11 of your report.

24        A.   Uh-huh, got it.

25        Q.   On the second paragraph on that page, please.

Russell Somma, Ph.D.                                    July 1, 2010

Page 218

1      A.    Okay. This means?

2      Q.    "This means that the drug or API used for the

3   product must be well-characterized and understood."

4            Do you see that?

5      A.    Yes, sir.

6      Q.    "We did not see any data that indicated the

7   firm did any physio --"

8      A.    Physicochemical.

9      Q.    "-- physicochemical review of the drug in

10  problem batches."

11           First of all, what batches are you talking

12  about?

13     A.    In this particular case, and I apologize that

14  it's not clearer, by "problem batches" I meant the

15  two -- the batches that I looked at.  One was that

16  batch that had the blend issue, and the other was

17  the -- the double thick tablet.  That was the problem

18  batches I've talk about.

19           And the comment to get to is simply that I

20  didn't see the -- customarily in my experience, the

21  culprit is usually the API, and you do a little more

22  looking at the API.

23     Q.    Which blend batch are you talking about?

24     A.    Again, this gets back to the batch I looked

25  at.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 219

 1      Q.    Yeah, I want to know which one it is?

 2      A.    That's 71 -- 710 -- the other one I looked

 3  at, which is 71005.

 4      Q.    71005?  Do you have Batch Record 71005 with

 5  you?

 6      A.    Yeah, I do.  It's right here.  And the thing

 7  I'm looking at is there is an OOS investigation tag on

 8  the back; okay?

 9      Q.    Do you know whether 71005 was released?

10      A.    I should be able to look here; right?

11      Q.    To market.

12      A.    I have a finished product release form.  I

13  guess it was.

14      Q.    Okay.  That's a 0.125 batch?

15      A.    Yeah, yes, sir.  Yes it is, yeah.

16      Q.    And what do you mean by a physicochemical?

17      A.    Customarily what we want to look at is that

18  API itself is behaving as it was.  These things have a

19  tendency to drift in properties:  Physical appearance,

20  morphology, things like that.

21            It's something Actavis would have to do to

22  monitor the guys selling the stuff to them.  Okay?

23  It's sort of a control of your supply chain.

24      Q.    Do you know whether they test every batch of

25  active pharmaceutical ingredient that they receive?

Russell Somma, Ph.D.                                    July 1, 2010

Page 220

1        A.    I looked at the ANDA for Digitek, and it was

2    clear to me that they tested all the incoming batches

3    based on the ANDA.   All incoming batches of API.

4        Q.    Okay.

5        A.    Right.

6        Q.    So is that the kind of physicochemical review

7    you are talking about?

8        A.    No, Matt.   It usually goes a little bit

9    beyond that, and they did do that.   I've seen evidence

10   of particle size determination by a Malvern

11   synthesizer when I did my walk through.   But there's

12   other things you look at:   Thermochemistry,

13   morphology, searching things under a microscope.

14            (A discussion is held off the record.)

15       A.    This is stuff that I customarily look at when

16   I'm doing such an investigation.

17       Q.    Okay.   I want to get back to something I was

18   asking you before, because I forgot something.   And

19   I'm sorry if I'm repeating anything I went over this

20   morning.

21            I asked you whether you had any basis to say

22   that there were thick tablets made or released in the

23   batches before and after 70924.   Do you remember that

24   question?

25       A.    Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 221

1      Q.    All right.  Do you have any basis to say that
2    there were extra-thick tablets made and released to
3    market in any other Digitek batch in 2005 or after?
4      A.    Without having the root cause in front of us,
5    I would say is it one-off?  I can't say yes or no.  So
6    the answer is:  Based on the information you presented
7    as far as testing goes, that certainly supports there
8    were.
9         My opinion is, until you have done the
10   investigation to the level I'd expected, it's
11   possible.
12     Q.    Do you have any opinion to a probability what
13   the kind of investigation you think should have been
14   done would have revealed?
15     A.    Yeah.  Number 1, it would have identified
16   compressability.  It would have identified
17   flowability.  It would have identified any changes in
18   morphology.  And these things are all in the
19   literature and they are in your citations -- the
20   citations I gave you.  And not only that, it's also
21   stuff that I customarily do.
22         What I would be looking for is any change in
23   crystal structure.  Even at the low dose we have, it
24   can make these things more sticky or less sticky; it
25   can cause more flow or less flow; and things that can

Russell Somma, Ph.D.                                    July 1, 2010

Page 222

1    happen in the background without your knowledge.

2    Okay?

3        Q.   But as far as I understand it, and you have

4    certain batch records that you looked at and you have

5    other batch records available on the plaintiffs'

6    lawyers' website of documents; correct?

7        A.   Uh-huh.

8        Q.   Yes?

9        A.   That's correct.

10       Q.   Mark doesn't understand um-um and uh-huh.

11       A.   Yes, yes.

12       Q.   Okay?  But you didn't see -- you don't talk

13   about in your report problems with extra-thick tablets

14   in any other batches before or after 70924; right?

15       A.   That's correct.

16       Q.   So it's conceivable that a good, solid

17   investigation would have revealed that they just left

18   some start-up tablets in the deduster and that it was

19   not a common problem to other batches; right?

20           MR. MILLER:  Object to form.

21       A.   If I -- I would -- I would agree, had I not

22   looked at the quality of the deduster that Actavis

23   uses.  It is not likely that that is the case.

