# EXHIBIT 16

Mark G. Kenny, Volume I                                    June 29, 2010

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION
MDL No. 1968

IN RE:                          VIDEOTAPED
DIGITEK PRODUCT                 DEPOSITION OF:
LIABILITY LITIGATION            MARK G. KENNY
                                VOLUME I

- - - - - - - - - - - -

          TRANSCRIPT of the stenographic notes of

the proceedings in the above-entitled matter, as

taken by and before CAROL ANN SHEPARD, a Certified

Court Reporter of the State of New Jersey, held at

the MARRIOTT NEWARK AIRPORT HOTEL, 1 Hotel Road,

Newark, New Jersey, on Tuesday, June 29, 2010,

commencing at 8:30 in the forenoon.



DEFENDANT'S
EXHIBIT
16

Mark G. Kenny, Volume I                                    June 29, 2010

Page 2

```
 1    A P P E A R A N C E S:

 2    MOTLEY RICE
      28 Bridgeside Boulevard
 3    Mount Pleasant, South Carolina 29464
      843-216-9000
 4    BY: MEGHAN JOHNSON CARTER, ESQ.
      mjohnson@motleyrice.com
 5    Attorneys for the Plaintiffs

 6    THE MILLER FIRM, LLC
      108 Railroad Avenue
 7    Orange, Virginia 22960
      540-672-4224
 8    BY: PETER A. MILLER, ESQ.
      pmiller@doctoratlaw.com
 9    Attorneys for the Plaintiffs

10    TUCKER, ELLIS & WEST, LLP
      1150 Huntington Building
11    925 Euclid Avenue
      Cleveland, Ohio 44115-1414
12    216-696-2276
      BY: MATTHEW P. MORIARTY, ESQ.
13        MICHAEL ANDERTON, ESQ.
      matthew.moriarty@tuckerellis.com
14    Attorneys for Defendant Actavis

15    SHOOK, HARDY & BACON
      2555 Grand Boulevard
16    Kansas City, Missouri 64108
      816-474-6550
17    BY: HARVEY L. KAPLAN, ESQ.
      hkaplan@shb.com
18    Attorneys for Defendant Mylan

19
      ALSO PRESENT:
20
      Adam DiCola, Videographer
21

22

23

24

25
```

Mark G. Kenny, Volume I                                June 29, 2010

```
                                                         Page 3
  1                          INDEX

  2    WITNESS                              PAGE

  3
       MARK G. KENNY
  4
          BY MR. MORIARTY                      5
  5

  6                      E X H I B I T S
  7
       NUMBER           DESCRIPTION              PAGE
  8
```

```
  9    Exhibit 63, Chapter 4, Advisory Actions      25

 10    Exhibit 64, Chapter 10, Other Procedures,    25

 11    Exhibit 39, FDA Printout                     47

 12    Exhibit 23, Letter dated 12/24/07 from       62
       Scott Talbot
 13
       Exhibit 24, FDA Collection Report for        69
 14    Sample Number 377410

 15    Exhibit 25, FDA Summary Report for Sample    84
       Number 448881
 16
       Exhibit 26, FDA Summary Report 448892,       87
 17
       Exhibit 27, FDA Collection Report for        89
 18    Sample 453913,

 19    Exhibit 28, FDA Summary Report for Sample    91
       Numbers 454866,
 20
       Exhibit 29, FDA Collection Report for        94
 21    Sample Number 452746,

 22    Exhibit 30, FDA Collection Report for        96
       Sample Number 462753,
 23
       Exhibit 31, FDA Summary Report for Sample    97
 24    Number,

 25    Exhibit 32, FDA Summary Report for Sample    98
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 4

1    Exhibit 33, FDA Summary Report for Sample      98
     Number 178890
2
     Exhibit 34, FDA Summary Report for Sample      99
3    Number 178891,

4    Exhibit 35, Celsis Report                      104

5    Exhibit 69, UDL Laboratories Receiving         107
     Form
6
     Exhibit 4, Letter dated June 8, 1995 to        118
7    Shah from Department of Health & Human
     Services
8
     Exhibit 5, Letter dated July 20, 1995 to       118
9    Shah from Department of Health & Human
     Services,
10
     Exhibit 36, Recall -- Firm Press Release,      120
11
     Exhibit 38, FDA Website Statement July         124
12   2009,

13   Exhibit 22, Letter dated 1/9/07                149

14   Exhibit 37, Recall Package 2009                158

15   Exhibit 21, Amide Investigation Final          203
     Report
16
     Exhibit 20, Summary of Findings                204
17
     Exhibit 47, Expert Opinion of Mr. Kenny        280
18   and CV

19

20

21

22

23

24

25

Mark G. Kenny, Volume I                                    June 29, 2010

1              THE VIDEOGRAPHER:  Good morning.  We

2    are on the record at 8:41 A.M., June 29, 2010.  This

3    is the videotaped deposition of Mr. Mark G. Kenny in

4    the matter of In Re:  Digitek Product Liability

5    Litigation, in the United States District Court for

6    the Southern District of New York, MLP Case No.

7    2:09-CV-121.

8              This deposition is being held at the

9    Marriott at Newark Airport Hotel, located at 1 Hotel

10   Road in Newark, New Jersey.

11             I am the videographer.  My name is Adam

12   DiCola of Rennillo Reporting.  Our court reporter is

13   Carol Ann Shepard, also with Rennillo Court

14   Reporting.

15             Will counsel please state their

16   appearances for the record.

17             MS. CARTER:  Meghan Carter, Motley

18   Rice, for the Plaintiffs.

19             MR. MILLER:  Peter Miller from The

20   Miller Firm for Plaintiffs.

21             MR. MORIARTY:  Matt Moriarty from

22   Tucker Ellis for the Actavis Defendants.

23             MR. ANDERTON:  Michael Anderton from

24   Tucker, Ellis & West, also for the Actavis

25   Defendants.

Mark G. Kenny, Volume I                                        June 29, 2010

 1              MR. KAPLAN:  Harvey Kaplan, Shook,

 2      Hardy & Bacon for Mylan.

 3              MR. MORIARTY:  Just so the record is

 4      clear, this is the Southern District of West

 5      Virginia that this litigation is in, not New York.

 6              Ready?

 7      M A R K   G.   K E N N Y, 2 SpyGlass Court,

 8      Annandale, New Jersey, having been duly sworn,

 9      testifies as follows:

10      EXAMINATION BY MR. MORIARTY:

11          Q.     Tell us your full name, please.

12          A.     My name is Mark George Kenny.

13          Q.     All right.  And, Mr. Kenny, have you

14      ever had your deposition taken before?

15          A.     Never.

16          Q.     First time.  Okay.

17                 I'm sure that either Mr. Miller or

18      Ms. Carter has told you that I'm going to ask you a

19      lot of questions today.

20                 Okay?

21                 They've done that, I assume?

22          A.     Correct.

23          Q.     And you know we probably will be here

24      all day.  Is that right?  And even then we may not

25      finish.

Mark G. Kenny, Volume I                                    June 29, 2010

 1                    Do you know that?

 2         A.      Correct.

 3         Q.      If you don't know the answer to my

 4    question, please tell me that you don't know.

 5                    All right?

 6         A.      Yes, sir.

 7         Q.      If you don't understand my question,

 8    please tell me that you don't understand me.

 9                    Okay?

10         A.      Sure.

11         Q.      If you need to look at a document,

12    including your report, your resume or anything else,

13    in order to answer my question, please do that.

14                    Okay?

15         A.      Yes, sir.

16         Q.      I don't want you to guess.

17                    You're going to have to keep your voice

18    up loud because the court reporter has to hear you.

19                    All right?

20         A.      Okay.

21         Q.      And if you say uh-huh or uh-uh, I will

22    say is that a yes or is that a no --

23         A.      Right.

24         Q.      -- because she needs to understand

25    these things in plain English.

Mark G. Kenny, Volume I                              June 29, 2010

                                                        Page 8

 1                Okay?

 2        A.      Surely.

 3        Q.      Now, at some point, we will mark your

 4    resume as Exhibit 47.  But that was made Appendix A

 5    to your report in this case.

 6                Is --

 7        A.      Correct.

 8        Q.      -- that right?

 9                And I notice that you live on SpyGlass

10    Court.

11                Is that right?

12        A.      That is correct.

13        Q.      And the name of your consulting company

14    is the SpyGlass Group.

15                Is that right?

16        A.      That is correct.

17        Q.      How many employees does SpyGlass Group

18    have?

19        A.      We have no employees.

20        Q.      You are not even employed by SpyGlass?

21        A.      Well, I'm an employee under a sub --

22    Subchapter S, yes, and so is my wife.

23        Q.      And you are the only employees?

24        A.      That is it.

25        Q.      Do you have any agreements with other

Mark G. Kenny, Volume I                              June 29, 2010

Page 9

1    people who are independent contractors and do

2    consulting work for you?

3          A.     We have agreements when there is a

4    project.

5          Q.     All right.  So on the -- on the Digitek

6    project, how many people reviewed documents and

7    worked to help you prepare this report?

8          A.     There were two additional people, one

9    Dr. Sal Romano, and my wife, who proofed it.

10                MR. KAPLAN:  Dr. who?

11                THE WITNESS:  My wife.

12                MR. KAPLAN:  No, no.  Dr. --

13                THE WITNESS:  Dr. Sal Romano.

14         Q.     What's your wife's name?

15         A.     Denise.

16         Q.     Denise Kenny?

17         A.     That's correct.

18         Q.     Did she do any technical input?

19         A.     None whatsoever.

20         Q.     And who is Sal Romano?

21         A.     Sal Romano is also a consultant.  He is

22    a core member of our consulting group and a former

23    quality assurance professional -- when I say former,

24    I mean working full time for a large company,

25    Johnson & Johnson -- who has done consulting for

Mark G. Kenny, Volume I                                      June 29, 2010

Page 10

1    over 10 years.

2         Q.     All right.  So I assume that when

3    SpyGlass -- when you or SpyGlass Group are asked to

4    do, say, a consulting project for a pharmaceutical

5    company --

6         A.     Correct.

7         Q.     -- if you can't staff that by yourself,

8    you reach out to people with whom you have previous

9    relationships and bring them in as consultants on

10   that project.

11              Is that right?

12        A.     That's correct.

13        Q.     Okay.  How old are you?

14        A.     I'm 61 years old.

15        Q.     Appendix B to your report, which we

16   will also have as an exhibit, is -- is referred to

17   as "References."

18              Is that correct?

19        A.     That is correct.

20        Q.     And on here are 60 listings.

21              Is that right?

22        A.     That is correct.

23        Q.     Have you reviewed anything else besides

24   these 60 listings since you drafted the report?

25        A.     Since I drafted the report, yes.

Mark G. Kenny, Volume I                                    June 29, 2010

```
                                                          Page 11
 1         Q.      All right.  Can you tell me what else
 2    you reviewed since drafting this?
 3         A.      I looked at some Mylan depositions.
 4                 There was nothing I felt substantive.
 5         Q.      Whose depositions?
 6         A.      I don't recall the name.
 7         Q.      Well, there was a -- Chuck Koon was
 8    deposed.
 9                 Did you look at his deposition?
10         A.      I briefly went through it.
11         Q.      Did you look at Lianna Radtke's
12    deposition?
13         A.      No, I did not.
14         Q.      I think there was a -- Susie Wolf was
15    deposed.
16                 Did you look at her deposition?
17         A.      I did not.
18         Q.      Anything else that you can recall
19    reviewing since you drafted your report?
20         A.      No.
21         Q.      Did you leave J&J in 2004?
22         A.      Yes, I did.
23         Q.      Why?
24         A.      I was offered, as was everybody in the
25    United States, an early retirement package.  I had
```

Mark G. Kenny, Volume I                          June 29, 2010

Page 12

1    the option of leaving or I had the option of

2    staying.

3           Q.      And you took the option of the early

4    retirement package?

5           A.      Yes.  Indeed.  That's correct.

6           Q.      All right.  Did you meet with and talk

7    with Mr. Miller either last night or this morning --

8           A.      No.

9           Q.      -- to talk about any last-minute

10   developments before your deposition?

11          A.      Nothing.

12          Q.      Have you heard anything from anyone

13   amongst the plaintiffs' lawyers about what happened

14   during Mr. Farley's deposition yesterday?

15          A.      No.  Nothing.

16          Q.      So what -- give me a general idea of

17   what consulting projects you work on now under this

18   banner of the SpyGlass Group.

19          A.      Okay.  I would say half of the projects

20   that I work on are auditing, auditing of medical

21   device, drug companies.  And that would be for GMP

22   purposes, also for ISO Regulation 1345:2003.

23                  The other projects are really

24   assistance in risk determinations, establishment of

25   quality systems, establishment of quality plans,

Mark G. Kenny, Volume I                                    June 29, 2010

Page 13

1    establishment of master validation plans, reasonably

2    high-level documents that would be submitted to the

3    management board or management level of a company.

4         Q.    Do you ever help companies remediate

5    483s or warning letters?

6         A.    As a consultant?

7         Q.    Yes.

8         A.    No.

9         Q.    How much of your consulting work is

10   spent on solid oral dose?

11        A.    You mean over the six-year period?

12        Q.    Yes.

13        A.    I would say within the last two years,

14   30 percent.

15        Q.    And how much of it is device work?

16        A.    It would be over half.  60 percent.

17        Q.    In the six years of SpyGlass Group

18   consulting, have you done any 483 or warning letter

19   remediation work?

20        A.    I would have to answer that yes.

21        Q.    When you worked for J&J in your various

22   capacities over the years, were part of your duties

23   to look at 483s and warning letters --

24        A.    Of course.

25        Q.    -- and help the company remediate them?

Mark G. Kenny, Volume I                                        June 29, 2010

Page 14

1          A.      Yes.

2          Q.      In the process of doing that, as an

3    example, if you got a 483 that had to do with a

4    manufacturing issue, would it be part of your job to

5    look at batch records?

6          A.      It could be, but probably would not be.

7          Q.      Why?

8          A.      Because I would not get involved at

9    that level.  I would get involved more at a

10   strategic level, determining whether the action

11   plans are comprehensive, rather than going through

12   the detail of reading batch records that normally

13   would be done by somebody else.

14         Q.      But as part of the project --

15         A.      Yeah.  You're talking -- are you

16   referring to a 483 project, or are you referring to

17   in general a project?

18         Q.      A 483 or warning letter remediation.

19         A.      No.  I -- I take that back.  Yes, I

20   would.

21         Q.      You would personally look at them or --

22         A.      Yes.

23         Q.      -- you would supervise somebody?

24         A.      No.  I would do it myself.

25         Q.      All right.

Mark G. Kenny, Volume I                                  June 29, 2010

1        A.     But would not -- I would not -- that is
2    not a major portion of what I do.
3        Q.     But --
4        A.     For -- for 483 remediations.
5        Q.     Sure.
6        A.     I do a high -- an extraordinary number
7    of batch reviews, capital reviews and the like as
8    part of my consulting practice over the last six
9    years.
10        Q.     So, for example, if somebody is looking
11    for a way to improve a manufacturing process, for
12    example, looking at batch records regarding that
13    process is something you would do?
14        A.     That's correct.
15        Q.     And if there was some question about
16    whether a process was validated or robust or staying
17    in validated control, looking at the batch records
18    over time would be one of the things that would be
19    important to do?
20        A.     That's correct.
21               And they would rely on me to be able to
22    make that determination.
23        Q.     All right.  In your years at J&J or as
24    a consultant, have you ever been involved in the
25    manufacture, QA or QC of a Digoxin product?

Mark G. Kenny, Volume I                                    June 29, 2010

 1        A.      Never.

 2        Q.      Now, over the years, in your work, have

 3   you come to appreciate the difference between

 4   possibility and probability?

 5        A.      I would think I do.

 6        Q.      All right.  So probability, for

 7   example, is generally defined as more likely than

 8   not.

 9                Would you agree with that?

10        A.      I would say that's reasonably fair.

11        Q.      And possibility is more in the realm of

12   speculation.

13                Is --

14        A.      Correct.

15        Q.      -- that true?

16                So that can -- can happen, might

17   happen, that's possibility and speculation; right?

18        A.      I would have to think about the terms,

19   but that -- that, perhaps, is a way of explaining

20   it.  I would not use those terms precisely.

21                I would determine risk levels.

22        Q.      Now, your report in this case, we're

23   going to ultimately mark as Exhibit 48, but I would

24   like you to take a look at page 23 of that.

25        A.      Yes, sir.

Mark G. Kenny, Volume I                                    June 29, 2010

1        Q.      Do you have that in front of you?

2        A.      Yes, I do.

3        Q.      And on this page, there is a section

4    called "Quality and Quality Systems SpyGlass Group

5    Summary."

6                Do you see that?

7        A.      Yes, I do.

8        Q.      And essentially, after the first 22

9    pages of your analysis, this is the one-sentence

10   essence of your opinion.

11               Is that right?

12       A.      I suppose you could put it that way.

13       Q.      Okay.  And it says that:  "It is my

14   opinion, to a reasonable degree of certainty, that

15   Actavis failed to establish reliable and GMP

16   compliance systems and procedures, resulting in the

17   release of adulterated product from at least the

18   period of 2004 to 2008."

19       A.      Correct.

20       Q.      Right?  Okay.

21               And among the things that you relied on

22   in this Appendix B are a number of FDA documents,

23   like 483s and warning letters; correct?

24       A.      That is correct.

25       Q.      And what are known as EIRs or

Mark G. Kenny, Volume I                                        June 29, 2010

Page 18

1    establishment inspection reports?

2          A.    That is correct.

3          Q.    I don't see anywhere on Exhibit B

4    references to batch numbers, other than

5    Batch 70924 A.

6                Did you review any other batch records?

7          A.    Yes, I did.  Perhaps two more.

8          Q.    Which ones?

9          A.    I don't recall the batch numbers.

10         Q.    All right.  Do you -- do you know how

11   many recalled batches there were in the Digitek

12   recall of April of 2008?

13         A.    No, I don't.

14         Q.    There were 151 or 152 of them.

15               Is what you're telling me now that you

16   may have reviewed as many as just three of those?

17         A.    Batch records, yes.  That's all I -- I

18   had available to me.

19         Q.    Do you know when batches were

20   manufactured, when batches were first manufactured

21   that were part of the recall?

22         A.    I would assume, and I think it's a safe

23   bet, that the batches would have been manufactured

24   within the expiration date that it was in the field.

25               In other words, all batches would have

Mark G. Kenny, Volume I                                June 29, 2010

 1   been recalled that were still within the expiry

 2   date.

 3          Q.      Do you know how long Digitek's

 4   expiration date is?

 5          A.      For what product?

 6          Q.      Digitek.

 7          A.      Oh, for Digitek?  No, I don't.

 8          Q.      Did you review any method operating

 9   instructions --

10          A.      Yes.

11          Q.      -- from Actavis?

12          A.      Yes, I did.

13          Q.      How many of them?

14          A.      Probably a dozen plus.

15          Q.      Are they listed in Exhibit B?

16          A.      No.

17          Q.      Appendix B?

18          A.      No.  I had no reference to them.

19          Q.      What do you mean you had no reference

20   to them?

21          A.      In other words, I had no observation to

22   those particular documents.

23          Q.      What does that mean?

24          A.      Could you restate your question?

25          Q.      What do you mean "observation"?

Mark G. Kenny, Volume I                                          June 29, 2010

1             Are you talking about in the regulatory

2    sense of observation being --

3        A.    Could you repeat the first question,

4    please?

5        Q.    I'm going to ask you a new question.

6             MR. MILLER:  Well, I think he wants to

7    make sure he understands the line of questioning.

8             You asked him the first question.  If

9    you reask the first question, then perhaps he can

10   phrase it.

11            Right -- right now, he's confused about

12   what the line of questioning is.

13       Q.    Well, there are no MOIs listed in

14   Appendix B.  You said it's because you had no

15   observations about it.

16       A.    I read certain documents.  And I had no

17   comment on those.

18       Q.    Okay.  So, for example, if MOI 145 has

19   to do with QC testing of Digitek, you didn't find

20   anything deficient, for lack of a better term, in

21   MOI 145.

22            MR. MILLER:  Object.  I'll object.  If

23   you'd let -- allow me, I'll object; and when I'm

24   done, then you can finish.

25            I'm sorry.  Excuse me.  But objection.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 21

1    Misstates previous testimony.

2              It's okay to answer.

3         A.    Okay.  If your question -- if you're

4    asking me did I look at documents and see

5    deficiencies in the documents, the answer to that

6    would be yes, I did see deficiencies in documents

7    that do not appear in here.

8         Q.    That's not what I'm asking you.

9              Did you review MOI 145?

10        A.    I don't recall.

11        Q.    Well, if you found a deficiency in a

12   method operating instruction regarding a key

13   manufacturing or testing process for Digitek, is it

14   likely that you would have put it in your report?

15        A.    If I -- if it -- it was significant and

16   if I saw it, I may have put it in the report, if I

17   felt it was important.

18        Q.    Did you understand -- well, first of

19   all, have you ever done litigation consulting before

20   this case?

21        A.    No, I have not.

22        Q.    Did either Mr. Miller or anybody from

23   Motley Rice let you know that the purpose of this

24   report was to put us on notice of what your opinions

25   were?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                                    Page 22

    1         A.      Yes.

    2         Q.      And what documents you relied on to

    3    reach those opinions?

    4         A.      Right.   And I provided those documents

    5    in the box.

    6         Q.      I understand that.

    7                 And you also listed 60 items that you

    8    reviewed.

    9         A.      Correct.

   10         Q.      So let me get back and make sure I

   11    understand this.

   12                 MOI 145 has to do with QC testing for

   13    Digitek.   I want you to assume that.

   14         A.      Okay.

   15         Q.      If you found that the QC testing

   16    process for Digitek was deficient in some way,

   17    technically or by some GMP standard, and you

   18    reviewed the document, is it likely you would have

   19    commented on it in your expert's report?

   20         A.      Okay.   I think it's important to

   21    understand that I am not an analytical chemist.

   22                 My experience is -- education

   23    experience is as an engineer, both mechanical

   24    engineer and a biomedical engineer in graduate

   25    school.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 23

1              When I review laboratory records, I

2    look at them from a compliance standpoint, not a

3    technical standpoint.

4              So I would review them, making sure

5    that there would be certain content in there in

6    terms of whether they appeared complete.

7              I would also be looking at -- if it was

8    a test method, which I think you are referring to, I

9    would ask whether there was a method validation

10   study in order to ascertain whether the test method

11   is valid.

12             That is the question that I would ask.

13   And that would, to me, be among the most important

14   questions.

15        Q.    Okay.  So if the technical aspects of

16   MOI 145 for the lab testing of Digitek, would you

17   feel more comfortable deferring to a quality control

18   chemist for opinions on whether that MOI was

19   consistent with the United States Pharmacopeia?

20        A.    I would ask the research person that,

21   not the quality control person.

22             The research person is the person who

23   understands the regulations, is responsible for

24   developing the procedure.

25             The quality control person is not

Mark G. Kenny, Volume I                                    June 29, 2010

Page 24

1    responsible for the technical content of that

2    document.  The quality control person is responsible

3    for executing that document, is responsible for

4    being part of the method transfer, is not even part

5    of the method validation study.

6              That person is an expert in performing

7    reproducible studies and getting accurate results.

8         Q.    But certainly the quality control

9    chemist is the person who actually has to be

10   performing the study --

11        A.    That's correct.

12        Q.    -- to get the results that are

13   documented in batch records; right?

14        A.    That's correct.  The basis of the

15   numbers that are in specification.  They would not

16   necessarily understand why those numbers were

17   selected.

18        Q.    Okay.  These 483s that we have been

19   talking about are regulatory documents sent to a

20   company by the FDA; correct?

21        A.    That is correct.

22        Q.    And a warning letter is also a

23   regulatory document sent to a company by the FDA?

24        A.    That's correct.

25        Q.    I'm handing you what's been marked as

Mark G. Kenny, Volume I                                    June 29, 2010

Page 25

 1    Exhibit 63.

 2                 (Exhibit 63, Chapter 4, Advisory

 3    Actions, was marked for identification.)

 4         Q.     This is Exhibit 64.

 5                 (Exhibit 64, Chapter 10, Other

 6    Procedures, was marked for identification.)

 7         Q.     Have you ever seen these documents

 8    before?

 9         A.     I have not.

10         Q.     These are from the Regulatory

11    Procedures Manual of the FDA.

12                 Have you ever seen any parts of the

13    Regulatory Procedures Manual for the FDA?

14         A.     I have not.

15         Q.     First, I'd like you to take a look at

16    Exhibit 63.

17         A.     Okay.

18         Q.     First page, it's entitled "Warning

19    Letters"; is it not?

20         A.     Yes, it is.

21         Q.     And one, two, three, four lines down it

22    says:  "Warning letters are issued to achieve

23    voluntary compliance and to establish prior notice."

24                 Do you agree with that?

25         A.     Yes.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 26

```
 1        Q.      Go to the next page, please, which is
 2    4-2, the fourth full paragraph.
 3               It says:  "A warning letter is informal
 4    and advisory."
 5               Do you agree with that?
 6        A.      Do I agree with that from a practical
 7    standpoint?
 8        Q.      Well, do you -- sure.
 9        A.      All right.  Let's put it this way --
10        Q.      Do you agree or disagree with the FDA's
11    own Regulatory Procedures Manual?
12        A.      May I ask you a question?
13        Q.      Actually, you can't.  I ask questions.
14        A.      All right.  I will state what I think.
15               From a --
16               MR. KAPLAN:  Just answer the question,
17    because I'm going to move to strike any answer
18    that's not responsive.
19               Please answer just the question that's
20    asked.  No statements, no speeches.
21               MR. MILLER:  Well, I think his
22    statement is in response to the question.
23               MR. MORIARTY:  Well, let him make his
24    statement, and I'll deal with it.  I haven't heard
25    his statement.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 27

 1              MR. MILLER:  That's what we're trying

 2    to do, Matt.  Let's do it.

 3              Go ahead, make your statement.

 4        A.    Could you ask the question?

 5        Q.    Yes.  At page 4-2 of the FDA's

 6    Regulatory Procedures Manual, it says:  "A warning

 7    letter is informal and advisory."

 8              Do you agree with that statement?

 9              MR. MILLER:  And I'm going to object to

10    reading one sentence out of a document he's never

11    seen before and asking him if he agrees with it.

12              I think he ought to take the time to

13    read at least the whole paragraph and put it in

14    context.

15        Q.    It's a three-sentence paragraph.  Go

16    ahead and read it.

17        A.    From an FDA standpoint, I agree with

18    this.

19        Q.    The next sentence says:  "It

20    communicates the agency's position on a matter, but

21    does not commit FDA to taking enforcement action."

22              Do you agree with that?

23        A.    Yes, I do.

24        Q.    The next sentence says:  "For these

25    reasons, FDA does not consider warning letters to be

Mark G. Kenny, Volume I                                    June 29, 2010

1    final agency action on which it can be sued."

2              Do you agree with that?

3        A.    I don't have the basis to disagree.  I

4    don't know what the basis for suit -- for forming a

5    suit would be.

6        Q.    Do you know what "final agency action"

7    is?

8        A.    No.  I don't know the term.

9        Q.    Now, are warning letters considered the

10   second step in this sort of note -- written

11   notification chain?

12       A.    From a business standpoint, yes.

13       Q.    The first step would be the 483.

14              Is that right?

15       A.    Correct.

16       Q.    And a 483 is also informal and

17   advisory.

18              Is it not?

19       A.    I don't perceive it as that.

20       Q.    Well --

21       A.    I perceive -- I perceive it as a

22   company put on warning that you have some

23   potentially very significant issues, or it would not

24   have been in the 483, and that you're expected to

25   understand those issues, investigate those issues,

Mark G. Kenny, Volume I                                    June 29, 2010

Page 29

 1    determine whether they represent systemic issues,

 2    and then put in corrective action plans that are

 3    appropriate with the risk determination that you've

 4    made as a result of your investigations.

 5         Q.     Do you have any opinion about whether

 6    the FDA considers 483s to be final agency action?

 7         A.     I don't have the experience to answer

 8    that question.

 9         Q.     All right.  Have you ever worked for

10    the FDA?

11         A.     I have not worked for the FDA.

12                I worked with the FDA.

13         Q.     Well, I assume what you mean by that is

14    when you were at J&J, sometimes you had to interact

15    with FDA regarding recalls or investigations or

16    something else; correct?

17         A.     I would not put it that way.  So if you

18    want me to put it my way --

19         Q.     How did you interact with FDA?

20         A.     I interacted with the FDA during an

21    inspection by the FDA if I determined in the

22    company, within the company I work for, that I would

23    be additive to the process.

24                I worked with the FDA on, for example,

25    a home HIV test, which was basically the first --

Mark G. Kenny, Volume I                              June 29, 2010

Page 30

 1   first concept of an HIV test that the consumer would

 2   participate in the testing itself.

 3            The regulations really didn't exist

 4   that were specific to that, so the FDA had to -- had

 5   to try to understand the technology, had to try to

 6   interpret the GMP regulations.

 7            And we assisted the FDA in doing that.

 8   And they assisted us in helping establish

 9   development validation.  Because, again, this --

10   this was a novel product.

11            So I have worked directly with the FDA

12   on items like that.

13      Q.    Essentially, your whole working career

14   from 1974 to 2004 was with different J&J companies.

15            Is that right?

16      A.    That's correct.

17      Q.    All right.  In your years at J&J, was

18   any part of J&J under a consent decree?

19      A.    To my knowledge, no.

20      Q.    To the best of your knowledge, while

21   you were at J&J over those years, were any products

22   ever seized by the FDA?

23      A.    Not to my knowledge.

24      Q.    Were any of the companies that you

25   worked for at J&J ever given Form 483s by the FDA?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 31

 1        A.     Yes.

 2        Q.     Were any companies that you worked for

 3   at J&J given warning letters by the FDA?

 4        A.     Yes.

 5        Q.     When you were with J&J, did J&J have

 6   product recalls?

 7        A.     Did J&J?  You mean the $60 billion

 8   company, of course?

 9        Q.     Did any of the business units for which

10   you worked have recalls?

11        A.     I only had one recall in my entire

12   career, which had nothing to do with compliance.

13        Q.     What did it have to do with?

14        A.     It had to do with two items.  I'm

15   sorry.  Had to do with one item.  And it's

16   reasonably complex.  Would you like me to go through

17   the description of what happened?

18        Q.     No.  I'd like the Reader's Digest,

19   simple version.

20        A.     I will do my very best.

21               We sold a product, a home HIV test,

22   which had a mailer.  The customer participated in

23   the test by pricking their finger and putting three

24   blood droppings on a sample card.  It was a paper

25   card, the same as -- anyway, it was a paper card

Mark G. Kenny, Volume I                                    June 29, 2010

Page 32

1   designed for that purpose, used by the FDA for the

2   last 50 years.

3               They would then send -- mail that to

4   the -- to the test center, which was under contract

5   with us.  And they would actually do the testing of

6   that and determine whether or not it was positive or

7   negative, the results.

8               Okay?  Now, the mailer that Johnson &

9   Johnson initially used was not a -- a -- a

10  Fed Ex-type mailer.  It was a normal mailer that

11  took three days to arrive at the lab.

12              The competition, six months after we

13  launched the product, put in next-day mailing

14  service.

15              Unbeknownst to everybody in the company

16  that I was aware of but sales, they decided to

17  develop mailers to expedite this.

18              So they went into the field, pulled out

19  the mailer for the three-day, you know, cycle and

20  put in the mailer for the one-day cycle.

21              Okay.  I was -- I was not aware of it.

22  I would not have authorized it, but it happened.  It

23  sounds innocent.

24              The product was kept behind the counter

25  in most instances.  It was almost a $40 product.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 33

 1    They were afraid -- pharmacists were afraid that the

 2    product would be stolen.

 3              The salesmen, I was told, were given

 4    instructions to physically place the mailer on the

 5    product.

 6              So when they went into the pharmacy,

 7    sometimes they did it, apparently.  Sometimes they

 8    did not.  The pharmacy frequently would say -- not

 9    frequently; we didn't have that many examples -- but

10    would say, I will do it for you because it is behind

11    the counter.  Don't worry about it.  Leave the

12    mailers.  How many products do I have?  Three.

13    Leave three mailers.

14              The pharmacists made an error, in that

15    when the competition came out, it was kind of like

16    Walmart.  They made a product that looked identical

17    in color, identical in shape, so that when the

18    pharmacist went to put the mailer onto the -- onto

19    Confide, which was the product, they -- and I don't

20    know if it was six instances, eight instances -- put

21    them on the competitive product.

22        Q.    Okay.  Let me stop --

23        A.    Can I finish the concept?

24        Q.    No.  Let me just stop you for a second.

25    I think I see where this story is going.

Mark G. Kenny, Volume I                    June 29, 2010

Page 34

1                I take it that this recall was not

2    because of the quality or integrity of the HIV

3    testing itself?

4         A.     That's correct.  As a matter of fact,

5    we were above, if you will, the gold standard.

6         Q.     Okay.  The recall was for regulatory

7    reasons related to FDA being involved in labeling

8    and other things post --

9         A.     No.  No.  That's not correct.

10        Q.     -- unrelated to the test itself?

11        A.     No.  It's related to the test.  The

12   samples went to the wrong lab.  They went to the

13   competition.

14        Q.     No.  That's not what I'm asking.

15               The quality or integrity of the HIV

16   test itself was not the reason for the recall?

17        A.     The integrity -- in other words, if the

18   samples arrived to the correct lab, and those

19   samples were -- see, we would receive competitive

20   samples.

21               Could the integrity of that test be

22   compromised?  It is conceivable, because we don't

23   know how their paper was made.  We don't know their

24   test methodology.  We only know what we did.  They

25   had the wrong competitive information.

Mark G. Kenny, Volume I                                June 29, 2010

Page 35

1              So is it conceivable?  Yes.  Is it --
2    you're talking about probabilities.  Probability
3    would be low.
4         Q.    Okay.
5         A.    But there is a probability that it
6    would not be tested.  So you would have somebody who
7    had -- who had -- would not have gotten the results.
8         Q.    Okay.  Among the things that you
9    reviewed, in Appendix B, Item Number 7 is a website?
10        A.    Item Number 7 is a website.  Correct.
11        Q.    Now, is that a part of the FDA's
12   website?
13        A.    No.  No, it is not.
14        Q.    So this is some --
15        A.    Another consulting firm's.
16        Q.    Learning Plus, Inc.?
17        A.    I don't recall the exact -- I'd have to
18   pull the website up.
19        Q.    But this is their description of what
20   the warning letter is and later what GMPs are;
21   correct?
22        A.    No.  No.
23        Q.    Well, I --
24        A.    That is --
25        Q.    -- printed --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 36

1          A.      That is specific to the reference.

2          Q.      I printed your Reference B.  Okay?

3    There is the definition of a warning letter.

4          A.      Right.

5          Q.      There is -- from Learning Plus, Inc.

6                  Do you see that?

7          A.      Yes.

8          Q.      There's about this site.

9                  Do you see that?

10         A.      Yes.

11         Q.      There's their definition of GMPs.

12                 Do you see that?

13         A.      Yes.

14         Q.      Okay.  This is not an FDA website?

15         A.      That is correct.

16         Q.      What I would call the official

17   definition of what a warning letter is, according to

18   the FDA; correct?

19         A.      That is correct.

20         Q.      Do you have any opinion on whether or

21   not an establishment inspection report constitutes

22   final agency action of the FDA?

23         A.      Yes.  It does not constitute final

24   action.

25         Q.      All right.  Tab 9 in your Appendix B is

Mark G. Kenny, Volume I                                June 29, 2010

Page 37

 1    Plaintiffs' Exhibit 147.  It is an E-mail about a

 2    483.

 3                     Do you have that?

 4         A.     Do I have it in my -- yes, I do.  Would

 5    you like me to try to pull it?

 6         Q.     Or you can just use mine.

 7         A.     If it's correct.

 8         Q.     What do you mean if it's correct?  You

 9    think I'm BSing you?

10                     MR. MILLER:  Objection.  That's not

11    what he was saying.

12                     MR. MORIARTY:  I don't know what he was

13    saying.

14         Q.     First of all, the first page of

15    Exhibit 147 is an E-mail; correct?

16         A.     That is correct.

17         Q.     The next page is a 483 from the FDA to

18    Actavis Totowa from the inspection of March 18

19    through May 20, 2008.

20                     Do you see that?

21         A.     Yes.  This is -- 147 continued into the

22    483?

23         Q.     It's one exhibit.

24         A.     Is this a new exhibit?

25         Q.     It's one exhibit.

Mark G. Kenny, Volume I                               June 29, 2010

Page 38

1       A.      Okay.

2       Q.      It is a plaintiffs' exhibit.

3       A.      Okay.

4       Q.      Do you see this Observation 2?

5       A.      Yes, I do.

6       Q.      Underneath Observation 2, there is a

7   statement that says:  "Drug products failing to meet

8   established specifications and quality control

9   criteria are not rejected."

10              Do you see that?

11      A.      Yes, I do.

12      Q.      In Chuck Koon's deposition, he said

13  that this is essentially the Turbo software

14  restatement of the language from an FDA regulation.

15              Do you agree with that?

16      A.      Oh, I don't know.

17      Q.      Okay.  And then what Chuck Koon said is

18  that under specifically is the example that an FDA

19  inspector gives based on their inspection.

20              Do you know anything about that?

21      A.      No.  I -- in other words, if you're

22  stating that this is the highlight, and this

23  substantiates that highlight, this is -- this is

24  the, you know, front page heading, and then they go

25  into specifics to support their broad statement.

Mark G. Kenny, Volume I                          June 29, 2010

Page 39

 1        Q.     That's not what I asked you.

 2               MR. MILLER:  Objection.  That is what

 3   you asked.

 4        A.     Would you ask it again, please.

 5               MR. MORIARTY:  You will not find that

 6   statement from me on this record, Pete.  Don't do

 7   that.

 8               MR. MILLER:  I will do that.

 9               MR. MORIARTY:  And don't coach him.

10               MR. MILLER:  And don't point at me and

11   tell me not -- what not to do.

12               MR. MORIARTY:  Don't coach him.

13               MR. MILLER:  I'm not coaching anything.

14   I'm pointing out what your -- the flaw of your

15   statement was.

16               You asked about the top of the

17   observation and the bottom.

18               MR. MORIARTY:  Pete -- Pete, this is

19   federal court.  Objection and your basis.  Don't

20   start this.  Okay?

21               MR. MILLER:  No, Matt.  I'm -- you

22   started this.  I'm just trying to point out your

23   flaws, Matt.

24        Q.     I asked you a very specific question.

25   A witness named Chuck Koon, a quality assurance

Mark G. Kenny, Volume I                              June 29, 2010

Page 40

 1   expert at Mylan, said that the FDA's Turbo

 2   software --

 3         A.     I'm not -- first of all, I'm not

 4   familiar with the FDA's --

 5         Q.     Okay.

 6         A.     -- Turbo software.

 7         Q.     I'm just asking you if you agree with

 8   Mr. Koon.

 9                He said that this statement about drug

10   products failing to meet established specifications

11   is essentially the FDA's kicking out the regulation

12   language.

13                And I asked you if you agreed with

14   that.  And you said you didn't know.

15         A.     I don't know.

16         Q.     Okay.  FDA is charged with protecting

17   public health, is it not?

18         A.     Yes.  It certainly is.

19         Q.     Sometimes, when the FDA acts, it has to

20   be flexible and act quickly to carry out its duty to

21   the public.

22                Do you agree with that?

23         A.     Yes.

24         Q.     In your experience, does FDA sometimes

25   act too hastily in ordering recalls of products?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 41

 1        A.      In ordering recalls, my experience is
 2   they do not act too hastily.
 3        Q.      In your experience, do they ever
 4   overreach?
 5        A.      Could you explain what you mean by
 6   "overreach"?
 7        Q.      Plain English definition of it.
 8        A.      Overreach what?
 9        Q.      Okay.  Well, for example, in -- in the
10   situation that you had with your HIV home health
11   testing, was there some other fix for the problem,
12   other than a recall, available?
13        A.      Other than a recall?  Yeah.  We could
14   have -- I suppose we -- no.  There was no logical
15   fix.
16              We could have gone out and inspected
17   competitive product.  First of all, we have no right
18   to look at competitive product.
19              But conceivably, we could have gone and
20   had our entire sales force go out, look for all the
21   product they could find, which may or may not be all
22   the product, and then pull the mailers off.
23              But the issue is compounded because
24   people have the product.  They may have the wrong
25   mailer.  They may keep the product for months.  So

Mark G. Kenny, Volume I                                    June 29, 2010

Page 42

 1   the -- the only responsible behavior is to recall.

 2        Q.    All right.

 3        A.    And may I say that, as part of the

 4   companies that I've worked for, we would take a

 5   very, very conservative approach to recalls,

 6   probably far more conservative than the FDA would.

 7        Q.    All right.  When you were at J&J, what

 8   percent of your personal work involved solid oral

 9   dose?

10        A.    It depends upon the point in my career.

11              There was a three-year career --

12        Q.    Overall.

13        A.    Overall?  8, 11, doing it recently.

14   I'd say 12 years.

15        Q.    Okay.  And overall, J&J has had recalls

16   of solid oral dose tablets or capsules even while

17   you worked there; correct?

18        A.    The $60 billion Johnson & Johnson

19   company most certainly has had recalls.

20        Q.    Okay.  So I think there was Tylenol

21   recall back in the '80s?

22        A.    '83.  I was somewhat involved in that.

23        Q.    Okay.  And did -- did J&J ever

24   internally assess, to your knowledge, what

25   percentage of the Tylenol that was recalled was

Mark G. Kenny, Volume I                                    June 29, 2010

Page 43

1    actually somehow outside its specifications?

2         A.     But that wasn't the issue.

3                The issue was whether or not it was

4    tampered by a -- an individual.

5         Q.     Okay.  What percentage of it was

6    tampered with?

7         A.     I don't know.  I don't recall.

8         Q.     Far less than --

9         A.     Less than 100.

10        Q.     100 instances?

11        A.     No.  Far less than probably -- no.  Far

12   less -- no.  The number of instances where -- if I

13   was going to guess, I would guess less -- less than

14   10.

15               In other words, they only had a few

16   instances where the product was tampered with by

17   whoever the felon was.

18        Q.     Sure.  Did -- in your career there at

19   J&J, did they have recalls of other solid dose

20   products, solid oral dose products?

21        A.     I'm sure they did.  I can't recite who

22   they were.  They weren't involved with companies

23   that I had responsibility for.

24        Q.     All right.  But in those instances,

25   either J&J could have voluntarily done a recall or

Mark G. Kenny, Volume I                                    June 29, 2010

Page 44

 1   FDA could have requested a recall, even if just a

 2   small percentage of the solid oral dose that had

 3   made it to market was possibly outside its

 4   specifications; right?

 5         A.     That is correct.  That is possible.

 6         Q.     So when we talk about, I use the term

 7   "hasty" or "overreaching," you would agree that

 8   sometimes recalls are conducted even though the

 9   possibility of an actual defect and harm to the

10   public is small; correct?

11         A.     I would answer that question not in

12   that way.

13                I would answer the question as we don't

14   know, and we would take a conservative approach and

15   pull it back.  And as part of the investigation

16   subsequently, we'd get some knowledge of the breadth

17   of the issue.

18         Q.     All right.  It's sort of an abundance

19   of caution thing.

20                Is that how you are referring to being

21   conservative?

22         A.     That's -- that's one way.

23         Q.     All right.  Your Reference B, Number 2,

24   is 21 Code of Federal Regulations Part 210 and 211

25   regarding GMPs; correct?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 45

 1          A.      That is correct.

 2          Q.      And I'd like -- do you have a printout

 3   version of it?

 4          A.      No, I don't.  Actually -- no, I don't.

 5          Q.      All right.  This is your Tab -- your

 6   Reference 2.

 7                  MR. MORIARTY:  Pete, you can come over

 8   here if you need to see it.

 9          Q.      Do you see that this is Part 210 of the

10   GMPs?

11          A.      Correct.

12          Q.      And the next page, in 210.1,

13   Section B --

14          A.      Yes, sir.

15          Q.      -- it says:  "The failure to comply

16   with any regulations set forth in this part, and in

17   parts 211 through 226 of this chapter, in the

18   manufacturing, processing, packing or holding of a

19   drug shall render such drug to be adulterated under

20   Section 50182B"; correct?

21          A.      Yes.

22          Q.      And then the last part of this long

23   sentence says:  "Shall be subjected to regulatory

24   action"; correct?

25          A.      That's exactly what it says.

Mark G. Kenny, Volume I                                June 29, 2010

                                                            Page 46

 1        Q.     All right.  And what this section of

 2    the CFR is about is the regulatory powers of the

 3    FDA.

 4                Is that right?

 5        A.     That's correct.

 6                MR. MILLER:  Object to the form.  The

 7    document speaks for itself.

 8        Q.     To your knowledge.

 9        A.     Yes.

10        Q.     Okay.  You -- I didn't see anything

11    about medical school, internships or residencies on

12    your resume.

13                You're not a physician; right?

14        A.     That is correct.

15        Q.     So I assume that you are not going to

16    be testifying about whether specific plaintiffs'

17    injuries had anything to do with defective Digitek;

18    correct?

19        A.     That is correct.

20        Q.     As far as I can understand your report

21    and, obviously, the summary at page 23, your role is

22    to talk about whether Actavis complied with certain

23    good manufacturing practices.

24                Is that right?

25        A.     That is correct.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 47

1        Q.      And for this definition of

2    adulteration, you are relying on CFR 351(b), I

3    assume?

4        A.      If that's what it says, yes.

5        Q.      And this is Tab 5 of your Reference B.

6                Is that right?

7        A.      I assume it's correct.

8                (Exhibit 39, FDA Printout, was marked

9    for identification.)

10       Q.      Now, that's Exhibit 39.  This is a

11   printout from the FDA's website.

12               Have you ever seen this before?

13       A.      Let me just take a look at it.

14               I believe I have.

15       Q.      And this particular section is called

16   "Facts About Current Good Manufacturing Practices";

17   correct?

18       A.      That's correct.  This is -- this is

19   somebody's interpretation of what the facts are.

20   It's not a guidance document.  It is a page in a --

21   in a website.

22       Q.      But it is a page from the FDA's

23   website?

24       A.      Absolutely.

25       Q.      All right.  Now, go down to the second

Mark G. Kenny, Volume I                              June 29, 2010

Page 48

 1   title that says "Why Are cGMPs So Important?"

 2             MR. MORIARTY:  When you type cGMP, the

 3   C is small and the GMP is large.

 4        Q.    The second sentence says:  "In most

 5   instances, testing is done on a small sample of a

 6   batch (for example, a drug manufacturer may test 100

 7   tablets from a batch that contains 2 million

 8   tablets) so that most of the batch can be used for

 9   patients rather than destroyed by testing."

10             Do you agree with that?

11             MR. MILLER:  Again, I would object.  I

12   would ask you to give him an opportunity to read the

13   whole paragraph before you ask him about a

14   particular sentence inside a paragraph so he can put

15   it in context.

16        Q.    Okay.  Do you need to read more or are

17   you ready to answer questions?

18        A.    I would like to read it.

19        Q.    You can read the whole thing.  Let me

20   know when you're ready.

21        A.    I've read it.

22        Q.    Let's go down to -- and let me linger

23   there a second.

24             From your experience, that is true in

25   practice; correct?

Mark G. Kenny, Volume I                              June 29, 2010

                                                          Page 49

1              I mean, a manufacturer can't test them

2     all, or there'd be nothing left to sell; correct?

3         A.    That's correct.  Of course.

4         Q.    So I assume at J&J, the products that

5     you were involved with had sampling plans?

6         A.    Most certainly.

7         Q.    All right.  And at some point in the

8     validation process or through inspections, FDA was

9     aware of what those sampling plans were?

10        A.    Well, if they reviewed them, yes.

11        Q.    Okay.  Let's go down to the fourth

12    heading, "If a Manufacturer is Not Following cGMPs,

13    Are Drug Products Safe for Use?"

14              Go ahead and read that whole section,

15    because I'm going to ask you about it.

16        A.    Okay.

17              Okay.  I've read it.

18        Q.    The first two sentences of that section

19    essentially state what's in these regulations in

20    Tabs 2 and 5 from your Reference B; right?

21        A.    Okay.

22        Q.    That if a drug is not manufactured in

23    compliance with cGMP, the FDA considers it

24    adulterated; correct?

25        A.    That's correct.

Mark G. Kenny, Volume I                                June 29, 2010

Page 50

1        Q.      The next sentence says:  "It does not
2    mean that there is necessarily something wrong with
3    the drug."
4                Do you agree with that?
5        A.      I think it's poor wording.
6        Q.      How do you think it's poor wording?
7        A.      Because the quality of a drug is
8    dependent upon executing a series of steps, starting
9    in the development process, going through -- going
10   through development process, going through to
11   technical transfer, going through to process
12   validation, going through to routine -- writing
13   procedures, etcetera, that are in place to control
14   the quality, and then ultimately, just making sure
15   that it's okay by taking a sample.
16               Because, of course, you don't know --
17   you don't know what you don't know, but what you do
18   know is that at least you've looked at X number of
19   samples, and those samples were good.
20               Since you've based your sampling upon
21   your validated state, and you know you have content
22   uniformity, you know that all the tablets are coming
23   off the -- the production line within specification,
24   therefore justifies, as the last step, taking a
25   sample.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 51

 1                    So the -- I think this is poor wording.

 2          Q.      Okay.  Well, let's -- let's get to the

 3      bottom of what it's saying.

 4                    The FDA could call a particular batch

 5      of tablets adulterated, could it not?

 6          A.      Yes.

 7          Q.      If it found a cGMP violation; correct?

 8          A.      Yes.

 9          Q.      All right.  Let's stick with one batch

10      for the time being.

11          A.      Certainly.

12          Q.      But if FDA -- if the manufacturer had

13      done United States Pharmacopeia testing on tablets,

14      and then the FDA itself did USP testing on tablets

15      from that same batch and confirmed that they were

16      within the USP's specifications, there would have

17      been nothing wrong with those tablets; correct?

18          A.      There would be nothing wrong with the

19      tablets that they tested.

20          Q.      Okay.  And when there is --

21          A.      If --

22          Q.      When --

23          A.      If -- may I say an if?

24                    If there was a valid test method done

25      by a qualified individual.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 52

1              So if we assume that the FDA and all

2      these other tests that were done were qualified,

3      that they had a validated test method, then we can

4      assume, and it's fair to assume that the units that

5      they tested, those tablets, those bottles, whatever

6      they tested to get individual samples are within the

7      specification.

8          Q.     Okay.

9          A.     If it's determined that it is.

10         Q.     And the FDA allows you to draw certain

11     conclusions from that because it's an appropriate

12     sampling size; correct?

13         A.     Tell me what you -- are you saying is

14     the conclusion.

15         Q.     All right.  Well, let me -- let me ask

16     you:  If FDA -- do you know what a 484 is?

17         A.     No.  I am not familiar with that.

18         Q.     You don't know what a 484 is?

19         A.     I said --

20                MR. MILLER:  Objection.  Asked and

21     answered.

22         Q.     FDA comes to Johnson & Johnson and

23     decides to take a sample from you of your product

24     for independent testing.

25         A.     Right.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 53

1        Q.      Do you know what that process is?

2        A.      Do -- I heard of it.  I haven't been

3   involved in it.

4        Q.      All right.

5        A.      Regulatory affairs department would

6   interact with the FDA, not the quality assurance

7   department.

8        Q.      Well --

9        A.      In -- in a situation like that.

10       Q.      Well, if FDA independently tested a J&J

11  product that you were involved in, what conclusions

12  would -- and it passed all the specifications, what

13  conclusions would you, at Johnson & Johnson, draw

14  from that?

15       A.      I would draw a conclusion that they

16  took X number of samples, and the samples that they

17  took were within specifications.

18              Since I know that my process is well

19  developed, well characterized, since I know I have a

20  validated process, since I know I have validated

21  test methods, since I know I have qualified

22  individuals conducting all of these studies, then I

23  can make a conclusion that their test results

24  confirmed that which I knew to begin with.

25       Q.      So it's good news; right?

Mark G. Kenny, Volume I                                June 29, 2010

Page 54

 1              MR. MILLER:  Object to form.

 2         Q.    Okay.  I'll use something more

 3    scientific.

 4              It corroborates your processes and

 5    testing, doesn't it?

 6         A.    Yes.  It certainly does.

 7         Q.    I didn't see on your Reference B that

 8    you looked at any of the process validation for

 9    Digitek.

10              Did you look at the process --

11         A.    Yes.

12         Q.    -- validation documents for Digitek?

13         A.    I looked at two process validations.

14    They were rather old.  1993, I believe, for

15    .5 milligram Digitek.  And there was -- there may

16    have been another one.  I don't recall.

17         Q.    Well, and that was submitted to the FDA

18    for purposes of the ANDA; correct?

19         A.    Perhaps.  I would assume that it was.

20    I don't know.  It doesn't say this was submitted.  I

21    don't have the submission.

22         Q.    Did you ever see anywhere in the

23    material that you reviewed a specific reference by

24    FDA that Digitek testing methods, like MOI 145, were

25    not validated?

Mark G. Kenny, Volume I                                    June 29, 2010

```
 1        A.      I believe there was one or two test
 2   methods not properly validated.
 3        Q.      Okay.  Find it.  I want to -- I want to
 4   hear from you where in all the material you reviewed
 5   there is a single reference by the FDA to a --
 6        A.      Test method.
 7        Q.      -- to a test method for finished
 8   tablets not being validated.
 9        A.      Well, you just added "finished
10   tablets."
11               I would -- I would assume that, based
12   upon your questioning and your challenge, that I
13   would not find that.
14               So -- so I may have misspoken in terms
15   of recalling a test method validation
16   non-conformance.
17        Q.      Let's go to the second paragraph in
18   Exhibit 39 in the section "If a Manufacturer Is Not
19   Following cGMPs, Are Drug Products Safe for Use?"
20        A.      Okay.
21        Q.      About two-thirds of the way down, it
22   says:  "The impact of cGMP violations depends on the
23   nature of those violations and on the specific drugs
24   involved."
25               Do you agree with that?
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                                Page 56

 1          A.      I think it's poor wording.

 2                  I would have to say I agree with it.

 3          Q.      All right.  The next sentence says:  "A

 4     drug manufactured in violation of cGMP may still

 5     meet its label specifications."

 6                  Do you agree with that?

 7          A.      Of course.

 8          Q.      And the remainder of the sentence says:

 9     "And the risk that the drug is unsafe or ineffective

10     could be minimal."

11          A.      Of course.

12          Q.      Do you agree with that?

13          A.      Of course.

14          Q.      So let me see if I state it another

15     way, if I understand what these regs mean.

16                  The finding of adulteration because of

17     a cGMP violation at most reflects a possibility that

18     out-of-specification drugs were produced; correct?

19                  MR. MILLER:  Object to form.  Misstates

20     previous testimony.

21          A.      You can repeat the question.  But I

22     don't think it's correct.  Would you repeat the

23     question?

24                  MR. MORIARTY:  Can you read it back,

25     please?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 57

1                    (Requested portion is read.)

2          A.      No.  No, that is not correct.

3          Q.      Okay.  Adulteration is a regulatory

4    definition; correct?

5          A.      The FDA defines adulteration in the

6    CFR.

7          Q.      All right.  And whether a particular

8    drug is within or without its specifications is

9    actually something you can test to determine;

10   correct?

11         A.      No.

12         Q.      You can't?

13         A.      No.  What you can determine is that

14   taking a sample, you have a certain level of

15   probability if the product tests acceptably.

16                 You have a certain level of probability

17   and a confidence interval that the product is

18   acceptable.

19                 You don't know what you don't know.

20   You haven't tested them all.

21                 If you tested them all, and they were

22   validated test methods, and they were a qualified

23   individual that did the test, I think a fair

24   assumption would be that all of them would be within

25   specification.

Mark G. Kenny, Volume I                                        June 29, 2010

Page 58

1        Q.     All right.  Well, let's just assume

2    that in the 484 process, the FDA comes in and takes

3    a sample of a solid oral dose product off a pharmacy

4    shelf.

5        A.     Sure.

6        Q.     And tests a certain number of tablets

7    for dissolution, assay, content uniformity within

8    the United States Pharmacopeia guidelines.

9        A.     Um-hum.

10       Q.     Okay?  And they are all within --

11       A.     And in accordance to your submission.

12       Q.     Yes.  And they're -- and they're all

13   within the USP parameters for that product.

14       A.     Assuming it's a USP.

15       Q.     Yeah.  What is -- I mean, what is the

16   confidence interval that the FDA would have

17   regarding that particular tested batch?

18       A.     Very low.

19       Q.     Very low?

20       A.     Yes.

21       Q.     So why do they do it?

22       A.     You have to ask them.

23       Q.     And you've --

24       A.     Because it will -- it would conceivably

25   detect gross issues.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 59

1              When I say "gross issues," gross of the
2    highest order.
3         Q.    Have you ever been involved personally
4    at J&J with the 484 process with the FDA?
5         A.    Of the sampling process, no.  If there
6    was a non-conformance, I would have heard about it
7    instantly.
8         Q.    Have you ever seen in any of the
9    material that you reviewed a final agency
10   determination that Digitek, that single product, was
11   adulterated?
12        A.    I don't recall.
13        Q.    Would you like to look?
14        A.    No.  It's too voluminous.  We're trying
15   to keep this within a day or two.
16        Q.    Well --
17        A.    I don't have the time -- I mean --
18        Q.    It may be -- it may be time-consuming,
19   but it's awful important for me to know.
20        A.    I -- I will tell you that in reviewing
21   the documents, I cannot recall an instance where
22   they said -- specifically used the word Digitek is
23   adulterated, separating that out.
24        Q.    Okay.  We typically take breaks every
25   hour to hour and a half.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 60

```
 1                 You let me know when you're ready for
 2      the first break.
 3           A.     I'm fine.
 4           Q.     Okay.  Do you know what the FDA's
 5      application integrity policy is?
 6           A.     No.
 7           Q.     Are you familiar with the CFRs
 8      pertaining to accuracy of documents like batch
 9      records, annual reports and things of that nature?
10           A.     No, I'm not familiar with it.
11           Q.     Well, what -- do you know anything
12      about the F -- what the FDA would do to a company if
13      it reasonably suspected that the company was
14      falsifying data either in an NDA or ANDA or a
15      run-of-the-mill record for production?
16           A.     And you're asking me do I know anything
17      about that?
18           Q.     Yes.
19           A.     Do I know anything?  I know logic, that
20      the -- it would be a serious offense, and I would
21      assume criminal -- potential criminal prosecution.
22           Q.     I didn't see anything in your report
23      referring to any FDA 483s or warning letters about
24      the integrity of Actavis's applications or data.
25                 Did I miss a reference?
```

Mark G. Kenny, Volume I                                June 29, 2010

Page 61

 1          A.      No.  You did not miss a reference.

 2          Q.      Did you -- do any of the references in

 3    your Appendix B contain FDA warnings or citations

 4    about data integrity regarding Digitek?

 5          A.      Could you repeat the question?

 6          Q.      Yes.  In your Appendix B, this thing

 7    we've been talking about where you have all these --

 8          A.      Right.  The references.

 9          Q.      -- things you referred to, do the 483s

10    or warning letters or EIRs in your Appendix B

11    contain FDA observations or findings about data

12    integrity concerning Digitek?

13          A.      I don't recall any.

14                  MR. MORIARTY:  Let's -- there's just a

15    couple minutes left on this tape, so let's take our

16    break now.

17                  THE VIDEOGRAPHER:  Please stand by.  We

18    are going off the record.  It is 9:58 A.M.  This

19    ends Tape Number 1.

20                  (Recess was taken.)

21                  THE VIDEOGRAPHER:  We are back on the

22    record.  The time is 10:12 A.M.  This is the

23    beginning of Tape Number 2.

24          Q.      All right, Mr. Kenny.

25                  Have you ever heard of Quantic

Mark G. Kenny, Volume I                                      June 29, 2010

                                                                Page 62

 1    Regulatory Services?

 2          A.     I've heard the name.

 3          Q.     Do you know anything about their

 4    reputation in the industry?

 5          A.     No.  I really don't.

 6          Q.     Do you know anything about their

 7    reputation with FDA?

 8          A.     No.  I have no idea.  I know they're a

 9    consulting firm.  And I believe they're rather

10    large.  That's it.

11          Q.     Are you familiar with any Actavis batch

12    record reviews done by Quantic Regulatory Services?

13          A.     Specifically, no.

14          Q.     And I didn't -- this is Exhibit 23.

15                 (Exhibit 23, Letter dated 12/24/07 from

16    Scott Talbot, was marked for identification.)

17          Q.     First of all, are you aware that in the

18    early 2007 FDA warning letter, they requested that

19    Actavis get independent batch record review?

20          A.     Yes.  I'm aware of that.

21          Q.     Have you ever seen Exhibit 23 before?

22                 MR. KAPLAN:  Do you have an extra?

23                 MR. MORIARTY:  I thought I passed one

24    down.

25          A.     When I look at the cover, I say no.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 63

1    I'm pretty sure I haven't seen this.

2          Q.     All right.

3          A.     It's a lot of blank.

4          Q.     It's a lot of redactions.  I understand

5    that.

6                 So -- first of all, you see that the

7    cover of Exhibit 23 is a letter dated December 24,

8    2007 to a compliance officer at FDA from Scott

9    Talbot, who was then site head of quality at Actavis

10   Totowa; correct?

11         A.     Correct.

12         Q.     And then attached, I will represent to

13   you that these are Quantic records regarding batch

14   record review.

15                And, if you look at Bates page

16   1867202 -- I think you're -- you're on the same

17   page -- on that page, Items 35 through 39 are

18   specific Digitek batch records; correct?

19         A.     It appears, yes.

20         Q.     And then later, at Bates page starting

21   1867214 --

22         A.     Okay.  Sure.

23         Q.     -- and spilling over into the next

24   page, between Items 47 to 80, inclusive, are all

25   specific Digitek batch records; correct?

Mark G. Kenny, Volume I                                June 29, 2010

Page 64

1        A.      Yeah.   Items 47, whatever you want to
2    call it, through 80 are Digitek.
3        Q.      All right.   And have you seen the
4    Quantic Regulatory Services protocol that they used
5    for the review of the Digitek batches?
6        A.      No, I did not.
7        Q.      And I will represent to you that if you
8    count them all up, they looked at 39 Digitek batch
9    records.
10               Would you trust me on that?
11       A.      I trust you implicitly.
12       Q.      And do you know how many of those 39
13   were of what ultimately became recalled batches?
14       A.      In 2007, no.   I -- I couldn't determine
15   that.
16               I'd have to look at the number of
17   batches that were within expiration, is the only way
18   I could tell.
19       Q.      All right.   I want you to assume that
20   19 of those 39 were of batches that were ultimately
21   recalled.
22               Okay?
23       A.      Okay.
24       Q.      And go back to the cover page of 23.
25       A.      Sure.

Mark G. Kenny, Volume I                                June 29, 2010

Page 65

1        Q.     Actavis tells the FDA that Quantic's
2   ultimate conclusion was:  "On December 21, 2007,
3   Quantic provided Actavis with a statement indicating
4   the audit was complete, and the manufacturing and
5   laboratory records have reliably confirmed the
6   identity, strength, quality and purity of the
7   marketed products."
8               Do you see that?
9        A.     I certainly do.
10       Q.     Do you have any basis on which to
11  disagree with Quantic's assessment in that regard?
12       A.     Well, I have to qualify this.
13       Q.     Well, can you answer my question first?
14  And then --
15       A.     Do I have any --
16              MR. MILLER:  Objection.
17              MR. MORIARTY:  He can qualify it.  I
18  want a yes or no, and then he can qualify it.
19       A.     Well, repeat it one more time, please.
20       Q.     Do you have any basis to disagree with
21  Quantic's conclusion regarding the 39 batches that
22  they --
23       A.     Yes, I would.
24       Q.     Okay.  What's the basis?
25       A.     Can I reread this out loud?  It says:

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 66

1    "Quantic provided Actavis with a statement

2    indicating the audit was complete, and manufacturing

3    and laboratory records have reliably confirmed the

4    identity, strength, quality and purity of the

5    marketed products."

6                I would disagree with the word

7    "reliably."

8         Q.    Why?

9         A.    Because they took a -- they looked at a

10   batch record that indicated that there was no major

11   issues, assuming there were no major issues, and if

12   there were major issues, the batch would have been

13   held and reviewed.

14               The assumption there is that the batch

15   records contained accurate information.  The

16   assumption is that the test methods that were used

17   were validated.  The assumption is that the process

18   is validated.

19               And if you form all the -- the

20   assumption is that the equipment is calibrated.  The

21   assumption is that people are properly trained.

22               Now, if all of those things were in

23   place, and then I looked at -- if I was Quantic,

24   looked at the batch records, I would say, you know,

25   they have a reliable process.  They have reliable

Mark G. Kenny, Volume I                                    June 29, 2010

Page 67

```
 1    testing.  Etcetera, etcetera.  Based on all that

 2    reliable good stuff, I will say that, hey, I can say

 3    reliably, you know, this sample -- I'm sorry, this

 4    sample -- these batch records make me feel good

 5    about it.

 6        Q.    Okay.  But if I'm correct, you've not

 7    only never seen Exhibit 23, and you've never seen

 8    Quantic's protocol, and you've only seen three batch

 9    records, compared to at least their 39; correct?

10        A.    Yes.

11        Q.    And I didn't see anywhere in your

12    report that indicated that any process for Digitek

13    was not validated.  Have you made an observation --

14            MR. MILLER:  Objection.

15            MR. MORIARTY:  Let me finish my

16    question.

17            MR. MILLER:  Sure.

18            MR. MORIARTY:  Then he gets to object.

19    Then you get to answer it.

20        Q.    I didn't see any observation in your

21    report indicating that any process for Digitek was

22    not validated.

23            Have you given that opinion in your

24    report?

25            MR. MILLER:  Object to form.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 68

1              You can answer.

2       A.     Okay.   The process that can produce

3   defective product is not a validated process.

4              MR. KAPLAN:   I'm going to object and

5   move to strike that answer as not being responsive

6   to the question you were asked.

7              THE WITNESS:   Okay.

8              MR. MILLER:   And continue on with the

9   same answer.

10             He can object, but you can still

11  continue on.

12      A.     Okay.   I don't -- I --

13      Q.     What I'm asking is:   I didn't see

14  anywhere in your report to indicate that any Digitek

15  process was not validated.

16      A.     Okay.   To answer your question

17  specifically, I did not use the term Digitek in

18  terms of a non-validated process --

19      Q.     Okay.

20      A.     -- specifically in here.

21      Q.     Okay.   Do you have any evidence that

22  the FDA did not accept Actavis's and Quantic's

23  findings as exhibited by Exhibit 23?

24      A.     No.   I have no evidence.

25      Q.     That's Exhibit 24.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 69

1                    A lot of paper.

2          A.        Um-hum.

3          Q.        And I'm not going to take you through

4     all of it.

5                    Now, in your Exhibit -- I'm sorry --

6     your Appendix B, I didn't see a reference to any FDA

7     Form 484s.

8          A.        That's correct.

9          Q.        Did you review any FDA Form 484s?

10         A.        No, I did not.

11         Q.        Well, let's look at Exhibit 24.

12                   (Exhibit 24, FDA Collection Report for

13    Sample Number 377410, was marked for

14    identification.)

15         Q.        Is that for Sample 377410?

16         A.        Yes.

17         Q.        And if you look at the narrative, does

18    it indicate that in February of 2007, FDA took two

19    bottles of 100-count, 125 microgram Digitek from

20    Actavis?

21         A.        Could you point to where that is?

22                   Is it here?

23                   MR. KAPLAN:  It's on the first page,

24    under "Description of Sample."

25         Q.        If you go to page 3 of 3 of Exhibit 24,

Mark G. Kenny, Volume I                          June 29, 2010

Page 70

1    it says:  "Method of Collection."

2                  Do you see that?

3         A.    Yes, I do.

4         Q.    Okay.  So here, they took 200-count

5    bottles of 125 microgram Digitek from the firm's

6    inventory.  And then it gives the Actavis batch

7    number; correct?

8         A.    It appears to, yes.

9         Q.    70078 A1.

10                 Do you see that?

11        A.    Yes.

12        Q.    And then FDA had an opportunity,

13   presumably, to test as much of this as they wished;

14   correct?

15        A.    I presume yes.  Sure.

16        Q.    All right.  And do you know whether or

17   not they used United States Pharmacopeia testing

18   standards for Digoxin?

19        A.    I don't specifically know what they

20   did.

21        Q.    Have you ever looked at the USP

22   reference standards for the monograph for Digoxin?

23        A.    Not for Digoxin.

24        Q.    Have you ever looked at the general USP

25   standards for content uniformity?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 71

```
 1       A.      Yes.

 2       Q.      And assay?

 3       A.      Yes, sir.

 4       Q.      All right.  But here, ultimately, based

 5  on whatever they tested, they say:  "All methods are

 6  compendial and follow USP 29-NF24, page 704, Digoxin

 7  Tablets Monograph."

 8               Do you see that?

 9       A.      Where?

10       Q.      Under "Remarks" on page 3.

11       A.      Yes.  With the exception of impurity

12  testing.

13       Q.      Which they use a house standard; right?

14       A.      "First in-house method is the limit

15  test... utilizes relative retention times" -- yes.

16  So they used USP methods, unless stated otherwise.

17       Q.      And according to Exhibit 24, did all

18  the samples that they tested from this batch

19  passed -- pass?

20       A.      I'm going to hunt for it.  Maybe you

21  can point to it.

22       Q.      Yeah.  I have to hunt myself.

23       A.      I think it's a fair assumption to say

24  they passed, or there would have been tremendous

25  issues.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 72

1        Q.      Okay.

2        A.      I will accept that it says passed

3    somewhere in here.

4        Q.      All right.  So what -- do you think

5    that's significant at all?

6        A.      Could you -- you know, could you define

7    what you mean by -- be more specific in terms of

8    "significant"?

9        Q.      Well, first of all, do you know whether

10   or not Batch 70078 A1 was among the recalled

11   batches?

12       A.      I -- since it was a 7, it probably was

13   recalled.

14       Q.      And as far as your opinions in this

15   case, do you find FDA's testing and passing of a --

16   of a recalled Digitek batch significant at all?

17       A.      Well, they don't test and accept.  What

18   they do is they test, they get acceptable results,

19   and they don't react to it.

20               They don't accept anything.  The FDA

21   doesn't accept batches.  They don't take that

22   responsibility of accepting a batch.

23               They can get -- they can derive

24   acceptable results.  When they do -- let's say they

25   do their surveillance program, and they take some of

Mark G. Kenny, Volume I                                          June 29, 2010

Page 73

 1    our product and they test it.

 2                They don't find the batch acceptable.

 3    What they find is the sample that they tested met

 4    specification, and they have no cause for concern

 5    because it met specification.  They don't accept or

 6    reject anything.

 7         Q.    I understand that.  But --

 8         A.    You used that term "accept."  That's

 9    all.

10         Q.    Well, they -- do these results

11    corroborate Actavis's testing of the same batch?

12         A.    Do they corroborate?

13                Well, if -- if Actavis got acceptable

14    results of their sample, the FDA took a small

15    sample, presumably smaller than Actavis's, and they

16    confirmed each other that the -- based upon only the

17    testing that the product is acceptable.  But the

18    testing is only a small portion of determination

19    whether a batch is acceptable.

20         Q.    I understand that.

21                Isn't it likely, given the Actavis

22    testing and the FDA corroborative testing, that the

23    tablets in Batch 70078 A1 were within the USP

24    specifications?

25         A.    I can answer that.

Mark G. Kenny, Volume I                                      June 29, 2010

Page 74

1              Is it probable?  I would say that,

2      based upon the fact that they do not have

3      validated -- that in general, they do not have

4      validated processes, based upon in general that

5      25 percent of the equipment is not proper -- not

6      qualified, based upon the lax practices that are

7      done in laboratories, etcetera, etcetera, I would

8      only state -- and this, I am being 100 percent

9      honest here.  I'm not trying to, you know -- to, you

10     know, avoid the question.

11              I would -- I cannot state that that

12     batch is in compliance because my entire history of

13     working in compliance is based upon systems working.

14     It's not based upon samples.  A sample is a merely

15     confirmatory way of saying guess what, guys?  At

16     least we know the three samples that we tested were

17     good.

18              Since they had significant issues with

19     content uniformity in general, it -- it -- I lack

20     the confidence that, in general, they -- they have

21     well validated processes.

22              But I'm talking in general, not

23     specifically to Digoxin.  But Digoxin is part of

24     this population, therefore...

25         Q.    So, if I really understand what you

Mark G. Kenny, Volume I                                    June 29, 2010

Page 75

1    just said at a global level --

2         A.     Yes.

3         Q.     -- you are assuming, because of general

4    cGMP violations, that Digitek had some problems;

5    right?

6                MR. MILLER:  Object.  Misstates

7    previous testimony.

8                It's okay to answer.

9         A.     Okay.  I don't understand the word

10   "problems," Digitek had some "problems."

11        Q.     In your answer, I asked whether it was

12   likely that the batch met USP specifications.  You

13   never said anything about that.

14               You said that, for a variety of

15   reasons, you didn't think the batch was likely in

16   compliance.

17               What do you mean by "in compliance"?

18               MR. MILLER:  Object to form.

19        A.     That the systems and procedures that

20   are in place that -- that formed the basis for

21   testing -- no -- formed the basis for determining

22   acceptability of the batch, if those are faulty, and

23   they've shown themselves to be having a lot of

24   issues, I cannot make the assumption that taking

25   samples from the FDA, taking samples from whoever --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 76

1    I can't make the assumption that that product is

2    acceptable.

3         Q.    All right.  What do you mean by

4    "acceptable"?

5         A.    "Acceptable," meaning meets

6    specification each and every time, each and every

7    unit.

8         Q.    Okay.  What I'm trying to find out --

9    and let's go back to Exhibit 39.  It says here:  "A

10   drug manufactured in violation of cGMP may still

11   meet its label specifications."

12             And you agreed with me on that?

13        A.    Yes.  I agree with that.

14        Q.    Okay.  I want to talk about the labeled

15   specifications.

16        A.    Surely.

17        Q.    Okay.  First of all, have you seen any

18   test results of any type to indicate that Batch

19   70078 A1 did not meet its labeled specifications?

20        A.    I don't believe I have seen any

21   information.

22        Q.    All right.  Now, can you please show me

23   anywhere in all the material that you reviewed

24   anyplace where the FDA said that Digitek did not

25   have validated manufacturing or testing processes?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 77

 1        A.     Well, the 25 percent of the equipment

 2    was not qualified.  It's in the 43.  I think it was

 3    2004, perhaps.  That's a significant issue.

 4        Q.     Are you finished with your answer?

 5        A.     I certainly am.

 6        Q.     Show me anywhere in the material that

 7    you reviewed anyplace that said that any equipment

 8    used to make Digitek was not qualified.

 9        A.     I don't know what the blenders,

10    etcetera that were used as examples of not being the

11    correct IQ OQ, which is installation qualification,

12    operation qualification and performance

13    qualification.

14               I can't link those two between the

15    manufacturing of Digitek and those particular pieces

16    of equipment.  I'd have to -- I'd have to do much

17    more research.

18        Q.     So sitting here today, you don't know

19    that any Digitek equipment was found to be not

20    qualified by the FDA; correct?

21        A.     Yes.  Based upon what I've reviewed.

22        Q.     All right.  Then let me go back to my

23    first question, now that we've taken care of

24    equipment.

25               Show me anywhere in all the material

Mark G. Kenny, Volume I                           June 29, 2010

Page 78

1    that you've reviewed, please, where FDA specifically

2    says that there is a Digitek manufacturing or

3    testing process that is not qualified or validated.

4         A.     All right.  The way I would answer that

5    is that the only evidence that I have seen where a

6    process is validated was done, I believe, in '93.

7              I glanced through it.  And the reason I

8    only glanced through it is whatever work was done in

9    '93 is of -- of little use to batches produced 13,

10   14 years later.  They may have done great work.

11             So I have yet to see any

12   well-constructed validation studies.  I will assume

13   that between '93 and the production of these batches

14   that they didn't do them because I haven't seen it.

15        Q.    Well, there's a lot of things you

16   haven't seen.  But we'll get to that later.

17             Is there an FDA reg that says

18   specifically that these processes have to be

19   revalidated?

20        A.     Is there a specific reg?  I'd have to

21   look at -- at 21 CFR.

22             Can I glance at it?  I do have a copy.

23        Q.    You have it among your materials?

24        A.     No, I don't.

25        Q.    I've never seen one, but perhaps you

Mark G. Kenny, Volume I                                    June 29, 2010

Page 79

 1    know of one.

 2         A.      It's in there someplace.

 3                 MR. MILLER:  We had it out once -- once

 4    already.

 5         Q.      Well, FDA inspected Actavis on a number

 6    of occasions for a variety of reasons between 1998

 7    and 2008, did they not?

 8         A.      1998 and -- yes.

 9                 MR. MILLER:  Matt, you asked him a

10    question.  And he wanted to answer if he could see

11    the CFR.

12                 MR. MORIARTY:  I'm changing the

13    question.  I don't want to dig for the reg.  Okay?

14         Q.      They did inspect a number of times for

15    a number of reasons over those 10 years?

16         A.      Yes.

17         Q.      And they had an opportunity to see and

18    observe whether Digitek processes and equipment were

19    validated or not validated; correct?

20         A.      Correct.

21         Q.      And even in 2008, when the focus was on

22    a Digitek batch, 70924, FDA never said in the 483 in

23    May of 2008 that Digitek processes and equipment

24    were not validated, did they?

25         A.      I believe that's accurate.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 80

1        Q.      And you said something --

2        A.      But they may not have looked for it.

3    They didn't look for everything.  They went in.

4    What the FDA does, they look for examples.  They

5    don't look to do a comprehensive review.

6               Once they find examples, they make the

7    assumption, and it's certainly a reasonable

8    assumption, that that particular quality system is

9    in violation of GMP.

10              They have found enough evidence so that

11   you need to go back, as the manufacturer, the

12   tester, to go back and do a comprehensive review of

13   that quality system, since you've shown that it's

14   unreliable, what you're doing.

15              You need to go back and do a

16   comprehensive and then determine whether or not

17   you're in compliance.

18              So, if it were me, and I found out,

19   which would not happen, that I had 25 percent of my

20   equipment that was not qualified, then I would go

21   back personally and take a look at all those things,

22   including process validation, which is the

23   culmination of all of these development events.

24              MR. KAPLAN:  With all due respect to

25   the witness, I'm going to move to strike your last

Mark G. Kenny, Volume I                                June 29, 2010

Page 81

```
 1   answer because you're not responsive to the question
 2   that Mr. Moriarty asked you.
 3              THE WITNESS:  It's not on purpose.
 4              MR. KAPLAN:  Then on purpose, if you
 5   would, listen carefully to his questions, and try to
 6   answer just the question that he asks.
 7              THE WITNESS:  I think I --
 8              MR. MILLER:  You've answered it
 9   perfectly, Mark.  He's allowed to object.  But you
10   answered it perfectly, and keep going.
11              MR. KAPLAN:  And I move to strike
12   counsel's comments as inappropriate.
13              MR. MORIARTY:  Can I go on?
14              THE WITNESS:  In all fairness, I
15   thought I did.
16      Q.    What independent analysis did you do to
17   determine whether Digitek manufacturing and testing
18   processes were validated?
19      A.     In -- in looking at, for example, the
20   batch with the double-thick tablets, that
21   particular -- the evidence that I was shown for that
22   particular batch was horrendous.
23              It showed more errors than any batch
24   record I -- I won't say I've ever seen.  It ranks up
25   there.
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                                Page 82

 1                 The level of investigation as a

 2       determination of a, quote, validated --

 3            Q.    Excuse me.

 4                 MR. MILLER:  No.

 5            Q.    I need to stop you.  What I'm asking is

 6       not your overall opinion of their sloppiness or

 7       their GMP.

 8                 I want to know what independent

 9       analysis you did whether they were validated.  Not

10       whether they made mistakes or -- whether they were

11       validated.

12            A.    I'm trying to answer.

13                 MR. MILLER:  And I'm going to object.

14       Excuse me, Mark.  I think the answer did go to the

15       question.

16                 MR. MORIARTY:  That's fine.  Let him

17       answer.

18                 MR. MILLER:  I'm going to let him

19       answer, Matt.

20            Q.    Go ahead.

21            A.    Did I find -- one more time.

22            Q.    I want to know what -- okay.  You've

23       already told me that nowhere in FDA's 483s or

24       warning letters did they make a specific comment

25       that FDA -- or Digitek processes were not validated

Mark G. Kenny, Volume I                                    June 29, 2010

Page 83

1    or that Digitek equipment was not qualified.

2              What independent assessment did you do

3    about validation?  Not about GMP, about validation.

4         A.    You mean a validation study?

5         Q.    Yes.

6         A.    The only thing that I read concerning

7    Digitek was a 1993 process validation study.

8         Q.    Okay.

9         A.    That's it.

10        Q.    All right.  Now, among your answers

11   earlier, you said that there were lax practices in

12   the lab.

13             Can you show me anywhere in the

14   material that you reviewed where FDA said that there

15   were any lax laboratory practices regarding Digitek?

16        A.    I'd have to look at the -- Digitek?

17   I'd have to look at the -- all of the 483s, the

18   EIRs.  I'm sorry.  I -- I don't recall.

19             MR. KAPLAN:  That's what you did,

20   didn't you?

21        A.    I did, but I don't recall.  I was -- my

22   focus was not specifically only on Digitek.

23             My -- my focus is first to understand

24   what kind of systems and procedures are in place.

25   Is this a well-controlled company?

Mark G. Kenny, Volume I                                   June 29, 2010

                                                              Page 84

 1                    Now, if --

 2                    MR. KAPLAN:  I'm going to move to

 3     strike that as not responsive.

 4                    All he asked you was where did -- did

 5     you see any reference to lax laboratory practices re

 6     Digitek in anything that you reviewed?  That was the

 7     question.

 8                    MR. MILLER:  And he's entitled to give

 9     an answer.

10                    MR. KAPLAN:  Yes or no?  Did you see

11     any reference?

12                    MR. MILLER:  Let's answer his question

13     before we get to your question.

14          A.    I mean, I'm not trying to avoid the

15     question.  Understand, I'm not trying to avoid it.

16     I don't recall any.

17          Q.    Mr. Kenny, what I'm trying to do today

18     is be very specific, okay, about Digitek and

19     findings about Digitek by FDA or by you.  Okay?

20                    (Exhibit 25, FDA Summary Report for

21     Sample Number 448881, was marked for

22     identification.)

23                    MR. MILLER:  Thank you, Matt.

24          Q.    Have you ever seen Exhibit 25 before?

25          A.    No.

Mark G. Kenny, Volume I                          June 29, 2010

Page 85

```
 1                   MS. CARTER:  Matt, real quick, I have a

 2    question about Exhibit 24 and 25.

 3                   Were these produced in -- in discovery?

 4                   MR. MORIARTY:  We got these from the

 5    FDA pursuant to an FOIA request, just like you got

 6    most of your documents from the FDA pursuant to an

 7    FOIA request.  These are not my company's documents.

 8                   MS. CARTER:  Okay.

 9        Q.     Have you ever seen Exhibit 25 before?

10        A.     No, I have not.

11        Q.     All right.  Is this Sample 448881?

12        A.     Oh, I'm sorry.  Yes.

13        Q.     FDA 484 sampling?

14        A.     Yes.

15        Q.     Okay.  And let's go -- if you go

16    through here, you see that what FDA did was go to a

17    Walmart pharmacy in Indiana and collect two

18    100-count bottles of Digitek 125 micrograms.

19        A.     Okay.

20        Q.     Is that right?

21        A.     I don't see the Walmart part, but

22    the -- I'll assume that what -- so they have

23    samples.  They collected them.  Okay.

24        Q.     Okay?

25        A.     Yeah.
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 86

 1        Q.     If you go to the second page, it says
 2   "Walmart pharmacy warehouse" down there.
 3               Do you see that?
 4        A.     Please point that to me.  "Low-cost
 5   generic" -- oh, yeah.  Okay.
 6        Q.     And this was in December of 2007;
 7   correct?
 8        A.     Collection identification.  Sample --
 9   it says something EB 12307?
10        Q.     Yes.  December 12, 2007.  The same
11   month in which Batch 70294 was on hold; correct?
12               Do you know that?
13        A.     I believe that's correct.  Wait a
14   minute.
15               Repeat the last part.
16        Q.     This is the same month, by coincidence,
17   that Batch 70924, the double-thick batch, was on
18   hold for investigation; correct?
19        A.     That is correct.
20        Q.     All right.  And what FDA did was,
21   again, test pursuant to the United States
22   Pharmacopeia methods.  And all these samples passed
23   all the tests to which FDA subjected them.
24               Is that correct?
25        A.     I'm going to assume, because in here it

Mark G. Kenny, Volume I                                    June 29, 2010

Page 87

1    says the lab -- the product specifications for

2    identity, dissolution and content uniformity,

3    product meets it.

4         Q.    Okay.

5         A.    That's on page 1.

6               So I am going assume, you know, not

7    going through this thing, that they would have

8    highlighted whether or not there were any

9    non-compliances, non-conformances.

10        Q.    And this was Batch 70298 A1.

11              Is that right?

12              It's in the middle of the second page,

13   under "Manufacturer's Code."

14        A.    Yes.  70298 A1, expiration April of

15   2009.

16        Q.    Do you know whether this was a recalled

17   batch?

18        A.    I will make the assumption that it's

19   recalled because of the batch number.

20        Q.    Have you seen any test results of any

21   type to indicate that tablets from Batch 70298 A1

22   did not pass USP testing?

23        A.    As finished product test, no, I have

24   not.  As a finished product test.

25              (Exhibit 26, FDA Summary Report 448892,

Mark G. Kenny, Volume I                                    June 29, 2010

Page 88

```
 1   was marked for identification.)

 2        Q.     Handing you what's been marked as

 3   Exhibit 26.

 4               MR. MORIARTY:  Harvey.

 5               MR. KAPLAN:  Yes, sir.  Thank you.

 6        Q.     We'll get good at reading these by the

 7   end.

 8        A.     I think we are getting better.

 9               Can I circle things or not?

10        Q.     Sure.

11               MR. MILLER:  Is that on the -- you

12   don't want to write on the -- on the copy that's

13   being marked as an exhibit.

14               THE WITNESS:  Oh, okay.

15        Q.     There's the exhibit copy.  You mark

16   whatever you want on it.

17               December 3, 2007, FDA collected Sample

18   448892, again from a Walmart warehouse in Indiana.

19        A.     Okay.

20        Q.     The same day as the other -- as

21   Exhibit 25.

22        A.     All right.

23        Q.     And this was 200-count bottles of

24   .250 microgram Digitek; correct?

25        A.     Yes.
```

Mark G. Kenny, Volume I                              June 29, 2010

Page 89

 1          Q.      From Batch 70664 A?

 2          A.      70664 A1, correct.

 3          Q.      And this -- all these samples tested

 4    appropriately within the specifications?

 5          A.      Yes.  It says:  "The product meets

 6    specification for identity dissolution and content

 7    uniformity."

 8          Q.      Do you have any evidence, have you seen

 9    any evidence to indicate that tablets from that

10    particular batch did not pass USP testing?

11          A.      I have no evidence to suggest that it

12    did not pass finished product testing.

13          Q.      Had you seen this before, by the way?

14          A.      No, I did not.  I haven't seen any of

15    the -- I can make a blanket statement.  I have not

16    seen those forms.

17                  (Exhibit 27, FDA Collection Report for

18    Sample 453913, was marked for identification.)

19          Q.      Showing you what's been marked as

20    Exhibit 27.

21          A.      Okay.

22          Q.      Does it indicate that in February of

23    2008, FDA took Sample 453913?

24          A.      45 -- right.  Yes.

25          Q.      Was it one 1,000-count bottle of 125

Mark G. Kenny, Volume I                                    June 29, 2010

Page 90

1   microgram Digitek?

2        A.      One.   Correct.

3        Q.      And it was from Actavis Batch 70737 A?

4        A.      That's correct.   A1.

5        Q.      And did all the tests to which FDA

6   subjected these tablets pass the USP criteria?

7        A.      I'm trying to find the -- this is a

8   little different.

9                I assume that somewhere, it has that

10  statement.

11               Digoxin, reason for collection,

12  description sample method, how prepared,

13  identification, delivered, remarks.  I don't see

14  where it says that.

15               Wait a minute.  Let's look in here.

16  Continuation.

17               Okay.  If you look on, I don't know,

18  around the third page, page 1 of 1 -- looks like

19  this.

20       Q.      Yep.

21       A.      Okay.  It states that the -- where is

22  it now?

23       Q.      "The sample meets USP specifications

24  for identification, content uniformity and

25  dissolution"; correct?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 91

1          A.      Correct.

2          Q.      Have you seen any evidence to indicate

3    that any samples from Batch 70811 -- I'm sorry --

4    from Batch 70737 A1 did not pass USP testing?

5          A.      I see no evidence that the final

6    samples that have been tested, they've all met

7    finished product specifications.

8                  (Exhibit 28, FDA Summary Report for

9    Sample Numbers 454866, was marked for

10   identification.)

11         Q.      Handing you what's been marked as

12   Exhibit 28.

13                 This is February 15, same day as

14   Exhibit 27, Sample 454866; correct?

15         A.      45 -- correct.

16         Q.      And this was taken from a McKesson

17   warehouse in Georgia?

18         A.      Low-cost generic drug sample survey.

19   I'm looking.

20                 I suspect it's here.

21         Q.      It's way at the back.  Way at the back.

22         A.      Oh, okay.

23         Q.      The second page from the back.  They

24   just send us these out of order.

25         A.      I understand.

Mark G. Kenny, Volume I                                June 29, 2010

Page 92

1        Q.     See that?  McKesson Drug Company?

2        A.     Yes, I do.

3        Q.     All right.  And this sample also was

4   subjected to USP testing for identification, content

5   uniformity and assay, and it passed; correct?

6        A.     Where does it say it passed?

7        Q.     Go to the very first page, under "Lab

8   Conclusion" --

9        A.     Yes.  Right.  "The sample meets USP

10  specifications for identity, dissolution and content

11  uniformity."  Yes.

12       Q.     Ever seen any test results to indicate

13  that Batch 70811 A had out-of-spec tablets?

14       A.     I don't recall it.  I would assume that

15  no, I have not seen it.

16       Q.     Do you know any of the other experts

17  hired by the plaintiffs in this case?

18       A.     I met Russ Soma.  I've talked with --

19  met him at a -- do I know -- yes.  Russ Soma.

20       Q.     Just Russ?

21       A.     Just Russ.

22       Q.     Did you refer the plaintiffs' lawyers

23  to Russ?

24       A.     Yes, I did.

25       Q.     Have you ever read an article written

Mark G. Kenny, Volume I                                    June 29, 2010

Page 93

 1   by one of the plaintiffs' experts named James

 2   Farley?

 3          A.      No.  I don't know the name.  But I've

 4   heard the name.  That's all.  I haven't read

 5   anything.

 6          Q.      He wrote an article.  And I thought I

 7   had extra copies of it here.  Let me just read you

 8   this, and you can tell me whether you agree with it.

 9                  He co-wrote this article with a lawyer

10   about discovering the cause of a drug's defect.  And

11   it says:  "Pre-filing investigation.  When a client

12   comes to you suspecting that he or she has taken an

13   adulterated drug, you should tell the client to save

14   the drug, the container and all labeling and

15   packaging information."

16                  Here's what I want to ask you about.

17   It says:  "Next, a laboratory must analyze the drug

18   and test for its active pharmaceutical ingredient

19   and for strength and purity."

20                  Do you agree with that statement?

21          A.      That they must or they should?  I guess

22   I --

23          Q.      It says here "must."

24          A.      I would say they should.  Because it

25   depends upon the sample and the condition of the

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 94

 1    sample and...

 2          Q.     Let's go to Exhibit 29.

 3                 (Exhibit 29, FDA Collection Report for

 4    Sample Number 452746, was marked for

 5    identification.)

 6          Q.     I assume you haven't seen this one

 7    either.

 8          A.     Correct.  Yeah, we can assume I haven't

 9    seen any of these that look like this form.

10          Q.     Okay.  And here, we are looking at

11    Sample 462746; correct?

12          A.     Correct.

13          Q.     Collected March 21, 2008.

14                 Is that right?

15          A.     Collected when?

16          Q.     March 21, 2008.

17          A.     March 26, 2008.  Correct.

18          Q.     And --

19                 MR. KAPLAN:  I think you were talking

20    over each other.  March 21, March 26.

21          A.     It says March 26.

22          Q.     All right.  That's fine.  And this is

23    Batch 70834 A?

24                 Oh, I'm sorry.  Batch 70300 A.

25                 Do you find that anywhere?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 95

1        A.     I'm trying.

2               I see 56008 A.

3        Q.     Do you see a different manufacturer's

4   batch number than I just read?

5        A.     Look at this.  It appears that that is

6   the lot number.

7               MR. MILLER:  And for the record, when

8   you say "this," perhaps we ought to --

9               THE WITNESS:  Exhibit 29.

10              MR. MILLER:  There was a lot number --

11              THE WITNESS:  Yeah.

12              MR. MILLER:  -- that you were referring

13  to, I believe?

14              THE WITNESS:  The only thing that looks

15  like a -- looks like a lot number is 56008 A.

16       Q.     All right.  Look on the third page.

17       A.     The third page.

18       Q.     The middle says Lot 7P964.

19       A.     Yes, it does.

20       Q.     You see that?

21       A.     Correct.

22       Q.     And I will represent to you that that

23  is Actavis Batch 70300 A, renumbered by UDL, which

24  made these blister packages, as 7P964.

25       A.     Which is not unusual.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 96

1        Q.      All right.  And FDA tested the same

2    things, identity, content uniformity and assay, and

3    all these specimens passed USP standards?

4        A.      Meets specs.  That's correct.

5        Q.      Do you have any evidence to indicate

6    that there are tablets from Batch 70300 A that do

7    not meet the USP specifications?

8        A.      No.  I have no evidence.

9                (Exhibit 30, FDA Collection Report for

10   Sample Number 462753, was marked for

11   identification.)

12       Q.      Here is Exhibit 30.

13               Is this another FDA 484 sample report?

14       A.      Correct.

15       Q.      Sample 462753, also collected March

16   2008.

17       A.      2008?  I'm sorry.  Would you repeat the

18   lot number?

19       Q.      I haven't said the lot number.  I said

20   the sample number and when it was collected.

21       A.      Correct.  That is correct.

22       Q.      And my notes indicate that that's from

23   Batch 70834 A.

24       A.      This has another, I guess, 8A332 on

25   this page.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 97

 1        Q.      I want you to assume that it is Actavis
 2    Batch 70834 A.
 3        A.      Surely.
 4        Q.      Did this -- did the specimens tested by
 5    the FDA meet the specifications for identification,
 6    dissolution and content uniformity?
 7        A.      On page 1 of 1, the fourth page, it
 8    states that:  "Lab Conclusion:  Meets specs for
 9    identification, dissolution and content uniformity."
10        Q.      Do you have any evidence to indicate
11    that tablets from Batch 70834 A did not meet those
12    specifications?
13        A.      I have no evidence.
14        Q.      Are you aware of any occasion in which
15    FDA did a 484 sample and found Digitek that didn't
16    meet the specifications under the USP?
17        A.      I have found no exceptions.
18        Q.      And I want to go through these quickly,
19    because we -- I will represent to you that the older
20    FDA has these documents, the less weighty they
21    become.
22                (Exhibit 31, FDA Summary Report for
23    Sample Number, was marked for identification.)
24        Q.      So Exhibit 31 is another 484 sample
25    set; correct?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 98

 1      A.     Correct.

 2      Q.     And it says here that this was Batch --

 3   well, this was -- this sample was taken in 2002;

 4   correct?

 5      A.     2002.  March 25th.

 6      Q.     All right.  And it passed the USP

 7   requirements for dissolution?

 8      A.     Correct.  "Meets USP uniformity of

 9   dosage units spec."

10      Q.     And then lower, it says it meets the

11   dissolution specs?

12      A.     "Product meets USP requirements for

13   dissolution at Stage 1."

14      Q.     All right.

15             (Exhibit 32, FDA Summary Report for

16   Sample Number 157504, was marked for

17   identification.)

18      Q.     Exhibit 32 is another Form 484 from the

19   FDA for a sample also taken in 2002; correct?

20      A.     Yes.

21      Q.     Did the -- did the product, as tested

22   by FDA, meet the USP specs?

23      A.     Yes, it did.

24             (Exhibit 33, FDA Summary Report for

25   Sample Number 178890, was marked for

Mark G. Kenny, Volume I                                    June 29, 2010

Page 99

 1   identification.)

 2         Q.      Exhibit 33.  Is Exhibit 33 another 484

 3   from the FDA?

 4         A.      Yes.

 5         Q.      Does it indicate that they took a

 6   Digitek sample in 2002?

 7         A.      Yes.

 8         Q.      And it passed?

 9         A.      They have conclusion --

10         Q.      Actually --

11         A.      It doesn't say anything.

12         Q.      Okay.  If it didn't -- well, here on

13   the right, it says "In Compliance," does it not?

14         A.      I don't know what that means.

15         Q.      All right.  If -- if it was found to be

16   out of spec, you would have expected to see some

17   evidence of that?

18         A.      I would -- I would presume that.  I

19   think it's a fair assumption.

20         Q.      And the last one of these is

21   Exhibit 34.

22                 (Exhibit 34, FDA Summary Report for

23   Sample Number 178891, was marked for

24   identification.)

25         Q.      Is this another Form 484 from the FDA?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 100

    1        A.      Oh, yes.  I'm sorry.

    2        Q.      And tested Digitek?

    3        A.      Correct.

    4        Q.      And like the last one we looked at, it

    5    says "In Compliance" in two different places?

    6        A.      Yes.

    7        Q.      Do you see any evidence that it didn't

    8    pass?

    9        A.      I see no evidence.  It's in compliance.

   10        Q.      At least in the eyes of the FDA, do you

   11    believe that these kind of 484 results provide some

   12    assurance to them that the product itself is meeting

   13    its labeled specifications?

   14        A.      I would say that all testing that meets

   15    specification provides added information, yes.

   16        Q.      Well, I asked whether it provided FDA

   17    assurances that the product was meeting

   18    specifications.

   19        A.      It provides a certain level of

   20    assurance.

   21        Q.      Does it also provide some level of

   22    assurance to FDA that its tests are corroborating

   23    the finished product tests performed by Actavis on

   24    these batches?

   25        A.      If I make the assumption that Actavis

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 101

 1    test results are acceptable, then I would say your

 2    statement is correct.

 3         Q.     All right.  You looked at the annual

 4    reports --

 5         A.     Correct.

 6         Q.     -- did you not?

 7         A.     Yes, I did.

 8         Q.     Did you find any instances of finished

 9    product, either assay or content uniformity, that

10    were outside the specifications, the USP

11    specifications, in the annual reports that you

12    reviewed?

13         A.     I'd have to go back to the annual

14    reports to say.

15         Q.     Okay.

16         A.     Which I have available, if you would

17    like me to.

18         Q.     First of all, if they were out of spec,

19    would you have expected there to be investigations?

20         A.     Most certainly.

21         Q.     Would you have expected there to be FDA

22    regulatory inquiries?

23         A.     Not necessarily.

24                They do sampling.  They don't -- they

25    don't do a comprehensive review of every annual

Mark G. Kenny, Volume I                                      June 29, 2010

Page 102

```
 1   product review and every batch record.  They do a
 2   sampling.
 3           Q.     Okay.  Well, in your report, did you
 4   note anywhere that there were out-of-specification
 5   finished product test results contained in any
 6   annual reports?
 7           A.     I'd have to do more research on Lots
 8   80224 A1 and 80227 and 80228 A1, because there's
 9   some records indicating that these batches were not
10   acceptable.  They had high weights.  Both of -- all
11   three of those batches, according to records, says
12   it has high weights.  I have not seen the batch
13   records.
14           Q.     Do you know how many of those batches
15   were rejected and not sent to Mylan for
16   distribution?
17           A.     I would assume that none of the
18   rejected batches were sent to Mylan.
19           Q.     Well, do you know specifically of those
20   three how many of them were rejected?
21           A.     No.  I'd have to go back through the
22   records.
23                  I am going to make the assumption that
24   they were rejected.  I think that's a fair
25   assumption.  The company is not going to release
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 103

1    based upon out-of-specification results to the

2    market.

3                 I mean, I don't know if that's a fair

4    assumption, but I'm going to assume they --

5         Q.    Well, let me get back to my -- my

6    question.

7                 Did you note -- did you make comments

8    in your report, which is long -- I mean, 35-some-odd

9    pages -- about any out-of-specification results on

10   batches that were sent to the market for finished

11   product testing?

12        A.    That was sent to the market?

13                I'd have to -- I'd have to go back

14   through the history of these batches to see if they

15   were released.  I can -- I can think of no example

16   at this particular point.

17                MR. KAPLAN:  Again, I'm going to move

18   to strike his last answer as not responsive.

19                He said in your report, did you make

20   any comments?

21        A.    Oh, in my report?  Well --

22                MR. KAPLAN:  No.  In your report, did

23   you make any comment on any out-of-spec batches that

24   were sent to the market?  Did you?  Yes or no?

25        A.    I can't answer it that way.

Mark G. Kenny, Volume I                                        June 29, 2010

Page 104

1            Did I make a remark?  No.  But I can't

2    tell you, without investigating these three batches,

3    whether they went to the market.

4         Q.    Okay.  Now, we've looked at all these

5    testing by FDA.  All right?

6         A.    Yes.

7         Q.    And let's just take the batches that

8    FDA tested.

9         A.    Okay.

10        Q.    All right?

11        A.    Yes.

12        Q.    Just those.

13            If somebody assumed that all of the

14   tablets in a particular batch were outside the USP

15   specifications, this FDA testing proves that that is

16   an incorrect assumption.

17            Is that right?

18        A.    That is correct.

19            MR. MORIARTY:  I need to look for an

20   exhibit.

21        Q.    I'll give you the flattest one.

22            This is Exhibit 35.

23            (Exhibit 35, Celsis Report, was for

24   identification.)

25        Q.    Do you see that?

Mark G. Kenny, Volume I                                      June 29, 2010

                                                              Page 105

 1          A.      Yes.

 2          Q.      This is captioned, on the first page,

 3     "Celsis," C-E-L-S-I-S, "Analytical Services."

 4                  Do you see that?

 5          A.      Yes.

 6          Q.      Are you familiar with Celsis Analytical

 7     Services?

 8          A.      No, I'm not.

 9          Q.      Have you reviewed Exhibit 35?  Is it

10     listed in your --

11          A.      No.

12          Q.      -- Appendix B?

13          A.      I have not reviewed it.  It is not

14     listed.

15          Q.      In the depositions of the Mylan or UDL

16     employees that you read, did you see that, from time

17     to time, UDL sent product out for USP testing?

18          A.      Yes.

19          Q.      And, on some occasions, they did that

20     just to -- for example, because when they repackage,

21     they need to test dissolution and whether their

22     repackaging is going to affect the stability of the

23     product; correct?

24          A.      I don't know why they sent it to UDL.

25          Q.      All right.  Did you see an instance in,

Mark G. Kenny, Volume I                                    June 29, 2010

1    say, any of the Mylan depositions where UDL sent

2    material out to be tested because FDA was concerned

3    about product quality?

4           A.     Not specifically.

5           Q.     Well, I will represent to you that

6    Exhibit 35, which is rather thick, contains testing

7    done at the behest of UDL, sent to Celsis

8    laboratories on a number of different occasions.

9    And in each instance, the Digitek they sent passed

10   the tests to which it was subjected.

11                Do you have any reason to believe that

12   that did not happen?

13          A.     I have no reason to believe, but I'd

14   like to read it in order to answer that, if it's

15   okay.

16                I'm not going to -- I just want to read

17   something.

18          Q.     Go ahead.

19          A.     Can I write on this?

20          Q.     Yes.  We have extras.

21          A.     It may be a question mark or something

22   like that.

23                I can't read this.  It says:  "No less

24   than 60 percent in 30," and they scribbled out

25   "percent."

Mark G. Kenny, Volume I                                    June 29, 2010

Page 107

1              In order to confirm this, I'd have to

2       go to the product specification that this is the

3       correct specification.

4          Q.     You mean 90 to 110 percent?

5          A.     No.  I'm assuming that's correct.

6       That's typical, but not necessarily correct.

7          Q.     Well, let -- let me rephrase it,

8       because this is a very long document.

9              At any point in the Mylan employee

10      depositions, did anybody bring to the attention of

11      those Mylan employees who were being questioned

12      out-of-specification Digitek results from any

13      testing that UDL had sent to Celsis laboratories?

14         A.     I -- I don't know, but I don't recall

15      seeing anything.

16              MR. KAPLAN:  Would you read back the

17      last question and answer, please.

18              (Requested portion is read.)

19         Q.     Okay.  Let's shift to Exhibit 69.

20              (Exhibit 69, UDL Laboratories Receiving

21      Form, was marked for identification.)

22         A.     Okay.

23         Q.     Have you ever seen Exhibit 69 before?

24         A.     It does not look familiar.

25         Q.     And attached to all this is documents

Mark G. Kenny, Volume I                              June 29, 2010

Page 108

1    regarding a shipment of Digitek that was sent to UDL

2    by Mylan and originally by Actavis; correct?

3         A.    Yeah.  I apologize.  I was looking at

4    the specification here of 90 to 105.

5               But could you repeat the question?

6         Q.    Well, the documents have to do with a

7    batch of Digitek that was sent to UDL; correct?

8         A.    No.  But I thought I saw here between

9    90 and 100 is the spec and -- oh, 110.  And here,

10   I'm seeing the 90 to 105.

11        Q.    Okay.  Could there be different specs

12   for different tests?

13        A.    Not for assay.

14              But it could be different products.

15   This is .25.

16              May I look at the other document?

17              MR. MILLER:  Certainly.

18              THE WITNESS:  That one.  I think it's

19   on top.

20        A.    These are .25, and it says 90 to 110.

21              This is .25, and it says 90 to 105.

22        Q.    Do you know whether -- go ahead.

23        A.    So one is incorrect.

24        Q.    Do you know whether FDA ever changed or

25   USP ever changed the testing specs?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 109

1        A.      I don't know, but it's highly unusual.

2        Q.      Have you ever seen any Celsis

3    laboratory or UDL documents which indicate that

4    Digitek samples tested by Celsis were ever out of

5    specification, according to the USP specs?

6        A.      I don't recall seeing anything.

7        Q.      All right.

8                Do you have an opinion as to whether or

9    not any consumer ever received a tablet that was

10   outside -- let me rephrase that.  Let me withdraw it

11   and rephrase it.

12               Do you have an opinion, to a reasonable

13   degree of probability, as to whether any consumer

14   ever received a tablet of recalled Digitek that was

15   normal in size but outside its USP specifications?

16       A.      Do I have a concern?  Yes.

17       Q.      That's not what I asked.

18       A.      You have to rephrase it.

19       Q.      Let's stop.  This is a very specific

20   question.

21       A.      Sure.

22       Q.      Do you have --

23       A.      I'm trying to answer it as well as I

24   can.

25               MR. KAPLAN:  Listen.  Just listen to

Mark G. Kenny, Volume I                                June 29, 2010

Page 110

1    his question.

2         Q.      It's a very specific question.

3                 Do you have an opinion, to a reasonable

4    degree of probability, as to whether any consumer

5    received a Digitek -- recalled Digitek tablet that

6    was normal in size but outside its USP

7    specifications?

8         A.      Not within a reasonable probability.

9         Q.      All right.  Are you a -- do you have

10   any expertise in statistics?

11        A.      I have knowledge of it.

12        Q.      Do you have expertise in it?

13        A.      No.  I would not say I'm an expert.

14        Q.      Do you know anything about statistical

15   significance?

16        A.      I have some knowledge of it.

17        Q.      All right.  Do you have an opinion as

18   to whether 4 1/2 percent -- let me rephrase that

19   question.

20                FDA tested 7 of the 152 recalled

21   batches --

22        A.      Okay.

23        Q.      -- independently in these 484s that I

24   have had marked as exhibits.

25                By my math, that's 4.6 percent.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                            Page 111

    1        A.      Okay.

    2        Q.      Okay?

    3                Is their testing statistically

    4    significant?

    5        A.      I don't know without taking a look at a

    6    statistical table.

    7                I will say that it appears like a -- a

    8    sample that had a 95 percent confidence interval

    9    would approach what would be considered a

   10    statistically significant sampling.

   11        Q.      All right.  Celsis labs, by --

   12        A.      But I would have to pull 105E, or

   13    whatever.

   14        Q.      What's 105E?

   15        A.      It is a military standard that's used

   16    throughout industry for sample -- sample

   17    inspections.

   18        Q.      You mean the one that nobody can read

   19    and understand?

   20        A.      No.  I can read and understand it.

   21        Q.      You may be the only person on earth.

   22                Have you used 105E in your work?

   23        A.      Yes.  Not recently, but yes.

   24        Q.      Is it reliable or considered to be

   25    reliable?

Mark G. Kenny, Volume I                                June 29, 2010

                                                           Page 112

1          A.     It's considered to be statistically
2     accurate, yes.
3          Q.     Okay.  Celsis, by my calculations --
4     please assume I'm correct -- independently tested at
5     UDL's request what turned out to be 11 out of the
6     152 recalled batches.
7          A.     Okay.
8          Q.     Which is 7.2 percent.
9          A.     Okay.
10         Q.     Is that statistically significant?
11         A.     I don't know.  I would have to take a
12    look at the tables.  It does approach the number
13    that I would anticipate would be in 105E.
14                I'm not trying to avoid it, but I don't
15    know that number.  I'd have to take a look at --
16         Q.     That's fine.  I understand.  I told you
17    early on if you don't know the answer to my
18    question, I want you to tell me you don't know.
19         A.     I don't know.
20         Q.     I don't want you to guess.
21         A.     I don't know.
22         Q.     Now, if we eliminate any overlap
23    between FDA testing and Celsis testing -- let's
24    assume that that is 16 of the 152 recalled batches.
25         A.     Um-hum.

Mark G. Kenny, Volume I                              June 29, 2010

Page 113

1        Q.      Which is about 10.5 percent.

2                Okay?  You with me?

3        A.      Yes.

4        Q.      That would be statistically

5    significant, wouldn't it?

6                MR. MILLER:  Object to form.

7                Go ahead.  You can answer.

8        A.      105E, all sampling is intended to be a

9    proactive sampling.  It is intended to take a look

10   at a distribution of homogeneous product.

11               Based upon the sampling, based upon

12   your acceptability, your AQL, you determine what the

13   sample size is.

14               So, basically, it goes down to how many

15   samples are you willing to say are unacceptable

16   in -- in whatever sampling population you did?

17               You don't back into it by taking

18   samples and keep your fingers -- keep sampling until

19   you find something that's potentially rejectable.

20               That's not a statistical sample.  A

21   statistical sample is a proactive, is an

22   experimental plan, and it's based upon probability

23   charts.

24       Q.      Were the Amide and then Actavis blend

25   uniformity sampling plans contained in the ANDA?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 114

         1        A.     I don't know.  I'd have to look at the

         2    ANDA.

         3        Q.     Were they contained in every batch

         4    record?

         5        A.     Could you repeat the question?

         6        Q.     Were they contained in every batch

         7    record?

         8        A.     What --

         9        Q.     One uniformity sampling plans.

        10        A.     One uniformity sampling plans, were

        11    they contained in -- in the batch records?  That's

        12    correct.

        13        Q.     So the number they took and where in

        14    the blender, etcetera; correct?

        15        A.     Yeah.

        16        Q.     All right.  Now, so FDA had every

        17    opportunity to comment on those in their analysis of

        18    the ANDA or if they ever looked at batch records;

        19    correct?

        20        A.     Yes.

        21        Q.     And Quantic Regulatory Services had

        22    that same opportunity, at least as to the 39 Digitek

        23    batches they reviewed; correct?

        24        A.     That's correct.

        25        Q.     All right.  Now, I don't want to talk

Mark G. Kenny, Volume I                                    June 29, 2010

Page 115

1    about blend uniformity out of specs.  I just want to

2    talk about the sampling plan.

3                  Have you seen any evidence in any FDA

4    document in which the FDA observed, cited or warned

5    Actavis about the sampling plan itself for blend

6    uniformity?

7         A.      FDA?  No.  I saw nothing.

8         Q.      Okay.  Now, you know that during batch

9    production of solid oral dose, operators in QA were

10   taking a certain number of tablets for thickness,

11   hardness, appearance and weight; correct?

12        A.      That's correct.

13        Q.      And those sampling plans were in the

14   ANDA and every batch record; correct?

15        A.      They are in the batch record.  I'm not

16   sure if it's in the ANDA.

17        Q.      And did you ever see, in any FDA

18   document, where FDA observed, criticized or warned

19   Actavis or Amide about the number of tablets that

20   they sampled in that manner in process?

21        A.      I don't recall.

22        Q.      And then lastly, and then we have to

23   stop to change the tape, the finished product

24   testing, you know, how many they take for content

25   uniformity, how many they take for assay, etcetera,

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 116

 1    was all in the ANDA and the batch records; correct?

 2          A.      It's in the batch records.

 3                  I can't tell you what's in the ANDA.

 4          Q.      Did you ever see any FDA criticism in

 5    any of the documents that you reviewed of the number

 6    of samples that Actavis took to test assay or

 7    content uniformity or dissolution or stability in --

 8          A.      In the sampling, no, I did not.

 9                  MR. MORIARTY:  Let's take a break

10    because of the timing.

11                  THE VIDEOGRAPHER:  Stand by.  We are

12    going off the record.  The time is 11:29 A.M.  This

13    is the end of Tape Number 2.

14                  (Recess was taken.)

15                  THE VIDEOGRAPHER:  We are back on the

16    record.  The time is 11:35 A.M.  This is the

17    beginning of Tape Number 3.

18          Q.      Before that short break, we were

19    talking about sampling plans.

20                  First of all, have you referred to any

21    literature in your Appendix B about sampling plans?

22          A.      I don't recall.  I don't think so.

23          Q.      And I don't recall seeing anything in

24    your report critical of my client's in process or

25    finished processed sampling plans.

Mark G. Kenny, Volume I                              June 29, 2010

1                   Is that correct?

2          A.      Not 100 percent correct.

3          Q.      Why not?

4          A.      I put in -- I put in there, or I put in

5    the report that as part of issues, non-conformances,

6    out of specifications, situations where high risk

7    could occur, I saw no evidence that they attempted

8    to take a look at the sampling plan to increase the

9    confidence that the product leaving the door didn't

10   have problems.

11         Q.      In your opinion, to a reasonable

12   probability, are any of my client's blend

13   uniformity, in process or finished processed

14   sampling plans negligent?

15                 MS. CARTER:  Objection to form.

16         Q.      For Digitek.  For Digitek.

17         A.      I would say their proactive plans, I

18   saw no -- no issues.  I think they were valid

19   sampling plans.

20         Q.      All right.  I forgot these before when

21   I was asking you about the FDA and their testing of

22   Digitek.

23                 Do you know what the batch

24   certification program was way back when, in the '80s

25   and '90s?

Mark G. Kenny, Volume I                                June 29, 2010

                                                        Page 118

 1        A.    I heard the term.  I'm not familiar

 2   with it.

 3        Q.    That's when, for some drugs, FDA had to

 4   test and approve the release of batches before they

 5   could go to market; correct?

 6        A.    I don't know if that's correct.

 7              (Exhibit 4, Letter dated June 8, 1995

 8   to Shah from Department of Health & Human Services,

 9   was marked for identification.)

10        Q.    Have you ever seen Exhibit 4?

11        A.    No, I have not.  1995?

12        Q.    This is a letter from FDA to then Amide

13   indicating that these nine batches of Digitek passed

14   their testing and could be released to market;

15   correct?

16        A.    That's correct.  This 1995 document,

17   yes.

18              (Exhibit 5, Letter dated July 20, 1995

19   to Shah from Department of Health & Human Services,

20   was marked for identification.)

21        Q.    And here is Exhibit 5.  Is this a

22   letter -- first of all, have you ever seen this

23   before?

24        A.    No, I have not.

25        Q.    Is this a letter from FDA to then Amide

Mark G. Kenny, Volume I                                    June 29, 2010

 1    indicating that they were exempt from the batch

 2    certification program?

 3         A.      That's what it states.

 4         Q.      And wouldn't FDA only do that if they

 5    had a high degree of confidence that the process was

 6    validated and in control?

 7         A.      I believe that's correct.

 8         Q.      Okay.  Do you know how many people in

 9    the United States were prescribed Digoxin between

10    2006 and 2008?

11         A.      No.  I have no idea.

12         Q.      Do you know how many prescriptions were

13    written for Digoxin products between 2006 and 2008?

14         A.      I have no idea.

15         Q.      Do you know how many people were taking

16    Digitek between 2006 and 2008?

17         A.      I have no idea.

18         Q.      Have you ever done the math to figure

19    out how many tablets were affected by the Digitek

20    recall?

21         A.      How many tablets were affected?  No, I

22    have not.

23                 If you figure there's 5 million

24    tablets, and go through the number of lots, and

25    multiply it out --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 120

1        Q.      It would be --

2        A.      -- millions.

3        Q.      -- about 688.2 million.

4        A.      Okay.

5        Q.      Approximately.  Is that correct?

6        A.      If you say so.  You've done the math.

7        Q.      If you go by the theoretical batch size

8    of 4.8 or 4.2.

9        A.      Okay.

10       Q.      Correct?  Depending on the dose size?

11       A.      If your math is right.  And I have no

12   reason to believe it's not.

13               (Exhibit 36, Recall -- Firm Press

14   Release, was marked for identification.)

15       Q.      This is Exhibit 36.

16               I believe you've seen this.

17               That's in your --

18       A.      Yes.

19       Q.      -- binder, isn't it?

20               That's the recall press release?

21       A.      Well, it might not be in my binder

22   because I looked at it electronically.

23       Q.      Is it the recall press release?

24               MR. KAPLAN:  Is there an answer to that

25   question?

Mark G. Kenny, Volume I                                          June 29, 2010

Page 121

1              THE WITNESS:  I'm briefly looking

2       through it.

3              MR. KAPLAN:  The question is simply:

4       Is that the recall press release?

5              THE WITNESS:  This is a -- yes.  Yes.

6       It appears to be, yes.

7          Q.     And it's Tab -- or it's Reference

8       Number 59 in your Appendix B, is it not?

9          A.     Yes.

10         Q.     Now, it indicates generally in here

11      that the recall is due to the possibility that

12      tablets with double the appropriate thickness may

13      have been commercially released.

14             Do you see that?

15         A.     Yes.

16         Q.     Is there anywhere in Exhibit 36 that

17      indicates that this recall was about tablets of

18      normal size with varying levels of deactive

19      pharmaceutical ingredient?

20         A.     Well, yes.  Double strength.  It varies

21      by two.

22         Q.     Let's -- let's read that again and ask

23      my question again.

24             It says:  "The voluntary all-lot recall

25      is due to the possibility that tablets with double

Mark G. Kenny, Volume I                                    June 29, 2010

Page 122

1    the appropriate thickness may have been commercially

2    released."

3              Do you see that?

4        A.    Yes.

5        Q.    My question is this:  Is there anything

6    in this FDA-approved press release that indicates

7    that this recall was about normally-sized tablets

8    with varying levels of the active pharmaceutical

9    ingredient?

10       A.    Normal size, no.

11       Q.    All right.  In your opinion, Mr. Kenny,

12   is double thick a different problem than normal size

13   with varying active pharmaceutical ingredient?

14       A.    Could you repeat the question again?

15   I'm trying to answer that clearly.

16       Q.    Sure.  You were in the pharmaceutical

17   business with J&J for 30 years; right?

18       A.    Yeah.  On and off.

19       Q.    Okay.  You know what investigations are

20   all about; correct?

21       A.    Most certainly.

22       Q.    And you know generally how to

23   manufacture, blend manufacture tablets?

24       A.    In general, correct.

25       Q.    All right.  If somebody came to you,

Mark G. Kenny, Volume I                                    June 29, 2010

Page 123

1    either at J&J or now in your consulting work with

2    SpyGlass, and said we've got a problem with

3    double-thick tablets, you would design an

4    investigation about that; correct?

5          A.     I would assist them, if asked.

6          Q.     Okay.  And I assume that what you're

7    looking for is some sort of a cause --

8          A.     Correct.

9          Q.     -- of what would make double-thick

10   tablets; right?

11         A.     Right.

12         Q.     And, obviously, it's a size issue.  At

13   its core, it's a size issue; correct?

14         A.     There is a -- it's -- I guess I would

15   say yes.

16         Q.     All right.  And then, by virtue of

17   size, you'd want to know what -- is it too many

18   excipients with normal pharmaceutical ingredient

19   levels, or is it double the active pharmaceutical

20   ingredients; right?

21         A.     Right.  You'd want to know the --

22   whether or not the content uniformity was correct.

23         Q.     Right.

24         A.     And if you made -- did an investigation

25   and said content uniformity is correct, then it

Mark G. Kenny, Volume I                                    June 29, 2010

 1   would probably pinpoint you to a tableting press,

 2   and you'd say that it is a physical issue.

 3        Q.     All right.  Now, but on the other side

 4   of the equation, if somebody at J&J or in your

 5   consulting business with SpyGlass said we have a

 6   problem with -- our tablets are normal in size, but

 7   the active pharmaceutical ingredient is varying all

 8   over the place, your investigation would potentially

 9   take a different course; correct?

10        A.     Of course.

11        Q.     And the root cause might be completely

12   different from the first scenario; correct?

13        A.     It is a possibility it could be

14   completely different, yes.

15        Q.     And that is a distinction that the FDA

16   would clearly recognize; is it not?

17        A.     I don't know.  I can't speak for them.

18        Q.     Have you seen any document to indicate

19   that the Digitek recall was about anything other

20   than the double-thick tablet investigation that grew

21   out of Batch 70924 A?

22        A.     Stated as such, no.

23               (Exhibit 38, FDA Website Statement July

24   2009, was marked for identification.)

25        Q.     I've handed you what's been marked as

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 125

1    Exhibit 38; correct?

2          A.      Correct.

3          Q.      Have you ever seen that before?

4          A.      Yes, I have.

5          Q.      This is a statement on an FDA website

6    from July of 2009.

7                  Is that right?

8          A.      Where do you see 2009?

9                  You printed it on 6/15/2010.

10         Q.      Which means it's still on the FDA

11   website this month; correct?

12         A.      I believe that.

13         Q.      Do you know when they initially posted

14   this?

15         A.      I have no idea.

16         Q.      And it's a -- it's entitled "Facts and

17   Myths About Generic Drugs."

18                 Do you see that?

19         A.      I certainly do.

20         Q.      And down about halfway on the first

21   page of this exhibit, it says:  "Recently, some

22   misinformation has raised concerns over generic

23   drugs.  Below are some common myths in circulation."

24                 Did I read that correctly?

25         A.      Halfway down?  Please show me.

Mark G. Kenny, Volume I                                      June 29, 2010

                                                              Page 126

     1          Q.      There or there.

     2          A.      "Recently, some misinformation" -- yes.

     3    "Below are some of the common myths in circulation."

     4          Q.      Go to the second page, please.

     5                  The first full section on the second

     6    page says:   "Myth:   There are quality problems with

     7    generic drug manufacturing.   A recent recall of

     8    generic Digoxin, called Digitek, shows that generic

     9    drugs put patients at risk."

    10                  Did I read the myth correctly?

    11          A.      I believe you did.

    12          Q.      And then it says:   "Fact:   FDA's

    13    aggressive action in this case demonstrates the high

    14    standards to which all prescription drugs, generic

    15    and brand name, are held."

    16                  Did I read that correctly?

    17          A.      Yes, you did.

    18          Q.      Now, let's go down to the fourth bullet

    19    point, the second sentence in the fourth bullet

    20    point.

    21                  "In our best judgment, given the very

    22    small number of defective tablets that may have

    23    reached the market and the lack of reported adverse

    24    events before the recall, harm to patients was very

    25    unlikely."

Mark G. Kenny, Volume I                                    June 29, 2010

1              Did I read it correctly?

2        A.      Yes, you did.

3        Q.      Do you disagree with the FDA's

4   statement in this website?

5        A.      Yes, I do.

6        Q.      What's your basis for disagreeing with

7   the FDA's conclusion in this regard?

8        A.      Okay.  There is, at least in my

9   industry, a generally-accepted term, or at least

10  concept, that you only receive a small portion of

11  the actual adverse reactions, general complaints,

12  regardless; that either the people don't realize

13  that they had a problem, they're lazy, so that

14  people have quoted 1 in 20 people will actually

15  complain.

16              On consumer products, it could be

17  slightly higher.  There's an 800 number they call up

18  and get a free product.

19              People don't even understand how to

20  complain, if you will.

21              So I would not agree with that

22  statement.

23       Q.      So the part that you're focusing in on

24  is what the FDA said here about the lack of reported

25  adverse events before the recall?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 128

 1        A.      Correct.

 2        Q.      When you were with J&J, were you in

 3   pharmacovigilance?

 4        A.      No.

 5        Q.      Are you a pharmacovigilance expert?

 6        A.      I am not.

 7        Q.      When you consult for SpyGlass to your

 8   current clients in the last six years, do you

 9   consult in pharmacovigilance?

10        A.      I -- I consult indirectly to that.

11               I look at complaints.  I look at

12   adverse events.  I look to the investigations that

13   they performed.  I determine whether or not their

14   investigations are adequate.

15               I make a clear determination, based

16   upon looking at, over the -- just the last year,

17   hundreds of adverse reactions and complaints as to

18   whether or not I felt, in my opinion, they were

19   adequately investigated.

20               So I will tell you, as part of the

21   pharmacovigilance process, that is my role I've been

22   asked to perform.

23        Q.      Have you seen any evidence in this case

24   that there were reports of harm to Actavis regarding

25   Digitek prior to the recall that were not reported

Mark G. Kenny, Volume I                                    June 29, 2010

Page 129

1    to the FDA at all?

2          A.     I have seen no evidence in that regard

3    at all.  I haven't seen any reports of adverse

4    events.  I have seen no complaint investigations,

5    other than 3611A.

6                 So I -- I can't answer that because I

7    haven't seen anything.

8          Q.     All right.  Let me break the FDA's

9    website statement down in phrases.

10         A.     Okay.

11         Q.     They say:  "In our best judgment, given

12   the very small number of defective tablets that may

13   have reached the market."

14                Do you agree with them when they make

15   that statement?

16         A.     I don't know how they can say the

17   number is very small.  They don't know.

18         Q.     And you don't know either, do you?

19         A.     Of course not.

20         Q.     Okay.

21         A.     But if somebody makes a determination

22   that's counter to my experience, I can't make

23   that -- say the number is very small.  I can't say

24   there's none.  I can't say that there are a lot.

25                I think, based upon this type of -- in

Mark G. Kenny, Volume I                                    June 29, 2010

1    this context, you know, I'm not trying to be

2    difficult, but I couldn't say that.

3         Q.    All right.  The last statement that

4    they make, "harm to patients was very unlikely," do

5    you agree with that?

6         A.    I have -- this is clearly going beyond

7    my own expertise.

8         Q.    Well, just statistically, if you don't

9    know the number of defective tablets that may have

10   gotten out, you have no way to quantitate the

11   potential harm to consumers, do you?

12        A.    I am not involved in harm to consumers.

13   I'm involved with the manufacturing process.  I'm

14   involved at the compliance level.  I'm involved with

15   adequate investigations.  I'm involved with annual

16   product reviews.  That's the extent.

17              Anything -- if I start going into the

18   field and determine whether something's safe or not,

19   I've gone beyond my own expertise.  And that would

20   be irresponsible.

21        Q.    Do you have any idea what percentage of

22   pharmacies still hand-count out tablets when they

23   fill prescriptions?

24        A.    I have no -- no idea.

25        Q.    Do you have any opinion, from a

Mark G. Kenny, Volume I                                    June 29, 2010

Page 131

1    pharmacy point of view, as to how easy it would be,

2    relatively speaking, to detect a double-thick

3    Digitek tablet?

4              MR. MILLER:  Object to form.

5         A.    I would have no idea.

6         Q.    If you wanted to scientifically

7    determine whether double-thick tablets -- let's just

8    leave it at that for now -- ever actually got to

9    consumers, would you look at batch records about the

10   weighing and measuring of tablets?

11        A.    Most certainly.

12        Q.    Would you ask consumers to have their

13   tablets weighed or measured?

14        A.    Ask consumers?  I don't believe so.

15        Q.    Okay.

16        A.    Let me answer that accurately.  What do

17   you mean by "ask consumers"?  I am not involved with

18   asking consumers.

19        Q.    That's fine.  We're in the context of a

20   litigation --

21        A.    Okay.

22        Q.    -- where the population on one side is

23   a discrete number of people who claim they got

24   defective tablets.  Let's continue to stick with

25   double thick.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 132

1        A.      Okay.

2        Q.      Among the people who still had tablets

3   left over, the weighing and measuring of them with

4   micrometers and sensitive scales is not a difficult

5   process, is it?

6        A.      Weighing -- no.

7        Q.      And if you wanted to investigate, like

8   Professor Farley's article said, weighing and

9   measuring could be done; correct?

10       A.      Yes.

11       Q.      And you would want to look to the

12  instances of customer complaints made to either the

13  distributor or to Actavis itself about double-thick

14  tablets found by consumers, would you not?

15       A.      I would look at that and other

16  potentially related adverse events and -- I would

17  look at the entire picture.  I would not just limit

18  it to this one situation, because it could be -- it

19  could be a compounded -- a confounded issue based

20  upon things that I don't know.

21              So you look at everything because you

22  don't know what you don't know.

23       Q.      Okay.  Well, let me ask:  First, with

24  regard to recalled Digitek, have you ever seen

25  anything in any of the material that you reviewed

Mark G. Kenny, Volume I                                    June 29, 2010

                                                            Page 133

1    that a pharmacist or a consumer has reported an

2    actual tablet that is outside its size or weight

3    specifications?

4         A.    I -- I don't believe that I've seen it.

5         Q.    Okay.  So I've asked you that.  An hour

6    or so ago, I asked if you have seen any evidence

7    that there were tablets of normal size with outside

8    the USP specifications for active pharmaceutical

9    ingredient.

10              And you said you hadn't seen any of

11   those either; correct?

12              MR. MILLER:  Objection to form.

13   Misstates previous testimony.

14        A.    You know, it's interesting, based upon

15   the fact --

16              MR. KAPLAN:  Wait, wait.

17              THE WITNESS:  I'm sorry.

18              MR. KAPLAN:  You started -- you started

19   making a comment.  You are not responding to the

20   question.  Please refrain from that.

21              THE WITNESS:  I want to answer his

22   questions, sir.

23        Q.    Have you seen any tests from consumers

24   or otherwise --

25        A.    Okay.  Are returned samples from

Mark G. Kenny, Volume I                          June 29, 2010

Page 134

1    consumers?

2          Q.      Returned samples from consumers or

3    tests that consumers have of samples that they kept

4    or tests done by the FDA or anybody else to indicate

5    that there are normal-sized tablets outside the

6    specification --

7          A.      I haven't seen any tests.

8          Q.      Okay.

9          A.      So I can't see any tests that are out.

10         Q.      All right.  So do you have any evidence

11   at all that Digitek, outside its labeled

12   specifications, reached consumers in this

13   litigation?

14         A.      Please, this is an important question.

15   Repeat it.

16                 MR. MORIARTY:  Read that one back,

17   please.

18                 (Requested portion is read.)

19         A.      I have no evidence.

20         Q.      Do you know what a red herring is?

21         A.      I think I do.

22         Q.      Do you know plaintiffs' lawyers in this

23   litigation said, in court and in court documents,

24   that the double-thick theory is a red herring?

25                 MR. MILLER:  Object to form.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 135

    1        A.      I'm not familiar with that.

    2                MR. MORIARTY:  What was wrong with the

    3    form of that question, Pete?  Because I'd really

    4    like the opportunity to correct it.

    5                MR. MILLER:  Well, it's vague.

    6                What -- what attorneys?  He's worked

    7    with several attorneys.  And it's -- I think the

    8    term "attorneys" is broad and vague.

    9                If you want to put the who into it.

   10                MR. MORIARTY:  Your colleagues in the

   11    PSC.

   12                He said he wasn't aware of it, so I

   13    don't need to get more specific.

   14        Q.      Can you point me to any FDA 483 warning

   15    letter or EIR in the material that you reviewed that

   16    specifically indicates that they found Digitek

   17    tablets of normal size with varying amounts of the

   18    active pharmaceutical ingredient?

   19        A.      That were released?

   20        Q.      Yes.

   21        A.      I don't recall any instances.

   22        Q.      Okay.  Can you show me in any of the

   23    material you reviewed any statement by the FDA that

   24    they found normal-sized Digitek tablets -- okay.

   25    I'll withdraw that question.

Mark G. Kenny, Volume I                          June 29, 2010

Page 136

1              When you say "released," you mean

2    released to a distributor to go to market; correct?

3         A.     Once you let -- once you say it's

4    released in your SAP system, it's released, because

5    it's out of your control at that particular point.

6    That's what I mean by "released."

7         Q.     Does the ANDA have a section that

8    contains the actual pharmaceutical product formula

9    for Digitek?

10        A.     Yes, it does.

11             But I will say I am and most quality

12   assurance people are not experts at the ANDA.

13             What we are, is we are experts once

14   that -- once that -- once -- the ripple effect, if

15   you will, somebody in regulatory and development has

16   taken that and translated it into a specification.

17   When it becomes a specification, then quality

18   assurance people are involved.

19        Q.     Okay.  But in general, from what you

20   know, is the pharmaceutical formulation, the recipe,

21   if you will, contained in all the batch records?

22        A.     In the batch records?  Yes, it is.

23        Q.     So FDA presumably has had an

24   opportunity to look at the ANDA and all these batch

25   records, if it looks at them, to see what the

Mark G. Kenny, Volume I                                    June 29, 2010

                                                          Page 137

 1   formula is about; correct?

 2        A.      I don't know what they looked at.

 3        Q.      All right.  And in order to start the

 4   process off right, you have to mix the ingredients

 5   appropriately and in their appropriate proportions;

 6   correct?

 7        A.      That is correct.

 8        Q.      One potential root cause of tablets

 9   outside their active pharmaceutical ingredient specs

10   would be if they mixed it wrong initially by putting

11   in either too much or too little API.

12                Is that right?

13        A.      Yes.

14        Q.      Have you seen in the material that you

15   reviewed any citations, warnings by FDA upon Actavis

16   or Amide for problems related to following the

17   formula appropriately and putting in the proper

18   amount of API?

19        A.      I do not recall a single instance.

20        Q.      All right.  And typically, the actual

21   mixing of the ingredients in its proportions is done

22   by one person and then verified by a second.

23                Is that right?

24        A.      That's the way it's supposed to be

25   done.  Correct.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 138

 1        Q.      Did you see any batch record that
 2   indicated that the company did not follow the
 3   appropriate formula?
 4        A.      No.
 5        Q.      If by chance, purely hypothetically,
 6   the company wanted to -- any pharmaceutical company
 7   wanted to cut corners and save costs, they would put
 8   too little API in the batch as opposed to too much;
 9   correct?
10        A.      Sir, it is illegal to vary from the
11   batch record.
12               If you are assuming that somebody was
13   totally unethical, then they may put that in.  I
14   can't speculate on somebody who is totally
15   dishonest.
16        Q.      All right.  And you've seen nothing in
17   here, in the material you've reviewed, to indicate
18   that anyone at Amide or Actavis was totally
19   dishonest in the manufacturing of Digitek; correct?
20        A.      Correct.
21        Q.      Are you aware that --
22        A.      Can I qualify that?
23               I don't know how I would understand
24   whether they were honest or not.
25               I guess I would say that it's a

Mark G. Kenny, Volume I                                    June 29, 2010

Page 139

1    question that nobody can answer.

2         Q.      Okay.  Are you aware that in the

3    process of making a solid oral dose, the raw

4    materials are weighed at the beginning of the batch

5    to assure that it complies with the formula?

6         A.      That's correct.

7         Q.      And then, as you go through the

8    process, after mixing and blending, it's weighed

9    again; correct?

10        A.      Correct.

11        Q.      And --

12        A.      "It," meaning the blend is weighed?

13        Q.      Yes.  The blend is weighed again.

14               And in the validation process, the

15   company should have figured out how much it is

16   supposed to weigh at various steps along the path.

17               Is that true?

18        A.      I wouldn't state it that way, but I

19   think I understand what you're trying to say.  I

20   would say it's true.

21        Q.      And it's -- in essence, it's a quality

22   control check to make sure that you're not losing

23   too much or gaining anything.

24               Is that right?

25        A.      Well, it's not that you're not losing

Mark G. Kenny, Volume I                          June 29, 2010

Page 140

1  or gaining.  It's did you put the correct amount of

2  ingredients in?

3           The issue with that is, if the

4  ingredients are very small, it's kind of like

5  weighing yourself on the Queen Mary.

6           You know, you jump on the Queen Mary,

7  weigh yourself, then you jump off and you weigh the

8  Queen Mary again, and you subtract to determine that

9  you're X number of pounds.

10          So yes, it is -- it is a check that is

11  supposed to provide some evidence that the correct

12  ingredients are there, yes.

13     Q.    All right.  But let's pick two extreme

14  examples.

15          If somebody tripped and dumped a bucket

16  of screws into a batch, and there was a weight

17  variance, that would provide a potential check for

18  the company to evaluate why does this batch at the

19  blend stage weigh 5 pounds more than it should;

20  right?

21     A.    I would say it depends.

22     Q.    Okay.

23     A.    It depends on -- do you want me to

24  answer?

25     Q.    I think you've -- I think you gave me

Mark G. Kenny, Volume I                                    June 29, 2010

Page 141

1    the answer.

2         A.    No.  I -- it's a different answer.

3              MR. MILLER:  Matt, why don't you let

4    him -- why don't you let him give the full answer.

5              MR. MORIARTY:  I got the answer I want.

6              MR. MILLER:  You got the answer and you

7    cut him off.  Okay.

8         Q.    At the other end of the -- of the

9    spectrum, if accidentally somebody dumped a certain

10   amount of product down the drain, they could check

11   why the batch at a particular stage of the process

12   was too light; correct?

13        A.    They would not necessarily detect it.

14             As I was going to state earlier, there

15   is a range, an acceptable yield range at every

16   single point in the process.

17             If those yield ranges are exceeded,

18   then it is out of specification and an investigation

19   would occur.

20        Q.    Okay.

21        A.    If -- if the error occurred so that you

22   threw a screw in there, and it didn't increase the

23   weight of the batch any significant amount, and it

24   stayed within the limits, you'd be oblivious to the

25   fact -- perhaps you would find out in the tableting

Mark G. Kenny, Volume I                                    June 29, 2010

Page 142

1    press, but you would be oblivious to it until

2    perhaps a later stage.

3         Q.    Sure.  But the purpose of these yield

4    calculations is it's a quality check along the way;

5    right?

6         A.    It is a gross quality check.

7         Q.    There is a lot of weighing and

8    measuring through the whole process; right?

9         A.    It's a gross quality check.

10        Q.    Okay.  And do you think that finished

11   product testing, according to the USP methods, is a

12   gross quality check or something else?

13        A.    I -- I wouldn't use the term "gross

14   quality check."

15              I would say it's a very specific test

16   for tablets.  It's a very good test method.  And it

17   is likely to detect any products that are out of

18   specification.

19        Q.    All right.  And one of the reasons you

20   do all these checks is to see whether a validated

21   process remains in control.

22              Is that right?

23        A.    One of the reasons you do these things

24   meaning what?  "These things"?

25        Q.    You have a formula, you weigh things,

Mark G. Kenny, Volume I                                     June 29, 2010

                                                              Page 143

1    you measure things, you test them for hardness, all

2    along the route.  Is that in order to assure that

3    your validated process remains in control?

4            A.     It is certainly one of the reasons,

5    yes.

6            Q.     Have you ever seen any statement in all

7    the material that you reviewed from FDA to indicate

8    that Digitek manufacturing processes were outside

9    their validated control methods?

10           A.     Yes.

11           Q.     For Digitek?

12           A.     Yeah.  I did not look at lot of

13   batches.  Yes, with the double-thickness batch.  A

14   validated batch cannot produce a double-thick

15   tablet.  It is considered invalidated if -- if at

16   end there is the least bit of -- of issue, then you

17   have to assume it is invalidated, is the

18   investigation which goes to the root cause, which

19   then either confirms that it remains a validated

20   state, or, in fact, your investigation determines

21   that there is an issue, and that you don't have a

22   reliable process.

23           Q.     All right.  So first of all, before

24   Batch 70924, did you see any evidence from FDA that

25   Digitek manufacturing processes were outside their

Mark G. Kenny, Volume I                                    June 29, 2010

Page 144

1    validated control levels?

2          A.     I really have to go back to the 43s and

3    the EIRs to answer that.  I'm not trying to avoid

4    the question.  I -- I would have to do that.

5          Q.     Okay.  In association with Batch 70924,

6    did the FDA ever explicitly say that, "We believe

7    your validated method is out of control"?

8                 MR. MILLER:  Object to form.

9          A.     Honestly, I'd have to go back to the

10   records to confirm that.

11         Q.     All right.  Well, what I'm trying to

12   find out is, you just gave me your opinion that

13   70924 indicates an out-of-control process.

14                I want to make sure that that's your

15   opinion, and not something you saw that the FDA

16   said.

17         A.     I understand.

18                Did they specifically point to Digitek?

19   I don't recall.  I -- I am willing to go back

20   through the records and answer that with, you know,

21   more facts and data.

22         Q.     Okay.  You can do that at the lunch

23   break, if you wish.

24         A.     I'd rather have lunch, but okay.

25                MR. KAPLAN:  Well, it is important.  I

Mark G. Kenny, Volume I                                    June 29, 2010

Page 145

1    just want to say it's very important for us here

2    today to -- to be able to get your opinions and test

3    your opinions.  You know you've issued a 35-page

4    report.  I think it's fair for us to assume that

5    you've done all the work that you need to do, you've

6    issued your opinions, now we get to ask you about

7    them.

8                    So whatever you need to do to answer

9    our questions, I assume you've done.

10                   But if you need to do something during

11   the lunch break, well, please do it.

12                   MR. MILLER:  It doesn't have to be

13   during the break.  You can review documents at any

14   point in time.

15        A.     If you -- if you feel it's important

16   enough to get a complete answer on that, I -- I gave

17   my answer.  I will gladly go back through it --

18                   MR. KAPLAN:  We need the truth, the

19   whole truth and nothing but the truth, and this is

20   our only opportunity to examine you.

21                   THE WITNESS:  Sir, I -- I respect that

22   100 percent.  You are getting 100 percent of the

23   truth.  You're talking to somebody who does not veer

24   away from the truth.  Okay?

25                   MR. MILLER:  Yeah, that's -- let's wait

Mark G. Kenny, Volume I                                    June 29, 2010

Page 146

```
 1   for a question.
 2                   THE WITNESS:  Okay.  Well --
 3                   MR. MILLER:  But if you want to
 4   review -- if you want to read the documents, then
 5   we --
 6                   MR. KAPLAN:  But when we're told
 7   something like, well, I can't answer it because I'd
 8   have to do the work all over again, then it's not
 9   fair.  It's just not fair.
10                   MR. MILLER:  He didn't say that.  He
11   said, I'll have to review the documents.  You can
12   certainly put the documents in front of him.
13                   MR. MORIARTY:  Can I get back to work?
14                   THE WITNESS:  Yeah.  I'm sorry.
15                   MR. MORIARTY:  Thanks.
16                   THE WITNESS:  Can I take a bio break?
17   I need a very quick bio break.
18                   MR. MILLER:  This is a good time for
19   lunch.
20                   MR. MORIARTY:  Can you hang on for four
21   minutes?
22                   THE WITNESS:  Four minutes.  Okay.
23        Q.     If a company -- if a pharmaceutical
24   company consistently put too much active
25   pharmaceutical ingredient into its batches, is it
```

Mark G. Kenny, Volume I                                June 29, 2010

                                                        Page 147

 1    more likely than not that their accounting for raw

 2    materials in inventory wouldn't reconcile?

 3         A.     I can't answer that question.  It

 4    depends upon the percentage of -- of active that

 5    they put in.

 6               Again, when they reconcile, there's an

 7    acceptable tolerance.  The tolerance is based upon

 8    the history.

 9               If the history is such that you add too

10    much, then it would be -- it would be hidden within

11    those specifications.

12               But, to answer your question again,

13    that is one of the control checks which you have to

14    try to determine whether or not you have misuse --

15    you use too much or too little.

16         Q.     Okay.  If a pharmaceutical company

17    consistently put so much active pharmaceutical

18    ingredient extra into its batches that they were

19    outside the specifications, would that be something

20    likely would be detected by --

21         A.     So you're talking about if they -- if

22    we used hypothetical -- let's say produced a product

23    that was outside of specification which was

24    consistently above 110 percent.

25         Q.     Yep.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 148

```
 1        A.     Would the --

 2        Q.     It's actually 105.

 3        A.     105.  The other one said 110.

 4        Q.     Trust me.

 5        A.     Well, I'm not necessarily going to

 6   trust you on this, but -- but it's above -- well,

 7   105 is harder, so I'll use the 105.

 8               Would it be detected in the long run if

 9   you --

10        Q.     Likely.  Would it likely be detected in

11   the long run.

12        A.     You know what, without looking at

13   their -- without looking at their yield limits, I

14   don't know how I could make that determination.

15        Q.     Would the added Digoxin likely be

16   detected at either blend uniformity or finished

17   product testing?

18               MR. MILLER:  Objection to form.

19        A.     Just repeat that, please.

20        Q.     If the company consistently added such

21   an amount of additional Digoxin that it was going to

22   be outside the specifications, would it likely be

23   detected by blend uniformity or finished product

24   testing?

25        A.     Yes, it would, if they have a valid
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                          Page 149

 1   test method.

 2              MR. MORIARTY:  Let's stop there because

 3   I'm going to push beyond four minutes and I don't

 4   want to do that to you.  And then do you want to

 5   just take our lunch break?

 6              MR. MILLER:  Yes.

 7              THE VIDEOGRAPHER:  Please stand by.  We

 8   are going off the record.  The time is 12:18 P.M.

 9   This is the end of Tape No. 3.

10              (Lunch recess was taken.)

11              THE VIDEOGRAPHER:  We are back on the

12   record.  The time is 1:37 P.M.  This is the

13   beginning of Tape No. 4.

14       Q.    All right, Mr. Kenny.  Let me do --

15   first start the afternoon with a little bit of

16   cleanups from some things.

17              (Exhibit 22, letter dated 1/9/07,

18   was marked for identification.)

19       Q.    And I want to show you what's been

20   marked as Exhibit 22.

21              This is a letter dated January 9, 2007,

22   from FDA to Actavis; correct?

23       A.    Correct.

24       Q.    It is a warning letter; correct?

25       A.    Correct.

Mark G. Kenny, Volume I                                June 29, 2010

Page 150

 1        Q.     And if you go to the second to last

 2   page, last paragraph, I'd like you to follow along

 3   with me.

 4               It says, "While the corrections that

 5   you promise in your correspondence appear to

 6   adequately address many of the cGMP deviations found

 7   during the July 10 through August 10, 2006

 8   inspection, we are concerned about the quality of

 9   drug products that have been released from your

10   facility under the serious lack of cGMP controls

11   found during the inspection."

12               Did I read that correctly so far?

13        A.     I believe so.

14        Q.     And then I'm going to skip the next

15   sentence -- well, actually, let's go on to the next

16   sentence.

17               "Your response provides no assurance."

18               Now, "provides no assurance" is a

19   frequent term used in FDA regulatory materials;

20   correct?

21        A.     Um-hum.

22        Q.     That's a yes?

23        A.     Yes.

24        Q.     "That the records and conditions of

25   manufacture and testing of each such lot of drug

Mark G. Kenny, Volume I                                June 29, 2010

 1   products released and marketed will be evaluated to

 2   assure that the released drug products have their

 3   appropriate identity, strength, quality, and

 4   purity."

 5            Again, "identity, strength, quality,

 6   and purity" are regulatory terms frequently

 7   contained in FDA materials; correct?

 8            MR. MILLER:  Object to form.

 9   A.    Yes.

10   Q.    Now, the next sentence says, "We feel

11   that to provide such assurance, your firm should

12   promptly initiate an audit program by a third-party

13   having appropriate cGMP expertise to provide

14   assurance that all marketed lots of drug products

15   that remain within expiration have their appropriate

16   identity, strength, quality and purity."

17            Did I read that correctly?

18   A.    Yes.

19   Q.    Do you understand this to be the

20   invitation which led Actavis to retain Quantic

21   Regulatory Services?

22   A.    I believe it is the invitation to bring

23   in a consultant, which became Quantic.

24   Q.    And we have already gone over the

25   Quantic exhibit.  I don't need to discuss that

Mark G. Kenny, Volume I                          June 29, 2010

Page 152

 1   again.

 2              But do you know whether FDA ever

 3   expressed any dissatisfaction with Quantic's results

 4   such that they did not provide assurances that

 5   Digitek had been produced under conditions which

 6   assured appropriate identity, strength, quality and

 7   purity?

 8        A.    Yeah.  I think that the FDA had a high

 9   level of concern based upon a complete system issue,

10   not necessarily -- taking a look at each of the

11   quality systems.

12              MR. KAPLAN:  I would ask the

13   reporter -- I move to strike that answer as not

14   being responsive.

15              MR. MORIARTY:  And I understand your

16   answer, but one --

17              MR. KAPLAN:  I'd like the reporter to

18   read back the question that you asked so he can

19   answer that question.

20              MR. MORIARTY:  And actually my question

21   was very bad.  Your -- your answer wasn't

22   responsive, but my question was pretty bad.  Okay?

23              MR. MILLER:  I know --

24              MR. MORIARTY:  Early on -- early on

25   after lunch, it's difficult to keep going.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                          Page 153

1        Q.      What I'm asking specifically is whether

2    FDA ever said, "Sorry, Actavis" or "Sorry, Quantic,"

3    the letter you, and results, you provided in

4    December of 2007 don't give us the assurances that

5    we need concerning Digitek.

6                MR. MILLER:   Object to form.

7        Q.      Anything like that in the material you

8    reviewed?

9        A.      I think their actions, the regulatory

10   and escalating of their actions state that they

11   weren't satisfied with their response.

12       Q.      Is there an explicit statement anywhere

13   in the materials you reviewed about Digitek, they

14   were not satisfied with Quantic's work in regard to

15   this specific invitation?

16       A.      I don't recall.

17       Q.      In your Tab 2 -- I'm sorry.  Tab -- I'm

18   sorry, Tab 5.  Reference 5 in your Appendix B is

19   this definition of adulterated; correct?

20       A.      Correct.

21       Q.      All right.  Well, we -- we printed this

22   from the website, and probably have other copies of

23   it, but this is the specific part about strength,

24   quality and purity differing from official

25   compendium; correct?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 154

1        A.        Um-hum.

2        Q.        Is that a yes?

3        A.        Yes.  Sorry, right.

4        Q.        And this is CFR 351B; correct?

5        A.        Correct.

6        Q.        Now, in this paragraph, is that

7   language -- again we're talking about assurances

8   that a product meets identity, purity, strength,

9   etcetera; correct?

10       A.        Correct.

11       Q.        Now, is there anything in here that

12  defines what an assurance is?

13       A.        Can I read it?

14                 I don't see that.

15       Q.        All right.  In other words, there's no

16  statement that -- of confidence intervals or

17  statistical probabilities in any precise

18  mathematical terms; correct?

19       A.        Correct.

20       Q.        Are the -- are the general -- are the

21  good manufacturing practice regulations subject to

22  varying interpretations from time to time?

23       A.        By whom?

24       Q.        Well, between a company and the FDA,

25  for example.

Mark G. Kenny, Volume I                          June 29, 2010

Page 155

1        A.      I'm sorry.  Would you repeat that?

2        Q.      Sure.  I mean could two reasonable

3   professionals, even in your field, look at a

4   definition in the GMP guidelines and have a

5   legitimate debate about what a particular word or

6   phrase means?

7        A.      Yes, sir.

8        Q.      All right.  So as far as the word

9   "assurance" is concerned, some expert like you could

10  say, I believe that we, as a company, have provided

11  the adequate assurance; and somebody else on the

12  other side could say, no, I disagree; right?

13       A.      That's correct.

14       Q.      And at least the FDA reg itself doesn't

15  provide specific guidance on what that means; right?

16       A.      In terms of assurance, sure it does.

17  It gives you guidance document and it tells you the

18  minimum requirements, and if you perform the minimum

19  requirements, you have assured, to at least a -- to

20  a legal standpoint that you've assured that the

21  product will meet -- will meet all specifications,

22  etcetera, GMP regulations, and will not be an

23  adulterated product.

24       Q.      You mean from a regulatory standpoint.

25       A.      I mean they're linked.  Whether --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 156

 1   whether you're talking about adulterated product
 2   meaning total GMP compliance issue, and no spec --
 3   and no out of specifications, that's -- let's say
 4   that's stated there.  But the assurance that they're
 5   implying is, also, that the product going out the
 6   door is -- is compliant to specifications.  So it
 7   refers to, I believe, both.
 8        Q.     But the FDA statement in their July --
 9   or their cGMP statement that we went over before
10   doesn't necessarily equate the assurance of
11   regulatory with the actual laboratory outcome of
12   tested product; correct?
13        A.     Seriously, I don't understand the
14   question.
15        Q.     That's fine.
16               You have expressed opinions in your
17   report that you have -- you believe that Actavis had
18   serious GMP issues in certain years; correct?
19        A.     Through the years I had evidence, yes.
20        Q.     Okay.  At the same time, FDA was
21   testing product in 2007/2008, and it was meeting
22   specifications; correct?
23        A.     Correct.  It appears, you've shown me a
24   lot of information to suggest that it met
25   specifications.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 157

1        Q.      Right.  And you've not shown me any

2    evidence in the material you reviewed to the

3    contrary, that it didn't meet specifications;

4    correct?

5        A.      Well, we haven't discussed -- you've

6    talked about whether or not a product tests as a

7    final product meets the specifications.

8        Q.      Right.

9        A.      Yes.  When you've asked me that

10   question, I've said yes.  I don't have any data for

11   that.  But I have data prior to that.  I mean,

12   there's -- there's tons of things prior to that that

13   would implicate the quality of that particular

14   product.

15       Q.      We'll get to that later.

16               But in the end --

17       A.      I mean actual test results.

18       Q.      -- if a consumer is going to take a

19   tablet and it meets the USP specs for weight,

20   thickness, content uniformity, assay, all those

21   things, that -- and there's -- and there's testing

22   to indicate that that batch meets those, validated

23   reliable testing, it's generally going to be safe

24   for the consumer; correct?

25       A.      Right.  Yes.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 158

1        Q.     Okay.  Thank you.

2               (Exhibit 37, Recall Package 2009 was

3     marked for identification.)

4        Q.     Exhibit 37, have you ever seen this

5     before?

6        A.     I haven't gone through this.

7        Q.     Does that mean that --

8        A.     Well, it might have been in here.  I

9     may -- I may have glanced at it.  I don't recall

10    having read it.

11       Q.     All right.  This is the FDA approved

12    Recall Package for Digitek in April/May 2008.  Okay?

13              Have you seen a Recall Package before?

14       A.     Recall Package before?  Not in years,

15    since I didn't have a lot of them.

16       Q.     Okay.  At the third page, under "Reason

17    for the recall," does it say Digoxin tablets

18    exceeded tablet thickness specifications?

19       A.     Yes.

20       Q.     Now, have you ever seen a batch record

21    for any other batch of Digitek, besides 70924, in

22    which tablets exceeded thickness specifications?

23       A.     Have I looked at the batch records?

24    No.  I've seen some evidence in E-mails and the like

25    that they were overweight, the tablets were

Mark G. Kenny, Volume I                              June 29, 2010

Page 159

1    overweight, double tablets were overweight.

2        Q.      Okay.  Well, have you ever seen any

3    evidence, in any other batch record or any other

4    E-mail, or anything else, to indicate that the

5    tablets released to the market exceeded their

6    thickness specifications?

7        A.      Exceeded the thickness?  Can I look at

8    my report for one second?

9        Q.      Yes.

10       A.      Could you rephrase your question?

11               You can ask --

12               MR. KAPLAN:  Why don't you have the

13   reporter read it back.

14               (Requested portion is read.)

15       A.      Thickness?  I would have to say I can't

16   recall at the moment.

17               MR. KAPLAN:  Is that a no?

18               THE WITNESS:  That's I cannot recall.

19               MR. KAPLAN:  Yes or no?

20               THE WITNESS:  I cannot -- I cannot

21   recall is my answer, if I'm allowed to give that

22   answer.

23               MR. MORIARTY:  Can I follow up?

24       Q.      I mean, this is a products liability

25   litigation over whether Digitek tablets exceeded

Mark G. Kenny, Volume I                                    June 29, 2010

 1    specifications and harmed consumers.  Okay?  It's

 2    important for me to know whether you, as an expert

 3    against my client in this case, have evidence,

 4    documents, testimony, and the like, to indicate the

 5    tablets that exceeded, and that's what I'm asking

 6    you about right now, tablets exceeded thickness

 7    specifications got to consumers.

 8         A.    Thickness -- can I look at an APR for

 9    one second?

10         Q.    A what?

11         A.    An APR.

12               MR. MILLER:  Certainly.

13               MR. MORIARTY:  What's an APR?

14         A.    I'm looking at a number of

15    out-of-specifications for blend uniformity.

16               Let me see.

17         Q.    Remember my question involves tablets

18    that reached consumers.

19         A.    Okay.  For thickness, no.

20         Q.    All right.  Have you seen -- now, I

21    asked you this before lunch, I asked if you had seen

22    any evidence, or had an opinion to a probability

23    that out-of-spec tablets of normal size, but varying

24    API, reached consumers, and you told me no.

25               Do you have evidence now, after the

Mark G. Kenny, Volume I                              June 29, 2010

Page 161

1    lunch break, that tablets of normal size with

2    varying API reached consumers?

3         A.     Potentially.

4         Q.     You potentially have evidence?

5         A.     Yeah.  Because you're talking about

6    probabilities, or possibilities.

7                Would you like me to go through it?

8         Q.     No.  You're talking about a blend

9    uniformity issue?

10        A.     Correct.

11        Q.     Did that batch --

12        A.     The batches.

13        Q.     -- test appropriately in finished

14   product testing?

15        A.     They tested appropriately at end

16   product testing.

17               They found it -- can I clarify?

18        Q.     I'm asking one question at a time.

19        A.     Surely.  Go ahead.  Sorry.

20        Q.     So they tested appropriately in

21   finished product testing; correct?

22        A.     The end product testing sample that was

23   taken was within specification.

24        Q.     Okay.

25        A.     And at the very end of the process.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 162

```
 1        Q.     All right.  And at the blend uniformity
 2    stage, and we'll get into the details of this
 3    investigation way later, you're talking about one
 4    out of the ten samples on the initial run was out of
 5    spec; correct?
 6        A.     I don't know.  The information I
 7    received doesn't have that type of specificity.
 8                I'm looking at the APR.
 9        Q.     You haven't reviewed the details of the
10    blend uniformity investigations that were done on
11    these batches?
12        A.     No.
13        Q.     Exhibit 37 contains -- has other
14    information in it like the health hazard evaluation.
15                Is that right?
16                And then a list of all the batches that
17    might be subject to the recall.
18                Is that correct?
19        A.     Are we talking about the document I
20    have?
21        Q.     Exhibit 37.
22        A.     Okay.  And your question is?
23        Q.     Does it contain a health hazard
24    evaluation and a list of all the batches that might
25    be potentially related to the recall?
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 163

 1      A.      Normally it would have it, a health
 2   hazard evaluation, and it should list the batches.
 3   I'd have to go through it to confirm that, but...
 4      Q.      And do you know whether or not the
 5   contents of a Recall Package are run past the FDA?
 6      A.      I'm not sure, but I -- it probably is.
 7              Certainly I know of instances where it
 8   is.
 9      Q.      I asked you earlier about Exhibit 39,
10   the July 2009 FDA statement about generic drugs, and
11   specifically the paragraph about Digitek.
12              Do you remember those questions?
13      A.      I'd like to reread it, but I remember
14   we went over it.
15      Q.      It's 38, Exhibit 38.
16              That information -- that information,
17   to your knowledge, is still on the FDA's website,
18   isn't it?
19      A.      I have no reason to believe they took
20   it off.
21      Q.      All right.  And that would be available
22   not only to consumers, but to medical professionals?
23      A.      The -- the information is available to
24   anyone who has an internet connection.
25      Q.      And that would include consumers and

Mark G. Kenny, Volume I                                    June 29, 2010

Page 164

1    medical professionals.

2           A.      They're part of that, yes.

3           Q.      And that would include regulatory and

4    quality professionals in the pharmaceutical

5    industry.  Is that correct?

6                   MR. MILLER:  Object to the form.  It's

7    outside the scope.  He's not here as an expert on

8    who's going to have access to the internet.

9           A.      Common sense would tell you everybody

10   has access, and they are part of everybody.

11          Q.      You -- do you have any reason to

12   believe that the FDA is -- has posted anything that

13   it believes is inaccurate in Exhibit 38?

14                  MR. MILLER:  Object to form.

15          A.      Please ask that again.

16          Q.      Sure.  Would you assume that FDA

17   investigated the facts behind that posting and the

18   content of the posting?

19                  MR. MILLER:  Object to form.

20          A.      Honestly, I don't know.  I don't know.

21                  I know they would check guidance

22   documents, etcetera.  I don't know if they check

23   things like that, so I don't know who would do it.

24          Q.      Did you review or rely on any materials

25   that are not listed in Appendix B to your report?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 165

 1          A.      Did I rely on them?  No.

 2          Q.      Did you bring anything with you today

 3     in your binders, or other materials, that is not

 4     listed in exhibit -- I'm sorry -- Appendix B to your

 5     report?

 6          A.      Yes.

 7          Q.      What did you bring with you --

 8          A.      I brought everything that I made a copy

 9     of.

10          Q.      Do you know --

11          A.      Which is everything that's pertinent

12     to -- to provide me information to try to make some

13     decision or some judgment.

14          Q.      And you believe that there are some

15     things in those materials that aren't listed in

16     Appendix B?

17          A.      Oh, I know there are.  I know there

18     are, sir.

19          Q.      All right.

20          A.      That's why I brought them.

21                  MR. MORIARTY:  At some point, Pete,

22     we're going to have to go through the binders,

23     identify what's not in B.

24                  MR. MILLER:  Okay.

25                  MR. MORIARTY:  And I would prefer that

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 166

 1   the court reporter take them, copy them, so that we

 2   can have them, and then return what we remove from

 3   Mr. Kenny's binders to Mr. Kenny, either directly or

 4   through you.

 5              MR. MILLER:  Procedurally I have no

 6   problem with that.  Actually, I'd like to be part of

 7   it and take a look at each document before it goes

 8   to --

 9              THE WITNESS:  And will I be able to get

10   these documents back?

11              MR. MORIARTY:  You will.

12              THE WITNESS:  Within a reasonable

13   period of time?

14              MR. MORIARTY:  You will.

15       A.    Okay.  You become attached to

16   documents.

17       Q.    The report that you signed on June 15,

18   2010, that's your final report; correct?

19       A.    That's the report I submitted, correct.

20       Q.    And were there drafts of this report

21   before this final version?

22       A.    Yes, there were.

23       Q.    Did you bring drafts with you?

24       A.    No.  But I can.

25              The drafts are electronic.

Mark G. Kenny, Volume I                              June 29, 2010

                                                     Page 167

 1               I did not have an opportunity to go

 2    through my files, because they're in multiple

 3    places, to give you each iteration of what I did.

 4               But I would go along and occasionally

 5    save a copy at a certain period of time, and then

 6    continue.

 7               But I can provide that to you.

 8        Q.     Okay.  Let's get back to where we left

 9    off before the lunch break.

10               I was asking you a series of questions

11    about, you know, what would happen if a manufacturer

12    consistently put too much API in its batches, and

13    would it be detected.

14               And just before lunch you said, yeah,

15    likely it would, if the company or FDA was using

16    valid test methods.

17               Do you remember that?

18        A.     Yes.

19        Q.     And in the course of a long day like

20    this, when we're talking about a lot of different

21    documents and topics, sometimes we jump around and

22    sometimes, accidentally, I repeat myself.  Okay?

23        A.     Um-hum.

24        Q.     So please excuse me if I do.

25               But have you seen any FDA citations or

Mark G. Kenny, Volume I                                    June 29, 2010

Page 168

 1    warnings or observations indicating that Actavis did
 2    not have validated test methods for Digitek?
 3                    MR. MILLER:  Objection.  Asked and
 4    answered.
 5                    It's okay to answer.
 6        A.      I would have to look at the records.
 7                    And the reason I say that is an
 8    out-of-specification result that has not been
 9    investigated, you don't know if it's an assay issue,
10    or you don't know if it's a content issue.  So
11    without the investigation, I can't tell you whether
12    the root cause of that, which goes back to when the
13    FDA found, as I did, out-of-specification tests, and
14    there is an adequate investigation, you don't know
15    whether it's a valid test method, a valid process,
16    you know nothing.
17                    And then they retest and it looks good,
18    so they pass it.
19        Q.      Did you see instances of out-of-spec
20    results in the materials that were not investigated
21    at all?
22        A.      I saw instances where a root cause
23    determination could not be made, and I saw instances
24    where retesting was conducted, and on Digitek, and
25    without a root cause investigation, retesting of the

Mark G. Kenny, Volume I                                    June 29, 2010

Page 169

1    product and releasing it is not an acceptable,

2    compliant procedure, not an acceptable practice.

3              You cannot test the quality into a

4    product merely by taking a secondary sample.

5         Q.    Do you always find a root cause when

6    you do an investigation?

7         A.    Do you always find a root cause?  No.

8         Q.    What is the scientific judgment rule in

9    batch release?

10        A.    Scientific judgment rule?  It's not

11   scientific.  It's do the numbers meet the

12   specifications.  Science is not involved.  The

13   people who review it are not scientists.  They look,

14   is it filled in, are there results in specification,

15   are there any unexplained cross-outs, and the like,

16   but it is a rather routine review, and it's only is

17   by exception that it gets escalated to somebody with

18   a greater level of technical abilities.

19        Q.    Again, we'll get to blend uniformity

20   failures in more detail later, but did FDA ever make

21   a 483 observation, or a warning letter observation,

22   to the effect that the lack of root cause

23   determinations in blend uniformity investigations

24   should have led to batch rejection?

25        A.    I don't recall, the way you've phrased

Mark G. Kenny, Volume I                                June 29, 2010

                                                        Page 170

 1   it.  I honestly don't recall.

 2             I'd have to go back to the 483s.  There

 3   are 172 observations, or whatever it is.

 4        Q.    Did you see any information in any of

 5   this material that the FDA asked Actavis to ever

 6   recall Digitek batches before April of 2008?

 7        A.    I don't recall seeing anything.

 8        Q.    Is there an FDA reg anywhere which

 9   specifically indicates that an out-of-spec test

10   result, 1 out of 10, at the blend uniformity stage,

11   mandates batch rejection?

12        A.    There are -- I don't know if it's 1 out

13   of 10.  What they specifically state is, if the test

14   results are out of specification, then you have to

15   follow a logical train of -- of investigation and

16   testing that's consistent with GMP.

17             So I can't tell you whether it is 1 out

18   of 10, or 2 out of 10, or 1 out of a thousand.

19        Q.    All right.  But what the reg

20   essentially says is, if you -- if you get an

21   out-of-spec result, you do an investigation;

22   correct?

23        A.    Correct.

24        Q.    It doesn't mandate batch rejection just

25   because you get an out-of-specification result, does

Mark G. Kenny, Volume I                                    June 29, 2010

1   it?

2          A.     That, in and of itself, would not

3   necessarily -- well, no.  The batch would be

4   rejected -- the batch would be placed in quarantine

5   until an adequate investigation could be conducted.

6                 After the investigation takes place,

7   there may be a determination that it's acceptable.

8   Perhaps they have done an investigation that's

9   acceptable to resample and retest, and then the --

10  in this case -- well, whatever.  Did I answer your

11  question?

12         Q.     Yes.

13                Whether it's at the blend uniformity

14  stage or at finished product testing, would I be

15  correct in saying that there are several different

16  reasons why there could be an out-of-spec?

17         A.     Oh, my gosh.  Of course.

18         Q.     Okay.  And some of them include

19  sampling errors.  Is that right?

20         A.     Yes.

21         Q.     Math errors.

22         A.     Sure.

23         Q.     An out-of-spec test result in the

24  course of this does not necessarily mean a product

25  is, in fact, out of spec; correct?

Mark G. Kenny, Volume I                          June 29, 2010

Page 172

1        A.     It has to be assumed that unless you

2   have a root cause, that you cannot discount the fact

3   that a sample tested out of spec.  You cannot take a

4   secondary sample, test it, and release a batch.

5        Q.     Where is that in the regulations?

6        A.     I can tell you that it is absolutely

7   100 percent industry practice, in every company.

8               If I ever saw a company, and I audited,

9   that went in, found no root cause determination, had

10  initial out-of-specification, decided that they were

11  going to resample, and that it was fine, I would --

12  I would have to take issue.

13              MR. KAPLAN:  I move to strike the last

14  answer as non-responsive to the question.

15       Q.     So if the root cause was determined to

16  be a math error, and on retest, it was fine, you

17  could release the batch; correct?

18       A.     If you found a root cause, and if you

19  could discount, you could ignore, you could justify

20  the fact and understand the fact that samples were

21  out of specification, and it makes sense to you,

22  then you can, if you will, retest the product using

23  a sample inspection.

24              But it is very important that you have

25  to get the root cause determined.

Mark G. Kenny, Volume I                                      June 29, 2010

Page 173

 1                  I've never -- I don't think I've ever

 2      released a batch, I'm sure I've never, where I had

 3      initial out-of-specification, I couldn't figure out

 4      why, and decided, for whatever reason, to retest --

 5      it's okay to retest, but I would do it as a

 6      diagnostic test, not as an acceptance determination

 7      test.

 8                  At that point, it would become an

 9      experimental batch, as far as I was concerned.

10          Q.      Is blend uniformity sampling considered

11      difficult?

12          A.      No.  It should not be difficult.

13          Q.      Do most companies struggle with blend

14      uniformity?

15          A.      The companies I've worked with, content

16      uniformity is not, in general, a major issue.

17          Q.      I was asking about blend uniformity.

18          A.      Blend uniformity.  I'm sorry.

19                  No.  It's -- I don't find, in the

20      companies that I work with, that blend uniformity is

21      an issue.

22          Q.      Okay.

23                  We touched a little bit before the lunch

24      break about batch yields.

25                  Let's get back to that.

Mark G. Kenny, Volume I                          June 29, 2010

Page 174

1        A.      Surely.

2        Q.      There's always going to be some waste,

3   for various reasons, in the pharmaceutical

4   manufacturing process of solid oral dose; correct?

5        A.      Yes.

6        Q.      And if, for whatever reason, a company

7   was consistently making double-thick tablets, the

8   batch theoretic -- or the yield numbers would not

9   match the theoretical numbers; correct?

10       A.      I don't understand what "constantly"

11  means, but if --

12       Q.      I said consistently.

13       A.      Consistently.  If they consistently --

14  I can't answer the question.  I mean, I would say

15  that I have to know more about how many units you're

16  talking about, how often.  I'd have to take a look

17  at the yield specifications.  We'd have to do a

18  mathematical determination.  Then, after that, we

19  could, you know, come to -- between the two of us,

20  come to a conclusion that, yes, it could be

21  affected, or no, it's -- it's buried within the

22  tolerances.

23       Q.      Have you done such an analysis for your

24  work here?

25       A.      As part of my work here, no.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 175

1              I would need all the -- I would need an

2    unlimited amount of data.

3              This is something that Digitek is

4    expected to do -- or I'm sorry, Actavis.

5         Q.    Have you ever seen anything in the FDA

6    documents, in your review of this case, to indicate

7    that there were double-thick tablets for any product

8    other than Digitek?

9         A.    No.

10              MR. KAPLAN:  Is there an answer?

11              MR. MORIARTY:  He said no.

12              THE WITNESS:  I didn't say that loudly?

13              MR. MILLER:  It came across to me.

14              THE WITNESS:  I'll try to be louder.

15        Q.    Did you ever see any observations in

16   the 483s or the warning letters in which the FDA

17   asked Actavis to increase its sampling rate for

18   Digitek?

19        A.    I don't recall seeing that, no.

20        Q.    Have you ever actually seen a Digitek

21   tablet?

22        A.    I've seen a picture of it on the

23   internet.

24        Q.    So you haven't --

25        A.    I haven't touched one.

Mark G. Kenny, Volume I                                    June 29, 2010

```
 1          Q.      Okay.  You haven't weighed one --

 2          A.      No.

 3          Q.      -- or anything like that?

 4          A.      No.

 5          Q.      You know what a Stokes BB2 tablet press

 6     is?

 7          A.      Relatively, sure.

 8          Q.      Does Johnson & Johnson ever use them?

 9          A.      I don't believe they use them anymore,

10     but they certainly did years ago.

11          Q.      Do you know when Johnson & Johnson

12     stopped using Stokes BB2 --

13          A.      Well, you're talking about, again, a

14     $60 billion company that has 140 operating units.

15                  If you're talking about the experience

16     that I've had -- actually, I -- the companies I've

17     been with, we did not use Stokes.

18          Q.      Is there any regulation, any FDA

19     regulation that specifies a particular age of

20     equipment, or type of equipment, that has to be used

21     for the manufacture of a solid oral dose product?

22          A.      Age, no.  Condition, yes.

23          Q.      Okay.  Condition.

24                  Do you know whether or not the Stokes BB2

25     presses were in use for Digitek at the time of the
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 177

1    ANDA?

2         A.    At the time of the information that

3    I've read, a Stokes press was being used.

4         Q.    Is the fact that Actavis uses Stokes

5    BB2 tablet presses in all the batch records?

6         A.    Is it -- I don't know.  I'd have to

7    look through all the batch records.

8         Q.    Did FDA ever make a 483 observation, or

9    a warning letter observation, to the effect that

10   Actavis should not be using Stokes BB2 tablet

11   presses to manufacture Digitek?

12        A.    I don't recall that that -- that

13   suggestion was made.

14        Q.    Are you an expert in manu -- tablet

15   manufacturing equipment with weight controls?

16        A.    No, I'm not.

17        Q.    Are you aware, from your review in this

18   litigation, that when UDL had Digitek tablets, it

19   performed random weight and thickness tests to make

20   sure that the tablets would fit into their blister

21   packs?

22        A.    I saw testing being conducted.  I don't

23   know how often, but I saw test results.

24        Q.    Do you know whether UDL ever found

25   Digitek tablets that were outside the USP thickness

Mark G. Kenny, Volume I                                    June 29, 2010

 1   or weight specifications?

 2        A.     I would have no way of knowing that.

 3               I would have -- I would have to see all

 4   the results.

 5               If I saw the results, then I could

 6   say -- in random, then I'd say yeah, they're all in

 7   spec.

 8        Q.     Well, when the Plaintiffs' lawyers

 9   deposed the UDL employees, and had the UDL

10   documents, was there anything that came out in those

11   depositions, or those exhibits, to indicate that UDL

12   ever found tablets outside the USP weight or

13   thickness specifications?

14        A.     I don't recall any instances.

15        Q.     We touched on adverse event reporting a

16   little bit this morning.

17               How much do you know about the FDA's

18   adverse event reporting database?

19        A.     Not a lot.

20        Q.     All right.  Are you aware that the FDA

21   generally considers that that system does not

22   reflect causation?

23               MR. MILLER:  Object to form.

24        A.     I'm not familiar enough and I couldn't

25   hazard a guess.

Mark G. Kenny, Volume I                                    June 29, 2010

1        Q.      All right.  Okay.  Would you prefer to

2    rely on pharmacovigilance experts to discuss issues

3    like that in this litigation?

4        A.      Would I rely upon them?

5                I don't know who the experts are.  You

6    know, I can't say I would or wouldn't.

7                I mean, people who say they're experts

8    are not necessarily experts.

9        Q.      That's true.

10               You're not professing expertise in

11   pharmacovigilance, are you?

12       A.      I have never professed that.

13       Q.      Have you ever seen any data which

14   compares adverse event experience for Digitek with

15   that of any of its competitors?

16       A.      Could you repeat that?

17       Q.      Sure.

18       A.      The statement "competitors."

19       Q.      Have you ever seen any data that

20   compares adverse events experience for Digitek with

21   adverse event experience for any other Digoxin

22   product?

23       A.      I don't recall.  It would not be

24   something that I would have focused on because it's

25   outside of my expertise.  I don't know what I would

Mark G. Kenny, Volume I                                        June 29, 2010

Page 180

1   do with the information.

2        Q.    Have you read the depositions of any

3   doctors --

4        A.    No.

5        Q.    -- who have been taken in this case?

6        A.    No.  I have no interest.

7        Q.    Do you know from any independent

8   research whether any hospital reported an increased

9   incidence of Digoxin toxicity in the years 2005,

10  '06, '07 or '08?

11       A.    I did no investigation of any sort, so

12  the answer is I know of nothing, because I didn't do

13  anything.

14             Does that make sense?

15       Q.    All right.  Let me get back to some

16  statistics that I was asking you about before.

17             Of this 688.2 million tablets that were

18  part of the recall, do you have any opinion, to a

19  reasonable probability, as to what percentage of

20  them were outside the USP specifications on the low

21  side?

22       A.    On the low side?

23             I have no way of knowing that.

24       Q.    Do you have any opinion, to a

25  probability, of what percentage of those tablets

Mark G. Kenny, Volume I                                    June 29, 2010

Page 181

1    were out of spec -- out of the USP specifications on

2    the high side?

3            A.      The -- the -- I'm sorry.  Just repeat

4    the question so I can answer it correctly.

5            Q.      Sure.

6                    Do you have an opinion, to a reasonable

7    degree of probability, as to how many of the

8    recalled Digitek tablets were outside the USP

9    specifications on the high side of their active

10   pharmaceutical --

11           A.      I would have no way of knowing that.

12           Q.      Are you an expert in pharmaceutical

13   distribution?

14           A.      No.  No.

15           Q.      And when I say distribution, just so

16   we're clear, I mean you work for J&J, which actually

17   makes pharmaceuticals and devices; correct?

18           A.      I did work for them, yes.

19           Q.      And then at some point, they might sell

20   or transfer the product to distributors who get it

21   ultimately on consumer shelves; correct?

22           A.      Yes.  I have some knowledge of it.  I'm

23   not an expert on it.

24           Q.      All right.  That's what I want to find

25   out, is whether you have any expertise on the

Mark G. Kenny, Volume I                                    June 29, 2010

Page 182

 1    distribution end of this, as opposed to quality and

 2    manufacturing.

 3         A.    No.  I've -- I've audited distribution

 4    centers, but I haven't done it -- I look for GMP

 5    issues.

 6         Q.    Just to make sure I'm clear, you would

 7    have no opinion, to a probability, as to any

 8    specific Digitek batch, as to how many of those

 9    tablets were outside their USP specifications;

10    correct?

11         A.    Well, you say "any."  There is a lot of

12    information on Batch 70924, so I -- I would have an

13    opinion on whether or not additional tablets were --

14    of double thickness or were thick that went out.  So

15    I would have an opinion on that.

16         Q.    Okay.  Other than that.

17         A.    Other than that --

18         Q.    If I went through the list of 152

19    batches that actually made it to market, that had to

20    come back, you would have no opinion to a

21    probability as to any of them other than 70924?

22         A.    No.  No.  I would have to say, no,

23    that's not correct.

24               When I evaluate a company, I evaluate

25    it for all those control systems and procedures that

Mark G. Kenny, Volume I                          June 29, 2010

 1   can affect the quality of the outgoing product.

 2              When I see a company that has most of

 3   their systems out of control, if you will, or not

 4   within control, or examples where they're not within

 5   control, I have a high level of concern that the

 6   product they are releasing is not conforming to

 7   specification.  I know it -- I know it's adulterated

 8   because of all the GMP issues.  The question is,

 9   does it meet specification.

10              I would have a very high level of

11   concern with that.  I would have -- and I don't

12   know, does that help answer my question -- or your

13   question?

14        Q.    Are you done with your answer?

15        A.    I think so.

16        Q.    Okay.  Well, I don't mean to repeat

17   myself, but I need to make sure I understand this.

18              Based on your review, you have a high

19   concern about this, whether product met

20   specifications; correct?

21        A.    I have a very high concern about it.

22        Q.    Okay.  But if -- but if I understand

23   it, you've never seen reports of double-thick

24   tablets in the hands of consumers, or pharmacists,

25   from recall batches.  You've never seen lab tests

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 184

 1    of --

 2          A.      Of what?

 3          Q.      -- of out-of-spec tablets; correct?

 4          A.      Lab tests of out-of-spec tablets in the

 5    field?

 6          Q.      Yes.

 7          A.      Okay.  Well, there are plenty of tests

 8    that are unreleased batches.

 9          Q.      But --

10          A.      It's --

11          Q.      -- unreleased batches aren't in the

12    hands of consumers, are they?

13          A.      That's not -- that's correct.

14          Q.      Okay.

15          A.      But they are a high level of concern

16    because they implicate the quality of those that

17    have been released.

18          Q.      Well, isn't the purpose of the Quality

19    Department to reject batches that are out of spec

20    for some reason?

21          A.      The primary objective of the Quality

22    Assurance Department is to make sure that controls

23    and systems are in place.  That's the primary

24    responsibility.

25                  A secondary responsibility, as a safety

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 185

 1    net, is to take samples at the end of the process

 2    and test them.

 3              But the primary -- it's a very, very

 4    small part of what Quality Assurance and Quality

 5    Control does.

 6         Q.    If a company finds a batch that's out

 7    of spec, truly out of spec, it should be rejected;

 8    correct?

 9         A.    If they find a batch that's truly --

10    well, of course.

11         Q.    So Batch 8022 --

12         A.    The "truly" part is --

13         Q.    Well, 80228, which, from your review,

14    had tablets that were out of spec by weight was

15    rejected; correct?

16         A.    Was rejected?  No.  Not all of them

17    were rejected.

18         Q.    Do you think 80228 went to market?

19         A.    I'd have to -- I'd have to look at the

20    record.  May I?

21         Q.    Sure.

22         A.    I don't know if they went out to

23    market.  In the records I looked at, I don't know if

24    they were released.

25              I'd love to have seen 2008 APRs because

Mark G. Kenny, Volume I                              June 29, 2010

Page 186

1    then it could confirm to me whether or not they were

2    released.

3              MR. KAPLAN:  I'm going move to strike

4    the last answer.  It's not responsive.

5              THE WITNESS:  It's what?

6              MR. KAPLAN:  Not responsive to the

7    question that was asked.  It is a gratuitous

8    statement.

9         Q.    All right.  Let me just -- I -- I

10   believe I've asked this, and I don't mean to ask it

11   over and over again.

12             I thought I heard you say on several

13   occasions today that you have no evidence in the

14   material you have reviewed of out-of-spec Digitek

15   tablets actually in the hands of consumers.

16             MR. MILLER:  Objection.

17        Q.    Am I correct about that?

18             MR. MILLER:  Objection.  Misstates the

19   previous testimony.

20        Q.    Then I guess I have to keep asking.

21        A.    Could you ask it again?

22        Q.    Because if it did --

23        A.    Could you ask it one more time?

24        Q.    Mr. Kenny --

25        A.    Could you rephrase it?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 187

 1        Q.       I'll get there.  Okay?  I want to make
 2    it clear to you.
 3                 I understand that you have GMP concerns
 4    about my client and you have concerns about whether
 5    Digitek was within or without the specifications;
 6    correct?
 7        A.       Correct.
 8        Q.       And I've shown you all kinds of 484s
 9    where the FDA tested the product; correct?
10        A.       That's correct.
11        Q.       And documents with Celsis labs tested
12    the product and it all met the specs; correct?
13        A.       Of what the -- evidence I've seen,
14    correct.
15        Q.       Done by sampling plans chosen by Celsis
16    and the FDA pursuant to the U.S.; correct?
17        A.       Well, it was a sampling plan of just
18    taking a few units.  It was done by a sampling plan.
19        Q.       Done by the U.S. -- according to USP
20    methods; correct?
21        A.       Yes.
22        Q.       And FDA regards the USP as essentially
23    the bible, so far as the chemical testing of
24    product; correct?
25        A.       You can use the term "bible."  They

Mark G. Kenny, Volume I                                    June 29, 2010

1    certainly consider it a knowledgeable and valid

2    source of testing.

3         Q.     All right.  And you know that the 152

4    recalled Digitek batches all had quality control

5    testing on them for finished product; correct?

6         A.     I will assume that they did.

7         Q.     And will you assume that they used the

8    USP validated method that the FDA was aware of?

9         A.     The method that they -- no.  What I --

10   what I can assume -- I don't want to assume

11   anything, but for the sake of this -- this

12   conversation, or this discussion, the methodology

13   that they have in their test method is probably the

14   USP method.

15             Now, did they adequately train the

16   person to perform that analysis?  Did they

17   adequately do verification batches to basically

18   validate that the method is acceptable, when tested

19   in their hands, I have seen no evidence to suggest

20   that they've done that.

21        Q.     Well, you've seen no evidence from FDA

22   that indicates they didn't; correct?

23        A.     For -- for what?

24        Q.     The Digitek testing.

25        A.     If you -- okay.  You're talking about a

Mark G. Kenny, Volume I                           June 29, 2010

Page 189

1    population here of all products.

2         Q.    No.  I'm talking about Digitek.

3         A.    I understand that.

4              MR. MILLER:  But let the man answer.

5    You are, but I object to the form.  You're

6    interrupting him.

7         A.    It -- it's sort of like a Venn diagram.

8    Here's the population.  If you say that they're

9    using practices that are out of compliance, the

10   assumption will be since Digitek -- Digitek is part

11   of that large diagram, that they also suffer in many

12   of the issues that are suffered across the plant.

13        Q.    I asked you hours ago whether you ever

14   saw a specific finding from the FDA that Digitek was

15   adulterated, and you said no.

16             MR. KAPLAN:  Object to form.

17             MR. MILLER:  Object to form.  Misstates

18   previous testimony.

19             MR. MORIARTY:  I don't think it does,

20   but...

21        Q.    Find for me in the documents a specific

22   statement by the FDA that Digitek was adulterated.

23   Find one, please.

24        A.    Why would -- why would a company --

25        Q.    Find one, please.

Mark G. Kenny, Volume I                                June 29, 2010

                                                         Page 190

 1               We've already gone over the recall

 2    notice.

 3               MR. MILLER:  Objection.

 4        Q.    We've gone over the Recall Package.

 5    You can't ask me why the company would do that

 6    because I get to ask the questions.  That's my

 7    prerogative today.

 8               What I want you to do is show me

 9    somewhere in the material you reviewed FDA finding

10    that this product, Digitek, that this litigation is

11    about, was adulterated.

12               MR. MILLER:  Objection.  Asked and

13    answered.

14               THE WITNESS:  I beg your pardon?

15               MR. MILLER:  That's okay.  Answer it.

16        A.    I don't recall where Digitek -- Digitek

17    was, let's say, clearly stated.

18        Q.    Okay.

19        A.    Does that answer your question?

20        Q.    Yes.

21               Now, if you had a client in your

22    consulting business and you wanted to know whether

23    GMP issues with -- overall were impacting on a

24    specific product, would you look at batch records

25    for that specific product?

Mark G. Kenny, Volume I                                          June 29, 2010

Page 191

1       A.      That would be a portion of my

2   investigation.

3       Q.      And do you think FDA would do that?

4       A.      I would assume.  I -- I would expect

5   them to take a look at batch records.

6               If the batch records are not

7   necessarily accurate representations of what

8   happened.

9       Q.      You have no evidence in this case that

10  Actavis --

11      A.      No.

12      Q.      -- has Digitek batch records that are

13  inaccurate in any respect, do you?

14      A.      That's correct.

15      Q.      Now, let's talk about Batch 70924.

16      A.      Okay.

17      Q.      In your opinion, to a probability, were

18  there more double-thick tablets in 70924 than the 20

19  they found during the investigation?

20      A.      I believe.  With a high level of

21  certainty, that, yes, there were.

22      Q.      How many?

23      A.      I have no clue.  I just know there were

24  more.

25      Q.      How do you have a high level of

Mark G. Kenny, Volume I                                    June 29, 2010

Page 192

1    certainty about that?

2           A.    Because visual inspection is regarded

3    as, and it's in my experience, and as an industry

4    acceptance, that visual inspection is horrendously

5    unreliable to the point that it cannot be relied on.

6           Q.    Is that any kind of visual inspection?

7           A.    No.  No.  It could be -- I'm talking

8    about human inspection.

9                 At best it's a safety net.

10          Q.    So you have a high degree of certainty

11   there were more, but you don't know how many more;

12   correct?

13          A.    Correct.

14          Q.    Certainly couldn't have been 4 million

15   more; right?

16          A.    I would think it would not be 4 million

17   more.

18          Q.    And you've never seen a report from any

19   consumer that they got a double-thick tablet in

20   2008; correct?

21          A.    Correct.

22          Q.    70924 wasn't shipped to market until

23   2008; right?

24          A.    I don't know.

25          Q.    Have you seen a report from any of the

Mark G. Kenny, Volume I                                    June 29, 2010

Page 193

1    litigants in this case, any of the Plaintiffs that

2    they had an actual double-thick tablet?

3         A.    No.  I don't know who the litigants

4    are, but I haven't seen that.

5         Q.    Have you seen any report from a

6    pharmacist that there was a double-thick tablet

7    found in 2008?

8         A.    2008?  No.

9         Q.    Do you think that with all these

10   Plaintiffs' lawyers scouring the country for

11   double-thick tablets, they might have found one if

12   there was one?

13              MR. MILLER:  Object to form.

14        A.    I can't -- I can't speak to that.  I

15   don't know what they did.

16        Q.    In the material that you reviewed to

17   prepare opinions was Reference 54 in Appendix B.

18              It's an article called, "Stop Depending

19   on Inspection."

20              Do you remember that?

21        A.    Yes, sir.

22        Q.    Is the journal from which this comes --

23   it's called "Quality Process."

24              Do you subscribe to that journal?

25        A.    I currently do not.  I have for years.

Mark G. Kenny, Volume I                              June 29, 2010

                                                    Page 194

 1          Q.     Does Quality Process --

 2          A.     Progress.

 3          Q.     -- Progress, I'm sorry, apply to a

 4    number of different manufacturing fields?

 5          A.     Yes, it does.

 6          Q.     Not just pharmaceuticals?

 7          A.     Yes, it does.

 8          Q.     Is this a peer-reviewed publication?

 9          A.     Is it peer-reviewed?  I don't know.

10          Q.     Do you know the author of this article?

11          A.     No, I do not know the author.

12          Q.     Well, here at page 40 in this article,

13    it says, "Because 100 percent inspection is only

14    80 percent accurate, even companies that do

15    100 percent inspection will allow one out of five

16    defects to slip through."

17                 Do you see that in your -- this

18    article?

19          A.     Yes.  That's basically from Juran.

20          Q.     What's Juran?  J-U-R-A-N?

21          A.     J-U-R-A-N.  He invented -- basically

22    formulated the current, or at least were the

23    pioneers of the current quality practices, and in

24    Juran's book, he comes up with the 80/20, basically

25    stating that a 100 percent inspection is not

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 195

 1    100 percent effective.

 2         Q.     Was there a --

 3         A.     And he claims -- he claims that there

 4    have been studies done that have corroborated that

 5    over and over.

 6                As a matter of fact, he gives an

 7    example where every time, or frequently, he would go

 8    to a conference, or whatever, and he'd ask a certain

 9    question, and they would respond to -- it looks like

10    you may have it.

11                And, apparently, he sees a high -- high

12    number of people who get that wrong, and -- but it

13    is one of the most consistent, generally-accepted

14    numbers that I'm aware of.

15         Q.     Were the studies Juran replied on -- or

16    relied on published?

17         A.     Were they published?  I'm sure they

18    were, because he -- he references -- I don't know,

19    is really the correct answer.

20                He reference -- references a study, but

21    I don't know if the reference is correct.  But he is

22    a rather reputable gentleman, or was.

23         Q.     Well, is it going to be your opinion

24    that the 100 percent inspection of Batch 70924 was

25    allowed 20 percent of the tablets through as

Mark G. Kenny, Volume I                                      June 29, 2010

Page 196

1    defective?

2          A.     I -- I would not claim that.

3          Q.     Okay.

4          A.     What I would say is that it would not

5    be 100 percent effective.

6                 The issue is that the methodology was

7    not validated, it was not qualified.  There was no

8    way of them knowing what level of detection is

9    possible based upon the operators, the methodology,

10   the through-put, without an understanding of how

11   reliable the inspection method is --

12         Q.     Is that -- go ahead.

13         A.     Without an understanding of the

14   inspection method, you basically are dealing in an

15   unknown area.

16                So you -- you would make the assumption

17   that it is an invalid inspection.

18                It could have more than 20 percent.  It

19   could have less.  There's no way of knowing.

20         Q.     And even assuming there were

21   double-thick tablets in 70924, that somehow evaded

22   the 100 percent inspection, do you think they also

23   evaded the tightened AQL inspection that followed?

24         A.     The tightened AQL inspection is not --

25   it's not much of a -- a challenge.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 197

 1              It tested 1250 tablets out of

 2     4.7 million.

 3              The probability that they would detect

 4     levels of -- of 1, 2 is very low.

 5         Q.     And --

 6         A.     In fact -- go ahead.

 7         Q.     Go ahead.

 8         A.     I said, in fact, the sampling method

 9     they used would allow -- would accept on one reject,

10     which is an incredible, I would say, violation of

11     the whole quality assurance practice.

12         Q.     You'd certainly agree that

13     Batch 70924 A got more inspections than any other

14     batch that you're aware of.

15         A.     I think it did.  I'd say more

16     inspections.

17         Q.     Yes.

18         A.     It got -- it got 100 percent

19     inspections, purportedly.

20         Q.     So even if there were some unknown

21     number of double-thick tablets that made it into

22     containers and went to Mylan, and then downstream to

23     consumers, you don't know how many of them were in

24     any given drugstore; correct?

25         A.     Correct.

Mark G. Kenny, Volume I                                    June 29, 2010

```
 1        Q.      In any given container that a consumer
 2    received; correct?
 3        A.      Correct.
 4        Q.      Whether they went to California, or
 5    Oregon, or Florida, or anywhere else; correct?
 6        A.      I have no idea where they went.
 7        Q.      Wasn't the tightened AQL developed
 8    under the highest level of scrutiny under the mill
 9    standard 105 that you referred to earlier.
10        A.      The -- it was --
11        Q.      First of all, yes or no?
12        A.      Well, the way you phrased it, no.
13        Q.      Okay.  What do you disagree with about
14    that question?
15        A.      Could you repeat the question?
16        Q.      Was the heightened AQL inspection that
17    was done on Digitek Batch 70924 done under mill
18    standard 105?
19        A.      That's not what you asked.
20        Q.      Okay.  I'm asking you a new question.
21        A.      Oh, the new question.  I got it.
22                MR. MILLER:  He asked you to repeat the
23    question.  He was assuming that's what you were
24    doing.  So now it's a new question.
25        Q.      I'm sorry.  Go on.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 199

1        A.      So you're asking what -- sorry.   Now

2    you have to repeat it.

3        Q.      Was the 70924 heightened AQL inspection

4    done according to mill standard 105?

5        A.      I believe it was, yes.   I looked at the

6    numbers and it looks correct.

7        Q.      Was that the highest level of scrutiny

8    under mill standard 105?

9        A.      I don't recall, but I don't believe so.

10               I'd have to go through 105, but I don't

11   believe that's the -- highest standard meaning the

12   highest level of scrutiny, no.   I don't think so,

13   but I'm not sure.

14       Q.      Certainly 100 percent is a higher level

15   of scrutiny than a heightened AQL of that nature;

16   correct?

17       A.      Not necessarily, no.

18       Q.      Now, I asked you a little bit ago

19   whether you had an opinion to a probability as to

20   numbers of tablets that were below or in excess of

21   the USP's API specs.

22               Do you remember those questions?

23       A.      Sure.

24       Q.      And you said you had no opinion as to a

25   probability as to whether those numbers were high or

Mark G. Kenny, Volume I                              June 29, 2010

Page 200

 1   low; correct?

 2        A.     Could you repeat it again?  I want to

 3   make sure that I'm answering the question.

 4              MR. MORIARTY:  Read my question back,

 5   please.

 6              (Requested portion is read back.)

 7              MR. MILLER:  I object to the form.

 8        A.     I'm not --

 9              MR. MILLER:  I'm not so sure I

10   understand what you're asking.

11        Q.     Let me get to my numbers.

12              All right.  Out of 152 recalled

13   batches, if you do the math, it's roughly 688 of

14   a million tablets.  Okay?

15        A.     I recall, yes.

16        Q.     I asked you whether you had an opinion

17   to a probability as to what percentage of those were

18   outside the USP specs high, and you said you had no

19   such opinion to a probability.

20              Am I correct on that?

21        A.     Of the number.  You asked me if I have

22   a probability of a certain number.

23              I have no idea what the number could

24   have been.

25        Q.     Okay.  And I asked the same question as

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 201

1    to low, and you had the same opinion; correct?

2         A.    Yeah.  I have no way of knowing how

3    many were low.

4         Q.    Now, even assuming, if there were some

5    that were outside the specs high --

6         A.    Um-hum.

7         Q.    -- you would have no opinion to a

8    reasonable probability as to how high.

9               Is that right?

10        A.    Well, I know --

11              MR. MILLER:  Objection.

12        A.    I know there's some double thickness,

13   but -- I'm not sure I can answer the question

14   without hearing it again.  I'm sorry.  I must be

15   getting tired.

16              Maybe this is an a good time for a break.

17        Q.    Let's finish this, and then we can take

18   a break.

19              Even if there were some number of

20   Digitek tablets among the recalled batches that were

21   outside the USP specs high --

22        A.    Right.

23        Q.    -- do you have an opinion, to a

24   reasonable degree of probability, as to how far

25   outside the specs high they were?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                            Page 202

 1                    MR. MILLER:  Object to form.

 2                    You can answer.

 3          A.    I have no way of knowing.

 4          Q.    All right.  Same thing on the low side.

 5          A.    I have no way of knowing.

 6          Q.    Okay.

 7                    MR. MORIARTY:  All right.  If you want

 8      to take a break, let's take one now.

 9                    THE VIDEOGRAPHER:  Stand by.  We are

10      going off the record.  The time is 2:52 P.M.  This

11      is the end of Tape No. 4.

12                    (Recess was taken.)

13                    THE VIDEOGRAPHER:  We are back on the

14      record.  The time is 3:02 P.M.  This is the

15      beginning of Tape No. 5.

16          Q.    Have you ever -- Mr. Kenny, have you

17      ever seen any evidence in the material that you

18      reviewed that Digitek was ever cross-contaminated

19      with another product made at Actavis during this

20      time?

21          A.    I saw that cleaning validation wasn't

22      adequate, but I didn't see a product that was

23      cross-contaminated.

24          Q.    Technically speaking, it was not the

25      cleaning validation that was inadequate, it was

Mark G. Kenny, Volume I                                    June 29, 2010

Page 203

1    cleaning validation studies that they found

2    inadequate; correct?

3         A.     Well, that's -- cleaning validation

4    is -- cleaning validation, you automatically add the

5    studies on the end.

6         Q.     Well, what the FDA was concerned with

7    was not the cleaning itself, but how you tested

8    whether the cleaning was adequate; correct?

9         A.     Yes.  But that's cleaning validation.

10        Q.     I just want to be technically correct.

11        A.     And recovery.

12        Q.     Okay.  But you never saw any evidence

13   in anything that there was cross-contamination at

14   any point, did you?

15        A.     I saw no evidence.

16               (Exhibit 21, Amide Investigation Final

17   Report, was marked for identification.)

18        Q.     Now, in the materials you reviewed, and

19   commented on in your report, was Plaintiff's Exhibit

20   128, which my team also marked as Defendant's

21   Exhibit 21.

22               That's the double-thick tablet

23   investigation from 2004; correct?

24        A.     Correct.

25        Q.     And are you aware that the tablet at

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 204

 1    issue was actually made in a batch in 2003?

 2         A.     Yes.

 3         Q.     And there was only one.  Is that

 4    correct?

 5         A.     Only one what?

 6         Q.     Tablet.

 7         A.     There's only -- I believe that's

 8    correct.

 9         Q.     And it was found by a pharmacist.

10                Is that right?

11         A.     I believe that's correct.

12         Q.     Now, I asked you before about the math

13    of this, but if the recall Digitek from mid-2006

14    forward was 688 million tablets, if we did the math

15    from 2003 forward, the number of Digitek tablets

16    made and distributed would be in the billions;

17    correct?

18         A.     If you say so.

19                I have no way of knowing those numbers,

20    but there's probably a lot of them.

21                (Exhibit 20, Summary of Findings, was

22    marked for identification.)

23         Q.     I want to hand you what's been marked

24    as Exhibit 20.

25                Have you seen this document before?

Mark G. Kenny, Volume I                                      June 29, 2010

Page 205

1        A.       This was just submitted to me.  I have

2    not had a chance to review it.

3        Q.       This is a 2004 EIR, is it not?

4        A.       It appears to be.  It says "EI," which

5    tends to mean inspection report.

6        Q.       There are three things I want to ask

7    you about in this document.

8                 So first I'd like you to go to

9    page 4.

10                Let me ask you a preliminary question.

11                In order to be under consent decree, do

12   you have to be in compliance with GMPs?

13       A.       In order -- you have to repeat that.

14       Q.       In order to stay under consent decree,

15   do you have to be in compliance with GMPs?

16       A.       Yes.

17       Q.       Now, go to page 4, the first paragraph

18   under "History Of Business Operations," the fourth

19   line down, it says -- it's referring to a consent

20   decree that was in effect from '92 to 2001.

21                It says, "The consent decree was lifted

22   in 2001 following successful demonstration of

23   sustained cGMP compliance."

24                Do you see that?

25       A.       Yes.

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 206

 1        Q.      And these EIRs, these are FDA

 2    documents.

 3                Is that right?

 4        A.      Correct.

 5        Q.      Now I'd like you to go to page 6.  In

 6    the paragraph about field alert reporting, the --

 7    first of all, are you aware that Actavis notified

 8    the FDA of this 2004 double-thick tablet episode,

 9    they notified the FDA through a field alert.

10                Is that right?

11        A.      That is correct.

12        Q.      And towards the bottom of the paragraph

13    I'm referring to, down here, it says, "No additional

14    complaints or reports of thick tablets have been

15    reviewed for this high-volume product."

16                Do you see that?

17        A.      Yes, I see that.

18        Q.      "The event was considered an isolated

19    incident, and corrective actions were put in place

20    to prevent its reoccurrence."

21                Do you see that?

22        A.      Yes.

23        Q.      Do you have any reason to disagree with

24    the FDA about the statement it made in its EIR at

25    that point in time?

Mark G. Kenny, Volume I                                June 29, 2010

 1        A.      Yes.

 2        Q.      And what's the basis for your

 3    disagreement with the FDA?

 4        A.      Because their investigation, in my

 5    opinion, based upon my experience, was not adequate.

 6    It did not --

 7        Q.      In 2004?

 8        A.      In 2004.

 9                In other words, there -- a complaint is

10    being handled.

11                At that particular point, a very

12    thorough investigation would have been expected,

13    which I did not see.

14        Q.      Did FDA criticize, observe or warn --

15        A.      I don't recall.

16        Q.      -- Actavis about its investigation?

17        A.      I don't recall.

18        Q.      Well, don't you think they would have

19    said so in this EIR, had they been concerned about

20    it?

21                MR. MILLER:  Objection to form.

22        A.      I can't tell you what the FDA would

23    have said.

24        Q.      Okay.  Let's go to page 9.

25                Under "Complaints," the second

Mark G. Kenny, Volume I                                June 29, 2010

Page 208

```
 1   paragraph.

 2            It says, "A larger number of complaints

 3   was also noted for Digoxin tablets; however, it is

 4   the highest volume product, 179 batches manufactured

 5   in 2003/2004, according to the list of batches

 6   produced per year.  There were also no trends

 7   observed for the types of complaints."

 8            Do you have any reason to disagree with

 9   the FDA about those comments?

10       A.    I have no reason to disagree.

11       Q.    Do you have any criticism of FDA's

12   investigation of the field alert that Actavis filed

13   with them in 2004 about this tablet incident?

14       A.    I have no opinion on it.

15       Q.    And are you -- you're aware, are you

16   not, that tablets made in 2003 would not have been

17   included in the recall in 2008?

18       A.    Yeah.  They would not have.  I'm

19   assuming they would not have been within expiration,

20   so they would not have been included.

21       Q.    Now, I told you earlier that I was

22   going to make sure that we had -- we knew all the

23   material you brought with you today, and things of

24   that nature.

25            Okay?
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 209

 1                    These are some documents from your

 2      file.

 3                    I don't know if they were actually

 4      pulled from binders.

 5                    First of all, did you have exchanges of

 6      E-mail with the Plaintiffs' lawyers in this case?

 7           A.       There's been some correspondence, yes.

 8           Q.       Who's been your primary contact with

 9      the Plaintiff's lawyers?

10           A.       I would say Meghan, primarily.

11           Q.       Have you had contact, other than today

12      and maybe yesterday, with Mr. Miller or his firm?

13           A.       Oh, sure.  He was always carbon-copied,

14      or most of the time.

15           Q.       But there's been exchange of E-mail?

16           A.       Yes.

17           Q.       Have you printed all the E-mails?

18           A.       I did print them.  I don't have them

19      with me.

20           Q.       All right.

21           A.       What I tried to do, just for the

22      record, is I tried to take the E-mail that had the

23      long list, as opposed to -- that covered each of the

24      replies, as opposed to, you know, taking each one

25      individually.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 210

1        Q.      All right.

2        A.      You may find it in there.  I didn't

3    find it this morning when I went through it.

4        Q.      So this particular document is

5    something about Juran's Quality Control Handbook.

6    Is that right?  About the 80/20 rule?

7        A.      Yeah.  I tried to quote what was in

8    his -- his documentation -- his book, which I have.

9    I've had the book for 20-plus years.

10       Q.      And here you have Plaintiff's Exhibit

11   133?

12       A.      Yep.

13       Q.      And it has handwriting on it?

14       A.      Yes, it does.

15       Q.      Is that your handwriting?

16       A.      Yes, it is.

17       Q.      And this has to do -- 133 has to do

18   with Quantic's -- Quantic Regulatory Services'

19   investigation, doesn't it?

20       A.      It's hard to tell what it has to do

21   with because it's all blank.

22       Q.      Well, let me make this easy for you.

23              In your own handwriting, in the middle

24   of the page, doesn't it say "Quantic" with the arrow

25   towards the people on the E-mail?

Mark G. Kenny, Volume I                                        June 29, 2010

 1        A.     Yes.  Actually Sal Romano wrote that.

 2   He told me that that is Quantic.  I would have no

 3   way of knowing that because I didn't know who it

 4   was.

 5              Which is meaningless to me other than

 6   the fact that they are a consulting firm.

 7        Q.     Now this document does not have a --

 8        A.     Right.

 9        Q.     -- exhibit sticker on it, and the Mylan

10   Bates number is kind of copied off of the document,

11   but it's a report of December 4, 2006 about an

12   audit.

13        A.     Yes.

14        Q.     Is that right?

15        A.     Yeah.  You're not really showing it to

16   me, but I believe it is.

17              Yeah.  I know that document.

18        Q.     This document that I'm holding looks to

19   be the consent decree from 1992; right?

20        A.     Yes.

21        Q.     This document I'm holding is not Bates

22   stamped, and it has no exhibit sticker.

23              Would you agree with that?

24        A.     Yes.

25        Q.     It is a November 6, 2006 letter to FDA

Mark G. Kenny, Volume I                                    June 29, 2010

Page 212

 1    on Actavis letterhead, is it not?

 2         A.     Yes, it is.

 3                One second.  One second.

 4         Q.     You can hold it.

 5         A.     Okay.  Right.  Okay.

 6         Q.     When did -- is it Mr. Romano or

 7    Dr. Romano?

 8         A.     Dr. Romano.

 9         Q.     When did Dr. Romano cease working on

10    this Digitek matter?

11         A.     Probably around a month ago.

12         Q.     The next document in the stack that I'm

13    holding looks like Exhibit 69 from the Galia

14    deposition.

15                Is that right?

16         A.     Yes.

17         Q.     This is a -- this is deposition Exhibit

18    159.

19                Is that right?

20         A.     Yes.

21         Q.     "Blend failure investigation"?

22         A.     Right.

23         Q.     Now, it has Russ's name above the top

24    redactions.  And Sal's name.

25                What's that all about?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 213

1          A.      Let me look at it.

2          Q.      First of all, there's handwriting all

3    over it.  Is that right?

4          A.      Right.  Yes.

5          Q.      Okay.  Why are Russ and Sal's

6    names above that --

7          A.      Because I -- I don't want to touch this

8    because I know nothing about technical sampling.  I

9    looked at it, and I tried to read it, and I tried to

10   understand.  It was foreign to me.  I didn't

11   understand the -- some of the terminology.  I

12   attempted to, and I said, this is something for

13   either Russ, or if Sal knows something about it,

14   perhaps he can add some insight, which -- which he

15   did not.

16         Q.      All right.  Well, this has to do with

17   blend failure investigation, and there are at least

18   two Digitek batches named in this investigation.

19                 Is that right?

20         A.      I'd have to see it, but I'm sure you're

21   right.

22                 Correct.  Yes.

23         Q.      So if I understand this correctly, you

24   at least looked at this document.

25         A.      Correct.

Mark G. Kenny, Volume I                                      June 29, 2010

Page 214

1        Q.      Is that right?

2                But then because you did not consider

3     yourself to be expert in what they're talking

4     about --

5        A.      The sampling technique, correct.

6        Q.      -- you had Russ and Sal look at it;

7     correct?

8        A.      No.  I put a note that Russ and Sal

9     should look at this.

10       Q.      And do you know if they did?

11       A.      I -- I -- since I never communicated

12    with Russ, I assume if he did, it was by his own

13    volition.

14               Sal, I believe, did take a look at it,

15    and he couldn't add my more depth than I could.

16               I had difficulty following it.

17       Q.      Is that because this blend uniformity

18    sampling and investigation material that's discussed

19    in here is really quality control chemistry issues?

20       A.      I don't know what the issues are.  I

21    can tell you that I don't understand the methodology

22    that's used in order to obtain a representative

23    sample.  They were using terms I'm not familiar

24    with.

25       Q.      Are you -- have you ever been a quality

Mark G. Kenny, Volume I                                    June 29, 2010

                                                            Page 215

 1    control chemist?

 2          A.     No.  I explained that earlier.

 3          Q.     Okay.  The next document I'm holding is

 4    an article called "Drugs with narrow therapeutic

 5    index as indicators in the risk management of

 6    hospitalized patients."

 7          A.     Yes.

 8          Q.     Did you read this article?

 9          A.     I tried to read it.

10          Q.     This is --

11          A.     Then I realized it was -- quite

12    honestly, I had no familiarity with the term, so I

13    went onto the internet to at least see what the term

14    meant, and then I realized when I went into it -- I

15    tried reading it, just to familiarize myself, but it

16    was clearly out of my territory.

17          Q.     All right.  And attached to it is

18    deposition Exhibit 164, 165, and 166.

19                 Is that right?

20          A.     Yes.

21          Q.     Okay.  The last document I'm holding

22    here appears to be a draft, "for discussion purposes

23    only," version of your report.

24                 Is that right?

25          A.     Correct.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 216

1        Q.      To whom did you send this draft?

2        A.      I sent it to Meghan, Sal and Pete.

3        Q.      Was this a first draft?

4        A.      That was a first draft.  The first

5    draft that they saw, right.

6        Q.      And then in here, there's handwriting.

7                Is it your handwriting?

8        A.      All of it's mine.

9        Q.      Is the handwriting based on discussions

10   you had with Plaintiffs' counsel about the draft?

11       A.      It is based upon two things, or three,

12   if you will.

13               One, listening to them.

14               Secondly, coming up with ideas as I'm

15   just going through the document.

16               And then later, going back and looking

17   at and making additional edits as I reread it.

18       Q.      Are you left-handed?

19       A.      Yes, I am.

20       Q.      Did you go to Catholic school?

21       A.      High school.

22       Q.      Backwards checkmarks, telltale sign.

23   Takes one to know one.

24               MR. MORIARTY:  Do you want me to mark

25   these as one exhibit?  How do you want to take this

Mark G. Kenny, Volume I                              June 29, 2010

                                                    Page 217

 1   up, because at some point, I need to have more time

 2   to go through them, and see if I have questions

 3   about them.

 4              MR. MILLER:  I'd like to mark them as

 5   individual exhibits, but something like the article

 6   with the three exhibits attached to it can stay as

 7   one exhibit.  I mean, we don't need to break it up.

 8   But things that are together should stay together,

 9   and those that are apart should stay apart.

10              MR. MORIARTY:  What I'd like to do is

11   give these all to the court reporter --

12              MS. CARTER:  Are you talking about

13   those specific handfuls?  Aren't we going to make

14   copies of the whole thing?

15              MR. MORIARTY:  Well, we'll get there in

16   a minute.  These is what I'm talking about right

17   now.  I'll give them to the court reporter.

18              I will confer with the people in my

19   office as to where we are in exhibits, and then give

20   her the numbers so she can mark them.

21              MR. ANDERTON:  We are at the 91.

22   We've -- and we've already used 100.

23              MR. MORIARTY:  Well, that's where we

24   were yesterday.  Is that okay?

25              MR. MILLER:  Okay.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                           Page 218

     1              MR. MORIARTY:  We still have to go

     2      through these to see if there are things that were

     3      not in Appendix B, but I don't need to mark

     4      everything he brought.

     5              MR. MILLER:  I'm fine with reading the

     6      title of what he brought that's not in Appendix B

     7      into the record, if that works for you.

     8              MS. CARTER:  I didn't know if you

     9      wanted to or not.

    10      Q.      Are you going to be able to readily

    11      identify what is in these binders that is not in

    12      Exhibit B?

    13      A.      No.  I'm -- not readily.  Sorry.

    14      Q.      So you don't have the E-mails with you

    15      today.

    16              Do you have all the attachments to the

    17      E-mails here today?

    18      A.      Attachments to E-mails.

    19              I don't know if there were any

    20      attachments to E-mails.

    21              Like the instructions of -- you know,

    22      legal instructions in deposition.

    23              I don't -- I can't, off the top of my

    24      head, recall any electronics exchanged other than

    25      late copy of the -- on June 15, I think it was, of

Mark G. Kenny, Volume I                                    June 29, 2010

Page 219

1    the draft, or thereabouts.

2         Q.    All right.  Well, at some point I need

3    you to print -- I need you to get us the E-mails.  I

4    need you to print the drafts.

5               MR. ANDERTON:  No.  I want them

6    electronically.

7               THE WITNESS:  Okay.

8               MR. MORIARTY:  He wants them

9    electronically.

10              THE WITNESS:  So how should I do that?

11              MR. MORIARTY:  Put them on a thumb

12   drive.

13              THE WITNESS:  No, I mean how to copy

14   it.

15              MR. ANDERTON:  Just transfer them onto

16   some sort of portable drive, thumb drive, disk.

17        A.    I'm not trying to be overly technical.

18   But how do you take an E-mail and copy it?  You

19   don't even know where the file is located.

20              MR. MILLER:  I'd have to go with him on

21   that.  If told me to put an E-mail on a thumb drive,

22   I'd have no clue how to do it.

23              MR. MORIARTY:  If you -- if you keep --

24   if you keep an -- if you keep an electronic Digitek

25   file and you keep the E-mails in the file, they

Mark G. Kenny, Volume I                                      June 29, 2010

Page 220

 1   should be there.

 2              MR. MILLER:  I think the notice asked

 3   for a hard copy.  I think -- I think it satisfies

 4   your request if he prints them out and provides you

 5   with a hard copy.  He's not going to provide you

 6   with an electronic copy.

 7              MR. ANDERTON:  The note does not ask

 8   for just a hard copy -- or the notice does not ask

 9   for just a hard copy.

10              I will accept hard copies of the

11   E-mails, subject to your preserving and not

12   destroying any of the electronic copies.

13              THE WITNESS:  Certainly.

14              MR. ANDERTON:  And with respect to

15   non-E-mails, other drafts I believe you testified

16   about earlier, that you maintain you still have in

17   electronic format --

18              THE WITNESS:  Yes.

19              MR. ANDERTON:  -- I want those

20   electronically.

21              Anything except an E-mail that relates

22   to this case that you maintain electronically and it

23   isn't part of the binders here, other drafts in

24   particular, you're going to need to transfer onto

25   some sort of portable media.

Mark G. Kenny, Volume I                              June 29, 2010

                                                        Page 221

 1                    THE WITNESS:  That's easy.

 2                    MR. ANDERTON:  Okay.  Fair enough.  And

 3     can -- and there's to be no dealing -- no modifying

 4     it electronically.  Transfer it, hand them the

 5     media --

 6                    MR. MILLER:  They will be PDFs, they're

 7     not going to be Microsoft Words.

 8                    MR. ANDERTON:  No.  I don't want PDFs.

 9     I want them --

10                    MR. MILLER:  You're going to get PDFs.

11     Yeah, I mean, you know, if you're going to take a

12     software and dissect this thing until he gets to the

13     first letter he typed in, I know that kind of stuff

14     is out there.  He's going to give you a PDF, and

15     that's what you're going to get.

16                    MR. ANDERTON:  That's not acceptable to

17     me.

18                    MR. MILLER:  We will --

19                    MR. MORIARTY:  Wait.  I don't want to

20     take up my deposition time.  Preserve everything

21     you've got in your computer on Digitek, and we'll

22     take this up later.

23                    THE WITNESS:  Okay.

24                    MR. MORIARTY:  We're not going to agree

25     on this on my record.

Mark G. Kenny, Volume I                                June 29, 2010

Page 222

1        Q.     Do you have any knowledge of which

2   consumers, or which Plaintiffs in the Digitek

3   litigation, received which batches of Digitek?

4        A.     Which consumers received what batches.

5               MR. MILLER:  Object to form.

6        A.     I'm not sure I understand the question.

7   You mean from the distribution center?

8        Q.     From anywhere.  I mean, Batch 70924

9   went to market; correct?

10       A.     Yes.

11       Q.     And presumably it was disseminated to

12  pharmacies, and some of it, potentially, to

13  consumers.

14              Is that correct?

15       A.     Yeah.

16       Q.     Right?

17       A.     Yes.  Yes.  I'm sorry.

18       Q.     First of all, do you even know for a

19  fact whether any consumers got tablets from 70924

20  before the recall?

21       A.     I have no way of knowing that.

22       Q.     Okay.  So if I went to other batches in

23  the recall and mentioned them by number, would you

24  have any way to know which consumers got tablets

25  from those batches?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 223

```
1          A.     No.  I don't have any way of knowing.

2          Q.     Do you know anything about how the

3     die -- die table set for Stokes BB2 tablet presses

4     is adjusted?

5          A.     No.  That's not my expertise.

6          Q.     Do you have any idea what percent of

7     pharmaceutical manufacturers have tablet presses

8     with weight controls?

9          A.     I have no way of knowing that.

10         Q.     Have you reviewed any manufacturing

11    documents from Actavis Elizabeth?

12         A.     I don't believe so.  No, I don't think

13    so.  I don't recall any.

14         Q.     How many of the 483s between 2006 and

15    2008, January 2006 to April of 2008, specifically

16    refer to Digitek?

17         A.     Specifically refer to Digitek.  I would

18    say there's -- I'd have to look through them, if

19    you'd allow me.  But I think there's --

20         Q.     How many?

21         A.     -- specifically, one.  That's -- I

22    don't -- I'd have to look at them, honestly.

23                If you want me to go to the 483s, I can

24    go through them.

25         Q.     Well --
```

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 224

 1        A.     When you say "specifically," you mean

 2   that mention Digitek?

 3        Q.     Yes.

 4        A.     There's several.

 5               Where Digitek's name is part of the --

 6   is included in the 483.

 7        Q.     All right.  Well, to save you time,

 8   here's what I see, and you tell me if you remember

 9   any other instances, and if you want to look at the

10   documents, fine.

11               In December of -- or February of 2006,

12   the FDA had a 483 about adverse report -- adverse

13   incident reporting.

14        A.     Correct.

15        Q.     You remember that one?

16        A.     Yes.

17        Q.     Then in August of 2006, there was this

18   cleaning validation test method; correct?

19        A.     Correct.

20        Q.     And the AER reporting was fully

21   remediated; correct?

22               MR. MILLER:  Object to form.

23        A.     I don't know if it was or wasn't.

24        Q.     That's not your area of expertise?

25        A.     No.  No, it's not.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 225

1        Q.      Was the cleaning validation test method
2    observation remediated?
3        A.      I believe it would have been, yes.  But
4    I -- I don't recall specifically.  I didn't
5    reconcile it.
6        Q.      Okay.  And then from my review, there
7    are three straight 483s, October of '06, November of
8    '06 and September of '07 in which Digitek is not
9    mentioned at all.
10              Do you remember that?
11       A.      I'd have to look at them.  I suspect
12   that if you looked through it and you don't see
13   Digitek named, that is accurate.  If you want me to
14   take a look at it, I will.
15       Q.      In May of 2008, there were two comments
16   about Digitek.  One had to do with blend uniformity
17   investigations and the other had to do with 70924.
18              Do you remember that?
19       A.      I remember those instances, yeah.
20       Q.      All right.  If you need to look at the
21   483s, I want to make sure that those are the three
22   483s which contain any reference to Digitek
23   specifically.
24              Do you need to check?
25              MR. MILLER:  Object to form.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 226

1              MR. MORIARTY:  What's the matter with

2       the form?

3              MR. MILLER:  It's misleading.  Your

4       whole line of questioning was -- was about

5       mentioning Digitek specifically, and then you

6       changed to summarizing it with -- with mentioning

7       Digitek in any way.  I forget how you mentioned it.

8       We can certainly take a look at it again.

9         Q.    Why don't you check the 483s and tell

10      me if there are any other 483s, besides the three I

11      mentioned, that refer to Digitek.

12             MR. MILLER:  Period.

13        A.    That use the term "Digitek" in there.

14        Q.    Yes.  As a product.

15        A.    Okay.  I understand that.  But if there

16      is -- so I can get clarify here.  If they say that

17      all so-and-so systems are -- are included, do you

18      want me to tell you that I believe that Digitek is

19      part of that universe?

20             In other words --

21        Q.    No.  I'm asking you about Digitek

22      specifically referred to.

23        A.    I'm trying to answer you for Digitek.

24             But if you say something about "all" or

25      "every," it means that Digitek is part of the "all"

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 227

1    or "every," or would be singled out as an exception.

2              So if I went through it, I'd have to

3    say, okay, here are the ones that say Digitek and

4    here are the ones that are -- that are -- are across

5    all operations, and, therefore, Digitek is part of

6    that, even though the name isn't there.

7              I'd have to literally go through -- we

8    could go through line by line.  It would be easy.

9         Q.    I'm asking you about a product, not a

10   system.

11        A.    A product.  Okay.  So now ask the

12   question again.  Maybe I can help you better.

13        Q.    Do you need to look at the 483s to tell

14   me whether or not Digitek is specifically mentioned

15   in any more than the three that I've told you about?

16        A.    I do not need to go through it to try

17   to find -- do a word search for the name Digitek.  I

18   will take your word that that's correct.

19        Q.    All right.  Now, you've seen references

20   in some of these documents to a total failure of the

21   quality system, haven't you?

22        A.    Yes.  Yes.

23        Q.    When FDA has tested Digitek, at least

24   seven times just in the recall batch period alone,

25   and the product met USP specifications every time,

Mark G. Kenny, Volume I                        June 29, 2010

Page 228

1   you can't have a total failure of a quality system

2   regarding Digitek and repeatedly pass USP --

3        A.     That's absolutely not true.

4               It depends on what you mean by total

5   failure.

6               Total failure, to me, means that you've

7   incurred a huge risk in terms of releasing product,

8   whether it be Digitek, whether it be the other drug

9   products, and by -- by having this huge risk, it's

10  a -- it's a huge problem.

11       Q.     Well, you said in your answer it

12  depends what you mean by total failure.

13       A.     Yeah.

14       Q.     What do you mean by that?

15       A.     What do I mean by what?

16              What do I mean by total failure?

17       Q.     No.

18       A.     Total failure --

19       Q.     No.  You said, it depends what you mean

20  by total failure.

21              What do you mean by that?  Does that

22  mean that total failure is in the eyes of the

23  beholder?

24       A.     Of course it is.

25       Q.     Are you talking about total failure of

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 229

1    the quality system from a regulatory standpoint?

2          A.      Versus what?

3          Q.      My question stands by itself.

4          A.      From a regulatory standpoint, is it a

5    total failure?  If I was using the word "total

6    failure," I would say from a regulatory and a

7    quality control standpoint, it is a failure.

8    "Total" is not a good word to use.

9                  Because it -- it's difficult to

10   quantify.

11         Q.      But certainly --

12         A.      It's a significant failure.

13         Q.      Certainly product quality, as defined

14   by the specifications, can still be met under these

15   circumstances; right?

16         A.      Is it conceivable?  Yes.

17         Q.      Well, isn't it a fact when FDA tested

18   seven of the recalled batches itself?

19         A.      It is -- if you're asking the question,

20   can you, in a total failure mode, produce some

21   product that is acceptable, yes, it can.  Whatever

22   "total failure mode" means.

23         Q.      And if some -- and if -- even if we

24   accept the FDA's statement that there was a --

25   somebody's statement that there's a total failure of

Mark G. Kenny, Volume I                                    June 29, 2010

Page 230

1    the quality system, that does not tell you if there

2    was out-of-spec Digitek in the hands of consumers,

3    or if there was, how much there was; right?

4          A.    That -- just that term, no.  It has

5    no -- no precision to it whatsoever.

6          Q.    Was there ever a statement by -- I'm

7    sorry.  Let me rephrase that.

8                Was there ever a final agency

9    determination, in any FDA document, that there was a

10   total failure of Actavis's quality systems?

11         A.    I don't know if they used that term.

12               I think what -- the only term that I

13   recall definitely is when people tried to paraphrase

14   what they felt the FDA either could call the outcome

15   or -- that type of reference.

16         Q.    Do you ever go on FDA's website and

17   study their statistics about compliance actions?

18         A.    Oh, sure.

19         Q.    Do you know how many warning letters

20   were issued in 2008 by the FDA?

21         A.    No.  No, I don't recall.

22         Q.    Do you recall how many recalls there

23   were?

24         A.    No.

25         Q.    Would it surprise you if there were

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 231

1    2,721?

2         A.    Recalls?

3         Q.    In 2008?

4         A.    Would it surprise me?  It may surprise

5    me.  It's a little bit higher than I would have

6    thought.

7         Q.    Do you know how many 483s were issued?

8         A.    No.  It's got to be tens of thousands.

9    It's got to be many.

10        Q.    Do you -- do you know how often FDA

11   issues a 483, percentage-wise --

12        A.    It's in --

13        Q.    -- when they do an inspection?

14        A.    All I know is I didn't get any.

15        Q.    I would assume that other parts of J&J

16   got plenty of 483s; right?

17        A.    They -- other companies did get 483s,

18   surely, just not mine.

19        Q.    Now, before I shift gears and get to

20   your resume and your actual report, let me ask you

21   an open-ended question.

22              If I asked you to prove to me that

23   tablets outside the specifications for active

24   pharmaceutical ingredient actually reached

25   consumers, how would you go about doing that?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 232

1          A.     I'd take a look at all of the -- first
2     of all, all of the exceptions, all the
3     out-of-specifications, all the deviations, all of
4     the departures, whatever -- the exceptions that were
5     done; in other words, the non-conformances that
6     occurred, I'd take a look at those first.  And then
7     determine whether or not, based upon that, there's a
8     reasonable probability that material would be
9     released to the market.  That would be the very
10    first step, which was a big step; meaning
11    energy-wise.
12         Q.     Okay.  Then what would you do?
13         A.     Then --
14         Q.     To check -- because at this point,
15    you're working with the hypothesis, the
16    reasonable -- I'm sorry.  Let me withdraw that.
17               I would assume you'd also look at batch
18    records and quality control testing.
19         A.     That would not be my first step.  The
20    others I'd --
21         Q.     I'm not asking if it's your first step.
22    I'm asking whether it's --
23         A.     You said approach.
24         Q.     -- a step.
25         A.     Is it a step?  Sure.

Mark G. Kenny, Volume I                              June 29, 2010

Page 233

1        Q.      I mean, you'd want to know whether the

2   product passed blend uniformity, in-process testing

3   and finished-product testing, wouldn't you?

4        A.      Yes.

5        Q.      Okay.  What would then be the next

6   step --

7                MR. MILLER:  Objection to form.

8        A.      You got me out of order.  The second

9   step would be looking at complaints.

10       Q.      Okay.

11       A.      And I would look at, did consumers

12  receive product that either they had some type of

13  medical issue, or some type of alleged issue with

14  the conformance of the product to what their

15  expectations were.

16       Q.      Okay.

17       A.      And then I'd go through those records,

18  and I'd determine how many were confirmed and how

19  many were not confirmed.  With the confirmed, I'd

20  say the customer got a product that was out of

21  specification, because they sent a sample and it's

22  out of spec.

23       Q.      Okay.

24       A.      Then I would -- this is off the cuff,

25  but what I eventually -- if your question is would I

Mark G. Kenny, Volume I                                    June 29, 2010

Page 234

1   what eventually look at the batch records,

2   absolutely.  I would take a sampling of the batch

3   records.  I wouldn't look at them all unless, for

4   some reason, I wanted to totally quantify it.

5          Q.     Okay.  Anything else?

6          A.     Let me think about the systems.

7                 I would look at -- yeah.  I would look

8   at systems that affected the quality of the product.

9   I'd take a look at process validation.

10                Basically I would do an audit.  I would

11  look at raw material acceptance.  I would look at,

12  as you said, batch records.  I'd look at preventive

13  maintenance.  I'd look at calibration.  I'd look at

14  in the labs, at lab notebooks, to try to scrutinize.

15                I'd look at standard solutions.  I'd

16  see how they controlled those, and whether or not

17  it's consistent with GMP.

18                I'd go into the micro lab.  I'd look

19  for -- sometimes they have a certain water quality.

20  Normally companies do an annual report of water

21  quality.  And then I'd take a look at the water

22  quality test results themselves.

23                I'd go into the micro lab.  I'd take a

24  look at the facility itself.  I'd take a look at the

25  equipment.  Was it qualified?  I'd ask questions

Mark G. Kenny, Volume I                                    June 29, 2010

Page 235

1   regarding the validation -- or the qualification,

2   rather, of those instruments, for example, an

3   incubator.  I'd ask whether or not it would have

4   been properly qualified, the temperature

5   distribution, whether they used qualified methods or

6   qualified equipment to do that.

7                I'd go through the analytical lab.  I

8   would determine whether or not the equipment that's

9   used to test has been properly qualified.

10               I'd look at the training records of

11  those people that did the tests, to see that they

12  were properly trained.

13               I would then follow through with -- on

14  a manufacturing level -- all -- all the areas I felt

15  that were -- could impact on the quality of the

16  product.

17               Basically as thorough a job -- again,

18  if I wanted to find out as a -- as comprehensively

19  as human -- humanly possible, I would do that type

20  of thing.

21               And I have done stuff comparable to

22  that.

23       Q.    You did not do all of that in this

24  instance; right?

25       A.    I did not, sir.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                          Page 236

    1         Q.      All right.  Now -- but if you're
    2    reviewing the internal documents, like the exception
    3    reports, the out-of-specs, the deviations, the batch
    4    records and the system reviews, what you wind up
    5    with there essentially is a hypothesis of, maybe we
    6    did or maybe we did not send defective product out
    7    into the marketplace; correct?
    8         A.      You'd have to repeat that question.
    9                 If you do -- if you do an analysis from
   10    what standpoint?
   11         Q.      The analysis that you just gave; right?
   12         A.      Right.
   13         Q.      You --
   14         A.      I talked about the exceptions.  That
   15    would have been the first thing.
   16         Q.      I understand that.  But at the end of
   17    that, if you're just looking at the internal
   18    material, at the end of that --
   19         A.      Internal material.
   20         Q.      The company's material.
   21         A.      "Material" meaning chemicals, product?
   22         Q.      Everything you just described except
   23    the --
   24         A.      Those are records, documentation,
   25    etcetera.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 237

    1        Q.      -- complaints.  Okay.  Everything you
    2   described, but the complaints.
    3        A.      Yeah.
    4        Q.      You just come up with a hypothesis that
    5   out-of-spec tablets went out; correct?
    6        A.      No.  I would have enough information,
    7   perhaps, to begin to find instances where product
    8   got out the door.
    9                I mean, I would look at stability.  If
   10   stability failed, product out the door was out of
   11   specification.
   12        Q.      All right.  I understand that.  But did
   13   you see any -- in the material you reviewed, were
   14   there stability failures for Digitek?
   15        A.      For Digitek, I don't recall seeing
   16   them.
   17        Q.      What I'm trying to find out is your
   18   scientific method to -- in your instance, you've
   19   been consulted, how do you prove that defective
   20   tablet actually got out?  Okay?  It seems to me that
   21   at the end of what you just described, except for
   22   the product complaints, so far you cannot actually
   23   prove that defective product left the premises?
   24        A.      No.  The -- what I would say is -- now,
   25   as part of the investigation, I would look at

Mark G. Kenny, Volume I                              June 29, 2010

Page 238

1    retained samples.  I would test retained samples.

2    When there's -- there's enough for a duplicate assay

3    for every single batch we produce.

4              I would test raw material components.

5              I would -- a lot of raw material

6    components are received on certification.

7              I would probably do redundant testing

8    to make sure that, again, we didn't have -- we

9    didn't have unacceptable raw materials.

10        Q.    What if it passed?

11        A.    If it passed, then I would continue my

12   investigation until I exhausted all those things

13   that I felt could be contributory.

14        Q.    What would constitute proof to you,

15   just from the internal documents, that

16   out-of-spec -- let me rephrase that question.  Okay?

17             You've got -- let's assume you've got a

18   very low number of out-of-spec investigations.

19        A.    Right.

20        Q.    Okay?  Let's assume that you have no

21   out-of-spec finished tablet testing.

22        A.    Okay.

23        Q.    Okay?

24        A.    "Finished" meaning commercially-sold

25   product --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 239

 1        Q.      Yes.

 2        A.      -- where you take your sample and --

 3    and use it to release.  We're not talking about

 4    stability, we're not talking about any other

 5    extra -- extraordinary testing.

 6        Q.      Well, let me -- let me continue.

 7        A.      Okay.

 8        Q.      You have a very low number of blend

 9    uniformity issues.  You have no out-of-spec finished

10    product testing.  You have no stability failures.

11        A.      The terms you're using -- I should let

12    you complete your sentence.

13        Q.      Because stability testing is done after

14    release; correct?

15        A.      Right.  It's frightening.  We find out

16    months, if not years, later that what you sold is no

17    good.

18        Q.      Okay.  But you're doing this review

19    after the fact because you're being consulted.

20        A.      You mean --

21        Q.      After a company has released the

22    product, they call you in because they want to know.

23    Okay?

24                So if you've got these things,

25    essentially, going for the product, at what point do

Mark G. Kenny, Volume I                                    June 29, 2010

Page 240

1    you say, I think there's proof that there was

2    defective product that's in the marketplace?

3         A.     As soon as I find a few instances where

4    there's -- where there was defective product.

5         Q.     Okay.

6         A.     And then I say, you know, do you want

7    me to continue to go and try to quantify, try to

8    figure out what batches, you know, it depends on the

9    level of scrutiny that you want.

10                The FDA, for example, when they go in,

11   when they see two or things wrong with a certain

12   system, they may not continue looking at that,

13   because they found out that the system is not

14   adequate.

15        Q.     All right.  And if you were --

16        A.     And that's their approach.

17        Q.     If you were called in on a consulting

18   job like this, for the part about the customer

19   complaints, would you have hired one of your

20   colleagues to come in and do the pharmacovigilance

21   analysis of the customer complaints?

22        A.     Wait.  Pharmaco, I would, myself, want

23   to go through, which I consider arguably the most

24   important feed-back from the customer, which are

25   customer complaints.  I would go through.  I would

Mark G. Kenny, Volume I                                    June 29, 2010

Page 241

1    ask for a summary of all the complaints.  I would

2    ask for some explanation of what they consider

3    critical, what they would consider trivial.

4              I would then ask them to sort, because

5    they'd be in an electronic base, I'd ask them to

6    sort what -- you know, the -- what we both perceived

7    as being potentially critical.

8              I would then look at the levels, the

9    incident levels, of those critical issues.  If you

10   have multiple batches that had the same issue,

11   multiple products, it's 16 complaints within one

12   batch and almost none in others.  So I'd look at the

13   trends, and then I would, myself, go through those

14   batches that were critical, and those complaint

15   records that are alleged to be critical, I would go

16   through those and review those myself, because I

17   would consider it that important.

18        Q.    Okay.  Did you personally consult

19   directly with a pharmacovigilance expert in your

20   work on the Digitek cases?

21        A.    Not at all.

22        Q.    Have you seen any reports of an expert,

23   or from the FDA, that says that there was a

24   pre-recall signal in the AER data to indicate that

25   there was a problem with the drug?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 242

```
 1        A.      I'm not sure what that term is.

 2                I guess not, because I'm not familiar

 3    with that term.

 4        Q.      Which term?

 5        A.      Pre --

 6        Q.      Pre-recall?

 7        A.      Pre-recall -- what is that?

 8        Q.      Signal?

 9        A.      Signal.  I don't recall that term.

10        Q.      To put it another way, has any

11    pharmacovigilance expert told that there was data

12    pre-recall to indicate that there was a problem with

13    Digitek in the field?

14        A.      Well, the only thing I recall was that

15    this was -- this was one of the top, I believe

16    number 3, most complained about product, if you

17    will, with the most issues.  So they needed a

18    high -- they wanted a high level of scrutiny.  That

19    might have been a document from my line.

20        Q.      Well, didn't the FDA, in that EIR that

21    I read you from a little bit ago, say that it was

22    the highest volume product, or one of the highest

23    volume products?

24                Yes?

25        A.      Yes.  Yes.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 243

    1        Q.     And didn't the FDA say that it was no
    2   trend to the adverse event reports?
    3        A.     I believe that's what they said.
    4        Q.     What I'm trying to find out --
    5               MS. CARTER:  Objection to form.
    6        Q.     What I'm trying to find out from you is
    7   whether you have consulted with or seen the report
    8   of FDA, or an expert, to indicate that there was
    9   some pre-recall signal, some pre-recall evidence
   10   that there was --
   11        A.     Associated with adverse experience.
   12        Q.     -- problems -- problem with the Digitek
   13   in the field from customers.
   14        A.     From customers?  I don't recall seeing
   15   that.
   16               MR. MORIARTY:  How far are we on the
   17   tape?
   18               THE VIDEOGRAPHER:  We have about
   19   another 28 minutes left.
   20               MR. MORIARTY:  All right.  Let's -- we
   21   need to take a five-minute break because my
   22   colleague needs to leave.  Okay?
   23               THE WITNESS:  Sure.  I could use it.
   24               THE VIDEOGRAPHER:  Stand by.  We are
   25   going off the record.  The time is 3:54 P.M.  This

Mark G. Kenny, Volume I                                          June 29, 2010

Page 244

 1   is the end of Tape No. 5.

 2              (Recess was taken.)

 3              THE VIDEOGRAPHER:   We are back on the

 4   record.   The time is 4:09 P.M.   This is the

 5   beginning of Tape No. 6.

 6        Q.    When were you first contacted about

 7   being an expert in this case?

 8        A.    Oh, I'm going to guess in February,

 9   perhaps.

10        Q.    Of what year?

11        A.    Of this -- I'd have to -- I think it

12   was February of this year.

13        Q.    And who contacted you?

14        A.    Actually, Sal Romano contacted me.

15        Q.    Who contacted Sal?

16        A.    John Kowalski contacted Sal.

17        Q.    Who is John Kowalski?

18        A.    John Kowalski is a gentlemen, he and I

19   worked -- someone I worked with, a microbiologist,

20   who does consulting.   He took a retirement package

21   similar to what --

22        Q.    Who contacted Mr. Kowalski?

23        A.    I don't know.   Somebody from the law

24   firm.

25        Q.    I assume you're charging Plaintiffs for

Mark G. Kenny, Volume I                                    June 29, 2010

Page 245

1    the time you spend reviewing records, writing

2    reports, and things of that nature.

3           A.      For the most part.

4           Q.      What are you charging them?

5           A.      I'm charging $430 an hour.

6           Q.      And then today, I assume I'm being

7    charged for the time spent questioning you; right?

8           A.      Yes.  I want to be sarcastic, but I

9    won't be.

10          Q.      How much are you charging me?

11          A.      Whatever the rate would be.

12          Q.      $430 an hour?

13          A.      Yes.

14          Q.      How did you come up with $430 an hour?

15          A.      We were told that they would pay 400.

16   We -- they asked us to bring in an expert on

17   tableting.  As part of standard consulting

18   agreements, he would have been part of the SpyGlass.

19   We decided that that was not the best use of Russ,

20   but then we had a loss of income, so we said that we

21   would like to get for ourselves another $30 an hour,

22   which we said did seem fair enough.  So each of us

23   went from 400 to $430 an hour.

24          Q.      When you say "each of us," are you

25   talking about you and Sal?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 246

1          A.      Sal and -- Sal, so when Sal billed --
2    bills -- billed, he would get $430 an hour, also.
3          Q.      And how was it -- I'm sorry.  Were you
4    done?
5          A.      Yes.
6          Q.      How was it decided that you would sign
7    the report and testify, as opposed to Sal?
8          A.      Because Sal's schedule would not
9    allow -- the visits, the deposition dates, the
10   potential trials, he's beyond busy.
11         Q.      All right.
12         A.      So it sounded like something he could
13   do to begin with, and he felt he couldn't do it.
14         Q.      And then did -- the Plaintiffs sent you
15   some material; correct?
16         A.      The Plaintiffs sent me material --
17         Q.      Plaintiff.
18         A.      Yes.
19         Q.      And you reviewed it?
20         A.      Correct.
21         Q.      Did you have a full opportunity to read
22   whatever they sent you?
23         A.      Yeah.
24         Q.      Did you have an opportunity to ask them
25   for additional documents if you wanted to?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 247

 1        A.     Yes.

 2        Q.     Did you -- did they let you know that

 3   there were depositions going on of various company

 4   witnesses?

 5        A.     No.

 6        Q.     You never knew that?

 7        A.     I suppose I knew it.

 8               I didn't -- it wasn't important to me.

 9        Q.     All right.  Did you --

10        A.     Because it's the facts and data that I

11   wanted to look at.  I didn't -- quite honestly,

12   never went through the deposition process, so it

13   wasn't totally clear to me what -- what all these

14   records -- what records would be collected,

15   etcetera, and what would be available.

16        Q.     So after you reviewed what they sent,

17   did you ask to see any additional data?

18        A.     I asked to see a ton of additional

19   data.

20        Q.     Did you get the data you asked for?

21        A.     I received what they had.

22               MR. KAPLAN:  That's not the question.

23        Q.     Did you ask for anything that you

24   didn't get?

25        A.     I'm sure, yeah.  I'd have to go back

Mark G. Kenny, Volume I                                June 29, 2010

Page 248

 1    through what I requested, but, yeah.

 2              Like I requested to go to the -- an

 3    audit, and it just -- just didn't seem -- later on,

 4    it just didn't seem practical or worthwhile.

 5         Q.    Okay.  Anything else that you asked for

 6    that you didn't get?

 7         A.    I suppose there is.  I'd have to go

 8    backwards -- or I'd have to go back in time and

 9    reconstruct that.

10         Q.    Would that be documented in the

11    E-mails, or other materials --

12         A.    That may be documented, yeah.

13         Q.    And then after reviewing whatever you

14    did have available, you wrote a report.

15              Is that right?

16         A.    That is correct.

17         Q.    And your signature appears at page 35

18    of that report.

19              Is that right?

20         A.    Correct.

21         Q.    And you had all the opportunity to

22    write this and include what you thought were the

23    significant things about this litigation.

24              Is that right?

25         A.    If it was available.

Mark G. Kenny, Volume I                                June 29, 2010

Page 249

1          Q.      And you had --

2          A.      I was told that the information is what

3     it is at that point.

4          Q.      And you had an opportunity later, after

5     writing a first draft, to discuss it with the

6     Plaintiffs' lawyers.

7          A.      That's right.

8          Q.      And it's come to this final version;

9     correct?

10         A.      Correct.

11         Q.      And you were aware that the purpose of

12    this was to put us on notice of all your opinions

13    about my client, Actavis, and Mr. Kaplan's client,

14    Mylan; right?

15         A.      Yes.

16         Q.      And you tried to do that?

17         A.      I did it as well as I knew how.

18         Q.      According to your resume, you got your

19    bachelor's degree in mechanical engineering.

20                 Is that right?

21         A.      That's correct.

22         Q.      And then you did some graduate work at

23    Iowa State?

24         A.      That's correct.

25         Q.      Did you -- did you get a degree from

Mark G. Kenny, Volume I                                    June 29, 2010

                                                           Page 250

    1    Iowa State?

    2          A.     I did not.

    3          Q.     You did some graduate work in

    4    biomedical engineering at the University of Rhode

    5    Island?

    6          A.     Correct.

    7          Q.     Did you get a degree from the

    8    University of Rhode Island?

    9          A.     No, I did not.

   10          Q.     At that point, you went and started at

   11    Ethicon; correct?

   12          A.     Ethicon, Inc.

   13          Q.     Was that all devices?

   14          A.     That was devices, correct.

   15                 I worked at quality assurance

   16    supervisor, and where we did certain level of

   17    inspection, visual inspection.  That was

   18    ineffective.  And I worked as -- I will call it a

   19    validation engineer for the last two-plus years.

   20          Q.     Do you have any of the Six Sigma

   21    degrees or --

   22          A.     I have a lot of training, yeah.

   23          Q.     Well, do you -- do you get degrees

   24    or --

   25          A.     Yeah, I have a -- I have a green belt.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 251

     1          Q.     Okay.  And is -- is the Six Sigma

     2     System valuable in -- in what you do?

     3          A.     Is it valuable?  It's a tool.  And if

     4     used properly, it can be valuable.

     5                 It sometimes is almost the opposite,

     6     but...

     7                 Because there's an expectation of what

     8     it can do that's not achievable.

     9          Q.     All right.  Then you worked from '86 to

    10     '89 -- wait a minute.

    11          A.     Then I went to Corporate.

    12          Q.     Well, what did you do between '79 and

    13     '86?

    14          A.     '79 and '86, I worked in

    15     Johnson & Johnson International, which became

    16     Johnson & Johnson Corporate.  I ended up going back

    17     there again.  You know this HIV company I explained

    18     to you?  Well, we went out of business, and as we

    19     closed the doors, I was looking for a job.  There

    20     were people, apparently, even though I didn't know

    21     them, at Corporate who said, we'd be glad to have

    22     you, you know, temporarily.  I had no interest in

    23     going back to the job, meaning full-time.  So I

    24     worked there for almost two years until I found

    25     something that I felt was -- would use my skills.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 252

```
 1                So I worked a total, I'll say, nine --
 2    say nine-plus years at Johnson & Johnson Corporate.
 3        Q.     On any specific products?
 4        A.     All products.  I -- I constantly moved.
 5    I can give you a little history, but it's up to you.
 6        Q.     When you were with Ortho Pharmaceutical
 7    from '86 to '89, was any of that solid oral dose?
 8        A.     Yeah.  90 percent.
 9        Q.     Did you work on any patch technology?
10        A.     Patch -- no.  It was not -- it was not
11    a viable technology at Ortho at that particular
12    time, that I recall.
13                I didn't work on it.
14        Q.     '89 to '91, you were at IOLAB.
15        A.     IOLAB, correct.
16        Q.     That's another Johnson & Johnson
17    company?
18        A.     Yes.
19        Q.     Was it solid oral dose?
20        A.     No.  It was interocular devices,
21    implantable devices, and also phacoemulsifier,
22    emulsifiers, which are electronic instruments used
23    during surgery, and we did -- they did chemicals,
24    but I don't think they're -- I don't think
25    they're -- no.  They're a device, not a drug.
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 253

```
 1          Q.      '92 to '95 at Advanced Care Products,
 2     was that solid or oral dose?
 3          A.      No.  That was topical.
 4          Q.      '95 to '97, Direct Access Diagnostics.
 5                  Was that solid oral dose?
 6          A.      No, it was not.
 7          Q.      Johnson & Johnson CPWW from '98 to '04.
 8                  Was that solid oral dose?
 9          A.      There was -- there was one, but there
10     were two to three, different -- most of it was
11     topical, and we did have some solid dosage form
12     products.
13          Q.      When you worked on solid oral dose
14     products at Johnson & Johnson, did you ever have
15     batches that were put on hold?
16          A.      Did we -- of course.
17          Q.      Did you -- I assume you rejected
18     batches from time to time?
19          A.      Rejected batches from time to time,
20     yes.
21          Q.      I didn't ask you this when I was asking
22     you about what you charge for litigation consulting,
23     but do you know what you charged the Plaintiffs'
24     lawyers to date for this litigation?
25          A.      Well, I have one bill in.  I don't
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 254

1    remember exactly, but we just got paid.  Probably --
2    I don't remember.  20-some-odd-thousand would be for
3    me.
4         Q.    Billed?
5         A.    Billed.  Yeah.  I would get about
6    $25,000.
7         Q.    And how much unbilled time do you have?
8         A.    I don't know.  But it's probably
9    equivalent to that.
10        Q.    So you may have as much as $40,000
11   worth of work into this case even before today?
12        A.    Yeah, I would say yeah.
13        Q.    40 or 50.
14        A.    Yeah, I put in a lot more hours that
15   I'm not billing, but when you put in a 16-hour day,
16   I bill for 8.
17        Q.    Have you talked -- other than with
18   somebody from Motley Rice, or Pete Miller, and Sal,
19   have you talked to anybody else about this
20   litigation?
21        A.    Not a human being, other than they know
22   I'm doing some kind of litigation.  That's it.
23        Q.    Do you advertise yourself as an expert
24   in any trade journals of any type?
25        A.    No.  No.  I do not.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 255

```
 1        Q.      Have you seen the expert reports of any
 2   of the other Plaintiffs' experts in this case?
 3        A.      No.  Not a single one.
 4        Q.      Do you have any military experience?
 5        A.      ROTC.
 6        Q.      Where?
 7        A.      University of Dayton.  It was required
 8   first two years.
 9        Q.      Where are you from originally?
10        A.      New Jersey.  Jersey City I was born in.
11        Q.      Have you ever had a faculty position at
12   any school?
13        A.      No.
14        Q.      Have you ever published any articles
15   about quality work in the pharmaceutical industry?
16        A.      I -- I have published, if you will,
17   within Johnson & Johnson Worldwide.  I was the
18   creator of Johnson & Johnson Worldwide guidance
19   documents when I was there, and I wrote procedure --
20   not procedures guidance documents, that affected all
21   companies worldwide.  So they would read it and they
22   would use that as a minimum acceptable approach
23   to -- to -- that quality control subject.
24        Q.      Have you ever published anything
25   outside Johnson & Johnson?
```

Mark G. Kenny, Volume I                              June 29, 2010

Page 256

 1        A.      No.  I had no interest in doing it.

 2        Q.      Have you ever taught at any seminars on

 3   quality assurance outside --

 4        A.      Seminars, no.  I trained --

 5        Q.      -- outside J&J?

 6        A.      Outside J&J, no.

 7        Q.      So do you consider yourself to be an

 8   expert in regulatory for the pharmaceutical

 9   industry?

10        A.      I consider myself an expert on systems

11   and controls.

12        Q.      Quality systems?

13        A.      Quality systems and controls.

14               MR. KAPLAN:  Was that "no" to

15   regulatory?

16               THE WITNESS:  Well, it encompasses

17   regulatory.  It's interpretation of regulatory and

18   in real fashion.

19               My -- my objective -- my objective --

20   well, I can explain it.  My objective --

21               MR. KAPLAN:  Well, he's asking the

22   question.  I just didn't hear.  I didn't know

23   whether you -- he asked the question, do you

24   consider yourself an expert in regulatory affairs.

25               THE WITNESS:  In regulatory affairs --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 257

1              MR. KAPLAN:  And I didn't hear that.

2        A.     Regulatory affairs is a much bigger

3    picture.  I do not consider myself expert on

4    regulatory affairs.  Regulatory affairs would --

5    would go into reporting.  It would go into other

6    aspects, medical aspects, which I have no -- no

7    experience in, and no interest.

8        Q.     In Tab 3 of the documents that were

9    contained in your Appendix B is a 483 from 2004.

10               Do you remember that?

11       A.     Well, I've read them all, so, yes, I

12   would remember it.

13       Q.     This precedes the recall of Digitek;

14   right?

15       A.     2004, yes.

16       Q.     And --

17       A.     Do you want me to pull the document?

18   Is that worthwhile?

19       Q.     Digitek isn't mentioned in this 483, is

20   it?

21       A.     I don't know.  I'd have to look at it.

22       Q.     I'm handing you my copy of that 483.

23       A.     The name "Digitek" does not appear on

24   that document.

25       Q.     And since this precedes by -- the

Mark G. Kenny, Volume I                                    June 29, 2010

Page 258

1    recall by several years, and since it doesn't refer

2    to Digitek, can we agree that this 2004 483 has

3    nothing to do directly with whether any consumer got

4    out-of-specification Digitek?

5          A.      No.  I would not say that.

6          Q.      Why not?

7          A.      I would say any time there is GMP

8    concern that affects -- potentially affects across a

9    system, I'm always concerned, as a quality

10   professional, that we could have released -- if it's

11   my company -- that we could have released defective

12   product.

13               Certainly, we are releasing, if it's

14   significant enough, adulterated product.  Now let's

15   determine whether or not a defective product, as we

16   would define as out-of-specification, went out the

17   door.

18               I would take that 483 very seriously.

19         Q.      Well, I'm not suggesting you wouldn't,

20   and I'm sure -- would you agree the FDA takes these

21   seriously?

22         A.      I think that's their job, so I would

23   make that assumption.

24         Q.      So if they had a concern about Digitek,

25   and found either GMP violations or

Mark G. Kenny, Volume I                                June 29, 2010

Page 259

1    out-of-specification results for Digitek, it's

2    likely that they'd address it in this 483.

3         A.    I don't know.  You'd have to talk with

4    them.

5         Q.    Tab 4 in your Appendix B was a

6    Complaint For Permanent Injunction.

7               Are you an expert at all on the legal

8    effect of a Complaint For Permanent Injunction?

9         A.    No, I am not.

10        Q.    Have you ever been sued?

11        A.    No.  Thank goodness.

12        Q.    Have you ever sued anyone else?

13        A.    Never will.

14        Q.    Well, you might have a customer stiff

15   you.  You might want to sue them for your fees.

16        A.    I would never do that.

17        Q.    You get it all up front?

18        A.    No.  The exact opposite.  If I don't

19   understand that customer well enough that I know I'm

20   going to get paid, it's my fault.

21        Q.    Okay.  But you --

22        A.    So I would not sue them.  No.

23        Q.    You don't know what the legal import of

24   this document is.

25        A.    No, I don't.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 260

 1        Q.      Do you know what a complaint is, just
 2   an accusation?
 3        A.      I believe I do.
 4        Q.      Not -- not proof of what's contained
 5   it?
 6        A.      Right.
 7                MR. MILLER:  Object to the form.
 8        A.      I believe that's correct, but I'm not
 9   an expert on the subject.
10        Q.      In Tab -- I already asked you that.
11                Your Reference 14 was Plaintiffs'
12   Exhibit 137.  Okay?
13                And it's -- I'm not sure who drafted
14   it, but it's essentially a summary of an August 2006
15   GMP inspection.
16                Is that right?
17        A.      Yes.  It appears that.
18        Q.      Is there anything in that document
19   about out-of-specification Digitek?
20        A.      I'd have to look through it.
21        Q.      Go ahead.
22                MR. MILLER:  I object to form in that
23   it's misleading.  Sometimes you say "specifically
24   Digitek," and sometimes "Digitek."  So you need to
25   let him know --

Mark G. Kenny, Volume I                                June 29, 2010

                                                            Page 261

 1                  MR. MORIARTY:  What's the difference?

 2          Q.    Is the word "Digitek" in that document?

 3    Did it talk about Digitek out-of-specs?

 4          A.    Repeat your question.  I don't have to

 5    look at -- I see you have it.

 6          Q.    What's the difference between "Digitek"

 7    and "specifically Digitek"?

 8          A.    Can I give you an example?

 9          Q.    Because I'm going to get a mouthful

10    about, well, if they say it about Aprodine, it must

11    apply to Digitek.

12                I want to know if Digitek out-of-spec

13    is in that document.  That's what I want to know.

14          A.    In -- indirectly.

15          Q.    Directly.  Is Digitek --

16          A.    No, not Digitek --

17          Q.    -- out-of-spec in there?

18          A.    I'm not trying to wordsmith it, but the

19    word "Digitek" does not appear in this document,

20    that I could see.

21          Q.    Okay.  Well, when you say indirectly,

22    show me what you're referring to.

23                Give me an example.

24          A.    We'll take the first one.

25                "Failure to fully investigate errors.

Mark G. Kenny, Volume I                                June 29, 2010

Page 262

1    All lab data not included with batch records.

2    Manufacturing deviations not always documented."

3              Well, that's a situation where you

4    don't know whether it includes Digitek or not, and

5    the assumption has to be, since there are so many

6    examples, that the system is out of whack, and that

7    you would have no way of assurance that if Digitek

8    had an issue, it would be part of the examples that

9    they looked at.

10        Q.    Have you done anything to determine

11   whether, in fact, Digitek was ever determined to

12   fall into this broad heading?

13        A.    The -- I don't need to do that.

14        Q.    Why not?

15        A.    Because when a quality system that cuts

16   through a company is found to be out of control, it

17   implicates all of the products.  And certainly when

18   I looked through records, I would look specifically

19   for the name Digitek, and if I found it, I would try

20   to make note of it and try to understand if it was

21   one of the specific examples that were used.

22              If you say that the -- if you don't

23   have a system to report out-of-specifications, I'm

24   never going to see the -- unless I looked at the

25   hard data, you know, going through laboratory

Mark G. Kenny, Volume I                                June 29, 2010

 1   records that don't appear in batch records, there

 2   would be no way of me knowing that they occurred

 3   unless I looked at them.

 4              So by saying that I can't find them,

 5   I'm saying that, you know, that Digitek is part of

 6   that.  I can't find if it did exist.

 7              MR. KAPLAN:  I'm going to move to

 8   strike the last answer as not responsive to the

 9   question that was asked.  You were asked, did you do

10   anything to determine.  Your answer was, I don't

11   need to do it.  The question was, did you do

12   anything.  Yes or no.  Did you?

13              MR. MILLER:  And that is an answer, yes

14   and no is not always required.

15              MR. KAPLAN:  Did you do anything?

16              THE WITNESS:  Did I do anything?  Yes.

17   Did I --

18              MR. KAPLAN:  Did you follow up on that?

19              THE WITNESS:  I -- I followed up on --

20              MR. MILLER:  Objection.  Asked and

21   answered.

22              THE WITNESS:  -- in that -- in that.  I

23   had a limited amount of information that was given

24   to me.

25              When I see, let's say, a qualified

Mark G. Kenny, Volume I                                      June 29, 2010

                                                              Page 264

 1    individual come up with example after example, and
 2    find that there is significant holes in the system,
 3    particularly where the information -- they're saying
 4    the information is not processed, it's not even --
 5    they don't even discover it.  Then I have to make
 6    the inference that it includes the entire population
 7    of products, of which Digitek is part of that
 8    population.
 9              You don't know what you don't know.
10              MR. KAPLAN:  So everything you're
11    saying is based on an inference.
12              THE WITNESS:  It is not an inference.
13              MR. MILLER:  Objection to form.
14              MR. KAPLAN:  That's what you said.
15              THE WITNESS:  No, I did not say --
16    well, if I said "inference," I used the wrong word.
17    I would say it's part of -- it would be -- do you
18    want me to explain?
19              MR. KAPLAN:  I really don't.
20              THE WITNESS:  Okay.
21              MR. KAPLAN:  I really want you to
22    answer that question.  That's why I moved to strike.
23              MR. MORIARTY:  Let me get back on my
24    track.
25         Q.    This is a -- the first column of this

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 265

1    Plaintiffs' Exhibit 137 is a statement out of a 483

2    observation or a warning letter; correct?

3          A.     I believe that's correct.

4          Q.     Which we established six hours ago, or

5    more, was not a final agency action of the FDA;

6    correct?

7          A.     Correct.

8          Q.     So would you concede that this may not

9    apply to Digitek, this observation?

10         A.     Okay.  It -- it -- could I concede that

11   there are -- there's a possibility that, for

12   whatever reason, a system breakdown only occurred

13   with the specific examples that they found?  I would

14   say there's a possibility, not a high probability.

15         Q.     Okay.  But you are assuming this

16   applies to Digitek.  Is that right?

17                MR. MILLER:  Objection to form.

18         A.     I'm assuming that it applies to

19   everything, because it is a system issue.  It's like

20   you -- if you go to five places, only five places,

21   and you find people weren't trained, you make the

22   assumption.  You're not going to go to every

23   single -- do a 100 percent inspection, if you will,

24   of every single position to find out if they're

25   adequately trained.

Mark G. Kenny, Volume I                                      June 29, 2010

Page 266

1              You have enough information to say the

2    training program is not in effect.

3        Q.    Okay.  So you're assuming it applies to

4    Digitek, is the short answer.

5              MR. MILLER:  Object to form.

6        A.    You say -- you say I'm assuming.

7              I'm saying that the system -- there's a

8    system issue.  Digitek is affected by that system;

9    therefore, it does not have a reliable system and,

10   therefore, affects, or potentially affects, Digitek.

11       Q.    But you haven't seen any direct proof

12   of this problem with Digitek, from this Exhibit 137.

13       A.    No.  I have not seen the name Digitek

14   associated as -- as an example with that.

15       Q.    All right.  And in just for this

16   example, "The failure to fully investigate errors,

17   all lab data not included within batch records,"

18   does not necessarily indicate that the final product

19   was outside its specifications, does it?

20       A.    Quality -- I'll tell you how the a

21   quality assurance and myself --

22       Q.    Yes or no.

23       A.    You have to repeat it.

24       Q.    No.  I want to know -- I want to know

25   whether this specific observation, "Failure of the

Mark G. Kenny, Volume I                          June 29, 2010

Page 267

1   quality unit to fulfill its responsibilities," is

2   the general statement.  "Failure to fully

3   investigate errors, all lab data not included within

4   batch records," that doesn't necessarily mean the

5   finished product is going to be out of

6   specifications, does it?

7                MR. MILLER:  Objection.  Asked and

8   answered.

9        Q.     Even for the specific product they're

10  talking about here.

11               Is that right?

12       A.     Can I reread it again, please?

13       Q.     Sure.

14       A.     I have no specific examples that I know

15  of where the FDA has found that would fall under

16  this category, specifically to Digitek.  This -- it

17  falls under this category because it's part of a

18  control system that affects the quality of Digitek

19  product.

20       Q.     And my next question, which I would

21  like an answer to, is whether the failure to fully

22  investigate errors and all lab data not included

23  with batch records, that doesn't necessarily mean

24  that the finished product is out of specification.

25  Is that correct?

Mark G. Kenny, Volume I                              June 29, 2010

                                                        Page 268

1          A.      It sure -- it sure potentially

2     implicates it as a potential out-of-specification.

3          Q.      Potentially.

4          A.      Correct.

5          Q.      But it doesn't necessarily --

6          A.      No.

7          Q.      -- follow as night does day.

8          A.      Correct.  That is correct.

9          Q.      Your Tab or Reference 15 is Exhibit 25.

10                 A February 1, 2007 warning letter.

11    Okay?

12                 Does it say anything in there about

13    Digitek tablets being out of specification, or

14    equipment used to make Digitek being not qualified?

15         A.      I'm going to have to read it.

16         Q.      Fire away.  Specifically.

17         A.      I understand -- I understand your

18    question now.

19                 If I can breeze through this, there are

20    no products specifically mentioned in this.

21         Q.      Okay.

22         A.      At least as I'm going through it.

23         Q.      All right.

24         A.      They talk about system failures.

25         Q.      Your Reference 21 is Exhibit M-16 from

Mark G. Kenny, Volume I                                    June 29, 2010

Page 269

1    Susie Wolf's deposition.

2                  Do you see that?

3         A.      Yes.

4         Q.      And it's a document about

5    Batch 80202 A; correct?

6         A.      Yes.

7         Q.      And a hold was put on that batch.

8                  Is that right?

9         A.      That is correct.

10        Q.      Now, do you know whether that batch was

11   ever distributed to the market?

12        A.      802 -- 80202 A, bulk tablet was

13   released --

14                  THE REPORTER:  Sir, you have speak up,

15   and speak slowly.

16                  THE WITNESS:  Oh, I'm sorry.

17        Q.      Talking to yourself is a bad idea.

18        A.      I was talking to everybody.  You just

19   didn't hear me.

20                  The -- what I put down here, and I

21   believe it's accurate, is, "Bulk tablet lot was

22   released to fill and packaging, only later to be

23   placed on hold due to a tablet weight issue.  They

24   indicated that this is one of the problem child."

25                  This is grammatically incorrect, but --

Mark G. Kenny, Volume I                              June 29, 2010

Page 270

1    so what -- what this implies is that they found out in

2    packaging that which they should have found out in

3    tableting.  Okay?  In other words, a product that is

4    out of weight should not -- or any defect, for that

5    matter -- should not be discovered in a subsequent

6    operation.

7         Q.    But it was discovered and not released

8    to the market; correct?

9         A.    It appears that way, yes.

10        Q.    You won't find it on the recall list;

11   correct?

12        A.    I'd have to compare it to the recall

13   list, but I would make that assumption.

14              Shall I give this back to you?

15        Q.    In your references was number 26, which

16   is Exhibit M-14 from the Wolf deposition.

17        A.    Yeah.

18        Q.    It's an E-mail, and it says here,

19   "Connie," and it gives two batch numbers, "have

20   assays too low."  Do you see that?

21        A.    Yes.

22        Q.    And then it gives numbers of 96.2 and

23   97.3 as the assay numbers; correct?

24        A.    Um-hum.

25        Q.    Are you familiar enough with the USP

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 271

 1   monograph to know that those assays are well within

 2   the specification?

 3                   MR. MILLER:   Object to form.

 4        A.      The way I read this, they could put

 5   100 percent.   It is not what I'm looking at.

 6                   When somebody says, in management,

 7   Susie Wolf says that the assays are too low, these

 8   may or may not be accurate information.   Something

 9   is going on.   You just don't say something is within

10   specification when, in fact, it's not.   Only a

11   person who should be working for the competition

12   should be saying that.

13                   And they are looking now at another

14   batch, 71004 A1, because, apparently, it's not being

15   implicated with a low assay.   So that number, to me,

16   is immaterial.   This is -- this is not somebody

17   who's saying the specification is, the USP states X,

18   this is -- this is -- and, therefore, this is Y,

19   and, therefore, it's out of specification, or it's

20   in specification.

21        Q.      Do you know who came up with those

22   assay numbers?

23        A.      No.

24        Q.      So you don't know whether those are

25   from Actavis or not; right?

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 272

 1        A.     Whether they're -- no.  I don't know
 2   where those numbers came from.
 3        Q.     Do you know whether Mylan or UDL
 4   subsequently had Celsis labs test any of those
 5   batches?
 6        A.     No, I don't.
 7        Q.     Do you know, in fact, whether or not
 8   those particular batches were out of specification,
 9   by anybody's measurements?
10        A.     Give me the batch numbers again,
11   please.
12        Q.     709 --
13        A.     I'd like to look at them myself.
14        Q.     Sure.
15        A.     Okay.  Please ask your question.
16        Q.     Okay.  My question was, do you know
17   whether or not these batches were ever tested as
18   actually out of spec by anyone?
19        A.     No, I don't know if they were.
20        Q.     In fact, do you know whether --
21   withdraw that last question fragment.
22             Okay.  In your references was number
23   33.  It was a Plaintiffs' Exhibit 172.  It's an
24   E-mail at Actavis from Jisheng Zhu, J-I-S-H-E-N-G,
25   Z-H-U, in March of 2008.

Mark G. Kenny, Volume I                                June 29, 2010

 1                     Do you see that?

 2          A.      Yes.

 3          Q.      And he's referring to three impurities

 4   in some Digoxin batch test.

 5                     Do you see that?

 6          A.      Yes, I do.

 7          Q.      Do you know whether, in fact, these

 8   were investigated?

 9          A.      Were they investigated?  I don't know.

10   I'd have to go back and research it.

11                     No, I don't know if they were

12   investigated.

13                     Can I read the statement again?

14          Q.      Sure.

15          A.      This appears to be self-explanatory.

16   Someone that said that they took a look at the

17   results, released data, and then all three lots

18   showed high impurities.  It's quite simple.

19          Q.      No.  My question is:  Do you know

20   whether these instances were investigated?

21          A.      No, I do not know if they were.

22          Q.      Do you know anything about whether the

23   impurities, if there were impurities, affected the

24   potency of any of these three lots?

25          A.      I am not technically qualified to

Mark G. Kenny, Volume I                          June 29, 2010

                                                      Page 274

 1   answer that.

 2        Q.     Your Reference 45 is a 483 and some

 3   associated data from 1999.

 4               What was the specific relevance of a

 5   1999 483 to your opinions in this case?

 6        A.     45?  I was looking for the -- any

 7   repeat pattern.

 8        Q.     Okay.  A repeat pattern of regulatory

 9   issues?

10        A.     Of GMP issues.

11        Q.     And there is nothing in this 483, your

12   reference number 45 --

13        A.     Yes.

14        Q.     -- about Digitek, is there?

15        A.     Can I read it one more time?

16               Well, the products are crossed out.  I

17   would have no way of knowing.

18        Q.     Well, just so you know, we didn't

19   redact Digitek out of it, because that's what the

20   litigation is about.

21        A.     Okay.  So my assumption is that none of

22   these are Digitek, that Digitek name does not appear

23   in this document.

24        Q.     Okay.  May I have that back, please.

25               Number 52, reference 52, is Plaintiff's

Mark G. Kenny, Volume I                                June 29, 2010

Page 275

1    Exhibit 168.  It's a packaging memo about why there

2    were two additional Digitek bottles in the

3    repackaging of 70924.  Okay?

4             What was the significance of this to

5    your opinions in this case?

6        A.    Okay.

7        Q.    If any.

8        A.    I did have some.

9             The -- this memo, or whatever it is, is

10   issued by Scott Talbot.  It is undated.  It is

11   unapproved.

12            What that immediately tells me, forget

13   about the content, per se, he is trying to explain

14   why something happened.

15            An unapproved, undated document is --

16   is not a -- does not provide me evidence that an

17   adequate investigation was done.  Here I see what

18   looks like some logical accounts of what the person

19   did, and trying to explain why -- why they had extra

20   tablets as a result of something that should have

21   had less tablets.

22            So I'd say -- I looked at this

23   immediately from a GMP compliance standpoint.  How

24   could you possibly issue a memo that's not dated,

25   not signed, and should be part of an investigation.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 276

 1    It's horrendous.

 2         Q.      Well, it doesn't say there are extra

 3    tablets, does it?  It says there are extra bottles.

 4         A.      Extra bottles, which means extra

 5    tablets.

 6         Q.      Well, if the fill machine is off by a

 7    tablet even every couple bottles, it is going to

 8    fill additional bottles; correct?

 9         A.      If it is off by a fraction -- I'm

10    sorry.  Could you repeat that?

11         Q.      The fill machine is putting maybe 100

12    tablets in a bottle.  I think for this batch, I

13    think they were all 100.  I don't remember what the

14    bottle count was.

15         A.      Yeah.

16         Q.      But even if it is off by one tablet

17    every couple of bottles you are going to get extra

18    bottles, aren't you?

19         A.      Using your assumption, if there is --

20    if the original process put more tablets in than the

21    labeled amount, and then the subsequent process put

22    the correct amount in, then one would assume that

23    the reasons for extra units is due to the fact that

24    you put too much in to begin with.

25         Q.      And that can happen; right?

Mark G. Kenny, Volume I                           June 29, 2010

Page 277

```
 1        A.      That can certainly happen.

 2        Q.      Okay.  Because these filling machines

 3   are not accurate enough to regularly put in 100

 4   tablets per bottle, through a run as large as this;

 5   correct?

 6        A.      Correct.  I would like to offer my

 7   experience, though.

 8                I have found very, very few instances

 9   where a company put too many tablets in.  In fact, I

10   have seen quite the opposite, and I can provide

11   examples, if you like.

12        Q.      Well, that's not the issue with this.

13                I think the point you were making is --

14        A.      GMP.

15        Q.      -- to you this is a GMP issue about is

16   this signed, authorized, etcetera.

17        A.      Because the value, even if it were a

18   very logical explanation, the value of it is nil.

19   It is a gross violation of GMP.  And how that

20   document could have been created and distributed,

21   and how anybody would have received it and not

22   kicked it back to the original person to make sure

23   it wasn't signed or dated, is beyond me.

24                It's a total -- talk about a breakdown,

25   this is a significant breakdown.
```

Mark G. Kenny, Volume I                          June 29, 2010

Page 278

```
 1        Q.     Okay.  And that is a classic example of
 2   how a -- in your view, a GMP violation may not
 3   affect the identity, purity, or potency of the
 4   tablets in the bottle; right?
 5        A.     No.  No.  I don't agree with that at
 6   all.
 7               I know nothing about that.  They had an
 8   overage.  Everybody would have expected that they
 9   lost tablets.  In other words, when they are doing
10   their inspections, they are going to see tablets,
11   perhaps, that have specks on them, that have chips
12   on them.  Every time you handle a tablet you will
13   abuse the tablet and ultimately end up with,
14   perhaps, cosmetic issues, but -- content issues,
15   too, if it has a chip.
16               So one would logically assume as part
17   of the ongoing production and handling of that, that
18   that number would dwindle.
19               There are no records in the 100 percent
20   inspection that even -- even referred to were there
21   any other defects found.  All it refers to is that
22   there were 20 total from that particular batch.
23               So it is void of information.  And I
24   make no assumptions on a letter that's not signed.
25   I -- I would say that that is a classic GMP issue,
```

Mark G. Kenny, Volume I                                    June 29, 2010

Page 279

1    of which I wouldn't respond to the content because

2    it is unofficial.

3         Q.     Okay.  I am not asking about the

4    content of the memo.

5                You wouldn't use your reference 52 as a

6    GMP violation that proves that the tablets were out

7    of specification, would you?

8         A.     Let me see how I used it, please.

9                I'm having a hard time finding those

10   small -- 53.  Here's an example -- ask your

11   question.  I'm sorry.

12        Q.     I want to stick with your reference 52.

13               You wouldn't use this memo as proof

14   that the tablets in these bottles were outside the

15   USP specifications, would you?

16        A.     I would use that -- I -- I couldn't use

17   that as an example.  What it tells me, though, is

18   things are so lax associated with that particular

19   process, I now question the competency of the people

20   that are even writing and reading these things.

21               So if I -- if I don't feel confident in

22   the person, now I really have an issue.  It is a

23   bigger issue than the content in that explanation.

24        Q.     Your reference 60 is to the "all

25   product recall" that followed the Digitek recall.

Mark G. Kenny, Volume I                                    June 29, 2010

1                 Is that correct?

2                 It's a press release.

3                 Here you can look at it.  Right here.

4      A.     Yes.  Yes.

5      Q.     Are you aware --

6      A.     I cut and pasted that.

7      Q.     Are you aware that that recall was not

8   to the consumer level?

9      A.     I believe that I was aware of that,

10   yes.

11                Yes, I was aware.

12                MR. MORIARTY:  All right.  The next

13   thing I want to get into is his report.

14                Off the record, please.

15                THE VIDEOGRAPHER:  Stand by.  We are

16   going off the record.  The time is 5:01.

17                (Exhibit 47, Expert Opinion of Mr.

18   Kenny and CV is received and marked for

19   identification.)

20                THE VIDEOGRAPHER:  We are back on the

21   record.  The time is 5:14 P.M.

22      Q.     Mr. Kenny, I had marked as Exhibit 47 a

23   50-page document.

24                Do you see this?

25      A.     Yes.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 281

1        Q.    And the beginning of it is your report

2    in this case.

3              Is that right?

4        A.    Correct.

5        Q.    Also contained within Exhibit 47 is --

6    are a number of appendices.

7              Is that right?

8        A.    Well, at the tail end.

9              I think it started with my resume.

10       Q.    Right.  Here is the list of appendices

11   at page 36.

12             Is that correct?

13       A.    Yes.

14       Q.    And then the appendices are your CV.

15       A.    Right.

16       Q.    B is the references.  C is a chronology

17   of lot 70924.

18             Is that right?

19       A.    Yes.

20       Q.    D is a press release of the Digitek

21   recall.

22             Is that correct?

23       A.    Yes.

24       Q.    And E is what I call the all products

25   recall press release.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                            Page 282

     1                    Is that right?

     2        A.     Yes.

     3        Q.     And then F is a summary of FDA

     4    observations and events.

     5        A.     That's right.

     6        Q.     Do you know who drafted the summary?

     7        A.     I did.

     8        Q.     Summary of FDA observations and events?

     9        A.     Yes.  I went through the observations

    10    and tried to put them into layman's terms,

    11    hopefully, or more easily understood terms.

    12        Q.     Okay.  Now, we issued a notice for your

    13    deposition.

    14                    Did you actually see the notice?

    15        A.     Yes, I did.

    16        Q.     And it asked you to bring a certain

    17    group of documents, did it not?

    18        A.     Yes.

    19        Q.     Let me go through some of the ones that

    20    I have questions about.

    21                    Number 2, "All correspondence,

    22    communication between the witness or anyone acting

    23    on the witness' behalf, and attorneys representing

    24    Plaintiffs in this Digitek litigation."

    25                    Did you bring all the correspondence?

Mark G. Kenny, Volume I                                    June 29, 2010

 1        A.      No.  I -- I didn't have the time to do

 2    it.

 3        Q.      You are going to supply it?

 4        A.      Absolutely.  I'm obligated.  I

 5    personally feel obligated.

 6        Q.      Has -- is Sal signatory to any of the

 7    correspondence with the Plaintiffs' lawyers?

 8        A.      What do you mean by "signatory"?

 9        Q.      Signed.

10        A.      No.  His name -- his signature is

11    nowhere.

12        Q.      Has Sal billed for time related to the

13    Digitek litigation?

14        A.      Yes, he has.

15        Q.      Does he bill you or the Plaintiffs'

16    lawyers?

17        A.      He, in essence, bills me, and then I

18    put it into the -- I put it into an invoice which

19    goes to the Plaintiffs' lawyers.

20        Q.      Are you doing any other litigation

21    consulting besides the Digitek litigation?

22        A.      I have never done it, and I'm not doing

23    it.

24        Q.      Okay.  This is the only one?

25        A.      This is it.

Mark G. Kenny, Volume I                              June 29, 2010

                                                    Page 284

     1        Q.      When you consult with pharmaceutical

     2   clients, do you bill them by the hour?

     3        A.      I try not to bill by the hour, per se.

     4                What I try to do is no greater than,

     5   because I know what it's like to receive a bill.  So

     6   what I do is I try to very carefully craft what my

     7   deliverables are.  I craft exactly how I think I am

     8   going to get to that deliverable, how much time it

     9   is going to take.

    10                I try to put some allowance in there

    11   for invariably stuff happens, but I put very little

    12   of that in.  And then I tell them that I am going to

    13   bill by the hour but it will not exceed that number.

    14   And that's the way I have done 90 percent of my

    15   billing.  This is an exception.

    16        Q.      And what do you bill pharmaceutical

    17   clients per hour?

    18        A.      Well, it depends upon -- I am going on

    19   an audit to Wales.  I am going to bill them 300

    20   and -- about $300 an hour.

    21        Q.      Do you bill any of your pharmaceutical

    22   clients $430 an hour?

    23        A.      You mean like -- no.  No is the answer.

    24        Q.      Item 3 on what we asked you to bring

    25   is, "All other documents prepared by the attorneys

Mark G. Kenny, Volume I                                        June 29, 2010

Page 285

 1    for the Plaintiffs and sent to you."

 2             Did you bring those?

 3        A.    No, I did not bring them with me.

 4        Q.    You are going to produce those?

 5        A.    Yes.  I am going to produce exactly

 6    what you asked for.

 7        Q.    Do you have a retainer agreement with

 8    them?

 9        A.    I received a retainer.

10        Q.    Do you have a retainer agreement?

11        A.    I don't even know what that is.

12        Q.    A fee agreement.

13        A.    A fee agreement?  Oh, yes.  Yes.

14        Q.    Is that among the correspondence that

15    you will produce?

16        A.    I wasn't realizing that was part of it,

17    but I will be glad to produce that.

18             So it also includes any business

19    dealings.  Is that it?

20        Q.    It does.

21        A.    Okay.

22        Q.    It says here -- number 6, all bills

23    that you've rendered to the attorneys and law firms

24    in connection with this.

25        A.    Yes, I do.  Since I knew I couldn't do

Mark G. Kenny, Volume I                                    June 29, 2010

 1    it, I didn't go through it with a fine-tooth comb to

 2    determine how to get it.

 3           Q.     And --

 4           A.     Which I will, though.  I will go

 5    through that with a fine-tooth comb.

 6           Q.     And I think you said you issued one

 7    bill?

 8           A.     That's right.

 9           Q.     For what period of time did that cover?

10           A.     That covered up until, I don't know,

11    March -- March sometime.

12           Q.     When is the next bill going to go out?

13           A.     The next bill is going to go out almost

14    immediately.  But I was waiting to get the money

15    before I sent a second bill.

16                  I don't want to say money is not an

17    issue, but it's not -- it's not my driving force.

18           Q.     I understand.

19                  Number 9, everything that you reviewed

20    that indicates that Plaintiffs ingested defective

21    Digitek.

22                  What did you bring responsive to number

23    9?

24           A.     Would you repeat that again?

25           Q.     It says --

Mark G. Kenny, Volume I                                    June 29, 2010

Page 287

```
 1        A.      I haven't read it in that detail.

 2        Q.      It says, "Everything the witness

 3   reviewed that indicates that the Plaintiffs ingested

 4   defective Digitek."

 5        A.      What did I bring to where?  As part of

 6   the --

 7        Q.      Well --

 8        A.      -- reference information and stuff that

 9   I read?

10        Q.      You were supposed to bring any

11   documents that indicated that Plaintiffs, people,

12   consumers --

13        A.      Yeah.

14        Q.      -- who have sued my client, actually

15   took defective Digitek.

16        A.      I haven't even thought about that

17   question.  I would have to think about it, determine

18   what -- what I've sent to them and then, basically,

19   formulate whether or not it falls into that

20   category.

21        Q.      Did you read any medical literature?

22        A.      No, I have no interest in it.

23        Q.      Now, you mentioned Mr. Kowalski, or

24   someone else --

25        A.      John Kowalski.
```

Mark G. Kenny, Volume I                                     June 29, 2010

Page 288

1       Q.      John Kowalski.  Has he billed any time
2   to the Digitek work?
3       A.      I have no idea.  I haven't talked to
4   John in years.
5               We know each other through a lot of
6   dealings years back.
7       Q.      And to whom do you send your Digitek
8   bills when you send them?
9       A.      I send them through Meghan, which goes
10  to some -- I don't know, somehow they pay it.
11      Q.      Okay.
12              MR. KAPLAN:  So you haven't been paid?
13              THE WITNESS:  No.  We did get paid two
14  days -- we received a check either Monday or Friday.
15  I don't recall.
16              MR. KAPLAN:  You just said you hadn't
17  been paid.
18              THE WITNESS:  No.  No.  No.  I said I
19  got -- I did receive a check.  And I said now --
20              MR. KAPLAN:  How much was it?
21              MR. MILLER:  Objection.  Asked and
22  answered.
23              THE WITNESS:  To be honest, I am not
24  trying to avoid it, the money is not that much of an
25  issue to me.  I just kind of throw more money in the

Mark G. Kenny, Volume I                                    June 29, 2010

Page 289

1    bank.  It's not why I do this job.  I don't do it so

2    that I can count up all this money.  I do it because

3    I enjoy it, and I'm helpful, and I get paid well in

4    all of my assignments.

5        Q.     Does Sal have an ongoing role, or do

6    you contemplate one in the Digitek consultation?

7        A.     No.  I have no intentions of involving

8    him at all.  It would be inappropriate at this

9    point.

10       Q.     In 2010, to date, how much of the

11   income of SpyGlass is related to the Digitek

12   litigation work versus your pharmaceutical

13   consulting?

14       A.     Well, I have contracts for -- I figure

15   100,000, I have another contract for 40,000, so

16   that's 140, I'll get -- I am going on a proposal

17   tomorrow and I'm going to get it, and that will be

18   billed at somewhere between 250 and $300 an hour,

19   depending on the work, because it is not as

20   technically challenging, so I like to keep it lower

21   if it is not using my -- my -- my strategic

22   abilities.

23              So having said that, right now, based

24   upon what I know I'm going to get, it -- the 25,

25   whatever it is, thousand dollars represents one -- I

Mark G. Kenny, Volume I                                    June 29, 2010

Page 290

1    don't know, one quarter, or something like that.

2              MR. KAPLAN:  I'm -- I'm going to move

3    to strike that last answer.

4              The question was simply to date, not

5    what you're going to get, not what --

6              THE WITNESS:  But I have contracts.

7              MR. KAPLAN:  It was, to date, what

8    percentage of your income has been represented by

9    your consulting.  It is to date.

10             MR. MILLER:  He is attempting to answer

11   that.

12       A.    Well, I got 22, I got -- to date

13   probably half of that one.  So to date 75,000, so

14   this is one quarter.  If I am getting 100,000, this

15   is one quarter.

16       Q.    Okay.  And what percentage of your time

17   is the Digitek litigation versus your consulting

18   work?

19       A.    The time?  Over the last several

20   months, it's been very high.  Higher than I

21   anticipated.  And it represents probably half.

22       Q.    Okay.  And how many times before you

23   wrote your report did you have in-person meetings

24   with the Plaintiffs' lawyers?

25       A.    Before I wrote the report?  I had no

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 291

 1    in-person meetings.

 2            Q.     All the communication was --

 3            A.     Was on the phone.

 4            Q.     -- phone or E-mail?

 5            A.     Yes.

 6            Q.     Did you have any video conferences with

 7    them before you wrote your report?

 8            A.     No.

 9            Q.     Did you meet with them in person

10    regarding the revisions to your draft reports?

11            A.     I met with them once regarding the

12    revisions.

13            Q.     When was that?

14            A.     Oh, a month ago, something like that.

15            Q.     And with whom did you meet before today

16    to prepare for your deposition?

17            A.     To prepare for my deposition, I met

18    with nobody.

19                   Oh, you mean met with physically?

20            Q.     Yeah.

21            A.     Before -- well, before today, I met

22    last night.

23            Q.     With whom?

24            A.     With Meghan.

25            Q.     For how long?

Mark G. Kenny, Volume I                                    June 29, 2010

Page 292

```
 1        A.      You mean how long did we talk about

 2   work, or how long did I see her?

 3        Q.      How long did you spend preparing for

 4   your deposition?

 5        A.      You mean with her or without her?

 6                I have to understand what you are

 7   talking about.

 8        Q.      With Meghan.

 9        A.      Oh, with Meghan?  I don't know.  An

10   hour.

11        Q.      Obviously, you spent time reviewing

12   documents again.

13        A.      Again, I went back and reread, you

14   know -- reread this, took a look at some of the 43s,

15   tried to -- yeah.  Took a look at those kinds of

16   things.

17                Spent very little time with Meghan.

18                We did go to dinner together, but that

19   was all casual.

20        Q.      And, at the outset of this project,

21   what was your understanding of what your function

22   was or your role?

23        A.      My role was to determine whether or not

24   this company was in compliance with GMPs over a

25   certain period of time, which turned out to be 2004
```

Mark G. Kenny, Volume I                                      June 29, 2010

                                                              Page 293

 1   to 2009, and to determine whether or not products

 2   that were violative were released.

 3          Q.    I understood your answer except for one

 4   word.

 5                When you said "violative," do you mean

 6   violative of cGMP regs?

 7          A.    cGMP regs, yes, and whether or not

 8   defective product was released.

 9          Q.    When you say "defective," what do you

10   mean BY defective?

11          A.    Product which does not meet finished

12   product specification requirements or stability

13   requirements.

14          Q.    I'm sorry.  Defective, in your mind,

15   means doesn't meets stability requirements or what

16   was the other element?

17          A.    Does not meet product specification

18   requirements.

19                MR. KAPLAN:  You said "finished

20   products."

21          A.    Finished.  Products specif --I

22   understand that you -- I am going to correct myself

23   and say product specifications.

24          Q.    Okay.  And what product specifications?

25          A.    Any specifications that would implicate

Mark G. Kenny, Volume I                                    June 29, 2010

Page 294

 1   that a defective product was in the field.

 2            So it could be, let's say, content

 3   uniformity, or bulk specification testing,

 4   tableting, packaging, finished product sampling,

 5   stability testing, any point along the way which

 6   would also implicate or -- or you would determine

 7   that defective product either was or highlight that

 8   it could have been released.

 9        Q.    Okay.  So is it your opinion that

10   product that didn't meet stability requirements for

11   Digitek was released to consumers?

12        A.    You are going to have to repeat that

13   question.

14        Q.    Do you have an opinion, to a

15   probability, about whether Digitek that didn't meet

16   the stability requirements reached consumers in the

17   recalled batches between 2006 and 2008?

18        A.    Stability, I have no -- I saw no data

19   to suggest that that would have been an issue.

20        Q.    Do you have an opinion, to a

21   probability, that product that did not meet the USP

22   finished product specifications made it to consumers

23   between 2006 and 2008?

24        A.    I think product did reach the consumer

25   s that is out of specification to a reasonable

Mark G. Kenny, Volume I                                   June 29, 2010

Page 295

 1    degree of certainty.

 2         Q.     Now, I asked you earlier how much

 3    product, how far out of spec, all of those things,

 4    and you had no opinions to quantify it; correct?

 5         A.     Correct.

 6         Q.     All right.  So what is the basis for

 7    your opinion that product not meeting the USP

 8    finished product specifications made it to

 9    consumers?

10         A.     Because of there are so many systemic

11    system issues, that it's -- it's difficult for me to

12    believe that product didn't get through.  And in my

13    heart of hearts that's what I believe.

14         Q.     So if I had to summarize the

15    methodology of your analysis for that answer that

16    you just gave me, you look at the cGMP violations,

17    and you conclude or opine that it is, therefore,

18    difficult for you to believe that

19    out-of-specification product didn't get through?

20              MR. MILLER:  Object to form.

21         Q.     You can answer.

22         A.     You are going to have to repeat it,

23    please.

24              MR. MORIARTY:  Read it back, Carol,

25    please.

Mark G. Kenny, Volume I                                    June 29, 2010

                                                              Page 296

 1                    (Requested portion is read.)

 2          A.      I would say that's accurate.

 3                    MR. MILLER:  It is after 5:30, Matt.

 4     Is this is a good time to wrap it up?

 5                    MR. MORIARTY:  This is probably the

 6     perfect breaking point.

 7                    MR. KAPLAN:  Before we go off the

 8     record, and I know that Matt has not finished his

 9     questioning -- I'm Harvey Kaplan, and I represent

10     Mylan.

11                    THE WITNESS:  I'm sorry.  What?

12                    MR. KAPLAN:  I represent Mylan, the

13     other Defendant --

14                    THE WITNESS:  Yes.

15                    MR. KAPLAN:  -- in the litigation.

16                    So I haven't had a chance to examine

17     you.  I will have a chance when you come back.

18                    There was a notice sent for your

19     deposition here today, and you said you saw the

20     notice.

21                    THE WITNESS:  Yes, I did.

22                    MR. KAPLAN:  And it -- it lists 13

23     categories of documents that you were requested to

24     bring.

25                    THE WITNESS:  I'll assume that's

Mark G. Kenny, Volume I                                    June 29, 2010

Page 297

1    correct.

2                MR. KAPLAN:  And I want you to please,

3    before your next deposition, not only carefully

4    review those 13 categories, but please bring those

5    documents with you, because we will surely ask you

6    for all of those things.  Okay?

7                THE WITNESS:  Understood.

8                MR. MILLER:  And just to be clear,

9    Harvey, when you said Matt was finished asking

10   questions --

11               MR. KAPLAN:  I said he was not

12   finished.

13               MR. MILLER:  Not finished.  Okay.  I'm

14   sorry, Harvey.

15               MR. KAPLAN:  I said Matt has not

16   finished. I've never gotten to begin my questioning.

17               MR. MORIARTY:  I have not finished.

18               MR. MILLER:  I totally understand.  And

19   I will have questioning, as well, so...

20               MR. KAPLAN:  Good.  Then we shall meet

21   again another day soon, I presume.  Probably the

22   same place.

23               THE WITNESS:  This place is fine with

24   me.

25               MR. KAPLAN:  If that's okay.

Mark G. Kenny, Volume I                                    June 29, 2010

Page 298

 1                MR. MORIARTY:  All right.  Off the

 2     record.

 3                THE VIDEOGRAPHER:  Stand by.  We are

 4     going off the record.  The time is 5:35 P.M.  This

 5     is the end of tape number 6.

 6                (Proceedings concluded at 5:34 p.m.)

 7                     J U R A T

 8

 9                I DO HEREBY CERTIFY that I have read

10     the foregoing transcript of my deposition testimony

11     and I certify that is it true and correct to the

12     best of my knowledge.

13

14

15                Mark G. Kenny

16

17     SWORN AND SUBSCRIBED

18     BEFORE ME ON THIS

19     DAY OF          2010

20

21     Notary Public of the State of

22

23

24

25

Mark G. Kenny, Volume I                                    June 29, 2010

Page 299

 1   ATTACH TO DEPOSITION OF:  Mark G. Kenny

 2   IN THE MATTER OF:  In Re: Digitek Product Liability
                        Litigation
 3
     DATE TAKEN:  June 29, 2010
 4
                     E R R A T A   S H E E T
 5
                 INSTRUCTIONS:  After reading the
 6   transcript of testimony, please note any change,
     addition or deletion on this sheet.  DO NOT make any
 7   marks or notations on the transcript itself.

 8
                 Please sign and date this errata sheet.
 9
     PAGE           LINE                    CHANGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23
     DATE and SIGNATURE:
24

25

Mark G. Kenny, Volume I                                    June 29, 2010

Page 300

 1                       CERTIFICATE

 2

 3              I, CAROL ANN SHEPARD, a Certified Court

 4      Reporter of the State of New Jersey, License No.

 5      30X100101900, do hereby certify that prior to the

 6      commencement of the examination, MARK G. KENNY was

 7      duly sworn by me to testify the truth, the whole

 8      truth and nothing but the truth.

 9              I DO FURTHER CERTIFY that the foregoing

10      is a true and accurate transcript of the testimony

11      as taken stenographically by and before me at the

12      time, place and on the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I am neither

14      a relative nor employee nor attorney nor counsel of

15      any of the parties to this action, and that I am

16      neither a relative nor employee of such attorney or

17      counsel, and that I am not financially interested in

18      the action.

19

20

21      _____

22      Certified Court Reporter of the State of New Jersey

23

24      Dated: July 2, 2010

25

Page 301

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

                    MDL NO. 1968


IN RE: DIGITEK PRODUCT        )CONTINUED
        LIABILITY LITIGATION  )VIDEOTAPED DEPOSITION
                              )OF:
                              )MARK G. KENNY
_____X
                          VOLUME II



        TRANSCRIPT of the stenographic notes of
The proceedings in the above-entitled matter, as
taken by and before JANE D. WATSON, a Notary Public
of the State of New York, held at the office of
Harris Beach, 100 Wall Street, New York, New York
10005 on Wednesday, February 16, 2011, commencing at
9:50 a.m.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 302

```
 1   A P P E A R A N C E S:

 2

 3   MOTLEY RICE

 4        28 Bridgeside Boulevard

 5        Mount Pleasant, South Carolina 29464

 6   BY: MEGHAN CARTER, ESQ.

 7   Counsel for Plaintiffs

 8

 9   SHOOK, HARDY & BACON, L.L.P.

10        2555 Grand Boulevard

11        Kansas City, Missouri 64108-2613

12   BY:  HARVEY L. KAPLAN, ESQ.

13   Counsel for Mylan

14

15   TUCKER, ELLIS & WEST

16        515 South Flower Street, 42nd Floor

17        Los Angeles, California 90071

18   BY:  MICHAEL ANDERTON, ESQ.

19   Counsel for Actavis

20

21   ALSO PRESENT:

22   Chris Martin, Videographer

23   Peter Cooper, Videographer in training

24   Rick Fern, Esq. (in a.m.)

25
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 303

1                    I N D E X

2   WITNESS                            PAGE

3   Mr. Kenny         Mr. Kaplan        305

4                     Mr. Anderton      526

5                     Ms. Carter        578

6

7                     EXHIBITS

8   IDENT.            DESCRIPTION             PAGE

9   Exhibit 110       Folder                  400

10  Exhibit 111       Chronology from disks   417

11  Exhibit 112       E-mail                  432

12  Exhibit 113       Amended notice for video

13                    Deposition              445

14  Exhbts  114-139   Documents brought by the

15                    Witness in milk crates  447

16  Exhibit 140       First draft report      466

17  Exhibit 141       Draft of expert report  482

18  Exhibit 143       E-mails                 527

19

20

21

22

23

24

25

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 304

```
 1              THE VIDEOGRAPHER:  Good morning.

 2        We're on the record.  Today's date is

 3        February 16, 2011, and the time is 9:50 a.m.

 4        This is the continuation of the videotaped

 5        deposition of Mark Kenny.  The caption on

 6        this case is In Re: Digitek Product

 7        Liability Litigation.  Case number -- I'm

 8        sorry -- MDL number 2:09-CV-121.  Case filed

 9        in the U.S. District Court, Southern

10        District of West Virginia, Charleston

11        Division.  We're at the office of Harris

12        Beach, 100 Wall Street, New York, New York.

13        This deposition was noticed by Attorney

14        Matthew Moriarty of the firm Tucker, Ellis &

15        West.  The videographer is Chris Martin.

16        The court reporter is Jane Watson.

17             At this time, will Counsel please

18        introduce themselves for the record.

19             MS. CARTER:  Meghan Carter for the

20        Plaintiffs.

21             THE WITNESS:  Mark Kenny.

22             MR. KAPLAN:  I'm Harvey Kaplan, Shook,

23        Hardy & Bacon for Mylan.

24             MR. ANDERTON:  Michael Anderton,

25        Tucker, Ellis & West for the Actavis
```

Mark Kenny, Volume II          Videotaped               February 16, 2011

                                                            Page 305

   1          defendants.

   2               THE VIDEOGRAPHER:  At this time, the

   3          court reporter will swear in the witness.

   4    M A R K   K E N N Y,   called as a

   5    Witness, having been duly sworn by a Notary

   6    Public, was examined and testified as follows:

   7

   8    EXAMINATION BY MR. KAPLAN:

   9          Q.    Good morning, Mr. Kenny.

  10          A.    Good morning.

  11          Q.    I think we met when your deposition

  12    was taken on June 29 of last year, June 29, 2010 in

  13    Newark, New Jersey, right?

  14          A.    Correct.

  15          Q.    At that time, you were examined by

  16    Mr. Moriarty on behalf of Activas, right?

  17          A.    That's correct.

  18          Q.    He took pretty much the full day, so I

  19    didn't have a chance to ask you questions, and today

  20    is my opportunity to examine you on behalf of my

  21    client, Mylan.

  22          A.    I understand.

  23          Q.    How are you doing?

  24          A.    I'm doing well, thank you.

  25          Q.    All right.  Good.  I know that you had

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 306

1   recent Achilles heel surgery, and we're sympathetic

2   to your situation.  And as I told you, if you need

3   breaks throughout the day, all you need to do is say

4   that you need a break and we'll do that.  Okay?

5          A.    Thank you.  It's much appreciated.

6          Q.    All right.  Just as you came to the

7   deposition on June 29, 2010 prepared to give your

8   opinions in this case -- you did?

9          A.    Yes.

10         Q.    You came prepared at that time, didn't

11  you?

12         A.    Yes.

13         Q.    And you are today prepared to give

14  opinions in this case; isn't that right?

15         A.    Yes, I am.

16         Q.    And all the work that you did in

17  preparation for any opinions that you will offer in

18  this case are contained within your report which was

19  dated June 15, 2010?

20         A.    That is correct.

21         Q.    And that report is in front of you?

22         A.    That is correct.

23         Q.    That -- that has all of your opinions,

24  right?

25         A.    That is correct.

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 307

```
 1          Q.    You stand by that report?

 2          A.    Yes, I do.

 3          Q.    Or -- or is there anything you want to

 4   withdrawal or modify?

 5          A.    I stand by the report.

 6          Q.    Stand by the report.  Okay.  And have

 7   you done any further work since June 15, 2010 with

 8   respect to --

 9          A.    Yes, I have.

10          Q.    What have you done?

11          A.    I've looked at some of the Mylan

12   exhibits again, I reviewed them.

13          Q.    Why?

14          A.    To familiarize myself with the

15   documents, refamiliarize, since it was a long time

16   ago that I reviewed it.

17          Q.    What -- what Mylan exhibits did you

18   look at?

19          A.    I have all of the Mylan exhibits here.

20          Q.    Okay.  But -- but I'm interested in

21   particularly what is it that you looked at and --

22          A.    Well, I'd have to pull it and show you

23   what --

24          Q.    Well, why don't you pull it and show

25   me what you looked at.
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 308

1          A.    Okay.  The vast majority of them are
2    ones that are referenced in my report.  One of the
3    issues if you --
4          Q.    Just -- there's -- there's a simple
5    question, and I'm going to ask you -- we'll get
6    through this a lot faster.  Don't -- don't go off
7    and give me narrative answers, just concentrate on
8    the question I ask, okay?
9          A.    I understand.
10         Q.    So my question is -- here's the simple
11   question:  You said that since your deposition was
12   taken on June 29, 2010, you reviewed some additional
13   Mylan documents?
14         A.    That's correct.
15         Q.    And my question is which documents did
16   you review, have you reviewed, since June 29, 2010?
17   That's all I want you to do is identify those.
18         A.    They're in this particular binder.
19         Q.    All right.  Tell me which Mylan
20   exhibits you have reviewed since your deposition was
21   taken on June 29, 2010.
22         A.    I can go through them?
23         Q.    Certainly.
24         A.    Okay.
25         Q.    Just tell me which they are.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 309

```
 1          A.    What additional ones?

 2          Q.    Yes.

 3          A.    Which ones -- see, the -- the

 4    difficulty, if I can explain something, is that

 5    between the original deposition and today, I don't

 6    have the original copies that I reviewed that I

 7    submitted.  So I went back to the computer database

 8    for Mylan and I went through to see if any of them

 9    were germane to my opinion.  And at that particular

10    point, I made copies of those and probably copies of

11    those -- a couple that were in addition to.  So,

12    anyway, going through this -- are you ready?

13          Q.    Yes.

14          A.    M55.

15          Q.    You're referring to the exhibit M55

16    from previous depositions?

17          A.    Right.

18          Q.    Let me see that.  M55 is an e-mail

19    from Lee Radtke to Chuck Koons dated December 13,

20    2006; is that correct?

21          A.    I believe -- I'm sure you're right.

22          Q.    Okay.  You reviewed -- you reviewed

23    that -- that exhibit?

24          A.    Yes.

25          Q.    Okay.  And what, if anything, did
```

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 310

1    that --

2          A.    This changed nothing, nothing at all.

3          Q.    Just so we got a clean record on this.

4    You reviewed exhibit M55, the e-mail from Lee Radtke

5    to Chuck Koons dated --

6          A.    Dated December 13, 2006.

7          Q.    But that did nothing to change your

8    opinion --

9          A.    Not in the least bit.  Not in the

10   least bit.

11         Q.    Didn't enlighten you in any regard?

12         A.    The only -- I would say the thing that

13   enlightened me is that it reconfirmed when I had

14   stated that they did not do a comprehensive audit.

15   And he says in here, Chuck Koons, says we did a

16   system audit, I just don't think they could handle

17   it right now.  But when I read the original report,

18   it was very clear to me that it did not represent

19   what the industry referred to as a comprehensive GMP

20   audit nor would it be in accordance to the procedure

21   that they had, which I did read.

22         Q.    Did the FDA do comprehensive GMP

23   audits of --

24         A.    I can't tell you whether it's

25   comprehensive or not.  I will tell you they looked

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 311

```
 1   in a lot of areas.

 2           Q.    A lot of times?

 3           A.    A lot of times.

 4           Q.    As many as 12 inspections between 1999

 5   and 2008, correct?

 6           A.    Okay.  If that's the number, I believe

 7   you.

 8           Q.    Over a period of 182 days?

 9           A.    Yes.

10           Q.    Is that right?

11           A.    If you say so.  I'll agree with that.

12           Q.    You don't have any reason to disagree

13   with it?

14           A.    No, I have no reason to disagree with

15   you.

16           Q.    You would agree with me that the FDA

17   extensively audited Actavis over a nine-year period?

18           A.    They inspected them, but yes.

19           Q.    And audited them?

20           A.    Well, they don't use the term "audit."

21           Q.    Extensive inspections?

22           A.    Yes.

23           Q.    GMP inspections?

24           A.    Correct.

25           Q.    In fact, it's GMP or good
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 312

 1   manufacturing practice regulations are the FDA's

 2   regulations?

 3           A.     They are -- I -- I suppose you could

 4   say that, yes.  They are codified in the CFR.

 5           Q.     And they are what you would refer to

 6   as expertly drafted law, right?

 7           A.     GMPs, yes, I believe that.

 8           Q.     All right.  What is the next Mylan

 9   document that you reviewed since your deposition was

10   taken on June 29, 2010?

11           A.     M53 (handing).

12           Q.     Exhibit M53 from a previous deposition

13   which you have just handed me, is a e-mail from Lee

14   Radtke to Chuck Koons dated October 13, 2006.  And

15   is the highlighting yours?

16           A.     Yes, every highlighting in here would

17   be mine.

18           Q.     You've -- you've highlighted an e-mail

19   below from Chuck Koons to Lee Radtke, you've

20   highlighted the sentence that says, "We were already

21   scheduled to do an on-sight audit on 11/8 and 11/9,

22   and we're trying to get a status report on this

23   prior to our visit."  That's the only thing that you

24   highlighted in 53, right?

25           A.     That's correct.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 313

```
 1          Q.    What -- what was the significance of
 2    this to you?
 3          A.    Well, I had earlier wondered why it
 4    wasn't scheduled and any -- any information that I
 5    looked at what -- what referred to the audit either
 6    explaining why -- why it was going to occur or why
 7    it didn't occur was notable to me.
 8          Q.    Okay.  And -- and how did this exhibit
 9    M53 enlighten you?
10          A.    It had no effect whatsoever on my
11    opinion.
12          Q.    Okay.  All right.  And by the way,
13    when you -- since your deposition was taken on
14    June 29, 2010, did you review these additional Mylan
15    documents at one time, over a period of time?  Tell
16    me how that occurred.
17          A.    I did it -- I started two days before
18    the first scheduled deposition for 2009.
19          Q.    2009?
20          A.    2010.  In other words, this calendar
21    year.  So I looked at it in --
22          Q.    We're now in 2011.
23          A.    Eleven, rather, I'm sorry.  In 2011, I
24    went back to review to familiarize myself, then I
25    realized I didn't have a lot of documents that I
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 314

1    felt were missing, and I went back to the Crivella

2    database and I picked out some procedures or some

3    documents including only these that are here.  This

4    is it. (Indicating.)  This is 100 percent

5    comprehensive (indicating).

6          Q.    And over a period of -- you did this

7    review over a period of days, one day --

8          A.    A period of two days.

9          Q.    Two days?  Okay.  And that was --

10         A.    But the -- can I explain that though,

11   if I may?

12         Q.    Just try to answer my questions and

13   we'll get along.  So I just want to understand what

14   you did, how much time you spent, why you did it,

15   what you looked at.  So what you're telling me is

16   that your deposition had been scheduled earlier in

17   2011, right?

18         A.    Correct.

19         Q.    Two days before your deposition had

20   been scheduled, you -- you started looking at Mylan

21   documents?

22         A.    Correct.  I -- I went to seek out

23   documents to refamiliarize myself with the

24   references in the report.  And then I found out I

25   didn't have those documents, then I went back into

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 315

1     the database for Mylan because I knew that the next

2     deposition was going to be focused on Mylan, and I

3     started looking at the documents and the numbers and

4     I made copies of anything that looked even remotely

5     close to the subject that I had put into my report.

6             Q.    Okay.  And how long did you spend

7     reviewing the Mylan documents?

8             A.    I spent a day and a half printing the

9     documents and finding them.  I spent another prior

10    to that, probably two hours reviewing the documents.

11            Q.    So it took you a day and a half to

12    find the documents that are in this notebook in

13    front of you?

14            A.    Right.  I was panicking, so to speak.

15            Q.    Okay.  So it was two days before your

16    deposition was scheduled, you were panicked?

17            A.    Yes.

18            Q.    Because you knew I was going to be

19    asking you questions.

20            A.    Correct.

21            Q.    About Mylan?

22            A.    Right.

23            Q.    And you said, gosh, I got to go back

24    and beef up here, right?

25            A.    Beef up is not the right term.  I have

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 316

1    to refamiliarize myself with the basis of my

2    opinion.

3              Q.     Okay.  And so that was the purpose?

4              A.     Correct.

5              Q.     And it took you a day and a half to

6    find the documents and print them, right?

7              A.     Approximately.

8              Q.     And you -- you charged for -- for

9    that, right?

10             A.     I have not charged for it.  I'm --

11             Q.     It's to be billed?

12             A.     Yeah, yeah.  But I'm not sure exactly

13   what the bill is going to be.

14             Q.     So a day and a half, is that 12 hours?

15             A.     That's 12 hours, yeah.

16             Q.     Okay.  At $430 an hour?

17             A.     Yeah.  It's actually much more than

18   that, but I will not bill because I feel somewhat

19   culpable perhaps in not having these documents.

20             Q.     So a day and a half to find the

21   documents and print them, and then two hours to

22   review them?

23             A.     Approximately, yeah.  And that

24   maybe --

25             Q.     So the two hours is also at $430

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 317

 1    dollars an hour, right?

 2              A.    That's correct.

 3              Q.    By the way, $430 an hour, is that the

 4    highest billing rate that -- that you have on any

 5    matter that you -- you're working on?

 6              A.    The highest billing rate -- when it's

 7    a rate, yes.

 8              Q.    And I believe you testified previously

 9    when your deposition was taken on June 29, 2010 that

10    you worked for various clients at $250 an hour?

11              A.    Two -- over 300.

12              Q.    Or $300 an hour?

13              A.    Three hundred ten, 12, depending on

14    where I'm at.

15              Q.    But for -- for the purposes of being

16    an expert witness in this case, you decided that you

17    could charge $430 an hour?

18              A.    Correct.

19              Q.    And you're being paid at that rate?

20              A.    That is correct.

21              Q.    Okay.  We'll get into -- I want to

22    clean up the payments and all.

23              A.    Sure.

24              Q.    We'll probably do that at the end.

25    Okay.  So now -- now we know what you did.  You

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 318

1    looked at documents two days before your deposition

2    was originally scheduled in 2011.  It was then

3    continued to eventually today, right?

4          A.    Yes.

5          Q.    But -- but the only time that you did

6    any additional work was what you've just described;

7    is that right?

8          A.    That is correct.

9          Q.    The two days before that deposition

10   was scheduled?

11         A.    Yes.

12         Q.    It was canceled?

13         A.    Correct.

14         Q.    And continued?

15         A.    Correct.

16         Q.    Okay.  But you've done nothing since

17   then?

18         A.    Since that time, yes, I did.

19         Q.    Oh, okay.  What -- what -- and what

20   have you done?

21         A.    I spent approximately eight hours now

22   reviewing the documents that I had made copies of

23   and re-reviewing all of the referenced documents

24   that were in the -- referenced in the -- the expert

25   report.

Mark Kenny, Volume II            Videotaped                February 16, 2011

Page 319

```
 1          Q.    Was that in that two days before your
 2   deposition was originally scheduled?
 3          A.    The second time.  This is two days
 4   before -- let's say three days ago, in essence,
 5   three days ago.
 6          Q.    Okay.  Okay.  So there was the initial
 7   re-review of Mylan documents?
 8          A.    Yes.
 9          Q.    Two days before your 2011 deposition
10   was to be taken?
11          A.    There was a two hour review, yes.
12          Q.    Okay.  Two hour review after a day and
13   a half spent finding and printing documents,
14   correct?
15          A.    Yes.
16          Q.    And then three days ago?
17          A.    Yes.
18          Q.    You spent another eight hours
19   reviewing these documents?
20          A.    That is correct.
21          Q.    The same documents?
22          A.    The same documents and the ones that
23   are in here that we -- you wanted to go through.
24          Q.    When you say the same documents and
25   the ones that are in here, that leads me to believe
```

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 320

1   that the documents you just reviewed three days ago

2   are not the same documents that you reviewed before

3   your deposition was to be originally taken earlier

4   in 2011.  Am I right?

5          A.    I don't recall, because some of the

6   documents I looked at electronically.  In this case,

7   I ended up printing anything that had anything to do

8   with the wording in my deposition because I wanted

9   to make sure -- sir, the way that unfortunately the

10  copies were made, there were many, many Mylan

11  documents which didn't have M numbers on them, they

12  had another number.  So -- and so in my report,

13  there are Mylan documents referred ATA or ATV, or

14  they could be plaintiff 1, 2, 3,4.  And I had no way

15  without -- I mean, each one took 45 minutes to

16  figure out which was the right copy, therefore, I

17  made copies of anything that was related to it,

18  which appears in here.  This is 100 percent.  Or

19  there could be something in there (indicating).  But

20  these were more, I would say pertinent.  Then I had

21  to read these in order to see if they were the right

22  P documents or ATA documents.  So I had a process.

23         Q.    I got you.  I understand.  In addition

24  to reviewing the documents contained in the notebook

25  in front of you, have you done anything else in

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 321

1    preparation for this deposition?

2          A.     No.

3          Q.     Have you talked to Ms. Carter or any

4    of the Plaintiff's lawyers?

5          A.     Nobody, no human being, not even my

6    wife.

7          Q.     Well -- all right.  So you haven't had

8    any conversations with any of the Plaintiff's

9    lawyers about anything related to preparation for

10   this deposition today?

11         A.     No.  Yesterday, I met with Meghan for

12   a period of approximately four hours of which we

13   probably spent a half hour talking and I spent three

14   and a half hours or so trying to, again, mentally

15   organize myself.

16         Q.     You met with -- with Ms. Carter

17   yesterday for four hours?

18         A.     Yes.

19         Q.     In preparation for your deposition?

20         A.     Correct.  We met for about a half

21   hour --

22         Q.     What did she tell you?

23         A.     She gave me -- she said it's, you

24   know, expect the same type of questions.  Expect

25   that since Harvey didn't have an opportunity --

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 322

1    yourself, Mr. Kaplan.

2           Q.     Harvey is fine.

3           A.     Didn't have an opportunity -- okay.

4    Didn't have an opportunity to ask you questions, he

5    will ask questions about Mylan.  And you just want

6    to make sure you are familiar with the documents.

7    That was the extent of our conversation.

8           Q.     Well, did you have any specific

9    discussions about any specific issues related to

10   Mylan?

11          A.     Zero.

12          Q.     Zero?

13          A.     Zero.  Absolutely zero.

14          Q.     So what did you do for the three and a

15   half, four hours?

16          A.     We talked a lot about different stuff.

17          Q.     But that's at $430 an hour.

18          A.     Sir, you're talking about two

19   different things.  $430 an hour is my rate.  What I

20   bill is not my total hours put into a project.

21   Never, ever, have I ever billed at what actually

22   I've put in.  I have always billed less than, not

23   even equal to it, just because I feel my efficiency

24   may not be 100 percent.  I should be billing when my

25   efficiency is 100 percent.

Mark Kenny, Volume II            Videotaped                February 16, 2011

Page 323

```
 1              Q.    Were you efficient yesterday?

 2              A.    Was I fishing?

 3              Q.    Were you efficient?

 4              A.    Was I efficient yesterday, no, not

 5     particularly.

 6              Q.    You weren't?

 7              A.    No.

 8              Q.    So for the four hours that you spent

 9     with Meghan yesterday, how much are you going to

10     bill for?

11              A.    I haven't decided.

12              Q.    Okay.  So you could bill up to four

13     hours at $430 an hour?

14              A.    Oh, no.  I could bill up to my travel

15     time, an hour and a half to get there, an hour and a

16     half to get back.  I could -- I could -- I'll have

17     to look back, see what I accomplished, and determine

18     whether or not I bill for eight hours.

19              Q.    Oh, okay.  So you may bill for eight

20     hours?

21              A.    That is a possibility.

22              Q.    Yesterday?

23              A.    Yes.

24              Q.    Okay.  Because you came over here to

25     Manhattan?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 324

1          A.     Correct.  It takes about two hours
2    door to door to get here and about two hours to get
3    back.
4          Q.     Okay.  Did you discuss any of your
5    opinions as to Mylan with Meghan yesterday?
6          A.     No, none at all.
7          Q.     Did you review these documents with
8    Meghan?
9          A.     No.  The only -- she didn't look at
10   the documents but I explained to her that --
11         Q.     When I say Meghan, I'm sorry.  We're
12   being a little informal.
13         A.     Yeah.  I understand.
14         Q.     We're all on kind of a first name
15   basis.
16         A.     I explained to her that I had gone
17   back to the Internet to see if there were any
18   references in warning letters or the like concerning
19   quality agreements or audits to see if specifically
20   the FDA issued warning letters that clearly outlined
21   or inferred that quality agreements and quality
22   audits were quite specifically a GMP requirement.
23         Q.     And did you find any?
24         A.     Yes, I did.
25         Q.     You did?  And are those --

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 325

```
 1           A.     They are not here, but I'll show you
 2      them in a minute, if you'd like.
 3           Q.     You're saying that you found documents
 4      from the FDA saying what now?
 5           A.     That there was a warning letter on a
 6      company associated with not having quality
 7      agreements and/or not performing audits.
 8           Q.     Was that on Mylan?
 9           A.     No.  That's on other industry
10      companies, drug companies.
11           Q.     What was the context of the FDA
12      document that you're talking about that --
13           A.     Would you like me to show you?
14           Q.     Well, just first answer my question.
15           A.     Surely.
16           Q.     Okay.  Give me the context.  You said
17      you found an FDA document or documents regarding a
18      warning letter issued to a company for not having a
19      quality agreement or -- or not performing?
20           A.     Audits.  G&P audits.
21           Q.     Okay.  Give me the context of that.
22      When, was the company?
23           A.     I would have to pull the document to
24      do that.
25           Q.     What's your best recollection?
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 326

1          A.    I would like to pull the document.

2          Q.    Let me just ask you, what's your best

3     recollection right now?

4          A.    My best recollection is I was looking

5     at drug companies that were inspected that received

6     warning letters.  There were three or four that I

7     saw on the screen, I printed two of them.

8          Q.    But -- but the drug company -- let me

9     just ask you this:  So you're saying you pulled

10    something from the Internet?

11         A.    Yes.

12         Q.    Warning -- there were two warning

13    letters that you found?

14         A.    Correct.

15         Q.    From the FDA to a manufacturer?

16         A.    To a manufacturer, correct, and a

17    contracting company.

18         Q.    What's a "contracting company"?

19         A.    A company who is the sponsor.

20         Q.    When you say "the sponsor," what do

21    you mean by "the sponsor"?

22         A.    One company sells the product with

23    their name on it, the other company makes it for

24    them.

25         Q.    When you say "the sponsor," who is the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 327

1    sponsor?

2          A.    It would be the company that sold the

3    product.

4          Q.    What are they sponsoring?

5          A.    It's just a term that is sometimes

6    used.  It's the manufacturer -- it's the name that's

7    on the label.

8          Q.    The name that's on the label of what?

9          A.    Of the product.

10          Q.    Is that the holder of the NDA?

11          A.    I don't know.

12          Q.    What -- what do you call the holder of

13    an NDA or an ANDA?

14          A.    I don't know what the official term

15    is.  The holder of the NDA.

16          Q.    You don't know?

17          A.    I don't know what the formal term is.

18          Q.    In all of the years that you were with

19    Johnson & Johnson in the drug industry, you don't

20    know what you call the company that holds the NDA?

21          A.    We'd say it owns the NDA.

22          Q.    What?

23          A.    The company that owns the NDA.  It's

24    what I would call it, perhaps it's an informal term.

25          Q.    And you don't know what you call the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 328

1    company that owns or holds the ANDA?

2            A.    No.

3            Q.    What is an ANDA?

4            A.    Abbreviated new drug application.

5            Q.    What is the difference between an ANDA

6    and an NDA?

7            A.    Sir, you're going beyond my expertise,

8    you're going into regulatory affairs areas.

9            Q.    All you have to say is I don't know.

10           A.    I don't know.

11           Q.    Okay.  Is that your answer?

12           A.    I don't have an expert opinion on

13   that.  I don't know.

14           Q.    Okay.  But I just want your honest

15   answer.  If you don't know, just say you don't know.

16           A.    I don't know.

17           Q.    And you told me before, you said the

18   term sponsor means the company that sold the product

19   and the contracting company is --

20           A.    The company that manufactured the

21   product.  The contractor or contracting company.

22           Q.    As -- as to DIGITEK, who is the holder

23   of the ANDA?

24           A.    I believe it's Actavis from the

25   records that I read.

Mark Kenny, Volume II          Videotaped                  February 16, 2011

                                                                Page 329

    1              Q.     And who is the manufacturer DIGITEK?

    2              A.     The manufacturer is Actavis.

    3              Q.     What is the significance of Actavis

    4     being the holder of the ANDA as to GMP compliance?

    5              A.     Well, they need to, as all companies

    6     do, need to comply with GMP.  I don't know how I

    7     could be more specific.

    8              Q.     Okay.  It's your understanding that

    9     Mylan is not the manufacturer of DIGITEK?

   10              A.     Mylan doesn't manufacture that

   11     product.

   12              Q.     Mylan --

   13              A.     I'm not using that as a formal term.

   14     I am saying that they do not manufacture that

   15     product.

   16              Q.     They also -- Mylan is not the holder

   17     of the ANDA?

   18              A.     That is my understanding, correct.

   19                     THE VIDEOGRAPHER:  We're off the

   20              record at 10:15.

   21                     (Recess taken.)

   22                     THE VIDEOGRAPHER:  We are back on the

   23              record.  The time is 10:19.

   24         BY MR. KAPLAN:

   25              Q.     When I was asking you questions about

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 330

```
 1   the difference between NDA and ANDA and you said I
 2   don't know, that's going beyond my area of
 3   expertise.
 4           A.    Correct.
 5           Q.    You are not an expert in regulatory
 6   affairs?
 7           A.    That is correct.
 8           Q.    FDA regulatory affairs?
 9           A.    That is absolutely correct.
10           Q.    You don't hold yourself out to be an
11   expert?
12           A.    That's correct.
13           Q.    All right.  Can you define -- you used
14   the term contract manufacturer?
15           A.    Yes.
16           Q.    What is a contract manufacturer?
17           A.    It's -- it's a company that you have a
18   formal agreement with that manufactures product
19   to -- to some predetermined specification.
20           Q.    Well, in -- in this case, you told me
21   that Actavis is the manufacturer of DIGITEK?
22           A.    Correct.
23           Q.    Actavis is the holder of the ANDA?
24           A.    That's what I read.
25           Q.    So Actavis manufactures DIGITEK in
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 331

1   accordance with the specifications set forth in the

2   ANDA; is that right?

3          A.    I don't know.  I haven't read the

4   ANDA.

5          Q.    So your -- that is something that

6   you're just not familiar with?

7          A.    It's something I wouldn't read because

8   it not within my expertise.

9          Q.    Okay.  Well, I'm just trying to set

10  some basic understandings here --

11         A.    Yes.

12         Q.    -- or lack thereof.

13         A.    Yeah.

14         Q.    I mean, maybe -- maybe you don't

15  understand the -- the roles of the various companies

16  involved here.

17         A.    Uh-huh.

18         Q.    But I want to find out what you know

19  and what you don't know.  So you don't know whether

20  Actavis as the holder of the ANDA for DIGITEK was

21  charged with the responsibility for manufacturing

22  DIGITEK in accordance with the specifications set

23  forth in the ANDA?

24         A.    Sir, you're going to have to repeat

25  that.  I'm sorry.

Mark Kenny, Volume II          Videotaped          February 16, 2011

                                                                Page 332

      1                MR. KAPLAN:  Would you repeat that?

      2                (Record read.)

      3                MS. CARTER:  Object to form.

      4         A.    If I understand the question, you're

      5    asking there is an ANDA.  And in that, it has

      6    content that talks about the CMC section.  It talks

      7    about chemistry, manufacturing, and control.  I as

      8    part of my profession, I don't go into either an NDA

      9    or an ANDA and look what the agreement has been

     10    reached between -- between the company and the FDA.

     11    So I don't -- I don't read that at all.  I have no

     12    interest in it whatsoever.

     13      BY MR. KAPLAN:

     14         Q.    How does the FDA qualify a

     15    manufacturer?

     16         A.    How do they qualify a manufacturer?

     17    They do a preapproval.  They -- they read whatever

     18    the submission is, whether it's medical device with

     19    PMA or 510K or an ANDA or an NDA.  They then

     20    schedule, in most instances, a preapproval

     21    inspection.  They would come in and they would

     22    review your GMP, they would spend whatever time they

     23    felt was appropriate, and then they would issue you

     24    as -- as a part of that approval process, issue you

     25    an approval letter.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 333

```
 1          Q.    In this case, in this situation with

 2   regard to DIGITEK, Actavis was qualified by the FDA

 3   as the manufacturer of that product, right?

 4          A.    I -- I don't know.  I didn't see that

 5   document.  It was done apparently in the '90s

 6   sometime.

 7          Q.    Who do you think was qualified as the

 8   manufacturer of DIGITEK?

 9          A.    I don't know.

10          Q.    You have no idea?

11          A.    No, I didn't see the documents.

12          Q.    Do you think it was Mylan?

13          A.    I have no idea.

14          Q.    Come on.  You know that Mylan was not

15   the manufacturer, right?

16          A.    I know they did not manufacture the

17   product.

18          Q.    You know that Actavis did?

19          A.    Correct.

20          Q.    Is it fair to assume that if Actavis

21   was manufacturing DIGITEK, they were qualified to do

22   so by the FDA?

23          A.    I would say it's fair to assume that

24   whatever FDA procedures were in place at the time of

25   approval that those procedures were followed.
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

                                                              Page 334

1          Q.     By Actavis?

2          A.     By the FDA in conjunction with

3     Actavis.

4          Q.     But not Mylan?

5          A.     But not Mylan?  I don't know what

6     Mylan's role would be.

7          Q.     Well, you -- you told me it was your

8     understanding that Mylan sold DIGITEK, right?

9          A.     Correct.

10         Q.     How is it that Mylan sold DIGITEK?

11         A.     Some type of agreement, verbal or

12    written agreement, would have to be reached, and

13    then they would sell the product.  And I suppose

14    there is -- there is some licenses that have to be

15    obtained from the FDA, licenses which I'm not

16    familiar with.

17         Q.     Well, tell me in this situation what

18    you have seen that tells you how it is that DIGITEK

19    came to be sold by Mylan.

20         A.     I -- I didn't go back that far in

21    terms of reviewing that documentation.

22         Q.     What documentation are you talking

23    about?

24         A.     I -- I didn't look at anything prior

25    to '99, let's say.

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 335

1          Q.    So in all of your review of -- of --
2    of documents in preparation for rendering your
3    opinions which are contained in your report of
4    June 15, 2010, and in preparation for your
5    deposition on June 29 and again -- of 2010, and
6    again today, February 16, 2011, you -- you reviewed
7    no document that gave you any understanding of the
8    relationship between Actavis and Mylan?
9          A.    No formal document that -- that's
10   correct, no formal document.  It would have been
11   implied or stated to some extent in memos and the
12   like.
13         Q.    But I'm going to ask the court
14   reporter to repeat the question again, and I am
15   going to ask you to answer it, please.
16         A.    Sure.
17         Q.    Yes or no.  Yes, you did review any
18   document or no, you didn't review?
19               MR. KAPLAN:  Would you repeat that?
20               (Record read.)
21         A.    I read documents, yes, that did
22   have -- gave me an understanding of the
23   relationship.
24         Q.    I'm going to ask you what your
25   understanding is of the relationship and what

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 336

 1  documents you read to --

 2          A.    Well, I don't recall the documents

 3  that I read, so that's not going to be possible.

 4  And my understanding is that Mylan had some -- an

 5  agreement with Actavis that they would be selling

 6  the product and that Actavis would be manufacturing

 7  that product.

 8          Q.    Is that document that you were just

 9  talking about contained in the binder in front of

10  you?

11          A.    Sir, I don't know what document it is,

12  where I -- or I would have made that determination.

13          Q.    Who had the authority to confer upon

14  Mylan the right and responsibility of manufacturing

15  DIGITEK?

16          A.    You have to repeat that, sir.

17                (Record read.)

18          A.    I don't know who had the right.  I'm

19  not -- I'm not sure I actually understand the

20  question.

21          Q.    What don't you understand?

22          A.    I don't understand the question.

23  Could you rephrase it, please.

24          Q.    Okay.  Is it your understanding that

25  it is the FDA and only the FDA that would have the

Mark Kenny, Volume II            Videotaped               February 16, 2011

Page 337

1   authority to confer upon Mylan the right to

2   manufacture DIGITEK?

3         A.    I don't know the process with Mylan

4   that would give them the authority to be able to

5   sell it.  I was not involved with the regulatory

6   affairs negotiations between the seller or the

7   distributor of the product and the FDA.

8         Q.    That was not my question, and I'll ask

9   the court reporter to read it back again.  And

10  concentrate on this, take your time.

11        A.    Yeah.

12        MR. KAPLAN:  Please read back the

13        question.

14        (Record read.)

15        A.    Oh, on Actavis?  Oh, yes.

16        Q.    It's the FDA?

17        A.    That's correct.

18        Q.    Only the FDA?

19        A.    As far as I know -- well, I'm only

20  involved with the FDA, but I know it is the FDA.

21  Whether there are other legal groups, I don't know.

22        Q.    Mylan has no authority to authorize

23  Actavis to manufacture DIGITEK?

24        A.    They don't have what?

25        Q.    Mylan has no authority to authorize

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 338

1    Actavis to manufacture DIGITEK?

2          A.    Using the word "authorize," I believe

3    that's correct.

4          Q.    Is there some other word that you

5    would use?

6          A.    I don't know.  Well, they would --

7    they would establish an agreement, and as part of

8    the agreement, to uphold the agreement, they would

9    manufacture certain number of lots, certain

10   quantity, under certain specifications, and other

11   conditions, for Mylan.  That I believe is the

12   relationship that which I'm involved with in my --

13   in my trade.

14         Q.    I don't know what you mean.  Can you

15   explain that, the relationship you're involved with

16   in your trade?

17         A.    I'm involved -- the expertise that I

18   bring is good manufacturing practices.  Once an

19   agreement is reached, a verbal agreement is reached

20   between the two parties, I would look at the

21   relationships of the supply and determine whether

22   between the two parties my company, which would be

23   the equivalent of Mylan, and the contract

24   manufacturer, and I would determine whether or not

25   the GMP conditions are adequately defined and

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 339

1    whether adequately executed.

2          Q.    Have you seen any such agreement?

3          A.    I have not seen a -- I saw a draft of

4    a quality agreement which was not approved.

5          Q.    You have seen no other agreement

6    between Actavis and Mylan?

7          A.    There was a supply agreement.  I have

8    not read the supply agreement.

9          Q.    Why not?

10         A.    Well, I didn't see it in the records.

11         Q.    Did you ask for it?

12         A.    I did not ask for it.

13         Q.    So in all of the work you've done, all

14   hours that you've billed, all of the time that

15   you've spent preparing for your report and writing

16   your report and giving your deposition, preparing

17   for your deposition, both on June 29, 2010 and again

18   today on February 16, 2011, you've never asked for

19   any supply agreement between Mylan and Actavis,

20   correct?

21         A.    I don't recall asking specifically for

22   a supply agreement.

23         Q.    So the answer to my question is no, I

24   have not?

25         A.    No, I have not.

Mark Kenny, Volume II          Videotaped              February 16, 2011

                                                              Page 340

 1              Q.     And you referred to Actavis as a

 2    contract manufacturer, that's -- that's a term of

 3    art.  What does that mean?

 4              A.     It means a company that's making

 5    product for you, making -- manufacturing product for

 6    you.

 7              Q.     And your understanding then is that --

 8    that Actavis was a contract manufacturer?

 9              A.     That's a term that is used in the

10    industry, yes.

11              Q.     What -- is that pursuant to

12    regulation, contract manufacturer?

13              A.     Well, the FDA does use that term in

14    some of its documents, so I would say it's an

15    industry -- external manufacturer or contract

16    manufacturer are the most common terms.

17              Q.     Is there a difference between a

18    manufacturer that is the holder of an ANDA and a

19    contract manufacturer?

20              A.     It's -- I -- from what I would say the

21    Mylan standpoint based upon my experience as a Mylan

22    perspective, there is no difference.

23              Q.     That wasn't my question.

24              A.     In terms of GMP.

25              Q.     That wasn't my question.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 341

 1          A.    Okay.

 2          Q.    I'm going to ask the court reporter to

 3    read back my question and see if you can try to

 4    answer specifically what I asked you.

 5                (Record read.)

 6          A.    I am not aware of any difference from

 7    a Mylan perspective, from a GMP perspective.

 8          Q.    Could you be more specific?

 9          A.    That the GMP is all of the controls

10    that are necessary -- if I'm the seller of a

11    product, I am -- if I'm a distributor of a product,

12    I sell it, I market it.  I have a responsibility to

13    all of those involved with it, the customers, the

14    patients, et cetera.  I have a responsibility -- and

15    to the FDA, to make sure that GMPs are upheld both

16    by my company and by the company manufacturing.  So

17    that the same level of controls in terms of GMP are

18    in effect between the two parties, that they

19    compliment one another to meet the GMP requirements.

20          Q.    So are you saying that according to

21    the code of federal regulations which the GMPs are

22    contained?

23          A.    Correct.

24          Q.    That Mylan as the seller of DIGITEK

25    had responsibility under the law to make sure that

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 342

1    GMPs were upheld in the manufacture of DIGITEK?

2              A.    That is correct.

3              Q.    And can you -- can you cite me to

4    that -- to that -- those regulations that put that

5    responsibility on a seller?

6              A.    I cannot right this second.

7              Q.    Well, take your time.

8              A.    Well, I don't have it here, but I

9    believe there is.  I cannot cite it currently, but I

10   believe there's enough information in print that

11   says that if I am Mylan, I am responsible for

12   ensuring that product manufactured in my name for me

13   has to meet GMP requirements.

14             Q.    Okay.  And I'm just asking you to tell

15   me, show me what it is that you have reviewed, seen,

16   relied upon in arriving at your opinions in this

17   case that leads you to believe that a seller of a

18   product has the responsibility to make sure that the

19   manufacturer of the product who is the ANDA holder

20   complies with GMPs?

21             A.    I can tell you through my experience

22   that I've been trained to -- to -- to ensure -- to

23   establish a relationship with the contract

24   manufacturer and that ensuring that I as -- Mylan,

25   if you will -- and the contractor have a full

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 343

1   compliment and meet the GMP requirements that I am

2   responsible and accountable for them.

3          Q.     I'm going to move to strike that as

4   nonresponsive and ask the court reporter to read

5   back my question.  And ask you to answer the

6   question that I asked you.

7          A.     Okay.

8                 (Record read.)

9          A.     I cannot show you right this second

10  what it is.  It's just that is my understanding

11  based upon years of experience and reading documents

12  and warning letters and GMPs and preambles and

13  guidance documents, I would say that is my

14  understanding.  So I cannot -- if you want to

15  restate the question.

16         Q.     You cannot?

17         A.     I don't know.  Restate the question.

18  I want to make sure I answer it.

19         Q.     There is no document --

20         A.     That I can point to.

21         Q.     That you can point to.  There is no

22  document upon which you rely to conclude that Mylan

23  as the seller of DIGITEK had the responsibility for

24  ensuring that Actavis as the ANDA holder and

25  manufacturer of DIGITEK complied with GMPs?

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 344

```
 1              A.    I cannot point to a document.

 2              Q.    You can't point to a document in

 3    your -- referenced in your report, can you?

 4              A.    That is correct.

 5              Q.    You can't point to a document, any

 6    document that you brought here today, can you?

 7              A.    I -- I don't know.  I'd have to -- at

 8    this particular point, I can't point to a document.

 9    I'd have to think about it and do a little more

10    research in order to confirm what I know.

11              Q.    With all due respect, I asked you if

12    you came here today prepared to give your opinions

13    and you said yes.

14              A.    I was prepared.

15              Q.    You are prepared, aren't you.

16              A.    I am prepared.  But you're asking me a

17    question that I cannot answer at this particular

18    point.

19              Q.    Pretty fundamental to your opinions as

20    to Mylan, isn't it?

21              A.    If that's -- I would not say that, no.

22    I don't think it's fundamental to our discussions.

23              Q.    You don't think that the legal

24    requirements for ensuring compliance with GMPs is

25    fundamental to your opinions as to Mylan?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 345

 1          A.    I am saying that I am aware of what

 2     are industry norms, what are standards, between a

 3     contracting company and a contract manufacturer, but

 4     I cannot pinpoint a document right this second which

 5     establishes that in terms of law.

 6          Q.    The legal responsibility for complying

 7     with GMPs is fundamental to any opinion you are

 8     offering in this case, isn't it?

 9               MS. CARTER:  Object to form.

10          A.    Yes.

11      BY MR. KAPLAN:

12          Q.    And you keep referring to Actavis as a

13     contract manufacturer.

14          A.    The relationship that Mylan has, if

15     I'm looking at it from Mylan's perspective, they are

16     what's referred to as a contract manufacturer.  And

17     Mylan refers to them as a contract manufacturer.

18          Q.    What's the basis for concluding that

19     Actavis is a "contract manufacturer"?

20          A.    It's in various documents where they

21     talk -- talk to Actavis as the contract

22     manufacturer.

23          Q.    How does a contract manufacturer

24     differ from a manufacturer who has an approved ANDA

25     approved by the FDA?  What is the difference?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 346

1          A.    I don't see any difference.  From
2     Mylan's perspective.
3          Q.    Well, from your perspective?
4          A.    But my perspective is in terms of my
5     experience, I've never been a contract manufacturer.
6     My perspective is as the company that distributes
7     the product that I am obligated, I've been trained
8     to assume that obligation that I have to be in
9     compliance with GMP, and that the company that makes
10    the product for us has to be compliant to GMP.
11         Q.    When you say I have to be compliant
12    with GMP, what do you mean?
13         A.    I means -- some people refer to the
14    distributor as a virtual company.  As part of a
15    virtual company, you'll have systems and procedures,
16    you'll have specifications that you approve.  You
17    will have other procedures that are approved.  You
18    perhaps have complete handling responsibility.  And
19    those would be -- there are supposed to be
20    established between you and the contractor as to
21    what my obligations were to compliment the FDA's
22    requirements and what your obligations are to meet
23    FDA requirements.
24         Q.    You started by saying some people
25    refer to a distributor as a virtual company.  When

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 347

1    you say "some people," who are you talking about?

2              A.    In the industry, it's a common term.

3              Q.    Who is the industry?

4              A.    The industry are my peers.

5              Q.    I don't know who your peers are.

6              A.    My peers are companies that I have

7    either worked for or have some relationship with.

8    It's -- I would call it it's an informal term that

9    is used.

10             Q.    Is the FDA --

11             A.    No, the FDA does not use that term,

12   that I've ever seen.

13             Q.    So the FDA that has established good

14   manufacturing practice regulations does not use the

15   term "virtual company"?

16             A.    As far as I know.  I don't know if

17   they use that term.  I've never seen it used by

18   them.

19             Q.    And you said that a seller of a

20   product has to approve specifications --

21             A.    That's correct.

22             Q.    -- for a product?  Can you -- can you

23   cite me to the -- to the regulations that impose

24   that responsibility on the seller?

25             A.    Sir, if I -- I cannot cite you to the

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 348

1  regulation.

2          Q.    But it's your understanding that the

3  FDA requires a seller of a product, in this case

4  Mylan, to approve manufacturing specifications for

5  the manufacture of DIGITEK by Actavis?

6          A.    To approve product specifications.

7          Q.    What's the difference between

8  manufacturing specifications and product

9  specifications?

10          A.    Product specifications are an end

11  specification.  Manufacturing is how you make it.

12          Q.    Be a little more specific.

13          A.    Manufacturing would be the process of

14  putting two chemicals together to -- and et cetera,

15  to process it to become a finished product.  And at

16  that particular point, as a finished product, you

17  would have a product specification.

18          Q.    You're saying that the responsibility

19  for the product specifications with regard to

20  DIGITEK rests with Mylan?

21          A.    A portion of that, most certainly.

22          Q.    What portion?

23          A.    They need to have approved

24  specifications in their system as to what they are

25  buying.  You have to know what you're buying.  What

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 349

 1    am I buying?  I define it as a specification of

 2    which Mylan or -- sorry -- Actavis, in this case, or

 3    the contractor, would manufacture in accordance to.

 4    So they deliver a product that meets my

 5    specification.  I take ownership for it because it's

 6    my product, it is my specification.

 7          Q.    So it's your understanding that --

 8    that Mylan tells Actavis what the specifications for

 9    DIGITEK are to be?

10          A.    No, I didn't say that.  I said that I

11    don't know who tells who.  All I can tell you is

12    that Mylan would have an approved specification that

13    they would use to determine whether or not the

14    product met their own specification and was fit to

15    be distributed.

16          Q.    Let's go back.  Isn't it the FDA that

17    has to approve the specifications for the

18    manufacturer of DIGITEK?

19          A.    No.

20          Q.    No?

21          A.    Not the specifications.  They would --

22    I wouldn't use that term.  You asked me

23    specifications, I would say no.

24          Q.    So it's not the FDA that has to

25    approve the specifications for the manufacture of

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 350

1  DIGITEK?

2          A.    The FDA does approve certain

3  information that's required by -- by them.  That is

4  contained in an ANDA and an NDA, and the product has

5  to be manufactured according to those requirements.

6          Q.    Well, what -- what authority does

7  Mylan have with regard to product specifications?

8          A.    I don't know.  If I understand your

9  question, I would say -- could you repeat the

10  question?  I don't think I'm answering the right

11  question.

12                (Record read.)

13          A.    Mylan has an obligation to have

14  product specifications that they use to determine

15  the acceptability of a product to be distributed in

16  their name.

17          Q.    I'm going ask you the question again.

18  I'll just repeat it.  What authority does Mylan have

19  under the law with respect to product specifications

20  for DIGITEK?

21          A.    I don't know.  Under the law.

22          Q.    Well, we were going through the

23  notebook you brought of all of the Mylan documents

24  that you have looked at since your deposition was

25  taken initially on June 29, 2010?

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 351

1          A.    Right.

2          Q.    We've actually only gotten through two

3    documents.  There was an exhibit M55 and an exhibit

4    M53.  Tell me what the next document is.

5              So the next document you're handing me is

6    marked Exhibit M21, and it is a e-mail from a John

7    Deiriggi, D-E-I-R-I-G-G-I, to Hal Korman,

8    K-O-R-M-A-N, dated January 4, 2007.  And then an

9    e-mail below that from Walt Owens to John Deiriggi

10   dated January 4, 2007.  There's nothing that you've

11   highlighted here.

12         A.    There was nothing of interest in

13   there.

14         Q.    All right.  So M21, nothing of

15   interest, right?

16         A.    Correct.

17         Q.    The next Mylan document that you

18   reviewed.

19         A.    Here's another one.

20         Q.    Okay.  The next document you've handed

21   me is another exhibit from a previous deposition,

22   and it's marked Exhibit M25.  It's an e-mail from

23   Chuck Koons to Hal Korman dated April 27, 2008.  And

24   you have highlighted a portion on the first and

25   second page, I'll just refresh your recollection.

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 352

1   The portion you've highlighted starts with

2   "Actavis's U.S. head of quality would be calling."

3   Then, "Mike Adams and I spoke to her on the phone,

4   and she described that the PAI had been going on for

5   six weeks and that they were being "beaten up" by

6   FDA.  She stated that the reason the recall was

7   expanded to all DIGITEK was that FDA felt that there

8   weren't adequate controls on their tablet presses to

9   ensure that the double tablet issue couldn't have

10  happened previously."  Then you -- then you

11  highlighted a portion of a sentence that says that

12  "other products were being recalled."

13          And then on the second page of M25,

14  you've highlighted "FDA is focusing on Amide's

15  systems to control and ensure product quality rather

16  than simply having concerns over just one

17  investigation."  And then finally, you highlighted

18  the following:  "Mike Adam, Cass, C-A-S-S, Bird, and

19  Ann Wolf, who've lead the charge from the MPI side."

20          So tell me what you learned or what was

21  the significance there.

22          A.    Well, there is only one sentence, if

23  you will, that I would say is -- was meaningful for

24  me.  And she stated -- it says, "she stated the

25  reason the recall was expanded to all DIGITEK was

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 353

1    that FDA felt there weren't adequate controls on

2    their tablets -- tablet press, to ensure that double

3    thick issues couldn't have happened previously."

4    That was the -- to me the notable sentence.

5              Q.    Okay.  And by the way, these documents

6    that you've just gone through, you hadn't reviewed

7    those prior to rendering your opinions in this case?

8              A.    No, I -- I almost assuredly did see

9    them.  M25, I did.

10             Q.    Okay.  And if they were significant to

11   you, you would have referenced them in your report?

12             A.    If they were significant -- if I felt

13   they were significant at the time, I would have

14   referenced them in my report.

15             Q.    Because all of your opinions are

16   contained within the four corners of your report?

17             A.    That is correct.  That is correct.

18             Q.    And you understand that that is your

19   obligation here?

20             A.    You've asked me that and I will repeat

21   it and say I understand that.

22             Q.    I just want to make sure we're on the

23   same wave length.

24             A.    We're on the same wave length

25   100 percent.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 354

```
 1          Q.    Thanks.  And reference was made to
 2    Amide, A-M-I-D-E.  You understand that when
 3    reference was made to Amide, that's Actavis?
 4          A.    That is correct.  That's my
 5    understanding.
 6          Q.    Okay.  And you also understand that
 7    throughout the documents, when reference is made to
 8    Bertek, B-E-R-T-E-K, that means Mylan?
 9          A.    That's correct.  That's my
10    understanding.
11          Q.    All right.  The next document that you
12    reviewed since your deposition was taken initially
13    on June 29, 2010.
14          A.    Reviewed or rereviewed?
15          Q.    You can tell me whether you reviewed
16    or rereviewed.
17          A.    Well, I reread.  I reread Adams.
18    There was nothing --
19          Q.    You reread what?
20          A.    I'm sorry.  Let me tell you what I
21    reread.  The deposition taken on Michael Adams
22    January 22, 2010, I think that's it.  And I reread
23    it to just familiarize myself.  They are long
24    documents, hundreds of pages.
25          Q.    When you say you reread the deposition
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 355

1    of Mike Adams, don't you recall that at your

2    previous deposition when you were asked whether you

3    reviewed any Mylan depositions, you said the only

4    one you looked at was Chuck Koons?

5          A.    I -- I read documents where I quickly

6    went through them, and perhaps I was in error.  I

7    think I did read Michael Adams because I did see

8    certain phrases where -- they were interesting

9    phrases.  They were at least mentally notable to me.

10         Q.    So you think that when you -- when you

11   testified on June 29, 2010 that the only Mylan

12   deposition you reviewed was Chuck Koons, you were

13   wrong?

14         A.    I believe I was wrong, correct.

15         Q.    And you think you also had reviewed

16   Mike Adams' deposition?

17         A.    I'm sorry, I think I got these

18   backwards.  Could you repeat your question?

19         Q.    You think that before your June 29

20   deposition was taken, you had also reviewed Mike

21   Adams' deposition?

22         A.    I believe I did, yes.

23         Q.    And then you re-reviewed Mike Adams'

24   deposition?

25         A.    Correct.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 356

```
 1          Q.    After June 29, 2010?

 2          A.    That is correct.

 3          Q.    And what did you learn from that?

 4          A.    Nothing.

 5          Q.    Did you look at any other Mylan

 6   deposition?

 7          A.    I looked at Chuck Koons.

 8          Q.    Again?

 9          A.    Yes.

10          Q.    What did you learn from that?

11          A.    I learned that Mr. Koons had not a

12   good memory.

13          Q.    Well, I'm going to move to strike that

14   as nonresponsive.

15          A.    Nothing that I recall notable.

16          Q.    How is your memory?

17          A.    Mediocre to good.  Depends.  Sometimes

18   it's very, very good.

19          Q.    How is it today?

20          A.    I believe it's pretty good.

21          Q.    Okay.  All right.  Any other Mylan

22   depositions that you reviewed?

23          A.    No, that's it.  If it's here, then I

24   reviewed it.

25          Q.    So Mike Adams and Chuck Koons, and
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 357

1    there's nothing remarkable that you gleaned from

2    either of those depositions?

3          A.    No.

4          Q.    All right.  What is the next document

5    that you reviewed?  Since June 29, 2010?

6          A.    I could short -- well, I'll go through

7    it per your process.

8          Q.    If you want to shortcut it, I'm all in

9    favor of it.  Tell me how you can shortcut it.

10         A.    Well, let's go through it so I don't

11   misspeak.

12         Q.    I don't want you to misspeak.

13         A.    Okay.  I read this particular

14   document, you can look at it.  And I made no --

15   there was nothing remarkable in there.

16         Q.    Okay.  So what you're handing me is a

17   document marked Exhibit M65, which bears a Bates

18   stamp -- which bears Bates stamp numbers UD as in

19   dog, LL 000005805 through 5818.

20               (Cell phone interruption.)

21         Q.    Does your handwriting appear anywhere

22   on here?

23         A.    Yes.

24         Q.    Is it on the front page?

25         A.    Yes, it is.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 358

1          Q.    And if I can read this correctly, it
2    says receiving and then there's an arrow, four of
3    96, 00S thickness found at UDL PKG 70175A.  What
4    does that mean?
5          A.    It's -- it's just when I looked
6    through it, there was an out of specification when I
7    review documents as any GMP person does, he or she
8    would look for the term out of specification,
9    because it's potentially notable when I reviewed it.
10   It was meaningless in the context to my expert
11   opinion.
12         Q.    Who is UDL?
13         A.    UDL is apparently a contract packaging
14   firm that I believe there's probably a Mylan
15   relationship with.
16         Q.    What do they do?
17         A.    They -- I think they form blister
18   packs, at least I read that.
19         Q.    Blister packs of?
20         A.    Of I would guess Digoxin, and perhaps
21   others, I don't know, but it was not important to
22   me.  Okay?
23         Q.    So there is nothing important to you
24   about document M65 that has anything to do with any
25   opinion that you're rendering in this case?

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 359

1          A.     Not in the least bit.

2          Q.     Okay.  Thank you.  Okay.  The next

3     Mylan document that you reviewed.

4              Okay.  You've handed me a document that

5     is Exhibit M52 which bears the Bates stamp numbers

6     UDLL 0000014256 through 14268.  UDL document you've

7     highlighted that it's from Lee Radtke dated

8     February 10, 2007, re 483/warning letter summary for

9     Actavis (Amide.)  And I see no other highlights

10    throughout the document.

11         A.     It was not remarkable.

12         Q.     There was nothing remarkable about

13    Exhibit M52.

14         A.     Correct.

15         Q.     It had no bearing on your opinion in

16    any way, shape, or form; is that right?

17         A.     Zero.  That is correct.

18         Q.     Zero, zero, zippo.  It's 11 o'clock.

19    You want to take a break?

20         A.     No.

21         Q.     You don't?  I do.

22              THE VIDEOGRAPHER:  We're off the

23              record.  The time is 11:02.  This is the end

24              of tape 1.

25              (Recess taken).

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 360

```
 1              (Whereupon, Rick Fern joined the
 2         deposition.)
 3              THE VIDEOGRAPHER:  We're back on the
 4         record.  The time is 11:18.  This is the
 5         beginning of tape two.
 6    BY MR. KAPLAN:
 7         Q.    Okay.  Mr. Kenny, I think we had just
 8    talked about Exhibit M65, which you told me was one
 9    of the Mylan documents that you reviewed since your
10    deposition was taken on June 29, 2010, and that
11    there was nothing remarkable about that document,
12    correct?
13         A.    That is correct.
14         Q.    All right.  Moving on.  Let's go to
15    the next Mylan document in your notebook, please.
16         A.    (Handing).
17         Q.    You're handing me a document which was
18    previously marked as deposition Exhibit M47 bearing
19    the Bates numbers UDLL 000211178 through 182.  Looks
20    like an e-mail string that ends up with an e-mail
21    from Lee Radtke to Val Schissel, S-C-H-I-S-S-E-L,
22    dated Friday December 14, 2007.  I see no
23    highlighting --
24         A.    Right.
25         Q.    -- of yours on this document?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 361

    1          A.     Nothing remarkable.

    2          Q.     And -- and you're concluding and

    3    telling me that there is nothing remarkable that you

    4    found in your review or rereview of previously

    5    marked Exhibit M47, correct?

    6          A.     That is correct.

    7          Q.     Thank you, sir.

    8          A.     (Handing).

    9          Q.     Okay, sir.  The next Mylan document

   10    that you reviewed or rereviewed which you've just

   11    handed me is one that was previously marked Exhibit

   12    M45 bearing the number UDLL 000025489 through, looks

   13    like we don't have a consecutively numbered exhibit

   14    here.  The first two pages are -- and it's last four

   15    digits are 5489 and 5490, and then attached to that

   16    is a document headed "UDL Laboratories, Inc. Quality

   17    Assurance (in process)" with Bates numbers MYLN

   18    000035615 through 35620.  And actually it's -- that

   19    document as I flip through it is out of order,

   20    because I think it starts actually with 35607 and

   21    continues through 35620.  Anyway, tell me, I see it

   22    looks like -- I'm starting to recognize your

   23    handwriting here, you circled the date January 21,

   24    2008, and you have written "still no Q agreement"?

   25          A.     It's -- it's meaningless comment.  It

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 362

1   had -- nothing remarkable there.  I'd have to go

2   through it to even tell you why I put that down.

3         Q.    Okay.  Is there anything at all

4   remarkable about this document or anything --

5         A.    Not in the least bit.

6         Q.    Thank you.  And it -- it had no

7   influence whatsoever on your opinions?

8         A.    Zero.

9         Q.    By the way, we talked about UDL

10  before.  In all of your preparation for your report

11  which you submitted on June 15, 2010, and in

12  preparation for your deposition on June 29, 2010 and

13  again here today on February 16, 2011, have you seen

14  anything that would indicate to you that at any time

15  that UDL tested DIGITEK tablets to make sure that

16  they were in accordance with --

17        A.    I saw some -- I saw some test

18  information.  I saw no exceptions.  I saw no out of

19  specification test results.

20        Q.    Next document.

21        A.    (Handing).

22        Q.    This is a previously marked deposition

23  exhibit M39 bearing Bates stamp numbers MYLN

24  0000000381 through 385, and it looks like somebody's

25  handwriting on all of the -- all of the pages here.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 363

1    What does this mean to you?

2            A.    Nothing.   There is nothing remarkable.

3            Q.    Nothing remarkable and nothing about

4    previously marked Exhibit M39 which had any bearing

5    whatsoever on -- on any opinion that you rendered in

6    this case?

7            A.    That is correct.

8            Q.    Thank you.

9            A.    (Handing).

10           Q.    All right.   The next document that you

11   handed me that you have either reviewed or

12   rereviewed since your deposition was first taken on

13   June 29, 2010 is a previously marked deposition

14   exhibit M-34 with Bates number MYLN 000000408, a

15   one-page document headed "recall team."   Anything

16   remarkable about that document?

17           A.    Not in the least bit.

18           Q.    So nothing about Exhibit M34 that has

19   had any bearing on any opinion that you've rendered

20   in this case?

21           A.    That is correct.   (Handing).

22           Q.    The next document you're handing me is

23   a previously marked deposition Exhibit M31.   It

24   looks like it was marked in the deposition of

25   Mr. Adams, the deposition that you just told me that

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 364

1    you -- you had reviewed, right?

2          A.    That's correct.

3          Q.    And it is an e-mail from Mr. Adams to

4    a Mr. Elinski, E-L-I-N-S-K-I, dated May 13, 2008,

5    Bates numbers MYLN 000035283 through 35285.

6    Anything at all remarkable about that document?

7          A.    Nothing, zero.

8          Q.    Nothing that enlightened you in any

9    way?

10         A.    Not in any way.

11         Q.    Nothing that affected any opinion that

12   you have rendered in this case?

13         A.    That is correct.  (Handing.)

14         Q.    The next document that you've handed

15   me that you reviewed or rereviewed since your

16   deposition was taken on June 29, 2010 is marked --

17   was previously marked as deposition Exhibit M30,

18   again, from the deposition of Mr. Adams, and it's an

19   e-mail from Mr. Adams to a number of people dated

20   May 6, 2008.  Is there anything about that document

21   that you found remarkable?

22         A.    Nothing remarkable.

23         Q.    Enlightening?

24         A.    Not in the least bit.

25         Q.    So there is nothing about Exhibit M30

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 365

1    that in any way bears upon the facts or your opinion

2    in this case?

3          A.     That is correct.  There is -- correct.

4    (Handing).

5          Q.     By the way -- and you just handed me

6    another document, and I'm going to go into that, but

7    I just want to make sure I understand this on your

8    educational background.  You have a undergraduate

9    degree in engineering?

10         A.     That's correct.

11         Q.     What -- what specialization?

12         A.     Mechanical engineering.

13         Q.     And that's from what school?

14         A.     University of Dayton.

15         Q.     University of Dayton.  Dayton, Ohio?

16         A.     That's correct.

17         Q.     So a guy from New Jersey goes out to

18   Ohio for school, right?

19         A.     That's correct.

20         Q.     All right.  The Dayton fliers?

21         A.     You got it.

22         Q.     All right.  You have no graduate

23   degree?

24         A.     I do not have a graduate degree,

25   that's correct.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 366

```
 1            Q.     Okay.  You've just handed me what has
 2     been previously marked as deposition Exhibit M26,
 3     again, from the deposition of Mr. Adams that you
 4     told me today that you reviewed but found nothing
 5     remarkable in it.  Here, I see your handwriting, I
 6     think it says by Mr. Adams' name, executive director
 7     QA at Mylan?
 8            A.     Yes.
 9            Q.     Okay.  Anything about M26 that you
10     found remarkable?
11            A.     Nothing remarkable.
12            Q.     Or enlightening?
13            A.     It did not enlighten any further.
14            Q.     Or that bears in any way on any
15     opinion that you have rendered in this case?
16            A.     It does not bear on any opinion.
17     (Handing).
18            Q.     The good new is for the record, it
19     looks like we're getting closer to the end here.
20            A.     Yeah, well, you asked for this.
21            Q.     I did, I did.  Well, I you didn't ask
22     for it.  You just -- I did ask for it.  You have
23     handed me what has been previously marked as
24     deposition Exhibit M54 with Bates numbers MYLN
25     000997539 and 7540.  A document dated December 13,
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 367

```
 1   2006 from Lee Radtke to Chuck Koons.  I'll ask you
 2   the same question, is there anything that you found
 3   remarkable about that document?
 4           A.    Nothing remarkable.
 5           Q.    Or enlightening?
 6           A.    It did not enlighten me at all.
 7           Q.    So it had no bearing on any opinion
 8   that you've given in this case?
 9           A.    That is correct.
10           Q.    The next document that you've handed
11   me that you've reviewed or rereviewed since your
12   deposition was taken on June 29, 2010 is a two-page
13   document bearing Bates numbers MLYN 000032342 and
14   32343.  It looks like a letter dated November 23,
15   2006 to Actavis from Christopher Benson, director of
16   technical purchasing at Mylan Pharmaceuticals, Inc.,
17   with an attachment regarding the fact that "Mylan is
18   an authorized distributor of record and has an
19   ongoing relationship with Actavis pursuant to a
20   written supply and distribution agreement covering
21   DIGITEK .125 milligrams and .25 milligrams."  Is
22   that right?
23           A.    That is correct.
24           Q.    Anything remarkable about that?
25           A.    No.  I did not read that beforehand.
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 368

```
 1    It appears to have established some type of legal
 2    agreement, but since I'm not familiar with the
 3    terms, it has no bearing whatsoever.
 4         Q.    Okay.  And -- and this document on
 5    Page 32343 refers to a written supply and
 6    distribution agreement covering DIGITEK.  Have you
 7    seen that?
 8         A.    Yes, I have, sir.
 9         Q.    And anything about that agreement that
10    you found important?
11         A.    The -- it's the lack of information
12    that I found important.  It did not have the clauses
13    in it and the requirements, and it didn't establish
14    the GMP responsibilities between two parties.
15         Q.    It did not establish the GMP
16    responsibilities between the two parties?
17         A.    Right.  It didn't deal --
18         Q.    Go ahead.
19         A.    It didn't deal in the specifics that
20    are required to run a business.
21         Q.    Okay.  What are the specifics required
22    under the law to "run a business," as you put it?
23         A.    Well, you -- if -- can I pull the GMP?
24         Q.    Can you pull what?
25         A.    The good manufacturing practices to
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 369

1    show you what I believe can help answer that?

2         Q.    Well, just answer my question.

3         A.    That's the way I would answer that.

4    I'd like to read that.

5         Q.    You would like to read a GMP --

6         A.    Just one clause within the GMP.

7         Q.    When you say "the GMP," there are a

8    lot of GMPs, aren't there?

9         A.    Yeah.  This is -- this is part 210 and

10   part 211.  It's specifically in part 211 -- CFR part

11   211.

12        Q.    Sounds like you're pretty familiar

13   with that?

14        A.    I'm reasonably familiar with that.

15        Q.    CFR 211?

16        A.    Right.  Well, I'd have to go to the

17   particular clause.

18        Q.    Okay.  By the way, was the supply and

19   distribution agreement a document that you reviewed

20   before your deposition was taken?

21        A.    Yes, it was.  I have not reviewed it

22   since.

23        Q.    Was it a document that you reviewed

24   before you issued your report in this case?

25        A.    Yes, it was.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 370

```
 1          Q.    Is it a document that you have
 2   referenced in your report?
 3          A.    I have not referenced it.
 4          Q.    Why not?
 5          A.    Because it was remarkable by its
 6   absence of information.  Supply agreements in -- in
 7   my experience do not contain any information that is
 8   associated with the details of good manufacturing
 9   practices.  Therefore, when I see a supply agreement
10   and I flip through it and it has nothing, no
11   attachments, no references, it's -- it's of no
12   interest to me.
13          Q.    So what -- what I'm interested in and
14   what I'm going to ask you to go ahead and -- and
15   show me then is the CFR, the code of federal
16   regulations, dealing with good manufacturing
17   practices which requires Mylan to have included
18   something that you say was missing from the supply
19   and distribution agreement.
20          A.    Okay.
21          Q.    In its status as the distributor of
22   DIGITEK manufactured by Actavis pursuant to its
23   abbreviated new drug application approved by the
24   FDA?
25          A.    I understand.
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 371

 1              Q.     Okay.  Do you understand?

 2              A.     I believe so.

 3              Q.     All right.  Show me what you've got.

 4       Okay.  Just for the record, you're now going outside

 5       of the notebook here?

 6              A.     That's right.  Well, I'm just pulling

 7       my references.

 8              Q.     No, I understand, but just for the

 9       record, you were going through a notebook with

10       documents pertaining to Mylan that you have reviewed

11       or rereviewed since your deposition was taken on

12       June 29, 2010, right?

13              A.     That is correct.

14              Q.     And now you've -- you have brought

15       another notebook here.  What's the spine title on

16       that?

17              A.     It says "references."  It contains the

18       majority of the documents that I referenced.  It

19       does not contain any additional documents.

20              Q.     Okay.  So when you say it contains the

21       majority of documents that are referenced, you mean

22       that are referenced in your report?

23              A.     That is correct.

24              Q.     And your report dated June 15, 2010

25       submitted in this case has an appendix with all of

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 372

1    the documents that you referenced in -- in arriving

2    at your opinions, right?

3            A.    That is correct.

4            Q.    The significant documents, right?

5            A.    That is correct.

6            Q.    And there are -- there are 60 of them;

7    is that right?

8            A.    There are -- whatever that number is,

9    yeah.

10           Q.    I'm looking at page 42, and the last

11   document listed is number 60?

12           A.    Then that's it.  That's correct.

13           Q.    It's a two-page document, appendix B,

14   as in boy, references pages 41 and 42 of your

15   report, lists documents one through 60, right?

16           A.    That's correct.

17           Q.    Okay.  You're handing me -- you're

18   handing me 21 CFR section 211.22 entitled,

19   "Responsibilities of Quality Control Unit; is that

20   right?

21           A.    That is correct.

22           Q.    Who is that directed to?

23           A.    That's directed to the distributor and

24   the manufacturer.

25           Q.    Where -- where do you see that it's --

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 373

 1    it's directed to both the distributor and the

 2    manufacturer?

 3          A.    It is my understanding based on my

 4    experience that that is who it's directed towards,

 5    that's what I used as a head of QA as my directive,

 6    and it's what I would expect out of a contract

 7    manufacturing company, somebody who made product for

 8    me.

 9          Q.    Let me -- let me just make sure I

10    understand the basis here of your conclusion that 21

11    CFR section 211.22 is directed to both the

12    manufacturer of DIGITEK, Actavis, that had an ANDA

13    approved by the FDA and its distributor, Mylan.  You

14    say you're referring to your own experience?

15          A.    Correct.

16          Q.    As head of QA.  You were head of QA

17    for --

18          A.    Many companies, nine different --

19    eight different companies.

20          Q.    Within the Johnson & Johnson family?

21          A.    Within the Johnson & Johnson family of

22    companies.

23          Q.    Okay.  And were any of those companies

24    distributors of a product?

25          A.    Could you tell me what you are

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 374

1   describing as the distributor?  Define that for me,

2   please.

3          Q.    Well, isn't that what we're talking

4   about in this case?

5          A.    Yeah.  But I'd like to understand your

6   understanding.

7          Q.    Mylan -- it's your understanding that

8   Mylan was the distributor of DIGITEK, right?

9          A.    I -- if I can answer your question.

10         Q.    Is it your understanding that Mylan

11  was a distributor of DIGITEK?

12         A.    Yes.

13         Q.    Were any of the eight Johnson &

14  Johnson family companies for whom you were the

15  director of QA distributors of a product

16  manufactured by another company pursuant to an NDA

17  or an ANDA that had been approved by the FDA?

18         A.    I don't recall any.

19         Q.    So you had no experience as a director

20  of QA for a company that was a distributor like

21  Mylan?

22                MS. CARTER:  Object to form.

23         A.    As a head of QA, I do not recall us

24  being a distributor, and I'd have to really think

25  about it.  We're talking about 30 years of

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 375

1   experience in that regard.  Could you give me a

2   minute?  I'd like to mentally go through the

3   companies I've worked for.

4        BY MR. KAPLAN:

5             Q.    Absolutely.  Because I want -- I want

6   you to have your memory refreshed.  I want you to

7   testify to the best of your ability here today.  I

8   want you to bring all of your experience to bear,

9   and I want the jury to be able to understand --

10            A.    Right.

11            Q.    -- that when I say you, Mr. Kenny, in

12  all of your experience, have never been in the shoes

13  of Mylan as a distributor of a product manufactured

14  by a company like Actavis who is the holder of an

15  ANDA approved by the FDA, I want the jury to

16  understand that you have had no such experience.

17            A.    Okay.

18            Q.    And if that's not correct, you tell me

19  what's correct.

20            A.    Okay.  As the head of QA, I cannot

21  recall a product, as eight years in corporate, I did

22  audit companies, operating companies, that did

23  distribute product, market it, with -- and they did

24  not hold the ANDA or the NDA.

25            Q.    Tell me about your experience.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 376

```
 1          A.    I -- for over a period of eight years

 2   on and off, I audited probably on average 20

 3   companies per year worldwide.

 4          Q.    For whom?

 5          A.    Johnson & Johnson corporate.

 6          Q.    You -- you audited companies who were

 7   distributors of Johnson & Johnson products?

 8          A.    I -- I audited companies that were

 9   similar to Mylan in that they would distribute

10   products that they manufactured and distributed

11   products that were manufactured by another company

12   who either did -- did in some instances hold the NDA

13   or -- but mostly did not hold the ANDA or NDA.

14          Q.    Tell me about -- let's go through the

15   products.

16          A.    I can't recall, sir.

17          Q.    Let's go through the companies.

18          A.    I went to 200 companies.

19          Q.    Well, give me an example of a

20   situation where you audited some company that --

21   that was in a position similar to Mylan distributing

22   a product manufactured by another company, in this

23   case, Actavis, who was the holder of an abbreviated

24   new drug application, ANDA, approved by the FDA.

25   Give me one example.
```

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 377

```
 1            A.    I can't recall -- I do know that I had
 2      done auditing for Cilag.  I did auditing -- I
 3      audited them.  And they were in a position where
 4      they had products, and I can't recall what they
 5      were, that were manufactured by the holder of an
 6      ANDA or an NDA, probably an NDA, but I can't tell
 7      you what -- what products they were.  But I did a
 8      lot of audits.
 9            Q.    You mentioned one company, Cilag?
10            A.    Cilag.
11            Q.    Can you spell that for us?
12            A.    C-I-L-A-G.
13            Q.    Where is Cilag located?
14            A.    Schaffhausen in Switzerland.
15            Q.    Is Cilag subject to FDA regulations in
16      the United States?
17            A.    They do when they export product to
18      the United States.
19            Q.    What did Cilag distribute in the
20      United States?
21            A.    I don't recall.
22            Q.    Did they distribute a product in the
23      United States?
24            A.    Yes, they most certainly did.
25            Q.    But you don't know what product?
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

                                                              Page 378

 1          A.     I don't recall, sir.

 2          Q.     Who manufactured the product?

 3          A.     Well, they were the primary

 4     manufacturer, but they used contract manufacturers

 5     as --

 6          Q.     Well, that's a different situation

 7     than Mylan, isn't it?

 8          A.     No.  I understand, but you --

 9          Q.     Isn't it?

10          A.     No.  They did --

11          Q.     Mylan is not the primary manufacturer

12     of DIGITEK, is it?

13          A.     Can I explain?

14          Q.     Is Mylan the primary manufacturer of

15     DIGITEK?

16          A.     They are not.

17          Q.     So if Cilag was the primary

18     manufacturer of some product that you can't

19     remember, it's not an equivocal situation?

20          A.     No, no, no.  No.  Cilag did one of two

21     things, they either were the manufacturer and

22     distributor of the product of which some of those

23     products came to the United States of which when

24     I -- I audited them, I would use current GMP.  They

25     also distributed product that were where the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 379

1    holder -- the manufacturer was the holder of an ANDA

2    or an NDA.  And you know, there's others, Janssen

3    Pharmaceutical, even more -- I did more for them

4    than Cilag.

5          Q.    Wait a minute.  You were asked to do a

6    GMP audit of a company called Cilag for your

7    employer, Janssen?

8          A.    Johnson & Johnson.

9          Q.    Is it Janssen?

10         A.    Janssen is another company, a larger

11   company than Cilag.

12         Q.    Did you audit Cilag in your capacity

13   as an employee of Johnson & Johnson?

14         A.    That's correct.

15         Q.    Why?

16         A.    Because it was part of our

17   responsibilities is to audit all companies

18   worldwide.  That was our -- our mission.

19         Q.    Is Cilag a Johnson & Johnson company?

20         A.    Yes, it is.

21         Q.    What -- what -- what products did it

22   distribute?

23         A.    I don't -- I don't recall, sir,

24   anymore.

25         Q.    But you're telling me that Cilag

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 380

1    distributed products manufactured by non Johnson &

2    Johnson companies?

3            A.    That is correct.

4            Q.    But you don't know what -- what

5    products?

6            A.    I don't recall.

7            Q.    And you don't know -- you don't know

8    what other manufacturers' products Cilag

9    distributed?

10           A.    I do not.  I cannot recall.

11           Q.    And did Cilag have a quality agreement

12   with -- with manufacturers for whom it distributed

13   products?

14           A.    This was in '82.  I don't recall.

15           Q.    Did you ding them if they didn't?

16           A.    Would I ding them?  At that particular

17   point, I probably would not have.

18           Q.    Did they operate under a supply and

19   distribution agreement?

20           A.    The -- I don't recall.

21           Q.    But you went to Switzerland to audit

22   Cilag; is that right?

23           A.    That is correct.

24           Q.    And it's your understanding that Cilag

25   was responsible as a distributor of a product that

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 381

```
 1   you can't remember for a company, a manufacturer
 2   that you can't remember, subject to FDA's good
 3   manufacturing practice regulations?
 4          A.    I -- in thinking back, I probably
 5   didn't ask that question of Cilag or Janssen at that
 6   particular point.
 7          Q.    What question didn't you ask?
 8          A.    I did not ask to see the quality
 9   agreement.
10          Q.    Can you give me any other examples of
11   any experience that you've had with a company that
12   you say was in the shoes of Mylan, in other words,
13   being a distributor of a product manufactured by
14   another company, in this instance, Actavis, pursuant
15   to an ANDA approved by the FDA?
16          A.    Janssen Pharmaceutical.
17          Q.    Is another example?
18          A.    Yes, similar to Cilag.
19          Q.    Pardon?
20          A.    Similar to Cilag.
21          Q.    What -- what -- tell me about the
22   Janssen situation.
23          A.    It would be much the same.  I would
24   audit the Janssen headquarters and I -- which is
25   also the -- a manufacturing site.  And I would audit
```

Mark Kenny, Volume II            Videotaped                February 16, 2011

Page 382

1    some of their own manufacturers and some of their

2    contract manufacturers.

3            Q.    When you use the term again, "contract

4    manufacturer," and you use that in conjunction with

5    Janssen, are -- are you telling me that there were

6    instances where Janssen held an NDA or an ANDA and

7    contracted with others to manufacture the product?

8            A.    That is correct.

9            Q.    Is it your understanding that Mylan

10   did not hold the ANDA for DIGITEK?

11           A.    It is my understanding they did not

12   hold the ANDA or NDA.

13           Q.    So that's different than the Jantzen

14   situation?

15           A.    In that particular situation.  But

16   they also -- I'm sorry, I'm answering your

17   questions.  Go ahead.

18           Q.    That's -- that's fine.  Getting back

19   to the CFR that you referred to, what -- what is it

20   here that you say has bearing on Mylan's

21   responsibility?

22           A.    Okay.  Can I read it aloud?

23           Q.    Why don't you first show it to me,

24   show me exactly what it is.

25           A.    (Handing).  Section 22.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 383

1          Q.     Were you going to read the highlighted
2     portions?
3          A.     No, the whole thing is actually
4     important.  Basically what it does is tell the
5     reader that there are certain requirements for
6     quality systems that needed to be established and
7     documented, and that's it.
8          Q.     Okay.  Now, are you -- are you
9     familiar with GMPs that are applicable to
10    distributors of outsourced products?
11         A.     The GMPs are applicable to both the
12    distributor and the person who manufactures the
13    product.
14         Q.     Where -- where -- where do you derive
15    that understanding?
16         A.     I derive it from that statement.
17         Q.     From which statement?
18         A.     The quality -- section 22.
19         Q.     "There shall be a quality control unit
20    that shall have the responsibility and authority to
21    approve or reject all components, drug product
22    containers, closures, and processed materials."  Is
23    that the statement?
24         A.     Yes.
25         Q.     And you think that applies to both

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 384

1    manufacturers and distributors?

2          A.    I know it does.

3          Q.    How do you know that?

4          A.    Because that's the way I was trained.

5          Q.    Can you show me something in -- in the

6    regulations here that says this is applicable to

7    distributors and to manufacturers of products that

8    are approved by the FDA pursuant to an ANDA or an

9    NDA?

10         A.    I am not a legal expert.  I cannot

11   point to that.

12         Q.    So if you are wrong, then, if this

13   only applies to a manufacturer and not a

14   distributor, that would affect your opinion?

15         A.    I am not wrong, but it would.

16         Q.    Are you familiar with the distribution

17   procedures that are set forth in the GMPs?

18         A.    Reasonably familiar, but I always

19   reread them to refamiliarize myself when I have

20   questions.

21         Q.    The regulation that you were referring

22   to is part of section two --

23         A.    Do you want me to give you the

24   specific thing?

25         Q.    Let me just see that.

Mark Kenny, Volume II            Videotaped                 February 16, 2011

Page 385

1            A.    Sure.  Let me turn the page for you.

2            Q.    So, you are also familiar with, I take

3    it, 21 CFR 210.1 regarding the status of good

4    manufacturing practice regulations?

5            A.    I have to reread it.

6            Q.    Well, I'll just -- I'll read you

7    section A under section 210.1, and ask you whether

8    you agree with this.  The regulation set forth in

9    this part and in parts 211 through 226 of this

10   chapter, "contain the minimum current good

11   manufacturing practice for methods to be use in and

12   the facilities or controls to be used for the

13   manufacture, processing, packing, or holding of a

14   drug to ensure that such drug meet the requirements

15   of the act as to safety and has the identity and

16   strength and meets the quality and purity

17   characteristics that it purports or is represented

18   to possess."  Does that sound familiar to you?

19           A.    Yes.

20           Q.    Okay.  That's the manufacturer's

21   responsibility, isn't it?

22           A.    That is the manufacturer's or the

23   distributor's responsibilities.

24           Q.    And -- and again, with all due

25   respect, sir, where do you see that that is a

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 386

 1    distributor's responsibility?
 2           A.    I did not see that word in there.  It
 3    is my understanding that it does include a
 4    distributor of the product.
 5           Q.    And that understanding is derived from
 6    what?
 7           A.    From my experience and my training.
 8           Q.    In all of the documents you reviewed
 9    regarding FDA inspections regarding DIGITEK, did you
10    ever see the FDA inspect Mylan?
11           A.    No, I did not.
12           Q.    Why not?
13           A.    I don't know, you have to ask them.  I
14    don't know.
15           Q.    Well, you have a lot of experience,
16    don't you?
17           A.    I have experience but not as a -- from
18    an FDA standpoint.  And whether they were audited or
19    not, I don't know.  Perhaps they were audited or
20    inspected.
21           Q.    Did you see anything that -- that led
22    you to believe that the FDA was ever critical of
23    Mylan?
24           A.    I didn't see any reference to Mylan
25    where there was criticism.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 387

1          Q.     By the FDA?

2          A.     By the FDA.

3          Q.     Okay.  Moving right along with your

4    book here of the Mylan documents that you reviewed

5    or rereviewed since your deposition was initially

6    taken on June 29, 2010, please hand me the next

7    document.

8          A.     This really is -- well, it's basically

9    the same.  Let me show you it to you.  It's an

10   unsigned version of a -- of a similar subject.

11         Q.     It may be in fact exactly the same.

12         A.     It may be.

13         Q.     It bears the Bates number -- it's a

14   one-page document with Bates number MLYN 000032343,

15   which was I believe the second page that was

16   attached to the earlier document, right?

17         A.     I am sure that's right.

18         Q.     Okay.  So, again, there is nothing

19   here that's remarkable to you?

20         A.     Nothing.

21         Q.     Nothing that bears upon your opinion?

22         A.     Correct.

23         Q.     Nothing that you found enlightening?

24         A.     No, nothing enlightening.

25         Q.     Okay.  In all of your experience,

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 388

1    let's go back to that situation you were describing

2    to me before about a company called Cilag.

3         A.    Cilag.

4         Q.    C-I-L-A-G, and Janssen, were they

5    considered authorized distributors of record?

6         A.    I don't know what legally they were

7    categorized as.

8         Q.    So how would you conduct an audit of

9    those companies without knowing what their legal

10   status or -- or the requirements were?

11        A.    Based upon my training, they were

12   required to meet all aspects of the GMPs, so the

13   compliment of the two companies had to meet every

14   requirement.

15        Q.    Fundamental to your opinions in this

16   case is the legal status of the party involved,

17   right?

18        A.    I'm not sure if it is.

19        Q.    Well, the legal status of the party

20   involved carries with it certain legal requirements,

21   doesn't it?

22        A.    But this is going beyond what I am

23   looking at.  I am looking at, based upon my

24   training, what the expectation is from the FDA and

25   business norms, expected business norms, what the

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 389

```
 1    control systems that should be in place to meet all
 2    aspects and conditions of GMP.
 3             Q.    When you refer to "business norms,"
 4    what's -- what's the foundation for your arriving
 5    at, quote, what "business norms" are?
 6             A.    When I review a company and I review
 7    for business norms, I would recommend to them
 8    perhaps improvement based upon benchmarking other
 9    companies.  It wouldn't be an observation, it would
10    be part of continual improvement process.
11             Q.    Just refer me to the underlying
12    documents that establish the business norms in your
13    area of expertise.
14             A.    It would be my informal understanding
15    of best practice.
16             Q.    Is there any document whatsoever that
17    establishes "business norms"?
18             A.    Absolutely nothing.
19             Q.    This is all kind of up in your head,
20    right?
21             A.    When it comes to success models, it is
22    in my head based upon the companies or experience
23    that I've had.
24             Q.    So -- so when you -- so when you use
25    the term and you refer to business norms, that's
```

Mark Kenny, Volume II          Videotaped              February 16, 2011

                                                              Page 390

 1   whatever Kenny says the norm shall be?

 2          A.    That is what -- in that regard, I

 3   wouldn't put it that way, but I understand your

 4   question, and I would say, yes, it's based upon

 5   my -- it's -- it's much like a consultant going in

 6   and saying it does not necessarily violate GMP, but

 7   it's a good thing to do.

 8          Q.    It is twelve o'clock.  Do you want

 9   to --

10          A.    I'll tell you if I'm not holding up

11   well.

12          (Handing.)  This is much the same.

13          Q.    Okay.  You've just handed me another

14   document that you've reviewed or rereviewed since

15   your deposition of June 29, 2010.  And it is a

16   previously marked Exhibit M-7 from the deposition of

17   Susie Wolf that bears Bates numbers MYLN 000032473

18   through 75.  By the way, you did not read the Susie

19   Wolf deposition, did you?

20          A.    Susie Wolf.  I don't recall.  I'd have

21   to -- I did not reread it, perhaps I read it earlier

22   and I found nothing --

23          Q.    Wait a minute.  Wait a minute.  In

24   your previous deposition, you said the only Mylan

25   deposition you read was Chuck Koons.  Earlier today

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 391

1    you said oh, no, no, I was mistaken.  I think I read

2    Mike Adam, and at least I reread Mike Adams.  That's

3    one of the documents here.  And then I said, well,

4    have you read any other Mylan depositions, and you

5    said no.

6              A.    And your question is?

7              Q.    You haven't read any other Mylan

8    depositions, have you?

9              A.    No, I have not read Susie Wolf's

10   deposition.

11             Q.    Is there anything about this document

12   marked Exhibit M7 that you found remarkable?

13             A.    Nothing.

14             Q.    Nothing enlightening?

15             A.    Nothing enlightening.

16             Q.    Nothing that bears on any opinion that

17   you have rendered in this case, right?

18             A.    That is correct.

19             Q.    The next document that you have handed

20   me is marked Exhibit M8.  Also from the deposition

21   of Susie Wolf, with Bates numbers MYLN 000032477

22   through 79.  It looks to me like your handwriting on

23   the front.  It says "done" with a big red checkmark?

24             A.    It just means I've read it.

25             Q.    And then you've got a line through the

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 392

1    first page, right?

2          A.    Yes.

3          Q.    And what -- what -- and then you put a

4    big checkmark on the second page?

5          A.    Yes.

6          Q.    You have a circle with a question mark

7    on it?

8          A.    I don't know what that meant.  That

9    was reviewed a while back.

10         Q.    So I take it there's nothing about

11   this Exhibit M8 that you found remarkable,

12   enlightening, or had any bearing upon any opinions

13   that you've given in this case?

14         A.    That is correct.  Do you want to see

15   things that I had read that are not --

16         Q.    Well, I want to know what it is that

17   you have done since your deposition was taken on

18   June 29, 2010 by way of research, review, testing,

19   discussions with counsel, anything that you've done

20   that you think, you know, was significant or not

21   significant.  I don't care.  I just want to know

22   what you've done.

23         A.    But if I reread a document to

24   familiarize myself with it, it didn't change

25   anything, you have no interest in looking at it.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 393

```
 1              Q.    Unless there was something significant
 2    or you learned something or it reinforced --
 3              A.    All of these were that.
 4              Q.    When you say all of these were, we're
 5    getting toward the end here?
 6              A.    Yeah.  We head towards the end, it's
 7    kind of like anything else, either I have read it,
 8    and you know, I understand it, et cetera, and I've
 9    factored that in accordingly into my expert opinion
10    or my report.
11              Q.    And if it was really significant, it
12    would be among the 60 documents that you have listed
13    in appendix B to your report of June 15, 2010 as the
14    referenced documents, correct?
15              A.    That is correct.  And -- so that's
16    what we're going through now.  It's kind of the tail
17    ends of this.  That's why --
18              Q.    Okay.  Well, we can do this.  In -- in
19    the tail end of these documents that are in this
20    notebook, is there anything that jumps off the page
21    at you?
22              A.    I really would like to look at it to
23    make sure I can answer that.
24              Q.    Okay.  And you know what I mean by
25    that?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 394

```
 1          A.    I know exactly what you mean.

 2                MS. CARTER:  Do you want him to do

 3          that during lunch?

 4          A.    It will only take me a couple of

 5    minutes.

 6                MR. KAPLAN:  Why don't we do that

 7          right now, and then we can get through this

 8          notebook, and then we'll move on to another

 9          subject after lunch.  We'll stay on the

10          record.

11          A.    To answer your consistent question,

12    there is nothing remarkable, and it had no effect,

13    the new documents had no effect on my report.

14          Q.    Okay.  And of these remaining

15    documents, tell me which ones are new to you.

16          A.    Well, a lot of them have to do with

17    UDL.  And again, as I explained, my process was to

18    just print these up.  And so I just -- when in

19    doubt, I printed them, I looked at them.  If there

20    is nothing remarkable, there is zero on it.  If

21    there was something remarkable, there may be a note,

22    even that may have no importance.

23          Q.    Okay.  So there is no either new

24    document pertaining to Mylan that you reviewed since

25    your deposition of June 29, 2010 or any old Mylan
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 395

```
 1   document that in any way was remarkable to you?
 2           A.    There was nothing.
 3           Q.    All right.  How about some lunch?
 4           A.    Sounds good.
 5           Q.    Not here yet.  Okay.  Well, we can
 6   take a restroom break and relax a little bit.
 7           A.    Do you want to take a short lunch?
 8                 THE VIDEOGRAPHER:  We're off the
 9           record.  The time is --
10                 THE WITNESS:  Do you want to continue
11           until lunch.
12      BY MR. KAPLAN:
13           Q.    I'm good to go.  Are you good to go?
14           A.    I'll raise my hand.
15           Q.    Okay.  You raise your hand.  I told
16   you earlier I don't want to put you --
17           A.    It's a challenge.
18           Q.    I don't want to put you through
19   anything unnecessarily.  Okay.  Let's -- let's do
20   this:  Remember at the end of your deposition on
21   June 29, 2010, I simply asked you to make sure that
22   you went through the documents you were requested to
23   bring to your deposition, which you hadn't brought
24   in their entirety the first time around.  And I
25   said, now, I'm going to have a chance to examine
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 396

1    you, and I want to make sure you bring everything

2    with you?

3              A.    Which I have.

4              Q.    Okay.  So let's go through the

5    documents requested in the amended notice of the

6    video deposition.  This is what we call like a

7    subpoena duces tecum, in other words, the witness is

8    requested to bring these documents.  And you told me

9    you would do that, and now you're telling me you

10   have brought them, right?

11             A.    That is correct.

12             Q.    Okay.  So number one asks for your

13   current curriculum vitae or résumé.

14             A.    Right.

15             Q.    Is there anything -- it's in that

16   report, isn't it?

17             A.    That's it.

18             Q.    And that's it?

19             A.    Yes.

20             Q.    So what -- what is on your CV in the

21   report of June 15, 2010 is accurate, right?

22             A.    That is correct.

23             Q.    And it's up-to-date, right?

24             A.    That is correct.

25             Q.    All right.  We'll -- we'll go through

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 397

1   some of that --

2          A.    Let me make sure it's up-to-date, sir.

3          Q.    Actually, you say in your report on

4   Page 3, that your complete CV is at appendix A of

5   your report, so that would be on page 37 and 38, 39,

6   40.  So 37 through 40, that is your CV, right?

7          A.    Yes.  And that is a complete CV.  Same

8   as what I brought here (indicating).

9          Q.    Okay.  Number two asks that you bring

10  all correspondence and communication between the

11  witness, you, or anyone acting on the witness'

12  behalf, and attorneys representing plaintiffs in

13  this Digitek litigation.  So have you brought that?

14         A.    Could you repeat that?  I'm sorry.  I

15  was reading.

16         Q.    Okay.  You -- you have had this --

17         A.    I have had that, and I went through it

18  line by line.

19         Q.    And I think Meghan told me you did.  I

20  appreciate you your being conscientious about that.

21  Correspondence and communication between you, the

22  witness, or anyone acting on your behalf.

23         A.    Yes.

24         Q.    And anyone else from SpyGlass or any

25  of your partners or business associates, and

Page 398

1    attorneys representing plaintiffs in this

2    DIGITEK litigation.

3          A.    That's correct.

4          Q.    Okay.  Do you have that

5    correspondence?

6          A.    Oh, yeah.  Oh, I thought you started

7    going through it.  It's going to take me a couple of

8    minutes just to -- I mean, I have three volumes of

9    this stuff.  (Handing.)

10         Q.    Okay.  By the way, you work pretty

11   closely with your colleague, Sal Romano, in this

12   case?

13         A.    I do at times.

14         Q.    You did in this case?

15         A.    Initially I did.

16         Q.    Well, you did up until ten days before

17   you issued your final opinion, didn't you?

18         A.    If that's the date.  I -- perhaps it

19   was ten days.

20         Q.    But you and Sal Romano collaborated on

21   the expert opinions that finally came out under your

22   name, right?

23         A.    Yes.  He was basically a consultant to

24   me, if you will, and then it was determined that --

25   originally we had discussed both of us signing a

Mark Kenny, Volume II              Videotaped                    February 16, 2011

Page 399

1   deposition.

2         Q.    Signing the report?

3         A.    Signing the report, rather, and he

4   felt he could not meet the legal schedule and

5   therefore had to -- had to pull back.

6         Q.    But he was your partner in -- in

7   getting to --

8         A.    I wouldn't use the name "partner," but

9   he participated.

10        Q.    He was part of the SpyGlass group?

11        A.    Part of the SpyGlass group.

12        Q.    He has billed for his time?

13        A.    That -- that is correct.

14        Q.    At $430 an hour as well, right?

15        A.    That is correct.

16        Q.    So essentially, the Plaintiff's

17   lawyers got two for one here, right, but charged

18   separately?

19        A.    Or one for two, but yeah.

20        Q.    Yeah.  So between the two of you,

21   that's $860 an hour?

22        A.    When we work -- yeah, right.  If we

23   work together, it would be -- it would add up to

24   that.

25        Q.    $860?

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                                Page 400

    1          A.    Yes.

    2          Q.    Okay.  And did you bring the -- the

    3   correspondence between you and Sal?

    4          A.    I brought all of the correspondence

    5   between Sal and I, yes.

    6          Q.    Oh, did you?  Okay.  Is that in this

    7   folder here?

    8          A.    That would be in the e-mails.

    9          Q.    Okay.  So I have a folder here, and

   10   I'm going to ask the court reporter to mark it as

   11   Exhibit 110.

   12                (Whereupon, Exhibit 110, Folder, was

   13          marked for identification as of today's

   14          date.)

   15     BY MR. KAPLAN:

   16          Q.    So this folder labeled "e-mails,"

   17   which has been marked as Exhibit 110, contains all

   18   the correspondence between you and any of the

   19   Plaintiff's lawyers for whom you are working here?

   20          A.    That is correct.

   21          Q.    And between you and Sal Romano?

   22          A.    That is correct.

   23          Q.    And who else collaborated on -- on

   24   your opinions in this case?

   25          A.    Nobody else.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 401

1          Q.    You had mentioned another person at

2    the deposition on June 29, 2010 who engaged you or

3    introduced you to the Motley Rice firm.

4          A.    Yeah, John Kowalski.

5          Q.    And who is John Kowalski?

6          A.    I worked with John 30 years ago, 25

7    years ago, and he's -- I think he has his own

8    independent consulting company.

9          Q.    Okay.  What was his role in this case?

10          A.    Giving us a telephone number of who to

11    call.

12          Q.    So he didn't participate

13    substantively?

14          A.    Not in the least bit.  I didn't even

15    talk to him.

16          Q.    And he hasn't billed for any of his

17    work in this case?

18          A.    No, he has not.

19          Q.    Okay.  How about Russ Somma,

20    S-O-M-M-A?

21          A.    Yeah.

22          Q.    Okay.  Was he part of your team?

23          A.    No, he was not part of the group.

24          Q.    Who is Russ Somma?

25          A.    Russ Somma is an independent

Mark Kenny, Volume II          Videotaped          February 16, 2011

                                                              Page 402

 1   consultant who is an expert on tableting, among

 2   other things.

 3          Q.    Well, didn't you recommend to the

 4   plaintiff's lawyers in this case that Russ Somma be

 5   included as part of the, quote, evaluation team?

 6          A.    We recommended -- we offered his name

 7   as somebody that based upon our research, was

 8   qualified.

 9          Q.    And you recommended that Russ Somma be

10   part of the "evaluation team," right?

11          A.    No, I would not say that.  I

12   recommended that they talk to him.  I don't have

13   first-hand --

14          Q.    You did say that, didn't you?

15          A.    What's that?

16          Q.    Well, I'm looking at an e-mail here,

17   and I'm going to show it to you, from SpyGlass

18   Group, Inc., that's you?

19          A.    Yeah.

20          Q.    Dated March 23, 2010 to Meghan Johnson

21   Carter, that's Meghan sitting here, and Sal Romano,

22   with copies to Sandy Summers, Fred Thompson, Pete

23   Miller, and SpyGlass Group, Inc., subject, drug

24   tableting expert.  And it says -- you tell me if I'm

25   wrong -- I'm going to show it to you.  "I recommend

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 403

1    that you consider Russ Somma as part of the

2    evaluation team."

3          A.     Yes, I said that, I'm sure.  I mean,

4    it's in there, and I did recommend that they

5    consider him, that based upon -- I'm sorry, go

6    ahead.

7          Q.     Go ahead.

8          A.     No.

9          Q.     What else did you want to add?  What

10   happened with Mr. Somma?

11         A.     They engaged him and had a contract

12   with him and they engaged him.

13         Q.     So is he part of the evaluation team?

14         A.     He's not part of any team that I'm a

15   part of.

16         Q.     Well, did he participate in the work

17   that you and Sal Romano did in arriving at opinions

18   in this case?

19         A.     No, zero, absolutely zero.

20         Q.     Mr. Romano is a PhD, is he?

21         A.     That is correct.

22         Q.     And what does he have his PhD in?

23         A.     Analytical chemistry.

24         Q.     And he is the vice president of the

25   SpyGlass Group?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 404

 1          A.     He's a vice president of the SpyGlass
 2     Group, that's his title.
 3          Q.     And you are the managing director of
 4     the SpyGlass Group?
 5          A.     That is correct.
 6          Q.     That is a corporation?
 7          A.     That is a corporation.
 8          Q.     That does work as expert witness in
 9     litigation?
10          A.     That does consulting work.
11          Q.     And work as expert witness in
12     litigation?
13          A.     Recently.  Recently.
14          Q.     Actually, the expert witness work is
15     more lucrative than the consulting work?
16          A.     It gets billed at a higher rate when
17     it's billed.
18          Q.     When you worked for Johnson & Johnson,
19     were you paid $430 an hour?
20          A.     No, I was not.
21          Q.     How much were you paid per hour?
22          A.     I don't know.  I made on average a
23     quarter of a million dollars a year.  You figure out
24     per hour what that is since 1990.
25          Q.     It wasn't 430 an hour?

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 405

```
 1          A.    I have no idea.  I'd have to
 2    extrapolate it out.  It was probably 5 cents an hour
 3    based upon the number of hours that I worked.
 4          Q.    Okay.  So what was Mr. or Dr. -- is it
 5    Dr. Romano?
 6          A.    Yes.
 7          Q.    What was Dr. Romano's role?
 8          A.    Originally it was to offer expert
 9    opinion.
10          Q.    On what?
11          A.    On this, the case that I worked on
12    that -- that we're discussing today.
13          Q.    Okay.  You have different areas of
14    expertise?
15          A.    Yes, that is correct.
16          Q.    Your expertise you say is in --
17          A.    Quality systems.
18          Q.    Quality systems.  And his expertise is
19    in?
20          A.    His expertise is in the laboratory and
21    in managing a world-class company from a corporate
22    standpoint.
23          Q.    What world-class company did he
24    manage?
25          A.    Johnson & Johnson.  He was the head of
```

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 406

1    quality and compliance services for, I don't know,

2    10 years or so at the company.

3           Q.    What -- what did he contribute to the

4    opinions that you rendered in your report of

5    June 15, 2010?

6           A.    Could you -- can I ask you to rephrase

7    that?  And it's an important question.  Rephrase it.

8           Q.    I'll have the court reporter to ask it

9    back again and you tell me.

10                (Record read.)

11          A.    Nothing.

12          Q.    Well, what did he bill for?

13          A.    He billed for review, as I billed for

14   review.

15          Q.    What was his review?

16          A.    His review -- he reviewed the same

17   things that I reviewed.

18          Q.    So you worked kind of in double

19   harness?

20          A.    Correct.  We were in parallel.

21          Q.    But you didn't find his input helpful

22   to you in arriving at opinions?

23          A.    I found his -- his opinions helpful

24   and that they reinforced what I understood to be the

25   business, and I understood the requirements.  He did

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 407

1    reinforce my opinion.  In other words -- yeah,

2    that's it.

3          Q.    What -- what -- what opinion did he

4    reinforce for you?

5          A.    Depends upon the section of the

6    document.  He read my report and then we discussed

7    it.  As a matter of fact, you have a copy of the

8    report where we met and he read, and you know, he

9    gave me his input.  Most of it was typing and

10   spelling kind of thing.

11         Q.    He helped you write the report?

12         A.    He assisted.  I would have to say yes,

13   yes.

14         Q.    How did he help you write the report?

15         A.    Well, he participated in it.

16         Q.    Who was the original drafter of the

17   report?

18         A.    I am.  I am the drafter.  I am the

19   writer.  He was a reviewer.

20         Q.    Meghan was a reviewer?

21         A.    No, Meghan didn't review anything.

22         Q.    She didn't?

23         A.    No.

24         Q.    Never did?

25         A.    Oh, yeah.  I sent her one copy, I

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 408

1    don't know, towards June 3rd or something like that.

2    She reviewed a copy on June 3rd, never saw -- never

3    saw a single document other than I flashed in front

4    of them the first document that I was working on,

5    that I was working on.

6              Q.    When you say "I flashed in front of

7    them" --

8              A.    Flashed, meaning we had a meeting,

9    very first meeting --

10             Q.    Who is we?

11             A.    Sal Romano and myself, Pete Miller and

12   Meghan.  We had a meeting and they asked me how is

13   it going?  And I said fine.  And I gave them my

14   approach and I said my approach is very analytical.

15   I don't jump to conclusions, but I logically go

16   through it, and at the end of it, I will make some

17   type of a conclusion.  And I showed them what I was

18   working on, I'm taking all of the facts, I'm

19   compiling them, I'm organizing them, which

20   ultimately became the tables or some edits became

21   the tables.  And based upon that which was the first

22   draft of my report, then I started adding meat to

23   the report narrative.  And at that point, Sal would

24   review the narrative.  We met twice.

25             Q.    When was it that you said you -- you

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 409

1    met with Meghan Carter and Pete Miller to show them

2    your report?

3              A.    I'd have to go through the e-mail, but

4    it -- it should be there.

5              Q.    But -- but you didn't meet with them

6    before your report was finalized?

7              A.    Yes.  That is correct.

8              Q.    And they reviewed that report?

9              A.    They did not review the report, they

10   didn't even look at it.  They didn't see a word in

11   it, nothing, zero.  I had -- I had something right

12   here, I'm explaining, please.

13             Q.    Okay.  Sure.

14             A.    This is very important, I understand

15   that.  I had a document which is quite similar to

16   the attachments that are in there (indicating),

17   which you have electronic copies of and you have

18   electronic copies of every single change that I made

19   because I was really particular about it, okay?  I

20   had that document here (indicating), and they said

21   what -- how are you doing?  I said I am reviewing

22   it.  I said I'm compiling it.  I said here is my

23   approach.  Is it -- I asked them if it was logical,

24   and they said sure, go for it.

25             Q.    So they didn't review -- Meghan Carter

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 410

1    or Pete Miller did not review your report?

2            A.    Sir, I will answer this again, but

3    it's not necessarily to repeat it.  They looked at

4    no report other than the June 3rd or whatever it

5    was, report, and that was it.

6            Q.    Okay.  So they looked at a report on

7    June 3rd?

8            A.    June 3rd, yeah, or thereabouts.

9            Q.    The Plaintiff's lawyers did?

10           A.    Yes.

11           Q.    They reviewed the report that you gave

12   them on June 3rd?

13           A.    That is correct.

14           Q.    And they had input into your final

15   report, didn't they?

16           A.    They had some wordsmithing assistance.

17           Q.    They -- they gave you direction as to

18   what -- what should be said in the final report?

19           A.    No.  They challenged me, quite

20   honestly.  They challenged me as to whether or

21   not -- they said, remember, and they gave me some

22   rules, if you will, as an expert that all of your

23   opinions have to be based upon facts and data and

24   experience.  And I wanted to make sure that I

25   wasn't, you know, shooting from the hip.  So it was

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 411

1    really to -- just to make sure I wasn't over

2    extending my -- my expert experience.

3          Q.    They told you that all of your

4    opinions had to be based on facts, data, and what,

5    research?

6          A.    Well, I'm paraphrasing.  They

7    didn't -- we didn't discuss it that way, but the way

8    I interpreted it is that my opinion need to be based

9    upon my expert -- or the experience that I had which

10   would render me a -- an expert witness.  And that --

11   yeah, sorry.

12         Q.    And -- and you got specific direction

13   from the plaintiffs' attorneys as to what should be

14   contained in the report, didn't you?

15         A.    I -- no.  I had some I would say

16   grammar -- Meghan, if I recall, just -- it was

17   grammar.  I don't think there was anything else.

18   And I believe there might have been a discussion

19   with Pete on whether or not I -- that's an expert

20   opinion or is that your opinion?  And I changed, I

21   don't know, a paragraph, two paragraphs, if that,

22   and rephrased it.  I'll give you an example.

23         Q.    You're kind of rambling and -- and

24   you're going beyond the question I asked you.

25         A.    Sure.  Go right ahead.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 412

1          Q.    You got substantive input from the

2     Plaintiff's lawyers on what should be contained in

3     your opinion.

4          A.    I would not call that substantive.

5     No, I did not get substantive opinion or direction.

6          Q.    So it's your testimony, then, you got

7     no substantive direction from any of the Plaintiff's

8     lawyers as to what should be contained in your

9     report of June 15, 2010?

10          A.    Yes.  Thank you for phrasing it that

11     way.  Yes, that is correct.

12          Q.    No Plaintiff's lawyer told you

13     anything about what you should say as to Mylan?

14          A.    Absolutely not, zero.

15          Q.    Let's -- why don't we -- why don't we

16     break now.  It's 12:30 and we'll have lunch and

17     we'll come back.

18                THE VIDEOGRAPHER:  We're off the

19                record.  The time is 12:34.  This is the end

20                of tape 2.

21                (Luncheon recess taken.)

22                A F T E R N O O N   S E S S I O N

23                        (1:33 p.m.)

24

25                THE VIDEOGRAPHER:  We're back on the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 413

```
 1        record.  The time is 1:32.  This is the
 2        beginning of tape 3.
 3
 4   M A R K   G.   K E N N Y, resumed having been
 5   previously duly sworn, was examined and testified
 6   further as follows:
 7
 8   EXAMINATION (Cont'd.)
 9   BY MR. KAPLAN:
10        Q.    All right.  So we were just asking you
11   about -- I was asking you about the preparation of
12   your report and whether or not you got substantive
13   input and direction from the Plaintiff's lawyers.
14        A.    Uh-huh.
15        Q.    And your answer to that?
16        A.    Absolutely no substantive information,
17   direction, of any sort.
18        Q.    Okay.  And I'm going to ask you
19   whether you got substantive input and direction in
20   the preparation of your report from Sal Romano?
21        A.    No, I did not.
22        Q.    Did not?
23        A.    Did not.  The report is my report.
24        Q.    He had no input into it?
25        A.    We discussed it.  Did he have input
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 414

1    into the report?  No.  Because the report is mine,

2    has to be in my words.  It has to be in my belief

3    system, and that's what is in this report.

4          Q.    Did Mr. Romano give you direction as

5    to things that you should include in your report

6    that you didn't include in previous drafts?

7          A.    Nothing, zero.

8          Q.    And likewise as to the Plaintiff's

9    lawyers, did the Plaintiff's lawyers give you any

10   direction or input as to matters that should be

11   included in your final report that weren't included

12   in previous drafts?

13         A.    No.

14         Q.    And you're sure of that?

15         A.    I'm sure of that.

16         Q.    Let's just -- let's continue marching

17   through the documents that you were requested to

18   bring today and see what we have.  You gave me the

19   correspondence and communication that you have had

20   with the Plaintiff's lawyers and other people with

21   whom you've been working, including Mr. Romano?

22         A.    Correct.

23         Q.    Number 3, all other documents prepared

24   by the attorneys for the plaintiffs and sent to the

25   witness?

Mark Kenny, Volume II            Videotaped                February 16, 2011

                                                              Page 415

     1          A.     Say that again, sir.

     2          Q.     All other documents prepared by the

     3    attorneys for the plaintiffs and sent to the

     4    witness?

     5          A.     Yes, I have -- I need to look through

     6    that, but I have the e-mails.

     7          Q.     What do you need to look through?

     8          A.     I don't know if I threw them all in

     9    there or not.

    10          Q.     Are they in here or are they not in

    11    here?

    12          A.     Well, I don't know.  I just want to

    13    check.

    14          Q.     Okay.  I have flagged some things --

    15          A.     Are those all of the e-mails?  If they

    16    are all e-mails, then -- because I have a letter, a

    17    contract letter, and I think that's pretty much it.

    18    Would you like me to --

    19          Q.     Just look and see whether other than

    20    this file that has been marked as Exhibit 110,

    21    whether there are any other documents that you

    22    brought with you today that constitute other

    23    documents prepared by the attorneys for the

    24    plaintiffs and sent to you.

    25          A.     You mean -- does that include -- I

Mark Kenny, Volume II            Videotaped            February 16, 2011

Page 416

1    gave you a CD of -- a copy of a CD with documents

2    that were sent to me.  Those were primarily

3    plaintiff documents.  I think all of them may have

4    begin with a P.  You have that copy of that.

5             Q.    You gave me two disks this morning.

6             A.    Correct.

7             Q.    Okay.  And you're saying that any

8    documents that you received from plaintiffs other

9    than the e-mail correspondence would be on -- on

10   those two disks?

11            A.    That's correct.

12            Q.    Okay.

13            A.    Do you want me to look, further look?

14            Q.    Well, we're here today to take your

15   testimony and to make sure that I have in front of

16   me all the items that were requested so that I can

17   ask you questions.

18            A.    (Handing.)

19            Q.    You're handing me a pile of documents

20   here that you are indicating would be responsive to

21   the request for documents prepared by attorneys for

22   the plaintiffs and sent to you?

23            A.    No.  Those are -- those are

24   communications.  I didn't get anything of documents

25   that were prepared by them other than a contract --

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 417

1   that's it.  That's the only thing that I received.

2                   MR. KAPLAN:  Let's mark as Exhibit 111

3           this document.

4                   (Whereupon, Exhibit 111, Chronology

5           from disks, was marked for identification as

6           of today's date.)

7   BY MR. KAPLAN:

8           Q.    I will just say for the record that

9   this came from one of the disks that you gave me,

10  and the cover on that says, "Host name:

11  172.17.66.179."  And then user name AMW.  I don't

12  know what that means.  And then job X10000012.XLS,

13  date and time, 2/16/11, 9:49.  Was that -- oh,

14  that's us printing, okay.  All right.  At 9:49 this

15  morning.  It was described as Motley timeline,

16  5/5/2010.

17          A.    Okay.

18          Q.    Does that ring a familiar note to you?

19          A.    I have several versions of this

20  document.

21          Q.    All right.  Identify for the record

22  Exhibit 111.

23          A.    Exhibit 111 does not have a title.  It

24  is -- appears to be or it is, a chronology that I

25  made based upon documents as I saw them.  So I tried

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 418

1    to understand the sequence of events.

2          Q.    Why does it say Motley timeline?

3          A.    Oh, why?  Because it was associated

4    with Motley, it had nothing to do with them.  They

5    did not originate this.  They didn't even see it.

6          Q.    Okay.  Mylan is not mentioned in

7    Exhibit 111, is it?

8          A.    Mylan is not mentioned, that is

9    correct.

10          Q.    From the group of documents that you

11   just gave me, and I'm just going through them for

12   the first time here.  I'm going to mark this, but I

13   want to read this to you and -- and I'm going to ask

14   you about it.  Something I just noted here is an

15   e-mail from Sal Romano to Meghan Johnson Carter with

16   a copy to SpyGlass, that's you, subject Re first

17   draft, and it says, "Meg, Mark and I" -- you're

18   Mark, right?

19          A.    Uh-huh.

20          Q.    "Mark and I were expecting to hear

21   from you today with your edits.  Mark will make the

22   final corrections tomorrow.  Can he e-mail you a

23   copy and send the signed copy at a later date?

24   Thanks, Sal."

25          A.    Right.  That had to do with the --

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 419

1    with the documents that you've seen, which you have

2    copies of.  So he's talking about the document that

3    I am creating.  See, Sal originally was --

4             Q.    Wait, wait, wait.

5             A.    Sure.  Go ahead.

6             Q.    There's no question pending right now.

7    Okay.  Again, with all due respect, you -- you have

8    to just slow down and answer my question, just my

9    question, okay?

10            A.    I understand.

11            Q.    Okay.  So Sal says on June 14th, the

12   day before you signed the report that you and he

13   were expecting to hear from Meg, who is sitting here

14   today, Meg -- Meghan Carter, the Plaintiff's

15   attorney, to get her edits to your report, right?

16            A.    That's correct.

17            Q.    So does that now refresh your

18   recollection and change your testimony that you gave

19   earlier that you did not get input and direction

20   from the plaintiff's attorney as to the content of

21   your report?

22            A.    No.  I explained earlier that Meghan

23   gave me spelling corrections.  There was no content

24   change as a result of our -- our working together,

25   none, zero.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 420

1          Q.    Okay.  So the only thing that -- that
2     the Plaintiff's lawyers did was check your spelling?
3          A.    Yes, basically.
4          Q.    And that's what you were waiting to
5     hear from them with regard to your spelling?
6          A.    No.  That is not -- what I said is not
7     correct with Meghan.  With another conversation, the
8     wording that I had used, they -- they said -- you
9     have to ask yourself a question, whether or not --
10    and I'd have to read the statement, but basically
11    it's -- let me read it.  And this is not part of my
12    vocabulary.
13         Q.    What are you referring to?
14         A.    It is my -- looking in the expert
15    witness, I repeated this phrase many times, looking
16    at page 35, the second paragraph (indicating).
17         Q.    With all due respect, let's go back to
18    my question, because I think you kind of brushed
19    over it.  Let's just repeat the question and then --
20    and then let me have your response.
21              MS. CARTER:  I think he's trying to
22         answer it though.
23         A.    I'm trying to.
24              MR. KAPLAN:  Okay.  Well, let's see.
25         Ask him the question again, and let's see.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 421

1              (Record read.)

2         A.    It does not change what I said.

3    BY MR. KAPLAN:

4         Q.    Okay.  That's the only question I

5    asked you.

6         A.    Okay.

7         Q.    And did you tell me that Russell Somma

8    was not involved in the --

9         A.    Russell Somma was -- I was not

10   involved with Russell, the work that he did.

11        Q.    Was he involved with you?

12        A.    Only through an introduction.

13        Q.    Okay.  Well -- and -- and I'm happy to

14   show you this too, but again, in this pile of

15   documents that you just handed me, I see an e-mail

16   from Russell Somma dated May 14, 2010.  That's a

17   month before you submit your final report of

18   June 15, 2010?

19        A.    Right.

20        Q.    To SpyGlass Group, that's you, and to

21   Sal Romano.

22        A.    Okay.

23        Q.    Re meeting with Motley Rice and Pete

24   Miller.  Motley Rice is Meghan, right?

25        A.    Yes.  That was -- that was a -- over

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 422

1    the phone, I believe.

2          Q.    And the e-mail says Mark --

3          A.    I was never with him.

4          Q.    "Mark, Sal, let's do a TC," telephone

5    call, "Saturday, easier for everyone I think.  Plan

6    for 9 a.m. for a half hour, call in."  And it gives

7    the number.  "Speak with you both then, Russ."

8          A.    And it had -- yes.  I don't remember

9    the exact conversation, but I do remember that we

10   talked over the phone.  Actually, I'm not sure that

11   actually happened, but it probably did.

12         Q.    And so you had Russell Somma's input

13   and direction in shaping the expert report of

14   June 15, 2010?

15         A.    Absolutely nothing.  He had no input.

16         Q.    So when Russell Somma says to you in

17   his e-mail of May 12, 2010, "Sal, Mark, met with

18   these folks until nine last night.  I requested some

19   further information and generally reviewed what the

20   expert report will be speaking to.  We need to

21   coordinate our efforts for sure.  Let me know when

22   you guys want to talk."

23         A.    Right.

24         Q.    "We can set up regular meetings for

25   review of progress."

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 423

1          A.     Right.

2          Q.     What do you think he meant?

3          A.     Originally, we thought that our

4     approach was going to be he takes a certain portion

5     of the operations, and then we don't duplicate that

6     work and do the rest of it.  As it turned out, we

7     had no collaboration whatsoever, zero.  It was -- it

8     was a theoretical model, if you will, that we went

9     into this that, you know, you take the left, I take

10    the center and the right.  And -- and as it turned

11    out, we became -- since he was not part of the

12    SpyGlass Group, I did not want to assume any

13    liability or whatever for what he did, so we became

14    100 percent independent at that point.

15         Q.     So he worked with you up until May 14,

16    2010, and then you cut him loose?

17         A.     No.  We had -- originally, we thought

18    that he would -- no.  To answer your question, no.

19         Q.     Did he work with you up until May 14

20    of 2010?

21         A.     Nothing, zero.  I had one -- I had one

22    interview with him up in Chester or something like

23    that.

24         Q.     What was the interview about?

25         A.     I wanted to see what his credentials

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 424

```
 1   were.  I wanted to see if he knew what he was
 2   talking about.
 3          Q.    Well, when he says on May 14 that he
 4   requested some further information --
 5          A.    I don't know what -- the information I
 6   am sure had to do with the scope of his review as
 7   opposed to our review.
 8          Q.    And then he says "and generally
 9   reviewed what the expert report will be speaking
10   to."  What do you mean?
11          A.    Right.  In other words, I know
12   exactly.  That would -- would take -- I knew nothing
13   about the technology of tableting.  I didn't want to
14   offer an opinion at all, zero, I didn't even want to
15   touch it.
16          Q.    And did you?
17          A.    No, of course not.
18          Q.    Okay.
19          A.    But he was.  I wanted to make sure
20   that he's covering that and I'm covering this.  And
21   I don't want him delving in an area that he's not an
22   expert in, okay.
23          Q.    And so when Russell Somma --
24          A.    So we tried -- we tried to set up a
25   line.
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 425

1          Q.    So when Russell Somma says to you on

2    this is May 12, I think I said May 14th.  It's May

3    12, 2010.  We need to coordinate our efforts?

4          A.    Yes, that's it.

5          Q.    What does that mean to you?

6          A.    It meant using a vin (phonetic)

7    diagram, who's covering what.

8          Q.    And what did you decide?

9          A.    We decided that he covers anything to

10   do with tableting and we would cover everything

11   else.

12         Q.    Is Denise your wife?

13         A.    Yes, she is.

14         Q.    And on April 26, 2010, I see an e-mail

15   here from SpyGlass Group to Meghan Johnson Carter,

16   Re SpyGlass billing, as follows:  "Hi, Meghan, this

17   is to confirm 340 per her for Russ and 430 per hour

18   for SpyGlass."

19         A.    Correct.

20         Q.    What does that mean?

21         A.    That means originally when we talked

22   to Motley, we -- we did it under the understanding

23   that he would be part of our consulting group.  Much

24   like all other consulting groups, you bring in

25   experts as is necessary.  I had a discussion with

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 426

1   him, and I was feeling more and more uncomfortable

2   about the scenario, so -- but I explained to him, I

3   said there is a loss on our part if you feel that

4   Russ can do the work.  So we negotiated an

5   additional $30 per.  So Russ would do his own thing

6   and we would do our own thing.  So we increased our

7   hourly rate $30.

8          Q.     Sounds like Russ was part of the

9   group?

10         A.     Russ was not part of the group.

11  That's the reason why we got -- we did the split

12  that way.  He was not part of the group.  He never

13  billed.  He's not part of our group in any manner,

14  there is no contract, there's not even an implicit

15  contract, nothing.

16         Q.     Why -- why do you think your wife told

17  Meghan what his hourly rate was?

18         A.     Because -- because originally, the

19  concept was that he would be part of the SpyGlass

20  Group.

21         Q.     Well, this is April 26, 2010.

22         A.     I don't care what date -- the date is

23  immaterial to me.  I am explaining to you what the

24  arrangements were.

25         Q.     Your initial draft report was

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 427

1    January 1, 2010.

2            A.    It doesn't -- okay.

3            Q.    Right?

4            A.    If it is, yeah, I gave you the report.

5            Q.    I'll guarantee it is, and it's right

6    in front of you.

7            A.    Oh, no, no.  This is not January 2010.

8    This is a place keeper.  This has nothing to do with

9    anything.

10           Q.    So you're looking at your initial

11   draft report, and it's dated January 1, 2010?

12           A.    It's meaningless.  That's a place

13   keeper.

14           Q.    What do you mean by that?

15           A.    I put January -- a place keeper, it's

16   so that I don't forget to put a date.  It's not the

17   date of the report, has nothing to do with --

18           Q.    What is the date of the report?

19           A.    I don't know.  You'd have to -- I

20   don't know what the date of the report is.

21           Q.    Well, look at it and tell me.

22           A.    I can't -- unless I wrote it down, I

23   can't tell you.

24           Q.    Okay.  I -- the only thing I see in

25   writing on your draft report is January 1, 2010.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 428

1     You see that?

2          A.    Now I understand some of the lack of

3     understanding.

4          Q.    Do you see January 1 --

5          A.    I could have put -- I could have put

6     January 1949.  It's meaningless.  This is a place

7     keeper.

8          Q.    Okay.  On your -- on your draft report

9     that you have in your hand right now --

10         A.    On every report, I don't put the date

11    until I was ready in the June whatever time frame.

12    That's -- that's when I started dating it because it

13    started making sense to date it.

14         Q.    Did you start dating it January 1,

15    2010 after January 1, 2010?

16         A.    You're going to have to ask that

17    again, please.

18         Q.    Let's go back.  I'm trying to figure

19    out here why it is in April 26 -- on April 26, 2010,

20    your wife, who does the business end of the SpyGlass

21    deal, writes to Meghan saying Russ' rate is 340 an

22    hour.  And all I'm trying to do is establish that

23    looks like Russ was part of the collaborative effort

24    that went into this report?

25         A.    That couldn't be more -- that couldn't

Mark Kenny, Volume II          Videotaped            February 16, 2011

                                                                Page 429

 1    be more false.

 2          Q.    Okay.  And I'm also looking at your

 3    draft report, and you look at it too, and you tell

 4    the jury what date is on there?

 5          A.    It says January 2010, but it is a --

 6          Q.    Just a minute.  What date is shown on

 7    that report?

 8          A.    Excuse me, sir.  January 1st, 2010.

 9          Q.    All right.  That's my -- that' all I

10    want you to --

11          A.    Okay.

12          Q.    I see another e-mail among the

13    documents that you gave me here from Sal Romano to

14    Meghan Johnson Carter with copies to Sandy Summers.

15    Who is that?

16          A.    I don't recall.

17          Q.    Fred Thompson, you know Mr. Thompson

18    from Motley, right?

19          A.    Well, I talked to him on the phone

20    once.

21          Q.    And the subject is, "need some files."

22    Sal says:  March 17, 2010:  "Meg, I think we had a

23    good meeting with you and Pete Miller on the phone

24    on Monday.  We have a better idea of what you want

25    from us, and we believe we can deliver it to you to

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 430

1    your satisfaction."

2            A.    In other words, a complete report.

3            Q.    What "better idea" did you get of what

4    they, the Plaintiff's lawyers, wanted from you?

5            A.    I -- I don't know that I can answer

6    that.  I don't recall.

7            Q.    What is it that you could deliver to

8    the Plaintiff's lawyers to their satisfaction?

9            A.    A comprehensive report because without

10   some direction, having no experience, zero, in this,

11   you know, you're dealing in somewhat of a void.

12           Q.    So you relied upon the plaintiff's

13   lawyers to tell you what they wanted in your report?

14           A.    What their -- what the objective was.

15   What is the objective, which later appeared in my

16   report.

17           Q.    When was it that you were first

18   contacted by the plaintiff's lawyers?

19           A.    I don't have the date, but the e-mail

20   trail would -- would speak to that.

21           Q.    How much have you billed the

22   plaintiff's lawyers to date for the work that you

23   have done?

24           A.    Approximately $90,000.

25           Q.    And how about Sal Romano?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 431

```
 1          A.    I'm going to guess, I don't know

 2    exactly, but I'm going to guess 20,000.

 3          Q.    And how much time do you have that is

 4    yet unbilled?

 5          A.    How much time, 14 yesterday, four and

 6    a half, and today.

 7          Q.    That's it?

 8          A.    That's it.

 9          Q.    Everything else has been billed?

10          A.    Everything else is billed, paid in

11    full.

12          Q.    So you billed approximately 90,000 or

13    exactly 90,000 or 100,000?

14          A.    Within -- I have the numbers over

15    there, but it's 90,000.  I have the records for you.

16          Q.    Okay.  Well, we'll get to that.

17    You -- you and Sal agreed that the batch records

18    would be critical for you to review?

19          A.    We wanted to see a lot of records,

20    correct.

21          Q.    You and Sal agreed that the batch

22    records would be critical for you to review,

23    correct?

24          A.    Yes.

25          Q.    152 batches were recalled; is that
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 432

1    right?

2              A.    I'd have to look at the numbers.

3              Q.    Is that approximately, correct?

4              A.    I'm going to assume that it is, it was

5    a lot -- lots.

6              Q.    You only looked at three batch

7    records, didn't you?

8              A.    Those were the only ones that I had

9    available, the only ones that were part of the data

10   base.  You know, you get what you get.  There was a

11   lot of information everybody wants.

12                   MR. KAPLAN:  I'm going to mark this as

13             Exhibit 112.

14                   (Whereupon, Exhibit 112, E-mail, was

15             marked for identification as of today's

16             date.)

17   BY MR. KAPLAN:

18             Q.    I'm handing you Exhibit 112.  First,

19   look at the e-mail from Sal Romano to you dated

20   February 24 -- I mean from you to Sal, dated

21   February 24, 2010.  You say as follows:  "Sal, the

22   actual batch records are extremely important.  Do

23   you want me to request the information?  Mark."

24   Then above that is an e-mail from Sal dated

25   February 24 to Meghan Johnson Carter saying, "Mark

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 433

1    and I believe the batch records will be critical for

2    us to review."

3              Do you see that?

4         A.    Yes.

5         Q.    "How many batches are recalled?  Do

6    you have all the batch records as PDF files?  We

7    have lots to read now, but I think we'll have to

8    look at the batch records soon, right?"

9         A.    Yes, that's what it says.

10        Q.    Did you?

11        A.    Did I see additional batch records

12   other than those that I have either here or in the

13   references, no.

14        Q.    You looked at only three batch

15   records?

16        A.    Three -- I believe that's correct,

17   three or four.

18        Q.    You looked at three batch records,

19   didn't you?

20        A.    I would have to add them up, but it's

21   at least three.  Yeah, but let's say three.

22        Q.    That was your sworn testimony on June

23   29, 2010.  Are you changing that testimony?

24        A.    No, I'm not.

25        Q.    All right.  You looked at three batch

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 434

1    records.

2          A.    Okay.

3          Q.    Meghan told you that there are

4    approximately 170 plus batches for Digoxin, right?

5          A.    Yes.

6          Q.    And you looked at three?

7          A.    I looked at three.

8          Q.    But they were critical?

9          A.    They were critical if you wanted to

10   find more exceptions, more issues.

11         Q.    Doesn't say if we wanted to find more

12   issues.  You say they're critical.

13         A.    That's what I said, and I'm telling

14   you what that means.

15         Q.    And you stand by that, don't you?

16         A.    What do I stand by, that I wrote that?

17         Q.    Those are your words, aren't they?

18         A.    I wrote that in an e-mail, that is

19   correct.

20         Q.    Those are your words, are they not?

21         A.    Those are my words.

22         Q.    There were a number of phone

23   conferences with Russell Somma, weren't there?

24         A.    We talked a couple of times.  I don't

25   know the number.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 435

1          Q.    Well, I'm looking at another e-mail

2    here dated March 30, 2010 from Russell Somma to you,

3    to Meghan Johnson Carter, to Pete Miller, and to Sal

4    Romano with a copy to Sandy Summers saying, "Mark,

5    Meghan, Sal, and Pete, I will be available for a

6    telephone conference on Monday at 9 a.m. and hope

7    this accommodates everyone's schedule.  Sorry about

8    the delay as I'm traveling right now."

9          A.    Okay.

10         Q.    Does that refresh your recollection

11   that --

12         A.    I don't remember that meeting actually

13   being held, but I'm going to assume it probably was.

14   It was an unmemorable meeting.

15         Q.    Now, Russell Somma has a bachelor of

16   science in pharmacy, doesn't he?

17         A.    If his résumé says that.

18         Q.    And a masters in science and

19   pharmaceutical science?

20         A.    If his resume says that.

21         Q.    And a PhD in pharmaceutical science?

22         A.    If his resume says that.

23         Q.    So you -- you had no idea what his

24   qualifications were?

25         A.    I read that and I received

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 436

1    recommendation that he knew -- his expertise, and

2    therefore, I wanted to interview him to see how

3    practical, was he a theoretician or did he know what

4    he was talking about.

5           Q.    Did he disagree with the conclusions

6    that you came to?

7           A.    He never saw any conclusions that I

8    came to, not a single piece of paper.

9           Q.    Never heard you say what your

10   conclusions were?

11          A.    No, he did not.

12          Q.    How about Sal's conclusions?

13          A.    You have to talk to Sal, but I don't

14   believe that he talked to Sal outside of

15   conversations that we had.  I'm almost positive.

16          Q.    Who is Denise DeLongas?

17          A.    That's my wife.

18          Q.    Oh, okay.  Sorry.

19          A.    Wonderful lady.

20          Q.    I'm sure.

21          A.    Best of the best.  Can you put that

22   down in the record?

23          Q.    You just did.

24          A.    Excellent.

25          Q.    You just did, and you know what, it

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 437

 1    was Valentine's day Monday, but I think you ought to

 2    show it to her now and --

 3         A.    We don't go there.

 4         Q.    Okay.  On March 23, 2010, you sent an

 5    e-mail to Meghan Johnson Carter with copies to Fred

 6    Thompson and Pete Miller saying that you would like

 7    them to review Russ Somma's qualifications.  And you

 8    said, "I recommend you consider Russ Somma as part

 9    of the evaluation team."

10         A.    Right.

11         Q.    "Russ has worked very closely with one

12    of the SpyGlass Group's core members.  His

13    credentials are outstanding."

14         A.    Right.

15         Q.    That's what you -- that's what you

16    told the plaintiff's lawyers, and that's what you

17    recommended?

18         A.    Yes.  That's correct.  But his

19    credentials means Bob Sierra's credentials.

20         Q.    Whose credentials?

21         A.    Bob Serra, the gentleman that I talked

22    to about finding an expert.  He said that this --

23    that this guy's the best.  I said great.  Let's

24    talk.

25         Q.    And you recommended him?

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 438

```
 1          A.    I recommended that they consider him,
 2    that's what I said.  I can't -- I didn't recommend
 3    him because I never worked with him, but I talked to
 4    him, he's a bright guy.  He's got great experience,
 5    he knows his stuff.
 6          Q.    He worked with somebody in the
 7    SpyGlass Group?
 8          A.    Bob Serra, apparently they have a long
 9    term relationship.  I never heard the man's name
10    before, nor did Sal.
11          Q.    As late as June 4, 2010, you and Sal
12    were meeting with the Plaintiff's lawyers?
13          A.    Were meeting what?
14          Q.    With the Plaintiff's lawyers?
15          A.    The Plaintiff's lawyers?  On the
16    phone, we probably discussed things.
17          Q.    How about early Friday morning,
18    June 4th, at the Newark airport?
19          A.    We met.
20          Q.    That wasn't on the phone, that was in
21    person?
22          A.    That was in person, correct.
23          Q.    You -- you met in a hotel conference
24    room there?
25          A.    Yes.
```

Mark Kenny, Volume II              Videotaped                    February 16, 2011

Page 439

1          Q.    Did you forget that?

2          A.    Yes.

3          Q.    And you met to discuss the report?

4          A.    That's correct.

5          Q.    Which Sal told Meghan Johnson Carter

6    on May 28 was in good shape?

7          A.    Okay.

8          Q.    And it's in its fourth draft; is that

9    right?

10         A.    If that's what it says.

11         Q.    He says we.  Doesn't say Mark.

12         A.    That's correct.  He was proofing it.

13         Q.    He says, "We are planning to have it

14   done next week."

15         A.    That's correct.  If it says that, that

16   is correct.

17         Q.    Sounds like he's had a lot of input on

18   this report?

19         A.    He's had no input to the context --

20   content of that report.  None.

21         Q.    Well, what was he billing all of that

22   time for?

23         A.    His review time.  It was redundant.

24         Q.    So you're saying Sal Romano is

25   redundant?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 440

```
 1          A.    I'm saying some of the work he looked
 2     at and the work he did was redundant.
 3          Q.    So when -- when Sal Romano says on
 4     May 24, 2010 in an e-mail to Meghan Johnson Carter,
 5     "Meg, let's talk about strategy for a moment."
 6          A.    I'm sorry.  You have to repeat that.
 7     Can I read these?
 8          Q.    Just -- just try to answer my
 9     questions, okay.  So when -- so when Sal Romano says
10     to Meghan Johnson Carter on May 24, 2010, "Meg,
11     let's talk about strategy for a moment."  And goes
12     on to say, "Mark and I will both sign our SpyGlass
13     report."
14          A.    Right.  That was originally the
15     concept.
16          Q.    Well, it was the concept through the
17     meeting at the Newark airport hotel conference room
18     on June 4, 2010?
19          A.    Okay.
20          Q.    Eleven days later, you submitted the
21     report?
22          A.    Right.
23          Q.    You had had a prior meeting, a meeting
24     prior to May 24, 2010 with the plaintiff's lawyers,
25     didn't you?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 441

```
 1          A.    A meeting where?  We talked on the
 2    phone a few times.
 3          Q.    Sal goes on to say in this e-mail of
 4    May 24, 2010 to Meghan Johnson Carter, "So if I
 5    understood you at our meeting with Pete, you will
 6    want to depose both Mark and me."
 7          A.    Right.  We met with them twice, one in
 8    New York City, one in Newark, and you're referring
 9    to both of those meetings.  On and off he referred
10    to them.
11          Q.    He goes on to say on May 24, 2010,
12    "Then should we be doing this on the same day?  If
13    that is the case, then I can't make it on June 24 or
14    25.  I do have free time June 16 and 23.  I don't
15    know about Mark."  The plan was that Sal was going
16    to sign this report along with you?
17          A.    That's correct.
18          Q.    And that Sal was going to be deposed
19    as an expert as well?
20          A.    I assume that is correct.  Well, it
21    depends --
22          Q.    What -- what changed that plan?
23          A.    He couldn't -- he couldn't do it.  He
24    didn't have the -- his schedule would not allow it.
25          Q.    What?
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 442

1          A.     His schedule would not allow it.

2          Q.     Well, he says -- he gives dates when

3     he is available.

4          A.     Whatever.  I don't know.  He talked, I

5     assume with them, and the dates, including science

6     day, including some trial date.  There is no way he

7     could possibly make it, so he felt that he couldn't

8     be -- participate any further.

9          Q.     I do have free time, he says, June 16

10    and 23.  That's what he says?

11         A.     I go by what I just said, he cannot

12    give a full commitment, as I could.  I can give a

13    full commitment.

14         Q.     So let me understand this now.  Sal

15    Romano contributed to the report and to the opinions

16    that were expressed in that report, but he was

17    pulled off to avoid his deposition?

18         A.     That is not correct.  That report is

19    my report.  Okay.  Every bit of it is my report.

20    Sal acted as a consultant to me of which I was the

21    one with the experience, not Sal.

22         Q.     Sal, in another e-mail, says, "It was

23    a pleasure meeting" -- to Meg, "It was a pleasure

24    meeting you and Pete in NYC."

25         A.     Yeah.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 443

1          Q.     That was a meeting in the city?

2          A.     Right.

3          Q.     "I'm available pretty much from

4     June 16 to 23 for a deposition if they want me."

5          A.     Right.  But he couldn't commit beyond

6     that, and his fear was that he would have to

7     interrupt all of his business and personal plans to

8     continue this -- this project.

9          Q.     You said something about -- well, he

10    also says, "I will be available for the trial dates

11    if needed."

12         A.     I can't tell you what that says.  I

13    can tell you that he felt he could not commit to the

14    time and bowed out.  It could say whatever it says,

15    I don't know.

16         Q.     Well, these aren't my words, these are

17    Sal Romano's words.

18         A.     You have to talk to Sal as to why he

19    felt he could not do it.

20         Q.     And that' what I'm wondering, how in

21    the world am I going to be talking to Sal when he

22    apparently has a role in the report that was

23    rendered on June 15 --

24                MS. CARTER:  Objection.

25

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 444

1      BY MR. KAPLAN:

2           Q.    -- 2010 but didn't sign that report?

3           A.    It sounds like a rhetorical question.

4      I don't understand your question.

5           Q.    What don't you understand?

6           A.    Well, I didn't -- it sounds like you

7      made a question and then answered it.

8           Q.    I'd love to hear what Sal Romano has

9      to say, but he was pulled off the report, wasn't he?

10          A.    He pulled himself off of it because of

11     a commitment.

12          Q.    When was the last time you talked to

13     Sal Romano about the report?

14          A.    The report?  It was before it was

15     issued.  I didn't talk to him since about this

16     subject.  I've talked to him, but not about this.

17     He had no interest in it.

18          Q.    Okay.  Number four, all documents

19     including documents and deposition transcripts which

20     refer or relate to DIGITEK that the witness received

21     from any source.  You brought all of that?

22          A.    Yes.

23          Q.    Where is it?

24          A.    You -- you have everything.

25          Q.    Where?

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 445

1          A.    Read it again, just to make sure.

2          Q.    All documents including documents and

3    deposition transcripts which refer or relate to

4    DIGITEK that the witness received from any source?

5          A.    Deposition?  I received nothing.

6          Q.    No, no.  You're focusing on

7    depositions.

8          A.    I need to read that, sir.

9              MR. KAPLAN:  Okay.  Can you put that

10          in front of him, Meghan?

11              (Off-the-record discussion.)

12          Here you are.  We'll just mark this as

13    Exhibit 113.

14              (Whereupon, Exhibit 113, Amended

15          notice for video deposition, was marked for

16          identification as of today's date.)

17    BY MR. KAPLAN:

18          Q.    Just for the record, Exhibit 113 that

19    I've put in front of you is the document that we've

20    been talking about which is the amended notice for

21    your video deposition here today requesting that you

22    bring categories of documents that are listed.  You

23    understand that, right?

24          A.    Oh, certainly.

25          Q.    And you saw it before you came here

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 446

1    today?

2          A.     Yes, I did.

3          Q.     And you have complied with the

4    request?

5          A.     That's correct.

6          Q.     And we're going through to make sure

7    now that -- that you did and that I have everything

8    and that Mr. Anderton has everything.  Okay?

9          A.     Yes.

10         Q.     All right.  So we're at number four.

11   All documents including documents and deposition

12   transcripts which refer or relate to DIGITEK that

13   the witness received from any source.

14         A.     The only depositions I have are the

15   ones that we've talked about, and I have my own

16   deposition.  That's it.

17         Q.     Again, with all due respect, as I said

18   before, you're focusing on the word deposition.

19   Look before that.  All documents including --

20         A.     This is -- this is everything that is

21   here falls underneath that.  There is --

22         Q.     So when you say "everything that is

23   here," and you point to something on the ground?

24         A.     I point to three huge volumes of paper

25   that I've collected and kept together so that when

Mark Kenny, Volume II            Videotaped                 February 16, 2011

                                                                Page 447

1    this is asked, I can hand it over.

2              Q.    That's fine.  And I just -- all I want

3    to do is have that.

4              A.    Yes.  You have it all.  You started

5    looking at it, sir.  I'm sorry.  I'm not trying to

6    be argumentative.

7              Q.    With -- with -- with all due respect,

8    I'm just trying to identify what is responsive to

9    these requests.

10             A.    I understand.  I think that's fair.

11             Q.    All right.  Thank you.  And so I want

12   to mark all of the documents that you pointed to

13   over there that you say are crates or whatever.  I

14   know you -- I know you came up with some --

15             A.    Crates is a better word.

16             Q.    Okay.  Notebooks.  So we can mark

17   those now.  Let's -- let's just do that.

18                   MR. KAPLAN:  In fact, we can take a

19             break and -- and we'll mark them.  We'll

20             just take a minute or two.  I just want to

21             make sure we have those marked, they are

22             part of the record.

23                   THE VIDEOGRAPHER:  We're off the

24             record.  The time is 2:19.

25                   (recess taken.)

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 448

```
 1                  (Whereupon, Exhibits 114-139,

 2            documents brought by the Witness in three

 3            milk crates, were marked for identification

 4            as of today's date.)

 5                  THE VIDEOGRAPHER:  We're back on the

 6            record.  The time is 2:35.

 7       BY MR. KAPLAN:

 8            Q.    We went off the record so that we

 9       could mark as exhibits the documents that you

10       brought with you here today.  The court reporter has

11       marked those documents as exhibits 114 through 139.

12       Does that include everything that you brought with

13       you?

14            A.    Yes.

15            Q.    All right.  And we're going through

16       the list of documents that you were requested to

17       bring pursuant to the amended notice duces tecum for

18       your deposition.  We were on number four, all

19       documents including documents and deposition

20       transcripts which refer or relate to DIGITEK that

21       the witness received from any source.  And those

22       documents are among exhibits 114 through 139, right?

23            A.    All of them are among that, yes.

24            Q.    Okay.  Number 5 asks for all retainer

25       agreements or other agreements under which the
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 449

```
 1   witness has been or will be paid for work related to
 2   the DIGITEK litigation?
 3          A.     Okay.  This is a portion of it.
 4   There's another folder in there.  Let me give you a
 5   portion of it.  Here it is.  Here are all of this
 6   (handing).  That -- that's going to be duplicates,
 7   by the way.  This should have everything.
 8          Q.     By the way, when your deposition was
 9   taken on June 29, 2010, you said that 50 percent of
10   the work that you were doing was for the plaintiff's
11   lawyers in this litigation, 50 percent of your total
12   work?
13          A.     Perhaps at that period of time.  It's
14   not -- it is approximately about over 30, less than
15   40 percent.  Because I grossed almost $400,000, so
16   90, at that point, would be 25, so it's less.  But I
17   was getting paid more and more by the end of the
18   year.  I did a lot of assignments.
19          Q.     So you're saying in 2010, you grossed
20   $400,000?
21          A.     Almost, 380,000.
22          Q.     And that your total bills to the
23   plaintiff's lawyers were?
24          A.     Approximately 90.
25          Q.     So about 25 percent of your income?
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 450

1          A.    Yeah.  Right.

2          Q.    In 2010 --

3          A.    Correct.

4          Q.    -- was attributable to work that you

5     did for the Plaintiff's lawyers in this litigation?

6          A.    That's correct.

7          Q.    But you -- you made a distinction in

8     your previous deposition as to the percentage of

9     your income and the amount of your work related to

10    this litigation.  You said 50 percent of your work

11    was related to the DIGITEK litigation?

12         A.    I believe you talked to me up to that

13    point, you said up to that point.  Then I said, well

14    I have all of these promissory notes, I'm going to

15    get contracts, I've got to get paid another 40,000,

16    and you said no, up to that point.  And that's what

17    I answered.

18         Q.    Okay.  Up to June 29, 2010?

19         A.    Yes, that was my guess.  But I also

20    told you I didn't know, and I don't pay attention to

21    it.

22         Q.    Got you.  I do note here on this

23    notebook that you gave me which has been marked as

24    Exhibit 135 which has the label "DIGITEK Motley Rice

25    attorneys at law."  Is that from your shop, from

Mark Kenny, Volume II          Videotaped          February 16, 2011

                                                      Page 451

 1   your -- from SpyGlass?

 2          A.    No.  That's information I received

 3   from -- probably I received from Motley.  I had

 4   asked for some copies --

 5          Q.    Who made this notebook?

 6          A.    That was made, I believe -- let me

 7   double check and make sure.

 8          Q.    Is this -- is this a Spyglass notebook

 9   with your --

10          A.    Let me just see it.  I'll tell you by

11   the labeling and whatnot.  This is a SpyGlass

12   notebook.  My wife did this.

13          Q.    Okay.  All right.  And the label on

14   the front?

15          A.    Yeah.

16          Q.    And the handwriting on the front is

17   yours, right?

18          A.    That handwriting is mine.

19          Q.    It says "MK," Mark Kenny, right?

20          A.    Yes.

21          Q.    Legal requirements?

22          A.    Yeah.  That meant that this section of

23   the -- of the request for the documents I think is

24   Number 5.  I tried to put anything that was legally

25   or financially related in there.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 452

```
 1          Q.     Okay.  The first page in this notebook
 2    marked Exhibit 135 is a note from your wife, Denise,
 3    to Meghan Johnson Carter, a message dated -- faxed
 4    on May 15, 2010, one month before you submitted your
 5    report saying, "Hi, Meghan, time sheets for Mark
 6    Kenny and Sal Romano, thanks DD."
 7          A.     Right.  That's my wife.
 8          Q.     Okay.  That's the same Sal Romano
 9    we've been talking about?
10          A.     Yes.
11          Q.     The proofreader?
12          A.     The proofreader.
13          Q.     I don't see anything -- the latest
14    invoice I see is August 24, 2010.  I don't see
15    anything more current than that.  Can you help me?
16          A.     No, that should be it.
17          Q.     August 24, 2010?
18          A.     Yeah, I didn't do any work.
19          Q.     So -- so you haven't billed for any
20    work since August 24, 2010; is that right?
21          A.     That is correct.  If those are the
22    records there.  That is a complete set of records.
23          Q.     I notice that one of the invoices
24    you've produced here, invoice statement number 1032,
25    which was invoiced on June 21, 2010, describes the
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 453

1    services as consulting experts exhibit review and

2    deposition writing, Sal Romano time sheet,

3    5/11-6/15?

4          A.    Uh-huh.

5          Q.    So Mr. Romano was working with you on

6    the report up until you submitted it on June 15?

7          A.    Yes.  Well, he was up to some point.

8    I don't know, a week or so before, perhaps.

9          Q.    And this is for 26 hours of

10   Mr. Romano's time?

11         A.    Right.

12         Q.    To proofread?

13         A.    To proofread, and he probably tried to

14   do some research.  I don't know.

15         Q.    Twenty-six hours at $430 an hour,

16   total, $11,180?

17         A.    Yes.

18         Q.    And here's an invoice dated May 11,

19   2010 showing Sal Romano time sheets 2/26 to

20   4/2/2010, 14 and a quarter hours, and time sheets

21   from 4/7 to 5/10, 32 hours.  For a total of 18 --

22   $19,460 for his time?

23         A.    Okay.

24         Q.    Well, you tell me, if I just add those

25   two together, 19,000 and 11,000, there's 30,000 for

Mark Kenny, Volume II           Videotaped              February 16, 2011

Page 454

1    Sal Romano, not 20,000?

2           A.    It could be anything, I don't -- I

3    have nothing to do with billing.  I have nothing to

4    do with those numbers.  Sal puts them in and gives

5    then to Denise.

6           Q.    And that's -- that's all before the

7    $19,460 between February 26 and May 10.  Is that

8    before the first draft of the report?

9           A.    Well, no.  I started drafting the

10   tables.  The tables, remember, I explained that

11   I did -- the tables were the beginning of the

12   report.

13          Q.    I was just confused because the first

14   report I see is dated January 1, 2010, and you tell

15   me it says January 1, 2010, but it doesn't mean

16   January 1, 2010?

17          A.    That is correct.

18          Q.    And I'm still searching for the date

19   of the first draft?

20          A.    I don't know what the date is.

21          Q.    Did you tell the plaintiff's lawyers

22   that Mr. Romano was billing all of this money just

23   to proofread your report?

24          A.    I didn't tell them anything.

25          Q.    Did they have any expectation as to

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 455

1    what Mr. Romano's role --

2         A.    The original expectation was that it

3    would be a co-authored report.

4         Q.    And -- and would testify by way of

5    deposition as an expert witness?

6         A.    That was the initial expectation.

7         Q.    So you've brought all of the bills

8    that you've sent?

9         A.    Right.

10        Q.    And you said that the only time

11   remaining is the time that you described earlier

12   which was two days before your original 2011

13   deposition was set?

14        A.    Right.

15        Q.    Where you spent one and a half days,

16   14 hours approximately, putting together all of

17   these documents?

18        A.    Correct.

19        Q.    You want to make sure we don't lose,

20   and I understand that.

21        A.    Correct.

22        Q.    And then an additional two hours and

23   then eight hours to review and reread all of the

24   referenced documents, and then another four hours

25   with Meghan yesterday, and then the time today?

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 456

     1          A.     Yes.

     2          Q.     So you have somewhere between 30 and

     3     40 more hours to bill?

     4          A.     You mean including deposition, et

     5     cetera?

     6          Q.     Yes.

     7          A.     If the numbers come out to that.

     8          Q.     So somewhere between 12 and 16,000

     9     more.

    10          A.     Okay.

    11          Q.     So that will push you over 100,000?

    12          A.     Are we talking about -- for Motley,

    13     that's correct.

    14          Q.     For Motley as opposed to?

    15          A.     As opposed to my other income.

    16          Q.     Oh, yeah.  Okay.  But that will push

    17     you over $100,000 for your work as an expert witness

    18     in this case?

    19          A.     That's correct.

    20          Q.     And your work as an expert in this

    21     case, did you do anything other than review

    22     documents?

    23          A.     Can you give me an example?  No, no.

    24          Q.     Did you do anything other than review

    25     documents?

Mark Kenny, Volume II          Videotaped            February 16, 2011

Page 457

1          A.     No, not that I'm aware of, not that I

2     can think of.

3          Q.     All you did as an expert witness was

4     review documents?

5          A.     Yes.

6          Q.     Documents that were sent to you by the

7     Plaintiff's lawyers?

8          A.     Documents that were either sent to me

9     or were available on the Internet from Crivella

10    West.

11         Q.     You did no original work yourself?

12         A.     What does that mean?

13         Q.     I don't know.  Did you do any

14    independent work.

15         A.     No.

16         Q.     In all of the documents that you

17    reviewed, you never saw any conclusion by the FDA

18    that Mylan was not in full compliance with FDA

19    regulations at all times as a wholesale distributor

20    of DIGITEK, did you?

21         A.     I'm sorry.  Let me reread that.  What

22    number is that?  Oh, this is a separate question?

23    I'm sorry.  I thought you were reading from here.

24              MR. KAPLAN:  Let me ask the court

25              reporter to repeat the question.

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 458

1                    (Record read.)

2          A.     That is correct.  I did not see

3    Mylan's name.

4          Q.     Category seven was the witness' entire

5    file including all electronic documents and

6    correspondence in connection with this matter.  And

7    I think that's among the documents that you've

8    produced including the disks, right?

9          A.     Correct.

10          Q.     Number eight calls for documents that

11    you received or additional materials since June 29,

12    data or writings that you've reviewed or relied

13    upon, et cetera, in preparing reports in this

14    matter.  And I think we've got all of that, don't

15    we?

16          A.     Correct.

17          Q.     Everything -- number nine is

18    everything the witness reviewed that indicates that

19    Plaintiffs suggested effective DIGITEK.

20          A.     I saw nothing.

21          Q.     So you have no opinions on that?

22          A.     Absolutely none.  I have no interest

23    in it.

24          Q.     Okay.  And ten is all notes that the

25    witness has taken in connection with review of this

Mark Kenny, Volume II             Videotaped                February 16, 2011

Page 459

 1    matter?

 2            A.    I don't take notes.

 3            Q.    Other than on the documents?

 4            A.    I make the a lot of notes on there.

 5            Q.    Occasionally?

 6            A.    More than occasionally.  You saw my

 7    number of.

 8            Q.    But you don't have a separate set of

 9    notes chronicling your review of documents?

10            A.    No, absolutely not.

11            Q.    All documents that the witness has

12    prepared concerning the subject matter of this

13    litigation, that's number 11.  Are there any

14    documents that you've prepared other than reports or

15    correspondence?

16            A.    Nothing.

17            Q.    And you've brought all reports, draft

18    reports, that you've prepared?

19            A.    Correct.

20            Q.    At the last deposition, you had your

21    final report of June 15, and one draft report, the

22    one that's in front of you, which appeared to me

23    because I see it on there, to be dated January 1,

24    2010, right?

25            A.    My apologies.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 460

1          Q.    At the last deposition, the only

2    reports you had were the draft report in front of

3    you that shows a date of January 1, 2010 and the

4    final report of June 15?

5          A.    Right.  And then I went back into

6    electronic records.

7          Q.    And -- and today, you've brought some

8    additional drafts, right?

9          A.    Correct.

10          Q.    And we'll go over those.  Okay.

11    Number 12, all medical, scientific, or other

12    literature upon which the witness relies in

13    connection with the opinions expressed in the

14    reports.  Is there any medical, scientific, or other

15    literature upon which you are relying?

16          A.    No, not for this report.

17          Q.    That covers those documents.  Okay.

18    Now, let's turn to some other matters.

19              I think you told me, I think this was

20    kind of off the record, but that your process for

21    arriving at your opinions were to construct a time

22    line; is that right?

23          A.    That's correct.

24          Q.    And then prepare tables?

25          A.    Yeah, the tables that are attached to

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 461

 1   the referenced documents.

 2          Q.    When -- when you say "tables attached

 3   to the referenced documents," can you be more

 4   precise in explaining what that is?

 5          A.    Well, the table is the referenced --

 6   the attachments.

 7          Q.    Oh, the attachments to your report?

 8          A.    Yes.

 9          Q.    Okay.  So you started by creating the

10   time line, and we earlier looked at a time line?

11          A.    Correct.

12          Q.    To give you a sense of the chronology,

13   right?

14          A.    Of space, yes.

15          Q.    And then -- and then that helps you

16   then prepare these tables that are attached as

17   appendices to your report; is that right?

18          A.    That is correct.

19          Q.    So from that information, then, you

20   constructed a rough draft of a report?

21          A.    Correct.

22          Q.    And then you went from there to revise

23   it?

24          A.    Correct.

25          Q.    Okay.  Your role as an expert witness

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 462

1    in this case was to determine whether or not Actavis

2    was in compliance with GMPs over the period 2004 to

3    2009, and to determine whether or not Actavis

4    released products that were violative of GMPs; is

5    that right?

6              A.    That is correct.

7              Q.    Okay.  Take a look at the draft report

8    which is in front of you.  Do you have that?

9              A.    Yes.

10             Q.    Who drafted that report and when?

11             A.    I drafted it.  I don't know the date

12   of it.

13             Q.    What is the date that appears on the

14   document?

15             A.    It says January 1st, but it is not

16   January 1st.  That's a place keeper.

17             Q.    It says January 1st, 2010, right?

18             A.    Yes.

19             Q.    I just honestly don't understand what

20   you mean when you say it wasn't January 1st, 2010,

21   it was just a place keeper.  What does that mean?

22             A.    It's just when I started formatting

23   the document, I said, well, it's got to have a date,

24   and it will be ultimately the date of the report.

25   So I just kept it as January 1st until I knew when I

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 463

1    was going to issue the report.

2         Q.    Did you do this before or after

3    January 1st, 2010?

4         A.    I have to look at my time line.

5         Q.    You're now looking -- you've asked for

6    and you're looking at Exhibit, for the record, 135?

7              MS. CARTER:  135.

8      BY MR. KAPLAN:

9         Q.    Which are your invoices; is that

10   right?

11        A.    Yes.  It looks like on or about -- I

12   started making some chronology around March.

13        Q.    March of 2010?

14        A.    Yes.

15        Q.    And this is the first version of the

16   report; is that right?

17        A.    That's correct.

18        Q.    You have handwritten notes on this

19   report?

20        A.    Yes.

21        Q.    Does that reflect input that you

22   received from others?

23        A.    It reflects a discussion I had with

24   Sal.  He was across from me, we went through the

25   report.  He read and we discussed, and then I made

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 464

1   notes.

2        Q.    So this was something more than just

3   proofreading from Sal?

4        A.    It was -- you mean -- describe what

5   you mean by proofreading.

6        Q.    Well, you -- you told me before that

7   Sal's role was strictly to proofread and correct

8   spelling errors?

9        A.    He looked at content and logic.

10        Q.    So he had input then into the

11   substance of the report?

12        A.    To a degree.

13        Q.    And so did the Plaintiff's lawyers?

14        A.    No.

15        Q.    Did you share this draft with the

16   Plaintiff's lawyers?

17        A.    No.

18        Q.    All right.  Look at the first page.

19   In other words, at this point in time, you did your

20   first draft and you kept it from the Plaintiff's

21   lawyers?

22        A.    Correct.

23        Q.    Why?

24        A.    Because I didn't want to show it to

25   them.  I didn't want to get any direction.  This is

Page 465

1    my report, not theirs.

2              Q.    On the first page on the top

3    right-hand corner, it says "second discussion."

4    What does that mean?

5              A.    That means Sal and I had talked about

6    this earlier.

7              Q.    You also have a note on the first page

8    that says, "my experience," two exclamation points?

9              A.    It just means -- I don't know what

10   that means, to be honest with you.

11             Q.    Then you have a note that says simply?

12             A.    "Sampling" -- wait a minute.

13             Q.    "Sampling retained"?

14             A.    "Sampling retained."

15             Q.    What does that mean?

16             A.    I don't know, I honestly don't.

17   Sampling retained?  Could be two different notes.

18   Sampling could refer to the 100 percent inspection

19   sampling.  Retained, did they look at retained

20   product.  That's the only thing I can think of in

21   looking at that note.

22             Q.    So, by time you compiled this draft

23   report, you had -- you had reviewed all of the

24   documents that had been sent to you?

25             A.    You say sent to me.  There was a

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 466

1    significant amount of information in Crivella West.

2    I tried to take all of the information that I had

3    time to review, and then I also reviewed the CD that

4    you have a copy of which is a duplicate of what's --

5            Q.    Was there any documents -- were there

6    any documents or information that you didn't have at

7    the time that you prepared this first draft report,

8    which we should mark here as Exhibit 140.  So we're

9    going to refer to this as 140.  My question is:  Was

10   there any -- were there any documents or information

11   that you didn't have that you needed to have in

12   order to fully express your opinions?

13           A.    I don't recall.  I would suspect that

14   since I was in the process of continually reading

15   documents that I saw other documents which could

16   have influenced the revision of this.  So this was

17   not a complete -- perhaps complete at this point, I

18   don't recall.

19                 (Whereupon, Exhibit 140, first draft

20                 report, was marked for identification as of

21                 today's date.)

22           Q.    So you saw none one way or the other?

23           A.    I don't know.

24           Q.    Okay.  Underneath "my experience,"

25   would you interpret your notes there for me, read

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 467

1    them.

2            A.    That I should focus only on my own

3    experience, and I got to constantly go over this

4    based on my experience.

5            Q.    Under that note, "my experience."

6    Only --

7            A.    Oh, only reason recall because --

8            Q.    Admit?

9            A.    Admit by -- I don't know.  I don't

10   know what it says anymore.

11           Q.    Admit by end --

12           A.    I don't know.  I can't read my

13   handwriting.

14           Q.    You can't read your handwriting?

15           A.    No.  I'm a lefty.  You see what my

16   handwriting looks like.

17           Q.    I understand.  We all seem to be able

18   to interpret our own though.

19           A.    Not in that case.  I can't.

20           Q.    You can't do it?

21           A.    No, I can't.

22           Q.    What would make sense to you there?

23           A.    I can't -- I can't help you on that

24   one.

25           Q.    Okay.  So illegible even to the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 468

1    author?

2           A.    Correct.

3           Q.    Okay.  Then under that, there is a

4    question mark, and then it says once product sent

5    out?

6           A.    I don't know what that meant, but it

7    meant something to me at the time.

8           Q.    Look on Page 2.  It says intro -- I

9    assume that Sal said you should have an

10   introduction?

11          A.    Well, we discussed it.  It wasn't that

12   Sal -- we discussed it.

13          Q.    And concluded that there should be an

14   introduction?

15          A.    Yes.

16          Q.    And that the summary of the opinions

17   should be moved to the end?

18          A.    Yes, it was kind of out of, you know

19   order.

20          Q.    And then there is a note that says,

21   "make clear"?

22          A.    Where is that?  Oh, make clear -- I

23   don't know.  Make something, format clear, summary

24   clear, I don't recall.

25          Q.    But it was important to have a

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 469

1    one-page summary of your opinions, right?

2          A.    It sounded like a good idea at the

3    time, yeah.

4          Q.    Well, that's what you ended up with,

5    wasn't it, a one-page summary of your opinions?

6          A.    I believe so, yeah.

7          Q.    On Page 3, there's a note that says

8    "one first recalled, arrow double thick."

9          A.    Right.

10         Q.    What does that mean?

11         A.    Just saying that the first recall was

12   only for double thick.

13         Q.    And then two, you have written

14   "active."  What does that mean?

15         A.    I don't know.

16         Q.    Read -- read your other notes here on

17   page three of your first draft report marked Exhibit

18   140.

19         A.    Systems illustrate more of a systems

20   problem, treatment of evidence, looks like

21   treatment, not exhaustive list, just examples.

22   Forty-three reflects -- reflect fact findings.

23   There are four different investigations associated

24   with something but not by name.

25         Q.    By the way, that first recall that you

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 470

1    noted about double thick, that was as to DIGITEK
2    only, wasn't it?
3              A.     Yes.
4              Q.     You have a note on the left-hand side
5    that says everybody will get asked about?
6              A.     Every -- it's everything.
7              Q.     Will get?
8              A.     Will get asked about.
9              Q.     What does that mean?
10             A.     Meaning that you have to understand
11   what you're writing, make sure that you can
12   substantiate what you're writing.
13             Q.     Did somebody have to tell you that?
14             A.     Reinforce it perhaps, I don't know.
15             Q.     Did Sal tell you that?
16             A.     No, he did not tell me that.
17             Q.     Did you tell yourself that?
18             A.     I told myself that.
19             Q.     Okay.  Then on page 4, you have a
20   note, "qualify background," is that what that is?
21             A.     Yeah.  In other words, introduce
22   earlier what your background is and do a summary of
23   it.  We had looked at some of the -- anyway, that's
24   what that means.
25             Q.     Is that Sal's advice?

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 471

1          A.    No, I don't think so.

2          Q.    On page five, you have a note that

3    says, "In the body of this report, only the company

4    name Activas will be used."  And then next to it,

5    "Done."

6          A.    Yeah.  What that means is I got up

7    front -- I -- I wanted to make sure that it was

8    clear that I was going to use the term Actavis and

9    not waffle back and forth depending upon the time

10   period, calling it Amide and then calling it Actavis

11   at a later time.  So I wanted to make sure that I

12   defined in the introduction that when I referred to

13   Actavis, I referred to this organization which

14   originally was known as Amide.

15         Q.    And then at the bottom on page five,

16   you have a handwritten note that says, "more detail

17   intro"?

18         A.    Yeah.

19         Q.    What's does that mean?

20         A.    I assumed that we discussed it and

21   that the introduction didn't -- there was not enough

22   in the introduction and that -- helping organize it.

23         Q.    The various other notes are made by

24   you.  I'm going to try to get through this as

25   quickly as a result of your discussion with Sal

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 472

 1    Romano, right?

 2          A.    Yes, or myself, or in reviewing it

 3    myself.

 4          Q.    The draft report, if you look on page

 5    28, has references listed, right?

 6          A.    Yes, the beginning of references.

 7          Q.    Now, nowhere in this draft report is

 8    there any opinion with regard to Mylan, is there?

 9          A.    In this report?

10          Q.    Well, let's look on Page 2, the

11    summary of your opinion.  Is there anything in there

12    with regard to Mylan?

13          A.    I don't see anything at this

14    particular revision level, no.

15          Q.    So in Exhibit 40, there is no opinion

16    that you expressed as to Mylan?

17          A.    At that particular point, that's

18    correct.  I had not looked at the Mylan documents.

19    I only looked at the plaintiff documents and

20    whatever else is listed.  There were probably more.

21          Q.    On page 20 of your draft report,

22    Exhibit 140 that you're looking at, there is a

23    SpyGlass Group summary.  Do you see that?

24          A.    Yes.

25          Q.    You wrote that?

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 473

 1          A.     Yes.

 2          Q.     You started off with, "Actavis

 3   demonstrated a general incompetence in the handling

 4   of this critical product quality."  Right?

 5          A.     Yes.

 6          Q.     Then you go on, and you end with the

 7   "Actavis environment was not focused on GMP and

 8   quality systems."

 9          A.     Right.

10          Q.     Not one word as to Mylan?

11          A.     That's correct.

12               MR. KAPLAN:  Let's let him change the

13          tape.

14               THE VIDEOGRAPHER:  We're off the

15          record.  The time is 3:11.  This is the end

16          of tape 3.

17               (Recess taken.)

18               THE VIDEOGRAPHER:  We are back on the

19          record.  The time is 3:16.  This is the

20          beginning of tape 4.

21     BY MR. KAPLAN:

22          Q.     We're looking at your initial draft

23   report marked Exhibit 140 which shows on page 1 a

24   date of January 1, 2010?

25          A.     Yes.

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 474

 1          Q.    We've gone through the report and
 2    looked at notes that you have made, and you said
 3    those were based on discussions you had with Sal
 4    Romano?
 5          A.    Either by myself or with discussions
 6    with Sal, yes.
 7          Q.    At least two discussions with Sal?
 8          A.    Two discussions with Sal, right.
 9          Q.    In fact, the notes from also based
10    upon discussions that you had with Meghan Carter and
11    Pete Miller as well?
12          A.    I don't know.  Could you explain where
13    they're at, I mean specifically?
14          Q.    I'm asking you; is that right?
15          A.    No, no, not at all.
16          Q.    You are sure about that?
17          A.    I'm positive about that.
18          Q.    You sent a draft to Meghan and Pete,
19    didn't you?
20          A.    No.  I did not send a draft to Meghan
21    and Pete.
22          Q.    Are you absolutely certain of that?
23          A.    I'm certain of it, yes.
24          Q.    And when you testified under oath on
25    June 29, 2010 and gave a deposition in this case and

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 475

1  gave sworn testimony, on Page 215, you were asked by

2  Mr. Moriarty:  "To whom did you send this draft,"

3  your answer:  "I sent it to Meghan, Sal, and Pete."

4          Question:  "Was this a first draft?"

5          Answer:  That was a first draft, the

6  draft that they saw, right."

7          Question:  "And then in here, there is

8  handwriting.  Is it your handwriting?

9          Answer:  "All of it is mine."

10         Question:  "Is the handwriting based on

11  discussions you had with Plaintiff's counsel about

12  the draft."

13         Answer:  "It is based upon two things or

14  three, if you will, one, listening to them;

15  secondly, coming up with ideas as I'm just going

16  through the document, and then later going back and

17  looking at it and making additional edits as I

18  reread it."

19         That was your sworn testimony on June 29,

20  2010, wasn't it?

21      A.    If you said that then, that is my

22  sworn testimony, yes.

23      Q.    You said it?

24      A.    Yeah, I understand that.

25      Q.    And today, you're telling a different

Mark Kenny, Volume II            Videotaped            February 16, 2011

Page 476

1    story?

2            A.    Well, I guess I'm confused.  The -- I

3    did have a meeting, I did send it.  I didn't think

4    it was this particular revision, because it doesn't

5    look like any of the notes that -- I guess it is.  I

6    don't know.  I --

7            Q.    You just swore under oath that you did

8    not send the initial draft to Pete and Meghan.

9    That's not true, is it?

10           A.    I'd have to go back through my

11   e-mails.

12                 MS. CARTER:  Objection.

13           A.    I -- I don't recall -- as of right

14   now, I don't recall sending this revision to Meghan

15   and Pete.  I do not recall doing that.

16      BY MR. KAPLAN:

17           Q.    Your sworn testimony when you were

18   deposed on June 29, 2010 was that you did send this

19   draft report to Meghan and Pete, wasn't it?

20           A.    Yes.

21           Q.    Are you telling the truth now or were

22   you telling the truth then?

23           A.    To the best of my recollection right

24   now, I did not send it.  I'd have to recreate

25   through e-mails, et cetera.  I did send them a copy

Mark Kenny, Volume II              Videotaped              February 16, 2011

Page 477

1    at one point.  I thought I recollected that was in

2    June.

3            Q.     Let me show you that testimony that I

4    just quoted and see if there's any doubt in your

5    mind that you said on June 29, 2010 that you sent

6    this draft to Meghan and Pete.

7            A.     June 29th?

8            Q.     That's when you were deposed.

9            A.     No, I understand that.

10           Q.     I'm going to put in front of you your

11   sworn deposition testimony on June 29, 2010, and I

12   will refer you to Page 215 beginning at line 21 and

13   continuing through Page 216 line 17.  Do you see it?

14           A.     Just kind of point to it, if you

15   would.

16           Q.     (Indicating.)  I'm going to mark --

17   I'm going to mark these lines for you, and ask you

18   to read that testimony.  You read that testimony.

19           A.     Okay.  Last document I'm holding

20   appears to be a draft for discussion purposes only.

21           Q.     Start again, please, and read slower.

22           A.     Question: "Okay.  The last document

23   I'm holding here appears to be a draft for

24   discussion purposes only version of your report; is

25   that correct?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 478

1              Correct.

2              To whom did you send this draft?

3              I sent it to Meghan, Sal, and Pete.  Was

4    it the first draft?  That was a first draft.

5              The first draft that they saw, right.

6              Right."

7         Q.   That's not a question; that's your

8    statement, isn't it?

9         A.   Yeah, I'm reaffirming it.

10        Q.   The first draft that they saw, right.

11        A.   "And then in here, there is

12   handwriting.  Is it your handwriting.

13             All of it is mine.

14             Is the handwriting based on discussions

15   you had with Plaintiff's counsel about the draft?

16             It's based upon two things or three, if

17   you will, one, listening to them.  Secondly, coming

18   up with ideas as I'm going through the document, and

19   then later going back and looking at and making

20   additional edits as I reread."

21             So, it looks like that my memory is

22   failing me right now that I did send this document

23   to them and discuss it.

24        Q.   So when you denied sending the first

25   draft of the document to Meghan and Pete, that was

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 479

1    not the truth?

2             A.     That was not accurate.

3             Q.     And when you said that the Plaintiff's

4    lawyers, Pete Miller and Meghan Carter, had no input

5    into your report, that was inaccurate?

6             A.     No.  They had no substantive input

7    into the report.  In other words, the data, the

8    conclusions.  They couldn't because this is my

9    report, my thinking.  I wouldn't allow anybody to

10   persuade me into saying something that was not true.

11            Q.     In your report, this report that we're

12   referring to, Exhibit 140, says not one word about

13   Mylan?

14            A.     That's correct.

15            Q.     In fact, that report, Exhibit 140,

16   says, "In body of this report, only the company name

17   Actavis will be used."  Correct?

18            A.     That is referring to -- yes, that's

19   correct, it does say that.

20            Q.     Somebody told you, gee, Mr. Kenny,

21   we've looked at your report here, your initial

22   draft, Exhibit 140, and you don't say anything about

23   Mylan.  You better add something about Mylan.

24            A.     I was asked a question, have you --

25   have you gone through the Mylan documents?  I said I

Page 480

1    have not gone through the Mylan documents.

2         Q.    Who asked you that question?

3         A.    I believe it was Pete Miller.  He had

4    a question.  And I said I have not gone through it.

5    And he says, well, do you have any opinion.  I said

6    I have to read the Mylan document.  I didn't even

7    open them up.

8         Q.    At this point in time when you got to

9    the point of drafting an opinion that is 35 pages

10   long that you shared with your colleague, Sal

11   Romano, that you shared with Plaintiff's lawyers,

12   Pete Miller and Meghan Carter, you hadn't looked at

13   any Mylan documents?

14        A.    I had not looked at any Mylan

15   documents at that point.

16        Q.    Did you have any idea that Mylan was a

17   defendant in this lawsuit?

18        A.    No, I actually did not.  I didn't know

19   what their role was in terms of the legal situation.

20   I was asked to look at two -- initially asked to

21   look at different things which is in this report.

22   And they had questions, did I look at Mylan, and I

23   said no, I haven't looked at any information

24   regarding Mylan.  And they directed me, it's under

25   Crivella West under so and so tab, et cetera, and I

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                          Page 481

 1   went to -- I went to the tab, I started reading it.

 2   And I made some conclusions off of the information

 3   that I read, but that's the extent of the direction.

 4          Q.    In your 35 page draft report, Exhibit

 5   140, you mention not one word about Mylan, and

 6   others reviewed it and said you better express

 7   opinions about Mylan because that's what we want?

 8               MS. CARTER:  Objection.

 9          A.    No, that's not even remotely close,

10   the way you put it.  They asked me very specifically

11   have you had an opportunity to look at Mylan, and I

12   said no.  They said the Mylan documents are in

13   Crivella West under dot, dot, dot, and -- anyway, so

14   then I took a look at them.

15     BY MR. KAPLAN:

16          Q.    So now you remember a specific

17   conversation with the Plaintiff's lawyers in which

18   they asked you have you looked at the Mylan

19   documents?

20          A.    I thought it was a later discussion.

21   Quite honestly, I thought it was later in perhaps

22   the discussion process.

23          Q.    Until I confronted you with your sworn

24   testimony on pages 215 and 216 of your previous

25   deposition of June 29, 2010, you denied sending this

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 482

1   report to the plaintiff's lawyers?

2               MS. CARTER:   Objection.

3     BY MR. KAPLAN:

4          Q.    Correct?

5          A.    It appears that is correct.

6          Q.    Appears?

7          A.    Yeah.

8          Q.    It is incorrect?  It is correct?

9          A.    No, you're right.  It is incorrect.  I

10   misspoke.  I didn't lie, I misspoke.  You know, in

11   trying to put together the sequence, the chronology,

12   I misspoke.

13         Q.    Let's look at the next draft of your

14   report.

15               (Whereupon, Exhibit 141, Draft of

16               expert opinion report, was marked for

17               identification as of today's date.)

18     BY MR. KAPLAN:

19         Q.    I've put before you Exhibit 141 which

20   is a subsequent draft of your expert opinion report.

21   And I will say for the record, according to the disk

22   that you gave me this morning, it is identified as

23   expert opinion report May 26, 2010.

24         A.    Right.

25         Q.    Is that correct?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 483

1          A.     Yes.

2          Q.     Is that your next --

3          A.     My next what?  Sorry, sir?

4          Q.     Pardon?  Is that your next report?

5          A.     No.  This is the prior report.  This

6    looks to me like the prior report.

7          Q.     Prior to?

8          A.     Prior to this report (indicating).

9          Q.     So are you telling me that Exhibit 141

10   was your first report?

11         A.     Yes.  Yes, there's no question.

12         Q.     No question.  How do you know that?

13         A.     Take a look at -- I had a lot of place

14   keepers.  I mean sections that I need to consider.

15         Q.     I'm sorry, tell me how it is that you

16   concluded that Exhibit 141 was drafted before?

17         A.     Well, in quickly looking at it, you

18   know, it looks like this is a more complete document

19   and more filled in than this one.  This one

20   meaning -- okay.  The one document that has all of

21   the (indicating) --

22         Q.     Look at the exhibit number and let's

23   get -- let's be clear on the record.

24         A.     So what's -- what's your question,

25   sir?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 484

```
 1          Q.    Exhibit 141, which I've just handed
 2    you, is a subsequent draft of your expert report,
 3    correct?
 4                MS. CARTER:  Objection.
 5          A.    No.  This is a -- this precedes -- 141
 6    precedes 140.
 7      BY MR. KAPLAN:
 8          Q.    Okay.  So 140 was a more advanced form
 9    of your report?
10          A.    Yes, that's correct.
11          Q.    Okay.  And even though you had an
12    initial -- prepared an initial draft which is 141.
13          A.    Right.
14          Q.    Then you got to 140 when you had time
15    to further review documents, right?
16          A.    Or further review and -- and collect
17    my thoughts.
18          Q.    And think about it, collect your
19    thoughts, be comprehensive?
20          A.    Yes.
21          Q.    And -- and Exhibit 140, the draft
22    report that came after the initial draft report, you
23    said nothing about Mylan, right?
24          A.    That is correct.
25          Q.    Okay.  Well, let's look at 141 which
```

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 485

1    you say was your initial draft report; is that

2    right?

3             A.    Yes.

4             Q.    Summary of the opinions is on page 1.

5    And there is nothing, there is no opinion

6    whatsoever, is there, as to Mylan?

7             A.    That is correct.

8             Q.    On Page 2, you state in the

9    introduction that it's not only you but it's Mark

10   Kenny and Salvatore Romano who have been engaged by

11   Motley Rice to prepare an expert report?

12            A.    That is correct.

13            Q.    That you, Mark Kenny, and Salvatore

14   Romano had been engaged to participate in a legal

15   deposition?

16            A.    That is correct.

17            Q.    And that you, Mark Kenny, and

18   Salvatore Romano, have been engaged to testify as an

19   expert witness at trial?

20            A.    Yes.

21            Q.    And then you refer to the expert

22   opinion as "our expert opinion," right?

23            A.    That is correct.

24            Q.    So in the -- in the subsequent draft

25   which is marked as Exhibit 141 -- I'm sorry.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 486

```
 1              In the initial draft, you make it clear

 2    that this is going to be a joint report from you and

 3    Sal, that you're both going to be experts to testify

 4    at deposition and trial?

 5         A.    Correct.

 6         Q.    And then you pull that idea down in

 7    the -- in the second draft which is 141?

 8         A.    Correct.

 9         Q.    Okay.  To -- to be correct, and make

10    sure that -- if you look at Exhibit 140, which you

11    said was the subsequent draft?

12         A.    Right.

13         Q.    You say in there too on page 5 that

14    it's you and Sal Romano?

15         A.    Right, and his name appears on the

16    front.

17         Q.    Yeah.  So let's look at what you say

18    is your initial report, Exhibit 141, which you

19    agreed says nothing about Mylan in the summary of

20    your opinion, right?

21         A.    Correct.

22         Q.    And that's in -- that's in a black box

23    on the first page, right?

24         A.    Black box?

25         Q.    First page of 141?
```

Mark Kenny, Volume II            Videotaped                February 16, 2011

Page 487

```
 1              A.    Oh, the box.
 2              Q.    Summary of opinion, black box, right?
 3     Isn't that right?
 4              A.    Yes.
 5              Q.    And if you look at page 14 where it
 6     says "SpyGlass Group Conclusion."  Do you see that?
 7     On Exhibit 141?
 8              A.    Yes.
 9              Q.    Nothing there pertaining to Mylan, is
10     there?
11              A.    Nothing.
12              Q.    Then look at page 16.  There's a
13     heading, "Overall observations of the quality system
14     at Actavis."  Underneath that, there is a note,
15     "Mark, we need to write a dialogue followed by
16     bullet points on the following."
17                   Who do you think that is from?  Would it
18     be Sal Romano?
19              A.    Yes.
20              Q.    So Sal Romano, who you described
21     earlier as somebody who just checked your spelling
22     and was a proofreader, was giving you substantive
23     input as to the content of your report?
24              A.    He attempted to.  He attempted to give
25     me substantive information of which I eliminated all
```

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 488

1   of it because I -- because I wanted input only into

2   spelling, format, completeness.

3          Q.    So you threw out what his input as to

4   substantive content of your report?

5          A.    Well, it was not substantive comment.

6   It was -- I had no interest in it.

7          Q.    Okay.

8          A.    Because I was the one that was going

9   to write the report and I was the one that was going

10  to testify, not him.

11         Q.    Exactly.  So on page 16 of the initial

12  draft report marked Exhibit 141, when Sal Romano

13  said to you, "We need to write a dialogue followed

14  by bullet points on the following," and if you look

15  down to the fifth and sixth bullet points or the

16  fifth bullet point, it says, "Mylan was negligent in

17  controlling its contractor, Actavis.  Lack of

18  visits, audits, and follow-up.  That was his

19  direction to you, right?  Incorporate that in a

20  bullet point.  He told you to do that, didn't he?

21              MS. CARTER:  Objection.

22         A.    I need to read it, sir.

23    BY MR. KAPLAN:

24         Q.    Do you see the fifth bullet point?

25         A.    Yes, sir.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 489

```
1              Q.     That is Sal telling you to put this
2   bullet point in saying Mylan was negligent in
3   controlling its contractor, Actavis, lack of visits,
4   audit, and follow-ups.  That's what it says, isn't
5   it?
6              A.     Yes.
7              Q.     But when you prepared the subsequent
8   report marked Exhibit 140, you rejected that and
9   didn't include such a bullet point, did you?
10             A.     At that point, I did not include it,
11  that's correct, because I threw out basically
12  anything that he told me.
13             Q.     Well, if you look at Page 18 of your
14  final report dated June 15, 2010, you didn't reject
15  his first bullet point, did you?  Do you have your
16  final report in front of you?
17             A.     Yes.
18             Q.     You accepted some things he told you
19  and you rejected others.  Right?
20                    MS. CARTER:  Objection.
21    BY MR. KAPLAN:
22             Q.     Are you looking on Page 18 of your
23  final report?
24             A.     That is correct.  That is correct
25  in -- could you ask the question --
```

Mark Kenny, Volume II            Videotaped                February 16, 2011

Page 490

```
1          Q.     Did you say that the corporate culture
2    was production at any cost and ignore the quality
3    systems?
4          A.     Did I say that?  No, these were --
5    these were Sal's ideas.
6          Q.     And did you incorporate that on Page
7    18 of your final report?
8          A.     Some of the information I did
9    incorporate after review of the documents.
10         Q.     Specifically, I'm looking at the first
11   bullet point and asking you whether you accepted
12   Sal's direction as to the substantive content of
13   your final report when he suggested that you say,
14   "the corporate culture was production at any cost
15   and ignore the quality systems."  You said that as
16   to Actavis, didn't you?
17              MS. CARTER:  Objection.
18         A.     Yes.
19     BY MR. KAPLAN:
20         Q.     So you accepted that?
21         A.     I accepted it because I agreed with
22   it.
23         Q.     Okay.  And then look on the second and
24   third bullet points, page 14 of your final report,
25   includes his suggestions that you say that "Actavis'
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 491

1    corporate and QA management was weak and not

2    knowledgeable of the CGMP."  You said that in your

3    final report, didn't you?

4           A.    Not in my final report.

5           Q.    Okay.  Look on page 14, the last

6    paragraph, you make the statement, "It is my opinion

7    to a reasonable degree of certainty that corporate

8    and QA management were not knowledgeable of the

9    CGMP."

10          A.    Yeah.  I didn't say anything about

11   weak.  Those are not terms that I would use.

12          Q.    So we're going to parse out the word

13   "weak"?

14          A.    No, it's an important word.

15          Q.    Okay.  But you did follow the

16   suggestion to include the statement that "Actavis'

17   corporate and QA management were not knowledgeable

18   of the CGMP."  Except to that, right?

19                MS. CARTER:  Objection.

20          A.    I accepted that because it agreed

21   with --

22     BY MR. KAPLAN:

23          Q.    Same with -- same with the next bullet

24   point.  With regard to Sal's direction as to the

25   substantive content of your report telling you that

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 492

1    you should say that many drug products were made and

2    sold without approved NDAs/ANDA showing arrogance or

3    a complete lack of knowledge of regulatory

4    requirements?

5              A.    I never did anything with that --

6              MS. CARTER:  Objection.

7              A.    Ultimately.

8       BY MR. KAPLAN:

9              Q.    Look at your final report, page 14.

10   Your final report is Exhibit 38.  Do you have that

11   in front of you?  Page 14.  Look at the last full

12   paragraph.  You parrot Sal Romano's words that say

13   "Additionally, there was a lack of understanding of

14   the regulatory approval process since many drug

15   products were made and sold without approved

16   NDA/ANDAs."  Right?

17             MS. CARTER:  Objection.

18             A.    I don't recall, to be honest with you.

19      BY MR. KAPLAN:

20             Q.    Well, just look at -- look at the

21   words.  You don't have to recall anything, you just

22   have to look at page 14.

23             A.    Fourteen, which bullet?

24             Q.    Page 14 of your final report, Exhibit

25   38?

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 493

```
 1          A.    Which bullet?

 2          Q.    There's no bullet.  It's Exhibit 38.

 3          A.    Oh, here, yeah.  So I understand, I

 4    want to read what you're saying that I parroted.

 5          Q.    You parroted these words, "many drug

 6    products were made and sold without approved

 7    NDAs/ANDAs," I think you eliminated the words

 8    "showing arrogance."  But then you used "evidencing

 9    a complete lack of knowledge or regulatory

10    requirements."

11               MS. CARTER:  He's on the wrong page on

12          that one.

13      BY MR. KAPLAN:

14          Q.    Are you on page 14 of Exhibit 38,

15    your final report dated June 15, 2010?

16          A.    Yes, but I'm on the wrong page when it

17    comes to this, I guess (indicating).

18          Q.    Look on page 16 of your initial draft

19    report.

20               MR. ANDERTON:  Exhibit 141.

21      BY MR. KAPLAN:

22          Q.    Yes.  Where Sal Romano is giving you

23    direction on the content of the report?

24               MS. CARTER:  Objection.

25          A.    Okay.  Could you please show me?  I'm
```

Mark Kenny, Volume II          Videotaped             February 16, 2011

Page 494

1    looking at page 16.

2              MR. ANDERTON:  You're on Exhibit 140,

3         go to 141, Page 16 of Exhibit 141.

4         A.    Got it.

5              MR. ANDERTON:  Look at the third

6         bullet point.

7         A.    And your question is?  One more time

8    so I understand it.

9    BY MR. KAPLAN:

10        Q.    That's fine.  Let's go through it.

11        A.    Sure.

12        Q.    If you're looking at page 16 of

13   Exhibit 141 where Sal Romano is giving you direction

14   as to the suggested content of the expert report to

15   be submitted in this case, in the third bullet

16   point, he says that you need to say the following:

17   "Many drug products were made and sold without

18   approved NDA/ANDA showing arrogance or a complete

19   lack of knowledge of regulatory requirements."

20           He's suggesting that you say that as to

21   Actavis, right?

22              MS. CARTER:  Objection.

23        A.    He's saying that that's his opinion.

24   BY MR. KAPLAN:

25        Q.    Right.  And then in your final report

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 495

1    which is Exhibit 38, on page 14, you say as follows:

2    "Apparently, there was a lack of understanding of

3    the regulatory approval process since many drug

4    products were made and sold without approved

5    NDA/ANDAs," citing footnote ten.  Isn't that what

6    you said --

7            A.    Yes.

8            Q.    -- in your final report?

9            A.    That is in my final report.

10           Q.    So you followed the direction of Sal

11   Romano as to the substantive content of your final

12   report on that issue, didn't you?

13                MS. CARTER:  Objection.

14           A.    I agreed with Sal.  I did not follow

15   his direction.  There's a big difference.

16      BY MR. KAPLAN:

17           Q.    You adopted Sal's characterization

18   that Actavis demonstrated or showed arrogance,

19   right?

20                MS. CARTER:  Objection.

21           A.    Sal?

22      BY MR. KAPLAN:

23           Q.    Look at the fourth bullet point on

24   page 16 of Exhibit 141 where Sal Romano is saying to

25   you, "We need to write a dialogue followed by bullet

Mark Kenny, Volume II          Videotaped                  February 16, 2011

Page 496

```
 1    points on the following," and the third bullet

 2    point, he uses the term "showing arrogance"?

 3              A.    Right.

 4              Q.    And you -- you adopted those words,

 5    didn't you, in your final report on page 14?

 6              A.    I wrote similar content.  I didn't

 7    write -- I didn't write the same words, I'm sure.

 8              Q.    Quote, page 14 of your report June 15,

 9    2010, Exhibit 38, "It is my opinion to a reasonable

10    degree of certainty that they" -- meaning Actavis --

11    were highly resistant to systematic change,

12    appearing sure that minor improvements would resolve

13    all of their issues.  This was a flawed strategy.

14    Their arrogance resulted in managing a drug company

15    that operated at a high risk level."  Correct?

16              A.    Correct what?

17              Q.    Isn't that what you said?

18              A.    That's what I said.

19              Q.    You followed Sal's direction as to the

20    content of your report?

21                    MS. CARTER:  Objection.

22       BY MR. KAPLAN:

23              Q.    Didn't you?

24              A.    We had -- we had discussions.  Sal did

25    not direct me, nobody directs me.  We had technical,
```

Mark Kenny, Volume II          Videotaped                 February 16, 2011

                                                              Page 497

1    if you will, professional discussions.  From that, I

2    made conclusions.  It's that simple.  I was being

3    respectful at that point.

4           Q.    So you were being respectful by

5    including what Sal told you to say in your final

6    report?

7           A.    I was being respectful and listening

8    to him.

9                 MS. CARTER:  Objection.

10     BY MR. KAPLAN:

11          Q.    And adopting --

12          A.    No.  I was not being respectful and

13   adopting, I was being -- if I agreed with it, I

14   wouldn't put it in.  If I didn't agree with it, I

15   would not put it in.

16          Q.    Let's look again at Exhibit 141 on

17   Page 16.  This is your initial draft report in this

18   case.  You see the heading review of "Actavis GMP

19   compliance history-all products"?

20          A.    Yes.

21          Q.    Below that in parenthesis is a note

22   from Sal Romano to you?

23          A.    Right.

24          Q.    "Mark, dot dot dot, I have added your

25   stuff on GMP.  Please add some dialogue, dot dot

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 498

1    dot.  I do not see -- I did not do a good fit of all

2    of your tables into this dock, exclamation point.

3    Maybe the table details should be as an attachment?

4    I think the following section on DIGITEK is good,

5    dot dot dot.  Can you get this section in the same

6    bullet format?"  And then the following section is

7    "SpyGlass Group conclusion result of FDA

8    documentation."  Do you see that?

9            A.    Yes.

10           Q.    Would you agree that this is further

11   evidence that Sal Romano gave you direction as to

12   the substantive content of your final expert report

13   and opinions in this case?

14           A.    Absolutely not.  I would say that he

15   assisted in trying to help me organize it.  Going

16   through and reviewing it and trying to make it into

17   a highly organized report and understandable.

18           Q.    Sounds like he was more than a spell

19   checker or proofreader, doesn't it?

20           A.    Helped me organize.

21           Q.    Now -- now he's spell checker,

22   proofreader, and organizer?

23           A.    Yeah.  I mean, I guess I would say

24   yes.

25           Q.    So I don't have any other draft

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 499

1    reports.  I have exhibit 141 which were just talking

2    about which you told me is the initial draft report.

3    I have Exhibit 140 which you told me is the next

4    draft report?

5              A.    Right.

6              Q.    And then I have your final report

7    dated June 15, 2010?

8              A.    Right.

9              Q.    Are there any others?

10             A.    No.

11             Q.    Mylan's role was that of an authorized

12   distributor of record and wholesale distributor,

13   correct?

14             A.    Correct.

15             Q.    Under 21CFR 203.3, an authorized

16   distributor of record means the distributor with

17   whom a manufacturer has established an ongoing

18   relationship to distribute such manufacturer's

19   products, correct?

20             A.    Okay.  If you say -- I'm not familiar

21   with that phraseology.

22             Q.    Would you like me to show you that

23   regulation?

24             A.    Surely.

25                   (Whereupon, Exhibit 142, Regulation,

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 500

1          was marked for identification as of today's

2          date.)

3     BY MR. KAPLAN:

4          Q.    I'm going to hand you what we've

5     marked as Exhibit 142, which is 21CFR section 203.3,

6     subparagraph B, defines authorized distributor of

7     record.  And I want you to take a look at that and

8     then read that into the record as soon as she marks

9     it.

10          A.    And that's what number?

11          Q.    203.3b, as in boy, where it says

12    "authorized distributor of record."  Do you see

13    that?

14          A.    203.

15          Q.    Point 3, subparagraph B.  What does it

16    say?

17          A.    "Authorized distributor, distributor

18    of record."

19          Q.    Read it.

20          A.    "Authorized distributor of record

21    means a distributor with whom a manufacturer has

22    established an ongoing relationship to distribute

23    such manufacturers' products."

24          Q.    So Mylan was an authorized distributor

25    of record?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 501

1          A.    I don't know that term.

2          Q.    Well, you see it, I've just showed it

3     to you.

4          A.    I see it, but I don't know the context

5     of this, and I am not the right person to give an

6     interpretation of the meaning of that.

7          Q.    Isn't it important to you, fundamental

8     to your opinions in this case, to know what Mylan's

9     legal status and responsibility was?

10         A.    I don't know if it's important or not,

11    sir.

12         Q.    Well, you can't make up something

13    about their -- their legal duties and

14    responsibilities, can you?

15         A.    I'm sorry?

16         Q.    It's not Kenny on the law, it's what

17    the law is?

18         A.    Correct.  And the law is good

19    manufacturing practices, of which I understand

20    fully.

21         Q.    I move to strike that because that

22    really makes no sense.

23              MS. CARTER:  Objection.

24       BY MR. KAPLAN:

25         Q.    Look at 21CFC 203.3, Exhibit 142,

Mark Kenny, Volume II          Videotaped            February 16, 2011

Page 502

```
 1   subparagraph D, defining wholesale distributor, and
 2   tell me if you agree that Mylan is not only -- is
 3   both an authorized distributor of record and a
 4   wholesale distributor according to the code of
 5   federal regulations?
 6            A.    You said 203.3D, the next page?
 7            Q.    Double D.
 8            A.    Double D.
 9            Q.    Do you see that?  Do you want to read
10   that?
11            A.    "Wholesale distributor means any
12   person engaged in the wholesale distribution of a
13   prescription drugs -- I beg your pardon --
14   prescription drugs, including but not limited to
15   manufacturers, repackagers, own label distributors,
16   private label distributors, jobbers, brokers,
17   warehouse, including manufacturers and distributors'
18   warehouses, chain drug warehouses, and wholesale
19   drug warehouses, independent wholesale drug traders,
20   and retail pharmacies that conduct wholesale
21   distribution."
22            Q.    Does that help you with respect to
23   understanding Mylan's role in this case?
24            A.    No, it doesn't.  I would have to --
25            Q.    Just yes or no.
```

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 503

1          A.    No, it does not.

2          Q.    Are you aware of any regulation that

3    places a responsibility for compliance with

4    manufacturing GMPs on a wholesale distributor?

5          A.    I'm not aware.

6          Q.    Are you aware of any regulation that

7    requires wholesale distributors to establish quality

8    agreements with manufacturers or suppliers?

9          A.    Regulation?  I understand the certain

10   sections of the GMP and what the expectations and

11   requirements of the FDA are.

12         Q.    Are you aware -- I'm going to ask you

13   the question again.  Are you aware of any regulation

14   that requires wholesale distributors to establish

15   quality agreements with manufacturers?

16         A.    Yes.

17         Q.    Show me the --

18         A.    I would show you the paragraph 22 of

19   21011122 where it talks about quality systems, and I

20   would interpret that to --

21         Q.    Just -- just tell me what you refer

22   to, what you rely on?

23         A.    I have to pull the GMP again.  We

24   talked about it earlier.

25         Q.    Give me -- give me the GMP that you're

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 504

1    talking about.  I want you to show me in there where

2    it -- where it says that a wholesale distributor

3    must establish a quality agreement with a

4    manufacturer.

5           A.    Okay.  I would interpret --

6           Q.    Just show me the language that says a

7    wholesale distributor must establish a quality

8    agreement with a manufacturer.  Just read the

9    language there.

10          A.    It does not say -- use the word

11   quality agreement.

12          Q.    Thank you.  And that regulation that

13   you have before you which has been previously marked

14   I believe as exhibit --

15                MS. CARTER:  I think it's Plaintiff's

16          49.

17      BY MR. KAPLAN:

18          Q.    Plaintiff's 49, is that included among

19   the documents that you relied upon in rendering your

20   opinions in this case which are contained in your

21   report of June 15, 2010?

22          A.    Yes, it is.

23          Q.    And where does that appear on the list

24   of references?

25          A.    It's the second one, number two.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 505

1          Q.     Okay.  That cites the entire 21CFR
2     part 210 and 21CFR part 211.
3          A.     Right.  So I did not specify what
4     sections within that.
5          Q.     And this is the precise regulation you
6     are relying upon, right?
7          A.     That is correct.
8          Q.     Which says nothing about a quality
9     agreement?
10          A.     It does not use those words.
11          Q.     Thank you.  Are you aware of any
12     regulations that requires wholesale distributors to
13     audit manufacturing companies?
14          A.     I'm aware of the requirements of GMP
15     which is to select, qualify, and monitor your
16     suppliers of which that would -- in Mylan's case
17     would include Actavis.
18          Q.     Are you aware, I'm going to ask you
19     again, of any regulation that requires a wholesale
20     distributor to audit a manufacturing company?
21          A.     Using those specific terms, no.
22          Q.     Are you aware of any regulation or law
23     that gives wholesale distributors the right to
24     inspect manufacturers for CGMP compliance?
25          A.     No.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 506

```
 1          Q.     Are you aware of any regulation that

 2   requires a wholesale distributor to require a

 3   certificate of analysis or certificate of

 4   conformance from a manufacturer for finished

 5   packaged product?

 6          A.     As stated, no.

 7          Q.     Are you aware of any regulation that

 8   requires a wholesale distributor to perform periodic

 9   chemical analysis of finished product purchased from

10   a manufacturer?

11          A.     You're going to have to repeat that.

12          Q.     Are you aware of any regulation that

13   requires a wholesale distributor to perform periodic

14   chemical analyses of finished product purchased from

15   a manufacturer?

16          A.     In the regulations, it does not state

17   that specifically.

18          Q.     Your final report in this case dated

19   June 15, 2010, previously marked as Exhibit 38, is a

20   lengthy one, isn't it?

21          A.     It is the number of pages it is.

22          Q.     The last numbered page is 50.  Is that

23   correct?

24          A.     Yes, it is.

25          Q.     Less than a page of those 50 pages is
```

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 507

1    devoted to any discussion about Mylan, isn't it?

2              A.    I believe that is correct, yes.

3              Q.    You assumed that Mylan was the holder

4    of the ANDA?

5              A.    No, I never assumed that.

6              Q.    So you know that Mylan was not the

7    ANDA holder for DIGITEK?

8              A.    That's correct, I knew that.

9              Q.    And you know that Mylan was not the

10   manufacturer of DIGITEK?

11             A.    They did not produce the product,

12   that's correct.

13             Q.    Let me state it again.  You know that

14   Mylan was not the manufacturer of DIGITEK?

15             A.    That Mylan was not the manufacturer,

16   correct.

17             Q.    Explain the basis for your assumption

18   that Mylan is required by GMP to investigate all

19   complaints as stated in -- on page 33 of your final

20   report dated June 15, 2010 previously marked as

21   Exhibit 38?

22             A.     If I recall correctly, which I think I

23   do, the supply agreements stated that Mylan would

24   handle complaints which was a good thing that it was

25   stated.  The -- since they took ownership of

Mark Kenny, Volume II            Videotaped            February 16, 2011

Page 508

```
 1    complaint handling, they needed to do it in

 2    accordance to good manufacturing practice and in

 3    cooperation with the manufacturer.

 4          Q.    So you've read the supply and

 5    distribution agreement?

 6          A.    Yes.

 7          Q.    And -- and you agree with me that it

 8    has provisions in there about complaint handling?

 9          A.    Yes, I believe it does.

10          Q.    Whose responsibility do you think it

11    was to handle the complaints?

12          A.    I'm sorry.

13          Q.    Whose responsibility do you think it

14    was to handle the complaints?

15          A.    Well, there's -- there's a lot of

16    functions associated with complaints.  The -- the

17    receipt of the complaints, the records of the

18    complaints, would side in two spots.  One would be

19    in Mylan and the other would be in Actavis.  Actavis

20    would engage in investigation if requested by Mylan.

21    If they weren't aware of a complaint, they couldn't

22    investigate it.

23          Q.    Can you tell me what part of the

24    agreement you're referring to?

25          A.    I don't recall.
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 509

1          Q.     Do you want to take a look at it?

2          A.     Sure.

3          Q.     Why don't you do that.

4          A.     I don't have the agreement here.

5          Q.     Did you look at the supply and

6    distribution agreement?

7          A.     Very early on.  Yes.

8          Q.     When did you last look at it?

9          A.     It was probably one of the first

10   documents I looked at.

11         Q.     How early in the process?

12         A.     Very early.

13         Q.     You told me just a few minutes ago

14   that when you drafted your initial report, you

15   didn't look at any Mylan documents?

16         A.     I realized that I did afterwards.

17         Q.     Have you misspoken yourself again?

18         A.     Yes.  I did look at it, I did see it.

19         Q.     So when you -- when you drafted your

20   initial report and said nothing about Mylan, you had

21   already looked at the supply and distribution

22   agreement between Mylan and Actavis?

23         A.     I had scanned through it.

24         Q.     And when you -- when you drafted your

25   subsequent report, draft number two, you had looked

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 510

1    at the supply and distribution agreement between

2    Mylan and Actavis?

3           A.    I had scanned at it at the original

4    time.  I didn't scan it again.

5           Q.    And still offered no opinion as to

6    Mylan?

7           A.    That's correct.

8           Q.    What was your -- what was your great

9    revelation then that caused you to --

10          A.    I explained it earlier.  I was asked

11   do I -- have I looked at the Mylan documents, and I

12   said, no, I have not looked at them.

13          Q.    But now you just told me you had

14   looked at them?

15          A.    Well, I looked at one document.  I

16   don't remember where the supply agreement was.

17          Q.    Maybe you had better rethink this

18   again because this is -- this is sworn testimony

19   that you're giving under oath, and I don't want you

20   to misspeak yourself.

21          A.    I understand.

22          Q.    You told me at the time that you

23   drafted the first two reports which led to the final

24   report?

25          A.    Right.

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 511

 1          Q.     You hadn't looked at Mylan documents.
 2    Now you say you had looked at the supply and
 3    distribution agreement.  What's -- what's the
 4    correct testimony here?
 5          A.     I saw that particular document and I
 6    recall that I did review it.
 7          Q.     When did you see that document?
 8          A.     As I said, very early on in the
 9    process.  I looked at it, I blitzed through it,
10    because I was seeking a quality agreement, not the
11    general terms of operating between two companies.
12    Because the supply agreement has nothing to do with
13    the area that I'm expert in unless it includes the
14    quality agreement type requirements and -- and
15    specification of responsibilities.
16          Q.     What criticisms do you have of the
17    supply and distribution agreement?
18          A.     I have no criticism of it.  I -- you
19    know, I scanned through it.  I would have no opinion
20    on it, it's an operations document.  It's focused as
21    an operations document.
22          Q.     It's what?
23          A.     It's an operations document.
24          Q.     What does that mean?
25          A.     Associated with terms, financial terms

Mark Kenny, Volume II            Videotaped                 February 16, 2011

Page 512

1    in general and a supply agreement.

2            Q.     It contains provisions such as the

3    fact that Actavis shall remain responsible for

4    maintaining and fulfilling all regulatory

5    requirements, doesn't it?

6            A.     Uh-huh.  That would be common

7    terminology used.

8            Q.     It provides for procedures in

9    reporting adverse drug experience information,

10   doesn't it?

11           A.     It says that, yeah.

12           Q.     That's important, isn't it?

13           A.     Important to whom?

14           Q.     Well, important to you as expert in

15   this case offering opinions against Mylan.  That's

16   important, isn't it?

17           A.     Is it important -- it's referenced in

18   there, but it's not the -- it's not what I'm looking

19   for.  I'm looking for substantive, specific

20   information as to who's responsible for what and

21   going down to on a day to day level.  Who is doing

22   what.

23           Q.     Well, how about this --

24           A.     Similar to the document that they

25   wrote, in other words, their draft is a reasonably

Mark Kenny, Volume II          Videotaped               February 16, 2011

                                                        Page 513

 1   comprehensive document.

 2          Q.     How about this:  Do you recall that

 3   the supply and distribution agreement between Mylan

 4   and Actavis provides that Mylan shall refer or

 5   submit to Actavis all drug experience reports and

 6   other medical inquiries or quality complaints

 7   associated with the products within 48 hours of

 8   Mylan's receipt of such reports?

 9          A.     Okay.

10          Q.     Do you recall that?

11          A.     I don't recall it specifically, but I

12   remember there was a complaint.

13          Q.     Is that an appropriate provision?

14          A.     I believe so.

15          Q.     It says all telephone calls shall be

16   referred to Actavis.  Is that appropriate?

17          A.     It a legal -- situation -- I would

18   have no expert opinion on that particular aspect of

19   it.

20          Q.     You don't have any criticism of that,

21   do you?

22          A.     I have no criticism of it.

23          Q.     It says, "Actavis shall be responsible

24   for fulfilling any regulatory requirements with

25   respect to such events, including but not limited to

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 514

```
 1    the filing of all form FD 2253s, contact and
 2    follow-up with the patient or reporter of the event
 3    and will make any necessary contact with the FDA
 4    regarding the subject matter of the same."
 5            A.    I'm not familiar with those terms.  I
 6    have no opinion on it.
 7            Q.    That places responsibility clearly on
 8    the shoulders of Actavis, doesn't it?
 9            A.    I would have to study that further.
10    I'm not going to -- I don't think I can give an
11    opinion based upon reading one sentence out of a
12    supply agreement.
13            Q.    The fact is you really haven't read
14    this supply agreement, have you?
15            A.    I told you I scanned through it and I
16    looked for certain conditions which I did not find
17    in there.  And the conditions that you're talking
18    about are not what I was not looking for.
19            Q.    The supply and distribution agreement
20    between Actavis and Mylan provides that "Actavis
21    shall be responsible for filing and maintaining all
22    documentation and other information as required by
23    each and every state and locality for the purpose of
24    listing the products on each state's formulary or
25    other similar authority, and for obtaining such
```

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 515

1   approvals as may be necessary to sell the products

2   in those states."

3              Is that an appropriate provision?

4         A.    I don't know what is appropriate or

5   not appropriate.  It's a regulatory legal issue, not

6   a GMP issue under the GMP category.

7         Q.    The supply and distribution agreement

8   between Actavis and Mylan which is dated August 5,

9   1999, provides that Actavis grants to Mylan the

10  exclusive right to market, sell, and promote and

11  distribute products.  Is that your understanding?

12        A.    Yes, that is my understanding.

13        Q.    Anything wrong with that?

14        A.    I can't say whether it's wrong or

15  right.  It just is.

16        Q.    The supply and distribution agreement

17  dated August 5 1999 between Mylan and Actavis

18  provides that "Actavis shall perform quality

19  assurance testing with respect to the products sold

20  hereunder."  That is DIGITEK.

21        A.    Right.

22        Q.    "Including stability testing so that

23  the products conform with the specifications."

24             Anything wrong with that?

25        A.    No, not that I can see.

Mark Kenny, Volume II         Videotaped              February 16, 2011

                                                            Page 516

1          Q.    That places responsibility squarely on

2     the shoulders of Actavis, didn't it?

3          A.    For that subject.

4          Q.    The agreement further provides that

5     "Actavis shall provide the results of such tests to

6     Mylan in the form of a certificate of analysis."

7               Is that appropriate?

8          A.    If they agree to it, certainly.

9          Q.    What is a certificate of analysis?

10         A.    The certificate of analysis is the

11    summary of all of the finished product testing

12    results.

13         Q.    That's a good thing that the

14    certificate of analysis was being provided?

15         A.    Absolutely.

16         Q.    The supply and distribution agreement

17    between Mylan and Actavis dated August 5, 1999

18    provides that "Actavis will manufacture, package,

19    label, store, and ship the products," being DIGITEK,

20    that is the subject of the agreement.  So Actavis

21    will "manufacture, package, label, store, and ship

22    DIGITEK in accordance with the specifications set

23    forth in the ANDA, and as such ANDA may be amended

24    from time to time."

25               Is that an appropriate provision in the

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 517

1    agreement?

2              A.    It seems appropriate.

3              Q.    Do you have any criticism of that?

4              A.    I have no criticism.

5              Q.    That seems to place responsibility

6    squarely on the shoulders of Actavis, doesn't it?

7              A.    In that particular situation, yes.

8              Q.    The agreement further provides that

9    "Mylan shall be promptly and fully advised of any

10   new instructions or specifications required by the

11   FDA or the FFDCA."

12             Is that appropriate?

13             A.    I believe so.

14             Q.    Further provides that "Mylan's quality

15   control personnel upon reasonable prior notice shall

16   be permitted to observe the manufacture of DIGITEK."

17             Is that appropriate?

18             A.    Yes.

19             Q.    Further provides that "in the event

20   Actavis cannot manufacture products in accordance

21   with the instructions and specifications, Actavis

22   shall promptly so advise Mylan."

23             Is that appropriate?

24             A.    Yes.

25             Q.    And further, that "Actavis shall not

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 518

1    change any ANDA or specification without the prior

2    written consent of Mylan."  Appropriate?

3            A.      Appropriate.

4            Q.      Good practice?

5            A.      Appropriate.  It is a must practice.

6            Q.      The supply and distribution agreement

7    of August 5, 1999 between Actavis and Mylan further

8    provides that "Actavis will package and label

9    products under the Mylan name and Actavis shall

10   provide all finished labeling for the products in

11   accordance with any applicable FDA or other

12   regulatory labeling requirements."  Appropriate

13   provision?

14           A.      I have no expertise on the subject,

15   but it appears appropriate.

16           Q.      Any criticism of that?

17           A.      No criticism.

18               MS. CARTER:  For the record, when

19           you're reading it, you're changing Amide to

20           Actavis and Bertek to Mylan.

21               MR. KAPLAN:  I sure am.  And we

22           established that before, and he agreed with

23           me that any references to Amide, we would

24           call Actavis and any references to Bertek we

25           would call Mylan.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 519

1          A.     And that is appreciated.

2     BY MR. KAPLAN:

3          Q.     Okay.  So this supply and distribution

4     agreement, which by the way, was previously marked

5     as Exhibit M1 at the deposition of Susie Wolf, which

6     is one of the depositions that you didn't read, is a

7     document that you scanned early on in your review

8     here, right?

9          A.     That's correct.

10         Q.     Before you ever wrote a draft report?

11         A.     Before, I don't know whether I wrote

12    the draft report or started.  When we're talking

13    about a draft report, we're talking about the

14    beginning of the graphs, the matrices.

15         Q.     And you were aware of the supply and

16    distribution agreement and reviewed it before you

17    drafted your first report.  That's what your

18    testimony was?

19         A.     I don't recall.

20         Q.     Now you don't recall?

21         A.     No.  Honestly, I'm not sure if I did

22    it before or after.  I look at hundreds of

23    documents.  I don't remember whether I read it

24    before or after.  That's unfair to ask me that.  I

25    mean, it's unfair to expect me to remember that.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 520

1          Q.     I move that that answer be stricken as

2     not responsive.

3               Do you cite the supply and distribution

4     agreement among the references that you relied upon?

5          A.     No, I did not.

6          Q.     Did the FDA ever criticize Mylan for

7     violating CGMP regulations relating to the

8     distribution of DIGITEK?

9          A.     I'm not aware of any.

10          Q.     Did the FDA ever criticize Mylan in

11     connection with its distribution of Digitek?

12          A.     I'm not aware of any.

13          Q.     Did the FDA ever criticize Mylan with

14     respect to the recall of DIGITEK?

15          A.     I'm not aware of any.

16          Q.     Did the FDA ever criticize Mylan

17     regarding the handling of DIGITEK related

18     complaints?

19          A.     I'm not aware of any.

20          Q.     Has the FDA ever criticized Mylan's

21     vendor management or supplier management policies?

22          A.     Again, I have no way of knowing.

23          Q.     Has the FDA ever criticized any other

24     distributor in connection with the events

25     surrounding the 2008 Actavis recalls?

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 521

 1          A.    I don't know how I would have that

 2    information, so I don't -- I would say I haven't

 3    seen anything.

 4                THE VIDEOGRAPHER:  We're off the

 5                record.  The time is 4:24.  This is the end

 6                of tape 4.

 7                (Recess taken.)

 8                THE VIDEOGRAPHER:  We're back on the

 9                record.  The time is 4:38.  This is the

10                beginning of tape 5.

11        BY MR. KAPLAN:

12          Q.    All right.  You would -- you would

13    agree that current good manufacturing practices

14    which is abbreviated CGMP, also referred to as GMP,

15    is a law that is established in the code of federal

16    regulations, right?

17          A.    Yes.

18          Q.    That's the law?

19          A.    That's the law.

20          Q.    And it sets standards for a product to

21    meet specific requirements for identity, strength,

22    quality, and purity, correct?

23          A.    That's a portion of it, yes, that's

24    correct.

25          Q.    And it's a law that outlines the

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 522

1    requirements for every drug manufacturer to follow?

2            A.    That's correct.

3            Q.    That law has been continually improved

4    over the years since it was first adopted?

5            A.    Slightly revised, but yes, it has

6    been.  Yes, it has been improved.

7            Q.    Has been continually improved?

8            A.    Yes, that's correct.

9            Q.    It's your opinion that the current

10   good manufacturing practice regulations are well

11   designed documents?

12           A.    That is correct.

13           Q.    The current good manufacturing

14   practice regulations are a great help in ensuring

15   that patients and customers receive 100 percent safe

16   and effective drug products?

17           A.    Yes, that's correct.

18           Q.    And it's your experience that the FDA

19   understands the business and fairly and impartially

20   uses a heavy hand only when they fear public safety?

21           A.    That's correct.

22           Q.    And even in those high risk

23   situations -- well, in those high risk situations,

24   they continually escalate their concerns until all

25   public risks are resolved?

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 523

1          A.    Yes, that is their objective.

2          Q.    And -- and that's what they did in the

3    case of DIGITEK, in the DIGITEK recall, right?

4          A.    I -- certainly they work with Actavis

5    and they escalated it to the point that you can't go

6    any further other than criminal prosecution, as far

7    as I could see.

8          Q.    Well, they escalated their concerns

9    until all public risks were resolved?

10         A.    Right.  Well put.  Correct.

11         Q.    In fact, that's how you put it on page

12   8 of your report of June 15, 2010, isn't it?

13         A.    Okay.  If it says that.  I don't have

14   it in front of me.

15         Q.    It is what you said?

16         A.    Okay.  I trust you.

17         Q.    And then the FDA, following the

18   resolution of risks to public safety with regard to

19   DIGITEK, published a document which is posted on the

20   FDA Website on the Internet titled, "facts and myths

21   about generic drugs."

22         A.    Yes.

23         Q.    And you are familiar with that

24   document, aren't you?

25         A.    Reasonably familiar.  I've read it.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 524

1          Q.    Well, let me read a portion to you.

2    "Myth, there are quality problems with generic drug

3    manufacturing.  A recent recall of generic Digoxin,

4    called DIGITEK, shows that generic drugs put

5    patients at risk.  Fact, FDA's aggressive action in

6    this case demonstrates the high standards to which

7    all prescription drugs, generic and brand name, are

8    held."

9          Would you agree with that?

10         A.    Can I read it again?  I would rather

11   read it than hear you say it.  Can I read it,

12   please?

13         Q.    I'm just asking whether you agree with

14   that statement?

15         A.    I understand that.  I would like to

16   read it.

17         Q.    I'm going to ask the question and I

18   would like you to answer it.  "FDA's aggressive

19   action in this case demonstrates the high standards

20   to which all prescription drugs, generic and brand

21   name, are held?

22         A.    I would say I agree with that.

23         Q.    The FDA, you acknowledge, has an

24   abiding interest in public safety?

25         A.    Most assuredly.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 525

1          Q.     Said "since the detection of the

2    manufacturing problem with DIGITEK, FDA has been

3    actively engaged with Actavis to ensure that all

4    potentially defective lots of DIGITEK have been

5    recalled."

6               Could you agree that they did that?

7          A.     They appear to have done that.

8          Q.     And then the FDA said, and continues

9    to say in the document entitled, "facts and myths

10   about generic drugs" posted on the FDA's Website,

11   the FDA says, "In our best judgment, given the very

12   small number of defective tablets, it may have

13   reached the market.  The lack of reported adverse

14   events before the recall, harm to patients was very

15   unlikely."

16         A.     I can't argue with that or -- I don't

17   know what would harm a person.  So the term "harm"

18   takes it away from something I would have an opinion

19   for.

20         Q.     In appendix F to your report of

21   June 15, 2010, pages 47 through 50, the heading is,

22   "FDA observations and events."  You would agree with

23   me that there is no mention of Mylan in there,

24   correct?

25         A.     That is correct.

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 526

1         Q.     And you would agree with me that in

2   your final report dated June 15, 2010 on page 35

3   under the heading of "expert witness final summary,"

4   there is no mention of Mylan?

5         A.     There is no mention of Mylan.

6         Q.     You would also agree with me that on

7   pages 5 and 6 of your final report dated June 15,

8   2010 under the heading, "introduction," there is no

9   mention of Mylan?

10        A.     That is correct.

11        Q.     And you would also agree with me that

12  on page 7 of your final report dated June 15, 2010

13  under the heading, "work plan," there is no mention

14  of Mylan?

15        A.     That is correct.

16               MR. KAPLAN:  Off the record.

17               THE VIDEOGRAPHER:  We're off the

18        record the time is 4:48.

19               (Recess taken.)

20               THE VIDEOGRAPHER:  We're back on the

21        record.  The time is 5:03.

22  EXAMINATION BY MR. ANDERTON:

23        Q.     Mr. Kenny, my name is Michael

24  Anderton.  I'm here on behalf of the Actavis

25  defendants.  We've met, correct?

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 527

     1          A.    That's correct.

     2          Q.    All right.  I'm going to ask you some

     3   questions.  We're going to cover some topics that

     4   you've already cover with Mr. Kaplan, and perhaps

     5   even some that we've covered a little bit in your

     6   prior deposition session.  I know Mr. Kaplan didn't

     7   go over this, but just to kind of remind you, if I

     8   ask you a question and you don't understand it,

     9   please make sure that you let me know that.

    10          A.    Yes.

    11          Q.    So that you and I have an

    12   understanding of what I'm asking and what you are

    13   answering before you give an answer.  Is that all

    14   right?

    15          A.    Yes.

    16          Q.    Okay.  So if you answer a question, I

    17   will assume that you understood it.  Is that fair?

    18          A.    Yes.

    19                (Whereupon, Exhibit 143, E-mails, was

    20          marked for identification as of today's

    21          date.)

    22          Q.    All right.  I am looking at a document

    23   that has been marked as Exhibit 143, and it is a

    24   stack of e-mails that you received -- I'm sorry --

    25   that you provided to us from your -- from the

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 528

1    documents that you brought with you today?

2          A.    Yes.

3          Q.    That weren't in this yellow folder?

4          A.    Okay.

5          Q.    And the yellow folder was marked

6    Exhibit 110?

7          A.    Right.  It was in another folder.

8          Q.    Right.  That's fine.  I'm going to ask

9    you some questions about both groups, some e-mails

10   in both groups.  This is a different stack.  Do you

11   remember giving us this stack?

12         A.    Yes.

13         Q.    All right.  And I'm looking now at --

14   and eventually, we're going to leave this with the

15   court reporter and she'll make copies and we'll

16   all -- you'll get your back, or a copy back, at

17   least, and we'll all have a copy.  But for now, we

18   don't have extra copies, all right?

19         A.    Okay.

20         Q.    I'm looking at an e-mail thread

21   that -- well, give me one second.  Looking at an

22   e-mail thread -- or actually, a single page e-mail,

23   it starts on -- well, it's an e-mail thread.  It

24   starts on February 19, an e-mail from Sandy Summers,

25   who is at Meghan Johnson's law firm, I believe she's

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 529

 1    a paralegal or a legal assistant of some type,

 2    forwarding to you and Mr. Romano a confidentiality

 3    order and a letter of engagement?

 4          A.    Right.

 5          Q.    Does that mean that your engagement

 6    with or on behalf of the plaintiffs started sometime

 7    right around February 19 of 2010?

 8          A.    I believe that's correct.

 9          Q.    Does that sound about right?

10          A.    Yes.

11          Q.    And then on the 23rd of February,

12    there's further e-mail communication from

13    Ms. Johnson to you about the protective order and

14    about sending you documents.  Another e-mail in this

15    stack -- actually, again, an e-mail thread, is dated

16    February -- the first e-mail in the thread is dated

17    February 24, 2010, so about five days after you

18    received the engagement letter to undertake work for

19    the plaintiffs?

20          A.    Okay.

21          Q.    And according to this e-mail, it's

22    from Sal Romano to Meghan Johnson and a copy to

23    SpyGlass.  I assume that you have access to that

24    e-mail box?

25          A.    Yes.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 530

1         Q.    Or the mail sent to that address?

2         A.    Yes, I have access to it.

3         Q.    And it says, "Mark and I have received

4    the dots on the CD.  Thanks.  We will be traveling

5    starting Friday until March 9.  We intend to take

6    the dots with us and review them on the trip."

7              That means -- is that the first group of

8    documents you would have received from the

9    Plaintiff's counsel?

10        A.    Yes, that's correct.  The disk which

11   you -- you have.

12        Q.    Okay.  So the first group of documents

13   that you received was February 24, 2010?

14        A.    Correct.

15        Q.    And on that same day about an hour

16   after you received an e-mail from Ms. Johnson, you

17   responded to Ms. Johnson.  Actually, you said to Sal

18   in an e-mail, "the actual batch records are

19   extremely important.  Do you want me to request the

20   information?"  Do you remember making -- sending

21   that e-mail?

22        A.    I don't remember, but I'm sure I put

23   that down.  No, I don't remember the e-mail.

24        Q.    All right.  And within a matter of

25   moments, Mr. Romano e-mailed Mrs. Johnson at 3:48 on

Page 531

1  February 24, the same day you got the first disk,

2  and said, "Mark and I believe the batch records will

3  be critical for us to review.  How many batches were

4  recalled?  Do you have all the batch records as PDF

5  files?  We have lots to read now, but I think we'll

6  have to take a look at the batch records soon.

7  Thanks Sal."  And your -- again, that SpyGlass

8  e-mail address is copied on that document?

9          A.     I understand.

10          Q.     Do you remember Mr. Romano sending

11  that e-mail?

12          A.     No, I don't but it makes sense.  I

13  mean I --

14          Q.     All right.  So the first day that you

15  got document from the plaintiff's counsel, you

16  immediately responded and said we need to see the

17  batch records?

18          A.     Correct.

19          Q.     And in response, Ms. Johnson says we

20  have the batch records.  She says later that day,

21  and I'll just read it so that it's accurate.  "I

22  just got Mark's message and tried to call him back.

23  We do have the batch records but there are

24  approximately 170 plus batches for Digoxin.  So

25  that's quite a bit of paperwork for a review on your

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 532

1    trip.  I'm here for at least the next hour or so.

2    Give me a call if you have a chance.  Thanks."

3              A.    Right.

4              Q.    So she responded to your e-mail by

5    essentially saying that's an awful lot, are you sure

6    you want to read that; is that right?

7              A.    Yes, that's correct.

8              Q.    And she never did send you those batch

9    records, did she?

10             A.    I don't think I ever saw them.

11             Q.    All right.  So you asked for the batch

12   records and identified them as absolutely critical,

13   and the Plaintiff's counsel responded by saying we

14   don't think you should review them?

15             A.     No, that's not what they said.  What

16   they said is we got a lot, if you want to see them,

17   you know, we'll give them to you.  And at that

18   particular point, early on and in -- I don't know if

19   you call it the discovery process, but of documents

20   I would like to see, that was clearly one of those

21   documents that I thought at that point I wanted to

22   see.

23             Q.    And how -- and in fact -- well, how

24   did it come to be that the batch records weren't

25   critical?

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 533

1          A.    When I do an audit, I'm looking for
2    exceptions.  I found so many exceptions in the three
3    batches that I looked at I could make conclusions
4    off of that.  I couldn't make conclusions that every
5    batch record was wrong, but I could make conclusions
6    that the batch records that I reviewed demonstrated
7    significant GMP issues.
8          Q.    For those batches?
9          A.    For those batches.
10         Q.    So you couldn't make any conclusions
11   about any of the other batches?
12         A.    It would be difficult in general.
13         Q.    Let's talk about -- I guess I just
14   want to make sure I have a clear understanding of
15   the timing, and actually, just give me one second.
16   I want to make sure that I have a clear
17   understanding of the timing of Mr. Romano's
18   involvement.  Your testimony has been repeatedly
19   that the original intention was that you and
20   Mr. Romano were going to be jointly engaged both to
21   draft the report and to testify, correct?
22         A.    That is correct.
23         Q.    And so that's how the engagement
24   certainly started, right?
25         A.    Yes.

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                          Page 534

 1        Q.    And we see from the billing records

 2    that Mr. Romano was billing substantive time on this

 3    engagement beginning at the beginning of the

 4    engagement in the February, March, April time frame,

 5    and that continued all the way through June,

 6    correct?

 7        A.    Correct.  We started the same time

 8    approximately.

 9        Q.    And in a -- now, this is where I'll

10    need you to take out the three versions of your

11    report that we've been talking about as exhibits and

12    kind of have them side by side.  All right?  You

13    have the final version that is I believe Exhibit 38,

14    as Mr. Kaplan identified that correctly?

15              MR. KAPLAN:  I think it's actually 48.

16              THE WITNESS:  I have my own copy, but

17         it's the same thing.

18              MR. KAPLAN:  I do believe that the

19         exhibit -- that the final report dated

20         June 15, 2010 was previously marked as

21         Exhibit 48, and I probably misspoke myself.

22              MR. ANDERTON:  More than once

23         probably.

24              MR. KAPLAN:  Probably more than once.

25         So if the record can be corrected, I think

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 535

```
 1              it was Exhibit 48, and we can check that.
 2              And the other thing where I think I misspoke
 3              perhaps was on the exhibit "facts and myths
 4              about generic drugs."  I know that has been
 5              previously marked, and I think that was
 6              previously marked as Exhibit 38.
 7              A.    I have 141.
 8         BY MR. ANDERTON:
 9              Q.    So although there was some confusion,
10    Mr. Kenny, about some of your earlier testimony, as
11    I understand your current testimony, it is that what
12    has been marked as Exhibit 141 was your first draft,
13    right?
14              A.    I believe that is correct, yes.
15              Q.    And we know from the fact that we got
16    this off of a CD that you gave us this morning that
17    this was identified by you as a May 26, 2010 draft?
18              A.    Correct.
19              Q.    So as of -- and in the -- on Page 2 of
20    this draft, it still clearly indicates that
21    Mr. Romano and you have been engaged to draft the
22    report and provide expert testimony, right?
23              A.    That's correct.
24              Q.    So as of May 26, we know he is still
25    actively engaged, and the intention is that he will
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 536

1    draft and testify?

2              A.    Yes.

3              Q.    And if you look at Exhibit 140 which

4    you believe is a draft prepared after --

5              A.    Right.

6              Q.    -- Exhibit 141.  And again, if you

7    look at -- one second.  Page 5 of Exhibit 140, will

8    you look at that page, please?

9              A.    140, yes.

10             Q.    You see that it also says -- still --

11   still indicates that Mr. Romano will be

12   participating in drafting the report and testifying,

13   correct?

14             A.    Correct.

15             Q.    So this is sometime after May 26,

16   right?

17             A.    Sometime after, I can't tell you when.

18             Q.    Well, we know that you met plaintiff's

19   counsel in early June in person, right?

20             A.    Early June?  We met in New York City

21   in person.

22             Q.    Sometime in early June?

23             A.    I don't remember -- if I looked at --

24   you know, my billing it will show.  Also.

25             Q.    Why don't you do that.  You've got

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 537

1    that, right?  Let's figure out when you met with the

2    Plaintiff's counsel.  You said there were two

3    meetings face-to-face, right?

4            A.    Yes.

5            Q.    Were those meetings after you had

6    already prepared a draft?

7            A.    The first one was not.  The second

8    one, I had started the document at that point.

9            Q.    Okay.

10           A.    I don't recall how far along that

11   document was.

12           Q.    Why don't you look at your time and

13   see if you can figure out when you met with the

14   plaintiffs in person.

15           A.    There was a meeting on May 5th.

16   May 5th, but I can't tell you if that was a phone

17   meeting or a physical meeting.  I can't tell you

18   from this, so far.  I can continue to try.

19           Q.    Well, let's -- actually, let's try

20   this another way.  I'm looking again at the

21   documents in Exhibit 143, one of which is an e-mail

22   dated May 28, 2010 from Ms. Johnson to both you and

23   to that SpyGlass e-mail address, talking about a

24   Friday morning, June 4 meeting at the Newark

25   airport?

Mark Kenny, Volume II            Videotaped                 February 16, 2011

Page 538

1          A.     Newark airport, yes.

2          Q.     Does that make it seem likely that you

3    met with Plaintiff's counsel in-person at the Newark

4    airport?

5          A.     I did.

6          Q.     On June 4th?

7          A.     June 4th, if it says that, yes.

8          Q.     Okay.  And Mr. Romano attended that

9    meeting, right?

10          A.     That's correct.

11          Q.     And as we understand from Mr. Romano's

12   earlier -- from something we saw earlier, an e-mail

13   from Mr. Romano to plaintiff's counsel, part of the

14   discussion at that June 4th meeting was to talk

15   about strategy, right?

16          A.     That's correct.

17          Q.     And --

18          A.     What Sal referred to as strategy.

19          Q.     Okay.

20          A.     In using his terms.  To me it was a

21   status check, where are we, you know, what's the

22   next step.

23          Q.     Well, this -- this document that is

24   marked as Exhibit 140 that is a draft that contains

25   handwritten notes, your handwritten notes, that you

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 539

1   now have acknowledged or that you previously

2   acknowledged and today forgot and now have

3   reaffirmed, reflect at least some comments of the

4   Plaintiff's counsel.  Did you have that draft with

5   you at that June 4th meeting?

6          A.    I had a draft with me at the June 4th

7   meeting, yes, I did.

8          Q.    And did you discuss that draft with

9   the Plaintiff's counsel at that June 4th meeting?

10         A.    In principle, we discussed it.

11         Q.    What do you mean by "in principle"?

12         A.    Principle.  Well, what are your

13  findings?  Did you look at XYZ, did you look at all

14  the attachments associated with -- because I was

15  having a lot of problems, as was Sal, with the

16  Crivella database.  It's very hard to navigate.  So

17  you find out later that there are documents in it

18  that you didn't realize were in it.  And so -- so

19  there were questions as to did we review certain

20  information.  That was the -- yes.  That was the

21  conversation.

22         Q.    And plaintiffs had seen a draft at

23  that time, right?

24         A.    They did not see a draft at that time.

25         Q.    When did they first see a draft?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 540

1           A.     We had a draft there.  The draft was

2     scanned over about a 30 second period by Mike.

3     Meghan did not see the draft.  That was -- that was

4     the extent of his review of that document.  So he

5     did see it, but he saw it in terms of format.  I

6     don't know if he could have read it in 30 seconds.

7           Q.     You mentioned a moment ago that you

8     and Mr. Romano were having difficulties with the

9     Crivella database.  That's some sort of hosting

10    environment where the plaintiffs hosted various

11    documents and they made them available to you and

12    Mr. Romano?

13          A.     That's correct.

14          Q.     So as of June 4 when you met with

15    plaintiff's counsel, you and Mr. Romano, you were

16    both still accessing and reviewing documents on the

17    database?

18          A.     We were accessing documents, yes.

19          Q.     And reviewing them?

20          A.     Reviewing, sure.

21          Q.     Including Mr. Romano?

22          A.     He was still doing it.  To a lesser

23    extent -- I don't remember if he was doing it or

24    not, to be honest with you.  I was.  I was.

25          Q.     You said -- I mean, the record will

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 541

1    show what you said a moment ago, Mr. Kenny, but your

2    testimony not three moments ago was that both you

3    and Mr. Romano were having difficulty accessing

4    documents.

5            A.    That's correct.

6            Q.    You wouldn't have difficulty accessing

7    if you weren't trying, right?

8            A.    Right.  That's a good point.

9            Q.    So the handwritten notes on Exhibit

10   140, I believe you also said early, as you responded

11   to questions by Mr. Kaplan, that those notes

12   reflected, at least in part, comments or thoughts

13   inquiring about whether you had reviewed certain

14   documents, right?

15           A.    Could you repeat that?  Please repeat

16   the question.

17           Q.    Could you read that back, please?

18                 (Record read.)

19           A.    That was a portion of that discussion.

20           Q.    Well, I want to be clear, now.  The

21   notes that --

22           A.    Oh, do you mean the notes that are on

23   here, did they reflect the conversation that I had

24   that talked about the documents, the additional

25   documents that I should review or look at?  It does

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 542

1    not include that.

2          Q.    I want to just make sure this part is

3    clear, okay?

4          A.    All right.

5          Q.    You answered some questions by

6    Mr. Kaplan about these notes earlier.  And the

7    record will show what your answers were.  To the

8    best of my recollection, one of the things you --

9    one of the characterizations that you gave to these

10   handwritten notes on Exhibit 140 is that they

11   reflected, at least in part, your notes about

12   comments that Plaintiff's counsel had made where

13   they were asking you if you had reviewed certain

14   documents or certain categories of documents.  Do

15   you remember giving that testimony?

16         A.    Yes, I do.

17         Q.    Okay.  And that is the same type of

18   discussion that you had at that June 4th meeting

19   with Plaintiff's counsel, right?

20         A.    Yes, but it's hard to remember.

21         Q.    Well, you now said yes twice that that

22   is one of the things that you discussed at that

23   meeting?

24         A.    The content, yes.  What was in the

25   content, most definitely.

Mark Kenny, Volume II            Videotaped            February 16, 2011

Page 543

1         Q.    Okay.  And does that make you more
2    able to tell whether the handwritten notes that you
3    put on this copy were made at the June 4th meeting
4    that you had with Plaintiff's counsel?
5         A.    I don't think these were made at that.
6    I believe these were made between Sal and I.  In my
7    house.
8         Q.    Well, but you've already testified,
9    Mr. Kenny, multiple times, that these notes reflect
10   at least in part, comments made by Plaintiff's
11   counsel.  You said that in your last deposition and
12   then you reaffirmed it after Mr. Kaplan pointed out
13   to you that you had overlooked that prior testimony.
14   So?
15        A.    The reality is it's hard for me to
16   remember.  I'm trying to put this thing together as
17   to what document I had, what did I write on down.  I
18   don't remember.  That's why -- and when I'm, let's
19   say refreshed, if you will, by prior testimony, it's
20   not coming together, I can't -- I can't tell you
21   with certainty regarding those conversations.
22        Q.    Well, but as of June 4, Mr. Romano was
23   still attending meetings with Plaintiff's counsel?
24        A.    That's correct.
25        Q.    And it was still his intention to

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 544

1   participate in drafting the report and to testify?

2          A.    I think it was his intention.

3          Q.    And so actually, your testimony was

4   that the reason it was ultimately decided that he --

5   Mr. Romano would not participate to that degree is

6   because he had a conflict with his schedule and

7   would have been the commitments of the litigation if

8   he had participated to that extent, correct?

9          A.    That's what he said.

10          Q.    Well, is that -- is that your

11   understanding of what happened?

12          A.    That's what he told me.  I have no

13   reason to question him.

14          Q.    So then but for those scheduling

15   conflicts, he would have stayed on the report and

16   testified, right?

17          A.    I don't know that he would have.

18          Q.    Well, are you aware of any other

19   reason why he didn't, other than the scheduling

20   conflicts?

21          A.    I think he -- yes, I think he had cold

22   feet.

23          Q.    Cold feet?

24          A.    Yes.  I think that he did not want to

25   ultimately appear in a court case.  That's what I

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 545

1    sensed.

2          Q.    That's what you sensed.  Did he say

3    that to you?

4          A.    No.

5          Q.    When -- when was the decision made?

6          A.    I don't know.  I really don't know.

7          Q.    But it was made after June 4 and

8    before June 15 when you finalized the report, right?

9          A.    Not necessarily, no.  It could have

10   happened before that.

11         Q.    How much before that?

12         A.    Oh, it would have been a week or so

13   before.

14         Q.    A week or so before what?

15         A.    The June 4th.  So it would have been

16   the end of May, beginning of June, somewhere around

17   there, where he determined that it didn't look like

18   he look -- he looked at his calendar, he's going to

19   Florida, XYZ.  And he said I can't do this.

20         Q.    Did you discuss that at the meeting

21   with Plaintiff's counsel at June 4?

22         A.    We discussed that.  I don't know if it

23   was discussed at June 4th.  I don't know.

24         Q.    Was it resolved by that meeting?

25         A.    I don't remember.  It might have been.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 546

```
 1          Q.    Okay.  But we know that we have a
 2   May 26 draft and we have a draft that we know is
 3   after May 26?
 4          A.    Right.
 5          Q.    And what we know is that in both of
 6   those drafts, so at least one draft after May 26,
 7   Mr. Romano is still indicated as part drafter and
 8   somebody who will testify?
 9          A.    Well, I didn't take his name out, but
10   it was -- he was still as of May 25th, 26th, still
11   the intention was that this was would be a draft, a
12   report signed by both of us.
13          Q.    Okay.  And when -- now, let's look at
14   exhibit -- give me one second.  Let's look at
15   Exhibit 141, which again, you've identified as the
16   first draft of your report.  And turn to page 16,
17   please.
18          A.    Sixteen.
19          Q.    Yes.  I want to ask you some more
20   questions about the bullet points that Mr. Kaplan
21   asked you about earlier.  And first, with respect to
22   the parenthetical, the first one under the "overall
23   observations" heading.  Do you see that
24   parenthetical?
25          A.    Yes.
```

Mark Kenny, Volume II            Videotaped            February 16, 2011

Page 547

1           Q.     It says, "Mark, we need to write a

2     dialogue followed by bullet points on the

3     following."  You said those are Mr. Romano's

4     comments, right?

5           A.     Those are his comments.

6           Q.     And he's telling you what to add to

7     the report, right?

8           A.     He's making a suggestion.

9           Q.     Well, it's not a suggestion; he's

10    telling you what to add to the report?

11                 MS. CARTER:  Objection.

12      BY MR. ANDERTON:

13          Q.     Isn't it?

14          A.     He's telling me whether or not I

15    accept them is another story.  He's telling me to

16    add these to the report.  He feels it's substantive.

17          Q.     And you said, you know, you keep

18    wanting to say that this is solely your report?

19          A.     Yes.

20          Q.     But as of June -- as of sometime after

21    May 26th, which is three months plus into the

22    process and within two and a half or three weeks

23    before the report is due, he is still being

24    indicated as a drafter and as somebody who is going

25    to testify?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 548

1          A.     Yes, he is.

2          Q.     And so when you say you were the one

3    who was going to testify, that's not true as of the

4    time of this draft, is it?

5          A.     It is true somewhere in June.

6          MS. CARTER:   Objection.

7          A.     I don't know when that decision was

8    made, I honestly don't.

9    BY MR. ANDERTON:

10         Q.     Well, but --

11         A.     It was a point where it became clear

12   that he was not going to testify.  He did -- how he

13   communicated that, I don't recall, and when did he

14   communicate it.

15         Q.     Well, speaking of communicating, we

16   now know that Plaintiff's counsel, Ms. Johnson,

17   Mr. Miller, et cetera, received a draft of your

18   report, correct?

19         A.     They received it in a very late stage

20   report in June.

21         Q.     How?  How did they get it?

22         A.     I sent it via -- did I fax it or

23   e-mail it?  It was either faxed or e-mailed.  I

24   don't recall.

25         Q.     I have looked through the documents

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 549

1    that you produced that you have represented as the

2    communications between you and Plaintiff's counsel.

3    There is no transmittal cover e-mail or other

4    document indicating that you are transmitting a

5    draft or a copy of your draft report to Plaintiff's

6    counsel.

7              A.    I understand.

8              Q.    Did you overlook that?

9              A.    No.  It was done at the Jersey Shore.

10   We were on vacation and I -- Denise handled it, and

11   I believe it was faxed.  I'm going to guess it was

12   faxed, but there was no intent to hide any

13   documents.

14             Q.    Who did you go to the Jersey Shore

15   with?

16             A.    My wife.

17             Q.    How long were you there?

18             A.    We were there probably a week or so.

19             Q.    When?

20             A.    Somewhere around Memorial Day.

21             Q.    After or before?

22             A.    After or before what?

23             Q.    Memorial Day?

24             A.    I have to pull my calendar.  We have a

25   house down there, we go down there regularly.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 550

1          Q.    I'm just trying to establish when you

2    were at the Jersey Shore.  When did you take your

3    vacation to the Jersey Shore in 2010?

4          A.    I don't recall.  We took -- it's not a

5    vacation.  We go down there for a couple of days.

6    When you're consulting, you go whenever you want,

7    you're off, you go down.  I went down there 15

8    times.  There is nothing remarkable.

9          Q.    Okay.  But it was sometime around

10   Memorial Day?

11         A.    Correct.

12         Q.    Which is before June 4?

13         A.    Yes.

14         Q.    So Plaintiffs had that draft before

15   you met with them in person on June 4?

16         A.    They had them -- wait a minute, wait a

17   minute.  I think I'm screwing this thing up.

18             MS. CARTER:  Just take your time.

19         A.    On June 4th -- on June 4th, I had a

20   copy, I can't tell you exactly which copy.  Of which

21   is the one that Mike -- scanned.

22     BY MR. ANDERTON:

23         Q.    Mike who?

24         A.    I'm losing it here.  Pete Miller.  I'm

25   sorry.  Pete Miller scanned.  I don't know what copy

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 551

1    that was, and he looked at it and then asked me a

2    couple of questions.  He did not focus on it, he

3    didn't read it.  He went like two seconds, two

4    seconds, two seconds (indicating).  That's it.

5           Q.    Are you saying he had his own copy or

6    he looked at your copy?

7           A.    No.  He would never saw a copy.  I had

8    a copy.

9           Q.    Mr. Kenny, you just told me that you

10   faxed or e-mailed a copy to the Plaintiff's counsel?

11          A.    I e-mailed a copy.

12          Q.    From the Jersey Shore sometime around

13   Memorial Day.  June 4 is after Memorial Day.

14                MS. CARTER:  Objection.

15          A.    Yeah.

16     BY MR. ANDERTON:

17          Q.    And now you are saying he never had a

18   copy.  I'm confused.

19          A.    Mike, I don't remember.  The realty is

20   I don't remember the exchange, other than if I had

21   to sit there and say what was I sure of, I was sure

22   that I brought a copy to Newark airport.  He took a

23   look at it, 30 seconds, on or about four days before

24   the finalization of that report.  I sent a copy, I

25   guess it was via e-mail to Meghan.  Pete got a copy

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 552

```
 1    of it.  Meghan got back to me and said -- had some

 2    specifics, you know, some grammar kind of stuff, and

 3    I believe Pete got back to me and questioned, either

 4    questioned it before or at that point, about had I

 5    looked at Mylan documents.  I don't recall if it was

 6    that or earlier.

 7            Q.    When Meghan got back to you, was

 8    that -- how did she do that?

 9            A.    Meghan got back to me, we talked over

10    the phone.

11            Q.    But you e-mailed them a copy of the

12    draft?

13            A.    Yes, I did.

14            Q.    All right.  Again, I don't see that

15    e-mail in any of the e-mails that you provided?

16            A.    I did my best to make copies of

17    everything.

18            Q.    If I ask you to look again for the --

19    specifically for any e-mail whereby you transmitted

20    drafts to the Plaintiff's counsel, will you do that?

21            A.    Sure.

22            Q.    All right.  So you'll do that sometime

23    in the next several days and follow-up with

24    Plaintiff's counsel and let them know whether you

25    come up with anything?
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 553

1          A.     Sure.

2          Q.     If you need to make a note, please do.

3          A.     I am going to make a note.

4          Q.     All right.  Take your time.

5          A.     Okay.  Got it.

6          Q.     So again, and again, the record will

7     reflect -- you know, your testimony will be

8     reflected in the transcript.  When you were

9     discussing with Mr. Kaplan Exhibit 140 and your

10    characterization of whether these bullet points on

11    page 16 were substantive input from Mr. Romano or

12    whether you considered them and accepted them only

13    if you felt they were appropriate, you said you were

14    the one who was going to testify.  But as of this

15    draft, that's not true, is it?

16          A.     It probably is not true.  It appears

17    not to be true.

18          Q.     Okay.  And in fact, as of the next

19    draft, Exhibit 141, whenever that was, sometime

20    after May 26, it's still not true, right?

21          A.     I don't recall.

22          Q.     Well, the document says --

23          A.     I understand that.

24          Q.     -- that he's going to testify and

25    identifies him as a drafter, right?

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                                  Page 554

1          A.    It most certainly does.

2          Q.    Okay.  And go down further on page 16.

3    The second parenthetical from Mr. Romano, and I'm

4    going to read the beginning of it, it says, "Mark, I

5    have added your stuff on GMP.  Please add some

6    dialogue."  So he actually was adding things to the

7    report apparently?

8          A.    He was next to me when we met, and he

9    would -- I would give him a copy, he would -- he

10   once, I believe only once, took the copy.  He said

11   you do your thing, work with Crivella, read

12   documents.  I'll do my thing.  Take a look at this

13   thing, try to organize it.  I had some of my own

14   thoughts, and ultimately, it came to this of which I

15   took this and then without his assistance, edited it

16   to what my opinion was.

17         Q.    He says here he added stuff to the

18   report, his language?

19         A.    No.  He added my stuff.  In other

20   words, it wasn't taken out -- I don't know what he

21   meant by it, to be honest with you.

22         Q.    Wait a minute.  You're drafting a

23   document?

24         A.    Yes.

25         Q.    And he says I have added your stuff on

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 555

1    GMP and you don't even know what that means?

2          A.    Actually, I believe -- yeah, it means

3    the attachments I believe.  I'm trying to recreate

4    this.  Yes, it's the attachments, and that there was

5    no dialogue associated with the attachments.  That

6    was his opinion.  I don't recall if I ever did

7    anything about it.

8          Q.    He then goes on to say, "I think the

9    following section on DIGITEK is good.  Can you get

10   this section in the same bullet format?"  Again,

11   adding substantive input to the report, right?

12         A.    That's -- that is purely format, sir,

13   purely format.  He liked the bullet approach.

14   That's all.

15         Q.    Go back to page 13 of Exhibit 141,

16   please.

17         A.    Page 13?

18         Q.    Please.

19         A.    Yes.

20         Q.    And again, we know that this is

21   according to your testimony, your first draft,

22   right?

23         A.    This is, yeah, my first draft.

24         Q.    You see --

25         A.    But it's -- I'm sorry.  Go ahead, sir.

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 556

1          Q.    You see the heading and then the first

2     full bullet point under the heading.  The heading

3     reads, "Ineffective and unreliable methods," and

4     continues on from there.  Do you see that heading?

5          A.    Yes.

6          Q.    And do you see the first bullet point

7     paragraph under that?

8          A.    Yes.

9          Q.    In that paragraph, you do an analysis

10    and make a comment on the reliability of visual

11    inspection.

12             Do you see that?

13          A.    I do see that.

14          Q.    And you actually gave testimony about

15    that in your earlier -- excuse me -- on June 29th at

16    your prior deposition session.  Do you remember

17    that?

18          A.    Yes.

19          Q.    In this draft, you say that in your

20    opinion, visual inspection is only 80 percent

21    effective.  Do you see that?

22          A.    Yes.

23          Q.    That is actually consistent with what

24    you testified to on June 29.  Do you remember that?

25          A.    Yes.

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 557

1          Q.    In this draft, however, you actually
2     do a calculation and say that on the basis of your
3     position, you believe there are five double thick
4     tablets that weren't found, and that in your
5     opinion, apparently went undetected when the batch
6     was released.  Do you see that?
7          A.    Yes.
8          Q.    So you actually at one point
9     formulated an opinion about exactly how many double
10    thick tablets you thought were still out there but
11    undetected?
12         A.    I -- no.  This is not -- this is --
13    Sal put that in there, not me.
14         Q.    Sal put that in there?
15         A.    Yes.  When we were sitting down, he's
16    going through it, and he added stuff that -- that's
17    why when I see check this math -- let me reread it
18    again, please, because I did do some calculations.
19    I think I wrote that.  I think I wrote that.
20         Q.    So then let's have the reporter please
21    read back the question I asked prior to that, I want
22    you to answer what question, please.
23              (Record read.)
24         A.    No, I did not form an opinion.  I
25    somehow did some math which doesn't even look

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 558

 1   correct.

 2          Q.    Well, but you wrote this in your

 3   expert witness report, right?

 4          A.    Expert witness report which was

 5   something that I was continually working on.

 6          Q.    But you did a calculation --

 7          A.    I calculated other things in there --

 8   I don't even remember the calculation.  It doesn't

 9   even look like it could be anywhere near correct.  I

10   guess if you take the 80/20 rule.

11          Q.    So it would be correct then?

12          A.    If you -- yeah -- it would be correct

13   what?

14          Q.    If you properly applied your theory,

15   then the result of five defective tablets would be

16   correct?

17          A.    Yeah.  It's a flawed theory.

18          Q.    It's a flawed theory, the 80/20 rule?

19          A.    No, that therefore five would still

20   remain.  This is a statistical approach that five is

21   just an extrapolated number which is I guess

22   20 percent -- 20 plus percent of 20.

23          Q.    So but it's a flawed theory?

24          A.    The theory, yeah, I would not say that

25   five remained in the market.  I have no idea how

Mark Kenny, Volume II            Videotaped              February 16, 2011

Page 559

```
 1   much would have remained in the market.  I have no
 2   idea.
 3           Q.    And in your final report, that fact
 4   came out, right, it wasn't in your final report?
 5           A.    That's correct.
 6           Q.    Why?
 7           A.    Because it's -- it shouldn't have been
 8   in there in the first place.  It's nonsense.
 9           Q.    It's nonsense?  Did you discuss that
10   calculation with Plaintiff's counsel.
11           A.    No.  No.  I don't recall ever, no.
12           Q.    Well, Mr. --
13           A.    No, no, no.  Let me back up.  I did
14   not -- can I answer it?  No, I did never discuss
15   this with Plaintiff's counsel.  No.
16           Q.    I guess I should caution you about
17   being so definitive in your testimony since on more
18   than one occasion today, we've learned that some of
19   your fairly definitive testimony has been a little
20   quick in terms of your thinking through it and how
21   accurate it is.  So, but you're certain then that
22   you didn't discuss this with Plaintiff's counsel?
23           A.    Correct.
24           Q.    I'm also looking at, and I'm back in
25   Exhibit 110, the folder of e-mails that you produced
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 560

```
 1   earlier today that we marked.  And again, I don't

 2   have extra copies.  I'm looking at an e-mail that is

 3   a two page e-mail, and again, it's an e-mail thread

 4   with a series of e-mails that relate to scheduling.

 5   And it looks as though in the first e-mail,

 6   Ms. Johnson asked you and Mr. Romano whether you're

 7   available for a call the next day and the date of

 8   Ms. Johnson's e-mail is June 8, 2010?

 9         A.    Okay.

10         Q.    In response the following morning --

11   I'm sorry, later that day, you respond and say

12   you're available after 1:00 p.m., and the following

13   morning early, Mr. Romano responds and says he's

14   available until about 3:30 for a call.  And then

15   there are further e-mails apparently setting the

16   call for 2 o'clock on June 9, 2010.  Do you remember

17   that telephone call?

18         A.    No.

19         Q.    Any reason to believe that it didn't

20   happen?

21         A.    No reason to believe that it didn't

22   happen.

23         Q.    All right.  That's five days before

24   your report was finalized?

25         A.    Okay.
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 561

1          Q.    Right?

2          A.    Yes.

3          Q.    I'm sorry, six days.  Now I'm not

4    doing math so well.  Mr. Romano is still

5    participating in the discussions about the report?

6          A.    He's still participating in

7    discussions, yes.

8          Q.    Okay.  That's not so he can proofread

9    it, is it?

10              MS. CARTER:  Objection.

11         A.    I don't know what his objectives are.

12    BY MR. ANDERTON:

13         Q.    Okay.  And the next day, I'm looking

14    at another e-mail dated June 10, 2010, and in the

15    original e-mail -- well, in this e-mail, Ms. Johnson

16    forwards to you as well to the SpyGlass e-mail

17    address, and to Saljromano@aol.com, a copy of a

18    Mylan deposition that "discusses the audits of

19    Actavis and frequency."  Now, there's comments in

20    your final report about the frequency of the audits

21    conducted by Mylan on Actavis, aren't there?

22         A.    Yes.

23         Q.    And that happens to be one of the

24    bullet points in your initial draft that Sal

25    suggested you add to the final version, right?

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 562

1          A.    I believe that's accurate.

2          Q.    So and that is Exhibit 141 that we've

3    talked about here over the last few minutes?

4          A.    Yes.

5          Q.    So here we are on June 10 and

6    Ms. Johnson is sending to you and Mr. Romano Mylan

7    deposition transcripts for your review and analysis,

8    right?

9          A.    Right.  Yes.

10          Q.    So Mr. Romano is still involved in

11    analyzing records for the purpose of continued

12    preparation of the report?

13          A.    No.  At that point, Sal basically

14    reviewed nothing.

15          Q.    Why is he getting copies of the

16    transcript?

17          A.    Out of respect.  The fact that he's

18    still part of the project.

19          Q.    So he suggests on -- sometime on or

20    about May 26 that you add comments in your report

21    about Mylan's audit practice with respect to

22    Actavis?

23                MS. CARTER:  Objection.

24      BY MR. ANDERTON:

25          Q.    And two weeks later, you guys receive

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 563

```
 1   deposition transcripts from Plaintiff's counsel on

 2   just that subject, and Mr. Romano receives them and

 3   then that subject ends up in the final version of

 4   the report, but he wasn't doing anything?

 5          A.    He did not do a thing with that,

 6   nothing.

 7          Q.    Just coincidence?

 8          A.    There's nothing coincidental about it.

 9   He did not review those documents.  I did.  I was

10   the one who looked at them objectively and entered

11   my opinion.

12          Q.    Will you get your billing records out,

13   please?

14          A.    Yeah.  Do you have them or do I have

15   them?

16          Q.    I don't have them.

17          A.    Okay.

18          Q.    Mr. Kenny, will you find your billing

19   records for June?

20          A.    May, June.

21          Q.    You got them?

22          A.    Yes.

23          Q.    May I see them very quickly?

24          A.    Sure.  (Handing).

25          Q.    In looking at these, I now realize
```

Mark Kenny, Volume II          Videotaped               February 16, 2011

Page 564

1    that you don't provide time or date detail?

2            A.    I provide what I provide.

3            Q.    So the answer to my question is?

4            A.    Well, I have to look at the specifics.

5    I have dates.

6            Q.    You don't have -- you have a date

7    range and then a total number of hours with a

8    charge?

9            A.    Okay.

10           Q.    Right?  So there's no way to determine

11   whether Mr. Romano charged any time for reviewing

12   this deposition transcript?

13           A.    There would be if you looked at the

14   bills associated with him.

15           Q.    Do you have those?

16           A.    Yes.

17           Q.    May I see those?  Are these marked?

18                 MS. CARTER:  They are all in that

19           same.

20      BY MR. ANDERTON:

21           Q.    All in that same folder?  Do you have

22   Mr. Romano's bills beyond April and May?

23           A.    I believe that should be complete.

24   That's what my wife gave me, Denise.

25           Q.    This is not complete.  It stops at

Page 565

 1   May 9 for Mr. Romano?

 2          A.    Then May 9 may have been the last time

 3   that he billed.

 4          Q.    Well, the document I just looked at

 5   stops at May 10 actually.  So sir, we don't have the

 6   time sheet -- according to invoice 1032, there's a

 7   time sheet for Mr. Romano for the period May 11 to

 8   June 15 and the detail sheets you've just given me

 9   don't go past May 10, so that actually fits.  Do we

10   have those time sheets?

11          A.    I don't have those time sheets.

12          Q.    Okay.  Will you make a note to

13   yourself to track those down and get those to

14   Plaintiff's counsel?

15          A.    Okay.  Time sheets for what?

16          Q.    Mr. Romano's detailed time sheets for

17   any time after May 10, 2010.

18          A.    Post, I'm sorry?

19          Q.    Post May 10, 2010.

20          A.    Okay.

21          Q.    Now, Mr. Kenny, I'm looking at

22   Mr. Romano's time sheets, and on April 10, 2010, he

23   charged one hour for what he characterized a draft

24   report.

25          A.    I don't know what that was.  What date

Mark Kenny, Volume II          Videotaped                 February 16, 2011

Page 566

1     was it?

2              Q.     April 10.

3              A.     I don't know.

4              Q.     On April 27, he charged an hour -- I'm

5     sorry -- on April 26th, he charged five and a half

6     hours, and the time actually says write draft number

7     one of report?

8              A.     Okay.  He was doing his own work.

9              Q.     Were you also writing parallel drafts?

10             A.     Were we writing parallel -- if you

11    could use that term, yes, I guess so.

12             Q.     So you wrote a draft and he wrote a

13    draft?

14             A.     He made some notes and gave them to

15    me.

16             Q.     This says write draft number one of

17    report?

18             A.     Yes.

19             Q.     Is that making notes?

20             A.     Yes, it was very cryptic of which he,

21    I believe, cut and pasted them into my document when

22    I was there.

23             Q.     Do you have the time detail sheets for

24    your time for this period?

25             A.     I don't know.  You have what I have.

Mark Kenny, Volume II          Videotaped                February 16, 2011

1          Q.    Well, what I don't have is any detail

2     for.  You see how this has the description of

3     services for Mr. Romano?  I don't have any of those

4     for you.  I have only invoices.

5          A.    I should have those.  I have them.

6          Q.    Do you have those?

7          A.    If they are not there, no, I don't

8     have them with me.

9          Q.    Actually, I misspoke.  I do have some

10    of yours.  My apologies, Mr. Kenny.  I didn't look

11    at it closely enough.  So I'm looking at your time

12    sheets now, I do have them, detailed time sheets.

13    And I start with the date of February 26, which is

14    the earliest entry which is consistent with the fact

15    that you said earlier it was around the 23rd or

16    fourth when you first got documents from Plaintiff's

17    counsel.  And as I look at your time entries all the

18    way through the end of April, I don't see any

19    drafting by you.  Is that accurate?

20         A.    From when to when?

21         Q.    From February through April 24, 2010.

22    I see no drafting by you?

23         A.    No.  I did drafting.  I did drafting

24    of the tables.  I started on the tables.

25         Q.    While Mr. Romano was drafting the

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 568

1    report.

2          A.    He was drafting -- something, I'm not

3    sure what he was drafting.

4          Q.    Well, so on April -- well, he spent

5    five and a half hours on it.  That sounds like a

6    little more than notes?

7          A.    Well, he drafted something.

8          Q.    You were charging plaintiff's counsel

9    $430 an hour?

10         A.    He was charging them and he was

11   working on the report.

12         Q.    $430 an hour?

13         A.    Yes.

14         Q.    So five and a half hours is $2300 or

15   so?

16         A.    Yes.

17         Q.    Does that sound about right, maybe

18   even a little more than that?

19         A.    Yes.

20         Q.    And he told Plaintiff's counsel that

21   he was writing a draft of the report, and that

22   that's what they were paying him $2300 for.  You're

23   now saying he wasn't doing that?

24         A.    I don't know what he was doing.

25              MS. CARTER:  Objection.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 569

```
 1        A.    He gave my wife the bills, and they're
 2  sent out.
 3     BY MR. ANDERTON:
 4        Q.    And he gave you the draft of the
 5  report for you to review as well, right?
 6        A.    He gave me the draft of a report, no,
 7  we sat down to review that report.  We -- we sat
 8  down to review what he had done.
 9        Q.    Okay.  The next day, he charged
10  another hour and a half for what he characterized as
11  work on report.  Two days after that, he charged
12  three hours, again, work on report.  The following
13  week, May 4, he charged a half hour, work on report.
14  That's ten and a half hours that he's characterized
15  as drafting and working report.  You say he's not
16  doing any drafting?
17        A.    I'm not sure what he's doing.  I know
18  he was at one point going to try to do the footnotes
19  or the references.
20        Q.    So the first draft that you produced
21  indicated that he was drafting and going to testify.
22  His time records are consistent with that?
23        A.    Uh-huh.
24        Q.    And you somehow are begging off that
25  and saying he wasn't doing that actually?
```

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 570

```
 1              MS. CARTER:  Objection.

 2         A.    I don't know what he did.  I don't

 3   know what he was working on.

 4     BY MR. ANDERTON:

 5         Q.    Well, we know exactly what he did.  We

 6   have a draft report that indicates he was -- it was

 7   drafted by him in April and early May, right?

 8              MS. CARTER:  Objection.

 9     BY MR. ANDERTON:

10         Q.    Is that right?

11         A.    Yes, that's what the records state.

12         Q.    Okay.  You don't have any reason to

13   believe these records are falsified, do you?

14         A.    No.  I have no reason to believe that.

15         Q.    I would be very curious to see those

16   additional time sheets from Mr. Romano, and I don't

17   think yours are in here as well, okay?

18         A.    Yeah.

19         Q.    Past May.

20         A.    I'm sorry.  What am I looking for?

21         Q.    Your detailed time sheets for time

22   beyond May 10?

23         A.    They are not there?

24         Q.    Neither of your detailed time sheets

25   are here.  The latest entry for either one of you is
```

Mark Kenny, Volume II            Videotaped                February 16, 2011

                                                            Page 571

 1    May 10.  You'll track those down?

 2            A.    Absolutely.

 3            Q.    Thank you very much.

 4                  In earlier deposition on June 29, you

 5    talked about process validation, and Mr. Moriarty

 6    asked you questions about whether you looked at

 7    process validation.  Do you remember that testimony?

 8            A.    Yes.  Yes.

 9            Q.    As somebody who is evaluating

10    whether -- or at least the likelihood, of whether

11    adulterated product was produced, process validation

12    is a pretty critical document, isn't it?

13            A.    It's a portion of that, yes.

14            Q.    So it's a very important document,

15    isn't it?

16            A.    Yes.

17            Q.    In fact, it's kind of the jumping off

18    point for the whole analysis, isn't it?

19            A.    No, I wouldn't call it that.  It's

20    like everything else, it's an important step in the

21    development process, in the commercialization

22    process.

23            Q.    If you were hired by a pharmaceutical

24    manufacturer today and they said, Mr. Kenny, we'd

25    like you to evaluate whether we have produced any of

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 572

1    product X that is adulterated, could you do that

2    analysis without looking at the process validation?

3          A.      Could I do it?  I could if I found

4    instances where adulteration occurred, but I don't

5    need that because I could do it by exception.  If I

6    saw falsified results, if I saw, let's say results

7    in a record that are not specification when in fact

8    they accepted it.  It doesn't meet specification.

9    So I don't need to look at validation in order to

10   find exceptions to determine whether it violates

11   GMP.

12         Q.    Would you ask to see the process

13   validation?

14         A.    Yes.

15         Q.    Back to a point I made a moment ago,

16   the process validation is significant because it's

17   somewhat of a foundation for whether you have

18   developed and created a process that is capable of

19   consistently manufacturing product within

20   specification, right?

21         A.    I wouldn't phrase it that way, but

22   it's very important as part of the development

23   process and the commercialization process.

24         Q.    Okay.  In fact, the commercialization

25   process cannot go forward without a validated

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 573

1   process; is that right?

2          A.     That is correct.

3          Q.     If the FDA came in and did an audit

4   and determined that your process wasn't validated,

5   they would do whatever they could to make you stop

6   making that product almost immediately, wouldn't

7   they?

8          A.     Correct.

9          Q.     But you didn't look at the process

10  validations for DIGITEK in this litigation, did you?

11         A.     I did not go into detail on those.

12         Q.     You saw the .5 milligram process

13  validation, but did not ask for the other process

14  validations, did you?

15         A.     I apparently did not ask for them,

16  yes.  I really don't recall, quite honestly.

17         Q.     Do you have any reason to believe that

18  you actually asked for the additional process

19  validations?

20         A.     I don't recall, honestly.

21         Q.     Well --

22         A.     But your question is again.

23         Q.     Do you have any reason to believe that

24  you did asked for them?

25         A.     No recollection that I asked for them.

Mark Kenny, Volume II          Videotaped          February 16, 2011

Page 574

 1          Q.     Okay.  What did you ask, for

 2   additional documents?  I mean, we saw earlier that

 3   you asked for batch records and didn't get them?

 4          A.     Uh-huh.

 5          Q.     Do you remember asking for and getting

 6   anything other than the FDA documents that

 7   plaintiffs thought were so important?

 8                 MS. CARTER:  Objection.

 9          A.     The documents that were available to

10   me were on Crivella, and I was able to do a search

11   and try to find a document.  If I couldn't find it,

12   it wasn't there.  That was the database.  So it

13   would be futile to ask for a document that didn't

14   exist because it was not there.

15   BY MR. ANDERTON:

16          Q.     Do you remember the last time that you

17   were deposed giving testimony about an unsigned

18   memo?

19          A.     There were several unsigned documents,

20   but yeah.

21          Q.     Okay.  I'm handing you a document that

22   has previously been marked as Plaintiff's Exhibit

23   317.  Take a moment to look at that document.

24          A.     Sure.

25          Q.     Have you seen that document before?

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 575

```
 1          A.    Yes, I saw it as an unsigned document.

 2          Q.    As an unsigned document?

 3          A.    That's correct.

 4          Q.    And when you were deposed in June, you

 5   testified about the unsigned document, didn't you?

 6          A.    Yes, I did.

 7          Q.    And you spoke pretty harshly about it,

 8   didn't you?

 9          A.    I wouldn't use the term "harshly," I

10   made comment to it.

11          Q.    Well, you said, and this is from page

12   277 of your prior deposition, "because the value,

13   even if it were a very logical explanation," that

14   it's not signed, is what you're referring to, "the

15   value of it is nill.  It is a gross violation of

16   GMP, and how that document could have been created

17   and distributed and how anybody would have received

18   it and not kicked it back to the original person to

19   make sure it wasn't signed or dated is beyond me.

20   It's a total -- talk about a breakdown.  This is a

21   significant breakdown."

22                That's a pretty harsh characterization,

23   isn't it?

24          A.    Yes.

25          Q.    Did you ever consider that the
```

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 576

1    unsigned version might be a draft?

2              A.    Did I consider that, yes, I suppose I

3    did consider it.

4              Q.    What did you do to satisfy yourself if

5    you considered it that it in fact wasn't a draft?

6              A.    I did do anything in addition.

7              Q.    So you're more than happy to supply

8    that scathing testimony about the GMP practices of

9    Actavis when you yourself didn't feel it was

10   necessary to do anything to satisfy your own logical

11   inquiry about whether that was the final version of

12   that document?

13                   MS. CARTER:  Objection.

14             A.    I assumed that it was there.  It was

15   the final document, the original was asked for, and

16   it did not exist.  That was my assumption. I didn't

17   go and search to see if -- I don't know how I could

18   search for a document that -- a second document that

19   was signed versus one that was unsigned.

20   BY MR. ANDERTON:

21             Q.    Do you know the nature of document

22   productions in litigations this large?

23             A.    No.

24             Q.    You don't know anything about how many

25   documents or whether drafts are produced or anything

Mark Kenny, Volume II          Videotaped                February 16, 2011

                                                              Page 577

 1    like that?

 2          A.    No.

 3          Q.    You see the sticker on that document,

 4    the 317, do you see the date on it?

 5          A.    Yes.

 6          Q.    What is it?

 7          A.    Well, it says underneath the Exhibit

 8    number, 51410.

 9          Q.    That means that document was used as

10    an exhibit by plaintiff's counsel in a deposition on

11    May 14, 2010, a month before you finalized your

12    report, and a month and a half before you testified.

13    It was available to you, readily available.  In

14    fact, plaintiffs had used it as an exhibit.  You

15    didn't feel it was even worth asking them whether

16    that was a draft?

17          A.    It wasn't a matter of asking them.  I

18    saw the document, I assumed that that naturally was

19    the single document.  I made an assumption.

20          Q.    An obviously incorrect assumption?

21                MS. CARTER:  Objection.

22          A.    It turned out to be incorrect that it

23    did exist.

24                MR. ANDERTON:  I want to consult with

25    Mr. Kaplan for a moment.  We're going to go

Mark Kenny, Volume II          Videotaped                February 16, 2011

Page 578

```
 1          out and take a break for a moment.  I may be
 2          done.
 3                  THE VIDEOGRAPHER:  We're off the
 4          record.  The time is 6:10.
 5                  (Recess taken.)
 6                  THE VIDEOGRAPHER:  I'm going to start
 7          up in a minute.  We're back on the record.
 8          The time is 6:16.
 9                  MR. ANDERTON:  I have no further
10          questions at this time.
11                  MS. CARTER:  I have just literally
12          three questions.
13   EXAMINATION BY MS. CARTER:
14          Q.    Your final report which is Exhibit 48,
15   I believe somewhere around here, you agree with all
16   of the opinions in this report?
17          A.    I absolutely do.
18          Q.    You stand by all the opinions in the
19   report?
20          A.    I stand by them all.
21          Q.    And these opinions you believe are
22   within your area of expertise?
23          A.    Yes, I do.
24                And can I make a statement that this
25   report was not signed I have to retract because it
```

Mark Kenny, Volume II          Videotaped                    February 16, 2011

Page 579

1    indeed was signed.  It doesn't mean that it's a

2    quality document, but indeed it was signed.

3              MR. ANDERTON:  By "this," you're

4         talking about what we discussed as having

5         previously been marked as Plaintiff's

6         Exhibit 137?

7              THE WITNESS:  Yes.

8              MS. CARTER:  That's all I have.

9              MR. ANDERTON:  No further questions.

10             THE VIDEOGRAPHER:  This is the end of

11        the deposition of Mark Kenny.  Today's date

12        is February 16, 2011.  The time is 6:17.

13        We're off the record.

14

15

16

17

18

19

20

21

22

23

24

25

Mark Kenny, Volume II          Videotaped              February 16, 2011

Page 580

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK     )

4                             :  Ss

5    COUNTY OF DUTCHESS    )

6

7

8          I, Jane Watson, a Reporter and Notary

9          Public within and for the State of New York

10         do hereby certify:

11         That MARK KENNY, the witness whose

12         deposition is hereinbefore set forth, was duly

13         sworn by me and that such deposition is a true

14         record of the testimony given by such witness.

15         I further certify that I am not related

16         to any of the parties to this action by blood

17         or marriage, and that I am in no way

18         interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto set my

20         hand this 21st day of February, 2011.

21                    _____

22                         JANE D. WATSON

23

24

25