# EXHIBIT 17

James J. Farley                                    June 28, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:   DIGITEK PRODUCT LIABILITY
         LITIGATION

                              MDL NO. 1968
_____

        The videotaped deposition of JAMES J. FARLEY taken

by counsel for the Defendants, Actavis Totowa, LLC,

Actavis, Inc., and Actavis Elizabeth, LLC, pursuant to

notice and by agreement of counsel, reported by Angela

S. Garrett, CSR, RPR, B-2407, at the Embassy Suites, 145

Mulberry Boulevard, Savannah, Georgia, on June 28, 2010,

commencing at 9:10 a.m.

--------------------------------------------------------



James J. Farley                                          June 28, 2010

```
                                                         Page 2

   1                   APPEARANCES OF COUNSEL

   2

   3     FOR THE PLAINTIFFS:

   4
                       PETER A. MILLER, ESQUIRE
   5                   THE MILLER FIRM, LLC
                       108 Railroad Avenue
   6                   Orange, Virginia  22960
                       (540) 672-4224
   7                   pmiller@doctoratlaw.com

   8     FOR THE DEFENDANTS, ACTAVIS TOTOWA, LLC, ACTAVIS, INC.,
         AND ACTAVIS ELIZABETH, LLC:
   9
                       MICHAEL ANDERTON, ESQUIRE
  10                   TUCKER, ELLIS & WEST, LLP
                       1150 Huntington Building
  11                   925 Euclid Avenue
                       Cleveland, Ohio 44115-1475
  12                   (216) 592-5000
                       manderton@tuckerellis.com
  13
         FOR THE DEFENDANTS, MYLAN PHARMACEUTICALS, INC., MYLAN,
  14     INC., MYLAN BERTEK PHARMACEUTICALS, INC., AND UDL
         LABORATORIES, INC.:
  15
  16
                       ERICKA DOWNIE, ESQUIRE
  17                   SHOOK, HARDY & BACON
                       1155 F Street, N.W., Suite 200
  18                   Washington, DC,  20004
                       (202) 662-4864
  19                   edownie@shb.com

  20     ALSO PRESENT:  Bill Kaska, Videographer

  21

  22

  23

  24

  25
```

James J. Farley                                      June 28, 2010

                                                          Page 3

 1                        I N D E X

 2                                                     PAGE

 3   DIRECT EXAMINATION

 4            By Mr. Anderton                            6

 5   CROSS EXAMINATION

 6            By Ms. Downie                            256

 7   DIRECT EXAMINATION (Cont'd)

 8            By Mr. Anderton                          261

 9   CROSS EXAMINATION

10            By Mr. Miller                            316

11   REDIRECT EXAMINATION

12            By Mr. Anderton                          319

13   Signature of Deponent                            323

14   Certificate of Reporter                          324

15            (Reporter's Disclosure Statement
              attached to back of transcript.)
16

17   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

18                    E X H I B I T S

19   DEFENDANTS'
     EXHIBIT
20   NUMBER          DESCRIPTION                      PAGE

21     20     2004 EIR inspection of Amide             223

22     38     "Facts and Myths About Generic Drugs"    202

23     39     Posting on the FDA Web site              194

24     44     Mr. Farley's curriculum vitae             34

25     45     Report of Review of Various Documents     21

James J. Farley                                    June 28, 2010

```
                                                       Page 4

  1                 E X H I B I T S (Cont'd)

  2    DEFENDANTS'
       EXHIBIT
  3    NUMBER            DESCRIPTION                    PAGE

  4    45A       Report of Review of Documents
                 dated 2/5/10                           321
  5
       45B       Report of Review of Documents
  6              dated 5/14/10                           321

  7    45C       Report of Review of Documents
                 dated 2/5/10                           321
  8
       46        Article titled "Discovering the
  9              Cause of a Drug's Defect"               70

 10    57        FDA 483 dated September, 2007          142

 11    58        2008 FDA 483                            298

 12    74        Notice of Video Deposition             59

 13    74A       Notice of Video Deposition with notes  60

 14    74B       Mr. Farley's updated curriculum vitae  66

 15    100       E-mail from Mr. Farley to Ms. Barton
                 dated 5/14/10 at 10:32 a.m.            321
 16
       101       E-mail from Mr. Farley to Ms. Barton
 17              dated 5/14/10 at 10:24 a.m.            321

 18    102       E-mail from Mr. Farley to Ms. Barton
                 dated 5/14/10 at 10:19 a.m.            321
 19
       103       E-mail from Mr. Farley to Ms. Barton
 20              dated 5/14/10 at 10:12 a.m.            321

 21    104       E-mail from Mr. Farley to Ms. Barton
                 dated 5/14/10 at 10:03 a.m.            321
 22
       105       E-mail from Mr. Farley to Ms. Barton
 23              dated 5/14/10 at 10:00 a.m.            321

 24

 25
```

James J. Farley                                    June 28, 2010

```
                                                          Page 5
  1                 THE VIDEOGRAPHER:  Good morning.  We're
  2          on record.  It's 9:11 a.m.  The date is June 28th,
  3          2010.  This is the videotaped deposition of James
  4          J. Farley in the matter of Digitek Product
  5          Liability Litigation, United States District Court
  6          for the Southern District of West Virginia,
  7          Charleston Division, MDL No. 1968.
  8                 This deposition is being held at Embassy
  9          Suites held at 145 Mulberry Boulevard, Savannah,
 10          Georgia, 31322.  The deposition was noticed by
 11          Matthew Moriarty of Tucker, Ellis & West, LLP,
 12          from Cleveland, Ohio.
 13                 My name is Bill Kaska for McKee Court
 14          Reporting here in Savannah, Georgia.  The court
 15          reporter is Angela Garrett of McKee Court
 16          Reporting, 4849 Paulsen Street, Suite 304,
 17          Savannah, Georgia, 31405-4426.
 18                 Counsel, please state your appearances
 19          for the record, please.
 20                 MR. MILLER:  My name is Pete Miller of
 21          The Miller Firm for Plaintiffs.
 22                 MS. DOWNIE:  Ericka Downie from Shook,
 23          Hardy & Bacon on behalf of the Mylan defendants.
 24                 MR. ANDERTON:  My name is Michael
 25          Anderton with Tucker, Ellis & West on behalf of
```

James J. Farley                                          June 28, 2010

Page 6

1        the Actavis defendants.

2                    THE VIDEOGRAPHER:  Thank you.  Madam

3        court reporter, would you please the witness.

4                    JAMES J. FARLEY

5     having been first duly sworn testified as follows:

6                    THE VIDEOGRAPHER:  Thank you.  At your

7        leisure.

8                    MR. ANDERTON:  Thank you.

9                    - - - - -

10                    DIRECT EXAMINATION

11   BY MR. ANDERTON:

12            Q    Good morning, Mr. Farley.

13            A    Good morning.

14            Q    We met a few moments ago.  My name is

15   Michael Anderton.  I am with Tucker, Ellis & West in

16   Cleveland.  And I am here on behalf of the Actavis

17   defendants in the Digitek litigation.

18            Will you just spell your name and provide your

19   home address for the record, please.

20            A    First name James, J-A-M-E-S, I usually use

21   my middle initial, J. for Joseph, last name, Farley,

22   F-A-R-L-E-Y.  Home address is in Savannah.  It's 101

23   Captain John's Drive, Savannah, 31410.

24            Q    And do you have a business address as

25   well?

James J. Farley                                    June 28, 2010

 1            A    That is my business address.  I have a

 2    home business.

 3            Q    And what business do you run out of

 4    your -- do you work for out of your home?

 5            A    I do chemistry and pharmaceutical

 6    consulting.

 7            Q    Do you have a name?  Is there a name for

 8    the company that you work for or operate or own?

 9            A    I call my company -- I am my company --

10    Cardinal Consulting and Training.  And in this case I'm

11    contracted out to do work for Smart Consulting Group in

12    West Chester, Pennsylvania.

13            Q    So the Cardinal Consulting and Training,

14    do I understand correctly that you are the sole employee

15    of that company?

16            A    I'm everything.

17            Q    Everything.

18            A    That is me.

19            Q    Okay.  And you say you're contracted out

20    by Smart Consulting in Pennsylvania?

21            A    West Chester, Pennsylvania, suburb of

22    Philadelphia.

23            Q    How did that relationship come to be in

24    existence, your current relationship with Smart

25    Consulting in the context of this litigation?

James J. Farley                                    June 28, 2010

Page 8

1          A   I've known Nigel Smart, Dr. Nigel Smart,
2    for over a dozen years now and we work together on
3    projects.  And most recently Nigel and his wife, Denise,
4    formed their own business.  By recently, the last half a
5    dozen years, somewhere thereabouts.
6          And he will call people he knows on certain
7    projects and contract with them and say, here's a
8    project, would you do this aspect of the project for me.
9    That's what I mean by contract out.
10         Q   Okay.  And is that how your relationship
11   with -- or how your involvement in this litigation came
12   to be?  Did he contact you and ask you to be involved in
13   some aspect of this litigation?
14         A   Yes.
15         Q   When did that happen?
16         A   I'd have to check the records for initial
17   contact, but it was around the end of last year or
18   beginning of this year.
19         Q   End of 2009, beginning of 2010?
20         A   Yes.
21         Q   After -- is it Dr. Smart?
22         A   Dr. Nigel Smart.
23         Q   After Dr. Smart contacted you did you
24   ultimately come to have direct contact with counsel for
25   the plaintiffs in this litigation?

James J. Farley                                    June 28, 2010

                                                        Page 9

1            A    Yes.

2            Q    And how did that come to be?  Did

3    Dr. Smart put you in touch with them?  Did they contact

4    you directly?  How did that happen?

5            A    He did what is pretty much typical in

6    situations like this.  He said a gentleman named Peter

7    Miller will be contacting you, I've given you his number

8    and he will call you to discuss the project with you.

9    And it was either the same day or the following day that

10   Pete Miller did call me and we discussed the project.

11           Q    Okay.  And he said gentleman?

12           A    I'm sorry?

13           Q    Never mind.  You're not a medical doctor,

14   are you?

15           A    No.

16           Q    Your testimony a moment ago was that you

17   provide consulting service on I think chemistry and what

18   was the second category?

19           A    Pharmaceuticals, general pharmaceuticals,

20   a lot of FDA regulatory.

21           Q    I want to find out a little bit more about

22   that.  When you say pharmaceuticals and then you expand

23   that a little bit by saying a lot of FDA regulatory, can

24   you give me more detail?

25                What does -- what type of consulting do you

James J. Farley                                June 28, 2010

Page 10

1    do?  What do you consult in with respect to

2    pharmaceuticals as you've described it?

3              A    I'll go back to 1996 when I resigned my

4    position at the FDA in Philadelphia.

5              Q    Okay.

6              A    And I formed Cardinal Consulting, which

7    was just give me the name and saying I'm going to be a

8    consultant.  And initially it was analytical methods and

9    analytical procedures because much of that was what I

10   did.

11             However, in my eight years at FDA, during

12   which time they promoted me to be director of the

13   science branch of the Philadelphia district where 30

14   chemists were in my employ, I -- since I had

15   participated in FDA inspections, since I had to assign

16   chemists to FDA inspections and since I had to review

17   Establishment Inspection Reports, called EIRs, and the

18   FDA 483s and review and in some cases sign warning

19   letters, I included that in my repertoire of services.

20             Q    So -- I mean, you just described how you

21   came to kind of provide consulting services and how you

22   expanded it beyond analytical methods consulting.

23             Can you give me just a little more detail just

24   about exactly what you -- what you do in a typical

25   consulting -- or what services you will offer?  I

James J. Farley                                    June 28, 2010

1    should -- let's start -- let's back that up.

2              A    Uh-huh.

3              Q    First tell me in more substance when you

4    say you consult with respect to analytical methods or

5    with respect to FDA regulatory, what types of activities

6    do you actually perform?

7              A    Uh-huh.  With regard to analytical test

8    procedures, those test procedures which are within my

9    area of expertise, I may design it for a pharmaceutical

10   firm or I may review one that they have and add, delete

11   or modify as necessary or I may review one that they're

12   having a problem with or I may visit a contract testing

13   firm and look at their methods.

14             If the big firm wants to contract out they

15   might say, Jim, go look them over and tell us that

16   they're okay.  So I could do any of those things

17   relevant to analytical procedures.  That would extend

18   over to Good Manufacturing Practices, GMPs.

19             A lot of times you see it with the little c

20   for current in front of it, but GMP is the normal term.

21   And that would involve everything from raw material

22   coming in to a firm, how is it tested, who tests it,

23   what procedures, standard operating procedures, SOPs,

24   are in place or are needed, how are -- how are these

25   materials transported to manufacturing, what in-process

James J. Farley                                    June 28, 2010

Page 12

1    tests are done in manufacturing, how about the

2    qualifications of people all along the way,

3    qualifications of training, up to and including finished

4    goods testing, which is also called release testing

5    because you're releasing the product to the public.  So

6    that's all the testing.

7             But there's more to it.  You have the

8    calibrations.  You have your systems.  You have the

9    entire system, not just of the test.  The test is part

10   of the system.

11            It's the training of the individuals, the

12   assignments given to the proper individuals, their

13   experience with it.  I'll pause here and look to you

14   for -- what more do you want?

15            Q   I think that's enough detail.  You've

16   given me a --

17            A   Okay.

18            Q   -- better understanding of what you do

19   when you provide pharmaceutical consulting.  And I

20   should pause briefly, Mr. Farley, and go over a quick

21   ground rule that I should have incorporated into the

22   examination at the very -- you know, at the very

23   beginning.  And I apologize.

24            But if I ask you a question today and you

25   don't understand it, if I say it poorly, if it just

James J. Farley                                          June 28, 2010

Page 13

 1   doesn't make sense, if for whatever reason you don't

 2   understand it, will you please ask me to say it

 3   differently or ask it differently or to rephrase it

 4   somehow?

 5            A    Yes, I will.

 6            Q    Okay.  And if you answer a question that I

 7   ask you and you don't ask me to rephrase it, I will

 8   assume that you understood it as asked and that you

 9   answered it with an understanding of it as I asked it.

10            Is that -- is that fair?

11            A    That's fair.  I understand what you're

12   saying now.

13            Q    Excellent.  So the consulting services

14   that you just described in reasonably significant

15   detail -- and I'm talking about the -- not the

16   analytical method consulting, but the consulting

17   services that you -- the pharmaceutical, the regulatory,

18   how much of your current workload at Cardinal is divided

19   between regulatory consulting and the analytical methods

20   consulting?

21            A    The analytical methods consulting is part

22   of the regulatory since the methods must be designed and

23   validated in order to be submitted to FDA.  So I'm going

24   to take my time and try to answer your question.  But

25   since regulatory includes these methods --

James J. Farley                                          June 28, 2010

                                                              Page 14

1            Q    Right.

2            A    -- at any given time these days it could

3    be anywhere from 10 to 40 percent.  It depends on the

4    individual project.

5            Q    So do I understand that you would say that

6    60 percent or so of your current consulting work focuses

7    on the analytical methods, purely the analytical methods

8    review and analysis?

9            A    No, no.  That's not what I meant.

10           Q    Okay.  Then I misunderstood.

11           A    I'll reword it.

12           Q    Okay.

13           A    Taking analytical methods development or

14   review or evaluation, anything related to analytical

15   methods as part of regulatory, that percentage of the

16   analytical methods work that is part of my overall

17   regulatory business can vary from 10 to 40 percent of

18   work with time involved at any given time.

19           Q    Okay.  Okay.

20           A    Is that --

21           Q    All right.  So you consider it all

22   regulatory with 10 to 40 percent being the analytical

23   methods type analysis?

24           A    Yes.

25           Q    Okay.  And your clients then typically are

James J. Farley                                    June 28, 2010

Page 15

1   pharmaceutical manufacturers or companies who are

2   somehow involved in the pharmaceutical industry?

3            A    Yes.

4            Q    Have you been -- well, when you're hired

5   by a company to engage in regulatory consulting as

6   you've described it, tell me how you would kind of

7   approach that engagement.

8            Tell me the steps that you would undertake in

9   a typical engagement if somebody is hiring you -- let's

10  say, for example, a company hires you to determine

11  regulatory compliance, whether they are in compliance

12  with Good Manufacturing Practices.

13           How would you undertake that engagement?

14           A    What I would do first is define the scope

15  of work, what do you want me to do, because the way that

16  is presented, get us in compliance, that could range

17  anywhere from two days to two years.

18           So as with any project in any field, define

19  the scope of work so that you're doing the proper thing

20  for the customer.  The reason I say that is a customer

21  might say, I have another consultant doing computer

22  validation.  Good.  You don't want me to go near your

23  computer validation.

24           But I want to look and say, all right, what do

25  you want me to do?  Analytical methods.  How many?  Let

James J. Farley                                    June 28, 2010

1    me see which ones they are.  Do you need any developed?

2    Do you want me to review them?  What do you want me to

3    do?  Then I will look at them.  And it could be -- and

4    I'm making this up to answer your question right now.

5              Q    Understood.

6              A    It might be, I've got to be at your firm

7    and watch this being done.  You have the method.  It's

8    not working out.  I have to be there to see -- meet the

9    analysts and see who's doing it.  Vastly different in

10   time and money than sending it as an e-mail attachment

11   and having me read it.

12             Q    Okay.

13             A    So I want to look at that and then put a

14   proposal to the client as to the job as I perceive it is

15   review the following methods.  I will come to your

16   facility for two days and work with your analytical

17   chemists.  Then I will go back to my home base and write

18   a report.

19             In some cases it might just be, we'll send you

20   the methods and tell us if they're in the proper format.

21   So getting to your original question, I would first

22   define the scope of work and then give them a proposal

23   as to how I would go about it to get their authorization

24   for it.  And then we proceed from there.

25             Q    And once you -- and once you provided them

James J. Farley                                          June 28, 2010

1    the proposal and defined the scope of the project as

2    you've described it, if you were asked by a company to

3    determine whether a certain product had been

4    manufactured and released in compliance with Good

5    Manufacturing Practices, would that involve document

6    review?

7              A    Yes.

8              Q    What types of documents would you review

9    in the context of that analysis?

10             A    Could I have that question again?

11             Q    Yes.  I asked you if you would review

12   documents in order to determine whether a certain

13   product had been manufactured in compliance with Good

14   Manufacturing Practices and you said yes.

15             A    Yes.

16             Q    What types of documents would you review

17   to undertake that analysis and advise the company

18   whether they then -- whether that product had been

19   manufactured in compliance with Good Manufacturing

20   Practices?

21             MR. MILLER:  And I'm going to object.

22         It's an incomplete hypothetical.  But it's okay to

23         answer.

24             A    For a thorough answer to your question, or

25   a thorough part of -- again, defining the work, I would

James J. Farley                                          June 28, 2010

Page 18

1    say to the client, well, what I want to do, I want to

2    see -- are you having any problems anywhere?  Are you

3    having problems with new analytical chemists that are

4    having problems with their answers?  I try to define it

5    more specifically.

6            And -- but typically it involves going back to

7    all the procedures from raw materials coming in, in

8    process materials as it is being produced and the

9    testing that's associated with it and the finished goods

10   released.

11           I want to see the whole workload from raw

12   materials in to finished product out.  That's what I

13   want to see.  And I also want to see -- and it's very

14   important -- the training records of the people involved

15   in doing it to make sure they're qualified.

16           Q   So you want to see -- if I understand

17   correctly, you want to see all documents associated with

18   production of that product?

19           A   Yes, I do.

20           Q   And you want -- and then you review them

21   and develop your opinion as to whether GMPs have been

22   complied with or not?

23           A   Yes, I would.  I want to put it in a

24   proposal first --

25           Q   Understood.

James J. Farley                                    June 28, 2010

Page 19

```
 1              A    -- so that the client knows the time and

 2    their money involved and they don't try to get me to

 3    short-cut something.  So you have to be thorough in

 4    things.  And I want them to know the degree of

 5    thoroughness and the amount of time and energy it will

 6    take to do it.

 7              Q    I understand.  But in order to be thorough

 8    and to properly advise that client about whether that

 9    product had been manufactured and released in compliance

10    with Good Manufacturing Practices, you'd tell them up

11    front so that they wouldn't be surprised at how much

12    time and cost might be involved that you need to require

13    all of the records you've just described -- or I'm

14    sorry -- you need to review all of the records that

15    you've just described.  You'd tell them that up front,

16    correct?

17              A    Yes, I would.  And it wouldn't surprise

18    them.  They usually expect me to say that.

19              Q    Okay.  What if they didn't want you to

20    review those records?  Could you do the analysis that

21    I've just described?

22              A    It is quite likely that I could not and I

23    would not accept the project.

24              Q    Okay.

25              A    I might just say, you don't want me, you
```

James J. Farley                                          June 28, 2010

                                                              Page 20

 1   want someone else, I can't do it under your constraints.

 2             Q    Okay.  Have you ever been deposed before?

 3             A    Yes.

 4             Q    How many times?

 5             A    In the last four years twice.

 6             Q    Tell me about those two times.

 7             A    Can I refer to my report?

 8             Q    Actually -- to your report?

 9             A    It's --

10             Q    Your expert report?

11             A    The depositions are in the report.

12             Q    Yeah.  Let's do this a little differently,

13   though, because I've actually got that marked as an

14   exhibit, so -- and if you can -- you can go ahead and

15   put those off to the side.  I'm going to review those

16   when we get a break.  But I --

17             A    All right.  If you have the two cases --

18             Q    I do.

19             A    -- that will be fine.

20             Q    Okay.  So, Mr. Farley, I have handed you a

21   copy of a document.  And we've pre-marked our exhibits.

22   You might have heard a little bit of that exchange as we

23   were getting ready to go on the record this morning.  So

24   the numbers aren't going to go sequentially necessarily.

25   If we mark new exhibits we'll make them somehow

James J. Farley                                          June 28, 2010

                                                              Page 21

 1    sequential.  But this document has been premarked as

 2    Exhibit 45.

 3               A    Can I write on this?  It's dark.

 4                    MR. MILLER:  No.

 5               Q    No, you can't.

 6               A    I'll just remember 45.  I'll remember it.

 7               Q    Yeah.  Well, we'll remember that it's your

 8    report.  Will you take a moment just to look at that

 9    document and confirm that it is the report you were

10    referring to a moment ago, your expert report in this

11    case?  And I will tell you in advance that we have taken

12    your CV off the back.  We'll make that a separate

13    exhibit.

14               A    That's my report.

15               Q    Okay.  So Exhibit 45 is the report that

16    you prepared I assume at the request of Plaintiffs'

17    counsel in this Digitek litigation and it's the report

18    you were referring to when I asked you to identify

19    the -- or you were about to review and refer to when I

20    asked you to identify the times you've been deposed in

21    the last couple of years, correct?

22               A    Yes.

23               Q    Will you -- so let's go back to my

24    question.  What are the times you've been deposed?  You

25    said you've been deposed twice.

James J. Farley                                    June 28, 2010

Page 22

```
 1              A    In the last two years.

 2              Q    Okay.

 3              A    I believe I was several years ago, but

 4    it's vague in my memory.  But these are the more recent

 5    ones and they're on page 4 under background.

 6              Q    Okay.  And so I see two cases listed here.

 7    One it looks like Chanin versus Desert Shadow Endoscopy

 8    Center.  Tell me about that.  What was the nature of

 9    your involvement in that litigation?

10              A    I heard the question.  I'm trying to think

11    of --

12              Q    Take your time.

13              A    I'm posing my answer so I know where to

14    start and get right to the answer.

15              Q    I appreciate that.

16              A    There was -- there are a couple of

17    endoscopy clinics all under the same ownership in Las

18    Vegas.  And there were a combination of factors.  They

19    were multi-dosing Propofol when they would sedate the

20    patients for endoscopies and other such procedures.

21              And they were accused of -- I say -- I'm

22    pausing about the word alleged.  It's been proven.  So

23    I'll knock out the word allege.

24              They were taking Propofol from a large

25    container, giving it to one patient and taking a little
```

James J. Farley                                    June 28, 2010

Page 23

1    more, giving it to that patient and then taking some and
2    giving it to another patient.  In the course of doing
3    that several patients contracted hepatitis.
4                Teva and Baxter, the manufacturer and
5    distributors, were involved in that they were selling
6    the large units where a purchaser like an endoscopy
7    clinic could get a discount price and were selling it to
8    a clinic known that they only needed the little vials.
9                And while I'm pausing, because once I did my
10   work I'm speculating what came after, but the court
11   judged that, yes --
12               Q   And I apologize for kind of cutting you
13   off.  Can you just describe for me what your involvement
14   in the case was?  Generally what were you engaged to
15   review and what was the general subject of your
16   opinions?
17               A   Thank you for that.  I was pausing because
18   I wasn't sure --
19               Q   Yeah, yeah.
20               A   -- this or that what the Court said when I
21   wasn't there.
22               Q   At least initially I'd only like to hear
23   your involvement and what your opinions were.  And then
24   I'll decide whether I want to ask more.
25               A   That's what I can answer most

James J. Farley                                          June 28, 2010

                                                              Page 24

 1   intelligently.

 2              Q    Okay.  Excellent.

 3              A    My involvement was looking at the labeling

 4   of the Propofol and the manufacturing of the Propofol

 5   and rendering an opinion in that regard.  Does that

 6   answer your question?

 7              Q    It absolutely does.  And does that mean

 8   that your involvement in that case did not touch on --

 9   you weren't asked to give an opinion about regulatory or

10   GMP compliance in any aspect?

11              A    With regard to the labeling.

12              Q    Not with respect to production or

13   manufacturing or analytical or laboratory related GMPs?

14              A    Not to any major degree.

15              Q    Okay.  The next case listed here, Olson

16   versus Septodont, tell me about your -- again, what was

17   your involvement?  What were you engaged to give an

18   opinion on in that case?

19              A    In one respect it was a similar case.  It

20   just happened to be.  A lady in the Tacoma, Washington

21   area who was a dental patient was given Septadine by her

22   dentist.  And the reason for that is to numb the gum

23   area while the dentist did his work.

24              But she -- I'll use the word overdosed, but

25   I'll put it in quotes, because I don't want to use

James J. Farley                                            June 28, 2010

Page 25

1   that -- too much was given.  And she -- it ruined her

2   nerve.  Her face sagged.  She has trouble talking.  It

3   was irreversible what happened to her.  And we looked at

4   manufacturer, industry and the labeling aspects of it,

5   including directions.

6            Q    And when you say we, do you mean you?

7            A    Oh, me.  There were no other chemists to

8   my knowledge.  At least I didn't meet any.  We meaning

9   my client, the lawyer.

10           Q    So what type of compliance issues did you

11  give an opinion about in that case?  Do you remember?

12           A    Labeling plus the responsibilities of a

13  generic manufacturer.

14           Q    With respect to what?

15           A    With respect to labeling, extra labeling,

16  putting warnings on, giving notices, keeping track of

17  who buys it.

18           Q    Okay.  So that was -- your involvement in

19  that case was fairly narrowly limited to labeling and

20  related issues?

21           A    Yes, uh-huh.

22           Q    Let's go back to your time at the FDA.

23  You were there from 1989 until 1996?  Does that sound

24  right?

25           A    Yes.

James J. Farley                                      June 28, 2010

                                                        Page 26

1              Q    And you said -- your background -- well,

2       first things first.  Your background, your educational

3       background, is in chemistry, correct?

4              A    Primarily.  I have a master's degree in

5       physio-chemistry, but then I went on to get an MBA in

6       financing and marketing.

7              Q    Okay.  And when you were at the FDA you

8       were initially hired as an analytical chemist?

9              A    Yes.

10             Q    How long were you in that position?

11             A    By title, about three years; by

12      assignment, about one year.  The district director of

13      the Philadelphia district and the regional director of I

14      think four districts at that time, Baltimore -- it's

15      been rearranged.  It's vague now.

16             But the regional director knew that I had

17      experience in the pharmaceutical industry.  And they had

18      some things they wanted me to help out with, like

19      getting the samples out more on time and looking at some

20      things that -- I'm pausing because I don't want to say

21      anything negative about government employees.

22             But there were some mindsets there of this is

23      the way we've always done it.  And as one of my bosses

24      said to me, you're breathing a breath of fresh air in

25      here letting us get done what we want to get done.

James J. Farley                                        June 28, 2010

Page 27

```
 1              And just helping them like, why are you doing
 2    this when you should do this, little management
 3    assistance but I was still classified as an analyst.
 4    But I would travel to the Baltimore lab and the
 5    Cincinnati lab as in effect the person who was sent by
 6    the regional director to work with them to improve their
 7    procedures.
 8         Q    Does that mean that you were providing
 9    guidance or insight with respect to what I'll
10    characterize as efficiency issues?
11         A    Yes.
12         Q    Okay.  And you say that started after
13    about a year?
14         A    Yes.
15         Q    It lasted how long?
16         A    Up to and including when they promoted me
17    to be director of the science branch, which is in effect
18    the laboratory director.
19         Q    Okay.  And that was after three years,
20    after you've been at the FDA for three years?
21         A    Three years, three and a half.  Three.
22    Just say three.
23         Q    Okay.  You were there a total of about
24    eight years?
25         A    About eight.
```

James J. Farley                                      June 28, 2010

Page 28

1              Q    When you became director of the lab I take

2    it that means you jumped over a couple levels of

3    supervisors to go from an analyst position with those

4    kind of efficiency responsibilities directly to the

5    director of the lab.

6              Does that mean you jumped over a couple of

7    levels?

8              A    Yes.  Some people I worked for were then

9    working for me.

10             Q    That's always fun.

11             A    It was.

12             Q    Tell me what you did as director of the

13   lab.

14             A    With 30 chemists in the lab I was

15   responsible for all of their functions.  I worked

16   through two supervisors.  There were two supervisors who

17   reported to me.  But I knew everyone in the lab on a

18   first name basis.

19             But they had to get their analytical work

20   done, their analytical work of samples that were taken

21   and brought in from pharmaceutical firms.  They had to

22   do that.

23             They did some analytical methods development

24   and they had to accompany the inspectors on the

25   inspections.  An inspector is an investigator, is a

James J. Farley                                    June 28, 2010

Page 29

1    consumer safety officer.  They were all the same.

2    Consumer safety officer is their designation, CSO, but

3    we called them inspectors or investigators.

4              When they go on an inspection they want one or

5    more chemists with them to be more knowledgeable about

6    the scientific aspects of their investigation.  An

7    investigator -- I've known investigators that had Ph.D.s

8    in science and I've known others that had 30 credits in

9    science.

10             The ones that -- the ones in inspections, they

11   know what they're going to be looking at.  And if they

12   don't know initially they see when they get there and

13   they'll call and say, I need a chemist who's

14   knowledgeable about this or this.  Okay, send them up.

15             So participating in inspections, assigning the

16   proper chemist and doing the scheduling to make sure

17   that the work flow in the lab is always done.  This was

18   all part of the job of running the lab.

19             Q   Okay.  So typically you weren't the person

20   who was in the field involved in FDA inspection,

21   correct?

22             A   I was as an analyst accompanying

23   investigators in the scenario I just mentioned.

24             Q   Well -- okay.  So as an analyst you mean

25   during that first year of employment before you started

James J. Farley                                          June 28, 2010

Page 30

1    traveling to other labs and counseling the FDA regional

2    offices or district offices on efficiency?

3              A    And during the second and third year.

4    When needed, when they needed me.

5              Q    How often?

6              A    It's tough to pick an average.  You might

7    go two in a row and then none for a couple months.  It's

8    difficult.  If I said a few, would that be too vague?

9              Q    Well, if you give me a better sense of a

10   few.  You were in that position for -- as an analyst --

11   let's break this down a little bit.  As an analysis you

12   were in that position for three years.

13             A    Yes.

14             Q    During those three years did you

15   participate -- and by participate I mean go out and

16   actually -- where you were actually on site, not

17   involved in scheduling and deciding who goes and things

18   like that, but where you were actually on site how many

19   inspections would you say you were involved with during

20   those three years?

21             A    I'm drawing on my memory now.

22             Q    All I can ask you is to the best of your

23   recollection.

24             A    One quarterly.

25             Q    One quarterly.  So that's perhaps a dozen

James J. Farley                                          June 28, 2010

Page 31

1    in three years?

2              A    Yes.

3              Q    And you weren't necessarily on the

4    premises for each and every day of all of those

5    inspections, right?  You were there as needed?

6              A    Generally as needed.  The inspectors feel

7    comfortable having you there every day, but the workload

8    doesn't always permit it.  They really feel comfortable

9    having one or two scientists around.  But you get there.

10   You do your job.  What do you want me to look at?  What

11   do you want me to evaluate?  And then you -- that's it.

12             Q    When you became director, so during that

13   last five years, how many inspections were you involved

14   with by actually -- and by involved I mean actually on

15   the premises during the inspection.

16             A    I wasn't assigned directly because it

17   wasn't my primary area of responsibility.  However,

18   in -- I should say the Philadelphia district included

19   Pennsylvania and Delaware.  And the laboratory covered

20   Jersey because they didn't have a lab.

21             I would not be assigned to go on any of them.

22   But I would on occasion say, I'm going to drop in on

23   such and such a day and just walk through with you.  And

24   that might be to Merck or what was then SmithKline

25   Beecham -- it's now GlaxoSmithKline -- just to make sure

James J. Farley                                      June 28, 2010

Page 32

1    that everything was going along well.

2          Q    So participating in investigations or

3    inspections in the field was not something you did

4    regularly?

5          A    You could say that, yes.

6          Q    How many -- you mentioned earlier and I

7    believe your report references it as well.  How many

8    warning letters did you issue while you were employed by

9    the FDA?

10         A    I signed?

11         Q    Well, let's break that down a little bit.

12   How many -- let's ask that question first.  How many

13   warning letters did you actually sign?

14         A    I might have only actually signed one.  I

15   was involved in the input of various -- our district

16   director signs the warning letter.

17         Q    How many -- well, did you draft that one

18   warning letter that you signed?

19         A    No.  It's drafted by the investigation

20   staff and then brought to you and you -- that is a

21   document that before you sign you read every word.  It's

22   not a glance at and sign and get it off your desk type

23   of document, not to imply that the federal government

24   has any like that.  But you read every word because of

25   the severity of it.

James J. Farley                                                    June 28, 2010

Page 33

```
 1              Q    Well, but there's a difference between
 2    reading it and having an understanding of it and
 3    actually drafting and having input, correct?
 4              A    Yes.
 5              Q    And as director of the lab you weren't
 6    responsible for drafting and developing warning letters,
 7    were you?
 8              A    No.
 9              Q    And in fact, the one that you signed you
10    signed only because you were in some sort of acting
11    capacity outside your lab director position?
12              A    It was while I was still a lab director,
13    but when the boss would either be on some -- maybe down
14    at headquarters for a meeting or on vacation he might
15    just say, Jim, take my place as district director for
16    this week.  And I might say, well, Boss, what have you
17    got coming in?  And he might give me a rundown of what
18    to expect.
19              Q    So that made you essentially acting
20    district director?
21              A    Yes.
22              Q    And that's why you signed that single
23    warning letter?
24              A    Yes.
25                   MR. ANDERTON:  Are you sharing one with
```

James J. Farley                                    June 28, 2010

                                                        Page 34

 1        him?

 2                    MR. MILLER:  It looks like I am.

 3                    MR. ANDERTON:  Okay.

 4                    THE WITNESS:  Okay.

 5                    MR. ANDERTON:  Actually do you need one

 6        while we're --

 7                    THE COURT REPORTER:  Not while we're

 8        doing this.

 9                    MR. ANDERTON:  Okay.  Thank you.  So the

10        ones that we give Mr. Farley can go to Angela.

11   BY MR. ANDERTON:

12             Q   Mr. Farley, I've handed you a document.

13   And I know the exhibit stickers perhaps are difficult to

14   read.  But it has been marked as Defendants' Exhibit 44.

15             A   Yes.

16             Q   Can you just take a moment to review that

17   document, please.

18             A   That's me.

19             Q   Okay.  Is that an accurate copy of your

20   CV?

21             A   Yes, it is.

22             Q   It's the one that you actually attached as

23   Attachment A to the report that you prepared in this

24   case, correct?

25             A   Yes.

James J. Farley                                      June 28, 2010

1              Q   I think I asked you this earlier.  You're

2    not a medical doctor, correct?

3              A   I'm not a medical doctor.

4              Q   All right.  Is it accurate to say that

5    your expert opinions in this case are limited to

6    opinions about whether Actavis was in regulatory

7    compliance with Good Manufacturing Practices?

8              A   Yes.

9              Q   You're not offering any opinion about how

10   any -- whether -- let me start that over.

11             You're not offering any opinion about whether

12   any specific consumer or patient got or received and

13   took product that was defective?

14                 MR. MILLER:  Object to form of the

15       question.

16             A   I'm not sure I'm understanding your

17   question the way it's worded.

18             Q   Let me see if I can ask it more clearly.

19   Is it true that you're not offering an expert opinion

20   about whether a patient in the market received a

21   defective Digitek tablet?

22             A   I wouldn't know if a patient in the market

23   received a defective tablet unless I was told or saw

24   data.  Is that --

25             Q   Well, so then -- but you need to answer my

James J. Farley                                    June 28, 2010

Page 36

1    question, Mr. Farley.  You're not offering an opinion in

2    this case about whether any consumer received a

3    defective Digitek tablet, correct?

4              MR. MILLER:  Object to the form of the

5         question.

6         A    I'm thinking the way it's worded, I read

7    that a consumer did, but I don't have an opinion on it.

8         Q    Well, so I need to be clear then.  You're

9    not offering an opinion on that subject, correct?

10        A    As to whether a person taking a particular

11   medication received it or not?

12        Q    Correct.

13        A    I have no idea who took it.

14        Q    Okay.  And you're also not offering any

15   opinion about how specific patients react to specific

16   doses of Digitek, are you?

17        A    Not a professional or an expert opinion.

18   There are things you know about certain drugs from being

19   in the industry 40 or 45 or more years, but not who

20   would be prescribed.  I don't prescribe.

21        Q    Well, all right.  Again, I want to make

22   clear.  In the context of this case and this litigation

23   you're not offering any opinions about how any patient

24   reacts to a specific dose of Digitek; is that correct?

25        A    Not with regard to a patient, no.

James J. Farley                                          June 28, 2010

Page 37

1          Q    Okay.  Have you ever been a defendant in a
2    lawsuit?
3          A    I'm pausing.  I should know, like would
4    know, but I'm -- in order to answer your question
5    correctly, no, I have not.
6          Q    Have you ever actually testified -- we've
7    talked about the times you've been deposed.  Have you
8    ever actually testified in court?
9          A    Not as a consultant.  When I was with the
10   FDA -- and that was not a case such as this.  That was
11   an EEO case since I was chairman of equal opportunity at
12   the same time.
13         Q    So it was an employment case, not a
14   regulatory and -- not a case that had anything to do
15   with regulatory compliance?
16         A    Correct.
17         Q    Any other times?  Have you ever testified
18   any other times?
19         A    I did not.  They all settled.  I would be
20   glad to do it, but they just -- the attorney, my client,
21   would contact me and say, we settled the case, send the
22   final bill.  And that was it.
23         Q    How did you prepare for this deposition?
24         A    During -- off and on.  During the last
25   several weeks I would receive documents from Miller Law

James J. Farley                                          June 28, 2010

                                                              Page 38

1    Firm, specifically Pete Miller.  And I would review

2    them.  And when I received notice about a week ago that

3    this deposition would be today I said, how about if I

4    review my reviews.  And that's what I did.

5                Q    And the documents that you said you

6    reviewed over the last several weeks, what documents

7    were those?  Well, let me make that question clearer.

8                The documents that you said you received from

9    the Miller Firm over the last several weeks, I believe

10   is your terminology, what documents were those?

11               A    They would include EIRs, Establishment

12   Inspection Reports; 483s; warning letters; a revised

13   warning letter; various documents within a firm; charts

14   of regulatory activity; some current Actavis

15   correspondence, internal and to the FDA; the request for

16   consent decree; the consent decree itself.

17               They would all come in binders and a binder

18   might contain a variety of document -- would contain a

19   variety of documents.  That's what.

20               Q    When did you start receiving those

21   documents, those binders of documents?

22               A    I believe the first binder arrived in

23   January.  Then -- I reported on that and then there was

24   a space in time and then another binder arrived in

25   April.

James J. Farley                                          June 28, 2010

Page 39

```
 1              Q   When you say then you reported on that
 2    first binder, what do you mean by you reported on that?
 3              A   Wrote a brief report on my evaluation --
 4              Q   Of that first binder?
 5              A   -- of the contents of the first binder.
 6    Yes.
 7              Q   And what became of that brief report
 8    regarding the contents of that first binder?
 9              A   I sent it to Pete Miller at Miller Law
10    Firm.
11              Q   Do you have that first report on that
12    first binder with you today?
13              A   I've got it on a thumb drive.
14              Q   Thumb drive.  I was --
15              A   There was only so much I could fit in
16    suitcases.
17              Q   And having read one of your prior
18    deposition transcripts I know that you use the thumb
19    drive.  So that's on my list of things to ask you today,
20    believe it or not.
21              We will definitely want to take the thumb
22    drive and -- or somehow get the documents that are on
23    that thumb drive that relate to this litigation in our
24    possession.  Okay?
25              A   Yes.
```

James J. Farley                                                    June 28, 2010

Page 40

1              Q    And in fact, it occurs to me I might want
2    to see those today before we leave so that I can
3    determine whether I want to ask you any questions about
4    that.
5              A    Yes.
6              Q    So we'll work on that during the break
7    somehow.   Okay?
8              A    Fine.
9              Q    How many binders total did you receive
10   from -- well, did you receive documents from anyone
11   except the Miller Firm?
12             A    I'm thinking.  I heard your question.
13             Q    Take your time.
14             A    I'm thinking to give you an accurate yes
15   or no on that.
16             Q    I appreciate that very much.
17             A    No, only the Miller Firm.
18             Q    How many binders or -- how many times did
19   you receive documents?  Perhaps they weren't always in
20   binders.   How many -- how many shipments of documents
21   did you receive from the Miller Firm?
22             A    A total of five binders.  There may have
23   been two in one shipment.  So my answer is it's
24   definitely binders and likely to be four shipments.
25             Q    Okay.  Are the documents -- and did you

James J. Farley                                    June 28, 2010

Page 41

1    review all of the documents in those binders?

2              A    Yes.

3              Q    Are the documents you reviewed -- now, I

4    asked you initially what you did to prepare for this

5    deposition and I think we've kind of transitioned to

6    what you did to prepare your report.

7              Is that a fair characterization of what we're

8    describing now when we're talking about all of these

9    binders received over what sounds like a five- or

10   six-month period?

11             A    Yes.  That was -- I had the initial binder

12   and then wrote a report on -- in February, I believe

13   February 5th.  And then later on more binders arrived.

14   So I reviewed them and I wrote another report.

15             Q    So you wrote -- did you write a report in

16   response to each binder that you received?

17             A    Not in response to each binder.  I just in

18   effect kept building up the original report.

19             Q    Okay.

20             A    I took the original report and just

21   expanded the table.  But each document has an individual

22   review electronic file on my thumb drive.

23             Q    Okay.  So each document then has a -- I

24   take it then that there are documents on that thumb

25   drive that reflect your specific analysis and perhaps

James J. Farley                                          June 28, 2010

Page 42

1    comments regarding each document that you reviewed?

2            A    All 93 of the -- all -- some were

3    duplicates in title but had different redactions.

4            Q    Okay.

5            A    So there may have been roughly 80 to 85

6    different documents.  I had a total of 93.  And in some

7    cases here's a 483, here's a 483 I received two months

8    ago, but there are different redactions.  I can see more

9    or less.  So I'm saying 93 documents and -- 90 to 93.

10   But each one is a file on the thumb drive in my pocket.

11           Q    Okay.  Well, that's going to speak to the

12   viability of my reviewing those documents on a break

13   today.  And unfortunately it may also speak to whether

14   we have to reconvene, leave the deposition open and have

15   a second session.  But those are decisions that we'll

16   make as we kind of move through the process.

17                MR. MILLER:  While we're on that topic, I

18       brought a hard copy of everything he's talking

19       about and you're certainly more than welcome to

20       take a look at mine.

21                And although it sounds quite lengthy,

22       it's not as lengthy as you would think.  I wasn't

23       anticipating the thumb drive.  So I brought a copy

24       for me.

25                So being the great guy that I am I'm

James J. Farley                                          June 28, 2010

Page 43

1        going to offer up the copy that I brought so you
2        can read them at lunch in hopes of possibly
3        wrapping this up.
4                MR. ANDERTON:  Okay.  Well, I appreciate
5        that and we'll certainly take a -- at least an
6        initial run through it and we'll decide from
7        there.
8                I mean, I apologize if there's an
9        inconvenience involved, Mr. Farley, but I hope you
10       understand, you know, we have to see what's out
11       there and then react accordingly.
12               THE WITNESS:  There's no inconvenience.
13       That's what we're here for and that's why I
14       brought the little computer and the thumb drive.
15               MR. ANDERTON:  I'm actually talking about
16       the possibility of reconvening and having at least
17       a partial second session, you know, if I decide
18       that we can't get it all done today and if we need
19       a little time to review those documents.  But
20       we'll make those decisions as we move through the
21       process.
22               THE WITNESS:  Your choice.
23               MR. ANDERTON:  Excellent.
24   BY MR. ANDERTON:
25       Q   So then you said you kept building up the

James J. Farley                                         June 28, 2010

Page 44

1    report.  Does that mean that you would characterize each

2    of these reports as drafts that led up to the final

3    report you issued in this case?

4              A    No.  They weren't intended to be drafts.

5    I might prepare a report and save it as a file on my

6    thumb drive and the C drive, the C drive of my PC in my

7    home office.

8              Q    Right.

9              A    And then I'd review it a couple days later

10   and I might say, oh, well, I looked at more references

11   than that, I looked at the Physicians' Desk Reference, I

12   looked at this.  And I would, upon thinking about it,

13   add more to it.

14             But then I felt I can't keep it as the same

15   document.  I added to it for the reason I just

16   mentioned.  I'll save it as a new document.  And I

17   usually did that just by the date.

18             Q    Okay.  Okay.  The 90 or so documents that

19   you said you reviewed, some duplicates or others with

20   different redactions and such, are all of those

21   documents listed in your report as documents that you

22   reviewed?

23             A    Yes, they are.

24             Q    Are there any documents that you reviewed

25   in order to prepare your report that are not listed and

James J. Farley                                June 28, 2010

Page 45

1    identified in your report?

2            A    My offhand answer is no.

3            Q    Are there any documents that you -- and

4    did you review every document that you received from the

5    Miller Firm?

6            A    Yes.

7            Q    Are there any documents that you received

8    from the Miller Firm that are not listed in your report?

9            A    No.

10           Q    The thumb drive that you have today that

11   we're going to do something with, are there any

12   documents that relate to your engagement in this

13   litigation that are not on that thumb drive, stored

14   somewhere else perhaps?

15           A    Documents that relate to this -- I'm

16   pausing answering the question because I would go to the

17   FDA Web site and look at certain things to make sure I

18   had the proper definitions.

19           I would look at some slides and presentations

20   that I've done in lectures to make sure that I said the

21   same thing or that I wasn't misleading any readers.  But

22   not counting that part my answer is I reviewed every

23   document.  There's nothing that I received that I didn't

24   review.

25           Q    Well -- and I guess I want to make sure.

James J. Farley                                      June 28, 2010

                                                        Page 46

 1   Are there any documents perhaps -- you identified what
 2   you don't want to call drafts, but various versions of
 3   your analysis of various documents.
 4           Are there any of those documents that you
 5   prepared, analytical type documents, that are not on
 6   that thumb drive?
 7       A   I'm thinking.  My answer is no.
 8       Q   Okay.  So every document that reflects
 9   your analysis of the materials you received as part of
10   your engagement in this litigation, notes and everything
11   is on that thumb drive?
12       A   Every document?
13       Q   Yes.
14       A   I'm pausing again because I would go to
15   the FDA Web site and look just to make sure certain
16   definitions.  I would look at some of my other work, the
17   slides from lectures that I've given, to make sure that
18   this is what I said and refresh my memory.
19           And they're on the C drive and not on here.
20   But what I call official documents relevant to the case,
21   my answer would be no.  There's nothing -- maybe we
22   ought to go back to the question again.
23       Q   Yeah.
24           MR. ANDERTON:  Can you read that back,
25       please?

James J. Farley                                      June 28, 2010

                                                            Page 47

 1            (The record was read back as requested.)
 2    BY MR. ANDERTON:
 3            Q   And the key there, Mr. Farley, is
 4    documents that reflect your analysis or your work
 5    product.
 6            A   Documents.  I'm -- then my answer is
 7    everything is on there.
 8            Q   Are there -- are your notes on there?  Did
 9    you take notes?  Let's start with that.  Did you take
10    any notes as you -- you know, you've described reviewing
11    documents, preparing some sort of report on that review.
12            Did you first take notes before you prepared
13    the review?
14            A   I might during a review just jot something
15    down, a word, a key phrase, and then I type the review.
16    And I look down, word or key phrase, sometimes to make
17    sure I got the word itself right and sometimes maybe
18    just a spelling.  And then I type it, it will look good,
19    and at that time toss the notes out, because that's all
20    they were for.
21            Q   Okay.  So you didn't keep any of those
22    notes?
23            A   I did not.
24            Q   Do you -- did you mark up or write on any
25    copies of the documents you received from the Miller

James J. Farley                                    June 28, 2010

```
                                                          Page 48
  1   Firm?

  2            A    Yes.

  3            Q    Did you bring those marked-up copies --

  4   well, did you keep those marked-up copies?

  5            A    Everything is in the case, the black

  6   suitcase and/or the tote.

  7            Q    Okay.  So if you wrote up -- wrote on or

  8   marked up a document that you received from the Miller

  9   Firm and -- or as you reviewed it, that marked-up copy

 10   is with you here today?

 11            A    Yes.

 12            Q    Okay.  Have you ever been involved in any

 13   consulting -- have you ever provided consulting services

 14   that related in any way to the manufacture of Digitek?

 15            A    No.

 16            Q    Ever been involved in any case that

 17   related to -- that related to Digitek in any way?

 18            A    No.

 19            Q    Did you review the Digoxin product label

 20   in this case, the Digitek product label?

 21            A    I'm not sure.  I really just don't

 22   remember.

 23            Q    You don't remember because you don't

 24   remember that it was -- whether it was one of the 90 or

 25   so documents you received from the Miller Firm or just
```

James J. Farley                                    June 28, 2010

Page 49

 1   don't remember?

 2           A    Once I knew that was a product that was

 3   either this case or part of it, I would look in the

 4   Physicians' Desk Reference to -- I will look at the

 5   molecule.  I would want to learn more about it, what

 6   it's used for, various aspects of it.  I would do that.

 7           Q    Other than the Physicians' Desk Reference

 8   what other medical literature did you review to prepare

 9   your report and the drafts -- or not -- I'm sorry -- not

10   drafts but the different reports you prepared along the

11   way?

12           A    Can I look in the report?

13           Q    You certainly may.

14           A    Some of them I could tell you offhand, but

15   for accuracy I think I better read the report.

16           Q    Please.  Mr. Miller will tell you I'm a

17   slave to accuracy.

18           A    That's what it's all about.  Why be here

19   if we're not going to be accurate?

20           Q    I couldn't agree more.

21           A    On page 16 and carrying over to page 17 --

22           Q    And so that we're clear, Mr. Farley -- I

23   apologize for interrupting you.  But you're talking

24   about pages 16 carrying over onto 17 of your report?

25           A    Dated -- my report dated June 14th.

James J. Farley                                    June 28, 2010

Page 50

1          Q    Your final report?

2          A    Yes.

3          Q    Is that a fair characterization?

4          A    Up to now it is my final report.

5          Q    Okay.  Well, you say up to now.  Do you

6     have any intention of revising it?

7          A    Not on my account, not unless you say so.

8     No, I don't have any intention to revise it.

9               THE VIDEOGRAPHER:  Mr. Michael, I need to

10          go off record and change tape, please, sir.

11               MR. ANDERTON:  Okay.

12               THE VIDEOGRAPHER:  We're off record at

13          10:09.

14               (A brief recess was taken.)

15               THE VIDEOGRAPHER:  It's 10:18 a.m.  This

16          is the beginning of Tape 2 in the deposition of

17          James J. Farley.

18     BY MR. ANDERTON:

19          Q    Welcome back, Mr. Farley.  Thanks for

20     coming back.  You were I think when the tape ran out

21     giving testimony about information on pages 16 and 17 of

22     your final report.  And I guess I just want to ask one

23     final question or maybe two.

24               But the medical literature and other

25     references identified in -- or on pages 16 and 17 of

James J. Farley                                    June 28, 2010

 1    your report, in your mind is that the total -- is that

 2    the complete list of resources other than documents you

 3    received from the Miller Firm that you reviewed in order

 4    to prepare your report?

 5            A    I'm thinking here.  I'm relying on my

 6    knowledge, looking at perhaps some of my presentations,

 7    because I do instructional training that are not --

 8    these are books or what we would generally classify as

 9    documents.

10            So if I say yes for the documents, I would

11    like to have as an exception from that any lecture

12    materials I might have used, because I flip through them

13    and look real quickly to check something, put it back

14    and I just didn't write it down.

15            Q    What -- well, then let's test your recall.

16    What of your lecture materials do you recall reviewing

17    as part of your work in this case?

18            A    Among others, it's called CAPA, C-A-P-A,

19    Corrective Action/Preventive Action.  That's a program

20    within the GMP, Good Manufacturing Practices structure.

21    I looked at that.

22            I looked at forms that I designed for clients

23    on how to handle deviations, forms I designed for

24    clients on how to handle out of specification results.

25    I looked at a lecture I gave on root cause analysis,

James J. Farley                                    June 28, 2010

Page 52

1    which is part of deviations and out of specifications

2    results, all under the Corrective Action/Preventive

3    Action umbrella within GMPs.

4            I would flip to them, just take a quick glance

5    and didn't bother noting it on here.  But -- and there's

6    any number of things.  That's just part of it.

7            Q    Okay.  And if we -- and I'm not saying

8    that we definitely want to, but if we wanted to ask you

9    to go back and identify and produce as many of those as

10   you could definitively identify as something you

11   reviewed as part of this case, you could do that?

12           A    I could do it.

13           Q    Okay.  For at least some of them, I

14   presume?

15           A    Those that I remember --

16           Q    Right.

17           A    -- and those that you want, yes.

18           Q    Okay.  Going back a little bit, we talked

19   about what you would do at the beginning of a typical

20   engagement for a pharmaceutical company.  And I believe

21   you said that you'd want to gather some additional --

22   not additional, gather some initial information and then

23   prepare what you described as a proposal so that you and

24   the prospective client are on the same page about the

25   scope of the engagement.

James J. Farley                                    June 28, 2010

Page 53

1                Do you remember that testimony?

2        A    Yes.  Yes, I do.

3        Q    Did you do that in this case?

4        A    I wasn't called by Actavis to help

5   Actavis.

6        Q    I understand.  You were contacted by

7   Dr. Smart, who apparently had the front end or direct

8   initial contact.  But then you were contacted by

9   Mr. Miller or somebody from his firm within a day or two

10  after that, correct?

11       A    Yes.

12       Q    Did you talk to Mr. Miller or someone from

13  his firm about the scope of your work or potential work

14  in this litigation and did you prepare a proposal and

15  submit it to him?

16       A    I didn't prepare a proposal and submit it

17  in this case that way, because my discussion with Peter

18  Miller, as I was getting ready to ask the questions, he

19  said, I have a binder of documents I will Fed Ex to you.

20  To which I said, what does it have in it?  Does it have

21  483s, anything like that?  And he said yes.

22            Fine, send me the documents, I will look at

23  them and then determine what questions I have.  Jumping

24  for a moment, if I may, if I were going in to help a

25  firm and defining the scope of work, I would say to the

James J. Farley                                June 28, 2010

                                                    Page 54

 1   firm, I want to know the results of your most recent

 2   internal audit and I want to know the results of the

 3   most recent two FDA inspections that you have.  And that

 4   would give me a feel.

 5            I didn't have to ask that in this case,

 6   because when Pete Miller and I talked on the phone and

 7   he said, I'll send you documents, I'll Fed Ex them,

 8   okay, I'll look at them and then see, the questions that

 9   I normally would have asked were answered by the

10   documents that were contained in the binder.

11            Q    Okay.

12            A    Did I put it in the proper perspective?

13            Q    Yes.

14            A    Okay.

15            Q    You've described four shipments containing

16   perhaps five binders of documents --

17            A    Yes.

18            Q    -- all selected by Mr. Miller or somebody

19   on -- associated with Plaintiffs' counsel, correct?

20            A    Yes.

21            Q    Did you ask for any specific documents

22   other than those that you received from Mr. Miller in

23   these binders?

24            A    As we went along when I received the first

25   binder -- let me start with the first binder, which had

James J. Farley                                          June 28, 2010

                                                              Page 55

 1    25 tabbed sections.  And it had Establishment Inspection

 2    Reports, 483s, various things on the list here in the

 3    report.

 4              And I would start reviewing them and preparing

 5    the individual electronic files, the ones that are on

 6    the drive, on them.  And then I would call Pete Miller

 7    and say, here's what I've got, do you have such and

 8    such, do you have this.

 9              And the answer might be, we're in the process

10    of getting them for you, keep working on what you've

11    got, when we get them we'll send them to you.  So there

12    was dialogue intermittently all along.

13         Q    Was any of that -- did you make any of

14    those requests in writing?

15         A    No.

16         Q    E-mail?

17         A    Maybe e-mail.

18         Q    So you did have e-mail communication with

19    Mr. Miller or with somebody from his firm starting

20    during the period let's say December 2009 through today?

21    You've have e-mail communications?

22         A    Yes.

23         Q    Do you have those e-mails?

24         A    I did not print them out and bring them

25    here.  Much of it was scheduling or when to expect

James J. Farley                                    June 28, 2010

                                                      Page 56

1    another package.  All my results I would confine to the

2    reviews, the individual reviews, each of which is the

3    electronic file, and to the report.

4            Q    Are those e-mails on that thumb drive?

5            A    No.  I just didn't think to save them,

6    because --

7            Q    Well, I guess I want to make clear, you

8    just -- a moment ago you -- the concept of saving them.

9    Do you still have those e-mails?

10           A    Not saved, per se.  If someone went into

11   my PC in the home office they would probably find them.

12   But they're not where I could pull them up.

13           Q    Okay.  Are they -- I take it you have --

14   what is your e-mail account?

15           A    AOL.

16           Q    Are they just in your AOL in-box

17   somewhere?

18           A    30 days --

19           Q    30 days.

20           A    -- and then --

21           Q    So your belief is any e-mail that you

22   would have received more than 30 days ago you no longer

23   have?

24           A    Correct.  But can I add something to that?

25           Q    If you like.

James J. Farley                                          June 28, 2010

Page 57

 1            A    If it was an e-mail that I perceived had

 2    direct relevance to my evaluation of the data, I would

 3    have saved it and printed it out.  Much of them were I

 4    might get something from Nia saying, Pete's out of town,

 5    he'll get back to you in such and such or --

 6            Q    From whom?

 7            A    Nia, N-I-A, last name Barton, B-A-R-T-O-N.

 8            Q    And who is that?

 9            A    She is either a secretary or paralegal to

10    Pete Miller.  And there was some scheduling.  I might

11    send an e-mail, Pete, do you know when the deposition

12    will be scheduled, simply for scheduling.  And since it

13    was scheduling and in my mind they had no basis for my

14    evaluation of this case, I didn't bother saving them.

15            Q    Okay.  When you asked for additional

16    documents, did you ask for any Digitek batch records?

17            A    Yes.

18            Q    Did you get them?

19            A    I got one, the batch in question, I

20    believe.

21            Q    Okay.  So let's make that clear.  As I

22    read your -- the list of documents in your report, did

23    you get a batch record or did you get records that

24    relate to that batch?  And you understand the

25    distinction?

James J. Farley                                                June 28, 2010

Page 58

 1              A    I understand the distinction.  I got batch
 2    records.
 3              Q    You did?
 4              A    Yes.
 5              Q    Okay.  So you saw the actual production.
 6    Was that batch record contained within a larger
 7    investigation report?
 8              A    No.  That is one I got by e-mail.  And I
 9    downloaded it and I have it on my file.
10              Q    Okay.  Do you happen to recall off the top
11    of your head that that is Batch 70924?
12              A    Since you've named it it rings a bell, and
13    I believe that is it.
14              Q    Okay.  And when you said the batch in
15    question a moment ago, do you mean the batch where
16    during manufacturing some tablets that were defectively
17    thick were found?
18              A    Is that 70924?
19              Q    70924.
20              A    Yes.
21              Q    So the batch you asked for and received,
22    one set of Digitek batch records, and that is the
23    records that relate to the batch that had the -- what
24    people have commonly referred to as the double thick
25    tablets?

James J. Farley                                          June 28, 2010

Page 59

 1              A    Yes.

 2              Q    Is that the only Digitek batch record you

 3    reviewed as part of your engagement in this litigation?

 4              A    Yes.

 5              Q    Is that the only Digitek batch record you

 6    received as part of your engagement in this litigation?

 7              A    Yes.

 8              Q    Mr. Farley, I've handed you a document

 9    that has been marked as Defendants' Exhibit 74.

10              Have you seen that document before?

11              A    Yes.

12              Q    That's a notice of the deposition here

13    today?

14              A    Yes.

15              Q    And attached to it if you go all the way

16    back -- it should be attached but is not.  Oh, I'm

17    sorry.  It's in the -- on the first couple of pages.

18    You see there's a list of documents that you are

19    requested to produce?

20              A    Yes.

21              Q    Did you read that list before you came

22    here today?

23              A    Yes.

24              Q    You're showing me a copy that has check

25    marks on it and that is marked up.

James J. Farley                                          June 28, 2010

Page 60

```
 1              A    And I made little notes of what -- the
 2      proverbial thumb drive.
 3              Q    Okay.
 4              A    That's what --
 5              Q    You know what?
 6              A    You want it?
 7              Q    I do.
 8              A    You can see it.
 9              Q    I do.
10              MR. ANDERTON:  Can we mark this?  And
11        we're just going to mark it 74A, the follow-up
12        practice of Mr. Moriarty.  I don't like it but --
13              MR. MILLER:  Wouldn't it be 74B?  You
14        wouldn't call it A.  You'd call it 74B.
15              MR. ANDERTON:  I said it's not my
16        practice, so --
17              MS. DOWNIE:  Well, we have 74, right?
18              MR. ANDERTON:  Yeah, we have 74.
19              MS. DOWNIE:  And then we would have --
20              MR. ANDERTON:  But we don't have 74A.
21              MS. DOWNIE:  And then 74A.
22        (Defendants' Exhibit No. 74A was marked.)
23              MR. MILLER:  Not to mention we jumped
24        from 45 to 74.
25              MR. ANDERTON:  Well, Pete, I warned you
```

James J. Farley                                          June 28, 2010

Page 61

```
1      about that.
2              MR. MILLER:  Yes, you did but I still had
3      to throw it in.
4              THE WITNESS:  Was there anything attached
5      to it?  I handed you everything without looking at
6      what might be behind it.
7              MR. ANDERTON:  Let me take a look and we
8      will only mark --
9              MR. MILLER:  There's another copy of the
10     report.
11             MR. ANDERTON:  Is it the final copy?
12             THE WITNESS:  June 14th?
13             MR. ANDERTON:  Does it say June 14th?
14             MR. MILLER:  The second page in the first
15     paragraph.
16             THE WITNESS:  If that says June 14th
17     that's the extra copy I printed out for anyone who
18     may need it.
19             MR. ANDERTON:  Well, the copy that I
20     have -- I thought it had the date right on the
21     front.  It does.  Oh, this one does, too.
22             THE WITNESS:  Left side, lower left.
23             MR. ANDERTON:  So I'm going to give that
24     back to you and we're going to mark only the
25     notice that you took and -- or that you received
```

James J. Farley                                          June 28, 2010

Page 62

1          and that you made comments on, or put some notes
2          on.
3    BY MR. ANDERTON:
4          Q    So anyway, my question, Mr. Farley, my
5    first question is -- and I'm looking at the -- what's
6    been marked as 74A.  And I'll give that back to you to
7    hold for a moment.
8          Is it correct to say that you reviewed this
9    notice carefully?
10         A    Yes.
11         Q    And that you checked your files to see
12   whether you had any documents that were responsive or
13   that were described by the categories on that notice?
14         A    Yes.
15         Q    Have you brought with you today all
16   documents that are responsive to that notice?
17         A    To the best of my eyes those that were
18   available.  You see here I put not all e-mails are
19   printed.
20         Q    Okay.
21         A    But in accordance with the way our
22   discussion has been going I will give you a qualified
23   yes.
24         Q    Okay.  May I see that just for one second?
25         A    Yes.

James J. Farley                                         June 28, 2010

Page 63

```
 1              Q   I see some notes on here.  Category No. 6
 2    asks you to produce all bills that the witness -- that
 3    you've rendered to attorneys and law firms.
 4              Do you have those invoices with you?
 5              A   On the thumb drive.  They're timesheets.
 6    I submit timesheets to Nigel and Denise Smart.  I e-mail
 7    them.  The week ends on a Saturday and I e-mail them
 8    usually on Monday morning.  And that's the way we do it.
 9    I don't prepare a specific invoice in this case for
10    Smart Consulting Group.
11              Q   Okay.  I see a comment next to -- well,
12    let's stay with the invoices for a second.  There's two
13    sets of notes here, one that says 450 and one that says
14    20,700.  Can you tell me what those notes mean?
15              A   Oh, sure.  Those notes, it tells me --
16    that should be 4,050.
17              Q   4,050?
18              A   That's an error on my part.  If I were
19    inspecting me I would write that up because that's a
20    wrong number.
21              Q   That notice would be adulterated.
22              A   I have received for 27 hours' work at
23    150 -- that's right -- 4,050.  I had at that moment 138
24    hours outstanding, or 20,700 dollars owed to me by Smart
25    Consulting Group.
```

James J. Farley                                          June 28, 2010

Page 64

1          Q    And does that mean that the total work you
2    had performed as of the time you did these -- had
3    performed as of the time you did these calculations is
4    the 20,700 plus what should be 4,050?
5          A    As of the time I wrote them.  And if you
6    want to be up-to-date, add 19 hours for last week.
7          Q    Okay.  So 19 times 150, that's just shy of
8    3,000 dollars, if my math is correct.  Let's call it
9    2,850.
10         A    Yes.
11         Q    Plus 4,050, plus 20,700?
12         A    Yes.
13         Q    Okay.  I see a note on here that says with
14   respect to No. 5, retainer agreements.  You've got a
15   verbal agreement with the Smart Consulting Group?  Tell
16   me that about.
17         A    Well, I have a confidentiality agreement
18   with them.  But Nigel will just call me up and say, Jim,
19   are you available for a project?  What are you talking
20   about, Nige?  I mean, we've known each other for a dozen
21   years now.
22              What are you talking about?  Well, it involves
23   this, it involves this, involves this.  Okay, fine, it
24   sounds like I've got the time for it, let's pursue it,
25   who should I call or who should call me.  That's the way

James J. Farley                                                     June 28, 2010

Page 65

1    we work it, as I do with some other consulting firms,

2    too.

3              Q    When you said a moment ago it sounds like

4    you've got the time for it, is that the only

5    consideration you used to determine whether you're going

6    to take an engagement like this one?

7              A    No, it's not the only consideration.  It

8    would be the engagement itself.  But if I didn't have

9    the time for it, I couldn't handle it and it wouldn't be

10   fair to tell them I could.

11             Q    I'm looking at another document that was

12   part of the stack of documents that you gave me.  And

13   before I mark this, it looks like it's a resume' but

14   it's not labeled the same.  And I can look at it and

15   initially see that it might -- sorry for --

16             A    That's okay.  That's all right.

17             Q    Is this the same thing as the CV that you

18   attached to your report?

19             A    That should be essentially the same thing.

20   I may have in the report added my association with the

21   Skidaway Institute of Oceanography here and with

22   Memorial Health, The Cancer Research Institute.

23             I have affiliations with them, board member of

24   one, safety -- and I believe -- and I'll be able to

25   answer that in another second if I can just look down at

James J. Farley                                          June 28, 2010

Page 66

1    this.

2              Q    Okay.

3                   MR. MILLER:  Take your time.

4              A    Yes.  What I did -- this is my CV as I had

5    it on my computer.

6              Q    Okay.

7              A    And since I just finished a three-year

8    tenure on the board of the Skidaway Institute of

9    Oceanography associated with the University of Georgia

10   and since I am now on the institutional biosafety

11   committee of Memorial Health, I figured I ought to put

12   them on there.  So this is what I work with.  I added

13   those two things to it and put it on the CV that's in

14   the report.

15             Q    The CV then that is attached to the report

16   is essentially updated and current.

17             A    Yes.

18             Q    Is that correct?

19             A    Yes.  It's that plus those two things I

20   mentioned.

21             Q    And the date on the bottom of this is

22   April of 2010.  I'm going to go ahead and mark this.

23                  MR. ANDERTON:  Can you mark that 74B,

24        please.

25        (Defendants' Exhibit No. 74B was marked.)

James J. Farley                                    June 28, 2010

                                                        Page 67

1                    MR. MILLER:  Mike, may I see the report?

2                    MR. ANDERTON:  You may.

3                    MR. MILLER:  Thanks.

4                    MR. ANDERTON:  Take your time.

5        BY MR. ANDERTON:

6              Q    So, Mr. Farley, I'm not going to spend any

7        time on this.  What's now been marked as 74B is your CV

8        as it existed as of April 2010?

9              A    Yes.

10             Q    And you've since updated it?

11             A    Yes.

12             Q    When did you prepare the updated resume',

13       or CV?

14             A    As I was preparing the report I just

15       thought, gee, there's something I should add, I've been

16       associated with these two institutions, which are

17       recognized as pretty good institutions down here, and I

18       thought, well, I ought to put them on it.  It was that

19       simple of a deal.

20             Q    Okay.  I see in your CV a reference to --

21       hold on one second.  If you'll pick up Exhibit 44 with

22       the difficult to read exhibit sticker.  All right.  On

23       page 24 I see a reference to your taking a course in --

24       or titled FDA Law and Evidence Development.

25             A    Yes.

James J. Farley                                          June 28, 2010

Page 68

1            Q    Do you see that?

2            A    Yes.

3            Q    Tell me what that was.

4            A    That was two weeks in Bandera, Texas, near

5    San Antonio.  And it's a course where certain people,

6    generally if they're grooming you for more things, you

7    go down and you take that course.

8                 You're there in Bandera, Texas, for two weeks.

9    You have your own cabin.  You have your own homework

10   assignments working with other students who are FDA

11   personnel from other districts.

12                And the first week you're taught by FDA people

13   and the second week every instructor is an attorney.

14   All lawyers teach you.

15           Q    Teach you what?

16           A    They teach you the laws associated with

17   evidence development or, as it says, law and evidence

18   development courses.  They're not trying to make you

19   lawyers.

20                They're trying to say from their point of view

21   if you have a sample that you're bringing in, here's the

22   way it is, put the seal on it, make sure that the seal

23   is signed.

24                They tell you how to handle the sample and

25   other procedures, how to talk to people at firms, the

James J. Farley                                        June 28, 2010

Page 69

1    associated paperwork to make sure that the Department of

2    Justice would then have a case that would be suitable

3    for court.

4              Q    So it's teaching FDA personnel how to

5    conduct themselves in the field so that the legal staff

6    can use what they collect and identify during an

7    inspection?

8              A    I would say just like you said, but I

9    would not say the field.  FDA personnel anywhere, any

10   time, any situation to help the attorneys have a strong

11   case.

12             Q    Okay.  You've written two books.

13             A    I have two published.  I have some more

14   sitting.  I have two published.

15             Q    You've published two books.

16             A    I have had published.  They have been

17   published by CRC Press.  They're not self-published.

18             Q    I understand.  You've had two books

19   published.  Is that the best way to say it?

20             A    Yes.

21             Q    Okay.  Do either of those books relate to

22   the issues on which you gave your opinion in this

23   litigation?

24             A    No.

25             Q    Mr. Farley, I have handed you a document

James J. Farley                                    June 28, 2010

Page 70

1    that is marked as Defendants' Exhibit 46.

2              A    Yes.

3              Q    Have you seen that document before?  Take

4    a moment or as long as you need to flip through it and

5    determine whether you can -- or figure out whether you

6    can answer my question as to whether you've seen it.

7              A    I'm one of the authors.

8              Q    Okay.  So that means, yes, you've seen

9    that before.

10             A    Yes, I've seen it.

11             Q    Tell me what it is.

12             A    Gene Brooks, who owns Brooks Law on York

13   Street in Savannah, and Jim Shipley, who at this writing

14   had just passed the Bar exam and works for Gene, and I

15   thought it would be good to join forces of a chemist who

16   used to work at FDA, pharmaceutical and stuff, and

17   attorneys.

18             I'm not familiar with Gene's cases, but I'd

19   have to assume that some of them might involve this.  So

20   we co-authored this, he quoting the USC, me quoting the

21   21 CFR.

22             We each quoted our own -- we brought our own

23   areas of expertise into it.  And it was published in

24   Trial Magazine, which is the publication of the American

25   Association of Justice, in November of '08.

James J. Farley                                    June 28, 2010

Page 71

1              Q    And you said a moment ago as you were

2    giving that answer he offered his input on the USC, you

3    on the CFR.

4              To be clear, that means -- by USC you mean

5    United States Code?

6              A    Yes, or in my words, he talked lawyer talk

7    and I talked chemist talk.

8              Q    Okay.  So -- and the CFR -- and I need to

9    be a little more methodical on how we break this down.

10   The CFR you referred to, that's the Code of Federal

11   Regulations?

12             A    Yes.

13             Q    So he offered his input on the law; you

14   offed your input on regulatory issues?

15             A    Yes.

16             Q    You didn't -- you're not a lawyer?

17             A    I'm not.

18             Q    Okay.  Do you know whether he represented

19   the law correctly?

20             A    Whether Gene represented the law

21   correctly?

22             Q    Yeah.

23             A    I assume he did.  I do not know if he

24   represented the law correctly.

25             Q    Okay.  The Food, Drug and Cosmetic Act,

James J. Farley                                          June 28, 2010

 1    that's -- if I say the Act will you understand that to

 2    mean that I'm talking about the Food, Drug and Cosmetic

 3    Act?

 4              A    Whenever our subject is general

 5    pharmaceuticals I would -- if I hear the Act I

 6    believe --

 7              Q    Okay.

 8              A    -- you mean the Food, Drug and Cosmetic.

 9              Q    Okay.  I will try to be diligent and use

10    the full name where I can, but if I get lazy and just

11    say the Act, I hope you'll understand by that I mean the

12    Federal Food, Drug and Cosmetic Act.

13              A    The Act is fine.

14              Q    Okay.  The Act provides certain minimum

15    standards.  We've talked a little bit about GMP

16    compliance and the area where you provide consulting.

17              GMP, which you have defined as Good

18    Manufacturing Practices, the minimum standards for GMPs

19    are set forth in the federal regulations, correct?

20              A    Yes.

21              Q    And that's the CFR that you referred to a

22    moment ago?

23              A    Title 21, 21 CFR.

24              Q    The GMP regulations are very general,

25    aren't they?

James J. Farley                                        June 28, 2010

                                                          Page 73

 1                MR. MILLER:  Object to form.

 2          A    I would say general.  I don't know if I'd

 3     say very general.  That's -- they're general.

 4          Q    Okay.  So they don't provide specific

 5     details about how every act related to manufacturing,

 6     testing and otherwise producing a pharmaceutical product

 7     is supposed to be performed?

 8          A    They do not.  May I say why they don't or

 9     would you rather me not yet?

10          Q    Well, the reason they don't is because

11     pharmaceutical companies are required to read and then

12     interpret the regulations and develop their own

13     procedures, correct?

14                MR. MILLER:  Object to form.

15          A    And then they submit them to FDA for

16     approval.  And once approved, they must adhere to what

17     they themselves submitted and we like to say do the

18     right thing the right way the same way every time.

19                That's why that the GMP say you have to do

20     such and such.  If you're a pharmaceutical firm you say,

21     I'm going to do it this way, time, temperature,

22     et cetera, and then you submit it.  And the FDA approves

23     it.

24                They approve it on the condition that you're

25     going to do the same thing exactly that way every time

James J. Farley                                          June 28, 2010

Page 74

1    the way you said, we looked at and approved.  And if you

2    ever don't do it that way you're in violation.

3              Q    Okay.

4              A    So that was a lengthy dissertation, but I

5    had to put it in proper perspective.

6              Q    Well, and I just want to make sure because

7    you didn't directly answer the question that I actually

8    asked.  You implicitly did, but I want to make sure that

9    this record is clear.

10             The pharmaceutical companies take the general

11   content of the GMP regulations and they develop their

12   own procedures which provide the precise detail on how

13   they're going to produce their products?

14             A    And then submit it for approval.

15             Q    Well, I need you to answer that question.

16   Correct?  They develop those procedures.

17             A    Okay.

18             Q    Is that a correct statement?

19             A    I want to hear that one more time.

20             Q    Is it a correct statement to say that the

21   pharmaceutical company -- a pharmaceutical company that

22   manufactures products in order to comply with the GMP

23   requirements is required to read the regulations and

24   then interpret those regulations and develop its own set

25   of procedures that they believe comply with the

James J. Farley                                      June 28, 2010

Page 75

1   regulations?

2           A    Yes.

3           Q    And then as you said, they submit their

4   interpretation, their procedures to the FDA for

5   approval.

6           A    Yes.

7           Q    They're required to comply with their own

8   procedures.

9           A    Yes.

10          Q    So when you talk about Good Manufacturing

11  Practices, you're not just talking about the federal

12  regulations.

13          A    Correct.

14          Q    You're talking about the regulations and

15  also any internal procedures developed by a

16  pharmaceutical company to interpret those regulations.

17          A    Yes.

18          Q    And interpretations are not uniform from

19  one company to the next, are they?

20          A    That's a tough one to answer yes or no.

21  Can you reword that?  If not, I'll just think a little

22  more and try to give you an answer.

23          Q    Well, if you want me to reword it I'll do

24  my best.  When a company reads the regulations and

25  develops its procedures they're not just copying

James J. Farley                                        June 28, 2010

Page 76

1    something somebody -- another company has done, correct?

2           A    Correct.

3           Q    So every company's interpretation of a

4    certain set of requirements can be different than --

5    or the specific -- let me start this over.

6                The procedures a company develops to interpret

7    and apply the regulations can be different than the

8    procedures developed by another company to interpret and

9    apply the exact same regulations.

10          A    If I can explain what I think you mean --

11          Q    Please.

12          A    -- then I can answer the question.

13          Q    Give it a shot.

14          A    If one company, assuming there's two firms

15   making the same product.

16          Q    Right.

17          A    One company selects a primary method of

18   analysis for product release and uses what they call

19   HPLC, high performance liquid chromatography, or a

20   chromatographic method for the purity.

21               And that method says you will take such and

22   such sample, you will prepare it this way, you will

23   dilute it this way, you will run it in this solvent, you

24   will do this and your answer must be no lower than this

25   percent, no higher than this percent.  Fine.

James J. Farley                                            June 28, 2010

Page 77

1            Now, if another company wants to make the same

2   product but says, I think I'll do an ultraviolet

3   spectrum method, they can develop their ultraviolet

4   spectrum method, which is vastly different than

5   chromatography, but they would have to say, I will take

6   my sample and I will dissolve it this way, weigh it this

7   way, I will scan it between this wavelength and that

8   wavelength, I will do the following calculation.  And it

9   must be, for example, 98 to 102 percent done that way.

10           Each of those could be submitted and could be

11  approved.  But each of them has to stick with what they

12  submitted.

13           Q   I agree with that.

14           A   So is that -- am I on track with answering

15  your question?

16           Q   You absolutely are.  So the short version

17  of that is the two companies that you're describing can

18  develop different methods for achieving the same

19  compliance with the same regulation, develop -- or

20  producing the same product?

21           A   Yes, provided they submit them, validated

22  and stick with them once they're approved.

23           Q   Understood.

24           A   Yes, sir.

25           Q   And the standards that -- or I'm sorry.

James J. Farley                                          June 28, 2010

                                                              Page 78

 1    The procedures that they develop, those can change over

 2    time?

 3              A    They --

 4              Q    They can change over time, correct?

 5              A    Not without approval.

 6              Q    But with approval they can change.

 7              A    With approval after the fact.  There's a

 8    system of doing it.

 9              Q    Well, and let me make sure that we're

10    talking about the same thing.

11              A    Yes.

12              Q    Are you talking about approval with

13    respect only to analytical methods or are you talking

14    about all practices and procedures a company utilizes to

15    manufacture a product?

16              A    Everything from raw materials received to

17    finished goods going out.

18              Q    Everything must be submitted and approved

19    by the FDA before any changes are made?

20              A    If you have a procedure that's been

21    approved and you want to use another procedure -- it

22    might be faster, more accurate, you think -- you have

23    to --

24              Q    Let me --

25              A    Go ahead.

James J. Farley                                      June 28, 2010

Page 79

1              Q    I want to make sure that we're talking

2        about the same thing.  So I apologize.

3              A    Okay.

4              Q    But I get the sense that you're using

5        procedure and when you use terms like faster and more

6        accurate, you're using chemistry terms.  You're still

7        kind of limiting your answer to an analytical method

8        type context.

9              A    No, I'm not.

10             Q    Okay.

11             A    No.

12             Q    If a company has a procedure for handling

13       documents, who they go to, how they're routed, whether

14       they're kept in secure storage, who has access to that,

15       an SOP that speaks to those issues, is that something

16       that has to be submitted to the FDA before it's changed?

17             A    For handling documents?

18             Q    Yes.

19             A    Record storage?

20             Q    It might not --

21             A    We're not talking about stability

22       testing --

23             Q    No, no.

24             A    -- storage, data that's important for

25       safety?

James J. Farley                                          June 28, 2010

                                                            Page 80

 1              Q    I'm just talking about --

 2              A    Record storage?

 3              Q    -- record storage, for example, batch

 4    records storage.

 5              A    You could --

 6              Q    Let's go through this.  Batch record

 7    storage.  When you produce a product you create a record

 8    reflecting that production process that's commonly

 9    referred to as batch record, correct?

10              A    Yes.

11              Q    And then documents that comprise a batch

12    record vary from one company to the next.

13              A    Yes.

14              Q    The batch records are kept by companies as

15    they manufacture products.

16              A    Yes.

17              Q    They're stored somewhere, I assume.

18              A    Yes.

19              Q    The methods for storing those batch

20    records, who has access to them, how they're stored,

21    whether they're stored electronically or in hard copy,

22    whether they're kept in a locked room, not kept in a

23    locked room, those methods are typically set forth in an

24    SOP, correct?

25              A    Yes.

James J. Farley                                          June 28, 2010

                                                              Page 81

1              Q    And SOP means standard operating

2     procedure.

3              A    Correct.

4              Q    You don't have to submit an SOP for that

5     to the FDA before you modify it, do you?

6              A    You do not.

7              Q    Okay.  So there are procedures that don't

8     necessarily have to be submitted to the FDA that a

9     company can change over time as it develops a better way

10    to do things or just decides it wants to do something

11    differently?

12             A    The example you gave, correct.

13             Q    There are other examples, right?

14             A    There are probably others, uh-huh.

15             Q    Probably a lot more.

16             A    Yes.

17             Q    Okay.

18             A    Everything I was talking about was in

19    direct manufacturing and testing line that would affect

20    the quality of a product.

21             Q    So you're talking about changing what

22    people in the industry typically refer to as the method?

23             A    Not just the test method.  It could be a

24    mixing procedure.

25             Q    Okay.

James J. Farley                                          June 28, 2010

Page 82

1              A    If someone got a new mixer and said, I
2     think I can mix for 30 minutes instead of 45, they would
3     have to run batches simultaneously, tell the FDA and
4     submit analytical data.  They couldn't just say this is
5     better, we think it's the same and use it.  That would
6     be a violation.
7              Q    And that starts all the way back at the
8     submission of, if you're a generic manufacturer, the
9     NDA -- the -- I'm sorry -- the ANDA --
10             A    The ANDA.
11             Q    -- the Abbreviated New Drug Application.
12             A    Yes.
13             Q    The specific methods, not just analytical
14    methods, but the techniques that a company is going to
15    use to manufacture that product, have to be set forth
16    and then submitted to and approved by the FDA.
17             A    Yes.
18             Q    And so going forward from there, any
19    changes to those techniques have to be submitted to and
20    approved by the FDA.
21             A    Yes.
22             Q    But there are any number of SOPs that are
23    relevant to a pharmaceutical company's operations that
24    are mandated by Good Manufacturing Practices regulations
25    that a company can change without submitting it to the

James J. Farley                                              June 28, 2010

                                                                  Page 83

 1    FDA.

 2              A    Yes.  I would say in the case that you

 3    just gave, record storage as opposed to data

 4    acquisition, data acquisition where you're getting data

 5    relevant to the identity, strength, quality and purity

 6    of the compound, that has to be approved.  But record

 7    storage, that would not have to be.

 8              Q    Okay.  If a company doesn't comply with

 9    the procedures that are in place to manufacture a drug,

10    does that mean that drug is adulterated?

11              A    If the company doesn't comply with the

12    procedures?  I believe that's defined in the Act as the

13    definition.  If a drug is not manufactured in accordance

14    with Good Manufacturing Practices it is considered

15    adulterated.  I believe the section is 501 or 502.

16              Q    Okay.

17              A    But, yes.  My answer is yes.

18              Q    Okay.  So the definition of adulterated in

19    the Act, the Food, Drug and Cosmetic Act, is focused on

20    non-compliance with the procedures that are in place to

21    manufacture that product.

22                   MR. MILLER:  Object to form.

23              A    Yes.  It's very broad, very broad.  If you

24    don't manufacture it according to GMPs it's adulterated.

25              Q    Well, and I want to make sure that what

James J. Farley                                          June 28, 2010

Page 84

1    you just said is clear in the record.  When you say if

2    you don't manufacture it in accordance to GMPs, you mean

3    if you don't comply with the GMPs while you're

4    manufacturing it then it's adulterated.

5              A    While you're manufacturing it.

6              Q    Or if you don't comply with the GMPs

7    either while you're manufacturing it or in some aspect

8    of the production then the drug is adulterated.

9              A    Yes.

10             Q    Adulterated doesn't mean defective.

11                  MR. MILLER:  Object to form.

12             A    Adulterated means it's not, to use FDA's

13   terms, of the identity, strength, quality and purity

14   that you purport -- they like that term -- purport to

15   have and therefore, my words, you can't trust it to be

16   of the quality it's supposed to be.

17             Q    Well, adulterated actually doesn't mean

18   it's not of the identity, strength, quality and purity.

19   It means it wasn't manufactured according to the

20   processes in place to try to make sure it meets the

21   identity, quality, strength and purity.  Isn't

22   that right?

23                  MR. MILLER:  Object to form, misstates

24        his previous testimony.

25             A    Yes.

James J. Farley                                         June 28, 2010

Page 85

1           Q    Okay.  So adulterated doesn't actually
2    mean the drug doesn't meet the identity, strength,
3    quality and purity it is supposed to have, correct?
4                 MR. MILLER:  Objection, asked and
5          answered.
6           A    It means it can't be guaranteed to have
7    that.  So are we saying the same thing?
8           Q    No, because I'm not sure that you're --
9    you can have a drug that's adulterated and -- well,
10   let's use an example.
11          If, if I have -- if I failed to comply with a
12   procedure in the course of manufacturing a drug that
13   relates to filling out a form or a part of the batch
14   record, if I have an SOP that says the batch record is
15   supposed to be filled out a certain way and I don't fill
16   out the batch record correctly, is that a violation of
17   GMPs?
18          A    Technically, yes.  Could I ask you to be
19   more specific in that case?  And I have a reason for
20   asking that.
21          Q    Well, what's your reason?
22          A    My reason is I saw -- it's a good example
23   of what we're discussing.  I saw a case where the
24   analyst put the initials and the reviewed by were the
25   same initials.  And you're not permitted to review your

James J. Farley                                    June 28, 2010

Page 86

1    own work.  It has to be someone else.

2              So that's a violation.  And technically that

3    material was not produced in accordance with GMPs,

4    because you had -- let's say a guy.  It could be a guy

5    or gal, those initials.  A guy writes his initials there

6    and then he reviews his own work.  And that's against

7    regulations.

8              Q    Okay.  So that --

9              A    That's what I was thinking of when you --

10             Q    And let's use that example.  That product

11   technically is adulterated.

12             A    Because it was not produced in accordance

13   with GMPs, yes.

14             Q    It doesn't mean it is defective.

15             A    It doesn't guarantee it's defective, but

16   it leads you to question, you didn't make it the way you

17   said you did, why didn't you make it right.

18             Q    But the bottom line is that that product,

19   the fact that it's adulterated for the reason you

20   described does not mean the product is defective.

21                  MR. MILLER:  Object to form.

22             A    If I interpret that is there a possibility

23   that the product may still be good, then I agree with

24   you.

25             Q    Well, it's more than just a possibility,

James J. Farley                                    June 28, 2010

Page 87

1    right?  I mean, in that case -- what I'm trying to

2    establish, Mr. Farley, is you've got a circumstance that

3    you described where if you apply a literal reading of

4    the regulations that product is adulterated.

5           A    Yeah.

6           Q    To determine whether the product is

7    defective you'd have to actually test the product,

8    right?

9           A    Yes.

10          Q    So to determine whether the product is --

11   was actually manufactured within the specifications for

12   the product, you'd have to test it.

13          A    To determine if it was actually

14   manufactured within the --

15          Q    Yes, whether it actually has --

16          A    Whether it is what it's supposed to be?

17          Q    Yes.  You have to test it.

18          A    Yes.

19          Q    So the fact that it's adulterated doesn't

20   tell you whether it's within specification.

21          A    It does not tell me it's within

22   specifications, but I -- if a firm said to me, look at

23   this contract manufacturer, and I went to the contract

24   manufacturer that my client firm wanted me to give an

25   opinion on and I saw that, why are you doing this?  Why?

James J. Farley                                    June 28, 2010

                                                      Page 88
1    I mean, how do I know to trust you with anything else
2    you're doing?  You're fouling up here.  And my
3    recommendation would be to the pharmaceutical firm,
4    don't deal with them, because --
5              Q    You've really --
6              A    -- it leads you to wonder.
7              Q    Because one -- non-conformance with one
8    practice or procedure you'd recommend not dealing with
9    them at all?
10             A    I recommend not dealing with them until
11   they found out why and what the reason was for it and I
12   would -- I've done it.  I've said to a firm, I would
13   seriously consider not dealing with Contract
14   Manufacturer A and here's the reason, it's in my report.
15             Q    Well, and don't -- let's take it out of
16   the context of a company potentially dealing with a
17   contract manufacturer.
18             A    Okay.
19             Q    Let's just deal with a company that's
20   manufacturing products.
21             A    Everything in-house.
22             Q    Right.  So if a product is adulterated --
23   we've already established that doesn't mean it's
24   defective -- it doesn't say anything about whether it's
25   safe or unsafe either, does it?

James J. Farley                                              June 28, 2010

                                                                Page 89

 1                    MR. MILLER:  Object to form.

 2            A    It doesn't say definitely that's it's safe

 3    or unsafe.

 4            Q    It doesn't say anything about whether it's

 5    safe.  You'd have to test the product to make that

 6    determination.

 7            A    Yes.

 8            Q    I'd like to talk a little bit about some

 9    of the things in your article.  If you'd pick up

10    Exhibit 46, please.

11            A    I have it.

12            Q    Give me one second.  This is what happens

13    when you leave your highlighted copies.  You said a

14    moment ago that the procedures a company is going to use

15    to develop its -- or to produce its drugs are submitted

16    to and approved by the FDA; is that correct?

17            A    Yes.

18                    MR. ANDERTON:  Let's take a couple of

19        minute break.  We're about -- we're about there,

20        aren't we?

21                    THE VIDEOGRAPHER:  Yes, sir.

22                    MR. ANDERTON:  Okay.  Let's take a couple

23        of minutes and then I can get a little more

24        organized on this.

25                    THE VIDEOGRAPHER:  We're off the record

James J. Farley                                    June 28, 2010

Page 90

1          at 11:11.

2                    (A brief recess was taken.)

3                    THE VIDEOGRAPHER:  It's 11:20 a.m.  We're

4          back on record and this is the beginning of Tape

5          No. 3 in the deposition of James J. Farley.

6    BY MR. ANDERTON:

7                    Q   Mr. Farley, if you will pick up the

8    article, your -- the article that you co-authored and

9    look at the first page.  It's -- and I'm talking about

10   Exhibit 46.

11                   You see the bottom, the very bottom of page 1

12   and continuing on to page 2, the last sentence of that

13   last paragraph on page 1 reads, The FDA's acceptance of

14   submitted procedures is evidence, not conclusive proof,

15   of the reasonableness of the company's manufacturing

16   practices and procedures, and the trier of fact may

17   assign FDA approval the weight it deserves.

18                   Did I read that correctly?

19                   A   Yes, you did.

20                   Q   Do you agree with that statement?

21                   A   I'm going to read it one more time.

22                   Q   Take your time.

23                   A   Of course, I've known Gene since we moved

24   down here five years ago and I would be reluctant.  But

25   I'm going to do just like you said.

James J. Farley                                          June 28, 2010

                                                            Page 91

1              Q    Well, let me ask you first, is that
2     something you drafted or Mr. --
3              A    Gene Brooks.
4              Q    -- Brooks drafted?
5                   MR. MILLER:  Give him a chance to read
6         it.
7                   MR. ANDERTON:  I am.  I am.
8              Q    Take your time.  Why don't you go ahead
9     and review it as you need to.
10             A    When you get into terms like trier of
11    fact, that's Gene.  And -- but he -- sometimes we just
12    meet for lunch.  Other times he'd send me an e-mail.
13    And we look and he says, this is my statement, and I
14    say, well, yeah.  The FDA's minimum standards you have
15    to at least do this.  That's the way I would have wrote
16    that.
17             Q    Okay.  So it's minimum standards?
18             A    Yes.
19             Q    If you comply with the submitted
20    procedures, as the term used here, you submit procedures
21    and get them approved by the FDA.  If you comply with
22    those, have you achieved compliance with Good
23    Manufacturing Practices?
24             A    If you comply with every procedure -- and
25    I'm going to use my terminology again of raw materials

James J. Farley                                        June 28, 2010

                                                          Page 92

1    received to finished product.  If you comply with all of

2    them there are cases where companies comply in one area

3    and they in fact foul up or are violative in another.

4    That ruins the whole -- right on down the line

5    everything has to be in compliance.  Then, yes.

6              Q    Well -- okay.  But I guess I want to make

7    sure that you answered my question, Mr. Farley.

8              A    Okay.

9              Q    If you comply with the submitted

10   procedures, have you achieved GMP compliance?

11             MR. MILLER:  Objection, asked and

12        answered.  It's okay to answer.

13             A    If you comply with every one of the

14   submitted procedures that had been approved relevant to

15   the manufacturer of a given product then --

16             Q    Have you achieved GMP compliance?

17             A    Yes.

18             Q    And you believe that a jury could still

19   hold the manufacturer liable and award damages if

20   somebody achieved that compliance that you've just

21   described?

22             MR. MILLER:  Objection, misstates facts

23        in evidence and previous testimony.

24             A    I don't know what goes on in jury's minds.

25   I don't know how I can answer that.

James J. Farley                                        June 28, 2010

Page 93

 1           Q    Okay.  So you can't -- I guess that means
 2    you really can't speak to whether that sentence that I
 3    read regarding whether a trier of fact -- or regarding a
 4    trier of fact assigning its own weight, you can't agree
 5    or disagree with that?
 6                     MR. MILLER:  Object to form.
 7           A    Well, I will agree with anything that I
 8    wrote here.  But your question was what I thought would
 9    go on in a jury's mind and I have no idea what goes on
10    in a jury's mind.
11           Q    But you -- so then you agree with what's
12    written here?
13           A    I wrote it.  I have to.  Definitely.
14           Q    Okay.  So you think a jury can take a
15    company that's achieved GMP compliance and still hold it
16    liable?
17                     MR. MILLER:  Object to form, misstates
18        the testimony.
19           A    I'm not getting the connection of -- it
20    sounds like you're changing subjects on me.
21           Q    No.  I'm talking about this sentence.  If
22    you agree with it then you think that a jury can take a
23    company that is complying with Good Manufacturing
24    Practices and say, not good enough, we're going to hold
25    you liable.

James J. Farley                                    June 28, 2010

                                                        Page 94

 1                  MR. MILLER:  Object to form.  That's not

 2          what it says.

 3          A    I'm not deliberately trying to be evasive.

 4   I just -- I'm not getting it.  I'm not --

 5          Q    Do you agree with what I just asked?

 6                  MR. MILLER:  Object to form.

 7          A    I'm still going to ask you one more time.

 8                  MR. ANDERTON:  Can you read that back,

 9          please?

10          (The record was read back as requested.)

11                  MR. MILLER:  Mike, that's not what the

12          statement says.

13          A    If the company complied with Good

14   Manufacturing Practices on every approved -- FDA

15   approved procedure from raw materials in to finished

16   product out --

17          Q    Yeah.

18          A    -- and didn't turn the other way for any

19   other situation, like if a carton was broken putting on

20   a truck and they look the other way and said, forget it,

21   we're done, if they did that then they've done

22   everything in accordance with FDA regulations.

23          Q    Can a jury hold them liable for damages in

24   that context if a consumer takes their product and is

25   injured?

James J. Farley                                          June 28, 2010

```
                                                        Page 95
 1                    MR. MILLER:  Object to form.

 2           A   I can't predict what a jury would do.

 3    That's what I'm having trouble with.

 4           Q   I'm not asking you to predict what they

 5    will do.  Are they permitted to do that?

 6                    MR. MILLER:  Object to form.

 7           A   A jury is permitted to do whatever the

 8    judge tells them within the range.

 9           Q   And you think it's appropriate that a

10    company that achieves that absolute compliance that you

11    just described can be held accountable -- or can be held

12    liable for damages?

13                    MR. MILLER:  Object to form.  Mike,

14        you're misstating -- you're asking questions about

15        a statement that don't compare.

16           Q   Okay.  I'm asking a question that I think

17    flows directly from this sentence, so --

18           A   I'm pausing because I haven't seen a

19    company that has been in complete compliance ever get in

20    a situation like that.  When you're in compliance you

21    don't get involved in that thing.

22           Q   So if you're in compliance you never get

23    sued?

24           A   I can't say never get sued.  I say that in

25    my eyes if you're in compliance you are quite likely
```

James J. Farley                                        June 28, 2010

                                                            Page 96

1    making a quality product.

2             Q    That doesn't mean you can't get sued.

3                  MR. MILLER:  Object to form.

4             A    No.  You can get sued any time for

5    anything.  Whether it goes through or who decides what,

6    that's another story.

7             Q    If a consulting -- a prospective

8    consulting client -- well, let's not call it

9    prospective.

10            If you are hired by a pharmaceutical company

11   to consult as to how to avoid litigation -- have you

12   ever been hired to do that?

13            A    Specifically help me to avoid litigation?

14            Q    Yes.

15            A    No, not in those words, no.

16            Q    Okay.  If a company hired you as a

17   consultant to advise it how to achieve regulatory

18   compliance -- well, if a company -- let's -- I'm going

19   to not ask that question.  I'm going to start a brand

20   new question.  Okay?

21            If a company hired you and said, Mr. Farley,

22   we'd like you to tell us how to manufacture and produce

23   any product, it doesn't matter what the product is, and

24   we want to do it so that we minimize or eliminate the

25   possibility of getting sued by consumers, what would you

James J. Farley                                    June 28, 2010

Page 97

 1   tell them?

 2                MR. MILLER:  Object to form of the

 3        question.

 4            Q   What would your approach to that

 5   engagement be?

 6            A   Word for word the way you just presented

 7   it, I'd say, well, as far as getting sued, I don't have

 8   anything to do with that.  Anybody can sue you any time.

 9   You want to get in compliance, I'll talk to you about

10   getting in compliance.

11                As far as litigation, you talk to your

12   attorneys about that.  I will help you get in compliance

13   and then I would go through the procedures as how -- I

14   would be asking them records of their previous

15   inspections, their previous internal audits.

16                But I wouldn't answer it the way it was

17   phrased, because I can't tell whether you're going to

18   get sued or not.  I will say, I can give you -- I will

19   make you be in compliance -- I will help you be in

20   compliance, I'll show you how to do it.  And it would --

21   that would be it.

22            Q   And would you do that because if they were

23   in compliance they, as you said a few moments ago, they

24   don't find -- they wouldn't find themselves in that

25   situation or they'd be less likely to find themselves in

James J. Farley                                          June 28, 2010

Page 98

1   that situation?

2          A   I would relate the more you are in

3   compliance the less possibility of litigation coming

4   about or a lawsuit being filed against you.  I would

5   believe there's a relationship there.

6          Q   Okay.  Go to page 3 of this article,

7   please.

8          A   Okay.  I'm on 3.

9          Q   And I want to -- first I want to ask you

10  about the headings.  You've got -- on the first

11  heading -- actually there are no headings until you get

12  to page 3.  But then you start having headings,

13  Prefiling Investigations, Discovery, Standard Operating

14  Procedures, Documentation of Internal Plant

15  Construction, FDA Inspection Documents.

16         Do you see those headings?

17         A   Yes.

18         Q   You know, the title of this article,

19  Mr. Farley, is "Discovering the Cause of a Drug's

20  Defect".  It reads more to me like a how to manual on

21  how to sue pharmaceutical companies.

22         Am I mischaracterizing it by reading it like

23  that?

24              MR. MILLER:  Object to form.

25         A   I think that a person could interpret it

James J. Farley                                          June 28, 2010

Page 99

1   like that, but that was not my intent.  Gene and I

2   thought, let's put our heads together and let's write an

3   article.  Gene never expressed to me that it was his

4   direct intent.

5           We just thought it would be nice to work

6   together on an article and get it out into the industry.

7   And I thought it would be nice to work on something that

8   would appear in a law journal.

9           Q   Didn't care what the subject was or what

10  impression it might have?

11              MR. MILLER:  Object to form.

12          A   Didn't care.  That's a question mark,

13  didn't care.  There are certain ones I probably wouldn't

14  write, either not knowledgeable or just didn't care to

15  talk about.  But since it sounded like a good subject,

16  product liability, and we both had an interest in it, we

17  put our minds together and wrote it.

18          But it was not my intention and I believe,

19  knowing Gene and Jim the way I do, that -- and I'm

20  guessing here -- that it's not their intention to how to

21  sue manual.

22          Q   Well, knowing what you do, what -- do they

23  handle cases where consumers sue pharmaceutical

24  companies?

25          A   I don't know anything about Gene's cases.

James J. Farley                                              June 28, 2010

                                                             Page 100

1              Q    Nothing?

2              A    Nothing.

3              Q    You don't know anything about his cases?

4              A    I've never done work for Gene.  He's

5    referred me to other attorneys, one in particular in

6    town for whom I did some work.  But I have not worked

7    for him directly.

8              It's more of a -- I don't know if I should use

9    the word social, but just -- he was someone I met when

10   we first moved to Savannah and he clued me in on

11   different things in Savannah and we hit it off more as

12   friends.

13             Q    Okay.  Turn to page 3 of your article,

14   please.

15             A    I'm there.

16             Q    Do you see the paragraph under the

17   Prefiling Investigation heading, the third paragraph on

18   page 3?

19             A    It starts with the word Microbiological?

20             Q    No.  Do I have a different copy than you?

21             A    I'll show you mine.  That's what I've got.

22             Q    Third paragraph.  I'm sorry.  Not -- the

23   third paragraph on the page.  I didn't say that clearly.

24   My apologies.

25             A    It begins with, When a client?

James J. Farley                                      June 28, 2010

                                                      Page 101

1              Q    That's the one.

2              A    I'm there.

3              Q    It reads, When a client comes to you

4    suspecting that he or she has taken an adulterated drug,

5    you should tell the client to save the drug, the

6    container and all labeling and packaging information.  A

7    laboratory must analyze the drug and test for its active

8    pharmaceutical ingredient, paren, API, closed paren, and

9    for strength and purity.

10             Did I read those two sentences correctly?

11             A    Yes, you did.

12             Q    So if you think a drug is adulterated you

13   have to test it to determine whether it was defective.

14   We established that earlier, right?

15             A    Yes.

16                  MR. MILLER:  Object to form, misstates

17        previous testimony.

18             Q    Well, that's what this says, right?

19             A    Well, what -- to put that in perspective,

20   I remember we were talking about it and Gene said to me,

21   what's the first thing you do?  I said, if someone took

22   a drug and had some sort of adverse event, adverse

23   effect, and they thought something was wrong with it, if

24   you are going to represent them or anyone who wants to

25   learn more about the situation, either side, so to

James J. Farley                                    June 28, 2010

Page 102

1    speak, your best bet is that container, the remainder of

2    the material in it, and get data right there as opposed

3    to comparing it to something that was made at some other

4    time.

5            Q    Okay.

6            A    So that's what we were talking about here.

7    Your best bet is do you have the same container of

8    medication and what's the lot number.  And you can be

9    more specific in getting to the solution of the problem.

10           Q    And ultimately what you're describing is a

11   method to determine whether the product was defective.

12           A    Yes, for either side.

13           Q    Understood.  And you should make that

14   determination whether the product is defective before

15   you file a lawsuit, shouldn't you?

16               MR. MILLER:  Object to form of the

17       question.

18           A    That's for an attorney to judge, but I

19   would think so.  But I don't feel that -- I feel

20   attorneys are better qualified for that because they

21   represent their clients.

22           Q    Okay.  Can you sue a pharmaceutical

23   company just because you take a product that's

24   adulterated?

25               MR. MILLER:  Object to form of the

James J. Farley                                                    June 28, 2010

```
                                                          Page 103
 1        question.

 2             A    You being an individual?

 3             Q    A consumer, yes.

 4             A    Can you sue a pharmaceutical company just

 5   because you took a product that's adulterated?  That's

 6   between you and your attorney.

 7             Q    You don't know?

 8             A    Well, I know that anybody can sue anybody

 9   over anything any time in the U.S. today.

10             Q    Well, you also know --

11             A    So that would be yes.

12             Q    Well, but is adulterated -- well --

13             A    I think, if I can interject something --

14                  MR. MILLER:  Hold off.  There's no

15        question.  When he asks a question you can answer.

16             Q    Yeah, Mr. Farley, I appreciate that and

17   I --

18             A    I'm holding off.

19             Q    Okay.  Look at the heading on -- still on

20   page 3 that says Discovery.  Do you see that heading?

21             A    Yes.

22             Q    It's important to request and review

23   documents when you're considering whether you should --

24   whether you can and should sue -- well, take that back.

25                  It's important to request and review documents
```

James J. Farley                                          June 28, 2010

Page 104

 1    if you're trying to figure out whether you've got a

 2    claim against a pharmaceutical company, correct?

 3              A    Yes.

 4              Q    And that includes reviewing batch records.

 5              A    Reviewing --

 6              Q    Batch records.

 7              A    Batch records, yes.

 8              Q    I mean, you say in the article here that

 9    you should start by requesting a review of the batch

10    records; is that right?

11              A    Of that particular lot of the bottle in

12    question, or container in question.

13              Q    If you can do that you should -- that

14    should be the first place you look is you look at batch

15    records of that particular lot.

16              A    Yes.

17              Q    And that will tell you whether the product

18    was manufactured in compliance with Good Manufacturing

19    Practices.

20                   MR. MILLER:  Object to form of the

21         question.

22              A    Yes.  It's the first place to look.  Deal

23    with the specific product that seems to be causing their

24    problem.

25              Q    I understand.  And like I said, that will

James J. Farley                                    June 28, 2010

Page 105

1    tell you whether the product was manufactured in

2    compliance with Good Manufacturing Practices.

3                    MR. MILLER:  Object to form of the

4         question.

5         A    If everything on it is presented

6    accurately and honestly, yes.

7         Q    Okay.  Your expert opinion in this case

8    doesn't speak to the accuracy of Actavis' documents,

9    correct?

10        A    Doesn't speak to the accuracy of Actavis'

11   documents?

12        Q    Yeah.  You don't offer an opinion about

13   whether the documents -- whether Actavis' records are

14   accurate.

15                   MR. MILLER:  Object to form of the

16        question.

17        A    Specifically -- I noticed something in

18   that double initial where the analyst was also the

19   reviewer, which I noticed that.  I also in another

20   document that I could find upon a short search where I

21   saw an analysis of an impurity.

22             And those results jumped out at me like they

23   are so precise, I mean, abnormally precise, more precise

24   than most people would see, which leads you to wonder

25   did they really run it.  But that's speculation, of

James J. Farley                                          June 28, 2010

```
                                                         Page 106
 1    course.  But that would -- so if everything was correct
 2    then the product should be good.  But --
 3              Q    But I want to make --
 4              A    What was your original question?
 5              Q    My question is, you're not offering an
 6    opinion in this case about whether Actavis' documents
 7    are accurate, are you?
 8              A    I have questions about some of the things
 9    on them, but the way you worded the question, I am not
10    questioning.  I'm not believing they all are accurate,
11    but I'm not questioning them.
12              Q    There's nothing in your report expressing
13    any opinion that the information in Actavis' documents
14    is inaccurate, right?
15                   MR. MILLER:  Object to the form of the
16         question.
17              A    There is an opinion in one file where they
18    did an impurity determination and they got -- I believe
19    it was 1.61 percent and 1.61 percent.  And I said these
20    are fantastically precise results.
21                   And I questioned the accuracy, one might even
22    say the legitimacy of that.  I would like to see the
23    analyst's records on that.  I don't have them.  I would
24    like to see them.
25              Q    When you say in one file, you're not
```

James J. Farley                                          June 28, 2010

Page 107

1   talking about your report?

2          A    In one of the documents I reviewed, one of

3   the 93 documents.

4          Q    So if I understand correctly, in one of

5   the 93 documents you reviewed you saw one test result

6   for impurity that in your mind caused you to question

7   some aspect of the performance of that test.

8          A    No, no.  In one I saw a set of results

9   that led me to question that.  There were a series of

10  analysis.  It wasn't just one.  One would not cause me

11  to question it, but a series did.  And in another I saw

12  the analyst and reviewer having the same initials.

13         Q    There's no mention of either of those

14  things in your expert report.

15         A    Not in the report.  It's in the files I

16  reviewed, the individual files.

17         Q    I understand.  So you're talking about

18  information in documents that you reviewed --

19         A    Yes.

20         Q    -- not in your expert report which

21  contains your expert opinions, right?

22         A    Yes.

23         Q    You understand --

24         A    Yes, you're correct it's not mentioned in

25  the report specifically.

James J. Farley                                    June 28, 2010

                                                      Page 108

1               Q    And you understand, Mr. Farley, that

2       you've been retained as an expert witness in this

3       litigation to give an expert opinion on certain

4       subjects.

5               A    Yes.

6               Q    The accuracy of Actavis' documents is not

7       one of those subjects; is that correct?

8               A    It is not one of them.  Some things raise

9       eyebrows, but I did not have enough data to make a

10      conclusive decision.  Did that answer it?  I know it

11      might be answered, but I'm trying to put it in the

12      proper perspective for you, for all of us.

13              Q    It's your answer.  The FDA when it

14      conducts inspections and based on your experience, if

15      they thought a company had fraudulent or falsified

16      documents, they'd take very swift and very decisive

17      action, wouldn't they?

18              A    I would hope so.  And I've known them to

19      do it in those cases.

20              Q    Okay.  And what actions would they take?

21              A    They immediately do a review of all

22      relevant documents to look for the extent of it and the

23      backgrounds of the individuals involved.

24              Q    What action would they take with respect

25      to that company's continued participation in the market,

James J. Farley                                    June 28, 2010

                                                    Page 109

 1   leaving their products in the market?

 2            A    Until they were sure they would be doing

 3   the investigation.  It's like any time.  You're doing

 4   the investigation but you -- it depends on the potential

 5   result out here as to whether you shut them down now or

 6   have a potential for shutting them down later.  They

 7   would do the investigation, depending on where they

 8   thought the fraud was.

 9            Q    You reviewed a series of FDA documents --

10            A    Yes.

11            Q    -- relating to Actavis, correct?

12            A    Correct.

13            Q    No reference to even the possibility of

14   fraud in any of those documents, is there?

15            A    Correct.

16            Q    So the FDA didn't think Actavis' documents

17   were fraudulent.

18            A    Correct.

19            Q    When you're -- let's go back to documents.

20   If you're looking at -- I'm sorry.  Let's go back to

21   your article and specifically your review of batch

22   records.

23            If you're looking to -- and if you look at

24   the -- your discussion of batch records here, it goes on

25   for almost a page.  And if you look at the second

James J. Farley                                    June 28, 2010

Page 110

1    paragraph on page 4 it starts -- well, no, the first
2    full paragraph, Batch records contain a wealth of
3    information about the production history of a specific
4    drug.
5            These records contain the names of people
6    actively involved in the manufacturing process,
7    operating procedures followed -- and there's a
8    parenthetical -- relevant dates and times and, most
9    important, the results of sample tests.
10           Essentially what you're saying in this article
11   is you're looking for evidence of GMP violations.
12           A   I'm looking to see how it was
13   manufactured.  If I was looking for a violation that's
14   where I would look for a violation.  If I was looking to
15   see that they made it correctly that's where I would
16   look to see that they made it correctly.
17           I guess my answer is it depends what side
18   you're on and what you're predisposed for looking.  But
19   that's going to give you the answer.
20           Q   Objectively if you're looking for those
21   through batch records -- and I guess if you're on the
22   plaintiff's side you're looking for evidence of GMP
23   violations when you review the batch records.
24           A   Yes.  Of course, the firm itself does --
25   should do periodic reviews to ensure that everything is

James J. Farley                                    June 28, 2010

Page 111

1    correct.  That's why I'm saying both sides.  When firms

2    do their own audits, which they should do periodically,

3    they would review batch records, not looking expecting

4    something is wrong, but expecting everything to be

5    correct.

6              Now, a plaintiff's representative, on the

7    other hand, might review it looking for that.  So that's

8    why I'm saying, you can review it either way depending

9    on what you're looking for.

10             Q   You're looking for different things, but

11   neither side can determine -- let's ask a slightly

12   different question.

13             You can't determine if there were GMP

14   violations associated with manufacturing a product

15   without reviewing the batch records, correct?

16             A   There are cases where you could.  There

17   are cases where it would be obvious.  You look at the

18   product and you see a crack or a double size.  I mean,

19   double size, I don't need to look at a batch record

20   to -- I want to look at the batch record after the fact,

21   but I can see there's something wrong here.

22             Q   Assuming you're not holding product that

23   is obviously -- well, let's explore that concept.  Let's

24   assume you're looking at a double thick tablet.  It

25   doesn't mean it was -- GMPs were violated when it was

James J. Farley                                        June 28, 2010

                                                        Page 112

1    manufactured, does it?

2              A    If you're looking at a product, just the

3    product, that's it.

4              Q    Yeah.

5              A    You have the product in your hand.

6              Q    Yeah.  It's twice the size it should be.

7    That could happen even if you have absolute strict

8    compliance with all relevant Good Manufacturing

9    Practices in the production of that product, correct?

10             A    Provided it didn't get to the consumer.

11   You're talking about the employees.

12             Q    If it gets to the consumer that doesn't

13   change whether it was manufactured properly.

14             A    What does matter is what did you do about

15   it.  Did you --

16             Q    Mr. Farley --

17             A    -- do an investigation --

18                 MR. MILLER:  Let him answer the question.

19             Q    -- answer my question.  If I have a

20   defective tablet in my hands --

21             A    Defective, your word.

22             Q    Okay.  It's twice as thick as it should

23   be.

24             A    Yes.

25             Q    It doesn't mean any GMPs were violated in

James J. Farley                                    June 28, 2010

                                                    Page 113

 1    manufacturing that product, does it?

 2                MR. MILLER:  And continue with your

 3         answer when you were cut off, please.

 4           A    It means something is wrong somewhere.

 5    This is not the product we want.  Let's launch a

 6    Corrective Action/Preventive Action investigation into

 7    it.  And then that would have to be launched the proper

 8    way to investigate it.

 9                It means something went wrong somewhere.  And

10    at that point you don't know where or why, but you have

11    to investigate it.  Failure to investigate it would be a

12    GMP infraction.

13           Q    Okay.  But you still haven't answered my

14    question.

15           A    Okay.

16           Q    It doesn't mean --

17           A    One more time.

18           Q    -- anything -- any GMP was violated while

19    it was being manufactured.

20           A    Yes, it does.

21           Q    What --

22           A    Because it's supposed to be a certain

23    weight and a certain size.

24           Q    Okay.  But --

25           A    And it's not.

James J. Farley                                    June 28, 2010

Page 114

1          Q    How could you know what GMP was violated
2     just because it's out of specification?  You can -- is
3     it true or not you can comply with every single GMP
4     requirement associated with manufacturing a product and
5     still produce a product that happens to be out of
6     specification?
7          A    Theoretically you're not complying.
8     Something went wrong somewhere.
9          Q    Something went wrong doesn't mean you
10    didn't comply with Good Manufacturing Practices.
11         A    The system that you're trusting didn't
12    comply --
13         Q    That doesn't mean --
14         A    -- that you --
15         Q    That means something went wrong.  That
16    doesn't mean you didn't comply with Good Manufacturing
17    Practices, does it?
18         A    You try to comply.  You didn't make a
19    double thick tablet deliberately.  But once you saw it
20    was double thick you know here's the specifications for
21    thickness and for weight, this is too thick and it
22    weighs too much, something is wrong with the system,
23    let's investigate it.
24              It's a defective product as you yourself said.
25    And what are we going to do about it?  What are you

James J. Farley                                              June 28, 2010

Page 115

1   going to do about it now?  That's --

2           Q   You're talking -- but now you're talking

3   about after the fact.  And I agree.  If you have a

4   defective product and you learn of it, perhaps from a

5   consumer, perhaps it comes back from a pharmacist, I

6   agree that now you have to determine what you're going

7   to do about it.

8           But you're not answering my questions about

9   the processes that resulted in production of that

10  product.  You can comply -- is it true or not, you can

11  comply with every single Good Manufacturing Practice

12  associated with manufacturing a product and it is still

13  possible that you could produce a product that is not

14  within specifications?

15              MR. MILLER:  Objection, asked and

16      answered.

17          A   Here's -- I'm going to reword a certain

18  way, because I can't answer that yes or no.  I'm going

19  to say you can believe you complied with everything

20  according to the way your high moral character, your

21  high ethics and the way you set your system up.

22          But you've got the evidence sitting right

23  there in the palm of your hand something is wrong

24  somewhere.  I obviously didn't comply.  Why didn't I and

25  how can I fix it?

James J. Farley                                          June 28, 2010

                                                            Page 116

 1              Q    You -- it's not that you didn't comply.
 2    It's that you -- the process didn't work properly.  That
 3    doesn't mean you didn't comply, does it?
 4              A    The process didn't produce the material
 5    within specifications; therefore you didn't comply.
 6              Q    That's not true.
 7              A    You didn't mean not to comply, but you
 8    didn't comply.
 9              Q    You didn't produce a product that was
10    within your specifications.  That does not -- do you
11    believe that automatically means you didn't comply with
12    the procedures you were supposed to?
13              A    Yes, I do.  And what comes to mind is did
14    Prius comply with the accelerator pedal?  Is BP
15    complying with the oil in the Gulf?  I mean, you know,
16    something is wrong somewhere, because the cars are going
17    there, your oil is going out in the Gulf.
18              You've got a tablet in your hand that you
19    acknowledge is defective.  You didn't mean not to
20    comply, but you didn't comply, because if you did you
21    would have had a quality product that met
22    specifications.  You wouldn't have that double thick
23    tablet in your hand.
24              Q    The Good Manufacturing Practices
25    regulations require that you develop a procedure for

James J. Farley                                     June 28, 2010

                                                      Page 117

 1    every step in the process of manufacturing a product,

 2    correct?

 3              A    Yes.

 4              Q    And they require that you submit those to

 5    the FDA --

 6              A    Yes.

 7              Q    -- and get approval, right?

 8              A    Yes.

 9              Q    And then they require that you follow

10    those procedures, right?

11              A    Yes.

12              Q    If you do that, develop them, submit them,

13    follow them, have you achieved compliance with Good

14    Manufacturing Practices?

15              A    If you look at your final product and it

16    meets all the specifications assigned to that product

17    and approved by the FDA, then you have.  If it does not

18    meet those specification then you have, by your

19    definition, a defective product and you didn't comply

20    even though you thought you did and you meant to.

21              Q    How does that speak to whether you

22    complied?  Because your product had a defect in it --

23    the regulations don't require perfection, do they?

24              A    They require that the product be within

25    the defined and approved specifications.  That's not

James J. Farley                                        June 28, 2010

                                                      Page 118

1    perfection.  It doesn't need perfection.  But you have

2    to make it the way you say you'd make it.

3              Q    If you're counseling one of your -- well,

4    let's back up.  You've been consulting and giving

5    counsel to pharmaceutical manufacturers for 13, 14 years

6    since you left the FDA?

7              A    Fourteen.

8              Q    Okay.  You've been involved in

9    circumstances where they conduct investigations into out

10   of specification results?

11             A    Yes.

12             Q    You don't always find a root cause, do

13   you?

14             A    No, once in a while you don't.  But you

15   have to exert a certain amount of effort to look into

16   it.

17             Q    You have to try.

18             A    Uh-huh, yes.

19             Q    But it's certainly possible and it happens

20   that you can do a completely thorough investigation into

21   the circumstances you're involved with and not determine

22   the root cause for why that happened.

23                  MR. MILLER:  Objection, asked and

24        answered.

25             A    It is possible and it happens once in a

James J. Farley                                    June 28, 2010

                                                   Page 119

 1    while.

 2              Q    Okay.  And the industry as a whole is

 3    based on sampling protocols, right?

 4              A    The industry is based on sampling -- the

 5    industry uses sampling protocols.

 6              Q    Well, and --

 7              A    Or is --

 8              Q    Maybe we're saying the same thing.

 9              A    I'm not questioning your choice of words,

10    but maybe reword it.

11              Q    Well, maybe we're saying the same thing.

12    The release decision was used -- or the release decision

13    made by all companies in the industry are -- they use

14    sampling protocols to make those release decisions.

15              A    Take your samples of whatever you're

16    sampling for analysis to get your data.

17              Q    You don't test every --

18              A    Not a hundred percent.

19              Q    -- individual tablet or -- and let's stick

20    with tablets.  You don't test every tablet for

21    compliance with all specifications.

22              A    Correct.

23              Q    And does any company test every tablet?

24              A    You wouldn't have anything left to sell.

25              Q    Not very economically viable.

James J. Farley                                          June 28, 2010

Page 120

1              A    Not economically viable.

2              Q    So the industry is based on sampling

3     protocols.

4              A    Correct.

5              Q    Deviations during a -- you talk in your

6     article about, the top of page 5, Corrective Action and

7     Preventive Action.  And you advise in the article that

8     you should request CAPA, C-A-P-A, records for the time

9     period that includes the production of the questionable

10    lot.  If something happened during production that

11    differed from approved procedures, this will be noted as

12    a deviation, which the company must investigate.

13             Did I read that correctly?

14             A    Yes.

15             Q    Deviations can occur during the

16    manufacture of a batch and a batch can still be released

17    properly, correct?

18             A    If the deviation was investigated

19    according to your protocols or procedures and found to

20    be acceptable, it can occur.

21             Q    Okay.  And you counsel manufacturing --

22    companies that manufacture pharmaceuticals.  You run

23    into, I would assume fairly regularly, deviations that

24    are properly investigated and the batch is still

25    released.

James J. Farley                                    June 28, 2010

                                              Page 121

1              A    Fairly regularly, yes, uh-huh.  That's
2     right.
3              Q    So there's nothing -- well, strike that.
4              Going back to reviewing batch records, batch
5     records will show whether a product was tested properly
6     in the lab, correct?
7              A    It will show theoretically everything in
8     the production line including --
9              Q    So you need to answer my question now,
10    Mr. Farley.
11             A    Yes.
12             Q    It will show whether a product was tested
13    properly in the lab.
14             A    Yes.
15             Q    It will show whether the results of that
16    laboratory testing were within specifications.
17             A    Yes.
18             Q    If the FDA was conducting an inspection of
19    a facility and wanted to determine whether the company
20    had complied with Good Manufacturing Practices, it would
21    review batch records, right?
22             A    Yes.
23             Q    And from that review would make a
24    determination about whether the FDA believed, whether
25    the inspector believed there was some non-conformance.

216.523.1313          www.rennillo.com          888.391.3376 (Depo)

James J. Farley                                    June 28, 2010

                                                        Page 122

1            A    Yes.

2                 MR. MILLER:  Object to form.

3            Q    And let me make that -- some

4    non-compliance with Good Manufacturing Practices.

5            A    That would be one of the things.  They

6    would have a whole schedule of things to look at of

7    which batch record examination would be one.

8            Q    When the FDA is -- well, never mind.  I'll

9    ask that later.  You can also review SOPs to determine

10   whether a company has complied with Good Manufacturing

11   Practices.

12                MR. MILLER:  Object to form.

13           A    You look, A, for existence of the proper

14   SOPs; and B, for the fact that they're using them and

15   doing what they say.

16           Q    Right.  So there are two -- there's

17   actually two forms of GMP compliance associated with

18   SOPs.  First, whether the SOP itself satisfies the

19   minimum requirements of the regulation, right?

20           A    Yes.

21           Q    When it's drafted properly.

22           A    Yes.

23           Q    And second, whether you comply with the

24   SOP during your manufacturing process.

25           A    Yes.

James J. Farley                                        June 28, 2010

Page 123

1          Q    And again, the FDA when it is inspecting a
2     company for GMP compliance it might undertake both of
3     those reviews.
4          A    Yes.
5          Q     It might review the substance of the SOP
6     to determine whether it believes it meets the minimum
7     requirements and it also might review the batch records
8     to determine whether you actually have complied with the
9     SOP during manufacturing.
10         A    Yes.
11         Q    You can't -- you can't determine whether
12    you've complied with the SOP without reviewing the batch
13    records.
14         A    In the case you're talking about, correct.
15         Q    Well, is there any case where you could
16    determine compliance with an SOP without reviewing the
17    batch records?
18         A    They would be SOPs not relating to the
19    batch, like the example you gave earlier.
20         Q    Okay.  Related -- well --
21         A    I can't qualify my answer.
22         Q    -- you can't determine -- and I apologize
23    for talking over you.
24         A    That's okay.
25         Q    You can't determine whether you've

James J. Farley                                    June 28, 2010

Page 124

```
 1    complied with an SOP that relates to the manufacture of
 2    a specific product without reviewing the batch records.
 3             A    That's your most sure way, yes.
 4             Q    Okay.  If you were doing a consulting
 5    assignment that's what you could do?
 6             A    Definitely.
 7             Q    You wouldn't tell that company whether
 8    they complied or not without reviewing the batch
 9    records.  That's being thorough like you described
10    earlier.
11             A    Correct.
12             Q    How would you offer an opinion about GMP
13    compliance with respect to manufacturing a specific
14    product without reviewing batch records?
15             A    How would I offer an opinion about --
16             Q    Yeah.
17             A    -- compliance?
18             Q    You couldn't -- well, you couldn't
19    offer -- you, Mr. Farley, as a consultant you couldn't
20    offer an opinion about whether a company -- if a company
21    came to you and said, I want to know whether we've
22    complied with GMPs as we manufactured and released these
23    batches of this product.
24             A    Sure.
25             Q    You could not undertake that exercise
```

James J. Farley                                                June 28, 2010

Page 125

1   without reviewing those batch records, right?

2              MR. MILLER:  Object to form.

3        A    I could not be assured of it without doing

4   the batch records.  And I would say in plain everyday

5   terms, I want to see how it's made.  And they would say,

6   oh, we'll have the batch record for you right away.

7        Q    And what if they said -- well, you

8   wouldn't offer an opinion about whether they had

9   complied with GMPs in manufacturing and releasing

10  that -- those batches of that product without reviewing

11  the batch records.

12             MR. MILLER:  Object to form.

13       Q    As you said earlier you'd say, I can't do

14  that, I need to turn that down.

15             MR. MILLER:  Object to form, misstates

16      previous testimony, incomplete hypothetical.

17       A    Could you give me the question again?

18             MR. ANDERTON:  Could you read that back,

19      please?

20      (The record was read back as requested.)

21       A    I would have to review the batch records

22  to render a complete opinion as to whether everything

23  was done properly.  Is that -- am I answering -- sure.

24       Q    Okay.  Go to the heading in your article

25  Witnesses, page 6.

James J. Farley                                          June 28, 2010

                                                        Page 126

     1                A    I have it.

     2                Q    Take a look at the fourth full paragraph

     3     under that heading.  It starts, When discussing.  Do you

     4     see that?

     5                A    I'm with you.

     6                Q    And it reads, When discussing alleged

     7     violations the expert should be able to describe what

     8     should have been done and why and the difference that

     9     compliance with relevant GMPs would have made to the

    10     finished product.

    11                He or she must connect the specific GMP

    12     violation to the negligence or defect that caused injury

    13     or loss.  This causation connection is important as

    14     determining the GMP violations -- I'm sorry -- this

    15     causation connection is as important as determining the

    16     GMP violations because irrelevant GMP violations cannot

    17     establish the prima facie case.

    18                Did I read that correctly with that little

    19     glitch in there where I went back and started that last

    20     sentence over?

    21                A    You read that correctly.

    22                Q    Okay.  So you've got to have an expert

    23     witness identify specific GMP violations and they have

    24     to apparently -- well, you believe that they have to

    25     actually connect directly to a specific defect, correct?

James J. Farley                                    June 28, 2010

                                                        Page 127

1                MR. MILLER:  Object to form.

2           A    In order to correct it, yes.

3           Q    Well, this isn't talking about correcting

4    it, Mr. Farley.  This article is about whether you can

5    bring a lawsuit against one of these companies; and if

6    so, how to do it, right?

7           A    Right.

8           Q    Okay.  So the paragraph I read where you

9    say -- where it reads, The expert must connect a

10   specific GMP violation to the negligence or defect that

11   caused injury or loss, you agree with that, right?

12          A    Yes, I do.

13          Q    And you also agree that irrelevant GMP

14   violations -- and by irrelevant that means a GMP

15   violation that doesn't actually relate to the defect

16   that allegedly caused harm to a consumer, correct?

17               MR. MILLER:  Object to form.

18          Q    Is that what that means?

19          A    It doesn't mean not important.  It means

20   not relevant to this situation.

21          Q    Right.  So you could have a GMP violation

22   that doesn't speak to the -- or in any way relate to the

23   defect that caused a consumer harm.  That's what you

24   mean when you use the term irrelevant GMP violations.

25               MR. MILLER:  Object to form.

James J. Farley                                    June 28, 2010

Page 128

1          A    Yes.  I had to hinge a bit when Gene, Jim

2    and I were writing that about using that term, but we

3    talked about it like we're talking now.  It doesn't mean

4    not important.  It means not relevant to that path.

5          Q    Okay.  What GMP violations can you connect

6    specifically to Digitek?

7               MR. MILLER:  And you feel free to pull

8          out the documents and go through them a page at a

9          time if you like.

10         A    Pretty much the -- all the 483s that were

11   written.  They mention one case.  I'd have to get the

12   483s to bring them out.

13         Q    We're going to get to those.

14         A    Okay.  And they're -- now, they are

15   printed.

16         Q    I've got plenty of copies.  Don't you

17   worry about that.

18         A    I'm sure.  I would have guessed that.

19   They're all listed in there.  An observation on a 483,

20   an observation of a particular GMP violation, and then

21   there are examples given.  It doesn't mean this is

22   everything.  Like here's the few examples of this

23   observation which is a violation.

24              And I believe the inspection that concluded in

25   May of 2008, I think it had 20 observations on it, which

James J. Farley                                          June 28, 2010

                                                         Page 129

1    was really a lot.  I mean, that's a lot for a 483.  And

2    so their rule -- offhand I'd say they're all GMP

3    violations on that document.

4            Q    Well, we're going to talk about whether

5    you're correct then that a 483 reflects any violations

6    of anything.

7            A    I would modify it slightly perhaps, but

8    I'm sure there's a lot going on.

9            Q    Modify it to what?

10           A    I might say 18 out of 20 or something like

11   that.

12           Q    No.  What --

13           A    But right now I'm saying every one on

14   there was a GMP violation.

15           Q    And you said as you started to describe a

16   483 and what's on a 483 that it lists what the inspector

17   believes is a violation and then examples.

18           A    Yes.

19           Q    Is Digitek listed in all 20 or 18 of those

20   examples on that 2008 483, do you remember?

21              MR. MILLER:  Object to form of the

22      question.

23           A    I believe that not every one refers to

24   Digitek.  But to me reading it it relates to the overall

25   system of quality assurance or a weak quality assurance

James J. Farley                                    June 28, 2010

Page 130

1   program.  But in answer to your question, I don't

2   believe every one in there refers to Digitek, per se.

3           Q    Well, if you have an observation on a 483

4   and you have examples, as a consultant to the

5   pharmaceutical industry, if a company said, we'd like

6   you to audit our records and identify all the products

7   this observation relates to, you'd have to go look at

8   the batch records, wouldn't you?

9           A    I would.

10          Q    So if an observation doesn't refer to

11  Digitek, in order to determine whether that observation

12  relates to Digitek you'd have to look at Digitek batch

13  records.

14          A    In order to determine if it related to

15  Digitek, but I would have formed an opinion as to the

16  overall system or management or the way the company

17  runs.  I mean, in plain words I might say this, this

18  thing is all fouled up, I don't know what they can make

19  right.  I mean, that's plain terms but --

20          Q    So that might be your initial thought, I

21  don't know what they can make right, but then you'd go

22  to the batch records and determine whether they did make

23  it right.

24          A    Yes, I would.

25          Q    Okay.  And if you didn't do that then you

James J. Farley                                    June 28, 2010

                                                    Page 131

1  can't say with any certainty whether the observation
2  relates to any product where you didn't review the batch
3  records, can you?
4           MR. MILLER:  Object to form.
5       A   It would relate to the product that the
6  investigator listed.  I would have to believe his or her
7  statement on the 483.  But to look at how much of it,
8  I'd have to review.
9       Q   Well, and to determine whether it related
10 to any product that's not listed by the investigator you
11 couldn't do that without reviewing batch records for
12 that product, could you?
13          MR. MILLER:  Object to form.  We'd have
14      to take a look at each one individual.
15      A   Yeah.  We would have to look at every one.
16      Q   Every one what?
17      A   Every product and all the batch records.
18 I would have an idea as to whether it would or not by
19 looking at that as I did look at the 483.  But to be
20 sure you'd have to go through each one of them.
21      Q   And unless you did that you couldn't offer
22 an opinion about whether it actually relates to each
23 product.
24      A   I could offer an opinion.  I just wouldn't
25 be sure of it.

James J. Farley                                    June 28, 2010

                                                   Page 132

 1          Q   Okay.  And your opinion in that context
 2   without being sure would be speculation.
 3              MR. MILLER:  Object to form.
 4          A   If you use that term.  I wouldn't want
 5   to -- I wouldn't want to take any of the firm's products
 6   until everything was investigated.
 7          Q   Okay.  But, Mr. Farley, the answer to my
 8   question is, yes, it would be -- until you did that
 9   review it would be -- you could offer your opinion but
10   it would be speculation.
11              MR. MILLER:  Object to form.
12          A   Speculation?  Yes.  Okay.  Yes.
13              MR. ANDERTON:  What have we got?
14              THE VIDEOGRAPHER:  Eight minutes.
15              MR. ANDERTON:  Eight?  I'm not going
16          to -- we're almost getting about to a breaking
17          point.  I'm going to talk to Ericka for a moment.
18          So we're gonna step outside.  If you'll just sit
19          tight for a minute.  We're within a couple minutes
20          of a break.
21              THE WITNESS:  Sure.  Whatever you like.
22              MR. ANDERTON:  But I want to --
23              THE VIDEOGRAPHER:  Off record at 12:14.
24          (A brief recess was taken.)
25              THE VIDEOGRAPHER:  Okay.  We're back on

James J. Farley                                    June 28, 2010

                                                         Page 133

 1          record.  The time is 1:19 p.m.  We did -- this is

 2          the beginning of Tape No. 4.  We did conclude Tape

 3          No. 3 at 12:14 p.m. and we broke for lunch.

 4   BY MR. ANDERTON:

 5          Q    Hello, Mr. Farley.  Welcome back from

 6   lunch.

 7          A    Thank you.

 8          Q    You understand that you are still under

 9   oath?

10          A    Yes.

11          Q    Okay.  And I want to just state, as I am

12   admonished for not wearing my microphone, that,

13   implicitly admonished, that while we were off the record

14   you copied over to a portable thumb drive that I have

15   with me all of the documents that were on your thumb

16   drive and that relate to -- the thumb drive that we

17   discussed earlier and that relate to the Digitek

18   litigation and your engagement for Plaintiffs in this

19   litigation.  Is that correct?

20          A    Yes, it is, in your presence and Peter

21   Miller's presence.

22          Q    Okay.  So it is your understanding that

23   all electronic documents that are on that thumb drive

24   that relate to this litigation have now been placed onto

25   my thumb drive?

James J. Farley                                    June 28, 2010

Page 134

 1           A    You are completely up-to-date as of this

 2    minute --

 3           Q    Okay.

 4           A    -- on everything I have.

 5           Q    And thank you for that.

 6           A    You're welcome.

 7           Q    Mr. Farley, what were you asked to do in

 8    the context of this engagement?

 9           A    Essentially it was, Jim, we want you to

10    evaluate some documents for us and assess the situation,

11    there will be a court case, here's the product, here's

12    the company, I want you to have some documents and

13    render your opinion about this.

14           Q    Render your opinion about what?

15           A    About the status of the situation.  These

16    are my words, now.  This is not a quote.  I don't

17    remember the -- I couldn't be quoted that part back.

18           But essentially what about this product and

19    that company that makes the product, would you review

20    these documents, give an opinion, at which time I said,

21    well, I'll give you an electronic review of each

22    document and then I'll render an opinion.

23           Q    When you say an opinion about the status

24    of this product, do you mean the regulatory compliance

25    status of that product?  What do you mean by that?

James J. Farley                                    June 28, 2010

Page 135

1            A    Did I use the word status?

2            Q    You did.

3            A    I didn't mean to use the word status.

4    About my evaluation of what this product is like and

5    what the company is like.

6            Q    Okay.  So your evaluation of what the

7    product is like and what the company is like with

8    respect to what?

9            A    Are they in compliance with FDA

10   regulations.

11           Q    Generally?  Is that what you were asked to

12   do, evaluate whether they were in -- whether this

13   company, Actavis, is in compliance with FDA regulations

14   generally?

15           A    Most clients -- some clients will be very

16   specific with you.  Others will say generally and as

17   specific as you want or tell me what areas you feel you

18   should put -- you want to talk more about or whatever.

19   It's essentially since I hadn't seen any documents, read

20   these, give an evaluation to whatever depth you feel.

21           Q    Okay.

22           A    Those are my words.

23           Q    I understand.  And I need to have as clear

24   as I can understanding with respect to an evaluation of

25   what?  I mean, what are you evaluating?  What were you

James J. Farley                                          June 28, 2010

                                                           Page 136

 1   evaluating as you read and reviewed the documents you

 2   were given?

 3          A    I was evaluating at a very minimum a

 4   product called Digitek and a company called Actavis --

 5   Actavis U.S. I believe it's called -- with regard to how

 6   well they can or cannot produce quality material.

 7          Q    With respect to Digitek specifically what

 8   were you evaluating?

 9          A    We looked at that one particular lot where

10   we had the double thickness, but as time went on I

11   looked more into the systems and began to realize that I

12   wouldn't trust anything made by that company.  I might

13   have digressed a bit there.

14          But it was essentially, look it over and tell

15   me what you find.  I don't really have clients that --

16   they don't tell me the answers they want.  They tell me

17   to look it over and tell me what you find.  And then I

18   say, I'll send you individual reports, individual files

19   of each review.

20          Q    Okay.  But you were asked to look

21   specifically at a product, Digitek, right?

22          A    And the company.

23          Q    That's two things, right?

24          A    It was one project which involved a couple

25   of different things.

James J. Farley                                    June 28, 2010

Page 137

1            Q    Two aspects of one project.

2            A    Yes.

3            Q    One of those aspects was evaluating

4    Digitek.

5            A    In my words can this company make Digitek

6    right and can this company make anything right, in my

7    words.

8            Q    Can this company make Digitek right or did

9    this company make Digitek right?  What were you

10   evaluating?

11           A    Both.

12           Q    So you evaluated whether the company

13   properly manufactured Digitek?

14           A    And whether I believe it is capable of

15   doing it.  I mean, it's more than one thing in the

16   process.

17           Q    I understand, Mr. Farley.  Is one of the

18   things that you evaluated whether Digitek was

19   manufactured properly?

20           A    Yes.

21           Q    Is that also something that was the

22   subject of your expert opinion, whether Digitek was

23   manufactured properly?

24           A    Yes.

25           Q    Let's talk about FDA 483s for a moment.

James J. Farley                                      June 28, 2010

                                                        Page 138

1              A    Yes.

2              Q    483s -- well, you tell me what a 483 is.

3              A    First I would like to define an

4    observation is a violation.

5              Q    Mr. Farley --

6              A    Yes.

7              Q    -- that wasn't close to the question I

8    asked.

9                   MR. MILLER:  I disagree.

10             Q    I asked you what a 483 form is.

11                  MR. MILLER:  But he's answering the

12        question.

13                  Start again where you were.

14             A    I have to start with what an observation

15   is because it's part of it.

16             Q    I'm asking you what a form is.  I didn't

17   ask you what -- an observation is something that goes on

18   the form.

19             A    Oh.  All right.

20             Q    I asked you what the form is.

21                  MR. MILLER:  Well, if he's explaining to

22        you what's on the form that's an answer.

23                  Go ahead and answer just the way you were

24        going to answer.  Don't let him tell you how to

25        answer a question.

James J. Farley                                    June 28, 2010

Page 139

1              A    Okay.  Continuing on, the 483 is so called
2       it because it's an FDA Form 483.  But that form is a
3       list of observations -- and I'm using that term
4       interchangeably with violations -- that an inspection --
5       an inspector or inspection team observes when they
6       inspect a facility.
7              Q    Your testimony is that an observation on a
8       483 reflects an actual violation of what?  Good
9       Manufacturing Practices?
10             A    Could be that.
11             Q    Could be what else?
12             A    A lot of times -- if it's a GMP inspection
13      it -- if it's a GMP inspection, then it will be a GMP
14      violation.  There are pre-approval inspections.  There
15      are for cause inspections when someone says, hey, I
16      think something is being done wrong at that plant.  But
17      if it's a GMP inspection then it will center on GMP
18      violations.
19             Q    But it's not an actual final determination
20      of violation of GMPs, is it?
21             A    It holds a lot of weight.  It's the
22      inspector's -- it's their jobs.  They turn it in to a
23      supervisory inspector.  It goes to district director.
24      Let me say it this way.  In almost eight years at FDA
25      I've never seen one changed.

James J. Farley                                          June 28, 2010

                                                          Page 140

 1              Q    You've never seen one changed?

 2              A    I haven't, not in the Philadelphia

 3    district, which is one of the busier districts.

 4              Q    Did you review the revised warning letter

 5    that was issued in this case?

 6              A    I did.

 7              Q    So revised means that it was changed,

 8    right?

 9              A    I should have reworded that and said I've

10    never seen one lessened.  But, no.  483 is a list of

11    observations.  Let's say that I'm walking through your

12    plant and I make observations.

13              Now, once I leave your plant, having told you

14    of these observations, there's absolutely no reason I'm

15    going to change anything.  They're observations.

16    They're facts.  They're not opinions.  They're facts.

17              Q    This is not a great -- well, but you keep

18    wanting to insist that there -- I think you testified a

19    moment ago that you use the term observation and

20    violation interchangeably.

21              A    I do.

22              Q    That's not correct, is it?

23                   MR. MILLER:  Object to form.

24              A    Yes, it is correct.

25              Q    Well, I asked you and I don't think you

James J. Farley                                    June 28, 2010

Page 141

1    answered it directly.

2              A    Okay.

3              Q    An observation is not a final agency

4    determination on whether the company has violated Good

5    Manufacturing Practices, is it?

6                   MR. MILLER:  Objection, asked and

7         answered.

8                   MR. ANDERTON:  It hasn't been asked and

9         answered.  He raised it unilaterally in responding

10        to the question.

11             A    Technically it's not.  They're all subject

12   to approval by the supervisory investigator.  But I've

13   never seen any supervisory investigator or district

14   director change one.

15             Q    But the answer to my question is an

16   observation on a Form 483 does not -- does not represent

17   the determination of the FDA as to whether GMPs have

18   been violated.

19             A    Yes, it does.  It represents the opinion

20   of that inspector or inspectional team who is

21   representing the FDA.

22             Q    Subject to review by several levels within

23   the FDA.

24             A    I think I maybe best say it if --

25             Q    Is that true or not, Mr. Farley, before

James J. Farley                                    June 28, 2010

                                                        Page 142

 1   you -- you can answer that question.

 2              A    Not several levels, no.  I wouldn't say

 3   several levels.

 4              Q    Two at least?

 5              A    Sometimes -- sometimes it's one.

 6              Q    FDA -- or observations on a Form 483 are

 7   written up by the inspector, the investigator, correct?

 8              A    Yes.

 9              Q    Not subject to review before they're

10   issued?

11              A    Not subject to review.  Correct.

12              Q    So they don't have to submit them to the

13   compliance division, for example, before they're issued?

14              A    Correct.

15              Q    Mr. Farley, I'm going to hand you a

16   document that's marked as Defendants' Exhibit 57.  It's

17   difficult to read the sticker.

18              A    Yes.

19              Q    Depending on your vision status it may be

20   difficult to read some language we're going to ask you

21   to read real quickly.  But I'm going to give it a shot

22   nonetheless.

23              A    Okay.

24              Q    Do you see that this is an FDA 483 issued

25   to Actavis covering an inspection that occurred in

James J. Farley                                    June 28, 2010

                                                        Page 143

1    September of 2007?

2              A    I see it.

3              Q    Is this one of the documents you reviewed

4    as part of your rendering an opinion in this litigation?

5              A    I believe it is.

6              Q    Okay.  I'm going to read the fine print,

7    if you will, right below the heading on the first page

8    there.  And I'll -- if you'll follow along.

9              This document lists observations made by the

10   FDA representative during the inspection of your

11   facility.  They are inspectional observations and do not

12   represent a final agency determination regarding your

13   compliance.

14             Did I read that correctly?

15             A    You read it correctly.

16             Q    That language is on all FDA 483 forms,

17   isn't it?

18             A    Standard.

19             Q    So on its face this document makes very

20   clear that observations on a 483 are not the final view

21   of the FDA with respect to whether a company has

22   complied or not complied with Good Manufacturing

23   Practices; is that correct?

24             A    My opinion is it's not the final view.

25   It's what they're going to do about the company.  Let it

James J. Farley                                     June 28, 2010

                                                    Page 144

1    open, shut it down, ask them to recall.  But it's not
2    going to change their opinion about the company or
3    whether they're in or out of compliance.  What happens
4    here, this then gets classified as OAI, VAI or NAI.
5              Q    What's VAI mean?
6              A    Voluntary action indicated.
7              Q    That's a very positive outcome for an
8    inspection, isn't it?
9                   MR. MILLER:  Object to form.
10             A    Not really.  NAI, no action indicated, is
11   a positive outcome for an inspection.  If you're a
12   pharmaceutical firm you want everything to be NAI, no
13   action indicated.
14             Voluntary action indicated means you're doing
15   something wrong and they told you to make it right.  But
16   like a recall, technically it's voluntary.  If you don't
17   do it they're going to shut you down.  But it's called
18   voluntary.
19             And an OAI is official action indicated, which
20   means if you don't do this we're really taking action
21   immediately.
22             Q    So, Mr. Farley, back to my question about
23   this language, this form on its face says whatever is
24   written on here is not final agency determination
25   regarding compliance, doesn't it?

James J. Farley                                          June 28, 2010

                                                        Page 145

1              A    That's what it says to be polite, but why

2    would they send someone out to inspect and write this on

3    a form?  They're not going to say, by the way, don't

4    worry about it, we're not listening to what our

5    inspectors say.

6              Q    I understand that, Mr. Farley.

7              A    The inspector carries weight with their

8    opinions.

9              Q    I understand that.  But at the end of the

10   day it is the first step in a multi-step process that

11   ultimately determines compliance.

12             A    It's probably in time invested 99 or more

13   percent by weight right here in front of us right now,

14   because the supervisory inspector gets the inspector,

15   how is this, how -- now, the inspector has been talking

16   on the phone in the meantime.

17             So the supervisory inspector knows, how is it

18   going at such and such.  Hey, I'm finding a lot of

19   problems here, this is going to be a big one.  So the

20   supervisory inspector knows whether -- what to expect.

21             Then they come in.  They look.  Do you have it

22   written up okay?  Fine.  Okay.  Good.  I mean, it isn't

23   like you're going before a board of review that doubts

24   the inspector.

25             Q    I'm not suggesting that the --

James J. Farley                                      June 28, 2010

Page 146

```
 1            A    Okay.  I mean, I just wanted --
 2            Q    -- inspector won't have the support of the
 3   people above him or her in the hierarchy at the FDA.
 4   But it is not accurate to say that an observation is a
 5   violation because the form itself says otherwise.
 6                 MR. MILLER:  Object to form.  It
 7        misstates what the form says.
 8            A    Well, I jump to Observation 2 only because
 9   I can't read exactly Observation 1 because of the print.
10   Observation 2, the written stability testing program is
11   not followed.  There's a violation of GMPs right there.
12   I mean --
13            Q    If it's true it could be a violation of
14   GMPs.  There are -- the company is permitted to respond
15   to a 483, correct?
16            A    They are permitted to.
17            Q    And sometimes the company will submit
18   facts and circumstances in response to the 483 that will
19   result in an observation being withdrawn.
20            A    I've never seen it happen.
21            Q    Well, that just means that your experience
22   isn't broad enough to have run into that, correct?
23            A    That could be.  Logically that could be.
24   But I think I have reasonable experience and it would
25   indicate that if it happens it's rare.
```

James J. Farley                                          June 28, 2010

                                                           Page 147

1          Q    Well, it happened in -- with respect to
2     this company, didn't it?
3          A    Did it?
4          Q    Yes.
5          A    I haven't seen it.
6          Q    The revised warning letter that you read
7     removed an observation when compared to the initial
8     warning letter.
9          A    The revised warning letter was after they
10    responded and perhaps corrected -- I don't know --
11    perhaps corrected that.
12         Q    Well, all warning letters are after they
13    respond and correct.
14         A    But I mean, suppose somebody says you have
15    to straighten that out.  You say, okay, I'll have that
16    straightened out by next week.  You have a violation at
17    that time, but you straighten it out and you say, could
18    you knock this off the letter, it doesn't exist anymore.
19         Q    Mr. Farley, if it were that simple there
20    would never be a warning letter, because everybody
21    responds to a 483 and offers corrections in response to
22    a 483.  So why would a warning letter ever be issued if
23    it were just as simple as it doesn't exist anymore?
24         A    No.  I'll tell you why.
25              MR. MILLER:  Objection, misstates his

James J. Farley                                    June 28, 2010

Page 148

```
 1       testimony.
 2            A    Because when you said everybody responds
 3   in a positive way, no, they don't.  That's why some
 4   places are shut down.  That's why there are consent
 5   decrees.  That's why some people either don't know how
 6   or don't care.  And so, no, not everybody responds to it
 7   in a positive way.  They all like to think they do but
 8   they don't.
 9            Q    There are plenty of warning letters that
10   are issued even though companies have responded in a
11   positive way, correct?
12                 MR. MILLER:  Object to form.
13            A    I'm not sure.  I don't know the answer to
14   that.
15            Q    You're an expert in regulatory compliance.
16   How can you not know the answer?
17            A    I haven't read all the warning letters
18   that were issued.  I'd have to --
19            Q    I'm not asking you to read all of them.
20   I'm asking you based on your experience in holding
21   yourself out as an expert in regulatory compliance,
22   isn't it true that, that warning letters are often
23   issued even though a company receives a 483, responds
24   positively to the 483 and corrects the situation?
25            A    I've never seen it happen and it should
```

James J. Farley                                    June 28, 2010

                                                        Page 149

 1    not happen.

 2              Q    Never seen it happen?

 3              A    I have never seen it happen.  I -- go

 4    ahead.  Should I continue or --

 5              Q    The warning letters essentially say

 6    nothing more than what's in the 483, correct?

 7              A    The warning letter -- yes, it does say

 8    more.  The warning letter says, you must respond in 15

 9    business days --

10              Q    Substantively --

11              A    -- or we're going to take further action.

12              Q    Okay.  But that's the threatening part of

13    the warning letter.  But with respect to the substance

14    of the warning letter and what it says about the facts

15    and circumstances or the alleged violations, it's

16    identical to what's in the 483, isn't it?

17              A    I wouldn't use the word identical.

18    It's -- a district director who looks over the 483 that

19    the inspector and supervisor inspector have presented to

20    him or her and determines if a warning letter is

21    appropriate, these people really have to shape up,

22    they're really not doing it good, I've got to have it

23    where they must respond to this in 15 business days or

24    we're going to take some other action like seizure or

25    we're going to adjoin them.

James J. Farley                                      June 28, 2010

1              And it gives you a deadline and it reaffirms

2      the importance of it.  It's -- they're significant 483

3      items.  And by significant I mean they can cause harm or

4      danger to the consumer, the patient.

5              Q    Are you familiar with the phrase Turbo --

6              A    It's a new --

7              Q    -- finding?

8              A    -- system for generating -- I'm familiar

9      with the phrase, but they did not use it when I was

10     there.

11             Q    So you don't have any experience with it?

12             A    Only in reading it and seeing it's a more

13     standardized format.

14             Q    So if you're familiar with it then you

15     know that all observations on FDA Form 483s are

16     pre-drafted and that FDA inspectors must select from a

17     pre-drafted -- what word do I want -- a pre-drafted

18     sentence or sentences, pre-drafted language, in order to

19     express an observation on a 483?

20                  MR. MILLER:  Object to form.  That only

21        pertains to a small portion of observation.

22                  MR. ANDERTON:  That's simply not true,

23        Pete.

24             Q    Do you know that to be true, Mr. Farley?

25             A    That it has a particular format, pick one?

James J. Farley                                          June 28, 2010

                                                              Page 151

1              Q    Yes.

2              A    I don't know all the details or all the

3    forms, but I know that to be true.

4              Q    Okay.  So FDA inspectors go.  They conduct

5    an inspection.  They make observations of things that

6    they believe are not in compliance with Good

7    Manufacturing Practices if it's a GMP inspection.

8              A    Yes.

9              Q    And they go and as they're preparing their

10   483 and listing the observation they select from

11   essentially a menu of observations and they must use one

12   of those menu options; is that correct?

13             A    Yes, much like the policeman does if he

14   stops you for speeding.  He's got to --

15             Q    Okay.  So the inspector is on a 483

16   listing facts and circumstances that he or she believes

17   violate the Act.

18             A    Yes.

19             Q    Isn't that the opinion of the inspector

20   about whether there's a violation?

21             A    The inspectors do not put opinions in a

22   483.  This is grilled into you your first week at the

23   agency.  You put facts in there, not opinions.

24             Q    The facts you put there must in your

25   opinion violate the Act.  You have to exercise some

James J. Farley                                           June 28, 2010

                                                              Page 152

 1    judgment, right, if you're an inspector and you're

 2    creating a 483?

 3              A    I feel like I'm getting into a play on

 4    words here and at the same time I'm trying to answer

 5    your question.

 6              Q    Well, you used, Mr. Farley, the example of

 7    a police officer.

 8              A    Yes.

 9              Q    If you're speeding -- if the speed limit

10    is 55 and the police officer clocks you --

11              A    Yes.  75.

12              Q    -- you're either above or you're not.

13              A    Yes.

14              Q    And with respect to an FDA inspector,

15    they're making judgment, exercise in judgment, in that

16    moment about whether something complies or doesn't

17    comply, right?

18              A    Yes.

19              Q    Judgment is very subjective, isn't it?

20              A    I wouldn't call it that.  If -- I guess

21    one of the classic examples that I really had, someone

22    inspected a plant and saw a bird flying through.  And he

23    said, this is unsanitary.

24              Well, technically in his opinion it was an

25    unsanitary situation with the bird flying through a

James J. Farley                                    June 28, 2010

                                                     Page 153

 1   pharmaceutical manufacturing plant.  And nowhere in the
 2   regulations does it say you shouldn't have a bird flying
 3   through, but it says appropriate hygienic material
 4   procedures must be there.
 5          So an inspector goes in and looks, taking that
 6   somewhat way out analogy and coming down now and looks
 7   and says, this is the same initials of the analyst and
 8   the reviewer, that's a violation.
 9          Now, I'm not calling that an opinion.  I'm
10   calling that a fact.  But if you want to call it an
11   opinion you can call it an opinion.  But it's right
12   there.  It's right there in front of you.  There's --
13   here's the initials, here's the initials.  And that's
14   it.
15          I've seen a case where somebody turned a wrong
16   valve and ruined a 300,000-dollar batch of material.
17   Well, nobody said, well, in my opinion you might have
18   turned a wrong valve.
19          He did it.  It's right there.  It's all logged
20   in.  It's a fact.  You can't ship that material.  You
21   ruined it.  You know, I believe there are facts and I'm
22   very reluctant -- in fact I'm resisting using the term
23   opinion.
24          Q   You did -- when you talked about the bird
25   example you said that the inspector who saw the bird

James J. Farley                                    June 28, 2010

Page 154

1    flying through the facility expressed his opinion that

2    that was unsanitary.

3             A    To show you that -- the fact is the bird

4    went through, but there's nothing in writing that says

5    the bird shouldn't go through.  But I used the opinion,

6    so --

7             Q    Likewise, there is not necessarily

8    anything in writing to suggest that somebody

9    shouldn't -- well, if somebody turns the wrong valve

10   there may not be something in writing to indicate that

11   they shouldn't turn the wrong valve.  They tell you

12   which valve to turn, but there's no regulation that says

13   don't turn the wrong valve.

14            A    But there's an SOP that says turn that

15   valve at that time, this valve at that time, that valve

16   at that time.  An SOP was violated.  Therefore, it's a

17   violation of GMPs.

18            Q    When you talked about -- as you counsel

19   clients in the industry do you tell them the Turbo

20   language FDA inspectors are required to use to express

21   an observation on a 483 don't always match up well with

22   the facts and circumstances that caused the FDA

23   inspector to write up that observation?

24            A    No, I don't.

25            Q    You've never told a client that?

James J. Farley                                          June 28, 2010

                                                              Page 155

1              A    No.  I don't tell them that.  I just tell
2      them it's a violation and how they should keep things
3      right.
4              Q    So you don't discuss the process of 483s
5      and what's on them and how to respond to them.  Do you
6      counsel clients on those subject matters?
7              A    Oh, we discuss it.  Most of them know a
8      whole lot about it from having been in the industry for
9      years and years and years.
10             Q    When -- as I understand your testimony,
11     you said the use of Turbo observations -- Turbo language
12     on observations on 483s, that practice started after you
13     left the FDA?
14             A    Yes.
15             Q    How long after?
16             A    I left in '96.  It might have started
17     around 2000.  I'm not sure when it started.
18             Q    Okay.  So it's been in place -- it was not
19     in place up until three, four, perhaps five years after
20     you left?
21             A    Correct.
22             Q    And what have you done to educate yourself
23     about use of Turbo language as you hold yourself out as
24     a consultant in the industry?
25             A    I don't look at the Turbo program, per se.

James J. Farley                                    June 28, 2010

Page 156

1    I look at what is written, if in fact the client had a

2    483 written.  In many cases my clients didn't have a 483

3    and they just want to make sure that everything is still

4    okay with them.

5            So the language of the Turbo program is not a

6    primary concern.  The content, the meaning of what an

7    inspection is, how you make a good product, that is.

8            Q    Do you counsel clients who have also

9    received 483s?

10           A    Sometimes.

11           Q    You have to look at the Turbo language

12   when you do that, don't you?

13           A    Yes, I do.

14           Q    You have to give your client guidance on

15   what it means, what to do about it in response, right?

16           A    Yes, I do.

17           Q    They pay you a couple hundred bucks an

18   hour to do that, right?

19           A    Yes.

20           Q    When you're giving that guidance you don't

21   ever say to a client, well, it's not really the Turbo

22   language you look at, it's the specific facts and

23   circumstances you have to deal with?

24           How do you deal with the fact that the Turbo

25   language doesn't always necessarily match up very well

James J. Farley                                    June 28, 2010

Page 157

1   with the underlying facts and circumstances?

2          A    They give you examples.  Whenever they

3   give you an observation they give you examples.  And in

4   the case of a client that had a problem, problem being

5   non-compliance, a 483, I wouldn't do that over e-mail.

6          I'd say, when do I visit your plant, I want to

7   see where this occurred, I want to see what's happening,

8   I want to talk to the people that you have employed.

9   That's -- I want to see for myself in addition to this

10  so that I can match it up.  And invariably it does match

11  up.

12         Q    Invariably?

13         A    I haven't seen it where I saw something

14  that disagreed with the 483.

15         Q    Have you ever talked to FDA inspectors who

16  were unhappy about the fact that in fact their choice of

17  observation -- choices, I should say, of observation

18  language, that they really feel their hands are tied

19  because the facts and circumstances they observe aren't

20  always covered very well or very squarely by the choices

21  they have from the Turbo program?

22         A    I haven't talked to any like that.  I

23  wouldn't be surprised if some do complain about that.

24  There are people in workplaces complain about everything

25  wanting to do something.  But I haven't heard any of

James J. Farley                                    June 28, 2010

Page 158

1    them.

2              Q    And your testimony is that you've never --

3    that it's always true that the Turbo language used by

4    FDA inspectors matches up with the facts and

5    circumstances they cite?

6                   MR. MILLER:  Object to form, asked and

7         answered, misstates previous testimony.

8              A    It's -- my experience has been that it's

9    always true that for the language they use, wherever

10   they got it, Turbo or wherever or whenever, has always

11   matched up.

12             Q    Okay.  I've handed you, Mr. Farley, a

13   document that has been marked as Defendants' Exhibit 58.

14   Have you seen that document before?

15             A    I believe so.

16             Q    That is the 483 issued at the end of the

17   2008 inspection of Actavis Totowa?

18             A    Yes.

19             Q    Will you look at Observation 2, please?

20             A    On the first page?

21             Q    Yes.

22             A    I have it.

23             Q    It reads, Drug products failing to meet

24   established specifications and quality control criteria

25   are not rejected.  Did I read that correctly?

James J. Farley                                          June 28, 2010

                                                              Page 159

 1              A    You read it correctly.

 2              Q    The first example they give relates to

 3   Digitek and specifically to Lot 70924.  Do you see that?

 4              A    The first line, A?

 5              Q    Yes, the first example, Example A.

 6              A    I'm with you.

 7              Q    Okay.  Why don't you take a moment.  You

 8   don't have to read it out loud.  But go ahead and read

 9   through just to refresh -- if you've seen this before

10   I'm sure you read that.  But refresh your memory and

11   read the contents of Paragraph A, please.

12              A    Just A?

13              Q    Yes, just A.

14              A    I read it.

15              Q    Can you tell me in there where it says

16   products that don't meet established specifications and

17   quality control criteria were not rejected?

18              A    The observation is drug products failing

19   to meet --

20              Q    I'm talking where in Paragraph A.

21                   MR. MILLER:  Well, he's stating what the

22          observation is.  So allow him to answer your

23          question, Mike.

24              Q    Go ahead, Mr. Farley.

25              A    I'm more or less setting a flow to my

James J. Farley                                    June 28, 2010

Page 160

1   answer.  Can I still do that?

2             Q    I apologize.

3             A    The observation is drug products failing

4   to meet established specifications and quality control

5   criteria are not rejected.  Now, I look at the bottom,

6   no additional thickness testing or analytical evaluation

7   of the double thick tablets.  They didn't analyze it.

8             And no root cause was determined for the

9   defect.  However, the lot was released to the market by

10  the quality unit in January of '08 following visual

11  inspection.  That's shoddy.  That is really lousy for a

12  pharmaceutical --

13            Q    Mr. Farley --

14            A    Oh, that's my opinion.

15            Q    -- I asked you where in Paragraph A it

16  indicates that a product that didn't meet established

17  specifications was not rejected.

18                 MR. MILLER:  Asked and answered.  He just

19        told you.

20                 MR. ANDERTON:  No, Pete.  He didn't come

21        close to answering that question.

22                 MR. MILLER:  I disagree.

23            A    I thought I did.

24                 MR. MILLER:  He gave you a perfect

25        answer.

James J. Farley                                        June 28, 2010

Page 161

1              A    I thought I did.  They didn't do
2    additional testing and they didn't do a root cause
3    analysis under the CAPA, Corrective Action/Preventive
4    Action portion of the GMPs.
5              Q    Wait.  They didn't do a root cause
6    analysis or they didn't determine a root cause?
7              A    It says no root cause analysis and none
8    was determined.
9              Q    Okay.  So it doesn't say -- wait, wait.
10   Mr. Farley, I don't want you to get in a hurry here
11   because this has to be precise.
12             A    Yes.
13             Q    It does not say no root cause analysis was
14   conducted, does it?
15             A    It does not say that.
16             Q    It says --
17             A    It says no root cause was determined.
18             Q    So a root cause analysis was conducted;
19   they just were unable to determine the root cause.  And
20   as you testified earlier, that happens, correct?
21                  MR. MILLER:  Object to form, misstates
22        previous testimony.
23             A    On occasion but they didn't do an analysis
24   of the material.  This is a powerful, dangerous -- they
25   didn't analyze it.

James J. Farley                                    June 28, 2010

Page 162

1          Q    They didn't analyze what?  The double

2    thick tablet?

3          A    Yes.

4          Q    They analyzed them to tell that they were

5    too thick and they rejected them.

6          A    That's measurement.

7          Q    Did those tablets go to market?

8          A    No, but any responsible manufacturer would

9    want to know is this double dose or is it the same dose

10   disbursed.  You want to know information about that to

11   prevent it from happening.

12         Q    Mr. Farley, I understand that.  Did those

13   double thick tablets go to market?

14         A    To my knowledge, no.

15         Q    They were rejected?

16         A    But I don't know how many may have made it

17   to the market that are not accounted for.  That's what I

18   wonder.  That's --

19         Q    That's --

20         A    -- what they caught.

21         Q    -- what you wonder?

22         A    I wonder, yeah.

23              MR. MILLER:  Well, that's what they

24         caught.  That's what he said.

25              MR. ANDERTON:  It's not what they caught.

James J. Farley                                          June 28, 2010

Page 163

1        Pete --

2                MR. MILLER:  That's what he said.  Read

3        it back.

4                MR. ANDERTON:  He said it's what they

5        wonder.

6                MR. MILLER:  And then he says -- well,

7        please read back his last answer.

8                MR. ANDERTON:  He never used the term

9        caught.

10               MR. MILLER:  Please read it back.

11       (The record was read back as requested.)

12               MR. ANDERTON:  Because there was nothing

13       about caught.

14               MR. MILLER:  There was a word caught in

15       there actually.  But it's on the record like she

16       said.  Let's keep going.

17   BY MR. ANDERTON:

18           Q   Mr. Farley, we're going to walk through

19   this.  Okay?

20           A   Okay.  There was one out in the market.  A

21   lady, a nurse or somebody in one of the documents found

22   it.

23           Q   From this batch?

24           A   I don't know at this instant what batch it

25   was from, but it was an oversized Digitek that she was

James J. Farley                                        June 28, 2010

Page 164

1   distributing to patients in I'm going to say an old

2   person's home, an aged home, aged facility.  And she

3   found it.  And she contacted them.

4            Q    What's the basis for that testimony?  What

5   is your basis for that testimony?

6            A    The document I read.

7            Q    Okay.

8            A    It's in the documents that we copied.

9            Q    Mr. Farley, so your -- well, let's focus

10  on this for a moment.  Okay?  And I'd like you to stay

11  focused on my question without interjecting your own

12  testimony.  Okay?

13            MR. MILLER:  Objection, argumentative.

14            Q    Mr. Farley, the first sentence, During the

15  packaging of Digoxin tablets 70924 five double thick

16  tablets were observed.  That doesn't say anything about

17  out of specification tablets not being rejected, does

18  it?

19            A    That one doesn't.

20            Q    Quality assurance approved a 100 percent

21  visual inspection of the 4.8 million tablet lot which

22  resulted in an additional 15 double thick tablets.

23            Again, 100 hundred percent of the batch was

24  inspected and they found 15 more tablets.  That doesn't

25  say anything about out of specification tablets not

James J. Farley                                      June 28, 2010

                                                     Page 165

 1    being rejected, does it?

 2              A    That as you worded it does not.

 3              Q    I just read the sentence, Mr. Farley.  I

 4    didn't -- it wasn't my wording.  That's the wording of

 5    the FDA, right?

 6              A    Yes.

 7              Q    So that doesn't say anything about out of

 8    specification tablets not being rejected, does it?

 9              A    Yes.

10              Q    Am I correct about that?

11              A    You're correct.

12              Q    Okay.  Although quality assurance was

13    aware of double thick tablet findings, the batch was

14    then released based on AQL sampling which included

15    visual inspection of 1,330 tablets.

16              Again, it does not say out of specification

17    tablets were released to market, does it?

18              A    It does not say that.

19              Q    No additional thickness testing or

20    analytical evaluation of the double thick tablets was

21    conducted.  Focusing on the double thick tablets, which

22    you already said were rejected, that sentence doesn't

23    say anything about out of specification tablets going to

24    market, does it?

25                   MR. MILLER:  Objection, asked and

James J. Farley                                            June 28, 2010

                                                            Page 166

 1        answered.

 2            A    It does not say anything about going to

 3     market.

 4            Q    Next sentence, no root -- well, or not

 5     being rejected, does it?

 6            A    Say that again.

 7            Q    Well, I -- never mind.  We'll go to the

 8     next sentence.  No root cause was determined for the

 9     defect; however, the lot was released to the market by

10     the quality unit on January 28, 2008, following the

11     visual inspection.

12            Again, it does not say out of specification

13     tablets were released to market, does it?

14            A    It does not.

15            Q    Next sentence, No documented evaluation of

16     the 89 -- approximately 89 lots that remained on the

17     market at the time of the inspection.  It doesn't say

18     anything about out of specification tablets going to

19     market.

20            A    No, but it does in that sentence right

21     there say they didn't bother checking the ones that are

22     on the market to see if any got out.

23            Q    It doesn't say defective tablets -- out of

24     specification tablets were released to market, does it?

25                 MR. MILLER:  Object to form.

James J. Farley                                         June 28, 2010

                                                              Page 167

 1              A    The way you have it worded it does not say

 2       that.

 3              Q    Okay.  It's not my wording, Mr. Farley.

 4              A    I know.

 5              Q    It's the FDA's.

 6              A    I know.

 7                   MR. MILLER:  Your last statement was your

 8          wording.  It was -- you were not reading.

 9              Q    I'm talking about the sentence.  That

10       doesn't say out of specification tablets were released

11       to market, does it?

12              A    Correct.

13              Q    So no sentence in that observation that

14       relates to Digitek says out of specification tablets

15       were released to marketing; yet the observation, the

16       Turbo language, says drug products failing to meet the

17       established specifications and quality control criteria

18       are not rejected.

19              A    I see it.

20                   MR. MILLER:  Hold on.  He's reading it.

21              Q    There's no question.

22              A    There was no question.

23              Q    Give me one second.  Mr. Farley, I'm going

24       to hand you a document that has been marked as

25       Plaintiffs' Exhibit 158.  We decided to leave some of

James J. Farley                                              June 28, 2010

Page 168

1    the numbering on some of the -- some, not all, of the

2    prior exhibits.

3                Have you seen that document before?

4                A    I believe so.

5                Q    Okay.  This is an EIR, Establishment

6    Inspection Report, relating to a 2007 inspection of

7    Actavis, correct?

8                A    Yes.

9                Q    And Actavis Totowa, I should say.

10               A    Yes.

11               Q    Tell me what an EIR is.

12               A    EIR means, as you just said, Establishment

13   Inspection Report.  It would be analogous to industry

14   when you have a trip report.  When there is an

15   inspection and there are no observations or violations

16   there's always a report, Establishment Inspection

17   Report.

18               And in many cases, many that I've seen where

19   there was a detailed inspection and the Establishment

20   Inspection Report is the inspector as the head of the

21   inspection team telling this is what we did, this is

22   where we visited, this is what we looked at.

23               And if there's an EIR and there's no

24   observations, that's as far as it goes.  If there are

25   observations then they are in effect excerpted from

James J. Farley                                    June 28, 2010

Page 169

1   there and put into a 483.  But that's -- before I

2   digress too much, that's an EIR.

3           Q    Well, that's actually not true, is it?

4   Isn't the 483 issued at the close of the inspection?

5           A    Yes.

6           Q    At the close-out meeting?

7           A    The typed-out version is not prepared at

8   the close-out meeting.  They are aware of what they're

9   going to receive, but they may come back.

10          Q    Is it your testimony really that the

11  typed-out version of the 483 is not delivered at the

12  close-out meeting?

13          A    Not at the -- not in my experience, not at

14  the very end of it.  They -- the word is, we're having

15  this typed up, it will be delivered to you.  Now --

16          Q    That makes me question your experience

17  significantly, Mr. Farley.

18               MR. MILLER:  Object to form.

19          A    You're welcome to do that, but what I have

20  seen is they say, we found this, we found this, they

21  show the handwritten one, this is going back to get

22  typed.  That's my experience.  And you're certainly

23  welcome to question it, but I'll hold with it.

24          Q    Can you turn to page 3 of Plaintiffs'

25  Exhibit 158?

James J. Farley                                          June 28, 2010

Page 170

```
 1              A    I have it.

 2              Q    While you have it, do you see the -- why

 3    don't you hold Defendants' Exhibit 57, which is the 483

 4    that relates to this 2007 inspection, another document

 5    that I had given you previously.

 6              A    That one?

 7              Q    That's the one.

 8              A    All right.

 9              Q    Now, back to page 3 of the EIR, at the

10    bottom, the second to last paragraph.  It's not

11    redacted.  It begins, On 9/28/07 an FDA 483,

12    inspectional observations, was issued to Mr. Apurva

13    Patel, managing director.

14              A    Yes.

15              Q    So this indicates the 483 was issued at

16    the close-out meeting.

17              A    Then she did it in that case that day.  I

18    mean --

19              Q    Will you look at -- well, she did the same

20    thing for the 2008 inspection, didn't she?

21              A    Could be district policy.  District

22    directors can choose their policy.

23              Q    Okay.

24              A    What I have seen is when they're shown

25    written, they say we're going to come back.  Now, when
```

James J. Farley                                    June 28, 2010

                                                     Page 171

1   they come back you may call that a close-out meeting or

2   others have just said we're coming to deliver the 483.

3   But I don't view that as any contradiction of what I

4   said.  It just makes it non-universal.  But you're

5   getting the 483 either way.

6          Q    What you said and what you said in your

7   report is that observations from the EIR end up in the

8   483.  It's actually the other way around.  It's the EIR

9   that's not issued until long after the inspection; isn't

10  that right?

11              MR. MILLER:  Object to form.

12         A    No.  It's not needed until after.  If you

13  have an inspection and you observed some good things and

14  some bad things, you want to get the bad things out

15  first to get them corrected and then you'll get the good

16  things that are things they were doing well.

17         Q    The good things would be an EIR, not the

18  483, right?

19              MR. MILLER:  Object to form.

20         A    Good and bad things are in the EIR, if

21  there are any bad things.

22         Q    Mr. Farley, turn in the Establishment --

23  in the EIR from the 2007 inspection.  And again staying

24  on page 3, do you see the first full paragraph?

25         A    Which one?

James J. Farley                                    June 28, 2010

                                                   Page 172

 1            Q    On page 3 the first full paragraph.   It
 2    begins on 9/5/07.
 3            A    I see it.
 4            Q    Okay.   And it describes the purpose of the
 5    inspection.   And the third sentence reads, I explained
 6    that the purpose of my visit was to provide follow-up
 7    coverage to Warning Letter No. 07-NWJ-06.
 8            And then it goes on to say also
 9    pre-inspectional -- pre-approval inspectional
10    coverage -- there's some redacted language that the FDA
11    redacted -- as well as GMP inspectional coverage.
12            Do you see that?   Did I read that correctly?
13            A    I see it.
14            Q    Did I read that correctly?
15            A    Yes, you did.
16            Q    Okay.   So the purpose of this visit --
17    this inspection, I should say, was to follow up on a
18    prior warning letter; is that right?
19            A    That's what it seems to be.
20            Q    I'm going to hand you a document that's
21    been marked as Plaintiffs' Exhibit 25.   You see that
22    this is a revised warning letter?
23            A    Yes.
24            Q    You see the number, the file number, on
25    the face of the warning letter, 07-NWJ-06?

James J. Farley                                              June 28, 2010

                                                              Page 173

 1              A   Yes.

 2              Q   Is that the same warning letter referenced

 3      in this EIR --

 4              A   Yes.

 5              Q   -- that is Exhibit 58?

 6              A   Yes.

 7              Q   So this inspection was to follow up on

 8      this one?

 9                  MR. MILLER:  Object to form, misstates

10          previous testimony.  You read it in there, as well

11          as GMP inspectional coverage.  You seem to be

12          forgetting half the sentence.

13              Q   One of the purposes of this inspection was

14      to follow up on this warning letter; is that correct?

15              A   Yes.

16              Q   You said you've seen the EIR that's marked

17      Exhibit 158, right?

18              A   This one?

19              Q   Yes, that's the one.

20              A   I've seen it.  I reviewed it.  I don't

21      remember everything at this moment, but please ask me

22      any questions you like.

23              Q   By reviewed it do you mean to say that you

24      reviewed it in the course of -- is it one of the

25      documents you received from the Miller Firm?

James J. Farley                                          June 28, 2010

Page 174

1               A    Yes.

2               Q    Is it something you reviewed in preparing

3    your expert report in this case?

4               A    Yes.

5               Q    Give me one second.  All right.  Will you

6    turn, Mr. Farley, to page 25 of Exhibit 158.

7               A    Page 25?

8               Q    Yes.

9               A    I have it.

10              Q    Will you read the first heading on that --

11   well, the first heading on that page reads Voluntary

12   Corrections, right?

13              A    Yes.

14              Q    It goes on to read in the body of the

15   paragraph under that, Corrections to the previous FDA

16   483 were reviewed with Ms. Wanda Eng, senior director

17   corporate compliance for Actavis.  The previous 483

18   observations in the associated corrections appear below.

19              A    I see it.

20              Q    So the FDA here is saying as part of this

21   inspection we reviewed prior 483 observations and the

22   corrective actions taken by the company, right?

23              A    Yes.

24              Q    And then they set forth pages of -- well,

25   let's kind of go through some of this.

James J. Farley                                              June 28, 2010

                                                              Page 175

 1               A    All right.

 2               Q    On page 25 the first observation relates

 3    to the quality control unit and the authority of the

 4    quality control unit.

 5               Do you see that?

 6               A    I see it.

 7               Q    And then under corrections it first

 8    indicates that a number of individuals have been hired.

 9    It lists several -- it looks like the better part of 15

10    to 20 new hires.  Do you see that?

11               A    I see it.

12               Q    On the next page, page 26, the first

13    paragraph indicates that since the previous inspection

14    the number of individuals in the quality assurance

15    department has increased.  It goes on to give the number

16    but it's redacted.  Do you see that?

17               A    I see it.

18               Q    And the rest of that page sets forth

19    several paragraphs of additional corrective action,

20    doesn't it?

21               A    Seems to be.

22               Q    Well, what do you mean seems to be?  This

23    is an FDA document, right?

24               A    I have to read what we're correcting.  I

25    mean, the details.  We said the quality control unit

James J. Farley                                          June 28, 2010

                                                        Page 176

1    lacks authority to fully investigate.  Then we jumped

2    over to details of what was observed and we went right

3    to the corrections.  So I -- before I answer your

4    question I've got to know more of what we're correcting.

5              Q    Please read the details.

6              A    You or me?

7              Q    You.  You don't have to read them out

8    loud.  You can just go ahead and read the paragraph of

9    Observation 1 on page 25.

10             A    You want me read out loud or --

11             Q    No, you don't have to read it out loud.

12   Just read it and let me know when you're ready to answer

13   questions.

14             A    It will just be a minute.

15             Q    Take your time.

16               THE VIDEOGRAPHER:  Mr. Mike, while he's

17         reading that I'm going to go off the record and

18         change tape.

19               MR. ANDERTON:  Okay.

20               THE VIDEOGRAPHER:  It is 2:15 p.m.

21           (A brief recess was taken.)

22               THE VIDEOGRAPHER:  All right.  We're back

23         on record.  It's 12 -- pardon me.  It's 2:22 p.m.

24         This is the beginning of Tape No. 5.

25   BY MR. ANDERTON:

James J. Farley                                          June 28, 2010

                                                            Page 177

```
 1              Q    All right.   Mr. Farley, we were talking
 2    when we left about Exhibit 1 -- what has previously been
 3    marked as Plaintiffs' Exhibit 158, the 2007 EIR.   And we
 4    were talking about information on pages 25 and 26 of
 5    that document.
 6              Have you had the opportunity to read the
 7    observation language that you were reviewing on page 25?
 8              A    Yes, I did.
 9              Q    And so then after that observation
10    language is a page and a half of actions that the
11    company took in order to correct deficiencies that might
12    have been reflected in that observation language; isn't
13    that right?
14              A    I just pause.   You said it might have been
15    reflected.   They're jumping out at me.   That -- you're
16    saying that might have been reflected.   I'm looking at
17    batches of drug products that have initially failed.
18              Q    Mr. Farley --
19              A    I mean --
20              Q    -- we're going to be here a long time if
21    you don't start answering my questions.   My question
22    was, is there a page and a half of corrective actions
23    set forth on pages 25 and 26?
24              A    Yes, there is.
25              Q    Okay.   Documented by the FDA in this EIR?
```

James J. Farley                                          June 28, 2010

                                                            Page 178

1                A    Yes, there is.

2                Q    Okay.  And accepted by the FDA?

3                     MR. MILLER:  Object to form.

4                A    Implicit acception (sic) by the FDA since

5        they wrote it.

6                Q    Yes.

7                A    Yes.

8                Q    Next, page 27 -- well, let me ask you

9        this, in the eyes of the FDA any deficiency that was set

10       forth in Observation 1 is resolved by these corrective

11       actions, right?

12                    MR. MILLER:  Object.  It misstates the

13              document.

14               A    If they agree that it is resolved they

15       could say -- and I'd have to refresh myself on the

16       complete detail -- that here's your correction that you

17       apply.  They might say more is needed.

18               Q    Do they say that with respect to

19       Observation 1?

20               A    I don't see it.

21               Q    Okay.  So in the eyes of the FDA any

22       deficiencies that are reflected in Observation 1 have

23       been corrected.

24                    MR. MILLER:  Object to form.

25               A    An attempt has been made.

James J. Farley                                June 28, 2010

Page 179

1         Q    I'm asking you about --

2               MR. MILLER:  Object.  He answered.

3         A    I wouldn't know if they were corrected

4    until I saw the subsequent batches that were

5    manufactured and if these people performed their jobs

6    properly.

7               Q    Mr. Farley, I'm talking about in the eyes

8    of the FDA -- well --

9               MR. MILLER:  Object, asked and answered.

10         He said it's been attempted.  That's what's been

11         done.  He gave you an answer.  You're badgering

12         him.

13              MR. ANDERTON:  Pete, you're not going to

14         just shout me down and allow him to avoid

15         answering the questions I ask him.

16              MR. MILLER:  I'm trying to shout over

17         you, Mike.  And you've already asked and answered.

18         He gave you an answer.

19              MR. ANDERTON:  He has not given me an

20         answer --

21              MR. MILLER:  He has.

22              MR. ANDERTON:  -- to the question and

23         we're going to stay here until he does.

24    BY MR. ANDERTON:

25              Q    So, Mr. Farley, I asked you a question.

James J. Farley                                      June 28, 2010

                                                      Page 180

1    You've acknowledged that there's a page and a half worth

2    of corrective actions that the FDA indicates were

3    taken --

4            A   Yes.

5                MR. MILLER:  Objection, misstates

6        previous testimony.

7            Q   -- right?

8            A   That there appear they're taking some

9    corrective action.

10           Q   Okay.  And the FDA wrote this document,

11   correct?

12           A   Yes.

13           Q   So the FDA wouldn't write this if it

14   didn't believe these things hadn't happened, right?

15           A   Correct.

16           Q   And that's based on the inspection that is

17   reflected in this EIR, right?

18           A   Correct.

19           Q   So the FDA comes in, they review

20   circumstances related to a prior observation to see

21   whether corrective actions have been taken.

22           A   Yes.

23           Q   And they issue this document which sets

24   forth all of these corrective actions, right?

25           A   Yes.

James J. Farley                                           June 28, 2010

Page 181

1              Q   And there's nothing in there indicating

2    further action -- further corrective action is necessary

3    for that observation, is there?

4                   MR. MILLER:  Objection.

5              A   Nothing that I see.

6              Q   Okay.  Observation 2, page 27, do you see

7    that language?

8              A   Starting with laboratory records?

9              Q   Yes.

10             A   I'm reading it.

11             Q   I don't want you to read it, but the

12   observation is set forth and there are examples that go

13   (a) through (g).  Do you see that?

14             A   Yes.

15             Q   Again, that's language from a prior

16   observation, right?

17             A   Yes.

18             Q   And on page 28 the FDA lists corrections.

19   Do you see that?

20             A   Top of 28?

21             Q   Yes, sir.

22             A   Yes.

23             Q   So corrective actions were taken by the

24   company in response to that observation, right?

25             A   Yes.

James J. Farley                                    June 28, 2010

                                                        Page 182

 1              Q    Does the FDA indicate any further action

 2    is necessary?

 3              A    Not at that point.

 4              Q    Observation 3, do you see that on page 28?

 5              A    I see it.

 6              Q    And do you see that it sets forth five,

 7    (a) through (e), five examples that support that prior

 8    observation?

 9              A    Yes.

10              Q    Do you see there are corrective actions

11    indicated at the bottom of page 28 and continuing on to

12    page 29?

13              A    Yes.

14              Q    Does the FDA indicate any further action

15    is necessary to correct that observation?

16              A    They do not.

17              Q    Observation 4 on page 29, and you see that

18    there are again five, (a) through (e), five examples,

19    supporting Observation 4?

20              A    I see it.

21              Q    Do you see at the top of page 30

22    corrective actions taken by the company?

23              A    I see it.

24              Q    Do you see -- does the FDA indicate any

25    further action is necessary to correct that observation?

James J. Farley                                      June 28, 2010

                                                      Page 183

1              A    It does not.

2              Q    Okay.  Observation 6, still on page 30, do

3    you see the observation?

4              A    6, bottom of 30?

5              Q    I'm sorry.  I misspoke, Mr. Farley.  I

6    jumped ahead and I apologize for that.  Observation 5 in

7    the middle of page 30.

8              A    I see it.

9              Q    Do you see that?

10             A    Yes.

11             Q    Do you see the corrective actions

12   indicated by the FDA?

13             A    I see it.

14             Q    Does the FDA indicate any further action

15   is necessary to correct that observation?

16             A    They do not.

17             Q    Observation 6 -- this time I mean it --

18   starting on the top of page 30, continuing on to page

19   31, and there are four specific examples, (a) through

20   (d), supporting Observation 6.

21             Do you see that language?

22             A    I see.

23             Q    And do you see the corrections that the

24   company took as indicated by the FDA in the EIR?

25             A    I see it.

James J. Farley                                    June 28, 2010

Page 184

1           Q    Does the FDA indicate any additional

2    actions are necessary to correct that observation?

3           A    They do not.

4           Q    I wish there was a way to make this

5    shorter, Mr. Farley, but there is not.  So I apologize.

6           A    That's all right.

7           Q    Mr. Farley, Observation 7 beginning on

8    page 31, do you see that?

9           A    I see it.

10          Q    It carries over very briefly to page 32

11   and then there are three paragraphs relating to the

12   corrective -- or reflecting, I should say, the

13   corrective actions taken.

14          Do you see that?

15          A    Where are we here?

16          Q    Now we're on page 32.

17          A    I see it.

18          Q    And do you see -- and, for example,

19   Mr. Farley, do you see the very first sentence of the

20   second paragraph of the corrections on page 32?

21          A    Beginning with, Corrections to the

22   stability program?

23          Q    Yeah.  Read that sentence out loud,

24   please.

25          A    Corrections to the stability program have

James J. Farley                                    June 28, 2010

                                                        Page 185

1    been verified during the current inspection.

2              Q    So that's the FDA saying, we looked at

3    this issue and we verified that the corrective actions

4    have been taken, right?

5              A    At that inspection, yes.

6              Q    Okay.  So does the FDA indicate any

7    further actions necessary to correct the items set forth

8    in Observation 7?

9              A    No.

10             Q    Observation 8, beginning on page 32.

11             A    I have it.

12             Q    Do you see that?

13             A    I see it.

14             Q    It carries over onto page 33 with -- again

15   with five examples.

16             A    I see it.

17             Q    And then there are corrective actions

18   indicated.  Do you see that?

19             A    I do.

20             Q    Does the FDA indicate that there are any

21   additional corrective actions necessary with respect to

22   Observation 8?

23             A    No.

24             Q    Observation 9, beginning on page 33 and

25   carrying over onto page 34 with three examples.

James J. Farley                                          June 28, 2010

                                                            Page 186

 1                Do you see that?

 2           A    Yes.

 3           Q    And again, corrective actions indicated in

 4      a paragraph about one-third of the way down on

 5      Paragraph -- or excuse me -- on page 34.

 6                Do you see that?

 7           A    I see it.

 8           Q    Does the FDA indicate that any further

 9      actions are necessary to correct Observation 9?

10           A    They do not.

11           Q    Observation 10, beginning on page 34

12      actually and concluding on page 34.  Do you see that

13      observation?

14           A    I do.

15           Q    And there are corrective actions indicated

16      on page 34 as well?

17           A    Yes.

18           Q    Any further actions necessary according to

19      the FDA to correct that observation?

20           A    No.

21           Q    Observation 11, page 35.

22           A    I'm with you.

23           Q    Do you see any corrective actions

24      indicated for Observation 11?

25           A    I'm reading Observation 11.

James J. Farley                                      June 28, 2010

                                                       Page 187

 1              Q    Take your time.

 2              A    Now I'm reading the corrections.

 3              Q    Take your time.

 4              A    And the question was?

 5              Q    Do you see any further actions necessary

 6    according to the FDA to correct Observation 11?

 7              A    No.

 8              Q    Observation 12 on page 36, do you see that

 9    observation?

10              A    I see it.

11              Q    And do you see the corrective actions

12    indicated?

13              A    I see it.  I just want to read this one.

14              Q    Take your time, Mr. Farley, whatever you

15    feel is appropriate.

16              A    I see it.

17              Q    According to the FDA is that -- the items

18    in Observation 12 corrected with no further action

19    necessary?

20              A    It appears to be.

21              Q    Well, do they indicate any further action

22    necessary to correct that?

23              A    They do not.

24              Q    And you said earlier that if there were

25    further actions necessary they'd say that, right?

James J. Farley                                        June 28, 2010

                                                        Page 188

    1             A    They would.

    2             Q    Observation 13, starting on page 36,

    3    continuing on to page 37, do you see that observation?

    4             A    I see it.

    5             Q    Do you see the corrective actions on page

    6    37?

    7             A    Yes.

    8             Q    Does the FDA indicate any further actions

    9    are necessary to correct Observation 13?

   10             A    No.

   11             Q    Observation 14, do you see that?

   12             A    Yes.

   13             Q    Do you see the corrective actions?

   14             A    I'm reading.

   15             Q    Take your time.

   16             A    I see them.

   17             Q    Does the FDA indicate any further action

   18    necessary to correct Observation 14?

   19             A    They do not.

   20             Q    And finally, Mr. Farley, Observation 15.

   21             A    Yes.

   22             Q    Do you see that beginning on page 37 and

   23    continuing over briefly onto page 38?

   24             A    Yes, I do.

   25             Q    Do you see the corrective actions

James J. Farley                                     June 28, 2010

Page 189

1    indicated?

2              A    Yes, I do.

3              Q    Does the FDA indicate any further actions

4    are necessary to correct Observation 15?

5              A    They do not.

6              Q    So according to the FDA, corrective

7    actions were taken in response to every single

8    observation from the prior inspection.

9              A    Taken or proposed?  They hired new people,

10   but you haven't seen them perform.

11             Q    Were taken -- Mr. Farley, let's talk about

12   you going down your own paths like that.

13             A    Okay.

14             Q    Taken means hiring.  If you tell the

15   FDA -- if the FDA cites you for not having enough

16   personnel and you hire additional personnel you've taken

17   a corrective action by hiring additional personnel.

18             A    Right.

19             Q    You don't need to see them perform to have

20   taken the first step of the corrective action.

21                  MR. MILLER:  That's a different question.

22        Why don't you ask him the question --

23                  MR. ANDERTON:  I didn't ask him that

24        question.  That's my point.  He keeps interjecting

25        his own thoughts.

James J. Farley                                          June 28, 2010

                                                        Page 190

 1                    MR. MILLER:  He keeps interjecting an
 2          answer and you keep stepping on him.  Why don't
 3          you try asking a question and he'll answer the
 4          question.
 5                    MR. ANDERTON:  I did ask him a question.
 6                    MR. MILLER:  Well, ask him again.
 7                    MR. ANDERTON:  Can you read the question
 8          that I asked before that back, please?
 9          (The record was read back as requested.)
10                    MR. MILLER:  Can you read what the answer
11          was, please?
12          (The record was read back as requested.)
13                    MR. MILLER:  And he was cut off.  Would
14          you like him to continue with his answer?
15                    MR. ANDERTON:  No, because he starts
16          talking about them performing.  That's not part of
17          the corrective action.  If the FDA --
18                    MR. MILLER:  Hiring somebody and their
19          performance isn't part of a corrective action?
20          Well, if you're asking if they just simply did
21          something and didn't care what the outcome was
22          then he's answering your question.
23                    MR. ANDERTON:  Well, there's a very
24          precise reason why I'm asking that, Pete.
25                    MR. MILLER:  Well, ask it and he'll

James J. Farley                                    June 28, 2010

                                                      Page 191

 1        answer it.

 2                  MR. ANDERTON:  I'm trying to get him to

 3        answer my --

 4                  MR. MILLER:  You're trying to get the

 5        answer you want to get.

 6                  MR. ANDERTON:  I'm trying to get him to

 7        answer my narrowly focused question.

 8   BY MR. ANDERTON:

 9        Q    Did -- in the eyes of the FDA -- well, let

10   me start that question over.  According to the FDA

11   corrective actions were taken in response to every

12   single one of the prior 483 observations, correct?

13        A    Yes.

14        Q    And the FDA didn't indicate any further

15   corrective actions necessary in response to any of those

16   483 observations --

17        A    They did not.

18        Q    -- did they?

19        A    They did not.  Could I explain my

20   seemingly roundabout --

21        Q    I don't think that's -- I mean no

22   disrespect, Mr. Farley, but I'll ask the questions and

23   then --

24        A    Okay.

25        Q    -- you go ahead and respond.

James J. Farley                                    June 28, 2010

```
                                                   Page 192
 1             A    I just felt there was something important
 2     that -- but we'll go with the flow here.
 3             Q    When is the last time you were hired and
 4     retained by a pharmaceutical company to consult about
 5     GMP compliance?
 6             A    Probably last year sometime.
 7             Q    2009, is that what you mean?
 8             A    Probably.  I just don't remember.  I'd
 9     have to go to their files.
10             Q    Could it have been before 2009?
11             A    Definitely it was before 2009.  I think it
12     might have been in 2009.
13             Q    Okay.  I mean the last time.  When is the
14     most recent?
15             A    I don't remember that one offhand.  I just
16     don't, because I took a little time off to write the
17     book and I did some other things.  And I turned down a
18     few.  I really honestly don't know.
19             Q    Okay.  And just so that we're clear, you
20     understand what final agency determination is, right?
21             A    Yes.
22             Q    A 483 is not final agency determination on
23     GMP compliance, correct?
24             A    Correct.
25             Q    Nor is an EIR; is that right?
```

James J. Farley                                    June 28, 2010

Page 193

 1          A    Correct.

 2          Q    In fact, a warning letter is not final

 3    agency determination, is it?

 4          A    Correct.

 5          Q    The FDA's perspective is to err on the

 6    side of caution as they engage in their regulatory

 7    activities, correct?

 8          A    I haven't heard it in those terms.  If

 9    you're telling me that I would say that as a patient, a

10    consumer, I would hope they would.

11          Q    I'm asking you that as a regulatory

12    consultant.  Does the FDA approach its regulatory duties

13    from the perspective of erring on the side of caution?

14          A    The FDA as I have always seen its

15    approaches is it don't err at all.  They never

16    mentioned -- if you're asking my perspective --

17          Q    I'm not talking about err in the context

18    of manufacturing pharmaceutical products.  I'm talking

19    about the FDA in performing its job.

20               For example, the FDA will ask a company to

21    recall a product -- well, the FDA doesn't have to

22    believe there is defective product in the market to ask

23    a company to recall a product, correct?

24          A    Do they have to?  They don't have to.

25          Q    They will ask a company to recall a

James J. Farley                                    June 28, 2010

Page 194

1    product if they believe there's a possibility a

2    defective product is in the market.

3              A    If they believe there's a finite

4    reasonable possibility that people can get hurt.

5              Q    Well, that's not the question I asked,

6    Mr. Farley.

7              A    I'm really trying to answer it.  I really

8    am.

9              Q    They'll ask a company to recall a product

10   if they believe there's the possibility that there is

11   defective product in the market.

12                  MR. MILLER:  Object to form.

13             A    Yes.

14             Q    You've seen that in your experience?

15             A    Yes.

16             Q    Mr. Farley, I'm handing you a document

17   that has been marked as Defendants' Exhibit 39.  And I

18   will represent to you that it is a print-out of a

19   posting on the FDA Web site.  And you can see on the

20   bottom right corner that it was accessed and printed on

21   June 14th of this year.

22             A    I see it.

23             Q    Have you seen that posting on the FDA Web

24   site previously?

25             A    I don't believe so.  I've seen a lot of

James J. Farley                                          June 28, 2010

                                                        Page 195

 1    them, but I don't believe I've seen this.

 2              Q    I understand.  So you're not -- you don't

 3    think you have?

 4              A    Correct.

 5              Q    Will you read -- give me one second.  Will

 6    you read the -- do you see the heading that says, If a

 7    Manufacturer is not Following cGMPs are Drug Products

 8    Safe for Use?  It's about two-thirds of the way down the

 9    page, the first page.  Do you see that?

10              A    I'm pointing to it.

11              Q    Okay.

12              A    I found it.  I see it.

13              Q    I'm going to read the first paragraph

14    under that heading.  If a company is not complying with

15    cGMP regulations any drug it makes is considered

16    adulterated under the law.  This kind of adulteration

17    means that the drug was not manufactured under

18    conditions that comply with cGMP.  It does not mean that

19    there is necessarily something wrong with the drug.

20              Did I read that correctly?

21              A    You read it correctly.

22              Q    Do you agree with that?

23              A    Skeptically.

24              Q    Skeptically yes?

25              A    Let me think about that.  It does not mean

James J. Farley                                    June 28, 2010

Page 196

1    that there is necessarily something wrong.  If I were

2    writing that I would say -- this is if I were writing it

3    and then -- that necessarily that there is something

4    wrong but it may not be harmful.

5              There's something wrong because you didn't

6    make it right; therefore something's wrong.  That's what

7    I would say.  I disagree with the way this is worded.

8         Q    So you would say it does not necessarily

9    mean the product is unsafe.

10        A    Or harmful, yes.

11        Q    Or harmful.

12        A    That's the way I would word that.

13        Q    Okay.  What's your understanding of why

14   Digitek was recalled?

15        A    Of why what?

16        Q    Digitek was recalled.

17        A    I believe that a lady died.  I believe

18   that there were numerous violations of GMPs and that

19   there's no assurance that the product on the market

20   wouldn't do harm.  That's my opinion from what I've

21   read.

22        Q    You read that a lady died from Digitek,

23   from taking Digitek?

24        A    Somewhere I read it.

25        Q    You read -- Mr. Farley, you read an

James J. Farley                                    June 28, 2010

                                                        Page 197

1    adverse event reflecting an event that was reported from

2    the market in sometime around 2000 and you believe that

3    had something to do with a product recall that occurred

4    in 2008?

5                    MR. MILLER:  Objection.  You're putting

6          words in his mouth.  That has nothing to -- it's

7          not even closely related.  You've grossly

8          misrepresented what he said.

9              A    Go back to your question.  Why do I think

10   it was recalled?

11             Q    Yeah.

12             A    Somebody died from it years before.

13             Q    How many years?

14             A    Eight or ten.

15             Q    And you think that had -- that related to

16   the recall?

17             A    No, no.  It wasn't the end of my sentence.

18   And in reading inspections and warning letters and

19   looking not just at Digitek but at the company itself, I

20   really question whether they can make anything right the

21   way they were set up.

22             I didn't -- I agree with the consent decree.

23   They're not capable -- were not capable of making a good

24   product themselves.  No guarantee of it.

25             Q    Well, let's talk about operating under a

James J. Farley                                    June 28, 2010

Page 198

1    consent decree.  When you operate under a consent decree

2    you're under incredibly close scrutiny, right?

3            A    Yes.  I have assisted firms operating

4    under a consent decree.

5            Q    Okay.  Would you do me a favor and just

6    close that laptop up?  I don't need you distracted and

7    there's no reason for it to be open anymore.

8            A    Okay.  I just --

9            Q    I apologize.

10           A    No, that's fine.  It was distracting me,

11   too.  I just thought you wanted it on.

12           Q    I don't need it on anymore.

13           A    We're going to shut it down then.

14           Q    Okay.  Now -- all set?

15           A    All set.

16           Q    You say you've consulted for firms that

17   have been operating under a consent decree.

18           A    Yes.

19           Q    Very close scrutiny when that happens,

20   right?

21           A    Yes.

22           Q    Everything they do is watched.

23           A    Yes.

24           Q    If a company operating under a consent

25   decree doesn't comply with GMPs, they're going to have

James J. Farley                                          June 28, 2010

Page 199

 1   big problems, aren't they?

 2           A    That's right.

 3           Q    They're not going to be able to release

 4   product, are they?

 5           A    They can't release it themselves.  They

 6   need a third party approval.  They're determined to be

 7   incapable of releasing it themselves when they're under

 8   a consent decree.

 9           Q    Well -- so if they're releasing product

10   under a consent decree then they are complying with Good

11   Manufacturing Practices.

12           A    I hope so.

13           Q    Well, they either are or aren't, right,

14   Mr. Farley?

15           A    That's right.

16           Q    So they are?

17               MR. MILLER:  Object to form.

18           A    They should be.

19           Q    If they're not they're not releasing

20   product.

21           A    I wouldn't doubt that some firms have

22   released product when they shouldn't have.

23           Q    But the third party has to approve.

24           A    Oh, with the third party.  Yes.  The third

25   party is the consulting function, usually a group of

James J. Farley                                    June 28, 2010

```
                                              Page 200
 1   many consultants, who will determine whether the
 2   material is good enough to be released to the market.
 3            Q    Well, and you indicated a few moments ago
 4   that when you're operating under a consent decree you're
 5   operating with a third party looking over your shoulder
 6   checking everything you do, right?
 7            A    Yes.
 8            Q    So if you're releasing product while
 9   operating under a consent decree with that third party,
10   you're complying with GMPs, aren't you?
11            A    For those batches of that product.
12            Q    For the batches that get released.
13            A    Yes.
14            Q    Any batch that gets released while you're
15   operating under a consent decree is GMP compliant.
16            A    If it went through the third party, if you
17   didn't do it on your own and sneak it out, which some
18   firms have been known to do.
19            Q    Assuming you didn't sneak product out the
20   back door --
21            A    You did everything right, then the answer
22   is, yes, it should be good.
23            Q    So when you're operating under a consent
24   decree for a long period of time you're actually
25   engaging in sustained GMP compliance, aren't you?
```

James J. Farley                                          June 28, 2010

Page 201

1            A    While you're still trying to repair all

2    your systems and get them in shape to do it yourself.

3            Q    The answer to my question is yes.

4            A    Yes.

5            Q    You're operating under sustained GMP

6    compliance, right?

7            A    Yes.

8            Q    Let's go back to the Digitek recall.  You

9    made -- when I asked you why Digitek was recalled you

10   insisted on referring to somebody dying eight or ten

11   years before the 2008 recall.

12           Do you believe that is one of the factors that

13   resulted in Digitek being recalled?

14           A    For the current recall?

15           Q    Yeah.

16           A    I believe it may have been in the minds of

17   FDA when they asked Digitek to recall, but I don't know

18   that.  I have no way of knowing what was in FDA's mind

19   other than the fact that they felt the product was

20   unsafe.

21           Q    Well, let's see if we can figure out

22   what's in FDA's mind on that issue.

23           A    Okay.  I mean yes.

24           Q    Mr. Farley, I have handed you a document

25   that has been marked Defendants' Exhibit 38 and it is

James J. Farley                                    June 28, 2010

Page 202

1    again a print-out of a posting from the FDA Web site.
2    The date it was accessed and printed is June 15, 2010.
3    And the title of the posting is "Facts and Myths about
4    Generic Drugs".
5              A   I see it.
6              Q   Have you seen this posting before?
7              A   No.
8              Q   You have not?
9              A   No.
10             Q   Okay.  Why don't you turn to page 2 of
11   that print-out.  And I'm going to read the first myth.
12   This is a sheet, Mr. Farley, that -- it's kind of a
13   publication put out by the FDA where they set forth
14   something that might be part of public perception and
15   then they set forth facts that the FDA believes kind of
16   prove that perception incorrect.
17             A   Yes.
18                 MR. MILLER:  Object to form.
19             Q   Do you agree with that?
20             A   I hear what you're saying.
21             Q   Do you agree with that?
22             A   That the FDA is putting this out to
23   educate the consumer?
24             Q   Yes.
25             A   Sure.

James J. Farley                                      June 28, 2010

Page 203

1           Q    Okay.  So -- and the education that's

2    occurring is the FDA making an effort to correct

3    misconceptions that might be out there.

4                MR. MILLER:  Object to form.

5           Q    Do you agree with that?

6           A    That's what it says.

7           Q    Okay.  So let's look at page 2.  Here is

8    the myth the FDA is addressing in this instance.  There

9    are quality problems with generic drug manufacturing.  A

10   recent recall of generic Digoxin, paren, called Digitek,

11   closed paren, shows that generic drugs put patients at

12   risk.

13               Did I read that correctly?

14          A    You read it correctly.

15          Q    All right.  That's the myth according to

16   the FDA.  The fact according to the FDA is, quote, FDA's

17   aggressive action in this case demonstrates the high

18   standards to which all prescription drugs, generic and

19   brand name, are held, closed quote.

20               Did I read that correctly?

21          A    You read it correctly.

22          Q    I'm going to go on and there are four

23   bullet points under that fact that the FDA set forth.

24   And the first one reads, In March 2008 FDA performed a

25   scheduled inspection of the Actavis production facility

James J. Farley                                    June 28, 2010

Page 204

1    and identified products that were not manufactured to

2    required specification over a period of time extending

3    back to the year 2006.  Included in this list of

4    products was one particular lot of Digitek.

5              Did I read that correctly?

6         A    You did.

7         Q    Does that give you some insight into why

8    the FDA started thinking about asking to recall that

9    product?

10        A    I'm not relating it yet.

11        Q    Okay.  Well, so far they're only talking

12   about one lot, right?

13        A    Yes.

14        Q    And according to the FDA they encountered

15   products not manufactured to required specifications and

16   only one lot of Digitek fell under that description,

17   right?

18        A    Yes.

19        Q    Okay.  It goes on in Bullet Point 2 to

20   read, Actavis detected a very small number of oversized

21   tablets in this lot, paren, specifically, comma, 20

22   double sized tablets in a sample of approximately 4.8

23   million tablets, closed paren, period.

24             Did I read that bullet point correctly?

25        A    Yes.

James J. Farley                                          June 28, 2010

Page 205

1          Q    So the FDA is still talking about only a
2    single lot, correct?

3          A    Yes.

4          Q    20 tablets out of 4.8 million.  Is that a
5    lot?

6          A    Is it a lot?  Numerically it's not a lot.

7          Q    Statistically is it a --

8          A    But I wouldn't want to be the one to take
9    the oversized tablet.

10         Q    Understood.  But statistically is it a
11   statistically significant number, 20 out of 4.8 million?

12         A    A statistician -- and I'm not a
13   statistician -- would probably say, no, it's not
14   statistically relevant.  But as a person in the
15   pharmaceutical industry I look at a drug like this and I
16   say everything counts.

17              It's like saying, well, some of the parachutes
18   won't work.  Well, I want one that works.  I mean, I --
19   your question to me is very serious.  And it is
20   relevant.  To a statistician it may not be.

21         Q    Understood.  Next bullet point -- and I
22   misspoke.  I said four.  There's actually five.  Next
23   bullet point, quote, Although Actavis attempted to
24   remove the affected Digitek tablets through visual
25   inspection FDA determined that this method of removal

James J. Farley                                    June 28, 2010

Page 206

1    was inadequate to assure the product's quality and

2    consistency in accordance with the current Good

3    Manufacturing Practice, and then cGMP in parentheses,

4    regulations, closed quote.

5              Did I read that correctly?

6         A    Yes.

7         Q    So the FDA is focusing on the inspection

8    method with respect to the double thick tablets for that

9    single batch, right?

10        A    Yes.

11        Q    Having read those three bullet points,

12   does that give you a better sense of why the FDA asked

13   Actavis to recall this product?

14        A    No, it doesn't really -- what it does, the

15   first thing I see was shocked that they mentioned

16   company names in here in what's supposed to be a public

17   document.

18        Q    Mr. Farley --

19        A    They shouldn't do that.  Yes.

20        Q    -- that wasn't even remotely close to

21   answering my question.  Now, I would ask that you

22   please --

23        A    Okay.

24        Q    -- answer my question.

25        A    I will try.  Please answer it -- I mean --

James J. Farley                                    June 28, 2010

Page 207

1              MR. ANDERTON:  Would you read that back,

2         please?

3         (The record was read back as requested.)

4         A    Does it give me a better sense than I

5    have?  No.

6         Q    It gives a pretty detailed explanation of

7    why the FDA -- what the FDA encountered and why they

8    asked Actavis to recall Digitek.  You're a consultant in

9    this industry and those -- that doesn't tell you --

10        A    Your question was does it give me any

11   better sense than I had and my answer is no.

12        Q    Well, you talked about a woman dying ten

13   years before this recall and you talked about all kinds

14   of other things.

15        The FDA is actually explaining why it asked

16   Actavis to recall this product, isn't it?

17             MR. MILLER:  Object to form.

18        A    They're not telling the whole story.  I

19   believe the recall was based on systems not functioning,

20   quality systems not functioning and quality assurance.

21   Does this give me any better -- no, it does not.

22        Q    Well, that's what you believe.  This is

23   the FDA telling the world why it asked for a recall on

24   this product, right?

25        A    But your question was does it give me any

James J. Farley                                    June 28, 2010

Page 208

1  clearer understanding.  My answer is no.

2          Q   When I asked you that question earlier you

3  said, I don't know why the FDA asked for that.  And my

4  question now is, does it give you a better sense of why

5  the FDA asked for it?  I'm not asking you your opinion

6  any longer.  I'm still trying to get you to answer why

7  the FDA asked for a recall on this product.

8          I asked you that question about five minutes

9  ago before we started reading this document and you said

10 you didn't know.  Now having read these three bullet

11 points I repeat my question.

12         Does it give you a better sense of why the FDA

13 asked for a recall on this product?

14         A   It does not give me a better sense than

15 what I had, that previous sense being that all the

16 systems were not functioning properly.

17         Q   Mr. Farley, that was the reason you gave

18 why you thought the product was recalled.  When I asked

19 you earlier why the FDA asked for it to be recalled you

20 said you didn't know.

21         A   If that's what I said then that's what I

22 said.

23         Q   Okay.  You definitely said that.  So this

24 doesn't help you?  I mean, are you now telling me that

25 you think your reason and the FDA's reason are the same?

James J. Farley                                      June 28, 2010

                                                         Page 209

1              A    They would be similar, identical overlap

2       or whatever.

3              Q    Why wouldn't the FDA say that?  Why would

4       the FDA make reference to a single lot and double thick

5       tablets and the inspection protocol and the concern

6       about the inspection protocol?

7              Why wouldn't they -- why would they fool the

8       entire world with a public posting on its Web site

9       available to anyone in the world and say, these things

10      are the reason we asked for a Digitek recall, if in fact

11      it was all of the things you believe?

12                  MR. MILLER:  Object to form, misstates

13          previous testimony.

14                  MR. ANDERTON:  It doesn't misstate his

15          previous testimony.

16      BY MR. ANDERTON:

17             Q    You may answer, Mr. Farley.

18             A    My answer is I don't know why they would

19      do that.

20             Q    Well, you worked for the FDA.  They're not

21      in the business of disseminating bad information, are

22      they?

23             A    They're not supposed to be, but this is

24      surprising to me, this --

25             Q    Would you have liked to have seen this as

James J. Farley                                          June 28, 2010

Page 210

 1  you were doing -- preparing your report in this case?

 2          A    If it's relevant information.  And it

 3  seems to be.  But I don't know that I'd change my

 4  statement to you.

 5          Q    Well, it's relevant information, though,

 6  right?

 7          A    Yes.

 8          Q    And it gives the FDA's position on this

 9  recall, doesn't it?

10          A    Yes.

11          Q    Bullet Point 4, Since the detection of

12  the -- and I'm reading quoting now -- Since the

13  detection of the manufacturing problem FDA has been

14  actively engaged with this company to ensure that all

15  potentially affected lots of Digitek have been recalled.

16  In our best judgment, given the very small number of

17  defective tablets that may have reached the market and

18  the lack of reported adverse events before the recall,

19  harm to patients was very unlikely, closed quote.

20          Did I read that correctly?

21          A    You read it correctly.

22          Q    So did you consider adverse events -- the

23  historical pattern of adverse events as you prepared

24  your report in this case?

25          A    I reviewed files relating to adverse

James J. Farley                                        June 28, 2010

                                                        Page 211

 1    events.

 2              Q    You reviewed FDA 483s.  Do you know how

 3    many adverse events for Digitek were received in, say,

 4    the five years before the recall?

 5              A    I don't know the exact number.

 6              Q    Because you didn't ask and you didn't

 7    review that information, did you?

 8                   MR. MILLER:  Object to form.

 9              A    I didn't ask and review.

10              Q    Would you have liked to have known as you

11    were preparing your report that the FDA thought that

12    harm to patients was very unlikely?

13              A    I would like to know -- if I was talking

14    to someone at the FDA I would like to say, how come you

15    say it's very unlikely and you tell them to do a Class 1

16    recall, which means that it's very likely?  The Class 1

17    recall means harm to the patient is likely and you put

18    on your Web site, FDA.  Who did you hire to put this

19    out?

20              Q    Harm to the --

21              A    That's a contradiction.

22              Q    A Class 1 recall means harm to the patient

23    is likely if they get a defective tablet.  You've got to

24    put that step in there, right, Mr. Farley?

25              A    And if you buy or use the product you have

James J. Farley                                          June 28, 2010

                                                          Page 212

 1    a possibility of getting a defective tablet.

 2              Q    I understand.  But you must first have

 3    defective tablets, right?

 4              A    Defective in any a number of ways --

 5              Q    Okay.

 6              A    -- not just oversized.

 7              Q    What other defect are we talking about?

 8              A    It could be over-strength, under-strength.

 9    I don't trust their results.

10              Q    Don't trust whose results?

11              A    Digitek -- or Actavis.

12              Q    Does the FDA say anything about anything

13    other than double thick tablets?

14              A    No, they do not.

15              Q    So the FDA was on site conducting an

16    inspection and asked the company to recall that product,

17    right?

18              A    They asked them to do a Class 1 recall,

19    which means that harm is likely.  And whoever --

20              Q    Harm because --

21              A    -- does this says it's unlikely and it's a

22    contradiction.

23              Q    Okay.  But, Mr. Farley, you didn't answer

24    my question.  The FDA was on site conducting an

25    inspection and asked the company to recall this product,

James J. Farley                                          June 28, 2010

                                                              Page 213

 1    correct?

 2              A    Yes.

 3              Q    Asked them to recall all lots, right?

 4              A    Yes.

 5              Q    Here they are explaining the reason why

 6    they did that, referring only to double thick tablets in

 7    a single lot.  Do you see that?

 8              A    Yes.

 9              Q    And yet you don't think that's the real

10    reason the FDA asked for this recall?

11              A    No.  I see a contradiction between this --

12    I read -- I see it.  You showed it to me.  It's right

13    here.  I see this and I see what I read and I see a

14    contradiction.  If it's unlikely why do a Class 1

15    recall?

16              Q    It's unlikely because it's unlikely any

17    defective tablets made it to market, Mr. Farley.

18              A    Then why would they do a Class 1 recall?

19                   MR. MILLER:  Wait.  That's not a

20         question.  Wait for a question.

21              Q    Mr. Farley --

22              A    Yes.

23              Q    -- you understand what a Class 1 recall

24    is.

25              A    Yes.

James J. Farley                                        June 28, 2010

                                                           Page 214

1              Q    I mean, you're a consultant in this

2    industry, right?

3              A    Yes.

4              Q    It's based more on the nature of the

5    product --

6              A    Yes.

7              Q    -- than on the likelihood of there being

8    defective product.  If there's any -- we established

9    earlier that if there's any possibility that defective

10   product made it to market the FDA will aggressively ask

11   for a recall, right?

12             A    Yes.

13             Q    And if you have a product that has -- that

14   is of the right nature and characteristics and there is

15   any possibility that defective product made it to

16   market, then that becomes a Class 1 recall, right?

17             A    If there's possibility of harm to the

18   patients.

19             Q    Right.

20             A    There's Class 1, Class 2 and Class 3.

21             Q    I understand.  So this drug, the nature of

22   it is such that if you get a defective tablet -- I don't

23   think anybody disputes -- you could potentially be

24   harmed.

25             Do you agree with that?

James J. Farley                                    June 28, 2010

                                                      Page 215

1              A    Yes.

2              Q    But the FDA is making very clear, again,

3    in a public announcement regarding this recall, it made

4    the request for a recall because there were 20 double

5    sized tablets in a single lot.

6              A    Uh-huh.

7              Q    Do you see that?

8              A    Yes.

9              Q    So we now have a lot more insight into why

10   the FDA -- when you first said I don't know and I

11   introduced this document, we now know why the FDA asked

12   for this recall, don't we?

13             A    This contradicts what I read.

14             Q    What you read was a recall announcement

15   and combined with the general standards for a Class 1

16   recall.

17             A    Uh-huh.

18             Q    I don't think the FDA is saying here if

19   you've got a defective tablet there's no possibility

20   you'll be harmed.  But they're very clearly saying, we

21   don't think you -- there's a likelihood that you got a

22   defective tablet, aren't they?

23                  MR. MILLER:  Object to form.  The

24        document speaks for itself.

25             A    That looks to be what they're saying.  Who

James J. Farley                                    June 28, 2010

                                                        Page 216

 1   signed it?  Who wrote it?

 2             Q    It's posted on the FDA Web site.  Do you

 3   think a computer hacker got in and --

 4             A    Not necessarily a hacker.

 5                  MR. MILLER:  Objection, argumentative.

 6             A    But I would wonder really because the way

 7   that's written.

 8                  MR. ANDERTON:  What time did we start

 9        this session?

10                  THE VIDEOGRAPHER:  This session was

11        started at 2:22, sir.

12   BY MR. ANDERTON:

13             Q    Mr. Farley, I've handed you a document

14   that was marked in a prior deposition as Plaintiffs'

15   Exhibit 106.

16             A    Yes.

17             Q    Do you see that?

18             A    Yes.

19             Q    You've seen that before?

20             A    Yes.

21             Q    It was a pretty significant document to

22   you, wasn't it?

23                  MR. MILLER:  Object to form.

24             A    Every document is significant to me.

25             Q    Well, you gave this one a lot of weight

James J. Farley                                            June 28, 2010

Page 217

1   when you prepared your report, didn't you, Mr. Farley?

2              A    Let me glance through it.

3              Q    Take your time.

4              A    I'm reading -- one of my questions when I

5   reviewed this was who wrote it.  There's no signature.

6   But I just mentioned that.  I'm prepared to answer your

7   question.

8              Q    My question is, you gave this a lot of

9   weight when you wrote your report, didn't you?

10             A    I gave them all a lot of weight.

11             Q    You gave this one particular weight.

12             A    If you say so.

13                  MR. MILLER:  No, don't let him say so.

14             A    I mean, I -- to my knowledge I looked and

15  felt what I thought was important and I tried to look at

16  everything as best I could.  I'm not sure -- did I give

17  it a lot of weight?  I gave them all a lot of weight.

18                  MR. ANDERTON:  Did somebody take my copy?

19        Oh, there it is.

20             Q    Your report contains an explicit analysis

21  of this document in particular, doesn't it?

22             A    Yes.

23             Q    Okay.  So I actually like your question,

24  Mr. Farley.  Who wrote this?  Do you know?

25             A    Are you asking me or are you agreeing --

James J. Farley                                    June 28, 2010

                                                      Page 218

```
 1              Q    I'm asking you.
 2              A    -- that's a good question?  It's on
 3    Actavis' letterhead.
 4              Q    Do you know who wrote it?
 5              A    I do not know who wrote it.
 6              Q    You describe it in your report as
 7    correspondence.  Do you know that it's correspondence?
 8              A    A memo, correspondence.  I mean, it's from
 9    someone at Actavis reporting on a close-out meeting.
10              Q    A close-out meeting is a meeting that
11    occurs at the end of an FDA inspection.
12              A    Yes.
13              Q    And on page 20 -- I'm sorry.  On page 17
14    of your report you have an entire paragraph devoted to
15    commenting about this.  And in particular you focus on
16    the term "total failure" that appears in the third full
17    paragraph on page 1 of Plaintiffs' Exhibit 106.
18              Do you see that?
19              A    Yes.
20              Q    Your comment is, To have a total failure
21    such as this indicates that there is no product of this
22    company at that location that can be relied upon to be
23    of the proper identity, strength, quality and purity
24    acceptable to the FDA as being safe for the consumer.
25              A    Yes.
```

James J. Farley                                      June 28, 2010

Page 219

1            Q    You've said multiple times during this
2    deposition that you believe -- that you didn't believe
3    in anything that this company released, right?
4            A    I wouldn't trust anything that company
5    produced as being safe.
6            Q    Is that because this document suggests
7    there was a total failure of the quality system?
8            A    That and -- well, pretty much all the
9    documents contributed in one way or another to what I
10   wrote.  This one I quoted from.
11           Q    What does total failure mean in the
12   context of this document?
13           A    No reliability on any of the steps in
14   their production system.
15           Q    Were you at this meeting?
16           A    No.
17           Q    Did you talk to anybody who attended it?
18           A    No.  That's why I quoted from it.
19           Q    Well, you quoted --
20           A    I wasn't there.
21           Q    I understand.  But do you know what the
22   person who prepared these notes meant?
23           A    I assume a total failure means total
24   failure.
25           Q    With respect to what?

James J. Farley                                    June 28, 2010

                                                        Page 220

1               MR. MILLER:  Objection.  The document

2       speaks for itself.

3          A    The production of pharmaceutical products.

4          Q    That's not what this document says.

5               MR. MILLER:  Take your time and read the

6       paragraph.

7          A    From the quality systems standpoint.

8          Q    But total failure of what aspect of the

9    quality systems?  Does this document say that?

10              MR. MILLER:  Object to form.

11         A    Total failure means --

12              MR. ANDERTON:  Pete, what's your --

13         A    -- total failure.

14              MR. ANDERTON:  -- objection on that

15      question?

16              MR. MILLER:  My objection is you're

17      taking it out of context.  You need to read the

18      whole sentence.  It's vague, asked and answered,

19      argumentative.  Let's take it from there.

20              MR. ANDERTON:  Would you read my question

21      back, please?

22      (The record was read back as requested.)

23              MR. ANDERTON:  All those objections to

24      that question, Pete?  Really?

25              MR. MILLER:  Yeah, leave them on there.

James J. Farley                                    June 28, 2010

                                                   Page 221

1          What the heck.  You can keep asking.

2     BY MR. ANDERTON:

3          Q    So notwithstanding Mr. Miller's frivolous

4     objections, I repeat -- I ask you to answer my question,

5     Mr. Farley.

6               MR. MILLER:  And he did.

7          A    Would you repeat the question, please?

8               MR. ANDERTON:  Would you read it back,

9          please?

10         (The record was read back as requested.)

11         A    I read total failure as total failure,

12    meaning there's nothing you can rely on as doing what

13    it's supposed to do.  Now, if you say of what aspect,

14    well, then we're talking about partial failure.

15         Q    But that's your read of this document.

16         A    That's my reading of this document.  Total

17    failure, I mean, you look at that and you say, this

18    company isn't doing anything right.

19         Q    What context was this in?  Were you there?

20              MR. MILLER:  Objection, asked and

21         answered.

22         A    I was not there.

23         Q    So you place -- to reach that conclusion

24    you're placing heavy reliance on the words in this

25    document?

James J. Farley                                    June 28, 2010

                                                         Page 222

 1            A    I place heavy reliance on words of any
 2   document that comes to -- that's given to me to review
 3   and it's an exhibit.  So, yes, I do, but not because of
 4   one thing or another, because it was there or anywhere
 5   else.
 6            Q    We can agree, Mr. Farley, that your
 7   comments in at least Paragraph A on page 17 are based
 8   entirely on this document.  Take your time.
 9            A    I wrote it but I want to review it to be
10   sure.
11            Q    Please take as much time as you think is
12   necessary.
13            A    Section A was based on this document.
14            Q    Entirely?
15            A    Yes.
16            Q    In order to have a true understanding of
17   the total failure comment in this -- that this document
18   reflects was made in this meeting you have to be at the
19   meeting and hear the context in which it was made,
20   wouldn't you?
21            A    I believe that helps anywhere if you're
22   present and you feel the full context.  So I'll give an
23   agreement, not just on this but any situation.
24            Q    So the answer to my question is yes.
25            A    Yes.

James J. Farley                                    June 28, 2010

                                                        Page 223

     1                THE VIDEOGRAPHER:  I'm going to go ahead

     2        and change tapes, sir.

     3                MR. ANDERTON:  Okay.

     4                THE VIDEOGRAPHER:  We're off record at

     5        3:20.

     6            (A brief recess was taken.)

     7                THE VIDEOGRAPHER:  All right.  We're back

     8        on record.  It's 3:24 p.m. and this is the

     9        beginning of Tape No. 6.

    10    BY MR. ANDERTON:

    11            Q   Mr. Farley, I'm going to hand you a

    12    document that has been marked as Defendants' Exhibit 20.

    13    I don't know whether you've seen that document before,

    14    but take a moment to look at it and let me know when

    15    you're ready to answer some questions about it.  And I

    16    will let you read sections necessary to answer any

    17    questions I might ask.

    18            A   It doesn't look familiar, so --

    19            Q   Okay.

    20            A   Thank you.

    21            Q   Are you ready to -- you want to -- are you

    22    ready to talk about it or do you want to --

    23            A   I'd like to glance through it.

    24            Q   Take your time.

    25            A   This should be fast enough?

James J. Farley                                      June 28, 2010

Page 224

1          Q    What's that?

2          A    Am I going fast enough?

3          Q    Are you ready to answer some questions

4     about it?

5          A    As you see I've not read it, but I think

6     that I can -- if you'll grant me if I'm stuck I'll go to

7     a section.

8          Q    You may take, as Mr. Miller says and I

9     agree with, you may take as much time as you think is

10    necessary to answer any specific question.

11         A    Then I say let's start when you're ready.

12         Q    All right.  So you say you don't think

13    you've seen that before.  Does your review change that,

14    that opinion?  Do you think you've seen this document

15    before?

16         A    I'm vague.  I saw so many.  I saw 93 of

17    them.  Some of them I could say definitely yes, maybe a

18    few definitely no.  I just don't know.  I'd have to --

19              MR. MILLER:  And if I could add something

20         to that.  This was just sent to me.  I saw it for

21         the first time last week.  And I believe I brought

22         a copy and there's probably a copy in Mr. Farley's

23         file.  But I just received it.

24              MR. ANDERTON:  I understand that.  I know

25         that to be true.  So that doesn't surprise me.

James J. Farley                                    June 28, 2010

                                                   Page 225

1              MR. MILLER:  So I think he has a copy,

2         but I don't think he's gotten a chance to actually

3         read it.

4              MR. ANDERTON:  Understood.

5    BY MR. ANDERTON:

6         Q   And whether you've seen it before is more

7    formal or substance than anything, Mr. Farley.

8         A   Thank you.

9         Q   Do you see and based on your experience in

10   the industry and as a consultant in the pharmaceutical

11   industry that this is an EIR relating to a 2004

12   inspection of Amide Pharmaceutical?

13        A   I see.

14        Q   You agree with that, right?

15        A   Yes.

16        Q   Okay.  And you know from your involvement

17   in this case that Amide Pharmaceutical is -- was the

18   predecessor to Actavis Totowa?

19        A   Yes.

20        Q   And they are the original holder of the

21   NDA -- excuse me; I misspoke -- the ANDA for Digitek?

22        A   Yes.

23        Q   Will you turn to page 4 of this EIR,

24   please.

25        A   I'm there.

James J. Farley                                    June 28, 2010

Page 226

 1              Q   And I'm going to read from the -- there's
 2    a heading, History of Business, slash, Operations.  I'm
 3    going to read some of that paragraph.  Amide
 4    Pharmaceutical, comma, Inc., is a privately held family
 5    owned organization which has been in operation since
 6    1983.
 7              Divya Patel, comma, President, comma, stated
 8    that the company has undergone significant changes,
 9    especially following the consent decree of permanent
10    injunction in 1992.  The site was shut down for one year
11    in 1992.  The consent decree was lifted in 2001
12    following successful demonstration of sustained cGMP
13    compliance.
14              Did I read those several sentences, correctly?
15              A   Yes.
16              Q   In your report on page -- well, on page
17    19, the fourth -- I'm sorry -- the third conclusion on
18    page 19 that you offer reads, To be under a consent
19    decree for more that -- and that's a typo I suppose --
20    that should be than --
21              A   That's a typo.
22              Q   -- ten consecutive years is an indication
23    of continuing serious problems with FDA regulations.
24              Do you see that sentence?
25              A   I see it.

James J. Farley                                        June 28, 2010

Page 227

1              Q    Did I read that correctly?

2              A    Yes.

3              Q    Well, they weren't under a consent decree

4    for more than ten consecutive years, were they?

5              A    I believe it was nearly ten consecutive

6    years.  So more than would not be correct.

7              Q    Okay.  So that's inaccurate and you got

8    bad information apparently.

9              A    Apparently on that one.

10             Q    Okay.  And we talked earlier about what it

11   means to be under a consent decree and you agreed that

12   if you're under a consent decree you're actually

13   engaging in sustained compliance with cGMPs, aren't you,

14   with current Good Manufacturing Practices?

15                  MR. MILLER:  Objection, misstates

16        previous testimony.

17             A    You are obligated to have third party

18   review and release any product you make.

19             Q    You're ultimately performing all of the

20   activities to put those products in the position where

21   you offer them for that review and release, right?

22             A    Through the third party.  They're actually

23   doing some of the work for you.

24             Q    They're not running machines for you.

25   They're not --

James J. Farley                                    June 28, 2010

Page 228

```
1          A    They can.

2          Q    -- testing products for you.

3          A    They can.

4          Q    The product is being manufactured and

5    offered for release under your name, correct?

6          A    Yes.

7          Q    You're ultimately responsible for that

8    product.

9          A    Yes.

10         Q    The third party doesn't have any

11   responsibility.

12         A    The third party has responsibility to you

13   the pharmaceutical company.  I wouldn't say they don't

14   have any responsibility.

15         Q    Your testimony -- I didn't say they had no

16   responsibility.  They're not ultimately responsible for

17   the product in the market, for the quality of the

18   product in the market.  That responsibility always rely

19   with you the manufacturer, correct?

20         A    Ultimately, yes.

21         Q    And your testimony -- and the record will

22   reflect what you said earlier.  But you said that if

23   you're operating under a consent decree with that third

24   party oversight your -- you must comply with Good

25   Manufacturing Practices.
```

James J. Farley                                    June 28, 2010

Page 229

1              MR. MILLER:  Object to form, misstates

2        his testimony.

3   BY MR. ANDERTON:

4        Q    Because otherwise -- if you're releasing

5   product you must comply with Good Manufacturing

6   Practices because you can't release it without

7   compliance, right?

8        A    That's correct.

9        Q    And this EIR indicates that the reason the

10  FDA agreed to lift the prior consent decree that wasn't

11  ten years -- wasn't more than ten years as you indicate

12  in your report, because of successful demonstration of

13  sustained cGMP compliance.

14             Is that accurate?

15        A    Yes.

16        Q    So when you say if you're under a consent

17  decree for more than ten years -- forget the fact that

18  the time is wrong -- and that that's an indication of

19  continuing serious problems, the FDA apparently

20  indicates that you -- that this company actually was

21  successfully demonstrating sustained cGMP compliance,

22  right?

23        A    Yes.  However, my experience in assisting

24  firms to work their way out of a consent decree is that

25  it normally takes one to two years to do it.  And even

James J. Farley                                    June 28, 2010

                                                    Page 230

1    though I said more than ten and it's nine plus, just

2    under ten, that's still three or four times the normal

3    amount.

4              So while the third party is putting the

5    approval on the product it leads me to wonder why does

6    it take them so long, admittedly not over ten but just

7    under ten, why does it take them so long to work their

8    way out?  That's what I'm wondering.

9              Q   Well, and so that we're clear, you're

10   offering a conclusion that there are continuing serious

11   problems with FDA regulations in your report, but now

12   here today you're wondering whether they had serious

13   problems with FDA regulations?  You're wondering why it

14   took so long?

15             A   Wondering is a term I'm using in this

16   discussion.  I am very sure it had serious problems.

17   They had trouble fixing them.  And why does it take a

18   firm more than eight years, more than nine years to

19   repair something that other firms repair in one or two?

20             Q   What documents did you review that relate

21   to Amide's manufacturing operations during the period

22   1992 to 2002?

23             A   I would have to go through the whole list

24   of the 93 to answer that question.

25             Q   Did you review any?

James J. Farley                                      June 28, 2010

                                                        Page 231

1              A    I quite likely did.  It's all in the list
2    in the report.
3              Q    Let's take a look at that.  Starting on
4    page 8 of 27.
5              A    Yes.
6              Q    Mr. Farley, would you walk -- or work your
7    way through the documents in that list -- and you
8    testified earlier that this is the entire list of
9    documents you reviewed to prepare this report, correct?
10             A    Yes.
11             Q    Will you work your way through that list
12   and identify all documents that relate to or reflect
13   manufacturing operations of Amide during 1992 to 2002?
14             A    Of Amide.
15             Q    Correct.
16             A    I'm going to skip --
17             Q    I want you to work your way through it and
18   you can identify them.  You can do it however you like.
19   But I want to know about every single one.
20             A    All right.  In order to identify them as I
21   present them to you, should I point or name them or --
22             Q    You can name them.  You can simply name
23   them.
24             A    I'm looking now for the name Amide as my
25   key to answer your question.  I see the distributing

James J. Farley                                      June 28, 2010

                                                        Page 232

1    agreement, Mylan/Amide distributing agreement.  I'm on

2    the second page halfway down and I'm looking for

3    complaint for permanent injunction and consent decree

4    for permanent injunction.  And I'm saying I believe that

5    would be part of the answer, but I'd have to pull it up.

6              Q   Well, I can represent to you that those

7    two documents relate to Actavis in 2008 and not the

8    Amide consent decree that we've talked about.

9              A   I'll move right on.

10                 MR. MILLER:  I object to that.

11             A   I'm on page 11, the second line or area

12   of -- Amide's FDA inspectional history, March 23rd, 1992

13   to March 31st of 2004.

14             Q   Okay.

15                 MR. MILLER:  What was the number of that

16       document?

17                 THE WITNESS:  Plaintiffs' 235.

18             A   On page 13 near the top, Plaintiffs' 241,

19   a letter from Jasmine Shah, Amide.  Do you see where I'm

20   pointing?

21             Q   Yes.  Is that -- is that during 1992 to

22   2002?

23             A   2004 is later than 2002.

24             Q   Okay.

25             A   I was going to say the one immediately

James J. Farley                                    June 28, 2010

                                                       Page 233

1   following Plaintiffs' 128, but that's 2004, which is

2   later than 2002.  And the following one is 2004.  Those

3   three in a row relate to someone questioning Jasmine

4   Shah and him answering them.  But they're all after

5   2002.  I've done the table.

6                MR. MILLER:  You indicated you were

7           looking for the word Amide.  You jumped over the

8           word Amide in Tab No. 6.

9                MR. ANDERTON:  Pete.

10                MR. MILLER:  He indicated he was doing a

11          word search.

12                MR. ANDERTON:  Pete, do you want to let

13          him testify?

14                MR. MILLER:  I'm helping him with his

15          word search.

16                MR. ANDERTON:  You're helping him with

17          his testimony.

18                MR. MILLER:  No, I don't believe so.  He

19          was very clear, I'm going to go down the list and

20          tell you every time I see the word Amide.  He

21          missed it.  All right.  Do you want facts or do

22          you want --

23                MR. ANDERTON:  Pete, I want you to not

24          testify for him.

25                MR. MILLER:  I'm not going to testify.

James J. Farley                                      June 28, 2010

Page 234

1          You can go ahead.

2                    MR. ANDERTON:  We can give you an oath

3          and have you sit in that chair if you like.

4                    THE WITNESS:  I didn't flip to that page

5          because I'm not sure if I should or should not.

6                    MR. MILLER:  That's fine.

7                    MR. ANDERTON:  Which page?

8                    THE WITNESS:  Whatever he said that I --

9                    MR. ANDERTON:  You may flip to whatever

10         page you like, Mr. Farley.  I --

11                   THE WITNESS:  Apparently I skipped a

12         Plaintiffs' something; although I thought I went

13         down the whole list.

14                   MR. MILLER:  You indicated you were

15         looking for the word Amide.  And, Mr. Farley, you

16         passed over the word Amide on Tab No. 6.

17                   MS. DOWNIE:  Of course, it's the wrong

18         time frame.

19                   MR. MILLER:  I have no idea what time

20         frame.

21                   THE WITNESS:  I passed over it.  I passed

22         over that because it was January of '07.

23                   MR. MILLER:  I have no idea of the time

24         frame.

25                   THE WITNESS:  So I'm going to hold with

James J. Farley                                    June 28, 2010

Page 235

1          what I finished --

2    BY MR. ANDERTON:

3              Q    What you've identified?

4              A    Yes.

5              Q    There were four or five documents.

6              A    I lost count but, yes, there were a

7    couple.

8              Q    Okay.  And so let's look at those

9    documents.  The first one you identified is the very

10   first one on page 8, the Mylan/Amide distributing

11   agreement.

12             A    Yes.

13             Q    Well, will that give you any insight into

14   where Amide was complying or having difficulty complying

15   with FDA regulations?

16             A    That would not.

17             Q    The next ones you identified were 20 and

18   21.  And I will tell you that those have nothing to do

19   with Amide but are instead the complaint and the consent

20   decree for Actavis.

21                  MR. MILLER:  And I'll object.  The

22        documents speak for themselves.

23                  MR. ANDERTON:  Yeah, and what they say,

24        Pete, is that they relate to Actavis in 2008, not

25        Amide in 1992.

James J. Farley                                          June 28, 2010

                                                            Page 236

 1                    MR. MILLER:  And I believe there's a

 2          little bit of repertory history in those

 3          documents.  I don't have them in front of me, but

 4          I think the simple answer is the documents speak

 5          for themselves, Mike.

 6                    MR. ANDERTON:  Okay.

 7     BY MR. ANDERTON:

 8            Q   And the next one you identified was on

 9     page 11, Mr. Farley, Plaintiff's Exhibit 235.  What is

10     that document?  Do you know?

11            A   Amide's inspectional history.

12            Q   Do you know what that is?

13                    MR. MILLER:  Why don't you allow him to

14          get the document.  He brought it for you.

15            Q   As we sit here -- I mean, I have it if I

16     want to ask you questions about it specifically.  Do you

17     know from looking at this document what it is?

18            A   It says it's an inspectional history and

19     it is quite likely an inspectional history.  But to take

20     that one out of 93 documents and answer specific

21     questions would not be fair to give you an honest

22     answer.

23            Q   I understand.  What is the next

24     document -- well, is it accurate to say -- if you turn

25     back to page 19 and that third conclusion, is there any

James J. Farley                                    June 28, 2010

Page 237

1    source of information other than the documents you just

2    identified which would have allowed you to form the

3    opinion reflected in that conclusion?

4              MR. MILLER:  I'll object.  In all

5         fairness I think he ought to see that document

6         before he's asked a question about it.

7              MR. ANDERTON:  I'm asking him if there

8         are any additional documents besides the ones

9         you've identified.

10        A    Not a document but the fact that it was

11   just under ten years and such a long, long time to be

12   under a consent decree, which is very expensive and

13   embarrassing, that opens your eyes as soon as you see

14   that.

15        Q    It opens your eyes in as a consultant, an

16   expert consultant in this industry, it would prompt you

17   to want to see more information, wouldn't it?

18        A    Yes.

19        Q    And so before, as you said earlier, before

20   you could opine about compliance issues for that period

21   or any period, while the consent decree might open your

22   eyes you'd say, I'd want to see more information, right?

23        A    Yes.

24        Q    Are you familiar with the FDA surveillance

25   program?

James J. Farley                                    June 28, 2010

Page 238

1            A   I've heard of it.  And honestly at

2    different times it's had different meanings over the

3    years.  So if you could tell me which surveillance

4    program --

5            Q   Are you familiar with the fact that the

6    FDA -- do you know what an FDA 484 is?

7            A   484?

8            Q   Yeah.

9            A   I'm not familiar with a 484.

10           Q   You're not familiar with a 484?

11           A   I'm not familiar with a 484.  I may know

12   it not as a 484.  Sample request.  Is that the sample

13   request form?

14           Q   Yes.

15           A   I just didn't call it the 484.  That's a

16   sample request where they come in and take samples

17   periodically and then analyze it.

18           Q   And test the product --

19           A   I just blanked out on the 484 number and

20   in a matter of seconds it came to me.

21           Q   Okay.

22           A   I'm not one to memorize 4 numbers too

23   much.

24           Q   That's okay.

25           A   But it did come to me.

James J. Farley                                    June 28, 2010

                                                        Page 239

1            Q    Did Plaintiffs' lawyers tell you that
2     Digitek was routinely tested by the FDA as part of its
3     surveillance program?
4            A    No, but it's not surprising that they
5     would be.
6            Q    Okay.  But you didn't know that as you
7     formed your expert opinion in this litigation?
8            A    I would have assumed it.  I mean, we did
9     surveillance in Philadelphia.  They went out to
10    SmithKline and Merck, brought them in.  That
11    surveillance program apparently is the same surveillance
12    program we're talking about.  And the 483 is the sample.
13    So, yes.
14           Q    And your understanding -- well, do you
15    have an understanding of the surveillance program that's
16    conducted under the auspices of the 484s that allow you
17    to take a sample?  What is your understanding?
18           A    There are periodic checks of samples as
19    they would be going to the marketplace.
20           Q    Samples taken from the market.
21           A    In effect, random.  We could use the term
22    random.
23           Q    Well --
24           A    But I mean -- okay.
25           Q    Are they ever taken from the market,

James J. Farley                                    June 28, 2010

Page 240

 1   from --

 2              A    Yes.

 3              Q    -- a pharmacist?

 4              A    Sometimes from a pharmacist and

 5   sometimes -- and I'm pausing because there are imaginary

 6   people who will get a prescription.  In other words, it

 7   will be John Jones.  And there is no John Jones, but

 8   they may order it over the Internet and have a post

 9   office box.

10              And they'll take this prescription for John

11   Jones, who is a non-existent person, but it represents a

12   prescription that was obtained over the Internet or

13   through other means and analyze it.

14              Q    Alternatively, the FDA can just show up at

15   a pharmacist and issue a 484 and take a sample, can't

16   they?

17              A    They can.

18              Q    Okay.  And they do.

19              A    They can.

20              Q    And they do.

21              A    They do.

22              Q    Okay.  And they did that while you were

23   employed by the FDA from time to time.

24              A    They did.

25              Q    And it sounds like your lab was involved

James J. Farley                                    June 28, 2010

                                                        Page 241

 1    in testing some of those samples.

 2              A    That's part of what we did.

 3              Q    Okay.  And so if you thought Digitek might

 4    be part of the surveillance program as you were

 5    undertaking your responsibilities in this engagement for

 6    this litigation, why didn't you ask to see documents

 7    related to that to see how Digitek had performed?

 8              A    It didn't occur to me.  It didn't occur to

 9    me.

10              Q    You were evaluating Digitek.  Wasn't one

11    of the things you might want to know, how the FDA came

12    down in its surveillance -- or what the results of the

13    FDA surveillance program relating to this product were?

14              A    In retrospect any additional information

15    could have been helpful, but I didn't feel it necessary.

16              Q    So you had formed an opinion based on your

17    review of a FDA document.  You didn't actually want to

18    be bothered with the facts of the product in the market.

19    You just wanted to look at FDA documents.

20                   MR. MILLER:  Object to form.

21              A    No.  I would not put it that way.

22              Q    How would you put it?

23              A    I wouldn't be bothered to do it.  I'm not

24    in agreement with that choice of words.  I was

25    evaluating a situation.  And I believe I had, after

James J. Farley                                    June 28, 2010

                                                        Page 242

 1    asking for more and getting more, sufficient documents
 2    to do my evaluation.  And I wrote it.  Right here.
 3              Q    To formulate a thorough opinion, if you
 4    knew Digitek was part of the surveillance program and
 5    consciously chose not to ask for that information, do
 6    you feel you've given a thorough evaluation -- if one of
 7    your pharmaceutical clients asked you to evaluate one of
 8    its products and you thought about whether it was part
 9    of the 484, the surveillance program, wouldn't you ask
10    them to see that information?
11              A    Yes, I would.
12              Q    But you didn't here?
13              A    I didn't.  I didn't know the surveillance
14    program as it related to them.  And I don't work for the
15    FDA anymore.  I would not have ready access to that
16    information.
17              Q    You can get it through FOIA.
18              A    I can get what?
19              Q    You can get it through FOIA.
20              A    We come back to the fact that I thought I
21    had sufficient information here.
22              Q    But if you were counseling a client you
23    wouldn't think you had sufficient information.  You said
24    you would want to see and ask for the surveillance
25    program results, right?

James J. Farley                                    June 28, 2010

Page 243

1              A    Probably that would be my viewpoint if I
2    were counseling a client, yes.
3              Q    Okay.  So your analysis here is narrower
4    because of the perspective you're taking.
5                   MR. MILLER:  Object to form.
6              A    If you're saying -- if you're Plaintiff
7    versus Defendant and which one, you might -- I would
8    probably think of other things in carrying out my
9    assignment.
10             Q    Well, but I want to make clear, you said
11   your analysis here is narrower and you don't -- there's
12   information out there that you didn't consider and don't
13   feel you need to consider because you're working for
14   plaintiffs, correct?
15                  MR. MILLER:  Object to form.
16             A    I didn't say my analysis was --
17                  MR. MILLER:  It misstates previous
18        testimony.  While I'm objecting you've got to hold
19        on until I'm done --
20                  THE WITNESS:  Oh, I'm sorry.
21                  MR. MILLER:  -- and then you can answer.
22        I'm going to object.  It misstates previous
23        testimony.  Now it's okay to answer.
24             A    I mean, I didn't say it was narrower.  I
25   think you said it was narrower.

James J. Farley                                    June 28, 2010

                                                    Page 244

1              Q   Well, you said that there's information in

2      the surveillance program that you would consider if you

3      were evaluating a product -- well, let me back this out

4      a little bit.

5              You'd consider the surveillance information --

6      surveillance program information if you were consulting

7      for a client in the pharmaceutical industry that said

8      evaluate this product, right?

9              A   I might.

10             Q   You said earlier that you would want to

11     see it and that you might.

12             A   I would -- I might --

13             Q   Are you changing your testimony now?

14                 MR. MILLER:   Object to form.

15             A   I'm not changing my testimony.  If I said

16     I would I would.

17             Q   Okay.  And you would also want to see all

18     of the regulatory documents that you reviewed in this

19     case, right?

20             A   Yes.

21             Q   But if you were counseling plaintiffs in

22     the context of this litigation you don't want to see the

23     484 information because you thought about it and chose

24     not to ask for it.

25                 MR. MILLER:   Object to form.

James J. Farley                                      June 28, 2010

Page 245

```
 1              A    The reason to look -- to have one sample
 2    taken and analyzed and be found good doesn't tell me
 3    after reading all of this that the firm is not making
 4    unsafe material out there to have one sample.  So it
 5    wasn't anything that would have any statistical
 6    relevance to me.
 7              Q    What if it was more than one sample?  What
 8    if it was part of the surveillance program year after
 9    year?
10              A    It's tough to pick a finite number, but
11    the answer would be yes.  If it got to the point where
12    it was a statistically representative number, then, yes.
13              Q    Out of 152 what would be a statistically
14    representative number?
15                   MR. MILLER:  Object to form.
16              A    152 what?
17              Q    Batches.
18              A    We would be looking at -- I'd rely on a
19    statistician's answer for that.  If you're asking for my
20    opinion, my opinion would be I'd want a sample from
21    every batch.
22              Q    That's not a statistically representative
23    number.  Your term, Mr. Farley, not mine.
24              A    Okay.
25              Q    So when you -- what would be a
```

James J. Farley                                    June 28, 2010

Page 246

1    representative sample sufficient to allow you to credit

2    that?

3              MR. MILLER:  Object to form, asked and

4         answered.

5              MR. ANDERTON:  It hasn't been asked.  It

6         hasn't been answered.

7              MR. MILLER:  It has been asked and it has

8         been answered.

9    BY MR. ANDERTON:

10             Q    You may answer it.

11             A    I believe I would not make that

12   determination myself.  I would ask a statistician,

13   because the answer, I'm sure, would depend on whether it

14   was one campaign making 150 lots straight on through one

15   after another or whether they made 10 lots and then

16   changed the equipment over and made something else and a

17   few weeks later started making this material again and

18   then stopped and start again.  And that number would

19   vary.  And I would rely on the statistician for that.

20             Q    And if it was a single campaign of 152

21   straight batches, according to you would the number be

22   higher or lower than if it was multiple campaigns of

23   four batches and five batches and then three batches?

24             A    If it was a single campaign right on

25   through, same equipment, same everything, I would

James J. Farley                                        June 28, 2010

Page 247

1   believe the number would be lower --

2            Q    Okay.

3            A    -- than if they were disassembling the

4   equipment, making something else, cleaning it,

5   re-assembling for that.

6            Q    Did you ask about any external testing of

7   the recalled Digitek?

8            A    Did I ask about any external testing?

9            Q    Yes.

10           A    External testing.

11           Q    Yes.

12           A    I did not.  I looked for analytical

13   results on the double thicks, but I did not ask about

14   external testing.

15           Q    Explain to me the significance of the

16   analytical results on the double thick tablets.  The 20

17   tablets out of 4.8 million, what significance would that

18   have?

19           A    If, and especially this with a low

20   therefore dangerous therapeutic index where a patient

21   can overdose very readily, if it's double thick and

22   double weight, is it the same amount of active

23   ingredient and twice the excipients or is it a double

24   strength tablet, because a double strength tablet could

25   kill someone.

James J. Farley                                        June 28, 2010

Page 248

1          Q    Okay.  So your analysis would be intended
2    to determine the potentially harmful effects of those 20
3    tablets?
4               MR. MILLER:  Object to form.
5          A    Yes.  I would do that in any case as good
6    practice because knowing the analytical results helps
7    you determine where along the line something went wrong.
8          Q    I understand.  But the point is it would
9    help you determine the potentially harmful effects of
10   those 20 tablets and perhaps allow you better insight
11   into determining the root cause.
12         A    Yes.
13         Q    But it doesn't affect the potency of the
14   other -- let's call it 4.8 million tablets, because 20
15   out of 4.8 million leaves almost still 4.8 million.
16         A    In theory it does and if the analytical
17   results were all within specification by their sampling
18   procedures, then theoretically they're all in the proper
19   strength.
20         Q    And those batch records you reviewed.  But
21   the double thick batch are the records you reviewed.
22         A    Batch record, yes.
23         Q    And no others.
24         A    Did not see them.
25         Q    Didn't ask for them.  Didn't ask for any

James J. Farley                                    June 28, 2010

Page 249

 1   additional batches, did you?

 2              A    I asked for a batch before and a batch

 3   after.

 4              Q    Did you get it?

 5              A    No.

 6              Q    Did you ask for any batches other than the

 7   batch before and the batch after?

 8              A    I said if we can't get the one immediately

 9   before and immediately after, get me one that was

10   sometime before, the closer the better, and sometime

11   after, the closer the better.

12              Q    Didn't get those.

13              A    Didn't get them.

14              Q    Why not?

15              A    I don't know.

16              Q    How many times did you ask?

17              A    Twice.

18              Q    What were you told when you asked and

19   didn't get them?

20              A    We'll get them.

21              Q    Didn't.

22              A    Didn't.

23              Q    Did that affect your opinion at all?

24              A    Of what?

25              Q    Well, of anything in this case.  I mean,

James J. Farley                                        June 28, 2010

Page 250

1    you're giving expert testimony in the form of an

2    opinion.  You asked for information that you obviously

3    thought might be relevant, or you wouldn't have asked

4    for it, and didn't get it.

5             A    I had less to work with, but I still had

6    what I felt was a sufficient amount.  I had a batch

7    record, the batch that had the double thick tablets.

8             And there's -- when you do a project there's

9    also it'd be nice to have this, nice to have this, this

10   will be good.  And some things if you don't have them

11   you say, I can't go on without this.  Others you say,

12   I'll evaluate what I have.

13            Q    The batch before and the batch after, if

14   they had come in, if the records for those batches show

15   everything within specifications how does that affect

16   your opinion in this case?

17            A    If that came in I will look to picture

18   that whatever it was that went wrong that made that

19   occurred at that particular point in time.

20            Q    It was an isolated incident.

21            A    I would tend to look that way, yes.

22            Q    Okay.

23               MR. ANDERTON:  How much time we got?

24               THE VIDEOGRAPHER:  25 minutes.

25               MR. ANDERTON:  Okay.

James J. Farley                                      June 28, 2010

Page 251

```
 1   BY MR. ANDERTON:

 2           Q    What discussions have you had with

 3   Mr. Miller or other Plaintiffs' counsel about the theory

 4   being pursued by Plaintiffs in this litigation?

 5           A    I'm not sure what you mean by the theory.

 6           Q    Well, when you sue somebody alleging

 7   you've been injured by their product, you have to have a

 8   reason for suing them.  You understand that, right?

 9           A    Yes.

10           Q    And, you know, I suppose it's lawyer speak

11   a little bit, but when you bring a lawsuit, until it's

12   been proven or proved you're pursuing a theory.

13           You understand now what I mean when I use the

14   term theory?

15           A    Yes.

16           Q    All right.  So what conversations have you

17   had with Mr. Miller or any other lawyer for the

18   plaintiffs in this litigation about the theory of

19   liability being pursued by the plaintiffs in this

20   litigation and specifically as it relates to what they

21   think was defective about the Digitek?

22           A    I can't recall the exact words of any

23   discussions I had, but Pete Miller would say, what did

24   you find, what are you coming up with, and, of course,

25   when can I expect the report or the results; although I
```

James J. Farley                                    June 28, 2010

Page 252

1    try to get them promptly.

2              But I believe what I said to Pete Miller,

3    Pete, this place is really fouled up at this time, I

4    wouldn't trust anything coming out of it.  And Pete

5    would say, well, we're looking at that aspect of it, or

6    something to that effect.

7              But I believe that I brought the subject up to

8    him that you're talking about Digitek, but I wouldn't

9    trust anything made in this company by these people at

10   that time.

11             Q   And the basis for that statement is your

12   review of FDA regulatory documents, correct?

13             A   Documents, the various things, a lot of

14   different things that were -- it wasn't one violation

15   over and over.  It was different violations.

16             Q   But all of those are set forth in FDA

17   regulatory documents, right?

18             A   Yes.

19             Q   Because you didn't review any

20   manufacturing documents for any product to reach your

21   conclusion that this place is really fouled up, right?

22             A   Other than that one batch record.  And my

23   conclusion was based on the various observations of the

24   various 483s.

25             Q   So your contention is based entirely on

James J. Farley                                    June 28, 2010

Page 253

1    comments set forth in FDA in the 483s and FDA regulatory

2    documents.

3                    MR. MILLER:  Object to form.

4          A    Mostly.  There are some of the other

5    things we discussed, I'm sure played a role, but

6    predominantly the FDA documents, the inspection results.

7          Q    This industry as we talked about earlier

8    is based on sampling of finished product, right?

9          A    The industry is based on it?

10         Q    Or --

11         A    I don't know if I would use that word.

12         Q    That's a poorly-phrased question and I

13   apologize.

14         A    You said it.

15         Q    The release of product into the market in

16   this industry is based on sampling of finished product,

17   right?

18         A    Yes.

19         Q    How do you assure -- how can you be sure

20   that all product released into the market is within

21   specification?  Is there any real way to do that?

22         A    Is there any real way to be sure that

23   every individual tablet and the batches?  To be sure you

24   would have to test every tablet.

25         Q    Right.

James J. Farley                                      June 28, 2010

                                                        Page 254

    1           A    You do statistically representative

    2    sampling.  And you have statisticians who know where the

    3    statistical tables are.  When you're making this much

    4    take a sample, take it from here, take it from there.

    5    And you do your -- we call it representative sampling.

    6    You analyze that.

    7           Q    So if somebody says, assure me every

    8    tablet in the market is within specification, is that

    9    possible?

   10           A    Not without testing every sample.  Now,

   11    when you say specification, specification for weight?

   12    For size?  For analysis?  For everything?  For

   13    everything?  The right excipients?  The right active

   14    ingredient?  The right strength?  You would test

   15    everything and you would have nothing left to sell.

   16           Q    So if somebody says, assure me that every

   17    product that you've already released into the market is

   18    within specification, that's not possible.

   19           A    In an absolute sense, no.  You would base

   20    it on your sampling and your test results.

   21           Q    You'd go back to your batch records.

   22           A    Uh-huh.

   23           Q    You'd review the batch records and there

   24    would be nothing else you could do at that point, right?

   25           A    Nothing else you could do with regard to

James J. Farley                                          June 28, 2010

Page 255

1    the answer for the person?

2            Q    Yes.

3            A    You say, here's our batch, here's the

4    results, it all tested well.

5            Q    Right.  Nothing else you can do, right?

6            A    According to your procedures nothing else

7    you would do.

8            Q    Nothing else you could do other than --

9    other than go test it all.

10           A    Or test some more to any degree.  But you

11   likely wouldn't do that.  You likely would say, here's

12   the results that we had and this is statistical

13   sampling; therefore the batch is released.  That's what

14   you would do.

15           Q    Okay.

16           A    Uh-huh.

17               MR. ANDERTON:  Let's take a brief break.

18               THE VIDEOGRAPHER:  We're off the record

19       at 4:07.

20           (A brief recess was taken.)

21                   - - - - -

22               THE VIDEOGRAPHER:  We're back on record.

23       The time is 4:19.

24                   - - - - -

25               CROSS EXAMINATION

James J. Farley                                          June 28, 2010

                                                           Page 256

     1    BY MS. DOWNIE:

     2           Q    Mr. Farley, my name is Ericka Downie.  I'm

     3    going to ask you a few questions today, this afternoon.

     4    I was looking through the records that you brought with

     5    you today and I understood that you brought with you

     6    documents that you reviewed in preparation for your --

     7    in preparing your report as well as in preparing for

     8    your deposition today related to this litigation; is

     9    that correct?

    10           A    Yes.

    11           Q    Okay.  In going through those documents I

    12    found some e-mails and some documents I wanted to

    13    question you about.  Who is Hua, H-U-A?

    14           A    Hua.

    15           Q    Hua.  Fair enough.

    16           A    Hua is Dr. Hua Zhao.  He is a chemistry

    17    teacher at Savannah State University and I asked -- he's

    18    a friend, a fellow chemist and a neighbor.  And I asked

    19    him to weigh a couple of tablets for me in the

    20    laboratory.

    21           Q    Why?

    22           A    I wanted to look at the various

    23    medications, the ratio of active ingredient, API, active

    24    pharmaceutical ingredient, to the total tablet weight

    25    and get those ratios.

James J. Farley                                          June 28, 2010

Page 257

1          Q    Why was that important information for
2     you?
3          A    It was important to me because when I
4     looked at .125 milligram strength of Digoxin, the
5     Digitek product that is .125 strength, and then I saw
6     that the tablet weight was 105 milligrams, I calculated
7     that out on a -- first on a percentage basis -- I see
8     you have the chart in front of you -- on a percentage
9     basis and then I converted to a parts per thousand,
10    parts of active ingredient per thousand parts total
11    tablet weight.
12               And I'm saying this off the top of my head.  I
13    just asked Hua to do the tablet weights of the others,
14    the Benadryl, the Advil.  I did not have the tablet
15    weight of Digitek, but I got the tablet weight from the
16    records.  And then I calculated that for the .125
17    strength Digitek.
18               That is just over one part of active
19    ingredient, 1.2 parts perhaps of active ingredient, to a
20    thousand parts of total blend.  And that's difficult to
21    mix, I would believe, such a dilute mixture.
22               So he weighed a Benadryl, he weighed a
23    Lipitor -- and that was right out of my prescription
24    bottle, the Lipitor -- and an Advil.  And I think you
25    have the --

James J. Farley                                          June 28, 2010

Page 258

1          Q    And it appears -- I'm sorry -- also

2     Diovan.

3          A    Diovan.

4          Q    Right.  Okay.  So he did these weights for

5     you?

6          A    He just did the tablet weights.

7          Q    Right.

8          A    The strengths are the claimed strengths on

9     the labels.

10         Q    Okay.

11         A    And I just looked -- and I'm looking at

12    the data upside down as you have it there --

13         Q    Right.

14         A    -- that when I looked and I said to

15    myself, wow, this is 1.2 parts per million mixture of

16    the active ingredient in the Digitek product at the.125

17    milligram strength, that really has to have a lot of

18    care taken to mix it pretty thoroughly.  And while the

19    others had -- I forget.  One was well over 100 --

20         Q     Well, we have one that's 56, another

21    that's 65, another that's 99.  So three of them are

22    under 100.

23         A    Under?  And what's the one that's --

24         Q    Then there are two that are well over 100,

25    the Advil and the Diovan.

James J. Farley                                    June 28, 2010

Page 259

 1              A    And while you want blend uniformity in

 2      anything you mix it's, quote, unquote, it's easier to

 3      get in the Diovan or the other ingredients and it would

 4      be tougher to get in the more dilute product.

 5              Q    Did you review -- did you conduct this

 6      examination at Plaintiffs' counsel's request?

 7              A    No.   In fact --

 8              Q    And did you actually have any Digitek

 9      tablets to weigh?

10              A    No.   I got that from the batch record.

11              Q    So there weren't any Digitek tablets that

12      were actually weighed as part of this analysis that you

13      conducted?

14                   MR. MILLER:   Object to form.

15              A    There weren't.

16              Q    So, Dr. -- I'm sorry.

17              A    Dr. Hua Zhao.

18              Q    Dr. Zhao, he didn't weigh any Digitek; he

19      weighed other medications for you.

20              A    The others that you have in the bag there.

21              Q    And you haven't reviewed any other batch

22      records with respect to Digitek to determine anything

23      regarding blend uniformity or content or anything of

24      that nature for a product that was actually released and

25      distributed on the market?

James J. Farley                                         June 28, 2010

                                                        Page 260

     1              A    Did not, only that one lot in question.

     2              Q    And do you -- this looks like this

     3     analysis was done on June 11th, 2010?

     4              A    That's probably when Hua gave me the data

     5     or sometime there and I just entered it and did my

     6     calculations on the Excel spreadsheet there.

     7              Q    Approximately how many hours have you

     8     spent on this litigation?

     9              A    On the litigation total?

    10              Q    Yeah.

    11              A    I'm pausing because I'm thinking back to

    12     the billable hours.

    13              Q    If you can just give me an estimate.

    14              A    About 175.

    15              Q    And are you currently engaged by any other

    16     entities or facilities with respect to consulting?  Any

    17     other consulting engagements currently?

    18              A    I just finished one.  I have another

    19     pending but not actually doing it right now.

    20              Q    Okay.

    21                  MS. DOWNIE:  All right.  I'm going to

    22          turn the questioning back to Mr. Anderton.

    23                  MR. ANDERTON:  Okay.  Thank you.

    24                       - - - - -

    25                  DIRECT EXAMINATION (Cont'd)

James J. Farley                                    June 28, 2010

                                                        Page 261

 1   BY MR. ANDERTON:

 2           Q   Mr. Farley, I started to ask you some

 3   questions about this earlier and then I changed course

 4   and I never finished my thoughts on this issue.  So I

 5   want to follow up.

 6           We looked at the FDA document from the Web

 7   site which indicates the FDA's thoughts that the recall

 8   of this product is -- flows from the double thick

 9   tablets found in one lot.

10           Would it bother you -- or does it bother you

11   to know as you form your opinion in this case that

12   Plaintiffs have changed their theory -- we started

13   talking about theory earlier -- and that initially they

14   brought claims that they were taking and had taken

15   double thick tablets and that since then they've changed

16   their theory to now being pursuing this notion of

17   varying degrees of active pharmaceutical ingredients,

18   whether the tablet is double thick or not?

19               MR. MILLER:  Objection.  Object to form,

20        overbroad and it's facts not in evidence.

21           Q   You may answer.

22           A   Well, I didn't know it.  Since I didn't

23   know it it doesn't bother me.

24           Q   Hearing it now does it bother you?

25           A   No.  My work was look at these documents,

James J. Farley                                    June 28, 2010

Page 262

1    provide an evaluation.  And I -- it would bother me if I

2    thought people were dying taking medication, I mean, as

3    a fellow human being.  But speaking of the case, no.

4              Q    Do you know how many lots were subject to

5    this recall?

6              A    The number 33 comes up and a number of 85

7    comes up.

8              Q    Okay.  If I told you it was 152, would you

9    have any reason to doubt that?

10             A    I would not have any reason to doubt that.

11   In fact, I would relate it to the number that you

12   mentioned earlier.

13             Q    Okay.  And if I tell you that the .125 --

14   the theoretical batch size of .125 is 4.8 million and

15   the theoretical batch size of .25 is 4.2 million, do you

16   have any reason to doubt those numbers?

17             A    No reason to doubt them.

18             Q    So if there's 152 batches that were

19   subject to recall in this case, those numbers mean we're

20   looking at north of 680 million tablets.

21             Does that sound about right?

22             A    Quick calculation, sounds about right.

23             Q    Okay.  Not a single double thick tablet

24   has been presented to Defendants in this case.  Do

25   you -- are you aware of that?

James J. Farley                                        June 28, 2010

Page 263

1             A    I was not aware of that.

2             Q    Is that something you would have liked to

3    have known as you formulated your opinion, as you put

4    it, as you evaluated Digitek?

5             A    It would have been helpful but not

6    necessary.  When I read those 483s and I saw the

7    observations on the 483s and I read the warning letters

8    to -- now to answer with that knowledge after reading

9    that to answer your question, oh, it wouldn't matter.

10            Q    The 483s would do nothing but prompt you

11   to look further, right?

12            A    It would prompt me to look further because

13   I see violations and I want to know why don't they

14   correct them, are they going to correct them, which is

15   what FDA wants to know.

16            Q    Okay.  And they would prompt you to -- if

17   you're evaluating Digitek and if you're doing it

18   properly, you'd take the information you learned in the

19   483 and you'd evaluate information reflecting the

20   manufacturer of Digitek, right?

21            A    Yes, but I'm taking the FDA's word for

22   what they put in the 483.  I'm not --

23            Q    You still have to connect --

24                 MR. MILLER:  Hang on.  He's answering.

25            You're cutting him off.

James J. Farley                                    June 28, 2010

                                                        Page 264

1              Q    Go ahead and answer.

2              A    I'm not looking for supplemental

3    information because I doubt the FDA's content of the 483

4    or the warning letter.  But any supplemental information

5    is always helpful.

6              Q    Well, you still have to connect the

7    information on the FDA's documents to Digitek, right?

8              A    Oh, yes.  In some cases they mention it

9    and other cases they mention other products.

10             Q    And in the cases where they don't mention

11   Digitek, as you said earlier, you have to connect that

12   specific citation to Digitek --

13                  MR. MILLER:  Object to form.

14             Q    -- somehow.

15                  MR. MILLER:  Misstates previous

16       testimony.

17             A    I'm looking to evaluate the whole firm and

18   Digitek, but I'm not looking to say how can I get this

19   to make it look bad for Digitek.  No, I'm not.  Maybe

20   I'm not getting the question right.

21             Q    Yeah.  Let me try to say it differently.

22   Let's separate your evaluation of the firm from your

23   evaluation of Digitek.  All right?

24                  MR. MILLER:  Object to form.

25             Q    So I don't want to hear in my response to

James J. Farley                                         June 28, 2010

                                                        Page 265

1    this question about your evaluation of the firm.  As

2    you're evaluating Digitek and forming an opinion about

3    Digitek, if you find a reference on a FDA form to a --

4    what the inspector believes is a GMP deficiency, in

5    order to evaluate Digitek, as you testified earlier, you

6    have to go look for information about Digitek, right?

7                MR. MILLER:  Object to form.

8            A    Yes, but I would also look for more

9    information about how they're making other things if

10   it's in the same plant by the same people.  I would do

11   what you say first, but not only, because although you

12   said to me separate Digitek from the firm, I can try to

13   do it but there's overlap.  There's overlap.

14           It's the firm that makes the Digitek.  It's

15   the same firm that made these products that's making the

16   Digitek.  So I know you said to me separate it, but I

17   can't completely separate it.

18           Q    Is it your opinion that if a firm makes

19   one product defectively they make all products

20   defectively?

21           A    No.  It's my opinion that there is a

22   possibility that some other products are being made

23   defectively.

24           Q    But you can't confirm unless you look at

25   records, right?

James J. Farley                                        June 28, 2010

                                                        Page 266

1              A    That's right.

2              Q    You know about batch yields, right?

3              A    Yes.

4              Q    Are you -- a theoretical yield is the

5    number of tablets that should be produced in a typical

6    batch if tablets are manufactured within specification,

7    correct?

8              A    Yes.

9              Q    If batches contained double thick tablets,

10   that would potentially impact the yield of the batch,

11   right?

12             A    Of the number of tablets, yes.

13             Q    Something you could examine as part of

14   your evaluation of Digitek?

15             A    Yes.

16             Q    You didn't do that, did you?

17             A    For the number of tablets, 15 out of 4.8

18   million, the yield would not have given me an indication

19   either way.

20             Q    It wouldn't be because 15 or even 20 is in

21   fact I think the real number, 20 out of 4.8 million

22   would not have affected the yield.

23             A    The yield as in the specifications.  I

24   forget the number offhand, but if it's so many kilograms

25   put in and 98 to 102 percent and it came out, you

James J. Farley                                    June 28, 2010

Page 267

1    wouldn't see it by looking in that area.

2              Q    Okay.  But you didn't look at any yield

3    for any batches other than the double thick batch?

4              A    And that was in reviewing the whole batch

5    record I saw you go through.

6              Q    So as I understand that comment, you saw

7    the yield but not because you were looking for the

8    yield.  You just were reviewing the batch record and it

9    was in there.

10             A    It's one of those things where you're

11   looking at an aspect of something and you want to look

12   at other parameters.  Which parameters do you look at

13   that will give you information that will help you

14   explain this situation?  And I don't think that would

15   give me any information.

16             Q    Are you familiar with Quantic Regulatory

17   Services, Quantic?

18             A    Am I familiar with it.  I've done work for

19   them.

20             Q    You have done work for them?

21             A    Sure.

22             Q    Are you aware that they -- at the request

23   of the FDA that Actavis hired Quantic to undertake a

24   review of various batch records and documents?

25             A    Quantic is good on that.  I've done batch

James J. Farley                                      June 28, 2010

Page 268

1    reviews for them on other projects, other clients.

2            Q    You trust their results?

3            A    I trust Quantic's results.

4               THE VIDEOGRAPHER:  I have to change tape

5       now.

6               MR. ANDERTON:  Okay.

7               THE VIDEOGRAPHER:  Off at 4:35.  One

8       moment, please.

9                 (Off the record.)

10              THE VIDEOGRAPHER:  Okay.  This is the

11      beginning of Tape No. 7.  It is 4:36 p.m.

12   BY MR. ANDERTON:

13           Q    Mr. Farley, before we changed tapes I

14   asked you a question about Quantic Regulatory Services.

15   You indicated that -- there were several questions.  You

16   indicated you're familiar with them, you've worked with

17   them and for them and that you trust them.

18              Is that a fair characterization?

19           A    Yes, to all.

20           Q    Okay.  But you didn't answer the question

21   I asked you originally which was, were you aware that

22   Actavis hired Quantic to undertake an audit review of

23   batch records at the request of the FDA in 2007?

24           A    Not the way you say it.  I saw Claudio

25   Pincus' name and Owen Richards' name.  And Claudio

James J. Farley                                          June 28, 2010

Page 269

1    Pincus and Owen Richards are Quantic.  They own it.  And

2    so I knew they were involved because I saw their name on

3    correspondence or they were cc'd on some e-mail.  So I

4    realized that.  And I also saw PAREXEL, which is a

5    competing firm.  So that's how I knew.

6                 Q   Did you ask for any documents relating to

7    Quantic's involvement?

8                 A   No, I did not.

9                 Q   You trust them.  You knew they were

10   involved.  You didn't ask to see what they had done or

11   what the results were?

12                A   I didn't need to.  If Claudio has a team

13   in there doing a job, they're doing a good job.  I did

14   that type of work for him on various projects.

15                Q   I'm not asking if you asked to see

16   Quantic's documents because I'm asking you to second

17   guess their results.  I'm asking you whether you thought

18   that was potentially relevant to your evaluation of the

19   firm.

20                If Quantic did a good job, as you've now said

21   multiple times --

22                A   Yes.

23                Q   -- wouldn't you want to see their outcome

24   as part of your evaluation of the company?

25                     MR. MILLER:  Object to form.

James J. Farley                                    June 28, 2010

Page 270

1              A   I want to see the immediate FDA inspection

2      that follows Claudio's implementation of the results to

3      verify that what he did, and which I have explicit

4      trust, has been put to use satisfactory.

5              So I don't need to see what Claudio's doing --

6      or I should say Quantic was doing.  I want to see the

7      FDA inspection, because they're the ones that are going

8      to say you can now market it or you can't market it.  So

9      that's why I didn't ask to see it.  And this moment I

10     still don't care to see it.

11             Q   What's a compliance hold?  Do you know?

12             A   You're holding something until something

13     else is done and then you will release it when that

14     something else is done.  That's obviously not the FDA

15     definition.

16             Q   What's the FDA definition of a compliance

17     hold?

18             A   I gave you mine because I was vague on

19     their words.  That's why I gave you mine.

20             Q   Okay.  Let me ask it a different way.

21     When a company has been issued a warning letter -- and

22     I'll characterize that as being under or subject to a

23     warning letter -- is the company -- is the FDA going to

24     grant new product approvals while that is the case?

25             A   In a warning letter?

James J. Farley                                    June 28, 2010

                                                      Page 271

    1           Q    Yes.

    2           A    That would depend on the content of the

    3    warning letter, the scope of the warning letter and what

    4    else was needed.  If it all centered in one location --

    5    I mean same company, one location, and there was never

    6    any problem with another location of the same company

    7    and the warning letter applied here, they may let them

    8    produce here.

    9           Q    At the other location.

   10           A    Yes.

   11           Q    What if it's all one location?

   12           A    Here again we get into that it is quite

   13    likely not, but in certain instances of a product that

   14    is needed in the market, when you have someone who is

   15    primary supplier and the shortage of that product on the

   16    market would be harmful to people who need the

   17    medication, they will -- I don't know how to put -- work

   18    with the company, but put that in quotes, work with the

   19    company in trying to help them get the product to

   20    market.  So it will be a warning letter --

   21           Q    Are you talking about a product that's

   22    already been approved?

   23           A    Yes.

   24           Q    Okay.  I asked you about new approvals.

   25           A    New approvals.

James J. Farley                                         June 28, 2010

Page 272

1           Q    Yes.  Will the FDA grant new product
2    approvals while a company is under a warning letter?
3           A    Quite likely not but in theory they could.
4           Q    In your experience have you ever seen that
5    happen?
6           A    No.
7           Q    You were -- were you told by Plaintiffs'
8    lawyers in this -- as you were preparing your report for
9    this litigation that after the 2007 inspection that we
10   talked about earlier eight to ten new product approvals
11   were granted by the FDA to Actavis Totowa within two
12   months after that?
13          A    No, I don't recall that.
14          Q    Were you told by the plaintiffs' lawyers
15   that the outcome of that inspection is that the warning
16   letter that had been in effect since early 2007 was
17   lifted?
18          A    I wasn't told.  I have information that
19   I've been reviewing.
20          Q    And you saw the outcome of that 2007
21   inspection was VAI, correct --
22          A    Yes.
23          Q    -- voluntary actions indicated?
24          A    Yes.
25          Q    So if Quantic did a review of Digitek

James J. Farley                                    June 28, 2010

                                                        Page 273

 1   batch records as part of a project for which they were

 2   hired by Actavis in 2007 and that review included

 3   recalled batches, that's of no interest to you in

 4   evaluating Digitek?

 5            A    It's of interest to me, but what is more

 6   interest is what the FDA says.  Quantic is coming in to

 7   fix it and if someone comes in and says, hey, that's

 8   great, they can market it, I want to see what the FDA

 9   says, because the FDA is the regulatory body.  Quantic

10   isn't.

11            Q    Quantic is not coming in to fix it.

12   They're coming in to review what had already been

13   released.

14            A    They do both and I wasn't sure what they

15   did here.

16            Q    Well, what they did here was review what

17   had already been released.  So let me start that over a

18   little bit.

19            If Quantic came in and reviewed batch records

20   for Digitek that had been released to market to

21   determine compliance, is that something you'd want to

22   see as you evaluate Digitek?

23                 MR. MILLER:  Objection, asked and

24        answered.

25            A    It would be helpful to see, but I want to

James J. Farley                                          June 28, 2010

Page 274

 1  see what the FDA says.  We keep coming back to this.

 2          Q    But Quantic was hired at the request of

 3  the FDA and the results were submitted to the FDA.

 4          Would that be of significance to you?

 5               MR. MILLER:  Objection, asked and

 6      answered.

 7               MR. ANDERTON:  It hasn't been asked and

 8      answered, Pete.  Not close to asked and answered.

 9          A    I thought it was.  So I guess I better --

10  let me think.  It would be of interest to me, but it

11  wouldn't be absolutely necessary.  I read a series of

12  483s and a couple of warning letters and I have a very

13  low opinion of the capabilities of the company.

14          Q    Based on that review of those 483s --

15          A    Those several 483s --

16          Q    -- and the warning letter.

17          A    -- and the various EIRs.  And if a company

18  like Quantic is coming in to review the batch records, I

19  say fine.  And if you say what's the company look like,

20  let me see the latest thing from FDA that says they're

21  good again.

22          But -- so that's why I don't think that I miss

23  what they -- I know they're good.  I know what they do.

24  And they do in some cases help prepare, actually put

25  people in position.

James J. Farley                                    June 28, 2010

Page 275

1             And -- but I didn't have to see that.  It

2    won't change my judgment of what was and what needs to

3    be to have a quality product on the market.

4             Q   Let's turn to your report.  Again my copy

5    has disappeared.  Will you turn to page 17, Mr. Farley?

6             A   I am at 17.

7             Q   What is the purpose of the comments

8    section of this report?

9             A   My comments -- I didn't know who all was

10   going to read this, how familiar the people would be

11   with the pharmaceutical industry.

12            And in this regard I do remember I asked Peter

13   Miller, I said, in doing my report I don't know the

14   whole readership of this and I would like to put in a

15   comments section that's going to maybe make it a little

16   more worthy, but I feel it will explain things.

17            And the reply was something to the effect of,

18   whatever tells the story when in doubt.  So I requested

19   the okay to put a comments section in for the reason I

20   just mentioned.

21            Q   Okay.  So those aren't part of your

22   official expert opinions in this case.  They're

23   background information that you feel helps tell the

24   story and allows the reader who might not have FDA

25   experience to have a better understanding of the

James J. Farley                                    June 28, 2010

Page 276

1    opinions you've offered which are in the conclusion

2    section.

3                    MR. MILLER:  Object to form, misstates

4         previous testimony.

5              A    I got lost somewhere in that question.

6                    MR. ANDERTON:  Will you please read that

7         back and read it relatively slow so that I can

8         understand it as well.  I need it slow.

9         (The record was read back as requested.)

10             A    There are facts and opinions in here.  I

11   do some quotes, which, of course, are facts.  And then

12   I'm looking to see where -- well, just statements.

13   Recalls are actions taken by a firm.  I'm reading D.

14   What I am doing is exploring that are these my opinions.

15   I'm looking to see if I have opinions in here.

16             Q    So I think your testimony is that you do

17   have opinions in your comments section.

18             A    I'm looking here where I have that total

19   failure thing again.  When I say to have a total failure

20   such as this indicates there's no product of this

21   company at that location that can be relied on, that's

22   my opinion.  I'm sure it's shared by many, many, many

23   people that I work with.  But you could classify that as

24   an opinion.

25             Q    Okay.  So let's work our way through these

James J. Farley                                    June 28, 2010

                                                        Page 277

1   then.  That Paragraph A on page 17, it's accurate to say

2   that that's based entirely on that -- the notes of that

3   close-out meeting, correct?

4                   MR. MILLER:  Objection, asked and

5        answered.

6              A   Based on that three- or four-page --

7              Q   Yes.

8              A   -- correspondence that we saw?  I saw

9   somewhere else somewhere Robert Wessman and agreement.

10  Other than that I just can't remember it now, so --

11             Q   Well, you've indicated here that you're

12  quoting Plaintiffs' Exhibit 106.

13             A   I am.

14             Q   And you're not referring to any other

15  document and you're using quotes.

16             A   I did in there, right.  Yes.  Everything

17  you said is correct.

18             Q   So this paragraph refers exclusively to

19  Plaintiffs' Exhibit 106?

20             A   But I saw Wessman's name somewhere else

21  and I'm just not clicking whether I relate it to this.

22  But predominantly that three- or four-page

23  correspondence, unsigned and undated on Actavis

24  letterhead.

25             Q   Well, how can -- Mr. Farley, let's not

James J. Farley                                    June 28, 2010

Page 278

1  throw common sense out the window.  Okay?

2            A    Right.

3                 MR. MILLER:  Object to form.

4            Q    In the first sentence here you refer

5  exclusively to Plaintiffs' Exhibit 106.  And the rest of

6  the text until your opinion is in quotes.

7                 MR. MILLER:  Is that a question?

8            A    What is -- I don't understand the

9  question.

10           Q    So how can it not be true that that

11 paragraph and that opinion is based entirely instead of

12 just predominantly on Plaintiffs' Exhibit 106 when you

13 refer to it and then quote exclusively from it?

14           A    It quite likely is exclusively from it,

15 but I remember reading the name Wessman somewhere else.

16 And I may have incorporated some of that in there, if in

17 fact I'm correct.

18           Q    So you may have incorporated some of that

19 in there even though you refer to a document and then go

20 on to quote from it twice.  So the reader is supposed to

21 understand that the next comment actually incorporate --

22 and then in the next sentence you go back and quote from

23 it again, to have a total failure.

24           Do you see that?

25           A    Yes.

James J. Farley                                    June 28, 2010

Page 279

1              Q    Okay.  That's another quote from
2    Plaintiffs' Exhibit 106.
3              A    From Plaintiffs' 106.
4              Q    So the reader is supposed to be able to
5    understand that you've actually, perhaps implicitly, but
6    without giving anything that would indicate such worked
7    information from another document into that comment?
8                   MR. MILLER:  Object to form.
9              A    I did not work information from another
10   document into that.
11             Q    Okay.  Then my question stands.  Is it
12   accurate to say that the comment in Paragraph A is based
13   entirely on Plaintiffs' Exhibit 106?
14             A    To the best of my knowledge, yes.
15             Q    Okay.  Now, this total failure comment
16   that is in the Plaintiffs' Exhibit 106 which we talked
17   about earlier, it doesn't appear in an EIR, does it?
18             A    It appears in -- well, the Actavis
19   document is quoting from what, the lady's name, Erin,
20   the inspector, either wrote or said.
21             Q    My question is, does it appear in an EIR?
22             A    I don't remember if it's written or said.
23             Q    Wouldn't you have cited and quoted that if
24   it appeared in an EIR?  I mean, that's a little more
25   official than scribed notes, right?

James J. Farley                                    June 28, 2010

                                                        Page 280

 1              MR. MILLER:  Object to form.

 2         A    I may or may not have.

 3         Q    Total failure would be the opinion of the

 4    investigator, right?

 5         A    Since Actavis -- go ahead.

 6         Q    Total failure would be the opinion of the

 7    investigator, right?

 8         A    Yes.  And I think I read that somewhere.

 9         Q    You did, in Plaintiffs' Exhibit 106 to the

10    extent it's accurate.

11         A    I believe that whoever wrote that was

12    referring to what Erin, the inspector, said to him or

13    her.

14         Q    Okay.  But I'm now -- I'm simply trying to

15    ask you, Mr. Farley, and if you just pay very close

16    attention --

17         A    I'm trying.

18         Q    -- I'm trying to ask you whether it

19    appears in another document.  That's not that difficult

20    a question, yet you're so intent on not conceding this

21    that you're just ignoring my question and answering

22    whatever question you want.

23         A    Can I see Plaintiffs' 106?

24         Q    Can you see it?

25         A    Yeah.

James J. Farley                                    June 28, 2010

                                                        Page 281

     1              Q    You absolutely may.  You absolutely may.

     2              A    I can't find Plaintiffs' 106.  I've got a

     3    big pile here.  Let me look through my pile.  106,

     4    page 1, whoever the author was is referring to Erin

     5    McCaffery and seems to be quoting -- she puts total

     6    failure in quotes -- leading me to believe that Erin

     7    McCaffery said or wrote it.

     8              Q    Now, my question is, that total failure

     9    comment doesn't appear in an EIR, does it?

    10              A    I don't remember if it's in an EIR.

    11              Q    Well, the document will speak for itself.

    12              A    Yes.

    13              Q    But it either does or it doesn't, right?

    14              A    It either does or doesn't.

    15              Q    And that would be the opinion of the

    16    investigator, right?

    17              A    She would be reflecting an opinion based

    18    on facts that she observed.

    19              Q    So it wouldn't belong in an EIR if it's

    20    there, right?

    21              A    They're not supposed to put opinions.

    22    You're not supposed to put opinions on 483s.  You're

    23    supposed to put facts on 483s and you're only supposed

    24    to put facts on EIRs also.

    25              Q    So it doesn't belong in either an EIR or a

James J. Farley                                          June 28, 2010

                                                            Page 282

 1   483.

 2                  MR. MILLER:   Object to form.

 3           A    That is correct.

 4           Q    And in fact, it doesn't appear in either

 5   the EIR or the 483, does it?

 6           A    I don't -- apparently Erin McCaffery

 7   either wrote it or said it, because she's being quoted.

 8   That's why I put the single quotes in there.

 9           Q    Okay.   In Comment A you refer to products

10   with no impurity profile.   Do you see that?

11           A    48 products with no impurity profile.

12           Q    Was Digitek one of those products?

13           A    Don't know.

14           Q    You didn't review any batch records to

15   find out, did you?

16           A    Did not have to.

17           Q    You didn't review any batch records to

18   find out, did you?

19           A    Correct.

20                  MR. MILLER:   Objection.

21           Q    Paragraph B --

22           A    Yes.

23           Q    -- you quote from a complaint for

24   permanent injunction and then you offer a comment.  Now,

25   you authored an article with lawyers.  I assume you've

James J. Farley                                        June 28, 2010

                                                            Page 283

1    been around enough to know, and you worked for FDA for

2    eight years, you know a complaint is nothing but

3    allegations, right?

4                    MR. MILLER:  Object to form, calls for a

5         legal conclusion.

6         A    I'm thinking of that.  The way you have it

7    worded I'd say it's an allegation.

8         Q    Allegations are -- statements in a

9    complaint are allegations, right?

10        A    Yes.

11        Q    Untested, unproved.

12                   MR. MILLER:  Object to form.

13        A    Yes.

14        Q    Your comment in Paragraph B, this leads

15   any responsible person to ask why didn't they fix what

16   was broken.

17        A    Yes.

18        Q    Did one of Plaintiffs' lawyers suggest

19   that things were broken at Actavis to you?

20        A    No.

21        Q    Did you ever talk to a gentleman named Ed

22   Blizzard?

23        A    No.  I've read that name in depositions.

24        Q    Okay.

25        A    He's an attorney?

James J. Farley                                    June 28, 2010

                                                    Page 284

1              Q    He is an attorney.

2              A    I've never spoken to or met the gentleman.

3              Q    Okay.  We spent a lot of time going

4    through the EIR for the 2007 inspection.  Do you

5    remember that?

6              A    Yes.

7              Q    Fifteen observations.  Every one Actavis

8    proposed and implemented corrective actions in response

9    to every one.  Do you remember that?

10             A    I don't remember implementing them.  What

11   I saw was, here's what we're going to do, here's what

12   we're going to do here, here's what we're going to do,

13   we hire this many people.

14             And then I was trying to say time will tell if

15   it works out if they really do it.  But at that instant

16   in time that's what they proposed.

17             Q    Okay.  Mr. Farley --

18             A    We had a difference there.

19             Q    Mr. Farley, it isn't what they proposed;

20   it's what they did.  There's a difference between doing

21   and your notion of time will tell whether it is the

22   absolute effective solution.

23             You understand that, right?

24                  MR. MILLER:  Object to form,

25        argumentative.

James J. Farley                                        June 28, 2010

Page 285

1            A    State your two points, now.

2            Q    You understand that, right, that there's a

3    difference --

4            A    Yes, I do.

5            Q    Okay.  And if we have to go back through

6    that again and convene for another day of deposition,

7    I'm happy to do that.

8            A    Fine.

9            Q    The record will show what it shows.

10           A    Yes.

11           Q    But in fact, the EIR shows 15

12   observations, 15 sets of corrective actions actually

13   taken by Actavis, doesn't it?

14           A    Taken, started at that time.

15           Q    Yes.

16           A    Yes.

17           Q    None of them indicated by -- nowhere does

18   the FDA indicate that additional corrective actions are

19   necessary.

20           A    Not if they work out.

21           Q    Well, but the FDA is saying no corrective

22   actions are necessary.  You gave that testimony in

23   response to all 15.  You're not going to go back on

24   that, are you?

25                MR. MILLER:  Object to form.

James J. Farley                                    June 28, 2010

                                                   Page 286

    1            A    I'm not.

    2                 MR. MILLER:   Misstates previous

    3        testimony.

    4            A    But the FDA is also saying back at their

    5    district office, let's get the calendar and look when

    6    we're going to inspect them to make sure those

    7    corrections work out.

    8            Q    Okay.

    9            A    That's the point that I'm trying to make.

   10            Q    And I'm not suggesting that they are

   11    absolved of compliance on all those issues forever.

   12            A    Yes.

   13            Q    I merely want to explore the notion of

   14    whether corrective actions were taken.

   15            A    They were.

   16            Q    Absolutely were.

   17            A    We agreed on that step by step, every one.

   18            Q    All the way through.

   19            A    Sure.

   20            Q    Go to Paragraph C.

   21            A    I'm there.

   22            Q    It's not true that companies hire third

   23    parties only when they can't achieve compliance by

   24    themselves, is it?

   25            A    You say it's not true?

James J. Farley                                          June 28, 2010

                                                         Page 287

1              Q    Yeah.

2              A    Correct.  It is not true.  They hire third

3     parties to help them out whenever they feel they need

4     them, not necessarily when they have a problem.

5              Q    Okay.  And sometimes they hire them just

6     because maybe they want to expedite something and they

7     don't necessarily have the resources themselves to do it

8     and they want some assistance making sure something

9     happens within a time frame that they need to

10    accomplish, correct?

11             A    Yes.

12             Q    Have you ever been hired for that purpose?

13             A    Yes.

14             Q    How many times?

15             A    A few times every year for a variety of

16    things, reviewing internal documents, evaluating a

17    contract manufacturer or contract packager.  It varies

18    as to what they need you for.

19             Q    Okay.  And you also can hire a GMP expert

20    to evaluate your methods and facilities and controls

21    just because you want to conduct some sort of

22    evaluation, correct?

23             A    Yes.

24             Q    And that happens?

25             A    Yes.

James J. Farley                                    June 28, 2010

Page 288

1           Q    So it's not true that that happens only in
2      the context of a consent decree.
3           A    Correct.
4           Q    You're aware that all of the other
5      products made by Actavis Totowa other than Digitek were
6      recalled at some point during 2008, right?
7           A    Yes.
8           Q    Are you aware that was not a consumer
9      level recall?
10          A    Yes.
11          Q    Patients were instructed to continue
12     taking those products?
13          A    Yes.
14          Q    By the FDA.
15          A    Yes.
16          Q    Why would the FDA do that?
17          A    Were permitted to by the FDA, I would say.
18          Q    Well --
19          A    If you want to say instructed, I'm saying
20     permitted.
21          Q    Press releases announcing recalls are
22     submitted and approved by the FDA, correct?
23          A    You're not talking about these unsigned
24     things that you saw on the Web that you showed me?
25          Q    No.  I'm talking about the official press

James J. Farley                                    June 28, 2010

                                                      Page 289

 1   release --
 2            A    Official press release?
 3            Q    -- where a recall is announced.
 4            A    Yes.
 5            Q    Submitted to and approved by the FDA,
 6   right?
 7            A    Yes.
 8            Q    So the press release -- the press release
 9   that announced the recall of the products other than
10   Digitek was submitted to and approved by the FDA?
11            A    Yes.
12            Q    Had to be.
13            A    Oh, yes.
14            Q    So it told consumers to continue taking
15   all those products submitted to and approved by the FDA,
16   right?
17            A    Yes.  That took a minute, but then it
18   kicked in to my memory.
19            Q    Okay.  Let's go back to this comment
20   about -- you keep wanting to say that sometimes the FDA
21   will let a product go to market if it's necessary.
22            What's the basis for that statement?
23            A    Let's say that a particular firm, Firm A,
24   makes a product and it has 80 percent of the market of
25   that product.  But Firm A now encounters a problem with

James J. Farley                                    June 28, 2010

Page 290

1    that.

2              But if Firm A were to be shut down there would

3    be patients who couldn't get the product because the

4    only other firm that makes it doesn't make enough of it

5    and can't get gear's up to do it.

6              So the FDA will then come.  And remember I

7    said put work with in quotes.  They'll work with them in

8    giving them more guidance in how can we approve things

9    to get them out to the people who need it.  That's what

10   I was referring to.  They're rare cases indeed, but they

11   do happen.

12             Q    Well -- and ultimately the only thing that

13   really matters is GMP compliance, right?

14             A    That's right.

15             Q    So it doesn't matter whether the product

16   is important or not.  If you don't have GMP compliance

17   it's not going to market.

18             A    That's correct.

19             Q    Now, you keep -- or you've referred

20   several times and I believe earlier you actually said an

21   observation you use interchangeably with a violation on

22   a 483.

23             A    In conversation I use it interchangeably.

24             Q    Okay.  I guess that's a qualification on

25   your earlier testimony then.  So I need to make clear.

James J. Farley                                    June 28, 2010

                                                        Page 291

 1    And we talked about this a little bit earlier.

 2              An observation on a 483 is not -- is not even

 3    intended to reflect an actual violation.  It's just the

 4    observation of the inspector about some condition that

 5    they want to see changed.

 6              A    That they want to see changed because it's

 7    violative.

 8              Q    Well, will you look at your report on page

 9    18, Mr. Farley.

10              A    Page 18?

11              Q    Yeah.

12              A    I'm there.

13              Q    And you, in Paragraph E on the Fact versus

14    Opinion --

15              A    Yes.

16              Q    -- you quote the Investigations Operations

17    Manual, Section 5.2.3.3 as reading, Do not -- quote, Do

18    not report opinions, conclusions or characterize

19    conditions as violative.  The determination of whether

20    any condition is violative is an agency decision made

21    after considering all circumstances, facts and evidence.

22              Do you see that?

23              A    I see it.

24              Q    Did I read that correctly?

25              A    You read it correctly.

James J. Farley                                June 28, 2010

                                                  Page 292

1              Q    I have the section here as an exhibit, but

2    do you believe you accurately quoted that --

3              A    I believe I accurately quoted that.

4              Q    -- operations manual?  So the operations

5    manual tells inspectors, whatever you write don't

6    indicate it as a violation, we'll do that after the --

7    somewhere down the line, right?

8              A    Say that again.

9              Q    The operations manual is saying here to

10   inspectors, whatever you write don't indicate it as a

11   violation, we'll figure out whether it's a violation

12   later.

13             A    I have to explain what that means.

14             Q    What what means?

15             A    What that means, they determine as

16   violative.

17             Q    It means that they haven't made a

18   determination as to whether it's a violation.

19                  MR. MILLER:  Are you testifying for him?

20             A    It's, it's the way the system is set up.

21   The inspectors come back from an inspection along with

22   the scientists.  The scientists go to the lab visiting

23   the inspectors periodically to help with the report.

24                  The compliance division, which is -- exists as

25   another division within the district, their

James J. Farley                                          June 28, 2010

Page 293

1    responsibility is to determine the classification.  Is

2    it NAI, no action indicated; is it VAI; is it OAI,

3    official action indicated?  It's their area.

4          So in not treading into their work area it's

5    essentially, you do the inspection, you make your

6    observations.  They don't doubt them.  They just say,

7    make your observations.  But then it comes to this area

8    to look at it and determine whether it's a NAI, VAI or

9    OAI.

10         Q   This doesn't say anything about NAI, VAI

11   or OAI, does it?

12         A   But the violative status that -- it's just

13   a matter of responsibilities.  We will over here

14   determine if it's violative.  You wrote it, you know it,

15   anybody that reads it knows it, but over here we are the

16   ones who officially make it violative.

17         Q   And until you get over here where you make

18   that official determination it's not violative.

19         A   And over here is right across the hall.

20   It would be like right over there.

21         Q   I understand, but that happens after the

22   483 is issued.

23         A   Legally that's the process.  In the

24   regulatory system that's the process.

25         Q   So yes.  The answer is yes.

James J. Farley                                          June 28, 2010

Page 294

```
 1              A    Yes.

 2              Q    It happens after the 483 is issued.

 3              A    Yes.  Everybody knows it's going to be,

 4    but it isn't official until it goes across the hall and

 5    they do it.

 6              Q    Paragraph F.

 7              A    Yes.

 8              Q    When you use the term systemic -- well,

 9    when you say in the last sentence there all products,

10    including Digitek, were adulterated -- you see that --

11              A    Yes.

12              Q    -- did you -- you didn't review any

13    Digitek batch records to reach that conclusion.

14              A    I reviewed one Digitek batch record, but

15    that did not come into this conclusion.

16              Q    Well, this conclusion flows exclusively

17    from FDA documents.

18              A    Yes.  In fact, it's not in the conclusion

19    section.  It's in the comments section.

20              Q    This comment flows exclusively from your

21    review of FDA documents.  You took the FDA at their

22    word.

23              A    Yes.

24              Q    You didn't do anything to follow up and

25    specifically determine whether Digitek was adulterated.
```

James J. Farley                                    June 28, 2010

Page 295

1           A    Looking at failure to -- when you're not

2    manufacturing in compliance with GMPs, by definition in

3    the Act it's adulterated.

4           Q    You didn't do anything to follow up and

5    find out whether Digitek other than Batch 70924 --

6                MR. MILLER:  Object to form.

7           Q    -- had not been -- had been manufactured

8    not in compliance with GMPs.

9                MR. MILLER:  Object to form, misstates

10       previous testimony.

11          A    I didn't do anything beyond all the other

12   483 -- reading the 483s and -- well, I was looking for

13   everything in there, not just for Digitek.

14          Q    I understand that.  But we talked earlier

15   about what you do when you find that situation and you

16   want to associate it with a specific product, you go

17   look at the records for that product.  You didn't do

18   that.

19          A    The way you have worded the question, no,

20   I didn't do that.  I looked at the batch record for that

21   one lot.

22          Q    Blend Uniformity, Paragraph G.

23          A    Yes.

24          Q    You talk about the products that were

25   temporarily discontinued due to blend uniformity and/or

James J. Farley                                          June 28, 2010

Page 296

1    content uniformity issues.

2              Do you see that?

3         A    I see it.

4         Q    Was Digitek one of those products?

5         A    I just don't recall offhand.  Perhaps I

6    should, but I just don't recall offhand.

7         Q    Okay.  Well, don't you think you would

8    have said that if it was in your comment?

9         A    I may or may not.

10        Q    Did you see any Digitek batch records that

11   indicated out of specification results for content

12   uniformity for Digitek?

13        A    I don't believe I saw any of them, but I

14   do believe I saw someone questioning blend uniformity.

15   And it was correspondence between two individuals, but

16   with 93 documents I'm at a loss to tell you.

17        Q    So the answer to my content uniformity

18   question is, no, you didn't see any documents

19   questioning the -- or indicating out of specification

20   results for content uniformity for Digitek.

21        A    Not indicating.  There was someone

22   questioned it.

23        Q    Content uniformity or blend uniformity?

24        A    Content.  There was content uniformity and

25   blend uniformity somewhere in all those documents.  But

James J. Farley                                      June 28, 2010

Page 297

1    I -- your question was did I see any.  No.

2              Q    Blend uniformity actually isn't required

3    for all products in the market, is it?

4              A    Could you explain that answer, blend

5    uniformity determination?

6              Q    What?

7              A    Blend uniformity determination -- blend

8    uniformity is required.

9              Q    Blend uniformity testing isn't required

10   for all products in the market, is it?

11             A    You would not need it for a liquid

12   injectable.  Your sampling procedure would take care of

13   that.

14             Q    The FDA will allow companies to not test

15   for blend uniformity in certain circumstances; isn't

16   that correct?

17             A    They won't allow them to not test for it,

18   but your question is blend uniformity is the way I heard

19   it.

20             Q    I said -- I revised my question,

21   Mr. Farley, to ask --

22             A    Oh.  You revised the question.

23             Q    -- blend uniformity testing is not

24   required for all products in this market, correct?

25             A    Correct.

James J. Farley                                    June 28, 2010

                                                        Page 298

1            Q    Including things other than liquids,

2    correct?

3            A    Correct.

4            Q    So there are solid oral dose tablets that

5    are dry blends --

6            A    Yes.

7            Q    -- where the FDA allows companies to not

8    test for blend uniformity, correct?

9            A    Yes.

10           Q    And will you look at Defendants'

11   Exhibit 58?  It is the 2008 483.

12           A    I'm looking through.  Didn't get it yet.

13           Q    Perhaps Mr. Miller can lend some

14   assistance.

15                MR. MILLER:  You're getting hotter.

16                THE WITNESS:  What's the exhibit number?

17                MR. MILLER:  It's in that pile right

18        here.

19                THE WITNESS:  Which exhibit number is it?

20                MR. ANDERTON:  58.

21                MR. MILLER:  No, the next one.  It should

22        be this one here.  Is that 2008?

23                THE WITNESS:  May of 2008, Erin

24        McCaffery?

25                MR. ANDERTON:  Yes.

James J. Farley                                      June 28, 2010

Page 299

1                THE WITNESS:  I've got it.

2    BY MR. ANDERTON:

3            Q    Turn to page -- well, I can't read the

4    number myself.  Let's call it 6.  And the number down in

5    the bottom right corner should be 28230.

6            Do you see that?  It's cut off.  The zero is

7    cut off.

8            A    Yes.  The zero is cut off.  It contains

9    primarily Observation 4 --

10           Q    Correct.

11           A    -- and part of Observation 3.

12           Q    Correct.

13           A    I've got it.

14           Q    Do you see Observation 4a refers to blend

15   uniformity and particularly Digitek?

16           A    Yes.

17           Q    And I'm going to read that out loud.  It

18   says, Although three out of specification results -- and

19   I'm going to skip the batch numbers, but -- Although

20   three out of specification results were obtained for

21   blend uniformity at the right top sample location for

22   Digoxin tablets .125 milligrams -- and then it has the

23   lots which I'm skipping -- on February 20, March 14 --

24   February 20, 2007, March 14, 2007, and September 29,

25   2007, no manufacturing investigations were conducted.

James J. Farley                                    June 28, 2010

Page 300

1            Did I read that correctly?

2        A    Yes.

3        Q    So the issue the FDA has here is not that

4    there were out of specification results for blend

5    uniformity, it's that there were no manufacturing

6    investigations conducted.

7                MR. MILLER:  Object to form.  The

8            document speaks for itself.

9        A    It says three out of specification -- the

10   very first line.

11       Q    That's what happened.  But the reason the

12   FDA cites this fact, or these facts, is not because

13   there happen to be three out of specification results.

14   It's because they didn't conduct manufacturing

15   investigations.

16               MR. MILLER:  Object to form.

17       A    The way this is written they didn't

18   perform under the Corrective Action/Preventive Action

19   program and investigate these results as they should

20   have.

21       Q    Right.  So the problem, if you want to

22   call it a problem, that resulted in this observation is

23   not the mere fact that there were out of specification

24   results, correct?

25               MR. MILLER:  Object to form.  The

James J. Farley                                          June 28, 2010

                                                          Page 301

 1          document speaks for itself.
 2                  A    It says although they were obtained you
 3          didn't look at them.
 4                  Q    Okay.  So the FDA is not taking any issue
 5          with -- I'm trying to establish something, Mr. Farley.
 6          And you're an expert in this field.  You counsel clients
 7          on reading these documents.
 8                  A    Yes.
 9                  Q    And you charge them a nice handsome fee to
10          do that.
11                  A    Comfortable.
12                  Q    The issue that resulted in this
13          observation is not the mere fact that there was an out
14          of specification result three times in blending Digoxin,
15          correct?
16                  A    Yes, yes.
17                  Q    All right.  And this next sentence,
18          Additional samples were used to retest the blend and
19          were reported.
20                  Do you know whether that's called for by the
21          relevant SOP?
22                  A    I would think it would have to be where in
23          the blend you were doing it, what time of the blend you
24          were doing it.  If you were nearly ready to take the
25          blend and press out the tablets that's one thing.

James J. Farley                                           June 28, 2010

Page 302

1              If it's an intermediate sample, like just say

2    a 30-minute mix, take one sample after 15 minutes and

3    you should be in this range, then you'd have to write

4    your specifications, your SOPs in accordance with that

5    part of the process.

6              Q   Mr. Farley, please --

7              A   I'm trying.

8              Q   Do you know whether the SOP for blend

9    uniformity testing allows retesting of sample -- of

10   extra samples taken?

11             A   I do not know what their SOP says.

12             Q   Did you review their SOP?

13             A   I do not remember seeing it.

14             Q   Did you see any SOPs from Actavis?

15             A   I don't -- if I did it's only a few, but I

16   don't remember any.

17             Q   Okay.  So you rendered an expert opinion

18   about the GMP compliance status of Actavis and didn't

19   review a single SOP.

20             A   To my knowledge I didn't review the SOPs.

21             Q   Didn't ask for them either.

22             A   I relied on what the FDA said.  The FDA

23   said you're not in compliance with your SOPs, the ones

24   you have.

25             Q   How was Digitek adulterated?

James J. Farley                                    June 28, 2010

                                                        Page 303

1              A    By not being manufactured in accordance

2      with GMPs.

3              Q    Which GMPs?

4              A    Which?  21 CFR 211.

5              Q    All of them.

6              A    No.  That's the set.

7              Q    Which of those was Digitek not

8      manufactured in compliance with?

9                   MR. MILLER:  Take your time.  If you need

10          to go through all the documents we'll get all the

11          documents.

12             Q    Absolutely right.

13             A    This is --

14                  MR. MILLER:  If you need help with the

15          documents, like he just said, I'll help with the

16          documents.  We'll get them all out and you can go

17          right down the list.

18             A    I mean, I know I can come up with the

19      answer.  I'm just trying to think and give you the

20      answer of the correct one, of course.

21                  MR. MILLER:  Well, it's not a memory

22          test.  We can go through each and every --

23             A    The primary one, the one that jumps to

24      mind, is the Corrective Action/Preventive Action, not

25      looking at out of specification results as thoroughly --

James J. Farley                                    June 28, 2010

                                                      Page 304

1                    MR. ANDERTON:  Pete, what are you doing?

2                    MR. MILLER:  I'm helping him.  You asked

3          me a minute ago to help him with documents.  I'm

4          helping him with documents.

5                    MR. ANDERTON:  Pete, we work with

6          exhibits in this context.  You don't just sit down

7          in front of a witness and start randomly putting

8          documents --

9                    MR. MILLER:  I'm not randomly doing

10         anything.  He brought documents at your request

11         today.  These are documents that he brought at

12         your request today and now he's trying to answer

13         your question.

14                   MR. ANDERTON:  I asked him a question.

15         He's trying to answer it.  If he wants to review

16         documents he'll let me know, Pete.

17                   MR. MILLER:  Well, I'm objecting --

18                   MR. ANDERTON:  Put the binder away.

19                   MR. MILLER:  It requires --

20                   MR. ANDERTON:  Put the binder away.

21                   MR. MILLER:  I'm not putting the binder

22         away.  If the man wants to look at the binder --

23                   MR. ANDERTON:  I'm going to reach across

24         the table -- Pete.

25                   MR. MILLER:  He's going to reach over and

James J. Farley                                         June 28, 2010

Page 305

```
 1          grab it and if you need it to answer the question

 2          you ask for it and he'll give it right back to

 3          you.  Watch how this works.

 4    BY MR. ANDERTON:

 5              Q    Mr. Farley --

 6                   MR. MILLER:  Would you like to see the

 7          binder, Mr. Farley, to answer the question to be

 8          fair?

 9                   THE WITNESS:  I'm not sure, but I didn't

10          touch the binder.

11                   MR. MILLER:  Well, it doesn't matter who

12          touches the binder.  You just answer the question.

13                   THE WITNESS:  I want to think about it

14          for a minute.  I want to hear the question again

15          and I want to think about my answer and then maybe

16          I'll ask to see some documents.

17    BY MR. ANDERTON:

18              Q    Okay.  How was Digitek adulterated?

19              A    And my answer was generally not being

20    manufactured in compliance with GMPs.  And then I think

21    you said specifically point out the instances.

22              Q    Well, let me ask it a different way, or

23    another question.  Never mind.  You use -- if you'll

24    turn to page 19 of your report, first conclusion.

25              A    I'm on 19.
```

James J. Farley                                            June 28, 2010

                                                               Page 306

 1              Q   And you -- the last sentence you talk
 2      about deviation -- or I'm sorry -- you talk about
 3      violations and then you go on to say in the last
 4      sentence, All of these are shown to recur, thereby
 5      indicating that no corrective actions were made.
 6              Did I read that last sentence correctly?
 7              A   I'm looking for where --
 8                  MR. MILLER:  Which paragraph?
 9              Q   Page 19, the first conclusion.
10                  MR. MILLER:  Thank you.
11              Q   I apologize.
12              A   I'm going to read the paragraph to myself.
13              Q   Take your time.
14              A   I've read it.
15              Q   Okay.  The last sentence -- in the first
16      sentence you talk about -- I'm sorry.  In the second
17      sentence you talk about violations.  And then in the end
18      of the paragraph you say all of these, all of these, are
19      shown to recur, thereby indicating that no corrective
20      actions were made.
21              Did I read that last sentence correctly?
22              A   Yes.
23              Q   So it's your testimony that every single
24      violation recurred.
25              A   That is what I concluded after reading

James J. Farley                                        June 28, 2010

                                                              Page 307

 1  District Director Douglas Ellsworth's warning letter.

 2              Q    Every single one?

 3              A    He says -- I conclude that from it.  He

 4  says these -- he mentions in the warning letter such and

 5  such and these continue to recur, you have made no

 6  effort to -- I forget the exact wording, but we can get

 7  it and I can tell you.  But he says they're recurring.

 8              Q    What warning letter are you referring to?

 9  There's no warning letter after the 2008 inspection.

10              A    No.  Douglas Ellsworth's warning letter.

11  98 documents, I just --

12                   MR. MILLER:  This paragraph doesn't

13          mention the 2008 inspection.

14              A    This paragraph refers to my overall

15  conclusion --

16              Q    Okay.

17              A    -- of the company itself.  I'm not

18  directing that to any inspection.  But the recurrence is

19  what I read plus what -- and I don't know Douglas

20  Ellsworth.  I'm just mentioning his name because he's

21  the district director.

22              Q    Okay.  The last sentence where you say, no

23  corrective actions were made, our discussion of the 2007

24  inspection and EIR shows that that's simply not

25  accurate, doesn't it?

James J. Farley                                    June 28, 2010

Page 308

 1          A    It -- my interpretation, if the corrective

 2     actions worked you wouldn't have a recurrence of the

 3     problem.  So therefore, they didn't work.

 4          Q    So we are talking about 2008.

 5               MR. MILLER:  Object to form, misstating

 6          previous testimony.

 7               MR. ANDERTON:  No, Pete.  This is in

 8          forward.  It's the calendar.

 9          Q    If you are assessing whether the

10     corrections in the 2007 inspection worked you've got to

11     go forward, right?

12          A    Yes.

13          Q    That would lead us into 2008.

14          A    Yes.

15          Q    So there was no warning letter after the

16     2008 inspection.

17          A    I'm trying to think of the date of the

18     last warning letter.  And your question was?

19          Q    So we're talking about 2008.  If your --

20     your use of the term recur means you're talking about

21     2008, right?

22          A    Yes.

23          Q    That was three minutes of too much work.

24          A    I just want to make sure that I'm giving

25     you the right answer --

James J. Farley                                    June 28, 2010

Page 309

```
 1              Q    I understand.
 2              A    -- for everyone's sake.
 3              Q    And if it's recurred -- you understand the
 4    difference between recur and continue?
 5              A    Yes.
 6              Q    So if it's recurred that means it's
 7    happening again, not --
 8              A    Yes.
 9              Q    -- continued to happen since the last
10    time.
11              A    Yes.
12              Q    So it isn't true to say that something
13    that recurs means no corrective action was made.  I can
14    correct something and if it happens again it happens
15    again.
16              A    You try corrective actions and at some
17    point in time they didn't work.
18              Q    At some point in time it happened again.
19              A    Yes.
20              Q    That doesn't mean no corrective actions
21    were made, does it?
22              A    They weren't effective.  They didn't last.
23    I'm --
24              Q    How do you know -- how do you know that
25    the violation or the circumstance didn't occur for a
```

James J. Farley                                          June 28, 2010

                                                          Page 310

 1    different reason?

 2                    MR. MILLER:  Object to form, asked and

 3         answered.

 4         A    Some of them are the same.  They're almost

 5    word for word the same infraction, the same reasoning.

 6         Q    All based on your review of the FDA

 7    documents?

 8         A    Of the whole 93 documents, many of which

 9    were --

10         Q    None of which were production records for

11    any product manufactured by Actavis, correct?

12         A    One was the batch record.

13         Q    The single batch record of one lot.

14         A    That exception.

15         Q    Okay.  With that exception of that single

16    batch, none of which were production records, correct?

17         A    Correct.

18         Q    Do you know when Digitek was recalled?

19         A    I read it in the data.  I'm at a loss

20    offhand for the exact date.

21         Q    If I say April 28th -- I'm sorry --

22    April 25, 2008, do you have any reason to dispute that?

23         A    I have no reason to dispute that.

24         Q    Does that sound about right, April 25?

25         A    Sounds about right.

James J. Farley                                        June 28, 2010

                                                        Page 311

 1             Q    Okay.  Do you know when the inspection
 2    ended?
 3             A    May of '08.  Is that the one you're
 4    referring to?
 5             Q    Yes, May 20 of '08.
 6             A    Yes.
 7             Q    Turn to the last conclusion in your
 8    report.
 9             A    The very top of page 20 above my
10    signature?
11             Q    Correct.
12             A    I have it.
13             Q    It reads, Patients have no assurance of
14    the proper quality of the Actavis products since they
15    were produced under non-compliant conditions in
16    violation of FDA regulation.
17             A    Yes.
18                  MR. MILLER:  You left out the word many.
19             Q    I apologize.  Since many were produced
20    under non-compliant conditions in violation of FDA
21    regulations.
22             With that correction did I read that
23    correctly?
24             A    Yes, you did.
25             Q    Which many?

James J. Farley                                    June 28, 2010

                                                        Page 312

 1              A    Which many?

 2              Q    Yeah.  Which products?

 3              A    Whatever were produced in that plant

 4    during that time period.  And I don't know all the

 5    production records as to what was made during that time.

 6    They were in a period of being non-compliant.

 7              And I'm saying whatever they made during that

 8    time when their quality system was not functioning --

 9    Erin McCaffery said total failure; I'm saying not

10    functioning well -- that you can't trust the quality of

11    any product that was made during that time.

12              Q    Why did you say many and not all?

13              A    All would have been a very, very inclusive

14    term and I didn't really know that it was all.

15              Q    You just --

16              A    So I put many.

17              Q    So you don't really know that it's all.

18              A    I don't know that it's all.  That's why I

19    didn't write all.

20                   THE VIDEOGRAPHER:  I'm going to go off

21         the record to change tapes, sir.  It's 5:35.  One

22         moment.

23                        (Off the record.)

24                   THE VIDEOGRAPHER:  This is the beginning

25         of Tape No. 8.  It's 5:36 p.m.

James J. Farley                                    June 28, 2010

Page 313

1            MR. ANDERTON:  Mr. Farley, subject to my
2        review of the documents that were produced today,
3        the draft reports and such, at the moment I don't
4        believe I have any further questions.  I'm going
5        to leave the record -- Pete -- Mr. Miller is going
6        to make a responsive comment.  So don't get up and
7        leave just yet.
8            THE WITNESS:  I'm here.
9            MR. ANDERTON:  So I reserve the right to
10       reconvene this session on behalf of Defendants in
11       the event our review of those documents suggests
12       further examination based on those documents as
13       necessary.
14           THE WITNESS:  Yes.  I understand.
15           MR. MILLER:  To the extent your review of
16       documents you -- if you believe from that review
17       that you need to come back then I would say that
18       we restrict it obviously only to his documents.
19           But my position would be that I offered
20       up a vast majority of those documents before lunch
21       and certainly we could have gone over the rest of
22       them during lunch.
23           I think you've had ample opportunity to
24       review them.  But we'll look at this more as we go
25       forward and decide.

James J. Farley                                    June 28, 2010

                                                        Page 314

 1                    MR. ANDERTON:  Well, actually -- before I
 2        close the record -- I almost -- let's not mess
 3        this up.  I don't have copies of those.
 4                    MR. MILLER:  You do.  It's on the thumb
 5        drive.
 6                    MR. ANDERTON:  I need hard copies if I'm
 7        going to introduce them as exhibits.  If you want
 8        to minimize the -- I'm going to mark them and
 9        introduce them.
10                    MR. MILLER:  All right.  But you asked
11        for the thumb drive and we gave them to you on the
12        thumb drive.
13                    MR. ANDERTON:  I understand.  I don't
14        have --
15                    MR. MILLER:  I mean, there's not a
16        requirement to give you multiple copies.  You've
17        got copies.  And if --
18                    MR. ANDERTON:  Can I take that and get
19        copies made, Pete?
20                    MR. MILLER:  Yes.
21                    MR. ANDERTON:   Okay.
22                    MR. MILLER:  Well, I've got questions
23        before we close this.
24                    MR. ANDERTON:  Well, I don't have time.
25        This --

James J. Farley                                         June 28, 2010

Page 315

```
 1                  MR. MILLER:  I've got five minutes of
 2         questions.
 3                  MR. ANDERTON:  Pete --
 4                  MR. MILLER:  You can sit here or not sit
 5         here.  I've got five minutes of questions.
 6                  MR. ANDERTON:  We're past 5:30.  We've
 7         got a PTL that says we cut off at 5:30.
 8                  MR. MILLER:  Well, I mean, I've got five
 9         minutes.
10                  MR. ANDERTON:  So it sounds -- no, Pete.
11         I'm not missing my flight.  I don't have --
12                  MR. MILLER:  You're not going to miss
13         your flight.  I'm going to ask four questions.
14                  MR. ANDERTON:  I don't have the ability
15         to --
16                  MR. MILLER:  I'm going to ask these
17         questions.  So you do have the ability.  Just pack
18         up while I'm -- I'll be done before you get
19         everything packed up.  Okay?  Allow me to ask
20         these questions.
21                  MR. ANDERTON:  Okay.
22                  MR. MILLER:  Thank you.
23                  Mr. Farley --
24                  MR. ANDERTON:  Wait.  Before you do that,
25         we're going to mark these documents.  So if you
```

James J. Farley                                          June 28, 2010

                                                          Page 316

 1          want to -- I mean, she's got to mark these

 2          exhibits.

 3                   I suggest actually we just allow her to

 4          mark those.  She'll take them.  I'll get copies

 5          from her and you can print new copies.

 6                   MR. MILLER:  I'll get copies from her as

 7          well.  That's fine.  I have no problem with that.

 8                   MR. ANDERTON:  Okay.

 9                   MR. MILLER:  But let's mark them after I

10          get done with my time.

11                   MR. ANDERTON:  Well, you can mark those

12          after we leave.

13                   THE COURT REPORTER:  I can.

14                   MR. ANDERTON:  Okay.

15                   MR. MILLER:  Perfect.

16                        - - - - -

17                   CROSS EXAMINATION

18     BY MR. MILLER:

19          Q   Mr. Farley, you were asked extensively

20     about the EIR with the September 2007 FDA inspection.

21          Do you recall that?

22          A   Yes.

23          Q   And you were asked several times about the

24     corrections, voluntary corrections, that were put in

25     place from the 15 observations that were made on the

James J. Farley                                    June 28, 2010

                                                        Page 317

 1   previous inspection, correct?

 2           A    Yes.

 3           Q    And because observation -- or correction.

 4   Because corrections have been proposed and implemented

 5   as noted by the FDA, that doesn't mean that they are

 6   successful; is that correct?

 7           A    That's correct.

 8           Q    Okay.  And ultimately following regulatory

 9   investigations will determine if they were successful or

10   not; is that correct?

11           A    That's correct.  And that's the point I

12   was trying to make.

13           Q    Thank you.  And on your conclusions, sir,

14   looking at that first paragraph of conclusions -- and I

15   won't read them all.  But that first sentence of the

16   first conclusion, Based on the review of the documents

17   listed in this report I conclude that Actavis had

18   essentially no quality control over the products it

19   produced and shipped.

20           Did I read that correctly, sir?

21           A    Yes.

22           Q    And you base that opinion on all the

23   documents that you reviewed, correct?

24           A    Yes.

25                MR. ANDERTON:  Peter, are you leading --

James J. Farley                                    June 28, 2010

Page 318

```
 1        wait.
 2                   MR. MILLER:  You can object.
 3                   MR. ANDERTON:  I am objecting.  You've
 4        got to give me a chance.
 5                   MR. MILLER:  All right.  I didn't hear
 6        the word objection.  I'm sorry.
 7                   MR. ANDERTON:  Objection.  You're leading
 8        the witness.
 9   BY MR. MILLER:
10        Q    Was speculation required in any way in
11   determining your opinions?
12        A    My speculation?
13        Q    Yes.
14        A    No.  It was based on opinions from my
15   experience.
16        Q    Fair enough.  And that's true with all the
17   opinions that you have in this report; is that correct,
18   sir?
19                   MR. ANDERTON:  Objection.  Again, are
20        you -- is this cross-examination?  Direct
21        examination?  What --
22                   MR. MILLER:  I didn't hear objection.
23                   MR. ANDERTON:  Objection, leading.
24                   MR. MILLER:  Thank you.
25   BY MR. MILLER:
```

James J. Farley                                    June 28, 2010

Page 319

1           Q    Did you have to speculate in any way on

2    all the opinions in this report?

3           A    I didn't speculate on anything.  I used my

4    opinion based on my best judgment and my years of

5    experience and knowledge.

6           Q    Did you feel you had a satisfactory amount

7    of information to make the opinions that you've rendered

8    in this report?

9           A    Yes, I do.

10          Q    Okay.  Was anything said today that

11   affected any of your opinions?

12          A    No.  While various other documents that I

13   had not seen were mentioned they, I believe, would not

14   affect my opinions.

15          Q    Okay.  And were all these opinions given

16   to a reasonable degree of scientific certainty?

17          A    Yes.

18               MR. MILLER:  That's all the questions I

19       have.

20                    - - - - -

21               REDIRECT EXAMINATION

22   BY MR. ANDERTON:

23          Q    Okay.  I have a couple follow-up

24   questions, Mr. Farley.

25          A    I'm here.

James J. Farley                                    June 28, 2010

Page 320

1          Q    Is GMP compliance evaluation a science?

2          A    It's not considered a science.  It's a

3    system like total quality management is a system.  It's

4    the FDA's equivalent of total quality management.

5          Q    So when you were asked a moment ago

6    whether they were rendered with a reasonable degree of

7    scientific certainty, what did you mean when you said

8    yes?

9          A    I interpreted that as Peter Miller was

10   asking me about my scientific knowledge, my work

11   experience.  That's how I interpreted that when I said

12   yes.  It's my scientific certainty.

13         Q    Yeah, but in the area of GMP compliance

14   it's not scientific knowledge.  It's, as you said,

15   specialized perhaps but not scientific.

16         A    Well, chemists, physicists and some other

17   scientists have what we call the scientific way of

18   thinking, the logical way of thinking.  And we're rather

19   proud of it, in fact.  And when I was asked if it's

20   scientific or whatever deduction, I said yes, meaning my

21   scientific way of thinking.

22              MR. ANDERTON:  Thank you.  I have no

23         further questions.  And again, I reserve the right

24         to reconvene based on --

25              THE WITNESS:  Yes.

James J. Farley                                    June 28, 2010

Page 321

```
 1                    MR. ANDERTON:  But we're going to mark --
 2                    THE VIDEOGRAPHER:  Read and sign?
 3                    MR. MILLER:  Yes.
 4                    MR. ANDERTON:  We're going to mark the
 5          documents in this binder -- how many are there?
 6                    MR. MILLER:  How many?  Several.  You
 7          want to go by tab?  Each one of these is an
 8          individual file on that thumb drive.  Like you're
 9          going to see these are several documents.  But
10          each one of those is going to be --
11                    MR. ANDERTON:  Okay.
12                    MR. MILLER:  -- a document on the thumb
13          drive.  We'll just go by tabs.  We're going to
14          group each one in tabs.
15                    MR. ANDERTON:  Okay.  So you can mark
16          the -- each tab in that white binder as an
17          individual document.  And those can be -- well,
18          let's call it Defendants' Exhibit 100, just to be
19          safe.  And start with 100 and go up.
20                    And then the draft reports is, what I'll
21          call them -- I'm not sure they're actually drafts
22          according to Mr. Farley.  There are three.  You
23          can make those 45A, 45B and 45C.
24                    THE COURT REPORTER:  Okay.
25                    MR. ANDERTON:  Okay?  And then if you
```

James J. Farley                                    June 28, 2010

                                                    Page 322

 1          will -- we'll contact you to get copies.

 2                    THE COURT REPORTER:  Okay.

 3                    MR. ANDERTON:  Okay?  Thank you very

 4          much.

 5                    THE VIDEOGRAPHER:  All right.  The

 6          deposition is concluded and it is 5:44 p.m.

 7          (Defendants' Exhibit Nos. 45A, 45B, 45C, 100, 101,

 8     102, 103, 104 and 105 were marked.)

 9       (The proceedings were concluded at 5:44 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James J. Farley                                    June 28, 2010

Page 323

1                    ERRATA SHEET

2

3         I, the undersigned, JAMES J. FARLEY, do hereby

4    certify that I have read the foregoing deposition and

5    find it to be a true and accurate transcription of my

6    testimony, with the following corrections, if any:

7

8    PAGE   LINE              CHANGE              REASON

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22

23                    _____

      JAMES J. FARLEY              Date

24

25                                              ASG

James J. Farley                                    June 28, 2010

Page 324

1                        CERTIFICATE

2

3    GEORGIA:

4    CHATHAM COUNTY:

5

6            I, Angela S. Garrett, Certified Shorthand

7    Reporter for the State of Georgia, do hereby certify:

8            That the foregoing deposition was taken before

9    me on the date and at the time and location stated on

10   Page 1 of this transcript; that the witness was duly

11   sworn to testify to the truth, the whole truth, and

12   nothing but the truth; that the testimony of the witness

13   and all objections made at the time of the examination

14   were recorded stenographically by me and were thereafter

15   transcribed by computer-aided transcription; that the

16   foregoing deposition, as typed, is a true, accurate, and

17   complete record of the testimony of the witness and of

18   all objections made at the time of the examination.

19           I further certify that I am neither related to

20   nor counsel for any party to the cause pending or

21   interested in the events thereof.

22

23

24

25

James J. Farley                                          June 28, 2010

Page 325

1          Witness my hand, I have hereunto affixed my

2    official seal this 6th day of July, 2010, at Savannah,

3    Chatham County, Georgia.

4

5                    _____

                     Angela S. Garrett, CSR, RPR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James J. Farley                                         June 28, 2010

Page 326

 1                    D I S C L O S U R E

 2         Pursuant to Article 8.B. of the Rules and

 3    Regulations of the Board of Court Reporting of the

 4    Judicial Council of Georgia, I make the following

 5    disclosure:

 6         I am a Georgia Certified Court Reporter.  I was

 7    contacted by my office of McKee Court Reporting, Inc.,

 8    to provide court reporting services for this deposition.

 9         I will not be taking this deposition under any

10    contract that is prohibited by O.C.G.A. 15-14-37(a) and

11    (b).

12         I have no contract/agreement to provide reporting

13    services with any party to the case, any counsel in the

14    case or any reporter or reporting agency from whom a

15    referral might have been made to cover the deposition.

16         I will charge its usual and customary rates to all

17    parties in the case, and a financial discount will not

18    be given to any party to this litigation.

19

20

21

22

23    _____       Date:  July 6, 2010
      Angela S. Garrett
24    RPR, CCR-B2407

25

James J. Farley       Volume II & Videotaped       January 19, 2011

Page 327

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION
                                        MDL NO. 1968
_____


VOLUME II


        The continued videotaped deposition of JAMES J.
FARLEY taken by counsel for the Defendants, Actavis
Totowa, LLC, Actavis, Inc., and Actavis Elizabeth, LLC,
pursuant to notice and by agreement of counsel, reported
by Angela S. Garrett, CSR, RPR, B-2407, at the Embassy
Suites, 145 Mulberry Boulevard, Savannah, Georgia, on
January 19, 2011, commencing at 9:03 a.m.

James J. Farley          Volume II & Videotaped          January 19, 2011

```
                                                          Page 328

  1                     APPEARANCES OF COUNSEL

  2

  3    FOR THE PLAINTIFFS:

  4
                  MIKE KERENSKY, ESQUIRE
  5               WILLIAMSON & RUSNAK
                  4130 Yoakum Boulevard
  6               Houston, Texas  77056
                  (713) 223-3330
  7               mike@jimmywilliamson.com

  8               MEGHAN JOHNSON CARTER, ESQUIRE
                  MOTLEY RICE, LLC
  9               28 Bridgeside Boulevard
                  Mt. Pleasant, South Carolina  29464
 10               (843) 216-9383
                  mjohnson@motleyrice.com
 11
                  DON ERNST, ESQUIRE (Via telephone)
 12               ERNST & MATTISON, ALC
                  1020 Palm Street
 13               San Luis Obispo, California  93401-3284
                  (805) 541-0300
 14
       FOR THE DEFENDANTS, ACTAVIS TOTOWA, LLC, ACTAVIS, INC.,
 15    AND ACTAVIS ELIZABETH, LLC:

 16
                  MATTHEW P. MORIARTY, ESQUIRE
 17               TUCKER, ELLIS & WEST, LLP
                  1150 Huntington Building
 18               925 Euclid Avenue
                  Cleveland, Ohio 44115-1475
 19               (216) 592-5000
                  matthew.moriarty@tuckerellis.com
 20

 21

 22

 23

 24

 25
```

James J. Farley        Volume II & Videotaped        January 19, 2011

```
                                                  Page 329
 1              APPEARANCES OF COUNSEL (Cont'd)

 2

 3       FOR THE DEFENDANTS, MYLAN PHARMACEUTICALS, INC.,
     MYLAN, INC., MYLAN BERTEK PHARMACEUTICALS, INC., AND UDL
 4   LABORATORIES, INC.:

 5

                 ALICIA J. DONAHUE, ESQUIRE
 6               SHOOK, HARDY & BACON, LLP
                 333 Bush Street, Suite 600
 7               San Francisco, California  94104-2828
                 (415) 544-1900
 8               adonahue@shb.com

 9   ALSO PRESENT:  Bill Kaska, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 330

```
 1                 I N D E X

 2                                              PAGE

 3   DIRECT EXAMINATION

 4           By Mr. Moriarty                    333

 5   CROSS EXAMINATION

 6           By Ms. Donahue                     448

 7           By Mr. Kerensky                    450

 8           By Mr. Ernst                       452

 9   REDIRECT EXAMINATION

10           By Mr. Moriarty                    454

11   Certificate of Reporter                    457

12           (Reporter's Disclosure Statement
             attached to back of transcript.)
13
```

```
14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15                 E X H I B I T S

16   DEFENDANTS'
     EXHIBIT
17   NUMBER          DESCRIPTION                PAGE
```

```
18    23    Letter from Scott Talbot with final
            update for audit program            385
19
      24    Form 484 for Sample 377410          388
20
      25    Form 484 for Sample 448881          399
21
      26    Form 484 for Sample 448892          399
22
      27    Form 484 for Sample 453913          399
23
      28    Form 484 for Sample 454866          399
24

25
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 331

1                   E X H I B I T S (Cont'd)

2    DEFENDANTS'
     EXHIBIT
3    NUMBER              DESCRIPTION                    PAGE

4     29      Form 484 for Sample 462746               399

5     30      Form 484 for Sample 462753               399

6     31      Form 484 for Sample 157503               399

7     32      Form 484 for Sample 157504               399

8     33      Form 484 for Sample 178890               399

9     34      Form 484 for Sample 178891               399

10    35      Celsis test results on three
              Digitek batches                          401
11
      63      Regulatory Procedures Manual,
12            Chapter 4, Advisory Actions              370

13    69      UDL Laboratories Receiving Form
              dated 4/10/08                            403
14
      70      UDL Laboratories Receiving Form
15            dated 2/28/08                            403

16    71      UDL Laboratories Receiving Form
              dated 1/21/08                            404
17
      72      UDL Laboratories Receiving Form
18            dated 6/21/07                            404

19    74C     Notice to Take Deposition               445

20

21

22

23

24

25

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 332

 1                    THE VIDEOGRAPHER:  Good morning.  We're

 2        on record.  It's 9:03 a.m.  This is the deposition

 3        of James J. Farley in the United States District

 4        Court for the Southern District of West Virginia,

 5        Charleston Division, the Digitek Product Liability

 6        Litigation, MDL No. 1968.

 7                    It is Wednesday, January 19th, 2011.  We

 8        are at Embassy Suites, 145 Mulberry Boulevard,

 9        Savannah, Georgia, 31322.

10                    Would the counsel present please

11        introduce yourself for the record, please.

12                    MR. KERENSKY:  Mike Kerensky and Meghan

13        Carter Johnson for the plaintiffs --

14                    MR. MORIARTY:  Matthew --

15                    MR. KERENSKY:  -- and also Don Ernst, who

16        is on speakerphone.

17                    MR. MORIARTY:  Matthew Moriarty for the

18        Actavis defendants.

19                    MS. DONAHUE:  I'm Alicia Donahue from

20        Shook, Hardy & Bacon for the Mylan defendants and

21        UDL Laboratories.

22                    THE VIDEOGRAPHER:  Thank you.

23                    Madam court reporter, would you swear the

24        witness, please.

25

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 333

```
1                    JAMES J. FARLEY
2     having been first duly sworn testified as follows:
3                       EXAMINATION
4    BY MR. MORIARTY:
5              Q    Now, Mr. Farley, I know you've been
6    through depositions before.  So let's just go over the
7    rules very quickly.  If you don't understand my question
8    for whatever reason, you tell me and I'll make it clear
9    to you.  Okay?
10             A    Yes, sir.
11             Q    And if you need to take a break for
12   whatever reason let us know and we'll do that.
13   Typically we break every hour, hour and a half anyway.
14   Okay?
15             A    Yes, sir.
16             Q    And if you need to look at a document
17   we'll either give you one or you can get it out of your
18   own supply of documents that you've reviewed and brought
19   with you.  Okay?
20             A    Yes.
21             Q    All right.  Have you been -- have you had
22   your deposition taken in any other litigation since my
23   colleague, Mr. Anderton, took your deposition in June of
24   2010?
25             A    No, I have not.
```

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 334

 1              Q    Have you given any trial testimony since
 2    June of 2010?
 3              A    No, I have not.
 4              Q    Have you been sued as a plaintiff or
 5    defendant in any lawsuit?
 6              A    No, I have not.
 7              Q    All right.  Since June 2010 have you met
 8    with any of the plaintiffs' lawyers in the Digitek
 9    litigation?
10              A    Just last night, Meghan and Mike --
11              Q    Okay.
12              A    -- here.  But other than e-mails and phone
13    calls from Meghan in the past couple of weeks telling me
14    that I would be called upon, no.
15              Q    All right.  So the only in-person meeting
16    you've had with any plaintiffs' lawyers in the Digitek
17    litigation was last night to prepare for today's
18    deposition, correct?
19              A    Yes.
20              Q    All right.  And other than Mike Kerensky
21    and Meghan Johnson Carter was anyone present?
22              A    No.
23              Q    Did you take any notes of that meeting
24    last night?
25              A    Yes.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 335

```
 1              Q    Do you have those notes with you?

 2              A    Yes.

 3              Q    Where are they?

 4              A    They're in my folder that I put on the

 5      chair.

 6              Q    Okay.  Can I see those?

 7              A    Yes.  I'll get up.

 8              Q    Sure.  Don't forget to take your

 9      microphone off.

10              A    Thanks for reminding me.

11                   MR. MORIARTY:  Don, can you hear?

12                   MR. ERNST:  Yes.  Although, Matt, I'm

13           going to call in and see if we can have a

14           speakerphone brought down to the room.  So that

15           may happen in the next half hour.  But you're fine

16           now.  Thank you.  I appreciate it.

17                   MS. CARTER:  I've already talked to them.

18           They'll have it here in 45 minutes.

19                   MR. MORIARTY:  Meghan talked to the

20           management.  They're bringing one.

21      BY MR. MORIARTY:

22              Q    Okay.  Can I see the notes that you took

23      from the meeting yesterday?

24              A    This is what Meghan drew to assure

25      everyone that --
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 336

1              MR. KERENSKY:  Go ahead.

2         A    This is what Meghan drew to differentiate

3    between the Little Falls and the Riverview facilities to

4    make sure that the three of us all were on the same

5    page, so to speak.  And we were.

6         Q    Okay.  Can I tear this off the tablet, the

7    rest of which seems to be blank?

8         A    Yes, sir.

9         Q    What other notes did you take?

10        A    Here's a sheet.  I wrote less than a mile

11   apart when Meghan and Mike were on speaker talking to a

12   gentleman about the difference between Little Falls and

13   the Riverview facilities.  I wrote less than a mile

14   apart.

15        Q    Okay.

16        A    And then later on in the evening Mike told

17   me his phone number in case I needed to reach him.

18        Q    Do you know who the other gentleman on the

19   phone was?

20        A    I was introduced to him and I don't

21   remember his name.  I'm sorry.

22        Q    Was it Mr. Ernst from California?

23        A    I don't know.  I would have to ask Mike

24   for that.  I should know.  I just don't remember his

25   name.  I didn't take any notes.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 337

1          Q    Did you take any other notes?

2          A    Tucker, Ellis.

3          Q    Important to know who am, I guess.  You've

4    handed me another sheet that says EIR, July 10th, 2006,

5    Exhibit 90.  Review the 483s and EIR.  Put in --

6          A    Chronological.

7          Q    -- chronological order.

8          A    Chronological order.

9          Q    Anything else?

10         A    These are notes I made to myself.  I don't

11   even know whose phone number that is at the top.  But

12   they're little notes I made to myself that don't seem to

13   be connected even to me at this moment.

14         Q    Okay.  So the phone number at the top of

15   this page of notes is 805-441-0988.  Have you talked to

16   any lawyers from California regarding the Digitek

17   litigation?

18         A    No, I have not.

19         Q    What does the shoddy, S-H-O-D-D-Y, refer

20   to?

21         A    I believe to put it in the context we were

22   talking about my opinion of Actavis and I was making my

23   notes.  I was not yet speaking, but I wrote shoddy.  And

24   then when Meghan and Mike finished and looked my way I

25   used that term.  Something like that.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 338

1          Q    All right.  Do you have any other notes
2     from the meeting?
3          A    No, sir.
4          Q    All right.  How much time have you spent
5     reviewing materials and talking to lawyers since your
6     last deposition in June of 2010?
7          A    Since then -- I heard the question.  I'm
8     pausing to try to give you an accurate answer.  24 hours
9     last week and whatever time we spent here yesterday.
10         Q    Okay.  So essentially you did almost no
11    work on Digitek between your last deposition and last
12    week, correct?
13         A    Correct.
14         Q    All right.  And you spent 24 hours last
15    week, right?
16         A    Yes.
17         Q    What are you charging me and my law firm
18    for the time we spend today in this deposition?
19         A    I don't know the answer to that and the
20    reason I don't is because I'm doing this for Smart
21    Consulting Group, which is Dr. Nigel Smart and his wife,
22    Denise Smart.  They're doing the billing.  I know
23    they're paying me 150 dollars an hour.  I really don't
24    know what they bill any attorneys.
25         Q    Do you know what the total amount to date

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 339

1    that you have been paid on the Digitek litigation

2    including 2009, 2010 and this year?

3            A    Around 36,000 dollars, give or take 3,000

4    on that.

5            Q    Okay.  Now, since your last deposition

6    have you reviewed additional materials?  I don't want to

7    talk about the re-review of old materials.  I want to

8    talk about new materials.

9            A    I'm pausing to give you an accurate

10   answer.  No, sir.

11           Q    So we took the depositions -- the same

12   week that you were deposed here we took the depositions

13   of Karen Frank, Russ Soma and Mark Kinney in

14   Philadelphia and New Jersey respectively.

15           Have you read any of their deposition

16   testimony?

17           A    No.

18           Q    Have you reviewed the reports of Soma,

19   Kinney, Frank or Bliesner?

20           A    No.

21           Q    Have you seen the reports of any defense

22   experts in this case?

23           A    No.

24           Q    Some names would be Ron Snee, Lou M. Sell,

25   Martha Bennett.  Those would be three examples.  Have

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 340

 1    you seen their reports?

 2              A    None of them.  I haven't heard of them.

 3              Q    Have you requested any additional

 4    materials since June 2010?

 5              A    No.

 6              Q    All right.  Let's go into a couple of

 7    background things that weren't covered the last time.

 8              A    Yes.

 9              Q    Have you updated your resume' since June

10    2010?

11              A    No.

12              Q    And remind me where you went to college.

13              A    My primary degree is from La Salle College

14    in Philadelphia.  It's now La Salle University.  And

15    then my master's degree in physical chemistry was at

16    St. Joseph's College, which is now St. Joseph's

17    University.  And my MBA in marketing and finance was at

18    Temple University.

19              Q    And St. Joseph's and Temple are the ones

20    in Philadelphia?

21              A    Oh, all my schools were in Philadelphia.

22    Yes, sir.

23              Q    Are you a member of any societies or

24    professional associations?

25              A    The American Chemical Society.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 341

1              Q    Is that it?

2              A    I'm thinking.  One other organization is

3    called AOPA.  It's Aircraft Owners and Pilots

4    Association.  And it's a rather well-known organization

5    for pilots.

6              Q    All right.  But as far as your profession,

7    it's really the American Chemical Society?

8              A    Just the American Chemical Society.

9              Q    And do you hold any certifications or

10   licenses?

11             A    No.

12             Q    Do you have any special training in

13   quality assurance as opposed to quality control?

14             A    I'm thinking.  Do I have special training

15   in it.  I've taught it, but within what I think of as

16   special training, no.

17             Q    Do you consider yourself an expert in

18   quality assurance in the pharmaceutical industry?

19             A    That's tough to answer yes or no because

20   it lies within the definition of an expert.  I believe

21   I'm very knowledgeable about it.  I have consulted

22   people on it and I believe I have helped them in the

23   consultation.  I would have used the term expert,

24   although there are various definitions of what an expert

25   is.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 342

```
 1              Q    Well, is your core expertise in quality
 2    control chemistry?
 3              A    It is -- it overlaps.  It's like a Venn
 4    diagram.  It's tough to pick one thing.  It's analytical
 5    chemistry.  It's physical chemistry.  It's quality
 6    control, which is part of quality assurance.
 7              It's most recently manufacturing in the last
 8    dozen years.  I can't answer that directly yes or no.  I
 9    hope that I -- with that little dissertation I put it in
10    the proper perspective.
11              Q    Do you have expertise in regulatory
12    affairs?
13              A    Yes.
14              Q    So what year did you graduate from
15    La Salle?
16              A    1957.
17              Q    And did you go straight for your master's
18    after that?
19              A    I enrolled at St. Joseph's University at
20    night and then since I had four years of ROTC my work
21    time was interrupted with military.  And after getting
22    out of the Army I went back to what was then Smith,
23    Kline and French and continued my studies at night at
24    St. Joseph's, receiving my degree in 1961.
25              Q    When were you in the Army?
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 343

1          A    1958.

2          Q    Just the one year?

3          A    Yes.

4          Q    And what was your rank on discharge?

5          A    Final discharge from Reserves was captain,

6    but discharge from active duty was second lieutenant.

7          Q    So once you finished the Army what was

8    your employment for the first few years after?

9          A    At what was then Smith, Kline and French

10   Laboratories in Philadelphia.

11         Q    What did you do for them?

12         A    I was the research analytical chemist,

13   developing analytical procedures for new compounds.

14         Q    Did that involve validation of methods?

15         A    That was before the GMPs came into play

16   and validation was not a term that was used.  In effect

17   you did that, but you didn't say we'll validate it,

18   because the GMPs came into play around 1964, '65, '66.

19         Q    All right.  And how long did you work at

20   Smith, Kline?

21         A    I'm pausing to give you accurate

22   information.  In 1961 I left to go to SKF, no connection

23   to Smith, Kline and French.  It's called The Ball

24   Bearing Place, metals and lubricants.  I simply wanted

25   to see what else was around in the field.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 344

1          Q    In the field of chemistry?

2          A    Yes.

3          Q    So SKF was not a pharmaceutical company?

4          A    Was not.

5          Q    How long did you work there?

6          A    Two years.  And then while I liked what I
7     did as a research chemist there, I decided I liked
8     pharmaceuticals and wanted to get back to the
9     pharmaceutical industry.

10         Q    Where did you go?

11         A    What was then Wyeth Laboratories.

12         Q    What did you do for Wyeth?

13         A    Senior analytical chemist, developing new
14    methods that would be used for testing raw materials,
15    compounds and submissions to the FDA.

16         Q    And did you do validation when you were at
17    Wyeth?

18         A    I want to say I did, but it was still just
19    coming into play.  The term wasn't used as it is today.
20    But the equivalent of a validation, making sure that
21    this method will work for the intended use.

22              So I'm going to say yes, but at the same time
23    say the term validation, it was verify, validate, make
24    sure it's right.  These are the terms that were used
25    then.

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 345

```
 1              Q    For either Smith, Kline or Wyeth did you

 2    work in pharmacovigilance?

 3              A    No.

 4              Q    Did you work in regulatory affairs?

 5              A    No.

 6              Q    Did you work in quality assurance?

 7              A    Not directly.

 8              Q    All right.

 9              A    I interacted with them, but I was not in

10    quality assurance.  I was research.

11              Q    How long did you work at Wyeth?

12              A    Until 1966.

13              Q    Then where did you go?

14              A    The West Company, now called West

15    Pharmaceutical Services.

16              Q    How long did you work at West?

17              A    Until 1982.

18              Q    All right.  Now, did you leave Smith,

19    Kline voluntarily?

20              A    Yes.

21              Q    Did you leave SKF voluntarily?

22              A    Yes.

23              Q    Did you leave Wyeth voluntarily?

24              A    Yes.

25              Q    All right.  What did you do for The West
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 346

1  Company?

2          A   A variety of things.  I started out

3  supervising their quality control department.  That was

4  one of the reasons I left, because it was a supervisory

5  position.

6          As the company grew, the department expanded

7  and they did more research, I mentioned that we might

8  have a separate research function since now I had

9  quality control background and the research background.

10 And they let me form a research and development group

11 more officially than they had before.

12         Then -- and I'm a little vague on this because

13 so many years.  But I ended up as assistant director of

14 laboratories as the company expanded and was involved in

15 talking to the customers, all of whom were

16 pharmaceutical firms who wanted to bring their products

17 to the market, because they bought the rubber stoppers

18 from us.

19         And I interacted highly with various people,

20 various firms that got more involved in the regulatory

21 aspect in that our products, which were components of

22 their final product, had to meet regulations.

23         Q   All right.  Did The West Company

24 manufacture solid oral dose pharmaceuticals when you

25 worked for them between '66 and '82?

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 347

```
 1              A    No.
 2              Q    Did you work on the manufacture of solid
 3    oral dose products when you were at Wyeth?
 4              A    Do you mean making them, putting them
 5    together --
 6              Q    Yes, sir.
 7              A    -- or if -- not putting them together.  I
 8    analyzed them.
 9              Q    Okay.  I'm asking whether you helped
10    manufacture them.
11              A    No.
12              Q    Did you help in any way manufacturing when
13    you were at Smith, Kline?
14              A     In testing materials at points along the
15    way to make sure a process was working well, but I
16    myself was not in manufacturing.
17              Q    All right.  Did you go to the FDA in 1982?
18              A    No.
19              Q    Where did you go after The West Company?
20              A    I formed my own training business.
21              Q    What was it called?
22              A    James Farley Seminars.
23              Q    And how long did you run James Farley
24    Seminars?
25              A    That was off and on until 1987.  I say off
```

James J. Farley         Volume II & Videotaped         January 19, 2011

Page 348

1    and on.  The business was on, but I realized at that
2    point that I wasn't running my own business as well as I
3    thought I could and I wanted to get back to the more
4    steady income.
5              Q    All right.  So in 1987 did you go to the
6    FDA?
7              A    No, sir.
8              Q    Where did you go in '87?
9              A    Federal Government, Department of Defense
10   in Philadelphia.
11             Q    What did do you do for the Department of
12   Defense?
13             A    I was working with -- some parts were
14   fabrics, but other parts were testing drugs that the
15   Department of Defense would use.  They were usually
16   drugs beyond the expiration date that the DOD,
17   Department of Defense, wanted to use for the military.
18   And we would analyze them to verify that they were still
19   good even though beyond expiration date.
20             Q    Okay.  So those years from '82 through --
21   how long were you with the Department of Defense?
22             A    I was with the Department of Defense
23   approximately one and a half years.
24             Q    So sometime in '88 or '89?
25             A    June of '89, to be precise.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 349

1              Q    All right.  And so the years '82 when you

2    were with West, you had your training business and then

3    Department of Defense, you were not involved in the

4    manufacture of solid oral dose pharmaceutical products?

5              A    Not involved in the manufacture directly.

6              Q    All right.  And then what did you do in

7    '89?

8              A    I realized that while I now had steady

9    income coming in, which is what I wanted, that I really

10   wanted to get back to pharmaceuticals.  And transferring

11   from one federal organization to another was relatively

12   easy.  And the FDA was not even across town in

13   Philadelphia.  I applied there and they accepted me and

14   I started working there.

15             Q    Okay.  So in your career have you ever

16   done blend uniformity testing for solid oral dose?

17             A    Testing?

18             Q    Yeah, blend uniformity testing.

19             A    I believe I have tested it; although I'm

20   at a loss to say when and where.

21             Q    Have you been involved in content

22   uniformity testing of solid --

23             A    Yes.

24             Q    -- oral dose --

25             A    Yeah.

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                          Page 350

1            Q    Where?

2            A    At Smith, Kline and at Wyeth.  I'm trying

3    to think, but definitely there.

4            Q    When you were at -- when you did content

5    uniformity testing did you use United States

6    Pharmacopeia methods?

7            A    I don't remember if we did or not.  You

8    don't have to use a USP method.  You use the method that

9    is most appropriate and is approved by the FDA.  So

10   while I don't remember which one, it could have been a

11   USP method.  It could have been a validated company

12   method.

13           Q    Would you agree with me that if a company

14   is not going to use USP methods to test its

15   pharmaceutical finished products, then it has to use a

16   method validated and approved by the FDA?

17           A    Yes, for materials that are to be released

18   to the consumer.

19           Q    All right.  Did you have law and evidence

20   training at FDA?

21           A    Yes.

22           Q    And I assume that was so you would have

23   some understanding not only of what the regulations said

24   but how FDA interpreted them; is that correct?

25           A    Yes.

2ecc7874fa4e8ffb

James J. Farley        Volume II & Videotaped        January 19, 2011

1              Q   How many times did you actually go out on

2     an inspection when you were with FDA?

3              A   I'm trying to give you an accurate answer.

4     I would say approximately quarterly.

5              Q   Quarterly?

6              A   Quarterly, which would be four times a

7     year.  Is that -- that's the best I can zero in on that.

8              Q   All right.  If I were to go back somehow

9     and be able to study the records of FDA and look at

10    warning letters and 483s from that period of time, how

11    many would have your signature on them?

12             A   One warning letter would have my signature

13    on it.  The 483s, I don't remember but I wouldn't be

14    surprised if none of them did because the investigator's

15    signature is on them.  Oh, the analytical chemist does

16    sign.  Yes.  There would -- a couple.  I really don't

17    want to mislead you or myself with a number.

18             Q   The warning letter that would have your

19    signature, if I recall correctly from your earlier

20    testimony, is that the one you did not draft, you signed

21    because somebody was out of the office that day?

22             A   My boss was out and he said, you're in

23    charge of the district the whole week.  And a warning

24    letter came in.  That typically is signed by the

25    district director.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                         Page 352

1            And it is drafted by someone else, but it is a

2    document that you, the person who signs it, read every

3    word on and verify before doing it.  So that's a -- is

4    that a qualified yes?

5            Q    I'm just asking if that's the instance.

6            A    Yes.

7            Q    Thank you.  Have you ever done assay or

8    content uniformity on Digoxin?

9            A    I myself?

10           Q    Yeah.

11           A    No.

12           Q    Have you supervised people doing assay or

13   content uniformity on Digoxin?

14           A    No.

15           Q    Do you have any association whatever with

16   assay or content uniformity on Digoxin?

17           A    No.

18           Q    When you did assay or content uniformity

19   for any solid oral dose pharmaceutical product, did you

20   ever use only single point UV testing?

21           A    Would you tell me what you mean by single

22   point UV?

23           Q    Well, I'm not an analytical chemist, but

24   I've had somebody tell me that that's how they analyzed

25   a particular product.  Okay?  Not HPLC or any of those

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 353

1    things.  They used the single point UV.  Okay?

2             Do you know what that is?

3             A    I would be speculating.  If I could

4    explain what is normally done -- would you like me to do

5    that?

6             Q    Nope.  So you're not familiar with single

7    point UV testing --

8             A    If it's the single point -- oh, I'm sorry.

9             Q    -- as the sole method for content

10   uniformity of a pharmaceutical product?

11            A    I know people have done single point UV.

12   My personal opinion is you should do the complete scan

13   and measure a couple of points to look for the shape of

14   the curve to give you a better instance.  So what I'm

15   saying is I didn't do it -- excuse me -- because I don't

16   feel that's the real accurate method.

17            Q    It's not reliable, in other words?

18            A    I would say you don't know the reliability

19   of it and certainly the complete spectrum and taking

20   readings at different points I believe would be more

21   reliable.

22            Q    Okay.  In your -- in your -- in the last

23   session of your deposition we marked an exhibit, 46.  It

24   was an article that you co-authored with a lawyer here

25   in Savannah.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 354

1               Do you remember that?

2        A    With Gene Brooks?

3        Q    Yes, sir.

4        A    The article with Gene Brooks?

5        Q    Yes.

6        A    I co-authored that article with him.

7        Q    All right.  In that article you say that a

8   laboratory must analyze the drug and test for its active

9   pharmaceutical ingredient and for strength and purity.

10  We'll get back to that in a little bit.

11              But it says here gas chromatography, liquid

12  chromatography and microbiological tests are the three

13  most common testing methods used for analysis, correct?

14       A    Yes.

15       Q    Single point UV is not one you would list,

16  right?

17       A    It's used but I probably would not list

18  it.  And I don't remember if I did or not there.

19       Q    I read you the sentence.  Do you want to

20  see your own article?

21       A    Yes, please.

22       Q    Right there where the highlighting is.

23       A    I read the highlighted part.

24       Q    Okay.  And single point UV is not a test

25  method that you listed in your article, right?

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 355

1          A    Correct, it is not what I listed in our

2    article.

3          Q    Okay.  Now, is it now universally accepted

4    that a method used in forensic work has to undergo

5    validation?

6          A    All methods have to undergo validation.

7          Q    All right.  So when you were actively

8    doing chemistry, analytical chemistry, how many times

9    did you run a method before you considered it validated?

10         A    Validation of a method is not just a

11   matter of how many times you run it.

12         Q    I understand that.  But overall how many

13   times do you think you went through the process before

14   you and your company considered it validated?

15         A    Assuming the results came out as

16   anticipated, a rule of thumb number is three.  But that

17   could be more or less, because there are -- there's a

18   retrospective validation.  There's other things we could

19   bring in.  But just keeping my question confined to what

20   I'm considering now our area, rule of thumb would be

21   three.

22         Q    All right.  So let me make sure I

23   understand.  Let's assume you in your work as a chemist

24   are going to perform an analysis on a product that

25   you've never analyzed before, ever, okay, and you're

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 356

 1   going to start to figure out how to analyze this.  So

 2   you're going to create the method and you're going to

 3   run the method and you're going to validate it from

 4   scratch essentially.  Okay?

 5            How long in terms of time, in hours, days,

 6   weeks, months, would that typically take?

 7            A    I have to ask you a couple of questions

 8   before I answer that.

 9            Q    Well, I'll let you even though it's my job

10   to ask.  But go ahead.

11            A    In order for the purpose of accuracy,

12   we're talking about a chemical method, not a

13   microbiological?

14            Q    Chemical method on solid oral dose

15   pharmaceutical products.

16            A    A completed product like a tablet --

17            Q    Yes.

18            A    -- that has the active pharmaceutical

19   ingredient?

20            Q    Yes.

21            A    And the excipients in it?

22            Q    Yes.

23            A    How long would it take me to validate it?

24            Q    Yeah.

25            A    If you're working straight through on

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                    Page 357

1    nothing else, it could range anywhere from two days to

2    two weeks.

3            Q    Okay.  So if I told you that a lab ran

4    content testing on a solid oral dose product, in the

5    total time from scratch through validation, running the

6    standards, running the blanks and the ultimate sample

7    took a total of two hours, that would be inconsistent

8    with your experience, wouldn't it?

9            A    To validate the method?

10           Q    To start from scratch --

11           A    From scratch.

12           Q    -- on a product that they had never tested

13   before, to create the method, validate it, run the

14   standards, run blanks and run a sample for forensic

15   reporting purposes, total of two hours, that would be

16   inconsistent with your experience, wouldn't it?

17           A    I would use the word inconsistent as

18   opposed to impossible, inconsistent, surprising.

19           Q    Okay.

20               MR. MORIARTY:  Don, did you say

21       something?

22               MR. ERNST:  Yeah, I did.  I thought it

23       was a compound question.

24               MR. MORIARTY:  Okay.

25               MR. ERNST:  I objected.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 358

1                    MR. MORIARTY:  Okay.

2     BY MR. MORIARTY:

3            Q    In your work either at FDA or a

4     pharmaceutical company did you use the Regulatory and

5     Procedures Manual in the FDA?

6            A    Yes.

7            Q    Did you use the Investigation Operations

8     Manual?

9            A    Yes.

10           Q    In your opinions in this case are you

11    relying on FDA Form 483s?

12           A    Among other things, yes.

13           Q    And some of those other things would be

14    warning letters?

15           A    Warning letters.

16           Q    And EIRs?

17           A    That's Establishment Inspection Report,

18    yes.

19           Q    And so when you are looking at those FDA

20    documents you believe they're reliable?

21           A    Yes.

22           Q    And how often do you look at the FDA's Web

23    site?

24           A    I go to the FDA's Web site a couple times

25    a week for different purposes each time.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 359

1         Q    All right.  Do you consider it reliable?

2         A    Most of the time.  I've seen cases where I

3    believe it hasn't been.

4         Q    Can you identify any instances where you

5    question the reliability of the FDA's Web site so far as

6    it applies to this litigation?

7         A    Could you give me that question again?

8              MR. MORIARTY:  Can you read it back,

9         Angela, please?

10        (The record was read back as requested.)

11             THE WITNESS:  Not that I saw on the Web

12        site, no.

13   BY MR. MORIARTY:

14        Q    Okay.  Do you have any teaching duties

15   now?

16        A    Now?  No.

17        Q    When was the last time you had teaching

18   responsibilities?

19        A    The year 2000 in the Philadelphia area.

20        Q    Doing what?

21        A    I was teaching in the Graduate School of

22   Pharmacy at Temple University, teaching -- excuse me --

23   process validation and another course was NDA

24   submissions.  I believe I was also teaching at a Penn

25   State Philadelphia area campus management.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 360

1          Q    Okay.  In your career as a consultant have
2     you ever consulted for Actavis, Mylan, UDL or Amide?
3          A    No.
4          Q    Do you know the difference between
5     possibility and probability?
6          A    I believe I do.
7          Q    All right.  Probability would be more
8     likely than not?
9          A    Yes.
10         Q    Possibility would be speculation,
11    generally less than 50 percent chance of occurring?
12         A    I haven't equated possibility with the
13    word speculation, but I agree with the probability.
14         Q    Okay.  Now, before you drafted your
15    original report in this case, which I believe was
16    Exhibit 45 -- I'd have to make sure; hang on a second
17    here -- yeah, Exhibit 45, I assume you read all of the
18    material that had been supplied to you, correct?
19         A    Yes.
20         Q    And at that point did you know that the
21    purpose of the report was essentially to put lawyers
22    like me for the pharmaceutical defendants on notice of
23    what your opinions were so that we had some idea what
24    you were going to say when we came and questioned you?
25         A    My answer is yes, but I would word it as

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 361

1    the purpose of the report was to render my opinion for

2    anyone who cared to read it.

3              Q    All right.  And when was the last time you

4    read your original report?

5              A    Last week.

6              Q    All right.  And would you agree with me

7    that nowhere in your original report, Exhibit 45, do you

8    say that Digitek was in fact defective?

9              A    I did not use those words.

10             Q    All right.  Now, this article, Exhibit 46,

11   what was your role in writing this article as opposed to

12   Mr. Brooks' role?

13             A    I would like to take a minute to go back

14   in the relationship.  Gene Brooks is a person that we

15   met on a vacation here in Savannah and he sort of clued

16   us in on Savannah when we said we might consider moving

17   here, it's a nice place.

18             And then Gene -- when we moved here Gene

19   became a friend.  And we meet periodically for lunch.

20   Just talk about Savannah.  And I don't even remember

21   which one of us, but one of us at one time said, you

22   know, we ought to put an article in some journal, let's

23   get together and write something.

24             Whether he's the one that said with your

25   background, Jim, and my law or whether I said with your

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 362

1    law and my background, I really don't remember.  But we

2    thought it would be a nice article to publish.

3              And (ck0 Jim Shepherd, he had just passed the

4    Bar right around that time.  So it's -- that was how

5    that evolved, so to speak.  That's the best answer I can

6    give you on that.

7              Q    Well, that gives me the evolution.  But

8    what was your role in the writing?  I'm sure you two sat

9    down and said you're going to do X and you're going to

10   do Y.  What was your role?

11             A    In effect, Gene, you do the law stuff, Jim

12   Farley, you do the pharmaceutical stuff.

13             Q    Okay.  So the statement, A laboratory must

14   analyze the drug and test for its active pharmaceutical

15   ingredient and for strength and purity, is that a

16   statement that you wrote or that Gene Brooks wrote?

17             A    I don't remember offhand, but it might

18   have been Gene put it together and ran it by me and I

19   might have agreed as is or modified it in some way.

20   That's probably how it happened.

21             Q    All right.  So why did you or you and Gene

22   say the laboratory must analyze the drug and test it for

23   its API?

24             A    So that you know that you have the proper

25   drug.  Am I answering your question properly?

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                      Page 363

1                Q    Just answer it and I'll follow up.  Why
2     did you say that?
3                A    Why did we say that?
4                Q    A lab must analyze the drug and test it
5     for its API and for strength and purity.  Why?
6                A    To be sure that it is what it is supposed
7     to be.
8                Q    Okay.
9                A    Yeah.
10               Q    So in other parts of this article you do
11    talk about adulteration, correct?
12               A    Yes.
13               Q    So what you're advocating is to go beyond
14    the regulatory definition of adulteration to testing to
15    find out whether it is what it purports to be, correct?
16               A    Yes.
17               Q    Did you tell Mr. Brooks or did you
18    contribute in any way to an analysis of the impact, if
19    you will, or the meaning of GMP violations or recalls?
20               A    In any way?
21               Q    Yeah.
22               A    We discussed it.  I just am at a loss as
23    to the exact nature of the conversation.  But we
24    discussed GMPs and what is a GMP violation.  Yes, we
25    did.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 364

1          Q    Okay.  But did you discuss and did you
2    contribute to writing about the actual impact, what does
3    it mean when there is a GMP violation?
4          A    I don't remember if we put that in there
5    or not.
6          Q    Do you consider yourself an expert on the
7    legal ramifications of a violation of GMP?
8          A    I'm not a lawyer.  So I --
9          Q    That's not what I asked.
10         A    Well, that wasn't the whole sentence.  It
11   was I'm not a lawyer, therefore I don't consider myself
12   an expert on legal ramifications.
13         Q    All right.  So when you were with these
14   pharmaceutical companies in the years before you went to
15   FDA, how much experience did you have with
16   pharmaceutical recalls?
17         A    Not much.
18         Q    In your consulting work have you been
19   asked to participate with your clients in working on
20   recall issues?
21         A    In some cases -- I'm pausing because I'm
22   thinking of confidentiality.
23         Q    I didn't ask for the name of a company.
24         A    Okay.
25         Q    I just right now I've asked --

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 365

1            A    Yes, sir.

2            Q    -- whether you've had experience in

3    consulting with recalls.

4            A    To a degree, yes.

5            Q    All right.  To your knowledge can FDA ask

6    a pharmaceutical company to recall a product for

7    virtually any reason?

8            A    For virtually any reason?  For -- I would

9    say for a reason where they think there is potential for

10   harm to the consumer.  For any valid reason.  I guess

11   I'm getting a little tied up on that for any reason part

12   of your question.

13           Q    That's fine.  That's fine.  The FDA can

14   ask a company to recall a product because of the

15   potential for harm to consumers, correct?

16           A    Yes.

17           Q    They don't -- there does not have to be

18   some proof before the recall that there's likely to be

19   harm to consumers; is that right?

20           A    Yes.

21           Q    So in other words, neither FDA nor the

22   pharmaceutical company have to come up with some proof

23   that there is in fact out-of-specification and dangerous

24   drug product in the marketplace and in the hands of

25   consumers, right?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 366

```
 1              A    Before I say right, you're saying proof
 2     and I would use the term they have a valid reason,
 3     somehow, somewhere they have a valid reason for asking
 4     for a recall, would you recall such and such from the
 5     market.  It's a very expensive thing to do and it hurts
 6     the company's reputation.
 7              So you use the word proof.  I'm saying the FDA
 8     has a valid reason to believe there's a possibility or
 9     probability that a consumer or some consumers will be
10     injured, harmed and they say, we want you to recall
11     that.  I had to extend that to put my answer in the
12     proper context.
13              Q    Okay.  But you didn't answer my question.
14                   MR. MORIARTY:  Angela, can you read my
15         question back, please?
16         (The record was read back as requested.)
17                   MR. ERNST:  I'm going to object.  It's
18         been asked and answered.  He's answered the
19         question.  It's also compound.
20              A    I --
21              Q    Go on.
22              A    I hear it again and it's still -- I'm
23     getting -- the difference between proof and valid reason
24     to believe that there's a probability that something can
25     happen.  And --
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 367

```
 1              Q    Let me ask it a different way.  There
 2    doesn't have to be actual scientific evidence before a
 3    recall that there is likely out-of-specification and
 4    dangerous drug product in the marketplace, correct?
 5                    MR. ERNST:  Objection, vague, ambiguous
 6              speculative.  Those are not terms that -- you're
 7              making those terms.  It's also compound.
 8                    MR. MORIARTY:  And I'm going to just say
 9              that we don't have speaking objections in this MDL
10              and those aren't PTO 22 objections.  So if we're
11              going to do this let's do it right.
12    BY MR. MORIARTY:
13              Q    Can you answer my question?
14              A    Could you tell me one more time, please?
15                    MR. MORIARTY:  You better read it back,
16              Angela.
17              (The record was read back as requested.)
18              A    Yes, correct.
19              Q    Okay.  Thank you.
20                    MR. ERNST:  Objection, vague, ambiguous.
21              Q    Has any company that you either worked for
22    or have consulted with been subject to a consent decree?
23              A    Yes.
24              Q    How about a seizure?
25              A    No.
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 368

1          Q    How about 483s?

2          A    Yes.

3          Q    Warning letters?

4          A    Yes.

5          Q    Recalls?

6          A    Yes.

7          Q    Have you seen any -- have you -- I'm

8    sorry.  Let me rephrase that.

9          Have you been provided with any scientific

10   information whatsoever that there was a spike in Digoxin

11   toxicity at hospitals, nursing homes, poison control

12   centers or outpatient facilities in -- at any point

13   between 2005 and 2008?

14          A    I'm not sure what you mean by Digoxin

15   toxicity.

16          Q    Do you have any idea what that means?

17          A    You mean OD, overdosing, or too much

18   strength?  I mean, Digoxin when used properly is not

19   toxic.  And to say Digoxin toxicity, if you mean

20   over-strength tablets -- I'm not -- let me not put

21   words -- please tell me again.

22          Q    Digoxin toxicity simply for the purpose of

23   my question is somebody who has a toxic reaction to

24   Digoxin, whether the -- regardless of what the dose is.

25   Okay?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 369

1          What I'm asking you is whether you've been

2     provided with any scientific proof that there was a

3     spike in Digoxin toxicity at any sort of medical

4     facility in the United States between 2005 and 2008.

5              A    No.

6                   MR. ERNST:  I'm going to object, vague,

7          ambiguous, calls for speculation.

8                   MR. KERENSKY:  When you get to a breaking

9          point I'd like to take a break.

10                  MR. ERNST:  Scientific proof is not a

11         standard.

12                  MR. MORIARTY:  Now is fine.

13                  THE VIDEOGRAPHER:  Okay.  We're going off

14         the --

15                  MR. MORIARTY:  Mike wants to take a

16         break, Don.  So we're going to do that.

17                  THE VIDEOGRAPHER:  Going off record.

18         This is the end of Tape No. 1.  9:55.

19              (A brief recess was taken.)

20                  THE VIDEOGRAPHER:  Okay.  We're back on

21         record.  It's 10:11 and this is the beginning of

22         Media Unit No. 2.

23     BY MR. MORIARTY:

24              Q    Mr. Farley, this is Exhibit 57 from your

25     first deposition.  This is a Form 483, is it not?

James J. Farley          Volume II & Videotaped          January 19, 2011

 1                 A    May I?  Yes.

 2                 Q    Okay.  And the Form 483 itself says, The

 3    document lists observations made by the FDA

 4    representatives during the inspection of your facility.

 5    They are inspectional observations and do not represent

 6    a final agency determination regarding your compliance.

 7                 Is that what it says right at the top of the

 8    document itself?

 9                 A    It should.  It's standard procedure.

10                 Q    Okay.  And to your knowledge does the

11    Regulatory Procedures Manual say essentially the same

12    thing?

13                 A    As I recall, yes.

14                 Q    All right.  So Exhibit 63, which is

15    Chapter 4 of the Regulatory Procedures Manual, in

16    Section 4-1-1 on the second page of this document,

17    fourth full paragraph, A warning letter is informal and

18    advisory.  It communicates the agency's position on a

19    matter, but it does not commit FDA to take any

20    enforcement action.

21                 Did I read that correctly so far?

22                 A    Yes.

23                 Q    For these reasons FDA does not consider

24    warning letters to be final agency action on which it

25    can be sued.

James J. Farley          Volume II & Videotaped          January 19, 2011

1              Did I read that correctly?

2         A    Yes.

3         Q    Now, I want to ask you some questions

4    about your report.  Do you have a copy of it there?

5         A    Yes.

6         Q    All right.  And that was Exhibit 45 in the

7    last deposition, correct?

8         A    If you say so.  I don't remember the

9    exhibit number of my report.

10        Q    All right.  Well, I have the original

11   exhibits here if you need to look at them.

12             MS. CARTER:  I think there was a 45A, B

13        and C.

14             MR. MORIARTY:  I think this was 45.

15        Q    This one where it says, yes, 1 of 27.  You

16   got that in front of you?

17        A    Yes.

18        Q    Okay.  Let's go to page 2 -- I'm sorry --

19   page 3.  And when I say page 3, you've got these pages

20   numbered, right?

21        A    Yes.

22        Q    So on page 3 the -- one, two -- third

23   statement under your experience with FDA it's talking

24   about your directing the activities of the 30-member lab

25   staff, correct?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 372

```
 1              A    Yes.
 2              Q    Now, did your work in that regard include
 3    processing 484 samples?
 4              A    Yes.
 5              Q    You know what 484 --
 6              A    Yes.
 7              Q    -- samples are, correct?
 8              A    Surveillance samples.
 9              Q    FDA collects samples from companies or
10    pharmacy shelves and tests them, correct?
11              A    Yes.
12              Q    Using USP or comparable methods, correct?
13              A    Yes.
14              Q    And they're running things like assay and
15    content uniformity on them, right?
16              A    Yes.
17              Q    And do they typically do surveillance
18    samples on products that have narrow therapeutic
19    indexes?
20              A    Yes.
21              Q    Do you know if Digitek is one such
22    product?
23              A    I do.
24              Q    Do you know whether your lab in
25    Philadelphia ever did 484 samples on any Digoxin
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 373

```
 1    products when you were there?
 2              A    I don't remember.
 3              Q    All right.  Let's go to page 4.  At the
 4    very bottom the last sentence refers to ineffective or
 5    unsafe product.  Do you see that?
 6              A    Yes, I do.
 7              Q    All right.  First let's talk about
 8    ineffective product.  What do you mean by that?
 9              A    A product that does not do what it is
10    supposed to do would be an ineffective product.
11              Q    So, for example, a product that had too
12    little of the active pharmaceutical ingredient might be
13    ineffective, right?
14              A    Might be.
15              Q    All right.  And then what do you mean by
16    unsafe product?
17              A    I want to read the whole context.  Can I
18    do that?
19              Q    Sure.  I just want to know what you mean
20    by unsafe product.
21              A    Unsafe would be something that would do
22    harm to the consumer.
23              Q    Okay.  So theoretically a product that had
24    too much of its active pharmaceutical ingredient could
25    potentially be harmful to a consumer, correct?
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 374

```
 1              A    That's one of the ways it could do harm to

 2      a consumer, yes.

 3              Q    All right.  Let's go out to page 17.  Now,

 4      under comments in Section 5 in Paragraph A you use the

 5      term "total failure" several times.

 6              Do you see that?

 7              A    I see it.

 8              Q    To your knowledge was there ever a final

 9      agency determination by FDA that there was a total

10      failure of quality systems at Actavis?

11              A    Not using the terms total failure, but the

12      consent decree told me that the FDA and the Court deemed

13      they were incapable of making a quality product on their

14      own.

15              Q    What consent decree?

16              A    The consent decree that Actavis received.

17      I forget the date.

18              Q    The one that ended in 2002?

19              A    There was another one after that.

20              Q    When?

21              A    I'd have to look through.

22              Q    What I'm asking is to your knowledge is

23      there some final agency determination that says in these

24      words that you've used here there was a total failure of

25      Actavis' quality systems?
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 375

1          A    Not the agency.  The agency did not use

2     that term.

3          Q    All right.  Now, is it your opinion that

4     Actavis made no products in 2006, '7 or '8 that were

5     within their specifications?

6               MR. ERNST:  Object.

7          A    I can't answer that if they made no

8     products that were within their specifications.  No.  I

9     would have to see the date on every single product they

10    made in order to answer that.

11         Q    Okay.  Did FDA ever say in any document

12    that there was a total failure of quality regarding

13    Digitek?

14         A    I did not see that from the FDA about

15    Digitek.

16         Q    Okay.  Let's go to page 18.  Go down to

17    your Paragraph F on page 18.

18         A    I'm there.

19         Q    The end of your sentence says, All

20    products, including Digitek, were adulterated.  Do you

21    see that?

22         A    At the end.

23         Q    Yes.

24         A    Yes.

25         Q    Can you show me a 483 or a warning letter

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 376

```
 1   or any other FDA document that specifically says that
 2   Digitek was adulterated?
 3            A    That uses the term Digitek was
 4   adulterated?
 5            Q    Or something like that.
 6            A    I did not see it worded that way.
 7            Q    Okay.  What was your understanding of why
 8   Digitek was recalled?
 9            A    My understanding was that there -- a
10   combination of things.  There were some adverse events
11   reported from persons taking it.  And upon FDA
12   inspection some double thick or extra thick tablets were
13   found.  And at least one double thick tablet was found
14   by a nurse or attendant person in a nursing home.
15            Q    What is -- when was that -- well, let me
16   break that down then in pieces.  Okay?  Let's get to the
17   last thing you talked about first, this nursing home
18   incident.
19            Was that tablet measured?
20            A    Measured physically?
21            Q    Yes.
22            A    I believe but I am not sure.  It went back
23   to the company and they measured it and verified double
24   thickness, but they did not analyze it.
25            Q    What year was this?
```

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 377

1              A    I forget offhand.  I'd have to check the

2       records.

3              Q    Well, was it years before the recall or

4       was it after the recall?  Which the recall occurred in

5       April of 2008.

6              A    I believe it was before the recall.

7              Q    You're talking about years before, the

8       incident that was reported to the FDA, correct?

9              A    I'm associating with 2006, but I'd have to

10      go through the files to verify that date.

11             Q    Well, let's just assume that it happened

12      in 2005 or 2006.  Did FDA order a recall when that

13      occurred?

14             A    Based on the one incident?

15             Q    Yeah.

16             A    No.

17             Q    Did Actavis, or at the time Amide, report

18      that incident to FDA in both a field alert and in its

19      annual reporting?

20             A    I believe they did.

21             Q    And FDA was satisfied with the explanation

22      given by Actavis in that it was an isolated incident,

23      correct?

24                  MR. ERNST:  Objection to form.

25             A    Yes.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 378

```
 1            Q    All right.  So can you show me a single
 2    document in all the documents that you reviewed to
 3    indicate that adverse event reporting had any influence
 4    on the Digitek recall?
 5                 MR. ERNST:  Objection to form.
 6            A    In the 483s there's indicated that there's
 7    an inadequate adverse event reporting system at Actavis
 8    and that some events that should have been reported were
 9    not.  So I would call that inadequate.
10            Q    Didn't that happen in 2006 or 2007?
11            A    Yes.
12            Q    Didn't Actavis remediate that 483?
13                 MR. ERNST:  Objection to form.
14            A    I don't believe it was satisfactory.  They
15    made some attempts, but they didn't do it well.
16            Q    What does FDA do to a company when it is
17    not satisfied with the remediation of a 483?
18            A    They will go to a warning letter or they
19    could just go to injunction procedure.
20            Q    And if they -- if the company doesn't
21    adequately remediate a warning letter what does the FDA
22    do?
23            A    They can -- they'll usually go to a
24    consent -- they may go to a consent decree or they may
25    shut them down.
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 379

```
 1            Q   Can you show me any evidence whatsoever
 2    that the FDA was not satisfied with the remediation of
 3    the adverse event reporting 483 that occurred in 2006 or
 4    2007?
 5                 MR. ERNST:  Objection to form.
 6            A   Could you repeat that, please?
 7            Q   Okay.  You've got a whole pile of
 8    documents here that you reviewed to prepare your report
 9    and your opinions.  Show me somewhere in all that
10    material anywhere that you can that the FDA was
11    dissatisfied with Amide's remediation or Actavis'
12    remediation of the 483 regarding adverse event
13    reporting.
14                 MR. ERNST:  Objection to form, compound.
15            A   I see a series of 483s, then a warning
16    letter, then a consent decree.  To me that says they're
17    not pleased with it.  Otherwise they wouldn't have done
18    that.
19            Q   Okay.  I'm talking about one issue,
20    adverse event reporting, pharmacovigilance.  Okay?
21            A   Yes.
22            Q   Not some mountain of events.  I want to
23    isolate AERs.  Is there anything in the FDA's
24    documentation in 2008 when Digitek was recalled that
25    refers to adverse event reporting for Digitek?
```

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 380

 1                    MR. ERNST:  Objection to form.

 2          A    That refers only to the adverse event

 3    reporting and not to not using the proper methods and

 4    not investigating deviations or out of spec, only the

 5    adverse event reporting?

 6          Q    Adverse reporting.

 7          A    No.

 8          Q    And can you find me any documents in all

 9    the material you reviewed to indicate that the FDA was

10    not satisfied with the remediation of the adverse event

11    reporting --

12                    MR. ERNST:  Same objection.

13          Q    -- adverse event reporting 483 back in '06

14    or '07?

15                    MR. ERNST:  Objection to form.

16          A    My indications was it was a combination of

17    violations.  But with regard to that one area, adverse

18    event reporting, no, I did not.

19          Q    Does the recall notice that was FDA

20    approved say anything about adverse event reporting?

21          A    No.

22                    MR. MORIARTY:  I happened to look at the

23          transcript that is rolling up on the court

24          reporter's computer screen and she has your name

25          wrong, Don.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 381

 1                    THE COURT REPORTING:  No, I don't.  I

 2        don't.

 3                    MR. MORIARTY:  So we're going to correct

 4        that.  Okay?  I just want to make sure everybody

 5        knows.  That should be Don Ernst, E-R-N-S-T.

 6                    THE COURT REPORTING:  I know.  That's

 7        coming up from the last deposition.

 8                    MR. MORIARTY:  All right.  And I'm not

 9        Mr. Anderton either.

10                    THE COURT REPORTING:  I know.

11                    MR. ERNST:  Thank you, Matt.

12                    MR. MORIARTY:  I was looking out for your

13        interest, Don.

14   BY MR. MORIARTY:

15             Q   Okay.  Page 19 of your report, when a

16   company is under consent decree don't they have to be in

17   compliance with GMPs?

18             A   You're asking me a question?  You're

19   not --

20             Q   Well, at page 19 of your report under

21   conclusions, Section 6, the fourth paragraph refers to

22   the consent decree for ten consecutive years.

23             A   Yes.

24             Q   I assume you mean the one that expired in

25   2002, correct?

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 382

 1            A    Yes.

 2            Q    And I'm asking you a question about that.

 3    To be under consent decree with the FDA don't you have

 4    to be in compliance with GMPs?

 5            A    The consultants that are brought in assure

 6    that the product leaving the facility is in compliance.

 7            Q    So is that a yes?

 8                 MR. KERENSKY:  Wait, wait.  You can't do

 9         that.

10            Q    Okay.  You go ahead.

11                 MR. KERENSKY:  Thanks.

12            A    I just want to make sure that I put this

13    in the proper perspective.  The material is in

14    compliance because the consultants are there making it

15    in compliance.

16            Q    Okay.  So in other words, for these ten

17    years that you're referring to at page 19 of your

18    report, Amide was within -- acting within the GMPs?

19            A    In whatever areas the consultants were

20    functioning in helping them to do so they were.

21            Q    Okay.  And ultimately when they came off

22    consent decree in 2002 it was because of sustained

23    compliance with GMPs, correct?

24            A    It is when the Court decides that they are

25    capable of making a quality product themselves, yes.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 383

     1              Q    Let's go to the very end of page 19.

     2     Okay?

     3              A    Yes.

     4              Q    And you're talking about since the

     5     non-compliance problem was systemic all products,

     6     including Digitek, were adulterated as defined in

     7     Section 501 of the Food, Drug and Cosmetic Act.

     8              Do you see that?

     9              A    Yes.

    10              Q    Okay.  Is it your understanding that this

    11     litigation is about whether Digitek and other products

    12     at Actavis were considered adulterated under its

    13     regulatory definition?

    14              A    That's part of it.  It's my understanding

    15     that there was a probability that some material produced

    16     by Digitek could harm a consumer.

    17              Q    Okay.  Is there some statement in any FDA

    18     document that there is a probability that

    19     out-of-specification Digitek was shipped to the

    20     marketplace?

    21              A    Specifically as you worded that, no.

    22                   MR. ERNST:  Objection to form.

    23              Q    To your knowledge did FDA say anywhere in

    24     a 483 or a warning letter that double thick tablets had

    25     in fact made it to the marketplace?

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 384

```
 1                A    In a 483?

 2                Q    Or a warning letter.

 3                A    Warning letter?  No, they did not say it

 4    the way you just worded it.

 5                Q    Did the FDA anywhere in a 483 or warning

 6    letter say that out-of-specification Digitek tablets had

 7    made it to the marketplace or in the hands of consumers?

 8                     MR. ERNST:  Objection to form.

 9                A    I'm pausing because they're not going to

10    say that in a 483.  The 483 is going to say what you're

11    doing in the plant, the facility that's being inspected.

12    It's not in the range of a 483 to say whether it's on

13    the marketplace or not.

14                So that's why I'm looking surprised at the

15    wording of the question, because the answer is not --

16    it's like, of course, not, it won't in a 483.

17                Q    Okay.  Were you aware that FDA in the

18    latter half of 2006 asked Actavis to bring in a

19    consultant for some batch record reviews?

20                A    Yes.

21                Q    And the purpose of that in essence was to

22    see according to the batch record reviews whether

23    products were being made in accordance with GMPs,

24    correct?

25                A    Currently or before?
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 385

1           Q    At the time.

2           A    The previous batch review or the current

3    batch record review?  Because they do both.

4           Q    Whatever.  That was what FDA wanted

5    Actavis to do, correct?

6           A    Yes.

7           Q    All right.  This is Exhibit 23.  Have you

8    ever seen this before?

9           A    Yes.  I think.  Yes.

10          Q    The top sheet is a letter December --

11               MR. ERNST:  To clarify, when you say have

12        you seen this before can you identify that for me.

13               MR. MORIARTY:  Exhibit 23.

14               MR. ERNST:   Thank you.

15          Q    The top sheet is a letter dated

16   December 24th, 2007, to FDA from Scott Talbot at

17   Actavis, correct?

18          A    Oh.  Yes.

19          Q    All right.  And attached is reports from

20   Quantic Regulatory Services, correct?

21          A    Yes.

22          Q    Do you know anything about the reputation

23   of Quantic Regulatory Services?

24          A    I have done work for Claudio Pincus, who

25   owns Quantic.  I've done work for --

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 386

 1                 MR. KERENSKY:  That's not the question.

 2           A    So, yes.  They have a very good

 3    reputation.

 4           Q    Have you -- when you had Exhibit 23 did

 5    you look through the attachments that actually came from

 6    Quantic Regulatory Services?

 7           A    Much was redacted.  But, yes, I did.

 8           Q    And do you know that they looked at a

 9    number of Digitek batches?

10           A    I'd have to go back to the text.  Because

11    of all the redactions I can't see what they did or

12    didn't do.  Oh.  I see some Digitek.

13           Q    Well, did you ever count how many Digitek

14    batches there were?

15           A    I probably did at that time and I'm at a

16    loss to tell you what that number is at this moment.

17           Q    Okay.  If I told you that 19 of the batch

18    records that they looked at were ultimately amongst the

19    recalled batches, would you have any reason to dispute

20    that?

21           A    I would not have any reason to dispute

22    that.

23           Q    And I think they looked at a total of 23

24    Digitek batch records.  Have you looked at any batch

25    records of Digitek other than Batch 70924?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 387

1          A    Other than that batch, no.

2          Q    It says on the first page of this exhibit

3    in the letter from Mr. Talbot to FDA, On December 21st,

4    2007, Quantic provided Actavis with a statement

5    indicating the audit was complete and the manufacturing

6    and the lab records will reliably confirm the identity,

7    strength, quality and purity of the marketed products.

8          Do you see that?

9          A    I see it.

10         Q    Do you have any basis to disagree with

11   Quantic Regulatory Services' conclusions regarding the

12   batch record -- or the batch records that they reviewed?

13         A    In one sense I do not have any reason to

14   disagree with what Quantic said and found.  But based on

15   what I read in the 483s about the way they were

16   manufacturing, it is surprising to me.

17         Q    Okay.  Now, this phrase that they use in

18   this sentence, reliably confirm identity, strength,

19   quality and purity, that mirrors the definition

20   contained in the Food, Drug and Cosmetic Act regarding

21   adulteration, correct?

22         A    Yes.

23         Q    So if you were to assume that Quantic was

24   correct in reliably confirming identity, strength,

25   quality and purity of at least the batches they

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 388

1    reviewed, assuming they were correct, those wouldn't

2    even be considered adulterated.  Isn't that true?

3              A   If they confirm identity, strength,

4    quality and purity they are normally not considered

5    adulterated.

6              Q   I'm handing you what's been marked as

7    Exhibit 24, do you recognize that as a Form 484 from

8    FDA?

9              A   I don't.

10             Q   Have you ever seen that document before?

11             A   I'm taking a look in here.  I'm having

12   trouble reading the top where it's dark.

13             Q   Well, let's go slowly -- let's go slowly

14   through it.  Okay?  It's Sample 377410, correct?  Up

15   here.

16             A   Oh.  Sample No. 377 -- I'm just having

17   trouble reading it because of the Xerox copy of it.  But

18   you're reading right here where I'm pointing in the dark

19   area?

20             Q   I have my own notes.

21             A   Oh, okay.  For Sample No. 377410.

22             Q   Okay.  And in the document, if you look at

23   the first page, on February 9th, 2007, FDA secured two

24   bottles of hundred count .125 milligram Digitek from

25   Actavis.  Do you see that?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 389

```
 1            A    I'm looking for -- I'm looking for where

 2    it says two bottles.  It's either in small print or my

 3    eyes are getting weak.

 4            Q    I apologize.  I used to have highlighted

 5    versions of these so I could point right to the part of

 6    this document that you need to see.

 7                 MR. KERENSKY:  It's under description of

 8         sample two-thirds of the way down.

 9                 THE WITNESS:  Thank you.  I wasn't that

10         far down.  I was still way up here.

11                 MR. KERENSKY:  You want me to find it for

12         you?

13                 THE WITNESS:  I see it now.

14    BY MR. MORIARTY:

15            Q    Okay.  And then in the middle in the same

16    area where Mr. Kerensky just pointed out, you see

17    manufacturing code?  Right here.

18            A    Yes.

19            Q    That's Actavis Batch 70078A.  Do you see

20    that?

21            A    Yes.

22            Q    Okay.  And you can look at this as

23    thoroughly as you would like, but wouldn't I be correct

24    in saying that after running thorough quality control

25    chemistry testing on these tablets using USP methods,
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 390

1    FDA found them to be in compliance with their stated

2    specifications?

3                A    I'm looking to read this.  I want to see

4    where it says they used the USP method.

5                Q    You take your time and look at the whole

6    thing.

7                A    Okay.

8                Q    These are exhibits I've covered with other

9    experts.  If you doubt that I'm representing these to

10   you accurately, you take all the time you want, because

11   I've got about ten of these to go through.

12               A    I'm not doubting your presentation.  It's

13   I want to make sure what I'm reading.

14               MR. KERENSKY:  Let's take a little break.

15               MR. MORIARTY:  We have 15 minutes on the

16        tape and there's a pending question.  As soon as

17        he answers this question we can take a break.

18               MR. KERENSKY:  Well, for the purpose of

19        review I'm just saying let's stop the tape and

20        just give him time.  I'm not saying so I can talk

21        to him.  I'm saying let's go off the tape and see

22        if we can find a sane way to go through that stack

23        of documents.

24               MR. MORIARTY:  That's fine.

25               MR. KERENSKY:  Okay?

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                      Page 391

 1                    THE VIDEOGRAPHER:  We're off record --

 2                    MR. MORIARTY:  Oh, wait.  Before we go

 3         off record -- you still on?

 4                    THE VIDEOGRAPHER:  Yes, sir.

 5    BY MR. MORIARTY:

 6         Q    I'm ultimately going to ask you about

 7    Exhibits 25, 26, 27, 28, 29, 30, 31, 32, 33 and 34.  And

 8    I'm going to ask you essentially the same questions

 9    about --

10         A    Yes.

11         Q    -- all of them.  Okay?

12         A    Yes.

13         Q    So if you want to look at all of them

14    while we're on break I'll put the whole stack right

15    here.  Okay?

16         A    Actually I forgot that question already.

17                    MR. KERENSKY:  The question -- are we

18         still on record?

19                    THE VIDEOGRAPHER:  We are still on the

20         record, yes.

21                    MR. KERENSKY:  The question as I

22         understand that you want to ask is whether or not

23         these documents show that the FDA tested the

24         samples that they took and found them to be in

25         compliance with their specifications.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 392

1                   Is that right?

2                   MR. MORIARTY:  Yes, sir.

3                   MR. KERENSKY:  Okay.  All right.  Let's

4        go off the record.

5                   THE VIDEOGRAPHER:  We're off the record,

6        10:47 a.m.

7              (A brief recess was taken.)

8                   THE VIDEOGRAPHER:  All right.  We're back

9        on record.  Back on record.  It's 11:05 a.m.

10                  MR. KERENSKY:  We took a break.  And we

11       are stipulating for the purposes of this

12       deposition that Exhibits 24 through 34 -- is that

13       the range, is that the correct range --

14                  MR. MORIARTY:  Yes, sir.

15                  MR. KERENSKY:  -- represent testing done

16       by the FDA on Digitek tablets wherein the FDA

17       found that the Digitek tablets were within

18       specification.

19                  MR. MORIARTY:  Okay.

20                  MR. KERENSKY:  Okay.  So no need to go

21       through each and every one.  We're -- and you

22       can -- he's going to assume that to be true and

23       you can ask him questions from there.

24                  MR. MORIARTY:  Okay.

25    BY MR. MORIARTY:

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 393

```
 1              Q    From the two exhibits that you did review,
 2    which were 24 and 25, that is correct, isn't it --
 3              A    Yes.
 4              Q    -- that FDA did 484 sampling, tested them
 5    and they complied with the specs, correct?
 6              A    Yes.
 7              Q    All right.  Now, when FDA runs tests under
 8    the 484 program they can test assay, content uniformity,
 9    dissolution and impurity, correct?
10              A    Yes.
11              Q    They may not necessarily run all those
12    tests on every sample, right?
13              A    Correct.
14              Q    Okay.  Have you ever seen a 484 sample
15    from FDA of Digitek which found that the product was not
16    within specifications?
17              A    I did not.
18              Q    Do you know if any exist?
19              A    I do not.
20              Q    Do you know if the plaintiffs' lawyers who
21    retained you as an expert in this case ever ran a
22    Freedom of Information Act request to find out that kind
23    of information?
24              A    I know that there were I believe 1,880
25    samples taken over a period of time.  And my --
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 394

```
 1                    MR. KERENSKY:  No, no.  The question is
 2          whether or not you know if the lawyers
 3          representing the plaintiffs --
 4                    MR. ERNST:  Objection, vague.  Objection
 5          to form.
 6                    MR. KERENSKY:  -- made a Freedom of
 7          Information Act -- listen to the question.
 8                    MR. MORIARTY:  This is great.  Don,
 9          you're objecting to your own side's question.  I
10          love it.
11                    MR. KERENSKY:  No.  I'm just trying to
12          help him.
13                    He's asking you do you know did the
14          lawyers make a Freedom of Information request, yes
15          or no.  That's what he asked you.
16                    THE WITNESS:  Is that what you asked me?
17      BY MR. MORIARTY:
18            Q    Yes, that's what I asked you.
19            A    That did the lawyers for the plaintiffs
20      ever -- say again, please.
21            Q    Do you know whether the lawyers for the
22      plaintiffs, the lawyers who hired you as an expert in
23      this case, made a Freedom of Information Act request to
24      get 484 sampled?
25            A    I do not know that.
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 395

1          Q    Okay.  So to the best of your knowledge
2    FDA never found any out-of-spec Digitek in the field in
3    its 484 program testing?
4          A    To the best -- I don't know the answer.  I
5    don't know if they did or didn't.  I believe that --
6    that's all for that answer.
7          Q    Would it be important for you to know
8    that?
9          A    It would be important for me to know if
10   they sampled a couple hundred thousand and found every
11   one in specification.  That would be important for me to
12   know and to change the opinion that I have formed.
13          These samples don't tell me statistical
14   representation that there is not a likelihood of harm
15   from Digitek -- was not a likelihood of harm from
16   Digitek out there.
17          Q    Okay.  Let's talk about scientific data
18   available to you.  Okay?
19          A    Yes.
20          Q    FDA is your former employer, correct?
21          A    Yes.
22          Q    You're relying on their 483s and their
23   warning letters for your opinions in this case about
24   adulteration, aren't you?
25          A    Yes.

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 396

```
 1              Q    FDA chooses the sample size for their 484
 2    program, don't they?
 3              A    Yes.
 4              Q    They can take as many samples as they
 5    want, couldn't they?
 6              A    Yes.
 7              Q    So do you have any data anywhere, any
 8    scientific data, that shows out-of-specification Digitek
 9    in the hands of pharmacists or consumers?
10              A    I don't have scientific data.  However,
11    the purpose of a surveillance, also known as survey
12    sample, is to take a sample not indicative of everything
13    that was produced, but a sample to determine if that
14    sample is good or not.  It does not tell me that there
15    isn't any harmful Digitek out there.  All of this is
16    small.
17              Q    That's nice.  What I'm asking you,
18    Mr. Farley, what data do you have that there is in fact
19    harmful out-of-specification Digitek out there in the
20    hands of consumers?  Okay?  This is what I've got plus
21    more.
22              A    Yes.
23              Q    What have you got?
24              A    If you mean other than the 483s saying it
25    was not made right, you mean analytical data showing
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 397

1    that something was double strength?

2             Q    Let's start there.  Do you have any

3    analytical data?

4             A    I do not have analytical data indicating

5    that.

6             Q    Do you have physical measurements from

7    pharmacists or any reliable scientific person?

8                  MR. ERNST:  Objection to form.

9             A    Of a tablet?

10            Q    Of any tablets that were out of spec.

11            A    What I read in here that there were at

12   least 20 of them that were double thickness and they

13   never analyzed them to see if they were double strength.

14   But not from a pharmacist I contacted.

15            Q    Did any of those 20 double strength

16   tablets or double thick tablets, whatever you want to

17   call them, even leave the Actavis facility?

18            A    The one that was found by someone at a

19   nursing home obviously did.

20            Q    In 2006?

21            A    I believe that's the year.

22            Q    I'm asking about the 20 in Batch 70924.

23   They were removed and destroyed, weren't they?

24            A    They were, but it leads me to wonder how

25   many weren't caught and got out to the consumer.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 398

1          Q    You can --

2          A    It doesn't tell me it never happened, that
3    nothing got out.

4          Q    You can wonder about that.  I'm asking for
5    your data that it happened.  Do you have any data?

6          A    No concrete data that it happened.

7          Q    All right.  So of all the lawsuits and all
8    the lawyers in the Digitek litigation, did any of them
9    send you either a double thick tablet or a report that
10   there was a double thick tablet?

11               MR. ERNST:  Objection.

12         A    The data that I received from Pete Miller
13   and all the documents had contained in it the finding of
14   the double thick tablets.  So is that what you -- so my
15   answer would be yes based on that.

16         Q    Okay.  I want you to go in the corner and
17   get your material and I want you to find any piece of
18   paper in there that says that there was a double thick
19   tablet in the hands of a consumer in 2006, '7 or '8.

20         A    No, not in the hands of a consumer.

21         Q    How about in the hands of a pharmacist in
22   2006, '7 or '8, can you find a piece of paper that says
23   that?

24         A    I cannot find a -- I do not have a paper
25   that says that.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 399

     1              Q    Had you ever seen Exhibit 25 before?

     2              A    I believe not.

     3              Q    Had you ever seen Exhibit 26 before?

     4              A    I'd have to check my list of exhibits, but

     5     I believe I did not see these.

     6              Q    How about 27?

     7              A    And so on right through the list.

     8              Q    What about 27?

     9              A    No.

    10              Q    What about 28?

    11              A    No.

    12              Q    29?

    13              A    No.

    14              Q    30?

    15              A    No.

    16              Q    31?

    17              A    No.

    18              Q    32?

    19              A    No.

    20              Q    33?

    21              A    No.

    22              Q    Or 34?

    23              A    No.

    24              Q    In your consultation work is this the kind

    25     of data that you rely on, these 484s, is this the kind

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                            Page 400

1    of data that you rely on in your consulting work?

2            A    To do what?

3            Q    To talk to your own clients.

4            A    To advise them on how to make good

5    material?

6            Q    Okay.  Let me go back, because my question

7    was bad.  Have you ever been consulted by a

8    pharmaceutical company that the question posed to you

9    was, do we have any out-of-specification product in the

10   marketplace?

11           A    In the marketplace?

12           Q    Yeah.

13           A    No, not worded that way.

14           Q    Okay.  If a client consulted you and

15   wanted help from you in regard to figuring out whether

16   there was out-of-specification product in the

17   marketplace, okay --

18           A    Yes.

19           Q    -- is the 484 results something that would

20   be important for you to look at?

21           A    They would be part of the picture, not

22   all.

23           Q    Do you know who or what Celsis

24   Laboratories is?

25           A    Could you spell that, please?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 401

1          Q    I believe it's C-E-L-S-I-S.

2          A    No, not offhand.  It might be, but it's

3    not ringing a bell offhand.

4          Q    All right.  Are you aware that Actavis

5    sold all the Digitek it made to distributors, not

6    directly to pharmacists, in other words?

7          A    That's what is normally done.  So it

8    doesn't surprise me.

9          Q    And do you know for a fact whether the

10   distributors like Mylan or UDL commissioned any testing

11   on the Digitek that it bought from Actavis?

12         A    Do I know that they did?  I know -- I

13   would recommend that they should in any case from

14   anybody.  But whether they did, I am not sure offhand.

15         Q    Okay.  I'm going to hand you Exhibit 35.

16   First of all, have you ever seen that document before?

17         A    I have not.

18         Q    Why don't you take a quick look through

19   it.  I'll represent to you that this document contains

20   information on three Digitek batches made in 2006.

21   These tests were commissioned by Mylan or UDL and the

22   testing was done by Celsis Analytical Services.  Okay?

23         A    I see.

24         Q    And I believe they did assay and

25   dissolution testing on these three Digitek batches and

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 402

1   found them all to be within the specs.  Okay?  So take

2   your time, take a look at that stuff if you'd like and

3   tell me if I am incorrect in the way I've represented

4   this exhibit to you.

5          A    I hear what you said, but I'm just looking

6   through it.

7          Q    Have you had a chance to go through that?

8          A    I'm glancing through some of it.  I'm

9   showing you how far I am.  Do you want me to go through

10  the whole thing?

11         Q    All I want you to -- I mean, is that

12  Celsis Labs results from testing three batches of

13  Digitek and did they all conform with the specs?  That's

14  the question.

15              MR. KERENSKY:  Object to the form of the

16         question.  They didn't test three batches.  They

17         tested three bottles, one bottle each from each

18         batch.

19         Q    Mr. Kerensky is correct.

20         A    I heard two questions.  Is there

21  analytical data from Celsis Labs?  Yes.  Did they test

22  three --

23         Q    Three samples.

24         A    Samples.

25         Q    Or samples from three batches of Digitek.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 403

1              A    I'm checking that now.  It's taking time.

2      They've got cross-outs on here.  I mean, this is not a

3      good analytical sheet.  The numbers are good.  But if I

4      were training an analytical chemist I'd say you don't

5      cross the number out and not put your initials and the

6      date on there.  That's what I'm looking at right there.

7              Q    Regardless of whether you like Celsis

8      Analytical Labs' methods, did the three samples pass?

9              A    It was just distracting to me.  But the

10     three samples, samples, passed, yes.

11             Q    Okay.  Had you ever seen that document

12     before?

13             A    No.

14             Q    Here's Exhibit 69.  Have you ever seen

15     this before?

16             A    I'm only on the first page, but my answer

17     is no.

18             Q    Okay.  I will represent to you that

19     Exhibit 69 represents UDL documents concerning the

20     testing of Digitek Lot 80111A and that it passed the

21     tests to which it was subjected.  Am I correct?

22             A    This .25 milligram dose, yes, you are

23     correct.

24             Q    All right.  I'm showing you Exhibit 70.

25     Have you ever seen that before?

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                    Page 404

1              A   I believe I have not seen that before.

2              Q   I will represent to you that that's UDL

3    documents about the testing of Digitek Lot 71034A and

4    that the samples passed the test to which they subjected

5    it.  Am I correct?

6                  MR. KERENSKY:  You read 71034A and there

7         appears to be a 1 after the A.

8                  MR. MORIARTY:  Correct.

9                  MR. KERENSKY:  You didn't say the 1.

10             Q   Okay.  Well --

11             A   I heard your question.  I'm looking up the

12   data to tell you if they did pass.  Yes, they do pass.

13   The sample passed.

14             Q   I'm handing you Exhibit 71.  Have you ever

15   seen it before?

16             A   I believe not.

17             Q   I will represent to you that Exhibit 71 is

18   the UDL documents concerning their testing of Digitek

19   Batch 71004A1 and that the Digitek passed all the tests

20   to which they subjected it.  Am I correct?

21             A   Yes.  I'm looking at what tests were done.

22   That's why I'm pausing.  Yes.

23             Q   I'm showing you Exhibit 72.  Have you ever

24   seen that document?

25             A   I believe I have not.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                            Page 405

 1              Q    I will represent to you that it is UDL's

 2    documents regarding the testing of Digitek Lot 70175A1

 3    and that the Digitek passed the tests that they -- to

 4    which they subjected it.  Am I correct?

 5              A    I'm looking.  Yes, you are correct.

 6              Q    Okay.  Now, are you aware that UDL, one of

 7    the things that they did was to re-package Digitek from

 8    bottles to blister packs?

 9              A    I was not aware it was UDL who did that.

10              Q    But you know it happened at some

11    distributor level?

12              A    Yes.

13              Q    And do you know for a fact from any

14    documents you've reviewed or any depositions you've read

15    whether tablets that were double their intended

16    thickness would have fit into UDL blister packs for

17    Digitek?

18              A    I don't know the answer as to whether they

19    would or would not.

20              Q    Would it be important for you to know the

21    answer to that question?

22              A    I believe it would certainly be, yes, nice

23    to know.

24              Q    Because if UDL never rejected any Digitek

25    tablets as double thick, that would be some scientific

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 406

1    information about consistency of the thickness of the

2    product, correct?

3              A    It would.  I would have to see their

4    records as to whether they rejected any.  I would have

5    to see their method of packaging to determine if -- what

6    system they used to reject anything that was too large

7    or too small.

8              Q    Do you know whether the UDL thickness

9    specifications for the product were even tighter than

10   the Actavis specifications?

11             A    I don't know that.

12                  THE VIDEOGRAPHER:  It's time to make a

13        tape change, sir.

14                  MR. MORIARTY:  I'm sorry?

15                  THE VIDEOGRAPHER:  I have to make a tape

16        change.  We are off record at 11:28.  Just one

17        moment.  Pause, please.

18                  (Off the record.)

19                  THE VIDEOGRAPHER:  All right.  We're back

20        on record.  This is the beginning of Tape No. 3 in

21        the Farley deposition.

22   BY MR. MORIARTY:

23             Q    From your knowledge of the way that FDA

24   looks at things, if UDL re-packaged Digitek from bottles

25   to blister packs, would UDL be required to test for

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 407

1    stability on the product in order to assure that the

2    change in packaging didn't change the shelf life of the

3    drug?

4              A    If you have a contact surface area of the

5    plastic to use to generate current against there,

6    somebody would be required to test for stability because

7    of the contact with the drug product.

8              Q    Have you ever seen any records from UDL

9    regarding the results of stability testing for Digitek?

10             A    No.

11             Q    When they test for stability do they test

12   for assay typically?

13             A    Among others, but that would definitely be

14   it.

15             Q    Would they typically do content

16   uniformity?  Or I'm sorry.  Let me withdraw that.

17             Would they typically also do dissolution?

18             A    For tablets would they typically?

19   Usually, not invariably, but most times.  Typically was

20   your word.  Let's use that.  Yes.

21             Q    To your knowledge did any Digitek batch

22   ever fail stability under any UDL program?

23             A    I don't know the answer to that.

24             Q    Would that be important information for

25   you to know?

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 408

1            A    It would be.

2            Q    And if you assume that no Digitek batch

3    ever failed stability under a UDL program, does that

4    speak to the consistency of the quality of the product?

5            A    If I saw the stability protocol and if I

6    saw the method they used and agreed that it was a good

7    method and if I knew it was a well-trained person

8    conducting it, everything that would give credibility to

9    the results, then, yes, it would.

10           Q    And no one has submitted any of that kind

11   of data to you for review in this litigation, correct?

12           A    I believe they did not.

13           Q    And you have no reason to believe that FDA

14   has questioned the testing methods of UDL, correct?

15           A    Correct.

16           Q    If -- have you been supplied any

17   information about testing on Digitek done by NMS Labs

18   from your previous home area of Philadelphia?

19           A    No.

20           Q    Are you familiar with NMS Labs?

21           A    No.

22           Q    If anybody ever presented you with testing

23   information about Digitek would you want to look at

24   their methodology and validation before you drew any

25   conclusions about the validity of the testing?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 409

```
 1              A    That and more.  The reputation of the
 2   company, something about the training of the analysts
 3   who were running it.  Everything you said and more.
 4              Q    Okay.  Now, my colleague, Mr. Anderton,
 5   already asked you some questions about the regulatory
 6   definition of adulteration.  And I don't want to repeat
 7   those questions, but I have a follow-up.
 8              Have you ever seen any peer reviewed
 9   scientific literature, any FDA statements or any other
10   kind of scientific statement which says in words or
11   effect that the regulatory definition of adulteration
12   means that there was out-of-specification product in
13   fact either made or distributed?
14              A    You're getting to like within the
15   definition of adulteration?  Is that -- am I reading
16   your question properly or am I not?
17                   MR. ERNST:  Objection to form.
18              Q    I thought the question was plain.  If you
19   don't understand it I'll be happy to rephrase it.
20              A    Okay.  Just one more time.  Let me see if
21   I get it this time.
22              Q    Okay.  All right.  Let me go back.  All
23   right.  Mr. Anderton asked you about Exhibit 39.  Okay?
24              A    I forget what one that is offhand but --
25              Q    I'm handing you from the original stack
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 410

 1  what Exhibit 39 is.  Okay?

 2          A   Yes.  I see it.

 3          Q   And this is the statement from the FDA's

 4  own Web site, Facts About Current Good Manufacturing

 5  Practices, correct?

 6          A   It looks like it is.

 7          Q   And about halfway down there's a bolded

 8  question that says, If a manufacturer is not following

 9  CGMPs are drug products safe for use.

10          Do you see that?

11          A   Yes.

12          Q   And then it basically gives the statement

13  that if a company is not complying with CGMPs it makes

14  the drug adulterated under the law.

15          Do you see that?

16          A   Yes.

17          Q   The last sentence of that paragraph says,

18  It does not mean that there is necessarily something

19  wrong with the drug.

20          Do you see that?

21          A   Yes.

22          Q   Okay.  Now, what I want to know from you

23  is whether you have any peer reviewed literature or an

24  FDA statement or some other scientific statement

25  contrary to what the FDA is saying in its Web site in

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 411

1    Exhibit 39.

2              A    Stating --

3              Q    First a yes or no and then you can

4    explain.

5              A    Do I have any evidence of anyone who

6    directly contradicts that?

7              Q    That's basically what I was asking you.

8              A    I do not.

9              Q    Okay.  Now, did you want to explain your

10   answer?

11             A    Yes.

12             Q    Go ahead.

13             A    When there's a violation of GMPs it is

14   implied or understood in the industry or generally

15   accepted there is a likelihood that an improper

16   harmful -- potentially harmful product is being released

17   to the public.

18             It, as you say, is not a guarantee, but

19   there's a likelihood that there's a, quote, bad product

20   getting out to the market if in fact it was released.

21             So while there's no direct contradiction here

22   as you asked, it's the general thinking among people in

23   the industry and FDA you didn't comply with GMPs,

24   there's a likelihood of a problem with this material.

25             Q    Okay.  Let me ask you about that.  Does

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 412

1  every finding of adulteration lead to a recall?

2           A   No.

3           Q   Well, if you are correct that there is a

4  likelihood that bad product is out, how come it isn't

5  recalled?

6           A   It's a combination of factors.  It depends

7  on the product itself.  If it's a drug, how sensitive is

8  that drug.  In this case it's therapeutic index.  A

9  person might get harmed.  It's who's taking it.  There's

10 a whole variety of factors that go into the

11 determination to do a recall or not.

12          Q   But you told me that every time there's an

13 adulteration there's a likelihood that bad product got

14 out.  Okay?  So where in the FDA rules, regs,

15 interpretations, field manuals does it give this sort of

16 rule that you just said that there's a likelihood but it

17 all depends?  Where is it?

18          A   In the regulations where it says there's a

19 likelihood?

20          Q   Yeah.  Where in the regs, where in a piece

21 of scientific peer reviewed literature, where in a

22 manual anywhere that I can go read to check on what you

23 just told me?

24          A   It says it's an adulterated product.

25 Since it's an adulterated product it has not been made

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 413

1    the way it should have been made and will quite likely,

2    quite likely, not be of the identity, strength, quality

3    and purity they say that it is purported to be and in --

4    it could be harmful.

5          Q    Well, does the definition of adulteration

6    in the regulations say that?  Does it use the word

7    likely?

8          A    I read it somewhere and I'm at a loss to

9    quote it now.  I don't know if I read it in the

10   regulations or some document but -- or whether I heard

11   it at meetings at the FDA.  I don't know.

12         Q    I'm asking you a question of whether the

13   regulation itself that defines adulteration --

14         A    Yes.

15         Q    -- uses the word likely.

16         A    I do not know if it does or doesn't

17   offhand.  I would have to read that regulation.  I'm not

18   saying it does; I'm not saying it doesn't.  I just don't

19   know.

20         Q    So let me get back to my basic question.

21   Can you cite for me a piece of peer reviewed literature,

22   a regulation, a manual, any piece of scientific

23   information that indicates that adulteration means that

24   there is a likelihood that bad product actually made it

25   to the market?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 414

1                MR. ERNST:  Objection to form.

2           A    It means by definition --

3           Q    Wait.  Answer my question, please, and

4    then you can give your explanation.

5                MR. ERNST:  Objection to form.  You

6            haven't asked a question.

7           A    I thought I was trying to answer your

8    question.  Can I try that again to see --

9           Q    Sure.

10          A    It means you didn't make it the way you

11   said you would make it, and therefore, it is not exactly

12   what you said it would be.

13          Q    Isn't it in fact just possible that it's

14   not what you said it would be?

15               MR. ERNST:  Objection to form.

16          A    The way we would think when I was at FDA,

17   the thinking that's engrained into you is, you didn't

18   make it the way you said, therefore it isn't what you

19   want it to be.

20          Q    Okay.  I'm asking you, but isn't it just

21   possible that it's not what you want it to be as opposed

22   to likely?

23               MR. ERNST:  Objection to form.

24          A    Getting into possible, likely, probable,

25   that depends on who you ask.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 415

1              Q    I'm asking you under oath today as an

2    expert in the Digitek litigation.  Okay?  You can't

3    point me to anything in the regs or any other scientific

4    writings that support what you're saying.

5              So I'm asking, isn't it in -- a fact that when

6    there is an adulteration by definition under the FDCA,

7    that it only means it's possible that bad product

8    actually got out?

9              MR. ERNST:  Objection to form.

10             A    Now, if you're asking me how I would feel

11   about it, if you put a medication in front of me like

12   Lipitor that I take and said this is a -- this is a

13   generic firm made this, but it wasn't made according to

14   GMPs, take it, Jim, and save a few bucks, I would say, I

15   don't want to take that, because in my mind there's a

16   likelihood that something is wrong with that.

17             Q    So that's your personal opinion?

18             A    That's -- that's the opinion I just gave.

19   I wouldn't take it if someone said this is -- this would

20   save you a couple bucks, but it's not made according to

21   GMPs.  I wouldn't.

22             Q    Okay.  So that's why in your article that

23   we asked you about before you actually want to test it

24   to see if it is or isn't, right?

25             A    I would want to test it to see the final

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 416

1    product, assay, everything.  But I also want to know

2    it's made according to GMPs.

3           Q   Well, that's -- anything in Exhibit 39 in

4    the FDA's own Web site that says that it's likely that

5    the product that got out was in fact bad?

6           A   I don't see the word likely.

7              MR. ERNST:  Form.

8           Q   Did your co-author, Mr. Brooks, in your

9    article that you guys wrote cite any law or regulations

10   to say that it's likely that defective product is out

11   there when it's adulterated?

12          A   I don't actually remember whether we did

13   or not.  I don't.  It was over two years ago we wrote

14   that.

15          Q   Okay.

16              MR. MORIARTY:  Does it smell to anyone

17          else in here like there is something burning?

18              THE VIDEOGRAPHER:  Do you want to go off

19          record?

20              MR. MORIARTY:  Yeah.

21              THE VIDEOGRAPHER:  We're off record.  The

22          time is 11:44.

23              (A brief recess was taken.)

24              THE VIDEOGRAPHER:  We're back on record,

25          11:44.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 417

1               MR. MORIARTY:  Okay.  Let's go back on

2        the record.

3    BY MR. MORIARTY:

4               Q    Have you ever seen any Actavis documents

5    from either blend uniformity testing or finished product

6    testing that show out-of-specification results for

7    Digitek?

8               A    Out-of-specification with regard to double

9    thickness?

10              Q    Or normal size, too much API, other than

11   the 20 tablets in 70924.

12              A    Other than that?

13              Q    Yeah.

14              A    I was going to say what I've seen is those

15   documents and I didn't --

16              Q    And the assays?

17              A    -- see those results on them.  I have not

18   seen anything since then.

19              Q    Okay.  Let's go back to this statement

20   about likelihood or not likelihood.  Okay?  This goes

21   here.  This is Exhibit 38.  It's another statement from

22   the FDA's Web site called Facts and Myths About Generic

23   Drugs.

24              A    I see it.

25              Q    On the second page near the top it says

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 418

1    Myth, There are quality problems with generic drug

2    manufacturing.  A recent recall of generic Digoxin,

3    called Digitek, shows that generic drugs put patients at

4    risk.

5              And then it says Fact, FDA's aggressive action

6    in this case demonstrates the high standards to which

7    all prescription drugs, generic and brand name, are

8    held.

9              Do you see that?

10         A    I do.

11         Q    All right.  In the fourth bullet point it

12   says, In our best judgment given the very small number

13   of defective tablets that may have reached the market

14   and the lack of reported adverse events before the

15   recall, harm to patients was very unlikely.

16             Do you see that?

17         A    The fourth bullet point?

18         Q    Yes, sir.

19         A    I see it but I'm questioning the FDA

20   putting that on their Web site.  I'm not doubting what

21   you put in front of me, but I'm questioning their

22   mentality when they put that out there, because they

23   don't usually get specific.

24             And I think when Mr. Anderton presented this I

25   said the same thing.  I said they don't usually go into

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                        Page 419

1    brand names.  And it's very much of a surprise.  But,

2    yes, I see what you put in front of me.

3              Q    All right.  Other than 483s and warning

4    letters what documents have you seen to indicate that it

5    is likely that there was defective Digitek in the hands

6    of any consumer?

7              A    Consent decree.

8              Q    Anything else?

9              A    A consent decree is a big deal.  That's a

10   big --

11             Q    Can consent decree say -- even have the

12   word Digitek in it?

13             A    It essentially said, my words, we don't

14   think you're capable of making anything right;

15   therefore, you need a third party to help you make it.

16             Q    Okay.  So you've seen all this Celsis Labs

17   testing.

18             A    No.

19             Q    You've seen the FDA's testing.

20             A    This morning.

21             Q    And you haven't even looked at any Actavis

22   batch records other than 70924.  So other than the FDA's

23   regulatory documents what have you seen to indicate to

24   you that there is any likelihood of out-of-spec Digitek

25   in the hands of any consumer?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 420

    1                 A    It sounds to me like you're minimizing the

    2     significance of a 483 or a warning letter.

    3                 Q    No, sir.

    4                 A    They are serious things.

    5                 Q    What I'm trying to ask you -- I'm trying

    6     to understand your opinions and the support for your

    7     opinions.

    8                 A    Yes.

    9                 Q    I understand what you relied on, those

   10     three categories.  I want to know if there's anything

   11     else.  Okay?  You've said warning letters, 483s and a

   12     consent decree.  Anything else?

   13                 A    And the double thick tablets that were

   14     found and not analyzed, which is surprising.

   15                 Q    I'm -- maybe you're missing the question.

   16                 A    I might be.

   17                 Q    Okay?  I want to know any documents that

   18     indicate to you the likelihood that out-of-spec Digitek

   19     made it to the hands of consumers, okay, hands of

   20     consumers, not rejected at the plant.

   21                 A    Separate from my feeling that there was a

   22     good possibility that some might, I haven't seen a

   23     document that indicated that there was.  But what I'm

   24     looking at is not the quantity.

   25                 You could show me a hundred more analytical

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 421

1    results of a bottle here and a bottle there.  But when I

2    take the few 483s and couple of warning letters and I

3    look at what was wrong with that place, I realized the

4    sampling was a very small amount.  And I would not have

5    confidence in taking any medication that they produced.

6              Q    Okay.

7              A    So that's a lengthy answer, but I want to

8    put it in a proper perspective for all of us.

9              Q    If a client hired you to analyze this, you

10   would look at the actual records, the manufacturing

11   records, the testing records, things of that nature.

12   You would actually want the detail, not just the

13   broadbrush of the 483s, correct?

14             A    Including the methods and the training,

15   all of the above.

16             Q    All right.  Did you review any annual data

17   reviews or annual reports?

18             A    I did not.  I believe I did not.

19             Q    Do you know that has summaries of all of

20   the testing, finished product testing --

21             A    Yes.

22             Q    -- for every batch?

23             A    Yes.

24             Q    Now, the ANDA -- you know what that is,

25   right --

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 422

1          A    It's the Abbreviated New Drug Application

2     for generic.

3          Q    -- contains a -- have you seen the ANDA

4     for Digitek?

5          A    The actual ANDA?

6          Q    Yeah.

7          A    No.

8          Q    I mean, a copy of it?

9          A    No.

10          Q    Well, you know that the ANDA has a product

11     formula, does it not?

12          A    Yes.

13          Q    It lists the ingredients and the amount of

14     an ingredient?

15          A    Yes.

16          Q    And you know that formula was approved by

17     FDA?

18          A    Yes.

19          Q    And do you know typically in the

20     manufacturing process that raw materials, including the

21     API, are weighed at the beginning of each batch to

22     assure that the proper amount is put in that complies

23     with the formula?

24          A    Yes.

25          Q    Do you know that from review of any batch

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 423

1    records that when they are blended one person verifies

2    it and it's verified by a second person that the

3    blending is done properly?

4              A    Yes.  I only reviewed the one batch record

5    and in that one I found that the same person checked his

6    or her own work, which is sacrilegious, one might say.

7              Q    In the blend?

8              A    In -- somewhere along the way.  I forget

9    offhand.  I'd have to review the batch record again to

10   answer that.  But I found -- in effect I'm saying I

11   found a flaw in it and that flaw was a person checking

12   his or her own work, same initials on the left side and

13   right side of the sheet, which is a violation right

14   there.

15             Q    Have you seen any citations, warnings or

16   sanctions from the FDA upon Actavis for not following

17   the Digitek formula that was set out in the ANDA?

18             A    No.

19             Q    Did Actavis keep raw material inventory

20   cards?

21             A    I do not know that.  They should.  They're

22   supposed to.

23             Q    Have you ever seen anything to indicate

24   that Actavis was using Digitek components at rates

25   inconsistent with their batch production?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 424

1          A    No.  I saw they were not cleaning the

2    materials properly, the equipment, between batches,

3    which cause concern.  But your question referred to the

4    proper amounts, I believe, and my answer is no.

5          Q    My questions are relatively specific and

6    direct.

7          A    Okay.

8          Q    If you can just answer mine --

9          A    Okay.

10         Q    -- not some other.  I didn't ask you about

11   cleaning validation or anything else.

12         A    Yes.

13         Q    I asked about inventory.

14         A    Yes.

15         Q    Okay?  Have you ever seen evidence of an

16   FDA citation, warning or observation that Actavis was

17   using too much Digoxin as tested at the blend uniformity

18   stage?

19         A    No.

20         Q    Do you know that periodically tablets are

21   tested by QA and production during manufacturing for

22   hardness, thickness and weight?

23         A    Yes.

24         Q    Do you know that those sampling plans were

25   approved by the FDA?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 425

```
 1              A   I didn't see them, but I would have to
 2       assume they were.
 3              Q   Have you ever seen any FDA citation,
 4       warning or observation to indicate that Actavis was not
 5       following its FDA approved sampling plans?
 6              A   I'm reflecting on the 483s as I'm
 7       formulating my answer.  I'm trying to think if sampling
 8       plans were in the 483s.  My answer is no.
 9              Q   Do you know how many out-of-specification
10       results occurred of the 270 Digitek batches made between
11       2003 and 2007 during production for weight, thickness or
12       hardness?
13              A   I do not know.
14              Q   Now, from a manufacturing and quality
15       standpoint is there a difference between a double thick
16       tablet and a normal sized tablet with too much active
17       pharmaceutical ingredient?
18              A   Is there a difference?
19              Q   Yeah.
20              A   The very fact it's double thick is the
21       difference.  I need a little more information --
22              Q   Sure.
23              A   -- on the question.  I'm not getting it.
24              Q   Well, I know you're not a manufacturing
25       expert.  But in fact, is the root cause of a double
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 426

1    thick tablet different from the root cause of a normal

2    sized tablet that has too much active pharmaceutical

3    ingredient?

4             A    It can be.

5             Q    Do you think the FDA knows the difference

6    between a double thick tablet and a normal sized tablet

7    with too much active pharmaceutical ingredient?

8             A    They should.

9             Q    Did you ever see any citations, warnings

10   or observations to indicate that Actavis was

11   manufacturing Digitek normal size but too much active

12   pharmaceutical ingredient?

13            A    I did not see much analytical data at all

14   and I did not see anything to that effect.

15            Q    I'm not asking you about analytical data.

16   I'm asking whether you saw any FDA observations,

17   citations or warnings to indicate that Actavis was

18   making Digitek normal size but with too much active

19   pharmaceutical ingredient.

20            A    No.

21            Q    And the FDA approved recall notice didn't

22   say anything about normal size tablets with too much

23   API, did it?

24            A    Correct.

25            Q    If FDA was concerned about the specific

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 427

```
 1   problem of normal sized tablets with too much API, do

 2   you think they would have had Actavis say something

 3   about that in the recall notice?

 4              MR. ERNST:  Objection to form.

 5        A    I'm thinking whether they would have

 6   tested it first or got the recall out first.  I believe

 7   they would have said something about it, tell the reason

 8   for the recall.

 9        Q    And they probably would have said

10   something about it in Exhibit 38 on their Web site when

11   they specifically talk about Digitek and the recall a

12   year and a quarter after the recall had occurred,

13   correct?

14        A    I can't predict what they would or would

15   not because I'm not in agreement with the way they

16   formulated this in the first place.

17        Q    Well, if information had come to the FDA's

18   attention even post-recall that there was a problem with

19   normal sized tablets and too much active pharmaceutical

20   ingredient in them, don't you think they would have said

21   something in Exhibit 38 about that?

22        A    I don't know.  I can't predict what they

23   would or wouldn't put on there.  I really can't answer

24   that.  I don't know who can.

25        Q    Well, if you worked for the FDA wouldn't
```

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 428

 1    you say something about that?

 2              A    I think the answer to that you'd have to

 3    ask Dr. Margaret Hanburg.  She's the commissioner.

 4              Q    Were the finished product testing plans

 5    approved by FDA?

 6              A    They should have been.

 7              Q    Were they in every batch record?

 8              A    Should have been.

 9              Q    Did FDA have every opportunity to inspect

10    and comment upon those testing plans between 2004 and

11    2008?

12              A    I don't know what the inspectors had on

13    their agendas when they left the office to go and

14    inspect.  I can't speak for that.  I'd be happy to read

15    the minds of the ladies who did the inspections.

16              Q    I'm not asking whether they had it on

17    their agenda, Mr. Farley.  I'm asking whether they had

18    the batch records available for review when they did

19    their inspections.

20              A    They could request the batch records at

21    any time.  So in that regard it would be available for

22    review if they felt they needed the batch records.

23              Q    And if they were suspicious about Actavis'

24    finished product testing program do you think it likely

25    that the inspectors would have looked at those?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 429

1            A    About Actavis' finished product testing

2    program --

3            Q    Yes.

4            A    -- is it likely -- we get into this word

5    likely.  It is possible they may have.

6            Q    No.  So you think if FDA was concerned

7    about Actavis' finished product testing that it's only

8    possible they would have looked at batch records?

9            A    At that time when that inspection when

10   they're finding deviations, out-of-specification

11   results, things not being documented, they had their

12   hands full with all the other violations.

13           And they might have gone back to the district

14   and said, I need a couple other people to come with me

15   next week.  I'm assuming you mean that day are they

16   going to ask for it.

17           Q    No.  At some point they would have gotten

18   to it, right?

19           A    At some point?  They may have gotten to it

20   depending on the personnel -- they had their hands full

21   with all of the violations in the first place.

22           Q    At some point it's probable they would

23   have gotten to it, right?

24           A    Possible.

25           Q    Okay.  Did FDA ever cite, warn or observe

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                      Page 430

1    that Actavis was not following its finished product ANDA

2    procedures for Digitek?

3              A    ANDA procedures?  Could you explain that

4    more?

5              Q    The ANDA sets forth the finished product

6    testing procedures, doesn't it?

7              A    I didn't hear you say finished product

8    testing.  I'm sorry.

9              Q    And it's FDA approved, correct?

10             A    Yes.

11             Q    Did FDA ever cite, warn or observe that

12   Actavis was not following its finished product testing

13   procedures regarding Digitek?

14             A    Procedures that Digitek proposed and FDA

15   said, okay, they're good, do it?  No, I did not see

16   that.

17             Q    When we say finished product testing

18   procedures, we're on the same page.  We're talking about

19   assay, dissolution and content uniformity, correct?

20             A    From what I've read here this morning,

21   finished product testing is testing on the product as it

22   leaves to go to the next consumer.

23             Q    Do you know what kind of testing it is?

24             A    I'm sorry.  Say again?

25             Q    Do you know what kind of testing they do?

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 431

1            A    From what I read this morning -- I know
2    what they should do normally, but I know more
3    specifically from what you showed me this morning.
4            Q    Well, when you read Batch 70924's records
5    did you look at the kind of testing Actavis subjected
6    the product to?
7            A    Yes.
8            Q    And it was assay, dissolution and content
9    uniformity, correct?
10           A    Yes.
11           Q    Okay.  Did FDA ever cite Actavis or
12   observe that Actavis had out-of-specification stability
13   results for Digitek?
14           A    They cited them for not taking samples at
15   the prescribed time that was in their stability
16   protocol.  Therefore, they found a flaw in the program.
17   So when you have a flaw in the program and then you say
18   did I have out-of-spec samples, it's a tough one to
19   answer because you aren't taking all the samples you
20   were supposed to take.
21           Q    Okay.  I'm just asking, did they ever
22   cite, observe or warn Actavis for out-of-specification
23   stability samples?  Yes or no?
24           A    For out-of-specification stability
25   samples?  No.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 432

1          Q    Or content uniformity?

2          A    No.

3                    MR. MORIARTY:  How much time on the tape?

4                    THE VIDEOGRAPHER:  The time on the tape

5          left is 25 minutes.

6                    MR. MORIARTY:  Okay.

7      BY MR. MORIARTY:

8          Q    Let me see if I can put a question to you

9      a different way.  You've -- you've seen the 484s.

10     You've seen the Celsis and UDL testing.  I want you to

11     assume that the batch records for Digitek show

12     consistent production within the specifications.  Okay?

13         A    Yes.

14         Q    I want you to assume that.

15         A    We'll do that.

16         Q    All right.  Are you -- do you intend to

17     tell a jury that Actavis was in fact producing defective

18     Digitek and it's just shear coincidence that none of

19     that defective product was discovered by Actavis, FDA,

20     UDL or Celsis?

21         A    I do not intend to tell anybody that

22     because I don't know that.  I was -- I don't have

23     confidence they're capable of making a quality product

24     even though they got good analytical results on what is

25     an extremely small percentage of sampling.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 433

1              But I can't say they made bad stuff.  I say in

2      my mind I believe there's a likelihood, in my mind, a

3      likelihood that there could be bad material on the

4      market.

5              Q    Okay.

6              A    Can I clarify that more for my own mind,

7      too?

8              Q    Now, if you were going to be consulted by

9      a client for that very problem, okay, somebody says we

10     think there was adulterated product, but all the testing

11     that's been done shows that the product is within specs,

12     what would be your next step to figure out whether there

13     was in fact bad product in order to remove the doubts

14     and wonderings?

15             A    I would say to them why do you think you

16     made adulterated product?

17             Q    That's not what I'm asking you.  You've

18     been consulted.  Okay?

19             A    Right.

20             Q    We know the FDA has done these 483s and

21     the warning letters.  Okay?

22             A    Uh-huh.

23             Q    But all the test results show normal

24     Digitek.  No one has come and shown you defective

25     Digitek.  What would be your next step as a consultant

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 434

1   to advise the company about whether there was in fact

2   out-of-specification Digitek out in the market?

3           A   I don't think that's the same question you

4   asked me a minute ago.

5           Q   Well, I think -- answer the one I just

6   asked you.

7           A   The question --

8           Q   Answer the one I just asked.

9           A   Give it to me again, please.

10           MR. MORIARTY:  Read it back, Angela,

11       please.

12       (The record was read back as requested.)

13           A   What's the company asking me?  I mean,

14   what's -- I'm missing --

15           Q   Mr. Farley, is there defective Digitek in

16   the hands of consumers?

17           A   Oh, your company.

18           Q   Yeah.  Not is it adulterated.  We want to

19   know, because we've got all these good test results, is

20   there defective Digitek in the hands of consumers?  What

21   do you do as a consultant?

22           A   I want to review all your procedures,

23   every procedure, your lab testing, your manufacturing.

24   I want to see existing data.  But you've just assured me

25   existing data was good.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                    Page 435

1            I want to verify that the methods were

2     accurate, validated and that the personnel are trained.

3     And then I want to look -- I want to watch you make a

4     batch.  I want to watch you test it.

5            Q    Did FDA ever cite, warn or observe that

6     Actavis didn't have validated methods for the production

7     and testing of Digitek?

8            A    They said they weren't using certain

9     methods, that methods that were supposed to be used were

10    not being used.  Whether they cited for any being not

11    validated, I'm not sure.  There may have been.  I'm just

12    not sure.  But I do know they said you had procedures,

13    you weren't using them.

14           Q    Any that specifically involved the actual

15    quality of the end product?

16           A    Anything in manufacturing involves quality

17    of the end product.  So my answer is yes.

18           Q    Okay.  So in your mind if somebody put a

19    label on upside down -- which would be a GMP violation,

20    wouldn't it --

21           A    Yes.

22           Q    -- that is -- that means it's likely that

23    that product is out of specification?

24           A    It means you don't know anything about

25    that product.  It means what are you going to do about

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 436

1    it.  You've got to take that product, that big drum or

2    whatever it is, and test it to be sure that what you

3    think it is is really what it is.

4             Q    Okay.

5             A    You can't --

6             Q    Well, it passed finished product testing,

7    Mr. Farley.  So are you telling me that in your mind the

8    upside down label means that that product is out of

9    specification?

10            A    No.  It means they're -- it means you have

11   to look more into it.  There's a possibility it may be.

12   Upside down label, you don't know what's there.

13   Whatever the label says, you don't know what's in that

14   drum.

15            So you have to do a tracking of how whatever

16   it is got there, plus you've got to do some more testing

17   here and now before you do anything with that.

18            Q    Okay.  Did FDA ever cite, warn or observe

19   that Actavis employees were not properly trained in

20   manufacture of Digitek?

21            A    I did not read anything to that effect.

22            Q    If the -- if Actavis was consistently

23   producing double thick tablets, is it more likely than

24   not that it would have been detected either by

25   pharmacists filling prescriptions, consumers taking

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 437

 1   prescriptions or UDL when it was packaging the product

 2   in blister packs?

 3          A    Consistently, that's a somewhat vague

 4   term.  But if you mean daily with batches that go out,

 5   it is likely that someone somewhere would have caught

 6   it.  It's also likely that some people would have

 7   ingested it and either died or had some serious medical

 8   problems.

 9          Q    All I'm asking you is whether it's likely

10   it would have been detected and that is the look,

11   correct?

12          A    Oh.  I was just saying before or after the

13   fact.  It's likely it would have been defected.  When I

14   don't know.

15          Q    All right.  Do you know -- do you know how

16   many -- do you know how many Digitek tablets were

17   recalled?

18          A    A figure -- or not -- no.  4.8 million,

19   that's a batch.  Many, many millions.  I don't know the

20   exact number offhand.

21          Q    Okay.

22          A    Tablets you're talking about?

23          Q    Yeah.

24          A    Okay.  Many, many millions.

25          Q    Like 688 million?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 438

```
 1            A    That wouldn't surprise me.

 2            Q    Do you know how many of the recalled

 3   batches were .125 versus .250?

 4            A    Not offhand.

 5            Q    Do you know what percentage -- do you have

 6   an opinion to a probability what percentage of the

 7   recalled Digitek was defective by being out of

 8   specification low?

 9            A    Out of specification low?

10            Q    Yes.

11            A    I do not --

12                 MR. ERNST:  Objection to form.

13            A    -- have any knowledge to that effect.

14            Q    Do you have an opinion to a probability?

15            A    No.

16            Q    Do you have an opinion to a reasonable

17   degree of probability as to what percentage of the

18   recalled Digitek was defective by being out of

19   specification on the high side of the API?

20                 MR. ERNST:  Objection to form.

21            A    No, I don't have an opinion or any

22   knowledge of that.

23            Q    If there were out-of-specification Digitek

24   with the API on the high side, above its specifications,

25   do you have any opinion to a probability as to how high
```

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                        Page 439

 1    those were?

 2                   MR. ERNST:  Objection to form.

 3           A    If they were out on the high side do I

 4    have an opinion how high they would be?

 5           Q    Yep.

 6           A    No.

 7           Q    Do you have an opinion as to how many

 8    double thick tablets were released to the marketplace

 9    between 2006 and 2008?

10           A    I do not.

11           Q    Do you have an opinion to a reasonable

12    probability as to how many normal sized tablets with too

13    much API were released to the market?

14           A    I do not.

15           Q    Given what you have told me so far I

16    assume you have no opinion to a probability as to how

17    many out-of-specification tablets may have made it into

18    a particular patient's prescription vial, whether they

19    got one or whether they got none, whether some people

20    got tend out of thirty.

21                 Do you have any opinions to a probability on

22    that?

23           A    No opinion as to a probability.

24                   MR. MORIARTY:  How we doing on time,

25           Bill?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 440

```
 1              THE VIDEOGRAPHER:  We have thirteen
 2       minutes, sir.
 3              MR. MORIARTY:  Okay.
 4  BY MR. MORIARTY:
 5       Q   All right.  Flipping through notes, some
 6  of these I've already asked you, so -- I think you said
 7  in your first deposition you said something about
 8  somebody dying from Digitek eight to ten years before
 9  the recall.
10              Do you know where you got that information?
11       A   I mentioned something that I had heard or
12  read that a person had died.  And I think it was
13  Mr. Anderton who put it in the proper perspective and
14  mentioned when.
15              The other part of your question was where did
16  I get that.  I am not sure.  It might have been Pete
17  Miller telling me or in a conversation.  But it was
18  something like that.
19       Q   Do you have any scientific basis to know
20  whether people taking normal doses of Digoxin can have
21  toxicity and die as a result?
22       A   No.  That would be more for an M.D. and
23  I'm not a physician.
24       Q   And you haven't read the depositions of
25  Dr. Semigran or Ph.D. Nelson from Cincinnati in this
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 441

 1   litigation?

 2           A    No, neither of them.

 3           Q    So you don't know whether that came from

 4   an adverse event report that was in your material or

 5   some anecdotal piece of information?

 6           A    I don't know that -- what was in the

 7   adverse --

 8           Q    This thing about somebody dying eight to

 9   ten years before.

10           A    I don't know.

11           Q    Okay.  Are you an expert in statistics?

12           A    No, I'm not an expert in statistics.  I

13   know a little bit, but not an expert.

14           Q    Do you know what level of testing of a

15   product would rise to the level of statistical

16   significance or would you defer to a statistician on

17   that?

18           A    I would defer to a -- I would have an

19   idea, but I would defer to a statistician to look for

20   the traditional 95 percent probability of this occurring

21   rather than that.

22           Q    Okay.  Now, this statement about a total

23   failure of the quality systems --

24           A    Yes.

25           Q    -- if somebody were to assume that there

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 442

```
 1   was a total failure and that Actavis could not make
 2   Digitek within the specs, that would be an improper
 3   assumption, wouldn't it?
 4           A   I'm trying to think if it's the same that
 5   my thoughts are.  I wouldn't trust anything they made
 6   after seeing that.  But to say that a particular bottle
 7   is good or bad, I would have no way of knowing.
 8           Q   Okay.
 9           A   Did I answer your question?
10           Q   Well, not exactly but I'm going to follow
11   up.
12           A   Okay.
13           Q   If somebody said there was a total failure
14   of the quality system, so we assume that Digitek could
15   not have been made properly, that would be a wrong
16   assumption, wouldn't it?
17           A   If somebody said there was a total
18   failure --
19           Q   Yes.
20           A   -- and --
21           Q   And then assumed that Actavis could not
22   make any Digitek properly, they would be wrong, wouldn't
23   they?
24           A   Well, if somebody told me there was a
25   total failure I'd say, tell me why you say that, why are
```

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                    Page 443

1    you saying a total failure.  Then I would want to hear

2    all the various reasons that made them use that term.

3    Then I would pass judgment.

4            Q    I'm asking you a simple question.  Okay?

5    If somebody said there's a total failure of the quality

6    system and then they assumed that Actavis could not make

7    Digitek within the specs, from what you know and what

8    you've even seen today that would be a wrong assumption,

9    wouldn't it?

10               MR. ERNST:  Objection.

11           A    On the samples that were tested those

12   samples were good.  So it would be an erroneous

13   assumption to say that everything that came out was bad.

14           Q    Okay.  Thank you.  Now, let me make sure I

15   understand something you said in your deposition -- your

16   first session of your deposition.  We had 70924 with the

17   20 double thick tablets, correct?

18           A    Yes.

19           Q    You remember that?

20           A    I remember that.

21           Q    And I got the impression from what you've

22   said earlier that if somebody showed you the preceding

23   batch and the trailing batch after 70924 and they were

24   fine and within the specs during production and finished

25   product testing, that you would consider something like

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 444

1    70924 to be an isolated incident.

2              Do I understand that correctly?

3         A    I need more batches.  No, no, not just the

4    one before or the one after.  Maybe the five or ten

5    before and the five or ten after.

6         Q    Okay.

7         A    I need more than just what you said to

8    have me look at that I say potentially isolated

9    incident.

10        Q    All right.  Did you ask for any specific

11   number of preceding or trailing batches in this case?

12        A    I believe my words were something to the

13   effect of give me whatever you can get before and after.

14        Q    And did you get anything other than 70924?

15        A    No, sir.

16        Q    So as it stands right now you don't know

17   whether that was an isolated incident.  Is that fair?

18        A    Whether the findings of the 20 double

19   thick tablets were isolated?

20        Q    Yes, sir.

21        A    I do not know if that was or was not an

22   isolated incident.

23              MR. MORIARTY:  Okay.  Let's go off the

24        record.  I want to take five minutes with my

25        colleague to see if I am finished and then she can

James J. Farley        Volume II & Videotaped        January 19, 2011

                                                          Page 445

1        ask questions if she wants.

2                THE VIDEOGRAPHER:  All right.  Off

3        record, 12:25 p.m.

4              (A brief recess was taken.)

5                THE VIDEOGRAPHER:  We're back on record.

6        This is the beginning of Media Unit No. 4 and it

7        is 12:49.

8   BY MR. MORIARTY:

9        Q    Okay.  Mr. Farley, I just have two things

10   to do.  One is housekeeping.  Okay?  This is

11   Exhibit 74C.  It is the latest version of the notice for

12   this deposition.  Okay?

13        A    Yes.

14        Q    The first notice of deposition was marked

15   as an exhibit in your last session.  Do you remember

16   that?

17        A    Yes.

18        Q    The big difference between this one and

19   that one basically says that you are to bring with you

20   all additional documents that you reviewed.

21        A    Yes.

22        Q    I asked you in the beginning of your

23   deposition whether you had reviewed additional documents

24   and you said you had not; is that correct?

25        A    Yes.

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                      Page 446

     1              Q    All right.  So let me ask you my final

     2    question just to make sure that I can understand how you

     3    got to a conclusion.  Okay?

     4              A    Yes.

     5              Q    If somebody concluded, like you, that

     6    there was likely out-of-specification product in the

     7    marketplace, they could reach that conclusion in one of

     8    two ways.  Okay?  One is to read the regulatory

     9    documents and reach that conclusion, right?

    10              A    The 483s?

    11              Q    Yes.

    12              A    Yes.

    13              Q    And that's the way you reached your

    14    conclusion, correct?

    15              A    Yes.

    16              Q    Another way would be to read the results

    17    of scientific tests or reports that people had measured

    18    out-of-specification tablet in the field.  That would be

    19    a different way to reach that conclusion, correct?

    20              A    I wouldn't reach the same conclusion.

    21              Q    I'm not asking whether you reached that

    22    conclusion.  That would be another way to reach that

    23    conclusion if in fact that it occurred, right?

    24              A    The conclusion that there was a high

    25    probability?

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 447

1            Q    You told me --

2            A    They're different things.  A sample is a

3       sample, but the --

4            Q    Can you listen to the question --

5            A    I'm listening.

6            Q    -- please?  Don't read too much into the

7       question.  Okay?  You've reached the conclusion that

8       there was likely defective Digitek in the marketplace,

9       right?

10           A    Yes.

11           Q    You reached that conclusion through the

12      regulatory documents, the 483s, the warning letters and

13      a consent decree, correct?

14           A    Yes.

15           Q    You did not reach that conclusion by

16      reading reports of scientists who had observed, measured

17      or tested out-of-specification Digitek in the

18      marketplace, correct?

19           A    Correct.

20                MR. MORIARTY:  Thank you.  I'm done.

21                MS. DONAHUE:  Are you ready?

22                THE WITNESS:  Any time.

23                     - - - - -

24                CROSS EXAMINATION

25

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 448

1    BY MS. DONAHUE:

2              Q    Good afternoon, Mr. Farley.

3              A    Yes, ma'am.

4              Q    I introduced myself off the record.  I'm

5    Alicia Donahue.  I'm with Shook, Hardy & Bacon in

6    San Francisco and I represent the Mylan entities, as we

7    call them, Mylan defendants, and UDL Labs in this case.

8              A    Yes.

9              Q    And one follow-up question to the

10   deposition notice that I wanted to make sure we covered

11   was in regard to that notice and the documents that you

12   were requested to bring with you today pursuant to the

13   second deposition notice, did you bring any new

14   documents today to the deposition that weren't produced

15   by you either physically or by virtue of the thumb drive

16   at your original deposition back in July?

17             A    My time log where I log in what day and

18   how many hours I worked for Meghan.

19             Q    That's been updated since your last

20   deposition?

21             A    It's last week.  It just essentially is

22   last week.

23             Q    Could we get a copy of that?

24             A    Yes.  I have it on the thumb drive over

25   there.

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 449

1              THE WITNESS:  And, Meghan, I gave that to

2        you last night.

3         A    I mean -- excuse me.  And I gave it to

4    Meghan last night, yes.

5              MS. DONAHUE:  Can we just agree, counsel

6        that, you will --

7         A    One is a time log and the other is an

8    activity chart that says more what I did and the time

9    log says when I did it so that it tells me I did what I

10   was supposed to do and I know how much time to --

11        Q    I appreciate that.

12        A    -- how much time.

13        Q    Thank you.

14             MS. DONAHUE:  So, counsel, are we in

15        agreement we can get a copy of that?

16             MS. CARTER:  Yes.

17             MS. DONAHUE:  Thank you.

18   BY MS. DONAHUE:

19        Q    Okay.  And now, very quickly, I believe,

20   Mr. Farley, you in regard -- in response to one of

21   Mr. Moriarty's earlier questions, I believe you

22   testified that the purpose of your report in this case

23   was to provide the opinions that you plan to render at

24   trial in this case; is that correct?

25        A    Yes.

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 450

1          Q    Okay.  And I went through your report

2    pretty diligently and I didn't see any mention of any

3    opinions in regard to either the Mylan defendants or UDL

4    Labs.

5          A    Yes.

6          Q    Nowhere in that report did you opine that

7    Mylan or UDL -- did you opine in any regard on their

8    conduct in regard to distributing Digitek?

9          A    Correct.

10         Q    And nowhere in that report did you comment

11   in regard to Mylan or UDL's conduct in regard to any

12   testing that any of those entities may have done in

13   regard to Digitek?

14         A    Correct.

15         Q    As you sit here today, Mr. Farley, do you

16   intend to offer any opinions at the trial of these cases

17   in regard to Mylan or UDL's conduct in relation to its

18   distribution of Digitek?

19         A    I do not intend to.

20              MS. DONAHUE:  Thank you.  That's all the

21      questions I have.

22                   - - - - -

23              CROSS EXAMINATION

24   BY MR. KERENSKY:

25         Q    Sir, do you have -- excuse me.  Sir, do

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                          Page 451

1    you have an opinion about whether or not it is probable,

2    that being more likely true than not, that Actavis

3    manufactured Digitek tablets that presented an

4    unreasonable risk of serious bodily injury or death to

5    consumers and that those tablets were actually

6    distributed to the consuming public?  Do you have an

7    opinion about that based on reasonable probability and

8    that being more likely true than not?

9              MR. MORIARTY:  Objection.

10        Q    Answer.

11        A    I do have an opinion.

12        Q    What is that opinion?

13        A    It's my opinion -- and it is based on the

14   483s and the warning letters and the consent decree --

15   that in which the entire manufacturing and testing flow

16   is shown to be completely inadequate and not in

17   compliance with regulatory.

18             It is my opinion there's a very high

19   likelihood that there may be what I call bad product out

20   on the market and that consumers have a chance of being

21   seriously injured.

22             MR. KERENSKY:  Thank you.  No further

23        questions.

24             Any questions from you, Mr. Ernst?  Did

25        we start without him?  Don?

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 452

```
 1                   MR. MORIARTY:  It' snot my day to watch

 2        him.

 3                   MR. ERNST:  Yes, I do.  I've got some

 4        questions --

 5                   MR. KERENSKY:  Go ahead.

 6                   MR. ERNST:  -- if I can ask him.

 7                   MR. KERENSKY:  Go ahead and ask him.

 8        It's your turn.

 9                   MR. ERNST:  All right.

10                        - - - - -

11                   CROSS EXAMINATION

12   BY MR. ERNST:

13             Q   Is it more likely true than untrue that

14   Digitek tablets that presented a danger to consumers,

15   including the risk of injury and death, were

16   manufactured and placed into the stream of commerce by

17   Actavis?

18                   MR. MORIARTY:  Objection, asked and

19        answered not 120 seconds ago.  Go ahead.

20             A   In my opinion it is true what you said,

21   yes.

22             Q   Is it more likely true than untrue that

23   Actavis failed to provide adequate quality control over

24   the Digitek tablets that it manufactured?

25             A   It is more likely true.
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 453

```
 1            Q    Is it more likely true than not true that
 2    out-of-specification Digitek tablets were manufactured
 3    and distributed by Actavis?
 4            A    It is more likely true.  I believe that.
 5            Q    Is it more likely true than untrue or more
 6    probably than not that Digitek tablets that presented a
 7    danger to consumers, including the risk of death, were
 8    actually placed into the stream of commerce and were
 9    received by consumers based upon the information and the
10    documentation that you have reviewed to date?
11            A    In my opinion it is more likely true.
12            Q    Is it your opinion that based upon your
13    training and experience that documents that you have
14    reviewed, all of the reading material that you are aware
15    of to date that Digitek tablets that were manufactured
16    by Actavis presented a risk of harm to consumers?
17            A    Yes.
18            Q    And is it your opinion that because of
19    this risk of harm to consumers that Digitek tablets were
20    recalled?
21                 MR. MORIARTY:  Objection.
22            A    Say again, please.
23            Q    Sure.  Is it your opinion and is it more
24    likely true than untrue that based upon the material
25    that you have reviewed that the Digitek tablets were
```

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 454

```
 1    recalled because they presented a danger to consumers,

 2    including the risk of death?

 3                  MR. MORIARTY:  Objection.

 4           A    Yes.

 5                  MR. ERNST:  Thank you.  I have nothing

 6        else.

 7                       - - - - -

 8                  REDIRECT EXAMINATION

 9    BY MR. MORIARTY:

10           Q    I have a follow-up question for you.

11           A    Yes, sir.

12           Q    Now, you've heard Mr. Ernst over the

13    telephone ask you some questions.  Does his voice sound

14    familiar?

15           A    He was on speaker last night in here.

16           Q    Okay.  Did Mr. Ernst tell you that in his

17    specific case tablets from his client's prescription

18    were tested by NMS Laboratories and found to be within

19    the Digitek specifications?

20           A    No.

21           Q    Okay.  Is that kind of information

22    important to you in rendering opinions in a case like

23    this?

24           A    All information such as that is important,

25    some more or less.
```

James J. Farley          Volume II & Videotaped          January 19, 2011

```
                                                    Page 455
 1                  MR. MORIARTY:  Okay.  Thank you.  That's
 2          all I have.
 3                  MR. KERENSKY:  Let's wrap it up.  Head
 4          for the airport.
 5                  THE VIDEOGRAPHER:  All right.  That
 6          concludes the deposition of James Farley.  It is
 7          12:59 p.m this is the end of Media Unit No. 4.
 8          Thank you.
 9            (Off the record discussion was had.)
10                  MR. MORIARTY:  As you know from previous
11          deposition experience you have the right, if you
12          wish, to read and sign the transcript when it is
13          prepared and distributed --
14                  THE WITNESS:  Yes.
15                  MR. MORIARTY:  -- to make sure that she
16          typed complicated words properly, spelled them,
17          got everything you said, et cetera.  Okay?
18                  THE WITNESS:  Yes.
19                  MR. MORIARTY:  Or you can waive that
20          right, trusting that she's an excellent court
21          reporter with obvious long-term experience in this
22          and never had to stop us to ask us anything.  It's
23          up to you.
24                  THE WITNESS:  With all due respect to
25          Angela, I would like to read it.
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 456

1                    MR. MORIARTY:  Fine.

2          (The proceedings were concluded at 1:00 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 457

1                    CERTIFICATE

2

3    GEORGIA:

4    CHATHAM COUNTY:

5

6            I, Angela S. Garrett, Certified Shorthand

7    Reporter for the State of Georgia, do hereby certify:

8            That the foregoing deposition was taken before

9    me on the date and at the time and location stated on

10   Page 1 of this transcript; that the witness was duly

11   sworn to testify to the truth, the whole truth, and

12   nothing but the truth; that the testimony of the witness

13   and all objections made at the time of the examination

14   were recorded stenographically by me and were thereafter

15   transcribed by computer-aided transcription; that the

16   foregoing deposition, as typed, is a true, accurate, and

17   complete record of the testimony of the witness and of

18   all objections made at the time of the examination.

19           I further certify that I am neither related to

20   nor counsel for any party to the cause pending or

21   interested in the events thereof.

22

23

24

25

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 458

1            Witness my hand, I have hereunto affixed my

2    official seal this 24th day of January, 2011, at

3    Savannah, Chatham County, Georgia.

4

5                    _____

                     Angela S. Garrett, CSR, RPR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 459

1                    D I S C L O S U R E

2          Pursuant to Article 8.B. of the Rules and

3    Regulations of the Board of Court Reporting of the

4    Judicial Council of Georgia, I make the following

5    disclosure:

6          I am a Georgia Certified Court Reporter.  I was

7    contacted by my office of McKee Court Reporting, Inc.,

8    to provide court reporting services for this deposition.

9          I will not be taking this deposition under any

10   contract that is prohibited by O.C.G.A. 15-14-37(a) and

11   (b).

12         I have no contract/agreement to provide reporting

13   services with any party to the case, any counsel in the

14   case or any reporter or reporting agency from whom a

15   referral might have been made to cover the deposition.

16         I will charge its usual and customary rates to all

17   parties in the case, and a financial discount will not

18   be given to any party to this litigation.

19

20

21

22

23   _____     Date:  January 24, 2011
     Angela S. Garrett
24   RPR, CCR-B2407

25