# EXHIBIT 25

# EXPERT REPORT

# MARTHA M. BENNETT

1. Qualifications and Background

   1.1. My name is Martha M. Bennett and I make this disclosure as an individual on behalf of, and in conjunction with, the above-captioned litigation.

   1.2. Currently, I am President of Bennett and Company, a consulting firm which I established in 1985 to provide FDA related consulting services to pharmaceutical, biologics, medical device, food, and cosmetic companies. My office address is 107 S. West Street, Alexandria, Virginia 22314.

   1.3. I have been retained by attorneys representing Actavis Totowa LLC (Actavis).

   1.4. I graduated from the University of Tennessee in 1972 with a Bachelor of Science degree concentrated in the fields of zoology and chemistry. Subsequently, I successfully completed significant course work in various scientific and technical fields, as described in my curriculum vitae attached as Exhibit 1. The selection of course work was based on the need for specific knowledge related to work assignments, rather than pursuit of advanced degrees. As part of my job I am in a continual learning process. I stay current with the technical and regulatory aspects of my consulting career through regular review of scientific and technical materials, FDA laws, regulations, guidelines, and enforcement policies, as well as through my clients.

   1.5. I have extensive experience in Food and Drug regulatory matters. I worked at the Food and Drug Administration (FDA) for thirteen years from 1972 to 1985. During that time, I was a field investigator responsible for inspecting manufacturers of pharmaceutical and other products regulated by the agency in order to assess their compliance with current good manufacturing practices and other FDA requirements. In 1977, I became a compliance officer in the agency's Center for Drug Evaluation and Research. In that capacity I participated in the writing of regulations pertaining to the approval of new drugs, post-approval reporting requirements, and current good manufacturing practices (CGMP). I prepared some of the agency's injunction and prosecution cases that resulted from evidence that companies had violated FDA laws and regulations. I worked with colleagues in the agency's Center for Devices and Radiological Health, Office of Chief Counsel, and Office of Regulatory Affairs on regulatory matters involving drugs and medical devices. I also worked with attorneys in the Justice Department and U.S.



DEFENDANT'S EXHIBIT 25

1

Attorneys offices on FDA-related litigation. My final position in FDA began in 1982 as a supervisory policy analyst in the immediate office of the FDA Commissioner. My staff and I were responsible for providing direct support to the Commissioner and FDA's Policy Board in their decision-making process that affected all products regulated by the agency. I worked with staff from various congressional committees and the White House as part of their responsibilities of oversight and development of FDA legislation.

1.6. In 1985, I resigned from FDA to start my consulting business. As a consultant I have conducted several hundred inspections of domestic and foreign facilities that manufacture pharmaceuticals (finished dosage forms and active pharmaceutical ingredients), as well as other products regulated by the FDA. I have taught and lectured extensively on FDA regulatory requirements. I have assisted numerous pharmaceutical clients in complying with regulatory requirements and CGMP at all stages of the life cycle of products, including preparing and reviewing product clearance (marketing) submissions, identifying weaknesses in regulatory and quality systems, and establishing corrective action plans to prevent regulatory problems with FDA. I have taught classes on validation, written a "how-to" manual on validation requirements, and reviewed hundreds of validation protocols and reports for regulated products. I have assisted companies in their investigation and resolution of manufacturing problems, customer complaints, out-of-norm, and out-of-specification test results.

1.7. I maintain my board certification in Regulatory Affairs, initially awarded in 1991. This certification is sponsored by the Regulatory Affairs Professionals Society (RAPS), an international organization of more than 12,000 members, dedicated to the ongoing education of FDA regulatory professionals. The certification process involves an independent review of experience, a written test, and demonstration of ongoing training or instruction. As summarized in my C.V., I have been a member of RAPS throughout my consulting career. During my tenure as RAPS Vice President of Education, I participated in the establishment of the certification program and its qualifying criteria. In 2010 I was selected as a RAPS Fellow, a distinction awarded to senior regulatory professionals for their continued significant contributions and leadership in the advancement of the profession.

1.8. I serve as an elected member of the Society of Quality Assurance (SQA) Education Committee and I am an instructor for their quality college. SQA is an organization of professionals dedicated to the exchange and utilization of knowledge in research and regulatory quality assurance. I also serve on the board of the American Society of Quality (ASQ) – FDC Division. With more than 85,000 members, ASQ is a global community of experts and the leading authority on quality in all fields, organizations, and industries.

2. Other Expert Testimony

   2.1. Exhibit 2 contains a list of expert testimony and depositions that I have provided during the last five years.

3. Bases for Opinion

   3.1. Experience and Documents Reviewed

      3.1.1.   At the request of counsel, I reviewed deposition transcripts, exhibits and other documents involved in this case that are related to the FDA approval and manufacture of Digitek® (a brand of digoxin) tablets by Actavis.  (These documents are listed in Exhibit 3.)

      3.1.2.   Counsel requested that I evaluate the information contained in these documents and consider the Actavis experience with Digitek® in view of my knowledge of and experience with other manufacturers of FDA approved finished pharmaceuticals.

      3.1.3.   In my review, evaluation, and consideration of the information presented in this case, I drew upon my knowledge and understanding of pharmaceutical industry practices as well as FDA regulations, guidelines, and enforcement policies obtained from 38 years of professional experience of FDA regulatory matters, as outlined in the first section of this statement. This includes practical training in industrial pharmacy as well as witnessing many drug manufacturing activities. My professional experience is enhanced by an extensive library of FDA regulatory material that is regularly updated. I subscribe to and regularly read numerous sources of information about FDA regulations, enforcement actions, policies, procedures, and guidelines.

   3.2. Regulatory Background

      3.2.1.   Drug Product Approval Process

         3.2.1.1.   Digoxin (the generic name for Digitek®) has been used for centuries to treat various heart conditions; therefore, its use precedes the 1938 passage of the Federal Food Drug, and Cosmetic Act (FD&C Act). For many years digoxin was marketed without formal FDA review and approval but that changed in 1974 when FDA announced that digoxin drug products for oral use

3

are "new drugs" under the provisions of the FD&C Act and are required to be submitted to the FDA for formal review and approval before marketing.[1]

3.2.1.2.    Between 1974 and 2002 FDA regulated oral digoxin products through 21 C.F.R. 310.500 that required a mandatory batch certification program in which FDA independently tested samples from every batch of oral digoxin products before distribution. In 2002 FDA revoked 21 C.F.R. 310.500 and required that manufacturers submit and gain approval of new drug applications (NDAs) or abbreviated new drug applications (ANDAs) to market oral digoxin drug products.

3.2.1.3.    An NDA is a lengthy and detailed file which contains evidence and data to demonstrate that a drug product is safe and effective for its labeled use(s). An NDA contains data from pre-clinical (laboratory and animal) and clinical (human) safety and effectiveness studies as well as detailed information about the chemistry, manufacture and control of the active pharmaceutical ingredient and finished drug product[2]. Since Digitek® was the subject of an ANDA, not an NDA, I will focus on the content of an ANDA.

3.2.1.4.    An ANDA is a type of NDA which also contains detailed information about the chemistry, manufacture, and controls over the drug product which it describes[3]. Information includes the location of manufacturing facilities and quality control laboratories which support manufacture, testing, and release of drug product to the market. Also, the ANDA contains documentation associated with at least one batch of drug product, i.e., a copy of the batch production record, analytical test data for raw materials, in-process drug product, and the finished drug product. Finally, the ANDA contains stability data, i.e., analytical test data for at least one batch of drug product which has been held in storage for several months and tested at designated time points to demonstrate that the drug product continues to meet its release specifications throughout its shelf-life.

3.2.1.5.    An ANDA is a 'living' document in the sense that it is routinely updated or modified to describe current controls associated with the drug product it describes. During the pre-approval review period, FDA reviewers frequently

---

[1] 39 FR 2471, January 22, 1974
[2] 21 CFR 314 Subpart B.
[3] 21 CFR 314 Subpart C.

raise technical questions, or request specific changes, which are characterized as "deficiencies" and documented in "non-approval" letters. ANDA sponsors respond to the deficiencies in the form of amendments. All amendments are cleared (i.e., approved, not approved, withdrawn) before an ANDA is approved.

3.2.1.6.    After a drug is approved, ANDA sponsors are required to update their applications with various post-approval submissions. Certain types of post-approval reports include changes which are considered significant enough to require either notification or prior approval before implementation.[4] These post-approval ANDA submissions are known as "supplements".

3.2.1.7.    Both amendments and supplements must clearly describe the change(s) to conditions for marketing as well as data to support the technical, clinical, or regulatory validity of proposed modifications. Therefore, amendments and supplements frequently include copies of manufacturing records and analytical test data. Frequently, they also contain additional stability data.

3.2.1.8.    Regardless of whether an ANDA sponsor has filed a supplement, FDA regulations require that an annual report be submitted for each application.[5] Each annual report must contain chemistry, manufacturing, and controls changes, including updated stability data and reports of experiences, investigations, studies, or tests involving chemical or physical properties, or any other properties of the ANDA drug.

3.2.1.9.    When the following is received or known to the ANDA sponsor, a "Field Alert" report must be submitted[6]: (i) information concerning any incident that causes the drug product or its labeling to be mistaken for, or applied to, another article; (ii) information concerning any bacteriological contamination, or any significant chemical, physical, or other change or deterioration in the distributed drug product, or any failure of one or more distributed batches of the drug product to meet the specification established for it in the application.

3.2.1.10.   As the foregoing paragraphs demonstrate, ANDA sponsors and FDA are in frequent communication before and after a drug product is marketed regarding manufacturing processes and laboratory controls, as well as actual production experience and drug product test results.

