# EXHIBIT 44

# In Re:
*Digitek*

*Liana Radtke*
*January 26, 2010*
*Confidential – Subject to Further Confidentiality Review*

## GOLKOW TECHNOLOGIES, INC.
*Excellence In Court Reporting For Over 20 Years*
*877.370.3377*
*deps@golkow.com*

Original File lr012610.txt
Min-U-Script®



Liana Radtke
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  DIGITEK PRODUCTS: MDL NO.
LIABILITY LITIGATION    : 1968

(This document relates to all cases.)
------------------------------------------------------
CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

IN THE CIRCUIT COURT OF KANAWHA COUNTY,
WEST VIRGINIA

IN RE: DIGITEK LITIGATION
Civil Action No. 08-C-5555

THIS DOCUMENT APPLIES TO:
Diana L. Adkins v.            No. 09-C-40 KAND
Mylan Pharmaceuticals, Inc.,
et al.
Thomas Beveridge v.          No. 08-C-273 OHI
Mylan Pharmaceuticals, Inc.,
et al.
Carl Brown v.                No. 09-C-123 NIC
Mylan Pharmaceuticals, Inc.,
et al.
Elizabeth Byus v.            No. 08-C-1954 KAN
Mylan Pharmaceuticals, Inc.,
et al.
James R. Christian v.        No. 09-C-292 MON
Mylan Pharmaceuticals, Inc.,
et al.
John Anthony Conte v.        No. 08-C-1995 KAN
Mylan pharmaceuticals, Inc.,
et al.
Martha Florence Guy, POA v.  No. 08-C-303 OHI
Mylan Pharmaceuticals, Inc.,
et al.
Claude E. Jarrell v.         No. 09-C-512 KAN
Actavis Group, et al.

(Caption Continued)

THE DEPOSITION OF LIANA RADTKE
JANUARY 26, 2010

Liana Radtke
Confidential – Subject to Further Confidentiality Review

2

1   Bobbi J. Myers v.                    No. 08-C-999 KAN
    Mylan Pharmaceuticals, Inc.,
2   et al.
    Melvin L. Pennington,                No. 08-C-172 PNM
3   et ux. v. Mylan Pharmaceuticals,
    Inc., et al.
4   Lola Jean Smith, et us. v.           No. 08-C-1069 KAN
    Mylan Pharmaceuticals, Inc.,
5   et al.
    Russell A. Wells v.                  No. 09-C-003 NIC
6   Mylan Pharmaceuticals, Inc.,
    et al.

7

8            The deposition of LIANA RADTKE, called

9   for examination, taken pursuant to the Federal

10  Rules of Civil Procedure of the United States

11  District Courts pertaining to the taking of

12  depositions, taken before JULIANA F. ZAJICEK, CSR

13  No. 84-2604, a Notary Public within and for the

14  County of Kane, State of Illinois, and a Certified

15  Shorthand Reporter of said state, at the offices of

16  Segal McCambridge Singer & Mahoney, Ltd., Suite

17  5500, 233 South Wacker Drive, Chicago, Illinois, on

18  January 26, 2010, at 9:00 a.m.

19

20

21

22

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

3

1      PRESENT:

2            SANFORD BARLOW LLP,
             BY:  ANTHONY C. COVENY, PH.D., ESQ.
3            1500 McGowen, Suite 250,
             Houston, Texas 77004,
4            713-524-6677
             acoveny@SanfordBarlow.com
5            Counsel for Plaintiffs and Plaintiffs'
             Steering Committee
6
             LAW OFFICES OF MICHAEL F. COLEY & ASSOCIATES
7            BY:  MICHAEL F. COLEY, ESQ.
             1201 Dove Street, Suite 220,
8            Newport Beach, California 92660
             949-955-0700
9            m-law@att.net
             Counsel for Plaintiff Connie Quinn
10
             TUCKER ELLIS & WEST LLP
11           BY:  EDWARD E. TABER, ESQ.
             1150 Huntington Building
12           925 Euclid Avenue
             Cleveland, Ohio 44115-1414
13           216-696-2365
             edward.taber@tuckerellis.com
14           Counsel for Actavis Defendants

15           SHOOK HARDY & BACON L.L.P.
             BY:  HARVEY L. KAPLAN, ESQ.
16           2555 Grand Boulevard
             Kansas City, Missouri 64108-2613
17           816-474-6550
             hkaplan@shb.com
18           Counsel for Mylan Defendants

19           ALLEN GUTHRIE & THOMAS, PLLC
             BY:  JAMES S. ARNOLD, ESQ.
20           500 Lee Street, East, Suite 800
             Charleston, West Virginia 25301
21           304-720-4225
             jsarnold@agmtlaw.com
22           Counsel for West Virginia Actavis Defendants

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

4

1     VIDEOTAPED BY:

2          MR. ANTHONY MICHELETTO,

3            Golkow Technologies, Inc.

4

5

6     REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.

7                  CERTIFICATE NO. 84-2604.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

5

1          THE VIDEOGRAPHER:  We are now on the record.

2     My name is Anthony Micheletto.  I am the

3     videographer for Golkow Technologies.

4               Today's date is January 26th, 2010.  The

5     time is 9:01 a.m. as indicated on the video screen.

6     This video deposition is being held in Chicago,

7     Illinois, in the matter of In Re Digitek Products

8     Liability Litigation for the court of United States

9     District Court for the Southern District of West

10    Virginia.  The deponent is Liana Radtke.

11              Counsel, please introduce yourselves for

12    the video record.

13         MR. COVENY:  I am Tony Coveny representing

14    various Plaintiffs in the MDL.

15         MR. COLEY:  Michael Coley, and I represent the

16    Quinn family.

17         MR. ARNOLD:  Jim Arnold, West Virginia local

18    counsel for all Defendants.

19         MR. KAPLAN:  My name is Harvey Kaplan with

20    Shook, Hardy & Bacon.  I represent the Defendant

21    Mylan.

22         THE VIDEOGRAPHER:  The court reporter today is

23    Juliana Zajicek.  Please swear in the witness.

24                    (WHEREUPON, the witness was duly

Liana Radtke
Confidential – Subject to Further Confidentiality Review

6

1                    sworn.)

2          THE VIDEOGRAPHER:  You may proceed.

3                    LIANA RADTKE,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                    EXAMINATION

7    BY MR. COVENY:

8          Q.    Good morning, Ms. Radtke.

9          A.    Good morning.

10         Q.    And how are you this fine day.

11               First off, I'd like to ask you, how did

12   you prepare for today's deposition?  Who did you

13   speak to and did you review any documents?

14         A.    I -- about two weeks ago I met with

15   Erica Downey to indicate that I would be deposed in

16   a couple of weeks and then yesterday I met with

17   Mr. Kaplan.  And, no, I did not review any

18   documents.

19         Q.    Okay.  Would you please for the record

20   give us a bit of your education background

21   preparing yourself for the position you currently

22   hold?

23         A.    Okay.  I have a bachelor's degree in

24   education.  I was an English teacher.  And

Liana Radtke
Confidential – Subject to Further Confidentiality Review

7

1    approximately close to 25 years ago I began my

2    employment at UDL Laboratories and started out in

3    various positions until to the position that I hold

4    today.

5         Q.   Okay.  Did you work in the area of

6    pharmacy -- it appears you say -- said no, you did

7    not work in pharmacy before going to UDL?

8         A.   No, no.

9         Q.   Is the primary basis of your current

10   position then work experience?

11        A.   Yes.

12        Q.   Okay.  Is there any specialized training

13   to hold the position that you have now, any

14   particular certificates, any particular

15   certifications that are required?

16        A.   No.  I belong to RAPS, but --

17        Q.   Which is?

18        A.   Regulatory Affairs Professional Society.

19        Q.   Okay.  All right.  What positions have

20   you held at UDL prior to your current position?

21        A.   I started out at -- with just the

22   stability program where we were testing and then I

23   worked in government contracts for a short time and

24   then I assumed my position of regulatory affairs

Liana Radtke
Confidential – Subject to Further Confidentiality Review

8

1    compliance, which is the position I assume today.

2          Q.    Okay.  Would you say that that's

3    standard in your experience across the board in the

4    industry, that people that work in regulatory

5    affairs, it's primarily on-the-job training?

6          A.    I really can't respond to that.  I

7    don't -- I can't respond to that.

8          Q.    Okay.  That's just your personal one?

9          A.    Yes, um-hum.

10         Q.    Okay.  All right.  If you don't mind,

11   I'm going to take just a moment to go over the

12   relationship between UDL, Mylan.  I have right

13   here --

14         MR. COVENY:  And, counsel, I'll provide you

15   with the UDL Laboratory management.

16   BY MR. COVENY:

17         Q.    This is Mylan 35607, which I believe is

18   already in an exhibit, but for today -- I received

19   a text.  I believe we are starting with M42 in

20   terms of exhibits.  They weren't quite certain if

21   they were updated, so we are going to go ahead and

22   start with M42 for exhibits, and we'll go ahead and

23   put this in in case it's not in.

24               I'm going to go ahead and hand you --

Liana Radtke
Confidential – Subject to Further Confidentiality Review

9

1          A.     Okay.

2          Q.     -- Ms. Radtke, the --

3          MR. COVENY:  And other counsel, do you prefer

4     that I put this up on the screen just so you can

5     see what we are referring to?  It may have some of

6     my own writing on it, not much, but -- let's see if

7     we can get that into focus.  I guess we can read

8     that pretty well.

9                      (WHEREUPON, a certain document was

10                      marked Deposition Exhibit No. M42,

11                      for identification, as of 1/26/10.)

12    BY MR. COVENY:

13         Q.     Ms. Radtke, you currently work for UDL

14    Laboratories and have for 25 years?

15         A.     It will be 25 years in July, yes.

16         Q.     Okay.  Are you an employee of Mylan

17    then?

18         A.     I am an employee of UDL and we are owned

19    by Mylan, Inc.

20         Q.     Okay.  I noticed on this one here, do

21    you answer directly to Louis Debone in your -- in

22    your job as federal regulatory affair?

23         A.     No.

24         Q.     Okay.  Do you answer to anyone at Mylan

Liana Radtke
Confidential – Subject to Further Confidentiality Review

10

1    directly or do you stick strictly with UDL?

2         A.    No.  I have -- my direct record is to

3    UDL.

4         Q.    Okay.  I noticed across from you is Sue

5    Powers, director of quality assurance.

6              Could you explain to me a little bit

7    about the difference between your job as director

8    of regulatory affairs and compliance and how you

9    understand her job as director of quality

10   assurance?

11        A.    Okay.  Sue is in charge of quality

12   insurance receiving, and she is also in charge of

13   quality assurance in process.  The validation

14   department reports to her and label control.

15        Q.    Okay.  And so she is in charge of making

16   sure that the product is up to standard at all

17   times from the time it's received?

18        A.    Yes.

19        Q.    To the time that you then send it out?

20        A.    Yes.

21        Q.    How does that differ from your job?

22        A.    I -- my particular position we take care

23   of the stability program.

24        Q.    Could you explain that for a moment?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

11

1          A.    Yes.   Okay.   Before we can market a

2     product, we have to put it in the packaging

3     material that we would commercialize it in.   It's

4     sent out for testing per the USP, and it must

5     conform to all of its specifications in order for

6     us to assign an expiration date.   And once it's in

7     the line, we have a continuing program to continue

8     to support the expiration date of the product.

9          Q.    Okay.   So, both Ms. Powers and yourself

10    are in charge of the process but different aspects

11    of the process?

12         A.    That's correct.

13         Q.    How much of the product is sampled when

14    you say you test it?   You receive product obviously

15    from Actavis?

16         A.    We receive this product directly from

17    Mylan and --

18         Q.    Okay.

19         A.    -- under the Mylan label.

20         Q.    Okay.   And when you receive -- so, you

21    don't receive any product directly from Actavis?

22         A.    We -- currently?   No.

23         Q.    No, no, no.   In the past.

24         A.    In the past, we -- this is with regard

Liana Radtke
Confidential – Subject to Further Confidentiality Review

12

1    to Digitek?

2         Q.    With regard to Digitek.

3         A.    No.  We would receive -- we received all

4    of that through Mylan Pharmaceutical.

5         Q.    Okay.  So, are you aware of the fact

6    that it went from Actavis to Mylan and then to you?

7                    (WHEREUPON, Mr. Edward E. Taber

8                     entered the deposition

9                     proceedings.)

10   BY THE WITNESS:

11        A.    Yes.

12   BY MR. COVENY:

13        Q.    Was the testing of the product then done

14   at Mylan prior to coming to you or did you continue

15   to test product at UDL?

16        A.    Test it -- could you clarify what you

17   mean by test?

18        Q.    You said that during part of the

19   stability program you would test the product?

20        A.    Well, when you put it into the

21   blister -- in your packaging configuration, you are

22   required to support your expiration date.  So we

23   would have -- it was a sample lot that we would

24   send out for testing each year.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

13

1        MR. COVENY:  Just a moment.  Mr. Taber?

2        MR. TABER:  Yes.

3        MR. COVENY:  Mr. Taber has just joined us.

4    BY MR. COVENY:

5        Q.    On page 12 of the document that I handed

6    you --

7        MR. TABER:  Counsel, do you have an extra copy

8    of the exhibits?

9        MR. COVENY:  Just right here and we have --

10   I've put them up on the screens right here.  You

11   can either look on with Mr. Kaplan or we can get

12   you a -- turn a monitor around for you if it would

13   be easier for you.

14       MR. TABER:  Yeah, that would be great, if I

15   could see that as well.

16       MR. COVENY:  Just a moment here.  We are going

17   to turn my monitor around since I can see it.

18   We'll see how far this monitor will reach.

19                  (WHEREUPON, there was a short

20                   interruption.)

21   BY MR. COVENY:

22       Q.    Ms. Radtke, then you answer to Vince

23   Mancinelli, is that correct?

24       A.    No.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

14

1        Q.    Okay.  According to this on page 12, you
2    are underneath him.  Who do you report directly to
3    then?
4        A.    Jodi Eichelberger.
5        Q.    Jodi Eichelberger, okay.
6              And is she somewhere on this
7    organizational chart that you are aware of?  Did
8    you see her on page 1 or --
9        A.    No.
10       Q.    Okay.  And do you know what her position
11   then is?
12       A.    She is vice president, general manager
13   of UDL Laboratories.
14       Q.    Okay.  All right.  So when -- during the
15   time period in question when you were receiving
16   Digitek, it was coming to you from Mylan?
17       A.    Correct.
18       Q.    Your job was packaging it and
19   distributing it?
20       A.    And to distribute those.
21       Q.    You sent samples out to be tested?
22       A.    Yes.
23       Q.    How many samples of each batch would be
24   sent out, do you recall?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

15

1          A.    I can't give you a specific number.  I
2     don't have that on the top of my head.
3          Q.    Okay.  But every batch was tested?
4          A.    No, not stability testing.
5          Q.    Okay.  Okay.
6          A.    Okay.
7          Q.    I'm going to put up another document up
8     here on the screen.  This is document 191569.  And
9     I am going to give you a copy of it here.  This
10    will be Exhibit --
11          MR. COVENY:  44 or 45 now?
12          THE COURT REPORTER:  43.
13    BY MR. COVENY:
14          Q.    -- 43, M43.  And, again, I believe this
15    is where they left off of these depositions.  They
16    are moving rather quickly in order.
17                      (WHEREUPON, a certain document was
18                       marked Deposition Exhibit No. M43,
19                       for identification, as of 1/26/10.)
20    BY MR. COVENY:
21          Q.    This right here is a confidentiality
22    agreement between UDL and Actavis dated 2006.
23                In your recollection, when is the
24    soonest -- you've been at UDL for 25 years.  When

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

16

1    is the -- when did the relationship between UDL and

2    Actavis begin?  What is the earliest in your

3    recollection you began receiving product from them?

4          MR. KAPLAN:  Objection; it misstates the

5    witness' early testimony about receiving product.

6    She said they did not receive product from Actavis.

7          MR. COVENY:  Absolutely, okay.

8    BY MR. COVENY:

9          Q.    Digitek you received from Mylan?

10         A.    Correct.

11         Q.    When is the earliest in your

12   recollection you began receiving Digitek from Mylan

13   that was produced at Actavis?

14         A.    I can't give you the exact year.

15         Q.    Okay.

16         A.    I don't remember the exact year.

17         Q.    That's fine.  We'll go through that --

18         A.    Okay.

19         Q.    -- a little bit later in some of the

20   documents.

21               I'm going to go ahead and pull that one

22   off the screen and put up here -- well, we'll hold

23   off on that.

24               Are you aware of there being an

Liana Radtke
Confidential – Subject to Further Confidentiality Review

17

1    indemnity agreement directly between UDL and

2    Actavis at all?

3         A.    I'm not certain.

4         Q.    That's fine.  Okay.  That would be...

5              During the recall, I'll go ahead and put

6    this up here, this is an e-mail and we'll mark this

7    as Exhibit 44 then 202701.

8                   (WHEREUPON, a certain document was

9                   marked Deposition Exhibit No. M44,

10                  for identification, as of 1/26/10.)

11   BY MR. COVENY:

12        Q.    This e-mail is from Sue Powers and you

13   are copied on it.  In the second -- at the top of

14   the page, halfway through the first e-mail, it

15   says, "FYI - UDL has received some reimbursement

16   for the total cost listed for the Actavis recalls."

17             In your recollection, was UDL being

18   reimbursed for their recall activities during the

19   recall up to the present?  Were they receiving

20   reimbursement directly from Actavis for those

21   procedures?

22        A.    I'm not sure.  I'm not certain.

23        Q.    Okay.  This e-mail does that refresh

24   your memory at all?  Do you remember who you were

Liana Radtke
Confidential – Subject to Further Confidentiality Review

18

1    receiving reimbursement from?  Was it coming from

2    Mylan?

3        A.    No, I -- that's not my area of

4    responsibility, so I'm uncertain.

5        Q.    Okay.  And who is Chuck Koon?

6        A.    Chuck Koon is in the quality assurance

7    department in Mylan Pharmaceutical.

8        Q.    Okay.  All right.  We'll set that one

9    aside.

10            Could you tell me what a consent decree

11    is?

12        A.    As I understand a consent decree, it's

13    something that a company enters into with the FDA.

