# EXHIBIT 1

# In Re:

*Digitek*

---

*Suzanna Wolfe*

*January 21, 2010*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File sw012110.txt

**Min-U-Script®**

Confidential – Subject to Further Confidentiality Review

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

-----------------------------X

IN RE: DIGITEK          :  MDL NO. 1968

PRODUCTS LIABILITY LITIGATION :

-----------------------------X

THIS DOCUMENT RELATES TO      :

ALL CASES                     :

-----------------------------X

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

Videotaped Deposition of Suzanna Wolfe

Thursday, January 21, 2010


a witness herein, taken on behalf of the

Plaintiffs in the above-entitled cause of action

pursuant to notice and the West Virginia Rules of

Civil Procedure by and before Debra A. Volk,

Professional Court Reporter and Notary Public

within and for the State of West Virginia at the

law offices of Jackson Kelly, PLLC, 150 Clay

Street, Suite 500, Morgantown, West Virginia

26501, commencing at 11:40 a.m.

Case 2:08-md-01968   Document 573-1   Filed 09/07/11   Page 4 of 168 PageID #: 18736
Confidential – Subject to Further Confidentiality Review

2

1                    IN THE CIRCUIT COURT

2              OF KANAWHA COUNTY, WEST VIRGINIA

3       -------------------------X

4       IN RE: DIGITEK LITIGATION :   CIVIL ACTION NO.

5       -------------------------X      08-C-5555

6       THIS DOCUMENT APPLIES TO  :

7       Diana L. Adkins v. Mylan Pharmaceuticals, Inc.,
        et al.                   C.A. No. 09-C-40KAN
8
        Thomas Beveridge v. Mylan Pharmaceuticals, Inc.,
9       et al.                   C.A. No. 08-C-273-OHI

10      Carl Brown v. Mylan Pharmaceuticals, Inc., et al.
                                 C.A. No. 09-C-123 NIC
11
        Elizabeth Byus v. Mylan Pharmaceuticals, Inc.,
12      et al.                   C.A. No. 08-C-1954 KAN

13      James R. Christian v. Mylan Pharmaceuticals,
        Inc., et al.             C.A. No. 09-C-292 MON
14
        John Anthony Conte v. Mylan Pharmaceuticals,
15      Inc., et al.             C.A. No. 08-C-1995 KAN

16      Martha Florence Guy MOA v. Mylan Pharmaceuticals,
        Inc., et al.             C.A. No.08-C-303 OHI
17
        Claude E. Jarrell v. Actavis Group, et al.
18                               C.A. No. 09-C-512 KAN

19      Bobbi J. Myers v. Mylan Pharmaceuticals, Inc.,
        et al.                   C.A. No. 08-C-999 KAN
20
        Melvin L. Pennington, et ux, v. Mylan
21      Pharmaceuticals, Inc., et al.
                                 C.A. No. 08-C-172 PNM
22
        Lola Jean Smith, et ux, v. Mylan Pharmaceuticals,
23      Inc., et al.             C.A. No. 08-C-1069 KAN

24      Russell A. Wells v. Mylan Pharmaceuticals, Inc.,
        et al.                   C.A. No. 09-C-003 NIC
25

Confidential – Subject to Further Confidentiality Review

3

1     APPEARANCES:

2

3

4     On behalf of the Plaintiffs:

5

6     PETER A. MILLER, ESQUIRE

7     The Miller Firm, LLC

8     The Sherman Building

9     108 Railroad Avenue

10    Orange, Virginia 22960

11    Telephone:  (540) 672-4224

12    Fax:  (540) 672-3055

13    E-mail:  pmiller@doctoratlaw.com

14

15    On behalf of the Plaintiffs:

16

17    CARL N. FRANKOVITCH, ESQUIRE

18    Frankovitch, Anetakis,

19    Colantonio & Simon

20    21 Twelfth Street, Suite 504

21    Wheeling West Virginia 26003-2839

22    Telephone:  (304) 233-1212

23    Fax:  (304) 233-1251

24    E-mail:  carln@facslaw.com

25

Confidential – Subject to Further Confidentiality Review

4

```
1    APPEARANCES (Cont.):

2

3    On behalf of the Plaintiffs:

4

5    MEGHAN JOHNSON CARTER, ESQUIRE

6    Motley Rice, LLC

7    28 Bridgeside Boulevard

8    Mt.Pleasant, South Carolina 29464

9    Telephone:  (843) 216-9383

10   Fax:  (843) 216-9430

11   E-mail:  mjohnson@motleyrice.com

12

13   On behalf of the Defendant, Mylan and Suzanna

14   Wolfe:

15

16   MADELEINE M. MCDONOUGH, ESQUIRE

17   ERICKA L. DOWNIE, ESQUIRE

18   Shook, Hardy & Bacon, LLP

19   2555 Grand Boulevard

20   Kansas City, Missouri 64108

21   Telephone:  (816) 474-6550

22   Fax:  (816) 421-5547

23   E-mail:  mmcdonough@shb.com

24           edownie@shb.com

25
```

Confidential – Subject to Further Confidentiality Review

5

1    APPEARANCES (Cont.):

2

3    On behalf of the Defendant, Mylan:

4

5    ERIK C. NAFT, ESQUIRE

6    Mylan

7    1500 Corporate Drive

8    Canonsburg,Pennsylvania 15317

9    Telephone:  (724) 514-1897

10   Fax:  (724) 514-1871

11   E-mail:  erik.naft@mylan.com

12

13

14   On behalf of the Defendant, Actavis Totowa, LLC:

15

16   EDWARD E. TABER, ESQUIRE

17   Tucker, Ellis & West, LLP

18   1150 Huntington Building

19   925 Euclid Avenue

20   Cleveland, Ohio 44115-1414

21   Telephone:  (216) 696-2365

22   Fax:  (216) 592-5009

23   E-mail:  etaber@tuckerellis.com

24

25

Confidential – Subject to Further Confidentiality Review

6

```
 1    APPEARANCES (Cont.):

 2

 3    On behalf of all Defendants:

 4

 5    JAMES S. ARNOLD, ESQUIRE

 6    Allen, Guthrie & Thomas, PLLC

 7    500 Lee Street, East, Suite 800

 8    Charleston, West Virginia 25301

 9    Telephone:  (304) 345-7250

10    Fax:  (304) 345-9941

11    E-mail:  jsarnold@agmtlaw.com

12

13

14    ALSO PRESENT:  Greg Diefenbaugh, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Confidential – Subject to Further Confidentiality Review

7

1                    I N D E X

2    WITNESS                                    PAGE

3    Suzanna Wolfe

4          Examination By Mr. Miller ............ 11

5          Examination By Mr. Frankovitch ....... 139

6          Examination By Mr. Miller ............ 157

7          Examination By Mr. Taber ............. 158

8          Examination By Mr. Miller ............ 159

9

10

11                 E X H I B I T S

12                                               PAGE

13   Wolfe Deposition Exhibit No. M-1 .......... 30

14   Wolfe Deposition Exhibit No. M-2 .......... 33

15   Wolfe Deposition Exhibit No. M-3 .......... 35

16   Wolfe Deposition Exhibit No. M-4 .......... 42

17   Wolfe Deposition Exhibit No. M-5 .......... 53

18   Wolfe Deposition Exhibit No. M-6 .......... 59

19   Wolfe Deposition Exhibit No. M-7 .......... 62

20   Wolfe Deposition Exhibit No. M-8 .......... 65

21   Wolfe Deposition Exhibit No. M-9 .......... 75

22   Wolfe Deposition Exhibit No. M-10 ......... 78

23   Wolfe Deposition Exhibit No. M-11 ......... 89

24   Wolfe Deposition Exhibit No. M-12 ......... 99

25   Wolfe Deposition Exhibit No. M-13 ......... 102

Confidential – Subject to Further Confidentiality Review

8

1               E X H I B I T S (Cont.)

2                                                    PAGE

3     Wolfe Deposition Exhibit No. M-14 .......... 112

4     Wolfe Deposition Exhibit No. M-15 .......... 115

5     Wolfe Deposition Exhibit No. M-16 .......... 122

6     Wolfe Deposition Exhibit No. M-17 .......... 126

7     Wolfe Deposition Exhibit No. M-18 .......... 128

8     Wolfe Deposition Exhibit No. M-19 .......... 134

9

10

11               O B J E C T I O N S

12                                        PAGE LINE

13    By Ms. McDonough ...................... 14    6

14    By Mr. Taber .......................... 35    22

15    By Ms. McDonough ...................... 36    8

16    By Ms. McDonough ...................... 45    5

17    By Mr. Taber .......................... 48    3

18    By Mr. Taber .......................... 48    21

19    By Mr. Taber .......................... 49    20

20    By Ms. McDonough ...................... 49    21

21    By Mr. Taber .......................... 51    1

22    By Ms. McDonough ...................... 55    23

23    By Mr. Taber .......................... 64    14

24    By Mr. Taber .......................... 64    22

25    By Ms. McDonough ...................... 76    18

Confidential – Subject to Further Confidentiality Review

9

```
 1          O B J E C T I O N S  (Cont.)

 2                                   PAGE LINE

 3    By Ms. McDonough ..................... 76   25

 4    By Ms. McDonough ..................... 81   14

 5    By Ms. McDonough ..................... 86   10

 6    By Ms. McDonough ..................... 90   24

 7    By Ms. McDonough ..................... 95   11

 8    By Mr. Taber ......................... 130  19

 9    By Mr. Taber ......................... 131  14

10    By Ms. McDonough ..................... 134  2

11    By Ms. McDonough ..................... 141  17

12    By Mr. Taber ......................... 145  4

13    By Mr. Taber ......................... 145  18

14    By Ms. McDonough ..................... 145  20

15    By Mr. Taber ......................... 146  4

16    By Mr. Taber ......................... 146  20

17    By Ms. McDonough ..................... 147  11

18    By Ms. McDonough ................... 148  1

19

20

21

22

23

24

25
```

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

10

1                          *   *   *

2                    P R O C E E D I N G S

3                          *   *   *

4                    VIDEOGRAPHER:  The time is

5      11:40 and we're now on the record. This is the

6      videotaped deposition of Suzanna Wolfe taken by

7      the Plaintiffs in the matter of In Re: Digitek

8      Products Liability Litigation being case number

9      MDL-1968 in the U.S. District Court for the

10     Southern District of West Virginia, Charleston

11     Division held at the offices of Jackson Kelly in

12     Morgantown, West Virginia on the 21st day of

13     January 2010.

14                    My name is Greg Diefenbaugh and I am

15     the Video Specialist.  The Court Reporter is

16     Debbie Volk; we are both associated with Golkow

17     Litigation Technologies. Would counsel please

18     introduce themselves and who they represent?

19                         MS. CARTER:  Meghan Carter

20     for the Plaintiffs.

21                         MR. FRANKOVITCH:  Carl

22     Frankovitch for the Plaintiffs.

23                         MR. MILLER:  Pete Miller with

24     Plaintiffs.

25                         MS. MCDONOUGH:  Madeleine

Confidential – Subject to Further Confidentiality Review

11

1    McDonough representing Mylan and the witness,

2    Suzy Wolfe.

3                    MS. DOWNIE:  Ericka Downie

4    representing Mylan and the witness, Suzy Wolfe.

5                    MR. NAFT:  Erik Naft for

6    Mylan.

7                    MR. TABER:  Ed Taber for the

8    Actavis defendants.

9                    MR. ARNOLD:  Jim Arnold for

10   -- West Virginia counsel for all defendants.

11                   VIDEOGRAPHER:  Would the

12   Court Reporter please swear in the witness?

13                   *  *  *

14                   SUZANNA WOLFE

15   being first duly sworn, was examined and deposed

16   as follows:

17                   *  *  *

18               E X A M I N A T I O N

19   BY MR. MILLER:

20   Q.          Ma'am, we met earlier, but if you

21   would please state your full name for the record.

22   A.          Sure, it's Suzanna Wolfe.  Please

23   feel free to call me Suzy.

24   Q.          Thank you.  Before we get started I'd

25   like to go over a of couple rules. If I ask a

Suzanna Wolf

Confidential – Subject to Further Confidentiality Review

12

1    question, I'm going to assume that you understand

2    the question I asked and if you don't understand

3    the question, I'm going to ask that you ask me to

4    rephrase the question so you do understand; is

5    that fair?

6    A.          Sure, yes.

7    Q.          This lady is trying to repeat

8    everything we say so that sometimes it takes me a

9    while to get the question out and we don't want

10   to talk over each other, on top of each other, so

11   if you wait until I'm done that would be great;

12   is that fair?

13   A.          Yes.

14   Q.          Perfect.  Have you ever been deposed

15   before?

16   A.          Once many years ago for a personal

17   issue.

18   Q.          Okay.

19               It had nothing to do with --

20   A.          No, no.

21   Q.          Okay.

22               What is your title at Mylan?

23   A.          Currently my title is Third-Party

24   Liaison for North America, and that's in the

25   Global Quality Group.

Confidential – Subject to Further Confidentiality Review

13

1    Q.          Third-party liaison -- third-party
2    liaison for safety or for any specific issue or
3    is it just?
4    third-party liaison?
5    A.          For Quality Assurance.
6    Q.          For quality assurance.  And I've kind
7    of heard it phrased a few different ways, when
8    you say quality assurance, am I correct in saying
9    that that is taking the quality control systems
10   as two parts, quality control and quality
11   assurance?
12   A.          Yes, you could say that. Quality
13   assurance is more oversight, so all of quality --
14   it depends how different companies are set up and
15   established.  Typically quality control is within
16   quality assurance.  In Mylan, that's the way
17   our systems are set up.  So quality control
18   reports in through quality assurance.
19   Q.          Okay.
20               And when you say at Mylan, you're
21   discussing a product that would be made at Mylan,
22   there's a quality control and a quality assurance
23   that oversees that; is that correct?
24   A.          Correct.
25   Q.          So there would be no counterpart to

Confidential – Subject to Further Confidentiality Review

14

1    you that's quality controlled to third parties?

2    A.          Exactly, that's right.

3    Q.          So when it comes to safety issues or

4    quality issues with third parties, you're it; is

5    that fair?

6                        MS. MCDONOUGH:  Sorry, what

7    do you mean by you're it?  Objection.

8                        MR. MILLER:  Yeah, I guess

9    you're it.  Tag, you're it.  That there's no one

10   -- that there is no liaison at Mylan to third

11   parties regarding quality control systems, it's

12   all quality assurance?

13                       THE WITNESS:  Well, no,

14   that's not true.

15                       MR. MILLER:  Okay.

16                       THE WITNESS:  This is my

17   current job and my current job, third-party

18   liaison, really, I'm just writing technical

19   agreements for the global -- right now I work for

20   Mylan, Inc.

21                       MR. MILLER:  Okay.

22                       THE WITNESS:  So I'm writing

23   technical agreements for all of the sites within

24   North America and Mylan.

25   BY MR. MILLER:

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

15

```
 1    Q.          How long have you been in that
 2    position?
 3    A.          In that position, going on two years
 4    now.
 5    Q.          Okay.
 6                So we're at the beginning of 2010,
 7    okay, so the beginning of 2008.  What was your
 8    title prior to becoming Third-Party Liaison for
 9    Quality Assurance?
10    A.          I was quality assurance manager for
11    outsourced products reporting in to MPI, Mylan
12    Pharmaceuticals.
13    Q.          Give me an overview, if you would
14    please, when you say Mylan Inc. and Mylan
15    Pharmaceuticals; what's the difference between
16    those two?
17    A.          Well, Mylan has become a global
18    company within the last year, year and a half;
19    Mylan has become global.  In other words,
20    acquiring businesses and entities and facilities
21    around the world, globally.  So we have a Mylan
22    Inc. unit, we have global quality, which
23    represents all of Mylan Inc., so all the regions
24    around the world.  MPI, Mylan Pharmaceuticals is
25    strictly Morgantown, West Virginia.  It's that
```

Confidential – Subject to Further Confidentiality Review

16

```
 1      site, that manufacturing and packaging site.
 2      Q.          Okay.
 3                  And I want to focus then from 2008 or
 4      actually from April specifically of 2008 going
 5      backwards in time; is it fair to say that Mylan
 6      was not global during that time?
 7      A.          Correct.
 8      Q.          Okay.
 9                  And so Mylan -- is it fair to say
10      that from April going back in time you were
11      employed by Mylan Pharmaceuticals -- well, you
12      said MPI, Mylan Pharmaceuticals,  --
13      A.          Inc.
14      Q.          Inc., now I'm confused because I
15      thought Mylan Pharmaceuticals, Inc. was the
16      global --
17      A.          Mylan Inc.
18      Q.          Got you.  All right.
19                  It takes me a while; I'll catch on.
20      How long did you have the title of quality
21      assurance manager for outsourced products?
22      A.          For -- I started in 2005, so from
23      January of 2005 until 2008, probably the end of
24      2008, November, December.
25      Q.          Okay.
```

Confidential – Subject to Further Confidentiality Review

17

```
 1              So you had that title up to -- up
 2    through to 2008?
 3    A.         Right.
 4    Q.         Okay.
 5              And when were you first hired by MPI?
 6    A.         January of 2005.
 7    Q.         So you were hired --
 8    A.         Yes.
 9    Q.         -- at that title, okay.  What are the
10    functions or the duties in your own words of what
11    a quality assurance manager for outsourced
12    products does? What's a daily function?
13    A.         Well, the job responsibilities were
14    to review documentation and released product that
15    was manufactured by outsourced companies, which
16    means companies that manufacture or package for
17    Mylan.
18    Q.         And you understand that this case is
19    about the product Digitek?
20    A.         Yes.
21    Q.         And it's fair to say that Digitek was
22    one of the outsourced products during that time?
23    A.         Yes, it was.
24    Q.         How many outsourced products would
25    you have been handling from 2005 through 2009?
```

Confidential – Subject to Further Confidentiality Review

18

1    A.          I would say probably eight to 10

2    products then.

3    Q.          And would there have been someone

4    else handling other outsourced products during

5    that time or were there a total of eight to 10

6    outsourced products being produced --

7    A.          As far as -- that would have been the

8    total, eight to 10.

9    Q.          Okay.  All right.

10           And for Digitek, was MPI the holder

11   of the ANDA?

12   A.          No.  Actavis was.

13   Q.          Actavis was.

14   A.          Actavis.

15   Q.          Actavis, thanks.  Was it typical of

16   the eight to 10 products, if you recall, were any

17   of them -- were the ANDA's held by MPI?

18   A.          Only one product was.

19   Q.          Okay.

20           So it was more -- it was standard for

21   the manufacturer to hold the ANDA?

22   A.          Yes.

23   Q.          I want to talk a little bit to the

24   relationship of MPI with the outsourced product

25   in this case, or the company Actavis.  Actavis

Confidential – Subject to Further Confidentiality Review

19

1    dealt also with Bertek; what's the relationship

2    -- what's the relationship between MPI and

3    Bertek?

4    A.          I probably wouldn't be the best to

5    answer that, other than Bertek is an affiliate,

6    I'm not sure if that's our correct legal term --

7    Q.          Sure.

8    A.          -- but they're an affiliate for

9    Mylan.

10   Q.          Do you know any more about the

11   relationship between MPI and UDL?

12   A.          UDL, Rockford; UDL, Sugar Land, Texas?

13   Q.          UDL that the product Digitek would

14   have been sent to, UDL, do you have any knowledge

15   of that?

16   A.          I don't, no.

17   Q.          Well, am I correct in saying that if

18   Bertek were to order the product Digitek, it

19   would come through Mylan and go to Bertek?

20                    MS. MCDONOUGH:  If you know.

21                    THE WITNESS:  I would only be

22   guessing.  Probably, but I'm not sure how they

23   had it set up, if it was a direct shipment from

24   Actavis to Bertek or if they went through the

25   distribution center.  Most likely they went

Suzanna Wolf
Confidential – Subject to Further Confidentiality Review

20

1     through the distribution center, which is in

2     North Carolina, Greensboro, North Carolina.

3     BY MR. MILLER:

4     Q.          You're familiar with the terms COC

5     and COA?

6     A.          Oh, yes.

7     Q.          Okay.

8                 And what's the COC?

9     A.          A COC?

10    Q.          Yes.

11    A.          Is Certificate of Compliance.

12    Q.          And a COA?

13    A.          Certificate of Analysis.

14    Q.          And I'm correct in saying that if MPI

15    were to order a lot of Digitek, then you with the

16    title QA manager for outsourced product would

17    review the COC and the COA in order to determine

18    if that lot was going to be accepted; is that

19    fair?

20    A.          Right.

21    Q.          But you don't have an understanding

22    or do you know who would have accepted the COC's

23    and a COA's for Bertek?

24    A.          It probably would have been MPI,

25    myself, if it would have been repackaged.  Again,

Confidential – Subject to Further Confidentiality Review

21

1    I'm guessing because UDL, Rockford, is a

2    repackaging site. Primarily that's what they do.

3    They take product packaged in bottles from a

4    distribution center and they repack them in the

5    unit doses or something for pharmacies.

6    Q.        Okay.

7              And just so I understand, under your

8    title you do have a memory of or you were in a

9    position where you reviewed COC's and COA's for

10   Digitek, but what happened to the product after

11   it was -- left your desk, if you will, that part

12   you're not sure as far as if it went to Bertek or

13   not?

14   A.        The product itself?

15   Q.        Right.

16   A.        No.  I just strictly would release

17   the product.

18   Q.        And in the time frame of 2007 through

19   April of 2008, would you have worked with someone

20   else as far as reviewing the COC's and COA's for

21   Digitek or does anyone help you in this job or

22   is it a one-person job?

23   A.        I had one person reporting to me.

24   Q.        Okay.

25   A.        He helped -- it wasn't his primary

Confidential – Subject to Further Confidentiality Review

22

