# EXHIBIT 503

PLAINTIFFS' EXHIBITS 000790

# In Re:

*Digitek*

---

*Phyllis A. Lambridis*

*January 18, 2010*

*Confidential – Subject to Further Confidentiality Review*

---

*GOLKOW TECHNOLOGIES, INC.*

*Excellence In Court Reporting For Over 20 Years*

*877.370.3377*

*deps@golkow.com*

Original File pl011810.txt

**Min-U-Script®**

PLAINTIFFS' EXHIBITS 000791

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

- - -

IN RE:  DIGITEK PRODUCTS   :   MDL NO.
LIABILITY LITIGATION       :   1968


(This document relates to all cases.)

- - -

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -

Wayne, New Jersey
Monday, January 18, 2010

- - -


Videotaped Deposition of PHYLLIS A.

LAMBRIDIS, held at Ramada Inn, 334 US Rt. 46,

on the above date, beginning at 9:06 a.m.,

before Kimberly A. Overwise, a Certified

Realtime Reporter and Notary Public.

- - -


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph │ 917.591.5672 fax
deps@golkow.com

PLAINTIFFS' EXHIBITS 000792

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

2

```
1     APPEARANCES:

2

3          BLIZZARD, McCARTHY & NABERS, LLP
           BY:  EDWARD F. BLIZZARD, ESQ.
4               SOFIA BRUERA, ESQ.
           Lyric Centre
5          440 Louisiana, Suite 1710
           Houston, TX  77002-1689
6          713-844-3750
           eblizzard@blizzardlaw.com
7          sbruera@blizzardlaw.com
           Counsel for Plaintiffs

8

9          MOTLEY RICE LLC
           BY:  MEGHAN JOHNSON CARTER, ESQ.
10         28 Bridgeside Boulevard
           Mt. Pleasant, SC  29464
11         843-216-9118
           mjohnson@motleyrice.com
12         Counsel for Plaintiffs

13

14         THE MILLER FIRM LLC
           BY:  PETER A. MILLER, ESQ.
15         The Sherman Building
           108 Railroad Avenue
16         Orange, VA  22960
           540-672-4224
17         pmiller@doctoratlaw.com
           Counsel for Plaintiffs
18

19

20         LOCKS LAW FIRM LLC
           BY:  JAMES J. PETTIT, ESQ.
21         457 Haddonfield Road, Suite 500
           Cherry Hill, NJ  08002
22         856-663-8200
           jpettit@lockslaw.com
23         Counsel for Plaintiffs

24
```

PLAINTIFFS' EXHIBITS 000793

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

3

```
 1    APPEARANCES:   (Continued)

 2

 3         BAILEY PERRIN BAILEY
           BY:  FLETCH TRAMMELL, ESQ.
 4         The Lyric Centre
           440 Louisiana, Suite 2100
 5         Houston, TX  77002
           713-425-7100
 6         Counsel for Plaintiffs

 7

 8         LEVIN, FISHBEIN, SEDRAN & BERMAN
           BY:  MICHAEL M. WEINKOWITZ, ESQ.
 9             (via telephone)
           510 Walnut Street, Suite 500
10         Philadelphia, PA  19106-3697
           215-592-1500
11         mweinkowitz@lfsblaw.com
           Counsel for Plaintiffs
12

13         TUCKER ELLIS & WEST LLP
           BY:  RICHARD A. DEAN, ESQ.
14             MICHAEL ANDERTON, ESQ.
           1150 Huntington Building
15         925 Euclid Avenue
           Cleveland, OH  44115-1414
16         216-696-2276
           rdean@tuckerellis.com
17         michael.anderton@tuckerellis.com
           Counsel for Actavis Defendants
18

19

20         SHOOK, HARDY & BACON, LLP
           BY:  HUNTER K. AHERN, ESQ.
21         JPMorgan Chase Tower
           600 Travis Street, Suite 1600
22         Houston, TX  77002-2992
           713-227-8008
23         hahern@shb.com
           Counsel for Mylan Defendants
24
```

PLAINTIFFS' EXHIBITS 000794

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

4

1    APPEARANCES:   (Continued)

2

         ALLEN GUTHRIE & THOMAS, PLLC
3        BY:   ZACKARY B. MAZEY, ESQ.
         500 Lee Street, East, Suite 800
4        Charleston, WV   25301
         304-720-4226
5        zbmazey@agmtlaw.com
         Actavis Liaison Counsel in the MDL
6

7

8    ALSO PRESENT:

9
     Catherine Smalfus, videographer
10   Golkow Technologies, Inc.

11   Mike Kauffmann

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' EXHIBITS 000795

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

5

1                    I N D E X

2       WITNESS:                              Page

3       PHYLLIS A. LAMBRIDIS

4          By Mr. Blizzard.......................11

5          By Mr. Pettit........................186

6          By Mr. Miller...................280, 385

7          By Mr. Dean.....................365, 392

8

9

10

11                   E X H I B I T S

12                      (Attached.)

13      Plaintiff's
        No.              Description          Page
14
        105      Resume                        21
15
        106      Minutes of FDA Little Falls   42
16               Inspection Closeout, May
                 20, 2008, Bates Nos.
17               ACTAV000543001-543004

18      107      E-mail chain, Bates Nos.      56
                 ACTAV000292438-439
19
        108      Actavis Totowa, LLC           68.
20               Corrective Action Plan
                 Status Report, August 28,
21               2008, Bates Nos.
                 ACTAV000918567-577
22
        109      E-mail chain, Bates No.       83
23               ACTAV000475895

24

PLAINTIFFS' EXHIBITS 000796

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

6

1                E X H I B I T S  (Continued)

2                      (Attached.)

3    Plaintiff's
     No.             Description              Page
4
     110     Organizational charts,            90
5            Bates Nos.
             ACTAV000542861-865
6
     111     E-mail chain, Bates Nos.          93
7            ACTAV000609594-596

8    112     Totowa FDA Audit, Bates          103
             Nos. ACTAV001863647-683
9
     113     Documents entitled "URGENT:      139
10           DRUG RECALL," Bates Nos.
             ACTAV000526961-969
11
     114     E-mail chain, Bates Nos.         153
12           ACTAV000142150-151

13   115     E-mail, 4/28/08, to              159
             Mancinelli from Adams,
14           Bates No. MYLN000934214

15   116     E-mail, 8/14/08, from            165
             Castellazzo, Bates No.
16           ACTAV000302469

17   117     E-mail chain, Bates Nos.         170
             ACTAV000527229-231
18
     118     E-mail chain, Bates No.          178
19           ACTAV001267772

20   119     November 2008 Monthly            182
             Deviations and CAPA Data,
21           Bates Nos.
             ACTAV000309296-309305
22
     120     Documents entitled "URGENT:      197
23           DRUG RECALL," Bates Nos.
             UDLL000004006-8
24

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

PLAINTIFFS' EXHIBITS 000797

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

7

1                    E X H I B I T S   (Continued)

2                         (Attached.)

3        Plaintiff's
         No.                Description              Page
4
         121      Documents Bates Nos.              229
5                 ACTAV001472833-34

6        122      Documents Bates Nos.              230
                  ACTAV001423183-220
7
         123      E-mail, 4/14/08, from            245
8                 Hussain, with attachment,
                  Bates Nos.
9                 ACTAV001423939-42

10       124      Section 351 - "Adulterated       308
                  drugs and devices"
11
         125      Mylan Inc. Quality Incident      352
12                Report, Bates No.
                  MYLN000016459
13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFFS' EXHIBITS 000798

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

8

1                    THE VIDEOGRAPHER:  We are now

2           on the record.  My name is Catherine

3           Smalfus.  I am a videographer for Golkow

4           technologies.  Today's date is

5           January 18th, 2010, and the time is

6           9:06 a.m.  This deposition is being held

7           in Wayne, New Jersey, In Re:  Digitek

8           Products Liability Litigation, for the

9           United States District Court for the

10          Southern District of West Virginia.  The

11          deponent is Phyllis A. Lambridis.

12                   Will counsel please identify

13          themselves.

14                   MR. BLIZZARD:  My name is Ed

15          Blizzard.  My law firm is called

16          Blizzard, McCarthy & Nabers.  It's

17          located in Houston, Texas.  And I'm here

18          on behalf of Ms. Kelch and her family as

19          well as other plaintiffs and as well as a

20          member of the Plaintiffs' Steering

21          Committee for the MDL.

22                   MS. BRUERA:  I'm Sofia Bruera.

23          And I'm from Blizzard, McCarthy & Nabers,

24          and I'm here on behalf of plaintiffs.

PLAINTIFFS' EXHIBITS 000799

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

9

```
1                    MR. PETTIT:  Jim Pettit, Locks
2          Law Firm, for various plaintiffs in
3          New Jersey and as a member of the PSC.
4                    MR. MILLER:  Pete Miller from
5          The Miller Firm here on behalf of
6          plaintiffs.
7                    MS. CARTER:  Meghan Carter from
8          Motley Rice on behalf of plaintiffs.
9                    MR. MAZEY:  Zack Mazey with
10         Allen Guthrie & Thomas, Actavis liaison
11         counsel in the MDL.
12                   MS. AHERN:  I'm Hunter Ahern
13         from Shook Hardy & Bacon on behalf of
14         Mylan defendants.
15                   MR. ANDERTON:  Michael Anderton
16         with Tucker Ellis & West on behalf of the
17         Actavis defendants.
18                   MR. DEAN:  And Richard Dean
19         with Tucker Ellis & West in Cleveland on
20         behalf of the Actavis defendants.
21                   And let me just note briefly
22         for the record that I certainly have no
23         objection to Mr. Pettit or Mr. Miller
24         asking questions in their role as members
```

PLAINTIFFS' EXHIBITS 000800

10

1        of the plaintiffs' liaison committee in

2        the Multidistrict Litigation.  But the

3        deposition was not cross-noticed at all

4        in the New Jersey State cases, and

5        Mr. Miller's notice in the Philadelphia

6        cases is null and void on its face.

7                But, as I say, I have no

8        objection to either of them asking

9        questions in their role on the

10       Plaintiffs' Steering Committee.

11               MR. MILLER:  I'd like a little

12       more clarification on how you feel the

13       Philadelphia notice is null and void.

14               MR. DEAN:  You can look at it

15       and you can tell.  So let's go ahead with

16       the deposition.

17               THE VIDEOGRAPHER:  The court

18       reporter is Kim Overwise, and she will

19       now swear in the witness.

20                    - - -

21

22

23

24

PLAINTIFFS' EXHIBITS 000801

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

11

1                    ...PHYLLIS A. LAMBRIDIS, after

2           having been duly sworn, was examined and

3           testified as follows:

4      BY MR. BLIZZARD:

5           Q    Tell us your full name, please.

6           A    Phyllis Ann Lambridis.

7           Q    And where do you live,

8      Ms. Lambridis?

9           A    19 Braemar Drive in Wayne, New

10     Jersey.

11          Q    Were you employed by Actavis at one

12     point in time?

13          A    Yes, I was.

14          Q    During what period of time were you

15     employed by Actavis?

16          A    From September 2007 until

17     December 1st, 2008.

18          Q    Have you ever given a deposition

19     before?

20          A    Yes, I have.

21          Q    On how many occasions?

22          A    Twice.

23          Q    What kind of cases?

24          A    One was a divorce proceeding.  And

PLAINTIFFS' EXHIBITS 000802

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

12

1    one was with another job-related matter.

2         Q    What job did you hold when you gave

3    the deposition in connection with a

4    job-related matter?

5         A    Project manager.

6         Q    For what company?

7         A    Barr Laboratories.

8         Q    And what year was that that you gave

9    a deposition for Barr Laboratories?

10        A    1992.

11        Q    So has it been a while since you've

12   given sworn testimony in a deposition?

13        A    Yes.

14        Q    Have you had a chance to talk to the

15   lawyers for Actavis, and have they

16   reintroduced you to the concept of giving

17   sworn testimony in a deposition?

18        A    Yes.

19        Q    So you understand that you're under

20   oath here today?

21        A    Yes.

22        Q    You understand that you're required

23   by the oath that you've taken to tell the

24   truth?

PLAINTIFFS' EXHIBITS 000803

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 15 of 200 PageID #: 19767
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

13

1          A     Yes.

2          Q     You understand that I'm going to be

3     asking you questions during the day; and if

4     you don't understand one of my questions, you

5     should tell me that you don't understand it

6     and I'll try to repeat it or rephrase it so

7     that at the end of the day we can be assured

8     that we have accurate testimony from you in

9     response to questions that you understood?

10         A     Yes.

11         Q     I'll try not to talk over your

12    answers if you'll try to wait until I finish

13    my questions.  Although I grew up in

14    Philadelphia, I've been in the south long

15    enough that I talk kind of slow.  And

16    sometimes I don't quickly finish my question.

17    So if you'll wait, be patient with me, I'll

18    try to finish and then you can start your

19    answer.  Okay?

20         A     Okay.

21         Q     All right.  You also have to give

22    verbal responses to my questions.  You can't

23    just nod or shake your head because the court

24    reporter will actually write down "nods head"

PLAINTIFFS' EXHIBITS 000804

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

14

1  or "shakes head," but it's much better if you

2  give a verbal response.  Okay?

3      A    Okay.

4      Q    Are you represented by counsel here

5  at the deposition today?

6      A    No.

7      Q    Have you had an opportunity to talk

8  to Actavis counsel about what kinds of

9  questions might be asked today?

10     A    Yes.

11     Q    On how many occasions did you meet

12  with Actavis counsel in preparation for

13  today's deposition?

14     A    Three.

15     Q    Could you tell me as best you can

16  when those meetings were and how long they

17  lasted?

18     A    The first meeting was Monday of last

19  week in the afternoon, half a day, so from

20  about 1:30 to 5 o'clock; again on Thursday of

21  last week.  I'm sorry.  I don't remember the

22  dates.  Same time frame, about 1:30 in the

23  afternoon till 5:00.

24     Q    Okay.  Last Monday, I believe, was

PLAINTIFFS' EXHIBITS 000805

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

15

1    January 11?

2         A    11th, yes.

3         Q    And then you met again on Thursday

4    of that same week?

5         A    14th.

6         Q    And then how long did you meet on

7    Thursday, the 14th?

8         A    Again, the same time period, about

9    1:30 till 5:00.

10        Q    And how about the third meeting?

11        A    The third meeting was yesterday.

12        Q    That would have been January 17?

13        A    Correct.

14        Q    And what time was that meeting?

15        A    From about 7:00 till 8:00.

16        Q    In the evening?

17        A    In the evening.

18        Q    Were you shown any documents during

19    any of these meetings?

20        A    One document, which was the redacted

21    483.

22        Q    Okay.  The 483 from --

23        A    Issued --

24        Q    From what period of time?

PLAINTIFFS' EXHIBITS 000806

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

16

1        A     May of 2008.

2        Q     And that was the only document you

3     were shown during the --

4        A     Yes.

5        Q     -- meetings that you had with

6     counsel for Actavis?

7        A     Yes.

8        Q     What was discussed during the other

9     eight to nine hours that you met?

10        A     Procedural issues regarding the

11     deposition; some of the things you mentioned

12     to me just a few minutes ago about how to

13     answer questions, to give full responses, to

14     ask if I don't understand, ask them to repeat

15     if I don't hear something; mostly procedural

16     issues.

17            Some of the other items we talked

18     about were my involvement with the Digitek

19     recall and my interactions with FDA regarding

20     that matter.  That's about the majority of the

21     discussion.

22        Q     Okay.  So the procedural issues

23     about, you know, how to answer questions and

24     make sure that you answer them fully -- I talk

PLAINTIFFS' EXHIBITS 000807

Confidential – Subject to Further Confidentiality Review

17

 1    slow but that couldn't have consumed that much
 2    time, could it?
 3           A    No.  As I mentioned, we talked about
 4    the issues related to the Digitek recall --
 5           Q    Okay.
 6           A    -- and how much -- sequence of
 7    events and my interactions and how most of
 8    that unfolded.
 9           Q    Do you have a good memory of those
10    things?
11           A    Fairly good but I don't recall all
12    of the detail.
13           Q    Okay.  What do you remember about
14    the discussion with counsel about your
15    involvement in the recall and your
16    interactions with FDA?
17           A    I'm sorry?
18           Q    I'm sorry.  What do you remember
19    about your discussions with counsel for
20    Actavis where you discussed your interaction
21    with FDA and your involvement in the Digitek
22    recall?
23           A    Just the decision-making piece of
24    that and who was contacted and involved in the

PLAINTIFFS' EXHIBITS 000808

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

18

1    recall decision, what -- who spoke with FDA

2    regarding the matter, some of the discussion

3    that was part of the inspection that was

4    ongoing with FDA and that interaction with FDA

5    on-site.  That was, you know, the details

6    surrounding that.

7         Q    Okay.  Specifically what did you

8    tell them about the details?

9         A    Can you be -- can you ask me the

10   question and I'll answer it?  The question

11   was, you know, who did you speak to?  Who did

12   you notify first?  I talked to them about what

13   was discussed with Erin, who was an

14   investigator on-site, and then subsequent

15   conversations with Actavis management and then

16   with the FDA recall coordinator.

17        Q    Erin is -- was one of the FDA

18   investigators?

19        A    Yes.

20        Q    What was her last name?

21        A    McCaffery.

22        Q    And when did you first meet with her

23   in conjunction with the inspection?

24        A    The inspection began in March of

PLAINTIFFS' EXHIBITS 000809

19

```
 1    2008, middle of March.  I think it was --
 2         Q    And --
 3         A    -- around St. Patrick's Day.
 4         Q    And is that when you first met with
 5    Erin McCaffery?
 6         A    Yes.
 7         Q    Were you the person who was in
 8    charge of interacting with FDA on behalf of
 9    Actavis concerning the inspection in March,
10    April, and May of 2008, and the efforts that
11    were made thereafter to correct the problems
12    identified?
13         A    Yes.
14         Q    Is there anything that you've done
15    to prepare for this deposition other than what
16    we've discussed so far?
17         A    No.
18         Q    So the totality of your preparation
19    has been meeting with counsel for Actavis on
20    three occasions and also reviewing the FDA 483
21    that was issued in May of 2008 following an
22    inspection of the Actavis facility at
23    Little Falls?
24         A    Yes, but I would like to note that
```

PLAINTIFFS' EXHIBITS 000810

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

20

1    the 483 that was given to me, I only really

2    read the first page.  So I didn't review the

3    whole document.

4         Q    Now, before we talk about your time

5    at Actavis, let me ask you about your

6    educational background and your work history.

7              First of all, where did you go to

8    school, undergrad?  We can start there.

9         A    My undergraduate was at Rutgers

10   University.

11        Q    And did you get a Bachelor's Degree

12   from Rutgers?

13        A    A Bachelor's Degree in microbiology.

14        Q    What did you do after that?

15        A    I was employed by Beecham, which is

16   now part of Glaxo.

17                   MR. DEAN:  Excuse me, Ed.  If

18             it will speed things up, she does have a

19             resume.

20                   MR. BLIZZARD:  Sure, that would

21             be great.

22                   MR. DEAN:  However you want to

23             go about it.

24                   MR. BLIZZARD:  Sure.  That's

PLAINTIFFS' EXHIBITS 000811

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

21

1          good.

2                    (Plaintiff's Exhibit No. 105

3          was marked for identification.)

4     BY MR. BLIZZARD:

5          Q    I've marked as Exhibit 107 a copy of

6     your resume.  Do you have another copy in

7     front of you?

8          A    No, I don't.

9                    MR. BLIZZARD:  I've already

10         messed up on the exhibits.  I'm going to

11         re-mark this Exhibit 105 so we don't have

12         any gaps.  I'm going to put it up on this

13         display device we call an Elmo so we all

14         can read it.

15    BY MR. BLIZZARD:

16         Q    I assume that your work history

17    starts on Page 2 and then works its way up --

18         A    Correct.

19         Q    -- to the front.

20              Okay.  So you were manager in the

21    microbiology laboratory for Beecham?

22         A    I started actually as a

23    microbiologist at Beecham in the year I

24    graduated, 1983.  And then while I was

PLAINTIFFS' EXHIBITS 000812

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

22

1    employed there, I began work for my Master's.

2         Q    And then it looks like your next job

3    was at Barr Laboratories; correct?

4         A    Correct.

5         Q    And Barr Laboratories, it says on

6    this resume, is currently called Teva

7    Pharmaceuticals; correct?

8         A    Correct.

9         Q    And it looks like you worked for

10   them from 1987 until 1998; is that true?

11        A    Yes.

12        Q    And it shows, I think, on this

13   resume that you started out as a manager in

14   the microbiology laboratory and then moved up

15   the ladder to ultimately a position as

16   director of regulatory compliance; correct?

17        A    Correct.

18        Q    Now, did you get any additional

19   education during this period of time?

20        A    I started my Master's while I was

21   employed at Beecham, and I completed it while

22   I was working for Barr.

23        Q    In what year?

24        A    I believe it was 1990.  If you go

PLAINTIFFS' EXHIBITS 000813

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

23

1     down a little on the resume, you can -- oh, I

2     didn't put the dates.  I believe it was 1990.

3          Q    So it was with Barr that you gave

4     another deposition, you said, in about 1992;

5     is that true?

6          A    Correct.

7          Q    And at that time it shows on your

8     resume that you were a project manager?

9          A    Correct.

10         Q    Or associate director of quality

11    assurance.

12              In what capacity were you working in

13    when you gave your deposition?

14         A    As the project manager.

15         Q    In connection with what activity did

16    you give your deposition?

17         A    There was a court proceeding,

18    US versus Barr Laboratories.  And I

19    participated in the preparation work for that

20    activity, and I appeared at trial and then

21    also gave a deposition.

22         Q    When you say "appeared at trial,"

23    did you actually testify at trial?

24         A    Yes, I did.

PLAINTIFFS' EXHIBITS 000814

Confidential – Subject to Further Confidentiality Review

24

1          Q     And this was a proceeding brought by

2     the United States government against Barr

3     Pharmaceuticals in the District Court in New

4     Jersey?

5          A     Yes.

6          Q     And the government of the United

7     States was trying to enjoin Barr

8     Pharmaceuticals from making pharmaceuticals

9     because they believed Barr was in violation of

10    good manufacturing practices; is that correct?

11         A     Yes, it is correct.

12         Q     And you were involved in giving

13    testimony defending Barr Pharmaceuticals?

14         A     Yes.

15         Q     And actually you have on your -- on

16    other resumes that I've seen indicated your

17    involvement in those proceedings; correct?

