Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

199

1          A     The expiration date on the bottle,

2      on the product.  This letter --

3                      MR. BLIZZARD:  This is the

4          original exhibit, so if we could switch

5          out.

6                      MR. PETTIT:  I'll show you the

7          original, and then I can mark up this

8          one.

9      BY MR. PETTIT:

10         Q     Were you going to finish saying

11     something?  It sounded like you were saying

12     something else.

13         A     I was just commenting that the

14     document -- this is a letter that Mylan sent

15     out, not Actavis.

16         Q     I understand that.

17         A     Oh, okay.

18         Q     But you sent it, meaning Actavis

19     sent it over your signature, to Mylan?

20         A     Yes.

21         Q     And then do you have any knowledge,

22     personal actual knowledge that Mylan sent this

23     letter out?

24         A     Product came back.  So I'm not sure

PLAINTIFFS' EXHIBITS 000990

200

```
 1    what your question is.
 2         Q    My question is whether or not
 3    products came back for some reason.  Do you
 4    know whether this actual letter went out from
 5    Mylan to someone else?
 6         A    I would not be -- I wouldn't
 7    participate in that activity, so no.
 8         Q    Did you ever ask anyone at Mylan or
 9    did Mylan ever tell you that it went out?
10         A    Yes.
11         Q    Who did you speak to at Mylan?
12         A    I didn't speak to anyone directly,
13    but the information was conveyed back to me
14    mainly because that's why I recognize
15    Stericycle, because the product that they were
16    bringing back went to a different third party
17    for the recall.  So ours was -- if you look at
18    my original draft, that information for the
19    return is different.
20         Q    And just because this is a different
21    numbered exhibit, you're looking at the third
22    page -- or the second page of the document?
23         A    Yes.
24         Q    And that's your signature; correct?
```

PLAINTIFFS' EXHIBITS 000991

201

```
 1          A     No, that's not my signature.

 2          Q     Someone signed for you?

 3          A     Someone -- I don't recognize the

 4     signature.  It says someone's name for and it

 5     uses my name, but it's not my signature.

 6          Q     Is that a practice that you followed

 7     at some point in 2008, that someone could sign

 8     a formal document?

 9          A     As I said before, this appears to

10     be -- it appears to me that this document was

11     Mylan's document, that it was altered to

12     include their information.  And I don't

13     recognize the signature.

14          Q     Okay.  I'd like you to take as long

15     as it takes for you to read that

16     one-and-a-half-page letter and tell me if

17     there's anything in it that you would not sign

18     sitting here today.

19          A     That I would not?

20          Q     That you would not sign, that

21     there's something that you would be unhappy

22     that your signature was, in fact, on the

23     second page.

24          A     It doesn't have the attachment with
```

PLAINTIFFS' EXHIBITS 000992

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

202

```
 1     the lot numbers.  But other than that, it
 2     seems to be a document that I would sign, yes.
 3          Q    Okay.  And you're referring to the
 4     fact that Exhibit 113, which Mr. Blizzard
 5     showed you, had a list of the batches;
 6     correct?
 7          A    Yes.  And this refers to the --
 8     actually it says the product labels, but
 9     they're not attached.
10          Q    But the actual substance of this
11     one-and-a-half-page letter is correct and
12     accurate?
13          A    Yes.
14          Q    Now, if this letter went out around
15     April 30th or May 1st, somewhere in that time
16     period, that would be three weeks after you
17     made a commitment that there was a probable
18     Digitek recall on April the 9th, 2008;
19     correct?
20          A    The timing you're referring to is
21     correct, but my statement was to a colleague
22     about where I thought we were headed with the
23     digoxin review.
24               And from what I can recall, that
```

PLAINTIFFS' EXHIBITS 000993

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 5 of 200 PageID #: 19957
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

203

| 1 | time period after -- there were a number of |
|---|---|

1    time period after -- there were a number of

2    other products that the Agency was looking at

3    that Actavis committed to recall.  And that

4    pretty much wrapped up around April 9th where

5    I put it in writing that we were going to

6    recall those other products.

7              When we got to that point, Erin had

8    moved off of those products and was starting

9    to look at other products, Digitek being one

10   of them.  So April 9th was when -- around the

11   time frame when she started to look at the

12   Digitek and question the investigation

13   associated with the batch with the so-called

14   double-thick tablets.

15             So there was no commitment to recall

16   that batch until probably at least a week or

17   so later because there was a number -- there

18   were --for one thing, she was asking for more

19   information, and we were providing information

20   to her.  And we were still in the -- in the

21   mode of trying to, I guess, satisfy her

22   concerns.

23        Q    Are you retracting any of your

24   testimony to Mr. Blizzard today about whether

PLAINTIFFS' EXHIBITS 000994

204

1      there was a probable Digitek recall, in your

2      mind, as of April 9, 2008?

3                      MR. DEAN:  Objection to form.

4                      Go ahead.

5                      THE WITNESS:  I would have to

6          look back at what exactly I wrote, but I

7          said it's probably a recall.  But that,

8          again, is a statement I made to a

9          colleague.  It is not a formal commitment

10         to FDA to recall something.  There's a

11         big difference.

12     BY MR. PETTIT:

13         Q    In your mind -- are you finished

14     your answer?  I'm trying not to speak over

15     your answer.

16         A    Yes, yes.

17         Q    In your mind, on April the 9th,

18     2008, it was already probable that there would

19     be a Digitek recall --

20                      MR. DEAN:  Objection.

21     BY MR. PETTIT:

22         Q    -- is that correct?

23                      MR. DEAN:  Objection; misstates

24         the testimony, misstates the document.

PLAINTIFFS' EXHIBITS 000995

205

```
1                     Do you want to look at 107?
2                THE WITNESS:  Yes.
3                It was --
4    BY MR. PETTIT:
5        Q    Now that Mr. Dean has coached you on
6    answering the question --
7                MR. DEAN:  I showed her the
8           document.  You're the one who's
9           misstating it.
10               MR. PETTIT:  Counsel, there is
11          not only no speaking objections, there's
12          no shoving documents in front of the
13          witness.  I mean, I don't know what court
14          you practice in.  I've never seen such a
15          thing.
16               MR. DEAN:  I've never seen an
17          attorney try to trick a witness and say
18          she's testified to one thing when she
19          hasn't testified to it at all.  I think
20          it's only fair to show the witness the
21          document.  I think, in fairness, you're
22          probably confused about the document.
23               MR. PETTIT:  All right.  Now
24          you've totally coached your witness on
```

PLAINTIFFS' EXHIBITS 000996

Confidential – Subject to Further Confidentiality Review

```
 1        what to say.
 2    BY MR. PETTIT:
 3        Q    So let me put the document that does
 4    not have the oral testimony that you gave
 5    Mr. Blizzard on it; but I will show you the
 6    document, now that Mr. Dean has put it in
 7    front of you, so the jury can see what your
 8    lawyer -- excuse me -- what Actavis' lawyer
 9    put in front of you.  And I'm going to let the
10    jury look at it, and then I have to hand it
11    back to you.  Okay?
12              Now, does that help you in answering
13    your question -- answering my question, which
14    was whether or not you choose now to retract
15    any of the testimony you gave to Mr. Blizzard
16    today about the fact that, in your mind, on
17    April the 9th, 2008, there was probably going
18    to be a Digitek recall?
19                  MR. DEAN:  Objection.  That's a
20              different question than what you asked
21              her before.
22                  Go ahead.
23                  THE WITNESS:  I don't retract
24              anything I said before.  I never said --
```

PLAINTIFFS' EXHIBITS 000997

207

```
1           I am putting it in the context of what is
2           written here and the intent of it.  Erin
3           looked at the investigation and was
4           not -- visibly not pleased with it.  My
5           comment to my colleague was that I
6           thought it was going into that direction.
7                        But in terms of actually what
8           had happened was that we spent several
9           days giving her information to help
10          clarify the issues, which turned out to
11          be unsuccessful.
12                       So it was not a formal
13          commitment to the FDA to recall anything
14          until at least a week later.
15     BY MR. PETTIT:
16          Q    On April the 9th, 2008, Actavis had
17     no plans to recall Digitek and they were
18     waiting for the FDA to pressure them into
19     doing it; is that correct?
20                       MR. DEAN:  Objection;
21          argumentative.
22                       Go ahead.
23                       THE WITNESS:  No.  It was the
24          beginning -- in any of these instances,
```

PLAINTIFFS' EXHIBITS 000998

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

208

1          the FDA is reviewing something and

2          there's supplemental information that can

3          be provided to clarify issues, to satisfy

4          concerns.  And it became clearer as we

5          moved on that nothing -- there was

6          nothing that was -- I had testified also

7          earlier that I had no experience with

8          what she was looking at.  I didn't

9          participate in it.  I was not actively

10         involved in it.

11                    So as a responsible individual,

12         I needed to look into the issues and

13         provide her with the information and the

14         people for her to question so that she

15         could fully understand it.  No company is

16         going to jump up and recall something the

17         first time FDA reviews it and says they

18         don't like it.

19    BY MR. PETTIT:

20         Q    Do you think that April 2008 was the

21    first time the FDA reviewed this Digitek

22    problem?

23                    MR. DEAN:  Objection to form;

24         vague and ambiguous.

PLAINTIFFS' EXHIBITS 000999

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

209

1              Go ahead.

2                    THE WITNESS:  I don't know the

3         exact date, but it was early April when

4         she first started to look at the digoxin

5         batches, yes.

6    BY MR. PETTIT:

7         Q    As the vice president of quality and

8    compliance, from September 2007 to April 9th,

9    2008, did you make an effort to find out if

10   the FDA was concerned about the release of the

11   batch that we've been talking about that had

12   the double thickness?

13        A    Why would I do that?  FDA didn't

14   know that batch existed until they came

15   on-site in March and subsequently picked up a

16   batch record, saw it, and looked at the

17   investigation.  That was the first time I saw

18   it.

19        Q    Did you make any effort, as the vice

20   president for quality and compliance, to

21   inform the FDA that there had been a batch of

22   4.8 million pills of Digitek released after

23   there had been an inspection, which was 07-093

24   inspection?

PLAINTIFFS' EXHIBITS 001000

210

```
 1                    MR. DEAN:  Objection; assumes
 2            she had knowledge of it.
 3                    Go ahead.
 4                    THE WITNESS:  As I stated
 5            before, I had no knowledge of this issue
 6            until FDA looked at the batch record
 7            during the inspection in 2008.
 8      BY MR. PETTIT:
 9            Q    Did you ever criticize Mr. Bitler
10      for not consulting you about his decision to
11      release that batch?
12            A    No, I don't believe so.  And there
13      was also another director in between -- Dan
14      did not report directly to me.
15            Q    Did you ever criticize Scott Talbot
16      for not telling you?
17            A    Not necessarily because the
18      day-to-day operations really fell into the
19      site quality purview.  And I would typically
20      not be consulted on every issue.  I would have
21      liked to have been consulted in this
22      particular case, but there was no criteria for
23      which they needed to notify me.
24            Q    Which was my next question.  Is
```

PLAINTIFFS' EXHIBITS 001001

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

211

1       there a written policy or criteria for when

2       Mr. Bitler would tell Mr. Talbot or when --

3       strike that.

4                   Is there a written criteria or

5       policy for when Mr. Talbot would inform you of

6       a decision to release 4.8 million pills in a

7       batch where there had been double-thick

8       tablets found?

9                   MR. DEAN:   Objection to form.

10                  Go ahead.

11                  THE WITNESS:   There was no

12          criteria of any sort at that time.

13      BY MR. PETTIT:

14          Q    When you say you would have liked if

15      Mr. Talbot had informed you, was that your

16      thought in April 2008?

17          A    When I saw the investigation, yes, I

18      would have liked to have been consulted on it.

19          Q    And did you wish that there were an

20      Actavis criteria or policy in place to make

21      Mr. Talbot talk to you about release of that

22      batch?

23                  MR. DEAN:   Objection.

24                  Go ahead.

PLAINTIFFS' EXHIBITS 001002

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

212

1                    THE WITNESS:  I can answer?

2                    MR. DEAN:  Sure.

3                    THE WITNESS:  Even with

4          guidelines for communication and

5          elevating of issues, it would be

6          difficult for any site to run where the

7          VP of all of US operations had to be

8          consulted on every decision.

9                    So I do agree that there should

10         be criteria, and I believe there were

11         subsequently procedures put in place so

12         that things of a certain nature would be

13         elevated to my level.  But it's still

14         never practical for it -- it would never

15         always be on every batch or every

16         decision.

17   BY MR. PETTIT:

18         Q    But, in fact, it was possible to

19   have done it if Actavis had chosen to do it?

20                    MR. DEAN:  Objection.

21                    Go ahead.

22   BY MR. PETTIT:

23         Q    To have such a policy in writing.

24         A    You could never outline every

PLAINTIFFS' EXHIBITS 001003

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

213

1    instance in which you want to get a phone
2    call.  So I don't think anybody was going to
3    write into any SOP that if you have
4    double-thick tablets and you want to release
5    the batch after inspection, that you have to
6    call the VP.
7              You're being very specific in your
8    questioning.
9         Q    Was there anything in your CAPA
10   afterwards, after the April 2008 -- March and
11   April 2008 inspection that suggested there be
12   such a criteria?
13        A    There was no such criteria as far as
14   I know.  But what it did enable was just more
15   visibility about what was going on at the site
16   in terms of the investigations that were being
17   opened and closed and the nature of those
18   investigations, which would allow reporting
19   and visibility to the issue so that if there
20   was something, I could question it or any VP
21   in my role or anyone in my role could question
22   it.
23        Q    Are you finished your answer?
24   Because I don't want to speak over you.

PLAINTIFFS' EXHIBITS 001004

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

214

1       A    Yes, uh-huh.

2       Q    I'm going back to Exhibit 120, which

3    is up here on the screen, the April 28th,

4    2008, letter that Actavis sent to Mylan.  And

5    at the very beginning, it talks about the

6    recall.  It says:  "This recall has been

7    initiated due to overweight tablets."

8            Do you see that?

9       A    Yes.

10      Q    And that, in fact, is accurate; is

11   that correct?

12      A    I'm trying to remember where that

13   wording came from.  And I don't recall, but

14   that was what was agreed upon as the reason

15   for the recall.

16      Q    Agreed upon among others by Actavis?

17      A    Yes.

18      Q    And agreed upon by yourself as well

19   personally while you were vice president at

20   Actavis?

21      A    Yes.

22      Q    There -- well, let me ask it a

23   different way.

24           Were there letters that were drafted

PLAINTIFFS' EXHIBITS 001005

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

215

1    by Actavis that were intended for pharmacies

2    to send to the patient or the consumer about

3    the recall?

4         A    For Digitek?

5         Q    Yes, about the Digitek recall.

6         A    I don't think so, not to my

7    knowledge.

8         Q    Were there -- without speculating,

9    were there letters drafted by Mylan -- drafted

10   by Mylan that were intended for use by the

11   pharmacies to send to consumers or patients?

12        A    I don't know.

13        Q    Did you ever ask how the consumer or

14   the patient was going to learn about the

15   recall?  Did you ever ask anybody at Mylan?

16        A    No.

17        Q    Did anybody at Mylan ever talk to

18   you about what their intentions were so that

19   the consumers and the patients could find out

20   about the recall?

21        A    No.

22        Q    Did Actavis ever do anything to find

23   out if the pharmacies were sending letters to

24   the consumers?

PLAINTIFFS' EXHIBITS 001006

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

216

```
 1              MR. DEAN:  Objection.
 2              Go ahead.
 3              THE WITNESS:  I know that there
 4         were several other groups of people that
 5         were coordinating these efforts, but I
 6         was not directly involved.
 7    BY MR. PETTIT:
 8         Q    Do you know who that was?
 9         A    More along the lines of customer
10    service groups so that they could answer
11    questions and handle information because
12    people were calling and not -- if they were
13    Mylan's customers, we had no familiarity with
14    them.
15              So I know that the customer service
16    groups had to work together to help answer
17    questions and direct the product to the right
18    locations.  But I didn't participate in that
19    directly.
20         Q    Mr. -- I'm moving on to another
21    topic.
22              Mr. Blizzard asked you some
23    questions about risk assessment.  And I want
24    to ask you, is there something different
```

PLAINTIFFS' EXHIBITS 001007

217

1     called a health hazard assessment?

2          A     Actually we talked about a health

3     hazard assessment this morning.

4          Q     Correct.

5          A     Yes.

6          Q     And Mr. Blizzard -- I don't want to

7     try to characterize what he said and what you

8     answered.  That's what actually I'm trying to

9     find out now.

10               When you were talking about a health

11    hazard assessment this morning to

12    Mr. Blizzard, in your mind, is that different

13    than something called a risk assessment?

14         A     Yes.

15         Q     Okay.  What's the difference?

16         A     I think a health hazard assessment

17    is one form of a risk assessment, but there

18    are other types of risk assessments that are

19    not always health hazard-related.

20               So, I mean, I don't know if that

21    answers you, but that kind of puts it -- I put

22    it in two different categories.

23         Q     Again, somewhat paraphrasing what

24    you said, I think you said that you did not

PLAINTIFFS' EXHIBITS 001008

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

218

1    know if there was a health hazard assessment

2    done for Digitek; correct?

3         A     Correct.

4         Q     Do you know, sitting here today, who

5    might likely know that at Actavis if there

6    were one done?

7         A     If there were one done, the

8    pharmacovigilance group.

9         Q     And who is that?  I mean the names

10   of people.

11        A     Sarita -- I don't know her last

12   name.

13        Q     Spell Sarita for us, please.

14        A     S-A-R-I-T-A.

15        Q     What was her title or her

16   approximate title?

17        A     I don't know if she's director or

18   manager of pharmacovigilance.

19        Q     What department?

20        A     Regulatory affairs.

21   Pharmacovigilance is a department name, and it

22   falls under the regulatory affairs group.

23        Q     Do you know if she's still at

24   Actavis?

PLAINTIFFS' EXHIBITS 001009

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

219

```
 1         A    I don't know.

 2         Q    You were speaking to Mr. Blizzard

 3    earlier this morning about some duties that

 4    you had after the recall.  And one of the

 5    things that he and you were speaking about was

 6    something called refresher GMP training?

 7         A    Yes.

 8         Q    And that's good manufacturing

 9    practices?

10         A    Yes.

11         Q    Were there any refresher GMP

12    training sessions prior to the recall

13    regarding Digitek?  Well, strike that.  I'll

14    ask you a completely different question.

15              Prior to the April 2008 recall, were

16    there any refresher GMP training sessions --

17                   MR. DEAN:  Objection.

18                   Go ahead.

19    BY MR. PETTIT:

20         Q    -- as of the time that you began

21    there in September of 2007 up to April of

22    2008?

23                   MR. DEAN:  Let me state the

24       basis of my objection; lack of foundation
```

PLAINTIFFS' EXHIBITS 001010

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

220

1          with this witness.

2                    Go ahead.

3                    THE WITNESS:  GMP training is

4          done site-specific.  And I'm not sure

5          what the schedule was for that training,

6          but you typically would do periodic

7          training.  So you would be trained upon

8          employment, and then everyone would get

9          updated, ongoing training at regular

10         intervals on different topics or a

11         general GMP training.

12    BY MR. PETTIT:

13         Q    "Typically" meaning it should

14    happen, or "typically" meaning you know for a

15    fact that it did happen?

16         A    I could not answer with respect to

17    this site because I do not know what the -- I

18    don't know the detail in the SOP.

19         Q    If there were GMP refresher

20    training -- refresher GMP training from

21    September 2007 to April 2008, what department

22    would cause that to happen?

23         A    There was a training department.  It

24    was a training person on-site.

PLAINTIFFS' EXHIBITS 001011

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

221

1          Q     Was that under regulatory or under

2     quality or something else?

3          A     In this particular case, it fell

4     under the quality organization.

5          Q     Which is your organization?

6          A     Yes.

7          Q     Do you just not know because you

8     delegated that job to someone else, or do you

9     just not know period or what?

10         A     Again, I was the head of all US

11    operations that had multiple facilities.  So I

12    don't know the details of the SOPs in every

13    facility.

14              As a matter of fact, one of the

15    directions that we were going in at the time

16    was to consolidate and make some of those

17    practices consistent across all of the

18    facilities.

19         Q     I'm going to go on to a different

20    topic.  I want to ask you a couple questions

21    about the recall.

22              Did you personally ever have a

23    session where you orally spoke to the

24    employees at Actavis or some of the employees

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

222

1        at Actavis to tell them what the reason was

2        for the recall, the Digitek recall?

3               A     The whole entire --

4               Q     No.  I'm assuming it would be

5        smaller groups.

6               A     So now ask me the question again.

7               Q     Sure.  Did you personally ever give

8        any session where you orally presented to some

9        of the Actavis employees what the reason or

10       reasons were for the Digitek recall?

11              A     Not that I can recall.

12              Q     Did that happen by somebody else, if

13       you know, without guessing?

14              A     I believe there were discussions

15       about what was going on at the facility in

16       employee meetings, so updates to the employees

17       as to the status of the inspection and what

18       was going on.  Recalls were part of that

19       discussion to let people know.  Specifically

20       when we stopped manufacturing, there were a

21       number of times that the employees were

22       brought together, but I didn't give those

23       presentations.

24              Q     Do you know whether any of those

PLAINTIFFS' EXHIBITS 001013

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

223

1      presentations presented the reasons for the

2      Digitek recall?

3              A     I don't know for a fact.

4              Q     Have you ever heard of a

5      pharmaceutical company stop making all of its

6      products after an FDA inspection?

7                      MR. DEAN:   Objection.

8                      Go ahead.

9                      THE WITNESS:   Yes.

10     BY MR. PETTIT:

11             Q     What other companies?

12             A     There was a facility -- several --

13     two facilities that Schein owned that stopped

14     manufacturing product.

15             Q     All of its products?

16             A     Yes.

17             Q     Any others?

18             A     There are other facilities that I

19     have not worked at that were in the news and

20     trade press that had resulted in a stop of

21     manufacturing.

22             Q     Of all their products?

23             A     Yes.

24             Q     How many?  How many companies?

PLAINTIFFS' EXHIBITS 001014

224

1          A      I can think of at least two others.

2          Q      Any others besides Schein and the

3     two others?

4          A      That's all I can recall right now

5     off the top of my head.

6          Q      And is that in your entire career?

7          A      That's what I can remember now.

8          Q      Stretching back over your entire

9     career?

