# EXHIBIT 507

PLAINTIFFS' EXHIBITS 001224

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


MDL NO: 1968


IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION,
_____/


                    100 N. Tampa Street
                      Suite 2900
                      Tampa, FL 33602
                      January 25, 2011
                      at 9:08 a.m.



 VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.



     Taken on behalf of the Defendants before

PHILIP RYAN, RPR, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Defendant's Notice of Taking

Deposition in the above cause.

PLAINTIFFS' EXHIBITS 001225

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 2

```
 1   APPEARANCES:
 2   MIKE KERENSKY, ESQUIRE
     Williamson & Rusnak
 3   4310 Yoakum Boulevard
     Houston, TX 77006-5818
 4   (713)223-3330
 5   TERRY J. KILPATRICK, ESQUIRE
     Ernst & Mattison
 6   1020 Palm Street
     San Luis Obispo, CA 93401
 7   (805)541-0300
 8   MEGHAN JOHNSON CARTER, ESQUIRE
     Motley Rice, LLC
 9   28 Bridgeside Boulevard
     Mt. Pleasant, SC 29464
10   (843)216-9383
11          Attorneys for Plaintiffs
12   MATTHEW P. MORIARTY, ESQUIRE
     MICHAEL ANDERTON, ESQUIRE
13   Tucker, Ellis & West, LLP
     1150 Huntington Building
14   925 Euclid Avenue
     Cleveland, OH 44115
15   (216)592-5000
16          Attorney for Defendant Actavis Totowa,
            LLC, Actavis, Inc.,
17          and Actavis Elizabeth, LLC
18   ALICIA J. DONAHUE, ESQUIRE
     Shook, Hardy & Bacon, LLP
19   333 Bush Street
     Suite 600
20   San Francisco, CA 94014-2828
     (415)544-1900
21
            Attorney for Mylan Pharmaceuticals,
22          Inc., Mylan Inc., Mylan Bertek
            Pharmaceuticals, Inc., and UDL Labs
23
     ALSO PRESENT:
24          Alan Pokotilow, videographer
25
```

PLAINTIFFS' EXHIBITS 001226

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 3

```
 1

 2                    * * * * * *
                        INDEX
 3
                                        PAGE
 4   DIRECT EXAMINATION:
     BY MR. MORIARTY                       5
 5   BY MS. DONAHUE                      231
                    EXHIBIT INDEX
 6
                                      MAR
 7   Exhibit
     Exhibit 106   Notice of taking video deposition   226
 8           duces tecum.

 9   Exhibit 107   Handwritten notes, re Mylan         45
             deposition exhibits.
10
     Exhibit 108   Handwritten notes re. Plaintiffs'   45
11           Exhibits 1 to 263.

12   Exhibit 109   Handwritten notes taken during the  240
             deposition.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 001227

David Bliesner, Ph.D.        Videotaped        January 25, 2011

Page 4

```
 1              THE VIDEOGRAPHER:  My name is Alan        09:08
 2      Pokotilow with Veritext.  The date today is      09:08
 3      January 25 of 2011.  The time is                 09:08
 4      approximately 9:08 a.m.                           09:08
 5              This deposition is being held at the      09:08
 6      office of Shook, Hardy & Bacon, located at 100    09:08
 7      North Tampa in Tampa, Florida.                    09:08
 8              The caption of the case is in regards to  09:08
 9      Digitek product liability litigation, MDL         09:08
10      number 168, to be heard in United States          09:08
11      District Court of the Southern District of        09:08
12      West Virginia, Charleston Division.               09:08
13              The name of the witness is Dr. David      09:08
14      Bliesner.                                          09:08
15              At this time the attorneys will please    09:08
16      identify themselves and the parties they          09:08
17      represent, after which then our court reporter    09:08
18      Phil Ryan of Veritext will swear the witness      09:08
19      and we can proceed.                                09:08
20          MR. MORIARTY:  My name is Matt                09:09
21      Moriarty, and I represent the Actavis             09:09
22      Defendants.                                        09:09
23          MR. ANDERTON:  Michael Anderton also on      09:09
24      behalf of the Actavis defendants.                 09:09
25          MS. DONAHUE:  Alicia Donahue, Shook          09:09
```

PLAINTIFFS' EXHIBITS 001228

David Bliesner, Ph.D.        Videotaped        January 25, 2011

Page 5

| | | |
|---|---|---|
| 1 | Hardy & Bacon on behalf of the Mylan | 09:09 |
| 2 | Defendants and UDL Laboratories. | 09:09 |
| 3 | MR. KERENSKY:  And for the Plaintiffs | 09:09 |
| 4 | we have Mike Kerensky, Terry Fitzpatrick, | 09:09 |
| 5 | and Meghan Johnson Carter. | 09:09 |
| 6 | THE VIDEOGRAPHER:  Would the court | 09:09 |
| 7 | reporter please swear the witness. | 09:09 |
| 8 | The Deponent herein, | 09:09 |
| 9 | DAVID BLIESNER, Ph.D., | 09:09 |
| 10 | being first duly sworn to tell the truth, the | 09:09 |
| 11 | whole truth, and nothing but the truth, was | 09:09 |
| 12 | examined and testified as follows: | 09:09 |
| 13 | DIRECT EXAMINATION | 09:09 |
| 14 | BY MR. MORIARTY: | 09:09 |
| 15 | Q.    Tell us your name. | 09:09 |
| 16 | A.    David Bliesner. | 09:09 |
| 17 | Q.    Okay.  Have you ever given testimony in | 09:09 |
| 18 | court before? | 09:09 |
| 19 | A.    When you say "testimony"? | 09:09 |
| 20 | Q.    Gone into court, been sworn and | 09:09 |
| 21 | testified. | 09:09 |
| 22 | A.    In court? | 09:09 |
| 23 | Q.    In court. | 09:09 |
| 24 | A.    No. | 09:09 |
| 25 | Q.    How about in an arbitration | 09:09 |

PLAINTIFFS' EXHIBITS 001229

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 6

| | | |
|---|---|---|
| 1 | proceeding? | 09:09 |
| 2 | A.    Yes. | 09:09 |
| 3 | Q.    What kind of arbitration proceeding | 09:10 |
| 4 | was that? | 09:10 |
| 5 | A.    It was an HR arbitration. | 09:10 |
| 6 | Q.    Does that stand for human resources? | 09:10 |
| 7 | A.    Yes. | 09:10 |
| 8 | Q.    All right.  So this was some sort of | 09:10 |
| 9 | employment dispute at one of your jobs or your | 09:10 |
| 10 | consulting arrangements? | 09:10 |
| 11 | A.    It wasn't employment dispute, no. | 09:10 |
| 12 | Q.    All right.  Were you just a witness or | 09:10 |
| 13 | had you been sued in the case or were you suing | 09:10 |
| 14 | somebody else? | 09:10 |
| 15 | A.    I was a witness. | 09:10 |
| 16 | Q.    Have you only testified in one | 09:10 |
| 17 | arbitration proceeding? | 09:10 |
| 18 | A.    Just one arbitration, yes. | 09:10 |
| 19 | Q.    Have you ever given a deposition such as | 09:10 |
| 20 | we're about to do today? | 09:10 |
| 21 | A.    Yes. | 09:10 |
| 22 | Q.    How many times have you done that? | 09:10 |
| 23 | A.    One time. | 09:10 |
| 24 | Q.    What sort of case was it? | 09:10 |
| 25 | A.    Probate. | 09:10 |

PLAINTIFFS' EXHIBITS 001230

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 7

| | | | |
|---|---|---|---|
| 1 | Q. | All right.  So you have never testified | 09:11 |
| 2 | in a pharmaceutical products liability case in | | 09:11 |
| 3 | deposition? | | 09:11 |
| 4 | A. | No. | 09:11 |
| 5 | Q. | How many times have you been retained as | 09:11 |
| 6 | an expert witness in a pharmaceutical products | | 09:11 |
| 7 | liability case? | | 09:11 |
| 8 | A. | One time. | 09:11 |
| 9 | Q. | Just this time? | 09:11 |
| 10 | A. | Yes. | 09:11 |
| 11 | Q. | All right.  Now, do you know who Pete | 09:11 |
| 12 | Miller is? | | 09:11 |
| 13 | A. | Yes. | 09:11 |
| 14 | Q. | He's one of the Plaintiffs' lawyers in | 09:11 |
| 15 | this Digitek litigation; correct? | | 09:11 |
| 16 | A. | Yes. | 09:11 |
| 17 | Q. | When was the last time you met Pete | 09:11 |
| 18 | Miller in person? | | 09:11 |
| 19 | A. | Yesterday. | 09:11 |
| 20 | Q. | Where was that? | 09:11 |
| 21 | A. | At the Sheraton. | 09:11 |
| 22 | Q. | And how long did you spend with Pete | 09:11 |
| 23 | Miller? | | 09:11 |
| 24 | A. | Several hours. | 09:11 |
| 25 | Q. | Mr. Kerensky was just here a second | 09:12 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  | Page 8 |
|---|---|---|
| 1 | ago.  When did you first meet him in person? | 09:12 |
| 2 | A.    Yesterday. | 09:12 |
| 3 | Q.    How long did you spend with him? | 09:12 |
| 4 | A.    A couple of hours. | 09:12 |
| 5 | Q.    All right.  When did you first meet | 09:12 |
| 6 | Mr. Fitzpatrick? | 09:12 |
| 7 | A.    Yesterday. | 09:12 |
| 8 | Q.    How long did you spend with him? | 09:12 |
| 9 | A.    Several hours. | 09:12 |
| 10 | Q.    And you've met Meghan before; correct? | 09:12 |
| 11 | A.    Correct. | 09:12 |
| 12 | Q.    Are there any other lawyers for the | 09:12 |
| 13 | Plaintiffs in the Digitek litigation with whom you | 09:12 |
| 14 | have met either in person or by telephone? | 09:12 |
| 15 | A.    I'm not good with legal terms.  So | 09:12 |
| 16 | Plaintiff, please? | 09:12 |
| 17 | Q.    The people who are suing the | 09:12 |
| 18 | pharmaceutical companies. | 09:12 |
| 19 | A.    Could you ask the question again, | 09:12 |
| 20 | please? | 09:12 |
| 21 | Q.    Sure.  Other than the people I've just | 09:12 |
| 22 | named, have you met with -- either in person or by | 09:12 |
| 23 | phone -- any other Plaintiffs' lawyers in the | 09:12 |
| 24 | Digitek litigation? | 09:12 |
| 25 | A.    By phone, yes. | 09:12 |

PLAINTIFFS' EXHIBITS 001232

David Bliesner, Ph.D.　　　　Videotaped　　　　January 25, 2011

|  |  |  |  |
|---|---|---|---|
|  |  |  | Page 9 |
| 1 | Q. | Who? | 09:12 |
| 2 | A. | I don't recall who was on the | 09:12 |
| 3 | teleconference. | | 09:13 |
| 4 | Q. | How many people were on the | 09:13 |
| 5 | teleconference? | | 09:13 |
| 6 | A. | I don't know the exact number. | 09:13 |
| 7 | Q. | And when was that telephone conference? | 09:13 |
| 8 | A. | I believe it was in January of last | 09:13 |
| 9 | year. | | 09:13 |
| 10 | Q. | Now, I'll get in -- later into more | 09:13 |
| 11 | detail about what you did to prepare for today, | | 09:13 |
| 12 | but do you know who Russ Soma is? | | 09:13 |
| 13 | A. | No. | 09:13 |
| 14 | Q. | How about Mr. Kenny? | 09:13 |
| 15 | A. | No. | 09:13 |
| 16 | Q. | Jim Farley? | 09:13 |
| 17 | A. | No. | 09:13 |
| 18 | Q. | Karen Frank? | 09:13 |
| 19 | A. | No. | 09:13 |
| 20 | Q. | Each one of those people were hired by | 09:13 |
| 21 | the Plaintiffs' lawyers and wrote reports much | | 09:13 |
| 22 | like you wrote here with your opinions about this | | 09:13 |
| 23 | Digitek situation. | | 09:14 |
| 24 | Have you ever read any of those reports? | | 09:14 |
| 25 | A. | Not to my knowledge, no. | 09:14 |

PLAINTIFFS' EXHIBITS 001233

Page 10

| | |
|---|---|
| 1 | Q. Did any of the Plaintiffs' lawyers read | 09:14 |
| 2 | to you from those reports? | 09:14 |
| 3 | A. No. | 09:14 |
| 4 | Q. Recently in December of 2010 we produced | 09:14 |
| 5 | to the other side reports of our experts -- Lou | 09:14 |
| 6 | Amsel, Martha Bennett, several other people. | 09:14 |
| 7 | Have you seen any of those reports? | 09:14 |
| 8 | A. Not that I recall. | 09:14 |
| 9 | Q. To the best of your knowledge, have any | 09:14 |
| 10 | of the Plaintiffs' lawyers read to you from those | 09:14 |
| 11 | reports? | 09:14 |
| 12 | A. Not that I recall. | 09:14 |
| 13 | Q. Have they told you in general what those | 09:15 |
| 14 | reports contain and what their conclusions were? | 09:15 |
| 15 | A. No. | 09:15 |
| 16 | Q. Last June and then even last week I took | 09:15 |
| 17 | and Mr. Anderton took and a Mr. Dean from my | 09:15 |
| 18 | office took testimony from Russ Soma, Mr. Kenny, | 09:15 |
| 19 | Karen Frank and Jim Farley; okay? | 09:15 |
| 20 | Have you seen any of those deposition | 09:15 |
| 21 | transcripts? | 09:15 |
| 22 | A. Who are those individuals again? | 09:15 |
| 23 | Q. They are experts hired by the same | 09:15 |
| 24 | people who hired you. | 09:15 |
| 25 | A. I don't recognize those names. | 09:15 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                        Page 11

1        Q.     But have you read any of their           09:15

2    deposition testimony?                               09:16

3        A.     Not that I recall.                       09:16

4        Q.     Did the Plaintiffs' lawyers read to you  09:16

5    any excerpts from their transcripts?                09:16

6        A.     No.                                      09:16

7        Q.     When you met with these lawyers          09:16

8    yesterday to get ready for today, did they tell     09:16

9    you any of the kind of questions that you could     09:16

10   expect from me?                                      09:16

11       A.     Yes.                                      09:16

12       Q.     All right.  I assume that since you have  09:16

13   both a college degree from a very reputable          09:16

14   institution and a Ph.D., that you have had to        09:16

15   study for and take examinations in your career; is   09:16

16   that correct?                                         09:16

17       A.     Yes.                                      09:16

18       Q.     Did you ever have an occasion in your     09:16

19   academic career when you studied real hard for a     09:16

20   test but did poorly?                                 09:16

21       A.     Specifically I don't recall.             09:17

22       Q.     Did you ever have an occasion where you   09:17

23   didn't study too hard at all but you did rather      09:17

24   well?                                                09:17

25       A.     Specifically I don't recall.             09:17

PLAINTIFFS' EXHIBITS 001235

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 12

| | | | |
|---|---|---|---|
| 1 | Q. | All right.  Generally do you recall? | 09:17 |
| 2 | A. | Vaguely. | 09:17 |
| 3 | Q. | And is it your vague recollection that | 09:17 |
| 4 | | those two things probably happened at some point | 09:17 |
| 5 | | in your academic career? | 09:17 |
| 6 | A. | Perhaps. | 09:17 |
| 7 | Q. | All right.  So if perhaps that happened, | 09:17 |
| 8 | | you would agree with me logically that the amount | 09:17 |
| 9 | | of work put in the process of studying did not | 09:17 |
| 10 | | always necessarily correlate with the outcome; | 09:18 |
| 11 | | right? | 09:18 |
| 12 | A. | Could you say that again, please. | 09:18 |
| 13 | | MR. MORIARTY:  Can you read that back? | 09:18 |
| 14 | | (Whereupon, the testimony was read | 09:18 |
| 15 | | back by the court reporter, as recorded above) | 09:18 |
| 16 | | THE WITNESS:  I wouldn't agree with you | 09:18 |
| 17 | | on that statement. | 09:18 |
| 18 | BY MR. MORIARTY: | | 09:18 |
| 19 | Q. | All right.  Are you a golf fan? | 09:18 |
| 20 | A. | No. | 09:18 |
| 21 | Q. | Do you still shoot and skeet or trap | 09:18 |
| 22 | | tournaments competitively? | 09:18 |
| 23 | A. | No. | 09:18 |
| 24 | Q. | Did you ever do that? | 09:18 |
| 25 | A. | No. | 09:18 |

PLAINTIFFS' EXHIBITS 001236

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 13

| | | | |
|---|---|---|---|
| 1 | Q. | Do you still coach? | 09:18 |
| 2 | A. | I don't know if I understand what you | 09:19 |
| 3 | mean by "coach." | | 09:19 |
| 4 | Q. | Well, you have a website that talks | 09:19 |
| 5 | about your online shotgun classes. I think it | | 09:19 |
| 6 | even says the word "coach." | | 09:19 |
| 7 | Do you still do that? | | 09:19 |
| 8 | A. | I don't know if I understand what you | 09:19 |
| 9 | mean by "coach." | | 09:19 |
| 10 | Q. | Did you ever play any sports in high | 09:19 |
| 11 | school or -- | | 09:19 |
| 12 | A. | Yes. | 09:19 |
| 13 | Q. | -- college? | 09:19 |
| 14 | A. | Yes. | 09:19 |
| 15 | Q. | Did you have coaches? | 09:19 |
| 16 | A. | Yes. | 09:19 |
| 17 | Q. | Elders, those with more experience who | 09:19 |
| 18 | taught you how to block or tackle or do freestyle | | 09:19 |
| 19 | better? | | 09:19 |
| 20 | A. | Whatever sport. | 09:19 |
| 21 | Q. | Okay. So you do have a website that | 09:19 |
| 22 | talks about you being the online coach? | | 09:19 |
| 23 | A. | No, it does not talk about me being the | 09:19 |
| 24 | online coach. | | 09:19 |
| 25 | Q. | Okay. I want to make sure I'm not | 09:19 |

PLAINTIFFS' EXHIBITS 001237

David Bliesner, Ph.D.            Videotaped            January 25, 2011

