# EXHIBIT 508

PLAINTIFFS' EXHIBITS 003040

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       CHARLESTON DIVISION

 3
                         MDL NO: 1968
 4

 5
       IN RE:  DIGITEK PRODUCT LIABILITY
 6              LITIGATION,
       _____/
 7

 8

 9                       100 N. Tampa Street
                         Suite 2900
10                       Tampa, FL 33602
                         February 18, 2011
11                       at 8:15 a.m.

12

13

14
          VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.
15

16

17
           Taken on behalf of the Defendants before
18
       PHILIP RYAN, RPR, Court Reporter, Notary Public in
19
       and for the State of Florida at Large, pursuant to
20
       Defendant's Notice of Taking Deposition in the
21
       above cause.
22

23

24

25
```

PLAINTIFFS' EXHIBITS 003041

David M. Bliesner, Ph.D.                         Videotaped                              February 18, 2011

---

Page 2

```
 1   APPEARANCES:
 2   MIKE KERENSKY, ESQUIRE
     Williamson & Rusnak
 3   4310 Yoakum Boulevard
     Houston, TX 77006-5818
 4   (713)223-3330
     (via telephone)
 5
         Attorney for Plaintiffs
 6
     MICHAEL ANDERTON, ESQUIRE
 7   Tucker, Ellis & West, LLP
     1150 Huntington Building
 8   925 Euclid Avenue
     Cleveland, OH 44115
 9   (216)592-5000
10       Attorney for Defendant Activis Totowa,
         LLC, Activis, Inc.,
11       and Activis Elizabeth, LLC
     SARAH E. DREWES, ESQUIRE
12   Shook, Hardy & Bacon, LLP
13   2555 Grand Boulevard
     Kansas City, Missouri 64108
14   (816)474-6550
15       Attorney for Mylan Pharmaceuticals,
         Inc., Mylan Inc., Mylan Bertek
16       Pharmaceuticals, Inc., and UDL Labs
17   ALSO PRESENT:
         Alan Pokotilow, videographer
18
         INDEX
19                              PAGE
     DIRECT EXAMINATION:
20   BY MR. ANDERTON              5
21
22
23
24
25
```

---

Page 3

```
 1          EXHIBIT INDEX
 2                        MAR
     Exhibit
 3   Exhibit 145   Invoices.        94
 4   Exhibit 146   E-mail.          99
 5   Exhibit 147   Binder.         117
 6   Exhibit 148   Binder.         117
 7   Exhibit 149   Binder.         117
 8   Exhibit 150   Binder.         117
 9   Exhibit 151   Notice.         122
10   Exhibit 152   Notes.          123
11   Exhibit 153   Notes.          123
12   Exhibit 154   Binder.         161
13   Exhibit 155   Binder.         337
14   Exhibit 156   Binder.         337
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1          THE VIDEOGRAPHER:  We're on the       08:15
 2   record at 8:15 a.m.  The date today is       08:15
 3   February 18th of 2011.  This is the videotape 08:15
 4   deposition of Dr. David M. Bliesner in regard 08:15
 5   to the Digitek product liability litigation,  08:16
 6   civil action MDL 1968.                        08:16
 7          This videotape deposition is being held 08:16
 8   at 100 North Tampa, within suite 2900.  The   08:16
 9   deposition was noticed by attorney Matt       08:16
10   Moriarty, I believe.                          08:16
11          MR. ANDERTON:  Richard Dean, actually.  08:16
12          THE VIDEOGRAPHER:  Okay.  The          08:16
13   videographer is Alan Pokotilow and the court  08:16
14   reporter is Philip Ryan.  At the time of      08:16
15   transcript, the tape will be archived at      08:16
16   Renillo Deposition and Discovery.             08:16
17          Counsel, please state your name and    08:16
18   affiliation for the record, after which our   08:16
19   court reporter will swear the witness and we  08:16
20   can proceed.                                  08:16
21          MR. ANDERTON:  Michael Anderton with   08:16
22   Tucker Ellis & West on behalf of the Activis  08:16
23   Defendants.                                   08:16
24          MS. DREWES:  Sarah Drewes, with Shook, 08:16
25   Hardy & Bacon on behalf of the Mylan          08:16
```

---

Page 5

```
 1   Defendants.                                   08:16
 2          MR. KERENSKY:  Mike Kerensky for the   08:16
 3   Plaintiff Mimi Vega.                          08:16
 4          MR. ANDERTON:  And just so the record is 08:16
 5   clear, Mr. Kerensky is participating by       08:17
 6   telephone.                                    08:17
 7          MR. KERENSKY:  Correct.                08:17
 8   The Deponent herein,                          08:17
 9          DAVID BLIESNER, Ph.D.,                 08:17
10   Being first duly sworn to tell the truth, the 08:17
11   whole truth, and nothing but the truth, was   08:17
12   examined and testified as follows:            08:17
13          DIRECT EXAMINATION                     08:17
14   BY MR. ANDERTON:                              08:17
15   Q.   Good morning, Dr. Bliesner.             08:17
16   A.   Good morning, sir.                      08:17
17   Q.   How are you?                            08:17
18   A.   Okay.                                   08:17
19   Q.   Thanks for accommodating the early start 08:17
20   time.                                         08:17
21   A.   Sure.                                   08:17
22   Q.   I know it's an early day, but if we're  08:17
23   going to get everybody home to spend time with 08:17
24   their families this weekend, I thought 8 o'clock 08:17
25   was the best time to start.  So thank you.    08:17
```

2 (Pages 2 to 5)

PLAINTIFFS' EXHIBITS 003042

David M. Bliesner, Ph.D.   Videotaped   February 18, 2011

Page 6

1 A. You're welcome. 08:17
2 Q. Some ground rules. I know you -- we did 08:17
3 this about two or three weeks ago now, a little 08:17
4 more than three weeks ago so you're familiar with 08:17
5 the process, but I just want to repeat some ground 08:17
6 rules. And if you have any questions about them, 08:17
7 kind of let me know; okay? 08:17
8 A. Okay. 08:17
9 Q. As you know, I'm going to ask questions, 08:17
10 you're going to answer my questions. If you don't 08:17
11 understand a question, I would ask that you tell 08:17
12 me that and ask me to rephrase it or to state it 08:18
13 differently; is that fair? 08:18
14 A. That is fair. 08:18
15 Q. All right. And if I ask a question and 08:18
16 you answer it without asking me to rephrase or 08:18
17 restate it somehow, I will assume that you 08:18
18 understood it. 08:18
19 Is that all right? 08:18
20 A. Okay. 08:18
21 Q. You need to keep your voice up probably 08:18
22 just a little. I know you're mic'd and I know 08:18
23 from the last time that you're -- at times at 08:18
24 least are probably fairly soft-spoken. So just 08:18
25 try to make sure that your voice stays elevated so 08:18

Page 7

1 at least the mic hears it because as you know, the 08:18
2 proceedings are being recording by video camera 08:18
3 and audio as well; all right? 08:18
4 A. Okay. 08:18
5 Q. Now, Dr. Bliesner, one more kind of key 08:18
6 point. You know, I attended the last session and 08:18
7 I noticed as I did that, that there were what I 08:18
8 felt were a fair amount of occasions where you 08:18
9 didn't really respond to the questions that 08:19
10 Mr. Moriarty had asked you. And it's obvious from 08:19
11 your credentials and from your -- just -- just 08:19
12 dealing with you in the last deposition that 08:19
13 you're a very intelligent, very capable listener. 08:19
14 We know that you've been told by Plaintiffs' 08:19
15 counsel to listen very carefully. So I would ask 08:19
16 that you really do me the favor of listening and 08:19
17 making sure that when you answer a question, 08:19
18 you're actually answering the question that I ask; 08:19
19 okay? 08:19
20 A. Okay. 08:19
21 Q. I want to talk for a moment about your 08:19
22 credentials. Do you have a copy of your CV with 08:19
23 you? 08:19
24 A. Let me check. 08:19
25 Q. Please. And if you don't, I have an 08:19

Page 8

1 extra one. 08:19
2 A. I do not. 08:19
3 Q. Okay. Well, I'm going to hand you a 08:20
4 copy. 08:20
5 A. Okay. 08:20
6 Q. Mike, this is Exhibit 93. 08:20
7 Dr. Bliesner, I have handed you a document 08:20
8 that has been marked as Exhibit 93. Have you seen 08:20
9 that document before? 08:20
10 A. Yes. 08:20
11 Q. It's a copy of your CV, your resume; 08:20
12 correct? 08:20
13 A. It is. 08:20
14 Q. You prepared it? 08:20
15 A. I did. 08:20
16 Q. Is it accurate and current? 08:20
17 A. No. 08:21
18 Q. And last time you were asked -- I think 08:21
19 that you gave some testimony that there were a 08:21
20 couple of board memberships that had kind of 08:21
21 changed and there were some minor changes. But as 08:21
22 concerns your education and work experience, is 08:21
23 that CV accurate and current? 08:21
24 A. No. 08:21
25 Q. What is not accurate or current about 08:21

Page 9

1 your work experience or education as reflected on 08:21
2 that CV? 08:21
3 A. Yesterday I presented a guest lecture at 08:21
4 the University of South Florida College of 08:21
5 Medicine. 08:21
6 Q. What was the topic of that lecture? 08:21
7 A. The topic was something to the effect 08:21
8 "Consumer Health and GMPs." 08:21
9 Q. Tell me generally the substance of 08:21
10 the -- of the lecture, the subject of the lecture 08:21
11 that you gave yesterday at you said South Florida? 08:21
12 A. University South Florida. 08:21
13 Q. University of South Florida. 08:21
14 A. Yes. 08:21
15 Q. Can you give me a little more detail 08:21
16 than just the topic you just described? 08:21
17 A. Other than pulling up the course outline 08:22
18 and taking a look at it, in general it was an 08:22
19 overview of the drug development process and where 08:22
20 GMPs become pertinent in the drug development 08:22
21 process and an introduction to people who had not 08:22
22 been exposed to the concepts of the GMPs, and some 08:22
23 examples of enforcement and where they could go to 08:22
24 review the GMPs themselves. 08:22
25 Q. Drug development. Does that mean -- 08:22

3 (Pages 6 to 9)

PLAINTIFFS' EXHIBITS 003043

David M. Bliesner, Ph.D.                Videotaped                February 18, 2011

Page 10

1   well, you tell me what that means.  What do you        08:22
2   mean by drug development?        08:22
3       A.   Drug development is the process of        08:22
4   discovering an entity that may have        08:22
5   pharmacological activity and moving it to a final        08:22
6   product.        08:22
7       Q.   What would you characterize as the        08:22
8   primary target audience for that lecture?        08:22
9       A.   The students in the class were getting a        08:22
10  masters in biotechnology.        08:22
11      Q.   And when you talk about introduction to        08:23
12  GMPs in the course or in the context of that        08:23
13  lecture that you gave yesterday, tell me in more        08:23
14  detail about the types of concepts that you        08:23
15  presented with respect to the introduction to        08:23
16  GMPs.        08:23
17      A.   I would have to go back and pull up the        08:23
18  course outline to talk explicitly about it.        08:23
19      Q.   Well, you just did it yesterday, right,        08:23
20  Dr. Bliesner?        08:23
21      A.   Uh-huh.        08:23
22      Q.   You're a very smart man; right?        08:23
23          MR. KERENSKY:  Michael, that's not        08:23
24  necessary.        08:23
25          MR. ANDERTON:  Mike.        08:23

Page 11

1           MR. KERENSKY:  I object to the form of        08:23
2   the question.        08:23
3           MR. ANDERTON:  You can object and I        08:23
4   appreciate your objection and you make your        08:23
5   record obviously, but I asked him what he        08:23
6   talked about yesterday.  Certainly he can        08:23
7   remember that.        08:23
8           MR. KERENSKY:  Well, you certainly need        08:23
9   to be professional and not say things like        08:23
10  "You're smart man; right?"  That's what I'm        08:23
11  scolding you about.        08:23
12          MR. ANDERTON:  Your scolding is noted,        08:23
13  Mike.        08:23
14          MR. KERENSKY:  Thank you very much.        08:23
15  BY MR. ANDERTON:        08:23
16      Q.   Dr. Bliesner, please tell me when you        08:23
17  described a few moments ago that you gave an        08:24
18  introduction to GMPs --        08:24
19      A.   Yes.        08:24
20      Q.   -- as part of a presentation you made        08:24
21  yesterday.        08:24
22      A.   Yes.        08:24
23      Q.   Please give me a description of the        08:24
24  types of concept that you presented on with        08:24
25  respect to introduction to GMPs?        08:24

Page 12

1       A.   I gave a brief overview of the drug        08:24
2   development process, I indicated at what point        08:24
3   GMPs become applicable, talked about the hierarchy        08:24
4   of the law in a very general sense and where the        08:24
5   GMPs come into play.  I talked about the guidance        08:24
6   documents and compliance program guidance manuals        08:24
7   that are available online on the FDA website,        08:24
8   what's contained generally in those documents, the        08:25
9   quality systems that are associated with that, and        08:25
10  the hierarchy with respect to enforcement of        08:25
11  compliance of the GMPs.  Much of the course was        08:25
12  left as attachments for the students to go and        08:25
13  look in detail if they sought to.        08:25
14      Q.   When you used term -- just to be clear,        08:25
15  when you used the term GMP as you did in the        08:25
16  description and the ones you gave before, that is        08:25
17  an acronym for good manufacturing practices;        08:25
18  correct?        08:25
19      A.   It is.        08:25
20      Q.   And that is a subject or a topic that        08:25
21  emanates from the code of federal regulations        08:25
22  under the United States code; correct?        08:25
23      A.   The GMPs are part of the code of federal        08:25
24  regulations.        08:25
25      Q.   You said that you discussed -- that one        08:26

Page 13

1   of the things you discussed was at what point GMPs        08:26
2   become relevant to the drug development process.        08:26
3       A.   (The witness nodded).        08:26
4       Q.   What is that point in your mind?        08:26
5       A.   In my opinion?        08:26
6       Q.   Yes.        08:26
7       A.   The point at which the GMPs become        08:26
8   applicable is when you start testing the product        08:26
9   or active in people.        08:26
10      Q.   In people you said?        08:26
11      A.   Yes.        08:26
12      Q.   Does that mean when you are        08:26
13  participating in some sort of clinical trial?        08:26
14      A.   Yes.        08:26
15      Q.   So GMPs in your mind aren't applicable        08:26
16  if you're merely doing animal or other lab        08:26
17  studies; is that correct?        08:26
18      A.   That is correct.        08:26
19      Q.   And when you used the term "drug        08:26
20  development process," I assume that you're        08:26
21  talking -- and correct me if my assumption is        08:27
22  wrong -- I assume that you're talking about a drug        08:27
23  or an entity as you used that term that has not        08:27
24  yet been approved for market sale by the FDA.        08:27
25      A.   Not necessarily.        08:27

4 (Pages 10 to 13)

PLAINTIFFS' EXHIBITS 003044

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 14

1    Q.   Under what circumstances can a drug that   08:27
2  hasn't been developed be approved by the FDA?   08:27
3    A.   I don't know if I understand exactly the   08:27
4  question you're asking.   08:27
5    Q.   Well, you described -- you used the term   08:27
6  "drug development process" and then you clarified   08:27
7  and added substance to that term by indicating   08:27
8  that it was the -- the process of taking an entity   08:27
9  from concept to production and marketing; correct?   08:27
10   A.   Correct.   08:28
11   Q.   If your -- that process begins before   08:28
12 FDA approval; correct?   08:28
13   A.   Drug development process is very complex   08:28
14 and it's not, does not fit to one specific case.   08:28
15 For instance, if you have a generic drug you have   08:28
16 to do drug development as well but it's already on   08:28
17 a product that has been approved for market.  So   08:28
18 that could be considered drug development as well,   08:28
19 as opposed to discovering a new entity and moving   08:28
20 it forward.   08:28
21   Q.   Well, even a generic drug --   08:28
22   A.   Uh-huh.   08:28
23   Q.   -- isn't actually -- the brand name is   08:28
24 approved for marketing; correct?   08:28
25   A.   Correct.   08:28

Page 15

1    Q.   Even the generic drug must go through a   08:28
2  drug development process and must be submitted to   08:28
3  the FDA before it can be marketed using an ANDA   08:28
4  rather than an NDA; correct?   08:28
5    A.   Correct.   08:28
6    Q.   So this course that you or this   08:28
7  presentation that you gave yesterday, how long did   08:29
8  it last?   08:29
9    A.   An hour and a half approximately.   08:29
10   Q.   How long did you prepare for that   08:29
11 presentation?   08:29
12   A.   Several hours.   08:29
13   Q.   What did you do to prepare for that   08:29
14 presentation?   08:29
15   A.   I took my course that I teach routinely   08:29
16 at client sites, my book, and a course that I also   08:29
17 teach at conferences routinely, looked at that   08:29
18 core value that was there, based on input from the   08:29
19 professor who invited me, trying to target what   08:30
20 she thought might be useful for the students to be   08:30
21 exposed in a general sense.   08:30
22   Q.   And I -- I understand from your prior   08:30
23 answer that you distributed some sort of materials   08:30
24 at that presentation yesterday.   08:30
25   A.   I did via Internet link.   08:30

Page 16

1    Q.   Describe how that works.  I haven't been   08:30
2  in college in a long time, so what is the current   08:30
3  practice with respect to distributing course   08:30
4  materials or even a seminar like this?  How do you   08:30
5  distribute via Internet link?   08:30
6    A.   To answer your first question, I don't   08:30
7  know if there is a general way to do it.   08:30
8    Q.   How did you do it?   08:30
9    A.   How did I do it?  I took the   08:30
10 presentation -- as I told you -- from my basic   08:30
11 course material, targeted it to the needs of the   08:30
12 professor, put in a Power Point presentation,   08:30
13 converted it to a PDF file so it's secure.  I   08:30
14 created a folder up on one of my websites that was   08:30
15 blind, I uploaded it and provided a link to the   08:30
16 professor and said that the students could access   08:31
17 it if they'd like.   08:31
18   Q.   Okay.  And then did you -- I assume then   08:31
19 that you repeated the web address for that link   08:31
20 during the presentation?   08:31
21   A.   No.   08:31
22   Q.   Okay.  So they got it from the professor   08:31
23 and chose to go get it or not?   08:31
24   A.   Correct.   08:31
25   Q.   Other than -- well, did you bring any of   08:31

Page 17

1  the materials that you used in yesterday's   08:31
2  presentation with you?   08:31
3    A.   No.   08:31
4    Q.   During the presentation during this   08:31
5  hour, what -- how much of that was spent on   08:31
6  manufacturing processes, if any?   08:31
7    A.   Could you explain to me what you mean by   08:31
8  "manufacturing processes"?   08:31
9    Q.   Certainly.  The drug development   08:31
10 process -- well, let me back that up.  Let me   08:32
11 start over.   08:32
12      The drug production process involves several   08:32
13 different components.  Developing a drug and   08:32
14 getting it ready to be manufactured and then   08:32
15 actually going forward and physically producing   08:32
16 the product I will characterize as two separate   08:32
17 components of that process.   08:32
18      Did you discuss during your presentation   08:32
19 yesterday, that second component, the acts   08:32
20 associated with physically manufacturing and   08:32
21 producing a drug product?   08:32
22   A.   No because the students -- it was an   08:32
23 open lecture and the students were allowed to   08:32
24 drive it where they wanted to go and many of their   08:33
25 questions were not related to manufacturing.   08:33

5 (Pages 14 to 17)

PLAINTIFFS' EXHIBITS 003045

David M. Bliesner, Ph.D.                     Videotaped                     February 18, 2011

Page 18

1    Q.   Were you planning to discuss that if      08:33
2  they drove the discussion -- to use your term --      08:33
3  in that direction?                               08:33
4    A.   Brief overview, yes.                       08:33
5    Q.   Do you know the or can you tell us the     08:33
6  link, the address for the link to the presentation      08:33
7  materials for yesterday?                         08:33
8    A.   Actually, I can't off the top of my        08:33
9  head.                                            08:33
10   Q.   Can you tell us generally how one might    08:33
11 get to that link?  Is it available through Delphi,      08:33
12 is it available from claycoachonline?            08:33
13   A.   It's available through Delphi in a blind   08:33
14 web link.                                        08:33
15   Q.   What do you mean by blind web link?        08:33
16   A.   The students and the instructor is the     08:33
17 only ones that have it.                          08:33
18   Q.   So they need some sort of password or      08:33
19 invitation?                                      08:33
20   A.   Just the right link to get to the page.    08:33
21   Q.   I mean it's not available to anybody who   08:33
22 happens to go to the Delphi website?             08:33
23   A.   No, sir.                                   08:33
24   Q.   When we get a break sometime today, will  08:34
25 you see what you can do about figuring out how to      08:34

Page 19

1  provide me and defense counsel with access to that      08:34
2  link, please?                                    08:34
3    A.   Sure.                                      08:34
4    Q.   Thank you.                                 08:34
5    A.   Uh-huh.                                    08:34
6    Q.   Now other than -- I'll let you make your   08:34
7  note.                                            08:34
8       Other than this presentation that you gave  08:34
9  yesterday, is the document that is in front of you      08:34
10 and that is marked as Exhibit 93 current with     08:34
11 respect to your education and experience?        08:34
12   A.   No.                                        08:35
13   Q.   What else is not on that version of your   08:35
14 CV that relates to your education and experience?      08:35
15   A.   I am on a major consulting project right   08:35
16 now, and that's not on the list.                 08:35
17   Q.   Okay.  What's that consulting project?     08:35
18   A.   I'm not at liberty to share that with      08:35
19 you because I'm under a confidentiality agreement.      08:35
20   Q.   Well, is it going to go on your CV at      08:35
21 some point?                                      08:35
22   A.   Perhaps.                                   08:35
23   Q.   What is the -- without revealing the       08:35
24 client, what is the nature generally of that      08:35
25 consulting project?                              08:36

Page 20

1    A.   The general nature of the consulting       08:36
2  project is to support laboratory and manufacturing      08:36
3  investigation review as a third-party independent.      08:36
4    Q.   When did that start?                       08:36
5    A.   June last year.                            08:36
6    Q.   Of 2010?                                   08:36
7    A.   Yes, sir.                                  08:36
8    Q.   Does that mean that this CV hasn't been    08:36
9  updated since June 2010 or perhaps before then?      08:36
10   A.   I don't know.  I'd have to go back and     08:36
11 look and see when it was last updated.           08:36
12   Q.   Other than the consulting project and      08:36
13 the presentation you gave yesterday, what -- is   08:36
14 there anything else that's not on this CV that     08:36
15 relates to your experience or your education?     08:36
16   A.   Without going through it line by line, I   08:36
17 do not see my assistant -- excuse me associate    08:37
18 professorship at St. Leo University.             08:37
19   Q.   Is that a current position?                08:37
20   A.   It is.                                     08:37
21   Q.   When did it start?                         08:37
22   A.   Sometime I want to say approximately       08:37
23 late spring, early summer of last year.          08:37
24   Q.   That's St. Leo University?                 08:37
25   A.   Yes, sir.                                  08:38

Page 21

1    Q.   And it's associate professor?             08:38
2    A.   Yes.                                       08:38
3    Q.   What general --                            08:38
4    A.   Non-tenured track.                         08:38
5    Q.   Okay.  Describe that generally.  What do  08:38
6  you do, what are your responsibilities as an      08:38
7  associate, non-tenured professor at St. Leo      08:38
8  University?                                      08:38
9    A.   I was one of the distance learning        08:38
10 instructors.                                     08:38
11   Q.   What is distance learning?                08:38
12   A.   Online education.                          08:38
13   Q.   So what is your role and what are your    08:38
14 responsibilities?  What do you do?               08:38
15   A.   I oversaw and taught via Internet         08:38
16 learning packages provided by the university,     08:38
17 introductory to science class.                   08:38
18   Q.   Any direct interaction with students in   08:38
19 that role?                                       08:38
20   A.   How would you define "direct"?             08:38
21   Q.   Well, did you deal with students           08:38
22 face-to-face or in a classroom setting?          08:38
23   A.   No.                                        08:38
24   Q.   Did you deal with them exclusively via    08:38
25 online contact?                                  08:38

6 (Pages 18 to 21)

PLAINTIFFS' EXHIBITS 003046

David M. Bliesner, Ph.D. | Videotaped | February 18, 2011

Page 22

```
1      A.   No.                              08:38
2      Q.   How did you interact with your students?   08:38
3      A.   Online in the course, e-mail and      08:38
4  telephone.                                 08:39
5      Q.   And telephone.                     08:39
6      You used or you spoke in the past tense when   08:39
7  you described that position.  Is it ongoing?   08:39
8      A.   I am -- do have that position within the   08:39
9  organization.  I'm not currently teaching a course   08:39
10 because of additional workload.            08:39
11     Q.   Is it your expectation that you will   08:39
12 teach it again in the future?              08:39
13     A.   Yes.                              08:39
14     Q.   Do you believe that the university   08:39
15 shares that expectation?                   08:39
16     A.   I couldn't say.                   08:39
17     Q.   Are you being paid by St. Leo University   08:39
18 for -- in any way at the moment?           08:39
19     A.   At the current moment?            08:39
20     Q.   Yes.                              08:39
21     A.   No.                              08:39
22     Q.   When did you stop receiving compensation   08:39
23 from St. Leo University?                   08:39
24     A.   When the semester ended.          08:39
25     Q.   Last spring?                      08:39
```

Page 23

```
1      A.   Whenever it was.  I'd have to go back   08:39
2  and look at that.                          08:39
3      Q.   Well, there's two semesters in an   08:39
4  academic year.                            08:39
5      A.   There are several actually, depends,   08:40
6  distant learning, stuff like that.  I would have   08:40
7  to go back and look it up.                 08:40
8      Q.   Give me your best estimate on when that   08:40
9  semester commenced and ended.             08:40
10     A.   I really can't tell you when it   08:40
11 started.  When it ended it was I think somewhere   08:40
12 in June.                                   08:40
13     Q.   Of 2010?                          08:40
14     A.   Yes.                              08:40
15     Q.   Okay.  Now, as I look at your CV, I want   08:40
16 to go through that a little bit with you.  I see   08:40
17 that your first work experience after you left the   08:40
18 University of Vermont, graduated from the   08:40
19 University of Vermont is with Zeneca; is that   08:40
20 right?                                     08:41
21     A.   Yes.                              08:41
22     Q.   As an analytical research chemist?   08:41
23     A.   That is correct.                  08:41
24     Q.   And according to your CV, in that role   08:41
25 you developed and validated analytical methods;   08:41
```

Page 24

```
1  right?                                     08:41
2      A.   That is correct.                  08:41
3      Q.   Analytical methods describe -- am I   08:41
4  correct that that generally means the method by   08:41
5  which laboratory testing is conducted on some   08:41
6  material that is part of the pharmaceutical --   08:41
7  part of a pharmaceutical manufacturing process?   08:41
8      A.   Can you restate that, please?     08:41
9      Q.   Sure.  When you use the term "analytical   08:41
10 method," am I correct in my understanding that   08:41
11 that means or is used generally to describe the   08:41
12 method by which laboratory testing is conducted on   08:41
13 something, some entity that is part of a   08:41
14 pharmaceutical manufacturing process -- whether   08:42
15 it's finished product or in-process material or   08:42
16 raw material or --                         08:42
17     A.   Packaging material.               08:42
18     Q.   Okay.  So analytical method is   08:42
19 developing a testing method; correct?     08:42
20     A.   I'd say that's accurate.          08:42
21     Q.   So your role with Zeneca was entirely in   08:42
22 the laboratory; correct?                   08:42
23     A.   When you say "entirely in the   08:42
24 laboratory," could you define that, please?   08:42
25     Q.   Well did you do any -- you didn't do   08:42
```

Page 25

```
1  anything it looks like other than perform job   08:42
2  functions related to and around developing,   08:42
3  validating analytical methods; is that accurate?   08:42
4      A.   I don't think that's an accurate   08:42
5  statement, no.                            08:42
6      Q.   Well what else did you do other than   08:42
7  work with developing and validating analytical   08:42
8  methods as your CV says?                   08:42
9      A.   As it says here, worked closely with   08:43
10 formulation specialists, designed testing   08:43
11 protocols and methods for new dosage forms.   08:43
12     Q.   Okay.  And that is a -- does that have   08:43
13 anything to do with product manufacturing, the   08:43
14 actual physical manufacturing process?   08:43
15     A.   It does.                          08:43
16     Q.   How?                              08:43
17     A.   There is actually quite of bit of   08:43
18 extensive formulation development and interaction   08:43
19 with the formulators in the initial dosage form   08:43
20 manufacturing.                            08:43
21     Q.   Well, what does that have --      08:43
22     A.   Report it back.                   08:43
23     Q.   What does that have to do with tablet or   08:43
24 product manufacturing?                     08:43
25     A.   This lays all the basis because this is   08:43
```

7 (Pages 22 to 25)

PLAINTIFFS' EXHIBITS 003047

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

---

Page 26

1  the initial work that's done to get to the final        08:43
2  validated process in product.                            08:43
3      Q.   Well, but you're not -- I mean                  08:43
4  Dr. Bliesner your resume says "developing                08:43
5  analytical methods," not validating manufacturing        08:43
6  processes.                                               08:43
7      A.   As part of that process you are                 08:43
8  interacting very closely with the formulators and        08:43
9  the manufacturing folks to test their products and       08:44
10 be involved in those cross-functional meetings to        08:44
11 make sure that they're hitting what they're              08:44
12 supposed to be hitting and when they have problems       08:44
13 that, you know -- when they're developing                08:44
14 processes, that you are there to provide                 08:44
15 additional input and feedback with respect to how        08:44
16 your analyses are reflecting on what they're             08:44
17 doing.                                                   08:44
18     Q.   What type of products did Zeneca make          08:44
19 while you were in that job?  Solid oral dose,            08:44
20 liquids, gels?                                           08:44
21     A.   As a company at large?                          08:44
22     Q.   Yeah.                                           08:44
23     A.   Specifically I couldn't -- I'd have to         08:44
24 go back and look, but it covered the broad lanes         08:44
25 of product types and formulations.                       08:44

Page 27

1      Q.   And do you believe it included solid            08:44
2  oral dose?                                               08:44
3      A.   That, it did.                                   08:44
4      Q.   Okay.  So they were -- were you involved        08:44
5  in developing and validating analytical methods          08:44
6  for tablets?                                             08:44
7      A.   Yes, sir.                                       08:44
8      Q.   For Digoxin tablets?                            08:44
9      A.   No, sir.                                        08:44
10     Q.   Have you ever been involved with any           08:45
11 sort of method development or validation with            08:45
12 respect to Digoxin in any form?                          08:45
13     A.   No, sir.                                        08:45
14     Q.   Your next job with UDL, you described it       08:45
15 as a principal chemist.  And again you indicate --      08:45
16 hold on one moment.  My apologies, Dr. Bliesner,        08:45
17 for the interruption.                                    08:45
18     A.   It's okay.                                      08:45
19     Q.   You indicate that you are responsible          08:45
20 for developing and validating analytical methods.       08:45
21 Tell me what that means.                                 08:45
22     A.   As we just talked about being part of a       08:45
23 cross-functional team that supports product             08:45
24 development to determine the best analytical            08:46
25 technique to support the required testing and --       08:46

Page 28

1      Q.   Well -- I'm sorry.  Go ahead.                   08:46
2      A.   And once the method is developed to a          08:46
3  point where it appears to be validatable, a              08:46
4  validation program protocol is developed and then       08:46
5  validated to prove in fact the method works for         08:46
6  its intended use.                                        08:46
7      Q.   And according to resume, your primary          08:46
8  emphasis was on HPLC method development; is that        08:46
9  right?                                                   08:46
10     A.   That's correct.                                 08:46
11     Q.   And HPLC stands for high performance           08:46
12 liquid chromatography; am I correct about that?         08:46
13     A.   Yes, and it also stands for high               08:46
14 pressure liquid chromatography.  It's a term that       08:46
15 is cross-confused sometimes.  It's now becoming         08:46
16 more popular again.                                      08:46
17     Q.   On your resume --                               08:46
18     A.   Yes.                                            08:46
19     Q.   -- what does it mean?                           08:46
20     A.   High performance liquid chromatography.        08:47
21     Q.   And that's a method by which a chemical        08:47
22 analysis is performed on some entity; correct?         08:47
23     A.   How would you define "chemical                 08:47
24 analysis"?                                               08:47
25     Q.   Well, let me --                                 08:47

Page 29

1      A.   Uh-huh.                                         08:47
2      Q.   -- ask you, Dr. Bliesner.  What is high        08:47
3  performance liquid chromatography?                       08:47
4      A.   It's a separation technique.                    08:47
5      Q.   Separation of what?                             08:47
6      A.   Components and mixtures.                         08:47
7      Q.   So it is a technique to analyze                 08:47
8  components and mixtures of various drug entities;       08:47
9  correct?                                                 08:47
10     A.   Drug products and also to look for             08:47
11 impurities if you will in actives and drug             08:47
12 products.                                                08:47
13     Q.   All right.  So it's a lab-based                 08:47
14 function, am I correct?                                  08:47
15     A.   That's correct.                                 08:47
16     Q.   Your next -- the next work experience on       08:47
17 your resume is again for UDL and you're listed as      08:48
18 analytical group leader.  Do you see that on page      08:48
19 3?                                                       08:48
20     A.   I do.                                           08:48
21     Q.   And in that role, you indicate you are         08:48
22 responsible for supervising research chemists.         08:48
23     A.   Yes.                                            08:48
24     Q.   Do you see that?                                08:48
25 Tell me what you did there.                             08:48

8 (Pages 26 to 29)

PLAINTIFFS' EXHIBITS 003048

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 30

1    A.   I was responsible for the people who        08:48
2    were doing method development and validation and    08:48
3    testing.                                08:48
4    Q.   Again, a lab-based function?              08:48
5    A.   Yes, and we also interacted with product      08:48
6    development teams and manufacturing.           08:48
7    Q.   Okay.  But your primary responsibilities      08:48
8    were in the lab overseeing research chemists who    08:48
9    were doing the -- performing the tasks you just     08:48
10   described; correct?                       08:48
11   A.   The primary function, yes.              08:48
12   Q.   The next position you have listed here        08:48
13   is analytical laboratory manager.              08:49
14   A.   Yes.                              08:49
15   Q.   You indicate in that role you supervised      08:49
16   day-to-day operation of lab -- analytical lab       08:49
17   personnel in various tasks that you list there.     08:49
18      Do you see that?                        08:49
19   A.   Including methods validation, routine        08:49
20   analysis, equipment qualification and calibration,   08:49
21   stability and experimental protocol, yes.        08:49
22   Q.   Right.  And again that's a lab-based        08:49
23   position.                             08:49
24   A.   It is.                             08:49
25   Q.   And was while you occupied it.             08:49

Page 31

1    A.   Yes.                              08:49
2    Q.   The next one, Somerset Pharmaceuticals,      08:49
3    director of analytical research and             08:49
4    development/quality control.  You characterize it    08:49
5    as a senior analytical laboratory supervisor.      08:49
6       Is that also a lab-based position?            08:49
7    A.   It is, in addition to interacting          08:49
8    extensively with product development people who --   08:50
9    some of whom reported to me, clinical trial        08:50
10   material manufacturing, dosage formula           08:50
11   manufacturing, some of who reported to me.         08:50
12   Various different -- it was a small company and     08:50
13   everybody wore a lot of hats.  In this particular   08:50
14   case we did the whole development bailiwick.        08:50
15   Q.   Okay.  But your position was so you         08:50
16   interacted with the product development people.     08:50
17   A.   Some of who reported to me too.            08:50
18   Q.   Okay.  Those are also lab-based           08:50
19   positions; correct?                       08:50
20   A.   Not all of them, no.                   08:50
21   Q.   What people -- well, did you have any QA      08:50
22   responsibilities?                         08:50
23   A.   No.  QA was a separate function outside      08:50
24   the lab.                              08:50
25   Q.   And I guess I should go back.  Let's go      08:50

Page 32

1    back to Zeneca.                          08:50
2    A.   Okay.                             08:50
3    Q.   As an analytical research chemist, any       08:50
4    QA responsibilities?                       08:51
5    A.   No, QA is a separate function.            08:51
6    Q.   Okay.                             08:51
7    A.   Distinct and clear separate function or      08:51
8    should be.                            08:51
9    Q.   And I understand that.                 08:51
10   A.   Uh-huh.                            08:51
11   Q.   But I need to -- I hope you understand,      08:51
12   Dr. Bliesner, I need to establish certain things    08:51
13   for the record.                          08:51
14   A.   Absolutely.                        08:51
15   Q.   So with Zeneca -- because as you said QA    08:51
16   is a separate and distinct function from the lab    08:51
17   operations --                           08:51
18   A.   Uh-huh.                            08:51
19   Q.   -- which are typically referred to as       08:51
20   quality control; correct?                   08:51
21   A.   No.                              08:51
22   Q.   Well --                            08:51
23   A.   Quality control and quality assurance       08:51
24   are two different functions.                08:51
25   Q.   That's what I meant.                   08:51

Page 33

1    A.   Yes.                              08:51
2    Q.   Maybe I didn't say that very clearly.        08:51
3    A.   Uh-huh.                            08:51
4    Q.   Lab functions are typically within the       08:51
5    industry referred to as quality control; is that    08:51
6    correct?                             08:51
7    A.   That's a fair statement.                08:51
8    Q.   Okay.  And quality assurance -- or QA as    08:51
9    I've been using that term and as I believe you      08:51
10   understood when I used that term --             08:51
11   A.   Uh-huh.                            08:51
12   Q.   -- is as you described a separate and       08:51
13   distinct function totally separate from lab        08:51
14   testing and quality control; correct?            08:51
15   A.   As an oversight function.  Quality         08:52
16   assurance itself is integrated into everything,     08:52
17   including the lab functions you know, review the    08:52
18   data, integrity of data, method development        08:52
19   validation.  As far as the title as an oversight,   08:52
20   as a final signoff and a separate pair of eyes      08:52
21   with a different reporting structure, that is the    08:52
22   QA function.                           08:52
23   Q.   Okay.  At Zeneca --                   08:52
24   A.   Uh-huh.                            08:52
25   Q.   -- you had no QA responsibilities;          08:52

9 (Pages 30 to 33)

PLAINTIFFS' EXHIBITS 003049

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 34

1  correct?                                    08:52
2      A.  No, but GMP responsibilities that are      08:52
3  oversight by QA.                            08:52
4      Q.  Dr. Bliesner.                       08:52
5      A.  Yes.                                08:52
6      Q.  This is what I'm talking about.  I asked      08:52
7  you very succinctly whether you had QA      08:52
8  responsibilities.  If you would answer that      08:52
9  question and only that question, I would      08:52
10  appreciate it; okay?                       08:52
11      Did you have QA responsibilities?      08:52
12      A.  As we define QA -- you and I understand      08:52
13  -- quality assurance, separate function,      08:52
14  oversight, no.                             08:52
15      Q.  Same question with respect to the next      08:52
16  position you have listed, UDL Laboratories and      08:52
17  principal chemist.  Did you have any QA      08:52
18  responsibilities?                          08:52
19      A.  As we've defined it, no.           08:53
20      Q.  Same question with respect to the next      08:53
21  UDL position you have as analytical group leader      08:53
22  on your CV.  As we've defined QA responsibilities,      08:53
23  did you have any of those QA responsibilities in      08:53
24  that position?                             08:53
25      A.  No.                                08:53

Page 35

1      Q.  As an analytical laboratory manager for      08:53
2  Somerset Pharmaceuticals, did you have any QA      08:53
3  responsibilities?                          08:53
4      A.  In the formal sense, as QA as we've      08:53
5  defined it, no.                            08:53
6      Q.  As the director of analytical research      08:53
7  and development/quality control for Somerset      08:53
8  Pharmaceuticals, any QA responsibilities?      08:53
9      A.  No.                                08:53
10      Q.  Moving to the next entry in your CV,      08:53
11  HPLC, product marketing manager for Restek      08:54
12  Corporation aParently at Penn State University.      08:54
13  Tell me about that position.               08:54
14      A.  It was not at Penn State.  It's a state      08:54
15  college.                                   08:54
16      Q.  Is that different?                 08:54
17      A.  Yes.                               08:54
18      Q.  Is that not Penn State?            08:54
19      A.  Yes.                               08:54
20      Q.  My apologies.                      08:54
21      Tell me about that position.  What did you do?      08:54
22      A.  Initially, I stepped into a business      08:54
23  role, business development role, to assist them in      08:54
24  finding ways to increase their sales of HPLC      08:54
25  products.                                  08:54

Page 36

1      Q.  Okay.  And do I understand then that      08:54
2  when you took this position with Restek, you      08:54
3  stepped outside the laboratory and the technical      08:54
4  aspect of the pharmaceutical business and      08:55
5  transitioned to a more business and marketing      08:55
6  role?                                      08:55
7      A.  I don't think that's an accurate      08:55
8  assessment.                                08:55
9      Q.  Well, why is it not accurate?      08:55
10      A.  Because the technical aspects all came      08:55
11  with it in addition to business still.      08:55
12      Q.  I understand.  But your title is product      08:55
13  marketing manager.  And as you described your      08:55
14  responsibilities, you were hired to and did assist      08:55
15  them with trying to increase sales of HPLC      08:55
16  columns; right?                            08:55
17      A.  I did for a brief period of time.      08:55
18      Q.  And your -- what do you mean by a brief      08:55
19  period of time?  Does that mean you were only      08:55
20  there for five months, is that what you mean?      08:55
21      A.  I only served in that position for five      08:55
22  months.                                    08:55
23      Q.  And then you transitioned to director of      08:55
24  Restek analytical services?                08:55
25      A.  I created the position and the title.      08:55

Page 37

1      Q.  Okay.  And backing up to your product      08:55
2  marketing manager position.                08:56
3      A.  Uh-huh.                            08:56
4      Q.  Did you have any QA responsibilities in      08:56
5  that role?                                 08:56
6      A.  Yes.                               08:56
7      Q.  Really?                            08:56
8      A.  For HPLC column manufacturing.      08:56
9      Q.  You had actual oversight responsibility      08:56
10  for checking the compliance of product      08:56
11  manufacturing with specifications?         08:56
12      A.  For HPLC columns.                  08:56
13      Q.  What do you mean by that?  Tell me what      08:56
14  distinction you're making.                 08:56
15      A.  HPLC column is a major component of high      08:56
16  performance liquid chromatography.         08:56
17      Q.  I understand.                      08:56
18      A.  We manufactured HPLC columns at Restek.      08:56
19      Q.  Did Restek manufacture any drug      08:56
20  products?                                  08:56
21      A.  No.                               08:56
22      Q.  So as director of analytical services,      08:56
23  that position has -- again is not associated with      08:56
24  manufacturing drug products, am I correct?      08:57
25      A.  We did not manufacture products on site.      08:57

PLAINTIFFS' EXHIBITS 003050

David M. Bliesner, Ph.D.        Videotaped        February 18, 2011

Page 38

1   Q.  Did you have any role or responsibility    08:57
2 for manufacturing -- for any aspect of    08:57
3 manufacturing any drug product when you were    08:57
4 employed by Restek?    08:57
5   A.  I can't say for sure because we    08:57
6 consulted to the industry as well and we may have    08:57
7 performed some consultation with respect to drug    08:57
8 product manufacturers.    08:57
9   Q.  Dr. Bliesner, I asked what your    08:57
10 experience was, not the company as a whole.    08:57
11   A.  No, no. I would have been the one that    08:57
12 would have been providing that consulting to the    08:57
13 manufacturing of drug product. I don't recall    08:57
14 whether we did or not, but we did provide    08:58
15 consultation in addition to the lab services as    08:58
16 well. So I can't say definitively that I did or    08:58
17 did not have input into the drug manufacturing    08:58
18 process.    08:58
19   Q.  What consultation did you yourself    08:58
20 provide while you were employed by Restek to -- to    08:58
21 drug product manufacturers?    08:58
22   A.  We were in constant contact with them    08:58
23 because they were our customers for the columns    08:58
24 and the lab services. So we provided consultation    08:58
25 on many aspects of the drug development process,    08:58

Page 39

1 production, manufacturing.    08:58
2   Q.  Are you telling me that you were    08:58
3 involved with developing drug products for other    08:58
4 companies while you were employed by Restek?    08:58
5   A.  They were our clients. We consulted    08:58
6 with them if they needed things.    08:58
7   Q.  You consulted with them with respect to    08:58
8 various functionality issues of your HPLC columns;    08:58
9 correct?    08:58
10   A.  No, not necessarily. We did contract    08:58
11 work, analytical work and product development work    08:58
12 for them as part of the mission.    08:58
13   Q.  Well, as part of the mission, as I read    08:58
14 your CV, Dr. Bliesner, that you prepared, it lists    08:59
15 only business functions. It doesn't say anything    08:59
16 about being involved in drug development    08:59
17 processes, does it?    08:59
18   A.  If you look at the director of Restek    08:59
19 Analytical Services, it offers analytical method    08:59
20 development, validation, HPLC, GC, education,    08:59
21 training, customer stationary phase design, CGMP    08:59
22 regulatory services and support. That's where    08:59
23 that would fall into.    08:59
24   Q.  And your testimony is that you performed    08:59
25 those functions while you were at Restek?    08:59

Page 40

1   A.  Some of them, yes.    08:59
2   Q.  What do you mean by some of them?    08:59
3   A.  I interacted primarily with the client    08:59
4 as the first line.    08:59
5   Q.  You mean you were the first line -- you    09:00
6 were Restek's front line person interacting with    09:00
7 the client. Is that what you mean by that?    09:00
8   A.  Yes, sir. For this division, Restek    09:00
9 Analytical Services.    09:00
10   Q.  Well, your job duties and    09:00
11 responsibilities as you described them included    09:00
12 market research, drafting a business plan, and    09:00
13 obtaining funding and approval from Restek.    09:00
14 You go on to describe what Restek does, but    09:00
15 you don't say anything about your -- about you    09:00
16 being involved in any of the analytical method    09:00
17 development consultation, do you?    09:00
18   A.  If I was to list here, the document    09:00
19 would be about 25 pages long for all the different    09:00
20 jobs that I've had.    09:00
21   Q.  Dr. Bliesner, I'm merely pointing out    09:00
22 that you described your job duties and    09:00
23 responsibilities strictly in a business capacity;    09:00
24 is that right?    09:00
25   A.  No, that's not correct.    09:00

Page 41

1   Q.  Your statement on here says that you    09:01
2 were responsible for conception, design, building,    09:01
3 staffing, and qualification of Restek Analytical    09:01
4 Services.    09:01
5   A.  That is correct.    09:01
6   Q.  And you go on to say that included    09:01
7 conducting market research, drafting a business    09:01
8 plan, and obtaining funding.    09:01
9   A.  That is correct.    09:01
10   Q.  You don't say anything about interacting    09:01
11 with clients on assisting with development of    09:01
12 analytical methods.    09:01
13   A.  As I said, if I put everything down I    09:01
14 did here, the document would be 25 pages long.    09:01
15 This is a summary resume to send out to people.    09:01
16 Could I interrupt for a second, please?    09:01
17   Q.  Would you like to take a break?    09:01
18   A.  Yes, please.    09:01
19   MR. ANDERTON: Absolutely.    09:01
20   THE VIDEOGRAPHER: The time is 9:01 a.m.    09:01
21 We're going off the record briefly.    09:01
22   (Short break)    09:12
23   THE VIDEOGRAPHER: The time is 9:12 a.m.    09:12
24 We're back on the record. This is the    09:13
25 beginning of tape two.    09:13

PLAINTIFFS' EXHIBITS 003051

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 42

1   BY MR. ANDERTON:                              09:13
2       Q.   Dr. Bliesner, -- hey Mike.  Mike?    09:13
3           MR. KERENSKY:  Yes.                    09:13
4           MR. ANDERTON:  If you're going to be   09:13
5   typing --                                      09:13
6           MR. KERENSKY:  All right.  I'll put it 09:13
7   back on mute.  Happens all the time.  I'm      09:13
8   sorry.                                         09:13
9           MR. ANDERTON:  That's all right.       09:13
10  BY MR. ANDERTON:                               09:13
11      Q.   All right.  Dr. Bliesner, we were     09:13
12  discussing various things on your resume and we 09:13
13  left off -- your CV.  We left off with director 09:13
14  of analytical services for Restek.             09:13
15      A.   Restek, yes.                          09:13
16      Q.   Restek.  Sorry.  And the State College 09:13
17  of Pennsylvania.  The next -- well, let me let me 09:13
18  ask one final question about that position.    09:13
19      The consultation that you described being  09:13
20  involved with in that position was primarily   09:14
21  consultation -- well, was exclusively consultation 09:14
22  related to lab-based activities; correct?      09:14
23      A.   No, I don't think you'd say that      09:14
24  exclusively.  We went into a lot of different  09:14
25  client sites, interacted with groups of folks at 09:14

Page 43

1   the client sites which included, you know, product 09:14
2   development, manufacturing types, lab types,   09:14
3   usually looking for a source of additional     09:14
4   information in addition to solving problems.   09:14
5       Q.   Primarily lab-based activities that you 09:14
6   were giving consultation on?                   09:14
7       A.   I wouldn't say primarily.             09:14
8       Q.   Well, you sold --                     09:14
9       A.   It was very broad-based in our approach 09:14
10  in how we were trying to line up customers.    09:14
11      Q.   Well, you sold HPLC columns; right?   09:14
12      A.   And services.                         09:15
13      Q.   And what type of services?  What do you 09:15
14  mean by services?                              09:15
15      A.   That's what Restek Analytical Services 09:15
16  was all about.  It wasn't just about selling HPLC 09:15
17  columns.  It was about selling contract analytical 09:15
18  services and providing consulting services -- GMP 09:15
19  training, those types of things -- to the industry 09:15
20  so they could partner with us and be interested in 09:15
21  buying the columns and we would validate the   09:15
22  methods.                                       09:15
23      Q.   Analytical services again relates to lab 09:15
24  functions; right?                              09:15
25      A.   It wasn't necessarily all analytical  09:15

Page 44

1   services because there was formulation development 09:15
2   discussions that went on in there as well.     09:15
3       Q.   When you left Restek and went to work -- 09:15
4   the next position listed on your CV is         09:15
5   vice-president of operations for Laboratory    09:15
6   Management Systems in New Castle, Delaware.    09:15
7       A.   That's correct.                       09:15
8       Q.   According to your CV, you created and  09:16
9   drove sales and marketing plans; is that right? 09:16
10      A.   As one part of my responsibilities, yes. 09:16
11      Q.   What else did you do?                  09:16
12      A.   Primary responsibility took up the     09:16
13  lion's share of the time as I was an active    09:16
14  consultant with the Wyeth and Schering Plough  09:16
15  consent decrees.                               09:16
16      Q.   Doing what?                            09:16
17      A.   Being part of the FDA-mandated         09:16
18  third-party expert contingent consult, where we 09:16
19  went in and did very detailed, thorough        09:16
20  assessments, documented the findings, developed 09:16
21  corrective actions and went back in and did    09:16
22  verification and then backed the actions that had 09:16
23  been put into place that were stable -- were   09:16
24  verifiable and sustainable from a quality systems 09:16
25  standpoint.                                     09:16

Page 45

1       Q.   Wyeth and who else?                    09:16
2       A.   Schering Plough.                       09:16
3       Q.   Schering Plough.  Both were under      09:16
4   consent decrees?                               09:16
5       A.   They were.                             09:17
6       Q.   Did you visit both of those companies  09:17
7   while you were employed by Laboratory Management 09:17
8   Systems?                                       09:17
9       A.   When you say "visit," they're very large 09:17
10  organizations that have many different sites.  09:17
11      Q.   Did you visit any of them?             09:17
12      A.   Yes, sir.                              09:17
13      Q.   For both companies?                    09:17
14      A.   Yes, sir.                              09:17
15      Q.   And --                                 09:17
16      A.   The visit actually was on site         09:17
17  extensively for some of them.                  09:17
18      Q.   And so you were part of what I'll      09:17
19  characterize as the remediation activities for 09:17
20  both of those companies?                       09:17
21      A.   I wouldn't characterize it as such.    09:17
22      Q.   What's wrong with my term remediation  09:17
23  activities?                                    09:17
24      A.   Remediation assumes that you've already 09:17
25  found everything that was wrong.               09:17

12 (Pages 42 to 45)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 46

1     Q.   Okay.  But there were certainly          09:17
2  remediation activities.                          09:17
3     A.   That followed, yes.                       09:17
4     Q.   Well, if you're under a consent decree,  09:17
5  there are certain things that have already been  09:17
6  identified; right?                               09:17
7     A.   The FDA would have found and documented  09:17
8  through 483s, warning letters, and presented an  09:17
9  EIR, continuing deficiencies, yes.               09:18
10    Q.   And tell me about the process that        09:18
11 you -- and let's ask first about Wyeth.          09:18
12    A.   Uh-huh.                                   09:18
13    Q.   Tell me about the process that you        09:18
14 followed as you provided consulting services to  09:18
15 them to help them address the issues that were   09:18
16 raised by the consent decree and the underlying  09:18
17 regulatory activities that resulted in that      09:18
18 consent decree.                                   09:18
19    A.   Okay.                                     09:18
20    Q.   What process did you follow?              09:18
21    A.   As a global?                              09:18
22    Q.   Yeah, generally.                          09:18
23    A.   Generally.                                09:18
24    Q.   And then I'll ask more specific           09:18
25 questions based on your response.                09:18

Page 47

1     A.   First of all, each consent decree as I'm  09:18
2  sure you know is an individually negotiated plan. 09:18
3     Q.   Understood.                               09:18
4     A.   In the Wyeth consent decree, we first     09:18
5  came in and did very detailed assessments of the 09:18
6  major quality system elements.                   09:18
7     Q.   Which involved what?                      09:18
8     A.   Going into individual departments --      09:19
9  laboratories, manufacturing areas, packaging     09:19
10 areas -- usually in teams of two people and asking 09:19
11 questions, performing interviews, looking at data, 09:19
12 looking at protocols, the whole plethora of      09:19
13 activities for each one of the quality system    09:19
14 elements.  Document them.                        09:19
15    Q.   Looking at data and looking at            09:19
16 protocols, two things that you identified in that 09:19
17 response.  What do each of those mean?  Looking at 09:19
18 what type of data, looking at what type of       09:19
19 protocols?                                        09:19
20    A.   It really depended because it was a huge  09:19
21 organization and addressed many different        09:19
22 components.  So you would be assigned a department 09:19
23 for instance that you could go in on for a       09:19
24 particular week and you would determine their work 09:19
25 flow, how they conducted business, how they      09:19

Page 48

1  documented things, how data was collected, and you 09:19
2  would go soup to nuts, systematic approach,       09:19
3  looking through to see if they, in fact, had      09:19
4  quality systems or any systems in place, whether  09:20
5  they had procedures in place, whether people were 09:20
6  trained and just in a laboratory notebook document 09:20
7  all these findings and go back and write them up  09:20
8  as findings from the assessment, very similar to  09:20
9  what the FDA would do on a 483.  A very extensive, 09:20
10 heavy-duty process.                               09:20
11    That was only the first part.                  09:20
12    Q.   What was the second part?                 09:20
13    A.   The second part was a compilation of all  09:20
14 of the findings into a report.                    09:20
15    Q.   The findings meaning your analysis of     09:20
16 the data as you described it and protocols that   09:20
17 you reviewed and all the other information that   09:20
18 you reviewed.                                     09:20
19    A.   Systems in general; okay?  Quality        09:20
20 system, laboratory control system, product system, 09:20
21 packaging, labeling, all of those different       09:20
22 things.  You know, it was a detailed assessment   09:20
23 and that would include reviewing training records 09:20
24 for instance for the individuals that are there,  09:20
25 looking at, you know, production records.         09:20

Page 49

1  Everything you would imagine that constitutes a   09:21
2  modern pharmaceutical manufacturing system -- down 09:21
3  to excruciating details.                          09:21
4     Q.   That was all part of your consulting?     09:21
5     A.   Yes.  We had a 150 people team initially  09:21
6  on the one site with Wyeth.                       09:21
7     Q.   How long did that process take?           09:21
8     A.   The initial assessment?                   09:21
9     Q.   Yes.                                       09:21
10    A.   The initial site where we started --       09:21
11 it's been a long time.  The assessment ran        09:21
12 somewhere in the neighborhood of approximately    09:21
13 three months.                                      09:21
14    Q.   With 150 people on site for three         09:21
15 months?                                            09:21
16    A.   Absolutely.                                09:21
17    Q.   150 laboratory management systems         09:21
18 employees on Wyeth's site for three months?       09:21
19    A.   We were subcontractors as part of a       09:21
20 team.                                              09:22
21    Q.   Okay.  As you performed that              09:22
22 assessment.                                        09:22
23    A.   Uh-huh.                                   09:22
24    Q.   That's a correct term?                    09:22
25    A.   Yes.                                       09:22

13 (Pages 46 to 49)

PLAINTIFFS' EXHIBITS 003053

David M. Bliesner, Ph.D.                Videotaped                February 18, 2011

Page 50

1    Q.   Is that the same thing as an audit?        09:22
2    A.   I don't think I would define it like        09:22
3  that, but...                                        09:22
4    Q.   Well --                                      09:22
5    A.   It's the same process, yeah.              09:22
6    Q.   Okay.  So if I describe the process that    09:22
7  you just described.                                09:22
8    A.   Uh-huh.                                      09:22
9    Q.   150 people on site for three months,        09:22
10  soup to nuts, virtually everything you can think    09:22
11  of with respect to a manufacturing and production  09:22
12  process.                                           09:22
13   A.   Uh-huh.                                      09:22
14   Q.   That's an accurate description of what       09:22
15  you guys -- the activity you undertook.           09:22
16   A.   Everything.  All of the components of       09:22
17  the quality systems that constituted that.        09:22
18   Q.   So if I described that process as an        09:22
19  audit, would that be an accurate or a fair        09:22
20  characterization?                                 09:22
21   A.   Perhaps.  There's confusion in the          09:23
22  industry in general about what's an assessment,     09:23
23  what's a self-assessment, what's an audit, what's   09:23
24  an inspection, so...                               09:23
25   Q.   I understand.                                09:23

Page 51

1    A.   Yes.                                         09:23
2    Q.   I'm asking you.                              09:23
3    A.   To me, personally?                          09:23
4    Q.   Yes.                                         09:23
5    A.   An audit is a like the agency coming in      09:23
6  and doing something from the outside.  It's not     09:23
7  necessarily open and collaborative.  This          09:23
8  assessment was full disclosure from all employees   09:23
9  and everything.  You know, sit down, tell us       09:23
10  what's wrong, tell us everything that's there, you   09:23
11  know, everybody volunteering information.  I       09:23
12  consider that to be different than an audit.       09:23
13   Q.   Well, when you -- so you then used the       09:23
14  term audit and believe it is best used only to     09:23
15  apply to a -- a -- I guess I'll characterize that   09:23
16  as third-party or just the FDA?  I mean I'm not     09:24
17  sure I understand the distinction.                09:24
18   A.   And to be perfectly honest with you,        09:24
19  there's confusion in the industry too.  So I don't   09:24
20  know if your statement is the best description of   09:24
21  it.                                                09:24
22   Q.   Well, then I mean what is -- what is the    09:24
23  difference between an audit and the assessment      09:24
24  that you just described?                          09:24
25   A.   An audit, in my experience, they usually    09:24

Page 52

1  come in the form of a corporate entity, quality    09:24
2  assurance coming down to a specific site and        09:24
3  performing a compliance assessment that's an audit    09:24
4  to try to determine stuff.                         09:24
5    When corporate comes down to a site, it isn't    09:24
6  necessarily a free and open sharing of things with   09:24
7  individuals because it's corporate.  So that is     09:24
8  how audits work per se.                            09:24
9    An assessment is when -- I've actually just     09:24
10  recently finished a very extensive one where we     09:24
11  would sit down and it's full, open, and honest      09:24
12  disclosure, everybody is laying things out because   09:24
13  you really want to get to the root cause during an   09:24
14  assessment, self-assessment, to find out what's     09:25
15  broken and what potential corrective actions may     09:25
16  be and how to implement corrective and preventive    09:25
17  actions and verify the actions, collecting these    09:25
18  data, all the things we've described.             09:25
19   Q.   So then as you understand and use, as      09:25
20  you used the term audit, does that mean you don't    09:25
21  think it's -- that there's as much disclosure and    09:25
22  openness when an audit is being conducted?         09:25
23   A.   I would say that's a fair assessment,       09:25
24  yes.  Because people volunteer information during    09:25
25  an assessment, but if the FDA comes in to do an     09:25

Page 53

1  audit, people don't volunteer information.         09:25
2    Q.   Well, if corporate comes in to do an        09:25
3  audit, they volunteer information don't they,       09:25
4  typically?                                         09:25
5    A.   It's restrained in my experience.          09:25
6    Q.   Do you feel that the people who are the     09:25
7  subject of either an assessment or an audit make     09:25
8  that type of distinction or do they kind of look    09:25
9  at it as though it's corporate or the FDA or a      09:25
10  third party asking questions about what they do     09:26
11  and how they do it?                               09:26
12   A.   I don't know if I really understand the     09:26
13  question.                                         09:26
14   MR. ANDERTON:  Can you read that back,          09:26
15  Phil.                                             09:26
16   THE WITNESS:  I think there's a couple of       09:26
17  questions in there.  I think people in            09:26
18  general -- again, confusion on terms.  We'll       09:26
19  use my definition audit, a third party coming      09:26
20  in or a corporate entity, something like that,     09:26
21  as opposed to assessment, being               09:26
22  self-assessment you want to uncover           09:26
23  everything.  Those two distinctions.  I think     09:26
24  people respond to audits and assessments,          09:26
25  self-assessments differently, yes.  And the        09:26

14 (Pages 50 to 53)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 54

1    reason for that is that audits -- corporate,        09:26
2    FDA or whatever -- obviously carry tremendous       09:27
3    consequences.                                       09:27
4    BY MR. ANDERTON:                                    09:27
5        Q.   Okay.  When you performed this             09:27
6    assessment of Wyeth with 150 people on site for     09:27
7    three months.                                       09:27
8        A.   About three months.                        09:27
9        Q.   Okay.  Fair enough.                        09:27
10       A.   And there are several other sites that     09:27
11   were involved as well.                              09:27
12       Q.   Fair enough.  Well, when your team         09:27
13   performed this assessment that lasted               09:27
14   approximately three months at various locations of  09:27
15   Wyeth and you did your soup to nuts review, did     09:27
16   you have access to any information that you         09:27
17   wanted?                                             09:27
18       A.   By agreement and communication with the   09:27
19   company, the official position was yes, we were to  09:27
20   have access to any information we wished.           09:27
21       Q.   And by that you mean that was a            09:27
22   condition of you doing the assessment because it's  09:27
23   necessary to do it properly?                        09:27
24       A.   That's correct.                            09:28
25       Q.   And that's typical when you do that type  09:28

Page 55

1    of assessment; correct?  You need to have full      09:28
2    access to whatever documents you think are          09:28
3    necessary and appropriate in order to properly      09:28
4    perform an assessment as you've described; is that  09:28
5    right?                                              09:28
6        A.   "Typical" is a very broad term.  I don't  09:28
7    know if I'd necessarily use it.  Because, again,    09:28
8    each consent decree as you know is negotiated       09:28
9    differently and may involve certain departments     09:28
10   within the larger company that may or may not       09:28
11   necessarily be involved with the consent decree or  09:28
12   initially involved in the consent decree for        09:28
13   example.                                            09:28
14       Q.   The consent decree --                      09:28
15       A.   Yes.                                        09:28
16       Q.   -- or if it's another regulatory           09:28
17   document is a starting point for the assessment;    09:28
18   correct?                                            09:28
19       A.   When you say "another regulatory          09:28
20   document."                                          09:28
21       Q.   Might be a 483, might be a warning        09:28
22   letter.  You've done consulting engagements where   09:28
23   the company wasn't involved in a negotiated         09:29
24   consent decree; correct?                            09:29
25       A.   That's correct.                            09:29

Page 56

1        Q.   And sometimes you're doing an assessment  09:29
2    based on an FDA warning letter; correct?            09:29
3        A.   Or a preparation for a preapproval         09:29
4    inspection for FDA, another example.                09:29
5        Q.   But to answer my question, it's true      09:29
6    that you've done assessments where a company        09:29
7    receives a warning letter, they hire you or people  09:29
8    that you work with and for and they ask you to do   09:29
9    what you've described as an assessment on the       09:29
10   basis of that warning letter; is that true?         09:29
11       A.   That is correct, yes.                       09:29
12       Q.   All right.  And have you also done         09:29
13   assessments on the basis of FDA 483s?               09:29
14       A.   Specifically 483s?                          09:29
15       Q.   Yeah.                                       09:29
16       A.   No.                                         09:29
17       Q.   Okay.  When you -- when you do those --    09:29
18   and I believe last time you testified that you've   09:29
19   done about five -- and I think the term that you    09:29
20   used was audit rather than assessment, you've done  09:30
21   about five GMP compliance audits in your career.    09:30
22   Does that sound about right?                        09:30
23       A.   Let me think about it for a second.        09:30
24       Q.   Take your time.                            09:30
25       A.   Yeah, about five or six.                   09:30

Page 57

1        Q.   Back to the assessments that you said     09:31
2    you've done for or on the basis of an FDA warning   09:31
3    letter.  When you undertook those engagements, was  09:31
4    it also a condition of your engagement that you     09:31
5    would have access to the documents you and your     09:31
6    team felt were necessary to review in order to      09:31
7    conduct the assessment?                             09:31
8        A.   In the circumstance where it was just a   09:31
9    warning letter, the project did not start out as    09:31
10   we're bringing you in to do an assessment.  It      09:31
11   evolved into that.                                  09:31
12       Q.   And when it did --                          09:31
13       A.   Yes.                                        09:31
14       Q.   -- did you insist on having full access   09:31
15   to the documents you deemed necessary to properly   09:32
16   conduct your assessment?                            09:32
17       A.   We didn't insist.  We just expected       09:32
18   because it was the next evolution for the client    09:32
19   to ask for it that we would have what we needed.    09:32
20       Q.   Would you do an assessment if a           09:32
21   potential client said no, we're not going to give   09:32
22   you access to certain documents?  Production        09:32
23   records for example.                                09:32
24       A.   Would we do the assessment?               09:32
25       Q.   Yeah.                                      09:32

15 (Pages 54 to 57)

PLAINTIFFS' EXHIBITS 003055

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 58

1    A.   Depends on what the client wants out of          09:32
2  the assessment.                                         09:32
3    Q.   Well, if a client hired you to assess            09:32
4  GMP compliance.                                         09:32
5    A.   Okay.  In general.                               09:32
6    Q.   Yes.                                             09:32
7    A.   Uh-huh.                                          09:32
8    Q.   And said I'm not going to -- I want you          09:32
9  to do it without looking at production records,         09:32
10 would you do that?                                      09:32
11   A.   If it was to be a comprehensive review           09:32
12 of compliance with the GMPs using a quality             09:32
13 systems based approach, we would inform the client      09:32
14 that unless we had access to those records, that        09:32
15 they wouldn't be getting what they were asking          09:33
16 for.                                                    09:33
17   Q.   So they wouldn't be getting a                    09:33
18 comprehensive, accurate assessment of GMP               09:33
19 compliance?                                             09:33
20   A.   Any my opinion, if they did not give             09:33
21 open access to the records, yes.                        09:33
22   Q.   To the production records.  That's the           09:33
23 records I was talking about.                            09:33
24   A.   Well, specifically -- it depends what            09:33
25 the client wants; okay?  If the client wants the        09:33

Page 59

1  whole thing, then access to production records          09:33
2  would probably be something you would want to have      09:33
3  access to.                                              09:33
4    Q.   And I want -- I guess I want to make             09:33
5  sure this is clear because I was talking about          09:33
6  production records.                                     09:33
7    A.   Okay.  I misunderstood you.                      09:33
8    Q.   I said it -- I thought I said it pretty          09:33
9  clearly.                                                09:33
10   A.   Sorry.                                           09:33
11   Q.   If a client hired you to assess its              09:33
12 general GMP compliance.                                 09:33
13   A.   Right.                                           09:33
14   Q.   And said, I don't want to give you -- I,         09:33
15 client, don't want to give you access to the            09:33
16 production records, you can do it from other            09:33
17 records, could you properly do that?                    09:33
18   A.   If it was a -- included an assessment of         09:33
19 the production system?                                  09:33
20   Q.   Yes.                                             09:33
21   A.   No, you couldn't.                                09:34
22   Q.   Couldn't do it?                                  09:34
23   A.   In my opinion, no.                               09:34
24   Q.   Okay.  In your work experience, have you         09:34
25 ever worked in manufacturing?                           09:34

Page 60

1    A.   On the floor in manufacturing?                   09:34
2    Q.   Yes.                                             09:34
3    A.   During product development, yes.                 09:34
4    Q.   What did you do?                                 09:34
5    A.   Helped troubleshoot a fluid bed dryer.           09:34
6    Q.   Tell me more about that.                         09:34
7    A.   I was, had one of my individuals at the          09:34
8  Somerset facility.  He was working with a Glatt,        09:34
9  G-L-A-T-T.  It's a fluid bed coater if you will.        09:34
10 And he was having a lot of problems with it and         09:34
11 everything else and asked me if I would come in         09:35
12 and watch him go through the process and if I           09:35
13 could offer any suggestions on how to correct it.       09:35
14   Q.   Okay.  Have you ever actually -- other           09:35
15 than a support functionality as, you know, since        09:35
16 it's troubleshooting like that --                       09:35
17   A.   Uh-huh.                                          09:35
18   Q.   -- have you ever actually had daily              09:35
19 responsibilities in the manufacturing context?         09:35
20   A.   No.                                              09:35
21   Q.   In a packaging context?                          09:35
22   A.   As in a production environment package?          09:35
23   Q.   Yes.                                             09:35
24   A.   No.                                              09:35
25   Q.   In a QA context.  Have you ever been             09:35

Page 61

1  directly in the QA operation or functionality?          09:35
2    A.   As we defined it for QA?                         09:35
3    Q.   Yes.                                             09:35
4    A.   Separate oversight?                              09:35
5    Q.   Yeah.                                            09:35
6    A.   No.                                              09:35
7    Q.   Do you have a copy of your report,               09:36
8  Dr. Bliesner?                                           09:36
9    A.   I do.                                            09:36
10   Q.   All right.  Why don't you get it in              09:36
11 front of you --                                         09:36
12   A.   Okay.                                            09:36
13   Q.   -- please.  And, Mike, this is Exhibit           09:36
14 92.  I believe is the version we were looking at        09:36
15 last time.                                              09:36
16   A.   Now, this is my personal version so I            09:36
17 don't have a copy of the 92 that you're working         09:36
18 off of.                                                 09:36
19   Q.   Well, let's make sure, then.                     09:36
20   A.   I know there was a couple of page                09:36
21 discrepancies before.                                   09:36
22   Q.   I understand.  So we're going to hand            09:36
23 you a copy of Exhibit 92.                                09:36
24   A.   Okay.                                            09:36
25   Q.   Turn to page -- well, what is my page.           09:36

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 003056

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 62

1    A.   It's 92.  We should be okay now.          09:37
2    Q.   Okay.  Fair enough.  Yeah, these should   09:37
3  be the same actually.                            09:37
4    A.   Yes.                                       09:37
5    Q.   So.                                        09:37
6    A.   It was just there was two different        09:37
7  exhibits before and they were a page off because 09:37
8  of formatting or something like that.            09:37
9    Q.   Okay.                                      09:37
10   A.   With respect to my format.                 09:37
11   Q.   So turn to page 21.                        09:37
12   A.   Okay.                                      09:37
13   Q.   And paragraph number 8 on page 21 which   09:37
14 has the heading "conclusions."                   09:37
15   Do you see that?                               09:37
16   A.   Yes.                                       09:37
17   Q.   And in that paragraph, you issue, I       09:37
18 guess, your opinion in this case; is that        09:37
19 accurate?                                         09:37
20   A.   It is my opinion based on the documents   09:37
21 I reviewed.                                       09:37
22   Q.   Okay.  And your opinion is that           09:37
23 adulterated drug product made it to the          09:38
24 marketplace.                                      09:38
25   Is that a fair characterization of your        09:38

Page 63

1  opinion?                                          09:38
2    A.   We know it did because the pharmacist     09:38
3  found product that was double-thick.             09:38
4    Q.   Well, when you give that response, are    09:38
5  you talking about the 2004 circumstances where a 09:38
6  pharmacist reported a double-thick tablet?       09:38
7    A.   I'd have to go back through and take a     09:38
8  look.                                             09:38
9    Q.   Please do.                                 09:38
10   A.   Do you have a sticky by chance?           09:40
11   Q.   Yes.  I don't but?                         09:40
12   MS. DREWES:  I do.                             09:40
13   THE WITNESS:  Can I have?                      09:40
14   MS. DREWES:  Sure.                             09:40
15   THE WITNESS:  Bunches of them, please.        09:40
16   MS. DREWES:  Here.                            09:40
17   THE WITNESS:  Just to make sure.  Else        09:40
18 you know me, I'll be writing all over this       09:40
19 thing.                                            09:40
20 BY MR. ANDERTON:                                 09:46
21   Q.   Dr. Bliesner, are you re-reading your    09:46
22 report?                                           09:46
23   A.   No, I'm just being careful, make sure    09:46
24 that I pull out the information that you wanted.  09:46
25   Q.   Well, I asked you what you were          09:46

Page 64

1  referring to when you said "we know."            09:46
2    A.   Uh-huh.                                    09:46
3    Q.   "Product made it to market."              09:46
4    A.   Uh-huh.  And you asked me to identify     09:46
5  all those circumstances in the report so that's  09:46
6  what I'm doing.  Would you like me to stop?      09:46
7    Q.   Well, how many do you think there are?    09:46
8    A.   I'm going to finish reviewing the report  09:46
9  and then I'll tell you.                           09:46
10   Q.   Answer my question.  How many do you      09:46
11 think there are?                                  09:46
12   A.   I'm not going to say off the top of my    09:46
13 head.                                             09:46
14   Q.   Did you -- did you prepare for this       09:46
15 deposition, Dr. Bliesner?                         09:46
16   A.   Today?                                     09:46
17   Q.   Yes.                                       09:46
18   MR. KERENSKY:  Mike, that's an               09:46
19 unnecessary question.  You don't have to         09:46
20 answer that, Mr. Bliesner.                        09:46
21   MR. ANDERTON:  Are you instructing him       09:46
22 not to answer that, Mike?                         09:46
23   MR. KERENSKY:  He's not because that's an     09:46
24 unprofessional question.                          09:46
25   MR. ANDERTON:  Are you instructing him       09:46

Page 65

1  not to answer?                                    09:46
2    MR. KERENSKY:  Yes.  What you're doing --     09:46
3    MR. ANDERTON:  On what basis?                  09:46
4    MR. KERENSKY:  Change the question, Mike.     09:46
5    MR. ANDERTON:  On what basis are you          09:47
6  instructing him not to answer?                    09:47
7    MR. KERENSKY:  Because it's harassing.        09:47
8    MR. ANDERTON:  I'm not harassing him.         09:47
9  I'm asking him -- I'm going to get into this      09:47
10 line of questioning whether at this moment or     09:47
11 some other time.  I'm allowed to inquire what     09:47
12 he did to prepare.                                09:47
13   MR. KERENSKY:  All right.  Maybe a later       09:47
14 time when you're actually asking those            09:47
15 questions we'll answer that question.             09:47
16   MR. ANDERTON:  No, Mike, you cannot           09:47
17 instruct a witness not to answer because you      09:47
18 don't like the timing of the question.            09:47
19   MR. KERENSKY:  Yes, I can.                     09:47
20   MR. ANDERTON:  No, you cannot.                09:47
21   MR. KERENSKY:  Let him finish answering       09:47
22 the question you've asked.                         09:47
23   MR. ANDERTON:  I'm asking a different         09:47
24 question now.  Dr. Bliesner --                     09:47
25   THE WITNESS:  Can I get some water?           09:47

17 (Pages 62 to 65)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 66

1    MR. ANDERTON:  Yes, you may get some    09:47
2  water.  Let's go off the record for a moment.    09:47
3    THE VIDEOGRAPHER:  The time is 9:47 a.m.    09:47
4  We're going off the record briefly.    09:47
5    (Short break)    09:48
6    THE VIDEOGRAPHER:  The name is 9:48 a.m.    09:48
7  We are back on the record.    09:48
8  BY MR. ANDERTON:    09:48
9    Q.    Dr. Bliesner, I'm going to let you    09:48
10  continue your review, but I'm going to briefly ask    09:48
11  you a few questions.    09:48
12    Did you prepare for this deposition today?    09:48
13    A.    Some.    09:48
14    Q.    What did you do to prepare?    09:48
15    A.    At Mike's suggestion I took all of the    09:48
16  boxes and stuff that were disorganized from the    09:48
17  last deposition -- but I did nothing with them --    09:48
18  and put them in order.    09:48
19    Q.    Did you do anything else besides    09:48
20  organize your boxes?    09:48
21    A.    Reviewed the report.    09:48
22    Q.    You did review the report?    09:48
23    A.    Uh-huh.    09:49
24    Q.    When did you do that?    09:49
25    A.    This morning.    09:49

Page 67

1    Q.    This morning?    09:49
2    A.    Uh-huh.    09:49
3    Q.    When you got here at 7:30 or so?    09:49
4    A.    Uh-huh.    09:49
5    Q.    What time did you get up to review your    09:49
6  report this morning?    09:49
7    A.    I woke up at 3:30 this morning.    09:49
8    Q.    Do you typically wake up at 3:30?    09:49
9    A.    Unfortunately I have to say this, but    09:49
10  yes, I do.    09:49
11    Q.    It is unfortunate.    09:49
12    A.    Middle age.    09:49
13    Q.    Did you -- did you review the entire    09:49
14  report this morning?    09:49
15    A.    No.    09:49
16    Q.    Well, what parts of it did you review    09:49
17  and what the purpose of your reviewing the report    09:49
18  this morning, what were you looking for?    09:49
19    A.    Just glancing through, familiarize    09:49
20  myself with some of the attachments.    09:49
21    Q.    Before organizing -- other than    09:49
22  organizing your boxes and reading your report this    09:49
23  morning, what else did you do to prepare for this    09:49
24  deposition today?    09:49
25    A.    Preparation, that was it.  I didn't do    09:50

Page 68

1  much at all.    09:50
2    Q.    Didn't do much at all.  Did you meet    09:50
3  with any of the lawyers for the Plaintiffs in this    09:50
4  litigation Mr. Kerensky, Miss Johnson, any of    09:50
5  those lawyers?    09:50
6    A.    When you say "meet."    09:50
7    Q.    Did you meet with them in person?    09:50
8    A.    No.    09:50
9    Q.    Did you speak to them on the telephone?    09:50
10    A.    I spoke with them but it didn't have    09:50
11  much to do with prep.    09:50
12    Q.    Did you speak to them on the telephone?    09:50
13    A.    I did speak with Miss Johnson.    09:50
14    Q.    Miss Johnson?    09:50
15    A.    Yeah, briefly, and confirmed with    09:50
16  Mike -- I can never pronounce.    09:50
17    Q.    Kerensky.    09:50
18    A.    Kerensky, yeah.    09:50
19    MR. ANDERTON:  I got your back, Mike.    09:50
20    MR. KERENSKY:  Got it.    09:50
21  BY MR. ANDERTON:    09:50
22    Q.    You spoke with Miss Johnson how many    09:50
23  times?    09:50
24    A.    Once.    09:50
25    Q.    How long did that conversation last?    09:50

Page 69

1    A.    About a minute and a half.    09:51
2    Q.    That was -- that was since January 25th,    09:51
3  between January 25th and today?    09:51
4    A.    No.  You asked yesterday in preparation    09:51
5  for this.    09:51
6    Q.    No, I said before this deposition.  I    09:51
7  was not limiting my question to yesterday.    09:51
8    Q.    Okay.  Before this deposition?    09:51
9    A.    Yeah.  So let's break this down, okay,    09:51
10  Dr. Bliesner.    09:51
11    A.    Uh-huh.    09:51
12    Q.    I need you to listen very carefully,    09:51
13  please.    09:51
14    A.    Right.  I am.    09:51
15    Q.    Since you were -- since we began this    09:51
16  deposition and opened the record on January 25th    09:51
17  and up to today --    09:51
18    A.    Okay.    09:51
19    Q.    -- what did you do -- what have you done    09:51
20  to prepare for today's session?    09:51
21    A.    What I said already.  I organized my    09:51
22  papers and I reviewed the report.  Preparation, if    09:51
23  that's what you want to call it, for the -- with    09:51
24  Miss Johnson and Mr. Kerensky was just a matter of    09:51
25  just show up and your organize your papers.  I    09:51

18 (Pages 66 to 69)

PLAINTIFFS' EXHIBITS 003058

David M. Bliesner, Ph.D.                     Videotaped                          February 18, 2011

Page 70

1  don't think you need to do much else.  And you      09:51
2  just do what you did last time.                09:51
3      Miss Johnson didn't provide any guidance      09:52
4  whatsoever.  She was in the process of looking up   09:52
5  some additional documentation, but I never looked   09:52
6  at it.                                   09:52
7      Q.  How many times have you -- did you speak   09:52
8  with Miss Johnson between January 25th and today?   09:52
9      A.  Specifically a number, I don't know.      09:52
10     Q.  More than once?                     09:52
11     A.  Once, maybe.                      09:52
12     Q.  Twice?                         09:52
13     A.  Maybe.  I don't think it was more than    09:52
14 two.                                  09:52
15     Q.  Did you speak to her?                 09:52
16     A.  Yesterday, yes, for sure.             09:52
17     Q.  Any time before yesterday and since      09:52
18 January 25th?                            09:52
19     A.  I don't recall.                   09:52
20     Q.  How about Mr. Kerensky?  Did you speak    09:52
21 to him between January 25th and today?           09:52
22     A.  Well, yesterday, coordinated to get     09:52
23 here.                                  09:52
24     Q.  Other than yesterday, have you spoken to  09:52
25 Mr. Kerensky since January 25th?               09:52

Page 71

1      A.  Perhaps once.                     09:52
2      Q.  When?                          09:53
3      A.  I don't recall specifically.            09:53
4      Q.  Was that a telephone conversation?       09:53
5      A.  I -- I don't recall specifically.  It       09:53
6  was not what you would consider prep.  It was just   09:53
7  coordination.                            09:53
8      Q.  Dr. Bliesner, you need to answer my       09:53
9  questions.                               09:53
10     A.  Uh-huh.  I'm answering your questions.     09:53
11     Q.  No, you're not.  I asked you if you       09:53
12 spoke to Mr. Kerensky.  I didn't ask you to        09:53
13 characterize the phone call yet.               09:53
14     Have you spoken to Mr. Kerensky since January  09:53
15 25th?                                  09:53
16     A.  Yes.                          09:53
17     Q.  Was it a telephone conversation?         09:53
18     A.  Yes.                          09:53
19     Q.  Have you met with Mr. Kerensky in person   09:53
20 since January 25th?                         09:53
21     A.  No.                           09:53
22     Q.  I mean we're only talking about three     09:53
23 weeks.                                 09:53
24     A.  Yeah, I didn't.                   09:53
25     Q.  Okay.                          09:53

Page 72

1      A.  I know this was prep per se.  It's not     09:53
2  like we sat down and spent hours going back and     09:53
3  forth and discussing how I'm supposed to respond    09:53
4  to your questions or anything like that.  It was     09:54
5  just like are we on?  Just organize your paper.     09:54
6  That stuff.  Nothing detailed.                09:54
7      Q.  So you didn't have any discussion with    09:54
8  Mr. Kerensky since January 25th about what         09:54
9  happened on January 25th and what you might expect  09:54
10 to happen during this session?                09:54
11     A.  Between January 25th and this morning?    09:54
12     A.  Yes.                          09:54
13     A.  Interestingly enough, I don't think I     09:54
14 heard anything from him following the whole thing.  09:54
15     Q.  Well, how many times did you speak to     09:54
16 him?                                   09:54
17     A.  I said yesterday I know for sure.  Maybe   09:54
18 one other time to coordinate the schedule and that  09:54
19 was it.                                09:54
20     Q.  Well, he told you to organize your       09:54
21 papers.  That's not coordinating the schedule, is   09:54
22 it?                                    09:54
23     A.  It's -- it's what he told me to do.  He    09:54
24 says don't worry necessarily about preps, words to  09:54
25 that effect.  Just organize your papers so you      09:54

Page 73

1  don't flounder around and waste people's time.      09:54
2      Q.  And how long was your conversation with   09:55
3  Mr. Kerensky?                            09:55
4      A.  That particular one?                 09:55
5      Q.  Yeah.                          09:55
6      A.  Maybe a minute or two.               09:55
7      Q.  Were there other conversations before    09:55
8  yesterday and since January 25th besides that      09:55
9  minute or two conversation?                   09:55
10     A.  There may have been one other, but it     09:55
11 was nothing extensive.                       09:55
12     Q.  How long was it?                   09:55
13     A.  If there was one, is was e-mail or        09:55
14 whatever.  Similar thing.  Maybe a minute and a     09:55
15 half.                                  09:55
16     Q.  Well, was it a conversation or was it     09:55
17 e-mail communication.  Because I haven't asked      09:55
18 about e-mails communications.  I asked you about    09:55
19 conversations.                           09:55
20     A.  I don't know.  I'd have to go pull them    09:55
21 out and look at them.  All I know is none of these   09:55
22 conversations were substantive in terms of         09:55
23 guidance or anything like that.               09:55
24     Q.  Dr. Bliesner, I am entitled to find out   09:55
25 how many there were, then we'll talk about the      09:55

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313                          www.rennillo.com                          888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 003059

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 74

1  substance of them; okay?                         09:55
2      A.   I cannot tell you with certainty how    09:55
3  many telephone conversations or e-mails I had with  09:55
4  them.  I know that it was not a large number.    09:55
5      Q.   Okay.  So you know that it was more than  09:56
6  one, though; correct?                            09:56
7      A.   I can't say that with certainty.  I     09:56
8  really don't.  My life is busy.  I'm working 70,  09:56
9  80 hours a week on another consulting job.  This  09:56
10 is minor in terms of coordination, get things    09:56
11 done.  I don't know.  I can't say it explicitly.  09:56
12 I'm not going to make stuff up to make you happy.  09:56
13     Q.   I'm not asking you to make me happy.    09:56
14 I'm merely asking you to answer my questions      09:56
15 truthfully.                                       09:56
16     As we said earlier, you're a very intelligent  09:56
17 man and we're only talking about a three-week     09:56
18 period here.                                      09:56
19     MR. KERENSKY:  I think I need a break.        09:56
20     MR. ANDERTON:  Why do you need a break?       09:56
21     MR. KERENSKY:  I have to go to the            09:56
22 bathroom.                                         09:56
23     MR. ANDERTON:  All right.  All right.         09:56
24 Let's go off the record.                          09:56
25     THE VIDEOGRAPHER:  The time is                09:56

Page 75

1  9:56 p.m. -- we're going -- or a.m.  We're        09:56
2  going off the record.                             09:56
3      (Short break)                                 10:08
4      THE VIDEOGRAPHER:  The time is    .  We       10:08
5  are back on the record.  This is the beginning    10:08
6  of tape three.                                    10:08
7      MR. ANDERTON:  Mike, are you with us?         10:09
8      MR. KERENSKY:  I am.                          10:09
9  BY MR. ANDERTON:                                  10:09
10     Q.   All right.  Dr. Bliesner, before         10:09
11 Mr. Kerensky's break or requested break, we were  10:09
12 discussing what you've done to prepare for today's  10:09
13 session and I just want to remind you of something  10:09
14 we agreed earlier in the day and that is that you  10:09
15 would focus very hard on the questions that I ask  10:09
16 and do your best to actually answer those         10:09
17 questions.                                        10:09
18     A.   I understand.                            10:09
19     Q.   Okay.  So I'm going to go back into some  10:09
20 of that subject.                                  10:09
21     A.   Okay.                                    10:09
22     Q.   How many times have you spoken to        10:09
23 Mr. Kerensky on the telephone since January 25th?  10:09
24     A.   I really honestly don't know.            10:09
25     Q.   Is it more than just yesterday?          10:09

Page 76

1      A.   I really honestly don't know.           10:09
2      Q.   Dr. Bliesner, we're talking about a     10:09
3  three-week period and you're -- as I've said --   10:09
4  obviously a very intelligent, very organized      10:10
5  individual.  Prepared a very extensive report in  10:10
6  this case, reviewed thousands of pages of         10:10
7  documents.  I'm merely asking you how many times  10:10
8  you've spoken on the telephone to Mr. Kerensky in  10:10
9  the last three weeks.                             10:10
10     A.   I honestly cannot tell you for sure.     10:10
11     Q.   Have you spoken to any lawyers other     10:10
12 than Mr. Kerensky and Ms Johnson in the last three  10:10
13 weeks?                                            10:10
14     A.   Yes.                                     10:10
15     Q.   Who?                                     10:10
16     A.   A gentleman out of Oklahoma.             10:10
17     Q.   Brad Miller?                             10:10
18     A.   Yes.                                     10:10
19     Q.   When did you speak to Brad Miller?       10:10
20     A.   Yesterday.                               10:10
21     Q.   What prompted that phone conversation    10:10
22 with Mr. Miller?                                  10:10
23     A.   Apparently he had the opportunity to     10:10
24 review my report.                                 10:10
25     Q.   And tell me about that conversation with  10:10

Page 77

1  Mr. Miller.                                       10:10
2      A.   He was just curious of -- my involvement  10:11
3  in the -- in this case.                           10:11
4      Q.   How long did the phone conversation last  10:11
5  with Mr. Miller, yesterday?                       10:11
6      A.   Maybe a half an hour.                    10:11
7      Q.   So what did you discuss with Mr. Miller  10:11
8  during that 30-minute or so phone conversation?   10:11
9      A.   What I did for a living primarily.       10:11
10     Q.   Yeah.                                    10:11
11     A.   And a few things about the report.       10:11
12     Q.   Such as?  Mike?  Mike?  Mike?            10:11
13     MR. KERENSKY:  Yes, sorry, sorry, sorry.      10:11
14 BY MR. ANDERTON:                                  10:12
15     Q.   A few things about the report,           10:12
16 Dr. Bliesner.  Such as what?                      10:12
17     A.   The conclusions that were in there.      10:12
18 That was it primarily.                            10:12
19     Q.   Well tell me about that discussion with  10:12
20 Mr. Miller about the conclusions that were in     10:12
21 there.                                            10:12
22     A.   Just what's written in the report.  My   10:12
23 conclusions with respect to compliance and those  10:12
24 kinds of things.  It wasn't a very specific       10:12
25 discussion.  It was more about my work background,  10:12

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 003060

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 78

1  what I'd done, what I do now, things like that.  10:12
2      Q.   Well, I want to know what you discussed  10:12
3  with him with respect to the conclusion in your  10:12
4  report.  Tell me about that conversation.  It was  10:12
5  just yesterday.  10:12
6      A.   Yes.  10:12
7      Q.   So tell me about that conversation.  10:12
8      A.   Basically said you have the report, the  10:12
9  conclusions that I have come to in the report are  10:12
10  supported by the documents that are in the  10:12
11  attachment.  That's how I did the review.  10:12
12      Q.   What kind of questions did Mr. Miller  10:12
13  ask you with respect to the conclusions in your  10:12
14  report yesterday?  10:12
15      A.   I think he asked me if I reviewed any  10:13
16  additional documents since I wrote the report.  10:13
17      Q.   What did you tell him?  10:13
18      A.   I said additional documents, no.  It was  10:13
19  just like I told you.  I just prepared for this  10:13
20  and then organized them, so...  10:13
21      Q.   Well, you didn't tell me that you  10:13
22  prepared for this.  10:13
23      A.   Well, what I did to get ready for this  10:13
24  was organize my mass of documents after the last  10:13
25  thing so I wouldn't waste time.  10:13

Page 79

1      Q.   Okay.  And so he asked you what  10:13
2  additional documents or whether you had reviewed  10:13
3  any additional documents.  You told Mr. Miller you  10:13
4  had not reviewed any additional documents since  10:13
5  you wrote the report?  10:13
6      A.   I'm pretty sure that's what I told him.  10:13
7      Q.   Well, let me ask you --  10:13
8      A.   Uh-huh.  10:13
9      Q.   -- have you reviewed any additional  10:13
10  documents since you wrote the report?  10:14
11      A.   Other than what was already present --  10:14
12  what I did the last time, no, I have not.  10:14
13      Q.   What do you mean by other than what you  10:14
14  did the last time.  10:14
15      A.   This stuff.  All of these documents that  10:14
16  are in here.  10:14
17      Q.   The documents that are in there -- and  10:14
18  so that we're clear, Dr. Bliesner, you're pointing  10:14
19  to boxes that you brought with you; correct?  10:14
20      A.   Uh-huh.  10:14
21      Q.   Those are documents you had reviewed as  10:14
22  you wrote the report or as you were in the process  10:14
23  of writing the report; is that correct?  10:14
24      A.   Yes.  The supporting data for this.  10:14
25      Q.   "The supporting data for this" meaning  10:14

Page 80

1  your report?  10:14
2      A.   Yes.  10:14
3      Q.   Are the documents in these boxes that  10:14
4  you read and reviewed after you wrote and  10:14
5  submitted the report -- the date of your report is  10:14
6  June 15, 2010.  10:14
7      A.   This would be the only one.  This is the  10:14
8  deposition.  10:14
9      Q.   Of?  10:14
10      A.   Of last time we met.  It was sent to me,  10:14
11  but I need to review.  I haven't gotten all the  10:15
12  way through it.  10:15
13      Q.   So the transcript of January 25th?  10:15
14      A.   Yes.  10:15
15      Q.   Your deposition proceedings?  10:15
16      A.   Yes.  10:15
17      Q.   Is that the only document that you have  10:15
18  reviewed that relates to this litigation and to  10:15
19  your report since you wrote the report?  10:15
20      A.   No.  Because you also asked me to get  10:15
21  what my hourly rate was and the billing records.  10:15
22      Q.   Okay.  10:15
23      A.   So those are the things.  10:15
24      Q.   Other than your billing records and the  10:15
25  transcript of the January 25th session, are there  10:15

Page 81

1  any other documents that you've reviewed that  10:15
2  relate to this litigation and to the report issued  10:15
3  in this litigation since June 15, 2010?  10:15
4      A.   Since June 15th?  10:15
5      Q.   Since you submitted your report.  10:15
6      A.   Uh-huh.  I can't recall if there were  10:15
7  any specific additional documents.  I don't  10:16
8  believe there were.  Because when the report was  10:16
9  done, I was pretty much checked out and  10:16
10  concentrating on a current client.  10:16
11      Q.   When Mr. Miller asked you that question  10:16
12  yesterday, is that what you told him as well, that  10:16
13  you can't recall?  10:16
14      A.   He didn't explicitly ask the question  10:16
15  like you did.  10:16
16      Q.   What did he ask?  10:16
17      A.   He said have you reviewed any additional  10:16
18  documentation.  10:16
19      Q.   And what did you say?  10:16
20      A.   I said not that I remember.  10:16
21      Q.   What else did Mr. Miller ask you?  10:16
22      A.   That was about it.  10:16
23      Q.   Well, it was a 30-minute conversation,  10:16
24  Dr. Bliesner.  And it doesn't take 30 minutes to  10:16
25  ask you if you reviewed additional documents and  10:16

21 (Pages 78 to 81)

PLAINTIFFS' EXHIBITS 003061

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

|  | Page 82 |
|---|---|
| 1 | to talk about the background of the work that you        10:16 |
| 2 | do. So what else did Mr. Miller ask you yesterday        10:16 |
| 3 | when you spoke with him?        10:16 |
| 4 | A.   We talked about -- just to get        10:16 |
| 5 | acquainted, talked about my other two companies.        10:16 |
| 6 | Q.   Did you talk about your deposition        10:17 |
| 7 | today?        10:17 |
| 8 | A.   I did mention to him that I went through        10:17 |
| 9 | it.        10:17 |
| 10 | Q.   That you were?        10:17 |
| 11 | A.   Today's?        10:17 |
| 12 | Q.   Yes.        10:17 |
| 13 | A.   No, no. But the one before, yeah.        10:17 |
| 14 | Q.   Did you talk about your January 25th        10:17 |
| 15 | session with him?        10:17 |
| 16 | A.   A little, yes.        10:17 |
| 17 | Q.   What did you talk about with him with        10:17 |
| 18 | respect to the January 25th deposition session?        10:17 |
| 19 | A.   How difficult it was because I've never        10:17 |
| 20 | done anything like this before.        10:17 |
| 21 | Q.   Why do you think it's difficult?        10:17 |
| 22 | A.   It's just a different way of doing        10:17 |
| 23 | business than anything I've ever seen before.        10:17 |
| 24 | Q.   In what way?        10:17 |
| 25 | A.   That's a good question.        10:17 |

|  | Page 83 |
|---|---|
| 1 | Q.   Every so often I try to come up with a        10:17 |
| 2 | good one.        10:17 |
| 3 | A.   I'm used to collaborative conversations        10:17 |
| 4 | not combative conversations.        10:17 |
| 5 | Q.   I don't intend for this to be a        10:18 |
| 6 | combative conversation. Do you intend for this to        10:18 |
| 7 | be a combative conversation?        10:18 |
| 8 | A.   Absolutely not.        10:18 |
| 9 | Q.   Do you think this is a combative        10:18 |
| 10 | conversation?        10:18 |
| 11 | A.   It's not fun. I can tell you that.        10:18 |
| 12 | Q.   Well, just because it's not fun doesn't        10:18 |
| 13 | mean it's combative, does it?        10:18 |
| 14 | A.   I suppose not.        10:18 |
| 15 | Q.   Do you think this is a combative        10:18 |
| 16 | conversation or a combative process?        10:18 |
| 17 | MR. KERENSKY: I think you can be that        10:18 |
| 18 | way, Mike. But let's try and ask some real        10:18 |
| 19 | questions about the case.        10:18 |
| 20 | BY MR. ANDERTON:        10:18 |
| 21 | Q.   I'm waiting for an answer, Dr. Bliesner.        10:18 |
| 22 | A.   I don't know if combative is the right        10:18 |
| 23 | word for it, but it's not the give and take,        10:18 |
| 24 | casual problem-solving in an open environment that        10:18 |
| 25 | I'm used to in my workplaces.        10:18 |

|  | Page 84 |
|---|---|
| 1 | Q.   And were you told to make it so when you        10:19 |
| 2 | prepared for your first deposition session?        10:19 |
| 3 | A.   Told what, sir?        10:19 |
| 4 | Q.   Well, I'm going to hand you -- and I        10:19 |
| 5 | don't have a stapler so this isn't stapled.        10:19 |
| 6 | A.   Uh-huh.        10:19 |
| 7 | Q.   We marked this last time as --        10:19 |
| 8 | A.   Yes.        10:19 |
| 9 | Q.   -- Exhibit 109.        10:19 |
| 10 | A.   Yes.        10:19 |
| 11 | Q.   Do you see that, Dr. Bliesner?        10:19 |
| 12 | A.   I do.        10:19 |
| 13 | Q.   Tell me what it is. Mike. Typing.        10:19 |
| 14 | MR. KERENSKY: I'm sorry.        10:19 |
| 15 | THE WITNESS: This is my notes of 25        10:19 |
| 16 | January. Yeah, outlines a condensation of        10:19 |
| 17 | points that are listed in the report, some        10:19 |
| 18 | scratching with respect to calculation that we        10:20 |
| 19 | were talking about.        10:20 |
| 20 | BY MR. ANDERTON:        10:20 |
| 21 | Q.   And you actually made the body notes on        10:20 |
| 22 | page 1 during your last deposition; right?        10:20 |
| 23 | A.   Bottom one, yes, yes. Yeah, that was        10:20 |
| 24 | the thickness discussion if I recall properly.        10:20 |
| 25 | Q.   All right.        10:20 |

|  | Page 85 |
|---|---|
| 1 | A.   Uh-huh.        10:20 |
| 2 | Q.   So, let's go to page 2.        10:20 |
| 3 | A.   Okay.        10:20 |
| 4 | Q.   What are those?        10:20 |
| 5 | A.   Guidance from Mr. Kerensky on how things        10:20 |
| 6 | would go generally in a deposition because I've        10:20 |
| 7 | never been in one like this, so...        10:20 |
| 8 | Q.   These are notes that you made --        10:20 |
| 9 | A.   Uh-huh.        10:20 |
| 10 | Q.   -- of a conversation? You have to        10:20 |
| 11 | answer yes or no, Doctor.        10:20 |
| 12 | A.   Oh, I'm sorry. Yes.        10:20 |
| 13 | Q.   Of a conversation you had with        10:20 |
| 14 | Mr. Kerensky?        10:20 |
| 15 | A.   And Mr. Miller and the other gentleman        10:20 |
| 16 | that was with them, the other attorney.        10:20 |
| 17 | Q.   Mr. Thompson, Fred Thompson?        10:20 |
| 18 | A.   No, no, no. This was the day before        10:20 |
| 19 | the --        10:21 |
| 20 | MR. KERENSKY: I think it was Terry        10:21 |
| 21 | Kilpatrick.        10:21 |
| 22 | MR. ANDERTON: Terry Kilpatrick?        10:21 |
| 23 | THE WITNESS: Yeah.        10:21 |
| 24 | MR. KERENSKY: Meghan was there, too.        10:21 |
| 25 | THE WITNESS: Meghan, yeah, was there        10:21 |

22 (Pages 82 to 85)

PLAINTIFFS' EXHIBITS 003062

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

---

Page 86

1      too.                                10:21
2   BY MR. ANDERTON:                        10:21
3      Q.   So there were four lawyers there:   10:21
4   Mr. Kerensky, Mr. Miller, Ms Johnson, and   10:21
5   Mr. Kilpatrick.                         10:21
6      A.   Yes.                            10:21
7      Q.   Who told you to answer questions as   10:21
8   briefly as possible, to give no more or no less   10:21
9   than is needed?                         10:21
10     A.   I believe that they -- all of the people   10:21
11  in that room gave that guidance if I recall.   10:21
12     Q.   One of your notes here says, "saying no   10:21
13  closes the door." What does that mean? Well,   10:21
14  what does it mean?                      10:21
15     A.   If there is additional information that   10:21
16  needs to come out that would clarify the   10:21
17  situation, you can just go no. Then you're not   10:21
18  going to have that conversation again. So -- as I   10:21
19  understood the guidance.                10:22
20     Q.   Who -- well, whose term is "closes the   10:22
21  door." Who said that to you?            10:22
22     A.   I don't know which one specifically.   10:22
23  This is a whole new process for me at this stage   10:22
24  of the game so I was just listening.     10:22
25     Q.   What does it mean, "keep doors open."   10:22

Page 87

1   What does that mean?                    10:22
2      A.   If there's line of questions that would   10:22
3   add clarification to the conversation, I want to   10:22
4   make sure that they stay open. Just saying no, it   10:22
5   stops conversation potentially in the future.   10:22
6      Q.   And your notes say "yes, but" and what I   10:22
7   will call ellipses and "no, but" with another   10:22
8   ellipses. What do those notes mean?      10:22
9      A.   Those are with respect to, for instance,   10:22
10  if you would ask a question that was very narrow   10:22
11  that didn't necessarily include the additional   10:22
12  information that I felt would be appropriate to   10:22
13  explain the situation, "but" let's me continue on   10:22
14  to give the additional information to clarify the   10:22
15  point.                                  10:23
16     Q.   So you don't believe in answering --   10:23
17  they told you not to answer a narrowly crafted   10:23
18  question with a narrow answer; is that right?   10:23
19     A.   I don't think I got that specific   10:23
20  guidance.                               10:23
21     Q.   Well, I was merely following up on your   10:23
22  response a moment ago, Dr. Bliesner.     10:23
23     These notes are from a meeting that occurred   10:23
24  when?                                   10:23
25     A.   That was the day before we had the first   10:23

Page 88

1   deposition.                             10:23
2      Q.   So January 24th.                10:23
3      A.   I believe that was the date, yes.   10:23
4      Q.   Did you meet with the lawyers for the   10:23
5   Plaintiffs in person to prepare for the January   10:23
6   25th deposition other than on January 24?   10:23
7      A.   To prepare for the deposition?   10:23
8      Q.   Yes.                           10:23
9      A.   No.                            10:23
10     Q.   Did you talk to them on the telephone,   10:23
11  any of them, to prepare for the deposition other   10:23
12  than on January 24th?                   10:24
13     A.   I can't recall specifically.     10:24
14     Q.   You don't remember whether you even had   10:24
15  a conversation with them?               10:24
16     A.   No, I don't. I have conversations with   10:24
17  people day in and day out and this is just one   10:24
18  small part of it. I can't recall.        10:24
19     Q.   Well, you had to make arrangements to   10:24
20  meet with them on the 24th; correct?    10:24
21     A.   Yes.                           10:24
22     Q.   So you had to have some communication.   10:24
23  Do you think that was by telephone?      10:24
24     A.   Perhaps and perhaps e-mail. I have to   10:24
25  go back and look at them.               10:24

Page 89

1      Q.   Well, would you have those e-mails with   10:24
2   you?                                    10:24
3      A.   I believe I gave all of those to Miss   10:24
4   Johnson. We copied them over off of an external   10:24
5   hard drive and she has them.            10:25
6      Q.   She has them?                   10:25
7      A.   Huh-huh.                       10:25
8      Q.   Do you have them?               10:25
9      A.   No.                            10:25
10     Q.   Do you have the hard drive with you?   10:25
11     A.   Yes.                           10:25
12     Q.   May I see it, please?           10:25
13     A.   Sure.                          10:25
14     Q.   Let's go back to your conversation   10:25
15  yesterday with Brad Miller.             10:25
16     A.   Okay.                          10:25
17     Q.   How did he come to have your contact   10:25
18  information, do you know?                10:25
19     A.   I believe he said Pete Miller and he had   10:25
20  interacted. I believe that's what he said.   10:25
21     Q.   Did -- did Mr. Miller -- Brad Miller,   10:25
22  since we now have two Millers -- did Brad Miller   10:25
23  yesterday -- did you and he discuss the   10:25
24  possibility of him retaining you as an expert in   10:26
25  his case?                               10:26

23 (Pages 86 to 89)

PLAINTIFFS' EXHIBITS 003063

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 90

1    A.    We did have that conversation.          10:26
2    Q.    And tell me about that conversation.    10:26
3    A.    He asked me, you know, whether I was    10:26
4  interested potentially in doing it.             10:26
5        MR. KERENSKY:  I need to interrupt for a  10:26
6  second.  We may be treading into a violation    10:26
7  of the consulting expert privilege.             10:26
8        MR. ANDERTON:  Well, okay.                10:26
9        MR. KERENSKY:  Because I don't know if    10:26
10 Brad hired him or not hired him.  At this       10:26
11 point, I think that would make him a            10:26
12 consulting expert.  Since I'm here not for --   10:26
13 I'm here for Miss Vega, but I think the         10:26
14 witness should be advised that conversations    10:26
15 prior to being retained by a Plaintiff's        10:26
16 lawyer are confidential and protected and       10:26
17 privileged under what we call the consulting    10:26
18 expert rule.  And until you're retained and     10:26
19 disclosed as a testifying expert, those         10:26
20 conversations are privileged.  And I guess I    10:27
21 will assert that privilege on behalf of Mr. --  10:27
22 is it Miller, Brad Miller?                       10:27
23       THE WITNESS:  Yes.                        10:27
24       MR. KERENSKY:  Okay.                      10:27
25       MR. ANDERTON:  Well, Mike, I'm not sure I 10:27

Page 91

1  agree with your characterization of the         10:27
2  privilege and I hope that you're not making a   10:27
3  representation of Oklahoma law with respect to  10:27
4  expert privileges, are you?                     10:27
5        MR. KERENSKY:  Oh, I think it's in the    10:27
6  federal rules, consulting experts.              10:27
7        MR. ANDERTON:  Well, you are aware        10:27
8  Mr. Kerensky of course that the case            10:27
9  Mr. Miller is discussing with Dr. Bliesner --   10:27
10 with Dr. Bliesner is not a federal case;        10:27
11 right.                                           10:27
12       MR. KERENSKY:  Well, I'm guessing that    10:27
13 Oklahoma law probably has the same privileges   10:27
14 as every other state I've been in.  So no       10:28
15 doubt I'm guessing but I want to make sure      10:28
16 that I assert the privilege to the extent it    10:28
17 exists.  During the case I'm sure you've        10:28
18 updated yourself on the rules and know one way  10:28
19 or the other whether it exists.  And I just     10:28
20 think I owe it to him to assert it at this      10:28
21 time.                                            10:28
22       MR. ANDERTON:  Okay.                      10:28
23 BY MR. ANDERTON:                                10:28
24 Q.    Have you been retained by Brad Miller?    10:28
25 A.    No.                                        10:28

Page 92

1    Q.    Do you anticipate that you're going to  10:28
2  talk to him again?                              10:28
3    A.    Perhaps.                                10:28
4    Q.    Let's go back to what you did to        10:28
5  prepare.                                        10:29
6    The -- before January 25th, we know that you 10:29
7  met with Mr. Kerensky and several other folks to 10:29
8  prepare for the session the next day.  How long 10:29
9  did that meeting on January 24th last?          10:29
10   A.    I think last time I said it was         10:29
11 something in the neighborhood of four, five hours, 10:29
12 something like that.                            10:29
13   Q.    Did you --                              10:29
14   A.    That I recall.                          10:29
15   Q.    I asked you a moment ago if you met with 10:29
16 any of those Plaintiffs' lawyers in person other 10:29
17 than on January 24th.  Your testimony was no, you 10:29
18 did not; correct?                               10:29
19   A.    For preparation with the deposition.    10:29
20   Q.    You met with them in person as you      10:29
21 prepared your report?                           10:29
22   A.    Yes, one time.                          10:29
23   Q.    Where was that?                         10:30
24   A.    In Indian Rocks Beach.                  10:30
25   Q.    They came to see you?                   10:30

Page 93

1    A.    Uh-huh.                                 10:30
2    Q.    Yes or no?                              10:30
3    A.    They came to see me.  Yes.  Sorry.      10:30
4    Q.    That's all right.                       10:30
5    A.    Sorry.                                  10:30
6    Q.    I'm just trying to make sure that the.  10:30
7    A.    Yes.                                    10:30
8    Q.    Videographer and court reporter --      10:30
9    A.    It actually wasn't in preparation of    10:30
10 the -- well, it wasn't writing the report.  They 10:30
11 just delivered more documents to me.            10:30
12   Q.    In person?                              10:30
13   A.    Uh-huh.                                 10:30
14   Q.    That's awfully nice of them.            10:30
15   A.    Uh-huh.                                 10:30
16   Q.    Who did that?                           10:30
17   A.    Who was there?                          10:30
18   Q.    Yeah, who delivered the documents?      10:30
19   A.    It was Pete Miller and Meghan Johnson   10:30
20 Carter.                                          10:30
21   Q.    How long -- did you have a meeting with 10:30
22 them when they delivered more documents?        10:30
23   A.    They actually came over to my home      10:30
24 office.                                          10:30
25   Q.    So did you have a meeting with them?    10:30

24 (Pages 90 to 93)

PLAINTIFFS' EXHIBITS 003064

David M. Bliesner, Ph.D.                     Videotaped                     February 18, 2011

Page 94

1    A.   If you'd call it a meeting, yes.          10:30
2    Q.   How long?                                 10:30
3    A.   I honestly have to go back and look it    10:30
4 up.                                               10:30
5    Q.   Did you bring your billing and time       10:30
6 records with you?                                 10:30
7    A.   Yes, I did.                               10:30
8    Q.   May I see them?                           10:30
9    A.   Sure.                                     10:30
10   Q.   Phil, you want to mark those, please?     10:31
11 Let's call it 145 please.                        10:31
12       (Whereupon, Exhibit 145 was marked for     10:31
13 identification)                                  10:31
14   Dr. Bliesner, I'm looking at a document that   10:31
15 has been marked as Exhibit 145.                  10:31
16   A.   Uh-huh.                                   10:31
17   Q.   And it is a stack of invoices that you    10:31
18 just handed me; is that correct?                 10:31
19   A.   I guess it is.                            10:32
20   Q.   Is this all of the invoices that you      10:32
21 have submitted to Plaintiffs' counsel for your   10:32
22 services as an expert witness?  Dr. Bliesner, you 10:32
23 just handed -- I asked you if you had --         10:32
24   A.   Yes.                                      10:32
25   Q.   -- your billing records.                  10:32

Page 95

1    A.   I don't do the billing so I don't know    10:32
2 if these are all of the invoices.  I was looking  10:32
3 for the last date on here.                        10:32
4    Q.   You were asked to bring them with you.    10:32
5    A.   Yes.                                      10:32
6    Q.   I just asked you if you brought them.     10:32
7 You said yes.                                     10:32
8    A.   Yes, sir.                                 10:32
9    Q.   In response I said may I see them and     10:32
10 you said yes.                                    10:32
11   A.   Yes.                                      10:32
12   Q.   And then you handed me a stack of         10:32
13 documents.                                       10:32
14   A.   Yes, sir.                                 10:32
15   Q.   Are you now looking at them as though     10:32
16 you're not sure whether you actually brought the 10:32
17 right records with you?  What are you doing?      10:32
18   A.   Well, you said "all records"; okay.       10:32
19   Q.   I said are they all of the invoices.      10:32
20   A.   All the invoices.  I am not sure because  10:32
21 I prepared this stack immediately after the last 10:32
22 deposition at your request.  I'm not sure whether 10:32
23 that deposition invoice was included in this     10:33
24 stack.  See what I'm saying?                     10:33
25   Q.   Okay.                                     10:33

Page 96

1    A.   That's all I'm trying to do.              10:33
2    Q.   You were asked to bring them with you     10:33
3 today.  Did you not double check to make sure you 10:33
4 had all the records you were supposed to bring?   10:33
5    A.   I forwarded them via e-mail to           10:33
6 Mr. Miller and Mr. -- Miss Johnson before.  So I  10:33
7 made the assumption that they forwarded them to   10:33
8 you.                                             10:33
9    Q.   They did not.                             10:33
10   A.   Okay                                      10:33
11   Q.   And you know that you were asked to       10:33
12 bring them with you today; right?                10:33
13   A.   Yes, yes.                                 10:33
14   Q.   So --                                     10:33
15   A.   I brought a copy because I thought that   10:33
16 you got them all.                                10:33
17   Q.   I have got nothing.                       10:33
18   A.   Okay.                                     10:33
19   Q.   From any of the lawyers and Plaintiffs.   10:33
20   A.   Okay.                                     10:33
21   Q.   Or any of the Plaintiffs' lawyers.        10:33
22   A.   Okay.                                     10:33
23   Q.   That's why we asked you to bring them.    10:33
24   A.   Okay.                                     10:33
25   Q.   You understood that you were supposed to  10:33

Page 97

1 bring all of your billing records today; correct? 10:33
2    A.   Not specifically because I'd already      10:33
3 provided them.  I just brought this because this  10:33
4 is the hard copy that I had I scanned in e-mail,  10:33
5 so...                                             10:33
6    Q.   When did you provide them to Plaintiffs'  10:34
7 counsel?  After January 25th?                     10:34
8    A.   Yes.  At your request.                    10:34
9    Q.   Okay.  I guess then you have to look      10:34
10 through that stack of documents and take up more  10:34
11 of our time looking at something that you should  10:34
12 know because you should have been prepared to     10:34
13 bring them with you today, but if you need to,    10:34
14 please do.                                        10:34
15       MR. KERENSKY:  Objection, form.            10:34
16       MR. ANDERTON:  Proceed, Dr. Bliesner.      10:34
17       THE WITNESS:  This does not include last,  10:35
18   the 25th's billing.                            10:35
19 BY MR. ANDERTON:                                 10:35
20   Q.   Have you invoiced Plaintiffs' counsel     10:35
21 for that -- for the time that you spent preparing 10:35
22 for and participating in the January 25th        10:35
23 deposition?                                      10:35
24   A.   I don't know because I don't do it.       10:35
25   Q.   Dr. Bliesner, I see -- did you review     10:35

25 (Pages 94 to 97)

PLAINTIFFS' EXHIBITS 003065

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 98

1  these documents before you came here today?    10:35
2    A.   That stack?                                10:35
3    Q.   Yes.                                       10:35
4    A.   No.                                        10:35
5    Q.   The first invoice indicates a rate of     10:35
6  $350. It's dated January 16, 2010, $350 per      10:35
7  hour. And the next invoice dated a week later,   10:35
8  January 23rd, indicates a rate of $550 per hour. 10:35
9  Did your rate go up?                             10:35
10   A.   There was a misunderstanding on the rate  10:35
11 to begin with.                                   10:36
12   Q.   Whose misunderstanding?                   10:36
13   A.   The Miller Law Firm.                       10:36
14   Q.   You sent the invoice out.                  10:36
15   A.   Yes.                                       10:36
16   Q.   So whose misunderstanding?                 10:36
17   A.   This was the additional -- I thought       10:36
18 that you received that as well but apparently not. 10:36
19   Q.   As I've said, I've not received anything  10:36
20 from Plaintiffs about --                          10:36
21   A.   Uh-huh.                                    10:36
22   Q.   -- your communications with them --        10:36
23   A.   Uh-huh.                                    10:36
24   Q.   -- your billing records --                 10:36
25   A.   Uh-huh.                                    10:36

Page 99

1    Q.   -- anything.                               10:36
2    A.   Uh-huh.                                    10:36
3    Q.   So you just handed me a document that      10:36
4  Phil is going to mark as Exhibit 146.             10:36
5    A.   Uh-huh.                                    10:36
6    Q.   Please, Phil. Thank you, sir.              10:36
7    A.   And this was prior to being retained       10:37
8  obviously.                                        10:37
9    Q.   Prior to being retained.                   10:37
10   A.   Yes.                                       10:37
11   (Whereupon, Exhibit 146 was marked for          10:37
12 identification)                                   10:37
13   Q.   So I'm reading a letter that says --        10:37
14 well, tell me what this is, 146. Is it an e-mail, 10:37
15 is it a letter, what is it?                       10:37
16   A.   This is -- I believe it is a Word          10:37
17 document that I cut and paste into e-mail. So I   10:37
18 can -- I design a document first.                 10:37
19   Q.   Okay.                                      10:37
20   A.   And I put it in an e-mail. So this is      10:37
21 what that is.                                     10:37
22   Q.   That's just a Word document?               10:37
23   A.   I'm thinking it is.                        10:37
24   Q.   You're thinking it is?                     10:37
25   A.   Yeah. I'm not sure; okay? Because it      10:37

Page 100

1  doesn't have the headers on it or not so I can't  10:37
2  say definitively. On something like this normally 10:37
3  for a business transaction -- because I would like 10:37
4  to be accurate in an e-mail -- I create a Word     10:37
5  document first, do spell check and everything else 10:37
6  and I cut and paste it in an e-mail.               10:37
7    Q.   So you copy the text?                       10:38
8    A.   Yes.                                        10:38
9    Q.   And paste it into an e-mail?                10:38
10   A.   Yes, sir.                                   10:38
11   Q.   So that means that -- well, did you send   10:38
12 this -- the contents of the document that is       10:38
13 marked as 146 to Mr. Miller?                       10:38
14   A.   I did.                                      10:38
15   Q.   In what form?                               10:38
16   A.   In e-mail.                                  10:38
17   Q.   Do you have that e-mail with you?          10:38
18   A.   I do not.                                   10:38
19   Q.   Why not?                                    10:38
20   A.   Because I gave all the e-mails to Miss     10:38
21 Johnson Carter.                                    10:38
22   Q.   May I see that, please?                    10:38
23   A.   Sure.                                       10:38
24   Q.   So you sent an e-mail to Mr. Miller        10:38
25 somewhere around January 4, 2010, with the        10:38

Page 101

1  following text or that includes the following     10:38
2  text. As discussed, my rates are, and then you    10:38
3  list your rates.                                   10:38
4    A.   Uh-huh.                                     10:38
5    Q.   $350 an hour for standard document         10:38
6  review, on-site time, consultations, etc.          10:38
7    A.   Uh-huh.                                     10:38
8    Q.   $450 an hour for testimonies or            10:38
9  depositions?                                       10:38
10   A.   Uh-huh.                                    10:39
11   Q.   Is that right? Is that correct?            10:39
12   Q.   Is that what it says there? Yes.           10:39
13   Q.   And $550 involving for any cases           10:39
14 involving capital crimes.                          10:39
15   A.   Uh-huh.                                    10:39
16   Q.   You have to say yes or no.                 10:39
17   A.   Yes, sorry.                                10:39
18   Q.   That's all right.                          10:39
19   A.   I'll get this some day.                    10:39
20   Q.   So the first invoice you submitted was    10:39
21 at the $350 per hour rate?                          10:39
22   A.   Yes.                                       10:39
23   Q.   And every invoice thereafter was at the   10:39
24 $550 per hour rate.                                10:39
25   A.   Yes.                                       10:39

PLAINTIFFS' EXHIBITS 003066

David M. Bliesner, Ph.D.                          Videotaped                          February 18, 2011

Page 102

1    Q.   Does this case involve a capital crime?   10:39
2    A.   Well, it involved a death potentially.   10:39
3  So that wasn't necessarily explained to me when I   10:39
4  was doing the initial consultation.   10:39
5    Q.   So you quoted your rate as $550 per hour   10:39
6  for a case involving a capital crime?   10:39
7    A.   A death, potentially.  A capital crime,   10:39
8  I don't know the legal term.  So that's the term I   10:39
9  used.   10:39
10   Q.   Oh, you used capital crime to indicate a   10:39
11  death?   10:39
12   A.   Anything that involved potentially a   10:39
13  death, yes.  I'm not a lawyer.  It's just a term   10:39
14  that I came up with.   10:39
15   Q.   Had you ever been involved -- you've   10:39
16  never been an expert witness before.   10:40
17   A.   No, absolutely not.  This is all brand   10:40
18  new stuff for me.  So there was confusion on that   10:40
19  and it turns out that there was potentially   10:40
20  somebody that was hurt, so the rate was increased   10:40
21  to 550.   10:40
22   Q.   You misunderstand that there was   10:40
23  potentially somebody who was hurt?   10:40
24   A.   It was never specifically told to me   10:40
25  that, you know, it was put to me we've got a case   10:40

Page 103

1  going on, something like this.  I do have a   10:40
2  question, though, you know?  This is falling into   10:40
3  pre, you know, retainer and stuff like that.  Do I   10:40
4  have the same right not to discuss the details   10:40
5  here?   10:40
6    MR. ANDERTON:  Well, Mr. Kerensky -- like   10:40
7  I said, I disagree with Mr. Kerensky's   10:40
8  characterization of the scope of that   10:40
9  privilege.   10:40
10   THE WITNESS:  Right.   10:40
11   MR. ANDERTON:  So...   10:40
12   THE WITNESS:  I'm not particularly   10:40
13  comfortable talking about negotiations that I   10:40
14  had with somebody prior to being put on   10:40
15  retainer.   10:40
16   MR. ANDERTON:  I mean no disrespect,   10:40
17  Dr. Bliesner.  Whether you're comfortable or   10:40
18  not, it's something I'm allowed to inquire   10:40
19  into.   10:40
20   MR. KERENSKY:  Wait a minute.  We're   10:40
21  talking about -- I lost track of you guys.   10:41
22  You're not talking back again about another   10:41
23  case other than --   10:41
24   MR. ANDERTON:  No, no.  We're talking   10:41
25  about his retention.   10:41

Page 104

1    THE WITNESS:  Prior to the retention.   10:41
2  BY MR. ANDERTON:   10:41
3    Q.   You have now been disclosed --   10:41
4    A.   Uh-huh.   10:41
5    Q.   -- as a testifying expert.   10:41
6    A.   Uh-huh.   10:41
7    Q.   So even if Mr. Kerensky's   10:41
8  characterization of the privilege is accurate, all   10:41
9  communications you've had with counsel for   10:41
10  Plaintiffs are open to my examination.   10:41
11   A.   Okay.   10:41
12   Q.   Okay.   10:41
13   A.   Okay.   10:41
14   MR. KERENSKY:  If it is about cases that   10:41
15  you've been retained, if there is a file you   10:41
16  have been retained on, he's right.  Everything   10:41
17  you talked to the PSC about or anything like   10:41
18  that, that's fair game.   10:41
19   MR. ANDERTON:  And that's what we're   10:41
20  discussing, Mike.  You'll see when you see   10:41
21  Exhibit 146 that it is communication between   10:41
22  Dr. Bliesner and Pete Miller.   10:41
23   MR. KERENSKY:  Okay.  That's great.   10:41
24   THE WITNESS:  Okay.   10:41
25  BY MR. ANDERTON:   10:41

Page 105

1    Q.   So -- and why aren't you comfortable   10:41
2  discussing negotiations you had?   10:41
3    A.   It's just bad business to talk to other   10:41
4  people about negotiations in business with your   10:42
5  clients.   10:42
6    Q.   Well, this isn't business,   10:42
7  Dr. Bliesner.  This is testimony in a legal   10:42
8  proceeding.  You understand that; right?   10:42
9    A.   I agree of course, but it's a   10:42
10  transaction.   10:42
11   Q.   Dr. Bliesner, did you receive a notice   10:42
12  of today's proceeding?   10:42
13   A.   Today's proceeding?   10:42
14   Q.   Yes.   10:42
15   A.   I received a notice for the one on the   10:42
16  25th, but one specifically for today?   10:42
17   Q.   Yeah.   10:42
18   A.   Not that I recall.   10:42
19   Q.   Not that you recall.   10:42
20   Did you look at the one that you received   10:42
21  prior to coming on January 25th?   10:42
22   A.   For today?   10:43
23   Q.   No, before you came on January 25th.   10:43
24   A.   Yes.   10:43
25   Q.   And did you review that notice to   10:43

27 (Pages 102 to 105)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 106

1  identify documents and other materials that you      10:43
2  were supposed to bring with you on January 25th?     10:43
3      A.   For the 25th one?                            10:43
4      Q.   Yes.                                          10:43
5      A.   Yeah.                                         10:43
6      Q.   One second, getting a drink.                 10:43
7      A.   May I do the same?                            10:43
8      Q.   Uh-huh, yes you may.  Yes, you may.          10:43
9  We'll stay on the record.                             10:43
10     Are you ready?                                     10:43
11     A.   Yes, sir.                                     10:44
12     Q.   So Dr. Bliesner, you did not receive any     10:44
13 notice of today's deposition?                         10:44
14     A.   Not that I recall, no.                        10:44
15     Q.   Before you came on January 25th --           10:44
16     A.   Uh-huh.                                       10:44
17     Q.   -- to the first session of your              10:44
18 deposition, did you review the notice that you        10:44
19 received for the 25th and collect all of the          10:44
20 information, documents, and materials that were       10:44
21 identified in the notice to bring with you?           10:44
22     A.   I did.                                        10:44
23     Q.   And did you bring them with you on that      10:44
24 day?                                                  10:44
25     A.   I did.                                        10:44

Page 107

1      Q.   Did you bring them with you again today?     10:44
2      A.   I did.                                        10:44
3      Q.   Same materials?                               10:44
4      A.   Yes.                                          10:44
5      Q.   Is there anything that you brought with      10:44
6  you on the 25th that isn't here today?                10:44
7      A.   No.                                           10:44
8      Q.   You went through and organized them per      10:44
9  the --                                                10:44
10     A.   Uh-huh.                                       10:44
11     Q.   -- suggestion of Mr. Kerensky?               10:44
12     A.   Uh-huh.                                       10:44
13     Q.   But you brought the same materials with      10:44
14 you?                                                  10:44
15     A.   Uh-huh.                                       10:44
16     Q.   I'll represent to you, Dr. Bliesner,         10:44
17 that this notice is identical to the prior notice     10:44
18 except for the date and time.  Mr. Kerensky will      10:44
19 speak up and tell me if I'm wrong.  But item          10:45
20 number 2 --                                           10:45
21     A.   Uh-huh.                                       10:45
22     Q.   -- requests that you bring all               10:45
23 correspondence and communication between the          10:45
24 witness -- that's you -- and anyone acting on the     10:45
25 witness's behalf.  So anyone acting on your           10:45

Page 108

1  behalf.                                               10:45
2      A.   Uh-huh.                                       10:45
3      Q.   And attorneys representing the               10:45
4  Plaintiffs in this litigation.                        10:45
5      A.   Uh-huh.                                       10:45
6      Q.   Do you understand that request?              10:45
7      A.   Yes.                                          10:45
8      Q.   Did you bring those materials with you?      10:45
9  Do you have all correspondence and communication     10:45
10 between yourself or your wife as a --                 10:45
11     A.   Uh-huh.                                       10:45
12     Q.   -- representative of Delphi?                 10:45
13     A.   Uh-huh.                                       10:45
14     Q.   Or -- these invoices are under Delphi.       10:45
15 Do you have all correspondence between you, your      10:45
16 wife, or anyone at Delphi and any of the              10:45
17 Plaintiffs' lawyers with you today?                   10:45
18     A.   The original e-mails were copied off the     10:45
19 hard drive and Miss Johnson has them.  So to          10:46
20 answer your question, that set of e-mails I do not    10:46
21 have with me.  It's not on the hard drive.            10:46
22     Q.   Not on the hard drive.                        10:46
23     A.   I have e-mails since that time that the      10:46
24 communications are on that hard drive.                10:46
25     Q.   So the original e-mails were copied off      10:46

Page 109

1  of that same hard drive that you brought with you     10:46
2  today?                                                10:46
3      A.   Yes, sir.                                     10:46
4      Q.   Given -- printed off of that?                10:46
5      A.   No, they were just copied as file.           10:46
6      Q.   When did that happen?                         10:46
7      A.   The 24th, I believe.  That was the day       10:46
8  before.                                               10:46
9      Q.   So you brought them on that same hard        10:46
10 drive on January 24th to your meeting with            10:46
11 Plaintiffs' counsel?                                  10:46
12     A.   Yes.                                          10:46
13     Q.   And in that meeting, somebody copied         10:46
14 them off that hard drive onto some media that         10:46
15 they brought with them?                               10:46
16     A.   Yes.                                          10:46
17     Q.   Who was that?                                 10:46
18     A.   It was Miss Johnson.                          10:46
19     Q.   What was the media she copied it onto,       10:46
20 do you know?                                          10:46
21     A.   I don't recall.                               10:46
22     Q.   And then after that meeting --               10:46
23     A.   Uh-huh.                                       10:47
24     Q.   -- did you bring that -- did you have        10:47
25 that hard drive with you on the 25th?                 10:47

28 (Pages 106 to 109)

PLAINTIFFS' EXHIBITS 003068

David M. Bliesner, Ph.D.                     Videotaped                     February 18, 2011

Page 110

```
 1     A.   Yes.                              10:47
 2     Q.   Were the e-mails between you and        10:47
 3  Plaintiffs' counsel still on the hard drive at       10:47
 4  that time?                                 10:47
 5     A.   No.                               10:47
 6     Q.   So you went home on the 24th and you    10:47
 7  removed them?                             10:47
 8     A.   No, no.  She copied them off.      10:47
 9     Q.   Well, when you copy, you don't remove.  10:47
10     A.   She removed them.  She copied -- cut the  10:47
11  whole folder and dropped it over onto her   10:47
12  computer.                                  10:47
13     Q.   So you had that hard drive with you on  10:47
14  the 25th but you didn't have the e-mails with you.  10:47
15     A.   No, she he did.                   10:47
16     Q.   She did?                          10:47
17     A.   Yeah.                             10:47
18          MR. ANDERTON:  You see that we have a  10:47
19  problem here, Mr. Kerensky?  Mike?         10:47
20          MR. KERENSKY:  Sorry, I was on mute.  I  10:47
21  don't think -- I'm pretty sure Meghan sent  10:47
22  those to me and I was supposed to bring them.  10:47
23  I am looking for an e-mail.  Why don't you  10:47
24  move to another subject and I'll see if I can  10:47
25  solve it in a minute.                      10:47
```

Page 111

```
 1  BY MR. ANDERTON:                           10:47
 2     Q.   Okay.  So back to -- well, I'm going to  10:48
 3  stay on this subject for a minute.  She copied  10:48
 4  them onto some media that she had.         10:48
 5     A.   Yeah, I believe it was her computer.  10:48
 6     Q.   Okay.                             10:48
 7     A.   That she was going to share with   10:48
 8  everybody.                                 10:48
 9     Q.   And then you removed them from your hard  10:48
10  drive?                                     10:48
11     A.   No, no, no.  She took them off.    10:48
12  Everything that I've done with respect to   10:48
13  electronic records and everything else,     10:48
14  communication, has been on that external hard  10:48
15  drive.                                     10:48
16     Q.   This one you brought you?          10:48
17     A.   This exact reason.  It could be shared  10:48
18  with people.                               10:48
19     Q.   Okay.                             10:48
20     A.   So when we met on the 24th.        10:48
21     Q.   Correct.                          10:48
22     A.   Right?  They said so do you have any  10:48
23  e-mails?  And I said yeah, I did what you told.  10:48
24  Here they are on the external hard drive and Miss  10:48
25  Johnson plugged it in I believe it was her  10:48
```

Page 112

```
 1  computer, and she goes -- there's e-mail and  10:48
 2  communications back and forth here.  You got to  10:48
 3  figure out -- words to this effect, you know -- a  10:48
 4  good way to distribute them so we're not passing  10:48
 5  the hard drive around.  She goes so I'm going to  10:48
 6  cut them off and then I'll make sure they're  10:48
 7  available to people.                       10:49
 8     A.   Okay.  She removed them from your hard  10:49
 9  drive.                                     10:49
10     A.   Yes.                             10:49
11     Q.   And you don't have them here today.  10:49
12     A.   No.  You have e-mails since that time of  10:49
13  communication.                            10:49
14     Q.   On this hard drive.               10:49
15     A.   Yes.                             10:49
16     Q.   All e-mails, all correspondence between  10:49
17  you and Plaintiffs' counsel.              10:49
18     A.   There should be, yes.  I'm pretty  10:49
19  meticulous about when I get that, I make sure it  10:49
20  goes onto the hard drive.                  10:49
21     Q.   So you're pretty meticulous that you  10:49
22  preserve and maintain a complete set of records?  10:49
23     A.   Yes.                             10:49
24     Q.   The documents that Mr. Miller and Ms  10:49
25  Johnson delivered in person to you at your home,  10:49
```

Page 113

```
 1  what were they?                            10:49
 2     A.   I could show you.                 10:49
 3     Q.   Please do.                        10:50
 4     A.   We're talking just about that visit at  10:50
 5  the home office.                           10:50
 6     Q.   Well, were there other visits where they  10:50
 7  delivered documents to you?                10:50
 8     A.   No.                              10:50
 9     Q.   Just one?                         10:50
10     A.   Yes.                             10:50
11     Q.   Okay.  Is that it?                10:50
12     A.   The first set, they did not deliver.  I  10:51
13  apologize for that.                        10:51
14     Q.   The first set?                    10:51
15     A.   That's stuff I had mailed to me    10:51
16  originally.                                10:51
17     Q.   Okay.                            10:51
18     A.   So on that particular day, it would have  10:51
19  been the second set I'm pretty sure.       10:51
20     Q.   These two binders labeled second set?  10:51
21     A.   Yeah.  There may have been some    10:51
22  additional documents mailed to me prior to that  10:51
23  day, but they're all in here.              10:51
24     Q.   All right.  You can sit back down.  10:52
25     A.   Sure.                            10:52
```

29 (Pages 110 to 113)

PLAINTIFFS' EXHIBITS 003069

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 114

1   Q.   That's all right.                          10:52
2   A.   Uh-huh.                                    10:52
3   Q.   The other documents -- well, are there     10:52
4   other documents that you have received from     10:52
5   Plaintiffs' counsel as part of your engagement? 10:52
6   A.   I've reviewed through this Crivella West    10:52
7   site.                                           10:52
8   Q.   Okay.                                       10:52
9   A.   Some of which I printed out to review,     10:52
10  others which I just left online because they were 10:52
11  too big.                                        10:52
12  Q.   Okay.  Are these the only documents that   10:52
13  you've actually received from Plaintiffs' counsel? 10:52
14  A.   No.                                         10:52
15  Q.   What else have you received from           10:53
16  Plaintiffs' counsel?                            10:53
17  A.   Yesterday evening, late, I believe I got   10:53
18  one or two reports from process development or  10:53
19  something like that.  I didn't review them.     10:53
20  Q.   Process validation?                        10:53
21  A.   I'm trying -- I don't recall because I     10:53
22  didn't look at them.                            10:53
23  Q.   Okay.                                       10:53
24  A.   I got a document.  I know that and I       10:53
25  just didn't look at it.                         10:53

Page 115

1   Q.   Who did you get that from?                 10:53
2   A.   Miss Johnson.                              10:53
3   Q.   Yesterday?                                 10:53
4   A.   Evening, yes.                              10:53
5   Q.   Mail?  Electronic?  How did you get it?    10:53
6   A.   It was electronic.                         10:53
7   Q.   By e-mail?                                 10:53
8   A.   Yes.                                        10:53
9   Q.   Is the e-mail --                           10:53
10  A.   Should be on there, yes.                   10:53
11  Q.   Is that on the hard drive?                 10:53
12  A.   Yeah, should be there.                     10:53
13  Q.   The -- other than the documents you       10:53
14  received yesterday electronically from          10:53
15  Ms. Johnson, are there any other documents in   10:53
16  addition to the ones that you've handed me today 10:53
17  that you actually received from Plaintiffs'     10:53
18  counsel?                                        10:53
19  A.   Not that I recall.  I think this is        10:53
20  pretty much it, yeah.  It's a lot of stuff so to 10:53
21  say definitively everything I've got is here.    10:53
22  Q.   You just said you're a pretty meticulous   10:54
23  --                                              10:54
24  A.   Right.                                      10:54
25  Q.   -- detailed guy.                           10:54

Page 116

1   A.   Right, right.                              10:54
2   Q.   That's the military background; right?     10:54
3   A.   Or just anal retentiveness as a human     10:54
4   being.                                          10:54
5   Q.   Okay.                                       10:54
6   A.   The reason I'm not saying absolutely       10:54
7   yes, this is it, is that I'd have to go back and 10:54
8   look at the electronic records to make sure that 10:54
9   there was one attached that I didn't review or I 10:54
10  forgot about that would be there.               10:54
11  Q.   But those would be included among e-mail   10:54
12  communications?                                 10:54
13  A.   Yes.                                        10:54
14  Q.   That Miss Johnson --                       10:54
15  A.   Yes.                                        10:54
16  Q.   -- took from you and hasn't produced to    10:54
17  us.                                             10:54
18  A.   If she hasn't produced them, yes.          10:54
19  Q.   Okay.  Are there any other documents at    10:54
20  your home that you did not bring with you today 10:54
21  that you have received from Plaintiffs' counsel? 10:54
22  A.   No.                                         10:54
23       MR. ANDERTON:  Phil, we're going to mark   10:54
24  these.  There are four of them.  We're marking  10:54
25  documents Mike.  Just show you know, there's a  10:55

Page 117

1   stack and three binders.  We'll make            10:55
2   arrangements to get them copied and back to     10:55
3   Dr. Bliesner.                                   10:55
4        MR. KERENSKY:  No problem.  Who is going   10:55
5   to do the copying?                              10:55
6        MR. ANDERTON:  We will figure that out     10:55
7   before we leave today.                          10:55
8        MR. KERENSKY:  Very good.                  10:55
9        THE WITNESS:  Now, there are an            10:55
10  additional documents that support the report,   10:55
11  the attachments.                                10:55
12       (Whereupon, Exhibits 147, 148, 149,        10:55
13  150 were marked for identification)             10:55
14  BY MR. ANDERTON:                                10:55
15  Q.   Uh-huh.                                    10:55
16  A.   Do you want those as well?                 10:55
17  Q.   Well, we'll get there.                     10:55
18  A.   Okay.                                       10:55
19  Q.   I take it those are documents that you     10:55
20  reviewed and printed from the Crivella West?    10:55
21  A.   They could have been provided at some      10:55
22  point through this document delivery that you've 10:56
23  talked about.  They e-mailed me some, they mailed 10:56
24  me some, and then they delivered some personally. 10:56
25  So they're all weaved together.                 10:56

30 (Pages 114 to 117)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 118

1    Q.   But I asked you, Dr. Bliesner, if there    10:56
2  are any other documents that you've received from    10:56
3  Plaintiffs' counsel.  I didn't specify personal    10:56
4  delivery.    10:56
5    A.   Well.    10:56
6    Q.   That's what you gave me when you gave me    10:56
7  these things.    10:56
8    A.   I'm sorry.  I misunderstood you because    10:56
9  I thought you said just for that visit at the home    10:56
10  office.  I'm sorry.    10:56
11    Q.   Okay.    10:56
12    A.   Uh-huh.    10:56
13    Q.   So let's make sure.    10:56
14    A.   Okay.    10:56
15    Q.   It's imperative --    10:56
16    A.   Uh-huh.    10:56
17    Q.   -- Dr. Bliesner that you listen very    10:56
18  carefully to the questions that I ask.    10:56
19    A.   I understand.    10:56
20    Q.   Are there any other documents that you    10:56
21  have received from Plaintiffs' counsel --    10:56
22    A.   Uh-huh, yes.  Sorry.    10:56
23    Q.   -- that you have with you today?    10:56
24    A.   Yes.    10:56
25    Q.   We're going to mark them.  You've handed    10:56

Page 119

1  me two more binders.    10:57
2    A.   Yes, sir.    10:57
3    Q.   They have post-it notes on the key    10:57
4  documents A1 to A30 and A31 to A63?    10:57
5    A.   Yes, sir.    10:57
6    Q.   Who designated them key documents?    10:57
7    A.   Me.    10:57
8    Q.   Okay.  I've got another stack of    10:57
9  documents with a post it on it that says last    10:58
10  supplemental set; right?    10:58
11    A.   Yes.    10:58
12    Q.   What is that?    10:58
13    A.   Those were -- if I recall those were    10:58
14  printouts of e-mails that I received from one of    10:58
15  the attorneys prior to the 25th.    10:58
16    Q.   Okay.    10:58
17    A.   I believe that we reviewed those.  You    10:58
18  have them as well and we've reviewed them.    10:58
19    Q.   Okay.    10:58
20    A.   Uh-huh.    10:58
21    Q.   So these appear to be all or largely the    10:58
22  records relating to the FDA 484 sampling program.    10:58
23  You can stay right there.    10:58
24    Q.   Okay.  It looks like there's an    10:58
25  additional set there too.  So to answer your    10:59

Page 120

1  question, it appears to be that and some more.    10:59
2    Q.   Okay.  But you received those prior    10:59
3  to -- somewhat close in proximity to the last    10:59
4  deposition session.    10:59
5    A.   Yeah.    10:59
6    Q.   As I look at these binders that have    10:59
7  been marked as 148, 149 and 150.    10:59
8    A.   Uh-huh.    10:59
9    Q.   I see highlighting on various    10:59
10  documents.  Who did the highlighting?    10:59
11    A.   Let's see.    10:59
12    Q.   In particular, I'm looking at --    10:59
13    A.   Oh.    10:59
14    Q.   -- the third set of supplemental    10:59
15  documents.    10:59
16    Who did the highlighting?    10:59
17    A.   Me.    10:59
18    Q.   Is it true that any highlighting that I    10:59
19  will encounter on these documents was done by you?    10:59
20    A.   I believe so, yes.    10:59
21    Q.   Okay.    10:59
22    A.   I -- nobody pointed out anything    10:59
23  specifically for me to...    11:00
24    Q.   You can have that stack back and you can    11:00
25  put it away.    11:00

Page 121

1    A.   Okay.    11:00
2    Q.   We're not going to copy that or mark    11:00
3  it.    11:00
4    A.   Okay.    11:00
5    Q.   Now, you've handed me another binder of    11:00
6  deposition transcripts.    11:00
7    A.   Yeah.  Those were printed out off of    11:00
8  Crivella.    11:00
9    Q.   You can have that back.  We're not going    11:00
10  to mark that.    11:00
11    A.   Okay.    11:00
12    Q.   Are there any other documents,    11:00
13  Dr. Bliesner, that you have received from    11:01
14  Plaintiffs' counsel that you brought with you    11:01
15  today?    11:01
16    A.   Other than the electronic ones that I    11:01
17  could not account for, not to my knowledge, no.    11:01
18    Q.   Okay.    11:01
19    A.   Uh-huh.    11:01
20    Q.   What else is in the boxes that you    11:01
21  brought with you today?    11:01
22    A.   Today?    11:01
23    Q.   Just describe it.    11:01
24    A.   Describe it?  Textbook, the transcript    11:01
25  of the last deposition that I need to review.    11:01

31 (Pages 118 to 121)

PLAINTIFFS' EXHIBITS 003071

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 122

1    Q.   What else?                          11:01
2    A.   I think I've got some notes from -- the   11:01
3  stuff like this.                          11:01
4    Q.   Some notes like that or --          11:01
5    A.   Would you like me to look?          11:01
6    Q.   Sure.                               11:01
7    A.   Because I'm not sure whether you have   11:01
8  copies of this or not.                    11:01
9    Q.   Well, let me see the notes.         11:01
10   A.   Sure.  That's it.  Did you want to --   11:01
11   Q.   No.                                 11:01
12   A.   Okay.                               11:01
13        MR. ANDERTON:  While -- Phil, while we're   11:02
14  at it, we may as well mark the notice.  Mike,   11:02
15  I'm marking the notice as 151.            11:02
16        (Whereupon, Exhibit 151 was marked   11:02
17  for identification)                       11:02
18  BY MR. ANDERTON:                          11:02
19   Q.   Do you have any other notes with you?   11:02
20   A.   No.                                 11:02
21   Q.   Okay.  You described -- you said you had   11:02
22  your textbook, you said you had your deposition   11:02
23  transcript, you said you had these additional   11:02
24  notes that we're about to mark.           11:03
25   A.   Uh-huh.                             11:03

Page 123

1    Q.   Do you have anything else with you in   11:03
2  the boxes that you brought today?          11:03
3    A.   No.                                 11:03
4        MR. ANDERTON:  Phil, would you mark these   11:03
5  as 152 and 3?  Mike, these are additional sets   11:03
6  of notes.                                  11:03
7        (Whereupon, Exhibits 152 and 153   11:03
8  were marked for identification)            11:03
9        THE VIDEOGRAPHER:  The time is        11:03
10       a.m.  We're going off the record.    11:03
11       (Short break)                        11:14
12       THE VIDEOGRAPHER:  The time is        11:14
13  11:14 a.m. We're back on the record.  This is   11:15
14  the beginning of tape four.               11:15
15  BY MR. ANDERTON:                          11:15
16   Q.   Dr. Bliesner, I'm going to hand you a   11:15
17  document that has been marked as Exhibit 152.   11:15
18   A.   Yes.                                11:15
19   Q.   Tell me what that is.               11:15
20   A.   That's my handwritten notes I believe it   11:15
21  was for the day when I met before the first   11:15
22  deposition with the attorneys.            11:15
23   Q.   Your handwritten notes.  Okay.  Well, we   11:15
24  had some testimony earlier about a document that's   11:15
25  marked as 109.                            11:15

Page 124

1    A.   Yes.                               11:15
2    Q.   Do you remember that?               11:15
3    A.   Yes, uh-huh.                        11:15
4    Q.   You described those as your handwritten   11:16
5  notes.  Did you take two sets of notes that day?   11:16
6    A.   I cleaned them up so I could read them.   11:16
7    Q.   When did you do that?               11:16
8    A.   I don't recall, but I think it was at   11:16
9  the same time, like at the end of the day.   11:16
10   Q.   Okay.  So the document that is 109, is   11:16
11  that the uncleaned up version or is it the cleaned   11:16
12  up version?                               11:16
13   A.   This one right here?                11:16
14   Q.   109.                               11:16
15   A.   Yeah, I think that's just the summary at   11:16
16  the end of the -- this and the other notes that   11:16
17  were there.                              11:16
18   Q.   So the document that's 152 --        11:16
19   A.   Uh-huh.                            11:16
20   Q.   -- let's get them both in front you.   11:16
21   A.   Okay.                              11:16
22   Q.   I'm also handling you a document that is   11:16
23  marked 153.                              11:16
24   A.   Uh-huh.                            11:16
25   Q.   What is that?                       11:16

Page 125

1    A.   153 looks like notes from a conversation   11:16
2  I had.                                    11:16
3    Q.   With?                              11:16
4    A.   It looks like -- specifically, I'm not   11:16
5  sure who called me.  It was either Pete or Meghan   11:17
6  to tell me a time.                        11:17
7    Q.   To tell you a time?                  11:17
8    A.   Yeah, hold on.  That's not right.  10 --   11:17
9  oh, I'd have to look at the calendar.  We did our   11:17
10  deposition on what day of the week?        11:17
11   Q.   Tuesday.                            11:17
12   A.   Tuesday, yes.  So this was notes with   11:17
13  respect to them, to meet me on the Monday before.   11:17
14   Q.   And by "this," you mean Exhibit 153?   11:17
15   A.   Yes.                               11:17
16   Q.   But this is notes of a phone            11:17
17  conversation that obviously occurred before Monday   11:17
18  24th; right?                              11:17
19   A.   I suppose that's -- that's the case,   11:17
20  yes.                                     11:17
21   Q.   You suppose?                         11:17
22   A.   It doesn't have a date on it.  I don't   11:17
23  have a time so I can't tell you definitively what   11:17
24  day.                                     11:17
25   Q.   Are these notes that you took during   11:17

32 (Pages 122 to 125)

PLAINTIFFS' EXHIBITS 003072

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 126

1  that meeting with the lawyers?                    11:18
2     A.  No.                                        11:18
3     Q.  And it references a meeting time and       11:18
4  place, 10 a.m., 10, Monday, 100 North Tampa.      11:18
5     A.  Right.  So chances are it's the            11:18
6  telephone record.                                 11:18
7     Q.  You mean record of notes during a          11:18
8  telephone conversation?                           11:18
9     A.  When they called up and said, you know,    11:18
10 we want to get together on the 24th, the day      11:18
11 before.                                           11:18
12    Q.  Well, this is a lot more than we want to   11:18
13 get together on 24th, isn't it, Dr. Bliesner?     11:18
14    A.  This sheet is.  The rest of them, I'm      11:18
15 not sure where -- if that was part of the day     11:18
16 that -- on the day before the deposition or not.  11:18
17 I -- I really -- because I don't have a date and a 11:18
18 time on it here.  Just -- I think that this --    11:18
19 this page 2 here of 153.                          11:18
20    Q.  Yeah.                                      11:18
21    A.  If I had to offer a suggestion, I think    11:18
22 that those pages probably went with this, the     11:18
23 preparation day.                                  11:19
24    Q.  So you think these are notes that you      11:19
25 made when you met with them on the 24th?          11:19

Page 127

1     A.  Yes.                                       11:19
2     Q.  And you think 152 are notes that you       11:19
3  made when you met with them on the 24th?          11:19
4     A.  152.                                       11:19
5     Q.  Yes.                                       11:19
6     A.  Yes.                                       11:19
7     Q.  And you think that 109 is a clean up of    11:19
8  notes you made when you met with them on the 24th 11:19
9  and made them later that day?                     11:19
10    A.  Yes.                                       11:19
11    Q.  Three sets of notes, Dr. Bliesner.         11:19
12 Really?                                           11:19
13    A.  Three set pages.                           11:19
14    Q.  In the same day?                           11:19
15    A.  This is the telephone conversation.        11:19
16    Q.  The first page of Exhibit 153.             11:19
17    A.  153.                                       11:19
18    Q.  Your testimony is that what remains in     11:19
19 153 -- and just so we're clear --                 11:19
20    A.  Uh-huh.                                    11:19
21    Q.  -- you handed me the document that we've   11:19
22 marked as Exhibit 153 --                          11:19
23    A.  Yes.                                       11:19
24    Q.  -- as a single group of notes; right?      11:19
25    A.  I -- if that's how it's -- you             11:19

Page 128

1  interpreted it, it's -- that's not an accurate    11:19
2  statement.  It's just notes that I had.  I just   11:19
3  gave you my notes.  Now what days they were on    11:19
4  specifically, that's what we're trying to         11:19
5  determine right now.                              11:20
6     Q.  And you're unable to do that.             11:20
7     A.  Considering I didn't put a date at the    11:20
8  top, yeah.                                        11:20
9     Q.  So let's look at Exhibit 152 --           11:20
10    A.  Okay.                                      11:20
11    Q.  -- first; okay?                            11:20
12    A.  Okay.                                      11:20
13    Q.  The top says "90 percent."  What does     11:20
14 that mean?                                         11:21
15    A.  I'm not really sure.  I'm thinking that    11:21
16 it was a reference to listening to the question   11:21
17 like you've said and thinking about what's really 11:21
18 been said as opposed to jumping in and trying to  11:21
19 answer without really understanding the question. 11:21
20 So 90 percent of the effort would be sitting down,11:21
21 listening to the question, and making sure that   11:21
22 you're answering in a way that's accurate.        11:21
23    Q.  Under there it says, "defending turf."    11:21
24 What does that mean?                               11:21
25    A.  I believe that was guidance, since I       11:21

Page 129

1  have never done this before, that, you know, don't 11:21
2  allow yourself to be headed down a direction that  11:22
3  isn't the truth.  So, again, I as said before,     11:22
4  this is such -- so different than the              11:22
5  collaborative stuff that -- that I've done in the  11:22
6  past that obviously I need a little instruction on 11:22
7  how to do this.                                    11:22
8     Q.  Well, it would be great if this was        11:22
9  collaborative.  You're obviously getting guidance  11:22
10 on how to make it combative; right?                11:22
11       MR. KERENSKY:  Objection, form.             11:22
12 BY MR. ANDERTON:                                   11:22
13    Q.  You may answer.                             11:22
14    A.  Could you say the question again?          11:22
15       MR. ANDERTON:  Read it back, please,        11:22
16 Phil.                                              11:22
17       (Whereupon, the testimony was read          11:22
18 back by the court reporter, as recorded above)     11:22
19       THE WITNESS:  I wouldn't agree with that.    11:22
20 BY MR. ANDERTON:                                   11:22
21    Q.  You don't think that somebody telling      11:22
22 you to defend your turf isn't a guidance on how to 11:22
23 make a process combative?                          11:22
24    A.  Absolutely not.                             11:22
25    Q.  Okay.  In the next line there's a          11:22

33 (Pages 126 to 129)

PLAINTIFFS' EXHIBITS 003073

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

---

Page 130

1  bracketed phrase that says "easier said than        11:23
2  done." Is that what it says?                          11:23
3      A.    Where are we at again?                      11:23
4      Q.    The first page of Exhibit 152, top of       11:23
5  the page.                                             11:23
6      A.    Easier said than done, yes.                 11:23
7      Q.    What does that mean?                         11:23
8      A.    To listen very carefully, things are in     11:23
9  the box.  To listen to the questions.  Don't guess   11:23
10 or propose a hypothesis and then the third and       11:23
11 fourth thing.  So that's what it is.  It's very      11:23
12 simple guidance, but it's, as I'm discovering, not   11:23
13 real easy.                                           11:23
14     Q.    What do you mean by that?                    11:23
15     A.    It's just hard work.                         11:23
16     Q.    I think you're making it harder than it    11:23
17 actually is, Dr. Bliesner, but that's just my        11:23
18 humble opinion.                                       11:23
19     The next page of Exhibit 152 says "write these   11:24
20 down."                                               11:24
21     A.    Uh-huh.                                      11:24
22     Q.    Why did you make that note?                 11:24
23     A.    I believe the conversation went to this    11:24
24 effect, you know?  How do you -- in your report,     11:24
25 what are the things that come to mind off the top    11:24

---

Page 131

1  of your head that line up in some entry position     11:24
2  outside of the report.  So I went (witness makes     11:24
3  noise) right off the top of my head.                 11:24
4      Q.    So in essence what are the documents        11:24
5  that support the conclusions in your report?         11:24
6      A.    Yeah.                                        11:24
7      Q.    And so they are the AERs, adverse event    11:24
8  reports; right?                                      11:24
9      A.    Uh-huh.                                      11:24
10     Q.    The FDA documents; right?                   11:24
11     A.    Yes.                                         11:24
12     Q.    Pharmacy complaints; right?                 11:24
13     A.    Yes.                                         11:24
14     Q.    Deposition testimony?                       11:24
15     A.    Yes.                                         11:24
16     Q.    Company responses to FDA inspections?      11:24
17     A.    Yes.                                         11:25
18     Q.    Company internal                            11:25
19 document/investigations?                             11:25
20     A.    Yes.                                         11:25
21     Q.    Recall documents?                           11:25
22     A.    Yes.                                         11:25
23     Q.    Mylan documents?                            11:25
24     A.    Yes.                                         11:25
25     Q.    Deviation from standard industry           11:25

---

Page 132

1  practices?                                           11:25
2      A.    Yes.                                         11:25
3      Q.    Who created that list?                      11:25
4      A.    Me.                                          11:25
5      Q.    In the moment in that meeting with         11:25
6  Plaintiffs' lawyers?                                 11:25
7      A.    Yeah.                                        11:25
8      Q.    Did they make suggestions on -- as to      11:25
9  what ought to be on the list?                        11:25
10     A.    Not really.                                 11:25
11     Q.    Batch records isn't on that list, is it?   11:25
12     A.    Specifically, no.                           11:25
13     Q.    "The big yes but tell me everything."      11:25
14 That notation can be seen on this page 2 of the      11:25
15 Exhibit 152; is that right?                          11:25
16     A.    Yes.                                         11:25
17     Q.    What does that mean?                        11:25
18     A.    To tell you the truth, I have no idea.     11:25
19     Q.    Your notes.                                 11:25
20     A.    I know it's my notes, but I have no idea   11:25
21 what that means.  I really don't.                    11:25
22     Q.    What does the bottom note say "and        11:25
23 that's dangerous"?                                   11:25
24     A.    Yeah.                                        11:26
25     Q.    What does that mean?                        11:26

---

Page 133

1      A.    To tell you the truth, I don't remember    11:26
2  in this conversation.                                11:26
3      Q.    Let's go look at Exhibit 153.               11:26
4      A.    Okay.                                        11:26
5      Q.    And let's look at the second page of       11:26
6  Exhibit 153.                                         11:26
7      A.    Okay.                                        11:26
8      Q.    What is that list of six things?           11:26
9      A.    Looks like references to documents that    11:26
10 are included in the report.                          11:26
11     Q.    Who made the list?                         11:26
12     A.    Well, I wrote the list.                    11:26
13     Q.    Why?  What's the intention of making the  11:26
14 list?                                               11:26
15     A.    I'm trying to -- trying to remember.       11:26
16     Q.    Please do.                                  11:26
17     A.    Uh-huh.  As we said before I'm pretty      11:26
18 sure these are pages that went with the -- this     11:27
19 set, the notes.  I'm not sure when these notes      11:27
20 were made, if it was with this or if it was this    11:27
21 conversation because I don't have a time and a      11:27
22 date on it, but it was some suggestions that if I   11:27
23 wanted to -- in preparation for the deposition      11:28
24 that the -- I go back and look at them since they   11:28
25 were in my report -- by one of the attorneys.       11:28

---

34 (Pages 130 to 133)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 134

1    Q.   So one of the attorneys -- the list on    11:28
2  the second page of Exhibit 153 is a list of     11:28
3  suggestions made by one of the lawyers for the  11:28
4  Plaintiffs on things that you should go review  11:28
5  prior to your deposition?                       11:28
6    A.   As I recall, yeah, they were             11:28
7  suggestions.  Just if I wanted to go back and look 11:28
8  at it, yeah, I could, so...                     11:28
9    Q.   And somebody advised you to look for     11:28
10 specific failures which resulted in blend       11:28
11 uniformity; right?                              11:28
12   A.   No, I already had.  They were just       11:28
13 saying, you know, if I wanted to go back and    11:28
14 review it, that they would suggest that.        11:28
15   Q.   To look for specific failures which      11:28
16 resulted in blend uniformity?                   11:28
17   A.   Right, which is in the report.           11:28
18   Q.   What does that mean "look for specific   11:28
19 failures which resulted in blend uniformity"?   11:28
20 What I've just read is a quote from your notes.  11:28
21 What does it mean?                              11:28
22   A.   It's not a quote.  It's just my notes.   11:29
23   Q.   I've read it.                            11:29
24   A.   I don't recall specifically what the     11:29
25 guidance was on that.  They made suggestions.  If 11:29

Page 135

1  I want to review the documents, I did.  I can tell 11:29
2  you this:  Is that this list that is listed here  11:29
3  it was suggestions.  I didn't go back and review  11:29
4  those documents.  I just reviewed the report.     11:29
5    Q.   I see on the right side about halfway     11:29
6  down that page.                                  11:29
7    A.   Uh-huh.                                   11:29
8    Q.   An underlined term "gross negligence."   11:29
9  Is that what it says?                            11:29
10   A.   It is.                                    11:29
11   Q.   What does that mean?                      11:29
12   A.   Apparently that's a definition that one  11:29
13 of the attorneys gave me because I'd never heard 11:29
14 the term before.  Somebody was talking about it  11:29
15 and I go what's that?  So I jotted it down.  Never 11:29
16 heard it before.                                 11:29
17   Q.   Which attorney?                           11:29
18   A.   I don't know.                             11:29
19   Q.   What does it say underneath it.  I can't 11:29
20 read that.  Can you please read that for me?     11:29
21   A.   I think it's supposed to be consequences 11:30
22 indifferent from -- I don't know those three     11:30
23 words.  And welfare of persons involved in the   11:30
24 action with involved risk, suicide, injury, or   11:30
25 death.  I just jotted it down quickly.           11:30

Page 136

1    Q.   The consequences indifferent for the --  11:30
2  what's that word after "the"?                    11:30
3    A.   I don't know.                             11:30
4    Q.   For the health, perhaps?                  11:30
5    A.   I don't know.                             11:30
6    Q.   And welfare of the person involved?      11:30
7    A.   I -- I can't tell you.                    11:30
8    Q.   You can't read your own writing?         11:30
9    A.   No, I can't.                              11:30
10   Q.   One of the lawyers --                     11:30
11   A.   It was a term that came up and I go      11:30
12 what's that?  I never heard it before.  So I just 11:30
13 jotted it down.                                  11:30
14   Q.   Did they tell you to work it into one of 11:30
15 your answers?                                    11:30
16   A.   No.                                       11:30
17   Q.   Did they tell you that it's a topic and  11:30
18 a concept you should be familiar with as you     11:30
19 responded to questions?                          11:31
20   A.   Gross negligence?                         11:31
21   A.   Yes.                                      11:31
22   A.   No.                                       11:31
23   Q.   Did you use that term in your report     11:31
24 ever?                                            11:31
25   A.   I would have to go back and review it.   11:31

Page 137

1  I don't think so.                                11:31
2    Q.   Well, Dr. Bliesner --                     11:31
3    A.   Uh-huh.  Because I've never heard it,    11:31
4  so...                                            11:31
5    Q.   Dr. Bliesner, this is why this process   11:31
6  takes so long.                                   11:31
7    A.   Okay.                                     11:31
8    Q.   You tell me you've never heard the term  11:31
9  before this meeting which would have occurred long 11:31
10 after your report was prepared.                  11:31
11   A.   Uh-huh.                                   11:31
12   Q.   Do you really have to go back and look   11:31
13 at your report to tell me whether that term is in 11:31
14 your report if you had never heard it before?  Now 11:31
15 I understand that you prepared and were told to be 11:31
16 cautious in answering questions, but this process 11:31
17 takes as long as it does because of your         11:31
18 deliberately being difficult like that.          11:31
19      MR. KERENSKY:  We don't need this kind of  11:31
20 speech, Mike.                                    11:31
21      MR. ANDERTON:  What I need, Mike, is a     11:31
22 witness who will answer the questions that are   11:31
23 put to him.                                      11:31
24      MR. KERENSKY:  Well, I think he's doing a  11:31
25 great job of that.  And we don't need your       11:32

35 (Pages 134 to 137)

PLAINTIFFS' EXHIBITS 003075

Page 138

1   speech. And really this is out of bounds.        11:32
2   You ask all questions you want, but making        11:32
3   speeches like this is highly objectionable.        11:32
4   You're just trying to intimidate the witness,        11:32
5   which will not work.                    11:32
6        MR. ANDERTON: I'm not trying to --        11:32
7        MR. KERENSKY: He's not intimidated and        11:32
8   neither am I.                        11:32
9        MR. ANDERTON: I'm not trying to --        11:32
10       MR. KERENSKY: So why don't you just ask        11:32
11  questions.                            11:32
12       MR. ANDERTON: Are you done, Mike?        11:32
13       MR. KERENSKY: I'm done.                11:32
14       MR. ANDERTON: I'm not trying to        11:32
15  intimidate anyone. I'm merely trying to get        11:32
16  this process to move forward. What we're        11:32
17  going to see as we make our way through these        11:32
18  notes is that Dr. Bliesner is holding very        11:32
19  firmly to certain concepts he was -- that were        11:32
20  given to him by the lawyers in this case and        11:32
21  is deliberately being non-responsive.        11:32
22       MR. KERENSKY: That's a total        11:32
23  mischaracterization of what's going on here.        11:32
24  BY MR. ANDERTON:                        11:32
25       Q.   Dr. Bliesner, does the term gross        11:32

Page 139

1   negligence appear in your report?            11:32
2        A.   Not that I recall.                11:32
3        Q.   The next page of Exhibit 153.        11:33
4        A.   Okay.                        11:33
5        Among other things is that same list        11:33
6   that we saw in Exhibit -- well, yeah. This        11:33
7   appears to be the same or a similar list that we        11:33
8   saw in Exhibit 152.                    11:33
9        Do you see that?                    11:33
10       A.   This down here at the bottom?        11:33
11       Q.   Yeah.                        11:33
12       A.   No.                        11:33
13       Q.   About the same list, isn't it?        11:33
14       A.   Yeah, it looks like it. This would be a        11:33
15  transcript of this that was more readable.        11:33
16       Q.   Okay.                        11:33
17       A.   Uh-huh.                        11:33
18       Q.   On the middle of the right side of this        11:33
19  page it says, "my top list." What does that mean?        11:33
20       A.   I'm sorry. Where are we talking about?        11:33
21       Q.   The middle of that page. It's the third        11:34
22  page of Exhibit 153.                    11:34
23       A.   The third page?                11:34
24       Q.   Middle right side, about halfway down,        11:34
25  right edge, it says "my top list." What does that        11:34

Page 140

1   mean?                                11:34
2        A.   That was the list that I came up with        11:34
3   off the top of my head.                    11:34
4        Q.   The next page of that same Exhibit 153        11:34
5   is note that says, "are you aware of the fact that        11:34
6   FDA" and then a semi-colon. What does that mean?        11:34
7        A.   I have no idea.                11:34
8        Q.   The next item, number two, says        11:34
9   "possible equals we loose." I assume that you        11:34
10  meant to say "we lose."                    11:34
11       A.   I believe that's what it was intended to        11:34
12  be.                                11:34
13       Q.   So "loose" is a misspelling of "lose"?        11:34
14       A.   I would assume that's correct, yes.        11:34
15       Q.   "Possible equals we lose." What does        11:34
16  that mean?                            11:35
17       A.   I believe it was one of the attorneys        11:35
18  talking about trying to define for me "possible"        11:35
19  and "probable" because I didn't understand it.        11:35
20       Q.   So you then -- well, so you discussed        11:35
21  with Plaintiffs' counsel the difference between        11:35
22  "possible" and "probable," right?            11:35
23       A.   Yes.                        11:35
24       Q.   And you didn't understand it before that        11:35
25  conversation; right?                    11:35

Page 141

1        A.   That's correct. In legal terms.        11:35
2        Q.   Did you understand it after that        11:35
3   conversation?                        11:35
4        A.   I still think I had difficulty with it        11:35
5   up until the deposition because Mr. -- what was        11:35
6   the other gentleman's name? Moriarty?        11:35
7        Q.   Yeah, Moriarty.                11:35
8        A.   Yeah. We went back and forth on it so I        11:35
9   was still a little bit cloudy at that stage of the        11:35
10  game.                                11:36
11       Q.   Okay. A little bit cloudy? You said        11:36
12  you had no idea.                        11:36
13       A.   No. Gross negligence.            11:36
14       Q.   No. When you were being examined by        11:36
15  Mr. Moriarty, you said you had no notion of the        11:36
16  difference between probable and possible.        11:36
17       A.   I don't recall being that definitive.        11:36
18  We could look it up in the transcript.        11:36
19       Q.   Well, we can. The record will show what        11:36
20  it shows.                            11:36
21       A.   Okay.                        11:36
22       Q.   But what you're now saying is you        11:36
23  actually discussed that distinction with        11:36
24  Plaintiffs' counsel the day before you were        11:36
25  deposed.                            11:36

36 (Pages 138 to 141)

PLAINTIFFS' EXHIBITS 003076

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 142

1    A.    Yes.                                    11:36
2    Q.    And they did such a great job in that    11:36
3  discussion that you came to that deposition still   11:36
4  having no idea.                                 11:36
5    A.    Apparently they didn't prepare me very    11:36
6  well, did they?                                 11:36
7        MR. KERENSKY:  Oh, sorry.                 11:36
8  BY MR. ANDERTON:                                11:36
9    Q.    Now back to the substance of this       11:36
10  comment.  "Possible equals we lose."  You've told   11:36
11  me that that jars your recollection that you were   11:36
12  discussing the difference between probability and   11:36
13  possibility with Plaintiffs' counsel.          11:36
14      Now tell me what that means.               11:36
15    A.    Probable, according to my notes and as I   11:37
16  understand it now, probable means there's a      11:37
17  reasonable degree of a certainty.              11:37
18    Q.    Dr. Bliesner?                          11:37
19    A.    Yes.                                    11:37
20    Q.    Pay attention to my question and answer   11:37
21  my question or we're going to be here all day, and   11:37
22  we're going to be back for a third session.     11:37
23    A.    Okay.                                   11:37
24    Q.    Tell me what your note, "possible equals   11:37
25  we lose" means.  I didn't ask you to define     11:37

Page 143

1  probable versus possible.  I ask you now for the   11:37
2  third time to tell me what your note means.     11:37
3    A.    I'm thinking about it because it was --    11:37
4    Q.    Take as much time as you need to think    11:37
5  about it, but answer that question.            11:37
6    A.    I will.  Can I get some more water,      11:37
7  please?                                         11:37
8    Q.    Yes, you may.                            11:37
9    A.    Thank you.                               11:37
10      MR. ANDERTON:  Let's go off the record.     11:38
11      THE VIDEOGRAPHER:  The time is 11:37 a.m.    11:38
12  We're going off the record.                     11:38
13      (Short break)                               11:38
14      THE VIDEOGRAPHER:  Time is    ; we're        11:38
15  back on the record.                             11:38
16      MR. ANDERTON:  Phil, will you read that     11:39
17  last question back, please?                     11:39
18        (Whereupon, the testimony was read        11:39
19  back by the court reporter, as recorded above)   11:39
20      THE WITNESS:  From what I recall in the     11:39
21  conversation, possible leaves room for doubt;    11:39
22  probable does not.  And "may" leaves doubt.      11:39
23  So from protecting, what do they call them,      11:39
24  the client, that from a legal opinion, they      11:39
25  were trying to describe to me they thought       11:39

Page 144

1  that the cases would not stand up if it was     11:39
2  possible or may.                                11:39
3  BY MR. ANDERTON:                                11:39
4    Q.    So if you -- so you were told by the     11:39
5  Plaintiffs' counsel that if you acknowledged     11:39
6  something was only possible, Plaintiffs would    11:39
7  lose?                                           11:39
8    A.    The conversation as I recall in this     11:39
9  discussion was I need to determine in my mind    11:39
10  based on my report and the data that I looked at   11:39
11  those three things.                            11:40
12    Q.    I understand that.                      11:40
13    A.    Yes.                                    11:40
14    Q.    But you were told that if you answer a    11:40
15  question and acknowledge something was possible,   11:40
16  Plaintiffs would lose; right?                   11:40
17    A.    Yes.                                    11:40
18    Q.    And if you answered a question and       11:40
19  acknowledged that something -- if you said may?   11:40
20    A.    Yes.                                    11:40
21    Q.    Instead of probable, Plaintiffs would    11:40
22  lose.                                           11:40
23    A.    Yes.                                    11:40
24    Q.    So you were told not to answer questions   11:40
25  as possible or may, if possible; right?         11:40

Page 145

1    A.    No, that's not true at all.             11:40
2    Q.    It isn't?                                11:40
3    A.    I was told specifically these are the    11:40
4  conditions that may lead to "lose," if you will;   11:40
5  all right?  And that I needed to make sure where I   11:40
6  was comfortable with respect to my report on those   11:40
7  definitions, and it was up to me.               11:40
8    Q.    And how does -- how does your comfort     11:40
9  with respect to your report factor into whether   11:40
10  the Plaintiffs are going to lose or not?  That's   11:40
11  not something you considered in drafting your    11:40
12  report, is it?                                  11:40
13    A.    Could you say that again, please?  I'm    11:40
14  not being a pain.  I'm just trying to.          11:40
15      MR. ANDERTON:  Phil would be happy to       11:40
16  read that back to you.                          11:40
17        (Whereupon, the testimony was read        11:40
18  back by the court reporter, as recorded above)   11:40
19      THE WITNESS:  No, not at all.  I didn't     11:41
20  consider win or loss or anything.  I reviewed    11:41
21  the data, I put together a report, I drew        11:41
22  conclusions based on the documents that I had    11:41
23  reviewed, and that was it.                      11:41
24  BY MR. ANDERTON:                                11:41
25    Q.    And as you prepared for the deposition   11:41

37 (Pages 142 to 145)

PLAINTIFFS' EXHIBITS 003077

David M. Bliesner, Ph.D.                      Videotaped                      February 18, 2011

Page 146

```
 1   and to be asked questions about the analysis and    11:41
 2   conclusions reached, you were told to consider      11:41
 3   whether Plaintiffs would lose.                       11:41
 4       A.   They said words to the effect, if I        11:41
 5   recall, be aware that if you use these words this   11:41
 6   is what it means from a legal term.  Because        11:41
 7   apparently I didn't understand the difference       11:41
 8   between probable and possible.  That's what they    11:41
 9   said.                                                11:41
10       Q.   So you were told that if you said          11:41
11   possible rather than probable, it would mean        11:42
12   Plaintiffs would lose?                               11:42
13       A.   Potentially, yes.  But I was not           11:42
14   directed to specifically use those words or not     11:42
15   use those words.  It was me.                         11:42
16       Q.   I understand.  And were you also told if   11:42
17   you say "may" rather than "probable," Plaintiffs    11:42
18   would lose?                                          11:42
19       A.   According to my notes, yes.                11:42
20       Q.   I want to tell me if that's what you       11:42
21   were told, Dr. Bliesner.                             11:42
22       A.   I was told that, yes.                      11:42
23       Q.   Okay.  Below that --                        11:42
24       A.   Uh-huh.                                    11:42
25       Q.   -- there's a bracketed or kind of like    11:42
```

Page 147

```
 1   an almost box.  It says "problem could be with."    11:42
 2   That's W/sub potent for blend uniformity.  What     11:42
 3   does that mean?                                      11:42
 4       A.   I think one of the attorneys asked me      11:42
 5   that question so I just jotted it down.             11:42
 6       Q.   Who asked you?                             11:43
 7       A.   I don't recall.                            11:43
 8       Q.   You just jotted down the question they    11:43
 9   asked you?                                           11:43
10       A.   I did, yeah.  There was points where       11:43
11   they asked think about this.  Okay.  So I jotted    11:43
12   it down.                                             11:43
13       Q.   So they told you that -- they told you    11:43
14   that as you answered -- listened to and answered    11:43
15   questions, you should -- you should remember that   11:43
16   the problem -- I assume that means with Digitek --  11:43
17   could be with a blend uniformity or a sub-potent    11:43
18   product; right?                                      11:43
19       A.   No, I don't think that's the case          11:43
20   necessarily.  There was instruction going on here   11:43
21   with attorneys on top of it all.  So some of this   11:43
22   was, you know, go back, make a note of it, go back  11:43
23   and explain to them my interpretation because they  11:43
24   hadn't been exposed to any of this stuff before.    11:43
25       Q.   "They" who?                                11:43
```

Page 148

```
 1       A.   The attorneys.  They don't understand      11:43
 2   some of the subtleties in the manufacturing arena.  11:43
 3       Q.   So your testimony is that on the day       11:43
 4   before your deposition, almost three years into     11:43
 5   this litigation, you felt that the Plaintiffs'      11:44
 6   lawyers you were working with needed guidance on    11:44
 7   something as basic as whether something was         11:44
 8   sub-potent or whether there was a blend uniformity  11:44
 9   issue?                                               11:44
10       A.   I can't state to that fact.  I know        11:44
11   there were two new people in the room -- mike and   11:44
12   what was the other gentleman's name? -- and they    11:44
13   asked me questions so I jotted them down.           11:44
14       Q.   Well, Dr. Bliesner --                      11:44
15       A.   Uh-huh.                                    11:44
16       Q.   -- this is one of those situations where  11:44
17   it seems to me like you kind of want to have it     11:44
18   both ways.  When I ask you a specific question and  11:44
19   said -- and asked whether this is what that means,  11:44
20   you said no, that's not what it means.  When I ask  11:44
21   you generally what it means, you respond by saying  11:44
22   "I don't know."                                      11:44
23       MR. KERENSKY:  Objection, form.                 11:44
24   BY MR. ANDERTON:                                     11:44
25       Q.   So, I mean --                              11:44
```

Page 149

```
 1       A.   I cannot definitively tell you where       11:44
 2   this statement fits into this conversation.  I      11:44
 3   just cannot.                                         11:44
 4       Q.   Okay.  The next -- below that on the       11:44
 5   left side there's like a phrase that says           11:44
 6   "conscious indifference."  "Gross negligence."      11:45
 7   Do you see that?                                     11:45
 8       A.   Yes.                                        11:45
 9       Q.   Why did you write that?                    11:45
10       A.   Because they were terms that they were     11:45
11   throwing around.  So I jotted them down so I could  11:45
12   try to figure out what it meant.                    11:45
13       Q.   On the very bottom right corner -- don't  11:45
14   turn the page just yet, Dr. Bliesner.              11:45
15       A.   Sorry.                                     11:45
16       Q.   There's another bracketed phrase that     11:45
17   says, "what is the likelihood of blend uniformity   11:45
18   causing these super of sub-potent."  I assume       11:45
19   that's supposed to be super or sub potent?          11:45
20       A.   I'm thinking that's probably what it was  11:45
21   supposed to be.                                      11:45
22       Q.   All right.  So why did you make that      11:45
23   note?                                               11:45
24       A.   I don't know.  I don't recall why I made  11:45
25   that note.  Again, it might have been a question    11:45
```

38 (Pages 146 to 149)

PLAINTIFFS' EXHIBITS 003078

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 150

1  from one of the attorneys or.                11:45
2      Q.   Did you discuss with the Plaintiffs'    11:45
3  counsel on the 24th the notion of the difference  11:45
4  between double-thick tablets and tablets that were  11:45
5  either super or sub-potent?                 11:45
6      A.   The difference between?           11:46
7      Q.   Yeah.                           11:46
8      A.   I don't recall that conversation, the  11:46
9  difference between.                        11:46
10     Q.   Did they tell you to make sure that you  11:46
11 kept the door open -- to use your terminology --  11:46
12 to give testimony that there were either super  11:46
13 potent or sub-potent tablets produced?       11:46
14     A.   Do we need to read this back?        11:46
15     Q.   We do, please.                     11:46
16     A.   Okay.                            11:46
17         (Whereupon, the testimony was read back  11:46
18 by the court reporter, as recorded above)     11:46
19         THE WITNESS:  I don't recall being     11:46
20 specifically asked to leave the door open or   11:46
21 that issue in particular with respect to super  11:46
22 or sub-potent.                            11:46
23         MR. ANDERTON:  Okay.  I need to go off  11:46
24 the record for about 30 seconds.  Mike, stay   11:47
25 close.                                   11:47

Page 151

1          THE VIDEOGRAPHER:  The time is       11:47
2  11:46 a.m.  We're going off the record        11:47
3  briefly.                                 11:47
4          (Short break)                     11:47
5          THE VIDEOGRAPHER:  The time is       11:47
6  a.m.  We're back on the record.             11:47
7  BY MR. ANDERTON:                          11:47
8      Q.   All right.  So turn to the next page of  11:47
9  Exhibit 153, Dr. Bliesner.                  11:47
10     A.   Yes.                            11:47
11     Q.   On the top it says, the second line of  11:47
12 that next page it says "think:"              11:47
13     A.   Uh-huh.                         11:47
14     Q.   "Can I ask this question?"  What does  11:47
15 that mean?                               11:48
16     A.   I think I had a question can I ask -- as  11:48
17 I'm being deposed, can I ask questions back of the  11:48
18 people who are asking me questions.          11:48
19     Q.   What did they tell you?            11:48
20     A.   They said no, you're pretty much      11:48
21 supposed to sit there and answer questions, if I  11:48
22 remember right.                           11:48
23     Q.   Okay.                           11:48
24     A.   Uh-huh.                         11:48
25     Q.   Next a little bit below that it says   11:48

Page 152

1  "tell me all" with an extended ellipses, and then  11:48
2  it says, "give them roman numerals."  What does  11:48
3  that mean?                               11:48
4      A.   That's the lists that we came up with.  11:48
5      Q.   Okay.  "We" came up with?           11:48
6      A.   Well, I gave it.  Somebody wrote it on  11:48
7  the board as I was saying it.               11:48
8      Q.   Oh, you had a white board?          11:48
9      A.   Uh-huh.                         11:48
10     Q.   Where was this?                    11:48
11     A.   The conference room.               11:48
12     Q.   Where?                          11:48
13     A.   In the hotel next door.            11:48
14     Q.   At the Hyatt?                     11:48
15     A.   What was it?  Sheraton, I believe.    11:48
16     Q.   Okay.                           11:48
17     A.   Uh-huh.                         11:48
18     Q.   Who was writing on the board?        11:48
19     A.   At that time?  I think it was Mike.   11:48
20     Q.   Mike Kerensky?                     11:49
21     A.   Yes.                            11:49
22     Q.   I'm sorry I missed that.           11:49
23  So what -- help me out here with context,     11:49
24  then.  You were collectively generating a list and  11:49
25  the list that is set forth in Roman numerals in  11:49

Page 153

1  Exhibit 152?                             11:49
2      A.   Yes.                            11:49
3      Q.   And then you wrote them down as you    11:49
4  collectively generated that list?            11:49
5      A.   As I was pontificating, somebody said  11:49
6  oh, okay.  I believe it was, if I recall, Mike  11:49
7  just writing it down.  It was all off the top of  11:49
8  my head.                                 11:49
9      Q.   Well, but -- okay.                 11:49
10     A.   Uh-huh.                         11:49
11     Q.   Go to the next page.  The very last page  11:50
12 of Exhibit 153.                           11:50
13     A.   Last page?                       11:50
14     Q.   Yeah.  And let me ask you this:       11:50
15     A.   Uh-huh.                         11:50
16     Q.   Have you given a copy of these notes to  11:50
17 the lawyers?                             11:50
18     A.   I don't know.  I really don't know if  11:50
19 they've got a copy of it.                   11:50
20     Q.   You would have made the copies; right,  11:50
21 Dr. Bliesner?                            11:50
22     A.   Not necessarily.                 11:50
23     Q.   Your wife would have made them for you?  11:50
24     A.   The notes were done in the conference  11:50
25 room when we prepped the day before.          11:50

39 (Pages 150 to 153)

PLAINTIFFS' EXHIBITS 003079

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 154

```
 1     Q.   And you think the lawyers maybe took    11:50
 2   them and made copies of them?                  11:50
 3     A.   I have no idea.  They perhaps could      11:50
 4   have.                                           11:50
 5     Q.   On that last page --              11:50
 6     A.   Uh-huh.                           11:50
 7     Q.   -- number two says NTI.  I take it       11:51
 8   that's supposed to mean narrow therapeutic index?   11:51
 9     A.   I don't know.                      11:51
10     Q.   You don't know?                    11:51
11     A.   I really don't.                    11:51
12     Q.   Bracket references the EIR 2008, "95    11:51
13   pages.  Will ask."  What does that mean?        11:51
14     A.   I don't know.                      11:51
15     Q.   At the very bottom it says, "Pills      11:51
16   probably got out there."                        11:51
17     Do you see that?                       11:51
18     A.   I do.                             11:51
19     Q.   You wrote that; right?             11:51
20     A.   I did write that.                  11:51
21     Q.   What's it mean?                    11:51
22     A.   It means at the end of the day, after   11:51
23   looking at my report again and having these     11:51
24   discussions that I was convinced that it was    11:51
25   probable that more than just two or three or    11:52
```

Page 155

```
 1   whatever, double-thick or whatever, thin tablets   11:52
 2   that were out there got out there.  I was       11:52
 3   convinced with the data.                        11:52
 4     Q.   Which brings us back to the underlying   11:52
 5   question that prompted all of this.             11:52
 6     A.   Uh-huh.                           11:52
 7     Q.   Your opinion indicates that you believe   11:52
 8   adulterated product reached the market.         11:52
 9     A.   Well, we know it reached the market.  We   11:52
10   have a couple of circumstances where we know that   11:52
11   it did.                                         11:52
12     Q.   Okay.  And when you say a couple of     11:52
13   circumstances, you're talking about the 2004    11:52
14   circumstance and the 2008 allegations that      11:52
15   double-thick tablets reached the market.        11:52
16     Am I correct about that?               11:52
17     A.   Not necessarily because we stopped      11:52
18   sometime back going through, picking out to make   11:52
19   sure that there was other points other than what   11:52
20   you're pointing out right there.                11:53
21     Q.   Are you aware of any other circumstances   11:53
22   that suggest to you that we -- that you know    11:53
23   double-thick tablets reached the market?        11:53
24     A.   In your original question --       11:53
25     Q.   I'm asking you that question now.   11:53
```

Page 156

```
 1     A.   Unless I finish reviewing this report, I   11:53
 2   can't answer that question.                     11:53
 3     MR. ANDERTON:  Let's go off the record    11:53
 4   and allow you to do that.                       11:53
 5     THE VIDEOGRAPHER:  The time is now       11:53
 6   a.m.  We're going off the record                11:53
 7   briefly.                                        11:53
 8     (Short break)                          12:01
 9     THE VIDEOGRAPHER:  The time is          12:01
10   p.m.  We are back on record.                    12:01
11   BY MR. ANDERTON:                                12:01
12     Q.   Dr. Bliesner, I asked you a question or   12:01
13   I started to ask you a question about your      12:01
14   opinions in this case.                          12:01
15     A.   Uh-huh, yes.                      12:01
16     Q.   And in response you said "we know".   12:01
17   Know --                                         12:02
18     A.   Uh-huh.                           12:02
19     Q.   -- adulterated product reached the      12:02
20   market.                                         12:02
21     A.   Yes.                              12:02
22     Q.   I then asked you the basis for your     12:02
23   testimony that we know adulterated product reached   12:02
24   the market and you said -- you asked to review   12:02
25   your report which you just did; right?          12:02
```

Page 157

```
 1     A.   Yes.                              12:02
 2     Q.   Have you reviewed your report and are   12:02
 3   you able to answer my questions on how we know or   12:02
 4   you think you know adulterated product reached the   12:02
 5   market?                                         12:02
 6     A.   I have a -- general idea is to go back   12:02
 7   and specifically look at the wording, I would have   12:02
 8   to go to the appendices, but I can give you the   12:02
 9   references.                                     12:02
10     Q.   You've got a 90-some page document in   12:02
11   front of you.                                   12:02
12     A.   Yes.                              12:02
13     Q.   You need to go outside that 90-page     12:02
14   document to answer my question about how we -- how   12:02
15   you think you know adulterated product reached the   12:02
16   market?                                         12:02
17     A.   Yeah, I want to make sure I'm answering   12:02
18   the question completely.                        12:02
19     Q.   Well, tell me what you know from        12:03
20   reviewing the report.                           12:03
21     A.   From reviewing the report on page 79,   12:03
22   number 12, that there was a Class II recall     12:03
23   initiated through variation in tablet size      12:03
24   resulting in sub or super potent drug product,   12:03
25   according to reference attachment D5.           12:03
```

40 (Pages 154 to 157)

PLAINTIFFS' EXHIBITS 003080

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 158

1    Q.   Was that Digitek?                    12:03
2    A.   I don't recall.  I'd have to look it up.    12:03
3    Q.   What was the year of that?            12:03
4    A.   1990.                                12:03
5    Q.   1990?                                12:03
6    A.   Uh-huh.                              12:03
7    Q.   21 years ago?                        12:03
8    A.   Yes.                                 12:03
9    Q.   Okay.  What else do you know from         12:03
10   reviewing your report?                    12:03
11       Page 81, June 2004, complaint received    12:03
12   from a pharmacist in Bellingham, Washington,    12:03
13   regarding thick Digoxin tablet.  MI confirms    12:03
14   thickness.  No definitive root cause found.    12:04
15   Q.   2004, a single tablet; right?         12:04
16   A.   I would have to look at the reference to    12:04
17   determine whether it was one tablet or not.    12:04
18   Q.   Dr. Bliesner, this is your report;     12:04
19   right?                                   12:04
20   A.   It is my report, yes, sir.           12:04
21   Q.   Now this is why this takes so long.  Is    12:04
22   it more than a single tablet?              12:04
23       MR. KERENSKY:  He doesn't need be      12:04
24   lectured about how long it takes.  We need you    12:04
25   to ask questions.                         12:04

Page 159

1        MR. ANDERTON:  I need him to answer    12:04
2    questions, Mike.                          12:04
3        MR. KERENSKY:  He's answering them.    12:04
4        MR. ANDERTON:  No, he's not.          12:04
5        MR. KERENSKY:  Well, when you ask a real    12:04
6    broad question about tell me everything you    12:04
7    know, it's going to take time, bro?        12:04
8        MR. ANDERTON:  Bro?                    12:04
9        MR. KERENSKY:  Bro.                    12:04
10   BY MR. ANDERTON:                           12:04
11   Q.   Dr. Bliesner.                         12:04
12   A.   Yes.                                 12:04
13   Q.   Your report on page 81 refers to a    12:04
14   single thick tablet; right?               12:04
15   A.   Unless I go back and pull up those    12:05
16   reference, I can't tell you whether it's one or    12:05
17   more.                                    12:05
18   Q.   You can't?                           12:05
19   A.   No, definitively.  I would be guessing    12:05
20   unless I go back to that primary reference.    12:05
21   Q.   All right.  Moving on.               12:05
22       What else from your report supports your    12:05
23   conclusion that adulterated Digitek reached the    12:05
24   market?                                  12:05
25   A.   On page 87.                          12:05

Page 160

1    Q.   Yeah?                                12:05
2    A.   And this is where I would have to go    12:05
3    back and specifically look because I'm not sure    12:05
4    whether these are returned products or not, but    12:05
5    overweight tablets were found during packaging;    12:05
6    okay?  That one I'm...                     12:05
7    Q.   What number are you referring to?     12:05
8    A.   47, 47.                              12:05
9    Q.   47?                                  12:05
10   A.   Yeah.  A39 reference.  That's why I     12:05
11   wanted to look at it because I'm not sure whether    12:05
12   that has to do with stuff that made it to the    12:05
13   market or they caught it within the facility.    12:06
14   Q.   Would reference number 47, your       12:06
15   reference number 47 tell you that?         12:06
16   A.   A39.                                 12:06
17   Q.   I'm sorry.  Would that tell you whether    12:06
18   it made it to market?                      12:06
19   A.   More than likely whether this was done    12:06
20   internally and it wasn't returned.         12:06
21   Q.   Okay.  What else from your report?    12:06
22   A.   Number 49 on page 84, Mylan acknowledges    12:06
23   pharmacist identifying double-thick product in    12:06
24   marketplace.                             12:06
25   Q.   Okay.                               12:06

Page 161

1    A.   A58.                                 12:06
2    Q.   Anything else?                        12:06
3    A.   From what I can see, no.             12:06
4    Q.   Okay.  Now, this binder -- oh, Phil    12:06
5    would you mark this, please?               12:06
6        (Whereupon, Exhibit 154 was marked for    12:07
7    identification)                          12:07
8        Dr. Bliesner, will you look at the binder    12:07
9    that's marked as Exhibit 154 and find your    12:07
10   reference attachment A36, please.  I'm sorry.  I    12:07
11   misspoke.  A39, please.                   12:07
12       Did you find A36?                     12:08
13   A.   I'm just double checking here.  Does not    12:08
14   appear to be the direct reference that I thought    12:08
15   it was going to.                          12:08
16   Q.   I'm sorry.  A39.  I misspoke again.  Did    12:08
17   you find A39?                             12:08
18   A.   I did find A39, but it does not appear    12:08
19   to me to be the reference that I referenced    12:08
20   here -- A39.                              12:08
21   Q.   What is A39, Doctor?                  12:09
22   A.   A39 is response to the FDA 483 issued to    12:09
23   Activis on 5/20/2008.                     12:10
24   Q.   Let's not take our common sense hats    12:10
25   off; okay?  Let's think about this logically.    12:10

41 (Pages 158 to 161)

PLAINTIFFS' EXHIBITS 003081

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 162

1    A.   Okay.                          12:10
2    Q.   Your paragraph 47 on page 87 of your    12:10
3    report refers to an investigation of Digoxin    12:10
4    tablets, lot 8022881.                  12:10
5    A.   Uh-huh.                        12:10
6    Q.   For overweight tablets --          12:10
7    A.   Uh-huh.                        12:10
8    Q.   -- which were found during packaging    12:10
9    right?                             12:10
10   A.   Uh-huh.                        12:10
11   Q.   You have to say yes or no, please.    12:10
12   A.   Yes, I'm sorry.                   12:10
13   Q.   Okay.                          12:10
14   A.   I'm sorry.                      12:10
15   Q.   Do you cite that as support in your    12:10
16   report, in the body of your conclusion that    12:10
17   product actually made it to market?       12:10
18   A.   What I was asked to review, I was asked    12:10
19   to pick up things and I'm not sure whether these    12:10
20   were picked up in site or they were returned    12:10
21   products or something like that.          12:10
22   Q.   Now answer my question.           12:10
23   A.   Okay.                          12:10
24   Q.   Do you cite that batch and the        12:10
25   circumstances -- and any circumstances relating to    12:10

Page 163

1    that batch in the body of your report as an    12:11
2    indication that product -- defective product or    12:11
3    adulterated product made it to market?    12:11
4    A.   This is the citation.  Criminal      12:11
5    investigation, QA hold pending.          12:11
6    Q.   Dr. Bliesner.                    12:11
7    A.   I'm trying to answer your question, sir.    12:11
8    Q.   I asked you if you cite it in your    12:11
9    report.  You're now looking at something other    12:11
10   than your report.                    12:11
11   A.   Right, because I've got to go back --    12:11
12   Q.   How do you determine --           12:11
13   A.   Because I want to see where the       12:11
14   investigation is, if it's cited in the reference    12:11
15   to make sure that the reference is correct.    12:11
16   Q.   Okay.                          12:12
17   A.   Okay?                          12:12
18   Q.   Okay.                          12:12
19   A.   I'm not messing with you.           12:12
20   Q.   You actually are.                12:12
21   A.   I'm just trying to get the right      12:12
22   answer.  No, sir, I'm not.             12:12
23   That reference does not support the statement    12:15
24   that product made it to market.  That specific    12:15
25   reference does not.                   12:15

Page 164

1    Q.   Okay.                          12:15
2    A.   Okay.                          12:15
3    Q.   So -- well, suffice to say,          12:15
4    Dr. Bliesner, that there's ample information out    12:16
5    there in the record making very clear that that    12:16
6    batch was in fact rejected and never went to    12:16
7    market.                            12:16
8    You don't have any information that       12:16
9    contradicts that, do you?              12:16
10   A.   Not to my knowledge, no.           12:16
11   Q.   Okay.  So, if that batch was rejected    12:16
12   that -- that -- the circumstances relating to or    12:16
13   set forth in your paragraph 47 on page 18 of your    12:16
14   report do not constitute any evidence that    12:16
15   defective or adulterated Digitek -- I want to make    12:16
16   this clear.  That adulterated Digitek actually    12:16
17   made it to market, did they?            12:16
18   A.   That is correct.                 12:16
19   Q.   Okay.  You also referred to -- and so    12:16
20   that we're clear, you also made reference to that    12:16
21   batch 8022801 from paragraph 47 on page 87.  So    12:17
22   your prior testimony about that possibly      12:17
23   supporting a statement that we know adulterated    12:17
24   product made it to market, that's not accurate    12:17
25   with respect to any circumstances relating to    12:17

Page 165

1    batch 8022801, is there?              12:17
2    A.   What page was that?               12:17
3    Q.   87.                            12:17
4    A.   No, it's the same -- same statement.    12:17
5    It's just information put in a different place.    12:17
6    Q.   Okay.                          12:17
7    A.   Uh-huh.                        12:17
8    Q.   All right.                      12:17
9    A.   We were going to check on number 49.    12:17
10   Q.   We'll get there.                 12:17
11   A.   Okay.                          12:17
12   Q.   The -- Dr. Bliesner, so we've eliminated    12:17
13   batch 80228.  The circumstances in 2004 where a    12:18
14   pharmacist found a tablet in the market, was that    12:18
15   part of the recalled product?           12:18
16   A.   Which recall?                   12:18
17   Q.   The 2008 recall of Digitek.        12:18
18   A.   The product for the?              12:18
19   Q.   The tablet that was found in the market    12:18
20   in 2004, was that part of the recalled product?    12:18
21   A.   Not to my knowledge.              12:18
22   Q.   The expiration period for this product    12:18
23   is two years.  Are you aware of that?     12:18
24   A.   I am not.                      12:18
25   Q.   Okay.  You'll take my word for it?    12:18

42 (Pages 162 to 165)

PLAINTIFFS' EXHIBITS 003082

David M. Bliesner, Ph.D.                     Videotaped                     February 18, 2011

Page 166

1   A.   I'll take your word for it.               12:18
2   Q.   So if a tablet was found in the market    12:18
3  in 2004 and was manufactured no later than 2004  12:18
4  and therefore was no longer in the market and    12:18
5  within expiration as of 2008; correct?          12:18
6   A.   2004, two years I would say yes, that's   12:18
7  fair.                                            12:18
8   Q.   Okay.  And again, there's plenty of       12:19
9  evidence out there that speaks to what or was not 12:19
10 part of the recall product.                      12:19
11  Which leaves us -- and the 1990 circumstances   12:19
12 certainly have nothing, no -- none of the product 12:19
13 that was involved in the circumstances you cited  12:19
14 in 1990 were part of the 2008 recall; correct?   12:19
15  A.   Not part of the 2008 recall, no.          12:19
16  Q.   Okay.  All right.                          12:19
17  A.   It may have impacted the product,         12:19
18 though.                                          12:19
19      THE VIDEOGRAPHER:  We've got five minutes  12:19
20 left on the tape.                                12:19
21 BY MR. ANDERTON:                                 12:19
22  Q.   Okay.  It may have impacted what          12:19
23 product?                                         12:19
24  A.   We're not sure because the reference is   12:19
25 just for a recall for double-thick, double thin. 12:19

Page 167

1  The information I was provided doesn't           12:19
2  specifically say what the product is.            12:19
3   Q.   Okay.                                      12:19
4   A.   There was indications that they've had    12:19
5  problems with double-thick, double thin or thin or 12:19
6  thick tablets in days gone by in the manufacturing 12:19
7  process.                                         12:19
8   Q.   And so you're willing to infer that       12:19
9  something that happened in 1990 was still        12:19
10 occurring in 199-- or in 2008, 18 years later?   12:19
11  A.   I think it's fair to say that the         12:20
12 information that's there in documents that I      12:20
13 reviewed showed that the same people who were in  12:20
14 charge of the quality and manufacturing back then 12:20
15 are the same people that were there later down the 12:20
16 road.  The same processes -- I'm trying to think  12:20
17 when the ANDAs were, the equipment was.  So if    12:20
18 people and equipment were in place and obviously  12:20
19 they had problems with quality systems difficulty, 12:20
20 else they wouldn't have had all the problems with 12:20
21 the FDA.                                          12:20
22  So there were documented problems with the     12:20
23 quality systems, same people and mostly like the  12:20
24 same equipment on the stuff that occurred later   12:20
25 on.                                              12:20

Page 168

1   Q.   Okay.  Who was the director of           12:20
2  manufacturing in 2008, do you know?             12:20
3   A.   I'd have to go back.                      12:20
4   Q.   I'm sorry.  In 2007.                      12:20
5   A.   I'd have to go back and look at that.     12:20
6   Q.   It was Rick Dowling.                      12:20
7   A.   Okay.                                     12:20
8   Q.   You'll take my word for that?            12:20
9   A.   Sure.                                     12:20
10  Q.   When was Rick Dowling hired?             12:20
11  A.   I'd have to go back and look that up.     12:20
12  Q.   Was he employed in 1990?                 12:20
13  A.   I'd have to go back and look it up.       12:20
14  Q.   Because Activis in 1990 was Amide;        12:21
15 correct?                                         12:21
16  A.   I believe it was.                         12:21
17  Q.   Were they making Digitek as of 1990?     12:21
18  A.   I'd have to look that up, but it's a      12:21
19 possibility they were.                           12:21
20  Q.   It is?                                     12:21
21  A.   Yes.                                       12:21
22  Q.   Their ANDA was approved when?            12:21
23  A.   They were releasing product by the batch  12:21
24 release certification process back then.  So they 12:21
25 submitted and sold product based on that and not  12:21

Page 169

1  the ANDA.                                        12:21
2   Q.   If it's true --                            12:21
3   A.   Uh-huh.                                    12:21
4   Q.   -- that Activis -- or Amide rather --      12:21
5  wasn't making Digoxin until 1995, then the 1990   12:21
6  circumstances have no bearing on your conclusion  12:21
7  that adulterated Digitek -- that your supposed    12:21
8  conclusion that we know adulterated Digitek made  12:21
9  it to market; correct?                           12:21
10  A.   I don't know if I understand that          12:21
11 question.                                        12:21
12  Q.   You don't understand it because it was a  12:21
13 very poorly worded question.  So I'm going to     12:21
14 start that one over.                              12:22
15  If it's true that Amide didn't start           12:22
16 manufacturing Digitek until 1995, then the        12:22
17 circumstances you refer to about a 1990 recall    12:22
18 have nothing to do with your conclusion in your   12:22
19 report that we know adulterated Digitek reached   12:22
20 the market; correct?                             12:22
21  A.   I don't think you can say that.           12:22
22  Q.   They weren't making it.                   12:22
23  A.   They were making Digoxin very early on.   12:22
24  Q.   Dr. Bliesner, if they didn't start        12:22
25 making it until 1995, they couldn't -- the recall 12:22

43 (Pages 166 to 169)

David M. Bliesner, Ph.D.                          Videotaped                          February 18, 2011

Page 170

1   in 1990 could not have been Digoxin; correct?          12:22
2       A.   I'm not sure without going back and          12:22
3   reviewing the record when they actually started          12:22
4   making Digoxin tablets.          12:22
5       Q.   Now answer my question.          12:22
6       A.   Okay.          12:22
7       Q.   If they didn't start making it until          12:22
8   1995, the 1990 recall circumstances could not have          12:22
9   been a recall of Digoxin; correct?          12:23
10      A.   If they did not, that's correct.          12:23
11      Q.   Okay.          12:23
12      A.   If.  But we don't know for sure.          12:23
13      Q.   But we do, Dr. Bliesner.          12:23
14      A.   We do?          12:23
15      Q.   Okay.          12:23
16      A.   Yes.          12:23
17      Q.   We do.          12:23
18           THE VIDEOGRAPHER:  You have about two          12:23
19   minutes left.          12:23
20           MR. ANDERTON:  Let's break for lunch.          12:23
21           THE VIDEOGRAPHER:  The time is          12:23
22   12:22 p.m.  We're going off the record.          12:23
23           (Short break for lunch)          12:52
24           THE VIDEOGRAPHER:  The time is now          12:52
25   12:52 p.m.  We are back on the record.  This          12:53

Page 171

1        is the beginning of tape five.          12:53
2   BY MR. ANDERTON:          12:53
3       Q.   Dr. Bliesner, would you look at page 9          12:53
4   of your report, please?          12:53
5       A.   Sure, yes.          12:53
6       Q.   You see paragraph four on page 9?          12:53
7       A.   Yes.          12:53
8       Q.   That indicates that in June of 1995 the          12:53
9   FDA issued a certification to Amide which allowed          12:53
10  Amide to manufacture and sell Digoxin under the          12:53
11  batch certification program; right?          12:53
12      A.   Correct.          12:53
13      Q.   Does that refresh your recollection as          12:54
14  to when Amide began manufacturing and distributing          12:54
15  Digitek and whether it was as far back as 1990?          12:54
16      A.   Yes.          12:54
17      Q.   Okay.  What we know now is that the 1990          12:54
18  recall was not Digitek or Digoxin; correct?          12:54
19      A.   Most likely.          12:54
20      Q.   And so then as I understand it, you          12:54
21  agree that the 2004 tablet was not part of the          12:54
22  recalled Digitek; right?          12:54
23      A.   Based on expiration date and the fact          12:54
24  that it was two years and then later on, yes.          12:54
25      Q.   The 1990 recall was not Digitek; right?          12:54

Page 172

1       A.   Most likely, yes.          12:54
2       Q.   And the 2008 batch 80228 was rejected          12:54
3   and never made it to market.  That leaves the          12:54
4   tablet referenced in --          12:55
5       A.   Well, that was that -- just that one lot          12:55
6   that we talked about that was rejected.          12:55
7       Q.   I understand.          12:55
8       A.   Okay.          12:55
9       Q.   But you've identified for me -- I gave          12:55
10  you a considerable amount of time.          12:55
11      A.   Uh-huh.          12:55
12      Q.   Let's back this up, Dr. Bliesner.          12:55
13  I asked you about your conclusion in this          12:55
14  case.          12:55
15      A.   Uh-huh.          12:55
16      Q.   And about the conclusion that          12:55
17  adulterated Digitek was released to market and you          12:55
18  said very clearly "we know that adulterated defect          12:55
19  made it to market."          12:55
20      A.   Yes.          12:55
21      Q.   I gave you almost a half hour to review          12:55
22  your report and other related documents to come up          12:55
23  with evidence which you believe indicates that you          12:55
24  know adulterated Digitek made it to market.          12:55
25      A.   Uh-huh.          12:55

Page 173

1       Q.   And you identified all of those          12:55
2   instances and circumstances; right?          12:55
3       A.   With the information I have reviewed,          12:55
4   yes.          12:55
5       Q.   Okay.  And you've identified everything          12:55
6   that you're aware of; correct?          12:56
7       A.   In the documents that I was -- reviewed,          12:56
8   yes.          12:56
9       Q.   Dr. Bliesner.          12:56
10      A.   Yes.          12:56
11      Q.   Have you identified every instance that          12:56
12  you are aware of where you believe adulterated          12:56
13  Digitek made it to market?          12:56
14      A.   In the documents I reviewed, yes.          12:56
15      Q.   Doctor --          12:56
16      A.   There may be other documents out there          12:56
17  that would support the --          12:56
18      Q.   Are you aware of those?          12:56
19      A.   I haven't reviewed everything that's on          12:56
20  there, been put out.  So I can't -- I can't say          12:56
21  whether I'm aware of it or not.          12:56
22      Q.   If you haven't reviewed it, can you be          12:56
23  aware of what's in it?  Is that possible?          12:56
24      A.   No, that's what I'm saying.  There are          12:56
25  additional documents and reports and things like          12:56

44 (Pages 170 to 173)

PLAINTIFFS' EXHIBITS 003084

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 174

1  that I'm sure have since become available and I        12:56
2  have not reviewed it.  The documents that I            12:56
3  reviewed, the statement is correct.                    12:56
4      Q.   We're going to stay here all afternoon        12:57
5  until you answer my question.                          12:57
6      A.   That's fine.                                  12:57
7      Q.   Are you aware -- do you know of any           12:57
8  circumstances you haven't identified that you          12:57
9  believe indicate adulterated Digitek made it to        12:57
10 market?                                                12:57
11     A.   You see, I still don't understand when        12:57
12 you say "any and all" and "aware."  The documents      12:57
13 I've reviewed, that I am told to review and, you        12:57
14 know, looked at and reviewed are the ones that          12:57
15 I've built my report off of, and that's the            12:57
16 circumstances where I found it.                         12:57
17     I can't make a statement as broad as aware or       12:57
18 whatever because there may be others out there.  I      12:57
19 don't know.                                             12:57
20     Q.   You can't tell me what you know?              12:57
21     A.   I'm telling you --                            12:57
22     Q.   My question --                                12:57
23     A.   -- what I know based on this, sir.            12:57
24     Q.   My question was do you know of any other      12:57
25 circumstances?                                          12:57

Page 175

1      A.   Not to the documents I've reviewed.          12:57
2      Q.   Dr. Bliesner, do you know of any other       12:57
3  circumstances that indicate defective Digitek --       12:57
4  adulterated -- let me ask this correctly.              12:58
5      Do you know, do you have knowledge from any        12:58
6  source other than those that you've identified?        12:58
7      A.   Other than those that I've reviewed.         12:58
8      Q.   No.  Other than that you've identified,      12:58
9  do you personally have knowledge as we sit here        12:58
10 today of any circumstances indicating adulterated      12:58
11 Digitek made it to market other than those you've      12:58
12 identified?                                             12:58
13     A.   The two references, no.                       12:58
14     Q.   Other than those you've identified,          12:58
15 you're not aware of any other circumstances            12:58
16 indicating that defective -- I keep saying that --     12:58
17 that adulterated Digitek was released to market;       12:58
18 is that correct?                                        12:58
19     A.   To this point, no, that is correct.          12:58
20     MR. ANDERTON:  Okay.  I want this to be           12:58
21 clear.  You keep injecting all this extra              12:58
22 stuff.  So, Phil, I'm going to ask you to read          12:58
23 my last question back and I want you to answer         12:58
24 it very clearly, okay, without injecting all           12:59
25 kinds of additional stuff.                              12:59

Page 176

1      THE WITNESS:  I don't understand when you         12:59
2  say "injecting."                                        12:59
3      MR. ANDERTON:  You think because of your          12:59
4  prep sessions with counsel that you're               12:59
5  absolutely required to qualify everything you         12:59
6  say to leave doors open, as your notes say.           12:59
7  This is a concise --                                   12:59
8      THE WITNESS:  That's not true.                    12:59
9      MR. ANDERTON:  It's absolutely true.              12:59
10     THE WITNESS:  It is not true.                     12:59
11     MR. ANDERTON:  You wait till you watch            12:59
12 the video.  This is a very concise, very              12:59
13 direct question.  Phil, would you read it             12:59
14 back?                                                   12:59
15     (Whereupon, the testimony was read               12:59
16 back by the court reporter, as recorded above)        12:59
17     THE WITNESS:  Other than what I've                12:59
18 reviewed -- which you state in there -- no.           01:00
19 BY MR. ANDERTON:                                       01:00
20     Q.   Other than what you've identified.  Stop     01:00
21 injecting what you've reviewed into this.  I'm        01:00
22 asking you what you know, Dr. Bliesner.  And we're     01:00
23 going to ask this for hours until you answer my       01:00
24 question.                                              01:00
25     You have identified certain circumstances that    01:00

Page 177

1  you believe indicate adulterated Digitek was          01:00
2  released to market; is that correct?                   01:00
3      A.   Yes, yes.                                    01:00
4      Q.   Other than the ones you've identified,      01:00
5  are you aware of any other circumstances that you     01:00
6  believe indicate adulterated Digitek was released     01:00
7  to market?                                             01:00
8      A.   No.                                          01:00
9      Q.   Thank you.                                   01:00
10     So what we have haven't discussed then is the     01:00
11 single tablet that is referenced in -- can you        01:00
12 turn to your report at page 87.  Let me know when     01:00
13 you are there.                                          01:01
14     I am on page 87, sir.                              01:01
15     Q.   All right.  Do you see paragraphs 46 and     01:01
16 49?                                                     01:01
17     Q.   46, yes.                                     01:01
18     Q.   Okay.                                        01:01
19     Q.   49, yes.                                     01:01
20     Q.   All right.  So to be clear, we talked        01:01
21 about the 1990 circumstances and we now know that     01:01
22 that had nothing to do with Digitek; right?           01:01
23     A.   Most likely no.                              01:01
24     Q.   We talked about the 2004 circumstances       01:01
25 and we now know that that was not product that was    01:01

45 (Pages 174 to 177)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 178

1  part of the Digitek recall; right?               01:01
2  A.   That is correct.                            01:01
3  Q.   And we talked about -- or we talked         01:01
4  about the 2008 batch 80228, which is part of     01:01
5  paragraph 47 here, and we know that because that 01:02
6  batch was rejected, it also doesn't show anything 01:02
7  about product making it to market.               01:02
8  A.   With that batch, no.                        01:02
9  Q.   Correct?                                    01:02
10 A.   Yes.                                        01:02
11 Q.   Talking only about that paragraph,          01:02
12 Dr. Bliesner.                                    01:02
13 A.   Okay, okay.                                 01:02
14 Q.   Part of the issue here is that              01:02
15 Plaintiffs' lawyers have told you never to trust a 01:02
16 single word that comes out of my mouth, so...    01:02
17 A.   That's not true.  They've never made a      01:02
18 statement even remotely related to that.         01:02
19 Q.   Do you want me to find it in your           01:02
20 notes?                                           01:02
21 Dr. Bliesner, what do you know about the         01:02
22 circumstances referred to in paragraphs 46 and 49 01:02
23 from memory?                                     01:02
24 A.   From memory, I couldn't tell you whether    01:03
25 they were e-mails or they were reports.  That's  01:03

Page 179

1  what I can tell you from memory.                 01:03
2  Q.   Okay.  And does that mean that you also     01:03
3  don't remember the -- kind of the underlying     01:03
4  circumstances, regardless of whether you remember 01:03
5  the source?                                      01:03
6  A.   Underlying circumstances?                   01:03
7  Q.   Yeah.                                        01:03
8  A.   46 and 49?                                   01:03
9  Q.   Yeah.                                        01:03
10 A.   No, I'd have to go back and look at the     01:03
11 records.                                         01:03
12 MR. ANDERTON:  All right.  Well, just           01:03
13 give me one moment.  Let's go off the record     01:03
14 for a minute.                                    01:04
15 THE VIDEOGRAPHER:  The time is now              01:04
16 1:03 p.m.  We're going off the record briefly.  01:04
17 (Short break)                                    01:06
18 THE VIDEOGRAPHER:  The time is now              01:06
19 1:06 p.m.  We are back on the record.           01:06
20 BY MR. ANDERTON:                                 01:06
21 Q.   Dr. Bliesner, I'm handing you a document   01:06
22 that has been marked as Exhibit 59A.  Just take a 01:06
23 moment and look at that document, please.        01:06
24 A.   Sure.  It trails off.  It's not a          01:06
25 complete --                                      01:09

Page 180

1  Q.   I understand.                               01:09
2  A.   Okay.                                        01:09
3  Q.   Have you seen that document before?         01:09
4  A.   I believe I have, yes.                      01:09
5  Q.   Okay.  Turn to page 60 of your report,     01:09
6  please.                                          01:09
7  A.   Okay.                                        01:09
8  Q.   In fact this document is what you list     01:09
9  as your reference A58; isn't that right?         01:09
10 A.   No.                                          01:10
11 Q.   No?                                          01:10
12 A.   It's got a different control number on     01:10
13 it than the one that I referenced, according to my 01:10
14 report.  This is Mylan 000932683.               01:10
15 Q.   Look at the next page, Doctor.             01:10
16 A.   Okay.  There we go.                         01:10
17 Q.   So there's an extra page on our Exhibit    01:10
18 59A about, but what you refer to as A58, the     01:10
19 precise page is exactly your -- is the second page 01:10
20 of our 59A; is that correct?                     01:10
21 A.   It looks like it.                           01:10
22 Q.   And are you -- do you have any reason to   01:10
23 believe that the --                              01:10
24 A.   Excuse me for just a second.  Yes.  It's   01:10
25 the same, yes.                                   01:11

Page 181

1  Q.   All right.  So this is an e-mail thread    01:11
2  between somebody at Mylan and somebody with an   01:11
3  e-mail extension indicated as goldenliving.com,  01:11
4  correct?                                         01:11
5  A.   At the top level, yes.                      01:11
6  Q.   What's goldenliving.com, do you know?      01:11
7  A.   I have no idea.                             01:11
8  Q.   Is it a pharmacist?                         01:11
9  A.   I have no idea.                             01:11
10 Q.   Yet on page 87 you characterize this as    01:11
11 a pharmacist identifying a double-thick product  01:11
12 from the marketplace; right?                     01:11
13 A.   I say that based on the -- Pharm America   01:11
14 brought the statement in here, so...             01:11
15 Q.   Is Pharm America a pharmacist?             01:11
16 A.   I couldn't say for sure.                    01:11
17 Q.   You don't know?                             01:11
18 A.   No.                                          01:12
19 Q.   And you don't know if golden living is a   01:12
20 pharmacist?                                       01:12
21 A.   I could not say, no.                        01:12
22 Q.   Okay.  But you would be happy to write in  01:12
23 your report that Mylan acknowledged a pharmacist 01:12
24 identifying a double-thick product in the market; 01:12
25 right?  Look at page 87 of the report.           01:12

46 (Pages 178 to 181)

PLAINTIFFS' EXHIBITS 003086

David M. Bliesner, Ph.D.      Videotaped      February 18, 2011

Page 182

```
1     A.   Yes, yes.  Thank you.  I do use the word    01:12
2  pharmacist.  And based on this e-mail alone, I      01:12
3  couldn't definitively say in fact that was a        01:12
4  pharmacist.                                         01:12
5     Q.   Okay.  So that doesn't appear to be an      01:12
6  accurate characterization in your paragraph 49,     01:12
7  does it?                                            01:12
8     A.   I'm sorry?                                  01:12
9     Q.   It doesn't appear to be an accurate         01:12
10 characterization in your 49, does it?               01:13
11    A.   It does not appear --                       01:13
12    Q.   Okay.                                       01:13
13    A.   -- to be.  I'm sorry.  I heard              01:13
14 inaccurate, so.                                     01:13
15    Q.   Well, I didn't say inaccurate.  I said      01:13
16 "an accurate," and I apologize if I spoke too       01:13
17 quickly.                                            01:13
18    Turn to then the page that you actually refer    01:13
19 to as A58.  Now, is this the -- am I correct that   01:13
20 this document is the basis for your concluding      01:13
21 that adulterated Digitek that was part of the       01:13
22 recall made it to market?                           01:13
23    A.   One of the two.                             01:13
24    Q.   What's the other one?                       01:13
25    A.   The other one was the pharmacist found a    01:13
```

Page 183

```
1  double-thick tablet, 47, what we talked about.      01:13
2     Q.   But we know that wasn't part of the 2008    01:13
3  recall.                                             01:13
4     A.   No, it was not part of the recall.          01:13
5     Q.   All right.  So this is the sole piece of    01:13
6  information that you have that provides any          01:13
7  indication that adulterated Digitek that was part   01:13
8  of the 2008 recall made it to market.               01:13
9     A.   This is the only document I have            01:14
10 reviewed thus far, that...                          01:14
11    Q.   You're not aware of anything else.          01:14
12 You're not aware of any other document.             01:14
13    A.   I have not reviewed any documents.          01:14
14    Q.   That say that; right?                       01:14
15    A.   No.                                         01:14
16    Q.   Okay.  Let's look at this.                  01:14
17    A.   Uh-huh.                                     01:14
18    Q.   Particularly the page -- and we touched     01:14
19 on this a little bit last time, but I want to talk  01:14
20 about it a little bit more thoroughly; okay?        01:14
21    A.   Sure.                                       01:14
22    Q.   A card of Digoxin with one                  01:14
23 double-thickness tablet.                            01:14
24    A.   Uh-huh.                                     01:14
25    Q.   So it's in a blister pack; right?           01:14
```

Page 184

```
1     A.   I assume that's what the card is.          01:14
2     Q.   Are you an expert on blister packs?        01:14
3     A.   No.                                        01:14
4     Q.   Packaging?                                 01:14
5     A.   Packaging, no.                             01:14
6     Q.   Okay.  Do you know whether this blister    01:14
7  pack was opaque on one side, like a lot of them    01:14
8  are?                                               01:14
9     A.   I've never seen a description of a         01:14
10 blister pack with respect to this.                 01:14
11    Q.   You don't know anything about this        01:14
12 blister pack.                                       01:14
13    A.   This one here?                             01:14
14    Q.   Yeah?                                       01:14
15    A.   I -- there's not enough information to     01:14
16 say.                                               01:14
17    Q.   Okay.  And you don't know -- well, we      01:14
18 know that the tablet wasn't taken out of the       01:14
19 blister pack and measured, don't we?               01:15
20    A.   This particular one?                       01:15
21    Q.   Yeah.                                       01:15
22    A.   It says please advise that -- and,        01:15
23 again, I'm just -- this is all data we got here.   01:15
24    Q.   I understand.                              01:15
25    A.   "Please be advised that Lynn Carol, CSC,  01:15
```

Page 185

```
1  reports finding a card of Digoxin with one double  01:15
2  thickness tablet at GL" Gloucester.  Whatever GL   01:15
3  is.  I guess maybe that's their --                 01:15
4     Q.   An acronym for -- I can never say that.    01:15
5  Gloucester?                                         01:15
6     A.   Gloucester, yeah.  "The card has four      01:15
7  tablets remaining, one of which she reported was   01:15
8  obviously double-thick."                            01:15
9     So there were four tablets remaining in the     01:15
10 blister pack, one of which was identified as       01:15
11 double-thick.                                       01:15
12    Q.   Which she believed was double-thick.       01:15
13    A.   She believed was double-thick, yes.        01:15
14    Q.   Did you do anything to try to verify       01:15
15 whether this report was accurate or could be       01:15
16 accurate?                                           01:16
17    A.   No.                                        01:16
18    Q.   You just accepted it at face value?        01:16
19    A.   I accepted it as data that supported       01:16
20 double packaging.                                   01:16
21    Q.   At face value?                             01:16
22    A.   Yes, sir.                                  01:16
23    Q.   You get paid for your analytical skills;   01:16
24 right?                                              01:16
25    A.   I do, sir.                                 01:16
```

47 (Pages 182 to 185)

PLAINTIFFS' EXHIBITS 003087

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 186

1    Q.    And you hold yourself out to out as an        01:16
2    individual possessing a high level of analytical    01:16
3    skills; correct?                                    01:16
4    A.    I would say that's a fair assessment.         01:16
5    Q.    550 an hour, that's a pretty talented         01:16
6    analysis I would hope.  And yet you didn't feel     01:16
7    like this warranted any further analysis?           01:16
8    A.    I don't think that's a fair statement.        01:16
9    Q.    You didn't do any further analysis.           01:16
10   A.    I didn't have -- first of all, I was          01:16
11   asked to review certain sets of documents --        01:17
12   Q.    Right.                                        01:17
13   A.    -- that were available to me at that          01:17
14   time.                                               01:17
15   Q.    Right.                                        01:17
16   A.    And I reviewed those documents and            01:17
17   extracted out of, you know, the thousands of pages  01:17
18   that I reviewed, those things that were             01:17
19   pertinent.  I identified, as you saw, that lended   01:17
20   support to the fact that there were difficulties.   01:17
21   Q.    Okay.                                         01:17
22   A.    And by the time that rolled around,           01:17
23   there was no additional time to do any more         01:17
24   detailed investigation other than what I had        01:17
25   looked at.                                          01:17

Page 187

1    Q.    Well, in fact -- and so you didn't do         01:17
2    any more detailed investigation other than looking  01:17
3    it with the Plaintiffs' attorneys.                  01:17
4    A.    With respect to this particular case?         01:17
5    Q.    Right.                                        01:17
6    A.    No.                                           01:17
7    Q.    Well, but you actually reviewed a             01:17
8    document that directly refutes the possibility of   01:17
9    this being accurate, didn't you?                    01:17
10   A.    What was that?                                01:17
11   Q.    I mean you certainly wouldn't have            01:17
12   ignored information that made it clear that this    01:17
13   woman couldn't be correct, would you?              01:17
14   A.    I'm sorry.  I didn't understand that          01:17
15   statement.                                          01:17
16   Q.    If you had seen information that made it      01:17
17   clear that this report couldn't be correct, you    01:18
18   wouldn't have ignored that, would you?              01:18
19   A.    If I had seen information that                01:18
20   corroborated that?                                  01:18
21   Q.    No, that contradicted it and made it          01:18
22   very clear that this observation couldn't be        01:18
23   correct, you wouldn't have ignored that, would      01:18
24   you?                                                01:18
25   A.    Oh, absolutely not, no.                       01:18

Page 188

1    Q.    I wouldn't think so.  Not for 550 an          01:18
2    hour.                                               01:18
3    Dr. Bliesner, I'm going to hand you a document      01:18
4    that has been marked as Defendant's Exhibit 73,     01:18
5    although it doesn't have a sticker on it.           01:18
6    A.    Okay.                                         01:18
7    Q.    Phil, would you mind putting a sticker        01:18
8    on this one?  Just says Exhibit 73.                 01:18
9    Have you seen that -- well, Dr. Bliesner, take      01:19
10   a moment to look at that document, please.          01:19
11   A.    Uh-huh.                                       01:19
12   Q.    Have you reviewed Exhibit 73?                 01:23
13   A.    I have, sir.                                  01:23
14   Q.    Have you see that document before?            01:23
15   A.    That's a good question.                       01:23
16   Q.    Well, why don't you turn to page 47 of        01:23
17   your report.                                        01:23
18   A.    Okay.                                         01:23
19   Q.    We'll make short work of that good            01:23
20   question.                                           01:23
21   A.    Okay.                                         01:23
22   Q.    And for the record, that's two today.         01:23
23   A.    I'm sorry?                                    01:23
24   Q.    That's two good questions today.              01:23
25   Are you on page 47?                                 01:23

Page 189

1    A.    I am.                                         01:23
2    Q.    Do you see Exhibit -- or reference A36?       01:23
3    A.    I do.                                         01:23
4    Q.    Do you see that you described that as         01:23
5    being Plaintiffs' Exhibit M69?                      01:23
6    A.    I do.                                         01:23
7    Q.    Do you see the front of our Exhibit 63,       01:23
8    indicating that that's M69?                         01:23
9    A.    It is.                                        01:23
10   Q.    And you see that that is a UDL internal       01:23
11   investigation record?                               01:23
12   A.    Yes.                                          01:23
13   Q.    From Digitek tablets?  So what you're         01:23
14   looking at as Defendant's 73 --                     01:23
15   A.    Yes.                                          01:23
16   Q.    -- is in fact your A36 reference;             01:23
17   correct?                                            01:23
18   A.    Yes.                                          01:23
19   Q.    So you looked at this document?              01:23
20   A.    Yes, sir.                                     01:24
21   Q.    In fact you made a point of highlighting     01:24
22   in your report information which you thought was    01:24
23   negative and adverse with respect to Activis.  You 01:24
24   made a point of indicating that there was a         01:24
25   complaint about some tablets; right?                01:24

48 (Pages 186 to 189)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 190

1    A.  Yes.                                    01:24
2    Q.  Can you turn to page 2 of Exhibit 73?   01:24
3    A.  Yes.                                    01:24
4    Q.  Do you see the heading that says        01:24
5    "Examination of Retained Samples"?          01:24
6    A.  Yes.                                    01:24
7    Q.  Read that paragraph please for me out   01:24
8    loud.                                       01:24
9    A.  Sure.  "Examination of retained         01:24
10   samples.  On 4/3/08, a visual examination of  01:24
11   retains for both strengths of Digitek were  01:24
12   completed.  Upon evaluating the fit of the tablets  01:24
13   within the blister cavity, it was observed that  01:24
14   both blister cavity sizes have minimal head space  01:24
15   that would prevent tablets to be packaged with  01:25
16   double the thickness.  If the tablet thickness  01:25
17   were to exceed the blister cavity size during  01:25
18   packaging, visible damage to the blister package  01:25
19   would occur and the -- excuse me -- the equipment  01:25
20   would experience a seal station overload, jamming  01:25
21   within the seal station, that would result in a  01:25
22   shutdown of the equipment.                  01:25
23       This type of occurrence is documented on the  01:25
24   inspection record and the batch record.  As stated  01:25
25   above, there is no documentation in the batch  01:25

Page 191

1    record of a machine- or inspection-related issues  01:25
2    involving tablet thickness."                01:25
3    Q.  Did you read that document before you   01:25
4    prepared your report.  You obviously did; right?  01:25
5    A.  Yes sir.                                01:25
6    Q.  You read that language?                 01:25
7    A.  Yes, sir.                               01:25
8    Q.  It makes it clear that the woman who    01:25
9    thought she saw a double-thick tablet in a blister  01:25
10   pack couldn't have been correct, doesn't it?  01:25
11   A.  I don't think you can say that          01:25
12   definitively.  This is an internal investigation  01:25
13   report.  This is what they report.  There's --  01:25
14   it's opinion based on their experience and  01:25
15   observation.                                01:26
16   Q.  But it's not opinion.  It's a very      01:26
17   specific statement about the technical      01:26
18   specifications and capabilities of their packaging  01:26
19   equipment, isn't it?                        01:26
20   A.  Perhaps.                                01:26
21   Q.  What do you mean "perhaps"?             01:26
22   A.  It's an investigation summary.          01:26
23   Investigation summaries don't necessarily report  01:26
24   all of the information in an accurate fashion on  01:26
25   what happened in the investigation.         01:26

Page 192

1    Q.  Do you have any reason to believe that  01:26
2    the information in this paragraph that you just  01:26
3    read is inaccurate?                         01:26
4    A.  Any reason?                             01:26
5    Q.  Yes.                                    01:26
6    A.  Based on my experience, unless I        01:26
7    actually review an investigation report, I always  01:26
8    wonder if the summary is -- how accurate it is,  01:26
9    based on my experience.                     01:26
10   Q.  Do you have any reason to believe that  01:26
11   this paragraph and the information in this  01:26
12   paragraph is inaccurate?                    01:26
13   A.  Based on the comment from the person who  01:26
14   saw it, I would say that there was a possibility  01:26
15   that there was a double-thick tablet in that  01:26
16   blister pack.                               01:27
17   Q.  So you're going to reject the           01:27
18   information of the packaging entity that says  01:27
19   their equipment would not allow packaging of  01:27
20   double-thick tablet in favor of an unreliable,  01:27
21   uncorroborated, unverified account of a woman in a  01:27
22   nursing home that you characterized as a    01:27
23   pharmacist.                                 01:27
24       MR. KERENSKY:  Excuse me.  Form.        01:27
25   BY MR. ANDERTON:                            01:27

Page 193

1    Q.  Is that what you're going to do?        01:27
2    A.  What was his question.  I'm sorry.      01:27
3    Q.  His question was form.  That means you  01:27
4    get to answer my question.  Phil, would you please  01:27
5    read that back.                             01:27
6        MR. KERENSKY:  That's correct.          01:27
7        (Whereupon, the testimony was read      01:28
8    back by the court reporter, as recorded above)  01:28
9        THE WITNESS:  Okay.                     01:28
10       I am not rejecting this information.    01:28
11   It's part of the data.  As far as the       01:28
12   characterization of a pharmacist, I don't have  01:28
13   any way to prove in fact it was a pharmacist  01:28
14   the way it's written in there.  So this is  01:28
15   just additional data to -- that was discovered  01:28
16   during my review.                           01:28
17   BY MR. ANDERTON:                            01:28
18   Q.  You have given sworn testimony today --  01:28
19   A.  Yes.                                    01:28
20   Q.  -- that her report, the information in  01:28
21   our Exhibit 59A allows you to say we know   01:29
22   adulterated Digitek was released to market.  01:29
23   That's your sworn testimony.                01:29
24   A.  My sworn testimony is we know that      01:29
25   there -- based on that pharmacist report in  01:29

49 (Pages 190 to 193)

PLAINTIFFS' EXHIBITS 003089

David M. Bliesner, Ph.D.      Videotaped      February 18, 2011

Page 194

1  Bellingham, Washington, that that is true.     01:29
2  Q.  Dr. Bliesner?                              01:29
3  A.  Yes, sir.                                  01:29
4  Q.  I'm talking strictly about this 2008       01:29
5  situation and I want you to stay focused on that  01:29
6  for me; okay?                                  01:29
7  A.  Okay.                                      01:29
8  Q.  You've given sworn testimony here today    01:29
9  that says that this report of the woman who works  01:29
10 for goldenliving.com is the evidence that allows  01:29
11 you to conclude in your expert witness report that  01:29
12 you know adulterated Digitek that was part of the  01:29
13 recall --                                      01:29
14 A.  That's --                                  01:29
15 Q.  -- made it to market.                      01:30
16 A.  That's -- that's a misunderstanding of     01:30
17 what I said.  We know that adulterated Digitek  01:30
18 made it to market because of the pharmacist's  01:30
19 discovery here.  I have not definitively made a  01:30
20 statement this is a piece of evidence that     01:30
21 somebody potentially found a double-thick tablet  01:30
22 in the market characterized as a pharmacist.   01:30
23 Q.  So then if I understand what you're        01:30
24 doing right now, Dr. Bliesner, you're backing away  01:30
25 from this report.                              01:30

Page 195

1  A.  No, I'm not backing away.                  01:30
2  Q.  Let's get it clear.                        01:30
3  A.  Okay.                                      01:30
4  Q.  Does this -- do you believe this allows    01:30
5  to you conclude that --                        01:30
6  A.  With the recalled lot?                     01:30
7  Q.  That part that of -- that -- I'm talking   01:30
8  only about this situation.                     01:30
9  A.  Okay.                                      01:30
10 Q.  Do not --                                  01:30
11 A.  That situation.                            01:30
12 Q.  Do not inject any additional               01:30
13 circumstances into your answer; okay?          01:30
14 A.  Okay.                                      01:30
15 Q.  Are we clear on that?                      01:30
16 A.  Yes, sir.                                  01:30
17 Q.  Are you sure?                              01:31
18 A.  Yes, sir.                                  01:31
19 Q.  I'm talking about this report that is in   01:31
20 Defense Exhibit 59A.                           01:31
21 A.  Yes.                                       01:31
22 Q.  Do you conclude from this report that      01:31
23 adulterated Digitek made it to market?         01:31
24 A.  Based on that one report and the fact      01:31
25 that I may have mischaracterized them as a     01:31

Page 196

1  pharmacist, I can't come to a firm conclusion on  01:31
2  that.                                          01:31
3  Q.  You can't come to a firm conclusion on     01:31
4  that?                                          01:31
5  A.  That's correct.                            01:31
6  Q.  So when you said earlier --                01:31
7  A.  Uh-huh.                                    01:31
8  Q.  -- we know --                              01:31
9  A.  Yes.                                       01:31
10 Q.  -- which is definitive.  Am I correct --   01:31
11 A.  Yes.                                       01:31
12 Q.  -- that adulterated Digitek was released   01:31
13 to market, the only thing you have to support that  01:31
14 definitive statement is the 2004 circumstances?  01:31
15 A.  In the documents I have already            01:31
16 reviewed; correct.                             01:31
17 Q.  Okay.  The only thing you're aware of --   01:31
18 no matter what you've reviewed -- is the 2004  01:31
19 circumstances; correct?                        01:31
20 A.  That's the specific one, yes.              01:31
21 THE WITNESS:  I hate to do this to you.        01:32
22 I need a bathroom break.                       01:32
23 MR. ANDERTON:  You certainly may.              01:32
24 THE VIDEOGRAPHER:  The time is 1:31 p.m.       01:32
25 We're going off the record briefly.            01:32

Page 197

1  (Short break)                                  01:40
2  THE VIDEOGRAPHER:  The time is 1:42 p.m.       01:40
3  We're back on the record.                      01:40
4  BY MR. ANDERTON:                               01:40
5  Q.  Dr. Bliesner, you just took a break.       01:40
6  Did you speak with Mr. Kerensky during that break?  01:40
7  A.  Yes, I did.                                01:40
8  Q.  Who called who?                            01:40
9  A.  He called me.                              01:40
10 Q.  He did?                                    01:40
11 A.  Yes.                                       01:40
12 Q.  What did you talk about?                    01:40
13 A.  He wanted to ask me how I felt things      01:40
14 were going, how I felt.                        01:41
15 Q.  What did you tell him?                      01:41
16 A.  I said it's tiring, hard work.  I didn't   01:41
17 get to the point where I said I don't know how you  01:41
18 people do this for a living, but that's what I was  01:41
19 thinking then he offered some advice.          01:41
20 Q.  What was his advice?                        01:41
21 A.  His advice was you realize the report      01:41
22 that you wrote is not based on just one or two  01:41
23 observations of the adulterated product in the  01:41
24 market.  The basis -- the majority of the basis of  01:41
25 the report is this total lack of compliance over  01:41

50 (Pages 194 to 197)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 198

1   the course of years.  I said okay.                    01:41
2   Q.    Okay.  So he told you to say that?              01:41
3   A.    No, he didn't tell me to say that.  He          01:41
4   said just remember.                                   01:41
5   Q.    That's his words though, not yours.             01:41
6   A.    No, it's -- yeah it's his words in              01:41
7   general.                                              01:41
8   Q.    His words?                                      01:41
9   A.    Yeah.  But it is the basis of the               01:41
10  report.  It's true.  That's how it was written.       01:41
11  Q.    But let's call that what it is.                 01:41
12  A.    Uh-huh.                                          01:41
13  Q.    The basis of the report is inferences;          01:41
14  right?                                                01:41
15  A.    Inferences?                                     01:41
16  Q.    Sure.                                           01:41
17  A.    How are you defining inferences?                01:41
18  Q.    Well, you have either direct proof --           01:42
19  A.    Uh-huh.                                          01:42
20  Q.    -- or inferential proof.  You understand        01:42
21  the difference between the two; right?                01:42
22  A.    I do not.                                        01:42
23  Q.    Direct proof is something that proves a         01:42
24  proposition to be true.  Something follows -- A       01:42
25  follows from B.                                        01:42

Page 199

1   A.    Okay.                                            01:42
2   Q.    Inferential proof is something that             01:42
3   doesn't necessarily prove something is true but       01:42
4   suggests it's true.                                    01:42
5   Do you understand the difference?                      01:42
6   A.    I think in those terms, yes.                    01:42
7   Q.    You know what an inference is; right?           01:42
8   A.    Yes.                                             01:42
9   Q.    You know what I mean?  Dr. Bliesner, I'm        01:42
10  a little bit befuddled by your claimed lack of        01:42
11  understanding of some of these very basic terms       01:42
12  when you spend your life charging people $500 an      01:42
13  hour or more to do highly technical analytical --     01:42
14  to provide highly technical analytical services.      01:43
15  How do you not know the difference off the top of     01:43
16  your head between direct and inferential?             01:43
17        MR. KERENSKY:  Objection, form.                 01:43
18  BY MR. ANDERTON:                                      01:43
19  Q.    You may answer.                                 01:43
20  A.    I never been in a deposition with the           01:43
21  legal implication of some words.  It's like the       01:43
22  definition of "is," is with Clinton.                  01:43
23  Q.    Do you know the difference between              01:43
24  direct proof and inferential proof in the ordinary    01:43
25  course of your FDA GMP consulting career?             01:43

Page 200

1   A.    We never use the term infer.                    01:43
2   Q.    Okay.  You've got --                            01:43
3   A.    In my experience.                               01:43
4   Q.    So your conclusion in your report which        01:43
5   is set forth at page 21, you say it is my opinion     01:43
6   to a reasonable degree of certainty that the         01:44
7   systemic failure to implement quality systems and    01:44
8   to comply with regulations -- with the               01:44
9   regulations -- resulted in adulterated drug          01:44
10  products making it to the marketplace.                01:44
11  Did I read that correctly?                            01:44
12  A.    Yes, you did.                                    01:44
13  Q.    As concerns the product, the Digitek           01:44
14  product that was part of the recall, you don't       01:44
15  have any direct proof of that, do you?               01:44
16  A.    I have proof that they were in                 01:44
17  substantial state of discompliance and that those    01:44
18  tablets were manufactured under the quality         01:44
19  systems or lack of quality systems therein and      01:45
20  therefore were at risk.                               01:45
21  Q.    So what you have proof of is the               01:45
22  possibility that adulterated Digitek was            01:45
23  manufactured; correct?                                01:45
24  A.    The likelihood that it could have been         01:45
25  manufactured.                                         01:45

Page 201

1   Q.    Which is a possibility.                         01:45
2   A.    It's probable.                                  01:45
3   Q.    Oh, now you know the difference between        01:45
4   possibility and probability.                          01:45
5   A.    We talked about it earlier today              01:45
6   remember?                                             01:45
7   Q.    I see.  You're a quick study.  That's          01:45
8   good to know.                                          01:45
9   So in your mind it's probable but still you          01:45
10  have no proof; right?                                 01:45
11  A.    With respect to the recalled lot?             01:45
12  Q.    Correct.  Lots.                                 01:45
13  A.    Lots.                                            01:45
14  Q.    Correct.  With respect to the recalled        01:45
15  lots.                                                 01:45
16  A.    In what I've reviewed, no.                     01:45
17  Q.    All right.  And so if you assert as a         01:45
18  conclusion that adulterated Digitek that was part    01:45
19  of the recalled lots made it to marketplace, the     01:46
20  only way you do that is by inference; right?         01:46
21  A.    The only way?                                   01:46
22  Q.    You don't have any direct proof.             01:46
23  A.    For the recalled lots.                         01:46
24  Q.    Correct.  And so the only way to reach        01:46
25  that conclusion is by inference; right?             01:46

51 (Pages 198 to 201)

PLAINTIFFS' EXHIBITS 003091

David M. Bliesner, Ph.D.                      Videotaped                      February 18, 2011

Page 202

1    A.   The chronic systemic failure of the          01:46
2  quality system and the FDA actions, including two   01:46
3  consent decrees and anything like that, if you're   01:46
4  defining that as an inference, then the answer      01:46
5  would be yes.                                        01:46
6    Q.   Well, we know you didn't look at any         01:46
7  Digitek production records; right?                  01:46
8    A.   That's not necessarily true.                01:46
9    Q.   You looked at a portion of one batch         01:46
10 record; right?                                       01:46
11   A.   I can't remember specifically.  I know I     01:46
12 reviewed the ANDA that had batch records in it and   01:46
13 I have probably read another document or two.        01:46
14   Q.   Okay.  There were 152 batches that were      01:46
15 recalled.                                            01:47
16   A.   Okay.                                         01:47
17   Q.   You didn't review any of the batch           01:47
18 records for those 152 batches except for a partial   01:47
19 review of the batch where some double-thick          01:47
20 tablets were found during manufacturing that were    01:47
21 inspected out of the batch before it was             01:47
22 released.  And the only reason you read that is      01:47
23 because you read the investigation report for that   01:47
24 batch; correct?                                      01:47
25   A.   I don't recall which batch record I          01:47

Page 203

1  looked at.  I tell you that right now.              01:47
2    Q.   Okay.  You gave testimony about it last      01:47
3  time.                                                01:47
4    A.   Okay.                                         01:47
5    Q.   The record will show what it shows.          01:47
6    A.   Okay.                                         01:47
7    Q.   But you certainly didn't review any of       01:47
8  the batch records beyond that single batch with     01:47
9  respect to the recalled batches; correct?           01:47
10   A.   I don't believe so.                          01:47
11   Q.   Okay.  So you conducted a paper audit?       01:47
12   A.   Yes, sir.                                     01:47
13   Q.   Without reviewing production records?        01:47
14   A.   Yes.                                          01:47
15   Q.   And from that paper audit of                 01:48
16 non-production records, primarily FDA regulatory     01:48
17 documentation, you conclude there is a possibility   01:48
18 that adulterated Digitek was produced and            01:48
19 therefore there is a possibility that adulterated    01:48
20 Digitek was released; correct?                       01:48
21   A.   No, it probably was released to market.      01:48
22 If you go back and you look at the FDA reports and   01:48
23 the findings, first of all, batch record is not     01:48
24 the end all be all for documenting whether things    01:48
25 are good or bad.  In fact as we know from reading    01:48

Page 204

1  the documentation here is that there are numbers     01:48
2  of people in the facility that don't even read       01:48
3  English.  So are they going to document anything     01:48
4  bad on a batch record?  It brings that into          01:48
5  question.                                            01:48
6    So, you know, the reality is, is if people         01:49
7  make mistakes and they don't read English, are      01:49
8  they going to document them on a batch record?       01:49
9  That's a good question and I can't answer it.  But   01:49
10 it brings into question the batch records doesn't    01:49
11 necessarily show you anything definitive.            01:49
12   Q.   You can't answer it because you didn't        01:49
13 care enough to ask for or even attempt to review     01:49
14 the batch records.  You can't give any testimony     01:49
15 about the information in the batch records for the   01:49
16 recalled batches, can you?                           01:49
17   A.   In the batch records?                         01:49
18   Q.   Correct.                                      01:49
19   A.   Again, I have to go back.  But if I take      01:49
20 you at your word, then -- and that from the          01:49
21 previous testimony I reviewed a small portion of     01:49
22 the batch record, then the answer is I reviewed a    01:49
23 small portion of the batch record.                   01:49
24   Q.   From one lot.                                 01:49
25   A.   If that's what's in the testimony            01:49

Page 205

1  previously, I'll say yes.                            01:49
2    Q.   And as concerns all of the other 151         01:49
3  lots at four-plus million tablets each that were    01:49
4  part of the recall, you can't give any testimony    01:49
5  about those batch records, can you?                  01:50
6    A.   Specifically the batch records?             01:50
7    Q.   Yeah.                                         01:50
8    A.   No.                                           01:50
9    Q.   So you can't say anything one way or the     01:50
10 other about whether they're accurate not accurate,   01:50
11 whether there appears to be some sort of mistake     01:50
12 in them, you can't give any testimony about them,    01:50
13 can you?                                             01:50
14   A.   That's not true.  If you have a               01:50
15 substantial quality system failures as documented    01:50
16 by the FDA, you're going to have problems.           01:50
17   Q.   How would the FDA determine whether a         01:50
18 quality system deficiency impacted a specific        01:50
19 product?  How would the FDA do it?                   01:50
20   A.   How would they determine?                     01:50
21   Q.   Yeah.                                         01:50
22   A.   They don't have to.  They see quality         01:50
23 system failure, they write you up.                   01:50
24   Q.   They write you up.                           01:50
25   How would they determine whether a specific        01:50

52 (Pages 202 to 205)

PLAINTIFFS' EXHIBITS 003092

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 206

1   product was impacted?                           01:50
2       A.   If it would not fall under the GMPs and   01:51
3   there was doubt, that's how they determine.      01:51
4       Q.   That would create a possibility that     01:51
5   some deficiency impacted some product; right?    01:51
6       A.   Say that again, or should I have him     01:51
7   read it back?  Because I don't know if I         01:51
8   understand that.                                 01:51
9          MR. ANDERTON:  Please, Phil, read it      01:51
10   back.                                           01:51
11          (Whereupon, the testimony was read       01:51
12   back by the court reporter, as recorded above)   01:51
13          THE WITNESS:  Possibility that some       01:51
14   deficiency could potentially impact.  The FDA   01:51
15   does not need the probable definition.  All     01:51
16   they have to go in and see that there are       01:51
17   deficiencies with respect to the quality        01:51
18   systems.  They do whatever they want and take   01:51
19   action on it.                                   01:51
20   BY MR. ANDERTON:                                01:51
21       Q.   I understand that.                      01:51
22       A.   Uh-huh.                                 01:51
23       Q.   I asked you a question and I would like  01:51
24   you to answer now.  How would the FDA determine  01:51
25   whether a specific GMP systems deficiency impacted  01:51

Page 207

1   a specific problem?  I'm sorry a specific       01:52
2   product.                                        01:52
3       A.   Well, I don't work for the FDA and I'm  01:52
4   not going to speak for the FDA, but if they     01:52
5   find -- go back look at the EIRs and see that   01:52
6   there are all kinds of problems with respect to  01:52
7   manufacturing records and lack of manufacturing  01:52
8   records, validated processes and things like    01:52
9   that.  So that's what they do.                  01:52
10       They put -- if the question as to the      01:52
11   integrity of the manufactured product, then, you  01:52
12   know, they take action.                         01:52
13       Q.   What question were you just answering?  01:52
14   I move to strike that as completely             01:52
15   non-responsive.                                 01:52
16       Were you talking about Activis or their    01:52
17   records somehow?                                01:52
18       A.   I'm talking about the records that the  01:52
19   FDA reviewed and their systems and places that  01:52
20   will show up on the establishment inspection    01:52
21   report.                                         01:52
22       Q.   Are you an expert in GMP compliance or  01:52
23   not?                                            01:53
24       A.   Am I am, sir.                           01:53
25       Q.   Okay.  I'm asking you a question about  01:53

Page 208

1   FDA practice that ought to be right down the    01:53
2   middle of that expertise.  I don't know why you  01:53
3   don't want to answer it, but -- I know exactly why  01:53
4   you don't want to answer it but I'm going to keep  01:53
5   asking it until you do.                          01:53
6          MR. KERENSKY:  Objection, form.         01:53
7   BY MR. ANDERTON:                                01:53
8       Q.   Okay.  How would the FDA -- let's      01:53
9   assume, Dr. Bliesner, that the FDA was doing an  01:53
10   inspection and uncovered a GMP practice that they  01:53
11   believed was deficient.                          01:53
12       A.   Okay.                                   01:53
13       Q.   That happens; right?                    01:53
14       A.   Yes, it does.                           01:53
15       Q.   That's what you charge your clients to  01:53
16   assess; right?                                   01:53
17       A.   Yes.                                    01:53
18       Q.   If the FDA wanted to determine whether  01:53
19   that GMP deficiency impacted a particular product,  01:53
20   how would they do that?                          01:53
21       A.   They may or may not start looking at all  01:54
22   of the quality systems that are in there.  I'm   01:54
23   just telling you how they do it.  They could stop  01:54
24   when they see significant deficiencies and there  01:54
25   is doubt in their mind they just stop.  That's   01:54

Page 209

1   what they do.                                   01:54
2       Q.   Why don't you want to ask answer that  01:54
3   question?  I know the answer.  I know why you   01:54
4   don't want to.                                   01:54
5       A.   Well, what's the answer?               01:54
6       Q.   Dr. Bliesner, how would the FDA        01:54
7   determine whether a specific GMP deficiency     01:54
8   impacted a specific product?  What would they do?  01:54
9          MR. KERENSKY:  Objection, form, prior to  01:54
10   the word "how?"                                 01:54
11   BY MR. ANDERTON:                                01:54
12       Q.   You may answer.                        01:54
13       A.   Again, please.                         01:54
14       Q.   I'll ask it again.                     01:54
15       A.   Okay.                                  01:54
16       Q.   And we're going to set up the whole    01:54
17   situation again; okay?                          01:54
18       A.   Okay.                                  01:54
19       Q.   So that I understand -- so that I know  01:54
20   you're clear in what we're talking about.       01:54
21       A.   Okay.                                  01:55
22       Q.   The FDA can -- the FDA conducts        01:55
23   inspections; right?                             01:55
24       A.   That's correct.                        01:55
25       Q.   If they notice a condition which they  01:55

53 (Pages 206 to 209)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 210

1  believe is a violation of good manufacturing          01:55
2  practices --                                          01:55
3     A.   Yes.                                           01:55
4     Q.   -- they make a note or a record of that        01:55
5  somehow; correct?                                     01:55
6     A.   Yes, they do.                                  01:55
7     Q.   If that GMP violation or deficiency            01:55
8  related to a specific -- or to a quality system,       01:55
9  they'd make a note of that; right?                     01:55
10    A.   Yes, they do                                   01:55
11    Q.   And they notify the company of that            01:55
12 quality system GMP deficiency; right?                  01:55
13    A.   Typically, yes.                                01:55
14    Q.   All right.  In the ordinary course,            01:55
15 that's what they would do?                             01:55
16    A.   Yes.                                           01:55
17    Q.   They are not in the business of ignoring       01:55
18 or overlooking deficiencies that they find, are        01:55
19 they?                                                  01:55
20    A.   No, not at all.  Not at all.                   01:55
21    Q.   I don't know why you felt compelled to         01:55
22 say typically in that situation.  But Dr. Bliesner     01:55
23 in that situation, if the FDA found a GMP              01:55
24 deficiency in the quality systems and wanted then      01:56
25 to inquire or determine whether that deficiency        01:56

Page 211

1  had any impact on a specific product --               01:56
2     A.   Yes.                                           01:56
3     Q.   -- what would they do?                         01:56
4        MR. KERENSKY:  Form.  Objection, form.          01:56
5        THE WITNESS:  It depends, you know, what         01:56
6  deficiency it is in quality systems; all              01:56
7  right?  For instance, let's say they go in the         01:56
8  laboratory, they pull up some data, they look          01:56
9  at chromatograms --                                    01:56
10 BY MR. ANDERTON:                                       01:56
11    Q.   Stop.  Data and chromatograms for what?       01:56
12 For the product?                                       01:56
13    A.   Yes.                                           01:56
14    Q.   Sounds to me like they're reviewing            01:56
15 production records for that product.                   01:56
16    A.   They will review batch records as well.        01:56
17    Q.   Okay.                                          01:56
18    A.   Chromatographic data and reports aren't        01:56
19 necessarily -- you know, they're included with the     01:56
20 reported results, included in batch record, but        01:57
21 the raw data and the stuff is not.                     01:57
22    Q.   You don't think that's part of the batch      01:57
23 record?                                                01:57
24    A.   The data is reported results, but              01:57
25 chromatograms in my experience traditionally are      01:57

Page 212

1  not.  Electronic data are traditionally not.          01:57
2     Q.   But the data is?                               01:57
3     A.   The final results.                             01:57
4     Q.   The data that the chromatogram generates       01:57
5  or reflects is part of the batch record; right?        01:57
6     A.   We're talking about -- I'm -- please           01:57
7  don't take this wrong.  Your understanding of raw      01:57
8  data as opposed to a result, they're different         01:57
9  things.                                                01:57
10    Q.   Okay.                                           01:57
11    A.   Okay.                                           01:57
12    Q.   But the bottom line is the FDA if they         01:57
13 wanted to determine whether a quality systems          01:57
14 deficiency impacted a specific product, they'd go      01:57
15 look at the records, some portion of the records       01:57
16 for that specific product, wouldn't they?              01:57
17    A.   They'll look at the records that               01:57
18 indicate where the difficulties are.  For              01:57
19 instance, if they think there's problems with an       01:58
20 analytical method, they'll go in and they'll start     01:58
21 pulling up chromatographic data, look at the           01:58
22 results that come out there, look at peaks, look       01:58
23 how they're innovated, pull up the development         01:58
24 report, pull up the validation report, things like     01:58
25 that.                                                  01:58

Page 213

1     If they think there are discrepancies with        01:58
2  respect to improper documentation or execution of      01:58
3  batch records, then they can pull the batch           01:58
4  records and take a look at it.                         01:58
5     Q.   So what you've just described is a            01:58
6  process whereby the FDA would look at some             01:58
7  variation, some component -- some or all of the        01:58
8  production records for the product.  The only way      01:58
9  they could conclude that a quality system             01:58
10 deficiency actually impacted a specific product is     01:58
11 to go look at the records that relate to that          01:58
12 product; correct?                                      01:58
13    A.   The raw data in the records, the reports      01:58
14 that come out of it.                                   01:58
15    Q.   Right.                                         01:58
16    A.   That's correct.                                01:58
17    Q.   Couldn't reach that to product -- strike      01:58
18 that.                                                  01:58
19       MR. ANDERTON:  We're going to change the        01:59
20 tape.                                                  01:59
21       THE VIDEOGRAPHER:  It's 2:01 p.m.  We're        01:59
22 going off the record.                                  01:59
23       (Short break)                                   02:00
24       THE VIDEOGRAPHER:  The time is 2:03 p.m.        02:00
25 We are back on record.  This is the beginning         02:02

54 (Pages 210 to 213)

PLAINTIFFS' EXHIBITS 003094

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 214

1    of tape six.                              02:02
2    BY MR. ANDERTON:                          02:02
3       Q.   Dr. Bliesner, in the paper audit that       02:02
4    you conducted, you placed heavy emphasis on the      02:02
5    FDA regulatory documents, didn't you?               02:02
6       A.   Yes, sir, I did.                   02:02
7       Q.   They carry great weight with you, don't      02:02
8    they?                                      02:02
9       A.   Yes, they do.                      02:02
10      Q.   Dr. Bliesner, I'm handing you a document     02:02
11   that has been marked as -- previously marked by      02:03
12   the Plaintiffs as Exhibit 68.  As you can see by     02:03
13   the sticker, they used it in a deposition on        02:03
14   December 9, 2009.                          02:03
15      A.   Okay.                             02:03
16      Q.   Will you just look at that document for      02:03
17   a moment?  I don't want you to read it.             02:03
18      A.   Okay.                             02:03
19      Q.   I just want you to skim through it and       02:03
20   satisfy yourself of what it is.                     02:03
21           MR. KERENSKY:  I can't hear what            02:03
22   exhibit.  I'm sorry.                       02:03
23           MR. ANDERTON:  68, Mike.           02:03
24           MR. KERENSKY:  Okay.               02:04
25           MR. ANDERTON:  And it's Plaintiffs'        02:04

Page 215

1    Exhibit 68.  You got that part; right?             02:04
2            MR. KERENSKY:  I did not.  Thank you.      02:04
3    That's why I couldn't find it.                     02:04
4            MR. ANDERTON:  Right.  I'm here to help,    02:04
5    Mike.                                      02:04
6    BY MR. ANDERTON:                           02:05
7       Q.   Have you seen that document before?        02:05
8       A.   I believe I have seen it either as part     02:05
9    of an EIR or stand-alone or both.                   02:05
10      Q.   I'll take that as a yes.  It's a 2006       02:05
11   483 -- it's a 483 form issued in August of 2006 by   02:05
12   the FDA, following an inspection of the Activis      02:05
13   Totowa Little Falls facility; correct?             02:05
14      A.   Yes.                              02:05
15      Q.   Dates of inspection July 10, 2006, to       02:05
16   August 10, 2006; correct?                   02:05
17      A.   Correct.                          02:05
18      Q.   All right.  And are you familiar enough     02:05
19   with the document, Dr. Bliesner, to -- to say that   02:05
20   this document relates to various GMP circumstances   02:06
21   of Activis Totowa, as reflected in this inspection   02:06
22   report?                                    02:06
23      A.   GMP circumstances?                 02:06
24      Q.   Yeah.                             02:06
25      A.   Failure of compliance?  Failure of         02:06

Page 216

1    compliance I would say, yes.                       02:06
2       Q.   For GMP issues?                    02:06
3       A.   Yes.                              02:06
4       Q.   Look at page 5.                    02:06
5       A.   Uh-huh.                           02:06
6       Q.   Observation seven.  Do you see that?        02:06
7       A.   Yes.                              02:06
8       Q.   That is an observation that relates to      02:06
9    the bulk stability hold times studies.             02:06
10           Do you see that?                   02:06
11      A.   Yes.  Just, if I may, I may not --         02:06
12      Q.   Dr. Bliesner.                      02:06
13      A.   -- have seen some of this stuff because     02:07
14   a lot of the copies we had were redacted, just so    02:07
15   you know.                                  02:07
16      Q.   Well, nothing like hiding something from    02:07
17   yourself.                                  02:07
18           Well, let's just do it.  You see observation  02:08
19   five on there or observation seven there on page     02:08
20   5?                                         02:08
21      A.   Yes.                              02:08
22      Q.   All right.  Do you remember the            02:08
23   testimony that you gave on January 25th about bulk   02:08
24   stability hold time studies?                02:08
25      A.   No.                               02:08

Page 217

1       Q.   You don't; okay.                   02:08
2            Do you remember telling Mr. Moriarty that you   02:08
3    questioned whether the Activis -- whether the        02:08
4    Digitek process validation -- whether the FDA had    02:08
5    any issues with the Digitek process validation      02:08
6    because you had seen a reference to bulk stability   02:08
7    hold times in this 483, and you thought that that    02:08
8    related to process validation?                     02:08
9       A.   I don't recall that, that statement.        02:08
10      Q.   Do you -- do you --                 02:08
11      A.   I --                              02:08
12      Q.   -- stand by that testimony?  Does bulk      02:08
13   stability hold time studies have anything to do      02:09
14   with process validation?                   02:09
15      A.   I'm not clear what they're meaning by       02:09
16   bulk stability hold here.                   02:09
17      Q.   You gave the testimony, Dr. Bliesner, I     02:09
18   didn't.  I'm asking you a question.  Does bulk       02:09
19   stability hold time studies have anything to do      02:09
20   with process validation?                   02:09
21           MR. KERENSKY:  Objection, form.    02:09
22           MR. ANDERTON:  What's wrong with that       02:09
23   form, Mike?  I would like to correct it if you       02:09
24   will allow.                                02:09
25           MR. KERENSKY:  It's a sidebar.  You gave    02:09

55 (Pages 214 to 217)

PLAINTIFFS' EXHIBITS 003095

Page 218

1  him the answer, I didn't.  I doubt you will.    02:09
2        MR. ANDERTON:  Say that one more time.    02:09
3  What's wrong with the form?    02:09
4        MR. KERENSKY:  It is a sidebar of you    02:09
5  gave the testimony, I didn't.  That kind of    02:09
6  comment prior to the question is objectionable    02:09
7  where I practice law.    02:09
8        MR. ANDERTON:  Oh, okay.    02:09
9  BY MR. ANDERTON:    02:09
10   Q.   So my question, Dr. Bliesner, absent any    02:09
11  preface comment is do bulk stability hold time    02:10
12  studies have anything to do with process    02:10
13  validation?    02:10
14   A.   They can, yes.    02:10
15   Q.   As you read this observation 7, does it?    02:10
16   A.   With respect to these products.    02:10
17   Q.   It does?    02:10
18   A.   Bulk stability -- we're talking about    02:10
19  final blend or are we talking about manufactured    02:10
20  tablets?  In this particular case it's    02:10
21  particularly clear.    02:10
22   Q.   Okay.  What's really clear, however --    02:10
23   A.   Uh-huh.    02:10
24   Q.   -- is that Digitek --    02:10
25   A.   Uh-huh.    02:10

Page 219

1   Q.   -- is not mentioned as one of the    02:10
2  products that the FDA cited in this observation;    02:10
3  correct?    02:10
4   A.   In the copy I'm looking at, yes.    02:10
5   Q.   Do you think that I'm looking at a    02:10
6  different copy?    02:10
7   A.   I was specifically told don't look at    02:10
8  anything that has to do with any other product    02:10
9  other than Digitek.  So if I had this copy with no    02:10
10  Digitek on there, I'm pretty sure I would not have    02:11
11  made a comment on it.    02:11
12   Q.   Well, Dr. Bliesner, again, the last time    02:11
13  you were here --    02:11
14   A.   Okay.    02:11
15   Q.   -- you identified this observation as a    02:11
16  reason why you questioned the validity of the    02:11
17  Digitek process validation.  I'm sorry.  Let me    02:11
18  strike that.    02:11
19  You cited to this observation as a basis for    02:11
20  wondering whether the FDA questioned the process    02:11
21  validation for Digitek.  So does this have    02:11
22  anything to do with the process validation for    02:11
23  Digitek?    02:11
24   A.   In this particular case, it does not    02:11
25  look so.    02:11

Page 220

1   Q.   It does not?    02:11
2   A.   Yes, uh-huh.    02:11
3   Q.   Okay.  Are you aware of any other    02:11
4  evidence that you have reviewed that calls into    02:11
5  question the validity of the Digitek process    02:11
6  validation?    02:12
7   A.   Yes.    02:12
8   Q.   What?    02:12
9   A.   There were internal studies and    02:12
10  investigations with respect to process validation,    02:12
11  blend uniformity.    02:12
12   Q.   Okay.  So there were investigations --    02:12
13   A.   I misspoke.  With respect to process    02:12
14  validation, no.    02:12
15   Q.   Okay.    02:12
16   A.   With respect to blend uniformity.  I'm    02:12
17  sorry.    02:12
18        MR. ANDERTON:  Phil, would you please    02:12
19  read back my question very slowly and very    02:12
20  deliberately.  Dr. Bliesner, would you please    02:12
21  answer my question?    02:12
22        THE WITNESS:  Yes, sir.    02:13
23        (Whereupon, the testimony was read    02:13
24  back by the court reporter, as recorded above)    02:13
25        THE WITNESS:  I have to go back through    02:13

Page 221

1  my report and take a look.    02:13
2  BY MR. ANDERTON:    02:13
3   Q.   You're really desperate not to do    02:13
4  anything you can to undermine Activis, aren't    02:13
5  you?  You already testified about this last time,    02:13
6  Dr. Bliesner, and you identified only the bulk    02:13
7  stability hold time studies.    02:13
8        MR. KERENSKY:  Form.    02:13
9  BY MR. ANDERTON:    02:13
10   Q.   Now you have reviewed your report    02:13
11  forwards and backwards many times today and many    02:13
12  times last time.  Are you aware --    02:13
13        MR. KERENSKY:  The witness is allowed to    02:13
14  review his report as much as he can to give    02:13
15  accurate testimony, and I think you probably    02:13
16  know that.    02:13
17        MR. ANDERTON:  I do know that.  I also    02:13
18  know that he's now contradicting his own prior    02:13
19  testimony whether he realizes it or not.  So    02:13
20  if he wants to go back through his report, he    02:13
21  certainly may.    02:13
22  BY MR. ANDERTON:    02:14
23   Q.   But my question is are you aware of any    02:14
24  other evidence that calls into question the    02:14
25  validity of the process validation for Digitek?    02:14

56 (Pages 218 to 221)

PLAINTIFFS' EXHIBITS 003096

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 222

1     A.   Any other information?  Again, I need to        02:14
2   go back through my report and see what references     02:14
3   I reviewed with respect to process validation.        02:14
4     Q.   You didn't say anything about the              02:14
5   Digitek process validation in your report, not a      02:14
6   word about it being unreliable, and you testified     02:14
7   last time that you didn't review the process          02:14
8   validations.                                          02:14
9     Out of a desperate attempt to create some           02:14
10  negative inference with respect to Activis, you       02:14
11  tried to identify this bulk stability hold time       02:14
12  reference in this 483 as evidence.                    02:14
13       MR. KERENSKY:  Is that a question or a           02:14
14  speech?  In either case, I object as to form.         02:14
15  BY MR. ANDERTON:                                      02:14
16    Q.   So, Dr. Bliesner, what -- if you didn't        02:14
17  say anything in your report about process             02:14
18  validation, what would you be looking for?            02:15
19       MR. KERENSKY:  Objection, form.  Assumes         02:15
20  facts not in evidence.                                02:15
21  BY MR. ANDERTON:                                      02:15
22    Q.   You may -- you may answer.                     02:15
23    A.   Ask it again, please.                          02:15
24    Q.   If you didn't say anything about the           02:15
25  Digitek process validation in your report --          02:15

Page 223

1     A.   That's correct.                                02:15
2     Q.   -- what would you be looking for?              02:15
3     A.   If I didn't?                                   02:15
4     Q.   Yeah.                                          02:15
5     A.   Chances are I didn't have documents that       02:15
6   would support that.                                   02:15
7     Q.   So --                                          02:15
8     A.   Chances are.                                   02:15
9     Q.   So you wouldn't have any evidence?             02:15
10    A.   None of the documents were not given to        02:15
11  me to review.                                         02:15
12    Q.   Oh, you assume they're out there, you          02:15
13  just didn't get them?                                 02:15
14    A.   I know they're out there.                      02:15
15    Q.   You know there's documents out there           02:15
16  that call the process validation into question?       02:15
17    A.   No, I don't have a question on the             02:15
18  documents with respect to process validation.        02:15
19    Q.   And by the way, you most certainly were        02:15
20  given them if you reviewed all of Plaintiffs'         02:15
21  exhibits.                                             02:15
22    A.   I did not review all of Plaintiffs'            02:15
23  Exhibits in detail.                                   02:15
24    Q.   Didn't you tell me that last night from        02:15
25  Plaintiffs' counsel you received process              02:16

Page 224

1   validation?                                           02:16
2     A.   Yes, and that's when I told you I got          02:16
3   that document last night and I didn't review it.      02:16
4     Q.   Okay.                                          02:16
5     A.   That's -- I got it late.                       02:16
6     Q.   Well, Dr. Bliesner, you've already given       02:16
7   this testimony last time.  With respect to            02:16
8   observation 7 --                                      02:16
9     A.   Uh-huh.                                        02:16
10    Q.   -- on the 2006, 483 --                         02:16
11    A.   Uh-huh.                                        02:16
12    Q.   -- does that have anything to do with          02:16
13  the Digitek process validation?                       02:16
14    A.   No, this is just related to these              02:16
15  products here.                                        02:16
16    Q.   Okay.                                          02:16
17    A.   According to this document.                    02:16
18    Q.   Can't resist, can you?                         02:16
19    A.   Resist what?  I'm sorry.                       02:16
20    Q.   Your -- your solicited, gratuitous,            02:16
21  editorial comments at the end of every answer to      02:16
22  make sure you follow Plaintiffs' counsels'            02:16
23  directive to keep the door open.                      02:16
24       MR. KERENSKY:  Objection to form.  You           02:16
25  know, speaking objections go for both sides of        02:16

Page 225

1   the table.                                            02:16
2        MR. ANDERTON:  I'm sorry, Mike.  I'm not         02:16
3   sure I understand.                                    02:17
4        MR. KERENSKY:  You know when you give a          02:17
5   speech like that, admonishing the witness and         02:17
6   trying to intimidate the witness, that's just         02:17
7   like a speaking objection, trying to coach the        02:17
8   witness.                                              02:17
9        MR. ANDERTON:  I'm merely trying to get          02:17
10  him to answer the questions that are asked of         02:17
11  him.  We've been down this road all day.              02:17
12       MR. KERENSKY:  I think you should stick          02:17
13  to questions and not speeches.                        02:17
14       MR. ANDERTON:  Okay.                             02:17
15       MR. KERENSKY:  Save speeches for the             02:17
16  judge and the jury would be my recommendation.        02:17
17       MR. ANDERTON:  I appreciate your                 02:17
18  recommendation, Mike.                                 02:17
19       MR. KERENSKY:  Thank you.                        02:17
20  BY MR. ANDERTON:                                      02:17
21    Q.   So Dr. Bliesner, I'm now going to hand         02:17
22  you a document that has been marked as --             02:17
23  previously marked as Plaintiffs' Exhibit 25.  Take    02:17
24  a moment and look at that document, please.           02:17
25  Actually, may I see that back?                        02:18

57 (Pages 222 to 225)

PLAINTIFFS' EXHIBITS 003097

David M. Bliesner, Ph.D.       Videotaped       February 18, 2011

Page 226

```
 1    A.   Sure.                            02:18
 2    Q.   I may have given you the wrong    02:18
 3  document.  No.                          02:18
 4        THE WITNESS:  This is going to look like   02:18
 5  delaying tactics, but I've got to go to the   02:18
 6  bathroom.                               02:18
 7        MR. ANDERTON:  Okay.              02:18
 8        THE VIDEOGRAPHER:  The time is 2:19 p.m.   02:18
 9  We're going off the record.             02:18
10        (Short break)                     02:25
11        THE VIDEOGRAPHER:  The time is 2:27 p.m.   02:25
12  We are back on the record.              02:25
13        MR. ANDERTON:  We're going to make a   02:25
14  record of that before we close down, Mike, if   02:25
15  that's all right.                       02:25
16        MR. KERENSKY:  Yes, that's fine.   02:25
17  BY MR. ANDERTON:                        02:25
18    Q.   Dr. Bliesner, I'm going to hand you what   02:25
19  has previously been marked as Plaintiffs' Exhibit   02:25
20  25.                                     02:25
21    A.   Okay.                           02:25
22    Q.   Have you seen that document before?   02:25
23    A.   I believe I have, but there was an   02:26
24  original one and there was a revised one, and I'm   02:26
25  not sure which one I had the ability to review.   02:26
```

Page 227

```
 1    Q.   You don't know whether you got to review   02:26
 2  the revised warning letter?  If you don't know   02:26
 3  that, how do you know there was one?    02:26
 4    A.   There was -- if I recall, correctly   02:26
 5  there was a warning letter and then there was a   02:27
 6  revised warning letter.                 02:27
 7    Q.   Yeah, what's this document say on top?   02:27
 8    A.   This one is the revised warning letter.   02:27
 9  I'm not sure which one I looked at.     02:27
10    Q.   Did you only look at one of those two?   02:27
11    A.   I don't recall.  Let's see.      02:27
12    Q.   All right.  Dr. Bliesner, look at page   02:27
13  41 of your report.                      02:27
14    A.   Okay.  Okay.  And that would be it?   02:27
15    Q.   Have you seen that document before?   02:27
16    A.   Yes.                            02:27
17    Q.   In fact you reviewed it preparing your   02:27
18  report; right?                          02:28
19    A.   Yes.                            02:28
20    Q.   And according to your description of   02:28
21  content, I'll use your words not mine, this   02:28
22  warning letter -- this is -- starts on page 41 and   02:28
23  continues on to page 42.                02:28
24    A.   Yes.                            02:28
25    Q.   This warning letter is -- relates   02:28
```

Page 228

```
 1  directly to the 483 that we discussed a moment   02:28
 2  ago, that is Plaintiffs' Exhibit 68; correct?   02:28
 3    A.   I'm sorry.  Say that again.  I was   02:28
 4  looking at the contents.                02:28
 5    Q.   This warning letter --           02:28
 6    A.   Yes.                            02:28
 7    Q.   -- relates directly to the 483 that is   02:28
 8  Plaintiffs' Exhibit 68; correct?        02:28
 9    A.   I don't know.  The warning letter?  Yes.   02:28
10    Q.   Okay.  So you have an inspection in July   02:28
11  and August of 2006 resulting a 483; right?   02:28
12    A.   Uh-huh.                         02:28
13    Q.   You have to say or no?           02:28
14    A.   Yes, I'm sorry.                 02:29
15    Q.   About six months later, a warning letter   02:29
16  was issued by the FDA; right?           02:29
17    A.   That's correct, uh-huh.         02:29
18    Q.   Okay.  All right.  Dr. Bliesner, I'm   02:29
19  handing you a document that has been marked as   02:29
20  Plaintiffs' Exhibit 171.                02:29
21    A.   Okay.                           02:29
22    Q.   And this document was actually marked   02:29
23  twice.  Go to page 44 of your report, please.   02:29
24    A.   I'm sorry 44 of the?             02:30
25    Q.   Of your report.                 02:30
```

Page 229

```
 1    A.   My report; okay.  A little punchy.   02:30
 2  Sorry.                                  02:30
 3    Q.   Do you see reference A29?        02:30
 4    A.   I do.                           02:30
 5    Q.   Is your reference A29 -- notwithstanding   02:30
 6  the discrepancy in the exhibit numbers as I told   02:30
 7  you, this document was marked twice at two   02:30
 8  depositions, one says 158, one says 171.   02:30
 9  Nevertheless, please look at your reference A29   02:30
10  and tell me whether that is the same thing as what   02:30
11  you've now been given, which is in front of you as   02:30
12  Exhibit 171.                            02:30
13    A.   A29.  And your statement again was?   02:31
14    Q.   Is that the same as your reference A29?   02:31
15    A.   Let me double check.  My A29 doesn't   02:31
16  have the cover letter.                  02:31
17    Q.   Doesn't have the cover letter, but   02:31
18  otherwise is it the exact same EIR?     02:31
19    A.   It is, but there's redactions      02:32
20    Q.   In which one?                    02:32
21    A.   This one you just handed me as opposed   02:32
22  to this one.                            02:32
23    Q.   Okay.                           02:32
24    A.   So there --                      02:32
25    Q.   That's fine.                    02:32
```

58 (Pages 226 to 229)

PLAINTIFFS' EXHIBITS 003098

David M. Bliesner, Ph.D.                     Videotaped                     February 18, 2011

Page 230

1    A.   Uh-huh.                              02:32
2    Q.   Now, let's look at -- and again working  02:32
3    from the one I handed you as 171.          02:32
4    A.   Okay.                               02:32
5    Q.   Turn to page 11.                     02:32
6    11 of 40?                                 02:33
7    Q.   Correct.                            02:33
8    A.   Okay.                               02:33
9    Q.   Actually, let's go to page 2 of 40.     02:33
10   Do you see the summary?                   02:33
11   A.   Yes, sir.                           02:33
12   Q.   The first sentence of the summary       02:33
13   indicates that this inspection was conducted as a  02:33
14   follow-up to warning letter 07-NWJ-06.     02:33
15   A.   Okay.                               02:33
16   Q.   Is that the same warning letter that is   02:33
17   Plaintiffs' Exhibit 25 that you just looked at a  02:33
18   moment ago?                               02:33
19   A.   25 you said; correct?               02:33
20   Q.   Uh-huh.                             02:34
21   A.   Okay.  It does appear to be, yes.       02:34
22   Q.   Okay.  Is it or not?                 02:34
23   A.   Yes, according to the code, yeah.       02:34
24   Q.   Okay.  And -- and so you know from your  02:34
25   experience that when a warning letter is issued  02:34

Page 231

1    oftentimes -- maybe not perhaps all of the time --  02:34
2    the FDA will come back and ask to see verification  02:34
3    of remedial activities and corrective activities  02:34
4    performed by the manufacturer to the items set  02:34
5    forth in the warning letter; correct?      02:34
6    A.   That is common, yes.                02:34
7    Q.   Okay.  You've assisted clients with --   02:34
8    with exactly those types of inspections, haven't  02:34
9    you?                                      02:34
10   A.   Inspections or the remediation.         02:34
11   Q.   Well, remediation and then the follow-up  02:34
12   inspections.                              02:34
13   A.   Yes.                               02:34
14   Q.   You've assisted with both.             02:34
15   A.   Yes.                               02:34
16   Q.   Right?                             02:34
17   A.   Yes.                               02:34
18   Q.   Okay.  So this inspection then that was   02:34
19   conducted in 2007 --                       02:35
20   A.   Okay.                               02:35
21   Q.   -- from September 5 to September 28 --    02:35
22   do I have those dates right?               02:35
23   A.   Yes.                               02:35
24   Q.   It was a follow-up inspection to the     02:35
25   warning letter that was -- the revised warning  02:35

Page 232

1    letter that was issued February 1, 2007, which was  02:35
2    issued after an inspection in July and August of  02:35
3    2006; correct?                           02:35
4    A.   The original inspection July, August,    02:35
5    2006, yes.  Follow-up inspection off the issued  02:35
6    warning letter September, yes.             02:35
7    Q.   Okay.                               02:35
8    A.   Uh-huh.                            02:35
9    Q.   So the items that are set forth in the   02:35
10   warning letter --                          02:35
11   A.   Uh-huh.                            02:35
12   Q.   -- of February 1, 2007 --             02:35
13   A.   Uh-huh.                            02:35
14   Q.   -- are the items that are also set forth  02:35
15   in the 483 issued in August of 2006 following the  02:35
16   inspection; right?                        02:36
17   A.   Correct.                            02:36
18   Q.   Now -- now we can go to -- well,        02:36
19   actually go to page 5 of 60.               02:36
20   A.   5 of 60?                            02:36
21   Q.   On the EIR for the 2007 inspection.      02:36
22   A.   Okay.                               02:36
23   Q.   Do you see the first paragraph there?     02:36
24   A.   The compliance status?               02:36
25   Q.   Yes.                               02:36

Page 233

1    A.   Yes.                               02:36
2    Q.   What's a compliance hold?             02:36
3    A.   A compliance hold is where they may put   02:36
4    a hold on manufacturing and shipping of certain  02:36
5    products, depending on the impact in the EIR.  02:36
6    Q.   Okay.  And might they also put a hold on   02:36
7    new product approvals?                     02:37
8    A.   Not necessarily.                    02:37
9    Q.   Might they?                         02:37
10   A.   They could.                         02:37
11   Q.   Could?                             02:37
12   A.   Uh-huh.                            02:37
13   Q.   Is it -- is it uncommon for a           02:37
14   manufacturer who is -- who is, to use the term   02:37
15   quote "under" a warning letter, to have new    02:37
16   product approvals stayed until the warning letter  02:37
17   is lifted?                               02:37
18       MR. ANDERTON:  Phil, would you read it     02:38
19   back, please?                             02:38
20       THE VIDEOGRAPHER:  The time is 2:40 p.m    02:38
21   going off the record.                      02:38
22       (Short break)                        02:40
23       THE VIDEOGRAPHER:  The time is 2:42 p.m.   02:40
24   We're back on the record.                  02:40
25       MR. ANDERTON:  Phil, would you please     02:40

59 (Pages 230 to 233)

PLAINTIFFS' EXHIBITS 003099

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 234

```
 1    slowly read back that question?           02:40
 2         (Whereupon, the testimony was read    02:40
 3    back by the court reporter, as recorded above)  02:40
 4         THE WITNESS:  In my experience, companies  02:40
 5    that are under regulatory action like a    02:40
 6    warning letter or consent decree in my     02:40
 7    experience is that they are allowed to     02:41
 8    continue new product development and have  02:41
 9    regular inspections by the FDA as it       02:41
10    progresses.                                02:41
11  BY MR. ANDERTON:                             02:41
12    Q.   Okay.  But a compliance hold is -- is 02:41
13    some restriction on the company's activities? 02:41
14    A.   Yes.                                  02:41
15    Q.   Defined by the circumstances, I       02:41
16    suppose.                                   02:41
17    A.   Yes.                                  02:41
18    Q.   Now, after this -- well, let's go to  02:41
19    page 11 of 40.                             02:41
20         Do you see the inspection coverage heading? 02:41
21    A.   Yes.                                  02:41
22    Q.   According to that page, the quality   02:41
23    production laboratory control materials and 02:41
24    facilities and equipment systems were covered 02:41
25    during this inspection.  That is five of the six 02:41
```

Page 235

```
 1    systems typically inspected by the FDA; correct? 02:42
 2    A.   Yes.                                  02:42
 3    Q.   The only one not covered is packaging. 02:42
 4    A.   Packaging and labeling.               02:42
 5    Q.   Sorry packaging and labeling.  And you 02:42
 6    know packaging and labeling was in a different 02:42
 7    facility from all of these other operations; 02:42
 8    right?                                     02:42
 9    A.   I didn't know if it was exclusive, but I 02:42
10    know there was packaging and labeling going on in 02:42
11    another facility.                          02:42
12    Q.   Okay.  Well, you know that it wasn't at 02:42
13    the Little Falls facility; right?          02:42
14    A.   I didn't know whether there was some or 02:42
15    not.  I didn't specifically look at that.  02:42
16    Q.   I see.  Okay.  So what you didn't know 02:42
17    is whether there was packaging in another facility 02:42
18    and also at the Little Falls facility.     02:42
19    A.   That's correct.                       02:42
20    Q.   Okay.  Would you look at -- well, after 02:42
21    this inspection, another a 483 was issued.  Do you 02:42
22    remember that?                             02:42
23    A.   Specifically, no.                     02:42
24    Q.   All right.  Well, look at page 44 of  02:43
25    your report.                               02:43
```

Page 236

```
 1    A.   Okay.  All right.  Yes.  It would      02:43
 2    reflect -- you can go back and at the 483s, it 02:43
 3    would be there.                            02:43
 4    Q.   So my question is, Dr. Bliesner, after 02:43
 5    the inspection that is reflected in the EIR, that 02:43
 6    is Plaintiffs' or, yeah, Plaintiffs' Exhibit 171, 02:43
 7    a 483 was issued; correct?                 02:43
 8    A.   171.  Okay.  I just want to make sure  02:44
 9    because we've got several different layers here. 02:44
10    Yes.                                       02:44
11    Q.   All right.  You say so in your report. 02:44
12    A.   Yes, yes.  I'm just confused because we 02:44
13    have different versions and different numbers and 02:44
14    stuff.  I wanted to be sure.               02:44
15    Q.   Okay.  And in that 483, there were three 02:44
16    observations; right?                       02:44
17    A.   Yes, according to this.               02:44
18    Q.   You lay those out on page 44 of your   02:44
19    report and they are also set forth in this EIR; 02:44
20    isn't that right?                          02:44
21    A.   Yes.                                  02:44
22    Q.   And in among those three observations, 02:44
23    none of them have anything do with Digitek, 02:44
24    correct?                                   02:44
25    A.   The general observations and supporting 02:46
```

Page 237

```
 1    data, the general observations indicate there is 02:46
 2    nothing referred back to Digitek.          02:46
 3    Q.   Okay.                                 02:46
 4    A.   Uh-huh.                               02:46
 5    Q.   And do you know that the outcome of this 02:46
 6    inspection was what is referred to as V -- as in 02:46
 7    victory -- VAI?                            02:46
 8    A.   Voluntary action indicated?           02:46
 9    Q.   Yes.                                  02:46
10    A.   I don't recall.                       02:46
11    Q.   Do you have any reason to believe it was 02:46
12    VAI?                                       02:46
13    A.   No.                                   02:47
14    Q.   Okay.  I mean I could put the 2008 EIR 02:47
15    in front of you that explicitly says that. 02:47
16    A.   Yeah.                                 02:47
17    Q.   Okay.                                 02:47
18    A.   Yeah.                                 02:47
19    Q.   So VAI is a reasonable outcome for an  02:47
20    FDA inspection; correct?                   02:47
21    A.   It's reasonable in that they're not    02:47
22    forcing you to do something specifically, that 02:47
23    it's up to you to do it, yes.              02:47
24    Q.   Everybody would love to have NAI for all 02:47
25    --                                         02:47
```

60 (Pages 234 to 237)

PLAINTIFFS' EXHIBITS 003100

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 238

1    A.   Absolutely.                        02:47
2    Q.   -- for all inspections; right?     02:47
3    A.   Absolutely.                        02:47
4    Q.   But VAI with three modest observations,   02:47
5    that's a favorable outcome for an inspection,   02:47
6    wouldn't you agree?                     02:47
7    A.   I wouldn't necessarily agree that it's a   02:47
8    modest observation.                     02:47
9    Q.   Well, after --                     02:47
10   A.   It's better to have -- as you said, you   02:48
11   know, the real goal is no action indicated.  And   02:48
12   the next step up is voluntary action indicated.   02:48
13   Q.   If they weren't modest or not major at   02:48
14   least, there would have been an OAI outcome;   02:48
15   right?                                  02:48
16   A.   Potentially.  It's one of those gray   02:48
17   areas in the industry.  If the agency sees you're   02:48
18   progressing and even though there are some   02:48
19   significant failures and you're implementing a   02:48
20   corrective action, then they'll go okay, VAI.   02:48
21   Q.   Okay.  But a VAI is a reasonable   02:48
22   outcome?                                02:48
23   A.   It's reasonable.                   02:48
24   Q.   Okay.  A lot of companies never get   02:48
25   anything but VAI outcomes; right?       02:48

Page 239

1    A.   I don't know lots.  I mean, you know,   02:48
2    that's a broad term.                    02:48
3    Q.   Okay.  Now continuing on this in EIR,   02:48
4    Dr. Bliesner, turn to page 25 of 40.    02:48
5    Are you there?                          02:49
6    A.   I'm double checking.               02:49
7    Q.   Dr. Bliesner, we've already established   02:49
8    that it's the same document.            02:49
9    A.   I agree.                          02:49
10   Q.   Okay.  Then you don't need to be looking   02:49
11   at both documents.                     02:49
12   A.   I'm more comfortable if I do; okay.   02:49
13   What was the question please?           02:49
14   Q.   I didn't ask a question.  I merely   02:49
15   wanted you to turn to page 25.  I asked -- the   02:49
16   question?  Are you at page 25?          02:49
17   A.   I am.                             02:49
18   Q.   Okay.  Look at Exhibit 171.  Okay,   02:49
19   Dr. Bliesner, you've already conceded --   02:49
20   A.   Uh-huh.                           02:49
21   Q.   -- that is the same EIR.  There's no   02:49
22   reason to keep referring back and forth between   02:49
23   the two documents; all right?  Now --   02:49
24   MR. KERENSKY:  And, Dr. Bliesner, if you   02:49
25   feel more comfortable referring back and   02:49

Page 240

1    forth, of course you are free to.       02:49
2    THE WITNESS:  I do because I want to make   02:49
3    sure the redactions don't interrupt with the   02:49
4    current version we're looking at.       02:50
5    MR. KERENSKY:  Fair enough.            02:50
6    BY MR. ANDERTON:                        02:50
7    Q.   What do you mean interrupt?         02:50
8    A.   Well, I wrote my report based on this   02:50
9    document that has redactions into it and this   02:50
10   doesn't.  So I want would make sure that there's   02:50
11   no gaps.  That's all it is.             02:50
12   Q.   Okay.  Gaps?  What do you mean gaps?   02:50
13   A.   Specifically, I don't know.  I just want   02:50
14   to make sure.  This is the one I reviewed   02:50
15   specifically, the second document.  I'm just more   02:50
16   comfortable doing that.                 02:50
17   Q.   Okay.  Dr. Bliesner, under the heading   02:50
18   voluntary corrections on page 25 --     02:50
19   A.   Yes.                             02:50
20   Q.   -- the FDA indicates that during this   02:50
21   inspection, corrections to the previous FDA 483   02:50
22   were reviewed with Ms. Ang.  Do you see that?   02:50
23   A.   I do, sir.                        02:50
24   Q.   So that would be the 483 that was issued   02:50
25   in August 2006 that resulted in a warning letter   02:50

Page 241

1    in February of 2007; right?            02:50
2    A.   Yes.                             02:50
3    Q.   And the observation -- the EIR then goes   02:50
4    on to list all of the observations that were in   02:51
5    that prior 483.  Do you see that?  Starting at   02:51
6    page 25 and going all the way through, oh, all the   02:51
7    way to page 39 of the EIR; right?       02:51
8    A.   So the question is, these are the   02:51
9    observations from the previous inspection that   02:51
10   happened?  I'm sorry.  What date?  I'm confused.   02:51
11   The one in 2006?                        02:51
12   A.   Correct.                         02:52
13   A.   Okay.                            02:52
14   Q.   Right.                           02:52
15   A.   It looks like it, yes.  483 to the EIR.   02:52
16   Q.   Okay.                            02:52
17   A.   Yes.                             02:52
18   Q.   And so --                         02:52
19   A.   And there were -- how many did we have   02:52
20   here?  They had 13 and they went back through all   02:52
21   13, yes.                                02:52
22   Q.   Okay.                            02:52
23   A.   Uh-huh.                           02:52
24   Q.   So at this point during this 2007   02:52
25   inspection, as you might expect from -- as you   02:52

61 (Pages 238 to 241)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 242

1  indicated you might expect in the ordinary course,    02:52
2  the FDA reviewed the corrective actions taken by    02:52
3  Activis and assessed them or evaluated them;    02:52
4  correct?    02:52
5      A.   According to the EIR, yes.    02:52
6      Q.   You place great weight on FDA documents,    02:52
7  don't you, Dr. Bliesner?    02:52
8      A.   I do.    02:52
9      Q.   Okay.  This EIR is no different than all    02:53
10  the other FDA document you give significant weight    02:53
11  to, is it?    02:53
12     A.   No.    02:53
13     Q.   Okay.  It gets the same level of    02:53
14  credibility --    02:53
15     A.   I'm sorry.  I don't know if I understand    02:53
16  your consternation there.    02:53
17     Q.   Don't worry about it.    02:53
18     A.   Okay, okay.    02:53
19     Q.   Dr. Bliesner, did you review this    02:53
20  section of this EIR when you looked at it as you    02:53
21  compiled your report?    02:53
22     A.   Yes.    02:53
23     Q.   You did?    02:53
24     A.   I did.    02:53
25     Q.   So you must have known then in the eyes    02:53

Page 243

1  of the FDA, all of the GMP deficiencies that were    02:53
2  part of the 2006 483 and the 2007 warning letter    02:53
3  were remediated to the FDA's satisfaction; right?    02:53
4      A.   I can't say all definitively.  They have    02:54
5  made progress and their observations were -- are    02:54
6  here.  I have to go back and look and say all is a    02:54
7  broad term.  They addressed them, yes.    02:54
8      Q.   And the document speaks for itself.  It    02:54
9  will show --    02:54
10     A.   Okay.    02:54
11     Q.   -- whether the FDA believed there was    02:54
12  any unresolved corrective actions; right?    02:54
13     A.   If the document -- I haven't reviewed it    02:54
14  in a while.  If it says that, then it's true.    02:54
15     Q.   So as you look -- as I look at your    02:54
16  report on pages 15 and 16 --    02:54
17     A.   Uh-huh.    02:54
18     Q.   -- in chronological progression, you    02:55
19  refer to this EIR or to the inspection that is    02:55
20  reflected in this 2007 EIR, and you make a point    02:55
21  to identify the three observations that the FDA    02:55
22  issued following that inspection.  Do you see that    02:55
23  beginning at the top of page -- I'm sorry, the    02:55
24  bottom of page 15 and continuing on to 16,    02:55
25  paragraph 37?    02:55

Page 244

1      A.   Yes.    02:55
2      Q.   So you made a point of noting the    02:55
3  observations that the FDA issued after that    02:55
4  inspection; right?    02:55
5      A.   That's correct.    02:55
6      Q.   You didn't note the corrective actions.    02:55
7      A.   That was not my intent to do a search    02:55
8  and review the documentations to look for    02:55
9  corrective actions.    02:56
10     Q.   A search.  You didn't have to search.    02:56
11  You read it.    02:56
12     A.   Yes.    02:56
13     Q.   You knew they did the corrective action    02:56
14  if you read the documents.  You chose not to    02:56
15  include that positive fact in your report; right?    02:56
16     A.   I suppose so, yes.    02:56
17     Q.   Okay.  It seems awfully selective,    02:56
18  Dr. Bliesner, don't you think so?    02:56
19     A.   No, not at all.    02:56
20     Q.   Okay.    02:56
21     A.   I was looking for patterns of lack of    02:56
22  compliance which continued all the way up to the    02:56
23  second consent decree.    02:56
24     Q.   Except that in the eyes of the FDA, all    02:56
25  prior GMP deficiencies had been corrected as of    02:56

Page 245

1  the time this inspection occurred, except for    02:56
2  those three new observations.    02:56
3      A.   Of the original observations, yes.    02:56
4      Q.   So as of the time that inspection was    02:56
5  completed, in the eyes of the FDA, the GMP    02:56
6  deficiencies that existed at Activis Totowa were    02:56
7  those three observations?    02:56
8      A.   At that point, yes.    02:56
9      Q.   Okay.  So when you say in a broad,    02:56
10  sweeping fashion that they continued right up    02:57
11  through the second consent decree, that's not    02:57
12  accurate, is it?    02:57
13     A.   I disagree.  You can correct actions and    02:57
14  put them in place but still not change the    02:57
15  fundamental systems.  You can correct the    02:57
16  procedures but you didn't necessarily change the    02:57
17  system, and that was shown when they got a second    02:57
18  consent decree after this.    02:57
19     Q.   The FDA audited all of those systems;    02:57
20  right?    02:57
21     A.   If this was done under the compliance    02:57
22  program guidance manual where they look at quality    02:57
23  systems base, there was a turn in here.  Let me    02:57
24  just check because the agency hasn't always looked    02:57
25  at it from a quality systems standpoint.    02:57

62 (Pages 242 to 245)

PLAINTIFFS' EXHIBITS 003102

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 246

1    Q.   Well, Dr. Bliesner, you already        02:58
2   acknowledged that the FDA conducted an inspection    02:58
3   of five of the six major systems.  The only one    02:58
4   not there is packaging and labeling; right?    02:58
5    A.   That's correct.    02:58
6    Q.   So the FDA issued its written opinion    02:58
7   that the company had corrected all outstanding    02:58
8   previously identified GMP deficiencies except for    02:59
9   the three new ones that they identified as of the    02:59
10   time they conducted this inspection; is that    02:59
11   right?    02:59
12    A.   They corrected the actions that they had    02:59
13   made the observations on.    02:59
14    Q.   Okay.  So --    02:59
15    A.   That doesn't mean it was a systems-based    02:59
16   correction.  It was a correction of those specific    02:59
17   actions.    02:59
18    Q.   Do you want go through each one,    02:59
19   Dr. Bliesner?  You're so insistent on qualifying    02:59
20   your responses -- again to keep doors open as    02:59
21   you've been coached to do -- that you can't    02:59
22   concede the FDA -- the viability of this FDA    02:59
23   document.  You can't have it both ways.    02:59
24    Do you understand that?    02:59
25    MR. KERENSKY:  Objection, form.    02:59

Page 247

1   BY MR. ANDERTON:    02:59
2    Q.   If you want to give credit to FDA    02:59
3   documents --    02:59
4    A.   Yes.    02:59
5    Q.   -- as a substantial basis for your    02:59
6   opinion --    02:59
7    A.   Yes.    02:59
8    Q.   -- you must credit the documents that    02:59
9   don't necessarily align with your opinion.  You    02:59
10   understand that; right?    02:59
11    MR. KERENSKY:  Objection form.  Not a    02:59
12   true statement.    03:00
13    THE WITNESS:  I would disagree with that.    03:00
14   BY MR. ANDERTON:    03:00
15    Q.   You can pick and choose?    03:00
16    A.   I'm not picking and choosing.  It's just    03:00
17   that there's been a progression in the FDA's    03:00
18   inspection procedures over the years.    03:00
19    Q.   Right.    03:00
20    A.   Where they would go in and look at these    03:00
21   major components; right?  But they wouldn't    03:00
22   necessarily look at their internal document that    03:00
23   says how you do an inspection by a quality    03:00
24   systems-based approach.  That didn't happen until    03:00
25   later on.    03:00

Page 248

1    Looking at this cover document right now, I'm    03:00
2   not sure whether they implemented the new quality    03:00
3   systems-based approach further.    03:00
4    Q.   Do you have any reason to believe they    03:00
5   didn't?    03:00
6    A.   Potentially, yes.    03:00
7    Q.   What's that?    03:00
8    A.   Because if I'm not mistaken -- and we    03:00
9   can look it up -- the next inspection which    03:00
10   resulted in the consent decree, they specifically    03:00
11   say this inspection was conducted using the FDA    03:00
12   compliance program guidance manual and the number.    03:00
13    Q.   Okay.  So --    03:00
14    A.   And I don't see that they did that    03:00
15   here.  That's why I'm bringing up the point.  I'm    03:00
16   not trying to be difficult.  I just -- again, the    03:00
17   agency's made significant progress over the course    03:00
18   since like 2002 when they adopted the quality    03:01
19   systems-based approach and they didn't necessarily    03:01
20   implement it in full force all the way out.    03:01
21   That's all it is.    03:01
22    Q.   So you're going to, as I said, that's a    03:01
23   long-winded way of saying you're going to    03:01
24   discredit this FDA document and give some limited    03:01
25   weight to others.    03:01

Page 249

1    A.   I'm not discrediting it all; okay?  As a    03:01
2   matter of fact, all right, we're back on Exhibit    03:01
3   171.  I missed when we went first through.    03:01
4    Q.   And look at that --    03:01
5    A.   Inspection.    03:01
6    Q.   Inspectional guidance was afforded --    03:01
7    A.   Through compliance program and guidance    03:01
8   manuals.  73506002.  So with that being said, yes,    03:01
9   they would use the newest guidance documents to    03:01
10   look at it from a quality systems-based approach.    03:01
11    Q.   So does that change your earlier    03:01
12   testimony or allow you to accept the fact that as    03:01
13   of the date, this inspection was concluded in the    03:01
14   eyes of the FDA?    03:01
15    A.   Uh-huh.    03:01
16    Q.   Activis had corrected all prior GMP    03:01
17   deficiencies and the only GMP deficiencies the FDA    03:02
18   identified were the three new ones that are set    03:02
19   forth in that -- after this inspection.    03:02
20    A.   They corrected all of the findings that    03:02
21   came up with the 483.  I wouldn't -- I'm not    03:02
22   disputing that at all.    03:02
23    Q.   Okay.    03:02
24    A.   All right.    03:02
25    Q.   And after --    03:02

63 (Pages 246 to 249)

PLAINTIFFS' EXHIBITS 003103

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 250

1    A.    And they were recidivistic though          03:02
2  because obviously they went back to their old       03:02
3  ways.  That's why they got a consent decree.        03:02
4  That's the real problem with companies ending up    03:02
5  in consent decree.  They will get through warning   03:02
6  letters, you know --                                03:02
7    Q.    Dr. Bliesner, there's no question          03:02
8  pending.                                            03:02
9    A.    Oh, I'm sorry.                              03:02
10       MR. KERENSKY:  No, I'm sorry.  He can say     03:02
11  whatever in his question and you can't stop        03:02
12  him.                                               03:02
13       MR. ANDERTON:  No, he can't, Mike.  There     03:02
14  was no --                                          03:02
15       MR. KERENSKY:  Non-responsive, that's        03:02
16  your remedy.                                       03:02
17       MR. ANDERTON:  There was no question         03:02
18  pending.                                           03:02
19       MR. KERENSKY:  He was still answering the    03:02
20  last question.                                     03:02
21       MR. ANDERTON:  No, he wasn't.                 03:02
22       MR. KERENSKY:  Do not interrupt the          03:02
23  witness.                                           03:02
24       MR. ANDERTON:  He just started talking       03:02
25  gratuitously.                                      03:02

Page 251

1        MR. KERENSKY:  That is not true.           03:02
2        MR. ANDERTON:  It is true.  There's no     03:02
3  question pending.                                 03:03
4        MR. KERENSKY:  Are you refusing to let      03:03
5  the witness continue his answer?                 03:03
6        MR. ANDERTON:  There is no answer, Mike.   03:03
7        MR. KERENSKY:  Are you refusing to let      03:03
8  the witness finish his answer?                   03:03
9        MR. ANDERTON:  He finished his answer and  03:03
10  then just started talking again without a        03:03
11  question being posed to him.                     03:03
12       MR. KERENSKY:  Are you refusing to let      03:03
13  the witness finish his answer?                   03:03
14       MR. ANDERTON:  Mike, you can't instruct    03:03
15  him to talk.  There's no question pending.       03:03
16       MR. KERENSKY:  I'm not -- there is a       03:03
17  question pending.                                03:03
18       MR. ANDERTON:  No, there is not.           03:03
19       MR. KERENSKY:  You interrupted him.  Are   03:03
20  you refusing to let him finish his answer?       03:03
21       THE WITNESS:  He's finished his answer.    03:03
22  I'm not refusing anything.                       03:03
23       MR. KERENSKY:  I'm sorry.  The record is   03:03
24  real clear.  You interrupted him and told him    03:03
25  to stop because you thought he was answering     03:03

Page 252

1  something other than what you asked him.          03:03
2        MR. ANDERTON:  No, because --              03:03
3        MR. KERENSKY:  Your objection is           03:03
4  unresponsive, not to stop him from talking and    03:03
5  tell him he's just -- he's not answering.         03:03
6        MR. ANDERTON:  Mike, if you want to clean  03:03
7  this up with questions, you certainly may.        03:03
8  We're going to move on.                           03:03
9        MR. KERENSKY:  I'm sorry.  We're going to  03:03
10  stop the deposition until he finishes his        03:03
11  answer.                                          03:03
12       MR. ANDERTON:  No we're not -- there is    03:03
13  no question pending, Mike.                       03:03
14       MR. KERENSKY:  There is.                    03:03
15       MR. ANDERTON:  No, there isn't.  He        03:03
16  answered my question.                            03:03
17       MR. KERENSKY:  Tell you what.  Let's have  03:04
18  the court reporter go back and read it.          03:04
19       MR. KERENSKY:  Mike, if you --             03:04
20       MR. KERENSKY:  Read the question and the   03:04
21  answer, please.  And the answer and             03:04
22  Mr. Anderton's interruption.                     03:04
23       MR. ANDERTON:  If you keep obstructing     03:04
24  this deposition and instructing the witness     03:04
25  what to say, we're going to call the court.      03:04

Page 253

1        MR. KERENSKY:  I think it's a good time    03:04
2  to call the court.                                03:04
3        MR. ANDERTON:  I mean he was done and had  03:04
4  moved on, and I was about to ask another         03:04
5  question, and he just started talking.           03:04
6        MR. KERENSKY:  I accept your invitation    03:04
7  to call the court so he can hear the last        03:04
8  question, the last answer, your interruption.    03:04
9        MR. ANDERTON:  There is no interruption.   03:04
10  I interrupted something that he was saying in    03:04
11  response to no question.                         03:04
12       MR. KERENSKY:  That is not my take on it,  03:04
13  but your remedy if you think that, is to say     03:04
14  unresponsive.                                    03:04
15       MR. ANDERTON:  Your remedy is to clear it  03:04
16  up if you think there's something here was       03:04
17  answering in response to one of my questions.    03:04
18  You have that right.  Now we're moving on.       03:04
19       MR. KERENSKY:  I do not think that.  And   03:04
20  no, he's not going to ask answer any more        03:04
21  questions until you let him finish his           03:05
22  answer.                                          03:05
23       MR. ANDERTON:  What's the basis for you    03:05
24  instructing him not to answer?                   03:05
25       MR. KERENSKY:  Because you interrupted     03:05

64 (Pages 250 to 253)

PLAINTIFFS' EXHIBITS 003104

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 254

1   him.                                      03:05
2       MR. ANDERTON: There was no question   03:05
3   pending.                                   03:05
4       MR. KERENSKY: I'm sorry. There was.   03:05
5       MR. ANDERTON: There wasn't, Mike. Now, 03:05
6   I'm not going to argue with you anymore. This 03:05
7   is ridiculous.                             03:05
8       MR. KERENSKY: Okay. Well, Dr. Bliesner, 03:05
9   start packing up.                          03:05
10      MR. ANDERTON: You cannot instruct him to 03:05
11  stop the deposition, Mike.                 03:05
12      MR. KERENSKY: Sure I can.             03:05
13      MR. ANDERTON: No, you can't.          03:05
14      MR. KERENSKY: I just did. Until he    03:05
15  finishes that answer, we're not going to do 03:05
16  any more, or we can call the judge.        03:05
17      MR. ANDERTON: Read the question back, 03:05
18  Phil.                                      03:05
19      MR. KERENSKY: There you go. And the   03:05
20  answer and the interruption, please, Phil. 03:05
21      (Whereupon, the testimony was read    03:07
22  back by the court reporter, as recorded above) 03:07
23      MR. ANDERTON: So what that shows, Mike, 03:07
24  is that in fact --                         03:07
25      MR. KERENSKY: I am not done listening, 03:07

Page 255

1   Michael.                                   03:07
2       MR. ANDERTON: Listen carefully, Mike, 03:07
3   because what you'll see that in fact       03:07
4   Dr. Bliesner interrupted my question.      03:07
5       MR. KERENSKY: That's an interesting   03:07
6   interpretation.                            03:07
7       MR. ANDERTON: Read it back, Phil.     03:07
8       (Whereupon, the testimony was read    03:07
9   back by the court reporter, as recorded above) 03:07
10      MR. KERENSKY: Your question obviously 03:07
11  interrupted his answer inadvertently that time 03:07
12  and then the second time intentionally.    03:07
13      MR. ANDERTON: Mike, not true. Read it 03:07
14  back.                                      03:07
15      MR. KERENSKY: That's my take on it.   03:07
16      MR. ANDERTON: Read it back, Phil.     03:07
17      MR. KERENSKY: I'm telling you I'm not 03:07
18  going to let you do this. I'm not going to 03:07
19  let you do it. Call the judge now. It's real 03:07
20  simple. We can call the judge now, we can  03:07
21  stop the deposition, or you can stop, let him 03:07
22  say what he wants to say, and to finish this 03:07
23  question to talk about recidivism.         03:07
24      MR. ANDERTON: There was no question   03:07
25  about that.                                03:07

Page 256

1       MR. KERENSKY: And then you can object. 03:07
2       MR. ANDERTON: And I object to you to  03:07
3   your speaking --                           03:07
4       MR. KERENSKY: There are three choices 03:07
5   you've got right now. Pick one.            03:07
6       MR. ANDERTON: I'm sorry. Are you --   03:07
7       THE WITNESS: Can I take a break?      03:08
8       MR. KERENSKY: Yeah, go ahead Dave.    03:08
9       MR. ANDERTON: Wait a minute. I'm sorry, 03:08
10  Mike. Do you get to decide now?            03:08
11      MR. KERENSKY: Yeah.                   03:08
12      MR. ANDERTON: This witness is stopping 03:08
13  this deposition every 30 minutes. Why are we 03:08
14  doing that?                                03:08
15      MR. KERENSKY: Because I don't know.   03:08
16  It's a very grueling deposition. You're one 03:08
17  of the toughest guys I've been around in a 03:08
18  long time. It's very difficult.            03:08
19      MR. ANDERTON: Mike, stop. Why are we  03:08
20  stopping every 30 minutes?                 03:08
21      THE WITNESS: Because I got to go to the 03:08
22  bathroom.                                  03:08
23      MR. ANDERTON: Then go to the restroom. 03:08
24      THE VIDEOGRAPHER: The time is 3:10 p.m. 03:08
25  We are going off the record.               03:08

Page 257

1       (Short break)                          03:17
2       THE VIDEOGRAPHER: The time is 3:19 p.m. 03:17
3   We are back on the record. This is the     03:17
4   beginning of tape seven.                   03:17
5       MR. KERENSKY: I would like the court  03:17
6   reporter to finish reading the witness's last 03:17
7   answer and I ask he be allowed to finish that 03:17
8   answer.                                    03:17
9       MR. ANDERTON: Go head, Phil.          03:18
10      (Whereupon, the testimony was read    03:18
11  back by the court reporter, as recorded above) 03:18
12      MR. KERENSKY: That's a good place to  03:18
13  stop. Dr. Bliesner, do you need to add to  03:18
14  that answer?                               03:18
15      THE WITNESS: Read the last part of that 03:18
16  again, please. Just the -- not the whole   03:18
17  thing, just the last sentence.             03:18
18      (Whereupon, the testimony was read    03:18
19  back by the court reporter, as recorded above) 03:18
20      And try to implement corrective actions. 03:18
21  And when they do so, they're not           03:18
22  systems-based, quality systems-based and they 03:18
23  go right back to it because it's a culture 03:19
24  that comes along with it. And it's not a true 03:19
25  corrective action that stands up to scrutiny. 03:19

65 (Pages 254 to 257)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 258

1    MR. ANDERTON: Move to strike that entire        03:19
2    speech as utterly non-responsive. Responsive    03:19
3    to no pending question.                          03:19
4    BY MR. ANDERTON:                                 03:19
5    Q.    The -- you testified last time            03:19
6    Dr. Bliesner that -- and I want to read it because   03:19
7    I think it is interesting and because I'd like to    03:19
8    be accurate.                                     03:20
9    Mr. Moriarty asked you a question at page 117   03:20
10   and carrying over on to page 118. You gave a    03:20
11   response and during that response you said, and I   03:20
12   quote: "This is the first time I went up to my   03:20
13   medicine cabinet and I looked for anything that   03:20
14   had an Activis label on it and flushed it down the   03:20
15   toilet because it was that gross in terms of what   03:20
16   I was seeing."                                   03:20
17   Do you remember that testimony?                 03:20
18   A.    I do.                                      03:20
19   Q.    What did you flush down the toilet?       03:20
20   A.    Products that had Activis's name on it.   03:21
21   Q.    Such as?                                   03:21
22   A.    I don't recall specifically.              03:21
23   Q.    Did you have products that had Activis's   03:21
24   name on it?                                      03:21
25   A.    I did.                                     03:21

Page 259

1    Q.    How many?                                 03:21
2    A.    I don't recall. I think one bottle.       03:21
3    Q.    One bottle. Was it for you or for         03:21
4    another family member?                          03:21
5    A.    It was for me.                            03:21
6    Q.    So you don't even know what you flushed   03:21
7    down the toilet.                                03:21
8    A.    I don't recall. It was a such a gross     03:21
9    failure of compliance I didn't want to be putting   03:21
10   it in my body.                                  03:21
11   Q.    Well, you had to go out and replace it;   03:21
12   right? It was a prescription medication?        03:21
13   A.    Yes.                                      03:21
14   Q.    So what did you go replace?               03:21
15   A.    You'll find somebody else that            03:21
16   manufactures. You ask the pharmacist to give you   03:21
17   a different replacement.                        03:21
18   Q.    What was it? What did you replace?        03:21
19   A.    I don't recall what I replaced            03:21
20   Q.    Well, it was sometime in the last 12      03:21
21   months. You don't remember?                     03:21
22   A.    No.                                       03:21
23   Q.    That seems like a pretty striking         03:21
24   event. You ran up to your medicine cabinet.     03:21
25   A.    Yes, sir.                                 03:21

Page 260

1    Q.    You threw open the door and you flushed   03:21
2    medicine down the toilet.                       03:21
3    A.    I did.                                    03:21
4    Q.    Was that medicine manufactured by         03:21
5    Activis Elizabeth or Activis Totowa?            03:21
6    A.    I wouldn't know. It didn't say on the     03:22
7    bottle.                                         03:22
8    Q.    You didn't even check, did you?           03:22
9    A.    I don't believe that the bottle tells     03:22
10   you where it's manufactured.                    03:22
11   Q.    You didn't check, did you?                03:22
12   A.    I didn't have to.                          03:22
13   Q.    Sure you did. What do you mean you        03:22
14   didn't have to?                                 03:22
15   A.    Because of the failure in the quality     03:22
16   systems that I had seen in reviewing the document,   03:22
17   I didn't want to take any of the company's      03:22
18   product.                                        03:22
19   Q.    Well, do you know anything about the      03:22
20   distinction between Activis Totowa and Activis   03:22
21   Elizabeth?                                      03:22
22   A.    From a business standpoint, not           03:22
23   specifically.                                   03:22
24   Q.    Do you know who manufactured what         03:22
25   products?                                       03:22

Page 261

1    A.    If I go back and review, I can piece      03:22
2    together a list.                                03:22
3    Q.    Well, you shouldn't --                    03:22
4    A.    I can't right off the top of my head.     03:22
5    Q.    You shouldn't have any information about   03:22
6    Activis Elizabeth. They're not party to this    03:22
7    lawsuit. Do you know that Activis Elizabeth and   03:22
8    Activis Totowa work out of two totally different   03:22
9    facilities?                                     03:22
10   A.    I know they are two different locations,   03:22
11   yes.                                            03:22
12   Q.    And you know they have two totally        03:22
13   different quality systems?                      03:22
14   A.    No, I don't.                              03:22
15   Q.    Different leadership?                     03:22
16   A.    No, I don't.                              03:22
17   Q.    Different personnel?                      03:22
18   A.    No, I don't.                              03:22
19   Q.    Didn't bother to try to find out, did    03:22
20   you?                                            03:22
21   A.    I was told not to review them.            03:22
22   Q.    I'm talking about when you were in such   03:23
23   a hurry to flush your medicine down the toilet,   03:23
24   you didn't bother to try to find out whether that   03:23
25   product came from Activis Totowa or from Activis   03:23

66 (Pages 258 to 261)

PLAINTIFFS' EXHIBITS 003106

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 262

1   Elizabeth or from another Activis entity.        03:23
2       A.   No, I didn't.                           03:23
3       Q.   Is that a logical, reasoned reaction to    03:23
4   anything?                                       03:23
5       A.   Yes.                                   03:23
6       Q.   You said last time that -- you made    03:23
7   reference to your belief or you indicated -- I   03:23
8   shouldn't say may reference to -- you indicated   03:23
9   your belief that the FDA puts things on its      03:23
10  website that are pure politics.                 03:23
11      Do you remember that testimony?             03:23
12      A.   I did not make that blanket statement   03:23
13  that I recall.                                  03:24
14      Q.   Well, let me ask you this.             03:24
15      A.   Okay.                                  03:24
16      Q.   When you conducted an analysis that you   03:24
17  did to issue your opinion in this case --       03:24
18      A.   Yes.                                   03:24
19      Q.   -- did you do a political analysis or   03:24
20  some other type of analysis?                    03:24
21      A.   I reviewed the documentation as I would   03:24
22  if I was a client in the facility looking for data   03:24
23  to support whatever conclusions come up.        03:24
24      Q.   Is that a political analysis?          03:24
25      A.   No.                                    03:24

Page 263

1       Q.   Did politics enter into your analysis at   03:24
2   all?                                            03:24
3       A.   No.                                    03:24
4       Q.   Are you an expert in politics?         03:24
5       A.   No.                                    03:24
6       Q.   Do you have anything to support your   03:24
7   testimony that things the FDA puts on its website   03:24
8   result from politics?                           03:24
9       A.   In my experience, there are sometimes   03:25
10  competing opinions against different branches   03:25
11  within FDA which appear to be -- appear to be   03:25
12  politically motivated.                          03:25
13      Q.   Appear to be politically motivated?    03:25
14      A.   Yes.                                   03:25
15      Q.   Bliesner on politics?  Is that the     03:25
16  source for that, Bliesner on politics?          03:25
17      A.   No, it's not Bliesner on politics.     03:25
18      Q.   What observation -- what supports that   03:25
19  observation?                                    03:25
20      A.   My experience.                         03:25
21      Q.   Do you have any political experience?   03:25
22      A.   Political?                             03:25
23      Q.   Yes.                                   03:25
24      A.   Like in formal office or running for   03:25
25  anything like that?                             03:25

Page 264

1       Q.   Yes.                                   03:25
2       A.   No.                                    03:25
3       Q.   Did you ever work for the FDA?         03:25
4       A.   No.                                    03:25
5       Q.   Did you ever spend any time inside     03:25
6   either one of the various branches?  Well not   03:25
7   either one.  Any of the various branches of the   03:26
8   FDA?                                            03:26
9       A.   No.                                    03:26
10      Q.   So you believe that when one branch    03:26
11  issues something that isn't necessarily consistent   03:26
12  with something issued by another branch, it's   03:26
13  strictly politics?                              03:26
14      A.   Not strictly.  There are components to   03:26
15  it that do arise.  For instance, drug shortage   03:26
16  often has serious discussions with compliance   03:26
17  group because they have different missions      03:26
18      Q.   Have you ever been party to any of those   03:26
19  discussions?                                    03:26
20      A.   Directly, no.                          03:26
21      Q.   So you have no idea what is said in     03:26
22  those discussions between -- I'm sorry drug     03:26
23  shortage and compliance; right?                 03:26
24      A.   Meaning the folks that are in charge of   03:26
25  making sure they're supplied to market and the   03:26

Page 265

1   compliance people.                             03:26
2       Q.   You have no idea what's ever been said   03:26
3   in any of those conversations; right?          03:26
4       A.   That's not true.                       03:26
5       Q.   Have you ever been --                  03:26
6       A.   I've not sat in meetings.  I have      03:26
7   clients convey it.                              03:26
8       Q.   Clients who sat in the meetings?       03:26
9       A.   Yes.                                   03:27
10      Q.   So you're getting it at least third    03:27
11  hand?                                           03:27
12      A.   Second-hand.                           03:27
13      Q.   Second-hand?                           03:27
14      A.   Yes.                                   03:27
15      Q.   Ever do anything to verify that?       03:27
16      A.   Specifically, no.                      03:27
17      Q.   I want to talk about --                03:27
18      A.   Can you adjust the air-conditioning in   03:27
19  here?  I'm starting to get to the same point.   03:27
20      MS. DREWES:  I will.  But I tried earlier   03:27
21  and she turned it down as much as she could.   03:27
22  Apparently it's an issue especially later in    03:27
23  the day when the sun comes around.             03:27
24      MR. ANDERTON:  Comes around this side of   03:27
25  the building.                                   03:27

67 (Pages 262 to 265)

PLAINTIFFS' EXHIBITS 003107

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 266

1    MR. KERENSKY:  It's getting hot in here,      03:28
2  too.  It must be coming right over the phone.    03:28
3    MR. ANDERTON:  Yeah.                           03:28
4  BY MR. ANDERTON:                                 03:28
5    Q.   You produced today invoices that you      03:28
6  have submitted to the Plaintiffs' counsel for    03:28
7  payment; right?                                  03:28
8    A.   Yes.                                       03:28
9    Q.   You said there's least one that's         03:28
10 outstanding; right?                              03:28
11   A.   Yes.                                       03:28
12   Q.   I don't -- there is no detail on those    03:28
13 invoices.  Do you have detailed time records that 03:28
14 show what you did and how many hours you spent    03:28
15 besides a general summary as is set forth in these 03:28
16 invoices?                                         03:28
17   A.   I just have a spreadsheet where I did     03:28
18 the work, I put the hour in and then I send that  03:28
19 to the bookkeeper.                                03:28
20   Q.   Okay.  So you do have records?            03:28
21   A.   Uh-huh.                                    03:28
22   Q.   Do you provide any description of what    03:28
23 you did during the --                            03:28
24   A.   On those records?                         03:28
25   Q.   Yes.                                       03:28

Page 267

1    A.   I don't believe so.  There may be a word  03:28
2  or two.                                          03:28
3    Q.   Services rendered.  Is that the --        03:28
4    A.   I'd have to look at -- I'm fairly         03:28
5  certain that I provided those sheets.            03:29
6    Q.   On?                                        03:29
7    A.   The hard drive, I think.                  03:29
8    Q.   Oh, in the hard drive?                    03:29
9    A.   I think so.                                03:29
10   Q.   Okay.                                      03:29
11   A.   If not, I can get them for you.           03:29
12   Q.   Do you know how much money you have       03:29
13 billed and been paid from this engagement?        03:29
14   A.   To this point?                            03:29
15   Q.   Yes.                                       03:29
16   A.   No.                                        03:29
17   Q.   Is there only one invoice that's          03:29
18 outstanding beyond this one?                     03:29
19   A.   I'm fairly certain yes, there is.         03:29
20   Q.   Rough estimate puts it somewhere north   03:29
21 of $140,000.  Does that sound right?             03:29
22   A.   If you add it up and that's what the     03:30
23 number is, then it is.  I really don't know.     03:30
24   Q.   How many other engagements did you have  03:30
25 in 2010?                                         03:30

Page 268

1    A.   Engagements, you mean consulting         03:30
2  projects?                                         03:30
3    Q.   Uh-huh.                                    03:30
4    A.   One for sure.  It's still ongoing.  And  03:30
5  I may have had one other just briefly.           03:30
6    Q.   Any of them as big as this one?          03:30
7    A.   And when you say "big," what do you mean 03:30
8  by big?                                           03:30
9    Q.   Well $140,000, that's a reasonable       03:30
10 amount of revenue wouldn't you say?              03:30
11   A.   It is.                                     03:30
12   Q.   I mean even at 550 an hour, that's 700   03:30
13 hours; right?  No, that's wrong.                 03:30
14   A.   I can tell you this.  I've been fully    03:31
15 engaged with a client since June.                03:31
16   Q.   In addition to this engagement?          03:31
17   A.   Yes.  This is on the side.               03:31
18   Q.   Oh, this is on the side?                 03:31
19   A.   Prior to -- it started prior to and then 03:31
20 this -- this has been done on weekends.           03:31
21   Q.   Okay.                                      03:31
22   A.   I do anything about 60 to 90 hours a     03:31
23 week at that current client site.  I have been   03:31
24 since June.                                       03:31
25   Q.   Okay.  Will you pick up Exhibit 109?     03:31

Page 269

1    A.   Sure, if I can find it.  Which one is    03:31
2  that, sir?                                        03:31
3    Q.   It's one of the sets of notes that you   03:31
4  produced that we took last time.                 03:32
5    A.   Yes, got it.                              03:32
6    Q.   I'm looking at the first page of 109.    03:32
7  Are you with me?                                  03:32
8    A.   I am.                                      03:32
9    Q.   Roman numeral I -- on 109, the first     03:32
10 page is as I read the heading, "Collective Proof  03:32
11 of Adulterated Digitek Making it to Market."      03:32
12   A.   Yes.                                       03:32
13   Q.   The first item Roman numeral I is        03:32
14 Adverse Event Reports; right?                     03:32
15   A.   Yes.                                       03:32
16   Q.   You are not a pharmacovigilence expert,  03:32
17 are you?                                          03:32
18   A.   I am not.                                  03:32
19   Q.   You don't know -- you're not able to     03:32
20 give your expert opinion about the reliability of 03:32
21 the facts and circumstances in adverse event     03:32
22 reports, are you?                                 03:33
23   A.   No, this was based on observation that   03:33
24 was in one of the EIRs.  I'd have to look.        03:33
25   Q.   Okay.  What you mean by that?            03:33

68 (Pages 266 to 269)

PLAINTIFFS' EXHIBITS 003108

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 270

1    A.   There was a -- in reviewing, if I'm not      03:33
2  mistaken an EIR or 483, that this is one of the     03:33
3  items the agency found specifically.                03:33
4    There was a death within a certain period of      03:33
5  time or whatever, so...                             03:33
6    Q.   That was the report?                         03:33
7    A.   Yes.                                          03:33
8    Q.   That wasn't a finding of the EIR.            03:33
9    A.   It was a report.                             03:33
10   Q.   Yeah.                                         03:33
11   A.   That there was a death from an adverse       03:33
12 event and it was not reported to the FDA.           03:33
13   Q.   So agency, to be clear --                     03:33
14   A.   Uh-huh.                                        03:33
15   Q.   -- the agency, the FDA didn't find that      03:33
16 there was a death within several hours of taking    03:33
17 the product.                                         03:33
18   A.   They found there was an adverse event        03:33
19 that had not been reported to them that stated      03:33
20 that there was a death within a certain short       03:33
21 period of time, yeah.                               03:33
22   Q.   And, again, you're not qualified to           03:33
23 assess the reliability of the facts and             03:33
24 circumstances that are set forth in or were set     03:34
25 forth in that adverse event, are you?               03:34

Page 271

1    A.   No, but it triggered my eye because it       03:34
2  was a short period of time for an immediate dose    03:34
3  of product, and it was like maybe there's           03:34
4  something.  That was actually the first thing that  03:34
5  got me started on this -- this review.              03:34
6    Q.   Well, Dr. Bliesner, I'm a little bit         03:34
7  confused.                                           03:34
8    A.   Uh-huh.                                        03:34
9    Q.   You say -- when you make that statement      03:34
10 --                                                   03:34
11   A.   Uh-huh.                                        03:34
12   Q.   -- you're presuming the accuracy or --       03:34
13 I'm sorry.  You're presuming the cause and effect   03:34
14 relationship between taking a product and the       03:34
15 event set forth in the adverse event report,        03:34
16 aren't you?                                          03:34
17   A.   Say that again specifically.                 03:34
18     MR. ANDERTON:  Phil, would you please           03:35
19   read that back?                                    03:35
20     (Whereupon, the testimony was read             03:35
21 back by the court reporter, as recorded above)      03:35
22     THE WITNESS:  There is a potential cause        03:35
23   and effect there.                                  03:35
24 BY MR. ANDERTON:                                     03:35
25   Q.   Potential?                                    03:35

Page 272

1    A.   Yes.                                          03:35
2    Q.   Which you've said you're not qualified       03:35
3  to evaluate.                                         03:35
4    A.   No, that's correct.                          03:35
5    Q.   Okay.                                         03:35
6    A.   But the potential was there, which           03:35
7  from -- would you like me to continue or stop?  I   03:35
8  don't want to...                                     03:35
9    Q.   You were answering.                          03:35
10   A.   Okay.  From a, you know, compliance          03:35
11 standpoint, you look at that and you say to         03:35
12 yourself, jeez, if there was an adverse event, a    03:35
13 person potentially passed away in two and a half    03:35
14 hours, you sit back and go okay, from a product     03:35
15 standpoint, me working for this company again,      03:35
16 from a product standpoint, jeez, could that have    03:35
17 been product-related?                               03:35
18   So you go look and you see it's immediate         03:35
19 dosage form, and you try to pull up the PK lead     03:35
20 out of an ANDA.  And if the PK says it's like six   03:35
21 hours or whatever, you don't worry about it.  You   03:35
22 move on.  It's not related to that.  That's how     03:35
23 the logic went on that.                             03:35
24   Q.   Okay.  And so is that proof that            03:35
25 adulterated Digitek made it to market?              03:35

Page 273

1    A.   No, it's not proof.                          03:35
2    Q.   Okay.  You characterize it as such in        03:35
3  this document.  That's just why I'm --             03:36
4    A.   My notes --                                   03:36
5    Q.   Okay.                                         03:36
6    A.   Proof is --                                    03:36
7    Q.   So it's not proof?                            03:36
8    A.   No, it's not.  It's a piece of data that     03:36
9  was the start of a potential pattern that was the   03:36
10 first thing -- quite honestly that was first thing  03:36
11 that caught my eye so I just started digging.       03:36
12   Q.   I'm merely asking about your                  03:36
13 characterization in your document.                  03:36
14   A.   Yes.                                          03:36
15   Q.   So it's not proof.                           03:36
16   A.   No.                                           03:36
17   Q.   And look at Roman numeral VI.                03:36
18   A.   Okay.                                          03:36
19   Q.   Company internal documents and              03:36
20 investigations.                                      03:36
21   A.   Uh-huh.                                        03:36
22   Q.   You see your reference to purchase           03:36
23 presses.                                             03:36
24   A.   Yes.                                          03:36
25   Q.   How is that proof that adulterated          03:36

69 (Pages 270 to 273)

PLAINTIFFS' EXHIBITS 003109

David M. Bliesner, Ph.D.                              Videotaped                              February 18, 2011

Page 274

1  Digitek made it to market?                              03:36
2      A.   There were a couple of circumstances as        03:36
3  I recall where they had reasonable suspect that         03:36
4  they had problems with tablet presses.  So they         03:37
5  committed -- if I'm not mistaken without taking          03:37
6  more time and going back and looking at the             03:37
7  document -- they would purchase new presses with        03:37
8  weight controls or whatever and they never did.         03:37
9  And that happened over the course of a -- if I'm        03:37
10 not mistaken, going back to look at the book, a         03:37
11 year or two.                                            03:37
12     Q.   Okay.  So you work with companies all          03:37
13 the time on GMP compliance; right?                      03:37
14     A.   That's correct.                                03:37
15     Q.   And one of the things I'm sure you tell        03:37
16 them is that they ought to be constantly                03:37
17 evaluating and reevaluating their quality systems;      03:37
18 right?                                                  03:37
19     A.   Absolutely.  CGMP current today, not           03:37
20 yesterday.                                              03:37
21     Q.   Exactly.  And so it's an evolutionary          03:37
22 process.                                                03:37
23     A.   Absolutely.                                    03:37
24     Q.   Never stops evolving.                          03:37
25     A.   No, it doesn't.                                03:37

Page 275

1      Q.   So upgrading presses or purchasing new         03:37
2  presses --                                              03:37
3      A.   Uh-huh.                                        03:37
4      Q.   -- doesn't say anything about whether          03:37
5  adulterated product was produced or made it to         03:38
6  market, does it?                                        03:38
7      A.   It doesn't say anything about whether          03:38
8  adulterated products have made it to the market.        03:38
9      That's right.                                       03:38
10     A.   I wouldn't agree with that statement.          03:38
11 It -- it shows they had problems.                       03:38
12     Q.   It does?                                       03:38
13     A.   It shows they had problems with the            03:38
14 presses because they said they had problems with         03:38
15 the presses.                                            03:38
16     Q.   They didn't say they had problems.  They       03:38
17 said they wanted to purchase new presses            03:38
18     A.   With weight control, if I remember             03:38
19 correctly.                                              03:38
20     Q.   Okay.  So that doesn't mean they're            03:38
21 having problems; it means they're looking at a          03:38
22 different technology.                                   03:38
23     A.   Uh-huh.                                        03:38
24     Q.   Right?                                         03:38
25     A.   Yes, an upgrade if you will.                   03:38

Page 276

1      Q.   Well, let's call it an upgrade.                03:38
2      A.   Uh-huh.                                        03:38
3      Q.   Doesn't mean you had problems before;          03:38
4  right?                                                  03:38
5      A.   But they committed to the FDA and they         03:38
6  didn't purchase them, as I recall.                      03:38
7      Q.   You just changed the subject,                  03:38
8  Dr. Bliesner.                                           03:38
9      A.   I did?                                         03:38
10     Q.   Yeah?                                          03:38
11     A.   I'm sorry.                                     03:38
12     Q.   I asked you if the mere act of upgrading       03:38
13 presses means that they had problems.                   03:38
14     A.   Not specifically, no.                          03:39
15     Q.   And so purchasing presses doesn't              03:39
16 constitute proof that there is adulterated Digitek      03:39
17 in the market, does it?                                 03:39
18     A.   Not necessarily, no.                           03:39
19     Q.   But you characterize it on that               03:39
20 document.                                               03:39
21     A.   It's my notes, uh-huh.                         03:39
22     Q.   You understand, Dr. Bliesner?                  03:39
23     A.   I do sir.                                      03:39
24     Q.   That we get these documents.                   03:39
25     A.   Uh-huh.                                        03:39

Page 277

1      Q.   And we get your report?                        03:39
2      A.   Uh-huh.                                        03:39
3      Q.   And we are -- we have to try to figure         03:39
4  out --                                                  03:39
5      A.   Uh-huh.                                        03:39
6      Q.   -- how you reached the conclusions that        03:39
7  you reached.                                            03:39
8      A.   Correct.                                       03:39
9      Q.   That's what we're doing today.                 03:39
10     A.   I understand.                                  03:39
11     Q.   So I understand that this is your notes.       03:39
12     A.   Uh-huh.                                        03:39
13     Q.   You're the one who characterized this as      03:39
14 proof --                                                03:39
15     A.   Uh-huh.                                        03:39
16     Q.   -- that adulterated Digitek was in the        03:39
17 market.                                                 03:39
18     A.   Uh-huh.                                        03:39
19     Q.   I'm just inquiring about some of these        03:39
20 things.                                                 03:39
21     A.   Understood.                                    03:39
22     Q.   Excuse me?                                     03:40
23     A.   Uh-huh.                                        03:40
24     Q.   Dr. Bliesner, would you now find Exhibit       03:40
25 107.  It's another set of notes that we collected       03:40

70 (Pages 274 to 277)

PLAINTIFFS' EXHIBITS 003110

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 278

1  from you last time.                                03:40
2      A.   May I see the top of?                     03:40
3      Q.   You may.  It the thicker one.  It's the   03:40
4  Mylan deposition exhibits.                          03:40
5      A.   I have it here.                            03:40
6      Q.   Okay.  You see on the first page there     03:40
7  it says probably equals more likely than not?       03:40
8      A.   Uh-huh.                                    03:40
9      Q.   When did you write that?                   03:40
10     A.   I don't recall specifically, but I'm --    03:40
11 my suspect is it was the preparation meeting        03:40
12 before the first deposition.                        03:40
13     Q.   Okay.  And --                              03:40
14     A.   Because I was still struggling with that   03:40
15 whole concept of possible and probable.             03:40
16     Q.   Well, you understand what probably         03:41
17 meant; right?                                       03:41
18     A.   If I'm not mistaken I was told that's      03:41
19 what it was.  It was a definition.  These were      03:41
20 my -- my documents that I had laid out as an        03:41
21 indices in the discussion, and it was the first     03:41
22 thing I wrote on, so...                             03:41
23     Q.   Okay.  So you wrote in your discussions    03:41
24 with Plaintiffs' counsel, that probably equals      03:41
25 more likely than not; right?                        03:41

Page 279

1      A.   I'm fairly confident that's what they      03:41
2  mentioned to me as the definition.                  03:41
3      Q.   Okay.  And the very next day --            03:41
4      A.   Uh-huh                                     03:41
5      Q.   -- you testified that you did not know     03:41
6  the difference between possibility and              03:41
7  probability?                                        03:41
8      A.   Obviously I was still confused with        03:41
9  that.                                               03:41
10     Q.   And in the same meeting where you wrote    03:41
11 probably equals more likely than not -- well,       03:41
12 strike that.                                        03:41
13     A.   I --                                       03:41
14     Q.   Strike that.                               03:41
15     Okay, okay.                                     03:41
16     Q.   Look at the second page of Exhibit 107,    03:41
17 please.                                             03:41
18     A.   Sure.                                      03:41
19     Q.   You made a note about Exhibit M09?         03:42
20     A.   Yes.                                       03:42
21     Q.   You see that?                              03:42
22     A.   Yes.                                       03:42
23     Q.   And you indicated outside of spec 98 to    03:42
24 103 percent.  And then you parenthetically          03:42
25 indicated 97.1 percent.                             03:42

Page 280

1      Q.   Do you see that?                           03:42
2      A.   I do.                                      03:42
3      Q.   97.1 is well within specification for      03:42
4  Digitek as approved by the FDA in the ANDA, isn't   03:42
5  it?                                                 03:42
6      A.   I don't know.  I'd have to go back and     03:42
7  look at it.                                         03:42
8      Q.   Well, didn't you -- I mean if you made a   03:42
9  note that something was out of spec.                03:42
10     A.   Somebody made a statement somewhere in     03:42
11 this document whatever M09 was apparently.  I'm     03:42
12 not going back and looking at it.                   03:42
13     Q.   I understand.                              03:42
14     A.   That somebody made a statement you         03:42
15 realize that what this is, is not a detailed        03:42
16 reading of these documents what the search          03:42
17 capabilities of that Crivella West I think is the   03:42
18 name of it, is abysmal, so you can't find           03:43
19 anything.  So I just basically went in and said,    03:43
20 pulled up 01, skimmed it.  If I saw something, you   03:43
21 know -- well, I tried to do a thumbnail summary on  03:43
22 there so later on if I needed to go pull it up, I    03:43
23 would.  So --                                       03:43
24     Q.   Okay.                                      03:43
25     A.   Obviously -- or maybe not obviously --     03:43

Page 281

1  it looks as if I probably printed that one and      03:43
2  it's somewhere in the stack.                        03:43
3      Q.   And you acknowledge of course that --      03:43
4  that the fact that it might -- that UDL might have   03:43
5  or Mylan might have a tighter specification says    03:43
6  nothing about whether the product is actually out   03:43
7  of specification; correct?                          03:43
8      A.   That's correct.                            03:43
9      Q.   At the end of the day, the operative       03:43
10 number with respect to whether something is in or   03:43
11 out of specification is the number for number for   03:43
12 any particular attribute set forth in the ANDA; is  03:43
13 that right?                                         03:44
14     A.   The approved application; that's           03:44
15 correct.                                            03:44
16     Q.   Okay.  So if you make a product and it's   03:44
17 distributed by somebody else and they, the          03:44
18 distributor prefers tighter specifications, that    03:44
19 doesn't have any bearing on whether the product     03:44
20 you make is actually out of specification, does     03:44
21 it?                                                 03:44
22     A.   Tighter specs are always around.           03:44
23     Q.   Okay.                                      03:44
24     A.   It's an additional level of control.       03:44
25     Q.   And if they had tighter specs and the      03:44

71 (Pages 278 to 281)

PLAINTIFFS' EXHIBITS 003111

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 282

1  product doesn't meet them but still falls within        03:44
2  the ANDA specifications, that product is within        03:44
3  specification; right?                              03:44
4      A.   For the manufacturing service.             03:44
5      Q.   Yes.                                     03:44
6      A.   In this particular case.  UDL probably       03:44
7  would have rejected it because that's their spec.     03:44
8      Q.   Fair enough, but with respect to that --      03:44
9      A.   The original ap., yes.                      03:44
10     Q.   And with respect to whether it is out of     03:44
11 spec, out of specification in the eyes of the FDA,    03:44
12 it is not out of specification; correct?             03:44
13     A.   I would say that's a fair statement,         03:44
14 yes.                                              03:44
15     Q.   Okay.  Can you look at the page that        03:44
16 refers to Exhibit M44, please?                     03:45
17     A.   Sure, yes.                                03:45
18     Q.   Did you -- do you recall enough about       03:45
19 M44 from looking at this document to know whether    03:45
20 you read it or not?                               03:46
21     A.   I don't.                                 03:46
22     Q.   Okay.  Your thumbnail sketch as you        03:46
23 described it indicates this is an e-mail from Sue      03:46
24 Powers to Chuck Kuhn, regarding the recall costs     03:46
25 for UDL.                                          03:46

Page 283

1  Do you see that?                                  03:46
2      A.   I do.                                    03:46
3      Q.   You wrote that; right?                     03:46
4      A.   Yes.                                     03:46
5      Q.   All right.  So that's some brief            03:46
6  characterization of what you saw when you read       03:46
7  that document?                                    03:46
8      A.   I scanned it.  I didn't read it, I          03:46
9  scanned it.                                       03:46
10     Q.   Do the costs of a recall have anything      03:46
11 to do with whether there's adulterated or out of     03:46
12 specification product in the market?                03:46
13     A.   I don't believe so.                       03:46
14     Q.   Look at the page of Exhibit 107 that       03:46
15 refers to M56, please.                            03:47
16     A.   56?                                      03:47
17     Q.   Yes, please.                             03:47
18     A.   Uh-huh.                                 03:47
19     Q.   Do you see your handwritten note about     03:47
20 that?                                             03:47
21     A.   I do.                                    03:47
22     Q.   And it says that UDL to file from Lee       03:47
23 Roedke, 16 September, 2006, Activis warning        03:47
24 letter, Little Falls, New Jersey.  Did I read that    03:47
25 correctly so far?                                 03:47

Page 284

1      A.   What did you say?                         03:47
2      Q.   UDL to file from Lee Roedke, 16           03:47
3  September, abbreviated, 2006?                      03:47
4      A.   Uh-huh.                                 03:47
5      Q.   Activis warning letter, Little Falls,       03:47
6  New Jersey.  Did I read that correctly so far?       03:47
7      A.   Yes.                                     03:47
8      Q.   It goes on to say not addressing FDA ADE   03:47
9  concerns.  Did I read that correctly?              03:47
10     A.   Yes.                                     03:47
11     Q.   And ADE concerns in that context is an     03:47
12 acronym for adverse drug events; correct?          03:48
13     A.   Without specifically pulling it up, I       03:48
14 would say yes, that's true.                        03:48
15     Q.   Okay.  Do you use ADE for any other        03:48
16 purpose in the context of performing your GMP       03:48
17 compliance consulting services?                    03:48
18     A.   No.  But like you said, I'm not an         03:48
19 adverse drug event person.                        03:48
20     Q.   This is your terminology.                 03:48
21     A.   This is a summary.                        03:48
22     Q.   I understand.                            03:48
23     A.   And, again, unless we pull it up, that     03:48
24 may be what they refer to it as in the e-mail.      03:48
25 Chances are that's what it is.                     03:48

Page 285

1      Q.   But you made the note.                    03:48
2      A.   Yes.                                     03:48
3      Q.   Do you mean to use the term ADE to stand  03:48
4  for adverse drug event?                           03:48
5      A.   More than likely, yes.                    03:48
6      Q.   Okay.                                    03:48
7      A.   Uh-huh.                                 03:48
8      Q.   I'm handing you, Dr. Bliesner, a          03:48
9  document that has been marked as Defendant's        03:48
10 Exhibit 87.                                       03:48
11     A.   Okay.                                    03:48
12     Q.   Take a moment please and review that      03:48
13 document very briefly.                            03:48
14     A.   Uh-huh.                                 03:48
15     Q.   Let me know when you have reviewed it.    03:48
16     A.   Sure.  Okay.                            03:49
17     Q.   Have you seen that document before?       03:49
18     A.   I'm not sure.                            03:49
19     Q.   All right.  Well you see that -- that it    03:49
20 is referencing a warning letter --                 03:49
21     A.   Uh-huh.                                 03:49
22     Q.   -- issued to Activis in August of 2006.    03:49
23     A.   Uh-huh.                                 03:49
24     Q.   That relates to adverse drug             03:49
25 experiences.  Do you see that?                    03:50

72 (Pages 282 to 285)

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 286

1     A.   I do.                              03:50
2     Q.   And this is the warning letter that you     03:50
3  referred to earlier when you were talking about     03:50
4  the reports and the ADE, and we talked for a        03:50
5  moment about the connection, whether there's        03:50
6  reliability in ADE reporting, and all that.  It's   03:50
7  the same point.                           03:50
8     A.   I'll take your word.              03:50
9     Q.   So in this letter, the FDA accepts the      03:50
10 corrective actions Activis has proposed and         03:50
11 implemented with respect to that warning letter;    03:50
12 right?                                    03:50
13    A.   Correct.                          03:50
14    Q.   Okay.  So when you wrote in response to     03:50
15 or in connection with Exhibit M56 that Activis      03:50
16 wasn't addressing the ADE concerns, is that         03:50
17 accurate?                                 03:50
18    A.   It's what's in the e-mail more than        03:50
19 likely -- or memo, whatever it is.         03:50
20    Q.   Okay.                             03:50
21    A.   It's somebody, whoever that individual     03:50
22 was.                                      03:50
23    Q.   Lee Roedke.                       03:50
24    A.   Apparently that's who it was.  Again       03:50
25 this is a snapshot summary, glancing it at this.    03:51

Page 287

1  Whether it's an e-mail, memo or whatever.   03:51
2     Q.   Okay.                             03:51
3     A.   That's their concern I'm assuming, not     03:51
4  going back and pulling it out.             03:51
5     Q.   Okay.  Well --                     03:51
6     A.   Knee deep in paper.                03:51
7     Q.   Yeah.  Unfortunately that's a necessary    03:51
8  part of this process, Dr. Bliesner.  All right.     03:51
9  Find 108, please.                         03:51
10    A.   Which one are we on, sir?          03:51
11    Q.   Exhibit 108.                      03:51
12    A.   Exhibit 108.  Yes, sir.           03:51
13    Q.   What do you mean when you use the term     03:52
14 "blend uniformity failure."  To you, what does      03:52
15 that mean?                                03:52
16    A.   Blend uniformity failure?          03:52
17    Q.   Yeah.                             03:52
18    A.   It means that blend gets sampled and      03:52
19 tested wouldn't necessarily, does not have the,     03:52
20 you know, assay value that it was supposed to       03:52
21 have.                                     03:52
22    Q.   At what point of the sampling and         03:52
23 testing process does something become a blend      03:52
24 uniformity failure?                       03:52
25    A.   Well, there's a spec for blend      03:52

Page 288

1  uniformity test.                          03:52
2     Q.   So by that you mean that you take a       03:52
3  sample of the blend, you conduct a chemical test    03:52
4  on it to determine the assay of that sample, and    03:53
5  then you apply the specifications to determine      03:53
6  whether that sample -- whether the assay value for  03:53
7  that sample is within those specifications;         03:53
8  correct?                                  03:53
9     A.   That's a fair assessment.          03:53
10    Q.   And so when you sample blends for         03:53
11 testing to determine whether it is uniformly        03:53
12 distributed -- excuse me -- most manufacturers      03:53
13 take samples of blend in duplicate or triplicate;   03:53
14 correct?                                  03:53
15    A.   Most manufacturers?  I don't know if I    03:53
16 can speak to most manufacturers, but there's more   03:53
17 than one.                                 03:53
18    Q.   Okay.  So it's not uncommon for a         03:53
19 pharmaceutical manufacturer to take blend samples   03:53
20 in duplicate or triplicate; right?         03:53
21    A.   I would say that's fair.           03:53
22    Q.   And that is an acceptable practice so     03:53
23 long as you, the manufacturer, have an             03:54
24 appropriately drafted SOP?                 03:54
25    A.   Manufacturer, during process validation  03:54

Page 289

1  will come up with a sampling plan, and a sampling   03:54
2  approach.  Manufacturing does the sampling and      03:54
3  delivers the sample for you.               03:54
4     Q.   So it is acceptable to draft a sampling   03:54
5  plan with respect to blend sampling that calls for  03:54
6  blend samples to be taken in duplicate or          03:54
7  triplicate; right?                        03:54
8     A.   At least, yes.                    03:54
9     Q.   And it is acceptable to draft a testing   03:54
10 plan.                                     03:54
11    A.   Yes.                             03:54
12    Q.   For blend samples that allows for         03:54
13 testing the second or third sample from a given     03:54
14 location under appropriate circumstances; right?    03:54
15    A.   Content uniformity, yeah, under        03:54
16 appropriate circumstances.                 03:54
17    Q.   Well, so -- so it is -- you've seen and    03:55
18 it is okay to have a sampling plan that says you    03:55
19 take blend samples in triplicate, for example.      03:55
20    A.   Uh-huh.                           03:55
21    Q.   You test the first sample from each       03:55
22 location and in appropriate circumstances if -- if  03:55
23 one of those samples is not tested within          03:55
24 specification, you may test the second sample from  03:55
25 that location.                            03:55

73 (Pages 286 to 289)

PLAINTIFFS' EXHIBITS 003113

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 290

1    A.    Same location.  I would say it's a fair    03:55
2    statement if it's in the protocol.    03:55
3    Q.    If it's in the protocol.    03:55
4    A.    Yes.    03:55
5    Q.    And you have to have the circumstances    03:55
6    that are called for by the protocol and that allow    03:55
7    you to test that second sample; right?    03:55
8    A.    Yes    03:55
9    Q.    And you have to do an appropriate    03:55
10   inspection or investigation and try to determine    03:55
11   why the first sample tested out of specification;    03:56
12   correct?    03:56
13   A.    Correct.  Just for content uniformity    03:56
14   for finished products, yes.    03:56
15   Q.    If you have an initial sample of the    03:56
16   triplicate sample that tests out of specification,    03:56
17   do you call that a blend failure?    03:56
18   A.    Do you want to say that again?    03:56
19       MR. ANDERTON:  Phil, would you read it    03:56
20   back?    03:56
21       (Whereupon, the testimony was read    03:56
22   back by the court reporter, as recorded above)    03:56
23       THE WITNESS:  Potentially.    03:56
24   BY MR. ANDERTON:    03:56
25   Q.    Potentially.    03:56

Page 291

1    A.    Yes.    03:56
2    Q.    But if you have a protocol that allows    03:56
3    you to test the second or third sample after    03:56
4    conducting an appropriate investigation and after    03:56
5    following the protocol properly --    03:56
6    A.    Uh-huh.    03:56
7    Q.    -- that first out of specification    03:56
8    result is not a blend failure, am I correct?    03:56
9    A.    If it meets the protocol, that is    03:56
10   correct.    03:56
11   Q.    Okay.  So you wouldn't call it a blend    03:56
12   failure until you've run all the way to the end of    03:57
13   the protocol --    03:57
14   A.    Huh-huh.    03:57
15   Q.    -- is the way I'll describe that to you;    03:57
16   is that correct?    03:57
17   A.    That's a fair way to put it.    03:57
18   Q.    Okay.  Which might mean in certain    03:57
19   circumstances until you've tested the third of the    03:57
20   triplicate samples from one or more locations;    03:57
21   right?    03:57
22   A.    Yes.    03:57
23   Q.    When you use the term -- and looking at    03:57
24   Exhibit 108.    03:57
25   A.    Yes.    03:57

Page 292

1    Q.    Well, hold on one second.    03:57
2       MS. DREWES:  I don't want to interrupt,    03:57
3    but on that hard drive that you -- that the    03:57
4    witness gave, is it okay with everyone if we    03:57
5    give everyone a CD attached with the documents    03:57
6    rather than a hard copy?  Because apparently    03:57
7    you can't read them when they were printing.    03:57
8       MR. ANDERTON:  Yeah, that's acceptable to    03:58
9    me.  Mike, are you all right with that?    03:58
10      MR. KERENSKY:  Your voice was too faint    03:58
11   for to me to hear your comment, ma'am.    03:58
12      MS. DREWES:  Would the hard drive that    03:58
13   Dr. Bliesner gave us earlier, today, the -- we    03:58
14   can print the -- we can print the documents    03:58
15   but they are not legible, some of them, when    03:58
16   we print them.  For some reason they come out    03:58
17   really dark is what I'm told.    03:58
18   So if we can just give everyone a disc if    03:58
19   that's agreeable to you.    03:58
20      MR. ANDERTON:  Are you okay with that,    03:58
21   Mike?    03:58
22      MS. DREWES:  Apparently you can read it    03:58
23   on the disc or on the computer screen.    03:58
24      MR. KERENSKY:  Just as long as a general,    03:58
25   average, normal, everyday computer will open    03:58

Page 293

1    it, I'm happy.    03:58
2       MR. ANDERTON:  Well, that's just    03:58
3    described my unit, so.    03:58
4    BY MR. ANDERTON:    03:58
5    Q.    And then Dr. Bliesner, continuing on    03:58
6    with this line of questioning, if you -- again if    03:58
7    your protocol is appropriately drafted and you    03:59
8    follow that factual progression that I just    03:59
9    described, where you take samples of a blend and    03:59
10   you test the first sample from a location and it    03:59
11   is out of specification, then you follow the    03:59
12   protocol and that results in you testing then the    03:59
13   second sample from that location and it is within    03:59
14   specification, it's okay to release that batch;    03:59
15   right?    03:59
16   A.    If you're meeting your protocol.    03:59
17   Q.    If you have a protocol that allows for    03:59
18   all of that, specifies it, and if you comply with    03:59
19   it along the way; correct?    03:59
20   A.    That's a reasonable statement.    03:59
21   Q.    It's okay to release that batch?    03:59
22   A.    That blend, sure.    03:59
23   Q.    That --    03:59
24   A.    Final blend in this case.    03:59
25   Q.    That initial I guess then -- correct.    03:59

74 (Pages 290 to 293)

PLAINTIFFS' EXHIBITS 003114

David M. Bliesner, Ph.D.                Videotaped                February 18, 2011

Page 294

1  So let me ask it another way.                    03:59
2      That initial out-of-specification result      04:00
3  doesn't require that the entire blend and        04:00
4  therefore the entire batch be rejected.          04:00
5      A.   Not necessarily.                          04:00
6      Q.   Okay.                                     04:00
7      A.   It may be, you know, extraordinary        04:00
8  circumstances where it comes in at 25 percent of  04:00
9  assay or whatever, then it's a whole different    04:00
10 bailiwick.                                         04:00
11     Q.   Then your -- well, then your              04:00
12 investigation your protocol provides for probably 04:00
13 is going to reveal something other than just a    04:00
14 single out-of-specification result?               04:00
15     A.   More than likely, yes.                    04:00
16     Q.   Okay.                                     04:00
17         MR. KERENSKY:  Are you guys still there?   04:00
18         MR. ANDERTON:  Yeah, we are here.          04:00
19         MR. KERENSKY:  Man, you got quiet.  I      04:00
20     thought you hung up on me.                     04:00
21 BY MR. ANDERTON:                                   04:00
22     Q.   Dr. Bliesner, when you did your paper     04:00
23 audit of -- of this -- of Activis to prepare your 04:00
24 report -- paper audit is your term not mine -- did 04:01
25 you ask for and did you receive the SOP of Activis 04:01

Page 295

1  Totowa that provides the protocol for testing     04:01
2  blend samples and retesting second or third       04:01
3  samples if you have an initial                     04:01
4  out-of-specification result?                       04:01
5      A.   I don't think I specifically asked for    04:01
6  that SOP.  I remember reviewing an investigation   04:01
7  having to do with blend uniformity failure.        04:01
8      Q.   If you didn't ask for it, does that mean  04:01
9  you didn't review it either?                       04:01
10     A.   I don't know if I could say that.  I'd    04:01
11 have to go back and look at the paper at I         04:01
12 reviewed.                                          04:01
13     Q.   Okay.                                     04:01
14     A.   With respect to that investigation.       04:01
15     Q.   The documents -- well, the documents      04:01
16 that you reviewed --                               04:02
17     A.   Uh-huh.                                   04:02
18     Q.   -- are set forth in your report; right?   04:02
19     A.   They should be, yes.                      04:02
20     Q.   So if you reviewed it, our review of      04:02
21 those documents will reveal that you reviewed it?  04:02
22     A.   That I reviewed it, yes.                  04:02
23     Q.   Right.                                    04:02
24     A.   That's a fair statement.                  04:02
25     Q.   So if it's not listed among the          04:02

Page 296

1  documents that you reviewed -- if it's not listed  04:02
2  in your report, it's not something you reviewed?   04:02
3      A.   Not necessarily.                          04:02
4      Q.   Pardon?                                   04:02
5      A.   They're not mutually exclusive, most of   04:02
6  it because of all the volume of documents here.    04:02
7  It obviously didn't include every single one that  04:02
8  I reviewed, just ones that I felt had pertinent    04:02
9  points with respect to this.                       04:02
10     Q.   If it's not listed in your report --      04:02
11     A.   Yes.                                       04:02
12     Q.   -- is it fair to say that you didn't      04:02
13 place any significance on it and didn't rely on it 04:02
14 in drafting your report?                           04:02
15     A.   I didn't rely on it.  I don't know if     04:02
16 significance is a word that I would use.           04:02
17     Q.   How are we to know or to identify if I    04:03
18 asked you right now whether you reviewed this SOP  04:03
19 --                                                 04:03
20     A.   Uh-huh.                                   04:03
21     Q.   -- and it's not listed in your report --  04:03
22     A.   That's right.                             04:03
23     Q.   -- how would you know?                    04:03
24     A.   It's not listed in the report.  I'd go    04:03
25 through this index and see if I popped it up.      04:03

Page 297

1      Q.   And if it's not in this index?            04:03
2      A.   And it's not in the supplemental          04:03
3  documents that were sent to me by -- then chances  04:03
4  are I didn't review it.                            04:03
5      Q.   Okay.                                     04:03
6  I'm going to hand you a document that has been     04:03
7  marked as -- well, what's it say on there?         04:03
8      A.   58.                                       04:03
9      Q.   58?                                       04:04
10     A.   Yeah.                                      04:04
11         MR. ANDERTON:  Plaintiffs' Exhibit 58.     04:04
12     Plaintiffs', Mike.                             04:04
13         MR. KERENSKY:  Got it.                     04:04
14 BY MR. ANDERTON:                                   04:04
15     Q.   Have you seen that before, Dr. Bliesner?  04:04
16     A.   Isn't this one that we -- the 483s that   04:04
17 were included before?  Can I take a look at the    04:04
18 report?  I'm pretty sure that I have, but I just   04:04
19 want to make sure.                                 04:04
20     Q.   Well, if you didn't look at this, you     04:04
21 don't have a report.                               04:04
22     A.   Okay.                                     04:04
23     Q.   But you may do whatever you like to       04:04
24 satisfy yourself, but I guess I can shortcircuit   04:04
25 that.                                              04:04

75 (Pages 294 to 297)

PLAINTIFFS' EXHIBITS 003115

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 298

1    A.   Okay.  Please.                          04:04
2    Q.   Well, I'm here to help, Dr. Bliesner.    04:04
3  Sarah will tell you I'm a giver.                04:05
4       MS. DREWES:  Oh, yeah.  Big time.          04:05
5       MR. KERENSKY:  Note the snickers on the    04:05
6  phone.                                          04:05
7       MR. ANDERTON:  I'm sorry.  Defense         04:05
8  Exhibit 58, Mike.  I misspoke earlier.          04:05
9       MR. KERENSKY:  About you being a giving    04:05
10  person?                                         04:05
11       MS. DREWES:  Yeah, but got also about the  04:05
12  exhibit.                                        04:05
13       MR. KERENSKY:  That you are here to        04:05
14  help?  You're not with the IRS.                 04:05
15       MR. ANDERTON:  It's Defendant's Exhibit    04:05
16  58.                                             04:05
17       MR. KERENSKY:  Thank you.                  04:05
18       MR. ANDERTON:  It's Plaintiffs' Exhibit    04:05
19  90, I believe.  No.  Not true.                  04:05
20  BY MR. ANDERTON:                                04:05
21    Q.   Dr. Bliesner, did you review this or    04:05
22  not.  What do you think?                        04:06
23    A.   Yes.                                     04:09
24    Q.   What page of your report are you looking  04:09
25  at?                                             04:09

Page 299

1    A.   47.                                      04:09
2    Q.   What reference?                          04:09
3    A.   A37.                                     04:09
4    Q.   Well?                                    04:09
5    A.   By the look of it.                       04:09
6    Q.   That's an EIR, not a 483.               04:09
7    A.   It is the EIR that had the 483s in      04:09
8  them.  I misspoke.  I'm sorry.                   04:09
9    Q.   So you didn't review this apparently?    04:09
10    A.   The 483s stand-alone?                    04:09
11    Q.   Yes.                                     04:09
12    A.   No, it would be the EIR.                04:09
13    Q.   So that's Exhibit 91.  You agree with   04:09
14  that; right?                                    04:10
15    A.   Yes.                                    04:10
16    Q.   All right.  I'm going to hand you a copy  04:10
17  of Exhibit 91.                                  04:10
18    A.   Okay.                                   04:10
19    Q.   So that we do this and keep you as     04:10
20  comfortable as you need to be.  I'm here for your  04:10
21  comfort.                                        04:10
22  I would like you to first look at the document  04:10
23  I just handed you and tell me if you reviewed that  04:10
24  document.                                       04:10
25    A.   91.  Plaintiffs' Exhibit 91, yes, sir.   04:10

Page 300

1    Q.   Okay.  Turn to page 43 of that document.  04:10
2    A.   May have a second, please?  I want to    04:10
3  make sure that I -- because there were some of   04:10
4  these reports that didn't necessarily have all of  04:10
5  the pages that came with them, the EIR.  There was  04:11
6  one circumstance that I recall that didn't.  So I  04:11
7  want to make sure that what I've got over here is  04:11
8  the same and inclusive.                          04:11
9    Q.   Okay.                                    04:11
10    A.   Okay.  Is that fair?                     04:11
11    Q.   Well, I guess I would hope that you     04:11
12  would have noted in your report when you reviewed  04:11
13  a document that was incomplete, but you didn't do  04:11
14  that with respect to this document.             04:11
15    A.   I just want to look at it.              04:11
16    Q.   Of course you do.                       04:11
17       THE VIDEOGRAPHER:  While he's doing that,  04:11
18  you have five minutes left on the tape.          04:11
19       MR. ANDERTON:  Let's go off the record    04:11
20  and change the tape.                             04:11
21       THE WITNESS:  The time is 4:13 p.m.        04:11
22  We're going off the record.                     04:11
23            (Short break)                         04:21
24       THE VIDEOGRAPHER:  The time is 4:24 p.m.  04:21
25  We are on the record.  This is the beginning    04:22

Page 301

1  of tape eight.                                  04:22
2  BY MR. ANDERTON:                                04:22
3    Q.   Dr. Bliesner, are you all set?          04:22
4    A.   Yes, sir.                               04:22
5    Q.   Okay.  I want to ask you --             04:22
6  Dr. Bliesner, I'm going to go away from that    04:23
7  document for just a moment and ask you a general  04:23
8  question.                                        04:23
9    A.   Okay.                                    04:23
10    Q.   You are a chemist by trade; right?      04:23
11    A.   I am a Ph.D. and analytical chemist by  04:23
12  training.                                        04:23
13    Q.   Does that mean the answer to my question  04:23
14  is yes?                                          04:23
15    A.   Chemist?  Yes.  Sorry.  There are many  04:23
16  flavors of chemists.  That's why.               04:24
17    Q.   I understand, but above all else as a   04:24
18  matter of fact you call yourself a chemist?      04:24
19    A.   A research chemist, yes, I do.          04:24
20    Q.   When testing a tablet and particularly a  04:24
21  solid oral dose tablet for potency --           04:24
22    A.   Uh-huh.                                 04:24
23    Q.   -- what method would you use if you     04:24
24  could use any method you wanted?                 04:24
25    A.   Not to sound cryptic, but it depends on  04:24

76 (Pages 298 to 301)

PLAINTIFFS' EXHIBITS 003116

Page 302

1   the dosage form and what the characteristics are    04:24
2   and what it's amenable to as far as analysis    04:24
3   goes.    04:24
4     Q.   What do you mean by that?    04:24
5     A.   Well, it turns out that certain    04:24
6   compounds might not be appropriately soluble let's    04:24
7   say and therefore easily dissolved and injected    04:24
8   into an HPLC system let's say.    04:24
9     Q.   Did you review the ANDA for Digoxin and    04:24
10   particularly for the Digitek version of Digoxin    04:25
11   tablets manufactured by Amide and then Activis    04:25
12   sufficiently to allow you to have an opinion about    04:25
13   which methods could be used to examine the potency    04:25
14   of a tablet -- of one of those tablets?    04:25
15     A.   I'm sorry. Go again.    04:25
16     MR. ANDERTON: Phil, can you get that? I    04:25
17   did it very methodically. I would like    04:25
18   Dr. Bliesner to hear that. I think I got it    04:25
19   right.    04:25
20     THE WITNESS: If I recall, I didn't get    04:26
21   an opportunity to read all of the ANDA    04:26
22   sections because I think that they were all    04:26
23   available to me at the time of review. Just    04:26
24   to put that in perspective.    04:26
25     As far as being able to assess whether --    04:26

Page 303

1     I guess the question is assess whether the    04:26
2   methods are appropriate for use?    04:26
3   BY MR. ANDERTON:    04:26
4     Q.   No. Do you have an opinion about --    04:26
5   about which of those -- which of the available    04:26
6   methods to test a tablet for potency could be    04:26
7   used?    04:26
8     A.   Could be used with -- HPLC is a method    04:26
9   of choice.    04:26
10     Q.   Okay.    04:26
11     A.   If I'm not mistaken, having looking at    04:26
12   the 484 stuff, those were HPLC methods for assays    04:26
13   and related compounds.    04:26
14     Q.   And the Activis analytical method was    04:26
15   also HPLC methods; correct?    04:26
16     A.   I'm pretty sure yes, yes.    04:27
17     Q.   So unless nobody knew what they were    04:27
18   doing, HPLC was an acceptable method to test this    04:27
19   compound; correct?    04:27
20     A.   For assay.    04:27
21     Q.   For assay.    04:27
22     A.   Correct.    04:27
23     Q.   Well, and to go back to the term I used,    04:27
24   for potency.    04:27
25     A.   Yes. Assay, potency, same thing.    04:27

Page 304

1     Q.   Okay. What about single point UV? How    04:27
2   does that compare to HPLC as a test method to test    04:27
3   the potency of a tablet and specifically of one of    04:27
4   these Digitek Digoxin tablets?    04:27
5     A.   Single point UV?    04:27
6     Q.   Yes.    04:27
7     A.   How would it compare? It depends    04:27
8   because LC is a separations technique that    04:27
9   separates out any potential interference from the    04:27
10   main component so you get an assay. An HPLC    04:27
11   system essentially a UV system at the end. The    04:27
12   detector for HPLC is just a UV. But in this case    04:28
13   it is has, if you will, as an analogy, the HPLC is    04:28
14   a means of preparing the sample so you're looking    04:28
15   at a single component when it goes into the UV    04:28
16   detector; okay? If you have -- it is possible    04:28
17   with a product to develop and validate a method,    04:28
18   single point UV method if there are no    04:28
19   interferences.    04:28
20     Q.   If somebody sent you a sample --    04:28
21     A.   Uh-huh.    04:28
22     Q.   -- and said Dr. Bliesner, chemist --    04:28
23   Ph.D. Chemist Bliesner, we'd like you to examine    04:28
24   this tablet for potency.    04:28
25     A.   Uh-huh.    04:28

Page 305

1     Q.   How would you compare the reliability of    04:28
2   results of a test conducted using single point UV    04:28
3   versus a test using HPLC?    04:29
4     A.   How would you compare?    04:29
5     Q.   How would you compare? Not literally    04:29
6   how would you put them side by side and compare.    04:29
7   How would you characterize the differences between    04:29
8   results reached using single point UV versus the    04:29
9   results reached using HPLC. Is one more reliable    04:29
10   than the other?    04:29
11     A.   Not necessarily. It depends on whether    04:29
12   there are interference issues. You've got to    04:29
13   realize that HPLC with a UV detector is a single    04:29
14   point UV detection, just like you put it into a UV    04:29
15   spectrometer. Same thing. It's only a single    04:29
16   point.    04:29
17     Q.   So you need to know more about the    04:29
18   circumstances before you would be able to --    04:29
19     A.   Absolutely. Sure.    04:29
20     Q.   Be able to compare the reliability of    04:29
21   outcomes for --    04:29
22     A.   Right.    04:29
23     Q.   -- those two tests.    04:29
24     A.   For instance, they do dissolution    04:29
25   testing. And the dissolution method is UV, but    04:29

77 (Pages 302 to 305)

PLAINTIFFS' EXHIBITS 003117

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 306

1   there is a whole -- if I recall correctly, pulling   04:29
2   off memory -- there is a derivatization and things   04:30
3   that like that with respect to the UV because that   04:30
4   would suggest that there are potential   04:30
5   interferences.  And derivatization and looking at   04:30
6   it in the means that they did would suggest -- not   04:30
7   having looked at the validation -- that they were   04:30
8   able to get around interferences in that fashion.   04:30
9       Q.    Just to be clear with respect to   04:30
10  Activis, are the entirety of your opinions in this   04:30
11  case set forth in the report you've issued?  Do   04:31
12  you have any supplemental or additional opinions   04:31
13  with respect to Activis?   04:31
14      A.    I don't believe so.   04:31
15      Q.    Well, you don't believe so or you don't?   04:31
16      A.    It's a broad statement.   04:31
17      Q.    I need this question to be answered   04:31
18  definitively, Dr. Bliesner.  It's a very important   04:31
19  question.   04:31
20      A.    Additional, post-the-report?   04:31
21      Q.    Yes.   04:31
22      A.    In the report?   04:31
23      Q.    Yeah, you have issued a report in this   04:31
24  case --   04:31
25      A.    Yes.   04:31

Page 307

1       Q.    -- that we've been told contains your   04:31
2   opinions --   04:31
3       A.    Yes.   04:31
4       Q.    -- about Activis.  And there was some   04:31
5   exchange last time about whether you had an   04:31
6   opinion about Mylan or didn't have an opinion and   04:31
7   we got a representation from Plaintiffs' counsel   04:31
8   about that, and that issue is done and resolved as   04:31
9   far as we're concerned.   04:31
10      A.    Okay.   04:31
11      Q.    So I'm asking you now strictly about   04:31
12  Activis and the opinions that are set forth in   04:32
13  your June 15, 2010, report.   04:32
14      A.    Yes.   04:32
15      Q.    About Activis.   04:32
16      A.    Yes.   04:32
17      Q.    Do they -- do they comprise the entirety   04:32
18  of your opinions about Activis in this case?   04:32
19      A.    That's a fair statement, yes.   04:32
20      Q.    Yes, they do?   04:32
21      A.    Uh-huh.   04:32
22      Q.    You need to say that.   04:32
23      A.    Yes, they do.   04:32
24      Q.    Okay.  So there are no supplemental   04:32
25  opinions about Activis that are not contained in   04:32

Page 308

1   your report?   04:32
2       A.    I've not reviewed any documentation or   04:32
3   anything else that would supplement what I've   04:32
4   written in the report.   04:32
5       Q.    So again need this answered my way.  You   04:32
6   don't have any supplemental opinions about Activis   04:32
7   that are not contained in this report; is that a   04:32
8   correct statement?   04:32
9       A.    That is a correct statement.   04:33
10      Q.    Thank you.   04:33
11      So the process -- well, you -- the product   04:33
12  that was in the market and subject to recall you   04:33
13  know was .125 and .25 milligram Digitek.  You are   04:33
14  aware of that; right?   04:33
15      A.    Yes, sir.   04:33
16      Q.    Two dose strengths; right?   04:33
17      A.    Yes, sir.   04:33
18      Q.    And both processes were validated;   04:33
19  correct?   04:33
20      A.    I have not seen the process validation   04:33
21  reports so I can't say definitively, but because   04:34
22  they're in the application and it was approved,   04:34
23  one would extrapolate that they were validated.   04:34
24      Q.    Any reason to believe that either   04:34
25  process was not validated?   04:34

Page 309

1       A.    No.   04:34
2       Q.    And I believe you testified last time   04:34
3   that you're not an expert in process validation   04:34
4   but that you certainly support -- I believe those   04:34
5   were your words.   04:34
6       A.    Yes.   04:34
7       Q.    From an -- I forget what perspective you   04:34
8   said.   04:34
9       A.    Cross-functional and analytical   04:34
10  development testing, troubleshooting.   04:34
11      Q.    That's a fancy way of saying you   04:34
12  recognize the value and importance of process   04:34
13  validation.   04:34
14      A.    I absolutely, yeah.   04:34
15      Q.    Okay.   04:34
16      A.    It's a very critical component to the   04:34
17  whole application development.   04:34
18      Q.    It's kind of a jumping off point for   04:34
19  everything, isn't it?   04:34
20      A.    Process validation?   04:34
21      Q.    Yes.   04:34
22      A.    Jumping off point?   04:34
23      Q.    Well, with respect actually producing   04:34
24  and manufacturing a drug product.   04:34
25      A.    Uh-huh.   04:34

78 (Pages 306 to 309)

PLAINTIFFS' EXHIBITS 003118

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 310

1  Q.  You must first develop and validate a          04:34
2  process for doing that; correct?                   04:35
3  A.  If you need to develop and validate --         04:35
4  develop a dosage form, a formulation and then to a 04:35
5  small scale move it into process validation,       04:35
6  that's correct.                                    04:35
7  Q.  Okay.  So once you have a formulation          04:35
8  developed --                                        04:35
9  A.  Yes.                                            04:35
10 Q.  -- the next step is to develop and             04:35
11 validate the process; right?                       04:35
12 A.  Scale up first and then validate.              04:35
13 Q.  Okay.  So let's make that the not the          04:35
14 next immediate step after developing the           04:35
15 formulation but two steps later is a process       04:35
16 validation.  And you cannot go forward without     04:35
17 manufacturing any drug product without a validated 04:35
18 process; is that correct?                          04:35
19 A.  That's correct.                                04:35
20 Q.  The FDA would not approve either an NDA        04:35
21 or an ANDA without demonstration of a validated    04:35
22 process; correct?                                  04:35
23 A.  And the demonstration would be for             04:35
24 instance in the ANDA III production run.           04:35
25 Q.  Understood.                                     04:35

Page 311

1  A.  That's the output of process validation       04:35
2  specifically requiring, you know, a validation,    04:36
3  reported development on the application, that       04:36
4  isn't necessarily the case.                        04:36
5  Q.  In whatever form, you must prove to the        04:36
6  FDA --                                             04:36
7  A.  Uh-huh.                                        04:36
8  Q.  -- that you have developed and validated       04:36
9  your process before they will approve your         04:36
10 application.                                        04:36
11 A.  Yes.                                            04:36
12 Q.  Is that correct?                               04:36
13 A.  That is correct.                               04:36
14 Q.  All right.  And a process validation           04:36
15 tells you that you have developed a process that   04:36
16 allows you to consistently manufacture product     04:36
17 within specification; right?                       04:36
18 A.  Within the operating parameters of the         04:36
19 equipment; correct.                                04:36
20 Q.  Understood.                                     04:36
21 A.  Uh-huh.                                         04:36
22 Q.  And as you move forward from your              04:36
23 process validation, there are various things that  04:36
24 speak to or that confirm the conclusions reached   04:36
25 in your process validation study, one of which is  04:36

Page 312

1  manufacturing product within specification over   04:37
2  time; correct?                                     04:37
3  A.  That's one aspect; correct.  You also          04:37
4  monitor complaints, returns, you know,             04:37
5  investigations, that come up during the course of  04:37
6  the manufacturing.  Lots of different things.      04:37
7  Q.  Understood.                                     04:37
8  You continue to monitor the things that might     04:37
9  call into question the validation of your process; 04:37
10 right?                                              04:37
11 A.  That's correct.  Because in my                 04:37
12 experience when you go from scale up to            04:37
13 manufacturing, invariably as you gain experience   04:37
14 with the product there, you'll find things that    04:37
15 are potentially difficult.                         04:37
16 Q.  And finding things that are potential          04:37
17 difficulties, to use your words?                   04:37
18 A.  Uh-huh.                                        04:37
19 Q.  That doesn't mean your process is              04:37
20 invalidated.  It means you need to investigate and 04:37
21 determine whether they require an adjustment of    04:37
22 your process; right?                               04:38
23 A.  That's open to interpretation.  It             04:38
24 really is.  And the agency, you know, in one       04:38
25 circumstance may say your process is out of        04:38

Page 313

1  control, it's invalidated, but in another          04:38
2  circumstance the same people within the same       04:38
3  division may say, you know, it's okay.  You need   04:38
4  to put in some additional controls.  So it's open  04:38
5  to interpretation.                                 04:38
6  Q.  What weight do you give -- in validating       04:38
7  as you're undertaking a consulting engagement --   04:38
8  A.  Uh-huh.                                        04:38
9  Q.  -- and evaluating whether your client          04:38
10 has or is achieving GMP compliance?                04:38
11 A.  Uh-huh.                                        04:38
12 Q.  What weight do you give to the fact that       04:38
13 the client has a validated process followed by     04:38
14 years and years and production of literally        04:38
15 billions and billions of tablets that were within  04:38
16 specification?                                     04:39
17 A.  I'm sorry.  It was a long one, so --           04:39
18 MR. ANDERTON:  Please read it back.                04:39
19 (Whereupon, the testimony was read                 04:39
20 back by the court reporter, as recorded above)     04:39
21 THE WITNESS:  That's obviously an                  04:39
22 important part of the picture.                     04:39
23 BY MR. ANDERTON:                                   04:39
24 Q.  Okay.                                           04:39
25 A.  Supporting process validation and             04:39

79 (Pages 310 to 313)

PLAINTIFFS' EXHIBITS 003119

David M. Bliesner, Ph.D.                     Videotaped                          February 18, 2011

Page 314

```
 1   showing you're in control.                  04:39
 2       Q.   Okay.  So that is a significant fact  04:39
 3   that -- as you did an evaluation of circumstances  04:39
 4   that met those -- that description, that would be  04:39
 5   one piece of information that you put in, in the  04:39
 6   bucket if you will, suggesting GMP compliance.  04:39
 7       A.   One piece.  Manufacturing investigations  04:39
 8   would go hand and hand with that in particular.  04:39
 9       Q.   Understood.  But that fact that I've  04:39
10   described --                                 04:40
11       A.   Uh-huh.                             04:40
12       Q.   -- validated process and years of  04:40
13   in-specification production covering billions of  04:40
14   tablets, that would go certainly go in the --  04:40
15       A.   It would.  We're assuming that the data  04:40
16   reporting capture and all that stuff is accurate.  04:40
17       Q.   Understood.                         04:40
18       A.   Okay.  That's a big assumption because  04:40
19   it isn't necessarily the case in a lot of  04:40
20   facilities.                                  04:40
21       Q.   Okay.                               04:40
22       A.   Uh-huh.                             04:40
23       Q.   But you would only be able to determine  04:40
24   whether it was accurate if you looked at the  04:40
25   data.                                        04:40
```

Page 315

```
 1       A.   You'd have to look at the data and then  04:40
 2   confirm with individuals that are doing entry into  04:40
 3   the system, or validation of the system and  04:40
 4   whatever.                                    04:40
 5       Q.   Understood.                         04:40
 6       A.   That they would hold up.  I'm sorry.  04:40
 7   No.  Would hold up.                          04:40
 8       Q.   But inherent in what you've just said --  04:40
 9       A.   Uh-huh.                             04:40
10       Q.   -- is that you must look at the data in  04:40
11   order to challenge it; correct?             04:40
12       A.   The data in a broad sense.          04:40
13       Q.   You used that term, Dr. Bliesner.   04:40
14       A.   Yes, I know.  But if we are talking  04:40
15   specific process validation, methods validation,  04:41
16   data in general because the data can be -- I'm  04:41
17   sorry.                                       04:41
18       Q.   As you used the term?              04:41
19       A.   Yes.                                04:41
20       Q.   I was merely trying to ask you questions  04:41
21   about how you --                             04:41
22       A.   Okay.                               04:41
23       Q.   -- used the term?                   04:41
24       A.   Okay.                               04:41
25       Q.   Now, you can't use it and then say --  04:41
```

Page 316

```
 1       A.   No.                                 04:41
 2       Q.   -- what the heck are you talking about?  04:41
 3       A.   I understand.                       04:41
 4       Q.   Okay.                               04:41
 5       A.   I just want to make sure that we're on  04:41
 6   all on the same page here.  It's late in the day  04:41
 7   and I'm not trying to be evasive.            04:41
 8       Q.   I understand but as I understood your  04:41
 9   answer, if you were going to question or challenge  04:41
10   the data -- you said assuming the data.      04:41
11       A.   Are valid.                          04:41
12       Q.   Valid.                              04:41
13       A.   Your reflection of what's reality.  04:41
14       Q.   Exactly.                            04:41
15       A.   Uh-huh.                             04:41
16       Q.   The only way you could determine whether  04:41
17   the data are valid is to start by looking at the  04:41
18   data.  There would be other steps you perform, but  04:41
19   the first step you'd have to do is look at the  04:41
20   data, am I correct?                          04:41
21       A.   That's correct.                     04:41
22       Q.   Look at page 16 of your report, please.  04:42
23       A.   Yes.                                04:42
24       Q.   Give me one second.                 04:42
25       A.   Sure.                               04:42
```

Page 317

```
 1       Q.   Dr. Bliesner, paragraph 39 on page 16.  04:43
 2   Do you see that?                             04:43
 3       A.   Yes, sir.  I do.                     04:43
 4       Q.   There you discuss investigation into --  04:43
 5   well, you don't identify the lot number, but --  04:43
 6       A.   No, sir.                            04:43
 7       Q.   But the lot that had some defectively  04:43
 8   thick tablets discovered during manufacturing.  04:43
 9   And the second to last sentence says:        04:43
10       "Product is released to market without  04:43
11   conclusive evidence of what caused the       04:43
12   double-thick problem on 5 December, 2007."   04:43
13       That's not accurate is it?               04:43
14       A.   I'd have to go back and pull up the  04:43
15   reference to be sure.                        04:43
16       Q.   Okay.  Well you --                   04:43
17       A.   Because it's very -- the investigation,  04:43
18   if I recall how it's done and how it's written,  04:43
19   anything like that, it was stuff to pull dates  04:43
20   together so I can't definitively say that that's  04:43
21   an incorrect date.                           04:43
22       Q.   Well there's -- if you read the       04:43
23   investigation record, there's plenty of documents  04:43
24   in the investigation report indicating activities  04:44
25   occurring.  In fact the 100 percent visual  04:44
```

80 (Pages 314 to 317)

PLAINTIFFS' EXHIBITS 003120

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 318

1   inspection very clearly didn't occur until January    04:44
2   2008.                                                  04:44
3       A.   Okay.                                          04:44
4       Q.   So did you just misread that                   04:44
5   investigation?                                         04:44
6       A.   Incident report.  I'm sorry.  What is          04:44
7   the question?                                          04:44
8       Q.   Did you just misread that investigative        04:44
9   report?                                                04:44
10      A.   I don't think so.  Like I said, I have         04:44
11  to go back and look at it and reconstruct it again     04:44
12  to determine if that -- your claim that that's an      04:44
13  incorrect date is incorrect.                           04:44
14      Q.   You made comment earlier about operators       04:44
15  or employees being unable to read or speak English     04:45
16  or cannot read English.                                04:45
17      A.   Uh-huh.                                         04:45
18      Q.   What did you do to verify the accuracy         04:46
19  of that statement?                                     04:46
20      A.   I -- if I'm not mistaken, it was in an         04:46
21  e-mail and I read the e-mail.                          04:46
22      Q.   So you just read the e-mail and that was       04:46
23  enough for you?                                        04:46
24      A.   Yes.                                            04:46
25      Q.   Okay.  So you didn't do anything beyond        04:46

Page 319

1   that?                                                  04:46
2       A.   I'm not sure what I could have done            04:46
3   beyond that, quite honestly.                           04:46
4       Q.   Dr. Bliesner, do you understand the           04:46
5   nature of litigation?  You've never been an expert     04:46
6   witness before.                                        04:46
7       A.   I have not.                                    04:46
8       Q.   Do you understand the general nature of       04:46
9   litigation?                                            04:46
10      A.   The general nature of litigation?             04:46
11      Q.   Yeah.                                           04:46
12      A.   How you would define it and how I define      04:46
13  it, probably different things.                         04:46
14      Q.   Well, do you understand that Plaintiffs       04:46
15  are the ones who bring lawsuits and they make          04:47
16  allegations against Defendants.  They allege that      04:47
17  certain things happened and in this context --         04:47
18  pharmaceutical product liability context --            04:47
19  Plaintiffs allege that they were harmed by             04:47
20  products; right?                                       04:47
21      A.   That's correct, yes.                           04:47
22      Q.   And you understand that the lawyers for       04:47
23  the Plaintiffs are required to or are attempting       04:47
24  to prove those allegations.                            04:47
25      A.   That's correct, as I understand it.           04:47

Page 320

1       Q.   Okay.  And you understand, then, that         04:47
2   the lawyers for the Plaintiffs as part of              04:47
3   performing their job are going to go out and find      04:47
4   documents that they believe support their              04:47
5   position.                                              04:47
6       A.   I would say that's a fair statement.  It      04:48
7   would make sense.                                      04:48
8       Q.   Reasonably self-evident; right?               04:48
9       A.   Yeah, it makes sense.                          04:48
10      Q.   Okay.  And when you got the documents         04:48
11  from Plaintiffs' counsel in this case, I see two       04:48
12  primary lists of documents that you got.  One is       04:48
13  Plaintiffs' exhibits.                                  04:48
14      A.   Uh-huh.                                         04:48
15      Q.   And the other Mylan exhibits.                  04:48
16      A.   Uh-huh.                                         04:48
17      Q.   Did it trouble you at all that you were       04:48
18  looking only at the documents that Plaintiffs'         04:48
19  counsel wanted to you see?                             04:48
20      A.   I don't think that's necessarily the way      04:48
21  it was.  In particular I asked at the start of the     04:48
22  project for a list of -- again, go back to my          04:48
23  report.  I was serving as a consultant, and they       04:48
24  asked me to evaluate the status of, you know, the      04:48
25  facility in terms of manufacturing restricted to       04:48

Page 321

1   Digitek, restricted to Amide, Activis, or             04:49
2   whatever, and then they then asked me if there         04:49
3   were documents that I thought would be useful for      04:49
4   my review so I created the list and gave it to         04:49
5   them.                                                  04:49
6       Q.   You did?                                       04:49
7       A.   Yes.                                           04:49
8       Q.   Do we have that list?                          04:49
9       A.   It was given the last go around.  I           04:49
10  handed it out, or it was on the disc, one of the       04:49
11  two.                                                   04:49
12      Q.   Well, the only thing you gave last go         04:49
13  around was Exhibits -- you have them there in          04:49
14  front of you, 107, 108?                                04:49
15      A.   Uh-huh.  It may be on that hard drive.        04:49
16  It was provided.                                       04:49
17      Q.   Okay.  And when did you prepare that          04:49
18  list that you gave to Plaintiffs?                      04:49
19      A.   Very early on in the process.                 04:49
20      Q.   Did you get the documents that were on        04:49
21  that list?                                             04:49
22      A.   Not all of them, no.                           04:49
23      Q.   Did that trouble you at all?                   04:49
24      A.   Trouble is not a word.  It was a little       04:49
25  frustrating for me.                                    04:50

81 (Pages 318 to 321)

PLAINTIFFS' EXHIBITS 003121

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 322

1   Q.   What didn't you get?                04:50
2   A.   I would have to look at the list    04:50
3   specifically.  I think like we talked about, I got    04:50
4   late yesterday evening -- was it process    04:50
5   validation report, you know, those kinds of    04:50
6   things.  I know there were difficulties with the    04:50
7   system from my understanding.    04:50
8   Q.   Okay.                        04:50
9   A.   In getting documents and they're not all    04:50
10  loaded up and that kind of stuff.    04:50
11  Q.   Okay.                        04:50
12  A.   So.                         04:50
13  Q.   Well, so what didn't you get?    04:50
14  A.   I would have to pull up the list.    04:50
15  Q.   But there were things that you asked for    04:50
16  and didn't get.    04:50
17  A.   That's correct.    04:50
18  Q.   You definitely got all of the    04:50
19  Plaintiffs' exhibits, though; right?    04:50
20  A.   I -- I can't say whether I got all the    04:50
21  Plaintiffs' exhibits.    04:50
22  Q.   Well?    04:50
23  A.   If they are all of them, I, then, yes.    04:50
24  But I don't know if that's all of them.  Because    04:50
25  we -- they created as I understand -- excuse me.    04:50

Page 323

1   They created folders that individuals could look    04:50
2   at.                         04:50
3   Q.   Individual whos?  I mean.    04:50
4   A.   People like myself that were reviewing    04:51
5   documents.    04:51
6   Q.   Okay.    04:51
7   A.   And those documents that they wished me    04:51
8   to review were placed in folders on their    04:51
9   electronic system or they delivered them, sent,    04:51
10  e-mail -- e-mailed them.    04:51
11  Q.   Okay.    04:51
12  A.   Uh-huh.    04:51
13  Q.   And did you understand as you conducted    04:51
14  your paper audit that the Plaintiffs' exhibits    04:51
15  were the documents the Plaintiffs' lawyers    04:51
16  believed helped them?    04:51
17  A.   Actually I didn't give it any    04:51
18  consideration.  I was just doing an audit.    04:51
19  Q.   Never occurred to you?    04:51
20  A.   Actually, it did not.    04:51
21  Q.   Well, you weren't necessarily doing an    04:51
22  audit.  You were looking at the documents they    04:51
23  selected to give you.    04:51
24  A.   I don't think that's a -- that's fair    04:51
25  statement.    04:51

Page 324

1   Q.   Is it not fair wholly or is it not fair    04:51
2   just partially.  I mean you got all the documents    04:51
3   they wanted you to have but did not get the    04:51
4   documents, all of the documents you asked for.    04:51
5   A.   That's a true statement.    04:51
6   Q.   Okay.    04:51
7   A.   And why that happened, I'm not sure.    04:52
8   Other than it was --    04:52
9   Q.   Got a guess?    04:52
10  A.   No.  Remember rule number one, don't    04:52
11  guess.    04:52
12  Q.   I understand.  I understand.    04:52
13  A.   And that's what so much of this has been    04:52
14  today is that I'm trying to make sure that I'm not    04:52
15  guessing.    04:52
16  Q.   I don't want you to guess.    04:52
17  A.   Yes.    04:52
18  Q.   But you're a sharp guy.  I'm sure you    04:52
19  can figure out why it is that you got what they    04:52
20  wanted you to have but didn't get everything you    04:52
21  asked for.    04:52
22  A.   I wouldn't comment on that.    04:52
23  Q.   Does it trouble you at all Dr. Bliesner    04:52
24  that nobody has produced a single double-thick    04:53
25  tablet from the market from the recalled batches?    04:53

Page 325

1   A.   Trouble?    04:53
2   Q.   You're a GMP compliance expert.  You've    04:53
3   conducted $140,000's worth of analysis here,    04:54
4   reaching the conclusion that you think adulterated    04:54
5   product reached the market, yet no one has    04:54
6   produced a double-thick tablet from the recalled    04:54
7   batches in almost three years since the recall.    04:54
8   A.   They have not.  That's a fact.    04:54
9   Q.   That's a fact?    04:54
10  A.   Okay.  I take you at your word.    04:54
11  Q.   That's a fact.  Does that trouble you?    04:54
12  A.   Trouble is not a word that I would use;    04:54
13  okay?    04:54
14  Q.   Does it have any impact on the way you    04:54
15  think about your engagement or about on the    04:54
16  conclusions that you you've reached?    04:54
17  A.   No, not necessarily.  Even though again    04:54
18  we've established I'm not a recall expert.    04:54
19  Recalls are not a science -- let's put it that    04:54
20  way -- and we've already established that there    04:54
21  are a large number.    04:55
22  Q.   680 million.    04:55
23  A.   Billion I think is what Mr. Moriarty    04:55
24  said last go around.    04:55
25  Q.   Subject to the recall, 680 million.  In    04:55

82 (Pages 322 to 325)

PLAINTIFFS' EXHIBITS 003122

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 326

1  fact Plaintiff told you that in your meeting          04:55
2  before your deposition.                               04:55
3      A.   Yes, sir.  That --                           04:55
4      Q.   And --                                       04:55
5      A.   -- a small number of a large number is       04:55
6  still substantial in my mind.                         04:55
7      Q.   Zero is not substantial, is it?              04:55
8      A.   Just because you haven't seen anything       04:55
9  doesn't mean it's not there, especially when you      04:55
10 look at the lack of controls within that facility.    04:55
11     Q.   You're relying on inferences again;          04:55
12 right?                                                04:55
13     A.   I don't think it's inferences.               04:55
14     Q.   You don't have any direct proof so it        04:55
15 must be an inference; right?                          04:55
16     A.   I don't think an inference.  It's a mass     04:55
17 of data.  I think that the thing that troubles me     04:55
18 more than anything -- I'm sorry.  I'm done.           04:56
19     Q.   It's a mass of data that create an           04:56
20 inference.                                            04:56
21     MR. KERENSKY:  There you go again, Mike.          04:56
22     MR. ANDERTON:  Mike, he stopped his               04:56
23 answer and said I'm done.                             04:56
24     MR. KERENSKY:  He took a breath.                  04:56
25     MR. ANDERTON:  He said --                         04:56

Page 327

1      MR. KERENSKY:  And you jumped on him.             04:56
2  Let him finish.                                       04:56
3      MR. ANDERTON:  Mike, he said I'm done.            04:56
4      MR KERENSKY:  Read it back.  If you are           04:56
5  right, I'll take it back.                             04:56
6          (Whereupon, the testimony was read           04:56
7  back by the court reporter, as recorded above)        04:56
8      Q.   Are you done, Dr. Bliesner?                  04:56
9      A.   On which point here?                         04:56
10     Q.   Exactly.                                     04:56
11     MR. KERENSKY:  Let's read back what he            04:56
12 was saying when you jumped on his sentence            04:56
13 there.                                                04:56
14     MR. ANDERTON:  And I think the record             04:56
15 clearly showed earlier that he interrupted            04:56
16 me.  I let that go.  Go ahead, Phil.                  04:56
17     MR. KERENSKY:  I think his last word was          04:57
18 "and."                                                04:57
19     MR. ANDERTON:  No, it wasn't.                     04:57
20     MR. KERENSKY:  What was the last word             04:57
21 before you said no, no.  I couldn't quite hear        04:57
22 Phil.  He was fairly far away.                        04:57
23     MR. ANDERTON:  The thing that tells me            04:57
24 more than anything.                                   04:57
25     MR. KERENSKY:  You don't end a sentence           04:57

Page 328

1  in anything.                                          04:57
2      MR. ANDERTON:  Mike, the problem is, he           04:57
3  answered my question.  He recognized --               04:57
4      MR. ANDERTON:  There's just disagreement.         04:57
5      MR. ANDERTON:  He recognized -- Mike, he          04:57
6  recognized and stopped himself when he was            04:57
7  answering a question that hadn't been asked.          04:57
8  He did it.                                            04:57
9      MR. KERENSKY:  Well, I don't how he could         04:57
10 be doing both, Mike.  He was still talking and        04:57
11 you interrupted him.  That's all there is to          04:57
12 it.                                                   04:57
13     MR. ANDERTON:  I didn't interrupt him,            04:57
14 Mike.  Now, I really don't appreciate this --         04:57
15 I mean you are telling him what to do, Mike.          04:57
16 It's inappropriate.                                   04:57
17     MR. KERENSKY:  I'm telling you what to            04:57
18 do.  Don't interrupt him.                             04:58
19     MR. ANDERTON:  Dr. Bliesner, are you              04:58
20 done?                                                 04:58
21     MR. KERENSKY:  Read that whole answer             04:58
22 back before Mike started talking again and            04:58
23 then ask him that question and we'll move on.         04:58
24     MR. ANDERTON:  I asked him the question.          04:58
25 He stopped himself, Mike.  You're not here.           04:58

Page 329

1  He put his hands up and said "I'm sorry."  And        04:58
2  he stopped and said --                                04:58
3      MR. ANDERTON:  And you started to                 04:58
4  interrupt him.                                        04:58
5      MR. ANDERTON:  Not true.  Dr. Bliesner,           04:58
6  do you have anything to add to that answer?           04:58
7      MR. KERENSKY:  If you need to hear it             04:58
8  read back to you, Dr. Bliesner, you may ask           04:58
9  for that.                                             04:58
10     THE WITNESS:  Read it back one more time,         04:58
11 please.                                               04:58
12         (Whereupon, the testimony was read back       04:59
13 by the court reporter, as recorded above)             04:59
14     THE WITNESS:  Was the fact that nobody            04:59
15 ever tested double-thick tablets they found in        04:59
16 the facility.  That's what I find troubling.          04:59
17 BY MR. ANDERTON:                                      04:59
18     Q.   Okay.  But is that more --                   04:59
19     MR. KERENSKY:  Make your objection, Mike.         04:59
20 BY MR. ANDERTON:                                      04:59
21     Q.   Is that more troubling to you,               04:59
22 Dr. Bliesner, than the fact that out of 680           04:59
23 million tablets, in three years nobody has            04:59
24 presented a single double-thick tablet?               04:59
25     A.   Absolutely because not testing on a          04:59

83 (Pages 326 to 329)

PLAINTIFFS' EXHIBITS 003123

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 330

1  product that's clearly failed and identified had        04:59
2  failed is -- it really raises eyebrows.  All kinds      04:59
3  of questions come up.  Why didn't they?  Is             04:59
4  somebody hiding something?  Have found things           04:59
5  before?  Are they dumping it?  These are just           04:59
6  questions that come to mind.  I'm not suggesting         04:59
7  --                                                      04:59
8      Q.   All of --                                      04:59
9      A.   -- all of these things.  Just a whole          04:59
10 plethora of questions come into play when you           04:59
11 don't see -- it's happened several times as we          04:59
12 both recognize.                                         05:00
13     Q.   And the way to answer those questions          05:00
14 would be to take them and dive into the                 05:00
15 manufacturing and production records for that           05:00
16 product.                                                05:00
17     A.   No, that's not true.                           05:00
18     Q.   Or for any other product.                      05:00
19     A.   That's not true.  They didn't collect          05:00
20 the samples and test them.                              05:00
21     Q.   The way --                                     05:00
22     A.   In my experience -- in my experience           05:00
23 with respect to batch records, okay, personal           05:00
24 experience, recent personal experience, batch           05:00
25 records don't necessarily reflect reality.  I've        05:00

Page 331

1  had a client in the last year that manufactures         05:00
2  product and doesn't even look at the batch record       05:00
3  because it isn't written where you can follow it.       05:00
4  They just go out there and wing it on the floor.        05:00
5  So just because you got a batch record doesn't          05:00
6  mean that that's gospel what's happening on the         05:00
7  floor.  That's my personal experience.                  05:00
8      Q.   Did you throw your medicine from that          05:00
9  manufacturer away?  They're not following their         05:00
10 batch records.  Did you go run up to your medicine      05:00
11 cabinet and throw that away?                            05:00
12     A.   It's not appropriate.                          05:00
13     Q.   What do you mean it's not appropriate?         05:01
14     A.   Because it's not a solid oral dosage for       05:01
15 me.                                                     05:01
16     Q.   Dr. Bliesner, last time you talked             05:01
17 about, you gave some testimony about conversation       05:01
18 you had with your doctor regarding this subject,        05:01
19 the subject of this litigation.  And I wasn't           05:01
20 satisfied that we established whether the               05:01
21 conversation was in fact protected by a                05:01
22 physician-patient privilege.  So I am going to ask      05:01
23 some questions to develop the details surrounding      05:01
24 that conversation that will tell us that.               05:01
25     A.   And I'm not going to answer those              05:01

Page 332

1  questions.                                              05:01
2      Q.   You don't have right to refuse to answer       05:01
3  that unless you -- unless it is truly privileged.       05:01
4  Do you understand that?                                 05:01
5      A.   I believe it's truly privileged between        05:01
6  my doctor.  Because I specifically asked that           05:01
7  because he asked me.                                    05:01
8      Q.   Were you seeking medical advice when you       05:01
9  asked him these questions?                              05:01
10     A.   I was in for an appointment yes.               05:01
11     Q.   Were you seeking medical advice when you       05:01
12 asked him questions about Digoxin?                      05:01
13     A.   When I asked him questions about it?  I        05:02
14 didn't ask him questions.  He volunteered.              05:02
15     Q.   How did he come to volunteer?                  05:02
16     A.   I'm not comfortable talking about this.        05:02
17     Q.   I'm not asking for the substance               05:02
18     A.   I'm not comfortable talking about it.          05:02
19     Q.   You don't have a choice.                       05:02
20     MR. KERENSKY:  Mike, maybe I can settle             05:02
21 this.  No one is going to ask this witness to           05:02
22 tell any jury what his doctor said about               05:02
23 Digitek.  I will stipulate to that right now.          05:02
24     MR. ANDERTON:  Well, we're going to ask             05:02
25 this witness what his doctor told him so we             05:02

Page 333

1  know whether it formed part of the basis for           05:02
2  his expert opinion in this case.                       05:02
3      THE WITNESS:  It was after the fact.  I            05:02
4  will tell you that.                                    05:02
5  BY MR. ANDERTON:                                       05:02
6      Q.   You are still subject to testifying,          05:02
7  Dr. Bliesner.                                          05:02
8      MR. KERENSKY:  You have a right to                 05:02
9  protect your conversations between you and             05:02
10 your doctor.  And you've got two                       05:02
11 countervailing opinions from two lawyers,             05:02
12 neither of which represent you.  You got to           05:02
13 make the call, doctor.                                 05:02
14 BY MR. ANDERTON:                                       05:03
15     Q.   Dr. Bliesner, you know what you're doing      05:03
16 here.  You're setting yourself up to be brought        05:03
17 back for another session of deposition.               05:03
18     A.   So be it.  I am not comfortable sharing       05:03
19 that information with you.                            05:03
20     Q.   I'm allowed to ask the parameters of the      05:03
21 conversation.  I'm not asking for the substance.       05:03
22 I'm allowed to ask the details of the                 05:03
23 conversations that surround the conversation so       05:03
24 that I can evaluate whether I think it's a            05:03
25 privileged communication or not.                     05:03

84 (Pages 330 to 333)

PLAINTIFFS' EXHIBITS 003124

David M. Bliesner, Ph.D.                    Videotaped                    February 18, 2011

Page 334

1    A.   I'm not going to answer your          05:03
2    questions.                                 05:03
3    Q.   I'm going to make my record.          05:03
4    Did you talk to your doctor about Digoxin.  05:03
5    Have you spoken to your doctor about Digoxin in   05:03
6    the last 12 months?                        05:03
7    A.   I'm not going to answer these         05:03
8    questions.                                 05:03
9    Q.   You're refusing to answer that        05:03
10   question?                                  05:03
11   A.   I am.                                 05:03
12   Q.   Have you spoken to your doctor about   05:03
13   this litigation in the last 12 months?     05:03
14   A.   I'm not going to answer the question.  05:03
15   Q.   Have you spoken to your doctor about   05:03
16   your engagement as an expert witness in the last   05:03
17   12 months?                                 05:03
18   A.   I'm not going to answer any           05:03
19   questions.  It was within confidentiality with   05:03
20   my doctor.                                 05:03
21   Q.   Your engagement as an expert witness?  05:03
22   A.   I'm not going to answer the question.  05:04
23   Q.   Have you spoken to your doctor about   05:04
24   the effects of Digoxin and its uses?       05:04
25   A.   I'm not going to answer the question.  05:04

Page 335

1    Q.   Do you take Digoxin, Dr. Bliesner?    05:04
2    A.   I do not.                             05:04
3    Q.   Do you take any heart medications?    05:04
4    A.   What do you mean by heart            05:04
5    medications?                               05:04
6    Q.   Dr. Bliesner, do you take any         05:04
7    medications for heart conditions?          05:04
8    A.   Is blood pressure a heart condition in   05:04
9    your mind?                                 05:04
10   Q.   If you think it is, say yes.          05:04
11   A.   I've never really considered it a     05:04
12   heart condition.  I considered it high blood   05:04
13   pressure.                                  05:04
14   Q.   Other than your blood pressure        05:04
15   medication, do you take any medications for   05:04
16   heart conditions?                          05:04
17   A.   No.                                   05:04
18   Q.   Does anyone in your family take any   05:04
19   medications for heart conditions?          05:04
20   A.   No.                                   05:04
21   MR. ANDERTON:  Off the record.            05:04
22   THE VIDEOGRAPHER:  The time is             05:04
23   5:06 p.m. We're going off the record      05:04
24   briefly.                                   05:05
25   (Short break)                             05:06

Page 336

1    THE VIDEOGRAPHER:  The time is 5:07.      05:06
2    We are back on the record.                 05:06
3    MR. ANDERTON:  Dr. Bliesner, I have no    05:06
4    further questions at this time.            05:06
5    Unfortunately because we haven't had a     05:06
6    chance to review all the documents that you   05:06
7    produced because we have the outstanding --   05:06
8    some outstanding issues, as much as I would   05:06
9    like to tell you that this is the final    05:06
10   session of this deposition, I can't give you   05:06
11   that guarantee.                            05:06
12   THE WITNESS:  I understand.               05:06
13   MR. ANDERTON:  So if it is not, we will   05:06
14   in touch with counsel for the Plaintiffs to   05:06
15   make arrangements and they will be in      05:06
16   contact with you.                          05:06
17   THE WITNESS:  I understand.               05:06
18   MR. ANDERTON:  We are going to keep       05:06
19   these binders.  Phil, will you mark both of   05:06
20   these binders as the next exhibits as well?   05:06
21   And then here are the others.  And they are   05:06
22   going to stay -- all of these document are   05:06
23   going to stay with Shook, Hardy,           05:06
24   Dr. Bliesner.  And pursuant to agreement   05:06
25   with Mr. Kerensky, we are going to have them   05:06

Page 337

1    make copies and you're going to get back the   05:07
2    originals.  And then we will get a copy.   05:07
3    THE WITNESS:  Okay.                       05:07
4    MR. ANDERTON:  Okay.  The court           05:07
5    reporter can keep a copy and then make a   05:07
6    copy.  I'm sorry.  The court reporter will   05:07
7    get a copy.                                05:07
8    THE WITNESS:  Okay.                       05:07
9    MR. ANDERTON:  And then we will get       05:07
10   copies as they provide us copies of the    05:07
11   transcript.                                05:07
12   THE WITNESS:  Okay.                       05:07
13   MR. ANDERTON:  Okay.  Thank you very      05:07
14   much for your patience.  It was a long day,   05:07
15   a long process.  Thank you very much.      05:07
16   THE WITNESS:  Same to you.                05:07
17   MR. ANDERTON:  Mr. Kerensky.  We're off   05:07
18   the record now.                            05:07
19   THE VIDEOGRAPHER:  The time is 5:09 p.m.   05:07
20   This concludes the videotape deposition of   05:07
21   Dr. Bliesner.  We are off the record.      05:07
22   (Whereupon, Exhibits 155 and 156
23   were marked for identification)
24   (THEREUPON, the taking of the deposition
     was concluded at 5:09.)
25

85 (Pages 334 to 337)

David M. Bliesner, Ph.D.                         Videotaped                         February 18, 2011

Page 338

```
1            CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY OF HILLSBOROUGH
5
6            I, the undersigned authority,
7   certify that DAVID M. BLIESNER, Ph.D.,
8   personally appeared before me and was duly sworn
9   by me.
10           WITNESS my hand and official
11  seal, this 2nd day of MARCH, 2011.
12
13
14
    _____
15  PHILIP RYAN, RPR
    NOTARY PUBLIC - STATE OF FLORIDA
16  COMMISSION # DD 988415
    MY COMMISSION EXPIRES:  JUNE 28, 2014
17
18
19
20
21
22
23
24
25
```

Page 339

```
1            CERTIFICATE OF REPORTER
2   STATE OF FLORIDA
3   COUNTY OF HILLSBOROUGH
4            I, PHILIP RYAN, RPR, certify that I
5   was authorized to and did stenographically
6   report the foregoing deposition; and that the
7   foregoing transcript is a true record of the
8   testimony given by the witness.
9            I further certify that I am not a
10  relative, employee, attorney, or counsel of any
11  of the parties, nor am I a relative or employee
12  of any of the parties' attorneys or counsel
13  connected with the action, nor am I financially
14  interested in the action.
15
16           DATED this 2nd day of March, 2011.
17
18
19
20
    _____
21  PHILIP RYAN, RPR
22
23
24
25
```

86 (Pages 338 to 339)

PLAINTIFFS' EXHIBITS 003126