# EXHIBIT 508.2

PLAINTIFFS' EXHIBITS 003463

Page 243

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

MDL NO: 1968

IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION,
_____/

                        100 N. Tampa Street
                          Suite 2900
                          Tampa, FL 33602
                          February 18, 2011
                          at 8:15 a.m.

     VIDEOTAPE DEPOSITION OF DAVID BLIESNER, Ph.D.

     Taken on behalf of the Defendants before

PHILIP RYAN, RPR, Court Reporter, Notary Public in

and for the State of Florida at Large, pursuant to

Defendant's Notice of Taking Deposition in the

above cause.

PLAINTIFFS' EXHIBITS 003464

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 244

```
 1   APPEARANCES:

 2   MIKE KERENSKY, ESQUIRE
     Williamson & Rusnak
 3   4310 Yoakum Boulevard
     Houston, TX 77006-5818
 4   (713)223-3330
     (via telephone)
 5
             Attorney for Plaintiffs
 6
     MICHAEL ANDERTON, ESQUIRE
 7   Tucker, Ellis & West, LLP
     1150 Huntington Building
 8   925 Euclid Avenue
     Cleveland, OH 44115
 9   (216)592-5000

10           Attorney for Defendant Activis Totowa,
             LLC, Activis, Inc.,
11           and Activis Elizabeth, LLC

12   SARAH E. DREWES, ESQUIRE
     Shook, Hardy & Bacon, LLP
13   2555 Grand Boulevard
     Kansas City, Missouri 64108
14   (816)474-6550

15           Attorney for Mylan Pharmaceuticals,
             Inc., Mylan Inc., Mylan Bertek
16           Pharmaceuticals, Inc., and UDL Labs

17   ALSO PRESENT:
             Alan Pokotilow, videographer
18
                         INDEX
19                                          PAGE
     DIRECT EXAMINATION:
20   BY MR. ANDERTON                          5

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 003465

Page 245

```
 1                        EXHIBIT INDEX

 2                                              MAR
     Exhibit
 3   Exhibit 145    Invoices.                    94

 4   Exhibit 146    E-mail.                       99

 5   Exhibit 147    Binder.                      117

 6   Exhibit 148    Binder.                      117

 7   Exhibit 149    Binder.                      117

 8   Exhibit 150    Binder.                      117

 9   Exhibit 151    Notice.                      122

10   Exhibit 152    Notes.                       123

11   Exhibit 153    Notes.                       123

12   Exhibit 154    Binder.                      161

13   Exhibit 155    Binder.                      337

14   Exhibit 156    Binder.                      337

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 003466

Page 246

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We're on the | 08:15 |
| 2 | record at 8:15 a.m.  The date today is | 08:15 |
| 3 | February 18th of 2011.  This is the videotape | 08:15 |
| 4 | deposition of Dr. David M. Bliesner in regard | 08:15 |
| 5 | to the Digitek product liability litigation, | 08:16 |
| 6 | civil action MDL 1968. | 08:16 |
| 7 | This videotape deposition is being held | 08:16 |
| 8 | at 100 North Tampa, within suite 2900.  The | 08:16 |
| 9 | deposition was noticed by attorney Matt | 08:16 |
| 10 | Moriarty, I believe. | 08:16 |
| 11 | MR. ANDERTON:  Richard Dean, actually. | 08:16 |
| 12 | THE VIDEOGRAPHER:  Okay.  The | 08:16 |
| 13 | videographer is Alan Pokotilow and the court | 08:16 |
| 14 | reporter is Philip Ryan.  At the time of | 08:16 |
| 15 | transcript, the tape will be archived at | 08:16 |
| 16 | Renillo Deposition and Discovery. | 08:16 |
| 17 | Counsel, please state your name and | 08:16 |
| 18 | affiliation for the record, after which our | 08:16 |
| 19 | court reporter will swear the witness and we | 08:16 |
| 20 | can proceed. | 08:16 |
| 21 | MR. ANDERTON:  Michael Anderton with | 08:16 |
| 22 | Tucker Ellis & West on behalf of the Activis | 08:16 |
| 23 | Defendants. | 08:16 |
| 24 | MS. DREWES:  Sarah Drewes, with Shook, | 08:16 |
| 25 | Hardy & Bacon on behalf of the Mylan | 08:16 |

PLAINTIFFS' EXHIBITS 003467

David M. Bliesner, Ph.D., Volume II          Videotaped - Revised                    February 18, 2011

                                                                 Page 247
 1    Defendants.                                                  08:16
 2          MR. KERENSKY:  Mike Kerensky for the                  08:16
 3    Plaintiff Mimi Vega.                                        08:16
 4          MR. ANDERTON:  And just so the record is              08:16
 5    clear, Mr. Kerensky is participating by                     08:17
 6    telephone.                                                  08:17
 7          MR. KERENSKY:  Correct.                               08:17
 8  The Deponent herein,                                          08:17
 9             DAVID BLIESNER, Ph.D.,                             08:17
10  Being first duly sworn to tell the truth, the                08:17
11  whole truth, and nothing but the truth, was                  08:17
12  examined and testified as follows:                           08:17
13             DIRECT EXAMINATION                                 08:17
14  BY MR. ANDERTON:                                              08:17
15      Q.    Good morning, Dr. Bliesner.                         08:17
16      A.    Good morning, sir.                                  08:17
17      Q.    How are you?                                        08:17
18      A.    Okay.                                               08:17
19      Q.    Thanks for accommodating the early start           08:17
20  time.                                                         08:17
21      A.    Sure.                                               08:17
22      Q.    I know it's an early day, but if we're             08:17
23  going to get everybody home to spend time with               08:17
24  their families this weekend, I thought 8 o'clock             08:17
25  was the best time to start.  So thank you.                   08:17

PLAINTIFFS' EXHIBITS 003468

Page 248

| | | |
|---|---|---|
| 1 | A.   You're welcome. | 08:17 |
| 2 | Q.   Some ground rules.  I know you -- we did | 08:17 |
| 3 | this about two or three weeks ago now, a little | 08:17 |
| 4 | more than three weeks ago so you're familiar with | 08:17 |
| 5 | the process, but I just want to repeat some ground | 08:17 |
| 6 | rules.  And if you have any questions about them, | 08:17 |
| 7 | kind of let me know; okay? | 08:17 |
| 8 | A.   Okay. | 08:17 |
| 9 | Q.   As you know, I'm going to ask questions, | 08:17 |
| 10 | you're going to answer my questions.  If you don't | 08:17 |
| 11 | understand a question, I would ask that you tell | 08:17 |
| 12 | me that and ask me to rephrase it or to state it | 08:18 |
| 13 | differently; is that fair? | 08:18 |
| 14 | A.   That is fair. | 08:18 |
| 15 | Q.   All right.  And if I ask a question and | 08:18 |
| 16 | you answer it without asking me to rephrase or | 08:18 |
| 17 | restate it somehow, I will assume that you | 08:18 |
| 18 | understood it. | 08:18 |
| 19 | Is that all right? | 08:18 |
| 20 | A.   Okay. | 08:18 |
| 21 | Q.   You need to keep your voice up probably | 08:18 |
| 22 | just a little.  I know you're mic'd and I know | 08:18 |
| 23 | from the last time that you're -- at times at | 08:18 |
| 24 | least are probably fairly soft-spoken.  So just | 08:18 |
| 25 | try to make sure that your voice stays elevated so | 08:18 |

PLAINTIFFS' EXHIBITS 003469

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 249

1    at least the mic hears it because as you know, the        08:18

2    proceedings are being recording by video camera          08:18

3    and audio as well; all right?                            08:18

4        A.    Okay.                                          08:18

5        Q.    Now, Dr. Bliesner, one more kind of key         08:18

6    point.  You know, I attended the last session and        08:18

7    I noticed as I did that, that there were what I          08:18

8    felt were a fair amount of occasions where you           08:19

9    didn't really respond to the questions that              08:19

10   Mr. Moriarty had asked you.  And it's obvious from       08:19

11   your credentials and from your -- just -- just           08:19

12   dealing with you in the last deposition that             08:19

13   you're a very intelligent, very capable listener.        08:19

14   We know that you've been told by Plaintiffs'             08:19

15   counsel to listen very carefully.  So I would ask        08:19

16   that you really do me the favor of listening and         08:19

17   making sure that when you answer a question,             08:19

18   you're actually answering the question that I ask;       08:19

19   okay?                                                    08:19

20       A.    Okay.                                          08:19

21       Q.    I want to talk for a moment about your         08:19

22   credentials.  Do you have a copy of your CV with         08:19

23   you?                                                     08:19

24       A.    Let me check.                                  08:19

25       Q.    Please.  And if you don't, I have an           08:19

PLAINTIFFS' EXHIBITS 003470

Page 250

1    extra one.                                        08:19

2        A.    I do not.                               08:19

3        Q.    Okay.  Well, I'm going to hand you a    08:20

4    copy.                                             08:20

5        A.    Okay.                                   08:20

6        Q.    Mike, this is Exhibit 93.               08:20

7        Dr. Bliesner, I have handed you a document    08:20

8    that has been marked as Exhibit 93.  Have you seen 08:20

9    that document before?                             08:20

10       A.    Yes.                                     08:20

11       Q.    It's a copy of your CV, your resume;    08:20

12   correct?                                          08:20

13       A.    It is.                                  08:20

14       Q.    You prepared it?                        08:20

15       A.    I did.                                  08:20

16       Q.    Is it accurate and current?            08:20

17       A.    No.                                     08:21

18       Q.    And last time you were asked -- I think 08:21

19   that you gave some testimony that there were a    08:21

20   couple of board memberships that had kind of      08:21

21   changed and there were some minor changes.  But as 08:21

22   concerns your education and work experience, is    08:21

23   that CV accurate and current?                     08:21

24       A.    No.                                     08:21

25       Q.    What is not accurate or current about   08:21

PLAINTIFFS' EXHIBITS 003471

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 251

| | | |
|---|---|---|
| 1 | your work experience or education as reflected on | 08:21 |
| 2 | that CV? | 08:21 |
| 3 | A.    Yesterday I presented a guest lecture at | 08:21 |
| 4 | the University of South Florida College of | 08:21 |
| 5 | Medicine. | 08:21 |
| 6 | Q.    What was the topic of that lecture? | 08:21 |
| 7 | A.    The topic was something to the effect | 08:21 |
| 8 | "Consumer Health and GMPs." | 08:21 |
| 9 | Q.    Tell me generally the substance of | 08:21 |
| 10 | the -- of the lecture, the subject of the lecture | 08:21 |
| 11 | that you gave yesterday at you said South Florida? | 08:21 |
| 12 | A.    University South Florida. | 08:21 |
| 13 | Q.    University of South Florida. | 08:21 |
| 14 | A.    Yes. | 08:21 |
| 15 | Q.    Can you give me a little more detail | 08:21 |
| 16 | than just the topic you just described? | 08:21 |
| 17 | A.    Other than pulling up the course outline | 08:22 |
| 18 | and taking a look at it, in general it was an | 08:22 |
| 19 | overview of the drug development process and where | 08:22 |
| 20 | GMPs become pertinent in the drug development | 08:22 |
| 21 | process and an introduction to people who had not | 08:22 |
| 22 | been exposed to the concepts of the GMPs, and some | 08:22 |
| 23 | examples of enforcement and where they could go to | 08:22 |
| 24 | review the GMPs themselves. | 08:22 |
| 25 | Q.    Drug development.  Does that mean -- | 08:22 |

PLAINTIFFS' EXHIBITS 003472

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised        February 18, 2011

Page 252

```
 1   well, you tell me what that means.  What do you        08:22

 2   mean by drug development?                              08:22

 3        A.    Drug development is the process of          08:22

 4   discovering an entity that may have                    08:22

 5   pharmacological activity and moving it to a final      08:22

 6   product.                                               08:22

 7        Q.    What would you characterize as the          08:22

 8   primary target audience for that lecture?              08:22

 9        A.    The students in the class were getting a    08:22

10   masters in biotechnology.                              08:22

11        Q.    And when you talk about introduction to     08:23

12   GMPs in the course or in the context of that           08:23

13   lecture that you gave yesterday, tell me in more       08:23

14   detail about the types of concepts that you            08:23

15   presented with respect to the introduction to          08:23

16   GMPs.                                                  08:23

17        A.    I would have to go back and pull up the     08:23

18   course outline to talk explicitly about it.            08:23

19        Q.    Well, you just did it yesterday, right,     08:23

20   Dr. Bliesner?                                          08:23

21        A.    Uh-huh.                                     08:23

22        Q.    You're a very smart man; right?             08:23

23            MR. KERENSKY:  Michael, that's not            08:23

24        necessary.                                        08:23

25            MR. ANDERTON:  Mike.                          08:23
```

PLAINTIFFS' EXHIBITS 003473

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised    February 18, 2011

                                                      Page 253

1          MR. KERENSKY:  I object to the form of        08:23

2      the question.                                     08:23

3          MR. ANDERTON:  You can object and I           08:23

4      appreciate your objection and you make your       08:23

5      record obviously, but I asked him what he         08:23

6      talked about yesterday.  Certainly he can         08:23

7      remember that.                                     08:23

8          MR. KERENSKY:  Well, you certainly need       08:23

9      to be professional and not say things like        08:23

10      "You're smart man; right?"  That's what I'm       08:23

11      scolding you about.                               08:23

12          MR. ANDERTON:  Your scolding is noted,       08:23

13      Mike.                                             08:23

14          MR. KERENSKY:  Thank you very much.          08:23

15  BY MR. ANDERTON:                                      08:23

16      Q.   Dr. Bliesner, please tell me when you        08:23

17  described a few moments ago that you gave an          08:24

18  introduction to GMPs --                               08:24

19      A.   Yes.                                         08:24

20      Q.   -- as part of a presentation you made        08:24

21  yesterday.                                            08:24

22      A.   Yes.                                         08:24

23      Q.   Please give me a description of the          08:24

24  types of concept that you presented on with          08:24

25  respect to introduction to GMPs?                      08:24

PLAINTIFFS' EXHIBITS 003474

Page 254

```
 1      A.    I gave a brief overview of the drug          08:24
 2   development process, I indicated at what point        08:24
 3   GMPs become applicable, talked about the hierarchy    08:24
 4   of the law in a very general sense and where the      08:24
 5   GMPs come into play.  I talked about the guidance     08:24
 6   documents and compliance program guidance manuals     08:24
 7   that are available online on the FDA website,         08:24
 8   what's contained generally in those documents, the    08:25
 9   quality systems that are associated with that, and    08:25
10   the hierarchy with respect to enforcement of          08:25
11   compliance of the GMPs.  Much of the course was       08:25
12   left as attachments for the students to go and        08:25
13   look in detail if they sought to.                     08:25
14      Q.    When you used term -- just to be clear,      08:25
15   when you used the term GMP as you did in the          08:25
16   description and the ones you gave before, that is     08:25
17   an acronym for good manufacturing practices;          08:25
18   correct?                                              08:25
19      A.    It is.                                       08:25
20      Q.    And that is a subject or a topic that        08:25
21   emanates from the code of federal regulations         08:25
22   under the United States code; correct?                08:25
23      A.    The GMPs are part of the code of federal     08:25
24   regulations.                                          08:25
25      Q.    You said that you discussed -- that one      08:26
```

PLAINTIFFS' EXHIBITS 003475

Page 255

 1    of the things you discussed was at what point GMPs          08:26

 2    become relevant to the drug development process.            08:26

 3         A.     (The witness nodded).                           08:26

 4         Q.     What is that point in your mind?                08:26

 5         A.     In my opinion?                                  08:26

 6         Q.     Yes.                                            08:26

 7         A.     The point at which the GMPs become              08:26

 8    applicable is when you start testing the product           08:26

 9    or active in people.                                       08:26

10         Q.     In people you said?                             08:26

11         A.     Yes.                                            08:26

12         Q.     Does that mean when you are                     08:26

13    participating in some sort of clinical trial?              08:26

14         A.     Yes.                                            08:26

15         Q.     So GMPs in your mind aren't applicable          08:26

16    if you're merely doing animal or other lab                 08:26

17    studies; is that correct?                                  08:26

18         A.     That is correct.                                08:26

19         Q.     And when you used the term "drug                08:26

20    development process," I assume that you're                 08:26

21    talking -- and correct me if my assumption is              08:27

22    wrong -- I assume that you're talking about a drug         08:27

23    or an entity as you used that term that has not            08:27

24    yet been approved for market sale by the FDA.              08:27

25         A.     Not necessarily.                                08:27

PLAINTIFFS' EXHIBITS 003476

David M. Bliesner, Ph.D., Volume II       Videotaped - Revised                    February 18, 2011

Page 256

1        Q.    Under what circumstances can a drug that          08:27
2    hasn't been developed be approved by the FDA?              08:27
3        A.    I don't know if I understand exactly the          08:27
4    question you're asking.                                    08:27
5        Q.    Well, you described -- you used the term          08:27
6    "drug development process" and then you clarified          08:27
7    and added substance to that term by indicating            08:27
8    that it was the -- the process of taking an entity         08:27
9    from concept to production and marketing; correct?        08:27
10       A.    Correct.                                         08:28
11       Q.    If your -- that process begins before            08:28
12   FDA approval; correct?                                     08:28
13       A.    Drug development process is very complex         08:28
14   and it's not, does not fit to one specific case.          08:28
15   For instance, if you have a generic drug you have         08:28
16   to do drug development as well but it's already on         08:28
17   a product that has been approved for market.  So          08:28
18   that could be considered drug development as well,        08:28
19   as opposed to discovering a new entity and moving         08:28
20   it forward.                                                08:28
21       Q.    Well, even a generic drug --                     08:28
22       A.    Uh-huh.                                          08:28
23       Q.    -- isn't actually -- the brand name is          08:28
24   approved for marketing; correct?                          08:28
25       A.    Correct.                                         08:28

PLAINTIFFS' EXHIBITS 003477

Page 257

1     Q.    Even the generic drug must go through a        08:28
2   drug development process and must be submitted to     08:28
3   the FDA before it can be marketed using an ANDA       08:28
4   rather than an NDA; correct?                          08:28
5     A.    Correct.                                       08:28
6     Q.    So this course that you or this               08:28
7   presentation that you gave yesterday, how long did    08:29
8   it last?                                               08:29
9     A.    An hour and a half approximately.             08:29
10    Q.    How long did you prepare for that             08:29
11  presentation?                                         08:29
12    A.    Several hours.                                08:29
13    Q.    What did you do to prepare for that           08:29
14  presentation?                                         08:29
15    A.    I took my course that I teach routinely       08:29
16  at client sites, my book, and a course that I also    08:29
17  teach at conferences routinely, looked at that        08:29
18  core value that was there, based on input from the    08:29
19  professor who invited me, trying to target what       08:30
20  she thought might be useful for the students to be    08:30
21  exposed in a general sense.                           08:30
22    Q.    And I -- I understand from your prior         08:30
23  answer that you distributed some sort of materials    08:30
24  at that presentation yesterday.                       08:30
25    A.    I did via Internet link.                      08:30

PLAINTIFFS' EXHIBITS 003478

Page 258

| | | |
|---|---|---|
| 1 | Q. Describe how that works. I haven't been | 08:30 |
| 2 | in college in a long time, so what is the current | 08:30 |
| 3 | practice with respect to distributing course | 08:30 |
| 4 | materials or even a seminar like this? How do you | 08:30 |
| 5 | distribute via Internet link? | 08:30 |
| 6 | A. To answer your first question, I don't | 08:30 |
| 7 | know if there is a general way to do it. | 08:30 |
| 8 | Q. How did you do it? | 08:30 |
| 9 | A. How did I do it? I took the | 08:30 |
| 10 | presentation -- as I told you -- from my basic | 08:30 |
| 11 | course material, targeted it to the needs of the | 08:30 |
| 12 | professor, put in a Power Point presentation, | 08:30 |
| 13 | converted it to a PDF file so it's secure. I | 08:30 |
| 14 | created a folder up on one of my websites that was | 08:30 |
| 15 | blind, I uploaded it and provided a link to the | 08:30 |
| 16 | professor and said that the students could access | 08:31 |
| 17 | it if they'd like. | 08:31 |
| 18 | Q. Okay. And then did you -- I assume then | 08:31 |
| 19 | that you repeated the web address for that link | 08:31 |
| 20 | during the presentation? | 08:31 |
| 21 | A. No. | 08:31 |
| 22 | Q. Okay. So they got it from the professor | 08:31 |
| 23 | and chose to go get it or not? | 08:31 |
| 24 | A. Correct. | 08:31 |
| 25 | Q. Other than -- well, did you bring any of | 08:31 |

PLAINTIFFS' EXHIBITS 003479

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                             Page 259

