David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 376

```
 1     Q.    So one of the attorneys -- the list on       11:28
 2  the second page of Exhibit 153 is a list of           11:28
 3  suggestions made by one of the lawyers for the        11:28
 4  Plaintiffs on things that you should go review        11:28
 5  prior to your deposition?                             11:28
 6     A.    As I recall, yeah, they were                 11:28
 7  suggestions.  Just if I wanted to go back and look    11:28
 8  at it, yeah, I could, so...                           11:28
 9     Q.    And somebody advised you to look for         11:28
10  specific failures which resulted in blend             11:28
11  uniformity; right?                                    11:28
12     A.    No, I already had.  They were just           11:28
13  saying, you know, if I wanted to go back and          11:28
14  review it, that they would suggest that.              11:28
15     Q.    To look for specific failures which          11:28
16  resulted in blend uniformity?                         11:28
17     A.    Right, which is in the report.               11:28
18     Q.    What does that mean "look for specific       11:28
19  failures which resulted in blend uniformity"?         11:28
20  What I've just read is a quote from your notes.       11:28
21  What does it mean?                                     11:28
22     A.    It's not a quote.  It's just my notes.       11:29
23     Q.    I've read it.                                 11:29
24     A.    I don't recall specifically what the         11:29
25  guidance was on that.  They made suggestions.  If     11:29
```

PLAINTIFFS' EXHIBITS 003597

Page 377

1   I want to review the documents, I did.  I can tell          11:29

2   you this:  Is that this list that is listed here           11:29

3   it was suggestions.  I didn't go back and review           11:29

4   those documents.  I just reviewed the report.              11:29

5        Q.    I see on the right side about halfway           11:29

6   down that page.                                            11:29

7        A.    Uh-huh.                                         11:29

8        Q.    An underlined term "gross negligence."          11:29

9   Is that what it says?                                      11:29

10       A.    It is.                                          11:29

11       Q.    What does that mean?                            11:29

12       A.    Apparently that's a definition that one         11:29

13  of the attorneys gave me because I'd never heard           11:29

14  the term before.  Somebody was talking about it            11:29

15  and I go what's that?  So I jotted it down.  Never          11:29

16  heard it before.                                           11:29

17       Q.    Which attorney?                                 11:29

18       A.    I don't know.                                   11:29

19       Q.    What does it say underneath it.  I can't        11:29

20  read that.  Can you please read that for me?               11:29

21       A.    I think it's supposed to be consequences        11:30

22  indifferent from -- I don't know those three               11:30

23  words.  And welfare of persons involved in the             11:30

24  action with involved risk, suicide, injury, or             11:30

25  death.  I just jotted it down quickly.                     11:30

PLAINTIFFS' EXHIBITS 003598

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

```
                                                           Page 378
 1      Q.    The consequences indifferent for the --      11:30

 2   what's that word after "the"?                         11:30

 3      A.    I don't know.                                 11:30

 4      Q.    For the health, perhaps?                      11:30

 5      A.    I don't know.                                 11:30

 6      Q.    And welfare of the person involved?           11:30

 7      A.    I -- I can't tell you.                        11:30

 8      Q.    You can't read your own writing?              11:30

 9      A.    No, I can't.                                  11:30

10      Q.    One of the lawyers --                         11:30

11      A.    It was a term that came up and I go           11:30

12   what's that?  I never heard it before.  So I just      11:30

13   jotted it down.                                        11:30

14      Q.    Did they tell you to work it into one of      11:30

15   your answers?                                          11:30

16      A.    No.                                           11:30

17      Q.    Did they tell you that it's a topic and       11:30

18   a concept you should be familiar with as you           11:30

19   responded to questions?                                11:31

20      A.    Gross negligence?                             11:31

21      Q.    Yes.                                          11:31

22      A.    No.                                           11:31

23      Q.    Did you use that term in your report          11:31

24   ever?                                                  11:31

25      A.    I would have to go back and review it.        11:31
```

PLAINTIFFS' EXHIBITS 003599

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 379

```
 1   I don't think so.                                11:31
 2       Q.    Well, Dr. Bliesner --                  11:31
 3       A.    Uh-huh.  Because I've never heard it,  11:31
 4   so...                                            11:31
 5       Q.    Dr. Bliesner, this is why this process 11:31
 6   takes so long.                                   11:31
 7       A.    Okay.                                  11:31
 8       Q.    You tell me you've never heard the term 11:31
 9   before this meeting which would have occurred long 11:31
10   after your report was prepared.                  11:31
11       A.    Uh-huh.                                11:31
12       Q.    Do you really have to go back and look 11:31
13   at your report to tell me whether that term is in 11:31
14   your report if you had never heard it before?  Now 11:31
15   I understand that you prepared and were told to be 11:31
16   cautious in answering questions, but this process 11:31
17   takes as long as it does because of your         11:31
18   deliberately being difficult like that.          11:31
19          MR. KERENSKY:  We don't need this kind of 11:31
20       speech, Mike.                                11:31
21          MR. ANDERTON:  What I need, Mike, is a    11:31
22       witness who will answer the questions that are 11:31
23       put to him.                                  11:31
24          MR. KERENSKY:  Well, I think he's doing a 11:31
25       great job of that.  And we don't need your   11:32
```

PLAINTIFFS' EXHIBITS 003600

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 380

| | | |
|---|---|---|
| 1 | speech.  And really this is out of bounds. | 11:32 |
| 2 | You ask all questions you want, but making | 11:32 |
| 3 | speeches like this is highly objectionable. | 11:32 |
| 4 | You're just trying to intimidate the witness, | 11:32 |
| 5 | which will not work. | 11:32 |
| 6 | MR. ANDERTON:  I'm not trying to -- | 11:32 |
| 7 | MR. KERENSKY:  He's not intimidated and | 11:32 |
| 8 | neither am I. | 11:32 |
| 9 | MR. ANDERTON:  I'm not trying to -- | 11:32 |
| 10 | MR. KERENSKY:  So why don't you just ask | 11:32 |
| 11 | questions. | 11:32 |
| 12 | MR. ANDERTON:  Are you done, Mike? | 11:32 |
| 13 | MR. KERENSKY:  I'm done. | 11:32 |
| 14 | MR. ANDERTON:  I'm not trying to | 11:32 |
| 15 | intimidate anyone.  I'm merely trying to get | 11:32 |
| 16 | this process to move forward.  What we're | 11:32 |
| 17 | going to see as we make our way through these | 11:32 |
| 18 | notes is that Dr. Bliesner is holding very | 11:32 |
| 19 | firmly to certain concepts he was -- that were | 11:32 |
| 20 | given to him by the lawyers in this case and | 11:32 |
| 21 | is deliberately being non-responsive. | 11:32 |
| 22 | MR. KERENSKY:  That's a total | 11:32 |
| 23 | mischaracterization of what's going on here. | 11:32 |
| 24 | BY MR. ANDERTON: | 11:32 |
| 25 | Q.   Dr. Bliesner, does the term gross | 11:32 |

PLAINTIFFS' EXHIBITS 003601

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                              Page 381
1    negligence appear in your report?                        11:32

2        A.    Not that I recall.                             11:32

3        Q.    The next page of Exhibit 153.                  11:33

4        A.    Okay.                                          11:33

5        Q.    Among other things is that same list           11:33

6    that we saw in Exhibit -- well, yeah.  This              11:33

7    appears to be the same or a similar list that we         11:33

8    saw in Exhibit 152.                                      11:33

9        Do you see that?                                     11:33

10       A.    This down here at the bottom?                  11:33

11       Q.    Yeah.                                          11:33

12       A.    No.                                            11:33

13       Q.    About the same list, isn't it?                 11:33

14       A.    Yeah, it looks like it.  This would be a       11:33

15   transcript of this that was more readable.               11:33

16       Q.    Okay.                                          11:33

17       A.    Uh-huh.                                        11:33

18       Q.    On the middle of the right side of this        11:33

19   page it says, "my top list."  What does that mean?       11:33

20       A.    I'm sorry.  Where are we talking about?        11:34

21       Q.    The middle of that page.  It's the third       11:34

22   page of Exhibit 153.                                     11:34

23       A.    The third page?                                11:34

24       Q.    Middle right side, about halfway down,         11:34

25   right edge, it says "my top list."  What does that       11:34

PLAINTIFFS' EXHIBITS 003602

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                  February 18, 2011

Page 382

```
 1   mean?                                                   11:34

 2        A.    That was the list that I came up with        11:34

 3   off the top of my head.                                 11:34

 4        Q.    The next page of that same Exhibit 153       11:34

 5   is note that says, "are you aware of the fact that      11:34

 6   FDA" and then a semi-colon.  What does that mean?       11:34

 7        A.    I have no idea.                              11:34

 8        Q.    The next item, number two, says              11:34

 9   "possible equals we loose."  I assume that you          11:34

10   meant to say "we lose."                                 11:34

11        A.    I believe that's what it was intended to     11:34

12   be.                                                     11:34

13        Q.    So "loose" is a misspelling of "lose"?       11:34

14        A.    I would assume that's correct, yes.          11:34

15        Q.    "Possible equals we lose."  What does        11:34

16   that mean?                                              11:35

17        A.    I believe it was one of the attorneys        11:35

18   talking about trying to define for me "possible"        11:35

19   and "probable" because I didn't understand it.          11:35

20        Q.    So you then -- well, so you discussed        11:35

21   with Plaintiffs' counsel the difference between         11:35

22   "possible" and "probable," right?                       11:35

23        A.    Yes.                                         11:35

24        Q.    And you didn't understand it before that     11:35

25   conversation; right?                                    11:35
```

PLAINTIFFS' EXHIBITS 003603

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                                Page 383

 1      A.      That's correct.  In legal terms.           11:35

 2      Q.      Did you understand it after that           11:35

 3   conversation?                                         11:35

 4      A.      I still think I had difficulty with it     11:35

 5   up until the deposition because Mr. -- what was       11:35

 6   the other gentleman's name?  Moriarty?                11:35

 7      Q.      Yeah, Moriarty.                            11:35

 8      A.      Yeah.  We went back and forth on it so I   11:35

 9   was still a little bit cloudy at that stage of the    11:35

10   game.                                                 11:36

11      Q.      Okay.  A little bit cloudy?  You said      11:36

12   you had no idea.                                      11:36

13      A.      No.  Gross negligence.                     11:36

14      Q.      No.  When you were being examined by       11:36

15   Mr. Moriarty, you said you had no notion of the       11:36

16   difference between probable and possible.             11:36

17      A.      I don't recall being that definitive.      11:36

18   We could look it up in the transcript.                11:36

19      Q.      Well, we can.  The record will show what   11:36

20   it shows.                                             11:36

21      A.      Okay.                                      11:36

22      Q.      But what you're now saying is you          11:36

23   actually discussed that distinction with             11:36

24   Plaintiffs' counsel the day before you were          11:36

25   deposed.                                              11:36

PLAINTIFFS' EXHIBITS 003604

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

```
                                                        Page 384
 1      A.    Yes.                                       11:36
 2      Q.    And they did such a great job in that      11:36
 3   discussion that you came to that deposition still   11:36
 4   having no idea.                                      11:36
 5      A.    Apparently they didn't prepare me very     11:36
 6   well, did they?                                      11:36
 7          MR. KERENSKY:  Oh, sorry.                     11:36
 8   BY MR. ANDERTON:                                     11:36
 9      Q.    Now back to the substance of this          11:36
10   comment.  "Possible equals we lose."  You've told   11:36
11   me that that jars your recollection that you were   11:36
12   discussing the difference between probability and   11:36
13   possibility with Plaintiffs' counsel.               11:36
14      Now tell me what that means.                      11:36
15      A.    Probable, according to my notes and as I   11:37
16   understand it now, probable means there's a         11:37
17   reasonable degree of a certainty.                    11:37
18      Q.    Dr. Bliesner?                               11:37
19      A.    Yes.                                        11:37
20      Q.    Pay attention to my question and answer    11:37
21   my question or we're going to be here all day, and  11:37
22   we're going to be back for a third session.          11:37
23      A.    Okay.                                       11:37
24      Q.    Tell me what your note, "possible equals   11:37
25   we lose" means.  I didn't ask you to define          11:37
```

PLAINTIFFS' EXHIBITS 003605

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 385

```
 1    probable versus possible.  I ask you now for the      11:37
 2    third time to tell me what your note means.           11:37
 3        A.    I'm thinking about it because it was --     11:37
 4        Q.    Take as much time as you need to think      11:37
 5    about it, but answer that question.                   11:37
 6        A.    I will.  Can I get some more water,         11:37
 7    please?                                               11:37
 8        Q.    Yes, you may.                               11:37
 9        A.    Thank you.                                  11:37
10        MR. ANDERTON:  Let's go off the record.          11:38
11        THE VIDEOGRAPHER:  The time is 11:37 a.m.         11:38
12    We're going off the record.                           11:38
13        (Short break)                                     11:38
14        THE VIDEOGRAPHER:  Time is     ; we're            11:38
15    back on the record.                                   11:38
16        MR. ANDERTON:  Phil, will you read that           11:39
17    last question back, please?                           11:39
18            (Whereupon, the testimony was read           11:39
19    back by the court reporter, as recorded above)        11:39
20        THE WITNESS:  From what I recall in the           11:39
21    conversation, possible leaves room for doubt;         11:39
22    probable does not.  And "may" leaves doubt.           11:39
23    So from protecting, what do they call them,           11:39
24    the client, that from a legal opinion, they           11:39
25    were trying to describe to me they thought            11:39
```

PLAINTIFFS' EXHIBITS 003606

```
                                                    Page 386
 1      that the cases would not stand up if it was      11:39

 2      possible or may.                                 11:39

 3   BY MR. ANDERTON:                                    11:39

 4      Q.    So if you -- so you were told by the       11:39

 5   Plaintiffs' counsel that if you acknowledged        11:39

 6   something was only possible, Plaintiffs would       11:39

 7   lose?                                               11:39

 8      A.    The conversation as I recall in this       11:39

 9   discussion was I need to determine in my mind       11:39

10   based on my report and the data that I looked at    11:39

11   those three things.                                 11:40

12      Q.    I understand that.                         11:40

13      A.    Yes.                                        11:40

14      Q.    But you were told that if you answer a     11:40

15   question and acknowledge something was possible,    11:40

16   Plaintiffs would lose; right?                       11:40

17      A.    Yes.                                        11:40

18      Q.    And if you answered a question and         11:40

19   acknowledged that something -- if you said may?     11:40

20      A.    Yes.                                        11:40

21      Q.    Instead of probable, Plaintiffs would      11:40

22   lose.                                               11:40

23      A.    Yes.                                        11:40

24      Q.    So you were told not to answer questions   11:40

25   as possible or may, if possible; right?             11:40
```

PLAINTIFFS' EXHIBITS 003607

Page 387

| | | |
|---|---|---|
| 1 | A.    No, that's not true at all. | 11:40 |
| 2 | Q.    It isn't? | 11:40 |
| 3 | A.    I was told specifically these are the | 11:40 |
| 4 | conditions that may lead to "lose," if you will; | 11:40 |
| 5 | all right?  And that I needed to make sure where I | 11:40 |
| 6 | was comfortable with respect to my report on those | 11:40 |
| 7 | definitions, and it was up to me. | 11:40 |
| 8 | Q.    And how does -- how does your comfort | 11:40 |
| 9 | with respect to your report factor into whether | 11:40 |
| 10 | the Plaintiffs are going to lose or not?  That's | 11:40 |
| 11 | not something you considered in drafting your | 11:40 |
| 12 | report, is it? | 11:40 |
| 13 | A.    Could you say that again, please?  I'm | 11:40 |
| 14 | not being a pain.  I'm just trying to. | 11:40 |
| 15 | MR. ANDERTON:  Phil would be happy to | 11:40 |
| 16 | read that back to you. | 11:40 |
| 17 | (Whereupon, the testimony was read | 11:40 |
| 18 | back by the court reporter, as recorded above) | 11:40 |
| 19 | THE WITNESS:  No, not at all.  I didn't | 11:41 |
| 20 | consider win or loss or anything.  I reviewed | 11:41 |
| 21 | the data, I put together a report, I drew | 11:41 |
| 22 | conclusions based on the documents that I had | 11:41 |
| 23 | reviewed, and that was it. | 11:41 |
| 24 | BY MR. ANDERTON: | 11:41 |
| 25 | Q.    And as you prepared for the deposition | 11:41 |

PLAINTIFFS' EXHIBITS 003608

```
                                                      Page 388
 1   and to be asked questions about the analysis and    11:41

 2   conclusions reached, you were told to consider      11:41

 3   whether Plaintiffs would lose.                      11:41

 4       A.    They said words to the effect, if I       11:41

 5   recall, be aware that if you use these words this   11:41

 6   is what it means from a legal term.  Because        11:41

 7   apparently I didn't understand the difference       11:41

 8   between probable and possible.  That's what they    11:41

 9   said.                                               11:41

10       Q.    So you were told that if you said         11:41

11   possible rather than probable, it would mean        11:42

12   Plaintiffs would lose?                              11:42

13       A.    Potentially, yes.  But I was not          11:42

14   directed to specifically use those words or not     11:42

15   use those words.  It was me.                        11:42

16       Q.    I understand.  And were you also told if  11:42

17   you say "may" rather than "probable," Plaintiffs    11:42

18   would lose?                                         11:42

19       A.    According to my notes, yes.               11:42

20       Q.    I want you to tell me if that's what you  11:42

21   were told, Dr. Bliesner.                            11:42

22       A.    I was told that, yes.                     11:42

23       Q.    Okay.  Below that --                      11:42

24       A.    Uh-huh.                                   11:42

25       Q.    -- there's a bracketed or kind of like    11:42
```

PLAINTIFFS' EXHIBITS 003609

Page 389

1   an almost box.  It says "problem could be with."        11:42
2   That's W/sub potent for blend uniformity.  What         11:42
3   does that mean?                                          11:42
4        A.    I think one of the attorneys asked me        11:42
5   that question so I just jotted it down.                  11:42
6        Q.    Who asked you?                                11:43
7        A.    I don't recall.                               11:43
8        Q.    You just jotted down the question they        11:43
9   asked you?                                               11:43
10        A.    I did, yeah.  There was points where         11:43
11   they asked think about this.  Okay.  So I jotted        11:43
12   it down.                                                11:43
13        Q.    So they told you that -- they told you       11:43
14   that as you answered -- listened to and answered        11:43
15   questions, you should -- you should remember that       11:43
16   the problem -- I assume that means with Digitek --      11:43
17   could be with a blend uniformity or a sub-potent        11:43
18   product; right?                                         11:43
19        A.    No, I don't think that's the case            11:43
20   necessarily.  There was instruction going on here       11:43
21   with attorneys on top of it all.  So some of this       11:43
22   was, you know, go back, make a note of it, go back      11:43
23   and explain to them my interpretation because they     11:43
24   hadn't been exposed to any of this stuff before.        11:43
25        Q.    "They" who?                                  11:43

PLAINTIFFS' EXHIBITS 003610

Page 390

1     A.     The attorneys.  They don't understand          11:43

2   some of the subtleties in the manufacturing arena.      11:43

3     Q.     So your testimony is that on the day           11:43

4   before your deposition, almost three years into         11:43

5   this litigation, you felt that the Plaintiffs'          11:44

6   lawyers you were working with needed guidance on        11:44

7   something as basic as whether something was             11:44

8   sub-potent or whether there was a blend uniformity      11:44

9   issue?                                                  11:44

10    A.     I can't state to that fact.  I know            11:44

11  there were two new people in the room -- mike and       11:44

12  what was the other gentleman's name? -- and they        11:44

13  asked me questions so I jotted them down.               11:44

14    Q.     Well, Dr. Bliesner --                          11:44

15    A.     Uh-huh.                                        11:44

16    Q.     -- this is one of those situations where       11:44

17  it seems to me like you kind of want to have it         11:44

18  both ways.  When I ask you a specific question and      11:44

19  said -- and asked whether this is what that means,      11:44

20  you said no, that's not what it means.  When I ask      11:44

21  you generally what it means, you respond by saying      11:44

22  "I don't know."                                         11:44

23        MR. KERENSKY:  Objection, form.                   11:44

24  BY MR. ANDERTON:                                        11:44

25    Q.     So, I mean --                                  11:44

PLAINTIFFS' EXHIBITS 003611

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

```
                                                    Page 391

 1      A.    I cannot definitively tell you where        11:44

 2   this statement fits into this conversation.  I       11:44

 3   just cannot.                                         11:44

 4      Q.    Okay.  The next -- below that on the         11:44

 5   left side there's like a phrase that says            11:44

 6   "conscious indifference."  "Gross negligence."       11:45

 7   Do you see that?                                     11:45

 8      A.    Yes.                                        11:45

 9      Q.    Why did you write that?                      11:45

10      A.    Because they were terms that they were       11:45

11   throwing around.  So I jotted them down so I could    11:45

12   try to figure out what it meant.                     11:45

13      Q.    On the very bottom right corner -- don't     11:45

14   turn the page just yet, Dr. Bliesner.                11:45

15      A.    Sorry.                                       11:45

16      Q.    There's another bracketed phrase that        11:45

17   says, "what is the likelihood of blend uniformity    11:45

18   causing these super of sub-potent."  I assume        11:45

19   that's supposed to be super or sub potent?           11:45

20      A.    I'm thinking that's probably what it was     11:45

21   supposed to be.                                       11:45

22      Q.    All right.  So why did you make that          11:45

23   note?                                                11:45

24      A.    I don't know.  I don't recall why I made     11:45

25   that note.  Again, it might have been a question     11:45
```

PLAINTIFFS' EXHIBITS 003612

```
                                                      Page 392
 1    from one of the attorneys or.                     11:45

 2        Q.    Did you discuss with the Plaintiffs'    11:45

 3    counsel on the 24th the notion of the difference  11:45

 4    between double-thick tablets and tablets that were 11:45

 5    either super or sub-potent?                        11:45

 6        A.    The difference between?                  11:46

 7        Q.    Yeah.                                     11:46

 8        A.    I don't recall that conversation, the    11:46

 9    difference between.                                 11:46

10        Q.    Did they tell you to make sure that you  11:46

11    kept the door open -- to use your terminology --   11:46

12    to give testimony that there were either super     11:46

13    potent or sub-potent tablets produced?             11:46

14        A.    Do we need to read this back?            11:46

15        Q.    We do, please.                           11:46

16        A.    Okay.                                    11:46

17              (Whereupon, the testimony was read back  11:46

18    by the court reporter, as recorded above)          11:46

19              THE WITNESS:  I don't recall being       11:46

20         specifically asked to leave the door open or  11:46

21         that issue in particular with respect to super 11:46

22         or sub-potent.                                11:46

23              MR. ANDERTON:  Okay.  I need to go off    11:46

24         the record for about 30 seconds.  Mike, stay  11:47

25         close.                                        11:47
```

