|   |   |   |
|---|---|---|
|   |   | Page 510 |
| 1 | A.    Engagements, you mean consulting | 03:30 |
| 2 | projects? | 03:30 |
| 3 | Q.    Uh-huh. | 03:30 |
| 4 | A.    One for sure.  It's still ongoing.  And | 03:30 |
| 5 | I may have had one other just briefly. | 03:30 |
| 6 | Q.    Any of them as big as this one? | 03:30 |
| 7 | A.    And when you say "big," what do you mean | 03:30 |
| 8 | by big? | 03:30 |
| 9 | Q.    Well $140,000, that's a reasonable | 03:30 |
| 10 | amount of revenue wouldn't you say? | 03:30 |
| 11 | A.    It is. | 03:30 |
| 12 | Q.    I mean even at 550 an hour, that's 700 | 03:30 |
| 13 | hours; right?  No, that's wrong. | 03:30 |
| 14 | A.    I can tell you this.  I've been fully | 03:31 |
| 15 | engaged with a client since June. | 03:31 |
| 16 | Q.    In addition to this engagement? | 03:31 |
| 17 | A.    Yes.  This is on the side. | 03:31 |
| 18 | Q.    Oh, this is on the side? | 03:31 |
| 19 | A.    Prior to -- it started prior to and then | 03:31 |
| 20 | this -- this has been done on weekends. | 03:31 |
| 21 | Q.    Okay. | 03:31 |
| 22 | A.    I do anything about 60 to 90 hours a | 03:31 |
| 23 | week at that current client site.  I have been | 03:31 |
| 24 | since June. | 03:31 |
| 25 | Q.    Okay.  Will you pick up Exhibit 109? | 03:31 |

PLAINTIFFS' EXHIBITS 003731

Page 511

| | | |
|---|---|---|
| 1 | A.    Sure, if I can find it.  Which one is | 03:31 |
| 2 | that, sir? | 03:31 |
| 3 | Q.    It's one of the sets of notes that you | 03:31 |
| 4 | produced that we took last time. | 03:32 |
| 5 | A.    Yes, got it. | 03:32 |
| 6 | Q.    I'm looking at the first page of 109. | 03:32 |
| 7 | Are you with me? | 03:32 |
| 8 | A.    I am. | 03:32 |
| 9 | Q.    Roman numeral I -- on 109, the first | 03:32 |
| 10 | page is as I read the heading, "Collective Proof | 03:32 |
| 11 | of Adulterated Digitek Making it to Market." | 03:32 |
| 12 | A.    Yes. | 03:32 |
| 13 | Q.    The first item Roman numeral I is | 03:32 |
| 14 | Adverse Event Reports; right? | 03:32 |
| 15 | A.    Yes. | 03:32 |
| 16 | Q.    You are not a pharmacovigilence expert, | 03:32 |
| 17 | are you? | 03:32 |
| 18 | A.    I am not. | 03:32 |
| 19 | Q.    You don't know -- you're not able to | 03:32 |
| 20 | give any expert opinion about the reliability of | 03:32 |
| 21 | the facts and circumstances in adverse event | 03:32 |
| 22 | reports, are you? | 03:33 |
| 23 | A.    No, this was based on observation that | 03:33 |
| 24 | was in one of the EIRs.  I'd have to look. | 03:33 |
| 25 | Q.    Okay.  What you mean by that? | 03:33 |

PLAINTIFFS' EXHIBITS 003732

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised        February 18, 2011

Page 512

1       A.      There was a -- in reviewing, if I'm not          03:33

2   mistaken an EIR or 483, that this is one of the              03:33

3   items the agency found specifically.                         03:33

4       There was a death within a certain period of             03:33

5   time or whatever, so...                                      03:33

6       Q.      That was the report?                             03:33

7       A.      Yes.                                             03:33

8       Q.      That wasn't a finding of the EIR.                03:33

9       A.      It was a report.                                03:33

10      Q.      Yeah.                                            03:33

11      A.      That there was a death from an adverse           03:33

12  event and it was not reported to the FDA.                    03:33

13      Q.      So agency, to be clear --                        03:33

14      A.      Uh-huh.                                          03:33

15      Q.      -- the agency, the FDA didn't find that          03:33

16  there was a death within several hours of taking             03:33

17  the product.                                                 03:33

18      A.      They found there was an adverse event            03:33

19  that had not been reported to them that stated               03:33

20  that there was a death within a certain short                03:33

21  period of time, yeah.                                        03:33

22      Q.      And, again, you're not qualified to              03:33

23  assess the reliability of the facts and                      03:33

24  circumstances that are set forth in or were set              03:34

25  forth in that adverse event, are you?                        03:34

PLAINTIFFS' EXHIBITS 003733

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 513

```
 1      A.     No, but it triggered my eye because it        03:34
 2  was a short period of time for an immediate dose         03:34
 3  of product, and it was like maybe there's                03:34
 4  something.  That was actually the first thing that       03:34
 5  got me started on this -- this review.                   03:34
 6      Q.     Well, Dr. Bliesner, I'm a little bit           03:34
 7  confused.                                                03:34
 8      A.     Uh-huh.                                        03:34
 9      Q.     You say -- when you make that statement        03:34
10  --                                                       03:34
11      A.     Uh-huh.                                        03:34
12      Q.     -- you're presuming the accuracy or --         03:34
13  I'm sorry.  You're presuming the cause and effect        03:34
14  relationship between taking a product and the            03:34
15  event set forth in the adverse event report,             03:34
16  aren't you?                                              03:34
17      A.     Say that again specifically.                  03:34
18          MR. ANDERTON:  Phil, would you please            03:35
19      read that back?                                      03:35
20              (Whereupon, the testimony was read           03:35
21  back by the court reporter, as recorded above)           03:35
22          THE WITNESS:  There is a potential cause         03:35
23      and effect there.                                    03:35
24  BY MR. ANDERTON:                                         03:35
25      Q.     Potential?                                    03:35
```

PLAINTIFFS' EXHIBITS 003734

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

Page 514

| 1 | A. | Yes. | 03:35 |

1      A.    Yes.                                            03:35

2      Q.    Which you've said you're not qualified          03:35

3    to evaluate.                                            03:35

4      A.    No, that's correct.                             03:35

5      Q.    Okay.                                           03:35

6      A.    But the potential was there, which              03:35

7    from -- would you like me to continue or stop?  I       03:35

8    don't want to...                                        03:35

9      Q.    You were answering.                             03:35

10     A.    Okay.  From a, you know, compliance             03:35

11   standpoint, you look at that and you say to             03:35

12   yourself, jeez, if there was an adverse event, a        03:35

13   person potentially passed away in two and a half        03:35

14   hours, you sit back and go okay, from a product         03:35

15   standpoint, me working for this company again,          03:35

16   from a product standpoint, jeez, could that have        03:35

17   been product-related?                                   03:35

18       So you go look and you see it's immediate           03:35

19   dosage form, and you try to pull up the PK lead         03:35

20   out of an ANDA.  And if the PK says it's like six       03:35

21   hours or whatever, you don't worry about it.  You       03:35

22   move on.  It's not related to that.  That's how         03:35

23   the logic went on that.                                 03:35

24     Q.    Okay.  And so is that proof that                03:35

25   adulterated Digitek made it to market?                  03:35

PLAINTIFFS' EXHIBITS 003735

Page 515

| | | | |
|---|---|---|---|
| 1 | A. | No, it's not proof. | 03:35 |
| 2 | Q. | Okay.  You characterize it as such in | 03:35 |
| 3 | this document.  That's just why I'm -- | | 03:36 |
| 4 | A. | My notes -- | 03:36 |
| 5 | Q. | Okay. | 03:36 |
| 6 | A. | Proof is -- | 03:36 |
| 7 | Q. | So it's not proof? | 03:36 |
| 8 | A. | No, it's not.  It's a piece of data that | 03:36 |
| 9 | was the start of a potential pattern that was the | | 03:36 |
| 10 | first thing -- quite honestly that was first thing | | 03:36 |
| 11 | that caught my eye so I just started digging. | | 03:36 |
| 12 | Q. | I'm merely asking about your | 03:36 |
| 13 | characterization in your document. | | 03:36 |
| 14 | A. | Yes. | 03:36 |
| 15 | Q. | So it's not proof. | 03:36 |
| 16 | A. | No. | 03:36 |
| 17 | Q. | And look at Roman numeral VI. | 03:36 |
| 18 | A. | Okay. | 03:36 |
| 19 | Q. | Company internal documents and | 03:36 |
| 20 | investigations. | | 03:36 |
| 21 | A. | Uh-huh. | 03:36 |
| 22 | Q. | You see your reference to purchase | 03:36 |
| 23 | presses. | | 03:36 |
| 24 | A. | Yes. | 03:36 |
| 25 | Q. | How is that proof that adulterated | 03:36 |

PLAINTIFFS' EXHIBITS 003736

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

```
                                                         Page 516
 1    Digitek made it to market?                          03:36
 2         A.    There were a couple of circumstances as  03:36
 3    I recall where they had reasonable suspect that     03:36
 4    they had problems with tablet presses.  So they     03:37
 5    committed -- if I'm not mistaken without taking      03:37
 6    more time and going back and looking at the         03:37
 7    document -- they would purchase new presses with    03:37
 8    weight controls or whatever and they never did.     03:37
 9    And that happened over the course of a -- if I'm    03:37
10    not mistaken, going back to look at the book, a     03:37
11    year or two.                                        03:37
12         Q.    Okay.  So you work with companies all    03:37
13    the time on GMP compliance; right?                  03:37
14         A.    That's correct.                          03:37
15         Q.    And one of the things I'm sure you tell  03:37
16    them is that they ought to be constantly            03:37
17    evaluating and reevaluating their quality systems;  03:37
18    right?                                              03:37
19         A.    Absolutely.  CGMP current today, not     03:37
20    yesterday.                                          03:37
21         Q.    Exactly.  And so it's an evolutionary    03:37
22    process.                                            03:37
23         A.    Absolutely.                              03:37
24         Q.    Never stops evolving.                    03:37
25         A.    No, it doesn't.                          03:37
```

PLAINTIFFS' EXHIBITS 003737

Page 517

| | | |
|---|---|---|
| 1 | Q.    So upgrading presses or purchasing new | 03:37 |
| 2 | presses -- | 03:37 |
| 3 | A.    Uh-huh. | 03:37 |
| 4 | Q.    -- doesn't say anything about whether | 03:37 |
| 5 | adulterated product was produced or made it to | 03:38 |
| 6 | market, does it? | 03:38 |
| 7 | A.    It doesn't say anything about whether | 03:38 |
| 8 | adulterated products have made it to the market. | 03:38 |
| 9 | Q.    That's right. | 03:38 |
| 10 | A.    I wouldn't agree with that statement. | 03:38 |
| 11 | It -- it shows they had problems. | 03:38 |
| 12 | Q.    It does? | 03:38 |
| 13 | A.    It shows they had problems with the | 03:38 |
| 14 | presses because they said they had problems with | 03:38 |
| 15 | the presses. | 03:38 |
| 16 | Q.    They didn't say they had problems.  They | 03:38 |
| 17 | said they wanted to purchase new presses | 03:38 |
| 18 | A.    With weight control, if I remember | 03:38 |
| 19 | correctly. | 03:38 |
| 20 | Q.    Okay.  So that doesn't mean they're | 03:38 |
| 21 | having problems; it means they're looking at a | 03:38 |
| 22 | different technology. | 03:38 |
| 23 | A.    Uh-huh. | 03:38 |
| 24 | Q.    Right? | 03:38 |
| 25 | A.    Yes, an upgrade if you will. | 03:38 |

