# EXHIBIT 509

PLAINTIFFS' EXHIBITS 003864

Page 1

```
 1          UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2          CHARLESTON DIVISION
            MDL No. 1968
 3

 4

 5
    IN RE:                        VIDEOTAPED
 6  DIGITEK PRODUCT               DEPOSITION OF:
    LIABILITY LITIGATION          MARK G. KENNY
 7                                VOLUME I
    - - - - - - - - - - - -
 8

 9

10            TRANSCRIPT of the stenographic notes of

11  the proceedings in the above-entitled matter, as

12  taken by and before CAROL ANN SHEPARD, a Certified

13  Court Reporter of the State of New Jersey, held at

14  the MARRIOTT NEWARK AIRPORT HOTEL, 1 Hotel Road,

15  Newark, New Jersey, on Tuesday, June 29, 2010,

16  commencing at 8:30 in the forenoon.

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 003865

Mark G. Kenny, Volume I                                                                June 29, 2010

---

**Page 2**

```
 1  A P P E A R A N C E S:
 2  MOTLEY RICE
    28 Bridgeside Boulevard
 3  Mount Pleasant, South Carolina 29464
    843-216-9000
 4  BY: MEGHAN JOHNSON CARTER, ESQ.
    mjohnson@motleyrice.com
 5  Attorneys for the Plaintiffs
 6  THE MILLER FIRM, LLC
    108 Railroad Avenue
 7  Orange, Virginia 22960
    540-672-4224
 8  BY: PETER A. MILLER, ESQ.
    pmiller@doctoratlaw.com
 9  Attorneys for the Plaintiffs
10  TUCKER, ELLIS & WEST, LLP
    1150 Huntington Building
11  925 Euclid Avenue
    Cleveland, Ohio 44115-1414
12  216-696-2276
    BY: MATTHEW P. MORIARTY, ESQ.
13   MICHAEL ANDERTON, ESQ.
    matthew.moriarty@tuckerellis.com
14  Attorneys for Defendant Actavis
15  SHOOK, HARDY & BACON
    2555 Grand Boulevard
16  Kansas City, Missouri 64108
    816-474-6550
17  BY: HARVEY L. KAPLAN, ESQ.
    hkaplan@shb.com
18  Attorneys for Defendant Mylan
19
    ALSO PRESENT:
20
    Adam DiCola, Videographer
21
22
23
24
25
```

**Page 4**

```
 1  Exhibit 33, FDA Summary Report for Sample    98
    Number 178890
 2
    Exhibit 34, FDA Summary Report for Sample    99
 3  Number 178891,
 4  Exhibit 35, Celsis Report           104
 5  Exhibit 69, UDL Laboratories Receiving     107
    Form
 6
    Exhibit 4, Letter dated June 8, 1995 to    118
 7  Shah from Department of Health & Human
    Services
 8
    Exhibit 5, Letter dated July 20, 1995 to    118
 9  Shah from Department of Health & Human
    Services,
10
    Exhibit 36, Recall -- Firm Press Release,    120
11
    Exhibit 38, FDA Website Statement July     124
12  2009,
13  Exhibit 22, Letter dated 1/9/07        149
14  Exhibit 37, Recall Package 2009       158
15  Exhibit 21, Amide Investigation Final     203
    Report
16
    Exhibit 20, Summary of Findings       204
17
    Exhibit 47, Expert Opinion of Mr. Kenny    280
18  and CV
19
20
21
22
23
24
25
```

**Page 3**

```
 1           INDEX
 2  WITNESS                 PAGE
 3
    MARK G. KENNY
 4
    BY MR. MORIARTY          5
 5
 6
 7       E X H I B I T S
 8  NUMBER    DESCRIPTION      PAGE
 9  Exhibit 63, Chapter 4, Advisory Actions   25
10  Exhibit 64, Chapter 10, Other Procedures,  25
11  Exhibit 39, FDA Printout         47
12  Exhibit 23, Letter dated 12/24/07 from    62
    Scott Talbot
13
    Exhibit 24, FDA Collection Report for    69
14  Sample Number 377410
15  Exhibit 25, FDA Summary Report for Sample  84
    Number 448881
16
    Exhibit 26, FDA Summary Report 448892,    87
17
    Exhibit 27, FDA Collection Report for    89
18  Sample 453913,
19  Exhibit 28, FDA Summary Report for Sample  91
    Numbers 454866,
20
    Exhibit 29, FDA Collection Report for    94
21  Sample Number 452746,
22  Exhibit 30, FDA Summary Report for Sample  96
    Sample Number 462753,
23
    Exhibit 31, FDA Summary Report for Sample  97
24  Number,
25  Exhibit 32, FDA Summary Report for Sample  98
```

**Page 5**

```
 1          THE VIDEOGRAPHER:  Good morning.  We
 2  are on the record at 8:41 A.M., June 29, 2010.  This
 3  is the videotaped deposition of Mr. Mark G. Kenny in
 4  the matter of In Re:  Digitek Product Liability
 5  Litigation, in the United States District Court for
 6  the Southern District of New York, MLP Case No.
 7  2:09-CV-121.
 8          This deposition is being held at the
 9  Marriott at Newark Airport Hotel, located at 1 Hotel
10  Road in Newark, New Jersey.
11          I am the videographer.  My name is Adam
12  DiCola of Rennillo Reporting.  Our court reporter is
13  Carol Ann Shepard, also with Rennillo Court
14  Reporting.
15          Will counsel please state their
16  appearances for the record.
17          MS. CARTER:  Meghan Carter, Motley
18  Rice, for the Plaintiffs.
19          MR. MILLER:  Peter Miller from The
20  Miller Firm for Plaintiffs.
21          MR. MORIARTY:  Matt Moriarty from
22  Tucker Ellis for the Actavis Defendants.
23          MR. ANDERTON:  Michael Anderton from
24  Tucker, Ellis & West, also for the Actavis
25  Defendants.
```

2 (Pages 2 to 5)

PLAINTIFFS' EXHIBITS 003866

Mark G. Kenny, Volume I                                                                                  June 29, 2010

Page 6

1          MR. KAPLAN:  Harvey Kaplan, Shook,
2  Hardy & Bacon for Mylan.
3          MR. MORIARTY:  Just so the record is
4  clear, this is the Southern District of West
5  Virginia that this litigation is in, not New York.
6          Ready?
7  M A R K  G.  K E N N Y, 2 SpyGlass Court,
8  Annandale, New Jersey, having been duly sworn,
9  testifies as follows:
10 EXAMINATION BY MR. MORIARTY:
11     Q.    Tell us your full name, please.
12     A.    My name is Mark George Kenny.
13     Q.    All right.  And, Mr. Kenny, have you
14 ever had your deposition taken before?
15     A.    Never.
16     Q.    First time.  Okay.
17           I'm sure that either Mr. Miller or
18 Ms. Carter has told you that I'm going to ask you a
19 lot of questions today.
20           Okay?
21           They've done that, I assume?
22     A.    Correct.
23     Q.    And you know we probably will be here
24 all day.  Is that right?  And even then we may not
25 finish.

Page 7

1           Do you know that?
2     A.    Correct.
3     Q.    If you don't know the answer to my
4  question, please tell me that you don't know.
5           All right?
6     A.    Yes, sir.
7     Q.    If you don't understand my question,
8  please tell me that you don't understand me.
9           Okay?
10    A.    Sure.
11    Q.    If you need to look at a document,
12 including your report, your resume or anything else,
13 in order to answer my question, please do that.
14           Okay?
15    A.    Yes, sir.
16    Q.    I don't want you to guess.
17           You're going to have to keep your voice
18 up loud because the court reporter has to hear you.
19           All right?
20    A.    Okay.
21    Q.    And if you say uh-huh or uh-uh, I will
22 say is that a yes or is that a no --
23    A.    Right.
24    Q.    -- because she needs to understand
25 these things in plain English.

Page 8

1           Okay?
2     A.    Surely.
3     Q.    Now, at some point, we will mark your
4  resume as Exhibit 47.  But that was made Appendix A
5  to your report in this case.
6           Is --
7     A.    Correct.
8     Q.    -- that right?
9           And I notice that you live on SpyGlass
10 Court.
11           Is that right?
12    A.    That is correct.
13    Q.    And the name of your consulting company
14 is the SpyGlass Group.
15           Is that right?
16    A.    That is correct.
17    Q.    How many employees does SpyGlass Group
18 have?
19    A.    We have no employees.
20    Q.    You are not even employed by SpyGlass?
21    A.    Well, I'm an employee under a sub --
22 Subchapter S, yes, and so is my wife.
23    Q.    And you are the only employees?
24    A.    That is it.
25    Q.    Do you have any agreements with other

Page 9

1  people who are independent contractors and do
2  consulting work for you?
3     A.    We have agreements when there is a
4  project.
5     Q.    All right.  So on the -- on the Digitek
6  project, how many people reviewed documents and
7  worked to help you prepare this report?
8     A.    There were two additional people, one
9  Dr. Sal Romano, and my wife, who proofed it.
10          MR. KAPLAN:  Dr. who?
11          THE WITNESS:  My wife.
12          MR. KAPLAN:  No, no.  Dr. --
13          THE WITNESS:  Dr. Sal Romano.
14    Q.    What's your wife's name?
15    A.    Denise.
16    Q.    Denise Kenny?
17    A.    That's correct.
18    Q.    Did she do any technical input?
19    A.    None whatsoever.
20    Q.    And who is Sal Romano?
21    A.    Sal Romano is also a consultant.  He is
22 a core member of our consulting group and a former
23 quality assurance professional -- when I say former,
24 I mean working full time for a large company,
25 Johnson & Johnson -- who has done consulting for

3 (Pages 6 to 9)

Page 10

1 over 10 years.
2     Q.    All right.  So I assume that when
3 SpyGlass -- when you or SpyGlass Group are asked to
4 do, say, a consulting project for a pharmaceutical
5 company --
6     A.    Correct.
7     Q.    -- if you can't staff that by yourself,
8 you reach out to people with whom you have previous
9 relationships and bring them in as consultants on
10 that project.
11         Is that right?
12    A.    That's correct.
13    Q.    Okay.  How old are you?
14    A.    I'm 61 years old.
15    Q.    Appendix B to your report, which we
16 will also have as an exhibit, is -- is referred to
17 as "References."
18         Is that correct?
19    A.    That is correct.
20    Q.    And on here are 60 listings.
21         Is that right?
22    A.    That is correct.
23    Q.    Have you reviewed anything else besides
24 these 60 listings since you drafted the report?
25    A.    Since I drafted the report, yes.

Page 11

1     Q.    All right.  Can you tell me what else
2 you reviewed since drafting this?
3     A.    I looked at some Mylan depositions.
4         There was nothing I felt substantive.
5     Q.    Whose depositions?
6     A.    I don't recall the name.
7     Q.    Well, there was a -- Chuck Koon was
8 deposed.
9         Did you look at his deposition?
10    A.    I briefly went through it.
11    Q.    Did you look at Lianna Radtke's
12 deposition?
13    A.    No, I did not.
14    Q.    I think there was a -- Susie Wolf was
15 deposed.
16         Did you look at her deposition?
17    A.    I did not.
18    Q.    Anything else that you can recall
19 reviewing since you drafted your report?
20    A.    No.
21    Q.    Did you leave J&J in 2004?
22    A.    Yes, I did.
23    Q.    Why?
24    A.    I was offered, as was everybody in the
25 United States, an early retirement package.  I had

Page 12

1 the option of leaving or I had the option of
2 staying.
3     Q.    And you took the option of the early
4 retirement package?
5     A.    Yes.  Indeed.  That's correct.
6     Q.    All right.  Did you meet with and talk
7 with Mr. Miller either last night or this morning --
8     A.    No.
9     Q.    -- to talk about any last-minute
10 developments before your deposition?
11    A.    Nothing.
12    Q.    Have you heard anything from anyone
13 amongst the plaintiffs' lawyers about what happened
14 during Mr. Farley's deposition yesterday?
15    A.    No.  Nothing.
16    Q.    So what -- give me a general idea of
17 what consulting projects you work on now under this
18 banner of the SpyGlass Group.
19    A.    Okay.  I would say half of the projects
20 that I work on are auditing, auditing of medical
21 device, drug companies.  And that would be for GMP
22 purposes, also for ISO Regulation 1345:2003.
23         The other projects are really
24 assistance in risk determinations, establishment of
25 quality systems, establishment of quality plans,

Page 13

1 establishment of master validation plans, reasonably
2 high-level documents that would be submitted to the
3 management board or management level of a company.
4     Q.    Do you ever help companies remediate
5 483s or warning letters?
6     A.    As a consultant?
7     Q.    Yes.
8     A.    No.
9     Q.    How much of your consulting work is
10 spent on solid oral dose?
11    A.    You mean over the six-year period?
12    Q.    Yes.
13    A.    I would say within the last two years,
14 30 percent.
15    Q.    And how much of it is device work?
16    A.    It would be over half.  60 percent.
17    Q.    In the six years of SpyGlass Group
18 consulting, have you done any 483 or warning letter
19 remediation work?
20    A.    I would have to answer that yes.
21    Q.    When you worked for J&J in your various
22 capacities over the years, were part of your duties
23 to look at 483s and warning letters --
24    A.    Of course.
25    Q.    -- and help the company remediate them?

4 (Pages 10 to 13)

PLAINTIFFS' EXHIBITS 003868

Mark G. Kenny, Volume I                                                                                    June 29, 2010

Page 14

1    A.    Yes.
2    Q.    In the process of doing that, as an
3  example, if you got a 483 that had to do with a
4  manufacturing issue, would it be part of your job to
5  look at batch records?
6    A.    It could be, but probably would not be.
7    Q.    Why?
8    A.    Because I would not get involved at
9  that level.  I would get involved more at a
10 strategic level, determining whether the action
11 plans are comprehensive, rather than going through
12 the detail of reading batch records that normally
13 would be done by somebody else.
14   Q.    But as part of the project --
15   A.    Yeah.  You're talking -- are you
16 referring to a 483 project, or are you referring to
17 in general a project?
18   Q.    A 483 or warning letter remediation.
19   A.    No.  I -- I take that back.  Yes, I
20 would.
21   Q.    You would personally look at them or --
22   A.    Yes.
23   Q.    -- you would supervise somebody?
24   A.    No.  I would do it myself.
25   Q.    All right.

Page 15

1    A.    But would not -- I would not -- that is
2  not a major portion of what I do.
3    Q.    But --
4    A.    For -- for 483 remediations.
5    Q.    Sure.
6    A.    I do a high -- an extraordinary number
7  of batch reviews, capital reviews and the like as
8  part of my consulting practice over the last six
9  years.
10   Q.    So, for example, if somebody is looking
11 for a way to improve a manufacturing process, for
12 example, looking at batch records regarding that
13 process is something you would do?
14   A.    That's correct.
15   Q.    And if there was some question about
16 whether a process was validated or robust or staying
17 in validated control, looking at the batch records
18 over time would be one of the things that would be
19 important to do?
20   A.    That's correct.
21         And they would rely on me to be able to
22 make that determination.
23   Q.    All right.  In your years at J&J or as
24 a consultant, have you ever been involved in the
25 manufacture, QA or QC of a Digoxin product?

Page 16

1    A.    Never.
2    Q.    Now, over the years, in your work, have
3  you come to appreciate the difference between
4  possibility and probability?
5    A.    I would think I do.
6    Q.    All right.  So probability, for
7  example, is generally defined as more likely than
8  not.
9          Would you agree with that?
10   A.    I would say that's reasonably fair.
11   Q.    And possibility is more in the realm of
12 speculation.
13         Is --
14   A.    Correct.
15   Q.    -- that true?
16         So that can -- can happen, might
17 happen, that's possibility and speculation; right?
18   A.    I would have to think about the terms,
19 but that -- that, perhaps, is a way of explaining
20 it.  I would not use those terms precisely.
21         I would determine risk levels.
22   Q.    Now, your report in this case, we're
23 going to ultimately mark as Exhibit 48, but I would
24 like you to take a look at page 23 of that.
25   A.    Yes, sir.

Page 17

1    Q.    Do you have that in front of you?
2    A.    Yes, I do.
3    Q.    And on this page, there is a section
4  called "Quality and Quality Systems SpyGlass Group
5  Summary."
6          Do you see that?
7    A.    Yes, I do.
8    Q.    And essentially, after the first 22
9  pages of your analysis, this is the one-sentence
10 essence of your opinion.
11         Is that right?
12   A.    I suppose you could put it that way.
13   Q.    Okay.  And it says that:  "It is my
14 opinion, to a reasonable degree of certainty, that
15 Actavis failed to establish reliable and GMP
16 compliance systems and procedures, resulting in the
17 release of adulterated product from at least the
18 period of 2004 to 2008."
19   A.    Correct.
20   Q.    Right?  Okay.
21         And among the things that you relied on
22 in this Appendix B are a number of FDA documents,
23 like 483s and warning letters; correct?
24   A.    That is correct.
25   Q.    And what are known as EIRs or

PLAINTIFFS' EXHIBITS 003869

Mark G. Kenny, Volume I                                                                                    June 29, 2010

Page 18

1  establishment inspection reports?
2      A.    That is correct.
3      Q.    I don't see anywhere on Exhibit B
4  references to batch numbers, other than
5  Batch 70924 A.
6          Did you review any other batch records?
7      A.    Yes, I did.  Perhaps two more.
8      Q.    Which ones?
9      A.    I don't recall the batch numbers.
10     Q.    All right.  Do you -- do you know how
11  many recalled batches there were in the Digitek
12  recall of April of 2008?
13     A.    No, I don't.
14     Q.    There were 151 or 152 of them.
15         Is what you're telling me now that you
16  may have reviewed as many as just three of those?
17     A.    Batch records, yes.  That's all I -- I
18  had available to me.
19     Q.    Do you know when batches were
20  manufactured, when batches were first manufactured
21  that were part of the recall?
22     A.    I would assume, and I think it's a safe
23  bet, that the batches would have been manufactured
24  within the expiration date that it was in the field.
25         In other words, all batches would have

Page 19

1  been recalled that were still within the expiry
2  date.
3      Q.    Do you know how long Digitek's
4  expiration date is?
5      A.    For what product?
6      Q.    Digitek.
7      A.    Oh, for Digitek?  No, I don't.
8      Q.    Did you review any method operating
9  instructions --
10     A.    Yes.
11     Q.    -- from Actavis?
12     A.    Yes, I did.
13     Q.    How many of them?
14     A.    Probably a dozen plus.
15     Q.    Are they listed in Exhibit B?
16     A.    No.
17     Q.    Appendix B?
18     A.    No.  I had no reference to them.
19     Q.    What do you mean you had no reference
20  to them?
21     A.    In other words, I had no observation to
22  those particular documents.
23     Q.    What does that mean?
24     A.    Could you restate your question?
25     Q.    What do you mean "observation"?

Page 20

1          Are you talking about in the regulatory
2  sense of observation being --
3      A.    Could you repeat the first question,
4  please?
5      Q.    I'm going to ask you a new question.
6          MR. MILLER:  Well, I think he wants to
7  make sure he understands the line of questioning.
8          You asked him the first question.  If
9  you reask the first question, then perhaps he can
10  phrase it.
11         Right -- right now, he's confused about
12  what the line of questioning is.
13     Q.    Well, there are no MOIs listed in
14  Appendix B.  You said it's because you had no
15  observations about it.
16     A.    I read certain documents.  And I had no
17  comment on those.
18     Q.    Okay.  So, for example, if MOI 145 has
19  to do with QC testing of Digitek, you didn't find
20  anything deficient, for lack of a better term, in
21  MOI 145.
22         MR. MILLER:  Object.  I'll object.  If
23  you'd let -- allow me, I'll object; and when I'm
24  done, then you can finish.
25         I'm sorry.  Excuse me.  But objection.

Page 21

1  Misstates previous testimony.
2          It's okay to answer.
3      A.    Okay.  If your question -- if you're
4  asking me did I look at documents and see
5  deficiencies in the documents, the answer to that
6  would be yes, I did see deficiencies in documents
7  that do not appear in here.
8      Q.    That's not what I'm asking you.
9          Did you review MOI 145?
10     A.    I don't recall.
11     Q.    Well, if you found a deficiency in a
12  method operating instruction regarding a key
13  manufacturing or testing process for Digitek, is it
14  likely that you would have put it in your report?
15     A.    If I -- if it -- it was significant and
16  if I saw it, I may have put it in the report, if I
17  felt it was important.
18     Q.    Did you understand -- well, first of
19  all, have you ever done litigation consulting before
20  this case?
21     A.    No, I have not.
22     Q.    Did either Mr. Miller or anybody from
23  Motley Rice let you know that the purpose of this
24  report was to put us on notice of what your opinions
25  were?

6 (Pages 18 to 21)

PLAINTIFFS' EXHIBITS 003870

Mark G. Kenny, Volume I                                                              June 29, 2010

Page 22

1    A.    Yes.
2    Q.    And what documents you relied on to
3  reach those opinions?
4    A.    Right.  And I provided those documents
5  in the box.
6    Q.    I understand that.
7          And you also listed 60 items that you
8  reviewed.
9    A.    Correct.
10   Q.    So let me get back and make sure I
11 understand this.
12         MOI 145 has to do with QC testing for
13 Digitek.  I want you to assume that.
14   A.    Okay.
15   Q.    If you found that the QC testing
16 process for Digitek was deficient in some way,
17 technically or by some GMP standard, and you
18 reviewed the document, is it likely you would have
19 commented on it in your expert's report?
20   A.    Okay.  I think it's important to
21 understand that I am not an analytical chemist.
22         My experience is -- education
23 experience is as an engineer, both mechanical
24 engineer and a biomedical engineer in graduate
25 school.

Page 23

1          When I review laboratory records, I
2  look at them from a compliance standpoint, not a
3  technical standpoint.
4          So I would review them, making sure
5  that there would be certain content in there in
6  terms of whether they appeared complete.
7          I would also be looking at -- if it was
8  a test method, which I think you are referring to, I
9  would ask whether there was a method validation
10 study in order to ascertain whether the test method
11 is valid.
12         That is the question that I would ask.
13 And that would, to me, be among the most important
14 questions.
15   Q.    Okay.  So if the technical aspects of
16 MOI 145 for the lab testing of Digitek, would you
17 feel more comfortable deferring to a quality control
18 chemist for opinions on whether that MOI was
19 consistent with the United States Pharmacopeia?
20   A.    I would ask the research person that,
21 not the quality control person.
22         The research person is the person who
23 understands the regulations, is responsible for
24 developing the procedure.
25         The quality control person is not

Page 24

1  responsible for the technical content of that
2  document.  The quality control person is responsible
3  for executing that document, is responsible for
4  being part of the method transfer, is not even part
5  of the method validation study.
6          That person is an expert in performing
7  reproducible studies and getting accurate results.
8    Q.    But certainly the quality control
9  chemist is the person who actually has to be
10 performing the study --
11   A.    That's correct.
12   Q.    -- to get the results that are
13 documented in batch records; right?
14   A.    That's correct.  The basis of the
15 numbers that are in specification.  They would not
16 necessarily understand why those numbers were
17 selected.
18   Q.    Okay.  These 483s that we have been
19 talking about are regulatory documents sent to a
20 company by the FDA; correct?
21   A.    That is correct.
22   Q.    And a warning letter is also a
23 regulatory document sent to a company by the FDA?
24   A.    That's correct.
25   Q.    I'm handing you what's been marked as

Page 25

1  Exhibit 63.
2          (Exhibit 63, Chapter 4, Advisory
3  Actions, was marked for identification.)
4    Q.    This is Exhibit 64.
5          (Exhibit 64, Chapter 10, Other
6  Procedures, was marked for identification.)
7    Q.    Have you ever seen these documents
8  before?
9    A.    I have not.
10   Q.    These are from the Regulatory
11 Procedures Manual of the FDA.
12         Have you ever seen any parts of the
13 Regulatory Procedures Manual for the FDA?
14   A.    I have not.
15   Q.    First, I'd like you to take a look at
16 Exhibit 63.
17   A.    Okay.
18   Q.    First page, it's entitled "Warning
19 Letters"; is it not?
20   A.    Yes, it is.
21   Q.    And one, two, three, four lines down it
22 says:  "Warning letters are issued to achieve
23 voluntary compliance and to establish prior notice."
24         Do you agree with that?
25   A.    Yes.

PLAINTIFFS' EXHIBITS 003871

Mark G. Kenny, Volume I                                                      June 29, 2010

---

Page 26

1        Q.    Go to the next page, please, which is
2    4-2, the fourth full paragraph.
3            It says:  "A warning letter is informal
4    and advisory."
5        Do you agree with that?
6        A.    Do I agree with that from a practical
7    standpoint?
8        Q.    Well, do you -- sure.
9        A.    All right.  Let's put it this way --
10       Q.    Do you agree or disagree with the FDA's
11   own Regulatory Procedures Manual?
12       A.    May I ask you a question?
13       Q.    Actually, you can't.  I ask questions.
14       A.    All right.  I will state what I think.
15           From a --
16           MR. KAPLAN:  Just answer the question,
17   because I'm going to move to strike any answer
18   that's not responsive.
19           Please answer just the question that's
20   asked.  No statements, no speeches.
21           MR. MILLER:  Well, I think his
22   statement is in response to the question.
23           MR. MORIARTY:  Well, let him make his
24   statement, and I'll deal with it.  I haven't heard
25   his statement.

Page 27

1           MR. MILLER:  That's what we're trying
2    to do, Matt.  Let's do it.
3            Go ahead, make your statement.
4        A.    Could you ask the question?
5        Q.    Yes.  At page 4-2 of the FDA's
6    Regulatory Procedures Manual, it says:  "A warning
7    letter is informal and advisory."
8        Do you agree with that statement?
9            MR. MILLER:  And I'm going to object to
10   reading one sentence out of a document he's never
11   seen before and asking him if he agrees with it.
12           I think he ought to take the time to
13   read at least the whole paragraph and put it in
14   context.
15       Q.    It's a three-sentence paragraph.  Go
16   ahead and read it.
17       A.    From an FDA standpoint, I agree with
18   this.
19       Q.    The next sentence says:  "It
20   communicates the agency's position on a matter, but
21   does not commit FDA to taking enforcement action."
22           Do you agree with that?
23       A.    Yes, I do.
24       Q.    The next sentence says:  "For these
25   reasons, FDA does not consider warning letters to be

Page 28

1    final agency action on which it can be sued."
2        Do you agree with that?
3        A.    I don't have the basis to disagree.  I
4    don't know what the basis for suit -- for forming a
5    suit would be.
6        Q.    Do you know what "final agency action"
7    is?
8        A.    No.  I don't know the term.
9        Q.    Now, are warning letters considered the
10   second step in this sort of note -- written
11   notification chain?
12       A.    From a business standpoint, yes.
13       Q.    The first step would be the 483.
14           Is that right?
15       A.    Correct.
16       Q.    And a 483 is also informal and
17   advisory.
18           Is it not?
19       A.    I don't perceive it as that.
20       Q.    Well --
21       A.    I perceive -- I perceive it as a
22   company put on warning that you have some
23   potentially very significant issues, or it would not
24   have been in the 483, and that you're expected to
25   understand those issues, investigate those issues,

Page 29

1    determine whether they represent systemic issues,
2    and then put in corrective action plans that are
3    appropriate with the risk determination that you've
4    made as a result of your investigations.
5        Q.    Do you have any opinion about whether
6    the FDA considers 483s to be final agency action?
7        A.    I don't have the experience to answer
8    that question.
9        Q.    All right.  Have you ever worked for
10   the FDA?
11       A.    I have not worked for the FDA.
12           I worked with the FDA.
13       Q.    Well, I assume what you mean by that is
14   when you were at J&J, sometimes you had to interact
15   with FDA regarding recalls or investigations or
16   something else; correct?
17       A.    I would not put it that way.  So if you
18   want me to put it my way --
19       Q.    How did you interact with FDA?
20       A.    I interacted with the FDA during an
21   inspection by the FDA if I determined in the
22   company, within the company I work for, that I would
23   be additive to the process.
24           I worked with the FDA on, for example,
25   a home HIV test, which was basically the first --

8 (Pages 26 to 29)

PLAINTIFFS' EXHIBITS 003872

Mark G. Kenny, Volume I

June 29, 2010

Page 30

1 first concept of an HIV test that the consumer would
2 participate in the testing itself.
3         The regulations really didn't exist
4 that were specific to that, so the FDA had to -- had
5 to try to understand the technology, had to try to
6 interpret the GMP regulations.
7         And we assisted the FDA in doing that.
8 And they assisted us in helping establish
9 development validation. Because, again, this --
10 this was a novel product.
11         So I have worked directly with the FDA
12 on items like that.
13     Q.    Essentially, your whole working career
14 from 1974 to 2004 was with different J&J companies.
15         Is that right?
16     A.    That's correct.
17     Q.    All right. In your years at J&J, was
18 any part of J&J under a consent decree?
19     A.    To my knowledge, no.
20     Q.    To the best of your knowledge, while
21 you were at J&J over those years, were any products
22 ever seized by the FDA?
23     A.    Not to my knowledge.
24     Q.    Were any of the companies that you
25 worked for at J&J ever given Form 483s by the FDA?

Page 31

1     A.    Yes.
2     Q.    Were any companies that you worked for
3 at J&J given warning letters by the FDA?
4     A.    Yes.
5     Q.    When you were with J&J, did J&J have
6 product recalls?
7     A.    Did J&J? You mean the $60 billion
8 company, of course?
9     Q.    Did any of the business units for which
10 you worked have recalls?
11     A.    I only had one recall in my entire
12 career, which had nothing to do with compliance.
13     Q.    What did it have to do with?
14     A.    It had to do with two items. I'm
15 sorry. Had to do with one item. And it's
16 reasonably complex. Would you like me to go through
17 the description of what happened?
18     Q.    No. I'd like the Reader's Digest,
19 simple version.
20     A.    I will do my very best.
21         We sold a product, a home HIV test,
22 which had a mailer. The customer participated in
23 the test by pricking their finger and putting three
24 blood droppings on a sample card. It was a paper
25 card, the same as -- anyway, it was a paper card

Page 32

1 designed for that purpose, used by the FDA for the
2 last 50 years.
3         They would then send -- mail that to
4 the -- to the test center, which was under contract
5 with us. And they would actually do the testing of
6 that and determine whether or not it was positive or
7 negative, the results.
8         Okay? Now, the mailer that Johnson &
9 Johnson initially used was not a -- a -- a
10 Fed Ex-type mailer. It was a normal mailer that
11 took three days to arrive at the lab.
12         The competition, six months after we
13 launched the product, put in next-day mailing
14 service.
15         Unbeknownst to everybody in the company
16 that I was aware of but sales, they decided to
17 develop mailers to expedite this.
18         So they went into the field, pulled out
19 the mailer for the three-day, you know, cycle and
20 put in the mailer for the one-day cycle.
21         Okay. I was -- I was not aware of it.
22 I would not have authorized it, but it happened. It
23 sounds innocent.
24         The product was kept behind the counter
25 in most instances. It was almost a $40 product.

Page 33

1 They were afraid -- pharmacists were afraid that the
2 product would be stolen.
3         The salesmen, I was told, were given
4 instructions to physically place the mailer on the
5 product.
6         So when they went into the pharmacy,
7 sometimes they did it, apparently. Sometimes they
8 did not. The pharmacy frequently would say -- not
9 frequently; we didn't have that many examples -- but
10 would say, I will do it for you because it is behind
11 the counter. Don't worry about it. Leave the
12 mailers. How many products do I have? Three.
13 Leave three mailers.
14         The pharmacists made an error, in that
15 when the competition came out, it was kind of like
16 Walmart. They made a product that looked identical
17 in color, identical in shape, so that when the
18 pharmacist went to put the mailer onto the -- onto
19 Confide, which was the product, they -- and I don't
20 know if it was six instances, eight instances -- put
21 them on the competitive product.
22     Q.    Okay. Let me stop --
23     A.    Can I finish the concept?
24     Q.    No. Let me just stop you for a second.
25 I think I see where this story is going.

9 (Pages 30 to 33)

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 34

1              I take it that this recall was not
2    because of the quality or integrity of the HIV
3    testing itself?
4         A.    That's correct.  As a matter of fact,
5    we were above, if you will, the gold standard.
6         Q.    Okay.  The recall was for regulatory
7    reasons related to FDA being involved in labeling
8    and other things post --
9         A.    No.  No.  That's not correct.
10        Q.    -- unrelated to the test itself?
11        A.    No.  It's related to the test.  The
12   samples went to the wrong lab.  They went to the
13   competition.
14        Q.    No.  That's not what I'm asking.
15             The quality or integrity of the HIV
16   test itself was not the reason for the recall?
17        A.    The integrity -- in other words, if the
18   samples arrived to the correct lab, and those
19   samples were -- see, we would receive competitive
20   samples.
21             Could the integrity of that test be
22   compromised?  It is conceivable, because we don't
23   know how their paper was made.  We don't know their
24   test methodology.  We only know what we did.  They
25   had the wrong competitive information.

Page 35

1              So is it conceivable?  Yes.  Is it --
2    you're talking about probabilities.  Probability
3    would be low.
4         Q.    Okay.
5         A.    But there is a probability that it
6    would not be tested.  So you would have somebody who
7    had -- who had -- would not have gotten the results.
8         Q.    Okay.  Among the things that you
9    reviewed, in Appendix B, Item Number 7 is a website?
10        A.    Item Number 7 is a website.  Correct.
11        Q.    Now, is that a part of the FDA's
12   website?
13        A.    No.  No, it is not.
14        Q.    So this is some --
15        A.    Another consulting firm's.
16        Q.    Learning Plus, Inc.?
17        A.    I don't recall the exact -- I'd have to
18   pull the website up.
19        Q.    But this is their description of what
20   the warning letter is and later what GMPs are;
21   correct?
22        A.    No.  No.
23        Q.    Well, I --
24        A.    That is --
25        Q.    -- printed --

Page 36

1         A.    That is specific to the reference.
2         Q.    I printed your Reference B.  Okay?
3    There is the definition of a warning letter.
4         A.    Right.
5         Q.    There is -- from Learning Plus, Inc.
6              Do you see that?
7         A.    Yes.
8         Q.    There's about this site.
9              Do you see that?
10        A.    Yes.
11        Q.    There's their definition of GMPs.
12             Do you see that?
13        A.    Yes.
14        Q.    Okay.  This is not an FDA website?
15        A.    That is correct.
16        Q.    What I would call the official
17   definition of what a warning letter is, according to
18   the FDA; correct?
19        A.    That is correct.
20        Q.    Do you have any opinion on whether or
21   not an establishment inspection report constitutes
22   final agency action of the FDA?
23        A.    Yes.  It does not constitute final
24   action.
25        Q.    All right.  Tab 9 in your Appendix B is

Page 37

1    Plaintiffs' Exhibit 147.  It is an E-mail about a
2    483.
3              Do you have that?
4         A.    Do I have it in my -- yes, I do.  Would
5    you like me to try to pull it?
6         Q.    Or you can just use mine.
7         A.    If it's correct.
8         Q.    What do you mean if it's correct?  You
9    think I'm BSing you?
10             MR. MILLER:  Objection.  That's not
11   what he was saying.
12             MR. MORIARTY:  I don't know what he was
13   saying.
14        Q.    First of all, the first page of
15   Exhibit 147 is an E-mail; correct?
16        A.    That is correct.
17        Q.    The next page is a 483 from the FDA to
18   Actavis Totowa from the inspection of March 18
19   through May 20, 2008.
20             Do you see that?
21        A.    Yes.  This is -- 147 continued into the
22   483?
23        Q.    It's one exhibit.
24        A.    Is this a new exhibit?
25        Q.    It's one exhibit.

10 (Pages 34 to 37)

PLAINTIFFS' EXHIBITS 003874

Mark G. Kenny, Volume I

June 29, 2010

Page 38

1    A.    Okay.
2    Q.    It is a plaintiffs' exhibit.
3    A.    Okay.
4    Q.    Do you see this Observation 2?
5    A.    Yes, I do.
6    Q.    Underneath Observation 2, there is a
7  statement that says:  "Drug products failing to meet
8  established specifications and quality control
9  criteria are not rejected."
