# EXHIBIT 510

PLAINTIFFS' EXHIBITS 004821

Page 301

1    UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3    CHARLESTON DIVISION

4                    MDL NO. 1968

5

6    IN RE: DIGITEK PRODUCT        )CONTINUED
            LIABILITY LITIGATION )VIDEOTAPED DEPOSITION
7                                 )OF:
                                  )MARK G. KENNY
8    _____X
                                   VOLUME II
9

10

11          TRANSCRIPT of the stenographic notes of

12   The proceedings in the above-entitled matter, as

13   taken by and before JANE D. WATSON, a Notary Public

14   of the State of New York, held at the office of

15   Harris Beach, 100 Wall Street, New York, New York

16   10005 on Wednesday, February 16, 2011, commencing at

17   9:50 a.m.

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 004822

Page 302

1  A P P E A R A N C E S :
2
3  MOTLEY RICE
4       28 Bridgeside Boulevard
5       Mount Pleasant, South Carolina 29464
6  BY: MEGHAN CARTER, ESQ.
7  Counsel for Plaintiffs
8
9  SHOOK, HARDY & BACON, L.L.P.
10      2555 Grand Boulevard
11      Kansas City, Missouri 64108-2613
12  BY:  HARVEY L. KAPLAN, ESQ.
13  Counsel for Mylan
14
15  TUCKER, ELLIS & WEST
16      515 South Flower Street, 42nd Floor
17      Los Angeles, California 90071
18  BY:  MICHAEL ANDERTON, ESQ.
19  Counsel for Actavis
20
21  ALSO PRESENT:
22  Chris Martin, Videographer
23  Peter Cooper, Videographer in training
24  Rick Fern, Esq. (in a.m.)
25

Page 303

1              I N D E X
2  WITNESS                    PAGE
3  Mr. Kenny        Mr. Kaplan      305
4                   Mr. Anderton    526
5                   Ms. Carter      578
6
7              EXHIBITS
8  IDENT.      DESCRIPTION       PAGE
9  Exhibit 110   Folder            400
10  Exhibit 111   Chronology from disks   417
11  Exhibit 112   E-mail            432
12  Exhibit 113   Amended notice for video
13              Deposition        445
14  Exhbts 114-139 Documents brought by the
15              Witness in milk crates   447
16  Exhibit 140   First draft report   466
17  Exhibit 141   Draft of expert report   482
18  Exhibit 143   E-mails           527
19
20
21
22
23
24
25

Page 304

1          THE VIDEOGRAPHER:  Good morning.
2  We're on the record.  Today's date is
3  February 16, 2011, and the time is 9:50 a.m.
4  This is the continuation of the videotaped
5  deposition of Mark Kenny.  The caption on
6  this case is In Re: Digitek Product
7  Liability Litigation.  Case number -- I'm
8  sorry -- MDL number 2:09-CV-121.  Case filed
9  in the U.S. District Court, Southern
10  District of West Virginia, Charleston
11  Division.  We're at the office of Harris
12  Beach, 100 Wall Street, New York, New York.
13  This deposition was noticed by Attorney
14  Matthew Moriarty of the firm Tucker, Ellis &
15  West.  The videographer is Chris Martin.
16  The court reporter is Jane Watson.
17          At this time, will Counsel please
18  introduce themselves for the record.
19          MS. CARTER:  Meghan Carter for the
20  Plaintiffs.
21          THE WITNESS:  Mark Kenny.
22          MR. KAPLAN:  I'm Harvey Kaplan, Shook,
23  Hardy & Bacon for Mylan.
24          MR. ANDERTON:  Michael Anderton,
25  Tucker, Ellis & West for the Actavis

Page 305

1  defendants.
2          THE VIDEOGRAPHER:  At this time, the
3  court reporter will swear in the witness.
4  M A R K   K E N N Y ,  called as a
5  Witness, having been duly sworn by a Notary
6  Public, was examined and testified as follows:
7
8  EXAMINATION BY MR. KAPLAN:
9      Q.   Good morning, Mr. Kenny.
10      A.   Good morning.
11      Q.   I think we met when your deposition
12  was taken on June 29 of last year, June 29, 2010 in
13  Newark, New Jersey, right?
14      A.   Correct.
15      Q.   At that time, you were examined by
16  Mr. Moriarty on behalf of Activas, right?
17      A.   That's correct.
18      Q.   He took pretty much the full day, so I
19  didn't have a chance to ask you questions, and today
20  is my opportunity to examine you on behalf of my
21  client, Mylan.
22      A.   I understand.
23      Q.   How are you doing?
24      A.   I'm doing well, thank you.
25      Q.   All right.  Good.  I know that you had

2 (Pages 302 to 305)

PLAINTIFFS' EXHIBITS 004823

Mark Kenny, Volume II                         Videotaped                         February 16, 2011

Page 306

1  recent Achilles heel surgery, and we're sympathetic
2  to your situation.  And as I told you, if you need
3  breaks throughout the day, all you need to do is say
4  that you need a break and we'll do that.  Okay?
5      A.    Thank you.  It's much appreciated.
6      Q.    All right.  Just as you came to the
7  deposition on June 29, 2010 prepared to give your
8  opinions in this case -- you did?
9      A.    Yes.
10     Q.    You came prepared at that time, didn't
11 you?
12     A.    Yes.
13     Q.    And you are today prepared to give
14 opinions in this case; isn't that right?
15     A.    Yes, I am.
16     Q.    And all the work that you did in
17 preparation for any opinions that you will offer in
18 this case are contained within your report which was
19 dated June 15, 2010?
20     A.    That is correct.
21     Q.    And that report is in front of you?
22     A.    That is correct.
23     Q.    That -- that has all of your opinions,
24 right?
25     A.    That is correct.

Page 307

1      Q.    You stand by that report?
2      A.    Yes, I do.
3      Q.    Or -- is there anything you want to
4  withdrawal or modify?
5      A.    I stand by the report.
6      Q.    Stand by the report.  Okay.  And have
7  you done any further work since June 15, 2010 with
8  respect to --
9      A.    Yes, I have.
10     Q.    What have you done?
11     A.    I've looked at some of the Mylan
12 exhibits again, I reviewed them.
13     Q.    Why?
14     A.    To familiarize myself with the
15 documents, refamiliarize, since it was a long time
16 ago that I reviewed it.
17     Q.    What -- what Mylan exhibits did you
18 look at?
19     A.    I have all of the Mylan exhibits here.
20     Q.    Okay.  But -- but I'm interested in
21 particularly what is it that you looked at and --
22     A.    Well, I'd have to pull it and show you
23 what --
24     Q.    Well, why don't you pull it and show
25 me what you looked at.

Page 308

1      A.    Okay.  The vast majority of them are
2  ones that are referenced in my report.  One of the
3  issues if you --
4      Q.    Just -- there's -- there's a simple
5  question, and I'm going to ask you -- we'll get
6  through this a lot faster.  Don't -- don't go off
7  and give me narrative answers, just concentrate on
8  the question I ask, okay?
9      A.    I understand.
10     Q.    So my question is -- here's the simple
11 question:  You said that since your deposition was
12 taken on June 29, 2010, you reviewed some additional
13 Mylan documents?
14     A.    That's correct.
15     Q.    And my question is which documents did
16 you review, have you reviewed, since June 29, 2010?
17 That's all I want you to do is identify those.
18     A.    They're in this particular binder.
19     Q.    All right.  Tell me which Mylan
20 exhibits you have reviewed since your deposition was
21 taken on June 29, 2010.
22     A.    I can go through them?
23     Q.    Certainly.
24     A.    Okay.
25     Q.    Just tell me which they are.

Page 309

1      A.    What additional ones?
2      Q.    Yes.
3      A.    Which ones -- see, the -- the
4  difficulty, if I can explain something, is that
5  between the original deposition and today, I don't
6  have the original copies that I reviewed that I
7  submitted.  So I went back to the computer database
8  for Mylan and I went through to see if any of them
9  were germane to my opinion.  And at that particular
10 point, I made copies of those and probably copies of
11 those -- a couple that were in addition to.  So,
12 anyway, going through this -- are you ready?
13     Q.    Yes.
14     A.    M55.
15     Q.    You're referring to the exhibit M55
16 from previous depositions?
17     A.    Right.
18     Q.    Let me see that.  M55 is an e-mail
19 from Lee Radtke to Chuck Koons dated December 13,
20 2006; is that correct?
21     A.    I believe -- I'm sure you're right.
22     Q.    Okay.  You reviewed -- you reviewed
23 that -- that exhibit?
24     A.    Yes.
25     Q.    Okay.  And what, if anything, did

3 (Pages 306 to 309)

PLAINTIFFS' EXHIBITS 004824

Page 310

1  that --
2      A.   This changed nothing, nothing at all.
3      Q.   Just so we got a clean record on this.
4  You reviewed exhibit M55, the e-mail from Lee Radtke
5  to Chuck Koons dated --
6      A.   Dated December 13, 2006.
7      Q.   But that did nothing to change your
8  opinion --
9      A.   Not in the least bit.  Not in the
10  least bit.
11     Q.   Didn't enlighten you in any regard?
12     A.   The only -- I would say the thing that
13  enlightened me is that it reconfirmed when I had
14  stated that they did not do a comprehensive audit.
15  And he says in here, Chuck Koons, says we did a
16  system audit, I just don't think they could handle
17  it right now.  But when I read the original report,
18  it was very clear to me that it did not represent
19  what the industry referred to as a comprehensive GMP
20  audit nor would it be in accordance to the procedure
21  that they had, which I did read.
22     Q.   Did the FDA do comprehensive GMP
23  audits of --
24     A.   I can't tell you whether it's
25  comprehensive or not.  I will tell you they looked

Page 311

1  in a lot of areas.
2      Q.   A lot of times?
3      A.   A lot of times.
4      Q.   As many as 12 inspections between 1999
5  and 2008, correct?
6      Q.   Okay.  If that's the number, I believe
7  you.
8      Q.   Over a period of 182 days?
9      A.   Yes.
10     Q.   Is that right?
11     A.   If you say so.  I'll agree with that.
12     Q.   You don't have any reason to disagree
13  with it?
14     A.   No, I have no reason to disagree with
15  you.
16     Q.   You would agree with me that the FDA
17  extensively audited Actavis over a nine-year period?
18     A.   They inspected them, but yes.
19     Q.   And audited them?
20     A.   Well, they don't use the term "audit."
21     Q.   Extensive inspections?
22     A.   Yes.
23     Q.   GMP inspections?
24     A.   Correct.
25     Q.   In fact, it's GMP or good

Page 312

1  manufacturing practice regulations are the FDA's
2  regulations?
3      A.   They are -- I -- I suppose you could
4  say that, yes.  They are codified in the CFR.
5      Q.   And they are what you would refer to
6  as expertly drafted law, right?
7      A.   GMPs, yes, I believe that.
8      Q.   All right.  What is the next Mylan
9  document that you reviewed since your deposition was
10  taken on June 29, 2010?
11     A.   M53 (handing).
12     Q.   Exhibit M53 from a previous deposition
13  which you have just handed me, is a e-mail from Lee
14  Radtke to Chuck Koons dated October 13, 2006.  And
15  is the highlighting yours?
16     A.   Yes, every highlighting in here would
17  be mine.
18     Q.   You've -- you've highlighted an e-mail
19  below from Chuck Koons to Lee Radtke, you've
20  highlighted the sentence that says, "We were already
21  scheduled to do an on-sight audit on 11/8 and 11/9,
22  and we're trying to get a status report on this
23  prior to our visit."  That's the only thing that you
24  highlighted in 53, right?
25     A.   That's correct.

Page 313

1      Q.   What -- what was the significance of
2  this to you?
3      A.   Well, I had earlier wondered why it
4  wasn't scheduled and any -- any information that I
5  looked at what -- what referred to the audit either
6  explaining why -- why it was going to occur or why
7  it didn't occur was notable to me.
8      Q.   Okay.  And -- and how did this exhibit
9  M53 enlighten you?
10     A.   It had no effect whatsoever on my
11  opinion.
12     Q.   Okay.  All right.  And by the way,
13  when you -- since your deposition was taken on
14  June 29, 2010, did you review these additional Mylan
15  documents at one time, over a period of time?  Tell
16  me how that occurred.
17     A.   I did it -- I started two days before
18  the first scheduled deposition for 2009.
19     Q.   2009?
20     A.   2010.  In other words, this calendar
21  year.  So I looked at it in --
22     Q.   We're now in 2011.
23     A.   Eleven, rather, I'm sorry.  In 2011, I
24  went back to review to familiarize myself, then I
25  realized I didn't have a lot of documents that I

4 (Pages 310 to 313)

PLAINTIFFS' EXHIBITS 004825

Page 314

1  felt were missing, and I went back to the Crivella
2  database and I picked out some procedures or some
3  documents including only these that are here.  This
4  is it. (Indicating.)  This is 100 percent
5  comprehensive (indicating).
6      Q.   And over a period of -- you did this
7  review over a period of days, one day --
8      A.   A period of two days.
9      Q.   Two days?  Okay.  And that was --
10     A.   But the -- can I explain that though,
11 if I may?
12     Q.   Just try to answer my questions and
13 we'll get along.  So I just want to understand what
14 you did, how much time you spent, why you did it,
15 what you looked at.  So what you're telling me is
16 that your deposition had been scheduled earlier in
17 2011, right?
18     A.   Correct.
19     Q.   Two days before your deposition had
20 been scheduled, you -- you started looking at Mylan
21 documents?
22     A.   Correct.  I -- I went to seek out
23 documents to refamiliarize myself with the
24 references in the report.  And then I found out I
25 didn't have those documents, then I went back into

Page 315

1  the database for Mylan because I knew that the next
2  deposition was going to be focused on Mylan, and I
3  started looking at the documents and the numbers and
4  I made copies of anything that looked even remotely
5  close to the subject that I had put into my report.
6      Q.   Okay.  And how long did you spend
7  reviewing the Mylan documents?
8      A.   I spent a day and a half printing the
9  documents and finding them.  I spent another prior
10 to that, probably two hours reviewing the documents.
11     Q.   So it took you a day and a half to
12 find the documents that are in this notebook in
13 front of you?
14     A.   Right.  I was panicking, so to speak.
15     Q.   Okay.  So it was two days before your
16 deposition was scheduled, you were panicked?
17     A.   Yes.
18     Q.   Because you knew I was going to be
19 asking you questions.
20     A.   Correct.
21     Q.   About Mylan?
22     A.   Right.
23     Q.   And you said, gosh, I got to go back
24 and beef up here, right?
25     A.   Beef up is not the right term.  I have

Page 316

1  to refamiliarize myself with the basis of my
2  opinion.
3      Q.   Okay.  And so that was the purpose?
4      A.   Correct.
5      Q.   And it took you a day and a half to
6  find the documents and print them, right?
7      A.   Approximately.
8      Q.   And you -- you charged for -- for
9  that, right?
10     A.   I have not charged for it.  I'm --
11     Q.   It's to be billed?
12     A.   Yeah, yeah.  But I'm not sure exactly
13 what the bill is going to be.
14     Q.   So a day and a half, is that 12 hours?
15     A.   That's 12 hours, yeah.
16     Q.   Okay.  At $430 an hour?
17     A.   Yeah.  It's actually much more than
18 that, but I will not bill because I feel somewhat
19 culpable perhaps in not having these documents.
20     Q.   So a day and a half to find the
21 documents and print them, and then two hours to
22 review them?
23     A.   Approximately, yeah.  And that
24 maybe --
25     Q.   So the two hours is also at $430

Page 317

1  dollars an hour, right?
2      A.   That's correct.
3      Q.   By the way, $430 an hour, is that the
4  highest billing rate that -- that you have on any
5  matter that you -- you're working on?
6      A.   The highest billing rate -- when it's
7  a rate, yes.
8      Q.   And I believe you testified previously
9  when your deposition was taken on June 29, 2010, that
10 you worked for various clients at $250 an hour?
11     A.   Two -- over 300.
12     Q.   Or $300 an hour?
13     A.   Three hundred ten, 12, depending on
14 where I'm at.
15     Q.   But for -- for the purposes of being
16 an expert witness in this case, you decided that you
17 could charge $430 an hour?
18     A.   Correct.
19     Q.   And you're being paid at that rate?
20     A.   That is correct.
21     Q.   Okay.  We'll get into -- I want to
22 clean up the payments and all.
23     A.   Sure.
24     Q.   We'll probably do that at the end.
25 Okay.  So now -- now we know what you did.  You

5 (Pages 314 to 317)

PLAINTIFFS' EXHIBITS 004826

Page 318

1 looked at documents two days before your deposition
2 was originally scheduled in 2011. It was then
3 continued to eventually today, right?
4      A.   Yes.
5      Q.   But -- but the only time that you did
6 any additional work was what you've just described;
7 is that right?
8      A.   That is correct.
9      Q.   The two days before that deposition
10 was scheduled?
11     A.   Yes.
12     Q.   It was canceled?
13     A.   Correct.
14     Q.   And continued?
15     A.   Correct.
16     Q.   Okay. But you've done nothing since
17 then?
18     A.   Since that time, yes, I did.
19     Q.   Oh, okay. What -- what -- and what
20 have you done?
21     A.   I spent approximately eight hours now
22 reviewing the documents that I had made copies of
23 and re-reviewing all of the referenced documents
24 that were in the -- referenced in the -- the expert
25 report.

Page 319

1      Q.   Was that in that two days before your
2 deposition was originally scheduled?
3      A.   The second time. This is two days
4 before -- let's say three days ago, in essence,
5 three days ago.
6      Q.   Okay. Okay. So there was the initial
7 re-review of Mylan documents?
8      A.   Yes.
9      Q.   Two days before your 2011 deposition
10 was to be taken?
11     A.   There was a two hour review, yes.
12     Q.   Okay. Two hour review after a day and
13 a half spent finding and printing documents,
14 correct?
15     A.   Yes.
16     Q.   And then three days ago?
17     A.   Yes.
18     Q.   You spent another eight hours
19 reviewing these documents?
20     A.   That is correct.
21     Q.   The same documents?
22     A.   The same documents and the ones that
23 are in here that we -- you wanted to go through.
24     Q.   When you say the same documents and
25 the ones that are in here, that leads me to believe

Page 320

1 that the documents you just reviewed three days ago
2 are not the same documents that you reviewed before
3 your deposition was to be originally taken earlier
4 in 2011. Am I right?
5      A.   I don't recall, because some of the
6 documents I looked at electronically. In this case,
7 I ended up printing anything that had anything to do
8 with the wording in my deposition because I wanted
9 to make sure -- sir, the way that unfortunately the
10 copies were made, there were many, many Mylan
11 documents which didn't have M numbers on them, they
12 had another number. So -- and so in my report,
13 there are Mylan documents referred ATA or ATV, or
14 they could be plaintiff 1, 2, 3,4. And I had no way
15 without -- I mean, each one took 45 minutes to
16 figure out which was the right copy, therefore, I
17 made copies of anything that was related to it,
18 which appears in here. This is 100 percent. Or
19 there could be something in there (indicating). But
20 these were more, I would say pertinent. Then I had
21 to read these in order to see if they were the right
22 P documents or ATA documents. So I had a process.
23     Q.   I got you. I understand. In addition
24 to reviewing the documents contained in the notebook
25 in front of you, have you done anything else in

Page 321

1 preparation for this deposition?
2      A.   No.
3      Q.   Have you talked to Ms. Carter or any
4 of the Plaintiff's lawyers?
5      A.   Nobody, no human being, not even my
6 wife.
7      Q.   Well -- all right. So you haven't had
8 any conversations with any of the Plaintiff's
9 lawyers about anything related to preparation for
10 this deposition today?
11     A.   No. Yesterday, I met with Meghan for
12 a period of approximately four hours of which we
13 probably spent a half hour talking and I spent three
14 and a half hours or so trying to, again, mentally
15 organize myself.
16     Q.   You met with -- with Ms. Carter
17 yesterday for four hours?
18     A.   Yes.
19     Q.   In preparation for your deposition?
20     A.   Correct. We met for about a half
21 hour --
22     Q.   What did she tell you?
23     A.   She gave me -- she said it's, you
24 know, expect the same type of questions. Expect
25 that since Harvey didn't have an opportunity --

6 (Pages 318 to 321)

PLAINTIFFS' EXHIBITS 004827

Page 322

1  yourself, Mr. Kaplan.
2      Q.   Harvey is fine.
3      A.   Didn't have an opportunity -- okay.
4  Didn't have an opportunity to ask you questions, he
5  will ask questions about Mylan.  And you just want
6  to make sure you are familiar with the documents.
7  That was the extent of our conversation.
8      Q.   Well, did you have any specific
9  discussions about any specific issues related to
10  Mylan?
11      A.   Zero.
12      Q.   Zero?
13      A.   Zero.  Absolutely zero.
14      Q.   So what did you do for the three and a
15  half, four hours?
16      A.   We talked a lot about different stuff.
17      Q.   But that's at $430 an hour.
18      A.   Sir, you're talking about two
19  different things.  $430 an hour is my rate.  What I
20  bill is not my total hours put into a project.
21  Never, ever, have I ever billed at what actually
22  I've put in.  I have always billed less than, not
23  even equal to it, just because I feel my efficiency
24  may not be 100 percent.  I should be billing when my
25  efficiency is 100 percent.

Page 323

1      Q.   Were you efficient yesterday?
2      A.   Was I fishing?
3      Q.   Were you efficient?
4      A.   Was I efficient yesterday, no, not
5  particularly.
6      Q.   You weren't?
7      A.   No.
8      Q.   So for the four hours that you spent
9  with Meghan yesterday, how much are you going to
10  bill for?
11      A.   I haven't decided.
12      Q.   Okay.  So you could bill up to four
13  hours at $430 an hour?
14      A.   Oh, no.  I could bill up to my travel
15  time, an hour and a half to get there, an hour and a
16  half to get back.  I could -- I could -- I'll have
17  to look back, see what I accomplished, and determine
18  whether or not I bill for eight hours.
19      Q.   Oh, okay.  So you may bill for eight
20  hours?
21      A.   That is a possibility.
22      Q.   Yesterday?
23      A.   Yes.
24      Q.   Okay.  Because you came over here to
25  Manhattan?

Page 324

1      A.   Correct.  It takes about two hours
2  door to door to get here and about two hours to get
3  back.
4      Q.   Okay.  Did you discuss any of your
5  opinions as to Mylan with Meghan yesterday?
6      A.   No, none at all.
7      Q.   Did you review these documents with
8  Meghan?
9      A.   No.  The only -- she didn't look at
10  the documents but I explained to her that --
11      Q.   When I say Meghan, I'm sorry.  We're
12  being a little informal.
13      A.   Yeah.  I understand.
14      Q.   We're all on kind of a first name
15  basis.
16      A.   I explained to her that I had gone
17  back to the Internet to see if there were any
18  references in warning letters or the like concerning
19  quality agreements or audits to see if specifically
20  the FDA issued warning letters that clearly outlined
21  or inferred that quality agreements and quality
22  audits were quite specifically a GMP requirement.
23      Q.   And did you find any?
24      A.   Yes, I did.
25      Q.   You did?  And are those --

Page 325

1      A.   They are not here, but I'll show you
2  them in a minute, if you'd like.
3      Q.   You're saying that you found documents
4  from the FDA saying what now?
5      A.   That there was a warning letter on a
6  company associated with not having quality
7  agreements and/or not performing audits.
8      Q.   Was that on Mylan?
9      A.   No.  That's on other industry
10  companies, drug companies.
11      Q.   What was the context of the FDA
12  document that you're talking about that --
13      A.   Would you like me to show you?
14      Q.   Well, just first answer my question.
15      A.   Surely.
16      Q.   Okay.  Give me the context.  You said
17  you found an FDA document or documents regarding a
18  warning letter issued to a company for not having a
19  quality agreement or -- or not performing?
20      A.   Audits.  G&P audits.
21      Q.   Okay.  Give me the context of that.
22  When, was the company?
23      A.   I would have to pull the document to
24  do that.
25      Q.   What's your best recollection?

7 (Pages 322 to 325)

PLAINTIFFS' EXHIBITS 004828

Mark Kenny, Volume II                                 Videotaped                            February 16, 2011

Page 326

1      A.   I would like to pull the document.
2      Q.   Let me just ask you, what's your best
3  recollection right now?
4      A.   My best recollection is I was looking
5  at drug companies that were inspected that received
6  warning letters. There were three or four that I
7  saw on the screen, I printed two of them.
8      Q.   But -- but the drug company -- let me
9  just ask you this: So you're saying you pulled
10 something from the Internet?
11     A.   Yes.
12     Q.   Warning -- there were two warning
13 letters that you found?
14     A.   Correct.
15     Q.   From the FDA to a manufacturer?
16     A.   To a manufacturer, correct, and a
17 contracting company.
18     Q.   What's a "contracting company"?
19     A.   A company who is the sponsor.
20     Q.   When you say "the sponsor," what do
21 you mean by "the sponsor"?
22     A.   One company sells the product with
23 their name on it, the other company makes it for
24 them.
25     Q.   When you say "the sponsor," who is the

Page 327

1  sponsor?
2      A.   It would be the company that sold the
3  product.
4      Q.   What are they sponsoring?
5      A.   It's just a term that is sometimes
6  used. It's the manufacturer -- it's the name that's
7  on the label.
8      Q.   The name that's on the label of what?
9      A.   Of the product.
10     Q.   Is that the holder of the NDA?
11     A.   I don't know.
12     Q.   What -- what do you call the holder of
13 an NDA or an ANDA?
14     A.   I don't know what the official term
15 is. The holder of the NDA.
16     Q.   You don't know?
17     A.   I don't know what the formal term is.
18     Q.   In all of the years that you were with
19 Johnson & Johnson in the drug industry, you don't
20 know what you call the company that holds the NDA?
21     A.   We'd say it owns the NDA.
22     Q.   What?
23     A.   The company that owns the NDA. It's
24 what I would call it, perhaps it's an informal term.
25     Q.   And you don't know what you call the

Page 328

1  company that owns or holds the ANDA?
2      A.   No.
3      Q.   What is an ANDA?
4      A.   Abbreviated new drug application.
5      Q.   What is the difference between an ANDA
6  and an NDA?
7      A.   Sir, you're going beyond my expertise,
8  you're going into regulatory affairs areas.
9      Q.   All you have to say is I don't know.
10     A.   I don't know.
11     Q.   Okay. Is that your answer?
12     A.   I don't have an expert opinion on
13 that. I don't know.
14     Q.   Okay. But I just want your honest
15 answer. If you don't know, just say you don't know.
16     A.   I don't know.
17     Q.   And you told me before, you said the
18 term sponsor means the company that sold the product
19 and the contracting company is --
20     A.   The company that manufactured the
21 product. The contractor or contracting company.
22     Q.   As -- as to DIGITEK, who is the holder
23 of the ANDA?
24     A.   I believe it's Actavis from the
25 records that I read.

Page 329

1      Q.   And who is the manufacturer DIGITEK?
2      A.   The manufacturer is Actavis.
3      Q.   What is the significance of Actavis
4  being the holder of the ANDA as to GMP compliance?
5      A.   Well, they need to, as all companies
6  do, need to comply with GMP. I don't know how I
7  could be more specific.
8      Q.   Okay. It's your understanding that
9  Mylan is not the manufacturer of DIGITEK?
10     A.   Mylan doesn't manufacture that
11 product.
12     Q.   Mylan --
13     A.   I'm not using that as a formal term.
14 I am saying that they do not manufacture that
15 product.
16     Q.   They also -- Mylan is not the holder
17 of the ANDA?
18     A.   That is my understanding, correct.
19          THE VIDEOGRAPHER: We're off the
20 record at 10:15.
21          (Recess taken.)
22          THE VIDEOGRAPHER: We are back on the
23 record. The time is 10:19.
24 BY MR. KAPLAN:
25     Q.   When I was asking you questions about

8 (Pages 326 to 329)

PLAINTIFFS' EXHIBITS 004829

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 330

1  the difference between NDA and ANDA and you said I
2  don't know, that's going beyond my area of
3  expertise.
4       A.    Correct.
5       Q.    You are not an expert in regulatory
6  affairs?
7       A.    That is correct.
8       Q.    FDA regulatory affairs?
9       A.    That is absolutely correct.
10      Q.    You don't hold yourself out to be an
11 expert?
12      A.    That's correct.
13      Q.    All right.  Can you define -- you used
14 the term contract manufacturer?
15      A.    Yes.
16      Q.    What is a contract manufacturer?
17      A.    It's -- it's a company that you have a
18 formal agreement with that manufactures product
19 to -- to some predetermined specification.
20      Q.    Well, in -- in this case, you told me
21 that Actavis is the manufacturer of DIGITEK?
22      A.    Correct.
23      Q.    Actavis is the holder of the ANDA?
24      A.    That's what I read.
25      Q.    So Actavis manufactures DIGITEK in

Page 331

1  accordance with the specifications set forth in the
2  ANDA; is that right?
3       A.    I don't know.  I haven't read the
4  ANDA.
5       Q.    So your -- that is something that
6  you're just not familiar with?
7       A.    It's something I wouldn't read because
8  it not within my expertise.
9       Q.    Okay.  Well, I'm just trying to set
10 some basic understandings here --
11      A.    Yes.
12      Q.    -- or lack thereof.
13      A.    Yeah.
14      Q.    I mean, maybe -- maybe you don't
15 understand the -- the roles of the various companies
16 involved here.
17      A.    Uh-huh.
18      Q.    But I want to find out what you know
19 and what you don't know.  So you don't know whether
20 Actavis as the holder of the ANDA for DIGITEK was
21 charged with the responsibility for manufacturing
22 DIGITEK in accordance with the specifications set
23 forth in the ANDA?
24      A.    Sir, you're going to have to repeat
25 that.  I'm sorry.

Page 332

1            MR. KAPLAN:  Would you repeat that?
2            (Record read.)
3            MS. CARTER:  Object to form.
4       A.    If I understand the question, you're
5  asking there is an ANDA.  And in that, it has
6  content that talks about the CMC section.  It talks
7  about chemistry, manufacturing, and control.  I as
8  part of my profession, I don't go into either an NDA
9  or an ANDA and look what the agreement has been
10 reached between -- between the company and the FDA.
11 So I don't -- I don't read that at all.  I have no
12 interest in it whatsoever.
13      BY MR. KAPLAN:
14      Q.    How does the FDA qualify a
15 manufacturer?
16      A.    How do they qualify a manufacturer?
17 They do a preapproval.  They -- they read whatever
18 the submission is, whether it's medical device with
19 PMA or 510K or an ANDA or an NDA.  They then
20 schedule, in most instances, a preapproval
21 inspection.  They would come in and they would
22 review your GMP, they would spend whatever time they
23 felt was appropriate, and then they would issue you
24 as -- as a part of that approval process, issue you
25 an approval letter.

Page 333

1       Q.    In this case, in this situation with
2  regard to DIGITEK, Actavis was qualified by the FDA
3  as the manufacturer of that product, right?
4       A.    I -- I don't know.  I didn't see that
5  document.  It was done apparently in the '90s
6  sometime.
7       Q.    Who do you think was qualified as the
8  manufacturer of DIGITEK?
9       A.    I don't know.
10      Q.    You have no idea?
11      A.    No, I didn't see the documents.
12      Q.    Do you think it was Mylan?
13      A.    I have no idea.
14      Q.    Come on.  You know that Mylan was not
15 the manufacturer, right?
16      A.    I know they did not manufacture the
17 product.
18      Q.    You know that Actavis did?
19      A.    Correct.
20      Q.    Is it fair to assume that if Actavis
21 was manufacturing DIGITEK, they were qualified to do
22 so by the FDA?
23      A.    I would say it's fair to assume that
24 whatever FDA procedures were in place at the time of
25 approval that those procedures were followed.

9 (Pages 330 to 333)

PLAINTIFFS' EXHIBITS 004830

Page 334

1    Q.    By Actavis?
2    A.    By the FDA in conjunction with
3  Actavis.
4    Q.    But not Mylan?
5    A.    But not Mylan?  I don't know what
6  Mylan's role would be.
7    Q.    Well, you -- you told me it was your
8  understanding that Mylan sold DIGITEK, right?
9    A.    Correct.
10    Q.    How is it that Mylan sold DIGITEK?
11    A.    Some type of agreement, verbal or
12  written agreement, would have to be reached, and
13  then they would sell the product.  And I suppose
14  there is -- there is some licenses that have to be
15  obtained from the FDA, licenses which I'm not
16  familiar with.
17    Q.    Well, tell me in this situation what
18  you have seen that tells you how it is that DIGITEK
19  came to be sold by Mylan.
20    A.    I -- I don't go back that far in
21  terms of reviewing that documentation.
22    Q.    What documentation are you talking
23  about?
24    A.    I -- I didn't look at anything prior
25  to '99, let's say.