24           I agree there that's a credible excuse, Matt;

25   but after my inspection, it's not likely.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 223

1        Q.   Well, a good solid investigation could have
2    found a root cause that was just a one-off; right?
3        A.   Usually -- My point exactly.  A one-off, if
4    you agree that it's a one-off and everybody says it's
5    okay and you move on, is fine, as long as you are
6    absolutely certain it's a one-off.
7        Q.   It's pretty hard to always be absolutely
8    certain; isn't it?
9        A.   Yes.  Uh-huh.
10       Q.   You said yes; right?
11       A.   Yes.
12       Q.   Have there been many times in your work in
13   the pharmaceutical industry where you didn't come to a
14   root cause?
15       A.   Yes.
16       Q.   Okay.  Page 11.
17       A.   Uh-huh.
18       Q.   Fifth paragraph.
19       A.   "The attributes"?
20       Q.   Yes.
21       A.   Uh-huh.
22       Q.   The second sentence I don't understand.
23       A.   Okay.
24       Q.   "Tablet weight assures the proper level of
25   API is contained within each tablet."

Russell Somma, Ph.D.                                    July 1, 2010

                                                         Page 224

 1            Do you see that?

 2       A.   Yes, sir.

 3       Q.   Is that true?

 4       A.   "The tablet weight assures the proper level

 5   of API is contained in each tablet."

 6            That is true because the blend feed stock is

 7   uniform.

 8       Q.   Okay.

 9       A.   Right?

10       Q.   I mean you could have a proper weight tablet

11   that's 100 percent excipients; right?

12       A.   Exactly the point, Matt.  And that -- but

13   that speaks to the blend, not the tablet.

14       Q.   All right.  And presumably that's why you do

15   finished product testing?

16       A.   Yes, but remember:  One of the things we as

17   an industry suffer from is end-use testing.  End-use

18   testing is not adequate in most cases to control the

19   process.

20       Q.   Did you ever see any place where FDA cited or

21   warned Actavis, or even Amide, for the use of Stokes'

22   BB2 tablet presses.

23       A.   I don't recall seeing stuff about that.

24       Q.   The fact that --

25       A.   There was a question about their

Russell Somma, Ph.D.                                    July 1, 2010

Page 225

1    qualification, but not the use as I recall it.

2        Q.   Have you ever seen anything in the material

3    that says that the Stokes machines weren't qualified?

4        A.   I'd have to actually -- to be -- I vaguely

5    remember seeing something about qualification.

6    Whether it was the Stokes or not, Matt, I have to say

7    I don't know.  I'd have to go and look.

8             MR. MILLER:  Well, you can take your time and

9        look if you need to.

10       Q.   Can you answer while you look?

11            MR. MILLER:  No.

12       Q.   Can you multi task?

13            MR. MILLER:  No.

14       Q.   Let me ask you a couple of questions before

15   you look.

16       A.   Yeah.

17       Q.   FDA was well aware that my client was using

18   Stokes BB2 tablet presses from the ANDA and every

19   batch record; correct?

20       A.   Absolutely.  Batch presses are noted in the

21   ANDA, yes.

22       Q.   Even after Batch 70924, did FDA ever give a

23   483 or warning letter about the use of Stokes BB2

24   tablet presses?

25       A.   No, I don't recall that.

Russell Somma, Ph.D.                                July 1, 2010

Page 226

1          And, again, my only question was whether or

2    not they did their homework on qualifying.  Okay?

3    That's it.

4       Q.   Is there any CFR or any other regulations

5    requiring the use of tabletting equipment with weight

6    controls?

7       A.   Again, CFRs are meant to give equipment --

8    excuse me -- to given industry guidance, but not to

9    mandate how they run their business.  So there is no

10   mandatory requirement that they run an instrumented

11   tablet press.

12      Q.   Okay.  Have you ever seen any evidence that

13   Digitek was cross contaminated with any other product?

14      A.   Absolutely not.

15      Q.   When there is equipment, tabletting equipment

16   with weight controls, do they typically weigh all the

17   tablets, or is it random sampling?

18      A.   Well, Matt, tablets -- with a weight control

19   system does not weigh tablets.  What it weighs is the

20   force applied to form the tablets.  So what it does is

21   it monitors the pressure in a finite environment.

22          To clarify, it measures every one, every

23   tablet is measured.  It's not necessarily weighed.

24   It's indirect.  Okay?

25      Q.   Let's go to Page 13 of your report.

Russell Somma, Ph.D.                                    July 1, 2010

Page 227

```
 1       A.    Yes, sir.
 2       Q.    It says, "The data for digoxin manufacture
 3   that we reviewed show a lack of appreciation of the
 4   dangers of this compound."
 5             My client has made billions of digoxin
 6   tablets.  How many have you been involved in making?
 7       A.    I never made digoxin, sir.
 8       Q.    So what is the basis for your statement that
 9   my client shows a lack of appreciation for the dangers
10   of the compoundinig?
11       A.    It seems to me that my involvement with
12   highly potent products in the past, which is more
13   in -- highly potent means low dose, as taken here;
14   that more care is given to maintaining their weight,
15   assuring homogeneity.  That's all.  That's what I'm
16   trying to say.
17             I was comparing it to people making highly
18   potent compounds.
19       Q.    Well, so far as weight is concerned, did you
20   find evidence in the material that you reviewed that
21   there were batches which made it to market that had
22   weight issues?
23       A.    Not based on the run -- the run sheets I
24   looked at, no.
25       Q.    Okay.
```