---

[4] 21 CFR Part 314.
[5] 21 CFR 314.81(b)(2).
[6] 21 CFR 314.81(b)(1)

3.2.2. Current Good Manufacturing Practices (CGMP)

3.2.2.1. In addition to the requirements for submission, approval, and maintenance of ANDAs, the FD&C Act and FDA regulations[7] require that drugs be manufactured according to CGMP. CGMP covers a variety of matters which, collectively, results in a high degree of assurance that drug products meet their specifications for identity, strength, quality, and purity throughout their shelf-life.

3.2.2.2. To comply with the CGMP regulations, drug product manufacturers must validate drug manufacturing processes and controls as well as adequately monitor and control their facilities and operations to ensure that every portion of every batch will consistently meet quality specifications and that every batch can be made in a reproducible manner.

3.2.2.3. To validate manufacturing processes and controls, drug product manufacturers must successfully complete a series of complex and multi-level activities that include the installation, operation, and performance qualification of manufacturing and testing equipment and the validation of manufacturing processes. Validation studies demonstrate that the manufacturing procedures and controls, as described in master production records (i.e., manufacturing instructions), are appropriate to ensure that batches of drug product uniformly and consistently meet pre-determined specifications.

3.2.2.4. Quality control of drug products is required by the CGMPs, but the regulations recognize that product failures sometimes occur and they allow products to be reprocessed to meet specifications.

Drug products failing to meet established standards or specifications and any other relevant quality control criteria shall be rejected. Reprocessing may be performed. Prior to acceptance and use, reprocessed material must meet appropriate standards, specifications, and any other relevant criteria.[8]

Reprocessing typically involves repeating a manufacturing or packaging step in order to eliminate or correct a product-related defect.

---

[7] 21 CFR Parts 210 and 211
[8] 21 C.F.R. 211.165(f)

3.2.2.5.    21 C.F.R. 211.192 requires the investigation of discrepancies or batch failures. The scope, depth and conduct of investigations vary depending upon the circumstances which need further review and examination. Current industry practice, and FDA expectation, requires that companies diligently try to find the root cause for a discrepancy or failure; however, sometimes the root cause is elusive and investigations are closed without ever identifying the cause. Failure to identify the root cause of a discrepancy or failure is not a violation of CGMP.

3.2.2.6.    It is noteworthy that, unlike some universal plumbing and electrical standards, CGMP is general in nature and lacks specificity in defining control requirements. Each drug product manufacturer must interpret the regulations and define and apply the specific controls it determines necessary to assure the quality of their drug products. For example, the regulation pertaining to manufacturing equipment design, size, and location states:

> Equipment used in the manufacture, processing, packing, or holding of a drug product shall be of appropriate design, adequate size, and suitably located to facilitate operations for its intended use and for its cleaning and maintenance.[9]

Clearly, this standard needs further definition before it can be applied in a manufacturing environment and, consequently, companies use their discretion to apply various ways and methods to achieve compliance.

3.2.3.   CGMP Factory Inspections and Drug Product Surveillance

3.2.3.1.    FDA conducts comprehensive regulatory coverage of all aspects of production and distribution of drug products to assure that such products meet CGMP requirements of the FD&C Act, using two basic strategies to realize this goal.

> Factory Inspections - To evaluate the conditions and practices under which drug products are manufactured, packed, tested and held.

---

[9] CFR 211.63

Drug Product Surveillance Analysis - To monitor the quality of drug products through surveillance activities such as sampling and analyzing drugs in distribution.[10]

3.2.3.1.1.    Factory Inspections

3.2.3.1.1.1.    FDA inspects drug product manufacturers by concentrating their attention on those "systems" which have the greatest impact on drug product quality. Examination of the following systems is meant to provide a broad and deep evaluation of a firm's CGMP compliance.[11]

- Quality System
- Facilities and Equipment System
- Materials System
- Production System
- Packaging and Labeling System
- Laboratory Control System

3.2.3.1.1.2.    During their inspection of drug product manufacturers, FDA investigators assess company compliance with CGMPs based on their interpretation of the regulations from related experience and training. It is common for FDA investigators to find and report CGMP deficiencies which they record on Form FDA 483, a copy of which is issued to and discussed with facility management at the close of an inspection. During fiscal year 2008, FDA issued 4,987 Forms FDA 483 during 15,245 inspections.[12]

3.2.3.1.1.3.    The observations recorded on the Form FDA 483 are not necessarily violations of FDA law or regulations. In fact the form states this fact before any observations are presented:

This document lists observations made by the FDA representative(s) during the inspection of your facility. They are inspectional observations, and do not represent a final Agency determination regarding your compliance.[13]

---

[10] Compliance Program Guidance Manual # 7356.002, Drug Manufacturing Inspections
[11] Ibid.
[12] www.fda.gov/downloads/ICECI/EnforcementActions/EnforcementStory/UCM129824.pdf
[13] Form FDA 483; Investigations Operations Manual Section 5.2.3.1.4

3.2.3.1.1.4.  FDA's Investigations Operations Manual, Section 5.2.3.3, cautions investigators about Form FDA 483:

> Do not report opinions, conclusions, or characterize conditions as "violative." The determination of whether any condition is violative is an agency decision made after considering all circumstances, facts and evidence.

3.2.3.1.1.5.  Section 5.2.7 of FDA's Investigations Operations Manual further advises investigators about discussion of Form FDA 483 observations with management.

> During the discussion be frank, courteous and responsive with management. Point out the observations listed on the FDA 483, are your observations of objectionable conditions found during the inspection, and explain the significance of each… You should inform management during the closeout discussion the conditions listed may, after further review by the Agency, be considered to be violations of the Food, Drug and Cosmetic Act or other statutes. .. Explain, in your judgment the conditions you observed MAY be determined by the FDA, after review of all the facts, to be violations.

3.2.3.1.1.6.  The Form FDA 483 ultimately becomes part of the Establishment Inspection Report (EIR), written by the investigator(s) to more fully describe the inspection, persons interviewed and results of meetings with management, documents examined, and operations observed.

3.2.3.1.1.7.  Another aspect of FDA inspections can be the collection of physical samples at factory sites. Instructions to investigators state:

> Samples of defective product constitute persuasive evidence that significant CGMP problems exist. Physical samples may be an integral part of a CGMP inspection where control deficiencies are observed.

> Investigators may decide independently or in consultation with their supervisor whether to collect such evidentiary samples.

Physical samples are usually not collected unless the investigator believes they include defective product.

3.2.3.1.1.8.        The EIR, Form FDA 483, and physical sample test results, when available, are reviewed by a district level supervisory investigator who classifies the inspection according to one of three compliance categories: NAI (No Action Indicated), OAI (Official Action Indicated), or VAI (Voluntary Action Indicated).[14]

- An NAI classification means that the facility was found to be in substantial compliance with the regulations.

- An OAI classification means that regulatory action (e.g., Warning Letter, seizure, injunction, or prosecution) will be recommended.

- A VAI classification means that objectionable conditions were found but that FDA is not prepared to take regulatory action since the objectionable conditions do not meet the threshold for regulatory action. Any corrective action is left to the establishment to take voluntarily.

3.2.3.1.1.9.        EIRs, classified as VAI or OAI, are referred to a district-level compliance officer for further review and evaluation. Sometimes EIRs are also referred to compliance officers in FDA headquarters (e.g., Center for Drug Evaluation and Research) for even further review and evaluation. Finally, recommendations for regulatory actions such as Warning Letters, seizure, injunction, or prosecution involve additional FDA levels of review and concurrence.

3.2.3.1.2.        Drug Product Surveillance

3.2.3.1.2.1.        In addition to conducting factory inspections, FDA surveys drugs marketed within the United States as another method to monitor the CGMP compliance of drug product manufacturers. The drug product surveillance program assumes that information derived

---

[14] http://www.fda.gov/ICECI/Inspections/FieldManagementDirectives/ucm061430.htm

from direct product analysis is important in itself, apart from information obtained about the process that produced the product.[15]

3.2.3.1.2.2.    One of the stated objectives of the drug product surveillance program is to obtain information about the quality of the nation's drug supply by product analysis of selected finished dosage forms. Periodic surveillance is designed to identify emerging problems with particular drug products.

## 3.2.4.   FDA Regulatory Actions

3.2.4.1.    The lack of an objective CGMP regulatory standard creates a challenge for the pharmaceutical industry and the FDA, causing inconsistent interpretation, inspection results, and enforcement actions. Drug product manufacturers vary considerably in their application of the CGMP regulations, resulting in a varied array of industry practices. Therefore, it is not uncommon for drug product manufacturers to be found in compliance during an inspection one year and out of compliance in the following year. Nor is it uncommon for a drug factory to be found out of compliance during an inspection in one district while another district accepts similar practices in another drug factory.

3.2.4.2.    Nonetheless, when FDA believes that companies have violated the FD&C Act, it can rely on a variety of enforcement tools. The Warning Letter is typically the first level of regulatory action. It is intended to achieve voluntary compliance and provide notification to company management of FDA concerns when a violative situation does not present a danger to health or does not constitute intentional, gross or flagrant violations.[16] During fiscal years 2007 and 2008, FDA issued 471 and 445 Warning Letters respectively.[17]

3.2.4.3.    FDA regulatory actions (e.g., Warning Letter, seizure, injunction, or prosecution) based on CGMP deficiencies do not require evidence that defective or unsafe product be identified. In fact, FDA instructs its compliance officers,

It is not mandatory to demonstrate that the law has been violated to seek an injunction, only that there is likelihood that it may be violated if an injunction is not entered.[18]

---

[15] FDA Compliance Program Guidance Manual # 7356.008 Drug Product Surveillance
[16] FDA Regulatory Procedures Manual, Sections 4 and 10.
[17] www.fda.gov/downloads/ICECI/EnforcementActions/EnforcementStory/UCM129824.pdf
[18] FDA Regulatory Procedures Manual, Section 6

3.2.4.4.    Regulatory Actions – Adulterated Products

3.2.4.4.1.    According to 21 U.S.C. § 351(a)(2)(B), a drug shall be deemed to be adulterated:

> If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

3.2.4.4.2.    This legal definition of "adulterated" does not mean that a drug is unsafe or otherwise defective or unfit for use. Nor does it mean that out-of-specification drug products have been distributed. FDA regulatory actions against companies with poor CGMPs are taken as a preventive measure. When issuing press releases about such regulatory actions and even related drug recalls, FDA typically advises consumers who are taking drugs from a company that was not following CGMPs not to interrupt their drug therapy, which could have serious implications for their health[19].