14        Q.    Okay.

15        A.    Certain conditions in which I'm not sure

16    what the particulars would be, but that's my

17    understanding, it's an agreement between the FDA

18    and manufacturing -- or a firm.

19        Q.    And it's -- is it fair to say that a

20    company would not want to be under a consent

21    decree?

22        MR. KAPLAN:  Objection.  It calls for hearsay.

23        MR. TABER:  Objection.

24    BY MR. COVENY:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

19

1          Q.     Okay.  Is a consent decree given

2     following violations of some sort, the FDA finding

3     some violations of some sort?

4          MR. KAPLAN:  Objection; lacks foundation.

5          MR. COVENY:  Okay.  All right.

6     BY MR. COVENY:

7          Q.     Are you aware that Amide

8     Pharmaceuticals, thereafter Actavis

9     Pharmaceuticals, was operating under a consent

10     decree for a period of time?

11          A.     I don't recollect that.

12          Q.     Okay.  Well, we'll come up with some

13     documents --

14          A.     Okay.

15          Q.     -- that probably will refresh your

16     memory in a moment.

17               Let's go to what is a Quality Systems

18     Improvement Plan, a QSIP, are you familiar?

19          A.     That would -- again, that is something

20     that would be submitted to the FDA.  Exactly what

21     it says.  It's a quality system improvement plan.

22     Other than that I don't -- I can't give you any

23     specifics.

24          Q.     Is there a difference in your

Liana Radtke
Confidential – Subject to Further Confidentiality Review

20

1 understanding between a consent decree and a

2 quality system improvement plan?  Is one more

3 serious than the other?

4     A.    In my -- I believe that you would have a

5 quality system improvement plan first.  I'm -- I

6 would be uncertain as to when a consent decree

7 would be issued.  I don't know.

8     Q.    Has -- has UDL Laboratories in your

9 tenure there as -- let me see your official

10 title -- you're in charge of FDA compliance, ever

11 operated under an concept decree?

12     A.    No, we have not.

13     Q.    Have you ever been subject to a quality

14 system improvement plan?

15     A.    No.

16     Q.    You have not, okay.

17     And how long at UDL would -- and is that

18 true your entire time at UDL or only during your

19 tenure in your current position?

20     A.    I can only speak to -- to my tenure, and

21 I would say that that is.

22     Q.    All right.  In your -- to your

23 knowledge, is there a supply and distribution

24 agreement directly between UDL and Actavis?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

21

1          A.    I don't believe so.

2          Q.    Okay.  So your relationship -- in your

3     understanding, your relationship was with Mylan and

4     Mylan has --

5          A.    Correct.

6          Q.    Its -- okay.  Its agreement with

7     Actavis.  All right.

8                This next document I'm going to go ahead

9     and pop up here.  This next document here is a

10    memorandum from yourself dated January 21st, 2008,

11    and we'll go ahead and put this in as 45.  It's

12    document No. 25489.  Here you are and here you are.

13                    (WHEREUPON, a certain document was

14                     marked Deposition Exhibit No. M45,

15                     for identification, as of 1/26/10.)

16    BY MR. COVENY:

17         Q.    What is an F -- what is FOI?

18         A.    Freedom of information.

19         Q.    Okay.  And according to this memo here

20    regarding Actavis, on the background information it

21    states, "Actavis Totowa has been approved by the

22    UDL as a supplier of pharmaceutical drug products

23    since 2004 when the company operated as Amide

24    Pharmaceuticals."  UDL currently purchases three

Liana Radtke
Confidential – Subject to Further Confidentiality Review

22

1    products.  Digitek is the one named.

2             Down here it says under FOI request,

3    "Additional information must be obtained through

4    FOI.  The last review of available information was

5    performed on January 21, 2008.  It was verified

6    that the information we currently have on file is

7    more currently that -- than that -- than what is

8    available through this service."

9             MR. TABER:  I'll just object to the reading as

10   you are not reading that correctly, but go ahead.

11            MR. COVENY:  At least to holding.  Thank you.

12   BY MR. COVENY:

13       Q.    All right.  On this one here, what

14   service do you use to obtain your information?

15       A.    Typically we use the FOI service, the

16   freedom of information.

17       Q.    Okay.  And yet your information on file

18   was more current than theirs?

19            What other source do you use for your

20   information?

21       A.    If -- if the supplier were to provide us

22   information, well, that would be the only other way

23   we would be able to obtain information if they

24   would release it to us.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

23

1      Q.    Does Mylan provide you periodic updates

2   of third-party suppliers?

3      A.    Only if we were to request that through

4   Mylan.

5      Q.    Okay.  Do you -- do you directly

6   consider -- is UDL a third-party supplier to --

7   excuse me.  Is Actavis a third-party supplier to

8   UDL?

9      A.    Currently?

10      Q.    Well, during this time, was it a

11   third-party supplier to you?  Did you consider that

12   a third-party supplier or were you simply getting

13   the product from Mylan and they were a third-party

14   supplier to Mylan?

15      A.    As it, well, applies to Digitek, we

16   would have gotten the product through Mylan.

17      Q.    Did UDL ever perform an inspection of

18   Actavis itself, of its plant, of its processing

19   procedures?

20      A.    I don't recall.

21      MR. KAPLAN:  Tony, just for the record, a

22   number of documents that you are putting up have

23   highlighting on them, and just for the record that

24   highlighting is your highlighting and not the

Liana Radtke
Confidential – Subject to Further Confidentiality Review

24

1    witness' highlighting?

2            MR. COVENY:  That is correct, it is mine.

3            MR. KAPLAN:  Okay.

4    BY MR. COVENY:

5            Q.    Can you tell me how often the DEA

6    performs inspections of UDL?

7            A.    The DEA, drug enforcement?

8            Q.    Yeah.  I'm going to go ahead and put

9    this up here.  This is a Notice of Inspection of

10   Controlled Premises.  This is the document here.

11           A.    It's a --

12                  (WHEREUPON, a certain document was

13                   marked Deposition Exhibit No. M46,

14                   for identification, as of 1/26/10.)

15   BY MR. COVENY:

16           Q.    Just very quickly for the record, this

17   would be Exhibit M46, document No. 20672.  We have

18   here the document.

19                  Would you tell me what this document is?

20           A.    This is a Notice of Inspection when the

21   DEA comes to your facility to perform its

22   inspection.

23           Q.    How does this differ from an FDA

24   inspection?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

25

1      A.    The DEA only deals directly with

2    controlled substances or list one chemicals.  So,

3    if you have a license to process controlled

4    substances or list one chemicals, you have to have

5    a DEA license, and they -- they have the right and

6    obligation to come in and inspect you periodically.

7      Q.    Okay.  Do you know how often they come

8    in to perform inspections?

9      A.    Typically it's every three to four

10    years.

11      Q.    Every three to four years, okay.

12            How does it differ from an FDA

13    inspection?

14      A.    The DEA looks for signs of diversion.  I

15    would say that that is probably their -- their main

16    performance.  They also check your -- make sure

17    that your security is in line with the controlled

18    substances.  There are certain provisions that you

19    must meet.  So, that's -- that's usually their

20    focus.

21      Q.    Okay.  All right.  Then let's move to

22    FDA inspections.  How often does the FDA inspect a

23    pharmaceutical manufacturer --

24      A.    They typically --

Liana Radtke
Confidential – Subject to Further Confidentiality Review

26

1          Q.     -- distributor?

2          A.     -- come in every three years.

3          Q.     Every three years?

4          A.     Um-hum.

5          Q.     And how many inspections have you gone

6     through -- or in your -- in your current position

7     would you be the point person when the FDA comes

8     in?

9          A.     Correct.  I can't give you the exact

10    number of inspections.

11         Q.     Understood.  But approximately every

12    three years?

13         A.     Approximately every three years.

14         Q.     Okay.  All right.  I'm going to put an

15    e-mail up here.  We'll do this as M46.

16         THE COURT REPORTER:  47.

17    BY MR. COVENY:

18         Q.     47, M47.  This is an e-mail from

19    yourself and then a chain with Sue Powers listed as

20    well.  Here is the e-mail.  Here you are.

21                    (WHEREUPON, a certain document was

22                     marked Deposition Exhibit No. M47,

23                     for identification, as of 1/26/10.)

24    BY MR. COVENY:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

27

1        Q.    On the second page there, it looks like
2   an e-mail from Sue Powers to Chuck.  And, yes, the
3   highlighting is mine on this copy here.
4              The e-mail indicates that many of the
5   suppliers have not been audited.
6              In your time at UDL, did you -- you said
7   you were not familiar with whether or not UDL -- or
8   you could not recall whether or not UDL had ever
9   audited Actavis directly.
10             Were you in charge of auditing any other
11  pharmaceutical distributors or manufacturers?
12       A.    I would -- I can't recall at what point
13  in -- you know, in my tenure that I started
14  participating in supplier audits.  I really don't
15  remember the year.  I wouldn't have done that
16  right, you know, immediately.  I just don't
17  remember the year that I would have participated in
18  that type of audit of a supplier.
19       Q.    In your recollection, how many have you
20  done of on-site inspections of manufacturers or
21  producers?
22       A.    Maybe four or five at the -- I really
23  don't know the exact number.
24       Q.    Okay.  And you do not recall whether you

Liana Radtke
Confidential – Subject to Further Confidentiality Review

28

1    ever went to Actavis?

2         A.    I'm uncertain on that.

3         Q.    Is this mandated by -- under -- does the

4    FDA have a requirement that you audit third-party

5    suppliers?

6         A.    There is nothing in the Code of Federal

7    Regulations that requires you to audit your

8    suppliers.

9         Q.    Okay.  Do you have a standard operating

10   procedure at UDL that indicates that you should

11   perform these audits?

12        A.    We have a vendor assessment program

13   that's undergoing some changes right now through

14   global quality, but it would be to monitor the

15   activities, the compliance history of your -- the

16   companies that you're -- you're purchasing from.

17        Q.    When you say monitor the compliance

18   history, does that require an on-site inspection or

19   is that more akin to a document review?

20        A.    It's not -- if you're asking -- are you

21   asking if it's a requirement in the -- within

22   the --

23        Q.    No, no.  When you do a compliance review

24   of a third-party vendor, are you going to that

Liana Radtke
Confidential – Subject to Further Confidentiality Review

29

1    third-party vendor and actually reviewing their --

2    their site and their production?

3        A.    No, not necessarily.  No, uhn-uhn.

4        Q.    Okay.  Would it consist of reviewing

5    documents pertaining to the FDA?

6        A.    Yes.  We would get freedom of

7    information, we would access the FDA website to see

8    if there was any type of information that would be

9    available.

10       Q.    Okay.  Would it be fair to say that a

11   third-party vendor usually notifies you of a

12   violation prior to you finding out about it from

13   the FDA directly?

14       MR. TABER:  Objection.

15   BY MR. COVENY:

16       Q.    Have you ever found out about an FDA

17   violation directly from the FDA without having been

18   notified by the vendor itself?

19       A.    From -- through the FDA?

20       Q.    From a review of say the FDA web

21   page like you said or through the review of the FDA

22   documents.

23       A.    Could you -- okay.  Could you rephrase

24   your question?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

30

1          Q.     Absolutely.

2          A.     Okay.

3          Q.     When a third-party vendor or one of your

4    suppliers is given a warning letter or a QSIP or

5    operating under a consent decree, do they have to

6    notify you directly?

7          MR. TABER:  Objection.

8    BY MR. COVENY:

9          Q.     Have you been notified directly from

10   third-party vendors when those situations take

11   place?

12         MR. KAPLAN:  Objection; vague, general, lacks

13   specificity.

14   BY MR. COVENY:

15         Q.     All right.  We'll go -- we'll come back

16   to that question.  I have some documents.

17                This next document then will be M48.  It

18   begins with document 203166.

19                        (WHEREUPON, a certain document was

20                         marked Deposition Exhibit No. M48,

21                         for identification, as of 1/26/10.)

22   BY MR. COVENY:

23         Q.     Do you recall when the most current FDA

24   inspection of UDLs took place?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

31

1          A.    Yes.   August of 2008.

2          Q.    And it is fair to say that that was the

3     standard three-year --

4          A.    Yes.

5          Q.    -- inspection from the FDA?

6          A.    Yes, correct.

7          MR. TABER:  Just note my objection to the

8     phrase "standard."  I think that's your phrase and

9     not hers and not the FDA's.

10    BY MR. COVENY:

11         Q.    All right.  It was a scheduled

12    inspection from the FDA?

13         A.    FDA does not schedule our inspections.

14    They just arrive.  So, this was just a -- their

15    inspection of UDL.

16         Q.    What is a 483?

17         A.    That is actually referencing the form

18    that the FDA would use that would put -- they would

19    put down observations if they were to find

20    something during an inspection that you may have to

21    explain further.

22         Q.    Okay.  During this recent inspection of

23    UDL, did UDL receive any 483s?

24         A.    No, we did not.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

32

1        Q.   Could you tell me what a change control

2    is?

3        A.   We have various change controls.  This

4    would -- it would just depend on what change

5    control we were talking about.  Could you be a

6    little bit more specific?

7        Q.   Yes.  On page 4 of that document, in the

8    middle of the last large paragraph there, it says,

9    "These issues were addressed in a change control

10   which was presented to the inspector prior to the

11   closeout of inspection."

12       A.   Without knowing what the specific change

13   control is, I don't think I can respond to your

14   question.

15       Q.   Okay.

16      MR. TABER:  Sorry.  Is that your writing in

17   the margin?

18      MR. COVENY:  This is my writing, yes.  I did

19   not anticipate putting them up on here.  I was just

20   going to hand copies, so I wrote on my originals.

21      MR. KAPLAN:  And I'm going to object to the

22   relevancy.  This has nothing to do with Digitek.

23   BY MR. COVENY:

24       Q.   Okay.  Would you consider it to have

Liana Radtke
Confidential – Subject to Further Confidentiality Review

33

1    been a successful inspection?

2         A.    Yes.

3         Q.    Okay.  In your opinion then, UDL has

4    complied with all FDA regulations during your

5    tenure there?

6         MR. KAPLAN:  I'm going to object.  This calls

7    for opinion testimony from a fact witness.  She is

8    not an expert.

9    BY MR. COVENY:

10        Q.    Okay.  But it is fair to say that you've

11   received no 483s and no QSIPs during your -- at

12   least in the last inspection?

13        A.    Yes, that's correct, we have not.

14        Q.    Your job is FDA compliance.  Does the

15   FDA require a person hold that position at UDL?

16        A.    Excuse me.  I --

17        Q.    Let me rephrase that.

18        A.    Yes, please.

19        Q.    The FDA has many, many requirements on

20   pharmaceutical manufacturers and distributors.  How

21   important is having that position, of having FDA

22   compliance at UDL?

23        A.    Oh, it's very important to be a

24   compliant firm.  Are you asking me specifically of

Liana Radtke
Confidential – Subject to Further Confidentiality Review

34

1    my -- my --

2         Q.    Obviously as a pharmaceutical company

3    you produce a lot of products that are going to be

4    consumed by individuals.  Is compliance with FDA

5    regulations important for their safety?

6         MR. KAPLAN:  Objection.  First of all, UDL

7    does not produce any products.  They distribute

8    products.

9         MR. COVENY:  Certainly distribute.

10        MR. KAPLAN:  Yeah, and it calls for hearsay.

11   BY MR. COVENY:

12        Q.    Would you consider your position an

13   important position?

14        A.    Yes, I do.

15        Q.    Would you consider compliance with FDA

16   regulations important?

17        A.    Yes, I do.

18        Q.    Based on what?  Why is it important --

19   why is it important that UDL comply with FDA

20   regulations?

21        A.    We have certain responsibilities for the

22   safety of the product that we are producing.

23        Q.    In this case distributing?

24        A.    Distributing.  I said producing.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

35

1     Distributing, yes.

2          Q.     Would you say that compliance with FDA

3     regulations is indicative of quality product or

4     quality distribution?

5          MR. TABER:  Objection.

6          MR. KAPLAN:  Overbroad, lacks specificity,

7     calls for hearsay.

8     BY MR. COVENY:

9          Q.     We don't need to go any further on that.

10              I just want to give you one document

11    before we leave the FDA inspection of UDL.

12         A.     Okay.

13                   (WHEREUPON, a certain document was

14                    marked Deposition Exhibit No. M49,

15                    for identification, as of 1/26/10.)

16    BY MR. COVENY:

17         Q.     Are you familiar with this document?

18    This will be M49, document No. 202712.

19         A.     I'd have to review the entire document.

20         Q.     Okay.

21         MR. KAPLAN:  Go ahead and take your time to do

22    it.

23    BY THE WITNESS:

24         A.     I believe this was -- this is a

Liana Radtke
Confidential – Subject to Further Confidentiality Review

36

1    spreadsheet that the quality assurance department

2    issued.

3    BY MR. COVENY:

4        Q.    Do you know who Melinda Brazer is?

5        A.    Yes.  She is the administrative

6    assistant for Sue Powers.

7        Q.    Okay.  And is it your understanding that

8    this was produced in response to the FDA inspection

9    in 2008?

10       A.    Yes, that's my understanding.

11       Q.    Okay.  Just one question.  On

12   page No. 4 -- and, again, those of you looking at

13   it, on the document monitor, the writing is mine --

14   No. 76.

15       A.    Okay.

16       Q.    It says, "Not enough QA checks in phases

17   of validation."

18            Is it your understanding that the FDA

19   wanted additional quality assurance checks during

20   the validation process?

21       MR. KAPLAN:  I'm going to object.  This has

22   nothing to do with Digitek.

23       MR. COVENY:  We'll go ahead and put that one

24   down.

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

37

1    BY MR. COVENY:

2        Q.    So, in addition to DEA and FDA

3    inspections, Mylan Pharmaceuticals periodically

4    does -- conducts an audit of its third-party

5    vendors.  Let me go ahead and provide you with this

6    document.  This will be M48, document 30303.

7            THE COURT REPORTER:  It is 50.

8            MR. KAPLAN:  This would be 50.

9            MR. COVENY:  50.  Thank you.

10                   (WHEREUPON, a certain document was

11                    marked Deposition Exhibit No. M50,

12                    for identification, as of 1/26/10.)

13   BY MR. COVENY:

14       Q.    Take a moment to look that over.

15             On page 2 of 3 -- tell me when you

16   are -- when you feel comfortable looking at this

17   document there.