```
 1    function but if there was a lot to do he would
 2    help if I needed help.
 3    Q.        Okay.
 4              And who was that?
 5    A.        His name was Tom Conroy.
 6    Q.        Did Mr. Conroy have authority to
 7    approve a lot or would he still need to go
 8    through you to have that done?
 9    A.        No, he was trained to be able to
10    release a lot.
11    Q.        Okay.
12              So if you were away from the desk
13    then Tom could review the COC's and COA's and
14    release the lot just the same as you could?
15    A.        If I was on vacation or out of the
16    office, yes.
17    Q.        Okay.
18              And then who did you report to at
19    Mylan?
20    A.        I reported to Chuck Koon, Charles
21    Koon.
22    Q.        What was Chuck Koon's title?
23    A.        Director of -- it might have been
24    compliance then, part of the quality assurance
25    group, quality compliance let's call it.
```

Confidential – Subject to Further Confidentiality Review

23

1    Q.            If in your position -- I'm sorry.

2    A.            I'm sorry.  Let me clarify, do you

3    mean -- at what point in time who did I report to

4    then?  In that 2008 time frame?

5    Q.            Exactly.  I'm focusing on -- let's go

6    for an 18-month period from the beginning of 2007

7    to mid-2008.

8    A.            Okay, it was Chuck.

9    Q.            Okay.

10                 Who was it prior to Chuck?

11   A.            Rich Bergen.

12   Q.            And when did it shift from Rich to

13   Chuck?

14   A.            Rich retired, so Rich was when I

15   started in 2005, '06, probably to the early part

16   of 2007, I'm guessing.  I don't recall.

17   Q.            Okay.

18                 So you're saying Rich Bergen held the

19   position to 2007?

20   A.            I think so.

21   Q.            Okay.

22                 And would you need to receive

23   authority on individual lots from Chuck Koon when

24   it came to releasing them after you reviewed a

25   COC and a COA or was it something you would only

Confidential – Subject to Further Confidentiality Review

24

1    go report up to him if there was an issue with a
2    particular batch?
3    A.          That's correct.  I could release on
4    my own.
5    Q.          Okay.
6    A.          If I had questions, anything I needed
7    to discuss with him, sure.
8    Q.          Was there any SOP or guidance
9    specifically on how you would contact him or deal
10   with him or was it e-mails and kind of open
11   communication?
12   A.          It was open communication.
13   Q.          Once you released a lot or a batch,
14   were you involved at all with the customers where
15   the pills were ultimately going to reside on the
16   shelf? Did you deal with the customers of MPI?
17   A.          No.
18   Q.          So when a batch was released through
19   your office, you had no idea where it was going?
20   A.          No.  I know they're released and
21   they're in our distribution center and that's the
22   last I know of it.
23   Q.          Okay.
24               I assume there comes time to time
25   when MPI would receive phone calls regarding

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

25

1     health concerns from either doctors, pharmacists

2     or individuals who took the pills; does that

3     sound fair, that statement?

4     A.          I think what you're saying is a

5     complaint; we call it complaints.

6     Q.          A complaint; were you in any way

7     involved in complaints that were received at MPI?

8     A.          Yes, from a quality standpoint.

9     Q.          What would be your involvement of

10    complaints?

11    A.          We have a group, they're called PSRM,

12    product safety -- I can't remember what the

13    acronym stands for, but it's our pharmacovigilance

14    group.  They receive the complaints, log them

15    into a database and anything that is quality

16    related, then the quality group would have to

17    review or investigate if anything -- and we

18    strictly were just following up on the

19    investigations for the quality complaint side.

20    Q.          All right.

21                When you say there was a database,

22    you don't happen to know the title of the

23    database, do you?

24    A.          AERS, A-E-R-S.

25    Q.          So you would not get involved with

Confidential – Subject to Further Confidentiality Review

1     the complaints that actually came in, it would be

2     processed in the AERS and someone determined that

3     it was a quality issue before it would get to

4     you?

5     A.          Right.

6     Q.          Okay.

7     A.          Right.

8     Q.          And then would you make an entry into

9     AERS after you were told that this particular

10    complaint had issues with quality; would you --

11    what would you do from there?

12    A.          It would depend on the situation, but

13    in summary, yes, we would put in an investigation

14    and investigate the complaint if it needed to be

15    investigated and electronically signed off.  It's

16    an electronic system, electronically sign off on

17    the investigation and then it goes back to the

18    PSRM group, the pharmacovigilance group for

19    their review.

20    Q.          Okay.

21                Would your investigation become part

22    of AERS or did it take on its own number and

23    entity and stay out of the system?

24    A.          My portion would stay within AERS.

25    If it's something -- if it was a complaint having

Confidential – Subject to Further Confidentiality Review

27

```
 1     to do with MPI, Morgantown, or something that was
 2     manufactured in Morgantown, that would be
 3     investigated and it would go into the
 4     investigation deviation database for Morgantown,
 5     and that has its own number.
 6     Q.          Specifically speaking it's a Digitek
 7     and we are not holding the ANDA and it's being
 8     produced off-site, what would -- would that
 9     change the procedures of the complaint?
10     A.          Absolutely, actually because that's
11     all that was handled by Actavis.  The complaint
12     was sent to Actavis by the PSRM group and they
13     responded to it.
14     Q.          So it would be a correct statement
15     that if it was a complaint involving Digitek that
16     it would or would not be entered in AERS?
17     A.          It was entered in AERS, not by
18     myself.
19     Q.          Okay.
20                 But if there was a quality issue, it
21     would not be presented to you, it would be
22     presented to Actavis or --
23     A.          Right.
24     Q.          -- would you still comment?
25     A.          No.
```

Confidential – Subject to Further Confidentiality Review

28

1    Q.          Give me, if you don't mind, just a

2    quick synopsis of your education and training up

3    to 2005 when you were employed by MPI.

4    A.          Sure.  I went to college at Michigan

5    State, degree in packaging engineering, was

6    employed by Owens-Illinois out of Toledo, Ohio as

7    a quality engineer, did a lot of troubleshooting,

8    traveled around the country, went to a lot of

9    different sites where manufacturers, various

10   manufacturers, food, pharmaceuticals, health

11   care, anyone having issues on their lines

12   packaging.

13          Owens-Illinois was a packaging

14   company, glass, plastic, closures, bottles.  So I

15   would troubleshoot at the different sites.

16   Transferred -- after two years from Toledo,

17   transferred to the Vandalia, Illinois site in

18   statistical process control.  I was at that site

19   probably a year which promoted and transferred to

20   a site in Pennsylvania, Brookville, Pennsylvania.

21          I was the quality assurance manager

22   at that site.  Brookville primarily produced all

23   the plastic child resistant closures for the

24   pharmaceutical industry, the type you can't usually

25   get off.  They're hard to get off.  Plastic vials

Confidential – Subject to Further Confidentiality Review

29

1   and bottles for the pharmaceutical industry.  So

2   I was responsible for all raw materials that came

3   into the site and all finished goods that left

4   the site -- not finished goods, they were packaging

5   components that left the site.

6              From there -- so I was with

7   Owens-Illinois for roughly 12, 13 years.  And

8   then I went to DSM Pharmaceuticals in Greenville,

9   North Carolina.  That would have been

10  approximately 2000, and at DSM I was a quality

11  assurance manager.  I don't remember my exact

12  title but it was similar to that for -- and I was

13  responsible for all the orals and topical group,

14  which means ointments, creams, tablets,

15  everything that was manufactured at the site for

16  orals and topicals.  I was responsible for batch

17  record review.  My group reviewed all the batch

18  records, reviewed investigations and released the

19  product for DSM.  And that is when I left there

20  in 2005 and came to Mylan.

21  Q.          Got it.  So it's fair to say that the

22  vast majority of your work experience is on the

23  packaging side of the quality assurance; is that

24  accurate?

25  A.          You could say that.  It was packaging

Suzanna Wolf

Confidential – Subject to Further Confidentiality Review

30

1    with a high emphasis on pharmaceuticals.

2    Q.          The packaging of pharmaceuticals?

3    A.          Right, but I also had to troubleshoot

4    pharmaceuticals, so I was in a lot of facilities,

5    the Eli Lilly's, McNeil's, everyone that had --

6    that used those components.  So I was at their

7    sites a lot.

8    Q.          I guess what I'm trying to get at is

9    you don't have any chemistry experience or

10   laboratory experience?

11   A.          Correct.

12   Q.          All right.

13               I'm going to mark exhibit one and I'm

14   going to call it M-1 since we have so many

15   already marked on the Actavis side, so we can

16   separate them because we'll be marking them

17   concurrently tomorrow and that would be a mess.

18                         *   *   *

19               (Whereupon, Deposition Exhibit M-1

20   marked for purposes of identification.)

21                         *   *   *

22   BY MR. MILLER:

23   Q.          Take a look at that and let me know

24   when you're ready for questions.

25   A.          Is there anything in particular you

Confidential – Subject to Further Confidentiality Review

31

1     want me to look at or the entire document?

2     Q.         My first question is and take your

3     time, is have you seen the document before in the

4     past?

5                      MS. MCDONOUGH:  You may want

6     to just look through the whole thing and make

7     sure.  It looks like -- I don't know if there are

8     appendices or exhibits, I can't quite tell yet.

9     If you are familiar with it, feel free.

10                     THE WITNESS:  I probably have

11    seen the document and I say that because a lot of

12    -- we call these supply agreements, a lot of

13    supply agreements come across my desk since I am

14    -- especially now since I'm writing technical

15    agreements, a lot of supply agreements come

16    across.

17    BY MR. MILLER:

18    Q.         Would supply agreements come across

19    your desk on your previous title of third-party

20    products --

21    A.         If I had been working on a quality

22    agreement or a technical agreement and one

23    existed, I would have seen one most likely.

24    Q.         Okay.

25                     If you take a look at, and the first

Confidential – Subject to Further Confidentiality Review

32

1    page for the record is Mylan 0032383 and I'm

2    going to the third page, which is 0032385 and it

3    states Supply and Distribution Sgreement.  This

4    Supply and Distribution Agreement ("Agreement')

5    is entered into this 5th day of August 1999 by

6    and between.  Reading that, does it jog your memory

7    on having specifically seen or worked with the

8    distribution agreement for the product Digitek?

9    A.          Well, I definitely can tell you we

10   never worked with this agreement.  This agreement

11   would have already been established and in place.

12   I'm not responsible for them at all.

13   Q.          Okay.

14   A.          I just used them for a reference if

15   they exist when creating a quality agreement or

16   technical agreement, make sure maybe some of the

17   terms don't conflict, if there were terms in

18   there.

19   Q.          Fair enough.

20              That being the case it's probably

21   best if we come back to this in a little while.

22   So set that off to the side.

23   A.          Okay.

24   Q.          And we will -- we will come back to

25   it. Most of my questions are going to be in

Suzanna Wolf

Confidential – Subject to Further Confidentiality Review

33

1    chronological order, so I'll probably come back

2    and hit different topics at different times, and

3    I don't mind, you can hand me the whole thing.

4                         COURT REPORTER:  Here you go.

5                         MR. MILLER:  That might be

6    easier.

7    BY MR. MILLER:

8    Q.           I'm going to mark M-2; have you seen

9    this before? Take a look at that document and --

10                        MS. MCDONOUGH:  Do you have

11   an extra one?

12                        MR. MILLER:  I do, I'm sorry.

13                        *   *   *

14                  (Whereupon, Deposition Exhibit M-2

15   marked for purposes of identification.)

16                        *   *   *

17   BY MR. MILLER:

18   Q.           Would you have seen this before?

19   A.           No.

20   Q.           For any reason?  No.

21   A.           This is the first time I've seen

22   this.

23   Q.           There's no, at least I don't recall

24   seeing a date on it and I was trying to -- I was

25   hoping you had seen it before but I guess not,

Confidential – Subject to Further Confidentiality Review

34

1    but if you look down at the -- it's titled, Guide

2    for Handling Atypical Calls; are you familiar

3    with the term atypical calls?

4    A.          No.

5    Q.          The second paragraph states: For

6    product information calls received for redacted

7    products, obtain the contact name, address, phone

8    number and question, explain to the contact that

9    someone from redacted will be returning their

10   call, call redacted and relay the information.

11   Document calls on product information log.  Have

12   you ever dealt with the term product information

13   log at Mylan?

14   A.          No, this -- I guess I shouldn't

15   guess but this must be from our product safety

16   group.  They are the ones that collect the

17   complaints, like I said earlier.

18                  MS. MCDONOUGH:  Just for the

19   record, I'm not sure of this but it says at the

20   bottom this is part of Bertek's patient

21   assistance program, so it may have come from

22   Bertek and just I believe as a point of

23   clarification that Bertek stopped its

24   distribution of Digitek back in '05.  So this may

25   be unrelated but I'm not positive.

Confidential – Subject to Further Confidentiality Review

35

```
 1    BY MR. MILLER:
 2    Q.        Okay.
 3              I appreciate it.  It came from Mylan,
 4    the Mylan, it's document 00, Mylan 0033543.  I'm
 5    going to mark Mylan 3. And I'll represent to you
 6    this is an e-mail from Chuck Koon to you, subject,
 7    remaining quality agreements needed; would this
 8    be the same quality agreement that we discussed
 9    just a while ago?
10                         *   *   *
11              (Whereupon, Deposition Exhibit M-3
12    marked for purposes of identification.)
13                         *   *   *
14                    THE WITNESS:  Uh-huh (yes)
15    Yes.
16    BY MR. MILLER:
17    Q.        All right.
18              They redacted apparently a few
19    product names but you would agree that it's
20    indicated Actavis Totowa's Digitek is a product
21    that needs a quality agreement?
22                    MR. TABER:  Objection.
23                    MR. MILLER:  It's okay to
24    answer.
25                    THE WITNESS:  Yes.
```

Confidential – Subject to Further Confidentiality Review

36

1    BY MR. MILLER:

2    Q.         Do you recall this e-mail in

3    particular?

4    A.         No, I don't recall it in particular.

5    Q.         Do you recall having conversations

6    with Chuck Koon regarding the need to have a

7    quality agreement with Actavis?

8                   MS. MCDONOUGH:  Probably a

9    continuing objection to the phrase the need for a

10   quality agreement until it's defined.

11                  THE WITNESS:  It's -- I agree

12   with the need.  There's an initiative -- at that

13   time there was an initiative to put quality

14   agreements, technical agreements in place with

15   everyone, all of our outsource companies and as

16   this shows, the other sites that were redacted,

17   these are our, I would say, three sites here that

18   were remaining -- that needed to have the

19   technical agreements put in place.  A technical

20   agreement is the same as a quality agreement.

21   BY MR. MILLER:

22   Q.         Okay.

23              What's the purpose of a quality

24   agreement?

25   A.         The primary purpose is to delineate

Suzanna Wolf

Confidential – Subject to Further Confidentiality Review

37

1     the responsibilities between the sites.  For

2     example, who's responsible for reviewing a batch

3     record?  Who would be responsible for the artwork

4     that needs to be supplied, who -- complaints, who

5     answers complaints, things like that.  That's

6     within a quality agreement.  You don't get into

7     the financial information that you might have in

8     a supply agreement.

9     Q.          Are you familiar with the term good

10    manufacturing practices?

11    A.          Sure.

12    Q.          GMP?

13    A.          Uh-huh (yes).

14    Q.          Would identifying who's responsible

15    for GMP issues is that at a typical item in a

16    quality agreement?

17    A.          It's not worded that way.  The way it

18    more -- it would be worded in a technical

19    agreement is that a particular site must follow

20    GMP guidelines, must manufacture with GMP

21    guidelines, that type of language.

22    Q.          As a quality -- as the individual who

23    is, and correct me if I'm stating this wrong,

24    who's overseeing quality assurance with a

25    third-party product manufacturer, what

Confidential – Subject to Further Confidentiality Review

38

```
 1     responsibility do you have, if any, to ensure
 2     that the third-party is producing the product
 3     within GMP?
 4     A.          Really my only responsibility at that
 5     time was the release of product.  Quality assurance
 6     is more a release of product, the liaison between
 7     that outsourced company and Mylan, issues come
 8     up; I was the point of contact.  If an issue came
 9     up, I would notify my direct -- my upper
10     management.
11     Q.          Would your office or you ever have
12     been involved in such things as inspecting the
13     third-party?
14     A.          We -- auditing?
15     Q.          Yes.
16     A.          No.
17     Q.          Are you aware that MPI would audit
18     the third-party even if it wasn't your office?
19     A.          Yes.  We had an auditing group that
20     also reported to --
21     Q.          Are you aware of any specific audits
22     of Actavis?
23     A.          I believe there was an audit.
24     Q.          Do you know when that was?
25     A.          I don't.
```

Confidential – Subject to Further Confidentiality Review

1    Q.          Are you familiar with the term 483

2    inspection?

3    A.          Yes.

4    Q.          Do you have any reason to be part of

5    -- well, let's ask this question; Mylan, MPI

6    produces a number of products themselves, right?

7    A.          Yes.

8    Q.          Okay.

9                Other than the eight to 10 products

10   that are outsourced to third parties, how many

11   products during your tenure, let's specifically,

12   let's say 2007, if you know, were produced by

13   Mylan?

14   A.          How many different products?

15   Q.          Yes.

16   A.          Probably close to 100.

17   Q.          Would you have any involvement in the

18   quality department with those products that were

19   produced there at Mylan?

20   A.          No.

21   Q.          If a 483 was conducted at Mylan,

22   would you have any reason to review it or any

23   involvement in the outcome or response to it?

24   A.          You mean if a 483 was issued to

25   Mylan?

Suzanna Wolfe
Confidential – Subject to Further Confidentiality Review

40

1    Q.         Yes.

2    A.         No.

3    Q.         As quality -- in the quality

4    assurance department for third parties, would you

5    have any reason to be involved in 483's of the

6    third-party?

7    A.         No.

8    Q.         Was it the responsibility of anyone

9    in the quality assurance department to maintain

10   copies of 483's of third parties?

11   A.         I don't know.

12   Q.         I've seen e-mails that are to and

13   from Suzanna Wolfe and e-mails that are to or

14   from Ann Wolfe; is there someone else at the

15   company or do you go by Ann sometimes and

16   Suzanna?

17   A.         No, there is an Ann Wolfe.

18   Q.         Okay.

19              What's Ann Wolfe's title?

20   A.         I don't know.  She's in, oh, what do

21   we call that group?  She's in business supply

22   logistics.  She's in that area.  I don't know

23   Ann's title.

24   Q.         Other than you, who would have

25   reported or what offices would have reported to

Confidential – Subject to Further Confidentiality Review

41

1       Chuck Koon?

2       A.          The auditing group and, let's see, at

3       that time I believe that was just the

4       auditing group and myself.

5       Q.          Was there any routine or scheduled

6       communication between your group, QA, and the

7       auditing group?

8       A.          No.

9       Q.          Would -- so there was never any time

10      when -- you do recall there was an audit on

11      Actavis?

12      A.          Uh-huh.

13      Q.          But there was never any time when the

14      quality assurance group at Mylan would have

15      discussed the findings of the audit with the

16      auditing group?

17      A.          I don't understand your question.

18      Q.          Fair enough.

19                  Would there be any reason for the QA

20      of third parties, yourself, at Mylan to interact

21      with the auditing group at Mylan following an

22      audit of a third-party producer?

23      A.          Okay, myself, no, other than locker

24      room gossip, there is no -- it's not discussed.

25      Audits are really kept confidential.

Confidential – Subject to Further Confidentiality Review

42

```
 1    Q.          Okay.