18         A     Yes, that's correct.

19         Q     In fact, you currently work for Halo

20    Pharmaceuticals; is that right?

21         A     Yes, that's correct.

22         Q     And in the bio on the Halo web site,

23    does it indicate that you actually were

24    involved in the proceedings where the

PLAINTIFFS' EXHIBITS 000815

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

25

1     government had tried to shut Barr down?

2          A     Correct.

3          Q     So you worked for Barr from --

4     ultimately you moved up to director of

5     regulatory compliance; correct?

6          A     Yes.

7          Q     And then it looks like you worked

8     for Schein Pharmaceuticals, which then became

9     Watson Pharmaceuticals; is that true?

10         A     Schein, yes.

11         Q     And Schein, you worked as director

12    of corporate quality standards, policies, and

13    systems; is that right?

14         A     Yes.

15         Q     And for what period of time?

16         A     From November of '98 until March of

17    2001.

18         Q     And then going over to the first

19    page of your resume -- well, let me ask you,

20    first, why did you leave Barr

21    Pharmaceuticals -- Barr Laboratories?   I'm

22    sorry.

23         A     The opportunity presented itself

24    with Schein.   It was an opportunity and

PLAINTIFFS' EXHIBITS 000816

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

```
 1        actually quite a desirable offer.  And so I
 2        had pretty much gone as far as I could in
 3        terms of career opportunities with Barr, and I
 4        decided to make a move over to Schein.
 5             Q    And then you stayed at Schein for,
 6        it looks like, about two and a half years?
 7             A    Yes.
 8             Q    Why did you leave Schein?
 9             A    Watson purchased Schein and roles
10        and responsibilities were changing.  And,
11        again, another opportunity presented itself.
12        I was -- when the company was put for sale, I
13        started to look for other jobs and one came
14        along.  Even though I had been asked by Watson
15        to stay, I decided to move on.
16             Q    Did you not like the new management?
17             A    Actually, that was one of the
18        reasons.
19             Q    The next time -- the next job you
20        had looks like for Halsey Drug Company?
21             A    Correct.
22             Q    And that's currently named Acura
23        Pharmaceutical; is that true?
24             A    Yes.
```

PLAINTIFFS' EXHIBITS 000817

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

27

1        Q     And it looks like you worked for

2    them from March of 2001 to April of 2003,

3    according to your resume; is that true?

4        A     Yes.

5        Q     And your job there was, again, in

6    compliance and quality?

7        A     Correct.

8        Q     And you were actually a vice

9    president of the company and a corporate

10   officer, weren't you?

11       A     Correct.

12       Q     What did -- why did you leave -- is

13   it Halsey?

14       A     Halsey.

15       Q     Why did you leave there?

16       A     Halsey was a very small company that

17   was trying to do a number of different things,

18   actually make a go of it, so to speak.  And

19   they were financially not very stable, and

20   they were not doing very well at the time.

21   And actually the site that I worked at was

22   here in New York and subsequently was closing.

23   So the only one that exists right now is the

24   facility in Indiana.

PLAINTIFFS' EXHIBITS 000818

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

28

```
 1          Q     In India?
 2          A     Indiana.
 3          Q     Indiana.  Okay.
 4                Then the next job you had was with
 5     Pliva, Inc.; is that right?
 6          A     Correct.
 7          Q     And what was your job there?
 8          A     Vice president of quality in
 9     New Jersey.  That was the job I was hired for.
10     And while I was employed -- Pliva was a
11     Croatian company that had a site here in the
12     US where I was employed.  And then I was asked
13     to go to Croatia where I spent approximately a
14     year there working at that facility.
15          Q     Did you again work in quality and
16     compliance?
17          A     Yes.
18          Q     And you left them after two and a
19     half years?
20          A     Correct.
21          Q     What was the reason you left them?
22          A     Barr Laboratories bought Pliva.
23          Q     So you're back to square one.
24          A     I was back to square one.
```

PLAINTIFFS' EXHIBITS 000819

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

29

```
 1         Q    Did you not like being at square
 2    one?
 3         A    I didn't mind necessarily except
 4    that Barr Laboratories wanted me to stay in
 5    Croatia.
 6         Q    That's a different kind of square,
 7    isn't it?
 8         A    It is.
 9         Q    So you left because you were
10    essentially going to be required to stay in
11    Croatia for Barr Laboratories?
12         A    And my job here was now redundant,
13    so...
14         Q    Okay.  So what was your next job?
15         A    Actavis.  Well, I'm a consultant.
16    Back in 2003 when I left Halsey, I started a
17    consulting firm.  So I did do some consulting
18    in the gap between leaving Halsey and being
19    employed by Pliva.  I still have that -- that
20    company is still active.
21              And I may be skipping ahead here,
22    but -- yeah, I'm skipping ahead.  But I went
23    from Pliva to Actavis.  But I just wanted to
24    note, because it just reminded me when I saw
```

PLAINTIFFS' EXHIBITS 000820

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

30

1      that, that between Halsey and Pliva, there was

2      a consulting opportunity.

3           Q    Thank you for that.  I noticed that

4      you actually gave a presentation at a

5      conference in 2004 in which you were noted to

6      be employed by Framework?

7           A    Okay.

8           Q    And so you actually did work for

9      this -- for your own consulting company --

10          A    Correct.

11          Q    -- in 2004 between your jobs for

12     Halsey and Pliva?

13          A    Correct.

14          Q    And then after you left Actavis, you

15     returned and did some additional consulting

16     work again for your own company named

17     Framework?

18          A    Correct.

19          Q    So you worked for Actavis, according

20     to this, from September of 2007 to December of

21     2008; is that right?

22          A    Correct.

23          Q    And, again, for Actavis, you were in

24     quality and compliance; is that true?

PLAINTIFFS' EXHIBITS 000821

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

31

1          A     Yes, it is.

2          Q     And then for Framework, when you did

3     consulting, you did consulting on quality

4     system issues and compliance issues; correct?

5          A     Correct.

6          Q     And that's what you spoke about at

7     the conference I noted.

8          A     Yes.

9          Q     And did you speak at other

10    conferences?

11         A     Yes.

12         Q     How often did you speak on quality

13    issues either during the time that you were

14    employed by one of these pharmaceutical

15    companies or as a consultant?

16                    MR. DEAN:  You want to clarify

17         "speak"?  At any conference or --

18                    MR. BLIZZARD:  Yes.

19    BY MR. BLIZZARD:

20         Q     I don't mean speak as "I'm going to

21    ask a question" kind of speak.  I mean you

22    actually were presenting to an audience at a

23    conference.

24         A     I would have to estimate about a

PLAINTIFFS' EXHIBITS 000822

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

32

1    dozen times over the years.

2         Q    Okay.  When was the last time?

3         A    June of last year.

4         Q    2009?

5         A    2009, yes.

6         Q    And who sponsored that conference?

7         A    New Jersey Pharmaceutical Quality

8    Control Association.

9         Q    What fancy place was it located at?

10        A    Actually, it was at the Ramada

11   Inn --

12        Q    That's pretty fancy.

13        A    The Ramada Inn, East Hanover, on the

14   Turnpike, Route 10, I think it is.

15        Q    And what was your presentation

16   about?

17        A    Oh, my goodness.

18             MR. DEAN:  If you remember.

19             THE WITNESS:  I'm trying to

20        remember the title and I can't.

21             MR. DEAN:  Could you give

22        Mr. Blizzard the subject matter?

23             THE WITNESS:  Yes, I can do

24        that.

PLAINTIFFS' EXHIBITS 000823

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

33

```
1    BY MR. BLIZZARD:

2         Q    Sure.

3         A    About FDA and some new guidelines

4    and how to manage and use the information that

5    you are obtaining in your facility to -- let

6    me back up for a second.

7              There are new FDA guidelines that

8    talk about how to -- what FDA's expectations

9    are and how you can use the information within

10   your own facility to enhance and improve and

11   put continuous improvement in play based on

12   information that you trend and gather as you

13   do your job.

14        Q    Okay.  So it's about learning from

15   your own experience, examining trends, and

16   then making changes based upon those --

17        A    Correct.

18        Q    -- analyses?

19        A    Uh-huh.

20        Q    Is that true?

21        A    True.

22        Q    Okay.  So your current job is what?

23        A    My current job is with Halo

24   Pharmaceutical as, again, vice president of
```

PLAINTIFFS' EXHIBITS 000824

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

34

1    quality.

2        Q    Now, I've noticed that since you

3    moved out of working as a microbiologist, all

4    of your work has been in quality assurance,

5    quality control, compliance, and regulatory

6    affairs; is that fair?

7        A    Yes.

8        Q    What do those terms mean in the

9    pharmaceutical industry?

10       A    I'm not sure I understand the

11   question.

12       Q    I really want the jury, who may not

13   understand how pharmaceutical companies work,

14   to have an understanding of the purpose of

15   your job in quality assurance or quality

16   control or compliance or regulatory affairs.

17                   MR. DEAN:  Could we take those

18           one at a time since there are four of

19           them there, Ed?

20                   THE WITNESS:  They are all

21           different.

22   BY MR. BLIZZARD:

23       Q    Let's take them one at a time.  What

24   is the purpose of quality assurance?

PLAINTIFFS' EXHIBITS 000825

35

```
 1              A     Quality assurance is usually the
 2      group employed that does all the checks and
 3      balances throughout the operation, everything
 4      from sampling all the way through to the
 5      release of the product.
 6              Q     Okay.
 7              A     It also is the area that monitors
 8      the systems and gathers information for
 9      trending, et cetera.
10              Q     Okay.  So that's quality assurance.
11      What is quality control?
12              A     In most companies, quality control
13      is defined as the laboratory operations that
14      test the products, although in some companies,
15      they use QA and QC interchangeably.
16              Q     And so what is compliance?
17              A     Compliance is a more broad term.
18      And it really is defined differently from
19      company to company.  In most cases, my role
20      was regulatory compliance, which was limited
21      to FDA-related matters.
22                    The broader term would be compliance
23      with every agency.  So it could be DEA.  It
24      could be OSHA, et cetera.  But for my
```

PLAINTIFFS' EXHIBITS 000826

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

36

1    purposes, the majority of my role has been

2    with regulatory compliance and FDA-related

3    matters.

4         Q    And regulatory affairs, the purpose

5    of the regulatory affairs department, as I

6    understand it, is to interact with FDA about

7    FDA regulations and compliance with those

8    regulations?

9         A    Regulatory affairs typically

10   interacts with FDA mostly out of the

11   Washington office and is part of the drug

12   approval process.  So that group is typically

13   interacting with trying to get new drugs'

14   applications approved and not necessarily in

15   the day-to-day operation.

16        Q    Okay.  Have you worked in regulatory

17   affairs?

18        A    I've had regulatory affairs groups

19   reporting in to me, yes.

20        Q    Okay.  So typically the regulatory

21   affairs group is involved in submitting new

22   drug applications or ANDAs; correct?

23        A    Correct.

24        Q    And also making sure they comply

PLAINTIFFS' EXHIBITS 000827

Case 2:08-md-01968 Document 577-12 Filed 09/08/11 Page 39 of 200 PageID #: 19791
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

37

```
 1      with the regulations for keeping those

 2      applications current?

 3          A    Yes.

 4          Q    Which would include reporting of

 5      adverse drug experiences?

 6          A    Yes.

 7          Q    Now, with respect to quality control

 8      and quality assurance and compliance with FDA

 9      regulations and communicating with FDA about

10      new drug applications and ANDAs, are all of

11      those issues related to safety?

12          A    It's one of the issues; but, yes,

13      they all touch on safety.

14          Q    And how do those functions of

15      quality and compliance touch on safety?

16          A    Well, I guess the best way that I

17      could describe it is that when a new drug or a

18      generic drug is approved, it's already gone

19      through its review to determine that it's

20      safe.  And when you're working in the role as

21      quality day to day, you're ensuring that the

22      drug is manufactured in accordance with those

23      formulas and procedures in that application.

24      And you release the drug to market, provided
```

PLAINTIFFS' EXHIBITS 000828

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

38

```
 1   that it meets those specifications.
 2        Q    And so how do good manufacturing
 3   practices fit into that story?
 4                  MR. DEAN:  Objection to form.
 5                  Go ahead.
 6                  Go ahead.  You can answer.
 7                  THE WITNESS:  Repeat that.
 8                  MR. BLIZZARD:  Yeah.  Let me
 9        change the question.
10   BY MR. BLIZZARD:
11        Q    As I understand what you just said
12   is that a new drug is approved or a generic
13   drug is approved according to a particular
14   formulation.  And so quality is involved in
15   making sure that the company actually makes
16   the drug in accordance with the formulation
17   that was approved as safe by the FDA; is that
18   right?
19        A    Yes.
20        Q    Now, good manufacturing processes,
21   are those things that have to be done to make
22   sure that what is actually being manufactured
23   is in accordance with what the FDA approved
24   and is safe?
```

PLAINTIFFS' EXHIBITS 000829

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 41 of 200 PageID #: 19793
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

39

1                    MR. DEAN:  Same objection.

2                    Go ahead.  You can answer.

3                    THE WITNESS:  Okay.  Not

4          entirely.

5     BY MR. BLIZZARD:

6          Q    Okay.

7          A    Good manufacturing practices are the

8     processes and procedures you put in place in

9     your facility to ensure that the facility is

10    run adequately.

11                   Following the master formulas

12    written is part of the -- is the compliance

13    piece of that, but there are many other things

14    that come into play when you're talking about

15    the manufacturing practices.  It has to do

16    with everything from -- it's proceduralizing

17    everything.

18                   And there are laws written which are

19    the GMPs; but they don't give you enough

20    detail, and they don't tell you how to do it.

21    So facilities have to interpret those laws and

22    put procedures in place to comply with the

23    drug regulations.

24                   So there's the piece of it that has

PLAINTIFFS' EXHIBITS 000830

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

40

1      to do with the manufacture of the drug, which

2      is part of the drug application.  And then the

3      GMPs have to do with following the law.

4           Q    Okay.  These good manufacturing

5      practices, are those standards set by the

6      United States government for drug

7      manufacturers to comply with?

8           A    Yes.

9           Q    And are those minimum standards?

10          A    Yes.

11          Q    And are the drug manufacturers

12     expected to follow those by FDA?

13          A    Yes.

14          Q    Why do we have them?

15          A    Food, Drug and Cosmetic Act, which

16     to make sure that drugs that are released to

17     the market are pure, safe, effective.  I

18     should know it by heart, but I don't know all

19     the phraseology.

20          Q    Okay.  Let me see if this refreshes

21     your memory.  Do you recall that the GMPs are

22     to ensure that the pills being made by the

23     company, taken by Americans have the identity,

24     strength, quality, and purity that they're

PLAINTIFFS' EXHIBITS 000831

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

41

1    supposed to have?

2        A   Yes.

3        Q   Do the FDA regulations also require

4    that the company have an effective quality

5    control unit with appropriate responsibility

6    and authority?

7        A   Yes.

8        Q   Now, you worked at Actavis, you

9    said, in 2007 and 2008; correct?

10       A   Yes.

11       Q   According to FDA, during that period

12    of time, was there a total failure of the

13    quality system at Actavis?

14       A   Can you repeat that?

15       Q   Yes.  During that period of time

16    between 2007 and 2008, according to the FDA

17    investigators, was there a total failure of

18    the quality system?

19       A   According to the investigator, yes.

20       Q   I'm going to show you what I'm going

21    to mark as 106 to your deposition.

22            Can we put up -- it's 543001.

23               (Plaintiff's Exhibit No. 106

24       was marked for identification.)

PLAINTIFFS' EXHIBITS 000832

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

42

```
1    BY MR. BLIZZARD:
2         Q    Do you have this document in front
3    of you, Ms. Lambridis?
4         A    Yes.
5         Q    You can look at the document in
6    front of you.  We may be highlighting some of
7    it on the screen.  If you need to look at it
8    there, you obviously can.
9         A    I can't see it there.
10        Q    But it might be easier for you to
11   look at the document in front of you.
12             Does this appear from the title of
13   the document to be an FDA Little Falls
14   inspection closeout minutes?
15        A    Yes.
16        Q    And is the date of the minutes
17   May 20th, 2008?
18        A    Yes.
19        Q    It shows who the FDA attendees were,
20   and it shows Lisa Harlan and Erin McCaffery,
21   who we mentioned earlier; correct?
22        A    Correct.
23        Q    And Erin McCaffery was, according to
24   this document at least, the consumer safety
```

PLAINTIFFS' EXHIBITS 000833

43

```
 1   officer for FDA; is that true?
 2        A    Yes.
 3        Q    And the Actavis attendees included
 4   the executive chairman at the time, Robert
 5   Wessman, and yourself, who was vice president
 6   of US quality and compliance; correct?
 7        A    Correct.
 8        Q    And then also -- could you help me
 9   with the pronunciation?  I think he's been
10   referred to several times as Siggi.
11        A    Siggi is correct.  I believe it's
12   Sigurdur.
13        Q    Sigurdur, okay, Olafsson, who was
14   CEO of Actavis, Inc.; correct?
15        A    Correct.
16        Q    And then it has Jeff Rope, vice
17   president of operations, Actavis Totowa, and
18   then Garret Wolan, who was the manager of
19   compliance.  Did he report to you?
20        A    Indirectly.  There was someone in
21   between.
22        Q    And there's a parentheses there that
23   says "scribe."
24             Do you see that?
```

PLAINTIFFS' EXHIBITS 000834

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

44

1        A    Yes.

2        Q    And does that indicate to you that

3    he's the one who prepared these minutes?

4        A    Yes.

5        Q    If you look down to I guess it's the

6    third paragraph, it says -- the paragraph that

7    starts "Erin stated," do you see that?

8        A    Yes.

9        Q    Could you read that, those first two

10   sentences for us?

11       A    "Erin stated that one of the best

12   outcomes of the Inspection was the input from

13   the laboratory.  Erin also said that from a

14   Quality Systems standpoint, there was 'Total

15   Failure.'"

16       Q    And that's what you gave testimony

17   to earlier; correct?

18       A    Yes.

19       Q    If you look over to Page 2, do you

20   see the paragraph that starts "Robert

21   Wessman" --

22       A    Yes.

23       Q    -- "stated that they stopped

24   shipping product from Little Falls and hired

PLAINTIFFS' EXHIBITS 000835

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

45

1       twelve consultants (PAREXEL) to review the

2       products."

3               Do you see that?

4           A   Yes.

5           Q   So when was it that the company

6       stopped shipping products from Little Falls

7       and hired PAREXEL?

8           A   End of April 2008.

9           Q   So as of April of 2008, the company

10      stopped completely shipping product from

11      Little Falls and hired PAREXEL to review the

12      products; correct?

13          A   Yes.

14          Q   And that would have included

15      stopping selling Digitek; correct?

16          A   Yes.

17          Q   And also recalling Digitek about the

18      same time; right?

19          A   Yes.

20          Q   And the investigators, it says,

21      expressed additional concerns.

22              Do you see that?

23          A   Yes.

24          Q   It says -- first bullet says:

PLAINTIFFS' EXHIBITS 000836

46

1    "Investigations on the 483 have still not been

2    completed."

3             Do you see that?

4         A    Yes.

5         Q    Was there an explanation for that?

6                 MR. DEAN:   Excuse me.

7         Explanation given at the meeting, or does

8         she have an explanation now?

9    BY MR. BLIZZARD:

10        Q    Actually both.   Was there an

11   explanation given at the meeting for why the

12   483 investigations had not been completed as

13   of the time of the closeout?

14        A    I don't recall whether that was

15   explained at that time.

16        Q    Do you have an explanation for it,

17   independent of what was discussed at the

18   meeting?

19        A    We were engaged in the inspection

20   when some of these things had come to -- well,

21   there were open investigations that were the

22   subject of discussion during the inspection.

23   And the people that would typically be

24   involved with handling those investigations

PLAINTIFFS' EXHIBITS 000837

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

47

1    were tied up with the inspection.  So we

2    didn't have them completed, but they were

3    subsequently completed.

4         Q    Okay.  Do you know when they were

5    completed?

6         A    Various different times because

7    we're talking about multiple investigations.

8    But from what I can recall, there was a

9    concerted effort at the close of the

10   inspection to complete those investigations.

11             And we completed those and all of

12   the others that were pending that summer,

13   going into the fall.  So I would say by the

14   end of August, those were all completed.

15        Q    Okay.  The next bullet says:  "FDA

16   does not have final copies of recall letters."

17             Do you see that?

18        A    Yes.

19        Q    Was there a discussion of that at

20   the meeting of why that had happened?

21        A    Typically the minutes would reflect

22   if there was discussion.  So I don't know if

23   it's in here at all, but I don't recall.

24        Q    Okay.  The next bullet says:

PLAINTIFFS' EXHIBITS 000838

48

```
 1        "Recalls have not been issued."

 2             Do you know what that relates to?

 3        A    As I look at this, it looks like

 4   it's a recap of some of the concerns expressed

 5   over the course of the investigation.  So it

 6   doesn't necessarily reflect the state of

 7   affairs at that point in time.

 8        Q    Okay.  So the bullet point that says

 9   "Recalls have not been issued," are you saying

10   that that doesn't really reflect the state of

11   affairs as of May 20th?

12        A    Correct.

13        Q    Okay.  The next bullet says:

14   "Health hazards related to recalls are

15   delinquent."

16             What does that mean?

17        A    When you -- when there's a recall or

18   you're considering a recall or you are -- you

19   have a product that may be -- may potentially

20   be a recall, the company typically would look

21   for expert opinion, which they call a health

22   hazard assessment, as to the nature of what

23   the severity of the issue might be.  And in

24   some cases, the health hazard assessment
```

PLAINTIFFS' EXHIBITS 000839

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

49

1     will -- might even tell you that there is no

2     issue.  And it helps you to justify to FDA why

3     you may not do a recall.

4              In this particular case, we also --

5     companies would also do this because FDA is

6     the final -- makes the final determination on

7     the level of a recall, but a company would

8     typically do their own health hazard

9     assessment to try to work with FDA to minimize

10    the impact of what level of -- you know, to

11    determine what level, to talk with them and

12    get their own personal assessment.

13             So in this particular case, we had

14    done health hazard assessments on several of

15    the products that were the subject of recalls

16    that were in process; and they weren't

17    satisfied with all of the content, or some of

18    them were not timely.

19        Q     Okay.  So do you know whether one

20    was done for Digitek?