10         A      Yes.

11         Q      Do you know whether the consumers or

12    patients that took Digitek were ever offered a

13    refund by Actavis after the recall?

14         A      I don't know.

15         Q      Do you know who would most likely

16    know that at Actavis?

17         A      As I mentioned earlier, there were

18    customer service representatives that were

19    working in conjunction with those

20    representatives from Mylan to answer

21    customer-related issues and inquiries about

22    the recall.  So I don't know if -- typically

23    in a recall, there's some instruction as to

24    what to do with the product and whether they

PLAINTIFFS' EXHIBITS 001015

225

1        would be reimbursed or whether product would

2        be replaced, et cetera.  I don't know the

3        detail of this one.

4             Q    Are you talking about a third party

5        when you talk about customer service people or

6        are you talking about Actavis?

7             A    Both, both.

8             Q    Who at -- if I wanted to, for

9        example, take a deposition of someone at

10       Actavis who most likely would know about a

11       refund program, who do you think that would

12       be?

13            A    It would be -- I'm guessing that it

14       would be somebody in the customer service

15       department.

16            Q    Of Actavis and you just don't know

17       the names?

18            A    Right.

19            Q    Would you agree with me that but for

20       the FDA inspection in March and April of 2008,

21       Actavis would not have recalled Digitek?

22                 MR. DEAN:  Objection; calls for

23            speculation.

24                 Go ahead.

PLAINTIFFS' EXHIBITS 001016

226

1                    THE WITNESS:  I would say

2              that's probably true.

3       BY MR. PETTIT:

4          Q    Are you able to estimate what

5       percentage of all the batches produced by

6       Actavis in New Jersey in 2007 were batches of

7       Digitek?

8                    MR. DEAN:  Objection; lack of

9              foundation.

10                   Go ahead.

11                   THE WITNESS:  I don't know.

12      BY MR. PETTIT:

13         Q    Do you have any sense at all?

14         A    I only know that it was one of the

15      higher-volume products due to the number of

16      tablets in the batch size but not necessarily

17      the number of batches, if that makes sense.

18         Q    In going through documents, I have

19      seen references to the batch that we've been

20      talking about, which is the batch that they

21      found the, quote, double-thick tablets in.

22      And I have seen references to 70924, 70924A,

23      70924A1, and 70924A2.

24                   Have you made any effort to find out

PLAINTIFFS' EXHIBITS 001017

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

227

1      if all or some of those batch numbers were, in

2      fact, the ones that were involved with the

3      discovery of the 20 tablets and the

4      investigation of it?

5                     MR. DEAN:  Objection to form.

6                     Go ahead.

7                     THE WITNESS:  I believe it's

8            all the same batch.  It's just a -- it's

9            just a -- it gets the letters and numbers

10           at the end as it's being processed

11           through the -- it goes from manufacturing

12           into packaging.

13                    So it's given a batch number in

14           the manufacturing.  And then in some

15           cases product is packaged into more than

16           one container size.  So then it gets

17           different designations on the ends to

18           distinguish different parts of the batch

19           being packaged, perhaps hundred-count

20           versus 500-count versus a larger size.

21                    So it's all the same batch.

22           It's all the same manufactured batch.

23           The letter designations and the number

24           designations at the very end are just

PLAINTIFFS' EXHIBITS 001018

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

228

1              distinguishing between different

2              packaging sizes, from what I can recall.

3         BY MR. PETTIT:

4              Q    So if the batch that we're talking

5         about were about 4.8 million tablets, it's

6         your understanding that that is the sum total

7         of the batch and there wouldn't be two

8         separate batches with one of these other

9         designations that I just listed?

10             A    Correct.  No two batches have the

11        same number, not the same batch number.

12             Q    So there could not be such a thing

13        as a Batch 70924A1 and also a Batch 70924A2?

14             A    They're both the same manufacturing

15        batch.  They are just designated as A1 and A2

16        because they're packaged in different

17        container sizes.

18             Q    So if there were 4.8 million tablets

19        that were packaged differently, there would be

20        less than 4.8 million in A1 and less than

21        4.8 million in A2?

22             A    And when you add them together, they

23        would be 4.8.

24             Q    So when the many documents refer to

PLAINTIFFS' EXHIBITS 001019

229

1     four different designations, is it your

2     testimony that people meant to refer to just

3     the same batch?

4          A     Yes.

5               (Plaintiff's Exhibit No. 121

6          was marked for identification.)

7     BY MR. PETTIT:

8          Q     Now, this is what is called a

9     redacted document.  I'm zooming out so the

10    jury can see the entire document.  And at the

11    top are columns that say "Product," "Date

12    Letter Sent to Capital Returns," "Date Letter

13    Mailed to Customers," and "Comments."  And the

14    part that's not redacted says the Product:

15    Digoxin Tablets; the Date Letter Mailed to

16    Customer is April 29th, 2008.

17              Now, first of all, have you ever

18    seen this actual document before just now?

19    And I don't know if you can recognize it with

20    the redaction, but I'm going to ask it anyway.

21         A     I honestly can't recognize it.

22         Q     Without guessing, do you know what

23    it means?

24         A     Yes.  It's a list that indicates

230

1     when we sent the -- Capital Returns was the

2     third-party group that we were working with to

3     handle the recalls.  And so it's saying here

4     that we sent the final version of the recall

5     letter to them on the 28th and that they

6     mailed it to the customer on the 29th.

7          Q    The customer, again, meaning Mylan?

8          A    Correct.

9               MR. PETTIT:  Go off the record

10        for a second?

11               THE VIDEOGRAPHER:  Off the

12        record, 3:19.

13               (Discussion off the record.)

14               THE VIDEOGRAPHER:  Back on the

15        record, 3:21.

16               (Plaintiff's Exhibit No. 122

17        was marked for identification.)

18    BY MR. PETTIT:

19          Q    Ms. Lambridis, I've shown you a

20    document which I've marked -- is it 122?

21          A    122.

22          Q    Thank you.  My first question is:

23    Have you had a minute to just glance through

24    it?  And tell me if you've ever seen it before

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

231

1    just now.

2         A    I've not seen it in this exact

3    format, but I've seen something similar.

4         Q    And can you tell the jury what it

5    looks like to you?

6         A    It looks like a log of what

7    investigations were opened on a monthly basis.

8         Q    So what the jury's looking at right

9    now is just the top page, July 2006; correct?

10        A    Uh-huh.

11        Q    August, September, October, and so

12   on; correct?

13        A    Yes.

14        Q    And can you turn to Page 1423204,

15   which is December 2007.  And can you see that

16   there's an investigation 07-093?

17        A    Yes.

18        Q    And there's a column in the

19   beginning that says "Investigation Open By

20   Department."  And this one says

21   "Manufacturing"?

22        A    Yes.

23        Q    And there's an "Investigation

24   Initiated Date" and a "Disposition Approved

PLAINTIFFS' EXHIBITS 001022

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

232

1      Date"; correct?

2           A    Yes.

3           Q    Now, do you know, without guessing,

4      what that line means:  07-93, manufacturing

5      department opened an investigation on

6      December 5th, 2007, 1/25/2008?

7                First of all, I said that in a

8      sentence.  So is that sentence even correct?

9      Can you put those words together and make a

10     sentence like I just did?

11          A    By looking at the column headers, I

12     can say that there was an investigation opened

13     on December 5 by the manufacturing department

14     and it was given an investigation number,

15     07-093.

16          Q    If -- first of all, do you recognize

17     that number, 07-093, as a specific

18     investigation?

19          A    No.

20          Q    Have you ever seen 07-093 as an

21     investigation regarding a batch of Digitek

22     which had tablets that were out of

23     specification?

24          A    If you're referring to the batch

PLAINTIFFS' EXHIBITS 001023

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

233

1    that is under discussion, I actually read

2    excerpts from that investigation report during

3    the FDA inspection.  But I wouldn't recognize

4    that as the number.

5         Q    If that were an inspection number

6    for an inspection for an out-of-spec --

7                   MR. DEAN:  You mean

8         investigation?

9                   MR. PETTIT:  What did I say?

10                  MR. DEAN:  Inspection.

11                  MR. PETTIT:  I'm sorry.  Thank

12        you.

13   BY MR. PETTIT:

14        Q    If that is a number for an

15   investigation for an out-of-spec Digitek

16   batch, a batch of Digitek where there were

17   some out-of-spec Digitek tablets, is it

18   unusual for the department that opened the

19   investigation to be manufacturing?

20        A    No.  It would depend on what the

21   issue is.  Whoever -- it varies from company

22   to company, but typically where the event

23   occurred is where -- the department given the

24   responsibility for the investigation, to open

PLAINTIFFS' EXHIBITS 001024

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

234

1     it and to conduct it.  Sometimes it's found by

2     another department, but it would still go back

3     to where it originated.

4          Q    So if 07-03 were an investigation

5     number for that batch of Digitek that we've

6     been talking about all day, even if the

7     inspection were handled by Mr. Bitler out of

8     the quality group, it could still be opened by

9     manufacturing; is that correct?

10         A    Yes.

11         Q    And do you have memory, from this

12    document refreshing your memory or not, as to

13    whether those dates are correct for the

14    inspection, without guessing?

15                   MR. DEAN:  For the

16         investigation?

17                   MR. PETTIT:  I'm so sorry.

18    BY MR. PETTIT:

19         Q    "For the investigation" is what I

20    mean to say.

21         A    I am not that familiar with this

22    format.  I'm not sure what you're asking me.

23    Do you want me to verify that those are the

24    dates?

PLAINTIFFS' EXHIBITS 001025

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

235

1              MR. PETTIT:  No.  It's a bad

2        question, so let me make it a smaller

3        question.

4    BY MR. PETTIT:

5        Q    Separate from this document, do you

6    have any knowledge as to the beginning date

7    and ending date of the inspection Mr. Bitler

8    did on that batch?

9        A    No.

10       Q    If this is an accurate document for

11   investigations opened in December 2007, does

12   that refresh your recollection, without making

13   a guess?

14       A    I don't have that knowledge.

15       Q    And would Mr. Bitler be a good

16   person to ask when that investigation was

17   opened and closed?

18       A    Yes.

19       Q    Would there be anybody else that I

20   could ask that question to?

21       A    Mr. Talbot.

22       Q    Anybody else?

23       A    Not that I'm --

24              MR. DEAN:  You should speak up.

PLAINTIFFS' EXHIBITS 001026

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

236

1              THE WITNESS:  No.

2     BY MR. PETTIT:

3          Q    So Mr. Talbot and Mr. Bitler would

4     be the two most knowledgeable people about the

5     beginning and ending date of that

6     investigation?

7          A    Yes.

8          Q    There was plan to move some or all

9     of the Little Falls manufacturing operations

10    to Riverview; correct?

11         A    Yes.

12         Q    Was it some of the Little Falls

13    production operations or all of it?  What was

14    the plan?

15         A    I believe the plan was for all of it

16    to move.

17         Q    And obviously that would mean that

18    all of the Digitek production -- the plan was

19    to move all of the Digitek production to

20    Riverview; correct?

21         A    Correct.

22         Q    When -- well, you got there in

23    September 2007.  Do you know if that plan was

24    already in place when you arrived?

PLAINTIFFS' EXHIBITS 001027

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

237

```
 1          A      Which part of the plan?
 2          Q      The plan to move all of the Digitek
 3    production from Little Falls to Riverview.
 4          A      It was already in --
 5          Q      The plan was in place, not the --
 6          A      The plan was in place, yes.
 7          Q      -- not the finality of it?
 8          A      Right.
 9          Q      Do you know when the plan began?
10          A      No.
11          Q      Was the plan to have Little Falls
12    continue to manufacture some Digitek, or would
13    that end and then a hundred percent of the
14    Digitek would be produced at Riverview?  What
15    was that plan?
16          A      I was not there when all of the
17    plans were made, but it was my understanding
18    that all of the operations would move out of
19    the Little Falls facility at some point in
20    time.  So there would probably be
21    manufacturing going on in both places for a
22    while until they could close the Little Falls
23    facility and have everything all set in the
24    other facility.
```

PLAINTIFFS' EXHIBITS 001028

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

238

1          Q    What was the reason for the plan to

2     move all of the manufacturing operations for

3     Digitek to Riverview?

4                    MR. DEAN:  Objection; no

5               foundation.

6                    Go ahead.

7                    THE WITNESS:  As I said before,

8               I was not part of the discussions

9               regarding the rationale behind it all.

10              But from what I do know, it was to handle

11              the increase in the number of products

12              and also because the Little Falls

13              facility was leased and the Riverview

14              facility was owned.

15    BY MR. PETTIT:

16         Q    Where did you learn those two

17    possible reasons?  Was that from speaking to

18    someone?

19         A    Just from discussions, just from

20    discussions.

21         Q    With whom?  My point being if I

22    wanted to take someone's deposition on that

23    issue, who would be a good person to ask?

24         A    It was part of general meetings, so

PLAINTIFFS' EXHIBITS 001029

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

239

1    I would say the operations group, the senior

2    management at Actavis.

3            Q    Mr. Dowling?

4            A    I don't -- I would think it would be

5    more along the lines of above that level, more

6    of a higher level with --

7            Q    Can you give me a name?

8            A    Chris, Chris Young; Jeff Rope;

9    Apurva; at the time it was Steinthor.

10           Q    Apurva Patel?

11           A    Patel.  Steinthor, who was actually

12   the most senior person in operations at the

13   time.

14           Q    Do you know, without guessing,

15   whether there were any backlogs or backorders

16   for Digitek in the fall of 2007 when you

17   arrived?

18                   MR. DEAN:  Objection; no

19           foundation.

20                   Go ahead.

21                   THE WITNESS:  I don't know the

22           answer to that.

23   BY MR. PETTIT:

24           Q    Who would be the person or persons

PLAINTIFFS' EXHIBITS 001030

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

240

1    who you think would have knowledge about that

2    if I wanted to ask them?

3           A     People in supply chain.

4           Q     Is that a department?

5           A     Yeah.  It's the plan -- basically

6    the planning department and the department

7    that coordinates the orders for material with

8    the delivery dates.  They work with production

9    and plan out the production schedule.

10          Q     Since I'm looking for names, I at

11   least need a department that I can recognize

12   in these documents.  I was wondering if that's

13   a department I can look for or are they in

14   some other department?

15          A     Regarding backorder?

16          Q     Backorders or backlogs for Digitek

17   in 2007.

18          A     Bharat or Dhaval.

19          Q     Spell those for me.

20          A     B-H-A --

21          Q     Do you need a piece of paper to

22   scribble?

23          A     No.  That's all right.

24                B-H-A-R-A-T.  And the other was

PLAINTIFFS' EXHIBITS 001031

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

241

1    Dhaval, D-H-A-V-A-L, I believe.

2         Q    And I'm sorry to ask it this way,

3    but are those first names or last names?

4         A    Those are first names.

5         Q    Do you know the last names?

6         A    I'm not sure.

7         Q    And not to repeat the question too

8    many times --

9         A    No.  That's okay.  Go ahead.

10        Q    Are they in a department that I can

11   look at a department organizational chart?

12        A    It varies what they call that group

13   from company to company, but it would be the

14   planning department or the supply chain

15   logistics department.

16                 MR. PETTIT:  I'm sorry.  That's

17        already been marked.  That will confuse

18        the record.  Just void that out.

19   BY MR. PETTIT:

20        Q    This has previously been marked as

21   Plaintiff's Exhibit 96.

22             While you're looking at that,

23   Ms. Lambridis, I'll just identify it for the

24   jury.  It purports to be a photocopy of an

PLAINTIFFS' EXHIBITS 001032

242

 1    e-mail from Anthony Castellazzo to a lot of

 2    people, including Mr. Bitler, Mr. Dowling, and

 3    ultimately copied to you.  And the date on

 4    Plaintiff's Exhibit 96, the date of e-mail is

 5    November 14th, 2007.

 6             Did you get that e-mail?

 7        A    Yes.

 8        Q    On the second paragraph, it says:

 9    "We all have plenty on our plates and we'll

10    continue to for some time.  That state of

11    affairs is nothing new.  Considering the

12    recent push in production demand and having to

13    provide enough resources to meet this

14    immediate need, the needs of the Tech Transfer

15    Project continue to suffer from insufficient

16    resources."  And then the paragraph goes on.

17             Do you know what Mr. Castellazzo is

18    referring to when he talks about there being a

19    recent push in production demand?

20        A    I don't know specifically what he's

21    referring to, but it usually means that

22    there's been an increase in the need -- it

23    could be any product.  In other words, we have

24    an increase in business or an increase in

PLAINTIFFS' EXHIBITS 001033

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

243

1     orders.

2          Q    This is about two months after you

3     arrived, November 14th, 2007; correct?

4          A    Correct.

5          Q    Were you aware that there was a

6     recent push in production demands in

7     November 2007?

8          A    The context of this memo is back to

9     what I stated earlier.  The Little Falls

10    facility was significantly smaller than the

11    Riverview facility.  So part of the reason for

12    the move was because we could obviously

13    produce more in the bigger facility because we

14    would have more production rooms and more

15    equipment.  So Tony Castellazzo is referring

16    to the tech transfer, meaning activities

17    surrounding getting the new building approved,

18    and that our increasing demand for increased

19    number of orders for product, that the sooner

20    that we can do that, the better.

21         Q    Okay.

22         A    The sooner we move, the sooner we'll

23    get to a point where we'll be able to meet

24    this increase in demand.  The recent push

PLAINTIFFS' EXHIBITS 001034

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

244

1      means that it's the planning group and the
2      sales and marketing group telling us we have
3      an increase in orders, so we need to work
4      toward getting the means to produce
5      everything.
6          Q    So there is an increase in orders
7      and a concern that LF -- Little Falls;
8      correct?
9          A    Right.
10         Q    -- Little Falls represents a finite
11     production capacity, even though you're
12     getting these sales orders; is that what you
13     just meant?
14         A    Yes.
15         Q    So it was important in the fall of
16     2007 to have a way to produce more Digitek and
17     other products; would you agree with that?
18         A    Yes.  And that's what the next
19     sentence says.
20         Q    And at the present time, meaning
21     November 2007, there's sales orders coming in;
22     there's a need to have more production; and
23     there was concern that it wasn't happening at
24     Little Falls and you needed a bigger place;

PLAINTIFFS' EXHIBITS 001035

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

245

1    correct?  That's what you just said?

2         A    I think that's one way of looking at

3    it, but there could also be a demand in

4    business where you can't accept that business

5    until you have more capacity.  So --

6         Q    Which would not be a good thing for

7    the company?

8         A    Right.  You don't want to turn down

9    business.

10                   MR. PETTIT:  And I notice that

11              the sun is now sinking, and it's about to

12              hit your face.  So if you have a problem

13              with that, please let me know.  We'll do

14              something about that.

15                   All right.  I'm finished with

16              that document.  So this will be 123.

17                   (Plaintiff's Exhibit No. 123

18              was marked for identification.)

19    BY MR. PETTIT:

20         Q    While you're taking a look at that,

21    Ms. Lambridis, I'm going to just identify what

22    it looks to be to the jury.  It looks to be an

23    e-mail from Rahana Hussain on behalf of

24    Augustine Frimpong dated April 14th, 2008, to,

PLAINTIFFS' EXHIBITS 001036

246

1       again, a lot of people, including Phyllis

2       Lambridis.  The subject is FDA Communication,

3       and there's an attachment about digoxin

4       tablets.

5                Did you receive that e-mail?

6           A    Yes.

7           Q    The attachment, at least the way it

8       was produced to me, was a two-page letter,

9       Actavis 001423940 to 941.  Is that what it

10      looks like to you, a two-page letter, and then

11      there's an electronic signature page at the

12      very end?

13          A    Yes.

14          Q    Does that attachment look like it

15      goes with that e-mail?

16          A    Yes.

17          Q    Who is Jacob Haroon, Ph.D., who is

18      the person FDA sent this letter to at Actavis?

19          A    He was the director of regulatory

20      affairs at the time.

21          Q    The first sentence -- and you would

22      agree with me this is a letter from the FDA to

23      Actavis; correct?

24          A    Yes.

PLAINTIFFS' EXHIBITS 001037

247

1          Q    On the second page, it's from

2     Florence Fang of the FDA.

3          A    Correct.

4          Q    The first sentence of the letter:

5     "Dear Sir:  This refers to your supplemental

6     new drug application dated January 22, 2008."

7               And then there's a reference to a

8     regulation for digoxin tablets.  Now, I

9     paraphrased the sentence, but you would agree

10    with me?

11         A    Yes.

12         Q    And it refers to -- at the middle of

13    the page to Actavis Totowa, LLC, 900 Riverview

14    Drive, Totowa, New Jersey; correct?

15         A    Yes.

16         Q    And the next paragraph makes a

17    reference to a phone conversation on

18    February 27th, 2008, between the FDA and Jacob

19    Haroon, Ph.D., who's the head of regulatory at

20    the time for your company?

21         A    I'm sorry.  I didn't hear the first

22    part of your --

23         Q    Sorry.  I had a lot packed into it.

24    That's why.  Sorry.

PLAINTIFFS' EXHIBITS 001038

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

248

1           Let me start:  The letter states:

2     "Reference is also made to the February 27,

3     2008, telephone conversation between Nitin

4     Patel of this Administration "-- that's the

5     FDA; right?

6           A     Uh-huh.

7           Q     -- "and Jacob Haroon and Augustine

8     Frimpong of Actavis Totowa LLC."  And the

9     sentence goes on.

10          A     Right.

11          Q     And in the next sentence, the FDA

12    says:  "The change that you described is not,

13    in our opinion, the kind permitted by

14    regulation to be put into effect in advance of

15    approval of the supplement."

16          Did I read that correctly?

17          A     Yes.

18          Q     Now, can you tell the jury, if you

19    know -- and I know you're not in regulatory,

20    so tell me if you don't know.  I don't want

21    you to guess.

22          Do you know, is this the FDA telling

23    Actavis that they cannot produce Digitek in

24    Riverview yet; something else has to happen?

PLAINTIFFS' EXHIBITS 001039

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 51 of 200 PageID #: 20003
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

249

1        A     It's telling them that their

2   supplement to move the manufacturing there

3   can't proceed yet.  But you have to make

4   product in that facility to get it approved,

5   so it doesn't prohibit them from making

6   batches there.

7             The context of this letter is that

8   there are different types of supplements to be

9   filed for changes.  The company chose the

10  category as the changes being effected zero,

11  meaning that it would be immediately

12  effective.