```
                                                    Page 14
 1    misquoting anything.  Is the name of the website    09:20
 2    still claycoachonline.com?                          09:20
 3         A.    It is.                                    09:20
 4         Q.    So the word "coach" is in the title of   09:20
 5    the website; correct?                               09:20
 6         A.    It is, correct.                          09:20
 7         Q.    All right.                               09:20
 8         So what is it?                                 09:20
 9         A.    It's what it says on the web page there. 09:20
10         Q.    Yeah, but what is it?  Is it just a      09:20
11    video system that you sell?                         09:21
12         A.    It's more than a video system.           09:21
13         Q.    But you don't do one-on-one coaching     09:21
14    with people; right?                                 09:21
15         A.    Again, how do you define "coaching"?     09:21
16         Q.    Teaching, encouraging, helping them      09:21
17    improve, trying to tell them about their            09:21
18    technique.                                          09:21
19         A.    Professionally, for a fee?               09:21
20         Q.    I didn't ask that.  Do you do that at    09:21
21    all, whether for free or for a fee?                 09:21
22         A.    Coaching again, you know, I have         09:21
23    children.  I coach all the time.                    09:21
24         Q.    Okay.  Do you know the difference        09:21
25    between probability and possibility?                09:21
```

PLAINTIFFS' EXHIBITS 001238

|  |  |  | Page 15 |
|---|---|---|---|
| 1 | A. | From a legal term? | 09:21 |
| 2 | Q. | Do you know the difference between | 09:21 |
| 3 | probability and possibility? | | 09:22 |
| 4 | A. | In what context? | 09:22 |
| 5 | Q. | Any context. | 09:22 |
| 6 | A. | No. | 09:22 |
| 7 | Q. | So in your work as -- in the | 09:22 |
| 8 | pharmaceutical business and then as a | | 09:22 |
| 9 | pharmaceutical consultant, you've never understood | | 09:22 |
| 10 | the distinction between possibility and | | 09:22 |
| 11 | probability? | | 09:22 |
| 12 | A. | I don't recall whether I've ever sat | 09:23 |
| 13 | down and thought about the difference between the | | 09:23 |
| 14 | two. | | 09:23 |
| 15 | Q. | Okay. Do -- does adherence with GMPs | 09:23 |
| 16 | absolutely guarantee that a drug product will be | | 09:23 |
| 17 | within its specifications all the time? | | 09:23 |
| 18 | A. | Could you say that again, please. | 09:23 |
| 19 | MR. MORIARTY: Would you read that back, | | 09:23 |
| 20 | please? | | 09:23 |
| 21 | (Whereupon, the testimony was read | | 09:23 |
| 22 | back by the court reporter, as recorded above) | | 09:23 |
| 23 | THE WITNESS: When you say GMPs, what | | 09:23 |
| 24 | specifically are you talking about? | | 09:24 |
| 25 | BY MR. MORIARTY: | | 09:24 |

PLAINTIFFS' EXHIBITS 001239

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  | Page 16 |
|--|--|--|---------|
| 1 | Q. | Do you go by Dr. or Mr.? | 09:24 |
| 2 | A. | Doctor. | 09:24 |
| 3 | Q. | Okay.  Dr. Bliesner, it has been | 09:24 |
| 4 | | represented to me in your resume, in your website, | 09:24 |
| 5 | | and in this lengthy report that you authored in | 09:24 |
| 6 | | the Digitek case, that you are an expert in GMPs | 09:24 |
| 7 | | for the pharmaceutical industry. | 09:24 |
| 8 | A. | That is true. | 09:24 |
| 9 | Q. | So why are you asking me what I mean by | 09:24 |
| 10 | | GMPs? | 09:24 |
| 11 | A. | I'm not sure if you understand the | 09:24 |
| 12 | | definition of GMPs in some context.  Some people | 09:24 |
| 13 | | don't. | 09:24 |
| 14 | Q. | Well, I do. | 09:24 |
| 15 | A. | Okay. | 09:24 |
| 16 | Q. | Okay.  So can you answer my question? | 09:24 |
| 17 | A. | Are we talking about 21 CFR 210 and | 09:24 |
| 18 | | 211? | 09:24 |
| 19 | Q. | You got other GMPs for the | 09:24 |
| 20 | | pharmaceutical industry? | 09:24 |
| 21 | A. | There's currently industry practices | 09:24 |
| 22 | | that sometimes people -- | 09:24 |
| 23 | Q. | No, GMPs. | 09:24 |
| 24 | A. | 21 CFR 210, 211? | 09:24 |
| 25 | Q. | Yes, sir. | 09:24 |

PLAINTIFFS' EXHIBITS 001240

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                        Page 17
 1      A.    Okay.  And your question again, please.   09:24
 2      Q.    Does adherence with GMPs guarantee to     09:24
 3   100 percent certainty that a drug product will     09:25
 4   always meet its specifications as set forth in the 09:25
 5   United States pharmacopeia?                         09:25
 6      A.    Following the GMPs; right?  I just want   09:25
 7   to make sure I understand what your question is.   09:25
 8   That you're saying if you follow the GMPs, then    09:25
 9   there's a 100 percent guarantee that those         09:25
10   products will be -- what was the term?             09:25
11      Q.    Within their specs.                        09:25
12      A.    Within their specs.  There's no           09:25
13   guarantee, 100 percent guarantee.                   09:25
14      Q.    Okay.  So you would agree with me that    09:25
15   adherence with GMPs increases the chances that     09:25
16   they will be within the specs; is that right?      09:25
17      A.    Could you say that again, please?         09:26
18          MR. MORIARTY:  Can you read it back,        09:26
19      please.                                          09:26
20            (Whereupon, the testimony was read        09:26
21   back by the court reporter, as recorded above)     09:26
22          THE WITNESS:  The GMPs are a minimum        09:26
23      standard that's laid out by the federal         09:26
24      government.                                       09:26
25   BY MORIARTY:                                        09:26
```

PLAINTIFFS' EXHIBITS 001241

Page 18

| | |
|---|---|
| 1 | Q.    That wasn't my question.  My question is | 09:26 |
| 2 | whether in your opinion adherence to the GMPs | 09:26 |
| 3 | increases the chances that a drug product will | 09:26 |
| 4 | meet its USP specs. | 09:26 |
| 5 | A.    Possibly. | 09:26 |
| 6 | Q.    Now you used the word "possibly." | 09:26 |
| 7 | A.    Uh-huh. | 09:26 |
| 8 | Q.    You told me earlier you don't know the | 09:26 |
| 9 | difference between possibility and probability. | 09:26 |
| 10 | So tell me what you mean by possibility or | 09:26 |
| 11 | possibly in that answer. | 09:26 |
| 12 | A.    Previously I actually said I've never | 09:27 |
| 13 | sat down and thought about the difference between | 09:27 |
| 14 | possibility and possibility.  In this case you're | 09:27 |
| 15 | asking me what I mean by possibly. | 09:27 |
| 16 | Q.    Yeah, what do you mean by possibly in | 09:27 |
| 17 | that answer? | 09:27 |
| 18 | A.    Again, the GMPs are a minimum set of | 09:27 |
| 19 | standards.  They're designed to provide operating | 09:27 |
| 20 | space if you will, to produce drugs that are safe | 09:27 |
| 21 | and effective.  And just because you follow them | 09:27 |
| 22 | doesn't guarantee that everything you make falls | 09:27 |
| 23 | into those categories. | 09:27 |
| 24 | Q.    Okay.  But if you adhere to them, does | 09:27 |
| 25 | it increase the chances that you will meet the | 09:27 |

PLAINTIFFS' EXHIBITS 001242

Page 19

| | |
|---|---|
| 1   ANDA or NDA or USP specs for that drug? | 09:27 |
| 2        A.    I don't think that you can say just | 09:28 |
| 3   because you follow the law it makes your product | 09:28 |
| 4   going to be better. | 09:28 |
| 5        Q.    Okay.  Have you ever heard of the | 09:28 |
| 6   scientific method? | 09:28 |
| 7        A.    Yes. | 09:28 |
| 8        Q.    What is it? | 09:28 |
| 9        A.    Scientific method is a systematic means | 09:28 |
| 10   of developing a hypothesis, collecting data. | 09:28 |
| 11   After doing experiments, analyzing the data, | 09:28 |
| 12   drawing conclusions to try to support or detract | 09:28 |
| 13   from your hypothesis. | 09:28 |
| 14        Q.    Is the scientific method best achieved | 09:28 |
| 15   when you actually look at the underlying data as | 09:28 |
| 16   opposed to somebody's interpretation of the data? | 09:29 |
| 17        A.    The scientific method is an approach to | 09:29 |
| 18   collecting data. | 09:29 |
| 19        Q.    Okay.  But in order to reach | 09:29 |
| 20   scientifically valid conclusions, should you look | 09:29 |
| 21   at the actual data as opposed to somebody's | 09:29 |
| 22   interpretation of the data? | 09:29 |
| 23        A.    I don't know if I understand exactly | 09:29 |
| 24   your question. | 09:29 |
| 25        Q.    Well, in your -- in your reading to | 09:29 |

PLAINTIFFS' EXHIBITS 001243

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 20

| | | |
|---|---|---|
| 1 | prepare opinions in this case, you read this | 09:29 |
| 2 | article by Jerry Bauman and Robert Didomenico and | 09:29 |
| 3 | William Galanter about Digoxin; correct? | 09:30 |
| 4 | A.    May I see it? | 09:30 |
| 5 | Q.    Sure.  That Post-It may even say what | 09:30 |
| 6 | the reference was in your report. | 09:30 |
| 7 | A.    May I take a moment and confirm that | 09:30 |
| 8 | that is the article that I read? | 09:30 |
| 9 | Q.    If you don't trust me, go ahead. | 09:30 |
| 10 | A.    Okay.  I need to step over here and grab | 09:30 |
| 11 | a -- | 09:30 |
| 12 | Q.    Go ahead.  Be careful with your | 09:30 |
| 13 | microphone cord. | 09:30 |
| 14 | MR. KERENSKY:  Yeah, take it off. | 09:30 |
| 15 | THE WITNESS:  I did review that | 09:32 |
| 16 | document. | 09:32 |
| 17 | BY MR. MORIARTY: | 09:32 |
| 18 | Q.    The document is an article from the | 09:32 |
| 19 | medical literature, is it not? | 09:32 |
| 20 | A.    Yes. | 09:32 |
| 21 | Q.    Do you commonly read medical literature? | 09:32 |
| 22 | A.    How do you define commonly? | 09:32 |
| 23 | Q.    Well, how many articles have you read | 09:32 |
| 24 | about Digoxin in the past two years? | 09:32 |
| 25 | A.    I don't recall. | 09:32 |

PLAINTIFFS' EXHIBITS 001244

Page 21

| | | |
|---|---|---|
| 1 | Q.    Do you subscribe to any medical | 09:32 |
| 2 | journals? | 09:32 |
| 3 | A.    When you say subscribe, permanent | 09:32 |
| 4 | subscription? | 09:33 |
| 5 | Q.    Well, I don't expect that any | 09:33 |
| 6 | subscription is permanent, but people subscribe to | 09:33 |
| 7 | magazines for several years, maybe a year, maybe | 09:33 |
| 8 | two, maybe for their entire career. | 09:33 |
| 9 | Do you subscribe to any medical journals? | 09:33 |
| 10 | A.    I buy access to online medical journals, | 09:33 |
| 11 | sites, and articles. | 09:33 |
| 12 | Q.    And what sites are those? | 09:33 |
| 13 | A.    I'd have to go back and look it up. | 09:33 |
| 14 | Q.    But the bottom line is that this article | 09:33 |
| 15 | doesn't just contain data.  It contains analysis | 09:33 |
| 16 | of data and editorial information about the data; | 09:33 |
| 17 | correct? | 09:33 |
| 18 | A.    What do you mean by editorial? | 09:33 |
| 19 | Q.    Well, did you -- when did you last read | 09:33 |
| 20 | that article? | 09:34 |
| 21 | A.    Bless you.  I don't recall.  I guess | 09:34 |
| 22 | probably early on when Miller firm contacted me | 09:34 |
| 23 | somewhere in January. | 09:34 |
| 24 | Q.    Do you read the newspaper? | 09:34 |
| 25 | A.    Occasionally. | 09:34 |

PLAINTIFFS' EXHIBITS 001245

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                              Page 22
 1      Q.    Does it have an editorial section?        09:34
 2      A.    Yes.                                       09:34
 3      Q.    Do you know the editorial section from     09:34
 4   the rest of the newspaper?                          09:34
 5      A.    Yes.                                       09:34
 6      Q.    So you have some idea what editorial       09:34
 7   means, don't you?                                   09:34
 8      A.    Yes.                                       09:34
 9      Q.    I'm handing you what has been marked as    09:34
10   Exhibit 78A.                                        09:35
11      Have you ever seen that before?                  09:35
12      A.    Do you mind if I check my notes?           09:35
13      Q.    Oh, by all means.  Let me ask you this     09:35
14   first:  Do you have -- in this report that you      09:35
15   drafted, do you repeatedly refer to 21 United       09:35
16   States Code, Section 351, the section that defines  09:35
17   adulteration?                                       09:35
18      A.    Repeatedly.                                09:36
19      Q.    Yeah.                                      09:36
20      A.    Can I see the report?                      09:36
21      Q.    Do you ever refer to it?  I'm not going    09:36
22   to quibble about the quantification.  Do you ever   09:36
23   refer to this report?                               09:36
24      A.    What's the number of that document?        09:36
25      Q.    21 United States Code, Section 351.        09:36

PLAINTIFFS' EXHIBITS 001246

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 23

| | | | |
|---|---|---|---|
| 1 | A. | May I see the report, please? | 09:36 |
| 2 | Q. | You have your own copy? | 09:36 |
| 3 | A. | I do. | 09:36 |
| 4 | Q. | See if you ever refer to the section | 09:36 |
| 5 | | that defines what adulterated drug product is -- | 09:36 |
| 6 | A. | Say again the code that you are | 09:36 |
| 7 | | specifically citing. | 09:36 |
| 8 | Q. | 351 -- | 09:36 |
| 9 | A. | 21 CFR, 351? | 09:36 |
| 10 | Q. | Yeah.  While you're looking, tell me how | 09:36 |
| 11 | | long again you took to prepare for today's | 09:36 |
| 12 | | deposition -- | 09:36 |
| 13 | | MR. KERENSKY:  Oh, my.  Let's not get | 09:36 |
| 14 | | testy.  It's his first deposition.  He's | 09:36 |
| 15 | | taking his time.  Let's not get testy. | 09:36 |
| 16 | | MR. MORIARTY:  Okay.  I'll withdraw that | 09:36 |
| 17 | | question.  See if you ever refer to this code | 09:36 |
| 18 | | provision in your report. | 09:36 |
| 19 | | THE WITNESS:  On page 9, difficulty in | 09:37 |
| 20 | | manufacture of Digoxin tablets have been known | 09:37 |
| 21 | | for some time and the concern to FDA -- | 09:37 |
| 22 | | THE COURT REPORTER:  Sir, slow down. | 09:37 |
| 23 | | THE WITNESS:  Oh, I'm sorry. | 09:37 |
| 24 | BY MR. MORIARTY: | | 09:37 |
| 25 | Q. | You don't have to read all that.  Just | 09:37 |

PLAINTIFFS' EXHIBITS 001247

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 24

| | | |
|---|---|---|
| 1 | tell me do you refer to it in the report, yes or | 09:37 |
| 2 | no? | 09:37 |
| 3 | A.    21 CFR, Part 310.500? | 09:37 |
| 4 | Q.    351 United States Code.  Not the code of | 09:37 |
| 5 | Federal regulations, the United States code, 21 | 09:37 |
| 6 | USC 351.  It defines adulteration.  Do you refer | 09:37 |
| 7 | to that in your report?  What page are you on? | 09:37 |
| 8 | A.    Fifteen. | 09:39 |
| 9 | Q.    Let's -- let me withdraw the question | 09:39 |
| 10 | and ask you another question. | 09:39 |
| 11 | A.    Okay. | 09:39 |
| 12 | Q.    Do you use the word "adulterated" in | 09:39 |
| 13 | your report?  Without looking, do you remember off | 09:39 |
| 14 | the top of your head whether you used the word | 09:39 |
| 15 | "adulterated" in your report? | 09:39 |
| 16 | A.    Okay. | 09:40 |
| 17 | Q.    Do you know what it means? | 09:40 |
| 18 | A.    Yes. | 09:40 |
| 19 | Q.    Okay.  Let's look back at 78A, which is | 09:40 |
| 20 | the statutory definition of adulteration; okay? | 09:40 |
| 21 | Have you ever seen this before? | 09:40 |
| 22 | A.    This document, 78A? | 09:40 |
| 23 | Q.    Have you ever seen 21 USC Section 351, | 09:40 |
| 24 | the definition of adulteration? | 09:40 |
| 25 | A.    I have reviewed the Federal Food, Drug | 09:41 |

PLAINTIFFS' EXHIBITS 001248

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  | Page 25 |
|---|---|---|
| 1 | and Cosmetic Act. | 09:41 |
| 2 | Q.    Okay. | 09:41 |
| 3 | A.    Online. | 09:41 |
| 4 | Q.    So -- | 09:41 |
| 5 | A.    But I do not commit the numbers to | 09:41 |
| 6 | memory. | 09:41 |
| 7 | Q.    Okay.  But you have seen this statute | 09:41 |
| 8 | before, whether you saw it on a piece of paper or | 09:41 |
| 9 | online; correct? | 09:41 |
| 10 | A.    I'm not sure whether the document you | 09:41 |
| 11 | have in front of me is what I reviewed online. | 09:41 |
| 12 | Q.    What does that mean?  Do you think you | 09:41 |
| 13 | looked at a different version of the United States | 09:41 |
| 14 | code or a different provision of the code? | 09:42 |
| 15 | A.    Possibly.  Whatever version this was | 09:42 |
| 16 | that's on the website for the Government printing | 09:42 |
| 17 | office. | 09:42 |
| 18 | Q.    Okay.  Well, do you have a copy of this | 09:42 |
| 19 | in your own material that you printed and relied | 09:42 |
| 20 | on for purposes of your opinions in this case? | 09:42 |
| 21 | A.    78A? | 09:42 |
| 22 | Q.    Mr. Bliesner, 21 United States Code, | 09:42 |
| 23 | section 351, whether it's marked as an exhibit or | 09:42 |
| 24 | not. | 09:42 |
| 25 | A.    Let me check. | 09:42 |