1    the materials that you used in yesterday's              08:31

2    presentation with you?                                  08:31

3         A.    No.                                          08:31

4         Q.    During the presentation during this          08:31

5    hour, what -- how much of that was spent on             08:31

6    manufacturing processes, if any?                        08:31

7         A.    Could you explain to me what you mean by     08:31

8    "manufacturing processes"?                              08:31

9         Q.    Certainly.  The drug development             08:31

10   process -- well, let me back that up.  Let me           08:32

11   start over.                                             08:32

12        The drug production process involves several       08:32

13   different components.  Developing a drug and            08:32

14   getting it ready to be manufactured and then            08:32

15   actually going forward and physically producing         08:32

16   the product I will characterize as two separate         08:32

17   components of that process.                             08:32

18        Did you discuss during your presentation           08:32

19   yesterday, that second component, the acts              08:32

20   associated with physically manufacturing and            08:32

21   producing a drug product?                               08:32

22        A.    No because the students -- it was an         08:32

23   open lecture and the students were allowed to           08:32

24   drive it where they wanted to go and many of their      08:33

25   questions were not related to manufacturing.            08:33

PLAINTIFFS' EXHIBITS 003480

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                          Page 260
 1      Q.    Were you planning to discuss that if        08:33
 2   they drove the discussion -- to use your term --     08:33
 3   in that direction?                                   08:33
 4      A.    Brief overview, yes.                        08:33
 5      Q.    Do you know the or can you tell us the      08:33
 6   link, the address for the link to the presentation  08:33
 7   materials for yesterday?                             08:33
 8      A.    Actually, I can't off the top of my         08:33
 9   head.                                                08:33
10      Q.    Can you tell us generally how one might     08:33
11   get to that link?  Is it available through Delphi,   08:33
12   is it available from claycoachonline?                08:33
13      A.    It's available through Delphi in a blind    08:33
14   web link.                                            08:33
15      Q.    What do you mean by blind web link?         08:33
16      A.    The students and the instructor is the      08:33
17   only ones that have it.                              08:33
18      Q.    So they need some sort of password or       08:33
19   invitation?                                          08:33
20      A.    Just the right link to get to the page.     08:33
21      Q.    I mean it's not available to anybody who    08:33
22   happens to go to the Delphi website?                 08:33
23      A.    No, sir.                                    08:33
24      Q.    When we get a break sometime today, will    08:34
25   you see what you can do about figuring out how to    08:34
```

PLAINTIFFS' EXHIBITS 003481

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                    February 18, 2011

Page 261

| | | |
|---|---|---|
| 1 | provide me and defense counsel with access to that | 08:34 |
| 2 | link, please? | 08:34 |
| 3 | A.    Sure. | 08:34 |
| 4 | Q.    Thank you. | 08:34 |
| 5 | A.    Uh-huh. | 08:34 |
| 6 | Q.    Now other than -- I'll let you make your | 08:34 |
| 7 | note. | 08:34 |
| 8 | Other than this presentation that you gave | 08:34 |
| 9 | yesterday, is the document that is in front of you | 08:34 |
| 10 | and that is marked as Exhibit 93 current with | 08:34 |
| 11 | respect to your education and experience? | 08:34 |
| 12 | A.    No. | 08:35 |
| 13 | Q.    What else is not on that version of your | 08:35 |
| 14 | CV that relates to your education and experience? | 08:35 |
| 15 | A.    I am on a major consulting project right | 08:35 |
| 16 | now, and that's not on the list. | 08:35 |
| 17 | Q.    Okay.  What's that consulting project? | 08:35 |
| 18 | A.    I'm not at liberty to share that with | 08:35 |
| 19 | you because I'm under a confidentiality agreement. | 08:35 |
| 20 | Q.    Well, is it going to go on your CV at | 08:35 |
| 21 | some point? | 08:35 |
| 22 | A.    Perhaps. | 08:35 |
| 23 | Q.    What is the -- without revealing the | 08:35 |
| 24 | client, what is the nature generally of that | 08:35 |
| 25 | consulting project? | 08:36 |

PLAINTIFFS' EXHIBITS 003482

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

                                                                  Page 262
1        A.     The general nature of the consulting          08:36
2    project is to support laboratory and manufacturing       08:36
3    investigation review as a third-party independent.       08:36
4        Q.     When did that start?                          08:36
5        A.     June last year.                               08:36
6        Q.     Of 2010?                                      08:36
7        A.     Yes, sir.                                     08:36
8        Q.     Does that mean that this CV hasn't been       08:36
9    updated since June 2010 or perhaps before then?          08:36
10       A.     I don't know.  I'd have to go back and        08:36
11   look and see when it was last updated.                   08:36
12       Q.     Other than the consulting project and         08:36
13   the presentation you gave yesterday, what -- is          08:36
14   there anything else that's not on this CV that           08:36
15   relates to your experience or your education?            08:36
16       A.     Without going through it line by line, I      08:36
17   do not see my assistant -- excuse me associate           08:37
18   professorship at St. Leo University.                     08:37
19       Q.     Is that a current position?                   08:37
20       A.     It is.                                        08:37
21       Q.     When did it start?                            08:37
22       A.     Sometime I want to say approximately          08:37
23   late spring, early summer of last year.                  08:37
24       Q.     That's St. Leo University?                    08:37
25       A.     Yes, sir.                                     08:38

PLAINTIFFS' EXHIBITS 003483

Page 263

| | | | |
|---|---|---|---|
| 1 | Q. | And it's associate professor? | 08:38 |
| 2 | A. | Yes. | 08:38 |
| 3 | Q. | What general -- | 08:38 |
| 4 | A. | Non-tenured track. | 08:38 |
| 5 | Q. | Okay. Describe that generally. What do | 08:38 |

6   you do, what are your responsibilities as an        08:38

7   associate, non-tenured professor at St. Leo         08:38

8   University?                                          08:38

9        A.    I was one of the distance learning        08:38

10  instructors.                                         08:38

11       Q.    What is distance learning?                08:38

12       A.    Online education.                         08:38

13       Q.    So what is your role and what are your    08:38

14  responsibilities?  What do you do?                   08:38

15       A.    I oversaw and taught via Internet         08:38

16  learning packages provided by the university,        08:38

17  introductory to science class.                       08:38

18       Q.    Any direct interaction with students in   08:38

19  that role?                                           08:38

20       A.    How would you define "direct"?            08:38

21       Q.    Well, did you deal with students          08:38

22  face-to-face or in a classroom setting?              08:38

23       A.    No.                                       08:38

24       Q.    Did you deal with them exclusively via    08:38

25  online contact?                                      08:38

PLAINTIFFS' EXHIBITS 003484

Page 264

| | | | |
|---|---|---|---|
| 1 | A. | No. | 08:38 |
| 2 | Q. | How did you interact with your students? | 08:38 |
| 3 | A. | Online in the course, e-mail and | 08:38 |
| 4 | telephone. | | 08:39 |
| 5 | Q. | And telephone. | 08:39 |
| 6 | | You used or you spoke in the past tense when | 08:39 |
| 7 | you described that position.  Is it ongoing? | | 08:39 |
| 8 | A. | I am -- do have that position within the | 08:39 |
| 9 | organization.  I'm not currently teaching a course | | 08:39 |
| 10 | because of additional workload. | | 08:39 |
| 11 | Q. | Is it your expectation that you will | 08:39 |
| 12 | teach it again in the future? | | 08:39 |
| 13 | A. | Yes. | 08:39 |
| 14 | Q. | Do you believe that the university | 08:39 |
| 15 | shares that expectation? | | 08:39 |
| 16 | A. | I couldn't say. | 08:39 |
| 17 | Q. | Are you being paid by St. Leo University | 08:39 |
| 18 | for -- in any way at the moment? | | 08:39 |
| 19 | A. | At the current moment? | 08:39 |
| 20 | Q. | Yes. | 08:39 |
| 21 | A. | No. | 08:39 |
| 22 | Q. | When did you stop receiving compensation | 08:39 |
| 23 | from St. Leo University? | | 08:39 |
| 24 | A. | When the semester ended. | 08:39 |
| 25 | Q. | Last spring? | 08:39 |

PLAINTIFFS' EXHIBITS 003485

                                                          Page 265

 1      A.    Whenever it was.  I'd have to go back        08:39
 2   and look at that.                                     08:39
 3      Q.    Well, there's two semesters in an            08:39
 4   academic year.                                        08:39
 5      A.    There are several actually, depends,         08:40
 6   distant learning, stuff like that.  I would have      08:40
 7   to go back and look it up.                            08:40
 8      Q.    Give me your best estimate on when that      08:40
 9   semester commenced and ended.                         08:40
10      A.    I really can't tell you when it              08:40
11   started.  When it ended it was I think somewhere      08:40
12   in June.                                              08:40
13      Q.    Of 2010?                                     08:40
14      A.    Yes.                                         08:40
15      Q.    Okay.  Now, as I look at your CV, I want     08:40
16   to go through that a little bit with you.  I see      08:40
17   that your first work experience after you left the    08:40
18   University of Vermont, graduated from the             08:40
19   University of Vermont is with Zeneca; is that         08:40
20   right?                                                08:41
21      A.    Yes.                                         08:41
22      Q.    As an analytical research chemist?           08:41
23      A.    That is correct.                             08:41
24      Q.    And according to your CV, in that role       08:41
25   you developed and validated analytical methods;       08:41

PLAINTIFFS' EXHIBITS 003486

```
                                                          Page 266
 1   right?                                              08:41
 2        A.     That is correct.                        08:41
 3        Q.     Analytical methods describe -- am I     08:41
 4   correct that that generally means the method by     08:41
 5   which laboratory testing is conducted on some       08:41
 6   material that is part of the pharmaceutical --      08:41
 7   part of a pharmaceutical manufacturing process?     08:41
 8        A.     Can you restate that, please?           08:41
 9        Q.     Sure.  When you use the term "analytical 08:41
10   method," am I correct in my understanding that      08:41
11   that means or is used generally to describe the     08:41
12   method by which laboratory testing is conducted on  08:41
13   something, some entity that is part of a            08:41
14   pharmaceutical manufacturing process -- whether     08:42
15   it's finished product or in-process material or     08:42
16   raw material or --                                  08:42
17        A.     Packaging material.                     08:42
18        Q.     Okay.  So analytical method is          08:42
19   developing a testing method; correct?               08:42
20        A.     I'd say that's accurate.                08:42
21        Q.     So your role with Zeneca was entirely in 08:42
22   the laboratory; correct?                            08:42
23        A.     When you say "entirely in the           08:42
24   laboratory," could you define that, please?         08:42
25        Q.     Well did you do any -- you didn't do    08:42
```

PLAINTIFFS' EXHIBITS 003487

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised    February 18, 2011

Page 267

| | |
|---|---|
| 1 | anything it looks like other than perform job | 08:42 |
| 2 | functions related to and around developing, | 08:42 |
| 3 | validating analytical methods; is that accurate? | 08:42 |
| 4 | A.    I don't think that's an accurate | 08:42 |
| 5 | statement, no. | 08:42 |
| 6 | Q.    Well what else did you do other than | 08:42 |
| 7 | work with developing and validating analytical | 08:42 |
| 8 | methods as your CV says? | 08:42 |
| 9 | A.    As it says here, worked closely with | 08:43 |
| 10 | formulation specialists, designed testing | 08:43 |
| 11 | protocols and methods for new dosage forms. | 08:43 |
| 12 | Q.    Okay.  And that is a -- does that have | 08:43 |
| 13 | anything to do with product manufacturing, the | 08:43 |
| 14 | actual physical manufacturing process? | 08:43 |
| 15 | A.    It does. | 08:43 |
| 16 | Q.    How? | 08:43 |
| 17 | A.    There is actually quite of bit of | 08:43 |
| 18 | extensive formulation development and interaction | 08:43 |
| 19 | with the formulators in the initial dosage form | 08:43 |
| 20 | manufacturing. | 08:43 |
| 21 | Q.    Well, what does that have -- | 08:43 |
| 22 | A.    Report it back. | 08:43 |
| 23 | Q.    What does that have to do with tablet or | 08:43 |
| 24 | product manufacturing? | 08:43 |
| 25 | A.    This lays all the basis because this is | 08:43 |

PLAINTIFFS' EXHIBITS 003488

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised              February 18, 2011

Page 268

```
 1   the initial work that's done to get to the final      08:43
 2   validated process in product.                         08:43
 3       Q.    Well, but you're not -- I mean              08:43
 4   Dr. Bliesner your resume says "developing             08:43
 5   analytical methods," not validating manufacturing     08:43
 6   processes.                                            08:43
 7       A.    As part of that process you are             08:43
 8   interacting very closely with the formulators and     08:43
 9   the manufacturing folks to test their products and    08:44
10   be involved in those cross-functional meetings to     08:44
11   make sure that they're hitting what they're           08:44
12   supposed to be hitting and when they have problems    08:44
13   that, you know -- when they're developing             08:44
14   processes, that you are there to provide              08:44
15   additional input and feedback with respect to how     08:44
16   your analyses are reflecting on what they're          08:44
17   doing.                                                08:44
18       Q.    What type of products did Zeneca make       08:44
19   while you were in that job?  Solid oral dose,         08:44
20   liquids, gels?                                        08:44
21       A.    As a company at large?                      08:44
22       Q.    Yeah.                                       08:44
23       A.    Specifically I couldn't -- I'd have to      08:44
24   go back and look, but it covered the broad lanes      08:44
25   of product types and formulations.                    08:44
```

PLAINTIFFS' EXHIBITS 003489

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                            Page 269
 1      Q.    And do you believe it included solid         08:44
 2   oral dose?                                            08:44
 3      A.    That, it did.                                08:44
 4      Q.    Okay.  So they were -- were you involved     08:44
 5   in developing and validating analytical methods       08:44
 6   for tablets?                                          08:44
 7      A.    Yes, sir.                                    08:44
 8      Q.    For Digoxin tablets?                         08:44
 9      A.    No, sir.                                     08:44
10      Q.    Have you ever been involved with any         08:45
11   sort of method development or validation with         08:45
12   respect to Digoxin in any form?                       08:45
13      A.    No, sir.                                     08:45
14      Q.    Your next job with UDL, you described it     08:45
15   as a principal chemist.  And again you indicate --    08:45
16   hold on one moment.  My apologies, Dr. Bliesner,      08:45
17   for the interruption.                                 08:45
18      A.    It's okay.                                   08:45
19      Q.    You indicate that you are responsible       08:45
20   for developing and validating analytical methods.    08:45
21   Tell me what that means.                              08:45
22      A.    As we just talked about being part of a     08:45
23   cross-functional team that supports product          08:45
24   development to determine the best analytical         08:46
25   technique to support the required testing and --     08:46
```

PLAINTIFFS' EXHIBITS 003490

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 270

 1      Q.     Well -- I'm sorry.  Go ahead.                        08:46

 2      A.     And once the method is developed to a                08:46

 3   point where it appears to be validatable, a                    08:46

 4   validation program protocol is developed and then             08:46

 5   validated to prove in fact the method works for                08:46

 6   its intended use.                                              08:46

 7      Q.     And according to resume, your primary                08:46

 8   emphasis was on HPLC method development; is that               08:46

 9   right?                                                         08:46

10      A.     That's correct.                                      08:46

11      Q.     And HPLC stands for high performance                 08:46

12   liquid chromatography; am I correct about that?               08:46

13      A.     Yes, and it also stands for high                     08:46

14   pressure liquid chromatography.  It's a term that             08:46

15   is cross-confused sometimes.  It's now becoming               08:46

16   more popular again.                                            08:46

17      Q.     On your resume --                                    08:46

18      A.     Yes.                                                 08:46

19      Q.     -- what does it mean?                                08:46

20      A.     High performance liquid chromatography.             08:47

21      Q.     And that's a method by which a chemical              08:47

22   analysis is performed on some entity; correct?               08:47

23      A.     How would you define "chemical                       08:47

24   analysis"?                                                     08:47

25      Q.     Well, let me --                                      08:47

PLAINTIFFS' EXHIBITS 003491

                                                              Page 271

1      A.     Uh-huh.                                          08:47

2      Q.     -- ask you, Dr. Bliesner.  What is high          08:47

3   performance liquid chromatography?                        08:47

4      A.     It's a separation technique.                    08:47

5      Q.     Separation of what?                             08:47

6      A.     Components and mixtures.                        08:47

7      Q.     So it is a technique to analyze                 08:47

8   components and mixtures of various drug entities;         08:47

9   correct?                                                  08:47

10     A.     Drug products and also to look for              08:47

11  impurities if you will in actives and drug                08:47

12  products.                                                 08:47

13     Q.     All right.  So it's a lab-based                 08:47

14  function, am I correct?                                   08:47

15     A.     That's correct.                                 08:47

16     Q.     Your next -- the next work experience on        08:47

17  your resume is again for UDL and you're listed as         08:48

18  analytical group leader.  Do you see that on page         08:48

19  3?                                                        08:48

20     A.     I do.                                           08:48

21     Q.     And in that role, you indicate you are          08:48

22  responsible for supervising research chemists.            08:48

23     A.     Yes.                                            08:48

24     Q.     Do you see that?                                08:48

25            Tell me what you did there.                     08:48

PLAINTIFFS' EXHIBITS 003492

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 272

1    A.    I was responsible for the people who          08:48

2    were doing method development and validation and    08:48

3    testing.                                             08:48

4    Q.    Again, a lab-based function?                   08:48

5    A.    Yes, and we also interacted with product      08:48

6    development teams and manufacturing.                 08:48

7    Q.    Okay.  But your primary responsibilities       08:48

8    were in the lab overseeing research chemists who     08:48

9    were doing the -- performing the tasks you just      08:48

10   described; correct?                                  08:48

11   A.    The primary function, yes.                     08:48

12   Q.    The next position you have listed here         08:48

13   is analytical laboratory manager.                    08:49

14   A.    Yes.                                           08:49

15   Q.    You indicate in that role you supervised       08:49

16   day-to-day operation of lab -- analytical lab        08:49

17   personnel in various tasks that you list there.      08:49

18   Do you see that?                                     08:49

19   A.    Including methods validation, routine          08:49

20   analysis, equipment qualification and calibration,   08:49

21   stability and experimental protocol, yes.            08:49

22   Q.    Right.  And again that's a lab-based           08:49

23   position.                                            08:49

24   A.    It is.                                         08:49

25   Q.    And was while you occupied it.                 08:49

PLAINTIFFS' EXHIBITS 003493

Page 273

| | | |
|---|---|---|
| 1 | A.    Yes. | 08:49 |
| 2 | Q.    The next one, Somerset Pharmaceuticals, | 08:49 |
| 3 | director of analytical research and | 08:49 |
| 4 | development/quality control.  You characterize it | 08:49 |
| 5 | as a senior analytical laboratory supervisor. | 08:49 |
| 6 | Is that also a lab-based position? | 08:49 |
| 7 | A.    It is, in addition to interacting | 08:49 |
| 8 | extensively with product development people who -- | 08:50 |
| 9 | some of whom reported to me, clinical trial | 08:50 |
| 10 | material manufacturing, dosage formula | 08:50 |
| 11 | manufacturing, some of who reported to me. | 08:50 |
| 12 | Various different -- it was a small company and | 08:50 |
| 13 | everybody wore a lot of hats.  In this particular | 08:50 |
| 14 | case we did the whole development bailiwick. | 08:50 |
| 15 | Q.    Okay.  But your position was so you | 08:50 |
| 16 | interacted with the product development people. | 08:50 |
| 17 | A.    Some of who reported to me too. | 08:50 |
| 18 | Q.    Okay.  Those are also lab-based | 08:50 |
| 19 | positions; correct? | 08:50 |
| 20 | A.    Not all of them, no. | 08:50 |
| 21 | Q.    What people -- well, did you have any QA | 08:50 |
| 22 | responsibilities? | 08:50 |
| 23 | A.    No.  QA was a separate function outside | 08:50 |
| 24 | the lab. | 08:50 |
| 25 | Q.    And I guess I should go back.  Let's go | 08:50 |

PLAINTIFFS' EXHIBITS 003494

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

```
                                                        Page 274
 1   back to Zeneca.                                       08:50

 2        A.    Okay.                                      08:50

 3        Q.    As an analytical research chemist, any     08:50

 4   QA responsibilities?                                  08:51

 5        A.    No, QA is a separate function.             08:51

 6        Q.    Okay.                                      08:51

 7        A.    Distinct and clear separate function or    08:51

 8   should be.                                            08:51

 9        Q.    And I understand that.                     08:51

10        A.    Uh-huh.                                    08:51

11        Q.    But I need to -- I hope you understand,    08:51

12   Dr. Bliesner, I need to establish certain things      08:51

13   for the record.                                       08:51

14        A.    Absolutely.                                08:51

15        Q.    So with Zeneca -- because as you said QA   08:51

16   is a separate and distinct function from the lab      08:51

17   operations --                                         08:51

18        A.    Uh-huh.                                    08:51

19        Q.    -- which are typically referred to as      08:51

20   quality control; correct?                             08:51

21        A.    No.                                        08:51

22        Q.    Well --                                    08:51

23        A.    Quality control and quality assurance      08:51

24   are two different functions.                          08:51

25        Q.    That's what I meant.                       08:51
```

PLAINTIFFS' EXHIBITS 003495

Page 275

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 08:51 |
| 2 | Q. | Maybe I didn't say that very clearly. | 08:51 |
| 3 | A. | Uh-huh. | 08:51 |
| 4 | Q. | Lab functions are typically within the | 08:51 |

industry referred to as quality control; is that     08:51

correct?                                             08:51

| 7 | A. | That's a fair statement. | 08:51 |
| 8 | Q. | Okay.  And quality assurance -- or QA as | 08:51 |

I've been using that term and as I believe you       08:51

understood when I used that term --                  08:51

| 11 | A. | Uh-huh. | 08:51 |
| 12 | Q. | -- is as you described a separate and | 08:51 |

distinct function totally separate from lab          08:51

testing and quality control; correct?               08:51

| 15 | A. | As an oversight function.  Quality | 08:52 |

assurance itself is integrated into everything,      08:52

including the lab functions you know, review the     08:52

data, integrity of data, method development          08:52

validation.  As far as the title as an oversight,    08:52

as a final signoff and a separate pair of eyes       08:52

with a different reporting structure, that is the    08:52

QA function.                                          08:52

| 23 | Q. | Okay.  At Zeneca -- | 08:52 |
| 24 | A. | Uh-huh. | 08:52 |
| 25 | Q. | -- you had no QA responsibilities; | 08:52 |

PLAINTIFFS' EXHIBITS 003496

Page 276

1   correct?                                          08:52

2       A.    No, but GMP responsibilities that are   08:52

3   oversight by QA.                                  08:52

4       Q.    Dr. Bliesner.                            08:52

5       A.    Yes.                                     08:52

6       Q.    This is what I'm talking about.  I asked  08:52

7   you very succinctly whether you had QA            08:52

8   responsibilities.  If you would answer that       08:52

9   question and only that question, I would          08:52

10  appreciate it; okay?                              08:52

11      Did you have QA responsibilities?             08:52

12      A.    As we define QA -- you and I understand  08:52

13  -- quality assurance, separate function,          08:52

14  oversight, no.                                    08:52

15      Q.    Same question with respect to the next  08:52

16  position you have listed, UDL Laboratories and    08:52

17  principal chemist.  Did you have any QA           08:52

18  responsibilities?                                 08:52

19      A.    As we've defined it, no.                08:53

20      Q.    Same question with respect to the next  08:53

21  UDL position you have as analytical group leader  08:53

22  on your CV.  As we've defined QA responsibilities,  08:53

23  did you have any of those QA responsibilities in  08:53

24  that position?                                    08:53

25      A.    No.                                     08:53

PLAINTIFFS' EXHIBITS 003497

```
                                                      Page 277
 1      Q.    As an analytical laboratory manager for      08:53
 2   Somerset Pharmaceuticals, did you have any QA          08:53
 3   responsibilities?                                      08:53
 4      A.    In the formal sense, as QA as we've           08:53
 5   defined it, no.                                        08:53
 6      Q.    As the director of analytical research        08:53
 7   and development/quality control for Somerset           08:53
 8   Pharmaceuticals, any QA responsibilities?              08:53
 9      A.    No.                                           08:53
10      Q.    Moving to the next entry in your CV,          08:53
11   HPLC, product marketing manager for Restek             08:54
12   Corporation aPparently at Penn State University.       08:54
13   Tell me about that position.                           08:54
14      A.    It was not at Penn State.  It's a state       08:54
15   college.                                               08:54
16      Q.    Is that different?                            08:54
17      A.    Yes.                                          08:54
18      Q.    Is that not Penn State?                       08:54
19      A.    Yes.                                          08:54
20      Q.    My apologies.                                 08:54
21      Tell me about that position.  What did you do?      08:54
22      A.    Initially, I stepped into a business         08:54
23   role, business development role, to assist them in     08:54
24   finding ways to increase their sales of HPLC           08:54
25   products.                                              08:54
```