PLAINTIFFS' EXHIBITS 003613

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised         February 18, 2011

```
                                                    Page 393
 1           THE VIDEOGRAPHER:  The time is          11:47
 2      11:46 a.m.  We're going off the record       11:47
 3      briefly.                                      11:47
 4               (Short break)                        11:47
 5           THE VIDEOGRAPHER:  The time is           11:47
 6            a.m.  We're back on the record.         11:47
 7   BY MR. ANDERTON:                                 11:47
 8      Q.    All right.  So turn to the next page of 11:47
 9   Exhibit 153, Dr. Bliesner.                       11:47
10      A.    Yes.                                    11:47
11      Q.    On the top it says, the second line of  11:47
12   that next page it says "think:"                  11:47
13      A.    Uh-huh.                                 11:47
14      Q.    "Can I ask this question?"  What does   11:47
15   that mean?                                       11:48
16      A.    I think I had a question can I ask -- as 11:48
17   I'm being deposed, can I ask questions back of the 11:48
18   people who are asking me questions.              11:48
19      Q.    What did they tell you?                 11:48
20      A.    They said no, you're pretty much        11:48
21   supposed to sit there and answer questions, if I 11:48
22   remember right.                                  11:48
23      Q.    Okay.                                   11:48
24      A.    Uh-huh.                                 11:48
25      Q.    Next a little bit below that it says    11:48
```

PLAINTIFFS' EXHIBITS 003614

```
                                                       Page 394
 1    "tell me all" with an extended ellipses, and then      11:48
 2    it says, "give them roman numerals."  What does        11:48
 3    that mean?                                              11:48
 4         A.    That's the lists that we came up with.      11:48
 5         Q.    Okay.  "We" came up with?                   11:48
 6         A.    Well, I gave it.  Somebody wrote it on      11:48
 7    the board as I was saying it.                           11:48
 8         Q.    Oh, you had a white board?                  11:48
 9         A.    Uh-huh.                                      11:48
10         Q.    Where was this?                             11:48
11         A.    The conference room.                        11:48
12         Q.    Where?                                      11:48
13         A.    In the hotel next door.                     11:48
14         Q.    At the Hyatt?                               11:48
15         A.    What was it?  Sheraton, I believe.          11:48
16         Q.    Okay.                                       11:48
17         A.    Uh-huh.                                     11:48
18         Q.    Who was writing on the board?              11:48
19         A.    At that time?  I think it was Mike.        11:48
20         Q.    Mike Kerensky?                              11:49
21         A.    Yes.                                        11:49
22         Q.    I'm sorry I missed that.                   11:49
23         So what -- help me out here with context,        11:49
24    then.  You were collectively generating a list and   11:49
25    the list that is set forth in Roman numerals in      11:49
```

```
                                                          Page 395
 1    Exhibit 152?                                         11:49

 2        A.    Yes.                                       11:49

 3        Q.    And then you wrote them down as you        11:49

 4    collectively generated that list?                   11:49

 5        A.    As I was pontificating, somebody said      11:49

 6    oh, okay.  I believe it was, if I recall, Mike       11:49

 7    just writing it down.  It was all off the top of     11:49

 8    my head.                                             11:49

 9        Q.    Well, but -- okay.                         11:49

10        A.    Uh-huh.                                    11:49

11        Q.    Go to the next page.  The very last page   11:50

12    of Exhibit 153.                                      11:50

13        A.    Last page?                                 11:50

14        Q.    Yeah.  And let me ask you this:            11:50

15        A.    Uh-huh.                                    11:50

16        Q.    Have you given a copy of these notes to    11:50

17    the lawyers?                                         11:50

18        A.    I don't know.  I really don't know if      11:50

19    they've got a copy of it.                            11:50

20        Q.    You would have made the copies; right,     11:50

21    Dr. Bliesner?                                        11:50

22        A.    Not necessarily.                           11:50

23        Q.    Your wife would have made them for you?    11:50

24        A.    The notes were done in the conference      11:50

25    room when we prepped the day before.                 11:50
```

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

Page 396

1       Q.     And you think the lawyers maybe took        11:50
2    them and made copies of them?                          11:50
3       A.     I have no idea.  They perhaps could          11:50
4    have.                                                   11:50
5       Q.     On that last page --                         11:50
6       A.     Uh-huh.                                       11:50
7       Q.     -- number two says NTI.  I take it           11:51
8    that's supposed to mean narrow therapeutic index?      11:51
9       A.     I don't know.                                11:51
10      Q.     You don't know?                              11:51
11      A.     I really don't.                              11:51
12      Q.     Bracket references the EIR 2008, "95         11:51
13   pages.  Will ask."  What does that mean?               11:51
14      A.     I don't know.                                11:51
15      Q.     At the very bottom it says, "Pills           11:51
16   probably got out there."                               11:51
17      Do you see that?                                    11:51
18      A.     I do.                                        11:51
19      Q.     You wrote that; right?                       11:51
20      A.     I did write that.                            11:51
21      Q.     What's it mean?                              11:51
22      A.     It means at the end of the day, after        11:51
23   looking at my report again and having these            11:51
24   discussions that I was convinced that it was           11:51
25   probable that more than just two or three or           11:52

PLAINTIFFS' EXHIBITS 003617

Page 397

1    whatever, double-thick or whatever, thin tablets          11:52

2    that were out there got out there.  I was                 11:52

3    convinced with the data.                                  11:52

4         Q.    Which brings us back to the underlying         11:52

5    question that prompted all of this.                       11:52

6         A.    Uh-huh.                                        11:52

7         Q.    Your opinion indicates that you believe        11:52

8    adulterated product reached the market.                   11:52

9         A.    Well, we know it reached the market.  We       11:52

10   have a couple of circumstances where we know that         11:52

11   it did.                                                   11:52

12        Q.    Okay.  And when you say a couple of             11:52

13   circumstances, you're talking about the 2004              11:52

14   circumstance and the 2008 allegations that                11:52

15   double-thick tablets reached the market.                  11:52

16        Am I correct about that?                             11:52

17        A.    Not necessarily because we stopped             11:52

18   sometime back going through, picking out to make          11:52

19   sure that there was other points other than what          11:52

20   you're pointing out right there.                          11:53

21        Q.    Are you aware of any other circumstances       11:53

22   that suggest to you that we -- that you know               11:53

23   double-thick tablets reached the market?                  11:53

24        A.    In your original question --                   11:53

25        Q.    I'm asking you that question now.               11:53

PLAINTIFFS' EXHIBITS 003618

Page 398

1    A.    Unless I finish reviewing this report, I         11:53

2    can't answer that question.                            11:53

3         MR. ANDERTON:  Let's go off the record            11:53

4    and allow you to do that.                              11:53

5         THE VIDEOGRAPHER:  The time is now                 11:53

6         a.m.  We're going off the record                  11:53

7    briefly.                                               11:53

8              (Short break)                                12:01

9         THE VIDEOGRAPHER:  The time is                    12:01

10        p.m.  We are back on record.                      12:01

11   BY MR. ANDERTON:                                       12:01

12    Q.    Dr. Bliesner, I asked you a question or         12:01

13   I started to ask you a question about your             12:01

14   opinions in this case.                                 12:01

15    A.    Uh-huh, yes.                                    12:01

16    Q.    And in response you said "we know".             12:01

17   Know --                                                12:02

18    A.    Uh-huh.                                         12:02

19    Q.    -- adulterated product reached the              12:02

20   market.                                                12:02

21    A.    Yes.                                            12:02

22    Q.    I then asked you the basis for your             12:02

23   testimony that we know adulterated product reached     12:02

24   the market and you said -- you asked to review         12:02

25   your report which you just did; right?                 12:02

PLAINTIFFS' EXHIBITS 003619

```
                                                    Page 399
 1     A.     Yes.                                   12:02

 2     Q.     Have you reviewed your report and are  12:02

 3   you able to answer my questions on how we know or  12:02

 4   you think you know adulterated product reached the  12:02

 5   market?                                        12:02

 6     A.     I have a -- general idea is to go back  12:02

 7   and specifically look at the wording, I would have  12:02

 8   to go to the appendices, but I can give you the  12:02

 9   references.                                     12:02

10     Q.     You've got a 90-some page document in  12:02

11   front of you.                                   12:02

12     A.     Yes.                                   12:02

13     Q.     You need to go outside that 90-page    12:02

14   document to answer my question about how we -- how  12:02

15   you think you know adulterated product reached the  12:02

16   market?                                         12:02

17     A.     Yeah, I want to make sure I'm answering  12:02

18   the question completely.                        12:02

19     Q.     Well, tell me what you know from       12:03

20   reviewing the report.                           12:03

21     A.     From reviewing the report on page 79,  12:03

22   number 12, that there was a Class II recall       12:03

23   initiated through variation in tablet size       12:03

24   resulting in sub or super potent drug product,   12:03

25   according to reference attachment D5.            12:03
```

PLAINTIFFS' EXHIBITS 003620

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 400

| | | | |
|---|---|---|---|
| 1 | Q. | Was that Digitek? | 12:03 |
| 2 | A. | I don't recall.  I'd have to look it up. | 12:03 |
| 3 | Q. | What was the year of that? | 12:03 |
| 4 | A. | 1990. | 12:03 |
| 5 | Q. | 1990? | 12:03 |
| 6 | A. | Uh-huh. | 12:03 |
| 7 | Q. | 21 years ago? | 12:03 |
| 8 | A. | Yes. | 12:03 |

9     Q.    Okay.  What else do you know from          12:03
10   reviewing your report?                          12:03
11     A.    Page 81, June 2004, complaint received    12:03
12   from a pharmacist in Bellingham, Washington,     12:03
13   regarding thick Digoxin tablet.  MI confirms     12:03
14   thickness.  No definitive root cause found.      12:04
15     Q.    2004, a single tablet; right?            12:04
16     A.    I would have to look at the reference to  12:04
17   determine whether it was one tablet or not.      12:04
18     Q.    Dr. Bliesner, this is your report;       12:04
19   right?                                           12:04
20     A.    It is my report, yes, sir.               12:04
21     Q.    Now this is why this takes so long.  Is  12:04
22   it more than a single tablet?                    12:04
23          MR. KERENSKY:  He doesn't need be         12:04
24      lectured about how long it takes.  We need you 12:04
25      to ask questions.                             12:04

PLAINTIFFS' EXHIBITS 003621

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 401

| | | |
|---|---|---|
| 1 | MR. ANDERTON:  I need him to answer | 12:04 |
| 2 | questions, Mike. | 12:04 |
| 3 | MR. KERENSKY:  He's answering them. | 12:04 |
| 4 | MR. ANDERTON:  No, he's not. | 12:04 |
| 5 | MR. KERENSKY:  Well, when you ask a real | 12:04 |
| 6 | broad question about tell me everything you | 12:04 |
| 7 | know, it's going to take time, bro? | 12:04 |
| 8 | MR. ANDERTON:  Bro? | 12:04 |
| 9 | MR. KERENSKY:  Bro. | 12:04 |
| 10 | BY MR. ANDERTON: | 12:04 |
| 11 | Q.   Dr. Bliesner. | 12:04 |
| 12 | A.   Yes. | 12:04 |
| 13 | Q.   Your report on page 81 refers to a | 12:04 |
| 14 | single thick tablet; right? | 12:04 |
| 15 | A.   Unless I go back and pull up those | 12:05 |
| 16 | reference, I can't tell you whether it's one or | 12:05 |
| 17 | more. | 12:05 |
| 18 | Q.   You can't? | 12:05 |
| 19 | A.   No, definitively.  I would be guessing | 12:05 |
| 20 | unless I go back to that primary reference. | 12:05 |
| 21 | Q.   All right.  Moving on. | 12:05 |
| 22 | What else from your report supports your | 12:05 |
| 23 | conclusion that adulterated Digitek reached the | 12:05 |
| 24 | market? | 12:05 |
| 25 | A.   On page 87. | 12:05 |

PLAINTIFFS' EXHIBITS 003622

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

```
                                                      Page 402

 1      Q.     Yeah?                                   12:05

 2      A.     And this is where I would have to go    12:05

 3   back and specifically look because I'm not sure   12:05

 4   whether these are returned products or not, but   12:05

 5   overweight tablets were found during packaging;   12:05

 6   okay?  That one I'm...                            12:05

 7      Q.     What number are you referring to?       12:05

 8      A.     47, 47.                                 12:05

 9      Q.     47?                                     12:05

10      A.     Yeah.  A39 reference.  That's why I     12:05

11   wanted to look at it because I'm not sure whether 12:05

12   that has to do with stuff that made it to the     12:05

13   market or they caught it within the facility.     12:06

14      Q.     Would reference number 47, your         12:06

15   reference number 47 tell you that?                12:06

16      A.     A39.                                    12:06

17      Q.     I'm sorry.  Would that tell you whether 12:06

18   it made it to market?                             12:06

19      A.     More than likely whether this was done  12:06

20   internally and it wasn't returned.                12:06

21      Q.     Okay.  What else from your report?      12:06

22      A.     Number 49 on page 84, Mylan acknowledges 12:06

23   pharmacist identifying double-thick product in    12:06

24   marketplace.                                      12:06

25      Q.     Okay.                                   12:06
```

Page 403

| | | | |
|---|---|---|---|
| 1 | A. | A58. | 12:06 |
| 2 | Q. | Anything else? | 12:06 |
| 3 | A. | From what I can see, no. | 12:06 |
| 4 | Q. | Okay.  Now, this binder -- oh, Phil | 12:06 |

5   would you mark this, please?                    12:06

6       (Whereupon, Exhibit 154 was marked for       12:07

7   identification)                                  12:07

8       Dr. Bliesner, will you look at the binder    12:07

9   that's marked as Exhibit 154 and find your       12:07

10  reference attachment A36, please.  I'm sorry.  I 12:07

11  misspoke.  A39, please.                          12:07

12      Did you find A36?                            12:08

13      A.   I'm just double checking here.  Does not 12:08

14  appear to be the direct reference that I thought 12:08

15  it was going to.                                 12:08

16      Q.   I'm sorry.  A39.  I misspoke again.  Did 12:08

17  you find A39?                                    12:08

18      A.   I did find A39, but it does not appear  12:08

19  to me to be the reference that I referenced      12:08

20  here -- A39.                                     12:08

21      Q.   What is A39, Doctor?                     12:09

22      A.   A39 is response to the FDA 483 issued to 12:09

23  Activis on 5/20/2008.                            12:10

24      Q.   Let's not take our common sense hats     12:10

25  off; okay?  Let's think about this logically.    12:10

PLAINTIFFS' EXHIBITS 003624

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                              Page 404

 1      A.    Okay.                                           12:10

 2      Q.    Your paragraph 47 on page 87 of your           12:10

 3   report refers to an investigation of Digoxin            12:10

 4   tablets, lot 8022881.                                   12:10

 5      A.    Uh-huh.                                         12:10

 6      Q.    For overweight tablets --                      12:10

 7      A.    Uh-huh.                                         12:10

 8      Q.    -- which were found during packaging           12:10

 9   right?                                                   12:10

10      A.    Uh-huh.                                         12:10

11      Q.    You have to say yes or no, please.             12:10

12      A.    Yes, I'm sorry.                                12:10

13      Q.    Okay.                                           12:10

14      A.    I'm sorry.                                      12:10

15      Q.    Do you cite that as support in your            12:10

16   report, in the body of your conclusion that             12:10

17   product actually made it to market?                     12:10

18      A.    What I was asked to review, I was asked        12:10

19   to pick out things and I'm not sure whether these       12:10

20   were picked up in site or they were returned            12:10

21   products or something like that.                        12:10

22      Q.    Now answer my question.                        12:10

23      A.    Okay.                                           12:10

24      Q.    Do you cite that batch and the                 12:10

25   circumstances -- and any circumstances relating to      12:10

PLAINTIFFS' EXHIBITS 003625

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 405

| | | |
|---|---|---|
| 1 | that batch in the body of your report as an | 12:11 |
| 2 | indication that product -- defective product or | 12:11 |
| 3 | adulterated product made it to market? | 12:11 |
| 4 | A.    This is the citation.  Criminal | 12:11 |
| 5 | investigation, QA hold pending. | 12:11 |
| 6 | Q.    Dr. Bliesner. | 12:11 |
| 7 | A.    I'm trying to answer your question, sir. | 12:11 |
| 8 | Q.    I asked you if you cite it in your | 12:11 |
| 9 | report.  You're now looking at something other | 12:11 |
| 10 | than your report. | 12:11 |
| 11 | A.    Right, because I've got to go back -- | 12:11 |
| 12 | Q.    How do you determine -- | 12:11 |
| 13 | A.    Because I want to see where the | 12:11 |
| 14 | investigation is, if it's cited in the reference | 12:11 |
| 15 | to make sure that the reference is correct. | 12:11 |
| 16 | Q.    Okay. | 12:12 |
| 17 | A.    Okay? | 12:12 |
| 18 | Q.    Okay. | 12:12 |
| 19 | A.    I'm not messing with you. | 12:12 |
| 20 | Q.    You actually are. | 12:12 |
| 21 | A.    I'm just trying to get the right | 12:12 |
| 22 | answer.  No, sir, I'm not. | 12:12 |
| 23 | That reference does not support the statement | 12:15 |
| 24 | that product made it to market.  That specific | 12:15 |
| 25 | reference does not. | 12:15 |

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised    February 18, 2011

Page 406

1    Q.    Okay.    12:15

2    A.    Okay.    12:15

3    Q.    So -- well, suffice to say,    12:15

4  Dr. Bliesner, that there's ample information out    12:16

5  there in the record making very clear that that    12:16

6  batch was in fact rejected and never went to    12:16

7  market.    12:16

8    You don't have any information that    12:16

9  contradicts that, do you?    12:16

10    A.    Not to my knowledge, no.    12:16

11    Q.    Okay.  So, if that batch was rejected    12:16

12  that -- that -- the circumstances relating to or    12:16

13  set forth in your paragraph 47 on page 18 of your    12:16

14  report do not constitute any evidence that    12:16

15  defective or adulterated Digitek -- I want to make    12:16

16  this clear.  That adulterated Digitek actually    12:16

17  made it to market, did they?    12:16

18    A.    That is correct.    12:16

19    Q.    Okay.  You also referred to -- and so    12:16

20  that we're clear, you also made reference to that    12:16

21  batch 8022801 from paragraph 47 on page 87.  So    12:17

22  your prior testimony about that possibly    12:17

23  supporting a statement that we know adulterated    12:17

24  product made it to market, that's not accurate    12:17

25  with respect to any circumstances relating to    12:17

PLAINTIFFS' EXHIBITS 003627

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                              Page 407

1    batch 8022801, is there?                               12:17

2        A.    What page was that?                          12:17

3        Q.    87.                                           12:17

4        A.    No, it's the same -- same statement.         12:17

5    It's just information put in a different place.        12:17

6        Q.    Okay.                                         12:17

7        A.    Uh-huh.                                       12:17

8        Q.    All right.                                    12:17

9        A.    We were going to check on number 49.         12:17

10       Q.    We'll get there.                              12:17

11       A.    Okay.                                         12:17

12       Q.    The -- Dr. Bliesner, so we've eliminated     12:17

13   batch 80228.  The circumstances in 2004 where a        12:18

14   pharmacist found a tablet in the market, was that      12:18

15   part of the recalled product?                          12:18

16       A.    Which recall?                                 12:18

17       Q.    The 2008 recall of Digitek.                   12:18

18       A.    The product for the?                          12:18

19       Q.    The tablet that was found in the market      12:18

20   in 2004, was that part of the recalled product?        12:18

21       A.    Not to my knowledge.                          12:18

22       Q.    The expiration period for this product       12:18

23   is two years.  Are you aware of that?                  12:18

24       A.    I am not.                                     12:18

25       Q.    Okay.  You'll take my word for it?           12:18

PLAINTIFFS' EXHIBITS 003628

Page 408

| | | |
|---|---|---|
| 1 | A.    I'll take your word for it. | 12:18 |
| 2 | Q.    So if a tablet was found in the market | 12:18 |
| 3 | in 2004 and was manufactured no later than 2004 | 12:18 |
| 4 | and therefore was no longer in the market and | 12:18 |
| 5 | within expiration as of 2008; correct? | 12:18 |
| 6 | A.    2004, two years I would say yes, that's | 12:18 |
| 7 | fair. | 12:18 |
| 8 | Q.    Okay.  And again, there's plenty of | 12:19 |
| 9 | evidence out there that speaks to what or was not | 12:19 |
| 10 | part of the recall product. | 12:19 |
| 11 | Which leaves us -- and the 1990 circumstances | 12:19 |
| 12 | certainly have nothing, no -- none of the product | 12:19 |
| 13 | that was involved in the circumstances you cited | 12:19 |
| 14 | in 1990 were part of the 2008 recall; correct? | 12:19 |
| 15 | A.    Not part of the 2008 recall, no. | 12:19 |
| 16 | Q.    Okay.  All right. | 12:19 |
| 17 | A.    It may have impacted the product, | 12:19 |
| 18 | though. | 12:19 |
| 19 | THE VIDEOGRAPHER:  We've got five minutes | 12:19 |
| 20 | left on the tape. | 12:19 |
| 21 | BY MR. ANDERTON: | 12:19 |
| 22 | Q.    Okay.  It may have impacted what | 12:19 |
| 23 | product? | 12:19 |
| 24 | A.    We're not sure because the reference is | 12:19 |
| 25 | just for a recall for double-thick, double thin. | 12:19 |

PLAINTIFFS' EXHIBITS 003629

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 409

| | | |
|---|---|---|
| 1 | The information I was provided doesn't | 12:19 |
| 2 | specifically say what the product is. | 12:19 |
| 3 | Q. Okay. | 12:19 |
| 4 | A. There was indications that they've had | 12:19 |
| 5 | problems with double-thick, double thin or thin or | 12:19 |
| 6 | thick tablets in days gone by in the manufacturing | 12:19 |
| 7 | process. | 12:19 |
| 8 | Q. And so you're willing to infer that | 12:19 |
| 9 | something that happened in 1990 was still | 12:19 |
| 10 | occurring in 199-- or in 2008, 18 years later? | 12:19 |
| 11 | A. I think it's fair to say that the | 12:20 |
| 12 | information that's there in documents that I | 12:20 |
| 13 | reviewed showed that the same people who were in | 12:20 |
| 14 | charge of the quality and manufacturing back then | 12:20 |
| 15 | are the same people that were there later down the | 12:20 |
| 16 | road. The same processes -- I'm trying to think | 12:20 |
| 17 | when the ANDAs were, the equipment was. So if | 12:20 |
| 18 | people and equipment were in place and obviously | 12:20 |
| 19 | they had problems with quality systems difficulty, | 12:20 |
| 20 | else they wouldn't have had all the problems with | 12:20 |
| 21 | the FDA. | 12:20 |
| 22 | So there were documented problems with the | 12:20 |
| 23 | quality systems, same people and mostly like the | 12:20 |
| 24 | same equipment on the stuff that occurred later | 12:20 |
| 25 | on. | 12:20 |