PLAINTIFFS' EXHIBITS 003738

Page 518

| 1  | Q.   | Well, let's call it an upgrade. | 03:38 |

1    Q.    Well, let's call it an upgrade.              03:38

2    A.    Uh-huh.                                      03:38

3    Q.    Doesn't mean you had problems before;        03:38

4    right?                                             03:38

5    A.    But they committed to the FDA and they       03:38

6    didn't purchase them, as I recall.                 03:38

7    Q.    You just changed the subject,                03:38

8    Dr. Bliesner.                                      03:38

9    A.    I did?                                       03:38

10   Q.    Yeah?                                        03:38

11   A.    I'm sorry.                                   03:38

12   Q.    I asked you if the mere act of upgrading     03:38

13   presses means that they had problems.              03:38

14   A.    Not specifically, no.                        03:39

15   Q.    And so purchasing presses doesn't            03:39

16   constitute proof that there is adulterated Digitek 03:39

17   in the market, does it?                            03:39

18   A.    Not necessarily, no.                         03:39

19   Q.    But you characterize it on that              03:39

20   document.                                          03:39

21   A.    It's my notes, uh-huh.                       03:39

22   Q.    You understand, Dr. Bliesner?                03:39

23   A.    I do sir.                                    03:39

24   Q.    That we get these documents.                 03:39

25   A.    Uh-huh.                                      03:39

PLAINTIFFS' EXHIBITS 003739

Page 519

| | | | |
|---|---|---|---|
| 1 | Q. | And we get your report? | 03:39 |
| 2 | A. | Uh-huh. | 03:39 |
| 3 | Q. | And we are -- we have to try to figure | 03:39 |
| 4 | out -- | | 03:39 |
| 5 | A. | Uh-huh. | 03:39 |
| 6 | Q. | -- how you reached the conclusions that | 03:39 |
| 7 | you reached. | | 03:39 |
| 8 | A. | Correct. | 03:39 |
| 9 | Q. | That's what we're doing today. | 03:39 |
| 10 | A. | I understand. | 03:39 |
| 11 | Q. | So I understand that this is your notes. | 03:39 |
| 12 | A. | Uh-huh. | 03:39 |
| 13 | Q. | You're the one who characterized this as | 03:39 |
| 14 | proof -- | | 03:39 |
| 15 | A. | Uh-huh. | 03:39 |
| 16 | Q. | -- that adulterated Digitek was in the | 03:39 |
| 17 | market. | | 03:39 |
| 18 | A. | Uh-huh. | 03:39 |
| 19 | Q. | I'm just inquiring about some of these | 03:39 |
| 20 | things. | | 03:39 |
| 21 | A. | Understood. | 03:39 |
| 22 | Q. | Excuse me? | 03:40 |
| 23 | A. | Uh-huh. | 03:40 |
| 24 | Q. | Dr. Bliesner, would you now find Exhibit | 03:40 |
| 25 | 107.  It's another set of notes that we collected | 03:40 |

PLAINTIFFS' EXHIBITS 003740

                                                            Page 520

 1    from you last time.                                     03:40

 2        A.    May I see the top of?                         03:40

 3        Q.    You may.  It the thicker one.  It's the       03:40

 4    Mylan deposition exhibits.                              03:40

 5        A.    I have it here.                                03:40

 6        Q.    Okay.  You see on the first page there        03:40

 7    it says probably equals more likely than not?           03:40

 8        A.    Uh-huh.                                        03:40

 9        Q.    When did you write that?                       03:40

10        A.    I don't recall specifically, but I'm --        03:40

11    my suspect is it was the preparation meeting            03:40

12    before the first deposition.                            03:40

13        Q.    Okay.  And --                                 03:40

14        A.    Because I was still struggling with that      03:40

15    whole concept of possible and probable.                 03:40

16        Q.    Well, you understand what probably            03:41

17    meant; right?                                            03:41

18        A.    If I'm not mistaken I was told that's         03:41

19    what it was.  It was a definition.  These were          03:41

20    my -- my documents that I had laid out as an            03:41

21    indices in the discussion, and it was the first         03:41

22    thing I wrote on, so...                                  03:41

23        Q.    Okay.  So you wrote in your discussions        03:41

24    with Plaintiffs' counsel, that probably equals          03:41

25    more likely than not; right?                            03:41

PLAINTIFFS' EXHIBITS 003741

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised          February 18, 2011

                                                              Page 521

 1      A.    I'm fairly confident that's what they          03:41

 2   mentioned to me as the definition.                      03:41

 3      Q.    Okay.  And the very next day --                03:41

 4      A.    Uh-huh                                         03:41

 5      Q.    -- you testified that you did not know         03:41

 6   the difference between possibility and                  03:41

 7   probability?                                            03:41

 8      A.    Obviously I was still confused with            03:41

 9   that.                                                   03:41

10      Q.    And in the same meeting where you wrote        03:41

11   probably equals more likely than not -- well,           03:41

12   strike that.                                            03:41

13      A.    I --                                           03:41

14      Q.    Strike that.                                   03:41

15      A.    Okay, okay.                                    03:41

16      Q.    Look at the second page of Exhibit 107,        03:41

17   please.                                                 03:41

18      A.    Sure.                                          03:41

19      Q.    You made a note about Exhibit M09?             03:42

20      A.    Yes.                                           03:42

21      Q.    You see that?                                  03:42

22      A.    Yes.                                           03:42

23      Q.    And you indicated outside of spec 98 to        03:42

24   103 percent.  And then you parenthetically              03:42

25   indicated 97.1 percent.                                03:42

PLAINTIFFS' EXHIBITS 003742

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

                                                        Page 522

1        Do you see that?                              03:42

2        A.    I do.                                   03:42

3        Q.    97.1 is well within specification for   03:42

4    Digitek as approved by the FDA in the ANDA, isn't 03:42

5    it?                                               03:42

6        A.    I don't know.  I'd have to go back and  03:42

7    look at it.                                       03:42

8        Q.    Well, didn't you -- I mean if you made a 03:42

9    note that something was out of spec.              03:42

10       A.    Somebody made a statement somewhere in  03:42

11   this document whatever M09 was apparently.  I'm   03:42

12   not going back and looking at it.                 03:42

13       Q.    I understand.                           03:42

14       A.    That somebody made a statement you      03:42

15   realize that what this is, is not a detailed      03:42

16   reading of these documents because the search     03:42

17   capabilities of that Crivella West I think is the 03:42

18   name of it, is abysmal, so you can't find         03:43

19   anything.  So I just basically went in and said,  03:43

20   pulled up 01, skimmed it.  If I saw something, you 03:43

21   know -- well, I tried to do a thumbnail summary on 03:43

22   there so later on if I needed to go pull it up, I  03:43

23   would.  So --                                     03:43

24       Q.    Okay.                                   03:43

25       A.    Obviously -- or maybe not obviously --  03:43

PLAINTIFFS' EXHIBITS 003743

Page 523

| | | |
|---|---|---|
| 1 | it looks as if I probably printed that one and | 03:43 |
| 2 | it's somewhere in the stack. | 03:43 |
| 3 | Q.    And you acknowledge of course that -- | 03:43 |
| 4 | that the fact that it might -- that UDL might have | 03:43 |
| 5 | or Mylan might have a tighter specification says | 03:43 |
| 6 | nothing about whether the product is actually out | 03:43 |
| 7 | of specification; correct? | 03:43 |
| 8 | A.    That's correct. | 03:43 |
| 9 | Q.    At the end of the day, the operative | 03:43 |
| 10 | number with respect to whether something is in or | 03:43 |
| 11 | out of specification is the number the number for | 03:43 |
| 12 | any particular attribute set forth in the ANDA; is | 03:43 |
| 13 | that right? | 03:44 |
| 14 | A.    The approved application; that's | 03:44 |
| 15 | correct. | 03:44 |
| 16 | Q.    Okay.  So if you make a product and it's | 03:44 |
| 17 | distributed by somebody else and they, the | 03:44 |
| 18 | distributor prefers tighter specifications, that | 03:44 |
| 19 | doesn't have any bearing on whether the product | 03:44 |
| 20 | you make is actually out of specification, does | 03:44 |
| 21 | it? | 03:44 |
| 22 | A.    Tighter specs are always around. | 03:44 |
| 23 | Q.    Okay. | 03:44 |
| 24 | A.    It's an additional level of control. | 03:44 |
| 25 | Q.    And if they had tighter specs and the | 03:44 |

PLAINTIFFS' EXHIBITS 003744

Page 524

1   product doesn't meet them but still falls within        03:44

2   the ANDA specifications, that product is within         03:44

3   specification; right?                                   03:44

4        A.    For the manufacturing service.               03:44

5        Q.    Yes.                                          03:44

6        A.    In this particular case.  UDL probably        03:44

7   would have rejected it because that's their spec.       03:44

8        Q.    Fair enough, but with respect to that --     03:44

9        A.    The original ap., yes.                        03:44

10       Q.    And with respect to whether it is out of      03:44

11  spec, out of specification in the eyes of the FDA,      03:44

12  it is not out of specification; correct?               03:44

13       A.    I would say that's a fair statement,          03:44

14  yes.                                                    03:44

15       Q.    Okay.  Can you look at the page that          03:44

16  refers to Exhibit M44, please?                          03:45

17       A.    Sure, yes.                                    03:45

18       Q.    Did you -- do you recall enough about         03:45

19  M44 from looking at this document to know whether       03:45

20  you read it or not?                                     03:46

21       A.    I don't.                                      03:46

22       Q.    Okay.  Your thumbnail sketch as you           03:46

23  described it indicates this is an e-mail from Sue       03:46

24  Powers to Chuck Kuhn, regarding the recall costs       03:46

25  for UDL.                                                03:46

PLAINTIFFS' EXHIBITS 003745

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 525

| | | |
|---|---|---|
| 1 | Do you see that? | 03:46 |
| 2 | A.    I do. | 03:46 |
| 3 | Q.    You wrote that; right? | 03:46 |
| 4 | A.    Yes. | 03:46 |
| 5 | Q.    All right.  So that's some brief | 03:46 |
| 6 | characterization of what you saw when you read | 03:46 |
| 7 | that document? | 03:46 |
| 8 | A.    I scanned it.  I didn't read it, I | 03:46 |
| 9 | scanned it. | 03:46 |
| 10 | Q.    Do the costs of a recall have anything | 03:46 |
| 11 | to do with whether there's adulterated or out of | 03:46 |
| 12 | specification product in the market? | 03:46 |
| 13 | A.    I don't believe so. | 03:46 |
| 14 | Q.    Look at the page of Exhibit 107 that | 03:46 |
| 15 | refers to M56, please. | 03:47 |
| 16 | A.    56? | 03:47 |
| 17 | Q.    Yes, please. | 03:47 |
| 18 | A.    Uh-huh. | 03:47 |
| 19 | Q.    Do you see your handwritten note about | 03:47 |
| 20 | that? | 03:47 |
| 21 | A.    I do. | 03:47 |
| 22 | Q.    And it says that UDL to file from Lee | 03:47 |
| 23 | Roedke, 16 September, 2006, Activis warning | 03:47 |
| 24 | letter, Little Falls, New Jersey.  Did I read that | 03:47 |
| 25 | correctly so far? | 03:47 |