10       Do you see that?
11   A.    Yes, I do.
12   Q.    In Chuck Koon's deposition, he said
13 that this is essentially the Turbo software
14 restatement of the language from an FDA regulation.
15       Do you agree with that?
16   A.    Oh, I don't know.
17   Q.    Okay.  And then what Chuck Koon said is
18 that under specifically is the example that an FDA
19 inspector gives based on their inspection.
20       Do you know anything about that?
21   A.    No.  I -- in other words, if you're
22 stating that this is the highlight, and this
23 substantiates that highlight, this is -- this is
24 the, you know, front page heading, and then they go
25 into specifics to support their broad statement.

Page 39

1    Q.    That's not what I asked you.
2    MR. MILLER:  Objection.  That is what
3  you asked.
4    A.    Would you ask it again, please.
5    MR. MORIARTY:  You will not find that
6  statement from me on this record, Pete.  Don't do
7  that.
8    MR. MILLER:  I will do that.
9    MR. MORIARTY:  And don't coach him.
10   MR. MILLER:  And don't point at me and
11 tell me not -- what not to do.
12   MR. MORIARTY:  Don't coach him.
13   MR. MILLER:  I'm not coaching anything.
14 I'm pointing out what your -- the flaw of your
15 statement was.
16       You asked about the top of the
17 observation and the bottom.
18   MR. MORIARTY:  Pete -- Pete, this is
19 federal court.  Objection and your basis.  Don't
20 start this.  Okay?
21   MR. MILLER:  No, Matt.  I'm -- you
22 started this.  I'm just trying to point out your
23 flaws, Matt.
24   Q.    I asked you a very specific question.
25 A witness named Chuck Koon, a quality assurance

Page 40

1  expert at Mylan, said that the FDA's Turbo
2  software --
3    A.    I'm not -- first of all, I'm not
4  familiar with the FDA's --
5    Q.    Okay.
6    A.    -- Turbo software.
7    Q.    I'm just asking you if you agree with
8  Mr. Koon.
9        He said that this statement about drug
10 products failing to meet established specifications
11 is essentially the FDA's kicking out the regulation
12 language.
13       And I asked you if you agreed with
14 that.  And you said you didn't know.
15   A.    I don't know.
16   Q.    Okay.  FDA is charged with protecting
17 public health, is it not?
18   A.    Yes.  It certainly is.
19   Q.    Sometimes, when the FDA acts, it has to
20 be flexible and act quickly to carry out its duty to
21 the public.
22       Do you agree with that?
23   A.    Yes.
24   Q.    In your experience, does FDA sometimes
25 act too hastily in ordering recalls of products?

Page 41

1    A.    In ordering recalls, my experience is
2  they do not act too hastily.
3    Q.    In your experience, do they ever
4  overreach?
5    A.    Could you explain what you mean by
6  "overreach"?
7    Q.    Plain English definition of it.
8    A.    Overreach what?
9    Q.    Okay.  Well, for example, in -- in the
10 situation that you had with your HIV home health
11 testing, was there some other fix for the problem,
12 other than a recall, available?
13   A.    Other than a recall?  Yeah.  We could
14 have -- I suppose we -- no.  There was no logical
15 fix.
16       We could have gone out and inspected
17 competitive product.  First of all, we have no right
18 to look at competitive product.
19       But conceivably, we could have gone and
20 had our entire sales force go out, look for all the
21 product they could find, which may or may not be all
22 the product, and then pull the mailers off.
23       But the issue is compounded because
24 people have the product.  They may have the wrong
25 mailer.  They may keep the product for months.  So

11 (Pages 38 to 41)

Page 42

1  the -- the only responsible behavior is to recall.
2      Q.    All right.
3      A.    And may I say that, as part of the
4  companies that I've worked for, we would take a
5  very, very conservative approach to recalls,
6  probably far more conservative than the FDA would.
7      Q.    All right. When you were at J&J, what
8  percent of your personal work involved solid oral
9  dose?
10     A.    It depends upon the point in my career.
11     There was a three-year career --
12     Q.    Overall.
13     A.    Overall? 8, 11, doing it recently.
14  I'd say 12 years.
15     Q.    Okay. And overall, J&J has had recalls
16  of solid oral dose tablets or capsules even while
17  you worked there; correct?
18     A.    The $60 billion Johnson & Johnson
19  company most certainly has had recalls.
20     Q.    Okay. So I think there was Tylenol
21  recall back in the '80s?
22     A.    '83. I was somewhat involved in that.
23     Q.    Okay. And did -- did J&J ever
24  internally assess, to your knowledge, what
25  percentage of the Tylenol that was recalled was

Page 43

1  actually somehow outside its specifications?
2      A.    But that wasn't the issue.
3            The issue was whether or not it was
4  tampered by a -- an individual.
5      Q.    Okay. What percentage of it was
6  tampered with?
7      A.    I don't know. I don't recall.
8      Q.    Far less than --
9      A.    Less than 100.
10     Q.    100 instances?
11     A.    No. Far less than probably -- no. Far
12  less -- no. The number of instances where -- if I
13  was going to guess, I would guess less -- less than
14  10.
15            In other words, they only had a few
16  instances where the product was tampered with by
17  whoever the felon was.
18     Q.    Sure. Did -- in your career there at
19  J&J, did they have recalls of other solid dose
20  products, solid oral dose products?
21     A.    I'm sure they did. I can't recite who
22  they were. They weren't involved with companies
23  that I had responsibility for.
24     Q.    All right. But in those instances,
25  either J&J could have voluntarily done a recall or

Page 44

1  FDA could have requested a recall, even if just a
2  small percentage of the solid oral dose that had
3  made it to market was possibly outside its
4  specifications; right?
5      A.    That is correct. That is possible.
6      Q.    So when we talk about, I use the term
7  "hasty" or "overreaching," you would agree that
8  sometimes recalls are conducted even though the
9  possibility of an actual defect and harm to the
10  public is small; correct?
11     A.    I would answer that question not in
12  that way.
13            I would answer the question as we don't
14  know, and we would take a conservative approach and
15  pull it back. And as part of the investigation
16  subsequently, we'd get some knowledge of the breadth
17  of the issue.
18     Q.    All right. It's sort of an abundance
19  of caution thing.
20            Is that how you are referring to being
21  conservative?
22     A.    That's -- that's one way.
23     Q.    All right. Your Reference B, Number 2,
24  is 21 Code of Federal Regulations Part 210 and 211
25  regarding GMPs; correct?

Page 45

1      A.    That is correct.
2      Q.    And I'd like -- do you have a printout
3  version of it?
4      A.    No, I don't. Actually -- no, I don't.
5      Q.    All right. This is your Tab -- your
6  Reference 2.
7            MR. MORIARTY: Pete, you can come over
8  here if you need to see it.
9      Q.    Do you see that this is Part 210 of the
10  GMPs?
11     A.    Correct.
12     Q.    And the next page, in 210.1,
13  Section B --
14     A.    Yes, sir.
15     Q.    -- it says: "The failure to comply
16  with any regulations set forth in this part, and in
17  parts 211 through 226 of this chapter, in the
18  manufacturing, processing, packing or holding of a
19  drug shall render such drug to be adulterated under
20  Section 50182B"; correct?
21     A.    Yes.
22     Q.    And then the last part of this long
23  sentence says: "Shall be subjected to regulatory
24  action"; correct?
25     A.    That's exactly what it says.

PLAINTIFFS' EXHIBITS 003876

Page 46

1    Q.    All right.  And what this section of
2  the CFR is about is the regulatory powers of the
3  FDA.
4          Is that right?
5    A.    That's correct.
6          MR. MILLER:  Object to the form.  The
7  document speaks for itself.
8    Q.    To your knowledge.
9    A.    Yes.
10   Q.    Okay.  You -- I didn't see anything
11 about medical school, internships or residencies on
12 your resume.
13         You're not a physician; right?
14   A.    That is correct.
15   Q.    So I assume that you are not going to
16 be testifying about whether specific plaintiffs'
17 injuries had anything to do with defective Digitek;
18 correct?
19   A.    That is correct.
20   Q.    As far as I can understand your report
21 and, obviously, the summary at page 23, your role is
22 to talk about whether Actavis complied with certain
23 good manufacturing practices.
24         Is that right?
25   A.    That is correct.

Page 47

1    Q.    And for this definition of
2  adulteration, you are relying on CFR 351(b), I
3  assume?
4    A.    If that's what it says, yes.
5    Q.    And this is Tab 5 of your Reference B.
6          Is that right?
7    A.    I assume it's correct.
8          (Exhibit 39, FDA Printout, was marked
9  for identification.)
10   Q.    Now, that's Exhibit 39.  This is a
11 printout from the FDA's website.
12         Have you ever seen this before?
13   A.    Let me just take a look at it.
14         I believe I have.
15   Q.    And this particular section is called
16 "Facts About Current Good Manufacturing Practices";
17 correct?
18   A.    That's correct.  This is -- this is
19 somebody's interpretation of what the facts are.
20 It's not a guidance document.  It is a page in a --
21 in a website.
22   Q.    But it is a page from the FDA's
23 website?
24   A.    Absolutely.
25   Q.    All right.  Now, go down to the second

Page 48

1  title that says "Why Are cGMPs So Important?"
2          MR. MORIARTY:  When you type cGMP, the
3  C is small and the GMP is large.
4    Q.    The second sentence says:  "In most
5  instances, testing is done on a small sample of a
6  batch (for example, a drug manufacturer may test 100
7  tablets from a batch that contains 2 million
8  tablets) so that most of the batch can be used for
9  patients rather than destroyed by testing."
10         Do you agree with that?
11         MR. MILLER:  Again, I would object.  I
12 would ask you to give him an opportunity to read the
13 whole paragraph before you ask him about a
14 particular sentence inside a paragraph so he can put
15 it in context.
16   Q.    Okay.  Do you need to read more or are
17 you ready to answer questions?
18   A.    I would like to read it.
19   Q.    You can read the whole thing.  Let me
20 know when you're ready.
21   A.    I've read it.
22   Q.    Let's go down to -- and let me linger
23 there a second.
24         From your experience, that is true in
25 practice; correct?

Page 49

1          I mean, a manufacturer can't test them
2  all, or there'd be nothing left to sell; correct?
3    A.    That's correct.  Of course.
4    Q.    So I assume at J&J, the products that
5  you were involved with had sampling plans?
6    A.    Most certainly.
7    Q.    All right.  And at some point in the
8  validation process or through inspections, FDA was
9  aware of what those sampling plans were?
10   A.    Well, if they reviewed them, yes.
11   Q.    Okay.  Let's go down to the fourth
12 heading, "If a Manufacturer is Not Following cGMPs,
13 Are Drug Products Safe for Use?"
14         Go ahead and read that whole section,
15 because I'm going to ask you about it.
16   A.    Okay.
17         Okay.  I've read it.
18   Q.    The first two sentences of that section
19 essentially state what's in these regulations in
20 Tabs 2 and 5 from your Reference B; right?
21   A.    Okay.
22   Q.    That if a drug is not manufactured in
23 compliance with cGMP, the FDA considers it
24 adulterated; correct?
25   A.    That's correct.

13 (Pages 46 to 49)

PLAINTIFFS' EXHIBITS 003877

Page 50

1    Q.    The next sentence says:  "It does not
2  mean that there is necessarily something wrong with
3  the drug."
4         Do you agree with that?
5    A.    I think it's poor wording.
6    Q.    How do you think it's poor wording?
7    A.    Because the quality of a drug is
8  dependent upon executing a series of steps, starting
9  in the development process, going through -- going
10  through development process, going through to
11  technical transfer, going through to process
12  validation, going through to routine -- writing
13  procedures, etcetera, that are in place to control
14  the quality, and then ultimately, just making sure
15  that it's okay by taking a sample.
16         Because, of course, you don't know --
17  you don't know what you don't know, but what you do
18  know is that at least you've looked at X number of
19  samples, and those samples were good.
20         Since you've based your sampling upon
21  your validated state, and you know you have content
22  uniformity, you know that all the tablets are coming
23  off the -- the production line within specification,
24  therefore justifies, as the last step, taking a
25  sample.

Page 51

1         So the -- I think this is poor wording.
2    Q.    Okay.  Well, let's -- let's get to the
3  bottom of what it's saying.
4         The FDA could call a particular batch
5  of tablets adulterated, could it not?
6    A.    Yes.
7    Q.    If it found a cGMP violation; correct?
8    A.    Yes.
9    Q.    All right.  Let's stick with one batch
10  for the time being.
11    A.    Certainly.
12    Q.    But if FDA -- if the manufacturer had
13  done United States Pharmacopeia testing on tablets,
14  and then the FDA itself did USP testing on tablets
15  from that same batch and confirmed that they were
16  within the USP's specifications, there would have
17  been nothing wrong with those tablets; correct?
18    A.    There would be nothing wrong with the
19  tablets that they tested.
20    Q.    Okay.  And when there is --
21    A.    If --
22    Q.    When --
23    A.    If -- may I say an if?
24         If there was a valid test method done
25  by a qualified individual.

Page 52

1         So if we assume that the FDA and all
2  these other tests that were done were qualified,
3  that they had a validated test method, then we can
4  assume, and it's fair to assume that the units that
5  they tested, those tablets, those bottles, whatever
6  they tested to get individual samples are within the
7  specification.
8    Q.    Okay.
9    A.    If it's determined that it is.
10    Q.    And the FDA allows you to draw certain
11  conclusions from that because it's an appropriate
12  sampling size; correct?
13    A.    Tell me what you -- are you saying is
14  the conclusion.
15    Q.    All right.  Well, let me -- let me ask
16  you:  If FDA -- do you know what a 484 is?
17    A.    No.  I am not familiar with that.
18    Q.    You don't know what a 484 is?
19    A.    I said --
20         MR. MILLER:  Objection.  Asked and
21  answered.
22    Q.    FDA comes to Johnson & Johnson and
23  decides to take a sample from you of your product
24  for independent testing.
25    A.    Right.

Page 53

1    Q.    Do you know what that process is?
2    A.    Do -- I heard of it.  I haven't been
3  involved in it.
4    Q.    All right.
5    A.    Regulatory affairs department would
6  interact with the FDA, not the quality assurance
7  department.
8    Q.    Well --
9    A.    In -- in a situation like that.
10    Q.    Well, if FDA independently tested a J&J
11  product that you were involved in, what conclusions
12  would -- and it passed all the specifications, what
13  conclusions would you, at Johnson & Johnson, draw
14  from that?
15    A.    I would draw a conclusion that they
16  took X number of samples, and the samples that they
17  took were within specifications.
18         Since I know that my process is well
19  developed, well characterized, since I know I have a
20  validated process, since I know I have validated
21  test methods, since I know I have qualified
22  individuals conducting all of these studies, then I
23  can make a conclusion that their test results
24  confirmed that which I knew to begin with.
25    Q.    So it's good news; right?

14 (Pages 50 to 53)

Mark G. Kenny, Volume I                                                                    June 29, 2010

Page 54

1          MR. MILLER:  Object to form.
2     Q.    Okay.  I'll use something more
3   scientific.
4          It corroborates your processes and
5   testing, doesn't it?
6     A.    Yes.  It certainly does.
7     Q.    I didn't see on your Reference B that
8   you looked at any of the process validation for
9   Digitek.
10         Did you look at the process --
11    A.    Yes.
12    Q.    -- validation documents for Digitek?
13    A.    I looked at two process validations.
14  They were rather old.  1993, I believe, for
15  .5 milligram Digitek.  And there was -- there may
16  have been another one.  I don't recall.
17    Q.    Well, and that was submitted to the FDA
18  for purposes of the ANDA; correct?
19    A.    Perhaps.  I would assume that it was.
20  I don't know.  It doesn't say this was submitted.  I
21  don't have the submission.
22    Q.    Did you ever see anywhere in the
23  material that you reviewed a specific reference by
24  FDA that Digitek testing methods, like MOI 145, were
25  not validated?

Page 55

1     A.    I believe there was one or two test
2   methods not properly validated.
3     Q.    Okay.  Find it.  I want to -- I want to
4   hear from you where in all the material you reviewed
5   there is a single reference by the FDA to a --
6     A.    Test method.
7     Q.    -- to a test method for finished
8   tablets not being validated.
9     A.    Well, you just added "finished
10  tablets."
11         I would -- I would assume that, based
12  upon your questioning and your challenge, that I
13  would not find that.
14         So -- so I may have misspoken in terms
15  of recalling a test method validation
16  non-conformance.
17    Q.    Let's go to the second paragraph in
18  Exhibit 39 in the section "If a Manufacturer Is Not
19  Following cGMPs, Are Drug Products Safe for Use?"
20    A.    Okay.
21    Q.    About two-thirds of the way down, it
22  says:  "The impact of cGMP violations depends on the
23  nature of those violations and on the specific drugs
24  involved."
25         Do you agree with that?

Page 56

1     A.    I think it's poor wording.
2          I would have to say I agree with it.
3     Q.    All right.  The next sentence says:  "A
4   drug manufactured in violation of cGMP may still
5   meet its label specifications."
6          Do you agree with that?
7     A.    Of course.
8     Q.    And the remainder of the sentence says:
9   "And the risk that the drug is unsafe or ineffective
10  could be minimal."
11    A.    Of course.
12    Q.    Do you agree with that?
13    A.    Of course.
14    Q.    So let me see if I state it another
15  way, if I understand what these regs mean.
16         The finding of adulteration because of
17  a cGMP violation at most reflects a possibility that
18  out-of-specification drugs were produced; correct?
19         MR. MILLER:  Object to form.  Misstates
20  previous testimony.
21    A.    You can repeat the question.  But I
22  don't think it's correct.  Would you repeat the
23  question?
24         MR. MORIARTY:  Can you read it back,
25  please?

Page 57

1          (Requested portion is read.)
2     A.    No.  No, that is not correct.
3     Q.    Okay.  Adulteration is a regulatory
4   definition; correct?
5     A.    The FDA defines adulteration in the
6   CFR.
7     Q.    All right.  And whether a particular
8   drug is within or without its specifications is
9   actually something you can test to determine;
10  correct?
11    A.    No.
12    Q.    You can't?
13    A.    No.  What you can determine is that
14  taking a sample, you have a certain level of
15  probability if the product tests acceptably.
16         You have a certain level of probability
17  and a confidence interval that the product is
18  acceptable.
19         You don't know what you don't know.
20  You haven't tested them all.
21         If you tested them all, and they were
22  validated test methods, and they were a qualified
23  individual that did the test, I think a fair
24  assumption would be that all of them would be within
25  specification.

15 (Pages 54 to 57)

Page 58

1      Q.     All right.  Well, let's just assume
2   that in the 484 process, the FDA comes in and takes
3   a sample of a solid oral dose product off a pharmacy
4   shelf.
5      A.     Sure.
6      Q.     And tests a certain number of tablets
7   for dissolution, assay, content uniformity within
8   the United States Pharmacopeia guidelines.
9      A.     Um-hum.
10      Q.     Okay?  And they are all within --
11      A.     And in accordance with your submission.
12      Q.     Yes.  And they're -- and they're all
13   within the USP parameters for that product.
14      A.     Assuming it's a USP.
15      Q.     Yeah.  What is -- I mean, what is the
16   confidence interval that the FDA would have
17   regarding that particular tested batch?
18      A.     Very low.
19      Q.     Very low?
20      A.     Yes.
21      Q.     So why do they do it?
22      A.     You have to ask them.
23      Q.     And you've --
24      A.     Because it will -- it would conceivably
25   detect gross issues.

Page 59

1          When I say "gross issues," gross of the
2   highest order.
3      Q.     Have you ever been involved personally
4   at J&J with the 484 process with the FDA?
5      A.     Of the sampling process, no.  If there
6   was a non-conformance, I would have heard about it
7   instantly.
8      Q.     Have you ever seen in any of the
9   material that you reviewed a final agency
10   determination that Digitek, that single product, was
11   adulterated?
12      A.     I don't recall.
13      Q.     Would you like to look?
14      A.     No.  It's too voluminous.  We're trying
15   to keep this within a day or two.
16      Q.     Well --
17      A.     I don't have the time -- I mean --
18      Q.     It may be -- it may be time-consuming,
19   but it's awful important for me to know.
20      A.     I -- I will tell you that in reviewing
21   the documents, I cannot recall an instance where
22   they said -- specifically used the word Digitek is
23   adulterated, separating that out.
24      Q.     Okay.  We typically take breaks every
25   hour to hour and a half.

Page 60

1          You let me know when you're ready for
2   the first break.
3      A.     I'm fine.
4      Q.     Okay.  Do you know what the FDA's
5   application integrity policy is?
6      A.     No.
7      Q.     Are you familiar with the CFRs
8   pertaining to accuracy of documents like batch
9   records, annual reports and things of that nature?
10      A.     No, I'm not familiar with it.
11      Q.     Well, what -- do you know anything
12   about the F -- what the FDA would do to a company if
13   it reasonably suspected that the company was
14   falsifying data either in an NDA or ANDA or a
15   run-of-the-mill record for production?
16      A.     And you're asking me do I know anything
17   about that?
18      Q.     Yes.
19      A.     Do I know anything?  I know logic, that
20   the -- it would be a serious offense, and I would
21   assume criminal -- potential criminal prosecution.
22      Q.     I didn't see anything in your report
23   referring to any FDA 483s or warning letters about
24   the integrity of Actavis's applications or data.
25          Did I miss a reference?

Page 61

1      A.     No.  You did not miss a reference.
2      Q.     Did you -- do any of the references in
3   your Appendix B contain FDA warnings or citations
4   about data integrity regarding Digitek?
5      A.     Could you repeat the question?
6      Q.     Yes.  In your Appendix B, this thing
7   we've been talking about where you have all these --
8      A.     Right.  The references.
9      Q.     -- things you referred to, do the 483s
10   or warning letters or EIRs in your Appendix B
11   contain FDA observations or findings about data
12   integrity concerning Digitek?
13      A.     I don't recall any.
14          MR. MORIARTY:  Let's -- there's just a
15   couple minutes left on this tape, so let's take our
16   break now.
17          THE VIDEOGRAPHER:  Please stand by.  We
18   are going off the record.  It is 9:58 A.M.  This
19   ends Tape Number 1.
20          (Recess was taken.)
21          THE VIDEOGRAPHER:  We are back on the
22   record.  The time is 10:12 A.M.  This is the
23   beginning of Tape Number 2.
24      Q.     All right, Mr. Kenny.
25          Have you ever heard of Quantic

16 (Pages 58 to 61)

PLAINTIFFS' EXHIBITS 003880

Mark G. Kenny, Volume I

June 29, 2010

Page 62

1  Regulatory Services?
2      A.    I've heard the name.
3      Q.    Do you know anything about their
4  reputation in the industry?
5      A.    No.  I really don't.
6      Q.    Do you know anything about their
7  reputation with FDA?
8      A.    No.  I have no idea.  I know they're a
9  consulting firm.  And I believe they're rather
10 large.  That's it.
11     Q.    Are you familiar with any Actavis batch
12 record reviews done by Quantic Regulatory Services?
13     A.    Specifically, no.
14     Q.    And I didn't -- this is Exhibit 23.
15          (Exhibit 23, Letter dated 12/24/07 from
16 Scott Talbot, was marked for identification.)
17     Q.    First of all, are you aware that in the
18 early 2007 FDA warning letter, they requested that
19 Actavis get independent batch record review?
20     A.    Yes.  I'm aware of that.
21     Q.    Have you ever seen Exhibit 23 before?
22          MR. KAPLAN:  Do you have an extra?
23          MR. MORIARTY:  I thought I passed one
24 down.
25     A.    When I look at the cover, I say no.

Page 63

1  I'm pretty sure I haven't seen this.
2      Q.    All right.
3      A.    It's a lot of blank.
4      Q.    It's a lot of redactions.  I understand
5  that.
6          So -- first of all, you see that the
7  cover of Exhibit 23 is a letter dated December 24,
8  2007 to a compliance officer at FDA from Scott
9  Talbot, who was then site head of quality at Actavis
10 Totowa; correct?
11     A.    Correct.
12     Q.    And then attached, I will represent to
13 you that these are Quantic records regarding batch
14 record review.
15          And, if you look at Bates page
16 1867202 -- I think you're -- you're on the same
17 page -- on that page, Items 35 through 39 are
18 specific Digitek batch records; correct?
19     A.    It appears, yes.
20     Q.    And then later, at Bates page starting
21 1867214 --
22     A.    Okay.  Sure.
23     Q.    -- and spilling over into the next
24 page, between Items 47 to 80, inclusive, are all
25 specific Digitek batch records; correct?

Page 64

1      A.    Yeah.  Items 47, whatever you want to
2  call it, through 80 are Digitek.
3      Q.    All right.  And have you seen the
4  Quantic Regulatory Services protocol that they used
5  for the review of the Digitek batches?
6      A.    No, I did not.
7      Q.    And I will represent to you that if you
8  count them all up, they looked at 39 Digitek batch
9  records.
10          Would you trust me on that?
11     A.    I trust you implicitly.
12     Q.    And do you know how many of those 39
13 were of what ultimately became recalled batches?
14     A.    In 2007, no.  I -- I couldn't determine
15 that.
16          I'd have to look at the number of
17 batches that were within expiration, is the only way
18 I could tell.
19     Q.    All right.  I want you to assume that
20 19 of those 39 were of batches that were ultimately
21 recalled.
22          Okay?
23     A.    Okay.
24     Q.    And go back to the cover page of 23.
25     A.    Sure.

Page 65

1      Q.    Actavis tells the FDA that Quantic's
2  ultimate conclusion was:  "On December 21, 2007,
3  Quantic provided Actavis with a statement indicating
4  the audit was complete, and the manufacturing and
5  laboratory records have reliably confirmed the
6  identity, strength, quality and purity of the
7  marketed products."
8          Do you see that?
9      A.    I certainly do.
10     Q.    Do you have any basis on which to
11 disagree with Quantic's assessment in that regard?
12     A.    Well, I have to qualify this.
13     Q.    Well, can you answer my question first?
14 And then --
15     A.    Do I have any --
16          MR. MILLER:  Objection.
17          MR. MORIARTY:  He can qualify it.  I
18 want a yes or no, and then he can qualify it.
19     A.    Well, repeat it one more time, please.
20     Q.    Do you have any basis to disagree with
21 Quantic's conclusion regarding the 39 batches that
22 they --
23     A.    Yes, I would.
24     Q.    Okay.  What's the basis?
25     A.    Can I reread this out loud?  It says:

17 (Pages 62 to 65)

PLAINTIFFS' EXHIBITS 003881

Mark G. Kenny, Volume I                                                                           June 29, 2010

Page 66

1    "Quantic provided Actavis with a statement
2    indicating the audit was complete, and manufacturing
3    and laboratory records have reliably confirmed the
4    identity, strength, quality and purity of the
5    marketed products."
6              I would disagree with the word
7    "reliably."
8         Q.   Why?
9         A.   Because they took a -- they looked at a
10   batch record that indicated that there was no major
11   issues, assuming there were no major issues, and if
12   there were major issues, the batch would have been
13   held and reviewed.
14             The assumption there is that the batch
15   records contained accurate information.  The
16   assumption is that the test methods that were used
17   were validated.  The assumption is that the process
18   is validated.
19             And if you form all the -- the
20   assumption is that the equipment is calibrated.  The
21   assumption is that people are properly trained.
22             Now, if all of those things were in
23   place, and then I looked at -- if I was Quantic,
24   looked at the batch records, I would say, you know,
25   they have a reliable process.  They have reliable

Page 67

1    testing.  Etcetera, etcetera.  Based on all that
2    reliable good stuff, I will say that, hey, I can say
3    reliably, you know, this sample -- I'm sorry, this
4    sample -- these batch records make me feel good
5    about it.
6         Q.   Okay.  But if I'm correct, you've not
7    only never seen Exhibit 23, and you've never seen
8    Quantic's protocol, and you've only seen three batch
9    records, compared to at least their 39; correct?
10        A.   Yes.
11        Q.   And I didn't see anywhere in your
12   report that indicated that any process for Digitek
13   was not validated.  Have you made an observation --
14             MR. MILLER:  Objection.
15             MR. MORIARTY:  Let me finish my
16   question.
17             MR. MILLER:  Sure.
18             MR. MORIARTY:  Then he gets to object.
19   Then you get to answer it.
20        Q.   I didn't see any observation in your
21   report indicating that any process for Digitek was
22   not validated.
23             Have you given that opinion in your
24   report?
25             MR. MILLER:  Object to form.

Page 68

1              You can answer.
2         A.   Okay.  The process that can produce
3    defective product is not a validated process.
4              MR. KAPLAN:  I'm going to object and
5    move to strike that answer as not being responsive
6    to the question you were asked.
7              THE WITNESS:  Okay.
8              MR. MILLER:  And continue on with the
9    same answer.
10             He can object, but you can still
11   continue on.
12        A.   Okay.  I don't -- I --
13        Q.   What I'm asking is:  I didn't see
14   anywhere in your report to indicate that any Digitek
15   process was not validated.
16        A.   Okay.  To answer your question
17   specifically, I did not use the term Digitek in
18   terms of a non-validated process --
19        Q.   Okay.
20        A.   -- specifically in here.
21        Q.   Okay.  Do you have any evidence that
22   the FDA did not accept Actavis's and Quantic's
23   findings as exhibited by Exhibit 23?
24        A.   No.  I have no evidence.
25        Q.   That's Exhibit 24.

Page 69

1              A lot of paper.
2         A.   Um-hum.
3         Q.   And I'm not going to take you through
4    all of it.
5              Now, in your Exhibit -- I'm sorry --
6    your Appendix B, I didn't see a reference to any FDA
7    Form 484s.
8         A.   That's correct.
9         Q.   Did you review any FDA Form 484s?
10        A.   No, I did not.
11        Q.   Well, let's look at Exhibit 24.
12             (Exhibit 24, FDA Collection Report for
13   Sample Number 377410, was marked for
14   identification.)
15        Q.   Is that for Sample 377410?
16        A.   Yes.
17        Q.   And if you look at the narrative, does
18   it indicate that in February of 2007, FDA took two
19   bottles of 100-count, 125 microgram Digitek from
20   Actavis?
21        A.   Could you point to where that is?
22             Is it here?
23             MR. KAPLAN:  It's on the first page,
24   under "Description of Sample."
25        Q.   If you go to page 3 of 3 of Exhibit 24,

18 (Pages 66 to 69)

PLAINTIFFS' EXHIBITS 003882

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 70

1   it says:  "Method of Collection."
2        Do you see that?
3        A.    Yes, I do.
4        Q.    Okay.  So here, they took 200-count
5   bottles of 125 microgram Digitek from the firm's
6   inventory.  And then it gives the Actavis batch
7   number; correct?
8        A.    It appears to, yes.
9        Q.    70078 A1.
10       Do you see that?
11       A.    Yes.
12       Q.    And then FDA had an opportunity,
13  presumably, to test as much of this as they wished;
14  correct?
15       A.    I presume yes.  Sure.
16       Q.    All right.  And do you know whether or
17  not they used United States Pharmacopeia testing
18  standards for Digoxin?
19       A.    I don't specifically know what they
20  did.
21       Q.    Have you ever looked at the USP
22  reference standards for the monograph for Digoxin?
23       A.    Not for Digoxin.
24       Q.    Have you ever looked at the general USP
25  standards for content uniformity?

Page 71

1        A.    Yes.
2        Q.    And assay?
3        A.    Yes, sir.
4        Q.    All right.  But here, ultimately, based
5   on whatever they tested, they say: "All methods are
6   compendial and follow USP 29-NF24, page 704, Digoxin
7   Tablets Monograph."
8        Do you see that?
9        A.    Where?
10       Q.    Under "Remarks" on page 3.
11       A.    Yes.  With the exception of impurity
12  testing.
13       Q.    Which they use a house standard; right?
14       A.    "First in-house method is the limit
15  test... utilizes relative retention times" -- yes.
16  So they used USP methods, unless stated otherwise.
17       Q.    And according to Exhibit 24, did all
18  the samples that they tested from this batch
19  passed -- pass?
20       A.    I'm going to hunt for it.  Maybe you
21  can point to it.
22       Q.    Yeah.  I have to hunt myself.
23       A.    I think it's a fair assumption to say
24  they passed, or there would have been tremendous
25  issues.

Page 72

1        Q.    Okay.
2        A.    I will accept that it says passed
3   somewhere in here.
4        Q.    All right.  So what -- do you think
5   that's significant at all?
6        A.    Could you -- you know, could you define
7   what you mean by -- be more specific in terms of
8   "significant"?
9        Q.    Well, first of all, do you know whether
10  or not Batch 70078 A1 was among the recalled
11  batches?
12       A.    I -- since it was a 7, it probably was
13  recalled.
14       Q.    And as far as your opinions in this
15  case, do you find FDA's testing and passing of a --
16  of a recalled Digitek batch significant at all?
17       A.    Well, they don't test and accept.  What
18  they do is they test, they get acceptable results,
19  and they don't react to it.
20       They don't accept anything.  The FDA
21  doesn't accept batches.  They don't take that
22  responsibility of accepting a batch.
23       They can get -- they can derive
24  acceptable results.  When they do -- let's say they
25  do their surveillance program, and they take some of

Page 73

1   our product and they test it.
2        They don't find the batch acceptable.
3   What they find is the sample that they tested met
4   specification, and they have no cause for concern
5   because it met specification.  They don't accept or
6   reject anything.
7        Q.    I understand that.  But --
8        A.    You used that term "accept."  That's
9   all.
10       Q.    Well, they -- do these results
11  corroborate Actavis's testing of the same batch?
12       A.    Do they corroborate?
13       Well, if -- if Actavis got acceptable
14  results of their sample, the FDA took a small
15  sample, presumably smaller than Actavis's, and they
16  confirmed each other that the -- based upon only the
17  testing that the product is acceptable.  But the
18  testing is only a small portion of determination
19  whether a batch is acceptable.
20       Q.    I understand that.
21       Isn't it likely, given the Actavis
22  testing and the FDA corroborative testing, that the
23  tablets in Batch 70078 A1 were within the USP
24  specifications?
25       A.    I can answer that.

PLAINTIFFS' EXHIBITS 003883

Page 74

1        Is it probable?  I would say that,
2  based upon the fact that they do not have
3  validated -- that in general, they do not have
4  validated processes, based upon in general that
5  25 percent of the equipment is not proper -- not
6  qualified, based upon the lax practices that are
7  done in laboratories, etcetera, etcetera, I would
8  only state -- and this, I am being 100 percent
9  honest here.  I'm not trying to, you know -- to, you
10  know, avoid the question.
11        I would -- I cannot state that that
12  batch is in compliance because my entire history of
13  working in compliance is based upon systems working.
14  It's not based upon samples.  A sample is a merely
15  confirmatory way of saying guess what, guys?  At
16  least we know the three samples that we tested were
17  good.
18        Since they had significant issues with
19  content uniformity in general, it -- it -- I lack
20  the confidence that, in general, they -- they have
21  well validated processes.
22        But I'm talking in general, not
23  specifically to Digoxin.  But Digoxin is part of
24  this population, therefore...
25        Q.    So, if I really understand what you

Page 75

1  just said at a global level --
2        A.    Yes.
3        Q.    -- you are assuming, because of general
4  cGMP violations, that Digitek had some problems;
5  right?
6        MR. MILLER:  Object.  Misstates
7  previous testimony.
8        It's okay to answer.
9        A.    Okay.  I don't understand the word
10  "problems," Digitek had some "problems."
11        Q.    In your answer, I asked whether it was
12  likely that the batch met USP specifications.  You
13  never said anything about that.
14        You said that, for a variety of
15  reasons, you didn't think the batch was likely in
16  compliance.
17        What do you mean by "in compliance"?
18        MR. MILLER:  Object to form.
19        A.    That the systems and procedures that
20  are in place that -- that formed the basis for
21  testing -- no -- formed the basis for determining
22  acceptability of the batch, if those are faulty, and
23  they've shown themselves to be having a lot of
24  issues, I cannot make the assumption that taking
25  samples from the FDA, taking samples from whoever --

Page 76

1  I can't make the assumption that that product is
2  acceptable.
3        Q.    All right.  What do you mean by
4  "acceptable"?