Page 335

1    Q.    So in all of your review of -- of --
2  of documents in preparation for rendering your
3  opinions which are contained in your report of
4  June 15, 2010, and in preparation for your
5  deposition on June 29 and July -- of 2010, and
6  again today, February 16, 2011, you -- you reviewed
7  no document that gave you any understanding of the
8  relationship between Actavis and Mylan?
9    A.    No formal document that -- that's
10  correct, no formal document.  It would have been
11  implied or stated to some extent in memos and the
12  like.
13    Q.    But I'm going to ask the court
14  reporter to repeat the question again, and I am
15  going to ask you to answer it, please.
16    A.    Sure.
17    Q.    Yes or no.  Yes, you did review any
18  document or no, you didn't review?
19        MR. KAPLAN:  Would you repeat that?
20        (Record read.)
21    A.    I read documents, yes, that did
22  have -- gave me an understanding of the
23  relationship.
24    Q.    I'm going to ask you what your
25  understanding is of the relationship and what

Page 336

1  documents you read to --
2    A.    Well, I don't recall the documents
3  that I read, so that's not going to be possible.
4  And my understanding is that Mylan had some -- an
5  agreement with Actavis that they would be selling
6  the product and that Actavis would be manufacturing
7  that product.
8    Q.    Is that document that you were just
9  talking about contained in the binder in front of
10  you?
11    A.    Sir, I don't know what document it is,
12  where I -- or I would have made that determination.
13    Q.    Who had the authority to confer upon
14  Mylan the right and responsibility of manufacturing
15  DIGITEK?
16    A.    You have to repeat that, sir.
17        (Record read.)
18    A.    I don't know who had the right.  I'm
19  not -- I'm not sure I actually understand the
20  question.
21    Q.    What don't you understand?
22    A.    I don't understand the question.
23  Could you rephrase it, please.
24    Q.    Okay.  Is it your understanding that
25  it is the FDA and only the FDA that would have the

Page 337

1  authority to confer upon Mylan the right to
2  manufacture DIGITEK?
3    A.    I don't know the process with Mylan
4  that would give them the authority to be able to
5  sell it.  I was not involved with the regulatory
6  affairs negotiations between the seller or the
7  distributor of the product and the FDA.
8    Q.    That was not my question, and I'll ask
9  the court reporter to read it back again.  And
10  concentrate on this, take your time.
11    A.    Yeah.
12        MR. KAPLAN:  Please read back the
13  question.
14        (Record read.)
15    A.    Oh, on Actavis?  Oh, yes.
16    Q.    It's the FDA?
17    A.    That's correct.
18    Q.    Only the FDA?
19    A.    As far as I know -- well, I'm only
20  involved with the FDA, but I know it is the FDA.
21  Whether there are other legal groups, I don't know.
22    Q.    Mylan has no authority to authorize
23  Actavis to manufacture DIGITEK?
24    A.    They don't have what?
25    Q.    Mylan has no authority to authorize

10 (Pages 334 to 337)

PLAINTIFFS' EXHIBITS 004831

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 338

1 Actavis to manufacture DIGITEK?
2        Q.    Using the word "authorize," I believe
3 that's correct.
4        Q.    Is there some other word that you
5 would use?
6        A.    I don't know.  Well, they would --
7 they would establish an agreement, and as part of
8 the agreement, to uphold the agreement, they would
9 manufacture certain number of lots, certain
10 quantity, under certain specifications, and other
11 conditions, for Mylan.  That I believe is the
12 relationship that which I'm involved with in my --
13 in my trade.
14       Q.    I don't know what you mean.  Can you
15 explain that, the relationship you're involved with
16 in your trade?
17       A.    I'm involved -- the expertise that I
18 bring is good manufacturing practices.  Once an
19 agreement is reached, a verbal agreement is reached
20 between the two parties, I would look at the
21 relationships of the supply and determine whether
22 between the two parties my company, which would be
23 the equivalent of Mylan, and the contract
24 manufacturer, and I would determine whether or not
25 the GMP conditions are adequately defined and

Page 339

1 whether adequately executed.
2        Q.    Have you seen any such agreement?
3        A.    I have not seen a -- I saw a draft of
4 a quality agreement which was not approved.
5        Q.    You have seen no other agreement
6 between Actavis and Mylan?
7        A.    There was a supply agreement.  I have
8 not read the supply agreement.
9        Q.    Why not?
10       A.    Well, I didn't see it in the records.
11       Q.    Did you ask for it?
12       A.    I did not ask for it.
13       Q.    So in all of the work you've done, all
14 hours that you've billed, all of the time that
15 you've spent preparing for your report and writing
16 your report and giving your deposition, preparing
17 for your deposition, both on June 29, 2010 and again
18 today on February 16, 2011, you've never asked for
19 any supply agreement between Mylan and Actavis,
20 correct?
21       A.    I don't recall asking specifically for
22 a supply agreement.
23       Q.    So the answer to my question is no, I
24 have not?
25       A.    No, I have not.

Page 340

1        Q.    And you referred to Actavis as a
2 contract manufacturer, that's -- that's a term of
3 art.  What does that mean?
4        A.    It means a company that's making
5 product for you, making -- manufacturing product for
6 you.
7        Q.    And your understanding then is that --
8 that Actavis was a contract manufacturer?
9        A.    That's a term that is used in the
10 industry, yes.
11       Q.    What -- is that pursuant to
12 regulation, contract manufacturer?
13       A.    Well, the FDA does use that term in
14 some of its documents, so I would say it's an
15 industry -- external manufacturer or contract
16 manufacturer are the most common terms.
17       Q.    Is there a difference between a
18 manufacturer that is the holder of an ANDA and a
19 contract manufacturer?
20       A.    It's -- I -- from what I would say the
21 Mylan standpoint based upon my experience as a Mylan
22 perspective, there is no difference.
23       Q.    That wasn't my question.
24       A.    In terms of GMP.
25       Q.    That wasn't my question.

Page 341

1        A.    Okay.
2        Q.    I'm going to ask the court reporter to
3 read back my question and see if you can try to
4 answer specifically what I asked you.
5             (Record read.)
6        A.    I am not aware of any difference from
7 a Mylan perspective, from a GMP perspective.
8        Q.    Could you be more specific?
9        A.    That the GMP is all of the controls
10 that are necessary -- if I'm the seller of a
11 product, I am -- if I'm a distributor of a product,
12 I sell it, I market it.  I have a responsibility to
13 all of those involved with it, the customers, the
14 patients, et cetera.  I have a responsibility -- and
15 to the FDA, to make sure that GMPs are upheld both
16 by my company and by the company manufacturing.  So
17 that the same level of controls in terms of GMP are
18 in effect between the two parties, that they
19 compliment one another to meet the GMP requirements.
20       Q.    So are you saying that according to
21 the code of federal regulations which the GMPs are
22 contained?
23       A.    Correct.
24       Q.    That Mylan as the seller of DIGITEK
25 had responsibility under the law to make sure that

11 (Pages 338 to 341)

PLAINTIFFS' EXHIBITS 004832

Mark Kenny, Volume II                    Videotaped                February 16, 2011

Page 342

1  GMPs were upheld in the manufacture of DIGITEK?
2      A.   That is correct.
3      Q.   And can you -- can you cite me to
4  that -- to that -- those regulations that put that
5  responsibility on a seller?
6      A.   I cannot right this second.
7      Q.   Well, take your time.
8      A.   Well, I don't have it here, but I
9  believe there is.  I cannot cite it currently, but I
10 believe there's enough information in print that
11 says that if I am Mylan, I am responsible for
12 ensuring that product manufactured in my name for me
13 has to meet GMP requirements.
14     Q.   Okay.  And I'm just asking you to tell
15 me, show me what it is that you have reviewed, seen,
16 relied upon in arriving at your opinions in this
17 case that leads you to believe that a seller of a
18 product has the responsibility to make sure that the
19 manufacturer of the product who is the ANDA holder
20 complies with GMPs?
21     A.   I can tell you through my experience
22 that I've been trained to -- to -- to ensure -- to
23 establish a relationship with the contract
24 manufacturer and that ensuring that I as -- Mylan,
25 if you will -- and the contractor have a full

Page 343

1  compliment and meet the GMP requirements that I am
2  responsible and accountable for them.
3      Q.   I'm going to move to strike that as
4  nonresponsive and ask the court reporter to read
5  back my question.  And ask you to answer the
6  question that I asked you.
7      A.   Okay.
8          (Record read.)
9      A.   I cannot show you right this second
10 what it is.  It's just that is my understanding
11 based upon years of experience and reading documents
12 and warning letters and GMPs and preambles and
13 guidance documents, I would say that is my
14 understanding.  So I cannot -- if you want to
15 restate the question.
16     Q.   You cannot?
17     A.   I don't know.  Restate the question.
18 I want to make sure I answer it.
19     Q.   There is no document --
20     A.   That I can point to.
21     Q.   That you can point to.  There is no
22 document upon which you rely to conclude that Mylan
23 as the seller of DIGITEK had the responsibility for
24 ensuring that Actavis as the ANDA holder and
25 manufacturer of DIGITEK complied with GMPs?

Page 344

1      A.   I cannot point to a document.
2      Q.   You can't point to a document in
3  your -- referenced in your report, can you?
4      A.   That is correct.
5      Q.   You can't point to a document, any
6  document that you brought here today, can you?
7      A.   I -- I don't know.  I'd have to -- at
8  this particular point, I can't point to a document.
9  I'd have to think about it and do a little more
10 research in order to confirm what I know.
11     Q.   With all due respect, I asked you if
12 you came here today prepared to give your opinions
13 and you said yes.
14     A.   I was prepared.
15     Q.   You are prepared, aren't you.
16     A.   I am prepared.  But you're asking me a
17 question that I cannot answer at this particular
18 point.
19     Q.   Pretty fundamental to your opinions as
20 to Mylan, isn't it?
21     A.   If that's -- I would not say that, no.
22 I don't think it's fundamental to our discussions.
23     Q.   You don't think that the legal
24 requirements for ensuring compliance with GMPs is
25 fundamental to your opinions as to Mylan?

Page 345

1      A.   I am saying that I am aware of what
2  are industry norms, what are standards, between a
3  contracting company and a contract manufacturer, but
4  I cannot pinpoint a document right this second which
5  establishes that in terms of law.
6      Q.   The legal responsibility for complying
7  with GMPs is fundamental to any opinion you are
8  offering in this case, isn't it?
9          MS. CARTER:  Object to form.
10     A.   Yes.
11 BY MR. KAPLAN:
12     Q.   And you keep referring to Actavis as a
13 contract manufacturer.
14     A.   The relationship that Mylan has, if
15 I'm looking at it from Mylan's perspective, they are
16 what's referred to as a contract manufacturer.  And
17 Mylan refers to them as a contract manufacturer.
18     Q.   What's the basis for concluding that
19 Actavis is a "contract manufacturer"?
20     A.   It's in various documents where they
21 talk -- talk to Actavis as the contract
22 manufacturer.
23     Q.   How does a contract manufacturer
24 differ from a manufacturer who has an approved ANDA
25 approved by the FDA?  What is the difference?

12 (Pages 342 to 345)

Page 346

1     A.    I don't see any difference.  From
2  Mylan's perspective.
3     Q.    Well, from your perspective?
4     A.    But my perspective is in terms of my
5  experience, I've never been a contract manufacturer.
6  My perspective is as the company that distributes
7  the product that I am obligated, I've been trained
8  to assume that obligation that I have to be in
9  compliance with GMP, and that the company that makes
10 the product for us has to be compliant to GMP.
11    Q.    When you say I have to be compliant
12 with GMP, what do you mean?
13    A.    I means -- some people refer to the
14 distributor as a virtual company.  As part of a
15 virtual company, you'll have systems and procedures,
16 you'll have specifications that you approve.  You
17 will have other procedures that are approved.  You
18 perhaps have complete handling responsibility.  And
19 those would be -- there are supposed to be
20 established between you and the contractor as to
21 what my obligations were to compliment the FDA's
22 requirements and what your obligations are to meet
23 FDA requirements.
24    Q.    You started by saying some people
25 refer to a distributor as a virtual company.  When

Page 347

1  you say "some people," who are you talking about?
2     A.    In the industry, it's a common term.
3     Q.    Who is the industry?
4     A.    The industry are my peers.
5     Q.    I don't know who your peers are.
6     A.    My peers are companies that I have
7  either worked for or have some relationship with.
8  It's -- I would call it it's an informal term that
9  is used.
10    Q.    Is the FDA --
11    A.    No, the FDA does not use that term,
12 that I've ever seen.
13    Q.    So the FDA that has established good
14 manufacturing practice regulations does not use the
15 term "virtual company"?
16    A.    As far as I know.  I don't know if
17 they use that term.  I've never seen it used by
18 them.
19    Q.    And you said that a seller of a
20 product has to approve specifications --
21    A.    That's correct.
22    Q.    -- for a product?  Can you -- can you
23 cite me to the -- to the regulations that impose
24 that responsibility on the seller?
25    A.    Sir, if I -- I cannot cite you to the

Page 348

1  regulation.
2     Q.    But it's your understanding that the
3  FDA requires a seller of a product, in this case
4  Mylan, to approve manufacturing specifications for
5  the manufacture of DIGITEK by Actavis?
6     A.    To approve product specifications.
7     Q.    What's the difference between
8  manufacturing specifications and product
9  specifications?
10    A.    Product specifications are an end
11 specification.  Manufacturing is how you make it.
12    Q.    Be a little more specific.
13    A.    Manufacturing would be the process of
14 putting two chemicals together to -- and et cetera,
15 to process it to become a finished product.  And at
16 that particular point, as a finished product, you
17 would have a product specification.
18    Q.    You're saying that the responsibility
19 for the product specifications with regard to
20 DIGITEK rests with Mylan?
21    A.    A portion of that, most certainly.
22    Q.    What portion?
23    A.    They need to have approved
24 specifications in their system as to what they are
25 buying.  You have to know what you're buying.  What

Page 349

1  am I buying?  I define it as a specification of
2  which Mylan or -- sorry -- Actavis, in this case, or
3  the contractor, would manufacture in accordance to.
4  So they deliver a product that meets my
5  specification.  I take ownership for it because it's
6  my product, it is my specification.
7     Q.    So it's your understanding that --
8  that Mylan tells Actavis what the specifications for
9  DIGITEK are to be?
10    A.    No, I didn't say that.  I said that I
11 don't know who tells who.  All I can tell you is
12 that Mylan would have an approved specification that
13 they would use to determine whether or not the
14 product met their own specification and was fit to
15 be distributed.
16    Q.    Let's go back.  Isn't it the FDA that
17 has to approve the specifications for the
18 manufacturer of DIGITEK?
19    A.    No.
20    Q.    No?
21    A.    Not the specifications.  They would --
22 I wouldn't use that term.  You asked me
23 specifications, I would say no.
24    Q.    So it's not the FDA that has to
25 approve the specifications for the manufacture of

13 (Pages 346 to 349)

PLAINTIFFS' EXHIBITS 004834

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 350

1  DIGITEK?
2        A.    The FDA does approve certain
3  information that's required by -- by them.  That is
4  contained in an ANDA and an NDA, and the product has
5  to be manufactured according to those requirements.
6        Q.    Well, what -- what authority does
7  Mylan have with regard to product specifications?
8        A.    I don't know.  If I understand your
9  question, I would say -- could you repeat the
10  question?  I don't think I'm answering the right
11  question.
12        (Record read.)
13        A.    Mylan has an obligation to have
14  product specifications that they use to determine
15  the acceptability of a product to be distributed in
16  their name.
17        Q.    I'm going ask you the question again.
18  I'll just repeat it.  What authority does Mylan have
19  under the law with respect to product specifications
20  for DIGITEK?
21        A.    I don't know.  Under the law.
22        Q.    Well, we were going through the
23  notebook you brought of all of the Mylan documents
24  that you have looked at since your deposition was
25  taken initially on June 29, 2010?

Page 351

1        A.    Right.
2        Q.    We've actually only gotten through two
3  documents.  There was an exhibit M55 and an exhibit
4  M53.  Tell me what the next document is.
5        So the next document you're handing me is
6  marked Exhibit M21, and it is a e-mail from a John
7  Deiriggi, D-E-I-R-I-G-G-I, to Hal Korman,
8  K-O-R-M-A-N, dated January 4, 2007.  And then an
9  e-mail below that from Walt Owens to John Deiriggi
10  dated January 4, 2007.  There's nothing that you've
11  highlighted here.
12        A.    There was nothing of interest in
13  there.
14        Q.    All right.  So M21, nothing of
15  interest, right?
16        A.    Correct.
17        Q.    The next Mylan document that you
18  reviewed.
19        A.    Here's another one.
20        Q.    Okay.  The next document you've handed
21  me is another exhibit from a previous deposition,
22  and it's marked Exhibit M25.  It's an e-mail from
23  Chuck Koons to Hal Korman dated April 27, 2008.  And
24  you have highlighted a portion on the first and
25  second page, I'll just refresh your recollection.

Page 352

1  The portion you've highlighted starts with
2  "Actavis's U.S. head of quality would be calling."
3  Then, "Mike Adams and I spoke to her on the phone,
4  and she described that the PAI had been going on for
5  six weeks and that they were being "beaten up" by
6  FDA.  She stated that the reason the recall was
7  expanded to all DIGITEK was that FDA felt that there
8  weren't adequate controls on their tablet presses to
9  ensure that the double tablet issue couldn't have
10  happened previously."  Then you -- then you
11  highlighted a portion of a sentence that says that
12  "other products were being recalled."
13        And then on the second page of M25,
14  you've highlighted "FDA is focusing on Amide's
15  systems to control and ensure product quality rather
16  than simply having concerns over just one
17  investigation."  And then finally, you highlighted
18  the following:  "Mike Adam, Cass, C-A-S-S, Bird, and
19  Ann Wolf, who've lead the charge from the MPI side."
20        So tell me what you learned or what was
21  the significance there.
22        A.    Well, there is only one sentence, if
23  you will, that I would say is -- was meaningful for
24  me.  And she stated -- it says, "she stated the
25  reason the recall was expanded to all DIGITEK was

Page 353

1  that FDA felt there weren't adequate controls on
2  their tablets -- tablet press, to ensure that double
3  thick issues couldn't have happened previously."
4  That was the -- to me the notable sentence.
5        Q.    Okay.  And by the way, these documents
6  that you've just gone through, you hadn't reviewed
7  those prior to rendering your opinions in this case?
8        A.    No, I -- I almost assuredly did see
9  them.  M25, I did.
10        Q.    Okay.  And if they were significant to
11  you, you would have referenced them in your report?
12        A.    If they were significant -- if I felt
13  they were significant at the time, I would have
14  referenced them in my report.
15        Q.    Because all of your opinions are
16  contained within the four corners of your report?
17        A.    That is correct.  That is correct.
18        Q.    And you understand that that is your
19  obligation here?
20        A.    You've asked me that and I will repeat
21  it and say I understand that.
22        Q.    I just want to make sure we're on the
23  same wave length.
24        A.    We're on the same wave length
25  100 percent.

14 (Pages 350 to 353)

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 004835

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 354

1    Q.   Thanks.  And reference was made to
2  Amide, A-M-I-D-E.  You understand that when
3  reference was made to Amide, that's Actavis?
4    A.   That is correct.  That's my
5  understanding.
6    Q.   Okay.  And you also understand that
7  throughout the documents, when reference is made to
8  Bertek, B-E-R-T-E-K, that means Mylan?
9    A.   That's correct.  That's my
10 understanding.
11   Q.   All right.  The next document that you
12 reviewed since your deposition was taken initially
13 on June 29, 2010.
14   A.   Reviewed or rereviewed?
15   Q.   You can tell me whether you reviewed
16 or rereviewed.
17   A.   Well, I reread.  I reread Adams.
18 There was nothing --
19   Q.   You reread what?
20   A.   I'm sorry.  Let me tell you what I
21 reread.  The deposition taken on Michael Adams
22 January 22, 2010, I think that's it.  And I reread
23 it to just familiarize myself.  They are long
24 documents, hundreds of pages.
25   Q.   When you say you reread the deposition

Page 355

1  of Mike Adams, don't you recall that at your
2  previous deposition when you were asked whether you
3  reviewed any Mylan depositions, you said the only
4  one you looked at was Chuck Koons?
5    A.   I -- I read documents where I quickly
6  went through them, and perhaps I was in error.  I
7  think I did read Michael Adams because I did see
8  certain phrases where -- they were interesting
9  phrases.  They were at least mentally notable to me.
10   Q.   So you think that when you -- when you
11 testified on June 29, 2010 that the only Mylan
12 deposition you reviewed was Chuck Koons, you were
13 wrong?
14   A.   I believe I was wrong, correct.
15   Q.   And you think you also had reviewed
16 Mike Adams' deposition?
17   A.   I'm sorry, I think I got these
18 backwards.  Could you repeat your question?
19   Q.   You think that before your June 29
20 deposition was taken, you had also reviewed Mike
21 Adams' deposition?
22   A.   I believe I did, yes.
23   Q.   And then you re-reviewed Mike Adams'
24 deposition?
25   A.   Correct.

Page 356

1    Q.   After June 29, 2010?
2    A.   That is correct.
3    Q.   And what did you learn from that?
4    A.   Nothing.
5    Q.   Did you look at any other Mylan
6  deposition?
7    A.   I looked at Chuck Koons.
8    Q.   Again?
9    A.   Yes.
10   Q.   What did you learn from that?
11   A.   I learned that Mr. Koons had not a
12 good memory.
13   Q.   Well, I'm going to move to strike that
14 as nonresponsive.
15   A.   Nothing that I recall notable.
16   Q.   How is your memory?
17   A.   Mediocre to good.  Depends.  Sometimes
18 it's very, very good.
19   Q.   How is it today?
20   A.   I believe it's pretty good.
21   Q.   Okay.  All right.  Any other Mylan
22 depositions that you reviewed?
23   A.   No, that's it.  If it's here, then I
24 reviewed it.
25   Q.   So Mike Adams and Chuck Koons, and

Page 357

1  there's nothing remarkable that you gleaned from
2  either of those depositions?
3    A.   No.
4    Q.   All right.  What is the next document
5  that you reviewed?  Since June 29, 2010?
6    A.   I could short -- well, I'll go through
7  it per your process.
8    Q.   If you want to shortcut it, I'm all in
9  favor of it.  Tell me how you can shortcut it.
10   A.   Well, let's go through it so I don't
11 misspeak.
12   Q.   I don't want you to misspeak.
13   A.   Okay.  I read this particular
14 document, you can look at it.  And I made no --
15 there was nothing remarkable in there.
16   Q.   Okay.  So what you're handing me is a
17 document marked Exhibit M65, which bears a Bates
18 stamp -- which bears Bates stamp numbers UD as in
19 dog, LL 000005805 through 5818.
20       (Cell phone interruption.)
21   Q.   Does your handwriting appear anywhere
22 on here?
23   A.   Yes.
24   Q.   Is it on the front page?
25   A.   Yes, it is.

15 (Pages 354 to 357)

PLAINTIFFS' EXHIBITS 004836

Page 358

1    Q.    And if I can read this correctly, it
2  says receiving and then there's an arrow, four of
3  96, 00S thickness found at UDL PKG 70175A.  What
4  does that mean?
5    A.    It's -- it's just when I looked
6  through it, there was an out of specification when I
7  review documents as any GMP person does, he or she
8  would look for the term out of specification,
9  because it's potentially notable when I reviewed it.
10 It was meaningless in the context to my expert
11 opinion.
12   Q.    Who is UDL?
13   A.    UDL is apparently a contract packaging
14 firm that I believe there's probably a Mylan
15 relationship with.
16   Q.    What do they do?
17   A.    They -- I think they form blister
18 packs, at least I read that.
19   Q.    Blister packs of?
20   A.    Of I would guess Digoxin, and perhaps
21 others, I don't know, but it was not important to
22 me.  Okay?
23   Q.    So there is nothing important to you
24 about document M65 that has anything to do with any
25 opinion that you're rendering in this case?

Page 359

1    A.    Not in the least bit.
2    Q.    Okay.  Thank you.  Okay.  The next
3  Mylan document that you reviewed.
4    Okay.  You've handed me a document that
5  is Exhibit M52 which bears the Bates stamp numbers
6  UDLL 0000014256 through 14268.  UDL document you've
7  highlighted that it's from Lee Radtke dated
8  February 10, 2007, re 483/warning letter summary for
9  Actavis (Amide.)  And I see no other highlights
10 throughout the document.
11   A.    It was not remarkable.
12   Q.    There was nothing remarkable about
13 Exhibit M52.
14   A.    Correct.
15   Q.    It had no bearing on your opinion in
16 any way, shape, or form; is that right?
17   A.    Zero.  That is correct.
18   Q.    Zero, zero, zippo.  It's 11 o'clock.
19 You want to take a break?
20   A.    No.
21   Q.    You don't?  I do.
22       THE VIDEOGRAPHER:  We're off the
23 record.  The time is 11:02.  This is the end
24 of tape 1.
25       (Recess taken).

Page 360

1        (Whereupon, Rick Fern joined the
2  deposition.)
3        THE VIDEOGRAPHER:  We're back on the
4  record.  The time is 11:18.  This is the
5  beginning of tape two.
6  BY MR. KAPLAN:
7    Q.    Okay.  Mr. Kenny, I think we had just
8  talked about Exhibit M65, which you told me was one
9  of the Mylan documents that you reviewed since your
10 deposition was taken on June 29, 2010, and that
11 there was nothing remarkable about that document,
12 correct?
13   A.    That is correct.
14   Q.    All right.  Moving on.  Let's go to
15 the next Mylan document in your notebook, please.
16   A.    (Handing).
17   Q.    You're handing me a document which was
18 previously marked as deposition Exhibit M47 bearing
19 the Bates numbers UDLL 000211178 through 182.  Looks
20 like an e-mail string that ends up with an e-mail
21 from Lee Radtke to Val Schissel, S-C-H-I-S-S-E-L,
22 dated Friday December 14, 2007.  I see no
23 highlighting --
24   A.    Right.
25   Q.    -- of yours on this document?

Page 361

1    A.    Nothing remarkable.
2    Q.    And -- and you're concluding and
3  telling me that there is nothing remarkable that you
4  found in your review or rereview of previously
5  marked Exhibit M47, correct?
6    A.    That is correct.
7    Q.    Thank you, sir.
8    A.    (Handing).
9    Q.    Okay, sir.  The next Mylan document
10 that you reviewed or rereviewed which you've just
11 handed me is one that was previously marked Exhibit
12 M45 bearing the number UDLL 000025489 through, looks
13 like we don't have a consecutively numbered exhibit
14 here.  The first two pages are -- and it's last four
15 digits are 5489 and 5490, and then attached to that
16 is a document headed "UDL Laboratories, Inc. Quality
17 Assurance (in process)" with Bates numbers MYLN
18 000035615 through 35620.  And actually it's -- that
19 document as I flip through it is out of order,
20 because I think it starts actually with 35607 and
21 continues through 35620.  Anyway, tell me, I see it
22 looks like -- I'm starting to recognize your
23 handwriting here, you circled the date January 21,
24 2008, and you have written "still no Q agreement"?
25   A.    It's -- it's meaningless comment.  It

16 (Pages 358 to 361)

PLAINTIFFS' EXHIBITS 004837

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 362

1 had -- nothing remarkable there. I'd have to go
2 through it to even tell you why I put that down.
3        Q.   Okay. Is there anything at all
4 remarkable about this document or anything --
5        A.   Not in the least bit.
6        Q.   Thank you. And it -- it had no
7 influence whatsoever on your opinions?
8        A.   Zero.
9        Q.   By the way, we talked about UDL
10 before. In all of your preparation for your report
11 which you submitted on June 15, 2010, and in
12 preparation for your deposition on June 29, 2010 and
13 again here today on February 16, 2011, have you seen
14 anything that would indicate to you that at any time
15 that UDL tested DIGITEK tablets to make sure that
16 they were in accordance with --
17        A.   I saw some -- I saw some test
18 information. I saw no exceptions. I saw no out of
19 specification test results.
20        Q.   Next document.
21        A.   (Handing.)
22        Q.   This is a previously marked deposition
23 exhibit M39 bearing Bates stamp numbers MYLN
24 0000000381 through 385, and it looks like somebody's
25 handwriting on all of the -- all of the pages here.

Page 363

1 What does this mean to you?
2        A.   Nothing. There is nothing remarkable.
3        Q.   Nothing remarkable and nothing about
4 previously marked Exhibit M39 which had any bearing
5 whatsoever on -- on any opinion that you rendered in
6 this case?
7        A.   That is correct.
8        Q.   Thank you.
9        A.   (Handing.)
10        Q.   All right. The next document that you
11 handed me that you have either reviewed or
12 rereviewed since your deposition was first taken on
13 June 29, 2010 is a previously marked deposition
14 exhibit M-34 with Bates number MYLN 000000408, a
15 one-page document headed "recall team." Anything
16 remarkable about that document?
17        A.   Not in the least bit.
18        Q.   So nothing about Exhibit M34 that has
19 had any bearing on any opinion that you've rendered
20 in this case?
21        A.   That is correct. (Handing.)
22        Q.   The next document you're handing me is
23 a previously marked deposition Exhibit M31. It
24 looks like it was marked in the deposition of
25 Mr. Adams, the deposition that you just told me that

Page 364

1 you -- you had reviewed, right?
2        A.   That's correct.
3        Q.   And it is an e-mail from Mr. Adams to
4 a Mr. Elinski, E-L-I-N-S-K-I, dated May 13, 2008,
5 Bates numbers MYLN 000035283 through 35285.
6 Anything at all remarkable about that document?
7        A.   Nothing, zero.
8        Q.   Nothing that enlightened you in any
9 way?
10        A.   Not in any way.
11        Q.   Nothing that affected any opinion that
12 you have rendered in this case?
13        A.   That is correct. (Handing.)
14        Q.   The next document that you've handed
15 me that you reviewed or rereviewed since your
16 deposition was taken on June 29, 2010 is marked --
17 was previously marked as deposition Exhibit M30,
18 again, from the deposition of Mr. Adams, and it's an
19 e-mail from Mr. Adams to a number of people dated
20 May 6, 2008. Is there anything about that document
21 that you found remarkable?
22        A.   Nothing remarkable.
23        Q.   Enlightening?
24        A.   Not in the least bit.
25        Q.   So there is nothing about Exhibit M30

Page 365

1 that in any way bears upon the facts or your opinion
2 in this case?
3        A.   That is correct. There is -- correct.
4 (Handing.)
5        Q.   By the way -- and you just handed me
6 another document, and I'm going to go into that, but
7 I just want to make sure I understand this on your
8 educational background. You have a undergraduate
9 degree in engineering?
10        A.   That's correct.
11        Q.   What -- what specialization?
12        A.   Mechanical engineering.
13        Q.   And that's from what school?
14        A.   University of Dayton.
15        Q.   University of Dayton. Dayton, Ohio?
16        A.   That's correct.
17        Q.   So a guy from New Jersey goes out to
18 Ohio for school, right?
19        A.   That's correct.
20        Q.   All right. The Dayton fliers?
21        A.   You got it.
22        Q.   All right. You have no graduate
23 degree?
24        A.   I do not have a graduate degree,
25 that's correct.

17 (Pages 362 to 365)

PLAINTIFFS' EXHIBITS 004838

Mark Kenny, Volume II                         Videotaped                         February 16, 2011

Page 366

1    Q.    Okay.  You've just handed me what has
2  been previously marked as deposition Exhibit M26,
3  again, from the deposition of Mr. Adams that you
4  told me today that you reviewed but found nothing
5  remarkable in it.  Here, I see your handwriting, I
6  think it says by Mr. Adams' name, executive director
7  QA at Mylan?
8    A.    Yes.
9    Q.    Okay.  Anything about M26 that you
10  found remarkable?
11    A.    Nothing remarkable.
12    Q.    Or enlightening?
13    A.    It did not enlighten any further.
14    Q.    Or that bears in any way on any
15  opinion that you have rendered in this case?
16    A.    It does not bear on any opinion.
17  (Handing).
18    Q.    The good new is for the record, it
19  looks like we're getting closer to the end here.
20    A.    Yeah, well, you asked for this.
21    Q.    I did, I did.  Well, I you didn't ask
22  for it.  You just -- I did ask for it.  You have
23  handed me what has been previously marked as
24  deposition Exhibit M54 with Bates numbers MYLN
25  000997539 and 7540.  A document dated December 13,

Page 367

1  2006 from Lee Radtke to Chuck Koons.  I'll ask you
2  the same question, is there anything that you found
3  remarkable about that document?
4    A.    Nothing remarkable.
5    Q.    Or enlightening?
6    A.    It did not enlighten me at all.
7    Q.    So it had no bearing on any opinion
8  that you've given in this case?
9    A.    That is correct.
10    Q.    The next document that you've handed
11  me that you've reviewed or rereviewed since your
12  deposition was taken on June 29, 2010 is a two-page
13  document bearing Bates numbers MLYN 000032342 and
14  32343.  It looks like a letter dated November 23,
15  2006 to Actavis from Christopher Benson, director of
16  technical purchasing at Mylan Pharmaceuticals, Inc.,
17  with an attachment regarding the fact that "Mylan is
18  an authorized distributor of record and has an
19  ongoing relationship with Actavis pursuant to a
20  written supply and distribution agreement covering
21  DIGITEK .125 milligrams and .25 milligrams."  Is
22  that right?
23    A.    That is correct.
24    Q.    Anything remarkable about that?
25    A.    No.  I did not read that beforehand.

Page 368

1  It appears to have established some type of legal
2  agreement, but since I'm not familiar with the
3  terms, it has no bearing whatsoever.
4    Q.    Okay.  And -- and this document on
5  Page 32343 refers to a written supply and
6  distribution agreement covering DIGITEK.  Have you
7  seen that?
8    A.    Yes, I have, sir.
9    Q.    And anything about that agreement that
10  you found important?
11    A.    The -- it's the lack of information
12  that I found important.  It did not have the clauses
13  in it and the requirements, and it didn't establish
14  the GMP responsibilities between two parties.
15    Q.    It did not establish the GMP
16  responsibilities between the two parties?
17    A.    Right.  It didn't deal --
18    Q.    Go ahead.
19    A.    It didn't deal in the specifics that
20  are required to run a business.
21    Q.    Okay.  What are the specifics required
22  under the law to "run a business," as you put it?
23    A.    Well, you -- if -- can I pull the GMP?
24    Q.    Can you pull what?
25    A.    The good manufacturing practices to

Page 369

1  show you what I believe can help answer that?
2    Q.    Well, just answer my question.
3    A.    That's the way I would answer that.
4  I'd like to read that.
5    Q.    You would like to read a GMP --
6    A.    Just one clause within the GMP.
7    Q.    When you say "the GMP," there are a
8  lot of GMPs, aren't there?
9    A.    Yeah.  This is -- this is part 210 and
10  part 211.  It's specifically in part 211 -- CFR part
11  211.
12    Q.    Sounds like you're pretty familiar
13  with that?
14    A.    I'm reasonably familiar with that.
15    Q.    CFR 211?
16    A.    Right.  Well, I'd have to go to the
17  particular clause.
18    Q.    Okay.  By the way, was the supply and
19  distribution agreement a document that you reviewed
20  before your deposition was taken?
21    A.    Yes, it was.  I have not reviewed it
22  since.
23    Q.    Was it a document that you reviewed
24  before you issued your report in this case?
25    A.    Yes, it was.

18 (Pages 366 to 369)

PLAINTIFFS' EXHIBITS 004839

Page 370

1    Q.    Is it a document that you have
2  referenced in your report?
3    A.    I have not referenced it.
4    Q.    Why not?
5    A.    Because it was remarkable by its
6  absence of information.  Supply agreements in -- in
7  my experience do not contain any information that is
8  associated with the details of good manufacturing
9  practices.  Therefore, when I see a supply agreement
10  and I flip through it and it has nothing, no
11  attachments, no references, it's -- it's of no
12  interest to me.
13    Q.    So what -- what I'm interested in and
14  what I'm going to ask you to go ahead and -- and
15  show me then is the CFR, the code of federal
16  regulations, dealing with good manufacturing
17  practices which requires Mylan to have included
18  something that you say was missing from the supply
19  and distribution agreement.
20    A.    Okay.
21    Q.    In its status as the distributor of
22  DIGITEK manufactured by Actavis pursuant to its
23  abbreviated new drug application approved by the
24  FDA?
25    A.    I understand.