Russell Somma, Ph.D.                                          July 1, 2010

Page 228

```
 1      A.   But, again, understand that the weight of the
 2   tablet is not an indicator of its uniformity.
 3      Q.   I know.  But you just used weight as an
 4   example?
 5      A.   True, but weight is in fact only an indicator
 6   of the dosage form.  We get right back to the fact
 7   that the dosage form itself has to be uniform, and
 8   what I'm trying to be clear about is:  You could have
 9   a uniformly weight -- a uniform weight batch, tablets
10   right down the middle, but the blend that goes to feed
11   that material has to be uniform, so that each aliquot
12   is the same.
13           I'm sorry, if I misunderstood -- if I
14   misunderstood.
15      Q.   And you are basing that on the less than a
16   handful of blend investigations that you saw in these
17   materials.  Is that right?
18           MR. MILLER:  Object to form.
19      A.   Here again, in my profession, usually we are
20   brought in, we are not given all of the details.  The
21   answer (sic) is:  Do we see a potential problem?  And
22   based on the information I was presented, the answer
23   is:  Yeah.
24           I looked for the usual candidates that lead
25   to problems, and they were all there.  Lack of
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 229

1    investigation, lack of understanding of the API, you

2    know, in general.

3              There's a lot of investigations, Matt, and

4    there's not a lot on the side -- you know, not a lot

5    that focus on the things that I would have looked at.

6    Q.    What do you mean in the next paragraph by

7    "The firm lacks the fundamental understanding of the

8    need to define the requirements of the product to be

9    manufactured and take actions within their supply

10   chain"?

11   A.    That gets back to my API point.  If, in fact,

12   they didn't look at the API, how would they be able to

13   feed back into their supply chain that they are

14   getting the necessary material for the necessary

15   functionality purpose.  That's all I'm saying.

16   Q.    Have you ever seen any FDA 483 or warning

17   letter indicating that Actavis did not pay adequate

18   attention to its API -- raw API?

19   A.    I don't think that they were cited

20   specifically on that, no.

21   Q.    Do you have any information at all that shows

22   that active pharmaceutical ingredient that was of

23   inappropriate potency or purity was used in Digitek?

24   A.    No.

25   Q.    Does -- At Page 14 --

Russell Somma, Ph.D.                                          July 1, 2010

```
                                                         Page 230
 1      A.   Yes.

 2      Q.   -- you are talking about V-shaped blenders

 3   and double-cone blenders --

 4      A.   Right.

 5      Q.   -- being of different geometry; right?

 6      A.   Right, uh-huh.

 7      Q.   That's a yes?

 8      A.   Yes, sir.

 9      Q.   Does FDA actually consider them part of the

10   same family?

11      A.   Yes, they do.

12      Q.   What do the SUPAC guidelines say about the

13   use of V-shaped and double-cone blenders in the

14   same --

15      A.   They're in the same class, but different sub

16   classes.

17      Q.   Does SUPAC specifically say not to use them

18   in the same drug production?

19      A.   It doesn't given you that guidance.  When we

20   put SUPAC together, we dealt with that question

21   specifically to give industry flexibility, but it

22   requires that the owner of the firm assure that that's

23   done properly.

24      Q.   So the bottom line is:  My client's use of

25   this blender configuration doesn't violate any --
```

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 231

 1        A.    Any regulation.

 2        Q.    -- regulation or guidance from SUPAC; right?

 3        A.    No, sir.

 4        Q.    Now, I've asked you a lot of questions today

 5   about whether you had evidence of out-of-spec Digitek

 6   making it to the hands of consumers.  I don't need to

 7   rehash that.

 8              But as we've gone through that, when I've

 9   been asking about out-of-spec tablets getting to

10   consumers, what have you understood that to mean?

11        A.    My understanding was out-of-spec tablets

12   getting to consumers -- I've taken that simply from

13   the analytical perspective.  Okay?  In other words,

14   you have a set of specs and you test it.  Right?

15        Q.    Okay.  Do the analytical specs include weight

16   and thickness?

17        A.    I believe those are in the testing monograph.

18        Q.    And the testing monograph includes the range

19   for the active pharmaceutical ingredient; right?

20        A.    That's correct.

21        Q.    All right.  Anywhere in your report, did you

22   say that tablets, either extra thick or outside the

23   USP's active pharmaceutical ingredient specifications

24   made it to the hands of consumers?

25        A.    No, sir, I didn't make that statement.

Russell Somma, Ph.D.                                  July 1, 2010

Page 232

```
 1            MR. MORIARTY:  Adam, how much time left do we
 2       have on the tape?
 3            THE VIDEOGRAPHER: We have I'd say a full 40
 4       minutes left.
 5            MR. MORIARTY: Okay. Let's just take a --
 6            Do you have questions that you know of right
 7       now?
 8            MS. CARTER: One or two.
 9            MR. MORIARTY:  Let's take a five or ten-minute
10       break.  Let me go through all my notes with Ms.
11       Downie and we will see where we are and be in a
12       position to wrap this up.  Okay?
13            MR. MILLER:  Okay.
14            THE VIDEOGRAPHER: Please stand by.  We are
15       going off the record.  The time is 3:48 p.m.
16            (A recess is taken.)
17
18  CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:
19            THE VIDEOGRAPHER: We are back on the record.
20       The time is 4:04 p.m.
21       Q.   Dr. Somma, I have a couple exhibits that I
22  hadn't asked you about yet.  I'm anxious to lighten my
23  load.
24            This is Exhibit 9.  It's MOI145.
25            You know what an MOI is; don't you?
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 233

```
 1      A.   Yes, sir.

 2      Q.   Method operating instruction?

 3      A.   Yes, sir.

 4      Q.   Have you seen this document?

 5      A.   I have seen it, yes, sir.

 6      Q.   I didn't notice any criticisms --

 7      A.   No.

 8      Q.   -- in your report about MOI145?

 9      A.   No, sir.

10      Q.   You don't have any criticisms of it?

11      A.   No, sir.

12      Q.   This is Exhibit -- it's actually Plaintiffs'

13  Exhibit 159.  Have you seen this document before?

14      A.   Yes, sir.

15      Q.   This is a blend failure investigation?

16      A.   Uh-huh.

17      Q.   Is that a yes?

18      A.   Yes, sir.

19      Q.   Is this one of the documents you were relying

20  on for your opinions about the blend issues in this

21  situation?

22      A.   Yes, sir.

23      Q.   And lastly, this is Exhibit 288.  And I'm

24  sorry, I can't tell you whether that's Defense or

25  Plaintiff's Exhibit 288, but it's 288.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 234