3.2.4.5.    Regulatory Actions - Application Integrity Policy

3.2.4.5.1.    As a consequence of wrongdoing on the part of some pharmaceutical companies and FDA employees in the late 1980's and early 1990's, FDA developed and implemented the Application Integrity Policy to ensure validity of data submissions, to withdraw approval of, or refuse to approve, applications containing fraudulent data.[20]

3.2.4.5.2.    According to this program, FDA may "debar" individuals and companies if they are convicted of certain felonies or misdemeanors, such as those related to the drug approval process or FDA's regulation of drugs

---

[19] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm169105.htm
[20] FDA Compliance Policy Guide Sec. 120.100 Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities

in general. Once individuals have been debarred, they may no longer work for anyone with an approved or pending drug product application at FDA. A debarred company cannot submit, or assist others in submitting, ANDAs.

3.2.4.5.3.    Since the policy was implemented, FDA's inspections have placed more emphasis on data integrity to ensure that data upon which drug approval is based are accurate and complete.[21] During their inspections, FDA investigators audit raw data to authenticate information submitted in drug approval applications (NDAs and ANDAs) and to verify that all relevant data were submitted. Typical documentation reviewed during such an audit includes batch production records, raw material records, and laboratory testing records.

3.2.4.5.4.    Violations of the Application Integrity Policy can result in product approval delays, denial of product approval, withdrawal of product approval, and debarment of individuals and companies.

3.2.4.6.    Drug Product Recalls

3.2.4.6.1.    Drug product recalls are not FDA regulatory actions and FDA does not have the authority to recall drug products. Nonetheless, companies may voluntarily recall products when FDA has expressed concern about product quality from CGMP focused inspections. Recalls are not uncommon events. During fiscal years 2007 and 2008, more than 10,000 products were recalled (5,585 and 5,778 products respectively).[22]

3.2.4.6.2.    A product recall is a voluntary action taken by manufacturers and distributors to protect the public health from products that present a risk of harm or injury or are otherwise defective.[23] There need not be objective evidence that defective, harmful or out-of-specification product is on the market for a recall to occur.

3.3. Factual Background

---

[21] FDA Compliance Program Guide 7346.832
[22] Ibid.
[23] 21 Code of Federal Regulations 7.40 Recall Policy

3.3.1.   In accordance with 21 C.F.R. 314.500, Amide participated in the digoxin batch certification program which required that samples from each batch of Digitek® be tested and cleared by FDA. The regulations also required that Amide submit their laboratory test results for each batch of Digitek®. On July 20, 1995, after numerous batches passed testing and were certified for distribution, FDA exempted Amide from the batch certification program.[24]

3.3.2.   After FDA began accepting applications for generic oral digoxin drug products in 1997, Amide Pharmaceutical, Inc. (later Actavis) submitted an ANDA for Digitek®, receiving approval on December 23, 1999. As described earlier in this report, the ANDA contained detailed information about the chemistry, manufacture, and control of Digitek®, including data from batch production records and laboratory testing of in-process, finished product, and stability samples.

3.3.3.   In January 2002 Amide filed a prior approval supplement to its Digitek® ANDA, along with supporting documentation and data, requesting a change in the product manufacturing instruction to adjust the quantity of digoxin added to each batch based on the assay results of the active ingredient. FDA approved the supplement in June 2002. [25]

3.3.4.   After Digitek® approval, Amide and later Actavis filed annual reports according to the requirements of 21 C.F.R. 314.81. During the years 2003 through 2007 the company reported on the experience of manufacturing 209 batches (more than one billion tablets) of Digitek® 0.125 mg drug product and 219 batches of Digitek® 0.25 mg drug product (more than 900 million tablets). During that time, all released batches were found to be within specifications.[26] Also, all sample test results from thirty-six month stability studies were found to be within specifications. [27]

3.3.5.   In accordance with 21 C.F.R. 211.180 (General Requirements), Actavis performed annual product reviews with the same results as described above.[28]

3.3.6.   In accordance with CGMP requirements, Amide successfully completed process validation studies as summarized below. These validated processes were used to manufacture the products until they were discontinued in 2008. Revalidation is not required unless significant process changes occur.

---

[24] Document number 0009.
[25] ACTAV 000006497-8
[26] An out-of-specification investigation for blend uniformity was conducted on one lot, batch # 60992A, 0.125 mg; however, the investigation and additional testing invalidated the initial result and the batch was released for distribution.
[27] ACTAV 000005687-6026, 6042-6145, 6201-6436, 6484-6488, 6489-6508
[28] ACTAV 000005658-5686, 6027-6041, 6146-6260, 6437-6483, 6509-6541

- Digitek® 0.125 mg, 1,600,000 tablet batch size, validated in December 1994 and March 1995[29].
- Digitek® 0.125 mg, 4,800,000 tablet batch size, validated in September, 1996.
- Digitek® 0.25 mg, 4,200,000 tablet batch size, validated in January 1995.
- Digitek® 0.5 mg, 4,200,000 tablet batch size, validated in November 1994.

3.3.7.   The equipment used to manufacture Digitek® (i.e., twin shell blender, double cone blender, BB Stokes tablet press) has been and continues to be used in the pharmaceutical industry. According to the documents I reviewed, FDA never criticized the make, model, or age of the manufacturing equipment

3.3.8.   In accordance with 21 C.F.R. 211.22, Actavis had a quality control unit with the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated.

3.3.9.   From 2005 until Digitek® production was halted, no incidents occurred which required Amide (later Actavis) to submit a field alert to FDA notifying them of a problem with a distributed drug product.

3.3.10. FDA inspected Actavis in September 2007, covering all systems (Quality, Production, Laboratory Control, Materials, Facilities, and Equipment), classifying the inspection as "VAI" [30] (Voluntary Action Indicated).

3.3.11. The quality unit of Actavis complied with 21 C.F.R. 211.192 (Production Record Review) in its release of Digitek® lot 70924A. During the packaging of this lot, two tablets with approximately double the normal thickness were found from packaging machine counter channels. Packaging operators then performed a 100% inspection on the tablets from the hopper (tablet bucket numbers 15 & 16) as well as the two subsequent buckets (17 & 18). One more tablet was identified in bucket number 17. Packaging continued while the operators performed a continuous inspection of the tablets. While inspecting the final bucket (number 34), two more tablets were identified, bringing the total of double thick tablets to five. The batch record for previous manufacturing steps was reviewed and evaluated. Then, every tablet in the

---

[29] This validation included tablet press speeds up to 28 rpm.
[30] As described earlier in this report, VAI is an inspection classification meaning that objectionable conditions do not meet the threshold for regulatory action.

batch was visually inspected, resulting in the identification of fifteen more double-thick tablets, bringing the total to twenty. As a final control to ensure that all affected tablets had been identified, rejected, and removed from the batch yet another visual inspection (a tightened AQL (acceptance quality level)) was performed. These actions were consistent with the language in 21 C.F.R. 211.192 which allows an investigation to be limited to one batch and one product.

All drug product production and control records, including those for packaging and labeling, shall be reviewed and approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed. Any unexplained discrepancy (including a percentage of theoretical yield exceeding the maximum or minimum percentages established in master production and control records) or the failure of a batch or any of its components to meet any of its specifications shall be thoroughly investigated, whether or not the batch has already been distributed. The investigation shall extend to other batches of the same drug product and other drug products that may have been associated with the specific failure or discrepancy. A written record of the investigation shall be made and shall include the conclusions and follow-up.

3.3.12. Lot 70924A was reprocessed through repeated inspections to ensure that it met appropriate standards and specifications as allowed by 21 C.F.R. 165(f).

3.3.13. Visual inspection is an accepted quality control method. According to Juran's Quality Handbook, "Visual inspection remains the largest single form of inspection activity."[31]

3.3.14. FDA did not collect any physical samples of drug products in support of their findings during the 2008 inspection.  According to FDA internal instructions, it appears that the FDA investigator did not believe that samples would provide persuasive evidence that significant CGMP problems existed.

3.3.15. The FDA investigator demonstrated a lack of understanding of quality systems in her inconsistent analysis of inspectional observations when she reportedly advised Actavis management that "one of the best outcomes of the Inspection was the input from the laboratory" followed by the statement, "… from a Quality Systems standpoint, there was "Total Failure".[32] It is not possible to have a totally failing quality system when the laboratory is found to be acceptable.

---

[31] Juran, Joseph, Juran's Quality Handbook, Fifth Edition, McGraw-Hill, Section 23.26
[32] Memo of Inspection Closeout, May 20, 2008. ACTAV 000543001-4.