18       A.    Okay.

19       Q.    Okay.  On the bottom of page 2 of 3 in

20   the paragraph beginning, "Amide Pharmaceuticals was

21   acquired by Actavis in July 2005."

22       A.    Okay.

23       Q.    Would you mind reading the very last

24   line?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

38

1          A.    "A shortage of qualified" --

2          MR. KAPLAN:  I am going to object to the

3     relevancy.  This has nothing to do with the UDL and

4     it has nothing to do with Digitek.

5     BY MR. COVENY:

6          Q.    Okay.  This -- Mylan's inspection of

7     Actavis, is it fair to say from this document that

8     they found there to be a shortage of qualified

9     individuals, key individuals at Actavis?

10          MR. TABER:  I'll just object to the hearsay.

11     Are you asking her if she knows in her personal

12     knowledge or if -- you are asking her solely to

13     interpret the document?  I think the latter is also

14     objectionable.

15     BY MR. COVENY:

16          Q.    In your personal knowledge, was Actavis

17     operating with a lack of qualified individuals?

18          MR. TABER:  Objection.

19          MR. KAPLAN:  When, for what purpose?

20     BY MR. COVENY:

21          Q.    Were you familiar with this review --

22          A.    This document?

23          Q.    -- of Actavis from Mylan?

24          A.    No.  This is the first time I've ever

Liana Radtke
Confidential – Subject to Further Confidentiality Review

39

1    seen this document.

2         Q.    Okay.  So you -- you were not privy then

3    at any time to Mylan's inspection of Actavis

4    itself?

5         A.    I don't recall seeing this document.

6         MR. KAPLAN:  And just for the record, you've

7    got two different documents here.  You start with a

8    document dated January 23, 2008, and then you flip

9    over to --

10        THE WITNESS:  November 2006.

11        MR. KAPLAN:  Well, November 2006 and then

12   December of 2006 is the document that you were

13   referring to on page 2 of 3.  So, just for the

14   record.

15   BY MR. COVENY:

16        Q.    Were you aware at any time of Mylan

17   performing an independent inspection of Actavis?

18        MR. COLEY:  This is Michael Coley speaking.

19             Counsel, do you have an extra hand copy

20   of Exhibit 50?

21        MR. COVENY:  I'll give you mine.

22        MR. COLEY:  Thank you.

23   BY THE WITNESS:

24        A.    Could you rephrase your question?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

40

1    BY MR. COVENY:

2        Q.    I'll withdraw the question.

3        A.    Oh, withdraw it.  Okay.

4        Q.    Would you agree that high quality

5    assurance standards are necessary at a

6    pharmaceutical manufacturer or distributor?

7        A.    Yes.

8        Q.    Can you tell me what an assay result is?

9    A-s-s-a-y.

10        A.    A-s-s-a-y?

11        Q.    Yes.

12        A.    Okay.  That would be where you are

13    testing the product for potency.

14        Q.    Would you agree that it is important to

15    have strict standards for assay results?

16        MR. KAPLAN:  Objection; vague, indefinite as

17    to what is meant by "strict standards."

18    BY MR. COVENY:

19        Q.    Do you know what the assay result UDL

20    perimeter limit is for Digitek?

21        A.    I can't -- I can't tell you what the

22    exact parameter limit is for Digitek or was for

23    Digitek.

24        Q.    Okay.  This would be 51 then,

Liana Radtke
Confidential – Subject to Further Confidentiality Review

41

1    Exhibit 51, document 7647.

2                     (WHEREUPON, a certain document was

3                      marked Deposition Exhibit No. M51,

4                      for identification, as of 1/26/10.)

5    BY MR. COVENY:

6          Q.    And on this document here -- here you

7    are.  And, counsel, I will hand you my copy

8    momentarily.  I want to -- it's a rather long

9    document.

10          If you could turn to page No. 5, the

11    Actavis Certificate of Analysis, and I'll put this

12    up here for everyone to see.

13          MR. KAPLAN:  Can we see what this document is?

14          MR. COVENY:  Absolutely.  This is the UDL

15    Laboratories, Inc. Receiving Form.

16          MR. KAPLAN:  Is there a date on the document?

17          MR. COVENY:  4/10/2008, received from

18    Amide/Bertek/Mylan.

19          MR. KAPLAN:  Is that your writing on it?

20          MR. COVENY:  This right here No. 1 and 2 is my

21    writing, the handwriting, the marginalia is mine.

22    BY MR. COVENY:

23          Q.    On Page 5 --

24          MR. KAPLAN:  Did you say you have an extra

Liana Radtke
Confidential – Subject to Further Confidentiality Review

42

1    copy of that?

2          MR. COVENY:  I'll hand you this one

3    momentarily.  I have two of this one here.  The

4    next two documents are rather lengthy.

5          MR. KAPLAN:  All right.

6          MR. COVENY:  I'll hand it to you momentarily.

7    BY MR. COVENY:

8          Q.    That is a Certificate of Analysis?

9          A.    Okay.  I want to make sure I'm on the

10   same page.  Did you say 5, page 5?

11         Q.    Page 5 at the top.  It is page 5.  This

12   would be -- the Bates number down in the corner

13   would be 7649.

14         A.    Oh, this one.  It says page 5 at the

15   top.

16         Q.    Absolutely.

17         A.    Correct, I have it.

18         Q.    Can you tell me what the assay range is

19   for this Certificate of Analysis?

20         A.    It is 90 percent to 105.

21         Q.    Okay.  And this particular batch, what

22   was its assay result?

23         A.    97.4.

24         Q.    Okay.  If you move now down to -- it

Liana Radtke
Confidential – Subject to Further Confidentiality Review

43

1    will be Bates No. 7656.  Can you tell me what this

2    is?

3         A.    Okay.  This -- this -- our parameter

4    limits are tighter than the specifications.  And so

5    this particular product was slightly below our

6    parameter limits.

7         Q.    Could you tell me how your parameter

8    limits are determined?

9         A.    We base them on stability results and

10   product -- we track the product history of the

11   particular product.  So we establish tighter limits

12   than what the requirements are.

13        Q.    And who establishes the requirements?

14        A.    This particular -- this is by the USP or

15   it -- the ANDA requirements, but this is a USP

16   product.  So, the 90 to 105, that is the USP cry --

17   it has to meet between -- it has to be within that

18   range to meet the labeled claim.

19        Q.    And yet you have a tighter limit you

20   said for stability reasons?

21        A.    No.  It's just internal purposes we've

22   established tighter limits.

23        Q.    And why would you have a tighter limit

24   than the USP?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

44

1          A.    Well, we would -- we do track through

2     the stability program.  That's not to say that the

3     97.4 -- it would still meet the specifications of

4     the product.  It still is very well within the

5     specifications.

6          MR. KAPLAN:  The USP?

7     BY THE WITNESS:

8          A.    The USP specifications for the product.

9     This is a -- this is a self-imposed process that

10    we've put in place.

11    BY MR. COVENY:

12         Q.    Why would you have a self-imposed

13    process that's tighter than the USP?

14         A.    I'm not sure -- I'm not sure how to

15    respond to that -- that question.

16         Q.    Okay.  Would there be any justification

17    or any reason why you would feel that you would

18    need a tighter specification than the USP?

19         A.    No.  There -- I mean, we would be

20    allowed -- as long as it's within its

21    specification, we would be allowed to bring it in

22    and repackage it.  This is something that we have

23    established tighter limits for the products.

24    That's just a self-imposed process that we put in

Liana Radtke
Confidential – Subject to Further Confidentiality Review

45

1    place.

2         Q.    Okay.  Is there any particular reason

3    why you simply don't adopt the USP?

4         A.    No.

5         Q.    I am going to forward to -- it will be

6    Bates No. 7682.

7         A.    This is another C of A.

8         MR. KAPLAN:  Is this all part of one document

9    or are we --

10        THE WITNESS:  No.  This is --

11        MR. COVENY:  These were all -- the way they

12   were produced, it was just contiguous document

13   numbers.  This will be another receiving -- a

14   receiving form similar to the first one.

15   BY THE WITNESS:

16        A.    This is a different -- a different lot

17   number.  I'm wondering if this is --

18   BY MR. COVENY:

19        Q.    Yeah, this one here will be a different

20   lot number with a different assay.

21        A.    I'm still not finding that in here.

22        MR. KAPLAN:  And I don't have it in front of

23   me.  I don't know, but I see at the bottom here

24   this has a date of 12/23/07.  Is that right?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

46

1          MR. COVENY:  That is correct.

2     BY MR. COVENY:

3          Q.   At the bottom corner, the 7682 is the

4     Bates number.

5          A.   I have it.

6          Q.   Okay.  Again, what is the assay limit on

7     this Certificate of Analysis from Actavis?

8          A.   It is 90 percent to 105.

9          Q.   And the result was?

10         A.   96.6.

11         Q.   Okay.  And, again, was this -- was that

12    acceptable at UDL for distribution?

13         A.   It -- it meets its -- it meets the

14    requirements.  It meets its internal -- or the

15    specifications for assay.

16         MR. KAPLAN:  Of the USP?

17    BY THE WITNESS:

18         A.   Of the USP.

19    BY MR. COVENY:

20         Q.   And so on document No. 7694, referring

21    to the same lot number, then on 1/9 of '08 you

22    approved this for distribution?

23         A.   Correct.

24                   (WHEREUPON, discussion was had

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

47

1                         off the stenographic record.)

2         MR. COVENY:  Counsel, here is that, and I will

3    go ahead and give you.

4         MR. KAPLAN:  Can we have an agreement that any

5    and all highlighting or your notations on these

6    exhibits for the attachment to the deposition will

7    be redacted?

8         MR. COVENY:  Yes.

9                    (WHEREUPON, a certain document was

10                    marked Deposition Exhibit No. M52,

11                    for identification, as of 1/26/10.)

12   BY MR. COVENY:

13        Q.    All right.  The next document here, this

14   will be No. 52, document 14256.

15             Could you tell me what this is?

16        A.    This would have been a summary of 483s

17   or a warning letter that I had -- I had done.

18        Q.    Okay.  Is this -- so this is regarding a

19   warning letter summary for Actavis?  The "Re" at

20   the top.

21        A.    Correct.

22        Q.    On page 1 there, No. 1, the "Firm failed

23   to validate analytical testing method for API."

24             What is API?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

48

1           A.     Active pharmaceutical ingredient.

2           MR. TABER:  Before you continue to ask your

3     questions, I don't want to interrupt each time, but

4     much of this I know has nothing to do with Digitek,

5     so I'm going to object and ask that as you read

6     various portions of this I be given a continuing

7     objection to anything that has nothing to do with

8     Digitek.  Is that fair?

9           MR. COVENY:  That would be fair.  And I

10    believe most of that has been redacted -- some has

11    been.  Okay.

12    BY MR. COVENY:

13          Q.     The first one, "4 Point 483, 12/8/99.

14    No 1, Firm failed to validate analytical testing

15    method for API."

16                 Is that a serious accusation?

17          MR. TABER:  Objection.

18          MR. KAPLAN:  Objection; calls for

19    characterization, hearsay.

20    BY MR. COVENY:

21          Q.     Have you ever received a similar 483 at

22    UDL?

23          A.     We don't manufacture products, so we

24    don't deal with active pharmaceutical ingredient.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

49

1      Q.    Okay.  How important is hardness,

2    thickness and the blend on a product that's going

3    to be shipped by UDL?

4      MR. KAPLAN:  Objection; it calls for a

5    hypothetical.

6    BY MR. COVENY:

7      Q.    Well, as director of FDA compliance, is

8    thickness, hardness and blend part of FDA

9    requirements?

10     A.    For the releasing of the product?

11     Q.    Yes.

12     A.    The manufacturer must meet all of its

13   required specifications in order to release a

14   product.  Yes, it's important.

15     Q.    And why would it be important that the

16   hardness, thickness or blend be up to FDA

17   standards?

18     A.    Product must meet its -- the

19   specifications within its -- the approved

20   application.

21     MR. KAPLAN:  And I'm also going to ask for a

22   continuing objection here because I don't think any

23   of this has to do with Digitek specifically.

24   BY MR. COVENY:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

50

1   Q.  What is a master batch record?

2   A.  A master batch record, are you asking me

3 if a master batch record as I understand it within

4 our operation?

5   Q.  Yes, that would be correct.

6   A.  Okay.  A master batch record would be

7 all of the product and all of the packaging

8 materials that would be necessary to create our

9 unit dose package.

10   Q.  Turning the page, at the very top of the

11 page in your summary of 1 Point 483 on 11/29/01,

12 UDL, it says, "No assurance that thin tablets are

13 rejected."

14    Do you test the product for a tablet

15 thickness at UDL?

16   A.  During the receiving inspection a

17 sampling of the product is taken where they -- we

18 measure to ensure that it meets our tooling

19 requirements.  We have tighter specifications for

20 the -- for the tooling of -- that forms our

21 blister.

22   Q.  Okay.  You have tighter specifications

23 for that than does Actavis?

24   A.  Our -- are you asking me if our

Liana Radtke
Confidential – Subject to Further Confidentiality Review

51

1    specifications are tighter?

2        Q.    Yeah, I -- I understand that that's what

3    you said that your specifications are tighter than

4    those received by your suppliers.

5        MR. KAPLAN:  I don't mean to interrupt you,

6    but if you just explain --

7        THE WITNESS:  What the tooling --

8        MR. KAPLAN:  -- the blister pack and what the

9    tooling --

10        THE WITNESS:  Right.

11        MR. KAPLAN:  -- is and all of that --

12        THE WITNESS:  Right.

13        MR. KAPLAN:  -- so you can put that into

14    context for him.

15    BY THE WITNESS:

16        A.    When we -- when we create a tool for the

17    product, it's based on the sampling of it so that

18    we can get a custom fit blister.  So --

19        MR. KAPLAN:  He hasn't gone into blister pack.

20    He doesn't know what UDL does.  He might -- you

21    might explain how you distribute the product.

22    BY THE WITNESS:

23        A.    Okay.  What we do is we put it into unit

24    dose so it has a blister which is like -- in this

Liana Radtke
Confidential – Subject to Further Confidentiality Review

52

1      case clear PVDC and then it has got the peelable

2      lidding, various packaging configurations.  So,

3      when we measure the product, it's in order to make

4      sure that the form die that creates the blister

5      that will -- the product will go into that it is --

6      it's going to be tighter so that you can't get two

7      pills in there and you can't damage the product.

8      BY MR. COVENY:

9          Q.    So you test for -- you test product size

10     for packaging but not necessarily for the dosage or

11     the strength?

12         A.    Incoming we just -- that would be what

13     we would do is just examine the product for the

14     size.

15         Q.    Is it important to have quality

16     equipment at your -- at the pharmaceutical

17     companies that produce the product for you?

18         A.    You are going to need to specify what

19     quality equipment.

20         Q.    Does the FDA require that certain

21     equipment or that certain equipment be certified or

22     that it be up to specifications for production?

23         A.    The FDA requires that you have quality

24     system checks in place and then the firm has to

Liana Radtke
Confidential – Subject to Further Confidentiality Review

53

1    determine the equipment that will be utilized to

2    ensure that it's meeting its specifications.

3         Q.    And equipment that was not up to

4    specification would be dangerous?

5         MR. TABER:  Objection.

6         MR. KAPLAN:  It calls for speculation.

7    BY MR. COVENY:

8         Q.    Okay.  Would equipment that was not up

9    to specification, would that be a problem for the

10   FDA?

11        MR. KAPLAN:  Objection; speculation.

12   BY MR. COVENY:

13        Q.    Would that they consider that a

14   violation?

15        MR. KAPLAN:  It calls for speculation.

16   BY MR. COVENY:

17        Q.    Has the equipment at UDL been inspected

18   by the FDA?

19        A.    Not -- inspected during -- it would be

20   inspected -- as far as an inspection goes, they may

21   look at the equipment that you are using, but I

22   don't recall any specific equipment.

23        Q.    Has the FDA ever cited UDL during your

24   tenure in your current position for having

Liana Radtke
Confidential – Subject to Further Confidentiality Review

54

1    equipment that was antiquated?

2        A.    I don't believe so.  I don't --

3        Q.    Have they ever cited UDL during your

4    tenure in your current position for equipment that

5    was faulty or failed to meet specifications?

6        A.    I -- I don't recall -- I really -- in my

7    best recollection I would say no.

8        Q.    Okay.  Have you ever been faulted for

9    equipment that was improperly cleaned or -- well,

10   any equipment that -- have you ever been cited for

11   any equipment that was improperly cleaned?

12       A.    I -- I don't -- I don't recall.

13       Q.    Have you ever been cited by the FDA for

14   any equipment malfunctions or problems that you are

15   aware of during your tenure in your current

16   position?

17       A.    I'm not aware of any.

18       Q.    Okay.  Would it be of concern to you if

19   the FDA were to cite you for equipment that was

20   faulty or in violation in some way?

21       MR. KAPLAN:  Objection.

22   BY MR. COVENY:

23       Q.    In your current position, are you

24   pleased that during -- after the last FDA

Liana Radtke
Confidential – Subject to Further Confidentiality Review

55

1    inspection there were no citations given to UDL?

2         A.    Yes, yes, um-hum.

3         Q.    When you wrote this memo, were you

4    surprised at the number of 483s received by

5    Actavis?

6         MR. TABER:  Objection.

7    BY MR. COVENY:

8         Q.    Okay.  Would you consider the results of

9    the FDA inspection of Actavis to be concerning or

10   to be -- let me rephrase that.

11         Why did you write this memo concerning

12   the 483 warning letters summary for Actavis?

13         A.    This is one of my responsibilities is

14   to -- is to monitor the GMP compliance of any

15   company that we purchase product from.  So, this

16   would have just been one of the -- one of my

17   responsibilities to communicate to management if

18   there was anything that I was able to obtain

19   through freedom of information or through the FDA

20   website or whatever source.

21         Q.    And why did you produce this document

22   then going back to 1999?  What facilitated your

23   going and producing this document?

24         A.    I don't remember the exact reason why I

Liana Radtke
Confidential – Subject to Further Confidentiality Review

56

1   would have produced this document.

2   Q.   Is it fair to say that you were

3   concerned about Actavis, the product being

4   produced?