 2                I'm going to mark this as M-4.

 3                      *   *   *

 4                (Whereupon, Deposition Exhibit M-4

 5    marked for purposes of identification.)

 6                      *   *   *

 7    BY MR. MILLER:

 8    Q.          Have you seen this document before?

 9    A.          No.

10    Q.          It was produced to us by Mylan, I

11    believe, from the custodial files of Mr. Koon,

12    but I'll make the statement that it's -- I'll

13    represent it is what it is, Actavis, Little

14    Falls, New Jersey, August inspections summary.

15                Were you aware of an inspection of

16    Actavis in August of 2006?

17                      MS. MCDONOUGH:  I may need

18    just a minute to read this. Have you read it yet?

19                      THE WITNESS:  No, I haven't

20    read this.

21                      MR. MILLER:  Would you like

22    to review it?

23                      THE WITNESS:  Yeah, that

24    would be great.

25                      *   *   *
```

Confidential – Subject to Further Confidentiality Review

43

```
1                    (Brief pause)
2                       *   *   *
3                    THE WITNESS:  I'm ready.
4       BY MR. MILLER:
5       Q.          All right.
6                    Now that you've taken the time to
7       read this document, does it come to
8       mind that you perhaps have seen it?
9       A.          No, I have not seen it.
10      Q.          All right.
11                   Are you -- were you aware that there
12      was an inspection, FDA 483 at Actavis in August
13      of '06?
14      A.          At that time when I was
15      performing the job duties then I don't believe I
16      was aware of.  After, you know, after the issue
17      why we're all here today, then it became -- that
18      I understood there were 483's issued.
19      Q.          Now that you've read it, will you
20      agree with me that it's observations,
21      findings during an inspection that discuss GMP
22      issues at Actavis?
23      A.          Uh-huh, yes.
24      Q.          And were you aware of the GMP issues
25      at Actavis in 2006 and '07?
```

Confidential – Subject to Further Confidentiality Review

44

```
1     A.          I was not because that responsibility
2     more is -- it wasn't part of my job duties or
3     responsibilities to be involved in that. That's
4     more my upper management that was more involved
5     with the compliance, the auditing of the sites.
6     That wasn't part of my role.
7     Q.          So you viewed your role as looking at
8     the paperwork, the documents, the documentation
9     of each individual lot to determine that it met
10    compliance?
11    A.          Right.
12    Q.          And then take that lot and release
13    that lot?
14    A.          Yes.
15    Q.          Okay.
16                I'm going to hand you what's been
17    marked previously as Plaintiffs Exhibit 25, and
18    it is -- I'll represent to you it provides a
19    warning letter that went out to Actavis in
20    February of 2007.  Have you seen this before?
21    A.          I believe I've read it at some point
22    in time.
23    Q.          Are you familiar with the term
24    warning letter that results from a 483?
25    A.          Sure. Yes.
```

Confidential – Subject to Further Confidentiality Review

45

1    Q.       And would you agree with the

2    statement that 483's don't typically come with a

3    warning letter, that's kind of a step beyond the

4    findings of the 483?

5               MS. MCDONOUGH:  Objection,

6    if you know.

7               THE WITNESS:  Usually, yes.

8    BY MR. MILLER:

9    Q.       Were you aware of this warning letter

10    at the time it was received at Actavis back in

11    February of 2007 or sometime close?

12               MS. MCDONOUGH:  Do you want

13    to take a minute to read it?

14               THE WITNESS:  No, I know what

15    this is.  I don't know -- what I'm having

16    difficulty is, I don't know at -- I know about

17    all this now.  I'm aware of it now, but at the

18    time, I don't know at what point in time I did

19    become aware of this.  I definitely have seen

20    some of these documents, was aware of the

21    documents after we had the issue with the problem

22    batch and the batches recalled.  That's

23    really when I, you know, became aware of all

24    these documents.  So I can't tell you at what

25    point in time I knew about it.

Confidential – Subject to Further Confidentiality Review

46

1       BY MR. MILLER:

2       Q.          When you say the problem batch; is

3       there a specific batch in your mind that stands

4       out whenever it comes to Digitek?

5       A.          I thought that's why we were all here

6       today.

7       Q.          Were all batches recalled?

8       A.          Now that I don't know.

9       Q.          Okay.

10                  What did you do in preparation for

11      the deposition today?

12      A.          Met with our attorneys.

13      Q.          How many times did you meet?

14      A.          Twice.  I think twice.

15      Q.          For how long?

16      A.          Several hours both times.

17      Q.          Were you shown any documents?

18      A.          Yes.

19      Q.          What documents were you shown?

20                      MS. MCDONOUGH:  I'll just

21      step in and explain.  We didn't show her anything

22      you haven't been produced and we did pick out

23      certain documents to show her and you've got some

24      of them here, but, or probably there but we do

25      consider that work product, but there's nothing

Confidential – Subject to Further Confidentiality Review

47

1    that the witness was shown that you don't already

2    have.

3    BY MR. MILLER:

4    Q.            Did you personally review any

5    documents in preparation not being in the company

6    of your counsel?

7    A.            Yes.

8    Q.            What documents?

9    A.            I reviewed the investigation for, I

10   don't know the batch number, 709 -- the

11   particular batch, the batch that was recalled,

12   70924, I think.  I reread that investigation.

13   Q.            Did you have that investigation in

14   your file at work or is it something that you

15   received since the time of the investigation?

16   A.            No, that's at work.  It's within the

17   batch.

18               It's part of the batch documentation

19   of that batch, which is kept at Mylan.

20   Q.            Okay.

21               Going back to what was previously

22   marked as Plaintiffs Exhibit 25, the revised

23   warning letter, I won't read the entire -- you're

24   familiar with it now, just going back to the

25   bottom paragraph where it starts out: The

Confidential – Subject to Further Confidentiality Review

48

```
 1      significant observations included but were not
 2      limited to the following --
 3                       MR. TABER:  Objection to the
 4      reading of the document and also the parts that
 5      don't relate to Digitek.
 6      BY MR. MILLER:
 7      Q.           And number one, significant
 8      deficiencies were found in the operations of your
 9      firm's quality control unit and as a result there
10      is no assurance that many drug products
11      manufactured and released into interstate
12      commerce by your firm have the identity,
13      strength, quality and purity that they purport to
14      possess.  Do you see that?
15      A.           Uh-huh.
16      Q.           Is it important for a quality
17      assurance personnel at Mylan dealing with a
18      third-party producer, Actavis, who has received a
19      warning letter to this -- with this language; is
20      it important for you to know that --
21                       MR. TABER:  Objection.
22                       MR. MILLER:  -- in your job?
23                       THE WITNESS:  It's important
24      for our department to know that.  It wasn't my --
25      as I explained earlier, it wasn't part of my job
```

Confidential – Subject to Further Confidentiality Review

49

1    responsibility to get, if you want to say, into

2    the nitty-gritty of the sites.  It was to release

3    products.  If there were issues that came up, I

4    reported to my upper management.  It was quality

5    assurance, upper management quality assurance.

6    It's part of their responsibilities and decisions

7    of investigating, if you say, issues at sites.

8    BY MR. MILLER:

9    Q.          Of the eight to 10 products that were

10   being made off-site, the third-party products,

11   how many companies were making those eight to 10

12   products?

13   A.          Probably six perhaps, five or six.

14   Q.          Those six companies, Actavis -- how

15   many products did Actavis make?

16   A.          Two.

17   Q.          Of those six companies, excuse my

18   extremely non-technical term, would these types

19   of issues make Actavis a problem child?

20                       MR. TABER:  Objection.

21                       MS. MCDONOUGH:  Objection,

22   even you knew that was objectionable.

23   BY MR. MILLER:

24   Q.          Is it more of a concern when a

25   third-party producer has this type of warning

Confidential – Subject to Further Confidentiality Review

50

1    letter in the file than say a third-party

2    producer who wouldn't have such a warning letter

3    in the file?

4    A.          I would say it would be more of a

5    concern, but understand that the pharmaceutical

6    industry is heavily regulated by the FDA and are

7    inspected all the time.  Observations are written

8    all the time, the FDA never comes out of a site

9    without writing up observations.  It's part of their

10   job is to write up observations.  So it's not

11   unusual to find sites with lots of observations

12   written.

13   Q.          Lots of observations may not be

14   unusual, but would you agree with the statement a

15   warning letter is unusual?

16   A.          I don't want to use the word unusual.

17   A warning letter might be more significant.

18   Q.          Okay.

19               And would a company ceasing the

20   production of a product even be more significant

21   than that?

22   A.          Yes.

23   Q.          Do you recall dealing with warning

24   letter issues with the other five or so

25   third-party producers?

Confidential – Subject to Further Confidentiality Review

51

```
 1                    MR. TABER:  Objection.
 2                    THE WITNESS:  I have to think
 3    who they were.  Not that I recall.
 4    BY MR. MILLER:
 5    Q.          Did MPI have sales reps?
 6    A.          Yes.
 7    Q.          Do you know if MPI sales reps would
 8    have marketed Digitek or would Actavis sales reps
 9    market Digitek?
10    A.          I have no idea.
11    Q.          Fair enough.
12                    MR. TABER:  Off the record
13    for a moment.
14                    VIDEOGRAPHER:  The time is
15    12:29; we're going off the record.
16                         *   *   *
17                    (Brief pause)
18                         *   *   *
19                    VIDEOGRAPHER:  The time is
20    12:29; we're back on the record.
21    BY MR. MILLER:
22    Q.          Who is Patricia Latzo?
23    A.          Trish Latzo is now our vice
24    president.  She might be senior vice president of
25    quality assurance.
```

Confidential – Subject to Further Confidentiality Review

52

1    Q.          So Chuck Koon would report to her?

2    A.          Yes.

3    Q.          And how long has she held that title?

4    A.          Probably -- she's had a series of

5    promotions lately in the last three years.  So

6    she's been at least vice president probably the

7    last three or four years.

8    Q.          Okay.

9                So is it fair to say that since 2000

10   -- the beginning of 2007 the basic structure

11   hasn't changed as far as you reporting to Chuck

12   Koon, Chuck Koon reporting to Ms. Latzo?

13   A.          There was a slight change.  When I

14   reported to Chuck, he reported to Mike Adams,

15   Mike Adams reported to Trish --

16   Q.          Okay.

17   A.          -- Latzo.

18   Q.          What was Mike Adams title at that

19   time?

20   A.          I don't know if he was senior

21   director or vice president of quality assurance.

22   It wouldn't have been vice president.  It must

23   have been senior director of quality assurance.

24   Q.          And Ms. Latzo was vice president of

25   quality assurance?

Confidential – Subject to Further Confidentiality Review

53

1    A.        Yes.

2    Q.        And that's vice president of quality

3    assurance across the board.  That's not a

4    third-party thing; it's a Mylan quality

5    assurance?

6    A.        Right.  Right.  We've had a lot of

7    changes, so I apologize because it's hard to keep

8    everyone straight.

9    Q.        I want to mark M-5.  Take a look at

10   that, please.  The warning letter was previously

11   marked.

12                    *   *   *

13             (Whereupon, Deposition Exhibit M-5

14   marked for purposes of identification.)

15                    *   *   *

16   BY MR. MILLER:

17   Q.        Have you seen this before?

18   A.        Yes.

19   Q.        Do you recall the topic?

20   A.        Well, in reading this I see that it

21   was a request for an investigation from Dan

22   Bitler at Actavis.

23   Q.        Did you -- who did you typically deal

24   with at Actavis?

25   A.        Dan Bitler most of the time.

Confidential – Subject to Further Confidentiality Review

54

```
 1    Q.          Who else would you have dealt with?

 2    A.          Actually probably Dan.  I didn't have

 3    many conversations but when I did they would have

 4    been with Dan.

 5    Q.          And just so I get the picture right,

 6    you weren't involved in the lot or batch being

 7    ordered, but if a lot or a batch were to be

 8    ordered and delivered, then that's when you would

 9    review the COC and the COA and if there were any

10    issues, that's why you would talk to Dan?

11    A.          Yes.

12    Q.          Okay.

13                So it would be seamless, or I say

14    seamless, it would take place without

15    communication if the lot or batch was ordered,

16    delivered, the COC, COA were within your specs,

17    then it would move on without needing to

18    communicate with Dan at all?

19    A.          If I had all the documentation, yes.

20    Q.          Okay.

21                And this case -- it's probably been

22    produced, but there are so many documents I

23    haven't found it yet, but it starts out like most

24    e-mail chains, we have to go to the bottom to get

25    it in the right order, and where it says Dan at
```

Confidential – Subject to Further Confidentiality Review

1    the very bottom, I see there is a deviation for

2    Lot 60992A1 deviation of 00SN-0014.  Can you send

3    me a copy of this?  Regards, Suzy Wolfe.  You

4    agree that that's a request from you to Dan?

5    A.        Yes.

6    Q.        How did you come to learn that there

7    was a deviation in that particular lot?

8    A.        The documents that they send, the

9    COC's, the Certificate of Compliance, there's a

10   section on the compliance, the certificate form,

11   that states whether there were any deviations

12   during the manufacturing of the product.  This

13   particular deviation 00SN was noted on the

14   certificate of compliance, that there was a

15   deviation with that lot, 60092.

16   Q.        Would you agree with the statement

17   that if a deviation was observed in the testing

18   at the third-party producer, it was resolved

19   before it came to you; it didn't come with a

20   deviation in the COC or the COA, it just

21   commented on the fact that there was one; is that

22   correct?  If that makes sense.

23                  MS. MCDONOUGH:  Objection,

24   vague.

25                  THE WITNESS:  Do you mean was

Confidential – Subject to Further Confidentiality Review

56

1     there one in the past?  Maybe you could rephrase
2     it.
3     BY MR. MILLER:
4     Q.          You didn't catch something that they
5     didn't catch?
6     A.          I think what you're trying to say is
7     was the deviation closed before it was received
8     at our --
9     Q.          That was beautiful, yes.
10    A.          That's my job.  Yes, it was closed.
11    Q.          Thanks.  And then we see Dan's
12    response: Suzy, we do not send copies of
13    documents, batch records, investigations,
14    et cetera, to customers especially where we own
15    the filing.  You are welcome to come to our
16    facility and review documents or I can send you a
17    brief summary of the investigation via e-mail.
18    Please let me know what you prefer. Dan.  Did I
19    read that correctly?
20    A.          Yes.
21    Q.          And my question is, is that -- was
22    that -- did that language comport to what you
23    understood the agreement to be with third-party
24    producers, that he wouldn't provide that
25    information to you?

Confidential – Subject to Further Confidentiality Review

57

1    A.            Some do.  Some who own the ANDA are

2    very, very protective -- the ANDA, are very, very

3    protective of their documents, will share very

4    little of it because it's their product.  They

5    own it.  This is not unusual for someone to

6    provide me a summary.

7    Q.            Did you ever take him up on his offer

8    to go over and inspect the lab?

9    A.            That's not what he's volunteering

10   here.

11   Q.            Well, all right, you're correct, hang

12   on, let me make sure I state it right.  Did you

13   ever take him up on the opportunity to go over

14   and visit his facility and review documents?

15   A.            No.  I did not.

16   Q.            All right.

17                 And then it says:  A summary would

18   suffice and if you could please note that it's

19   actually resolved and closed as well.  Thanks so

20   much.  Regards, Suzy Wolfe.  As we sit here today,

21   do you have a memory of receiving that document

22   indicating that this deviation was closed?

23   A.            This specific one, I don't recall

24   specifically.

25   Q.            Do you recall having other issues

Confidential – Subject to Further Confidentiality Review

58

1    with deviations on lots of Digitek?

2    A.          Yes.

3    Q.          What type of deviations would you

4    typically see?

5    A.          The ones that -- the ones that I

6    remember and it's correct, it's not typical and

7    atypical was a label lifting issue that we had.

8    Actavis had a label lifting issue where the label

9    around the bottle was starting to lift off on

10   either end.

11   Q.          Called flagging?

12   A.          Flagging, yes.  That was on a

13   particular lot, which actually extended -- there

14   were several lots that and actually we found it

15   throughout the industry, various other different

16   manufacturers were having the same issue with the

17   label lifting, flagging.

18   Q.          Would you ever talk to Dan Bitler on

19   the phone or was the majority of your

20   communication via e-mail?

21   A.          There were a few conversations on the

22   phone, brief.

23   Q.          Do you have any type of log you keep

24   on phone calls or is that something you wouldn't

25   do?

Suzanna Wolfe
Confidential – Subject to Further Confidentiality Review

59

A.          No.  I have a daytimer on my desk and
if there was something I needed to remember,
perhaps there was something in our conversation I
needed to find or look up, I would have jotted
something down but that's it.

Q.          I'll mark M-6.  Do you recall seeing
this?

                    *   *   *

          (Whereupon, Deposition Exhibit M-6
marked for purposes of identification.)

                    *   *   *

                    THE WITNESS:  Yes.

BY MR. MILLER:

Q.          If we go back to M-3 real quick, it
talks about needing quality agreements with
Actavis back in January 30 of 2007.  Will you
agree with me that this is a contract request
form?

A.          Yes.

Q.          And by you to Actavis, were
requesting a quality agreement?

A.          It was by me to -- it's not to
Actavis.  This is an internal document to our
legal group.

Q.          Okay.  Fair enough.

Confidential – Subject to Further Confidentiality Review

60

```
 1                    And this is -- okay, so your request
 2        to the legal group in May of '07 regarding a
 3        quality agreement with Actavis?
 4        A.          Can you repeat that?
 5        Q.          Well, it's a contract request form
 6        from you to the Mylan legal department regarding
 7        a quality agreement with Actavis?
 8        A.          Yes.
 9        Q.          And you agree that it was in mid-May
10        of '07?
11        A.          Yes.
12        Q.          Well, I guess my question is, we've
13        discussed the e-mail from January 30 of 2007
14        stating that a quality agreement needed to be
15        established with Actavis, but do you recall or is
16        there a reason why it's taken until May before a
17        request is out?
18        A.          Well, let me explain what this form
19        is.  The quality agreement is drafted usually by
20        myself and then once it's ready for legal to
21        review, you fill this form out.  And what this is
22        doing is asking legal to put it in the queue as a
23        project for an attorney to review.  So I may have
24        written the quality agreement months prior to
25        this, but when I was ready to submit it to legal
```

Confidential – Subject to Further Confidentiality Review

61