21        A     I honestly don't recall.

22        Q     Do you know who did the health

23    hazard analysis for Digitek if it was done?

24        A     If it was done, it would have been

GOLKOW TECHNOLOGIES, INC. - 1.877.370.3377

PLAINTIFFS' EXHIBITS 000840

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

50

1    done by the same group that did the others,

2    but I don't recall the name.

3        Q    Was that PAREXEL?

4        A    No.

5        Q    Okay.  Then who -- was it somebody

6    within the Actavis corporate structure?

7        A    No.  It was an outside party.  And

8    it was someone more engaged in the medical

9    field.

10       Q    Okay.  So some third party, if a

11   health hazard analysis was done for Digitek,

12   some third party outside the company would

13   have done it?

14       A    Yes.  And that is typically done

15   through -- it was requested through the

16   pharmacovigilance group at Actavis.  So an

17   Actavis representative from that

18   pharmacovigilance group, which was not part of

19   my -- part of the regulatory group, worked

20   with the consultant.  So I don't know the

21   consultant's name.

22       Q    So you also don't know whether one

23   was done at all or whether it was delinquent?

24       A    For Digitek?

PLAINTIFFS' EXHIBITS 000841

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

51

```
 1          Q     Yes.

 2          A     I don't recall.

 3          Q     Then the next bullet says:  "That

 4     you put effective Quality Systems in place."

 5                Do you see that?

 6          A     Yes.

 7          Q     And do you agree that as of May of

 8     2008, there weren't effective quality systems

 9     in place for Actavis Totowa?

10                     MR. DEAN:  Object to the form.

11                     Go ahead.

12                     THE WITNESS:  That was Erin's

13          statement.

14     BY MR. BLIZZARD:

15          Q     Okay.  Did you agree with FDA on

16     that issue?

17          A     Not necessarily, no.

18          Q     Did you agree with it at all?

19          A     I agreed that that was her view and,

20     based on what she had seen, that she had come

21     to that conclusion.

22          Q     And she was acting on behalf of FDA

23     in coming to that conclusion; correct?

24          A     Yes.
```

PLAINTIFFS' EXHIBITS 000842

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

52

1         Q     Do you see the next bullet says:

2    "Get very nervous when you tell us that you

3    are releasing product using the current

4    Quality Systems (open issues remain)."

5              Do you see that?

6         A     Yes.

7         Q     Were you nervous -- well, let me

8    stop you there.

9              Was there product still being

10   released by the Little Falls plant at this

11   period of time?

12        A     As you pointed out earlier, the

13   PAREXEL consultants were engaged the end of

14   April.  And at that point in time, we stopped

15   shipping product, end of April.  But after

16   PAREXEL came in, they were reviewing product

17   by product.  And some additional products

18   started to be released again based on the

19   PAREXEL review.

20        Q     And this -- sorry.  Go ahead.

21        A     I believe her statement here, she

22   was referring to herself --

23        Q     Right.

24        A     -- that she gets nervous that we are

PLAINTIFFS' EXHIBITS 000843

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

53

1     still releasing product.

2          Q    And she's charged with making sure

3     that US citizens receive safe drugs; correct?

4                    MR. DEAN:  Objection; calls for

5          a legal conclusion.

6                    Go ahead.

7                    THE WITNESS:  She's part of the

8          organization that does that.

9     BY MR. BLIZZARD:

10         Q    Right.

11         A    As a consumer safety officer, yes,

12    that's her job.

13         Q    And then the next one, bullet point

14    says:  "Do not fix broken Systems - get new

15    Systems.  (I can't tell you what to do but

16    start from scratch)."

17              Do you see that?

18         A    Yes.

19         Q    So you agreed with her that the

20    system was broken and needed to be fixed?

21         A    That's a very general statement.  I

22    think there were definitely systems that

23    required some improvement.  And there were

24    still systems, I think, in place that were

PLAINTIFFS' EXHIBITS 000844

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 56 of 200  PageID #: 19808
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

54

1      working.  So I would have to say I would agree

2      perhaps on some of the issues and disagree on

3      others.  It would have to be more specific.

4          Q     Which parts of the quality system,

5      both quality assurance and quality control,

6      did you think were broken and needed to be

7      fixed?

8          A     There were SOPs, I believe, that

9      needed to be perhaps put into more detail

10     regarding investigations and other things that

11     she had noted that were obviously not the ones

12     that weren't closed, et cetera, and some other

13     areas.

14           I would have to go back and really

15     look, but not -- when you referred to systems,

16     FDA's view is there's six systems; and she's,

17     I think, here not referring to the whole

18     entire company.  She's referring to the

19     systems that she's looked at.

20         Q     Right.  And she's saying that

21     they're broken and need to be fixed and you

22     should start from scratch; right?

23         A     That's her opinion, yes.

24         Q     Right.  And essentially did the

55

1   company do that?

2       A    Eventually we did do that.  We did

3   assess everything, and we did improve or put

4   new systems in place.

5       Q    So you attempted to start from

6   scratch, didn't you?

7       A    In some cases.  And in other cases,

8   we borrowed procedures from other facilities,

9   other Actavis facilities.

10      Q    And you knew early on in the process

11  of this inspection that FDA was not happy with

12  Digitek and there were things that needed to

13  be fixed; right?

14      A    No, I wouldn't say that.  The

15  inspection started sometime in March.  And I

16  don't think the Digitek issue was discussed

17  until sometime in April, so there was a month

18  of inspection before Digitek was discussed.

19      Q    Okay.  Well --

20      A    Approximately.

21      Q    -- the inspection started about

22  March 18th; correct?

23      A    Right.

24      Q    By April 9th, you knew they were

PLAINTIFFS' EXHIBITS 000846

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

56

1      unhappy with Digitek, didn't you?

2            A    I couldn't say.  I don't...

3                      (Plaintiff's Exhibit No. 107

4            was marked for identification.)

5      BY MR. BLIZZARD:

6            Q    Let me show you what I'm going to

7      hand you marked as Plaintiff's Exhibit 107,

8      which is 292438.  Do you see that this is an

9      e-mail dated April 9, 2008, at the top?

10           A    Yes.

11           Q    And is it from you?

12           A    Yes.

13           Q    And its subject is "RE:  Memo to

14     FDA."

15                Is that true?

16           A    Yes.

17           Q    And if you look down, can you tell

18     what the subject matter of this is from

19     looking at this e-mail string?

20           A    Yes.

21           Q    What is the subject matter?

22           A    It's a discussion between Chris

23     Young and myself.  Chris was the head of

24     operations.

PLAINTIFFS' EXHIBITS 000847

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

57

```
1              And the subject matter in the e-mail
2    says "Memo to FDA."  And the April 9th memo
3    that I'm referring to was a document that we
4    were preparing to give to FDA regarding
5    actions we were going to take relative to what
6    was happening with the inspection.  It
7    involved recall of other products, and it
8    involved -- what he's referring to here about
9    rationalization -- or actually what I'm asking
10   him to do is we were having discussions with
11   FDA about looking at our entire product line
12   and then streamlining it.
13             So that's the subject of what
14   started the e-mail chain, I guess.  And then
15   this note was my note again to Chris giving
16   him feedback on what was discussed.
17        Q    Okay.  So it looks like the first
18   e-mail is -- on the bottom of the page is from
19   you to Chris Young, Subject:  Memo to FDA, on
20   4/9/2008 at 11:21 a.m.; correct?
21        A    Right.
22        Q    And it asks him to write a piece to
23   insert in the memo regarding the
24   rationalization so that we can take care of it
```

PLAINTIFFS' EXHIBITS 000848

58

```
 1      at lunch today; correct?
 2           A     Correct.
 3           Q     And then about five minutes later,
 4      at 11:26 a.m., you write another e-mail;
 5      correct?
 6           A     Correct.
 7           Q     Again to Chris Young?
 8           A     It doesn't say.
 9           Q     Let's look at the top.  So what's
10      the body of the e-mail at the top say?
11           A     That's from Chris back to me; and
12      that's his answer, yes, from the previous, so
13      if you go backwards.
14           Q     So Chris responds back at 11:22,
15      about a minute after you send him the e-mail,
16      saying he'll prepare this paragraph containing
17      the rationalization; correct?
18           A     Correct.
19           Q     And then if you look, if we go up
20      top, you then send an e-mail back to somebody.
21      It's not identified here.  And it says:  "She
22      is not happy with the Digoxin.  I think it's a
23      recall on that batch.  She is not happy with
24      inspection and partial rejection/release as a
```

PLAINTIFFS' EXHIBITS 000849

Case 2:08-md-01968 Document 577-12 Filed 09/08/11 Page 61 of 200 PageID #: 19813
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

59

```
 1    practice."

 2             Is that what it says?

 3        A    Yes.

 4        Q    Do you know what that refers to?

 5        A    It refers to her review of digoxin.

 6    And the second sentence is referring to a

 7    batch that she reviewed that was the subject

 8    of the investigation.  And my view from her

 9    comments was that she felt the batch needed to

10    be recalled.

11             And then the last sentence is

12    referring to the activities related to that

13    inspection, which was an inspection and

14    partial rejection/release of a product, so the

15    fact that a batch would be inspected and then

16    only part of the batch would be released and

17    the other part would be rejected.

18        Q    So when it says "She is not happy

19    with the Digoxin," that's saying that the FDA

20    investigator --

21        A    It's referring to Erin.

22        Q    Erin McCaffery; correct?

23        A    Yes, yes.

24        Q    So the FDA investigator was not
```

PLAINTIFFS' EXHIBITS 000850

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

60

1      happy with digoxin; and you're saying, "I

2      think it's a recall on that batch"; correct?

3              A      Uh-huh.

4              Q      And then you refer to the fact that

5      she, again being the FDA investigator, Erin

6      McCaffery, is not happy with inspection,

7      partial rejection of a batch, and then release

8      of the remaining batch, part of the batch;

9      correct?

10             A      Just in general.

11             Q      Right.

12             A      In general, she doesn't like that

13     practice.  It's not -- I mean...

14             Q      In general, did you like that

15     practice?

16             A      It's an acceptable practice when

17     it's on an exception basis.  So FDA doesn't

18     like to see that as a normal course of

19     business, but there are occasions where it's

20     very much warranted.  It really depends on the

21     situation.

22             Q      Okay.  Was it warranted on this

23     occasion with respect to the Digitek

24     investigation?

PLAINTIFFS' EXHIBITS 000851

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

61

1        A    The Digitek investigation, I

2    wouldn't characterize that as a partial.  When

3    I think of a partial rejection -- well, I

4    guess it depends on how you define "partial."

5    But in my mind, "partial" means, you know, you

6    make a huge batch and you are rejecting a

7    substantial amount of that batch and then

8    releasing the rest of it.

9            In this particular case, from what I

10   recall with the digoxin, it was not a

11   substantial part of the batch that had been

12   rejected.

13       Q    Okay.  So with respect to the

14   conduct of the company on the digoxin batch

15   that is being -- was found to be partially

16   released and partially rejected, are you

17   comfortable signing off as a quality assurance

18   professional and a compliance professional

19   that that conduct was reasonable?

20               MR. DEAN:  Objection; assumes

21           facts not in evidence and misstates her

22           prior testimony.  I don't think she said

23           that there was a partial rejection and

24           release of any Digitek batch, as she

PLAINTIFFS' EXHIBITS 000852

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

62

1           defined those terms.  Now you're asking
2           her to assume there was.
3                      MR. BLIZZARD:  Well, let me
4           restate it, then.
5      BY MR. BLIZZARD:
6           Q    As a quality assurance professional,
7      are you standing by the conduct of Actavis in
8      handling the Digitek batch at issue?
9           A    I can't answer that question.  For
10     one thing, I didn't participate in the
11     activities related to that, and I wasn't
12     consulted on that matter.  And I don't know
13     the details of it, so I honestly can't answer
14     that.
15                And you make a decision based on
16     information that you have and the
17     investigation that you do.  And a lot of this
18     is a judgment call.  I can't make that
19     determination now without looking at
20     everything and determining the details of
21     that.
22          Q    So do you know who made the judgment
23     call?
24          A    I know who signed off on the

PLAINTIFFS' EXHIBITS 000853

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

63

1    investigation.

2        Q    Who signed off on the investigation

3    and made the decision to partially release it?

4                MR. DEAN:  Objection to form.

5                Go ahead.

6                THE WITNESS:  Dan Bitler, who

7        was the QA director, I believe.

8    BY MR. BLIZZARD:

9        Q    Okay.  And so you can't say whether

10   that was -- because you weren't involved and

11   you don't know all the details, you can't say

12   whether it was good judgment or bad judgment

13   on Dan Bitler's behalf; correct?

14       A    In hindsight, I may have one

15   opinion.  At the time, I would probably have

16   another.

17       Q    Okay.  At the time, what was your

18   opinion?

19       A    No.  What I'm saying is if I had

20   been consulted on the matter --

21       Q    Right.

22       A    -- I would have more detail and I

23   could make a better judgment call.

24       Q    Okay.  Do you have --

PLAINTIFFS' EXHIBITS 000854

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 66 of 200 PageID #: 19818
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

64

1            A    But I don't have the detail.  I only
2      know what was presented in the investigation
3      report that was written.  And I don't recall
4      most of that at this point in time.
5            Q    So either at the time or in
6      hindsight, can you say whether it was good or
7      bad judgment on behalf of Dan Bitler?
8            A    I really find that hard to answer.
9      And I'm not trying to be difficult.  We're
10     sitting here -- I'm sitting here in a room
11     full of lawyers, so I wish that Dan had not
12     released that batch.
13            But as a professional and looking at
14     a situation, there have been other cases where
15     product has been released under the same
16     circumstances and it's been fine and there
17     have been no issues.  And even if FDA may not
18     have been pleased with the activity, there
19     were -- it didn't result in what we're doing
20     now.
21            Q    Who did Dan Bitler report to?
22            A    Dan Bitler reported to Scott Talbot.
23            Q    And who did Scott Talbot report to?
24            A    Scott Talbot reported to me.

PLAINTIFFS' EXHIBITS 000855

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

65

1        Q    And Dan Bitler's job was what?

2        A    He was the director of QA for the

3    Little Falls site.  And the majority of his

4    job -- well, his job was all of the in-process

5    controls, all of the sampling, the group of --

6    the quality individuals that do the sampling,

7    and all of the batch-related work up to and

8    including the release of the product.

9            And Dan also handled investigations.

10   He was part of the group of people that would

11   write and approve investigations.

12       Q    Was Dan fired after this inspection?

13       A    Dan was let go.  It was not

14   characterized as fired.

15       Q    What's the difference between

16   "firing" and "letting go"?

17       A    There were changes -- there was no

18   cause.  It was not for cause.  It was a

19   restructuring.

20       Q    Okay.  So who -- so there was no job

21   left for him?

22       A    There were -- the position was

23   allocated to -- there were redundancies.  So

24   there was another QA director, and there were

PLAINTIFFS' EXHIBITS 000856

66

1    also people at other Actavis facilities that

2    filled the role.

3         Q    When was Dan Bitler let go?

4         A    I honestly don't recall.

5         Q    Who was involved in letting him go?

6         A    I believe I sat in on that

7    discussion.  It was with human resources and

8    with legal, as with most.

9         Q    And what do you recall about the

10   discussion?

11              MR. DEAN:  Let me just caution

12        you if there was actual legal advice

13        given, you shouldn't reveal that.  But as

14        far as personnel decisions, it's fine to

15        answer Mr. Blizzard's question.

16              THE WITNESS:  I can't even

17        recall the detail.  Basically, that we

18        were making changes.

19   BY MR. BLIZZARD:

20        Q    Had you known Dan Bitler before?

21        A    I had -- I knew him in terms of my

22   visits to the site, and I knew him as he

23   assisted with getting information for the

24   inspections.  That was the most interaction.

PLAINTIFFS' EXHIBITS 000857

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

67

1          Q     What was he told about being let go?

2          A     That we were making some changes and

3     that we brought some folks from the Elizabeth

4     facility in to help with lending us some of

5     the procedures that they had in place and

6     their experience in batch release, putting

7     some new procedures in place there, and

8     actually moved personnel from that facility

9     over.

10                    MR. DEAN:  Excuse me.  We've

11          been going about an hour and ten minutes.

12          If you want to go ahead for a few more

13          minutes, that's fine; but when we reach a

14          good breaking point --

15                    MR. BLIZZARD:  No.  We can take

16          a break.

17                    THE VIDEOGRAPHER:  We are now

18          going off the record.  This is the end of

19          Videotape No. 1.  The time is 10:17.

20                    (Short recess.)

21                    THE VIDEOGRAPHER:  We are now

22          back on the record.  This is the

23          beginning of Videotape No. 2.  The time

24          is 10:39.

PLAINTIFFS' EXHIBITS 000858

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

68

1    BY MR. BLIZZARD:

2        Q    Good morning, Ms. Lambridis.  We're

3    back on the record after taking a break.  Are

4    you ready to proceed?

5        A    Yes.

6                  MR. DEAN:  Excuse me.  Can we

7        get the appearance here?

8                  MR. TRAMMELL:  Fletch Trammell

9        for plaintiffs.

10                 MR. DEAN:  For which plaintiff,

11       Fletch?  Which litigation?  The MDL?

12                 MR. TRAMMELL:  MDL.

13                 MR. DEAN:  Thank you.

14                 (Plaintiff's Exhibit No. 108

15       was marked for identification.)

16   BY MR. BLIZZARD:

17       Q    When we went off the record, we were

18   talking about Dan Bitler being let go.  I've

19   now marked as Exhibit No. 108 to the

20   deposition a copy of a document that starts or

21   ends with Bates Nos. 918567.  Do you see that

22   that document on Page 1 is described as a

23   Corrective Action Plan?

24       A    Yes.

PLAINTIFFS' EXHIBITS 000859

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

69

1          Q    And is it dated August 28th, 2008?

2          A    Yes.

3          Q    And so would this have been after

4     the FDA inspection was completed?

5          A    Yes.

6          Q    During this period of time, was the

7     company still making changes designed to

8     correct problems that were identified by FDA

9     during the inspection?

10         A    Yes.

11         Q    And was this corrective action plan

12    part of that process?

13         A    Yes.

14         Q    What is -- strike that.

15              MR. WEINKOWITZ:  Hello?

16              MR. BLIZZARD:  Hey, Mike.  This

17         is Ed Blizzard.

18              MR. WEINKOWITZ:  Hey, Ed.  How

19         are you?

20              MR. BLIZZARD:  Good.  Do you

21         want to make your appearance for the

22         record?

23              MR. WEINKOWITZ:  This is Mike

24         Weinkowitz with Levin, Fishbein, Sedran &

PLAINTIFFS' EXHIBITS 000860

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

70

1          Berman, Philadelphia, Pennsylvania.

2          Thank you.

3                    MR. BLIZZARD:  Would you mind

4          putting your phone on mute?

5                    MR. WEINKOWITZ:  I'm going.

6          I'm going on mute.

7                    MR. BLIZZARD:  Thank you.

8    BY MR. BLIZZARD:

9          Q    Corrective action plans, does that

10   have a certain meaning in the quality and

11   compliance profession?

12         A    Yes.  This was a voluntary plan put

13   together to address FDA's issues.  So it was

14   considered a corrective action plan because it

15   specifically was designed to not only respond

16   to the 483 but to take it beyond that so that

17   upon reinspection the site would have a

18   successful inspection.

19         Q    So this was not only to address past

20   issues, but to make sure you didn't flunk any

21   inspections in the future?

22         A    Right.

23         Q    And the corrective action plan

24   included issues relating to Digitek; correct?

PLAINTIFFS' EXHIBITS 000861

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

71

```
 1          A    I would have to refresh my memory.
 2     Can I look through the document?
 3          Q    Well, I'm not specifically referring
 4     to this document right now.
 5          A    Oh, okay.
 6          Q    But, generally speaking, were some
 7     of the corrective actions that were taken in
 8     response to the FDA's inspection related to
 9     Digitek?
10          A    Some of them, yes.
11          Q    And if you look at Page 18571 where
12     there's a heading called "Status of
13     Organizational Changes," do you see that
14     paragraph?
15          A    Yes.
16          Q    Do you see that you're mentioned in
17     the first paragraph of the organizational
18     changes?
19          A    Yes.
20          Q    It says specifically:  "Phyllis
21     Lambridis, Vice President of US Quality &
22     Compliance, reports directly to Mr. Olafsson."
23               Is that true?
24          A    Yes.
```

PLAINTIFFS' EXHIBITS 000862

72

```
 1        Q    And Mr. Olafsson was the CEO of
 2    Actavis worldwide, wasn't he?
 3        A    No.  I believe that might be his
 4    title now, but at the time Mr. Olafsson was
 5    the deputy CEO to Robert Wessman.  Robert
 6    Wessman was the global CEO of Actavis, and
 7    Mr. Olafsson was his deputy CEO.
 8        Q    Okay.
 9        A    The change that they're referring to
10    here is that they each took a more involved
11    role in the US operations.  So Siggi became
12    the CEO of Actavis, Inc., in the US.  And then
13    because he became CEO of Actavis, Inc., I now
14    reported directly to him.
15        Q    So you reported directly to the CEO
16    of Actavis here in the United States?
17        A    Yes.
18        Q    And that was part of the
19    organizational change that was made in
20    response to the FDA inspection?
21        A    Yes.
22        Q    Also described here on the next page
23    at the top, does it talk about Dan Bitler
24    there?
```

PLAINTIFFS' EXHIBITS 000863

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

73

1          A     Yes.

2          Q     Do you see where it says:  "Dan

3     Bitler was dismissed"?

4                Do you see that?

5          A     Uh-huh.

6          Q     Is there a difference between being

7     fired and dismissed?

8          A     I think dismissed can be dismissed

9     in many different ways.

10         Q     He was dismissed and new quality

11    oversight was put in place with Tony Delicato

12    being appointed director of QA for New Jersey

13    SOD -- what's SOD?

14         A     Solid oral dose.

15         Q     -- and has QA responsibility for

16    both of Actavis' New Jersey sites.

17               Did I read that right?

18         A     Correct.

19         Q     So Tony Delicato took over Dan

20    Bitler's job at the Little Falls plant and

21    also had responsibility for the other plant as

22    well; correct?