13       Q    Zero days?

14       A    Zero days, meaning that once it was

15  filed, it would be immediately effective.  And

16  upon doing so, they received this phone call

17  from the Agency on the 27th stating that a GMP

18  inspection would be required before they would

19  grant it.

20             So this letter is just follow-up to

21  that conversation.  It sort of makes it

22  official.  But the facility at Riverview Drive

23  was part of Actavis Totowa, the company

24  Actavis Totowa.

250

1              And there were ongoing discussions

2      with FDA prior that they considered that what

3      they called a contiguous site. Because it was

4      within a certain mile radius of the original

5      facility and because it was part of the same

6      company, they considered it, as I said before,

7      a contiguous site, which means the level of

8      work to be done in terms of filing and the

9      approval process for making changes between

10     those facilities is less burdensome.

11             So with that understanding, Actavis

12     filed a change -- the changes being effected

13     supplement. The Agency then came back on the

14     27th and clarified and said even though it's

15     the same facility, we want to come in and see

16     that building and do an inspection on that

17     particular facility before you make the

18     change. And that's what led to the inspection

19     that occurred in March.

20             So this letter came at a later date,

21     I believe.

22        Q    That's actually my next question.

23     So --

24        A    Yeah, it came at a later date, but

Confidential – Subject to Further Confidentiality Review

251

1      that's just the Agency's very slow process.

2           Q    The FDA letter -- I'm sorry.

3           A    I'm sorry.  I'm just saying the

4      Agency is very slow sometimes.  They reacted

5      quickly with the phone call, but then the

6      letter comes later because the letter is

7      typically after a review.

8           Q    Let me ask you a specific question

9      about the date, and then we'll figure it out.

10     There's an email that says April the 14th.

11          A    Correct.

12          Q    And that transmits this to a number

13     of people.  It's from Actavis to Actavis.

14     It's an internal e-mail.

15          A    Yes.

16          Q    And that's April the 14th.

17          A    Yes.

18          Q    Now, we know this letter is at least

19     after February 27th?

20          A    Yes.

21          Q    Can we narrow it down any more than

22     that when this letter was received?

23          A    Based on practice, it would have

24     been received by the regulatory group that

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

252

1      distributes it either the same day or the day

2      before.  So they would --

3           Q    Meaning April 13th or 14th?

4           A    Automatically.  If you go to the

5      back on the electronic signatures, the

6      electronic signatures show you April 7.  So

7      that's when FDA signed off on it.  So it came

8      through the US mail after that.

9           Q    Now, do you know, without guessing,

10     since you're not in regulatory, whether the

11     FDA ever formally permitted Digitek to be

12     produced at Riverview?

13                    MR. DEAN:  Objection to form.

14                    Go ahead.

15                    THE WITNESS:  In other words,

16          were they ever approved to manufacture it

17          there?  Is that what you're asking?

18     BY MR. PETTIT:

19          Q    Yes.

20          A    No, because that -- not that I'm

21     aware of.

22          Q    Without guessing, is it necessary

23     for the FDA to approve it to be manufactured

24     at a different facility when the Little Falls

PLAINTIFFS' EXHIBITS 001043

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

253

1    facility had been making it up until then?

2         A    Yes.  The FDA needs to approve or,

3    by some of these other mechanisms, at least be

4    notified of the change.  If that facility had

5    already had a GMP inspection, then they could

6    have just moved it and notified FDA.  They

7    wouldn't have to wait.  The waiting part had

8    to do with the GMP inspection of the facility,

9    not the product itself.

10        Q    Okay.  So do you know whether the

11   FDA ever finally approved the production and

12   manufacture of Digitek at Riverview?

13        A    When I was there, as far as I know,

14   no.

15                  MR. PETTIT:  All right.  We're

16           going to take a break because we're at

17           the end of this tape.  And I'm actually

18           pretty close to being finished.

19                  THE VIDEOGRAPHER:  We are now

20           going off the record.  This is the end of

21           Videotape No. 4.  The time is 3:50.

22                  (Short recess.)

23                  THE VIDEOGRAPHER:  We are now

24           back on the record.  This is the

PLAINTIFFS' EXHIBITS 001044

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

254

1          beginning of Videotape No. 5.  The time

2          is 4:01.

3     BY MR. PETTIT:

4          Q    I'm showing you what was marked as

5     P-16 at an earlier deposition.  And it's a

6     large document.  And there is handwriting at

7     the top that says:  1 through 67.  And if you

8     look at the very last page, it says:  67 of

9     67.  I'm stating this for the record.  And

10    it's already been marked and introduced into

11    evidence at another deposition.

12              I want to show you some pages out of

13    this document.  And if you need to slow down

14    and look at the page before or the page after,

15    whatever, you have to tell me.  Otherwise, I'm

16    going to believe that you understood the

17    question and were able to answer it.

18              Is that fair?

19         A    That's fair.

20         Q    Can you look at the Bates number at

21    the bottom and go to 859?  You know what,

22    that's not even going to work.

23              Let's go off the record for a

24    second.

PLAINTIFFS' EXHIBITS 001045

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

                                                              255

1                    THE VIDEOGRAPHER:  Off the

2            record, 4:03.

3                    (Discussion off the record.)

4                    THE VIDEOGRAPHER:  Back on the

5            record, 4:03.

6        BY MR. PETTIT:

7            Q    Ms. Lambridis, I think an easier way

8        to get through this document will be to look

9        at some of the handwriting at the top, Page 2

10       of 67, 3 of 67, and so forth.  All right?

11           A    Okay.

12           Q    Now, on Page 6 of 67, if you would

13       turn to that, now, this is a page out of an

14       Investigation Log No. 07-093.

15                Do you see that?

16           A    Yes.

17           Q    And do you recognize that as the

18       number that we were talking about about a half

19       hour ago as an investigation number which may

20       have been about the batch that Mr. Bitler did

21       the investigation?

22           A    Yes.

23           Q    And this is Mr. Bitler's signature;

24       is that correct?

PLAINTIFFS' EXHIBITS 001046

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

256

```
 1        A    Yes.
 2        Q    And it purports to have been
 3    signed -- and I know you don't know for sure,
 4    but at least the document purports to have
 5    been signed January 25th, '08; correct?
 6        A    Correct.
 7        Q    Now, the section that -- you're
 8    familiar with this form because it's a quality
 9    group form; correct?
10        A    Yes.
11        Q    And this is Section IV of the form.
12    It says "QA & Regulatory Evaluation."
13             Correct?
14        A    Yes.
15        Q    Now, Mr. Bitler signed in that
16    section, but he's not in regulatory, is he?
17        A    Well, the section is for QA &
18    Regulatory Evaluation.
19        Q    Is there supposed to be a signature
20    from anybody from regulatory?
21        A    In that particular case, he's
22    signing for QA.  It says:  "QA Review
23    Investigation for Completeness and Accuracy
24    and preventive actions for appropriateness."
```

PLAINTIFFS' EXHIBITS 001047

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

257

1          Q    I'd like you to turn to 59 of 67.
2     I'll zoom out for a moment so the jury gets a
3     sense of this page.  And this is referring to
4     an On-Line Product Inspection Form, or that's
5     what it is; right?
6          A    That's the title of the form, yes.
7          Q    And it's dealing with Batch 70924A1.
8     And that's, according to your testimony, one
9     of the designations for this batch, always
10    speaking about the same batch that Mr. Bitler
11    investigated; right?
12         A    Correct.
13         Q    And at the bottom where it talks
14    about Management Comment, it says that a total
15    of 15 tablets with approximate double the
16    thickness were removed during the inspection
17    of this batch.
18              Did I read that correctly?
19         A    Yes.
20         Q    So it's your understanding that a
21    total of 20 tablets were found; correct?  Not
22    on this document, but a total of 20 out of
23    that batch; is that your understanding?
24         A    Yes.

PLAINTIFFS' EXHIBITS 001048

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

258

1              Q     And is it your understanding that

2       some were found in the production part of it

3       or the packaging part of it -- I'm using those

4       terms the wrong way.

5                    It was found while -- in the normal

6       course of business as the pills were going

7       through; correct?

8              A     Correct.

9              Q     And then some pills were found

10      during the investigation?

11             A     Yes.

12             Q     And according to this, 15 of the

13      pills were found during the investigation; is

14      that your understanding?

15             A     According to this form, yes.

16             Q     Do you have any other understanding

17      other than that?

18             A     No, I have no other detail.

19             Q     Do you know where the 20 tablets are

20      today, the 20 out-of-specification tablets

21      that were found in Batch 70924A1?

22                    MR. DEAN:  Objection; asked and

23             answered.

24                    Go ahead.

PLAINTIFFS' EXHIBITS 001049

259

1              THE WITNESS:  I don't know

2         where they are.  They were not available

3         during the time of the FDA inspection

4         because the batch had been released, and

5         they were subsequently rejected as we

6         would during the normal course of

7         business.

8    BY MR. PETTIT:

9         Q    "Rejected" meaning they were not

10   released?

11        A    Correct.

12        Q    And do you have an understanding

13   that they were destroyed or lost or turned

14   over to the lawyers or some other possible

15   result?

16        A    It was my understanding from the

17   conversations during the inspection that they

18   were no longer available because they were

19   destroyed.

20        Q    Who told you that they were

21   destroyed?

22        A    That was part of the conversation

23   with Erin and Scott Talbot.

24        Q    I'm sure this was asked and I

PLAINTIFFS' EXHIBITS 001050

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

260

1    apologize, but when was that?

2         A    During the time frame that I

3    referred to earlier when she reviewed the

4    investigation, beginning of April.

5         Q    Turn over to the next page, please.

6    That's Page 60 of 67.  And the title of this

7    page, at least, is Digoxin Tablets

8    .125 milligrams, and, again, dealing with

9    Lot 70924A1; correct?

10        A    Yes.

11        Q    And it's referring to something

12   called a tightened AQL inspection; correct?

13        A    Right.

14        Q    Do you know what that is?

15        A    Yes.

16        Q    What is it, please?

17        A    I can't recall what the letters

18   "AQL" stand for.  But what it is is it's a

19   requirement -- whenever a batch is produced,

20   QA will then do an inspection of that batch

21   prior to its release.  That inspection varies,

22   depending on the product.

23             In this particular case, I would

24   have to read this.  If you give me a minute,

PLAINTIFFS' EXHIBITS 001051

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

261

1    I'll take a look at it and I can speak in more
2    detail.
3         Q    Well, I want you to read it until
4    you're comfortable, but I'm actually not going
5    to ask you detailed questions.
6              I'm asking:  What is an AQL
7    inspection, in general?
8         A    An AQL inspection is the inspection
9    QA would do in order to make its decision to
10   release.  The tightened part of this is --
11   when you say it's tightened, it means that the
12   criteria is stricter.  So it would appear that
13   this AQL inspection was done, again, after the
14   work that was done to inspect the batch and
15   pull those 15 tablets out.  Then QA then went
16   in and did a sampling of that batch to do
17   further inspection before making the decision
18   to release.  So this part was done by various
19   production people, not QA, where they found
20   these 15 tablets.  QA always comes in after
21   the fact.
22        Q    Where did you come to that
23   conclusion?
24        A    Based on the --

PLAINTIFFS' EXHIBITS 001052

262

1         Q     Let me ask a clear question.

2               When did you come to the

3    conclusion -- what's the basis for your

4    conclusion that the 15 out of the 20 tablets

5    were discovered by people in production rather

6    than people doing Investigation 07-093?

7         A     I'm basing my answer on the

8    signatures that I see here.  But under normal

9    circumstances, when an activity like this

10   occurs, if it's not already proceduralized, it

11   will be written out in some kind of protocol

12   or document which QA approves.

13              Just because the inspection took

14   place of the batch, QA would not inspect the

15   batch and then do a review of the batch and

16   release the batch.  Someone else would have to

17   do that inspection in order for QA to come in

18   as a third-party review to release the batch.

19              So what I am seeing here is on this

20   page, which is the inspection form, the

21   results of the inspection, which these

22   initials and signatures look to be either

23   packaging or production people.  It refers to

24   a protocol that they follow.  And then this

PLAINTIFFS' EXHIBITS 001053

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

263

1    document --

2         Q    What signatures?  I don't mean to

3    interrupt you, but I'm trying to keep up with

4    your answer.

5         A    On this Page 59, which was the prior

6    page, if you look like where 1 is and it says

7    "Done By, Date, Checked By," those are

8    initials.  And then it says -- and that's to

9    clear the room to say you can take product

10   into this room, it's clean, et cetera.

11        Q    So you're giving a lot of testimony.

12        A    I'm sorry.

13        Q    I don't mean to interrupt you, but

14   I'm trying to keep up.

15        A    Do you want the detail or am I --

16        Q    Well, I just want to stop you every

17   once in a while.  You can keep on going with

18   your answer.  I'm just trying to keep up.

19             Are these the initials you're

20   referring to in your answer just then?

21        A    Some of them, and the others are

22   above.

23        Q    So these initials here.  And can you

24   read any of them?

PLAINTIFFS' EXHIBITS 001054

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

264

1        A    I'm referring to the initials down
2    in the box in the middle where it says "Done
3    By" or "Checked By."
4        Q    Oh, here?
5        A    Right.  Those are initials of
6    individuals.
7        Q    And do you recognize that -- and I
8    apologize.  I don't mean to talk over you.
9             Do you recognize those initials?
10       A    I don't recognize them, which is why
11   I'm saying they probably were not quality
12   signatures.
13       Q    I'm going to ask another question.
14   And when I'm done asking you these interim
15   questions, if you were in the middle of
16   answering something --
17       A    Okay.
18       Q    Do you know who those initials
19   are --
20       A    No.
21       Q    -- Checked By?
22       A    No.
23       Q    Do you know who these initials are
24   at the bottom?  One says "Production

PLAINTIFFS' EXHIBITS 001055

265

1    Management" and an initial.

2         A    Right.

3                   MR. DEAN:  It might help if you

4         look at the copy you have instead of

5         that.

6                   THE WITNESS:  It would be --

7         again, production management would have

8         that signature, and then there would be a

9         QA signature there, but that's an

10        approval signature.  It's not signing for

11        the work done.

12   BY MR. PETTIT:

13        Q    Whose initials am I highlighting

14   here at the bottom of Page 59 of 67 if you can

15   tell without guessing?

16        A    I can't.

17        Q    What is your -- I'm going to stop

18   for a second.  Do you remember if you were in

19   the middle of answering some other question?

20   It's really unfair.  Just before I move on.

21        A    I was explaining the tightened AQL.

22        Q    Okay.  I promise you I will come

23   back to that when we're done.  You had turned

24   to this page, and I wanted to catch up with

PLAINTIFFS' EXHIBITS 001056

266

1    you.  I will get back to that page.  Okay?  Is

2    that fair?

3         A    Okay.

4         Q    So on page 59 of 67, at the bottom

5    it says "QA Approval," and there's some

6    initials you don't recognize.  And it looks

7    like the date is January 18th, 2008.

8              Do you know, without guessing, what

9    is the significance of somebody from QA

10   signing their initials on that line?

11              MR. DEAN:  Objection; asked and

12         answered.

13              Go ahead.

14              THE WITNESS:  Without seeing

15         the actual protocol, I can't say what

16         they're signing for.  But it appears to

17         me that it's typically verifying what's

18         there.  So QA usually is doing the second

19         check on something.

20              So they do a verification --

21         someone does an action, and QA verifies

22         it.  So it's written there that there are

23         15 tablets, so QA most likely saw the

24         tablets and verified that.

PLAINTIFFS' EXHIBITS 001057

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

267

1    BY MR. PETTIT:

2         Q    The date of the production

3    management signature, initials, is the same as

4    the QA approval; correct?

5         A    Correct.

6         Q    And then on --

7         A    That would have to match for them to

8    verify.  Well, it could be a subsequent day,

9    but typically they would be at the same time.

10        Q    Would it physically be at the same

11   time, same place, standing next to each other

12   or does that vary?

13        A    It can vary, depending on what

14   activity is going on.

15        Q    So you can't tell just from looking

16   at this document whether the QA person, who we

17   can't identify yet, did an investigation

18   finding the 15 tablets or whether the

19   production management did, but that's the

20   normal policy; is that your testimony?

21        A    The investigation is one piece.  The

22   inspection of the product is another piece.

23   This refers to the inspection of the product.

24             And all I'm saying is that an

PLAINTIFFS' EXHIBITS 001058

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

268

1    inspection was done.  It appears to have been

2    done by a production personnel where they

3    found 15 tablets, and then QA came in and saw

4    that it was 15 tablets and approved.

5        Q    Okay.  Now I want to go over to

6    Page 60 of 67.  It's the page we were just on

7    a couple minutes ago.  I'll zoom out again.

8            Now, at the bottom of this page is

9    an approval by -- is that Ashesh Dave for

10   packaging?

11       A    Approved by, yes.

12       Q    Can you recognize the signature?

13       A    Ashesh, yes, uh-huh.

14       Q    Is that how you pronounce his last

15   name?

16       A    I couldn't tell you.

17       Q    And Dan Bitler is QA?

18       A    Correct.

19       Q    Now, is this one page that the

20   jury's now looking at, which is

21   Actavis 002615, other than the signatures and

22   the dates at the bottom, which I'm going to

23   put my hand over for a second, is the rest of

24   it a preprinted form that could be used --

PLAINTIFFS' EXHIBITS 001059

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

269

```
 1      and, of course, the top where it says a number
 2      and a batch.  Is the rest of that a preprinted
 3      form?
 4                      MR. DEAN:  Objection.
 5                      Go ahead.
 6                      THE WITNESS:  No.  It's written
 7          specific to this activity.
 8      BY MR. PETTIT:
 9          Q    And it would be -- I'm really asking
10      a poor question.  Is the format that is used
11      for referring to batches and holds and AQL
12      sample, is that set forth in a form that
13      people use?  A template is a better way.
14      That's what I should say.
15                      Is there a template that people use
16      to fill out an inspection like this, an
17      investigation report like this?
18                      MR. DEAN:  Objection to form.
19                      Go ahead.
20                      THE WITNESS:  It varies from
21          company to company, but there was --
22      BY MR. PETTIT:
23          Q    Actavis.
24          A    This is specifically a document
```

PLAINTIFFS' EXHIBITS 001060

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

270

```
1    created to attach to the investigation.  So
2    it's not standard -- it's not a standard form.
3                 MR. DEAN:  "This" being Page 60
4         of 67?
5                 THE WITNESS:  Correct.
6    BY MR. PETTIT:
7         Q    I want to ask you a question, and
8    tell me if you're able to answer it.
9         A    Before you do that, can I finish?
10        Q    I thought you were.  I apologize.
11        A    As far as the AQL, if you look at
12   this document, it gives you the history in the
13   overview to say that two tablets were found.
14   When they were found, they did a review of
15   what was in front of them and found a total of
16   five tablets.
17                It goes on to refer to the protocol
18   that I mentioned a few minutes ago and
19   indicates that this 100 percent inspection was
20   done by the packaging department where 15
21   tablets were found.  So that sort of brings
22   you to those 20.
23                And the AQL, after all of that was
24   done, QA went back and did what's called a
```

PLAINTIFFS' EXHIBITS 001061

271

```
 1    tightened AQL, which means that they then took
 2    what the packaging department deemed as the
 3    good product and did an inspection of those at
 4    that AQL level with that sample size.  And it
 5    says there they inspected 1,250 more tablets;
 6    and the criteria was accept one, reject two
 7    for the batch.
 8         Q    Are you finished your answer?
 9         A    Yes.
10         Q    The last bullet point, for lack of a
11    better phrase, accept -- it says:  "Accept on
12    1/Reject on 2 (total for batch)."
13              Does that mean that if one
14    out-of-spec tablet -- one additional
15    out-of-spec Digitek tablet is found, that the
16    whole batch should be accepted; but if two
17    additional Digitek tablets are out of spec or
18    found, that batch should be not released?
19         A    That's the criteria based on that
20    AQL level.  That's standard criteria.  And
21    it's based on the batch size and the sampling
22    plan.  So that's not pulled out of the air.
23    That is criteria set forth by -- these are
24    standards used by quality assurance
```

PLAINTIFFS' EXHIBITS 001062

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 74 of 200 PageID #: 20026
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

272

1    professionals in multiple industries, not just

2    in pharmaceuticals.

3         Q    There is the phrase "visual

4    inspection" in some of these documents, "AQL,"

5    and "tightened AQL."  For this particular

6    investigation, 07-093, of this particular

7    batch, can you tell me, was there a visual

8    inspection, was there an AQL, and was there a

9    tightened AQL?  Were there all three?

10        A    There was a visual inspection and a

11   tightened AQL.  There's typically a normal AQL

12   for the release.  But that was -- I don't -- I

13   didn't review that, so I can't say for sure.

14             But that would typically happen at

15   some point during the manufacture of the batch

16   in order to get that batch through to the

17   point where it would be packaged and released.

18   So it may be in the regular batch

19   documentation, which I don't have in front of

20   me.

21        Q    So now I'm not talking about this

22   particular investigation, but there could be

23   such a thing as a visual inspection and then

24   an AQL and then a tightened AQL?  Is that

PLAINTIFFS' EXHIBITS 001063

273

1      possible, generally speaking?

2                      MR. DEAN:  On one batch; right?

3                      MR. PETTIT:  On one batch, yes.

4                      THE WITNESS:  Under normal

5            circumstances, there's an AQL and the

6            batch is released.  Because this batch

7            identified a problem -- in any batch that

8            identifies a problem, it is possible that

9            they would do a visual inspection and

10           then another AQL before they release it.

11     BY MR. PETTIT:

12          Q    So it is possible that you could

13     have a visual and an AQL and a tightened AQL;

14     that's possible?

15          A    Yes, but not in that order.

16          Q    What would the order be?

17          A    It would be AQL, visual inspection,

18     tightened AQL.

19          Q    And the decision to have a tightened

20     AQL would be made by whom, generally, at

21     Actavis in 2007?

22          A    It would typically be done by -- at

23     Actavis it would be done by the director of

24     QA, but it's standard practice.  It should be

PLAINTIFFS' EXHIBITS 001064

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

274

1      standard practice.

2          Q    So I don't mean to be zigzagging;

3      but back to this particular investigation,

4      it's Mr. Bitler who would have made the

5      decision to have a tightened AQL?

6          A    Correct.

7          Q    Do you know that from looking at the

8      documents or it's just policy?