PLAINTIFFS' EXHIBITS 001249

|  |  |  |
|---|---|---|
|  | | Page 26 |
| 1 | MR. MORIARTY:  Go off the record, | 09:42 |
| 2 | please. | 09:42 |
| 3 | THE VIDEOGRAPHER:  The time is now | 09:42 |
| 4 | 9:43 a.m. and we're going off the record | 09:42 |
| 5 | briefly. | 09:42 |
| 6 | (Short break) | 09:57 |
| 7 | THE VIDEOGRAPHER:  The time is 9:58 a.m. | 09:57 |
| 8 | We're back on the record. | 09:57 |
| 9 | BY MR. MORIARTY: | 09:57 |
| 10 | Q.    In the time that you did spend looking | 09:57 |
| 11 | in materials, you didn't find either 21 USC | 09:58 |
| 12 | section 351 or 21, Code of Federal Regulations, | 09:58 |
| 13 | Section 351, did you? | 09:58 |
| 14 | A.    In my stuff? | 09:58 |
| 15 | Q.    Correct. | 09:58 |
| 16 | A.    No, I did not. | 09:58 |
| 17 | Q.    But because the word adulteration is in | 09:58 |
| 18 | your written report, presumably you know what that | 09:58 |
| 19 | means; correct? | 09:58 |
| 20 | A.    Yes. | 09:58 |
| 21 | Q.    So what I've placed before you is | 09:58 |
| 22 | Exhibit 78A.  It is the United States Code | 09:58 |
| 23 | definition of adulteration. | 09:58 |
| 24 | A.    Okay. | 09:58 |
| 25 | Q.    And I'm going to refer to Section A2(b) | 09:58 |

PLAINTIFFS' EXHIBITS 001250

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 27

| | | |
|---|---|---|
| 1 | okay. And A2(b) is -- see A right here? | 09:58 |
| 2 | A.    Yes. | 09:58 |
| 3 | Q.    And then there's one? | 09:58 |
| 4 | A.    Yes. | 09:58 |
| 5 | Q.    And then there's two and then there's | 09:58 |
| 6 | 2(b) down here; okay? | 09:58 |
| 7 | A.    2(b). | 09:58 |
| 8 | Q.    2(b). I would like you to read A2(b) to | 09:58 |
| 9 | yourself. | 09:59 |
| 10 | MR. KERENSKY: I can't even find A2(b). | 09:59 |
| 11 | MR. MORIARTY: The first page, Mike. | 09:59 |
| 12 | THE WITNESS: Just to be clear, please. | 09:59 |
| 13 | It's the one that starts off, "if it is." | 09:59 |
| 14 | BY MR. MORIARTY: | 09:59 |
| 15 | Q.    If it is a drug -- | 09:59 |
| 16 | A.    Yes. | 09:59 |
| 17 | Q.    -- and the methods used in. | 09:59 |
| 18 | A.    Okay. | 09:59 |
| 19 | Q.    You see that? | 09:59 |
| 20 | A.    Yes. | 09:59 |
| 21 | Q.    Read that to yourself, please. | 09:59 |
| 22 | Have you read it? | 09:59 |
| 23 | A.    Yes. | 09:59 |
| 24 | Q.    Is that the definition of adulterated | 09:59 |
| 25 | with which you are familiar under circumstances | 10:00 |

PLAINTIFFS' EXHIBITS 001251

Page 28

| | | |
|---|---|---|
| 1 | when GMPs are not complied with? | 10:00 |
| 2 | A. Yes. | 10:00 |
| 3 | Q. All right. Now, does that section A2(b) | 10:00 |
| 4 | say anything about drugs actually being outside | 10:00 |
| 5 | their specifications? | 10:00 |
| 6 | A. The word specification is not here. | 10:00 |
| 7 | Q. Does it say anything about drugs being | 10:00 |
| 8 | dangerous to consumers? | 10:00 |
| 9 | A. It applies safety. | 10:00 |
| 10 | Q. Where does the word -- | 10:01 |
| 11 | A. "As to safety and has the identity and | 10:01 |
| 12 | strength." | 10:01 |
| 13 | Q. I'm asking whether it says anything | 10:01 |
| 14 | about danger to consumers. | 10:01 |
| 15 | A. It does not say anything in that | 10:01 |
| 16 | sentence. | 10:01 |
| 17 | Q. Does it use the word -- does A2(b) use | 10:01 |
| 18 | the word defective? | 10:01 |
| 19 | A. The word defective is not here. | 10:01 |
| 20 | Q. Does A2(b) say anything about whether | 10:01 |
| 21 | these adulterated products are possibly or likely | 10:01 |
| 22 | defective or out of specification? Does that | 10:01 |
| 23 | phrase or wording appear anywhere in the statute? | 10:02 |
| 24 | A. Could you say that again, please. | 10:02 |
| 25 | MR. MORIARTY: Can you read that back? | 10:02 |

PLAINTIFFS' EXHIBITS 001252

David Bliesner, Ph.D.        Videotaped        January 25, 2011

Page 29

|  | | |
|---|---|---|
| 1 | (Whereupon, the testimony was read | 10:02 |
| 2 | back by the court reporter, as recorded above) | 10:02 |
| 3 | THE WITNESS:  Not right here in this | 10:02 |
| 4 | sentence, no. | 10:02 |
| 5 | BY MR. MORIARTY: | 10:02 |
| 6 | Q.    To the best of your knowledge, does that | 10:02 |
| 7 | phrase or wording appear in the Code of Federal | 10:02 |
| 8 | Regulations that mirrors this statutory | 10:02 |
| 9 | definition? | 10:02 |
| 10 | A.    I couldn't say because this regulation | 10:02 |
| 11 | is not one that we refer to in the industry.  We | 10:02 |
| 12 | stay with the GMPs.  This is the higher-level | 10:02 |
| 13 | document and the lawyers are concerned with this. | 10:02 |
| 14 | We are not, at the operational level. | 10:03 |
| 15 | Q.    And when you say the GMPs, are you | 10:03 |
| 16 | talking about Code of Federal Regulations, Title | 10:03 |
| 17 | 21, Section 210? | 10:03 |
| 18 | A.    210 and 211. | 10:03 |
| 19 | Q.    Okay.  So I'm handing you what's Exhibit | 10:03 |
| 20 | 75. | 10:03 |
| 21 | A.    Yes. | 10:04 |
| 22 | Q.    You've seen that before; correct? | 10:04 |
| 23 | A.    I have. | 10:04 |
| 24 | Q.    All right.  So -- | 10:04 |
| 25 | A.    Not this particular exhibit, but I have | 10:04 |

PLAINTIFFS' EXHIBITS 001253

David Bliesner, Ph.D.                Videotaped                January 25, 2011

|  |  | Page 30 |
|---|---|---|
| 1 | seen 21 CFR 210 and 211. | 10:04 |
| 2 | Q. So when we look at 210.1(b), it says, | 10:04 |
| 3 | "The failure to comply with any regulations | 10:04 |
| 4 | set forth in this part and in parts 211 through | 10:04 |
| 5 | 226 of this chapter, in the manufacture, | 10:04 |
| 6 | processing, packing and folding of a drug, shall | 10:04 |
| 7 | render such drug to be adulterated under section | 10:04 |
| 8 | 501 A(2)(b) of the Act, and such drug as well as | 10:04 |
| 9 | the person who is responsible for the failure to | 10:05 |
| 10 | comply shall be subject to regulatory action." | 10:05 |
| 11 | Did I read that correctly? | 10:05 |
| 12 | A. Yes, sir. | 10:05 |
| 13 | Q. Now, is it -- is it your understanding | 10:05 |
| 14 | that this lawsuit is not a regulatory action? | 10:05 |
| 15 | A. Regulatory action on the part of the | 10:05 |
| 16 | Government, is that -- is that what you're talking | 10:05 |
| 17 | about? | 10:05 |
| 18 | Q. No, I'm asking is this lawsuit -- is it | 10:05 |
| 19 | your understanding that this lawsuit is or is not | 10:05 |
| 20 | a regulatory action? | 10:05 |
| 21 | A. It is not a regulatory action by the | 10:05 |
| 22 | Federal Government as I understand it. | 10:05 |
| 23 | Q. Okay. And that's what you understand | 10:05 |
| 24 | Exhibit 75, section 210.1(b) to mean, is a | 10:05 |
| 25 | regulatory action by the Federal Government; | 10:06 |

PLAINTIFFS' EXHIBITS 001254

David Bliesner, Ph.D.          Videotaped          January 25, 2011

                                                          Page 31
 1   correct?                                              10:06
 2       A.    That's how I interpret it, yes.             10:06
 3       Q.    Now, does anything in 210.1(b) refer to    10:06
 4   out of specification, dangerous, or defective --      10:06
 5   by the way, please don't write on the exhibits.       10:06
 6       A.    Sorry.                                      10:06
 7       Q.    You really don't need your pen.             10:06
 8            MR. KERENSKY:  No, he can use his pen to     10:06
 9       help him find it, but he will not write on it.    10:06
10            MR. MORIARTY:  Put the cap on.               10:06
11            THE WITNESS:  I won't write on your          10:06
12       documents.  Sorry.                                10:06
13            MR. MORIARTY:  They're not mine anymore.     10:06
14       Once I give them to you, they're not mine.        10:06
15            THE WITNESS:  I'm sorry.                     10:06
16   BY MR. MORIARTY:                                      10:06
17       Q.    The question is does 210.1(b) say           10:06
18   anything about out of specification, dangerous, or    10:06
19   defective?                                            10:06
20       A.    It does not say out of specification,       10:07
21   dangerous, or defective in here.                      10:07
22       Q.    Does Section A say those words?             10:07
23       A.    It's dangerous specifications and --        10:07
24       Q.    Dangerous, out of specification, or         10:07
25   defective.                                            10:07

PLAINTIFFS' EXHIBITS 001255

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                    Page 32
 1      A.    No.                                    10:07
 2      Q.    All right.  May have that Exhibit 75?  10:07
 3      A.    Sure.  Can I have yours?               10:07
 4           MR. KERENSKY:  Sure.                    10:07
 5    BY MR. MORIARTY:                               10:07
 6      Q.    Did you -- you wrote on that one, too. 10:07
 7    Terry, can I have your 78(a)?                  10:07
 8      A.    Sorry.                                 10:07
 9      Q.    All right.  So at some point last      10:07
10    winter, last spring, the Plaintiffs' lawyers sent 10:08
11    you material to review; correct?              10:08
12      A.    Yes.                                   10:08
13      Q.    Did you review it carefully?          10:08
14      A.    Yes.                                   10:08
15      Q.    Did you talk to them before you wrote 10:08
16    this report?                                   10:08
17      A.    In relation to the documents I was    10:08
18    getting, those types of things, yes.          10:08
19      Q.    Yeah.  And by the way, when we talk    10:08
20    about your report, we're talking about Exhibit 92, 10:08
21    are we not?                                    10:08
22      A.    I'm not sure because the page numbers 10:09
23    don't match up in content.                    10:09
24      Q.    Did you write two versions of the     10:09
25    report?                                        10:09
```

|  | | | Page 33 |
|---|---|---|---|
| 1 | A. | No. | 10:09 |
| 2 | Q. | Are you sure? | 10:09 |
| 3 | A. | Yeah. | 10:09 |
| 4 | Q. | Well, does Exhibit 94 match the one you | 10:09 |
| 5 | have with you? | | 10:09 |
| 6 | A. | No, the page numbers are off, which may | 10:09 |
| 7 | be a matter of printing possibly. | | 10:09 |
| 8 | Q. | Okay. Do 92 and 94 appear to be your | 10:09 |
| 9 | report, even though the page numbers may be off in | | 10:09 |
| 10 | some way? | | 10:10 |
| 11 | A. | They appear to be my report. | 10:10 |
| 12 | Q. | Okay. So in the process, you reviewed | 10:10 |
| 13 | material, you spoke with the lawyers who retained | | 10:10 |
| 14 | you and then ultimately you drafted a report; | | 10:10 |
| 15 | correct? | | 10:10 |
| 16 | A. | Yes. | 10:10 |
| 17 | Q. | And were you aware that in this process | 10:10 |
| 18 | of drafting the report, what you were doing was | | 10:10 |
| 19 | putting lawyers like me who represent the | | 10:10 |
| 20 | pharmaceutical manufacturer on notice of what your | | 10:10 |
| 21 | opinions were in this case? | | 10:10 |
| 22 | A. | Can you say that again, please? | 10:10 |
| 23 | Q. | As you went through this process, did | 10:10 |
| 24 | you realize that the purpose of the report was not | | 10:10 |
| 25 | only to organize your thoughts but it was to put | | 10:10 |

PLAINTIFFS' EXHIBITS 001257

Page 34

| | | |
|---|---|---|
| 1 | people like me on notice of what your opinions | 10:10 |
| 2 | were? | 10:10 |
| 3 | A. On notice I'm assuming is reporting the | 10:10 |
| 4 | information that I saw and the conclusions I came | 10:10 |
| 5 | to, yes. | 10:10 |
| 6 | Q. Yeah, put me on notice so that when I | 10:11 |
| 7 | came to question you, I would have some idea as a | 10:11 |
| 8 | starting point what your thoughts were; right? | 10:11 |
| 9 | A. I'm actually having difficulty here. On | 10:11 |
| 10 | notice means different things to me than it may | 10:11 |
| 11 | mean to you. | 10:11 |
| 12 | Q. Well, in some way you were communicating | 10:11 |
| 13 | to readers -- including people like me -- what | 10:11 |
| 14 | your opinions were; right? | 10:11 |
| 15 | A. Yes. | 10:11 |
| 16 | Q. And you tried to do the best you could | 10:11 |
| 17 | to make your report thorough so that you would | 10:11 |
| 18 | remember in an organized fashion what your | 10:11 |
| 19 | opinions were; correct? | 10:11 |
| 20 | A. Correct. | 10:11 |
| 21 | Q. And these lawyers like Fred Thompson, | 10:11 |
| 22 | and Meghan and Mike would know what your opinions | 10:11 |
| 23 | were; right? | 10:11 |
| 24 | A. Correct. | 10:11 |
| 25 | Q. And the court presumably, if it read | 10:11 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 35