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 278

1      Q.    Okay.  And do I understand then that          08:54

2   when you took this position with Restek, you            08:54

3   stepped outside the laboratory and the technical        08:54

4   aspect of the pharmaceutical business and               08:55

5   transitioned to a more business and marketing           08:55

6   role?                                                   08:55

7      A.    I don't think that's an accurate               08:55

8   assessment.                                             08:55

9      Q.    Well, why is it not accurate?                  08:55

10     A.    Because the technical aspects all came         08:55

11  with it in addition to business still.                  08:55

12     Q.    I understand.  But your title is product       08:55

13  marketing manager.  And as you described your           08:55

14  responsibilities, you were hired to and did assist      08:55

15  them with trying to increase sales of HPLC              08:55

16  columns; right?                                         08:55

17     A.    I did for a brief period of time.              08:55

18     Q.    And your -- what do you mean by a brief        08:55

19  period of time?  Does that mean you were only           08:55

20  there for five months, is that what you mean?           08:55

21     A.    I only served in that position for five        08:55

22  months.                                                 08:55

23     Q.    And then you transitioned to director of       08:55

24  Restek analytical services?                             08:55

25     A.    I created the position and the title.          08:55

PLAINTIFFS' EXHIBITS 003499

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 279

1      Q.    Okay.  And backing up to your product            08:55

2    marketing manager position.                              08:56

3      A.    Uh-huh.                                          08:56

4      Q.    Did you have any QA responsibilities in          08:56

5    that role?                                               08:56

6      A.    Yes.                                             08:56

7      Q.    Really?                                          08:56

8      A.    For HPLC column manufacturing.                   08:56

9      Q.    You had actual oversight responsibility          08:56

10   for checking the compliance of product                   08:56

11   manufacturing with specifications?                       08:56

12     A.    For HPLC columns.                                08:56

13     Q.    What do you mean by that?  Tell me what          08:56

14   distinction you're making.                               08:56

15     A.    HPLC column is a major component of high         08:56

16   performance liquid chromatography.                       08:56

17     Q.    I understand.                                    08:56

18     A.    We manufactured HPLC columns at Restek.          08:56

19     Q.    Did Restek manufacture any drug                  08:56

20   products?                                                08:56

21     A.    No.                                              08:56

22     Q.    So as director of analytical services,          08:56

23   that position has -- again is not associated with        08:56

24   manufacturing drug products, am I correct?               08:57

25     A.    We did not manufacture products on site.         08:57

PLAINTIFFS' EXHIBITS 003500

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised            February 18, 2011

                                                                 Page 280

1        Q.    Did you have any role or responsibility      08:57

2    for manufacturing -- for any aspect of                 08:57

3    manufacturing any drug product when you were           08:57

4    employed by Restek?                                     08:57

5        A.    I can't say for sure because we              08:57

6    consulted to the industry as well and we may have      08:57

7    performed some consultation with respect to drug       08:57

8    product manufacturers.                                 08:57

9        Q.    Dr. Bliesner, I asked what your              08:57

10   experience was, not the company as a whole.            08:57

11       A.    No, no.  I would have been the one that      08:57

12   would have been providing that consulting to the       08:57

13   manufacturing of drug product.  I don't recall         08:57

14   whether we did or not, but we did provide              08:58

15   consultation in addition to the lab services as        08:58

16   well.  So I can't say definitively that I did or       08:58

17   did not have input into the drug manufacturing         08:58

18   process.                                               08:58

19       Q.    What consultation did you yourself           08:58

20   provide while you were employed by Restek to -- to     08:58

21   drug product manufacturers?                            08:58

22       A.    We were in constant contact with them       08:58

23   because they were our customers for the columns        08:58

24   and the lab services.  So we provided consultation     08:58

25   on many aspects of the drug development process,       08:58

PLAINTIFFS' EXHIBITS 003501

Page 281

1    production, manufacturing.                          08:58

2        Q.    Are you telling me that you were          08:58

3    involved with developing drug products for other    08:58

4    companies while you were employed by Restek?        08:58

5        A.    They were our clients.  We consulted      08:58

6    with them if they needed things.                    08:58

7        Q.    You consulted with them with respect to   08:58

8    various functionality issues of your HPLC columns;  08:58

9    correct?                                            08:58

10       A.    No, not necessarily.  We did contract     08:58

11   work, analytical work and product development work  08:58

12   for them as part of the mission.                    08:58

13       Q.    Well, as part of the mission, as I read   08:58

14   your CV, Dr. Bliesner, that you prepared, it lists  08:59

15   only business functions.  It doesn't say anything   08:59

16   about being involved in drug development            08:59

17   processes, does it?                                 08:59

18       A.    If you look at the director of Restek     08:59

19   Analytical Services, it offers analytical method    08:59

20   development, validation, HPLC, GC, education,        08:59

21   training, customer stationary phase design, CGMP    08:59

22   regulatory services and support.  That's where      08:59

23   that would fall into.                               08:59

24       Q.    And your testimony is that you performed  08:59

25   those functions while you were at Restek?           08:59

PLAINTIFFS' EXHIBITS 003502

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 282

1      A.    Some of them, yes.                          08:59

2      Q.    What do you mean by some of them?           08:59

3      A.    I interacted primarily with the client     08:59

4   as the first line.                                   08:59

5      Q.    You mean you were the first line -- you     09:00

6   were Restek's front line person interacting with    09:00

7   the client.  Is that what you mean by that?          09:00

8      A.    Yes, sir.  For this division, Restek        09:00

9   Analytical Services.                                 09:00

10     Q.    Well, your job duties and                   09:00

11  responsibilities as you described them included     09:00

12  market research, drafting a business plan, and      09:00

13  obtaining funding and approval from Restek.         09:00

14       You go on to describe what Restek does, but    09:00

15  you don't say anything about your -- about you      09:00

16  being involved in any of the analytical method      09:00

17  development consultation, do you?                    09:00

18     A.    If I was to list this here, the document    09:00

19  would be about 25 pages long for all the different  09:00

20  jobs that I've had.                                  09:00

21     Q.    Dr. Bliesner, I'm merely pointing out       09:00

22  that you described your job duties and               09:00

23  responsibilities strictly in a business capacity;   09:00

24  is that right?                                       09:00

25     A.    No, that's not correct.                     09:00

PLAINTIFFS' EXHIBITS 003503

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 283

1        Q.    Your statement on here says that you              09:01

2    were responsible for conception, design, building,          09:01

3    staffing, and qualification of Restek Analytical           09:01

4    Services.                                                   09:01

5        A.    That is correct.                                  09:01

6        Q.    And you go on to say that included               09:01

7    conducting market research, drafting a business            09:01

8    plan, and obtaining funding.                                09:01

9        A.    That is correct.                                  09:01

10       Q.    You don't say anything about interacting         09:01

11   with clients on assisting with development of              09:01

12   analytical methods.                                         09:01

13       A.    As I said, if I put everything down I            09:01

14   did here, the document would be 25 pages long.             09:01

15   This is a summary resume to send out to people.            09:01

16       Could I interrupt for a second, please?               09:01

17       Q.    Would you like to take a break?                  09:01

18       A.    Yes, please.                                      09:01

19          MR. ANDERTON:  Absolutely.                          09:01

20          THE VIDEOGRAPHER:  The time is 9:01 a.m.            09:01

21       We're going off the record briefly.                   09:01

22              (Short break)                                    09:12

23          THE VIDEOGRAPHER:  The time is 9:12 a.m.            09:12

24       We're back on the record.  This is the                 09:13

25       beginning of tape two.                                 09:13

PLAINTIFFS' EXHIBITS 003504

```
                                                      Page 284

 1   BY MR. ANDERTON:                                   09:13

 2       Q.    Dr. Bliesner, -- hey Mike.  Mike?        09:13

 3            MR. KERENSKY:  Yes.                        09:13

 4            MR. ANDERTON:  If you're going to be       09:13

 5       typing --                                       09:13

 6            MR. KERENSKY:  All right.  I'll put it     09:13

 7       back on mute.  Happens all the time.  I'm       09:13

 8       sorry.                                          09:13

 9            MR. ANDERTON:  That's all right.           09:13

10   BY MR. ANDERTON:                                    09:13

11       Q.    All right.  Dr. Bliesner, we were         09:13

12   discussing various things on your resume and we     09:13

13   left off -- or your CV.  We left off with director  09:13

14   of analytical services for Restek.                  09:13

15       A.    Restek, yes.                              09:13

16       Q.    Restek.  Sorry.  And the State College    09:13

17   of Pennsylvania.  The next -- well, let me let me    09:13

18   ask one final question about that position.          09:13

19       The consultation that you described being        09:14

20   involved with in that position was primarily         09:14

21   consultation -- well, was exclusively consultation   09:14

22   related to lab-based activities; correct?            09:14

23       A.    No, I don't think you'd say that           09:14

24   exclusively.  We went into a lot of different         09:14

25   client sites, interacted with groups of folks at     09:14
```

PLAINTIFFS' EXHIBITS 003505

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 285

| | | |
|---|---|---|
| 1 | the client sites which included, you know, product | 09:14 |
| 2 | development, manufacturing types, lab types, | 09:14 |
| 3 | usually looking for a source of additional | 09:14 |
| 4 | information in addition to solving problems. | 09:14 |
| 5 | Q.    Primarily lab-based activities that you | 09:14 |
| 6 | were giving consultation on? | 09:14 |
| 7 | A.    I wouldn't say primarily. | 09:14 |
| 8 | Q.    Well, you sold -- | 09:14 |
| 9 | A.    It was very broad-based in our approach | 09:14 |
| 10 | in how we were trying to line up customers. | 09:14 |
| 11 | Q.    Well, you sold HPLC columns; right? | 09:14 |
| 12 | A.    And services. | 09:15 |
| 13 | Q.    And what type of services?  What do you | 09:15 |
| 14 | mean by services? | 09:15 |
| 15 | A.    That's what Restek Analytical Services | 09:15 |
| 16 | was all about.  It wasn't just about selling HPLC | 09:15 |
| 17 | columns.  It was about selling contract analytical | 09:15 |
| 18 | services and providing consulting services -- GMP | 09:15 |
| 19 | training, those types of things -- to the industry | 09:15 |
| 20 | so they could partner with us and be interested in | 09:15 |
| 21 | buying the columns and we would validate the | 09:15 |
| 22 | methods. | 09:15 |
| 23 | Q.    Analytical services again relates to lab | 09:15 |
| 24 | functions; right? | 09:15 |
| 25 | A.    It wasn't necessarily all analytical | 09:15 |

PLAINTIFFS' EXHIBITS 003506

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 286

| | | |
|---|---|---|
| 1 | services because there was formulation development | 09:15 |
| 2 | discussions that went on in there as well. | 09:15 |
| 3 | Q.    When you left Restek and went to work -- | 09:15 |
| 4 | the next position listed on your CV is | 09:15 |
| 5 | vice-president of operations for Laboratory | 09:15 |
| 6 | Management Systems in New Castle, Delaware. | 09:15 |
| 7 | A.    That's correct. | 09:15 |
| 8 | Q.    According to your CV, you created and | 09:16 |
| 9 | drove sales and marketing plans; is that right? | 09:16 |
| 10 | A.    As one part of my responsibilities, yes. | 09:16 |
| 11 | Q.    What else did you do? | 09:16 |
| 12 | A.    Primary responsibility took up the | 09:16 |
| 13 | lion's share of the time as I was an active | 09:16 |
| 14 | consultant with the Wyeth and Schering Plough | 09:16 |
| 15 | consent decrees. | 09:16 |
| 16 | Q.    Doing what? | 09:16 |
| 17 | A.    Being part of the FDA-mandated | 09:16 |
| 18 | third-party expert contingent consult, where we | 09:16 |
| 19 | went in and did very detailed, thorough | 09:16 |
| 20 | assessments, documented the findings, developed | 09:16 |
| 21 | corrective actions and went back in and did | 09:16 |
| 22 | verification and then backed the actions that had | 09:16 |
| 23 | been put into place that were stable -- were | 09:16 |
| 24 | verifiable and sustainable from a quality systems | 09:16 |
| 25 | standpoint. | 09:16 |

PLAINTIFFS' EXHIBITS 003507

```
                                                    Page 287

 1      Q.     Wyeth and who else?                    09:16

 2      A.     Schering Plough.                        09:16

 3      Q.     Schering Plough.  Both were under       09:16

 4   consent decrees?                                  09:16

 5      A.     They were.                              09:17

 6      Q.     Did you visit both of those companies   09:17

 7   while you were employed by Laboratory Management  09:17

 8   Systems?                                          09:17

 9      A.     When you say "visit," they're very large 09:17

10   organizations that have many different sites.     09:17

11      Q.     Did you visit any of them?              09:17

12      A.     Yes, sir.                               09:17

13      Q.     For both companies?                     09:17

14      A.     Yes, sir.                               09:17

15      Q.     And --                                  09:17

16      A.     The visit actually was on site          09:17

17   extensively for some of them.                     09:17

18      Q.     And so you were part of what I'll       09:17

19   characterize as the remediation activities for    09:17

20   both of those companies?                          09:17

21      A.     I wouldn't characterize it as such.     09:17

22      Q.     What's wrong with my term remediation   09:17

23   activities?                                       09:17

24      A.     Remediation assumes that you've already 09:17

25   found everything that was wrong.                  09:17
```

PLAINTIFFS' EXHIBITS 003508

Page 288

| | | |
|---|---|---|
| 1 | Q.    Okay.  But there were certainly | 09:17 |
| 2 | remediation activities. | 09:17 |
| 3 | A.    That followed, yes. | 09:17 |
| 4 | Q.    Well, if you're under a consent decree, | 09:17 |
| 5 | there are certain things that have already been | 09:17 |
| 6 | identified; right? | 09:17 |
| 7 | A.    The FDA would have found and documented | 09:17 |
| 8 | through 483s, warning letters, and presented an | 09:17 |
| 9 | EIR, continuing deficiencies, yes. | 09:18 |
| 10 | Q.    And tell me about the process that | 09:18 |
| 11 | you -- and let's ask first about Wyeth. | 09:18 |
| 12 | A.    Uh-huh. | 09:18 |
| 13 | Q.    Tell me about the process that you | 09:18 |
| 14 | followed as you provided consulting services to | 09:18 |
| 15 | them to help them address the issues that were | 09:18 |
| 16 | raised by the consent decree and the underlying | 09:18 |
| 17 | regulatory activities that resulted in that | 09:18 |
| 18 | consent decree. | 09:18 |
| 19 | A.    Okay. | 09:18 |
| 20 | Q.    What process did you follow? | 09:18 |
| 21 | A.    As a global? | 09:18 |
| 22 | Q.    Yeah, generally. | 09:18 |
| 23 | A.    Generally. | 09:18 |
| 24 | Q.    And then I'll ask more specific | 09:18 |
| 25 | questions based on your response. | 09:18 |

PLAINTIFFS' EXHIBITS 003509

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 289

```
 1      A.     First of all, each consent decree as I'm       09:18
 2   sure you know is an individually negotiated plan.        09:18
 3      Q.     Understood.                                    09:18
 4      A.     In the Wyeth consent decree, we first          09:18
 5   came in and did very detailed assessments of the         09:18
 6   major quality system elements.                           09:18
 7      Q.     Which involved what?                           09:18
 8      A.     Going into individual departments --           09:19
 9   laboratories, manufacturing areas, packaging             09:19
10   areas -- usually in teams of two people and asking       09:19
11   questions, performing interviews, looking at data,       09:19
12   looking at protocols, the whole plethora of              09:19
13   activities for each one of the quality system            09:19
14   elements.  Document them.                                09:19
15      Q.     Looking at data and looking at                 09:19
16   protocols, two things that you identified in that        09:19
17   response.  What do each of those mean?  Looking at       09:19
18   what type of data, looking at what type of               09:19
19   protocols?                                               09:19
20      A.     It really depended because it was a huge       09:19
21   organization and addressed many different                09:19
22   components.  So you would be assigned a department       09:19
23   for instance that you could go in on for a               09:19
24   particular week and you would determine their work       09:19
25   flow, how they conducted business, how they              09:19
```

PLAINTIFFS' EXHIBITS 003510

Page 290

```
 1   documented things, how data was collected, and you      09:19
 2   would go soup to nuts, systematic approach,             09:19
 3   looking through to see if they, in fact, had            09:19
 4   quality systems or any systems in place, whether        09:20
 5   they had procedures in place, whether people were       09:20
 6   trained and just in a laboratory notebook document      09:20
 7   all these findings and go back and write them up        09:20
 8   as findings from the assessment, very similar to        09:20
 9   what the FDA would do on a 483.  A very extensive,      09:20
10   heavy-duty process.                                     09:20
11       That was only the first part.                       09:20
12       Q.    What was the second part?                     09:20
13       A.    The second part was a compilation of all      09:20
14   of the findings into a report.                          09:20
15       Q.    The findings meaning your analysis of         09:20
16   the data as you described it and protocols that         09:20
17   you reviewed and all the other information that         09:20
18   you reviewed.                                           09:20
19       A.    Systems in general; okay?  Quality            09:20
20   system, laboratory control system, product system,     09:20
21   packaging, labeling, all of those different            09:20
22   things.  You know, it was a detailed assessment        09:20
23   and that would include reviewing training records      09:20
24   for instance for the individuals that are there,       09:20
25   looking at, you know, production records.               09:20
```

PLAINTIFFS' EXHIBITS 003511

Page 291

1    Everything you would imagine that constitutes a          09:21
2    modern pharmaceutical manufacturing system -- down       09:21
3    to excruciating details.                                 09:21
4         Q.    That was all part of your consulting?         09:21
5         A.    Yes.  We had a 150 people team initially      09:21
6    on the one site with Wyeth.                              09:21
7         Q.    How long did that process take?               09:21
8         A.    The initial assessment?                       09:21
9         Q.    Yes.                                          09:21
10        A.    The initial site where we started --          09:21
11   it's been a long time.  The assessment ran               09:21
12   somewhere in the neighborhood of approximately           09:21
13   three months.                                            09:21
14        Q.    With 150 people on site for three             09:21
15   months?                                                  09:21
16        A.    Absolutely.                                   09:21
17        Q.    150 laboratory management systems             09:21
18   employees on Wyeth's site for three months?              09:21
19        A.    We were subcontractors as part of a           09:21
20   team.                                                    09:22
21        Q.    Okay.  As you performed that                  09:22
22   assessment.                                              09:22
23        A.    Uh-huh.                                       09:22
24        Q.    That's a correct term?                        09:22
25        A.    Yes.                                           09:22

PLAINTIFFS' EXHIBITS 003512

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

```
                                                    Page 292
 1      Q.    Is that the same thing as an audit?       09:22
 2      A.    I don't think I would define it like      09:22
 3   that, but...                                        09:22
 4      Q.    Well --                                    09:22
 5      A.    It's the same process, yeah.               09:22
 6      Q.    Okay.  So if I describe the process that   09:22
 7   you just described.                                 09:22
 8      A.    Uh-huh.                                    09:22
 9      Q.    150 people on site for three months,       09:22
10   soup to nuts, virtually everything you can think    09:22
11   of with respect to a manufacturing and production   09:22
12   process.                                            09:22
13      A.    Uh-huh.                                    09:22
14      Q.    That's an accurate description of what     09:22
15   you guys -- the activity you undertook.             09:22
16      A.    Everything.  All of the components of      09:22
17   the quality systems that constituted that.          09:22
18      Q.    So if I described that process as an       09:22
19   audit, would that be an accurate or a fair          09:22
20   characterization?                                   09:22
21      A.    Perhaps.  There's confusion in the         09:23
22   industry in general about what's an assessment,     09:23
23   what's a self-assessment, what's an audit, what's   09:23
24   an inspection, so...                                09:23
25      Q.    I understand.                              09:23
```

PLAINTIFFS' EXHIBITS 003513

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 293

1      A.     Yes.                                            09:23

2      Q.     I'm asking you.                                 09:23

3      A.     To me, personally?                              09:23

4      Q.     Yes.                                            09:23

5      A.     An audit is a like the agency coming in         09:23

6    and doing something from the outside.  It's not          09:23

7    necessarily open and collaborative.  This                09:23

8    assessment was full disclosure from all employees        09:23

9    and everything.  You know, sit down, tell us             09:23

10   what's wrong, tell us everything that's there, you       09:23

11   know, everybody volunteering information.  I             09:23

12   consider that to be different than an audit.             09:23

13     Q.     Well, when you -- so you then used the          09:23

14   term audit and believe it is best used only to          09:23

15   apply to a -- a -- I guess I'll characterize that       09:23

16   as third-party or just the FDA?  I mean I'm not          09:24

17   sure I understand the distinction.                       09:24

18     A.     And to be perfectly honest with you,           09:24

19   there's confusion in the industry too.  So I don't      09:24

20   know if your statement is the best description of        09:24

21   it.                                                      09:24

22     Q.     Well, then I mean what is -- what is the       09:24

23   difference between an audit and the assessment          09:24

24   that you just described?                                 09:24

25     A.     An audit, in my experience, they usually       09:24

PLAINTIFFS' EXHIBITS 003514

```
                                                        Page 294
 1   come in the form of a corporate entity, quality         09:24

 2   assurance coming down to a specific site and            09:24

 3   performing a compliance assessment that's an audit      09:24

 4   to try to determine stuff.                              09:24

 5       When corporate comes down to a site, it isn't       09:24

 6   necessarily a free and open sharing of things with      09:24

 7   individuals because it's corporate.  So that is         09:24

 8   how audits work per se.                                 09:24

 9       An assessment is when -- I've actually just         09:24

10   recently finished a very extensive one where we         09:24

11   would sit down and it's full, open, and honest          09:24

12   disclosure, everybody is laying things out because      09:24

13   you really want to get to the root cause during an      09:24

14   assessment, self-assessment, to find out what's         09:25

15   broken and what potential corrective actions may        09:25

16   be and how to implement corrective and preventive       09:25

17   actions and verify the actions, collecting these        09:25

18   data, all the things we've described.                   09:25

19       Q.   So then as you understand and use, as          09:25

20   you used the term audit, does that mean you don't       09:25

21   think it's -- that there's as much disclosure and       09:25

22   openness when an audit is being conducted?              09:25

23       A.   I would say that's a fair assessment,          09:25

24   yes.  Because people volunteer information during       09:25

25   an assessment, but if the FDA comes in to do an         09:25
```