PLAINTIFFS' EXHIBITS 003630

Page 410

| | | | |
|---|---|---|---|
| 1 | Q. | Okay.  Who was the director of | 12:20 |
| 2 | manufacturing in 2008, do you know? | | 12:20 |
| 3 | A. | I'd have to go back. | 12:20 |
| 4 | Q. | I'm sorry.  In 2007. | 12:20 |
| 5 | A. | I'd have to go back and look at that. | 12:20 |
| 6 | Q. | It was Rick Dowling. | 12:20 |
| 7 | A. | Okay. | 12:20 |
| 8 | Q. | You'll take my word for that? | 12:20 |
| 9 | A. | Sure. | 12:20 |
| 10 | Q. | When was Rick Dowling hired? | 12:20 |
| 11 | A. | I'd have to go back and look that up. | 12:20 |
| 12 | Q. | Was he employed in 1990? | 12:20 |
| 13 | A. | I'd have to go back and look it up. | 12:20 |
| 14 | Q. | Because Activis in 1990 was Amide; | 12:21 |
| 15 | correct? | | 12:21 |
| 16 | A. | I believe it was. | 12:21 |
| 17 | Q. | Were they making Digitek as of 1990? | 12:21 |
| 18 | A. | I'd have to look that up, but it's a | 12:21 |
| 19 | possibility they were. | | 12:21 |
| 20 | Q. | It is? | 12:21 |
| 21 | A. | Yes. | 12:21 |
| 22 | Q. | Their ANDA was approved when? | 12:21 |
| 23 | A. | They were releasing product by the batch | 12:21 |
| 24 | release certification process back then.  So they | | 12:21 |
| 25 | submitted and sold product based on that and not | | 12:21 |

PLAINTIFFS' EXHIBITS 003631

Page 411

1   the ANDA.                                             12:21

2       Q.    If it's true --                             12:21

3       A.    Uh-huh.                                     12:21

4       Q.    -- that Activis -- or Amide rather --       12:21

5   wasn't making Digoxin until 1995, then the 1990       12:21

6   circumstances have no bearing on your conclusion      12:21

7   that adulterated Digitek -- that your supposed        12:21

8   conclusion that we know adulterated Digitek made      12:21

9   it to market; correct?                                12:21

10      A.    I don't know if I understand that           12:21

11  question.                                             12:21

12      Q.    You don't understand it because it was a    12:21

13  very poorly worded question.  So I'm going to         12:21

14  start that one over.                                  12:22

15      If it's true that Amide didn't start              12:22

16  manufacturing Digitek until 1995, then the            12:22

17  circumstances you refer to about a 1990 recall        12:22

18  have nothing to do with your conclusion in your       12:22

19  report that we know adulterated Digitek reached       12:22

20  the market; correct?                                  12:22

21      A.    I don't think you can say that.             12:22

22      Q.    They weren't making it.                     12:22

23      A.    They were making Digoxin very early on.     12:22

24      Q.    Dr. Bliesner, if they didn't start          12:22

25  making it until 1995, they couldn't -- the recall     12:22

PLAINTIFFS' EXHIBITS 003632

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 412

| | | |
|---|---|---|
| 1 | in 1990 could not have been Digoxin; correct? | 12:22 |
| 2 | A.    I'm not sure without going back and | 12:22 |
| 3 | reviewing the record when they actually started | 12:22 |
| 4 | making Digoxin tablets. | 12:22 |
| 5 | Q.    Now answer my question. | 12:22 |
| 6 | A.    Okay. | 12:22 |
| 7 | Q.    If they didn't start making it until | 12:22 |
| 8 | 1995, the 1990 recall circumstances could not have | 12:22 |
| 9 | been a recall of Digoxin; correct? | 12:23 |
| 10 | A.    If they did not, that's correct. | 12:23 |
| 11 | Q.    Okay. | 12:23 |
| 12 | A.    If.  But we don't know for sure. | 12:23 |
| 13 | Q.    But we do, Dr. Bliesner. | 12:23 |
| 14 | A.    We do? | 12:23 |
| 15 | Q.    Okay. | 12:23 |
| 16 | A.    Yes. | 12:23 |
| 17 | Q.    We do. | 12:23 |
| 18 | THE VIDEOGRAPHER:  You have about two | 12:23 |
| 19 | minutes left. | 12:23 |
| 20 | MR. ANDERTON:  Let's break for lunch. | 12:23 |
| 21 | THE VIDEOGRAPHER:  The time is | 12:23 |
| 22 | 12:22 p.m.  We're going off the record. | 12:23 |
| 23 | (Short break for lunch) | 12:52 |
| 24 | THE VIDEOGRAPHER:  The time is now | 12:52 |
| 25 | 12:52 p.m.  We are back on the record.  This | 12:53 |

PLAINTIFFS' EXHIBITS 003633

Page 413

| | | |
|---|---|---|
| 1 | is the beginning of tape five. | 12:53 |
| 2 | BY MR. ANDERTON: | 12:53 |
| 3 | Q.    Dr. Bliesner, would you look at page 9 | 12:53 |
| 4 | of your report, please? | 12:53 |
| 5 | A.    Sure, yes. | 12:53 |
| 6 | Q.    You see paragraph four on page 9? | 12:53 |
| 7 | A.    Yes. | 12:53 |
| 8 | Q.    That indicates that in June of 1995 the | 12:53 |
| 9 | FDA issued a certification to Amide which allowed | 12:53 |
| 10 | Amide to manufacture and sell Digoxin under the | 12:53 |
| 11 | batch certification program; right? | 12:53 |
| 12 | A.    Correct. | 12:53 |
| 13 | Q.    Does that refresh your recollection as | 12:54 |
| 14 | to when Amide began manufacturing and distributing | 12:54 |
| 15 | Digitek and whether it was as far back as 1990? | 12:54 |
| 16 | A.    Yes. | 12:54 |
| 17 | Q.    Okay.  What we know now is that the 1990 | 12:54 |
| 18 | recall was not Digitek or Digoxin; correct? | 12:54 |
| 19 | A.    Most likely. | 12:54 |
| 20 | Q.    And so then as I understand it, you | 12:54 |
| 21 | agree that the 2004 tablet was not part of the | 12:54 |
| 22 | recalled Digitek; right? | 12:54 |
| 23 | A.    Based on expiration date and the fact | 12:54 |
| 24 | that it was two years and then later on, yes. | 12:54 |
| 25 | Q.    The 1990 recall was not Digitek; right? | 12:54 |

PLAINTIFFS' EXHIBITS 003634

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                 February 18, 2011

                                                              Page 414

 1        A.    Most likely, yes.                                12:54

 2        Q.    And the 2008 batch 80228 was rejected            12:54

 3   and never made it to market.  That leaves the               12:54

 4   tablet referenced in --                                     12:55

 5        A.    Well, that was that -- just that one lot          12:55

 6   that we talked about that was rejected.                     12:55

 7        Q.    I understand.                                    12:55

 8        A.    Okay.                                            12:55

 9        Q.    But you've identified for me -- I gave           12:55

10   you a considerable amount of time.                          12:55

11        A.    Uh-huh.                                          12:55

12        Q.    Let's back this up, Dr. Bliesner.                12:55

13        I asked you about your conclusion in this              12:55

14   case.                                                       12:55

15        A.    Uh-huh.                                          12:55

16        Q.    And about the conclusion that                    12:55

17   adulterated Digitek was released to market and you          12:55

18   said very clearly "we know that adulterated defect          12:55

19   made it to market."                                         12:55

20        A.    Yes.                                             12:55

21        Q.    I gave you almost a half hour to review          12:55

22   your report and other related documents to come up          12:55

23   with evidence which you believe indicates that you          12:55

24   know adulterated Digitek made it to market.                 12:55

25        A.    Uh-huh.                                          12:55

PLAINTIFFS' EXHIBITS 003635

Page 415

1    Q.    And you identified all of those          12:55

2    instances and circumstances; right?           12:55

3    A.    With the information I have reviewed,    12:55

4    yes.                                           12:55

5    Q.    Okay.  And you've identified everything  12:55

6    that you're aware of; correct?                 12:56

7    A.    In the documents that I was -- reviewed, 12:56

8    yes.                                           12:56

9    Q.    Dr. Bliesner.                            12:56

10   A.    Yes.                                     12:56

11   Q.    Have you identified every instance that  12:56

12   you are aware of where you believe adulterated 12:56

13   Digitek made it to market?                     12:56

14   A.    In the documents I reviewed, yes.        12:56

15   Q.    Doctor --                                12:56

16   A.    There may be other documents out there   12:56

17   that would support the --                      12:56

18   Q.    Are you aware of those?                  12:56

19   A.    I haven't reviewed everything that's on  12:56

20   there, been put out.  So I can't -- I can't say 12:56

21   whether I'm aware of it or not.                12:56

22   Q.    If you haven't reviewed it, can you be   12:56

23   aware of what's in it?  Is that possible?      12:56

24   A.    No, that's what I'm saying.  There are   12:56

25   additional documents and reports and things like 12:56

PLAINTIFFS' EXHIBITS 003636

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 416

| | | |
|---|---|---|
| 1 | that I'm sure have since become available and I | 12:56 |
| 2 | have not reviewed it.  The documents that I | 12:56 |
| 3 | reviewed, the statement is correct. | 12:56 |
| 4 | Q.    We're going to stay here all afternoon | 12:57 |
| 5 | until you answer my question. | 12:57 |
| 6 | A.    That's fine. | 12:57 |
| 7 | Q.    Are you aware -- do you know of any | 12:57 |
| 8 | circumstances you haven't identified that you | 12:57 |
| 9 | believe indicate adulterated Digitek made it to | 12:57 |
| 10 | market? | 12:57 |
| 11 | A.    You see, I still don't understand when | 12:57 |
| 12 | you say "any and all" and "aware."  The documents | 12:57 |
| 13 | I've reviewed, that I was told to review and, you | 12:57 |
| 14 | know, looked at and reviewed are the ones that | 12:57 |
| 15 | I've built my report off of, and that's the | 12:57 |
| 16 | circumstances where I found it. | 12:57 |
| 17 | I can't make a statement as broad as aware or | 12:57 |
| 18 | whatever because there may be others out there.  I | 12:57 |
| 19 | don't know. | 12:57 |
| 20 | Q.    You can't tell me what you know? | 12:57 |
| 21 | A.    I'm telling you -- | 12:57 |
| 22 | Q.    My question -- | 12:57 |
| 23 | A.    -- what I know based on this, sir. | 12:57 |
| 24 | Q.    My question was do you know of any other | 12:57 |
| 25 | circumstances? | 12:57 |

PLAINTIFFS' EXHIBITS 003637

Page 417

| | | |
|---|---|---|
| 1 | A.    Not to the documents I've reviewed. | 12:57 |
| 2 | Q.    Dr. Bliesner, do you know of any other | 12:57 |
| 3 | circumstances that indicate defective Digitek -- | 12:57 |
| 4 | adulterated -- let me ask this correctly. | 12:58 |
| 5 | Do you know, do you have knowledge from any | 12:58 |
| 6 | source other than those that you've identified? | 12:58 |
| 7 | A.    Other than those that I've reviewed. | 12:58 |
| 8 | Q.    No.  Other than that you've identified, | 12:58 |
| 9 | do you personally have knowledge as we sit here | 12:58 |
| 10 | today of any circumstances indicating adulterated | 12:58 |
| 11 | Digitek made it to market other than those you've | 12:58 |
| 12 | identified? | 12:58 |
| 13 | A.    The two references, no. | 12:58 |
| 14 | Q.    Other than those you've identified, | 12:58 |
| 15 | you're not aware of any other circumstances | 12:58 |
| 16 | indicating that defective -- I keep saying that -- | 12:58 |
| 17 | that adulterated Digitek was released to market; | 12:58 |
| 18 | is that correct? | 12:58 |
| 19 | A.    To this point, no, that is correct. | 12:58 |
| 20 | MR. ANDERTON:  Okay.  I want this to be | 12:58 |
| 21 | clear.  You keep injecting all this extra | 12:58 |
| 22 | stuff.  So, Phil, I'm going to ask you to read | 12:58 |
| 23 | my last question back and I want you to answer | 12:58 |
| 24 | it very clearly, okay, without injecting all | 12:59 |
| 25 | kinds of additional stuff. | 12:59 |

```
                                                  Page 418
 1          THE WITNESS:  I don't understand when you    12:59
 2      say "injecting."                                 12:59
 3          MR. ANDERTON:  You think because of your     12:59
 4      prep sessions with counsel that you're           12:59
 5      absolutely required to qualify everything you    12:59
 6      say to leave doors open, as your notes say.      12:59
 7      This is a concise --                             12:59
 8          THE WITNESS:  That's not true.               12:59
 9          MR. ANDERTON:  It's absolutely true.         12:59
10          THE WITNESS:  It is not true.                12:59
11          MR. ANDERTON:  You wait till you watch       12:59
12      the video.  This is a very concise, very         12:59
13      direct question.  Phil, would you read it        12:59
14      back?                                            12:59
15              (Whereupon, the testimony was read       12:59
16      back by the court reporter, as recorded above)   12:59
17          THE WITNESS:  Other than what I've           12:59
18      reviewed -- which you state in there -- no.      01:00
19  BY MR. ANDERTON:                                     01:00
20      Q.   Other than what you've identified.  Stop    01:00
21  injecting what you've reviewed into this.  I'm       01:00
22  asking you what you know, Dr. Bliesner.  And we're   01:00
23  going to ask this for hours until you answer my      01:00
24  question.                                            01:00
25      You have identified certain circumstances that   01:00
```

PLAINTIFFS' EXHIBITS 003639

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

```
                                                        Page 419
 1   you believe indicate adulterated Digitek was            01:00

 2   released to market; is that correct?                    01:00

 3       A.    Yes, yes.                                      01:00

 4       Q.    Other than the ones you've identified,         01:00

 5   are you aware of any other circumstances that you        01:00

 6   believe indicate adulterated Digitek was released        01:00

 7   to market?                                               01:00

 8       A.    No.                                            01:00

 9       Q.    Thank you.                                     01:00

10       So what we have haven't discussed then is the        01:00

11   single tablet that is referenced in -- can you          01:00

12   turn to your report at page 87.  Let me know when       01:00

13   you are there.                                          01:01

14       A.    I am on page 87, sir.                          01:01

15       Q.    All right.  Do you see paragraphs 46 and       01:01

16   49?                                                     01:01

17       A.    46, yes.                                       01:01

18       Q.    Okay.                                          01:01

19       A.    49, yes.                                       01:01

20       Q.    All right.  So to be clear, we talked          01:01

21   about the 1990 circumstances and we now know that       01:01

22   that had nothing to do with Digitek; right?             01:01

23       A.    Most likely no.                                01:01

24       Q.    We talked about the 2004 circumstances         01:01

25   and we now know that that was not product that was       01:01
```

PLAINTIFFS' EXHIBITS 003640

Page 420

```
 1  part of the Digitek recall; right?                     01:01
 2      A.    That is correct.                              01:01
 3      Q.    And we talked about -- or we talked           01:01
 4  about the 2008 batch 80228, which is part of           01:01
 5  paragraph 47 here, and we know that because that       01:02
 6  batch was rejected, it also doesn't show anything      01:02
 7  about product making it to market.                     01:02
 8      A.    With that batch, no.                          01:02
 9      Q.    Correct?                                      01:02
10      A.    Yes.                                          01:02
11      Q.    Talking only about that paragraph,            01:02
12  Dr. Bliesner.                                           01:02
13      A.    Okay, okay.                                   01:02
14      Q.    Part of the issue here is that               01:02
15  Plaintiffs' lawyers have told you never to trust a     01:02
16  single word that comes out of my mouth, so...          01:02
17      A.    That's not true.  They've never made a        01:02
18  statement even remotely related to that.               01:02
19      Q.    Do you want me to find it in your            01:02
20  notes?                                                  01:02
21      Dr. Bliesner, what do you know about the           01:02
22  circumstances referred to in paragraphs 46 and 49     01:02
23  from memory?                                            01:02
24      A.    From memory, I couldn't tell you whether      01:03
25  they were e-mails or they were reports.  That's        01:03
```

PLAINTIFFS' EXHIBITS 003641

Page 421

| | | |
|---|---|---|
| 1 | what I can tell you from memory. | 01:03 |
| 2 | Q.    Okay.  And does that mean that you also | 01:03 |
| 3 | don't remember the -- kind of the underlying | 01:03 |
| 4 | circumstances, regardless of whether you remember | 01:03 |
| 5 | the source? | 01:03 |
| 6 | A.    Underlying circumstances? | 01:03 |
| 7 | Q.    Yeah. | 01:03 |
| 8 | A.    46 and 49? | 01:03 |
| 9 | Q.    Yeah. | 01:03 |
| 10 | A.    No, I'd have to go back and look at the | 01:03 |
| 11 | records. | 01:03 |
| 12 | MR. ANDERTON:  All right.  Well, just | 01:03 |
| 13 | give me one moment.  Let's go off the record | 01:03 |
| 14 | for a minute. | 01:04 |
| 15 | THE VIDEOGRAPHER:  The time is now | 01:04 |
| 16 | 1:03 p.m.  We're going off the record briefly. | 01:04 |
| 17 | (Short break) | 01:06 |
| 18 | THE VIDEOGRAPHER:  The time is now | 01:06 |
| 19 | 1:06 p.m.  We are back on the record. | 01:06 |
| 20 | BY MR. ANDERTON: | 01:06 |
| 21 | Q.    Dr. Bliesner, I'm handing you a document | 01:06 |
| 22 | that has been marked as Exhibit 59A.  Just take a | 01:06 |
| 23 | moment and look at that document, please. | 01:06 |
| 24 | A.    Sure.  It trails off.  It's not a | 01:06 |
| 25 | complete -- | 01:09 |

PLAINTIFFS' EXHIBITS 003642

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                              Page 422

 1      Q.    I understand.                                    01:09

 2      A.    Okay.                                            01:09

 3      Q.    Have you seen that document before?             01:09

 4      A.    I believe I have, yes.                           01:09

 5      Q.    Okay.  Turn to page 60 of your report,           01:09

 6   please.                                                   01:09

 7      A.    Okay.                                            01:09

 8      Q.    In fact this document is what you list           01:09

 9   as your reference A58; isn't that right?                  01:09

10      A.    No.                                              01:10

11      Q.    No?                                              01:10

12      A.    It's got a different control number on          01:10

13   it than the one that I referenced, according to my       01:10

14   report.  This is Mylan 000932683.                        01:10

15      Q.    Look at the next page, Doctor.                   01:10

16      A.    Okay.  There we go.                              01:10

17      Q.    So there's an extra page on our Exhibit          01:10

18   59A about, but what you refer to as A58, the             01:10

19   precise page is exactly your -- is the second page       01:10

20   of our 59A; is that correct?                             01:10

21      A.    It looks like it.                                01:10

22      Q.    And are you -- do you have any reason to         01:10

23   believe that the --                                      01:10

24      A.    Excuse me for just a second.  Yes.  It's        01:10

25   the same, yes.                                            01:11

PLAINTIFFS' EXHIBITS 003643

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 423

| | | |
|---|---|---|
| 1 | Q.    All right.  So this is an e-mail thread | 01:11 |
| 2 | between somebody at Mylan and somebody with an | 01:11 |
| 3 | e-mail extension indicated as goldenliving.com, | 01:11 |
| 4 | correct? | 01:11 |
| 5 | A.    At the top level, yes. | 01:11 |
| 6 | Q.    What's goldenliving.com, do you know? | 01:11 |
| 7 | A.    I have no idea. | 01:11 |
| 8 | Q.    Is it a pharmacist? | 01:11 |
| 9 | A.    I have no idea. | 01:11 |
| 10 | Q.    Yet on page 87 you characterize this as | 01:11 |
| 11 | a pharmacist identifying a double-thick product | 01:11 |
| 12 | from the marketplace; right? | 01:11 |
| 13 | A.    I say that based on the -- Pharm America | 01:11 |
| 14 | brought the statement in here, so... | 01:11 |
| 15 | Q.    Is Pharm America a pharmacist? | 01:11 |
| 16 | A.    I couldn't say for sure. | 01:11 |
| 17 | Q.    You don't know? | 01:11 |
| 18 | A.    No. | 01:12 |
| 19 | Q.    And you don't know if golden living is a | 01:12 |
| 20 | pharmacist? | 01:12 |
| 21 | A.    I could not say, no. | 01:12 |
| 22 | Q.    Okay.  But you were happy to write in | 01:12 |
| 23 | your report that Mylan acknowledged a pharmacist | 01:12 |
| 24 | identifying a double-thick product in the market; | 01:12 |
| 25 | right?  Look at page 87 of the report. | 01:12 |

PLAINTIFFS' EXHIBITS 003644

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised          February 18, 2011

                                                            Page 424

 1      A.    Yes, yes.  Thank you.  I do use the word    01:12

 2   pharmacist.  And based on this e-mail alone, I        01:12

 3   couldn't definitively say in fact that was a          01:12

 4   pharmacist.                                           01:12

 5      Q.    Okay.  So that doesn't appear to be an       01:12

 6   accurate characterization in your paragraph 49,       01:12

 7   does it?                                              01:12

 8      A.    I'm sorry?                                   01:12

 9      Q.    It doesn't appear to be an accurate          01:12

10   characterization in your 49, does it?                 01:13

11      A.    It does not appear --                        01:13

12      Q.    Okay.                                        01:13

13      A.    -- to be.  I'm sorry.  I heard               01:13

14   inaccurate, so.                                       01:13

15      Q.    Well, I didn't say inaccurate.  I said       01:13

16   "an accurate," and I apologize if I spoke too         01:13

17   quickly.                                              01:13

18      Turn to then the page that you actually refer      01:13

19   to as A58.  Now, is this the -- am I correct that     01:13

20   this document is the basis for your concluding        01:13

21   that adulterated Digitek that was part of the         01:13

22   recall made it to market?                             01:13

23      A.    One of the two.                              01:13

24      Q.    What's the other one?                        01:13

25      A.    The other one was the pharmacist found a     01:13

Page 425

```
 1   double-thick tablet, 47, what we talked about.        01:13
 2      Q.    But we know that wasn't part of the 2008    01:13
 3   recall.                                               01:13
 4      A.    No, it was not part of the recall.          01:13
 5      Q.    All right.  So this is the sole piece of    01:13
 6   information that you have that provides any           01:13
 7   indication that adulterated Digitek that was part    01:13
 8   of the 2008 recall made it to market.                01:13
 9      A.    This is the only document I have            01:14
10   reviewed thus far, that...                            01:14
11      Q.    You're not aware of anything else.          01:14
12   You're not aware of any other document.               01:14
13      A.    I have not reviewed any documents.          01:14
14      Q.    That say that; right?                        01:14
15      A.    No.                                          01:14
16      Q.    Okay.  Let's look at this.                   01:14
17      A.    Uh-huh.                                      01:14
18      Q.    Particularly the page -- and we touched     01:14
19   on this a little bit last time, but I want to talk    01:14
20   about it a little bit more thoroughly; okay?          01:14
21      A.    Sure.                                        01:14
22      Q.    A card of Digoxin with one                   01:14
23   double-thickness tablet.                              01:14
24      A.    Uh-huh.                                      01:14
25      Q.    So it's in a blister pack; right?           01:14
```