PLAINTIFFS' EXHIBITS 003746

```
                                                      Page 526
 1      A.    What did you say?                        03:47

 2      Q.    UDL to file from Lee Roedke, 16          03:47

 3  September, abbreviated, 2006?                      03:47

 4      A.    Uh-huh.                                  03:47

 5      Q.    Activis warning letter, Little Falls,    03:47

 6  New Jersey.  Did I read that correctly so far?    03:47

 7      A.    Yes.                                     03:47

 8      Q.    It goes on to say not addressing FDA ADE 03:47

 9  concerns.  Did I read that correctly?             03:47

10      A.    Yes.                                     03:47

11      Q.    And ADE concerns in that context is an  03:47

12  acronym for adverse drug events; correct?         03:48

13      A.    Without specifically pulling it up, I   03:48

14  would say yes, that's true.                       03:48

15      Q.    Okay.  Do you use ADE for any other     03:48

16  purpose in the context of performing your GMP     03:48

17  compliance consulting services?                   03:48

18      A.    No.  But like you said, I'm not an      03:48

19  adverse drug event person.                        03:48

20      Q.    This is your terminology.               03:48

21      A.    This is a summary.                       03:48

22      Q.    I understand.                            03:48

23      A.    And, again, unless we pull it up, that  03:48

24  may be what they refer to it as in the e-mail.    03:48

25  Chances are that's what it is.                     03:48
```

PLAINTIFFS' EXHIBITS 003747

Page 527

| | | | |
|---|---|---|---|
| 1 | Q. | But you made the note. | 03:48 |
| 2 | A. | Yes. | 03:48 |
| 3 | Q. | Do you mean to use the term ADE to stand | 03:48 |
| 4 | for adverse drug event? | | 03:48 |
| 5 | A. | More than likely, yes. | 03:48 |
| 6 | Q. | Okay. | 03:48 |
| 7 | A. | Uh-huh. | 03:48 |
| 8 | Q. | I'm handing you, Dr. Bliesner, a | 03:48 |
| 9 | document that has been marked as Defendant's | | 03:48 |
| 10 | Exhibit 87. | | 03:48 |
| 11 | A. | Okay. | 03:48 |
| 12 | Q. | Take a moment please and review that | 03:48 |
| 13 | document very briefly. | | 03:48 |
| 14 | A. | Uh-huh. | 03:48 |
| 15 | Q. | Let me know when you have reviewed it. | 03:48 |
| 16 | A. | Sure.  Okay. | 03:49 |
| 17 | Q. | Have you seen that document before? | 03:49 |
| 18 | A. | I'm not sure. | 03:49 |
| 19 | Q. | All right.  Well you see that -- that it | 03:49 |
| 20 | is referencing a warning letter -- | | 03:49 |
| 21 | A. | Uh-huh. | 03:49 |
| 22 | Q. | -- issued to Activis in August of 2006. | 03:49 |
| 23 | A. | Uh-huh. | 03:49 |
| 24 | Q. | That relates to adverse drug | 03:49 |
| 25 | experiences.  Do you see that? | | 03:50 |

PLAINTIFFS' EXHIBITS 003748

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

```
                                                          Page 528
 1      A.    I do.                                         03:50

 2      Q.    And this is the warning letter that you       03:50

 3   referred to earlier when you were talking about        03:50

 4   the reports and the ADE, and we talked for a           03:50

 5   moment about the connection, whether there's           03:50

 6   reliability in ADE reporting, and all that.  It's      03:50

 7   the same point.                                        03:50

 8      A.    I'll take your word.                          03:50

 9      Q.    So in this letter, the FDA accepts the        03:50

10   corrective actions Activis has proposed and            03:50

11   implemented with respect to that warning letter;       03:50

12   right?                                                 03:50

13      A.    Correct.                                      03:50

14      Q.    Okay.  So when you wrote in response to       03:50

15   or in connection with Exhibit M56 that Activis         03:50

16   wasn't addressing the ADE concerns, is that            03:50

17   accurate?                                              03:50

18      A.    It's what's in the e-mail more than           03:50

19   likely -- or memo, whatever it is.                     03:50

20      Q.    Okay.                                         03:50

21      A.    It's somebody, whoever that individual        03:50

22   was.                                                   03:50

23      Q.    Lee Roedke.                                   03:50

24      A.    Apparently that's who it was.  Again          03:50

25   this is a snapshot summary, glancing it at this.       03:51
```

PLAINTIFFS' EXHIBITS 003749

Page 529

| | | |
|---|---|---|
| 1 | Whether it's an e-mail, memo or whatever. | 03:51 |
| 2 | Q.    Okay. | 03:51 |
| 3 | A.    That's their concern I'm assuming, not | 03:51 |
| 4 | going back and pulling it out. | 03:51 |
| 5 | Q.    Okay.  Well -- | 03:51 |
| 6 | A.    Knee deep in paper. | 03:51 |
| 7 | Q.    Yeah.  Unfortunately that's a necessary | 03:51 |
| 8 | part of this process, Dr. Bliesner.  All right. | 03:51 |
| 9 | Find 108, please. | 03:51 |
| 10 | A.    Which one are we on, sir? | 03:51 |
| 11 | Q.    Exhibit 108. | 03:51 |
| 12 | A.    Exhibit 108.  Yes, sir. | 03:51 |
| 13 | Q.    What do you mean when you use the term | 03:52 |
| 14 | "blend uniformity failure."  To you, what does | 03:52 |
| 15 | that mean? | 03:52 |
| 16 | A.    Blend uniformity failure? | 03:52 |
| 17 | Q.    Yeah. | 03:52 |
| 18 | A.    It means that blend gets sampled and | 03:52 |
| 19 | tested wouldn't necessarily, does not have the, | 03:52 |
| 20 | you know, assay value that it was supposed to | 03:52 |
| 21 | have. | 03:52 |
| 22 | Q.    At what point of the sampling and | 03:52 |
| 23 | testing process does something become a blend | 03:52 |
| 24 | uniformity failure? | 03:52 |
| 25 | A.    Well, there's a spec for blend | 03:52 |

PLAINTIFFS' EXHIBITS 003750

Page 530

| | | |
|---|---|---|
| 1 | uniformity test. | 03:52 |
| 2 | Q.    So by that you mean that you take a | 03:52 |
| 3 | sample of the blend, you conduct a chemical test | 03:52 |
| 4 | on it to determine the assay of that sample, and | 03:53 |
| 5 | then you apply the specifications to determine | 03:53 |
| 6 | whether that sample -- whether the assay value for | 03:53 |
| 7 | that sample is within those specifications; | 03:53 |
| 8 | correct? | 03:53 |
| 9 | A.    That's a fair assessment. | 03:53 |
| 10 | Q.    And so when you sample blends for | 03:53 |
| 11 | testing to determine whether it is uniformly | 03:53 |
| 12 | distributed -- excuse me -- most manufacturers | 03:53 |
| 13 | take samples of blend in duplicate or triplicate; | 03:53 |
| 14 | correct? | 03:53 |
| 15 | A.    Most manufacturers?  I don't know if I | 03:53 |
| 16 | can speak to most manufacturers, but there's more | 03:53 |
| 17 | than one. | 03:53 |
| 18 | Q.    Okay.  So it's not uncommon for a | 03:53 |
| 19 | pharmaceutical manufacturer to take blend samples | 03:53 |
| 20 | in duplicate or triplicate; right? | 03:53 |
| 21 | A.    I would say that's fair. | 03:53 |
| 22 | Q.    And that is an acceptable practice so | 03:53 |
| 23 | long as you, the manufacturer, have an | 03:54 |
| 24 | appropriately drafted SOP? | 03:54 |
| 25 | A.    Manufacturer, during process validation | 03:54 |

PLAINTIFFS' EXHIBITS 003751

Page 531

1    will come up with a sampling plan, and a sampling      03:54

2    approach.  Manufacturing does the sampling and         03:54

3    delivers the sample for you.                           03:54

4        Q.    So it is acceptable to draft a sampling      03:54

5    plan with respect to blend sampling that calls for     03:54

6    blend samples to be taken in duplicate or              03:54

7    triplicate; right?                                     03:54

8        A.    At least, yes.                               03:54

9        Q.    And it is acceptable to draft a testing      03:54

10   plan.                                                  03:54

11       A.    Yes.                                         03:54

12       Q.    For blend samples that allows for            03:54

13   testing the second or third sample from a given        03:54

14   location under appropriate circumstances; right?       03:54

15       A.    Content uniformity, yeah, under              03:54

16   appropriate circumstances.                             03:54

17       Q.    Well, so -- so it is -- you've seen and      03:55

18   it is okay to have a sampling plan that says you       03:55

19   take blend samples in triplicate, for example.         03:55

20       A.    Uh-huh.                                      03:55

21       Q.    You test the first sample from each          03:55

22   location and in appropriate circumstances if -- if     03:55

23   one of those samples is not tested within              03:55

24   specification, you may test the second sample from     03:55

25   that location.                                         03:55

PLAINTIFFS' EXHIBITS 003752

Page 532

1     A.    Same location.  I would say it's a fair        03:55

2   statement if it's in the protocol.                    03:55

3     Q.    If it's in the protocol.                       03:55

4     A.    Yes.                                           03:55

5     Q.    And you have to have the circumstances         03:55

6   that are called for by the protocol and that allow    03:55

7   you to test that second sample; right?                03:55

8     A.    Yes                                            03:55

9     Q.    And you have to do an appropriate              03:55

10  inspection or investigation and try to determine      03:55

11  why the first sample tested out of specification;     03:56

12  correct?                                              03:56

13    A.    Correct.  Just for content uniformity         03:56

14  for finished products, yes.                           03:56

15    Q.    If you have an initial sample of the          03:56

16  triplicate sample that tests out of specification,    03:56

17  do you call that a blend failure?                     03:56

18    A.    Do you want to say that again?                03:56

19        MR. ANDERTON:  Phil, would you read it          03:56

20    back?                                               03:56

21            (Whereupon, the testimony was read          03:56

22  back by the court reporter, as recorded above)        03:56

23        THE WITNESS:  Potentially.                      03:56

24  BY MR. ANDERTON:                                       03:56

25    Q.    Potentially.                                  03:56

PLAINTIFFS' EXHIBITS 003753

```
                                                        Page 533
 1      A.    Yes.                                       03:56
 2      Q.    But if you have a protocol that allows     03:56
 3   you to test the second or third sample after        03:56
 4   conducting an appropriate investigation and after   03:56
 5   following the protocol properly --                  03:56
 6      A.    Uh-huh.                                     03:56
 7      Q.    -- that first out of specification         03:56
 8   result is not a blend failure, am I correct?        03:56
 9      A.    If it meets the protocol, that is          03:56
10   correct.                                            03:56
11      Q.    Okay.  So you wouldn't call it a blend     03:56
12   failure until you've run all the way to the end of  03:57
13   the protocol --                                     03:57
14      A.    Huh-huh.                                   03:57
15      Q.    -- is the way I'll describe that to you;   03:57
16   is that correct?                                    03:57
17      A.    That's a fair way to put it.               03:57
18      Q.    Okay.  Which might mean in certain         03:57
19   circumstances until you've tested the third of the  03:57
20   triplicate samples from one or more locations;      03:57
21   right?                                              03:57
22      A.    Yes.                                       03:57
23      Q.    When you use the term -- and looking at    03:57
24   Exhibit 108.                                        03:57
25      A.    Yes.                                       03:57
```