5        A.    "Acceptable," meaning meets
6  specification each and every time, each and every
7  unit.
8        Q.    Okay.  What I'm trying to find out --
9  and let's go back to Exhibit 39.  It says here:  "A
10  drug manufactured in violation of cGMP may still
11  meet its label specifications."
12        And you agreed with me on that?
13        A.    Yes.  I agree with that.
14        Q.    Okay.  I want to talk about the labeled
15  specifications.
16        A.    Surely.
17        Q.    Okay.  First of all, have you seen any
18  test results of any type to indicate that Batch
19  70078 A1 did not meet its labeled specifications?
20        A.    I don't believe I have seen any
21  information.
22        Q.    All right.  Now, can you please show me
23  anywhere in all the material that you reviewed
24  anyplace where the FDA said that Digitek did not
25  have validated manufacturing or testing processes?

Page 77

1        A.    Well, the 25 percent of the equipment
2  was not qualified.  It's in the 43.  I think it was
3  2004, perhaps.  That's a significant issue.
4        Q.    Are you finished with your answer?
5        A.    I certainly am.
6        Q.    Show me anywhere in the material that
7  you reviewed anyplace that said that any equipment
8  used to make Digitek was not qualified.
9        A.    I don't know what the blenders,
10  etcetera that were used as examples of not being the
11  correct IQ OQ, which is installation qualification,
12  operation qualification and performance
13  qualification.
14        I can't link those two between the
15  manufacturing of Digitek and those particular pieces
16  of equipment.  I'd have to -- I'd have to do much
17  more research.
18        Q.    So sitting here today, you don't know
19  that any Digitek equipment was found to be not
20  qualified by the FDA; correct?
21        A.    Yes.  Based upon what I've reviewed.
22        Q.    All right.  Then let me go back to my
23  first question, now that we've taken care of
24  equipment.
25        Show me anywhere in all the material

PLAINTIFFS' EXHIBITS 003884

Page 78

1  that you've reviewed, please, where FDA specifically
2  says that there is a Digitek manufacturing or
3  testing process that is not qualified or validated.
4      A.    All right.  The way I would answer that
5  is that the only evidence that I have seen where a
6  process is validated was done, I believe, in '93.
7          I glanced through it.  And the reason I
8  only glanced through it is whatever work was done in
9  '93 is of -- of little use to batches produced 13,
10  14 years later.  They may have done great work.
11         So I have yet to see any
12  well-constructed validation studies.  I will assume
13  that between '93 and the production of these batches
14  that they didn't do them because I haven't seen it.
15     Q.    Well, there's a lot of things you
16  haven't seen.  But we'll get to that later.
17         Is there an FDA reg that says
18  specifically that these processes have to be
19  revalidated?
20     A.    Is there a specific reg?  I'd have to
21  look at -- at 21 CFR.
22         Can I glance at it?  I do have a copy.
23     Q.    You have it among your materials?
24     A.    No, I don't.
25     Q.    I've never seen one, but perhaps you

Page 79

1  know of one.
2      A.    It's in there someplace.
3          MR. MILLER:  We had it out once -- once
4  already.
5      Q.    Well, FDA inspected Actavis on a number
6  of occasions for a variety of reasons between 1998
7  and 2008, did they not?
8      A.    1998 and -- yes.
9          MR. MILLER:  Matt, you asked him a
10  question.  And he wanted to answer if he could see
11  the CFR.
12         MR. MORIARTY:  I'm changing the
13  question.  I don't want to dig for the reg.  Okay?
14     Q.    They did inspect a number of times for
15  a number of reasons over those 10 years?
16     A.    Yes.
17     Q.    And they had an opportunity to see and
18  observe whether Digitek processes and equipment were
19  validated or not validated; correct?
20     A.    Correct.
21     Q.    And even in 2008, when the focus was on
22  a Digitek batch, 70924, FDA never said in the 483 in
23  May of 2008 that Digitek processes and equipment
24  were not validated, did they?
25     A.    I believe that's accurate.

Page 80

1      Q.    And you said something --
2      A.    But they may not have looked for it.
3  They didn't look for everything.  They went in.
4  What the FDA does, they look for examples.  They
5  don't look to do a comprehensive review.
6          Once they find examples, they make the
7  assumption, and it's certainly a reasonable
8  assumption, that that particular quality system is
9  in violation of GMP.
10         They have found enough evidence so that
11  you need to go back, as the manufacturer, the
12  tester, to go back and do a comprehensive review of
13  that quality system, since you've shown that it's
14  unreliable, what you're doing.
15         You need to go back and do a
16  comprehensive and then determine whether or not
17  you're in compliance.
18         So, if it were me, and I found out,
19  which would not happen, that I had 25 percent of my
20  equipment that was not qualified, then I would go
21  back personally and take a look at all those things,
22  including process validation, which is the
23  culmination of all of these development events.
24         MR. KAPLAN:  With all due respect to
25  the witness, I'm going to move to strike your last

Page 81

1  answer because you're not responsive to the question
2  that Mr. Moriarty asked you.
3          THE WITNESS:  It's not on purpose.
4          MR. KAPLAN:  Then on purpose, if you
5  would, listen carefully to his questions, and try to
6  answer just the question that he asks.
7          THE WITNESS:  I think I --
8          MR. MILLER:  You've answered it
9  perfectly, Mark.  He's allowed to object.  But you
10  answered it perfectly, and keep going.
11         MR. KAPLAN:  And I move to strike
12  counsel's comments as inappropriate.
13         MR. MORIARTY:  Can I go on?
14         THE WITNESS:  In all fairness, I
15  thought I did.
16     Q.    What independent analysis did you do to
17  determine whether Digitek manufacturing and testing
18  processes were validated?
19     A.    In -- in looking at, for example, the
20  batch with the double-thick tablets, that
21  particular -- the evidence that I was shown for that
22  particular batch was horrendous.
23         It showed more errors than any batch
24  record I -- I won't say I've ever seen.  It ranks up
25  there.

21 (Pages 78 to 81)

PLAINTIFFS' EXHIBITS 003885

Page 82

1    The level of investigation as a
2  determination of a, quote, validated --
3    Q.    Excuse me.
4    MR. MILLER:  No.
5    Q.    I need to stop you.  What I'm asking is
6  not your overall opinion of their sloppiness or
7  their GMP.
8    I want to know what independent
9  analysis you did whether they were validated.  Not
10  whether they made mistakes or -- whether they were
11  validated.
12    A.    I'm trying to answer.
13    MR. MILLER:  And I'm going to object.
14  Excuse me, Mark.  I think the answer did go to the
15  question.
16    MR. MORIARTY:  That's fine.  Let him
17  answer.
18    MR. MILLER:  I'm going to let him
19  answer, Matt.
20    Q.    Go ahead.
21    A.    Did I find -- one more time.
22    Q.    I want to know what -- okay.  You've
23  already told me that nowhere in FDA's 483s or
24  warning letters did they make a specific comment
25  that FDA -- or Digitek processes were not validated

Page 83

1  or that Digitek equipment was not qualified.
2    What independent assessment did you do
3  about validation?  Not about GMP, about validation.
4    A.    You mean a validation study?
5    Q.    Yes.
6    A.    The only thing that I read concerning
7  Digitek was a 1993 process validation study.
8    Q.    Okay.
9    A.    That's it.
10    Q.    All right.  Now, among your answers
11  earlier, you said that there were lax practices in
12  the lab.
13    Can you show me anywhere in the
14  material that you reviewed where FDA said that there
15  were any lax laboratory practices regarding Digitek?
16    A.    I'd have to look at the -- Digitek?
17  I'd have to look at the -- all of the 483s, the
18  EIRs.  I'm sorry.  I -- I don't recall.
19    MR. KAPLAN:  That's what you did,
20  didn't you?
21    A.    I did, but I don't recall.  I was -- my
22  focus was not specifically only on Digitek.
23    My -- my focus is first to understand
24  what kind of systems and procedures are in place.
25  Is this a well-controlled company?

Page 84

1    Now, if --
2    MR. KAPLAN:  I'm going to move to
3  strike that as not responsive.
4    All he asked you was where did -- did
5  you see any reference to lax laboratory practices re
6  Digitek in anything that you reviewed?  That was the
7  question.
8    MR. MILLER:  And he's entitled to give
9  an answer.
10    MR. KAPLAN:  Yes or no?  Did you see
11  any reference?
12    MR. MILLER:  Let's answer his question
13  before we get to your question.
14    A.    I mean, I'm not trying to avoid the
15  question.  Understand, I'm not trying to avoid it.
16  I don't recall any.
17    Q.    Mr. Kenny, what I'm trying to do today
18  is be very specific, okay, about Digitek and
19  findings about Digitek by FDA or by you.  Okay?
20    (Exhibit 25, FDA Summary Report for
21  Sample Number 448881, was marked for
22  identification.)
23    MR. MILLER:  Thank you, Matt.
24    Q.    Have you ever seen Exhibit 25 before?
25    A.    No.

Page 85

1    MS. CARTER:  Matt, real quick, I have a
2  question about Exhibit 24 and 25.
3    Were these produced in -- in discovery?
4    MR. MORIARTY:  We got these from the
5  FDA pursuant to an FOIA request, just like you got
6  most of your documents from the FDA pursuant to an
7  FOIA request.  These are not my company's documents.
8    MS. CARTER:  Okay.
9    Q.    Have you ever seen Exhibit 25 before?
10    A.    No, I have not.
11    Q.    All right.  Is this Sample 448881?
12    A.    Oh, I'm sorry.  Yes.
13    Q.    FDA 484 sampling?
14    A.    Yes.
15    Q.    Okay.  And let's go -- if you go
16  through here, you see that what FDA did was go to a
17  Walmart pharmacy in Indiana and collect two
18  100-count bottles of Digitek 125 micrograms.
19    A.    Okay.
20    Q.    Is that right?
21    A.    I don't see the Walmart part, but
22  the -- I'll assume that what -- so they have
23  samples.  They collected them.  Okay.
24    Q.    Okay?
25    A.    Yeah.

PLAINTIFFS' EXHIBITS 003886

Mark G. Kenny, Volume I                                                                    June 29, 2010

Page 86

1      Q.     If you go to the second page, it says
2   "Walmart pharmacy warehouse" down there.
3           Do you see that?
4      A.    Please point that to me.  "Low-cost
5   generic" -- oh, yeah.  Okay.
6      Q.     And this was in December of 2007;
7   correct?
8      A.    Collection identification.  Sample --
9   it says something EB 12307?
10     Q.     Yes.  December 12, 2007.  The same
11  month in which Batch 70294 was on hold; correct?
12          Do you know that?
13     A.    I believe that's correct.  Wait a
14  minute.
15          Repeat the last part.
16     Q.     This is the same month, by coincidence,
17  that Batch 70924, the double-thick batch, was on
18  hold for investigation; correct?
19     A.    That is correct.
20     Q.     All right.  And what FDA did was,
21  again, test pursuant to the United States
22  Pharmacopeia methods.  And all these samples passed
23  all the tests to which FDA subjected them.
24          Is that correct?
25     A.    I'm going to assume, because in here it

Page 87

1   says the lab -- the product specifications for
2   identity, dissolution and content uniformity,
3   product meets it.
4      Q.    Okay.
5      A.    That's on page 1.
6           So I am going assume, you know, not
7   going through this thing, that they would have
8   highlighted whether or not there were any
9   non-compliances, non-conformances.
10     Q.    And this was Batch 70298 A1.
11          Is that right?
12          It's in the middle of the second page,
13  under "Manufacturer's Code."
14     A.    Yes.  70298 A1, expiration April of
15  2009.
16     Q.    Do you know whether this was a recalled
17  batch?
18     A.    I will make the assumption that it's
19  recalled because of the batch number.
20     Q.    Have you seen any test results of any
21  type to indicate that tablets from Batch 70298 A1
22  did not pass USP testing?
23     A.    As finished product test, no, I have
24  not.  As a finished product test.
25          (Exhibit 26, FDA Summary Report 448892,

Page 88

1   was marked for identification.)
2      Q.     Handing you what's been marked as
3   Exhibit 26.
4           MR. MORIARTY:  Harvey.
5           MR. KAPLAN:  Yes, sir.  Thank you.
6      Q.     We'll get good at reading these by the
7   end.
8      A.    I think we are getting better.
9           Can I circle things or not?
10     Q.    Sure.
11          MR. MILLER:  Is that on the -- you
12  don't want to write on the -- on the copy that's
13  being marked as an exhibit.
14          THE WITNESS:  Oh, okay.
15     Q.     There's the exhibit copy.  You mark
16  whatever you want on it.
17          December 3, 2007, FDA collected Sample
18  448892, again from a Walmart warehouse in Indiana.
19     A.    Okay.
20     Q.     The same day as the other -- as
21  Exhibit 25.
22     A.    All right.
23     Q.     And this was 200-count bottles of
24  .250 microgram Digitek; correct?
25     A.    Yes.

Page 89

1      Q.     From Batch 70664 A?
2      A.    70664 A1, correct.
3      Q.     And this -- all these samples tested
4   appropriately within the specifications?
5      A.    Yes.  It says:  "The product meets
6   specification for identity dissolution and content
7   uniformity."
8      Q.     Do you have any evidence, have you seen
9   any evidence to indicate that tablets from that
10  particular batch did not pass USP testing?
11     A.    I have no evidence to suggest that it
12  did not pass finished product testing.
13     Q.     Had you seen this before, by the way?
14     A.    No, I did not.  I haven't seen any of
15  the -- I can make a blanket statement.  I have not
16  seen those forms.
17          (Exhibit 27, FDA Collection Report for
18  Sample 453913, was marked for identification.)
19     Q.     Showing you what's been marked as
20  Exhibit 27.
21     A.    Okay.
22     Q.     Does it indicate that in February of
23  2008, FDA took Sample 453913?
24     A.    45 -- right.  Yes.
25     Q.     Was it one 1,000-count bottle of 125

23 (Pages 86 to 89)

PLAINTIFFS' EXHIBITS 003887

Mark G. Kenny, Volume I                                                              June 29, 2010

Page 90

1  microgram Digitek?
2      A.    One.  Correct.
3      Q.    And it was from Actavis Batch 70737 A?
4      A.    That's correct.  A1.
5      Q.    And did all the tests to which FDA
6  subjected these tablets pass the USP criteria?
7      A.    I'm trying to find the -- this is a
8  little different.
9          I assume that somewhere, it has that
10 statement.
11         Digoxin, reason for collection,
12 description sample method, how prepared,
13 identification, delivered, remarks.  I don't see
14 where it says that.
15         Wait a minute.  Let's look in here.
16 Continuation.
17         Okay.  If you look on, I don't know,
18 around the third page, page 1 of 1 -- looks like
19 this.
20     Q.    Yep.
21     A.    Okay.  It states that the -- where is
22 it now?
23     Q.    "The sample meets USP specifications
24 for identification, content uniformity and
25 dissolution"; correct?

Page 91

1      A.    Correct.
2      Q.    Have you seen any evidence to indicate
3  that any samples from Batch 70811 -- I'm sorry --
4  from Batch 70737 A1 did not pass USP testing?
5      A.    I see no evidence that the final
6  samples that have been tested, they've all met
7  finished product specifications.
8          (Exhibit 28, FDA Summary Report for
9  Sample Numbers 454866, was marked for
10 identification.)
11     Q.    Handing you what's been marked as
12 Exhibit 28.
13         This is February 15, same day as
14 Exhibit 27, Sample 454866; correct?
15     A.    45 -- correct.
16     Q.    And this was taken from a McKesson
17 warehouse in Georgia?
18     A.    Low-cost generic drug sample survey.
19 I'm looking.
20         I suspect it's here.
21     Q.    It's way at the back.  Way at the back.
22     A.    Oh, okay.
23     Q.    The second page from the back.  They
24 just send us these out of order.
25     A.    I understand.

Page 92

1      Q.    See that?  McKesson Drug Company?
2      A.    Yes, I do.
3      Q.    All right.  And this sample also was
4  subjected to USP testing for identification, content
5  uniformity and assay, and it passed; correct?
6      A.    Where does it say it passed?
7      Q.    Go to the very first page, under "Lab
8  Conclusion" --
9      A.    Yes.  Right.  "The sample meets USP
10 specifications for identity, dissolution and content
11 uniformity."  Yes.
12     Q.    Ever seen any test results to indicate
13 that Batch 70811 A had out-of-spec tablets?
14     A.    I don't recall it.  I would assume that
15 no, I have not seen it.
16     Q.    Do you know any of the other experts
17 hired by the plaintiffs in this case?
18     A.    I met Russ Soma.  I've talked with --
19 met him at a -- do I know -- yes.  Russ Soma.
20     Q.    Just Russ?
21     A.    Just Russ.
22     Q.    Did you refer the plaintiffs' lawyers
23 to Russ?
24     A.    Yes, I did.
25     Q.    Have you ever read an article written

Page 93

1  by one of the plaintiffs' experts named James
2  Farley?
3      A.    No.  I don't know the name.  But I've
4  heard the name.  That's all.  I haven't read
5  anything.
6      Q.    He wrote an article.  And I thought I
7  had extra copies of it here.  Let me just read you
8  this, and you can tell me whether you agree with it.
9          He co-wrote this article with a lawyer
10 about discovering the cause of a drug's defect.  And
11 it says:  "Pre-filing investigation.  When a client
12 comes to you suspecting that he or she has taken an
13 adulterated drug, you should tell the client to save
14 the drug, the container and all labeling and
15 packaging information."
16         Here's what I want to ask you about.
17 It says:  "Next, a laboratory must analyze the drug
18 and test for its active pharmaceutical ingredient
19 and for strength and purity."
20         Do you agree with that statement?
21     A.    That they must or they should?  I guess
22 I --
23     Q.    It says here "must."
24     A.    I would say they should.  Because it
25 depends upon the sample and the condition of the

24 (Pages 90 to 93)

PLAINTIFFS' EXHIBITS 003888

Page 94

1  sample and...
2      Q.     Let's go to Exhibit 29.
3            (Exhibit 29, FDA Collection Report for
4  Sample Number 452746, was marked for
5  identification.)
6      Q.     I assume you haven't seen this one
7  either.
8      A.     Correct.  Yeah, we can assume I haven't
9  seen any of these that look like this form.
10     Q.     Okay.  And here, we are looking at
11 Sample 462746; correct?
12     A.     Correct.
13     Q.     Collected March 21, 2008.
14           Is that right?
15     A.     Collected when?
16     Q.     March 21, 2008.
17     A.     March 26, 2008.  Correct.
18     Q.     And --
19           MR. KAPLAN:  I think you were talking
20 over each other.  March 21, March 26.
21     A.     It says March 26.
22     Q.     All right.  That's fine.  And this is
23 Batch 70834 A?
24           Oh, I'm sorry.  Batch 70300 A.
25           Do you find that anywhere?

Page 95

1      A.     I'm trying.
2            I see 56008 A.
3      Q.     Do you see a different manufacturer's
4  batch number than I just read?
5      A.     Look at this.  It appears that that is
6  the lot number.
7            MR. MILLER:  And for the record, when
8  you say "this," perhaps we ought to --
9            THE WITNESS:  Exhibit 29.
10           MR. MILLER:  There was a lot number --
11           THE WITNESS:  Yeah.
12           MR. MILLER:  -- that you were referring
13 to, I believe?
14           THE WITNESS:  The only thing that looks
15 like a -- looks like a lot number is 56008 A.
16     Q.     All right.  Look on the third page.
17     A.     The third page.
18     Q.     The middle says Lot 7P964.
19     A.     Yes, it does.
20     Q.     You see that?
21     A.     Correct.
22     Q.     And I will represent to you that that
23 is Actavis Batch 70300 A, renumbered by UDL, which
24 made these blister packages, as 7P964.
25     A.     Which is not unusual.

Page 96

1      Q.     All right.  And FDA tested the same
2  things, identity, content uniformity and assay, and
3  all these specimens passed USP standards?
4      A.     Meets specs.  That's correct.
5      Q.     Do you have any evidence to indicate
6  that there are tablets from Batch 70300 A that do
7  not meet the USP specifications?
8      A.     No.  I have no evidence.
9            (Exhibit 30, FDA Collection Report for
10 Sample Number 462753, was marked for
11 identification.)
12     Q.     Here is Exhibit 30.
13           Is this another FDA 484 sample report?
14     A.     Correct.
15     Q.     Sample 462753, also collected March
16 2008.
17     A.     2008?  I'm sorry.  Would you repeat the
18 lot number?
19     Q.     I haven't said the lot number.  I said
20 the sample number and when it was collected.
21     A.     Correct.  That is correct.
22     Q.     And my notes indicate that that's from
23 Batch 70834 A.
24     A.     This has another, I guess, 8A332 on
25 this page.

Page 97

1      Q.     I want you to assume that it is Actavis
2  Batch 70834 A.
3      A.     Surely.
4      Q.     Did this -- did the specimens tested by
5  the FDA meet the specifications for identification,
6  dissolution and content uniformity?
7      A.     On page 1 of 1, the fourth page, it
8  states that:  "Lab Conclusion:  Meets specs for
9  identification, dissolution and content uniformity."
10     Q.     Do you have any evidence to indicate
11 that tablets from Batch 70834 A did not meet those
12 specifications?
13     A.     I have no evidence.
14     Q.     Are you aware of any occasion in which
15 FDA did a 484 sample and found Digitek that didn't
16 meet the specifications under the USP?
17     A.     I have found no exceptions.
18     Q.     And I want to go through these quickly,
19 because we -- I will represent to you that the older
20 FDA has these documents, the less weighty they
21 become.
22           (Exhibit 31, FDA Summary Report for
23 Sample Number, was marked for identification.)
24     Q.     So Exhibit 31 is another 484 sample
25 set; correct?

PLAINTIFFS' EXHIBITS 003889

Mark G. Kenny, Volume I                                                    June 29, 2010

Page 98

1      A.    Correct.
2      Q.    And it says here that this was Batch --
3   well, this was -- this sample was taken in 2002;
4   correct?
5      A.    2002.  March 25th.
6      Q.    All right.  And it passed the USP
7   requirements for dissolution?
8      A.    Correct.  "Meets USP uniformity of
9   dosage units spec."
10     Q.    And then lower, it says it meets the
11  dissolution specs?
12     A.    "Product meets USP requirements for
13  dissolution at Stage 1."
14     Q.    All right.
15          (Exhibit 32, FDA Summary Report for
16  Sample Number 157504, was marked for
17  identification.)
18     Q.    Exhibit 32 is another Form 484 from the
19  FDA for a sample also taken in 2002; correct?
20     A.    Yes.
21     Q.    Did the -- did the product, as tested
22  by FDA, meet the USP specs?
23     A.    Yes, it did.
24          (Exhibit 33, FDA Summary Report for
25  Sample Number 178890, was marked for

Page 99

1   identification.)
2      Q.    Exhibit 33.  Is Exhibit 33 another 484
3   from the FDA?
4      A.    Yes.
5      Q.    Does it indicate that they took a
6   Digitek sample in 2002?
7      A.    Yes.
8      Q.    And it passed?
9      A.    They have conclusion --
10     Q.    Actually --
11     A.    It doesn't say anything.
12     Q.    Okay.  If it didn't -- well, here on
13  the right, it says "In Compliance," does it not?
14     A.    I don't know what that means.
15     Q.    All right.  If -- if it was found to be
16  out of spec, you would have expected to see some
17  evidence of that?
18     A.    I would -- I would presume that.  I
19  think it's a fair assumption.
20     Q.    And the last one of these is
21  Exhibit 34.
22          (Exhibit 34, FDA Summary Report for
23  Sample Number 178891, was marked for
24  identification.)
25     Q.    Is this another Form 484 from the FDA?

Page 100

1      A.    Oh, yes.  I'm sorry.
2      Q.    And tested Digitek?
3      A.    Correct.
4      Q.    And like the last one we looked at, it
5   says "In Compliance" in two different places?
6      A.    Yes.
7      Q.    Do you see any evidence that it didn't
8   pass?
9      A.    I see no evidence.  It's in compliance.
10     Q.    At least in the eyes of the FDA, do you
11  believe that these kind of 484 results provide some
12  assurance to them that the product itself is meeting
13  its labeled specifications?
14     A.    I would say that all testing that meets
15  specification provides added information, yes.
16     Q.    Well, I asked whether it provided FDA
17  assurances that the product was meeting
18  specifications.
19     A.    It provides a certain level of
20  assurance.
21     Q.    Does it also provide some level of
22  assurance to FDA that its tests are corroborating
23  the finished product tests performed by Actavis on
24  these batches?
25     A.    If I make the assumption that Actavis

Page 101

1   test results are acceptable, then I would say your
2   statement is correct.
3      Q.    All right.  You looked at the annual
4   reports --
5      A.    Correct.
6      Q.    -- did you not?
7      A.    Yes, I did.
8      Q.    Did you find any instances of finished
9   product, either assay or content uniformity, that
10  were outside the specifications, the USP
11  specifications, in the annual reports that you
12  reviewed?
13     A.    I'd have to go back to the annual
14  reports to say.
15     Q.    Okay.
16     A.    Which I have available, if you would
17  like me to.
18     Q.    First of all, if they were out of spec,
19  would you have expected there to be investigations?
20     A.    Most certainly.
21     Q.    Would you have expected there to be FDA
22  regulatory inquiries?
23     A.    Not necessarily.
24          They do sampling.  They don't -- they
25  don't do a comprehensive review of every annual

26 (Pages 98 to 101)

PLAINTIFFS' EXHIBITS 003890

Page 102

1 product review and every batch record. They do a
2 sampling.
3    Q.    Okay. Well, in your report, did you
4 note anywhere that there were out-of-specification
5 finished product test results contained in any
6 annual reports?
7    A.    I'd have to do more research on Lots
8 80224 A1 and 80227 and 80228 A1, because there's
9 some records indicating that these batches were not
10 acceptable. They had high weights. Both of -- all
11 three of those batches, according to records, says
12 it has high weights. I have not seen the batch
13 records.
14    Q.    Do you know how many of those batches
15 were rejected and not sent to Mylan for
16 distribution?
17    A.    I would assume that none of the
18 rejected batches were sent to Mylan.
19    Q.    Well, do you know specifically of those
20 three how many of them were rejected?
21    A.    No. I'd have to go back through the
22 records.
23          I am going to make the assumption that
24 they were rejected. I think that's a fair
25 assumption. The company is not going to release

Page 103

1 based upon out-of-specification results to the
2 market.
3          I mean, I don't know if that's a fair
4 assumption, but I'm going to assume they --
5    Q.    Well, let me get back to my -- my
6 question.
7          Did you note -- did you make comments
8 in your report, which is long -- I mean, 35-some-odd
9 pages -- about any out-of-specification results on
10 batches that were sent to the market for finished
11 product testing?
12    A.    That was sent to the market?
13          I'd have to -- I'd have to go back
14 through the history of these batches to see if they
15 were released. I can -- I can think of no example
16 at this particular point.
17          MR. KAPLAN:  Again, I'm going to move
18 to strike his last answer as not responsive.
19          He said in your report, did you make
20 any comments?
21    A.    Oh, in my report? Well --
22          MR. KAPLAN:  No. In your report, did
23 you make any comment on any out-of-spec batches that
24 were sent to the market? Did you? Yes or no?
25    A.    I can't answer it that way.

Page 104

1          Did I make a remark? No. But I can't
2 tell you, without investigating these three batches,
3 whether they went to the market.
4    Q.    Okay. Now, we've looked at all these
5 testing by FDA. All right?
6    A.    Yes.
7    Q.    And let's just take the batches that
8 FDA tested.
9    A.    Okay.
10    Q.    All right?
11    A.    Yes.
12    Q.    Just those.
13          If somebody assumed that all of the
14 tablets in a particular batch were outside the USP
15 specifications, this FDA testing proves that that is
16 an incorrect assumption.
17          Is that right?
18    A.    That is correct.
19          MR. MORIARTY:  I need to look for an
20 exhibit.
21    Q.    I'll give you the flattest one.
22          This is Exhibit 35.
23          (Exhibit 35, Celsis Report, was for
24 identification.)
25    Q.    Do you see that?

Page 105

1    A.    Yes.
2    Q.    This is captioned, on the first page,
3 "Celsis," C-E-L-S-I-S, "Analytical Services."
4          Do you see that?
5    A.    Yes.
6    Q.    Are you familiar with Celsis Analytical
7 Services?
8    A.    No, I'm not.
9    Q.    Have you reviewed Exhibit 35? Is it
10 listed in your --
11    A.    No.
12    Q.    -- Appendix B?
13    A.    I have not reviewed it. It is not
14 listed.
15    Q.    In the depositions of the Mylan or UDL
16 employees that you read, did you see that, from time
17 to time, UDL sent product out for USP testing?
18    A.    Yes.
19    Q.    And, on some occasions, they did that
20 just to -- for example, because when they repackage,
21 they need to test dissolution and whether their
22 repackaging is going to affect the stability of the
23 product; correct?
24    A.    I don't know why they sent it to UDL.
25    Q.    All right. Did you see an instance in,

27 (Pages 102 to 105)

Page 106

1  say, any of the Mylan depositions where UDL sent
2  material out to be tested because FDA was concerned
3  about product quality?
4       A.    Not specifically.
5       Q.    Well, I will represent to you that
6  Exhibit 35, which is rather thick, contains testing
7  done at the behest of UDL, sent to Celsis
8  laboratories on a number of different occasions.
9  And in each instance, the Digitek they sent passed
10  the tests to which it was subjected.
11          Do you have any reason to believe that
12  that did not happen?
13      A.    I have no reason to believe, but I'd
14  like to read it in order to answer that, if it's
15  okay.
16          I'm not going to -- I just want to read
17  something.
18      Q.    Go ahead.
19      A.    Can I write on this?
20      Q.    Yes.  We have extras.
21      A.    It may be a question mark or something
22  like that.
23          I can't read this.  It says:  "No less
24  than 60 percent in 30," and they scribbled out
25  "percent."

Page 107

1          In order to confirm this, I'd have to
2  go to the product specification that this is the
3  correct specification.
4       Q.    You mean 90 to 110 percent?
5       A.    No.  I'm assuming that's correct.
6  That's typical, but not necessarily correct.
7       Q.    Well, let -- let me rephrase it,
8  because this is a very long document.
9          At any point in the Mylan employee
10  depositions, did anybody bring to the attention of
11  those Mylan employees who were being questioned
12  out-of-specification Digitek results from any
13  testing that UDL had sent to Celsis laboratories?
14      A.    I -- I don't know, but I don't recall
15  seeing anything.
16          MR. KAPLAN:  Would you read back the
17  last question and answer, please.
18          (Requested portion is read.)
19      Q.    Okay.  Let's shift to Exhibit 69.
20          (Exhibit 69, UDL Laboratories Receiving
21  Form, was marked for identification.)
22      A.    Okay.
23      Q.    Have you ever seen Exhibit 69 before?
24      A.    It does not look familiar.
25      Q.    And attached to all this is documents

Page 108

1  regarding a shipment of Digitek that was sent to UDL
2  by Mylan and originally by Actavis; correct?
3       A.    Yeah.  I apologize.  I was looking at
4  the specification here of 90 to 105.
5          But could you repeat the question?
6       Q.    Well, the documents have to do with a
7  batch of Digitek that was sent to UDL; correct?
8       A.    No.  But I thought I saw here between
9  90 and 100 is the spec and -- oh, 110.  And here,
10  I'm seeing the 90 to 105.
11      Q.    Okay.  Could there be different specs
12  for different tests?
13      A.    Not for assay.
14          But it could be different products.
15  This is .25.
16          May I look at the other document?
17          MR. MILLER:  Certainly.
18          THE WITNESS:  That one.  I think it's
19  on top.
20      A.    These are .25, and it says 90 to 110.
21          This is .25, and it says 90 to 105.
22      Q.    Do you know whether -- go ahead.
23      A.    So one is incorrect.
24      Q.    Do you know whether FDA ever changed or
25  USP ever changed the testing specs?

Page 109

1       A.    I don't know, but it's highly unusual.
2       Q.    Have you ever seen any Celsis
3  laboratory or UDL documents which indicate that
4  Digitek samples tested by Celsis were ever out of
5  specification, according to the USP specs?
6       A.    I don't recall seeing anything.
7       Q.    All right.
8          Do you have an opinion as to whether or
9  not any consumer ever received a tablet that was
10  outside -- let me rephrase that.  Let me withdraw it
11  and rephrase it.
12          Do you have an opinion, to a reasonable
13  degree of probability, as to whether any consumer
14  ever received a tablet of recalled Digitek that was
15  normal in size but outside its USP specifications?
16      A.    Do I have a concern?  Yes.
17      Q.    That's not what I asked.
18      A.    You have to rephrase it.
19      Q.    Let's stop.  This is a very specific
20  question.
21      A.    Sure.
22      Q.    Do you have --
23      A.    I'm trying to answer it as well as I
24  can.
25          MR. KAPLAN:  Listen.  Just listen to

28 (Pages 106 to 109)

PLAINTIFFS' EXHIBITS 003892

Page 110

1   his question.
2       Q.    It's a very specific question.
3            Do you have an opinion, to a reasonable
4   degree of probability, as to whether any consumer
5   received a Digitek -- recalled Digitek tablet that
6   was normal in size but outside its USP
7   specifications?
8       A.    Not within a reasonable probability.
9       Q.    All right.  Are you a -- do you have
10  any expertise in statistics?
11      A.    I have knowledge of it.
12      Q.    Do you have expertise in it?
13      A.    No.  I would not say I'm an expert.
14      Q.    Do you know anything about statistical
15  significance?
16      A.    I have some knowledge of it.
17      Q.    All right.  Do you have an opinion as
18  to whether 4 1/2 percent -- let me rephrase that
19  question.
20           FDA tested 7 of the 152 recalled
21  batches --
22      A.    Okay.
23      Q.    -- independently in these 484s that I
24  have had marked as exhibits.
25           By my math, that's 4.6 percent.

Page 111

1       A.    Okay.
2       Q.    Okay?
3            Is their testing statistically
4   significant?
5       A.    I don't know without taking a look at a
6   statistical table.
7            I will say that it appears like a -- a
8   sample that had a 95 percent confidence interval
9   would approach what would be considered a
10  statistically significant sampling.
11      Q.    All right.  Celsis labs, by --
12      A.    But I would have to pull 105E, or
13  whatever.
14      Q.    What's 105E?
15      A.    It is a military standard that's used
16  throughout industry for sample -- sample
17  inspections.
18      Q.    You mean the one that nobody can read
19  and understand?
20      A.    No.  I can read and understand it.
21      Q.    You may be the only person on earth.
22           Have you used 105E in your work?
23      A.    Yes.  Not recently, but yes.
24      Q.    Is it reliable or considered to be
25  reliable?

Page 112

1       A.    It's considered to be statistically
2   accurate, yes.
3       Q.    Okay.  Celsis, by my calculations --
4   please assume I'm correct -- independently tested at
5   UDL's request that turned out to be 11 out of the
6   152 recalled batches.
7       A.    Okay.
8       Q.    Which is 7.2 percent.
9       A.    Okay.
10      Q.    Is that statistically significant?
11      A.    I don't know.  I would have to take a
12  look at the tables.  It does approach the number
13  that I would anticipate would be in 105E.
14           I'm not trying to avoid it, but I don't
15  know that number.  I'd have to take a look at --
16      Q.    That's fine.  I understand.  I told you
17  early on if you don't know the answer to my
18  question, I want you to tell me you don't know.
19      A.    I don't know.
20      Q.    I don't want you to guess.
21      A.    I don't know.
22      Q.    Now, if we eliminate any overlap
23  between FDA testing and Celsis testing -- let's
24  assume that that is 16 of the 152 recalled batches.
25      A.    Um-hum.

Page 113

1       Q.    Which is about 10.5 percent.
2            Okay?  You with me?
3       A.    Yes.
4       Q.    That would be statistically
5   significant, wouldn't it?
6            MR. MILLER:  Object to form.
7            Go ahead.  You can answer.
8       A.    105E, all sampling is intended to be a
9   proactive sampling.  It is intended to take a look
10  at a distribution of homogeneous product.
11           Based upon the sampling, based upon
12  your acceptability, your AQL, you determine what the
13  sample size is.
14           So, basically, it goes down to how many
15  samples are you willing to say are unacceptable
16  in -- in whatever sampling population you did?