Page 371

1    Q.    Okay.  Do you understand?
2    A.    I believe so.
3    Q.    All right.  Show me what you've got.
4  Okay.  Just for the record, you're now going outside
5  of the notebook here?
6    A.    That's right.  Well, I'm just pulling
7  my references.
8    Q.    No, I understand, but just for the
9  record, you were going through a notebook with
10  documents pertaining to Mylan that you have reviewed
11  or rereviewed since your deposition was taken on
12  June 29, 2010, right?
13    A.    That is correct.
14    Q.    And now you've -- you have brought
15  another notebook here.  What's the spine title on
16  that?
17    A.    It says "references."  It contains the
18  majority of the documents that I referenced.  It
19  does not contain any additional documents.
20    Q.    Okay.  So when you say it contains the
21  majority of documents that are referenced, you mean
22  that are referenced in your report?
23    A.    That is correct.
24    Q.    And your report dated June 15, 2010
25  submitted in this case has an appendix with all of

Page 372

1  the documents that you referenced in -- in arriving
2  at your opinions, right?
3    A.    That is correct.
4    Q.    The significant documents, right?
5    A.    That is correct.
6    Q.    And there are -- there are 60 of them;
7  is that right?
8    A.    There are -- whatever that number is,
9  yeah.
10    Q.    I'm looking at page 42, and the last
11  document listed is number 60?
12    A.    Then that's it.  That's correct.
13    Q.    It's a two-page document, appendix B,
14  as in boy, references pages 41 and 42 of your
15  report, lists documents one through 60, right?
16    A.    That's correct.
17    Q.    Okay.  You're handing me -- you're
18  handing me 21 CFR section 211.22 entitled,
19  "Responsibilities of Quality Control Unit; is that
20  right?
21    A.    That is correct.
22    Q.    Who is that directed to?
23    A.    That's directed to the distributor and
24  the manufacturer.
25    Q.    Where -- where do you see that it's --

Page 373

1  it's directed to both the distributor and the
2  manufacturer?
3    A.    It is my understanding based on my
4  experience that that is who it's directed towards,
5  that's what I used as a head of QA as my directive,
6  and it's what I would expect out of a contract
7  manufacturing company, somebody who made product for
8  me.
9    Q.    Let me -- let me just make sure I
10  understand the basis here of your conclusion that 21
11  CFR section 211.22 is directed to both the
12  manufacturer of DIGITEK, Actavis, that had an ANDA
13  approved by the FDA and its distributor, Mylan.  You
14  say you're referring to your own experience?
15    A.    Correct.
16    Q.    As head of QA.  You were head of QA
17  for --
18    A.    Many companies, nine different --
19  eight different companies.
20    Q.    Within the Johnson & Johnson family?
21    A.    Within the Johnson & Johnson family of
22  companies.
23    Q.    Okay.  And were any of those companies
24  distributors of a product?
25    A.    Could you tell me what you are

19 (Pages 370 to 373)

PLAINTIFFS' EXHIBITS 004840

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 374

1  describing as the distributor?  Define that for me,
2  please.
3          Q.    Well, isn't that what we're talking
4  about in this case?
5          A.    Yeah.  But I'd like to understand your
6  understanding.
7          Q.    Mylan -- it's your understanding that
8  Mylan was the distributor of DIGITEK, right?
9          A.    I -- if I can answer your question.
10         Q.    Is it your understanding that Mylan
11  was a distributor of DIGITEK?
12         A.    Yes.
13         Q.    Were any of the eight Johnson &
14  Johnson family companies for whom you were the
15  director of QA distributors of a product
16  manufactured by another company pursuant to an NDA
17  or an ANDA that had been approved by the FDA?
18         A.    I don't recall any.
19         Q.    So you had no experience as a director
20  of QA for a company that was a distributor like
21  Mylan?
22              MS. CARTER:  Object to form.
23         A.    As a head of QA, I do not recall us
24  being a distributor, and I'd have to really think
25  about it.  We're talking about 30 years of

Page 375

1  experience in that regard.  Could you give me a
2  minute?  I'd like to mentally go through the
3  companies I've worked for.
4      BY MR. KAPLAN:
5          Q.    Absolutely.  Because I want -- I want
6  you to have your memory refreshed.  I want you to
7  testify to the best of your ability here today.  I
8  want you to bring all of your experience to bear,
9  and I want the jury to be able to understand --
10         A.    Right.
11         Q.    -- that when I say you, Mr. Kenny, in
12  all of your experience, have never been in the shoes
13  of Mylan as a distributor of a product manufactured
14  by a company like Actavis who is the holder of an
15  ANDA approved by the FDA, I want the jury to
16  understand that you have had no such experience.
17         A.    Okay.
18         Q.    And if that's not correct, you tell me
19  what's correct.
20         A.    Okay.  As the head of QA, I cannot
21  recall a product, as eight years in corporate, I did
22  audit companies, operating companies, that did
23  distribute product, market it, with -- and they did
24  not hold the ANDA or the NDA.
25         Q.    Tell me about your experience.

Page 376

1          A.    I -- for over a period of eight years
2  on and off, I audited probably on average 20
3  companies per year worldwide.
4          Q.    For whom?
5          A.    Johnson & Johnson corporate.
6          Q.    You -- you audited companies who were
7  distributors of Johnson & Johnson products?
8          A.    I -- I audited companies that were
9  similar to Mylan in that they would distribute
10  products that they manufactured and distributed
11  products that were manufactured by another company
12  who either did -- did in some instances hold the NDA
13  or -- but mostly did not hold the ANDA or NDA.
14         Q.    Tell me about -- let's go through the
15  products.
16         A.    I can't recall, sir.
17         Q.    Let's go through the companies.
18         A.    I went to 200 companies.
19         Q.    Well, give me an example of a
20  situation where you audited some company that --
21  that was in a position similar to Mylan distributing
22  a product manufactured by another company, in this
23  case, Actavis, who was the holder of an abbreviated
24  new drug application, ANDA, approved by the FDA.
25  Give me one example.

Page 377

1          A.    I can't recall -- I do know that I had
2  done auditing for Cilag.  I did auditing -- I
3  audited them.  And they were in a position where
4  they had products, and I can't recall what they
5  were, that were manufactured by the holder of an
6  ANDA or an NDA, probably an NDA, but I can't tell
7  you what -- what products they were.  But I did a
8  lot of audits.
9          Q.    You mentioned one company, Cilag?
10         A.    Cilag.
11         Q.    Can you spell that for us?
12         A.    C-I-L-A-G.
13         Q.    Where is Cilag located?
14         A.    Schaffhausen in Switzerland.
15         Q.    Is Cilag subject to FDA regulations in
16  the United States?
17         A.    They do when they export product to
18  the United States.
19         Q.    What did Cilag distribute in the
20  United States?
21         A.    I don't recall.
22         Q.    Did they distribute a product in the
23  United States?
24         A.    Yes, they most certainly did.
25         Q.    But you don't know what product?

20 (Pages 374 to 377)

PLAINTIFFS' EXHIBITS 004841

Page 378

1    A.    I don't recall, sir.
2    Q.    Who manufactured the product?
3    A.    Well, they were the primary
4  manufacturer, but they used contract manufacturers
5  as --
6    Q.    Well, that's a different situation
7  than Mylan, isn't it?
8    A.    No.  I understand, but you --
9    Q.    Isn't it?
10   A.    No.  They did --
11   Q.    Mylan is not the primary manufacturer
12 of DIGITEK, is it?
13   A.    Can I explain?
14   Q.    Is Mylan the primary manufacturer of
15 DIGITEK?
16   A.    They are not.
17   Q.    So if Cilag was the primary
18 manufacturer of some product that you can't
19 remember, it's not an equivocal situation?
20   A.    No, no, no.  No.  Cilag did one of two
21 things, they either were the manufacturer and
22 distributor of the product of which some of those
23 products came to the United States of which when
24 I -- I audited them, I would use current GMP.  They
25 also distributed product that were where the

Page 379

1  holder -- the manufacturer was the holder of an ANDA
2  or an NDA.  And you know, there's others, Janssen
3  Pharmaceutical, even more -- I did more for them
4  than Cilag.
5    Q.    Wait a minute.  You were asked to do a
6  GMP audit of a company called Cilag for your
7  employer, Janssen?
8    A.    Johnson & Johnson.
9    Q.    Is it Janssen?
10   A.    Janssen is another company, a larger
11 company than Cilag.
12   Q.    Did you audit Cilag in your capacity
13 as an employee of Johnson & Johnson?
14   A.    That's correct.
15   Q.    Why?
16   A.    Because it was part of our
17 responsibilities is to audit all companies
18 worldwide.  That was our -- our mission.
19   Q.    Is Cilag a Johnson & Johnson company?
20   A.    Yes, it is.
21   Q.    What -- what -- what products did it
22 distribute?
23   A.    I don't -- I don't recall, sir,
24 anymore.
25   Q.    But you're telling me that Cilag

Page 380

1  distributed products manufactured by non Johnson &
2  Johnson companies?
3    A.    That is correct.
4    Q.    But you don't know what -- what
5  products?
6    A.    I don't recall.
7    Q.    And you don't know -- you don't know
8  what other manufacturers' products Cilag
9  distributed?
10   A.    I do not.  I cannot recall.
11   Q.    And did Cilag have a quality agreement
12 with -- with manufacturers for whom it distributed
13 products?
14   A.    This was in '82.  I don't recall.
15   Q.    Did you ding them if they didn't?
16   A.    Would I ding them?  At that particular
17 point, I probably would not have.
18   Q.    Did they operate under a supply and
19 distribution agreement?
20   A.    The -- I don't recall.
21   Q.    But you went to Switzerland to audit
22 Cilag; is that right?
23   A.    That is correct.
24   Q.    And it's your understanding that Cilag
25 was responsible as a distributor of a product that

Page 381

1  you can't remember for a company, a manufacturer
2  that you can't remember, subject to FDA's good
3  manufacturing practice regulations?
4    A.    I -- in thinking back, I probably
5  didn't ask that question of Cilag or Janssen at that
6  particular point.
7    Q.    What question didn't you ask?
8    A.    I did not ask to see the quality
9  agreement.
10   Q.    Can you give me any other examples of
11 any experience that you've had with a company that
12 you say was in the shoes of Mylan, in other words,
13 being a distributor of a product manufactured by
14 another company, in this instance, Actavis, pursuant
15 to an ANDA approved by the FDA?
16   A.    Janssen Pharmaceutical.
17   Q.    Is another example?
18   A.    Yes, similar to Cilag.
19   Q.    Pardon?
20   A.    Similar to Cilag.
21   Q.    What -- what -- tell me about the
22 Janssen situation.
23   A.    It would be much the same.  I would
24 audit the Janssen headquarters and I -- which is
25 also the -- a manufacturing site.  And I would audit

21 (Pages 378 to 381)

PLAINTIFFS' EXHIBITS 004842

Page 382

1  some of their own manufacturers and some of their
2  contract manufacturers.
3       Q.   When you use the term again, "contract
4  manufacturer," and you use that in conjunction with
5  Janssen, are -- are you telling me that there were
6  instances where Janssen held an NDA or an ANDA and
7  contracted with others to manufacture the product?
8       A.   That is correct.
9       Q.   Is it your understanding that Mylan
10  did not hold the ANDA for DIGITEK?
11      A.   It is my understanding they did not
12  hold the ANDA or NDA.
13      Q.   So that's different than the Jantzen
14  situation?
15      A.   In that particular situation.  But
16  they also -- I'm sorry, I'm answering your
17  questions.  Go ahead.
18      Q.   That's -- that's fine.  Getting back
19  to the CFR that you referred to, what -- what is it
20  here that you say has bearing on Mylan's
21  responsibility?
22      A.   Okay.  Can I read it aloud?
23      Q.   Why don't you first show it to me,
24  show me exactly what it is.
25      A.   (Handing).  Section 22.

Page 383

1       Q.   Were you going to read the highlighted
2  portions?
3       A.   No, the whole thing is actually
4  important.  Basically what it does it tell the
5  reader that there are certain requirements for
6  quality systems that needed to be established and
7  documented, and that's it.
8       Q.   Okay.  Now, are you -- are you
9  familiar with GMPs that are applicable to
10  distributors of outsourced products?
11      A.   The GMPs are applicable to both the
12  distributor and the person who manufactures the
13  product.
14      Q.   Where -- where -- where do you derive
15  that understanding?
16      A.   I derive it from that statement.
17      Q.   From which statement?
18      A.   The quality -- section 22.
19      Q.   "There shall be a quality control unit
20  that shall have the responsibility and authority to
21  approve or reject all components, drug product
22  containers, closures, and processed materials."  Is
23  that the statement?
24      A.   Yes.
25      Q.   And you think that applies to both

Page 384

1  manufacturers and distributors?
2       A.   I know it does.
3       Q.   How do you know that?
4       A.   Because that's the way I was trained.
5       Q.   Can you show me something in -- in the
6  regulations here that says this is applicable to
7  distributors and to manufacturers of products that
8  are approved by the FDA pursuant to an ANDA or an
9  NDA?
10      A.   I am not a legal expert.  I cannot
11  point to that.
12      Q.   So if you are wrong, then, if this
13  only applies to a manufacturer and not a
14  distributor, that would affect your opinion?
15      A.   I am not wrong, but it would.
16      Q.   Are you familiar with the distribution
17  procedures that are set forth in the GMPs?
18      A.   Reasonably familiar, but I always
19  reread them to refamiliarize myself when I have
20  questions.
21      Q.   The regulation that you were referring
22  to is part of section two --
23      A.   Do you want me to give you the
24  specific thing?
25      Q.   Let me just see that.

Page 385

1       A.   Sure.  Let me turn the page for you.
2       Q.   So, you are also familiar with, I take
3  it, 21 CFR 210.1 regarding the status of good
4  manufacturing practice regulations?
5       A.   I have to reread it.
6       Q.   Well, I'll just -- I'll read you
7  section A under section 210.1, and ask you whether
8  you agree with this.  The regulation set forth in
9  this part and in parts 211 through 226 of this
10  chapter, "contain the minimum current good
11  manufacturing practice for methods to be use in and
12  the facilities or controls to be used for the
13  manufacture, processing, packing, or holding of a
14  drug to ensure that such drug meet the requirements
15  of the act as to safety and has the identity and
16  strength and meets the quality and purity
17  characteristics that it purports or is represented
18  to possess."  Does that sound familiar to you?
19      A.   Yes.
20      Q.   Okay.  That's the manufacturer's
21  responsibility, isn't it?
22      A.   That is the manufacturer's or the
23  distributor's responsibilities.
24      Q.   And -- and again, with all due
25  respect, sir, where do you see that that is a

PLAINTIFFS' EXHIBITS 004843

Page 386

1 distributor's responsibility?
2      A.    I did not see that word in there.  It
3 is my understanding that it does include a
4 distributor of the product.
5      Q.    And that understanding is derived from
6 what?
7      A.    From my experience and my training.
8      Q.    In all of the documents you reviewed
9 regarding FDA inspections regarding DIGITEK, did you
10 ever see the FDA inspect Mylan?
11      A.    No, I did not.
12      Q.    Why not?
13      A.    I don't know, you have to ask them.  I
14 don't know.
15      Q.    Well, you have a lot of experience,
16 don't you?
17      A.    I have experience but not as a -- from
18 an FDA standpoint.  And whether they were audited or
19 not, I don't know.  Perhaps they were audited or
20 inspected.
21      Q.    Did you see anything that -- that led
22 you to believe that the FDA was ever critical of
23 Mylan?
24      A.    I didn't see any reference to Mylan
25 where there was criticism.

Page 387

1      Q.    By the FDA?
2      A.    By the FDA.
3      Q.    Okay.  Moving right along with your
4 book here of the Mylan documents that you reviewed
5 or rereviewed since your deposition was initially
6 taken on June 29, 2010, please hand me the next
7 document.
8      A.    This really is -- well, it's basically
9 the same.  Let me show you it to you.  It's an
10 unsigned version of a -- of a similar subject.
11      Q.    It may be in fact exactly the same.
12      A.    It may be.
13      Q.    It bears the Bates number -- it's a
14 one-page document with Bates number MLYN 000032343,
15 which was I believe the second page that was
16 attached to the earlier document, right?
17      A.    I am sure that's right.
18      Q.    Okay.  So, again, there is nothing
19 here that's remarkable to you?
20      A.    Nothing.
21      Q.    Nothing that bears upon your opinion?
22      A.    Correct.
23      Q.    Nothing that you found enlightening?
24      A.    No, nothing enlightening.
25      Q.    Okay.  In all of your experience,

Page 388

1 let's go back to that situation you were describing
2 to me before about a company called Cilag.
3      A.    Cilag.
4      Q.    C-I-L-A-G, and Janssen, were they
5 considered authorized distributors of record?
6      A.    I don't know what legally they were
7 categorized as.
8      Q.    So how would you conduct an audit of
9 those companies without knowing what their legal
10 status or -- or the requirements were?
11      A.    Based upon my training, they were
12 required to meet all aspects of the GMPs, so the
13 compliment of the two companies had to meet every
14 requirement.
15      Q.    Fundamental to your opinions in this
16 case is the legal status of the party involved,
17 right?
18      A.    I'm not sure if it is.
19      Q.    Well, the legal status of the party
20 involved carries with it certain legal requirements,
21 doesn't it?
22      A.    But this is going beyond what I am
23 looking at.  I am looking at, based upon my
24 training, what the expectation is from the FDA and
25 business norms, expected business norms, what the

Page 389

1 control systems that should be in place to meet all
2 aspects and conditions of GMP.
3      Q.    When you refer to "business norms,"
4 what's -- what's the foundation for your arriving
5 at, quote, what "business norms" are?
6      A.    When I review a company and I review
7 for business norms, I would recommend to them
8 perhaps improvement based upon benchmarking other
9 companies.  It wouldn't be an observation, it would
10 be part of continual improvement process.
11      Q.    Just refer me to the underlying
12 documents that establish the business norms in your
13 area of expertise.
14      A.    It would be my informal understanding
15 of best practice.
16      Q.    Is there any document whatsoever that
17 establishes "business norms"?
18      A.    Absolutely nothing.
19      Q.    This is all kind of up in your head,
20 right?
21      A.    When it comes to success models, it is
22 in my head based upon the companies or experience
23 that I've had.
24      Q.    So -- so when you -- so when you use
25 the term and you refer to business norms, that's

PLAINTIFFS' EXHIBITS 004844

Page 390

1  whatever Kenny says the norm shall be?
2      A.  That is what -- in that regard, I
3  wouldn't put it that way, but I understand your
4  question, and I would say, yes, it's based upon
5  my -- it's -- it's much like a consultant going in
6  and saying it does not necessarily violate GMP, but
7  it's a good thing to do.
8      Q.  It is twelve o'clock.  Do you want
9  to --
10     A.  I'll tell you if I'm not holding up
11 well.
12         (Handing.)  This is much the same.
13     Q.  Okay.  You've just handed me another
14 document that you've reviewed or rereviewed since
15 your deposition of June 29, 2010.  And it is a
16 previously marked Exhibit M-7 from the deposition of
17 Susie Wolf that bears Bates numbers MYLN 000032473
18 through 75.  By the way, you did not read the Susie
19 Wolf deposition, did you?
20     A.  Susie Wolf.  I don't recall.  I'd have
21 to -- I did not reread it, perhaps I read it earlier
22 and I found nothing --
23     A.  Wait a minute.  Wait a minute.  In
24 your previous deposition, you said the only Mylan
25 deposition you read was Chuck Koons.  Earlier today

Page 391

1  you said oh, no, no, I was mistaken.  I think I read
2  Mike Adam, and at least I reread Mike Adams.  That's
3  one of the documents here.  And then I said, well,
4  have you read any other Mylan depositions, and you
5  said no.
6      A.  And your question is?
7      Q.  You haven't read any other Mylan
8  depositions, have you?
9      A.  No, I have not read Susie Wolf's
10 deposition.
11     Q.  Is there anything about this document
12 marked Exhibit M7 that you found remarkable?
13     A.  Nothing.
14     Q.  Nothing enlightening?
15     A.  Nothing enlightening.
16     Q.  Nothing that bears on any opinion that
17 you have rendered in this case, right?
18     A.  That is correct.
19     Q.  The next document that you have handed
20 me is marked Exhibit M8.  Also from the deposition
21 of Susie Wolf, with Bates numbers MYLN 000032477
22 through 79.  It looks to me like your handwriting on
23 the front.  It says "done" with a big red checkmark?
24     A.  It just means I've read it.
25     Q.  And then you've got a line through the

Page 392

1  first page, right?
2      A.  Yes.
3      Q.  And what -- what -- and then you put a
4  big checkmark on the second page?
5      A.  Yes.
6      Q.  You have a circle with a question mark
7  on it?
8      A.  I don't know what that meant.  That
9  was reviewed a while back.
10     Q.  So I take it there's nothing about
11 this Exhibit M8 that you found remarkable,
12 enlightening, or had any bearing upon any opinions
13 that you've given in this case?
14     A.  That is correct.  Do you want to see
15 things that I had read that are not --
16     Q.  Well, I want to know what it is that
17 you have done since your deposition was taken on
18 June 29, 2010 by way of research, review, testing,
19 discussions with counsel, anything that you've done
20 that you think, you know, was significant or not
21 significant.  I don't care.  I just want to know
22 what you've done.
23     A.  But if I reread a document to
24 familiarize myself with it, it didn't change
25 anything, you have no interest in looking at it.

Page 393

1      Q.  Unless there was something significant
2  or you learned something or it reinforced --
3      A.  All of these were that.
4      Q.  When you say all of these were, we're
5  getting toward the end here?
6      A.  Yeah.  We head towards the end, it's
7  kind of like anything else, either I have read it,
8  and you know, I understand it, et cetera, and I've
9  factored that in accordingly into my expert opinion
10 or my report.
11     Q.  And if it was really significant, it
12 would be among the 60 documents that you have listed
13 in appendix B to your report of June 15, 2010 as the
14 referenced documents, correct?
15     A.  That is correct.  And -- so that's
16 what we're going through now.  It's kind of the tail
17 ends of this.  That's why --
18     Q.  Okay.  Well, we can do this.  In -- in
19 the tail end of these documents that are in this
20 notebook, is there anything that jumps off the page
21 at you?
22     A.  I really would like to look at it to
23 make sure I can answer that.
24     Q.  Okay.  And you know what I mean by
25 that?

24 (Pages 390 to 393)

PLAINTIFFS' EXHIBITS 004845

Page 394

1    A.    I know exactly what you mean.
2         MS. CARTER:  Do you want him to do
3    that during lunch?
4    A.    It will only take me a couple of
5    minutes.
6         MR. KAPLAN:  Why don't we do that
7    right now, and then we can get through this
8    notebook, and then we'll move on to another
9    subject after lunch.  We'll stay on the
10   record.
11   A.    To answer your consistent question,
12   there is nothing remarkable, and it had no effect,
13   the new documents had no effect on my report.
14   Q.    Okay.  And of these remaining
15   documents, tell me which ones are new to you.
16   A.    Well, a lot of them have to do with
17   UDL.  And again, as I explained, my process was to
18   just print these up.  And so I just -- when in
19   doubt, I printed them, I looked at them.  If there
20   is nothing remarkable, there is zero on it.  If
21   there was something remarkable, there may be a note,
22   even that may have no importance.
23   Q.    Okay.  So there is no either new
24   document pertaining to Mylan that you reviewed since
25   your deposition of June 29, 2010 or any old Mylan

Page 395

1    document that in any way was remarkable to you?
2    A.    There was nothing.
3    Q.    All right.  How about some lunch?
4    A.    Sounds good.
5    Q.    Not here yet.  Okay.  Well, we can
6    take a restroom break and relax a little bit.
7    A.    Do you want to take a short lunch?
8         THE VIDEOGRAPHER:  We're off the
9    record.  The time is --
10        THE WITNESS:  Do you want to continue
11   until lunch.
12   BY MR. KAPLAN:
13   Q.    I'm good to go.  Are you good to go?
14   A.    I'll raise my hand.
15   Q.    Okay.  You raise your hand.  I told
16   you earlier I don't want to put you --
17   A.    It's a challenge.
18   Q.    I don't want to put you through
19   anything unnecessarily.  Okay.  Let's -- let's do
20   this:  Remember at the end of your deposition on
21   June 29, 2010, I simply asked you to make sure that
22   you went through the documents you were requested to
23   bring to your deposition, which you hadn't brought
24   in their entirety the first time around.  And I
25   said, now, I'm going to have a chance to examine

Page 396

1    you, and I want to make sure you bring everything
2    with you?
3    A.    Which I have.
4    Q.    Okay.  So let's go through the
5    documents requested in the amended notice of the
6    video deposition.  This is what we call like a
7    subpoena duces tecum, in other words, the witness is
8    requested to bring these documents.  And you told me
9    you would do that, and now you're telling me you
10   have brought them, right?
11   A.    That is correct.
12   Q.    Okay.  So number one asks for your
13   current curriculum vitae or résumé.
14   A.    Right.
15   Q.    Is there anything -- it's in that
16   report, isn't it?
17   A.    That's it.
18   Q.    And that's it?
19   A.    Yes.
20   Q.    So what -- what is on your CV in the
21   report of June 15, 2010 is accurate, right?
22   A.    That is correct.
23   Q.    And it's up-to-date, right?
24   A.    That is correct.
25   Q.    All right.  We'll -- we'll go through

Page 397

1    some of that --
2    A.    Let me make sure it's up-to-date, sir.
3    Q.    Actually, you say in your report on
4    Page 3, that your complete CV is at appendix A of
5    your report, so that would be on page 37 and 38, 39,
6    40.  So 37 through 40, that is your CV, right?
7    A.    Yes.  And that is a complete CV.  Same
8    as what I brought here (indicating).
9    Q.    Okay.  Number two asks that you bring
10   all correspondence and communication between the
11   witness, you, or anyone acting on the witness'
12   behalf, and attorneys representing plaintiffs in
13   this Digitek litigation.  So have you brought that?
14   A.    Could you repeat that?  I'm sorry.  I
15   was reading.
16   Q.    Okay.  You -- you have had this --
17   A.    I have had that, and I went through it
18   line by line.
19   Q.    And I think Meghan told me you did.  I
20   appreciate you your being conscientious about that.
21   Correspondence and communication between you, the
22   witness, or anyone acting on your behalf.
23   A.    Yes.
24   Q.    And anyone else from SpyGlass or any
25   of your partners or business associates, and

PLAINTIFFS' EXHIBITS 004846

Page 398

1   attorneys representing plaintiffs in this
2   DIGITEK litigation.
3       A.    That's correct.
4       Q.    Okay.  Do you have that
5   correspondence?
6       A.    Oh, yeah.  Oh, I thought you started
7   going through it.  It's going to take me a couple of
8   minutes just to -- I mean, I have three volumes of
9   this stuff.  (Handing.)
10      Q.    Okay.  By the way, you work pretty
11  closely with your colleague, Sal Romano, in this
12  case?
13      A.    I do at times.
14      Q.    You did in this case?
15      A.    Initially I did.
16      Q.    Well, you did up until ten days before
17  you issued your final opinion, didn't you?
18      A.    If that's the date.  I -- perhaps it
19  was ten days.
20      Q.    But you and Sal Romano collaborated on
21  the expert opinions that finally came out under your
22  name, right?
23      A.    Yes.  He was basically a consultant to
24  me, if you will, and then it was determined that --
25  originally we had discussed both of us signing a

Page 399

1   deposition.
2       Q.    Signing the report?
3       A.    Signing the report, rather, and he
4   felt he could not meet the legal schedule and
5   therefore had to -- had to pull back.
6       Q.    But he was your partner in -- in
7   getting to --
8       A.    I wouldn't use the name "partner," but
9   he participated.
10      Q.    He was part of the SpyGlass group?
11      A.    Part of the SpyGlass group.
12      Q.    He has billed for his time?
13      A.    That -- that is correct.
14      Q.    At $430 an hour as well, right?
15      A.    That is correct.
16      Q.    So essentially, the Plaintiff's
17  lawyers got two for one here, right, but charged
18  separately?
19      A.    Or one for two, but yeah.
20      Q.    Yeah.  So between the two of you,
21  that's $860 an hour?
22      A.    When we work -- yeah, right.  If we
23  work together, it would be -- it would add up to
24  that.
25      Q.    $860?

Page 400

1       A.    Yes.
2       Q.    Okay.  And did you bring the -- the
3   correspondence between you and Sal?
4       A.    I brought all of the correspondence
5   between Sal and I, yes.
6       Q.    Oh, did you?  Okay.  Is that in this
7   folder here?
8       A.    That would be in the e-mails.
9       Q.    Okay.  So I have a folder here, and
10  I'm going to ask the court reporter to mark it as
11  Exhibit 110.
12            (Whereupon, Exhibit 110, Folder, was
13            marked for identification as of today's
14            date.)
15  BY MR. KAPLAN:
16      Q.    So this folder labeled "e-mails,"
17  which has been marked as Exhibit 110, contains all
18  the correspondence between you and any of the
19  Plaintiff's lawyers for whom you are working here?
20      A.    That is correct.
21      Q.    And between you and Sal Romano?
22      A.    That is correct.
23      Q.    And who else collaborated on -- on
24  your opinions in this case?
25      A.    Nobody else.

Page 401

1       Q.    You had mentioned another person at
2   the deposition on June 29, 2010 who engaged you or
3   introduced you to the Motley Rice firm.
4       A.    Yeah, John Kowalski.
5       Q.    And who is John Kowalski?
6       A.    I worked with John 30 years ago, 25
7   years ago, and he's -- I think he has his own
8   independent consulting company.
9       Q.    Okay.  What was his role in this case?
10      A.    Giving us a telephone number of who to
11  call.
12      Q.    So he didn't participate
13  substantively?
14      A.    Not in the least bit.  I didn't even
15  talk to him.
16      Q.    And he hasn't billed for any of his
17  work in this case?
18      A.    No, he has not.
19      Q.    Okay.  How about Russ Somma,
20  S-O-M-M-A?
21      A.    Yeah.
22      Q.    Okay.  Was he part of your team?
23      A.    No, he was not part of the group.
24      Q.    Who is Russ Somma?
25      A.    Russ Somma is an independent

26 (Pages 398 to 401)

PLAINTIFFS' EXHIBITS 004847

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 402

1  consultant who is an expert on tableting, among
2  other things.
3       Q.   Well, didn't you recommend to the
4  plaintiff's lawyers in this case that Russ Somma be
5  included as part of the, quote, evaluation team?
6       A.   We recommended -- we offered his name
7  as somebody that based upon our research, was
8  qualified.
9       Q.   And you recommended that Russ Somma be
10  part of the "evaluation team," right?
11       A.   No, I would not say that.  I
12  recommended that they talk to him.  I don't have
13  first-hand --
14       Q.   You did say that, didn't you?
15       A.   What's that?
16       Q.   Well, I'm looking at an e-mail here,
17  and I'm going to show it to you, from SpyGlass
18  Group, Inc., that's you?
19       A.   Yeah.
20       Q.   Dated March 23, 2010 to Meghan Johnson
21  Carter, that's Meghan sitting here, and Sal Romano,
22  with copies to Sandy Summers, Fred Thompson, Pete
23  Miller, and SpyGlass Group, Inc., subject, drug
24  tableting expert.  And it says -- you tell me if I'm
25  wrong -- I'm going to show it to you.  "I recommend

Page 403

1  that you consider Russ Somma as part of the
2  evaluation team."
3       A.   Yes, I said that, I'm sure.  I mean,
4  it's in there, and I did recommend that they
5  consider him, that based upon -- I'm sorry, go
6  ahead.
7       Q.   Go ahead.
8       A.   No.
9       Q.   What else did you want to add?  What
10  happened with Mr. Somma?
11       A.   They engaged him and had a contract
12  with him and they engaged him.
13       Q.   So is he part of the evaluation team?
14       A.   He's not part of any team that I'm a
15  part of.
16       Q.   Well, did he participate in the work
17  that you and Sal Romano did in arriving at opinions
18  in this case?
19       A.   No, zero, absolutely zero.
20       Q.   Mr. Romano is a PhD, is he?
21       A.   That is correct.
22       Q.   And what does he have his PhD in?
23       A.   Analytical chemistry.
24       Q.   And he is the vice president of the
25  SpyGlass Group?

Page 404

1       A.   He's a vice president of the SpyGlass
2  Group, that's his title.
3       Q.   And you are the managing director of
4  the SpyGlass Group?
5       A.   That is correct.
6       Q.   That is a corporation?
7       A.   That is a corporation.
8       Q.   That does work as expert witness in
9  litigation?
10       A.   That does consulting work.
11       Q.   And work as expert witness in
12  litigation?
13       A.   Recently.  Recently.
14       Q.   Actually, the expert witness work is
15  more lucrative than the consulting work?
16       A.   It gets billed at a higher rate when
17  it's billed.
18       Q.   When you worked for Johnson & Johnson,
19  were you paid $430 an hour?
20       A.   No, I was not.
21       Q.   How much were you paid per hour?
22       A.   I don't know.  I made on average a
23  quarter of a million dollars a year.  You figure out
24  per hour what that is since 1990.
25       Q.   It wasn't 430 an hour?