```
 1          MR. MILLER:  It's plaintiffs'.
 2          MR. MORIARTY:  Is it?  Oh, it says,
 3      "Plaintiffs" on it.  That's a pretty good hint.
 4          (A discussion is held off the record.)
 5      Q.   Have you seen this document before?
 6      A.   I've seen test reports of blend assay, not
 7   this specific one.
 8      Q.   Okay.  Is this an investigation of a --
 9   either a planned or an unplanned deviation in blend
10   uniformity?  And I see in here some planned
11   deviations, and then in the back I see an out-of-spec
12   investigation.
13          Do you know what this document is?
14      A.   I haven't looked through it yet.
15      Q.   Did you rely on it in forming opinions in
16   this case?
17      A.   No, sir.
18      Q.   All right.
19      A.   Not that I recall.
20      Q.   Okay.  Then I won't ask you about it.
21      A.   Okay.
22      Q.   Does FDA have a good scientific reason to
23   take 484 samples and test them?
24          MR. MILLER:  Object to form.
25      A.   That's a good question -- that's a good
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 235

1    question.  I don't think I know the answer.   From a

2    scientific standpoint it's to confirm that you've done

3    what they told you to do.  Isn't that called -- isn't

4    that part of vigilance, follow-up, I guess?

5        Q.   If either Actavis' finished product testing

6    or any testing done by Celsis Labs or any 484 sampling

7    and testing done by FDA had been out of specification

8    regarding Digitek, do you think that would have been

9    important to your opinions?

10       A.   Yes.

11       Q.   On the flip side of that coin, isn't the

12   absence of out-of-spec testing by all three of those

13   entities unfinished product testing significant?

14            MR. MILLER:  Object to form.

15            MS. CARTER:  Object to form.

16            (A discussion is held off the record.)

17       A.   I think it's significant.

18       Q.   Did you perceive your role in this

19   consultation to be to assess whether there were

20   potential problems with the production of Digitek?

21       A.   If there was a -- a problem that was not

22   identified, perhaps; something that was not seen

23   before.

24       Q.   In other words, a potential problem?

25       A.   A potential problem.

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 236

 1      Q.   And "potential" is really "possibility"; is
 2   it not?
 3           MR. MILLER:   Object to form.
 4      A.   I guess I'd have to put it in that category
 5   of possible, yeah.
 6      Q.   And the existence of a potential problem does
 7   not always mean that there is an actual problem.  Is
 8   that right?
 9      A.   Unless you go about answering the question in
10   the investigation; then you can't say if it's
11   potential or not.  But that's how I do business, how I
12   do my job.
13      Q.   And just to make sure I understand your
14   thoughts on this case completely, are you saying that
15   Actavis was, in fact, producing Digitek outside the
16   specifications, and it's just a sheer coincidence that
17   none of it was detected by Actavis, FDA or Celsis or
18   pharmacists?
19           MR. MILLER:   Object to form.
20      A.   I would say yes.
21      Q.   What's the scientific basis for you to say
22   that?
23      A.   Because without identifying as these issues
24   myself, the potential with the blend, the observations
25   I made with the blend, that they -- in here; the

Russell Somma, Ph.D.                                July 1, 2010

                                                        Page 237

1    observations with even the heavyweight tablets or
2    whatever we call them, double-thick tablets, I am not
3    thoroughly convinced that the investigation into the
4    root cause uncovered all the potential issues.  To my
5    satisfaction.
6        Q.   Are you done with your answer?
7        A.   Yes, sir.
8             MR. MORIARTY:  Can you read that back, please,
9        from the "I'm not thoroughly convinced" part.
10            (The answer is read.)
11       Q.   Would you agree with me that the fact that
12   Russ Somma is not thoroughly convinced that the
13   investigation uncovered all of the problems to your
14   satisfaction does not mean that consumers actually
15   received out-of-specification Digitek?
16            MR. MILLER:  Object to form.
17       A.   That I am not convinced, me?  I am not
18   convinced that they --
19            Let me have the question again, please.
20            I'm sorry, Matt.
21            (The question is read.).
22       A.   Gee, I must be thick.  I'm sorry.
23       Q.   Okay.  That's fine.  If you don't understand
24   it -- or it's late, it's late.
25       A.   I'm a little thick.  I'm sorry.

Russell Somma, Ph.D.                                   July 1, 2010

Page 238

1      Q.   You told me --

2      A.   Yeah.

3      Q.   -- just a minute ago that you weren't

4  thoroughly convinced that the investigation of 70924

5  uncovered all the problems to your satisfaction?

6      A.   Right.

7      Q.   Correct?

8      A.   That's correct.

9      Q.   That's your opinion --

10     A.   That's my opinion.

11     Q.   Russell Somma?

12     A.   Right.

13     Q.   Correct?

14     A.   That's right.

15     Q.   Just because you are not thoroughly convinced

16 that that investigation uncovered all the problems to

17 your satisfaction does not necessarily mean that

18 consumers actually got Digitek that was outside the

19 specifications.  Isn't that correct?