3.3.16. In accordance with FDA's drug surveillance program, Digitek® samples from marketed batches were randomly selected and tested by FDA over several years. All samples were found to be within specifications as summarized below.

| Lot # Product | FDA Sample # Sample size | Date Collected Location | Date of Results | Results/Conclusions |
|---|---|---|---|---|
| 70298A1 0.125 mg | 448881 2 x 100 ct bottles | 12/3/2007 WalMart Pharmacy Warehouse, Crawfordsville, IN | 4/30/2008 | In Compliance – meets specifications for identification, dissolution, content uniformity. |
| 70664A1 0.25 mg | 448892 2 x 100 ct bottles | 12/3/2007 WalMart Pharmacy Warehouse, Crawfordsville, IN | 4/29/2008 | In Compliance – meets specifications for identification, dissolution, content uniformity. |
| 70811A1 0.25 mg | 454866 2 x 100 ct bottles | 2/15/2008 McKesson Drug Co., Duluth, GA | 6/5/2008 | In Compliance – meets USP specifications for identification, dissolution, content uniformity. |
| 8A332 0.25 mg | 462753 2 x 180 ct boxes | 3/21/2008 WalMart, Hanford, CA | 9/23/2008 | In Compliance – meets specifications for identification, dissolution, content uniformity. |
| 70078A1 0.125 mg | 377410 2 x 180 ct boxes | 2/9/2007 Actavis (Taft Rd) | 7/5/2007 | Meets specifications for assay, content uniformity, dissolution, organic volatile impurities. |
| 70737A1 Strength unknown | 453913 1 x 1000 ct box | 2/15/2008 Dealer name purged | 6/10/2008 | In Compliance – meets USP specifications for identification, dissolution, content uniformity. |
| Unknown 0.125 mg | 157503 Unknown | Unknown | 7/12/2002 11/1/2002 | In Compliance – meets USP specifications for uniformity of dosage units and dissolution. |
| Unknown 0.125 mg | 178891 Unknown | Unknown | 4/2/2003 | No action indicated. (NAI) |
| Unknown 0.125 mg | 157504 Unknown | Unknown | 7/12/2002 11/1/2002 | In Compliance – meets USP specifications for uniformity of dosage units and dissolution. |

17

| Lot # Product | FDA Sample # Sample size | Date Collected Location | Date of Results | Results/Conclusions |
|---|---|---|---|---|
| Unknown 0.125 mg | 178890 Unknown | Unknown | 4/2/2003 | In Compliance. |

3.3.17. In addition to FDA's laboratories, other independent laboratories (Celsis on behalf of Mylan) tested Digitek® samples and found them to be within specifications.[33] Also, Quantic Regulatory Services, LLC, performed a third party audit of recalled Digitek® batches which revealed no evidence that defective drug product had been distributed.

3.3.18. During the 2008 FDA inspection, Actavis management decided to voluntarily recall all strengths and lots of Digitek®. The company's April 25, 2008 press release, which was approved by FDA[34], stated: "The voluntary all lot recall is due to the possibility that tablets with double the appropriate thickness may have been commercially released."[35]  The recall did not mention dose variability (i.e., the presence of more or less active drug ingredient in different tablets) in normal sized tablets.

3.3.19. Actavis reported that it had chosen to voluntarily recall products as a good faith measure to move forward and remove any doubt in the mind of the Agency regarding product quality.[36]

3.3.20. FDA notified the public about the Digitek® recall by posting the following information on its website. FDA did not advise patients to stop taking the drug.

The product is being recalled due to the possibility that tablets with double the appropriate thickness may contain twice the approved level of active ingredient… Patients should contact their healthcare professional with questions.

3.3.21. A year after the recall, in the publication "Facts and Myths about Generic Drugs", FDA stated the following about the Digitek® recall.

---

[33] UDLL 000011679-11769, Digitek® list of recalled batches; Defendants exhibits 83 and 84.
[34] Deposition of Misbash Sherwani, page 158.
[35] http://ww.fda.gov/SafetY/Recalls/ArchiveRecalls/2008/ucm112435.htm
[36] ACTAV 00918572 (Actavis Corrective Action Plan Status Report, 8/28/08, Lambridis Deposition Exhibit 108 page 6)

In our best judgment, given the very small number of defective tablets that may have reached the market and the lack of reported adverse events before the recall, harm to patients was very unlikely.

3.3.22. FDA never raised concerns about the integrity of individuals developing data to support and maintain the Digitek® ANDA approval or proposed any debarment actions or enforce the application integrity policy.

4. Opinion

4.1. The Digitek® manufacturing process had been validated, thereby demonstrating a reliable and consistent process. I did not observe documentation that FDA ever found the Digitek® process validation, or underlying manufacturing equipment qualification, studies to be insufficient or invalid. Therefore, I have no reason to believe that the validation was inadequate.

4.2. The type of blenders (twin shell, double cone) and tablet compression equipment (Stokes BB2) used to manufacture Digitek® is well known in the industry and has been used throughout the world for many years. I did not observe documentation that FDA found the equipment inappropriate or unfit for use.

4.3. The investigation of double-thick tablets in Digitek® lot 70924A and subsequent inspection were based on sound quality principles. The Digitek® distributor, Mylan Pharmaceutical, accepted the scope and conduct of the investigation and visual inspection, and the ultimate release of the drug product to them for distribution. The positive nature of Digitek® manufacturing and distribution history over many years, documented in annual product reviews and ANDA annual reports, supported a quality conclusion that the incident associated with lot 70924A was isolated and could be managed with multiple visual inspections.

4.4. Not long before double-thick tablets were observed in Digitek® lot 70924A, FDA had conducted a comprehensive inspection which failed to identify any objectionable conditions serious enough for regulatory action thereby giving confidence to company management that their quality system, including deviation management, was compliant.

4.5. During the close-out of the 2008 inspection, the FDA investigator contradicted herself by stating that the quality system was a total failure at the same time she stated that "one of the best outcomes of the inspection was the input from the laboratory". Such an inconsistent opinion undermines the credibility of the investigator. The laboratory is an

integral part of the quality unit and, therefore, part of the quality system. Also, she failed to comply with FDA instructions prohibiting the issuance of opinions or conclusions about violations. Finally, FDA investigators do not have the authority to make the final determination about CGMP compliance; therefore, her stated opinion is not the opinion of the agency.

4.6. FDA accepted Digitek® ANDA, manufacturing, and quality control documentation and data according to FDA's Application Integrity Policy, thereby providing assurance that recorded batch histories and laboratory data were trustworthy.

4.7. FDA and third party laboratories provided numerous independent results which demonstrated that distributed batches of Digitek® met all specifications, another indication that the Actavis laboratory results were valid and that the quality system was not totally failing. During the 2008 inspection, the FDA investigator did not collect any physical samples, presumably because she did not believe they would demonstrate that significant CGMP problems existed.

4.8. According to FDA documents[37], the reason for the recall of Digitek® batches was limited to the possibility that tablets with double the appropriate thickness may have been commercially released and did not extend to tablet variability from other potential causes. FDA did not claim that double-thick tablets had been released and distributed.

4.9. Although I reviewed numerous documents related to the company's CGMP compliance history, and am aware of the Form FDA 483s and Warning Letters issued from 2006 to 2008, I observed no documentation to demonstrate that any of the recalled Digitek® batches contained double-thick or otherwise out-of-specification drug product or that any consumer ever received a double-thick tablet.

*Martha M. Bennett*
_____
Martha M. Bennett, RAC

*Dec 13, 2010*
_____
Date

---

[37] http://www.fda.gov/Safety/Recalls/ArchiveRecalls/2008/ucm112435.htm,
http://www.fda.gov/Safety/Recalls/EnforcementReports/2008/ucm120518.htm

# EXHIBIT 1

*Bennett and Company*

Martha M. Bennett, RAC
President

## EXPERIENCE

**1985-Present**  **<u>Independent Consultant, FDA related matters</u>**

**Quality Systems & Risk Management**
*(Current Good Manufacturing and Laboratory Practices, ICH, ISO, HACCP)*
- conduct site audits
- conduct in-plant training
- write/review SOPs
- write/review GMP (CMC) sections of FDA submissions
- respond to FDA inspections (FD-483s); consent decree support
- process and computer validations
- risk-based quality management systems

**Clinical Investigations, Institutional Review Boards**
- conduct site visits
- audit clinical investigators
- overall review of INDs and IDEs

**510(k)s, PMAs, NDAs, ANDAs, IDEs, INDs, PLAs, ELAs**
- conduct comprehensive audits of submissions
- develop overall strategy
- write/review technical sections
- facilitate communications with FDA

**Product Complaint Systems**
- conduct independent investigations
- develop complaint handling systems and procedures

**Other**
- U.S. Agent duties
- review product labels for compliance with FD&C Act and regulations, including OTC monographs
- testify in FDA related litigation
- FDA regulatory research

**1982-1985**  **<u>Supervisory Policy Analyst, FDA Office of Commissioner</u>**

- write responses to incoming correspondence
- prepare Commissioner for meetings, Congressional hearings
- manage staff of policy analysts
- analyze policy decisions, recommend actions
- prepare briefing books for meetings, Congressional testimony
- assist in overall management of Commissioner's duties

107 S. West St., PMB 730
Alexandria, VA 22314
marthabenn@aol.com

(928) 208-7180
(703) 717-9791

*Bennett and Company*

| | |
|---|---|
| 1977-1982 | **Senior Compliance Officer, FDA Bureau of Drugs** |

- recommend approval/disapproval of regulatory actions
- manage litigation, prepare expert witnesses, testify
- participate in agency-wide policy development committees
- write GMP regulations
- manage FDA Emergency Command Center
- develop in-depth investigations related to NDA violations
- manage administrative hearings on new drug matters

| | |
|---|---|
| 1972-1977 | **Investigator, Nashville District Office** |

- conduct full range of inspections and investigations
- conduct lengthy undercover investigation of health fraud
- District recall coordinator
- testify in FDA litigation

## EDUCATION

**1972-Present**   I have followed a continuing education program of self-study as well as short-term and graduate courses to enhance my work. Subjects include: validation, ISO standards, software development, food science, food and drug law, pharmacology, computer science, business management, microbiology, and industrial pharmacy.