5   A.   No.

6   MR. KAPLAN:  Which product being produced?

7   BY THE WITNESS:

8   A.   Which product?  Digitek?

9   BY MR. COVENY:

10   Q.   Digitek, specifically Digitek.

11   A.   I was confident in our processes and

12   procedures that we have in place to ensure that we

13   were distributing product that met its

14   specification.

15   Q.   Absolutely.  But in producing this

16   document, were you concerned at all about the

17   compliance history of Actavis in your role as a

18   firm that distributes their product?

19   A.   I would say that there -- yes, I would

20   say that there -- in reading this, I would say that

21   there is -- there was concern, yes.

22   Q.   Okay.  And is it fair to say that that

23   concern, looking at this document, went back to

24   December of 1999?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

57

1          A.     That I can't really respond to.

2          Q.     But it's your understanding that that is

3     the first -- the first time in your understanding

4     that the FDA issued a 483 to Actavis at least

5     during its relationship concerning Digitek with

6     UDL?

7          MR. TABER:  Objection.

8          MR. KAPLAN:  Objection as to relevancy.  There

9     is no indication that 483 had anything to do with

10    Digitek in 1999.

11         MR. COVENY:  Okay.

12    BY MR. COVENY:

13         Q.     Have you written memorandum like this

14    concerning other third-party suppliers?

15         A.     Yes.

16         Q.     Have there been other third-party

17    suppliers where you found this many FDA warnings

18    and/or issuances of 483s?

19         MR. KAPLAN:  Objection as to relevancy.

20    BY MR. COVENY:

21         Q.     Okay.  Would you consider this an -- let

22    me rephrase that.

23              When you wrote this memorandum, did this

24    stand out as being a memorandum with an unusual

Liana Radtke
Confidential – Subject to Further Confidentiality Review

58

1    number of 483s?

2          MR. KAPLAN:  Objection as to the

3    characterization.

4    BY MR. COVENY:

5          Q.    If you'd go to page No. 5, under that

6    15 Point 483 on 8/10/06.

7          A.    Is that page 14260?

8          Q.    It would be page 5 at the bottom.

9          A.    Okay.  I have it.

10         Q.    No. 14260 Bates number.

11         A.    Okay.

12         Q.    And would you read the first line of

13   point No. 1?

14         MR. KAPLAN:  Objection as to relevancy.

15   BY MR. COVENY:

16         Q.    Would you say that it is important for

17   the quality control unit to have authority to fully

18   investigate errors that have occurred at a

19   pharmaceutical manufacturer?

20         A.    Yes.

21         Q.    Would you say that a citation by the FDA

22   that that is not the case would be worrisome?

23         MR. KAPLAN:  Objection; calls for speculation

24   and as to relevancy.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

59

1    BY MR. COVENY:

2        Q.    Why would the QC need authority to fully

3    investigate errors at a pharmacy manufacturer?

4        A.    I don't have enough specifics here to

5    comment one way or another to your --

6        Q.    Just in general?

7        A.    In general?

8        Q.    The quality control department, why

9    should they be given full authority to investigate

10   errors that occur?

11       MR. KAPLAN:  Objection; calls for speculation.

12   BY MR. COVENY:

13       Q.    The FDA has clearly indicated that a

14   quality control unit should be allowed the full

15   authority to investigate errors.  Why do you think

16   the FDA would require that?

17       A.    The quality assurance department would

18   be responsible for releasing a batch into

19   commercial distribution.

20       Q.    Does your quality control unit at UDL

21   have full authority to investigate errors?

22       A.    We don't have a quality control unit.

23   We don't have a laboratory.

24       Q.    Okay.  If there is an error at UDL, who

Liana Radtke
Confidential – Subject to Further Confidentiality Review

60

1    does your investigation?

2          A.    Quality assurance.

3          Q.    Quality assurance.  And do they have

4    full authority to investigate all errors?

5          A.    Yes, yes.

6          Q.    Why is that important?

7          A.    It's important because we have to ensure

8    that our product is meeting the specifications to

9    release it into commercial distribution within our

10   control.

11         Q.    Is it fair to say on this, going back to

12   this same document, that the FDA is indicating that

13   at Actavis the QC unit did lack full authority to

14   investigate errors?

15         A.    Again --

16         MR. TABER:  Just note my objection because you

17   are not reading that verbatim.  You are

18   paraphrasing.

19   BY MR. COVENY:

20         Q.    This will be 53.  This is an e-mail.  In

21   fact, if you could just look at this document.

22   This is an e-mail from yourself to Chuck Koon,

23   again, who I believe you stated on the record was

24   with Mylan.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

61

1              (WHEREUPON, a certain document was

2              marked Deposition Exhibit No. M53,

3              for identification, as of 1/26/10.)

4        MR. KAPLAN:  Can we have a date on that?

5        MR. COVENY:  It is October 13, 2006.

6    BY MR. COVENY:

7        Q.    You wrote this e-mail to Chuck Koon in

8    response to the FDA inspection in 2006 of Actavis,

9    is that correct, or Amide?

10       A.    Excuse me.  Rephrase that.

11       Q.    Did you -- go ahead and give me the

12   context of this e-mail.  You wrote -- you wrote

13   this in response to the Amide warning letter?

14       A.    This would have been my contacting Chuck

15   Koon to -- it was a continuing of monitoring the

16   situation.

17       Q.    At this time had you read the Amide

18   warning letter?

19       A.    Without seeing the actual warning

20   letter, I can't respond to that.

21       Q.    Okay.  Who was -- who is Jasmine Shaw?

22       A.    Jasmine Shaw, as I remember, was in

23   charge of regulatory affairs at Actavis.

24       Q.    Okay.  And according to this e-mail, it

Liana Radtke
Confidential – Subject to Further Confidentiality Review

62

1    looks like Jasmine Shaw and Actavis had received a

2    warning letter and they were preparing a response

3    to that warning letter.

4              Did you receive that response?

5       A.    No.

6       Q.    Okay.  It looks, if you go down that

7    page, Chuck Koon had sent you an e-mail prior to

8    your response to him indicating in the second

9    paragraph that Amide was slow to respond to

10   concerns.

11             Did you have direct contact with Actavis

12   during our following the issuance of the warning

13   letter in 2006?

14      A.    Did we have direct contact?

15      Q.    Did you have direct contact with

16   Actavis?

17      A.    Everything that went through went

18   through Mylan.  The only thing I recall is at the

19   one point speaking to Jasmine Shaw.  But no, we

20   didn't contact them directly.

21      Q.    Okay.  Is it fair to characterize that

22   Chuck Koon said it was difficult to get Actavis to

23   respond to their inquiries concerning the warning

24   letter?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

63

1        MR. TABER:  I'll just object because the

2    document speaks for itself.

3    BY MR. COVENY:

4        Q.    So you never requested copies of the

5    warning letter from Actavis directly in your

6    recollection?

7        A.    Well, according to this document, I

8    requested it, but I was told that I couldn't get

9    them.  And I was given some assurance that the plan

10   that they had in place with the FDA was found

11   acceptable, but they would not release the document

12   to me.

13       Q.    Do you have agreements with any of your

14   third-party vendors to provide copies of warning

15   letters or -- from the FDA -- from FDA inspections?

16       MR. KAPLAN:  You know, I think we established

17   earlier that Actavis is not a third-party vendor of

18   UDL, that UDL purchased all of its product from

19   Mylan.

20       MR. COVENY:  Okay.

21   BY MR. COVENY:

22       Q.    So and -- so, you may not be able to

23   answer this.  I'll just drop that question.  Okay.

24       MR. TABER:  Is this a good time for a break?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

64

1       MR. COVENY:  Yeah, this is a good time for a

2   break.

3       MR. TABER:  Okay.

4       THE VIDEOGRAPHER:  We are off the record at

5   10:13 a.m.

6              (WHEREUPON, a recess was had

7               from 10:13 to 10:31 a.m.)

8       THE VIDEOGRAPHER:  We are back on record at

9   10:31 a.m.

10  BY MR. COVENY:

11      Q.   All right.  Ms. Radtke, I'm going to go

12  ahead and put that e-mail on the projector here.

13  Here is a copy for you and counsel.

14      A.    Thank you.

15      MR. COVENY:  Just a moment, counsel, because

16  that's not the same one.  Give me just a second

17  here to find the same -- all right.  It looks like

18  on this -- on this particular document I only have

19  two copies of it.  It is a short one.

20  BY THE WITNESS:

21      A.    Actually, there is two -- they are both

22  identical.

23  BY MR. COVENY:

24      Q.    That's why.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

65

1          MR. KAPLAN:  Yeah, why don't you tear that

2     off.

3          MR. COVENY:  Excellent.  Thank you.

4          MR. KAPLAN:  All right.  So that's 54.

5          MR. COVENY:  That would explain the duplicate

6     copy.  Okay.  Give me just a moment here to get

7     page 1 and 2.  It looks like it was stapled

8     incorrectly.

9                    (WHEREUPON, a certain document was

10                    marked Deposition Exhibit No. M54,

11                    for identification, as of 1/26/10.)

12    BY MR. COVENY:

13         Q.    All right.  In front of you you have

14    what we'll go ahead and put in as Exhibit No. 54,

15    document 997539.  This is your response to

16    Mr. Chuck Koon, dated December 13, 2006.

17              Now, on the monitor here I have the

18    precipitating e-mail to which he responded in that

19    one.  I'm going to go ahead and hand this one to

20    you and give you the full one.  If I can have that

21    one back here.

22         A.    Oh, sure.

23         Q.    Your second page didn't print, so there

24    it is.  The second page there.  Unfortunately we

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

66

1    only have the response.

2             Could you simply then for the record

3    read your response to Mr. Koon, right, your e-mail

4    to Mr. Koon and tell us the date and the time in

5    which it was sent?

6         MR. KAPLAN:  Is there a second page?

7         THE WITNESS:  Yeah, right here.  You don't

8    have it.  Do you want to see it?

9         MR. COVENY:  Just a moment.

10        THE WITNESS: That would have been my e-mail to

11   Chuck.

12        MR. KAPLAN:  Oh, okay.  I gotcha.

13        MR. COVENY:  Here is a copy of it.  Here it

14   is.  It was in a separate e-mail.  Okay.  Let me go

15   ahead and put it up here on the screen for

16   everyone.

17   BY THE WITNESS:

18        A.   You are asking me to read?

19   BY MR. COVENY:

20        Q.   Yes, could you just read that brief

21   e-mail to him.

22        A.   Yes.  "Hope all is well with you and the

23   family.  Between the holidays and projects, things

24   are a bit hectic at UDL.  Could you provide Sue and

Liana Radtke
Confidential – Subject to Further Confidentiality Review

67

1    I with a status on the Actavis Warning Letter?  I

2    know you were going out there to audit Actavis and

3    that was part of the agenda.  Otherwise, how did

4    you -- excuse me -- how did you find their

5    operation?  Thank you and take care."

6            MR. KAPLAN:  And that's dated?

7            THE WITNESS:  That is dated on the 12/7/06.

8    BY MR. COVENY:

9       Q.    He responded back to you.  Now, for the

10   record, it says, "Can you provide sue and I."

11   Would that be Sue Powers?

12      A.    Sue Powers, yes.

13      Q.    Okay.  On this one here you were

14   obviously concerned a bit about the warning letter

15   that's on it?

16      A.    Yes, um-hum.

17      Q.    Okay.  And as you've testified, you went

18   through Charles Koon on most situations to remedy

19   that.

20            Could you summarize his response to

21   that?  If you familiarize yourself again with that

22   e-mail, did he consider Actavis to have responded

23   appropriately to that?  Was he satisfied with their

24   response?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

68

1          MR. TABER:  Objection; the document speaks for

2     itself.

3          MR. COVENY:  Okay.

4          MR. KAPLAN:  It calls for hearsay.

5     BY MR. COVENY:

6          Q.    In his response, again, looking at that

7     document, he indicates, "Overall Amide/Actavis is

8     having lots of problems and is also trying to

9     integrate with their new owners, Actavis."  He

10    indicates that they did not do a systems audit.

11    And he says, "I don't think they could handle one

12    right now."

13              In your discussions with Chuck Koon, is

14    it fair to say that it appears that Actavis was

15    overwhelmed at this time with the FDA warning

16    letters that had come in?

17         MR. KAPLAN:  Objection; calls for speculation.

18    BY MR. COVENY:

19         Q.    From your -- why did you inquire with

20    Chuck why the progress of the warning -- the

21    progress Actavis was making with the warning

22    letter?

23         A.    In order to obtain -- it was one of our

24    monitoring processes.  In order to obtain more

Liana Radtke
Confidential – Subject to Further Confidentiality Review

69

1    information, we would have gone through Chuck to

2    see if we could obtain any more information.

3         Q.    Okay.  And at this time we've already

4    looked at your summary of the warning letters.  But

5    at this time were you starting to be concerned with

6    Actavis as a supplier?

7         A.    I was -- I was very confident within our

8    processes and procedures that we have in place that

9    everything that we were releasing was within our --

10   the specifications for the product.

11        Q.    And what was the basis of that

12   confidence?

13        A.    Knowing the systems that we have in

14   place when we bring product in and our -- all of

15   our quality system checks.

16        Q.    Would that include your independent

17   testing of the product?

18        A.    Yes.

19        Q.    Did you conduct that independent testing

20   on premise?

21        A.    No.

22        Q.    Could you tell us how that independent

23   testing was done?

24        A.    It would have been sent out to one of

Liana Radtke
Confidential – Subject to Further Confidentiality Review

70

1    our outside contract laboratories.  We do not have

2    a laboratory at UDL.

3          Q.    Okay.  Is Salay one of the --

4          A.    Celsus?

5          Q.    Is it Celsus?

6          A.    Yes.

7          Q.    Okay.  One of the ones that you would

8    regularly use --

9          A.    Yes.

10         Q.    -- to test product?

11               Were there others?

12         A.    To test this product I believe at the

13   time it was Celsus.  We do have another contract

14   laboratory, but I believe it was Celsus.

15         Q.    And based on their testing of the

16   product, you were confident that the product you

17   were distributing was -- met standards?

18         A.    It met the requirements of our stability

19   program that it met the USP criteria for potency

20   and dissolution.

21         Q.    Okay.  If you wouldn't mind at the very

22   top of that, would you mind just reading that very

23   short e-mail you sent back to Chuck in response?

24         A.    "Thank you for the update.  In view of

Liana Radtke
Confidential – Subject to Further Confidentiality Review

71

1    your findings, is Mylan having any second thoughts

2    on Digitek?  That would impact UDL as well since we

3    unit dose that product.  Any insight you could

4    provide would be helpful."

5        Q.    Okay.  In your under -- did check

6    indicate in your recollection, Mr. Chuck Koon, that

7    Mylan was having second thoughts about Digitek at

8    this time?

9        A.    I don't recall getting a response back

10   from Chuck other than the document that I'm looking

11   at.

12       Q.    Okay.  I'll go ahead and put up another

13   e-mail here then.  This one here will be No. 55.

14   Here are copies.  This begins with Bates

15   No. 211109.  And it is Chuck's response, Chuck

16   Koon's response there.

17                    (WHEREUPON, a certain document was

18                     marked Deposition Exhibit No. M55,

19                     for identification, as of 1/26/10.)

20   BY MR. COVENY:

21       Q.    And are you with me on there?

22       A.    Yes, okay.

23       Q.    Okay.  Would you mind reading that one

24   as a way to refresh your memory?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

72

1     A.    His response?

2     Q.    Yes.

3     A.    Okay.  "I couldn't speak as to second

4  thoughts, but we are definitely going to keep close

5  tabs on the situation at Amide.  I've briefed our

6  quality management, and I don't think any new

7  actions have been taken but rather than -- excuse

8  me -- rather we want to stay in close contact with

9  Amide and perform much more extensive release than

10 we did previously."

11    Q.    Okay.  What is a -- what is a release?

12 What is he referring to when he says "perform much

13 more extensive releases"?

14    A.    This would be Mylan's release of the

15 product, and I can't speak to that.  I'm not

16 familiar with what they do to release the product.

17    Q.    At UDL do you have any authority or

18 influence over third-party vendors on -- with over

19 which ones you use?

20    A.    It is my responsibility to provide

21 information with the compliance status of the

22 company, and I give that information to management.

23    Q.    And who specifically in management to

24 you give that to?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

73

1          A.     Right now it would be my direct report
2     which is Jodi Eichelberger.
3          Q.     Okay.  How long has Ms. Eichelberger
4     been in that position?
5          A.     Approximately two years.
6          Q.     And do you know who -- who you would
7     have sent that to prior to her?
8          A.     Prior to that would have been Vince
9     Mancinelli.
10         Q.     Vince Mancinelli on our -- let me have
11    that organizational chart.
12                Executive vice president and general
13    manager of UDL Laboratories?
14         A.     Correct.
15         Q.     Is he no longer in that position?
16         A.     He is no longer in that position.
17         Q.     Okay.  All right.  Did you have any
18    discussions with anyone concerning dropping Actavis
19    as a supplier of Digitek?
20         A.     Dropping Actavis?  I don't recall having
21    any conversation along that line.
22         Q.     Okay.  Why then did you -- did you ask
23    Chuck Koon if they were having second thoughts?
24    Was it your understanding that they might be

Liana Radtke
Confidential – Subject to Further Confidentiality Review

74

1    considering moving away from Actavis as a supplier

2    of Digitek?

3         A.    I would have kept in close contact with

4    Mylan since they were the supplier of the product,

5    they are a subsidiary of ours, so that I could pass

6    that information on to our management.

7         Q.    Would it be fair to say that you

8    deferred to Mylan, Mylan's decision as to whether

9    or not to distribute product made at Actavis?

10        A.    If Mylan were to make that decision, we

11   would not be purchasing that product since it came

12   directly from Actavis.  So, it would have

13   impacted --

14        MR. KAPLAN:  From Actavis to Mylan.

15   BY THE WITNESS:

16        A.    From Actavis to Mylan and then it would

17   come to UDL, so we could not have been getting that

18   product directly from Actavis.  So anything that

19   Mylan -- any decision that Mylan would do would

20   impact -- would impact our company as well.

21   BY MR. COVENY:

22        Q.    Okay.  If -- is it fair to say then that

23   if Mylan continues to carry and distribute that

24   product that you would continue to distribute it

Liana Radtke
Confidential – Subject to Further Confidentiality Review

75

1    for Mylan?