```
 1      then I submit this form and they assign it to an
 2      attorney to review and it's given a project
 3      number.
 4      Q.           Fair enough.  That's what I was
 5      looking for.
 6                   How much of your time is spent on
 7      drafting quality agreements or getting quality
 8      agreements signed; is that a large portion?
 9      A.           Now or back then?
10      Q.           The time frame 2007.
11      A.           It was probably 40 percent of my
12      time.
13      Q.           And then the other remaining 60
14      percent of your time, how much of that would have
15      been reviewing COC's, COA's for individual lots?
16      A.           Primarily most of the rest of the
17      time was reviewing documentation.
18      Q.           So those are your two primary
19      functions?
20      A.           Yes.
21                        MS. MCDONOUGH:  Would this be
22      a good time to just take a few minutes of a break
23      or --
24                        MR. MILLER:  Yeah, it
25      certainly is.  We'll take a break.
```

Confidential – Subject to Further Confidentiality Review

62

1           VIDEOGRAPHER:  The timing is

2     12:52; we're going off the record.

3                    *   *   *

4               (Short break taken)

5                    *   *   *

6           VIDEOGRAPHER:  The time is

7     12:56; we're back on the record.

8     BY MR. MILLER:

9     Q.        Ma'am, I'm going to hand you what I

10    have marked Exhibit M-7.

11                   *   *   *

12          (Whereupon, Deposition Exhibit M-7

13    marked for purposes of identification.)

14                   *   *   *

15          MS. MCDONOUGH:  Thank you.

16    BY MR. MILLER:

17    Q.        Have you seen this e-mail before?

18    A.        Give me a second to read it first.

19    Okay.

20    Q.        Do you recall seeing this in the

21    past?

22    A.        Yes.

23    Q.        The only thing I really want to refer

24    to is the very top line there.  It says -- well,

25    it's an e-mail from you; correct?

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

63

1    A.          Yes.

2    Q.          To Chuck Koon and this is Mylan

3    document 0032473 for the record.  The subject is

4    regarding forwarded Digitek docs:  Yes, these would

5    be fixed batches or batches with the new labels.

6    No batch records for Digitek, only redacted.  They

7    send just the COA and COC. Suzy.  Do you agree

8    that this is discussing the flagging issue that

9    we talked about?

10   A.          Yes.

11   Q.          What I want to address is the comment

12   they send just the COA and COC, and those are the

13   two documents that we identified earlier;

14   correct?

15   A.          Uh-huh.

16   Q.          Would other companies send additional

17   documents or less documents?

18   A.          Like I stated earlier, there are some

19   that do and some that don't.

20   Q.          Isn't that governed by some SOP or

21   document internal to Mylan or is that governed by

22   documents at the third-party?

23   A.          The SOP internal to Mylan states that

24   at minimum you need C of A, C of C, possibly it

25   could also receive batch records, miscellaneous

Confidential – Subject to Further Confidentiality Review

64

1    documents.

2    Q.          So you don't receive batch records

3    from Actavis regarding Digitek?

4    A.          No.

5    Q.          Other than the COA's, COC and batch

6    records, what, if any, are some of the other

7    documents that you received from third-party

8    manufacturers?

9    A.          Investigations that would have been

10   related to a particular batch.

11   Q.          And you would agree that Actavis did

12   not send investigations of a particular batch as

13   we saw in the previous e-mail?

14                     MR. TABER:  Objection.

15                     THE WITNESS:  The previous

16   e-mail, it showed that I requested it and they

17   sent a summary of the investigation.

18   BY MR. MILLER:

19   Q.          We can go back and look at it but do

20   you agree that Dan Bitler informed you that he

21   wasn't going to send the investigation?

22                     MR. TABER:  Objection.

23                     THE WITNESS:  He said like I

24   just stated, he said he would not send the

25   investigation but he would send a summary of the

Confidential – Subject to Further Confidentiality Review

65

1    investigation.

2    BY MR. MILLER:

3    Q.          Fair enough.

4                Do you know as you sit here what SOP

5    would be at Mylan that directs that COA's and

6    COC's will be sent at a minimum?

7    A.          I don't know the specific number.

8    The title would be something of the effect of

9    releasing batches for outsourced parties or

10   something of that sort.

11   Q.          I'm going to mark Exhibit M-8.  If

12   you would take your time to read that, I would

13   appreciate it.

14                        *   *   *

15                (Whereupon, Deposition Exhibit M-8

16   marked for purposes of identification.)

17                        *   *   *

18   BY MR. MILLER:

19   Q.          And this is Mylan document 0032479,

20   an e-mail from yourself to Rebecca Pinnell, July

21   of 2007; do you recall seeing this document or

22   the topic?

23   A.          Yes.

24   Q.          Who is Rebecca Pinnell?

25   A.          Pinnell.

Suzanna Wolf

Confidential – Subject to Further Confidentiality Review

66

1   Q.          Pinnell, I'm sorry.

2   A.          Becky worked in our group at that

3   time.

4               She helped back me up or was my

5   replacement when I was out a couple times, she

6   was filling in for me.

7   Q.          Okay.

8               So we discussed a gentleman by the

9   name of Tom Conroy.  Would she have done the same

10  functions as Tom Conroy?  The same title?

11  A.          No.  Becky actually at that time, I

12  believe, was an associate director and she was

13  trained as well to release batches.  There was a

14  point in time and I don't remember the exact

15  dates, there was a restructuring of our group and

16  I reported to her just for a couple months before

17  I went to another position.  So she resumed my

18  duties, she was in our group.

19  Q.          And we'll go to the end of the e-mail

20  to get the beginning of the topic chain and it's

21  -- where it says:  Hello Suzanna, I have in order

22  due to ship to UDL next week for Digitek .125

23  milligrams.  The following lots are available to

24  ship but I will need to know if UDL parameters

25  are met.  Do you have the UDL parameter listing

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

67

1    for Digitek?  I'll stop there and my question is;

2    did you maintain documents for UDL regarding

3    parameters or specifications?

4    A.          What she's asking -- no, we didn't

5    maintain documents.

6    Q.          What was she asking you?

7    A.          What she's asking is for us to review

8    the C of A that came with a particular batch that

9    we, MPI, would have released.  So she's asking

10   for us to review the Certificate of Analysis and

11   does it meet UDL specifications.  UDL has tighter

12   specifications, disso and assay here; these

13   limits are tighter than what Actavis's parameters

14   are.

15   Q.          Okay.

16               I'm going to take that in two

17   different parts.  One is she's asking about lots

18   that you would have already released to UDL?

19   A.          We don't release them to UDL.  Lots

20   -- it's confusing, lots that we would have

21   released for distribution, they're in a release

22   status down at the distribution center.

23   Q.          But are these distributions for UDL?

24   A.          They're distributions for the world.

25   They can go to anybody.

Confidential – Subject to Further Confidentiality Review

68

1    Q.          Okay.

2                Well, that brings me back to the

3    question then it would be your understanding that

4    UDL doesn't have a counterpart that's equal to

5    you, UDL doesn't have someone that reviews COC's

6    and COA's?

7    A.          I don't know.

8    Q.          Okay.

9                But you do know that lots down --

10   lots that you have accepted could potentially

11   fill UDL orders?

12   A.          Yes.

13   Q.          Okay.

14               And were you aware that UDL had

15   parameters different than those set by MLI or

16   SOPs at Actavis?

17   A.          Yes.

18   Q.          And so then is it fair to say that

19   you would operate under those tightened

20   specifications because obviously you don't know

21   if it was going to UDL or Bertek or MPI, so did

22   you use the tightened specs yourself?

23   A.          No.

24   Q.          Okay.

25               So if -- looking at an assay, for

Confidential – Subject to Further Confidentiality Review

69

1    example, would those numbers be on the COA or the

2    COC?

3    A.          None of these numbers are on the C of

4    A or C of C.  These -- and if you're referring to

5    the bottom of this, yes, this assay of 98 percent

6    to 103 percent, disso, 90 to 60 minutes, that's

7    UDL's parameters.  UDL has their own

8    specifications for Digitek.

9    Q.          Okay.

10   A.          So in essence what they're asking

11   here is, hey, only send us lots that would meet

12   this.  If they're anything outside this, say the

13   assay was 97 percent; we don't want it.  It's

14   well within specifications of Actavis's

15   specifications.  UDL just has a tighter, tighter

16   spec.  So they only want specific batches.

17   Q.          Were you the gatekeeper that would

18   determine if it was inside the tighter parameters

19   or would someone else determine that?

20   A.          Well, that's what she's asking here.

21   She was asking me to do that.  I always try to

22   push back to UDL because they could do the same

23   thing I was doing as well, take Actavis's C of A,

24   does it meet their specifications.  If it does,

25   they can receive that batch.  That's all this --

Confidential – Subject to Further Confidentiality Review

70

1    that's all she's asking for here.  She, being
2    Connie Hatcher.
3    Q.          Well, if that information is not
4    included in the COC or COA, is there
5    documentation in the packet that comes to you
6    that has the assay findings from Actavis?
7    A.          The assay and disso is on the C of A.
8    Q.          Oh, okay.
9    A.          But it's Actavis's specifications --
10   Q.          Right.
11   A.          -- which are let's say this wide
12   (indicating).
13   Q.          Okay.
14   A.          UDL has specifications this wide
15   (indicating).  They are tighter.
16   Q.          I'm with you now.
17   A.          Okay.
18   Q.          If a COA came down to you for a
19   specific lot and it was outside of UDL's
20   parameters but inside of Actavis's parameters,
21   what would your action be, if anything?
22                        MR. TABER:  I'm sorry.  Could
23   you clarify which parameters you're asking her
24   about?  Are we just talking about assay and
25   dissolution?

Confidential – Subject to Further Confidentiality Review

71

1            MR. MILLER:  Yes.

2     BY MR. MILLER:

3     Q.           The assay, typically the assay is

4     what, if you know, for Actavis?

5     A.           I don't know.  I don't recall.

6     Q.           Would you agree we've defined that

7     they are broader limits than the ones requested

8     by UDL?

9     A.           Yes.

10    Q.           And so my question is regarding assay

11    as it's defined in this e-mail, if you, the

12    reviewer of the COA were to see an assay value for

13    a particular lot that were outside of the

14    parameters UDL is requesting, but inside the

15    parameters of Actavis, what action would you

16    take, if any?

17    A.           When I -- to release the batch for

18    MPI, we use Actavis's specifications and then the

19    batch is released.  It's down at the distribution

20    center.  UDL will pull from those batches that

21    are already released and they'll send an e-mail

22    saying I want this particular batch.  Is it okay

23    to send?  Their parameters are tighter like we

24    discussed, so we take a look at the C of A and

25    tell UDL they meet your specifications, you can

Confidential – Subject to Further Confidentiality Review

72

1   have it.  If they don't meet UDL's

2   specifications, then they'll pick another batch.

3   It's still good product.  It's still viable

4   product, just not for UDL.

5   Q.          I totally understand.  But I guess

6   my question is, is there any specific action that

7   you take as you're reviewing the COA if you see

8   that it falls outside of the parameters of UDL

9   but inside the parameters of Actavis?

10  A.          If I'm reviewing it for UDL?

11  Q.          Yes.

12  A.          I respond back to UDL and say it's

13  outside your specs.  You don't want this batch.

14  Q.          So you know if a lot batch comes in

15  that's being inspected or accepted for UDL --

16  A.          No.

17  Q.          -- if it's not?

18  A.          No.

19  Q.          Okay.

20              Then how would you know if you needed

21  to know what parameters to use?

22  A.          I get an e-mail from UDL.

23  Q.          After the acceptance of the COA or

24  prior?

25  A.          After.

Confidential – Subject to Further Confidentiality Review

73

1    Q.          Then wouldn't it already have been
2    released or they send the same release back to
3    you and say this is a UDL; I need the parameters
4    to be tighter?
5    A.          No, well, back up.  I release the
6    batch --
7    Q.          Right.
8    A.          -- for MPI, for Mylan and it's down
9    at the distribution center.  It's a released
10   batch. UDL draws from those batches.  They will
11   pick a particular batch, something that I've
12   already reviewed, I've already released, it's
13   good.
14   Q.          Right.
15   A.          It's a good viable product.  UDL
16   picks batch X and says does this meet our
17   specifications, like she's asking for here.  Is
18   the assay and disso within these specs?  It
19   either is or it isn't.  If it is, we say, yes.
20   So UDL takes -- I don't know how much they take,
21   they might only take a pallet, they may take a
22   carton, I don't know.  But they'll take a
23   quantity from that batch.  The rest of that batch
24   gets shipped.  It's shipped to whomever, but it's
25   good, viable product.  UDL for some reason has a

Suzanna Wolfe
Confidential – Subject to Further Confidentiality Review

74

1     tighter specification.  They only want this

2     particular product.

3     Q.          Okay.

4     A.          Does that make sense?

5     Q.          It does make sense and I'm with you.

6     Then is it correct to say that if UDL is going to

7     take a portion of a lot, any time that UDL has

8     identified a lot or portion of a lot that they

9     want to draw from, that they have to come back to

10    your office and say, is this particular lot

11    within our parameters?

12    A.          Yes.

13    Q.          And is that typically done at your

14    desk?  Is that one of the functions that you

15    have?

16    A.          At that time I did that for them.

17    Q.          When you say at that time, you mean

18    the entire time that you were QA of third

19    parties?

20    A.          Right.

21    Q.          Would Mylan have any SOPs, MLIs or

22    anything of the like that would address the

23    tightened parameters by UDL?

24    A.          Not Mylan, MPI.

25    Q.          Any entity of Mylan?

Confidential – Subject to Further Confidentiality Review

1      A.          I don't know about anybody else.

2      Q.          Which leads me to Mylan 9.  Not

3      that one because I've highlighted it.  Take a

4      look at that document, please.

5                            *   *   *

6                  (Whereupon, Deposition Exhibit M-9

7      marked for purposes of identification.)

8                            *   *   *

9      BY MR. MILLER:

10     Q.          And this is document 0027853, and

11     I'll represent it's titled UDL Laboratories, Inc.

12     Memorandum; and is it fair to say this is a

13     document that reflects exactly what we've just

14     went through as far as UDL requesting information

15     of out of spec assay?

16     A.          It's not out of spec assay.

17     Q.          Out of tightened parameters assay?

18     A.          That's not correct either.

19     Q.          How would you say it?

20     A.          They're within specifications;

21     they're UDL's tightened.

22     Q.          They're outside of UDL's tightened

23     specifications?

24     A.          We acknowledge that the assay result

25     is outside -- yes, that is correct to say that.

Confidential – Subject to Further Confidentiality Review

76

1    Q.          Within safety parameters but not
2    within the tightened parameters of UDL?
3    A.          Correct.
4    Q.          And this is to Mylan Quality
5    Assurance, so would that be Mr. Koon at this
6    time?
7    A.          I don't know who this was sent to or
8    directed to in quality assurance.  I'm copied on
9    it obviously.
10   Q.          Was there a standard form for when
11   UDL requested a lot to say inspect this lot to
12   see if it's within our parameters?
13   A.          No.
14   Q.          No?  Do you have a sense for what
15   percentage of the product was branded UDL versus
16   Bertek?
17   A.          UDL versus Bertek?
18                    MS. MCDONOUGH:  Objection,
19   as to what time period and I'm not sure that
20   there's foundation for that.
21   BY MR. MILLER:
22   Q.          In September of 2007 at the time of
23   this memorandum, what percentage of the product,
24   Digitek, went to UDL versus went to Bertek?
25                    MS. MCDONOUGH:  And just

Confidential – Subject to Further Confidentiality Review

77

1    objection, I think as we noted before, I believe

2    Bertek stopped any distribution in '05.

3                        MR. MILLER:  I'm a slow

4    learner.

5                        MS. MCDONOUGH:  That's all

6    right.

7    BY MR. MILLER:

8    Q.          If you understand the question, at

9    this time frame, do you have an idea of what

10   percentage of the tablets would have gone to UDL

11   versus Mylan?

12   A.          No.

13   Q.          And the third page of this document,

14   although it's been cut off, I believe it's Mylan

15   0027855, is in fact a copy of a Certificate of

16   Analysis; correct?

17   A.          Yes.

18   Q.          For this particular lot.  And the

19   typical form that you would have seen it in, but

20   this is not the typical paperwork that you would

21   have received to release a lot batch?

22   A.          Actually, no, the last two pages

23   would have been what I would have received.  That

24   was typical for a C of A.

25   Q.          Oh, yeah, I wouldn't notice it but

Confidential – Subject to Further Confidentiality Review

78

1      the second page is a Certificate of Analysis?

2      A.          It's just a cover page for the third

3      page.

4      Q.          But you would agree that you would

5      also receive, which is not here, a Certificate of

6      Conformance?

7      A.          Correct.

8      Q.          I'll mark M-10.

9                          *   *   *

10                 (Whereupon, Deposition Exhibit M-10

11     marked for purposes of identification.)

12                         *   *   *

13     BY MR. MILLER:

14     Q.          Take a look at that.  What is this

15     document?

16     A.          This is a batch record.

17     Q.          Would you agree it's a typical batch

18     -- a typical batch record?

19     A.          For Actavis, yes.

20     Q.          For the product Digitek?

21     A.          Yes.

22     Q.          And the first page here, what's the

23     significance of the barcodes, if I'm using the

24     right term?

25     A.          I don't usually see this.  This is

Suzanna Wolf
Confidential – Subject to Further Confidentiality Review

79

1    applied by -- all of our documents are
2    electronically scanned --
3    Q.          Okay.
4    A.          -- and electronically filed.  So the
5    scanning group attaches these barcodes.  I don't
6    know what they're for, to identify it somehow.
7    Q.          Oh, so that's something that you
8    typically --
9    A.          No.
10   Q.          -- would not see.  Okay.  But this
11   Mylan cover letter, the second page, Mylan
12   document 00263221 is the typical cover page that
13   you would get?
14   A.          Yes.
15   Q.          And was it typical that you'd get
16   four lots listed at one time if that's what I'm
17   seeing?
18   A.          Actually, it's not what I'd get, it's
19   what I create.
20   Q.          What you create, okay.
21   A.          I created this page.
22   Q.          That makes sense, yes, okay.  This is
23   ultimately what -- when you release the lot, this
24   is what you would create, put the cover letter on
25   top of it?

Confidential – Subject to Further Confidentiality Review

80

1    A.          Yes.

2    Q.          Okay.

3                And what you're stating is, the

4    following products have been approved for release

5    and distribution pending acceptable incoming

6    inspection at the Greensboro distribution center;

7    is that correct?

8    A.          Yes.

9    Q.          Would follow-on testing be conducted

10   -- or actually, strike that.

11               Would follow-on review of the

12   documents for approval be done at the Greensboro

13   distribution center as far as you know?

14   A.          Would follow-on?

15   Q.          Well, it says pending acceptable

16   incoming inspection; what type of inspection, if

17   you know, is completed at Greensboro?

18   A.          Yes, Greensboro performs a visual

19   inspection of the product at their site.

20   Q.          Visual of -- do they open up bottles

21   and visually inspect the tablets, do you know or

22   is it visual inspection of the bottles and

23   packages?

24   A.          Visual inspection of the bottles and

25   packages.

Confidential – Subject to Further Confidentiality Review

81

1    Q.          But they would not review any -- if
2    you allow me to use the term, laboratory GMP
3    issues or assays, test or --
4    A.          No.
5    Q.          No, okay.  And you finish up with the
6    line:  The analysis records and Certificate of
7    Conformance were reviewed and found to be in GMP
8    compliance; did I read that correctly?
9    A.          Yes.
10   Q.          And you were the only person
11   at Mylan who for this particular lot and most
12   lots who would accept it as far as GMP issues go
13   with each lot?
14                    MS. MCDONOUGH:  Objection,
15   vague.  I'm not sure what you mean.
16                    MR. MILLER:  It was.
17                    THE WITNESS:  I was going to
18   say that before she did.
19                    MR. MILLER:  I was thinking
20   that.
21                    THE WITNESS:  She beat me to
22   it.
23   BY MR. MILLER:
24   Q.          That was your primary function as the
25   QA third-party producer at Mylan was to do just

Confidential – Subject to Further Confidentiality Review

1   that, that's your function is to determine that

2   they would be found to be within compliance of

3   GMP's?

4   A.          The records.  The documentation?

5   Q.          Yes.

6   A.          Yes.

7   Q.          And the next page, again, the

8   barcodes that you didn't generate?

9   A.          No.

10  Q.          All right.

11              And then it goes to a quality

12  assurance inspection form for distribution centers

13  -- excuse me, what exactly is that?

14  A.          This is the form that the

15  distribution center uses when they inspect

16  product, on incoming they fill out this form.

17  Q.          So you didn't fill out the form?

18  A.          No.

19  Q.          What is the information -- okay,

20  so this is the lot coming to Mylan and it goes

21  through some other department or office to gather

22  this information before it gets to you?

23  A.          I see documentation; this is the

24  physical product.  The product is shipped down to

25  Greensboro, North Carolina.

Confidential – Subject to Further Confidentiality Review

83

1    Q.          Oh, okay.

2                So Greensboro -- all right, the

3    product goes right to Greensboro.  You get the

4    paperwork, you okay it, now that it's sitting in

5    Greensboro, it's clear to go somewhere else?

6    A.          Yes.

7    Q.          And as it's sitting there in

8    Greensboro, someone fills this information out

9    and it gets put on to the COC, COA before it gets

10   sent to you?

11   A.          No.

12   Q.          Okay.

13   A.          Close.  The C of A and C of C have

14   already -- usually have already been sent to me.

15   Q.          Got you.

16   A.          This documentation, once the quality

17   group down at the distribution center completes

18   this, they send it to me and I add it to, so it

19   all becomes part of the batch record.

20   Q.          Okay.

21                So this quality assurance inspection

22   form would come to you, you would look to see

23   what lot it is and marry it up with the COC and

24   COA for that particular lot and then it becomes a

25   document?

Confidential – Subject to Further Confidentiality Review

84

1    A.          Yes.

2    Q.          Okay.

3                And down at the bottom, that

4    highlighted box at the bottom, it says QA

5    disposition, batch record review, there's a check

6    mark, yes, would this be your handwriting inside

7    this box?

8    A.          No, I have nothing to do with this

9    form.

10   Q.          Okay.

11               Would you agree that to the right of

12   that where it says if yes, reviewed by; is that

13   your signature?

14   A.          No.  That is Miss Janet Kinsley, down

15   here at the bottom.  what she's saying is, off to

16   the left where it says batch record reviewed,

17   yes, NA, she's checked marked the yes and if yes,

18   who was it reviewed by --

19   Q.          Okay.

20   A.               -- and she's saying it's reviewed by

21   S. Wolfe.

22   Q.          And what's Mrs. King's title?

23   A.          Kinsley. Janet Kinsley --

24   Q.          Kinsley, I'm sorry.

25   A.               -- is her name.

Confidential – Subject to Further Confidentiality Review

85

1    Q.          Yes.

2    A.          She's quality assurance.  I don't

3    know her title.

4    Q.          All right.  Fair enough.

5                And again, there's another barcode

6    that's added after your -- after you've reviewed

7    the document; correct?

8    A.          Yes.

9    Q.          All right.

10               And then we go to a Certificate of

11   Conformance.  Is this form something that was

12   created by Actavis -- the blank template or was

13   it something that you provided to Actavis or

14   Mylan provided to Actavis?

15                        MS. MCDONOUGH:  If you know.

16                        THE WITNESS:  I believe when

17   we first started doing business with Digitek

18   products, we -- they asked what would we like to

19   receive and we, I believe we did supply this

20   language to them, to put in as a standard

21   template.

22   BY MR. MILLER:

23   Q.          And the next page is the title page

24   for the Certificate of Analysis but not the

25   Certificate of Analysis itself; correct?

Confidential – Subject to Further Confidentiality Review

86

1    A.          Correct.

2    Q.          All right.

3                And if we turn to the Certificate of

4    Analysis, we see -- do you agree that it's a fair

5    statement that this is the quality control

6    lab at Actavis; it's their findings when doing

7    routine testing for the product?

8    A.          I'm assuming that.  I don't know.

9    Q.          All right.

10               MS. MCDONOUGH:  Objection to

11   the phrase, did you say quality assurance lab?

12   I'm not sure if that's accurate.

13               MR. MILLER:  All right,

14   quality -- the quality control system at Actavis?

15               THE WITNESS:  I don't know

16   what they call it, quality control or quality

17   assurance, but it's from the lab.

18   BY MR. MILLER:

19   Q.          Fair enough.

20               And then -- so you don't have any

21   reason to review the data on this sheet.  It's

22   your -- do you go through and determine if each

23   one of these is within the specs?

24   A.          Yes.

25   Q.          You do?

Confidential – Subject to Further Confidentiality Review

87

1   A.          Yes.

2   Q.          And you do that by the limit, so it's

3   the third column on the right, so you take the

4   limit that they've put down and make sure that

5   the second column matches or is inside the limit?

6   A.          Yes.

7   Q.          Okay.

8               And then when you do that -- so the

9   only reason, the only time you would ever go in

10  here and look at the Certificate of Analysis for

11  something outside of the limit is if you --

12  there's been some type of investigation for out

13  of specification; would that be one reason you

14  would go in here and look to see if there was

15  data outside of the limits?

16  A.          We always are looking

17  for data to be inside the limits --

18  Q.          Right.

19  A.          -- when we're reviewing it to

20  release.

21  Q.          Well, okay, I'm going to try to come

22  up with a better question here.

23              By way of example -- well, the assay,

24  which is the fourth or fifth col -- row down and

25  this one, you see where it's 98.3 percent?

Confidential – Subject to Further Confidentiality Review

1   A.          Yes.

2   Q.          And then you go to the right and the

3   limit is 90 to 105 percent?

4   A.          Right.

5   Q.          So we'd agree that that's inside the

6   limit; if you were to find out from UDL that they

7   wanted some portion of the product from this lot,

8   would you go back and reprint this document in

9   order to see if the assay was inside that tighter

10  limit that we discussed or is there a file you

11  keep for each lot?  How do you regenerate this to

12  determine the UDL's request?

13  A.          Well, this is electronic, like I

14  explained earlier, so I have the access to go

15  online and pull the batch record up

16  electronically and would print out this page for

17  UDL and then just verify that, in this example

18  the assay is within specification.

19  Q.          So there's a software you use where

20  you go online and open up a secure software and

21  you can type in the lot number and the

22  information pops up?

23  A.          It's an application.  It's whatever

24  is used to create this.

25  Q.          You don't know what the application

Confidential – Subject to Further Confidentiality Review

89

1    is called?

2    A.         I don't.  I'm not familiar with it.

3    Q.         Okay.

4    A.         It's document retention really is

5    what it does.  It retains all the documents

6    electronically.

7    Q.         I need to mark this as M-11.  I'm

8    going to hand this do you.

9                        *   *   *

10                   (Whereupon, Deposition Exhibit M-11

11   marked for purposes of identification.)

12                        *   *   *

13                        THE WITNESS:  There's two

14   here.

15                        MS. MCDONOUGH:  Thank you.

16   BY MR. MILLER:

17   Q.         Do you recall seeing this document

18   before?

19   A.         Yes.

20   Q.         Is this the inspection that you

21   indicated you reviewed -- the document that you

22   reviewed on your own prior to this deposition?

23   A.         Yes.

24   Q.         And how did you go about obtaining a

25   copy, did you use that application online that we

Confidential – Subject to Further Confidentiality Review

90

1    just discussed to get a copy?

2    A.          We have a -- we have a copy of all

3    the documentation that was supplied to our legal

4    department when it was all requested from legal

5    and we have -- all the original documentation

6    came back to us in a box --

7    Q.          Okay.

8    A.          -- labeled Digitek, Actavis, this

9    batch, so that's where I got it from.

10   Q.          Other than what is -- would you agree

11   this is the -- what's the proper term for this

12   document as a whole?  Not just this lot, on every

13   --

14   A.          Batch record.

15   Q.          Batch record, okay.  Would you agree

16   that this is the batch record that you originally

17   received for lot 70924?

18   A.          Originally received, meaning?

19   Q.          Back when -- would there have been --

20   I don't know; would there have been a batch

21   record for this particular lot that you would

22   have received prior to this?

23   A.          Well --

24               MS. MCDONOUGH:  Objection, I

25   mean the document looks like it contains many

Confidential – Subject to Further Confidentiality Review

91

1    different pages, some of them from different

2    dates but then compiled to one record.  So I

3    think when you say received at that time,

4    it may not be quite accurate.

5                        MR. MILLER:  I guess that's

6    my -- that is my question.

7    BY MR. MILLER:

8    Q.          How did all these pages -- did all

9    these pages come to you at one time?

10   A.          No.

11   Q.          Explain to me how the documents came

12   to you in your role as QA of third parties.

13   A.          Okay.  The fourth page back -- the

14   Certificate of Conformance from Actavis --

15   Q.          Right.

16   A.          -- it's titled, that document as well

17   as the Certificate of Analysis, the next page,

18   would have come to me.  I don't recall if the

19   investigation came to me at that time when those

20   two did or I had to request it.  But definitely

21   the C of A and C of C would have come to me at

22   one point in time and then Janet's -- or the

23   distribution center inspection report that we

24   talked about that, that would have come at

25   another time, point in time, and then I would

Confidential – Subject to Further Confidentiality Review

1    have put all the documents together as well as my

2    release memo.

3    Q.          All right.

4                Is it a fair statement to say then

5    when there was an incoming document, but at some

6    point in time you released the lot based on

7    completed batch record, is this -- all these

8    documents in Exhibit 11 as it's marked, does it

9    represent the completed batch record that you

10   would have released that lot with?

11   A.          Yes.

12   Q.          Okay.

13               Is this entire document what you

14   would have uploaded, if that's the right term,

15   into the application where all the batch records

16   are stored online?

17   A.          The batch record group would have

18   uploaded this.

19   Q.          Okay.

20               But you agree this is the document

21   that would have been uploaded?

22   A.          Yes.

23   Q.          Did you ever go back into the

24   application and download what was uploaded in

25   order to see either for preparing for this

Confidential – Subject to Further Confidentiality Review

93

1    deposition or for any reason since you reviewed

2    all the documents?

3    A.          No.

4    Q.          And if we go to the page after the

5    Certificate of Analysis titled Investigation of

6    Deviation Report, it's Mylan 002283, you'd agree

7    that this is nonstandard, the only time you would

8    receive this type of report is if, in fact, there

9    was an investigation with some type of

10   specification issue with the lot?

11   A.          Right.

12   Q.          And then what is your -- setting

13   aside this particular batch, what are your

14   standard procedures when you receive a batch

15   record that has an investigation report?

16   A.          Review the investigation, if I would

17   have any questions about it, contact Mr. Bitler

18   and discuss with him if I would have any

19   questions or if I needed to see something

20   further.  If I was satisfied and felt everything

21   was within compliance and within specification and

22   the investigations were done according to

23   procedure, then I would release the batch.  If I

24   had a concern with any investigation or a

25   question, I would also talk to my management, my

Confidential – Subject to Further Confidentiality Review

94