23         A     He did -- Tony Delicato was the

24    director of QA in the Elizabeth facility.  And

PLAINTIFFS' EXHIBITS 000864

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

74

```
 1      this change actually elevated him to a level
 2      of having oversight at both facilities for all
 3      of QA.  So he didn't go directly into Dan's
 4      seat, but he took over all of the QA
 5      activities at the site.  So it was Dan's role
 6      and other QA activities.
 7           Q     Now, this corrective action plan
 8      that we're looking at was dated in August of
 9      2008; correct?
10           A     Correct.
11           Q     And you were talking about the CEOs
12      for the company at that period of time;
13      correct?
14           A     Right.
15           Q     Talking about Siggi and also Robert
16      Wessman being the worldwide CEO; correct?
17           A     Right.
18           Q     Now, there actually was a CEO in
19      April of 2008 over the Actavis Totowa that
20      was -- he resigned; correct?
21           A     There was really no CEO, single CEO.
22      The Actavis, Inc., organization had three
23      gentlemen that ran the organization.
24           Q     So this is in April of 2008 we're
```

PLAINTIFFS' EXHIBITS 000865

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

75

```
1    talking about?
2         A    When I joined up until April when
3    this change -- well, May 1st, I think, was the
4    official date that Siggi took over in the CEO
5    role.
6         Q    Okay.  So from 2007 until May 1 of
7    2008, who were the three people in charge of
8    running the operation?
9         A    Divya Patel, Steinthor Palsson, and
10   Doug Boothe.
11        Q    Doug Boothe, did you say?
12        A    Yes.
13        Q    Okay.  The second one I may need
14   help from you to spell that.
15        A    Steinthor, S-T-E-I-N-T-H-O-R.
16        Q    Okay.  And the last name is Palsson?
17        A    Palsson.
18        Q    Is that spelled like we would spell
19   Palsson here in the United States or are there
20   two Ss?
21        A    I can't recall.  I think there might
22   be two Ss, but I don't -- I don't remember.
23        Q    Now, as of May of 2008, were any of
24   those people allowed to continue to run the
```

PLAINTIFFS' EXHIBITS 000866

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

76

1      company?

2                     MR. DEAN:  Objection to the

3          form.

4                     Go ahead.

5                     THE WITNESS:  In May, Divya was

6          given new responsibilities and was head

7          of the R&D -- his new role was head of

8          R&D, research and development.

9      BY MR. BLIZZARD:

10         Q    How about Doug Boothe?

11         A    Doug Boothe now reported to Siggi

12     along with the rest of the management team.

13         Q    Okay.  So he stayed on with the

14     company and reported to Siggi?

15         A    Yes.  We all now reported in to

16     Siggi.

17         Q    Okay.  But Doug Boothe stayed with

18     the organization?

19         A    Yes.

20         Q    Until when?

21         A    I believe he's still there.

22         Q    And Mr. Palsson, did he stay with

23     the organization?

24         A    He did stay with the organization.

PLAINTIFFS' EXHIBITS 000867

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

77

 1    He is still employed; but at some later date,

 2    he did return to Iceland in a new role.

 3         Q    And Divya Patel, did he stay with

 4    the organization?

 5         A    No.  Divya was there until August.

 6         Q    Of 2008?

 7         A    I believe it was August 2008.

 8         Q    And then what happened then?

 9         A    Divya left the company, and Doug

10    Boothe became the CEO of Actavis in the US.

11         Q    Now, Divya Patel, do you know what

12    his involvement in Actavis was -- strike that.

13              Do you know what Divya Patel's

14    involvement was with the predecessor to

15    Actavis and then continuing into Actavis?

16         A    I'm not sure what you mean by

17    "predecessor to Actavis."

18         Q    Do you know that Actavis purchased

19    Amide or Amide Pharmaceuticals?

20         A    Yes.

21         Q    And do you know what Divya's role

22    at -- how do you pronounce that?

23         A    Amide.

24         Q    -- Amide Pharmaceuticals was?

PLAINTIFFS' EXHIBITS 000868

78

```
 1            A     I don't know his title, but he was
 2      an owner of that pharmaceutical company.
 3            Q     And was that pharmaceutical company
 4      essentially a family-owned business?
 5            A     Yes.
 6            Q     And were there a number of Patel
 7      family members employed by the company?
 8            A     Yes.
 9            Q     And did a number of those family
10      members stay on once Actavis bought out Amide
11      Pharmaceuticals?
12            A     Yes.
13            Q     And which Patels are you familiar
14      with that continued to stay on and work for
15      Actavis after the acquisition of Amide
16      Pharmaceuticals, which Patel family members?
17            A     Divya, Apurva, A-P-U-R-V-A.
18            Q     Okay.  You've told us what Divya's
19      position was.  What was Apurva's position?
20            A     Apurva, at the time that I was
21      employed, Apurva was in manufacturing
22      operation at the Little Falls facility, so he
23      was -- I believe he was in charge of
24      manufacturing operations.
```

PLAINTIFFS' EXHIBITS 000869

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

79

1          Q     And were there any other Patels that
2     were involved -- any family members of the
3     Patel family who stayed on after the
4     acquisition of Amide Pharmaceuticals and
5     worked for Actavis?
6          A     I cannot recall her first name in
7     both cases.  There was a sister with a
8     different last name -- she had a married name.
9     I can't remember what it was -- employed in
10    the legal department.  And his mom, I think it
11    was Nila Patel.  I'm not sure.  She was
12    employed at the Little Falls facility in more
13    of an office manager's role.
14         Q     Now, following the FDA inspection
15    and through the time that you worked at the
16    company, did any of these, the Patel family
17    members, stay on with the company?
18         A     Up until I left, I believe the only
19    person that was still employed was the sister.
20         Q     That was in the legal department?
21         A     Correct.
22         Q     Okay.  Now, back at the time that
23    this inspection was going on in April of 2007,
24    did you communicate with Divya Patel about

PLAINTIFFS' EXHIBITS 000870

80

1     what products should be fixed in what order?

2          A    We talked about what products needed

3     to be addressed in terms of reintroduction

4     because we were discontinuing product as a

5     result of some of the activities.

6               We had some discussion about the

7     recalled products and what needed to be done

8     to enable us to market them.  Again, that was

9     the initial part of that discussion.

10         Q    And was Digitek among the recalled

11    products?

12         A    Yes.  Well, the first recall didn't

13    involve -- the first group of products that

14    were recalled, Digitek was not -- Digitek

15    stood alone.  It was handled in a different

16    manner because we did not market that product.

17    It was marketed by another company.

18         Q    Okay.  And that other company was

19    Mylan?

20         A    Correct.

21         Q    So the recall that was done for

22    Digitek was handled separately because of

23    Mylan's involvement; correct?

24         A    And because we had already committed

PLAINTIFFS' EXHIBITS 000871

81

1      to a group of products that were going to be

2      recalled, and that was already underway when

3      the Digitek issue was raised.

4           Q    And that recall for the other

5      products that you mentioned was a Class 2

6      recall; correct?

7           A    I believe so.

8           Q    And then the Digitek recall was a

9      Class I recall?

10          A    Yes.

11          Q    And a Class I recall reaches to the

12     consumer level; is that right?

13          A    Correct.

14          Q    And the reason for that is potential

15     health hazard for people who are continuing to

16     take it; correct?

17          A    Usually.  It's the severity of the

18     issue.  There's criteria that needs to be met.

19          Q    Right.  But there was discussion at

20     time, at some time, wasn't there, about

21     whether or not to reintroduce Digitek?

22          A    There was discussion with Mylan

23     regarding wanting to reintroduce Digitek.

24          Q    Okay.  And when did that occur?

PLAINTIFFS' EXHIBITS 000872

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

82

1           A     I couldn't give you an exact time,
2      but sometime after the recall.
3           Q     Who was the discussion between?
4           A     I didn't participate in those
5      discussions.
6           Q     Do you know who did on behalf of
7      Actavis?
8           A     No, I don't.
9           Q     Do you know who did on behalf of
10     Mylan?
11          A     No.
12          Q     Did you have any interaction with
13     people at Mylan about Digitek?
14          A     The interaction that I had with
15     Mylan on Digitek was regarding the execution
16     of the recall.
17          Q     And who was it at Mylan that you
18     interacted with about execution of the recall?
19          A     Michael.  I don't recall his last
20     name.  He was a quality -- in a similar role
21     as I, in quality.
22          Q     Could it have been Michael Adams?
23          A     That sounds familiar.
24          Q     About how many occasions did you

PLAINTIFFS' EXHIBITS 000873

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

83

1       have interaction with Michael Adams about the

2       recall?

3               A       There were several back-and-forth

4       phone calls mainly to work on the press

5       release, different iterations, and the recall

6       letter and whatever else, correspondence that

7       was needed.  It was several phone calls or

8       actually just several days at one point in

9       time.

10              Q       And you don't know what time period

11      this is likely these calls took place?

12              A       End of April.

13                       (Plaintiff's Exhibit No. 109

14              was marked for identification.)

15      BY MR. BLIZZARD:

16              Q       Now, I want to show you what I've

17      marked as Exhibit 109 to your deposition.  And

18      it's a document that has ending numbers

19      475895.

20                       Do you see that this is an e-mail

21      from you on April 10, 2008?

22              A       Yes.

23              Q       And it's to Chris Young, who was

24      head of operations at the time?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

84

```
1          A     Yes.
2          Q     And Doug Boothe, who was one of the
3     people running the company?
4          A     Yes.
5          Q     And Divya Patel, who was another
6     person running the company; correct?
7          A     Correct.
8          Q     And Apurva Patel, who was Divya's
9     brother and who was head of manufacturing;
10    right?
11         A     Yes.
12         Q     And what does the first -- what do
13    the first two sentences say?
14         A     "Attached are the color coded
15    product lists provided to FDA.  For the
16    products that we want to stop and fix can you
17    give me a first pass on the order of priority
18    that you would like them assessed."
19         Q     Okay.  And is this where you
20    actually took a look at the products or listed
21    the products that were going to be recalled
22    and asked the management of the company to
23    give you some idea of whether they had a
24    priority for how the products were reassessed?
```

PLAINTIFFS' EXHIBITS 000875

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

85

1           A     Can you say that again, just repeat

2     it?

3           Q     Let me ask a different question.

4                 Do you see where it says "For the

5     products that we want to stop and fix" -- do

6     you see that?

7           A     Yes.

8           Q     -- "can you give me a first pass on

9     the order of priority that you would like them

10    assessed."

11                So were you asking these management

12    people to give you some idea of the priority

13    order for reassessing these products that you

14    were going to stop and fix?

15          A     Yes.  I can explain if I can just

16    put it into context.

17          Q     Sure.

18          A     At this point in time, there were,

19    as I had mentioned before, a group of products

20    that we were recalling.  There were several

21    things going on.  If you refer back to this

22    memo --

23                      MR. DEAN:  "This" being 107?

24                      THE WITNESS:  -- 107 exhibit,

PLAINTIFFS' EXHIBITS 000876

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

86

1          we made some commitments to FDA to recall

2          product.  And that was outlined in a memo

3          that was given to the Agency.

4                    In addition to that, we

5          agreed -- because those recalls were full

6          recalls, so they involved taking all of

7          the product for those products off of the

8          market, they were affectionately known as

9          the stop-and-fix products.

10                    So the plan at the time was

11          to -- at least we had stopped obviously

12          manufacturing and shipping them.  And the

13          plan at the time was to evaluate them to

14          determine whether they would be

15          reintroduced and what would be needed

16          before they could be reintroduced.

17                    And the reason for that is

18          because in some cases there were

19          method-related issues or issues that

20          could improve the product that may --

21          would require a lot of resources or FDA

22          review that would be a lengthy review.

23          So it was a business decision as to

24          whether they were worth spending the time

PLAINTIFFS' EXHIBITS 000877

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

87

1           as opposed to spending that time and
2           resource elsewhere.
3                       So that's the context of what's
4           there.  So one of the things that we
5           presented to FDA, again back to the
6           Exhibit 107, on April 9th, the memo
7           that's referred to here, this FDA memo,
8           we committed to recalls of those
9           products; but we also were doing this
10          rationalization.
11                      So that list consisted of the
12          products, these stop-and-fix products,
13          and then other products that we were, for
14          business reasons, most likely going to
15          discontinue, and then the products that
16          would remain.
17     BY MR. BLIZZARD:
18          Q    Okay.  I think I understand.  So
19     what you're saying is there were these
20     products that the company was -- we're calling
21     stop-and-fix products, and digoxin was not a
22     stop-and-fix product?
23          A    No.
24          Q    But if you look at Exhibit -- if we

PLAINTIFFS' EXHIBITS 000878

Case 2:08-md-01968   Document 577-12   Filed 09/08/11   Page 90 of 200 PageID #: 19842
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

88

1    go back to Exhibit 107, I think, which is

2    Page 292438, and at the top, that exhibit

3    you're referring to, Exhibit 107, is dated

4    April 9, 2008.

5              And actually, while it may not have

6    been a stop-and-fix product, it was a

7    we-ain't-so-happy-with-it product at that

8    time, wasn't it?

9         A    Correct.

10        Q    And you knew FDA was not happy with

11   it; right?

12        A    Yes.

13        Q    And did the company ever try to fix

14   Digitek?

15        A    No.

16        Q    Do you know why the company never

17   tried to fix it and put it back on the market?

18        A    I -- digoxin was a high-volume

19   product that took a lot of resource away from

20   other things.  And it was a product that they

21   were manufacturing for someone else and not

22   necessarily for themselves.

23             So I think there was partly a

24   business issue and partly a resource issue.

PLAINTIFFS' EXHIBITS 000879

Confidential – Subject to Further Confidentiality Review

89

1    Efforts to reintroduce a product were put into

2    the products that were owned by Actavis.

3         Q    Okay.  So no attempt was ever made

4    to see if the Digitek manufacturing issues or

5    the Digitek quality issues could be fixed?

6         A    Correct.

7         Q    Do you know if PAREXEL ever did a

8    risk assessment on Digitek?

9         A    I don't think so.  PAREXEL did not

10   do a risk assessment on any of the products

11   that were recalled if I remember correctly.

12   The efforts were engaged mainly to look at the

13   product that was still on the market.

14        Q    Now, the inspection, this FDA

15   inspection we've been talking about all

16   morning, it started on March the 18th of 2008;

17   correct?

18        A    Correct.

19        Q    Who was Anthony Castellazzo?

20        A    He was a QA director that reported

21   in to Scott Talbot at the -- he was actually

22   located at the Riverview facility in the same

23   Actavis Totowa site.

24        Q    Okay.  So he reported to Scott

PLAINTIFFS' EXHIBITS 000880

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

90

1    Talbot at an Actavis Totowa site.  He was in

2    quality?

3         A    Yes.

4         Q    And what was his specific job in

5    quality?

6         A    As I said, he was hired as a QA

7    director.  His role was at the Totowa site,

8    which is Riverview.  This was the building

9    that was -- there was an effort underway to

10   move the operations from the Little Falls

11   facility on Main Street to the new site at

12   Riverview.  So his role was mainly at that

13   facility, and he was preparing that site for

14   the subsequent transfer.

15                  (Plaintiff's Exhibit No. 110

16        was marked for identification.)

17   BY MR. BLIZZARD:

18        Q    I'm going to show you what I'm going

19   to mark as Exhibit No. 110 to your deposition.

20   And this is a document with Bates numbers

21   ending 542861.

22        A    Okay.

23        Q    What is Exhibit 110?

24        A    A series of organizational charts.

PLAINTIFFS' EXHIBITS 000881

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 93 of 200 PageID #: 19845
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

91

```
 1        Q    And if you look over on the third
 2   page that starts 542863, does it show you're
 3   the head of Actavis US quality and compliance?
 4        A    Yes.
 5        Q    And if you look at the following
 6   page, does it show Tony Castellazzo on it?
 7        A    Yes.
 8        Q    And does it show that his job, at
 9   least as of the time of this organizational
10   chart, was qualification and remediation?
11        A    Yes.
12        Q    And what is qualification and
13   remediation?
14                  MR. DEAN:  Excuse me.  I think
15        it says "remedication."
16                  MR. BLIZZARD:  I think it does,
17        too, but I'm not sure that that's what it
18        means.
19                  MR. DEAN:  I'm not sure that's
20        right, but that's what it says.
21   BY MR. BLIZZARD:
22        Q    Let me ask the expert.  What's that
23   supposed to say?
24        A    It was meant to be "remediation."
```

PLAINTIFFS' EXHIBITS 000882

92

1          Q    So what was the job of qualification
2     and remediation?
3          A    These charts don't have a date, but
4     they appear to reflect the organization after
5     Doug Boothe was CEO.  So this is later in
6     2008.
7          Q    Right.  This also was after Dan
8     Bitler was let go or dismissed also, wasn't
9     it?
10         A    Yes.  And so when you --
11                  MR. DEAN:  The question was:
12          What is qualification and remediation?
13                  THE WITNESS:  Right.  So -- oh,
14          well, I'm getting there.
15                  MR. DEAN:  Okay.
16                  THE WITNESS:  By this point in
17          time -- again, Tony Castellazzo was hired
18          as a QA director for the Riverview site.
19          The purpose of the inspection was to move
20          everything into the Riverview site.
21                  So part of his initial
22          responsibility was the qualification of
23          that site, which was ongoing.  And what
24          had occurred by this point in time is

PLAINTIFFS' EXHIBITS 000883

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

93

1              because that we had stopped manufacturing

2              and there was other work, he was given a

3              role in what we called remediation, which

4              was he was assisting now with all of the

5              activities related to the Little Falls

6              product line and all of the activities to

7              get ready for reinspection.

8        BY MR. BLIZZARD:

9              Q    Okay.  Did he -- right before the

10       FDA inspection, do you recall him writing an

11       e-mail to you accusing you of being disengaged

12       from your work?

13             A    Yes.

14                  (Plaintiff's Exhibit No. 111

15             was marked for identification.)

16       BY MR. BLIZZARD:

17             Q    Let me show you what's marked as

18       Exhibit No. 111.  It's Document No. 609595.

19       It actually starts with Page No. 94, but we'll

20       start discussing it over on Page 95.

21                  Do you see that there's an e-mail --

22       the first e-mail is dated March 16, 2008, at

23       5:40 p.m. from Anthony Castellazzo to you?

24             A    Yes.

PLAINTIFFS' EXHIBITS 000884

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

94

 1          Q     Do you have a specific memory of

 2     this e-mail?

 3          A     Yes.

 4          Q     Why?

 5          A     I was just surprised that, given his

 6     level, that he would write such an e-mail to

 7     me, the tone of it.

 8          Q     What do you mean by that?

 9          A     Just questioning the -- I just was

10     offended by it actually.

11          Q     He had not attended any school for

12     diplomacy?

13          A     Exactly.  And he tended to be a

14     little -- blowing things out of proportion.

15          Q     So he says here:  "For reasons which

16     I can't confirm, you and I are not

17     communicating and that's troubling.  I was

18     surprised that you weren't able to call into

19     Friday's FDA readiness meeting given it's

20     apparent urgency."

21                Now, was this meeting a meeting that

22     was being conducted in preparation for the FDA

23     inspection that we've been talking about?

24          A     Yes.

PLAINTIFFS' EXHIBITS 000885

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

95

1        Q    He then says:  "Perhaps the FDA is

2   not coming on Monday, but next week" -- "but

3   next week and thus the meeting lacked the

4   sense of urgency for you.  If that's the case,

5   that's information the group should know.  I

6   found it rather curious that in your absence

7   you would ask Dan Bitler rather than me to run

8   the meeting.  Not to mention that the director

9   of technical services called the initial

10  meeting."

11            Then in the next paragraph, does he

12  say:  "I may be reading too much into this,

13  but your behavior of late strikes me as

14  someone who has disengaged themselves from the

15  process, and as a result given the impression

16  that you may have alternative plans.  I hope

17  your not going to throw in the towel so soon."

18            Was there -- how long had there been

19  meetings in preparation for this FDA

20  inspection?

21       A    There were several weeks of

22  meetings, so this would not have been the

23  first.

24       Q    And was there discussion in some of

PLAINTIFFS' EXHIBITS 000886

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

96

1   these meetings leading up to the FDA

2   inspection that there were problems within the

3   quality system?

4        A    No.   Tony was very frustrated in the

5   fact that he was hired actually prior to when

6   I started, so he was on board before

7   September 2007 and had been waiting anxiously.

8   So his references are mostly about getting the

9   product moved over to the other facility and

10  some of the issues related to delays in that

11  occurring.

12       Q    But when he says "throw in the

13  towel," doesn't that suggest that there were

14  problems such that people might want to give

15  up?

16                 MR. DEAN:   Objection; calls for

17            her to speculate as to what was in his

18            mind.

19  BY MR. BLIZZARD:

20       Q    Do you know what he was referring to

21  when he said "throw in the towel"?

22       A    It was mostly frustration from

23  getting cooperation to get things up and

24  ready.   It was not necessarily referring to

PLAINTIFFS' EXHIBITS 000887

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

97

1    systems and practices because his engagement

2    in his role was not in the day-to-day

3    activities going on at the Little Falls site.

4         Q    And did you write a response to him?

5         A    Yes.

6         Q    And is that the e-mail that's on

7    Page 1 of this document, which is dated

8    Monday, March 17th, 2008?

9         A    Yes.

10        Q    And is this the actual day before

11   the inspection started?

12        A    Yes.

13        Q    And if you look at the second

14   paragraph -- actually, you start out this

15   e-mail saying:  "While the FDA inspection at

16   Riverview is important it is only one of the

17   many urgent issues I need to attend to."

18        A    Yes.

19        Q    What other urgent issues were you

20   having to attend to at that time?

21        A    I was head of all the US sites, so

22   there were multiple sites within my purview of

23   responsibility that were scattered along the

24   East Coast.

PLAINTIFFS' EXHIBITS 000888

Confidential – Subject to Further Confidentiality Review

98

1                    And in addition to that, there were
2          third-party manufacturers that we did business
3          with that manufactured product for us.  So I
4          also had a group that had oversight of that.
5          So there were things I was dealing with every
6          day, not just that one site.
7                Q    If you look at the beginning of the
8          second paragraph, what does it say there?
9                A    "My behavior of late," is that the
10         paragraph?
11               Q    Yes.
12               A    "'My behavior of late' is a result
13         of being exhausted, both physically and
14         mentally.  In case you are not aware we just
15         had a major recall for one of our most
16         important products.  This was a huge
17         distraction and took up a lot of my time.  It
18         unfortunately could not be avoided.  I
19         recognize that I have not had a lot of time to
20         spend in Riverview.  I am offended by your
21         comment about being disengaged.  I spent two
22         weeks at Corium during their FDA inspection
23         and countless hours both in the office and at
24         home working on the recall, investigations,

PLAINTIFFS' EXHIBITS 000889

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

99

1    and various other projects.  Your perception

2    is wrong."