9          A    It's just policy.

10         Q    Do you know -- well, strike that.

11              Have you spoken to Mr. Bitler since

12     you have left Actavis?

13         A    No.

14         Q    Did you speak to Mr. Bitler about

15     the visual inspection which was currently part

16     of 07-093?

17         A    No.

18         Q    Do you know from any other source,

19     since you didn't speak to Mr. Bitler, how the

20     visual inspection of 07-093 was conducted?

21         A    I don't know the details, no.

22         Q    You said a few minutes ago that

23     the -- and I can put it back on the screen,

24     but accept if one, reject if two, that bullet

PLAINTIFFS' EXHIBITS 001065

275

1      point, you said that didn't come out of the

2      clear, blue sky.

3              Can you tell me where it comes from?

4          A    The AQL standards.

5          Q    AQ -- is there something called an

6      AQL sample plan?

7          A    Yes.

8          Q    Is that what you're talking about?

9          A    Yes.

10         Q    I don't want to put words in your

11     mouth.

12         A    Yes.  But I will be honest with you;

13     I don't have all the detail.  I can't give you

14     more than that to go on in terms of -- I can't

15     give you a specific reference to where you can

16     find them, but they're general standards used

17     throughout industry.  So it's a typical QA

18     term.

19         Q    Let me try to ask you direct, narrow

20     questions if I can.

21         A    Okay.

22         Q    And you can tell me you know or you

23     don't know.  Is there something called an AQL

24     sample plan at Actavis in 2007-2008?

PLAINTIFFS' EXHIBITS 001066

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

276

1          A      The sampling plans are based on AQL

2     standards.  So anything that's routine would

3     typically be based on the AQL standards.  This

4     is nonroutine, so they would most likely have

5     to go and research what the appropriate level

6     of -- level should be for this activity for

7     this particular scenario.

8          Q      Appropriate level, meaning how much

9     investigation?

10          A      How many to inspect based on what

11     the batch size is and what the sample sizes

12     should be and how -- and then the sample sizes

13     typically dictate what the criteria is.

14          Q      Do you know, without guessing, where

15     someone like Mr. Bitler would go to to check

16     if this was a nonroutine situation?

17          A      There are typical reference

18     documents that QA would have on-site.

19          Q      What are they called?

20          A      AQL standards.  There's books and

21     published documents.

22          Q      I want to go a step further back

23     than that.  Is there a standard which Actavis

24     used to develop and define the AQL sample

PLAINTIFFS' EXHIBITS 001067

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

277

1    plan?

2         A    I think I just said that.  It says

3    here in this document:  "The AQL sample will

4    be pulled by QA based on the following."  And

5    they give you the level, the sample --

6         Q    What page are you on, again?

7         A    This is Page 60 of 67.  It gives you

8    the detail all here in those bullet points.

9         Q    Okay.  But I'm going a step further

10   back than the AQL sample plan.  Is there a

11   standard that Actavis used to develop the AQL

12   sample plan?

13        A    No.  The AQLs -- I don't know how to

14   answer that.  You go to this reference

15   document.  And based on -- for example, here

16   it's saying your batch size is approximately

17   4,747 tablets.  So, therefore, that dictates a

18   certain sampling plan with a certain number of

19   tablets.

20             And then you devise how you're going

21   to randomly sample those.  So you're using it

22   as your guide.  So you look at the

23   reference -- you look at the AQL standards to

24   determine the sampling plan.  So they did that

PLAINTIFFS' EXHIBITS 001068

278

```
 1     and then -- the QA folks did that, and then

 2     they wrote down here what the criteria was and

 3     what they based everything on.

 4          Q    Let me try it this way:  If there's

 5     a document called an AQL sample plan and if

 6     there's a document or a binder of documents

 7     called AQL standards, who writes them?  Is it

 8     Actavis or is it something that comes to

 9     Actavis from an outside source?

10          A    The AQL standards are from an

11     outside source.

12          Q    Where?

13          A    I told you before, I don't know

14     exactly where, but they're industry standards.

15     And they're used in multiple industries, not

16     just pharmaceutical.

17          Q    Are they FDA approved, if you know

18     without guessing?

19          A    Absolutely.

20          Q    And the ones that Actavis uses are

21     FDA approved, if you know without guessing?

22          A    They're accepted by -- it's accepted

23     practice by FDA.  They're not specifically

24     approved by the Agency.
```

PLAINTIFFS' EXHIBITS 001069

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

279

1        Q    I'm not trying to jump on your every

2    word, but I want to make sure the record's

3    clear.  So it's FDA accepted, not FDA

4    approved?

5        A    It's -- AQL standards are what FDA

6    would expect you to use as a reference to

7    develop sample plans.

8        Q    How do you know that?

9        A    Because when they inspect you, they

10   typically want to know how you developed your

11   sampling plans.  And if you tell them you used

12   the AQL standards, they're usually satisfied.

13       Q    So if there is a standard that has

14   been developed which was the source of the AQL

15   standards, you don't know what that is; is

16   that correct?

17       A    I don't understand the question.

18       Q    I'm trying to just find out -- I

19   thought that you said, "I don't know," and I'm

20   trying to make a clear record.  If there is

21   some source that was used by the developers of

22   the AQL standards, you don't know what that

23   ultimate source was; correct?

24       A    It comes -- yeah, I do not.

PLAINTIFFS' EXHIBITS 001070

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

                                                      280

1                    MR. PETTIT:  I think that's all

2          I have.  Can I have two minutes and I'll

3          let you know?

4                    MR. DEAN:  Sure.

5                    THE VIDEOGRAPHER:  Off the

6          record, 4:34.

7                    (Short recess.)

8                    THE VIDEOGRAPHER:  Back on the

9          record, 4:42.

10                   MR. PETTIT:  Ms. Lambridis,

11         that's all the questions I have.  Thank

12         you very much.  I appreciate it.  And

13         other counsel are going to have some

14         questions for you.

15    BY MR. MILLER:

16         Q    Mrs. Lambridis, my name is Pete

17    Miller.  We just met.  The arrangement's that

18    we're supposed to be done by 5 o'clock.  I'm

19    going to try to wrap this up as close to 5:45,

20    which counsel has agreed to.

21              Your title -- correct me if I'm

22    wrong -- vice president of quality and

23    compliance; is that correct?

24         A    US quality and compliance.

PLAINTIFFS' EXHIBITS 001071

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

281

1          Q    US for Actavis?

2          A    Yes.

3          Q    And the term "quality" in there, am

4     I correct in saying that quality at a

5     pharmaceutical department can be split into

6     quality assurance and quality control?

7          A    Yes.

8          Q    And that "quality" in your title, is

9     that QA and QC?

10         A    Yes.

11         Q    So a couple times during the

12    deposition, you've referred to what you titled

13    "QA folks at Actavis."  Are you in charge of

14    QA folks at Actavis?

15         A    Yes.

16         Q    And so I know we went through the

17    AQL with great detail.  I want to ask a couple

18    follow-up questions.  I'm not too much

19    concerned about the AQL.  But the final

20    decision to accept if there's a lot with one

21    tablet out of spec, reject if there's two; am

22    I summarizing that correct?

23                   MR. DEAN:  Objection; misstates

24         the testimony.

PLAINTIFFS' EXHIBITS 001072

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

```
1                    THE WITNESS:  Can you just --
2      BY MR. MILLER:
3           Q    Certainly.  I can put it back up
4      there if you like.
5           A    No; just your question.
6           Q    Certainly.
7                    MR. DEAN:  Go ahead.  I'll just
8             object again if I need to.
9                    MR. MILLER:  I didn't hear the
10            objection the first time.
11                   MR. DEAN:  I think the first
12            question misstated the evidence.  I'm
13            trying to find the exhibit now.
14                   MR. MILLER:  I don't know what
15            my first question was.
16                   MR. DEAN:  It suggested that if
17            one tablet in an entire lot was found
18            wanting, you'd accept it; but if two
19            were, you'd reject it.  And I think that
20            misstates what the exhibit says.
21                   MR. MILLER:  Well, I think I'm
22            going to go with you on this.  I think
23            I'm going to put that exhibit back up on
24            the screen.
```

PLAINTIFFS' EXHIBITS 001073

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

283

1                    MR. DEAN:  I think it was a

2           smaller number that related to that one

3           and two, Pete.  That's my point.

4                    MR. MILLER:  I got you.

5      BY MR. MILLER:

6           Q    And that was Exhibit 16 previously

7      marked.  You had a copy of it, ma'am.  It

8      should be here.

9           A    I put it back.

10          Q    Okay.  Fair enough.  Specifically,

11     I'm going to put that page in question back up

12     you discussed at length.

13                   MR. DEAN:  Page 60.

14     BY MR. MILLER:

15          Q    All right.  We've talked at length

16     about digoxin tablets.  And this is a

17     tightened AQL.  And the bullet at the very

18     bottom was we accept on 1 and reject on 2

19     (total for batch).

20                   What is the -- as you understand it

21     as the vice president of quality at Actavis,

22     what is the "accept on 1" what?  What is

23     the 1?

24          A    You are taking samples according to

PLAINTIFFS' EXHIBITS 001074

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

284

1    the sample plan outlined above, in the bullets

2    above.  So you're going to inspect another

3    1,250 -- so they did this inspection, and they

4    pulled the additional 15 tablets out.

5              And then from the batch, now that

6    they were going to deem acceptable, they did a

7    tightened AQL.  So they took 1,250 tablets, 40

8    tablets from each of 33 drums, and then 10

9    tablets from the last drum, and they did -- QA

10   did a visual inspection of them.

11             And the criteria based on the

12   sampling plan was that it would be acceptable

13   if there was 1 and they would reject based on

14   the total batch.

15        Q    Thank you.  My question -- follow-up

16   question would be:  Does this tightened AQL

17   carry on to subsequent batches and lots, or is

18   this a one-time thing?

19        A    The tightened AQL is typically done

20   under these circumstances, and it's a one-time

21   event.

22        Q    And at the time that this was

23   signed, we discussed January 2008, you were

24   the vice president of quality and compliance;

PLAINTIFFS' EXHIBITS 001075

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

285

1    correct?

2         A    Correct.

3         Q    And, well, my question is, then:

4    Was there any criteria written up on how to

5    handle the one tablet if one additional

6    double-thick tablet was found?

7         A    No.

8         Q    Were you involved -- were you

9    involved in discussions to determine that you

10   were going to accept on 1 and reject on 2?

11   When I say "you," I mean the company.

12        A    I was not personally.  That criteria

13   comes out of the AQL standards.

14        Q    Fair enough.

15             Have you had any discussions with

16   any counsel in this case regarding potentially

17   giving testimony at trial?

18        A    (Witness shakes head.)

19        Q    You indicated currently your status

20   is consultant for Actavis?

21        A    Yes.

22        Q    How much are you currently getting

23   paid by Actavis?

24        A    About 12,700 per month.  That's

PLAINTIFFS' EXHIBITS 001076

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

286

1    before tax.

2         Q    And it's not going -- is it going

3    directly to you or is it going to your

4    consulting company?

5         A    It goes to the consulting company,

6    and it's a two-year period.

7         Q    During the entire time you were

8    employed by Actavis before you became a

9    consultant, you indicated that Scott Talbot

10   reported to you?

11        A    Yes.

12        Q    Was his physical position, his desk,

13   in Florida the entire time?

14        A    His location was originally in

15   Little Falls at the Main Street facility.  And

16   then he subsequently took a new role which

17   placed him back down to Florida.

18        Q    What were Scott Talbot's duties?

19   What did his duties entail as far as the 483

20   inspection in 2008?

21        A    During the inspection, he was

22   on-site to assist.  And he provided documents

23   and interviews during that inspection.  But

24   because he was not actively in his -- he had

PLAINTIFFS' EXHIBITS 001077

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

287

1    moved on to a different role at that point in

2    time.  So he was not full time on the site

3    anymore, which is why I was the one that was

4    the lead during that inspection.

5         Q    What was the role that he moved into

6    during the inspection?

7         A    Well, it was before that.  He

8    transitioned into an opening that occurred in

9    Florida.  There was a director -- or actually

10   it was an executive director of QA for that

11   R&D facility -- our R&D facility in Florida.

12   He left and took another job, and Scott

13   applied for that role and wanted to move back

14   down there because he was originally from that

15   area.

16        Q    Is it your belief that -- well, I'm

17   correct in saying that you were the point

18   person for Actavis during the inspection?

19        A    Correct.

20        Q    Is it your belief that Scott Talbot

21   would have been the point person for the

22   inspection had he remained here in Jersey?

23        A    Correct.

24        Q    And I believe you agreed to earlier

PLAINTIFFS' EXHIBITS 001078

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

288

1      that there was a total failure of the quality

2      department at Actavis during the inspection of

3      2008?

4           A     It's a little out of context, but I

5      believe the discussion was whether or not I

6      agreed to it in a conversation with Erin

7      during the closeout -- or during a meeting

8      with Erin.

9           Q     Did you, as the vice president of

10     quality and compliance, during the FDA 483 in

11     2008 believe that there was a total failure of

12     the quality control system at Actavis?  And

13     when I say that, I mean Little Falls and

14     Totowa.

15          A     We didn't present ourselves well to

16     FDA, for sure.  So it was very hard for me to

17     disagree with Erin during our discussions

18     because based on what she had reviewed, there

19     were numerous issues that she was able to

20     raise that, again, needed attention.

21               So, again, based on -- in the

22     context of what we were talking about and

23     based on the issues she presented, it was

24     not -- it was something that I couldn't

PLAINTIFFS' EXHIBITS 001079

289

1    refute.

2           Q    Do you believe, as you sit here

3    today, that if all the findings were presented

4    in a different manner, that the production of

5    64 products would not have been discontinued?

6           A    I don't understand the question.

7           Q    Are you telling me that it was the

8    way that the violations were presented or the

9    inspection was presented that would have

10   classified it as a total failure of QC?

11          A    No.  What I'm saying is that she

12   reviewed a group of products that were

13   known -- already known issues that -- and the

14   reason that she focused on those is because we

15   had already informed the Agency that we had a

16   problem.

17               So when you're only looking at a

18   problem, your conclusion -- her conclusion was

19   then broadened to include everything.  And her

20   comments were based on a sampling of the many

21   products that Actavis was making at the time.

22          Q    So it's your belief that because she

23   found issues with certain products, that it

24   didn't carry over to other products?

PLAINTIFFS' EXHIBITS 001080

290

1        A    Say that again.

2        Q    Well, you were indicating that

3    Actavis stated that there were problems with

4    certain products, and those were the products

5    that they investigated?

6        A    There's a mechanism and a

7    requirement that if you have an issue -- if

8    you do an investigation on a product that's

9    been marketed, that you have an obligation to

10   notify FDA.

11           So there were a number of -- and

12   even without that, every FDA inspection, when

13   they look at the quality system, it typically

14   asks you for documents related to your

15   investigations, your complaints, and so forth.

16   And they use that as a gauge for what they're

17   going to look at.  So they come in, and she

18   was looking at our investigation log and

19   looking at investigations specifically.  So

20   obviously she was going to be looking at

21   problem areas.

22       Q    But you agree with me that it wasn't

23   so much the investigation that led to the

24   violations of GMP but how the investigations

PLAINTIFFS' EXHIBITS 001081

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 93 of 200 PageID #: 20045
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

291

1    were handled?

2         A     Correct.  She was not happy with how

3    certain ones were handled.  And how we got to

4    it broadening beyond that was the fact that

5    she focused on a certain number of products

6    and then drew her conclusions based on that.

7         Q     At the time of the inspection,

8    Actavis was manufacturing 64 products; is that

9    correct?

10        A     I don't recall the number, but there

11   was at least that.

12        Q     Okay.  And at least that and my list

13   is including the Digitek.  And my question is:

14   You agree that 64 products, including Digitek,

15   were discontinued because the quality control

16   system at Actavis had several failures?

17        A     I'm trying to find a short way to

18   answer that.  One thing led to another is the

19   easiest way for me to say that.  We talked

20   earlier about PAREXEL's review and discussions

21   that occurred with the Agency even prior to

22   the inspection closing.

23             So Erin looked at a number of

24   products that were subject to investigations

PLAINTIFFS' EXHIBITS 001082

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

292

1    and was drawing conclusions and was asking us

2    to prove to her that that wasn't the case with

3    all products.

4              So that was why we had engaged

5    PAREXEL.  That was to get a third-party,

6    unbiased review of these other products so

7    that we could provide that evidence to the

8    Agency to show them that the issue was not

9    widespread.

10        Q    But ultimately the FDA concluded

11   that the issue was widespread?

12        A    Based on Erin's comments, yes.

13        Q    Based on the FDA inspector's

14   comments?

15        A    Right.

16        Q    And did you find any fault with the

17   FDA inspector's comments?

18        A    I -- there were things that we did

19   disagree on.  But her comments were basically

20   accurate, you know -- yes, her comments were

21   accurate.  What she presented was accurate.

22        Q    As you sit here now, anything -- do

23   you recall anything specifically that you

24   disagreed with the FDA inspector as far as her

PLAINTIFFS' EXHIBITS 001083

293

1    findings during the 483?

2         A    Fundamental issues.  I mean, Erin is

3    a very good investigator, very thorough, but

4    she has her own opinions, like anybody does.

5    So she had feelings about things that we

6    implemented that perhaps were given the

7    go-ahead by prior FDA investigators that

8    perhaps she felt differently about.

9              So there were things that were

10   discussed during the course of the

11   investigation that I viewed one way and she

12   viewed another, but that's not unusual.

13        Q    Can you think of any specifics, any

14   issues or topics that she viewed one way and

15   you viewed another?

16                   MR. DEAN:  I've been letting --

17              let me just object.  I'll try to be

18              succinct here.  I've been letting the

19              general inquiry about non-Digitek

20              products go at a general level.

21                   I don't object to her answering

22              that question as to Digitek specifics.

23              But as to general details -- I'm sorry --

24              as to specific details of discussions she

PLAINTIFFS' EXHIBITS 001084

294

1          had with Erin about non-Digitek products,

2          I'm going to instruct her not to answer

3          the question as to details.

4                     I might at a general level if

5          you're inquiring about whether there was

6          a concern about quality control; but as

7          to the specifics, I'm going to instruct

8          her not to answer on non-Digitek

9          products.

10    BY MR. MILLER:

11         Q    Were there any specifics that you

12    recall that you disagreed on from the findings

13    of the FDA inspector during the '08 483

14    inspection?

15                    MR. DEAN:  Let me just instruct

16         you just to answer that with respect to

17         Digitek.

18    BY MR. MILLER:

19         Q    And I'll point out that you can

20    answer with respect to Digitek or any general

21    GMP violations.  It can be general issues or

22    Digitek.  It doesn't have to be just Digitek.

23                    MR. DEAN:  At a general level,

24         I'm fine.  But if you're asking her for

PLAINTIFFS' EXHIBITS 001085

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

295

1           specific comments about non-Digitek

2           drugs, I think that is beyond the scope

3           of what's in PTO-12 and 27.  If you're at

4           a general level, I'm okay with it.  But I

5           think your last question could lead her

6           to go into specifics.  And I'm just

7           instructing her, as to specifics, to

8           limit it to Digitek.

9      BY MR. MILLER:

10          Q    If you understood all those

11     instructions, ma'am, it's okay to answer.

12          A    I think I can answer it.  In the

13     case of Digitek and with some of the other

14     drugs that were recalled, I didn't always see

15     the logic in extending it to all batches.  And

16     that doesn't mean that I didn't execute on all

17     batches because there was -- when you're

18     dealing in a situation as I was in, you get to

19     a point where you just -- in order to advance

20     to the next point and not belabor the point,

21     there's certain concessions that are made.

22               So in the case of some of the other

23     recalls, which based on his instruction, I'm

24     not going to give you the detail, but there

PLAINTIFFS' EXHIBITS 001086

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

296

1     were situations where there was an issue with

2     one batch and, through her interpretation, it

3     implicated all batches.

4          Q    How many -- I'm sorry.

5          A    And I didn't always agree with that.

6          Q    How many of the 64 products, give or

7     take -- I understand your position there --

8     were ultimately recalled?

9          A    All the products were recalled.

10         Q    And was that every batch in every

11    product?

12         A    Yes.

13         Q    So --

14         A    But there were multiple recalls, so

15    you have to distinguish one from the other.

16    There was a set of recalls that was done

17    initially for stability-related issues.  Those

18    are the ones that I'm referring to now when I

19    say that one batch with a problem, even though

20    it was a stability batch, to me did not always

21    mean or based on -- based on the issue --

22    again, I can't go into detail.

23              But her view was that it should have

24    been all batches based on that, and my view

PLAINTIFFS' EXHIBITS 001087

Confidential – Subject to Further Confidentiality Review

297

```
 1        was that I didn't believe that was the case.

 2        But I didn't argue that point.  I conceded

 3        that point, and we recalled everything.

 4                  The 65 products that you're

 5        referring to is part of the last recall.  And

 6        that recall, again, was a concession to remove

 7        product from the market in order for Actavis

 8        to even have a discussion with the Agency

 9        about next steps and getting their site back

10        into a position where they can manufacture

11        product.

12            Q    Okay.  Sixty-five products was the

13        last set?

14            A    Was the last set.

15            Q    How large were the other sets?  I

16        thought 65 was the total universe of products

17        at Actavis, Little Falls, Totowa?

18            A    I don't recall, but I don't think

19        so.  I think 65 was the last set.

20            Q    And, in your mind, Digitek was one

21        product that was recalled on its own set?

22            A    Correct.

23            Q    Okay.  And then there was a -- was

24        the stability recall, was that the group of 65
```

PLAINTIFFS' EXHIBITS 001088

Confidential – Subject to Further Confidentiality Review

298

1    or was that a subset of the 65?

2           A     The stability group was the first

3    set of recalls around the same time frame as

4    the digoxin recall.  And I don't recall if --

5    I think it was about a dozen products.

6           Q     Was there also an

7    out-of-specification group, an OOS group?

8           A     That's the stability group.

9           Q     That's the stability.  Okay.  Am I

10   correct in saying that if a manufacturing

11   company of pharmaceutical products violates a

12   CGMP, that it's viewed that the lab has

13   violated that CGMP for all products?

14                 MR. DEAN:  Objection to form.

15                 Go ahead.

16                 THE WITNESS:  I don't

17         understand the question.