```
 1   your report, would know what your opinions are; is    10:11
 2   that right?                                            10:11
 3       A.    Correct, yes.                                10:11
 4       Q.    Now, let's go to page 6.  And what are       10:11
 5   you --                                                 10:11
 6       A.    Which version would you like me to use?      10:11
 7       Q.    Well, pick 92 or 94.  Let's see if           10:12
 8   they're the same.                                      10:12
 9       A.    Okay.  I'll look at 92.                      10:12
10       Q.    Sure.  Page 6.                               10:12
11       A.    Page 6?                                      10:12
12       Q.    Lower right hand corner.  Look at the        10:12
13   top.  Is paragraph four the first thing on the         10:12
14   page?                                                  10:12
15       A.    Review of Amide/Actavis Status of            10:12
16   Compliance with cGMPs:  My approach?                   10:12
17       Q.    Yes.                                         10:12
18       A.    Yes.                                         10:12
19       Q.    All right.  By the way, is that the same     10:12
20   in 94?                                                 10:12
21       A.    Let's take a look.  It is.                   10:12
22       Q.    And the same as the version you brought      10:12
23   with you?                                              10:12
24       A.    No.                                          10:12
25       Q.    Can I see the one you brought with you?      10:12
```

PLAINTIFFS' EXHIBITS 001259

Page 36

1      A.     Yeah.  It appears to be a formatting          10:12

2    page thing.                                            10:13

3      Q.     Okay.  So it says here:  "In order to         10:13

4    accurately evaluate the status of Amide/Actavis's      10:13

5    status of compliance with the CGMPs, I took the        10:13

6    following approach."                                   10:13

7      Did I read that correctly?                           10:13

8      A.     You did.                                      10:13

9      Q.     Now did the lawyers who retained you in       10:13

10   this litigation tell you that your charge or your      10:13

11   job in this case was to evaluate the status of my      10:13

12   client's compliance with the GMPs?                     10:13

13     A.     Yes.                                          10:14

14     Q.     And they did not tell you that your           10:14

15   charge or your task in this case was to help them      10:14

16   determine if out of specification Digitek actually     10:14

17   reached the hands of consumers; correct?               10:14

18     A.     My guidance from them was fairly              10:14

19   general, included evaluate, in your opinion, the       10:14

20   status of compliance with GMPs and how that may        10:14

21   have affected a product that was potentially           10:14

22   dangerous getting to market, Digitek being the         10:14

23   one.                                                   10:14

24     Q.     Potentially dangerous?                        10:14

25     A.     Uh-huh.                                       10:14

PLAINTIFFS' EXHIBITS 001260

David Bliesner, Ph.D.             Videotaped            January 25, 2011

Page 37

| | | | |
|---|---|---|---|
| 1 | Q. | Right? | 10:15 |
| 2 | A. | Uh-huh. | 10:15 |
| 3 | Q. | You have to answer out loud. | 10:15 |
| 4 | A. | Yes, I'm sorry, yes. | 10:15 |
| 5 | Q. | Phil doesn't understand uh-huh, huh-uh, | 10:15 |
| 6 | and shakes and nods; okay? | | 10:15 |
| 7 | A. | Yes, sir. | 10:15 |
| 8 | Q. | So in bullet point number one, you | 10:15 |
| 9 | assumed that Amide and Actavis was a new | | 10:15 |
| 10 | consulting client needing assistance with | | 10:15 |
| 11 | determining their level of compliance with the | | 10:15 |
| 12 | GMPs. Is that what it says there? | | 10:15 |
| 13 | A. | It does. | 10:15 |
| 14 | Q. | And you performed a paper audit of the | 10:15 |
| 15 | facility to determine past and current status of | | 10:15 |
| 16 | compliance; right? | | 10:15 |
| 17 | A. | That is correct. | 10:15 |
| 18 | Q. | And then you list what your audit | 10:15 |
| 19 | included; is that right? | | 10:15 |
| 20 | A. | That's correct. | 10:15 |
| 21 | Q. | Now, how long have you been in the | 10:15 |
| 22 | consulting business in the pharmaceutical | | 10:15 |
| 23 | industry? | | 10:15 |
| 24 | A. | About 12, almost 13 years. | 10:15 |
| 25 | Q. | In those 12 to 13 years, how many times | 10:15 |

PLAINTIFFS' EXHIBITS 001261

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 38

1    have you actually been engaged by a pharmaceutical          10:15
2    company to do a project?                                    10:16
3         A.    A project?  Any type of project?                 10:16
4         Q.    Any type of project.                             10:16
5         A.    How many times?                                  10:16
6         Q.    Yeah.                                             10:16
7         A.    It's numerous.  I'd have to really sit           10:16
8    down and think about it.                                    10:16
9         Q.    How many times have you been asked by a          10:16
10   consulting client in those 12 to 13 years to               10:16
11   assess their status of compliance with GMPs?               10:16
12        A.    At least five.                                    10:16
13        Q.    In general, in the five times that you          10:16
14   were retained by a pharmaceutical client to assess         10:16
15   their GMP status, how many times in those five did         10:16
16   you look at batch records?                                  10:17
17        A.    It's tough to say.  Numerous.                    10:17
18        Q.    Okay.  And when you did, did you look at         10:17
19   a lot of batch records?                                     10:17
20        A.    Depends on how you're going to define "a        10:17
21   lot."                                                       10:17
22        Q.    Did you look at more than one batch             10:17
23   record?                                                     10:17
24        A.    Yes.                                             10:17
25        Q.    Did you look at more than two?                  10:17

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  | Page 39 |
|---|---|---|---|
| 1 | A. | Yes. | 10:17 |
| 2 | Q. | Did you look at annual reports or annual | 10:17 |
| 3 | data reviews in these five times when you were | | 10:17 |
| 4 | asked by pharmaceutical companies to assess their | | 10:17 |
| 5 | compliance? | | 10:17 |
| 6 | A. | Yes. | 10:17 |
| 7 | Q. | Did you look at FDA 484 testing if it | 10:17 |
| 8 | was available? | | 10:18 |
| 9 | A. | No. | 10:18 |
| 10 | | THE VIDEOGRAPHER:  We have five minutes | 10:18 |
| 11 | | left on the tape. | 10:18 |
| 12 | BY MR. MORIARTY: | | 10:18 |
| 13 | Q. | Do you know what US or FDA 484 testing | 10:18 |
| 14 | is? | | 10:18 |
| 15 | A. | Generally. | 10:18 |
| 16 | Q. | Okay.  If the pharmaceutical clients | 10:18 |
| 17 | that you hired had hired other companies to help | | 10:18 |
| 18 | them remediate 483s and warning letters, did you | | 10:18 |
| 19 | look at those remediation documents? | | 10:18 |
| 20 | A. | Yes. | 10:18 |
| 21 | Q. | Did you look at any sort of independent | 10:18 |
| 22 | testing of the product if it was available to you? | | 10:18 |
| 23 | A. | Yes. | 10:18 |
| 24 | Q. | And just to wrap up this segment before | 10:18 |
| 25 | the tape expires, I assume that you, when you | | 10:18 |

David Bliesner, Ph.D.         Videotaped          January 25, 2011

Page 40

| | | |
|---|---|---|
| 1 | looked at things like batch records and annual | 10:18 |
| 2 | reports and annual data reviews, you would have | 10:18 |
| 3 | been looking at finished product test results for | 10:18 |
| 4 | various products; is that true? | 10:19 |
| 5 | A.   Yes, and active pharmaceutical | 10:19 |
| 6 | ingredients as well. | 10:19 |
| 7 | MR. MORIARTY:  Let's take our tape | 10:19 |
| 8 | break. | 10:19 |
| 9 | THE VIDEOGRAPHER:  The time is | 10:19 |
| 10 | a.m.  We're going off the record | 10:19 |
| 11 | briefly. | 10:19 |
| 12 | (Short break) | 10:22 |
| 13 | THE VIDEOGRAPHER:  The time is now | 10:22 |
| 14 | 10:23 a.m.  We are back on record.  This is | 10:22 |
| 15 | the beginning of tape two. | 10:22 |
| 16 | BY MR. MORIARTY: | 10:22 |
| 17 | Q.   So getting back to how you did this | 10:22 |
| 18 | paper audit, another thing that I forgot to ask | 10:22 |
| 19 | you about is when you have checked GMP compliance | 10:22 |
| 20 | for some of your pharmaceutical clients, do you | 10:23 |
| 21 | look at process validation studies? | 10:23 |
| 22 | A.   I have, yes. | 10:23 |
| 23 | Q.   All right.  So in this litigation, how | 10:23 |
| 24 | many process validation studies for Digitek did | 10:23 |
| 25 | you look at? | 10:23 |

PLAINTIFFS' EXHIBITS 001264

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 41

1    A.    None were made available to me that I          10:23
2    recall.                                              10:23
3    Q.    Did the Plaintiffs' lawyers make               10:23
4    available to you an online repository of             10:23
5    documents?                                           10:23
6    A.    Yes.                                            10:23
7    Q.    Did you look through there to see what          10:23
8    was in there?                                         10:23
9    A.    Yes.                                            10:23
10   Q.    And --                                          10:23
11   A.    In detail.                                       10:23
12   Q.    And process validation studies were not        10:23
13   there?                                                10:23
14   A.    At the time I reviewed it, not to my           10:23
15   knowledge.                                            10:23
16   Q.    All right.  Now this is Exhibit 1.  It's       10:23
17   the Amide process validation report for Digitek,     10:23
18   .125, at the batch size of 1,600,000 tablets.        10:24
19   Have you ever seen that before?                       10:24
20   A.    May I check my documents?  It may have         10:24
21   been associated with an investigation.               10:24
22   Q.    Do you have a list so that we don't have       10:24
23   to watch you thumb through the boxes?  I mean you    10:24
24   told me a minute ago you don't recall seeing         10:24
25   them.  I'm just trying to verify whether you've      10:24

Page 42

1   seen this or not.                                      10:24

2        A.    It could have been part of the ANDA that   10:24

3   I looked at and I don't recall.  It might have        10:24

4   been part of the investigation.  So it would have     10:24

5   been part of a document associated with this.  As     10:24

6   far as a specific, stand-alone process validation,    10:25

7   I don't believe I ever saw one.                       10:25

8        Q.    Here is Exhibit 1(a), which is the         10:25

9   validation study for Digitek when they ramped the     10:25

10  .125 dose strength up to 4.8 million tablet batch     10:25

11  sizes.                                                10:25

12       Do you recall whether you've seen that           10:25

13  before?                                               10:25

14       A.    I don't recall seeing this document.       10:25

15       Q.    I'm showing you Exhibit 1(b).  I believe   10:25

16  this is the process validation when they were         10:25

17  still at the batch size of 1.6 million, but at a      10:25

18  different press speed.                                10:25

19       Have you ever seen that?                         10:26

20       A.    Let me check my documents, please.         10:26

21       Q.    Go ahead.  Look for every process          10:26

22  validation that you had because I have two more.      10:26

23  Look at the index or something.  Are you on or        10:26

24  off?                                                  10:26

25            THE VIDEOGRAPHER:  On.  Would you like me   10:26

PLAINTIFFS' EXHIBITS 001266

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|    |                                                          | Page 43 |
|----|----------------------------------------------------------|---------|
| 1  | to go off?                                               | 10:26   |
| 2  | MR. MORIARTY:  Sure.                                     | 10:27   |
| 3  | THE VIDEOGRAPHER:  The time is                          | 10:27   |
| 4  | a.m.  We're going off the record                        | 10:27   |
| 5  | briefly.                                                | 10:27   |
| 6  | (Short break)                                           | 10:30   |
| 7  | THE VIDEOGRAPHER:  The time is                          | 10:30   |
| 8  | a.m.  We are back on the record.                        | 10:30   |
| 9  | BY MR. MORIARTY:                                        | 10:30   |
| 10 | Q.   So, so far, we've talked about 1, 1(a)             | 10:30   |
| 11 | and 1(b).  The question is are those in your            | 10:30   |
| 12 | documents that you reviewed to formulate opinions       | 10:30   |
| 13 | in this case?                                           | 10:30   |
| 14 | A.   Just so you know, this is a list of                | 10:30   |
| 15 | every document I reviewed online.  I just want to       | 10:32   |
| 16 | make sure that I'm not misspeaking, so...               | 10:32   |
| 17 | Q.   Did you print everything you reviewed              | 10:32   |
| 18 | online?                                                 | 10:32   |
| 19 | A.   No, there's just too much.  It does not            | 10:32   |
| 20 | appear that I had access nor reviewed process           | 10:33   |
| 21 | validation.                                             | 10:33   |
| 22 | Q.   Okay.  So Exhibit 2, just for                      | 10:33   |
| 23 | completeness, this is the process validation for        | 10:33   |
| 24 | the 4.2 million tablet batch sizes for .25              | 10:33   |
| 25 | Digoxin.  You haven't seen this document?               | 10:34   |

PLAINTIFFS' EXHIBITS 001267

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  | Page 44 |
|---|---|---|---|
| 1 | A. | No. | 10:34 |
| 2 | Q. | And Exhibit 3, did you know that | 10:34 |
| 3 | Digitek, like other Digoxin products, used to be | | 10:34 |
| 4 | made in .5 milligrams? | | 10:34 |
| 5 | A. | I don't recall that fact. | 10:34 |
| 6 | Q. | No?  This is Exhibit 3. | 10:34 |
| 7 | A. | Uh-huh. | 10:34 |
| 8 | Q. | This is the process validation for the | 10:34 |
| 9 | .5 milligram Digitek.  Have you ever seen that | | 10:34 |
| 10 | document? | | 10:34 |
| 11 | A. | No. | 10:34 |
| 12 | Q. | May I see that compendium of documents | 10:34 |
| 13 | you reviewed online but you did not print or put | | 10:34 |
| 14 | in your boxes? | | 10:34 |
| 15 | A. | Sure. | 10:34 |
| 16 | Q. | I'm going to put an exhibit sticker on | 10:34 |
| 17 | this. | | 10:34 |
| 18 | A. | Sure. | 10:34 |
| 19 | Q. | These go together, these two? | 10:34 |
| 20 | A. | Yes. | 10:34 |
| 21 | Q. | Okay. | 10:34 |
| 22 | A. | One's for Mylan documents and others | 10:34 |
| 23 | were a Plaintiffs' exhibit, if I'm not mistaken. | | 10:34 |
| 24 | Q. | Okay.  So.  I am going -- | 10:35 |
| 25 | A. | They were organized differently on the | 10:35 |

Page 45

1    website.                                        10:35
2         Q.    I'm going to put Exhibit 107 on the list    10:35
3    you made of the Mylan documents and 108 on the   10:35
4    Plaintiffs' exhibits; okay?                      10:35
5         (Whereupon, Exhibits 107 and 108 were marked   10:35
6    for identification)                              10:35
7         A.    Okay.                                 10:35
8         Q.    I partially obscured your e-mail address   10:35
9    for this one; okay.                              10:35
10        Tell us all in general what process validation   10:35
11   is briefly.                                      10:35
12        A.    Briefly, process validation is just the   10:35
13   process of following a protocol, delineating those   10:35
14   critical components in the manufacturing process   10:35
15   that need to be varied and see the observing     10:35
16   effect on the product you have.                  10:36
17        Q.    Once a pharmaceutical company has     10:36
18   validated a process in manufacturing a           10:36
19   pharmaceutical --                                10:36
20        A.    Uh-huh.                               10:36
21        Q.    -- does that in essence mean that they   10:36
22   have shown that they can make the drug within its   10:36
23   specifications consistently?                     10:36
24        A.    That is the purpose of process        10:36
25   validation in general.  However, I will tell you   10:36

PLAINTIFFS' EXHIBITS 001269

|  |  | Page 46 |
|---|---|---|
| 1 | this:  I am not a process validation expert.  I | 10:36 |
| 2 | support process validation from a laboratory, | 10:36 |
| 3 | cross-functional standpoint, including reviewing | 10:36 |
| 4 | the protocols and looking at the samples that are | 10:36 |
| 5 | to be tested and how they are to be tested. | 10:36 |
| 6 | Q.    Okay.  So you have been involved in | 10:36 |
| 7 | process validation from the what I would call QC | 10:36 |
| 8 | or lab perspective; right? | 10:36 |
| 9 | A.    No, analytical R&D. | 10:36 |
| 10 | Q.    Okay. | 10:36 |
| 11 | A.    Which is different than a QC. | 10:36 |
| 12 | Q.    Not even finished product testing? | 10:36 |
| 13 | A.    No, that's not true.  I've done both. | 10:36 |
| 14 | Q.    Okay.  But the fact is that when you | 10:37 |
| 15 | have a process validation for the manufacturer of | 10:37 |
| 16 | a pharmaceutical, it includes the equipment you're | 10:37 |
| 17 | going to use to blend it, press it, package it, | 10:37 |
| 18 | and all the steps you're going to take to test it | 10:37 |
| 19 | to assure as best you can that you consistently | 10:37 |
| 20 | produce the product within its ANDA or NDA or USP | 10:37 |
| 21 | specs; correct? | 10:37 |
| 22 | A.    In general I'd say that's a fair | 10:37 |
| 23 | assessment. | 10:37 |
| 24 | Q.    And when the FDA approved the ANDA for | 10:37 |
| 25 | Digitek, at least at some point the FDA was | 10:37 |

PLAINTIFFS' EXHIBITS 001270

Page 47

| | |
|---|---|
| 1 | satisfied that the processes to make that drug had | 10:37 |
| 2 | been validated; correct? | 10:37 |
| 3 | A.   By review of the application, what was | 10:38 |
| 4 | in the application and what was associated with | 10:38 |
| 5 | the process validation, yes, at that time. | 10:38 |
| 6 | Q.   Okay.  Now have you been in the | 10:38 |
| 7 | pharmaceutical business long enough to know what | 10:38 |
| 8 | the batch certification program was? | 10:38 |
| 9 | A.   After reviewing the documents related to | 10:38 |
| 10 | this case, yes. | 10:38 |
| 11 | Q.   All right.  And batch certification was | 10:38 |
| 12 | when you actually had to submit samples of product | 10:38 |
| 13 | to the FDA from a batch before you could ship it | 10:38 |
| 14 | to market; correct? | 10:38 |
| 15 | A.   All I know is what I'm familiar with, | 10:38 |
| 16 | with this case, that Digitek was part of that.  As | 10:38 |
| 17 | far as other drugs, I couldn't say. | 10:38 |
| 18 | Q.   All right.  So, for example, have you | 10:38 |
| 19 | ever seen Exhibit 4, which was a letter from FDA | 10:38 |
| 20 | to what later became my client verified or | 10:38 |
| 21 | certifying that these batches could be | 10:39 |
| 22 | distributed? | 10:39 |
| 23 | Have you ever seen that letter? | 10:39 |
| 24 | A.   Possibly. | 10:39 |
| 25 | Q.   Have you ever seen Exhibit 5?  Please | 10:39 |

PLAINTIFFS' EXHIBITS 001271

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 48

| | | |
|---|---|---|
| 1 | take a look at Exhibit 5. | 10:39 |
| 2 | A.    Uh-huh. | 10:39 |
| 3 | Q.    I will tell you that it's a letter from | 10:39 |
| 4 | July 1995 from the FDA to Amide exempting it from | 10:39 |
| 5 | the batch certification process. | 10:39 |
| 6 | Have you ever seen that? | 10:39 |
| 7 | A.    I don't recall. | 10:39 |
| 8 | Q.    At least -- | 10:40 |
| 9 | A.    It's possible it could be part of the | 10:40 |
| 10 | ANDA package and I may have seen it, but I'm not | 10:40 |
| 11 | sure. | 10:40 |
| 12 | Q.    At least as of that time -- | 10:40 |
| 13 | A.    Uh-huh. | 10:40 |
| 14 | Q.    -- FDA was satisfied that Actavis was | 10:40 |
| 15 | making this product within its specifications | 10:40 |
| 16 | consistently so that it didn't need the advance | 10:40 |
| 17 | approval to ship product to market.  Is that | 10:40 |
| 18 | essentially what that says? | 10:40 |
| 19 | A.    Let me take a look at this.  As I | 10:40 |
| 20 | understand the batch certification process back in | 10:40 |
| 21 | 1995, from what I have reviewed from these case | 10:40 |
| 22 | documents, I'd say that statement is accurate. | 10:40 |
| 23 | Q.    All right.  Now have you heard the | 10:40 |
| 24 | phrase in the pharmaceutical business a process | 10:40 |
| 25 | that is in control? | 10:40 |

PLAINTIFFS' EXHIBITS 001272

|    |    |                                                 | Page 49 |
|----|----|-------------------------------------------------|---------|
| 1  | A. | Yes.                                            | 10:40   |
| 2  | Q. | So part of process validation is to             | 10:40   |
| 3  | assure that your process is in control; correct? |        | 10:41   |
| 4  | A. | Correct.                                        | 10:41   |
| 5  | Q. | Now, let's get back to your report and          | 10:41   |
| 6  | whether you look at --                          |         | 10:41   |
| 7  | A. | Whatever copy, yeah.                            | 10:41   |
| 8  | Q. | And just so you know, I think one               | 10:41   |
| 9  | version was produced in the Philadelphia        |         | 10:41   |
| 10 | litigation and the other was produced in the MDL. |      | 10:41   |
| 11 | I think that's what the difference is.          |         | 10:41   |
| 12 | A. | Okay.                                           | 10:41   |
| 13 | Q. | So you'll notice that the one on your           | 10:41   |
| 14 | right, 94 --                                    |         | 10:41   |
| 15 | A. | Yes.                                            | 10:41   |
| 16 | Q. | -- has a Philadelphia caption on it;            | 10:41   |
| 17 | okay?  See that up top?                         |         | 10:41   |
| 18 | A. | Yes.                                            | 10:41   |
| 19 | Q. | So look at 92, which was your MDL               | 10:41   |
| 20 | report.  Now in the first paragraph, where you say |     | 10:41   |
| 21 | purpose.                                        |         | 10:41   |
| 22 | A. | Uh-huh.                                         | 10:41   |
| 23 | Q. | In the last sentence you talk about a           | 10:41   |
| 24 | high likelihood that adulterated drug product made |     | 10:41   |
| 25 | it to the marketplace.                          |         | 10:42   |

PLAINTIFFS' EXHIBITS 001273

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|    |    |    | Page 50 |
|----|----|----|---------|
| 1  | Do you see that? | | 10:42 |
| 2  | A. | Yes. | 10:42 |
| 3  | Q. | And then if you go all the way back to | 10:42 |
| 4  | your conclusion at page 21, you talk about | | 10:42 |
| 5  | adulterated product making it to the marketplace. | | 10:42 |
| 6  | Do you see that? | | 10:42 |
| 7  | A. | Yes, I do. | 10:42 |
| 8  | Q. | Now, I reviewed your report pretty | 10:42 |
| 9  | carefully. | | 10:42 |
| 10 | A. | Uh-huh. | 10:42 |
| 11 | Q. | Nowhere do I see you make any statement | 10:42 |
| 12 | in this 21 page report that Digitek which was | | 10:42 |
| 13 | actually out of its specifications made it to the | | 10:42 |
| 14 | hands of consumers. | | 10:42 |
| 15 | Am I correct about that? | | 10:42 |
| 16 | A. | In this report? | 10:42 |
| 17 | Q. | Yes, sir. | 10:42 |
| 18 | A. | I don't know if I agree with that. | 10:42 |
| 19 | Q. | Let me ask that a different way. | 10:43 |
| 20 | A. | Uh-huh. | 10:43 |
| 21 | Q. | In the opinions section of your report | 10:43 |
| 22 | -- | | 10:43 |
| 23 | A. | Uh-huh. | 10:43 |
| 24 | Q. | -- anywhere do you say that out of | 10:43 |
| 25 | specification Digitek made it to the hands of | | 10:43 |

|  |  | Page 51 |
|---|---|---|
| 1 | consumers or to the marketplace? | 10:43 |
| 2 | A.    Those specific words, out of | 10:43 |
| 3 | specification? | 10:43 |
| 4 | Q.    Yes, sir. | 10:43 |
| 5 | A.    I don't believe I used the term "out of | 10:44 |
| 6 | specification."  However, if you look at 22, we | 10:45 |
| 7 | have an instance it goes back to my references | 10:45 |
| 8 | that there was a pharmacist in Bellingham, | 10:45 |
| 9 | Washington, who found double-thick tablets which | 10:45 |
| 10 | would be out of specification. | 10:45 |
| 11 | Q.    Okay.  I'm asking in your opinions | 10:45 |
| 12 | section in your report, that would be a fact upon | 10:45 |
| 13 | which you would rely.  I'm asking if in any | 10:45 |
| 14 | opinion section? | 10:45 |
| 15 | A.    Used the word specification? | 10:45 |
| 16 | Q.    Yeah.  No, out of specification. | 10:45 |
| 17 | A.    Not that I recall. | 10:45 |
| 18 | Q.    Is there anywhere in the opinions | 10:45 |
| 19 | section in your report where you render an opinion | 10:45 |
| 20 | that dangerous Digitek made it to the marketplace | 10:45 |
| 21 | or into the hands of consumers? | 10:45 |
| 22 | A.    I did not use the word dangerous; | 10:45 |
| 23 | however, you know it's -- | 10:45 |
| 24 | Q.    Is there any place? | 10:45 |
| 25 | MR. KERENSKY:  Wait.  He just said | 10:45 |

PLAINTIFFS' EXHIBITS 001275

Page 52

| | | |
|---|---|---|
| 1 | "however." | 10:45 |
| 2 | MR. MORIARTY: I don't. I want answers | 10:45 |
| 3 | to my questions. | 10:45 |
| 4 | MR. KERENSKY: No, he gets to say | 10:45 |
| 5 | "however", if he wants to say "however." | 10:46 |
| 6 | MR. MORIARTY: Go ahead with your | 10:46 |
| 7 | however. | 10:46 |
| 8 | THE WITNESS: However, you look through | 10:46 |
| 9 | the literature that was available to me, it's | 10:46 |
| 10 | obvious that Digitek which was out of | 10:46 |
| 11 | specification -- thick, thin, whatever -- has | 10:46 |
| 12 | showed up several times in the marketplace. | 10:46 |
| 13 | BY MR. MORIARTY: | 10:46 |
| 14 | Q.   We'll get to that. | 10:46 |
| 15 | A.   Okay. | 10:46 |
| 16 | Q.   Is there anywhere in your report where | 10:46 |
| 17 | you render an opinion that defective Digitek made | 10:46 |
| 18 | it to the marketplace? | 10:46 |
| 19 | A.   I don't believe I used the word | 10:46 |
| 20 | "defective." | 10:46 |
| 21 | Q.   Your conclusion in the both the | 10:46 |
| 22 | beginning and end is that it was adulterated; | 10:46 |
| 23 | correct? | 10:46 |
| 24 | A.   Digitek that was not manufactured to its | 10:46 |
| 25 | specifications made it to the market; therefore, | 10:46 |

PLAINTIFFS' EXHIBITS 001276

Page 53

| | | |
|---|---|---|
| 1 | by definition, it would be adulterated. | 10:46 |
| 2 | Q.    Can you identify a single Plaintiff in | 10:46 |
| 3 | this litigation who received out-of-specification | 10:46 |
| 4 | Digitek? | 10:47 |
| 5 | A.    An individual per se? | 10:47 |
| 6 | Q.    Yeah. | 10:47 |
| 7 | A.    I'm not familiar with the individuals | 10:47 |
| 8 | who found the cases. | 10:47 |
| 9 | Q.    Now, you know what a -- in general what | 10:47 |
| 10 | a double-thick tablet is, do you not? | 10:47 |
| 11 | A.    As described in the documents that I | 10:47 |
| 12 | reviewed, I'd say yes.  I've personally never seen | 10:47 |
| 13 | any double-thick tablet. | 10:47 |
| 14 | Q.    Not even in this litigation, nobody has | 10:47 |
| 15 | ever shown you one; right? | 10:47 |
| 16 | A.    From what I understand, nobody retained | 10:47 |
| 17 | any of the double-thick tablets. | 10:47 |
| 18 | Q.    Do you have some understanding that | 10:47 |
| 19 | somebody actually had one and threw it away? | 10:47 |
| 20 | A.    I wouldn't say that I know they threw it | 10:47 |
| 21 | away.  I know they had them. | 10:47 |
| 22 | Q.    Oh, tell me who had one. | 10:47 |
| 23 | A.    Well, first the pharmacist had one. | 10:47 |
| 24 | Q.    In 2003 or 4? | 10:48 |
| 25 | A.    I will take a look and see what date | 10:48 |

PLAINTIFFS' EXHIBITS 001277

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  | Page 54 |
|---|---|---|
| 1 | that was. | 10:48 |
| 2 | Q. Trust me. It was 2003 or 2004 if you're | 10:48 |
| 3 | talking about the Bellingham, Washington | 10:48 |
| 4 | incident. | 10:48 |
| 5 | A. All right. | 10:48 |
| 6 | Q. Okay. So was 2003 Digitek recalled? | 10:48 |
| 7 | A. I don't recall. | 10:48 |
| 8 | Q. When was the first batch of recalled | 10:48 |
| 9 | Digitek manufactured? | 10:48 |
| 10 | A. I have to look. | 10:48 |
| 11 | Q. Do you remember what the FDA said about | 10:48 |
| 12 | the 2004 incident? | 10:48 |
| 13 | A. No. | 10:48 |
| 14 | Q. Do you know what an establishment | 10:48 |
| 15 | inspection report is? | 10:48 |
| 16 | A. I do. | 10:48 |
| 17 | Q. Let me make sure I didn't write on | 10:48 |
| 18 | this. This is the EIR from the fall of 2004. | 10:48 |
| 19 | A. Uh-huh. | 10:49 |
| 20 | Q. First of all, you know that that | 10:49 |
| 21 | double-thick tablet incident was investigated by | 10:49 |
| 22 | Amide; correct? | 10:49 |
| 23 | A. Investigated as part of a manufacturing | 10:49 |
| 24 | investigation? | 10:49 |
| 25 | Q. Yes. | 10:49 |

PLAINTIFFS' EXHIBITS 001278

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|   |   |   | Page 55 |
|---|---|---|---|
| 1 | A. | Yes. | 10:49 |
| 2 | Q. | And you know that it was reported to the | 10:49 |
| 3 | FDA in a field alert; correct? | | 10:49 |
| 4 | A. | I've never seen a field alert. | 10:49 |
| 5 | Q. | They didn't make that available to you? | 10:49 |
| 6 | A. | Not that I recall.  It may have been on | 10:49 |
| 7 | the list, but I do not specifically require seeing | | 10:49 |
| 8 | a field alert. | | 10:50 |
| 9 | MR. FITZPATRICK:  And could you pass | | 10:50 |
| 10 | Exhibit 5? | | 10:50 |
| 11 | MR. MORIARTY:  Yeah, but I need my copy | | 10:50 |
| 12 | for a second, if you don't mind. | | 10:50 |
| 13 | BY MR. MORIARTY: | | 10:50 |
| 14 | Q. | Turn to page 6 of the 2004 EIR. | 10:50 |
| 15 | A. | Exhibit 20? | 10:50 |
| 16 | Q. | Yes, sir.  And first of all, I don't | 10:50 |
| 17 | remember.  Have you seen this EIR as part of your | | 10:50 |
| 18 | review? | | 10:50 |
| 19 | A. | No, this is for a preapproval inspection | 10:50 |
| 20 | for another product. | | 10:50 |
| 21 | Q. | Well, look at page 6.  You see the bold, | 10:50 |
| 22 | centered, in all cap, field alert reporting? | | 10:50 |
| 23 | A. | I do. | 10:51 |
| 24 | Q. | All right.  It describes this report | 10:51 |
| 25 | from a pharmacist of a quote "thick tablet." | | 10:51 |

PLAINTIFFS' EXHIBITS 001279

| | | |
|---|---|---|
| 1 | Do you see that? | 10:51 |
| 2 | A.    I do. | 10:51 |
| 3 | Q.    From lot 3611(a), with an expiration in | 10:51 |
| 4 | December of '04. | 10:51 |
| 5 | Do you see that? | 10:51 |
| 6 | A.    I do. | 10:51 |
| 7 | Q.    Now, certainly -- withdraw that. | 10:51 |
| 8 | New Jersey District Compliance Branch was | 10:51 |
| 9 | notified by the site and the investigation was | 10:51 |
| 10 | completed at the time of inspection; correct? | 10:51 |
| 11 | A.    That's what it says. | 10:51 |
| 12 | Q.    In other words, the company told FDA | 10:51 |
| 13 | about this incident; right? | 10:51 |
| 14 | A.    Uh-huh. | 10:51 |
| 15 | Q.    That's a yes? | 10:51 |
| 16 | A.    At the time of the inspection, yes. | 10:51 |
| 17 | Q.    All right.  And the field alert report | 10:51 |
| 18 | noted quote, "The most probable cause of the thick | 10:51 |
| 19 | tablet was a set up problem"; correct?  Is that | 10:51 |
| 20 | what it says? | 10:52 |
| 21 | A.    It says manufacturing set up problem. | 10:52 |
| 22 | Set up, yes. | 10:52 |
| 23 | Q.    And then it talks about procedural | 10:52 |
| 24 | enhancements and training, does it not? | 10:52 |
| 25 | A.    Yes. | 10:52 |

PLAINTIFFS' EXHIBITS 001280

Page 57

1      Q.    And then it says, "No additional                10:52
2   complaints or reports of thick tablets have been         10:52
3   received for this high volume product.  The event        10:52
4   was considered an isolated incident and corrective       10:52
5   actions were put in place to prevent its                 10:52
6   reoccurrence.  Corrective actions were verified          10:52
7   during the inspection."                                  10:52
8      Did I read that correctly?                            10:52
9      A.    Corrective actions, procedural                  10:52
10  enhancements, review of complaint files were             10:52
11  verified during inspection.                              10:52
12     Q.    Correct?                                        10:52
13     A.    Yes, that's what it says.                       10:52
14     Q.    Do you have some reason to disagree with        10:52
15  the FDA that this event was an isolated incident?        10:52
16     A.    Yes, I do.                                      10:52
17     Q.    Okay.  Show me any evidence that you            10:52
18  have that any extra thick tablet made it into the        10:52
19  hands of a pharmacist or consumer after 2004.            10:52
20        MR. FITZPATRICK:  Let me interpose an              10:53
21     objection as to form.                                10:53
22  BY MR. MORIARTY:                                         10:53
23     Q.    What are you looking for?                       10:53
24     A.    I'm looking for an e-mail chain that            10:53
25  shows a pharmacist somewhere in Massachusetts            10:53

PLAINTIFFS' EXHIBITS 001281

Page 58

| | | |
|---|---|---|
| 1 | found double-thick tablets in a card. | 10:53 |
| 2 | Q.   Excellent.   Here it is.   Okay.   I'm | 10:53 |
| 3 | showing you Exhibit 59.  Is that the document that | 10:54 |
| 4 | you are looking at from your own file? | 10:54 |
| 5 | A.   No, it's not. | 10:55 |
| 6 | Q.   Yeah, it's not because my staff didn't | 10:55 |
| 7 | copy the second page.  Let me see that, please. | 10:55 |
| 8 | A.   Sure.  The yellow tab is the specific | 10:55 |
| 9 | reference to it. | 10:55 |
| 10 | Q.   Okay.  That is supposed to be Exhibit | 10:55 |
| 11 | 59. | 10:55 |
| 12 | A.   Okay. | 10:55 |
| 13 | Q.   My staff did not copy the part at the | 10:55 |
| 14 | back; okay? | 10:55 |
| 15 | A.   Okay. | 10:55 |
| 16 | Q.   So let me ask you some questions about | 10:55 |
| 17 | that. | 10:55 |
| 18 | It's in an e-mail; correct? | 10:55 |
| 19 | A.   It is. | 10:55 |
| 20 | Q.   Have you seen any evidence that that | 10:55 |
| 21 | tablet or card of tablets was returned to Actavis | 10:55 |
| 22 | or Mylan for analysis? | 10:56 |
| 23 | A.   I have not seen any documentation that | 10:56 |
| 24 | shows that any chemical testing has been done on | 10:56 |
| 25 | any of the thick, thin, or whatever tablets. | 10:56 |

PLAINTIFFS' EXHIBITS 001282

Page 59

| | |
|---|---|
| 1    Q.    I didn't ask about chemical testing. | 10:56 |
| 2  All I did was ask if you've seen any documents to | 10:56 |
| 3  indicate that that tablet or card of tablets was | 10:56 |
| 4  returned to Actavis or Mylan. | 10:56 |
| 5    A.    This is the only reference that I've | 10:56 |
| 6  seen with respect to these. | 10:56 |
| 7    Q.    And it contains no statement that the | 10:56 |
| 8  tablet or tablets were returned to Actavis or | 10:57 |
| 9  Mylan; correct? | 10:57 |
| 10    A.    This e-mail does not say that it was | 10:57 |
| 11  returned. | 10:57 |
| 12    Q.    Was it in a blister pack? | 10:57 |
| 13    A.    It says the card had four tablets. | 10:57 |
| 14    Q.    Do you take that to mean blister pack? | 10:58 |
| 15    A.    I'm not sure.  I'm not sure what it | 10:58 |
| 16  means. | 10:58 |
| 17    Q.    Was it removed from the card or blister | 10:58 |
| 18  pack? | 10:58 |
| 19    A.    It says here just that the remaining | 10:58 |
| 20  tablets are in a blister pack -- not a blister | 10:58 |
| 21  pack but a card.  That's it.  That's all that it | 10:58 |
| 22  says. | 10:58 |
| 23    Q.    Do you know anything about the | 10:58 |
| 24  manufacturer specifications of the card or blister | 10:58 |
| 25  pack in which those tablets were? | 10:58 |

PLAINTIFFS' EXHIBITS 001283

Page 60

| | | |
|---|---|---|
| 1 | A. No, I don't know anything about those. | 10:58 |
| 2 | Q. So you don't know whether a blister pack | 10:58 |
| 3 | would even accommodate an extra thick tablet, do | 10:58 |
| 4 | you? | 10:58 |
| 5 | A. I'd have to go look at the documentation | 10:59 |
| 6 | because some of the documents I reviewed with | 10:59 |
| 7 | respect to UDL talks about that issue. | 10:59 |
| 8 | Q. And if this blister pack or card had | 10:59 |
| 9 | been made by UDL, a double-thick tablet couldn't | 10:59 |
| 10 | fit in it, could it? | 10:59 |
| 11 | A. I couldn't say. | 10:59 |
| 12 | Q. Do you remember what the specs were? | 10:59 |
| 13 | A. I don't remember the specs. | 10:59 |
| 14 | Q. Would a wise and prudent manufacturer | 10:59 |
| 15 | use so much raw materials of plastic and tinfoil | 10:59 |
| 16 | to accommodate more space than they needed in the | 10:59 |
| 17 | blister pack? | 10:59 |
| 18 | A. Could you say that again? | 10:59 |
| 19 | Q. Would a prudent manufacturer use more | 10:59 |
| 20 | plastic and tinfoil than needed to package the | 10:59 |
| 21 | tablets in a blister pack? | 10:59 |
| 22 | A. I don't think you can draw the | 10:59 |
| 23 | conclusion that a double tablet would not fit in a | 10:59 |
| 24 | blister pack. You just don't have enough | 10:59 |
| 25 | information to do that. | 10:59 |

PLAINTIFFS' EXHIBITS 001284

Page 61

| | | |
|---|---|---|
| 1 | Q.    You don't. | 10:59 |
| 2 | A.    No.  I don't think anybody does from the | 10:59 |
| 3 | literature I've read. | 11:00 |
| 4 | Q.    Okay.  Did anybody in that e-mail remove | 11:00 |
| 5 | a tablet and measure it with a micrometer? | 11:00 |
| 6 | A.    Not according to this e-mail.  And | 11:00 |
| 7 | that's a really interesting point out of all of | 11:00 |
| 8 | this that's very striking when you look at all the | 11:00 |
| 9 | data. | 11:00 |
| 10 | Q.    You have to answer my question. | 11:00 |
| 11 | MR. KERENSKY:  He just said he did. | 11:00 |
| 12 | MR. MORIARTY:  I don't want a speech, | 11:00 |
| 13 | Mike.  I want to know whether anybody | 11:00 |
| 14 | indicates that they removed it and measured it | 11:00 |
| 15 | with a micrometer, yes or no? | 11:00 |
| 16 | THE WITNESS:  In this e-mail, no. | 11:00 |
| 17 | MR. KERENSKY:  Wait a minute.  Wait a | 11:00 |
| 18 | minute. | 11:00 |
| 19 | MR. MORIARTY:  I'm going to let him make | 11:00 |
| 20 | his speech in minute; okay? | 11:00 |
| 21 | MR. KERENSKY:  Let him finish his answer. | 11:00 |
| 22 | MR. MORIARTY:  I want to ask my | 11:00 |
| 23 | questions. | 11:00 |
| 24 | MR. KERENSKY:  Let him finish his | 11:00 |
| 25 | answer.  Right now. | 11:00 |

David Bliesner, Ph.D.        Videotaped        January 25, 2011

Page 62

| | | |
|---|---|---|
| 1 | MR. MORIARTY: He did. He said correct. | 11:00 |
| 2 | MR. KERENSKY: He did not. You | 11:00 |
| 3 | interrupted him right in the middle? | 11:00 |
| 4 | Q. Now if you -- | 11:00 |
| 5 | MR. KERENSKY: Stop. The deposition is | 11:00 |
| 6 | stopped. | 11:00 |
| 7 | MR. MORIARTY: You think you have the | 11:00 |
| 8 | authority to do that under PTL 22? | 11:00 |
| 9 | MR. KERENSKY: I think I do. I'll take | 11:00 |
| 10 | the chance. Are you going to let him finish | 11:00 |
| 11 | his answer? | 11:00 |
| 12 | BY MR. MORIARTY: | 11:00 |
| 13 | Q. Go ahead and finish your speech. | 11:00 |
| 14 | A. Speech? | 11:00 |
| 15 | Q. Yeah, go ahead. | 11:00 |
| 16 | A. I -- to tell you the truth -- because of | 11:00 |
| 17 | that exchange, I don't know where the question | 11:00 |
| 18 | was. | 11:01 |
| 19 | MR. KERENSKY: Okay. Let's go back up | 11:01 |
| 20 | and pick up where he interrupted you and then | 11:01 |
| 21 | you can finish your thought. You have the | 11:01 |
| 22 | right to do that. | 11:01 |
| 23 | (Whereupon, the testimony was read | 11:01 |
| 24 | back by the court reporter, as recorded above) | 11:01 |
| 25 | MR. KERENSKY: Finish your thought and | 11:01 |

PLAINTIFFS' EXHIBITS 001286

Page 63