PLAINTIFFS' EXHIBITS 003515

Page 295

1   audit, people don't volunteer information.                    09:25

2        Q.    Well, if corporate comes in to do an              09:25

3   audit, they volunteer information don't they,                 09:25

4   typically?                                                    09:25

5        A.    It's restrained in my experience.                 09:25

6        Q.    Do you feel that the people who are the           09:25

7   subject of either an assessment or an audit make             09:25

8   that type of distinction or do they kind of look             09:25

9   at it as though it's corporate or the FDA or a               09:25

10  third party asking questions about what they do              09:26

11  and how they do it?                                           09:26

12       A.    I don't know if I really understand the           09:26

13  question.                                                     09:26

14            MR. ANDERTON:  Can you read that back,             09:26

15       Phil.                                                    09:26

16            THE WITNESS:  I think there's a couple of          09:26

17       questions in there.  I think people in                  09:26

18       general -- again, confusion on terms.  We'll            09:26

19       use my definition audit, a third party coming           09:26

20       in or a corporate entity, something like that,          09:26

21       as opposed to assessment, being                         09:26

22       self-assessment you want to uncover                     09:26

23       everything.  Those two distinctions.  I think           09:26

24       people respond to audits and assessments,               09:26

25       self-assessments differently, yes.  And the             09:26

PLAINTIFFS' EXHIBITS 003516

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 296

| | | |
|---|---|---|
| 1 | reason for that is that audits -- corporate, | 09:26 |
| 2 | FDA or whatever -- obviously carry tremendous | 09:27 |
| 3 | consequences. | 09:27 |
| 4 | BY MR. ANDERTON: | 09:27 |
| 5 | Q.    Okay.  When you performed this | 09:27 |
| 6 | assessment of Wyeth with 150 people on site for | 09:27 |
| 7 | three months. | 09:27 |
| 8 | A.    About three months. | 09:27 |
| 9 | Q.    Okay.  Fair enough. | 09:27 |
| 10 | A.    And there are several other sites that | 09:27 |
| 11 | were involved as well. | 09:27 |
| 12 | Q.    Fair enough.  Well, when your team | 09:27 |
| 13 | performed this assessment that lasted | 09:27 |
| 14 | approximately three months at various locations of | 09:27 |
| 15 | Wyeth and you did your soup to nuts review, did | 09:27 |
| 16 | you have access to any information that you | 09:27 |
| 17 | wanted? | 09:27 |
| 18 | A.    By agreement and communication with the | 09:27 |
| 19 | company, the official position was yes, we were to | 09:27 |
| 20 | have access to any information we wished. | 09:27 |
| 21 | Q.    And by that you mean that was a | 09:27 |
| 22 | condition of you doing the assessment because it's | 09:27 |
| 23 | necessary to do it properly? | 09:27 |
| 24 | A.    That's correct. | 09:28 |
| 25 | Q.    And that's typical when you do that type | 09:28 |

PLAINTIFFS' EXHIBITS 003517

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 297

 1    of assessment; correct?  You need to have full            09:28

 2    access to whatever documents you think are                09:28

 3    necessary and appropriate in order to properly            09:28

 4    perform an assessment as you've described; is that        09:28

 5    right?                                                    09:28

 6        A.    "Typical" is a very broad term.  I don't        09:28

 7    know if I'd necessarily use it.  Because, again,          09:28

 8    each consent decree as you know is negotiated             09:28

 9    differently and may involve certain departments           09:28

10    within the larger company that may or may not             09:28

11    necessarily be involved with the consent decree or        09:28

12    initially involved in the consent decree for              09:28

13    example.                                                  09:28

14        Q.    The consent decree --                           09:28

15        A.    Yes.                                            09:28

16        Q.    -- or if it's another regulatory                09:28

17    document is a starting point for the assessment;          09:28

18    correct?                                                  09:28

19        A.    When you say "another regulatory                09:28

20    document."                                                09:28

21        Q.    Might be a 483, might be a warning              09:28

22    letter.  You've done consulting engagements where        09:28

23    the company wasn't involved in a negotiated               09:29

24    consent decree; correct?                                 09:29

25        A.    That's correct.                                09:29

PLAINTIFFS' EXHIBITS 003518

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                    Page 298
 1      Q.    And sometimes you're doing an assessment      09:29
 2   based on an FDA warning letter; correct?               09:29
 3      A.    Or a preparation for a preapproval            09:29
 4   inspection for FDA, another example.                   09:29
 5      Q.    But to answer my question, it's true          09:29
 6   that you've done assessments where a company           09:29
 7   receives a warning letter, they hire you or people     09:29
 8   that you work with and for and they ask you to do      09:29
 9   what you've described as an assessment on the          09:29
10   basis of that warning letter; is that true?            09:29
11      A.    That is correct, yes.                          09:29
12      Q.    All right.  And have you also done            09:29
13   assessments on the basis of FDA 483s?                   09:29
14      A.    Specifically 483s?                             09:29
15      Q.    Yeah.                                          09:29
16      A.    No.                                            09:29
17      Q.    Okay.  When you -- when you do those --       09:29
18   and I believe last time you testified that you've      09:29
19   done about five -- and I think the term that you       09:29
20   used was audit rather than assessment, you've done     09:30
21   about five GMP compliance audits in your career.       09:30
22   Does that sound about right?                           09:30
23      A.    Let me think about it for a second.           09:30
24      Q.    Take your time.                                09:30
25      A.    Yeah, about five or six.                       09:30
```

PLAINTIFFS' EXHIBITS 003519

Page 299

```
 1      Q.    Back to the assessments that you said      09:31
 2   you've done for or on the basis of an FDA warning   09:31
 3   letter.  When you undertook those engagements, was  09:31
 4   it also a condition of your engagement that you      09:31
 5   would have access to the documents you and your      09:31
 6   team felt were necessary to review in order to       09:31
 7   conduct the assessment?                              09:31
 8      A.    In the circumstance where it was just a     09:31
 9   warning letter, the project did not start out as     09:31
10   we're bringing you in to do an assessment.  It       09:31
11   evolved into that.                                   09:31
12      Q.    And when it did --                          09:31
13      A.    Yes.                                        09:31
14      Q.    -- did you insist on having full access     09:31
15   to the documents you deemed necessary to properly    09:32
16   conduct your assessment?                             09:32
17      A.    We didn't insist.  We just expected         09:32
18   because it was the next evolution for the client     09:32
19   to ask for it that we would have what we needed.     09:32
20      Q.    Would you do an assessment if a             09:32
21   potential client said no, we're not going to give    09:32
22   you access to certain documents?  Production         09:32
23   records for example.                                 09:32
24      A.    Would we do the assessment?                 09:32
25      Q.    Yeah.                                       09:32
```

PLAINTIFFS' EXHIBITS 003520

Page 300

1      A.      Depends on what the client wants out of      09:32
2    the assessment.                                        09:32
3      Q.      Well, if a client hired you to assess        09:32
4    GMP compliance.                                        09:32
5      A.      Okay.  In general.                           09:32
6      Q.      Yes.                                         09:32
7      A.      Uh-huh.                                      09:32
8      Q.      And said I'm not going to -- I want you      09:32
9    to do it without looking at production records,        09:32
10   would you do that?                                     09:32
11     A.      If it was to be a comprehensive review       09:32
12   of compliance with the GMPs using a quality            09:32
13   systems based approach, we would inform the client     09:32
14   that unless we had access to those records, that       09:32
15   they wouldn't be getting what they were asking         09:33
16   for.                                                   09:33
17     Q.      So they wouldn't be getting a                09:33
18   comprehensive, accurate assessment of GMP              09:33
19   compliance?                                            09:33
20     A.      Any my opinion, if they did not give         09:33
21   open access to the records, yes.                       09:33
22     Q.      To the production records.  That's the       09:33
23   records I was talking about.                           09:33
24     A.      Well, specifically -- it depends what        09:33
25   the client wants; okay?  If the client wants the       09:33

PLAINTIFFS' EXHIBITS 003521

Page 301

```
 1    whole thing, then access to production records         09:33
 2    would probably be something you would want to have     09:33
 3    access to.                                             09:33
 4        Q.    And I want -- I guess I want to make         09:33
 5    sure this is clear because I was talking about         09:33
 6    production records.                                    09:33
 7        A.    Okay.  I misunderstood you.                  09:33
 8        Q.    I said it -- I thought I said it pretty      09:33
 9    clearly.                                               09:33
10        A.    Sorry.                                       09:33
11        Q.    If a client hired you to assess its         09:33
12    general GMP compliance.                                09:33
13        A.    Right.                                       09:33
14        Q.    And said, I don't want to give you -- I,    09:33
15    client, don't want to give you access to the          09:33
16    production records, you can do it from other          09:33
17    records, could you properly do that?                   09:33
18        A.    If it was a -- included an assessment of    09:33
19    the production system?                                 09:33
20        Q.    Yes.                                         09:33
21        A.    No, you couldn't.                            09:34
22        Q.    Couldn't do it?                              09:34
23        A.    In my opinion, no.                           09:34
24        Q.    Okay.  In your work experience, have you    09:34
25    ever worked in manufacturing?                          09:34
```

PLAINTIFFS' EXHIBITS 003522

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

                                                              Page 302

 1      A.    On the floor in manufacturing?              09:34

 2      Q.    Yes.                                        09:34

 3      A.    During product development, yes.            09:34

 4      Q.    What did you do?                            09:34

 5      A.    Helped troubleshoot a fluid bed dryer.      09:34

 6      Q.    Tell me more about that.                    09:34

 7      A.    I was, had one of my individuals at the     09:34

 8  Somerset facility.  He was working with a Glatt,      09:34

 9  G-L-A-T-T.  It's a fluid bed coater if you will.      09:34

10  And he was having a lot of problems with it and       09:34

11  everything else and asked me if I would come in       09:35

12  and watch him go through the process and if I         09:35

13  could offer any suggestions on how to correct it.     09:35

14      Q.    Okay.  Have you ever actually -- other      09:35

15  than a support functionality as, you know, since      09:35

16  it's troubleshooting like that --                     09:35

17      A.    Uh-huh.                                     09:35

18      Q.    -- have you ever actually had daily         09:35

19  responsibilities in the manufacturing context?       09:35

20      A.    No.                                         09:35

21      Q.    In a packaging context?                     09:35

22      A.    As in a production environment package?     09:35

23      Q.    Yes.                                        09:35

24      A.    No.                                         09:35

25      Q.    In a QA context.  Have you ever been        09:35

PLAINTIFFS' EXHIBITS 003523

Page 303

| | | |
|---|---|---|
| 1 | directly in the QA operation or functionality? | 09:35 |
| 2 | A. As we defined it for QA? | 09:35 |
| 3 | Q. Yes. | 09:35 |
| 4 | A. Separate oversight? | 09:35 |
| 5 | Q. Yeah. | 09:35 |
| 6 | A. No. | 09:35 |
| 7 | Q. Do you have a copy of your report, | 09:36 |
| 8 | Dr. Bliesner? | 09:36 |
| 9 | A. I do. | 09:36 |
| 10 | Q. All right. Why don't you get it in | 09:36 |
| 11 | front of you -- | 09:36 |
| 12 | A. Okay. | 09:36 |
| 13 | Q. -- please. And, Mike, this is Exhibit | 09:36 |
| 14 | 92. I believe is the version we were looking at | 09:36 |
| 15 | last time. | 09:36 |
| 16 | A. Now, this is my personal version so I | 09:36 |
| 17 | don't have a copy of the 92 that you're working | 09:36 |
| 18 | off of. | 09:36 |
| 19 | Q. Well, let's make sure, then. | 09:36 |
| 20 | A. I know there was a couple of page | 09:36 |
| 21 | discrepancies before. | 09:36 |
| 22 | Q. I understand. So we're going to hand | 09:36 |
| 23 | you a copy of Exhibit 92. | 09:36 |
| 24 | A. Okay. | 09:36 |
| 25 | Q. Turn to page -- well, what is my page. | 09:36 |

PLAINTIFFS' EXHIBITS 003524

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                                    Page 304

 1      A.     It's 92.  We should be okay now.              09:37

 2      Q.     Okay.  Fair enough.  Yeah, these should       09:37

 3   be the same actually.                                  09:37

 4      A.     Yes.                                          09:37

 5      Q.     So.                                           09:37

 6      A.     It was just there was two different          09:37

 7   exhibits before and they were a page off because       09:37

 8   of formatting or something like that.                  09:37

 9      Q.     Okay.                                         09:37

10      A.     With respect to my format.                   09:37

11      Q.     So turn to page 21.                          09:37

12      A.     Okay.                                         09:37

13      Q.     And paragraph number 8 on page 21 which      09:37

14   has the heading "conclusions."                         09:37

15      Do you see that?                                    09:37

16      A.     Yes.                                          09:37

17      Q.     And in that paragraph, you issue, I          09:37

18   guess, your opinion in this case; is that              09:37

19   accurate?                                              09:37

20      A.     It is my opinion based on the documents      09:37

21   I reviewed.                                            09:37

22      Q.     Okay.  And your opinion is that              09:37

23   adulterated drug product made it to the                09:38

24   marketplace.                                           09:38

25      Is that a fair characterization of your             09:38

PLAINTIFFS' EXHIBITS 003525

Page 305

```
 1  opinion?                                         09:38

 2      A.    We know it did because the pharmacist  09:38

 3  found product that was double-thick.             09:38

 4      Q.    Well, when you give that response, are 09:38

 5  you talking about the 2004 circumstances where a 09:38

 6  pharmacist reported a double-thick tablet?       09:38

 7      A.    I'd have to go back through and take a  09:38

 8  look.                                            09:38

 9      Q.    Please do.                             09:38

10      A.    Do you have a sticky by chance?        09:40

11      Q.    Yes.  I don't but?                     09:40

12          MS. DREWES:  I do.                       09:40

13          THE WITNESS:  Can I have?                09:40

14          MS. DREWES:  Sure.                       09:40

15          THE WITNESS:  Bunches of them, please.   09:40

16          MS. DREWES:  Here.                       09:40

17          THE WITNESS:  Just to make sure.  Else   09:40

18      you know me, I'll be writing all over this   09:40

19      thing.                                       09:40

20  BY MR. ANDERTON:                                 09:46

21      Q.    Dr. Bliesner, are you re-reading your  09:46

22  report?                                          09:46

23      A.    No, I'm just being careful, make sure  09:46

24  that I pull out the information that you wanted.  09:46

25      Q.    Well, I asked you what you were        09:46
```

PLAINTIFFS' EXHIBITS 003526

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

Page 306

1     referring to when you said "we know."                09:46

2         A.    Uh-huh.                                      09:46

3         Q.    "Product made it to market."                09:46

4         A.    Uh-huh.  And you asked me to identify       09:46

5     all those circumstances in the report so that's       09:46

6     what I'm doing.  Would you like me to stop?           09:46

7         Q.    Well, how many do you think there are?      09:46

8         A.    I'm going to finish reviewing the report    09:46

9     and then I'll tell you.                                09:46

10        Q.    Answer my question.  How many do you        09:46

11    think there are?                                       09:46

12        A.    I'm not going to say off the top of my      09:46

13    head.                                                  09:46

14        Q.    Did you -- did you prepare for this         09:46

15    deposition, Dr. Bliesner?                              09:46

16        A.    Today?                                       09:46

17        Q.    Yes.                                         09:46

18              MR. KERENSKY:  Mike, that's an              09:46

19        unnecessary question.  You don't have to          09:46

20        answer that, Mr. Bliesner.                         09:46

21              MR. ANDERTON:  Are you instructing him      09:46

22        not to answer that, Mike?                          09:46

23              MR. KERENSKY:  He's not because that's an   09:46

24        unprofessional question.                           09:46

25              MR. ANDERTON:  Are you instructing him      09:46

PLAINTIFFS' EXHIBITS 003527

```
                                                  Page 307
 1     not to answer?                                09:46
 2         MR. KERENSKY:  Yes.  What you're doing --  09:46
 3         MR. ANDERTON:  On what basis?              09:46
 4         MR. KERENSKY:  Change the question, Mike.  09:46
 5         MR. ANDERTON:  On what basis are you       09:47
 6     instructing him not to answer?                09:47
 7         MR. KERENSKY:  Because it's harassing.     09:47
 8         MR. ANDERTON:  I'm not harassing him.      09:47
 9     I'm asking him -- I'm going to get into this   09:47
10     line of questioning whether at this moment or  09:47
11     some other time.  I'm allowed to inquire what  09:47
12     he did to prepare.                             09:47
13         MR. KERENSKY:  All right.  Maybe a later   09:47
14     time when you're actually asking those         09:47
15     questions we'll answer that question.          09:47
16         MR. ANDERTON:  No, Mike, you cannot        09:47
17     instruct a witness not to answer because you   09:47
18     don't like the timing of the question.         09:47
19         MR. KERENSKY:  Yes, I can.                 09:47
20         MR. ANDERTON:  No, you cannot.             09:47
21         MR. KERENSKY:  Let him finish answering    09:47
22     the question you've asked.                     09:47
23         MR. ANDERTON:  I'm asking a different      09:47
24     question now.  Dr. Bliesner --                 09:47
25         THE WITNESS:  Can I get some water?        09:47
```

PLAINTIFFS' EXHIBITS 003528

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised              February 18, 2011

Page 308

1          MR. ANDERTON:  Yes, you may get some          09:47
2      water.  Let's go off the record for a moment.     09:47
3          THE VIDEOGRAPHER:  The time is 9:47 a.m.      09:47
4      We're going off the record briefly.               09:47
5              (Short break)                             09:48
6          THE VIDEOGRAPHER:  The name is 9:48 a.m.      09:48
7      We are back on the record.                        09:48
8  BY MR. ANDERTON:                                      09:48
9      Q.   Dr. Bliesner, I'm going to let you           09:48
10  continue your review, but I'm going to briefly ask   09:48
11  you a few questions.                                 09:48
12      Did you prepare for this deposition today?       09:48
13      A.   Some.                                       09:48
14      Q.   What did you do to prepare?                 09:48
15      A.   At Mike's suggestion I took all of the      09:48
16  boxes and stuff that were disorganized from the      09:48
17  last deposition -- but I did nothing with them --    09:48
18  and put them in order.                               09:48
19      Q.   Did you do anything else besides            09:48
20  organize your boxes?                                 09:48
21      A.   Reviewed the report.                        09:48
22      Q.   You did review the report?                  09:48
23      A.   Uh-huh.                                     09:49
24      Q.   When did you do that?                       09:49
25      A.   This morning.                               09:49

PLAINTIFFS' EXHIBITS 003529

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 309

| 1 | Q. | This morning? | 09:49 |
|---|---|---|---|
| 2 | A. | Uh-huh. | 09:49 |

1     Q.     This morning?                              09:49

2     A.     Uh-huh.                                    09:49

3     Q.     When you got here at 7:30 or so?           09:49

4     A.     Uh-huh.                                    09:49

5     Q.     What time did you get up to review your    09:49

6   report this morning?                               09:49

7     A.     I woke up at 3:30 this morning.            09:49

8     Q.     Do you typically wake up at 3:30?          09:49

9     A.     Unfortunately I have to say this, but      09:49

10  yes, I do.                                          09:49

11    Q.     It is unfortunate.                         09:49

12    A.     Middle age.                                09:49

13    Q.     Did you -- did you review the entire       09:49

14  report this morning?                                09:49

15    A.     No.                                        09:49

16    Q.     Well, what parts of it did you review      09:49

17  and what the purpose of your reviewing the report   09:49

18  this morning, what were you looking for?            09:49

19    A.     Just glancing through, familiarize         09:49

20  myself with some of the attachments.                09:49

21    Q.     Before organizing -- other than            09:49

22  organizing your boxes and reading your report this  09:49

23  morning, what else did you do to prepare for this   09:49

24  deposition today?                                   09:49

25    A.     Preparation, that was it.  I didn't do     09:50

PLAINTIFFS' EXHIBITS 003530

David M. Bliesner, Ph.D., Volume II        Videotaped - Revised                    February 18, 2011

|  |  |  |
|---|---|---|
|  |  | Page 310 |
| 1 | much at all. | 09:50 |
| 2 | Q.    Didn't do much at all.  Did you meet | 09:50 |
| 3 | with any of the lawyers for the Plaintiffs in this | 09:50 |
| 4 | litigation Mr. Kerensky, Miss Johnson, any of | 09:50 |
| 5 | those lawyers? | 09:50 |
| 6 | A.    When you say "meet." | 09:50 |
| 7 | Q.    Did you meet with them in person? | 09:50 |
| 8 | A.    No. | 09:50 |
| 9 | Q.    Did you speak to them on the telephone? | 09:50 |
| 10 | A.    I spoke with them but it didn't have | 09:50 |
| 11 | much to do with prep. | 09:50 |
| 12 | Q.    Did you speak to them on the telephone? | 09:50 |
| 13 | A.    I did speak with Miss Johnson. | 09:50 |
| 14 | Q.    Miss Johnson? | 09:50 |
| 15 | A.    Yeah, briefly, and confirmed with | 09:50 |
| 16 | Mike -- I can never pronounce. | 09:50 |
| 17 | Q.    Kerensky. | 09:50 |
| 18 | A.    Kerensky, yeah. | 09:50 |
| 19 | MR. ANDERTON:  I got your back, Mike. | 09:50 |
| 20 | MR. KERENSKY:  Got it. | 09:50 |
| 21 | BY MR. ANDERTON: | 09:50 |
| 22 | Q.    You spoke with Miss Johnson how many | 09:50 |
| 23 | times? | 09:50 |
| 24 | A.    Once. | 09:50 |
| 25 | Q.    How long did that conversation last? | 09:50 |

PLAINTIFFS' EXHIBITS 003531

```
                                                    Page 311
 1      A.    About a minute and a half.              09:51