PLAINTIFFS' EXHIBITS 003646

Page 426

1    A.    I assume that's what the card is.                01:14

2    Q.    Are you an expert on blister packs?             01:14

3    A.    No.                                             01:14

4    Q.    Packaging?                                      01:14

5    A.    Packaging, no.                                  01:14

6    Q.    Okay.  Do you know whether this blister         01:14

7    pack was opaque on one side, like a lot of them      01:14

8    are?                                                 01:14

9    A.    I've never seen a description of a              01:14

10   blister pack with respect to this.                   01:14

11   Q.    You don't know anything about this             01:14

12   blister pack.                                        01:14

13   A.    This one here?                                 01:14

14   Q.    Yeah?                                          01:14

15   A.    I -- there's not enough information to         01:14

16   say.                                                01:14

17   Q.    Okay.  And you don't know -- well, we          01:14

18   know that the tablet wasn't taken out of the        01:14

19   blister pack and measured, don't we?                01:15

20   A.    This particular one?                           01:15

21   Q.    Yeah.                                          01:15

22   A.    It says please advise that -- and,             01:15

23   again, I'm just -- this is all data we got here.     01:15

24   Q.    I understand.                                   01:15

25   A.    "Please be advised that Lynn Carol, CSC,       01:15

PLAINTIFFS' EXHIBITS 003647

Page 427

```
 1    reports finding a card of Digoxin with one double      01:15

 2    thickness tablet at GL" Gloucester.  Whatever GL       01:15

 3    is.  I guess maybe that's their --                     01:15

 4         Q.    An acronym for -- I can never say that.     01:15

 5    Gloucester?                                            01:15

 6         A.    Gloucester, yeah.  "The card has four       01:15

 7    tablets remaining, one of which she reported was       01:15

 8    obviously double-thick."                               01:15

 9         So there were four tablets remaining in the       01:15

10    blister pack, one of which was identified as           01:15

11    double-thick.                                          01:15

12         Q.    Which she believed was double-thick.        01:15

13         A.    She believed was double-thick, yes.         01:15

14         Q.    Did you do anything to try to verify        01:15

15    whether this report was accurate or could be           01:15

16    accurate?                                              01:16

17         A.    No.                                         01:16

18         Q.    You just accepted it at face value?         01:16

19         A.    I accepted it as data that supported        01:16

20    double packaging.                                      01:16

21         Q.    At face value?                              01:16

22         A.    Yes, sir.                                   01:16

23         Q.    You get paid for your analytical skills;    01:16

24    right?                                                 01:16

25         A.    I do, sir.                                  01:16
```

PLAINTIFFS' EXHIBITS 003648

Page 428

1      Q.    And you hold yourself out to out as an          01:16
2    individual possessing a high level of analytical       01:16
3    skills; correct?                                        01:16
4      A.    I would say that's a fair assessment.           01:16
5      Q.    550 an hour, that's a pretty talented           01:16
6    analysis I would hope.  And yet you didn't feel         01:16
7    like this warranted any further analysis?               01:16
8      A.    I don't think that's a fair statement.          01:16
9      Q.    You didn't do any further analysis.             01:16
10     A.    I didn't have -- first of all, I was            01:16
11   asked to review certain sets of documents --            01:17
12     Q.    Right.                                           01:17
13     A.    -- that were available to me at that            01:17
14   time.                                                    01:17
15     Q.    Right.                                           01:17
16     A.    And I reviewed those documents and              01:17
17   extracted out of, you know, the thousands of pages      01:17
18   that I reviewed, those things that were                 01:17
19   pertinent.  I identified, as you saw, that lended       01:17
20   support to the fact that there were difficulties.       01:17
21     Q.    Okay.                                            01:17
22     A.    And by the time that rolled around,             01:17
23   there was no additional time to do any more             01:17
24   detailed investigation other than what I had            01:17
25   looked at.                                               01:17

PLAINTIFFS' EXHIBITS 003649

```
                                                    Page 429
 1      Q.     Well, in fact -- and so you didn't do      01:17
 2   any more detailed investigation other than looking   01:17
 3   it with the Plaintiffs' attorneys.                    01:17
 4      A.     With respect to this particular case?       01:17
 5      Q.     Right.                                       01:17
 6      A.     No.                                          01:17
 7      Q.     Well, but you actually reviewed a           01:17
 8   document that directly refutes the possibility of    01:17
 9   this being accurate, didn't you?                      01:17
10      A.     What was that?                              01:17
11      Q.     I mean you certainly wouldn't have         01:17
12   ignored information that made it clear that this     01:17
13   woman couldn't be correct, would you?                01:17
14      A.     I'm sorry.  I didn't understand that       01:17
15   statement.                                            01:17
16      Q.     If you had seen information that made it   01:17
17   clear that this report couldn't be correct, you      01:18
18   wouldn't have ignored that, would you?               01:18
19      A.     If I had seen information that             01:18
20   corroborated that?                                    01:18
21      Q.     No, that contradicted it and made it       01:18
22   very clear that this observation couldn't be         01:18
23   correct, you wouldn't have ignored that, would       01:18
24   you?                                                  01:18
25      A.     Oh, absolutely not, no.                    01:18
```

PLAINTIFFS' EXHIBITS 003650

Page 430

```
 1      Q.    I wouldn't think so.  Not for 550 an      01:18
 2   hour.                                              01:18
 3      Dr. Bliesner, I'm going to hand you a document  01:18
 4   that has been marked as Defendant's Exhibit 73,    01:18
 5   although it doesn't have a sticker on it.          01:18
 6      A.    Okay.                                      01:18
 7      Q.    Phil, would you mind putting a sticker    01:18
 8   on this one?  Just says Exhibit 73.                01:18
 9      Have you seen that -- well, Dr. Bliesner, take  01:19
10   a moment to look at that document, please.         01:19
11      A.    Uh-huh.                                    01:19
12      Q.    Have you reviewed Exhibit 73?             01:23
13      A.    I have, sir.                               01:23
14      Q.    Have you see that document before?        01:23
15      A.    That's a good question.                   01:23
16      Q.    Well, why don't you turn to page 47 of   01:23
17   your report.                                       01:23
18      A.    Okay.                                      01:23
19      Q.    We'll make short work of that good        01:23
20   question.                                          01:23
21      A.    Okay.                                      01:23
22      Q.    And for the record, that's two today.    01:23
23      A.    I'm sorry?                                 01:23
24      Q.    That's two good questions today.         01:23
25      Are you on page 47?                             01:23
```

PLAINTIFFS' EXHIBITS 003651

David M. Bliesner, Ph.D., Volume II        Videotaped - Revised                    February 18, 2011

Page 431

| | | | |
|---|---|---|---|
| 1 | A. | I am. | 01:23 |
| 2 | Q. | Do you see Exhibit -- or reference A36? | 01:23 |
| 3 | A. | I do. | 01:23 |
| 4 | Q. | Do you see that you described that as | 01:23 |
| 5 | | being Plaintiffs' Exhibit M69? | 01:23 |
| 6 | A. | I do. | 01:23 |
| 7 | Q. | Do you see the front of our Exhibit 63, | 01:23 |
| 8 | | indicating that that's M69? | 01:23 |
| 9 | A. | It is. | 01:23 |
| 10 | Q. | And you see that that is a UDL internal | 01:23 |
| 11 | | investigation record? | 01:23 |
| 12 | A. | Yes. | 01:23 |
| 13 | Q. | From Digitek tablets?  So what you're | 01:23 |
| 14 | | looking at as Defendant's 73 -- | 01:23 |
| 15 | A. | Yes. | 01:23 |
| 16 | Q. | -- is in fact your A36 reference; | 01:23 |
| 17 | | correct? | 01:23 |
| 18 | A. | Yes. | 01:23 |
| 19 | Q. | So you looked at this document? | 01:23 |
| 20 | A. | Yes, sir. | 01:24 |
| 21 | Q. | In fact you made a point of highlighting | 01:24 |
| 22 | | in your report information which you thought was | 01:24 |
| 23 | | negative and adverse with respect to Activis.  You | 01:24 |
| 24 | | made a point of indicating that there was a | 01:24 |
| 25 | | complaint about some tablets; right? | 01:24 |

Page 432

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 01:24 |
| 2 | Q. | Can you turn to page 2 of Exhibit 73? | 01:24 |
| 3 | A. | Yes. | 01:24 |
| 4 | Q. | Do you see the heading that says | 01:24 |
| 5 | "Examination of Retained Samples"? | | 01:24 |
| 6 | A. | Yes. | 01:24 |
| 7 | Q. | Read that paragraph please for me out | 01:24 |
| 8 | loud. | | 01:24 |
| 9 | A. | Sure.  "Examination of retained | 01:24 |

10   samples.  On 4/3/08, a visual examination of        01:24

11   retains for both strengths of Digitek were           01:24

12   completed.  Upon evaluating the fit of the tablets   01:24

13   within the blister cavity, it was observed that      01:24

14   both blister cavity sizes have minimal head space    01:24

15   that would prevent tablets to be packaged with       01:25

16   double the thickness.  If the tablet thickness       01:25

17   were to exceed the blister cavity size during        01:25

18   packaging, visible damage to the blister package     01:25

19   would occur and the -- excuse me -- the equipment    01:25

20   would experience a seal station overload, jamming    01:25

21   within the seal station, that would result in a      01:25

22   shutdown of the equipment.                           01:25

23       This type of occurrence is documented on the    01:25

24   inspection record and the batch record.  As stated  01:25

25   above, there is no documentation in the batch        01:25

PLAINTIFFS' EXHIBITS 003653

Page 433

```
 1   record of a machine- or inspection-related issues       01:25

 2   involving tablet thickness."                            01:25

 3        Q.    Did you read that document before you        01:25

 4   prepared your report.  You obviously did; right?        01:25

 5        A.    Yes sir.                                      01:25

 6        Q.    You read that language?                       01:25

 7        A.    Yes, sir.                                     01:25

 8        Q.    It makes it clear that the woman who          01:25

 9   thought she saw a double-thick tablet in a blister      01:25

10   pack couldn't have been correct, doesn't it?           01:25

11        A.    I don't think you can say that               01:25

12   definitively.  This is an internal investigation        01:25

13   report.  This is what they report.  There's --          01:25

14   it's opinion based on their experience and              01:25

15   observation.                                            01:26

16        Q.    But it's not opinion.  It's a very           01:26

17   specific statement about the technical                  01:26

18   specifications and capabilities of their packaging      01:26

19   equipment, isn't it?                                    01:26

20        A.    Perhaps.                                      01:26

21        Q.    What do you mean "perhaps"?                   01:26

22        A.    It's an investigation summary.               01:26

23   Investigation summaries don't necessarily report       01:26

24   all of the information in an accurate fashion on        01:26

25   what happened in the investigation.                     01:26
```

PLAINTIFFS' EXHIBITS 003654

                                                          Page 434

 1      Q.    Do you have any reason to believe that        01:26

 2   the information in this paragraph that you just        01:26

 3   read is inaccurate?                                    01:26

 4      A.    Any reason?                                   01:26

 5      Q.    Yes.                                          01:26

 6      A.    Based on my experience, unless I             01:26

 7   actually review an investigation report, I always     01:26

 8   wonder if the summary is -- how accurate it is,        01:26

 9   based on my experience.                                01:26

10      Q.    Do you have any reason to believe that        01:26

11   this paragraph and the information in this            01:26

12   paragraph is inaccurate?                              01:26

13      A.    Based on the comment from the person who     01:26

14   saw it, I would say that there was a possibility      01:26

15   that there was a double-thick tablet in that          01:26

16   blister pack.                                          01:27

17      Q.    So you're going to reject the                01:27

18   information of the packaging entity that says         01:27

19   their equipment would not allow packaging of          01:27

20   double-thick tablet in favor of an unreliable,        01:27

21   uncorroborated, unverified account of a woman in a    01:27

22   nursing home that you characterized as a              01:27

23   pharmacist.                                            01:27

24          MR. KERENSKY:  Excuse me.  Form.               01:27

25   BY MR. ANDERTON:                                      01:27

PLAINTIFFS' EXHIBITS 003655

Page 435

```
 1      Q.    Is that what you're going to do?              01:27
 2      A.    What was his question.  I'm sorry.            01:27
 3      Q.    His question was form.  That means you        01:27
 4  get to answer my question.  Phil, would you please     01:27
 5  read that back.                                         01:27
 6            MR. KERENSKY:  That's correct.                01:27
 7               (Whereupon, the testimony was read         01:28
 8  back by the court reporter, as recorded above)          01:28
 9            THE WITNESS:  Okay.                            01:28
10            I am not rejecting this information.           01:28
11       It's part of the data.  As far as the              01:28
12       characterization of a pharmacist, I don't have     01:28
13       any way to prove in fact it was a pharmacist       01:28
14       the way it's written in there.  So this is         01:28
15       just additional data to -- that was discovered     01:28
16       during my review.                                  01:28
17  BY MR. ANDERTON:                                        01:28
18       Q.    You have given sworn testimony today --      01:28
19       A.    Yes.                                         01:28
20       Q.    -- that her report, the information in       01:28
21  our Exhibit 59A allows you to say we know               01:29
22  adulterated Digitek was released to market.             01:29
23  That's your sworn testimony.                            01:29
24       A.    My sworn testimony is we know that           01:29
25  there -- based on that pharmacist report in             01:29
```

PLAINTIFFS' EXHIBITS 003656

David M. Bliesner, Ph.D., Volume II       Videotaped - Revised                February 18, 2011

Page 436

1    Bellingham, Washington, that that is true.            01:29

2         Q.    Dr. Bliesner?                              01:29

3         A.    Yes, sir.                                  01:29

4         Q.    I'm talking strictly about this 2008       01:29

5    situation and I want you to stay focused on that      01:29

6    for me; okay?                                         01:29

7         A.    Okay.                                      01:29

8         Q.    You've given sworn testimony here today    01:29

9    that says that this report of the woman who works     01:29

10   for goldenliving.com is the evidence that allows      01:29

11   you to conclude in your expert witness report that    01:29

12   you know adulterated Digitek that was part of the     01:29

13   recall --                                             01:29

14        A.    That's --                                  01:29

15        Q.    -- made it to market.                      01:30

16        A.    That's -- that's a misunderstanding of     01:30

17   what I said.  We know that adulterated Digitek        01:30

18   made it to market because of the pharmacist's         01:30

19   discovery here.  I have not definitively made a       01:30

20   statement this is a piece of evidence that            01:30

21   somebody potentially found a double-thick tablet      01:30

22   in the market characterized as a pharmacist.          01:30

23        Q.    So then if I understand what you're        01:30

24   doing right now, Dr. Bliesner, you're backing away    01:30

25   from this report.                                     01:30

PLAINTIFFS' EXHIBITS 003657

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                                  Page 437

 1      A.    No, I'm not backing away.                           01:30

 2      Q.    Let's get it clear.                                 01:30

 3      A.    Okay.                                               01:30

 4      Q.    Does this -- do you believe this allows             01:30

 5    to you conclude that --                                     01:30

 6      A.    With the recalled lot?                              01:30

 7      Q.    That part that of -- that -- I'm talking            01:30

 8    only about this situation.                                 01:30

 9      A.    Okay.                                               01:30

10      Q.    Do not --                                           01:30

11      A.    That situation.                                     01:30

12      Q.    Do not inject any additional                        01:30

13    circumstances into your answer; okay?                       01:30

14      A.    Okay.                                               01:30

15      Q.    Are we clear on that?                               01:30

16      A.    Yes, sir.                                           01:30

17      Q.    Are you sure?                                       01:31

18      A.    Yes, sir.                                           01:31

19      Q.    I'm talking about this report that is in            01:31

20    Defense Exhibit 59A.                                        01:31

21      A.    Yes.                                                01:31

22      Q.    Do you conclude from this report that               01:31

23    adulterated Digitek made it to market?                      01:31

24      A.    Based on that one report and the fact               01:31

25    that I may have mischaracterized them as a                  01:31

PLAINTIFFS' EXHIBITS 003658

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 438

1    pharmacist, I can't come to a firm conclusion on          01:31

2    that.                                                     01:31

3        Q.    You can't come to a firm conclusion on          01:31

4    that?                                                     01:31

5        A.    That's correct.                                 01:31

6        Q.    So when you said earlier --                     01:31

7        A.    Uh-huh.                                         01:31

8        Q.    -- we know --                                   01:31

9        A.    Yes.                                            01:31

10       Q.    -- which is definitive.  Am I correct --        01:31

11       A.    Yes.                                            01:31

12       Q.    -- that adulterated Digitek was released        01:31

13   to market, the only thing you have to support that       01:31

14   definitive statement is the 2004 circumstances?          01:31

15       A.    In the documents I have already                01:31

16   reviewed; correct.                                        01:31

17       Q.    Okay.  The only thing you're aware of --        01:31

18   no matter what you've reviewed -- is the 2004            01:31

19   circumstances; correct?                                   01:31

20       A.    That's the specific one, yes.                   01:32

21             THE WITNESS:  I hate to do this to you.         01:32

22   I need a bathroom break.                                  01:32

23             MR. ANDERTON:  You certainly may.               01:32

24             THE VIDEOGRAPHER:  The time is 1:31 p.m.        01:32

25       We're going off the record briefly.                   01:32

PLAINTIFFS' EXHIBITS 003659

Page 439

```
 1                    (Short break)                      01:40
 2          THE VIDEOGRAPHER:  The time is 1:42 p.m.      01:40
 3      We're back on the record.                        01:40
 4   BY MR. ANDERTON:                                    01:40
 5      Q.   Dr. Bliesner, you just took a break.        01:40
 6   Did you speak with Mr. Kerensky during that break?  01:40
 7      A.   Yes, I did.                                 01:40
 8      Q.   Who called who?                             01:40
 9      A.   He called me.                               01:40
10      Q.   He did?                                     01:40
11      A.   Yes.                                        01:40
12      Q.   What did you talk about?                    01:40
13      A.   He wanted to ask me how I felt things       01:40
14   were going, how I felt.                             01:41
15      Q.   What did you tell him?                      01:41
16      A.   I said it's tiring, hard work.  I didn't    01:41
17   get to the point where I said I don't know how you  01:41
18   people do this for a living, but that's what I was  01:41
19   thinking then he offered some advice.               01:41
20      Q.   What was his advice?                        01:41
21      A.   His advice was you realize the report       01:41
22   that you wrote is not based on just one or two      01:41
23   observations of the adulterated product in the      01:41
24   market.  The basis -- the majority of the basis of  01:41
25   the report is this total lack of compliance over    01:41
```

PLAINTIFFS' EXHIBITS 003660

Page 440

1    the course of years.  I said okay.                   01:41

2        Q.    Okay.  So he told you to say that?         01:41

3        A.    No, he didn't tell me to say that.  He     01:41

4    said just remember.                                  01:41

5        Q.    That's his words though, not yours.        01:41

6        A.    No, it's -- yeah it's his words in         01:41

7    general.                                             01:41

8        Q.    His words?                                 01:41

9        A.    Yeah.  But it is the basis of the          01:41

10   report.  It's true.  That's how it was written.      01:41

11       Q.    But let's call that what it is.            01:41

12       A.    Uh-huh.                                     01:41

13       Q.    The basis of the report is inferences;     01:41

14   right?                                               01:41

15       A.    Inferences?                                01:41

16       Q.    Sure.                                      01:41

17       A.    How are you defining inferences?           01:41

18       Q.    Well, you have either direct proof --      01:42

19       A.    Uh-huh.                                    01:42

20       Q.    -- or inferential proof.  You understand   01:42

21   the difference between the two; right?               01:42

22       A.    I do not.                                  01:42

23       Q.    Direct proof is something that proves a    01:42

24   proposition to be true.  Something follows -- A      01:42

25   follows from B.                                      01:42

PLAINTIFFS' EXHIBITS 003661

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

```
                                                      Page 441
 1    A.    Okay.                                     01:42
 2    Q.    Inferential proof is something that       01:42
 3  doesn't necessarily prove something is true but   01:42
 4  suggests it's true.                               01:42
 5    Do you understand the difference?               01:42
 6    A.    I think in those terms, yes.              01:42
 7    Q.    You know what an inference is; right?     01:42
 8    A.    Yes.                                       01:42
 9    Q.    You know what I mean?  Dr. Bliesner, I'm  01:42
10  a little bit befuddled by your claimed lack of    01:42
11  understanding of some of these very basic terms   01:42
12  when you spend your life charging people $500 an  01:42
13  hour or more to do highly technical analytical -- 01:42
14  to provide highly technical analytical services.  01:43
15  How do you not know the difference off the top of 01:43
16  your head between direct and inferential?         01:43
17       MR. KERENSKY:  Objection, form.              01:43
18  BY MR. ANDERTON:                                  01:43
19    Q.    You may answer.                           01:43
20    A.    I never been in a deposition with the     01:43
21  legal implication of some words.  It's like the   01:43
22  definition of "is," is with Clinton.              01:43
23    Q.    Do you know the difference between        01:43
24  direct proof and inferential proof in the ordinary 01:43
25  course of your FDA GMP consulting career?         01:43
```

PLAINTIFFS' EXHIBITS 003662

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

                                                                    Page 442

1        A.      We never use the term infer.                         01:43

2        Q.      Okay.  You've got --                                 01:43

3        A.      In my experience.                                    01:43

4        Q.      So your conclusion in your report which              01:43

5   is set forth at page 21, you say it is my opinion                 01:43

6   to a reasonable degree of certainty that the                      01:44

7   systemic failure to implement quality systems and                 01:44

8   to comply with regulations -- with the                            01:44

9   regulations -- resulted in adulterated drug                       01:44

10  products making it to the marketplace.                            01:44

11       Did I read that correctly?                                   01:44

12       A.      Yes, you did.                                        01:44

13       Q.      As concerns the product, the Digitek                 01:44

14  product that was part of the recall, you don't                    01:44

15  have any direct proof of that, do you?                            01:44

16       A.      I have proof that they were in                       01:44

17  substantial state of discompliance and that those                 01:44

18  tablets were manufactured under the quality                       01:44

19  systems or lack of quality systems therein and                    01:45

20  therefore were at risk.                                           01:45

21       Q.      So what you have proof of is the                     01:45

22  possibility that adulterated Digitek was                          01:45

23  manufactured; correct?                                            01:45

24       A.      The likelihood that it could have been               01:45

25  manufactured.                                                     01:45

PLAINTIFFS' EXHIBITS 003663

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised          February 18, 2011

```
                                                      Page 443
 1      Q.     Which is a possibility.               01:45
 2      A.     It's probable.                        01:45
 3      Q.     Oh, now you know the difference between   01:45
 4    possibility and probability.                   01:45
 5      A.     We talked about it earlier today       01:45
 6    remember?                                      01:45
 7      Q.     I see.  You're a quick study.  That's   01:45
 8    good to know.                                  01:45
 9      So in your mind it's probable but still you   01:45
10    have no proof; right?                          01:45
11      A.     With respect to the recalled lot?     01:45
12      Q.     Correct.  Lots.                        01:45
13      A.     Lots.                                 01:45
14      Q.     Correct.  With respect to the recalled   01:45
15    lots.                                          01:45
16      A.     In what I've reviewed, no.            01:45
17      Q.     All right.  And so if you assert as a   01:45
18    conclusion that adulterated Digitek that was part   01:45
19    of the recalled lots made it to marketplace, the   01:46
20    only way you do that is by inference; right?   01:46
21      A.     The only way?                         01:46
22      Q.     You don't have any direct proof.      01:46
23      A.     For the recalled lots.                01:46
24      Q.     Correct.  And so the only way to reach   01:46
25    that conclusion is by inference; right?        01:46
```