PLAINTIFFS' EXHIBITS 003754

```
                                                       Page 534

 1     Q.   Well, hold on one second.               03:57

 2          MS. DREWES:  I don't want to interrupt,   03:57

 3     but on that hard drive that you -- that the    03:57

 4     witness gave, is it okay with everyone if we   03:57

 5     give everyone a CD attached with the documents 03:57

 6     rather than a hard copy?  Because apparently    03:57

 7     you can't read them when they were printing.   03:57

 8          MR. ANDERTON:  Yeah, that's acceptable to  03:58

 9     me.  Mike, are you all right with that?        03:58

10          MR. KERENSKY:  Your voice was too faint    03:58

11     for to me to hear your comment, ma'am.         03:58

12          MS. DREWES:  Would the hard drive that     03:58

13     Dr. Bliesner gave us earlier, today, the -- we  03:58

14     can print the -- we can print the documents    03:58

15     but they are not legible, some of them, when    03:58

16     we print them.  For some reason they come out   03:58

17     really dark is what I'm told.                  03:58

18          So if we can just give everyone a disc if  03:58

19     that's agreeable to you.                       03:58

20          MR. ANDERTON:  Are you okay with that,     03:58

21     Mike?                                          03:58

22          MS. DREWES:  Apparently you can read it    03:58

23     on the disc or on the computer screen.         03:58

24          MR. KERENSKY:  Just as long as a general,  03:58

25     average, normal, everyday computer will open   03:58
```

PLAINTIFFS' EXHIBITS 003755

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

```
                                                   Page 535
 1      it, I'm happy.                              03:58
 2          MR. ANDERTON:  Well, that's just        03:58
 3      described my unit, so.                      03:58
 4   BY MR. ANDERTON:                               03:58
 5      Q.   And then Dr. Bliesner, continuing on   03:58
 6   with this line of questioning, if you -- again if 03:58
 7   your protocol is appropriately drafted and you 03:59
 8   follow that factual progression that I just    03:59
 9   described, where you take samples of a blend and 03:59
10   you test the first sample from a location and it 03:59
11   is out of specification, then you follow the   03:59
12   protocol and that results in you testing then the 03:59
13   second sample from that location and it is within 03:59
14   specification, it's okay to release that batch; 03:59
15   right?                                         03:59
16      A.   If you're meeting your protocol.       03:59
17      Q.   If you have a protocol that allows for 03:59
18   all of that, specifies it, and if you comply with 03:59
19   it along the way; correct?                     03:59
20      A.   That's a reasonable statement.         03:59
21      Q.   It's okay to release that batch?       03:59
22      A.   That blend, sure.                      03:59
23      Q.   That --                                03:59
24      A.   Final blend in this case.              03:59
25      Q.   That initial I guess then -- correct.  03:59
```

PLAINTIFFS' EXHIBITS 003756

Page 536

1   So let me ask it another way.                         03:59

2      That initial out-of-specification result          04:00

3   doesn't require that the entire blend and            04:00

4   therefore the entire batch be rejected.              04:00

5      A.    Not necessarily.                             04:00

6      Q.    Okay.                                        04:00

7      A.    It may be, you know, extraordinary           04:00

8   circumstances where it comes in at 25 percent of     04:00

9   assay or whatever, then it's a whole different       04:00

10  bailiwick.                                            04:00

11     Q.    Then your -- well, then your                 04:00

12  investigation your protocol provides for probably    04:00

13  is going to reveal something other than just a       04:00

14  single out-of-specification result?                  04:00

15     A.    More than likely, yes.                       04:00

16     Q.    Okay.                                        04:00

17        MR. KERENSKY:  Are you guys still there?        04:00

18        MR. ANDERTON:  Yeah, we are here.               04:00

19        MR. KERENSKY:  Man, you got quiet.  I           04:00

20     thought you hung up on me.                         04:00

21  BY MR. ANDERTON:                                      04:00

22     Q.    Dr. Bliesner, when you did your paper        04:00

23  audit of -- of this -- of Activis to prepare your    04:00

24  report -- paper audit is your term not mine -- did   04:01

25  you ask for and did you receive the SOP of Activis   04:01

PLAINTIFFS' EXHIBITS 003757

Page 537

```
 1   Totowa that provides the protocol for testing        04:01

 2   blend samples and retesting second or third          04:01

 3   samples if you have an initial                       04:01

 4   out-of-specification result?                         04:01

 5       A.    I don't think I specifically asked for     04:01

 6   that SOP.  I remember reviewing an investigation     04:01

 7   having to do with blend uniformity failure.          04:01

 8       Q.    If you didn't ask for it, does that mean   04:01

 9   you didn't review it either?                         04:01

10       A.    I don't know if I could say that.  I'd     04:01

11   have to go back and look at the paper at I           04:01

12   reviewed.                                            04:01

13       Q.    Okay.                                      04:01

14       A.    With respect to that investigation.        04:01

15       Q.    The documents -- well, the documents       04:01

16   that you reviewed --                                 04:02

17       A.    Uh-huh.                                    04:02

18       Q.    -- are set forth in your report; right?    04:02

19       A.    They should be, yes.                       04:02

20       Q.    So if you reviewed it, our review of       04:02

21   those documents will reveal that you reviewed it?    04:02

22       A.    That I reviewed it, yes.                   04:02

23       Q.    Right.                                     04:02

24       A.    That's a fair statement.                   04:02

25       Q.    So if it's not listed among the           04:02
```

PLAINTIFFS' EXHIBITS 003758

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                 February 18, 2011

Page 538

| | | |
|---|---|---|
| 1 | documents that you reviewed -- if it's not listed | 04:02 |
| 2 | in your report, it's not something you reviewed? | 04:02 |
| 3 | A.     Not necessarily. | 04:02 |
| 4 | Q.     Pardon? | 04:02 |
| 5 | A.     They're not mutually exclusive, most of | 04:02 |
| 6 | it because of all the volume of documents here. | 04:02 |
| 7 | It obviously didn't include every single one that | 04:02 |
| 8 | I reviewed, just ones that I felt had pertinent | 04:02 |
| 9 | points with respect to this. | 04:02 |
| 10 | Q.     If it's not listed in your report -- | 04:02 |
| 11 | A.     Yes. | 04:02 |
| 12 | Q.     -- is it fair to say that you didn't | 04:02 |
| 13 | place any significance on it and didn't rely on it | 04:02 |
| 14 | in drafting your report? | 04:02 |
| 15 | A.     I didn't rely on it.  I don't know if | 04:02 |
| 16 | significance is a word that I would use. | 04:02 |
| 17 | Q.     How are we to know or to identify if I | 04:03 |
| 18 | asked you right now whether you reviewed this SOP | 04:03 |
| 19 | -- | 04:03 |
| 20 | A.     Uh-huh | 04:03 |
| 21 | Q.     -- and it's not listed in your report -- | 04:03 |
| 22 | A.     That's right. | 04:03 |
| 23 | Q.     -- how would you know? | 04:03 |
| 24 | A.     It's not listed in the report.  I'd go | 04:03 |
| 25 | through this index and see if I popped it up. | 04:03 |

PLAINTIFFS' EXHIBITS 003759

```
                                                        Page 539
 1     Q.    And if it's not in this index?              04:03
 2     A.    And it's not in the supplemental            04:03
 3  documents that were sent to me by -- then chances    04:03
 4  are I didn't review it.                              04:03
 5     Q.    Okay.                                        04:03
 6     I'm going to hand you a document that has been     04:03
 7  marked as -- well, what's it say on there?           04:03
 8     A.    58.                                          04:03
 9     Q.    58?                                          04:04
10     A.    Yeah.                                        04:04
11        MR. ANDERTON:  Plaintiffs' Exhibit 58.         04:04
12        Plaintiffs', Mike.                             04:04
13        MR. KERENSKY:  Got it.                          04:04
14  BY MR. ANDERTON:                                     04:04
15     Q.    Have you seen that before, Dr. Bliesner?    04:04
16     A.    Isn't this one that we -- the 483s that     04:04
17  were included before?  Can I take a look at the      04:04
18  report?  I'm pretty sure that I have, but I just     04:04
19  want to make sure.                                   04:04
20     Q.    Well, if you didn't look at this, you       04:04
21  don't have a report.                                 04:04
22     A.    Okay.                                        04:04
23     Q.    But you may do whatever you like to         04:04
24  satisfy yourself, but I guess I can shortcircuit     04:04
25  that.                                                04:04
```

PLAINTIFFS' EXHIBITS 003760

```
                                                     Page 540
 1      A.    Okay.  Please.                          04:04

 2      Q.    Well, I'm here to help, Dr. Bliesner.   04:04

 3   Sarah will tell you I'm a giver.                 04:05

 4          MS. DREWES:  Oh, yeah.  Big time.         04:05

 5          MR. KERENSKY:  Note the snickers on the   04:05

 6      phone.                                        04:05

 7          MR. ANDERTON:  I'm sorry.  Defense        04:05

 8      Exhibit 58, Mike.  I misspoke earlier.        04:05

 9          MR. KERENSKY:  About you being a giving   04:05

10      person?                                       04:05

11          MS. DREWES:  Yeah, but got also about the 04:05

12      exhibit.                                      04:05

13          MR. KERENSKY:  That you are here to       04:05

14      help?  You're not with the IRS.              04:05

15          MR. ANDERTON:  It's Defendant's Exhibit   04:05

16      58.                                           04:05

17          MR. KERENSKY:  Thank you.                 04:05

18          MR. ANDERTON:  It's Plaintiffs' Exhibit   04:05

19      90, I believe.  No.  Not true.                04:05

20   BY MR. ANDERTON:                                 04:05

21      Q.    Dr. Bliesner, did you review this or    04:05

22   not.  What do you think?                         04:06

23      A.    Yes.                                    04:09

24      Q.    What page of your report are you looking 04:09

25      at?                                           04:09
```

PLAINTIFFS' EXHIBITS 003761

Page 541

| | | |
|---|---|---|
| 1 | A. | 47. | 04:09 |
| 2 | Q. | What reference? | 04:09 |
| 3 | A. | A37. | 04:09 |
| 4 | Q. | Well? | 04:09 |
| 5 | A. | By the look of it. | 04:09 |
| 6 | Q. | That's an EIR, not a 483. | 04:09 |
| 7 | A. | It is the EIR that had the 483s in | 04:09 |
| 8 | them. I misspoke. I'm sorry. | 04:09 |

1       A.    47.                                        04:09

2       Q.    What reference?                            04:09

3       A.    A37.                                       04:09

4       Q.    Well?                                      04:09

5       A.    By the look of it.                         04:09

6       Q.    That's an EIR, not a 483.                  04:09

7       A.    It is the EIR that had the 483s in         04:09

8  them.  I misspoke.  I'm sorry.                        04:09

9       Q.    So you didn't review this apparently?      04:09

10      A.    The 483s stand-alone?                      04:09

11      Q.    Yes.                                       04:09

12      A.    No, it would be the EIR.                   04:09

13      Q.    So that's Exhibit 91.  You agree with      04:09

14  that; right?                                         04:10

15      A.    Yes.                                       04:10

16      Q.    All right.  I'm going to hand you a copy   04:10

17  of Exhibit 91.                                       04:10

18      A.    Okay.                                      04:10

19      Q.    So that we do this and keep you as         04:10

20  comfortable as you need to be.  I'm here for your    04:10

21  comfort.                                             04:10

22      I would like you to first look at the document  04:10

23  I just handed you and tell me if you reviewed that   04:10

24  document.                                            04:10

25      A.    91.  Plaintiffs' Exhibit 91, yes, sir.    04:10

PLAINTIFFS' EXHIBITS 003762

                                                              Page 542

```
 1      Q.    Okay.  Turn to page 43 of that document.      04:10
 2      A.    May have a second, please?  I want to         04:10
 3  make sure that I -- because there were some of          04:10
 4  these reports that didn't necessarily have all of       04:11
 5  the pages that came with them, the EIR.  There was      04:11
 6  one circumstance that I recall that didn't.  So I       04:11
 7  want to make sure that what I've got over here is       04:11
 8  the same and inclusive.                                 04:11
 9      Q.    Okay.                                         04:11
10      A.    Okay.  Is that fair?                          04:11
11      Q.    Well, I guess I would hope that you           04:11
12  would have noted in your report when you reviewed       04:11
13  a document that was incomplete, but you didn't do       04:11
14  that with respect to this document.                     04:11
15      A.    I just want to look at it.                    04:11
16      Q.    Of course you do.                             04:11
17            THE VIDEOGRAPHER:  While he's doing that,     04:11
18      you have five minutes left on the tape.             04:11
19            MR. ANDERTON:  Let's go off the record        04:11
20      and change the tape.                                04:11
21            THE WITNESS:  The time is 4:13 p.m.           04:11
22      We're going off the record.                         04:11
23                 (Short break)                            04:21
24            THE VIDEOGRAPHER:  The time is 4:24 p.m.      04:21
25      We are on the record.  This is the beginning        04:22
```