17           You don't back into it by taking
18  samples and keep your fingers -- keep sampling until
19  you find something that's potentially rejectable.
20           That's not a statistical sample.  A
21  statistical sample is a proactive, is an
22  experimental plan, and it's based upon probability
23  charts.
24      Q.    Were the Amide and then Actavis blend
25  uniformity sampling plans contained in the ANDA?

29 (Pages 110 to 113)

PLAINTIFFS' EXHIBITS 003893

Mark G. Kenny, Volume I                                                                                          June 29, 2010

Page 114

1     A.    I don't know.  I'd have to look at the
2  ANDA.
3     Q.    Were they contained in every batch
4  record?
5     A.    Could you repeat the question?
6     Q.    Were they contained in every batch
7  record?
8     A.    What --
9     Q.    One uniformity sampling plans.
10    A.    One uniformity sampling plans, were
11 they contained in -- in the batch records?  That's
12 correct.
13    Q.    So the number they took and where in
14 the blender, etcetera; correct?
15    A.    Yeah.
16    Q.    All right.  Now, so FDA had every
17 opportunity to comment on those in their analysis of
18 the ANDA or if they ever looked at batch records;
19 correct?
20    A.    Yes.
21    Q.    And Quantic Regulatory Services had
22 that same opportunity, at least as to the 39 Digitek
23 batches they reviewed; correct?
24    A.    That's correct.
25    Q.    All right.  Now, I don't want to talk

Page 115

1  about blend uniformity out of specs.  I just want to
2  talk about the sampling plan.
3         Have you seen any evidence in any FDA
4  document in which the FDA observed, cited or warned
5  Actavis about the sampling plan itself for blend
6  uniformity?
7     A.    FDA?  No.  I saw nothing.
8     Q.    Okay.  Now, you know that during batch
9  production of solid oral dose, operators in QA were
10 taking a certain number of tablets for thickness,
11 hardness, appearance and weight; correct?
12    A.    That's correct.
13    Q.    And those sampling plans were in the
14 ANDA and every batch record; correct?
15    A.    They are in the batch record.  I'm not
16 sure if it's in the ANDA.
17    Q.    And did you ever see, in any FDA
18 document, where FDA observed, criticized or warned
19 Actavis or Amide about the number of tablets that
20 they sampled in that manner in process?
21    A.    I don't recall.
22    Q.    And then lastly, and then we have to
23 stop to change the tape, the finished product
24 testing, you know, how many they take for content
25 uniformity, how many they take for assay, etcetera,

Page 116

1  was all in the ANDA and the batch records; correct?
2     A.    It's in the batch records.
3         I can't tell you what's in the ANDA.
4     Q.    Did you ever see any FDA criticism in
5  any of the documents that you reviewed of the number
6  of samples that Actavis took to test assay or
7  content uniformity or dissolution or stability in --
8     A.    In the sampling, no, I did not.
9         MR. MORIARTY:  Let's take a break
10 because of the timing.
11        THE VIDEOGRAPHER:  Stand by.  We are
12 going off the record.  The time is 11:29 A.M.  This
13 is the end of Tape Number 2.
14        (Recess was taken.)
15        THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 11:35 A.M.  This is the
17 beginning of Tape Number 3.
18    Q.    Before that short break, we were
19 talking about sampling plans.
20        First of all, have you referred to any
21 literature in your Appendix B about sampling plans?
22    A.    I don't recall.  I don't think so.
23    Q.    And I don't recall seeing anything in
24 your report critical of my client's in process or
25 finished processed sampling plans.

Page 117

1         Is that correct?
2     A.    Not 100 percent correct.
3     Q.    Why not?
4     A.    I put in -- I put in there, or I put in
5  the report that as part of issues, non-conformances,
6  out of specifications, situations where high risk
7  could occur, I saw no evidence that they attempted
8  to take a look at the sampling plan to increase the
9  confidence that the product leaving the door didn't
10 have problems.
11    Q.    In your opinion, to a reasonable
12 probability, are any of my client's blend
13 uniformity, in process or finished processed
14 sampling plans negligent?
15        MS. CARTER:  Objection to form.
16    Q.    For Digitek.  For Digitek.
17    A.    I would say their proactive plans, I
18 saw no -- no issues.  I think they were valid
19 sampling plans.
20    Q.    All right.  I forgot these before when
21 I was asking you about the FDA and their testing of
22 Digitek.
23        Do you know what the batch
24 certification program was way back when, in the '80s
25 and '90s?

30 (Pages 114 to 117)

PLAINTIFFS' EXHIBITS 003894

Mark G. Kenny, Volume I                                                                 June 29, 2010

Page 118

1      A.    I heard the term.  I'm not familiar
2  with it.
3      Q.    That's when, for some drugs, FDA had to
4  test and approve the release of batches before they
5  could go to market; correct?
6      A.    I don't know if that's correct.
7            (Exhibit 4, Letter dated June 8, 1995
8  to Shah from Department of Health & Human Services,
9  was marked for identification.)
10     Q.    Have you ever seen Exhibit 4?
11     A.    No, I have not.  1995?
12     Q.    This is a letter from FDA to then Amide
13 indicating that these nine batches of Digitek passed
14 their testing and could be released to market;
15 correct?
16     A.    That's correct.  This 1995 document,
17 yes.
18           (Exhibit 5, Letter dated July 20, 1995
19 to Shah from Department of Health & Human Services,
20 was marked for identification.)
21     Q.    And here is Exhibit 5.  Is this a
22 letter -- first of all, have you ever seen this
23 before?
24     A.    No, I have not.
25     Q.    Is this a letter from FDA to then Amide

Page 120

1      Q.    It would be --
2      A.    -- millions.
3      Q.    -- about 688.2 million.
4      A.    Okay.
5      Q.    Approximately.  Is that correct?
6      A.    If you say so.  You've done the math.
7      Q.    If you go by the theoretical batch size
8  of 4.8 or 4.2.
9      A.    Okay.
10     Q.    Correct?  Depending on the dose size?
11     A.    If your math is right.  And I have no
12 reason to believe it's not.
13           (Exhibit 36, Recall -- Firm Press
14 Release, was marked for identification.)
15     Q.    This is Exhibit 36.
16           I believe you've seen this.
17           That's in your --
18     A.    Yes.
19     Q.    -- binder, isn't it?
20           That's the recall press release?
21     A.    Well, it might not be in my binder
22 because I looked at it electronically.
23     Q.    Is it the recall press release?
24           MR. KAPLAN:  Is there an answer to that
25 question?

Page 119

1  indicating that they were exempt from the batch
2  certification program?
3      A.    That's what it states.
4      Q.    And wouldn't FDA only do that if they
5  had a high degree of confidence that the process was
6  validated and in control?
7      A.    I believe that's correct.
8      Q.    Okay.  Do you know how many people in
9  the United States were prescribed Digoxin between
10 2006 and 2008?
11     A.    No.  I have no idea.
12     Q.    Do you know how many prescriptions were
13 written for Digoxin products between 2006 and 2008?
14     A.    I have no idea.
15     Q.    Do you know how many people were taking
16 Digitek between 2006 and 2008?
17     A.    I have no idea.
18     Q.    Have you ever done the math to figure
19 out how many tablets were affected by the Digitek
20 recall?
21     A.    How many tablets were affected?  No, I
22 have not.
23           If you figure there's 5 million
24 tablets, and go through the number of lots, and
25 multiply it out --

Page 121

1            THE WITNESS:  I'm briefly looking
2  through it.
3            MR. KAPLAN:  The question is simply:
4  Is that the recall press release?
5            THE WITNESS:  This is a -- yes.  Yes.
6  It appears to be, yes.
7      Q.    And it's Tab -- or it's Reference
8  Number 59 in your Appendix B, is it not?
9      A.    Yes.
10     Q.    Now, it indicates generally in here
11 that the recall is due to the possibility that
12 tablets with double the appropriate thickness may
13 have been commercially released.
14           Do you see that?
15     A.    Yes.
16     Q.    Is there anywhere in Exhibit 36 that
17 indicates that this recall was about tablets of
18 normal size with varying levels of deactive
19 pharmaceutical ingredient?
20     A.    Well, yes.  Double strength.  It varies
21 by two.
22     Q.    Let's -- let's read that again and ask
23 my question again.
24           It says:  "The voluntary all-lot recall
25 is due to the possibility that tablets with double

31 (Pages 118 to 121)

PLAINTIFFS' EXHIBITS 003895

Mark G. Kenny, Volume I                                                    June 29, 2010

---

Page 122

1  the appropriate thickness may have been commercially
2  released?
3          Do you see that?
4      A.   Yes.
5      Q.   My question is this: Is there anything
6  in this FDA-approved press release that indicates
7  that this recall was about normally-sized tablets
8  with varying levels of the active pharmaceutical
9  ingredient?
10     A.   Normal size, no.
11     Q.   All right. In your opinion, Mr. Kenny,
12 is double thick a different problem than normal size
13 with varying active pharmaceutical ingredient?
14     A.   Could you repeat the question again?
15 I'm trying to answer that clearly.
16     Q.   Sure. You were in the pharmaceutical
17 business with J&J for 30 years; right?
18     A.   Yeah. On and off.
19     Q.   Okay. You know what investigations are
20 all about; correct?
21     A.   Most certainly.
22     Q.   And you know generally how to
23 manufacture, blend manufacture tablets?
24     A.   In general, correct.
25     Q.   All right. If somebody came to you,

---

Page 123

1  either at J&J or now in your consulting work with
2  SpyGlass, and said we've got a problem with
3  double-thick tablets, you would design an
4  investigation about that; correct?
5      A.   I would assist them, if asked.
6      Q.   Okay. And I assume that what you're
7  looking for is some sort of a cause --
8      A.   Correct.
9      Q.   -- of what would make double-thick
10 tablets; right?
11     A.   Right.
12     Q.   And, obviously, it's a size issue. At
13 its core, it's a size issue; correct?
14     A.   There is a -- it's -- I guess I would
15 say yes.
16     Q.   All right. And then, by virtue of
17 size, you'd want to know what -- is it too many
18 excipients with normal pharmaceutical ingredient
19 levels, or is it double the active pharmaceutical
20 ingredients; right?
21     A.   Right. You'd want to know the --
22 whether or not the content uniformity was correct.
23     Q.   Right.
24     A.   And if you made -- did an investigation
25 and said content uniformity is correct, then it

---

Page 124

1  would probably pinpoint you to a tableting press,
2  and you'd say that it is a physical issue.
3      Q.   All right. Now, but on the other side
4  of the equation, if somebody at J&J or in your
5  consulting business with SpyGlass said we have a
6  problem with -- our tablets are normal in size, but
7  the active pharmaceutical ingredient is varying all
8  over the place, your investigation would potentially
9  take a different course; correct?
10     A.   Of course.
11     Q.   And the root cause might be completely
12 different from the first scenario; correct?
13     A.   It is a possibility it could be
14 completely different, yes.
15     Q.   And that is a distinction that the FDA
16 would clearly recognize; is it not?
17     A.   I don't know. I can't speak for them.
18     Q.   Have you seen any document to indicate
19 that the Digitek recall was about anything other
20 than the double-thick tablet investigation that grew
21 out of Batch 70924 A?
22     A.   Stated as such, no.
23          (Exhibit 38, FDA Website Statement July
24 2009, was marked for identification.)
25     Q.   I've handed you what's been marked as

---

Page 125

1  Exhibit 38; correct?
2      A.   Correct.
3      Q.   Have you ever seen that before?
4      A.   Yes, I have.
5      Q.   This is a statement on an FDA website
6  from July of 2009.
7          Is that right?
8      A.   Where do you see 2009?
9          You printed it on 6/15/2010.
10     Q.   Which means it's still on the FDA
11 website this month; correct?
12     A.   I believe that.
13     Q.   Do you know when they initially posted
14 this?
15     A.   I have no idea.
16     Q.   And it's a -- it's entitled "Facts and
17 Myths About Generic Drugs."
18          Do you see that?
19     A.   I certainly do.
20     Q.   And down about halfway on the first
21 page of this exhibit, it says: "Recently, some
22 misinformation has raised concerns over generic
23 drugs. Below are some common myths in circulation."
24          Did I read that correctly?
25     A.   Halfway down? Please show me.

---

32 (Pages 122 to 125)

Mark G. Kenny, Volume I                                                                                    June 29, 2010

Page 126

1    Q.    There or there.
2    A.    "Recently, some misinformation" -- yes.
3 "Below are some of the common myths in circulation."
4    Q.    Go to the second page, please.
5          The first full section on the second
6 page says: "Myth: There are quality problems with
7 generic drug manufacturing.  A recent recall of
8 generic Digoxin, called Digitek, shows that generic
9 drugs put patients at risk."
10         Did I read the myth correctly?
11   A.    I believe you did.
12   Q.    And then it says: "Fact: FDA's
13 aggressive action in this case demonstrates the high
14 standards to which all prescription drugs, generic
15 and brand name, are held."
16         Did I read that correctly?
17   A.    Yes, you did.
18   Q.    Now, let's go down to the fourth bullet
19 point, the second sentence in the fourth bullet
20 point.
21         "In our best judgment, given the very
22 small number of defective tablets that may have
23 reached the market and the lack of reported adverse
24 events before the recall, harm to patients was very
25 unlikely."

Page 127

1          Did I read it correctly?
2    A.    Yes, you did.
3    Q.    Do you disagree with the FDA's
4 statement in this website?
5    A.    Yes, I do.
6    Q.    What's your basis for disagreeing with
7 the FDA's conclusion in this regard?
8    A.    Okay.  There is, at least in my
9 industry, a generally-accepted term, or at least
10 concept, that you only receive a small portion of
11 the actual adverse reactions, general complaints,
12 regardless; that either the people don't realize
13 that they had a problem, they're lazy, so that
14 people have quoted 1 in 20 people will actually
15 complain.
16         On consumer products, it could be
17 slightly higher.  There's an 800 number they call up
18 and get a free product.
19         People don't even understand how to
20 complain, if you will.
21         So I would not agree with that
22 statement.
23   Q.    So the part that you're focusing in on
24 is what the FDA said here about the lack of reported
25 adverse events before the recall?

Page 128

1    A.    Correct.
2    Q.    When you were with J&J, were you in
3 pharmacovigilance?
4    A.    No.
5    Q.    Are you a pharmacovigilance expert?
6    A.    I am not.
7    Q.    When you consult for SpyGlass to your
8 current clients in the last six years, do you
9 consult in pharmacovigilance?
10   A.    I -- I consult indirectly to that.
11         I look at complaints.  I look at
12 adverse events.  I look to the investigations that
13 they performed.  I determine whether or not their
14 investigations are adequate.
15         I make a clear determination, based
16 upon looking at, over the -- just the last year,
17 hundreds of adverse reactions and complaints as to
18 whether or not I felt, in my opinion, they were
19 adequately investigated.
20         So I will tell you, as part of the
21 pharmacovigilance process, that is my role I've been
22 asked to perform.
23   Q.    Have you seen any evidence in this case
24 that there were reports of harm to Actavis regarding
25 Digitek prior to the recall that were not reported

Page 129

1 to the FDA at all?
2    A.    I have seen no evidence in that regard
3 at all.  I haven't seen any reports of adverse
4 events.  I have seen no complaint investigations,
5 other than 3611A.
6          So I -- I can't answer that because I
7 haven't seen anything.
8    Q.    All right.  Let me break the FDA's
9 website statement down in phrases.
10   A.    Okay.
11   Q.    They say: "In our best judgment, given
12 the very small number of defective tablets that may
13 have reached the market."
14         Do you agree with them when they make
15 that statement?
16   A.    I don't know how they can say the
17 number is very small.  They don't know.
18   Q.    And you don't know either, do you?
19   A.    Of course not.
20   Q.    Okay.
21   A.    But if somebody makes a determination
22 that's counter to my experience, I can't make
23 that -- say the number is very small.  I can't say
24 there's none.  I can't say that there are a lot.
25         I think, based upon this type of -- in

33 (Pages 126 to 129)

PLAINTIFFS' EXHIBITS 003897

Mark G. Kenny, Volume I                                                                  June 29, 2010

Page 130

1  this context, you know, I'm not trying to be
2  difficult, but I couldn't say that.
3      Q.    All right.  The last statement that
4  they make, "harm to patients was very unlikely," do
5  you agree with that?
6      A.    I have -- this is clearly going beyond
7  my own expertise.
8      Q.    Well, just statistically, if you don't
9  know the number of defective tablets that may have
10 gotten out, you have no way to quantitate the
11 potential harm to consumers, do you?
12     A.    I am not involved in harm to consumers.
13 I'm involved with the manufacturing process.  I'm
14 involved at the compliance level.  I'm involved with
15 adequate investigations.  I'm involved with annual
16 product reviews.  That's the extent.
17     Anything -- if I start going into the
18 field and determine whether something's safe or not,
19 I've gone beyond my own expertise.  And that would
20 be irresponsible.
21     Q.    Do you have any idea what percentage of
22 pharmacies still hand-count out tablets when they
23 fill prescriptions?
24     A.    I have no -- no idea.
25     Q.    Do you have any opinion, from a

Page 131

1  pharmacy point of view, as to how easy it would be,
2  relatively speaking, to detect a double-thick
3  Digitek tablet?
4          MR. MILLER:  Object to form.
5      A.    I would have no idea.
6      Q.    If you wanted to scientifically
7  determine whether double-thick tablets -- let's just
8  leave it at that for now -- ever actually got to
9  consumers, would you look at batch records about the
10 weighing and measuring of tablets?
11     A.    Most certainly.
12     Q.    Would you ask consumers to have their
13 tablets weighed or measured?
14     A.    Ask consumers?  I don't believe so.
15     Q.    Okay.
16     A.    Let me answer that accurately.  What do
17 you mean by "ask consumers"?  I am not involved with
18 asking consumers.
19     Q.    That's fine.  We're in the context of a
20 litigation --
21     A.    Okay.
22     Q.    -- where the population on one side is
23 a discrete number of people who claim they got
24 defective tablets.  Let's continue to stick with
25 double thick.

Page 132

1      A.    Okay.
2      Q.    Among the people who still had tablets
3  left over, the weighing and measuring of them with
4  micrometers and sensitive scales is not a difficult
5  process, is it?
6      A.    Weighing -- no.
7      Q.    And if you wanted to investigate, like
8  Professor Farley's article said, weighing and
9  measuring could be done; correct?
10     A.    Yes.
11     Q.    And you would want to look to the
12 instances of customer complaints made to either the
13 distributor or to Actavis itself about double-thick
14 tablets found by consumers, would you not?
15     A.    I would look at that and other
16 potentially related adverse events and -- I would
17 look at the entire picture.  I would not just limit
18 it to this one situation, because it could be -- it
19 could be a compounded -- a confounded issue based
20 upon things that I don't know.
21     So you look at everything because you
22 don't know what you don't know.
23     Q.    Okay.  Well, let me ask:  First, with
24 regard to recalled Digitek, have you ever seen
25 anything in any of the material that you reviewed

Page 133

1  that a pharmacist or a consumer has reported an
2  actual tablet that is outside its size or weight
3  specifications?
4      A.    I -- I don't believe that I've seen it.
5      Q.    Okay.  So I've asked you that.  An hour
6  or so ago, I asked if you have seen any evidence
7  that there were tablets of normal size with outside
8  the USP specifications for active pharmaceutical
9  ingredient.
10     And you said you hadn't seen any of
11 those either; correct?
12         MR. MILLER:  Objection to form.
13 Misstates previous testimony.
14     A.    You know, it's interesting, based upon
15 the fact --
16         MR. KAPLAN:  Wait, wait.
17         THE WITNESS:  I'm sorry.
18         MR. KAPLAN:  You started -- you started
19 making a comment.  You are not responding to the
20 question.  Please refrain from that.
21         THE WITNESS:  I want to answer his
22 questions, sir.
23     Q.    Have you seen any tests from consumers
24 or otherwise --
25     A.    Okay.  Are returned samples from

34 (Pages 130 to 133)

PLAINTIFFS' EXHIBITS 003898

Mark G. Kenny, Volume I                                                                          June 29, 2010

Page 134

1   consumers?
2        Q.    Returned samples from consumers or
3   tests that consumers have of samples that they kept
4   or tests done by the FDA or anybody else to indicate
5   that there are normal-sized tablets outside the
6   specification --
7        A.    I haven't seen any tests.
8        Q.    Okay.
9        A.    So I can't see any tests that are out.
10       Q.    All right.  So do you have any evidence
11  at all that Digitek, outside its labeled
12  specifications, reached consumers in this
13  litigation?
14       A.    Please, this is an important question.
15  Repeat it.
16            MR. MORIARTY:  Read that one back,
17  please.
18            (Requested portion is read.)
19       A.    I have no evidence.
20       Q.    Do you know what a red herring is?
21       A.    I think I do.
22       Q.    Do you know plaintiffs' lawyers in this
23  litigation said, in court and in court documents,
24  that the double-thick theory is a red herring?
25            MR. MILLER:  Object to form.

Page 135

1        A.    I'm not familiar with that.
2            MR. MORIARTY:  What was wrong with the
3   form of that question, Pete?  Because I'd really
4   like the opportunity to correct it.
5            MR. MILLER:  Well, it's vague.
6            What -- what attorneys?  He's worked
7   with several attorneys.  And it's -- I think the
8   term "attorneys" is broad and vague.
9            If you want to put the who into it.
10           MR. MORIARTY:  Your colleagues in the
11  PSC.
12           He said he wasn't aware of it, so I
13  don't need to get more specific.
14       Q.    Can you point me to any FDA 483 warning
15  letter or EIR in the material that you reviewed that
16  specifically indicates that they found Digitek
17  tablets of normal size with varying amounts of the
18  active pharmaceutical ingredient?
19       A.    That were released?
20       Q.    Yes.
21       A.    I don't recall any instances.
22       Q.    Okay.  Can you show me in any of the
23  material you reviewed any statement by the FDA that
24  they found normal-sized Digitek tablets -- okay.
25  I'll withdraw that question.

Page 136

1            When you say "released," you mean
2   released to a distributor to go to market; correct?
3        A.    Once you let -- once you say it's
4   released in your SAP system, it's released, because
5   it's out of your control at that particular point.
6   That's what I mean by "released."
7        Q.    Does the ANDA have a section that
8   contains the actual pharmaceutical product formula
9   for Digitek?
10       A.    Yes, it does.
11           But I will say I am and most quality
12  assurance people are not experts at the ANDA.
13           What we are, is we are experts once
14  that -- once that -- once -- the ripple effect, if
15  you will, somebody in regulatory and development has
16  taken that and translated it into a specification.
17  When it becomes a specification, then quality
18  assurance people are involved.
19       Q.    Okay.  But in general, from what you
20  know, is the pharmaceutical formulation, the recipe,
21  if you will, contained in all the batch records?
22       A.    In the batch records?  Yes, it is.
23       Q.    So FDA presumably has had an
24  opportunity to look at the ANDA and all these batch
25  records, if it looks at them, to see what the

Page 137

1   formula is about; correct?
2        A.    I don't know what they looked at.
3        Q.    All right.  And in order to start the
4   process off right, you have to mix the ingredients
5   appropriately and in their appropriate proportions;
6   correct?
7        A.    That is correct.
8        Q.    One potential root cause of tablets
9   outside their active pharmaceutical ingredient specs
10  would be if they mixed it wrong initially by putting
11  in either too much or too little API.
12           Is that right?
13       A.    Yes.
14       Q.    Have you seen in the material that you
15  reviewed any citations, warnings by FDA upon Actavis
16  or Amide for problems related to following the
17  formula appropriately and putting in the proper
18  amount of API?
19       A.    I do not recall a single instance.
20       Q.    All right.  And typically, the actual
21  mixing of the ingredients in its proportions is done
22  by one person and then verified by a second.
23           Is that right?
24       A.    That's the way it's supposed to be
25  done.  Correct.

35 (Pages 134 to 137)

PLAINTIFFS' EXHIBITS 003899

Page 138

1       Q.      Did you see any batch record that
2   indicated that the company did not follow the
3   appropriate formula?
4       A.      No.
5       Q.      If by chance, purely hypothetically,
6   the company wanted to -- any pharmaceutical company
7   wanted to cut corners and save costs, they would put
8   too little API in the batch as opposed to too much;
9   correct?
10      A.      Sir, it is illegal to vary from the
11  batch record.
12          If you are assuming that somebody was
13  totally unethical, then they may put that in.  I
14  can't speculate on somebody who is totally
15  dishonest.
16      Q.      All right.  And you've seen nothing in
17  here, in the material you've reviewed, to indicate
18  that anyone at Amide or Actavis was totally
19  dishonest in the manufacturing of Digitek; correct?
20      A.      Correct.
21      Q.      Are you aware that --
22      A.      Can I qualify that?
23          I don't know how I would understand
24  whether they were honest or not.
25          I guess I would say that it's a

Page 139

1   question that nobody can answer.
2       Q.      Okay.  Are you aware that in the
3   process of making a solid oral dose, the raw
4   materials are weighed at the beginning of the batch
5   to assure that it complies with the formula?
6       A.      That's correct.
7       Q.      And then, as you go through the
8   process, after mixing and blending, it's weighed
9   again; correct?
10      A.      Correct.
11      Q.      And --
12      A.      "It," meaning the blend is weighed?
13      Q.      Yes.  The blend is weighed again.
14          And in the validation process, the
15  company should have figured out how much it is
16  supposed to weigh at various steps along the path.
17          Is that true?
18      A.      I wouldn't state it that way, but I
19  think I understand what you're trying to say.  I
20  would say it's true.
21      Q.      And it's -- in essence, it's a quality
22  control check to make sure that you're not losing
23  too much or gaining anything.
24          Is that right?
25      A.      Well, it's not that you're not losing

Page 140

1   or gaining.  It's did you put the correct amount of
2   ingredients in?
3           The issue with that is, if the
4   ingredients are very small, it's kind of like
5   weighing yourself on the Queen Mary.
6           You know, you jump on the Queen Mary,
7   weigh yourself, then you jump off and you weigh the
8   Queen Mary again, and you subtract to determine that
9   you're X number of pounds.
10          So yes, it is -- it is a check that is
11  supposed to provide some evidence that the correct
12  ingredients are there, yes.
13      Q.      All right.  But let's pick two extreme
14  examples.
15          If somebody tripped and dumped a bucket
16  of screws into a batch, and there was a weight
17  variance, that would provide a potential check for
18  the company to evaluate why does this batch at the
19  blend stage weigh 5 pounds more than it should;
20  right?
21      A.      I would say it depends.
22      Q.      Okay.
23      A.      It depends on -- do you want me to
24  answer?
25      Q.      I think you've -- I think you gave me

Page 141

1   the answer.
2       A.      No.  I -- it's a different answer.
3           MR. MILLER:  Matt, why don't you let
4   him -- why don't you let him give the full answer.
5           MR. MORIARTY:  I got the answer I want.
6           MR. MILLER:  You got the answer and you
7   cut him off.  Okay.
8       Q.      At the other end of the -- of the
9   spectrum, if accidentally somebody dumped a certain
10  amount of product down the drain, they could check
11  why the batch at a particular stage of the process
12  was too light; correct?
13      A.      They would not necessarily detect it.
14          As I was going to state earlier, there
15  is a range, an acceptable yield range at every
16  single point in the process.
17          If those yield ranges are exceeded,
18  then it is out of specification and an investigation
19  would occur.
20      Q.      Okay.
21      A.      If -- if the error occurred so that you
22  threw a screw in there, and it didn't increase the
23  weight of the batch any significant amount, and it
24  stayed within the limits, you'd be oblivious to the
25  fact -- perhaps you would find out in the tableting

36 (Pages 138 to 141)

PLAINTIFFS' EXHIBITS 003900

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 142

1   press, but you would be oblivious to it until
2   perhaps a later stage.
3        Q.    Sure.  But the purpose of these yield
4   calculations is it's a quality check along the way;
5   right?
6        A.    It is a gross quality check.
7        Q.    There is a lot of weighing and
8   measuring through the whole process; right?
9        A.    It's a gross quality check.
10        Q.    Okay.  And do you think that finished
11   product testing, according to the USP methods, is a
12   gross quality check or something else?
13        A.    I -- I wouldn't use the term "gross
14   quality check."
15             I would say it's a very specific test
16   for tablets.  It's a very good test method.  And it
17   is likely to detect any products that are out of
18   specification.
19        Q.    All right.  And one of the reasons you
20   do all these checks is to see whether a validated
21   process remains in control.
22             Is that right?
23        A.    One of the reasons you do these things
24   meaning what?  "These things"?
25        Q.    You have a formula, you weigh things,

Page 143

1   you measure things, you test them for hardness, all
2   along the route.  Is that in order to assure that
3   your validated process remains in control?
4        A.    It is certainly one of the reasons,
5   yes.
6        Q.    Have you ever seen any statement in all
7   the material that you reviewed from FDA to indicate
8   that Digitek manufacturing processes were outside
9   their validated control methods?
10        A.    Yes.
11        Q.    For Digitek?
12        A.    Yeah.  I did not look at lot of
13   batches.  Yes, with the double-thickness batch.  A
14   validated batch cannot produce a double-thick
15   tablet.  It is considered invalidated if -- if at
16   end there is the least bit of -- of issue, then you
17   have to assume it is invalidated, is the
18   investigation which goes to the root cause, which
19   then either confirms that it remains a validated
20   state, or, in fact, your investigation determines
21   that there is an issue, and that you don't have a
22   reliable process.
23        Q.    All right.  So first of all, before
24   Batch 70924, did you see any evidence from FDA that
25   Digitek manufacturing processes were outside their

Page 144

1   validated control levels?
2        A.    I really have to go back to the 43s and
3   the EIRs to answer that.  I'm not trying to avoid
4   the question.  I -- I would have to do it.
5        Q.    Okay.  In association with Batch 70924,
6   did the FDA ever explicitly say that, "We believe
7   your validated method is out of control"?
8             MR. MILLER:  Object to form.
9        A.    Honestly, I'd have to go back to the
10   records to confirm that.
11        Q.    All right.  Well, what I'm trying to
12   find out is, you just gave me your opinion that
13   70924 indicates an out-of-control process.
14             I want to make sure that that's your
15   opinion, and not something you saw that the FDA
16   said.
17        A.    I understand.
18             Did they specifically point to Digitek?
19   I don't recall.  I -- I am willing to go back
20   through the records and answer that with, you know,
21   more facts and data.
22        Q.    Okay.  You can do that at the lunch
23   break, if you wish.
24        A.    I'd rather have lunch, but okay.
25             MR. KAPLAN:  Well, it is important.  I

Page 145

1   just want to say it's very important for us here
2   today to -- to be able to get your opinions and test
3   your opinions.  You know you've issued a 35-page
4   report.  I think it's fair for us to assume that
5   you've done all the work that you need to do, you've
6   issued your opinions, now we get to ask you about
7   them.
8             So whatever you need to do to answer
9   our questions, I assume you've done.
10             But if you need to do something during
11   the lunch break, well, please do it.
12             MR. MILLER:  It doesn't have to be
13   during the break.  You can review documents at any
14   point in time.
15        A.    If you -- if you feel it's important
16   enough to get a complete answer on that, I -- I gave
17   my answer.  I will gladly go back through it --
18             MR. KAPLAN:  We need the truth, the
19   whole truth and nothing but the truth, and this is
20   our only opportunity to examine you.
21             THE WITNESS:  Sir, I -- I respect that
22   100 percent.  You are getting 100 percent of the
23   truth.  You're talking to somebody who does not veer
24   away from the truth.  Okay?
25             MR. MILLER:  Yeah, that's -- let's wait

37 (Pages 142 to 145)

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 146

1  for a question.
2       THE WITNESS:  Okay.  Well --
3       MR. MILLER:  But if you want to
4  review -- if you want to read the documents, then
5  we --
6       MR. KAPLAN:  But when we're told
7  something like, well, I can't answer it because I'd
8  have to do the work all over again, then it's not
9  fair.  It's just not fair.
10      MR. MILLER:  He didn't say that.  He
11 said, I'll have to review the documents.  You can
12 certainly put the documents in front of him.
13      MR. MORIARTY:  Can I get back to work?
14      THE WITNESS:  Yeah.  I'm sorry.
15      MR. MORIARTY:  Thanks.
16      THE WITNESS:  Can I take a bio break?
17 I need a very quick bio break.
18      MR. MILLER:  This is a good time for
19 lunch.
20      MR. MORIARTY:  Can you hang on for four
21 minutes?
22      THE WITNESS:  Four minutes.  Okay.
23   Q.    If a company -- if a pharmaceutical
24 company consistently put too much active
25 pharmaceutical ingredient into its batches, is it

Page 147

1  more likely than not that their accounting for raw
2  materials in inventory wouldn't reconcile?
3    A.    I can't answer that question.  It
4  depends upon the percentage of -- of active that
5  they put in.
6         Again, when they reconcile, there's an
7  acceptable tolerance.  The tolerance is based upon
8  the history.
9         If the history is such that you add too
10 much, then it would be -- it would be hidden within
11 those calculations.
12        But, to answer your question again,
13 that is one of the control checks which you have to
14 try to determine whether or not you have misuse --
15 you use too much or too little.
16   Q.    Okay.  If a pharmaceutical company
17 consistently put so much active pharmaceutical
18 ingredient extra into its batches that they were
19 outside the specifications, would that be something
20 likely would be detected by --
21   A.    So you're talking about if they -- if
22 we used hypothetical -- let's say produced a product
23 that was outside of specification which was
24 consistently above 110 percent.
25   Q.    Yep.

Page 148

1    A.    Would the --
2    Q.    It's actually 105.
3    A.    105.  The other one said 110.
4    Q.    Trust me.
5    A.    Well, I'm not necessarily going to
6  trust you on this, but -- but it's above -- well,
7  105 is harder, so I'll use the 105.
8         Would it be detected in the long run if
9  you --
10   Q.    Likely.  Would it likely be detected in
11 the long run.
12   A.    You know what, without looking at
13 their -- without looking at their yield limits, I
14 don't know how I could make that determination.
15   Q.    Would the added Digoxin likely be
16 detected at either blend uniformity or finished
17 product testing?
18      MR. MILLER:  Objection to form.
19   A.    Just repeat that, please.
20   Q.    If the company consistently added such
21 an amount of additional Digoxin that it was going to
22 be outside the specifications, would it likely be
23 detected by blend uniformity or finished product
24 testing?
25   A.    Yes, it would, if they have a valid

Page 149

1  test method.
2       MR. MORIARTY:  Let's stop there because
3  I'm going to push beyond four minutes and I don't
4  want to do that to you.  And then do you want to
5  just take our lunch break?
6       MR. MILLER:  Yes.
7       THE VIDEOGRAPHER:  Please stand by.  We
8  are going off the record.  The time is 12:18 P.M.
9  This is the end of Tape No. 3.
10      (Lunch recess was taken.)
11      THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 1:37 P.M.  This is the
13 beginning of Tape No. 4.
14   Q.    All right, Mr. Kenny.  Let me do --
15 first start the afternoon with a little bit of
16 cleanups from some things.
17      (Exhibit 22, letter dated 1/9/07,
18 was marked for identification.)
19   Q.    And I want to show you what's been
20 marked as Exhibit 22.
21        This is a letter dated January 9, 2007,
22 from FDA to Actavis; correct?
23   A.    Correct.
24   Q.    It is a warning letter; correct?
25   A.    Correct.

38 (Pages 146 to 149)

PLAINTIFFS' EXHIBITS 003902

Mark G. Kenny, Volume I                                                                                                June 29, 2010

Page 150

1     Q.     And if you go to the second to last
2  page, last paragraph, I'd like you to follow along
3  with me.
4            It says, "While the corrections that
5  you promise in your correspondence appear to
6  adequately address many of the cGMP deviations found
7  during the July 10 through August 10, 2006
8  inspection, we are concerned about the quality of
9  drug products that have been released from your
10  facility under the serious lack of cGMP controls
11  found during the inspection."
12           Did I read that correctly so far?
13     A.    I believe so.
14     Q.    And then I'm going to skip the next
15  sentence -- well, actually, let's go on to the next
16  sentence.
17           "Your response provides no assurance."