Page 405

1       A.   I have no idea.  I'd have to
2  extrapolate it out.  It was probably 5 cents an hour
3  based upon the number of hours that I worked.
4       Q.   Okay.  So what was Mr. or Dr. -- is it
5  Dr. Romano?
6       A.   Yes.
7       Q.   What was Dr. Romano's role?
8       A.   Originally it was to offer expert
9  opinion.
10       Q.   On what?
11       A.   On this, the case that I worked on
12  that -- that we're discussing today.
13       Q.   Okay.  You have different areas of
14  expertise?
15       A.   Yes, that is correct.
16       Q.   Your expertise you say is in --
17       A.   Quality systems.
18       Q.   Quality systems.  And his expertise is
19  in?
20       A.   His expertise is in the laboratory and
21  in managing a world-class company from a corporate
22  standpoint.
23       Q.   What world-class company did he
24  manage?
25       A.   Johnson & Johnson.  He was the head of

27 (Pages 402 to 405)

PLAINTIFFS' EXHIBITS 004848

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 406

1  quality and compliance services for, I don't know,
2  10 years or so at the company.
3       Q.   What -- what did he contribute to the
4  opinions that you rendered in your report of
5  June 15, 2010?
6       A.   Could you -- can I ask you to rephrase
7  that? And it's an important question. Rephrase it.
8       Q.   I'll have the court reporter to ask it
9  back again and you tell me.
10           (Record read.)
11      A.   Nothing.
12      Q.   Well, what did he bill for?
13      A.   He billed for review, as I billed for
14 review.
15      Q.   What was his review?
16      A.   His review -- he reviewed the same
17 things that I reviewed.
18      Q.   So you worked kind of in double
19 harness?
20      A.   Correct. We were in parallel.
21      Q.   But you didn't find his input helpful
22 to you in arriving at opinions?
23      A.   I found his -- his opinions helpful
24 and that they reinforced what I understood to be the
25 business, and I understood the requirements. He did

Page 407

1  reinforce my opinion. In other words -- yeah,
2  that's it.
3       Q.   What -- what -- what opinion did he
4  reinforce for you?
5       A.   Depends upon the section of the
6  document. He read my report and then we discussed
7  it. As a matter of fact, you have a copy of the
8  report where we met and he read, and you know, he
9  gave me his input. Most of it was typing and
10 spelling kind of thing.
11      Q.   He helped you write the report?
12      A.   He assisted. I would have to say yes,
13 yes.
14      Q.   How did he help you write the report?
15      A.   Well, he participated in it.
16      Q.   Who was the original drafter of the
17 report?
18      A.   I am. I am the drafter. I am the
19 writer. He was a reviewer.
20      Q.   Meghan was a reviewer?
21      A.   No, Meghan didn't review anything.
22      Q.   She didn't?
23      A.   No.
24      Q.   Never did?
25      A.   Oh, yeah. I sent her one copy, I

Page 408

1  don't know, towards June 3rd or something like that.
2  She reviewed a copy on June 3rd, never saw -- never
3  saw a single document other than I flashed in front
4  of them the first document that I was working on,
5  that I was working on.
6       Q.   When you say "I flashed in front of
7  them" --
8       A.   Flashed, meaning we had a meeting,
9  very first meeting --
10      Q.   Who is we?
11      A.   Sal Romano and myself, Pete Miller and
12 Meghan. We had a meeting and they asked me how is
13 it going? And I said fine. And I gave them my
14 approach and I say my approach is very analytical.
15 I don't jump to conclusions, but I logically go
16 through it, and at the end of it, I will make some
17 type of a conclusion. And I showed them what I was
18 working on, I'm taking all of the facts, I'm
19 compiling them, I'm organizing them, which
20 ultimately became the tables or some edits became
21 the tables. And based upon that which was the first
22 draft of my report, then I started adding meat to
23 the report narrative. And at that point, Sal would
24 review the narrative. We met twice.
25      Q.   When was it that you said you -- you

Page 409

1  met with Meghan Carter and Pete Miller to show them
2  your report?
3       A.   I'd have to go through the e-mail, but
4  it -- it should be there.
5       Q.   But -- but you didn't meet with them
6  before your report was finalized?
7       A.   Yes. That is correct.
8       Q.   And they reviewed that report?
9       A.   They did not review the report, they
10 didn't even look at it. They didn't see a word in
11 it, nothing, zero. I had -- I had something right
12 here, I'm explaining, please.
13      Q.   Okay. Sure.
14      A.   This is very important, I understand
15 that. I had a document which is quite similar to
16 the attachments that are in there (indicating),
17 which you have electronic copies of and you have
18 electronic copies of every single change that I made
19 because I was really particular about it, okay? I
20 had that document here (indicating), and they said
21 what -- how are you doing? I said I am reviewing
22 it. I said I'm compiling it. I said here is my
23 approach. Is it -- I asked them if it was logical,
24 and they said sure, go for it.
25      Q.   So they didn't review -- Meghan Carter

28 (Pages 406 to 409)

PLAINTIFFS' EXHIBITS 004849

Mark Kenny, Volume II                            Videotaped                         February 16, 2011

Page 410

1    or Pete Miller did not review your report?
2         A.    Sir, I will answer this again, but
3    it's not necessarily to repeat it.  They looked at
4    no report other than the June 3rd or whatever it
5    was, report, and that was it.
6         Q.    Okay.  So they looked at a report on
7    June 3rd?
8         A.    June 3rd, yeah, or thereabouts.
9         Q.    The Plaintiff's lawyers did?
10        A.    Yes.
11        Q.    They reviewed the report that you gave
12   them on June 3rd?
13        A.    That is correct.
14        Q.    And they had input into your final
15   report, didn't they?
16        A.    They had some wordsmithing assistance.
17        Q.    They -- they gave you direction as to
18   what -- what should be said in the final report?
19        A.    No.  They challenged me, quite
20   honestly.  They challenged me as to whether or
21   not -- they said, remember, and they gave me some
22   rules, if you will, as an expert that all of your
23   opinions have to be based upon facts and data and
24   experience.  And I wanted to make sure that I
25   wasn't, you know, shooting from the hip.  So it was

Page 411

1    really to -- just to make sure I wasn't over
2    extending my -- my expert experience.
3         Q.    They told you that all of your
4    opinions had to be based on facts, data, and what,
5    research?
6         A.    Well, I'm paraphrasing.  They
7    didn't -- we didn't discuss it that way, but the way
8    I interpreted it is that my opinion need to be based
9    upon my expert -- or the experience that I had which
10   would render me a -- an expert witness.  And that --
11   yeah, sorry.
12        Q.    And -- and you got specific direction
13   from the plaintiffs' attorneys as to what should be
14   contained in the report, didn't you?
15        A.    I -- no.  I had some I would say
16   grammar -- Meghan, if I recall, just -- it was
17   grammar.  I don't think there was anything else.
18   And I believe there might have been a discussion
19   with Pete on whether or not I -- that's an expert
20   opinion or is that your opinion?  And I changed, I
21   don't know, a paragraph, two paragraphs, if that,
22   and rephrased it.  I'll give you an example.
23        Q.    You're kind of rambling and -- and
24   you're going beyond the question I asked you.
25        A.    Sure.  Go right ahead.

Page 412

1         Q.    You got substantive input from the
2    Plaintiff's lawyers on what should be contained in
3    your opinion.
4         A.    I would not call that substantive.
5    No, I did not get substantive opinion or direction.
6         Q.    So it's your testimony, then, you got
7    no substantive direction from any of the Plaintiff's
8    lawyers as to what should be contained in your
9    report of June 15, 2010?
10        A.    Yes.  Thank you for phrasing it that
11   way.  Yes, that is correct.
12        Q.    No Plaintiff's lawyer told you
13   anything about what you should say as to Mylan?
14        A.    Absolutely not, zero.
15        Q.    Let's -- why don't we -- why don't we
16   break now.  It's 12:30 and we'll have lunch and
17   we'll come back.
18        THE VIDEOGRAPHER:  We're off the
19   record.  The time is 12:34.  This is the end
20   of tape 2.
21        (Luncheon recess taken.)
22        A F T E R N O O N   S E S S I O N
23             (1:33 p.m.)
24
25        THE VIDEOGRAPHER:  We're back on the

Page 413

1    record.  The time is 1:32.  This is the
2    beginning of tape 3.
3
4    M A R K   G.   K E N N Y, resumed having been
5    previously duly sworn, was examined and testified
6    further as follows:
7
8    EXAMINATION (Cont'd.)
9    BY MR. KAPLAN:
10        Q.    All right.  So we were just asking you
11   about -- I was asking you about the preparation of
12   your report and whether or not you got substantive
13   input and direction from the Plaintiff's lawyers.
14        A.    Uh-huh.
15        Q.    And your answer to that?
16        A.    Absolutely no substantive information,
17   direction, of any sort.
18        Q.    Okay.  And I'm going to ask you
19   whether you got substantive input and direction in
20   the preparation of your report from Sal Romano?
21        A.    No, I did not.
22        Q.    Did not?
23        A.    Did not.  The report is my report.
24        Q.    He had no input into it?
25        A.    We discussed it.  Did he have input

29 (Pages 410 to 413)

Page 414

1 into the report?  No.  Because the report is mine,
2 has to be in my words.  It has to be in my belief
3 system, and that's what is in this report.
4     Q.   Did Mr. Romano give you direction as
5 to things that you should include in your report
6 that you didn't include in previous drafts?
7     A.   Nothing, zero.
8     Q.   And likewise as to the Plaintiff's
9 lawyers, did the Plaintiff's lawyers give you any
10 direction or input as to matters that should be
11 included in your final report that weren't included
12 in previous drafts?
13     A.   No.
14     Q.   And you're sure of that?
15     A.   I'm sure of that.
16     Q.   Let's just -- let's continue marching
17 through the documents that you were requested to
18 bring today and see what we have.  You gave me the
19 correspondence and communication that you have had
20 with the Plaintiff's lawyers and other people with
21 whom you've been working, including Mr. Romano?
22     A.   Correct.
23     Q.   Number 3, all other documents prepared
24 by the attorneys for the plaintiffs and sent to the
25 witness?

Page 415

1     A.   Say that again, sir.
2     Q.   All other documents prepared by the
3 attorneys for the plaintiffs and sent to the
4 witness?
5     A.   Yes, I have -- I need to look through
6 that, but I have the e-mails.
7     Q.   What do you need to look through?
8     A.   I don't know if I threw them all in
9 there or not.
10     Q.   Are they in here or are they not in
11 here?
12     A.   Well, I don't know.  I just want to
13 check.
14     Q.   Okay.  I have flagged some things --
15     A.   Are those all of the e-mails?  If they
16 are all e-mails, then -- because I have a letter, a
17 contract letter, and I think that's pretty much it.
18 Would you like me to --
19     Q.   Just look and see whether other than
20 this file that has been marked as Exhibit 110,
21 whether there are any other documents that you
22 brought with you today that constitute other
23 documents prepared by the attorneys for the
24 plaintiffs and sent to you.
25     A.   You mean -- does that include -- I

Page 416

1 gave you a CD of -- a copy of a CD with documents
2 that were sent to me.  Those were primarily
3 plaintiff documents.  I think all of them may have
4 begin with a P.  You have that copy of that.
5     Q.   You gave me two disks this morning.
6     A.   Correct.
7     Q.   Okay.  And you're saying that any
8 documents that you received from plaintiffs other
9 than the e-mail correspondence would be on -- on
10 those two disks?
11     A.   That's correct.
12     Q.   Okay.
13     A.   Do you want me to look, further look?
14     Q.   Well, we're here today to take your
15 testimony and to make sure that I have in front of
16 me all the items that were requested so that I can
17 ask you questions.
18     A.   (Handing.)
19     Q.   You're handing me a pile of documents
20 here that you are indicating would be responsive to
21 the request for documents prepared by attorneys for
22 the plaintiffs and sent to you?
23     A.   No.  Those are -- those are
24 communications.  I didn't get anything of documents
25 that were prepared by them other than a contract --

Page 417

1 that's it.  That's the only thing that I received.
2     MR. KAPLAN:  Let's mark as Exhibit 111
3 this document.
4     (Whereupon, Exhibit 111, Chronology
5 from disks, was marked for identification as
6 of today's date.)
7 BY MR. KAPLAN:
8     Q.   I will just say for the record that
9 this came from one of the disks that you gave me,
10 and the cover on that says, "Host name:
11 172.17.66.179."  And then user name AMW.  I don't
12 know what that means.  And then job X10000012.XLS,
13 date and time, 2/16/11, 9:49.  Was that -- oh,
14 that's us printing, okay.  All right.  At 9:49 this
15 morning.  It was described as Motley timeline,
16 5/5/2010.
17     A.   Okay.
18     Q.   Does that ring a familiar note to you?
19     A.   I have several versions of this
20 document.
21     Q.   All right.  Identify for the record
22 Exhibit 111.
23     A.   Exhibit 111 does not have a title.  It
24 is -- appears to be or it is, a chronology that I
25 made based upon documents as I saw them.  So I tried

30 (Pages 414 to 417)

PLAINTIFFS' EXHIBITS 004851

Page 418

1  to understand the sequence of events.
2       Q.   Why does it say Motley timeline?
3       A.   Oh, why?  Because it was associated
4  with Motley, it had nothing to do with them.  They
5  did not originate this.  They didn't even see it.
6       Q.   Okay.  Mylan is not mentioned in
7  Exhibit 111, is it?
8       A.   Mylan is not mentioned, that is
9  correct.
10      Q.   From the group of documents that you
11 just gave me, and I'm just going through them for
12 the first time here.  I'm going to mark this, but I
13 want to read this to you and -- and I'm going to ask
14 you about it.  Something I just noted here is an
15 e-mail from Sal Romano to Meghan Johnson Carter with
16 a copy to SpyGlass, that's you, subject Re first
17 draft, and it says, "Meg, Mark and I" -- you're
18 Mark, right?
19      A.   Uh-huh.
20      Q.   "Mark and I were expecting to hear
21 from you today with your edits.  Mark will make the
22 final corrections tomorrow.  Can he e-mail you a
23 copy and send the signed copy at a later date?
24 Thanks, Sal."
25      A.   Right.  That had to do with the --

Page 419

1  with the documents that you've seen, which you have
2  copies of.  So he's talking about the document that
3  I am creating.  See, Sal originally was --
4       Q.   Wait, wait, wait.
5       A.   Sure.  Go ahead.
6       Q.   There's no question pending right now.
7  Okay.  Again, with all due respect, you -- you have
8  to just slow down and answer my question, just my
9  question, okay?
10      A.   I understand.
11      Q.   Okay.  So Sal says on June 14th, the
12 day before you signed the report that you and he
13 were expecting to hear from Meg, who is sitting here
14 today, Meg -- Meghan Carter, the Plaintiff's
15 attorney, to get her edits to your report, right?
16      A.   That's correct.
17      Q.   So does that now refresh your
18 recollection and change your testimony that you gave
19 earlier that you did not get input and direction
20 from the plaintiff's attorney as to the content of
21 your report?
22      A.   No.  I explained earlier that Meghan
23 gave me spelling corrections.  There was no content
24 change as a result of our -- our working together,
25 none, zero.

Page 420

1       Q.   Okay.  So the only thing that -- that
2  the Plaintiff's lawyers did was check your spelling?
3       A.   Yes, basically.
4       Q.   And that's what you were waiting to
5  hear from them with regard to your spelling?
6       A.   No.  That is not -- what I said is not
7  correct with Meghan.  With another conversation, the
8  wording that I had used, they -- they said -- you
9  have to ask yourself a question, whether or not --
10 and I'd have to read the statement, but basically
11 it's -- let me read it.  And this is not part of my
12 vocabulary.
13      Q.   What are you referring to?
14      A.   It is my -- looking in the expert
15 witness, I repeated this phrase many times, looking
16 at page 35, the second paragraph (indicating).
17      Q.   With all due respect, let's go back to
18 my question, because I think you kind of brushed
19 over it.  Let's just repeat the question and then --
20 and then let me have your response.
21           MS. CARTER:  I think he's trying to
22      answer it though.
23      A.   I'm trying to.
24           MR. KAPLAN:  Okay.  Well, let's see.
25      Ask him the question again, and let's see.

Page 421

1           (Record read.)
2       A.   It does not change what I said.
3  BY MR. KAPLAN:
4       Q.   Okay.  That's the only question I
5  asked you.
6       A.   Okay.
7       Q.   And did you tell me that Russell Somma
8  was not involved in the --
9       A.   Russell Somma was -- I was not
10 involved with Russell, the work that he did.
11      Q.   Was he involved with you?
12      A.   Only through an introduction.
13      Q.   Okay.  Well -- and -- and I'm happy to
14 show you this too, but again, in this pile of
15 documents that you just handed me, I see an e-mail
16 from Russell Somma dated May 14, 2010.  That's a
17 month before you submit your final report of
18 June 15, 2010?
19      A.   Right.
20      Q.   To SpyGlass Group, that's you, and to
21 Sal Romano.
22      A.   Okay.
23      Q.   Re meeting with Motley Rice and Pete
24 Miller.  Motley Rice is Meghan, right?
25      A.   Yes.  That was -- that was a -- over

31 (Pages 418 to 421)

PLAINTIFFS' EXHIBITS 004852

Mark Kenny, Volume II							Videotaped							February 16, 2011

Page 422

1  the phone, I believe.
2      Q.    And the e-mail says Mark --
3      A.    I was never with him.
4      Q.    "Mark, Sal, let's do a TC," telephone
5  call, "Saturday, easier for everyone I think.  Plan
6  for 9 a.m. for a half hour, call in."  And it gives
7  the number.  "Speak with you both then, Russ."
8      A.    And it had -- yes.  I don't remember
9  the exact conversation, but I do remember that we
10 talked over the phone.  Actually, I'm not sure that
11 actually happened, but it probably did.
12     Q.    And so you had Russell Somma's input
13 and direction in shaping the expert report of
14 June 15, 2010?
15     A.    Absolutely nothing.  He had no input.
16     Q.    So when Russell Somma says to you in
17 his e-mail of May 12, 2010, "Sal, Mark, met with
18 these folks until nine last night.  I requested some
19 further information and generally reviewed what the
20 expert report will be speaking to.  We need to
21 coordinate our efforts for sure.  Let me know when
22 you guys want to talk."
23     A.    Right.
24     Q.    "We can set up regular meetings for
25 review of progress."

Page 423

1      A.    Right.
2      Q.    What do you think he meant?
3      A.    Originally, we thought that our
4  approach was going to be he takes a certain portion
5  of the operations, and then we don't duplicate that
6  work and do the rest of it.  As it turned out, we
7  had no collaboration whatsoever, zero.  It was -- it
8  was a theoretical model, if you will, that we went
9  into this that, you know, you take the left, I take
10 the center and the right.  And -- and as it turned
11 out, we became -- since he was not part of the
12 SpyGlass Group, I did not want to assume any
13 liability or whatever for what he did, so we became
14 100 percent independent at that point.
15     Q.    So he worked with you up until May 14,
16 2010, and then you cut him loose?
17     A.    No.  We had -- originally, we thought
18 that he would -- no.  To answer your question, no.
19     Q.    Did he work with you up until May 14
20 of 2010?
21     A.    Nothing, zero.  I had one -- I had one
22 interview with him up in Chester or something like
23 that.
24     Q.    What was the interview about?
25     A.    I wanted to see what his credentials

Page 424

1  were.  I wanted to see if he knew what he was
2  talking about.
3      Q.    Well, when he says on May 14 that he
4  requested some further information --
5      A.    I don't know what -- the information I
6  am sure had to do with the scope of his review as
7  opposed to our review.
8      Q.    And then he says "and generally
9  reviewed what the expert report will be speaking
10 to."  What do you mean?
11     A.    Right.  In other words, I know
12 exactly.  That would -- would take -- I knew nothing
13 about the technology of tableting.  I didn't want to
14 offer an opinion at all, zero, I didn't even want to
15 touch it.
16     Q.    And did you?
17     A.    No, of course not.
18     Q.    Okay.
19     A.    But he was.  I wanted to make sure
20 that he's covering that and I'm covering this.  And
21 I don't want him delving in an area that he's not an
22 expert in, okay.
23     Q.    And so when Russell Somma --
24     A.    So we tried -- we tried to set up a
25 line.

Page 425

1      Q.    So when Russell Somma says to you on
2  this is May 12, I think I said May 14th.  It's May
3  12, 2010.  We need to coordinate our efforts?
4      A.    Yes, that's it.
5      Q.    What does that mean to you?
6      A.    It meant using a vin (phonetic)
7  diagram, who's covering what.
8      Q.    And what did you decide?
9      A.    We decided that he covers anything to
10 do with tableting and we would cover everything
11 else.
12     Q.    Is Denise your wife?
13     A.    Yes, she is.
14     Q.    And on April 26, 2010, I see an e-mail
15 here from SpyGlass Group to Meghan Johnson Carter,
16 Re SpyGlass billing, as follows:  "Hi, Meghan, this
17 is to confirm 340 per her for Russ and 430 per hour
18 for SpyGlass."
19     A.    Correct.
20     Q.    What does that mean?
21     A.    That means originally when we talked
22 to Motley -- we -- we did it under the understanding
23 that he would be part of our consulting group.  Much
24 like all other consulting groups, you bring in
25 experts as is necessary.  I had a discussion with

32 (Pages 422 to 425)

PLAINTIFFS' EXHIBITS 004853

Page 426

1  him, and I was feeling more and more uncomfortable
2  about the scenario, so -- but I explained to him, I
3  said there is a loss on our part if you feel that
4  Russ can do the work.  So we negotiated an
5  additional $30 per.  So Russ would do his own thing
6  and we would do our own thing.  So we increased our
7  hourly rate $30.
8      Q.    Sounds like Russ was part of the
9  group?
10     A.    Russ was not part of the group.
11 That's the reason why we got -- we did the split
12 that way.  He was not part of the group.  He never
13 billed.  He's not part of our group in any manner,
14 there is no contract, there's not even an implicit
15 contract, nothing.
16     Q.    Why -- why do you think your wife told
17 Meghan what his hourly rate was?
18     A.    Because -- because originally, the
19 concept was that he would be part of the SpyGlass
20 Group.
21     Q.    Well, this is April 26, 2010.
22     A.    I don't care what date -- the date is
23 immaterial to me.  I am explaining to you what the
24 arrangements were.
25     Q.    Your initial draft report was

Page 427

1  January 1, 2010.
2      A.    It doesn't -- okay.
3      Q.    Right?
4      A.    If it is, yeah, I gave you the report.
5      Q.    I'll guarantee it is, and it's right
6  in front of you.
7      A.    Oh, no, no.  This is not January 2010.
8  This is a place keeper.  This has nothing to do with
9  anything.
10     Q.    So you're looking at your initial
11 draft report, and it's dated January 1, 2010?
12     A.    It's meaningless.  That's a place
13 keeper.
14     Q.    What do you mean by that?
15     A.    I put January -- a place keeper, it's
16 so that I don't forget to put a date.  It's not the
17 date of the report, has nothing to do with --
18     Q.    What is the date of the report?
19     A.    I don't know.  You'd have to -- I
20 don't know what the date of the report is.
21     Q.    Well, look at it and tell me.
22     A.    I can't -- unless I wrote it down, I
23 can't tell you.
24     Q.    Okay.  I -- the only thing I see in
25 writing on your draft report is January 1, 2010.

Page 428

1      You see that?
2      A.    Now I understand some of the lack of
3  understanding.
4      Q.    Do you see January 1 --
5      A.    I could have put -- I could have put
6  January 1949.  It's meaningless.  This is a place
7  keeper.
8      Q.    Okay.  On your -- on your draft report
9  that you have in your hand right now --
10     A.    On every report, I don't put the date
11 until I was ready in the June whatever time frame.
12 That's -- that's when I started dating it because it
13 started making sense to date it.
14     Q.    Did you start dating it January 1,
15 2010 after January 1, 2010?
16     A.    You're going to have to ask that
17 again, please.
18     Q.    Let's go back.  I'm trying to figure
19 out here why it is in April 26 -- on April 26, 2010,
20 your wife, who does the business end of the SpyGlass
21 deal, writes to Meghan saying Russ' rate is 340 an
22 hour.  And all I'm trying to do is establish that
23 looks like Russ was part of the collaborative effort
24 that went into this report.
25     A.    That couldn't be more -- that couldn't

Page 429

1  be more false.  Okay.  And I'm also looking at your
2      Q.    Okay.  And I'm also looking at your
3  draft report, and you look at it too, and you tell
4  the jury what date is on there?
5      A.    It says January 2010, but it is a --
6      Q.    Just a minute.  What date is shown on
7  that report?
8      A.    Excuse me, sir.  January 1st, 2010.
9      Q.    All right.  That's my -- that' all I
10 want you to --
11     A.    Okay.
12     Q.    I see another e-mail among the
13 documents that you gave me here from Sal Romano to
14 Meghan Johnson Carter with copies to Sandy Summers.
15 Who is that?
16     A.    I don't recall.
17     Q.    Fred Thompson, you know Mr. Thompson
18 from Motley, right?
19     A.    Well, I talked to him on the phone
20 once.
21     Q.    And the subject is, "need some files."
22 Sal says: March 17, 2010:  "Meg, I think we had a
23 good meeting with you and Pete Miller on the phone
24 on Monday.  We have a better idea of what you want
25 from us, and we believe we can deliver it to you to

33 (Pages 426 to 429)

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 430

1  your satisfaction."
2      A.    In other words, a complete report.
3      Q.    What "better idea" did you get of what
4  they, the Plaintiff's lawyers, wanted from you?
5      A.    I -- I don't know that I can answer
6  that.  I don't recall.
7      Q.    What is it that you could deliver to
8  the Plaintiff's lawyers to their satisfaction?
9      A.    A comprehensive report because without
10 some direction, having no experience, zero, in this,
11 you know, you're dealing in somewhat of a void.
12     Q.    So you relied upon the plaintiff's
13 lawyers to tell you what they wanted in your report?
14     A.    What their -- what the objective was.
15 What is the objective, which later appeared in my
16 report.
17     Q.    When was it that you were first
18 contacted by the plaintiff's lawyers?
19     A.    I don't have the date, but the e-mail
20 trail would -- would speak to that.
21     Q.    How much have you billed the
22 plaintiff's lawyers to date for the work that you
23 have done?
24     A.    Approximately $90,000.
25     Q.    And how about Sal Romano?

Page 431

1      A.    I'm going to guess, I don't know
2  exactly, but I'm going to guess 20,000.
3      Q.    And how much time do you have that is
4  yet unbilled?
5      A.    How much time, 14 yesterday, four and
6  a half, and today.
7      Q.    That's it?
8      A.    That's it.
9      Q.    Everything else has been billed?
10     A.    Everything else is billed, paid in
11 full.
12     Q.    So you billed approximately 90,000 or
13 exactly 90,000 or 100,000?
14     A.    Within -- I have the numbers over
15 there, but it's 90,000.  I have the records for you.
16     Q.    Okay.  Well, we'll get to that.
17 You -- you and Sal said that the batch records
18 would be critical for you to review?
19     A.    We wanted to see a lot of records,
20 correct.
21     Q.    You and Sal agreed that the batch
22 records would be critical for you to review,
23 correct?
24     A.    Yes.
25     Q.    152 batches were recalled; is that

Page 432

1  right?
2      A.    I'd have to look at the numbers.
3      Q.    Is that approximately, correct?
4      A.    I'm going to assume that it is, it was
5  a lot -- lots.
6      Q.    You only looked at three batch
7  records, didn't you?
8      A.    Those were the only ones that I had
9  available, the only ones that were part of the data
10 base.  You know, you get what you get.  There was a
11 lot of information everybody wants.
12          MR. KAPLAN:  I'm going to mark this as
13     Exhibit 112.
14          (Whereupon, Exhibit 112, E-mail, was
15     marked for identification as of today's
16     date.)
17 BY MR. KAPLAN:
18     Q.    I'm handing you Exhibit 112.  First,
19 look at the e-mail from Sal Romano to you dated
20 February 24 -- I mean from you to Sal, dated
21 February 24, 2010.  You say as follows:  "Sal, the
22 actual batch records are extremely important.  Do
23 you want me to request the information?  Mark."
24 Then above that is an e-mail from Sal dated
25 February 24 to Meghan Johnson Carter saying, "Mark

Page 433

1  and I believe the batch records will be critical for
2  us to review."
3          Do you see that?
4      A.    Yes.
5      Q.    "How many batches are recalled?  Do
6  you have all the batch records as PDF files?  We
7  have lots to read now, but I think we'll have to
8  look at the batch records soon, right?"
9      A.    Yes, that's what it says.
10     Q.    Did you?
11     A.    Did I see additional batch records
12 other than those that I have either here or in the
13 references, no.
14     Q.    You looked at only three batch
15 records?
16     A.    Three -- I believe that's correct,
17 three or four.
18     Q.    You looked at three batch records,
19 didn't you?
20     A.    I would have to add them up, but it's
21 at least three.  Yeah, but let's say three.
22     Q.    That was your sworn testimony on June
23 29, 2010.  Are you changing that testimony?
24     A.    No, I'm not.
25     Q.    All right.  You looked at three batch

34 (Pages 430 to 433)

Page 434

1 records.
2    A.   Okay.
3    Q.   Meghan told you that there are
4 approximately 170 plus batches for Digoxin, right?
5    A.   Yes.
6    Q.   And you looked at three?
7    A.   I looked at three.
8    Q.   But they were critical?
9    A.   They were critical if you wanted to
10 find more exceptions, more issues.
11    Q.   Doesn't say if you wanted to find more
12 issues.  You say they're critical.
13    A.   That's what I said, and I'm telling
14 you what that means.
15    Q.   And you stand by that, don't you?
16    A.   What do I stand by, that I wrote that?
17    Q.   Those are your words, aren't they?
18    A.   I wrote that in an e-mail, that is
19 correct.
20    Q.   Those are your words, are they not?
21    A.   Those are my words.
22    Q.   There were a number of phone
23 conferences with Russell Somma, weren't there?
24    A.   We talked a couple of times.  I don't
25 know the number.

Page 435

1    Q.   Well, I'm looking at another e-mail
2 here dated March 30, 2010 from Russell Somma to you,
3 to Meghan Johnson Carter, to Pete Miller, and to Sal
4 Romano with a copy to Sandy Summers saying, "Mark,
5 Meghan, Sal, and Pete, I will be available for a
6 telephone conference on Monday at 9 a.m. and hope
7 this accommodates everyone's schedule.  Sorry about
8 the delay as I'm traveling right now."
9    A.   Okay.
10    Q.   Does that refresh your recollection
11 that --
12    A.   I don't remember that meeting actually
13 being held, but I'm going to assume it probably was.
14 It was an unmemorable meeting.
15    Q.   Now, Russell Somma has a bachelor of
16 science in pharmacy, doesn't he?
17    A.   If his résumé says that.
18    Q.   And a masters in science and
19 pharmaceutical science?
20    A.   If his resume says that.
21    Q.   And a PhD in pharmaceutical science?
22    A.   If his resume says that.
23    Q.   So you -- you had no idea what his
24 qualifications were?
25    A.   I read that and I received

Page 436

1 recommendation that he knew -- his expertise, and
2 therefore, I wanted to interview him to see how
3 practical, was he a theoretician or did he know what
4 he was talking about.
5    Q.   Did he disagree with the conclusions
6 that you came to?
7    A.   He never saw any conclusions that I
8 came to, not a single piece of paper.
9    Q.   Never heard you say what your
10 conclusions were?
11    A.   No, he did not.
12    Q.   How about Sal's conclusions?
13    A.   You have to talk to Sal, but I don't
14 believe that he talked to Sal outside of
15 conversations that we had.  I'm almost positive.
16    Q.   Who is Denise DeLongas?
17    A.   That's my wife.
18    Q.   Oh, okay.  Sorry.
19    A.   Wonderful lady.
20    Q.   I'm sure.
21    A.   Best of the best.  Can you put that
22 down in the record?
23    Q.   You just did.
24    A.   Excellent.
25    Q.   You just did, and you know what, it

Page 437

1 was Valentine's day Monday, but I think you ought to
2 show it to her now and --
3    A.   We don't go there.
4    Q.   Okay.  On March 23, 2010, you sent an
5 e-mail to Meghan Johnson Carter with copies to Fred
6 Thompson and Pete Miller saying that you would like
7 them to review Russ Somma's qualifications.  And you
8 said, "I recommend you consider Russ Somma as part
9 of the evaluation team."
10    A.   Right.
11    Q.   "Russ has worked very closely with one
12 of the SpyGlass Group's core members.  His
13 credentials are outstanding."
14    A.   Right.
15    Q.   That's what you -- that's what you
16 told the plaintiff's lawyers, and that's what you
17 recommended?
18    A.   Yes.  That's correct.  But his
19 credentials means Bob Sierra's credentials.
20    Q.   Whose credentials?
21    A.   Bob Serra, the gentleman that I talked
22 to about finding an expert.  He said that this --
23 that this guy's the best.  I said great.  Let's
24 talk.
25    Q.   And you recommended him?

35 (Pages 434 to 437)

PLAINTIFFS' EXHIBITS 004856

Page 438

1    A.   I recommended that they consider him,
2  that's what I said.  I can't -- I didn't recommend
3  him because I never worked with him, but I talked to
4  him, he's a bright guy.  He's got great experience,
5  he knows his stuff.
6    Q.   He worked with somebody in the
7  SpyGlass Group?
8    A.   Bob Serra, apparently they have a long
9  term relationship.  I never heard the man's name
10 before, nor did Sal.
11   Q.   As late as June 4, 2010, you and Sal
12 were meeting with the Plaintiff's lawyers?
13   A.   Were meeting what?
14   Q.   With the Plaintiff's lawyers?
15   A.   The Plaintiff's lawyers?  On the
16 phone, we probably discussed things.
17   Q.   How about early Friday morning,
18 June 4th, at the Newark airport?
19   A.   We met.
20   Q.   That wasn't on the phone, that was in
21 person?
22   A.   That was in person, correct.
23   Q.   You -- you met in a hotel conference
24 room there?
25   A.   Yes.

Page 439

1    Q.   Did you forget that?
2    A.   Yes.
3    Q.   And you met to discuss the report?
4    A.   That's correct.
5    Q.   Which Sal told Meghan Johnson Carter
6  on May 28 was in good shape?
7    A.   Okay.
8    Q.   And it's in its fourth draft; is that
9  right?
10   A.   If that's what it says.
11   Q.   He says we.  Doesn't say Mark.
12   A.   That's correct.  He was proofing it.
13   Q.   He says, "We are planning to have it
14 done next week."
15   A.   That's correct.  If it says that, that
16 is correct.
17   Q.   Sounds like he's had a lot of input on
18 this report?
19   A.   He's had no input to the context --
20 content of that report.  None.
21   Q.   Well, what was he billing all of that
22 time for?
23   A.   His review time.  It was redundant.
24   Q.   So you're saying Sal Romano is
25 redundant?

Page 440

1    A.   I'm saying some of the work he looked
2  at and the work he did was redundant.
3    Q.   So when -- when Sal Romano says on
4  May 24, 2010 in an e-mail to Meghan Johnson Carter,
5  "Meg, let's talk about strategy for a moment."
6    A.   I'm sorry.  You have to repeat that.
7  Can I read these?
8    Q.   Just -- just try to answer my
9  questions, okay.  So when -- so when Sal Romano says
10 to Meghan Johnson Carter on May 24, 2010, "Meg,
11 let's talk about strategy for a moment."  And goes
12 on to say, "Mark and I will both sign our SpyGlass
13 report."
14   A.   Right.  That was originally the
15 concept.
16   Q.   Well, it was the concept through the
17 meeting at the Newark airport hotel conference room
18 on June 4, 2010?
19   A.   Okay.
20   Q.   Eleven days later, you submitted the
21 report?
22   A.   Right.
23   Q.   You had a prior meeting, a meeting
24 prior to May 24, 2010 with the plaintiff's lawyers,
25 didn't you?