20          MR. MILLER:  Object to form.

21     A.   Everything I've looked at Matt, you know, for

22 me to agree with you, I would have to be convinced

23 that this information is there, and I'm not.  I'm

24 really not.  If this was Novartis and you asked me

25 that and you were -- you were my superior, my

Russell Somma, Ph.D.                                    July 1, 2010

Page 239

1   recommendation is no, I'm not convinced and,

2   therefore, I'm not comfortable with the situation.

3   That's just the way I am.

4        Q.   Well, are you asking me to prove to you that

5   there weren't defective tablets in the hands of

6   consumers?

7             MR. MILLER:  Object to form.

8        A.   No, I'm -- I want to see information that was

9   done in a rigorous enough fashion that I am convinced.

10  Sorry.

11       Q.   All right.  That's not my question.

12       A.   I'm sorry.

13       Q.   Okay.  The purpose of this lawsuit is not for

14  you to be convinced about the rigors of this

15  investigation.

16       A.   Okay.

17       Q.   All right?  I thought I'd asked this many

18  times before today, and I don't want to rehash it and

19  go on and on and on.

20            I haven't heard you say anything today where

21  you say to a probability that you have some scientific

22  proof that consumers got out-of-specification Digitek.

23            MR. MILLER:  Object to form.  If there's a

24       question.

25       Q.   Are you changing your opinion in that regard?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 240

1       A.   No, sir.

2       Q.   Okay.  So do you see what I'm trying to drive

3    at here?  Your level of -- your not being thoroughly

4    convinced that the investigation revealed problems

5    with that one batch does not prove that there was

6    out-of-spec Digitek in the hands of consumers; does

7    it?

8            MR. MILLER:  Object to form.

9       A.   And, again, what I have to point to is that

10   all of the parts have to move and have to work

11   properly.  And there's certainly information that says

12   in general, the quality systems here were not

13   functioning properly.

14      Q.   Give me all the affirmative, scientific

15   evidence that you have that any consumers got

16   out-of-specification Digitek in their prescription

17   vials?

18      A.   And, again, if all we rely upon is the

19   specifications, we wouldn't be having this

20   conversation.  The answer is:  There's got to be

21   another dimension to it, and that dimension is the way

22   in which they manufactured the product, and that is

23   the point I keep trying to make.

24           I haven't seen anything beyond:  They meet

25   specs.  If you live by the specs, you die by the

Russell Somma, Ph.D.                                    July 1, 2010

Page 241

1   specs.  It's as simple as that.  That's a

2   narrow-minded approach.  And I agree with you, they

3   all met spec.

4        MR. MORIARTY: I'm going to pass the witness to

5        Ms. Downie.

6

7   CROSS EXAMINATION BY MS. DOWNIE:

8        Q.   Dr. Somma, I have just a few questions for

9   you.

10        You testified earlier today that you were

11   contacted initially by Spyglass, Mr. Kenny's

12   organization.  Is that correct?

13        A.   That's correct.

14        Q.   And when were you first contacted by Mr.

15   Kenney?

16        A.   In March.

17        Q.   How many times have you spoken with him

18   regarding this litigation?

19        A.   Two -- three times.

20        Q.   And when he first contacted you, what did he

21   tell you he expected your role to be in this

22   litigation?

23        A.   To be the technical opinion.

24        Q.   And did he provide to you details regarding

25   what the litigation was about?

Russell Somma, Ph.D.                                    July 1, 2010

Page 242

1      A.   Other than the fact that an oversized tablet
2   was distributed, no.  That's all I understood.
3      Q.   Do you recall any other specifics of that
4   conversation?
5      A.   The conversation revolved around:  Had I seen
6   problems like this before, what is my opinion.  That's
7   about it.
8      Q.   And had you seen problems like this before?
9      A.   Yes, the same that I outlined before.
10      Q.   Okay.  And you said you had spoken to him
11   about two or three times?
12      A.   Right.
13      Q.   Do you recall the substance of your
14   conversations subsequently?
15      A.   The next one was we met on Crivella to talk
16   about the information, and then we decided -- you
17   know, we wanted to make sure that what I focused on as
18   far as content was something -- was nothing that he
19   had -- that he had focused on, I guess what I'm trying
20   to say; to understand what our approach was going to
21   be.
22      Q.   Why was it important that your opinions not
23   overlap?
24      A.   I wanted to make -- I wasn't going to produce
25   something that was -- in other words, as I understood

Russell Somma, Ph.D.                                July 1, 2010

Page 243

1    it, I told you what my limitations are.  I'm not a

2    regulatory person.  I'm not a compliance person. So my

3    point was:  I looked at the technical dimension. That

4    was it.

5        Q.   And what do you understand his role to be?

6        A.   My understanding is, Mark is quality

7    assurance.

8        Q.   Quality assurance?

9        A.   That's my understanding.

10       Q.   Have you taken a look at his report?

11       A.   No, sir.

12            No, ma'am.  Sorry.

13       Q.   That's okay.  It's been a long day.  I won't

14   take offense.

15            Have you discussed with him what his opinions

16   are?

17       A.   No, ma'am.

18       Q.   You just discussed what the scope of his

19   opinions would be?

20       A.   I discussed what -- where he would come down

21   as to what his definitions and his assessment would

22   be; not the scope.