I attend and participate in professional meetings where new policies and procedures are presented. I subscribe to numerous professional and technical journals in order to remain up-to-date on FDA matters.

Regulatory Affairs Certified

**1972**   B.S. Zoology, Chemistry - University of Tennessee

## AWARDS and RECOGNITION

| | |
|---|---|
| 2010 | Excellence in Humanity Award (Rotary) |
| | Who's Who (United) |
| | Who's Who of American Women |
| 2004, 2002 | Rotarian of Year |
| 1974, 1976, 1984, 1985 | FDA Awards – Commendable Service Award, Cash Award, Commendation, Commissioner's Citation |

## ASSOCIATIONS (Current)

Food and Drug Law Institute (FDLI)
American Society of Quality Control, Society of Quality Assurance (ASQC; SQA)
Chairman VOC Committee; Education Committee

107 S. West St., PMB 730
Alexandria, VA 22314
marthabenn@aol.com

(928) 208-7180
(703) 717-9791

*Bennett and Company*

Regulatory Affairs Professionals Society (RAPS)
- 1986 Annual meeting program committee
- 1987 Chairman, Annual meeting program committee
- 1988 Chairman, Annual meeting program committee
- 1989 Vice President, Programs
Parenteral Drug Association (PDA)
International Society for Pharmaceutical Engineers (ISPE)

## PAPERS AND PRESENTATIONS

| | |
|---|---|
| 2000 - Present | Instructor, Center for Professional Advancement - Medical Device QSR |
| 2010 | SQA Quality College – Lab to Market – Product Approvals |
| 1988-1994 | Co-Director, Center for Professional Advancement – GMPs (Drugs, Devices) |
| 2008-2009 | FDA Infant Formula regulations; GMPs; validation (Nestlé, E.U.) |
| 2007 | Medical Device QSR – Philips (Medical) |
| 2006 | Deviation Control, Genetic Engineering, May 15, 2006; WebCast August 2006 |
| | Quality systems in bioanlaysis (MDS Pharma) |
| 2005 | Risk-based quality management systems (MDS Pharma) |
| | Events resolution and investigation (MDS Pharma) |
| | Pharmaceutical cGMPS (MDS Pharma) |
| | Quality systems in bioanalysis (MDS Pharma) |
| 2004 | Customer Complaint Handling (Telerx) |
| | Pharmaceutical cGMPS (Fort Dodge Animal Health) |
| | Quality Auditing, Corrective Actions (Continuing Education Conference) |
| 2003 | Equipment Qualification and Process Validation (Perfectseal) |
| | Customer Complaint Handling (Roho Group) |
| 2002 | Change Control Requirements (Client) |
| 2001 | Current Good Manufacturing Practices (Client) |
| | Validation & Part 11(Client) |
| | Technical and Development Reports (Society of Quality Assurance) |
| 2000 | How to Conduct Internal Investigations |
| | Documentation of Internal Investigations |
| 1999 | Document Control in Laboratories |
| | General Laboratory Controls (Watson Pharmaceutical) |
| | CGMPs for Laboratories (Watson Pharmaceutical) |
| | How to Conduct Failure Investigations (Watson Pharmaceutical) |
| | CGMP update (Watson Pharmaceutical) |
| 1998 | GMPs in R&D Laboratories |
| | Infant Formula GMPs (Nestlé) |
| | Technical Writing for FDA Submissions |
| 1997 | Pre-Approval Inspections – IPS |
| | Infant Formula GMPs (Nestlé) |
| 1996 | Technology Transfer - FDA Regulatory Considerations; ISPE |
| | IPS - Pre-Approval Inspection Program |
| 1995 | GMP Training Manual |
| | Drug and Device GMPs, Edison Biotech Center |
| | The Cost of Compliance, HIMA In-Vitro Diagnostic Conference |
| 1994 | A Practical Guide to Validation Documentation |

107 S. West St., PMB 730
Alexandria, VA 22314
marthabenn@aol.com

(928) 208-7180
(703) 717-9791

*Bennett and Company*

|  | Pre-Approval Inspections, ISPE Spring Meeting |
|--|--|
|  | Medical Device GMPs, Edison Biotech Center |
|  | ANDA Compliance Issues, NAPM Fall Meeting |
| 1993 | Pre-Approval Inspections, ISPE Spring Meeting |
| 1992 | Speech on GMPs, Annual Meeting, Society for Quality Assurance |
| 1991 | Speech on Responding to FD-483s, NAPM |
| 1990 | Speech on Lessons from Generic Drug Scandal, NPA |
|  | Lecturer, Chromatography & Biotechnology Conference |
| 1989 | Lecturer, Good Clinical Practices, Interpharm |
|  | RAPS workshop director and speaker GMPs and Chromatography – Washington |
|  | Chromatography Discussion Group |
| 1988 | Guest Lecturer, Florida Atlantic University |
| 1987 | Regulatory Compliance - GMPs |
|  | Guest Lecturer, Florida Atlantic University |
|  | GMPs and Separation Science, Varex Corporation |
|  | "Prepare for FDA Inspection", Medical Device and Diagnostic Industry |
| 1986 | Bits and Bytes in Regulatory Affairs, RAPS annual meeting |
| 1985 | Management of Information, FDA Action Plan I |
| 1984 | FDA Update speech for Commissioner Hayes, Pharmacy Times |

**OTHER**

**Healthcare**

| 1999-2010 | Board of Trustees, Havasu Regional Medical Center |
|--|--|
|  | - Chairman (2008-2010); Vice Chairman (2007-2008) |
|  | - Hospital Volunteer – Auxiliary (2001 – 2010) |
|  | - Quality Improvement Council (2003 - 2010) |
|  | - Physician Recruitment Committee (2005-2009); |
|  | - CEO, CNO Selection Committees (2004, 2006, 2007, 2008, 2009) |
|  | - Medical and Board By-laws Committees (2004, 2006, 2007) |
| 2002-2010 | Board of Directors, Mohave Mental Health Clinic, Inc. |
|  | - Chairman (2006- 2008), Vice Chairman (2004 – 2006) |
|  | - Quality Improvement Steering Committee (2003 - 2010) |
| 2008-2010 | Board of Directors, Hospice of Havasu |
|  | - Quality Assurance Program Initiative Committee |
|  | - Board Development Committee |
|  | - Fund-raising Committee |
|  | - Major Donor |
|  | - President (2010) |
| 2006-2010 | Lake Havasu City Waste Water Expansion Program Oversight Committee – largest sewer construction project in North America ($450M) |
| 2007 | Delegate – Arizona Governor's Strategy Session on Health Care |

**Humanitarian**

| 2001-2010 | Lake Havasu City Rotary Club |
|--|--|
|  | - Excellence in Humanity Award |
|  | - Multiple Paul Harris Fellow; Paul Harris Society |
|  | - Vocational Program Committee (2002) |

107 S. West St., PMB 730                                                                (928) 208-7180
Alexandria, VA 22314                                                                      (703) 717-9791
marthabenn@aol.com

*Bennett and Company*

- Paul Harris Foundation Coordinator (2003-Present)
- District Literacy Coordinator (2003)
- Rotary Youth Leadership Award (RYLA) Counselor (2004)
- Rotary International Major Benefactor (2004-2010)
- Rotary Foundation Bequest Society (2005-2010)
- Wheelchair Donations to Indigent in Mexico (2007)
- Various local partnerships to improve family and child lives.

**Community**

| | |
|---|---|
| 2000-2008 | Partnership for Economic Development |
| | - Chairman of Board (2005 – 2007); Vice Chair (2004-2005) |
| | - Major Donor, Committee for Business Park Development (2004-2009) |
| | - Board of Directors (2002-2008) |
| | - Marketing Committee Chair (2000-2004) |
| | - Policies & Procedures Committee Chair (2003) |
| 2001-Present | Chamber of Commerce |
| | - Various volunteer duties, as needed. |
| | - Donor golf tournament fundraisers |
| 2006 | President, Havasu 100. |
| | Delegate, Town Hall of Arizona – Public Health Needs |
| 1997-2006 | Instructor, Lake Havasu Literacy Council |
| 2006-2007 | Reading Coach, Smoketree Elementary School |
| 2006-2008 | R/UDAT Steering Committee Co-Chair; Connecting Havasu |
| 1999-2000 | Town Hall of Lake Havasu City – Board of Directors (2000); delegate (1999) |
| 1996-2000 | Western Arizona Humane Society |
| | - Vice President (2000) |
| | - Managing Director (1998 – 2000) |
| | - Board of Directors (1997 – 2000) |
| | - Volunteer (1996 – 2000) |
| | - Major Donor (196-2000) |
| 1996-2010 | Major donor or sponsor – Kiwanis Circus, LHC Film Festival, LHC Concert Series, Big Brothers Big Sisters, March of Dimes |

107 S. West St., PMB 730
Alexandria, VA 22314
marthabenn@aol.com

(928) 208-7180
(703) 717-9791

# EXHIBIT 2

**Testimony and Depositions, 2005 to Present**

| 2005 | Deposition | American Home Assurance vs. Merck about insurance claims associated with damaged drugs. |
|------|------------|------------------------------------------------------------------------------------------|
| 2008 | Deposition | KDur antitrust litigation about FDA drug approval process, including cGMPs. |
| 2008 | Deposition Trial | Arava antitrust litigation about FDA drug approval process, including cGMPs. |
| 2008 | Deposition | Nifedipine antitrust litigation about FDA drug approval process, including cGMPs. |