2         A.    I would say yes because I'm -- I am

3    confident with the processes and procedures we have

4    in place to release product to ensure it meets its

5    specifications.

6         Q.    Have you ever recommended to management

7    that a distributor or supplier be dropped that you

8    no longer purchase product or distribute product

9    for them?

10        A.    Be dropped?

11        Q.    Be dropped, let me rephrase that.

12        A.    Okay.

13        Q.    Have you ever recommended to management

14   that the product from a certain manufacturer no

15   longer be distributed or that it was unsafe to be

16   distributed?

17        A.    That wouldn't have been my decision on

18   my own, but I don't recall ever expressing that to

19   management.

20        Q.    Okay.  These e-mails, the feel of the

21   e-mails is that you referred -- you deferred to

22   Chuck Koon in terms of his assessment of what was

23   happening at Actavis?  Is that a fair assessment?

24        A.    Could you rephrase that question?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

76

1      Q.    Yes.  Is it fair to take from these

2    e-mails that you deferred to Chuck Koon's

3    assessment of Actavis, that if he was happy with

4    how things were going at Actavis, you were

5    satisfied?

6      A.    Chuck would have just been providing the

7    information to us.  That decision would not be made

8    by Chuck alone, not to my knowledge.  He would have

9    been the -- my contact to obtain as much

10   information as I could so that I could pass it on

11   to management.

12      Q.    Did you share Chuck's opinion that

13   Actavis was having difficulties trying to integrate

14   with their new owners that -- and Mylan was having

15   difficulties integrating with its new owner Actavis

16   and that that perhaps was some of the source of the

17   problems?

18      MR. TABER:  Same objection; document speaks

19   for itself.  It was not authored by her.

20   BY MR. COVENY:

21      Q.    All right.  Okay.  I'm going to put up

22   this next one which will be No. 56.  This is a

23   memorandum from yourself.

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

77

1                    (WHEREUPON, a certain document was

2                    marked Deposition Exhibit No. M56,

3                    for identification, as of 1/26/10.)

4     BY MR. COVENY:

5          Q.    Could you tell us -- could you tell us

6     what -- when you generated this document,

7     approximately?

8          A.    According to this date, September 16th,

9     2006.

10         Q.    And, again, this was in response to the

11    Actavis warning letter; is that correct?

12         A.    Let me look.  Yes.

13         MR. KAPLAN:  When you say the warning letter,

14    what are you -- which one are you talking about?

15    BY THE WITNESS:

16         A.    The a warning letter.  It says was

17    issued August 15th, 2006.  So that would have been

18    what this is in reference to.

19    BY MR. COVENY:

20         Q.    All right.  Under "Findings" when you

21    wrote this, you indicate, "Deviations demonstrating

22    the firm's failure to comply with 21 CFR."

23                    No. 1, could you read No. 1 to us?

24         A.    Six potential serious and unexpected

Liana Radtke
Confidential – Subject to Further Confidentiality Review

78

1    ADEs dating back to 1999 for Digoxin."

2         Q.    What is an ADE?

3         A.    It is an adverse drug event.

4         Q.    Okay.  Could you read No. 2 to us?

5         A.    Actually I didn't finish reading No. 1.

6         Q.    Okay.

7         A.    It says, "Submitted information was

8    incomplete and/or inaccurate on some of the 15-day

9    alert reports."

10             So, you wanted me to read No. 2?

11        Q.    Yes.

12        A.    Okay.  "Serious and unexpected ADE

13   reports were not promptly investigated.  (Minimal

14   case information on a fatality with no follow-up.)"

15        Q.    Do you recall the specifics of that at

16   all?

17        A.    I'm not sure if that was relating to

18   Digitek.  I don't have enough information here in

19   front of me.  This is just a summary.

20        Q.    But according to this there are at least

21   six potentially serious and unexpected adverse

22   events dating all of the way back to 1999 for

23   Digoxin?

24        A.    Um-hum, that were either incomplete or

Liana Radtke
Confidential – Subject to Further Confidentiality Review

79

1    inaccurate.

2         Q.    Did this in any way lead you to wonder

3    whether Mylan was having second thoughts about

4    carrying Digitek from Actavis?

5         MR. TABER:   Just note my objection because you

6    are suggesting something to her that is not in that

7    document.   The fact that the ADEs were there is not

8    why there was a citation.   It was purely a matter

9    of paperwork.

10   BY MR. COVENY:

11        Q.    Let me reask the question then.

12             Having read the warning letters, was

13   that the basis of your wondering whether or not

14   Mylan was having second thoughts about carrying

15   Digitek?

16        A.    I'm unsure -- I'm not sure how to

17   respond to that.

18        Q.    Is it fair to say that you were at this

19   time concerned about the Digitek product coming out

20   of Actavis?

21        A.    Again, I can only speak to our process

22   and procedures, and I was very confident that

23   anything that we released met -- was within its

24   specification.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

80

1      Q.    Okay.  Okay.  Let's go ahead and put up

2   an e-mail.  Here you are.  This would be No. 57.

3                 (WHEREUPON, a certain document was

4                 marked Deposition Exhibit No. M57,

5                 for identification, as of 1/26/10.)

6   BY MR. COVENY:

7      Q.    It is document No. 36659.  Again, from

8   Chuck Koon to yourself sent Thursday, January 10,

9   2008.  It is 2006 responses.pdf.

10                I put this up because, again, Mr. Koon

11   referring to in No. 2 there, he says, "Actavis is

12   still on our radar.  They are very difficult to

13   deal with as I'm sure you know."

14                You indicated, I believe, earlier that

15   you did not have a lot of direct contact with Amide

16   or Actavis at this time, is that correct?

17      A.    That is correct.

18      Q.    Did you find contact with them difficult

19   or of course -- or difficult to get information

20   from them concerning the warning letter?

21      A.    We went through Mylan to see if we could

22   obtain the information.

23      Q.    Okay.  So, you didn't try -- you didn't

24   try directly -- most of your efforts were --

Liana Radtke
Confidential – Subject to Further Confidentiality Review

81

1          A.    Were through Mylan.

2          Q.    -- were directed through Mylan?

3          A.    That's correct.

4          Q.    And it's your understanding then that

5     Mylan was having a difficult time receiving that

6     information?

7          A.    According to what Chuck is stating,

8     that's what he is stating in this document.

9          Q.    And you wouldn't have any reason to

10    doubt him?

11         A.    No.

12         Q.    Okay.  This will be No. 58.

13                   (WHEREUPON, a certain document was

14                    marked Deposition Exhibit No. M58,

15                    for identification, as of 1/26/10.)

16    BY MR. COVENY:

17         Q.    Okay.  Can you tell us what this is?

18         A.    This is a reassessment summary of

19    Actavis.

20         Q.    Okay.  And when did you produce this?

21         A.    January 21, 2008.

22         Q.    Okay.  And why did you produce this?  Do

23    you --

24         A.    This is part of our vendor assessment

Liana Radtke
Confidential – Subject to Further Confidentiality Review

82

1    program.

2        Q.    Okay.  And traditionally do you always

3    do background information when you are producing

4    one of these?

5        A.    Background information is to just

6    basically identify the company, our association

7    with the company.  That would be what the

8    background is.

9        Q.    And according to this document, how long

10   had Actavis, and previously Amide, been

11   producing -- or been providing Digitek?  And

12   according to this it says manufactured by Actavis

13   but purchased through Mylan.  How long had that

14   relationship been going on?

15       A.    Since 2004.

16       MR. KAPLAN:  Chuck, do you want to take just a

17   minute and write down your choice there and then

18   we'll -- for lunch so I can turn it in.

19                    (WHEREUPON, there was a short

20                    interruption.)

21       MR. KAPLAN:  You can maybe turn off the camera

22   for a minute so we can finish that.

23       THE VIDEOGRAPHER:  We are off the record at

24   10:54 a.m.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

83

```
 1                    (WHEREUPON, a recess was had
 2                     from 10:54 to 11:00 a.m.)
 3          THE VIDEOGRAPHER:  We are back on the record
 4      at 11 o'clock a.m.
 5                         (WHEREUPON, a certain document was
 6                         marked Deposition Exhibit No. M59,
 7                         for identification, as of 1/26/10.)
 8      BY MR. COVENY:
 9          Q.    All right.  I'm going to go ahead and
10      hand you an e-mail here, and this will be
11      Exhibit M59.
12               Could you tell me who Cassandra Bird is?
13          A.    Cassandra Bird is in quality assurance
14      at Mylan Pharmaceutical.
15          Q.    And could you tell me the date that this
16      e-mail was sent?
17          A.    April 25th, 2008.
18          Q.    Okay.  And would you go ahead and read
19      the e-mail beginning "Actavis is issuing a recall."
20          A.    Okay.  "Actavis is issuing a recall on
21      Digitek.  We have placed the following materials on
22      QA hold and are in the process of locating the
23      remaining orders.  No product on this list can ship
24      from the D.C. to date.  Yesterday was the last day
```

Liana Radtke
Confidential – Subject to Further Confidentiality Review

84

1      any outbound shipments can be recorded in the

2      distribution history.  In the event there are any

3      invoicing issues to be corrected from yesterday's

4      shipment that would result in a shipping day of

5      today to be posted in the distribution history,

6      please document accordingly and provide the

7      information to Cass Bird in Morgantown.  There

8      should be no outbound shipments recorded after

9      yesterday," and that would be 4 -- on 4/24.

10         Q.    2008?

11         A.    2008, yes.

12         Q.    Okay.  Would you tell me was this -- how

13     were you originally notified of the recall, of this

14     Digitek recall?

15         A.    The -- originally?

16         Q.    Yes.

17         A.    Okay.  I would have been notified by

18     Cassandra Bird that there was a lot one lot in

19     question and that UDL did not receive any of that

20     lot.  We did not repackage or distribute any of

21     that lot.  And then there would have been a

22     follow-up at -- and I'm not exactly sure at what

23     point.  Cassandra would have notified UDL that the

24     recall had expanded to all lots of Digitek.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

85

1          Q.     This particular e-mail here, to which

2     does this refer, to the --

3          A.     I -- I am not sure.  This was not --

4     well, I was copied on this.  As far as the timing,

5     I can't speak to the timing.  I'm not sure what the

6     timing was.

7          Q.     Approximately how much time do you

8     recall when -- occurred between the time you were

9     notified original -- when you first were notified

10    that there was a problem with a particular lot and

11    the time in which the general recall -- this recall

12    was issued, do you recall how much time went by?

13         A.     I don't.

14         Q.     Okay.  Was it a matter of days, months?

15         A.     No, not months.  It would have been more

16    along the line of days.

17         Q.     Okay.  So, when this came through, it

18    wasn't entirely unexpected?

19         A.     I'm not sure what led up to this prior

20    to.

21         Q.     Okay.  What was your role specifically

22    when the recall was announced?  Did you have any

23    particular responsibilities?

24         A.     Yes.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

86

1        Q.    Could you tell me what those were?

2        A.    My responsibility is if there is a

3   recall conducted that I would -- I would be the one

4   that would issue the recall letter and that as far

5   as coordinating the recall, that would be done in

6   the -- coordinated between myself and Sue Powers

7   and quality assurance.

8        Q.    Had you conducted any recalls prior to

9   this Digitek recall in your tenure in your current

10  position?

11       A.    Have we -- are you asking me if we've

12  ever conducted a different --

13       Q.    Had you had to do a recall prior to this

14  one?

15       A.    Yes.

16       Q.    Okay.  So this wasn't your first

17  experience --

18       A.    No.

19       Q.    -- with a recall?

20       A.    No.

21       Q.    Had you done -- had you been tasked with

22  doing recalls of the same magnitude prior to this

23  one?

24       A.    A Class 1 recall, no.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

87

1        Q.    So this was your first experience with a

2   Class 1 --

3        A.    With Class 1, yes.

4        Q.    -- recall?  Okay.

5              And you said that you and Sue Powers

6   then worked together --

7        A.    Correct.

8        Q.    -- to initiate the recall?

9              But you had to assist in drafting the

10   letter, the recall letter?

11       A.    Yes.

12       Q.    Okay.  I'm going to pull that one down

13   here and we'll go ahead and put that e-mail up,

14   which is basically what you've just testified here.

15   This will be No. 60.  It is document No. 6050.

16                    (WHEREUPON, a certain document was

17                    marked Deposition Exhibit No. M60,

18                    for identification, as of 1/26/10.)

19   BY MR. COVENY:

20       Q.    In this e-mail to Sue Powers from

21   yourself, you basically state what you just

22   testified that you had to help draft the letter?

23       A.    Right.

24       Q.    Did Cassandra Bird -- and if this e-mail

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

88

1    refreshes your memory, did Cassandra Bird begin --

2    draft the letter for you at Mylan and you took

3    that?

4         A.    No.  She drafted a letter for Mylan and

5    then she sent that to me.

6         Q.    Did you use that as a template then to

7    draft your -- your letter?

8         A.    It's possible.  I'd have to compare the

9    two letters, but it is very possible.

10        Q.    It's fair to say you did not -- that

11   Cassandra Bird was taking the lead position since

12   she was from Mylan and that you got --

13        A.    Yes.

14        Q.    Okay.

15        A.    Because UDL would have been notified by

16   Mylan of the recall.

17        Q.    Did you have a set procedure in place

18   for engaging in a Class 1 recall?

19        A.    We have a procedure in place for

20   conducting -- if we get involved in a recall, we do

21   have a procedure in place for recalls.

22        Q.    Does that -- does that procedure have to

23   be in accordance with any FDA regulations?

24        A.    Yes.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

89

1          Q.    Okay.  And that would be I assume then

2     your job to make sure that the procedure complied

3     with FDA --

4          A.    Correct.

5          Q.    -- regulations?

6                I know earlier you indicated that most

7     of your training was on-the-job training.

8          A.    Um-hum.

9          Q.    How did you then come up -- come to

10    understand the FDA requirements?  Did you -- you

11    didn't -- did you take any courses or any --

12         A.    Training through seminars, this type of

13    thing, review of CFR guidances, any things along

14    that line.

15         Q.    What are guidances?

16         A.    FDA will put a guidance out, for

17    example, a recall guidance.  This is how you

18    conduct a recall.  So, there are guidances that

19    they provide to industry that would give you their

20    current thinking along the lines of how you should

21    perform a function of some sort.

22         Q.    And when you were first notified that

23    this recall -- when you were notified that it would

24    be a Class 1 recall, were you prepared to act

Liana Radtke
Confidential – Subject to Further Confidentiality Review

90

1    immediately or did you have to seek advice from the

2    FDA or anybody to go forward with it?

3         A.    We were prepared to act immediately on

4    the recall because we have a system in place that

5    would require us to put everything on hold.  And

6    then there would have been notification to our

7    district that we would be involved in this recall.

8         Q.    Okay.  According to -- or when the

9    recall first came out, at which time did you -- let

10   me rephrase that.

11         At first you were told that there was

12   simply one lot that was at question and you did not

13   believe that UDL had any of that product, is that

14   correct?

15        A.    We knew for a fact that we didn't.  We

16   never received that lot.

17        Q.    When the recall was expanded --

18        A.    Yes.

19        Q.    -- did you look simply for the lots that

20   were listed in the recall and put those on a hold

21   or did you put a hold on Digitek entirely?

22        A.    We put a hold on Digitek entirely.

23        Q.    I'm curious, why would you put a hold on

24   the entire -- on the entire product when only

Liana Radtke
Confidential – Subject to Further Confidentiality Review

91

1    certain batches had been indicated for recall?

2         A.    At the time we were notified that it

3    extended to all lots of Digitek.  So that would

4    have impacted anything that we would have packaged

5    and distributed.

6         Q.    Okay.  Did this impact any products

7    other than Digitek that you received from Mylan

8    that had been produced at Actavis?

9         A.    This recall?

10        MR. TABER:  Objection.

11   BY MR. COVENY:

12        Q.    No.  When this original recall came

13   out --

14        A.    Yes.

15        Q.    -- did you put a hold on any other

16   product that came from Actavis or did you limit it

17   strictly to Digitek?

18        MR. TABER:  Objection.

19        MR. COVENY:  That doesn't mean she can't

20   answer.

21   BY MR. COVENY:

22        Q.    Did you specifically --

23        A.    This recall -- this recall only involved

24   Digitek.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

92

1      Q.    And that's the only product that in
2  response to this recall you put on hold at that
3  time?
4      A.    Correct.  That to the best of my
5  knowledge, that is correct.
6      Q.    Could you tell me who Steritype is?
7      A.    Stericycle?
8      Q.    Stericycle, yes.
9      A.    Stericycle is the company that would
10 have been contracted to conduct the Class 1 recall.
11     Q.    And when you say "conduct the recall,"
12 what would you mean?
13     A.    They would have sent the letters to --
14 it had to go to the consumer level.  So they would
15 have been -- they would have been -- we would have
16 put them on contract to conduct that recall for us,
17 to send the letters.
18     Q.    And they were already retained prior to
19 the recall.  Were they part of your standard
20 operating procedure?
21     A.    No.
22     Q.    Had they already been contracted with?
23     A.    No.
24     Q.    Okay.  So you contacted them as a result

Liana Radtke
Confidential – Subject to Further Confidentiality Review

93

1    of the recall?

2         A.    They would have been contacted as a

3    result of the recall.

4         Q.    But not by you?

5         A.    No.

6         Q.    Okay.  Do you know who would have done

7    that?

8         A.    That would have been in coordination

9    with Mylan who would have done the same thing.  So,

10   I'm not sure -- I'm not certain who -- who actually

11   made the arrangements.

12        Q.    But it was made at Mylan, to your

13   knowledge?

14        A.    To my knowledge.  I don't know, but I

15   believe so.

16        Q.    Okay.  This is an e-mail from Cassandra

17   Bird.  We'll put this one in as 61.

18                    (WHEREUPON, a certain document was

19                     marked Deposition Exhibit No. M61,

20                     for identification, as of 1/26/10.)

21   BY MR. COVENY:

22        Q.    Let's see.  You were copied on this one,

23   I believe.  Let's see here.  I'm going to pull it

24   off the screen just for a second to see if you were

Liana Radtke
Confidential – Subject to Further Confidentiality Review

94

1      copied on this one here.