```
1    boss.
2    Q.          Do you recall specifically having
3    conversations with Mr. Bitler regarding this
4    investigation of lot 7092481?
5    A.          I don't recall specifically, no.
6    Q.          Does the -- will you let me use the
7    -- you agree with the term the issue was
8    double-thick tablets?
9    A.          Yes.
10   Q.          With this particular lot?
11   A.          Yes.
12   Q.          Do you recall having any particular
13   concerns with double-thick tablets that were
14   found in a lot of Digitek?
15   A.          What do you mean by concerns?
16   Q.          Well, as the quality assurance
17   representative for Mylan of third-party
18   producers, had you ever seen in the past lots
19   that had double-thick tablets in them?
20   A.          I had never personally seen any.  I
21   know that it can happen.
22   Q.          Okay.
23               You know that it can happen and you
24   haven't personally seen them.  My question is have
25   you ever received batch records in which there
```

Confidential – Subject to Further Confidentiality Review

95

1    was an investigation as to the batch record that

2    said we found double-thick tablets --

3    A.          No.

4    Q.          -- in this lot?

5    A.          No.

6    Q.          Is the word concern, I'm not sure

7    what the question is about the word concern.  As

8    a quality assurance representative for Mylan of

9    third-party producers, can you think of any

10   concerns with double-thick tablets?

11                   MS. MCDONOUGH:  Well,

12   objection, I guess now I'm not sure what you mean

13   exactly.  With this particular lot or a specific

14   time frame or in general, double-thick tablets or

15   what type of concern do you have in mind?

16                   MR. MILLER:  I'm asking for

17   concerns, if you understood the question, it's

18   okay to answer.

19                   THE WITNESS:  The way I

20   interpret a concern is anything that would be out

21   of specification.  If it's double-thick, then

22   obviously the thickness is outside of

23   specification.

24   BY MR. MILLER:

25   Q.          Okay.

Confidential – Subject to Further Confidentiality Review

96

```
 1                    And would the batch record indicate
 2    what action you took to follow up on this,
 3    whether you had phone conversations with Mr.
 4    Bitler or whether you did any personal
 5    investigation on this?
 6    A.              No, if there was any documentation,
 7    it would be in here.
 8    Q.         So --
 9    A.              It would be in here.
10    Q.              Do you agree that if you would have
11    done -- I mean it is an option to -- you said an
12    option would have been to call Mr. Bitler and
13    discuss it; would that phone conversation had it
14    occurred been logged?
15    A.              No, most likely not.
16    Q.         Okay.
17                    What other actions can you think of
18    that you potentially -- in your role, what options
19    did you have as far as digging further into this
20    investigation did you have?
21    A.              Well, discussing it with my
22    supervisor --
23    Q.         Uh-huh.
24    A.              -- at the time.
25    Q.              Do you recall discussing this issue
```

Suzanna Wolf
Confidential – Subject to Further Confidentiality Review

97

1    with your supervisor?

2    A.          Yes.

3    Q.          And that would have been Mr. Koon?

4    A.          Yes.

5    Q.          Okay.

6                And what conversations do you recall

7    between yourself and Mr. Koon?

8    A.          I showed him the investigation

9    report.  He read the investigation report.  We

10   discussed if we both felt that we were

11   comfortable and confident with how the

12   investigation was conducted, and how the batch

13   ultimately was handled and the CPA, that's

14   Corrective Preventative Action, the CPA that was

15   put in place.

16   Q.          Did all your knowledge regarding this

17   investigation come from the documents that are

18   attached to this batch record?

19   A.          I will say yes because I can't -- if

20   I did talk to Dan, I can't recall if I had a

21   conversation with him.

22   Q.          But you don't recall seeing any other

23   documentation from any other source?

24   A.          No.

25   Q.          Do you know if Mr. Koon reached out

Confidential – Subject to Further Confidentiality Review

98

1    and obtained any documentation beyond this batch
2    record?
3    A.        I don't believe he did.
4    Q.        You see in the upper right hand
5    corner the handwritten part, would you agree that
6    it says page one of 67?
7    A.        Yes.
8    Q.        And I'll represent to you that
9    there's not 67 pages here.  We can go through and
10   see which ones are not here.  Do you recall ever
11   having any concerns about seeing a complete
12   67-page document?
13   A.        I remember that this was a lengthy
14   investigation and Dan just provided the pertinent
15   information, like he said in, I think, a previous
16   e-mail, they don't provide the whole entire
17   investigation, but they'll provide a summary of the
18   investigation.  So -- and I believe too he had
19   even -- he had asked me, is this, you know, is
20   this what you want to see and we were comfortable
21   with, yeah, this was the important part.  We
22   didn't need, you know, all the extra attachments.
23   Q.        But you do agree that ultimately this
24   batch was released -- yes, it's the right term;
25   ultimately you did release this batch?

Suzanne Wolf
Confidential – Subject to Further Confidentiality Review

99

1    A.          We released it and then, yes, we
2    released it and then it was recalled.
3    Q.          Were you part of the recall at all?
4    A.          Define part of.
5    Q.          Well, you talked about your duty was
6    reviewing COC's and COA's and quality agreements;
7    did your daily functions change once the recall
8    happened?
9    A.          No. My only participation would have
10   been if a batch record was needed.
11   Q.          Do you have a memory of batch records
12   being requested because of the recall?
13   A.          I don't.
14   Q.          I'm going to mark Mylan 12.
15                      *   *   *
16              (Whereupon, Deposition Exhibit M-12
17   marked for purposes of identification.)
18                      *   *   *
19   BY MR. MILLER:
20   Q.          It's Actavis document 00514193 and
21   you can see that, do you agree that it's an
22   e-mail from you to Dan Bitler?
23   A.          Yes.
24   Q.          Do you recall this particular e-mail
25   or the conversation?

Suzanne Wofford
Confidential – Subject to Further Confidentiality Review

100

1    A.         Yes.

2    Q.         We have -- do you agree we had the

3    January of 2007 discussing getting the quality

4    agreement from Mylan and in May of 2007, I

5    believe it was a request to legal from you and

6    now in November of -- 27, 2007, do you agree that

7    you're requesting that Dan review and sign the

8    same document that was in question in the other

9    e-mails?

10   A.         Yes.

11   Q.         That was a convoluted question.

12   A.         But I followed it.

13   Q.         I was holding on.  Was it an issue

14   with you in your duties with quality agreements

15   that it was taking so long for this document to

16   get signed and in the file?

17   A.         Was it an issue?

18   Q.         Yeah, was it an issue or a concern, a

19   problem?

20   A.         It was a concern in that that was one

21   of my tasks to check off, it's part of my job

22   duties is to implement and institute technical

23   agreements and put them in place.

24   Q.         Well, did you feel any pressure that

25   a quality agreement with Actavis needed to be in

Suzanne Wolfe

Confidential – Subject to Further Confidentiality Review

101

1    place because of regulatory issues at Actavis?

2    A.          No, absolutely not.

3    Q.          Down at the bottom, it has the about

4    -- let's see, October 17 there is an e-mail going

5    from you to Dan roughly six weeks prior where you

6    say: Dan, see attached agreement.  Once you

7    review, please provide any comments if you'd like

8    revisions or if not I can have a duplicate

9    original prepared for signature.  Do you recall

10   ever receiving a reply from Dan Bitler in which

11   he requested changes?

12   A.          No.

13   Q.          Did Dan Bitler ever exchange e-mails

14   with you regarding the quality agreement at all;

15   did he reply?

16   A.          Yes.

17   Q.          And what type of replies were you

18   getting when you were requesting this document to

19   be signed?

20   A.          Usually -- if I recall just that he

21   was extremely busy and he just -- he knows he

22   needs to review, he just hasn't had time to get

23   to it yet, that type of reply.

24   Q.          If you turn the page to Actavis

25   00514194 and look at the bottom, I guess would be

Confidential – Subject to Further Confidentiality Review

102

1    the first e-mail, it's from you to Dan, where it

2    says: Good morning, Dan, can you please send the

3    documents for Digitek 70673A1.  Thank you very

4    much.  My question is, did typically on a lot, if

5    you knew that a lot needed a batch record, you,

6    every time would e-mail him that you needed it or

7    did it automatically come?

8    A.           No, not every time.  There were times

9    sometimes when I didn't have the documentation

10   before the batch was received down at the

11   distribution center.  So I would request it.

12   Q.           Do you recall any particular issues

13   with that lot?

14   A.           No.

15   Q.           It's not stapled but I'm going to

16   mark this as M-13.

17                      *   *   *

18              (Whereupon, Deposition Exhibit M-13

19   marked for purposes of identification.)

20                      *   *   *

21                   THE WITNESS:  When you run

22   out of stickers, are we done?

23                   MR. MILLER:  I have 200 of

24   them over there.

25                   THE WITNESS:  Darn it.

Confidential – Subject to Further Confidentiality Review

103

1                    MS. MCDONOUGH:  At some point

2      we might want to break for lunch when it makes

3      sense.

4                    MR. MILLER:  This is a good

5      time for everybody.  I'm going to jump into this

6      for a while.  So it might be a good time.  Let's

7      go ahead and do it.

8                    MS. MCDONOUGH:  Okay; that

9      sounds good.

10                   VIDEOGRAPHER:  The time is

11     1:48; we're going off the record.

12                        *   *   *

13                   (Lunch break taken)

14                        *   *   *

15                   VIDEOGRAPHER:  The time is

16     2:37; we're back on the record.  This is the

17     beginning of disc two.

18     BY MR. MILLER:

19     Q.          Well, right prior to lunch, ma'am, I

20     handed you what I've marked as exhibit M-13.  I

21     was wondering if you could take a look at it and

22     tell me if you've seen that document before?

23     A.          Yes, I have.

24     Q.          Okay.

25                   And you -- this is Actavis 00514195,

Confidential – Subject to Further Confidentiality Review

104

1    and would you agree with me that this is the

2    quality agreement that you were requesting Dan

3    Bitler to sign on behalf of Actavis?

4    A.          This is a draft version.

5    Q.          And if we go to what's marked as page

6    one, the third page of exhibit Actavis 0514197,

7    it starts out quality agreement at the top, was

8    this quality agreement as made and entered into as

9    of this third day of August 2007, the effective

10   date, does that date jog your mind as far as if

11   this is the final draft or a rough draft?

12   A.          This is a -- it's a draft version.

13   In other words, the date that's at the top would

14   be the date that this was originally first

15   written and I say it's a draft because of the

16   very last page.  There's information that needs

17   to be completed there.

18   Q.          All right.

19              And that was reflected in the e-mail;

20   would you agree that you're saying this to Dan

21   Bitler in order to complete with the Actavis

22   information that you were asking for?

23   A.          Yes.

24   Q.          Okay.

25              And you agree this quality agreement

Confidential – Subject to Further Confidentiality Review

105

1     was to be a quality agreement that was going --

2     directed to the product Digitek at Actavis?

3     A.          Yes.

4     Q.          Okay.

5                 If you go to that same page where we

6     saw the date, page one, and it says a paragraph,

7     1.0 quality requirements and the second paragraph

8     under that title, it says: This agreement defines

9     the operating procedures to be followed when

10    products are manufactured by Actavis for

11    Mylan Bertek to ensure compliance with CGMP and

12    other regulatory requirements.  My question is,

13    what agreement, if any, would have controlled

14    what's defined in that paragraph prior to this

15    quality agreement being in place?

16    A.          Whatever would have been stated in

17    the supply agreement and just the company itself

18    at Actavis's own internal procedures and systems.

19    Q.          Okay.

20                So a quality agreement really isn't

21    put in place to replace the production agreement,

22    it's to add to --

23    A.          The supply agreement?

24    Q.          Supply agreement; I'm sorry.  Yes.

25    A.          Oh, absolutely, it's not to replace

Suzanne Wong
Confidential – Subject to Further Confidentiality Review

106

1      it at all.

2      Q.          Did you write this draft?

3      A.          Yes, in conjunction with legal.

4      Q.          All right.

5                  Was there a boilerplate or template

6      of sorts that you would have altered to conform

7      to Actavis or would you have started from scratch

8      to generate this?

9      A.          A template.

10     Q.          Okay.

11                 And for Actavis in particular, other

12     than going through and changing the name of the

13     companies that you're dealing with; was there any

14     substantial changes to the document that you

15     recall from the template to this?

16     A.          Not that I recall, just the

17     appendices would be specific to the site.

18     Q.          And is there an SOP at Mylan that

19     defines what language is inside the quality

20     agreement?

21     A.          There is an SOP, a technical

22     agreement, I'm not sure if it defines what's to

23     be in the technical agreement.  The SOP is about

24     the process, creating it, generating it.

25     Q.          Who's the holder of that SOP as far

Suzanne M. Wolfe

Confidential – Subject to Further Confidentiality Review

107

1    as which department at Mylan?

2    A.          Well, the SOP that exists now, I

3    drafted it for -- because that's what I do, to

4    create technical agreements, quality agreements

5    right now.

6    Q.          Did you -- do you recall when you

7    wrote that SOP?

8    A.          Actually I think Chuck Koon wrote the

9    latest one.  There was a previous version, I

10   believe, that I wrote and I think the existing

11   SOP right now Chuck Koon wrote and I don't recall

12   when I originally wrote it.

13   Q.          Was it revisions to a previous SOP or

14   did you start from scratch?

15   A.          Scratch; started from scratch.

16   Q.          Because the SOP prior to that SOP was

17   terminated or because there was no SOP in place?

18   A.          None existed.

19   Q.          And what was the title of the SOP?

20   A.          Something along the lines of creation

21   of quality agreements or technical agreements.

22   Q.          And do you recall exactly when that

23   was -- that SOP was first created?

24   A.          I don't, no.

25   Q.          But you believe it was not in place

Suzanne Worrell

Confidential – Subject to Further Confidentiality Review

108

1      when this was in circulation in August of 2007?

2      Excuse me.

3      A.        The SOP?

4      Q.        No, the SOP, right, the SOP of that

5      creating quality agreements?

6      A.        I don't know.

7      Q.        If you go to page, numbered page two,

8      I believe the fourth page of the document,

9      0514198, and there at the top it says

10     manufacture, 3.1 premises and 3.1.1, it says:

11     All products supplied to Mylan Bertek shall be

12     manufactured at Actavis's Lincolnton, North

13     Carolina plant.  Do you believe that to be a typo

14     or something that needs to be changed?

15     A.        Yes, it would be.

16     Q.        Okay.

17               And do you know where Actavis

18     produced Digitek back when it was being --

19     A.        Totowa.

20     Q.        So back when you were drafting this

21     you would have replaced that information with

22     Totowa?

23     A.        Yes.

24     Q.        Paragraph 3.12, the next paragraph

25     down, it says: The premises and equipment used for

Confidential – Subject to Further Confidentiality Review

109