3         Q    Okay.  So you were sort of setting

4    him straight that you were working hard at the

5    job responsibilities that you had at the time?

6         A    Correct.

7         Q    And they involved not just the

8    Riverview facility but other facilities;

9    correct?

10        A    Correct.

11        Q    They involved not just recalls at

12   the Little Falls plant, but they involved

13   other recalls; right?

14        A    Well, at this particular time there

15   were no other recalls.

16        Q    And you indicated to him, kind of

17   candidly, that you were -- that this work that

18   you were engaged in at that time had caused

19   you to be exhausted both physically and

20   mentally?

21        A    Yes.

22        Q    Now, after the inspection which

23   lasted, again, between March 18th and the

24   closeout on May the 20th of 2008, was there a

PLAINTIFFS' EXHIBITS 000890

Case 2:08-md-01968 Document 577-12 Filed 09/08/11 Page 102 of 200 PageID #: 19854
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

100

1     list of responsibilities assigned to various

2     members of the Actavis team?

3          A    There were many lists.

4          Q    I may just show you one of them, but

5     let me just ask you before we get to the list,

6     I want to talk about your responsibilities

7     following the FDA inspection.  Were you

8     responsible for putting together the

9     corrective action plan?

10         A    Yes.

11         Q    Were you responsible for designing

12    the stability plan?

13         A    That does not sound familiar.

14         Q    Okay.  Were you responsible for

15    establishing a compendial review system?

16              MR. DEAN:  Was that

17         "compendial"?

18              MR. BLIZZARD:  Yes.

19              MR. DEAN:  Okay.  Thank you.

20              THE WITNESS:  There was

21         discussion about that, but that was not

22         within the context of the inspection.

23    BY MR. BLIZZARD:

24         Q    Okay.  Well, whether it was part of

PLAINTIFFS' EXHIBITS 000891

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

101

1      the inspection or not, did you have that

2      responsibility following the inspection?

3            A     It would fall in my area.

4            Q     Were you involved in developing a

5      laboratory strategy?

6            A     Yes.

7            Q     Were you responsible for designing

8      the format for weekly reports to FDA?

9            A     Yes.

10           Q     Were you responsible for preparing

11     the response to the FDA 483?

12           A     Yes.

13           Q     Were you responsible for putting in

14     place a universal recall process?

15           A     The only thing I -- yes, but I want

16     to just clarify that, not me personally, but

17     it would fall in my area of responsibility.

18     So it would be done by -- it would be

19     delegated to the appropriate person in my

20     group, in the quality group.

21           Q     Were you responsible for

22     preparing -- for putting in place -- for

23     finalizing the quality organization for

24     Totowa?

PLAINTIFFS' EXHIBITS 000892

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

102

1        A    Yes.

2        Q    Were you responsible for refresher

3   GMP training for employees who were involved

4   in manufacturing or in the quality group?

5        A    Yes.

6        Q    Were you involved in or responsible

7   for the risk review of products remaining on

8   the market?

9        A    Involved in I would say, yes.

10        Q    Were you responsible for doing the

11   protocol for the risk assessments that were

12   going to be done for products remaining on the

13   market?

14        A    That was really -- that protocol was

15   designed by the consultant team, PAREXEL.  So

16   my role would have been in approving that.

17        Q    Were you also involved in

18   establishing the analytical remediation group?

19        A    Yes.

20        Q    And were you responsible for

21   establishing the strategy for evaluation of

22   test methods?

23        A    That would have been shared with the

24   other function because I don't have that

PLAINTIFFS' EXHIBITS 000893

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

103

1    expertise.  We had called in help from the R&D

2    group for that.

3                    (Plaintiff's Exhibit No. 112

4        was marked for identification.)

5    BY MR. BLIZZARD:

6        Q    I'm going to show you what I've

7    marked as Exhibit No. 112 to your deposition,

8    which is Document 1863647.

9                Could you tell me what this appears

10   to be?

11       A    I'm not familiar with this document.

12       Q    Okay.  Do you see where it's

13   entitled, at least on the first page, "Totowa

14   FDA Audit"?

15       A    Yes.

16       Q    And there's a list of people on the

17   first page.  And you're one of the people

18   listed; correct?

19       A    Yes.

20       Q    It looks like a spreadsheet format,

21   doesn't it?

22       A    Excel spreadsheet, it looks like.

23       Q    And it says "Who Attended Meeting,"

24   and then it has a list of dates for the

PLAINTIFFS' EXHIBITS 000894

104

1      meetings and either a "yes" or a "no" next to

2      each; correct?

3              A    Correct.

4              Q    And it looks like that you --

5      looking at the dates, were these meetings with

6      FDA?

7              A    The only one that I can see that was

8      reflective of a meeting with FDA is the 20th,

9      which was the day that they issued the 483.

10             Q    Okay.

11             A    I think it was intended to be

12     reflective of internal meetings.

13             Q    Okay.  So it shows for the meetings

14     on May 17th, May 18th, May 19th, May 20th, and

15     another meeting on May 20th, it looks like you

16     attended them all; correct?

17             A    Correct.

18             Q    And then if you look at the --

19     beginning on the fifth page of this document,

20     which is Page 51, is there a list of what

21     appears to be who's responsible for what, who

22     will do what, the project area, and action

23     list as part of this Excel spreadsheet?

24             A    Yes.

PLAINTIFFS' EXHIBITS 000895

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

105

1          Q     Okay.  And I'm not going to go

2     through each of these, but does -- the first

3     one on Line 10, it says:  Project area, FDA

4     communication; category, CAPA; Who is you;

5     correct?

6          A     Correct.

7          Q     And then it says:  "Put together an

8     overall Corrective Action Plan that outlines

9     our commitments, action items and the

10    activities we will engage in to address FDA's

11    concerns."

12              Do you see that?

13         A     Correct.

14         Q     And that was one of the

15    responsibilities that you had; is that true?

16         A     Yes.

17         Q     And if you just kind of flip through

18    the remainder of the document, does it appear

19    that you were in this document, at least

20    according to this document, assigned other

21    responsibilities that we discussed here?

22         A     Yes, I was assigned other

23    responsibilities.

24              Was that your question?

PLAINTIFFS' EXHIBITS 000896

Confidential – Subject to Further Confidentiality Review

106

1      Q    Yes.  And some of those we've

2   discussed a minute ago, such as developing a

3   laboratory strategy and other things?

4      A    Yes.

5      Q    Now, this document, although you're

6   not familiar with it, it obviously was

7   prepared after the FDA inspection; correct?

8      A    No.  Actually, it was before because

9   the FDA inspection ended on May 20th.

10     Q    So it was prepared sometime before

11  the inspection ended?

12     A    Yes.

13     Q    Now, did you meet with FDA on a

14  number of occasions in connection with their

15  inspection at Actavis that we've been

16  discussing today?

17     A    I hosted the inspections if that's

18  what you're referring to.  I was present when

19  FDA was on-site.

20     Q    When you say "hosted the

21  inspections," I'm thinking of coffee and tea.

22     A    Yes, coffee and tea, I wish.

23     Q    No cake?

24     A    I was the point person for that

PLAINTIFFS' EXHIBITS 000897

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

107

1    inspection.

2         Q    And how many different meetings do

3    you recall?

4         A    She was on-site --

5                   MR. DEAN:  "She" being Erin?

6                   THE WITNESS:  -- Erin, from

7         March 18th until May 20th, but not every

8         day.  So I don't know how many days of

9         actual visits there were.

10   BY MR. BLIZZARD:

11        Q    Have you ever heard of an EIR

12   before?

13        A    Yes.

14        Q    What is an EIR?

15        A    An EIR is an establishment

16   inspection report.  And it's the report

17   written by the lead investigator for any FDA

18   inspection.  It's their internal report that

19   they write to their management.

20        Q    I'm going to hand you what I think

21   has previously been marked as Plaintiff's

22   Exhibit No. 91.  And it doesn't actually have

23   a Bates number on it because we obtained this

24   through a request to the FDA under the Freedom

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

108

```
 1      of Information Act.  So I'm showing you what
 2      we received from FDA.
 3              Have you ever seen the EIR for the
 4      inspection that was done by FDA of Actavis
 5      between March 18th, 2008, and May 20th, 2008?
 6          A    No.
 7          Q    If you look down at the summary on
 8      the bottom of the first page, do you see where
 9      it says in the middle of the first paragraph:
10      "The inspection provided general GMP
11      coverage"?
12          A    Yes.
13          Q    What does that mean?
14          A    That was the type of category of the
15      inspection.
16          Q    So it says right after that:
17      "Preapproval coverage was planned but not
18      conducted."
19              What's the difference between
20      preapproval coverage and GMP coverage?
21          A    Preapproval is used in many
22      different contexts.  In this particular case,
23      it was -- the inspection was held at the
24      Riverview facility.  And that, as I had
```

PLAINTIFFS' EXHIBITS 000899

109

```
1    mentioned earlier, was a new building that we
2    were planning to move into.
3              So the context of that inspection
4    was to come in and give a preapproval of that
5    facility so that we could move into it.  So
6    that's the preapproval part of it.  And as
7    part of any preapproval inspection, they also
8    do a GMP inspection.
9         Q   Okay.  So what this was
10   originally -- was this originally a
11   preapproval inspection, but it turned into a
12   GMP inspection?
13        A    It was originally a preapproval
14   inspection which would have included GMP, but
15   we -- she started doing the GMP portion of it,
16   and we never got to the preapproval portion of
17   it.
18        Q   If you look over on the next page,
19   Page 2, you see where it says beginning on
20   the -- I guess it's the first full sentence on
21   that page, "The previous inspection"?
22              Do you see that sentence?
23        A    Yes.
24        Q   The previous inspection of the
```

PLAINTIFFS' EXHIBITS 000900

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

110

1    Little Falls, New Jersey, facility provided

2    coverage of the quality, production,

3    laboratory control, materials and facilities

4    and equipment systems.  Deficiencies were

5    documented in the areas of field alerts, the

6    stability testing program, and investigations.

7                And then the last sentence says:

8    Corrections were promised for all

9    observations.  The inspection was classified

10   as -- is that a VAI?

11        A    Yes.

12        Q    What is VAI?

13        A    Voluntary action indicated.

14        Q    So that refers to a previous

15   inspection of the same facility; is that true?

16        A    Actually, it's an inspection of the

17   Little Falls facility on Main Street, not the

18   Riverview facility, but it's all Actavis

19   Totowa.

20        Q    Okay.  So it was an inspection of

21   the Little Falls plant?

22        A    Yes.

23        Q    Were you involved at all in that

24   inspection?

PLAINTIFFS' EXHIBITS 000901

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

111

1          A     That inspection took place just
2     prior to my arrival, so it was in process when
3     I started with Actavis.  And my only
4     involvement was to attend again the closeout
5     meeting that they held at the completion of
6     that inspection.
7          Q     Did you actually -- were you
8     provided with any of the 483 materials so that
9     you could be familiar with the issues at the
10    plant going forward?
11         A     Yes.
12         Q     So you were familiar with what
13    findings had been made in 2006 regarding the
14    Little Falls facility in the 483 inspection?
15         A     No.  This was 2007.  This inspection
16    that I'm referring to was September of 2007.
17         Q     Okay.  So did you know about an
18    inspection in 2006 of the Little Falls
19    facility?
20         A     Yes.
21         Q     And when did you learn about that?
22         A     Actually, I was aware of it prior to
23    joining the company.
24         Q     How so?

PLAINTIFFS' EXHIBITS 000902

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

112

1           A      Because they had been issued a

2      warning letter, and just normal surveillance

3      as part of my job.  I know -- I keep up on

4      what's going on with other companies, and it's

5      in the news --

6           Q      So was it --

7           A      Trade press.

8           Q      I'm sorry.

9           A      Sorry.  That's okay.

10          Q      So that was part of your role as a

11     consultant or while you were working for

12     another company?

13          A      No.  It was just knowledge I had

14     prior to joining.

15          Q      Okay.  So you saw the warning letter

16     that was issued in 2006 to Actavis regarding

17     the Little Falls facility?

18          A      Yes.

19          Q      And that was as an industry

20     observer, I guess?

21          A      Correct.

22          Q      Did you do any further research on

23     that subject when you arrived at the company?

24          A      No.

PLAINTIFFS' EXHIBITS 000903

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

113

1          Q     Did you do any review of the 483 or

2     any of the other documents that were generated

3     following that inspection about the

4     observations that had been made by FDA?

5          A     In which inspection are you

6     referring to?

7          Q     The 2006 inspection.

8          A     No.

9          Q     So did you ever review the company's

10    response to the warning letter?

11         A     I may have at a later date.  My

12    joining in September of 2007 -- that was the

13    follow-up inspection to that warning letter.

14    So the context of what's written here, she --

15    what typically happens in any of these reports

16    is they will refer back to the prior

17    inspection.  So what happened here was they

18    had another reinspection as a result of that

19    warning letter.  And this is the point in time

20    where they were classified as "voluntary

21    action indicated," so the warning letter was

22    lifted.

23         Q     So essentially what happened was the

24    inspection -- the warning letter was issued in

PLAINTIFFS' EXHIBITS 000904

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

114

1    2006, and then there was a follow-up

2    inspection in 2007 immediately before you

3    started to work for the company?

4         A    It started before I joined, yes.

5         Q    So then if we go to the next

6    paragraph, this paragraph is referring to the

7    2008 inspection; correct?

8         A    I'm sorry.  Which page?

9         Q    Page 2.  I'm sorry.  Next paragraph.

10        A    Yes.

11        Q    Okay.  So it says:  This inspection

12   was limited to coverage of the quality system

13   due to significant CGMP deficiencies including

14   but not limited to out-of-specification

15   in-process, finished product, and stability

16   results for more than -- and somebody's

17   redacted the number -- prescription

18   pharmaceutical products; release of digoxin

19   tablets, .125 milligrams, Lot 70924A2,

20   following visual inspection of the -- and then

21   there's another word blacked out -- to remove

22   double thick tablets; failure of the quality

23   unit to reject products not meeting

24   specifications, to complete quality assurance

PLAINTIFFS' EXHIBITS 000905

Confidential – Subject to Further Confidentiality Review

```
 1        investigations, to expand investigations to
 2        other lots and products, to file NDA field
 3        alerts within time frames, and to respond to
 4        out-of-specification products on the
 5        marketplace.  Analytical methods requiring
 6        remediation remained in use and
 7        approximately -- the number is blacked out --
 8        prescription drug products had no analytical
 9        evaluations of impurities on stability.
10        Written procedures were not followed and
11        changes with potential product quality impact
12        were not all reviewed and approved by the
13        quality unit.  No market action was taken by
14        the quality unit for any products on the
15        market at the initiation of the inspection,
16        despite the confirmed out-of-specification
17        in-process, finished product, and stability
18        results.
19               Now, was that what the general
20        description of the inspection in March of 2008
21        was about?
22        A     Description of the outcome of the
23        inspection.
24        Q     And it says -- in the sentence just
```

PLAINTIFFS' EXHIBITS 000906

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

116

1    after what we just read, does it say:  "No

2    comprehensive risk assessment or quality

3    evaluation for all products on the market was

4    conducted by the firm's Quality Unit prior to

5    completion of the inspection"?

6              Is that what it says?

7        A    Yes.

8        Q    And is that true?

9        A    Yes.

10       Q    Okay.  If you go over to Page 3, do

11   you see where there's a description beginning

12   on the bottom of the page:  "On 3/18/08, I,

13   Investigator Erin McCaffery"?

14             Do you see that?

15       A    Yes.

16       Q    And do you see where it talks about

17   she showed up on March 18 at the facility for

18   the inspection?  And then at the end of the

19   paragraph, does it indicate that you joined

20   the inspection later that morning?

21       A    Yes.

22       Q    And then does it show that you and

23   Apurva Patel and Scott Talbot provided all

24   requested information and documentation and

PLAINTIFFS' EXHIBITS 000907

117

1      arranged for meetings with additional

2      personnel?

3           A    Yes.

4           Q    On the following page, does it

5      indicate at the top that on April 7th of '08 a

6      meeting was held with Divya Patel, executive

7      chairman; Christopher Young, director of solid

8      oral dosage; and Apurva Patel, managing

9      director; and Phyllis Lambridis, vice

10     president, US quality and compliance, to

11     discuss inspectional findings and the lack of

12     response to out-of-specification products

13     which remained on the market?

14               Do you see that?

15          A    Yes.

16          Q    And was Digitek one of the products

17     that was remaining on the market on April 7th

18     of 2008?

19          A    Digitek was still on the market at

20     that time.

21          Q    Right.  And it was just a couple

22     days later that you wrote the e-mail about

23     Erin McCaffery being so unhappy with digoxin;

24     correct?

PLAINTIFFS' EXHIBITS 000908

118

```
 1          A    Correct.

 2          Q    And then if you go down to the

 3     middle paragraph that starts on April 9th, do

 4     you see that?

 5          A    Yes.

 6          Q    On April 9th, a written commitment

 7     was provided by yourself, and it shows it's

 8     Exhibit 12.  And it says in the middle of the

 9     paragraph:  "The letter also included a plan

10     to stop and remediate numerous

11     products/processes due to the current cGMP

12     findings."

13               Correct?

14          A    Yes.

15          Q    Is that the stop-and-fix list that

16     you talked about earlier?

17          A    Yes.

18          Q    And then it says at the last

19     sentence:  The District was formally notified

20     of a probable Class I recall of digoxin

21     tablets, .125 milligrams, and then it gives

22     the lot number; correct?

23          A    Correct.

24          Q    Okay.  Now, if you go over to
```

PLAINTIFFS' EXHIBITS 000909

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

119

```
1      Page 5, do you see at the bottom of Page 5
2      there's a paragraph that begins On April 14th
3      of '08?
4            A    May 14th?
5            Q    I'm sorry.  You're right.  May 14th
6      of '08.
7                 Do you see that?
8            A    Yes.
9            Q    It says:  On May 14th, '08,
10     Investigator McCaffery met with Ms. Gudrun --
11     how you do you pronounce that?
12           A    Gudrun Eyjolfsdottir.
13           Q    -- executive vice president, quality
14     and compliance, Actavis Group.
15                Was she your boss?
16           A    I reported to her.  She was the vice
17     president of quality global.  So I had a
18     reporting line in to her.
19           Q    Was she an officer of the company?
20           A    That I don't know.
21           Q    Were you an officer of the US-based
22     company?
23           A    No.
24           Q    It says you were meeting with FDA to
```

PLAINTIFFS' EXHIBITS 000910

Case 2:08-md-01968  Document 577-12  Filed 09/08/11  Page 122 of 200 PageID #: 19874
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

120

1    discuss the upcoming exit meeting; correct?

2         A    Correct.

3         Q    And then if you look at the top of

4    the next page, does it say there:  "Both

5    Ms. Eyjolfsdottir and Ms. Lambridis

6    acknowledged the severity of the cGMP

7    deficiencies and stated the need for

8    corrective actions, restructuring of the

9    Quality Unit, and hiring"?

10             Do you see that?

11        A    Yes.

12        Q    And do you recall making that

13   admission?

14        A    Yes.

15        Q    And it was accurate and correct?

16        A    Based on what was presented to us,

17   yes.

18        Q    Right.  And part of this, these

19   deficiencies involved the drug Digitek;

20   correct?

21        A    Yes.

22        Q    Now, if you'll go over to Page --

23   I'm going to skip a few pages now -- Page 15,

24   do you see there's a paragraph there that

PLAINTIFFS' EXHIBITS 000911

121

1    starts:  On April 23 of '08, following our

2    discussions, we were contacted by

3    Ms. Lambridis, who stated that they had

4    decided to stop distribution of all products

5    until further notice?

6         A    Yes.

7         Q    So that would include Digitek;

8    correct?

9         A    Yes.

10        Q    So not only was there a recall of

11   Digitek, but there was a decision made to stop

12   distribution of all Digitek; correct?

13        A    Yes.

14        Q    And then it says:  "At that time,

15   the firm" -- this is the next paragraph.  "At

16   that time, the firm did not commit to stopping

17   manufacturing despite the numerous product

18   quality issues identified."

19             Is that referring to other drugs?

20        A    Yes.

21        Q    Okay.  So there was a firm

22   commitment that was followed to not

23   manufacture any more Digitek; correct?

24             Let me rephrase it.

PLAINTIFFS' EXHIBITS 000912

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

122

```
 1          A    Yeah, I'm...
 2          Q    Back in April of '08, did Actavis
 3     commit to not only recall Digitek but to not
 4     manufacture any further Digitek at that point
 5     in time?
 6          A    I'm just trying to get my sequence
 7     of events.  Give me a minute.
 8          Q    Okay.
 9          A    Once you recall a product, you're
10     not making it anymore.  So the commitments
11     here really are referring mainly to the other
12     products.
13          Q    So you recall Digitek; and as part
14     of the recall, you decided you weren't going
15     to distribute it any further and you weren't
16     going to manufacture it in the future unless
17     you did something else; right?
18          A    Correct.
19          Q    And the something else never
20     happened; right?
21          A    Correct.
22          Q    For business reasons; correct?
23          A    Correct.
24          Q    And it says in the next paragraph:
```

PLAINTIFFS' EXHIBITS 000913

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

123

1     Although the firm -- it's the middle of that
2     next paragraph.  Although the firm intended to
3     restructure -- do you see that sentence there?
4          A    Yes.
5          Q    -- the quality organization and
6     continue hiring, they had difficulty hiring as
7     per Ms. Lambridis.  We also discussed our
8     significant concern with the release of
9     digoxin tablets, .125 milligrams,
10    Lot No. 70924A2, following the findings of
11    double thick tablets.  The investigation was
12    inconclusive and did not extend to all other
13    lots or strengths of digoxin tablets.
14              Do you see that?
15         A    Yes.
16         Q    I want to focus on the hiring issue.
17    What problems were you having hiring people at
18    that time?
19         A    Just availability of people,
20    attracting people to work for Actavis, which
21    was relatively unknown in the US.  We are in a
22    very competitive environment in New Jersey
23    with so many pharmaceutical companies.  So
24    it's very difficult to attract people, number

PLAINTIFFS' EXHIBITS 000914

124

1    one, because you're a generic and not one of

2    the brand-name companies but also with Actavis

3    being relatively unknown.