18   BY MR. MILLER:

19         Q     Have you seen -- I'm going to hand

20   you what's been previously marked, if you

21   bring up, Mike, a copy of Exhibit 82, which

22   was the Complaint for permanent injunction.

23                 Have you seen this document before?

24         A     Yes.

PLAINTIFFS' EXHIBITS 001089

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

299

1          Q    And what was the occasion which you
2     had an opportunity to read it?
3                    MR. DEAN:  Let me just instruct
4          the witness she can answer questions at a
5          general level about this document; but,
6          again, given PTO 12 and 27, I don't want
7          her to get into specific discussions of
8          products other than Digitek.  But she can
9          answer your questions at a general level
10         regarding this document.
11                   Go ahead.
12    BY MR. MILLER:
13         Q    Well, this document was filed, if
14    you look at the last page, on November 14th,
15    2008.  And you were in your position as vice
16    president of quality and compliance at Actavis
17    at that time; correct?
18         A    No.  I resigned on the 13th.  This
19    document was filed but not in this form.
20                   This is the final consent decree?
21    Is that what I'm looking at?
22         Q    No, ma'am.  This is the Complaint
23    that led to the consent decree.
24         A    Oh, this is the Complaint.

PLAINTIFFS' EXHIBITS 001090

300

1       Q     And on November 14, 2008, I believe

2    you were still at Actavis; correct?

3       A     Yes.  I did see this document.  I,

4    though, obtained it on the Internet.

5       Q     Did you -- were you in the position

6    of vice president of quality and compliance

7    when you downloaded this off the Internet?

8       A     Technically, yes, but I was not

9    on-site.  I resigned on the 13th.  This was

10   filed on the 14th.  And then on the 17th, it

11   was my last day on-site.

12      Q     Of December?

13      A     No.

14      Q     November?

15      A     Of November.

16      Q     I'm sorry.  I wrote down that you

17   worked for Actavis until December 1st of 2008.

18      A     On the record, I was paid until

19   December 1st as an employee.

20      Q     Oh, okay.

21      A     But I didn't actively work there

22   after the 17th.

23      Q     So right around the time you were

24   resigning is when you read this document?

301

```
 1        A    Correct.

 2        Q    And you read it -- did you read the

 3   entire document?

 4        A    Then I did, yes.

 5             MR. MILLER:  If you would,

 6        Mike, go to Page 6, and if you would

 7        enlarge Paragraph 13.

 8   BY MR. MILLER:

 9        Q    Paragraph 13 -- and this is filed by

10   the Department of Justice -- states that

11   compliance with CGMP requirements assures that

12   drugs meet the requirements of the FDCA as to

13   safety and have the identity, strength and

14   meet the quality and purity characteristics

15   that they purport or are represented to

16   possess.  Drugs not manufactured, processed,

17   packed, or held in conformance with CGMP

18   requirements are deemed adulterated as a

19   matter of law, without any showing of actual

20   defect.  Regulations implementing the CGMP

21   provisions are set forth at 21 CFR 210, 211.

22             Did I read that correctly?

23        A    Yes.

24        Q    Do you agree that the drugs being
```

PLAINTIFFS' EXHIBITS 001092

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

302

1    manufactured at this time would be considered

2    adulterated drugs?

3                    MR. DEAN:  Objection to form.

4           Excuse me.  What drugs are you asking

5           about?  I want to be more specific.

6                    MR. MILLER:  Drugs manufactured

7           by Actavis at Little Falls and Totowa.

8                    MR. DEAN:  And your question is

9           what?

10   BY MR. MILLER:

11        Q    Would you have considered -- did

12   you, as the vice president of quality and

13   compliance, agree with the Department of

14   Justice that the drugs manufactured were

15   adulterated drugs?

16                   MR. DEAN:  Objection; calls for

17          a legal conclusion.

18                   Go ahead.

19                   Go ahead.

20                   THE WITNESS:  Answer it?

21                   I wouldn't agree that -- no, I

22          don't agree with the Department of

23          Justice.  I believe that there were

24          issues involved with certain batches with

PLAINTIFFS' EXHIBITS 001093

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 105 of 200 PageID #: 20057
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

303

1          certain products that may have violated

2          GMP and may have had issues, but I don't

3          agree that all the drugs manufactured.

4     BY MR. MILLER:

5          Q    Were GMPs violated in the production

6     of Digitek?

7          A    Technically, no.  They followed

8     standard practices.  They did an

9     investigation.  They did all the necessary

10    things that they should have done.

11              I think it was a judgment call

12    perhaps on the amount of scrutiny that they

13    put that batch through after finding such an

14    issue.  And it's always easy to look at it in

15    hindsight and think of 50 other things you

16    should have done.

17              But there was nothing related to

18    that -- the only thing that I can -- they

19    followed procedures that were in place.  There

20    was a mechanism in place.  It was not done

21    randomly.

22         Q    I understand your answer to go

23    specifically to the double-thick pills.

24         A    Correct.

PLAINTIFFS' EXHIBITS 001094

304

1        Q    And I'm more of a broader question.
2    The production of Digitek, if one were to
3    review the 483 and all the write-ups, you
4    agree that there were other write-ups about
5    digoxin and Digitek other than the
6    double-thick pills?
7        A    I don't recall.  I thought the
8    majority of what was there was related to the
9    one batch, but I don't know.  Without seeing
10   that, I couldn't comment.
11       Q    All right.  We'll certainly cover
12   that as well.
13            Mike, would you blow up
14   Paragraph 12, please.
15            FDA's inspections establish that the
16   drugs being manufactured and distributed by
17   Defendants are adulterated within the meaning
18   of 21 USC 351, Paragraph (a)(2)(B), in that
19   the methods used in, or the facilities or
20   controls used for, their manufacture,
21   processing, packing, or holding do not conform
22   to or are not operated or administered in
23   conformity with the GMP requirements for
24   drugs.

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

305

1            So --
2                    MR. DEAN:  Let me just -- is
3        that just -- you're reading the question,
4        and you're going to ask if you read it
5        right?  Or do you have a question?
6                    MR. MILLER:  You cut me off
7        before I even got a chance to ask a
8        question, Dick.
9                    MR. DEAN:  Go ahead and ask
10       your question.
11   BY MR. MILLER:
12       Q    Did I read that correctly?
13       A    Yes.
14       Q    And it's your testimony here that
15   you disagree with that, or do you agree with
16   that paragraph?
17                   MR. DEAN:  Let me object and
18       reiterate the objection I gave before and
19       instruct her not to answer about details
20       of other non-Digitek drugs.  She can
21       certainly answer about Digitek, and she
22       can answer at a general level.
23                   Go ahead.
24                   THE WITNESS:  To me, this

PLAINTIFFS' EXHIBITS 001096

306

```
 1            paragraph just states what FDA does.  FDA
 2            inspections establish that.  It doesn't
 3            speak specific to Actavis.  It's just
 4            stating that.
 5      BY MR. MILLER:
 6            Q    Well, you're not an attorney;
 7      correct?
 8            A    I'm not an attorney.
 9            Q    If you go to that first page, ma'am,
10      this is a Complaint that the United States of
11      America filed against Actavis Totowa and other
12      defendants.
13            And enumerated Paragraph 12 is:
14      "FDA's inspections establish that the drugs
15      being manufactured and distributed by
16      Defendants are adulterated."
17            It's not what the -- I'll represent
18      to you that it's not what the FDA does.  It's
19      not explaining a duty.  It's explaining a
20      finding that if methods used or facilities or
21      controls used for their manufacture,
22      processing, packing, or holding do not conform
23      to or are not operated or administered in
24      conformity with the CGMP requirements for
```

PLAINTIFFS' EXHIBITS 001097

307

1    drugs, what they've done is defined what an

2    adulterated drug is.

3             Do you understand the paragraph,

4    ma'am?

5                  MR. DEAN:  Same objection.  She

6         can answer with regard to Digitek.

7                  I instruct you not to answer as

8         to the specifics on other drugs.

9                  Go ahead.

10                 THE WITNESS:  I'm sorry.  Now

11        that I'm rereading the paragraph, can you

12        ask me the question again?

13   BY MR. MILLER:

14        Q    Certainly.  Do you feel that you

15   understand the paragraph now?

16        A    Now I understand the paragraph, yes.

17        Q    Had you received training in CGMPs

18   as a vice president of quality and compliance?

19        A    Yes.

20        Q    Are you familiar with US -- with

21   21 USC 351 (a)(2)(B)?

22        A    Actually, not specifically.  I

23   couldn't tell you what that reference is in

24   detail.  GMPs are Sections 210 and 211 cited

PLAINTIFFS' EXHIBITS 001098

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

308

```
 1    below.
 2         Q    But you're not familiar with
 3    Section 351?
 4         A    I may be, but I can't recall what
 5    section that is.
 6                   (Plaintiff's Exhibit No. 124
 7         was marked for identification.)
 8    BY MR. MILLER:
 9         Q    I'm going to hand you what I'm going
10    to mark as Exhibit 124.  Ma'am, this is, I'll
11    represent to you, Title 21 of the Food and
12    Drug's Chapter 9, Subchapter V, Part A.  And
13    specifically it's Section 351 titled
14    "Adulterated drugs and devices."
15                   And the only section that's
16    specifically cited here in the Complaint by
17    the United States is 351(a)(2)(B).  And that
18    is:  A drug or device shall be deemed to be
19    adulterated -- and it goes into (a)(2)(B)
20    here -- and that is poisonous, insanitary,
21    et cetera, ingredients; adequate controls in
22    manufacture.  And (2)(b) goes on to say that
23    it is such if it is a drug and the methods
24    used in, or facilities or controls used for,
```

PLAINTIFFS' EXHIBITS 001099

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 111 of 200  PageID #: 20063
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

309

 1      its manufacture, processing, packing, or

 2      holding do not conform to or are not operated

 3      or administered in conformity with current

 4      good manufacturing practices to assure that

 5      the drug meets the requirements of this

 6      chapter as to safety and has the identity and

 7      strength and meets the quality and purity

 8      characteristics which it purports or is

 9      represented to possess.

10              A, did I read that correctly?

11          A    Yes.

12          Q    Have you seen this document before?

13          A    No.

14          Q    Did you receive any training on the

15      topic when you received training on CGMPs?

16          A    I've read this in the context --

17      elsewhere but not in this specific section

18      of -- this description is in other parts of

19      GMP but not in this -- I've never seen this

20      section.

21          Q    Okay.  Do you agree that if a

22      pharmaceutical lab for a manufacturing company

23      has issues with manufacturing, processing,

24      packing, or the facilities or controls used

PLAINTIFFS' EXHIBITS 001100

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

310

1    for, that that labels the drugs manufactured

2    by that company as adulterated drugs?

3                    MR. DEAN:  Calls for a legal

4            conclusion.

5                    Go ahead.

6                    THE WITNESS:  I don't know

7            where the lab fits into all of this.  You

8            keep referring to the lab.

9    BY MR. MILLER:

10       Q    If the QC, quality control, systems

11   of a pharmaceutical company are in violation

12   of Section 351, Adulterated drugs and devices,

13   is it -- would you agree with the statement

14   that if there is a processing issue or

15   something wrong with methods used in the

16   facilities or controls, that it's deemed that

17   the adulterated drug extends out to all

18   products made?

19                    MR. DEAN:  Same objection;

20           calls for a conclusion of law, also

21           assumes facts not in evidence.

22                    Go ahead.

23   BY MR. MILLER:

24       Q    It's okay to answer.

PLAINTIFFS' EXHIBITS 001101

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

311

1          A     It's a very convoluted question, but
2     I'll try to answer it.
3               I think what you're asking me is
4     that if a company is in violation of GMP or if
5     something is not produced under GMP
6     conditions, is it adulterated?
7          Q     Yes.  You asked it much better
8     than I.
9          A     Yes.
10         Q     You agree with that?
11         A     It is.
12         Q     And you agree that if Product A is
13    the one that has the CGMP violation for
14    manufacturing processes or whatever issues, if
15    Product A uses the same manufacturing process
16    and issues, that it is also an adulterated
17    drug?  Is that what the --
18         A     No.
19         Q     -- Complaint is stating?
20               MR. DEAN:  Objection to form;
21          calls for a legal conclusion.
22               THE WITNESS:  No, I don't agree
23          with that because you're talking about a
24          process.  And to me, a process that you

PLAINTIFFS' EXHIBITS 001102

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

312

1              use to manufacture is how you manufacture

2         that drug.

3                   And there's a formulation

4         that's associated with a certain drug.

5         And not all drugs are produced with the

6         same formulation or the same process.

7    BY MR. MILLER:

8         Q    You would disagree with the

9    statement that if a quality control system

10   department of a pharmaceutical lab had a GMP

11   violation in stability, that that general GMP

12   violation doesn't carry over to stability for

13   all products?

14        A    Still, it's not -- it would depend

15   on the case.  You're -- you can have a

16   stability issue or a problem with -- it would

17   vary -- you'd have to be more detailed to

18   that.

19        Q    As we sit here, you're not aware of

20   any GMP violations on Digitek in particular?

21        A    No, I'm not aware of any on Digitek

22   in particular.

23        Q    Let's go to Page 7 of the Complaint,

24   Paragraph 16.

PLAINTIFFS' EXHIBITS 001103

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

313

1              Blow that up, please.

2              Paragraph 16 states that the FDA's

3    inspection of Actavis Totowa's Little Falls

4    facility from January 10 to February 8, 2006,

5    revealed that the firm failed to comply with

6    GMP requirements in several respects,

7    including, for example, it failed to

8    investigate unexplained out-of-specification

9    testing results for drugs, specifically

10   21 CFR 211.192.

11             And my question is:  Do you agree

12   that failing to investigate unexplained

13   out-of-specification testing is a violation of

14   CGMP?

15             MR. DEAN:  Objection; calls for

16        a legal conclusion.

17             Go ahead.

18             THE WITNESS:  Yes, it is a

19        violation.

20   BY MR. MILLER:

21        Q    If we go to Page 10 and take a look

22   at Paragraph 21, the Complaint by the

23   US Department of Justice goes on to say that

24   from March 18 to May 20th, 2008, FDA inspected

PLAINTIFFS' EXHIBITS 001104

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

314

1    Actavis Totowa's Riverview Drive facility.

2    Throughout the inspection, the FDA

3    investigators advised defendants of the

4    numerous and significant deviations from the

5    CGMP requirements that the investigators

6    observed so the firm could take responsive

7    actions to protect the public health.

8              Ma'am, you would agree that you were

9    part of the conversations in which the FDA

10   investigators advised Actavis of the numerous

11   and significant deviations from CGMP?

12        A    Yes.

13        Q    And do you agree that there were

14   numerous and significant deviations from CGMP

15   during the March 18th to May 20, 2008,

16   inspection?

17        A    Yes, I would have to agree.

18              MR. MILLER:  Would you call up

19        Exhibit 91.

20   BY MR. MILLER:

21        Q    That first page -- we've gone over

22   this document in some detail.  I'm going to

23   make a very good attempt not to ask questions

24   that have already been asked, although I'm

PLAINTIFFS' EXHIBITS 001105

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

315

1    going to cover some statements that have

2    already been covered.

3                    MR. MILLER:  If you would

4         enlarge the summary of the establishment

5         inspection report that was discussed

6         earlier.

7                    THE WITNESS:  Could I have a

8         copy?

9    BY MR. MILLER:

10        Q    You certainly may.

11             That summary was already read into

12   the record earlier, but I'll read the first

13   sentence again:  An inspection of this large

14   generic prescription pharmaceutical

15   manufacturer was conducted as a qualifying GMP

16   inspection of a new site, 990 Riverview Drive,

17   Totowa, as per FACTS Assignment -- and it

18   gives the number, Operation ID, number.

19             When it states that it's an

20   inspection to qualify the GMP department, am I

21   paraphrasing that right?

22        A    There's no GMP department.  It's

23   doing a general GMP inspection of a site.

24        Q    And when you use the term "general

PLAINTIFFS' EXHIBITS 001106

316

```
 1    GMP inspection," would they look at good
 2    manufacturing practices -- if they look at,
 3    say, stability and the amount of time that you
 4    have in this field, will they go through and
 5    qualify GMP stability for every product or do
 6    they qualify stability for one or two
 7    products?  They wouldn't go through 64
 8    products? -- is my question.
 9         A    Correct.
10         Q    So there's a general term there
11    where, okay, three or four products or
12    whatever number it might be are approved for
13    GMP for stability, or any other example, then
14    it's approved across the board; is that
15    correct?
16         A    They look at the system itself, and
17    they use a sampling of the products to
18    determine if that system's working.
19         Q    Would you agree with me that when
20    they look at the system, again, they look at
21    stability; they don't look at stability for
22    each and every of the 64 products; is that
23    correct?
24         A    Correct.
```

PLAINTIFFS' EXHIBITS 001107

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

317

1        Q    And does the counterpart hold true?
2    When they come in to inspect, they won't
3    inspect every product's stability testing;
4    they'll inspect a couple and then say you
5    violated the GMP for stability across the
6    board; is that correct?
7                    MR. DEAN:  Objection.
8                    Go ahead.
9                    THE WITNESS:  If it's not
10          specific to a product, yes, then that
11          would be true.  So if they found a
12          problem that was related specifically to
13          one product, then you couldn't make that
14          assumption.  But if they found a general
15          problem, then you could.
16   BY MR. MILLER:
17       Q    Would you describe a general
18   problem?  If they found GMP violations in
19   three or four products out of 64, that then
20   does it become a general problem?
21                   MR. DEAN:  Objection;
22          incomplete hypothetical.
23   BY MR. MILLER:
24       Q    It's okay to answer.

PLAINTIFFS' EXHIBITS 001108

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

318

1          A    I was just saying that that's just

2     not the best example to use for that.

3          Q    You're in the field.  Give me an

4     example.

5          A    Say what you were -- what you asked.

6          Q    Well, we've identified if one

7     product is tested for something, say,

8     stability, and that one product is the only

9     product that's been found to violate CGMP,

10    that we consider it a one-product problem.

11              In your mind, if there's 65

12    products, how many products have to fail

13    stability before you would say it's a general

14    GMP violation?

15              MR. DEAN:  Objection;

16         incomplete hypothetical.

17              Go ahead.

18              THE WITNESS:  Their

19         inspectional approach is to look at

20         systems.  So there's six systems.  So

21         stability is part of a laboratory system.

22         So when they do an inspection, they

23         typically look at a quality system.  And

24         even in the quality system, there are a

PLAINTIFFS' EXHIBITS 001109

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

319

```
 1              lot of subcategories based on the
 2              different activities that quality
 3              performs.
 4                      So when FDA's review -- they
 5              need to review enough to make a -- to
 6              draw some kind of opinion of what --
 7              whether they feel that that system's
 8              working or not.
 9                      And what you're -- where you
10              were going with that is that if they find
11              one thing wrong, they're not going to
12              necessarily implicate the whole system;
13              but if they find multiple things wrong,
14              then they would implicate the whole
15              system.
16         BY MR. MILLER:
17              Q    Yes.  And my question is:  Being
18         that you've been in the field for so many
19         years and have so much experience, how many
20         multiple -- and by way of example, the
21         laboratory system, stability testing, what is
22         your opinion as to how many products would
23         have to fail or issues in stability,
24         violations of CGMP would they have to find
```

PLAINTIFFS' EXHIBITS 001110

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

320

1     before it is an across-the-board, general

2     problem?

3                    MR. DEAN:  Objection to form;

4          vague, ambiguous; lab system's undefined,

5          numerous other terms undefined.  The

6          question is vague and ambiguous.

7     BY MR. MILLER:

8          Q    It's okay to answer.

9                    MR. DEAN:  Go ahead if you can.

10                   THE WITNESS:  I forgot the

11         question.

12    BY MR. MILLER:

13         Q    Using your term, "laboratory

14    system," stability testing falls under

15    laboratory systems, which we have established.

16    And you indicated that one would be a problem

17    with that product, and you also indicated that

18    "multiple" would be an indication of

19    across-the-board problem.

20              My question is:  How many?

21         A    How many?  There's no definitive

22    number.

23              And just to clarify, in this

24    particular case, we had multiple stability

PLAINTIFFS' EXHIBITS 001111

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

321

| | |
|---|---|
| 1 | failures that led to recalls and those |
| 2 | products were recalled; but they were |
| 3 | product-related because, generally speaking, |
| 4 | the lab got a clean bill of health in this |
| 5 | inspection, for the most part.  That was the |
| 6 | area that they praised in terms of labs.  So |
| 7 | the fact that the lab found the out-of-specs, |
| 8 | I mean, it went to their credit. |
| 9 | If you recall, you put something up |
| 10 | a few minutes ago that criticized the company |
| 11 | from the prior inspection, whereby they were |
| 12 | not opening any investigations.  And you asked |
| 13 | me if that was a violation of GMP, and it is. |
| 14 | So the company had come quite a ways |
| 15 | in that they were opening these |
| 16 | investigations.  Now, of course, they were now |
| 17 | cited for failing to close them in a timely |
| 18 | fashion, but it was a new problem.  It was a |
| 19 | related problem. |
| 20 | But now the company was -- the |
| 21 | laboratory was actually given kudos for the |
| 22 | fact that it had done well during this |
| 23 | inspection, despite the stability failures |
| 24 | because they were product-related.  They were |

PLAINTIFFS' EXHIBITS 001112

322

1    related to either an issue with a product or a

2    batch or a method or something, something

3    else.

4                    MR. MILLER:  Let's go to Page 2

5        of 95.  And blow up the last five lines.

6        There's a sentence that begins with

7        "however."

8    BY MR. MILLER:

9        Q    And if you could start, read

10   whatever you need to catch up.  But it begins

11   with "However," the bottom of the page, four

12   or five lines up from the bottom.

13                   And it says regarding this

14   inspection:  However, there is no assurance of

15   the strength, quality and purity of the

16   approximately -- redacted number -- of other

17   products that remain on the market, all lots

18   remaining in the two distribution centers, and

19   the in-process products that remain at the

20   firm's Little Falls, New Jersey, and Totowa,

21   New Jersey, locations.  The products were

22   manufactured, tested and released by the same

23   quality system.

24                   Now, do you find praise in that --

PLAINTIFFS' EXHIBITS 001113

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

323

1              MR. DEAN:  Objection.  She said

2        that the lab was given high marks.

3              THE WITNESS:  The laboratory.

4    BY MR. MILLER:

5        Q    Does the laboratory do the testing

6    that assures strength, quality, and purity?