```
 1    then move on.                                        11:01
 2         THE WITNESS:  Yeah, it's been                   11:01
 3    demonstrated that a significant number -- when       11:01
 4    you look at FDA findings and reports or              11:01
 5    whatever -- of double-thick tablets that were        11:01
 6    produced, nobody ever performed any testing on       11:01
 7    those, according to the record that I can            11:01
 8    find.  Which is really unusual because we            11:01
 9    don't know whether it's out of spec or in            11:01
10    spec, all the points that you are going to,          11:01
11    you just don't know because nobody apparently        11:02
12    did it.  Or if they did it, they didn't report       11:02
13    it.                                                  11:02
14 BY MR. MORIARTY:                                        11:02
15    Q.    Are you done?                                  11:02
16    A.    Yes, sir.                                      11:02
17    Q.    So according to this e-mail, whatever          11:02
18 tablet or tablets those were -- first of all, it        11:02
19 only refers to one tablet doesn't it, in the            11:02
20 card?  It doesn't say all four were double; right?      11:02
21    A.    It says please be advised that Lynne           11:02
22 Farrell of CSC reports finding a card of Digoxin        11:02
23 with one double thick tablet at GL-Gloucester.          11:02
24    Q.    What a CSC?                                    11:02
25    A.    I don't know.                                  11:02
```

PLAINTIFFS' EXHIBITS 001287