 2      Q.    That was -- that was since January 25th,  09:51

 3  between January 25th and today?                   09:51

 4      A.    No.  You asked yesterday in preparation  09:51

 5  for this.                                          09:51

 6      Q.    No, I said before this deposition.  I    09:51

 7  was not limiting my question to yesterday.         09:51

 8      A.    Okay.  Before this deposition?           09:51

 9      Q.    Yeah.  So let's break this down, okay,   09:51

10  Dr. Bliesner.                                      09:51

11      A.    Uh-huh.                                  09:51

12      Q.    I need you to listen very carefully,     09:51

13  please.                                            09:51

14      A.    Right.  I am.                            09:51

15      Q.    Since you were -- since we began this    09:51

16  deposition and opened the record on January 25th  09:51

17  and up to today --                                 09:51

18      A.    Okay.                                    09:51

19      Q.    -- what did you do -- what have you done 09:51

20  to prepare for today's session?                   09:51

21      A.    What I said already.  I organized my     09:51

22  papers and I reviewed the report.  Preparation, if 09:51

23  that's what you want to call it, for the -- with   09:51

24  Miss Johnson and Mr. Kerensky was just a matter of 09:51

25  just show up and your organize your papers.  I     09:51
```

PLAINTIFFS' EXHIBITS 003532

Page 312

| | | |
|---|---|---|
| 1 | don't think you need to do much else.  And you | 09:51 |
| 2 | just do what you did last time. | 09:52 |
| 3 | Miss Johnson didn't provide any guidance | 09:52 |
| 4 | whatsoever.  She was in the process of looking up | 09:52 |
| 5 | some additional documentation, but I never looked | 09:52 |
| 6 | at it. | 09:52 |
| 7 | Q.   How many times have you -- did you speak | 09:52 |
| 8 | with Miss Johnson between January 25th and today? | 09:52 |
| 9 | A.   Specifically a number, I don't know. | 09:52 |
| 10 | Q.   More than once? | 09:52 |
| 11 | A.   Once, maybe. | 09:52 |
| 12 | Q.   Twice? | 09:52 |
| 13 | A.   Maybe.  I don't think it was more than | 09:52 |
| 14 | two. | 09:52 |
| 15 | Q.   Did you speak to her? | 09:52 |
| 16 | A.   Yesterday, yes, for sure. | 09:52 |
| 17 | Q.   Any time before yesterday and since | 09:52 |
| 18 | January 25th? | 09:52 |
| 19 | A.   I don't recall. | 09:52 |
| 20 | Q.   How about Mr. Kerensky?  Did you speak | 09:52 |
| 21 | to him between January 25th and today? | 09:52 |
| 22 | A.   Well, yesterday, coordinated to get | 09:52 |
| 23 | here. | 09:52 |
| 24 | Q.   Other than yesterday, have you spoken to | 09:52 |
| 25 | Mr. Kerensky since January 25th? | 09:52 |

PLAINTIFFS' EXHIBITS 003533

                                                          Page 313

1       A.    Perhaps once.                                09:52

2       Q.    When?                                        09:53

3       A.    I don't recall specifically.                 09:53

4       Q.    Was that a telephone conversation?           09:53

5       A.    I -- I don't recall specifically.  It        09:53

6   was not what you would consider prep.  It was just     09:53

7   coordination.                                          09:53

8       Q.    Dr. Bliesner, you need to answer my          09:53

9   questions.                                             09:53

10      A.    Uh-huh.  I'm answering your questions.        09:53

11      Q.    No, you're not.  I asked you if you           09:53

12  spoke to Mr. Kerensky.  I didn't ask you to            09:53

13  characterize the phone call yet.                       09:53

14      Have you spoken to Mr. Kerensky since January      09:53

15  25th?                                                  09:53

16      A.    Yes.                                          09:53

17      Q.    Was it a telephone conversation?             09:53

18      A.    Yes.                                          09:53

19      Q.    Have you met with Mr. Kerensky in person     09:53

20  since January 25th?                                    09:53

21      A.    No.                                           09:53

22      Q.    I mean we're only talking about three        09:53

23  weeks.                                                 09:53

24      A.    Yeah, I didn't.                               09:53

25      Q.    Okay.                                         09:53

PLAINTIFFS' EXHIBITS 003534

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

                                                            Page 314

 1       A.    I know this was prep per se.  It's not        09:53

 2   like we sat down and spent hours going back and         09:53

 3   forth and discussing how I'm supposed to respond        09:53

 4   to your questions or anything like that.  It was        09:54

 5   just like are we on?  Just organize your paper.         09:54

 6   That stuff.  Nothing detailed.                          09:54

 7       Q.    So you didn't have any discussion with        09:54

 8   Mr. Kerensky since January 25th about what              09:54

 9   happened on January 25th and what you might expect      09:54

10   to happen during this session?                          09:54

11       A.    Between January 25th and this morning?        09:54

12       Q.    Yes.                                           09:54

13       A.    Interestingly enough, I don't think I         09:54

14   heard anything from him following the whole thing.      09:54

15       Q.    Well, how many times did you speak to         09:54

16   him?                                                     09:54

17       A.    I said yesterday I know for sure.  Maybe      09:54

18   one other time to coordinate the schedule and that      09:54

19   was it.                                                 09:54

20       Q.    Well, he told you to organize your            09:54

21   papers.  That's not coordinating the schedule, is       09:54

22   it?                                                      09:54

23       A.    It's -- it's what he told me to do.  He       09:54

24   says don't worry necessarily about preps, words to      09:54

25   that effect.  Just organize your papers so you          09:54

PLAINTIFFS' EXHIBITS 003535

Page 315

```
 1    don't flounder around and waste people's time.        09:54

 2         Q.   And how long was your conversation with     09:55

 3    Mr. Kerensky?                                          09:55

 4         A.   That particular one?                         09:55

 5         Q.   Yeah.                                        09:55

 6         A.   Maybe a minute or two.                       09:55

 7         Q.   Were there other conversations before       09:55

 8    yesterday and since January 25th besides that          09:55

 9    minute or two conversation?                            09:55

10         A.   There may have been one other, but it       09:55

11    was nothing extensive.                                 09:55

12         Q.   How long was it?                             09:55

13         A.   If there was one, is was e-mail or           09:55

14    whatever.  Similar thing.  Maybe a minute and a        09:55

15    half.                                                  09:55

16         Q.   Well, was it a conversation or was it        09:55

17    e-mail communication.  Because I haven't asked          09:55

18    about e-mails communications.  I asked you about        09:55

19    conversations.                                          09:55

20         A.   I don't know.  I'd have to go pull them      09:55

21    out and look at them.  All I know is none of these      09:55

22    conversations were substantive in terms of             09:55

23    guidance or anything like that.                         09:55

24         Q.   Dr. Bliesner, I am entitled to find out     09:55

25    how many there were, then we'll talk about the         09:55
```

PLAINTIFFS' EXHIBITS 003536

```
                                                      Page 316
 1   substance of them; okay?                          09:55
 2       A.    I cannot tell you with certainty how    09:55
 3   many telephone conversations or e-mails I had with 09:55
 4   them.  I know that it was not a large number.      09:55
 5       Q.    Okay.  So you know that it was more than 09:56
 6   one, though; correct?                              09:56
 7       A.    I can't say that with certainty.  I      09:56
 8   really don't.  My life is busy.  I'm working 70,   09:56
 9   80 hours a week on another consulting job.  This   09:56
10   is minor in terms of coordination, get things      09:56
11   done.  I don't know.  I can't say it explicitly.   09:56
12   I'm not going to make stuff up to make you happy.  09:56
13       Q.    I'm not asking you to make me happy.     09:56
14   I'm merely asking you to answer my questions       09:56
15   truthfully.                                        09:56
16       As we said earlier, you're a very intelligent  09:56
17   man and we're only talking about a three-week      09:56
18   period here.                                       09:56
19           MR. KERENSKY:  I think I need a break.     09:56
20           MR. ANDERTON:  Why do you need a break?    09:56
21           MR. KERENSKY:  I have to go to the         09:56
22       bathroom.                                      09:56
23           MR. ANDERTON:  All right.  All right.      09:56
24       Let's go off the record.                       09:56
25           THE VIDEOGRAPHER:  The time is             09:56
```

PLAINTIFFS' EXHIBITS 003537

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                        Page 317
 1      9:56 p.m. -- we're going -- or a.m.  We're        09:56
 2      going off the record.                             09:56
 3                  (Short break)                         10:08
 4          THE VIDEOGRAPHER:  The time is      .  We      10:08
 5      are back on the record.  This is the beginning    10:08
 6      of tape three.                                    10:08
 7          MR. ANDERTON:  Mike, are you with us?         10:09
 8          MR. KERENSKY:  I am.                          10:09
 9   BY MR. ANDERTON:                                     10:09
10      Q.   All right.  Dr. Bliesner, before            10:09
11   Mr. Kerensky's break or requested break, we were    10:09
12   discussing what you've done to prepare for today's  10:09
13   session and I just want to remind you of something  10:09
14   we agreed earlier in the day and that is that you   10:09
15   would focus very hard on the questions that I ask   10:09
16   and do your best to actually answer those           10:09
17   questions.                                          10:09
18      A.   I understand.                               10:09
19      Q.   Okay.  So I'm going to go back into some    10:09
20   of that subject.                                    10:09
21      A.   Okay.                                       10:09
22      Q.   How many times have you spoken to          10:09
23   Mr. Kerensky on the telephone since January 25th?   10:09
24      A.   I really honestly don't know.              10:09
25      Q.   Is it more than just yesterday?            10:09
```

PLAINTIFFS' EXHIBITS 003538

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 318

| | | |
|---|---|---|
| 1 | A.    I really honestly don't know. | 10:09 |
| 2 | Q.    Dr. Bliesner, we're talking about a | 10:09 |
| 3 | three-week period and you're -- as I've said -- | 10:09 |
| 4 | obviously a very intelligent, very organized | 10:10 |
| 5 | individual.  Prepared a very extensive report in | 10:10 |
| 6 | this case, reviewed thousands of pages of | 10:10 |
| 7 | documents.  I'm merely asking you how many times | 10:10 |
| 8 | you've spoken on the telephone to Mr. Kerensky in | 10:10 |
| 9 | the last three weeks. | 10:10 |
| 10 | A.    I honestly cannot tell you for sure. | 10:10 |
| 11 | Q.    Have you spoken to any lawyers other | 10:10 |
| 12 | than Mr. Kerensky and Ms Johnson in the last three | 10:10 |
| 13 | weeks? | 10:10 |
| 14 | A.    Yes. | 10:10 |
| 15 | Q.    Who? | 10:10 |
| 16 | A.    A gentleman out of Oklahoma. | 10:10 |
| 17 | Q.    Brad Miller? | 10:10 |
| 18 | A.    Yes. | 10:10 |
| 19 | Q.    When did you speak to Brad Miller? | 10:10 |
| 20 | A.    Yesterday. | 10:10 |
| 21 | Q.    What prompted that phone conversation | 10:10 |
| 22 | with Mr. Miller? | 10:10 |
| 23 | A.    Apparently he had the opportunity to | 10:10 |
| 24 | review my report. | 10:10 |
| 25 | Q.    And tell me about that conversation with | 10:10 |

PLAINTIFFS' EXHIBITS 003539

Page 319

1    Mr. Miller.                                              10:10

2        A.    He was just curious of -- my involvement       10:11

3    in the -- in this case.                                  10:11

4        Q.    How long did the phone conversation last       10:11

5    with Mr. Miller, yesterday?                              10:11

6        A.    Maybe a half an hour.                          10:11

7        Q.    So what did you discuss with Mr. Miller        10:11

8    during that 30-minute or so phone conversation?          10:11

9        A.    What I did for a living primarily.             10:11

10       Q.    Yeah.                                          10:11

11       A.    And a few things about the report.            10:11

12       Q.    Such as?   Mike?  Mike?  Mike?                 10:11

13           MR. KERENSKY:  Yes, sorry, sorry, sorry.         10:11

14   BY MR. ANDERTON:                                         10:12

15       Q.    A few things about the report,                10:12

16   Dr. Bliesner.  Such as what?                             10:12

17       A.    The conclusions that were in there.           10:12

18   That was it primarily.                                   10:12

19       Q.    Well tell me about that discussion with        10:12

20   Mr. Miller about the conclusions that were in            10:12

21   there.                                                   10:12

22       A.    Just what's written in the report.  My        10:12

23   conclusions with respect to compliance and those         10:12

24   kinds of things.  It wasn't a very specific              10:12

25   discussion.  It was more about my work background,       10:12

PLAINTIFFS' EXHIBITS 003540

Page 320

| | | |
|---|---|---|
| 1 | what I'd done, what I do now, things like that. | 10:12 |
| 2 | Q.   Well, I want to know what you discussed | 10:12 |
| 3 | with him with respect to the conclusion in your | 10:12 |
| 4 | report.  Tell me about that conversation.  It was | 10:12 |
| 5 | just yesterday. | 10:12 |
| 6 | A.   Yes. | 10:12 |
| 7 | Q.   So tell me about that conversation. | 10:12 |
| 8 | A.   Basically said you have the report, the | 10:12 |
| 9 | conclusions that I have come to in the report are | 10:12 |
| 10 | supported by the documents that are in the | 10:12 |
| 11 | attachment.  That's how I did the review. | 10:12 |
| 12 | Q.   What kind of questions did Mr. Miller | 10:12 |
| 13 | ask you with respect to the conclusions in your | 10:12 |
| 14 | report yesterday? | 10:12 |
| 15 | A.   I think he asked me if I reviewed any | 10:13 |
| 16 | additional documents since I wrote the report. | 10:13 |
| 17 | Q.   What did you tell him? | 10:13 |
| 18 | A.   I said additional documents, no.  It was | 10:13 |
| 19 | just like I told you.  I just prepared for this | 10:13 |
| 20 | and then organized them, so... | 10:13 |
| 21 | Q.   Well, you didn't tell me that you | 10:13 |
| 22 | prepared for this. | 10:13 |
| 23 | A.   Well, what I did to get ready for this | 10:13 |
| 24 | was organize my mass of documents after the last | 10:13 |
| 25 | thing so I wouldn't waste time. | 10:13 |

PLAINTIFFS' EXHIBITS 003541

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised      February 18, 2011

                                                        Page 321

1       Q.     Okay.  And so he asked you what           10:13

2   additional documents or whether you had reviewed     10:13

3   any additional documents.  You told Mr. Miller you   10:13

4   had not reviewed any additional documents since      10:13

5   you wrote the report?                                10:13

6       A.     I'm pretty sure that's what I told him.   10:13

7       Q.     Well, let me ask you --                   10:13

8       A.     Uh-huh.                                   10:13

9       Q.     -- have you reviewed any additional       10:13

10  documents since you wrote the report?                10:14

11      A.     Other than what was already present --    10:14

12  what I did the last time, no, I have not.            10:14

13      Q.     What do you mean by other than what you   10:14

14  did the last time.                                   10:14

15      A.     This stuff.  All of these documents that  10:14

16  are in here.                                         10:14

17      Q.     The documents that are in there -- and    10:14

18  so that we're clear, Dr. Bliesner, you're pointing   10:14

19  to boxes that you brought with you; correct?         10:14

20      A.     Uh-huh.                                   10:14

21      Q.     Those are documents you had reviewed as   10:14

22  you wrote the report or as you were in the process   10:14

23  of writing the report; is that correct?             10:14

24      A.     Yes.  The supporting data for this.       10:14

25      Q.     "The supporting data for this" meaning    10:14

PLAINTIFFS' EXHIBITS 003542

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 322

 1    your report?                                                   10:14

 2         A.    Yes.                                                10:14

 3         Q.    Are the documents in these boxes that              10:14

 4    you read and reviewed after you wrote and                     10:14

 5    submitted the report -- the date of your report is            10:14

 6    June 15, 2010.                                                 10:14

 7         A.    This would be the only one.  This is the           10:14

 8    deposition.                                                    10:14

 9         Q.    Of?                                                 10:14

10         A.    Of last time we met.  It was sent to me,           10:14

11    but I need to review.  I haven't gotten all the               10:15

12    way through it.                                                10:15

13         Q.    So the transcript of January 25th?                 10:15

14         A.    Yes.                                                10:15

15         Q.    Your deposition proceedings?                       10:15

16         A.    Yes.                                                10:15

17         Q.    Is that the only document that you have            10:15

18    reviewed that relates to this litigation and to               10:15

19    your report since you wrote the report?                       10:15

20         A.    No.  Because you also asked me to get              10:15

21    what my hourly rate was and the billing records.              10:15

22         Q.    Okay.                                               10:15

23         A.    So those are the things.                           10:15

24         Q.    Other than your billing records and the           10:15

25    transcript of the January 25th session, are there            10:15

PLAINTIFFS' EXHIBITS 003543

Page 323

1   any other documents that you've reviewed that          10:15

2   relate to this litigation and to the report issued     10:15

3   in this litigation since June 15, 2010?                10:15

4       A.     Since June 15th?                            10:15

5       Q.     Since you submitted your report.            10:15

6       A.     Uh-huh.  I can't recall if there were       10:15

7   any specific additional documents.  I don't            10:16

8   believe there were.  Because when the report was       10:16

9   done, I was pretty much checked out and                10:16

10  concentrating on a current client.                     10:16

11      Q.     When Mr. Miller asked you that question      10:16

12  yesterday, is that what you told him as well, that     10:16

13  you can't recall?                                      10:16

14      A.     He didn't explicitly ask the question       10:16

15  like you did.                                          10:16

16      Q.     What did he ask?                            10:16

17      A.     He said have you reviewed any additional    10:16

18  documentation.                                         10:16

19      Q.     And what did you say?                       10:16

20      A.     I said not that I remember.                 10:16

21      Q.     What else did Mr. Miller ask you?           10:16

22      A.     That was about it.                          10:16

23      Q.     Well, it was a 30-minute conversation,      10:16

24  Dr. Bliesner.  And it doesn't take 30 minutes to       10:16

25  ask you if you reviewed additional documents and       10:16

PLAINTIFFS' EXHIBITS 003544

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 324

```
 1    to talk about the background of the work that you        10:16

 2    do.  So what else did Mr. Miller ask you yesterday       10:16

 3    when you spoke with him?                                 10:16

 4         A.    We talked about -- just to get                10:16

 5    acquainted, talked about my other two companies.         10:16

 6         Q.    Did you talk about your deposition            10:17

 7    today?                                                   10:17

 8         A.    I did mention to him that I went through      10:17

 9    it.                                                      10:17

10         Q.    That you were?                                10:17

11         A.    Today's?                                      10:17

12         Q.    Yes.                                          10:17

13         A.    No, no.  But the one before, yeah.            10:17

14         Q.    Did you talk about your January 25th          10:17

15    session with him?                                        10:17

16         A.    A little, yes.                                10:17

17         Q.    What did you talk about with him with         10:17

18    respect to the January 25th deposition session?         10:17

19         A.    How difficult it was because I've never      10:17

20    done anything like this before.                          10:17

21         Q.    Why do you think it's difficult?             10:17

22         A.    It's just a different way of doing           10:17

23    business than anything I've ever seen before.           10:17

24         Q.    In what way?                                 10:17

25         A.    That's a good question.                      10:17
```

PLAINTIFFS' EXHIBITS 003545

Page 325

```
 1      Q.    Every so often I try to come up with a      10:17
 2   good one.                                            10:17
 3      A.    I'm used to collaborative conversations     10:17
 4   not combative conversations.                         10:17
 5      Q.    I don't intend for this to be a             10:18
 6   combative conversation.  Do you intend for this to   10:18
 7   be a combative conversation?                         10:18
 8      A.    Absolutely not.                             10:18
 9      Q.    Do you think this is a combative            10:18
10   conversation?                                        10:18
11      A.    It's not fun.  I can tell you that.         10:18
12      Q.    Well, just because it's not fun doesn't     10:18
13   mean it's combative, does it?                        10:18
14      A.    I suppose not.                              10:18
15      Q.    Do you think this is a combative            10:18
16   conversation or a combative process?                 10:18
17           MR. KERENSKY:  I think you can be that       10:18
18      way, Mike.  But let's try and ask some real       10:18
19      questions about the case.                         10:18
20   BY MR. ANDERTON:                                     10:18
21      Q.    I'm waiting for an answer, Dr. Bliesner.    10:18
22      A.    I don't know if combative is the right      10:18
23   word for it, but it's not the give and take,         10:18
24   casual problem-solving in an open environment that   10:18
25   I'm used to in my workplaces.                        10:18
```

PLAINTIFFS' EXHIBITS 003546

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 326

1      Q.    And were you told to make it so when you          10:19

2    prepared for your first deposition session?              10:19

3      A.    Told what, sir?                                   10:19

4      Q.    Well, I'm going to hand you -- and I              10:19

5    don't have a stapler so this isn't stapled.              10:19

6      A.    Uh-huh.                                           10:19

7      Q.    We marked this last time as --                   10:19

8      A.    Yes.                                              10:19

9      Q.    -- Exhibit 109.                                  10:19

10     A.    Yes.                                              10:19

11     Q.    Do you see that, Dr. Bliesner?                   10:19

12     A.    I do.                                             10:19

13     Q.    Tell me what it is.  Mike.  Typing.              10:19

14          MR. KERENSKY:  I'm sorry.                         10:19

15          THE WITNESS:  This is my notes of 25              10:19

16    January.  Yeah, outlines a condensation of              10:19

17     points that are listed in the report, some             10:19

18     scratching with respect to calculation that we         10:20

19     were talking about.                                    10:20

20    BY MR. ANDERTON:                                        10:20

21     Q.    And you actually made the body notes on          10:20

22    page 1 during your last deposition; right?             10:20

23     A.    Bottom one, yes, yes.  Yeah, that was            10:20

24    the thickness discussion if I recall properly.         10:20

25     Q.    All right.                                       10:20

PLAINTIFFS' EXHIBITS 003547

Page 327

| | | | |
|---|---|---|---|
| 1 | A. | Uh-huh. | 10:20 |
| 2 | Q. | So, let's go to page 2. | 10:20 |
| 3 | A. | Okay. | 10:20 |
| 4 | Q. | What are those? | 10:20 |

5      A.    Guidance from Mr. Kerensky on how things        10:20
6  would go generally in a deposition because I've        10:20
7  never been in one like this, so...                     10:20
8      Q.    These are notes that you made --              10:20
9      A.    Uh-huh.                                       10:20
10     Q.    -- of a conversation?  You have to            10:20
11 answer yes or no, Doctor.                              10:20
12     A.    Oh, I'm sorry.  Yes.                          10:20
13     Q.    Of a conversation you had with                10:20
14 Mr. Kerensky?                                          10:20
15     A.    And Mr. Miller and the other gentleman        10:20
16 that was with them, the other attorney.                10:20
17     Q.    Mr. Thompson, Fred Thompson?                  10:20
18     A.    No, no, no.  This was the day before          10:20
19 the --                                                 10:21
20           MR. KERENSKY:  I think it was Terry           10:21
21     Kilpatrick.                                         10:21
22           MR. ANDERTON:  Terry Kilpatrick?              10:21
23           THE WITNESS:  Yeah.                           10:21
24           MR. KERENSKY:  Meghan was there, too.         10:21
25           THE WITNESS:  Meghan, yeah, was there         10:21

PLAINTIFFS' EXHIBITS 003548

Page 328

```
 1    too.                                             10:21
 2  BY MR. ANDERTON:                                   10:21
 3      Q.    So there were four lawyers there:        10:21
 4  Mr. Kerensky, Mr. Miller, Ms Johnson, and          10:21
 5  Mr. Kilpatrick.                                    10:21
 6      A.    Yes.                                      10:21
 7      Q.    Who told you to answer questions as       10:21
 8  briefly as possible, to give no more or no less    10:21
 9  than is needed?                                    10:21
10      A.    I believe that they -- all of the people 10:21
11  in that room gave that guidance if I recall.       10:21
12      Q.    One of your notes here says, "saying no  10:21
13  closes the door."  What does that mean?  Well,     10:21
14  what does it mean?                                 10:21
15      A.    If there is additional information that  10:21
16  needs to come out that would clarify the           10:21
17  situation, you can just go no.  Then you're not    10:21
18  going to have that conversation again.  So -- as I 10:21
19  understood the guidance.                           10:22
20      Q.    Who -- well, whose term is "closes the   10:22
21  door."  Who said that to you?                      10:22
22      A.    I don't know which one specifically.     10:22
23  This is a whole new process for me at this stage   10:22
24  of the game so I was just listening.               10:22
25      Q.    What does it mean, "keep doors open."    10:22
```