PLAINTIFFS' EXHIBITS 003664

```
                                                   Page 444
 1      A.    The chronic systemic failure of the      01:46

 2   quality system and the FDA actions, including two 01:46

 3   consent decrees and anything like that, if you're 01:46

 4   defining that as an inference, then the answer    01:46

 5   would be yes.                                      01:46

 6      Q.    Well, we know you didn't look at any     01:46

 7   Digitek production records; right?                 01:46

 8      A.    That's not necessarily true.             01:46

 9      Q.    You looked at a portion of one batch     01:46

10   record; right?                                     01:46

11      A.    I can't remember specifically.  I know I 01:46

12   reviewed the ANDA that had batch records in it and 01:46

13   I have probably read another document or two.      01:46

14      Q.    Okay.  There were 152 batches that were  01:46

15   recalled.                                          01:47

16      A.    Okay.                                     01:47

17      Q.    You didn't review any of the batch       01:47

18   records for those 152 batches except for a partial 01:47

19   review of the batch where some double-thick        01:47

20   tablets were found during manufacturing that were  01:47

21   inspected out of the batch before it was           01:47

22   released.  And the only reason you read that is    01:47

23   because you read the investigation report for that 01:47

24   batch; correct?                                    01:47

25      A.    I don't recall which batch record I      01:47
```

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                              Page 445
 1    looked at.  I tell you that right now.                    01:47
 2         Q.    Okay.  You gave testimony about it last        01:47
 3    time.                                                     01:47
 4         A.    Okay.                                          01:47
 5         Q.    The record will show what it shows.            01:47
 6         A.    Okay.                                          01:47
 7         Q.    But you certainly didn't review any of         01:47
 8    the batch records beyond that single batch with           01:47
 9    respect to the recalled batches; correct?                 01:47
10         A.    I don't believe so.                            01:47
11         Q.    Okay.  So you conducted a paper audit?         01:47
12         A.    Yes, sir.                                      01:47
13         Q.    Without reviewing production records?          01:47
14         A.    Yes.                                           01:47
15         Q.    And from that paper audit of                   01:48
16    non-production records, primarily FDA regulatory          01:48
17    documentation, you conclude there is a possibility        01:48
18    that adulterated Digitek was produced and                 01:48
19    therefore there is a possibility that adulterated         01:48
20    Digitek was released; correct?                            01:48
21         A.    No, it probably was released to market.        01:48
22    If you go back and you look at the FDA reports and        01:48
23    the findings, first of all, batch record is not           01:48
24    the end all be all for documenting whether things         01:48
25    are good or bad.  In fact as we know from reading         01:48

PLAINTIFFS' EXHIBITS 003666

Page 446

| | | |
|---|---|---|
| 1 | the documentation here is that there are numbers | 01:48 |
| 2 | of people in the facility that don't even read | 01:48 |
| 3 | English.  So are they going to document anything | 01:48 |
| 4 | bad on a batch record?  It brings that into | 01:48 |
| 5 | question. | 01:48 |
| 6 | So, you know, the reality is, is if people | 01:49 |
| 7 | make mistakes and they don't read English, are | 01:49 |
| 8 | they going to document them on a batch record? | 01:49 |
| 9 | That's a good question and I can't answer it.  But | 01:49 |
| 10 | it brings into question the batch records doesn't | 01:49 |
| 11 | necessarily show you anything definitive. | 01:49 |
| 12 | Q.    You can't answer it because you didn't | 01:49 |
| 13 | care enough to ask for or even attempt to review | 01:49 |
| 14 | the batch records.  You can't give any testimony | 01:49 |
| 15 | about the information in the batch records for the | 01:49 |
| 16 | recalled batches, can you? | 01:49 |
| 17 | A.    In the batch records? | 01:49 |
| 18 | Q.    Correct. | 01:49 |
| 19 | A.    Again, I have to go back.  But if I take | 01:49 |
| 20 | you at your word, then -- and that from the | 01:49 |
| 21 | previous testimony I reviewed a small portion of | 01:49 |
| 22 | the batch record, then the answer is I reviewed a | 01:49 |
| 23 | small portion of the batch record. | 01:49 |
| 24 | Q.    From one lot. | 01:49 |
| 25 | A.    If that's what's in the testimony | 01:49 |

PLAINTIFFS' EXHIBITS 003667

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

Page 447

| | | |
|---|---|---|
| 1 | previously, I'll say yes. | 01:49 |
| 2 | Q. And as concerns all of the other 151 | 01:49 |
| 3 | lots at four-plus million tablets each that were | 01:49 |
| 4 | part of the recall, you can't give any testimony | 01:49 |
| 5 | about those batch records, can you? | 01:50 |
| 6 | A. Specifically the batch records? | 01:50 |
| 7 | Q. Yeah. | 01:50 |
| 8 | A. No. | 01:50 |
| 9 | Q. So you can't say anything one way or the | 01:50 |
| 10 | other about whether they're accurate not accurate, | 01:50 |
| 11 | whether there appears to be some sort of mistake | 01:50 |
| 12 | in them, you can't give any testimony about them, | 01:50 |
| 13 | can you? | 01:50 |
| 14 | A. That's not true. If you have a | 01:50 |
| 15 | substantial quality system failures as documented | 01:50 |
| 16 | by the FDA, you're going to have problems. | 01:50 |
| 17 | Q. How would the FDA determine whether a | 01:50 |
| 18 | quality system deficiency impacted a specific | 01:50 |
| 19 | product? How would the FDA do it? | 01:50 |
| 20 | A. How would they determine? | 01:50 |
| 21 | Q. Yeah. | 01:50 |
| 22 | A. They don't have to. They see quality | 01:50 |
| 23 | system failure, they write you up. | 01:50 |
| 24 | Q. They write you up. | 01:50 |
| 25 | How would they determine whether a specific | 01:50 |

PLAINTIFFS' EXHIBITS 003668

Page 448

1   product was impacted?                                    01:50

2      A.    If it would not fall under the GMPs and         01:51

3   there was doubt, that's how they determine.              01:51

4      Q.    That would create a possibility that            01:51

5   some deficiency impacted some product; right?            01:51

6      A.    Say that again, or should I have him            01:51

7   read it back?  Because I don't know if I                 01:51

8   understand that.                                         01:51

9           MR. ANDERTON:  Please, Phil, read it             01:51

10     back.                                                 01:51

11             (Whereupon, the testimony was read            01:51

12   back by the court reporter, as recorded above)          01:51

13          THE WITNESS:  Possibility that some              01:51

14     deficiency could potentially impact.  The FDA         01:51

15     does not need the probable definition.  All           01:51

16     they have to go in and see that there are             01:51

17     deficiencies with respect to the quality              01:51

18     systems.  They do whatever they want and take         01:51

19     action on it.                                          01:51

20   BY MR. ANDERTON:                                        01:51

21     Q.    I understand that.                              01:51

22     A.    Uh-huh.                                          01:51

23     Q.    I asked you a question and I would like         01:51

24   you to answer now.  How would the FDA determine         01:51

25   whether a specific GMP systems deficiency impacted      01:51

PLAINTIFFS' EXHIBITS 003669

Page 449

```
 1   a specific problem?  I'm sorry a specific        01:52
 2   product.                                         01:52
 3       A.    Well, I don't work for the FDA and I'm  01:52
 4   not going to speak for the FDA, but if they      01:52
 5   find -- go back look at the EIRs and see that    01:52
 6   there are all kinds of problems with respect to  01:52
 7   manufacturing records and lack of manufacturing  01:52
 8   records, validated processes and things like     01:52
 9   that.  So that's what they do.                   01:52
10       They put -- if the question as to the        01:52
11   integrity of the manufactured product, then, you 01:52
12   know, they take action.                          01:52
13       Q.    What question were you just answering? 01:52
14   I move to strike that as completely              01:52
15   non-responsive.                                  01:52
16       Were you talking about Activis or their      01:52
17   records somehow?                                 01:52
18       A.    I'm talking about the records that the 01:52
19   FDA reviewed and their systems and places that   01:52
20   will show up on the establishment inspection     01:52
21   report.                                          01:52
22       Q.    Are you an expert in GMP compliance or 01:52
23   not?                                             01:53
24       A.    Am I am, sir.                          01:53
25       Q.    Okay.  I'm asking you a question about 01:53
```

PLAINTIFFS' EXHIBITS 003670

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised          February 18, 2011

Page 450

```
 1    FDA practice that ought to be right down the           01:53
 2    middle of that expertise.  I don't know why you        01:53
 3    don't want to answer it, but -- I know exactly why     01:53
 4    you don't want to answer it but I'm going to keep      01:53
 5    asking it until you do.                                01:53
 6             MR. KERENSKY:  Objection, form.               01:53
 7    BY MR. ANDERTON:                                       01:53
 8       Q.    Okay.  How would the FDA -- let's             01:53
 9    assume, Dr. Bliesner, that the FDA was doing an        01:53
10    inspection and uncovered a GMP practice that they      01:53
11    believed was deficient.                                01:53
12       A.    Okay.                                         01:53
13       Q.    That happens; right?                          01:53
14       A.    Yes, it does.                                 01:53
15       Q.    That's what you charge your clients to        01:53
16    assess; right?                                         01:53
17       A.    Yes.                                          01:53
18       Q.    If the FDA wanted to determine whether        01:53
19    that GMP deficiency impacted a particular product,     01:53
20    how would they do that?                                01:53
21       A.    They may or may not start looking at all      01:54
22    of the quality systems that are in there.  I'm         01:54
23    just telling you how they do it.  They could stop      01:54
24    when they see significant deficiencies and there       01:54
25    is doubt in their mind they just stop.  That's         01:54
```

PLAINTIFFS' EXHIBITS 003671

Page 451

| | | |
|---|---|---|
| 1 | what they do. | 01:54 |
| 2 | Q.    Why don't you want to ask answer that | 01:54 |
| 3 | question?  I know the answer.  I know why you | 01:54 |
| 4 | don't want to. | 01:54 |
| 5 | A.    Well, what's the answer? | 01:54 |
| 6 | Q.    Dr. Bliesner, how would the FDA | 01:54 |
| 7 | determine whether a specific GMP deficiency | 01:54 |
| 8 | impacted a specific product?  What would they do? | 01:54 |
| 9 | MR. KERENSKY:  Objection, form, prior to | 01:54 |
| 10 | the word "how?" | 01:54 |
| 11 | BY MR. ANDERTON: | 01:54 |
| 12 | Q.    You may answer. | 01:54 |
| 13 | A.    Again, please. | 01:54 |
| 14 | Q.    I'll ask it again. | 01:54 |
| 15 | A.    Okay. | 01:54 |
| 16 | Q.    And we're going to set up the whole | 01:54 |
| 17 | situation again; okay? | 01:54 |
| 18 | A.    Okay. | 01:54 |
| 19 | Q.    So that I understand -- so that I know | 01:54 |
| 20 | you're clear in what we're talking about. | 01:54 |
| 21 | A.    Okay. | 01:55 |
| 22 | Q.    The FDA can -- the FDA conducts | 01:55 |
| 23 | inspections; right? | 01:55 |
| 24 | A.    That's correct. | 01:55 |
| 25 | Q.    If they notice a condition which they | 01:55 |

PLAINTIFFS' EXHIBITS 003672

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                             Page 452

 1    believe is a violation of good manufacturing              01:55

 2    practices --                                              01:55

 3         A.    Yes.                                           01:55

 4         Q.    -- they make a note or a record of that        01:55

 5    somehow; correct?                                         01:55

 6         A.    Yes, they do.                                  01:55

 7         Q.    If that GMP violation or deficiency            01:55

 8    related to a specific -- or to a quality system,          01:55

 9    they'd make a note of that; right?                        01:55

10         A.    Yes, they do                                  01:55

11         Q.    And they notify the company of that            01:55

12    quality system GMP deficiency; right?                     01:55

13         A.    Typically, yes.                                01:55

14         Q.    All right.  In the ordinary course,            01:55

15    that's what they would do?                                01:55

16         A.    Yes.                                           01:55

17         Q.    They are not in the business of ignoring       01:55

18    or overlooking deficiencies that they find, are           01:55

19    they?                                                     01:55

20         A.    No, not at all.  Not at all.                   01:55

21         Q.    I don't know why you felt compelled to         01:55

22    say typically in that situation.  But Dr. Bliesner        01:55

23    in that situation, if the FDA found a GMP                 01:55

24    deficiency in the quality systems and wanted then         01:56

25    to inquire or determine whether that deficiency           01:56

PLAINTIFFS' EXHIBITS 003673

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised          February 18, 2011

Page 453

```
 1   had any impact on a specific product --              01:56
 2       A.    Yes.                                       01:56
 3       Q.    -- what would they do?                     01:56
 4             MR. KERENSKY:  Form.  Objection, form.     01:56
 5             THE WITNESS:  It depends, you know, what   01:56
 6       deficiency it is in quality systems; all         01:56
 7       right?  For instance, let's say they go in the   01:56
 8       laboratory, they pull up some data, they look    01:56
 9       at chromatograms --                              01:56
10   BY MR. ANDERTON:                                     01:56
11       Q.    Stop.  Data and chromatograms for what?    01:56
12   For the product?                                     01:56
13       A.    Yes.                                       01:56
14       Q.    Sounds to me like they're reviewing        01:56
15   production records for that product.                 01:56
16       A.    They will review batch records as well.    01:56
17       Q.    Okay.                                       01:56
18       A.    Chromatographic data and reports aren't    01:56
19   necessarily -- you know, they're included with the   01:56
20   reported results, included in batch record, but      01:57
21   the raw data and the stuff is not.                   01:57
22       Q.    You don't think that's part of the batch   01:57
23   record?                                              01:57
24       A.    The data is reported results, but          01:57
25   chromatograms in my experience traditionally are     01:57
```

PLAINTIFFS' EXHIBITS 003674

Page 454

1   not.  Electronic data are traditionally not.          01:57

2       Q.    But the data is?                             01:57

3       A.    The final results.                           01:57

4       Q.    The data that the chromatogram generates     01:57

5   or reflects is part of the batch record; right?       01:57

6       A.    We're talking about -- I'm -- please         01:57

7   don't take this wrong.  Your understanding of raw     01:57

8   data as opposed to a result, they're different        01:57

9   things.                                               01:57

10      Q.    Okay.                                         01:57

11      A.    Okay.                                         01:57

12      Q.    But the bottom line is the FDA if they       01:57

13  wanted to determine whether a quality systems         01:57

14  deficiency impacted a specific product, they'd go     01:57

15  look at the records, some portion of the records      01:57

16  for that specific product, wouldn't they?             01:57

17      A.    They'll look at the records that             01:57

18  indicate where the difficulties are.  For             01:57

19  instance, if they think there's problems with an      01:58

20  analytical method, they'll go in and they'll start    01:58

21  pulling up chromatographic data, look at the          01:58

22  results that come out there, look at peaks, look      01:58

23  how they're innovated, pull up the development        01:58

24  report, pull up the validation report, things like    01:58

25  that.                                                 01:58

PLAINTIFFS' EXHIBITS 003675

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised               February 18, 2011

                                                                Page 455

 1        If they think there are discrepancies with            01:58

 2    respect to improper documentation or execution of         01:58

 3    batch records, then they can pull the batch               01:58

 4    records and take a look at it.                             01:58

 5        Q.    So what you've just described is a               01:58

 6    process whereby the FDA would look at some                01:58

 7    variation, some component -- some or all of the            01:58

 8    production records for the product.  The only way          01:58

 9    they could conclude that a quality system                  01:58

10    deficiency actually impacted a specific product is         01:58

11    to go look at the records that relate to that             01:58

12    product; correct?                                          01:58

13        A.    The raw data in the records, the reports        01:58

14    that come out of it.                                       01:58

15        Q.    Right.                                           01:58

16        A.    That's correct.                                  01:58

17        Q.    Couldn't reach that to product -- strike        01:58

18    that.                                                      01:58

19            MR. ANDERTON:  We're going to change the           01:59

20        tape.                                                  01:59

21            THE VIDEOGRAPHER:  It's 2:01 p.m.  We're           01:59

22        going off the record.                                  01:59

23                (Short break)                                  02:00

24            THE VIDEOGRAPHER:  The time is 2:03 p.m.           02:00

25        We are back on record.  This is the beginning          02:02

PLAINTIFFS' EXHIBITS 003676

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 456

| | | |
|---|---|---|
| 1 | of tape six. | 02:02 |
| 2 | BY MR. ANDERTON: | 02:02 |
| 3 | Q.    Dr. Bliesner, in the paper audit that | 02:02 |
| 4 | you conducted, you placed heavy emphasis on the | 02:02 |
| 5 | FDA regulatory documents, didn't you? | 02:02 |
| 6 | A.    Yes, sir, I did. | 02:02 |
| 7 | Q.    They carry great weight with you, don't | 02:02 |
| 8 | they? | 02:02 |
| 9 | A.    Yes, they do. | 02:02 |
| 10 | Q.    Dr. Bliesner, I'm handing you a document | 02:02 |
| 11 | that has been marked as -- previously marked by | 02:03 |
| 12 | the Plaintiffs as Exhibit 68.  As you can see by | 02:03 |
| 13 | the sticker, they used it in a deposition on | 02:03 |
| 14 | December 9, 2009. | 02:03 |
| 15 | A.    Okay. | 02:03 |
| 16 | Q.    Will you just look at that document for | 02:03 |
| 17 | a moment?  I don't want you to read it. | 02:03 |
| 18 | A.    Okay. | 02:03 |
| 19 | Q.    I just want you to skim through it and | 02:03 |
| 20 | satisfy yourself of what it is. | 02:03 |
| 21 | MR. KERENSKY:  I can't hear what | 02:03 |
| 22 | exhibit.  I'm sorry. | 02:03 |
| 23 | MR. ANDERTON:  68, Mike. | 02:03 |
| 24 | MR. KERENSKY:  Okay. | 02:04 |
| 25 | MR. ANDERTON:  And it's Plaintiffs' | 02:04 |

PLAINTIFFS' EXHIBITS 003677

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 457

| | | |
|---|---|---|
| 1 | Exhibit 68.  You got that part; right? | 02:04 |
| 2 | MR. KERENSKY:  I did not.  Thank you. | 02:04 |
| 3 | That's why I couldn't find it. | 02:04 |
| 4 | MR. ANDERTON:  Right.  I'm here to help, | 02:04 |
| 5 | Mike. | 02:04 |
| 6 | BY MR. ANDERTON: | 02:05 |
| 7 | Q.    Have you seen that document before? | 02:05 |
| 8 | A.    I believe I have seen it either as part | 02:05 |
| 9 | of an EIR or stand-alone or both. | 02:05 |
| 10 | Q.    I'll take that as a yes.  It's a 2006 | 02:05 |
| 11 | 483 -- it's a 483 form issued in August of 2006 by | 02:05 |
| 12 | the FDA, following an inspection of the Activis | 02:05 |
| 13 | Totowa Little Falls facility; correct? | 02:05 |
| 14 | A.    Yes. | 02:05 |
| 15 | Q.    Dates of inspection July 10, 2006, to | 02:05 |
| 16 | August 10, 2006; correct? | 02:05 |
| 17 | A.    Correct. | 02:05 |
| 18 | Q.    All right.  And are you familiar enough | 02:05 |
| 19 | with the document, Dr. Bliesner, to -- to say that | 02:05 |
| 20 | this document relates to various GMP circumstances | 02:06 |
| 21 | of Activis Totowa, as reflected in this inspection | 02:06 |
| 22 | report? | 02:06 |
| 23 | A.    GMP circumstances? | 02:06 |
| 24 | Q.    Yeah. | 02:06 |
| 25 | A.    Failure of compliance?  Failure of | 02:06 |

PLAINTIFFS' EXHIBITS 003678

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 458

| | | |
|---|---|---|
| 1 | compliance I would say, yes. | 02:06 |
| 2 | Q.    For GMP issues? | 02:06 |
| 3 | A.    Yes. | 02:06 |
| 4 | Q.    Look at page 5. | 02:06 |
| 5 | A.    Uh-huh. | 02:06 |
| 6 | Q.    Observation seven.  Do you see that? | 02:06 |
| 7 | A.    Yes. | 02:06 |
| 8 | Q.    That is an observation that relates to | 02:06 |
| 9 | the bulk stability hold times studies. | 02:06 |
| 10 | Do you see that? | 02:06 |
| 11 | A.    Yes.  Just, if I may, I may not -- | 02:06 |
| 12 | Q.    Dr. Bliesner. | 02:06 |
| 13 | A.    -- have seen some of this stuff because | 02:07 |
| 14 | a lot of the copies we had were redacted, just so | 02:07 |
| 15 | you know. | 02:07 |
| 16 | Q.    Well, nothing like hiding something from | 02:07 |
| 17 | yourself. | 02:07 |
| 18 | Well, let's just do it.  You see observation | 02:08 |
| 19 | five on there or observation seven there on page | 02:08 |
| 20 | 5? | 02:08 |
| 21 | A.    Yes. | 02:08 |
| 22 | Q.    All right.  Do you remember the | 02:08 |
| 23 | testimony that you gave on January 25th about bulk | 02:08 |
| 24 | stability hold time studies? | 02:08 |
| 25 | A.    No. | 02:08 |

PLAINTIFFS' EXHIBITS 003679

```
                                                   Page 459

 1      Q.    You don't; okay.                        02:08

 2      Do you remember telling Mr. Moriarty that you 02:08

 3   questioned whether the Activis -- whether the    02:08

 4   Digitek process validation -- whether the FDA had 02:08

 5   any issues with the Digitek process validation   02:08

 6   because you had seen a reference to bulk stability 02:08

 7   hold times in this 483, and you thought that that 02:08

 8   related to process validation?                   02:08

 9      A.    I don't recall that, that statement.    02:08

10      Q.    Do you -- do you --                      02:08

11      A.    I --                                     02:08

12      Q.    -- stand by that testimony?  Does bulk   02:08

13   stability hold time studies have anything to do   02:09

14   with process validation?                          02:09

15      A.    I'm not clear what they're meaning by    02:09

16   bulk stability hold here.                          02:09

17      Q.    You gave the testimony, Dr. Bliesner, I  02:09

18   didn't.  I'm asking you a question.  Does bulk    02:09

19   stability hold time studies have anything to do   02:09

20   with process validation?                          02:09

21           MR. KERENSKY:  Objection, form.           02:09

22           MR. ANDERTON:  What's wrong with that      02:09

23      form, Mike?  I would like to correct it if you 02:09

24      will allow.                                     02:09

25           MR. KERENSKY:  It's a sidebar.  You gave   02:09
```