PLAINTIFFS' EXHIBITS 003763

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                      Page 543
 1      of tape eight.                                 04:22

 2   BY MR. ANDERTON:                                  04:22

 3      Q.    Dr. Bliesner, are you all set?           04:22

 4      A.    Yes, sir.                                04:22

 5      Q.    Okay.  I want to ask you --              04:22

 6   Dr. Bliesner, I'm going to go away from that      04:23

 7   document for just a moment and ask you a general  04:23

 8   question.                                         04:23

 9      A.    Okay.                                    04:23

10      Q.    You are a chemist by trade; right?       04:23

11      A.    I am a Ph.D. and analytical chemist by   04:23

12   training.                                         04:23

13      Q.    Does that mean the answer to my question 04:23

14   is yes?                                           04:23

15      A.    Chemist?  Yes.  Sorry.  There are many   04:23

16   flavors of chemists.  That's why.                 04:24

17      Q.    I understand, but above all else as a    04:24

18   matter of fact you call yourself a chemist?       04:24

19      A.    A research chemist, yes, I do.           04:24

20      Q.    When testing a tablet and particularly a 04:24

21   solid oral dose tablet for potency --             04:24

22      A.    Uh-huh.                                  04:24

23      Q.    -- what method would you use if you      04:24

24   could use any method you wanted?                  04:24

25      A.    Not to sound cryptic, but it depends on  04:24
```

PLAINTIFFS' EXHIBITS 003764

Page 544

1    the dosage form and what the characteristics are        04:24

2    and what it's amenable to as far as analysis            04:24

3    goes.                                                    04:24

4        Q.    What do you mean by that?                      04:24

5        A.    Well, it turns out that certain               04:24

6    compounds might not be appropriately soluble let's      04:24

7    say and therefore easily dissolved and injected         04:24

8    into an HPLC system let's say.                           04:24

9        Q.    Did you review the ANDA for Digoxin and       04:24

10   particularly for the Digitek version of Digoxin         04:25

11   tablets manufactured by Amide and then Activis          04:25

12   sufficiently to allow you to have an opinion about      04:25

13   which methods could be used to examine the potency     04:25

14   of a tablet -- of one of those tablets?                 04:25

15       A.    I'm sorry.  Go again.                         04:25

16            MR. ANDERTON:  Phil, can you get that?  I      04:25

17       did it very methodically.  I would like            04:25

18       Dr. Bliesner to hear that.  I think I got it       04:25

19       right.                                             04:25

20            THE WITNESS:  If I recall, I didn't get       04:26

21       an opportunity to read all of the ANDA            04:26

22       sections because I think that they were all       04:26

23       available to me at the time of review.  Just      04:26

24       to put that in perspective.                       04:26

25            As far as being able to assess whether --    04:26

PLAINTIFFS' EXHIBITS 003765

Page 545

| | | |
|---|---|---|
| 1 | I guess the question is assess whether the | 04:26 |
| 2 | methods are appropriate for use? | 04:26 |
| 3 | BY MR. ANDERTON: | 04:26 |
| 4 | Q.    No.  Do you have an opinion about -- | 04:26 |
| 5 | about which of those -- which of the available | 04:26 |
| 6 | methods to test a tablet for potency could be | 04:26 |
| 7 | used? | 04:26 |
| 8 | A.    Could be used with -- HPLC is a method | 04:26 |
| 9 | of choice. | 04:26 |
| 10 | Q.    Okay. | 04:26 |
| 11 | A.    If I'm not mistaken, having looking at | 04:26 |
| 12 | the 484 stuff, those were HPLC methods for assays | 04:26 |
| 13 | and related compounds. | 04:26 |
| 14 | Q.    And the Activis analytical method was | 04:26 |
| 15 | also HPLC methods; correct? | 04:26 |
| 16 | A.    I'm pretty sure yes, yes. | 04:27 |
| 17 | Q.    So unless nobody knew what they were | 04:27 |
| 18 | doing, HPLC was an acceptable method to test this | 04:27 |
| 19 | compound; correct? | 04:27 |
| 20 | A.    For assay. | 04:27 |
| 21 | Q.    For assay. | 04:27 |
| 22 | A.    Correct. | 04:27 |
| 23 | Q.    Well, and to go back to the term I used, | 04:27 |
| 24 | for potency. | 04:27 |
| 25 | A.    Yes.  Assay, potency, same thing. | 04:27 |

PLAINTIFFS' EXHIBITS 003766

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 546

1      Q.    Okay.  What about single point UV?  How          04:27

2  does that compare to HPLC as a test method to test         04:27

3  the potency of a tablet and specifically of one of         04:27

4  these Digitek Digoxin tablets?                             04:27

5      A.    Single point UV?                                 04:27

6      Q.    Yes.                                             04:27

7      A.    How would it compare?  It depends               04:27

8  because LC is a separations technique that                 04:27

9  separates out any potential interference from the         04:27

10 main component so you get an assay.  An HPLC              04:27

11 system essentially a UV system at the end.  The           04:27

12 detector for HPLC is just a UV.  But in this case         04:28

13 it is has, if you will, as an analogy, the HPLC is        04:28

14 a means of preparing the sample so you're looking         04:28

15 at a single component when it goes into the UV            04:28

16 detector; okay?  If you have -- it is possible            04:28

17 with a product to develop and validate a method,          04:28

18 single point UV method if there are no                    04:28

19 interferences.                                            04:28

20     Q.    If somebody sent you a sample --                04:28

21     A.    Uh-huh.                                         04:28

22     Q.    -- and said Dr. Bliesner, chemist --           04:28

23 Ph.D. Chemist Bliesner, we'd like you to examine         04:28

24 this tablet for potency.                                  04:28

25     A.    Uh-huh.                                         04:28

PLAINTIFFS' EXHIBITS 003767

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

```
                                                              Page 547
 1      Q.    How would you compare the reliability of    04:28
 2  results of a test conducted using single point UV      04:28
 3  versus a test using HPLC?                              04:29
 4      A.    How would you compare?                       04:29
 5      Q.    How would you compare?  Not literally        04:29
 6  how would you put them side by side and compare.       04:29
 7  How would you characterize the differences between     04:29
 8  results reached using single point UV versus the       04:29
 9  results reached using HPLC.  Is one more reliable       04:29
10  than the other?                                        04:29
11      A.    Not necessarily.  It depends on whether      04:29
12  there are interference issues.  You've got to          04:29
13  realize that HPLC with a UV detector is a single       04:29
14  point UV detection, just like you put it into a UV     04:29
15  spectrometer.  Same thing.  It's only a single         04:29
16  point.                                                 04:29
17      Q.    So you need to know more about the           04:29
18  circumstances before you would be able to --           04:29
19      A.    Absolutely.  Sure.                           04:29
20      Q.    Be able to compare the reliability of        04:29
21  outcomes for --                                        04:29
22      A.    Right.                                       04:29
23      Q.    -- those two tests.                          04:29
24      A.    For instance, they do dissolution            04:29
25  testing.  And the dissolution method is UV, but        04:29
```

PLAINTIFFS' EXHIBITS 003768

Page 548

| | | |
|---|---|---|
| 1 | there is a whole -- if I recall correctly, pulling | 04:29 |
| 2 | off memory -- there is a derivatization and things | 04:30 |
| 3 | that like that with respect to the UV because that | 04:30 |
| 4 | would suggest that there are potential | 04:30 |
| 5 | interferences.  And derivatization and looking at | 04:30 |
| 6 | it in the means that they did would suggest -- not | 04:30 |
| 7 | having looked at the validation -- that they were | 04:30 |
| 8 | able to get around interferences in that fashion. | 04:30 |
| 9 | Q.   Just to be clear with respect to | 04:30 |
| 10 | Activis, are the entirety of your opinions in this | 04:30 |
| 11 | case set forth in the report you've issued?  Do | 04:31 |
| 12 | you have any supplemental or additional opinions | 04:31 |
| 13 | with respect to Activis? | 04:31 |
| 14 | A.   I don't believe so. | 04:31 |
| 15 | Q.   Well, you don't believe so or you don't? | 04:31 |
| 16 | A.   It's a broad statement. | 04:31 |
| 17 | Q.   I need this question to be answered | 04:31 |
| 18 | definitively, Dr. Bliesner.  It's a very important | 04:31 |
| 19 | question. | 04:31 |
| 20 | A.   Additional, post-the-report? | 04:31 |
| 21 | Q.   Yes. | 04:31 |
| 22 | A.   In the report? | 04:31 |
| 23 | Q.   Yeah, you have issued a report in this | 04:31 |
| 24 | case -- | 04:31 |
| 25 | A.   Yes. | 04:31 |

PLAINTIFFS' EXHIBITS 003769