18           Now, "provides no assurance" is a
19  frequent term used in FDA regulatory materials;
20  correct?
21     A.    Um-hum.
22     Q.    That's a yes?
23     A.    Yes.
24     Q.    "That the records and conditions of
25  manufacture and testing of each such lot of drug

Page 151

1  products released and marketed will be evaluated to
2  assure that the released drug products have their
3  appropriate identity, strength, quality, and
4  purity."
5            Again, "identity, strength, quality,
6  and purity" are regulatory terms frequently
7  contained in FDA materials; correct?
8            MR. MILLER:  Object to form.
9      A.    Yes.
10     Q.    Now, the next sentence says, "We feel
11  that to provide such assurance, your firm should
12  promptly initiate an audit program by a third-party
13  having appropriate cGMP expertise to provide
14  assurance that all marketed lots of drug products
15  that remain within expiration have their appropriate
16  identity, strength, quality and purity."
17           Did I read that correctly?
18     A.    Yes.
19     Q.    Do you understand this to be the
20  invitation which led Actavis to retain Quantic
21  Regulatory Services?
22     A.    I believe it is the invitation to bring
23  in a consultant, which became Quantic.
24     Q.    And we have already gone over the
25  Quantic exhibit.  I don't need to discuss that

Page 152

1  again.
2            But do you know whether FDA ever
3  expressed any dissatisfaction with Quantic's results
4  such that they did not provide assurances that
5  Digitek had been produced under conditions which
6  assured appropriate identity, strength, quality and
7  purity?
8      A.    Yeah.  I think that the FDA had a high
9  level of concern based upon a complete system issue,
10  not necessarily -- taking a look at each of the
11  quality systems.
12           MR. KAPLAN:  I would ask the
13  reporter -- I move to strike that answer as not
14  being responsive.
15           MR. MORIARTY:  And I understand your
16  answer, but one --
17           MR. KAPLAN:  I'd like the reporter to
18  read back the question that you asked so he can
19  answer that question.
20           MR. MORIARTY:  And actually my question
21  was very bad.  Your -- your answer wasn't
22  responsive, but my question was pretty bad.  Okay?
23           MR. MILLER:  I know --
24           MR. MORIARTY:  Early on -- early on
25  after lunch, it's difficult to keep going.

Page 153

1      Q.    What I'm asking specifically is whether
2  FDA ever said, "Sorry, Actavis" or "Sorry, Quantic,"
3  the letter you, and results, you provided in
4  December of 2007 don't give us the assurances that
5  we need concerning Digitek.
6            MR. MILLER:  Object to form.
7      Q.    Anything like that in the material you
8  reviewed?
9      A.    I think their actions, the regulatory
10  and escalating of their actions state that they
11  weren't satisfied with their response.
12     Q.    Is there an explicit statement anywhere
13  in the materials you reviewed about Digitek, they
14  were not satisfied with Quantic's work in regard to
15  this specific invitation?
16     A.    I don't recall.
17     Q.    In your Tab 2 -- I'm sorry.  Tab -- I'm
18  sorry, Tab 5.  Reference 5 in your Appendix B is
19  this definition of adulterated; correct?
20     A.    Correct.
21     Q.    All right.  Well, we -- we printed this
22  from the website, and probably have other copies of
23  it, but this is the specific part about strength,
24  quality and purity differing from official
25  compendium; correct?

39 (Pages 150 to 153)

Page 154

1   A.   Um-hum.
2   Q.   Is that a yes?
3   A.   Yes.  Sorry, right.
4   Q.   And this is CFR 351B; correct?
5   A.   Correct.
6   Q.   Now, in this paragraph, is that
7   language -- again we're talking about assurances
8   that a product meets identity, purity, strength,
9   etcetera; correct?
10   A.   Correct.
11   Q.   Now, is there anything in here that
12   defines what an assurance is?
13   A.   Can I read it?
14        I don't see that.
15   Q.   All right.  In other words, there's no
16   statement that -- of confidence intervals or
17   statistical probabilities in any precise
18   mathematical terms; correct?
19   A.   Correct.
20   Q.   Are the -- are the general -- are the
21   good manufacturing practice regulations subject to
22   varying interpretations from time to time?
23   A.   By whom?
24   Q.   Well, between a company and the FDA,
25   for example.

Page 155

1   A.   I'm sorry.  Would you repeat that?
2   Q.   Sure.  I mean could two reasonable
3   professionals, even in your field, look at a
4   definition in the GMP guidelines and have a
5   legitimate debate about what a particular word or
6   phrase means?
7   A.   Yes, sir.
8   Q.   All right.  So as far as the word
9   "assurance" is concerned, some expert like you could
10   say, I believe that we, as a company, have provided
11   the adequate assurance; and somebody else on the
12   other side could say, no, I disagree; right?
13   A.   That's correct.
14   Q.   And at least the FDA reg itself doesn't
15   provide specific guidance on what that means; right?
16   A.   In terms of assurance, sure it does.
17   It gives you guidance document and it tells you the
18   minimum requirements, and if you perform the minimum
19   requirements, you have assured, to at least a -- to
20   a legal standpoint that you've assured that the
21   product will meet -- will meet all specifications,
22   etcetera, GMP regulations, and will not be an
23   adulterated product.
24   Q.   You mean from a regulatory standpoint.
25   A.   I mean they're linked.  Whether --

Page 156

1   whether you're talking about adulterated product
2   meaning total GMP compliance issue, and no spec --
3   and no out of specifications, that's -- let's say
4   that's stated there.  But the assurance that they're
5   implying is, also, that the product going out the
6   door is -- is compliant to specifications.  So it
7   refers to, I believe, both.
8   Q.   But the FDA statement in their July --
9   or their cGMP statement that we went over before
10   doesn't necessarily equate the assurance of
11   regulatory with the actual laboratory outcome of
12   tested product; correct?
13   A.   Seriously, I don't understand the
14   question.
15   Q.   That's fine.
16        You have expressed opinions in your
17   report that you have -- you believe that Actavis had
18   serious GMP issues in certain years; correct?
19   A.   Through the years I had evidence, yes.
20   Q.   Okay.  At the same time, FDA was
21   testing product in 2007/2008, and it was meeting
22   specifications; correct?
23   A.   Correct.  It appears, you've shown me a
24   lot of information to suggest that it met
25   specifications.

Page 157

1   Q.   Right.  And you've not shown me any
2   evidence in the material you reviewed to the
3   contrary, that it didn't meet specifications;
4   correct?
5   A.   Well, we haven't discussed -- you've
6   talked about whether or not a product tests as a
7   final product meets the specifications.
8   Q.   Right.
9   A.   Yes.  When you've asked me that
10   question, I've said yes.  I don't have any data for
11   that.  But I have data prior to that.  I mean,
12   there's -- there's tons of things prior to that that
13   would implicate the quality of that particular
14   product.
15   Q.   We'll get to that later.
16        But in the end --
17   A.   I mean actual test results.
18   Q.   -- if a consumer is going to take a
19   tablet and it meets the USP specs for weight,
20   thickness, content uniformity, assay, all those
21   things, that -- and there's -- and there's testing
22   to indicate that that batch meets those, validated
23   reliable testing, it's generally going to be safe
24   for the consumer; correct?
25   A.   Right.  Yes.

40 (Pages 154 to 157)

PLAINTIFFS' EXHIBITS 003904

Page 158

1    Q.    Okay.  Thank you.
2          (Exhibit 37, Recall Package 2009 was
3    marked for identification.)
4    Q.    Exhibit 37, have you ever seen this
5    before?
6    A.    I haven't gone through this.
7    Q.    Does that mean that --
8    A.    Well, it might have been in here.  I
9    may -- I may have glanced at it.  I don't recall
10   having read it.
11   Q.    All right.  This is the FDA approved
12   Recall Package for Digitek in April/May 2008.  Okay?
13         Have you seen a Recall Package before?
14   A.    Recall Package before?  Not in years,
15   since I didn't have a lot of them.
16   Q.    Okay.  At the third page, under "Reason
17   for the recall," does it say Digoxin tablets
18   exceeded tablet thickness specifications?
19   A.    Yes.
20   Q.    Now, have you ever seen a batch record
21   for any other batch of Digitek, besides 70924, in
22   which tablets exceeded thickness specifications?
23   A.    Have I looked at the batch records?
24   No.  I've seen some evidence in E-mails and the like
25   that they were overweight, the tablets were

Page 159

1    overweight, double tablets were overweight.
2    Q.    Okay.  Well, have you ever seen any
3    evidence, in any other batch record or any other
4    E-mail, or anything else, to indicate that the
5    tablets released to the market exceeded their
6    thickness specifications?
7    A.    Exceeded the thickness?  Can I look at
8    my report for one second?
9    Q.    Yes.
10   A.    Could you rephrase your question?
11         You can ask --
12         MR. KAPLAN:  Why don't you have the
13   reporter read it back.
14         (Requested portion is read.)
15   A.    Thickness?  I would have to say I can't
16   recall at the moment.
17         MR. KAPLAN:  Is that a no?
18         THE WITNESS:  That's I cannot recall.
19         MR. KAPLAN:  Yes or no?
20         THE WITNESS:  I cannot -- I cannot
21   recall is my answer, if I'm allowed to give that
22   answer.
23         MR. MORIARTY:  Can I follow up?
24   Q.    I mean, this is a products liability
25   litigation over whether Digitek tablets exceeded

Page 160

1    specifications and harmed consumers.  Okay?  It's
2    important for me to know whether you, as an expert
3    against my client in this case, have evidence,
4    documents, testimony, and the like, to indicate the
5    tablets that exceeded, and that's what I'm asking
6    you about right now, tablets exceeded thickness
7    specifications got to consumers.
8    A.    Thickness -- can I look at an APR for
9    one second?
10   Q.    A what?
11   A.    An APR.
12         MR. MILLER:  Certainly.
13         MR. MORIARTY:  What's an APR?
14   A.    I'm looking at a number of
15   out-of-specifications for blend uniformity.
16         Let me see.
17   Q.    Remember my question involves tablets
18   that reached consumers.
19   A.    Okay.  For thickness, no.
20   Q.    All right.  Have you seen -- now, I
21   asked you this before lunch, I asked if you had seen
22   any evidence, or had an opinion to a probability
23   that out-of-spec tablets of normal size, but varying
24   API, reached consumers, and you told me no.
25         Do you have evidence now, after the

Page 161

1    lunch break, that tablets of normal size with
2    varying API reached consumers?
3    A.    Potentially.
4    Q.    You potentially have evidence?
5    A.    Yeah.  Because you're talking about
6    probabilities, or possibilities.
7          Would you like me to go through it?
8    Q.    No.  You're talking about a blend
9    uniformity issue?
10   A.    Correct.
11   Q.    Did that batch --
12   A.    The batches.
13   Q.    -- test appropriately in finished
14   product testing?
15   A.    They tested appropriately at end
16   product testing.
17         They found it -- can I clarify?
18   Q.    I'm asking one question at a time.
19   A.    Surely.  Go ahead.  Sorry.
20   Q.    So they tested appropriately in
21   finished product testing; correct?
22   A.    The end product testing sample that was
23   taken was within specification.
24   Q.    Okay.
25   A.    And at the very end of the process.

PLAINTIFFS' EXHIBITS 003905

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 162

1      Q.     All right.  And at the blend uniformity
2  stage, and we'll get into the details of this
3  investigation way later, you're talking about one
4  out of the ten samples on the initial run was out of
5  spec; correct?
6      A.     I don't know.  The information I
7  received doesn't have that type of specificity.
8         I'm looking at the APR.
9      Q.     You haven't reviewed the details of the
10 blend uniformity investigations that were done on
11 these batches?
12     A.     No.
13     Q.     Exhibit 37 contains -- has other
14 information in it like the health hazard evaluation.
15        Is that right?
16        And then a list of all the batches that
17 might be subject to the recall.
18        Is that correct?
19     A.     Are we talking about the document I
20 have?
21     Q.     Exhibit 37.
22     A.     Okay.  And your question is?
23     Q.     Does it contain a health hazard
24 evaluation and a list of all the batches that might
25 be potentially related to the recall?

Page 163

1      A.     Normally it would have it, a health
2  hazard evaluation, and it should list the batches.
3  I'd have to go through it to confirm that, but...
4      Q.     And do you know whether or not the
5  contents of a Recall Package are run past the FDA?
6      A.     I'm not sure, but I -- it probably is.
7         Certainly I know of instances where it
8  is.
9      Q.     I asked you earlier about Exhibit 39,
10 the July 2009 FDA statement about generic drugs, and
11 specifically the paragraph about Digitek.
12        Do you remember those questions?
13     A.     I'd like to reread it, but I remember
14 we went over it.
15     Q.     It's 38, Exhibit 38.
16        That information -- that information,
17 to your knowledge, is still on the FDA's website,
18 isn't it?
19     A.     I have no reason to believe they took
20 it off.
21     Q.     All right.  And that would be available
22 not only to consumers, but to medical professionals?
23     A.     The -- the information is available to
24 anyone who has an internet connection.
25     Q.     And that would include consumers and

Page 164

1  medical professionals.
2      A.     They're part of that, yes.
3      Q.     And that would include regulatory and
4  quality professionals in the pharmaceutical
5  industry.  Is that correct?
6         MR. MILLER:  Object to the form.  It's
7  outside the scope.  He's not here as an expert on
8  who's going to have access to the internet.
9      A.     Common sense would tell you everybody
10 has access, and they are part of everybody.
11     Q.     You -- do you have any reason to
12 believe that the FDA is -- has posted anything that
13 it believes is inaccurate in Exhibit 38?
14        MR. MILLER:  Object to form.
15     A.     Please ask that again.
16     Q.     Sure.  Would you assume that FDA
17 investigated the facts behind that posting and the
18 content of the posting?
19        MR. MILLER:  Object to form.
20     A.     Honestly, I don't know.  I don't know.
21        I know they would check guidance
22 documents, etcetera.  I don't know if they check
23 things like that, so I don't know who would do it.
24     Q.     Did you review or rely on any materials
25 that are not listed in Appendix B to your report?

Page 165

1      A.     Did I rely on them?  No.
2      Q.     Did you bring anything with you today
3  in your binders, or other materials, that is not
4  listed in exhibit -- I'm sorry -- Appendix B to your
5  report?
6      A.     Yes.
7      Q.     What did you bring with you --
8      A.     I brought everything that I made a copy
9  of.
10     Q.     Do you know --
11     A.     Which is everything that's pertinent
12 to -- to provide me information to try to make some
13 decision or some judgment.
14     Q.     And you believe that there are some
15 things in those materials that aren't listed in
16 Appendix B?
17     A.     Oh, I know there are.  I know there
18 are, sir.
19     Q.     All right.
20     A.     That's why I brought them.
21        MR. MORIARTY:  At some point, Pete,
22 we're going to have to go through the binders,
23 identify what's not in B.
24        MR. MILLER:  Okay.
25        MR. MORIARTY:  And I would prefer that

42 (Pages 162 to 165)

PLAINTIFFS' EXHIBITS 003906

Mark G. Kenny, Volume I                                                                                June 29, 2010

Page 166

1  the court reporter take them, copy them, so that we
2  can have them, and then return what we remove from
3  Mr. Kenny's binders to Mr. Kenny, either directly or
4  through you.
5          MR. MILLER:  Procedurally I have no
6  problem with that.  Actually, I'd like to be part of
7  it and take a look at each document before it goes
8  to --
9          THE WITNESS:  And will I be able to get
10 these documents back?
11         MR. MORIARTY:  You will.
12         THE WITNESS:  Within a reasonable
13 period of time?
14         MR. MORIARTY:  You will.
15     A.    Okay.  You become attached to
16 documents.
17     Q.    The report that you signed on June 15,
18 2010, that's your final report; correct?
19     A.    That's the report I submitted, correct.
20     Q.    And were there drafts of this report
21 before this final version?
22     A.    Yes, there were.
23     Q.    Did you bring drafts with you?
24     A.    No.  But I can.
25         The drafts are electronic.

Page 167

1          I did not have an opportunity to go
2  through my files, because they're in multiple
3  places, to give you each iteration of what I did.
4          But I would go along and occasionally
5  save a copy at a certain period of time, and then
6  continue.
7          But I can provide that to you.
8      Q.    Okay.  Let's get back to where we left
9  off before the lunch break.
10         I was asking you a series of questions
11 about, you know, what would happen if a manufacturer
12 consistently put too much API in its batches, and
13 would it be detected.
14         And just before lunch you said, yeah,
15 likely it would, if the company or FDA was using
16 valid test methods.
17         Do you remember that?
18     A.    Yes.
19     Q.    And in the course of a long day like
20 this, when we're talking about a lot of different
21 documents and topics, sometimes we jump around and
22 sometimes, accidentally, I repeat myself.  Okay?
23     A.    Um-hum.
24     Q.    So please excuse me if I do.
25         But have you seen any FDA citations or

Page 168

1  warnings or observations indicating that Actavis did
2  not have validated test methods for Digitek?
3          MR. MILLER:  Objection.  Asked and
4  answered.
5          It's okay to answer.
6      A.    I would have to look at the records.
7          And the reason I say that is an
8  out-of-specification result that has not been
9  investigated, you don't know if it's an assay issue,
10 or you don't know if it's a content issue.  So
11 without the investigation, I can't tell you whether
12 the root cause of that, which goes back to when the
13 FDA found, as I did, out-of-specification tests, and
14 there is an adequate investigation, you don't know
15 whether it's a valid test method, a valid process,
16 you know nothing.
17         And then they retest and it looks good,
18 so they pass it.
19     Q.    Did you see instances of out-of-spec
20 results in the materials that were not investigated
21 at all?
22     A.    I saw instances where a root cause
23 determination could not be made, and I saw instances
24 where retesting was conducted, and on Digitek, and
25 without a root cause investigation, retesting of the

Page 169

1  product and releasing it is not an acceptable,
2  compliant procedure, not an acceptable practice.
3          You cannot test the quality into a
4  product merely by taking a secondary sample.
5      Q.    Do you always find a root cause when
6  you do an investigation?
7      A.    Do you always find a root cause?  No.
8      Q.    What is the scientific judgment rule in
9  batch release?
10     A.    Scientific judgment rule?  It's not
11 scientific.  It's do the numbers meet the
12 specifications.  Science is not involved.  The
13 people who review it are not scientists.  They look,
14 is it filled in, are there results in specification,
15 are there any unexplained cross-outs, and the like,
16 but it is a rather routine review, and it's only is
17 by exception that it gets escalated to somebody with
18 a greater level of technical abilities.
19     Q.    Again, we'll get to blend uniformity
20 failures in more detail later, but did FDA ever make
21 a 483 observation, or a warning letter observation,
22 to the effect that the lack of root cause
23 determinations in blend uniformity investigations
24 should have led to batch rejection?
25     A.    I don't recall, the way you've phrased

43 (Pages 166 to 169)

PLAINTIFFS' EXHIBITS 003907

Page 170

1  it.  I honestly don't recall.
2        I'd have to go back to the 483s.  There
3  are 172 observations, or whatever it is.
4        Q.     Did you see any information in any of
5  this material that the FDA asked Actavis to ever
6  recall Digitek batches before April of 2008?
7        A.     I don't recall seeing anything.
8        Q.     Is there an FDA reg anywhere which
9  specifically indicates that an out-of-spec test
10  result, 1 out of 10, at the blend uniformity stage,
11  mandates batch rejection?
12        A.     There are -- I don't know if it's 1 out
13  of 10.  What they specifically state is, if the test
14  results are out of specification, then you have to
15  follow a logical train of -- of investigation and
16  testing that's consistent with GMP.
17        So I can't tell you whether it is 1 out
18  of 10, or 2 out of 10, or 1 out of a thousand.
19        Q.     All right.  But what the reg
20  essentially says is, if you -- if you get an
21  out-of-spec result, you do an investigation;
22  correct?
23        A.     Correct.
24        Q.     It doesn't mandate batch rejection just
25  because you get an out-of-specification result, does

Page 171

1  it?
2        A.     That, in and of itself, would not
3  necessarily -- well, no.  The batch would be
4  rejected -- the batch would be placed in quarantine
5  until an adequate investigation could be conducted.
6        After the investigation takes place,
7  there may be a determination that it's acceptable.
8  Perhaps they have done an investigation that's
9  acceptable to resample and retest, and then the --
10  in this case -- well, whatever.  Did I answer your
11  question?
12        Q.     Yes.
13        Whether it's at the blend uniformity
14  stage or at finished product testing, would I be
15  correct in saying that there are several different
16  reasons why there could be an out-of-spec?
17        A.     Oh, my gosh.  Of course.
18        Q.     Okay.  And some of them include
19  sampling errors.  Is that right?
20        A.     Yes.
21        Q.     Math errors.
22        A.     Sure.
23        Q.     An out-of-spec test result in the
24  course of this does not necessarily mean a product
25  is, in fact, out of spec; correct?

Page 172

1        A.     It has to be assumed that unless you
2  have a root cause, that you cannot discount the fact
3  that a sample tested out of spec.  You cannot take a
4  secondary sample, test it, and release a batch.
5        Q.     Where is that in the regulations?
6        A.     I can tell you that it is absolutely
7  100 percent industry practice, in every company.
8        If I ever saw a company, and I audited,
9  that went in, found no root cause determination, had
10  initial out-of-specification, decided that they were
11  going to resample, and that it was fine, I would --
12  I would have to take issue.
13        MR. KAPLAN:  I move to strike the last
14  answer as non-responsive to the question.
15        Q.     So if the root cause was determined to
16  be a math error, and on retest, it was fine, you
17  could release the batch; correct?
18        A.     If you found a root cause, and if you
19  could discount, you could ignore, you could justify
20  the fact and understand the fact that samples were
21  out of specification, and it makes sense to you,
22  then you can, if you will, retest the product using
23  a sample inspection.
24        But it is very important that you have
25  to get the root cause determined.

Page 173

1        I've never -- I don't think I've ever
2  released a batch, I'm sure I've never, where I had
3  initial out-of-specification, I couldn't figure out
4  why, and decided, for whatever reason, to retest --
5  it's okay to retest, but I would do it as a
6  diagnostic test, not as an acceptance determination
7  test.
8        At that point, it would become an
9  experimental batch, as far as I was concerned.
10        Q.     Is blend uniformity sampling considered
11  difficult?
12        A.     No.  It should not be difficult.
13        Q.     Do most companies struggle with blend
14  uniformity?
15        A.     The companies I've worked with, content
16  uniformity is not, in general, a major issue.
17        Q.     I was asking about blend uniformity.
18        A.     Blend uniformity.  I'm sorry.
19        No.  It's -- I don't find, in the
20  companies that I work with, that blend uniformity is
21  an issue.
22        Q.     Okay.
23        We touched a little bit before the lunch
24  break about batch yields.
25        Let's get back to that.

PLAINTIFFS' EXHIBITS 003908

Page 174

1    A.    Surely.
2    Q.    There's always going to be some waste,
3  for various reasons, in the pharmaceutical
4  manufacturing process of solid oral dose; correct?
5    A.    Yes.
6    Q.    And if, for whatever reason, a company
7  was consistently making double-thick tablets, the
8  batch theoretic -- or the yield numbers would not
9  match the theoretical numbers; correct?
10    A.    I don't understand what "constantly"
11  means, but if --
12    Q.    I said consistently.
13    A.    Consistently.  If they consistently --
14  I can't answer the question.  I mean, I would say
15  that I have to know more about how many units you're
16  talking about, how often.  I'd have to take a look
17  at the yield specifications.  We'd have to do a
18  mathematical determination.  Then, after that, we
19  could, you know, come to -- between the two of us,
20  come to a conclusion that, yes, it could be
21  affected, or no, it's -- it's buried within the
22  tolerances.
23    Q.    Have you done such an analysis for your
24  work here?
25    A.    As part of my work here, no.

Page 175

1          I would need all the -- I would need an
2  unlimited amount of data.
3          This is something that Digitek is
4  expected to do -- or I'm sorry, Actavis.
5    Q.    Have you ever seen anything in the FDA
6  documents, in your review of this case, to indicate
7  that there were double-thick tablets for any product
8  other than Digitek?
9    A.    No.
10          MR. KAPLAN:  Is there an answer?
11          MR. MORIARTY:  He said no.
12          THE WITNESS:  I didn't say that loudly?
13          MR. MILLER:  It came across to me.
14          THE WITNESS:  I'll try to be louder.
15    Q.    Did you ever see any observations in
16  the 483s or the warning letters in which the FDA
17  asked Actavis to increase its sampling rate for
18  Digitek?
19    A.    I don't recall seeing that, no.
20    Q.    Have you ever actually seen a Digitek
21  tablet?
22    A.    I've seen a picture of it on the
23  internet.
24    Q.    So you haven't --
25    A.    I haven't touched one.

Page 176

1    Q.    Okay.  You haven't weighed one --
2    A.    No.
3    Q.    -- or anything like that?
4    A.    No.
5    Q.    You know what a Stokes BB2 tablet press
6  is?
7    A.    Relatively, sure.
8    Q.    Does Johnson & Johnson ever use them?
9    A.    I don't believe they use them anymore,
10  but they certainly did years ago.
11    Q.    Do you know when Johnson & Johnson
12  stopped using Stokes BB2 --
13    A.    Well, you're talking about, again, a
14  $60 billion company that has 140 operating units.
15          If you're talking about the experience
16  that I've had -- actually, I -- the companies I've
17  been with, we did not use Stokes.
18    Q.    Is there any regulation, any FDA
19  regulation that specifies a particular age of
20  equipment, or type of equipment, that has to be used
21  for the manufacture of a solid oral dose product?
22    A.    Age, no.  Condition, yes.
23    Q.    Okay.  Condition.
24          Do you know whether or not the Stokes BB2
25  presses were in use for Digitek at the time of the

Page 177

1  ANDA?
2    A.    At the time of the information that
3  I've read, a Stokes press was being used.
4    Q.    Is the fact that Actavis uses Stokes
5  BB2 tablet presses in all the batch records?
6    A.    Is it -- I don't know.  I'd have to
7  look through all the batch records.
8    Q.    Did FDA ever make a 483 observation, or
9  a warning letter observation, to the effect that
10  Actavis should not be using Stokes BB2 tablet
11  presses to manufacture Digitek?
12    A.    I don't recall that that -- that
13  suggestion was made.
14    Q.    Are you an expert in manu -- tablet
15  manufacturing equipment with weight controls?
16    A.    No, I'm not.
17    Q.    Are you aware, from your review in this
18  litigation, that when UDL had Digitek tablets, it
19  performed random weight and thickness tests to make
20  sure that the tablets would fit into their blister
21  packs?
22    A.    I saw testing being conducted.  I don't
23  know how often, but I saw test results.
24    Q.    Do you know whether UDL ever found
25  Digitek tablets that were outside the USP thickness

45 (Pages 174 to 177)

PLAINTIFFS' EXHIBITS 003909

Mark G. Kenny, Volume I                                                                    June 29, 2010

Page 178

1  or weight specifications?
2      A.   I would have no way of knowing that.
3           I would have -- I would have to see all
4  the results.
5           If I saw the results, then I could
6  say -- in random, then I'd say yeah, they're all in
7  spec.
8      Q.   Well, when the Plaintiffs' lawyers
9  deposed the UDL employees, and had the UDL
10 documents, was there anything that came out in those
11 depositions, or those exhibits, to indicate that UDL
12 ever found tablets outside the USP weight or
13 thickness specifications?
14     A.   I don't recall any instances.
15     Q.   We touched on adverse event reporting a
16 little bit this morning.
17          How much do you know about the FDA's
18 adverse event reporting database?
19     A.   Not a lot.
20     Q.   All right.  Are you aware that the FDA
21 generally considers that that system does not
22 reflect causation?
23          MR. MILLER:  Object to form.
24     A.   I'm not familiar enough and I couldn't
25 hazard a guess.

Page 179

1      Q.   All right.  Okay.  Would you prefer to
2  rely on pharmacovigilance experts to discuss issues
3  like that in this litigation?
4      A.   Would I rely upon them?
5           I don't know who the experts are.  You
6  know, I can't say I would or wouldn't.
7           I mean, people who say they're experts
8  are not necessarily experts.
9      Q.   That's true.
10          You're not professing expertise in
11 pharmacovigilance, are you?
12     A.   I have never professed that.
13     Q.   Have you ever seen any data which
14 compares adverse event experience for Digitek with
15 that of any of its competitors?
16     A.   Could you repeat that?
17     Q.   Sure.
18     A.   The statement "competitors."
19     Q.   Have you ever seen any data that
20 compares adverse event experience for Digitek with
21 adverse event experience for any other Digoxin
22 product?
23     A.   I don't recall.  It would not be
24 something that I would have focused on because it's
25 outside of my expertise.  I don't know what I would

Page 180

1  do with the information.
2      Q.   Have you read the depositions of any
3  doctors --
4      A.   No.
5      Q.   -- who have been taken in this case?
6      A.   No.  I have no interest.
7      Q.   Do you know from any independent
8  research whether any hospital reported an increased
9  incidence of Digoxin toxicity in the years 2005,
10 '06, '07 or '08?
11     A.   I did no investigation of any sort, so
12 the answer is I know of nothing, because I didn't do
13 anything.
14          Does that make sense?
15     Q.   All right.  Let me get back to some
16 statistics that I was asking you about before.
17          Of this 688.2 million tablets that were
18 part of the recall, do you have any opinion, to a
19 reasonable probability, as to what percentage of
20 them were outside the USP specifications on the low
21 side?
22     A.   On the low side?
23          I have no way of knowing that.
24     Q.   Do you have any opinion, to a
25 probability, of what percentage of those tablets

Page 181

1  were out of spec -- out of the USP specifications on
2  the high side?
3      A.   The -- the -- I'm sorry.  Just repeat
4  the question so I can answer it correctly.
5      Q.   Sure.
6           Do you have an opinion, to a reasonable
7  degree of probability, as to how many of the
8  recalled Digitek tablets were outside the USP
9  specifications on the high side of their active
10 pharmaceutical --
11     A.   I would have no way of knowing that.
12     Q.   Are you an expert in pharmaceutical
13 distribution?
14     A.   No.  No.
15     Q.   And when I say distribution, just so
16 we're clear, I mean you work for J&J, which actually
17 makes pharmaceuticals and devices; correct?
18     A.   I did work for them, yes.
19     Q.   And then at some point, they might sell
20 or transfer the product to distributors who get it
21 ultimately on consumer shelves; correct?
22     A.   Yes.  I have some knowledge of it.  I'm
23 not an expert on it.
24     Q.   All right.  That's what I want to find
25 out, is whether you have any expertise on the

46 (Pages 178 to 181)

Page 182

1  distribution end of this, as opposed to quality and
2  manufacturing.
3      A.    No. I've -- I've audited distribution
4  centers, but I haven't done it -- I look for GMP
5  issues.
6      Q.    Just to make sure I'm clear, you would
7  have no opinion, to a probability, as to any
8  specific Digitek batch, as to how many of those
9  tablets were outside their USP specifications;
10  correct?
11     A.    Well, you say "any." There is a lot of
12  information on Batch 70924, so I -- I would have an
13  opinion on whether or not additional tablets were --
14  of double thickness or were thick that went out. So
15  I would have an opinion on that.
16     Q.    Okay. Other than that.
17     A.    Other than that --
18     Q.    If I went through the list of 152
19  batches that actually made it to market, that had to
20  come back, you would have no opinion to a
21  probability as to any of them other than 70924?
22     A.    No. No. I would have to say, no,
23  that's not correct.
24           When I evaluate a company, I evaluate
25  it for all those control systems and procedures that

Page 183

1  can affect the quality of the outgoing product.
2           When I see a company that has most of
3  their systems out of control, if you will, or not
4  within control, or examples where they're not within
5  control, I have a high level of concern that the
6  product they are releasing is not conforming to
7  specification. I know it -- I know it's adulterated
8  because of all the GMP issues. The question is,
9  does it meet specification.
10          I would have a very high level of
11  concern with that. I would have -- and I don't
12  know, does that help answer my question -- or your
13  question?
14     Q.    Are you done with your answer?
15     A.    I think so.
16     Q.    Okay. Well, I don't mean to repeat
17  myself, but I need to make sure I understand this.
18          Based on your review, you have a high
19  concern about this, whether product met
20  specifications; correct?
21     A.    I have a very high concern about it.
22     Q.    Okay. But if -- but if I understand
23  it, you've never seen reports of double-thick
24  tablets in the hands of consumers, or pharmacists,
25  from recall batches. You've never seen lab tests

Page 184

1  of --
2      A.    Of what?
3      Q.    -- of out-of-spec tablets; correct?
4      A.    Lab tests of out-of-spec tablets in the
5  field?
6      Q.    Yes.
7      A.    Okay. Well, there are plenty of tests
8  that are unreleased batches.
9      Q.    But --
10     A.    It's --
11     Q.    -- unreleased batches aren't in the
12  hands of consumers, are they?
13     A.    That's not -- that's correct.
14     Q.    Okay.
15     A.    But they are a high level of concern
16  because they implicate the quality of those that
17  have been released.
18     Q.    Well, isn't the purpose of the Quality
19  Department to reject batches that are out of spec
20  for some reason?
21     A.    The primary objective of the Quality
22  Assurance Department is to make sure that controls
23  and systems are in place. That's the primary
24  responsibility.
25           A secondary responsibility, as a safety

Page 185

1  net, is to take samples at the end of the process
2  and test them.
3           But the primary -- it's a very, very
4  small part of what Quality Assurance and Quality
5  Control does.
6      Q.    If a company finds a batch that's out
7  of spec, truly out of spec, it should be rejected;
8  correct?
9      A.    If they find a batch that's truly --
10  well, of course.
11     Q.    So Batch 8022 --
12     A.    The "truly" part is --
13     Q.    Well, 80228, which, from your review,
14  had tablets that were out of spec by weight was
15  rejected; correct?
16     A.    Was rejected? No. Not all of them
17  were rejected.
18     Q.    Do you think 80228 went to market?
19     A.    I'd have to -- I'd have to look at the
20  record. May I?
21     Q.    Sure.
22     A.    I don't know if they went out to
23  market. In the records I looked at, I don't know if
24  they were released.
25           I'd love to have seen 2008 APRs because

47 (Pages 182 to 185)

PLAINTIFFS' EXHIBITS 003911

Page 186

1    then it could confirm to me whether or not they were
2    released.
3             MR. KAPLAN:  I'm going move to strike
4    the last answer.  It's not responsive.
5             THE WITNESS:  It's what?
6             MR. KAPLAN:  Not responsive to the
7    question that was asked.  It is a gratuitous
8    statement.
9        Q.    All right.  Let me just -- I -- I
10   believe I've asked this, and I don't mean to ask it
11   over and over again.
12            I thought I heard you say on several
13   occasions today that you have no evidence in the
14   material you have reviewed of out-of-spec Digitek
15   tablets actually in the hands of consumers.
16            MR. MILLER:  Objection.
17       Q.    Am I correct about that?
18            MR. MILLER:  Objection.  Misstates the
19   previous testimony.
20       Q.    Then I guess I have to keep asking.
21       A.    Could you ask it again?
22       Q.    Because if it did --
23       A.    Could you ask it one more time?
24       Q.    Mr. Kenny --
25       A.    Could you rephrase it?

Page 187

1        Q.    I'll get there.  Okay?  I want to make
2    it clear to you.
3             I understand that you have GMP concerns
4    about my client and you have concerns about whether
5    Digitek was within or without the specifications;
6    correct?
7        A.    Correct.
8        Q.    And I've shown you all kinds of 484s
9    where the FDA tested the product; correct?
10       A.    That's correct.
11       Q.    And documents with Celsis labs tested
12   the product and it all met the specs; correct?
13       A.    Of what the -- evidence I've seen,
14   correct.
15       Q.    Done by sampling plans chosen by Celsis
16   and the FDA pursuant to the U.S.; correct?
17       A.    Well, it was a sampling plan of just
18   taking a few units.  It was done by a sampling plan.
19       Q.    Done by the U.S. -- according to USP
20   methods; correct?
21       A.    Yes.
22       Q.    And FDA regards the USP as essentially
23   the bible, so far as the chemical testing of
24   product; correct?
25       A.    You can use the term "bible."  They

Page 188

1    certainly consider it a knowledgeable and valid
2    source of testing.