Page 441

1    A.   A meeting where?  We talked on the
2  phone a few times.
3    Q.   Sal goes on to say in this e-mail of
4  May 24, 2010 to Meghan Johnson Carter, "So if I
5  understood you at our meeting with Pete, you will
6  want to depose both Mark and me."
7    A.   Right.  We met with them twice, one in
8  New York City, one in Newark, and you're referring
9  to both of those meetings.  On and off he referred
10 to them.
11   Q.   He goes on to say on May 24, 2010,
12 "Then should we be doing this on the same day?  If
13 that is the case, then I can't make it on June 24 or
14 25.  I do have free time June 16 and 23.  I don't
15 know about Mark."  The plan was that Sal was going
16 to sign this report along with you?
17   A.   That's correct.
18   Q.   And that Sal was going to be deposed
19 as an expert as well?
20   A.   I assume that is correct.  Well, it
21 depends --
22   Q.   What -- what changed that plan?
23   A.   He couldn't -- he couldn't do it.  He
24 didn't have the -- his schedule would not allow it.
25   Q.   What?

36 (Pages 438 to 441)

PLAINTIFFS' EXHIBITS 004857

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 442

1    A.   His schedule would not allow it.
2    Q.   Well, he says -- he gives dates when
3 he is available.
4    A.   Whatever.  I don't know.  He talked, I
5 assume with them, and the dates, including science
6 day, including some trial date.  There is no way he
7 could possibly make it, so he felt that he couldn't
8 be -- participate any further.
9    Q.   I do have free time, he says, June 16
10 and 23.  That's what he says?
11    A.   I go by what I just said, he cannot
12 give a full commitment, as I could.  I can give a
13 full commitment.
14    Q.   So let me understand this now.  Sal
15 Romano contributed to the report and to the opinions
16 that were expressed in that report, but he was
17 pulled off to avoid his deposition?
18    A.   That is not correct.  That report is
19 my report.  Okay.  Every bit of it is my report.
20 Sal acted as a consultant to me of which I was the
21 one with the experience, not Sal.
22    Q.   Sal, in another e-mail, says, "It was
23 a pleasure meeting" -- to Meg, "It was a pleasure
24 meeting you and Pete in NYC."
25    A.   Yeah.

Page 443

1    Q.   That was a meeting in the city?
2    A.   Right.
3    Q.   "I'm available pretty much from
4 June 16 to 23 for a deposition if they want me."
5    A.   Right.  But he couldn't commit beyond
6 that, and his fear was that he would have to
7 interrupt all of his business and personal plans to
8 continue this -- this project.
9    Q.   You said something about -- well, he
10 also says, "I will be available for the trial dates
11 if needed."
12    A.   I can't tell you what that says.  I
13 can tell you that he felt he could not commit to the
14 time and bowed out.  It could say whatever it says,
15 I don't know.
16    Q.   Well, these aren't my words, these are
17 Sal Romano's words.
18    A.   You have to talk to Sal as to why he
19 felt he could not do it.
20    Q.   And that' what I'm wondering, how in
21 the world am I going to be talking to Sal when he
22 apparently has a role in the report that was
23 rendered on June 15 --
24    MS. CARTER:  Objection.
25

Page 444

1 BY MR. KAPLAN:
2    Q.   -- 2010 but didn't sign that report?
3    A.   It sounds like a rhetorical question.
4 I don't understand your question.
5    Q.   What don't you understand?
6    A.   Well, I didn't -- it sounds like you
7 made a question and then answered it.
8    Q.   I'd love to hear what Sal Romano has
9 to say, but he was pulled off the report, wasn't he?
10    A.   He pulled himself off of it because of
11 a commitment.
12    Q.   When was the last time you talked to
13 Sal Romano about the report?
14    A.   The report?  It was before it was
15 issued.  I didn't talk to him since about this
16 subject.  I've talked to him, but not about this.
17 He had no interest in it.
18    Q.   Okay.  Number four, all documents
19 including documents and deposition transcripts which
20 refer or relate to DIGITEK that the witness received
21 from any source.  You brought all of that?
22    A.   Yes.
23    Q.   Where is it?
24    A.   You -- you have everything.
25    Q.   Where?

Page 445

1    A.   Read it again, just to make sure.
2    Q.   All documents including documents and
3 deposition transcripts which refer or relate to
4 DIGITEK that the witness received from any source?
5    A.   Deposition?  I received nothing.
6    Q.   No, no.  You're focusing on
7 depositions.
8    A.   I need to read that, sir.
9    MR. KAPLAN:  Okay.  Can you put that
10 in front of him, Meghan?
11    (Off-the-record discussion.)
12    Here you are.  We'll just mark this as
13 Exhibit 113.
14    (Whereupon, Exhibit 113, Amended
15    notice for video deposition, was marked for
16    identification as of today's date.)
17 BY MR. KAPLAN:
18    Q.   Just for the record, Exhibit 113 that
19 I've put in front of you is the document that we've
20 been talking about which is the amended notice for
21 your video deposition here today requesting that you
22 bring categories of documents that are listed.  You
23 understand that, right?
24    A.   Oh, certainly.
25    Q.   And you saw it before you came here

37 (Pages 442 to 445)

PLAINTIFFS' EXHIBITS 004858

Page 446

1  today?
2      A.   Yes, I did.
3      Q.   And you have complied with the
4  request?
5      A.   That's correct.
6      Q.   And we're going through to make sure
7  now that -- that you did and that I have everything
8  and that Mr. Anderton has everything.  Okay?
9      A.   Yes.
10     Q.   All right.  So we're at number four.
11 All documents including documents and deposition
12 transcripts which refer or relate to DIGITEK that
13 the witness received from any source.
14     A.   The only depositions I have are the
15 ones that we've talked about, and I have my own
16 deposition.  That's it.
17     Q.   Again, with all due respect, as I said
18 before, you're focusing on the word deposition.
19 Look before that.  All documents including --
20     A.   This is -- this is everything that is
21 here falls underneath that.  There is --
22     Q.   So when you say "everything that is
23 here," and you point to something on the ground?
24     A.   I point to three huge volumes of paper
25 that I've collected and kept together so that when

Page 447

1  this is asked, I can hand it over.
2      A.   That's fine.  And I just -- all I want
3  to do is have that.
4      A.   Yes.  You have it all.  You started
5  looking at it, sir.  I'm sorry.  I'm not trying to
6  be argumentative.
7      Q.   With -- with -- with all due respect,
8  I'm just trying to identify what is responsive to
9  these requests.
10     A.   I understand.  I think that's fair.
11     Q.   All right.  Thank you.  And so I want
12 to mark all of the documents that you pointed to
13 over there that you say are crates or whatever.  I
14 know you -- I know you came up with some --
15     A.   Crates is a better word.
16     Q.   Okay.  Notebooks.  So we can mark
17 those now.  Let's -- let's just do that.
18         MR. KAPLAN:  In fact, we can take a
19     break and -- and we'll mark them.  We'll
20     just take a minute or two.  I just want to
21     make sure we have those marked, they are
22     part of the record.
23         THE VIDEOGRAPHER:  We're off the
24     record.  The time is 2:19.
25         (recess taken.)

Page 448

1          (Whereupon, Exhibits 114-139,
2      documents brought by the Witness in three
3      milk crates, were marked for identification
4      as of today's date.)
5          THE VIDEOGRAPHER:  We're back on the
6      record.  The time is 2:35.
7  BY MR. KAPLAN:
8      Q.   We went off the record so that we
9  could mark as exhibits the documents that you
10 brought with you here today.  The court reporter has
11 marked those documents as exhibits 114 through 139.
12 Does that include everything that you brought with
13 you?
14     A.   Yes.
15     Q.   All right.  And we're going through
16 the list of documents that you were requested to
17 bring pursuant to the amended notice duces tecum for
18 your deposition.  We were on number four, all
19 documents including documents and deposition
20 transcripts which refer or relate to DIGITEK that
21 the witness received from any source.  And those
22 documents are among exhibits 114 through 139, right?
23     A.   All of them are among that, yes.
24     Q.   Okay.  Number 5 asks for all retainer
25 agreements or other agreements under which the

Page 449

1  witness has been or will be paid for work related to
2  the DIGITEK litigation?
3      A.   Okay.  This is a portion of it.
4  There's another folder in there.  Let me give you a
5  portion of it.  Here it is.  Here are all of this
6  (handing).  That -- that's going to be duplicates,
7  by the way.  This should have everything.
8      Q.   By the way, when your deposition was
9  taken on June 29, 2010, you said that 50 percent of
10 the work that you were doing was for the plaintiff's
11 lawyers in this litigation, 50 percent of your total
12 work?
13     A.   Perhaps at that period of time.  It's
14 not -- it is approximately about over 30, less than
15 40 percent.  Because I grossed almost $400,000, so
16 90, at that point, would be 25, so it's less.  But I
17 was getting paid more and more by the end of the
18 year.  I did a lot of assignments.
19     Q.   So you're saying in 2010, you grossed
20 $400,000?
21     A.   Almost, 380,000.
22     Q.   And that your total bills to the
23 plaintiff's lawyers were?
24     A.   Approximately 90.
25     Q.   So about 25 percent of your income?

38 (Pages 446 to 449)

PLAINTIFFS' EXHIBITS 004859

Page 450

1    A.   Yeah.  Right.
2    Q.   In 2010 --
3    A.   Correct.
4    Q.   -- was attributable to work that you
5  did for the Plaintiff's lawyers in this litigation?
6    A.   That's correct.
7    Q.   But you -- you made a distinction in
8  your previous deposition as to the percentage of
9  your income and the amount of your work related to
10 this litigation.  You said 50 percent of your work
11 was related to the DIGITEK litigation?
12   A.   I believe you talked to me up to that
13 point, you said up to that point.  Then I said, well
14 I have all of these promissory notes, I'm going to
15 get contracts, I've got to get paid another 40,000,
16 and you said no, up to that point.  And that's what
17 I answered.
18   Q.   Okay.  Up to June 29, 2010?
19   A.   Yes, that was my guess.  But I also
20 told you I didn't know, and I don't pay attention to
21 it.
22   Q.   Got you.  I do note here on this
23 notebook that you gave me which has been marked as
24 Exhibit 135 which has the label "DIGITEK Motley Rice
25 attorneys at law."  Is that from your shop, from

Page 451

1  your -- from SpyGlass?
2    A.   No.  That's information I received
3  from -- probably I received from Motley.  I had
4  asked for some copies --
5    Q.   Who made this notebook?
6    A.   That was made, I believe -- let me
7  double check and make sure.
8    Q.   Is this -- is this a Spyglass notebook
9  with your --
10   A.   Let me just see it.  I'll tell you by
11 the labeling and whatnot.  This is a SpyGlass
12 notebook.  My wife did this.
13   Q.   Okay.  All right.  And the label on
14 the front?
15   A.   Yeah.
16   Q.   And the handwriting on the front is
17 yours, right?
18   A.   That handwriting is mine.
19   Q.   It says "MK," Mark Kenny, right?
20   A.   Yes.
21   Q.   Legal requirements?
22   A.   Yeah.  That meant that this section of
23 the -- of the request for the documents I think is
24 Number 5.  I tried to put anything that was legally
25 or financially related in there.

Page 452

1    Q.   Okay.  The first page in this notebook
2  marked Exhibit 135 is a note from your wife, Denise,
3  to Meghan Johnson Carter, a message dated -- faxed
4  on May 15, 2010, one month before you submitted your
5  report saying, "Hi, Meghan, time sheets for Mark
6  Kenny and Sal Romano, thanks DD."
7    A.   Right.  That's my wife.
8    Q.   Okay.  That's the same Sal Romano
9  we've been talking about?
10   A.   Yes.
11   Q.   The proofreader?
12   A.   The proofreader.
13   Q.   I don't see anything -- the latest
14 invoice I see is August 24, 2010.  I don't see
15 anything more current than that.  Can you help me?
16   A.   No, that should be it.
17   Q.   August 24, 2010?
18   A.   Yeah, I didn't do any work.
19   Q.   So -- so you haven't billed for any
20 work since August 24, 2010; is that right?
21   A.   That is correct.  If those are the
22 records there.  That is a complete set of records.
23   Q.   I notice that one of the invoices
24 you've produced here, invoice statement number 1032,
25 which was invoiced on June 21, 2010, describes the

Page 453

1  services as consulting experts exhibit review and
2  deposition writing, Sal Romano time sheet,
3  5/11-6/15?
4    A.   Uh-huh.
5    Q.   So Mr. Romano was working with you on
6  the report up until you submitted it on June 15?
7    A.   Yes.  Well, he was up to some point.
8  I don't know, a week or so before, perhaps.
9    Q.   And this is for 26 hours of
10 Mr. Romano's time?
11   A.   Right.
12   Q.   To proofread?
13   A.   To proofread, and he probably tried to
14 do some research.  I don't know.
15   Q.   Twenty-six hours at $430 an hour,
16 total, $11,180?
17   A.   Yes.
18   Q.   And here's an invoice dated May 11,
19 2010 showing Sal Romano time sheets 2/26 to
20 4/2/2010, 14 and a quarter hours, and time sheets
21 from 4/7 to 5/10, 32 hours.  For a total of 18 --
22 $19,460 for his time?
23   A.   Okay.
24   Q.   Well, you tell me, if I just add those
25 two together, 19,000 and 11,000, there's 30,000 for

39 (Pages 450 to 453)

PLAINTIFFS' EXHIBITS 004860

Mark Kenny, Volume II                           Videotaped                           February 16, 2011

Page 454

1  Sal Romano, not 20,000?
2      A.   It could be anything, I don't -- I
3  have nothing to do with billing.  I have nothing to
4  do with those numbers.  Sal puts them in and gives
5  then to Denise.
6      Q.   And that's -- that's all before the
7  $19,460 between February 26 and May 10.  Is that
8  before the first draft of the report?
9      A.   Well, no.  I started drafting the
10 tables.  The tables, remember, I explained that
11 I did -- the tables were the beginning of the
12 report.
13     Q.   I was just confused because the first
14 report I see is dated January 1, 2010, and you tell
15 me it says January 1, 2010, but it doesn't mean
16 January 1, 2010?
17     A.   That is correct.
18     Q.   And I'm still searching for the date
19 of the first draft?
20     A.   I don't know what the date is.
21     Q.   Did you tell the plaintiff's lawyers
22 that Mr. Romano was billing all of this money just
23 to proofread your report?
24     A.   I didn't tell them anything.
25     Q.   Did they have any expectation as to

Page 455

1  what Mr. Romano's role --
2      A.   The original expectation was that it
3  would be a co-authored report.
4      Q.   And -- and would testify by way of
5  deposition as an expert witness?
6      A.   That was the initial expectation.
7      Q.   So you've brought all of the bills
8  that you've sent?
9      A.   Right.
10     Q.   And you said that the only time
11 remaining is the time that you described earlier
12 which was two days before your original 2011
13 deposition was set?
14     A.   Right.
15     Q.   Where you spent one and a half days,
16 14 hours approximately, putting together all of
17 these documents?
18     A.   Correct.
19     Q.   You want to make sure we don't lose,
20 and I understand that.
21     A.   Correct.
22     Q.   And then an additional two hours and
23 then eight hours to review and reread all of the
24 referenced documents, and then another four hours
25 with Meghan yesterday, and then the time today?

Page 456

1      A.   Yes.
2      Q.   So you have somewhere between 30 and
3  40 more hours to bill?
4      A.   You mean including deposition, et
5  cetera?
6      Q.   Yes.
7      A.   If the numbers come out to that.
8      Q.   So somewhere between 12 and 16,000
9  more.
10     A.   Okay.
11     Q.   So that will push you over 100,000?
12     A.   Are we talking about -- for Motley,
13 that's correct.
14     Q.   For Motley as opposed to?
15     A.   As opposed to my other income.
16     Q.   Oh, yeah.  Okay.  But that will push
17 you over $100,000 for your work as an expert witness
18 in this case?
19     A.   That's correct.
20     Q.   And your work as an expert in this
21 case, did you do anything other than review
22 documents?
23     A.   Can you give me an example?  No, no.
24     Q.   Did you do anything other than review
25 documents?

Page 457

1      A.   No, not that I'm aware of, not that I
2  can think of.
3      Q.   All you did as an expert witness was
4  review documents?
5      A.   Yes.
6      Q.   Documents that were sent to you by the
7  Plaintiff's lawyers?
8      A.   Documents that were either sent to me
9  or were available on the Internet from Crivella
10 West.
11     Q.   You did no original work yourself?
12     A.   What does that mean?
13     Q.   I don't know.  Did you do any
14 independent work.
15     A.   No.
16     Q.   In all of the documents that you
17 reviewed, you never saw any conclusion by the FDA
18 that Mylan was not in full compliance with FDA
19 regulations at all times as a wholesale distributor
20 of DIGITEK, did you?
21     A.   I'm sorry.  Let me reread that.  What
22 number is that?  Oh, this is a separate question?
23 I'm sorry.  I thought you were reading from here.
24         MR. KAPLAN:  Let me ask the court
25     reporter to repeat the question.

40 (Pages 454 to 457)

PLAINTIFFS' EXHIBITS 004861

Mark Kenny, Volume II                     Videotaped                      February 16, 2011

Page 458

1              (Record read.)
2       A.    That is correct.  I did not see
3   Mylan's name.
4       Q.    Category seven was the witness' entire
5   file including all electronic documents and
6   correspondence in connection with this matter.  And
7   I think that's among the documents that you've
8   produced including the disks, right?
9       A.    Correct.
10      Q.    Number eight calls for documents that
11  you received or additional materials since June 29,
12  data or writings that you've reviewed or relied
13  upon, et cetera, in preparing reports in this
14  matter.  And I think we've got all of that, don't
15  we?
16      A.    Correct.
17      Q.    Everything -- number nine is
18  everything the witness reviewed that indicates that
19  Plaintiffs suggested effective DIGITEK.
20      A.    I saw nothing.
21      Q.    So you have no opinions on that?
22      A.    Absolutely none.  I have no interest
23  in it.
24      Q.    Okay.  And ten is all notes that the
25  witness has taken in connection with review of this

Page 459

1   matter?
2       A.    I don't take notes.
3       Q.    Other than on the documents?
4       A.    I make the a lot of notes on there.
5       Q.    Occasionally?
6       A.    More than occasionally.  You saw my
7   number of.
8       Q.    But you don't have a separate set of
9   notes chronicling your review of documents?
10      A.    No, absolutely not.
11      Q.    All documents that the witness has
12  prepared concerning the subject matter of this
13  litigation, that's number 11.  Are there any
14  documents that you've prepared other than reports or
15  correspondence?
16      A.    Nothing.
17      Q.    And you've brought all reports, draft
18  reports, that you've prepared?
19      A.    Correct.
20      Q.    At the last deposition, you had your
21  final report of June 15, and one draft report, the
22  one that's in front of you, which appeared to me
23  because I see it on there, to be dated January 1,
24  2010, right?
25      A.    My apologies.

Page 460

1       Q.    At the last deposition, the only
2   reports you had were the draft report in front of
3   you that shows a date of January 1, 2010 and the
4   final report of June 15?
5       A.    Right.  And then I went back into
6   electronic records.
7       Q.    And -- and today, you've brought some
8   additional drafts, right?
9       A.    Correct.
10      Q.    And we'll go over those.  Okay.
11  Number 12, all medical, scientific, or other
12  literature upon which the witness relies in
13  connection with the opinions expressed in the
14  reports.  Is there any medical, scientific, or other
15  literature upon which you are relying?
16      A.    No, not for this report.
17      Q.    That covers those documents.  Okay.
18  Now, let's turn to some other matters.
19            I think you told me, I think this was
20  kind of off the record, but that your process for
21  arriving at your opinions were to construct a time
22  line; is that right?
23      A.    That's correct.
24      Q.    And then prepare tables?
25      A.    Yeah, the tables that are attached to

Page 461

1   the referenced documents.
2       Q.    When -- when you say "tables attached
3   to the referenced documents," can you be more
4   precise in explaining what that is?
5       A.    Well, the table is the referenced --
6   the attachments.
7       Q.    Oh, the attachments to your report?
8       A.    Yes.
9       Q.    Okay.  So you started by creating the
10  time line, and we earlier looked at a time line?
11      A.    Correct.
12      Q.    To give you a sense of the chronology,
13  right?
14      A.    Of space, yes.
15      Q.    And then -- and then that helps you
16  then prepare these tables that are attached as
17  appendices to your report; is that right?
18      A.    That is correct.
19      Q.    So from that information, then, you
20  constructed a rough draft of a report?
21      A.    Correct.
22      Q.    And then you went from there to revise
23  it?
24      A.    Correct.
25      Q.    Okay.  Your role as an expert witness

41 (Pages 458 to 461)

PLAINTIFFS' EXHIBITS 004862

Page 462

1  in this case was to determine whether or not Actavis
2  was in compliance with GMPs over the period 2004 to
3  2009, and to determine whether or not Actavis
4  released products that were violative of GMPs; is
5  that right?
6      A.   That is correct.
7      Q.   Okay.  Take a look at the draft report
8  which is in front of you.  Do you have that?
9      A.   Yes.
10     Q.   Who drafted that report and when?
11     A.   I drafted it.  I don't know the date
12 of it.
13     Q.   What is the date that appears on the
14 document?
15     A.   It says January 1st, but it is not
16 January 1st.  That's a place keeper.
17     Q.   It says January 1st, 2010, right?
18     A.   Yes.
19     Q.   I just honestly don't understand what
20 you mean when you say it wasn't January 1st, 2010,
21 it was just a place keeper.  What does that mean?
22     A.   It's just when I started formatting
23 the document, I said, well, it's got to have a date,
24 and it will be ultimately the date of the report.
25 So I just kept it as January 1st until I knew when I

Page 463

1  was going to issue the report.
2      Q.   Did you do this before or after
3  January 1st, 2010?
4      A.   I have to look at my time line.
5      Q.   You're now looking -- you've asked for
6  and you're looking at Exhibit, for the record, 135?
7          MS. CARTER:  135.
8  BY MR. KAPLAN:
9      Q.   Which are your invoices; is that
10 right?
11     A.   Yes.  It looks like on or about -- I
12 started making some chronology around March.
13     Q.   March of 2010?
14     A.   Yes.
15     Q.   And this is the first version of the
16 report; is that right?
17     A.   That's correct.
18     Q.   You have handwritten notes on this
19 report?
20     A.   Yes.
21     Q.   Does that reflect input that you
22 received from others?
23     A.   It reflects a discussion I had with
24 Sal.  He was across from me, we went through the
25 report.  He read and we discussed, and then I made

Page 464

1  notes.
2      Q.   So this was something more than just
3  proofreading from Sal?
4      A.   It was -- you mean -- describe what
5  you mean by proofreading.
6      Q.   Well, you -- you told me before that
7  Sal's role was strictly to proofread and correct
8  spelling errors?
9      A.   He looked at content and logic.
10     Q.   So he had input then into the
11 substance of the report?
12     A.   To a degree.
13     Q.   And so did the Plaintiff's lawyers?
14     A.   No.
15     Q.   Did you share this draft with the
16 Plaintiff's lawyers?
17     A.   No.
18     Q.   All right.  Look at the first page.
19 In other words, at this point in time, you did your
20 first draft and you kept it from the Plaintiff's
21 lawyers?
22     A.   Correct.
23     Q.   Why?
24     A.   Because I didn't want to show it to
25 them.  I didn't want to get any direction.  This is

Page 465

1  my report, not theirs.
2      Q.   On the first page on the top
3  right-hand corner, it says "second discussion."
4  What does that mean?
5      A.   That means Sal and I had talked about
6  this earlier.
7      Q.   You also have a note on the first page
8  that says, "my experience," two exclamation points?
9      A.   It just means -- I don't know what
10 that means, to be honest with you.
11     Q.   Then you have a note that says simply?
12     A.   "Sampling" -- wait a minute.
13     Q.   "Sampling retained"?
14     A.   "Sampling retained."
15     Q.   What does that mean?
16     A.   I don't know, I honestly don't.
17 Sampling retained?  Could be two different notes.
18 Sampling could refer to the 100 percent inspection
19 sampling.  Retained, did they look at retained
20 product.  That's the only thing I can think of in
21 looking at that note.
22     Q.   So, by time you compiled this draft
23 report, you had -- you had reviewed all of the
24 documents that had been sent to you?
25     A.   You say sent to me.  There was a

PLAINTIFFS' EXHIBITS 004863

Page 466

1  significant amount of information in Crivella West.
2  I tried to take all of the information that I had
3  time to review, and then I also reviewed the CD that
4  you have a copy of which is a duplicate of what's --
5       Q.   Was there any documents -- were there
6  any documents or information that you didn't have at
7  the time that you prepared this first draft report,
8  which we should mark here as Exhibit 140.  So we're
9  going to refer to this as 140.  My question is:  Was
10 there any -- were there any documents or information
11 that you didn't have that you needed to have in
12 order to fully express your opinions?
13      A.   I don't recall.  I would suspect that
14 since I was in the process of continually reading
15 documents that I saw other documents which could
16 have influenced the revision of this.  So this was
17 not a complete -- perhaps complete at this point, I
18 don't recall.
19           (Whereupon, Exhibit 140, first draft
20           report, was marked for identification as of
21           today's date.)
22      Q.   So you saw none one way or the other?
23      A.   I don't know.
24      Q.   Okay.  Underneath "my experience,"
25 would you interpret your notes there for me, read

Page 467

1  them.
2       A.   That I should focus only on my own
3  experience, and I got to constantly go over this
4  based on my experience.
5       Q.   Under that note, "my experience."
6  Only --
7       A.   Oh, only reason recall because --
8       Q.   Admit?
9       A.   Admit by -- I don't know.  I don't
10 know what it says anymore.
11      Q.   Admit by end --
12      A.   I don't know.  I can't read my
13 handwriting.
14      Q.   You can't read your handwriting?
15      A.   No.  I'm a lefty.  You see what my
16 handwriting looks like.
17      Q.   I understand.  We all seem to be able
18 to interpret our own though.
19      A.   Not in that case.  I can't.
20      Q.   You can't do it?
21      A.   No, I can't.
22      Q.   What would make sense to you there?
23      A.   I can't -- I can't help you on that
24 one.
25      Q.   Okay.  So illegible even to the

Page 468

1  author?
2       A.   Correct.
3       Q.   Okay.  Then under that, there is a
4  question mark, and then it says once product sent
5  out?
6       A.   I don't know what that meant, but it
7  meant something to me at the time.
8       Q.   Look on Page 2.  It says intro -- I
9  assume that Sal said you should have an
10 introduction?
11      A.   Well, we discussed it.  It wasn't that
12 Sal -- we discussed it.
13      Q.   And concluded that there should be an
14 introduction?
15      A.   Yes.
16      Q.   And that the summary of the opinions
17 should be moved to the end?
18      A.   Yes, it was kind of out of, you know
19 order.
20      Q.   And then there is a note that says,
21 "make clear"?
22      A.   Where is that?  Oh, make clear -- I
23 don't know.  Make something, format clear, summary
24 clear, I don't recall.
25      Q.   But it was important to have a

Page 469

1  one-page summary of your opinions, right?
2       A.   It sounded like a good idea at the
3  time, yeah.
4       Q.   Well, that's what you ended up with,
5  wasn't it, a one-page summary of your opinions?
6       A.   I believe so, yeah.
7       Q.   On Page 3, there's a note that says
8  "one first recalled, arrow double thick."
9       A.   Right.
10      Q.   What does that mean?
11      A.   Just saying that the first recall was
12 only for double thick.
13      Q.   And then two, you have written
14 "active."  What does that mean?
15      A.   I don't know.
16      Q.   Read -- read your other notes here on
17 page three of your first draft report marked Exhibit
18 140.
19      A.   Systems illustrate more of a systems
20 problem, treatment of evidence, looks like
21 treatment, not exhaustive list, just examples.
22 Forty-three reflects -- reflect fact findings.
23 There are four different investigations associated
24 with something but not by name.
25      Q.   By the way, that first recall that you

43 (Pages 466 to 469)

PLAINTIFFS' EXHIBITS 004864

Page 470

1    noted about double thick, that was as to DIGITEK
2    only, wasn't it?
3         A.   Yes.
4         Q.   You have a note on the left-hand side
5    that says everybody will get asked about?
6         A.   Every -- it's everything.
7         Q.   Will get?
8         A.   Will get asked about.
9         Q.   What does that mean?
10        A.   Meaning that you have to understand
11   what you're writing, make sure that you can
12   substantiate what you're writing.
13        Q.   Did somebody have to tell you that?
14        A.   Reinforce it perhaps, I don't know.
15        Q.   Did Sal tell you that?
16        A.   No, he did not tell me that.
17        Q.   Did you tell yourself that?
18        A.   I told myself that.
19        Q.   Okay.  Then on page 4, you have a
20   note, "qualify background," is that what that is?
21        A.   Yeah.  In other words, introduce
22   earlier what your background is and do a summary of
23   it.  We had looked at some of the -- anyway, that's
24   what that means.
25        Q.   Is that Sal's advice?

Page 471

1         A.   No, I don't think so.
2         Q.   On page five, you have a note that
3    says, "In the body of this report, only the company
4    name Activas will be used."  And then next to it,
5    "Done."
6         A.   Yeah.  What that means is I got up
7    front -- I -- I wanted to make sure that it was
8    clear that I was going to use the term Actavis and
9    not waffle back and forth depending upon the time
10   period, calling it Amide and then calling it Actavis
11   at a later time.  So I wanted to make sure that I
12   defined in the introduction that when I referred to
13   Actavis, I referred to this organization which
14   originally was known as Amide.
15        Q.   And then at the bottom on page five,
16   you have a handwritten note that says, "more detail
17   intro"?
18        A.   Yeah.
19        Q.   What's does that mean?
20        A.   I assumed that we discussed it and
21   that the introduction didn't -- there was not enough
22   in the introduction and that -- helping organize it.
23        Q.   The various other notes are made by
24   you.  I'm going to try to get through this as
25   quickly as a result of your discussion with Sal

Page 472

1    Romano, right?
2         A.   Yes, or myself, or in reviewing it
3    myself.
4         Q.   The draft report, if you look on page
5    28, has references listed, right?
6         A.   Yes, the beginning of references.
7         Q.   Now, nowhere in this draft report is
8    there any opinion with regard to Mylan, is there?
9         A.   In this report?
10        Q.   Well, let's look on Page 2, the
11   summary of your opinion.  Is there anything in there
12   with regard to Mylan?
13        A.   I don't see anything at this
14   particular revision level, no.
15        Q.   So in Exhibit 40, there is no opinion
16   that you expressed as to Mylan?
17        A.   At that particular point, that's
18   correct.  I had not looked at the Mylan documents.
19   I only looked at the plaintiff documents and
20   whatever else is listed.  There were probably more.
21        Q.   On page 20 of your draft report,
22   Exhibit 140 that you're looking at, there is a
23   SpyGlass Group summary.  Do you see that?
24        A.   Yes.
25        Q.   You wrote that?

Page 473

1         A.   Yes.
2         Q.   You started off with, "Actavis
3    demonstrated a general incompetence in the handling
4    of this critical product quality."  Right?
5         A.   Yes.
6         Q.   Then you go on, and you end with the
7    "Actavis environment was not focused on GMP and
8    quality systems."
9         A.   Right.
10        Q.   Not one word as to Mylan?
11        A.   That's correct.
12             MR. KAPLAN:  Let's let him change the
13   tape.
14             THE VIDEOGRAPHER:  We're off the
15   record.  The time is 3:11.  This is the end
16   of tape 3.
17             (Recess taken.)
18             THE VIDEOGRAPHER:  We are back on the
19   record.  The time is 3:16.  This is the
20   beginning of tape 4.
21   BY MR. KAPLAN:
22        Q.   We're looking at your initial draft
23   report marked Exhibit 140 which shows on page 1 a
24   date of January 1, 2010?
25        A.   Yes.

44 (Pages 470 to 473)

PLAINTIFFS' EXHIBITS 004865

Mark Kenny, Volume II                              Videotaped                          February 16, 2011

Page 474

1    Q.    We've gone through the report and
2  looked at notes that you have made, and you said
3  those were based on discussions you had with Sal
4  Romano?
5    A.    Either by myself or with discussions
6  with Sal, yes.
7    Q.    At least two discussions with Sal?
8    A.    Two discussions with Sal, right.
9    Q.    In fact, the notes from also based
10  upon discussions that you had with Meghan Carter and
11  Pete Miller as well?
12    A.    I don't know. Could you explain where
13  they're at, I mean specifically?
14    Q.    I'm asking you; is that right?
15    A.    No, no, not at all.
16    Q.    You are sure about that?
17    A.    I'm positive about that.
18    Q.    You sent a draft to Meghan and Pete,
19  didn't you?
20    A.    No. I did not send a draft to Meghan
21  and Pete.
22    Q.    Are you absolutely certain of that?
23    A.    I'm certain of it, yes.
24    Q.    And when you testified under oath on
25  June 29, 2010 and gave a deposition in this case and

Page 475

1  gave sworn testimony, on Page 215, you were asked by
2  Mr. Moriarty: "To whom did you send this draft,"
3  your answer: "I sent it to Meghan, Sal, and Pete."
4        Question: "Was this a first draft?"
5        Answer: That was a first draft, the
6  draft that they saw, right."
7        Question: "And then in here, there is
8  handwriting. Is it your handwriting?
9        Answer: "All of it is mine."
10        Question: "Is the handwriting based on
11  discussions you had with Plaintiff's counsel about
12  the draft."
13        Answer: "It is based upon two things or
14  three, if you will, one, listening to them;
15  secondly, coming up with ideas as I'm just going
16  through the document, and then later going back and
17  looking at it and making additional edits as I
18  reread it."
19        That was your sworn testimony on June 29,
20  2010, wasn't it?
21    A.    If you said that then, that is my
22  sworn testimony, yes.
23    Q.    You said it?
24    A.    Yeah, I understand that.
25    Q.    And today, you're telling a different

Page 476

1  story?
2    A.    Well, I guess I'm confused. The -- I
3  did have a meeting, I did send it. I didn't think
4  it was this particular revision, because it doesn't
5  look like any of the notes that -- I guess it is. I
6  don't know. I --
7    Q.    You just swore under oath that you did
8  not send the initial draft to Pete and Meghan.
9  That's not true, is it?
10    A.    I'd have to go back through my
11  e-mails.
12        MS. CARTER: Objection.
13    A.    I -- I don't recall -- as of right
14  now, I don't recall sending this revision to Meghan
15  and Pete. I do not recall doing that.
16  BY MR. KAPLAN:
17    Q.    Your sworn testimony when you were
18  deposed on June 29, 2010 was that you did send this
19  draft report to Meghan and Pete, wasn't it?
20    A.    Yes.
21    Q.    Are you telling the truth now or were
22  you telling the truth then?
23    A.    To the best of my recollection right
24  now, I did not send it. I'd have to recreate
25  through e-mails, et cetera. I did send them a copy

Page 477

1  at one point. I thought I recollected that was in
2  June.
3    Q.    Let me show you that testimony that I
4  just quoted and see if there's any doubt in your
5  mind that you said on June 29, 2010 that you sent
6  this draft to Meghan and Pete.
7    A.    June 29th?
8    Q.    That's when you were deposed.
9    A.    No, I understand that.
10    Q.    I'm going to put in front of you your
11  sworn deposition testimony on June 29, 2010, and I
12  will refer you to Page 215 beginning at line 21 and
13  continuing through Page 216 line 17. Do you see it?
14    A.    Just kind of point to it, if you
15  would.
16    Q.    (Indicating.) I'm going to mark --
17  I'm going to mark these lines for you, and ask you
18  to read that testimony. You read that testimony.
19    A.    Okay. Last document I'm holding
20  appears to be a draft for discussion purposes only.
21    Q.    Start again, please, and read slower.
22    A.    Question: "Okay. The last document
23  I'm holding here appears to be a draft for
24  discussion purposes only version of your report; is
25  that correct?