23       Q.   What did he tell you his definitions of --

24       A.   Quality assurance, quality systems; you know,

25   these kind of things that lead up to that.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 244

 1    Customarily when we do a technical investigation, we
 2    don't go down and drill through training manuals and
 3    SOPs.  Okay?
 4         Q.   How long -- Or how many times have you worked
 5    with Mr. Kenney in investigations --
 6         A.   Never before.
 7         Q.   -- before consulting --
 8         A.   Never before.
 9              Oh, I'm sorry.  Never before.
10         Q.   And are you -- have you been retained by
11    Spyglass or are you retained by the plaintiffs'
12    counsel in litigation?
13         A.   I work for -- I work for Motley, Rice,
14    plaintiffs' counsel.
15         Q.   Okay.  Were you given any kind of consulting
16    fee or did you pay any consulting fee to Spyglass?
17         A.   No, I did not.
18         Q.   Okay.
19         A.   This was something, when -- when we first
20    talked, this was -- this was sorted out between
21    myself, Motley, Rice and Spyglass.  And Motley, Rice
22    gave us the direction and we were totally separate.
23         Q.   Other than Mr. Kenney, have you spoken to any
24    other individuals regarding this litigation, other
25    than of course plaintiffs' attorneys?

Russell Somma, Ph.D.                                      July 1, 2010

Page 245

1        A.    Sal Romano, who works with Mark Kenny.

2        Q.    And how many times have you spoken -- I'm

3    going to say Sal, because I'm not sure of the last

4    name.

5        A.    Right, Romano.

6              Two times, as far as I recall.

7        Q.    Two times.  And what were your discussions

8    with Mr. Romano?

9        A.    The initial investigation -- the initial

10   interview, if I had the background in tabletting.

11   Okay?  And the second time was when we trained on how

12   to use Crivella.

13       Q.    Remind me again what Crivella is?

14       A.    Crivella is a database --

15       Q.    Right.

16       A.    -- that all of this stuff is on.

17   C-r-i-v-e-l-l-a.

18       Q.    That's right.  That's what you looked at the

19   batch records on; is that correct?

20       A.    That's where the batch records are.

21       Q.    Why are the batch records important for you

22   to review?

23       A.    Batch records to me are the manner in which

24   the company manages that part of the manufacturing.

25   This is the hands-on approach that the operator does,

Russell Somma, Ph.D.                                    July 1, 2010

Page 246

 1    it's his direction, and that's his personal interface.
 2    That's the human interface, in my opinion.  It also is
 3    a reflection of all of the sum total knowledge from
 4    development to maturation, it's in the batch records.
 5    This is how you make it.
 6        Q.   And I believe it was your testimony earlier
 7    that you believe that Actavis should have reviewed the
 8    batch records before and after?
 9        A.   That's an opinion, yes.
10        Q.   That's right.   And you have only reviewed
11    the batch record that occurred prior.   Is that
12    correct?
13             (A discussion is held off the record.)
14        A.   As close as I can get.
15             MR. MILLER:  Asked and answered.
16             (A discussion is held off the record.)
17        Q.   How many times have you personally been
18    involved in a visual inspection of the type that was
19    conducted by Actavis?
20        A.   Two times.
21        Q.   When were those?
22        A.   I would have been -- guessing now, early
23    '80s, and these were primarily in a clinical dosage
24    form area.  But again --
25        Q.   What were the context of those individual

Russell Somma, Ph.D.                                    July 1, 2010

Page 247

1    inspections, why were they being conducted?

2         A.    In those particular cases, we were looking

3    for capsules, if I recall.  I think it was a cracked

4    capsule.

5         Q.    You were looking for cracked --

6         A.    Cracked capsules.

7         Q.    In both instances?

8         A.    In one instance, I think.  I think the other

9    one what is I recall was a double debossed problem.

10   It's kind of like a -- it's not a double thick, excuse

11   me.  It's sort of like an overwritten imprint.  That

12   was a total bust, by the way.

13           Most of my other have been systems,

14   electronic systems.

15        Q.    Okay.

16           MS. DOWNIE:  I don't have any other questions.

17   Thank you.

18           MR. MORIARTY:  I think I just have one more.

19

20   REDIRECT EXAMINATION BY MR. MORIARTY:

21        Q.    In that private consulting engagement you had

22   with the extra thick tablets, was anyone asked to

23   prove whether thick tablets were -- actually got to

24   consumers?

25        A.    I believe it was reacting -- I think it was

Russell Somma, Ph.D.                                July 1, 2010

Page 248

1    as a result of a field complaint.  And, again, I

2    didn't get deeply into that, but my understanding was

3    a field complaint.  Because there was subsequent

4    regulatory action as I recall as a result.

5         Q.   Is that what started the investigation?

6         A.   I believe so.

7         Q.   Okay.  So the fact that there was a field

8    complaint, do you know whether it was from a

9    pharmacist or a consumer?

10        A.   That I don't recall, Matt.  I don't.

11        Q.   All right.  Well, a field complaint, was it

12   pharmacist or consumer?

13        A.   To be honest, Matt, I don't know.  You know,

14   because I realize that they can come in by various

15   conduits.  To be perfectly honest, I don't -- all I

16   know is:  We got a complaint.

17             In my business, if I got a complaint from the

18   field.  To me that means, well, somebody caught it

19   outside the confines that you have control ove.

20   That's bad.  Okay?  That's how I took it.  How it came

21   in, Matt, I can't tell you. I don't know.

22        Q.   It's bad, but it happens?

23        A.   It happens.

24             MR. MORIARTY:  All right.  I don't have any

25        other questions.

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 249

1            MR. MILLER:  I have a couple of questions.

2

3     RECROSS EXAMINATION BY MR. MILLER:

4            MR. MORIARTY:  And, again, I object in general

5        to you asking your own experts questions in my

6        deposition.  But go ahead.

7            MR. MILLER:  Okay.

8     Q.    Dr. Somma, do you have an opinion to a

9     reasonable degree of probability that Actavis released

10    the product Digitek outside of specification with

11    regard to thickness specifications over the course of

12    time that the recalled products were manufactured?