# EXHIBIT 3

**CD: 2nd FOIA Response Digitek Litigation**

| Title | Bates # | Description |
|---|---|---|
| 1995 Documents | 008-009 | FDA letters (1995, 1996) re batch certification. |
| Letter | | Tucker, Ellis, West FOI request. |
| Mylan Documents | MYLN 00932682-3 | Mylan email re Digitek recall. |
| Untitled 001 | | FDA sample documentation (462753) |
| Untitled 002 | | FDA sample documentation (462753) |
| Untitled 003 | | FDA sample documentation (377410) |
| Untitled 004 | | FDA sample documentation (453913) |
| Untitled 005 | | FDA sample documentation (453913) |

**CD: Golkow Technologies, Inc. In Re: Digitek Phyllis A. Lambridis January 18, 2010**

| Title | Bates # | No. of Pages | Description |
|---|---|---|---|
| | | 399 | Lambridis deposition transcript. |

**CD: EIR for 2008 inspection 5/20/08 Little Falls Inspection**

| Title | Bates # | Description |
|---|---|---|
| 5 20 08 Little Falls Inspection | ACTAV 000543001-4 | May 2008 summary of inspection close-out meeting |
| Plaintiffs Deposition Exhibit 91 | | EIR from 2008 inspection. |

**CD: 70924A Batch Record**

| Title | Bates # | Description |
|---|---|---|
| 70924A Batch Record | 000002653-000003149 | Batch record for 70924A |

**CD: In Re: Digitek Batch records 70836 and 70925**

| Title | Bates # | Description |
|---|---|---|
| Batch 70836 | | Batch record for 70836. |
| Batch 70925 | | Batch record for 70925. |

| CD: In Re: Digitek Expert Documents 04/08/10 | | |
|---|---|---|
| Title | Bates # | Description |
| Batch 60371 | ACTAV 000003992-5 | 7104.pdf Batch records |
| | ACTAV 000003996-4012 | 7105.pdf Batch records |
| | ACTAV 000004013-8 | 7106.pdf Batch records |
| | ACTAV 000004104-4117 | 14825.pdf Batch records |
| | ACTAV 000648832-3 | 263368.tif Batch records |
| Batch 70025 | ACTAV 000031027-9 | 8316.tif Batch records |
| | ACTAV 000031030-5 | 8317.tif Batch records |
| | ACTAV 000031037-53 | 8319.tif Batch records |
| | ACTAV 000031054-9 | 8320.tif Batch records |
| | ACTAV 000031170-80 | 14413.tif Batch records |
| Batch 70454 | ACTAV 000044082-8 | 10393.tif Batch records |
| | ACTAV 000044089-94 | 10394.tif Batch records |
| | ACTAV 000044095-111 | 10395.tif Batch records |
| | ACTAV 000044115-120 | 10397.tif Batch records |
| | ACTAV 000044224-34 | 15483.tif Batch records |
| Batch 70559 | ACTAV 000046613-21 | 8822.tif Batch records |
| | ACTAV 000046622-38 | 8823.tif Batch records |
| | ACTAV 000046648-53 | 8825.tif Batch records |
| | ACTAV 000046696-703 | 14597.tif Batch records |
| | ACTAV 00004779-90 | 15224.tif Batch records |
| Batch 70836 | ACTAV 000056781-8 | 10932.tif batch records |
| | ACTAV 000056789-805 | 10933.tif Batch records |
| | ACTAV 000056891-6 | 10941.tif Batch records |
| | ACTAV 000056945-56 | 15612.tif Batch records |
| Batch 80002 | 11450 | 11450.tif Batch records |
| | 11451 | 11451.tif Batch records |
| | ACTAV 001897687 | 11461.tif Batch records |
| | ACTAV 001897688 | 11462.tif Batch records |
| | ACTAV 001885282-97 | 16140.tif Batch records |
| Batch 80202 | ACTAV 001884793-805 | 16060.tif Batch records |
| | ACTAV 001900180-96 | 77000.tif Batch records |
| | 77001 | 77001.tif Batch records |
| | 77002 | 77002.tif Batch records |
| | ACTAV 001900232 | 77011.tif Batch records |
| Batch 70207 | ACTAV 000053977-84 | 9037.tif Batch records |
| | ACTAV 000053985-4001 | 9038.tif Batch records |
| | ACTAV 000054002-24 | 9039.tif Batch records |
| | ACTAV 000054025-9 | 9040.tif Batch records |
| | ACTAV 000054030-4 | 9041.tif Batch records |
| | ACTAV 000054035-48 | 9042.tif Batch records |

2

|  | ACTAV 000054049-4100 | 9043.tif Batch records |
|---|---|---|
|  | ACTAV 000054101-6 | 9044.tif Batch records |
|  | ACTAV 000054107-15 | 9045.tif Batch records |
|  | ACTAV 000054116-7 | 9046.tif Batch records |
|  | ACTAV 000054118-37 | 9047.tif Batch records |
|  | ACTAV 000054142 | 9050.tif Batch records |
|  | ACTAV 000054143-50 | 14669.tif Batch records |
|  | ACTAV 000054151-63 | 14670.tif Batch records |
|  | ACTAV 000054164-76 | 14671.tif Batch records |
|  | ACTAV 000054177-81 | 14672.tif Batch records |
|  | ACTAV 000054182-5 | 14673.tif Batch records |
|  | ACTAV 000054186-219 | 14674.tif Batch records |
|  | ACTAV 000054220-7 | 15295.tif Batch records |
|  | ACTAV 000054228-40 | 15296.tif Batch records |
|  | ACTAV 000054241-53 | 15297.tif Batch records |
|  | ACTAV 000054254-8 | 15298.tif Batch records |
|  | ACTAV 000054259-62 | 15299.tif Batch records |
|  | ACTAV 000054263-96 | 15300.tif Batch records |
|  | ACTAV 000054297-304 | 19448.tif Batch records |
|  | ACTAV 000054305-43 | 22169.tif Batch records |
|  | ACTAV 000054344-57 | 22361.tif Batch records |
|  | ACTAV 000054358-85 | 22362.tif Batch records |
|  | ACTAV 000054386-431 | 22363.tif Batch records |
|  | ACTAV 000054332-77 | 22364.tif Batch records |
|  | ACTAV 000054378 | 22365.tif Batch records |
|  | ACTAV 000054379-82 | 22366.tif Batch records |
|  | ACTAV 00005483-5 | 22367.tif Batch records |
|  | ACTAV 00005486-90 | 73063.tif Batch records |
|  | ACTAV 000054259-62 | 15299.tif Batch records |
|  | ACTAV 000054263-96 | 15300.tif Batch records |
|  | ACTAV 000054297-304 | 19448.tif Batch records |
|  | ACTAV 000054305-43 | 22169.tif Batch records |
|  | ACTAV 000054344-57 | 22361.tif Batch records |
|  | ACTAV 000054358-85 | 22362.tif Batch records |
|  | ACTAV 000054386-431 | 22363.tif Batch records |
|  | ACTAV 000054332-77 | 22364.tif Batch records |
|  | ACTAV 000054378 | 22365.tif Batch records |
| Batch 70836 | ACTAV 000056781-8 | 10932.tif Batch records |
|  | ACTAV 000056789-05 | 10933.tif Batch records |
|  | ACTAV 000056806-19 | 10934.tif Batch records |
|  | ACTAV 000056820-33 | 10935.tif Batch records |
|  | ACTAV 000056834-48 | 10936.tif Batch records |
|  | ACTAV 000056849-66 | 10937.tif Batch records |
|  | ACTAV 000056867-77 | 10938.tif Batch records |

3

| | | |
|---|---|---|
| | ACTAV 000056878-82 | 10939.tif Batch records |
| | ACTAV 000056883-90 | 10940.tif Batch records |
| | ACTAV 000056891-96 | 10941.tif Batch records |
| | ACTAV 000056897-900 | 10942.tif Batch records |
| | ACTAV 000056901-4 | 10943.tif Batch records |
| | ACTAV 000056905-6 | 10944.tif Batch records |
| | ACTAV 000056907-19 | 10945.tif Batch records |
| | ACTAV 000056920-30 | 10946.tif Batch records |
| | ACTAV 000056931-4 | 10947.tif Batch records |
| | ACTAV 000056935 | 10948.tif Batch records |
| | ACTAV 000056936-44 | 15611.tif Batch records |
| | ACTAV 000056945-56 | 15612.tif Batch records |
| | ACTAV 000056957-69 | 15613.tif Batch records |
| | ACTAV 000056970-74 | 15614.tif Batch records |
| | ACTAV 000056975-8 | 15615.tif Batch records |
| | ACTAV 000056979-7012 | 15616.tif Batch records |
| | ACTAV 000057013 | 15617.tif Batch records |
| | ACTAV 000057014-20 | 22193.tif Batch records |
| | ACTAV 000057021 | 22194.tif Batch records |
| | ACTAV 000057022-49 | 22195.tif Batch records |
| | ACTAV 000057050-53 | 22197.tif Batch records |
| | ACTAV 000057054-81 | 22198.tif Batch records |
| | ACTAV 000057082-5 | 22200.tif Batch records |
| | ACTAV 000057086-138 | 22964.tif Batch records |
| Batch 70925 | ACTAV 000057139-46 | 9071.tif Batch records |
| | ACTAV 000057147-63 | 9072.tif Batch records |
| | ACTAV 000057164-75 | 9073.tif Batch records |
| | ACTAV 000057176-91 | 9074.tif Batch records |
| | ACTAV 000057192-207 | 9075.tif Batch records |
| | ACTAV 000057208-27 | 9076.tif Batch records |
| | ACTAV 000057228-41 | 9077.tif Batch records |
| | ACTAV 000057242-7 | 9078.tif Batch records |
| | ACTAV 000057248-51 | 9079.tif Batch records |
| | ACTAV 000057252-7 | 9080.tif Batch records |
| | ACTAV 000057258-63 | 9081.tif Batch records |
| | ACTAV 000057264-8 | 9082.tif Batch records |
| | ACTAV 000057269-72 | 9083.tif Batch records |
| | ACTAV 000057273-4 | 9084.tif Batch records |
| | ACTAV 000057275-80 | 9085.tif Batch records |
| | ACTAV 000057281-2 | 9086.tif Batch records |
| | ACTAV 000057283-92 | 9087.tif Batch records |
| | ACTAV 000057294-309 | 9088.tif Batch records |
| | ACTAV 000057310 | 9089.tif Batch records |
| | ACTAV 000057311 | 9090.tif Batch records |