2            A.    No.

3            Q.    Okay.  Well, I'll go ahead and pull that

4      one then.  Let's see here.  I'll leave it up there

5      since I have it in.  I'll just ask you a question.

6                  This is an e-mail from Sandra Bird?

7            A.    Um-hum.

8            MR. KAPLAN:  It's Cassandra.

9      BY THE WITNESS:

10           A.    Cassandra.

11     BY MR. COVENY:

12           Q.    Cassandra.  Thank you.

13                 Does the FDA require that you keep in

14     constant contact with them during a recall?

15           A.    Could you define what you mean by

16     "constant"?

17           Q.    Absolutely.  Did you have to report to

18     the FDA the progress of the recall?

19           A.    Yes.  You have to send periodic status

20     reports to the FDA.

21           Q.    Okay.  And that would have been your

22     job?

23           A.    Yes.

24           Q.    Did you have to do it independently at

Liana Radtke
Confidential – Subject to Further Confidentiality Review

95

1    UDL or could Mylan make those responses?

2         A.    No.  We had -- we had to go through our

3    distribute.  They went through their district.

4         Q.    All right.  Are you familiar with the

5    gold list?

6         A.    The gold list?

7         Q.    Yes, the customer gold list.

8         A.    I'm not too familiar.

9         Q.    All right.  But did you provide a

10   customer list then to Stericycle, a list of all of

11   the customers you wanted them to contact?

12        A.    Yes, yes.

13        Q.    Would that have been UDL's

14   responsibility to provide all contacts to

15   Stericycle for issuance of recall letters?

16        A.    If -- if they were contracted to conduct

17   the recall, we would have had to provide them with

18   a customer list.

19        Q.    Okay.  How quickly were you able to

20   generate that list for Stericycle following the

21   recall?

22        A.    I don't know the timeline.  I'm not

23   sure.

24        Q.    Okay.  Do you recall how many notices

Liana Radtke
Confidential – Subject to Further Confidentiality Review

96

1     had to be sent out?

2          A.    No, not to go to the consumer level, no.

3          Q.    Compared to your previous recalls, was

4     this -- was this a much more significant recall in

5     terms of the numbers of people that needed to be

6     contacted?

7          A.    That -- it went to the consumer level,

8     and that's what a Class 1 recall would do.  So,

9     being the first Class 1 recall I was involved in,

10    this was -- this went to a larger customer base.

11         Q.    Let me make sure -- yes, you were copied

12    on this one here.  I'm going to put up another

13    e-mail from Cassandra Bird that you were -- dated

14    May 8th of 2008.  This will be No. 62, document

15    No. 20272.

16         MR. KAPLAN:  Do you have another one?

17         MR. COVENY:  Sorry.

18         MR. KAPLAN:  Do you have another one?

19         MR. COVENY:  Yes.  Let me put it up here on

20    the screen for you.  There you are.

21                    (WHEREUPON, a certain document was

22                     marked Deposition Exhibit No. M62,

23                     for identification, as of 1/26/10.)

24    BY MR. COVENY:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

97

1          Q.    You were copied on this one along with
2     many other people, so you may need just a moment.
3     At the very bottom of the first page begins an
4     e-mail.  This is shortly after the recall is
5     issued.
6              Did you at any time attempt to or need
7     to contact Actavis to get information on the recall
8     directly?
9          A.    Myself personally, no.
10         Q.    No.  Mylan -- you got your information
11    from Mylan, is that correct?
12         A.    Yes.
13         Q.    And it appears that what was --
14    Cassandra Bird, was she the person -- the point
15    person at Mylan for the issuance of the recall?
16         A.    Yes.
17         Q.    Okay.  And so you -- did you ever talk
18    to Cassandra Bird concerning the recall yourself?
19         A.    I may have.  I don't remember back that
20    far.
21         Q.    She expresses in this e-mail repeated
22    attempts to reach anyone in the quality unit of
23    Actavis.
24         MR. TABER:  Just objection.  Are you

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

98

1    attributing that statement to Cassandra Bird?

2        MR. COVENY:  To Cassandra Bird.

3        MR. TABER:  I'm not sure that's an accurate,

4    but go ahead.

5    BY MR. COVENY:

6        Q.    Did Cassandra Bird or anyone at Mylan

7    indicate to you at this time that -- how long they

8    thought this recall process was going to take

9    place?

10       A.    No.

11       Q.    Did you have an understanding at the

12   inception of how long this process was going to

13   take?

14       A.    No.

15       Q.    Who produced the return kits for

16   consumers to send the products back?  Did you have

17   to produce those or did Stericycle?

18       A.    Stericycle.

19       Q.    Was -- okay.  Did you have to -- did you

20   have any involvement in making up those return

21   letters or --

22       A.    As in reviewing them?

23       Q.    Yeah.

24       A.    I don't recollect that.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

99

1        Q.    Okay.  From the time that you first

2    received notice that there was a Class 1 recall,

3    how long did it take you to get letters issued to

4    consumers?

5        A.    I can't -- I can't provide you the exact

6    timeline.  I don't remember.

7        Q.    Approximately was it -- did it take

8    days, months?

9        MR. TABER:  Objection.

10   BY MR. COVENY:

11       Q.    Okay.  Any recollection of how long it

12   took before you got your first letters out?

13       A.    I can't give you an exact timeline.

14       Q.    Okay.  Did any of the -- was any of the

15   product, to your knowledge, sent directly back to

16   UDL?

17       A.    Not to my knowledge, no.

18                  (WHEREUPON, a certain document was

19                   marked Deposition Exhibit No. M63,

20                   for identification, as of 1/26/10.)

21   BY MR. COVENY:

22       Q.    This is an e-mail which we'll mark M63

23   from yourself to Val --

24       A.    Schissel.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

100

1      Q.    -- Schissel.  Who is Val Schissel?

2      A.    Did you just ask me who she is?

3      Q.    Yes.

4      A.    Okay.  She works in my department and

5  she would have assisted in the coordination of the

6  recall information.

7      Q.    Okay.  And when is this e-mail dated?

8      A.    It's dated August 15th, 2008.

9      Q.    Okay.  Approximately four or five months

10  after the issuance of the recall?

11      A.    Um-hum.

12      Q.    And the recall was still ongoing?

13      A.    Yes.

14      Q.    Okay.  What is 100 percent

15  effectiveness?

16      A.    When -- depending on the classification

17  of the recall, it will tell you what percentage of

18  the original consignees, they call them consignees

19  that were contacted, how many that you would have

20  to contact to ensure, yes, they did receive the

21  recall notification.  That's all part of the

22  process.

23      Q.    Okay.  And were you in charge of

24  monitoring that process at UDL at all?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

101

1      A.    Are you asking me if we conducted that?

2      Q.    Yes.

3      A.    No.  Stericycle.

4      Q.    Okay.  Did they report to you the

5   progress?

6      A.    Yes.

7      Q.    Okay.  And as of August, down towards

8   the bottom of that page, "At this time we have

9   32,980 non-responders."

10          Who would be a non-responder?

11     A.    Someone that did not send a form back

12   saying, "Yes, we did receive it.  No, we don't have

13   product."  I'm not -- without seeing the actual

14   document that was sent to the customer, I can't

15   really respond as to who would have been the

16   non-respondent in this particular case.

17     Q.    At what point in time were all products

18   that were -- that had originated from Actavis put

19   on hold for distribution?

20     MR. TABER:  Objection; and I would remind you

21   that Judge Goodwin has already ruled that discovery

22   of products other than Digitek is not permissible.

23   So, I would ask that you either withdraw your

24   question or rephrase it in such a way that it

Liana Radtke
Confidential – Subject to Further Confidentiality Review

102

1    relates only to Digitek.

2                         (WHEREUPON, a certain document was

3                         marked Deposition Exhibit No. M64,

4                         for identification, as of 1/26/10.)

5    BY MR. COVENY:

6         Q.    Okay.  This one here will be Exhibit 64.

7    This is from Howard Martin.

8               Do you know who Howard Martin is?

9         A.    Howard Martin, I believe he is in

10   customer service at Mylan.

11        Q.    Okay.  And you are copied, it looks

12   like, on this next page, a document 593692.

13              Would you read your e-mail that you

14   wrote on 7/21/2008 at the bottom of that page?

15        A.    At the bottom of the page?

16        Q.    Yes.

17        A.    "We just received" --

18        MR. TABER:  Note my objection again for the

19   same purpose.

20        MR. COVENY:  Okay.

21        MR. TABER:  This is a document relating to

22   something other than Digitek I assume?

23        MR. COVENY:  I believe we have the part

24   redacted that is of concern.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

103

1        MR. TABER:  So, where does it say Digitek?

2        MR. COVENY:  We'll -- it's not that.  We'll

3    hold that one.  We'll come back to it.  We'll hold

4    that one for later.

5            One minute until the end of the tape.

6    All right.  Let me do -- well, we are going to

7    have -- we have one minute left until the end of

8    the tape.  I'll go ahead and get this document on

9    and then we'll have to go ahead and change out

10   tapes.  This one here will be No. 64.

11       MR. KAPLAN:  5.

12       THE COURT REPORTER:  65.

13               (WHEREUPON, a certain document was

14                marked Deposition Exhibit No. M65,

15                for identification, as of 1/26/10.)

16   BY MR. COVENY:

17       Q.    65.  There you are.  There is yours.

18   And if you'll go ahead and familiarize yourself

19   with the document.

20       A.    Okay.

21       Q.    I believe we'll have to change tapes

22   before we get to it, so we'll go off the record.

23       THE VIDEOGRAPHER:  We are off the record at

24   11:24 a.m. with the end of Tape 1.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

104

1            (WHEREUPON, a recess was had

2               from 11:24 to 11:30 a.m.)

3       THE VIDEOGRAPHER:  We are back on the record

4    at 11:30 a.m. with the start of Tape 2.

5    BY MR. COVENY:

6       Q.    All right.  We are beginning with

7    document M65, Bates No. 5805.

8            Are you familiar with this document?

9       A.    This is a receiving -- a copy of a

10   receiving document.

11      Q.    Okay.  Page 4 on this one here, the

12   fourth page would be Bates No. 5808.  I'll pop that

13   up here.

14            What's the date on this document?

15      A.    Down at the bottom.

16      Q.    Okay.

17      A.    It was verified on 6/29/07.

18      Q.    Okay.  And do you -- can you tell who

19   verified that?

20      A.    It looks like -- I can't remember her

21   first name, but it's McClean.  She is one of the QA

22   receiving inspectors.

23      Q.    Okay.  Up about halfway up the page

24   there it talks about containers sampled.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

105

1      A.    Right.

2      Q.    How many?

3      A.    Three bottles were sampled.

4      Q.    And how many pills were there?

5      A.    It said quantity sampled is 80 tablets.

6      Q.    Okay.  And then defects found?

7      A.    It says four tablets out of UDL's

8    thickness tolerance.

9      Q.    Now, originally it said none, is that

10   correct?

11     A.    Um-hum.

12     Q.    But that's crossed out.  And can you see

13   what's written next to that?

14     A.    Yeah.  That's Peggy Finch's initials and

15   date when she crossed that out.

16     Q.    Okay.  So that was a -- so, can you tell

17   me how that's done?  It indicates none found and

18   then she crossed that out and wrote in.  Was none

19   found by an original inspector and then when she

20   verified it, any idea?

21     A.    I don't know the details of why the --

22   for the reason for that strikeout.

23     Q.    Okay.  Was this batch then accepted?

24     A.    Yes.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

106

1      Q.    And it was accepted notwithstanding that
2   four tablets were out of UDL's thickness tolerance?
3      A.    They were out of UDL's thickness
4   tolerance, yes.
5      Q.    Okay.  Can you -- do you have any reason
6   to -- or any explanation as to why it was accepted?
7      A.    UDL would establish its specifications
8   for the creation of the tooling which is tighter
9   than what would be allowed, the range of the
10   thickness from the manufacturer.  So, it was within
11   their range, but it was not within our range.
12      MR. KAPLAN:  Lower or higher?
13   BY MR. COVENY:
14      Q.    Okay.  And which is something that we
15   discussed earlier in the deposition that you have
16   tighter standards --
17      A.    Right.
18      Q.    -- for size and for assay than do the --
19      A.    Right.
20      Q.    -- manufacturers?
21      A.    Right.
22      Q.    Okay.
23      MR. KAPLAN:  Tell him whether it was higher --
24   lower or higher?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

107

1    BY MR. COVENY:

2        Q.    Is that correct?

3        A.    But this actually -- these were actually

4    smaller.  These four tablets that they found were

5    out of our tolerance, but they were smaller, not

6    larger.

7    BY MR. COVENY:

8        Q.    Is that indicated on there?  I don't see

9    that.

10       MR. KAPLAN:  If you look at 5815, page 5815

11   you'll see the specs.

12   BY THE WITNESS:

13       A.    You'll have an example of the actual.

14   This is the actual --

15       MR. KAPLAN:  And if you look at numbers --

16       MR. COVENY:  Okay.

17       MR. KAPLAN:  -- 3, 7, 8 and 11, you'll see

18   that they are thinner than the UDL tolerance specs.

19   The UDL tolerance specs, just for your information,

20   are 3.15 millimeter to 3.29 millimeter.  And you'll

21   see that three of those four tablets were .01 or

22   1/100 of a millimeter smaller and one was .03 or

23   3/100 of a millimeter smaller, not larger, so, if

24   that helps.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

108

1    BY MR. COVENY:

2         Q.    How much of your time would you say

3    was -- well, all right.  Let me rephrase that.

4              Was a significant portion of your -- of

5    your daily work dedicated to the recall once it was

6    announced?

7         A.    Initially I would have had to spend some

8    time making sure.  There is more to it than just

9    issuing a recall letter.

10                   (WHEREUPON, a certain document was

11                    marked Deposition Exhibit No. M66,

12                    for identification, as of 1/26/10.)

13   BY MR. COVENY:

14        Q.    This would be Exhibit No. M66.  Do you

15   know what this is?  It's Bates No. 202796.

16        A.    I believe this document was something

17   that was requested through Mylan to document how

18   much time we were spending on actual -- the recall

19   as far as the ongoing paperwork associated with the

20   recall.

21        Q.    Did you keep time sheets?

22        A.    Did we keep time sheets?

23        Q.    Did you personally keep time sheets like

24   this on your time spent on the recall?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

109

1          A.    I may have originally, but I don't
2    remember what was -- what was on that, um-hum.
3                    (WHEREUPON, a certain document was
4                     marked Deposition Exhibit No. M67,
5                     for identification, as of 1/26/10.)
6    BY MR. COVENY:
7          Q.    Okay.  No. 67 here.  An e-mail from
8    yourself to Cassandra Bird.
9                Was Cassandra Bird the one that wanted
10   to keep time sheets on people, the time spent on
11   the recall?
12         A.    Yeah, originally she would have sent
13   that out saying that they wanted us all to keep
14   record of any of the time that we would have spent
15   on the recall.
16         Q.    To your knowledge, do you know why she
17   wanted to keep time sheets?
18         A.    Are you asking me to what purpose were
19   the time sheets?
20         Q.    Yeah.  Did she indicate why she wanted
21   you to keep time sheets concerning all of the time
22   you spent on the recall?
23         A.    Not directly.  I don't recall directly
24   if she told me what they would be used for.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

110

1      Q.    Okay.  Was UDL, to your knowledge, being

2   reimbursed for the time employees were being

3   spent -- spending on the recall?

4      A.    I don't know the details of any of the

5   reimbursement.

6      Q.    Okay.  But from this e-mail, is it fair

7   to say that you did not keep a daily log of the

8   hours that you spent on it?

9      A.    At the time that I received this

10  document, I wasn't aware that we were supposed to

11  be keeping track of our time so that that's -- at

12  that point forward I would have kept track of any

13  time.

14     Q.    So, for the first month and a half, you

15  did not?

16     A.    I didn't --

17     Q.    Approximately.

18     A.    Right.

19     Q.    Okay.  All right.

20     MR. COVENY:  All right.  At this time I do not

21  have any further questions for you.  It has been a

22  pleasure.  I believe counsel for one of the

23  Plaintiffs, Michael, has a few questions if you

24  wouldn't mind entertaining those.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

111

1            Michael, do you want to sit here so you
2    can have a microphone?
3        MR. COLEY:  You know what, I've got one
4    apparently.
5        MR. COVENY:  Oh, you do.
6                    EXAMINATION
7    BY MR. COLEY:
8        Q.    Okay.  Good morning, Ms. Radtke.
9        A.    Good morning.
10        Q.    My name is Michael Coley, and I
11    represent several Plaintiffs in the Digitek action,
12    Ms. Connie Quinn.  I'm going to just have a few
13    questions for you, just follow-up questions.
14            With regards to your training and
15    background, you mentioned that you had no formal
16    training after -- for the 25 years that you worked
17    with -- that you've been with UDL?
18        A.    You are asking if I've had any more
19    formal training?
20        Q.    Formal training, yes.
21        A.    Define formal.
22        Q.    Yes.  What I mean, in terms of -- you
23    mentioned that you had seminars, that you've
24    attended seminars.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

112

1          In the last five years have you attended

2     seminars with regards to the -- strike that.

3          A.    FDA type stuff?

4          Q.    Let me back up.  Let me understand this.

5          A.    Okay.

6          Q.    Apparently your current position -- for

7     how long have you held that position?

8          A.    This current position?

9          Q.    Yes.

10          A.    I would say probably 18 years.

11          Q.    Oh, okay.  So, it's fair to say that if

12     I asked you your training with regard to your

13     current position, in the last five years how many

14     seminars have you attended?

15          A.    I've probably -- I try to attend one a

16     year, one FDA seminar a year.  To give you an exact

17     number of the seminars, I really don't know.

18          Q.    Okay.  And in the last 12 months, other

19     than the FDA seminar, have you attended any other

20     seminars?

21          A.    Oh, I'm not sure because they've --

22     we've -- they've had some that were offered like

23     webinar type things, so I'm really -- I'm not

24     certain.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

113

1        Q.    Okay.  And in the last five years, other

2    than the FDA seminars, have you attended any other

3    seminars?

4        A.    I would have attended seminars.  I just

5    can't give you an exact number or tell you what the

6    nature was.

7        Q.    What would be your best estimate in the

8    last year how many seminars other than the FDA

9    seminar?