```
 1     manufacture must be in compliance with CGMP's,
 2     current regulatory requirements, and in accordance
 3     with the documentation approved by FDA.  Is that
 4     something that you would have put in this
 5     document or as part of the template?
 6     A.          That's standard language.
 7     Q.          Does the SOP regarding creating QA's
 8     that you worked on in any way address how that
 9     information is going to be passed from the
10     third-party manufacturer, Actavis in this case,
11     to Mylan?
12     A.          I don't understand your question.
13     Q.          As a drafter of the QA, how was it
14     planned or perceived that Mylan would keep up
15     with the fact that the premises and equipment
16     were going to be within compliance of GMP's?
17     A.          Well, the sites are periodically
18     audited.
19                 There is an auditing section within
20     the quality agreement that states that Mylan will
21     be allowed into the facility to audit.
22     Q.          And as the QA of third-party
23     production plants, is it your statement that
24     through audits Mylan would determine if Actavis
25     was in compliance with GMP's?
```

Confidential – Subject to Further Confidentiality Review

110

1    A.            That would be one of the ways.

2    Q.            Is one of the ways also to request

3    FDA inspections such as a 483?

4    A.            We don't -- we can't request

5    inspections from the FDA.  The FDA inspects on

6    their own.

7    Q.            I'm sorry, request a copy of the

8    report that results in a 483 inspection, the 483

9    report.

10   A.            Yes, that's also covered in here.

11   Q.            Would it have been -- I may have

12   asked this already, I'm not sure.  Would it have

13   been you as QA manager for third-party production

14   companies, the one that would have requested

15   483's or someone else in the quality department

16   at Mylan?

17   A.            I could have.  It could be anyone

18   within quality could request them.

19   Q.            And again, I think I might have asked

20   this but at no time did you -- you did not

21   request any copies of 483's from Actavis while

22   you were the QA of third-party production

23   facilities?

24   A.            No.

25   Q.            Throughout the document, I think part

Suzanne Wolfe
Confidential – Subject to Further Confidentiality Review

111

1    of what I just read, the term Mylan Bertek is

2    used.  Am I correct in saying that Mylan didn't

3    distribute any Digitek tablets under the Bertek

4    label after 2005?

5    A.            I don't know.

6    Q.            What's the significance of the term

7    Mylan Bertek when it's used together?

8    A.            Legal would have used that name when

9    they reviewed this.  Legal puts that in, usually

10   it's however the supply agreement is written,

11   whatever parties, however that language is used

12   for the parties in the supply agreement, that's

13   the language that's used for the technical

14   agreement.

15   Q.            Would this quality agreement

16   carry over and cover tablets that were distributed

17   to UDL as well?

18   A.            No, this agreement is specific to the

19   two parties on the front.  And the first

20   paragraph, the preamble, it says Chestnut Ridge,

21   Morgantown, West Virginia.

22   Q.            Uh-huh.  I'm sorry.  What's the

23   --

24   A.            That --

25   Q.            -- significance?

Confidential – Subject to Further Confidentiality Review

112

1       A.          That's who this agreement is with.

2   It's between Actavis, Totowa and Mylan Bertek

3   with Chestnut Ridge, Morgantown, which is the

4   site here in Morgantown.

5       Q.          I got you.

6                   I'm going to mark Exhibit 14, M-14.

7   Take a look at that e-mail and this is document

8   Mylan 0034729.

9                          *   *   *

10                  (Whereupon, Deposition Exhibit M-14

11  marked for purposes of identification.)

12                         *   *   *

13  BY MR. MILLER:

14      Q.          Take a look at it and let me know if

15  you recall the e-mail or the topic of.

16      A.          Yes.

17      Q.          And do you recall the e-mail because

18  it's specific to out of specification assays or

19  why is it that you recall this particular e-mail?

20      A.          Let me correct, I don't recall this

21  particular e-mail.  I recall this e-mail because

22  there were several e-mails of this type that went

23  back and forth between UDL and myself on this

24  subject.

25      Q.          But it's from you to Connie Hatcher;

Confidential – Subject to Further Confidentiality Review

113

1    who is Connie Hatcher?

2    A.           According to this, she's the senior

3    sales administrator at Mylan.

4    Q.           At Mylan?  Why is it that someone

5    from Mylan is requesting assays that comport --

6    that are within specifications of UDL -- wait, I

7    lost track of that question.

8              Why would someone from Mylan be

9    requesting assay information on a lot for UDL?

10   A.           Because Connie works -- apparently

11   part of her job function is releasing, not

12   releasing, but -- I don't know the term they use,

13   she gets the batches for UDL, distributes the

14   batches for UDL, takes the purchase orders,

15   whatever is involved.

16   Q.           Is Connie still at Mylan?

17   A.           I don't know.

18   Q.           How many employees does Mylan have

19   here in Morgantown?

20   A.           In Morgantown, I'd say 900, I

21   believe.

22   Q.           In early 2008, do you recall

23   conversations with Dan Bitler or anyone at

24   Actavis about the fact that they were moving

25   their plant?

Suzanne Worrell
Confidential – Subject to Further Confidentiality Review

114

1    A.          Yes.

2    Q.          How did that, if it did in any way,

3    affect your job clearing or releasing lots

4    through batch records?

5    A.          Only in the sense that I needed to

6    know if the new facility was validated and if any

7    of the product, any of the batches we were

8    receiving, what site were they coming from, the

9    old or the new.

10   Q.          And what do you mean by validated?

11   A.          Well, all the equipment, the building

12   itself, the whole processes that are done at

13   every site needs to be validated and you have to

14   prove that to the -- a quick summary is just that

15   you have to prove to the FDA that you are

16   manufacturing everything within tolerances and

17   specifications.

18   Q.          And would you request verification

19   from Actavis that that validation took place?

20   A.          I believe we did.  I don't recall if

21   I personally did, but I believe it was requested

22   from Actavis.

23   Q.          I'm going to mark as M-15 --

24               MS. MCDONOUGH:  It's 16 now.

25               MR. MILLER:  15 (fifteen).

Suzanne Wolfe
Confidential – Subject to Further Confidentiality Review

115

```
 1                    COURT REPORTER:   15
 2      (fifteen).
 3                    MR. MILLER:   Gosh, normally
 4      I'm the one that's always wrong on that.
 5                    MS. MCDONOUGH:   I apologize.
 6                        *   *   *
 7                    (Whereupon, Deposition Exhibit M-15
 8      marked for purposes of identification.)
 9                        *   *   *
10      BY MR. MILLER:
11      Q.          Let me know when you've had a chance
12      to take a look at that.
13      A.          Okay.
14      Q.          Do you recall the topic?
15      A.          Yes.
16      Q.          Do you recall this particular e-mail?
17      A.          Vaguely, yes.
18      Q.          Who was -- let's see, you've got the
19      -- I'm not going to read it into the record, but
20      there's the e-mail from Dan Bitler to you and you
21      agree that it's his write up on how things were
22      going as far as the Digitek move from one
23      facility to the other; is that correct?
24      A.          Yes.
25      Q.          All right.
```

Suzanne Wolfe

Confidential – Subject to Further Confidentiality Review

116

```
 1                 And then if we turn to the first
 2     page, at the very bottom, it's a paragraph that
 3     begins with Chuck and it ends with Suzy and it
 4     says: Chuck, obviously I'm asking to see all
 5     validation batch records and was not sure if you
 6     want to visit/audit the new site prior to release
 7     of the product for distribution.  FYI, I asked
 8     why we weren't notified earlier and the response
 9     was we're so busy, I forgot about it until now.
10     Suzy.
11                 Is that an e-mail from you to Chuck?
12     A.          Yes, at the top it says it's to Wayne
13     Talton and Chuck Koon.
14     Q.          Okay.
15                 And who is Wayne Talton?
16     A.          Wayne is regulatory affairs.
17     Q.          And this -- am I paraphrasing this
18     correctly that you're letting Chuck Koon, who you
19     report to, know that you're looking to see
20     validation batch records that regard to the move?
21     A.          Yes.
22     Q.          And is that validation batch records,
23     is that what you were discussing earlier when you
24     say that there had to be validation from the
25     move?
```

Suzanna Wolfe
Confidential – Subject to Further Confidentiality Review

117

1    A.          Right.

2    Q.          And it would come to you in the form

3    just like a batch record that you received on

4    other batches, but it will be a batch record

5    dedicated to the move itself?

6    A.          It can and typically there is a

7    summary report, the whole validation summary

8    report.

9    Q.          Is it a summary report about -- by

10   way of example because I don't know, would it be

11   the first couple lots that they tested at the new

12   facility and they would do extra tests because

13   the facility is new and it would just be that a

14   batch record that you're used to seeing with

15   additional paperwork because of the move?  I'm

16   probably wrong but if you could explain to me

17   what you would expect to see in a validation

18   batch record.

19   A.          Actually, you're pretty close.  It's

20   a validation of the first, typically it's usually

21   the first three lots that are manufactured and

22   packaged.  And you would see a normal batch

23   record, everything is done normally, there's not

24   extra tests that are performed.  It's just three

25   consecutive batches, typically.

Confidential – Subject to Further Confidentiality Review

118

1    Q.         Did you receive that on the first

2    three consecutive batches after Actavis moved

3    from Little Falls to Totowa?

4    A.         I really can't remember if I did or

5    not.

6    Q.         Does the fact that you stated FYI, I

7    asked why we weren't notified earlier and the

8    response was we were so busy, I forgot about it

9    until now; does that jog your memory as to not

10   being given information that you were requesting

11   at the time?

12   A.         I would say that it -- I probably was

13   given the information.  We had a very cooperative

14   and I had a very cooperative relationship with

15   Dan.  So usually anything I asked for, he

16   provided.

17   Q.         Do you have a memory of getting

18   validation batch records on any lot after the

19   move took place?

20   A.         I don't, and we might not have

21   specifically got batch records.   We might have

22   got the actual validation report, which

23   summarizes all of the batches.

24   Q.         And it's that validation report, is

25   that something that's also sent to the FDA or is

Suzanne Wortman

Confidential – Subject to Further Confidentiality Review

119

1   it just internally generated?

2   A.          It's internally generated.

3   Q.          But it would be titled validation

4   batch record?

5   A.          Each company titles it differently.

6   Q.          I guess my question is though, you

7   don't have any specific memory as we sit here

8   right now of receiving a validation batch record

9   from Actavis after their move to Totowa?

10  A.          No.

11  Q.          And then up at the very top, Wayne

12  replies saying: Suzy, it looks like that had --

13  wait a minute, if I can read that, it looks like:

14  that have had good interaction with FDA on this

15  matter, however, I don't see anywhere in his

16  e-mail where he talks about the regulatory

17  strategy, and I'll stop there.

18              When you received this e-mail, did

19  you understand that to going to your question

20  about not receiving validation batch records?  Is

21  that how you read it?

22  A.          No.

23  Q.          How do you read that sentence?

24  A.          What Wayne is inferring has to do

25  with -- Wayne's not involved with validation at

Confidential – Subject to Further Confidentiality Review

120

1   all.  He's involved with the regulatory side.  So
2   the submissions of the documentation -- there's
3   -- I can't speak for regulatory but there's forms
4   and reports that have to be written and submitted
5   to the FDA.
6   Q.          That are a part of the validation of
7   the new facility?
8                        MS. MCDONOUGH:  If you know.
9                        THE WITNESS:  Yeah, I might
10  -- I don't know.
11  BY MR. MILLER:
12  Q.          It goes on to say: Is FDA allowing
13  them to switch the new site via an annual report
14  notification, parenthetically, since they are
15  using the same establishment number, end of
16  parenthetical, or are they submitting a CBE-30
17  supplement; are you familiar with that language?
18  A.          Uh-huh.
19  Q.          Now am I paraphrasing it correctly
20  that he's assuming that if you keep the same
21  manufacturing number and you go from one plant to
22  the other, that you don't need a validation
23  report?
24  A.          He's not saying validation report.
25  It's a -- it's whatever regula -- whatever

Confidential – Subject to Further Confidentiality Review

121

1    documentation that regulatory needs.

2    Q.          Do you recall having any more

3    exchanges of e-mail on the topic beyond this?

4    A.          I don't recall.

5    Q.          During the time of this e-mail,

6    February 15 of 2008, as the quality assurance

7    director for third-party production facilities,

8    is it your job to ensure that the validation

9    batch records are received by Mylan?

10   A.          If it's -- if it would be something

11   that we would like to have, it would be my job to

12   request them.

13   Q.          Is it something that the company

14   would like to have?

15   A.          I can't answer for the company.

16   Q.          Is it something that you would like

17   to have had as the QA of third-party production

18   --

19   A.          It would have been nice to have or a

20   validation summary.

21   Q.          One or the other?

22   A.          Something -- yes, something to

23   provide evidence that, yes, the site has been

24   validated and it's okay to have production.

25   Q.          Would it affect your

Confidential – Subject to Further Confidentiality Review

122

1    duties as quality assurance director of

2    third-party production if they moved from one

3    place to the next and didn't produce a validation

4    batch record?

5    A.          Not so much if they didn't produce, if

6    they didn't -- what's more critical is whether they

7    did the validation or didn't do the validation.

8    That's what's critical.

9    Q.          Why would it be critical if they

10   didn't do the validation?

11   A.          Because you can't really run any

12   product in a site on equipment that hasn't been

13   validated.

14   Q.          Is that a safety -- safety issue?

15   A.          It's an FDA requirement.

16   Q.          Is it an FDA requirement because it's

17   a safety issue?

18                        MS. MCDONOUGH:  If you know.

19                        THE WITNESS:  I don't know

20   what the FDA's reasoning is behind it, whether

21   it's safety or not safety.

22   BY MR. MILLER:

23   Q.          I'm going to mark M-16.

24                        *   *   *

25                        (Whereupon, Deposition Exhibit M-16

Suzanne Worrall

Confidential – Subject to Further Confidentiality Review

123

1      marked for purposes of identification.)

2                          *   *   *

3      BY MR. MILLER:

4      Q.          And it's Mylan document 0025907; do

5      you recall seeing this document?

6      A.          This one in particular, no.

7      Q.          Am I accurate in saying that this is

8      what you would receive as a batch record much

9      like the one we previously saw except for here we

10     don't see your cover letter and we don't see the

11     barcodes.  So it's what you would get before you

12     put your final stamp of approval on it?

13     A.          Yes.

14     Q.          All right.

15                 And then this is for batch number

16     80202A1; is that correct?

17     A.          Yes.

18     Q.          And it appears that there is a sticky

19     that says hold OOS weights; do you agree with

20     that?

21     A.          Yes.

22     Q.          Is that your handwriting?

23     A.          It appears to be.  It looks like it.

24     Q.          Does it -- what do you mean by hold?

25     A.          Well, I don't know the background of

Confidential – Subject to Further Confidentiality Review

124

1    this document or where it came from and what

2    context it was pulled.  So I'm -- you know, hold

3    would mean -- I'm not sure what the

4    interpretation was here.

5    Q.          Okay.

6                What do you mean by -- what's OOS?

7    A.          Out of Specification.

8    Q.          And is that weights underneath that?

9    A.          Yes.

10   Q.          And what, if you know, what weights

11   would that refer to?

12   A.          There's none that are on the C of A,

13   so I don't know which weights those are.

14   Q.          And in fact, there's never any

15   weights on the C of A, right?

16   A.          Right.

17   Q.          So would that be something that would

18   -- obviously you would have to gather that

19   information from a source other than the batch

20   record itself?

21   A.          Right.  Right.

22   Q.          Was that -- is that typically how it

23   would happen, if some issue was with a batch, if

24   it ever happened before, someone would either

25   call you or e-mail you and say put the brakes on

Suzanne Worman

Confidential – Subject to Further Confidentiality Review

125