4         Q    So you had a difficulty identifying

5    and hiring qualified candidates?

6         A    It wasn't easy.  There was not a

7    large selection.

8         Q    Do you know whether that had been a

9    problem that had existed for a number of years

10   or whether that was a new problem?

11        A    I think it's always a problem, and

12   it's actually been an issue in most of the

13   companies that I've worked for.  We tend to

14   rely on a lot of networking.  So a lot of

15   times, as with Actavis, when I joined Actavis,

16   I would reach out to other people.  And I did

17   hire people that I worked with before to come

18   join me again.

19        Q    Do you know what efforts were made

20   by Mr. Patel to hire people back in 2006 about

21   the time of the FDA investigation?

22        A    I would have no knowledge of that.

23        Q    Now, if you'll go over to Page 23,

24   this is the last paragraph at the bottom.  Is

PLAINTIFFS' EXHIBITS 000915

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

125

1    this talking about the Digitek lot number that

2    we mentioned earlier?

3         A    It appears to be referring to it.

4         Q    This is the lot that Dan Bitler made

5    the decision to release part of; correct?

6         A    Correct.

7         Q    And it says here beginning in the

8    middle of the paragraph:  "No explanation was

9    provided for the failure to chemically analyze

10   the tablets or to evaluate the thickness or

11   weight of all tablets to determine a root

12   cause."

13             So, as I understand it -- you tell

14   me if I'm wrong -- they found some tablets

15   that looked like they were too thick, might be

16   twice the size of what the tablet should be,

17   and they didn't chemically analyze the

18   tablets; is that right?

19        A    They didn't chemically analyze them,

20   but the description of the tablets was that

21   they were double.  I never saw the tablets.

22   But the way that they were described to me was

23   that they were double, like two tablets stuck

24   together.

PLAINTIFFS' EXHIBITS 000916

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

126

1          Q     And did anybody take any

2    measurements of the tablets?

3          A     Not that I'm aware.

4          Q     And you've already indicated nobody

5    chemically analyzed?

6          A     Not that I was aware of.

7          Q     So nobody ever tried to determine

8    what caused the appearance of these tablets?

9          A     I would say that they didn't use

10   those -- they didn't use those types of

11   analyses to analyze the tablets, but there was

12   an investigation.  And there were several --

13   from what I recall, there were several items

14   discussed that could have caused it, but they

15   couldn't definitively pin it down to one

16   particular issue.

17         Q     Okay.  What did they do -- if they

18   didn't measure them and they didn't chemically

19   analyze them, what did they do to the pills in

20   the batch?

21         A     They did an inspection, a visual

22   inspection.

23         Q     So they looked at them?

24         A     Yes.

PLAINTIFFS' EXHIBITS 000917

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

1        Q    How many people looked at them?

2        A    I don't know the exact number of

3   people, but it would have been a group of

4   people.

5        Q    How many pills are in a batch?

6        A    This is a very large batch size, and

7   I believe the -- I don't recall the exact

8   number, but it was several million.

9        Q    How long does it take to visually

10  inspect several million pills?

11       A    I don't know how long that would

12  take.  I mean, it would vary on how many

13  people and the method of inspection.  So...

14       Q    Do you know any of the details on

15  it?

16       A    No.

17       Q    Would you agree that visually

18  inspecting pills like that is a crude way of

19  analyzing?

20            MR. DEAN:  Objection.

21            Go ahead.

22            THE WITNESS:  Again, the way it

23       was described to me was like they were

24       two pills stuck together.  So while I

PLAINTIFFS' EXHIBITS 000918

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

128

```
 1            would agree that visual inspection for
 2            that large a number of tablets might be a
 3            tedious exercise for some kind of defect,
 4            this was described to me as very obvious
 5            defect.
 6      BY MR. BLIZZARD:
 7            Q    Actually, I think I was asking you
 8      whether there are more scientifically precise
 9      ways of doing it than visual inspection.
10            A    I don't know that I can answer that
11      because you would have to measure every
12      tablet, and I don't know if that's practical.
13            Q    Okay.  Well, was a sample,
14      additional sample of the tablets taken and
15      chemically analyzed?
16            A    I don't follow the logic in the
17      chemical analysis piece.
18            Q    Okay.  Was there any chemical
19      analysis done of the double-thick pills, for
20      example, to determine whether or not they
21      contained too much active ingredient or too
22      much inert ingredient?
23            A    That was not done.
24            Q    And would you agree with what FDA
```

PLAINTIFFS' EXHIBITS 000919

129

```
 1    says here, that no analysis was done that

 2    could identify the root cause of the problem?

 3         A    I would say no -- I would object to

 4    saying no analysis.  She's saying -- she's

 5    pointing out the areas that were not

 6    considered, but there were several areas in

 7    the document that was written for the

 8    investigation where they did -- the areas that

 9    they did look at as a possible root cause.

10    They didn't determine the definitive cause.

11         Q    Okay.  So she says there was no

12    explanation provided for the failure to

13    chemically analyze the tablets.

14              Do you see that?

15         A    Yes.

16         Q    Did you provide any explanation to

17    her for that?

18         A    No.

19         Q    Okay.  She says here that she asked

20    you and Mr. Talbot how they could assure that

21    other tablets within the batch were not out of

22    specification and that you were unable to do

23    that; is that accurate?

24         A    Can I just read this for a second?
```

PLAINTIFFS' EXHIBITS 000920

130

1        Q    Sure.

2        A    Okay.  Now can you repeat the

3    question?

4        Q    Yes.  My question was:  This FDA

5    document says that Ms. McCaffery asked you and

6    Mr. Talbot how you could assure that other

7    tablets within the batch were not out of spec

8    and whether or not you provided any assurance

9    to them, to FDA, that tablets within that --

10   other tablets within that batch were not out

11   of spec.

12       A    Actually what it says here is that

13   we could not provide evidence to assure that

14   additional out-of-spec tablets would not be

15   identified if we inspected it by thickness,

16   weight, or chemical.

17       Q    Right.  So you're saying that you

18   could not assure that if we did additional

19   testing, that we wouldn't identify other

20   out-of-spec tablets?

21       A    I guess basically, yeah.

22            MR. BLIZZARD:  Okay.  We've got

23        two or three minutes left on the tape,

24        our videographer tells me.  So do we want

PLAINTIFFS' EXHIBITS 000921

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

131

1          to break now for lunch?  Do we want to

2          start a new tape?  Whatever y'all want to

3          do.

4                    THE VIDEOGRAPHER:  You know

5          what, let's go off the record.

6                    We are now going off the

7          record.  This is the end of Videotape No.

8          2.  The time is 11:58.

9                    (Luncheon recess taken from

10         11:58 a.m. to 1:10 p.m.)

11                   THE VIDEOGRAPHER:  We are now

12         back on the record.  This is the

13         beginning of Videotape No. 3.  The time

14         is 1:10.

15    BY MR. BLIZZARD:

16         Q    Ms. Lambridis, we took a break for

17    lunch and we're back.  Are you ready to

18    proceed?

19         A    Yes.

20         Q    We've been talking about a recall of

21    Digitek this morning, among other things.  And

22    I believe what we discussed was that there was

23    indication in early April or April 9th or

24    thereabouts that the FDA was not happy with

PLAINTIFFS' EXHIBITS 000922

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

132

1      digoxin and there would likely be a recall of

2      a batch of Digitek; is that right?

3            A      Correct.

4            Q      Did at some point in time that

5      recall expand -- or that discussion of a

6      recall expand from the one batch to all

7      Digitek?

8            A      Not during the inspection, no.

9            Q      When was it that the recall of

10     Digitek was expanded to all Digitek?

11           A      A commitment was made to recall the

12     one batch.  And we were in the process of

13     doing the necessary paperwork to execute that

14     recall.  And we received a call from the

15     Agency, the recall coordinator, and she had

16     inquired about the status of the recall and

17     asked to speak with our CEO in Iceland.

18           Q      And who was the recall coordinator?

19           A      The district office had another --

20     had a newly appointed or a recently appointed

21     recall coordinator.  I believe her first name

22     was Margaret.  I'm not sure.

23                  But the person who called was Mimi

24     Remache, who was in a higher level position

PLAINTIFFS' EXHIBITS 000923

133

```
 1    but had been the recall coordinator for a
 2    number of years.
 3         Q    So the person who called Actavis was
 4    this Mimi Remache; correct?
 5         A    Yes.
 6         Q    And how do you spell her last name?
 7         A    R-E-M-A-C-H-E.
 8         Q    And she said what when she called?
 9               MR. DEAN:  Objection; assumes
10         facts not in evidence as to the question
11         you directed to this witness.
12    BY MR. BLIZZARD:
13         Q    Okay.  Well, let me ask it this way:
14    Did you talk with her?
15         A    I spoke with her, yes.
16         Q    What did she say to you?
17         A    She asked me for the contact
18    information for our CEO, and she said she
19    wanted to speak to him with regard to the
20    Digitek recall.
21         Q    Do you have any estimate of what
22    date this was?
23         A    April 23rd or 24th.
24         Q    So you were in the process of
```

PLAINTIFFS' EXHIBITS 000924

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

134

1     preparing documents to execute the recall of a

2     single batch; correct?

3          A    Yes.

4          Q    And you started that process when?

5          A    I recall mid-April as being the time

6     frame.

7          Q    And then this call would have come

8     on the 23rd or 24th from the former recall

9     coordinator at FDA, who then held a higher

10    level position, Mimi Remache, and she asked to

11    speak to the CEO?

12         A    Correct.

13         Q    Did she tell you anything else?

14         A    She expressed concern over the fact

15    that the recall -- they wanted a press release

16    and that that press release for the recall was

17    taking an inordinate amount of time to get to

18    them, because they need to approve it before

19    it goes out.

20         Q    So the press release was supposed to

21    be prepared by Actavis?

22         A    Well, that was part of the delay

23    because the press release -- we had to

24    coordinate with Mylan and decide who and how

PLAINTIFFS' EXHIBITS 000925

135

```
 1    the press release was going to go.

 2         Q    So you were in the process of

 3    talking back and forth with Mylan when the

 4    recall coordinator or former recall

 5    coordinator called you about getting the CEO's

 6    number?

 7         A    Correct.

 8         Q    And did she indicate to you on the

 9    phone that she was proposing that the recall

10    be extended to all lots of Digitek?

11         A    No, we did not have that

12    conversation.

13         Q    When was it that you next heard

14    about the recall after you had this call with

15    Mimi?

16         A    I got permission to provide her the

17    information for contacting our CEO, reason

18    being the office in Iceland was closed, so she

19    needed another way to reach him.

20         Q    So she needed his home number in

21    Iceland?

22         A    Well, it was a cell number that was

23    given.

24         Q    Okay.  And who did you get
```

PLAINTIFFS' EXHIBITS 000926

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

136

```
1    permission from?
2         A    Our senior management in the US.
3    And they tried to contact the right people to
4    get the information.
5         Q    And who was the senior -- the person
6    in senior management that you talked to?
7         A    John LaRocca.
8         Q    And what was his job?
9         A    Legal counsel.
10        Q    Was he chief legal counsel for the
11   company?
12        A    I believe so.
13        Q    And after that did you -- what did
14   you next hear back about the recall?
15        A    I received a call back from Robert
16   Wessman indicating that I should try to get
17   them the press release within an hour, an
18   hour's time.
19        Q    Now, Robert Wessman is the CEO who
20   was located in Iceland whose cell number you
21   were giving out?
22        A    Correct.
23        Q    And what did he say about -- or what
24   did you say about whether you could get the
```

PLAINTIFFS' EXHIBITS 000927

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

137

1      press release out in an hour?

2            A      That we would do our best to try to

3      do that, accommodate that.

4            Q      Did it happen?

5            A      No.

6            Q      Why not?

7            A      Because in a subsequent conversation

8      with Mimi, she indicated to me that the recall

9      was for all lots and not just one lot.  And

10     that was the first that I had heard of that.

11           Q      And so was this the decision that

12     had been made by Robert Wessman after talking

13     to Mimi or was this a decision that was made

14     by FDA?

15           A      I do not know.

16           Q      So Mimi called you back -- strike

17     that.

18                  You said you had a conversation with

19     Mimi, and then you heard back from Robert

20     Wessman saying that you need to get a press

21     release out in an hour if you could.

22           A      Uh-huh.

23           Q      And then after that, you next heard

24     that the recall was going to be as to all

PLAINTIFFS' EXHIBITS 000928

138

1     lots?

2          A    Correct.

3          Q    When was that that you next heard?

4     Was it within the hour, or was it more than an

5     hour later?

6          A    It -- I don't know but in a

7     relatively short period of time, the same day,

8     the same day in subsequent conversation.

9          Q    So was paperwork prepared to recall

10    all lots of Digitek?

11         A    Eventually, yes.

12         Q    Was there any additional

13    conversation between you and Robert Wessman or

14    you and Mimi or you and any other senior

15    manager of Actavis about the recall before

16    this paperwork to recall all Digitek lots was

17    prepared?

18         A    I was working with my staff on

19    numerous things, including this recall, so I

20    was not the only person speaking with Mimi.

21    So I believe it's the conversation about it

22    being all lots occurred with one of my staff

23    who informed me, and then I had the

24    conversation with Mimi asking:  "Why all

PLAINTIFFS' EXHIBITS 000929

139

```
 1    lots?"
 2               And she indicated to me that that
 3    was what was agreed to in her conversation
 4    with Robert.  And I subsequently again went
 5    through the channels to reach Robert again
 6    myself and asked him, confirmed with him if he
 7    had, in fact, agreed to that, and he did.
 8         Q    Did you ask why?
 9         A    No.
10         Q    Do you know why?
11         A    No.
12         Q    Do you know of anybody in the
13    company that knew why other than Robert
14    Wessman?
15         A    No.
16         Q    Do you know anything about the
17    conversation between Mimi and Robert Wessman
18    other than what you've told me?
19         A    No.
20               (Plaintiff's Exhibit No. 113
21         was marked for identification.)
22    BY MR. BLIZZARD:
23         Q    Now, I'm going to show you what's
24    marked as Exhibit 113 to your deposition.
```

PLAINTIFFS' EXHIBITS 000930

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

```
                                              140

 1          A    Do you need this back?

 2                   MR. DEAN:  Put that one back

 3          together.

 4                   MR. BLIZZARD:  For now, yes.  I

 5          may come back to it.

 6     BY MR. BLIZZARD:

 7          Q    This has a Bates number ending in

 8     526961.  Now, this is entitled "URGENT: DRUG

 9     RECALL."

10               Correct?

11          A    Yes.

12          Q    Was it urgent?

13          A    All recall letters are urgent.

14          Q    And was this one, like the other

15     recall letters, urgent?

16          A    Yes.

17          Q    And did you prepare this letter?

18          A    It's a combination of people that

19     participated in the preparation of it.  Some

20     of it is standard format.  Some of it is our

21     wording.  And some of it actually is FDA's

22     wording.

23          Q    So it was prepared for your

24     signature; is that true?
```

PLAINTIFFS' EXHIBITS 000931

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

141

1        A    Yes.

2        Q    And it is dated April 24th of 2008;

3    is that correct?

4        A    Yes.

5        Q    And is that either the day of or the

6    day after the conversations that we just

7    discussed between you and Mimi and Robert

8    Wessman?

9        A    That was, yeah, the approximate date

10    that I had given.

11        Q    Okay.  And if you look over at

12    Pages -- I guess it begins on Page 4 of 9, do

13    you see that there are lists of lots to which

14    this applies, this recall?

15        A    Yes.

16        Q    So does it appear from this document

17    that you have in front of you that this recall

18    notice was intended to be sent out as a recall

19    of all lots of Digitek?

20        A    Yes.

21        Q    Okay.  It says "Dear Valued

22    Customer" on Page 1.

23        A    Uh-huh.

24        Q    Who was that addressed to?

PLAINTIFFS' EXHIBITS 000932

142

1          A     This is intended to be the letter

2     that goes to whoever received the product so

3     that they would have the information on the

4     recall and know where to return the product.

5          Q     Okay.  So this is intended primarily

6     for pharmacies?

7          A     Whoever the customer is.  So there

8     has to be a chain of events that occurs.  So

9     in some cases, depending on who you sell to,

10    if I send it to someone who's then distributed

11    it further, then they would either use my

12    recall letter to take it further or they would

13    create their own recall letter for their own

14    customers to return product back.

15         Q     So you send it only to the people

16    you sold to?

17         A     Typically.

18         Q     And so you would have sent this

19    letter that has a date of April 24, 2008, to

20    the people that you sold Digitek to?

21         A     In the particular case of Digitek,

22    it was sold to Mylan, who then sold it to

23    others.  So I don't know if this letter was

24    sent to their customers or if they used their

PLAINTIFFS' EXHIBITS 000933

143

1      own letter.

2             Q    So is it your recollection -- well,

3      let me back up.

4                  Did Actavis sell to anybody besides

5      Mylan?

6             A    For digoxin, no.

7             Q    Yes.  Okay.  So make sure we have a

8      clear record, was there any other customer of

9      Actavis for digoxin other than Mylan?

10            A    No.

11            Q    So when you say "Dear Valued

12     Customer" here in this letter, you could have

13     just as easily said "Dear Mylan"?

14            A    Correct.

15            Q    Then it says:  "This is to inform

16     you of a product recall involving "-- and then

17     it lists Digitek .125 milligrams; correct?

18     And then it says:  "See Attached List for Lot

19     Numbers/Expiration Dates."

20                 Do you see that?

21            A    Uh-huh.

22            Q    Is that a yes?

23            A    Oh, I'm sorry.  Yes.

24            Q    Okay.  Then the paragraph that

PLAINTIFFS' EXHIBITS 000934

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

144

1    starts, "This recall has been initiated due to

2    overweight tablets," do you see that?

3         A    Yes.

4         Q    It says:  "Potential risks to the

5    patient depend upon the constituency of the

6    tablets.  Depending on the constituency of the

7    tablets, double the dose is taken, it can be

8    expected that digitalis toxicity can occur in

9    individuals taking daily doses or in patients

10   with renal insufficiency.  Toxicity can cause

11   nausea, vomiting, dizziness, low blood

12   pressure, cardiac instability and bradycardia.

13   Death can result from excessive digitalis

14   intake."

15              Is that what the letter says?

16        A    Yes.

17        Q    Based upon your knowledge of

18   Digitek, is that accurate?

19              MR. DEAN:  Objection.

20              Go ahead.

21              THE WITNESS:  I don't have the

22        expertise.

23   BY MR. BLIZZARD:

24        Q    Okay.  Well, when you agreed to have

PLAINTIFFS' EXHIBITS 000935

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

145

1      your name associated with this letter, did you

2      consult with people who did have expertise?

3          A    Yes.

4          Q    And so far as you know, is this

5      information accurate?

6          A    Yes.

7          Q    Okay.  Then it says:  "If the

8      increased thickness is due to clinically inert

9      substances, then a decreased amount of

10     digitalis may be absorbed, leading to

11     exacerbation of the underlying cardiac disease

12     (congestive heart failure)and arrhythmia) due

13     to lack of therapeutic efficacy."

14              Is that what part of this letter

15     says?

16         A    Yes.

17         Q    Again, I understand you're not a

18     doctor.  But based upon the other consultants

19     that were utilized in the preparation of this

20     letter, is that accurate?

21         A    Yes.

22         Q    And then it says:  "Actavis has

23     distributed the subject lots from" -- and then

24     there's some dates that haven't been filled in

PLAINTIFFS' EXHIBITS 000936

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

146

```
 1    yet.
 2              And it says:  "This recall should be
 3    carried out to the consumer level."
 4              Is that correct?
 5         A    Yes.
 6         Q    Why was it to be carried out to the
 7    consumer level?
 8         A    Because FDA had indicated that it
 9    would be a Class I recall.  And a Class I
10    recall goes to the consumer level.
11         Q    What is it that differentiates
12    Class I recalls from Class 2 recalls?
13         A    The severity of the issue.
14         Q    Okay.  So the potential health
15    hazard involved is part of the decision
16    making?
17         A    Yes.
18         Q    And was that true with respect to
19    this recall of Digitek?
20         A    Based on what was characterized here
21    as the health hazard, yes.
22         Q    Right.  Okay.  Then it says here:
23    "Upon receipt of this letter, please take the
24    following action."  It says:  "Immediately
```

PLAINTIFFS' EXHIBITS 000937

147

```
 1      examine your inventory and quarantine and
 2      discontinue distribution of the affected
 3      lots."
 4              Again, that's being -- you're
 5      telling Mylan that in this letter; correct?
 6          A    Yes.
 7          Q    And then it says:  In addition, if
 8      you may have further distributed the recalled
 9      product, please identify your retail-level
10      consumers and notify them at once of this
11      product recall.
12              Do you see that?
13          A    Yes.
14          Q    And then it says:  "Additionally, if
15      the retail-level customers have further
16      distributed the recalled product, please
17      identify the consumer and notify them
18      immediately of this product recall."
19              Is that what that says?
20          A    Yes.
21          Q    Okay.  So basically this letter is
22      telling your valued customer to quarantine
23      what's left, and anything you distributed to
24      somebody else, try to get it back, and notify
```

PLAINTIFFS' EXHIBITS 000938

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

148

```
 1    them of the recall; and if it's been
 2    distributed further than that, then you should
 3    let those people you distributed it to know
 4    that they should try to get it back and inform
 5    people of the recall?
 6         A    Correct.
 7         Q    Now, did this letter go out on
 8    April 24th of 2008?
 9         A    I don't think so.
10         Q    Do you know when it went out?
11         A    Within the next few days.
12         Q    Did you provide FDA with a copy?
13         A    They always see the draft, which I
14    believe this is the draft, because all the
15    information is not in here.  But they usually
16    see a draft before it goes out.
17         Q    Did you provide the entire recall
18    package to FDA?
19         A    There's different terminology when
20    you talk about a recall package.  So are we
21    talking about the letter and what goes in that
22    mailing, or are we talking about the documents
23    that FDA requires for the recall?  Those are
24    two different.
```

PLAINTIFFS' EXHIBITS 000939

149

```
 1        Q    Okay.  Let me direct you to
 2   something that may help clarify for me my
 3   question and then maybe your answer.  If
 4   you'll look at Page 19 of Exhibit 112, the
 5   EIR -- oh, actually, it's not 112.
 6                 MR. DEAN:  91.
 7   BY MR. BLIZZARD:
 8        Q    It's 91.
 9        A    91.  Page 19?
10        Q    Page 19, yes.  Do you see at the top
11   of Page 19, the paragraph that begins
12   "Additionally"?
13        A    Uh-huh.
14        Q    It says:  Additionally, despite the
15   ten-day time frame to provide recall
16   information to the FDA following notification
17   of a voluntary recall, no completed recall
18   packages for any of the recalls had been
19   provided at the time of the exit meeting on
20   May 20th, '08.  Phyllis Lambridis, vice
21   president, quality and compliance,
22   acknowledged the delay.
23                 Do you see that?
24        A    Yes.
```

PLAINTIFFS' EXHIBITS 000940

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

150

```
 1        Q    Could you explain to me what that's
 2   referring to?
 3        A    That's why I asked the question,
 4   because there's a terminology used when you
 5   conduct a recall that's called a recall
 6   package.  And in the context of what they're
 7   talking about here, that recall package is
 8   documentation that FDA requires whenever a
 9   recall is done.
10             So that recall package, if it's one
11   batch, it's typically that entire batch
12   record, all the distribution for that product,
13   the active ingredient, where the active
14   ingredient came from, a whole series of
15   documents that makes up everything from
16   beginning to end on -- from when you first
17   received the raw material through the actual
18   distribution into the market.
19             So those packages had to be made for
20   any recall that we did.  And, as you know, we
21   did a substantial amount in addition to the --
22        Q    Digitek?
23        A    -- Digitek.  So all those packages
24   had to be assembled and sent to the Agency,
```

PLAINTIFFS' EXHIBITS 000941

151

1       and that's what they're referring to here.