7        A    The laboratory does the testing, but

8    QA releases the product.  And from what we've

9    seen throughout, the QA group is the group

10   that was targeted here, not the lab.

11       Q    Can you think of any document that

12   gave praise to the lab as you sit here?  Is

13   there any document that stands out in your

14   mind?

15       A    There should -- I don't know if we

16   had it in front of us today, but there's

17   references to conversations about the

18   laboratory in some of the documents related to

19   this inspection.  So it should be in the

20   minutes somewhere, perhaps the closeout

21   minutes.  I don't recall where we saw that.

22             MR. MILLER:  We're going to

23        take a quick break to swap out tapes.

24        Let's make it real fast, like five

PLAINTIFFS' EXHIBITS 001114

324

```
 1              minutes, so I can wrap this up.
 2                      THE VIDEOGRAPHER:  We're now
 3          going off the record.  This is the end of
 4          Videotape No. 5.  The time is 5:32.
 5                      (Short recess.)
 6                      THE VIDEOGRAPHER:  We are now
 7          back on the record.  This is the
 8          beginning of Videotape No. 6.  The time
 9          is 5:38.
10                      MR. MILLER:  Mike, Page 13 and
11          blow up the paragraph that's titled
12          "Inspectional Coverage."
13     BY MR. MILLER:
14          Q    If you take a look at that, please,
15     Ms. Lambridis.  Under Inspectional Coverage,
16     it states:  "The inspection was planned as a
17     qualifying cGMP inspection of the new site "--
18     redaction -- "and preapproval inspection.  Due
19     to the cGMP issues identified, the Quality
20     System was the only system reviewed.  The
21     inspection did not include the review of
22     preapproval applications.  However, a list of
23     pending ANDAs and supplements was provided as
24     Exhibit 25."
```

PLAINTIFFS' EXHIBITS 001115

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

325

1           The next sentence:  Although a
2    review of the new laboratory was conducted,
3    comprehensive coverage was not afforded due to
4    the significant deficiencies of the Quality
5    System.
6           Do you recall that due to the
7    deficiencies, significant deficiencies of the
8    quality system, that there was not
9    comprehensive coverage of the laboratory?  Do
10   you agree with that statement?
11       A    They did not do a full laboratory
12   inspection.  As I explained before, there are
13   six systems.  Quality is one, packaging is
14   one, manufacturing is one, laboratory is one.
15   So they looked at the quality system only.
16   And as I said, under quality, there's subparts
17   that interact with the lab, so investigation,
18   complaints, things that are related to
19   laboratory testing.  So they didn't do -- this
20   is correct in that they did not do a
21   comprehensive review of the laboratory.
22       Q    Okay.  So when they say "quality
23   systems," what different departments fall
24   under that?

PLAINTIFFS' EXHIBITS 001116

326

```
1           A     Mainly QA, but it relates to
2    other -- it relates to all areas.  That's why
3    they look at the quality system because it
4    relates to the entire facility.  So it
5    involves change control, annual product
6    reviews, investigations, complaint handling,
7    things that would go across the board.
8           Q     But you agree that due to the
9    significant deficiencies of the quality
10   system, that comprehensive coverage of the
11   laboratory was not conducted?  Do you agree
12   with the statement?
13                     MR. DEAN:  It doesn't say
14          "comprehensive coverage of the
15          laboratory."  You added a word there.
16                     THE WITNESS:  It says here they
17          did review the new laboratory.  So there
18          was an inspection -- part of this
19          inspection included a review of the
20          laboratory at Riverview, but they didn't
21          do the full laboratory GMP inspection.
22   BY MR. MILLER:
23          Q     But the plan was to do just that?
24          A     The plan was to do a GMP inspection
```

327

1     and a preapproval of the entire facility.

2          Q    But you agree that due to

3     significant deficiencies in the CGMP area,

4     that they never got to the second stage;

5     correct?

6          A    Oh, yes.  That's what she's saying;

7     they never got there.

8          Q    Go to Page 15 of 95, please.

9               You agree that that quality system

10    or the area in which there were deficiencies

11    of the GCMP program were found, that Digitek

12    was one of the products that fell under the

13    umbrella of the quality system?

14                    MR. DEAN:  Objection to form.

15                    Go ahead.

16                    THE WITNESS:  What's that

17        question again?

18    BY MR. MILLER:

19         Q    Well, was it the significant

20    deficiencies, violations of CGMPs that were

21    found that ultimately resulted in the ceasing

22    of production of all products at Actavis

23    Totowa?

24                    MR. DEAN:  Objection to form.

PLAINTIFFS' EXHIBITS 001118

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

328

1              Go ahead.

2                    THE WITNESS:  You asked

3         something specific to digoxin.

4                    MR. DEAN:  He changed the

5         question.

6                    MR. MILLER:  I did because I

7         forgot the first one.  You're going to

8         get me to forget the second one if you

9         don't give me an answer.

10                   MR. DEAN:  Why don't you try

11        again.

12   BY MR. MILLER:

13        Q    As the vice president of quality and

14   compliance at Actavis for a large area but

15   speaking to Totowa and all the products that

16   manufacturing of was ceased, were all the

17   products terminated because of violations of

18   GMPs?

19                   MR. DEAN:  Objection.

20                   Go ahead.

21                   THE WITNESS:  When we ceased

22        manufacturing?  You're referring to the

23        cease of manufacturing?

24

PLAINTIFFS' EXHIBITS 001119

329

1     BY MR. MILLER:

2          Q     Yes.

3          A     The products -- we discontinued

4     manufacturing because Erin raised the concern

5     regarding the fact that she couldn't -- she

6     reviewed certain products and she had issues.

7     And she extended that across the board and

8     asked us to provide her with evidence to the

9     contrary.

10               So in the absence of being able to

11    present her now with evidence for every

12    product, that it was -- that a review had been

13    done and that it was good, we ceased

14    manufacturing.  And that's when we called

15    PAREXEL in to do that review so that we could

16    provide that to her.

17         Q     And whether or not double-thick

18    tablets were found in Digitek, production

19    would have ceased on Digitek just the same?

20               MR. DEAN:  Objection; misstates

21         the prior testimony.

22               Go ahead.

23               MR. MILLER:  I'm not stating

24         any prior testimony.

PLAINTIFFS' EXHIBITS 001120

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

330

1    BY MR. MILLER:

2         Q    My question is:  If double-thick

3    tablets had never been discovered in any

4    Digitek lot or batch, would you agree that

5    production line would have stopped just the

6    same?

7         A    It would have been part of that

8    group of products.  Whatever we were

9    manufacturing was stopped.  So Digitek -- even

10   if she never found an issue with Digitek,

11   that's what you're asking?

12        Q    Yes.

13        A    If she never found any issue with

14   Digitek, that would have been stopped with all

15   the others.

16        Q    No.  I'm talking about that specific

17   issue.  There were several issues.  I guess

18   that specific issue of double-thick tablets,

19   had that not been found, the production of

20   Digitek still would have ceased?

21        A    Yes, because we ceased everything.

22   So it would have been included in the whole

23   group.

24        Q    And the whole group ceased because

PLAINTIFFS' EXHIBITS 001121

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

331

1    of significant GMP violations?

2         A    She found CGMP violations with

3    respect to certain things that she had looked

4    at and extended it across the board.  And it

5    was up to -- she was asking us to prove

6    otherwise.  So we had to stop in order to

7    evaluate and provide that information.

8         Q    And her findings came in the way of

9    observations in the 483?

10        A    Yes.

11        Q    And it was those observations in the

12   483 and violations of the GMP written in that

13   document that led to the cease of production

14   of all products; you agree with that?

15        A    Yes, even though we ceased before

16   actually having the official 483.

17        Q    Page 43 of 95, please.

18             And you agree that one group of

19   production recalls were due to stability, but

20   you agree that that was also -- included

21   out-of-specification results; is that correct?

22                  MR. DEAN:  Can I have that

23        question again?  I'm sorry.

24                  MR. MILLER:  Well, yeah, I

PLAINTIFFS' EXHIBITS 001122

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

332

1           agree.  I think I lost myself on that

2           one.

3      BY MR. MILLER:

4           Q    We broke this recall in --

5                    MR. DEAN:  You're on Page 43?

6                    MR. MILLER:  I am.  Yes, I am.

7      BY MR. MILLER:

8           Q    We broke the recall down into

9      separate groups, and it was Digitek on its own

10     and then another group were stability issues

11     and then another larger group of shutting

12     everything down?

13          A    Yes.

14          Q    You agree?

15          A    Agree.  I think there was actually

16     another group but --

17          Q    Okay.  There was another group on

18     top of that.

19          A    Another group.

20          Q    Take a look at Observation No. 4 if

21     you would, please.  And I'm going to ask you a

22     question about that, what's on the remainder

23     of Page 43 after Observation 4.

24          A    Okay.

PLAINTIFFS' EXHIBITS 001123

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

333

1      Q    I just want to ask you basically a
2    general question without getting too much into
3    the specifics.
4           You agree that this is a GMP
5    violation found by the FDA specifically
6    regarding Digitek, and it has nothing to do
7    with the double-thick lot?
8                  MR. DEAN:  That Observation 4?
9                  MR. MILLER:  Yes.
10                 MR. DEAN:  Okay.  Go ahead.
11                 THE WITNESS:  She -- it's --
12           part of this is the observation, and part
13           of it is her background information.  So
14           the first sentence is the GMP -- the GMP
15           issue.  The "specifically" part is the
16           example which involves Digitek.
17    BY MR. MILLER:
18      Q    Right.  It's an example of a
19    violation of GMP; do you agree?
20      A    It's the example she's using to
21    state that that GMP issue was --
22      Q    Was violated.
23      A    -- violated.
24                 MR. DEAN:  Was observed.  It's

PLAINTIFFS' EXHIBITS 001124

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

334

1          an EIR.

2                         THE WITNESS:  Because she

3              justifies her reaction.

4                         MR. MILLER:  Well, I'm not

5              looking for your answer.  I'm looking for

6              her answer.

7                         MR. DEAN:  I'll clear it up

8              later on.  Keep going.

9      BY MR. MILLER:

10         Q    Do you agree that specifically --

11     when you look at the paragraph "Specifically"

12     and it says:  Although three out of --

13     although three out-of-specification results

14     were obtained for blend uniformity at the

15     Right-Top sample location for digoxin

16     tablets -- and it goes on and on.  You've read

17     it.

18                    You agree that this is an example of

19     a GMP violation that she recorded during her

20     observation during the 483 inspection?

21                         MR. DEAN:  Objection to form.

22                         Go ahead.

23                         THE WITNESS:  She -- her

24              observation is the first sentence.  And

PLAINTIFFS' EXHIBITS 001125

335

```
 1           she's using what she observed with this
 2           digoxin to substantiate that GMP issue.
 3    BY MR. MILLER:
 4        Q    And the GMP issue is she's outlining
 5    a violation of the GMP issue?
 6        A    Right.  And then the rest of it is
 7    her rationale.
 8        Q    I'm sorry.  We stepped on each
 9    other.  Just to get something clean, her
10    write-up is about a violation of a GMP
11    specific to Digitek?
12                 MR. DEAN:  Objection to form.
13           Go ahead.
14                 THE WITNESS:  No.  That's why
15           I'm saying it's not specific to Digitek.
16    BY MR. MILLER:
17        Q    What is it specific to?
18        A    She's using this digoxin example --
19    this example, which happens to be digoxin, to
20    substantiate her claim that determinations of
21    conformance to appropriate written
22    specifications for acceptance are deficient
23    for in-process materials.  That's the GMP
24    issue.  She's using this as the example.  It
```

PLAINTIFFS' EXHIBITS 001126

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

336

1    happens to be Digitek.  So it's not specific
2    to Digitek is what I'm saying.
3         Q    Even though it says "specifically"
4    and gives an example?
5         A    It says "specifically" to say
6    because every --
7         Q    I'm with you.  Okay.
8         A    Every observation has to be
9    substantiated.
10        Q    Okay.  So is it specific to the GMP
11   or the quality systems?  It's specific to the
12   quality system, not so much for Digitek?
13        A    Correct.
14        Q    And you agree that Digitek is one of
15   the drugs being inspected by that quality
16   system, so in that way it does affect Digitek?
17        A    She's investigating the quality
18   systems for the manufacturing facility that
19   produces Digitek.
20        Q    Right.  And she has identified a
21   violation of a GMP.  And the example that she
22   used to show that the GMP was violated --
23        A    Was Digitek.
24        Q    -- was Digitek?

PLAINTIFFS' EXHIBITS 001127

337

1          A     Correct.

2          Q     If it was some other product that

3     they make, even if they had said by way of

4     example oxycodone hydrochloride tablets and

5     that was the example, it wouldn't matter

6     because the violation is a general violation

7     that's outlined at the top; right?  So it

8     wouldn't have mattered to you --

9          A     She's pointing out, yeah, what she

10    observed to be a violation.

11         Q     I understand.  And if you take a

12    look at Page 45 of 95, now, this issue, this

13    out-of-specification issue goes to -- am I

14    correct in using the term "blend uniformity"?

15         A     In the last example?

16         Q     Yes.

17         A     Yes.

18         Q     And blend uniformity is where you're

19    testing to see if the amount of active

20    pharmaceutical ingredient has dispersed evenly

21    in the mixture; is that a good way to put it?

22         A     That's a good way to put it.

23         Q     And "out of specification" means

24    that a sample that they took did not have the

PLAINTIFFS' EXHIBITS 001128

338

1     proper amount of active pharmaceutical

2     ingredient?

3          A     It could mean that, but there are a

4     lot of -- there's a lot of debate about the

5     sampling technique playing a role in whether

6     you get an accurate result.

7          Q     But as a manufacturer of a product

8     and vice president of quality, you do have

9     limits set high and low of how much active

10    pharmaceutical ingredient can be in a blend

11    uniformity test?

12         A     It has to meet the criteria for the

13    finished dose.

14         Q     Right.  And in this example, it was

15    Digitek that did not have the right amount of

16    digoxin in the test sample; is that correct?

17         A     If I can just look at this one more

18    time.

19         Q     Certainly.

20         A     I don't know all the details here,

21    but -- it's hard to do this with the redacted

22    version.  What was the question again?

23         Q     Certainly.  It discusses a Right-Top

24    sample.  You saw that?

PLAINTIFFS' EXHIBITS 001129

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

339

```
 1         A    Right.
 2         Q    And there are several samples from
 3    different spots in the mixture.  In this case,
 4    it was Digitek you're sampling; correct?
 5         A    Right.
 6         Q    And your department would look to
 7    see if the blend uniformity is correct; is
 8    that right?
 9         A    Correct.
10         Q    And the blend uniformity, the out of
11    specification that you're looking for is the
12    percentage of the active ingredient digoxin in
13    the mixture of Digitek; is that correct?
14         A    You're -- the purpose of the blend
15    uniformity test is to determine if the active
16    ingredient is uniform throughout the batch.
17         Q    And there's a high and low set on
18    that to determine if it's outside?
19         A    There's a range, uh-huh, yes.
20         Q    And there were out-of-range or
21    out-of-specification findings in these
22    batches?
23         A    The one location was out of
24    specification, but you don't stop there.  You
```

PLAINTIFFS' EXHIBITS 001130

Case 2:08-md-01968 Document 577-13 Filed 09/08/11 Page 142 of 200 PageID #: 20094
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

340

1    would have to look into whether that was --

2    what that was caused by because it could be

3    analytical.  It could be due to the sampling.

4    It could be due to a number of different

5    things.

6                She's indicating that a

7    manufacturing investigation was not conducted,

8    but something obviously was done because there

9    was additional testing done.  So without

10   everything in front of me, I couldn't

11   really -- I don't know the detail as to why

12   they did additional testing and what the

13   outcome of the testing is because all of this

14   is redacted.

15        Q    But you agree with the statement

16   that in the finding, in the original findings

17   in the lab, there was an improper amount of

18   digoxin found in the uniformity of blend tests

19   for those three lots?

20        A    The analytical result was out of

21   spec; but until you do an investigation and

22   know what happened, you can't definitively say

23   that it's a real result --

24        Q    I understand.

Case 2:08-md-01968   Document 577-13   Filed 09/08/11   Page 143 of 200 PageID #: 20095
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

341

1          A     -- it's a valid result.

2          Q     But ultimately you'd agree that the

3     CGMP violation that the FDA inspector found to

4     summarize all this was determinations of

5     conformance to appropriate written

6     specifications for acceptance are deficient

7     for in-process materials?

8                    MR. DEAN:  Object to the form

9               as to "found."

10                   Go ahead.

11                   THE WITNESS:  Her concern here

12              was that this issue didn't extend to

13              looking at the manufacturing process.

14              She's criticizing the fact that a

15              manufacturing investigation wasn't

16              conducted in this instance and that --

17              but it appears, in looking at the rest of

18              this, that there were -- there was some

19              type of investigation related to the

20              laboratory and additional samples were

21              tested.

22     BY MR. MILLER:

23          Q     Would you --

24          A     As I said, unless I read this whole

342

```
 1    thing and have the investigation in front of
 2    me, I can't --
 3         Q    But you would agree with me that if
 4    she --
 5                   MR. DEAN:  Wait.  Let her
 6         finish.
 7                   MR. MILLER:  Oh, I'm sorry.  I
 8         thought you were.
 9                   THE WITNESS:  I was going to
10         say I can't give you more detail.
11    BY MR. MILLER:
12         Q    Right.  Okay.  Well, you would agree
13    with this general statement, that if she found
14    that issue to be in compliance, she would
15    never have written Observation 4?  Obviously,
16    she found a violation of a GMP or she wouldn't
17    have found the observation?
18         A    The intent of both the 483 and this
19    report is to report what she observed to be in
20    violation.  She's stating what she thinks is a
21    violation and why she thinks it is.
22         Q    And that's what she's done here?
23         A    And that's what she's done here.
24         Q    Fair enough.  If we go to Page 45 of
```

PLAINTIFFS' EXHIBITS 001133

343

```
1    95 and blow up that very last sentence at the
2    bottom, it says:  "During the inspection, we
3    were provided with a list of products that
4    have been temporarily discontinued.  The list
5    includes 'blend uniformity issues' as a reason
6    for the temporary discontinuation in the
7    production of" -- and it goes on to list
8    several drugs.
9            Does this represent the cease of
10   production under the title of stability issues
11   that you discussed?
12       A    No.
13       Q    No?
14       A    Blend uniformity issues are not
15   stability issues.
16       Q    So this is above and beyond the
17   stability issues --
18       A    This --
19       Q    -- or separate and apart from?
20       A    Without looking at the exhibit that
21   she's referencing here, I believe this list --
22   we presented several lists during the course
23   of the inspection.  But I believe this list
24   was part of the product rationalization that
```

PLAINTIFFS' EXHIBITS 001134

344

1    was referred to in some of the earlier

2    discussions.

3              And at that point in time, there

4    were those stop-and-fix-type products; and so

5    there was reasons given for why certain things

6    were discontinued.  And in this case, she's

7    just pointing out that these products were

8    temporarily discontinued because of blend

9    uniformity issues.

10        Q    As the vice president of quality and

11   compliance, you agree with the statement that

12   digoxin would have been on the stop-and-fix

13   list for out-of-specification violations had

14   it not been for the Class I recall that was

15   already in place?

16        A    Absolutely, definitively no.

17        Q    Why?

18        A    Because there was not a repetitive

19   issue with blend uniformity for digoxin that

20   I -- other than that one observation that I

21   knew of.

22             These products here had on-and-off

23   issues related to some of the testing that

24   were more -- there were more documented issues

PLAINTIFFS' EXHIBITS 001135

345

```
 1    regarding this.

 2              And there were actually -- in the

 3    case of -- and actually in all three cases, we

 4    had ceased these products independent of the

 5    FDA inspection and were working on

 6    reformulating and working with -- in the case

 7    of the Chlor-Trimeton and the Drixoral, those

 8    were products we manufactured for

 9    Schering-Plough.  And we had even their folks

10    on board with trying to work on what were some

11    of those issues.  So we were --

12       Q    When you say "issues," are you

13    talking about some of the GMP violations that

14    pertain to those specific --

15       A    No, no.  Blend uniformity.  Blend

16    uniformity we're talking about here.

17              MR. DEAN:  Excuse me.  It's

18       about 6 o'clock.  Are you about finished?

19              MR. MILLER:  I can do it in 15

20       minutes.

21              MR. DEAN:  Keep going.

22    BY MR. MILLER:

23       Q    Look at Observation 5.  Let's go to

24    Page 48 of 95.
```

PLAINTIFFS' EXHIBITS 001136

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 148 of 200 PageID #: 20100
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

346

1            And it states:  "Laboratory controls

2      do not include the establishment of

3      scientifically sound and appropriate

4      specifications and test procedures designed to

5      assure that components, in-process materials,

6      and drug products conform to appropriate

7      standards of identity, strength, quality, and

8      purity."

9            Is that a violation of CGMPs as

10     written?

11       A    You do know that this text is

12     pre-written text.  It's text that FDA uses to

13     formulate their observations.  So that is

14     correct as stated, but it's the example, the

15     "specifically" part, that she -- is her

16     observation.

17       Q    Right.  But you discussed earlier

18     that the observation is specific to a drug,

19     but the GMP violation --

20       A    No.

21       Q    -- is general.

22       A    No.  This is a general -- when FDA

23     does an inspection, if they see something that

24     they believe is not conforming to GMP, they

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

347

1        take that example; and then when they write

2        the 483, they have to point to a regulation

3        that they think it's violating.

4              Q    And she's pointing here to the --

5              A    This is the regulation that she

6        believes is being violated.

7              Q    Right.

8              A    But I'm just pointing out that that

9        as written is a standard language that you'll

10       find over and over again in a lot of 483s.

11             Q    Right, because --

12             A    To make it easier for the

13       investigators, FDA has given them little

14       blurbs that they use.

15             Q    A boilerplate?

16             A    Right.  A template, yes.

17             Q    A template.  If you violate this

18       GMP, bam, this template gets on there?

19             A    Yeah, but they don't always synch

20       up.  I think this one's actually a very good

21       example.

22             Q    During the inspection, do you agree

23       that she wrote up Actavis, the quality systems

24       department, for this GMP violation?  I don't

PLAINTIFFS' EXHIBITS 001138

Case 2:08-md-01968   Document 577-13   Filed 09/08/11   Page 150 of 200 PageID #: 20102
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

348

1       want to have to read it again, but do you

2       agree that this is a finding of the FDA and

3       this finding is a violation of GMP?