```
                                                   Page 64
 1      Q.    So you don't know anything about the    11:02
 2    reliability of this person who supposedly found 11:02
 3    this; correct?                                   11:02
 4      A.    It's an e-mail.  It would be difficult   11:02
 5    to do that.                                      11:02
 6      Q.    All right.  And certainly this was not   11:02
 7    in the hands or mouth of a consumer; correct?    11:02
 8      A.    This particular one right here?          11:02
 9      Q.    Right.                                   11:02
10      A.    From the e-mail, that's the conclusion   11:02
11    you could probably draw.                         11:02
12      Q.    If you were using the scientific method  11:02
13    to figure out -- you're called in as a consultant 11:02
14    to find out if double-thick tablets have actually 11:03
15    made it to the hands of consumers and you're using 11:03
16    the scientific method with data, this e-mail is  11:03
17    not a particularly reliable report, is it?       11:03
18          MR. FITZPATRICK:  Object to the form.      11:03
19          THE WITNESS:  I wouldn't consider this a   11:03
20      report.  It's a statement in an e-mail.        11:03
21    BY MR. MORIARTY:                                 11:03
22      Q.    So it's not reliable data for you as a   11:03
23    scientist to conclude that that was in fact a    11:03
24    double-thick tablet; is that correct?            11:03
25      A.    I don't think that's correct.  It's      11:03
```

David Bliesner, Ph.D.        Videotaped        January 25, 2011

                                                    Page 65

1    something that starts a formal investigation.      11:03

2    It's a piece of data.                              11:03

3        Q.    With no measurement and no removal from  11:03

4    its packaging; correct?                            11:03

5        A.    Correct.  But observation is one of the  11:04

6    critical components to scientific experiment.  And 11:04

7    observations such as this are critical when you're 11:04

8    conducting investigations.                         11:04

9        Q.    Have you ever tried to observe the       11:04

10   thickness down to the millimeter of a tablet in a  11:04

11   blister pack?                                       11:04

12       A.    In a blister pack?                        11:04

13       Q.    Yeah.                                     11:04

14       A.    Down to the millimeter?                   11:04

15       Q.    Yes, sir.  That's how thin these tablets  11:04

16   are, isn't it?                                      11:04

17       A.    I forget what the spec is for            11:04

18   thickness.  Me, personally, looking a blister pack  11:04

19   --                                                  11:04

20       Q.    Yes.                                      11:04

21       A.    -- and trying to estimate what the       11:04

22   thickness would be, no, I had no -- would have no   11:04

23   desire or need to do that.  You wouldn't estimate   11:04

24   if you're trying to come up with a spec.  You'd     11:04

25   measure it.                                         11:04

PLAINTIFFS' EXHIBITS 001289

Page 66

| | | |
|---|---|---|
| 1 | Q.   So we started this line of questions | 11:04 |
| 2 | with you know what a double-thick tablet is or an | 11:04 |
| 3 | oversized tablet; correct? | 11:04 |
| 4 | A.   As they're referring to it in this | 11:04 |
| 5 | deposition, yes. | 11:05 |
| 6 | Q.   In any context in the pharmaceutical | 11:05 |
| 7 | industry if somebody said to you we have oversized | 11:05 |
| 8 | tablets or double-thick tablets, you know what | 11:05 |
| 9 | that is; right? | 11:05 |
| 10 | A.   This is the first time that I've heard | 11:05 |
| 11 | reference in the industry to a double-thick | 11:05 |
| 12 | tablet.  It's that unique a situation. | 11:05 |
| 13 | Q.   Okay.  Do you know how many recalls | 11:05 |
| 14 | there have been in the last 36 months for extra | 11:05 |
| 15 | thick tablets in the pharmaceutical industry? | 11:05 |
| 16 | A.   I do not. | 11:05 |
| 17 | Q.   And you know what a normal tablet with | 11:05 |
| 18 | too much active pharmaceutical ingredient is, | 11:05 |
| 19 | don't you? | 11:05 |
| 20 | A.   I don't know if I understand the | 11:05 |
| 21 | question.  You can't just look at a tablet and | 11:05 |
| 22 | know how much ingredient is in it. | 11:05 |
| 23 | Q.   I didn't imply or ask you if you could. | 11:05 |
| 24 | But a normal-sized tablet could have too much | 11:05 |
| 25 | active pharmaceutical ingredient; correct? | 11:05 |

PLAINTIFFS' EXHIBITS 001290

|  |  | Page 67 |
|---|---|---|
| 1 | A.    Yes. | 11:05 |
| 2 | Q.    You could assay or content uniformity | 11:05 |
| 3 | test that tablet to determine that; correct? | 11:05 |
| 4 | A.    Yes. | 11:05 |
| 5 | Q.    Do you know enough about the | 11:06 |
| 6 | manufacturing process to say whether the root | 11:06 |
| 7 | cause of an extra thick is typically different | 11:06 |
| 8 | than the root cause of a normal size with too much | 11:06 |
| 9 | active pharmaceutical ingredient? | 11:06 |
| 10 | A.    Say that again. | 11:06 |
| 11 | (Whereupon, the testimony was read back | 11:06 |
| 12 | by the court reporter, as recorded above) | 11:06 |
| 13 | THE WITNESS:  Based on the information | 11:06 |
| 14 | and the data that I have here, Actavis | 11:06 |
| 15 | specifically indicated that there were | 11:06 |
| 16 | problems in the manufacturing of this product | 11:06 |
| 17 | very early on.  It was very difficult.  In | 11:06 |
| 18 | 19-- whatever, 2000.  And it took them a lot | 11:06 |
| 19 | to do it.  And as they moved forward and they | 11:07 |
| 20 | had problems, they had problems with blend | 11:07 |
| 21 | uniformity and then obviously with | 11:07 |
| 22 | manufacturing the tablet and, therefore, it is | 11:07 |
| 23 | possible -- based on the information I looked | 11:07 |
| 24 | at -- that you could have both of those | 11:07 |
| 25 | problems because of difficulties with blend | 11:07 |

PLAINTIFFS' EXHIBITS 001291

Page 68

| | | |
|---|---|---|
| 1 | uniformity and with tableting.  It's possible. | 11:07 |
| 2 | MR. MORIARTY:  Motion to strike.  It was | 11:07 |
| 3 | completely non-responsive to my question. | 11:07 |
| 4 | MR. KERENSKY:  He has to do that for the | 11:07 |
| 5 | judge. | 11:07 |
| 6 | THE WITNESS:  I understand. | 11:07 |
| 7 | MR. KERENSKY:  That's fine. | 11:07 |
| 8 | BY MR. MORIARTY: | 11:07 |
| 9 | Q.    I'm talking about manufacturing tablets | 11:07 |
| 10 | and whether you have any knowledge of whether | 11:07 |
| 11 | those two distinct problems in manufacturing have | 11:07 |
| 12 | different root causes. | 11:07 |
| 13 | A.    In general? | 11:07 |
| 14 | Q.    Yes. | 11:07 |
| 15 | A.    Say that again, please. | 11:08 |
| 16 | Q.    Okay. | 11:08 |
| 17 | A.    Because it's a very broad statement. | 11:08 |
| 18 | Q.    Let's get back to basics. | 11:08 |
| 19 | A.    Okay. | 11:08 |
| 20 | Q.    If somebody says you have extra thick or | 11:08 |
| 21 | double-thick tablets, that's a reference to size; | 11:08 |
| 22 | correct? | 11:08 |
| 23 | A.    I would assume so, yes. | 11:08 |
| 24 | Q.    All right.  And that size could be | 11:08 |
| 25 | caused by too much active pharmaceutical | 11:08 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                                    Page 69
 1    ingredient, too much excipient, inadequate        11:08

 2    compression making a fluffy tablet, double        11:08

 3    compression, could be caused by any number of     11:08

 4    things; correct?                                  11:08

 5         A.    That's -- there are many things it could  11:08

 6    be, yes.                                          11:08

 7         Q.    All right.  So a normal-sized tablet    11:08

 8    with too much active pharmaceutical ingredient is  11:08

 9    a different problem in the pharmaceutical          11:08

10    manufacturing process, isn't it?                  11:08

11         A.    I don't think you can say that          11:09

12    exclusively.  I think that, you know, it's a      11:09

13    manufacturing train, it's a process.  And if you  11:09

14    don't have control of your process, it's possible  11:09

15    to have those two events as a failure in the      11:09

16    process.                                          11:09

17         Q.    I'm not asking whether you can only have  11:09

18    one or the other.  I'm asking whether they're      11:09

19    different.  And if a tablet is normal-sized, by    11:09

20    definition it's not extra-thick or double-thick;   11:09

21    correct?                                          11:09

22         A.    Yes.                                    11:09

23         Q.    So a normal-sized tablet with too much  11:09

24    ABI, the problem is the amount of active           11:09

25    pharmaceutical ingredient; correct?               11:09
```

PLAINTIFFS' EXHIBITS 001293

Page 70

| | | |
|---|---|---|
| 1 | A.    I'm not trying to be difficult.  I'm | 11:09 |
| 2 | just trying to understand the question here.  I | 11:09 |
| 3 | apologize. | 11:09 |
| 4 | Q.    If I said to you -- | 11:09 |
| 5 | A.    Uh-huh. | 11:09 |
| 6 | Q.    -- Mr. Bliesner, I want you to come in | 11:09 |
| 7 | and consult with my pharmaceutical manufacturing | 11:10 |
| 8 | company. | 11:10 |
| 9 | A.    Uh-huh. | 11:10 |
| 10 | Q.    Our tablets are double-thick. | 11:10 |
| 11 | A.    Uh-huh. | 11:10 |
| 12 | Q.    And I tell you nothing more. | 11:10 |
| 13 | A.    Uh-huh. | 11:10 |
| 14 | Q.    The problem is a size problem to start | 11:10 |
| 15 | with; correct? | 11:10 |
| 16 | A.    Uh-huh. | 11:10 |
| 17 | Q.    Is that a yes? | 11:10 |
| 18 | A.    Double-thick, yes. | 11:10 |
| 19 | Q.    All right.  At some point you'd get to | 11:10 |
| 20 | the issue of what the active pharmaceutical | 11:10 |
| 21 | content of those tablets is if you were doing an | 11:10 |
| 22 | investigation; correct? | 11:10 |
| 23 | A.    Yes, it would be one of the first things | 11:10 |
| 24 | you'd do. | 11:10 |
| 25 | Q.    But if I told you that my problem was | 11:10 |

PLAINTIFFS' EXHIBITS 001294

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  |
|---|---|---|
|  |  | Page 71 |
| 1 | normal-sized tablets with too much API, the | 11:10 |
| 2 | investigation process would be different, correct, | 11:10 |
| 3 | because the problem is different. | 11:10 |
| 4 | A.    Actually, no. | 11:10 |
| 5 | Q.    All right.  Well, the focus would be on | 11:10 |
| 6 | why is there too much API; right? | 11:10 |
| 7 | A.    I don't think you'd look at those things | 11:10 |
| 8 | mutually exclusively. | 11:10 |
| 9 | Q.    Do you think the FDA knows the | 11:10 |
| 10 | difference between extra-thick tablets and tablets | 11:10 |
| 11 | of normal size but too much Digoxin? | 11:10 |
| 12 | A.    I'm sure they do. | 11:11 |
| 13 | Q.    Have you seen the FDA approved press | 11:11 |
| 14 | release for this recall? | 11:11 |
| 15 | A.    I'm not sure. | 11:11 |
| 16 | Q.    There you go.  Exhibit 36.  Have you | 11:11 |
| 17 | seen this? | 11:11 |
| 18 | A.    Yes, I have. | 11:12 |
| 19 | Q.    Okay.  It says: | 11:12 |
| 20 | "The voluntary all-out recall is due to the | 11:12 |
| 21 | possibility that tablets with double the | 11:12 |
| 22 | appropriate thickness may have been commercially | 11:12 |
| 23 | released." | 11:12 |
| 24 | A.    It does say that. | 11:12 |
| 25 | Q.    And in this sentence, the words | 11:12 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

```
                                              Page 72
 1    "possibility" and "may" are different than      11:12
 2    "probability" "likely" and "certainty"; correct?  11:12
 3          MR. KERENSKY:  Objection, vague.          11:12
 4    BY MR. MORIARTY:                                11:12
 5      Q.    Is that right?                          11:12
 6      A.    Again, we're back to the definition of  11:12
 7    "probable" and "possible."                      11:12
 8      Q.    Which you don't know the difference;    11:12
 9    right?                                          11:12
10      A.    In the context in this industry, as     11:12
11    having sat down and thought about it, like I said  11:12
12    before, no.                                     11:12
13      Q.    Well, at least the sentence "FDA        11:12
14    approved" doesn't say that we know for a fact that  11:13
15    double-thick tablets were commercially released;  11:13
16    right?  It doesn't say that.                    11:13
17      A.    It does not say that.  However, I have  11:13
18    never seen a recall notice that says absolutely.  11:13
19    This is the way they're stated.                 11:13
20      Q.    And then it says these tablets may      11:13
21    contain twice the approved level of active      11:13
22    ingredient than is appropriate; correct?        11:13
23      A.    It does say that.                       11:13
24      Q.    Have you seen any FDA document which    11:13
25    says that this recall was for normal-sized tablets  11:13
```