PLAINTIFFS' EXHIBITS 003549

Page 329

1    What does that mean?                                  10:22

2        A.    If there's line of questions that would     10:22

3    add clarification to the conversation, I want to      10:22

4    make sure that they stay open.  Just saying no, it    10:22

5    stops conversation potentially in the future.         10:22

6        Q.    And your notes say "yes, but" and what I    10:22

7    will call ellipses and "no, but" with another         10:22

8    ellipses.  What do those notes mean?                   10:22

9        A.    Those are with respect to, for instance,    10:22

10   if you would ask a question that was very narrow       10:22

11   that didn't necessarily include the additional        10:22

12   information that I felt would be appropriate to        10:22

13   explain the situation, "but" let's me continue on     10:22

14   to give the additional information to clarify the     10:22

15   point.                                                 10:23

16       Q.    So you don't believe in answering --        10:23

17   they told you not to answer a narrowly crafted        10:23

18   question with a narrow answer; is that right?          10:23

19       A.    I don't think I got that specific           10:23

20   guidance.                                              10:23

21       Q.    Well, I was merely following up on your     10:23

22   response a moment ago, Dr. Bliesner.                   10:23

23       These notes are from a meeting that occurred      10:23

24   when?                                                  10:23

25       A.    That was the day before we had the first    10:23

PLAINTIFFS' EXHIBITS 003550

```
                                                    Page 330
 1   deposition.                                    10:23

 2        Q.    So January 24th.                    10:23

 3        A.    I believe that was the date, yes.   10:23

 4        Q.    Did you meet with the lawyers for the   10:23

 5   Plaintiffs in person to prepare for the January   10:23

 6   25th deposition other than on January 24?     10:23

 7        A.    To prepare for the deposition?      10:23

 8        Q.    Yes.                                10:23

 9        A.    No.                                 10:23

10        Q.    Did you talk to them on the telephone,   10:23

11   any of them, to prepare for the deposition other   10:23

12   than on January 24th?                          10:24

13        A.    I can't recall specifically.        10:24

14        Q.    You don't remember whether you even had   10:24

15   a conversation with them?                      10:24

16        A.    No, I don't.  I have conversations with   10:24

17   people day in and day out and this is just one   10:24

18   small part of it.  I can't recall.             10:24

19        Q.    Well, you had to make arrangements to   10:24

20   meet with them on the 24th; correct?           10:24

21        A.    Yes.                                10:24

22        Q.    So you had to have some communication.   10:24

23   Do you think that was by telephone?            10:24

24        A.    Perhaps and perhaps e-mail.  I have to   10:24

25   go back and look at them.                      10:24
```

PLAINTIFFS' EXHIBITS 003551

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 331

 1      Q.    Well, would you have those e-mails with          10:24

 2   you?                                                      10:24

 3      A.    I believe I gave all of those to Miss            10:24

 4   Johnson.  We copied them over off of an external         10:24

 5   hard drive and she has them.                             10:25

 6      Q.    She has them?                                    10:25

 7      A.    Huh-huh.                                         10:25

 8      Q.    Do you have them?                                10:25

 9      A.    No.                                              10:25

10      Q.    Do you have the hard drive with you?            10:25

11      A.    Yes.                                             10:25

12      Q.    May I see it, please?                           10:25

13      A.    Sure.                                            10:25

14      Q.    Let's go back to your conversation              10:25

15   yesterday with Brad Miller.                               10:25

16      A.    Okay.                                            10:25

17      Q.    How did he come to have your contact            10:25

18   information, do you know?                                 10:25

19      A.    I believe he said Pete Miller and he had        10:25

20   interacted.  I believe that's what he said.              10:25

21      Q.    Did -- did Mr. Miller -- Brad Miller,           10:25

22   since we now have two Millers -- did Brad Miller         10:25

23   yesterday -- did you and he discuss the                  10:25

24   possibility of him retaining you as an expert in         10:26

25   his case?                                                 10:26

PLAINTIFFS' EXHIBITS 003552

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                              Page 332

1      A.    We did have that conversation.            10:26

2      Q.    And tell me about that conversation.      10:26

3      A.    He asked me, you know, whether I was      10:26

4  interested potentially in doing it.                 10:26

5            MR. KERENSKY:  I need to interrupt for a  10:26

6       second.  We may be treading into a violation   10:26

7       of the consulting expert privilege.            10:26

8            MR. ANDERTON:  Well, okay.                 10:26

9            MR. KERENSKY:  Because I don't know if     10:26

10      Brad hired him or not hired him.  At this       10:26

11      point, I think that would make him a            10:26

12      consulting expert.  Since I'm here not for --   10:26

13      I'm here for Miss Vega, but I think the         10:26

14      witness should be advised that conversations   10:26

15      prior to being retained by a Plaintiff's        10:26

16      lawyer are confidential and protected and       10:26

17      privileged under what we call the consulting    10:26

18      expert rule.  And until you're retained and     10:26

19      disclosed as a testifying expert, those         10:26

20      conversations are privileged.  And I guess I    10:27

21      will assert that privilege on behalf of Mr. --  10:27

22      is it Miller, Brad Miller?                       10:27

23           THE WITNESS:  Yes.                          10:27

24           MR. KERENSKY:  Okay.                        10:27

25           MR. ANDERTON:  Well, Mike, I'm not sure I   10:27

PLAINTIFFS' EXHIBITS 003553

Page 333

| | | |
|---|---|---|
| 1 | agree with your characterization of the | 10:27 |
| 2 | privilege and I hope that you're not making a | 10:27 |
| 3 | representation of Oklahoma law with respect to | 10:27 |
| 4 | expert privileges, are you? | 10:27 |
| 5 | MR. KERENSKY:  Oh, I think it's in the | 10:27 |
| 6 | federal rules, consulting experts. | 10:27 |
| 7 | MR. ANDERTON:  Well, you are aware | 10:27 |
| 8 | Mr. Kerensky of course that the case | 10:27 |
| 9 | Mr. Miller is discussing with Dr. Bliesner -- | 10:27 |
| 10 | with Dr. Bliesner is not a federal case; | 10:27 |
| 11 | right. | 10:27 |
| 12 | MR. KERENSKY:  Well, I'm guessing that | 10:27 |
| 13 | Oklahoma law probably has the same privileges | 10:27 |
| 14 | as every other state I've been in.  So no | 10:28 |
| 15 | doubt I'm guessing but I want to make sure | 10:28 |
| 16 | that I assert the privilege to the extent it | 10:28 |
| 17 | exists.  During the case I'm sure you've | 10:28 |
| 18 | updated yourself on the rules and know one way | 10:28 |
| 19 | or the other whether it exists.  And I just | 10:28 |
| 20 | think I owe it to him to assert it at this | 10:28 |
| 21 | time. | 10:28 |
| 22 | MR. ANDERTON:  Okay. | 10:28 |
| 23 | BY MR. ANDERTON: | 10:28 |
| 24 | Q.   Have you been retained by Brad Miller? | 10:28 |
| 25 | A.   No. | 10:28 |

PLAINTIFFS' EXHIBITS 003554

                                                      Page 334

1       Q.    Do you anticipate that you're going to          10:28

2    talk to him again?                                       10:28

3       A.    Perhaps.                                        10:28

4       Q.    Let's go back to what you did to                10:28

5    prepare.                                                 10:29

6       The -- before January 25th, we know that you         10:29

7    met with Mr. Kerensky and several other folks to        10:29

8    prepare for the session the next day.  How long         10:29

9    did that meeting on January 24th last?                  10:29

10      A.    I think last time I said it was                 10:29

11   something in the neighborhood of four, five hours,      10:29

12   something like that.                                     10:29

13      Q.    Did you --                                      10:29

14      A.    That I recall.                                  10:29

15      Q.    I asked you a moment ago if you met with        10:29

16   any of those Plaintiffs' lawyers in person other        10:29

17   than on January 24th.  Your testimony was no, you       10:29

18   did not; correct?                                        10:29

19      A.    For preparation with the deposition.           10:29

20      Q.    You met with them in person as you             10:29

21   prepared your report?                                    10:29

22      A.    Yes, one time.                                  10:29

23      Q.    Where was that?                                 10:30

24      A.    In Indian Rocks Beach.                          10:30

25      Q.    They came to see you?                           10:30

PLAINTIFFS' EXHIBITS 003555

Page 335

| | | | |
|--|--|--|--|
| 1 | A. | Uh-huh. | 10:30 |
| 2 | Q. | Yes or no? | 10:30 |
| 3 | A. | They came to see me.  Yes.  Sorry. | 10:30 |
| 4 | Q. | That's all right. | 10:30 |
| 5 | A. | Sorry. | 10:30 |
| 6 | Q. | I'm just trying to make sure that the. | 10:30 |
| 7 | A. | Yes. | 10:30 |
| 8 | Q. | Videographer and court reporter -- | 10:30 |
| 9 | A. | It actually wasn't in preparation of | 10:30 |

10     the -- well, it wasn't writing the report.  They     10:30

11     just delivered more documents to me.                  10:30

| 12 | Q. | In person? | 10:30 |
| 13 | A. | Uh-huh. | 10:30 |
| 14 | Q. | That's awfully nice of them. | 10:30 |
| 15 | A. | Uh-huh. | 10:30 |
| 16 | Q. | Who did that? | 10:30 |
| 17 | A. | Who was there? | 10:30 |
| 18 | Q. | Yeah, who delivered the documents? | 10:30 |
| 19 | A. | It was Pete Miller and Meghan Johnson | 10:30 |

20     Carter.                                               10:30

21          Q.     How long -- did you have a meeting with     10:30

22     them when they delivered more documents?              10:30

23          A.     They actually came over to my home         10:30

24     office.                                               10:30

25          Q.     So did you have a meeting with them?        10:30

PLAINTIFFS' EXHIBITS 003556

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                    Page 336
 1     A.    If you'd call it a meeting, yes.        10:30

 2     Q.    How long?                               10:30

 3     A.    I honestly have to go back and look it  10:30

 4  up.                                              10:30

 5     Q.    Did you bring your billing and time     10:30

 6  records with you?                                10:30

 7     A.    Yes, I did.                             10:30

 8     Q.    May I see them?                         10:30

 9     A.    Sure.                                   10:30

10     Q.    Phil, you want to mark those, please?   10:31

11  Let's call it 145 please.                        10:31

12     (Whereupon, Exhibit 145 was marked for        10:31

13  identification)                                  10:31

14     Dr. Bliesner, I'm looking at a document that  10:31

15  has been marked as Exhibit 145.                  10:31

16     A.    Uh-huh.                                 10:31

17     Q.    And it is a stack of invoices that you  10:31

18  just handed me; is that correct?                 10:31

19     A.    I guess it is.                          10:32

20     Q.    Is this all of the invoices that you    10:32

21  have submitted to Plaintiffs' counsel for your   10:32

22  services as an expert witness?  Dr. Bliesner, you 10:32

23  just handed -- I asked you if you had --         10:32

24     A.    Yes.                                    10:32

25     Q.    -- your billing records.                10:32
```

PLAINTIFFS' EXHIBITS 003557

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 337

1       A.    I don't do the billing so I don't know        10:32

2    if these are all of the invoices.  I was looking       10:32

3    for the last date on here.                             10:32

4       Q.    You were asked to bring them with you.        10:32

5       A.    Yes.                                           10:32

6       Q.    I just asked you if you brought them.          10:32

7    You said yes.                                           10:32

8       A.    Yes, sir.                                      10:32

9       Q.    In response I said may I see them and         10:32

10   you said yes.                                           10:32

11      A.    Yes.                                           10:32

12      Q.    And then you handed me a stack of             10:32

13   documents.                                              10:32

14      A.    Yes, sir.                                      10:32

15      Q.    Are you now looking at them as though         10:32

16   you're not sure whether you actually brought the        10:32

17   right records with you?  What are you doing?            10:32

18      A.    Well, you said "all records"; okay.           10:32

19      Q.    I said are they all of the invoices.          10:32

20      A.    All the invoices.  I Am not sure because      10:32

21   I prepared this stack immediately after the last        10:32

22   deposition at your request.  I'm not sure whether       10:32

23   that deposition invoice was included in this            10:33

24   stack.  See what I'm saying?                            10:33

25      Q.    Okay.                                          10:33

PLAINTIFFS' EXHIBITS 003558

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 338

| | | | |
|---|---|---|---|
| 1 | A. | That's all I'm trying to do. | 10:33 |
| 2 | Q. | You were asked to bring them with you | 10:33 |
| 3 | today. | Did you not double check to make sure you | 10:33 |
| 4 | had all the records you were supposed to bring? | | 10:33 |
| 5 | A. | I forwarded them via e-mail to | 10:33 |
| 6 | Mr. Miller and Mr. -- Miss Johnson before. So I | | 10:33 |
| 7 | made the assumption that they forwarded them to | | 10:33 |
| 8 | you. | | 10:33 |
| 9 | Q. | They did not. | 10:33 |
| 10 | A. | Okay | 10:33 |
| 11 | Q. | And you know that you were asked to | 10:33 |
| 12 | bring them with you today; right? | | 10:33 |
| 13 | A. | Yes, yes. | 10:33 |
| 14 | Q. | So -- | 10:33 |
| 15 | A. | I brought a copy because I thought that | 10:33 |
| 16 | you got them all. | | 10:33 |
| 17 | Q. | I have got nothing. | 10:33 |
| 18 | A. | Okay. | 10:33 |
| 19 | Q. | From any of the lawyers and Plaintiffs. | 10:33 |
| 20 | A. | Okay. | 10:33 |
| 21 | Q. | Or any of the Plaintiffs' lawyers. | 10:33 |
| 22 | A. | Okay. | 10:33 |
| 23 | Q. | That's why we asked you to bring them. | 10:33 |
| 24 | A. | Okay. | 10:33 |
| 25 | Q. | You understood that you were supposed to | 10:33 |

PLAINTIFFS' EXHIBITS 003559

```
                                                    Page 339
 1    bring all of your billing records today; correct?     10:33

 2         A.    Not specifically because I'd already        10:33

 3    provided them.  I just brought this because this      10:33

 4    is the hard copy that I had I scanned in e-mail,      10:33

 5    so...                                                  10:34

 6         Q.    When did you provide them to Plaintiffs'    10:34

 7    counsel?  After January 25th?                          10:34

 8         A.    Yes.  At your request.                      10:34

 9         Q.    Okay.  I guess then you have to look        10:34

10    through that stack of documents and take up more      10:34

11    of our time looking at something that you should      10:34

12    know because you should have been prepared to         10:34

13    bring them with you today, but if you need to,        10:34

14    please do.                                             10:34

15         MR. KERENSKY:  Objection, form.                   10:34

16         MR. ANDERTON:  Proceed, Dr. Bliesner.             10:34

17         THE WITNESS:  This does not include last,         10:35

18    the 25th's billing.                                    10:35

19    BY MR. ANDERTON:                                       10:35

20         Q.    Have you invoiced Plaintiffs' counsel       10:35

21    for that -- for the time that you spent preparing     10:35

22    for and participating in the January 25th             10:35

23    deposition?                                            10:35

24         A.    I don't know because I don't do it.         10:35

25         Q.    Dr. Bliesner, I see -- did you review       10:35
```

PLAINTIFFS' EXHIBITS 003560

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

                                                            Page 340

1    these documents before you came here today?          10:35

2        A.    That stack?                                 10:35

3        Q.    Yes.                                         10:35

4        A.    No.                                          10:35

5        Q.    The first invoice indicates a rate of       10:35

6    $350.  It's dated January 16, 2010, $350 per          10:35

7    hour.  And the next invoice dated a week later,       10:35

8    January 23rd, indicates a rate of $550 per hour.      10:35

9    Did your rate go up?                                  10:35

10       A.    There was a misunderstanding on the rate    10:35

11   to begin with.                                        10:36

12       Q.    Whose misunderstanding?                     10:36

13       A.    The Miller Law Firm.                         10:36

14       Q.    You sent the invoice out.                   10:36

15       A.    Yes.                                         10:36

16       Q.    So whose misunderstanding?                  10:36

17       A.    This was the additional -- I thought        10:36

18   that you received that as well but apparently not.    10:36

19       Q.    As I've said, I've not received anything    10:36

20   from Plaintiffs about --                              10:36

21       A.    Uh-huh.                                      10:36

22       Q.    -- your communications with them --         10:36

23       A.    Uh-huh.                                      10:36

24       Q.    -- your billing records --                  10:36

25       A.    Uh-huh.                                      10:36

PLAINTIFFS' EXHIBITS 003561

Page 341

| | | | |
|---|---|---|---|
| 1 | Q. | -- anything. | 10:36 |
| 2 | A. | Uh-huh. | 10:36 |
| 3 | Q. | So you just handed me a document that | 10:36 |
| 4 | Phil is going to mark as Exhibit 146. | | 10:36 |
| 5 | A. | Uh-huh. | 10:36 |
| 6 | Q. | Please, Phil.  Thank you, sir. | 10:36 |
| 7 | A. | And this was prior to being retained | 10:37 |
| 8 | obviously. | | 10:37 |
| 9 | Q. | Prior to being retained. | 10:37 |
| 10 | A. | Yes. | 10:37 |
| 11 | (Whereupon, Exhibit 146 was marked for | | 10:37 |
| 12 | identification) | | 10:37 |
| 13 | Q. | So I'm reading a letter that says -- | 10:37 |
| 14 | well, tell me what this is, 146.  Is it an e-mail, | | 10:37 |
| 15 | is it a letter, what is it? | | 10:37 |
| 16 | A. | This is -- I believe it is a Word | 10:37 |
| 17 | document that I cut and paste into e-mail.  So I | | 10:37 |
| 18 | can -- I design a document first. | | 10:37 |
| 19 | Q. | Okay. | 10:37 |
| 20 | A. | And I put it in an e-mail.  So this is | 10:37 |
| 21 | what that is. | | 10:37 |
| 22 | Q. | That's just a Word document? | 10:37 |
| 23 | A. | I'm thinking it is. | 10:37 |
| 24 | Q. | You're thinking it is? | 10:37 |
| 25 | A. | Yeah.  I'm not sure; okay?  Because it | 10:37 |

PLAINTIFFS' EXHIBITS 003562

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                              Page 342

 1    doesn't have the headers on it or not so I can't        10:37

 2    say definitively.  On something like this normally      10:37

 3    for a business transaction -- because I would like      10:37

 4    to be accurate in an e-mail -- I create a Word          10:37

 5    document first, do spell check and everything else      10:37

 6    and I cut and paste it in an e-mail.                    10:37

 7         Q.    So you copy the text?                        10:38

 8         A.    Yes.                                         10:38

 9         Q.    And paste it into an e-mail?                 10:38

10         A.    Yes, sir.                                    10:38

11         Q.    So that means that -- well, did you send    10:38

12    this -- the contents of the document that is           10:38

13    marked as 146 to Mr. Miller?                           10:38

14         A.    I did.                                       10:38

15         Q.    In what form?                                10:38

16         A.    In e-mail.                                  10:38

17         Q.    Do you have that e-mail with you?           10:38

18         A.    I do not.                                   10:38

19         Q.    Why not?                                     10:38

20         A.    Because I gave all the e-mails to Miss      10:38

21    Johnson Carter.                                         10:38

22         Q.    May I see that, please?                     10:38

23         A.    Sure.                                        10:38

24         Q.    So you sent an e-mail to Mr. Miller         10:38

25    somewhere around January 4, 2010, with the             10:38

PLAINTIFFS' EXHIBITS 003563

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 343

| | | |
|---|---|---|
| 1 | following text or that includes the following | 10:38 |
| 2 | text.  As discussed, my rates are, and then you | 10:38 |
| 3 | list your rates. | 10:38 |
| 4 | A.     Uh-huh. | 10:38 |
| 5 | Q.     $350 an hour for standard document | 10:38 |
| 6 | review, on-site time, consultations, etc. | 10:38 |
| 7 | A.     Uh-huh. | 10:38 |
| 8 | Q.     $450 an hour for testimonies or | 10:38 |
| 9 | depositions? | 10:38 |
| 10 | A.     Uh-huh. | 10:39 |
| 11 | Q.     Is that right?  Is that correct? | 10:39 |
| 12 | A.     Is that what it says there?  Yes. | 10:39 |
| 13 | Q.     And $550 involving for any cases | 10:39 |
| 14 | involving capital crimes. | 10:39 |
| 15 | A.     Uh-huh. | 10:39 |
| 16 | Q.     You have to say yes or no. | 10:39 |
| 17 | A.     Yes, sorry. | 10:39 |
| 18 | Q.     That's all right. | 10:39 |
| 19 | A.     I'll get this some day. | 10:39 |
| 20 | Q.     So the first invoice you submitted was | 10:39 |
| 21 | at the $350 per hour rate? | 10:39 |
| 22 | A.     Yes. | 10:39 |
| 23 | Q.     And every invoice thereafter was at the | 10:39 |
| 24 | $550 per hour rate. | 10:39 |
| 25 | A.     Yes. | 10:39 |

PLAINTIFFS' EXHIBITS 003564

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 344

| | | |
|---|---|---|
| 1 | Q.    Does this case involve a capital crime? | 10:39 |
| 2 | A.    Well, it involved a death potentially. | 10:39 |
| 3 | So that wasn't necessarily explained to me when I | 10:39 |
| 4 | was doing the initial consultation. | 10:39 |
| 5 | Q.    So you quoted your rate as $550 per hour | 10:39 |
| 6 | for a case involving a capital crime? | 10:39 |
| 7 | A.    A death, potentially.  A capital crime, | 10:39 |
| 8 | I don't know the legal term.  So that's the term I | 10:39 |
| 9 | used. | 10:39 |
| 10 | Q.    Oh, you used capital crime to indicate a | 10:39 |
| 11 | death? | 10:39 |
| 12 | A.    Anything that involved potentially a | 10:39 |
| 13 | death, yes.  I'm not a lawyer.  It's just a term | 10:39 |
| 14 | that I came up with. | 10:39 |
| 15 | Q.    Had you ever been involved -- you've | 10:39 |
| 16 | never been an expert witness before. | 10:40 |
| 17 | A.    No, absolutely not.  This is all brand | 10:40 |
| 18 | new stuff for me.  So there was confusion on that | 10:40 |
| 19 | and it turns out that there was potentially | 10:40 |
| 20 | somebody that was hurt, so the rate was increased | 10:40 |
| 21 | to 550. | 10:40 |
| 22 | Q.    You misunderstood that there was | 10:40 |
| 23 | potentially somebody who was hurt? | 10:40 |
| 24 | A.    It was never specifically told to me | 10:40 |
| 25 | that, you know, it was put to me we've got a case | 10:40 |

PLAINTIFFS' EXHIBITS 003565

Page 345