PLAINTIFFS' EXHIBITS 003680

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 460

```
 1      him the answer, I didn't.  I doubt you will.        02:09
 2           MR. ANDERTON:  Say that one more time.         02:09
 3      What's wrong with the form?                         02:09
 4           MR. KERENSKY:  It is a sidebar of you          02:09
 5      gave the testimony, I didn't.  That kind of         02:09
 6      comment prior to the question is objectionable      02:09
 7      where I practice law.                               02:09
 8           MR. ANDERTON:  Oh, okay.                        02:09
 9  BY MR. ANDERTON:                                        02:09
10      Q.    So my question, Dr. Bliesner, absent any     02:09
11  preface comment is do bulk stability hold time         02:10
12  studies have anything to do with process               02:10
13  validation?                                            02:10
14      A.    They can, yes.                                02:10
15      Q.    As you read this observation 7, does it?     02:10
16      A.    With respect to these products.              02:10
17      Q.    It does?                                      02:10
18      A.    Bulk stability -- we're talking about        02:10
19  final blend or are we talking about manufactured       02:10
20  tablets?  In this particular case it's                 02:10
21  particularly clear.                                    02:10
22      Q.    Okay.  What's really clear, however --       02:10
23      A.    Uh-huh.                                       02:10
24      Q.    -- is that Digitek --                         02:10
25      A.    Uh-huh.                                       02:10
```

PLAINTIFFS' EXHIBITS 003681

Page 461

| | | |
|---|---|---|
| 1 | Q.     -- is not mentioned as one of the | 02:10 |
| 2 | products that the FDA cited in this observation; | 02:10 |
| 3 | correct? | 02:10 |
| 4 | A.     In the copy I'm looking at, yes. | 02:10 |
| 5 | Q.     Do you think that I'm looking at a | 02:10 |
| 6 | different copy? | 02:10 |
| 7 | A.     I was specifically told don't look at | 02:10 |
| 8 | anything that has to do with any other product | 02:10 |
| 9 | other than Digitek.  So if I had this copy with no | 02:10 |
| 10 | Digitek on there, I'm pretty sure I would not have | 02:11 |
| 11 | made a comment on it. | 02:11 |
| 12 | Q.     Well, Dr. Bliesner, again, the last time | 02:11 |
| 13 | you were here -- | 02:11 |
| 14 | A.     Okay. | 02:11 |
| 15 | Q.     -- you identified this observation as a | 02:11 |
| 16 | reason why you questioned the validity of the | 02:11 |
| 17 | Digitek process validation.  I'm sorry.  Let me | 02:11 |
| 18 | strike that. | 02:11 |
| 19 | You cited to this observation as a basis for | 02:11 |
| 20 | wondering whether the FDA questioned the process | 02:11 |
| 21 | validation for Digitek.  So does this have | 02:11 |
| 22 | anything to do with the process validation for | 02:11 |
| 23 | Digitek? | 02:11 |
| 24 | A.     In this particular case, it does not | 02:11 |
| 25 | look so. | 02:11 |

PLAINTIFFS' EXHIBITS 003682

Page 462

```
 1      Q.    It does not?                              02:11
 2      A.    Yes, uh-huh.                              02:11
 3      Q.    Okay.  Are you aware of any other         02:11
 4  evidence that you have reviewed that calls into     02:11
 5  question the validity of the Digitek process        02:11
 6  validation?                                         02:12
 7      A.    Yes.                                      02:12
 8      Q.    What?                                     02:12
 9      A.    There were internal studies and          02:12
10  investigations with respect to process validation,  02:12
11  blend uniformity.                                   02:12
12      Q.    Okay.  So there were investigations --    02:12
13      A.    I misspoke.  With respect to process      02:12
14  validation, no.                                     02:12
15      Q.    Okay.                                     02:12
16      A.    With respect to blend uniformity.  I'm    02:12
17  sorry.                                              02:12
18            MR. ANDERTON:  Phil, would you please     02:12
19      read back my question very slowly and very      02:12
20      deliberately.  Dr. Bliesner, would you please   02:12
21      answer my question?                             02:12
22            THE WITNESS:  Yes, sir.                   02:13
23            (Whereupon, the testimony was read        02:13
24  back by the court reporter, as recorded above)      02:13
25            THE WITNESS:  I have to go back through    02:13
```

PLAINTIFFS' EXHIBITS 003683

Page 463

| | |
|---|---|
| 1 | my report and take a look. | 02:13 |
| 2 | BY MR. ANDERTON: | 02:13 |
| 3 | Q.    You're really desperate not to do | 02:13 |
| 4 | anything you can to undermine Activis, aren't | 02:13 |
| 5 | you?  You already testified about this last time, | 02:13 |
| 6 | Dr. Bliesner, and you identified only the bulk | 02:13 |
| 7 | stability hold time studies. | 02:13 |
| 8 |        MR. KERENSKY:  Form. | 02:13 |
| 9 | BY MR. ANDERTON: | 02:13 |
| 10 | Q.    Now you have reviewed your report | 02:13 |
| 11 | forwards and backwards many times today and many | 02:13 |
| 12 | times last time.  Are you aware -- | 02:13 |
| 13 |        MR. KERENSKY:  The witness is allowed to | 02:13 |
| 14 |        review his report as much as he can to give | 02:13 |
| 15 |        accurate testimony, and I think you probably | 02:13 |
| 16 |        know that. | 02:13 |
| 17 |        MR. ANDERTON:  I do know that.  I also | 02:13 |
| 18 |        know that he's now contradicting his own prior | 02:13 |
| 19 |        testimony whether he realizes it or not.  So | 02:13 |
| 20 |        if he wants to go back through his report, he | 02:13 |
| 21 |        certainly may. | 02:13 |
| 22 | BY MR. ANDERTON: | 02:14 |
| 23 | Q.    But my question is are you aware of any | 02:14 |
| 24 | other evidence that calls into question the | 02:14 |
| 25 | validity of the process validation for Digitek? | 02:14 |

PLAINTIFFS' EXHIBITS 003684

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                 Page 464

1        A.     Any other information?  Again, I need to        02:14

2    go back through my report and see what references          02:14

3    I reviewed with respect to process validation.             02:14

4        Q.     You didn't say anything about the               02:14

5    Digitek process validation in your report, not a           02:14

6    word about it being unreliable, and you testified          02:14

7    last time that you didn't review the process               02:14

8    validations.                                               02:14

9        Out of a desperate attempt to create some              02:14

10   negative inference with respect to Activis, you            02:14

11   tried to identify this bulk stability hold time            02:14

12   reference in this 483 as evidence.                         02:14

13           MR. KERENSKY:  Is that a question or a             02:14

14       speech?  In either case, I object as to form.          02:14

15   BY MR. ANDERTON:                                           02:14

16       Q.     So, Dr. Bliesner, what -- if you didn't         02:14

17   say anything in your report about process                  02:14

18   validation, what would you be looking for?                 02:15

19           MR. KERENSKY:  Objection, form.  Assumes           02:15

20       facts not in evidence.                                 02:15

21   BY MR. ANDERTON:                                           02:15

22       Q.     You may -- you may answer.                      02:15

23       A.     Ask it again, please.                           02:15

24       Q.     If you didn't say anything about the            02:15

25   Digitek process validation in your report --               02:15

PLAINTIFFS' EXHIBITS 003685

Page 465

| | | | |
|---|---|---|---|
| 1 | A. | That's correct. | 02:15 |
| 2 | Q. | -- what would you be looking for? | 02:15 |
| 3 | A. | If I didn't? | 02:15 |
| 4 | Q. | Yeah. | 02:15 |
| 5 | A. | Chances are I didn't have documents that | 02:15 |
| 6 | | would support that. | 02:15 |
| 7 | Q. | So -- | 02:15 |
| 8 | A. | Chances are. | 02:15 |
| 9 | Q. | So you wouldn't have any evidence? | 02:15 |
| 10 | A. | None of the documents were not given to | 02:15 |
| 11 | | me to review. | 02:15 |
| 12 | Q. | Oh, you assume they're out there, you | 02:15 |
| 13 | | just didn't get them? | 02:15 |
| 14 | A. | I know they're out there. | 02:15 |
| 15 | Q. | You know there's documents out there | 02:15 |
| 16 | | that call the process validation into question? | 02:15 |
| 17 | A. | No, I don't have a question on the | 02:15 |
| 18 | | documents with respect to process validation. | 02:15 |
| 19 | Q. | And by the way, you most certainly were | 02:15 |
| 20 | | given them if you reviewed all of Plaintiffs' | 02:15 |
| 21 | | exhibits. | 02:15 |
| 22 | A. | I did not review all of Plaintiffs' | 02:15 |
| 23 | | Exhibits in detail. | 02:15 |
| 24 | Q. | Didn't you tell me that last night from | 02:15 |
| 25 | | Plaintiffs' counsel you received process | 02:16 |

PLAINTIFFS' EXHIBITS 003686

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 466

| | | |
|---|---|---|
| 1 | validation? | 02:16 |
| 2 | A.    Yes, and that's when I told you I got | 02:16 |
| 3 | that document last night and I didn't review it. | 02:16 |
| 4 | Q.    Okay. | 02:16 |
| 5 | A.    That's -- I got it late. | 02:16 |
| 6 | Q.    Well, Dr. Bliesner, you've already given | 02:16 |
| 7 | this testimony last time.  With respect to | 02:16 |
| 8 | observation 7 -- | 02:16 |
| 9 | A.    Uh-huh. | 02:16 |
| 10 | Q.    -- on the 2006, 483 -- | 02:16 |
| 11 | A.    Uh-huh. | 02:16 |
| 12 | Q.    -- does that have anything to do with | 02:16 |
| 13 | the Digitek process validation? | 02:16 |
| 14 | A.    No, this is just related to these | 02:16 |
| 15 | products here. | 02:16 |
| 16 | Q.    Okay. | 02:16 |
| 17 | A.    According to this document. | 02:16 |
| 18 | Q.    Can't resist, can you? | 02:16 |
| 19 | A.    Resist what?  I'm sorry. | 02:16 |
| 20 | Q.    Your -- your solicited, gratuitous, | 02:16 |
| 21 | editorial comments at the end of every answer to | 02:16 |
| 22 | make sure you follow Plaintiffs' counsels' | 02:16 |
| 23 | directive to keep the door open. | 02:16 |
| 24 |       MR. KERENSKY:  Objection to form.  You | 02:16 |
| 25 |       know, speaking objections go for both sides of | 02:16 |

PLAINTIFFS' EXHIBITS 003687

```
                                                  Page 467
 1     the table.                                   02:16
 2          MR. ANDERTON:  I'm sorry, Mike.  I'm not 02:16
 3     sure I understand.                           02:17
 4          MR. KERENSKY:  You know when you give a  02:17
 5     speech like that, admonishing the witness and 02:17
 6     trying to intimidate the witness, that's just 02:17
 7     like a speaking objection, trying to coach the 02:17
 8     witness.                                      02:17
 9          MR. ANDERTON:  I'm merely trying to get  02:17
10     him to answer the questions that are asked of 02:17
11     him.  We've been down this road all day.      02:17
12          MR. KERENSKY:  I think you should stick  02:17
13     to questions and not speeches.                02:17
14          MR. ANDERTON:  Okay.                     02:17
15          MR. KERENSKY:  Save speeches for the     02:17
16     judge and the jury would be my recommendation. 02:17
17          MR. ANDERTON:  I appreciate your         02:17
18     recommendation, Mike.                         02:17
19          MR. KERENSKY:  Thank you.                02:17
20     BY MR. ANDERTON:                              02:17
21          Q.   So Dr. Bliesner, I'm now going to hand 02:17
22     you a document that has been marked as --     02:17
23     previously marked as Plaintiffs' Exhibit 25.  Take 02:17
24     a moment and look at that document, please.   02:17
25     Actually, may I see that back?                02:18
```

PLAINTIFFS' EXHIBITS 003688

```
                                                      Page 468
 1     A.    Sure.                                       02:18
 2     Q.    I may have given you the wrong             02:18
 3  document.  No.                                       02:18
 4          THE WITNESS:  This is going to look like    02:18
 5     delaying tactics, but I've got to go to the      02:18
 6     bathroom.                                         02:18
 7          MR. ANDERTON:  Okay.                         02:18
 8          THE VIDEOGRAPHER:  The time is 2:19 p.m.    02:18
 9     We're going off the record.                       02:18
10               (Short break)                           02:25
11          THE VIDEOGRAPHER:  The time is 2:27 p.m.    02:25
12     We are back on the record.                        02:25
13          MR. ANDERTON:  We're going to make a        02:25
14     record of that before we close down, Mike, if   02:25
15     that's all right.                                 02:25
16          MR. KERENSKY:  Yes, that's fine.            02:25
17  BY MR. ANDERTON:                                     02:25
18     Q.    Dr. Bliesner, I'm going to hand you what  02:25
19  has previously been marked as Plaintiffs' Exhibit   02:25
20  25.                                                  02:25
21     A.    Okay.                                       02:25
22     Q.    Have you seen that document before?        02:25
23     A.    I believe I have, but there was an         02:26
24  original one and there was a revised one, and I'm   02:26
25  not sure which one I had the ability to review.     02:26
```

PLAINTIFFS' EXHIBITS 003689

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                Page 469

 1      Q.    You don't know whether you got to review      02:26

 2   the revised warning letter?  If you don't know         02:26

 3   that, how do you know there was one?                   02:26

 4      A.    There was -- if I recall, correctly           02:26

 5   there was a warning letter and then there was a        02:27

 6   revised warning letter.                                02:27

 7      Q.    Yeah, what's this document say on top?        02:27

 8      A.    This one is the revised warning letter.       02:27

 9   I'm not sure which one I looked at.                    02:27

10      Q.    Did you only look at one of those two?        02:27

11      A.    I don't recall.  Let's see.                   02:27

12      Q.    All right.  Dr. Bliesner, look at page        02:27

13   41 of your report.                                     02:27

14      A.    Okay.  Okay.  And that would be it?           02:27

15      Q.    Have you seen that document before?           02:27

16      A.    Yes.                                          02:27

17      Q.    In fact you reviewed it preparing your        02:27

18   report; right?                                         02:28

19      A.    Yes.                                          02:28

20      Q.    And according to your description of          02:28

21   content, I'll use your words not mine, this            02:28

22   warning letter -- this is -- starts on page 41 and     02:28

23   continues on to page 42.                               02:28

24      A.    Yes.                                          02:28

25      Q.    This warning letter is -- relates            02:28

PLAINTIFFS' EXHIBITS 003690

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 470

| | | |
|---|---|---|
| 1 | directly to the 483 that we discussed a moment | 02:28 |
| 2 | ago, that is Plaintiffs' Exhibit 68; correct? | 02:28 |
| 3 | A.    I'm sorry.  Say that again.  I was | 02:28 |
| 4 | looking at the contents. | 02:28 |
| 5 | Q.    This warning letter -- | 02:28 |
| 6 | A.    Yes. | 02:28 |
| 7 | Q.    -- relates directly to the 483 that is | 02:28 |
| 8 | Plaintiffs' Exhibit 68; correct? | 02:28 |
| 9 | A.    I don't know.  The warning letter?  Yes. | 02:28 |
| 10 | Q.    Okay.  So you have an inspection in July | 02:28 |
| 11 | and August of 2006 resulting a 483; right? | 02:28 |
| 12 | A.    Uh-huh. | 02:28 |
| 13 | Q.    You have to say or no? | 02:28 |
| 14 | A.    Yes, I'm sorry. | 02:29 |
| 15 | Q.    About six months later, a warning letter | 02:29 |
| 16 | was issued by the FDA; right? | 02:29 |
| 17 | A.    That's correct, uh-huh. | 02:29 |
| 18 | Q.    Okay.  All right.  Dr. Bliesner, I'm | 02:29 |
| 19 | handing you a document that has been marked as | 02:29 |
| 20 | Plaintiffs' Exhibit 171. | 02:29 |
| 21 | A.    Okay. | 02:29 |
| 22 | Q.    And this document was actually marked | 02:29 |
| 23 | twice but go to page 44 of your report, please. | 02:29 |
| 24 | A.    I'm sorry 44 of the? | 02:30 |
| 25 | Q.    Of your report. | 02:30 |

PLAINTIFFS' EXHIBITS 003691

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 471

```
 1      A.    My report; okay.  A little punchy.        02:30
 2   Sorry.                                             02:30
 3      Q.    Do you see reference A29?                 02:30
 4      A.    I do.                                      02:30
 5      Q.    Is your reference A29 -- notwithstanding  02:30
 6   the discrepancy in the exhibit numbers as I told   02:30
 7   you, this document was marked twice at two         02:30
 8   depositions, one says 158, one says 171.           02:30
 9   Nevertheless, please look at your reference A29    02:30
10   and tell me whether that is the same thing as what 02:30
11   you've now been given, which is in front of you as 02:30
12   Exhibit 171.                                       02:30
13      A.    A29.  And your statement again was?       02:31
14      Q.    Is that the same as your reference A29?   02:31
15      A.    Let me double check.  My A29 doesn't      02:31
16   have the cover letter.                             02:31
17      Q.    Doesn't have the cover letter, but        02:31
18   otherwise is it the exact same EIR?                02:31
19      A.    It is, but there's redactions             02:32
20      Q.    In which one?                             02:32
21      A.    This one you just handed me as opposed    02:32
22   to this one.                                       02:32
23      Q.    Okay.                                      02:32
24      A.    So there --                                02:32
25      Q.    That's fine.                               02:32
```

PLAINTIFFS' EXHIBITS 003692

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                 Page 472

 1        A.    Uh-huh.                                            02:32

 2        Q.    Now, let's look at -- and again working           02:32

 3    from the one I handed you as 171.                           02:32

 4        A.    Okay.                                             02:32

 5        Q.    Turn to page 11.                                  02:32

 6        A.    11 of 40?                                         02:33

 7        Q.    Correct.                                          02:33

 8        A.    Okay.                                             02:33

 9        Q.    Actually, let's go to page 2 of 40.              02:33

10        Do you see the summary?                                 02:33

11        A.    Yes, sir.                                         02:33

12        Q.    The first sentence of the summary                02:33

13    indicates that this inspection was conducted as a           02:33

14    follow-up to warning letter 07-NWJ-06.                      02:33

15        A.    Okay.                                             02:33

16        Q.    Is that the same warning letter that is          02:33

17    Plaintiffs' Exhibit 25 that you just looked at a            02:33

18    moment ago?                                                 02:33

19        A.    25 you said; correct?                             02:33

20        Q.    Uh-huh.                                           02:34

21        A.    Okay.  It does appear to be, yes.                 02:34

22        Q.    Okay.  Is it or not?                              02:34

23        A.    Yes, according to the code, yeah.                 02:34

24        Q.    Okay.  And -- and so you know from your           02:34

25    experience that when a warning letter is issued             02:34

Page 473

| | | |
|---|---|---|
| 1 | oftentimes -- maybe not perhaps all of the time -- | 02:34 |
| 2 | the FDA will come back and ask to see verification | 02:34 |
| 3 | of remedial activities and corrective activities | 02:34 |
| 4 | performed by the manufacturer to the items set | 02:34 |
| 5 | forth in the warning letter; correct? | 02:34 |
| 6 | A.    That is common, yes. | 02:34 |
| 7 | Q.    Okay.  You've assisted clients with -- | 02:34 |
| 8 | with exactly those types of inspections, haven't | 02:34 |
| 9 | you? | 02:34 |
| 10 | A.    Inspections or the remediation. | 02:34 |
| 11 | Q.    Well, remediation and then the follow-up | 02:34 |
| 12 | inspections. | 02:34 |
| 13 | A.    Yes. | 02:34 |
| 14 | Q.    You've assisted with both. | 02:34 |
| 15 | A.    Yes. | 02:34 |
| 16 | Q.    Right? | 02:34 |
| 17 | A.    Yes. | 02:34 |
| 18 | Q.    Okay.  So this inspection then that was | 02:34 |
| 19 | conducted in 2007 -- | 02:35 |
| 20 | A.    Okay. | 02:35 |
| 21 | Q.    -- from September 5 to September 28 -- | 02:35 |
| 22 | do I have those dates right? | 02:35 |
| 23 | A.    Yes. | 02:35 |
| 24 | Q.    It was a follow-up inspection to the | 02:35 |
| 25 | warning letter that was -- the revised warning | 02:35 |

PLAINTIFFS' EXHIBITS 003694

Page 474

1   letter that was issued February 1, 2007, which was        02:35

2   issued after an inspection in July and August of          02:35

3   2006; correct?                                            02:35

4        A.    The original inspection July, August,          02:35

5   2006, yes.  Follow-up inspection off the issued           02:35

6   warning letter September, yes.                            02:35

7        Q.    Okay.                                          02:35

8        A.    Uh-huh.                                        02:35

9        Q.    So the items that are set forth in the         02:35

10  warning letter --                                         02:35

11       A.    Uh-huh.                                        02:35

12       Q.    -- of February 1, 2007 --                      02:35

13       A.    Uh-huh.                                        02:35

14       Q.    -- are the items that are also set forth       02:35

15  in the 483 issued in August of 2006 following the         02:35

16  inspection; right?                                        02:36

17       A.    Correct.                                       02:36

18       Q.    Now -- now we can go to -- well,                02:36

19  actually go to page 5 of 60.                              02:36

20       A.    5 of 60?                                       02:36

21       Q.    On the EIR for the 2007 inspection.            02:36

22       A.    Okay.                                          02:36

23       Q.    Do you see the first paragraph there?          02:36

24       A.    The compliance status?                         02:36

25       Q.    Yes.                                           02:36

PLAINTIFFS' EXHIBITS 003695

Page 475

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 02:36 |
| 2 | Q. | What's a compliance hold? | 02:36 |
| 3 | A. | A compliance hold is where they may put | 02:36 |

4   a hold on manufacturing and shipping of certain      02:36

5   products, depending on the impact in the EIR.        02:36

6      Q.    Okay.  And might they also put a hold on    02:36

7   new product approvals?                               02:37

8      A.    Not necessarily.                            02:37

9      Q.    Might they?                                 02:37

10     A.    They could.                                 02:37

11     Q.    Could?                                      02:37

12     A.    Uh-huh.                                     02:37

13     Q.    Is it -- is it uncommon for a              02:37

14  manufacturer who is -- who is, to use the term       02:37

15  quote "under" a warning letter, to have new          02:37

16  product approvals stayed until the warning letter    02:37

17  is lifted?                                           02:37

18        MR. ANDERTON:  Phil, would you read it         02:38

19     back, please?                                     02:38

20        THE VIDEOGRAPHER:  The time is 2:40 p.m        02:38

21     going off the record.                             02:38

22             (Short break)                             02:40

23        THE VIDEOGRAPHER:  The time is 2:42 p.m.        02:40

24     We're back on the record.                         02:40

25        MR. ANDERTON:  Phil, would you please          02:40

PLAINTIFFS' EXHIBITS 003696

Page 476

| | | |
|---|---|---|
| 1 | slowly read back that question? | 02:40 |
| 2 | (Whereupon, the testimony was read | 02:40 |
| 3 | back by the court reporter, as recorded above) | 02:40 |
| 4 | THE WITNESS:  In my experience, companies | 02:40 |
| 5 | that are under regulatory action like a | 02:40 |
| 6 | warning letter or consent decree in my | 02:40 |
| 7 | experience is that they are allowed to | 02:41 |
| 8 | continue new product development and have | 02:41 |
| 9 | regular inspections by the FDA as it | 02:41 |
| 10 | progresses. | 02:41 |
| 11 | BY MR. ANDERTON: | 02:41 |
| 12 | Q.   Okay.  But a compliance hold is -- is | 02:41 |
| 13 | some restriction on the company's activities? | 02:41 |
| 14 | A.   Yes. | 02:41 |
| 15 | Q.   Defined by the circumstances, I | 02:41 |
| 16 | suppose. | 02:41 |
| 17 | A.   Yes. | 02:41 |
| 18 | Q.   Now, after this -- well, let's go to | 02:41 |
| 19 | page 11 of 40. | 02:41 |
| 20 | Do you see the inspection coverage heading? | 02:41 |
| 21 | A.   Yes. | 02:41 |
| 22 | Q.   According to that page, the quality | 02:41 |
| 23 | production laboratory control materials and | 02:41 |
| 24 | facilities and equipment systems were covered | 02:41 |
| 25 | during this inspection.  That is five of the six | 02:41 |