```
                                                      Page 549
 1      Q.    -- that we've been told contains your      04:31
 2   opinions --                                         04:31
 3      A.    Yes.                                        04:31
 4      Q.    -- about Activis.  And there was some       04:31
 5   exchange last time about whether you had an         04:31
 6   opinion about Mylan or didn't have an opinion and   04:31
 7   we got a representation from Plaintiffs' counsel    04:31
 8   about that, and that issue is done and resolved as  04:31
 9   far as we're concerned.                             04:31
10      A.    Okay.                                       04:31
11      Q.    So I'm asking you now strictly about        04:31
12   Activis and the opinions that are set forth in      04:32
13   your June 15, 2010, report.                         04:32
14      A.    Yes.                                        04:32
15      Q.    About Activis.                              04:32
16      A.    Yes.                                        04:32
17      Q.    Do they -- do they comprise the entirety   04:32
18   of your opinions about Activis in this case?        04:32
19      A.    That's a fair statement, yes.              04:32
20      Q.    Yes, they do?                               04:32
21      A.    Uh-huh.                                     04:32
22      Q.    You need to say that.                       04:32
23      A.    Yes, they do.                               04:32
24      Q.    Okay.  So there are no supplemental         04:32
25   opinions about Activis that are not contained in    04:32
```

PLAINTIFFS' EXHIBITS 003770

Page 550

1   your report?                                          04:32

2       A.    I've not reviewed any documentation or     04:32

3   anything else that would supplement what I've         04:32

4   written in the report.                                04:32

5       Q.    So again need this answered my way.  You    04:32

6   don't have any supplemental opinions about Activis    04:32

7   that are not contained in this report; is that a      04:32

8   correct statement?                                    04:32

9       A.    That is a correct statement.               04:33

10      Q.    Thank you.                                  04:33

11      So the process -- well, you -- the product        04:33

12  that was in the market and subject to recall you      04:33

13  know was .125 and .25 milligram Digitek.  You are     04:33

14  aware of that; right?                                 04:33

15      A.    Yes, sir.                                   04:33

16      Q.    Two dose strengths; right?                  04:33

17      A.    Yes, sir.                                   04:33

18      Q.    And both processes were validated;         04:33

19  correct?                                              04:33

20      A.    I have not seen the process validation     04:33

21  reports so I can't say definitively, but because      04:34

22  they're in the application and it was approved,       04:34

23  one would extrapolate that they were validated.       04:34

24      Q.    Any reason to believe that either          04:34

25  process was not validated?                            04:34

PLAINTIFFS' EXHIBITS 003771

Page 551

1     A.    No.                                             04:34

2     Q.    And I believe you testified last time          04:34

3   that you're not an expert in process validation        04:34

4   but that you certainly support -- I believe those      04:34

5   were your words.                                        04:34

6     A.    Yes.                                            04:34

7     Q.    From an -- I forget what perspective you        04:34

8   said.                                                   04:34

9     A.    Cross-functional and analytical                04:34

10  development testing, troubleshooting.                   04:34

11    Q.    That's a fancy way of saying you                04:34

12  recognize the value and importance of process          04:34

13  validation.                                             04:34

14    A.    I absolutely, yeah.                             04:34

15    Q.    Okay.                                           04:34

16    A.    It's a very critical component to the           04:34

17  whole application development.                          04:34

18    Q.    It's kind of a jumping off point for            04:34

19  everything, isn't it?                                   04:34

20    A.    Process validation?                             04:34

21    Q.    Yes.                                            04:34

22    A.    Jumping off point?                              04:34

23    Q.    Well, with respect actually producing           04:34

24  and manufacturing a drug product.                       04:34

25    A.    Uh-huh.                                         04:34

Page 552

1     Q.    You must first develop and validate a          04:34
2   process for doing that; correct?                        04:35
3     A.    If you need to develop and validate --          04:35
4   develop a dosage form, a formulation and then to a      04:35
5   small scale move it into process validation,            04:35
6   that's correct.                                         04:35
7     Q.    Okay.  So once you have a formulation           04:35
8   developed --                                            04:35
9     A.    Yes.                                             04:35
10    Q.    -- the next step is to develop and              04:35
11  validate the process; right?                            04:35
12    A.    Scale up first and then validate.               04:35
13    Q.    Okay.  So let's make that the not the           04:35
14  next immediate step after developing the                04:35
15  formulation but two steps later is a process            04:35
16  validation.  And you cannot go forward with             04:35
17  manufacturing any drug product without a validated      04:35
18  process; is that correct?                               04:35
19    A.    That's correct.                                 04:35
20    Q.    The FDA would not approve either an NDA         04:35
21  or an ANDA without demonstration of a validated         04:35
22  process; correct?                                        04:35
23    A.    And the demonstration would be for              04:35
24  instance in the ANDA III production run.                04:35
25    Q.    Understood.                                      04:35

PLAINTIFFS' EXHIBITS 003773

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 553

1        A.      That's the output of process validation        04:35

2    specifically requiring, you know, a validation,            04:36

3    reported development on the application, that              04:36

4    isn't necessarily the case.                                04:36

5        Q.      In whatever form, you must prove to the         04:36

6    FDA --                                                     04:36

7        A.      Uh-huh.                                         04:36

8        Q.      -- that you have developed and validated       04:36

9    your process before they will approve your                04:36

10   application.                                               04:36

11       A.      Yes.                                            04:36

12       Q.      Is that correct?                                04:36

13       A.      That is correct.                                04:36

14       Q.      All right.  And a process validation           04:36

15   tells you that you have developed a process that          04:36

16   allows you to consistently manufacture product            04:36

17   within specification; right?                              04:36

18       A.      Within the operating parameters of the        04:36

19   equipment; correct.                                       04:36

20       Q.      Understood.                                     04:36

21       A.      Uh-huh.                                         04:36

22       Q.      And as you move forward from your              04:36

23   process validation, there are various things that         04:36

24   speak to or that confirm the conclusions reached          04:36

25   in your process validation study, one of which is         04:36

PLAINTIFFS' EXHIBITS 003774

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                              Page 554

 1   manufacturing product within specification over        04:37

 2   time; correct?                                          04:37

 3        A.    That's one aspect; correct.  You also       04:37

 4   monitor complaints, returns, you know,                  04:37

 5   investigations, that come up during the course of       04:37

 6   the manufacturing.  Lots of different things.           04:37

 7        Q.    Understood.                                  04:37

 8        You continue to monitor the things that might      04:37

 9   call into question the validation of your process;      04:37

10   right?                                                  04:37

11        A.    That's correct.  Because in my               04:37

12   experience when you go from scale up to                 04:37

13   manufacturing, invariably as you gain experience        04:37

14   with the product there, you'll find things that         04:37

15   are potentially difficult.                              04:37

16        Q.    And finding things that are potential        04:37

17   difficulties, to use your words?                        04:37

18        A.    Uh-huh.                                      04:37

19        Q.    That doesn't mean your process is            04:37

20   invalidated.  It means you need to investigate and      04:37

21   determine whether they require an adjustment of         04:37

22   your process; right?                                    04:38

23        A.    That's open to interpretation.  It          04:38

24   really is.  And the agency, you know, in one            04:38

25   circumstance may say your process is out of             04:38

PLAINTIFFS' EXHIBITS 003775

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

Page 555

| | | |
|---|---|---|
| 1 | control, it's invalidated, but in another | 04:38 |
| 2 | circumstance the same people within the same | 04:38 |
| 3 | division may say, you know, it's okay.  You need | 04:38 |
| 4 | to put in some additional controls.  So it's open | 04:38 |
| 5 | to interpretation. | 04:38 |
| 6 | Q.    What weight do you give -- in validating | 04:38 |
| 7 | as you're undertaking a consulting engagement -- | 04:38 |
| 8 | A.    Uh-huh. | 04:38 |
| 9 | Q.    -- and evaluating whether your client | 04:38 |
| 10 | has or is achieving GMP compliance? | 04:38 |
| 11 | A.    Uh-huh. | 04:38 |
| 12 | Q.    What weight do you give to the fact that | 04:38 |
| 13 | the client has a validated process followed by | 04:38 |
| 14 | years and years and production of literally | 04:38 |
| 15 | billions and billions of tablets that were within | 04:38 |
| 16 | specification? | 04:39 |
| 17 | A.    I'm sorry.  It was a long one, so -- | 04:39 |
| 18 | MR. ANDERTON:  Please read it back. | 04:39 |
| 19 | (Whereupon, the testimony was read | 04:39 |
| 20 | back by the court reporter, as recorded above) | 04:39 |
| 21 | THE WITNESS:  That's obviously an | 04:39 |
| 22 | important part of the picture. | 04:39 |
| 23 | BY MR. ANDERTON: | 04:39 |
| 24 | Q.    Okay. | 04:39 |
| 25 | A.    Supporting process validation and | 04:39 |

PLAINTIFFS' EXHIBITS 003776

Page 556

| | | |
|---|---|---|
| 1 | showing you're in control. | 04:39 |
| 2 | Q.    Okay.  So that is a significant fact | 04:39 |
| 3 | that -- as you did an evaluation of circumstances | 04:39 |
| 4 | that met those -- that description, that would be | 04:39 |
| 5 | one piece of information that you put in, in the | 04:39 |
| 6 | bucket if you will, suggesting GMP compliance. | 04:39 |
| 7 | A.    One piece.  Manufacturing investigations | 04:39 |
| 8 | would go hand and hand with that in particular. | 04:39 |
| 9 | Q.    Understood.  But that fact that I've | 04:39 |
| 10 | described -- | 04:40 |
| 11 | A.    Uh-huh. | 04:40 |
| 12 | Q.    -- validated process and years of | 04:40 |
| 13 | in-specification production covering billions of | 04:40 |
| 14 | tablets, that would go certainly go in the -- | 04:40 |
| 15 | A.    It would.  We're assuming that the data | 04:40 |
| 16 | reporting capture and all that stuff is accurate. | 04:40 |
| 17 | Q.    Understood. | 04:40 |
| 18 | A.    Okay.  That's a big assumption because | 04:40 |
| 19 | it isn't necessarily the case in a lot of | 04:40 |
| 20 | facilities. | 04:40 |
| 21 | Q.    Okay. | 04:40 |
| 22 | A.    Uh-huh. | 04:40 |
| 23 | Q.    But you would only be able to determine | 04:40 |
| 24 | whether it was accurate if you looked at the | 04:40 |
| 25 | data. | 04:40 |

PLAINTIFFS' EXHIBITS 003777

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

```
                                                       Page 557
 1      A.    You'd have to look at the data and then      04:40

 2   confirm with individuals that are doing entry into    04:40

 3   the system, or validation of the system and           04:40

 4   whatever.                                             04:40

 5      Q.    Understood.                                   04:40

 6      A.    That they would hold up.  I'm sorry.          04:40

 7   No.  Would hold up.                                    04:40

 8      Q.    But inherent in what you've just said --      04:40

 9      A.    Uh-huh.                                       04:40

10      Q.    -- is that you must look at the data in       04:40

11   order to challenge it; correct?                        04:40

12      A.    The data in a broad sense.                    04:40

13      Q.    You used that term, Dr. Bliesner.             04:40

14      A.    Yes, I know.  But if we are talking           04:40

15   specific process validation, methods validation,      04:41

16   data in general because the data can be -- I'm         04:41

17   sorry.                                                 04:41

18      Q.    As you used the term?                         04:41

19      A.    Yes.                                          04:41

20      Q.    I was merely trying to ask you questions      04:41

21   about how you --                                       04:41

22      A.    Okay.                                         04:41

23      Q.    -- used the term?                             04:41

24      A.    Okay.                                         04:41

25      Q.    Now, you can't use it and then say --         04:41
```

PLAINTIFFS' EXHIBITS 003778

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 558

| | | | |
|---|---|---|---|
| 1 | A. | No. | 04:41 |
| 2 | Q. | -- what the heck are you talking about? | 04:41 |
| 3 | A. | I understand. | 04:41 |
| 4 | Q. | Okay. | 04:41 |
| 5 | A. | I just want to make sure that we're on | 04:41 |
| 6 | | all on the same page here.  It's late in the day | 04:41 |
| 7 | | and I'm not trying to be evasive. | 04:41 |
| 8 | Q. | I understand but as I understood your | 04:41 |
| 9 | | answer, if you were going to question or challenge | 04:41 |
| 10 | | the data -- you said assuming the data. | 04:41 |
| 11 | A. | Are valid. | 04:41 |
| 12 | Q. | Valid. | 04:41 |
| 13 | A. | Your reflection of what's reality. | 04:41 |
| 14 | Q. | Exactly. | 04:41 |
| 15 | A. | Uh-huh. | 04:41 |
| 16 | Q. | The only way you could determine whether | 04:41 |
| 17 | | the data are valid is to start by looking at the | 04:41 |
| 18 | | data.  There would be other steps you perform, but | 04:41 |
| 19 | | the first step you'd have to do is look at the | 04:41 |
| 20 | | data, am I correct? | 04:41 |
| 21 | A. | That's correct. | 04:41 |
| 22 | Q. | Look at page 16 of your report, please. | 04:42 |
| 23 | A. | Yes. | 04:42 |
| 24 | Q. | Give me one second. | 04:42 |
| 25 | A. | Sure. | 04:42 |

PLAINTIFFS' EXHIBITS 003779

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 559

1        Q.    Dr. Bliesner, paragraph 39 on page 16.        04:43

2    Do you see that?                                        04:43

3        A.    Yes, sir.  I do.                              04:43

4        Q.    There you discuss investigation into --       04:43

5    well, you don't identify the lot number, but --        04:43

6        A.    No, sir.                                      04:43

7        Q.    But the lot that had some defectively         04:43

8    thick tablets discovered during manufacturing.         04:43

9    And the second to last sentence says:                  04:43

10       "Product is released to market without             04:43

11   conclusive evidence of what caused the                 04:43

12   double-thick problem on 5 December, 2007."             04:43

13       That's not accurate is it?                         04:43

14       A.    I'd have to go back and pull up the          04:43

15   reference to be sure.                                  04:43

16       Q.    Okay.  Well you --                           04:43

17       A.    Because it's very -- the investigation,       04:43

18   if I recall how it's done and how it's written,        04:43

19   anything like that, it was stuff to pull dates         04:43

20   together so I can't definitively say that that's       04:43

21   an incorrect date.                                     04:43

22       Q.    Well there's -- if you read the              04:43

23   investigation record, there's plenty of documents      04:43

24   in the investigation report indicating activities      04:44

25   occurring.  In fact the 100 percent visual             04:44

PLAINTIFFS' EXHIBITS 003780

Page 560

1    inspection very clearly didn't occur until January     04:44

2    2008.                                                   04:44

3        A.    Okay.                                         04:44

4        Q.    So did you just misread that                 04:44

5    investigation?                                          04:44

6        A.    Incident report.  I'm sorry.  What is        04:44

7    the question?                                           04:44

8        Q.    Did you just misread that investigative      04:44

9    report?                                                 04:44

10       A.    I don't think so.  Like I said, I have       04:44

11   to go back and look at it and reconstruct it again     04:44

12   to determine if that -- your claim that that's an      04:44

13   incorrect date is incorrect.                           04:44

14       Q.  You made comment earlier about operators       04:44

15   or employees being unable to read or speak English     04:45

16   or cannot read English.                                04:45

17       A.    Uh-huh.                                       04:45

18       Q.    What did you do to verify the accuracy       04:46

19   of that statement?                                      04:46

20       A.    I -- if I'm not mistaken, it was in an       04:46

21   e-mail and I read the e-mail.                           04:46

22       Q.    So you just read the e-mail and that was     04:46

23   enough for you?                                         04:46

24       A.    Yes.                                          04:46

25       Q.    Okay.  So you didn't do anything beyond      04:46

PLAINTIFFS' EXHIBITS 003781

Page 561