3        Q.    All right.  And you know that the 152
4    recalled Digitek batches all had quality control
5    testing on them for finished product; correct?
6        A.    I will assume that they did.
7        Q.    And will you assume that they used the
8    USP validated method that the FDA was aware of?
9        A.    The method that they -- no.  What I --
10   what I can assume -- I don't want to assume
11   anything, but for the sake of this -- this
12   conversation, or this discussion, the methodology
13   that they have in their test method is probably the
14   USP method.
15            Now, did they adequately train the
16   person to perform that analysis?  Did they
17   adequately do verification batches to basically
18   validate that the method is acceptable, when tested
19   in their hands, I have seen no evidence to suggest
20   that they've done that.
21       Q.    Well, you've seen no evidence from FDA
22   that indicates they didn't; correct?
23       A.    For -- for what?
24       Q.    The Digitek testing.
25       A.    If you -- okay.  You're talking about a

Page 189

1    population here of all products.
2        Q.    No.  I'm talking about Digitek.
3        A.    I understand that.
4             MR. MILLER:  But let the man answer.
5    You are, but I object to the form.  You're
6    interrupting him.
7        A.    It -- it's sort of like a Venn diagram.
8    Here's the population.  If you say that they're
9    using practices that are out of compliance, the
10   assumption will be since Digitek -- Digitek is part
11   of that large diagram, that they also suffer in many
12   of the issues that are suffered across the plant.
13       Q.    I asked you hours ago whether you ever
14   saw a specific finding from the FDA that Digitek was
15   adulterated, and you said no.
16            MR. KAPLAN:  Object to form.
17            MR. MILLER:  Object to form.  Misstates
18   previous testimony.
19            MR. MORIARTY:  I don't think it does,
20   but...
21            Find for me in the documents a specific
22   statement by the FDA that Digitek was adulterated.
23   Find one, please.
24       A.    Why would -- why would a company --
25       Q.    Find one, please.

Page 190

1    We've already gone over the recall
2  notice.
3        MR. MILLER:  Objection.
4    Q.    We've gone over the Recall Package.
5  You can't ask me why the company would do that
6  because I get to ask the questions.  That's my
7  prerogative today.
8        What I want you to do is show me
9  somewhere in the material you reviewed FDA finding
10 that this product, Digitek, that this litigation is
11 about, was adulterated.
12       MR. MILLER:  Objection.  Asked and
13 answered.
14       THE WITNESS:  I beg your pardon?
15       MR. MILLER:  That's okay.  Answer it.
16   A.    I don't recall where Digitek -- Digitek
17 was, let's say, clearly stated.
18   Q.    Okay.
19   A.    Does that answer your question?
20   Q.    Yes.
21       Now, if you had a client in your
22 consulting business and you wanted to know whether
23 GMP issues with -- overall were impacting on a
24 specific product, would you look at batch records
25 for that specific product?

Page 191

1    A.    That would be a portion of my
2  investigation.
3    Q.    And do you think FDA would do that?
4    A.    I would assume.  I -- I would expect
5  them to take a look at batch records.
6        If the batch records are not
7  necessarily accurate representations of what
8  happened.
9    Q.    You have no evidence in this case that
10 Actavis --
11   A.    No.
12   Q.    -- has Digitek batch records that are
13 inaccurate in any respect, do you?
14   A.    That's correct.
15   Q.    Now, let's talk about Batch 70924.
16   A.    Okay.
17   Q.    In your opinion, to a probability, were
18 there more double-thick tablets in 70924 than the 20
19 they found during the investigation?
20   A.    I believe.  With a high level of
21 certainty, that, yes, there were.
22   Q.    How many?
23   A.    I have no clue.  I just know there were
24 more.
25   Q.    How do you have a high level of

Page 192

1  certainty about that?
2    A.    Because visual inspection is regarded
3  as, and it's in my experience, and as an industry
4  acceptance, that visual inspection is horrendously
5  unreliable to the point that it cannot be relied on.
6    Q.    Is that any kind of visual inspection?
7    A.    No.  No.  It could be -- I'm talking
8  about human inspection.
9        At best it's a safety net.
10   Q.    So you have a high degree of certainty
11 there were more, but you don't know how many more;
12 correct?
13   A.    Correct.
14   Q.    Certainly couldn't have been 4 million
15 more; right?
16   A.    I would think it would not be 4 million
17 more.
18   Q.    And you've never seen a report from any
19 consumer that they got a double-thick tablet in
20 2008; correct?
21   A.    Correct.
22   Q.    70924 wasn't shipped to market until
23 2008; right?
24   A.    I don't know.
25   Q.    Have you seen a report from any of the

Page 193

1  litigants in this case, any of the Plaintiffs that
2  they had an actual double-thick tablet?
3    A.    No.  I don't know who the litigants
4  are, but I haven't seen that.
5    Q.    Have you seen any report from a
6  pharmacist that there was a double-thick tablet
7  found in 2008?
8    A.    2008?  No.
9    Q.    Do you think that with all these
10 Plaintiffs' lawyers scouring the country for
11 double-thick tablets, they might have found one if
12 there was one?
13       MR. MILLER:  Object to form.
14   A.    I can't -- I can't speak to that.  I
15 don't know what they did.
16   Q.    In the material that you reviewed to
17 prepare opinions was Reference 54 in Appendix B.
18       It's an article called, "Stop Depending
19 on Inspection."
20       Do you remember that?
21   A.    Yes, sir.
22   Q.    Is the journal from which this comes --
23 it's called "Quality Process."
24       Do you subscribe to that journal?
25   A.    I currently do not.  I have for years.

49 (Pages 190 to 193)

PLAINTIFFS' EXHIBITS 003913

Page 194

1    Q.    Does Quality Process --
2    A.    Progress.
3    Q.    -- Progress, I'm sorry, apply to a
4  number of different manufacturing fields?
5    A.    Yes, it does.
6    Q.    Not just pharmaceuticals?
7    A.    Yes, it does.
8    Q.    Is this a peer-reviewed publication?
9    A.    Is it peer-reviewed?  I don't know.
10    Q.    Do you know the author of this article?
11    A.    No, I do not know the author.
12    Q.    Well, here at page 40 in this article,
13  it says, "Because 100 percent inspection is only
14  80 percent accurate, even companies that do
15  100 percent inspection will allow one out of five
16  defects to slip through."
17        Do you see that in your -- this
18  article?
19    A.    Yes.  That's basically from Juran.
20    Q.    What's Juran?  J-U-R-A-N?
21    A.    J-U-R-A-N.  He invented -- basically
22  formulated the current, or at least were the
23  pioneers of the current quality practices, and in
24  Juran's book, he comes up with the 80/20, basically
25  stating that a 100 percent inspection is not

Page 195

1  100 percent effective.
2    Q.    Was there a --
3    A.    And he claims -- he claims that there
4  have been studies done that have corroborated that
5  over and over.
6        As a matter of fact, he gives an
7  example where every time, or frequently, he would go
8  to a conference, or whatever, and he'd ask a certain
9  question, and they would respond to -- it looks like
10  you may have it.
11        And, apparently, he sees a high -- high
12  number of people who get that wrong, and -- but it
13  is one of the most consistent, generally-accepted
14  numbers that I'm aware of.
15    Q.    Were the studies Juran replied on -- or
16  relied on published?
17    A.    Were they published?  I'm sure they
18  were, because he -- he references -- I don't know,
19  is really the correct answer.
20        He reference -- references a study, but
21  I don't know if the reference is correct.  But he is
22  a rather reputable gentleman, or was.
23    Q.    Well, is it going to be your opinion
24  that the 100 percent inspection of Batch 70924 was
25  allowed 20 percent of the tablets through as

Page 196

1  defective?
2    A.    I -- I would not claim that.
3    Q.    Okay.
4    A.    What I would say is that it would not
5  be 100 percent effective.
6        The issue is that the methodology was
7  not validated, it was not qualified.  There was no
8  way of them knowing what level of detection is
9  possible based upon the operators, the methodology,
10  the through-put, without an understanding of how
11  reliable the inspection method is --
12    Q.    Is that -- go ahead.
13    A.    Without an understanding of the
14  inspection method, you basically are dealing in an
15  unknown area.
16        So you -- you would make the assumption
17  that it is an invalid inspection.
18        It could have more than 20 percent.  It
19  could have less.  There's no way of knowing.
20    Q.    And even assuming there were
21  double-thick tablets in 70924, that somehow evaded
22  the 100 percent inspection, do you think they also
23  evaded the tightened AQL inspection that followed?
24    A.    The tightened AQL inspection is not --
25  it's not much of a -- a challenge.

Page 197

1        It tested 1250 tablets out of
2  4.7 million.
3        The probability that they would detect
4  levels of -- of 1, 2 is very low.
5    Q.    And --
6    A.    In fact -- go ahead.
7    Q.    Go ahead.
8    A.    I said, in fact, the sampling method
9  they used would allow -- would accept on one reject,
10  which is an incredible, I would say, violation of
11  the whole quality assurance practice.
12    Q.    You'd certainly agree that
13  Batch 70924 A got more inspections than any other
14  batch that you're aware of.
15    A.    I think it did.  I'd say more
16  inspections.
17    Q.    Yes.
18    A.    It got -- it got 100 percent
19  inspections, purportedly.
20    Q.    So even if there were some unknown
21  number of double-thick tablets that made it into
22  containers and went to Mylan, and then downstream to
23  consumers, you don't know how many of them were in
24  any given drugstore; correct?
25    A.    Correct.

PLAINTIFFS' EXHIBITS 003914

Page 198

1    Q.    In any given container that a consumer
2  received; correct?
3    A.    Correct.
4    Q.    Whether they went to California, or
5  Oregon, or Florida, or anywhere else; correct?
6    A.    I have no idea where they went.
7    Q.    Wasn't the tightened AQL developed
8  under the highest level of scrutiny under the mill
9  standard 105 that you referred to earlier.
10   A.    The -- it was --
11   Q.    First of all, yes or no?
12   A.    Well, the way you phrased it, no.
13   Q.    Okay.  What do you disagree with about
14  that question?
15   A.    Could you repeat the question?
16   Q.    Was the heightened AQL inspection that
17  was done on Digitek Batch 70924 done under mill
18  standard 105?
19   A.    That's not what you asked.
20   Q.    Okay.  I'm asking you a new question.
21   A.    Oh, the new question.  I got it.
22         MR. MILLER:  He asked you to repeat the
23  question.  He was assuming that's what you were
24  doing.  So now it's a new question.
25   Q.    I'm sorry.  Go on.

Page 199

1    A.    So you're asking what -- sorry.  Now
2  you have to repeat it.
3    Q.    Was the 70924 heightened AQL inspection
4  done according to mill standard 105?
5    A.    I believe it was, yes.  I looked at the
6  numbers and it looks correct.
7    Q.    Was that the highest level of scrutiny
8  under mill standard 105?
9    A.    I don't recall, but I don't believe so.
10         I'd have to go through 105, but I don't
11  believe that's the -- highest standard meaning the
12  highest level of scrutiny, no.  I don't think so,
13  but I'm not sure.
14   Q.    Certainly 100 percent is a higher level
15  of scrutiny than a heightened AQL of that nature;
16  correct?
17   A.    Not necessarily, no.
18   Q.    Now, I asked you a little bit ago
19  whether you had an opinion to a probability as to
20  numbers of tablets that were below or in excess of
21  the USP's API specs.
22         Do you remember those questions?
23   A.    Sure.
24   Q.    And you said you had no opinion as to a
25  probability as to whether those numbers were high or

Page 200

1  low; correct?
2    A.    Could you repeat it again?  I want to
3  make sure that I'm answering the question.
4         MR. MORIARTY:  Read my question back,
5  please.
6         (Requested portion is read back.)
7         MR. MILLER:  I object to the form.
8    A.    I'm not --
9         MR. MILLER:  I'm not so sure I
10  understand what you're asking.
11   Q.    Let me get to my numbers.
12         All right.  Out of 152 recalled
13  batches, if you do the math, it's roughly 688 of
14  a million tablets.  Okay?
15   A.    I recall, yes.
16   Q.    I asked you whether you had an opinion
17  to a probability as to what percentage of those were
18  outside the USP specs high, and you said you had no
19  such opinion to a probability.
20         Am I correct on that?
21   A.    Of the number.  You asked me if I have
22  a probability of a certain number.
23         I have no idea what the number could
24  have been.
25   Q.    Okay.  And I asked the same question as

Page 201

1  to low, and you had the same opinion; correct?
2    A.    Yeah.  I have no way of knowing how
3  many were low.
4    Q.    Now, even assuming, if there were some
5  that were outside the specs high --
6    A.    Um-hum.
7    Q.    -- you would have no opinion to a
8  reasonable probability as to how high.
9         Is that right?
10   A.    Well, I know --
11         MR. MILLER:  Objection.
12   A.    I know there's some double thickness,
13  but -- I'm not sure I can answer the question
14  without hearing it again.  I'm sorry.  I must be
15  getting tired.
16         Maybe this is an good time for a break.
17   Q.    Let's finish this, and then we can take
18  a break.
19         Even if there were some number of
20  Digitek tablets among the recalled batches that were
21  outside the USP specs high --
22   A.    Right.
23   Q.    -- do you have an opinion, to a
24  reasonable degree of probability, as to how far
25  outside the specs high they were?

51 (Pages 198 to 201)

PLAINTIFFS' EXHIBITS 003915

Mark G. Kenny, Volume I                                                    June 29, 2010

Page 202

1        MR. MILLER:  Object to form.
2        You can answer.
3    A.    I have no way of knowing.
4    Q.    All right.  Same thing on the low side.
5    A.    I have no way of knowing.
6    Q.    Okay.
7        MR. MORIARTY:  All right.  If you want
8    to take a break, let's take one now.
9        THE VIDEOGRAPHER:  Stand by.  We are
10   going off the record.  The time is 2:52 P.M.  This
11   is the end of Tape No. 4.
12       (Recess was taken.)
13       THE VIDEOGRAPHER:  We are back on the
14   record.  The time is 3:02 P.M.  This is the
15   beginning of Tape No. 5.
16   Q.    Have you ever -- Mr. Kenny, have you
17   ever seen any evidence in the material that you
18   reviewed that Digitek was ever cross-contaminated
19   with another product made at Actavis during this
20   time?
21   A.    I saw that cleaning validation wasn't
22   adequate, but I didn't see a product that was
23   cross-contaminated.
24   Q.    Technically speaking, it was not the
25   cleaning validation that was inadequate, it was

Page 203

1    cleaning validation studies that they found
2    inadequate; correct?
3    A.    Well, that's -- cleaning validation
4    is -- cleaning validation, you automatically add the
5    studies on the end.
6    Q.    Well, what the FDA was concerned with
7    was not the cleaning itself, but how you tested
8    whether the cleaning was adequate; correct?
9    A.    Yes.  But that's cleaning validation.
10   Q.    I just want to be technically correct.
11   A.    And recovery.
12   Q.    Okay.  But you never saw any evidence
13   in anything that there was cross-contamination at
14   any point, did you?
15   A.    I saw no evidence.
16       (Exhibit 21, Amide Investigation Final
17   Report, was marked for identification.)
18   Q.    Now, in the materials you reviewed, and
19   commented on in your report, was Plaintiff's Exhibit
20   128, which my team also marked as Defendant's
21   Exhibit 21.
22       That's the double-thick tablet
23   investigation from 2004; correct?
24   A.    Correct.
25   Q.    And are you aware that the tablet at

Page 204

1    issue was actually made in a batch in 2003?
2    A.    Yes.
3    Q.    And there was only one.  Is that
4    correct?
5    A.    Only one what?
6    Q.    Tablet.
7    A.    There's only -- I believe that's
8    correct.
9    Q.    And it was found by a pharmacist.
10       Is that right?
11   A.    I believe that's correct.
12   Q.    Now, I asked you before about the math
13   of this, but if the recall Digitek from mid-2006
14   forward was 688 million tablets, if we did the math
15   from 2003 forward, the number of Digitek tablets
16   made and distributed would be in the billions;
17   correct?
18   A.    If you say so.
19       I have no way of knowing those numbers,
20   but there's probably a lot of them.
21       (Exhibit 20, Summary of Findings, was
22   marked for identification.)
23   Q.    I want to hand you what's been marked
24   as Exhibit 20.
25       Have you seen this document before?

Page 205

1    A.    This was just submitted to me.  I have
2    not had a chance to review it.
3    Q.    This is a 2004 EIR, is it not?
4    A.    It appears to be.  It says "EI," which
5    tends to mean inspection report.
6    Q.    There are three things I want to ask
7    you about in this document.
8        So first I'd like you to go to
9    page 4.
10       Let me ask you a preliminary question.
11       In order to be under consent decree, do
12   you have to be in compliance with GMPs?
13   A.    In order -- you have to repeat that.
14   Q.    In order to stay under consent decree,
15   do you have to be in compliance with GMPs?
16   A.    Yes.
17   Q.    Now, go to page 4, the first paragraph
18   under "History Of Business Operations," the fourth
19   line down, it says -- it's referring to a consent
20   decree that was in effect from '92 to 2001.
21       It says, "The consent decree was lifted
22   in 2001 following successful demonstration of
23   sustained cGMP compliance."
24       Do you see that?
25   A.    Yes.

52 (Pages 202 to 205)

Page 206

1    Q.    And these EIRs, these are FDA
2  documents.
3          Is that right?
4    A.    Correct.
5    Q.    Now I'd like you to go to page 6.  In
6  the paragraph about field alert reporting, the --
7  first of all, are you aware that Actavis notified
8  the FDA of this 2004 double-thick tablet episode,
9  they notified the FDA through a field alert.
10         Is that right?
11   A.    That is correct.
12   Q.    And towards the bottom of the paragraph
13  I'm referring to, down here, it says, "No additional
14  complaints or reports of thick tablets have been
15  reviewed for this high-volume product."
16         Do you see that.
17   A.    Yes, I see that.
18   Q.    "The event was considered an isolated
19  incident, and corrective actions were put in place
20  to prevent its reoccurrence."
21         Do you see that?
22   A.    Yes.
23   Q.    Do you have any reason to disagree with
24  the FDA about the statement it made in its EIR at
25  that point in time?

Page 207

1    A.    Yes.
2    Q.    And what's the basis for your
3  disagreement with the FDA?
4    A.    Because their investigation, in my
5  opinion, based upon my experience, was not adequate.
6  It did not --
7    Q.    In 2004?
8    A.    In 2004.
9          In other words, there -- a complaint is
10  being handled.
11         At that particular point, a very
12  thorough investigation would have been expected,
13  which I did not see.
14   Q.    Did FDA criticize, observe or warn --
15   A.    I don't recall.
16   Q.    -- Actavis about its investigation?
17   A.    I don't recall.
18   Q.    Well, don't you think they would have
19  said so in this EIR, had they been concerned about
20  it?
21         MR. MILLER:  Objection to form.
22   A.    I can't tell you what the FDA would
23  have said.
24   Q.    Okay.  Let's go to page 9.
25         Under "Complaints," the second

Page 208

1  paragraph.
2          It says, "A larger number of complaints
3  was also noted for Digoxin tablets; however, it is
4  the highest volume product, 179 batches manufactured
5  in 2003/2004, according to the list of batches
6  produced per year.  There were also no trends
7  observed for the types of complaints."
8          Do you have any reason to disagree with
9  the FDA about those comments?
10   A.    I have no reason to disagree.
11   Q.    Do you have any criticism of FDA's
12  investigation of the field alert that Actavis filed
13  with them in 2004 about this tablet incident?
14   A.    I have no opinion on it.
15   Q.    And are you -- you're aware, are you
16  not, that tablets made in 2003 would not have been
17  included in the recall in 2008?
18   A.    Yeah.  They would not have.  I'm
19  assuming they would not have been within expiration,
20  so they would not have been included.
21   Q.    Now, I told you earlier that I was
22  going to make sure that we had -- we knew all the
23  material you brought with you today, and things of
24  that nature.
25         Okay?

Page 209

1          These are some documents from your
2  file.
3          I don't know if they were actually
4  pulled from binders.
5          First of all, did you have exchanges of
6  E-mail with the Plaintiffs' lawyers in this case?
7    A.    There's been some correspondence, yes.
8    Q.    Who's been your primary contact with
9  the Plaintiff's lawyers?
10   A.    I would say Meghan, primarily.
11   Q.    Have you had contact, other than today
12  and maybe yesterday, with Mr. Miller or his firm?
13   A.    Oh, sure.  He was always carbon-copied,
14  or most of the time.
15   Q.    But there's been exchange of E-mail?
16   A.    Yes.
17   Q.    Have you printed all the E-mails?
18   A.    I did print them.  I don't have them
19  with me.
20   Q.    All right.
21   A.    What I tried to do, just for the
22  record, is I tried to take the E-mail that had the
23  long list, as opposed to -- that covered each of the
24  replies, as opposed to, you know, taking each one
25  individually.

53 (Pages 206 to 209)

PLAINTIFFS' EXHIBITS 003917

Mark G. Kenny, Volume I                                                                                          June 29, 2010

Page 210

1      Q.    All right.
2      A.    You may find it in there.  I didn't
3  find it this morning when I went through it.
4      Q.    So this particular document is
5  something about Juran's Quality Control Handbook.
6  Is that right?  About the 80/20 rule?
7      A.    Yeah.  I tried to quote what was in
8  his -- his documentation -- his book, which I have.
9  I've had the book for 20-plus years.
10     Q.    And here you have Plaintiff's Exhibit
11  133?
12     A.    Yep.
13     Q.    And it has handwriting on it?
14     A.    Yes, it does.
15     Q.    Is that your handwriting?
16     A.    Yes, it is.
17     Q.    And this has to do -- 133 has to do
18  with Quantic's -- Quantic Regulatory Services'
19  investigation, doesn't it?
20     A.    It's hard to tell what it has to do
21  with because it's all blank.
22     Q.    Well, let me make this easy for you.
23          In your own handwriting, in the middle
24  of the page, doesn't it say "Quantic" with the arrow
25  towards the people on the E-mail?

Page 211

1      A.    Yes.  Actually Sal Romano wrote that.
2  He told me that that is Quantic.  I would have no
3  way of knowing that because I didn't know who it
4  was.
5          Which is meaningless to me other than
6  the fact that they are a consulting firm.
7      Q.    Now this document does not have a --
8      A.    Right.
9      Q.    -- exhibit sticker on it, and the Mylan
10  Bates number is kind of copied off of the document,
11  but it's a report of December 4, 2006 about an
12  audit.
13     A.    Yes.
14     Q.    Is that right?
15     A.    Yeah.  You're not really showing it to
16  me, but I believe it is.
17          Yeah.  I know that document.
18     Q.    This document that I'm holding looks to
19  be the consent decree from 1992; right?
20     A.    Yes.
21     Q.    This document I'm holding is not Bates
22  stamped, and it has no exhibit sticker.
23          Would you agree with that?
24     A.    Yes.
25     Q.    It is a November 6, 2006 letter to FDA

Page 212

1  on Actavis letterhead, is it not?
2      A.    Yes, it is.
3          One second.  One second.
4      Q.    You can hold it.
5      A.    Okay.  Right.  Okay.
6      Q.    When did -- is it Mr. Romano or
7  Dr. Romano?
8      A.    Dr. Romano.
9      Q.    When did Dr. Romano cease working on
10  this Digitek matter?
11     A.    Probably around a month ago.
12     Q.    The next document in the stack that I'm
13  holding looks like Exhibit 69 from the Galia
14  deposition.
15          Is that right?
16     A.    Yes.
17     Q.    This is a -- this is deposition Exhibit
18  159.
19          Is that right?
20     A.    Yes.
21     Q.    "Blend failure investigation"?
22     A.    Right.
23     Q.    Now, it has Russ's name above the top
24  redactions.  And Sal's name.
25          What's that all about?

Page 213

1      A.    Let me look at it.
2      Q.    First of all, there's handwriting all
3  over it.  Is that right?
4      A.    Right.  Yes.
5      Q.    Okay.  Why are Russ and Sal's
6  names above that --
7      A.    Because I -- I don't want to touch this
8  because I know nothing about technical sampling.  I
9  looked at it, and I tried to read it, and I tried to
10  understand.  It was foreign to me.  I didn't
11  understand the -- some of the terminology.  I
12  attempted to, and I said, this is something for
13  either Russ, or if Sal knows something about it,
14  perhaps he can add some insight, which -- which he
15  did not.
16     Q.    All right.  Well, this has to do with
17  blend failure investigation, and there are at least
18  two Digitek batches named in this investigation.
19          Is that right?
20     A.    I'd have to see it, but I'm sure you're
21  right.
22          Correct.  Yes.
23     Q.    So if I understand this correctly, you
24  at least looked at this document.
25     A.    Correct.

54 (Pages 210 to 213)

Page 214

1    Q.    Is that right?
2         But then because you did not consider
3    yourself to be expert in what they're talking
4    about --
5    A.    The sampling technique, correct.
6    Q.    -- you had Russ and Sal look at it;
7    correct?
8    A.    No.  I put a note that Russ and Sal
9    should look at this.
10   Q.    And do you know if they did?
11   A.    I -- I since I never communicated
12   with Russ, I assume if he did, it was by his own
13   volition.
14        Sal, I believe, did take a look at it,
15   and he couldn't add my more depth than I could.
16        I had difficulty following it.
17   Q.    Is that because this blend uniformity
18   sampling and investigation material that's discussed
19   in here is really quality control chemistry issues?
20   A.    I don't know what the issues are.  I
21   can tell you that I don't understand the methodology
22   that's used in order to obtain a representative
23   sample.  They were using terms I'm not familiar
24   with.
25   Q.    Are you -- have you ever been a quality

Page 215

1    control chemist?
2    A.    No.  I explained that earlier.
3    Q.    Okay.  The next document I'm holding is
4    an article called "Drugs with narrow therapeutic
5    index as indicators in the risk management of
6    hospitalized patients."
7    A.    Yes.
8    Q.    Did you read this article?
9    A.    I tried to read it.
10   Q.    This is --
11   A.    Then I realized it was -- quite
12   honestly, I had no familiarity with the term, so I
13   went onto the internet to at least see what the term
14   meant, and then I realized when I went into it -- I
15   tried reading it, just to familiarize myself, but it
16   was clearly out of my territory.
17   Q.    All right.  And attached to it is
18   deposition Exhibit 164, 165, and 166.
19        Is that right?
20   A.    Yes.
21   Q.    Okay.  The last document I'm holding
22   here appears to be a draft, "for discussion purposes
23   only," version of your report.
24        Is that right?
25   A.    Correct.

Page 216

1    Q.    To whom did you send this draft?
2    A.    I sent it to Meghan, Sal and Pete.
3    Q.    Was this a first draft?
4    A.    That was a first draft.  The first
5    draft that they saw, right.
6    Q.    And then in here, there's handwriting.
7         Is it your handwriting?
8    A.    All of it's mine.
9    Q.    Is the handwriting based on discussions
10   you had with Plaintiffs' counsel about the draft?
11   A.    It is based upon two things, or three,
12   if you will.
13        One, listening to them.
14        Secondly, coming up with ideas as I'm
15   just going through the document.
16        And then later, going back and looking
17   at and making additional edits as I reread it.
18   Q.    Are you left-handed?
19   A.    Yes, I am.
20   Q.    Did you go to Catholic school?
21   A.    High school.
22   Q.    Backwards checkmarks, telltale sign.
23   Takes one to know one.
24        MR. MORIARTY:  Do you want me to mark
25   these as one exhibit?  How do you want to take this

Page 217

1    up, because at some point, I need to have more time
2    to go through them, and see if I have questions
3    about them.
4         MR. MILLER:  I'd like to mark them as
5    individual exhibits, but something like the entire
6    with the three exhibits attached to it can stay as
7    one exhibit.  I mean, we don't need to break it up.
8    But things that are together should stay together,
9    and those that are apart should stay apart.
10        MR. MORIARTY:  What I'd like to do is
11   give these all to the court reporter --
12        MS. CARTER:  Are you talking about
13   those specific handfuls?  Aren't we going to make
14   copies of the whole thing?
15        MR. MORIARTY:  Well, we'll get there in
16   a minute.  These is what I'm talking about right
17   now.  I'll give them to the court reporter.
18        I will confer with the people in my
19   office as to where we are in exhibits, and then give
20   her the numbers so she can mark them.
21        MR. ANDERTON:  We are at the 91.
22   We've -- and we've already used 100.
23        MR. MORIARTY:  Well, that's where we
24   were yesterday.  Is that okay?
25        MR. MILLER:  Okay.

55 (Pages 214 to 217)

PLAINTIFFS' EXHIBITS 003919

Mark G. Kenny, Volume I                                                                                    June 29, 2010

Page 218

1    MR. MORIARTY:  We still have to go
2  through these to see if there are things that were
3  not in Appendix B, but I don't need to mark
4  everything he brought.
5    MR. MILLER:  I'm fine with reading the
6  title of what he brought that's not in Appendix B
7  into the record, if that works for you.
8    MS. CARTER:  I didn't know if you
9  wanted to or not.
10    Q.    Are you going to be able to readily
11  identify what is in these binders that is not in
12  Exhibit B?
13    A.    No.  I'm -- not readily.  Sorry.
14    Q.    So you don't have the E-mails with you
15  today.
16        Do you have all the attachments to the
17  E-mails here today?
18    A.    Attachments to E-mails.
19        I don't know if there were any
20  attachments to E-mails.
21        Like the instructions of -- you know,
22  legal instructions in deposition.
23        I don't -- I can't, off the top of my
24  head, recall any electronics exchanged other than
25  late copy of the -- on June 15, I think it was, of

Page 219

1  the draft, or thereabouts.
2    Q.    All right.  Well, at some point I need
3  you to print -- I need you to get us the E-mails.  I
4  need you to print the drafts.
5    MR. ANDERTON:  No.  I want them
6  electronically.
7    THE WITNESS:  Okay.
8    MR. MORIARTY:  He wants them
9  electronically.
10    THE WITNESS:  So how should I do that?
11    MR. MORIARTY:  Put them on a thumb
12  drive.
13    THE WITNESS:  No, I mean how to copy
14  it.
15    MR. ANDERTON:  Just transfer them onto
16  some sort of portable drive, thumb drive, disk.
17    A.    I'm not trying to be overly technical.
18  But how do you take an E-mail and copy it?  You
19  don't even know where the file is located.
20    MR. MILLER:  I'd have to go with him on
21  that.  If told me to put an E-mail on a thumb drive,
22  I'd have no clue how to do it.
23    MR. MORIARTY:  If you -- if you keep --
24  if you keep an -- if you keep an electronic Digitek
25  file and you keep the E-mails in the file, they

Page 220

1  should be there.
2    MR. MILLER:  I think the notice asked
3  for a hard copy.  I think -- I think it satisfies
4  your request if he prints them out and provides you
5  with a hard copy.  He's not going to provide you
6  with an electronic copy.
7    MR. ANDERTON:  The note does not ask
8  for just a hard copy -- or the notice does not ask
9  for just a hard copy.
10        I will accept hard copies of the
11  E-mails, subject to your preserving and not
12  destroying any of the electronic copies.
13    THE WITNESS:  Certainly.
14    MR. ANDERTON:  And with respect to
15  non-E-mails, other drafts I believe you testified
16  about earlier, that you maintain you still have in
17  electronic format --
18    THE WITNESS:  Yes.
19    MR. ANDERTON:  -- I want those
20  electronically.
21        Anything except an E-mail that relates
22  to this case that you maintain electronically and it
23  isn't part of the binders here, other drafts in
24  particular, you're going to need to transfer onto
25  some sort of portable media.

Page 221

1    THE WITNESS:  That's easy.
2    MR. ANDERTON:  Okay.  Fair enough.  And
3  can -- and there's to be no dealing -- no modifying
4  it electronically.  Transfer it, hand them the
5  media --
6    MR. MILLER:  They will be PDFs, they're
7  not going to be Microsoft Words.
8    MR. ANDERTON:  No.  I don't want PDFs.
9  I want them --
10    MR. MILLER:  You're going to get PDFs.
11  Yeah, I mean, you know, if you're going to take a
12  software and dissect this thing until he gets to the
13  first letter he typed in, I know that kind of stuff
14  is out there.  He's going to give you a PDF, and
15  that's what you're going to get.
16    MR. ANDERTON:  That's not acceptable to
17  me.
18    MR. MILLER:  We will --
19    MR. MORIARTY:  Wait.  I don't want to
20  take up my deposition time.  Preserve everything
21  you've got in your computer on Digitek, and we'll
22  take this up later.
23    THE WITNESS:  Okay.
24    MR. MORIARTY:  We're not going to agree
25  on this on my record.

56 (Pages 218 to 221)

PLAINTIFFS' EXHIBITS 003920

Mark G. Kenny, Volume I

June 29, 2010

Page 222

1    Q.    Do you have any knowledge of which
2 consumers, or which Plaintiffs in the Digitek
3 litigation, received which batches of Digitek?
4    A.    Which consumers received what batches.
5        MR. MILLER:  Object to form.
6    A.    I'm not sure I understand the question.
7 You mean from the distribution center?
8    Q.    From anywhere.  I mean, Batch 70924
9 went to market; correct?
10    A.    Yes.
11    Q.    And presumably it was disseminated to
12 pharmacies, and some of it, potentially, to
13 consumers.
14        Is that correct?
15    A.    Yeah.
16    Q.    Right?
17    A.    Yes.  Yes.  I'm sorry.
18    Q.    First of all, do you even know for a
19 fact whether any consumers got tablets from 70924
20 before the recall?
21    A.    I have no way of knowing that.
22    Q.    Okay.  So if I went to other batches in
23 the recall and mentioned them by number, would you
24 have any way to know which consumers got tablets
25 from those batches?

Page 223

1    A.    No.  I don't have any way of knowing.
2    Q.    Do you know anything about how the
3 die -- die table set for Stokes BB2 tablet presses
4 is adjusted?
5    A.    No.  That's not my expertise.
6    Q.    Do you have any idea what percent of
7 pharmaceutical manufacturers have tablet presses
8 with weight controls?
9    A.    I have no way of knowing that.
10    Q.    Have you reviewed any manufacturing
11 documents from Actavis Elizabeth?
12    A.    I don't believe so.  No, I don't think
13 so.  I don't recall any.
14    Q.    How many of the 483s between 2006 and
15 2008, January 2006 to April of 2008, specifically
16 refer to Digitek?
17    A.    Specifically refer to Digitek.  I would
18 say there's -- I'd have to look through them, if
19 you'd allow me.  But I think there's --
20    Q.    How many?
21    A.    -- specifically, one.  That's -- I
22 don't -- I'd have to look at them, honestly.
23        If you want me to go to the 483s, I can
24 go through them.
25    Q.    Well --

Page 224

1    A.    When you say "specifically," you mean
2 that mention Digitek?
3    Q.    Yes.
4    A.    There's several.
5        Where Digitek's name is part of the --
6 is included in the 483.
7    Q.    All right.  Well, to save you time,
8 here's what I see, and you tell me if you remember
9 any other instances, and if you want to look at the
10 documents, fine.
11        In December of -- or February of 2006,
12 the FDA had a 483 about adverse report -- adverse
13 incident reporting.
14    A.    Correct.
15    Q.    You remember that one?
16    A.    Yes.
17    Q.    Then in August of 2006, there was this
18 cleaning validation test method; correct?
19    A.    Correct.
20    Q.    And the AER reporting was fully
21 remediated; correct?
22        MR. MILLER:  Object to form.
23    A.    I don't know if it was or wasn't.
24    Q.    That's not your area of expertise?
25    A.    No.  No, it's not.

Page 225

1    Q.    Was the cleaning validation test method
2 observation remediated?
3    A.    I believe it would have been, yes.  But
4 I -- I don't recall specifically.  I didn't
5 reconcile it.
6    Q.    Okay.  And then from my review, there
7 are three straight 483s, October of '06, November of
8 '06 and September of '07 in which Digitek is not
9 mentioned at all.
10        Do you remember that?
11    A.    I'd have to look at them.  I suspect
12 that if you looked through it and you don't see
13 Digitek named, that is accurate.  If you want me to
14 take a look at it, I will.
15    Q.    In May of 2008, there were two comments
16 about Digitek.  One had to do with blend uniformity
17 investigations and the other had to do with 70924.