45 (Pages 474 to 477)

PLAINTIFFS' EXHIBITS 004866

Page 478

1    Correct.
2        To whom did you send this draft?
3        I sent it to Meghan, Sal, and Pete.  Was
4  it the first draft?  That was a first draft.
5        The first draft that they saw, right.
6  Right."
7        Q.    That's not a question; that's your
8  statement, isn't it?
9        A.    Yeah, I'm reaffirming it.
10       Q.    The first draft that they saw, right.
11       A.    "And then in here, there is
12  handwriting.  Is it your handwriting.
13       All of it is mine.
14       Is the handwriting based on discussions
15  you had with Plaintiff's counsel about the draft?
16       It's based upon two things or three, if
17  you will, one, listening to them.  Secondly, coming
18  up with ideas as I'm going through the document, and
19  then later going back and looking at and making
20  additional edits as I reread."
21       So, it looks like that my memory is
22  failing me right now that I did send this document
23  to them and discuss it.
24       Q.    So when you denied sending the first
25  draft of the document to Meghan and Pete, that was

Page 479

1  not the truth?
2        A.    That was not accurate.
3        Q.    And when you said that the Plaintiff's
4  lawyers, Pete Miller and Meghan Carter, had no input
5  into your report, that was inaccurate?
6        A.    No.  They had no substantive input
7  into the report.  In other words, the data, the
8  conclusions.  They couldn't because this is my
9  report, my thinking.  I wouldn't allow anybody to
10  persuade me into saying something that was not true.
11       Q.    In your report, this report that we're
12  referring to, Exhibit 140, says not one word about
13  Mylan?
14       A.    That's correct.
15       Q.    In fact, that report, Exhibit 140,
16  says, "In body of this report, only the company name
17  Actavis will be used."  Correct?
18       A.    That is referring to -- yes, that's
19  correct, it does say that.
20       Q.    Somebody told you, gee, Mr. Kenny,
21  we've looked at your report here, your initial
22  draft, Exhibit 140, and you don't say anything about
23  Mylan.  You better add something about Mylan.
24       A.    I was asked a question, have you --
25  have you gone through the Mylan documents?  I said I

Page 480

1  have not gone through the Mylan documents.
2        Q.    Who asked you that question?
3        A.    I believe it was Pete Miller.  He had
4  a question.  And I said I have not gone through it.
5  And he says, well, do you have any opinion.  I said
6  I have to read the Mylan document.  I didn't even
7  open them up.
8        Q.    At this point in time when you got to
9  the point of drafting an opinion that is 35 pages
10  long that you shared with your colleague, Sal
11  Romano, that you shared with Plaintiff's lawyers,
12  Pete Miller and Meghan Carter, you hadn't looked at
13  any Mylan documents?
14       A.    I had not looked at any Mylan
15  documents at that point.
16       Q.    Did you have any idea that Mylan was a
17  defendant in this lawsuit?
18       A.    No, I actually did not.  I didn't know
19  what their role was in terms of the legal situation.
20  I was asked to look at two -- initially asked to
21  look at different things which is in this report.
22  And they had questions, did I look at Mylan, and I
23  said no, I haven't looked at any information
24  regarding Mylan.  And they directed me, it's under
25  Crivella West under so and so tab, et cetera, and I

Page 481

1  went to -- I went to the tab, I started reading it.
2  And I made some conclusions off of the information
3  that I read, but that's the extent of the direction.
4        Q.    In your 35 page draft report, Exhibit
5  140, you mention not one word about Mylan, and
6  others reviewed it and said you better express
7  opinions about Mylan because that's what we want?
8        MS. CARTER:  Objection.
9        A.    No, that's not even remotely close,
10  the way you put it.  They asked me very specifically
11  have you had an opportunity to look at Mylan, and I
12  said no.  They said the Mylan documents are in
13  Crivella West under dot, dot, dot, and -- anyway, so
14  then I took a look at them.
15       BY MR. KAPLAN:
16       Q.    So now you remember a specific
17  conversation with the Plaintiff's lawyers in which
18  they asked you have you looked at the Mylan
19  documents?
20       A.    I thought it was a later discussion.
21  Quite honestly, I thought it was later in perhaps
22  the discussion process.
23       Q.    Until I confronted you with your sworn
24  testimony on pages 215 and 216 of your previous
25  deposition of June 29, 2010, you denied sending this

46 (Pages 478 to 481)

PLAINTIFFS' EXHIBITS 004867

Mark Kenny, Volume II							Videotaped							February 16, 2011

Page 482

1   report to the plaintiff's lawyers?
2        MS. CARTER:  Objection.
3   BY MR. KAPLAN:
4        Q.   Correct?
5        A.   It appears that is correct.
6        Q.   Appears?
7        A.   Yeah.
8        Q.   It is incorrect?  It is correct?
9        A.   No, you're right.  It is incorrect.  I
10  misspoke.  I didn't lie, I misspoke.  You know, in
11  trying to put together the sequence, the chronology,
12  I misspoke.
13       Q.   Let's look at the next draft of your
14  report.
15            (Whereupon, Exhibit 141, Draft of
16       expert opinion report, was marked for
17       identification as of today's date.)
18  BY MR. KAPLAN:
19       Q.   I've put before you Exhibit 141 which
20  is a subsequent draft of your expert opinion report.
21  And I will say for the record, according to the disk
22  that you gave me this morning, it is identified as
23  expert opinion report May 26, 2010.
24       A.   Right.
25       Q.   Is that correct?

Page 483

1        A.   Yes.
2        Q.   Is that your next --
3        A.   My next what?  Sorry, sir?
4        Q.   Pardon?  Is that your next report?
5        A.   No.  This is the prior report.  This
6   looks to me like the prior report.
7        Q.   Prior to?
8        A.   Prior to this report (indicating).
9        Q.   So are you telling me that Exhibit 141
10  was your first report?
11       A.   Yes.  Yes, there's no question.
12       Q.   No question.  How do you know that?
13       A.   Take a look at -- I had a lot of place
14  keepers.  I mean sections that I need to consider.
15       Q.   I'm sorry, tell me how it is that you
16  concluded that Exhibit 141 was drafted before?
17       A.   Well, in quickly looking at it, you
18  know, it looks like this is a more complete document
19  and more filled in than this one.  This one
20  meaning -- okay.  The one document that has all of
21  the (indicating) --
22       Q.   Look at the exhibit number and let's
23  get -- let's be clear on the record.
24       A.   So what's -- what's your question,
25  sir?

Page 484

1        Q.   Exhibit 141, which I've just handed
2   you, is a subsequent draft of your expert report,
3   correct?
4        MS. CARTER:  Objection.
5        A.   No.  This is a -- this precedes -- 141
6   precedes 140.
7   BY MR. KAPLAN:
8        Q.   Okay.  So 140 was a more advanced form
9   of your report?
10       A.   Yes, that's correct.
11       Q.   Okay.  And even though you had an
12  initial -- prepared an initial draft which is 141.
13       A.   Right.
14       Q.   Then you got to 140 when you had time
15  to further review documents, right?
16       A.   Or further review and -- and collect
17  my thoughts.
18       Q.   And think about it, collect your
19  thoughts, be comprehensive?
20       A.   Yes.
21       Q.   And -- and Exhibit 140, the draft
22  report that came after the initial draft report, you
23  said nothing about Mylan, right?
24       A.   That is correct.
25       Q.   Okay.  Well, let's look at 141 which

Page 485

1   you say was your initial draft report; is that
2   right?
3        A.   Yes.
4        Q.   Summary of the opinions is on page 1.
5   And there is nothing, there is no opinion
6   whatsoever, is there, as to Mylan?
7        A.   That is correct.
8        Q.   On Page 2, you state in the
9   introduction that it's not only you but it's Mark
10  Kenny and Salvatore Romano who have been engaged by
11  Motley Rice to prepare an expert report.
12       A.   That is correct.
13       Q.   That you, Mark Kenny, and Salvatore
14  Romano had been engaged to participate in a legal
15  deposition?
16       A.   That is correct.
17       Q.   And that you, Mark Kenny, and
18  Salvatore Romano, have been engaged to testify as an
19  expert witness at trial?
20       A.   Yes.
21       Q.   And then you refer to the expert
22  opinion as "our expert opinion," right?
23       A.   That is correct.
24       Q.   So in the -- in the subsequent draft
25  which is marked as Exhibit 141 -- I'm sorry.

47 (Pages 482 to 485)

PLAINTIFFS' EXHIBITS 004868

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 486

1          In the initial draft, you make it clear
2    that this is going to be a joint report from you and
3    Sal, that you're both going to be experts to testify
4    at deposition and trial?
5          A.    Correct.
6          Q.    And then you pull that idea down in
7    the -- in the second draft which is 141?
8          A.    Correct.
9          Q.    Okay.  To -- to be correct, and make
10   sure that -- if you look at Exhibit 140, which you
11   said was the subsequent draft?
12         A.    Right.
13         Q.    You say in there too on page 5 that
14   it's you and Sal Romano?
15         A.    Right, and his name appears on the
16   front.
17         Q.    Yeah.  So let's look at what you say
18   is your initial report, Exhibit 141, which you
19   agreed says nothing about Mylan in the summary of
20   your opinion, right?
21         A.    Correct.
22         Q.    And that's in -- that's in a black box
23   on the first page, right?
24         A.    Black box?
25         Q.    First page of 141?

Page 487

1          A.    Oh, the box.
2          Q.    Summary of opinion, black box, right?
3    Isn't that right?
4          A.    Yes.
5          Q.    And if you look at page 14 where it
6    says "SpyGlass Group Conclusion."  Do you see that?
7    On Exhibit 141?
8          A.    Yes.
9          Q.    Nothing there pertaining to Mylan, is
10   there?
11         A.    Nothing.
12         Q.    Then look at page 16.  There's a
13   heading, "Overall observations of the quality system
14   at Actavis."  Underneath that, there is a note,
15   "Mark, we need to write a dialogue followed by
16   bullet points on the following."
17         Who do you think that is from?  Would it
18   be Sal Romano?
19         A.    Yes.
20         Q.    So Sal Romano, who you described
21   earlier as somebody who just checked your spelling
22   and was a proofreader, was giving you substantive
23   input as to the content of your report?
24         A.    He attempted to.  He attempted to give
25   me substantive information of which I eliminated all

Page 488

1    of it because I -- because I wanted input only into
2    spelling, format, completeness.
3          Q.    So you threw out what his input as to
4    substantive content of your report?
5          A.    Well, it was not substantive comment.
6    It was -- I had no interest in it.
7          Q.    Okay.
8          A.    Because I was the one that was going
9    to write the report and I was the one that was going
10   to testify, not him.
11         Q.    Exactly.  So on page 16 of the initial
12   draft report marked Exhibit 141, when Sal Romano
13   said to you, "We need to write a dialogue followed
14   by bullet points on the following," and if you look
15   down to the fifth and sixth bullet points or the
16   fifth bullet point, it says, "Mylan was negligent in
17   controlling its contractor, Actavis.  Lack of
18   visits, audits, and follow-up.  That was his
19   direction to you, right?  Incorporate that in a
20   bullet point.  He told you to do that, didn't he?
21         MS. CARTER:  Objection.
22         A.    I need to read it, sir.
23   BY MR. KAPLAN:
24         Q.    Do you see the fifth bullet point?
25         A.    Yes, sir.

Page 489

1          Q.    That is Sal telling you to put this
2    bullet point in saying Mylan was negligent in
3    controlling its contractor, Actavis, lack of visits,
4    audit, and follow-ups.  That's what it says, isn't
5    it?
6          A.    Yes.
7          Q.    But when you prepared the subsequent
8    report marked Exhibit 140, you rejected that and
9    didn't include such a bullet point, did you?
10         A.    At that point, I did not include it,
11   that's correct, because I threw out basically
12   anything that he told me.
13         Q.    Well, if you look at Page 18 of your
14   final report dated June 15, 2010, you didn't reject
15   his first bullet point, did you?  Do you have your
16   final report in front of you?
17         A.    Yes.
18         Q.    You accepted some things he told you
19   and you rejected others.  Right?
20         MS. CARTER:  Objection.
21   BY MR. KAPLAN:
22         Q.    Are you looking on Page 18 of your
23   final report?
24         A.    That is correct.  That is correct
25   in -- could you ask the question --

48 (Pages 486 to 489)

PLAINTIFFS' EXHIBITS 004869

Mark Kenny, Volume II                      Videotaped                      February 16, 2011

Page 490

1      Q.   Did you say that the corporate culture
2   was production at any cost and ignore the quality
3   systems?
4      A.   Did I say that?  No, these were --
5   these were Sal's ideas.
6      Q.   And did you incorporate that on Page
7   18 of your final report?
8      A.   Some of the information I did
9   incorporate after review of the documents.
10     Q.   Specifically, I'm looking at the first
11  bullet point and asking you whether you accepted
12  Sal's direction as to the substantive content of
13  your final report when he suggested that you say,
14  "the corporate culture was production at any cost
15  and ignore the quality systems."  You said that as
16  to Actavis, didn't you?
17        MS. CARTER:  Objection.
18     A.   Yes.
19  BY MR. KAPLAN:
20     Q.   So you accepted that?
21     A.   I accepted it because I agreed with
22  it.
23     Q.   Okay.  And then look on the second and
24  third bullet points, page 14 of your final report,
25  includes his suggestions that you say that "Actavis'

Page 491

1   corporate and QA management was weak and not
2   knowledgeable of the CGMP."  You said that in your
3   final report, didn't you?
4      A.   Not in my final report.
5      Q.   Okay.  Look on page 14, the last
6   paragraph, you make the statement, "It is my opinion
7   to a reasonable degree of certainty that corporate
8   and QA management were not knowledgeable of the
9   CGMP."
10     A.   Yeah.  I didn't say anything about
11  weak.  Those are not terms that I would use.
12     Q.   So we're going to parse out the word
13  "weak"?
14     A.   No, it's an important word.
15     Q.   Okay.  But you did follow the
16  suggestion to include the statement that "Actavis'
17  corporate and QA management were not knowledgeable
18  of the CGMP."  Except to that, right?
19        MS. CARTER:  Objection.
20     A.   I accepted that because it agreed
21  with --
22  BY MR. KAPLAN:
23     Q.   Same with -- same with the next bullet
24  point.  With regard to Sal's direction as to the
25  substantive content of your report telling you that

Page 492

1   you should say that many drug products were made and
2   sold without approved NDAs/ANDA showing arrogance or
3   a complete lack of knowledge of regulatory
4   requirements?
5      A.   I never did anything with that --
6        MS. CARTER:  Objection.
7      A.   Ultimately.
8   BY MR. KAPLAN:
9      Q.   Look at your final report, page 14.
10  Your final report is Exhibit 38.  Do you have that
11  in front of you?  Page 14.  Look at the last full
12  paragraph.  You parrot Sal Romano's words that say
13  "Additionally, there was a lack of understanding of
14  the regulatory approval process since many drug
15  products were made and sold without approved
16  NDA/ANDAs."  Right?
17        MS. CARTER:  Objection.
18     A.   I don't recall, to be honest with you.
19  BY MR. KAPLAN:
20     Q.   Well, just look at -- look at the
21  words.  You don't have to recall anything, you just
22  have to look at page 14.
23     A.   Fourteen, which bullet?
24     Q.   Page 14 of your final report, Exhibit
25  38?

Page 493

1      A.   Which bullet?
2      Q.   There's no bullet.  It's Exhibit 38.
3      A.   Oh, here, yeah.  So I understand, I
4   want to read what you're saying that I parroted.
5      Q.   You parroted these words, "many drug
6   products were made and sold without approved
7   NDAs/ANDAs," I think you eliminated the words
8   "showing arrogance."  But then you used "evidencing
9   a complete lack of knowledge or regulatory
10  requirements."
11        MS. CARTER:  He's on the wrong page on
12      that one.
13  BY MR. KAPLAN:
14     Q.   Are you on page 14 of Exhibit 38,
15  your final report dated June 15, 2010?
16     A.   Yes, but I'm on the wrong page when it
17  comes to this, I guess (indicating).
18     Q.   Look on page 16 of your initial draft
19  report.
20        MR. ANDERTON:  Exhibit 141.
21  BY MR. KAPLAN:
22     Q.   Yes.  Where Sal Romano is giving you
23  direction on the content of the report?
24        MS. CARTER:  Objection.
25     A.   Okay.  Could you please show me?  I'm

49 (Pages 490 to 493)

PLAINTIFFS' EXHIBITS 004870

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 494

1  looking at page 16.
2       MR. ANDERTON:  You're on Exhibit 140,
3  go to 141, Page 16 of Exhibit 141.
4       A.   Got it.
5       MR. ANDERTON:  Look at the third
6  bullet point.
7       A.   And your question is?  One more time
8  so I understand it.
9  BY MR. KAPLAN:
10      Q.   That's fine.  Let's go through it.
11      A.   Sure.
12      Q.   If you're looking at page 16 of
13  Exhibit 141 where Sal Romano is giving you direction
14  as to the suggested content of the expert report to
15  be submitted in this case, in the third bullet
16  point, he says that you need to say the following:
17  "Many drug products were made and sold without
18  approved NDA/ANDA showing arrogance or a complete
19  lack of knowledge of regulatory requirements."
20      He's suggesting that you say that as to
21  Actavis, right?
22      MS. CARTER:  Objection.
23      A.   He's saying that that's his opinion.
24  BY MR. KAPLAN:
25      Q.   Right.  And then in your final report

Page 495

1  which is Exhibit 38, on page 14, you say as follows:
2  "Apparently, there was a lack of understanding of
3  the regulatory approval process since many drug
4  products were made and sold without approved
5  NDA/ANDAs," citing footnote ten.  Isn't that what
6  you said --
7       A.   Yes.
8       Q.   -- in your final report?
9       A.   That is in my final report.
10      Q.   So you followed the direction of Sal
11  Romano as to the substantive content of your final
12  report on that issue, didn't you?
13      MS. CARTER:  Objection.
14      A.   I agreed with Sal.  I did not follow
15  his direction.  There's a big difference.
16  BY MR. KAPLAN:
17      Q.   You adopted Sal's characterization
18  that Actavis demonstrated or showed arrogance,
19  right?
20      MS. CARTER:  Objection.
21      A.   Sal?
22  BY MR. KAPLAN:
23      Q.   Look at the fourth bullet point on
24  page 16 of Exhibit 141 where Sal Romano is saying to
25  you, "We need to write a dialogue followed by bullet

Page 496

1  points on the following," and the third bullet
2  point, he uses the term "showing arrogance"?
3       A.   Right.
4       Q.   And you -- you adopted those words,
5  didn't you, in your final report on page 14?
6       A.   I wrote similar content.  I didn't
7  write -- I didn't write the same words, I'm sure.
8       Q.   Quote, page 14 of your report June 15,
9  2010, Exhibit 38, "It is my opinion to a reasonable
10  degree of certainty that they" -- meaning Actavis --
11  were highly resistant to systematic change,
12  appearing sure that minor improvements would resolve
13  all of their issues.  This was a flawed strategy.
14  Their arrogance resulted in managing a drug company
15  that operated at a high risk level."  Correct?
16      A.   Correct what?
17      Q.   Isn't that what you said?
18      A.   That's what I said.
19      Q.   You followed Sal's direction as to the
20  content of your report?
21      MS. CARTER:  Objection.
22  BY MR. KAPLAN:
23      Q.   Didn't you?
24      A.   We had -- we had discussions.  Sal did
25  not direct me, nobody directs me.  We had technical,

Page 497

1  if you will, professional discussions.  From that, I
2  made conclusions.  It's that simple.  I was being
3  respectful at that point.
4       Q.   So you were being respectful by
5  including what Sal told you to say in your final
6  report?
7       A.   I was being respectful and listening
8  to him.
9       MS. CARTER:  Objection.
10  BY MR. KAPLAN:
11      Q.   And adopting --
12      A.   No.  I was not being respectful and
13  adopting, I was being -- if I agreed with it, I
14  wouldn't put it in.  If I didn't agree with it, I
15  would not put it in.
16      Q.   Let's look again at Exhibit 141 on
17  Page 16.  This is your initial draft report in this
18  case.  You see the heading review of "Actavis GMP
19  compliance history-all products"?
20      A.   Yes.
21      Q.   Below that in parenthesis is a note
22  from Sal Romano to you?
23      A.   Right.
24      Q.   "Mark, dot dot dot, I have added your
25  stuff on GMP.  Please add some dialogue, dot dot

Rennillo Deposition & Discovery - A Veritext Company

216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)

PLAINTIFFS' EXHIBITS 004871

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 498

1   dot.  I do not see -- I did not do a good fit of all
2   of your tables into this dock, exclamation point.
3   Maybe the table details should be as an attachment?
4   I think the following section on DIGITEK is good,
5   dot dot dot.  Can you get this section in the same
6   bullet format?"  And then the following section is
7   "SpyGlass Group conclusion result of FDA
8   documentation."  Do you see that?
9        A.    Yes.
10       Q.    Would you agree that this is further
11  evidence that Sal Romano gave you direction as to
12  the substantive content of your final expert report
13  and opinions in this case?
14       A.    Absolutely not.  I would say that he
15  assisted in trying to help me organize it.  Going
16  through and reviewing it and trying to make it into
17  a highly organized report and understandable.
18       Q.    Sounds like he was more than a spell
19  checker or proofreader, doesn't it?
20       A.    Helped me organize.
21       Q.    Now -- now he's spell checker,
22  proofreader, and organizer?
23       A.    Yeah.  I mean, I guess I would say
24  yes.
25       Q.    So I don't have any other draft

Page 499

1   reports.  I have exhibit 141 which were just talking
2   about which you told me is the initial draft report.
3   I have Exhibit 140 which you told me is the next
4   draft report?
5        A.    Right.
6        Q.    And then I have your final report
7   dated June 15, 2010?
8        A.    Right.
9        Q.    Are there any others?
10       A.    No.
11       Q.    Mylan's role was that of an authorized
12  distributor of record and wholesale distributor,
13  correct?
14       A.    Correct.
15       Q.    Under 21CFR 203.3, an authorized
16  distributor of record means the distributor with
17  whom a manufacturer has established an ongoing
18  relationship to distribute such manufacturer's
19  products, correct?
20       A.    Okay.  If you say -- I'm not familiar
21  with that phraseology.
22       Q.    Would you like me to show you that
23  regulation?
24       A.    Surely.
25              (Whereupon, Exhibit 142, Regulation,

Page 500

1   was marked for identification as of today's
2   date.)
3   BY MR. KAPLAN:
4        Q.    I'm going to hand you what we've
5   marked as Exhibit 142, which is 21CFR section 203.3,
6   subparagraph B, defines authorized distributor of
7   record.  And I want you to take a look at that and
8   then read that into the record as soon as she marks
9   it.
10       A.    And that's what number?
11       Q.    203.3b, as in boy, where it says
12  "authorized distributor of record."  Do you see
13  that?
14       A.    203.
15       Q.    Point 3, subparagraph B.  What does it
16  say?
17       A.    "Authorized distributor, distributor
18  of record."
19       Q.    Read it.
20       A.    "Authorized distributor of record
21  means a distributor with whom a manufacturer has
22  established an ongoing relationship to distribute
23  such manufacturers' products."
24       Q.    So Mylan was an authorized distributor
25  of record?

Page 501

1        A.    I don't know that term.
2        Q.    Well, you see it, I've just showed it
3   to you.
4        A.    I see it, but I don't know the context
5   of this, and I am not the right person to give an
6   interpretation of the meaning of that.
7        Q.    Isn't it important to you, fundamental
8   to your opinions in this case, to know what Mylan's
9   legal status and responsibility was?
10       A.    I don't know if it's important or not,
11  sir.
12       Q.    Well, you can't make up something
13  about their -- their legal duties and
14  responsibilities, can you?
15       A.    I'm sorry?
16       Q.    It's not Kenny on the law, it's what
17  the law is?
18       A.    Correct.  And the law is good
19  manufacturing practices, of which I understand
20  fully.
21       Q.    I move to strike that because that
22  really makes no sense.
23             MS. CARTER:  Objection.
24  BY MR. KAPLAN:
25       Q.    Look at 21CFC 203.3, Exhibit 142,

51 (Pages 498 to 501)

PLAINTIFFS' EXHIBITS 004872

Page 502

1  subparagraph D, defining wholesale distributor, and
2  tell me if you agree that Mylan is not only -- is
3  both an authorized distributor of record and a
4  wholesale distributor according to the code of
5  federal regulations?
6      A.   You said 203.3D, the next page?
7      Q.   Double D.
8      A.   Double D.
9      Q.   Do you see that?  Do you want to read
10  that?
11     A.   "Wholesale distributor means any
12  person engaged in the wholesale distribution of a
13  prescription drugs -- I beg your pardon --
14  prescription drugs, including but not limited to
15  manufacturers, repackagers, own label distributors,
16  private label distributors, jobbers, brokers,
17  warehouse, including manufacturers and distributors'
18  warehouses, chain drug warehouses, and wholesale
19  drug warehouses, independent wholesale drug traders,
20  and retail pharmacies that conduct wholesale
21  distribution."
22     Q.   Does that help you with respect to
23  understanding Mylan's role in this case?
24     A.   No, it doesn't.  I would have to --
25     Q.   Just yes or no.

Page 503

1      A.   No, it does not.
2      Q.   Are you aware of any regulation that
3  places a responsibility for compliance with
4  manufacturing GMPs on a wholesale distributor?
5      A.   I'm not aware.
6      Q.   Are you aware of any regulation that
7  requires wholesale distributors to establish quality
8  agreements with manufacturers or suppliers?
9      A.   Regulation?  I understand the certain
10  sections of the GMP and what the expectations and
11  requirements of the FDA are.
12     Q.   Are you aware -- I'm going to ask you
13  the question again.  Are you aware of any regulation
14  that requires wholesale distributors to establish
15  quality agreements with manufacturers?
16     A.   Yes.
17     Q.   Show me the --
18     A.   I would show you the paragraph 22 of
19  21011122 where it talks about quality systems, and I
20  would interpret that to --
21     Q.   Just -- just tell me what you refer
22  to, what you rely on?
23     A.   I have to pull the GMP again.  We
24  talked about it earlier.
25     Q.   Give me -- give me the GMP that you're

Page 504

1  talking about.  I want you to show me in there where
2  it -- where it says that a wholesale distributor
3  must establish a quality agreement with a
4  manufacturer.
5      A.   Okay.  I would interpret --
6      Q.   Just show me the language that says a
7  wholesale distributor must establish a quality
8  agreement with a manufacturer.  Just read the
9  language there.
10     A.   It does not say -- use the word
11  quality agreement.
12     Q.   Thank you.  And that regulation that
13  you have before you which has been previously marked
14  I believe as exhibit --
15          MS. CARTER:  I think it's Plaintiff's
16     49.
17  BY MR. KAPLAN:
18     Q.   Plaintiff's 49, is that included among
19  the documents that you relied upon in rendering your
20  opinions in this case which are contained in your
21  report of June 15, 2010?
22     A.   Yes, it is.
23     Q.   And where does that appear on the list
24  of references?
25     A.   It's the second one, number two.

Page 505

1      Q.   Okay.  That cites the entire 21CFR
2  part 210 and 21CFR part 211.
3      A.   Right.  So I did not specify what
4  sections within that.
5      Q.   And this is the precise regulation you
6  are relying upon, right?
7      A.   That is correct.
8      Q.   Which says nothing about a quality
9  agreement?
10     A.   It does not use those words.
11     Q.   Thank you.  Are you aware of any
12  regulations that requires wholesale distributors to
13  audit manufacturing companies?
14     A.   I'm aware of the requirements of GMP
15  which is to select, qualify, and monitor your
16  suppliers of which that would -- in Mylan's case
17  would include Actavis.
18     Q.   Are you aware, I'm going to ask you
19  again, of any regulation that requires a wholesale
20  distributor to audit a manufacturing company?
21     A.   Using those specific terms, no.
22     Q.   Are you aware of any regulation or law
23  that gives wholesale distributors the right to
24  inspect manufacturers for CGMP compliance?
25     A.   No.

PLAINTIFFS' EXHIBITS 004873

Mark Kenny, Volume II                        Videotaped                         February 16, 2011

Page 506

1      Q.   Are you aware of any regulation that
2  requires a wholesale distributor to require a
3  certificate of analysis or certificate of
4  conformance from a manufacturer for finished
5  packaged product?
6      A.   As stated, no.
7      Q.   Are you aware of any regulation that
8  requires a wholesale distributor to perform periodic
9  chemical analysis of finished product purchased from
10 a manufacturer?
11     A.   You're going to have to repeat that.
12     Q.   Are you aware of any regulation that
13 requires a wholesale distributor to perform periodic
14 chemical analyses of finished product purchased from
15 a manufacturer?
16     A.   In the regulations, it does not state
17 that specifically.
18     Q.   Your final report in this case dated
19 June 15, 2010, previously marked as Exhibit 38, is a
20 lengthy one, isn't it?
21     A.   It is the number of pages it is.
22     Q.   The last numbered page is 50.  Is that
23 correct?
24     A.   Yes, it is.
25     Q.   Less than a page of those 50 pages is

Page 507

1  devoted to any discussion about Mylan, isn't it?
2      A.   I believe that is correct, yes.
3      Q.   You assumed that Mylan was the holder
4  of the ANDA?
5      A.   No, I never assumed that.
6      Q.   So you know that Mylan was not the
7  ANDA holder for DIGITEK?
8      A.   That's correct, I knew that.
9      Q.   And you know that Mylan was not the
10 manufacturer of DIGITEK?
11     A.   They did not produce the product,
12 that's correct.
13     Q.   Let me state it again.  You know that
14 Mylan was not the manufacturer of DIGITEK?
15     A.   That Mylan was not the manufacturer,
16 correct.
17     Q.   Explain the basis for your assumption
18 that Mylan is required by GMP to investigate all
19 complaints as stated in -- on page 33 of your final
20 report dated June 15, 2010 previously marked as
21 Exhibit 38?
22     A.   If I recall correctly, which I think I
23 do, the supply agreements stated that Mylan would
24 handle complaints which was a good thing that it was
25 stated.  The -- since they took ownership of

Page 508

1  complaint handling, they needed to do it in
2  accordance to good manufacturing practice and in
3  cooperation with the manufacturer.
4      Q.   So you've read the supply and
5  distribution agreement?
6      A.   Yes.
7      Q.   And -- and you agree with me that it
8  has provisions in there about complaint handling?
9      A.   Yes, I believe it does.
10     Q.   Whose responsibility do you think it
11 was to handle the complaints?
12     A.   I'm sorry.
13     Q.   Whose responsibility do you think it
14 was to handle the complaints?
15     A.   Well, there's -- there's a lot of
16 functions associated with complaints.  The -- the
17 receipt of the complaints, the records of the
18 complaints, would side in two spots.  One would be
19 in Mylan and the other would be in Actavis.  Actavis
20 would engage in investigation if requested by Mylan.
21 If they weren't aware of a complaint, they couldn't
22 investigate it.
23     Q.   Can you tell me what part of the
24 agreement you're referring to?
25     A.   I don't recall.

Page 509

1      Q.   Do you want to take a look at it?
2      A.   Sure.
3      Q.   Why don't you do that.
4      A.   I don't have the agreement here.
5      Q.   Did you look at the supply and
6  distribution agreement?
7      A.   Very early on.  Yes.
8      Q.   When did you last look at it?
9      A.   It was probably one of the first
10 documents I looked at.
11     Q.   How early in the process?
12     A.   Very early.
13     Q.   You told me just a few minutes ago
14 that when you drafted your initial report, you
15 didn't look at any Mylan documents?
16     A.   I realized that I did afterwards.
17     Q.   Have you misspoken yourself again?
18     A.   Yes.  I did look at it, I did see it.
19     Q.   So when you -- when you drafted your
20 initial report and said nothing about Mylan, you had
21 already looked at the supply and distribution
22 agreement between Mylan and Actavis?
23     A.   I had scanned through it.
24     Q.   And when you -- when you drafted your
25 subsequent report, draft number two, you had looked

53 (Pages 506 to 509)

PLAINTIFFS' EXHIBITS 004874

Mark Kenny, Volume II                           Videotaped                          February 16, 2011

Page 510

1 at the supply and distribution agreement between
2 Mylan and Actavis?
3      A.   I had scanned at it at the original
4 time.  I didn't scan it again.
5      Q.   And still offered no opinion as to
6 Mylan?
7      A.   That's correct.
8      Q.   What was your -- what was your great
9 revelation then that caused you to --
10      A.   I explained it earlier.  I was asked
11 do I -- have I looked at the Mylan documents, and I
12 said, no, I have not looked at them.
13      Q.   But now you just told me you had
14 looked at them?
15      A.   Well, I looked at one document.  I
16 don't remember where the supply agreement was.
17      Q.   Maybe you had better rethink this
18 again because this is -- this is sworn testimony
19 that you're giving under oath, and I don't want you
20 to misspeak yourself.
21      A.   I understand.
22      Q.   You told me at the time that you
23 drafted the first two reports which led to the final
24 report?
25      A.   Right.