13    A.    Yes.

14    Q.    Do you have an opinion to a reasonable degree

15    of probability that out-of-specification Digitek

16    tablets were released during the time of manufacturing

17    for the recall product that were out of specification

18    for blend uniformity specifications?

19    A.    Welt, that's certainly a tough one, but the

20    answer is, again, based on what I looked at because,

21    you know, the blend question itself in my opinion has

22    not been resolved to an adequate level, I would have

23    tosay yes.

24    Q.    We went over the opinions in your expert

25    report.  Other than the information that you had

Russell Somma, Ph.D.                                    July 1, 2010

Page 250

 1  corrected --

 2       A.   Right.

 3       Q.   -- that you had picked up yesterday, has

 4  anything been shown to you or said today that alters

 5  any of the opinions that you have in your report?

 6       A.   No.  We talked about the sample frequency.  I

 7  was wrong there.  Okay?

 8       Q.   Right.  We covered that.

 9       A.   Okay.  Other than the fact that I obviously

10  made that one mistake, these are still -- these

11  bullets are still -- are what I've put down and these

12  are my opinions based on what I've read.

13       Q.   Do you hold these opinions to a reasonable

14  degree of probability?

15       A.   Within the same probability that we have been

16  discussing today, yeah.

17            MR. MILLER:  I have no further questions.

18            MR. MORIARTY:  Okay.  I have more now.

19

20  RE-REDIRECT EXAMINATION BY MR. MORIARTY:

21       Q.   Let me see if I can make sure I understand.

22            Mr. Miller asked you if you had an opinion to

23  a reasonable probability about whether my client was

24  releasing Digitek that was too thick over the course

25  of the time of the recalled batches.

Russell Somma, Ph.D.                                      July 1, 2010

                                                          Page 251

1              Do you remember that question he just asked

2    you?

3        A.    Uh-huh.

4        Q.    How many batches?

5        A.    How many batches were recalled?

6        Q.    No.  How many batches had extra-thick tablets

7    that were released?

8        A.    I'm -- that I -- the probability of giving

9    you that number, I don't know.

10       Q.    Which batch numbers?  Which batch numbers had

11   extra-thick tablets?

12       A.    I think -- I'm thinking about this that this

13   had happened and gone undetected.  In that case, how

14   would I know the batch numbers?

15       Q.    Well, how would you know it happened and went

16   undetected?  What's that based on?

17       A.    Simply -- simply the lack of rigor that was

18   conducted and the way they analyzed the problem.

19       Q.    On 70924?

20             MR. MILLER:  Object to form.

21       Q.    That's the batch you said had no rigor;

22   right?

23       A.    Yes

24             MR. MILLER:  Object to form.

25       Q.    Okay.  That was December of 2007; correct?

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 252

     1     A.   Uh-huh, uh-huh, yes, it is.

     2     Q.   So tell me what basis you have whatsoever to

     3   say that out-of-spec tablets that were too thick ever

     4   left Actavis's premises before that even happened in

     5   2007?

     6     A.   Well, there was the one report on the 2000 --

     7   in 2004; right?  For a thick tablet.

     8     Q.   Yeah.

     9     A.   Okay.  Right?

    10     Q.   Okay.  Anything else?

    11     A.   No.

    12     Q.   So out of the billions that were made, we

    13   have one tablet that actually made it to a pharmacist

    14   out of billions; correct?

    15     A.   Uh-huh.

    16     Q.   Yes?

    17     A.   That's correct, sir.

    18     Q.   And that's your basis for an opinion to a

    19   scientific probability that this was an ongoing

    20   problem?

    21          MR. MILLER:  Object to form.  It misstates

    22     previous testimony.

    23     A.   Again --

    24     Q.   Yes or no?

    25          MR. MILLER:  No.

Russell Somma, Ph.D.                                    July 1, 2010

                                                           Page 253

```
 1      Q.    Is that your basis to say that this was an
 2   ongoing problem?
 3      A.    Yes.
 4      Q.    All right.  So I want to get back.
 5            What batches and how many batches, give me
 6   the numbers, give me how many?
 7            MR. MILLER:  Objection.  Asked and answered.
 8      Q.    Is the answer:  You can't do it?
 9            MR. MILLER:  Objection.
10            MR. MORIARTY:  Well, if it was answered, that
11      was the answer I heard.
12            MR. MILLER:  Well, you heard wrong.  That's
13      not what he said.
14            MR. MORIARTY:  Okay.
15            MR. MILLER:  He said he didn't know.
16      Q.    Got any field complaints you can show me?
17      A.    No, sir.
18      Q.    Got any test results you can show me for
19   thickness or weight?
20      A.    Nothing other than what you showed me.
21      Q.    Do you have anything scientific that you can
22   show me besides the 2004 incident, between then and
23   the end of November 2007, anything at all?
24            MR. MILLER:  Objection.  Asked and answered.
25      A.    Again, everything I've looked at -- All
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 254

1    right?  -- from a scientific basis indicates that

2    there is a product that was released, it was within

3    the requirements.  Does that mean all of the -- there

4    is nothing else going on?

5           And, again, this is simply my opinion.  And

6    in my opinion, without more investigation or better

7    rigor than that, I can't tell you if it got out there.

8    Is the evidence there?  There is one tablet in '04 and

9    that was it.

10      Q.   So it is your opinion, but when I ask you for

11   a scientific proof of the opinion, you can't point to

12   a document in the materials you've looked at.  Is that

13   right?

14           MR. MILLER:  Object to form.

15      A.   There was nothing in here that clearly drew

16   that conclusion, correct.

17      Q.   Okay.  Then the next opinion you had that Mr.

18   Miller asked you about was essentially the same

19   question:  Did you have a reason -- an opinion to a

20   reasonable probability that there was something about

21   out-of-spec blend uniformity that made it to end

22   release.

23           Do you remember that question?

24      A.   Yes.

25      Q.   Okay.  Let's get -- let's get accurate about

Russell Somma, Ph.D.                                    July 1, 2010

Page 255