|  | ACTAV 000057312 | 9091.tif Batch records |
|---|---|---|
|  | ACTAV 000057313-6 | 9092.tif Batch records |
|  | ACTAV 000057317-24 | 15322.tif Batch records |
|  | ACTAV 000057325-34 | 15323.tif Batch records |
|  | ACTAV 000057335-42 | 15324.tif Batch records |
|  | ACTAV 000057343-7 | 15325.tif Batch records |
|  | ACTAV 000057348-52 | 15326.tif Batch records |
|  | ACTAV 000057353-6 | 15327.tif Batch records |
|  | ACTAV 000057357-90 | 15328.tif Batch records |
|  | ACTAV 000057391 | 15329.tif Batch records |
|  | ACTAV 000057392-7 | 18231.tif Batch records |
|  | ACTAV 000057398-401 | 22383.tif Batch records |
|  | ACTAV 000057402-4 | 22384.tif Batch records |
|  | ACTAV 000057405-6 | 22386.tif Batch records |
|  | ACTAV 000057407 | 22387.tif Batch records |
|  | ACTAV 000057408-17 | 22388.tif Batch records |
|  | ACTAV 000057418 | 22389.tif Batch records |
|  | ACTAV 000057419 | 22390.tif Batch records |
|  | ACTAV 000057420-63 | 22394.tif Batch records |
|  | ACTAV 000057464-5 | 22399.tif Batch records |
|  | ACTAV 000057466 | 41549.tif Batch records |
| Batch 60777 | ACTAV 000020406-9 | 7410.tif Batch records |
|  | ACTAV 000020410-26 | 7411.tif Batch records |
|  | ACTAV 000020427-32 | 14951.tif Batch records |
|  | ACTAV 000020666-7 | 25781.tif Batch records |
| Batch 60994 | ACTAV 000024355-9 | 7532.tif Batch records |
|  | ACTAV 000024360-76 | 7533.tif Batch records |
|  | ACTAV 000024377 | 7534.tif Batch records |
|  | ACTAV 000024438-43 | 7541.tif Batch records |
|  | ACTAV 000024493-502 | 15012.tif Batch records |

| CD: Selected Standard Operating Procedures (Actavis Totowa) (Martha Bennett) | | |
|---|---|---|
| **Title** | **Bates #** | **Description (SOPs)** |
| 455917 | ACTAV 000063065-74 | AR-018 |
| 455929 | ACTAV 000063170-3 | PKG-002 |
| 455930 | ACTAV 000063174-7 | PKG-003 |
| 455931 | ACTAV 000063178-83 | PKG-004 |
| 455932 | ACTAV 000063184-6 | PKG-005 |
| 455941 | ACTAV 000063220-3 | PRD-001 |
| 455942 | ACTAV 000063224-7 | PRD-002 |
| 455946 | ACTAV 000063238-41 | PRD006 |
| 455958 | ACTAV 000063281-8 | PRD-022 |
| 455950 | ACTAV 000063294-9 | PRD-024 |

| 455981 | ACTAV 000063336-73 | PRD-062 |
| 455983 | ACTAV 000063374-8 | PRD-063 |
| 455986 | ACTAV 000063381-5 | PRD-065 |
| 455988 | ACTAV 000063393-5 | PRD-073 |
| 455989 | ACTAV 000063398-401 | PRD-076 |
| 455993 | ACTAV 000063402-4 | PRD-077 |
| 455994 | ACTAV 000063416-22 | PRD-084 |
| 455996 | ACTAV 000063423-6 | PRD-085 |
| 456004 | ACTAV 000063431-3 | PRD-087 |
| 456010 | ACTAV 000063458-60 | PRD-106 |
| 456011 | ACTAV 000063472-5 | PRD-117 |
| 456012 | ACTAV 000063476-9 | PRD-118 |
| 456026 | ACTAV 000063480-83 | PRD-119 |
| 456027 | ACTAV 000063527-31 | PRD-145 |
| 456030 | ACTAV 000063532-4 | PRD-147 |
| 456032 | ACTAV 000063542-4 | PRD-150 |
| 456048 | ACTAV 000063548-52 | PRD-154 |
| 456069 | ACTAV 000063606-11 | PRD-186 |
| 456092 | ACTAV 000063713-6 | PRD-219 |
| 456095 | ACTAV 000063803-7 | PRD-247 |
| 456108 | ACTAV 000063812-4 | PRD-250 |
| 456116 | ACTAV 000063867-70 | PRD-270 |
| 456118 | ACTAV 000063900-3 | QA-003 |
| 456119 | ACTAV 000063909-11 | QA-015 |
| 456121 | ACTAV 000063912-5 | QA-016 |
| 456122 | ACTAV 000063922-6 | QA-019 |
| 456129 | ACTAV 000063927-34 | QA-020 |
| 456131 | ACTAV 000063958-60 | QA-033 |
| 456134 | ACTAV 000063964-71 | QA-042 |
| 456146 | ACTAV 000063985-90 | QA-045 |
| 456147 | ACTAV 000064039-41 | QA-064 |
| 456149 | ACTAV 000064042-8 | QA-065 |
| 456170 | ACTAV 000064053-62 | QC-123 |
| 456184 | ACTAV 000064220-6 | QC-029 |
| 456206 | ACTAV 000064313-31 | QC-059 |
| 456254 | ACTAV 000064435-42 | QC-106 |
| 456271 | ACTAV 000064733-6 | QC-155L |
| 456282 | ACTAV 000064852-8 | QC-171 |
| 456284 | ACTAV 000064932-3 | RA-007 |
| 456294 | ACTAV 000064940-6 | RA-021 |
| 456307 | ACTAV 000065016-21 | SOP-0014 |
| 456308 | ACTAV 000065090-3 | SOP-0030 |
| 456310 | ACTAV 000065094-100 | SOP-0033 |
| 456311 | ACTAV 000065105-12 | SOP-0033 |
| 456312 | ACTAV 000065113-21 | SOP-0034 |

| 456318 | ACTAV 000065122-25 | SOP-0035 |
| 456323 | ACTAV 000065156-9 | SOP-0043 |
| 456328 | ACTAV 000065174-83 | SOP-0048 |
| 456329 | ACTAV 000065206-16 | SOP-0055 |
| 456336 | ACTAV 000065217-27 | SOP-0056 |
| 456337 | ACTAV 000065254-8 | SOP-0063 |
| 456343 | ACTAV 000065259-65 | SOP-0064 |
| 456346 | ACTAV 000065296-9 | SOP-0070 |
| 456350 | ACTAV 000065313-7 | SOP-0074 |
| 456353 | ACTAV 000065331-8 | SOP-0080 |
| 456354 | ACTAV 000065353-7 | SOP-0084 |
| 584864 | ACTAV 000065358-61 | SOP-0085 |
| 584866 | ACTAV 000065391-4 | SOP-0079 |

| CD: Annual Reports 2003-2007 Part I of II | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| | | Digitek Annual Reports 2003-2007 |

| CD: Annual Reports 2003-2007 Part II of II | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| | | Digitek Annual Reports 2003-2007 |

| CD: In re: Digitek Litigation Bitler & Dowling Transcripts and Recall Package | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| 41561 | ACTAV 000028178-222 | Recall package |
| Bitler, Daniel depo | | Deposition w/exhibits |
| Downling, Richard depo | | Deposition w/exhibits |

| CD: In re: Digitek Litigation Bitler & Dowling Transcripts and Recall Package | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| | ACTAV 000005658-86 | 2003 |
| | ACTAV 000006027-41 | 2004 |
| | ACTAV 000006146-200 | 2005 |
| | ACTAV 000006437-83 | 2006 |
| | ACTAV 000006509-6541 | 2007 |

| | None | 2008 |
|---|---|---|
| | ACTAV 000002576-622 | Investigation |
| | None | Recall Firm Press Release |

| CD: Annual Data reviews 2003-2008; Bitler Rpt; Recall Notice; July 2009 FDA Statement | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| Digitek Annual Data Reviews 2003-2008 | | |
| Bitler Report | | |
| Recall Notice | | |
| July 2009 FDA Statement | | |

| CD: FDA Documents 12/2009 | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| | | From notebooks with tabs |

| CD: In Re: Digitek Batch Records 701848, 80226 and 80228, 474 Test Results 448892 and 454866 | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| **80226** | | Batch records |
| 11375 | 11375 | Batch records |
| 11377 | 11377 | Batch records |
| 11379 | 11379 | Batch records |
| 11380 | 11380 | Batch records |
| 11381 | 11381 | Batch records |
| 11382 | 11382 | Batch records |
| 11383 | 11383 | Batch records |
| 11384 | 11384 | Batch records |
| 11385 | 11385 | Batch records |
| 11386 | 11386 | Batch records |
| 11387 | 11387 | Batch records |
| 11388 | 11388 | Batch records |
| 11389 | 11389 | Batch records |
| 11390 | 11390 | Batch records |
| 11391 | 11391 | Batch records |
| 11392 | 11392 | Batch records |
| 11393 | 11393 | Batch records |