10       MR. KAPLAN:  I would caution you not to guess

11   or speculate.  I think you said you can't give an

12   exact number.

13   BY THE WITNESS:

14       A.    Yeah, I can't -- I can't answer that.

15   I'm sorry.

16   BY MR. COLEY:

17       Q.    No, I'm not asking you to guess or

18   speculate.  What I'm asking is what would be your

19   best estimate?  Would it be less than five or would

20   it be more than 100 in the last year?

21       A.    Well, it won't be more than 100.  I'm

22   not sure.  I'm sorry.  I can't answer your

23   question.  I don't -- I can't give you an estimate.

24   I don't know.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

114

1      Q.    So, you wouldn't know whether it would
2   be 25 or 100 or closer to 5 or closer to 100?
3      A.    It would probably be closer to 5 than it
4   would be to 100.
5      Q.    Okay.  And the -- do you recall the
6   nature of any of the other seminars, the webinars
7   that you've attended?
8      A.    No, not --
9      Q.    Okay.  How about in the last five years,
10  do you have any -- do you remember any of the
11  webinars that you -- that you attended in the last
12  five years?
13     A.    There might have been some seminars on
14  like validation.  I'm really -- I really -- I'm
15  sorry.  I can't answer your question.
16     Q.    Okay.  You mentioned earlier that part
17  of your job was to take care of the stability
18  program, and I didn't quite understand.  What did
19  you mean by that?
20     A.    What is stability?
21     Q.    Yes.
22     A.    Okay.  As -- as a repackager, we are
23  responsible to ensure that the product meets its
24  specifications, meaning assay and dissolution, it's

Liana Radtke
Confidential – Subject to Further Confidentiality Review

115

1    analytical testing, and that's what would be

2    utilized to support an expiration date that we

3    assign to our package.

4            Once we remove it, we put it into a unit

5    dose blister, we are required to do analytical

6    testing to ensure that our package meets all of its

7    specifications through the expiry date.  So we have

8    an ongoing stability program that prior to it ever

9    being marketed we would test the product, it would

10   never go into commercial distribution, and that's

11   what would be our basis for our expiration date and

12   assignment, and then we would do a number of -- we

13   are required to do one annually to continue to

14   support the product in that container closure

15   system.

16        Q.   Okay.  And your role in the stability

17   process is -- stability program would be what?

18        A.   The stability manager.  He is the one

19   that's responsible for coordinating the program and

20   then he reports to me.

21        Q.   Okay.  With regards to the reporting

22   process, I understand -- and I think it was

23   clarified later on, but with regards to Jodi

24   Eichelberry, she -- I'm understanding that she took

Liana Radtke
Confidential – Subject to Further Confidentiality Review

116

1    the place of?

2         A.    Jodi Eichelberger took the place of

3    Vince Mancinelli.

4         Q.    Okay.  Vince Mancinelli was a vice

5    president as well?

6         A.    Um-hum.

7         Q.    Okay.  Let's see if I can do this

8    without butchering it too much.

9              What I -- apparently you testified that

10   you could only get information through the Freedom

11   of Information Act regarding -- with regards to

12   attempting to find out what had happened with

13   Actavis FDA inspections, is that correct?

14        MR. TABER:  Objection.

15        MR. COLEY:  She can answer.

16   BY THE WITNESS:

17        A.    Would you rephrase your question?

18   BY MR. COLEY:

19        Q.    What I'm understanding is that at some

20   point you were attempting to find out basically

21   more information with regards to the FDA

22   inspections of Actavis, is that correct?

23        A.    The freedom of information -- the

24   information you are able to obtain through the

Liana Radtke
Confidential – Subject to Further Confidentiality Review

117

1    freedom of information isn't always updated.

2    Sometimes it's not released.  In cases of warning

3    letters, they have to work through the FDA before

4    they would re- -- you know, release it to the

5    public domain.  So, in this situation I may have

6    asked to see if there were other options to obtain

7    more information, but we would start with the

8    freedom of information.  That's part of our

9    process.

10        Q.    And with -- you mentioned that you

11   had -- you had spoken with someone at Mylan about

12   getting more information beyond --

13        A.    Chuck, Chuck Koon.

14        Q.    Chuck Koon?

15        A.    Yes.

16        Q.    And were you ever satisfied that you had

17   gotten the information necessary to make your

18   assessment or to find out the information that you

19   were -- you were seeking?

20        A.    I believe UDL did everything within our

21   powers to obtain the information, and we were

22   trying to obtain it through Mylan, and Chuck Koon

23   would have been my contact point.

24        Q.    And there were several letters.  And I

Liana Radtke
Confidential – Subject to Further Confidentiality Review

118

1    don't have each of them, but apparently you were

2    requesting information from Mr. Koon with regards

3    to the Actavis warning letter.

4         A.    Right.

5         Q.    Other than the information that we

6    would -- that's been discussed here so far, did you

7    receive any other information with regards to the

8    Actavis warning letter other than the information

9    you received from the freedom of information and

10   the e-mails that have been discussed here?

11        A.    Any information, that's a very all

12   inclusive statement.  I don't -- I mean, all I know

13   is that we -- we attempt to get the information

14   through Mylan and it was either provided or it was

15   not.

16        Q.    And as you sit there, you have no

17   recollection or understanding that you ever

18   received any other information other than the

19   information that's been discussed in the e-mails

20   sent between you and Mr. Koon?

21        MR. KAPLAN:  Well, I'm going to object.

22   That's overly broad and not specific.

23   BY MR. COLEY:

24        Q.    Can I get the answer now, if you can.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

119

1        A.    Well, I really can't answer that because

2  that's a -- that's a very all inclusive type

3  question.  I don't know what you mean by "any

4  information."

5        Q.    Okay.  That's fair.

6        A.    Yeah.

7        Q.    What I'm understanding is that you have

8  the e-mails that are going back and forth.

9        A.    Right.

10        Q.    And apparently you are in a pretty

11  vigorous attempt to get information.

12        A.    Absolutely.

13        Q.    Okay.  Other than the information that

14  you received in these -- the e-mails, do you have

15  any recollection of receiving any further

16  information that we haven't discussed in those

17  e-mails?

18        A.    No.

19        Q.    Okay.  You mentioned that Mylan engages

20  in audits of third-party vendors.

21        Did UDL engage in any audits of

22  third-party vendors?

23        A.    Are you asking me if we ever have

24  engaged in?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

120

1        Q.    Yes, yes.

2        A.    We would have -- we could have

3    participated in -- in audits.

4        Q.    Okay.  Did you participate in any audits

5    with regards to Actavis or its predecessor Amide?

6        A.    I'm really not sure if I had or I

7    hadn't.  It would have been early on if I had

8    participated, so I don't really have a

9    recollection.

10       Q.    When you say "early on," early on in

11   your career?

12       A.    Career, um-hum.

13       Q.    Okay.  Referring to I believe it's

14   Exhibit 52 and which it's stated that quality

15   controls should have authority to fully investigate

16   errors at the manufacturer, were you referring to

17   quality control at UDL or quality control at Mylan?

18       MR. KAPLAN:  Don't guess or speculate --

19       THE WITNESS:  No.

20       MR. KAPLAN:  -- about some document that's not

21   in front of you.

22   BY THE WITNESS:

23       A.    Could you pull the document?

24   BY MR. COLEY:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

121

1          Q.    Sure, if we can pull that Exhibit 52.

2          A.    This one.  And you're referring to?

3          Q.    Yes, the statement that quality controls

4    should have authority to fully investigate errors

5    at the manufacturer.

6          A.    It's on page 5?

7          Q.    Yes.

8          A.    Um-hum.  This would have been in

9    reference to a summary of Actavis'.  This was a 483

10   that was issued to Actavis.  So to answer your

11   question, this would have been as a summary of what

12   was issued to Actavis.

13         Q.    And meaning that was referring to

14   corrective -- that would be part of the corrective

15   action is that quality control should have the

16   authority to fully investigate errors at the

17   manufacturer?

18         MR. TABER:  Objection.

19   BY MR. COLEY:

20         Q.    Maybe I'm misunderstanding.

21               Okay.  So in my understanding, this was

22   a recommendation from the FDA to Actavis?

23         A.    This would have been an observation

24   issued by the FDA to Actavis.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

122

1          Q.     To Actavis, okay.

2                 Okay.  The memorandum with -- regarding

3     the warning letters -- letters summary to Actavis,

4     you -- it was to file, that memorandum that you

5     made was to file?

6          MR. KAPLAN:  Are you referring to a certain

7     exhibit?

8          MR. COLEY:  Yeah.  I'm sorry.  I'm referring

9     to Exhibit 56.

10         MR. KAPLAN:  Okay.  Let's let her have that in

11    front of her.

12         MR. COLEY:  I'm sorry.  I believe that's

13    Exhibit 55.

14         MR. KAPLAN:  55.

15    BY THE WITNESS:

16         A.     Can you rephrase your question?

17    BY MR. COLEY:

18         Q.     Yes.  Let me withdraw that question.

19    I'll ask you another question.

20                With regards to 50 -- Exhibit 55,

21    apparently --

22         A.     He wants 55.  This is 56.  Okay.  Thank

23    you.  Oh, no.  This is 56.  Sorry.

24         Q.     Okay.  I'm sorry.  I'm probably causing

Liana Radtke
Confidential – Subject to Further Confidentiality Review

123

1     the confusion.

2          A.    I'm confused.

3          MR. KAPLAN:  Are we on the same page?

4          THE WITNESS:  Yes.

5          MR. COLEY:  I believe it is 55.

6          MR. KAPLAN:  55.

7     BY MR. COLEY:

8          Q.    Apparently in 55 it refers to much more

9     extensive releases in 55?

10         A.    Right.

11         Q.    Okay.  And can you explain what -- what

12    was meant by that?

13         A.    Chuck is responding -- and this pertains

14    to Mylan's system for releasing product, and I

15    really can't speak to that.

16         Q.    I see.  What was your understanding as

17    to what was meant by more intensive releases?

18         MR. TABER:  Objection.

19    BY THE WITNESS:

20         A.    I -- I don't know.

21         MR. KAPLAN:  I think it's been asked and

22    answered.

23         THE WITNESS:  Yeah.

24    BY THE WITNESS:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

124

1          A.    I think I answered that question.  I'm

2     not -- that is Mylan's releases, and I'm not

3     familiar enough to address your question.

4     BY MR. COLEY:

5          Q.    Okay.  I see.  Okay.  Okay.

6                And do you know what the CROM Data

7     Acquisition System is or I'm sorry, Total CROM Data

8     Acquisition System?

9          A.    CROM data system, no.

10         Q.    Total CROM Data Acquisition System?

11         A.    I'm sorry.

12         Q.    No.  That's fine.  That's fine.

13         MR. COLEY:  Okay.  I believe that's all I

14     have.

15         THE WITNESS:  Okay.

16         MR. KAPLAN:  Do you want to take a little

17     break?

18         MR. TABER:  Two-minute break.

19         MR. KAPLAN:  Yes, let's take a two-minute

20     break.

21         THE VIDEOGRAPHER:  We are off the record at

22     11:55 a.m.

23                     (WHEREUPON, a recess was had

24                      from 11:55 to 12:09 p.m.)

Liana Radtke
Confidential – Subject to Further Confidentiality Review

125

1           THE VIDEOGRAPHER:  We are back on the record

2      at 12:09 p.m.

3                          EXAMINATION

4      BY MR. TABER:

5           Q.    Ms. Radtke, my name is Ed Taber.  I

6      represent Actavis.  I have just a few follow-up

7      questions for you.

8           A.    Okay.

9           Q.    First I would like to hand you a

10     document that we've listed as UDL No. 13716, and if

11     I put this on the screen, tell me if you can see it

12     okay.

13          A.    I should be able to read it.  It is a

14     little out of focus, but I can -- I think I can

15     read it.  A little more.  No.  Oh, that's not bad.

16          MR. KAPLAN:  That's pretty good.

17     BY THE WITNESS:

18          A.    Yep, there you go.

19     BY MR. TABER:

20          Q.    All right.  First of all, is this a true

21     and accurate copy of an e-mail exchange that you

22     had back in 2006 with Mike Armstrong at UDL?

23          A.    That's correct.

24          Q.    Do you remember the chain of events that

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

126

1    led up to this particular e-mail exchange?

2         A.    I don't remember the particulars, but I

3    do remember asking Mike, he -- to -- he handles the

4    complaints, to make sure that they are -- just to

5    look into the file to see if there were any adverse

6    events reported for Digitek.

7         Q.    Okay.  And let me lay a brief foundation

8    for this document.

9              At UDL is there a process in place to

10   receive and follow up on product complaints?

11        A.    Yes.

12        Q.    And potentially from whom may such

13   complaints come in?

14        A.    The complaints come in through -- they

15   go through the customer relations for UDL that

16   is -- resides at Mylan Pharms, and then if it were

17   an adverse reaction that would impact any product

18   relating to Mylan, it would go through PSRM, which

19   is product safety -- I can never remember what that

20   stands for, but it is management of product

21   complaints.  And anything under our label would be

22   reported to UDL.

23        Q.    All right.  And so are there records

24   kept of those product complaints or adverse event

Liana Radtke
Confidential – Subject to Further Confidentiality Review

127

1    reports?

2         A.    Yes, we keep records.

3         Q.    And looking then at this document,

4    we're -- we're going to mark this in a moment.

5         MR. TABER:  What number are we up to in

6    exhibits?

7         THE COURT REPORTER:  68 is the next one.

8         MR. TABER:  All right.  We'll mark this as

9    Deposition Exhibit M68 I believe is the system.

10                    (WHEREUPON, a certain document was

11                     marked Deposition Exhibit No. M68,

12                     for identification, as of 1/26/10.)

13   BY MR. TABER:

14        Q.    Does it appear that Mr. Armstrong at

15   your request went through those same records as it

16   relates to Digoxin covering the years 1999 through

17   September of 2006?

18        A.    That's correct.

19        Q.    And is 1999 about the time when UDL

20   first began to distribute Digitek?

21        A.    Oh, I don't remember when we started

22   distributing Digitek.

23        Q.    All right.  For those -- for those seven

24   years did Mr. Armstrong find a single product

Liana Radtke
Confidential – Subject to Further Confidentiality Review

128

1    complaint for Digoxin?

2         A.    Are you talking about adverse reaction

3    complaints?

4         Q.    Yes, the ones that --

5         A.    No.  He found nothing.

6         Q.    And he looked?

7         A.    Yes, he did.

8         MR. COLEY:  Objection, a late objection.

9    BY MR. TABER:

10        Q.    And has Mr. Armstrong then go ahead --

11   did he go ahead and document his findings in this

12   particular piece of paper to you?

13        A.    Yes, he responded that there were no AE

14   complaints for Digitek dating back to 1999.

15        Q.    Okay.  And tell me if I read this

16   correctly.  He states, "Li," that's you, Li Radtke?

17        A.    Yeah.  I go by Li.

18        Q.    It says, "Li, I went back through 1999

19   and we have had no," and he has underlined no,

20   "Product/AE complaints for Digoxin."

21        A.    Correct.

22        Q.    Did I read that correctly?

23        A.    Yes, you did read that correctly.

24        Q.    All right.  Now, this e-mail was written

Liana Radtke
Confidential – Subject to Further Confidentiality Review

129

1    to you in September of 2006?

2         A.    Correct.

3         Q.    Okay.  Between September of 2006 and the

4    time of the Dig recall in April of 2008, did UDL --

5    UDL have any product complaints or AE complaints

6    for Digoxin during those two years?

7         A.    You are asking about the AE complaints?

8         Q.    Yes, I am.

9         A.    Yes, no, we did not have any AE

10   complaints from that point to the time of the

11   recall.

12        Q.    And if you had, would you in your

13   position know about it?

14        A.    Yes.

15        Q.    So then are you comfortable sort of

16   confirming that not only between 1999 and 2006, but

17   from 1999 and through April of 2008 there were no

18   such complaints for Digitek?

19        A.    That's correct.

20        MR. COLEY:  Objection.

21   BY MR. TABER:

22        Q.    Okay.  And just because -- I apologize.

23   Because the court reporter was coughing over, I'm

24   sorry, your answer was --

Liana Radtke
Confidential – Subject to Further Confidentiality Review

130

1          A.    Yes.

2          Q.    Your answer was what?

3          A.    Yes.

4          Q.    Okay.  And I believe I asked you this,

5     but our exit -- our Exhibit 68 is an accurate copy

6     of the e-mail from your e-mail then?

7          A.    Yes.

8          Q.    I see.  Okay.

9               All right.  Next I would like to ask you

10    about a four-page document which I'll hand to

11    counsel first and then hand to you.  This is Bates

12    numbered, and produced in discovery, UDL No. 4768

13    through 4771.  And I'll give the gentlemen an

14    opportunity to look at it first --

15         A.    Okay.

16         Q.    -- if you wouldn't mind.

17         MR. TABER:  We can go off the record if you

18    guys want to take more time.  This is an awkward

19    silence on the videotape.

20         MR. COLEY:  Yeah, that's fine.  We can go off

21    the record.

22         MR. TABER:  Off the record.

23         THE VIDEOGRAPHER:  We are off the record at

24    12:17 p.m.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

131

1                    (WHEREUPON, a recess was had

2                    from 12:17 to 12:18 p.m.)

3          THE VIDEOGRAPHER:  We are back on the record

4     at 12:18 p.m.

5     BY MR. TABER:

6          Q.    Ms. Radtke, I'm handing you the four

7     pages we've discussed which is a document entitled

8     "UDL Internal Investigation Record."

9          A.    Okay.

10         Q.    If you wouldn't mind, just take a moment

11    and look through those four pages, and I believe it

12    has your name at the fourth page of it.

13         MR. KAPLAN:  Are you marking this as 69?

14         MR. TABER:  (Nodding head.)

15    BY THE WITNESS:

16         A.    Okay.

17    BY MR. TABER:

18         Q.    Are you all set?

19         A.    Um-hum.

20         MR. TABER:  All right.  We'll mark this as 69,

21    please, all four pages, one exhibit.

22                    (WHEREUPON, a certain document was

23                    marked Deposition Exhibit No. M69,

24                    for identification, as of 1/26/10.)