```
 1      that one, we have -- there's something going on?
 2      A.              I could receive a phone call like
 3      that.
 4      Q.              Do you have a memory of it happening
 5      more than this one time?
 6      A.              No.
 7      Q.              But you don't have a specific memory
 8      of it happening here?
 9      A.              No, I don't.
10      Q.              And if -- what would be your
11      procedure as a QA of third-party production
12      plants once you were informed that something
13      needed to be held because of weights, then is
14      there additional paperwork that you would need to
15      receive before you would release this batch?
16      A.              Additional paperwork that I -- I need
17      to understand your question better.  If I would
18      receive --
19      Q.              How do you go about verifying that
20      it's now within weights? If it was out of
21      specification for weight, what do you do to make
22      sure it's in specification for weight in order to
23      release it; what's the next step?  If it sits
24      here on the desk as a hold --
25      A.              Right.
```

Suzanne Wolfe

Confidential – Subject to Further Confidentiality Review

126

```
 1    Q.           -- what's got to happen for it to no
 2    longer be on hold?
 3    A.           Well, if there truly was an issue
 4    with out of specification weights; I would need
 5    an investigation that would explain the
 6    corrective action and show the preventative
 7    action and what happened.
 8    Q.           And you don't have a memory of
 9    getting an investigation on this particular lot?
10    A.           I -- no, I don't.  I need more
11    information.
12    Q.           I'm going to mark M-17.
13                        *   *   *
14                 (Whereupon, Deposition Exhibit M-17
15    marked for purposes of identification.)
16                        *   *   *
17    BY MR. MILLER:
18    Q.           Do you agree this is an e-mail from
19    you to Janet Kinsley and subject line, Digitek
20    batches on hold?  And that top part from you, if
21    it says don't inspect the -202 batch.  Would it be
22    common for you to truncate the first portion of
23    the lot number and just use the 202?
24    A.           It's not significant.  Yes, I could
25    have.
```

Confidential – Subject to Further Confidentiality Review

127

1    Q.          I'm not saying it's significant.
2    Would you agree with me that that -202 is the
3    same lot that we're looking at on the previous --
4    A.          Yes.
5    Q.          And it goes on to say: They indicated
6    that this one is a problem child and that the
7    other two should be okay, ran on a different
8    press or something, so felt strongly they would
9    be coming off of hold.  Regards, Suzy Wolfe.
10             Now that I've read that; does it jog
11   your memory on receiving information regarding
12   the press at Actavis?
13   A.          I remember they had an
14   issue and I remember I received a phone call or
15   an e-mail about these batches or batches they
16   were having an issue with.  I don't recall what
17   happened after this, what subsequent information
18   came after this.
19   Q.          Do you remember any other
20   issues with presses at Actavis?
21   A.          No.
22   Q.          Do you know what you meant when you
23   typed in the word, when they ran off of a
24   different press or something; what does a press
25   mean to you?

Confidential – Subject to Further Confidentiality Review

128

```
 1    A.           A compressing, a press is something
 2    that compresses the tablets.
 3    Q.           Okay.
 4                 I'm really rifling through them now.
 5                        THE WITNESS:  It's okay, keep
 6    going.
 7                        MS. DOWNIE:  You only have a
 8    few stickers left.
 9                        MR. MILLER:  Choose your
10    exhibits wisely.
11    BY MR. MILLER:
12    Q.           I'm going to hand you Mylan 18, and
13    it is Mylan document 0032805 and it's from you,
14    unfortunately we don't know who it's to. When
15    you're done reading it, let me know.
16                        *   *   *
17                 (Whereupon, Deposition Exhibit M-18
18    marked for purposes of identification.)
19                        *   *   *
20                        THE WITNESS:  Okay.
21    BY MR. MILLER:
22    Q.           This April 10 e-mail in which you
23    generated, okay, when you indicate all, all the
24    cc's are folks within Mylan; is that correct?
25    A.           Yes.
```

Confidential – Subject to Further Confidentiality Review

129

1    Q.         Was there a group e-mail address

2    where you could send -- I forget the Microsoft

3    term, where you group a bunch of contacts

4    together and you can just use that one

5    identifying e-mail and send it to numerous folks;

6    did you have that at Mylan?

7    A.         For these?

8    Q.         Yes.

9    A.         Did we have the ability to do it? Or

10   --

11   Q.         Did you use it?  I mean did you use

12   it for this topic or any topic?

13   A.         No.

14   Q.         But you discussed information, the

15   reference batch was originally packaged as

16   70924A1 and it talks about the double thickness.

17   Would you have gathered this information from the

18   report that was given to you regarding the double

19   thick batch or do you have a memory of gathering

20   this information from someone at Actavis?

21   A.         I would have -- I would have gotten

22   this from Actavis.  Well, it could also be part

23   of the documentation too; here it says the batch

24   documents were reissued.  So I would have had

25   batch documentation in hand.

Suzanna Wonfor

Confidential – Subject to Further Confidentiality Review

130

1    Q.         Would you consider yourself the

2    primary point of contact with Actavis during

3    this, I'm going to call it the build up to the

4    recall?

5    A.         I was initially and then it escalated

6    above me.

7    Q.         And what do you mean by escalated

8    above you?

9    A.         Once we received -- I received a

10    phone call that the FDA was on-site and the batch

11    was being recalled.  There were several batches, I

12    think initially maybe that were listed as part of

13    the recall.  Then it went on to my upper

14    management.

15    Q.         Was it your understanding that the

16    FDA was on-site at Actavis because of this --

17    because of the issue, because of the double

18    thickness --

19                MR. TABER:  Objection.

20                MR. MILLER:  -- issue?

21                THE WITNESS:  I didn't know

22    specifically why the FDA was there.

23    BY MR. MILLER:

24    Q.         Did you ever learn why the FDA was

25    there?

Confidential – Subject to Further Confidentiality Review

131

1    A.          After the fact?

2    Q.          After the fact.

3    A.          I heard a reason why they could have

4    been there.

5    Q.          What was the reason you heard why

6    they could have been there?

7    A.          Issues with following up on

8    observations, that the FDA had issued

9    observations and they weren't getting the

10   follow-up that they wanted.

11   Q.          Did you ever become aware that all

12   products at Actavis, production of all products

13   at Actavis was halted?

14                    MR. TABER:  Objection,

15   that's not current.

16                    MR. MILLER:  Not current?

17                    MR. TABER:  You said Actavis.

18   You mean the one plant.

19                    MR. MILLER:  I'll try that

20   again.

21                    MR. TABER:  I didn't mean to

22   interrupt.

23                    MR. MILLER:  No, that's okay.

24   BY MR. MILLER:

25   Q.          Did it ever come to your attention

Confidential – Subject to Further Confidentiality Review

132

1    that all products at Actavis Totowa, the

2    production of all products at Actavis Totowa was

3    ceased following the inspection by the FDA?

4    A.          Yes.

5    Q.          And did you ever learn why?

6    A.          The FDA had issued that mandate.

7    Q.          Did you as the QA director of

8    third-party manufacturing plants ever investigate

9    if --

10   A.          You just promoted me, but that's

11   okay.

12   Q.          Okay.

13               As QA of third-party production

14   facilities at Mylan, did you ever do any

15   research, investigation to determine if the

16   Digitek recall was separate and apart from the

17   reasons why FDA was on-site at Totowa?

18   A.          No, I had no involvement.

19   Q.          What time is it getting to be?

20                    MS. MCDONOUGH:  3:20 I have.

21   BY MR. MILLER:

22   Q.          Did you have any involvement at all

23   in the recall letter for Digitek?

24   A.          Recall letter from?

25   Q.          From Mylan.

Suzanne Wolfe
Confidential – Subject to Further Confidentiality Review

133

| | |
|---|---|
| 1 | A.          No. |
| 2 | Q.          The recall letter for Actavis? |
| 3 | A.          No. |
| 4 | Q.          Did you receive a recall letter from |
| 5 | Actavis? |
| 6 | A.          No. |
| 7 | Q.          Have you ever seen any recall letters |
| 8 | associated with Digitek recall? |
| 9 | A.          I'm sure I have since that time. |
| 10 | Q.          It would have been something you were |
| 11 | researching on your own or came across your desk |
| 12 | as part of your duties and functions as QA of |
| 13 | third-party production? |
| 14 | A.          Not necessarily research on my own, |
| 15 | but since I was involved with the site early on, |
| 16 | I'm sure it was shared with me at some point. |
| 17 | Q.          Did Actavis generate a recall team? |
| 18 | A.          I don't know. |
| 19 | Q.          You're not Ann Wolfe, we established |
| 20 | that. |
| 21 | A.          She's blonde. |
| 22 | Q.          Do SOP's ever get violated at Mylan? |
| 23 | I mean if Mylan has an SOP and it's their own |
| 24 | internal SOP and it's not followed, is there any |
| 25 | type of -- any type of repercussion or is there |

Confidential – Subject to Further Confidentiality Review

134

1    any follow-up on that?

2                    MS. MCDONOUGH:  Well,

3    objection, it's vague. Can you be a little more

4    specific, what kind of SOP, what kind of

5    violation, something like that?

6                    MR. MILLER:  Strike that

7    question.

8    BY MR. MILLER:

9    Q.          I'm going to hand you what is marked,

10   will be M-19. Take a look at that, ma'am.  I'd

11   greatly appreciate it.

12                    *   *   *

13              (Whereupon, Deposition Exhibit M-19

14   marked for purposes of identification.)

15                    *   *   *

16   BY MR. MILLER:

17   Q.          I'm assuming there's more to his name

18   than what's typed here, but who is William

19   Brochu?

20   A.          He is the -- he's uhm, I want to say,

21   I don't know his title, but he's like the plant

22   manager, he's a quality director, vice president;

23   he's head of quality, whatever title that is of

24   Vermont MTI, it's called site, Mylan

25   Technologies.

Suzanne Word
Confidential – Subject to Further Confidentiality Review

135

1    Q.         And it starts out an e-mail that's --
2    you were copied on, an e-mail that was neither
3    sent or received by you, but it was forwarded to
4    you and it's: Ron, it's written by Bill, attached
5    is a complaint letter related to Mylan's recent
6    Digitek recall.  It's not clear to me why the
7    complainant chose to send it to us.  So were you
8    informed that a Digitek complaint went straight
9    to his office?
10   A.         Was I informed?
11   Q.         Is that why this e-mail is being sent
12   to you?
13   A.         I'm not really sure why I was
14   copied on this because the complaints go to our
15   PSRN group, product safety.  I was copied on it.
16   Q.         Then you forwarded it on to -- at the
17   very top, it starts, it says: Chuck, the
18   attachment is a letter from a physician/patient
19   who is disgruntled about how the Digitek recall
20   was handled, parenthetically 8 pages worth,
21   exclamation mark.  I have left a message with Ron
22   asking him how they are handling this complaint.
23   Will let you know, Suzy.  Now are you asking him
24   how they're going to handle this particular
25   complaint or are you asking him how are they

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

136

1    going to handle complaints?  If that question

2    makes sense to you.

3    A.          Uh-huh.  Well, it appears to be

4    specifically this complaint, how they were

5    handling this complaint.

6    Q.          Do you recall why that complaint had

7    significance?

8    A.          Only because it crossed my desk or I

9    was copied on it.

10   Q.          Well, wouldn't the handling if it was

11   like any other complaint, wouldn't you have sent

12   it to the facility that standard -- was typically

13   the recipient of complaints?

14   A.          Well, that's who Ron is I'm

15   referencing here.

16   Q.          Okay.

17   A.          Ron is the one that handles the

18   complaints.  I sent this to Chuck just as an FYI

19   because I knew he was involved with the recall.

20   Q.          Well, if there's a system in place

21   where the complaints are absorbed into a software

22   or the system that you had described, why

23   wouldn't it be that you would just let him know

24   here's the complaint?  I'm curious as to why you

25   would say I've left a message with Ron asking him

Confidential – Subject to Further Confidentiality Review

137

1    how they're handling this complaint?

2    A.          Well, because this complaint is not

3    about -- it's not about the product itself.  It's

4    about the system itself, the process, the Digitek

5    recall itself.

6    Q.          But do you agree that you had no

7    action in this type of complaint or any type

8    of complaint, that the complaint would go through

9    your --

10                        *   *   *

11                   (Brief interruption)

12                        *   *   *

13                   THE WITNESS:  Sounds like my

14   ring.  Repeat that question, please.

15   BY MR. MILLER:

16   Q.          The question is whether it was a

17   complaint dealing with the recall or a complaint

18   dealing with an adverse event or whatever, you

19   didn't handle any of those complaints, right?

20   A.          Right.

21   Q.          I'm just curious why you were looking

22   for information as to how this particular

23   complaint is going to be handled; what difference

24   does it make to you how it's handled?

25   A.          It doesn't really for me.  I was just

Suzanne Wofford
Confidential – Subject to Further Confidentiality Review

138

1    being a good employee because I knew Chuck would

2    ask.  So I was getting information for him.

3    Q.          When you say it is a letter from a

4    physician/patient because you don't know or

5    because it's both, can you recall?

6    A.          I don't know.  I'd have to see the

7    letter.

8    Q.          Did it happen often that complaints

9    came to you and you had to reroute them or is

10   this something that occurred rarely?

11   A.          No, I would rarely receive them.

12                   MS. MCDONOUGH:  Just for

13   clarification, it does look like on page two it

14   went to Ron, the person who does normally handle

15   these complaints, but then it was just cc'd to

16   several other people also.  So I don't know if

17   that's helpful, but --

18                   MR. MILLER:  Right, no, I

19   agree.  Okay.  Do you have questions?

20                   MR. FRANKOVITCH:  I have a

21   few.

22                   MR. MILLER:  I'm probably

23   going to have a couple cleanup, but I'll let Carl

24   jump in and --

25                   MS. MCDONOUGH:  Sure.

Suzanne Wolfe
Confidential – Subject to Further Confidentiality Review

139

1          MR. MILLER:  Can you do it
2     from there, so we can just stay here?
3          MR. FRANKOVITCH:  Sure.
4                    *   *   *
5              E X A M I N A T I O N
6     BY MR. FRANKOVITCH:
7     Q.        Ms. Wolfe, my name is Carl
8     Frankovitch and I'm going to ask you a few
9     questions.  They'll probably not make as much
10    sense as Pete's did, but they're on my mind so I
11    can get it straight.
12              The hierarchy at least from Ms.
13    Latzo, is that how you pronounce it?
14    A.        Uh-huh.
15    Q.        Latzo down was -- Mike Adams was
16    below her?
17    A.        Yes.
18    Q.        Is that correct?
19    A.        Yes.
20    Q.        And then Mr. Koon would report to Mr.
21    Adams?
22    A.        Yes.
23    Q.        And you would report to Mr. Koon?
24    A.        Yes.
25    Q.        And Mr. Koon, as I understood your

Confidential – Subject to Further Confidentiality Review

140

1    testimony, had two departments reporting to him,

2    yours; is that correct?

3    A.          Right.

4    Q.          Which was quality assurance manager,

5    outsourced products?

6    A.          Right.

7    Q.          And that was you individually and

8    occasionally a helper?

9    A.          Yes.

10   Q.          And then there was the auditing group

11   and how many were in the auditing group; do you

12   know?

13   A.          Four.

14   Q.          Okay.

15              So he had essentially five people

16   reporting to him?

17   A.          Yes.

18   Q.          Where were you -- these two groups

19   located; were you all out here on Chestnut Ridge?

20   A.          Yes.

21   Q.          And Mr. Koon was out there too; I

22   take it?

23   A.          Yes.

24   Q.          Were you near each other, same floor

25   --

Confidential – Subject to Further Confidentiality Review

141

1    A.          Uh-huh.

2    Q.          -- same complex of offices?

3    A.          Yes.

4    Q.          The way you describe your function

5    was that you would get a Certificate of

6    Compliance and a Certificate of Analysis and that

7    you would determine whether they -- the

8    Certificate of Compliance said that they were in

9    compliance --

10   A.          Uh-huh.

11   Q.          -- and their Certificate of Analysis

12   was the analysis was within your parameters?

13   A.          Right.

14   Q.          And that's all you did?

15   A.          Yes.

16   Q.          That was your whole job?

17                    MS. MCDONOUGH:  Well,

18   objection, with regard to a specific thing or --

19                    MR. FRANKOVITCH:  To your

20   routine work?

21                    THE WITNESS:  For Digitek it

22   was.

23                    MR. FRANKOVITCH:  Right, for

24   Digitek.

25                    THE WITNESS:  For Digitek and

Confidential – Subject to Further Confidentiality Review

142

1    for releasing a batch for Digitek, yes.

2    BY MR. FRANKOVITCH:

3    Q.          Okay.

4               And what other types of things did

5    you do besides -- there was eight products as I

6    understand it?

7    A.          Right.

8    Q.          Did you do something different for

9    the other products?

10   A.          Some of those products, entire batch

11   records were received, so I would have to review

12   an entire batch record, batch record being about

13   this thick (indicating), which is all the

14   manufacturing, all the production, reviewing any

15   of the investigations, if there are

16   investigations involved with that and writing,

17   drafting and creating quality agreements and

18   technical agreements.

19   Q.          Okay.

20              But as it related to Digitek, you

21   didn't have to do anything else.  You didn't rely

22   on their Dig -- on their batch records, you

23   relied on their Certificate of Compliance and

24   their Certificate of Analysis to approve them?

25   A.          Yes.

Confidential – Subject to Further Confidentiality Review

143

1    Q.         While you were there, you said it was
2    sort of off the record discussions or locker room
3    discussions or something about problems that
4    might be out in the field or out in these
5    outsourced facilities; is that correct?
6    A.         Yes.
7    Q.         The -- is it your recollection that
8    nobody ever mentioned to you that there was a
9    problem down at Actavis as it related to Digitek?
10   A.         At some point in time I knew.  I
11   don't recall now when that was, at
12   what point.
13   Q.         Were you curious as to whether 483's
14   had been issued?
15   A.         I don't know if I understand what
16   you're saying.
17   Q.         Well, I think you said that you never
18   saw a 483 relating to Actavis inspections and
19   Digitek?
20   A.         Correct.
21   Q.         Did -- and you'd never asked to see
22   if there were any?
23   A.         Right.
24   Q.         When you heard reports that there was
25   some friction with the inspection --

Suzanna Wolfe
Confidential – Subject to Further Confidentiality Review

144

1    A.          Uh-huh.

2    Q.           -- in Totowa, did you ask anybody

3    were there any 483's issued?

4    A.          No, because I knew there were others

5    in quality that were involved.

6    Q.          But you in particular was the

7    individual who would each time you approved a

8    batch would say that it was produced with good

9    manufacturing processes?

10   A.          Right.

11   Q.          Did you ever try to confirm that?

12   A.          It was not really part of my

13   responsibility to actually confirm that.  Part of

14   the auditing, when we send auditing teams out,

15   that part of their function is to do that.

16   Q.          Were -- when you found out that the,

17   and I think you said you did see the warning

18   letter and the 483 subsequently?

19   A.          Uh-huh.

20   Q.          Did you ever go to somebody and say

21   why didn't you tell me that there were issues

22   there?

23   A.          It wouldn't have mattered if I had.

24   Q.          Well, did it disturb you that for a

25   couple of years you were verifying that they were

Confidential – Subject to Further Confidentiality Review

145

1    meeting good manufacturing practices

2    when the government was issuing reports that they

3    weren't?

4                        MR. TABER:  Objection.

5                        THE WITNESS:  Yeah, I don't

6    know that the government is -- was issuing

7    reports that they weren't.  The government issues

8    observations like I stated earlier and 483's at

9    lots of companies.

10   BY MR. FRANKOVITCH:

11   Q.          Right, but you subsequently saw the

12   correspondence, the 483's and the warning letter

13   --

14   A.          Right.

15   Q.          -- that challenged whether they were

16   meeting good manufacturing processes and whether

17   they were shipping adulterated products.

18                        MR. TABER:  Objection as to

19   the question.  It's broad.

20                        MS. MCDONOUGH:  Same

21   objection and it is vague.

22   BY MR. FRANKOVITCH:

23   Q.          Well, did you -- at some point you

24   saw the warning letters --

25   A.          Uh-huh.

Confidential – Subject to Further Confidentiality Review

146

1    Q.            -- that indicated that there was at

2    least the possibility of adulterated products

3    being shipped from the plant?

4                        MR. TABER:  Objection.

5                        THE WITNESS:  I never saw the

6    term adulterated products.

7    BY MR. FRANKOVITCH:

8    Q.            Well, and it may not; it may not be

9    that term.  It may not say adulterated products.

10   I stand corrected.  It did say that there was

11   significant deficiencies found and I'm not

12   paraphrasing, but I'm -- well, I'll read it.

13                   Significant deficiencies were found

14   in the operation of the firm's quality control

15   unit and as a result there is no assurance that

16   many drug products manufactured and released into

17   interstate commerce by your firm have the

18   identity, strength, quality and purity that they

19   purport to possess.

20                        MR. TABER:  Objection, over

21   broad.

22                        MR. FRANKOVITCH:  Do you

23   remember seeing that?

24                        THE WITNESS:  Yes.

25   BY MR. FRANKOVITCH:

Confidential – Subject to Further Confidentiality Review

147