2           Q    So you acknowledge in your meeting

3       with FDA that you were late with the recall

4       packages?

5           A    Yes.

6           Q    Do you know when this letter that

7       was prepared for your signature actually went

8       out?

9           A    I don't know the exact date.

10          Q    Did it go out under your signature?

11          A    Yes.

12          Q    Did it go out only to Mylan?

13          A    I believe so.

14          Q    And do you know what Mylan did with

15      it after that?

16          A    No.

17          Q    Now, do you know what a tableting

18      equipment with weight controls are or is?

19          A    Yes.

20          Q    Tell me what tableting equipment

21      with weight controls is.

22          A    It's a tablet press that has a

23      computerized mechanism in it to weigh tablets

24      and adjust weights, so it's automated.

PLAINTIFFS' EXHIBITS 000942

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

152

```
 1           Q    So if you put the appropriate
 2      settings in and the tablet somehow comes out
 3      over- or underweight, the press automatically
 4      adjusts for that so that you're getting
 5      uniformly weighted tablets?
 6           A    That's my understanding.
 7                    (Phone interruption.)
 8                    MR. BLIZZARD:  That doesn't
 9           mean the deposition's over.
10                    MR. ANDERTON:  That's what she
11           said.
12      BY MR. BLIZZARD:
13           Q    So I'm going to show you a document
14      that's marked as -- or I'm going to mark as
15      Exhibit 114 to your deposition.
16                So this e-mail has actually number
17      on it, 140102.
18                    MR. DEAN:  No, that's not the
19           number mine has, is it?
20                    THE WITNESS:  Is that the
21           correct one?
22                    MR. BLIZZARD:  No.  It is the
23           correct one, but I picked up another one.
24                    MR. DEAN:  Do you need this
```

PLAINTIFFS' EXHIBITS 000943

153

```
 1        back?
 2                    MR. BLIZZARD:  Well, I guess I
 3        have a duplicate.  What number do you
 4        have?
 5                    THE WITNESS:  The page number?
 6                    MR. BLIZZARD:  Yes.
 7                    MR. DEAN:  The Bates number.
 8                    THE WITNESS:  142150.
 9                    (Plaintiff's Exhibit No. 114
10        was marked for identification.)
11   BY MR. BLIZZARD:
12        Q    All right.  We have it up on the
13   screen here.  But is this an e-mail that's
14   dated April -- actually, there's a couple of
15   e-mails on this document; correct?
16        A    Yes.
17        Q    The one at the bottom is the first
18   one in time, is it not?
19        A    Yes.
20        Q    It's from a Kevin Anderson to you
21   dated April 30th of 2008 at 9:16 a.m.; is that
22   right?
23        A    Yes.
24        Q    And this is shortly after the recall
```

PLAINTIFFS' EXHIBITS 000944

154

1      of all Digitek lots had been announced; is

2      that true?

3           A    Yes.

4           Q    And it's regarding a conversation

5      with a Mike Adams from Mylan; is that true?

6           A    Yes.

7           Q    It says:  "I know you are trying to

8      vaca this week."

9                Is that the verb for vacation?

10          A    I think so.

11          Q    So you were trying to vacay the week

12     of April 30th.  And then Mr. Anderson was

13     talking to you about this conversation with

14     Mike Adams wanting an update on Digitek;

15     correct?

16          A    Yes.

17          Q    And then there's another e-mail on

18     April the 30th at 10:42 from a Dan Bitler to

19     you and Kevin Anderson; is that true?

20                    MR. DEAN:  No.  It's from -- I

21          think you misread that.

22                    THE WITNESS:  This one here in

23          the middle?

24

PLAINTIFFS' EXHIBITS 000945

155

1    BY MR. BLIZZARD:

2        Q    Yeah.  There's an e-mail from Dan

3    Bitler in the middle, isn't there?

4        A    Yes.

5                MR. DEAN:  Okay.

6    BY MR. BLIZZARD:

7        Q    Okay?  From Dan Bitler to you and

8    Kevin Anderson; correct?

9        A    Yes.

10       Q    It says:  "I talked with Mike Adams

11   this morning and gave him an overview of where

12   we are with the inspection.  I indicated that

13   we expected the FDA back next week to issue

14   the 483 and he indicated that he would like to

15   talk with Phyllis briefly next week to discuss

16   the timeline moving forward for Digoxin.  He

17   was satisfied with the information I provided

18   and I indicated that we would contact him next

19   week."

20               Is that what it says?

21       A    Yes.

22       Q    And then you write an e-mail at the

23   top, is that right, top of this page?

24       A    Yes.

PLAINTIFFS' EXHIBITS 000946

156

1         Q    And it's April 30th at 11:21 a.m.;

2    is that right?

3         A    Correct.

4         Q    And then it says:  "It is my

5    understanding that Robert and Siggi" -- that's

6    Robert Wessman and Siggi Olafsson?

7         A    Correct.

8         Q    -- "have committed to stop producing

9    Digoxin until we have tableting equipment with

10   weight controls."

11             Did I read that correctly?

12        A    Yes.

13        Q    Then it says:  "Please do not have

14   any conversations with customers unless you

15   have the full story."

16             Is that what it says?

17        A    Yes.

18        Q    Okay.  The customers would be Mylan;

19   right?

20        A    Yes.

21        Q    And what was the full story?

22        A    I didn't know what the full story

23   was, so I was cautioning him on making any

24   commitments or having conversations without

PLAINTIFFS' EXHIBITS 000947

Case 2:08-md-01968   Document 577-12   Filed 09/08/11   Page 159 of 200 PageID #: 19911
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

157

1    all the information.

2         Q    Okay.  Did you subsequently have any

3    conversations with Mr. Wessman or Mr. Olafsson

4    about the commitment to not produce any more

5    digoxin until there was tableting equipment

6    with weight controls?

7         A    I was present during some of the

8    discussions with senior management regarding

9    Digitek.  And the context of this was that

10   they would not produce -- if they were going

11   to move forward with digoxin, that they would

12   want to purchase equipment with weight

13   controls.

14        Q    Okay.  And I take it that there

15   wasn't any existing equipment at the Little

16   Falls or Riverview plant that was a press with

17   weight controls; is that true?

18        A    I'm not sure if there were none, but

19   the presses -- majority of the presses there

20   were not automated.  So there might have been

21   one.  I'm not sure.

22        Q    But there wasn't enough presses that

23   were automated to produce digoxin with presses

24   that were all weight controlled; is that true?

PLAINTIFFS' EXHIBITS 000948

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

158

```
 1              A    Yes.  But you have to keep in mind
 2       that the presses with weight control are
 3       automated presses that companies may or may
 4       not have, and that in the absence of the
 5       automated weight controls, it's done manually.
 6              Q    Was it important that digoxin, in
 7       particular, have properly weighted pills?
 8                        MR. DEAN:  Objection.
 9                        Go ahead.
10                        THE WITNESS:  It's important
11              for any product produced to have...
12       BY MR. BLIZZARD:
13              Q    Do you know whether digoxin has a
14       narrow therapeutic window?
15              A    I couldn't answer that.  I don't...
16              Q    Or a narrow toxicity window?
17              A    I believe it's a toxic -- yes, it's
18       a relatively potent compound.
19              Q    So if the pills are not properly
20       weighted, it could have a health impact on a
21       patient; right?
22                        MR. DEAN:  Objection.
23                        Go ahead.
24                        THE WITNESS:  Yes.
```

PLAINTIFFS' EXHIBITS 000949

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

159

1          MR. BLIZZARD:  I'm going to

2      show you the next document, which I'm

3      going to mark as 115.

4              (Plaintiff's Exhibit No. 115

5      was marked for identification.)

6              MR. DEAN:  Excuse me.  Can we

7      take just a two-minute break to see if

8      there's a heat control?

9              MR. MILLER:  I just asked

10     Meghan to go check.

11             MR. BLIZZARD:  Yes.  I'm

12     agreeing with you, but I don't want to

13     get into a tug of war over the

14     thermostat.  I've had that before.

15             MR. ANDERTON:  Ever win one?

16             MR. BLIZZARD:  No.

17             MR. DEAN:  We're going to lose

18     some of us pretty quickly if we don't get

19     an adjustment here.

20             MR. BLIZZARD:  Let's take a

21     quick break and see if we can fix it if

22     that's okay with you.

23             THE VIDEOGRAPHER:  Off the

24     record, 1:44.

PLAINTIFFS' EXHIBITS 000950

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

160

1              (Discussion off the record.)

2                   THE VIDEOGRAPHER:  Back on the

3         record, 1:46.

4    BY MR. BLIZZARD:

5         Q    Ms. Lambridis, we went off the

6    record so we could talk about the temperature

7    controls and we're back.

8              Are you ready to proceed?

9         A    Yes.

10        Q    Now, have you looked at this

11   document that's dated April 28th, 2008?

12        A    Yes.

13        Q    Okay.  I'm sorry.  I didn't hear

14   you.

15             Do you see it's from Mike Adams?

16        A    Yes.

17        Q    And he was the -- as I recall, we've

18   identified him as a Mylan employee?

19        A    Correct.

20        Q    And he's writing to Vincent

21   Mancinelli regarding a discussion with Actavis

22   quality; is that right?

23        A    Yes.

24        Q    Now, do you know Mr. Mancinelli?

PLAINTIFFS' EXHIBITS 000951

161

1          A    No.

2          Q    It says here that Chuck Koon and

3     Becky Pinnell had an informal conversation

4     with Dan Bitler, Actavis quality, regarding

5     the ongoing FDA inspection of the Little Falls

6     facility.  And he's providing a brief summary

7     below; correct?

8          A    Yes.

9          Q    Do you know Chuck Koon or Becky

10    Pinnell?

11         A    No.

12         Q    It says:  The company has halted

13    production of all products at the Totowa

14    Little Falls, New Jersey, site.

15              Is that accurate?

16         A    Yes.

17         Q    It says:  "At this time they are not

18    sure when they will resume manufacture of

19    Digitek."

20              Is that correct?

21              Was that correct as of April 28th?

22         A    Well, it's correct in that's what's

23    stated here.  Yeah, I guess that would be

24    correct.

PLAINTIFFS' EXHIBITS 000952

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

162

1        Q    Okay.  So to make it clear, it was

2   correct that as of April 28th, the company was

3   not sure when they would resume manufacture of

4   Digitek; is that right?

5        A    We were in the process of recalling

6   product, so I doubt very much we were talking

7   about resuming.

8        Q    Then it says:  "There is a rumor

9   coming out of Actavis quality that the company

10  has committed to purchase a new tablet press

11  with appropriate weight control."

12             Do you see that?

13       A    Yes.

14       Q    Okay.  And, again, that reflects

15  what was being reported in the Actavis

16  e-mails --

17             MR. DEAN:  Objection.

18  BY MR. BLIZZARD:

19       Q    -- true?

20             MR. DEAN:  Calls for hearsay.

21             Go ahead.

22             THE WITNESS:  Oh, referring

23       back to my e-mail?

24

PLAINTIFFS' EXHIBITS 000953

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

163

```
 1    BY MR. BLIZZARD:
 2         Q    Yes.  Your e-mail of April 30th
 3    indicated that the company would not resume
 4    manufacture without automated tableting
 5    equipment with weight control; correct?
 6         A    Yes.
 7         Q    Now, this one actually suggested
 8    Actavis is saying -- there's a rumor that
 9    Actavis has committed to purchase a new tablet
10    press with appropriate weight control;
11    correct?
12         A    That's what it says.
13                   MR. DEAN:  Objection.  Actavis
14         doesn't say anything.  Mylan is saying
15         something.
16    BY MR. BLIZZARD:
17         Q    I said in this Mylan document -- let
18    me make it clear.
19              This Mylan document says that
20    there's a rumor coming out of Actavis that the
21    company has committed to purchase a new tablet
22    press with appropriate weight control.
23              Is that what it says?
24         A    Yes.
```

PLAINTIFFS' EXHIBITS 000954

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

164

1          Q     Did any -- was there any attempt

2     that you're aware of to buy a new press with

3     appropriate weight control during the time

4     that you remained employed by Actavis?

5          A     Not for Digitek.

6          Q     Okay.  Were there other automated

7     presses bought with weight controls that were

8     used to manufacture drugs other than Digitek

9     after the FDA inspection?

10                    MR. DEAN:  Objection.

11                    Go ahead.

12                    THE WITNESS:  I can answer?

13                    MR. DEAN:  You can answer,

14          sure.

15                    THE WITNESS:  We did evaluate

16          that.  I don't recall what was purchased

17          or if anything was purchased.

18     BY MR. BLIZZARD:

19          Q     Okay.  So you don't know one way or

20     the other?

21          A     No.

22          Q     In August of 2008, you were still

23     employed with the company?

24          A     In August, yes.

PLAINTIFFS' EXHIBITS 000955

Confidential – Subject to Further Confidentiality Review

165

1          Q     And there were -- the remediation
2     effort or the effort on the corrective action
3     plan, was it still underway at that time?
4          A     Yes.
5          Q     And had some of the items on the
6     corrective action plan actually been
7     completed?
8          A     Yes.
9          Q     Were there others that were
10    incomplete in August of 2008?
11         A     Yes.
12         Q     Were there still significant
13    weaknesses within the quality department and
14    the quality system as of August of 2008?
15         A     We were still in the process of
16    putting together a robust quality system to
17    inspect -- that would hold up to inspection.
18    So I think that there was still a lot of work
19    that needed to be done along those lines.  I
20    don't know that I can say there were
21    weaknesses.
22                    (Plaintiff's Exhibit No. 116
23         was marked for identification.)
24

PLAINTIFFS' EXHIBITS 000956

166

```
 1      BY MR. BLIZZARD:
 2          Q     Let me show you what I'm going to
 3      mark as Exhibit No. 116 to your deposition.
 4      And this ends in Bates numbers that are too
 5      small for me to read, 302466, I believe.
 6          A     69.
 7          Q     69.  It's an e-mail dated August 14,
 8      2008.
 9               Is this an e-mail dated August 14,
10      2008, from Anthony Castellanno?  Castellazzo.
11      I'm sorry.
12          A     Yes, correct.
13          Q     And he sent it to a number of people
14      and cc'd you?
15          A     Yes.
16          Q     And the subject of this e-mail is
17      Assessment Meetings; is that correct?
18          A     Yes.
19          Q     It says here:  "To All."  And does
20      it say:  "It would be an understatement to say
21      that I'm disappointed and perplexed over the
22      low turn out for these assessment follow-up
23      meetings"?
24               What was an assessment follow-up
```

PLAINTIFFS' EXHIBITS 000957

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

167

1    meeting?

2         A    One of the activities that we

3    undertook in the corrective action plan was to

4    have PAREXEL do an assessment of the existing

5    quality systems and help us to identify areas

6    that would require, you know, additional work

7    or improvement to strengthen them up to be

8    able to pass muster at the next inspection.

9              So it's sort of an internal audit of

10   sorts whereby they provided assessments.  And

11   then the activity that's being referred to

12   here is that people were assigned tasks to

13   address the issues, whether it be writing an

14   SOP or revising an SOP or doing some work to

15   put some information together.

16             And Tony Castellazzo, as we

17   mentioned earlier, part of his role now with

18   all of the activities was to track, track the

19   progress.  So he would hold weekly meetings

20   with the people that were assigned these tasks

21   to get status reports.

22        Q    Okay.  And he was saying that people

23   weren't showing up; right?

24        A    Correct.

PLAINTIFFS' EXHIBITS 000958

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

168

```
 1          Q    He says:  "Initially, attendance was
 2     good.  Then people were asked to commit to
 3     actions and report their status.  Perhaps I
 4     haven't stressed the importance of addressing
 5     these observations many of which speak to
 6     significant weakness in our Quality System."
 7               Is that what he wrote?
 8          A    That was what he wrote, yes.
 9          Q    Okay.  And it says:  "Several of
10     these same weaknesses have also been noted in
11     the recent 483."
12               And that's the 483 issued by FDA; is
13     that right?
14          A    Yes.
15          Q    It says in the next paragraph:  "In
16     order to resolve the observations and
17     strengthen our systems I need everyone's
18     cooperation not just a select few."
19               Is that what he says?
20          A    That's what's written, yes.
21          Q    Did you support him on that?
22          A    Support -- you have to be more
23     specific.  Did I support him in his opinion,
24     or did I support him in the fact that everyone
```

PLAINTIFFS' EXHIBITS 000959

169

```
 1      needed to participate to work through the
 2      tasks?
 3           Q     That people needed to show up and it
 4      wasn't just a select few, but everyone who was
 5      assigned tasks needed to show up and take the
 6      actions they were committed to.
 7           A     I believe, yes, everyone needed to
 8      participate and do the work that was assigned.
 9                But I want to just qualify that Tony
10      Castellazzo tended to blow things out of
11      proportion.  And some of the reasons behind
12      the meetings were that the meetings were not
13      that productive in -- some of it was related
14      to how he was conducting the meetings.  So
15      people were frustrated.  Because I also had
16      feedback from other areas telling me that the
17      meetings weren't productive.
18                So you have to take this in the
19      context of his frustration as opposed to
20      people not taking active involvement in the
21      activities.
22           Q     Okay.  Well, he was expressing to at
23      least the group internally that, in his
24      opinion, there were weaknesses in the quality
```

PLAINTIFFS' EXHIBITS 000960

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

170

1    system still in August of 2008; correct?

2         A    He is.  But at this point in time,

3    there was no production, no ongoing

4    production, so everything was stopped.

5         Q    And you were actually unhappy at the

6    same time frame about the company's problems

7    being publicly aired, weren't you?

8         A    I don't know what you mean by that.

9              (Plaintiff's Exhibit No. 117

10        was marked for identification.)

11   BY MR. BLIZZARD:

12        Q    Let me show you what I'm going to

13   mark as Exhibit No. 117 to your deposition.

14   And this is Document 527229.

15        A    Uh-oh.

16        Q    Is this top e-mail an e-mail

17   authored by you on August the 13th of 2008?

18        A    Yes, it is.

19        Q    Okay.  And that's the same time

20   frame the previous exhibit, 117 was dated

21   August 14 of 2008 from Mr. --

22        A    I'm sorry?

23        Q    Mr. Castellazzo's e-mail was dated

24   August 14th, so it's in the same time frame as

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

171

 1        his e-mail; correct?  I'm not saying there's a

 2        connection between them.

 3             A    Yes.  Okay.

 4             Q    It's in the same time frame, isn't

 5        it?

 6             A    Yes.

 7             Q    So your e-mail says:  "This sucks."

 8                  Right?

 9             A    Yes.

10             Q    "The quotes they lifted are in every

11        warning letter and recall press release."

12             A    Yes.

13             Q    And that's the totality of the

14        e-mail; correct?

15             A    Yes.

16             Q    And the e-mail relates to a news

17        article that is entitled "GMP Storm Cloud:

18        Generic Firms May Get Further Scrutiny After

19        Actavis Recall."

20                  Is that the title of the article?

21             A    Yes.

22             Q    Do you know in what newspapers that

23        article appeared?

24             A    I believe it's trade industry press.

PLAINTIFFS' EXHIBITS 000962

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

172

 1    It's not regular news.  I'm not sure.

 2         Q    What is it that you're referring to

 3    when you say, "This sucks"?

 4         A    It's -- I would have to read through

 5    it.  Can I --

 6         Q    Sure.

 7         A    I didn't read through all of it, but

 8    I refreshed my memory enough to know that the

 9    part about it that I didn't like was that

10    Actavis was being lumped in with Ranbaxy and

11    other companies that had, at least in my

12    opinion, more significant issues, particularly

13    with Department of Justice being involved with

14    Ranbaxy's products in India.

15         Q    And actually Ranbaxy issues,

16    actually there was evidence of outright fraud,

17    wasn't there?

18         A    Right.

19         Q    But the actual information that was

20    included in the quotes, as you say in your

21    e-mail, was taken out of the warning letter

22    and the recall press release; correct?

23                   MR. DEAN:  Objection.

24                   Go ahead.

PLAINTIFFS' EXHIBITS 000963

173

1              That's a miscategorization of

2         that sentence.

3    BY MR. BLIZZARD:

4         Q    Does the sentence say:  They -- "The

5    quotes they lifted are in every warning letter

6    and recall press release"?

7         A    Yes.

8         Q    And in the second paragraph, is

9    there a quote there that says:  Actavis said

10   August 1 that it is recalling all 65 products

11   manufactured at the plant following an

12   inspection that, quote, revealed operations

13   which did not meet the FDA's or Actavis'

14   standards for good manufacturing processes?

15             Did I read that correctly?

16        A    Yes.

17        Q    And do you agree that the inspection

18   by FDA did reveal operations which did not

19   meet the FDA or Actavis' standards for good

20   manufacturing practices?

21        A    Yes.  But that is also a standard

22   statement that is in most recall notices.

23        Q    Well, is that something that you

24   think the public should be entitled to know?