4                       MR. DEAN:  Objection to form.

5              It's not a finding of the FDA.

6                       THE WITNESS:  I actually --

7              this is one that I disagree with.

8       BY MR. MILLER:

9              Q    Okay.  I'm not asking if you agree

10      with it or not.

11                      Is this observation a finding of the

12      FDA?

13             A    It's a finding of the FDA

14      investigator, yes.

15             Q    And do you agree that this finding

16      as written is a violation of GMP?  I'm not

17      asking if you agree with it or not.  I'm

18      asking if it's, as written, a violation of

19      GMP.

20             A    I think it's an interpretation

21      issue.  I don't agree that it's a violation of

22      GMP.  I'll explain why if you'd like me to.

23             Q    Sure, go ahead.

24             A    The laboratory was in the Little

PLAINTIFFS' EXHIBITS 001139

349

1    Falls facility.  And the same people and

2    equipment and methods were taken and they were

3    moved across the road into the Totowa

4    facility.  And as a matter of an exercise,

5    they used two analytical techniques to show

6    that nothing changed when they moved as

7    opposed to transferring everything and doing a

8    re-qualification of every test method after it

9    moved.

10           So, in other words, they took all

11   the equipment and they re-qualified the

12   equipment; but now they took the people and

13   the methods, and there's something called a

14   method transfer.  Rather than doing that for

15   every single method, they took examples and

16   did a few.  And it's her opinion that that

17   wasn't enough.

18       Q    In your mind, as the vice president

19   of quality and compliance at Actavis, you

20   think it's fine to take the general method,

21   carry it 2 miles to the new lab, and produce

22   multiple products even though you don't have

23   the methods for each one?

24       A    We're talking about test methods at

Case 2:08-md-01968 Document 577-13 Filed 09/08/11 Page 152 of 200 PageID #: 20104
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

350

1    an analytical lab.

2        Q    Right.  Yes.  Did I state that

3    correctly?

4        A    I just want to be clear that we're

5    not talking about new product.  We're talking

6    about the testing of it.

7        Q    Right.

8        A    So the equipment was moved; so you

9    would need to do work to show that when you

10   move the equipment, it still works.  That was

11   all done.

12           If you had different people there,

13   then I would say you need to do it one by one

14   because now you have new people executing on

15   the other end that you would want to make sure

16   can follow the same method and have the same

17   technique, et cetera.

18           But this was literally the same

19   people going across the street and testing it.

20   So we didn't do it in every case.  We only did

21   a small subset of it to show that it was good.

22   And, in her opinion, it wasn't enough.

23       Q    And by way of example, a specific

24   method on how to do a particular test for a

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 153 of 200  PageID #: 20105
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

351

1      particular drug would not have been on-site;

2      it would have been at the other facility?

3           A     No.  It goes -- it's a method.  It's

4      written.  You follow -- you look at the method

5      and you test it here, or you go down there and

6      you follow it there.

7           Q     I'm lost.  What was not on-site?

8      What was it that the FDA felt like needed to

9      be there and you didn't think it needed to be

10     there?

11          A     That you would go through an

12     exercise with a protocol whereby you would

13     test it here, the same batch, test it here and

14     then test it there and show that the results

15     are the same and -- it's a qualification.

16     It's called test method transfer.

17               There's -- it's a standard practice,

18     but you would typically do that when you're

19     transferring it to another site where it's a

20     totally different site with different people,

21     different equipment, maybe not even your own

22     site; it's a contract site.

23               So in this particular case, it was

24     the same people and the same equipment that

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

352

```
 1    just moved across the road onto the other side
 2    of the highway.
 3         Q    And you agree that the FDA felt that
 4    was a violation, but you did not?
 5         A    To me, it's a matter of an opinion
 6    here that it wasn't enough.  It's not that we
 7    did nothing.  It's that what we did they
 8    didn't believe to be enough.
 9              MR. MILLER:  I am going to wrap
10         this up.  I don't know if this has been
11         marked as an exhibit or not, but just in
12         case I'm going to mark it 125.
13              MR. DEAN:  What is it?
14              MR. MILLER:  It is the Mylan
15         quality incident report.
16              (Plaintiff's Exhibit No. 125
17         was marked for identification.)
18    BY MR. MILLER:
19         Q    Ma'am, I'm going to hand you what's
20    been marked Exhibit 125.  And it was a
21    document produced by Mylan, specifically
22    Mylan 0016459.  And I will assume you probably
23    haven't seen this in the past, but I'll ask
24    you:  Have you seen this in the past?
```

PLAINTIFFS' EXHIBITS 001143

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

353

1          A     No, I have not.

2          Q     Well, it appears to be a report -- a

3     reporter contact information.  It's

4     third-party supplier name, it's Actavis.  And

5     if you read through it, I'll represent to you

6     it's contact information where Mike Adams

7     talked to someone at Actavis.

8                And it's not real long.  If you take

9     a minute to read, I'd greatly appreciate it.

10               When you're ready for a question --

11         A     I'm ready.

12         Q     It's prepared on 4/23/08, at least

13    it appears to be.  And the phone conversation

14    between Michael Adams at Mylan starts out by

15    saying:  Incident description.  And it states

16    that verbal notification received from quality

17    director at Actavis Totowa that the FDA has

18    requested a Class I recall of this lot of

19    product.

20               Do you see that?

21         A     Yes.

22         Q     And what they're talking about here

23    is product name.  It goes into Digitek, .125,

24    and goes through -- would you agree with me

PLAINTIFFS' EXHIBITS 001144

354

1    that that is the double-thick lot, Lot 70924,

2    Alpha 2?

3         A    It's the lot, yes, we've been

4    talking about all day.

5         Q    And it goes on to say that the lot

6    had been investigated for double-thick tablets

7    by Actavis.  The entire batch was visually

8    inspected, and we heard the story of 15

9    suspect tablets were found out of

10   approximately 4.8 million.  The lot was then

11   AQL'd and passed, released to MPI, and

12   subsequently distributed by MPI.

13            Did you have an understanding that

14   Mylan distributed that lot?

15        A    Yes.

16        Q    And when they say that a

17   notification was received by the quality

18   director at Actavis, who has that title?

19        A    There were two.  One was Dan Bitler.

20   The other was Tony Castellazzo.  I don't

21   know -- my -- Tony Castellazzo typically did

22   not interact with the customer, so the only

23   other quality director would be Dan.

24        Q    So as you sit here, if it was your

PLAINTIFFS' EXHIBITS 001145

Case 2:08-md-01968   Document 577-13   Filed 09/08/11   Page 157 of 200 PageID #: 20109
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

355

1      department, you would believe it was Dan

2      Bitler that had to have this --

3          A     If they're just referring to the

4      title, I would.

5          Q     Fair enough.  It says:  Actions

6      taken:  A conference call with quality

7      director of Actavis was immediately held by

8      MPI quality, procurement, and operations

9      representatives.  Actavis explained that this

10     is part of a larger recall of products

11     stemming from an on-site FDA inspection.

12              Would you agree with the language

13     that the quality director of Actavis used,

14     that it's part of a larger recall of products

15     stemming from an on-site FDA inspection?

16         A     I would qualify it a bit, but yes.

17     I think there were other recall -- other

18     products recalled as a result of the

19     inspection, and I think he was just basically

20     letting them know that this was an outcome of

21     the FDA inspection.

22         Q     And when you say "other products,"

23     we've agreed that it's all products that were

24     made or manufactured at Totowa?

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

356

1           A     Well, not at this particular point
2     in time.
3           Q     Not at that point in time?
4           A     Right.
5           Q     But as a result of the inspection,
6     you agree that all products were recalled at
7     Totowa?
8           A     Eventually.
9           Q     It goes on to say that Actavis
10    committed to gather all relevant data and hold
11    a conference call the next day, April 24th, to
12    provide specific details so that we may take
13    action to recall this lot.
14          Do you recall having -- or do you
15    recall being a part of any conference calls
16    with Mylan regarding the data of this lot or
17    any Digitek information?
18          A     Well, this actually sort of relates
19    to the events we talked about earlier.  We
20    were originally intending to call -- to recall
21    the one lot.  And then on the 24th -- between
22    this conversation and the 24th was that
23    conversation between Mimi Remache and Robert
24    Wessman where it became all lots.

PLAINTIFFS' EXHIBITS 001147

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

357

1          So by the time we got to April 24th
2     and talked with Mylan again, it had been
3     expanded to all the Digitek lots, not just
4     one.
5          Q    Did the decision to expand it to all
6     lots include the logic that there were serious
7     deficiencies in the GMP department other than
8     the double-thick pills?
9               MR. DEAN:  Objection.  She's
10          already said that was -- she's testified
11          fully on that, about a discussion between
12          Mimi and Wessman, and she said she
13          doesn't know what went on in that
14          conversation.
15               MR. MILLER:  Well, I'm talking
16          about any conversation with anyone.
17     BY MR. MILLER:
18          Q    Does the only conversation you've
19     ever had with anyone regarding the recall of
20     Digitek only include the double-thick lots, or
21     would you have discussed the significant
22     deviations from GMP that were found by the
23     FDA?
24          A    My discussions with FDA were

PLAINTIFFS' EXHIBITS 001148

358

1    relative to the one lot.  And on that

2    particular day, as I had mentioned earlier,

3    FDA inquired about contacting our CEO in

4    Iceland.  And after that conversation, I was

5    told to recall all lots.

6              So I didn't have any conversation.

7    I needed to scramble and recall all lots.  So

8    I didn't have a discussion with anybody about

9    the pros and cons.  It was pretty much

10   dictated to me that we were doing this.

11       Q    As the vice president of quality

12   control and compliance at Actavis, would you

13   agree that the recall of Digitek, if you're

14   looking at the double-thick pills, that there

15   was a larger issue of all the GMP violations

16   that were found in the inspection; and then

17   included in there were the double-thick pills?

18                    MR. DEAN:  Objection;

19              miscategorizes her testimony.

20                    Go ahead.

21                    THE WITNESS:  I can't say that.

22              I would not agree to that.  I think the

23              Digitek issue was in itself an issue.  I

24              don't think it had anything to do with

PLAINTIFFS' EXHIBITS 001149

359

1              anything else going on in the inspection

2              except that they were not happy with what

3              they had seen so far.

4                        And so when the Digitek one

5              came along, they took a harsher approach

6              in looking at it and most likely due to

7              the nature of the product, but that's

8              just my opinion.

9     BY MR. MILLER:

10        Q    Did they also take a harder look

11    because of the significant GMP issues that

12    were going on in the laboratory?

13        A    Her -- no, it had nothing to do with

14    the laboratory.

15        Q    I'm sorry.  Strike that.

16        A    This particular observation had

17    absolutely nothing to do with the laboratory.

18        Q    Let me rephrase the question.

19             You agree that there were

20    significant GMP deficiencies found in the

21    quality control system?

22                   MR. DEAN:  Objection.  That's

23             been asked and answered about ten times.

24                   MR. MILLER:  Well, I'm trying

PLAINTIFFS' EXHIBITS 001150

360

```
 1           to get to another answer.  I'm asking it
 2           again.
 3                     THE WITNESS:  Erin's concern
 4           was that it didn't find a definitive
 5           cause.  So her issue was, if you don't
 6           know what caused it, how -- perhaps you
 7           don't know it didn't happen with another
 8           batch.
 9      BY MR. MILLER:
10           Q    You're talking about double-thick
11      pills?
12           A    Correct.
13           Q    I'm not talking about that.  Set
14      that aside.
15                She found significant deficiencies
16      in GMPs with the quality control system?
17           A    But what I'm saying to you is that's
18      why I don't think that the Digitek had to
19      do -- anything to do with GMP issues.  I'm
20      saying that based on what I heard as being
21      Erin's concern was that we didn't -- that we
22      released that batch.
23                She was not happy with -- she felt
24      we could do more before making the decision to
```

PLAINTIFFS' EXHIBITS 001151

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

361

1    release that batch.  And she was complaining

2    about the fact that you didn't find a cause,

3    so you didn't -- you couldn't say that it

4    didn't happen with another batch.

5         Q    That's fine.  Again, I'm not talking

6    about the double-thick batch at all.

7              Of the other 65 or however many

8    products there were, you agree that all those

9    products were subject to the testing and

10   results of the quality control system that had

11   significant deficiencies; do you agree?

12        A    Say that again.

13        Q    Yes.  There were significant

14   deficiencies in the quality control system at

15   Actavis; we've agreed with that.  Do you --

16   right?

17        A    Are we talking about Digitek and why

18   it expanded to all lots?

19        Q    No, we are not.

20        A    We're not talking about that

21   anymore?

22        Q    No, we're not.  We're not.  No.

23        A    I'm confused.

24        Q    Okay.  No, no, no.  I'm talking

PLAINTIFFS' EXHIBITS 001152

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

362

1    about --
2          A    Now ask me the question again.
3          Q    I'll start the same way I started
4    last time.
5               The other products, the other 64 or
6    65 products, they were subject to a quality
7    control system that had significant
8    deficiencies with GMPs; correct?  Do you agree
9    with that?
10         A    That was the view that FDA took.
11         Q    What's different about Digitek?  Why
12   is Digitek not lumped in with those other 65
13   products?
14         A    Because of the time frame that
15   you're talking about.  Digitek was in April,
16   and the 65 products was in July.
17         Q    I'm talking about the findings of
18   the 4 --
19               MR. DEAN:  Let her finish.
20               THE WITNESS:  In April, we had
21         no intention of recalling the other 65
22         products.  In April, it was our intention
23         to do the review by PAREXEL of the
24         remaining products and be able to defend

PLAINTIFFS' EXHIBITS 001153

363

1           to FDA keeping those products on the
2           market.
3                        That actually -- that course of
4           events took place.  PAREXEL did review
5           those products.  We had information to
6           defend those products.  We chose not to
7           take that route because FDA would not let
8           us proceed and resume manufacturing until
9           we took action with the product that was
10          remaining on the market.  So the decision
11          was made to bite the bullet and bring the
12          rest of the product back.  That's why the
13          65 products were recalled in July.
14     BY MR. MILLER:
15          Q    So --
16          A    If nothing ever happened with
17     Digitek, all of it would have been recalled in
18     July just like everything else because we were
19     at a point where we stopped manufacturing.
20                   And FDA would not even grant us a
21     face-to-face meeting to discuss how to move
22     forward until we took action with product in
23     the distribution center and on the market.  So
24     we bit the bullet and we conceded and brought

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

364

1    everything back.  That's the story.  I'm

2    sorry.  I get -- I spent ages and ages trying

3    to defend it, and we brought it all back

4    anyway.  So I'm very passionate about this

5    topic.

6    BY MR. MILLER:

7        Q    It is your testimony today that up

8    to April 24th of 2008, the only product that

9    was being discussed to be recalled was

10   Digitek?

11       A    No.  It was Digitek and several of

12   the stability-related out-of-spec products.

13   And there's documentation with dates and

14   commitments.  And I put everything in writing,

15   so it should be here somewhere, the exhibits

16   that are referred to.

17                   MR. MILLER:  That's all the

18           questions I have.

19                   MR. DEAN:  I've got a few

20           questions.

21                   THE VIDEOGRAPHER:  We should

22           probably go off the record, and I'll give

23           you a new clip.

24                   MR. DEAN:  Oh, please.  That

PLAINTIFFS' EXHIBITS 001155

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

365

1          would be handy, I guess.

2                    THE VIDEOGRAPHER:  Off the

3          record at 6:23.

4                    (Discussion off the record.)

5                    THE VIDEOGRAPHER:  Back on the

6          record at 6:26.

7     BY MR. DEAN:

8          Q    Ms. Lambridis, as you know, my name

9     is Richard Dean.  I just have what I hope are

10    a few questions for you.

11              I want to direct your attention to

12    Exhibit 91.  Do you have that in front of you?

13         A    Yes.

14         Q    And both Mr. Blizzard and Mr. Miller

15    have asked you questions about the summary

16    paragraph at the beginning, which relates to a

17    2007 inspection; correct?

18         A    Yes.

19         Q    Did Actavis pass that inspection?

20         A    Yes.

21         Q    And how can you tell that from the

22    document?

23         A    Because it says that the inspection

24    was classified as VAI.

PLAINTIFFS' EXHIBITS 001156

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

366

1      Q     And I think you told I think it was
2    Mr. Blizzard that meant voluntary actions
3    indicated.  But could you explain what
4    "voluntary actions indicated" means?
5          A     It means that although there were
6    findings that were noted on the 483, that
7    there were corrections that were promised and
8    that the observations were not significant and
9    that we were voluntarily taking action to
10   correct them so there was no dispute over
11   whether -- no dispute by the company -- the
12   company was willing to modify whatever was
13   found to correct it.  And in some cases, it
14   may have been corrected even before the close
15   of the inspection.
16         Q     That inspection covered all -- did
17   that cover all the six areas you mentioned
18   before?
19         A     It indicates here that it covered
20   five.  It would not have covered packaging
21   because they don't do packaging, so that would
22   have been the sixth.
23         Q     So the five areas that they were
24   evaluating, the FDA gave you a good inspection

PLAINTIFFS' EXHIBITS 001157

367

1     on all five areas; correct?

2            A    Correct.

3            Q    Now, as a consequence of that, was

4     the company able to get new product approved?

5            A    Yes.

6            Q    And if the FDA had not given you a

7     good rating or passed you, would the company

8     have been able to get new product approved at

9     that time?

10           A    No, because prior -- prior to this

11    2007 inspection, the firm was under a warning

12    letter.  And then so usually under a warning

13    letter, you would not get new approvals.  And

14    there were several that were being held up as

15    a result of that.

16               So after the close of this

17    inspection in September of 2007, they were

18    basically -- we were basically given a clean

19    bill of health, and then the approvals started

20    to come through.

21           Q    All right.  Now, there's been

22    testimony during the course of the day about

23    certain drugs that had stability issues.  You

24    remember that testimony, do you not?

PLAINTIFFS' EXHIBITS 001158

368

1        A    Yes.

2        Q    Was there ever a stability issue

3   with Digitek?

4        A    Not that I'm aware of.

5        Q    Let's talk about the one lot that

6   we've -- I want to go back and ask you a few

7   questions about the lot that you spoke to

8   Mr. Miller about.  Is it fair to say in your

9   discussions with Erin McCaffery that the only

10  issue she ever addressed with you about that

11  one lot was what we have called here today the

12  double-thick issue?

13       A    Correct.

14       Q    Did she ever raise any other

15  concerns about that particular lot with you

16  other than double thickness?

17       A    No.

18       Q    Did she ever discuss any other lot

19  that had been shipped out of the facility with

20  you at any time during the course of your

21  discussions with her, of Digitek?

22       A    No.  The majority of what was

23  discussed related to this lot.

24       Q    And was the discussion about double

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

369

1      thick you had, was it limited to this one lot
2      that we've been talking about, 70924?
3             A     Yes.
4             Q     Do you know what a belt inspection
5      is?
6             A     Yes.
7             Q     What is it?
8             A     I can describe it.
9             Q     Very briefly.
10            A     It would be described as -- it's a
11     terminology used for when you would visually
12     want to inspect something.  So there are firms
13     that may actually have a belt that they put
14     tablets on, but typically it means that the
15     tablets are laid out perhaps on a table like
16     this and inspected, of course not on the table
17     but on trays or on liner paper, what you would
18     normally put product on as product contact
19     surface, clean area to inspect.
20            Q     Is a belt inspection an accepted
21     industry standard?
22            A     It's accepted as a means for
23     inspection, but it should not be a routine way
24     of doing business.  It's usually done on an

PLAINTIFFS' EXHIBITS 001160

Case 2:08-md-01968   Document 577-13   Filed 09/08/11   Page 172 of 200 PageID #: 20124
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

370

1    exception basis if there's an issue that

2    warrants it.

3         Q    The hour is late.  I don't want to

4    go through a lot of the documents that we've

5    been through today.  But you were shown a lot

6    of documents after -- whose date was after

7    July of 2008 with various comments about

8    production at the facility and standards and

9    goals and investigations.  At that point there

10   was no -- as of July 2008, there was no

11   product being made at the facility any longer;

12   is that correct?

13        A    We ceased, yes, in July -- prior to

14   July but definitely in July up until, I guess,

15   whenever FDA came back and allowed them to

16   manufacture.

17        Q    So I'm thinking specifically about

18   some of the -- kind of the production goals

19   and targets that were referenced in some of

20   those October and November documents.  Those

21   were just in hopes of getting back up to

22   manufacturing status; correct?

23        A    Those were part of the corrective

24   action plan or the self-assessments that were

PLAINTIFFS' EXHIBITS 001161

Case 2:08-md-01968   Document 577-13   Filed 09/08/11   Page 173 of 200 PageID #: 20125
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

371

1    done that identified what activities we were

2    going to be working on to put the facility in

3    a position to be reinspected.

4         Q    Those were your self-imposed

5    standards as opposed to FDA's standards at

6    that point; correct?

7         A    Correct.

8         Q    You were shown a number of different

9    recall letters, drafts, final versions.  And I

10   think there was testimony about getting

11   agreement for the recall letter.  Who did you

12   have to get agreement for -- agreement with

13   for the recall letter before it was finalized?

14        A    The main group would be FDA.  They

15   give the final okay.  So it was the three --

16   well, the two companies and FDA.

17        Q    In a usual situation where you're

18   just manufacturing yourself and there wouldn't

19   be a distributor like there was here, a

20   company would need to get the approval of the

21   FDA before it sent out a recall letter; right?

22        A    Yes.

23        Q    They'd have to agree as to the exact

24   wording; right?