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 73

| | | |
|---|---|---|
| 1 | with too much active pharmaceutical ingredient? | 11:13 |
| 2 | A.    Recall document? | 11:13 |
| 3 | Q.    Any document.  Any -- | 11:13 |
| 4 | A.    Any document? | 11:13 |
| 5 | Q.    Any document from the FDA. | 11:13 |
| 6 | A.    Say it again.  Again -- | 11:13 |
| 7 | Q.    Have you seen any -- | 11:13 |
| 8 | A.    -- I'm not trying to be difficult.  I | 11:13 |
| 9 | just want to make sure I answer your question | 11:13 |
| 10 | correctly. | 11:13 |
| 11 | Q.    Have you seen any document from the | 11:13 |
| 12 | FDA -- whether it's a paper they promulgated, a | 11:14 |
| 13 | report, or a 483 warning letter, anything -- or | 11:14 |
| 14 | even their website -- to indicate that this recall | 11:14 |
| 15 | was for normal-sized tablets with too much | 11:14 |
| 16 | Digoxin. | 11:14 |
| 17 | A.    Not that I recall. | 11:14 |
| 18 | Q.    To your recollection, did the FDA ever | 11:14 |
| 19 | cite, warn, or observe that Digitek with normal | 11:14 |
| 20 | size but too much active pharmaceutical ingredient | 11:14 |
| 21 | had reached the marketplace? | 11:14 |
| 22 | A.    Can I take a look real quick at my | 11:15 |
| 23 | report? | 11:15 |
| 24 | Q.    Sure. | 11:15 |
| 25 | A.    My notes and my report, I don't have any | 11:18 |

PLAINTIFFS' EXHIBITS 001297

Page 74

| | |
|---|---|
| 1  record of the FDA making a statement like that. | 11:18 |
| 2      Q.    Please look at Exhibit 38.  Terry, I'll | 11:18 |
| 3  give you a copy. | 11:18 |
| 4      Do you know if you've ever seen this before, | 11:18 |
| 5  Mr. Bliesner? | 11:18 |
| 6      A.    I think I may have. | 11:18 |
| 7      Q.    All right.  Exhibit 38 is a printout | 11:18 |
| 8  from the FDA's website.  I believe this was posted | 11:18 |
| 9  in July of 2009, a year and a quarter after the | 11:18 |
| 10  recall. | 11:18 |
| 11      Go to the second page, please. | 11:19 |
| 12      A.    Uh-huh. | 11:19 |
| 13      Q.    First of all, this is called Facts and | 11:19 |
| 14  Myths About Generic Drugs; right? | 11:19 |
| 15      A.    Yes. | 11:19 |
| 16      Q.    And on the second page it says, "Myth, | 11:19 |
| 17  there are quality problems with generic drug | 11:19 |
| 18  manufacturing.  A recent recall of generic | 11:19 |
| 19  Digoxin -- called Digitek -- shows that generic | 11:19 |
| 20  drugs put patients at risk." | 11:19 |
| 21      Did I read that correctly? | 11:19 |
| 22      A.    Yes. | 11:19 |
| 23      Q.    And then it says, "Fact.  FDA's | 11:19 |
| 24  aggressive action in this case demonstrates the | 11:19 |
| 25  high standards to which all prescription drugs -- | 11:19 |

PLAINTIFFS' EXHIBITS 001298

David Bliesner, Ph.D.        Videotaped        January 25, 2011

Page 75

| | | |
|---|---|---|
| 1 | generic and brand name -- are held"; correct? | 11:19 |
| 2 | A.    Correct. | 11:19 |
| 3 | Q.    All right.  Let's go down to the third | 11:19 |
| 4 | bullet point. | 11:19 |
| 5 | A.    Yes. | 11:19 |
| 6 | Q.    Well, actually, let's go to the second | 11:19 |
| 7 | bullet point.  Well, I'm sorry.  Withdraw that. | 11:20 |
| 8 | Look at the first three bullet points. | 11:20 |
| 9 | A.    Okay. | 11:20 |
| 10 | Q.    All right.  What they are describing in | 11:20 |
| 11 | the first three bullet points is the incident in | 11:20 |
| 12 | November, December, January 2007 to 2008 regarding | 11:20 |
| 13 | batch 70924 with the 20 double-thick tablets; | 11:20 |
| 14 | correct? | 11:20 |
| 15 | A.    I don't know if that's the specific | 11:20 |
| 16 | batch.  I'd have to go back and look it up. | 11:20 |
| 17 | Q.    Trust me. | 11:20 |
| 18 | A.    Yeah. | 11:20 |
| 19 | Q.    Okay.  That's that they're talking | 11:20 |
| 20 | about; right? | 11:20 |
| 21 | A.    It appears. | 11:20 |
| 22 | Q.    All right.  So in the third bullet point | 11:20 |
| 23 | it says: | 11:20 |
| 24 | "Although Actavis attempted to remove the | 11:20 |
| 25 | affected Digitek through visual inspection, FDA | 11:20 |

PLAINTIFFS' EXHIBITS 001299

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 76

1    determined that this method of removal was                11:20

2    inadequate to assure the product quality and              11:20

3    consistency in accordance with the current good           11:21

4    manufacturing practice regulations"; correct?            11:21

5        A.    Sure.                                            11:21

6        Q.    So what they're referring to is an              11:21

7    inspection issue; is that right?                          11:21

8        A.    A visual inspection.                            11:21

9        Q.    Yes.                                             11:21

10       A.    Correct.                                         11:21

11       Q.    Bullet point 4, second sentence:               11:21

12       "In our best judgment, given the very small           11:21

13   number of defective tablets that may have reached         11:21

14   the market and the lack of reported adverse events        11:21

15   before the recall, harm to patients was very              11:21

16   unlikely."                                                11:21

17       First of all, did I read it correctly?               11:21

18       A.    You read it as written.                         11:21

19       Q.    Do you have some reason to disagree with        11:21

20   the FDA's findings in this regard?                        11:21

21       A.    Absolutely.                                     11:21

22       Q.    What's the basis for your disagreement          11:21

23   with FDA?                                                 11:21

24       A.    My disagreement with FDA, first of all,         11:21

25   there's political overtones that are always               11:21

Page 77

|    |                                                      |       |
|----|------------------------------------------------------|-------|
| 1  | associated with these statements reporting to the    | 11:21 |
| 2  | press at the FDA.  And if you go back and look at     | 11:22 |
| 3  | the FDA's record over the course of, you know, the    | 11:22 |
| 4  | last 20 years if you will, approximately, go back     | 11:22 |
| 5  | and look at the timeline, the FDA has repeatedly      | 11:22 |
| 6  | found this company to be in significant violation     | 11:22 |
| 7  | of the GMPs.  To my knowledge, this is only           | 11:22 |
| 8  | company that's ever been under consent decree         | 11:22 |
| 9  | twice.                                                | 11:22 |
| 10 | Q.    Are you done with your answer?                  | 11:22 |
| 11 | A.    For now, yes.                                   | 11:22 |
| 12 | Q.    Okay.  Can you explain to us all,               | 11:22 |
| 13 | please, what expertise you have in the political      | 11:22 |
| 14 | analysis of the FDA?                                  | 11:22 |
| 15 | Can you explain that to me, please, what              | 11:23 |
| 16 | expertise you have from your background, training,    | 11:23 |
| 17 | and experience, that you can assess the political     | 11:23 |
| 18 | overtones or motivations of this statement on the     | 11:23 |
| 19 | website?                                              | 11:23 |
| 20 | A.    In my experience, recent experience, I          | 11:23 |
| 21 | see serious discussions that go on between two        | 11:23 |
| 22 | major branches within the FDA that are often in       | 11:23 |
| 23 | conflict with one another.  Drug shortage, for        | 11:23 |
| 24 | instance, and compliance.  And they are very          | 11:23 |
| 25 | politically motivated and their purpose is that       | 11:23 |

Page 78

| | | |
|---|---|---|
| 1 | their ends are -- end missions are different. | 11:23 |
| 2 | That's my experience of it. | 11:24 |
| 3 | Q.    Is that a scientific opinion? | 11:24 |
| 4 | A.    We're talking about politics. | 11:24 |
| 5 | Q.    Okay.  So what would be the political | 11:24 |
| 6 | motivation a year and a quarter after a recall for | 11:24 |
| 7 | them to say this about the number of defective | 11:24 |
| 8 | tablets that may have reached the market and the | 11:24 |
| 9 | level of risk to consumers? | 11:24 |
| 10 | A.    Why would they say that? | 11:24 |
| 11 | Q.    Yeah.  What data do you have to say that | 11:24 |
| 12 | this is somehow politically motivated?  What's | 11:24 |
| 13 | your -- what's your underlying data? | 11:24 |
| 14 | A.    The underlying data is their | 11:24 |
| 15 | documentation in the establishment inspection | 11:24 |
| 16 | reports that shows gross violation of the GMPs | 11:24 |
| 17 | throughout the history of this company and that | 11:24 |
| 18 | they approved them after the first consent decree | 11:24 |
| 19 | as being okay and they ended up right back in the | 11:24 |
| 20 | same place.  So I would be hard pressed to want to | 11:24 |
| 21 | admit in public that they may have potentially not | 11:24 |
| 22 | served their mission correctly after the first | 11:25 |
| 23 | consent decree. | 11:25 |
| 24 | Q.    So if I understand what you're saying, | 11:25 |
| 25 | the FDA soft-pedaled this statement about the | 11:25 |

PLAINTIFFS' EXHIBITS 001302

Page 79

| | | |
|---|---|---|
| 1 | Digitek recall to deflect attention from their | 11:25 |
| 2 | lack of oversight for the company; is that right? | 11:25 |
| 3 | A.    Politically it's a possibility. | 11:25 |
| 4 | Q.    Is it a probability? | 11:25 |
| 5 | A.    I don't -- I don't agree with that | 11:25 |
| 6 | statement. | 11:25 |
| 7 | Q.    Is it a probability? | 11:25 |
| 8 | A.    I couldn't go anywhere back to | 11:25 |
| 9 | possibility, probability either. | 11:25 |
| 10 | Q.    Is it a certainty? | 11:25 |
| 11 | A.    I don't know.  We're talking politics | 11:25 |
| 12 | here, we're not talking science.  We shifted from | 11:25 |
| 13 | science to politics. | 11:25 |
| 14 | Q.    I didn't; you did.  I'm asking whether | 11:25 |
| 15 | you have some data to support the opinion you're | 11:25 |
| 16 | now giving. | 11:25 |
| 17 | A.    It's my opinion and it's a political | 11:25 |
| 18 | one.  And there are no direct data other than the | 11:25 |
| 19 | FDA's voluminous EIR 483 inspections, warning | 11:25 |
| 20 | letters. | 11:25 |
| 21 | THE VIDEOGRAPHER:  The time is     .  We | 11:26 |
| 22 | are going off the record briefly. | 11:26 |
| 23 | (Short break) | 11:31 |
| 24 | THE VIDEOGRAPHER:  The time is now | 11:31 |
| 25 | 11:32 a.m.  We are back on the record.  This | 11:31 |

PLAINTIFFS' EXHIBITS 001303

|  |  | Page 80 |
|---|---|---|
| 1 | is the beginning of tape three. | 11:31 |
| 2 | BY MR. MORIARTY: | 11:31 |
| 3 | Q.   Mr. Bliesner, the -- or Dr. Bliesner I'm | 11:31 |
| 4 | sorry -- the -- I haven't asked you this in any | 11:32 |
| 5 | detail.  I will get to it later. | 11:32 |
| 6 | I assume that your opinions in this case about | 11:32 |
| 7 | adulterated product are based on 483s; is that | 11:32 |
| 8 | correct? | 11:32 |
| 9 | A.   Partially. | 11:32 |
| 10 | Q.   And warning letters? | 11:32 |
| 11 | A.   Partially. | 11:32 |
| 12 | Q.   And establishment inspection reports? | 11:32 |
| 13 | A.   Partially. | 11:32 |
| 14 | Q.   Those are all FDA documents; correct? | 11:32 |
| 15 | A.   Correct. | 11:32 |
| 16 | Q.   And are they based on the fact that | 11:32 |
| 17 | there have been two consent decrees? | 11:32 |
| 18 | A.   What's based on two consent? | 11:32 |
| 19 | Q.   Your opinions. | 11:32 |
| 20 | A.   Partially. | 11:32 |
| 21 | Q.   Okay.  And those are, although not FDA | 11:32 |
| 22 | documents, they're negotiated with the FDA; is | 11:33 |
| 23 | that correct? | 11:33 |
| 24 | A.   Consent decree? | 11:33 |
| 25 | Q.   Yeah. | 11:33 |

PLAINTIFFS' EXHIBITS 001304

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  | Page 81 |
|--|--|--|--|
| 1 | A. | Yes. | 11:33 |
| 2 | Q. | Okay.  So what other documents besides | 11:33 |
| 3 | FDA documents are your opinions based on that my | | 11:33 |
| 4 | client made adulterated Digitek, in general? | | 11:33 |
| 5 | A. | In general? | 11:33 |
| 6 | Q. | Yeah. | 11:33 |
| 7 | A. | E-mail communications within the | 11:33 |
| 8 | company.  Responses to 483 warning letters. | | 11:33 |
| 9 | Q. | Anything else? | 11:33 |
| 10 | A. | Investigations. | 11:33 |
| 11 | Q. | Those are by the FDA; correct? | 11:33 |
| 12 | A. | A.   No, internal investigations. | 11:33 |
| 13 |  | (Interruption) | 11:34 |
| 14 | | MR. MORIARTY:  We can go off the record. | 11:34 |
| 15 | | THE VIDEOGRAPHER:  The time is now | 11:34 |
| 16 | 11:33 a.m.  We are going off the record. | | 11:34 |
| 17 | | (Short break) | 11:35 |
| 18 | | THE VIDEOGRAPHER:  The time is now | 11:35 |
| 19 | | a.m.  We are back on the record. | 11:35 |
| 20 | | THE WITNESS:  The Marine Corps kicked in | 11:35 |
| 21 | there for a second. | | 11:35 |
| 22 | BY MR. MORIARTY: | | 11:35 |
| 23 | Q. | Have any of the companies that you | 11:35 |
| 24 | worked for in the pharmaceutical business or with | | 11:35 |
| 25 | which you've consulted had recalls? | | 11:35 |

PLAINTIFFS' EXHIBITS 001305

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  |  | Page 82 |
|---|---|---|---|
| 1 | A. | Yes. | 11:35 |
| 2 | Q. | Have there been recalls in your | 11:35 |
| 3 | experience where there was no actual proof that | | 11:35 |
| 4 | there was out of specification, dangerous product | | 11:35 |
| 5 | in the market? | | 11:35 |
| 6 | A. | I'm sorry.  Still a bit distracted. | 11:35 |
| 7 | Please. | | 11:35 |
| 8 | Q. | Okay.  In your experience, have there | 11:35 |
| 9 | been recalls of pharmaceutical product to the | | 11:35 |
| 10 | consumer level where there was no actual proof | | 11:35 |
| 11 | that there was out of specification, dangerous | | 11:36 |
| 12 | product in the hands of consumers? | | 11:36 |
| 13 | A. | I can't think of a specific example. | 11:36 |
| 14 | Q. | In general have there been? | 11:36 |
| 15 | A. | Possibly. | 11:36 |
| 16 | Q. | Okay.  So, for example, there could be a | 11:36 |
| 17 | recall of a drug product because of a packaging | | 11:36 |
| 18 | issue.  The label might be on upside down; is that | | 11:36 |
| 19 | right? | | 11:36 |
| 20 | A. | Correct. | 11:36 |
| 21 | Q. | So the mere fact that there's a recall | 11:36 |
| 22 | does not in and of itself mean that the product is | | 11:36 |
| 23 | out of spec and dangerous to the consumer; right? | | 11:36 |
| 24 | A. | That's correct. | 11:36 |
| 25 | Q. | You want to know more about that if | 11:36 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 83

| | | |
|---|---|---|
| 1 | you're going to -- if you're going to determine | 11:36 |
| 2 | whether it's actually out of spec and dangerous to | 11:36 |
| 3 | consumers, you want to know more than just the | 11:36 |
| 4 | fact that there was a recall; right? | 11:36 |
| 5 | A.    Yes. | 11:36 |
| 6 | Q.    Okay.  Now, if the FDA says in effect | 11:36 |
| 7 | that a product is adulterated, does that always | 11:37 |
| 8 | lead to a recall? | 11:37 |
| 9 | A.    No. | 11:37 |
| 10 | Q.    Why not? | 11:37 |
| 11 | A.    Numerous reasons it could be that way. | 11:37 |
| 12 | Q.    Give me some, please. | 11:37 |
| 13 | A.    Hasn't shipped is the first thing that | 11:37 |
| 14 | comes to mind. | 11:37 |
| 15 | Q.    Okay. | 11:37 |
| 16 | A.    That would be the primary one. | 11:37 |
| 17 | Q.    Any others? | 11:37 |
| 18 | A.    No.  But, I'm not an expert in recalls. | 11:37 |
| 19 | Q.    Okay.  Well, the FDA could determine | 11:37 |
| 20 | that there is adulterated product and have a | 11:37 |
| 21 | recall not to the consumer level also; correct? | 11:37 |
| 22 | A.    As I understand, yes. | 11:38 |
| 23 | Q.    In other words, the FDA in effect is | 11:38 |
| 24 | making a determination that whatever product is | 11:38 |
| 25 | being recalled isn't necessarily dangerous to the | 11:38 |