```
 1    going on, something like this.  I do have a          10:40
 2    question, though, you know?  This is falling into    10:40
 3    pre, you know, retainer and stuff like that.  Do I   10:40
 4    have the same right not to discuss the details       10:40
 5    here?                                                10:40
 6            MR. ANDERTON:  Well, Mr. Kerensky -- like    10:40
 7        I said, I disagree with Mr. Kerensky's           10:40
 8        characterization of the scope of that            10:40
 9        privilege.                                       10:40
10            THE WITNESS:  Right.                         10:40
11            MR. ANDERTON:  So...                         10:40
12            THE WITNESS:  I'm not particularly           10:40
13        comfortable talking about negotiations that I    10:40
14        had with somebody prior to being put on          10:40
15        retainer.                                        10:40
16            MR. ANDERTON:  I mean no disrespect,         10:40
17        Dr. Bliesner.  Whether you're comfortable or     10:40
18        not, it's something I'm allowed to inquire       10:40
19        into.                                            10:40
20            MR. KERENSKY:  Wait a minute.  We're         10:40
21        talking about -- I lost track of you guys.       10:41
22        You're not talking back again about another      10:41
23        case other than --                               10:41
24            MR. ANDERTON:  No, no.  We're talking        10:41
25        about his retention.                             10:41
```

PLAINTIFFS' EXHIBITS 003566

```
                                                  Page 346
 1            THE WITNESS:  Prior to the retention.      10:41
 2   BY MR. ANDERTON:                                    10:41
 3        Q.    You have now been disclosed --          10:41
 4        A.    Uh-huh.                                  10:41
 5        Q.    -- as a testifying expert.              10:41
 6        A.    Uh-huh.                                  10:41
 7        Q.    So even if Mr. Kerensky's               10:41
 8   characterization of the privilege is accurate, all 10:41
 9   communications you've had with counsel for          10:41
10   Plaintiffs are open to my examination.             10:41
11        A.    Okay.                                    10:41
12        Q.    Okay.                                    10:41
13        A.    Okay.                                    10:41
14            MR. KERENSKY:  If it is about cases that   10:41
15        you've been retained, if there is a file you  10:41
16        have been retained on, he's right.  Everything 10:41
17        you talked to the PSC about or anything like  10:41
18        that, that's fair game.                       10:41
19            MR. ANDERTON:  And that's what we're       10:41
20        discussing, Mike.  You'll see when you see    10:41
21        Exhibit 146 that it is communication between  10:41
22        Dr. Bliesner and Pete Miller.                 10:41
23            MR. KERENSKY:  Okay.  That's great.        10:41
24            THE WITNESS:  Okay.                        10:41
25   BY MR. ANDERTON:                                    10:41
```

PLAINTIFFS' EXHIBITS 003567

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

```
                                                      Page 347
 1      Q.    So -- and why aren't you comfortable       10:41

 2   discussing negotiations you had?                    10:41

 3      A.    It's just bad business to talk to other    10:41

 4   people about negotiations in business with your     10:42

 5   clients.                                            10:42

 6      Q.    Well, this isn't business,                 10:42

 7   Dr. Bliesner.  This is testimony in a legal         10:42

 8   proceeding.  You understand that; right?            10:42

 9      A.    I agree of course, but it's a              10:42

10   transaction.                                        10:42

11      Q.    Dr. Bliesner, did you receive a notice     10:42

12   of today's proceeding?                              10:42

13      A.    Today's proceeding?                        10:42

14      Q.    Yes.                                       10:42

15      A.    I received a notice for the one on the     10:42

16   25th, but one specifically for today?              10:42

17      Q.    Yeah.                                       10:42

18      A.    Not that I recall.                         10:42

19      Q.    Not that you recall.                       10:42

20      Did you look at the one that you received       10:42

21   prior to coming on January 25th?                    10:42

22      A.    For today?                                 10:43

23      Q.    No, before you came on January 25th.       10:43

24      A.    Yes.                                       10:43

25      Q.    And did you review that notice to          10:43
```

Page 348

| | | |
|---|---|---|
| 1 | identify documents and other materials that you | 10:43 |
| 2 | were supposed to bring with you on January 25th? | 10:43 |
| 3 | A.    For the 25th one? | 10:43 |
| 4 | Q.    Yes. | 10:43 |
| 5 | A.    Yeah. | 10:43 |
| 6 | Q.    One second, getting a drink. | 10:43 |
| 7 | A.    May I do the same? | 10:43 |
| 8 | Q.    Uh-huh, yes you may.  Yes, you may. | 10:43 |
| 9 | We'll stay on the record. | 10:43 |
| 10 | Are you ready? | 10:43 |
| 11 | A.    Yes, sir. | 10:44 |
| 12 | Q.    So Dr. Bliesner, you did not receive any | 10:44 |
| 13 | notice of today's deposition? | 10:44 |
| 14 | A.    Not that I recall, no. | 10:44 |
| 15 | Q.    Before you came on January 25th -- | 10:44 |
| 16 | A.    Uh-huh. | 10:44 |
| 17 | Q.    -- to the first session of your | 10:44 |
| 18 | deposition, did you review the notice that you | 10:44 |
| 19 | received for the 25th and collect all of the | 10:44 |
| 20 | information, documents, and materials that were | 10:44 |
| 21 | identified in the notice to bring with you? | 10:44 |
| 22 | A.    I did. | 10:44 |
| 23 | Q.    And did you bring them with you on that | 10:44 |
| 24 | day? | 10:44 |
| 25 | A.    I did. | 10:44 |

PLAINTIFFS' EXHIBITS 003569

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 349

| | | | |
|---|---|---|---|
| 1 | Q. | Did you bring them with you again today? | 10:44 |
| 2 | A. | I did. | 10:44 |
| 3 | Q. | Same materials? | 10:44 |
| 4 | A. | Yes. | 10:44 |
| 5 | Q. | Is there anything that you brought with | 10:44 |
| 6 | | you on the 25th that isn't here today? | 10:44 |
| 7 | A. | No. | 10:44 |
| 8 | Q. | You went through and organized them per | 10:44 |
| 9 | | the -- | 10:44 |
| 10 | A. | Uh-huh. | 10:44 |
| 11 | Q. | -- suggestion of Mr. Kerensky? | 10:44 |
| 12 | A. | Uh-huh. | 10:44 |
| 13 | Q. | But you brought the same materials with | 10:44 |
| 14 | | you? | 10:44 |
| 15 | A. | Uh-huh. | 10:44 |
| 16 | Q. | I'll represent to you, Dr. Bliesner, | 10:44 |
| 17 | | that this notice is identical to the prior notice | 10:44 |
| 18 | | except for the date and time.  Mr. Kerensky will | 10:44 |
| 19 | | speak up and tell me if I'm wrong.  But item | 10:45 |
| 20 | | number 2 -- | 10:45 |
| 21 | A. | Uh-huh. | 10:45 |
| 22 | Q. | -- requests that you bring all | 10:45 |
| 23 | | correspondence and communication between the | 10:45 |
| 24 | | witness -- that's you -- and anyone acting on the | 10:45 |
| 25 | | witness's behalf.  So anyone acting on your | 10:45 |

PLAINTIFFS' EXHIBITS 003570

Page 350

| | | |
|---|---|---|
| 1 | behalf. | 10:45 |
| 2 | A.    Uh-huh. | 10:45 |
| 3 | Q.    And attorneys representing the | 10:45 |
| 4 | Plaintiffs in this litigation. | 10:45 |
| 5 | A.    Uh-huh. | 10:45 |
| 6 | Q.    Do you understand that request? | 10:45 |
| 7 | A.    Yes. | 10:45 |
| 8 | Q.    Did you bring those materials with you? | 10:45 |
| 9 | Do you have all correspondence and communication | 10:45 |
| 10 | between yourself or your wife as a -- | 10:45 |
| 11 | A.    Uh-huh. | 10:45 |
| 12 | Q.    -- representative of Delphi? | 10:45 |
| 13 | A.    Uh-huh. | 10:45 |
| 14 | Q.    Or -- these invoices are under Delphi. | 10:45 |
| 15 | Do you have all correspondence between you, your | 10:45 |
| 16 | wife, or anyone at Delphi and any of the | 10:45 |
| 17 | Plaintiffs' lawyers with you today? | 10:45 |
| 18 | A.    The original e-mails were copied off the | 10:45 |
| 19 | hard drive and Miss Johnson has them.  So to | 10:46 |
| 20 | answer your question, that set of e-mails I do not | 10:46 |
| 21 | have with me.  It's not on the hard drive. | 10:46 |
| 22 | Q.    Not on the hard drive? | 10:46 |
| 23 | A.    I have e-mails since that time that the | 10:46 |
| 24 | communications are on that hard drive. | 10:46 |
| 25 | Q.    So the original e-mails were copied off | 10:46 |

PLAINTIFFS' EXHIBITS 003571

Page 351

| | | |
|---|---|---|
| 1 | of that same hard drive that you brought with you | 10:46 |
| 2 | today? | 10:46 |
| 3 | A.   Yes, sir. | 10:46 |
| 4 | Q.   Given -- printed off of that? | 10:46 |
| 5 | A.   No, they were just copied as file. | 10:46 |
| 6 | Q.   When did that happen? | 10:46 |
| 7 | A.   The 24th, I believe.  That was the day | 10:46 |
| 8 | before. | 10:46 |
| 9 | Q.   So you brought them on that same hard | 10:46 |
| 10 | drive on January 24th to your meeting with | 10:46 |
| 11 | Plaintiffs' counsel? | 10:46 |
| 12 | A.   Yes. | 10:46 |
| 13 | Q.   And in that meeting, somebody copied | 10:46 |
| 14 | them off of that hard drive onto some media that | 10:46 |
| 15 | they brought with them? | 10:46 |
| 16 | A.   Yes. | 10:46 |
| 17 | Q.   Who was that? | 10:46 |
| 18 | A.   It was Miss Johnson. | 10:46 |
| 19 | Q.   What was the media she copied it onto, | 10:46 |
| 20 | do you know? | 10:46 |
| 21 | A.   I don't recall. | 10:46 |
| 22 | Q.   And then after that meeting -- | 10:46 |
| 23 | A.   Uh-huh. | 10:47 |
| 24 | Q.   -- did you bring that -- did you have | 10:47 |
| 25 | that hard drive with you on the 25th? | 10:47 |

PLAINTIFFS' EXHIBITS 003572

Page 352

| | | |
|---|---|---|
| 1 | A.    Yes. | 10:47 |
| 2 | Q.    Were the e-mails between you and | 10:47 |
| 3 | Plaintiffs' counsel still on the hard drive at | 10:47 |
| 4 | that time? | 10:47 |
| 5 | A.    No. | 10:47 |
| 6 | Q.    So you went home on the 24th and you | 10:47 |
| 7 | removed them? | 10:47 |
| 8 | A.    No, no.  She copied them off. | 10:47 |
| 9 | Q.    Well, when you copy, you don't remove. | 10:47 |
| 10 | A.    She removed them.  She copied -- cut the | 10:47 |
| 11 | whole folder and dropped it over onto her | 10:47 |
| 12 | computer. | 10:47 |
| 13 | Q.    So you had that hard drive with you on | 10:47 |
| 14 | the 25th but you didn't have the e-mails with you. | 10:47 |
| 15 | A.    No, she he did. | 10:47 |
| 16 | Q.    She did? | 10:47 |
| 17 | A.    Yeah. | 10:47 |
| 18 | MR. ANDERTON:  You see that we have a | 10:47 |
| 19 | problem here, Mr. Kerensky?  Mike? | 10:47 |
| 20 | MR. KERENSKY:  Sorry, I was on mute.  I | 10:47 |
| 21 | don't think -- I'm pretty sure Meghan sent | 10:47 |
| 22 | those to me and I was supposed to bring them. | 10:47 |
| 23 | I am looking for an e-mail.  Why don't you | 10:47 |
| 24 | move to another subject and I'll see if I can | 10:47 |
| 25 | solve it in a minute. | 10:47 |

PLAINTIFFS' EXHIBITS 003573

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

                                                        Page 353
 1   BY MR. ANDERTON:                                    10:47

 2       Q.    Okay.  So back to -- well, I'm going to    10:48

 3   stay on this subject for a minute.  She copied       10:48

 4   them onto some media that she had.                   10:48

 5       A.    Yeah, I believe it was her computer.       10:48

 6       Q.    Okay.                                      10:48

 7       A.    That she was going to share with           10:48

 8   everybody.                                           10:48

 9       Q.    And then you removed them from your hard   10:48

10   drive?                                               10:48

11       A.    No, no, no.  She took them off.            10:48

12   Everything that I've done with respect to            10:48

13   electronic records and everything else,              10:48

14   communication, has been on that external hard        10:48

15   drive.                                               10:48

16       Q.    This one you brought you?                  10:48

17       A.    This exact reason.  It could be shared     10:48

18   with people.                                         10:48

19       Q.    Okay.                                      10:48

20       A.    So when we met on the 24th.                10:48

21       Q.    Correct.                                   10:48

22       A.    Right?  They said so do you have any       10:48

23   e-mails?  And I said yeah, I did what you told.      10:48

24   Here they are on the external hard drive and Miss    10:48

25   Johnson plugged it in I believe it was her           10:48

PLAINTIFFS' EXHIBITS 003574

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised               February 18, 2011

Page 354

| | | |
|---|---|---|
| 1 | computer, and she goes -- there's e-mail and | 10:48 |
| 2 | communications back and forth here.  You got to | 10:48 |
| 3 | figure out -- words to this effect, you know -- a | 10:48 |
| 4 | good way to distribute them so we're not passing | 10:48 |
| 5 | the hard drive around.  She goes so I'm going to | 10:48 |
| 6 | cut them off and then I'll make sure they're | 10:48 |
| 7 | available to people. | 10:49 |
| 8 |     Q.    Okay.  She removed them from your hard | 10:49 |
| 9 | drive. | 10:49 |
| 10 |     A.    Yes. | 10:49 |
| 11 |     Q.    And you don't have them here today. | 10:49 |
| 12 |     A.    No.  You have e-mails since that time of | 10:49 |
| 13 | communication. | 10:49 |
| 14 |     Q.    On this hard drive. | 10:49 |
| 15 |     A.    Yes. | 10:49 |
| 16 |     Q.    All e-mails, all correspondence between | 10:49 |
| 17 | you and Plaintiffs' counsel? | 10:49 |
| 18 |     A.    There should be, yes.  I'm pretty | 10:49 |
| 19 | meticulous about when I get that, I make sure it | 10:49 |
| 20 | goes onto the hard drive. | 10:49 |
| 21 |     Q.    So you're pretty meticulous that you | 10:49 |
| 22 | preserve and maintain a complete set of records? | 10:49 |
| 23 |     A.    Yes. | 10:49 |
| 24 |     Q.    The documents that Mr. Miller and Ms | 10:49 |
| 25 | Johnson delivered in person to you at your home, | 10:49 |

Page 355

| | | | |
|---|---|---|---|
| 1 | | what were they? | 10:49 |
| 2 | A. | I could show you. | 10:49 |
| 3 | Q. | Please do. | 10:50 |
| 4 | A. | We're talking just about that visit at | 10:50 |
| 5 | | the home office. | 10:50 |
| 6 | Q. | Well, were there other visits where they | 10:50 |
| 7 | | delivered documents to you? | 10:50 |
| 8 | A. | No. | 10:50 |
| 9 | Q. | Just one? | 10:50 |
| 10 | A. | Yes. | 10:50 |
| 11 | Q. | Okay.  Is that it? | 10:50 |
| 12 | A. | The first set, they did not deliver.  I | 10:51 |
| 13 | | apologize for that. | 10:51 |
| 14 | Q. | The first set? | 10:51 |
| 15 | A. | That's stuff I had mailed to me | 10:51 |
| 16 | | originally. | 10:51 |
| 17 | Q. | Okay. | 10:51 |
| 18 | A. | So on that particular day, it would have | 10:51 |
| 19 | | been the second set I'm pretty sure. | 10:51 |
| 20 | Q. | These two binders labeled second set? | 10:51 |
| 21 | A. | Yeah.  There may have been some | 10:51 |
| 22 | | additional documents mailed to me prior to that | 10:51 |
| 23 | | day, but they're all in here. | 10:51 |
| 24 | Q. | All right.  You can sit back down. | 10:52 |
| 25 | A. | Sure. | 10:52 |

PLAINTIFFS' EXHIBITS 003576

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 356

1      Q.      That's all right.                          10:52

2      A.      Uh-huh.                                    10:52

3      Q.      The other documents -- well, are there     10:52

4    other documents that you have received from         10:52

5    Plaintiffs' counsel as part of your engagement?      10:52

6      A.      I've reviewed through this Crivella West   10:52

7    site.                                                10:52

8      Q.      Okay.                                      10:52

9      A.      Some of which I printed out to review,     10:52

10   others which I just left online because they were    10:52

11   too big.                                             10:52

12     Q.      Okay.  Are these the only documents that   10:52

13   you've actually received from Plaintiffs' counsel?   10:52

14     A.      No.                                        10:52

15     Q.      What else have you received from           10:53

16   Plaintiffs' counsel?                                 10:53

17     A.      Yesterday evening, late, I believe I got   10:53

18   one or two reports from process development or       10:53

19   something like that.  I didn't review them.          10:53

20     Q.      Process validation?                        10:53

21     A.      I'm trying -- I don't recall because I     10:53

22   didn't look at them.                                 10:53

23     Q.      Okay.                                      10:53

24     A.      I got a document.  I know that and I       10:53

25   just didn't look at it.                              10:53

PLAINTIFFS' EXHIBITS 003577

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

```
                                                 Page 357
 1       Q.    Who did you get that from?             10:53
 2       A.    Miss Johnson.                          10:53
 3       Q.    Yesterday?                             10:53
 4       A.    Evening, yes.                          10:53
 5       Q.    Mail?  Electronic?  How did you get it? 10:53
 6       A.    It was electronic.                     10:53
 7       Q.    By e-mail?                             10:53
 8       A.    Yes.                                   10:53
 9       Q.    Is the e-mail --                       10:53
10       A.    Should be on there, yes.               10:53
11       Q.    Is that on the hard drive?             10:53
12       A.    Yeah, should be there.                 10:53
13       Q.    The -- other than the documents you    10:53
14   received yesterday electronically from           10:53
15   Ms. Johnson, are there any other documents in    10:53
16   addition to the ones that you've handed me today 10:53
17   that you actually received from Plaintiffs'      10:53
18   counsel?                                         10:53
19       A.    Not that I recall.  I think this is    10:53
20   pretty much it, yeah.  It's a lot of stuff so to 10:53
21   say definitively everything I've got is here.    10:53
22       Q.    You just said you're a pretty meticulous 10:54
23   --                                               10:54
24       A.    Right.                                 10:54
25       Q.    -- detailed guy.                       10:54
```

PLAINTIFFS' EXHIBITS 003578

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 358

| 1  | A. | Right, right. | 10:54 |
| 2  | Q. | That's the military background; right? | 10:54 |
| 3  | A. | Or just anal retentiveness as a human | 10:54 |
| 4  | being. | | 10:54 |
| 5  | Q. | Okay. | 10:54 |
| 6  | A. | The reason I'm not saying absolutely | 10:54 |
| 7  | yes, this is it, is that I'd have to go back and | | 10:54 |
| 8  | look at the electronic records to make sure that | | 10:54 |
| 9  | there was one attached that I didn't review or I | | 10:54 |
| 10 | forgot about that would be there. | | 10:54 |
| 11 | Q. | But those would be included among e-mail | 10:54 |
| 12 | communications? | | 10:54 |
| 13 | A. | Yes. | 10:54 |
| 14 | Q. | That Miss Johnson -- | 10:54 |
| 15 | A. | Yes. | 10:54 |
| 16 | Q. | -- took from you and hasn't produced to | 10:54 |
| 17 | us. | | 10:54 |
| 18 | A. | If she hasn't produced them, yes. | 10:54 |
| 19 | Q. | Okay. Are there any other documents at | 10:54 |
| 20 | your home that you did not bring with you today | | 10:54 |
| 21 | that you have received from Plaintiffs' counsel? | | 10:54 |
| 22 | A. | No. | 10:54 |
| 23 | | MR. ANDERTON: Phil, we're going to mark | 10:54 |
| 24 | | these. There are four of them. We're marking | 10:54 |
| 25 | | documents Mike. Just show you know, there's a | 10:55 |

PLAINTIFFS' EXHIBITS 003579

Page 359