PLAINTIFFS' EXHIBITS 003697

Page 477

```
 1   systems typically inspected by the FDA; correct?        02:42
 2        A.    Yes.                                          02:42
 3        Q.    The only one not covered is packaging.        02:42
 4        A.    Packaging and labeling.                       02:42
 5        Q.    Sorry packaging and labeling.  And you        02:42
 6   know packaging and labeling was in a different           02:42
 7   facility from all of these other operations;             02:42
 8   right?                                                   02:42
 9        A.    I didn't know if it was exclusive, but I      02:42
10   know there was packaging and labeling going on in        02:42
11   another facility.                                        02:42
12        Q.    Okay.  Well, you know that it wasn't at       02:42
13   the Little Falls facility; right?                        02:42
14        A.    I didn't know whether there was some or       02:42
15   not.  I didn't specifically look at that.                02:42
16        Q.    I see.  Okay.  So what you didn't know        02:42
17   is whether there was packaging in another facility       02:42
18   and also at the Little Falls facility.                   02:42
19        A.    That's correct.                               02:42
20        Q.    Okay.  Would you look at -- well, after       02:42
21   this inspection, another a 483 was issued.  Do you       02:42
22   remember that?                                           02:42
23        A.    Specifically, no.                             02:42
24        Q.    All right.  Well, look at page 44 of          02:43
25   your report.                                             02:43
```

PLAINTIFFS' EXHIBITS 003698

Page 478

1     A.    Okay.  All right.  Yes.  It would         02:43

2   reflect -- you can go back and at the 483s, it    02:43

3   would be there.                                    02:43

4     Q.    So my question is, Dr. Bliesner, after    02:43

5   the inspection that is reflected in the EIR, that  02:43

6   is Plaintiffs' or, yeah, Plaintiffs' Exhibit 171,  02:43

7   a 483 was issued; correct?                         02:43

8     A.    171.  Okay.  I just want to make sure     02:44

9   because we've got several different layers here.   02:44

10  Yes.                                               02:44

11    Q.    All right.  You say so in your report.    02:44

12    A.    Yes, yes.  I'm just confused because we    02:44

13  have different versions and different numbers and  02:44

14  stuff.  I wanted to be sure.                        02:44

15    Q.    Okay.  And in that 483, there were three  02:44

16  observations; right?                               02:44

17    A.    Yes, according to this.                    02:44

18    Q.    You lay those out on page 44 of your      02:44

19  report and they are also set forth in this EIR;    02:44

20  isn't that right?                                  02:44

21    A.    Yes.                                       02:44

22    Q.    And in among those three observations,    02:44

23  none of them have anything do with Digitek,        02:44

24  correct?                                           02:44

25    A.    The general observations and supporting   02:46

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

Page 479

```
 1   data, the general observations indicate there is        02:46
 2   nothing referred back to Digitek.                        02:46
 3       Q.   Okay.                                           02:46
 4       A.   Uh-huh.                                         02:46
 5       Q.   And do you know that the outcome of this        02:46
 6   inspection was what is referred to as V -- as in         02:46
 7   victory -- VAI?                                          02:46
 8       A.   Voluntary action indicated?                     02:46
 9       Q.   Yes.                                            02:46
10       A.   I don't recall.                                 02:46
11       Q.   Do you have any reason to believe it was        02:46
12   VAI?                                                     02:46
13       A.   No.                                             02:47
14       Q.   Okay.  I mean I could put the 2008 EIR          02:47
15   in front of you that explicitly says that.               02:47
16       A.   Yeah.                                           02:47
17       Q.   Okay.                                           02:47
18       A.   Yeah.                                           02:47
19       Q.   So VAI is a reasonable outcome for an           02:47
20   FDA inspection; correct?                                 02:47
21       A.   It's reasonable in that they're not             02:47
22   forcing you to do something specifically, that           02:47
23   it's up to you to do it, yes.                            02:47
24       Q.   Everybody would love to have NAI for all        02:47
25   --                                                       02:47
```

PLAINTIFFS' EXHIBITS 003700

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

                                                                    Page 480

 1      A.    Absolutely.                                     02:47

 2      Q.    -- for all inspections; right?                 02:47

 3      A.    Absolutely.                                     02:47

 4      Q.    But VAI with three modest observations,         02:47

 5   that's a favorable outcome for an inspection,            02:47

 6   wouldn't you agree?                                      02:47

 7      A.    I wouldn't necessarily agree that it's a        02:47

 8   modest observation.                                      02:47

 9      Q.    Well, after --                                  02:47

10      A.    It's better to have -- as you said, you         02:48

11   know, the real goal is no action indicated.  And        02:48

12   the next step up is voluntary action indicated.         02:48

13      Q.    If they weren't modest or not major at          02:48

14   least, there would have been an OAI outcome;             02:48

15   right?                                                   02:48

16      A.    Potentially.  It's one of those gray            02:48

17   areas in the industry.  If the agency sees you're        02:48

18   progressing and even though there are some               02:48

19   significant failures and you're implementing a           02:48

20   corrective action, then they'll go okay, VAI.            02:48

21      Q.    Okay.  But a VAI is a reasonable                02:48

22   outcome?                                                 02:48

23      A.    It's reasonable.                                02:48

24      Q.    Okay.  A lot of companies never get             02:48

25   anything but VAI outcomes; right?                        02:48

PLAINTIFFS' EXHIBITS 003701

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 481

| | | |
|---|---|---|
| 1 | A.    I don't know lots.  I mean, you know, | 02:48 |
| 2 | that's a broad term. | 02:48 |
| 3 | Q.    Okay.  Now continuing on this in EIR, | 02:48 |
| 4 | Dr. Bliesner, turn to page 25 of 40. | 02:48 |
| 5 | Are you there? | 02:49 |
| 6 | A.    I'm double checking. | 02:49 |
| 7 | Q.    Dr. Bliesner, we've already established | 02:49 |
| 8 | that it's the same document. | 02:49 |
| 9 | A.    I agree. | 02:49 |
| 10 | Q.    Okay.  Then you don't need to be looking | 02:49 |
| 11 | at both documents. | 02:49 |
| 12 | A.    I'm more comfortable if I do; okay. | 02:49 |
| 13 | What was the question please? | 02:49 |
| 14 | Q.    I didn't ask a question.  I merely | 02:49 |
| 15 | wanted you to turn to page 25.  I asked -- the | 02:49 |
| 16 | question?  Are you at page 25? | 02:49 |
| 17 | A.    I am. | 02:49 |
| 18 | Q.    Okay.  Look at Exhibit 171.  Okay, | 02:49 |
| 19 | Dr. Bliesner, you've already conceded -- | 02:49 |
| 20 | A.    Uh-huh. | 02:49 |
| 21 | Q.    -- that is the same EIR.  There's no | 02:49 |
| 22 | reason to keep referring back and forth between | 02:49 |
| 23 | the two documents; all right?  Now -- | 02:49 |
| 24 | MR. KERENSKY:  And, Dr. Bliesner, if you | 02:49 |
| 25 | feel more comfortable referring back and | 02:49 |

PLAINTIFFS' EXHIBITS 003702

Page 482

| | |
|---|---|
| 1 | forth, of course you are free to. | 02:49 |
| 2 | THE WITNESS:  I do because I want to make | 02:49 |
| 3 | sure the redactions don't interrupt with the | 02:49 |
| 4 | current version we're looking at. | 02:50 |
| 5 | MR. KERENSKY:  Fair enough. | 02:50 |
| 6 | BY MR. ANDERTON: | 02:50 |
| 7 | Q.    What do you mean interrupt? | 02:50 |
| 8 | A.    Well, I wrote my report based on this | 02:50 |
| 9 | document that has redactions into it and this | 02:50 |
| 10 | doesn't.  So I want would make sure that there's | 02:50 |
| 11 | no gaps.  That's all it is. | 02:50 |
| 12 | Q.    Okay.  Gaps?  What do you mean gaps? | 02:50 |
| 13 | A.    Specifically, I don't know.  I just want | 02:50 |
| 14 | to make sure.  This is the one I reviewed | 02:50 |
| 15 | specifically, the second document.  I'm just more | 02:50 |
| 16 | comfortable doing that. | 02:50 |
| 17 | Q.    Okay.  Dr. Bliesner, under the heading | 02:50 |
| 18 | voluntary corrections on page 25 -- | 02:50 |
| 19 | A.    Yes. | 02:50 |
| 20 | Q.    -- the FDA indicates that during this | 02:50 |
| 21 | inspection, corrections to the previous FDA 483 | 02:50 |
| 22 | were reviewed with Ms. Ang.  Do you see that? | 02:50 |
| 23 | A.    I do, sir. | 02:50 |
| 24 | Q.    So that would be the 483 that was issued | 02:50 |
| 25 | in August 2006 that resulted in a warning letter | 02:50 |

PLAINTIFFS' EXHIBITS 003703

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                            Page 483

1    in February of 2007; right?                            02:50

2        A.    Yes.                                          02:50

3        Q.    And the observation -- the EIR then goes      02:50

4    on to list all of the observations that were in        02:51

5    that prior 483.  Do you see that?  Starting at          02:51

6    page 25 and going all the way through, oh, all the      02:51

7    way to page 39 of the EIR; right?                       02:51

8        A.    So the question is, these are the             02:51

9    observations from the previous inspection that          02:51

10   happened?  I'm sorry.  What date?  I'm confused.        02:51

11   The one in 2006?                                         02:51

12       Q.    Correct.                                       02:52

13       A.    Okay.                                          02:52

14       Q.    Right.                                         02:52

15       A.    It looks like it, yes.  483 to the EIR.       02:52

16       Q.    Okay.                                          02:52

17       A.    Yes.                                           02:52

18       Q.    And so --                                      02:52

19       A.    And there were -- how many did we have        02:52

20   here?  They had 13 and they went back through all       02:52

21   13, yes.                                                 02:52

22       Q.    Okay.                                          02:52

23       A.    Uh-huh.                                        02:52

24       Q.    So at this point during this 2007             02:52

25   inspection, as you might expect from -- as you          02:52

PLAINTIFFS' EXHIBITS 003704

                                                        Page 484

 1    indicated you might expect in the ordinary course,        02:52

 2    the FDA reviewed the corrective actions taken by          02:52

 3    Activis and assessed them or evaluated them;              02:52

 4    correct?                                                  02:52

 5         A.    According to the EIR, yes.                     02:52

 6         Q.    You place great weight on FDA documents,       02:52

 7    don't you, Dr. Bliesner?                                  02:52

 8         A.    I do.                                          02:52

 9         Q.    Okay.  This EIR is no different than all       02:53

10    the other FDA document you give significant weight        02:53

11    to, is it?                                                02:53

12         A.    No.                                            02:53

13         Q.    Okay.  It gets the same level of               02:53

14    credibility --                                            02:53

15         A.    I'm sorry.  I don't know if I understand       02:53

16    your consternation there.                                 02:53

17         Q.    Don't worry about it.                          02:53

18         A.    Okay, okay.                                    02:53

19         Q.    Dr. Bliesner, did you review this              02:53

20    section of this EIR when you looked at it as you          02:53

21    compiled your report?                                     02:53

22         A.    Yes.                                           02:53

23         Q.    You did?                                       02:53

24         A.    I did.                                         02:53

25         Q.    So you must have known then in the eyes        02:53

PLAINTIFFS' EXHIBITS 003705

Page 485

1    of the FDA, all of the GMP deficiencies that were        02:53

2    part of the 2006 483 and the 2007 warning letter        02:53

3    were remediated to the FDA's satisfaction; right?       02:53

4         A.    I can't say all definitively.  They have    02:54

5    made progress and their observations were -- are        02:54

6    here.  I have to go back and look and say all is a      02:54

7    broad term.  They addressed them, yes.                  02:54

8         Q.    And the document speaks for itself.  It      02:54

9    will show --                                            02:54

10        A.    Okay.                                         02:54

11        Q.    -- whether the FDA believed there was        02:54

12   any unresolved corrective actions; right?               02:54

13        A.    If the document -- I haven't reviewed it     02:54

14   in a while.  If it says that, then it's true.           02:54

15        Q.    So as you look -- as I look at your          02:54

16   report on pages 15 and 16 --                            02:54

17        A.    Uh-huh.                                       02:54

18        Q.    -- in chronological progression, you         02:55

19   refer to this EIR or to the inspection that is          02:55

20   reflected in this 2007 EIR, and you make a point        02:55

21   to identify the three observations that the FDA         02:55

22   issued following that inspection.  Do you see that      02:55

23   beginning at the top of page -- I'm sorry, the          02:55

24   bottom of page 15 and continuing on to 16,              02:55

25   paragraph 37?                                           02:55

PLAINTIFFS' EXHIBITS 003706

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 486

1      A.    Yes.                                            02:55

2      Q.    So you made a point of noting the              02:55

3  observations that the FDA issued after that              02:55

4  inspection; right?                                       02:55

5      A.    That's correct.                                02:55

6      Q.    You didn't note the corrective actions.        02:55

7      A.    That was not my intent to do a search          02:55

8  and review the documentations to look for                02:55

9  corrective actions.                                      02:56

10     Q.    A search.  You didn't have to search.          02:56

11  You read it.                                            02:56

12     A.    Yes.                                           02:56

13     Q.    You knew they did the corrective action        02:56

14  if you read the documents.  You chose not to            02:56

15  include that positive fact in your report; right?       02:56

16     A.    I suppose so, yes.                             02:56

17     Q.    Okay.  It seems awfully selective,             02:56

18  Dr. Bliesner, don't you think so?                       02:56

19     A.    No, not at all.                                02:56

20     Q.    Okay.                                          02:56

21     A.    I was looking for patterns of lack of          02:56

22  compliance which continued all the way up to the        02:56

23  second consent decree.                                  02:56

24     Q.    Except that in the eyes of the FDA, all        02:56

25  prior GMP deficiencies had been corrected as of         02:56

PLAINTIFFS' EXHIBITS 003707

Page 487

1    the time this inspection occurred, except for          02:56

2    those three new observations.                          02:56

3         A.    Of the original observations, yes.          02:56

4         Q.    So as of the time that inspection was       02:56

5    completed, in the eyes of the FDA, the GMP             02:56

6    deficiencies that existed at Activis Totowa were       02:56

7    those three observations?                              02:56

8         A.    At that point, yes.                         02:56

9         Q.    Okay.  So when you say in a broad,          02:56

10   sweeping fashion that they continued right up          02:57

11   through the second consent decree, that's not          02:57

12   accurate, is it?                                        02:57

13        A.    I disagree.  You can correct actions and    02:57

14   put them in place but still not change the             02:57

15   fundamental systems.  You can correct the              02:57

16   procedures but you didn't necessarily change the       02:57

17   system, and that was shown when they got a second      02:57

18   consent decree after this.                             02:57

19        Q.    The FDA audited all of those systems;       02:57

20   right?                                                  02:57

21        A.    If this was done under the compliance       02:57

22   program guidance manual where they look at quality     02:57

23   systems base, there was a turn in here.  Let me        02:57

24   just check because the agency hasn't always looked     02:57

25   at it from a quality systems standpoint.               02:57

PLAINTIFFS' EXHIBITS 003708

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

```
                                                   Page 488
 1     Q.    Well, Dr. Bliesner, you already          02:58
 2  acknowledged that the FDA conducted an inspection 02:58
 3  of five of the six major systems.  The only one   02:58
 4  not there is packaging and labeling; right?        02:58
 5     A.    That's correct.                           02:58
 6     Q.    So the FDA issued its written opinion     02:58
 7  that the company had corrected all outstanding     02:58
 8  previously identified GMP deficiencies except for  02:59
 9  the three new ones that they identified as of the  02:59
10  time they conducted this inspection; is that       02:59
11  right?                                             02:59
12     A.    They corrected the actions that they had  02:59
13  made the observations on.                          02:59
14     Q.    Okay.  So --                              02:59
15     A.    That doesn't mean it was a systems-based  02:59
16  correction.  It was a correction of those specific 02:59
17  actions.                                           02:59
18     Q.    Do you want go through each one,          02:59
19  Dr. Bliesner?  You're so insistent on qualifying   02:59
20  your responses -- again to keep doors open as      02:59
21  you've been coached to do -- that you can't        02:59
22  concede the FDA -- the viability of this FDA       02:59
23  document.  You can't have it both ways.            02:59
24     Do you understand that?                         02:59
25        MR. KERENSKY:  Objection, form.              02:59
```

PLAINTIFFS' EXHIBITS 003709

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                      Page 489
 1    BY MR. ANDERTON:                                  02:59
 2        Q.    If you want to give credit to FDA       02:59
 3    documents --                                      02:59
 4        A.    Yes.                                     02:59
 5        Q.    -- as a substantial basis for your      02:59
 6    opinion --                                         02:59
 7        A.    Yes.                                     02:59
 8        Q.    -- you must credit the documents that   02:59
 9    don't necessarily align with your opinion.  You   02:59
10    understand that; right?                           02:59
11            MR. KERENSKY:  Objection form.  Not a     02:59
12        true statement.                                03:00
13            THE WITNESS:  I would disagree with that.  03:00
14    BY MR. ANDERTON:                                   03:00
15        Q.    You can pick and choose?                 03:00
16        A.    I'm not picking and choosing.  It's just 03:00
17    that there's been a progression with the FDA's    03:00
18    inspection procedures over the years.             03:00
19        Q.    Right.                                   03:00
20        A.    Where they would go in and look at these 03:00
21    major components; right?  But they wouldn't        03:00
22    necessarily look at their internal document that  03:00
23    says how you do an inspection by a quality         03:00
24    systems-based approach.  That didn't happen until 03:00
25    later on.                                          03:00
```

PLAINTIFFS' EXHIBITS 003710

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 490

 1          Looking at this cover document right now, I'm        03:00

 2     not sure whether they implemented the new quality         03:00

 3     systems-based approach further.                           03:00

 4          Q.    Do you have any reason to believe they         03:00

 5     didn't?                                                    03:00

 6          A.    Potentially, yes.                              03:00

 7          Q.    What's that?                                   03:00

 8          A.    Because if I'm not mistaken -- and we          03:00

 9     can look it up -- the next inspection which               03:00

10     resulted in the consent decree, they specifically        03:00

11     say this inspection was conducted using the FDA           03:00

12     compliance program guidance manual and the number.       03:00

13          Q.    Okay.  So --                                   03:00

14          A.    And I don't see that they did that            03:00

15     here.  That's why I'm bringing up the point.  I'm        03:00

16     not trying to be difficult.  I just -- again, the        03:00

17     agency's made significant progress over the course       03:00

18     since like 2002 when they adopted the quality            03:01

19     systems-based approach and they didn't necessarily       03:01

20     implement it in full force all the way out.              03:01

21     That's all it is.                                         03:01

22          Q.    So you're going to, as I said, that's a       03:01

23     long-winded way of saying you're going to                03:01

24     discredit this FDA document and give some limited        03:01

25     weight to others.                                         03:01

PLAINTIFFS' EXHIBITS 003711

Page 491

| | | |
|---|---|---|
| 1 | A.    I'm not discrediting it all; okay?  As a | 03:01 |
| 2 | matter of fact, all right, we're back on Exhibit | 03:01 |
| 3 | 171.  I missed when we went first through. | 03:01 |
| 4 | Q.    And look at that -- | 03:01 |
| 5 | A.    Inspection. | 03:01 |
| 6 | Q.    Inspectional guidance was afforded -- | 03:01 |
| 7 | A.    Through compliance program and guidance | 03:01 |
| 8 | manuals.  73506002.  So with that being said, yes, | 03:01 |
| 9 | they would use the newest guidance documents to | 03:01 |
| 10 | look at it from a quality systems-based approach. | 03:01 |
| 11 | Q.    So does that change your earlier | 03:01 |
| 12 | testimony or allow you to accept the fact that as | 03:01 |
| 13 | of the date, this inspection was concluded in the | 03:01 |
| 14 | eyes of the FDA? | 03:01 |
| 15 | A.    Uh-huh. | 03:01 |
| 16 | Q.    Activis had corrected all prior GMP | 03:01 |
| 17 | deficiencies and the only GMP deficiencies the FDA | 03:02 |
| 18 | identified were the three new ones that are set | 03:02 |
| 19 | forth in that -- after this inspection. | 03:02 |
| 20 | A.    They corrected all of the findings that | 03:02 |
| 21 | came up with the 483.  I wouldn't -- I'm not | 03:02 |
| 22 | disputing that at all. | 03:02 |
| 23 | Q.    Okay. | 03:02 |
| 24 | A.    All right. | 03:02 |
| 25 | Q.    And after -- | 03:02 |

PLAINTIFFS' EXHIBITS 003712