```
1   that?                                           04:46

2       A.    I'm not sure what I could have done    04:46

3   beyond that, quite honestly.                    04:46

4       Q.    Dr. Bliesner, do you understand the    04:46

5   nature of litigation?  You've never been an expert  04:46

6   witness before.                                 04:46

7       A.    I have not.                            04:46

8       Q.    Do you understand the general nature of  04:46

9   litigation?                                     04:46

10      A.    The general nature of litigation?      04:46

11      Q.    Yeah.                                  04:46

12      A.    How you would define it and how I define  04:46

13  it, probably different things.                  04:46

14      Q.    Well, do you understand that Plaintiffs  04:46

15  are the ones who bring lawsuits and they make   04:47

16  allegations against Defendants.  They allege that  04:47

17  certain things happened and in this context --  04:47

18  pharmaceutical product liability context --     04:47

19  Plaintiffs allege that they were harmed by      04:47

20  products; right?                                04:47

21      A.    That's correct, yes.                   04:47

22      Q.    And you understand that the lawyers for  04:47

23  the Plaintiffs are required to or are attempting  04:47

24  to prove those allegations.                     04:47

25      A.    That's correct, as I understand it.    04:47
```

PLAINTIFFS' EXHIBITS 003782

David M. Bliesner, Ph.D., Volume II    Videotaped - Revised                February 18, 2011

Page 562

```
 1     Q.    Okay.  And you understand, then, that      04:47
 2   the lawyers for the Plaintiffs as part of          04:47
 3   performing their job are going to go out and find   04:47
 4   documents that they believe support their          04:47
 5   position.                                           04:47
 6     A.    I would say that's a fair statement.  It   04:48
 7   would make sense.                                   04:48
 8     Q.    Reasonably self-evident; right?            04:48
 9     A.    Yeah, it makes sense.                       04:48
10     Q.    Okay.  And when you got the documents      04:48
11   from Plaintiffs' counsel in this case, I see two   04:48
12   primary lists of documents that you got.  One is   04:48
13   Plaintiffs' exhibits.                               04:48
14     A.    Uh-huh.                                     04:48
15     Q.    And the other Mylan exhibits.              04:48
16     A.    Uh-huh.                                     04:48
17     Q.    Did it trouble you at all that you were    04:48
18   looking only at the documents that Plaintiffs'     04:48
19   counsel wanted to you see?                          04:48
20     A.    I don't think that's necessarily the way   04:48
21   it was.  In particular I asked at the start of the 04:48
22   project for a list of -- again, go back to my      04:48
23   report.  I was serving as a consultant, and they   04:48
24   asked me to evaluate the status of, you know, the  04:48
25   facility in terms of manufacturing restricted to   04:48
```

PLAINTIFFS' EXHIBITS 003783

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

                                                                    Page 563

1    Digitek, restricted to Amide, Activis, or               04:49

2    whatever, and then they then asked me if there          04:49

3    were documents that I thought would be useful for       04:49

4    my review so I created the list and gave it to          04:49

5    them.                                                   04:49

6        Q.   You did?                                       04:49

7        A.   Yes.                                           04:49

8        Q.   Do we have that list?                          04:49

9        A.   It was given the last go around.  I            04:49

10   handed it out, or it was on the disc, one of the        04:49

11   two.                                                    04:49

12       Q.   Well, the only thing you gave last go          04:49

13   around was Exhibits -- you have them there in           04:49

14   front of you, 107, 108?                                 04:49

15       A.   Uh-huh.  It may be on that hard drive.         04:49

16   It was provided.                                        04:49

17       Q.   Okay.  And when did you prepare that           04:49

18   list that you gave to Plaintiffs?                       04:49

19       A.   Very early on in the process.                  04:49

20       Q.   Did you get the documents that were on         04:49

21   that list?                                              04:49

22       A.   Not all of then, no.                           04:49

23       Q.   Did that trouble you at all?                   04:49

24       A.   Trouble is not a word.  It was a little        04:49

25   frustrating for me.                                     04:50

PLAINTIFFS' EXHIBITS 003784

```
                                                    Page 564
 1      Q.    What didn't you get?                    04:50
 2      A.    I would have to look at the list        04:50
 3   specifically.  I think like we talked about, I got    04:50
 4   late yesterday evening -- was it process          04:50
 5   validation report, you know, those kinds of       04:50
 6   things.  I know there were difficulties with the  04:50
 7   system from my understanding.                     04:50
 8      Q.    Okay.                                    04:50
 9      A.    In getting documents and they're not all 04:50
10   loaded up and that kind of stuff.                 04:50
11      Q.    Okay.                                    04:50
12      A.    So.                                      04:50
13      Q.    Well, so what didn't you get?           04:50
14      A.    I would have to pull up the list.       04:50
15      Q.    But there were things that you asked for 04:50
16   and didn't get.                                   04:50
17      A.    That's correct.                         04:50
18      Q.    You definitely got all of the           04:50
19   Plaintiffs' exhibits, though; right?             04:50
20      A.    I -- I can't say whether I got all the  04:50
21   Plaintiffs' exhibits.                             04:50
22      Q.    Well?                                    04:50
23      A.    If they are all of them, I, then, yes.  04:50
24   But I don't know if that's all of them.  Because  04:50
25   we -- they created as I understand -- excuse me.  04:50
```

PLAINTIFFS' EXHIBITS 003785

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

Page 565

```
 1   They created folders that individuals could look      04:50
 2   at.                                                    04:50
 3       Q.    Individual whos?  I mean.                    04:50
 4       A.    People like myself that were reviewing       04:51
 5   documents.                                             04:51
 6       Q.    Okay.                                        04:51
 7       A.    And those documents that they wished me      04:51
 8   to review were placed in folders on their              04:51
 9   electronic system or they delivered them, sent,        04:51
10   e-mail -- e-mailed them.                               04:51
11       Q.    Okay.                                        04:51
12       A.    Uh-huh.                                      04:51
13       Q.    And did you understand as you conducted      04:51
14   your paper audit that the Plaintiffs' exhibits         04:51
15   were the documents the Plaintiffs' lawyers             04:51
16   believed helped them?                                  04:51
17       A.    Actually I didn't give it any                04:51
18   consideration.  I was just doing an audit.             04:51
19       Q.    Never occurred to you?                       04:51
20       A.    Actually, it did not.                        04:51
21       Q.    Well, you weren't necessarily doing an       04:51
22   audit.  You were looking at the documents they         04:51
23   selected to give you.                                  04:51
24       A.    I don't think that's a -- that's fair        04:51
25   statement.                                             04:51
```

PLAINTIFFS' EXHIBITS 003786

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                    February 18, 2011

|  |  | Page 566 |
|---|---|---|
| 1 | Q.    Is it not fair wholly or is it not fair | 04:51 |
| 2 | just partially.  I mean you got all the documents | 04:51 |
| 3 | they wanted you to have but did not get the | 04:51 |
| 4 | documents, all of the documents you asked for. | 04:51 |
| 5 | A.    That's a true statement. | 04:51 |
| 6 | Q.    Okay. | 04:51 |
| 7 | A.    And why that happened, I'm not sure. | 04:52 |
| 8 | Other than it was -- | 04:52 |
| 9 | Q.    Got a guess? | 04:52 |
| 10 | A.    No.  Remember rule number one, don't | 04:52 |
| 11 | guess. | 04:52 |
| 12 | Q.    I understand.  I understand. | 04:52 |
| 13 | A.    And that's what so much of this has been | 04:52 |
| 14 | today is that I'm trying to make sure that I'm not | 04:52 |
| 15 | guessing. | 04:52 |
| 16 | Q.    I don't want you to guess. | 04:52 |
| 17 | A.    Yes. | 04:52 |
| 18 | Q.    But you're a sharp guy.  I'm sure you | 04:52 |
| 19 | can figure out why it is that you got what they | 04:52 |
| 20 | wanted you to have but didn't get everything you | 04:52 |
| 21 | asked for. | 04:52 |
| 22 | A.    I wouldn't comment on that. | 04:52 |
| 23 | Q.    Does it trouble you at all Dr. Bliesner | 04:52 |
| 24 | that nobody has produced a single double-thick | 04:53 |
| 25 | tablet from the market from the recalled batches? | 04:53 |

PLAINTIFFS' EXHIBITS 003787

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                    February 18, 2011

                                                                 Page 567

1      A.     Trouble?                                              04:53

2      Q.     You're a GMP compliance expert.  You've              04:53

3   conducted $140,000's worth of analysis here,                   04:54

4   reaching the conclusion that you think adulterated             04:54

5   product reached the market, yet no one has                     04:54

6   produced a double-thick tablet from the recalled               04:54

7   batches in almost three years since the recall.                04:54

8      A.     They have not.  That's a fact.                       04:54

9      Q.     That's a fact?                                        04:54

10     A.     Okay.  I take you at your word.                       04:54

11     Q.     That's a fact.  Does that trouble you?                04:54

12     A.     Trouble is not a word that I would use;               04:54

13   okay?                                                          04:54

14     Q.     Does it have any impact on the way you                04:54

15   think about your engagement or about on the                   04:54

16   conclusions that you you've reached?                          04:54

17     A.     No, not necessarily.  Even though again              04:54

18   we've established I'm not a recall expert.                     04:54

19   Recalls are not a science -- let's put it that                04:54

20   way -- and we've already established that there                04:54

21   are a large number.                                            04:55

22     Q.     680 million.                                          04:55

23     A.     Billion I think is what Mr. Moriarty                  04:55

24   said last go around.                                           04:55

25     Q.     Subject to the recall, 680 million.  In             04:55

PLAINTIFFS' EXHIBITS 003788

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

Page 568

| | | |
|---|---|---|
| 1 | fact Plaintiff told you that in your meeting | 04:55 |
| 2 | before your deposition. | 04:55 |
| 3 | A.    Yes, sir.  That -- | 04:55 |
| 4 | Q.    And -- | 04:55 |
| 5 | A.    -- a small number of a large number is | 04:55 |
| 6 | still substantial in my mind. | 04:55 |
| 7 | Q.    Zero is not substantial, is it? | 04:55 |
| 8 | A.    Just because you haven't seen anything | 04:55 |
| 9 | doesn't mean it's not there, especially when you | 04:55 |
| 10 | look at the lack of controls within that facility. | 04:55 |
| 11 | Q.    You're relying on inferences again; | 04:55 |
| 12 | right? | 04:55 |
| 13 | A.    I don't think it's inferences. | 04:55 |
| 14 | Q.    You don't have any direct proof so it | 04:55 |
| 15 | must be an inference; right? | 04:55 |
| 16 | A.    I don't think an inference.  It's a mass | 04:55 |
| 17 | of data.  I think that the thing that troubles me | 04:55 |
| 18 | more than anything -- I'm sorry.  I'm done. | 04:56 |
| 19 | Q.    It's a mass of data that create an | 04:56 |
| 20 | inference. | 04:56 |
| 21 | MR. KERENSKY:  There you go again, Mike. | 04:56 |
| 22 | MR. ANDERTON:  Mike, he stopped his | 04:56 |
| 23 | answer and said I'm done. | 04:56 |
| 24 | MR. KERENSKY:  He took a breath. | 04:56 |
| 25 | MR. ANDERTON:  He said -- | 04:56 |

PLAINTIFFS' EXHIBITS 003789

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