18        Do you remember that?
19    A.    I remember those instances, yeah.
20    Q.    All right.  If you need to look at the
21 483s, I want to make sure that those are the three
22 483s which contain any reference to Digitek
23 specifically.
24        Do you need to check?
25        MR. MILLER:  Object to form.

57 (Pages 222 to 225)

PLAINTIFFS' EXHIBITS 003921

Page 226

1    MR. MORIARTY:  What's the matter with
2  the form?
3    MR. MILLER:  It's misleading.  Your
4  whole line of questioning was -- was about
5  mentioning Digitek specifically, and then you
6  changed to summarizing it with -- with mentioning
7  Digitek in any way.  I forget how you mentioned it.
8  We can certainly take a look at it again.
9    Q.    Why don't you check the 483s and tell
10  me if there are any other 483s, besides the three I
11  mentioned, that refer to Digitek.
12    MR. MILLER:  Period.
13    A.    That use the term "Digitek" in there.
14    Q.    Yes.  As a product.
15    A.    Okay.  I understand that.  But if there
16  is -- so I can get clarify here.  If they say that
17  all so-and-so systems are -- are included, do you
18  want me to tell you that I believe that Digitek is
19  part of that universe?
20    In other words --
21    Q.    No.  I'm asking you about Digitek
22  specifically referred to.
23    A.    I'm trying to answer you for Digitek.
24    But if you say something about "all" or
25  "every," it means that Digitek is part of the "all"

Page 227

1  or "every," or would be singled out as an exception.
2    So if I went through it, I'd have to
3  say, okay, here are the ones that say Digitek and
4  here are the ones that are -- that are -- are across
5  all operations, and, therefore, Digitek is part of
6  that, even though the name isn't there.
7    I'd have to literally go through -- we
8  could go through line by line.  It would be easy.
9    Q.    I'm asking you about a product, not a
10  system.
11    A.    A product.  Okay.  So now ask the
12  question again.  Maybe I can help you better.
13    Q.    Do you need to look at the 483s to tell
14  me whether or not Digitek is specifically mentioned
15  in any more than the three that I've told you about?
16    A.    I do not need to go through it to try
17  to find -- do a word search for the name Digitek.  I
18  will take your word that that's correct.
19    Q.    All right.  Now, you've seen references
20  in some of these documents to a total failure of the
21  quality system, haven't you?
22    A.    Yes.  Yes.
23    Q.    When FDA has tested Digitek, at least
24  seven times just in the recall batch period alone,
25  and the product met USP specifications every time,

Page 228

1  you can't have a total failure of a quality system
2  regarding Digitek and repeatedly pass USP --
3    A.    That's absolutely not true.
4    It depends on what you mean by total
5  failure.
6    Total failure, to me, means that you've
7  incurred a huge risk in terms of releasing product,
8  whether it be Digitek, whether it be the other drug
9  products, and by -- by having this huge risk, it's
10  a -- it's a huge problem.
11    Q.    Well, you said in your answer it
12  depends what you mean by total failure.
13    A.    Yeah.
14    Q.    What do you mean by that?
15    A.    What do I mean by what?
16    What do I mean by total failure?
17    Q.    No.
18    A.    Total failure --
19    Q.    No.  You said, it depends what you mean
20  by total failure.
21    What do you mean by that?  Does that
22  mean that total failure is in the eyes of the
23  beholder?
24    A.    Of course it is.
25    Q.    Are you talking about total failure of

Page 229

1  the quality system from a regulatory standpoint?
2    A.    Versus what?
3    Q.    My question stands by itself.
4    A.    From a regulatory standpoint, is it a
5  total failure?  If I was using the word "total
6  failure," I would say from a regulatory and a
7  quality control standpoint, it is a failure.
8  "Total" is not a good word to use.
9    Because it -- it's difficult to
10  quantify.
11    Q.    But certainly --
12    A.    It's a significant failure.
13    Q.    Certainly product quality, as defined
14  by the specifications, can still be met under these
15  circumstances; right?
16    A.    Is it conceivable?  Yes.
17    Q.    Well, isn't it a fact when FDA tested
18  seven of the recalled batches itself?
19    A.    It is -- if you're asking the question,
20  can you, in a total failure mode, produce some
21  product that is acceptable, yes, it can.  Whatever
22  "total failure mode" means.
23    Q.    And if some -- and if -- even if we
24  accept the FDA's statement that there was a --
25  somebody's statement that there's a total failure of

58 (Pages 226 to 229)

Mark G. Kenny, Volume I                                                June 29, 2010

Page 230

1    the quality system, that does not tell you if there
2    was out-of-spec Digitek in the hands of consumers,
3    or if there was, how much there was; right?
4        A.    That -- just that term, no.  It has
5    no -- no precision to it whatsoever.
6        Q.    Was there ever a statement by -- I'm
7    sorry.  Let me rephrase that.
8            Was there ever a final agency
9    determination, in any FDA document, that there was a
10   total failure of Actavis's quality systems?
11       A.    I don't know if they used that term.
12           I think what -- the only term that I
13   recall definitely is when people tried to paraphrase
14   what they felt the FDA either could call the outcome
15   or -- that type of reference.
16       Q.    Do you ever go on FDA's website and
17   study their statistics about compliance actions?
18       A.    Oh, sure.
19       Q.    Do you know how many warning letters
20   were issued in 2008 by the FDA?
21       A.    No.  No, I don't recall.
22       Q.    Do you recall how many recalls there
23   were?
24       A.    No.
25       Q.    Would it surprise you if there were

Page 231

1    2,721?
2        A.    Recalls?
3        Q.    In 2008?
4        A.    Would it surprise me?  It may surprise
5    me.  It's a little bit higher than I would have
6    thought.
7        Q.    Do you know how many 483s were issued?
8        A.    No.  It's got to be tens of thousands.
9    It's got to be many.
10       Q.    Do you -- do you know how often FDA
11   issues a 483, percentage-wise --
12       A.    It's in --
13       Q.    -- when they do an inspection?
14       A.    All I know is I didn't get any.
15       Q.    I would assume that other parts of J&J
16   got plenty of 483s; right?
17       A.    They -- other companies did get 483s,
18   surely, just not mine.
19       Q.    Now, before I shift gears and get to
20   your resume and your actual report, let me ask you
21   an open-ended question.
22           If I asked you to prove to me that
23   tablets outside the specifications for active
24   pharmaceutical ingredient actually reached
25   consumers, how would you go about doing that?

Page 232

1        A.    I'd take a look at all of the -- first
2    of all, all of the exceptions, all the
3    out-of-specifications, all the deviations, all of
4    the departures, whatever -- the exceptions that were
5    done; in other words, the non-conformances that
6    occurred, I'd take a look at those first.  And then
7    determine whether or not, based upon that, there's a
8    reasonable probability that material would be
9    released to the market.  That would be the very
10   first step, which was a big step; meaning
11   energy-wise.
12       Q.    Okay.  Then what would you do?
13       A.    Then --
14       Q.    To check -- because at this point,
15   you're working with the hypothesis, the
16   reasonable -- I'm sorry.  Let me withdraw that.
17           I would assume you'd also look at batch
18   records and quality control testing.
19       A.    That would not be my first step.  The
20   others I'd --
21       Q.    I'm not asking if it's your first step.
22   I'm asking whether it's --
23       A.    You said approach.
24       Q.    -- a step.
25       A.    Is it a step?  Sure.

Page 233

1        Q.    I mean, you'd want to know whether the
2    product passed blend uniformity, in-process testing
3    and finished-product testing, wouldn't you?
4        A.    Yes.
5        Q.    Okay.  What would then be the next
6    step --
7            MR. MILLER:  Objection to form.
8        A.    You got me out of order.  The second
9    step would be looking at complaints.
10       Q.    Okay.
11       A.    And I would look at, did consumers
12   receive product that either they had some type of
13   medical issue, or some type of alleged issue with
14   the conformance of the product to what their
15   expectations were.
16       Q.    Okay.
17       A.    And then I'd go through those records,
18   and I'd determine how many were confirmed and how
19   many were not confirmed.  With the confirmed, I'd
20   say the customer got a product that was out of
21   specification, because they sent a sample and it's
22   out of spec.
23       Q.    Okay.
24       A.    Then I would -- this is off the cuff,
25   but what I eventually -- if your question is would I

59 (Pages 230 to 233)

Mark G. Kenny, Volume I                                                                           June 29, 2010

Page 234

1  what eventually look at the batch records,
2  absolutely.  I would take a sampling of the batch
3  records.  I wouldn't look at them all unless, for
4  some reason, I wanted to totally quantify it.
5      Q.    Okay.  Anything else?
6      A.    Let me think about the systems.
7          I would look at -- yeah.  I would look
8  at systems that affected the quality of the product.
9  I'd take a look at process validation.
10         Basically I would do an audit.  I would
11 look at raw material acceptance.  I would look at,
12 as you said, batch records.  I'd look at preventive
13 maintenance.  I'd look at calibration.  I'd look at
14 in the labs, at lab notebooks, to try to scrutinize.
15         I'd look at standard solutions.  I'd
16 see how they controlled those, and whether or not
17 it's consistent with GMP.
18         I'd go into the micro lab.  I'd look
19 for -- sometimes they have a certain water quality.
20 Normally companies do an annual report of water
21 quality.  And then I'd take a look at the water
22 quality test results themselves.
23         I'd go into the micro lab.  I'd take a
24 look at the facility itself.  I'd take a look at the
25 equipment.  Was it qualified?  I'd ask questions

Page 235

1  regarding the validation -- or the qualification,
2  rather, of those instruments, for example, an
3  incubator.  I'd ask whether or not it would have
4  been properly qualified, the temperature
5  distribution, whether they used qualified methods or
6  qualified equipment to do that.
7          I'd go through the analytical lab.  I
8  would determine whether or not the equipment that's
9  used to test has been properly qualified.
10         I'd look at the training records of
11 those people that did the tests, to see that they
12 were properly trained.
13         I would then follow through with -- on
14 a manufacturing level -- all -- all the areas I felt
15 that were -- could impact on the quality of the
16 product.
17         Basically as thorough a job -- again,
18 if I wanted to find out as a -- as comprehensively
19 as human -- humanly possible, I would do that type
20 of thing.
21         And I have done stuff comparable to
22 that.
23     Q.    You did not do all of that in this
24 instance; right?
25     A.    I did not, sir.

Page 236

1      Q.    All right.  Now -- but if you're
2  reviewing the internal documents, like the exception
3  reports, the out-of-specs, the deviations, the batch
4  records and the system reviews, what you wind up
5  with there essentially is a hypothesis of, maybe we
6  did or maybe we did not send defective product out
7  into the marketplace; correct?
8      A.    You'd have to repeat that question.
9          If you do -- if you do an analysis from
10 what standpoint?
11     Q.    The analysis that you just gave; right?
12     A.    Right.
13     Q.    You --
14     A.    I talked about the exceptions.  That
15 would have been the first thing.
16     Q.    I understand that.  But at the end of
17 that, if you're just looking at the internal
18 material, at the end of that --
19     A.    Internal material.
20     Q.    The company's material.
21     A.    "Material" meaning chemicals, product?
22     Q.    Everything you just described except
23 the --
24     A.    Those are records, documentation,
25 etcetera.

Page 237

1      Q.    -- complaints.  Okay.  Everything you
2  described, but the complaints.
3      A.    Yeah.
4      Q.    You just come up with a hypothesis that
5  out-of-spec tablets went out; correct?
6      A.    No.  I would have enough information,
7  perhaps, to begin to find instances where product
8  got out the door.
9          I mean, I would look at stability.  If
10 stability failed, product out the door was out of
11 specification.
12     Q.    All right.  I understand that.  But did
13 you see any -- in the material you reviewed, were
14 there stability failures for Digitek?
15     A.    For Digitek, I don't recall seeing
16 them.
17     Q.    What I'm trying to find out is your
18 scientific method to -- in your instance, you've
19 been consulted, how do you prove that defective
20 tablet actually got out?  Okay?  It seems to me that
21 at the end of what you just described, except for
22 the product complaints, so far you cannot actually
23 prove that defective product left the premises?
24     A.    No.  The -- what I would say is -- now,
25 as part of the investigation, I would look at

60 (Pages 234 to 237)

PLAINTIFFS' EXHIBITS 003924

Mark G. Kenny, Volume I                                                      June 29, 2010

Page 238

1 retained samples. I would test retained samples.
2 When there's -- there's enough for a duplicate assay
3 for every single batch we produce.
4         I would test raw material components.
5         I would -- a lot of raw material
6 components are received on certification.
7         I would probably do redundant testing
8 to make sure that, again, we didn't have -- we
9 didn't have unacceptable raw materials.
10        Q.    What if it passed?
11        A.    If it passed, then I would continue my
12 investigation until I exhausted all those things
13 that I felt could be contributory.
14        Q.    What would constitute proof to you,
15 just from the internal documents, that
16 out-of-spec -- let me rephrase that question. Okay?
17        You've got -- let's assume you've got a
18 very low number of out-of-spec investigations.
19        A.    Right.
20        Q.    Okay? Let's assume that you have no
21 out-of-spec finished tablet testing.
22        A.    Okay.
23        Q.    Okay?
24        A.    "Finished" meaning commercially-sold
25 product --

Page 239

1        Q.    Yes.
2        A.    -- where you take your sample and --
3 and use it to release. We're not talking about
4 stability, we're not talking about any other
5 extra -- extraordinary testing.
6        Q.    Well, let me -- let me continue.
7        A.    Okay.
8        Q.    You have a very low number of blend
9 uniformity issues. You have no out-of-spec finished
10 product testing. You have no stability failures.
11        A.    The terms you're using -- I should let
12 you complete your sentence.
13        Q.    Because stability testing is done after
14 release; correct?
15        A.    Right. It's frightening. We find out
16 months, if not years, later that what you sold is no
17 good.
18        Q.    Okay. But you're doing this review
19 after the fact because you're being consulted.
20        A.    You mean --
21        Q.    After a company has released the
22 product, they call you in because they want to know.
23 Okay?
24        So if you've got these things,
25 essentially, going for the product, at what point do

Page 240

1 you say, I think there's proof that there was
2 defective product that's in the marketplace?
3        A.    As soon as I find a few instances where
4 there's -- where there was defective product.
5        Q.    Okay.
6        A.    And then I say, you know, do you want
7 me to continue to go and try to quantify, try to
8 figure out what batches, you know, it depends on the
9 level of scrutiny that you want.
10        The FDA, for example, when they go in,
11 when they see two or things wrong with a certain
12 system, they may not continue looking at that,
13 because they found out that the system is not
14 adequate.
15        Q.    All right. And if you were --
16        A.    And that's their approach.
17        Q.    If you were called in on a consulting
18 job like this, for the part about the customer
19 complaints, would you have hired one of your
20 colleagues to come in and do the pharmacovigilance
21 analysis of the customer complaints?
22        A.    Wait. Pharmaco, I would, myself, want
23 to go through, which I consider arguably the most
24 important feed-back from the customer, which are
25 customer complaints. I would go through. I would

Page 241

1 ask for a summary of all the complaints. I would
2 ask for some explanation of what they consider
3 critical, what they would consider trivial.
4         I would then ask them to sort, because
5 they'd be in an electronic base, I'd ask them to
6 sort what -- you know, the -- what we both perceived
7 as being potentially critical.
8         I would then look at the levels, the
9 incident levels, of those critical issues. If you
10 have multiple batches that had the same issue,
11 multiple products, it's 16 complaints within one
12 batch and almost none in others. So I'd look at the
13 trends, and then I would, myself, go through those
14 batches that were critical, and those complaint
15 records that are alleged to be critical, I would go
16 through those and review those myself, because I
17 would consider it that important.
18        Q.    Okay. Did you personally consult
19 directly with a pharmacovigilance expert in your
20 work on the Digitek cases?
21        A.    Not at all.
22        Q.    Have you seen any reports of an expert,
23 or from the FDA, that says that there was a
24 pre-recall signal in the AER data to indicate that
25 there was a problem with the drug?

61 (Pages 238 to 241)

PLAINTIFFS' EXHIBITS 003925

Page 242

1     A.    I'm not sure what that term is.
2          I guess not, because I'm not familiar
3   with that term.
4     Q.    Which term?
5     A.    Pre --
6     Q.    Pre-recall?
7     A.    Pre-recall -- what is that?
8     Q.    Signal?
9     A.    Signal.  I don't recall that term.
10    Q.    To put it another way, has any
11  pharmacovigilance expert told that there was data
12  pre-recall to indicate that there was a problem with
13  Digitek in the field?
14    A.    Well, the only thing I recall was that
15  this was -- this was one of the top, I believe
16  number 3, most complained about product, if you
17  will, with the most issues.  So they needed a
18  high -- they wanted a high level of scrutiny.  That
19  might have been a document from my line.
20    Q.    Well, didn't the FDA, in that EIR that
21  I read you from a little bit ago, say that it was
22  the highest volume product, or one of the highest
23  volume products?
24          Yes?
25    A.    Yes.  Yes.

Page 243

1     Q.    And didn't the FDA say that it was no
2   trend to the adverse event reports?
3     A.    I believe that's what they said.
4     Q.    What I'm trying to find out --
5     MS. CARTER:  Objection to form.
6     Q.    What I'm trying to find out from you is
7   whether you have consulted with or seen the report
8   of FDA, or an expert, to indicate that there was
9   some pre-recall signal, some pre-recall evidence
10  that there was --
11    A.    Associated with adverse experience.
12    Q.    -- problems -- problem with the Digitek
13  in the field from customers.
14    A.    From customers?  I don't recall seeing
15  that.
16    MR. MORIARTY:  How far are we on the
17  tape?
18    THE VIDEOGRAPHER:  We have about
19  another 28 minutes left.
20    MR. MORIARTY:  All right.  Let's -- we
21  need to take a five-minute break because my
22  colleague needs to leave.  Okay?
23    THE WITNESS:  Sure.  I could use it.
24    THE VIDEOGRAPHER:  Stand by.  We are
25  going off the record.  The time is 3:54 P.M.  This

Page 244

1   is the end of Tape No. 5.
2          (Recess was taken.)
3          THE VIDEOGRAPHER:  We are back on the
4   record.  The time is 4:09 P.M.  This is the
5   beginning of Tape No. 6.
6     Q.    When were you first contacted about
7   being an expert in this case?
8     A.    Oh, I'm going to guess in February,
9   perhaps.
10    Q.    Of what year?
11    A.    Of this -- I'd have to -- I think it
12  was February of this year.
13    Q.    And who contacted you?
14    A.    Actually, Sal Romano contacted me.
15    Q.    Who contacted Sal?
16    A.    John Kowalski contacted Sal.
17    Q.    Who is John Kowalski?
18    A.    John Kowalski is a gentlemen, he and I
19  worked -- someone I worked with, a microbiologist,
20  who does consulting.  He took a retirement package
21  similar to what --
22    Q.    Who contacted Mr. Kowalski?
23    A.    I don't know.  Somebody from the law
24  firm.
25    Q.    I assume you're charging Plaintiffs for

Page 245

1   the time you spend reviewing records, writing
2   reports, and things of that nature.
3     A.    For the most part.
4     Q.    What are you charging them?
5     A.    I'm charging $430 an hour.
6     Q.    And then today, I assume I'm being
7   charged for the time spent questioning you; right?
8     A.    Yes.  I want to be sarcastic, but I
9   won't be.
10    Q.    How much are you charging me?
11    A.    Whatever the rate would be.
12    Q.    $430 an hour?
13    A.    Yes.
14    Q.    How did you come up with $430 an hour?
15    A.    We were told that they would pay 400.
16  We -- they asked us to bring in an expert on
17  tableting.  As part of standard consulting
18  agreements, he would have been part of the SpyGlass.
19  We decided that that was not the best use of Russ,
20  but then we had a loss of income, so we said that we
21  would like to get for ourselves another $30 an hour,
22  which we said did seem fair enough.  So each of us
23  went from 400 to $430 an hour.
24    Q.    When you say "each of us," are you
25  talking about you and Sal?

PLAINTIFFS' EXHIBITS 003926

Mark G. Kenny, Volume I                                               June 29, 2010

Page 246

1      A.     Sal and -- Sal, so when Sal billed --
2   bills -- billed, he would get $430 an hour, also.
3      Q.     And how was it -- I'm sorry.  Were you
4   done?
5      A.     Yes.
6      Q.     How was it decided that you would sign
7   the report and testify, as opposed to Sal?
8      A.     Because Sal's schedule would not
9   allow -- the visits, the deposition dates, the
10  potential trials, he's beyond busy.
11     Q.     All right.
12     A.     So it sounded like something he could
13  do to begin with, and he felt he couldn't do it.
14     Q.     And then did -- the Plaintiffs sent you
15  some material; correct?
16     A.     The Plaintiffs sent me material --
17     Q.     Plaintiff.
18     A.     Yes.
19     Q.     And you reviewed it?
20     A.     Correct.
21     Q.     Did you have a full opportunity to read
22  whatever they sent you?
23     A.     Yeah.
24     Q.     Did you have an opportunity to ask them
25  for additional documents if you wanted to?

Page 247

1      A.     Yes.
2      Q.     Did you -- did they let you know that
3   there were depositions going on of various company
4   witnesses?
5      A.     No.
6      Q.     You never knew that?
7      A.     I suppose I knew it.
8          I didn't -- it wasn't important to me.
9      Q.     All right.  Did you --
10     A.     Because it's the facts and data that I
11  wanted to look at.  I didn't -- quite honestly,
12  never went through the deposition process, so it
13  wasn't totally clear to me what -- what all these
14  records -- what records would be collected,
15  etcetera, and what would be available.
16     Q.     So after you reviewed what they sent,
17  did you ask to see any additional data?
18     A.     I asked to see a ton of additional
19  data.
20     Q.     Did you get the data you asked for?
21     A.     I received what they had.
22         MR. KAPLAN:  That's not the question.
23     Q.     Did you ask for anything that you
24  didn't get?
25     A.     I'm sure, yeah.  I'd have to go back

Page 248

1   through what I requested, but, yeah.
2          Like I requested to go to the -- an
3   audit, and it just -- just didn't seem -- later on,
4   it just didn't seem practical or worthwhile.
5      Q.     Okay.  Anything else that you asked for
6   that you didn't get?
7      A.     I suppose there is.  I'd have to go
8   backwards -- or I'd have to go back in time and
9   reconstruct that.
10     Q.     Would that be documented in the
11  E-mails, or other materials --
12     A.     That may be documented, yeah.
13     Q.     And then after reviewing whatever you
14  did have available, you wrote a report.
15         Is that right?
16     A.     That is correct.
17     Q.     And your signature appears at page 35
18  of that report.
19         Is that right?
20     A.     Correct.
21     Q.     And you had all the opportunity to
22  write this and include what you thought were the
23  significant things about this litigation.
24         Is that right?
25     A.     If it was available.

Page 249

1      Q.     And you had --
2      A.     I was told that the information is what
3   it is at that point.
4      Q.     And you had an opportunity later, after
5   writing a first draft, to discuss it with the
6   Plaintiffs' lawyers.
7      A.     That's right.
8      Q.     And it's come to this final version;
9   correct?
10     A.     Correct.
11     Q.     And you were aware that the purpose of
12  this was to put us on notice of all your opinions
13  about my client, Actavis, and Mr. Kaplan's client,
14  Mylan; right?
15     A.     Yes.
16     Q.     And you tried to do that?
17     A.     I did it as well as I knew how.
18     Q.     According to your resume, you got your
19  bachelor's degree in mechanical engineering.
20         Is that right?
21     A.     That's correct.
22     Q.     And then you did some graduate work at
23  Iowa State?
24     A.     That's correct.
25     Q.     Did you -- did you get a degree from

63 (Pages 246 to 249)

PLAINTIFFS' EXHIBITS 003927

Mark G. Kenny, Volume I                                                           June 29, 2010

Page 250

1   Iowa State?
2       A.   I did not.
3       Q.   You did some graduate work in
4   biomedical engineering at the University of Rhode
5   Island?
6       A.   Correct.
7       Q.   Did you get a degree from the
8   University of Rhode Island?
9       A.   No, I did not.
10      Q.   At that point, you went and started at
11  Ethicon; correct?
12      A.   Ethicon, Inc.
13      Q.   Was that all devices?
14      A.   That was devices, correct.
15           I worked at quality assurance
16  supervisor, and where we did certain level of
17  inspection, visual inspection.  That was
18  ineffective.  And I worked as -- I will call it a
19  validation engineer for the last two-plus years.
20      Q.   Do you have any of the Six Sigma
21  degrees or --
22      A.   I have a lot of training, yeah.
23      Q.   Well, do you -- do you get degrees
24  or --
25      A.   Yeah, I have a -- I have a green belt.

Page 251

1       Q.   Okay.  And is -- is the Six Sigma
2   System valuable in -- in what you do?
3       A.   Is it valuable?  It's a tool.  And if
4   used properly, it can be valuable.
5            It sometimes is almost the opposite,
6   but...
7            Because there's an expectation of what
8   it can do that's not achievable.
9       Q.   All right.  Then you worked from '86 to
10  '89 -- wait a minute.
11      A.   Then I went to Corporate.
12      Q.   Well, what did you do between '79 and
13  '86?
14      A.   '79 and '86, I worked in
15  Johnson & Johnson International, which became
16  Johnson & Johnson Corporate.  I ended up going back
17  there again.  You know this HIV company I explained
18  to you?  Well, we went out of business, and as we
19  closed the doors, I was looking for a job.  There
20  were people, apparently, even though I didn't know
21  them, at Corporate who said, we'd be glad to have
22  you, you know, temporarily.  I had no interest in
23  going back to the plant, meaning full-time.  So I
24  worked there for almost two years until I found
25  something that I felt was -- would use my skills.

Page 252

1            So I worked a total, I'll say, nine --
2   say nine-plus years at Johnson & Johnson Corporate.
3       Q.   On any specific products?
4       A.   All products.  I -- I constantly moved.
5   I can give you a little history, but it's up to you.
6       Q.   When you were with Ortho Pharmaceutical
7   from '86 to '89, was any of that solid oral dose?
8       A.   Yeah.  90 percent.
9       Q.   Did you work on any patch technology?
10      A.   Patch -- no.  It was not -- it was not
11  a viable technology at Ortho at that particular
12  time, that I recall.
13           I didn't work on it.
14      Q.   '89 to '91, you were at IOLAB.
15      A.   IOLAB, correct.
16      Q.   That's another Johnson & Johnson
17  company?
18      A.   Yes.
19      Q.   Was it solid oral dose?
20      A.   No.  It was interocular devices,
21  implantable devices, and also phacoemulsifier,
22  emulsifiers, which are electronic instruments used
23  during surgery, and we did -- they did chemicals,
24  but I don't think they're -- I don't think
25  they're -- no.  They're a device, not a drug.

Page 253

1       Q.   '92 to '95 at Advanced Care Products,
2   was that solid or oral dose?
3       A.   No.  That was topical.
4       Q.   '95 to '97, Direct Access Diagnostics.
5            Was that solid oral dose?
6       A.   No, it was not.
7       Q.   Johnson & Johnson CPWW from '98 to '04.
8            Was that solid oral dose?
9       A.   There was -- there was one, but there
10  were two to three, different -- most of it was
11  topical, and we did have some solid dosage form
12  products.
13      Q.   When you worked on solid oral dose
14  products at Johnson & Johnson, did you ever have
15  batches that were put on hold?
16      A.   Did we -- of course.
17      Q.   Did you -- I assume you rejected
18  batches from time to time?
19      A.   Rejected batches from time to time,
20  yes.
21      Q.   I didn't ask you this when I was asking
22  you about what you charge for litigation consulting,
23  but do you know what you charged the Plaintiffs'
24  lawyers to date for this litigation?
25      A.   Well, I have one bill in.  I don't

64 (Pages 250 to 253)

PLAINTIFFS' EXHIBITS 003928

Mark G. Kenny, Volume I                                                                June 29, 2010

Page 254

1   remember exactly, but we just got paid.  Probably --
2   I don't remember.  20-some-odd-thousand would be for
3   me.
4       Q.    Billed?
5       A.    Billed.  Yeah.  I would get about
6   $25,000.
7       Q.    And how much unbilled time do you have?
8       A.    I don't know.  But it's probably
9   equivalent to that.
10      Q.    So you may have as much as $40,000
11  worth of work into this case even before today?
12      A.    Yeah, I would say yeah.
13      Q.    40 or 50.
14      A.    Yeah, I put in a lot more hours that
15  I'm not billing, but when you put in a 16-hour day,
16  I bill for 8.
17      Q.    Have you talked -- other than with
18  somebody from Motley Rice, or Pete Miller, and Sal,
19  have you talked to anybody else about this
20  litigation?
21      A.    Not a human being, other than they know
22  I'm doing some kind of litigation.  That's it.
23      Q.    Do you advertise yourself as an expert
24  in any trade journals of any type?
25      A.    No.  No.  I do not.

Page 255

1       Q.    Have you seen the expert reports of any
2   of the other Plaintiffs' experts in this case?
3       A.    No.  Not a single one.
4       Q.    Do you have any military experience?
5       A.    ROTC.
6       Q.    Where?
7       A.    University of Dayton.  It was required
8   first two years.
9       Q.    Where are you from originally?
10      A.    New Jersey.  Jersey City I was born in.
11      Q.    Have you ever had a faculty position at
12  any school?
13      A.    No.
14      Q.    Have you ever published any articles
15  about quality work in the pharmaceutical industry?
16      A.    I -- I have published, if you will,
17  within Johnson & Johnson Worldwide.  I was the
18  creator of Johnson & Johnson Worldwide guidance
19  documents when I was there, and I wrote procedure --
20  not procedures guidance documents, that affected all
21  companies worldwide.  So they would read it and they
22  would use that as a minimum acceptable approach
23  to -- to -- that quality control subject.
24      Q.    Have you ever published anything
25  outside Johnson & Johnson?

Page 256

1       A.    No.  I had no interest in doing it.
2       Q.    Have you ever taught at any seminars on
3   quality assurance outside --
4       A.    Seminars, no.  I trained --
5       Q.    -- outside J&J?
6       A.    Outside J&J, no.
7       Q.    So do you consider yourself to be an
8   expert in regulatory for the pharmaceutical
9   industry?
10      A.    I consider myself an expert on systems
11  and controls.
12      Q.    Quality systems?
13      A.    Quality systems and controls.
14          MR. KAPLAN:  Was that "no" to
15  regulatory?
16          THE WITNESS:  Well, it encompasses
17  regulatory.  It's interpretation of regulatory and
18  in real fashion.
19          My -- my objective -- my objective --
20  well, I can explain it.  My objective --
21          MR. KAPLAN:  Well, he's asking the
22  question.  I just didn't hear.  I didn't know
23  whether you -- he asked the question, do you
24  consider yourself an expert in regulatory affairs.
25          THE WITNESS:  In regulatory affairs --

Page 257

1           MR. KAPLAN:  And I didn't hear that.
2       A.    Regulatory affairs is a much bigger
3   picture.  I do not consider myself expert on
4   regulatory affairs.  Regulatory affairs would --
5   would go into reporting.  It would go into other
6   aspects, medical aspects, which I have no -- no
7   experience in, and no interest.
8       Q.    In Tab 3 of the documents that were
9   contained in your Appendix B is a 483 from 2004.
10          Do you remember that?
11      A.    Well, I've read them all, so, yes, I
12  would remember it.
13      Q.    This precedes the recall of Digitek;
14  right?
15      A.    2004, yes.
16      Q.    And --
17      A.    Do you want me to pull the document?
18  Is that worthwhile?
19      Q.    Digitek isn't mentioned in this 483, is
20  it?
21      A.    I don't know.  I'd have to look at it.
22      Q.    I'm handing you my copy of that 483.
23      A.    The name "Digitek" does not appear on
24  that document.
25      Q.    And since this precedes by -- the

PLAINTIFFS' EXHIBITS 003929

Page 258

1  recall by several years, and since it doesn't refer
2  to Digitek, can we agree that this 2004 483 has
3  nothing to do directly with whether any consumer got
4  out-of-specification Digitek?
5      A.    No.  I would not say that.
6      Q.    Why not?
7      A.    I would say any time there is GMP
8  concern that affects -- potentially affects across a
9  system, I'm always concerned, as a quality
10 professional, that we could have released -- if it's
11 my company -- that we could have released defective
12 product.
13            Certainly, we are releasing, if it's
14 significant enough, adulterated product.  Now let's
15 determine whether or not a defective product, as we
16 would define as out-of-specification, went out the
17 door.
18            I would take that 483 very seriously.
19      Q.    Well, I'm not suggesting you wouldn't,
20 and I'm sure -- would you agree the FDA takes these
21 seriously?
22      A.    I think that's their job, so I would
23 make that assumption.
24      Q.    So if they had a concern about Digitek,
25 and found either GMP violations or

Page 259

1  out-of-specification results for Digitek, it's
2  likely that they'd address it in this 483.
3      A.    I don't know.  You'd have to talk with
4  them.
5      Q.    Tab 4 in your Appendix B was a
6  Complaint For Permanent Injunction.
7            Are you an expert at all on the legal
8  effect of a Complaint For Permanent Injunction?
9      A.    No, I am not.
10     Q.    Have you ever been sued?
11     A.    No.  Thank goodness.
12     Q.    Have you ever sued anyone else?
13     A.    Never will.
14     Q.    Well, you might have a customer stiff
15 you.  You might want to sue them for your fees.
16     A.    I would never do that.
17     Q.    You get it all up front?
18     A.    No.  The exact opposite.  If I don't
19 understand that customer well enough that I know I'm
20 going to get paid, it's my fault.
21     Q.    Okay.  But you --
22     A.    So I would not sue them.  No.
23     Q.    You don't know what the legal import of
24 this document is.
25     A.    No, I don't.

Page 260

1      Q.    Do you know what a complaint is, just
2  an accusation?
3      A.    I believe I do.
4      Q.    Not -- not proof of what's contained
5  it?
6      A.    Right.
7            MR. MILLER:  Object to the form.
8      A.    I believe that's correct, but I'm not
9  an expert on the subject.
10     Q.    In Tab -- I already asked you that.
11           Your Reference 14 was Plaintiffs'
12 Exhibit 137.  Okay?
13           And it's -- I'm not sure who drafted
14 it, but it's essentially a summary of an August 2006
15 GMP inspection.
16           Is that right?
17     A.    Yes.  It appears that.
18     Q.    Is there anything in that document
19 about out-of-specification Digitek?
20     A.    I'd have to look through it.
21     Q.    Go ahead.
22           MR. MILLER:  I object to form in that
23 it's misleading.  Sometimes you say "specifically
24 Digitek," and sometimes "Digitek."  So you need to
25 let him know --

Page 261

1            MR. MORIARTY:  What's the difference?
2      Q.    Is the word "Digitek" in that document?
3  Did it talk about Digitek out-of-specs?
4      A.    Repeat your question.  I don't have to
5  look at -- I see you have it.
6      Q.    What's the difference between "Digitek"
7  and "specifically Digitek"?
8      A.    Can I give you an example?
9      Q.    Because I'm going to get a mouthful
10 about, well, if they say it about Aprodine, it must
11 apply to Digitek.
12           I want to know if Digitek out-of-spec
13 is in that document.  That's what I want to know.
14     A.    In -- indirectly.
15     Q.    Directly.  Is Digitek --
16     A.    No, not Digitek --
17     Q.    -- out-of-spec in there?
18     A.    I'm not trying to wordsmith it, but the
19 word "Digitek" does not appear in this document,
20 that I could see.
21     Q.    Okay.  Well, when you say indirectly,
22 show me what you're referring to.
23           Give me an example.
24     A.    We'll take the first one.
25           "Failure to fully investigate errors.

66 (Pages 258 to 261)

PLAINTIFFS' EXHIBITS 003930

Mark G. Kenny, Volume I                                                    June 29, 2010

Page 262

1   All lab data not included with batch records.
2   Manufacturing deviations not always documented."
3           Well, that's a situation where you
4   don't know whether it includes Digitek or not, and
5   the assumption has to be, since there are so many
6   examples, that the system is out of whack, and that
7   you would have no way of assurance that if Digitek
8   had an issue, it would be part of the examples that
9   they looked at.