Page 511

1      Q.   You hadn't looked at Mylan documents.
2 Now you say you had looked at the supply and
3 distribution agreement.  What's -- what's the
4 correct testimony here?
5      A.   I saw that particular document and I
6 recall that I did review it.
7      Q.   When did you see that document?
8      A.   As I said, very early on in the
9 process.  I looked at it, I blitzed through it,
10 because I was seeking a quality agreement, not the
11 general terms of operating between two companies.
12 Because the supply agreement has nothing to do with
13 the area that I'm expert in unless it includes the
14 quality agreement type requirements and -- and
15 specification of responsibilities.
16      Q.   What criticisms do you have of the
17 supply and distribution agreement?
18      A.   I have no criticism of it.  I -- you
19 know, I scanned through it.  I would have no opinion
20 on it, it's an operations document.  It's focused as
21 an operations document.
22      Q.   It's what?
23      A.   It's an operations document.
24      Q.   What does that mean?
25      A.   Associated with terms, financial terms

Page 512

1 in general and a supply agreement.
2      Q.   It contains provisions such as the
3 fact that Actavis shall remain responsible for
4 maintaining and fulfilling all regulatory
5 requirements, doesn't it?
6      A.   Uh-huh.  That would be common
7 terminology used.
8      Q.   It provides for procedures in
9 reporting adverse drug experience information,
10 doesn't it?
11      A.   It says that, yeah.
12      Q.   That's important, isn't it?
13      A.   Important to whom?
14      Q.   Well, important to you as expert in
15 this case offering opinions against Mylan.  That's
16 important, isn't it?
17      A.   Is it important -- it's referenced in
18 there, but it's not the -- it's not what I'm looking
19 for.  I'm looking for substantive, specific
20 information as to who's responsible for what and
21 going down to on a day to day level.  Who is doing
22 what.
23      Q.   Well, how about this --
24      A.   Similar to the document that they
25 wrote, in other words, their draft is a reasonably

Page 513

1 comprehensive document.
2      Q.   How about this:  Do you recall that
3 the supply and distribution agreement between Mylan
4 and Actavis provides that Mylan shall refer or
5 submit to Actavis all drug experience reports and
6 other medical inquiries or quality complaints
7 associated with the products within 48 hours of
8 Mylan's receipt of such reports?
9      A.   Okay.
10      Q.   Do you recall that?
11      A.   I don't recall it specifically, but I
12 remember there was a complaint.
13      Q.   Is that an appropriate provision?
14      A.   I believe so.
15      Q.   It says all telephone calls shall be
16 referred to Actavis.  Is that appropriate?
17      A.   It a legal -- situation -- I would
18 have no expert opinion on that particular aspect of
19 it.
20      Q.   You don't have any criticism of that,
21 do you?
22      A.   I have no criticism of it.
23      Q.   It says, "Actavis shall be responsible
24 for fulfilling any regulatory requirements with
25 respect to such events, including but not limited to

54 (Pages 510 to 513)

PLAINTIFFS' EXHIBITS 004875

Page 514

1  the filing of all form FD 2253s, contact and
2  follow-up with the patient or reporter of the event
3  and will make any necessary contact with the FDA
4  regarding the subject matter of the same."
5      A.   I'm not familiar with those terms.  I
6  have no opinion on it.
7      Q.   That places responsibility clearly on
8  the shoulders of Actavis, doesn't it?
9      A.   I would have to study that further.
10 I'm not going to -- I don't think I can give an
11 opinion based upon reading one sentence out of a
12 supply agreement.
13     Q.   The fact is you really haven't read
14 this supply agreement, have you?
15     A.   I told you I scanned through it and I
16 looked for certain conditions which I did not find
17 in there.  And the conditions that you're talking
18 about are not what I was not looking for.
19     Q.   The supply and distribution agreement
20 between Actavis and Mylan provides that "Actavis
21 shall be responsible for filing and maintaining all
22 documentation and other information as required by
23 each and every state and locality for the purpose of
24 listing the products on each state's formulary or
25 other similar authority, and for obtaining such

Page 515

1  approvals as may be necessary to sell the products
2  in those states."
3          Is that an appropriate provision?
4      A.   I don't know what is appropriate or
5  not appropriate.  It's a regulatory legal issue, not
6  a GMP issue under the GMP category.
7      Q.   The supply and distribution agreement
8  between Actavis and Mylan which is dated August 5,
9  1999, provides that Actavis grants to Mylan the
10 exclusive right to market, sell, and promote and
11 distribute products.  Is that your understanding?
12     A.   Yes, that is my understanding.
13     Q.   Anything wrong with that?
14     A.   I can't say whether it's wrong or
15 right.  It just is.
16     Q.   The supply and distribution agreement
17 dated August 5 1999 between Mylan and Actavis
18 provides that "Actavis shall perform quality
19 assurance testing with respect to the products sold
20 hereunder."  That is DIGITEK.
21     A.   Right.
22     Q.   "Including stability testing so that
23 the products conform with the specifications."
24          Anything wrong with that?
25     A.   No, not that I can see.

Page 516

1      Q.   That places responsibility squarely on
2  the shoulders of Actavis, didn't it?
3      A.   For that subject.
4      Q.   The agreement further provides that
5  "Actavis shall provide the results of such tests to
6  Mylan in the form of a certificate of analysis."
7          Is that appropriate?
8      A.   If they agree to it, certainly.
9      Q.   What is a certificate of analysis?
10     A.   The certificate of analysis is the
11 summary of all of the finished product testing
12 results.
13     Q.   That's a good thing that the
14 certificate of analysis was being provided?
15     A.   Absolutely.
16     Q.   The supply and distribution agreement
17 between Mylan and Actavis dated August 5, 1999
18 provides that "Actavis will manufacture, package,
19 label, store, and ship the products," being DIGITEK,
20 that is the subject of the agreement.  So Actavis
21 will "manufacture, package, label, store, and ship
22 DIGITEK in accordance with the specifications set
23 forth in the ANDA, and as such ANDA may be amended
24 from time to time."
25          Is that an appropriate provision in the

Page 517

1  agreement?
2      A.   It seems appropriate.
3      Q.   Do you have any criticism of that?
4      A.   I have no criticism.
5      Q.   That seems to place responsibility
6  squarely on the shoulders of Actavis, doesn't it?
7      A.   In that particular situation, yes.
8      Q.   The agreement further provides that
9  "Mylan shall be promptly and fully advised of any
10 new instructions or specifications required by the
11 FDA or the FFDCA."
12          Is that appropriate?
13     A.   I believe so.
14     Q.   Further provides that "Mylan's quality
15 control personnel upon reasonable prior notice shall
16 be permitted to observe the manufacture of DIGITEK."
17          Is that appropriate?
18     A.   Yes.
19     Q.   Further provides that "in the event
20 Actavis cannot manufacture products in accordance
21 with the instructions and specifications, Actavis
22 shall promptly so advise Mylan."
23          Is that appropriate?
24     A.   Yes.
25     Q.   And further, that "Actavis shall not

55 (Pages 514 to 517)

PLAINTIFFS' EXHIBITS 004876

Page 518

1  change any ANDA or specification without the prior
2  written consent of Mylan."  Appropriate?
3       A.   Appropriate.
4       Q.   Good practice?
5       A.   Appropriate.  It is a must practice.
6       Q.   The supply and distribution agreement
7  of August 5, 1999 between Actavis and Mylan further
8  provides that "Actavis will package and label
9  products under the Mylan name and Actavis shall
10 provide all finished labeling for the products in
11 accordance with any applicable FDA or other
12 regulatory labeling requirements."  Appropriate
13 provision?
14      A.   I have no expertise on the subject,
15 but it appears appropriate.
16      Q.   Any criticism of that?
17      A.   No criticism.
18           MS. CARTER:  For the record, when
19      you're reading it, you're changing Amide to
20      Actavis and Bertek to Mylan.
21           MR. KAPLAN:  I sure am.  And we
22      established that before, and he agreed with
23      me that any references to Amide, we would
24      call Actavis and any references to Bertek we
25      would call Mylan.

Page 519

1       A.   And that is appreciated.
2  BY MR. KAPLAN:
3       Q.   Okay.  So this supply and distribution
4  agreement, which by the way, was previously marked
5  as Exhibit M1 at the deposition of Susie Wolf, which
6  is one of the depositions that you didn't read, is a
7  document that you scanned early on in your review
8  here, right?
9       A.   That's correct.
10      Q.   Before you ever wrote a draft report?
11      A.   Before, I don't know whether I wrote
12 the draft report or started.  When we're talking
13 about a draft report, we're talking about the
14 beginning of the graphs, the matrices.
15      Q.   And you were aware of the supply and
16 distribution agreement and reviewed it before you
17 drafted your first report.  That's what your
18 testimony was?
19      A.   I don't recall.
20      Q.   Now you don't recall?
21      A.   No.  Honestly, I'm not sure if I did
22 it before or after.  I look at hundreds of
23 documents.  I don't remember whether I read it
24 before or after.  That's unfair to ask me that.  I
25 mean, it's unfair to expect me to remember that.

Page 520

1       Q.   I move that that answer be stricken as
2  not responsive.
3           Do you cite the supply and distribution
4  agreement among the references that you relied upon?
5       A.   No, I did not.
6       Q.   Did the FDA ever criticize Mylan for
7  violating CGMP regulations relating to the
8  distribution of DIGITEK?
9       A.   I'm not aware of any.
10      Q.   Did the FDA ever criticize Mylan in
11 connection with its distribution of Digitek?
12      A.   I'm not aware of any.
13      Q.   Did the FDA ever criticize Mylan with
14 respect to the recall of DIGITEK?
15      A.   I'm not aware of any.
16      Q.   Did the FDA ever criticize Mylan
17 regarding the handling of DIGITEK related
18 complaints?
19      A.   I'm not aware of any.
20      Q.   Has the FDA ever criticized Mylan's
21 vendor management or supplier management policies?
22      A.   Again, I have no way of knowing.
23      Q.   Has the FDA ever criticized any other
24 distributor in connection with the events
25 surrounding the 2008 Actavis recalls?

Page 521

1       A.   I don't know how I would have that
2  information, so I don't -- I would say I haven't
3  seen anything.
4           THE VIDEOGRAPHER:  We're off the
5      record.  The time is 4:24.  This is the end
6      of tape 4.
7           (Recess taken.)
8           THE VIDEOGRAPHER:  We're back on the
9      record.  The time is 4:38.  This is the
10     beginning of tape 5.
11 BY MR. KAPLAN:
12      Q.   All right.  You would -- you would
13 agree that current good manufacturing practices
14 which is abbreviated CGMP, also referred to as GMP,
15 is a law that is established in the code of federal
16 regulations, right?
17      A.   Yes.
18      Q.   That's the law?
19      A.   That's the law.
20      Q.   And it sets standards for a product to
21 meet specific requirements for identity, strength,
22 quality, and purity, correct?
23      A.   That's a portion of it, yes, that's
24 correct.
25      Q.   And it's a law that outlines the

56 (Pages 518 to 521)

PLAINTIFFS' EXHIBITS 004877

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 522

1  requirements for every drug manufacturer to follow?
2      A.   That's correct.
3      Q.   That law has been continually improved
4  over the years since it was first adopted?
5      A.   Slightly revised, but yes, it has
6  been.  Yes, it has been improved.
7      Q.   Has been continually improved?
8      A.   Yes, that's correct.
9      Q.   It's your opinion that the current
10  good manufacturing practice regulations are well
11  designed documents?
12     A.   That is correct.
13     Q.   The current good manufacturing
14  practice regulations are a great help in ensuring
15  that patients and customers receive 100 percent safe
16  and effective drug products?
17     A.   Yes, that's correct.
18     Q.   And it's your experience that the FDA
19  understands the business and fairly and impartially
20  uses a heavy hand only when they fear public safety?
21     A.   That's correct.
22     Q.   And even in those high risk
23  situations -- well, in those high risk situations,
24  they continually escalate their concerns until all
25  public risks are resolved?

Page 523

1      A.   Yes, that is their objective.
2      Q.   And -- and that's what they did in the
3  case of DIGITEK, in the DIGITEK recall, right?
4      A.   I -- certainly they work with Actavis
5  and they escalated it to the point that you can't go
6  any further other than criminal prosecution, as far
7  as I could see.
8      Q.   Well, they escalated their concerns
9  until all public risks were resolved?
10     A.   Right.  Well put.  Correct.
11     Q.   In fact, that's how you put it on page
12  8 of your report of June 15, 2010, isn't it?
13     A.   Okay.  If it says that.  I don't have
14  it in front of me.
15     Q.   It is what you said?
16     A.   Okay.  I trust you.
17     Q.   And then the FDA, following the
18  resolution of risks to public safety with regard to
19  DIGITEK, published a document which is posted on the
20  FDA Website on the Internet titled, "facts and myths
21  about generic drugs."
22     A.   Yes.
23     Q.   And you are familiar with that
24  document, aren't you?
25     A.   Reasonably familiar.  I've read it.

Page 524

1      Q.   Well, let me read a portion to you.
2  "Myth, there are quality problems with generic drug
3  manufacturing.  A recent recall of generic Digoxin,
4  called DIGITEK, shows that generic drugs put
5  patients at risk.  Fact, FDA's aggressive action in
6  this case demonstrates the high standards to which
7  all prescription drugs, generic and brand name, are
8  held."
9          Would you agree with that?
10     A.   Can I read it again?  I would rather
11  read it than hear you say it.  Can I read it,
12  please?
13     Q.   I'm just asking whether you agree with
14  that statement?
15     A.   I understand that.  I would like to
16  read it.
17     Q.   I'm going to ask the question and I
18  would like you to answer it.  "FDA's aggressive
19  action in this case demonstrates the high standards
20  to which all prescription drugs, generic and brand
21  name, are held?
22     A.   I would say I agree with that.
23     Q.   The FDA, you acknowledge, has an
24  abiding interest in public safety?
25     A.   Most assuredly.

Page 525

1      Q.   Said "since the detection of the
2  manufacturing problem with DIGITEK, FDA has been
3  actively engaged with Actavis to ensure that all
4  potentially defective lots of DIGITEK have been
5  recalled."
6          Could you agree that they did that?
7      A.   They appear to have done that.
8      Q.   And then the FDA said, and continues
9  to say in the document entitled, "facts and myths
10  about generic drugs" posted on the FDA's Website,
11  the FDA says, "In our best judgment, given the very
12  small number of defective tablets, it may have
13  reached the market.  The lack of reported adverse
14  events before the recall, harm to patients was very
15  unlikely."
16     A.   I can't argue with that or -- I don't
17  know what would harm a person.  So the term "harm"
18  takes it away from something I would have an opinion
19  for.
20     Q.   In appendix F to your report of
21  June 15, 2010, pages 47 through 50, the heading is,
22  "FDA observations and events."  You would agree with
23  me that there is no mention of Mylan in there,
24  correct?
25     A.   That is correct.

57 (Pages 522 to 525)

PLAINTIFFS' EXHIBITS 004878

Page 526

1    Q.   And you would agree with me that in
2  your final report dated June 15, 2010 on page 35
3  under the heading of "expert witness final summary,"
4  there is no mention of Mylan?
5    A.   There is no mention of Mylan.
6    Q.   You would also agree with me that on
7  pages 5 and 6 of your final report dated June 15,
8  2010 under the heading, "introduction," there is no
9  mention of Mylan?
10    A.   That is correct.
11    Q.   And you would also agree with me that
12  on page 7 of your final report dated June 15, 2010
13  under the heading, "work plan," there is no mention
14  of Mylan?
15    A.   That is correct.
16    MR. KAPLAN:  Off the record.
17    THE VIDEOGRAPHER:  We're off the
18  record the time is 4:48.
19    (Recess taken.)
20    THE VIDEOGRAPHER:  We're back on the
21  record.  The time is 5:03.
22  EXAMINATION BY MR. ANDERTON:
23    Q.   Mr. Kenny, my name is Michael
24  Anderton.  I'm here on behalf of the Actavis
25  defendants.  We've met, correct?

Page 527

1    A.   That's correct.
2    Q.   All right.  I'm going to ask you some
3  questions.  We're going to cover some topics that
4  you've already cover with Mr. Kaplan, and perhaps
5  even some that we've covered a little bit in your
6  prior deposition session.  I know Mr. Kaplan didn't
7  go over this, but just to kind of remind you, if I
8  ask you a question and you don't understand it,
9  please make sure that you let me know that.
10    A.   Yes.
11    Q.   So that you and I have an
12  understanding of what I'm asking and what you are
13  answering before you give an answer.  Is that all
14  right?
15    A.   Yes.
16    Q.   Okay.  So if you answer a question, I
17  will assume that you understood it.  Is that fair?
18    A.   Yes.
19    (Whereupon, Exhibit 143, E-mails, was
20  marked for identification as of today's
21  date.)
22    Q.   All right.  I am looking at a document
23  that has been marked as Exhibit 143, and it is a
24  stack of e-mails that you received -- I'm sorry --
25  that you provided to us from your -- from the

Page 528

1  documents that you brought with you today?
2    A.   Yes.
3    Q.   That weren't in this yellow folder?
4    A.   Okay.
5    Q.   And the yellow folder was marked
6  Exhibit 110?
7    A.   Right.  It was in another folder.
8    Q.   Right.  That's fine.  I'm going to ask
9  you some questions about both groups, some e-mails
10  in both groups.  This is a different stack.  Do you
11  remember giving us this stack?
12    A.   Yes.
13    Q.   All right.  And I'm looking now at --
14  and eventually, we're going to leave this with the
15  court reporter and she'll make copies and we'll
16  all -- you'll get your back, or a copy back, at
17  least, and we'll all have a copy.  But for now, we
18  don't have extra copies, all right?
19    A.   Okay.
20    Q.   I'm looking at an e-mail thread
21  that -- well, give me one second.  Looking at an
22  e-mail thread -- or actually, a single page e-mail,
23  it starts on -- well, it's an e-mail thread.  It
24  starts on February 19, an e-mail from Sandy Summers,
25  who is at Meghan Johnson's law firm, I believe she's

Page 529

1  a paralegal or a legal assistant of some type,
2  forwarding to you and Mr. Romano a confidentiality
3  order and a letter of engagement?
4    A.   Right.
5    Q.   Does that mean that your engagement
6  with or on behalf of the plaintiffs started sometime
7  right around February 19 of 2010?
8    A.   I believe that's correct.
9    Q.   Does that sound about right?
10    A.   Yes.
11    Q.   And then on the 23rd of February,
12  there's further e-mail communication from
13  Ms. Johnson to you about the protective order and
14  about sending you documents.  Another e-mail in this
15  stack -- actually, again, an e-mail thread, is dated
16  February -- the first e-mail in the thread is dated
17  February 24, 2010, so about five days after you
18  received the engagement letter to undertake work for
19  the plaintiffs?
20    A.   Okay.
21    Q.   And according to this e-mail, it's
22  from Sal Romano to Meghan Johnson and a copy to
23  SpyGlass.  I assume that you have access to that
24  e-mail box?
25    A.   Yes.

58 (Pages 526 to 529)

PLAINTIFFS' EXHIBITS 004879

Mark Kenny, Volume II                              Videotaped                              February 16, 2011

Page 530

1    Q.   Or the mail sent to that address?
2    A.   Yes, I have access to it.
3    Q.   And it says, "Mark and I have received
4  the dots on the CD.  Thanks.  We will be traveling
5  starting Friday until March 9.  We intend to take
6  the dots with us and review them on the trip."
7        That means -- is that the first group of
8  documents you would have received from the
9  Plaintiff's counsel?
10   A.   Yes, that's correct.  The disk which
11 you -- you have.
12   Q.   Okay.  So the first group of documents
13 that you received was February 24, 2010?
14   A.   Correct.
15   Q.   And on that same day about an hour
16 after you received an e-mail from Ms. Johnson, you
17 responded to Ms. Johnson.  Actually, you said to Sal
18 in an e-mail, "the actual batch records are
19 extremely important.  Do you want me to request the
20 information?"  Do you remember making -- sending
21 that e-mail?
22   A.   I don't remember, but I'm sure I put
23 that down.  No, I don't remember the e-mail.
24   Q.   All right.  And within a matter of
25 moments, Mr. Romano e-mailed Mrs. Johnson at 3:48 on

Page 531

1  February 24, the same day you got the first disk,
2  and said, "Mark and I believe the batch records will
3  be critical for us to review.  How many batches were
4  recalled?  Do you have all the batch records as PDF
5  files?  We have lots to read now, but I think we'll
6  have to take a look at the batch records soon.
7  Thanks Sal."  And your -- again, that SpyGlass
8  e-mail address is copied on that document?
9    A.   I understand.
10   Q.   Do you remember Mr. Romano sending
11 that e-mail?
12   A.   No, I don't but it makes sense.  I
13 mean I --
14   Q.   All right.  So the first day that you
15 got document from the plaintiff's counsel, you
16 immediately responded and said we need to see the
17 batch records?
18   A.   Correct.
19   Q.   And in response, Ms. Johnson says we
20 have the batch records.  She says later that day,
21 and I'll just read it so that it's accurate.  "I
22 just got Mark's message and tried to call him back.
23 We do have the batch records but there are
24 approximately 170 plus batches for Digoxin.  So
25 that's quite a bit of paperwork for a review on your

Page 532

1  trip.  I'm here for at least the next hour or so.
2  Give me a call if you have a chance.  Thanks."
3    A.   Right.
4    Q.   So she responded to your e-mail by
5  essentially saying that's an awful lot, are you sure
6  you want to read that; is that right?
7    A.   Yes, that's correct.
8    Q.   And she never did send you those batch
9  records, did she?
10   A.   I don't think I ever saw them.
11   Q.   All right.  So you asked for the batch
12 records and identified them as absolutely critical,
13 and the Plaintiff's counsel responded by saying we
14 don't think you should review them?
15   A.   No, that's not what they said.  What
16 they said is we got a lot, if you want to see them,
17 you know, we'll give them to you.  And at that
18 particular point, early on and in -- I don't know if
19 you call it the discovery process, but of documents
20 I would like to see, that was clearly one of those
21 documents that I thought at that point I wanted to
22 see.
23   Q.   And how -- and in fact -- well, how
24 did it come to be that the batch records weren't
25 critical?

Page 533

1    A.   When I do an audit, I'm looking for
2  exceptions.  I found so many exceptions in the three
3  batches that I looked at I could make conclusions
4  off of that.  I couldn't make conclusions that every
5  batch record was wrong, but I could make conclusions
6  that the batch records that I reviewed demonstrated
7  significant GMP issues.
8    Q.   For those batches?
9    A.   For those batches.
10   Q.   So you couldn't make any conclusions
11 about any of the other batches?
12   A.   It would be difficult in general.
13   Q.   Let's talk about -- I guess I just
14 want to make sure I have a clear understanding of
15 the timing, and actually, just give me one second.
16 I want to make sure that I have a clear
17 understanding of the timing of Mr. Romano's
18 involvement.  Your testimony has been repeatedly
19 that the original intention was that you and
20 Mr. Romano were going to be jointly engaged both to
21 draft the report and to testify, correct?
22   A.   That is correct.
23   Q.   And so that's how the engagement
24 certainly started, right?
25   A.   Yes.

59 (Pages 530 to 533)

PLAINTIFFS' EXHIBITS 004880

Page 534

1        Q.    And we see from the billing records
2   that Mr. Romano was billing substantive time on this
3   engagement beginning at the beginning of the
4   engagement in the February, March, April time frame,
5   and that continued all the way through June,
6   correct?
7        A.    Correct.  We started the same time
8   approximately.
9        Q.    And in a -- now, this is where I'll
10  need you to take out the three versions of your
11  report that we've been talking about as exhibits and
12  kind of have them side by side.  All right?  You
13  have the final version that is I believe Exhibit 38,
14  as Mr. Kaplan identified that correctly?
15            MR. KAPLAN:  I think it's actually 48.
16            THE WITNESS:  I have my own copy, but
17       it's the same thing.
18            MR. KAPLAN:  I do believe that the
19       exhibit -- that the final report dated
20       June 15, 2010 was previously marked as
21       Exhibit 48, and I probably misspoke myself.
22            MR. ANDERTON:  More than once
23       probably.
24            MR. KAPLAN:  Probably more than once.
25       So if the record can be corrected, I think

Page 535

1        it was Exhibit 48, and we can check that.
2        And the other thing where I think I misspoke
3        perhaps was on the exhibit "facts and myths
4        about generic drugs."  I know that has been
5        previously marked, and I think that was
6        previously marked as Exhibit 38.
7        A.    I have 141.
8   BY MR. ANDERTON:
9        Q.    So although there was some confusion,
10  Mr. Kenny, about some of your earlier testimony, as
11  I understand your current testimony, it is that what
12  has been marked as Exhibit 141 was your first draft,
13  right?
14       A.    I believe that is correct, yes.
15       Q.    And we know from the fact that we got
16  this off of a CD that you gave us this morning that
17  this was identified by you as a May 26, 2010 draft?
18       A.    Correct.
19       Q.    So as of -- and in the -- on Page 2 of
20  this draft, it still clearly indicates that
21  Mr. Romano and you have been engaged to draft the
22  report and provide expert testimony, right?
23       A.    That's correct.
24       Q.    So as of May 26, we know he is still
25  actively engaged, and the intention is that he will

Page 536

1   draft and testify?
2        A.    Yes.
3        Q.    And if you look at Exhibit 140 which
4   you believe is a draft prepared after --
5        A.    Right.
6        Q.    -- Exhibit 141.  And again, if you
7   look at -- one second.  Page 5 of Exhibit 140, will
8   you look at that page, please?
9        A.    140, yes.
10       Q.    You see that it also says -- still --
11  still indicates that Mr. Romano will be
12  participating in drafting the report and testifying,
13  correct?
14       A.    Correct.
15       Q.    So this is sometime after May 26,
16  right?
17       A.    Sometime after, I can't tell you when.
18       Q.    Well, we know that you met plaintiff's
19  counsel in early June in person, right?
20       A.    Early June?  We met in New York City
21  in person.
22       Q.    Sometime in early June?
23       A.    I don't remember -- if I looked at --
24  you know, my billing it will show.  Also.
25       Q.    Why don't you do that.  You've got

Page 537

1   that, right?  Let's figure out when you met with the
2   Plaintiff's counsel.  You said there were two
3   meetings face-to-face, right?
4        A.    Yes.
5        Q.    Were those meetings after you had
6   already prepared a draft?
7        A.    The first one was not.  The second
8   one, I had started the document at that point.
9        Q.    Okay.
10       A.    I don't recall how far along that
11  document was.
12       Q.    Why don't you look at your time and
13  see if you can figure out when you met with the
14  plaintiffs in person.
15       A.    There was a meeting on May 5th.
16  May 5th, but I can't tell you if that was a phone
17  meeting or a physical meeting.  I can't tell you
18  from this, so far.  I can continue to try.
19       Q.    Well, let's -- actually, let's try
20  this another way.  I'm looking again at the
21  documents in Exhibit 143, one of which is an e-mail
22  dated May 28, 2010 from Ms. Johnson to both you and
23  to that SpyGlass e-mail address, talking about a
24  Friday morning, June 4 meeting at the Newark
25  airport?

60 (Pages 534 to 537)

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 538

1    A.    Newark airport, yes.
2    Q.    Does that make it seem likely that you
3    met with Plaintiff's counsel in-person at the Newark
4    airport?
5    A.    I did.
6    Q.    On June 4th?
7    A.    June 4th, if it says that, yes.
8    Q.    Okay.  And Mr. Romano attended that
9    meeting, right?
10   A.    That's correct.
11   Q.    And as we understand from Mr. Romano's
12   earlier -- from something we saw earlier, an e-mail
13   from Mr. Romano to plaintiff's counsel, part of the
14   discussion at that June 4th meeting was to talk
15   about strategy, right?
16   A.    That's correct.
17   Q.    And --
18   A.    What Sal referred to as strategy.
19   Q.    Okay.
20   A.    In using his terms.  To me it was a
21   status check, where are we, you know, what's the
22   next step.
23   Q.    Well, this -- this document that is
24   marked as Exhibit 140 that is a draft that contains
25   handwritten notes, your handwritten notes, that you

Page 539

1    now have acknowledged or that you previously
2    acknowledged and today forgot and now have
3    reaffirmed, reflect at least some comments of the
4    Plaintiff's counsel.  Did you have that draft with
5    you at that June 4th meeting?
6    A.    I had a draft with me at the June 4th
7    meeting, yes, I did.
8    Q.    And did you discuss that draft with
9    the Plaintiff's counsel at that June 4th meeting?
10   A.    In principle, we discussed it.
11   Q.    What do you mean by "in principle"?
12   A.    Principle.  Well, what are your
13   findings?  Did you look at XYZ, did you look at all
14   the attachments associated with -- because I was
15   having a lot of problems, as was Sal, with the
16   Crivella database.  It's very hard to navigate.  So
17   you find out later that there are documents in it
18   that you didn't realize were in it.  And so -- so
19   there were questions as to did we review certain
20   information.  That was the -- yes.  That was the
21   conversation.
22   Q.    And plaintiffs had seen a draft at
23   that time, right?
24   A.    They did not see a draft at that time.
25   Q.    When did they first see a draft?

Page 540

1    A.    We had a draft there.  The draft was
2    scanned over about a 30 second period by Mike.
3    Meghan did not see the draft.  That was -- that was
4    the extent of his review of that document.  So he
5    did see it, but he saw it in terms of format.  I
6    don't know if he could have read it in 30 seconds.
7    Q.    You mentioned a moment ago that you
8    and Mr. Romano were having difficulties with the
9    Crivella database.  That's some sort of hosting
10   environment where the plaintiffs hosted various
11   documents and they made them available to you and
12   Mr. Romano?
13   A.    That's correct.
14   Q.    So as of June 4 when you met with
15   plaintiff's counsel, you and Mr. Romano, you were
16   both still accessing and reviewing documents on the
17   database?
18   A.    We were accessing documents, yes.
19   Q.    And reviewing them?
20   A.    Reviewing, sure.
21   Q.    Including Mr. Romano?
22   A.    He was still doing it.  To a lesser
23   extent -- I don't remember if he was doing it or
24   not, to be honest with you.  I was.  I was.
25   Q.    You said -- I mean, the record will

Page 541

1    show what you said a moment ago, Mr. Kenny, but your
2    testimony not three moments ago was that both you
3    and Mr. Romano were having difficulty accessing
4    documents.
5    A.    That's correct.
6    Q.    You wouldn't have difficulty accessing
7    if you weren't trying, right?
8    A.    Right.  That's a good point.
9    Q.    So the handwritten notes on Exhibit
10   140, I believe you also said early, as you responded
11   to questions by Mr. Kaplan, that those notes
12   reflected, at least in part, comments or thoughts
13   inquiring about whether you had reviewed certain
14   documents, right?
15   A.    Could you repeat that?  Please repeat
16   the question.
17   Q.    Could you read that back, please?
18   (Record read.)
19   A.    That was a portion of that discussion.
20   Q.    Well, I want to be clear, now.  The
21   notes that --
22   A.    Oh, do you mean the notes that are on
23   here, did they reflect the conversation that I had
24   that talked about the documents, the additional
25   documents that I should review or look at?  It does

Rennillo Deposition & Discovery - A Veritext Company
216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 004882

Mark Kenny, Volume II                    Videotaped                     February 16, 2011

Page 542

1  not include that.
2      Q.   I want to just make sure this part is
3  clear, okay?
4      A.   All right.
5      Q.   You answered some questions by
6  Mr. Kaplan about these notes earlier.  And the
7  record will show what your answers were.  To the
8  best of my recollection, one of the things you --
9  one of the characterizations that you gave to these
10 handwritten notes on Exhibit 140 is that they
11 reflected, at least in part, your notes about
12 comments that Plaintiff's counsel had made where
13 they were asking you if you had reviewed certain
14 documents or certain categories of documents.  Do
15 you remember giving that testimony?
16     A.   Yes, I do.
17     Q.   Okay.  And that is the same type of
18 discussion that you had at that June 4th meeting
19 with Plaintiff's counsel, right?
20     A.   Yes, but it's hard to remember.
21     Q.   Well, you now said yes twice that that
22 is one of the things that you discussed at that
23 meeting?
24     A.   The content, yes.  What was in the
25 content, most definitely.

Page 543

1      Q.   Okay.  And does that make you more
2  able to tell whether the handwritten notes that you
3  put on this copy were made at the June 4th meeting
4  that you had with Plaintiff's counsel?
5      A.   I don't think these were made at that.
6  I believe these were made between Sal and I.  In my
7  house.
8      Q.   Well, but you've already testified,
9  Mr. Kenny, multiple times, that these notes reflect
10 at least in part, comments made by Plaintiff's
11 counsel.  You said that in your last deposition and
12 then you reaffirmed it after Mr. Kaplan pointed out
13 to you that you had overlooked that prior testimony.
14 So?
15     A.   The reality is it's hard for me to
16 remember.  I'm trying to put this thing together as
17 to what document I had, what did I write on down.  I
18 don't remember.  That's why -- and when I'm, let's
19 say refreshed, if you will, by prior testimony, it's
20 not coming together, I can't -- I can't tell you
21 with certainty regarding those conversations.
22     Q.   Well, but as of June 4, Mr. Romano was
23 still attending meetings with Plaintiff's counsel?
24     A.   That's correct.
25     Q.   And it was still his intention to

Page 544

1  participate in drafting the report and to testify?
2      A.   I think it was his intention.
3      Q.   And so actually, your testimony was
4  that the reason it was ultimately decided that he --
5  Mr. Romano would not participate to that degree is
6  because he had a conflict with his schedule and
7  would have been the commitments of the litigation if
8  he had participated to that extent, correct?
9      A.   That's what he said.
10     Q.   Well, is that -- is that your
11 understanding of what happened?
12     A.   That's what he told me.  I have no
13 reason to question him.
14     Q.   So then but for those scheduling
15 conflicts, he would have stayed on the report and
16 testified, right?
17     A.   I don't know that he would have.
18     Q.   Well, are you aware of any other
19 reason why he didn't, other than the scheduling
20 conflicts?
21     A.   I think he -- yes, I think he had cold
22 feet.
23     Q.   Cold feet?
24     A.   Yes.  I think that he did not want to
25 ultimately appear in a court case.  That's what I

Page 545

1  sensed.
2      Q.   That's what you sensed.  Did he say
3  that to you?
4      A.   No.
5      Q.   When -- when was the decision made?
6      A.   I don't know.  I really don't know.
7      Q.   But it was made after June 4 and
8  before June 15 when you finalized the report, right?
9      A.   Not necessarily, no.  It could have
10 happened before that.
11     Q.   How much before that?
12     A.   Oh, it would have been a week or so
13 before.
14     Q.   A week or so before what?
15     A.   The June 4th.  So it would have been
16 the end of May, beginning of June, somewhere around
17 there, where he determined that it didn't look like
18 he look -- he looked at his calendar, he's going to
19 Florida, XYZ.  And he said I can't do this.
20     Q.   Did you discuss that at the meeting
21 with Plaintiff's counsel at June 4?
22     A.   We discussed that.  I don't know if it
23 was discussed at June 4th.  I don't know.
24     Q.   Was it resolved by that meeting?
25     A.   I don't remember.  It might have been.