```
 1   what happens.  If, in fact, there is a blend
 2   uniformity that is truly out of spec, it leads to the
 3   possibility that there will be more active
 4   pharmaceutical ingredient in some part of the batch
 5   and less in the other; correct?
 6       A.   That's correct.
 7       Q.   And a batch is not released that way; it is
 8   tabletted --
 9       A.   That's right.
10       Q.   -- and then it goes out; correct?
11            So the theory would be that some tablets in
12   that particular batch might have too much and others
13   might have too little of the active pharmaceutical
14   ingredient; correct?
15       A.   That's correct.
16       Q.   All right.  Now, I don't want to plow old
17   ground over and over, because I've asked you this
18   before.  But can you identify any field complaints
19   where that was documented to have occurred?
20            MR. MILLER:  Objection, asked and answered.
21       Q.   In the material you reviewed.
22       A.   Right.  No.
23       Q.   Can you document any test results to indicate
24   that that actually occurred?
25       A.   Not that I recall.
```

Russell Somma, Ph.D.                                          July 1, 2010

Page 256

1      Q.   Can you identify any batch by number where

2    that occurred?

3           MR. MILLER:  Objection.  Asked and answered.

4      A.   I think the answer was no for that.

5      Q.   Can you identify how many batches in which

6    that occurred?

7           MR. MILLER:  Objection, asked and answered.

8      A.   Again, that -- that gets into that point that

9    I really can't make an estimate.

10     Q.   All right.  And the last question is:  If

11   that ever occurred, you can't quantify how many

12   tablets were high or low; right?

13     A.   Exactly.  As we discussed.

14          MR. MILLER:  Objection.  Asked and answered.

15     A.   And I apologize.

16          MR. MILLER:  We are done.

17          THE VIDEOGRAPHER: Please stand by.

18          MR. MORIARTY:  Well, stay on mark's record.

19     You can go off the video.

20          THE VIDEOGRAPHER: Stand by.  We are going off

21     the record.  The time is 4:36 p.m. This is the end

22     of Tape Number 5.

23          MR. MORIARTY:  Exhibit 51A is the little white

24     box of thumb drives.  Do you have any problem with

25     me taking this in my briefcase back to my office?

Russell Somma, Ph.D.                                         July 1, 2010

                                                            Page 257

     1            MR. MILLER:  Those are three thumb drives that

     2      were produced for you.

     3            MR. MORIARTY:  Yes.

     4            MR. MILLER:  So those are yours.

     5            MR. MORIARTY:  Okay.  So I don't have to leave

     6      them with the court reporter.

     7            MR. MILLER:  Right.  We'd just like to have a

     8      note in the record, which is already there.  So,

     9      yeah, fine.

    10            MR. MORIARTY:  I'll take them.

    11            (The witness is excused.)

    12            (The deposition is adjourned at 4:37 p.m.)

    13

    14

    15

    16                       *      *      *

    17

    18

    19

    20

    21

    22

    23

    24

    25

Russell Somma, Ph.D.                                              July 1, 2010

Page 258

```
 1                  C E R T I F I C A T E

 2

 3

 4            I, MARK SCHAFFER, a Shorthand Reporter and

 5    Notary Public of the States of New York and New

 6    Jersey, do hereby certify that prior to the

 7    commencement of the examination the witness was sworn

 8    by me to testify to the truth, the whole truth and

 9    nothing but the truth.

10            I do further certify that the foregoing is a

11    true and accurate transcript of the testimony as taken

12    stenographically by and before me at the time, place

13    and on the date hereinbefore set forth.

14            I do further certify that I am neither of

15    counsel nor attorney for any party in this action and

16    that I am not interested in the event nor outcome of

17    this litigation.

18

19

20

21                          MARK SCHAFFER, C.S.R.

22

23    New Jersey C.S.R. License Number XI00794
      Notary Public of the State of New Jersey
24    Commission No. 55985 Expiring September 13, 2011
      Notary Public of the State of New York
25    Registration No. 01SC4953912 Expiring July 31, 2011
```

Russell Somma, Ph.D.                                            July 1, 2010

                                                               Page 259

 1    BOBBY R. MILLIGAN, et al.,        )
                                        )
 2                   Plaintiffs,        )
                                        )
 3                   vs.                )
                                        )
 4    ACtAVIS GROUP HF, et al.,         )
                                        )
 5                   Defendants.        )
      ------------------------------X

 6

 7

 8

 9

10

11            I have read the foregoing transcript and found

12    it to be a truthful and accurate representation of the

13    testimony I gave in connection with the captioned

14    matter on_____.

15

16

17

18                   _____
                                RUSSELL SOMMA, PhD
19

20

21    The State of:
      County of:
22

23

24    Sworn and subscribed before me
      this       day of           , 2010
25    My commission expires:

Russell Somma, Ph.D.                                        July 1, 2010

Page 260

```
 1                E R R A T A   S H E E T

 2
              Please list any correction with the
 3    corresponding page and line numbers.

 4
                 PAGE   LINE              CORRECTIONS
 5    1.                      :

 6    2.                      :

 7    3.                      :

 8    4.                      :

 9    5.                      :

10    6.                      :

11    7.                      :

12    8.                      :

13    9.                      :

14    10.                     :

15    11.                     :

16    12.                     :

17    13.                     :

18    14.                     :

19    15.                     :

20    16.                     :

21    17.                     :

22    18.                     :

23    19.                     :

24    20.                     :

25
```