8

| | | |
|---|---|---|
| 11394 | 11394 | Batch records |
| 11395 | 11395 | Batch records |
| 11396 | 11396 | Batch records |
| 11397 | 11397 | Batch records |
| 11398 | 11398 | Batch records |
| 11399 | 11399 | Batch records |
| 11400 | 11400 | Batch records |
| 11401 | 11401 | Batch records |
| 11402 | 11402 | Batch records |
| 11403 | 11403 | Batch records |
| 11404 | 11404 | Batch records |
| 15388 | ACTAV 001883966-8 | Batch records |
| 16105 | ACTAV 001885081-6 | Batch records |
| 16106 | ACTAV 001885087-99 | Batch records |
| 16107 | ACTAV 001885100-4 | Batch records |
| 19551 | 19551 | Batch records |
| 22707 | 22707 | Batch records |
| 22709 | 22709 | Batch records |
| 22710 | 22710 | Batch records |
| 22711 | 22711 | Batch records |
| 22712 | 22712 | Batch records |
| 22713 | 22713 | Batch records |
| 22714 | 22714 | Batch records |
| 22715 | 22715 | Batch records |
| 22903 | ACTAV 000029968-30024 | Batch records |
| 22924 | ACTAV 000003022-3101 | Batch records |
| 22952 | ACTAV 000061373-427 | Batch records |
| 22980 | 22980 | Batch records |
| 77039 | 77039 | Batch records |
| 77040 | 77040 | Batch records |
| 77042 | 77042 | Batch records |
| 77044 | 77044 | Batch records |
| 77045 | 77045 | Batch records |
| 77048 | 77048 | Batch records |
| 77049 | 77049 | Batch records |
| 77052 | 77052 | Batch records |
| 77053 | 77053 | Batch records |
| 77054 | 77054 | Batch records |
| 77055 | 77055 | Batch records |
| 77056 | 77056 | Batch records |
| 77057 | 77057 | Batch records |
| 000292567 | ACTAV 000292567 | Batch records |
| 0001442391 | ACTAV 0001442391 | Batch records |
| | | |

| 80228 | | |
|---|---|---|
| 11427 | 11427 | Batch records |
| 11428 | 11428 | Batch records |
| 11429 | 11429 | Batch records |
| 11430 | 11430 | Batch records |
| 11431 | 11431 | Batch records |
| 11432 | 11432 | Batch records |
| 11433 | 11433 | Batch records |
| 11435 | 11435 | Batch records |
| 11436 | 11436 | Batch records |
| 11437 | 11437 | Batch records |
| 11438 | 11438 | Batch records |
| 11439 | 11439 | Batch records |
| 11440 | 11440 | Batch records |
| 11441 | 11441 | Batch records |
| 11442 | 11442 | Batch records |
| 11443 | 11443 | Batch records |
| 11444 | 11444 | Batch records |
| 11445 | 11445 | Batch records |
| 16133 | 16133 | Batch records |
| 16134 | 16134 | Batch records |
| 16135 | 16135 | Batch records |
| 22721 | 22721 | Batch records |
| 22728 | 22728 | Batch records |
| 22729 | 22729 | Batch records |
| 22732 | 22732 | Batch records |
| 22733 | 22733 | Batch records |
| 22735 | 22735 | Batch records |
| 22962 | 22962 | Batch records |
| 22985 | 22985 | Batch records |
| 75252 | 75252 | Batch records |
| 77082 | 77082 | Batch records |
| 77083 | 77083 | Batch records |
| 77084 | 77084 | Batch records |
| 77085 | 77085 | Batch records |
| 77087 | 77087 | Batch records |
| 77089 | 77089 | Batch records |
| 77090 | 77090 | Batch records |
| 77092 | 77092 | Batch records |
| 77100 | 77100 | Batch records |
| 84683 | 84683 | Batch records |
| 343825 | 343825 | Batch records |
| 437164 | 437164 | Batch records |
| 493948 | 493948 | Batch records |
| 2416000 | 2416000 | Batch records |

| | | |
|---|---|---|
| ACTAV 001374256 | ACTAV 001374256 | Batch records |
| ACTAV 001883966 | ACTAV 001883966-8 | Batch records |
| ACTAV 001885188 | ACTAV 001885188-95 | Batch records |
| ACTAV 001885250 | ACTAV 001885250-55 | Batch records |
| ACTAV 001885256 | ACTAV 001885256-61 | Batch records |
| ACTAV 001885262 | ACTAV 001885262-69 | Batch records |
| ACTAV 001900529 | ACTAV 001900529 | Batch records |
| | | |
| **448892** | | |
| 00000001-62 | NONE | FDA sample records |
| | | |
| **454866** | | |
| 00000063-119 | NONE | FDA sample records |
| | | |
| **70148** | | Batch Records |
| 8548 | 8548 | Batch Records |
| 8549 | 8549 | Batch Records |
| 8550 | 8550 | Batch Records |
| 8551 | 8551 | Batch Records |
| 8552 | 8552 | Batch Records |
| 8553 | 8553 | Batch Records |
| 8554 | 8554 | Batch Records |
| 8555 | 8555 | Batch Records |
| 8556 | ACTAV 001897236-252 | Batch Records |
| 8557 | 8557 | Batch Records |
| 8558 | 8558 | Batch Records |
| 8559 | 8559 | Batch Records |
| 8560 | 8560 | Batch Records |
| 8561 | 8561 | Batch Records |
| 8562 | 8562 | Batch Records |
| 8563 | 8563 | Batch Records |
| 14501 | ACTAV 001883117-143 | Batch Records |
| 14502 | ACTAV 001883135-8 | Batch Records |
| 14503 | ACTAV 001883139-51 | Batch Records |
| 14504 | ACTAV 001883152 | Batch Records |
| 15127 | ACTAV 001883930-47 | Batch Records |
| 15128 | ACTAV 001883948-51 | Batch Records |
| 15129 | ACTAV 001883952-64 | Batch Records |
| 15131 | 15131 | Batch Records |
| 15132 | 15132 | Batch Records |
| 19436 | ACTAV 000030886-903 | Batch Records |
| 19449 | ACTAV 000037280-99 | Batch Records |
| 21720 | 21720 | Batch Records |
| 21721 | 21721 | Batch Records |
| 21722 | 21722 | Batch Records |

| | | |
|---|---|---|
| 21723 | ACTAV 000041909-49 | Batch Records |
| 21724 | ACTAV 000041950-72 | Batch Records |
| 21725 | 21725 | Batch Records |
| 21727 | 21727 | Batch Records |
| 21728 | 21728 | Batch Records |
| 21729 | ACTAV 000037360-400 | Batch Records |
| 21730 | 21730 | Batch Records |
| 21731 | ACTAV 000037401-6 | Batch Records |
| 21732 | ACTAV 000041973 | Batch Records |
| 21733 | 21733 | Batch Records |
| 21734 | 21734 | Batch Records |
| 21736 | 21736 | Batch Records |
| 21737 | 21737 | Batch Records |
| 38552 | ACTAV 000013235-511 | Batch Records |
| 39578 | ACTAV 000038601-43 | Batch Records |
| 73315 | 73315 | Batch Records |
| 75264 | 75264 | Batch Records |
| 208124 | 208124 | Batch Records |
| | | |
| **Potentially Privileged** | | |
| 16091 | 16091 | Batch reject form |
| 19438 | 19438 | Investigation log |
| 1603430 | 1603430 | Finished product release |
| | | |
| | | |
| | | |

| CD: Digitek Litigation 6-18-2010 ANDA (Production Version) | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| ANDA I-III | ACTAV 000000709-2111 | |
| | | |
| | | |

| CD: Digitek Litigation Stability Studies – recalled Batches 05/25/2010 | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| Batch 60319 | ACTAV 000006929-7146 | |
| Batch 70023 | ACTAV 000029867-966 | |
| Batch 70078 | ACTAV 000032708-3255 | |
| | ACTAV 000650898-902 | |
| | ACTAV 000977125-131 | |
| Batch 70081 | ACTAV 000033217-255 | |
| Batch 70174 | ACTAV 000650982-4 | |
| Batch 70670 | ACTAV 000049348-93 | |

| | | |
|---|---|---|
| Batch 80133 | ACTAV 001690549-64 | |
| Batch 71049-71050-710501 | ACTAV 001690580-604 | |
| Finished Product Stability Test report 146 | ACTAV 000065607-9 | |

| CD: Digitek Litigation 6-18-2010 ANDA (Production Version) | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| ANDA I-III | ACTAV 000000709-2111 | |
| | | |

| CD: Digitek Litigation (8) Folders containing... 3rd party testing; pre-recall docs; tabs 6-11 plaintiff's potential deposition | | |
|---|---|---|
| **Title** | **Bates #** | **Description** |
| 3rd party testing | UDLL 000011679-769 | Celsis documents |
| | | Digitek chart recalled batches |
| | | Gibraltar documents |
| | 74521 | QRS Protocol |
| | ACTAV 001867195-224 | Quantic Docs |
| | | Radtke depo transcript |
| 2008 pre-recall MedWatch & product complaints | | 2008 Pre-recall MedWatch Rpts recd 3-10-10 |
| | | 2008 Pre-recall MedWatch Complaint Forms recv 3-10-10 |
| Tab 6 | Plaintiffs ex 107 | |
| | Plaintiffs ex 125 | |
| | Plaintiffs ex 138 | |
| Tab 7 | Plaintiffs ex 128 | Double thick tablet Field Alert |
| Tab 8 | ACTAV 000028850-29378 | Response to Oct 2006 inspection |
| | 75911 | |
| | 144053 | |
| | 538415 | |
| | 72795 | |
| Tab 9 | ACTAV 000165623-30 | Blend failure |
| | ACTAV 001423286-8 | |
| Tab 10 | Plaintiffs ex 129 | |
| Tab 11 | Plaintiffs ex 141 | |

|  | Plaintiffs ex 142 |  |
|--|-------------------|--|
|  | Plaintiffs ex 144 |  |
|  | Plaintiffs ex 145 |  |