Liana Radtke
Confidential – Subject to Further Confidentiality Review

132

1    BY MR. TABER:

2        Q.    First of all I'd like to just identify

3    on the last page, Bates No. 4471.  First of all, is

4    that your signature at the bottom of that document?

5        A.    It is.

6        Q.    And you've dated that May 15th of 2008?

7        A.    Of 2008, um-hum.

8        Q.    All right.  Was this a report that was

9    prepared by you or for you?

10        A.    It was -- I -- it was prepared and I

11    reviewed it and approved the document.

12        Q.    Okay.  So you've seen this before?

13        A.    Um-hum.

14        Q.    I'd like to walk you through just a few

15    specific items.

16              First of all, on the bottom of page 1,

17    there is a list -- a category that says,

18    "Attachments."

19        A.    Right.

20        Q.    For context, was this a report that was

21    prepared in the immediate wake of the April 2008

22    Digitek recall?

23        A.    That's -- that is correct.

24        Q.    And as part of this report, did UDL

133

1    endeavor to determine if in fact they were in

2    possession of any so-called double thick tablets?

3          A.    That is correct.

4          Q.    And as part of this investigation, were

5    you involved in it?

6          A.    Involved in the actual investigation?

7          Q.    Or in the reviewing of the reports

8    thereof?

9          A.    Yes, I was involved in the reviewing.

10         Q.    Okay.  And in the first page it says

11   various components to this report, does it not, at

12   the bottom where it says, "Attachments"?

13         A.    "Attachments," yes.

14         Q.    And as part --

15               (WHEREUPON, there was a short

16               interruption.)

17         MR. TABER:  Let's go off the record.

18         THE VIDEOGRAPHER:  We are off the record at

19   12:22 p.m.

20               (WHEREUPON, a recess was had

21               from 12:22 to 12:23 p.m.)

22         THE VIDEOGRAPHER:  We are back on the record

23   at 12:23 p.m.

24   BY MR. TABER:

Liana Radtke
Confidential – Subject to Further Confidentiality Review

134

1          Q.    Ms. Radtke, at the bottom of page 1 of

2     this report, Exhibit M69, it indicates various

3     attachments.

4                My question is, as a component of this

5     investigation, did UDL and/or the people with whom

6     it was working endeavor to review the complaint

7     history for Digitek?

8          A.    That is correct.

9          Q.    And did UDL and/or its delegates also

10    examine retained samples of Digitek tablets?

11         A.    That is correct.

12         Q.    And did your folks at UDL also review

13    the stability testing records for Digitek?

14         A.    Yes.

15         Q.    Okay.  On page 2, which I'm showing you

16    now, was there a summary done of this investigation

17    then?

18         A.    Yes.

19         Q.    All right.  And beginning at the first

20    paragraph, does this indicate some of the records

21    of UDL that were reviewed in the course of this

22    investigation?

23         A.    That is correct.

24         Q.    Okay.  And it says here, "The QA

Liana Radtke
Confidential – Subject to Further Confidentiality Review

135

1        Receiving Product Inspection records were examined

2        and all lots demonstrated tablet thickness

3        measurements within UDL product specification

4        tolerances."

5              Did I read that correctly?

6        A.    Yes, you did.

7        Q.    All right.  And is that true?

8        A.    Yeah, to the best of my knowledge from

9        the records that were reviewed.

10       Q.    And then the report goes on -- by the

11       way, this is referring specifically to Digitek,

12       true?

13       A.    Correct.

14       Q.    The report goes on to set forth those

15       standards for thickness of the both 250 microgram

16       and 125 microgram doses of Digitek, true?

17       A.    True.

18       Q.    And you testified earlier in your

19       deposition that for various reasons UDL has even

20       tighter specifications than the FDA requires,

21       right?

22       A.    Correct, tighter specification than the

23       Actavis' specifications, yes.

24       Q.    Right.  And do you know one way or

Liana Radtke
Confidential – Subject to Further Confidentiality Review

136

1      another if Actavis' spec is the USP spec?

2            A.    It is -- to the best of my knowledge,

3      the USP does not determine the specification.

4            Q.    Okay.

5            A.    That is the -- within the ANDA or the

6      approved new drug application.

7            Q.    The abbreviated new drug application?

8            A.    Yes, that they would submit and get

9      approval to market the drug from the FDA.

10           Q.    Right.  So, when this report says that

11     all lots, being lots of Digitek, demonstrated

12     tablet thickness measurements within UDL product

13     specification tolerances, that means that all of

14     those lots are not only within Actavis' thickness

15     measurements but also within the tighter UDL

16     thickness parameters, true?

17           A.    Correct.

18           Q.    Okay.  Now, UDL, as I understand it,

19     takes Digitek tablets out of bottles and puts them

20     into a blister pack?

21           A.    That's correct.

22           Q.    And is there only a limited space around

23     the tablet within the blister pack available?

24           A.    Yes.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

137

1          Q.    All right.  So, the report in the next

2     paragraph discusses maximum thicknesses for

3     tablets.  Do you see that?

4          A.    Yes, um-hum.

5          Q.    Is it your understanding that if a

6     Digitek tablet was too large, it would not fit in

7     UDL's blister pack package?

8          MR. COLEY:  Objection.

9     BY THE WITNESS:

10         A.    That would be my understanding.

11    BY MR. TABER:

12         Q.    Okay.  And is that understanding set

13    forth in this report?

14         A.    Yes.

15         Q.    All right.  And it states on the second

16    full paragraph, "The depth of the blister tool is

17    NMT 110 percent of the maximum tablet thickness."

18              And does that mean in layman's terms

19    that if the Digitek tablet is more than 110 percent

20    of UDL's thickness specification, there may be --

21    there will probably be a problem encountered in

22    production?

23         A.    That's correct.

24         MR. COVENY:  Objection.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

138

1        MR. KAPLAN:  Objection.

2    BY MR. TABER:

3        Q.    Moving down the page then where it has a

4    new paragraph entitled, "Batch Record

5    Documentation," did this report that was provided

6    to you by UDL further go through then and review

7    UDL's batch records on all of the lots of Digitek

8    in question?

9        MR. COLEY:  Objection.

10   BY THE WITNESS:

11       A.    Yes.

12   BY MR. TABER:

13       Q.    Now, it states in the third full

14   paragraph -- third full sentence, sorry, in that

15   paragraph under Batch Record Documentation, "The

16   QA" -- by the way, QA is quality assurance?

17       A.    Correct.

18       Q.    "The QA In-Process Inspection records

19   were examined for each lot and there were no

20   machine issues or inspection observations related

21   to tablet thickness.  The lots meet all in-process

22   and finished goods inspection acceptance criteria

23   for product release."

24       A.    That's correct.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

139

1          Q.    Is that a fancy way of saying the

2     tablets were all the appropriate size?

3          MR. COLEY:  Objection.

4          MR. COVENY:  Objection.

5     BY THE WITNESS:

6          A.    That -- that would -- that would

7     indicate such, yes, that there was no document --

8     no record of a problem noted during the run.

9     BY MR. TABER:

10          Q.    All right.  By the way, did this report

11     at any time reveal that UDL had received any

12     so-called double thick tablets of Digitek?

13          MR. COVENY:  Objection.

14     BY THE WITNESS:

15          A.    There would have been no indication.

16     BY MR. TABER:

17          Q.    All right.  By the way, you've seen this

18     report before today, haven't you?

19          A.    Yes.

20          Q.    Okay.  And you know that nowhere in this

21     report does it state that a so-called double thick

22     Digitek tablet was ever received by UDL, true?

23          A.    That is correct.

24          Q.    All right.  Finally then, the next

Liana Radtke
Confidential – Subject to Further Confidentiality Review

140

1    paragraph is entitled "Examination of Retain

2    Samples."  And is this yet a third way in which UDL

3    went back after the recall and checked the quality

4    of the Digitek tablets it had?

5         A.    It would have -- yeah, that would have

6    been a way of us checking the tablets, yes.

7         Q.    Okay.  And in this paragraph does it

8    reference what would have occurred if the tablets

9    were too thick?

10        MR. COVENY:  Objection.

11   BY THE WITNESS:

12        A.    Yes, it does.

13   BY MR. TABER:

14        Q.    Okay.  And it states that the "blister

15   cavity sizes have minimal head space that would

16   prevent tablets to be packaged with double

17   thickness."

18             Is that your understanding of how the

19   manufacturing process at UDL works?

20        MR. COLEY:  Objection.

21   BY THE WITNESS:

22        A.    That's correct.

23   BY MR. TABER:

24        Q.    All right.  It goes on to state, "If the

Liana Radtke
Confidential – Subject to Further Confidentiality Review

141

1    tablet thickness were to exceed the blister cavity

2    size during packaging, visible damage to the

3    blister package would occur and the equipment would

4    experience a seal station overload (jamming within

5    the seal station) that would result in a breakdown

6    of equipment -- of the equipment."

7         A.    It would shut down, um-hum.

8         MR. KAPLAN:  Shut down.

9    BY THE WITNESS:

10        A.    Shut down.

11   BY MR. TABER:

12        Q.    So, in layman's terms, if double thick

13   tablets were received at UDL, they would shut down

14   the equipment?

15        MR. COLEY:  Objection.

16        MR. COVENY:  Objection.

17   BY THE WITNESS:

18        A.    That is correct.

19   BY MR. TABER:

20        Q.    All right.  And from what you know of

21   this report and from your personal knowledge

22   working at UDL, that never happened with Digitek,

23   true?

24        A.    No.  That is true.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

142

1          Q.    All right.  And records are kept that

2     would reveal such a problem if it had occurred,

3     true?

4          A.    That is correct.

5          Q.    Okay.  And based on those records, it

6     states in the very next sentence, "As stated above,

7     there was no documentation in the batch record of a

8     machine or inspection related issues involving

9     tablet thickness."

10               True?

11         A.    Correct.

12         Q.    And that's accurate?

13         A.    Correct.  To the best of my knowledge,

14    that's accurate.

15         Q.    And finally, retain samples were

16    actually physically measured, both 250 microgram

17    tablets and 125 micrograms, and were determined to

18    be within UDL's tolerances, correct?

19         A.    That's correct.

20         Q.    All right.  And just to wrap it up, you

21    also discussed complaint history, and the third

22    page of the report sets forth what you said before,

23    if I'm correct, which is that based on a review of

24    product complaints prior to the recall, there were

Liana Radtke
Confidential – Subject to Further Confidentiality Review

143

1     no complaints as to the thickness or double thick

2     tablets of Digitek, true?

3          A.     That is correct.

4          Q.     Okay.  And then this is the very last

5     page of this exhibit where you already

6     authenticated your signature.

7               And finally, there is a reference here

8     to the investigation summary, and it has a section

9     entitled "Stability Records History."

10         A.     Yes.

11         Q.     And based on this paragraph, could you

12    explain exactly what this means to us as it relates

13    to UDL's review of its stability testing program

14    for Digitek?

15         A.     We would have examined all of the

16    records of any of the stability, the analytical

17    data that was generated, to continue to ensure that

18    it met all of its specifications and that it was

19    within the defined specifications of the USP, and

20    we found -- we found no evidence that there was an

21    issue or problem.

22         Q.     All right.  And by the way, this

23    stability testing is something that is done on

24    pretty much every lot of Digitek that comes to UDL?

Liana Radtke
Confidential – Subject to Further Confidentiality Review

144

1        A.     No, no.

2        Q.     Or is done periodically?

3        A.     It's done -- yeah, one -- a random lot

4    is pulled each year to continue to support the

5    stability program.

6        Q.     Okay.  And so, appropriate and periodic

7    sampling of Digitek tablets is done by UDL not just

8    in the wake of the recall but in an ongoing basis?

9        A.     Correct.

10       MR. COVENY:  Objection.

11   BY MR. TABER:

12       Q.     And the end result of the review of

13   those records going back in time long before the

14   recall was that there was no out of specification

15   Digitek, true?

16       MR. COVENY:  Objection.

17   BY THE WITNESS:

18       A.     That is correct.

19       MR. TABER:  Okay.  I have no further

20   questions.  Thank you.

21       MR. KAPLAN:  No questions.

22       MR. COLEY:  No further questions.

23       MR. ARNOLD:  No questions.

24       MR. COVENY:  No questions.

Liana Radtke
Confidential – Subject to Further Confidentiality Review

145

1          MR. KAPLAN:  Okay.  We are complete.

2          THE VIDEOGRAPHER:  We are off the record at

3     12:35 p.m.  This concludes the videotape deposition

4     of Liana Radtke.

5                    (Time Noted:  12:35 p.m.)

6                    FURTHER DEPONENT SAITH NOT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

146

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF K A N E )

4              I, JULIANA F.  ZAJICEK, C.S.R.

5    No. 84-2604, a Notary Public within and for the

6    County of Kane, State of Illinois, and a Certified

7    Shorthand Reporter of said state, do hereby

8    certify:

9              That previous to the commencement of the

10   examination of the witness, the witness was duly

11   sworn to testify the whole truth concerning the

12   matters herein;

13             That the foregoing deposition transcript

14   was reported stenographically by me, was thereafter

15   reduced to typewriting under my personal direction

16   and constitutes a true record of the testimony

17   given and the proceedings had;

18             That the said deposition was taken

19   before me at the time and place specified;

20             That the reading and signing by the

21   witness of the deposition transcript was agreed

22   upon as stated herein;

23             That I am not a relative or employee or

24   attorney or counsel, nor a relative or employee of

Liana Radtke
Confidential – Subject to Further Confidentiality Review

147

1    such attorney or counsel for any of the parties

2    hereto, nor interested directly or indirectly in

3    the outcome of this action.

4              IN WITNESS WHEREOF, I do hereunto set my

5    hand this 3rd of February, 2009.

6

7

8

9              JULIANA F.  ZAJICEK, C.S.R. No. 84-2604

10             Notary Public, DuPage County, Illinois.

11             My commission expires August 30, 2010.

12

13

14

15

16

17

18

19

20

21

22

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

148

1                          I N D E X

2

3      WITNESS:                                    PAGE:

4       LIANA RADTKE

5            EXAM BY MR. COVENY.................    6

6            EXAM BY MR. COLEY.................    111

7            EXAM BY MR. TABER.................    125

8

9                          * * * * *

10

11                     E X H I B I T S

12      EXHIBIT                              MARKED FOR ID

13       No. M42   Bates Nos. MYLN 000035607 - 620....  9

14       No. M43   Bates Nos. UDLL 000191569 - 572.... 15

15       No. M44   Bates Nos. UDLL 000202701 - 702.... 17

16       No. M45   Bates Nos. UDLL 000025489 - 490.... 21

17       No. M46   Bates Nos. UDLL 000020672 - 675.... 24

18       No. M47   Bates Nos. UDLL 000211178 - 182.... 26

19       No. M48   Bates Nos. UDLL 000203166 - 169.... 30

20       No. M49   Bates Nos. UDLL 000202712 - 716.... 35

21       No. M50   Bates Nos. MLYN 000030303 - 307.... 37

22       No. M51   Bates Nos. UDLL 000007647 - 698.... 41

23       No. M52   Bates Nos. UDLL 000014256 - 268.... 47

24       No. M53   Bates No. MYLN 000997379........... 61

Liana Radtke
Confidential – Subject to Further Confidentiality Review

149

1              E X H I B I T S (Continued)

2    EXHIBIT                              MARKED FOR ID

3    No. M54   Bates Nos. MYLN 000997539 - 540.... 65

4    No. M55   Bates Nos. MYLN 000997541 - 543.... 71

5    No. M56   Bates No. UDLL 000211117........... 77

6    No. M57   Bates No. MYLN 000036659........... 80

7    No. M58   Bates Nos. UDLL 000201757 - 758.... 81

8    No. M59   Bates No. UDLL 000202733........... 83

9    No. M60   Bates No. UDLL 000006050........... 87

10   No. M61   Bates Nos. UDLL 000005966 - 967.... 93

11   No. M62   Bates Nos. UDLL 000202772 - 775.... 96

12   No. M63   Bates Nos. UDLL 000202717 - 721.... 99

13   No. M64   Bates Nos. MYLN 000593691 - 692....102

14   No. M65   Bates Nos. UDLL 000005805 - 818....103

15   No. M66   Bates No. UDLL 000202796...........108

16   No. M67   Bates Nos. UDLL 000202722 - 723....109

17   No. M68   Bates No. UDLL 000013716...........127

18   No. M69   Bates Nos. UDLL 000004768 - 771....131

19

20

21

22

23

24

Liana Radtke
Confidential – Subject to Further Confidentiality Review

150

1              UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                  CHARLESTON DIVISION

4

5     IN RE:  DIGITEK PRODUCTS: MDL NO.

6     LIABILITY LITIGATION    : 1968

7

8          (This document relates to all cases.)

9

10          I hereby certify that I have read the

11     foregoing transcript of my deposition given at the

12     time and place aforesaid, consisting of Pages 1 to

13     145, inclusive, and I do again subscribe and make

14     oath that the same is a true, correct and complete

15     transcript of my deposition so given as aforesaid,

16     and includes changes, if any, so made by me.

17

18                         LIANA RADTKE

19     SUBSCRIBED AND SWORN TO

20     before me this        day

21     of                  , A.D. 200 .

22

23          Notary Public

24

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

Liana Radtke
Confidential – Subject to Further Confidentiality Review

151

1             DEPOSITION ERRATA SHEET

2

3     Assignment No.  23029

4     Case Caption:  Digitek MDL

5

6         DECLARATION UNDER PENALTY OF PERJURY

7     I declare under penalty of perjury that I have read

8     the entire transcript of my Deposition taken in the

9     captioned matter or the same has been read to me,

10    and the same is true and accurate, save and

11    Except for changes and/or corrections, if any, as

12    indicated by me on the DEPOSITION ERRATA SHEET

13    hereof, with the understanding that I offer these

14    changes as if still under oath.

15    Signed on the _____ day of _____, 20___.

16

17         _____

18                  LIANA RADTKE

19

20

21

22

23

24

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3337

Liana Radtke
Confidential – Subject to Further Confidentiality Review

152

```
1                    DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23       SIGNATURE:_____DATE:_____
24                        LIANA RADTKE
```

Liana Radtke
Confidential – Subject to Further Confidentiality Review

153

1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                        LIANA RADTKE

GOLKOW TECHNOLOGIES, INC.  -  1.877.370.3377