```
 1     Q.          Did -- and that letter was issued in
 2     February of '07, but you don't think you saw it
 3     until sometime after the recall?
 4     A.          I believe so.
 5     Q.          Okay.
 6                 When you saw it, did you ever
 7     confront anybody else that had it in the auditing
 8     department and then say why didn't you pass this
 9     on?
10     A.          No.
11                         MS. MCDONOUGH:  Objection.
12     I don't know that there's a foundation that
13     someone there had that letter at that time at
14     Mylan.  If you can answer, go ahead.
15                         THE WITNESS:  I guess my
16     point is it doesn't really -- it didn't really
17     matter because those that needed to be aware were
18     aware.
19     BY MR. FRANKOVITCH:
20     Q.          The -- you think they were aware of
21     this?
22     A.          I'm sure, yeah, I'm just --
23     I'm guessing, so I should say I don't know.
24     Q.          It's something they should know
25     though?
```

Confidential – Subject to Further Confidentiality Review

148

```
 1                  MS. MCDONOUGH:  Well,
 2   objection, that calls for speculation and has no
 3   foundation, should know why, for what reasons,
 4   were they apprised of it.  I mean that's
 5   open-ended and lacks foundation.
 6   BY MR. FRANKOVITCH:
 7   Q.          Did you ever after you learned of it
 8   have a discussion with anybody, either Mr. Koon
 9   or Mr. Adams or any of your -- the other four
10   people in the auditing group to say were they
11   aware of these issues?
12   A.          I don't recall any specific
13   conversations.
14   Q.          Was the -- when you were confirming
15   that these products were made with good
16   manufacturing practices, you were relying
17   strictly on what Actavis had related to you; is
18   that right?
19   A.          Yes.
20   Q.          The -- and this is just informational
21   I guess, what's the abbreviations in the e-mails,
22   GSO and MGW?
23   A.          MGW is Morgantown.
24   Q.          Okay.
25   A.          GSO, it might be Greensboro.  I think
```

Confidential – Subject to Further Confidentiality Review

149

1    it's Greensboro.

2    Q.          Okay.

3               The -- as I understood your

4    testimony, so we don't have to go back through

5    it, you verify or confirm that there was a COC

6    and a COA and the product would be, what, then

7    shipped to the distribution center or would it be

8    there and you would receive these?

9    A.          The latter.  It would --

10   Q.          The latter -- it would be there, you

11   would get the COC and the COA?

12   A.          Right.

13   Q.          Did you -- were you involved in any

14   way with where it went after that?

15   A.          No.

16   Q.          Do you know where it went after that?

17   A.          No.

18   Q.          Could you determine where it went

19   after that?

20   A.          Could I determine?

21   Q.          Right.

22   A.          Today, could I --

23   Q.          Well, at the time at least?

24   A.          I don't know that I could have.

25   Q.          Who would be the person that would

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

150

1    know that?

2    A.           Someone in our sales and distribution

3    group.

4    Q.           That's -- you wouldn't have any --

5    you were designated as somebody that may know,

6    have that information as to distribution and sale

7    of Digitek to Wal-Mart?

8    A.           No, once I release the product, I

9    have no idea where it goes.

10   Q.           Okay.

11               And you're not involved in the

12   sales of that to Wal-Mart or distribution to

13   Wal-Mart; you don't have anything to do with

14   that?

15   A.           No.

16   Q.           Okay.

17               Who would know that; do you know the

18   individuals?

19   A.           Now I don't know.  Again, we've had,

20   you know, management changes.  I'm not sure.  At

21   that point in time it would have been Ann Wolfe

22   would know.  She may still, I'm not sure if she

23   still is in that same job function.

24   Q.           And where is she located, here in

25   Morgantown --

Suzanne Worrel
Confidential – Subject to Further Confidentiality Review

151

1    A.          Yes.

2    Q.          -- or Greensboro?  Okay.  Is there

3    anybody else?

4    A.          I would only be guessing and I don't

5    know.

6    Q.          But she would be the most

7    knowledgeable that you know?

8    A.          She would be knowledgeable.  I don't

9    know if she's the most knowledgeable.

10   Q.          To be clear in my mind, the

11   relationship of UDL and Mylan is what?

12   A.          UDL is a re-packager for Mylan.  They

13   are an affiliate though, a sister company,

14   whatever term you want to use for Mylan.

15   Q.          Okay.

16               They're essentially controlled by

17   Mylan; the parent?

18   A.          Yes.

19   Q.          And then Mylan Bertek functions how?

20   A.          That I don't know.  I don't know.

21   Bertek used to be years ago its own entity.  It

22   merged and for tax reasons the name still exists.

23   Q.          So there's a Mylan Bertek and there

24   is a Mylan?

25   A.          That's all I know.

Confidential – Subject to Further Confidentiality Review

152

1    Q.         Okay.

2              Is the UDL -- all they do is

3    repackage?

4    A.         I think so.

5    Q.         Okay.

6              Why would their parameters we talked

7    about, why would they be different than Mylan's

8    parameters?

9                        MS. MCDONOUGH:  If you know,

10   don't guess.

11                       MR. FRANKOVITCH:  If you

12   know.

13                       THE WITNESS:  Yeah, I don't

14   know.

15   BY MR. FRANKOVITCH:

16   Q.         Is the product sold to a different

17   customer?

18   A.         Again, I don't know.

19   Q.         Do you know who establishes those --

20   those -- the tighter parameters for UDL?

21   A.         No.

22   Q.         Does UDL -- when a product doesn't

23   meet UDL's parameters, do you follow me?

24   A.         Uh-huh.

25   Q.         What happens to it?

Suzanne Wolfe

Confidential – Subject to Further Confidentiality Review

153

```
 1    A.          It's not shipped to UDL.

 2    Q.          Okay.

 3                I thought everything went to UDL?

 4    A.          No, everything goes to Greensboro.

 5    Q.          And that's the --

 6    A.          That's the distribution --

 7    Q.          -- distribution center?

 8    A.          Right.

 9    Q.          And UDL and there's another shipment

10    then to UDL's plant?

11    A.          Yeah, a portion of an existing batch,

12    yes.

13    Q.          Where are they located, UDL's plant?

14    A.          Rockford, Illinois.

15    Q.          Okay.

16                And then what happens to the stuff

17    that doesn't go to UDL?

18    A.          That's released to whomever, other

19    customers.

20    Q.          Is it a classic customer that makes

21    the distinction between UDL and the other

22    customers?

23    A.          UDL repackages in blisters, so it's

24    whatever a customer requires in blister pack.

25    Actavis doesn't have the ability to -- they ship
```

Confidential – Subject to Further Confidentiality Review

154

1    it to us in bottles --

2    Q.          Okay.

3    A.              -- bottles, so UDL repackages in

4    blisters.  So if there's a particular customer

5    that would require blisters --

6    Q.          The -- I believe it's Exhibit 16,

7    there was a sticker on it that says hold OSS --

8    OOS, out of spec?

9    A.          Yes.

10   Q.          How would you get that information?

11   Who would tell you that it's out of spec?

12   A.          Dan, Actavis would have told me.

13   Q.          But I mean this -- these documents

14   would have shown that it's in conformance and the

15   analysis is correct.

16   A.          Weights aren't on here.  Weights are

17   an in process check that are done during the

18   manufacturing of the product.  Weights aren't

19   reflected on here, on the Certificate of

20   Analysis.  It's not an analytical test.  It's

21   performed on the finished product.

22   Q.          So he most likely, he would've called

23   you and said this is out of spec and weights?

24   A.          Call or e-mail, probably e-mail.

25   Q.          The -- excuse me one second.

Confidential – Subject to Further Confidentiality Review

155

1    A.          Sure.

2    Q.          The -- I'm looking at M-10.  We went

3    over this.

4    A.          This page?

5    Q.          Yes.  Yes.  And in the bottom block

6    it says on this particular one it says the batch

7    record reviewed; who would have reviewed it?

8    A.          I did.

9    Q.          I thought you didn't get batch

10   records?

11   A.          Well, we refer to this as a batch

12   record, the documentation that we receive we call

13   a batch record whether it's one page or 1000

14   pages, it's a batch record.

15   Q.          Okay.

16               So really you looked at the COC and

17   COA?

18   A.          Yes.

19   Q.          Okay.

20               And then they don't do any inspection

21   there, right, at the distribution

22   center?

23   A.          They do a physical external

24   inspection of the bottles themselves.

25   Q.          To see that they're not broken or --

Confidential – Subject to Further Confidentiality Review

156

1    A.          The labeling, verify the labeling.

2    Q.          But they don't test the product in

3    any way?

4    A.          No.

5    Q.          The phone call or the e-mail that

6    you'd get to say that these are out of

7    specification, is there any other documents for

8    that that would reflect what out of spec

9    would be?

10   A.          Typically, like I said earlier, an

11   investigation, we would receive an investigation

12   report.  For me to do this, to put a sticky on

13   it, I would have -- it was a heads up to me from

14   Actavis, you know, they were in the midst of

15   writing an investigation report but just letting

16   me know, hey, we've got an issue, just hang on to

17   the product until we resolve it.

18   Q.          What would be -- when you're talking

19   about the weight, would it be the weight of the

20   tablet or the weight of an entire shipment?

21   A.          The weight of a tablet.

22                      MR. FRANKOVITCH:  I don't

23   think that I have anything else.

24                      MR. MILLER:  Just a couple of

25   quick ones.

Confidential – Subject to Further Confidentiality Review

157

1                          *   *   *

2                  E X A M I N A T I O N

3       BY MR. MILLER:

4       Q.          When you were asked about the warning

5       letter just now, one of your responses was those

6       that needed to be aware were aware.  Concerning

7       the issue of the contents of the warning letter,

8       who is it at Mylan that you believe were those

9       that needed to be aware?

10      A.          Well, it should be our vice

11      president and president of quality.

12      Q.          And who was the vice president?

13      A.          At that time it was Trish Latzo.

14      Q.          And vice president of quality was

15      Chuck Koon?

16      A.          No.

17      Q.          It was who?

18      A.          Not vice president.  I don't know if

19      we had a vice president at that time.  Trish is

20      highest, Mike would have been the next layer

21      down, whatever his title at that time was, Mike

22      Adams.

23      Q.          So when you say those that needed to

24      be aware were aware, would that include Mike

25      Adams or are you saying it's just Patricia Latzo?

Confidential – Subject to Further Confidentiality Review

158

```
1    A.          All the way down to Chuck.

2    Q.          You didn't know for a fact that they

3    were aware of the warning issues; you are

4    assuming they were aware --

5    A.          Yes.

6    Q.          -- of the issues?

7                     MR. MILLER:  That's all I

8    have.  I appreciate your time.

9                     MS. MCDONOUGH:  We might take

10   five minutes break and just go through our notes,

11   if you can hang in there.  We'll be right back.

12                    VIDEOGRAPHER:  The time is

13   3:52; we're going off the record.

14                         *  *  *

15                    (Brief pause)

16                         *  *  *

17                    VIDEOGRAPHER:  The time is

18   3:59; we're back on the record.

19                    MR. TABER:  Ms. Wolfe, on

20   behalf of Actavis, I have just a couple quick

21   questions for you if you don't mind.

22                         *  *  *

23               E X A M I N A T I O N

24   BY MR. TABER:

25   Q.          With regard to the quality agreement
```

Confidential – Subject to Further Confidentiality Review

159

1       that you spoke about a few hours ago, was this

2       something that Mylan was doing with all of your

3       outsourced companies, not just Actavis?

4       A.          Yes, that's correct.

5       Q.          And was this done in response to a

6       problem with Actavis or done as a routine part of

7       something that was going on with all of your

8       outsources?

9       A.          It was routine.  It was an initiative

10      we started to put contracts in place with all of

11      our outsourced suppliers.

12      Q.          Okay.

13                      MR. TABER:  That's all I

14      have.  Thank you.

15                      MS. MCDONOUGH:  I have no

16      questions.

17                      MR. MILLER:  Just a couple

18      follow-up on those thoughts.

19                      *   *   *

20                  E X A M I N A T I O N

21      BY MR. MILLER:

22      Q.          Of the other outsource suppliers that

23      you were generating or receiving quality

24      agreements from, did you ever have any of those

25      outsource suppliers have a recall while you were

Confidential – Subject to Further Confidentiality Review

160

1    in the position of QA for third-party production

2    facilities?

3    A.          I'm sorry I hesitated because I'm

4    thinking there was one, but I'm not sure of the

5    timeframe when that happened.  So, no, I don't

6    believe so.

7                        MR. MILLER:  That's all I

8    have.

9                        MS. MCDONOUGH:  Thank you.

10                       VIDEOGRAPHER:  The time is

11   4:00 p.m.; we're going off the record.  This

12   concludes the deposition.

13                       MS. MCDONOUGH:  She just

14   wants me to say on the record that the client

15   will read and sign the deposition transcript.

16   Thanks.

17                        *   *   *

18            (Whereupon, this deposition was

19   concluded at 4:00 p.m.)

20                        *   *   *

21            (Whereupon, signature was not waived

22   by the witness.)

23                        *   *   *

24

25

Confidential – Subject to Further Confidentiality Review

161

THE STATE OF       :
WEST VIRGINIA      :
                   :    SS:  C E R T I F I C A T E
COUNTY OF OHIO     :

         I, DEBRA A. VOLK, Court Reporter and
Notary Public within and for the State of West
Virginia duly commissioned and qualified, do
hereby certify that the within-named witness,
SUZANNA WOLFE, was by me first duly sworn to
testify to the truth, the whole truth and nothing
but the truth in the cause aforesaid; and the
testimony then given by the witness was by me
reduced to stenotype in the presence of the
witness; afterwards reduced to Computer Aided
Transcription under my direction and control;
that the foregoing is a true and correct
transcription of the testimony given by said
witness.

         I do further certify that this
testimony was taken at the time and place in the
foregoing caption specified, and was completed
without adjournment.

         I do further certify that I am not a
relative, counsel or attorney of either party, or
otherwise interested in the event of this action.

         IN WITNESS THEREOF, I have hereunto set
my hand and affixed my seal of office at
Wheeling, West Virginia, on the _____ day of
_____, 2010.


                    _____
                    DEBRA A. VOLK
                    Notary Public within and for
                    the State of West Virginia


My Commission Expires:
July 25, 2015

Suzanna Wolfe

Confidential – Subject to Further Confidentiality Review

162

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     CHARLESTON DIVISION

 4       -----------------------------X
         IN RE: DIGITEK            :  MDL NO. 1968
 5       PRODUCTS LIABILITY LITIGATION :
         -----------------------------X
 6       THIS DOCUMENT RELATES TO     :
         ALL CASES                    :
 7       -----------------------------X

 8                      *    *    *

 9        D E P O N E N T ' S    C E R T I F I C A T E

10              I, SUZANNA WOLFE, deponent herein, do
         hereby certify that the above and foregoing
11       transcript is a full, true and complete copy of
         the proceedings which took place on the 21st day
12       of January, 2010, at the law offices of Jackson
         Kelly, PLLC, 150 Clay Street, Suite 500,
13       Morgantown, West Virginia 26501.
         ____ There are no changes.
14       ____ Please indicate the within changes.
                 In certification and verification
15       thereof, I hereunto place my signature on
         the____ day of_____, 2010.

16

17                       _____
                         Deponent
         STATE OF_____:
18       COUNTY OF_____:
         Subscribed and sworn to before me a Notary
19       Public on this the _____ day of
         _____, 2010.

20

21                       _____
                         NOTARY PUBLIC
         State of _____
22       County of_____

23

         My Commission Expires: _____
24       (DAV)

25
```

Confidential – Subject to Further Confidentiality Review

163

```
                        C H A N G E S
         I DESIRE TO MAKE THE FOLLOWING CHANGE(S) TO MY
         DEPOSITION:

          PAGE_____   LINE _____
         Change desired:_____
         _____
         Reason for change:_____
         _____


          PAGE_____   LINE _____
         Change desired:_____
         _____
         Reason for change:_____
         _____


          PAGE _____   LINE _____
         Change desired:_____
         _____
         Reason for change:_____
         _____


          PAGE_____   LINE _____
         Change desired:_____
         _____
         Reason for change:_____
         _____


          PAGE_____   LINE _____
         Change desired:_____
         _____
         Reason for change:_____
         _____


                         _____
                         Deponent
```

Confidential – Subject to Further Confidentiality Review

164

1                    CHANGES (Cont.)

2      PAGE_____    LINE _____
       Change desired:_____
3      _____
       Reason for change:_____
4      _____

5
       PAGE_____    LINE _____
6      Change desired:_____
       _____
7      Reason for change:_____
       _____
8

9      PAGE_____    LINE _____
       Change desired:_____
10     _____
       Reason for change:_____
11     _____

12
       PAGE _____   LINE _____
13     Change desired:_____
       _____
14     Reason for change:_____
       _____
15

16     PAGE_____    LINE _____
       Change desired:_____
17     _____
       Reason for change:_____
18     _____

19
                    _____
20                  Deponent

21

22

23

24

25

Confidential – Subject to Further Confidentiality Review

165

1                         CHANGES (Cont.)

2      PAGE_____    LINE _____
       Change desired:_____
3      _____
       Reason for change:_____
4      _____

5
       PAGE _____    LINE _____
6      Change desired:_____
7      _____
       Reason for change:_____
8      _____

9      PAGE_____    LINE _____
       Change desired:_____
10     _____
       Reason for change:_____
11     _____

12
       PAGE_____    LINE _____
13     Change desired:_____
14     _____
       Reason for change:_____
15     _____

16     PAGE _____    LINE _____
       Change desired:_____
17     _____
       Reason for change:_____
18     _____

19

20                         _____
                           Deponent

21

22

23

24

25

Confidential – Subject to Further Confidentiality Review

166

```
 1                        CHANGES (Cont.)

 2        PAGE_____   LINE _____
         Change desired:_____
 3       _____
         Reason for change:_____
 4       _____

 5        PAGE _____   LINE _____
         Change desired:_____
 6       _____
         Reason for change:_____
 7       _____

 8
          PAGE_____   LINE _____
 9       Change desired:_____
         _____
10       Reason for change:_____
         _____
11

12        PAGE_____   LINE _____
         Change desired:_____
13       _____
         Reason for change:_____
14       _____

15
          PAGE _____   LINE _____
16       Change desired:_____
         _____
17       Reason for change:_____
18       _____

19                      _____
                              Deponent
20

21

22

23

24

25
```