PLAINTIFFS' EXHIBITS 000964

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

174

```
 1              MR. DEAN:  Objection.
 2              Go ahead.
 3              THE WITNESS:  I'm not sure --
 4        the reason for the recall?  Is that what
 5        you're asking me, the public should know
 6        the reason for the recall?
 7   BY MR. BLIZZARD:
 8        Q    Yes.  Yes.
 9        A    Yes, you need to state the reason
10   for the recall.
11        Q    Right.  I guess what I'm trying to
12   make sure is that you're not saying that
13   telling the public that the company was not
14   meeting good manufacturing practices sucks?
15   You're not saying that, are you?
16        A    No.  I -- can I elaborate?
17        Q    Sure.
18        A    What I'm saying is that taken out of
19   context, to take just the snippets of what
20   happened at Actavis and try to liken it to
21   fraud in Ranbaxy was an -- it's an unfair
22   article.
23        Q    Okay.
24        A    And this article, as I said, was
```

PLAINTIFFS' EXHIBITS 000965

175

1    trade press for the pharmaceutical industry,

2    not a newspaper article for the public.

3         Q    So what you're saying is Ranbaxy was

4    intentionally trying to defraud the --

5         A    I have no knowledge of that.

6         Q    Okay.  Well, that's what the reports

7    that you heard?

8         A    Exactly.

9         Q    Okay.  But you know that FDA, as we

10   talked about earlier today, found that the

11   quality system of Actavis was a total failure;

12   correct?

13        A    I also know that this investigation

14   by the Justice Department against Ranbaxy was

15   dropped.

16        Q    Okay.  But what happened -- wasn't

17   there a proceeding by the Justice Department

18   against Actavis?

19        A    Subsequently, yes.

20        Q    When was that?

21        A    Discussions began with the

22   Department of Justice in September.

23        Q    And did you resign shortly after

24   that proceeding was initiated?

PLAINTIFFS' EXHIBITS 000966

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

176

1        A     In November.

2        Q     Did you resign in part because of

3    the proceeding?

4        A     Yes.

5        Q     Why?

6        A     Because the Justice Department was

7    proceeding with a consent decree which not

8    only named the company but also named the

9    individuals, one of which was me.  And after

10   several rounds of discussion as to who should

11   be and who should not be named on the

12   document, my name was -- several of the names

13   had been dropped, and my name was still on the

14   consent decree.

15            And I had asked that it be removed,

16   mainly because my experience in industry

17   tells -- has -- based on other cases was that

18   once your name is on a consent decree, it

19   becomes part of your public record and

20   history.  And I did not really want that in my

21   background check.  It would be a limiting

22   factor in my future employment.  And even

23   though cases have gone to trial and those

24   cases have, I guess, exonerated the

PLAINTIFFS' EXHIBITS 000967

177

```
 1      individuals, it still sort of follows them.
 2                  So while I was more than willing to
 3      stay with the company and carry out -- because
 4      I've done so in other organizations, as we
 5      mentioned earlier with Barr, more than willing
 6      to go through the consent decree activities, I
 7      felt that I was a better use to them as a
 8      person doing the work as opposed to the person
 9      being named on the decree.
10           Q    Was your name taken off the consent
11      decree after you resigned?
12           A    Yes.
13           Q    And was that part of a condition of
14      your resignation?
15           A    Yes.  It was the only way the name
16      would have come off.
17           Q    Now, before the Justice Department
18      took action against Actavis, you said
19      discussions started in September of 2008?
20           A    Yes.
21           Q    Were there additional problems that
22      developed during the remediation effort?
23                  MR. DEAN:  Remediation of
24           Digitek?
```

PLAINTIFFS' EXHIBITS 000968

178

1    BY MR. BLIZZARD:

2        Q    Were there additional problems

3    with -- let me ask you this:  Did the quality

4    system that was in effect at Actavis, did it

5    cover all the drugs manufactured by Actavis?

6        A    The quality system would cover the

7    entire facility, yes.

8        Q    Okay.  So there weren't any drugs

9    that were excluded from the operation of the

10   quality system; quality applied to each of the

11   drugs; right?

12       A    Yes.

13       Q    So were there problems with the

14   quality system in September of 2008?

15                  MR. DEAN:  Objection.  It's

16           vague and ambiguous.  You've already

17           established they weren't making product

18           at that point, Ed.  Could you clarify

19           that?

20                  (Plaintiff's Exhibit No. 118

21           was marked for identification.)

22   BY MR. BLIZZARD:

23       Q    Let me just show you a document

24   that's marked as Exhibit 118.  This is

PLAINTIFFS' EXHIBITS 000969

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

179

1    1267772.

2              Do you see the first e-mail here is

3    from Tony Delicato to Erislandy Dorado with a

4    carbon copy to you and Chris Young?

5         A    Yes.

6         Q    And it's dated September 16 of 2008;

7    is that right?

8         A    Yes.

9         Q    And then the subject says:  "These

10   are just examples - not all - inclusive."

11             Is that what it says?

12        A    Yes.

13        Q    And it says:  Quality unit

14   responsibilities SOP outdated/not accurate.

15             Do you know what that refers to?

16        A    There was an SOP, a standard

17   operating procedure.  And the one that was in

18   place did not reflect what was -- what we

19   wanted to have going forward, so it needed to

20   be revised.

21        Q    Then it says:  Quality review

22   board - SOP effective but no meetings held as

23   functional areas have not had time to generate

24   metrics.

PLAINTIFFS' EXHIBITS 000970

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

180

1             Is that what it says?

2        A    Yes.

3        Q    What was your understanding of that

4    issue?

5        A    The quality review board is

6    typically a management-level review that would

7    look at trends and look at whatever the

8    metrics were that were decided upon.

9             So what he's saying here is that we

10   put the SOP in place, but we haven't had

11   meetings because they have to still gather the

12   metrics to do that.

13       Q    Okay.

14       A    These metrics here, again, in this

15   time frame would be all of the past history.

16       Q    There's a recall SOP update.  It

17   says:  Revision in process but not ready?

18       A    Correct.

19       Q    Is that what that says?

20            And it says:  The site master

21   plans - with the exception of analytical...are

22   the others accurate and reflect current

23   thinking?  Same for SOPs that govern EQ, PV,

24   and CV.

PLAINTIFFS' EXHIBITS 000971

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

181

1          What's EQ, PV, and CV?

2          A     Equipment qualification, process

3     validation, and cleaning validation.

4          Q     Then it says:  Complaint and APR

5     SOP - requires revision; IP but not ready.

6                What's IP stand for?

7          A     In process.

8          Q     Then it says:  Complaints -

9     approximately 250 digoxin complaints overdue

10    due to Class I recall - massive volume

11    received.

12               Is that what that says?

13         A     Yes.

14         Q     Then it says:  Training level of

15    departments - at or just below 80 percent...we

16    are working on closing gaps to get 95 percent

17    but not there yet.

18               And then he says:  "I could go on

19    but you get the point."

20               Is that what he says?

21         A     Uh-huh.

22         Q     And then he says:  "Please don't get

23    me fired.  We are doing the best we can under

24    the circumstances."

PLAINTIFFS' EXHIBITS 000972

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

182

 1          A    Uh-huh.

 2          Q    And then you respond to it; correct?

 3          A    Yes.

 4          Q    And what do you say?

 5          A    "Don't worry.  You can stay.  I'll

 6     go."

 7          Q    Were you actually contemplating that

 8     at the time?

 9          A    No.  Actually, that was all in jest.

10               (PLAINTIFF'S Exhibit No. 119

11          was marked for identification.)

12     BY MR. BLIZZARD:

13          Q    Finally I want to show you a

14     document that's marked as Exhibit No. -- I'm

15     going to mark as Exhibit No. 119.  And this is

16     00 -- I'm sorry -- 309296.

17          A    Yes.

18          Q    Does this appear to be a document

19     that's dated November 2008, "Monthly

20     Deviations and CAPA Data"?

21          A    Yes.

22          Q    What does "CAPA" stand for?

23          A    Corrective and preventive action.

24          Q    So is this part of the corrective

PLAINTIFFS' EXHIBITS 000973

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

183

1    action plan?

2         A    No.  CAPA is a normal, coined, sort

3    of GMP phrase, corrective and preventive

4    action.  CAPA should be part of every quality

5    system.

6         Q    Okay.  And this appears to be a

7    monthly report from November; is that

8    accurate?

9         A    Yes.

10        Q    If you'll go over to Page 2,

11   November of 2008 was less than a month before

12   you left or a month before you left?

13        A    I'm sorry?

14        Q    I'm sorry.  Let me rephrase that.

15             When did you leave Actavis?  When

16   did you resign?

17        A    November 13.

18        Q    Did you see this plan before you

19   resigned?

20        A    I've never seen this.

21        Q    Have you seen any monthly reports

22   similar to this before you resigned?

23        A    Similar, yes.

24        Q    If you look at the second page, it

PLAINTIFFS' EXHIBITS 000974

184

1     says:  "Corrective and Preventive Actions -

2     Little Falls."

3          A     Uh-huh.

4          Q     And there's a percent overdue in the

5     middle of this.  It says 67 percent; right?

6          A     Yes.

7          Q     So it's 67 percent of the corrective

8     and preventive actions the company had agreed

9     should be done for the Little Falls facility

10    were still -- were overdue?

11         A     No, that's not correct.

12         Q     Explain that for me.

13         A     This is a self-imposed activity.  So

14    what's being reflected here is out of all of

15    the tasks that we chose to work on, based on

16    everything that we were doing to get the site

17    ready, to reintroduce product, there were

18    numerous activities and there were proposed

19    deadlines.  And this is just tracking that.

20              So these were not commitments to

21    FDA.  That was a management reporting

22    mechanism.  And at this particular point in

23    time, the operations had ceased.  So the

24    activities, if they were overdue, were only

PLAINTIFFS' EXHIBITS 000975

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

185

1    preventing the company from reengaging in the

2    manufacture of product.  So it was only -- we

3    were only holding up ourselves.  All product

4    was off the market at this point in time, and

5    all of these activities were activities to

6    bring product back.  So if they were overdue,

7    they were overdue.

8        Q    It was just the company losing

9    money?

10       A    Precisely.

11            MR. BLIZZARD:  Why don't we

12       take a couple minutes.  I may be finished

13       with my questioning.

14            MR. DEAN:  Sure.

15            THE VIDEOGRAPHER:  We are now

16       going off the record.  This is the end of

17       Videotape No. 3.  The time is 2:17.

18            (Short recess.)

19            THE VIDEOGRAPHER:  We are now

20       back on the record.  This is the

21       beginning of Videotape No. 4.  The time

22       is 2:28.

23            MR. BLIZZARD:  Ms. Lambridis,

24       we're back on the record.  I've looked at

PLAINTIFFS' EXHIBITS 000976

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

186

1           my notes.  I don't have any additional

2           questions for you at this time.  And I

3           want to thank you for your time.

4                      THE WITNESS:  You're welcome.

5                      THE VIDEOGRAPHER:  Off tape,

6           2:28.

7                      (Discussion off the record.)

8                      THE VIDEOGRAPHER:  Back on

9           tape, 2:29.

10   BY MR. PETTIT:

11           Q    Good afternoon, Ms. Lambridis.  I

12   name is Jim Pettit.  I'm an attorney with

13   Locks Law Firm, and I'm going to ask you some

14   questions on behalf of the PSC and on behalf

15   of New Jersey plaintiffs.  There may or may

16   not be an objection to that.  But, in any

17   event, I'm going to be asking you questions on

18   behalf of the PSC.

19                      MR. DEAN:  Before you start,

20           let me just restate my objection.  I have

21           no objection to you asking any questions

22           on behalf of the New Jersey state

23           plaintiffs.  The depositions were not

24           cross-noticed.  I'd like to reiterate

PLAINTIFFS' EXHIBITS 000977

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

187

1              that.  I have no objection to you asking

2              any questions in your role as PSC.

3                      So go ahead.

4       BY MR. PETTIT:

5              Q    Those were legal objections.

6                      Ms. Lambridis, I'm going to try very

7       hard not to ask you questions that are the

8       same or even similar to Mr. Blizzard's.  I had

9       a lot of questions that were similar and some

10      of the same documents.  So I'm going to be

11      zigzagging a lot more than Mr. Blizzard was.

12      And, also, I'm going to be using the Elmo

13      rather than the nice digital computer

14      projection that he used, so it's not going to

15      be quite as smooth.

16                     All right?

17             A    Okay.

18             Q    Mr. Blizzard asked you some

19      questions about your employment, and you said

20      you began with Actavis in September 2007.  I

21      was wondering if you could tell us the exact

22      date.

23             A    The 17th.

24             Q    So you came into the Actavis company

PLAINTIFFS' EXHIBITS 000978

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

188

1     during the FDA inspection that took place

2     between September 5th, 2007, and

3     September 28th, 2007; correct?

4          A     Correct.

5          Q     And were you involved with that in

6     terms of physically walking around with the

7     FDA inspectors?

8          A     No.

9          Q     Is there a reason that you were not?

10    Is there a reason that you're aware of that

11    you were not?

12         A     There was no reason given, but I

13    just started.  I had a week of orientation.

14    And honestly I wouldn't be able to host an

15    inspection with no knowledge of the facility,

16    so there was no point in my participating as

17    far as from my own perspective.

18         Q     When you left Actavis, which was, I

19    think you told us, December 1st, 2008 --

20         A     December 1st was technically the

21    last day of employment, but I resigned on the

22    13th.  And my last day on-site was the 17th, I

23    believe, of November.

24         Q     You resigned in November and left in

PLAINTIFFS' EXHIBITS 000979

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

189

1    November?

2         A    Correct.

3         Q    Physically left?

4         A    Physically left.

5         Q    Did you have sources of income

6    between December 1st, 2008, and when you went

7    to Halo in May 2009?

8         A    I had started consulting again.  I

9    had applied for unemployment and was

10   received -- and received unemployment.  And I

11   subsequently negotiated a consent -- a

12   consulting agreement with Actavis.

13        Q    Have you received any income from

14   Actavis since December 1st, 2008?

15        A    Me personally?

16        Q    Yes.

17        A    As a consultant.  So the consulting

18   agreement, I believe, was signed in 2009,

19   April, March or April of 2009.  And then

20   payments made -- are made to Framework, which

21   is my consulting company.

22        Q    And when was the last date that you

23   received any income from Actavis?

24        A    "Last" meaning most recent?

PLAINTIFFS' EXHIBITS 000980

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

190

1        Q    Yes.

2        A    The beginning of this month.  The

3   payment is monthly.

4        Q    And what consulting have you done in

5   the last month for Actavis?

6        A    The way the agreement is drawn up,

7   it is to retain my services for -- if needed

8   because of my involvement with all of the

9   activities that we're discussing here.

10            When I left, they were still

11   negotiating through the consent decree.  They

12   were still trying to resume manufacturing at

13   the Totowa facility.  And they did have the

14   pending litigations which they knew they may

15   need my help with.  So I was retained as a

16   consultant with the understanding that I would

17   be available to them when they needed me.

18        Q    And when you say "pending

19   litigations" in your last answer, do you

20   mean -- does that include personal injury

21   Digitek litigation, or are you just talking

22   about U.S. Government?

23        A    I'm talking about all of it.

24        Q    Everything.

PLAINTIFFS' EXHIBITS 000981

191

```
 1          A     Uh-huh.
 2          Q     Are you invoicing in any way your
 3    time spent in preparing for this deposition?
 4          A     No.
 5          Q     How about giving the deposition?
 6          A     No.
 7          Q     I want to ask you some, I think,
 8    pretty basic questions about the three
 9    facilities in New Jersey.  Okay?
10          A     (Witness shakes head.)
11          Q     When you have been using the term
12    the "Little Falls facility" today, you're
13    always talking about the Main Street facility?
14          A     Little Falls is typically the Main
15    Street facility.
16          Q     And the Taft Street -- and I'm
17    oversimplifying this -- was more packaging
18    than actual manufacturing operations; correct?
19          A     Yes.  Taft has specifically
20    packaging and some R&D labs.
21          Q     So there was never any Digitek
22    manufacturing at Taft; correct?
23          A     As far as I know.
24          Q     Would you or in your -- all right.
```

PLAINTIFFS' EXHIBITS 000982

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

192

1            During your time period, there was

2     never any manufacturing?

3         A     Never any manufacturing there.

4         Q     Was there ever any actual Digitek

5     manufacturing production at Riverview?

6         A     There were batches manufactured at

7     Riverview for the purpose of getting that site

8     approved to manufacture there subsequent to

9     the inspection.

10        Q     Okay.  So --

11        A     So those batches were never

12    marketed.

13        Q     And that's in relation to a

14    requirement that for Digitek to be produced in

15    a different facility, you had to go to the FDA

16    and get certain approvals?

17        A     Correct.

18        Q     What is the status of the building

19    at Little Falls on Main Street?

20        A     As far as I'm aware now, that

21    building is operating still, has had

22    subsequent FDA inspections.  I believe they

23    reintroduced one product, two strengths of one

24    product.

PLAINTIFFS' EXHIBITS 000983

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

193

```
1          Q     And if you went to that facility
2     today, would there be any signs identifying it
3     as an Actavis facility on the outside of the
4     building?
5          A     I haven't been there, but typically
6     there would be.
7          Q     When was the last time you were in
8     that Main Street facility?
9          A     Prior to November 13th of --
10         Q     2008.
11         A     -- 2008.
12         Q     And did the sign outside the
13    building then say "Actavis"?
14         A     Yes.
15         Q     What is the status of the building
16    on Riverview Drive?  And is that in Totowa?
17         A     Riverview Drive is in Totowa and --
18         Q     What is the -- go ahead.
19         A     -- I don't know the status.  I
20    believe the laboratory is still there, but
21    I -- I don't know the current status.
22         Q     What was the status -- when is the
23    last time you were there?  The end of 2008?
24         A     Yes.
```

PLAINTIFFS' EXHIBITS 000984

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

194

1          Q     What was the status then of that
2     building?
3          A     For lack of a better term, I guess
4     limbo would be the best.  Because the
5     inspection didn't result in them being able to
6     move into that building, it was still an
7     unknown as to whether they were going to
8     proceed and what they were going to do.
9          Q     Is "limbo" a religious term or a
10     legal term?  No.  Just kidding.
11          A     Business term.
12          Q     When you were answering some
13     questions to Mr. Blizzard, you told him -- and
14     I'm paraphrasing.  The record will speak for
15     itself as to what you said precisely.  But you
16     said on April the 9th, 2008, you had a written
17     commitment that there was a probable Class I
18     Digitek recall.
19               Do you remember testifying about
20     that today?
21          A     I didn't -- I didn't say it was
22     Class I.  I had made a comment to a colleague
23     that it looked like the Digitek was going to
24     result in recall of that batch.

PLAINTIFFS' EXHIBITS 000985

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

195

1          Q     And was that on April the 9th, 2008?

2          A     According to the memo that was

3     presented, it was April 9th.

4          Q     And does that date seem correct to

5     you now?

6          A     It seems, yes, factual.

7          Q     Now, the actual letters going to

8     Mylan that Mr. Blizzard talked to you about,

9     that one letter that went out over your

10    signature, do you remember that?

11         A     Yes.

12         Q     You said that even though that

13    letter was dated April the 28th, you

14    thought -- you didn't know the exact date it

15    went out, and you thought it was a few days

16    later; is that correct?

17         A     Yes.

18         Q     Do you, sitting here an hour later,

19    do you remember when it went out precisely?

20         A     I don't know the exact date.  The

21    letter that was in front of me today was the

22    draft, and it didn't have a signature on it.

23               So in the case of the Digitek

24    recall, we were working with a third party to

PLAINTIFFS' EXHIBITS 000986

196

```
 1    handle these recalls.  So sometimes I would
 2    sign a document, and those letters didn't go
 3    out for a day or so because of the mailings.
 4    So I don't -- the day I signed it and the day
 5    it actually goes out may differ.
 6         Q    Would you think that the earliest
 7    that that April 28, 2008, letter to Mylan,
 8    that the earliest date it went from Actavis to
 9    Mylan would have been in the first week of
10    May?
11         A    I couldn't say.
12         Q    If the letter were dated April
13    the 28th, 2008, would you agree with me that
14    the earliest it would have gone to Mylan was a
15    few days later, according to your testimony,
16    which would put it in the first week of May?
17                   MR. DEAN:  Objection.
18                   Go ahead.
19                   THE WITNESS:  I -- I don't
20         know, but I guess that's possible.
21    BY MR. PETTIT:
22         Q    Is it likely?
23         A    I could look at the dates.  I mean,
24    if April 28th was on a Thursday and May 1st
```

PLAINTIFFS' EXHIBITS 000987

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

197

1    was a Tuesday, it's possible.

2              MR. PETTIT:  I'm going to mark

3         this as 120.

4              (Plaintiff's Exhibit No. 120

5         was marked for identification.)

6    BY MR. PETTIT:

7         Q    Ms. Lambridis, I've shown you a

8    document which I have marked as Exhibit 120.

9    It has Bates No. UDLL004006, and it's three

10   pages long.

11             Do you see that?

12        A    Yes.

13        Q    Now, this is, would you agree with

14   me, a letter that's similar to Exhibit 113

15   that Mr. Blizzard showed you, except that

16   document had Xs on the sentence that says,

17   quote:  Actavis has distributed the subject

18   lots from 3/1/06 through 4/24/08,

19   quote/unquote.

20             Do you see where it says that on

21   this exhibit?

22        A    Yes, but that's not the only

23   difference.

24        Q    I'm not saying that it is.

PLAINTIFFS' EXHIBITS 000988

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

198

1          A     Yes, yes.

2          Q     I'm saying some of the Xs have been

3     filled in; correct?

4          A     Uh-huh.

5          Q     When you look at this exhibit,

6     Plaintiff's 120, does that seem to you to be

7     the final draft?

8          A     When I look at this document, I can

9     tell you that it's a copy of the draft that we

10    at Actavis prepared and it was modified to

11    accommodate recalls done by Mylan.

12         Q     Does that time period seem accurate

13    to you that recall lots went from March 1,

14    2006, to April 24, 2008?

15         A     I can't say specifically to the

16    exact dates, but that would reflect the

17    two-year period.  So when you're doing the

18    recall, you would have to go back to --

19    because it was for all lots, it would be any

20    lots within expiry.  So based on the dates

21    with the two-year expiry, that would cover all

22    lots manufactured in that time.

23         Q     And just so the jury knows what that

24    technical word "expiry" means --

PLAINTIFFS' EXHIBITS 000989