PLAINTIFFS' EXHIBITS 001162

372

```
 1        A    Yes.

 2        Q    In this case, there were three

 3   parties that had to agree on the language;

 4   right?

 5                  MR. MILLER:  I'm going to

 6        object.  You're leading the witness.

 7                  MR. DEAN:  I'm summarizing the

 8        testimony you guys have already gotten

 9        out.

10   BY MR. DEAN:

11        Q    But who had to agree for this recall

12   letter to go out?

13             Do it your way.

14        A    The letter was -- the letter for

15   digoxin was sent by Actavis to Mylan.  So

16   Mylan didn't necessarily have to agree with

17   what was in our letter; but I believe they did

18   participate, more so in the press release,

19   more so -- Mylan participated more so in the

20   press release than in the letter.

21             But FDA definitely weighs in and

22   will change wording or ask for certain things

23   to be put in or taken out of a recall letter.

24        Q    Does the FDA have to approve the
```

PLAINTIFFS' EXHIBITS 001163

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

373

1       exact words in a recall letter before it goes
2       out?
3              A     FDA has to give approval of a final
4       draft, and then we would typically send them
5       back whatever we send out.
6              Q     You were asked a number of questions
7       about good manufacturing practice and whether
8       a violation of those might result in a
9       conclusion that a product was adulterated.   Do
10      you remember that series of questions?
11             A     Yes.
12             Q     If a product is deemed adulterated,
13      does that mean that it is unsafe?
14             A     Not all the time.
15             Q     Why not?
16             A     Because as was pointed out in -- I
17      believe when I was speaking to Mr. Miller,
18      when he presented the citation from the Food,
19      Drug, Cosmetic Act, that states that if you
20      violate GMP, it considers a drug to be
21      adulterated.  But that violation of GMP could
22      just be because -- it could be a paperwork
23      issue and have nothing to do with the safety
24      and efficacy of the drug.  So there have

PLAINTIFFS' EXHIBITS 001164

374

1    been -- historically in industry there have

2    been recalls for GMP violations that have

3    nothing to do with safety.

4         Q    And here we -- I also want to go

5    back.  There's been reference during the

6    course of the day to a company called PAREXEL;

7    correct?

8         A    Yes.

9         Q    Did PAREXEL have anything to do with

10   studying or being involved with Digitek?

11        A    No.  PAREXEL came on-site around the

12   same time that this had already been in the

13   works.  So PAREXEL's scope was -- did not

14   include Digitek because it was already being

15   recalled.

16        Q    And I wanted to go back to what

17   Mr. Miller asked you right at the end of his

18   questions and he got a time line from you.

19   And I think you talked about there were

20   certain drugs with stability issues; correct?

21   There was a group of drugs with stability

22   issues?

23        A    Correct.

24        Q    Digitek was not one of those drugs;

PLAINTIFFS' EXHIBITS 001165

375

1     right?

2          A     Correct.

3          Q     Then there was Digitek.

4          A     Right.

5          Q     And then you said then -- what I

6     just described king of took place in the

7     April/May time frame.  And then in July, there

8     were 65 other drugs approximately?

9          A     Yes.  And there was a group in the

10    middle there, another group.

11         Q     And PAREXEL was dealing with those

12    middle and those later groups in July;

13    correct?

14         A     Correct.

15         Q     And I think you told us it was your

16    belief -- I want to make sure I heard this

17    correctly -- that there was no GMP violation

18    ever found in regard to the batch of Digitek?

19    Strike that.

20               Was it your testimony that there was

21    no GMP violation found on any Digitek

22    manufactured in 2007 and 2008?

23         A     I want to be careful how I answer

24    this.  There was something that was presented

Confidential – Subject to Further Confidentiality Review

```
 1      to me today which was on the 483 that was
 2      found by Kristy, who was another FDA
 3      investigator on-site.  She joined the
 4      inspection later.  And I don't know the detail
 5      around that issue.  I can't recall all the
 6      detail around that issue.
 7              With respect to the double thick,
 8      again, I believe in part of the earlier
 9      testimony, I had indicated that hindsight's
10      20/20.  And, you know, could that situation
11      have been handled better in terms of a
12      judgment call?  Yes.
13              But in most of the cases here, what
14      FDA is citing as a violation, in some cases
15      it's because, you know, something was
16      investigated but not investigated to the
17      extent that they would have liked to have seen
18      it investigated or it was only a lab
19      investigation and didn't extend to
20      manufacturing.  It wasn't a situation where it
21      was a "do nothing."
22              And as I had pointed out, it's a
23      fine line because the GMPs tell you that you
24      need to do certain things, that you need to
```

Case 2:08-md-01968 Document 577-13 Filed 09/08/11 Page 179 of 200 PageID #: 20131
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

377

1    investigate.  It doesn't tell you how.  It

2    doesn't tell you to the extent.  And so there

3    are certain judgments that are made in putting

4    procedures together.  So I'm trying to put

5    that in the context of my answer.

6         Q    Let me ask it this way:  Did Erin

7    McCaffery want you to recall Digitek because

8    there was a double-thick finding, or did she

9    tell you she wanted it recalled because there

10   was a GMP violation?

11        A    Because there was a double-thick

12   tablet.

13        Q    Did she ever tell you -- did Erin

14   McCaffery, just putting aside this note by

15   Christine that you mentioned, did Erin

16   McCaffery ever tell you there was a GMP

17   violation with this particular lot of Digitek

18   we've been talking about?

19        A    Erin points to the fact that the

20   double signature on the page where Dan signed

21   multiple times as a GMP violation and that's

22   just bad practice, but that's not the reason

23   for recalling the batch.

24        Q    Mr. Miller asked you a series of

Confidential – Subject to Further Confidentiality Review

378

1       questions about the lab in the context of the

2       2008 EIR.  And I think you said that if I -- I

3       want to go back to -- strike that.

4              Mr. Miller asked you about the lab

5       in regard to the 2008 EIR.  Did you have -- do

6       you recall specific discussions with Erin

7       McCaffery about her observations about the lab

8       during that 2008 inspection?

9           A    Yes.

10          Q    What do you recall?

11          A    There were several conversations

12      with Erin about the lab.  And as I indicated,

13      she looked at the lab because the lab was

14      already in the Riverview facility and -- it

15      was a new lab -- and was happy with what she

16      saw there.

17             She was -- also made several

18      comments about how the lab had improved based

19      on her knowledge of prior inspections because

20      she had inspected there several times in the

21      past, and she was also aware of the prior

22      inspection that -- in 2006 that was mainly

23      focused on the lab; at least most of the 483

24      items were focused on the lab.

PLAINTIFFS' EXHIBITS 001169

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

379

1        Q    So is it fair to say that her

2    concern in the 2008 EIR inspection process was

3    the QA group?

4        A    Yes.

5        Q    And she did not express a concern to

6    you during all your interactions with her

7    about the lab, did she?

8        A    Correct.

9        Q    Now, in the EIR -- and, again, it's

10   Exhibit 91 and it's right there in front of

11   you -- there are observations that are listed;

12   correct?

13       A    Yes.  They typically would write the

14   observations.

15       Q    I'm just looking, for example,

16   Page 48.  Let's just turn to Page 48 as an

17   example.  Is the -- first of all, what is an

18   observation generally?

19       A    An observation is the

20   investigator's -- what the investigator

21   observed during their inspection.

22       Q    Is an observation a finding of the

23   FDA?

24                MR. MILLER:  Objection; asked

PLAINTIFFS' EXHIBITS 001170

380

1          and answered.

2     BY MR. DEAN:

3          Q     Go ahead.

4          A     The 483 document itself, the form,

5     has a disclaimer on the top that basically

6     states that it's the view of the investigator

7     and not necessarily the opinion of the FDA.

8          Q     And you said -- you told Mr. Miller

9     that these observations, the actual language

10    of the observation were pre-written; is that

11    right?

12         A     There's -- I can't remember the name

13    of the computerized system that FDA has that

14    it's currently using.  But the investigators

15    often complain about it, and so I became a

16    little familiar with it.

17              There were complaints over the years

18    about inconsistencies with how different

19    districts and different investigators were

20    approaching FDA inspections and that there was

21    too much variance in opinion and so forth.

22              So in an effort to standardize it,

23    they chose to standardize certain language and

24    made it a requirement that when an

PLAINTIFFS' EXHIBITS 001171

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

381

1    investigator is going to cite something on a
2    483, that they have to cite something that
3    relates back to a specific GMP violation.  And
4    then what they did was they took those GMP
5    sections and wrote standard language for each
6    of it so that the investigator just pulls it
7    and inserts it into the document.  That's my
8    best way of describing it.
9         Q    And here's my question:  Is every
10   observation that's in Exhibit 91, the
11   language, is every single observation
12   pre-written language?
13        A    The first part is -- from what I can
14   tell is.  It's the "specifically" part or the
15   numbered parts, like the A, B, C parts are
16   specific to the company.  The others you would
17   probably find very similar language in other
18   people's -- or other companies.
19        Q    Just so I'm clear, for example, the
20   language on Page 48, Observation 5, you
21   know -- I don't know how many observations
22   there are, but Observations 1 through 5
23   through however many we get up to here, that
24   language that's under observation, all of

PLAINTIFFS' EXHIBITS 001172

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

382

1      those would be pre-written; correct?

2          A    That is -- yes.

3          Q    Mr. Miller asked you about Page 46

4      of that document, if you could turn to that.

5      And he was asking you about some drugs where

6      there were blend uniformity issues.  Did

7      Digitek ever have any consistent blend

8      uniformity issues?

9                    MR. MILLER:  Objection.

10     BY MR. DEAN:

11         Q    Go ahead.

12         A    Not that I'm aware of.

13         Q    Digitek is not listed on Page 46, is

14     it?

15         A    Actually, it is.  But I can tell you

16     why.

17         Q    Okay.  Go ahead.

18         A    There was a discussion about blend

19     uniformity specifications.  And I don't know

20     where we would find it in here.

21         Q    Do you remember what the discussion

22     was?

23         A    Right.  Blend uniformity

24     specification -- blend uniformity is -- you

PLAINTIFFS' EXHIBITS 001173

Case 2:08-md-01968  Document 577-13  Filed 09/08/11  Page 185 of 200 PageID #: 20137
Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

383

1    need to establish -- it's a requirement that

2    you establish that your blends are uniform.

3    You base that -- your specification on your

4    finished-product specifications.

5              But over the years, the manner in

6    which you do that testing -- sampling and

7    testing has changed, so there's been recent

8    guidance documents that were issued telling

9    you -- giving you more leeway in setting the

10   blend specifications.

11             And what had happened during this

12   inspection is that Erin and Kristy had both

13   noted that certain specifications for blends

14   had changed.  And when they questioned it, it

15   was the outcome of either letters from FDA

16   indicate -- for new products that were being

17   approved indicating that you set the

18   specifications differently and other

19   conversations with FDA.

20             And this actually points to

21   something I was mentioning earlier where we

22   were getting one set of information from the

23   center, which is Washington, D.C., office of

24   FDA.  And then the local district folks were

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

384

1    coming in and questioning it, but it was their
2    own agency.  So we had sort of a -- Erin had
3    her opinion about how it should be done, and
4    we were following direction coming out of the
5    Washington, D.C. office.
6              Long story, but in this particular
7    case, it says here:  Despite noted blend
8    uniformity issues, in-process blend uniformity
9    specifications for many products were changed
10   from individual RSD to average.  Current
11   in-process blend specifications for the
12   following products are listed.
13             So that -- digoxin is listed in that
14   list because of that issue and is listed in
15   this list by FDA.  We did not put digoxin in
16   this list.
17        Q    This is a list for the --
18        A    Where the specifications had
19   changed.
20        Q    Had changed, okay.  So let's go back
21   to where we started.  As far as that, there
22   were some products, I take it from your
23   testimony today to Mr. Miller, where there had
24   been blend uniformity issues; correct?

PLAINTIFFS' EXHIBITS 001175

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

385

1        A    Yes.

2        Q    And is it fair to say that Digitek

3    was historically not one of those in that

4    category?

5        A    To my knowledge, correct.

6                MR. DEAN:  I think that's all I

7        have.  Thank you.

8                MR. MILLER:  I've got a couple

9        follow-up.

10               MR. DEAN:  Do you want to

11       switch?

12               MR. MILLER:  No.  That's fine

13       if that's okay with you.

14               MR. DEAN:  Sure.

15   BY MR. MILLER:

16       Q    Ma'am, you were just asked about out

17   of specifications for blend uniformity,

18   specifically Digitek.  And the section that

19   we're looking at in Exhibit 91 was the list of

20   products on Page 46.

21               And if you turn pages backwards,

22   you'll notice that this is a write-up that

23   goes to Observation 4.  Would you agree with

24   that?  You can go backwards page by page until

PLAINTIFFS' EXHIBITS 001176

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

386

1    you get to Observation 4.

2         A    Well, Observation 4 had several

3    parts.

4         Q    Agreed.  But would you agree with me

5    that this is a part of Observation 4, what

6    we're looking at, the list on Page 46?  Is it

7    part of the write-up for Observation 4?

8         A    Well, 4c.  If you look at 4C, it

9    says:  Although approximately -- blank --

10   products were temporarily discontinued due to

11   blend and/or content uniformity issues, there

12   was no scientific rationale provided for the

13   change of in-process blend uniformity specs.

14               MR. MILLER:  Yes, ma'am.  And I

15        object because it's not responsive and I

16        move to strike.

17   BY MR. MILLER:

18        Q    My question is very simple.  Is it

19   part of Observation 4, not so much the content

20   of what it says, but this is a continuation of

21   Observation 4; is that a fair statement?

22        A    4c.

23        Q    Yes.  We --

24        A    Because 4a --

PLAINTIFFS' EXHIBITS 001177

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

387

```
 1          Q     Right.
 2          A     -- is substantiated here.
 3          Q     4c is part of --
 4          A     And then 4b is substantiated here.
 5     And then 4c is substantiated here.
 6          Q     Is 4c part of 4?
 7          A     Yes.
 8          Q     Thank you.  And you agree that
 9     Observation 4 starts out with the GMP
10     violation which we discussed at length and
11     which boils down to -- or "the template" is
12     the term you like to use, determinations of
13     conformance to appropriate written
14     specifications for acceptance are deficient
15     for in-process materials.
16               Do you agree that Observation 4,
17     once again, is a violation of a GMP?
18          A     Which part?
19          Q     The sentence I just read.
20                    MR. DEAN:  That's an
21          observation.
22                    THE WITNESS:  The sentence you
23          read is an observation.
24
```

PLAINTIFFS' EXHIBITS 001178

388

1    BY MR. MILLER:

2        Q    Is that observation outlined in the

3    finding of an FDA inspector for a violation of

4    a GMP as described?

5        A    That's the violation she believe --

6    that's the GMP regulation that she believes is

7    being violated.

8        Q    Thank you.  And the specific example

9    goes to three lots of Digitek that were not

10   the double-thick lots that had issues with out

11   of specifications during blend uniformity

12   testing; do you agree?

13       A    That's the -- one of the examples

14   that she uses here, yes.

15       Q    One of them.

16       A    Correct.

17       Q    And going to that -- well, you were

18   just asked by Mr. Dean about pre-written

19   observations.  You'd agree with me that these

20   pre-written observations don't wind up on a

21   report unless they find a violation; they're

22   triggered by a violation; correct?

23                    MR. DEAN:  Object to the form.

24                    Go ahead.

PLAINTIFFS' EXHIBITS 001179

389

1                    THE WITNESS:   The requirement

2              for the investigator is if they have a

3              finding, they have to tie it to what they

4              believe to be the GMP regulation that

5              it's violating.

6    BY MR. MILLER:

7         Q    If there were no violations of blend

8    uniformity or out of specifications with

9    stability or blend uniformity, then there

10   would be no pre-written template; is that

11   correct?

12        A    Just to be clear, blend uniformity

13   is not a -- there's nowhere in the GMPs that

14   says you have to do blend uniformity --

15        Q    Okay.

16        A    -- specifically.  I believe her

17   issue here had to do with -- okay.  She's

18   talking about in process.  I'll take that

19   back.  Different context.  Okay.

20        Q    But in the context of how she uses

21   it, she had to find that violation before the

22   pre-written language was used; correct?  The

23   pre-written language just don't show up; she's

24   got to find a violation first; correct?

PLAINTIFFS' EXHIBITS 001180

390

1              A     She has a finding; and, yes, in

2      order for her to -- in order for her to put it

3      on the -- the criteria would be for her to tie

4      it back.  If it's not tied back to a GMP

5      regulation, then the chances are that her

6      supervisor won't allow her to cite it.

7              Q     But the pre-written language that

8      we've discussed at length is not an option to

9      her; once the violation is found, then she

10     decides what pre-written language fits the

11     observation; correct?

12             A     Once the observation is found, she

13     has to find the pre-written language, correct.

14             Q     Thank you.  You were asked if you

15     passed the -- or Actavis passed the 2007

16     inspection.  I believe you said that you did;

17     correct?

18             A     Yes.

19             Q     But you agree that there were GMP

20     violations observed during that inspection?

21             A     There were 483 observations at the

22     end of that inspection.  It said so in this

23     report.

24             Q     Right.  And those 483 observations,

PLAINTIFFS' EXHIBITS 001181

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

391

1      you would agree, were GMP violations?

2            A     I'm going to give you the same

3      answer I've been giving for everything.  It's

4      the investigator's observations that they

5      believe are violations of GMP.

6            Q     Thank you.  Did you pass the

7      May 2008 inspection?

8            A     No.

9            Q     And there are different levels of --

10     would you say you failed that inspection?  Is

11     that one way to put it?

12           A     That inspection was not VAI.

13           Q     It was not voluntary?

14           A     It was OAI.

15           Q     Which is?

16           A     I think if it's -- it might be in

17     here.  I don't know.  OAI is official action

18     indicated, which means that more severe action

19     was taken as a result of that inspection.

20           Q     And if you're going to use the term

21     you passed the one in 2007, would you agree

22     with the term you failed the one in 2008?

23           A     Yes.

24           Q     Does a failed inspection result in

PLAINTIFFS' EXHIBITS 001182

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

392

1    an unsafe product?

2         A    Not always.

3         Q    Not always because you said --

4    correct me if I'm wrong -- that sometimes a

5    recall can be done because of paperwork

6    issues.  Would you agree with me that the

7    recall for Digitek had nothing to do with

8    paperwork issues?

9         A    For the one batch, yes.  For all

10   batches, no.

11                   MR. MILLER:  That's all I have.

12                   MR. DEAN:  Pete, it will take

13        me one and a half minutes here.  Then

14        we'll be done.

15   BY MR. DEAN:

16        Q    I want to direct you back.

17   Mr. Miller asked you a couple questions about

18   Observation 4.  Is it fair to say that the

19   observations in 4a and 4c are two different --

20   two different fact patterns being discussed?

21        A    Yes.

22        Q    And it's the fact pattern in c that

23   you testified is as a result of specifications

24   being changed over the course of time; is that

PLAINTIFFS' EXHIBITS 001183

393

1    correct?

2         A    Yes.

3         Q    And so I go back to my question.

4    This took place in -- these observations took

5    place in 2008, correct, that we're looking at

6    in --

7         A    Yes.

8         Q    Historically before 2008, were there

9    blend uniformity issues with Digitek?

10        A    Not that I'm aware of.

11                 MR. DEAN:  Thank you.

12                 MR. MILLER:  That's it.  Thanks

13            for your time.

14                 THE VIDEOGRAPHER:  That

15            concludes this videotaped deposition.

16            The time is 7:01.

17                 (Whereupon the deposition

18            adjourned at 7:01 p.m.)

19                         - - -

20

21

22

23

24

PLAINTIFFS' EXHIBITS 001184

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

394

1

2                          CERTIFICATE

3

4                   I HEREBY CERTIFY that the

5      witness was duly sworn by me and that the

6      deposition is a true record of the testimony

7      given by the witness.

8                        It was requested before

9      completion of the deposition that the witness,

10     PHYLLIS A. LAMBRIDIS, have the opportunity to

11     read and sign the deposition transcript.

12

13

14                  _____
                    KIMBERLY A. OVERWISE
15                  Certified Realtime Reporter
                    Notary Public
16                  Dated:  January 29, 2010

17

18

19                      (The foregoing certification of

20     this transcript does not apply to any

21     reproduction of the same by any means, unless

22     under the direct control and/or supervision of

23     the certifying reporter.)

24

PLAINTIFFS' EXHIBITS 001185

395

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition over

4        carefully and make any necessary corrections.

5        You should state the reason in the appropriate

6        space on the errata sheet for any corrections

7        that are made.

8                    After doing so, please sign the

9        errata sheet and date it.

10                   You are signing same subject to the

11       changes you have noted on the errata sheet,

12       which will be attached to your deposition.

13                   It is imperative that you return the

14       original errata sheet to the deposing attorney

15       within thirty (30) days of receipt of the

16       deposition transcript by you.  If you fail to

17       do so, the deposition transcript may be deemed

18       to be accurate and may be used in court.

19

20

21

22

23

24

PLAINTIFFS' EXHIBITS 001186

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

396

1                   E R R A T A   S H E E T

2                       -  -  -  -  -  -

3

4      PAGE    LINE      CHANGE

5      _____   _____     _____

6              REASON:   _____

7      _____   _____     _____

8              REASON:   _____

9      _____   _____     _____

10             REASON:   _____

11     _____   _____     _____

12             REASON:   _____

13     _____   _____     _____

14             REASON:   _____

15     _____   _____     _____

16             REASON:   _____

17     _____   _____     _____

18             REASON:   _____

19     _____   _____     _____

20             REASON:   _____

21     _____   _____     _____

22             REASON:   _____

23     _____   _____     _____

24             REASON:   _____

PLAINTIFFS' EXHIBITS 001187

397

1

2                      ACKNOWLEDGMENT OF DEPONENT

3

4                         I, PHYLLIS A. LAMBRIDIS, do

5       hereby certify that I have read the foregoing

6       pages, 1-396, and that the same is a correct

7       transcription of the answers given by me to

8       the questions therein propounded, except for

9       the corrections or changes in form or

10      substance, if any, noted in the attached

11      Errata Sheet.

12

13

14      _____      _____

        PHYLLIS A. LAMBRIDIS            DATE
15

16

17

18
        Subscribed and sworn
19      to before me this
        ____ day of _____, 2009.
20
        My commission expires:_____
21

22      _____
        Notary Public
23

24

PLAINTIFFS' EXHIBITS 001188

Phyllis A. Lambridis
Confidential – Subject to Further Confidentiality Review

398

1                        LAWYER'S NOTES

2      PAGE  LINE

3      _____  _____  _____

4      _____  _____  _____

5      _____  _____  _____

6      _____  _____  _____

7      _____  _____  _____

8      _____  _____  _____

9      _____  _____  _____

10     _____  _____  _____

11     _____  _____  _____

12     _____  _____  _____

13     _____  _____  _____

14     _____  _____  _____

15     _____  _____  _____

16     _____  _____  _____

17     _____  _____  _____

18     _____  _____  _____

19     _____  _____  _____

20     _____  _____  _____

21     _____  _____  _____

22     _____  _____  _____

23     _____  _____  _____

24     _____  _____  _____

PLAINTIFFS' EXHIBITS 001189