PLAINTIFFS' EXHIBITS 001307

Page 84

1    consumers; right?                                    11:38

2        A.    A recall can be of something that isn't    11:38

3    necessarily an immediate danger as I understand      11:38

4    it, not being an expert in recalls.                  11:38

5        Q.    Okay.  So I'm showing you Exhibit 39.      11:38

6    Have you ever seen that before?                      11:38

7        A.    I don't think so.                          11:39

8        Q.    All right.  This is a printout from the    11:39

9    FDA's website.                                       11:39

10       A.    Uh-huh.                                     11:39

11       Q.    And it's entitled "Facts About Current     11:39

12   Good Manufacturing Practices"; correct?              11:39

13       A.    It is titled that, yes.                    11:39

14       Q.    And the fourth bold section down, says:    11:39

15       "If a manufacturer is not following cGMPs, are   11:39

16   drug product safe for use; correct"?                 11:39

17       A.    It is.                                      11:39

18       Q.    The first sentence reads, "If the          11:39

19   company is not complying with cGMP regulations,      11:39

20   any drug it makes is considered adulterated under    11:39

21   the law."                                            11:39

22       Did I read it correctly?                         11:39

23       A.    You did.                                    11:39

24       Q.    Do you agree with it?                       11:39

25       A.    By definition, I would agree with that.    11:39

|  | | Page 85 |
|---|---|---|
| 1 | Q.    The next sentence says: | 11:39 |
| 2 | "This kind of adulteration means that the | 11:39 |
| 3 | drugs was not manufactured under conditions that | 11:40 |
| 4 | complied with GMP, cGMP." | 11:40 |
| 5 | Did I read it correctly? | 11:40 |
| 6 | A.    You did. | 11:40 |
| 7 | Q.    Do you agree with that? | 11:40 |
| 8 | A.    By definition, yes. | 11:40 |
| 9 | Q.    The next sentence says: | 11:40 |
| 10 | "It does not mean that there is necessarily | 11:40 |
| 11 | something wrong with the drug." | 11:40 |
| 12 | Did I read it correctly? | 11:40 |
| 13 | A.    You did. | 11:40 |
| 14 | Q.    Do you agree with it? | 11:40 |
| 15 | A.    Something wrong with the drug?  It's a | 11:40 |
| 16 | broad statement; but as it's written, I would | 11:40 |
| 17 | agree. | 11:40 |
| 18 | Q.    All right.  So in other words, the fact | 11:40 |
| 19 | that a drug may be considered adulterated does not | 11:40 |
| 20 | necessarily mean that it is outside its | 11:40 |
| 21 | specifications; right? | 11:40 |
| 22 | A.    Yes. | 11:40 |
| 23 | Q.    Because a drug could be adulterated for | 11:40 |
| 24 | a lot of different reasons having nothing to do | 11:40 |
| 25 | with the potency of the drug; right? | 11:40 |

PLAINTIFFS' EXHIBITS 001309

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 86

| | | | |
|---|---|---|---|
| 1 | A. | Correct. | 11:40 |
| 2 | Q. | Do you know how many batches of Digitek | 11:41 |
| 3 | were involved in the recall in 2008? | | 11:41 |
| 4 | A. | Off the top of my head, no. | 11:41 |
| 5 | Q. | How many batch records did you look at? | 11:41 |
| 6 | A. | For? | 11:41 |
| 7 | Q. | Digitek. | 11:41 |
| 8 | A. | I looked at the batch records during the | 11:41 |
| 9 | ANDA, and I don't recall the number that were in | | 11:41 |
| 10 | there. | | 11:42 |
| 11 | Q. | Is that all? | 11:42 |
| 12 | A. | I'd have to check.  Do you want me to | 11:42 |
| 13 | take the time to do that? | | 11:42 |
| 14 | Q. | Well, let me ask you this:  Did you look | 11:42 |
| 15 | at the batch that was involved in the double-thick | | 11:42 |
| 16 | investigation in 2007 and 8?  Did you look at the | | 11:42 |
| 17 | batch record, I should say. | | 11:42 |
| 18 | A. | I looked -- I'm pretty sure I've looked | 11:42 |
| 19 | at the investigation.  And how much the batch | | 11:42 |
| 20 | record was part of that, I'm not sure.  I'm pretty | | 11:42 |
| 21 | sure I looked at that investigation. | | 11:42 |
| 22 | Q. | But you're not sure if you've ever | 11:42 |
| 23 | looked at that entire batch record? | | 11:42 |
| 24 | A. | No. | 11:42 |
| 25 | Q. | And other than -- | 11:42 |

PLAINTIFFS' EXHIBITS 001310

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|   |   |   | Page 87 |
|---|---|---|---|
| 1 | A. | No. | 11:42 |
| 2 | Q. | -- what was in the ANDA, you can't tell | 11:42 |
| 3 | me that you looked at any other Digitek batch | | 11:42 |
| 4 | records? | | 11:43 |
| 5 | A. | No, I haven't. | 11:43 |
| 6 | Q. | All right.  Do you know how many tablets | 11:43 |
| 7 | would have been involved in the Digitek recall? | | 11:43 |
| 8 | A. | Since I don't know how many batches | 11:43 |
| 9 | there were and what the exact number without | | 11:43 |
| 10 | looking at it is, I couldn't tell you. | | 11:43 |
| 11 | Q. | All right.  Do you know how many other | 11:43 |
| 12 | recall batches were of the dose level of .125? | | 11:43 |
| 13 | A. | Again, the same answer.  I don't | 11:43 |
| 14 | remember the batches there were without | | 11:43 |
| 15 | referring -- knowing how many tablets per batch, | | 11:43 |
| 16 | what they would be. | | 11:43 |
| 17 | Q. | Do you have an opinion to a reasonable | 11:43 |
| 18 | degree of probability -- in other words, more | | 11:43 |
| 19 | likely than not. | | 11:43 |
| 20 | A. | Probability more likely than not? | 11:43 |
| 21 | Q. | How many of the Digitek tablets that | 11:43 |
| 22 | were recalled were outside their size | | 11:43 |
| 23 | specifications? | | 11:44 |
| 24 | A. | Okay. | 11:44 |
| 25 | Q. | Are you writing on an Exhibit? | 11:44 |

David Bliesner, Ph.D.          Videotaped          January 25, 2011

|  |  | Page 88 |
|---|---|---|
| 1 | A.    Oh. | 11:44 |
| 2 | Q.    A marked Exhibit? | 11:44 |
| 3 | A.    Yes.  I'm sorry.  That's my notes. | 11:44 |
| 4 | MR. KERENSKY:  Maybe we should put the | 11:44 |
| 5 | pen away. | 11:44 |
| 6 | THE WITNESS:  Take them away from me. | 11:44 |
| 7 | Sorry. | 11:44 |
| 8 | MR. MORIARTY:  Kind of like guns.  The | 11:44 |
| 9 | problem is the pen, not the paper; okay. | 11:44 |
| 10 | BY MR. MORIARTY: | 11:44 |
| 11 | Q.    Do you remember my question?  Do you | 11:44 |
| 12 | remember my question? | 11:44 |
| 13 | A.    No, I don't remember. | 11:44 |
| 14 | Q.    Do you have an opinion to a reasonable | 11:44 |
| 15 | degree of probability how many of the recalled | 11:44 |
| 16 | Digitek tablets were outside their size | 11:44 |
| 17 | specifications? | 11:44 |
| 18 | A.    The recalled batches in the total | 11:44 |
| 19 | number? | 11:44 |
| 20 | Q.    Yeah. | 11:44 |
| 21 | A.    Since I don't know how many are out | 11:44 |
| 22 | there, there's no way in the world that I could | 11:44 |
| 23 | estimate that. | 11:44 |
| 24 | Q.    Do you have an opinion to a probability | 11:44 |
| 25 | of how many recalled Digitek tablets were outside | 11:44 |

Page 89

| | | |
|---|---|---|
| 1 | their United States pharmacopeia specifications | 11:45 |
| 2 | for active pharmaceutical ingredient? | 11:45 |
| 3 | A.    In my opinion, I don't think there's | 11:45 |
| 4 | enough information for anybody to determine that. | 11:45 |
| 5 | Q.    Now, have you ever seen a report of a | 11:45 |
| 6 | Digitek tablet from a Plaintiff in this litigation | 11:45 |
| 7 | that was outside its size specifications? | 11:45 |
| 8 | A.    Say that again, please. | 11:45 |
| 9 | Q.    Sure.  In the course of your work -- | 11:45 |
| 10 | A.    Yes. | 11:45 |
| 11 | Q.    -- to prepare for this report -- | 11:45 |
| 12 | A.    Yes. | 11:45 |
| 13 | Q.    -- for today's deposition -- | 11:45 |
| 14 | A.    Yes. | 11:46 |
| 15 | Q.    -- have you seen either a tablet or the | 11:46 |
| 16 | report of a tablet from a Plaintiff in the | 11:46 |
| 17 | litigation that says that that tablet was outside | 11:46 |
| 18 | its size specifications? | 11:46 |
| 19 | A.    I would need to check the report again | 11:46 |
| 20 | to make sure. | 11:46 |
| 21 | Q.    You can, but I guarantee you there was | 11:46 |
| 22 | no discussion of such thing in your report.  But | 11:46 |
| 23 | if you'd like to check, you go right ahead. | 11:46 |
| 24 | A.    I would. | 11:46 |
| 25 | Q.    While you're looking, I want you to also | 11:46 |

PLAINTIFFS' EXHIBITS 001313

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 90

| | | |
|---|---|---|
| 1 | look to see whether you have any report from a | 11:46 |
| 2 | Plaintiff in this litigation of a Digitek tablet | 11:46 |
| 3 | that was normal in size but had too much active | 11:46 |
| 4 | pharmaceutical ingredient; okay? | 11:46 |
| 5 | A.    Uh-huh.  Sure. | 11:46 |
| 6 | Q.    Are you done? | 11:50 |
| 7 | A.    Yes.  Plaintiff, again, is the people | 11:50 |
| 8 | bringing the lawsuit? | 11:50 |
| 9 | Q.    Yeah. | 11:50 |
| 10 | A.    No, I don't have any reference in any | 11:50 |
| 11 | report. | 11:50 |
| 12 | Q.    Okay.  How often do you look at the | 11:50 |
| 13 | FDA's website in your work? | 11:50 |
| 14 | A.    Daily. | 11:50 |
| 15 | Q.    What would be a common source of | 11:50 |
| 16 | reference for you? | 11:50 |
| 17 | A.    The source of references has to do with | 11:50 |
| 18 | recall notice, Cedar newsletter, 483 reading, that | 11:50 |
| 19 | kind of thing. | 11:51 |
| 20 | Q.    So you rely on the information in the | 11:51 |
| 21 | FDA website for part of your day-to-day work in | 11:51 |
| 22 | your consulting business? | 11:51 |
| 23 | A.    I rely on it to see what the trends are | 11:51 |
| 24 | with respect to compliance enforcement and to use | 11:51 |
| 25 | examples for my clients of what not to do. | 11:51 |

PLAINTIFFS' EXHIBITS 001314

David Bliesner, Ph.D.            Videotaped            January 25, 2011

|   |   | Page 91 |
|---|---|---|
| 1 | Q.    If a company was consistently | 11:51 |
| 2 | manufacturing a drug with too much active | 11:51 |
| 3 | pharmaceutical ingredient in it; okay? | 11:51 |
| 4 | A.    Okay. | 11:51 |
| 5 | Q.    Would that likely be reflected in the | 11:51 |
| 6 | inventory usage cards? | 11:51 |
| 7 | A.    When you say inventory usage cards, what | 11:51 |
| 8 | are you calling inventory usage cards? | 11:51 |
| 9 | Q.    Do you know what inventory usage cards | 11:52 |
| 10 | are? | 11:52 |
| 11 | A.    I've never heard that term. | 11:52 |
| 12 | Q.    In your experience do your clients and | 11:52 |
| 13 | did the companies for which you worked keep | 11:52 |
| 14 | documentation of their inventory of raw materials? | 11:52 |
| 15 | A.    Oh, absolutely, yes. | 11:52 |
| 16 | Q.    So they could calculate how often they | 11:52 |
| 17 | needed to buy new material; correct? | 11:52 |
| 18 | A.    That's true. | 11:52 |
| 19 | Q.    And whether their usage of those raw | 11:52 |
| 20 | materials was consistent with the number of | 11:52 |
| 21 | batches that they were producing; right? | 11:52 |
| 22 | A.    That's correct.  It's part of the | 11:52 |
| 23 | control of the materials. | 11:52 |
| 24 | Q.    So if a company hypothetically was | 11:52 |
| 25 | consistently producing a drug with too much active | 11:52 |

PLAINTIFFS' EXHIBITS 001315

Page 92

| | | |
|---|---|---|
| 1 | pharmaceutical ingredient, would it likely be | 11:52 |
| 2 | somehow reflected in the inventory documentation | 11:52 |
| 3 | for the active pharmaceutical ingredient at that | 11:52 |
| 4 | company? | 11:52 |
| 5 | A.    Not necessarily. | 11:52 |
| 6 | Q.    Why not? | 11:53 |
| 7 | A.    If you have blend uniformity problems | 11:53 |
| 8 | for instance, you could be making sub-potent and | 11:53 |
| 9 | super-potent tablets all at the same time and that | 11:53 |
| 10 | would never reflect in an actual reconciliation | 11:53 |
| 11 | with your raw materials.  There wouldn't be a | 11:53 |
| 12 | difference. | 11:53 |
| 13 | Q.    Did FDA ever cite, warn, or observe that | 11:53 |
| 14 | Actavis was making Digitek with batches that had | 11:53 |
| 15 | super- and sub-potent tablets in it? | 11:53 |
| 16 | A.    Did they ever -- say that again, please. | 11:53 |
| 17 | Q.    Cite, warn, observe.  In other words, | 11:53 |
| 18 | did you see a warning letter, an EIR, or a 483, | 11:53 |
| 19 | some statement from FDA that Digitek had batches | 11:53 |
| 20 | with super- and sub-potent Digitek in it? | 11:53 |
| 21 | A.    They make reference to thick and thin | 11:53 |
| 22 | tablets, but I don't recall specifically if | 11:53 |
| 23 | they -- that's associated with super or | 11:53 |
| 24 | sub-potent. | 11:54 |
| 25 | Q.    Okay.  If a company was consistently | 11:54 |

PLAINTIFFS' EXHIBITS 001316

Page 93

| | | |
|---|---|---|
| 1 | manufacturing tablets with too much active | 11:54 |
| 2 | pharmaceutical ingredients, is it likely that that | 11:54 |
| 3 | would be detected at the blend uniformity stage? | 11:54 |
| 4 | A.    If you've got problems with blend | 11:54 |
| 5 | uniformity, it's going to be picked up on testing. | 11:54 |
| 6 | Q.    Okay.  Now -- and if a company was | 11:54 |
| 7 | consistently manufacturing a pharmaceutical | 11:54 |
| 8 | product with too much active pharmaceutical | 11:54 |
| 9 | ingredient, isn't it likely that that would be | 11:54 |
| 10 | detected on finished product testing? | 11:54 |
| 11 | A.    Yes. | 11:54 |
| 12 | Q.    Can you show me anything in a batch | 11:54 |
| 13 | record or an FDA record to indicate that there was | 11:54 |
| 14 | a problem with Digitek having finished product | 11:54 |
| 15 | testing of out of spec Digitek with too much | 11:54 |
| 16 | active pharmaceutical ingredient in it? | 11:55 |
| 17 | A.    FDA or Actavis both? | 11:55 |
| 18 | Q.    Let's start with FDA. | 11:55 |
| 19 | A.    Okay.  There's reference to difficulties | 11:55 |
| 20 | on content uniformity testing. | 11:55 |
| 21 | Q.    With Digitek? | 11:55 |
| 22 | A.    Content uniformity in general if I'm not | 11:55 |
| 23 | mistaken, yes. | 11:55 |
| 24 | Q.    I want to know about Digitek. | 11:55 |
| 25 | A.    Uh-huh. | 11:55 |

PLAINTIFFS' EXHIBITS 001317

Page 94

1      Q.    We're here about Digitek.  These people          11:55

2    represent people who took Digitek.                       11:55

3      A.    Uh-huh.  There are documents with                11:55

4    respect to content uniformity issues.                    11:55

5      Q.    Show me a document from the FDA or quite          11:55

6    frankly even from Actavis to indicate that there         11:55

7    were content uniformity problems with Digitek in         11:55

8    2005, 6, 7 or 8.                                          11:55

9      A.    This could take a while just so you              11:56

10   know.                                                    11:56

11     Q.    Well --                                           11:56

12     A.    I've looked at thousands and thousands           11:56

13   of pages of information.  And to answer a specific        11:56

14   question accurately and precisely, it's a                11:56

15   non-trivial thing.                                        11:56

16     Q.    Okay.  Take your time.  I want to know           11:56

17   what documents you have in all this material to           11:56

18   indicate that FDA or Actavis was having an                11:56

19   out-of-specification finished product testing with        11:56

20   Digitek in 2005, 6, 7 or 8?                               11:56

21     A.    Content uniformity, yes, with respect to          11:56

22   blend.                                                    11:56

23     Q.    Or assay.  I'm talking about finished            11:56

24   product --                                                11:56

25     A.    Finished product.                                11:56

PLAINTIFFS' EXHIBITS 001318

David Bliesner, Ph.D.          Videotaped          January 25, 2011

Page 95

| | | |
|---|---|---|
| 1 | Q.   -- testing? | 11:57 |
| 2 | A.   No.  In finished product, no.  I'm | 11:57 |
| 3 | sorry.  I misunderstood you because there are | 11:57 |
| 4 | issues with respect to blend uniformity; okay. | 11:57 |
| 5 | Nobody has ever tested the tablets that were | 11:57 |
| 6 | in question.  Nobody that I know of. | 11:57 |
| 7 | Q.   Nobody that you know of? | 11:57 |
| 8 | A.   Not that I know of. | 11:57 |
| 9 | Q.   Okay. | 11:57 |
| 10 | A.   Which is strange in itself. | 11:57 |
| 11 | Q.   Wouldn't it be required that Actavis | 11:57 |
| 12 | test every batch for assay, content uniformity, | 11:57 |
| 13 | dissolution, and then later certain batches tested | 11:57 |
| 14 | on stability? | 11:57 |
| 15 | A.   Absolutely.  And they would also be | 11:57 |
| 16 | expected to test those tablets that were found to | 11:57 |
| 17 | be double. | 11:57 |
| 18 | Q.   I'm not asking you that. | 11:57 |
| 19 | A.   Okay. | 11:57 |
| 20 | Q.   So let's assume there were 152 recalled | 11:57 |
| 21 | batches, okay, that made it to market. | 11:57 |
| 22 | A.   Uh-huh. | 11:57 |
| 23 | Q.   Isn't it reasonable to assume that the | 11:57 |
| 24 | batch records for those 152 batches have finished | 11:57 |
| 25 | product testing data in them? | 11:57 |

PLAINTIFFS' EXHIBITS 001319