```
 1      stack and three binders.  We'll make           10:55

 2      arrangements to get them copied and back to     10:55

 3      Dr. Bliesner.                                   10:55

 4          MR. KERENSKY:  No problem.  Who is going    10:55

 5      to do the copying?                              10:55

 6          MR. ANDERTON:  We will figure that out      10:55

 7      before we leave today.                          10:55

 8          MR. KERENSKY:  Very good.                   10:55

 9          THE WITNESS:  Now, there are an             10:55

10      additional documents that support the report,  10:55

11      the attachments.                                10:55

12              (Whereupon, Exhibits 147, 148, 149,     10:55

13   150 were marked for identification)                10:55

14   BY MR. ANDERTON:                                   10:55

15      Q.   Uh-huh.                                    10:55

16      A.   Do you want those as well?                 10:55

17      Q.   Well, we'll get there.                     10:55

18      A.   Okay.                                      10:55

19      Q.   I take it those are documents that you     10:55

20   reviewed and printed from the Crivella West?       10:55

21      A.   They could have been provided at some      10:55

22   point through this document delivery that you've   10:56

23   talked about.  They e-mailed me some, they mailed  10:56

24   me some, and then they delivered some personally.  10:56

25   So they're all weaved together.                    10:56
```

PLAINTIFFS' EXHIBITS 003580

Page 360

| | | |
|---|---|---|
| 1 | Q. But I asked you, Dr. Bliesner, if there | 10:56 |
| 2 | are any other documents that you've received from | 10:56 |
| 3 | Plaintiffs' counsel. I didn't specify personal | 10:56 |
| 4 | delivery. | 10:56 |
| 5 | A. Well. | 10:56 |
| 6 | Q. That's what you gave me when you gave me | 10:56 |
| 7 | these things. | 10:56 |
| 8 | A. I'm sorry. I misunderstood you because | 10:56 |
| 9 | I thought you said just for that visit at the home | 10:56 |
| 10 | office. I'm sorry. | 10:56 |
| 11 | Q. Okay. | 10:56 |
| 12 | A. Uh-huh. | 10:56 |
| 13 | Q. So let's make sure. | 10:56 |
| 14 | A. Okay. | 10:56 |
| 15 | Q. It's imperative -- | 10:56 |
| 16 | A. Uh-huh. | 10:56 |
| 17 | Q. -- Dr. Bliesner that you listen very | 10:56 |
| 18 | carefully to the questions that I ask. | 10:56 |
| 19 | A. I understand. | 10:56 |
| 20 | Q. Are there any other documents that you | 10:56 |
| 21 | have received from Plaintiffs' counsel -- | 10:56 |
| 22 | A. Uh-huh, yes. Sorry. | 10:56 |
| 23 | Q. -- that you have with you today? | 10:56 |
| 24 | A. Yes. | 10:56 |
| 25 | Q. We're going to mark them. You've handed | 10:56 |

PLAINTIFFS' EXHIBITS 003581

David M. Bliesner, Ph.D., Volume II        Videotaped - Revised                    February 18, 2011

                                                                          Page 361

 1    me two more binders.                                                10:57

 2         A.    Yes, sir.                                                 10:57

 3         Q.    They have post-it notes on the key                       10:57

 4    documents A1 to A30 and A31 to A63?                                  10:57

 5         A.    Yes, sir.                                                 10:57

 6         Q.    Who designated them key documents?                       10:57

 7         A.    Me.                                                       10:57

 8         Q.    Okay.  I've got another stack of                         10:57

 9    documents with a post it on it that says last                       10:58

10    supplemental set; right?                                            10:58

11         A.    Yes.                                                      10:58

12         Q.    What is that?                                            10:58

13         A.    Those were -- if I recall those were                     10:58

14    printouts of e-mails that I received from one of                    10:58

15    the attorneys prior to the 25th.                                    10:58

16         Q.    Okay.                                                     10:58

17         A.    I believe that we reviewed those.  You                   10:58

18    have them as well and we've reviewed them.                          10:58

19         Q.    Okay.                                                     10:58

20         A.    Uh-huh.                                                   10:58

21         Q.    So these appear to be all or largely the                 10:58

22    records relating to the FDA 484 sampling program.                   10:58

23    You can stay right there.                                           10:58

24         A.    Okay.  It looks like there's an                          10:58

25    additional set there too.  So to answer your                        10:59

PLAINTIFFS' EXHIBITS 003582

Page 362

1    question, it appears to be that and some more.         10:59

2       Q.    Okay.  But you received those prior          10:59

3    to -- somewhat close in proximity to the last         10:59

4    deposition session.                                   10:59

5       A.    Yeah.                                         10:59

6       Q.    As I look at these binders that have         10:59

7    been marked as 148, 149 and 150.                      10:59

8       A.    Uh-huh.                                       10:59

9       Q.    I see highlighting on various               10:59

10   documents.  Who did the highlighting?                 10:59

11      A.    Let's see.                                    10:59

12      Q.    In particular, I'm looking at --            10:59

13      A.    Oh.                                           10:59

14      Q.    -- the third set of supplemental            10:59

15   documents.                                             10:59

16      Who did the highlighting?                           10:59

17      A.    Me.                                            10:59

18      Q.    Is it true that any highlighting that I     10:59

19   will encounter on these documents was done by you?    10:59

20      A.    I believe so, yes.                            10:59

21      Q.    Okay.                                         10:59

22      A.    I -- nobody pointed out anything            10:59

23   specifically for me to...                              11:00

24      Q.    You can have that stack back and you can     11:00

25   put it away.                                           11:00

PLAINTIFFS' EXHIBITS 003583

Page 363

| | | |
|---|---|---|
| 1 | A.    Okay. | 11:00 |
| 2 | Q.    We're not going to copy that or mark | 11:00 |
| 3 | it. | 11:00 |
| 4 | A.    Okay. | 11:00 |
| 5 | Q.    Now, you've handed me another binder of | 11:00 |
| 6 | deposition transcripts. | 11:00 |
| 7 | A.    Yeah.  Those were printed out off of | 11:00 |
| 8 | Crivella. | 11:00 |
| 9 | Q.    You can have that back.  We're not going | 11:00 |
| 10 | to mark that. | 11:00 |
| 11 | A.    Okay. | 11:00 |
| 12 | Q.    Are there any other documents, | 11:00 |
| 13 | Dr. Bliesner, that you have received from | 11:01 |
| 14 | Plaintiffs' counsel that you brought with you | 11:01 |
| 15 | today? | 11:01 |
| 16 | A.    Other than the electronic ones that I | 11:01 |
| 17 | could not account for, not to my knowledge, no. | 11:01 |
| 18 | Q.    Okay. | 11:01 |
| 19 | A.    Uh-huh. | 11:01 |
| 20 | Q.    What else is in the boxes that you | 11:01 |
| 21 | brought with you today? | 11:01 |
| 22 | A.    Today? | 11:01 |
| 23 | Q.    Just describe it. | 11:01 |
| 24 | A.    Describe it?  Textbook, the transcript | 11:01 |
| 25 | of the last deposition that I need to review. | 11:01 |

PLAINTIFFS' EXHIBITS 003584

```
                                                    Page 364
 1      Q.    What else?                              11:01
 2      A.    I think I've got some notes from -- the 11:01
 3   stuff like this.                                 11:01
 4      Q.    Some notes like that or --              11:01
 5      A.    Would you like me to look?              11:01
 6      Q.    Sure.                                   11:01
 7      A.    Because I'm not sure whether you have   11:01
 8   copies of this or not.                           11:01
 9      Q.    Well, let me see the notes.             11:01
10      A.    Sure.  That's it.  Did you want to --   11:01
11      Q.    No.                                     11:01
12      A.    Okay.                                   11:01
13            MR. ANDERTON:  While -- Phil, while we're 11:02
14        at it, we may as well mark the notice.  Mike, 11:02
15        I'm marking the notice as 151.              11:02
16               (Whereupon, Exhibit 151 was marked   11:02
17   for identification)                              11:02
18   BY MR. ANDERTON:                                 11:02
19      Q.    Do you have any other notes with you?   11:02
20      A.    No.                                     11:02
21      Q.    Okay.  You described -- you said you had 11:02
22   your textbook, you said you had your deposition  11:02
23   transcript, you said you had these additional    11:03
24   notes that we're about to mark.                  11:03
25      A.    Uh-huh.                                 11:03
```

PLAINTIFFS' EXHIBITS 003585

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised          February 18, 2011

Page 365

1      Q.    Do you have anything else with you in          11:03

2    the boxes that you brought today?                      11:03

3      A.    No.                                            11:03

4          MR. ANDERTON:  Phil, would you mark these        11:03

5      as 152 and 3?  Mike, these are additional sets       11:03

6      of notes.                                            11:03

7              (Whereupon, Exhibits 152 and 153             11:03

8    were marked for identification)                        11:03

9          THE VIDEOGRAPHER:  The time is                   11:03

10          a.m.  We're going off the record.               11:03

11              (Short break)                               11:14

12          THE VIDEOGRAPHER:  The time is                  11:14

13      11:14 a.m.  We're back on the record.  This is      11:15

14      the beginning of tape four.                         11:15

15   BY MR. ANDERTON:                                       11:15

16      Q.    Dr. Bliesner, I'm going to hand you a         11:15

17   document that has been marked as Exhibit 152.          11:15

18      A.    Yes.                                          11:15

19      Q.    Tell me what that is.                         11:15

20      A.    That's my handwritten notes I believe it      11:15

21   was for the day when I met before the first            11:15

22   deposition with the attorneys.                         11:15

23      Q.    Your handwritten notes.  Okay.  Well, we      11:15

24   had some testimony earlier about a document that's     11:15

25   marked as 109.                                         11:15

PLAINTIFFS' EXHIBITS 003586

Page 366

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 11:15 |
| 2 | Q. | Do you remember that? | 11:15 |
| 3 | A. | Yes, uh-huh. | 11:15 |
| 4 | Q. | You described those as your handwritten | 11:16 |
| 5 | notes. Did you take two sets of notes that day? | | 11:16 |
| 6 | A. | I cleaned them up so I could read them. | 11:16 |
| 7 | Q. | When did you do that? | 11:16 |
| 8 | A. | I don't recall, but I think it was at | 11:16 |
| 9 | the same time, like at the end of the day. | | 11:16 |
| 10 | Q. | Okay. So the document that is 109, is | 11:16 |
| 11 | that the uncleaned up version or is it the cleaned | | 11:16 |
| 12 | up version? | | 11:16 |
| 13 | A. | This one right here? | 11:16 |
| 14 | Q. | 109. | 11:16 |
| 15 | A. | Yeah, I think that's just the summary at | 11:16 |
| 16 | the end of the -- this and the other notes that | | 11:16 |
| 17 | were there. | | 11:16 |
| 18 | Q. | So the document that's 152 -- | 11:16 |
| 19 | A. | Uh-huh. | 11:16 |
| 20 | Q. | -- let's get them both in front you. | 11:16 |
| 21 | A. | Okay. | 11:16 |
| 22 | Q. | I'm also handling you a document that is | 11:16 |
| 23 | marked 153. | | 11:16 |
| 24 | A. | Uh-huh. | 11:16 |
| 25 | Q. | What is that? | 11:16 |

PLAINTIFFS' EXHIBITS 003587

Page 367

| | | |
|---|---|---|
| 1 | A.    153 looks like notes from a conversation | 11:16 |
| 2 | I had. | 11:16 |
| 3 | Q.    With? | 11:16 |
| 4 | A.    It looks like -- specifically, I'm not | 11:16 |
| 5 | sure who called me.  It was either Pete or Meghan | 11:17 |
| 6 | to tell me a time. | 11:17 |
| 7 | Q.    To tell you a time? | 11:17 |
| 8 | A.    Yeah, hold on.  That's not right.  10 -- | 11:17 |
| 9 | oh, I'd have to look at the calendar.  We did our | 11:17 |
| 10 | deposition on what day of the week? | 11:17 |
| 11 | Q.    Tuesday. | 11:17 |
| 12 | A.    Tuesday, yes.  So this was notes with | 11:17 |
| 13 | respect to them, to meet me on the Monday before. | 11:17 |
| 14 | Q.    And by "this," you mean Exhibit 153? | 11:17 |
| 15 | A.    Yes. | 11:17 |
| 16 | Q.    But this is notes of a phone | 11:17 |
| 17 | conversation that obviously occurred before Monday | 11:17 |
| 18 | 24th; right? | 11:17 |
| 19 | A.    I suppose that's -- that's the case, | 11:17 |
| 20 | yes. | 11:17 |
| 21 | Q.    You suppose? | 11:17 |
| 22 | A.    It doesn't have a date on it.  I don't | 11:17 |
| 23 | have a time so I can't tell you definitively what | 11:17 |
| 24 | day. | 11:17 |
| 25 | Q.    Are these notes that you took during | 11:17 |

PLAINTIFFS' EXHIBITS 003588

Page 368

```
1    that meeting with the lawyers?                        11:18

2        A.    No.                                          11:18

3        Q.    And it references a meeting time and         11:18

4    place, 10 a.m., 10, Monday, 100 North Tampa.          11:18

5        A.    Right.  So chances are it's the             11:18

6    telephone record.                                     11:18

7        Q.    You mean record of notes during a           11:18

8    telephone conversation?                               11:18

9        A.    When they called up and said, you know,     11:18

10   we want to get together on the 24th, the day          11:18

11   before.                                               11:18

12       Q.    Well, this is a lot more than we want to    11:18

13   get together on 24th, isn't it, Dr. Bliesner?        11:18

14       A.    This sheet is.  The rest of them, I'm       11:18

15   not sure where -- if that was part of the day         11:18

16   that -- on the day before the deposition or not.      11:18

17   I -- I really -- because I don't have a date and a    11:18

18   time on it here.  Just -- I think that this --        11:18

19   this page 2 here of 153.                              11:18

20       Q.    Yeah.                                        11:18

21       A.    If I had to offer a suggestion, I think     11:18

22   that those pages probably went with this, the         11:18

23   preparation day.                                      11:19

24       Q.    So you think these are notes that you       11:19

25   made when you met with them on the 24th?              11:19
```

PLAINTIFFS' EXHIBITS 003589

Page 369

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 11:19 |
| 2 | Q. | And you think 152 are notes that you | 11:19 |
| 3 | made when you met with them on the 24th? | | 11:19 |
| 4 | A. | 152. | 11:19 |
| 5 | Q. | Yes. | 11:19 |
| 6 | A. | Yes. | 11:19 |
| 7 | Q. | And you think that 109 is a clean up of | 11:19 |
| 8 | notes you made when you met with them on the 24th | | 11:19 |
| 9 | and made them later that day? | | 11:19 |
| 10 | A. | Yes. | 11:19 |
| 11 | Q. | Three sets of notes, Dr. Bliesner. | 11:19 |
| 12 | Really? | | 11:19 |
| 13 | A. | Three set pages. | 11:19 |
| 14 | Q. | In the same day? | 11:19 |
| 15 | A. | This is the telephone conversation. | 11:19 |
| 16 | Q. | The first page of Exhibit 153. | 11:19 |
| 17 | A. | 153. | 11:19 |
| 18 | Q. | Your testimony is that what remains in | 11:19 |
| 19 | 153 -- and just so we're clear -- | | 11:19 |
| 20 | A. | Uh-huh. | 11:19 |
| 21 | Q. | -- you handed me the document that we've | 11:19 |
| 22 | marked as Exhibit 153 -- | | 11:19 |
| 23 | A. | Yes. | 11:19 |
| 24 | Q. | -- as a single group of notes; right? | 11:19 |
| 25 | A. | I -- if that's how it's -- you | 11:19 |

PLAINTIFFS' EXHIBITS 003590

Page 370

| | | |
|---|---|---|
| 1 | interpreted it, it's -- that's not an accurate | 11:19 |
| 2 | statement.  It's just notes that I had.  I just | 11:19 |
| 3 | gave you my notes.  Now what days they were on | 11:19 |
| 4 | specifically, that's what we're trying to | 11:19 |
| 5 | determine right now. | 11:20 |
| 6 | Q.    And you're unable to do that. | 11:20 |
| 7 | A.    Considering I didn't put a date at the | 11:20 |
| 8 | top, yeah. | 11:20 |
| 9 | Q.    So let's look at Exhibit 152 -- | 11:20 |
| 10 | A.    Okay. | 11:20 |
| 11 | Q.    -- first; okay? | 11:20 |
| 12 | A.    Okay. | 11:20 |
| 13 | Q.    The top says "90 percent."  What does | 11:20 |
| 14 | that mean? | 11:21 |
| 15 | A.    I'm not really sure.  I'm thinking that | 11:21 |
| 16 | it was a reference to listening to the question | 11:21 |
| 17 | like you've said and thinking about what's really | 11:21 |
| 18 | been said as opposed to jumping in and trying to | 11:21 |
| 19 | answer without really understanding the question. | 11:21 |
| 20 | So 90 percent of the effort would be sitting down, | 11:21 |
| 21 | listening to the question, and making sure that | 11:21 |
| 22 | you're answering in a way that's accurate. | 11:21 |
| 23 | Q.    Under there it says, "defending turf." | 11:21 |
| 24 | What does that mean? | 11:21 |
| 25 | A.    I believe that was guidance, since I | 11:21 |

PLAINTIFFS' EXHIBITS 003591

Page 371

| | |
|---|---|
| 1 | have never done this before, that, you know, don't | 11:21 |
| 2 | allow yourself to be headed down a direction that | 11:22 |
| 3 | isn't the truth.  So, again, I as said before, | 11:22 |
| 4 | this is such -- so different than the | 11:22 |
| 5 | collaborative stuff that -- that I've done in the | 11:22 |
| 6 | past that obviously I need a little instruction on | 11:22 |
| 7 | how to do this. | 11:22 |
| 8 | Q.   Well, it would be great if this was | 11:22 |
| 9 | collaborative.  You're obviously getting guidance | 11:22 |
| 10 | on how to make it combative; right? | 11:22 |
| 11 | MR. KERENSKY:  Objection, form. | 11:22 |
| 12 | BY MR. ANDERTON: | 11:22 |
| 13 | Q.   You may answer. | 11:22 |
| 14 | A.   Could you say the question again? | 11:22 |
| 15 | MR. ANDERTON:  Read it back, please, | 11:22 |
| 16 | Phil. | 11:22 |
| 17 | (Whereupon, the testimony was read | 11:22 |
| 18 | back by the court reporter, as recorded above) | 11:22 |
| 19 | THE WITNESS:  I wouldn't agree with that. | 11:22 |
| 20 | BY MR. ANDERTON: | 11:22 |
| 21 | Q.   You don't think that somebody telling | 11:22 |
| 22 | you to defend your turf isn't a guidance on how to | 11:22 |
| 23 | make a process combative? | 11:22 |
| 24 | A.   Absolutely not. | 11:22 |
| 25 | Q.   Okay.  In the next line there's a | 11:22 |

PLAINTIFFS' EXHIBITS 003592

Page 372

1    bracketed phrase that says "easier said than          11:23

2    done." Is that what it says?                          11:23

3        A.    Where are we at again?                      11:23

4        Q.    The first page of Exhibit 152, top of       11:23

5    the page.                                             11:23

6        A.    Easier said than done, yes.                 11:23

7        Q.    What does that mean?                         11:23

8        A.    To listen very carefully, things are in     11:23

9    the box. To listen to the questions. Don't guess      11:23

10   or propose a hypothesis and then the third and        11:23

11   fourth thing. So that's what it is. It's very         11:23

12   simple guidance, but it's, as I'm discovering, not    11:23

13   real easy.                                            11:23

14       Q.    What do you mean by that?                    11:23

15       A.    It's just hard work.                         11:23

16       Q.    I think you're making it harder than it     11:23

17   actually is, Dr. Bliesner, but that's just my         11:23

18   humble opinion.                                       11:23

19       The next page of Exhibit 152 says "write these    11:24

20   down."                                                11:24

21       A.    Uh-huh.                                      11:24

22       Q.    Why did you make that note?                  11:24

23       A.    I believe the conversation went to this     11:24

24   effect, you know? How do you -- in your report,       11:24

25   what are the things that come to mind off the top     11:24

Page 373

| | | |
|---|---|---|
| 1 | of your head that line up in some entry position | 11:24 |
| 2 | outside of the report.  So I went (witness makes | 11:24 |
| 3 | noise) right off the top of my head. | 11:24 |
| 4 | Q.    So in essence what are the documents | 11:24 |
| 5 | that support the conclusions in your report? | 11:24 |
| 6 | A.    Yeah. | 11:24 |
| 7 | Q.    And so they are the AERs, adverse event | 11:24 |
| 8 | reports; right? | 11:24 |
| 9 | A.    Uh-huh. | 11:24 |
| 10 | Q.    The FDA documents; right? | 11:24 |
| 11 | A.    Yes. | 11:24 |
| 12 | Q.    Pharmacy complaints; right? | 11:24 |
| 13 | A.    Yes. | 11:24 |
| 14 | Q.    Deposition testimony? | 11:24 |
| 15 | A.    Yes. | 11:24 |
| 16 | Q.    Company responses to FDA inspections? | 11:24 |
| 17 | A.    Yes. | 11:25 |
| 18 | Q.    Company internal | 11:25 |
| 19 | document/investigations? | 11:25 |
| 20 | A.    Yes. | 11:25 |
| 21 | Q.    Recall documents? | 11:25 |
| 22 | A.    Yes. | 11:25 |
| 23 | Q.    Mylan documents? | 11:25 |
| 24 | A.    Yes. | 11:25 |
| 25 | Q.    Deviation from standard industry | 11:25 |

PLAINTIFFS' EXHIBITS 003594

Page 374

| | | | |
|---|---|---|---|
| 1 | | practices? | 11:25 |
| 2 | A. | Yes. | 11:25 |
| 3 | Q. | Who created that list? | 11:25 |
| 4 | A. | Me. | 11:25 |
| 5 | Q. | In the moment in that meeting with | 11:25 |
| 6 | | Plaintiffs' lawyers? | 11:25 |
| 7 | A. | Yeah. | 11:25 |
| 8 | Q. | Did they make suggestions on -- as to | 11:25 |
| 9 | | what ought to be on the list? | 11:25 |
| 10 | A. | Not really. | 11:25 |
| 11 | Q. | Batch records isn't on that list, is it? | 11:25 |
| 12 | A. | Specifically, no. | 11:25 |
| 13 | Q. | "The big yes but tell me everything." | 11:25 |
| 14 | | That notation can be seen on this page 2 of the | 11:25 |
| 15 | | Exhibit 152; is that right? | 11:25 |
| 16 | A. | Yes. | 11:25 |
| 17 | Q. | What does that mean? | 11:25 |
| 18 | A. | To tell you the truth, I have no idea. | 11:25 |
| 19 | Q. | Your notes. | 11:25 |
| 20 | A. | I know it's my notes, but I have no idea | 11:25 |
| 21 | | what that means.  I really don't. | 11:25 |
| 22 | Q. | What does the bottom note say "and | 11:25 |
| 23 | | that's dangerous"? | 11:25 |
| 24 | A. | Yeah. | 11:26 |
| 25 | Q. | What does that mean? | 11:26 |

PLAINTIFFS' EXHIBITS 003595

Page 375

| | | | |
|---|---|---|---|
| 1 | A. | To tell you the truth, I don't remember | 11:26 |
| 2 | in this conversation. | | 11:26 |
| 3 | Q. | Let's go look at Exhibit 153. | 11:26 |
| 4 | A. | Okay. | 11:26 |
| 5 | Q. | And let's look at the second page of | 11:26 |
| 6 | Exhibit 153. | | 11:26 |
| 7 | A. | Okay. | 11:26 |
| 8 | Q. | What is that list of six things? | 11:26 |
| 9 | A. | Looks like references to documents that | 11:26 |
| 10 | are included in the report. | | 11:26 |
| 11 | Q. | Who made the list? | 11:26 |
| 12 | A. | Well, I wrote the list. | 11:26 |
| 13 | Q. | Why?  What's the intention of making the | 11:26 |
| 14 | list? | | 11:26 |
| 15 | A. | I'm trying to -- trying to remember. | 11:26 |
| 16 | Q. | Please do. | 11:26 |
| 17 | A. | Uh-huh.  As we said before I'm pretty | 11:26 |
| 18 | sure these are pages that went with the -- this | | 11:27 |
| 19 | set, the notes.  I'm not sure when these notes | | 11:27 |
| 20 | were made, if it was with this or if it was this | | 11:27 |
| 21 | conversation because I don't have a time and a | | 11:27 |
| 22 | date on it, but it was some suggestions that if I | | 11:27 |
| 23 | wanted to -- in preparation for the deposition | | 11:28 |
| 24 | that the -- I go back and look at them since they | | 11:28 |
| 25 | were in my report -- by one of the attorneys. | | 11:28 |

PLAINTIFFS' EXHIBITS 003596