```
                                                     Page 492
 1      A.   And they were recidivistic though       03:02
 2   because obviously they went back to their old   03:02
 3   ways.  That's why they got a consent decree.    03:02
 4   That's the real problem with companies ending up 03:02
 5   in consent decree.  They will get through warning 03:02
 6   letters, you know --                            03:02
 7      Q.   Dr. Bliesner, there's no question       03:02
 8   pending.                                        03:02
 9      A.   Oh, I'm sorry.                          03:02
10      MR. KERENSKY:  No, I'm sorry.  He can say    03:02
11   whatever in his question and you can't stop     03:02
12   him.                                            03:02
13      MR. ANDERTON:  No, he can't, Mike.  There    03:02
14   was no --                                       03:02
15      MR. KERENSKY:  Non-responsive, that's        03:02
16   your remedy.                                    03:02
17      MR. ANDERTON:  There was no question         03:02
18   pending.                                        03:02
19      MR. KERENSKY:  He was still answering the    03:02
20   last question.                                  03:02
21      MR. ANDERTON:  No, he wasn't.                03:02
22      MR. KERENSKY:  Do not interrupt the          03:02
23   witness.                                        03:02
24      MR. ANDERTON:  He just started talking       03:02
25   gratuitously.                                   03:02
```

PLAINTIFFS' EXHIBITS 003713

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised          February 18, 2011

Page 493

1           MR. KERENSKY:  That is not true.          03:02

2           MR. ANDERTON:  It is true.  There's no    03:02

3      question pending.                              03:03

4           MR. KERENSKY: Are you refusing to let     03:03

5      the witness continue his answer?               03:03

6           MR. ANDERTON:  There is no answer, Mike.  03:03

7           MR. KERENSKY: Are you refusing to let     03:03

8      the witness finish his answer?                 03:03

9           MR. ANDERTON:  He finished his answer and 03:03

10     then just started talking again without a      03:03

11     question being posed to him.                   03:03

12          MR. KERENSKY: Are you refusing to let     03:03

13     the witness finish his answer?                 03:03

14          MR. ANDERTON:  Mike, you can't instruct   03:03

15     him to talk.  There's no question pending.     03:03

16          MR. KERENSKY:  I'm not -- there is a      03:03

17     question pending.                              03:03

18          MR. ANDERTON:  No, there is not.          03:03

19          MR. KERENSKY:  You interrupted him.  Are  03:03

20     you refusing to let him finish his answer?     03:03

21          THE WITNESS:  He's finished his answer.   03:03

22     I'm not refusing anything.                     03:03

23          MR. KERENSKY:  I'm sorry.  The record is  03:03

24     real clear.  You interrupted him and told him  03:03

25     to stop because you thought he was answering   03:03

PLAINTIFFS' EXHIBITS 003714

Page 494

| | | |
|---|---|---|
| 1 | something other than what you asked him. | 03:03 |
| 2 | MR. ANDERTON:  No, because -- | 03:03 |
| 3 | MR. KERENSKY:  Your objection is | 03:03 |
| 4 | unresponsive, not to stop him from talking and | 03:03 |
| 5 | tell him he's just -- he's not answering. | 03:03 |
| 6 | MR. ANDERTON:  Mike, if you want to clean | 03:03 |
| 7 | this up with questions, you certainly may. | 03:03 |
| 8 | We're going to move on. | 03:03 |
| 9 | MR. KERENSKY:  I'm sorry.  We're going to | 03:03 |
| 10 | stop the deposition until he finishes his | 03:03 |
| 11 | answer. | 03:03 |
| 12 | MR. ANDERTON:  No we're not --  there is | 03:03 |
| 13 | no question pending, Mike. | 03:03 |
| 14 | MR. KERENSKY:  There is. | 03:03 |
| 15 | MR. ANDERTON:  No, there isn't.  He | 03:03 |
| 16 | answered my question. | 03:03 |
| 17 | MR. KERENSKY:  Tell you what.  Let's have | 03:04 |
| 18 | the court reporter go back and read it. | 03:04 |
| 19 | MR. ANDERTON:  Mike, if you -- | 03:04 |
| 20 | MR. KERENSKY:  Read the question and the | 03:04 |
| 21 | answer, please.  And the answer and | 03:04 |
| 22 | Mr. Anderton's interruption. | 03:04 |
| 23 | MR. ANDERTON:  If you keep obstructing | 03:04 |
| 24 | this deposition and instructing the witness | 03:04 |
| 25 | what to say, we're going to call the court. | 03:04 |

PLAINTIFFS' EXHIBITS 003715

Page 495

1        MR. KERENSKY:  I think it's a good time          03:04
2    to call the court.                                   03:04
3        MR. ANDERTON:  I mean he was done and had        03:04
4    moved on, and I was about to ask another             03:04
5    question, and he just started talking.               03:04
6        MR. KERENSKY:  I accept your invitation          03:04
7    to call the court so he can hear the last            03:04
8    question, the last answer, your interruption.        03:04
9        MR. ANDERTON:  There is no interruption.         03:04
10   I interrupted something that he was saying in        03:04
11   response to no question.                             03:04
12       MR. KERENSKY:  That is not my take on it,        03:04
13   but your remedy if you think that, is to say         03:04
14   unresponsive.                                        03:04
15       MR. ANDERTON:  Your remedy is to clear it        03:04
16   up if you think there's something here was           03:04
17   answering in response to one of my questions.        03:04
18   You have that right.  Now we're moving on.           03:04
19       MR. KERENSKY:  I do not think that.  And         03:04
20   no, he's not going to ask answer any more            03:04
21   questions until you let him finish his               03:05
22   answer.                                              03:05
23       MR. ANDERTON:  What's the basis for you          03:05
24   instructing him not to answer?                       03:05
25       MR. KERENSKY:  Because you interrupted           03:05

PLAINTIFFS' EXHIBITS 003716

```
                                             Page 496
1     him.                                    03:05
2          MR. ANDERTON:  There was no question   03:05
3     pending.                                03:05
4          MR. KERENSKY:  I'm sorry.  There was.  03:05
5          MR. ANDERTON:  There wasn't, Mike.  Now,  03:05
6     I'm not going to argue with you anymore.  This  03:05
7     is ridiculous.                          03:05
8          MR. KERENSKY:  Okay.  Well, Dr. Bliesner,  03:05
9     start packing up.                       03:05
10         MR. ANDERTON:  You cannot instruct him to  03:05
11    stop the deposition, Mike.              03:05
12         MR. KERENSKY:  Sure I can.         03:05
13         MR. ANDERTON:  No, you can't.      03:05
14         MR. KERENSKY:  I just did.  Until he  03:05
15    finishes that answer, we're not going to do  03:05
16    any more, or we can call the judge.     03:05
17         MR. ANDERTON:  Read the question back,  03:05
18    Phil.                                   03:05
19         MR. KERENSKY:  There you go.  And the  03:05
20    answer and the interruption, please, Phil.  03:05
21         (Whereupon, the testimony was read  03:07
22  back by the court reporter, as recorded above)  03:07
23         MR. ANDERTON:  So what that shows, Mike,  03:07
24    is that in fact --                      03:07
25         MR. KERENSKY:  I am not done listening,  03:07
```

PLAINTIFFS' EXHIBITS 003717

```
                                                Page 497
 1      Michael.                                  03:07
 2          MR. ANDERTON:  Listen carefully, Mike,  03:07
 3      because what you'll see that in fact        03:07
 4      Dr. Bliesner interrupted my question.       03:07
 5          MR. KERENSKY:  That's an interesting    03:07
 6      interpretation.                             03:07
 7          MR. ANDERTON:  Read it back, Phil.      03:07
 8              (Whereupon, the testimony was read  03:07
 9    back by the court reporter, as recorded above)  03:07
10          MR. KERENSKY:  Your question obviously  03:07
11      interrupted his answer inadvertently that time  03:07
12      and then the second time intentionally.     03:07
13          MR. ANDERTON:  Mike, not true.  Read it  03:07
14      back.                                        03:07
15          MR. KERENSKY:  That's my take on it.    03:07
16          MR. ANDERTON:  Read it back, Phil.      03:07
17          MR. KERENSKY:  I'm telling you I'm not  03:07
18      going to let you do this.  I'm not going to  03:07
19      let you do it.  Call the judge now.  It's real  03:07
20      simple.  We can call the judge now, we can   03:07
21      stop the deposition, or you can stop, let him  03:07
22      say what he wants to say, and to finish this  03:07
23      question to talk about recidivism.           03:07
24          MR. ANDERTON:  There was no question     03:07
25      about that.                                  03:07
```

PLAINTIFFS' EXHIBITS 003718

Page 498

| | | |
|---|---|---|
| 1 | MR. KERENSKY:  And then you can object. | 03:07 |
| 2 | MR. ANDERTON:  And I object to you to | 03:07 |
| 3 | your speaking -- | 03:07 |
| 4 | MR. KERENSKY:  There are three choices | 03:07 |
| 5 | you've got right now.  Pick one. | 03:07 |
| 6 | MR. ANDERTON:  I'm sorry.  Are you -- | 03:07 |
| 7 | THE WITNESS:  Can I take a break? | 03:08 |
| 8 | MR. KERENSKY:  Yeah, go ahead Dave. | 03:08 |
| 9 | MR. ANDERTON:  Wait a minute.  I'm sorry, | 03:08 |
| 10 | Mike.  Do you get to decide now? | 03:08 |
| 11 | MR. KERENSKY:  Yeah. | 03:08 |
| 12 | MR. ANDERTON:  This witness is stopping | 03:08 |
| 13 | this deposition every 30 minutes.  Why are we | 03:08 |
| 14 | doing that? | 03:08 |
| 15 | MR. KERENSKY:  Because I don't know. | 03:08 |
| 16 | It's a very grueling deposition.  You're one | 03:08 |
| 17 | of the toughest guys I've been around in a | 03:08 |
| 18 | long time.  It's very difficult. | 03:08 |
| 19 | MR. ANDERTON:  Mike, stop.  Why are we | 03:08 |
| 20 | stopping every 30 minutes? | 03:08 |
| 21 | THE WITNESS:  Because I got to go to the | 03:08 |
| 22 | bathroom. | 03:08 |
| 23 | MR. ANDERTON:  Then go to the restroom. | 03:08 |
| 24 | THE VIDEOGRAPHER:  The time is 3:10 p.m. | 03:08 |
| 25 | We are going off the record. | 03:08 |

PLAINTIFFS' EXHIBITS 003719

```
                                                  Page 499
 1                   (Short break)                  03:17
 2        THE VIDEOGRAPHER:  The time is 3:19 p.m.   03:17
 3    We are back on the record.  This is the       03:17
 4    beginning of tape seven.                       03:17
 5        MR. KERENSKY:  I would like the court      03:17
 6    reporter to finish reading the witness's last  03:17
 7    answer and I ask he be allowed to finish that  03:17
 8    answer.                                         03:17
 9        MR. ANDERTON:  Go head, Phil.              03:18
10           (Whereupon, the testimony was read     03:18
11    back by the court reporter, as recorded above) 03:18
12        MR. KERENSKY:  That's a good place to      03:18
13    stop.  Dr. Bliesner, do you need to add to     03:18
14    that answer?                                    03:18
15        THE WITNESS:  Read the last part of that   03:18
16    again, please.  Just the -- not the whole      03:18
17    thing, just the last sentence.                  03:18
18           (Whereupon, the testimony was read     03:18
19    back by the court reporter, as recorded above) 03:18
20        And try to implement corrective actions.   03:18
21    And when they do so, they're not               03:18
22    systems-based, quality systems-based and they  03:18
23    go right back to it because it's a culture     03:19
24    that comes along with it.  And it's not a true 03:19
25    corrective action that stands up to scrutiny.  03:19
```

PLAINTIFFS' EXHIBITS 003720

```
                                                        Page 500

 1            MR. ANDERTON:  Move to strike that entire      03:19

 2       speech as utterly non-responsive.  Responsive      03:19

 3       to no pending question.                            03:19

 4    BY MR. ANDERTON:                                      03:19

 5       Q.    The -- you testified last time               03:19

 6    Dr. Bliesner that -- and I want to read it because    03:19

 7    I think it is interesting and because I'd like to     03:19

 8    be accurate.                                          03:20

 9       Mr. Moriarty asked you a question at page 117      03:20

10    and carrying over on to page 118.  You gave a         03:20

11    response and during that response you said, and I     03:20

12    quote:  "This is the first time I went up to my       03:20

13    medicine cabinet and I looked for anything that       03:20

14    had an Activis label on it and flushed it down the    03:20

15    toilet because it was that gross in terms of what     03:20

16    I was seeing."                                        03:20

17       Do you remember that testimony?                    03:20

18       A.    I do.                                        03:20

19       Q.    What did you flush down the toilet?          03:20

20       A.    Products that had Activis's name on it.      03:21

21       Q.    Such as?                                     03:21

22       A.    I don't recall specifically.                 03:21

23       Q.    Did you have products that had Activis's     03:21

24    name on it?                                           03:21

25       A.    I did.                                       03:21
```

PLAINTIFFS' EXHIBITS 003721

```
                                                    Page 501
 1      Q.    How many?                                03:21
 2      A.    I don't recall.  I think one bottle.     03:21
 3      Q.    One bottle.  Was it for you or for       03:21
 4   another family member?                            03:21
 5      A.    It was for me.                            03:21
 6      Q.    So you don't even know what you flushed  03:21
 7   down the toilet.                                  03:21
 8      A.    I don't recall.  It was a such a gross   03:21
 9   failure of compliance I didn't want to be putting 03:21
10   it in my body.                                    03:21
11      Q.    Well, you had to go out and replace it;  03:21
12   right?  It was a prescription medication?         03:21
13      A.    Yes.                                      03:21
14      Q.    So what did you go replace?               03:21
15      A.    You'll find somebody else that           03:21
16   manufactures.  You ask the pharmacist to give you 03:21
17   a different replacement.                           03:21
18      Q.    What was it?  What did you replace?       03:21
19      A.    I don't recall what I replaced           03:21
20      Q.    Well, it was sometime in the last 12     03:21
21   months.  You don't remember?                      03:21
22      A.    No.                                       03:21
23      Q.    That seems like a pretty striking        03:21
24   event.  You ran up to your medicine cabinet.      03:21
25      A.    Yes, sir.                                 03:21
```

PLAINTIFFS' EXHIBITS 003722

```
                                                    Page 502
 1     Q.    You threw open the door and you flushed    03:21
 2   medicine down the toilet.                          03:21
 3     A.    I did.                                      03:21
 4     Q.    Was that medicine manufactured by          03:21
 5   Activis Elizabeth or Activis Totowa?               03:21
 6     A.    I wouldn't know.  It didn't say on the     03:22
 7   bottle.                                            03:22
 8     Q.    You didn't even check, did you?            03:22
 9     A.    I don't believe that the bottle tells      03:22
10   you where it's manufactured.                       03:22
11     Q.    You didn't check, did you?                 03:22
12     A.    I didn't have to.                          03:22
13     Q.    Sure you did.  What do you mean you        03:22
14   didn't have to?                                    03:22
15     A.    Because of the failure in the quality      03:22
16   systems that I had seen in reviewing the document, 03:22
17   I didn't want to take any of the company's         03:22
18   product.                                           03:22
19     Q.    Well, do you know anything about the       03:22
20   distinction between Activis Totowa and Activis     03:22
21   Elizabeth?                                         03:22
22     A.    From a business standpoint, not            03:22
23   specifically.                                      03:22
24     Q.    Do you know who manufactured what          03:22
25   products?                                          03:22
```

PLAINTIFFS' EXHIBITS 003723

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                    February 18, 2011

                                                                Page 503

 1       A.    If I go back and review, I can piece        03:22

 2   together a list.                                      03:22

 3       Q.    Well, you shouldn't --                      03:22

 4       A.    I can't right off the top of my head.       03:22

 5       Q.    You shouldn't have any information about    03:22

 6   Activis Elizabeth.  They're not party to this         03:22

 7   lawsuit.  Do you know that Activis Elizabeth and      03:22

 8   Activis Totowa work out of two totally different      03:22

 9   facilities?                                           03:22

10       A.    I know they are two different locations,    03:22

11   yes.                                                  03:22

12       Q.    And you know they have two totally          03:22

13   different quality systems?                            03:22

14       A.    No, I don't.                                03:22

15       Q.    Different leadership?                       03:22

16       A.    No, I don't.                                03:22

17       Q.    Different personnel?                        03:22

18       A.    No, I don't.                                03:22

19       Q.    Didn't bother to try to find out, did      03:22

20   you?                                                  03:22

21       A.    I was told not to review them.             03:22

22       Q.    I'm talking about when you were in such     03:23

23   a hurry to flush your medicine down the toilet,       03:23

24   you didn't bother to try to find out whether that     03:23

25   product came from Activis Totowa or from Activis      03:23

PLAINTIFFS' EXHIBITS 003724

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                          Page 504
 1    Elizabeth or from another Activis entity.              03:23
 2        A.    No, I didn't.                                03:23
 3        Q.    Is that a logical, reasoned reaction to      03:23
 4    anything?                                              03:23
 5        A.    Yes.                                         03:23
 6        Q.    You said last time that -- you made          03:23
 7    reference to your belief or you indicated -- I         03:23
 8    shouldn't say may reference to -- you indicated        03:23
 9    your belief that the FDA puts things on its            03:23
10    website that are pure politics.                        03:23
11        Do you remember that testimony?                    03:23
12        A.    I did not make that blanket statement        03:23
13    that I recall.                                         03:24
14        Q.    Well, let me ask you this.                   03:24
15        A.    Okay.                                        03:24
16        Q.    When you conducted an analysis that you      03:24
17    did to issue your opinion in this case --              03:24
18        A.    Yes.                                         03:24
19        Q.    -- did you do a political analysis or        03:24
20    some other type of analysis?                           03:24
21        A.    I reviewed the documentation as I would      03:24
22    if I was a client in the facility looking for data     03:24
23    to support whatever conclusions come up.               03:24
24        Q.    Is that a political analysis?                03:24
25        A.    No.                                          03:24
```

PLAINTIFFS' EXHIBITS 003725

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

```
                                                   Page 505
 1      Q.    Did politics enter into your analysis at      03:24
 2   all?                                                   03:24
 3      A.    No.                                           03:24
 4      Q.    Are you an expert in politics?                03:24
 5      A.    No.                                           03:24
 6      Q.    Do you have anything to support your          03:24
 7   testimony that things the FDA puts on its website      03:24
 8   result from politics?                                  03:24
 9      A.    In my experience, there are sometimes         03:25
10   competing opinions against different branches          03:25
11   within FDA which appear to be -- appear to be          03:25
12   politically motivated.                                 03:25
13      Q.    Appear to be politically motivated?           03:25
14      A.    Yes.                                          03:25
15      Q.    Bliesner on politics?  Is that the            03:25
16   source for that, Bliesner on politics?                 03:25
17      A.    No, it's not Bliesner on politics.            03:25
18      Q.    What observation -- what supports that        03:25
19   observation?                                           03:25
20      A.    My experience.                                03:25
21      Q.    Do you have any political experience?         03:25
22      A.    Political?                                     03:25
23      Q.    Yes.                                           03:25
24      A.    Like in formal office or running for          03:25
25   anything like that?                                    03:25
```

PLAINTIFFS' EXHIBITS 003726

```
                                                       Page 506
 1      Q.    Yes.                                      03:25
 2      A.    No.                                       03:25
 3      Q.    Did you ever work for the FDA?            03:25
 4      A.    No.                                       03:25
 5      Q.    Did you ever spend any time inside        03:25
 6  either one of the various branches?  Well not       03:25
 7  either one.  Any of the various branches of the     03:26
 8  FDA?                                                 03:26
 9      A.    No.                                        03:26
10      Q.    So you believe that when one branch        03:26
11  issues something that isn't necessarily consistent  03:26
12  with something issued by another branch, it's       03:26
13  strictly politics?                                  03:26
14      A.    Not strictly.  There are components to    03:26
15  it that do arise.  For instance, drug shortage      03:26
16  often has serious discussions with compliance       03:26
17  group because they have different missions          03:26
18      Q.    Have you ever been party to any of those  03:26
19  discussions?                                        03:26
20      A.    Directly, no.                             03:26
21      Q.    So you have no idea what is said in       03:26
22  those discussions between -- I'm sorry drug         03:26
23  shortage and compliance; right?                     03:26
24      A.    Meaning the folks that are in charge of   03:26
25  making sure they're supplied to market and the      03:26
```

PLAINTIFFS' EXHIBITS 003727

Page 507

```
 1   compliance people.                              03:26
 2       Q.   You have no idea what's ever been said  03:26
 3   in any of those conversations; right?            03:26
 4       A.   That's not true.                        03:26
 5       Q.   Have you ever been --                   03:26
 6       A.   I've not sat in meetings.  I have       03:26
 7   clients convey it.                               03:26
 8       Q.   Clients who sat in the meetings?        03:26
 9       A.   Yes.                                    03:27
10       Q.   So you're getting it at least third     03:27
11   hand?                                            03:27
12       A.   Second-hand.                            03:27
13       Q.   Second-hand?                            03:27
14       A.   Yes.                                    03:27
15       Q.   Ever do anything to verify that?        03:27
16       A.   Specifically, no.                       03:27
17       Q.   I want to talk about --                 03:27
18       A.   Can you adjust the air-conditioning in  03:27
19   here?  I'm starting to get to the same point.    03:27
20           MS. DREWES:  I will.  But I tried earlier 03:27
21       and she turned it down as much as she could. 03:27
22       Apparently it's an issue especially later in 03:27
23       the day when the sun comes around.           03:27
24           MR. ANDERTON:  Comes around this side of 03:27
25       the building.                                03:27
```

PLAINTIFFS' EXHIBITS 003728

```
                                                    Page 508
 1            MR. KERENSKY:  It's getting hot in here,      03:28
 2       too.  It must be coming right over the phone.     03:28
 3            MR. ANDERTON:  Yeah.                          03:28
 4    BY MR. ANDERTON:                                      03:28
 5       Q.    You produced today invoices that you        03:28
 6    have submitted to the Plaintiffs' counsel for        03:28
 7    payment; right?                                       03:28
 8       A.    Yes.                                         03:28
 9       Q.    You said there's least one that's           03:28
10    outstanding; right?                                   03:28
11       A.    Yes.                                         03:28
12       Q.    I don't -- there is no detail on those      03:28
13    invoices.  Do you have detailed time records that    03:28
14    show what you did and how many hours you spent        03:28
15    besides a general summary as is set forth in these   03:28
16    invoices?                                             03:28
17       A.    I just have a spreadsheet where I did       03:28
18    the work, I put the hour in and then I send that     03:28
19    to the bookkeeper.                                    03:28
20       Q.    Okay.  So you do have records?              03:28
21       A.    Uh-huh.                                      03:28
22       Q.    Do you provide any description of what      03:28
23    you did during the --                                03:28
24       A.    On those records?                           03:28
25       Q.    Yes.                                         03:28
```

PLAINTIFFS' EXHIBITS 003729

```
                                                      Page 509
 1      A.    I don't believe so.  There may be a word    03:28
 2   or two.                                               03:28
 3      Q.    Services rendered.  Is that the --           03:28
 4      A.    I'd have to look at -- I'm fairly            03:28
 5   certain that I provided those sheets.                 03:29
 6      Q.    On?                                          03:29
 7      A.    The hard drive, I think.                     03:29
 8      Q.    Oh, in the hard drive?                       03:29
 9      A.    I think so.                                  03:29
10      Q.    Okay.                                        03:29
11      A.    If not, I can get them for you.              03:29
12      Q.    Do you know how much money you have          03:29
13   billed and been paid from this engagement?            03:29
14      A.    To this point?                               03:29
15      Q.    Yes.                                         03:29
16      A.    No.                                          03:29
17      Q.    Is there only one invoice that's             03:29
18   outstanding beyond this one?                          03:29
19      A.    I'm fairly certain yes, there is.            03:29
20      Q.    Rough estimate puts it somewhere north       03:29
21   of $140,000.  Does that sound right?                  03:29
22      A.    If you add it up and that's what the         03:30
23   number is, then it is.  I really don't know.          03:30
24      Q.    How many other engagements did you have      03:30
25   in 2010?                                              03:30
```

PLAINTIFFS' EXHIBITS 003730