```
                                                    Page 569
 1          MR. KERENSKY:  And you jumped on him.        04:56
 2      Let him finish.                                  04:56
 3          MR. ANDERTON:  Mike, he said I'm done.       04:56
 4          MR KERENSKY:  Read it back.  If you are      04:56
 5      right, I'll take it back.                        04:56
 6              (Whereupon, the testimony was read       04:56
 7   back by the court reporter, as recorded above)      04:56
 8      Q.   Are you done, Dr. Bliesner?                 04:56
 9      A.   On which point here?                        04:56
10      Q.   Exactly.                                    04:56
11          MR. KERENSKY:  Let's read back what he       04:56
12      was saying when you jumped on his sentence       04:56
13      there.                                           04:56
14          MR. ANDERTON:  And I think the record        04:56
15      clearly showed earlier that he interrupted       04:56
16      me.  I let that go.  Go ahead, Phil.             04:56
17          MR. KERENSKY:  I think his last word was     04:57
18      "and."                                           04:57
19          MR. ANDERTON:  No, it wasn't.                04:57
20          MR. KERENSKY:  What was the last word        04:57
21      before you said no, no.  I couldn't quite hear   04:57
22      Phil.  He was fairly far away.                   04:57
23          MR. ANDERTON:  The thing that tells me       04:57
24      more than anything.                              04:57
25          MR. KERENSKY:  You don't end a sentence      04:57
```

PLAINTIFFS' EXHIBITS 003790

Page 570

| | | |
|---|---|---|
| 1 | in anything. | 04:57 |
| 2 | MR. ANDERTON:  Mike, the problem is, he | 04:57 |
| 3 | answered my question.  He recognized -- | 04:57 |
| 4 | MR. KERENSKY:  There's just disagreement. | 04:57 |
| 5 | MR. ANDERTON:  He recognized -- Mike, he | 04:57 |
| 6 | recognized and stopped himself when he was | 04:57 |
| 7 | answering a question that hadn't been asked. | 04:57 |
| 8 | He did it. | 04:57 |
| 9 | MR. KERENSKY:  Well, I don't how he could | 04:57 |
| 10 | be doing both, Mike.  He was still talking and | 04:57 |
| 11 | you interrupted him.  That's all there is to | 04:57 |
| 12 | it. | 04:57 |
| 13 | MR. ANDERTON:  I didn't interrupt him, | 04:57 |
| 14 | Mike.  Now, I really don't appreciate this -- | 04:57 |
| 15 | I mean you are telling him what to do, Mike. | 04:57 |
| 16 | It's inappropriate. | 04:57 |
| 17 | MR. KERENSKY:  I'm telling you what to | 04:57 |
| 18 | do.  Don't interrupt him. | 04:58 |
| 19 | MR. ANDERTON:  Dr. Bliesner, are you | 04:58 |
| 20 | done? | 04:58 |
| 21 | MR. KERENSKY:  Read that whole answer | 04:58 |
| 22 | back before Mike started talking again and | 04:58 |
| 23 | then ask him that question and we'll move on. | 04:58 |
| 24 | MR. ANDERTON:  I asked him the question. | 04:58 |
| 25 | He stopped himself, Mike.  You're not here. | 04:58 |

PLAINTIFFS' EXHIBITS 003791

Page 571

```
 1      He put his hands up and said "I'm sorry."  And      04:58

 2      he stopped and said --                              04:58

 3          MR. KERENSKY:  And you started to               04:58

 4      interrupt him.                                      04:58

 5          MR. ANDERTON:  Not true.  Dr. Bliesner,         04:58

 6      do you have anything to add to that answer?         04:58

 7          MR. KERENSKY:  If you need to hear it           04:58

 8      read back to you, Dr. Bliesner, you may ask         04:58

 9      for that.                                           04:58

10          THE WITNESS:  Read it back one more time,       04:58

11      please.                                             04:58

12          (Whereupon, the testimony was read back         04:59

13   by the court reporter, as recorded above)              04:59

14          THE WITNESS:  Was the fact that nobody          04:59

15      ever tested double-thick tablets they found in     04:59

16      the facility.  That's what I find troubling.        04:59

17   BY MR. ANDERTON:                                       04:59

18      Q.   Okay.  But is that more --                     04:59

19          MR. KERENSKY:  Make your objection, Mike.       04:59

20   BY MR. ANDERTON:                                       04:59

21      Q.   Is that more troubling to you,                 04:59

22   Dr. Bliesner, than the fact that out of 680            04:59

23   million tablets, in three years nobody has             04:59

24   presented a single double-thick tablet?                04:59

25      A.   Absolutely because not testing on a            04:59
```

PLAINTIFFS' EXHIBITS 003792

```
                                                  Page 572
 1    product that's clearly failed and identified had      04:59
 2    failed is -- it really raises eyebrows.  All kinds    04:59
 3    of questions come up.  Why didn't they?  Is           04:59
 4    somebody hiding something?  Have found things         04:59
 5    before?  Are they dumping it?  These are just         04:59
 6    questions that come to mind.  I'm not suggesting      04:59
 7    --                                                    04:59
 8        Q.    All of --                                   04:59
 9        A.    -- all of these things.  Just a whole       04:59
10    plethora of questions come into play when you         04:59
11    don't see -- it's happened several times as we        04:59
12    both recognize.                                       05:00
13        Q.    And the way to answer those questions       05:00
14    would be to take them and dive into the               05:00
15    manufacturing and production records for that         05:00
16    product.                                              05:00
17        A.    No, that's not true.                        05:00
18        Q.    Or for any other product.                   05:00
19        A.    That's not true.  They didn't collect       05:00
20    the samples and test them.                            05:00
21        Q.    The way --                                  05:00
22        A.    In my experience -- in my experience        05:00
23    with respect to batch records, okay, personal         05:00
24    experience, recent personal experience, batch         05:00
25    records don't necessarily reflect reality.  I've      05:00
```

PLAINTIFFS' EXHIBITS 003793

David M. Bliesner, Ph.D., Volume II     Videotaped - Revised                February 18, 2011

Page 573

1   had a client in the last year that manufactures         05:00
2   product and doesn't even look at the batch record       05:00
3   because it isn't written where you can follow it.       05:00
4   They just go out there and wing it on the floor.        05:00
5   So just because you got a batch record doesn't          05:00
6   mean that that's gospel what's happening on the         05:00
7   floor.  That's my personal experience.                  05:00
8        Q.    Did you throw your medicine from that        05:00
9   manufacturer away?  They're not following their         05:00
10  batch records.  Did you go run up to your medicine      05:00
11  cabinet and throw that away?                            05:00
12       A.    It's not appropriate.                        05:00
13       Q.    What do you mean it's not appropriate?       05:01
14       A.    Because it's not a solid oral dosage for     05:01
15  me.                                                     05:01
16       Q.    Dr. Bliesner, last time you talked           05:01
17  about, you gave some testimony about conversation       05:01
18  you had with your doctor regarding this subject,        05:01
19  the subject of this litigation.  And I wasn't           05:01
20  satisfied that we established whether the               05:01
21  conversation was in fact protected by a                 05:01
22  physician-patient privilege.  So I am going to ask      05:01
23  some questions to develop the details surrounding       05:01
24  that conversation that will tell us that.               05:01
25       A.    And I'm not going to answer those            05:01

PLAINTIFFS' EXHIBITS 003794

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                              Page 574
 1    questions.                                               05:01
 2        Q.    You don't have right to refuse to answer       05:01
 3    that unless you -- unless it is truly privileged.        05:01
 4    Do you understand that?                                  05:01
 5        A.    I believe it's truly privileged between        05:01
 6    my doctor.  Because I specifically asked that            05:01
 7    because he asked me.                                     05:01
 8        Q.    Were you seeking medical advice when you       05:01
 9    asked him these questions?                               05:01
10        A.    I was in for an appointment yes.               05:01
11        Q.    Were you seeking medical advice when you       05:01
12    asked him questions about Digoxin?                       05:01
13        A.    When I asked him questions about it?  I        05:02
14    didn't ask him questions.  He volunteered.               05:02
15        Q.    How did he come to volunteer?                  05:02
16        A.    I'm not comfortable talking about this.        05:02
17        Q.    I'm not asking for the substance              05:02
18        A.    I'm not comfortable talking about it.          05:02
19        Q.    You don't have a choice.                       05:02
20            MR. KERENSKY.  Mike, maybe I can settle          05:02
21        this.  No one is going to ask this witness to        05:02
22        tell any jury what his doctor said about             05:02
23        Digitek.  I will stipulate to that right now.        05:02
24            MR. ANDERTON:  Well, we're going to ask          05:02
25        this witness what his doctor told him so we          05:02

PLAINTIFFS' EXHIBITS 003795

David M. Bliesner, Ph.D., Volume II      Videotaped - Revised                February 18, 2011

                                                                Page 575
1        know whether it formed part of the basis for          05:02
2        his expert opinion in this case.                      05:02
3            THE WITNESS:  It was after the fact.  I           05:02
4        will tell you that.                                   05:02
5    BY MR. ANDERTON:                                          05:02
6        Q.   You are still subject to testifying,            05:02
7    Dr. Bliesner.                                             05:02
8            MR. KERENSKY:  You have a right to               05:02
9        protect your conversations between you and            05:02
10       your doctor.  And you've got two                      05:02
11       countervailing opinions from two lawyers,             05:02
12       neither of which represent you.  You got to           05:02
13       make the call, doctor.                                05:02
14   BY MR. ANDERTON:                                          05:03
15       Q.   Dr. Bliesner, you know what you're doing        05:03
16   here.  You're setting yourself up to be brought           05:03
17   back for another session of deposition.                   05:03
18       A.   So be it.  I am not comfortable sharing         05:03
19   that information with you.                                05:03
20       Q.   I'm allowed to ask the parameters of the        05:03
21   conversation.  I'm not asking for the substance.          05:03
22   I'm allowed to ask the details of the                     05:03
23   conversations that surround the conversation so           05:03
24   that I can evaluate whether I think it's a                05:03
25   privileged communication or not.                          05:03

PLAINTIFFS' EXHIBITS 003796