10      Q.    Have you done anything to determine
11  whether, in fact, Digitek was ever determined to
12  fall into this broad heading?
13      A.    The -- I don't need to do that.
14      Q.    Why not?
15      A.    Because when a quality system that cuts
16  through a company is found to be out of control, it
17  implicates all of the products.  And certainly when
18  I looked through records, I would look specifically
19  for the name Digitek, and if I found it, I would try
20  to make note of it and try to understand if it was
21  one of the specific examples that were used.
22          If you say that the -- if you don't
23  have a system to report out-of-specifications, I'm
24  never going to see the -- unless I looked at the
25  hard data, you know, going through laboratory

Page 263

1   records that don't appear in batch records, there
2   would be no way of me knowing that they occurred
3   unless I looked at them.
4           So by saying that I can't find them,
5   I'm saying that, you know, that Digitek is part of
6   that.  I can't find if it did exist.
7       MR. KAPLAN:  I'm going to move to
8   strike the last answer as not responsive to the
9   question that was asked.  You were asked, did you do
10  anything to determine.  Your answer was, I don't
11  need to do it.  The question was, did you do
12  anything.  Yes or no.  Did you?
13      MR. MILLER:  And that is an answer, yes
14  and no is not always required.
15      MR. KAPLAN:  Did you do anything?
16      THE WITNESS:  Did I do anything?  Yes.
17  Did I --
18      MR. KAPLAN:  Did you follow up on that?
19      THE WITNESS:  I -- I followed up on --
20      MR. MILLER:  Objection.  Asked and
21  answered.
22      THE WITNESS:  -- in that -- in that.  I
23  had a limited amount of information that was given
24  to me.
25          When I see, let's say, a qualified

Page 264

1   individual come up with example after example, and
2   find that there is significant holes in the system,
3   particularly where the information -- they're saying
4   the information is not processed, it's not even --
5   they don't even discover it.  Then I have to make
6   the inference that it includes the entire population
7   of products, of which Digitek is part of that
8   population.
9           You don't know what you don't know.
10      MR. KAPLAN:  So everything you're
11  saying is based on an inference.
12      THE WITNESS:  It is not an inference.
13      MR. MILLER:  Objection to form.
14      MR. KAPLAN:  That's what you said.
15      THE WITNESS:  No, I did not say --
16  well, if I said "inference," I used the wrong word.
17  I would say it's part of -- it would be -- do you
18  want me to explain?
19      MR. KAPLAN:  I really don't.
20      THE WITNESS:  Okay.
21      MR. KAPLAN:  I really want you to
22  answer that question.  That's why I moved to strike.
23      MR. MORIARTY:  Let me get back on my
24  track.
25      Q.    This is a -- the first column of this

Page 265

1   Plaintiffs' Exhibit 137 is a statement out of a 483
2   observation or a warning letter; correct?
3       A.    I believe that's correct.
4       Q.    Which we established six hours ago, or
5   more, was not a final agency action of the FDA;
6   correct?
7       A.    Correct.
8       Q.    So would you concede that this may not
9   apply to Digitek, this observation?
10      A.    Okay.  It -- it -- could I concede that
11  there are -- there's a possibility that, for
12  whatever reason, a system breakdown only occurred
13  with the specific examples that they found?  I would
14  say there's a possibility, not a high probability.
15      Q.    Okay.  But you are assuming this
16  applies to Digitek.  Is that right?
17      MR. MILLER:  Objection to form.
18      A.    I'm assuming that it applies to
19  everything, because it is a system issue.  It's like
20  you -- if you go to five places, only five places,
21  and you find people weren't trained, you make the
22  assumption.  You're not going to go to every
23  single -- do a 100 percent inspection, if you will,
24  of every single position to find out if they're
25  adequately trained.

PLAINTIFFS' EXHIBITS 003931

Page 266

1    You have enough information to say the
2  training program is not in effect.
3    Q.   Okay.  So you're assuming it applies to
4  Digitek, is the short answer.
5    MR. MILLER:  Object to form.
6    A.   You say -- you say I'm assuming.
7    I'm saying that the system -- there's a
8  system issue.  Digitek is affected by that system;
9  therefore, it does not have a reliable system and,
10 therefore, affects, or potentially affects, Digitek.
11   Q.   But you haven't seen any direct proof
12 of this problem with Digitek, from this Exhibit 137.
13   A.   No.  I have not seen the name Digitek
14 associated as -- as an example with that.
15   Q.   All right.  And in just for this
16 example, "The failure to fully investigate errors,
17 all lab data not included within batch records,"
18 does not necessarily indicate that the final product
19 was outside its specifications, does it?
20   A.   Quality -- I'll tell you how the a
21 quality assurance and myself --
22   Q.   Yes or no.
23   A.   You have to repeat it.
24   Q.   No.  I want to know -- I want to know
25 whether this specific observation, "Failure of the

Page 267

1  quality unit to fulfill its responsibilities," is
2  the general statement.  "Failure to fully
3  investigate errors, all lab data not included within
4  batch records," that doesn't necessarily mean the
5  finished product is going to be out of
6  specifications, does it?
7    MR. MILLER:  Objection.  Asked and
8  answered.
9    Q.   Even for the specific product they're
10 talking about here.
11   Is that right?
12   A.   Can I reread it again, please?
13   Q.   Sure.
14   A.   I have no specific examples that I know
15 of where the FDA has found that would fall under
16 this category, specifically to Digitek.  This -- it
17 falls under this category because it's part of a
18 control system that affects the quality of Digitek
19 product.
20   Q.   And my next question, which I would
21 like an answer to, is whether the failure to fully
22 investigate errors and all lab data not included
23 with batch records, that doesn't necessarily mean
24 that the finished product is out of specification.
25 Is that correct?

Page 268

1    A.   It sure -- it sure potentially
2  implicates it as a potential out-of-specification.
3    Q.   Potentially.
4    A.   Correct.
5    Q.   But it doesn't necessarily --
6    A.   No.
7    Q.   -- follow as night does day.
8    A.   Correct.  That is correct.
9    Q.   Your Tab or Reference 15 is Exhibit 25.
10   A February 1, 2007 warning letter.
11 Okay?
12   Does it say anything in there about
13 Digitek tablets being out of specification, or
14 equipment used to make Digitek being not qualified?
15   A.   I'm going to have to read it.
16   Q.   Fire away.  Specifically.
17   A.   I understand -- I understand your
18 question now.
19   If I can breeze through this, there are
20 no products specifically mentioned in this.
21   Q.   Okay.
22   A.   At least as I'm going through it.
23   Q.   All right.
24   A.   They talk about system failures.
25   Q.   Your Reference 21 is Exhibit M-16 from

Page 269

1  Susie Wolf's deposition.
2    Do you see that?
3    A.   Yes.
4    Q.   And it's a document about
5  Batch 80202 A; correct?
6    A.   Yes.
7    Q.   And a hold was put on that batch.
8    Is that right?
9    A.   That is correct.
10   Q.   Now, do you know whether that batch was
11 ever distributed to the market?
12   A.   802 -- 80202 A, bulk tablet was
13 released --
14   THE REPORTER:  Sir, you have speak up,
15 and speak slowly.
16   THE WITNESS:  Oh, I'm sorry.
17   Q.   Talking to yourself is a bad idea.
18   A.   I was talking to everybody.  You just
19 didn't hear me.
20   The -- what I put down here, and I
21 believe it's accurate, is, "Bulk tablet lot was
22 released to fill and packaging, only later to be
23 placed on hold due to a tablet weight issue.  They
24 indicated that this is one of the problem child."
25   This is grammatically incorrect, but --

68 (Pages 266 to 269)

Page 270

1  so what -- what this implies is that they found out in
2  packaging that which they should have found out in
3  tableting. Okay?  In other words, a product that is
4  out of weight should not -- or any defect, for that
5  matter -- should not be discovered in a subsequent
6  operation.
7      Q.    But it was discovered and not released
8  to the market; correct?
9      A.    It appears that way, yes.
10     Q.    You won't find it on the recall list;
11 correct?
12     A.    I'd have to compare it to the recall
13 list, but I would make that assumption.
14           Shall I give this back to you?
15     Q.    In your references was number 26, which
16 is Exhibit M-14 from the Wolf deposition.
17     A.    Yeah.
18     Q.    It's an E-mail, and it says here,
19 "Connie," and it gives two batch numbers, "have
20 assays too low."  Do you see that?
21     A.    Yes.
22     Q.    And then it gives numbers of 96.2 and
23 97.3 as the assay numbers; correct?
24     A.    Um-hum.
25     Q.    Are you familiar enough with the USP

Page 271

1  monograph to know that those assays are well within
2  the specification?
3           MR. MILLER:  Object to form.
4      A.    The way I read this, they could put
5  100 percent.  It is not what I'm looking at.
6           When somebody says, in management,
7  Susie Wolf says that the assays are too low, these
8  may or may not be accurate information.  Something
9  is going on.  You just don't say something is within
10 specification when, in fact, it's not.  Only a
11 person who should be working for the competition
12 should be saying that.
13           And they are looking now at another
14 batch, 71004 A1, because, apparently, it's not being
15 implicated with a low assay.  So that number, to me,
16 is immaterial.  This is -- this is not somebody
17 who's saying the specification is, the USP states X,
18 this is -- this is -- and, therefore, this is Y,
19 and, therefore, it's out of specification, or it's
20 in specification.
21     Q.    Do you know who came up with those
22 assay numbers?
23     A.    No.
24     Q.    So you don't know whether those are
25 from Actavis or not; right?

Page 272

1      A.    Whether they're -- no.  I don't know
2  where those numbers came from.
3      Q.    Do you know whether Mylan or UDL
4  subsequently had Celsis labs test any of those
5  batches?
6      A.    No, I don't.
7      Q.    Do you know, in fact, whether or not
8  those particular batches were out of specification,
9  by anybody's measurements?
10     A.    Give me the batch numbers again,
11 please.
12     Q.    709 --
13     A.    I'd like to look at them myself.
14     Q.    Sure.
15     A.    Okay.  Please ask your question.
16     Q.    Okay.  My question was, do you know
17 whether or not these batches were ever tested as
18 actually out of spec by anyone?
19     A.    No, I don't know if they were.
20     Q.    In fact, do you know whether --
21 withdraw that last question fragment.
22           Okay.  In your references was number
23 33.  It was a Plaintiffs' Exhibit 172.  It's an
24 E-mail at Actavis from Jisheng Zhu, J-I-S-H-E-N-G,
25 Z-H-U, in March of 2008.

Page 273

1           Do you see that?
2      A.    Yes.
3      Q.    And he's referring to three impurities
4  in some Digoxin batch test.
5           Do you see that?
6      A.    Yes, I do.
7      Q.    Do you know whether, in fact, these
8  were investigated?
9      A.    Were they investigated?  I don't know.
10 I'd have to go back and research it.
11           No, I don't know if they were
12 investigated.
13           Can I read the statement again?
14     Q.    Sure.
15     A.    This appears to be self-explanatory.
16 Someone that said that they took a look at the
17 results, released data, and then all three lots
18 showed high impurities.  It's quite simple.
19     Q.    No.  My question is:  Do you know
20 whether these instances were investigated?
21     A.    No, I do not know if they were.
22     Q.    Do you know anything about whether the
23 impurities, if there were impurities, affected the
24 potency of any of these three lots?
25     A.    I am not technically qualified to

69 (Pages 270 to 273)

PLAINTIFFS' EXHIBITS 003933

Page 274

1    answer that.
2        Q.    Your Reference 45 is a 483 and some
3    associated data from 1999.
4              What was the specific relevance of a
5    1999 483 to your opinions in this case?
6        A.    45? I was looking for the -- any
7    repeat pattern.
8        Q.    Okay. A repeat pattern of regulatory
9    issues?
10       A.    Of GMP issues.
11       Q.    And there is nothing in this 483, your
12   reference number 45 --
13       A.    Yes.
14       Q.    -- about Digitek, is there?
15       A.    Can I read it one more time?
16             Well, the products are crossed out. I
17   would have no way of knowing.
18       Q.    Well, just so you know, we didn't
19   redact Digitek out of it, because that's what the
20   litigation is about.
21       A.    Okay. So my assumption is that none of
22   these are Digitek, that Digitek name does not appear
23   in this document.
24       Q.    Okay. May I have that back, please.
25             Number 52, reference 52, is Plaintiff's

Page 275

1    Exhibit 168. It's a packaging memo about why there
2    were two additional Digitek bottles in the
3    repackaging of 70924. Okay?
4              What was the significance of this to
5    your opinions in this case?
6        A.    Okay.
7        Q.    If any.
8        A.    I did have some.
9              The -- this memo, or whatever it is, is
10   issued by Scott Talbot. It is undated. It is
11   unapproved.
12             What that immediately tells me, forget
13   about the content, per se, he is trying to explain
14   why something happened.
15             An unapproved, undated document is --
16   is not a -- does not provide me evidence that an
17   adequate investigation was done. Here I see what
18   looks like some logical accounts of what the person
19   did, and trying to explain why -- why they had extra
20   tablets as a result of something that should have
21   had less tablets.
22             So I'd say -- I looked at this
23   immediately from a GMP compliance standpoint. How
24   could you possibly issue a memo that's not dated,
25   not signed, and should be part of an investigation.

Page 276

1    It's horrendous.
2        Q.    Well, it doesn't say there are extra
3    tablets, does it? It says there are extra bottles.
4        A.    Extra bottles, which means extra
5    tablets.
6        Q.    Well, if the fill machine is off by a
7    tablet even every couple bottles, it is going to
8    fill additional bottles; correct?
9        A.    If it is off by a fraction -- I'm
10   sorry. Could you repeat that?
11       Q.    The fill machine is putting maybe 100
12   tablets in a bottle. I think for this batch, I
13   think they were all 100. I don't remember what the
14   bottle count was.
15       A.    Yeah.
16       Q.    But even if it is off by one tablet
17   every couple of bottles you are going to get extra
18   bottles, aren't you?
19       A.    Using your assumption, if there is --
20   if the original process put more tablets in than the
21   labeled amount, and then the subsequent process put
22   the correct amount in, then one would assume that
23   the reasons for extra units are due to the fact that
24   you put too much in to begin with.
25       Q.    And that can happen; right?

Page 277

1        A.    That can certainly happen.
2        Q.    Okay. Because these filling machines
3    are not accurate enough to regularly put in 100
4    tablets per bottle, through a run as large as this;
5    correct?
6        A.    Correct. I would like to offer my
7    experience, though.
8              I have found very, very few instances
9    where a company put too many tablets in. In fact, I
10   have seen quite the opposite, and I can provide
11   examples, if you like.
12       Q.    Well, that's not the issue with this.
13             I think the point you were making is --
14       A.    GMP.
15       Q.    -- to you this is a GMP issue about is
16   this signed, authorized, etcetera.
17       A.    Because the value, even if it were a
18   very logical explanation, the value of it is nil.
19   It is a gross violation of GMP. And how that
20   document could have been created and distributed,
21   and how anybody would have received it and not
22   kicked it back to the original person to make sure
23   it wasn't signed or dated, is beyond me.
24             It's a total -- talk about a breakdown,
25   this is a significant breakdown.

70 (Pages 274 to 277)

PLAINTIFFS' EXHIBITS 003934

Mark G. Kenny, Volume I                                                                 June 29, 2010

Page 278

1     Q.    Okay.  And that is a classic example of
2  how a -- in your view, a GMP violation may not
3  affect the identity, purity, or potency of
4  tablets in the bottle; right?
5     A.    No.  No.  I don't agree with that at
6  all.
7         I know nothing about that.  They had an
8  overage.  Everybody would have expected that they
9  lost tablets.  In other words, when they are doing
10  their inspections, they are going to see tablets,
11  perhaps, that have specks on them, that have chips
12  on them.  Every time you handle a tablet you will
13  abuse the tablet and ultimately end up with,
14  perhaps, cosmetic issues, but -- content issues,
15  too, if it has a chip.
16        So one would logically assume as part
17  of the ongoing production and handling of that, that
18  that number would dwindle.
19        There are no records in the 100 percent
20  inspection that even -- even referred to were there
21  any other defects found.  All it refers to is that
22  there were 20 total from that particular batch.
23        So it is void of information.  And I
24  make no assumptions on a letter that's not signed.
25  I -- I would say that that is a classic GMP issue,

Page 279

1  of which I wouldn't respond to the content because
2  it is unofficial.
3     Q.    Okay.  I am not asking about the
4  content of the memo.
5         You wouldn't use your reference 52 as a
6  GMP violation that proves that the tablets were out
7  of specification, would you?
8     A.    Let me see how I used it, please.
9         I'm having a hard time finding those
10  small -- 53.  Here's an example -- ask your
11  question.  I'm sorry.
12     Q.    I want to stick with your reference 52.
13        You wouldn't use this memo as proof
14  that the tablets in these bottles were outside the
15  USP specifications, would you?
16     A.    I would use that -- I -- I couldn't use
17  that as an example.  What it tells me, though, is
18  things are so lax associated with that particular
19  process, I now question the competency of the people
20  that are even writing and reading these things.
21        So if I -- if I don't feel confident in
22  the person, now I really have an issue.  It is a
23  bigger issue than the content in that explanation.
24     Q.    Your reference 60 is to the "all
25  product recall" that followed the Digitek recall.

Page 280

1         Is that correct?
2         It's a press release.
3         Here you can look at it.  Right here.
4     A.    Yes.  Yes.
5     Q.    Are you aware --
6     A.    I cut and pasted that.
7     Q.    Are you aware that that recall was not
8  to the consumer level?
9     A.    I believe that I was aware of that,
10  yes.
11        Yes, I was aware.
12        MR. MORIARTY:  All right.  The next
13  thing I want to get into is his report.
14        Off the record, please.
15        THE VIDEOGRAPHER:  Stand by.  We are
16  going off the record.  The time is 5:01.
17        (Exhibit 47, Expert Opinion of Mr.
18  Kenny and CV is received and marked for
19  identification.)
20        THE VIDEOGRAPHER:  We are back on the
21  record.  The time is 5:14 P.M.
22     Q.    Mr. Kenny, I had marked as Exhibit 47 a
23  50-page document.
24        Do you see this?
25     A.    Yes.

Page 281

1     Q.    And the beginning of it is your report
2  in this case.
3         Is that right?
4     A.    Correct.
5     Q.    Also contained within Exhibit 47 is --
6  are a number of appendices.
7         Is that right?
8     A.    Well, at the tail end.
9         I think it started with my resume.
10     Q.    Right.  Here is the list of appendices
11  at page 36.
12        Is that correct?
13     A.    Yes.
14     Q.    And then the appendices are your CV.
15     A.    Right.
16     Q.    B is the references.  C is a chronology
17  of lot 70924.
18        Is that right?
19     A.    Yes.
20     Q.    D is a press release of the Digitek
21  recall.
22        Is that correct?
23     A.    Yes.
24     Q.    And E is what I call the all products
25  recall press release.

71 (Pages 278 to 281)

Mark G. Kenny, Volume I                                                                                          June 29, 2010

Page 282

1              Is that right?
2      A.     Yes.
3      Q.     And then F is a summary of FDA
4  observations and events.
5      A.     That's right.
6      Q.     Do you know who drafted the summary?
7      A.     I did.
8      Q.     Summary of FDA observations and events?
9      A.     Yes.  I went through the observations
10  and tried to put them into layman's terms,
11  hopefully, or more easily understood terms.
12     Q.     Okay.  Now, we issued a notice for your
13  deposition.
14             Did you actually see the notice?
15     A.     Yes, I did.
16     Q.     And it asked you to bring a certain
17  group of documents, did it not?
18     A.     Yes.
19     Q.     Let me go through some of the ones that
20  I have questions about.
21             Number 2, "All correspondence,
22  communication between the witness or anyone acting
23  on the witness' behalf, and attorneys representing
24  Plaintiffs in this Digitek litigation."
25             Did you bring all the correspondence?

Page 283

1      A.     No.  I -- I didn't have the time to do
2  it.
3      Q.     You are going to supply it?
4      A.     Absolutely.  I'm obligated.  I
5  personally feel obligated.
6      Q.     Has -- is Sal signatory to any of the
7  correspondence with the Plaintiffs' lawyers?
8      A.     What do you mean by "signatory"?
9      Q.     Signed.
10     A.     No.  His name -- his signature is
11  nowhere.
12     Q.     Has Sal billed for time related to the
13  Digitek litigation?
14     A.     Yes, he has.
15     Q.     Does he bill you or the Plaintiffs'
16  lawyers?
17     A.     He, in essence, bills me, and then I
18  put it into the -- I put it into an invoice which
19  goes to the Plaintiffs' lawyers.
20     Q.     Are you doing any other litigation
21  consulting besides the Digitek litigation?
22     A.     I have never done it, and I'm not doing
23  it.
24     Q.     Okay.  This is the only one?
25     A.     This is it.

Page 284

1      Q.     When you consult with pharmaceutical
2  clients, do you bill them by the hour?
3      A.     I try not to bill by the hour, per se.
4             What I try to do is no greater than,
5  because I know what it's like to receive a bill.  So
6  what I do is I try to very carefully craft what my
7  deliverables are.  I craft exactly how I think I am
8  going to get to that deliverable, how much time it
9  is going to take.
10             I try to put some allowance in there
11  for invariably stuff happens, but I put very little
12  of that in.  And then I tell them that I am going to
13  bill by the hour but it will not exceed that number.
14  And that's the way I have done 90 percent of my
15  billing.  This is an exception.
16     Q.     And what do you bill pharmaceutical
17  clients per hour?
18     A.     Well, it depends upon -- I am going on
19  an audit to Wales.  I am going to bill them 300
20  and -- about $300 an hour.
21     Q.     Do you bill any of your pharmaceutical
22  clients $430 an hour?
23     A.     You mean like -- no.  No is the answer.
24     Q.     Item 3 on what we asked you to bring
25  is, "All other documents prepared by the attorneys

Page 285

1  for the Plaintiffs and sent to you."
2             Did you bring those?
3      A.     No, I did not bring them with me.
4      Q.     You are going to produce those?
5      A.     Yes.  I am going to produce exactly
6  what you asked for.
7      Q.     Do you have a retainer agreement with
8  them?
9      A.     I received a retainer.
10     Q.     Do you have a retainer agreement?
11     A.     I don't even know what that is.
12     Q.     A fee agreement.
13     A.     A fee agreement?  Oh, yes.  Yes.
14     Q.     Is that among the correspondence that
15  you will produce?
16     A.     I wasn't realizing that was part of it,
17  but I will be glad to produce that.
18             So it also includes any business
19  dealings.  Is that it?
20     Q.     It does.
21     A.     Okay.
22     Q.     It says here -- number 6, all bills
23  that you've rendered to the attorneys and law firms
24  in connection with this.
25     A.     Yes, I do.  Since I knew I couldn't do

72 (Pages 282 to 285)

PLAINTIFFS' EXHIBITS 003936

Page 286

1  it, I didn't go through it with a fine-tooth comb to
2  determine how to get it.
3        Q.    And --
4        A.    Which I will, though.  I will go
5  through that with a fine-tooth comb.
6        Q.    And I think you said you issued one
7  bill?
8        A.    That's right.
9        Q.    For what period of time did that cover?
10       A.    That covered up until, I don't know,
11 March -- March sometime.
12       Q.    When is the next bill going to go out?
13       A.    The next bill is going to go out almost
14 immediately.  But I was waiting to get the money
15 before I sent a second bill.
16             I don't want to say money is not an
17 issue, but it's not -- it's not my driving force.
18       Q.    I understand.
19             Number 9, everything that you reviewed
20 that indicates that Plaintiffs ingested defective
21 Digitek.
22             What did you bring responsive to number
23 9?
24       A.    Would you repeat that again?
25       Q.    It says --

Page 287

1        A.    I haven't read it in that detail.
2        Q.    It says, "Everything the witness
3  reviewed that indicates that the Plaintiffs ingested
4  defective Digitek."
5        A.    What did I bring to where?  As part of
6  the --
7        Q.    Well --
8        A.    -- reference information and stuff that
9  I read?
10       Q.    You were supposed to bring any
11 documents that indicated that Plaintiffs, people,
12 consumers --
13       A.    Yeah.
14       Q.    -- who have sued my client, actually
15 took defective Digitek.
16       A.    I haven't even thought about that
17 question.  I would have to think about it, determine
18 what -- what I've sent to them and then, basically,
19 formulate whether or not it falls into that
20 category.
21       Q.    Did you read any medical literature?
22       A.    No, I have no interest in it.
23       Q.    Now, you mentioned Mr. Kowalski, or
24 someone else --
25       A.    John Kowalski.

Page 288

1        Q.    John Kowalski.  Has he billed any time
2  to the Digitek work?
3        A.    I have no idea.  I haven't talked to
4  John in years.
5             We know each other through a lot of
6  dealings years back.
7        Q.    And to whom do you send your Digitek
8  bills when you send them?
9        A.    I send them through Meghan, which goes
10 to some -- I don't know, somehow they pay it.
11       Q.    Okay.
12             MR. KAPLAN:  So you haven't been paid?
13             THE WITNESS:  No.  We did get paid two
14 days -- we received a check either Monday or Friday.
15 I don't recall.
16             MR. KAPLAN:  You just said you hadn't
17 been paid.
18             THE WITNESS:  No.  No.  No.  I said I
19 got -- I did receive a check.  And I said now --
20             MR. KAPLAN:  How much was it?
21             MR. MILLER:  Objection.  Asked and
22 answered.
23             THE WITNESS:  To be honest, I am not
24 trying to avoid it, the money is not that much of an
25 issue to me.  I just kind of throw more money in the

Page 289

1  bank.  It's not why I do this job.  I don't do it so
2  that I can count up all this money.  I do it because
3  I enjoy it, and I'm helpful, and I get paid well in
4  all of my assignments.
5        Q.    Does Sal have an ongoing role, or do
6  you contemplate one in the Digitek consultation?
7        A.    No.  I have no intentions of involving
8  him at all.  It would be inappropriate at this
9  point.
10       Q.    In 2010, to date, how much of the
11 income of SpyGlass is related to the Digitek
12 litigation work versus your pharmaceutical
13 consulting?
14       A.    Well, I have contracts for -- I figure
15 100,000, I have another contract for 40,000, so
16 that's 140, I'll get -- I am going on a proposal
17 tomorrow and I'm going to get it, and that will be
18 billed at somewhere between 250 and $300 an hour,
19 depending on the work, because it is not as
20 technically challenging, so I like to keep it lower
21 if it is not using my -- my -- my strategic
22 abilities.
23             So having said that, right now, based
24 upon what I know I'm going to get, it -- the 25,
25 whatever it is, thousand dollars represents one -- I

73 (Pages 286 to 289)

Page 290

1   don't know, one quarter, or something like that.
2           MR. KAPLAN:  I'm -- I'm going to move
3   to strike that last answer.
4           The question was simply to date, not
5   what you're going to get, not what --
6           THE WITNESS:  But I have contracts.
7           MR. KAPLAN:  It was, to date, what
8   percentage of your income has been represented by
9   your consulting.  It is to date.
10          MR. MILLER:  He is attempting to answer
11  that.
12      A.    Well, I got 22, I got -- to date
13  probably half of that one.  So to date 75,000, so
14  this is one quarter.  If I am getting 100,000, this
15  is one quarter.
16      Q.    Okay.  And what percentage of your time
17  is the Digitek litigation versus your consulting
18  work?
19      A.    The time?  Over the last several
20  months, it's been very high.  Higher than I
21  anticipated.  And it represents probably half.
22      Q.    Okay.  And how many times before you
23  wrote your report did you have in-person meetings
24  with the Plaintiffs' lawyers?
25      A.    Before I wrote the report?  I had no

Page 291

1   in-person meetings.
2       Q.    All the communication was --
3       A.    Was on the phone.
4       Q.    -- phone or E-mail?
5       A.    Yes.
6       Q.    Did you have any video conferences with
7   them before you wrote your report?
8       A.    No.
9       Q.    Did you meet with them in person
10  regarding the revisions to your draft reports?
11      A.    I met with them once regarding the
12  revisions.
13      Q.    When was that?
14      A.    Oh, a month ago, something like that.
15      Q.    And with whom did you meet before today
16  to prepare for your deposition?
17      A.    To prepare for my deposition, I met
18  with nobody.
19          Oh, you mean met with physically?
20      Q.    Yeah.
21      A.    Before -- well, before today, I met
22  last night.
23      Q.    With whom?
24      A.    With Meghan.
25      Q.    For how long?

Page 292

1       A.    You mean how long did we talk about
2   work, or how long did I see her?
3       Q.    How long did you spend preparing for
4   your deposition?
5       A.    You mean with her or without her?
6           I have to understand what you are
7   talking about.
8       Q.    With Meghan.
9       A.    Oh, with Meghan?  I don't know.  An
10  hour.
11      Q.    Obviously, you spent time reviewing
12  documents again.
13      A.    Again, I went back and reread, you
14  know -- reread this, took a look at some of the 43s,
15  tried to -- yeah.  Took a look at those kinds of
16  things.
17          Spent very little time with Meghan.
18          We did go to dinner together, but that
19  was all casual.
20      Q.    And, at the outset of this project,
21  what was your understanding of what your function
22  was or your role?
23      A.    My role was to determine whether or not
24  this company was in compliance with GMPs over a
25  certain period of time, which turned out to be 2004

Page 293

1   to 2009, and to determine whether or not products
2   that were violative were released.
3       Q.    I understood your answer except for one
4   word.
5           When you said "violative," do you mean
6   violative of cGMP regs?
7       A.    cGMP regs, yes, and whether or not
8   defective product was released.
9       Q.    When you say "defective," what do you
10  mean BY defective?
11      A.    Product which does not meet finished
12  product specification requirements or stability
13  requirements.
14      Q.    I'm sorry.  Defective, in your mind,
15  means doesn't meets stability requirements or what
16  was the other element?
17      A.    Does not meet product specification
18  requirements.
19          MR. KAPLAN:  You said "finished
20  products."
21      A.    Finished.  Products specif --I
22  understand that you -- I am going to correct myself
23  and say product specifications.
24      Q.    Okay.  And what product specifications?
25      A.    Any specifications that would implicate

74 (Pages 290 to 293)

PLAINTIFFS' EXHIBITS 003938

Page 294

1    that a defective product was in the field.
2         So it could be, let's say, content
3    uniformity, or bulk specification testing,
4    tableting, packaging, finished product sampling,
5    stability testing, any point along the way which
6    would also implicate or -- you would determine
7    that defective product either was or highlight that
8    it could have been released.
9         Q.    Okay.  So is it your opinion that
10   product that didn't meet stability requirements for
11   Digitek was released to consumers?
12        A.    You are going to have to repeat that
13   question.
14        Q.    Do you have an opinion, to a
15   probability, about whether Digitek that didn't meet
16   the stability requirements reached consumers in the
17   recalled batches between 2006 and 2008?
18        A.    Stability, I have no -- I saw no data
19   to suggest that that would have been an issue.
20        Q.    Do you have an opinion, to a
21   probability, that product that did not meet the USP
22   finished product specifications made it to consumers
23   between 2006 and 2008?
24        A.    I think product did reach the consumer
25   s that is out of specification to a reasonable

Page 295

1    degree of certainty.
2         Q.    Now, I asked you earlier how much
3    product, how far out of spec, all of those things,
4    and you had no opinions to quantify it; correct?
5         A.    Correct.
6         Q.    All right.  So what is the basis for
7    your opinion that product not meeting the USP
8    finished product specifications made it to
9    consumers?
10        A.    Because of there are so many systemic
11   system issues, that it's -- it's difficult for me to
12   believe that product didn't get through.  And in my
13   heart of hearts that's what I believe.
14        Q.    So if I had to summarize the
15   methodology of your analysis for that answer that
16   you just gave me, you look at the cGMP violations,
17   and you conclude and opine that it is, therefore,
18   difficult for you to believe that
19   out-of-specification product didn't get through?
20        MR. MILLER:  Object to form.
21        Q.    You can answer.
22        A.    You are going to have to repeat it,
23   please.
24        MR. MORIARTY:  Read it back, Carol,
25   please.

Page 296

1         (Requested portion is read.)
2         A.    I would say that's accurate.
3         MR. MILLER:  It is after 5:30, Matt.
4    Is this is a good time to wrap it up?
5         MR. MORIARTY:  This is probably the
6    perfect breaking point.
7         MR. KAPLAN:  Before we go off the
8    record, and I know that Matt has not finished his
9    questioning -- I'm Harvey Kaplan, and I represent
10   Mylan.
11        THE WITNESS:  I'm sorry.  What?
12        MR. KAPLAN:  I represent Mylan, the
13   other Defendant --
14        THE WITNESS:  Yes.
15        MR. KAPLAN:  -- in the litigation.
16        So I haven't had a chance to examine
17   you.  I will have a chance when you come back.
18        There was a notice sent for your
19   deposition here today, and you said you saw the
20   notice.
21        THE WITNESS:  Yes, I did.
22        MR. KAPLAN:  And it -- it lists 13
23   categories of documents that you were requested to
24   bring.
25        THE WITNESS:  I'll assume that's

Page 297

1    correct.
2         MR. KAPLAN:  And I want you to please,
3    before your next deposition, not only carefully
4    review those 13 categories, but please bring those
5    documents with you, because we will surely ask you
6    for all of those things.  Okay?
7         THE WITNESS:  Understood.
8         MR. MILLER:  And just to be clear,
9    Harvey, when you said Matt was finished asking
10   questions --
11        MR. KAPLAN:  I said he was not
12   finished.
13        MR. MILLER:  Not finished.  Okay.  I'm
14   sorry, Harvey.
15        MR. KAPLAN:  I said Matt has not
16   finished. I've never gotten to begin my questioning.
17        MR. MORIARTY:  I have not finished.
18        MR. MILLER:  I totally understand.  And
19   I will have questioning, as well, so...
20        MR. KAPLAN:  Good.  Then we shall meet
21   again another day soon, I presume.  Probably the
22   same place.
23        THE WITNESS:  This place is fine with
24   me.
25        MR. KAPLAN:  If that's okay.

75 (Pages 294 to 297)

PLAINTIFFS' EXHIBITS 003939

Mark G. Kenny, Volume I                                                      June 29, 2010

Page 298

1          MR. MORIARTY:  All right.  Off the
2  record.
3          THE VIDEOGRAPHER:  Stand by.  We are
4  going off the record.  The time is 5:35 P.M.  This
5  is the end of tape number 6.
6          (Proceedings concluded at 5:34 p.m.)
7          J U R A T
8
9          I DO HEREBY CERTIFY that I have read
10  the foregoing transcript of my deposition testimony
11  and I certify that is it true and correct to the
12  best of my knowledge.
13
14
15          Mark G. Kenny
16
17  SWORN AND SUBSCRIBED
18  BEFORE ME ON THIS
19  DAY OF        2010
20
21  Notary Public of the State of
22
23
24
25

Page 300

1          CERTIFICATE
2
3          I, CAROL ANN SHEPARD, a Certified Court
4  Reporter of the State of New Jersey, License No.
5  30X100101900, do hereby certify that prior to the
6  commencement of the examination, MARK G. KENNY was
7  duly sworn by me to testify the truth, the whole
8  truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth.
13          I DO FURTHER CERTIFY that I am neither
14  a relative nor employee nor attorney nor counsel of
15  any of the parties to this action, and that I am
16  neither a relative nor employee of such attorney or
17  counsel, and that I am not financially interested in
18  the action.
19
20
21  _____
22  Certified Court Reporter of the State of New Jersey
23
24  Dated: July 2, 2010
25

Page 299

1  ATTACH TO DEPOSITION OF:  Mark G. Kenny
2  IN THE MATTER OF:  In Re: Digitek Product Liability
          Litigation
3
DATE TAKEN:  June 29, 2010
4
5          E R R A T A   S H E E T
6          INSTRUCTIONS:  After reading the
transcript of testimony, please note any change,
addition or deletion on this sheet.  DO NOT make any
7  marks or notations on the transcript itself.
8
9          Please sign and date this errata sheet.

PAGE      LINE              CHANGE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
DATE and SIGNATURE:
24
25

Rennillo Deposition & Discovery
216.523.1313                          www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 003940