Rennillo Deposition & Discovery - A Veritext Company

216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)

PLAINTIFFS' EXHIBITS 004883

Mark Kenny, Volume II                         Videotaped                         February 16, 2011

Page 546

1     Q.   Okay.  But we know that we have a
2  May 26 draft and we have a draft that we know is
3  after May 26?
4     A.   Right.
5     Q.   And what we know is that in both of
6  those drafts, so at least one draft after May 26,
7  Mr. Romano is still indicated as part drafter and
8  somebody who will testify?
9     A.   Well, I didn't take his name out, but
10 it was -- he was still as of May 25th, 26th, still
11 the intention was that this would be a draft, a
12 report signed by both of us.
13    Q.   Okay.  And when -- now, let's look at
14 exhibit -- give me one second.  Let's look at
15 Exhibit 141, which again, you've identified as the
16 first draft of your report.  And turn to page 16,
17 please.
18    A.   Sixteen.
19    Q.   Yes.  I want to ask you some more
20 questions about the bullet points that Mr. Kaplan
21 asked you about earlier.  And first, with respect to
22 the parenthetical, the first one under the "overall
23 observations" heading.  Do you see that
24 parenthetical?
25    A.   Yes.

Page 547

1     Q.   It says, "Mark, we need to write a
2  dialogue followed by bullet points on the
3  following."  You said those are Mr. Romano's
4  comments, right?
5     A.   Those are his comments.
6     Q.   And he's telling you what to add to
7  the report, right?
8     A.   He's making a suggestion.
9     Q.   Well, it's not a suggestion; he's
10 telling you what to add to the report?
11       MS. CARTER:  Objection.
12 BY MR. ANDERTON:
13    Q.   Isn't it?
14    A.   He's telling me whether or not I
15 accept them is another story.  He's telling me to
16 add these to the report.  He feels it's substantive.
17    Q.   And you said, you know, you keep
18 wanting to say that this is solely your report?
19    A.   Yes.
20    Q.   But as of June -- as of sometime after
21 May 26th, which is three months plus into the
22 process and within two and a half or three weeks
23 before the report is due, he is still being
24 indicated as a drafter and as somebody who is going
25 to testify?

Page 548

1     A.   Yes, he is.
2     Q.   And so when you say you were the one
3  who was going to testify, that's not true as of the
4  time of this draft, is it?
5     A.   It is true somewhere in June.
6        MS. CARTER:  Objection.
7     A.   I don't know when that decision was
8  made, I honestly don't.
9  BY MR. ANDERTON:
10    Q.   Well, but --
11    A.   It was a point where it became clear
12 that he was not going to testify.  He did -- how he
13 communicated that, I don't recall, and when did he
14 communicate it.
15    Q.   Well, speaking of communicating, we
16 now know that Plaintiff's counsel, Ms. Johnson,
17 Mr. Miller, et cetera, received a draft of your
18 report, correct?
19    A.   They received it in a very late stage
20 report in June.
21    Q.   How?  How did they get it?
22    A.   I sent it via -- did I fax it or
23 e-mail it?  It was either faxed or e-mailed.  I
24 don't recall.
25    Q.   I have looked through the documents

Page 549

1  that you produced that you have represented as the
2  communications between you and Plaintiff's counsel.
3  There is no transmittal cover e-mail or other
4  document indicating that you are transmitting a
5  draft or a copy of your draft report to Plaintiff's
6  counsel.
7     A.   I understand.
8     Q.   Did you overlook that?
9     A.   No.  It was done at the Jersey Shore.
10 We were on vacation and I -- Denise handled it, and
11 I believe it was faxed.  I'm going to guess it was
12 faxed, but there was no intent to hide any
13 documents.
14    Q.   Who did you go to the Jersey Shore
15 with?
16    A.   My wife.
17    Q.   How long were you there?
18    A.   We were there probably a week or so.
19    Q.   When?
20    A.   Somewhere around Memorial Day.
21    Q.   After or before?
22    A.   After or before what?
23    Q.   Memorial Day?
24    A.   I have to pull my calendar.  We have a
25 house down there, we go down there regularly.

Rennillo Deposition & Discovery - A Veritext Company

216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)

PLAINTIFFS' EXHIBITS 004884

Mark Kenny, Volume II                                    Videotaped                              February 16, 2011

Page 550

1      Q.    I'm just trying to establish when you
2   were at the Jersey Shore.  When did you take your
3   vacation to the Jersey Shore in 2010?
4      A.    I don't recall.  We took -- it's not a
5   vacation.  We go down there for a couple of days.
6   When you're consulting, you go whenever you want,
7   you're off, you go down.  I went down there 15
8   times.  There is nothing remarkable.
9      Q.    Okay.  But it was sometime around
10  Memorial Day?
11     A.    Correct.
12     Q.    Which is before June 4?
13     A.    Yes.
14     Q.    So Plaintiffs had that draft before
15  you met with them in person on June 4?
16     A.    They had them -- wait a minute, wait a
17  minute.  I think I'm screwing this thing up.
18          MS. CARTER:  Just take your time.
19     A.    On June 4th -- on June 4th, I had a
20  copy, I can't tell you exactly which copy.  Of which
21  is the one that Mike -- scanned.
22   BY MR. ANDERTON:
23     Q.    Mike who?
24     A.    I'm losing it here.  Pete Miller.  I'm
25  sorry.  Pete Miller scanned.  I don't know what copy

Page 551

1   that was, and he looked at it and then asked me a
2   couple of questions.  He did not focus on it, he
3   didn't read it.  He went like two seconds, two
4   seconds, two seconds (indicating).  That's it.
5      Q.    Are you saying he had his own copy or
6   he looked at your copy?
7      A.    No.  He would never saw a copy.  I had
8   a copy.
9      Q.    Mr. Kenny, you just told me that you
10  faxed or e-mailed a copy to the Plaintiff's counsel?
11     A.    I e-mailed a copy.
12     Q.    From the Jersey Shore sometime around
13  Memorial Day.  June 4 is after Memorial Day.
14          MS. CARTER:  Objection.
15     A.    Yeah.
16   BY MR. ANDERTON:
17     Q.    And now you are saying he never had a
18  copy.  I'm confused.
19     A.    Mike, I don't remember.  The realty is
20  I don't remember the exchange, other than if I had
21  to sit there and say what was I sure of, I was sure
22  that I brought a copy to Newark airport.  He took a
23  look at it, 30 seconds, or on about four days before
24  the finalization of that report.  I sent a copy, I
25  guess it was via e-mail to Meghan.  Pete got a copy

Page 552

1   of it.  Meghan got back to me and said -- had some
2   specifics, you know, some grammar kind of stuff, and
3   I believe Pete got back to me and questioned, either
4   questioned it before or at that point, about had I
5   looked at Mylan documents.  I don't recall if it was
6   that or earlier.
7      Q.    When Meghan got back to you, was
8   that -- how did she do that?
9      A.    Meghan got back to me, we talked over
10  the phone.
11     Q.    But you e-mailed them a copy of the
12  draft?
13     A.    Yes, I did.
14     Q.    All right.  Again, I don't see that
15  e-mail in any of the e-mails that you provided?
16     A.    I did my best to make copies of
17  everything.
18     Q.    If I ask you to look again for the --
19  specifically for any e-mail whereby you transmitted
20  drafts to the Plaintiff's counsel, will you do that?
21     A.    Sure.
22     Q.    All right.  So you'll do that sometime
23  in the next several days and follow-up with
24  Plaintiff's counsel and let them know whether you
25  come up with anything?

Page 553

1      A.    Sure.
2      Q.    If you need to make a note, please do.
3      A.    I am going to make a note.
4      Q.    All right.  Take your time.
5      A.    Okay.  Got it.
6      Q.    So again, and again, the record will
7   reflect -- you know, your testimony will be
8   reflected in the transcript.  When you were
9   discussing with Mr. Kaplan Exhibit 140 and your
10  characterization of whether these bullet points on
11  page 16 were substantive input from Mr. Romano or
12  whether you considered them and accepted them only
13  if you felt they were appropriate, you said you were
14  the one who was going to testify.  But as of this
15  draft, that's not true, is it?
16     A.    It probably is not true.  It appears
17  not to be true.
18     Q.    Okay.  And in fact, as of the next
19  draft, Exhibit 141, whenever that was, sometime
20  after May 26, it's still not true, right?
21     A.    I don't recall.
22     Q.    Well, the document says --
23     A.    I understand that.
24     Q.    -- that he's going to testify and
25  identifies him as a drafter, right?

64 (Pages 550 to 553)

PLAINTIFFS' EXHIBITS 004885

Page 554

1    A.    It most certainly does.
2    Q.    Okay.  And go down further on page 16.
3  The second parenthetical from Mr. Romano, and I'm
4  going to read the beginning of it, it says, "Mark, I
5  have added your stuff on GMP.  Please add some
6  dialogue."  So he actually was adding things to the
7  report apparently?
8    A.    He was next to me when we met, and he
9  would -- I would give him a copy, he would -- he
10  once, I believe only once, took the copy.  He said
11  you do your thing, work with Crivella, read
12  documents.  I'll do my thing.  Take a look at this
13  thing, try to organize it.  I had some of my own
14  thoughts, and ultimately, it came to this of which I
15  took this and then without his assistance, edited it
16  to what my opinion was.
17    Q.    He says here he added stuff to the
18  report, his language?
19    A.    No.  He added my stuff.  In other
20  words, it wasn't taken out -- I don't know what he
21  meant by it, to be honest with you.
22    Q.    Wait a minute.  You're drafting a
23  document?
24    A.    Yes.
25    Q.    And he says I have added your stuff on

Page 555

1  GMP and you don't even know what that means?
2    A.    Actually, I believe -- yeah, it means
3  the attachments I believe.  I'm trying to recreate
4  this.  Yes, it's the attachments, and that there was
5  no dialogue associated with the attachments.  That
6  was his opinion.  I don't recall if I ever did
7  anything about it.
8    Q.    He then goes on to say, "I think the
9  following section on DIGITEK is good.  Can you get
10  this section in the same bullet format?"  Again,
11  adding substantive input to the report, right?
12    A.    That's -- that is purely format, sir,
13  purely format.  He liked the bullet approach.
14  That's all.
15    Q.    Go back to page 13 of Exhibit 141,
16  please.
17    A.    Page 13?
18    Q.    Please.
19    A.    Yes.
20    Q.    And again, we know that this is
21  according to your testimony, your first draft,
22  right?
23    A.    This is, yeah, my first draft.
24    Q.    You see --
25    A.    But it's -- I'm sorry.  Go ahead, sir.

Page 556

1    Q.    You see the heading and then the first
2  full bullet point under the heading.  The heading
3  reads, "Ineffective and unreliable methods," and
4  continues on from there.  Do you see that heading?
5    A.    Yes.
6    Q.    And do you see the first bullet point
7  paragraph under that?
8    A.    Yes.
9    Q.    In that paragraph, you do an analysis
10  and make a comment on the reliability of visual
11  inspection.
12        Do you see that?
13    A.    I do see that.
14    Q.    And you actually gave testimony about
15  that in your earlier -- excuse me -- on June 29th at
16  your prior deposition session.  Do you remember
17  that?
18    A.    Yes.
19    Q.    In this draft, you say that in your
20  opinion, visual inspection is only 80 percent
21  effective.  Do you see that?
22    A.    Yes.
23    Q.    That is actually consistent with what
24  you testified to on June 29.  Do you remember that?
25    A.    Yes.

Page 557

1    Q.    In this draft, however, you actually
2  do a calculation and say that on the basis of your
3  position, you believe there are five double thick
4  tablets that weren't found, and that in your
5  opinion, apparently went undetected when the batch
6  was released.  Do you see that?
7    A.    Yes.
8    Q.    So you actually at one point
9  formulated an opinion about exactly how many double
10  thick tablets you thought were still out there but
11  undetected?
12    A.    I -- no.  This is not -- this is --
13  Sal put that in there, not me.
14    Q.    Sal put that in there?
15    A.    Yes.  When we were sitting down, he's
16  going through it, and he added stuff that -- that's
17  why when I see check this math -- let me reread it
18  again, please, because I did do some calculations.
19  I think I wrote that.  I think I wrote that.
20    Q.    So then let's have the reporter please
21  read back the question I asked prior to that, I want
22  you to answer what question, please.
23        (Record read.)
24    A.    No, I did not form an opinion.  I
25  somehow did some math which doesn't even look

PLAINTIFFS' EXHIBITS 004886

Mark Kenny, Volume II                              Videotaped                          February 16, 2011

Page 558

1  correct.
2      Q.   Well, but you wrote this in your
3  expert witness report, right?
4      A.   Expert witness report which was
5  something that I was continually working on.
6      Q.   But you did a calculation --
7      A.   I calculated other things in there --
8  I don't even remember the calculation.  It doesn't
9  even look like it could be anywhere near correct.  I
10 guess if you take the 80/20 rule.
11     Q.   So it would be correct then?
12     A.   If you -- yeah -- it would be correct
13 what?
14     Q.   If you properly applied your theory,
15 then the result of five defective tablets would be
16 correct?
17     A.   Yeah.  It's a flawed theory.
18     Q.   It's a flawed theory, the 80/20 rule?
19     A.   No, that therefore five would still
20 remain.  This is a statistical approach that five is
21 just an extrapolated number which is I guess
22 20 percent -- 20 plus percent of 20.
23     Q.   So but it's a flawed theory?
24     A.   The theory, yeah, I would not say that
25 five remained in the market.  I have no idea how

Page 559

1  much would have remained in the market.  I have no
2  idea.
3      Q.   And in your final report, that fact
4  came out, right, it wasn't in your final report?
5      A.   That's correct.
6      Q.   Why?
7      A.   Because it's -- it shouldn't have been
8  in there in the first place.  It's nonsense.
9      Q.   It's nonsense?  Did you discuss that
10 calculation with Plaintiff's counsel.
11     A.   No.  No.  I don't recall ever, no.
12     Q.   Well, Mr. --
13     A.   No, no, no.  Let me back up.  I did
14 not -- can I answer it?  No, I did never discuss
15 this with Plaintiff's counsel.  No.
16     Q.   I guess I should caution you about
17 being so definitive in your testimony since on more
18 than one occasion today, we've learned that some of
19 your fairly definitive testimony has been a little
20 quick in terms of your thinking through it and how
21 accurate it is.  So, but you're certain then that
22 you didn't discuss this with Plaintiff's counsel?
23     A.   Correct.
24     Q.   I'm also looking at, and I'm back in
25 Exhibit 110, the folder of e-mails that you produced

Page 560

1  earlier today that we marked.  And again, I don't
2  have extra copies.  I'm looking at an e-mail that is
3  a two page e-mail, and again, it's an e-mail thread
4  with a series of e-mails that relate to scheduling.
5  And it looks as though in the first e-mail,
6  Ms. Johnson asked you and Mr. Romano whether you're
7  available for a call the next day and the date of
8  Ms. Johnson's e-mail is June 8, 2010?
9      A.   Okay.
10     Q.   In response the following morning --
11 I'm sorry, later that day, you respond and say
12 you're available after 1:00 p.m., and the following
13 morning early, Mr. Romano responds and says he's
14 available until about 3:30 for a call.  And then
15 there are further e-mails apparently setting the
16 call for 2 o'clock on June 9, 2010.  Do you remember
17 that telephone call?
18     A.   No.
19     Q.   Any reason to believe that it didn't
20 happen?
21     A.   No reason to believe that it didn't
22 happen.
23     Q.   All right.  That's five days before
24 your report was finalized?
25     A.   Okay.

Page 561

1      Q.   Right?
2      A.   Yes.
3      Q.   I'm sorry, six days.  Now I'm not
4  doing math so well.  Mr. Romano is still
5  participating in the discussions about the report?
6      A.   He's still participating in
7  discussions, yes.
8      Q.   Okay.  That's not so he can proofread
9  it, is it?
10         MS. CARTER:  Objection.
11     A.   I don't know what his objectives are.
12 BY MR. ANDERTON:
13     Q.   Okay.  And the next day, I'm looking
14 at another e-mail dated June 10, 2010, and in the
15 original e-mail -- well, in this e-mail, Ms. Johnson
16 forwards to you as well to the SpyGlass e-mail
17 address, and to Saljromano@aol.com, a copy of a
18 Mylan deposition that "discusses the audits of
19 Actavis and frequency."  Now, there's comments in
20 your final report about the frequency of the audits
21 conducted by Mylan on Actavis, aren't there?
22     A.   Yes.
23     Q.   And that happens to be one of the
24 bullet points in your initial draft that Sal
25 suggested you add to the final version, right?

66 (Pages 558 to 561)

PLAINTIFFS' EXHIBITS 004887

Mark Kenny, Volume II                    Videotaped                    February 16, 2011

Page 562

1     A.   I believe that's accurate.
2     Q.   So and that is Exhibit 141 that we've
3  talked about here over the last few minutes?
4     A.   Yes.
5     Q.   So here we are on June 10 and
6  Ms. Johnson is sending to you and Mr. Romano Mylan
7  deposition transcripts for your review and analysis,
8  right?
9     A.   Right.  Yes.
10    Q.   So Mr. Romano is still involved in
11 analyzing records for the purpose of continued
12 preparation of the report?
13    A.   No.  At that point, Sal basically
14 reviewed nothing.
15    Q.   Why is he getting copies of the
16 transcript?
17    A.   Out of respect.  The fact that he's
18 still part of the project.
19    Q.   So he suggests on -- sometime on or
20 about May 26 that you add comments in your report
21 about Mylan's audit practice with respect to
22 Actavis?
23       MS. CARTER:  Objection.
24   BY MR. ANDERTON:
25    Q.   And two weeks later, you guys receive

Page 563

1  deposition transcripts from Plaintiff's counsel on
2  just that subject, and Mr. Romano receives them and
3  then that subject ends up in the final version of
4  the report, but he wasn't doing anything?
5     A.   He did not do a thing with that,
6  nothing.
7     Q.   Just coincidence?
8     A.   There's nothing coincidental about it.
9  He did not review those documents.  I did.  I was
10 the one who looked at them objectively and entered
11 my opinion.
12    Q.   Will you get your billing records out,
13 please?
14    A.   Yeah.  Do you have them or do I have
15 them?
16    Q.   I don't have them.
17    A.   Okay.
18    Q.   Mr. Kenny, will you find your billing
19 records for June?
20    A.   May, June.
21    Q.   You got them?
22    A.   Yes.
23    Q.   May I see them very quickly?
24    A.   Sure.  (Handing).
25    Q.   In looking at these, I now realize

Page 564

1  that you don't provide time or date detail?
2     A.   I provide what I provide.
3     Q.   So the answer to my question is?
4     A.   Well, I have to look at the specifics.
5  I have dates.
6     Q.   You don't have -- you have a date
7  range and then a total number of hours with a
8  charge?
9     A.   Okay.
10    Q.   Right?  So there's no way to determine
11 whether Mr. Romano charged any time for reviewing
12 this deposition transcript?
13    A.   There would be if you looked at the
14 bills associated with him.
15    Q.   Do you have those?
16    A.   Yes.
17    Q.   May I see those?  Are these marked?
18       MS. CARTER:  They are all in that
19 same.
20   BY MR. ANDERTON:
21    Q.   All in that same folder?  Do you have
22 Mr. Romano's bills beyond April and May?
23    A.   I believe that should be complete.
24 That's what my wife gave me, Denise.
25    Q.   This is not complete.  It stops at

Page 565

1  May 9 for Mr. Romano?
2     A.   Then May 9 may have been the last time
3  that he billed.
4     Q.   Well, the document I just looked at
5  stops at May 10 actually.  So sir, we don't have the
6  time sheet -- according to invoice 1032, there's a
7  time sheet for Mr. Romano for the period May 11 to
8  June 15 and the detail sheets you've just given me
9  don't go past May 10, so that actually fits.  Do we
10 have those time sheets?
11    A.   I don't have those time sheets.
12    Q.   Okay.  Will you make a note to
13 yourself to track those down and get those to
14 Plaintiff's counsel?
15    A.   Okay.  Time sheets for what?
16    Q.   Mr. Romano's detailed time sheets for
17 any time after May 10, 2010.
18    A.   Post, I'm sorry?
19    Q.   Post May 10, 2010.
20    A.   Okay.
21    Q.   Now, Mr. Kenny, I'm looking at
22 Mr. Romano's time sheets, and on April 10, 2010, he
23 charged one hour for what he characterized a draft
24 report.
25    A.   I don't know what that was.  What date

67 (Pages 562 to 565)

PLAINTIFFS' EXHIBITS 004888

Page 566

1    was it?
2        Q.    April 10.
3        A.    I don't know.
4        Q.    On April 27, he charged an hour -- I'm
5    sorry -- on April 26th, he charged five and a half
6    hours, and the time actually says write draft number
7    one of report?
8        A.    Okay.  He was doing his own work.
9        Q.    Were you also writing parallel drafts?
10       A.    Were we writing parallel -- if you
11   could use that term, yes, I guess so.
12       Q.    So you wrote a draft and he wrote a
13   draft?
14       A.    He made some notes and gave them to
15   me.
16       Q.    This says write draft number one of
17   report?
18       A.    Yes.
19       Q.    Is that making notes?
20       A.    Yes, it was very cryptic of which he,
21   I believe, cut and pasted them into my document when
22   I was there.
23       Q.    Do you have the time detail sheets for
24   your time for this period?
25       A.    I don't know.  You have what I have.

Page 567

1        Q.    Well, what I don't have is any detail
2    for.  You see how this has the description of
3    services for Mr. Romano?  I don't have any of those
4    for you.  I have only invoices.
5        A.    I should have those.  I have them.
6        Q.    Do you have those?
7        A.    If they are not there, no, I don't
8    have them with me.
9        Q.    Actually, I misspoke.  I do have some
10   of yours.  My apologies, Mr. Kenny.  I didn't look
11   at it closely enough.  So I'm looking at your time
12   sheets now, I do have them, detailed time sheets.
13   And I start with the date of February 26, which is
14   the earliest entry which is consistent with the fact
15   that you said earlier it was around the 23rd or
16   fourth when you first got documents from Plaintiff's
17   counsel.  And as I look at your time entries all the
18   way through the end of April, I don't see any
19   drafting by you.  Is that accurate?
20       A.    From when to when?
21       Q.    From February through April 24, 2010.
22   I see no drafting by you.
23       A.    No.  I did drafting.  I did drafting
24   of the tables.  I started on the tables.
25       Q.    While Mr. Romano was drafting the

Page 568

1    report.
2        A.    He was drafting -- something, I'm not
3    sure what he was drafting.
4        Q.    Well, so on April -- well, he spent
5    five and a half hours on it.  That sounds like a
6    little more than notes?
7        A.    Well, he drafted something.
8        Q.    You were charging plaintiff's counsel
9    $430 an hour?
10       A.    He was charging them and he was
11   working on the report.
12       Q.    $430 an hour?
13       A.    Yes.
14       Q.    So five and a half hours is $2300 or
15   so?
16       A.    Yes.
17       Q.    Does that sound about right, maybe
18   even a little more than that?
19       A.    Yes.
20       Q.    And he told Plaintiff's counsel that
21   he was writing a draft of the report, and that
22   that's what they were paying him $2300 for.  You're
23   now saying he wasn't doing that?
24       A.    I don't know what he was doing.
25           MS. CARTER:  Objection.

Page 569

1        A.    He gave my wife the bills, and they're
2    sent out.
3    BY MR. ANDERTON:
4        Q.    And he gave you the draft of the
5    report for you to review as well, right?
6        A.    He gave me the draft of a report, no,
7    we sat down to review that report.  We -- we sat
8    down to review what he had done.
9        Q.    Okay.  The next day, he charged
10   another hour and a half for what he characterized as
11   work on report.  Two days after that, he charged
12   three hours, again, work on report.  The following
13   week, May 4, he charged a half hour, work on report.
14   That's ten and a half hours that he's characterized
15   as drafting and working report.  You say he's not
16   doing any drafting?
17       A.    I'm not sure what he's doing.  I know
18   he was at one point going to try to do the footnotes
19   or the references.
20       Q.    So the first draft that you produced
21   indicated that he was drafting and going to testify.
22   His time records are consistent with that?
23       A.    Uh-huh.
24       Q.    And you somehow are begging off that
25   and saying he wasn't doing that actually?

68 (Pages 566 to 569)

PLAINTIFFS' EXHIBITS 004889

Mark Kenny, Volume II                      Videotaped                      February 16, 2011

Page 570

1           MS. CARTER:  Objection.
2       A.   I don't know what he did.  I don't
3   know what he was working on.
4     BY MR. ANDERTON:
5       Q.   Well, we know exactly what he did.  We
6   have a draft report that indicates he was -- it was
7   drafted by him in April and early May, right?
8           MS. CARTER:  Objection.
9     BY MR. ANDERTON:
10      Q.   Is that right?
11      A.   Yes, that's what the records state.
12      Q.   Okay.  You don't have any reason to
13  believe these records are falsified, do you?
14      A.   No.  I have no reason to believe that.
15      Q.   I would be very curious to see those
16  additional time sheets from Mr. Romano, and I don't
17  think yours are in here as well, okay?
18      A.   Yeah.
19      Q.   Past May.
20      A.   I'm sorry.  What am I looking for?
21      Q.   Your detailed time sheets for time
22  beyond May 10?
23      A.   They are not there?
24      Q.   Neither of your detailed time sheets
25  are here.  The latest entry for either one of you is

Page 571

1   May 10.  You'll track those down?
2       A.   Absolutely.
3       Q.   Thank you very much.
4           In earlier deposition on June 29, you
5   talked about process validation, and Mr. Moriarty
6   asked you questions about whether you looked at
7   process validation.  Do you remember that testimony?
8       A.   Yes.  Yes.
9       Q.   As somebody who is evaluating
10  whether -- or at least the likelihood, of whether
11  adulterated product was produced, process validation
12  is a pretty critical document, isn't it?
13      A.   It's a portion of that, yes.
14      Q.   So it's a very important document,
15  isn't it?
16      A.   Yes.
17      Q.   In fact, it's kind of the jumping off
18  point for the whole analysis, isn't it?
19      A.   No, I wouldn't call it that.  It's
20  like everything else, it's an important step in the
21  development process, in the commercialization
22  process.
23      Q.   If you were hired by a pharmaceutical
24  manufacturer today and they said, Mr. Kenny, we'd
25  like you to evaluate whether we have produced any of

Page 572

1   product X that is adulterated, could you do that
2   analysis without looking at the process validation?
3       A.   Could I do it?  I could if I found
4   instances where adulteration occurred, but I don't
5   need that because I could do it by exception.  If I
6   saw falsified results, if I saw, let's say results
7   in a record that are not specification when in fact
8   they accepted it.  It doesn't meet specification.
9   So I don't need to look at validation in order to
10  find exceptions to determine whether it violates
11  GMP.
12      Q.   Would you ask to see the process
13  validation?
14      A.   Yes.
15      Q.   Back to a point I made a moment ago,
16  the process validation is significant because it's
17  somewhat of a foundation for whether you have
18  developed and created a process that is capable of
19  consistently manufacturing product within
20  specification, right?
21      A.   I wouldn't phrase it that way, but
22  it's very important as part of the development
23  process and the commercialization process.
24      Q.   Okay.  In fact, the commercialization
25  process cannot go forward without a validated

Page 573

1   process; is that right?
2       A.   That is correct.
3       Q.   If the FDA came in and did an audit
4   and determined that your process wasn't validated,
5   they would do whatever they could to make you stop
6   making that product almost immediately, wouldn't
7   they?
8       A.   Correct.
9       Q.   But you didn't look at the process
10  validations for DIGITEK in this litigation, did you?
11      A.   I did not go into detail on those.
12      Q.   You saw the .5 milligram process
13  validation, but did not ask for the other process
14  validations, did you?
15      A.   I apparently did not ask for them,
16  yes.  I really don't recall, quite honestly.
17      Q.   Do you have any reason to believe that
18  you actually asked for the additional process
19  validations?
20      A.   I don't recall, honestly.
21      Q.   Well --
22      A.   But your question is again.
23      Q.   Do you have any reason to believe that
24  you did asked for them?
25      A.   No recollection that I asked for them.

69 (Pages 570 to 573)

PLAINTIFFS' EXHIBITS 004890

Mark Kenny, Volume II                          Videotaped                          February 16, 2011

Page 574

1      Q.    Okay.  What did you ask, for
2   additional documents?  I mean, we saw earlier that
3   you asked for batch records and didn't get them?
4      A.    Uh-huh.
5      Q.    Do you remember asking for and getting
6   anything other than the FDA documents that
7   plaintiffs thought were so important?
8          MS. CARTER:  Objection.
9      A.    The documents that were available to
10  me were on Crivella, and I was able to do a search
11  and try to find a document.  If I couldn't find it,
12  it wasn't there.  That was the database.  So it
13  would be futile to ask for a document that didn't
14  exist because it was not there.
15  BY MR. ANDERTON:
16     Q.    Do you remember the last time that you
17  were deposed giving testimony about an unsigned
18  memo?
19     A.    There were several unsigned documents,
20  but yeah.
21     Q.    Okay.  I'm handing you a document that
22  has previously been marked as Plaintiff's Exhibit
23  317.  Take a moment to look at that document.
24     A.    Sure.
25     Q.    Have you seen that document before?

Page 575

1      A.    Yes, I saw it as an unsigned document.
2      Q.    As an unsigned document?
3      A.    That's correct.
4      Q.    And when you were deposed in June, you
5   testified about the unsigned document, didn't you?
6      A.    Yes, I did.
7      Q.    And you spoke pretty harshly about it,
8   didn't you?
9      A.    I wouldn't use the term "harshly," I
10  made comment to it.
11     Q.    Well, you said, and this is from page
12  277 of your prior deposition, "because the value,
13  even if it were a very logical explanation," that
14  it's not signed, is what you're referring to, "the
15  value of it is nill.  It is a gross violation of
16  GMP, and how that document could have been created
17  and distributed and how anybody would have received
18  it and not kicked it back to the original person to
19  make sure it wasn't signed or dated is beyond me.
20  It's a total -- talk about a breakdown.  This is a
21  significant breakdown."
22         That's a pretty harsh characterization,
23  isn't it?
24     A.    Yes.
25     Q.    Did you ever consider that the

Page 576

1   unsigned version might be a draft?
2      A.    Did I consider that, yes, I suppose I
3   did consider it.
4      Q.    What did you do to satisfy yourself if
5   you considered it that it in fact wasn't a draft?
6      A.    I did do anything in addition.
7      Q.    So you're more than happy to supply
8   that scathing testimony about the GMP practices of
9   Actavis when you yourself didn't feel it was
10  necessary to do anything to satisfy your own logical
11  inquiry about whether that was the final version of
12  that document?
13         MS. CARTER:  Objection.
14     A.    I assumed that it was there.  It was
15  the final document, the original was asked for, and
16  it did not exist.  That was my assumption.  I didn't
17  go and search to see if -- I don't know how I could
18  search for a document that -- a second document that
19  was signed versus one that was unsigned.
20  BY MR. ANDERTON:
21     Q.    Do you know the nature of document
22  productions in litigations this large?
23     A.    No.
24     Q.    You don't know anything about how many
25  documents or whether drafts are produced or anything

Page 577

1   like that?
2      A.    No.
3      Q.    You see the sticker on that document,
4   the 317, do you see the date on it?
5      A.    Yes.
6      Q.    What is it?
7      A.    Well, it says underneath the Exhibit
8   number, 51410.
9      Q.    That means that document was used as
10  an exhibit by plaintiff's counsel in a deposition on
11  May 14, 2010, a month before you finalized your
12  report, and a month and a half before you testified.
13  It was available to you, readily available.  In
14  fact, plaintiffs had used it as an exhibit.  You
15  didn't feel it was even worth asking them whether
16  that was a draft?
17     A.    It wasn't a matter of asking them.  I
18  saw the document, I assumed that that naturally was
19  the single document.  I made an assumption.
20     Q.    An obviously incorrect assumption?
21         MS. CARTER:  Objection.
22     A.    It turned out to be incorrect that it
23  did exist.
24         MR. ANDERTON:  I want to consult with
25  Mr. Kaplan for a moment.  We're going to go

70 (Pages 574 to 577)

PLAINTIFFS' EXHIBITS 004891

Page 578

1  out and take a break for a moment.  I may be
2  done.
3        THE VIDEOGRAPHER:  We're off the
4  record.  The time is 6:10.
5        (Recess taken.)
6        THE VIDEOGRAPHER:  I'm going to start
7  up in a minute.  We're back on the record.
8  The time is 6:16.
9        MR. ANDERTON:  I have no further
10  questions at this time.
11        MS. CARTER:  I have just literally
12  three questions.
13  EXAMINATION BY MS. CARTER:
14        Q.    Your final report which is Exhibit 48,
15  I believe somewhere around here, you agree with all
16  of the opinions in this report?
17        A.    I absolutely do.
18        Q.    You stand by all the opinions in the
19  report?
20        A.    I stand by them all.
21        Q.    And these opinions you believe are
22  within your area of expertise?
23        A.    Yes, I do.
24        And can I make a statement that this
25  report was not signed I have to retract because it

Page 579

1  indeed was signed.  It doesn't mean that it's a
2  quality document, but indeed it was signed.
3        MR. ANDERTON:  By "this," you're
4  talking about what we discussed as having
5  previously been marked as Plaintiff's
6  Exhibit 137?
7        THE WITNESS:  Yes.
8        MS. CARTER:  That's all I have.
9        MR. ANDERTON:  No further questions.
10        THE VIDEOGRAPHER:  This is the end of
11  the deposition of Mark Kenny.  Today's date
12  is February 16, 2011.  The time is 6:17.
13  We're off the record.
14
15
16
17
18
19
20
21
22
23
24
25

Page 580

1        C E R T I F I C A T E
2
3  STATE OF NEW YORK   )
4        : Ss
5  COUNTY OF DUTCHESS   )
6
7
8        I, Jane Watson, a Reporter and Notary
9  Public within and for the State of New York
10  do hereby certify:
11        That MARK KENNY, the witness whose
12  deposition is hereinbefore set forth, was duly
13  sworn by me and that such deposition is a true
14  record of the testimony given by such witness.
15        I further certify that I am not related
16  to any of the parties to this action by blood
17  or marriage, and that I am in no way
18  interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set my
20  hand this 21st day of February, 2011.
21        _____
22        JANE D. WATSON
23
24
25

PLAINTIFFS' EXHIBITS 004892