# EXHIBIT 512

PLAINTIFFS' EXHIBITS 008116

James J. Farley                                                                    June 28, 2010

                                                                              Page 1

 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       CHARLESTON DIVISION

 3

 4

 5   IN RE:   DIGITEK PRODUCT LIABILITY
                  LITIGATION
 6                                        MDL NO. 1968
     _____
 7

 8

 9

10        The videotaped deposition of JAMES J. FARLEY taken

11   by counsel for the Defendants, Actavis Totowa, LLC,

12   Actavis, Inc., and Actavis Elizabeth, LLC, pursuant to

13   notice and by agreement of counsel, reported by Angela

14   S. Garrett, CSR, RPR, B-2407, at the Embassy Suites, 145

15   Mulberry Boulevard, Savannah, Georgia, on June 28, 2010,

16   commencing at 9:10 a.m.

17

18

19

20

21   --------------------------------------------------------

22

23

24

25

PLAINTIFFS' EXHIBITS 008117

James J. Farley                                                                 June 28, 2010

Page 2

```
1        APPEARANCES OF COUNSEL
2
3   FOR THE PLAINTIFFS:
4
5        PETER A. MILLER, ESQUIRE
         THE MILLER FIRM, LLC
6        108 Railroad Avenue
         Orange, Virginia  22960
7        (540) 672-4224
         pmiller@doctoratlaw.com
8   FOR THE DEFENDANTS, ACTAVIS TOTOWA, LLC, ACTAVIS, INC.,
    AND ACTAVIS ELIZABETH, LLC:
9
10       MICHAEL ANDERTON, ESQUIRE
         TUCKER, ELLIS & WEST, LLP
11       1150 Huntington Building
         925 Euclid Avenue
12       Cleveland, Ohio 44115-1475
         (216) 592-5000
13       manderton@tuckerellis.com
14  FOR THE DEFENDANTS, MYLAN PHARMACEUTICALS, INC., MYLAN,
    INC., MYLAN BERTEK PHARMACEUTICALS, INC., AND UDL
15  LABORATORIES, INC.:
16
17       ERICKA DOWNIE, ESQUIRE
         SHOOK, HARDY & BACON
18       1155 F Street, N.W., Suite 200
         Washington, DC,  20004
19       (202) 662-4864
         edownie@shb.com
20  ALSO PRESENT:  Bill Kaska, Videographer
21
22
23
24
25
```

Page 4

```
1                 E X H I B I T S (Cont'd)
2   DEFENDANTS'
    EXHIBIT
3   NUMBER          DESCRIPTION              PAGE
4   45A    Report of Review of Documents
           dated 2/5/10                       321
5
    45B    Report of Review of Documents
6          dated 5/14/10                      321
7   45C    Report of Review of Documents
           dated 2/5/10                       321
8
9   46     Article titled "Discovering the
           Cause of a Drug's Defect"           70
10  57     FDA 483 dated September, 2007      142
11  58     2008 FDA 483                       298
12  74     Notice of Video Deposition          59
13  74A    Notice of Video Deposition with notes  60
14  74B    Mr. Farley's updated curriculum vitae  66
15  100    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:32 a.m.        321
16
17  101    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:24 a.m.        321
18  102    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:19 a.m.        321
19
20  103    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:12 a.m.        321
21  104    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:03 a.m.        321
22
23  105    E-mail from Mr. Farley to Ms. Barton
           dated 5/14/10 at 10:00 a.m.        321
24
25
```

Page 3

```
1              I N D E X
2                                    PAGE
3   DIRECT EXAMINATION
4       By Mr. Anderton              6
5   CROSS EXAMINATION
6       By Ms. Downie                256
7   DIRECT EXAMINATION (Cont'd)
8       By Mr. Anderton              261
9   CROSS EXAMINATION
10      By Mr. Miller                316
11  REDIRECT EXAMINATION
12      By Mr. Anderton              319
13  Signature of Deponent            323
14  Certificate of Reporter          324
15      (Reporter's Disclosure Statement
         attached to back of transcript.)
16
17  * * * * * * * * * * * * * * * * *
18             E X H I B I T S
19  DEFENDANTS'
    EXHIBIT
20  NUMBER        DESCRIPTION          PAGE
21  20    2004 EIR inspection of Amide    223
22  38    "Facts and Myths About Generic Drugs"  202
23  39    Posting on the FDA Web site     194
24  44    Mr. Farley's curriculum vitae    34
25  45    Report of Review of Various Documents  21
```

Page 5

```
1        THE VIDEOGRAPHER:  Good morning.  We're
2   on record.  It's 9:11 a.m.  The date is June 28th,
3   2010.  This is the videotaped deposition of James
4   J. Farley in the matter of Digitek Product
5   Liability Litigation, United States District Court
6   for the Southern District of West Virginia,
7   Charleston Division, MDL No. 1968.
8        This deposition is being held at Embassy
9   Suites held at 145 Mulberry Boulevard, Savannah,
10  Georgia, 31322.  The deposition was noticed by
11  Matthew Moriarty of Tucker, Ellis & West, LLP,
12  from Cleveland, Ohio.
13       My name is Bill Kaska for McKee Court
14  Reporting here in Savannah, Georgia.  The court
15  reporter is Angela Garrett of McKee Court
16  Reporting, 4849 Paulsen Street, Suite 304,
17  Savannah, Georgia, 31405-4426.
18       Counsel, please state your appearances
19  for the record, please.
20       MR. MILLER:  My name is Pete Miller of
21  The Miller Firm for Plaintiffs.
22       MS. DOWNIE:  Ericka Downie from Shook,
23  Hardy & Bacon on behalf of the Mylan defendants.
24       MR. ANDERTON:  My name is Michael
25  Anderton with Tucker, Ellis & West on behalf of
```

2 (Pages 2 to 5)

James J. Farley                                                                                    June 28, 2010

1    the Actavis defendants.
2         THE VIDEOGRAPHER:  Thank you.  Madam
3    court reporter, would you please the witness.
4         JAMES J. FARLEY
5    having been first duly sworn testified as follows:
6         THE VIDEOGRAPHER:  Thank you.  At your
7    leisure.
8         MR. ANDERTON:  Thank you.
9         - - - - -
10        DIRECT EXAMINATION
11   BY MR. ANDERTON:
12        Q   Good morning, Mr. Farley.
13        A   Good morning.
14        Q   We met a few moments ago.  My name is
15   Michael Anderton.  I am with Tucker, Ellis & West in
16   Cleveland.  And I am here on behalf of the Actavis
17   defendants in the Digitek litigation.
18        Will you just spell your name and provide your
19   home address for the record, please.
20        A   First name James, J-A-M-E-S, I usually use
21   my middle initial, J. for Joseph, last name, Farley,
22   F-A-R-L-E-Y.  Home address is in Savannah.  It's 101
23   Captain John's Drive, Savannah, 31410.
24        Q   And do you have a business address as
25   well?

1        A   That is my business address.  I have a
2    home business.
3        Q   And what business do you run out of
4    your -- do you work for or operate out of your home?
5        A   I do chemistry and pharmaceutical
6    consulting.
7        Q   Do you have a name?  Is there a name for
8    the company that you work for or operate or own?
9        A   I call my company -- I am my company --
10   Cardinal Consulting and Training.  And in this case I'm
11   contracted out to do work for Smart Consulting Group in
12   West Chester, Pennsylvania.
13        Q   So the Cardinal Consulting and Training,
14   do I understand correctly that you are the sole employee
15   of that company?
16        A   I'm everything.
17        Q   Everything.
18        A   That is me.
19        Q   Okay.  And you say you're contracted out
20   by Smart Consulting in Pennsylvania?
21        A   West Chester, Pennsylvania, suburb of
22   Philadelphia.
23        Q   How did that relationship come to be in
24   existence, your current relationship with Smart
25   Consulting in the context of this litigation?

1        A   I've known Nigel Smart, Dr. Nigel Smart,
2    for over a dozen years now and we work together on
3    projects.  And most recently Nigel and his wife, Denise,
4    formed their own business.  By recently, the last half a
5    dozen years, somewhere thereabouts.
6        And he will call people he knows on certain
7    projects and contract with them and say, here's a
8    project, would you do this aspect of the project for me.
9    That's what I mean by contract out.
10        Q   Okay.  And is that how your relationship
11   with -- or how your involvement in this litigation came
12   to be?  Did he contact you and ask you to be involved in
13   some aspect of this litigation?
14        A   Yes.
15        Q   When did that happen?
16        A   I'd have to check the records for initial
17   contact, but it was around the end of last year or
18   beginning of this year.
19        Q   End of 2009, beginning of 2010?
20        A   Yes.
21        Q   After -- is it Dr. Smart?
22        A   Dr. Nigel Smart.
23        Q   After Dr. Smart contacted you did you
24   ultimately come to have direct contact with counsel for
25   the plaintiffs in this litigation?

1        A   Yes.
2        Q   And how did that come to be?  Did
3    Dr. Smart put you in touch with them?  Did they contact
4    you directly?  How did that happen?
5        A   He did what is pretty much typical in
6    situations like this.  He said a gentleman named Peter
7    Miller will be contacting you, I've given you his number
8    and he will call you to discuss the project with you.
9    And it was either the same day or the following day that
10   Pete Miller did call me and we discussed the project.
11        Q   Okay.  And he said gentleman?
12        A   I'm sorry?
13        Q   Never mind.  You're not a medical doctor,
14   are you?
15        A   No.
16        Q   Your testimony a moment ago was that you
17   provide consulting service on I think chemistry and what
18   was the second category?
19        A   Pharmaceuticals, general pharmaceuticals,
20   a lot of FDA regulatory.
21        Q   I want to find out a little bit more about
22   that.  When you say pharmaceuticals and then you expand
23   that a little bit by saying a lot of FDA regulatory, can
24   you give me more detail?
25        What does -- what type of consulting do you

3 (Pages 6 to 9)

James J. Farley                                                                                        June 28, 2010

Page 10

1  do?  What do you consult in with respect to
2  pharmaceuticals as you've described it?
3      A  I'll go back to 1996 when I resigned my
4  position at the FDA in Philadelphia.
5      Q  Okay.
6      A  And I formed Cardinal Consulting, which
7  was just give me the name and saying I'm going to be a
8  consultant.  And initially it was analytical methods and
9  analytical procedures because much of that was what I
10  did.
11          However, in my eight years at FDA, during
12  which time they promoted me to be director of the
13  science branch of the Philadelphia district where 30
14  chemists were in my employ, I -- since I had
15  participated in FDA inspections, since I had to assign
16  chemists to FDA inspections and since I had to review
17  Establishment Inspection Reports, called EIRs, and the
18  FDA 483s and review and in some cases sign warning
19  letters, I included that in my repertoire of services.
20      Q  So -- I mean, you just described how you
21  came to kind of provide consulting services and how you
22  expanded it beyond analytical methods consulting.
23          Can you give me just a little more detail just
24  about exactly what you -- what you do in a typical
25  consulting -- or what services you will offer?  I

Page 11

1  should -- let's start -- let's back that up.
2      A  Uh-huh.
3      Q  First tell me in more substance when you
4  say you consult with respect to analytical methods or
5  with respect to FDA regulatory, what types of activities
6  do you actually perform?
7      A  Uh-huh.  With regard to analytical test
8  procedures, those test procedures which are within my
9  area of expertise, I may design it for a pharmaceutical
10  firm or I may review one that they have and add, delete
11  or modify as necessary or I may review one that they're
12  having a problem with or I may visit a contract testing
13  firm and look at their methods.
14          If the big firm wants to contract out they
15  might say, Jim, go look them over and tell us that
16  they're okay.  So I could do any of those things
17  relevant to analytical procedures.  That would extend
18  over to Good Manufacturing Practices, GMPs.
19          A lot of times you see it with the little c
20  for current in front of it, but GMP is the normal term.
21  And that would involve everything from raw material
22  coming in to a firm, how is it tested, who tests it,
23  what procedures, standard operating procedures, SOPs,
24  are in place or are needed, how are -- how are these
25  materials transported to manufacturing, what in-process

Page 12

1  tests are done in manufacturing, how about the
2  qualifications of people all along the way,
3  qualifications of training, up to and including finished
4  goods testing, which is also called release testing
5  because you're releasing the product to the public.  So
6  that's all the testing.
7          But there's more to it.  You have the
8  calibrations.  You have your systems.  You have the
9  entire system, not just of the test.  The test is part
10  of the system.
11          It's the training of the individuals, the
12  assignments given to the proper individuals, their
13  experience with it.  I'll pause here and look to you
14  for -- what more do you want?
15      Q  I think that's enough detail.  You've
16  given me a --
17      A  Okay.
18      Q  -- better understanding of what you do
19  when you provide pharmaceutical consulting.  And I
20  should pause briefly, Mr. Farley, and go over a quick
21  ground rule that I should have incorporated into the
22  examination at the very -- you know, at the very
23  beginning.  And I apologize.
24          But if I ask you a question today and you
25  don't understand it, if I say it poorly, if it just

Page 13

1  doesn't make sense, if for whatever reason you don't
2  understand it, will you please ask me to say it
3  differently or ask it differently or to rephrase it
4  somehow?
5      A  Yes, I will.
6      Q  Okay.  And if you answer a question that I
7  ask you and you don't ask me to rephrase it, I will
8  assume that you understood it as asked and that you
9  answered it with an understanding of it as I asked it.
10          Is that -- is that fair?
11      A  That's fair.  I understand what you're
12  saying now.
13      Q  Excellent.  So the consulting services
14  that you just described in reasonably significant
15  detail -- and I'm talking about the -- not the
16  analytical method consulting, but the consulting
17  services that you -- the pharmaceutical, the regulatory,
18  how much of your current workload at Cardinal is divided
19  between regulatory consulting and the analytical methods
20  consulting?
21      A  The analytical methods consulting is part
22  of the regulatory since the methods must be designed and
23  validated in order to be submitted to FDA.  So I'm going
24  to take my time and try to answer your question.  But
25  since regulatory includes these methods --

4 (Pages 10 to 13)

PLAINTIFFS' EXHIBITS 008120

James J. Farley                                                                    June 28, 2010

Page 14

1    Q  Right.
2    A  -- at any given time these days it could
3  be anywhere from 10 to 40 percent.  It depends on the
4  individual project.
5    Q  So do I understand that you would say that
6  60 percent or so of your current consulting work focuses
7  on the analytical methods, purely the analytical methods
8  review and analysis?
9    A  No, no.  That's not what I meant.
10    Q  Okay.  Then I misunderstood.
11    A  I'll reword it.
12    Q  Okay.
13    A  Taking analytical methods development or
14  review or evaluation, anything related to analytical
15  methods as part of regulatory, that percentage of the
16  analytical methods work that is part of my overall
17  regulatory business can vary from 10 to 40 percent of
18  work with time involved at any given time.
19    Q  Okay.  Okay.
20    A  Is that --
21    Q  All right.  So you consider it all
22  regulatory with 10 to 40 percent being the analytical
23  methods type analysis?
24    A  Yes.
25    Q  Okay.  And your clients then typically are

Page 15

1  pharmaceutical manufacturers or companies who are
2  somehow involved in the pharmaceutical industry?
3    A  Yes.
4    Q  Have you been -- well, when you're hired
5  by a company to engage in regulatory consulting as
6  you've described it, tell me how you would kind of
7  approach that engagement.
8       Tell me the steps that you would undertake in
9  a typical engagement if somebody is hiring you -- let's
10  say, for example, a company hires you to determine
11  regulatory compliance, whether they are in compliance
12  with Good Manufacturing Practices.
13       How would you undertake that engagement?
14    A  What I would do first is define the scope
15  of work, what do you want me to do, because the way that
16  is presented, get us in compliance, that could range
17  anywhere from two days to two years.
18       So as with any project in any field, define
19  the scope of work so that you're doing the proper thing
20  for the customer.  The reason I say that is a customer
21  might say, I have another consultant doing computer
22  validation.  Good.  You don't want me to go near your
23  computer validation.
24       But I want to look and say, all right, what do
25  you want me to do?  Analytical methods.  How many?  Let

Page 16

1  me see which ones they are.  Do you need any developed?
2  Do you want me to review them?  What do you want me to
3  do?  Then I will look at them.  And it could be -- and
4  I'm making this up to answer your question right now.
5    Q  Understood.
6    A  It might be, I've got to be at your firm
7  and watch this being done.  You have the method.  It's
8  not working out.  I have to be there to see -- meet the
9  analysts and see who's doing it.  Vastly different in
10  time and money than sending it as an e-mail attachment
11  and having me read it.
12    Q  Okay.
13    A  So I want to look at that and then put a
14  proposal to the client as to the job as I perceive it is
15  review the following methods.  I will come to your
16  facility for two days and work with your analytical
17  chemists.  Then I will go back to my home base and write
18  a report.
19       In some cases it might just be, we'll send you
20  the methods and tell us if they're in the proper format.
21  So getting to your original question, I would first
22  define the scope of work and then give them a proposal
23  as to how I would go about it to get their authorization
24  for it.  And then we proceed from there.
25    Q  And once you -- and once you provided them

Page 17

1  the proposal and defined the scope of the project as
2  you've described it, if you were asked by a company to
3  determine whether a certain product had been
4  manufactured and released in compliance with Good
5  Manufacturing Practices, would that involve document
6  review?
7    A  Yes.
8    Q  What types of documents would you review
9  in the context of that analysis?
10    A  Could I have that question again?
11    Q  Yes.  I asked you if you would review
12  documents in order to determine whether a certain
13  product had been manufactured in compliance with Good
14  Manufacturing Practices and you said yes.
15    A  Yes.
16    Q  What types of documents would you review
17  to undertake that analysis and advise the company
18  whether they then -- whether that product had been
19  manufactured in compliance with Good Manufacturing
20  Practices?
21       MR. MILLER:  And I'm going to object.
22  It's an incomplete hypothetical.  But it's okay to
23  answer.
24    A  For a thorough answer to your question, or
25  a thorough part of -- again, defining the work, I would

5 (Pages 14 to 17)

PLAINTIFFS' EXHIBITS 008121

James J. Farley

June 28, 2010

Page 18

1  say to the client, well, what I want to do, I want to
2  see -- are you having any problems anywhere?  Are you
3  having problems with new analytical chemists that are
4  having problems with their answers?  I try to define it
5  more specifically.
6       And -- but typically it involves going back to
7  all the procedures from raw materials coming in, in
8  process materials as it is being produced and the
9  testing that's associated with it and the finished goods
10  released.
11       I want to see the whole workload from raw
12  materials in to finished product out.  That's what I
13  want to see.  And I also want to see -- and it's very
14  important -- the training records of the people involved
15  in doing it to make sure they're qualified.
16       Q  So you want to see -- if I understand
17  correctly, you want to see all documents associated with
18  production of that product?
19       A  Yes, I do.
20       Q  And you want -- and then you review them
21  and develop your opinion as to whether GMPs have been
22  complied with or not?
23       A  Yes, I would.  I want to put it in a
24  proposal first --
25       Q  Understood.

Page 19

1       A  -- so that the client knows the time and
2  their money involved and they don't try to get me to
3  short-cut something.  So you have to be thorough in
4  things.  And I want them to know the degree of
5  thoroughness and the amount of time and energy it will
6  take to do it.
7       Q  I understand.  But in order to be thorough
8  and to properly advise that client about whether that
9  product had been manufactured and released in compliance
10  with Good Manufacturing Practices, you'd tell them up
11  front so that they wouldn't be surprised at how much
12  time and cost might be involved that you need to require
13  all of the records you've just described -- or I'm
14  sorry -- you need to review all of the records that
15  you've just described.  You'd tell them that up front,
16  correct?
17       A  Yes, I would.  And it wouldn't surprise
18  them.  They usually expect me to say that.
19       Q  Okay.  What if they didn't want you to
20  review those records?  Could you do the analysis that
21  I've just described?
22       A  It is quite likely that I could not and I
23  would not accept the project.
24       Q  Okay.
25       A  I might just say, you don't want me, you

Page 20

1  want someone else, I can't do it under your constraints.
2       Q  Okay.  Have you ever been deposed before?
3       A  Yes.
4       Q  How many times?
5       A  In the last four years twice.
6       Q  Tell me about those two times.
7       A  Can I refer to my report?
8       Q  Actually -- to your report?
9       A  It's --
10       Q  Your expert report?
11       A  The depositions are in the report.
12       Q  Yeah.  Let's do this a little differently,
13  though, because I've actually got that marked as an
14  exhibit, so -- and if you can -- you can go ahead and
15  put those off to the side.  I'm going to review those
16  when we get a break.  But I --
17       A  All right.  If you have the two cases --
18       Q  I do.
19       A  -- that will be fine.
20       Q  Okay.  So, Mr. Farley, I have handed you a
21  copy of a document.  And we've pre-marked our exhibits.
22  You might have heard a little bit of that exchange as we
23  were getting ready to go on the record this morning.  So
24  the numbers aren't going to go sequentially necessarily.
25  If we mark new exhibits we'll make them somehow

Page 21

1  sequential.  But this document has been premarked as
2  Exhibit 45.
3       A  Can I write on this?  It's dark.
4       MR. MILLER:  No.
5       Q  No, you can't.
6       A  I'll just remember 45.  I'll remember it.
7       Q  Yeah.  Well, we'll remember that it's your
8  report.  Will you take a moment just to look at that
9  document and confirm that it is the report you were
10  referring to a moment ago, your expert report in this
11  case?  And I will tell you in advance that we have taken
12  your CV off the back.  We'll make that a separate
13  exhibit.
14       A  That's my report.
15       Q  Okay.  So Exhibit 45 is the report that
16  you prepared I assume at the request of Plaintiffs'
17  counsel in this Digitek litigation and it's the report
18  you were referring to when I asked you to identify
19  the -- or you were about to review and refer to when I
20  asked you to identify the times you've been deposed in
21  the last couple of years, correct?
22       A  Yes.
23       Q  Will you -- so let's go back to my
24  question.  What are the times you've been deposed?  You
25  said you've been deposed twice.

6 (Pages 18 to 21)

PLAINTIFFS' EXHIBITS 008122

James J. Farley                                                                June 28, 2010

Page 22

1     A   In the last two years.
2     Q   Okay.
3     A   I believe I was several years ago, but
4  it's vague in my memory.  But these are the more recent
5  ones and they're on page 4 under background.
6     Q   Okay.  And so I see two cases listed here.
7  One it looks like Chanin versus Desert Shadow Endoscopy
8  Center.  Tell me about that.  What was the nature of
9  your involvement in that litigation?
10    A   I heard the question.  I'm trying to think
11  of --
12    Q   Take your time.
13    A   I'm posing my answer so I know where to
14  start and get right to the answer.
15    Q   I appreciate that.
16    A   There was -- there are a couple of
17  endoscopy clinics all under the same ownership in Las
18  Vegas.  And there were a combination of factors.  They
19  were multi-dosing Propofol when they would sedate the
20  patients for endoscopies and other such procedures.
21        And they were accused of -- I say -- I'm
22  pausing about the word alleged.  It's been proven.  So
23  I'll knock out the word allege.
24        They were taking Propofol from a large
25  container, giving it to one patient and taking a little

Page 23

1  more, giving it to that patient and then taking some and
2  giving it to another patient.  In the course of doing
3  that several patients contracted hepatitis.
4        Teva and Baxter, the manufacturer and
5  distributors, were involved in that they were selling
6  the large units where a purchaser like an endoscopy
7  clinic could get a discount price and were selling it to
8  a clinic known that they only needed the little vials.
9        And while I'm pausing, because once I did my
10  work I'm speculating what came after, but the court
11  judged that, yes --
12    Q   And I apologize for kind of cutting you
13  off.  Can you just describe for me what your involvement
14  in the case was?  Generally what were you engaged to do
15  review and what was the general subject of your
16  opinions?
17    A   Thank you for that.  I was pausing because
18  I wasn't sure --
19    Q   Yeah, yeah.
20    A   -- this or that what the Court said when I
21  wasn't there.
22    Q   At least initially I'd only like to hear
23  your involvement and what your opinions were.  And then
24  I'll decide whether I want to ask more.
25    A   That's what I can answer most

Page 24

1  intelligently.
2     Q   Okay.  Excellent.
3     A   My involvement was looking at the labeling
4  of the Propofol and the manufacturing of the Propofol
5  and rendering an opinion in that regard.  Does that
6  answer your question?
7     Q   It absolutely does.  And does that mean
8  that your involvement in that case did not touch on --
9  you weren't asked to give an opinion about regulatory or
10  GMP compliance in any aspect?
11    A   With regard to the labeling.
12    Q   Not with respect to production or
13  manufacturing or analytical or laboratory related GMPs?
14    A   Not to any major degree.
15    Q   Okay.  The next case listed here, Olson
16  versus Septodont, tell me about your -- again, what was
17  your involvement?  What were you engaged to give an
18  opinion on in that case?
19    A   In one respect it was a similar case.  It
20  just happened to be.  A lady in the Tacoma, Washington
21  area who was a dental patient was given Septadine by her
22  dentist.  And the reason for that is to numb the gum
23  area while the dentist did his work.
24        But she -- I'll use the word overdosed, but
25  I'll put it in quotes, because I don't want to use

Page 25

1  that -- too much was given.  And she -- it ruined her
2  nerve.  Her face sagged.  She has trouble talking.  It
3  was irreversible what happened to her.  And we looked at
4  manufacturer, industry and the labeling aspects of it,
5  including directions.
6     Q   And when you say we, do you mean you?
7     A   Oh, me.  There were no other chemists to
8  my knowledge.  At least I didn't meet any.  We meaning
9  my client, the lawyer.
10    Q   So what type of compliance issues did you
11  give an opinion about in that case?  Do you remember?
12    A   Labeling plus the responsibilities of a
13  generic manufacturer.
14    Q   With respect to what?
15    A   With respect to labeling, extra labeling,
16  putting warnings on, giving notices, keeping track of
17  who buys it.
18    Q   Okay.  So that was -- your involvement in
19  that case was fairly narrowly limited to labeling and
20  related issues?
21    A   Yes, uh-huh.
22    Q   Let's go back to your time at the FDA.
23  You were there from 1989 until 1996?  Does that sound
24  right?
25    A   Yes.

7 (Pages 22 to 25)

PLAINTIFFS' EXHIBITS 008123

James J. Farley                                                                June 28, 2010

Page 26

1     Q  And you said -- your background -- well,
2  first things first.  Your background, your educational
3  background, is in chemistry, correct?
4     A  Primarily.  I have a master's degree in
5  physio-chemistry, but then I went on to get an MBA in
6  financing and marketing.
7     Q  Okay.  And when you were at the FDA you
8  were initially hired as an analytical chemist?
9     A  Yes.
10     Q  How long were you in that position?
11     A  By title, about three years; by
12  assignment, about one year.  The district director of
13  the Philadelphia district and the regional director of I
14  think four districts at that time, Baltimore -- it's
15  been rearranged.  It's vague now.
16     But the regional director knew that I had
17  experience in the pharmaceutical industry.  And they had
18  some things they wanted me to help out with, like
19  getting the samples out more on time and looking at some
20  things that -- I'm pausing because I don't want to say
21  anything negative about government employees.
22     But there were some mindsets there of this is
23  the way we've always done it.  And as one of my bosses
24  said to me, you're breathing a breath of fresh air in
25  here letting us get done what we want to get done.

Page 27

1     And just helping them like, why are you doing
2  this when you should do this, little management
3  assistance but I was still classified as an analyst.
4  But I would travel to the Baltimore lab and the
5  Cincinnati lab as in effect the person who was sent by
6  the regional director to work with them to improve their
7  procedures.
8     Q  Does that mean that you were providing
9  guidance or insight with respect to what I'll
10  characterize as efficiency issues?
11     A  Yes.
12     Q  Okay.  And you say that started after
13  about a year?
14     A  Yes.
15     Q  It lasted how long?
16     A  Up to and including when they promoted me
17  to be director of the science branch, which is in effect
18  the laboratory director.
19     Q  Okay.  And that was after three years,
20  after you've been at the FDA for three years?
21     A  Three years, three and a half.  Three.
22  Just say three.
23     Q  Okay.  You were there a total of about
24  eight years?
25     A  About eight.

Page 28

1     Q  When you became director of the lab I take
2  it that means you jumped over a couple levels of
3  supervisors to go from an analyst position with those
4  kind of efficiency responsibilities directly to the
5  director of the lab.
6     Does that mean you jumped over a couple of
7  levels?
8     A  Yes.  Some people I worked for were then
9  working for me.
10     Q  That's always fun.
11     A  It was.
12     Q  Tell me what you did as director of the
13  lab.
14     A  With 30 chemists in the lab I was
15  responsible for all of their functions.  I worked
16  through two supervisors.  There were two supervisors who
17  reported to me.  But I knew everyone in the lab on a
18  first name basis.
19     But they had to get their analytical work
20  done, their analytical work of samples that were taken
21  and brought in from pharmaceutical firms.  They had to
22  do that.
23     They did some analytical methods development
24  and they had to accompany the inspectors on the
25  inspections.  An inspector is an investigator, is a

Page 29

1  consumer safety officer.  They were all the same.
2  Consumer safety officer is their designation, CSO, but
3  we called them inspectors or investigators.
4     When they go on an inspection they want one or
5  more chemists with them to be more knowledgeable about
6  the scientific aspects of their investigation.  An
7  investigator -- I've known investigators that had Ph.D.s
8  in science and I've known others that had 30 credits in
9  science.
10     The ones that -- the ones in inspections, they
11  know what they're going to be looking at.  And if they
12  don't know initially they see when they get there and
13  they'll call and say, I need a chemist who's
14  knowledgeable about this or this.  Okay, send them up.
15     So participating in inspections, assigning the
16  proper chemist and doing the scheduling to make sure
17  that the work flow in the lab is always done.  This was
18  all part of the job of running the lab.
19     Q  Okay.  So typically you weren't the person
20  who was in the field involved in FDA inspection,
21  correct?
22     A  I was as an analyst accompanying
23  investigators in the scenario I just mentioned.
24     Q  Well -- okay.  So as an analyst you mean
25  during that first year of employment before you started

8 (Pages 26 to 29)

PLAINTIFFS' EXHIBITS 008124

James J. Farley                                                                                      June 28, 2010

Page 30

1  traveling to other labs and counseling the FDA regional
2  offices or district offices on efficiency?
3          A   And during the second and third year.
4  When needed, when they needed me.
5          Q   How often?
6          A   It's tough to pick an average.  You might
7  go two in a row and then none for a couple months.  It's
8  difficult.  If I said a few, would that be too vague?
9          Q   Well, if you give me a better sense of a
10 few.  You were in that position for -- as an analyst --
11 let's break this down a little bit.  As an analysis you
12 were in that position for three years.
13         A   Yes.
14         Q   During those three years did you
15 participate -- and by participate I mean go out and
16 actually -- where you were actually on site, not
17 involved in scheduling and deciding who goes and things
18 like that, but where you were actually on site how many
19 inspections would you say you were involved with during
20 those three years?
21         A   I'm drawing on my memory now.
22         Q   All I can ask you is to the best of your
23 recollection.
24         A   One quarterly.
25         Q   One quarterly.  So that's perhaps a dozen

Page 31

1  in three years?
2          A   Yes.
3          Q   And you weren't necessarily on the
4  premises for each and every day of all of those
5  inspections, right?  You were there as needed?
6          A   Generally as needed.  The inspectors feel
7  comfortable having you there every day, but the workload
8  doesn't always permit it.  They really feel comfortable
9  having one or two scientists around.  But you get there.
10 You do your job.  What do you want me to look at?  What
11 do you want me to evaluate?  And then you -- that's it.
12         Q   When you became director, so during that
13 last five years, how many inspections were you involved
14 with by actually -- and by involved I mean actually on
15 the premises during the inspection.
16         A   I wasn't assigned directly because it
17 wasn't my primary area of responsibility.  However,
18 in -- I should say the Philadelphia district included
19 Pennsylvania and Delaware.  And the laboratory covered
20 Jersey because they didn't have a lab.
21         I would not be assigned to go on any of them.
22 But I would on occasion say, I'm going to drop in on
23 such and such a day and just walk through with you.  And
24 that might be to Merck or what was then SmithKline
25 Beecham -- it's now GlaxoSmithKline -- just to make sure

Page 32

1  that everything was going along well.
2          Q   So participating in investigations or
3  inspections in the field was not something you did
4  regularly?
5          A   You could say that, yes.
6          Q   How many -- you mentioned earlier and I
7  believe your report references it as well.  How many
8  warning letters did you issue while you were employed by
9  the FDA?
10         A   I signed?
11         Q   Well, let's break that down a little bit.
12 How many -- let's ask that question first.  How many
13 warning letters did you actually sign?
14         A   I might have only actually signed one.  I
15 was involved in the input of various -- our district
16 director signs the warning letter.
17         Q   How many -- well, did you draft that one
18 warning letter that you signed?
19         A   No.  It's drafted by the investigation
20 staff and then brought to you and you -- that is a
21 document that before you sign you read every word.  It's
22 not a glance at and sign and get it off your desk type
23 of document, not to imply that the federal government
24 has any like that.  But you read every word because of
25 the severity of it.

Page 33

1          Q   Well, but there's a difference between
2  reading it and having an understanding of it and
3  actually drafting and having input, correct?
4          A   Yes.
5          Q   And as director of the lab you weren't
6  responsible for drafting and developing warning letters,
7  were you?
8          A   No.
9          Q   And in fact, the one that you signed you
10 signed only because you were in some sort of acting
11 capacity outside your lab director position?
12         A   It was while I was still a lab director,
13 but when the boss would either be on some -- maybe down
14 at headquarters for a meeting or on vacation he might
15 just say, Jim, take my place as district director for
16 this week.  And I might say, well, Boss, what have you
17 got coming in?  And he might give me a rundown of what
18 to expect.
19         Q   So that made you essentially acting
20 district director?
21         A   Yes.
22         Q   And that's why you signed that single
23 warning letter?
24         A   Yes.
25             MR. ANDERTON:  Are you sharing one with

9 (Pages 30 to 33)

James J. Farley                                                                                    June 28, 2010

Page 34

1   him?
2           MR. MILLER:  It looks like I am.
3           MR. ANDERTON:  Okay.
4           THE WITNESS:  Okay.
5           MR. ANDERTON:  Actually do you need one
6   while we're --
7           THE COURT REPORTER:  Not while we're
8   doing this.
9           MR. ANDERTON:  Okay.  Thank you.  So the
10  ones that we give Mr. Farley can go to Angela.
11  BY MR. ANDERTON:
12      Q   Mr. Farley, I've handed you a document.
13  And I know the exhibit stickers perhaps are difficult to
14  read.  But it has been marked as Defendants' Exhibit 44.
15      A   Yes.
16      Q   Can you just take a moment to review that
17  document, please.
18      A   That's me.
19      Q   Okay.  Is that an accurate copy of your
20  CV?
21      A   Yes, it is.
22      Q   It's the one that you actually attached as
23  Attachment A to the report that you prepared in this
24  case, correct?
25      A   Yes.

Page 35

1       Q   I think I asked you this earlier.  You're
2   not a medical doctor, correct?
3       A   I'm not a medical doctor.
4       Q   All right.  Is it accurate to say that
5   your expert opinions in this case are limited to
6   opinions about whether Actavis was in regulatory
7   compliance with Good Manufacturing Practices?
8       A   Yes.
9       Q   You're not offering any opinion about how
10  any -- whether -- let me start that over.
11          You're not offering any opinion about whether
12  any specific consumer or patient got or received and
13  took product that was defective?
14          MR. MILLER:  Object to form of the
15      question.
16      A   I'm not sure I'm understanding your
17  question the way it's worded.
18      Q   Let me see if I can ask it more clearly.
19  Is it true that you're not offering an expert opinion
20  about whether a patient in the market received a
21  defective Digitek tablet?
22      A   I wouldn't know if a patient in the market
23  received a defective tablet unless I was told or saw
24  data.  Is that --
25      Q   Well, so then -- but you need to answer my

Page 36

1   question, Mr. Farley.  You're not offering an opinion in
2   this case about whether any consumer received a
3   defective Digitek tablet, correct?
4           MR. MILLER:  Object to the form of the
5       question.
6       A   I'm thinking the way it's worded, I read
7   that a consumer did, but I don't have an opinion on it.
8       Q   Well, so I need to be clear then.  You're
9   not offering an opinion on that subject, correct?
10      A   As to whether a person taking a particular
11  medication received it or not?
12      Q   Correct.
13      A   I have no idea who took it.
14      Q   Okay.  And you're also not offering any
15  opinion about how specific patients react to specific
16  doses of Digitek, are you?
17      A   Not a professional or an expert opinion.
18  There are things you know about certain drugs from being
19  in the industry 40 or 45 or more years, but not who
20  would be prescribed.  I don't prescribe.
21      Q   Well, all right.  Again, I want to make
22  clear.  In the context of this case and this litigation
23  you're not offering any opinions about how any patient
24  reacts to a specific dose of Digitek; is that correct?
25      A   Not with regard to a patient, no.

Page 37

1       Q   Okay.  Have you ever been a defendant in a
2   lawsuit?
3       A   I'm pausing.  I should know, like would
4   know, but I'm -- in order to answer your question
5   correctly, no, I have not.
6       Q   Have you ever actually testified -- we've
7   talked about the times you've been deposed.  Have you
8   ever actually testified in court?
9       A   Not as a consultant.  When I was with the
10  FDA -- and that was not a case such as this.  That was
11  an EEO case since I was chairman of equal opportunity at
12  the same time.
13      Q   So it was an employment case, not a
14  regulatory and -- not a case that had anything to do
15  with regulatory compliance?
16      A   Correct.
17      Q   Any other times?  Have you ever testified
18  any other times?
19      A   I did not.  They all settled.  I would be
20  glad to do it, but they just -- the attorney, my client,
21  would contact me and say, we settled the case, send the
22  final bill.  And that was it.
23      Q   How did you prepare for this deposition?
24      A   During -- off and on.  During the last
25  several weeks I would receive documents from Miller Law

10 (Pages 34 to 37)

PLAINTIFFS' EXHIBITS 008126

James J. Farley                                                                                    June 28, 2010

Page 38

1  Firm, specifically Pete Miller.  And I would review
2  them.  And when I received notice about a week ago that
3  this deposition would be today I said, how about if I
4  review my reviews.  And that's what I did.
5       Q   And the documents that you said you
6  reviewed over the last several weeks, what documents
7  were those?  Well, let me make that question clearer.
8       The documents that you said you received from
9  the Miller Firm over the last several weeks, I believe
10  is your terminology, what documents were those?
11      A   They would include EIRs, Establishment
12  Inspection Reports; 483s; warning letters; a revised
13  warning letter; various documents within a firm; charts
14  of regulatory activity; some current Actavis
15  correspondence, internal and to the FDA; the request for
16  consent decree; the consent decree itself.
17      They would all come in binders and a binder
18  might contain a variety of document -- would contain a
19  variety of documents.  That's what.
20      Q   When did you start receiving those
21  documents, those binders of documents?
22      A   I believe the first binder arrived in
23  January.  Then -- I reported on that and then there was
24  a space in time and then another binder arrived in
25  April.

Page 39

1       Q   When you say then you reported on that
2  first binder, what do you mean by you reported on that?
3       A   Wrote a brief report on my evaluation --
4       Q   Of that first binder?
5       A   -- of the contents of the first binder.
6  Yes.
7       Q   And what became of that brief report
8  regarding the contents of that first binder?
9       A   I sent it to Pete Miller at Miller Law
10  Firm.
11      Q   Do you have that first report on that
12  first binder with you today?
13      A   I've got it on a thumb drive.
14      Q   Thumb drive.  I was --
15      A   There was only so much I could fit in
16  suitcases.
17      Q   And having read one of your prior
18  deposition transcripts I know that you use the thumb
19  drive.  So that's on my list of things to ask you today,
20  believe it or not.
21      We will definitely want to take the thumb
22  drive and -- or somehow get the documents that are on
23  that thumb drive that relate to this litigation in our
24  possession.  Okay?
25      A   Yes.

Page 40

1       Q   And in fact, it occurs to me I might want
2  to see those today before we leave so that I can
3  determine whether I want to ask you any questions about
4  that.
5       A   Yes.
6       Q   So we'll work on that during the break
7  somehow.  Okay?
8       A   Fine.
9       Q   How many binders total did you receive
10  from -- well, did you receive documents from anyone
11  except the Miller Firm?
12      A   I'm thinking.  I heard your question.
13      Q   Take your time.
14      A   I'm thinking to give you an accurate yes
15  or no on that.
16      Q   I appreciate that very much.
17      A   No, only the Miller Firm.
18      Q   How many binders or -- how many times did
19  you receive documents?  Perhaps they weren't always in
20  binders.  How many -- how many shipments of documents
21  did you receive from the Miller Firm?
22      A   A total of five binders.  There may have
23  been two in one shipment.  So my answer is it's
24  definitely binders and likely to be four shipments.
25      Q   Okay.  Are the documents -- and did you

Page 41

1  review all of the documents in those binders?
2       A   Yes.
3       Q   Are the documents you reviewed -- now, I
4  asked you initially what you did to prepare for this
5  deposition and I think we've kind of transitioned to
6  what you did to prepare your report.
7       Is that a fair characterization of what we're
8  describing now when we're talking about all of these
9  binders received over what sounds like a five- or
10  six-month period?
11      A   Yes.  That was -- I had the initial binder
12  and then wrote a report on -- in February, I believe
13  February 5th.  And then later on more binders arrived.
14  So I reviewed them and I wrote another report.
15      Q   So you wrote -- did you write a report in
16  response to each binder that you received?
17      A   Not in response to each binder.  I just in
18  effect kept building up the original report.
19      Q   Okay.
20      A   I took the original report and just
21  expanded the table.  But each document has an individual
22  review electronic file on my thumb drive.
23      Q   Okay.  So each document then has a -- I
24  take it then that there are documents on that thumb
25  drive that reflect your specific analysis and perhaps

11 (Pages 38 to 41)

PLAINTIFFS' EXHIBITS 008127

James J. Farley                                                                                    June 28, 2010

Page 42

1  comments regarding each document that you reviewed?
2      A  All 93 of the -- all -- some were
3  duplicates in title but had different redactions.
4      Q  Okay.
5      A  So there may have been roughly 80 to 85
6  different documents.  I had a total of 93.  And in some
7  cases here's a 483, here's a 483 I received two months
8  ago, but there are different redactions.  I can see more
9  or less.  So I'm saying 93 documents and -- 90 to 93.
10  But each one is a file on the thumb drive in my pocket.
11     Q  Okay.  Well, that's going to speak to the
12  viability of my reviewing those documents on a break
13  today.  And unfortunately it may also speak to whether
14  we have to reconvene, leave the deposition open and have
15  a second session.  But those are decisions that we'll
16  make as we kind of move through the process.
17         MR. MILLER:  While we're on that topic, I
18     brought a hard copy of everything he's talking
19     about and you're certainly more than welcome to
20     take a look at mine.
21         And although it sounds quite lengthy,
22     it's not as lengthy as you would think.  I wasn't
23     anticipating the thumb drive.  So I brought a copy
24     for me.
25         So being the great guy that I am I'm

Page 43

1  going to offer up the copy that I brought so you
2  can read them at lunch in hopes of possibly
3  wrapping this up.
4         MR. ANDERTON:  Okay.  Well, I appreciate
5     that and we'll certainly take a -- at least an
6     initial run through it and we'll decide from
7     there.
8         I mean, I apologize if there's an
9     inconvenience involved, Mr. Farley, but I hope you
10    understand, you know, we have to see what's out
11    there and then react accordingly.
12        THE WITNESS:  There's no inconvenience.
13    That's what we're here for and that's why I
14    brought the little computer and the thumb drive.
15        MR. ANDERTON:  I'm actually talking about
16    the possibility of reconvening and having at least
17    a partial second session, you know, if I decide
18    that we can't get it all done today and if we need
19    a little time to review those documents.  But
20    we'll make those decisions as we move through the
21    process.
22        THE WITNESS:  Your choice.
23        MR. ANDERTON:  Excellent.
24  BY MR. ANDERTON:
25     Q  So then you said you kept building up the

Page 44

1  report.  Does that mean that you would characterize each
2  of these reports as drafts that led up to the final
3  report you issued in this case?
4      A  No.  They weren't intended to be drafts.
5  I might prepare a report and save it as a file on my
6  thumb drive and the C drive, the C drive of my PC in my
7  home office.
8      Q  Right.
9      A  And then I'd review it a couple days later
10  and I might say, oh, well, I looked at more references
11  than that, I looked at the Physicians' Desk Reference, I
12  looked at this.  And I would, upon thinking about it,
13  add more to it.
14        But then I felt I can't keep it as the same
15  document.  I added to it for the reason I just
16  mentioned.  I'll save it as a new document.  And I
17  usually did that just by the date.
18     Q  Okay.  Okay.  The 90 or so documents that
19  you said you reviewed, some duplicates or others with
20  different redactions, are all of those
21  documents listed in your report as documents that you
22  reviewed?
23     A  Yes, they are.
24     Q  Are there any documents that you reviewed
25  in order to prepare your report that are not listed and

Page 45

1  identified in your report?
2      A  My offhand answer is no.
3      Q  Are there any documents that you -- and
4  did you review every document that you received from the
5  Miller Firm?
6      A  Yes.
7      Q  Are there any documents that you received
8  from the Miller Firm that are not listed in your report?
9      A  No.
10     Q  The thumb drive that you have today that
11  we're going to do something with, are there any
12  documents that relate to your engagement in this
13  litigation that are not on that thumb drive, stored
14  somewhere else perhaps?
15     A  Documents that relate to this -- I'm
16  pausing answering the question because I would go to the
17  FDA Web site and look at certain things to make sure I
18  had the proper definitions.
19        I would look at some slides and presentations
20  that I've done in lectures to make sure that I said the
21  same thing or that I wasn't misleading any readers.  But
22  not counting that part my answer is I reviewed every
23  document.  There's nothing that I received that I didn't
24  review.
25     Q  Well -- and I guess I want to make sure.

12 (Pages 42 to 45)

James J. Farley                                                                June 28, 2010

Page 46

1  Are there any documents perhaps -- you identified what
2  you don't want to call drafts, but various versions of
3  your analysis of various documents.
4        Are there any of those documents that you
5  prepared, analytical type documents, that are not on
6  that thumb drive?
7        A  I'm thinking.  My answer is no.
8        Q  Okay.  So every document that reflects
9  your analysis of the materials you received as part of
10 your engagement in this litigation, notes and everything
11 is on that thumb drive?
12       A  Every document?
13       Q  Yes.
14       A  I'm pausing again because I would go to
15 the FDA Web site and look just to make sure certain
16 definitions.  I would look at some of my other work, the
17 slides from lectures that I've given, to make sure that
18 this is what I said and refresh my memory.
19       And they're on the C drive and not on here.
20 But what I call official documents relevant to the case,
21 my answer would be no.  There's nothing -- maybe we
22 ought to go back to the question again.
23       Q  Yeah.
24       MR. ANDERTON:  Can you read that back,
25    please?

Page 47

1        (The record was read back as requested.)
2  BY MR. ANDERTON:
3        Q  And the key there, Mr. Farley, is
4  documents that reflect your analysis or your work
5  product.
6        A  Documents.  I'm -- then my answer is
7  everything is on there.
8        Q  Are there -- are your notes on there?  Did
9  you take notes?  Let's start with that.  Did you take
10 any notes as you -- you know, you've described reviewing
11 documents, preparing some sort of report on that review.
12       Did you first take notes before you prepared
13 the review?
14       A  I might during a review just jot something
15 down, a word, a key phrase, and then I type the review.
16 And I look down, word or key phrase, sometimes to make
17 sure I got the word itself right and sometimes maybe
18 just a spelling.  And then I type it, it will look good,
19 and at that time toss the notes out, because that's all
20 they were for.
21       Q  Okay.  So you didn't keep any of those
22 notes?
23       A  I did not.
24       Q  Do you -- did you mark up or write on any
25 copies of the documents you received from the Miller

Page 48

1  Firm?
2        A  Yes.
3        Q  Did you bring those marked-up copies --
4  well, did you keep those marked-up copies?
5        A  Everything is in the case, the black
6  suitcase and/or the tote.
7        Q  Okay.  So if you wrote up -- wrote on or
8  marked up a document that you received from the Miller
9  Firm and -- or as you reviewed it, that marked-up copy
10 is with you here today?
11       A  Yes.
12       Q  Okay.  Have you ever been involved in any
13 consulting -- have you ever provided consulting services
14 that related in any way to the manufacture of Digitek?
15       A  No.
16       Q  Ever been involved in any case that
17 related to -- that related to Digitek in any way?
18       A  No.
19       Q  Did you review the Digoxin product label
20 in this case, the Digitek product label?
21       A  I'm not sure.  I really just don't
22 remember.
23       Q  You don't remember because you don't
24 remember that it was -- whether it was one of the 90 or
25 so documents you received from the Miller Firm or just

Page 49

1  don't remember?
2        A  Once I knew that was a product that was
3  either this case or part of it, I would look in the
4  Physicians' Desk Reference to -- I will look at the
5  molecule.  I would want to learn more about it, what
6  it's used for, various aspects of it.  I would do that.
7        Q  Other than the Physicians' Desk Reference
8  what other medical literature did you review to prepare
9  your report and the drafts -- or not -- I'm sorry -- not
10 drafts but the different reports you prepared along the
11 way?
12       A  Can I look in the report?
13       Q  You certainly may.
14       A  Some of them I could tell you offhand, but
15 for accuracy I think I better read the report.
16       Q  Please.  Mr. Miller will tell you I'm a
17 slave to accuracy.
18       A  That's what it's all about.  Why be here
19 if we're not going to be accurate?
20       Q  I couldn't agree more.
21       A  On page 16 and carrying over to page 17 --
22       Q  And so that we're clear, Mr. Farley -- I
23 apologize for interrupting you.  But you're talking
24 about pages 16 carrying over onto 17 of your report?
25       A  Dated -- my report dated June 14th.

13 (Pages 46 to 49)

James J. Farley                                                                                              June 28, 2010

Page 50

1    Q   Your final report?
2    A   Yes.
3    Q   Is that a fair characterization?
4    A   Up to now it is my final report.
5    Q   Okay.  Well, you say up to now.  Do you
6  have any intention of revising it?
7        A   Not on my account, not unless you say so.
8  No, I don't have any intention to revise it.
9            THE VIDEOGRAPHER:  Mr. Michael, I need to
10       go off record and change tape, please, sir.
11           MR. ANDERTON:  Okay.
12           THE VIDEOGRAPHER:  We're off record at
13       10:09.
14        (A brief recess was taken.)
15           THE VIDEOGRAPHER:  It's 10:18 a.m.  This
16       is the beginning of Tape 2 in the deposition of
17       James J. Farley.
18  BY MR. ANDERTON:
19       Q   Welcome back, Mr. Farley.  Thanks for
20  coming back.  You were I think when the tape ran out
21  giving testimony about information on pages 16 and 17 of
22  your final report.  And I guess I just want to ask one
23  final question or maybe two.
24       But the medical literature and other
25  references identified in -- or on pages 16 and 17 of

Page 51

1  your report, in your mind is that the total -- is that
2  the complete list of resources other than documents you
3  received from the Miller Firm that you reviewed in order
4  to prepare your report?
5        A   I'm thinking here.  I'm relying on my
6  knowledge, looking at perhaps some of my presentations,
7  because I do instructional training that are not --
8  these are books or what we would generally classify as
9  documents.
10       So if I say yes for the documents, I would
11  like to have as an exception from that any lecture
12  materials I might have used, because I flip through them
13  and look real quickly to check something, put it back
14  and I just didn't write it down.
15       Q   What -- well, then let's test your recall.
16  What of your lecture materials do you recall reviewing
17  as part of your work in this case?
18       A   Among others, it's called CAPA, C-A-P-A,
19  Corrective Action/Preventive Action.  That's a program
20  within the GMP, Good Manufacturing Practices structure.
21  I looked at that.
22       I looked at forms that I designed for clients
23  on how to handle deviations, forms I designed for
24  clients on how to handle out of specification results.
25  I looked at a lecture I gave on root cause analysis,

Page 52

1  which is part of deviations and out of specifications
2  results, all under the Corrective Action/Preventive
3  Action umbrella within GMPs.
4        I would flip to them, just take a quick glance
5  and didn't bother noting it on here.  But -- and there's
6  any number of things.  That's just part of it.
7        Q   Okay.  And if we -- and I'm not saying
8  that we definitely want to, but if we wanted to ask you
9  to go back and identify and produce as many of those as
10  you could definitively identify as something you
11  reviewed as part of this case, you could do that?
12       A   I could do it.
13       Q   Okay.  For at least some of them, I
14  presume?
15       A   Those that I remember --
16       Q   Right.
17       A   -- and those that you want, yes.
18       Q   Okay.  Going back a little bit, we talked
19  about what you would do at the beginning of a typical
20  engagement for a pharmaceutical company.  And I believe
21  you said that you'd want to gather some additional --
22  not additional, gather some initial information and then
23  prepare what you described as a proposal so that you and
24  the prospective client are on the same page about the
25  scope of the engagement.

Page 53

1        Do you remember that testimony?
2        A   Yes.  Yes, I do.
3        Q   Did you do that in this case?
4        A   I wasn't called by Actavis to help
5  Actavis.
6        Q   I understand.  You were contacted by
7  Dr. Smart, who apparently had the front end or direct
8  initial contact.  But then you were contacted by
9  Mr. Miller or somebody from his firm within a day or two
10  after that, correct?
11       A   Yes.
12       Q   Did you talk to Mr. Miller or someone from
13  his firm about the scope of your work or potential work
14  in this litigation and did you prepare a proposal and
15  submit it to him?
16       A   I didn't prepare a proposal and submit it
17  in this case that way, because my discussion with Peter
18  Miller, as I was getting ready to ask the questions, he
19  said, I have a binder of documents I will Fed Ex to you.
20  To which I said, what does it have in it?  Does it have
21  483s, anything like that?  And he said yes.
22       Fine, send me the documents, I will look at
23  them and then determine what questions I have.  Jumping
24  for a moment, if I may, if I were going in to help a
25  firm and defining the scope of work, I would say to the

James J. Farley                                                                June 28, 2010

Page 54

1  firm, I want to know the results of your most recent
2  internal audit and I want to know the results of the
3  most recent two FDA inspections that you have.  And that
4  would give me a feel.
5      I didn't have to ask that in this case,
6  because when Pete Miller and I talked on the phone and
7  he said, I'll send you documents, I'll Fed Ex them,
8  okay, I'll look at them and then see, the questions that
9  I normally would have asked were answered by the
10  documents that were contained in the binder.
11      Q   Okay.
12      A   Did I put it in the proper perspective?
13      Q   Yes.
14      A   Okay.
15      Q   You've described four shipments containing
16  perhaps five binders of documents --
17      A   Yes.
18      Q   -- all selected by Mr. Miller or somebody
19  on -- associated with Plaintiffs' counsel, correct?
20      A   Yes.
21      Q   Did you ask for any specific documents
22  other than those that you received from Mr. Miller in
23  these binders?
24      A   As we went along when I received the first
25  binder -- let me start with the first binder, which had

Page 55

1  25 tabbed sections.  And it had Establishment Inspection
2  Reports, 483s, various things on the list here in the
3  report.
4      And I would start reviewing them and preparing
5  the individual electronic files, the ones that are on
6  the drive, on them.  And then I would call Pete Miller
7  and say, here's what I've got, do you have such and
8  such, do you have this.
9      And the answer might be, we're in the process
10  of getting them for you, keep working on what you've
11  got, when we get them we'll send them to you.  So there
12  was dialogue intermittently all along.
13      Q   Was any of that -- did you make any of
14  those requests in writing?
15      A   No.
16      Q   E-mail?
17      A   Maybe e-mail.
18      Q   So you did have e-mail communication with
19  Mr. Miller or with somebody from his firm starting
20  during the period let's say December 2009 through today?
21  You've have e-mail communications?
22      A   Yes.
23      Q   Do you have those e-mails?
24      A   I did not print them out and bring them
25  here.  Much of it was scheduling or when to expect

Page 56

1  another package.  All my results I would confine to the
2  reviews, the individual reviews, each of which is the
3  electronic file, and to the report.
4      Q   Are those e-mails on that thumb drive?
5      A   No.  I just didn't think to save them,
6  because --
7      Q   Well, I guess I want to make clear, you
8  just -- a moment ago you -- the concept of saving them.
9  Do you still have those e-mails?
10      A   Not saved, per se.  If someone went into
11  my PC in the home office they would probably find them.
12  But they're not where I could pull them up.
13      Q   Okay.  Are they -- I take it you have --
14  what is your e-mail account?
15      A   AOL.
16      Q   Are they just in your AOL in-box
17  somewhere?
18      A   30 days --
19      Q   30 days.
20      A   -- and then --
21      Q   So your belief is any e-mail that you
22  would have received more than 30 days ago you no longer
23  have?
24      A   Correct.  But can I add something to that?
25      Q   If you like.

Page 57

1      A   If it was an e-mail that I perceived had
2  direct relevance to my evaluation of the data, I would
3  have saved it and printed it out.  Much of them were I
4  might get something from Nia saying, Pete's out of town,
5  he'll get back to you in such and such or --
6      Q   From whom?
7      A   Nia, N-I-A, last name Barton, B-A-R-T-O-N.
8      Q   And who is that?
9      A   She is either a secretary or paralegal to
10  Pete Miller.  And there was some scheduling.  I might
11  send an e-mail, Pete, do you know when the deposition
12  will be scheduled, simply for scheduling.  And since it
13  was scheduling and in my mind they had no basis for my
14  evaluation of this case, I didn't bother saving them.
15      Q   Okay.  When you asked for additional
16  documents, did you ask for any Digitek batch records?
17      A   Yes.
18      Q   Did you get them?
19      A   I got one, the batch in question, I
20  believe.
21      Q   Okay.  So let's make that clear.  As I
22  read your -- the list of documents in your report, did
23  you get a batch record or did you get records that
24  relate to that batch?  And you understand the
25  distinction?

15 (Pages 54 to 57)

James J. Farley                                                                                     June 28, 2010

Page 58

1        A   I understand the distinction.  I got batch
2   records.
3        Q   You did?
4        A   Yes.
5        Q   Okay.  So you saw the actual production.
6   Was that batch record contained within a larger
7   investigation report?
8        A   No.  That is one I got by e-mail.  And I
9   downloaded it and I have it on my file.
10       Q   Okay.  Do you happen to recall off the top
11  of your head that that is Batch 70924?
12       A   Since you've named it it rings a bell, and
13  I believe that is it.
14       Q   Okay.  And when you said the batch in
15  question a moment ago, do you mean the batch where
16  during manufacturing some tablets that were defectively
17  thick were found?
18       A   Is that 70924?
19       Q   70924.
20       A   Yes.
21       Q   So the batch you asked for and received,
22  one set of Digitek batch records, and that is the
23  records that relate to the batch that had the -- what
24  people have commonly referred to as the double thick
25  tablets?

Page 59

1        A   Yes.
2        Q   Is that the only Digitek batch record you
3   reviewed as part of your engagement in this litigation?
4        A   Yes.
5        Q   Is that the only Digitek batch record you
6   received as part of your engagement in this litigation?
7        A   Yes.
8        Q   Mr. Farley, I've handed you a document
9   that has been marked as Defendants' Exhibit 74.
10       Have you seen that document before?
11       A   Yes.
12       Q   That's a notice of the deposition here
13  today?
14       A   Yes.
15       Q   And attached to it if you go all the way
16  back -- it should be attached but is not.  Oh, I'm
17  sorry.  It's in the -- on the first couple of pages.
18  You see there's a list of documents that you are
19  requested to produce?
20       A   Yes.
21       Q   Did you read that list before you came
22  here today?
23       A   Yes.
24       Q   You're showing me a copy that has check
25  marks on it and that is marked up.

Page 60

1        A   And I made little notes of what -- the
2   proverbial thumb drive.
3        Q   Okay.
4        A   That's what --
5        Q   You know what?
6        A   You want it?
7        Q   I do.
8        A   You can see it.
9        Q   I do.
10       MR. ANDERTON:  Can we mark this?  And
11  we're just going to mark it 74A, the follow-up
12  practice of Mr. Moriarty.  I don't like it but --
13       MR. MILLER:  Wouldn't it be 74B?  You
14  wouldn't call it A.  You'd call it 74B.
15       MR. ANDERTON:  I said it's not my
16  practice, so --
17       MS. DOWNIE:  Well, we have 74, right?
18       MR. ANDERTON:  Yeah, we have 74.
19       MS. DOWNIE:  And then we would have --
20       MR. ANDERTON:  But we don't have 74A.
21       MS. DOWNIE:  And then 74A.
22  (Defendants' Exhibit No. 74A was marked.)
23       MR. MILLER:  Not to mention we jumped
24  from 45 to 74.
25       MR. ANDERTON:  Well, Pete, I warned you

Page 61

1   about that.
2        MR. MILLER:  Yes, you did but I still had
3   to throw it in.
4        THE WITNESS:  Was there anything attached
5   to it?  I handed you everything without looking at
6   what might be behind it.
7        MR. ANDERTON:  Let me take a look and we
8   will only mark --
9        MR. MILLER:  There's another copy of the
10  report.
11       MR. ANDERTON:  Is it the final copy?
12       THE WITNESS:  June 14th?
13       MR. ANDERTON:  Does it say June 14th?
14       MR. MILLER:  The second page in the first
15  paragraph.
16       THE WITNESS:  If that says June 14th
17  that's the extra copy I printed out for anyone who
18  may need it.
19       MR. ANDERTON:  Well, the copy that I
20  have -- I thought it had the date right on the
21  front.  It does.  Oh, this one does, too.
22       THE WITNESS:  Left side, lower left.
23       MR. ANDERTON:  So I'm going to give that
24  back to you and we're going to mark only the
25  notice that you took and -- or that you received

16 (Pages 58 to 61)

PLAINTIFFS' EXHIBITS 008132

James J. Farley                                                                                          June 28, 2010

Page 62

1    and that you made comments on, or put some notes
2    on.
3    BY MR. ANDERTON:
4        Q   So anyway, my question, Mr. Farley, my
5    first question is -- and I'm looking at the -- what's
6    been marked as 74A.  And I'll give that back to you to
7    hold for a moment.
8        Is it correct to say that you reviewed this
9    notice carefully?
10       A   Yes.
11       Q   And that you checked your files to see
12   whether you had any documents that were responsive or
13   that were described by the categories on that notice?
14       A   Yes.
15       Q   Have you brought with you today all
16   documents that are responsive to that notice?
17       A   To the best of my eyes those that were
18   available.  You see here I put not all e-mails are
19   printed.
20       Q   Okay.
21       A   But in accordance with the way our
22   discussion has been going I will give you a qualified
23   yes.
24       Q   Okay.  May I see that just for one second?
25       A   Yes.

Page 63

1        Q   I see some notes on here.  Category No. 6
2    asks you to produce all bills that the witness -- that
3    you've rendered to attorneys and law firms.
4        Do you have those invoices with you?
5        A   On the thumb drive.  They're timesheets.
6    I submit timesheets to Nigel and Denise Smart.  I e-mail
7    them.  The week ends on a Saturday and I e-mail them
8    usually on Monday morning.  And that's the way we do it.
9    I don't prepare a specific invoice in this case for
10   Smart Consulting Group.
11       Q   Okay.  I see a comment next to -- well,
12   let's stay with the invoices for a second.  There's two
13   sets of notes here, one that says 450 and one that says
14   20,700.  Can you tell me what those notes mean?
15       A   Oh, sure.  Those notes, it tells me --
16   that should be 4,050.
17       Q   4,050?
18       A   That's an error on my part.  If I were
19   inspecting me I would write that up because that's a
20   wrong number.
21       Q   That notice would be adulterated.
22       A   I have received for 27 hours' work at
23   150 -- that's -- 4,050.  I had at that moment 138
24   hours outstanding, or 20,700 dollars owed to me by Smart
25   Consulting Group.

Page 64

1        Q   And does that mean that the total work you
2    had performed as of the time you did these --
3    performed as of the time you did these calculations is
4    the 20,700 plus what should be 4,050?
5        A   As of the time I wrote them.  And if you
6    want to be up-to-date, add 19 hours for last week.
7        Q   Okay.  So 19 times 150, that's just shy of
8    3,000 dollars, if my math is correct.  Let's call it
9    2,850.
10       A   Yes.
11       Q   Plus 4,050, plus 20,700?
12       A   Yes.
13       Q   Okay.  I see a note on here that says with
14   respect to No. 5, retainer agreements.  You've got a
15   verbal agreement with the Smart Consulting Group?  Tell
16   me that about.
17       A   Well, I have a confidentiality agreement
18   with them.  But Nigel will just call me up and say, Jim,
19   are you available for a project?  What are you talking
20   about, Nige?  I mean, we've known each other for a dozen
21   years now.
22       What are you talking about?  Well, it involves
23   this, it involves this, it involves this.  Okay, fine, it
24   sounds like I've got the time for it, let's pursue it,
25   who should I call or who should call me.  That's the way

Page 65

1    we work it, as I do with some other consulting firms,
2    too.
3        Q   When you said a moment ago it sounds like
4    you've got the time for it, is that the only
5    consideration you used to determine whether you're going
6    to take an engagement like this one?
7        A   No, it's not the only consideration.  It
8    would be the engagement itself.  But if I didn't have
9    the time for it, I couldn't handle it and it wouldn't be
10   fair to tell them I could.
11       Q   I'm looking at another document that was
12   part of the stack of documents that you gave me.  And
13   before I mark this, it looks like it's a resume' but
14   it's not labeled the same.  And I can look at it and
15   initially see that it might -- sorry for --
16       A   That's okay.  That's all right.
17       Q   Is this the same thing as the CV that you
18   attached to your report?
19       A   That should be essentially the same thing.
20   I may have in the report added my association with the
21   Skidaway Institute of Oceanography here and with
22   Memorial Health, The Cancer Research Institute.
23       I have affiliations with them, board member of
24   one, safety -- and I believe -- and I'll be able to
25   answer that in another second if I can just look down at

17 (Pages 62 to 65)

PLAINTIFFS' EXHIBITS 008133

James J. Farley                                                                                              June 28, 2010

Page 66

1  this.
2        Q.  Okay.
3           MR. MILLER:  Take your time.
4        A.  Yes.  What I did -- this is my CV as I had
5  it on my computer.
6        Q.  Okay.
7        A.  And since I just finished a three-year
8  tenure on the board of the Skidaway Institute of
9  Oceanography associated with the University of Georgia
10  and since I am now on the institutional biosafety
11  committee of Memorial Health, I figured I ought to put
12  them on there.  So this is what I work with.  I added
13  those two things to it and put it on the CV that's in
14  the report.
15        Q.  The CV then that is attached to the report
16  is essentially updated and current.
17        A.  Yes.
18        Q.  Is that correct?
19        A.  Yes.  It's that plus those two things I
20  mentioned.
21        Q.  And the date on the bottom of this is
22  April of 2010.  I'm going to go ahead and mark this.
23           MR. ANDERTON:  Can you mark that 74B,
24        please.
25        (Defendants' Exhibit No. 74B was marked.)

Page 67

1           MR. MILLER:  Mike, may I see the report?
2           MR. ANDERTON:  You may.
3           MR. MILLER:  Thanks.
4           MR. ANDERTON:  Take your time.
5  BY MR. ANDERTON:
6        Q.  So, Mr. Farley, I'm not going to spend any
7  time on this.  What's now been marked as 74B is your CV
8  as it existed as of April 2010?
9        A.  Yes.
10        Q.  And you've since updated it?
11        A.  Yes.
12        Q.  When did you prepare the updated resume',
13  or CV?
14        A.  As I was preparing the report I just
15  thought, gee, there's something I should add, I've been
16  associated with these two institutions, which are
17  recognized as pretty good institutions down here, and I
18  thought, well, I ought to put them on it.  It was that
19  simple of a deal.
20        Q.  Okay.  I see in your CV a reference to --
21  hold on one second.  If you'll pick up Exhibit 44 with
22  the difficult to read exhibit sticker.  All right.  On
23  page 24 I see a reference to your taking a course in --
24  or titled FDA Law and Evidence Development.
25        A.  Yes.

Page 68

1        Q.  Do you see that?
2        A.  Yes.
3        Q.  Tell me what that was.
4        A.  That was two weeks in Bandera, Texas, near
5  San Antonio.  And it's a course where certain people,
6  generally if they're grooming you for more things, you
7  go down and you take that course.
8        You're there in Bandera, Texas, for two weeks.
9  You have your own cabin.  You have your own homework
10  assignments working with other students who are FDA
11  personnel from other districts.
12        And the first week you're taught by FDA people
13  and the second week every instructor is an attorney.
14  All lawyers teach you.
15        Q.  Teach you what?
16        A.  They teach you the laws associated with
17  evidence development or, as it says, law and evidence
18  development courses.  They're not trying to make you
19  lawyers.
20        They're trying to say from their point of view
21  if you have a sample that you're bringing in, here's the
22  way it is, put the seal on it, make sure that the seal
23  is signed.
24        They tell you how to handle the sample and
25  other procedures, how to talk to people at firms, the

Page 69

1  associated paperwork to make sure that the Department of
2  Justice would then have a case that would be suitable
3  for court.
4        Q.  So it's teaching FDA personnel how to
5  conduct themselves in the field so that the legal staff
6  can use what they collect and identify during an
7  inspection?
8        A.  I would say just like you said, but I
9  would not say the field.  FDA personnel anywhere, any
10  time, any situation to help the attorneys have a strong
11  case.
12        Q.  Okay.  You've written two books.
13        A.  I have two published.  I have some more
14  sitting.  I have two published.
15        Q.  You've published two books.
16        A.  I have had published.  They have been
17  published by CRC Press.  They're not self-published.
18        Q.  I understand.  You've had two books
19  published.  Is that the best way to say it?
20        A.  Yes.
21        Q.  Okay.  Do either of those books relate to
22  the issues on which you gave your opinion in this
23  litigation?
24        A.  No.
25        Q.  Mr. Farley, I have handed you a document

18 (Pages 66 to 69)

PLAINTIFFS' EXHIBITS 008134

James J. Farley                                                        June 28, 2010

Page 70

1   that is marked as Defendants' Exhibit 46.
2       A  Yes.
3       Q  Have you seen that document before?  Take
4   a moment or as long as you need to flip through it and
5   determine whether you can -- or figure out whether you
6   can answer my question as to whether you've seen it.
7       A  I'm one of the authors.
8       Q  Okay.  So that means, yes, you've seen
9   that before.
10      A  Yes, I've seen it.
11      Q  Tell me what it is.
12      A  Gene Brooks, who owns Brooks Law on York
13  Street in Savannah, and Jim Shipley, who at this writing
14  had just passed the Bar exam and works for Gene, and I
15  thought it would be good to join forces of a chemist who
16  used to work at FDA, pharmaceutical and stuff, and
17  attorneys.
18          I'm not familiar with Gene's cases, but I'd
19  have to assume that some of them might involve this.  So
20  we co-authored this, he quoting the USC, me quoting the
21  21 CFR.
22          We each quoted our own -- we brought our own
23  areas of expertise into it.  And it was published in
24  Trial Magazine, which is the publication of the American
25  Association of Justice, in November of '08.

Page 71

1       Q  And you said a moment ago as you were
2   giving that answer he offered his input on the USC, you
3   on the CFR.
4           To be clear, that means -- by USC you mean
5   United States Code?
6       A  Yes, or in my words, he talked lawyer talk
7   and I talked chemist talk.
8       Q  Okay.  So -- and the CFR -- and I need to
9   be a little more methodical on how we break this down.
10  The CFR you referred to, that's the Code of Federal
11  Regulations?
12      A  Yes.
13      Q  So he offered his input on the law; you
14  offed your input on regulatory issues?
15      Q  You didn't -- you're not a lawyer?
16      A  I'm not.
17      Q  Okay.  Do you know whether he represented
18      A  Whether Gene represented the law
19  the law correctly?
20      A  Whether Gene represented the law
21  correctly?
22      Q  Yeah.
23      A  I assume he did.  I do not know if he
24  represented the law correctly.
25      Q  Okay.  The Food, Drug and Cosmetic Act,

Page 72

1   that's -- if I say the Act will you understand that to
2   mean that I'm talking about the Food, Drug and Cosmetic
3   Act?
4       A  Whenever our subject is general
5   pharmaceuticals I would -- if I hear the Act I
6   believe --
7       Q  Okay.
8       A  -- you mean the Food, Drug and Cosmetic.
9       Q  Okay.  I will try to be diligent and use
10  the full name where I can, but if I get lazy and just
11  say the Act, I hope you'll understand by that I mean the
12  Federal Food, Drug and Cosmetic Act.
13      A  The Act is fine.
14      Q  Okay.  The Act provides certain minimum
15  standards.  We've talked a little bit about GMP
16  compliance and the area where you provide consulting.
17          GMP, which you have defined as Good
18  Manufacturing Practices, the minimum standards for GMPs
19  are set forth in the federal regulations, correct?
20      A  Yes.
21      Q  And that's the CFR that you referred to a
22  moment ago?
23      A  Title 21, 21 CFR.
24      Q  The GMP regulations are very general,
25  aren't they?

Page 73

1           MR. MILLER:  Object to form.
2       A  I would say general.  I don't know if I'd
3   say very general.  That's -- they're general.
4       Q  Okay.  So they don't provide specific
5   details about how every act related to manufacturing,
6   testing and otherwise producing a pharmaceutical product
7   is supposed to be performed?
8       A  They do not.  May I say why they don't or
9   would you rather me not yet?
10      Q  Well, the reason they don't is because
11  pharmaceutical companies are required to read them and
12  interpret the regulations and develop their own
13  procedures, correct?
14          MR. MILLER:  Object to form.
15      A  And then they submit them to FDA for
16  approval.  And once approved, they must adhere to what
17  they themselves submitted and we like to say do the
18  right thing the right way the same way every time.
19          That's why that the GMP say you have to do
20  such and such.  If you're a pharmaceutical firm you say,
21  I'm going to do it this way, time, temperature,
22  et cetera, and then you submit it.  And the FDA approves
23  it.
24          They approve it on the condition that you're
25  going to do the same thing exactly that way every time

19 (Pages 70 to 73)

James J. Farley                                                                June 28, 2010

Page 74

1  the way you said, we looked at and approved.  And if you
2  ever don't do it that way you're in violation.
3          Q   Okay.
4          A   So that was a lengthy dissertation, but I
5  had to put it in proper perspective.
6          Q   Well, and I just want to make sure because
7  you didn't directly answer the question that I actually
8  asked.  You implicitly did, but I want to make sure that
9  this record is clear.
10         The pharmaceutical companies take the general
11 content of the GMP regulations and they develop their
12 own procedures which provide the precise detail on how
13 they're going to produce their products?
14         A   And then submit it for approval.
15         Q   Well, I need you to answer that question.
16 Correct?  They develop those procedures.
17         A   Okay.
18         Q   Is that a correct statement?
19         A   I want to hear that one more time.
20         Q   Is it a correct statement to say that the
21 pharmaceutical company -- a pharmaceutical company that
22 manufactures products in order to comply with the GMP
23 requirements is required to read the regulations and
24 then interpret those regulations and develop its own set
25 of procedures that they believe comply with the

Page 75

1  regulations?
2          A   Yes.
3          Q   And then as you said, they submit their
4  interpretation, their procedures to the FDA for
5  approval.
6          A   Yes.
7          Q   They're required to comply with their own
8  procedures.
9          A   Yes.
10         Q   So when you talk about Good Manufacturing
11 Practices, you're not just talking about the federal
12 regulations.
13         A   Correct.
14         Q   You're talking about the regulations and
15 also any internal procedures developed by a
16 pharmaceutical company to interpret those regulations.
17         A   Yes.
18         Q   And interpretations are not uniform from
19 one company to the next, are they?
20         A   That's a tough one to answer yes or no.
21 Can you reword that?  If not, I'll just think a little
22 more and try to give you an answer.
23         Q   Well, if you want me to reword it I'll do
24 my best.  When a company reads the regulations and
25 develops its procedures they're not just copying

Page 76

1  something somebody -- another company has done, correct?
2          A   Correct.
3          Q   So every company's interpretation of a
4  certain set of requirements can be different than --
5  or the specific -- let me start this over.
6          The procedures a company develops to interpret
7  and apply the regulations can be different than the
8  procedures developed by another company to interpret and
9  apply the exact same regulations.
10         A   If I can explain what I think you mean --
11         Q   Please.
12         A   -- then I can answer the question.
13         Q   Give it a shot.
14         A   If one company, assuming there's two firms
15 making the same product.
16         Q   Right.
17         A   One company selects a primary method of
18 analysis for product release and uses what they call
19 HPLC, high performance liquid chromatography, or a
20 chromatographic method for the purity.
21         And that method says you will take such and
22 such sample, you will prepare it this way, you will
23 dilute it this way, you will run it in this solvent, you
24 will do this and your answer must be no lower than this
25 percent, no higher than this percent.  Fine.

Page 77

1          Now, if another company wants to make the same
2  product but says, I think I'll do an ultraviolet
3  spectrum method, they can develop their ultraviolet
4  spectrum method, which is vastly different than
5  chromatography, but they would have to say, I will take
6  my sample and I will dissolve it this way, weigh it this
7  way, I will scan it between this wavelength and that
8  wavelength, I will do the following calculation.  And it
9  must be, for example, 98 to 102 percent done that way.
10         Each of those could be submitted and could be
11 approved.  But each of them has to stick with what they
12 submitted.
13         Q   I agree with that.
14         A   So is that -- am I on track with answering
15 your question?
16         Q   You absolutely are.  So the short version
17 of that is the two companies that you're describing can
18 develop different methods for achieving the same
19 compliance with the same regulation, develop -- or
20 producing the same product?
21         A   Yes, provided they submit them, validated
22 and stick with them once they're approved.
23         Q   Understood.
24         A   Yes, sir.
25         Q   And the standards that -- or I'm sorry.

20 (Pages 74 to 77)

James J. Farley                                                                                    June 28, 2010

---

Page 78

1  The procedures that they develop, those can change over
2  time?
3        A   They --
4        Q   They can change over time, correct?
5        A   Not without approval.
6        Q   But with approval they can change.
7        A   With approval after the fact.  There's a
8  system of doing it.
9        Q   Well, and let me make sure that we're
10  talking about the same thing.
11       A   Yes.
12       Q   Are you talking about approval with
13  respect only to analytical methods or are you talking
14  about all practices and procedures a company utilizes to
15  manufacture a product?
16       A   Everything from raw materials received to
17  finished goods going out.
18       Q   Everything must be submitted and approved
19  by the FDA before any changes are made?
20       A   If you have a procedure that's been
21  approved and you want to use another procedure -- it
22  might be faster, more accurate, you think -- you have
23  to --
24       Q   Let me --
25       A   Go ahead.

---

Page 79

1        Q   I want to make sure that we're talking
2  about the same thing.  So I apologize.
3        A   Okay.
4        Q   But I get the sense that you're using
5  procedure and when you use terms like faster and more
6  accurate, you're using chemistry terms.  You're still
7  kind of limiting your answer to an analytical method
8  type context.
9        A   No, I'm not.
10       Q   Okay.
11       A   No.
12       Q   If a company has a procedure for handling
13  documents, who they go to, how they're routed, whether
14  they're kept in secure storage, who has access to that,
15  an SOP that speaks to those issues, is that something
16  that has to be submitted to the FDA before it's changed?
17       A   For handling documents?
18       Q   Yes.
19       A   Record storage?
20       Q   It might not --
21       A   We're not talking about stability
22  testing --
23       Q   No, no.
24       A   -- storage, data that's important for
25  safety?

---

Page 80

1        Q   I'm just talking about --
2        A   Record storage?
3        Q   -- record storage, for example, batch
4  records storage.
5        A   You could --
6        Q   Let's go through this.  Batch record
7  storage.  When you produce a product you create a record
8  reflecting that production process that's commonly
9  referred to as batch record, correct?
10       A   Yes.
11       Q   And then documents that comprise a batch
12  record vary from one company to the next.
13       A   Yes.
14       Q   The batch records are kept by companies as
15  they manufacture products.
16       A   Yes.
17       Q   They're stored somewhere, I assume.
18       A   Yes.
19       Q   The methods for storing those batch
20  records, who has access to them, how they're stored,
21  whether they're stored electronically or in hard copy,
22  whether they're kept in a locked room, not kept in a
23  locked room, those methods are typically set forth in an
24  SOP, correct?
25       A   Yes.

---

Page 81

1        Q   And SOP means standard operating
2  procedure.
3        A   Correct.
4        Q   You don't have to submit an SOP for that
5  to the FDA before you modify it, do you?
6        A   You do not.
7        Q   Okay.  So there are procedures that don't
8  necessarily have to be submitted to the FDA that a
9  company can change over time as it develops a better way
10  to do things or just decides it wants to do something
11  differently?
12       A   The example you gave, correct.
13       Q   There are other examples, right?
14       A   There are probably others, uh-huh.
15       Q   Probably a lot more.
16       A   Yes.
17       Q   Okay.
18       A   Everything I was talking about was in
19  direct manufacturing and testing line that would affect
20  the quality of a product.
21       Q   So you're talking about changing what
22  people in the industry typically refer to as the method?
23       A   Not just the test method.  It could be a
24  mixing procedure.
25       Q   Okay.

---

21 (Pages 78 to 81)

PLAINTIFFS' EXHIBITS 008137

James J. Farley                                                                                          June 28, 2010

Page 82

1        A   If someone got a new mixer and said, I
2   think I can mix for 30 minutes instead of 45, they would
3   have to run batches simultaneously, tell the FDA and
4   submit analytical data.  They couldn't just say this is
5   better, we think it's the same and use it.  That would
6   be a violation.
7        Q   And that starts all the way back at the
8   submission of, if you're a generic manufacturer, the
9   NDA -- the -- I'm sorry -- the ANDA --
10       A   The ANDA.
11       Q   -- the Abbreviated New Drug Application.
12       A   Yes.
13       Q   The specific methods, not just analytical
14  methods, but the techniques that a company is going to
15  use to manufacture that product, have to be set forth
16  and then submitted to and approved by the FDA.
17       A   Yes.
18       Q   And so going forward from there, any
19  changes to those techniques have to be submitted to and
20  approved by the FDA.
21       A   Yes.
22       Q   But there are any number of SOPs that are
23  relevant to a pharmaceutical company's operations that
24  are mandated by Good Manufacturing Practices regulations
25  that a company can change without submitting it to the

Page 83

1   FDA.
2        A   Yes.  I would say in the case that you
3   just gave, record storage as opposed to data
4   acquisition, data acquisition where you're getting data
5   relevant to the identity, strength, quality and purity
6   of the compound, that has to be approved.  But record
7   storage, that would not have to be.
8        Q   Okay.  If a company doesn't comply with
9   the procedures that are in place to manufacture a drug,
10  does that mean that drug is adulterated?
11       A   If the company doesn't comply with the
12  procedures?  I believe that's defined in the Act as the
13  definition.  If a drug is not manufactured in accordance
14  with Good Manufacturing Practices it is considered
15  adulterated.  I believe the section is 501 or 502.
16       Q   Okay.
17       A   But, yes.  My answer is yes.
18       Q   Okay.  So the definition of adulterated in
19  the Act, the Food, Drug and Cosmetic Act, is focused on
20  non-compliance with the procedures that are in place to
21  manufacture that product.
22       MR. MILLER:  Object to form.
23       A   Yes.  It's very broad, very broad.  If you
24  don't manufacture it according to GMPs it's adulterated.
25       Q   Well, and I want to make sure that what

Page 84

1   you just said is clear in the record.  When you say if
2   you don't manufacture it in accordance with GMPs, you mean
3   if you don't comply with the GMPs while you're
4   manufacturing it then it's adulterated.
5        A   While you're manufacturing it.
6        Q   Or if you don't comply with the GMPs
7   either while you're manufacturing it or in some aspect
8   of the production then the drug is adulterated.
9        A   Yes.
10       Q   Adulterated doesn't mean defective.
11       MR. MILLER:  Object to form.
12       A   Adulterated means it's not, to use FDA's
13  terms, of the identity, strength, quality and purity
14  that you purport -- they like that term -- purport to
15  have and therefore, my words, you can't trust it to be
16  of the quality it's supposed to be.
17       Q   Well, adulterated actually doesn't mean
18  it's not of the identity, strength, quality and purity.
19  It means it wasn't manufactured according to the
20  processes in place to try to make sure it meets the
21  identity, quality, strength and purity.  Isn't
22  that right?
23       MR. MILLER:  Object to form, misstates
24       his previous testimony.
25       A   Yes.

Page 85

1        Q   Okay.  So adulterated doesn't actually
2   mean the drug doesn't meet the identity, strength,
3   quality and purity it is supposed to have, correct?
4        MR. MILLER:  Objection, asked and
5       answered.
6        A   It means it can't be guaranteed to have
7   that.  So are we saying the same thing?
8        Q   No, because I'm not sure that you're --
9   you can have a drug that's adulterated and -- well,
10  let's use an example.
11       If, if I have -- if I failed to comply with a
12  procedure in the course of manufacturing a drug that
13  relates to filling out a form or a part of the batch
14  record, if I have an SOP that says the batch record is
15  supposed to be filled out a certain way and I don't fill
16  out the batch record correctly, is that a violation of
17  GMPs?
18       A   Technically, yes.  Could I ask you to be
19  more specific in that case?  And I have a reason for
20  asking that.
21       Q   Well, what's your reason?
22       A   My reason is I saw -- it's a good example
23  of what we're discussing.  I saw a case where the
24  analyst put the initials and the reviewed by were the
25  same initials.  And you're not permitted to review your

Rennillo Deposition & Discovery
216.523.1313                          www.rennillo.com                          888.391.3376 (Depo)

PLAINTIFFS' EXHIBITS 008138

Page 86

1 own work. It has to be someone else.
2         So that's a violation. And technically that
3 material was not produced in accordance with GMPs,
4 because you had -- let's say a guy. It could be a guy
5 or gal, those initials. A guy writes his initials there
6 and then he reviews his own work. And that's against
7 regulations.
8      Q Okay. So that --
9      A That's what I was thinking of when you --
10     Q And let's use that example. That product
11 technically is adulterated.
12     A Because it was not produced in accordance
13 with GMPs, yes.
14     Q It doesn't mean it is defective.
15     A It doesn't guarantee it's defective, but
16 it leads you to question, you didn't make it the way you
17 said you did, why didn't you make it right.
18     Q But the bottom line is that that product,
19 the fact that it's adulterated for the reason you
20 described does not mean the product is defective.
21        MR. MILLER: Object to form.
22     A If I interpret that is there a possibility
23 that the product may still be good, then I agree with
24 you.
25     Q Well, it's more than just a possibility,

Page 87

1 right? I mean, in that case -- what I'm trying to
2 establish, Mr. Farley, is you've got a circumstance that
3 you described where if you apply a literal reading of
4 the regulations that product is adulterated.
5      A Yeah.
6      Q To determine whether the product is
7 defective you'd have to actually test the product,
8 right?
9      A Yes.
10     Q So to determine whether the product is --
11 was actually manufactured within the specifications for
12 the product, you'd have to test it.
13     A To determine if it was actually
14 manufactured within the --
15     Q Yes, whether it actually has --
16     A Whether it is what it's supposed to be?
17     Q Yes. You have to test it.
18     A Yes.
19     Q So the fact that it's adulterated doesn't
20 tell you whether it's within specification.
21     A It does not tell me it's within
22 specifications, but I -- if a firm said to me, look at
23 this contract manufacturer, and I went to the contract
24 manufacturer that my client firm wanted me to give an
25 opinion on and I saw that, why are you doing this? Why?

Page 88

1 I mean, how do I know to trust you with anything else
2 you're doing? You're fouling up here. And my
3 recommendation would be to the pharmaceutical firm,
4 don't deal with them, because --
5      Q You've really --
6      A -- it leads you to wonder.
7      Q Because one -- non-conformance with one
8 practice or procedure you'd recommend not dealing with
9 them at all?
10     A I recommend not dealing with them until
11 they found out why and what the reason was for it and I
12 would -- I've done it. I've said to a firm, I would
13 seriously consider not dealing with Contract
14 Manufacturer A and here's the reason, it's in my report.
15     Q Well, and don't -- let's take it out of
16 the context of a company potentially dealing with a
17 contract manufacturer.
18     A Okay.
19     Q Let's just deal with a company that's
20 manufacturing products.
21     A Everything in-house.
22     Q Right. So if a product is adulterated --
23 we've already established that doesn't mean it's
24 defective -- it doesn't say anything about whether it's
25 safe or unsafe either, does it?

Page 89

1        MR. MILLER: Object to form.
2      A It doesn't say definitely that's it's safe
3 or unsafe.
4      Q It doesn't say anything about whether it's
5 safe. You'd have to test the product to make that
6 determination.
7      A Yes.
8      Q I'd like to talk a little bit about some
9 of the things in your article. If you'd pick up
10 Exhibit 46, please.
11     A I have it.
12     Q Give me one second. This is what happens
13 when you leave your highlighted copies. You said a
14 moment ago that the procedures a company is going to use
15 to develop its -- or to produce its drugs are submitted
16 to and approved by the FDA; is that correct?
17     A Yes.
18        MR. ANDERTON: Let's take a couple of
19     minute break. We're about -- we're about there,
20     aren't we?
21        THE VIDEOGRAPHER: Yes, sir.
22        MR. ANDERTON: Okay. Let's take a couple
23     of minutes and then I can get a little more
24     organized on this.
25        THE VIDEOGRAPHER: We're off the record

23 (Pages 86 to 89)

PLAINTIFFS' EXHIBITS 008139

James J. Farley                                                                                    June 28, 2010

Page 90

1    at 11:11.
2         (A brief recess was taken.)
3         THE VIDEOGRAPHER: It's 11:20 a.m.  We're
4    back on record and this is the beginning of Tape
5    No. 3 in the deposition of James J. Farley.
6    BY MR. ANDERTON:
7         Q   Mr. Farley, if you will pick up the
8    article, your -- the article that you co-authored and
9    look at the first page.  It's -- and I'm talking about
10   Exhibit 46.
11        You see the bottom, the very bottom of page 1
12   and continuing on to page 2, the last sentence of that
13   last paragraph on page 1 reads, The FDA's acceptance of
14   submitted procedures is evidence, not conclusive proof,
15   of the reasonableness of the company's manufacturing
16   practices and procedures, and the trier of fact may
17   assign FDA approval the weight it deserves.
18        Did I read that correctly?
19        A   Yes, you did.
20        Q   Do you agree with that statement?
21        A   I'm going to read it one more time.
22        Q   Take your time.
23        A   Of course, I've known Gene since we moved
24   down here five years ago and I would be reluctant.  But
25   I'm going to do just like you said.

Page 91

1         Q   Well, let me ask you first, is that
2    something that you drafted or Mr. --
3         A   Gene Brooks.
4         Q   -- Brooks drafted?
5         MR. MILLER:  Give him a chance to read
6    it.
7         MR. ANDERTON:  I am.  I am.
8         Q   Take your time.  Why don't you go ahead
9    and review it as you need to.
10        A   When you get into terms like trier of
11   fact, that's Gene.  And -- but he -- sometimes we just
12   meet for lunch.  Other times he'd send me an e-mail.
13   And we look and he says, this is my statement, and I
14   say, well, yeah.  The FDA's minimum standards you have
15   to at least do this.  That's the way I would have wrote
16   that.
17        Q   Okay.  So it's minimum standards?
18        A   Yes.
19        Q   If you comply with the submitted
20   procedures, as the term used here, you submit procedures
21   and get them approved by the FDA.  If you comply with
22   those, have you achieved compliance with Good
23   Manufacturing Practices?
24        A   If you comply with every procedure -- and
25   I'm going to use my terminology again of raw materials

Page 92

1    received to finished product.  If you comply with all of
2    them there are cases where companies comply in one area
3    and they in fact foul up or are violative in another.
4    That ruins the whole -- right on down the line
5    everything has to be in compliance.  Then, yes.
6         Q   Well -- okay.  But I guess I want to make
7    sure that you answered my question, Mr. Farley.
8         A   Okay.
9         Q   If you comply with the submitted
10   procedures, have you achieved GMP compliance?
11        MR. MILLER:  Objection, asked and
12   answered.  It's okay to answer.
13        A   If you comply with every one of the
14   submitted procedures that had been approved relevant to
15   the manufacturer of a given product then --
16        Q   Have you achieved GMP compliance?
17        A   Yes.
18        Q   And you believe that a jury could still
19   hold the manufacturer liable and award damages if
20   somebody achieved that compliance that you've just
21   described?
22        MR. MILLER:  Objection, misstates facts
23   in evidence and previous testimony.
24        A   I don't know what goes on in jury's minds.
25   I don't know how I can answer that.

Page 93

1         Q   Okay.  So you can't -- I guess that means
2    you really can't speak to whether that sentence that I
3    read regarding whether a trier of fact -- or regarding a
4    trier of fact assigning its own weight, you can't agree
5    or disagree with that?
6         MR. MILLER:  Object to form.
7         A   Well, I will agree with anything that I
8    wrote here.  But your question was what I thought would
9    go on in a jury's mind and I have no idea what goes on
10   in a jury's mind.
11        Q   But you -- so then you agree with what's
12   written here?
13        A   I wrote it.  I have to.  Definitely.
14        Q   Okay.  So you think a jury can take a
15   company that's achieved GMP compliance and still hold it
16   liable?
17        MR. MILLER:  Object to form, misstates
18   the testimony.
19        A   I'm not getting the connection of -- it
20   sounds like you're changing subjects on me.
21        Q   No.  I'm talking about this sentence.  If
22   you agree with it then you think that a jury can take a
23   company that is complying with Good Manufacturing
24   Practices and say, not good enough, we're going to hold
25   you liable.

24 (Pages 90 to 93)

PLAINTIFFS' EXHIBITS 008140

James J. Farley                                                        June 28, 2010

Page 94

```
 1            MR. MILLER:  Object to form.  That's not
 2   what it says.
 3       A  I'm not deliberately trying to be evasive.
 4   I just -- I'm not getting it.  I'm not --
 5       Q  Do you agree with what I just asked?
 6            MR. MILLER:  Object to form.
 7       A  I'm still going to ask you one more time.
 8            MR. ANDERTON:  Can you read that back,
 9   please?
10       (The record was read back as requested.)
11            MR. MILLER:  Mike, that's not what the
12   statement says.
13       A  If the company complied with Good
14   Manufacturing Practices on every approved -- FDA
15   approved procedure from raw materials in to finished
16   product out --
17       Q  Yeah.
18       A  -- and didn't turn the other way for any
19   other situation, like if a carton was broken putting on
20   a truck and they look the other way and said, forget it,
21   we're done, if they did that then they've done
22   everything in accordance with FDA regulations.
23       Q  Can a jury hold them liable for damages in
24   that context if a consumer takes their product and is
25   injured?
```

Page 95

```
 1            MR. MILLER:  Object to form.
 2       A  I can't predict what a jury would do.
 3   That's what I'm having trouble with.
 4       Q  I'm not asking you to predict what they
 5   will do.  Are they permitted to do that?
 6            MR. MILLER:  Object to form.
 7       A  A jury is permitted to do whatever the
 8   judge tells them within the range.
 9       Q  And you think it's appropriate that a
10   company that achieves that absolute compliance that you
11   just described can be held accountable -- or can be held
12   liable for damages?
13            MR. MILLER:  Object to form.  Mike,
14   you're misstating -- you're asking questions about
15   a statement that don't compare.
16       Q  Okay.  I'm asking a question that I think
17   flows directly from this sentence, so --
18       A  I'm pausing because I haven't seen a
19   company that has been in complete compliance ever get in
20   a situation like that.  When you're in compliance you
21   don't get involved in that thing.
22       Q  So if you're in compliance you never get
23   sued?
24       A  I can't say never get sued.  I say that in
25   my eyes if you're in compliance you are quite likely
```

Page 96

```
 1   making a quality product.
 2       Q  That doesn't mean you can't get sued.
 3            MR. MILLER:  Object to form.
 4       A  No.  You can get sued any time for
 5   anything.  Whether it goes through or who decides what,
 6   that's another story.
 7       Q  If a consulting -- a prospective
 8   consulting client -- well, let's not call it
 9   prospective.
10       If you are hired by a pharmaceutical company
11   to consult as to how to avoid litigation -- have you
12   ever been hired to do that?
13       A  Specifically help me to avoid litigation?
14       Q  Yes.
15       A  No, not in those words, no.
16       Q  Okay.  If a company hired you as a
17   consultant to advise it how to achieve regulatory
18   compliance -- well, if a company -- let's -- I'm going
19   to not ask that question.  I'm going to start a brand
20   new question.  Okay?
21       If a company hired you and said, Mr. Farley,
22   we'd like you to tell us how to manufacture and produce
23   any product, it doesn't matter what the product is, and
24   we want to do it so that we minimize or eliminate the
25   possibility of getting sued by consumers, what would you
```

Page 97

```
 1   tell them?
 2            MR. MILLER:  Object to form of the
 3   question.
 4       Q  What would your approach to that
 5   engagement be?
 6       A  Word for word the way you just presented
 7   it, I'd say, well, as far as getting sued, I don't have
 8   anything to do with that.  Anybody can sue you any time.
 9   You want to get in compliance, I'll talk to you about
10   getting in compliance.
11       As far as litigation, you talk to your
12   attorneys about that.  I will help you get in compliance
13   and then I would go through the procedures as how -- I
14   would be asking them records of their previous
15   inspections, their previous internal audits.
16       But I wouldn't answer it the way it was
17   phrased, because I can't tell whether you're going to
18   get sued or not.  I will say, I can give you -- I will
19   make you be in compliance -- I will help you be in
20   compliance, I'll show you how to do it.  And it would --
21   that would be it.
22       Q  And would you do that because if they were
23   in compliance they, as you said a few moments ago, they
24   don't find -- they wouldn't find themselves in that
25   situation or they'd be less likely to find themselves in
```

25 (Pages 94 to 97)

PLAINTIFFS' EXHIBITS 008141

1 that situation?
2         A   I would relate the more you are in
3 compliance the less possibility of litigation coming
4 about or a lawsuit being filed against you.  I would
5 believe there's a relationship there.
6         Q   Okay.  Go to page 3 of this article,
7 please.
8         A   Okay.  I'm on 3.
9         Q   And I want to -- first I want to ask you
10 about the headings.  You've got -- on the first
11 heading -- actually there are no headings until you get
12 to page 3.  But then you start having headings,
13 Prefiling Investigations, Discovery, Standard Operating
14 Procedures, Documentation of Internal Plant
15 Construction, FDA Inspection Documents.
16         Do you see those headings?
17         A   Yes.
18         Q   You know, the title of this article,
19 Mr. Farley, is "Discovering the Cause of a Drug's
20 Defect".  It reads more to me like a how to manual on
21 how to sue pharmaceutical companies.
22         Am I mischaracterizing it by reading it like
23 that?
24         MR. MILLER:  Object to form.
25         A   I think that a person could interpret it

1 like that, but that was not my intent.  Gene and I
2 thought, let's put our heads together and let's write an
3 article.  Gene never expressed to me that it was his
4 direct intent.
5         We just thought it would be nice to work
6 together on an article and get it out into the industry.
7 And I thought it would be nice to work on something that
8 would appear in a law journal.
9         Q   Didn't care what the subject was or what
10 impression it might have?
11         MR. MILLER:  Object to form.
12         A   Didn't care.  That's a question mark,
13 didn't care.  There are certain ones I probably wouldn't
14 write, either not knowledgeable or just didn't care to
15 talk about.  But since it sounded like a good subject,
16 product liability, and we both had an interest in it, we
17 put our minds together and wrote it.
18         But it was not my intention and I believe,
19 knowing Gene and Jim the way I do, that -- and I'm
20 guessing here -- that it's not their intention to how to
21 sue manual.
22         Q   Well, knowing what you do, what -- do they
23 handle cases where consumers sue pharmaceutical
24 companies?
25         A   I don't know anything about Gene's cases.

1         Q   Nothing?
2         A   Nothing.
3         Q   You don't know anything about his cases?
4         A   I've never done work for Gene.  He's
5 referred me to other attorneys, one in particular in
6 town for whom I did some work.  But I have not worked
7 for him directly.
8         It's more of a -- I don't know if I should use
9 the word social, but just -- he was someone I met when
10 we first moved to Savannah and he clued me in on
11 different things in Savannah and we hit it off more as
12 friends.
13         Q   Okay.  Turn to page 3 of your article,
14 please.
15         A   I'm there.
16         Q   Do you see the paragraph under the
17 Prefiling Investigation heading, the third paragraph on
18 page 3?
19         A   It starts with the word Microbiological?
20         Q   No.  Do I have a different copy than you?
21         A   I'll show you mine.  That's what I've got.
22         Q   Third paragraph.  I'm sorry.  Not -- the
23 third paragraph on the page.  I didn't say that clearly.
24 My apologies.
25         A   It begins with, When a client?

1         Q   That's the one.
2         A   I'm there.
3         Q   It reads, When a client comes to you
4 suspecting that he or she has taken an adulterated drug,
5 you should tell the client to save the drug, the
6 container and all labeling and packaging information.  A
7 laboratory must analyze the drug and test for its active
8 pharmaceutical ingredient, paren, API, closed paren, and
9 for strength and purity.
10         Did I read those two sentences correctly?
11         A   Yes, you did.
12         Q   So if you think a drug is adulterated you
13 have to test it to determine whether it was defective.
14 We established that earlier, right?
15         A   Yes.
16         MR. MILLER:  Object to form, misstates
17         previous testimony.
18         Q   Well, that's what this says, right?
19         A   Well, what -- to put that in perspective,
20 I remember we were talking about it and Gene said to me,
21 what's the first thing you do?  I said, if someone took
22 a drug and had some sort of adverse event, adverse
23 effect, and they thought something was wrong with it, if
24 you are going to represent them or anyone who wants to
25 learn more about the situation, either side, so to

26 (Pages 98 to 101)

James J. Farley                                                                                    June 28, 2010

Page 102

1  speak, your best bet is that container, the remainder of
2  the material in it, and get data right there as opposed
3  to comparing it to something that was made at some other
4  time.
5      Q   Okay.
6      A   So that's what we were talking about here.
7  Your best bet is do you have the same container of
8  medication and what's the lot number.  And you can be
9  more specific in getting to the solution of the problem.
10     Q   And ultimately what you're describing is a
11  method to determine whether the product was defective.
12     A   Yes, for either side.
13     Q   Understood.  And you should make that
14  determination whether the product is defective before
15  you file a lawsuit, shouldn't you?
16         MR. MILLER:  Object to form of the
17  question.
18     A   That's for an attorney to judge, but I
19  would think so.  But I don't feel that -- I feel
20  attorneys are better qualified for that because they
21  represent their clients.
22     Q   Okay.  Can you sue a pharmaceutical
23  company just because you take a product that's
24  adulterated?
25         MR. MILLER:  Object to form of the

Page 103

1  question.
2      A   You being an individual?
3      Q   A consumer, yes.
4      A   Can you sue a pharmaceutical company just
5  because you took a product that's adulterated?  That's
6  between you and your attorney.
7      Q   You don't know?
8      A   Well, I know that anybody can sue anybody
9  over anything any time in the U.S. today.
10     Q   Well, you also know --
11     A   So that would be yes.
12     Q   Well, but is adulterated -- well --
13     A   I think, if I can interject something --
14         MR. MILLER:  Hold off.  There's no
15  question.  When he asks a question you can answer.
16     Q   Yeah, Mr. Farley, I appreciate that and
17  I --
18     A   I'm holding off.
19     Q   Okay.  Look at the heading on -- still on
20  page 3 that says Discovery.  Do you see that heading?
21     A   Yes.
22     Q   It's important to request and review
23  documents when you're considering whether you should --
24  whether you can and should sue -- well, take that back.
25         It's important to request and review

Page 104

1  if you're trying to figure out whether you've got a
2  claim against a pharmaceutical company, correct?
3      A   Yes.
4      Q   And that includes reviewing batch records.
5      A   Reviewing --
6      Q   Batch records.
7      A   Batch records, yes.
8      Q   I mean, you say in the article here that
9  you should start by requesting a review of the batch
10  records; is that right?
11     A   Of that particular lot of the bottle in
12  question, or container in question.
13     Q   If you can do that you should -- that
14  should be the first place you look is you look at batch
15  records of that particular lot.
16     A   Yes.
17     Q   And that will tell you whether the product
18  was manufactured in compliance with Good Manufacturing
19  Practices.
20         MR. MILLER:  Object to form of the
21  question.
22     A   Yes.  It's the first place to look.  Deal
23  with the specific product that seems to be causing their
24  problem.
25     Q   I understand.  And like I said, that will

Page 105

1  tell you whether the product was manufactured in
2  compliance with Good Manufacturing Practices.
3         MR. MILLER:  Object to form of the
4  question.
5      A   If everything on it is presented
6  accurately and honestly, yes.
7      Q   Okay.  Your expert opinion in this case
8  doesn't speak to the accuracy of Actavis' documents,
9  correct?
10     A   Doesn't speak to the accuracy of Actavis'
11  documents?
12     Q   Yeah.  You don't offer an opinion about
13  whether the documents -- whether Actavis' records are
14  accurate.
15         MR. MILLER:  Object to form of the
16  question.
17     A   Specifically -- I noticed something in
18  that double initial where the analyst was also the
19  reviewer, which I noticed that.  I also in another
20  document that I could find upon a short search where I
21  saw an analysis of an impurity.
22         And those results jumped out at me like they
23  are so precise, I mean, abnormally precise, more precise
24  than most people would see, which leads you to wonder
25  did they really run it.  But that's speculation, of

27 (Pages 102 to 105)

PLAINTIFFS' EXHIBITS 008143

James J. Farley                                                                    June 28, 2010

Page 106

1  course.  But that would -- so if everything was correct
2  then the product should be good.  But --
3         Q   But I want to make --
4         A   What was your original question?
5         Q   My question is, you're not offering an
6  opinion in this case about whether Actavis' documents
7  are accurate, are you?
8         A   I have questions about some of the things
9  on them, but the way you worded the question, I am not
10 questioning.  I'm not believing they all are accurate,
11 but I'm not questioning them.
12        Q   There's nothing in your report expressing
13 any opinion that the information in Actavis' documents
14 is inaccurate, right?
15             MR. MILLER:  Object to the form of the
16        question.
17        A   There is an opinion in one file where they
18 did an impurity determination and they got -- I believe
19 it was 1.61 percent and 1.61 percent.  And I said these
20 are fantastically precise results.
21             And I questioned the accuracy, one might even
22 say the legitimacy of that.  I would like to see the
23 analyst's records on that.  I don't have them.  I would
24 like to see them.
25        Q   When you say in one file, you're not

Page 107

1  talking about your report?
2         A   In one of the documents I reviewed, one of
3  the 93 documents.
4         Q   So if I understand correctly, in one of
5  the 93 documents you reviewed you saw one test result
6  for impurity that in your mind caused you to question
7  some aspect of the performance of that test.
8         A   No, no.  In one I saw a set of results
9  that led me to question that.  There were a series of
10 analysis.  It wasn't just one.  One would not cause me
11 to question it, but a series did.  And in another I saw
12 the analyst and reviewer having the same initials.
13        Q   There's no mention of either of those
14 things in your expert report.
15        A   Not in the report.  It's in the files I
16 reviewed, the individual files.
17        Q   I understand.  So you're talking about
18 information in documents that you reviewed --
19        A   Yes.
20        Q   -- not in your expert report which
21 contains your expert opinions, right?
22        A   Yes.
23        Q   You understand --
24        A   Yes, you're correct it's not mentioned in
25 the report specifically.

Page 108

1         Q   And you understand, Mr. Farley, that
2  you've been retained as an expert witness in this
3  litigation to give an expert opinion on certain
4  subjects.
5         A   Yes.
6         Q   The accuracy of Actavis' documents is not
7  one of those subjects; is that correct?
8         A   It is not one of them.  Some things raise
9  eyebrows, but I did not have enough data to make a
10 conclusive decision.  Did that answer it?  I know it
11 might be answered, but I'm trying to put it in the
12 proper perspective for you, for all of us.
13        Q   It's your answer.  The FDA when it
14 conducts inspections and based on your experience, if
15 they thought a company had fraudulent or falsified
16 documents, they'd take very swift and very decisive
17 action, wouldn't they?
18        A   I would hope so.  And I've known them to
19 do it in those cases.
20        Q   Okay.  And what actions would they take?
21        A   They immediately do a review of all
22 relevant documents to look for the extent of it and the
23 backgrounds of the individuals involved.
24        Q   What action would they take with respect
25 to that company's continued participation in the market,

Page 109

1  leaving their products in the market?
2         A   Until they were sure they would be doing
3  the investigation.  It's like any time.  You're doing
4  the investigation but you -- it depends on the potential
5  result out here as to whether you shut them down now or
6  have a potential for shutting them down later.  They
7  would do the investigation, depending on where they
8  thought the fraud was.
9         Q   You reviewed a series of FDA documents --
10        A   Yes.
11        Q   -- relating to Actavis, correct?
12        A   Correct.
13        Q   No reference to even the possibility of
14 fraud in any of those documents, is there?
15        A   Correct.
16        Q   So the FDA didn't think Actavis' documents
17 were fraudulent.
18        A   Correct.
19        Q   When you're -- let's go back to documents.
20 If you're looking at -- I'm sorry.  Let's go back to
21 your article and specifically your review of batch
22 records.
23             If you're looking to -- and if you look at
24 the -- your discussion of batch records here, it goes on
25 for almost a page.  And if you look at the second

PLAINTIFFS' EXHIBITS 008144

James J. Farley                                                                                June 28, 2010

Page 110

1  paragraph on page 4 it starts -- well, no, the first
2  full paragraph, Batch records contain a wealth of
3  information about the production history of a specific
4  drug.
5        These records contain the names of people
6  actively involved in the manufacturing process,
7  operating procedures followed -- and there's a
8  parenthetical -- relevant dates and times and, most
9  important, the results of sample tests.
10       Essentially what you're saying in this article
11 is you're looking for evidence of GMP violations.
12     A  I'm looking to see how it was
13 manufactured.  If I was looking for a violation that's
14 where I would look for a violation.  If I was looking to
15 see that they made it correctly that's where I would
16 look to see that they made it correctly.
17       I guess my answer is it depends what side
18 you're on and what you're predisposed for looking.  But
19 that's going to give you the answer.
20     Q  Objectively if you're looking for those
21 through batch records -- and I guess if you're on the
22 plaintiff's side you're looking for evidence of GMP
23 violations when you review the batch records.
24     A  Yes.  Of course, the firm itself does --
25 should do periodic reviews to ensure that everything is

Page 111

1  correct.  That's why I'm saying both sides.  When firms
2  do their own audits, which they should do periodically,
3  they would review batch records, not looking expecting
4  something is wrong, but expecting everything to be
5  correct.
6        Now, a plaintiff's representative, on the
7  other hand, might review it looking for that.  So that's
8  why I'm saying, you can review it either way depending
9  on what you're looking for.
10     Q  You're looking for different things, but
11 neither side can determine -- let's ask a slightly
12 different question.
13       You can't determine if there were GMP
14 violations associated with manufacturing a product
15 without reviewing the batch records, correct?
16     A  There are cases where you could.  There
17 are cases where it would be obvious.  You look at the
18 product and you see a crack or a double size.  I mean,
19 double size, I don't need to look at a batch record
20 to -- I want to look at the batch record after the fact,
21 but I can see there's something wrong here.
22     Q  Assuming you're not holding product that
23 is obviously -- well, let's explore that concept.  Let's
24 assume you're looking at a double thick tablet.  It
25 doesn't mean it was -- GMPs were violated when it was

Page 112

1  manufactured, does it?
2     A  If you're looking at a product, just the
3  product, that's it.
4     Q  Yeah.
5     A  You have the product in your hand.
6     Q  Yeah.  It's twice the size it should be.
7  That could happen even if you have absolute strict
8  compliance with all relevant Good Manufacturing
9  Practices in the production of that product, correct?
10     A  Provided it didn't get to the consumer.
11 You're talking about the employees.
12     Q  If it gets to the consumer that doesn't
13 change whether it was manufactured properly.
14     A  What does matter is what did you do about
15 it.  Did you --
16     Q  Mr. Farley --
17     A  -- do an investigation --
18        MR. MILLER:  Let him answer the question.
19     Q  -- answer my question.  If I have a
20 defective tablet in my hands --
21     A  Defective, your word.
22     Q  Okay.  It's twice as thick as it should
23 be.
24     A  Yes.
25     Q  It doesn't mean any GMPs were violated in

Page 113

1  manufacturing that product, does it?
2        MR. MILLER:  And continue with your
3  answer when you were cut off, please.
4     A  It means something is wrong somewhere.
5  This is not the product we want.  Let's launch a
6  Corrective Action/Preventive Action investigation into
7  it.  And then that would have to be launched the proper
8  way to investigate it.
9        It means something went wrong somewhere.  And
10 at that point you don't know where or why, but you have
11 to investigate it.  Failure to investigate it would be a
12 GMP infraction.
13     Q  Okay.  But you still haven't answered my
14 question.
15     A  Okay.
16     Q  It doesn't mean --
17     A  One more time.
18     Q  -- anything -- any GMP was violated while
19 it was being manufactured.
20     A  Yes, it does.
21     Q  What --
22     A  Because it's supposed to be a certain
23 weight and a certain size.
24     Q  Okay.  But --
25     A  And it's not.

29 (Pages 110 to 113)

James J. Farley                                                                                         June 28, 2010

Page 114

1    Q   How could you know what GMP was violated
2  just because it's out of specification?  You can -- is
3  it true or not you can comply with every single GMP
4  requirement associated with manufacturing a product and
5  still produce a product that happens to be out of
6  specification?
7        A   Theoretically you're not complying.
8  Something went wrong somewhere.
9        Q   Something went wrong doesn't mean you
10 didn't comply with Good Manufacturing Practices.
11       A   The system that you're trusting didn't
12 comply --
13       Q   That doesn't mean --
14       A   -- that you --
15       Q   That means something went wrong.  That
16 doesn't mean you didn't comply with Good Manufacturing
17 Practices, does it?
18       A   You try to comply.  You didn't make a
19 double thick tablet deliberately.  But once you saw it
20 was double thick you know here's the specifications for
21 thickness and for weight, this is too thick and it
22 weighs too much, something is wrong with the system,
23 let's investigate it.
24       It's a defective product as you yourself said.
25 And what are we going to do about it?  What are you

Page 115

1  going to do about it now?  That's --
2        Q   You're talking -- but now you're talking
3  about after the fact.  And I agree.  If you have a
4  defective product and you learn of it, perhaps from a
5  consumer, perhaps it comes back from a pharmacist, I
6  agree that now you have to determine what you're going
7  to do about it.
8        But you're not answering my questions about
9  the processes that resulted in production of that
10 product.  You can comply -- is it true or not, you can
11 comply with every single Good Manufacturing Practice
12 associated with manufacturing a product and it is still
13 possible that you could produce a product that is not
14 within specifications?
15       MR. MILLER:  Objection, asked and
16   answered.
17       A   Here's -- I'm going to reword a certain
18 way, because I can't answer that yes or no.  I'm going
19 to say you can believe you complied with everything
20 according to the way your high moral character, your
21 high ethics and the way you set your system up.
22       But you've got the evidence sitting right
23 there in the palm of your hand something is wrong
24 somewhere.  I obviously didn't comply.  Why didn't I and
25 how can I fix it?

Page 116

1    Q   You -- it's not that you didn't comply.
2  It's that you -- the process didn't work properly.  That
3  doesn't mean you didn't comply, does it?
4        A   The process didn't produce the material
5  within specifications; therefore you didn't comply.
6        Q   That's not true.
7        A   You didn't mean not to comply, but you
8  didn't comply.
9        Q   You didn't produce a product that was
10 within your specifications.  That does not -- do you
11 believe that automatically means you didn't comply with
12 the procedures you were supposed to?
13       A   Yes, I do.  And what comes to mind is did
14 Prius comply with the accelerator pedal?  Is BP
15 complying with the oil in the Gulf?  I mean, you know,
16 something is wrong somewhere, because the cars are going
17 there, your oil is going out in the Gulf.
18       You've got a tablet in your hand that you
19 acknowledge is defective.  You didn't mean not to
20 comply, but you didn't comply, because if you did you
21 would have had a quality product that met
22 specifications.  You wouldn't have that double thick
23 tablet in your hand.
24       Q   The Good Manufacturing Practices
25 regulations require that you develop a procedure for

Page 117

1  every step in the process of manufacturing a product,
2  correct?
3        A   Yes.
4        Q   And they require that you submit those to
5  the FDA --
6        A   Yes.
7        Q   -- and get approval, right?
8        A   Yes.
9        Q   And then they require that you follow
10 those procedures, right?
11       A   Yes.
12       Q   If you do that, develop them, submit them,
13 follow them, have you achieved compliance with Good
14 Manufacturing Practices?
15       A   If you look at your final product and it
16 meets all the specifications assigned to that product
17 and approved by the FDA, then you have.  If it does not
18 meet those specification then you have, by your
19 definition, a defective product and you didn't comply
20 even though you thought you did and you meant to.
21       Q   How does that speak to whether you
22 complied?  Because your product had a defect in it --
23 the regulations don't require perfection, do they?
24       A   They require that the product be within
25 the defined and approved specifications.  That's not

30 (Pages 114 to 117)

PLAINTIFFS' EXHIBITS 008146

James J. Farley                                                                              June 28, 2010

Page 118

1  perfection.  It doesn't need perfection.  But you have
2  to make it the way you say you'd make it.
3       Q   If you're counseling one of your -- well,
4  let's back up.  You've been consulting and giving
5  counsel to pharmaceutical manufacturers for 13, 14 years
6  since you left the FDA?
7       A   Fourteen.
8       Q   Okay.  You've been involved in
9  circumstances where they conduct investigations into out
10 of specification results?
11      A   Yes.
12      Q   You don't always find a root cause, do
13 you?
14      A   No, once in a while you don't.  But you
15 have to exert a certain amount of effort to look into
16 it.
17      Q   You have to try.
18      A   Uh-huh, yes.
19      Q   But it's certainly possible and it happens
20 that you can do a completely thorough investigation into
21 the circumstances you're involved with and not determine
22 the root cause for why that happened.
23      MR. MILLER:  Objection, asked and
24   answered.
25      A   It is possible and it happens once in a

Page 119

1  while.
2       Q   Okay.  And the industry as a whole is
3  based on sampling protocols, right?
4       A   The industry is based on sampling -- the
5  industry uses sampling protocols.
6       Q   Well, and --
7       A   Or is --
8       Q   Maybe we're saying the same thing.
9       A   I'm not questioning your choice of words,
10 but maybe reword it.
11      Q   Well, maybe we're saying the same thing.
12 The release decision was used -- or the release decision
13 made by all companies in the industry are -- they use
14 sampling protocols to make those release decisions.
15      A   Take your samples of whatever you're
16 sampling for analysis to get your data.
17      Q   You don't test every --
18      A   Not a hundred percent.
19      Q   -- individual tablet or -- and let's stick
20 with tablets.  You don't test every tablet for
21 compliance with all specifications.
22      A   Correct.
23      Q   And does any company test every tablet?
24      A   You wouldn't have anything left to sell.
25      Q   Not very economically viable.

Page 120

1       A   Not economically viable.
2       Q   So the industry is based on sampling
3  protocols.
4       A   Correct.
5       Q   Deviations during a -- you talk in your
6  article about, the top of page 5, Corrective Action and
7  Preventive Action.  And you advise in the article that
8  you should request CAPA, C-A-P-A, records for the time
9  period that includes the production of the questionable
10 lot.  If something happened during production that
11 differed from approved procedures, this will be noted as
12 a deviation, which the company must investigate.
13      Did I read that correctly?
14      A   Yes.
15      Q   Deviations can occur during the
16 manufacture of a batch and a batch can still be released
17 properly, correct?
18      A   If the deviation was investigated
19 according to your protocols or procedures and found to
20 be acceptable, it can occur.
21      Q   Okay.  And you counsel manufacturing --
22 companies that manufacture pharmaceuticals.  You run
23 into, I would assume fairly regularly, deviations that
24 are properly investigated and the batch is still
25 released.

Page 121

1       A   Fairly regularly, yes, uh-huh.  That's
2  right.
3       Q   So there's nothing -- well, strike that.
4       Going back to reviewing batch records, batch
5  records will show whether a product was tested properly
6  in the lab, correct?
7       A   It will show theoretically everything in
8  the production line including --
9       Q   So you need to answer my question now,
10 Mr. Farley.
11      A   Yes.
12      Q   It will show whether a product was tested
13 properly in the lab.
14      A   Yes.
15      Q   It will show whether the results of that
16 laboratory testing were within specifications.
17      A   Yes.
18      Q   If the FDA was conducting an inspection of
19 a facility and wanted to determine whether the company
20 had complied with Good Manufacturing Practices, it would
21 review batch records, right?
22      A   Yes.
23      Q   And from that review would make a
24 determination about whether the FDA believed, whether
25 the inspector believed there was some non-conformance.

31 (Pages 118 to 121)

PLAINTIFFS' EXHIBITS 008147

James J. Farley                                                                                          June 28, 2010

Page 122

1    A    Yes.
2         MR. MILLER:  Object to form.
3    Q    And let me make that -- some
4    non-compliance with Good Manufacturing Practices.
5    A    That would be one of the things.  They
6    would have a whole schedule of things to look at of
7    which batch record examination would be one.
8    Q    When the FDA is -- well, never mind.  I'll
9    ask that later.  You can also review SOPs to determine
10   whether a company has complied with Good Manufacturing
11   Practices.
12        MR. MILLER:  Object to form.
13   A    You look, A, for existence of the proper
14   SOPs; and B, for the fact that they're using them and
15   doing what they say.
16   Q    Right.  So there are two -- there's
17   actually two forms of GMP compliance associated with
18   SOPs.  First, whether the SOP itself satisfies the
19   minimum requirements of the regulation, right?
20   A    Yes.
21   Q    When it's drafted properly.
22   A    Yes.
23   Q    And second, whether you comply with the
24   SOP during your manufacturing process.
25   A    Yes.

Page 123

1    Q    And again, the FDA when it is inspecting a
2    company for GMP compliance it might undertake both of
3    those reviews.
4    A    Yes.
5    Q    It might review the substance of the SOP
6    to determine whether it believes it meets the minimum
7    requirements and it also might review the batch records
8    to determine whether you actually have complied with the
9    SOP during manufacturing.
10   A    Yes.
11   Q    You can't -- you can't determine whether
12   you've complied with the SOP without reviewing the batch
13   records.
14   A    In the case you're talking about, correct.
15   Q    Well, is there any case where you could
16   determine compliance with an SOP without reviewing the
17   batch records?
18   A    They would be SOPs not relating to the
19   batch, like the example you gave earlier.
20   Q    Okay.  Related -- well --
21   A    I can't qualify my answer.
22   Q    -- you can't determine -- and I apologize
23   for talking over you.
24   A    That's okay.
25   Q    You can't determine whether you've

Page 124

1    complied with an SOP that relates to the manufacture of
2    a specific product without reviewing the batch records.
3    A    That's your most sure way, yes.
4    Q    Okay.  If you were doing a consulting
5    assignment that's what you could do?
6    A    Definitely.
7    Q    You wouldn't tell that company whether
8    they complied or not without reviewing the batch
9    records.  That's being thorough like you described
10   earlier.
11   A    Correct.
12   Q    How would you offer an opinion about GMP
13   compliance with respect to manufacturing a specific
14   product without reviewing batch records?
15   A    How would I offer an opinion about --
16   Q    Yeah.
17   A    -- compliance?
18   Q    You couldn't -- well, you couldn't
19   offer -- you, Mr. Farley, as a consultant you couldn't
20   offer an opinion about whether a company -- if a company
21   came to you and said, I want to know whether we've
22   complied with GMPs as we manufactured and released these
23   batches of this product.
24   A    Sure.
25   Q    You could not undertake that exercise

Page 125

1    without reviewing those batch records, right?
2         MR. MILLER:  Object to form.
3    A    I could not be assured of it without doing
4    the batch records.  And I would say in plain everyday
5    terms, I want to see how it's made.  And they would say,
6    oh, we'll have the batch record for you right away.
7    Q    And what if they said -- well, you
8    wouldn't offer an opinion about whether they had
9    complied with GMPs in manufacturing and releasing
10   that -- those batches of that product without reviewing
11   the batch records.
12        MR. MILLER:  Object to form.
13   Q    As you said earlier you'd say, I can't do
14   that, I need to turn that down.
15        MR. MILLER:  Object to form, misstates
16   previous testimony, incomplete hypothetical.
17   A    Could you give me the question again?
18        MR. ANDERTON:  Could you read that back,
19   please?
20   (The record was read back as requested.)
21   A    I would have to review the batch records
22   to render a complete opinion as to whether everything
23   was done properly.  Is that -- am I answering -- sure.
24   Q    Okay.  Go to the heading in your article
25   Witnesses, page 6.

                                                        32 (Pages 122 to 125)

PLAINTIFFS' EXHIBITS 008148

James J. Farley                                                                    June 28, 2010

Page 126

1     A   I have it.
2     Q   Take a look at the fourth full paragraph
3 under that heading.  It starts, When discussing.  Do you
4 see that?
5     A   I'm with you.
6     Q   And it reads, When discussing alleged
7 violations the expert should be able to describe what
8 should have been done and why and the difference that
9 compliance with relevant GMPs would have made to the
10 finished product.
11     He or she must connect the specific GMP
12 violation to the negligence or defect that caused injury
13 or loss.  This causation connection is important as
14 determining the GMP violations -- I'm sorry -- this
15 causation connection is as important as determining the
16 GMP violations because irrelevant GMP violations cannot
17 establish the prima facie case.
18     Did I read that correctly with that little
19 glitch in there where I went back and started that last
20 sentence over?
21     A   You read that correctly.
22     Q   Okay.  So you've got to have an expert
23 witness identify specific GMP violations and they have
24 to apparently -- well, you believe that they have to
25 actually connect directly to a specific defect, correct?

Page 127

1     MR. MILLER:  Object to form.
2     A   In order to correct it, yes.
3     Q   Well, this isn't talking about correcting
4 it, Mr. Farley.  This article is about whether you can
5 bring a lawsuit against one of these companies; and if
6 so, how to do it, right?
7     A   Right.
8     Q   Okay.  So the paragraph I read where you
9 say -- where it reads, The expert must connect a
10 specific GMP violation to the negligence or defect that
11 caused injury or loss, you agree with that, right?
12     A   Yes, I do.
13     Q   And you also agree that irrelevant GMP
14 violations -- and by irrelevant that means a GMP
15 violation that doesn't actually relate to the defect
16 that allegedly caused harm to a consumer, correct?
17     MR. MILLER:  Object to form.
18     Q   Is that what that means?
19     A   It doesn't mean not important.  It means
20 not relevant to this situation.
21     Q   Right.  So you could have a GMP violation
22 that doesn't speak to the -- or in any way relate to the
23 defect that caused a consumer harm.  That's what you
24 mean when you use the term irrelevant GMP violations.
25     MR. MILLER:  Object to form.

Page 128

1     A   Yes.  I had to hinge a bit when Gene, Jim
2 and I were writing about using that term, but we
3 talked about it like we're talking now.  It doesn't mean
4 not important.  It means not relevant to that path.
5     Q   Okay.  What GMP violations can you connect
6 specifically to Digitek?
7     MR. MILLER:  And you feel free to pull
8 out the documents and go through them a page at a
9 time if you like.
10     A   Pretty much the -- all the 483s that were
11 written.  They mention one case.  I'd have to get the
12 483s to bring them out.
13     Q   We're going to get to those.
14     A   Okay.  And they're -- now, they are
15 printed.
16     Q   I've got plenty of copies.  Don't you
17 worry about that.
18     A   I'm sure.  I would have guessed that.
19 They're all listed in there.  An observation on a 483,
20 an observation of a particular GMP violation, and then
21 there are examples given.  It doesn't mean this is
22 everything.  Like here's the few examples of this
23 observation which is a violation.
24     And I believe the inspection that concluded in
25 May of 2008, I think it had 20 observations on it, which

Page 129

1 was really a lot.  I mean, that's a lot for a 483.  And
2 so their rule -- offhand I'd say they're all GMP
3 violations on that document.
4     Q   Well, we're going to talk about whether
5 you're correct then that a 483 reflects any violations
6 of anything.
7     A   I would modify it slightly perhaps, but
8 I'm sure there's a lot going on.
9     Q   Modify to what?
10     A   I might say 18 out of 20 or something like
11 that.
12     Q   No.  What --
13     A   But right now I'm saying every one on
14 there was a GMP violation.
15     Q   And you said as you started to describe a
16 483 and what's on a 483 that it lists what the inspector
17 believes is a violation and then examples.
18     A   Yes.
19     Q   Is Digitek listed in all 20 or 18 of those
20 examples on that 2008 483, do you remember?
21     MR. MILLER:  Object to form of the
22 question.
23     A   I believe that not every one refers to
24 Digitek.  But to me reading it it relates to the overall
25 system of quality assurance or a weak quality assurance

33 (Pages 126 to 129)

PLAINTIFFS' EXHIBITS 008149

James J. Farley                                                                  June 28, 2010

Page 130

1  program.  But in answer to your question, I don't
2  believe every one in there refers to Digitek, per se.
3       Q   Well, if you have an observation on a 483
4  and you have examples, as a consultant to the
5  pharmaceutical industry, if a company said, we'd like
6  you to audit our records and identify all the products
7  this observation relates to, you'd have to go look at
8  the batch records, wouldn't you?
9       A   I would.
10      Q   So if an observation doesn't refer to
11 Digitek, in order to determine whether that observation
12 relates to Digitek you'd have to look at Digitek batch
13 records.
14      A   In order to determine if it related to
15 Digitek, but I would have formed an opinion as to the
16 overall system or management or the way the company
17 runs.  I mean, in plain words I might say this, this
18 thing is all fouled up, I don't know what they can make
19 right.  I mean, that's plain terms but --
20      Q   So that might be your initial thought, I
21 don't know what they can make right, but then you'd go
22 to the batch records and determine whether they did make
23 it right.
24      A   Yes, I would.
25      Q   Okay.  And if you didn't do that then you

Page 131

1  can't say with any certainty whether the observation
2  relates to any product where you didn't review the batch
3  records, can you?
4           MR. MILLER:  Object to form.
5       A   It would relate to the product that the
6  investigator listed.  I would have to believe his or her
7  statement on the 483.  But to look at how much of it,
8  I'd have to review.
9       Q   Well, and to determine whether it related
10 to any product that's not listed by the investigator you
11 couldn't do that without reviewing batch records for
12 that product, could you?
13          MR. MILLER:  Object to form.  We'd have
14 to take a look at each one individual.
15      A   Yeah.  We would have to look at every one.
16      Q   Every one what?
17      A   Every product and all the batch records.
18 I would have an idea as to whether it would or not by
19 looking at that as I did look at the 483.  But to be
20 sure you'd have to go through each one of them.
21      Q   And unless you did that you couldn't offer
22 an opinion about whether it actually relates to each
23 product.
24      A   I could offer an opinion.  I just wouldn't
25 be sure of it.

Page 132

1       Q   Okay.  And your opinion in that context
2  without being sure would be speculation.
3           MR. MILLER:  Object to form.
4       A   If you use that term.  I wouldn't want
5  to -- I wouldn't want to take any of the firm's products
6  until everything was investigated.
7       Q   Okay.  But, Mr. Farley, the answer to my
8  question is, yes, it would be -- until you did that
9  review it would be -- you could offer your opinion but
10 it would be speculation.
11          MR. MILLER:  Object to form.
12      A   Speculation?  Yes.  Okay.  Yes.
13          MR. ANDERTON:  What have we got?
14          THE VIDEOGRAPHER:  Eight minutes.
15          MR. ANDERTON:  Eight?  I'm not going
16 to -- we're almost getting about to a breaking
17 point.  I'm going to talk to Ericka for a moment.
18 So we're gonna step outside.  If you'll just sit
19 tight for a minute.  We're within a couple minutes
20 of a break.
21          THE WITNESS:  Sure.  Whatever you like.
22          MR. ANDERTON:  But I want to --
23          THE VIDEOGRAPHER:  Off record at 12:14.
24          (A brief recess was taken.)
25          THE VIDEOGRAPHER:  Okay.  We're back on

Page 133

1  record.  The time is 1:19 p.m.  We did -- this is
2  the beginning of Tape No. 4.  We did conclude Tape
3  No. 3 at 12:14 p.m. and we broke for lunch.
4  BY MR. ANDERTON:
5       Q   Hello, Mr. Farley.  Welcome back from
6  lunch.
7       A   Thank you.
8       Q   You understand that you are still under
9  oath?
10      A   Yes.
11      Q   Okay.  And I want to just state, as I am
12 admonished for not wearing my microphone, that,
13 implicitly admonished, that while we were off the record
14 you copied over to a portable thumb drive that I have
15 with me all of the documents that were on your thumb
16 drive and that relate to -- the thumb drive that we
17 discussed earlier and that relate to the Digitek
18 litigation and your engagement for Plaintiffs in this
19 litigation.  Is that correct?
20      A   Yes, it is, in your presence and Peter
21 Miller's presence.
22      Q   Okay.  So it is your understanding that
23 all electronic documents that are on that thumb drive
24 that relate to this litigation have now been placed onto
25 my thumb drive?

34 (Pages 130 to 133)

PLAINTIFFS' EXHIBITS 008150

James J. Farley                                                                         June 28, 2010

Page 134

1    A   You are completely up-to-date as of this
2    minute --
3    Q   Okay.
4    A   -- on everything I have.
5    Q   And thank you for that.
6    A   You're welcome.
7    Q   Mr. Farley, what were you asked to do in
8    the context of this engagement?
9    A   Essentially it was, Jim, we want you to
10   evaluate some documents for us and assess the situation,
11   there will be a court case, here's the product, here's
12   the company, I want you to have some documents and
13   render your opinion about this.
14   Q   Render your opinion about what?
15   A   About the status of the situation.  These
16   are my words, now.  This is not a quote.  I don't
17   remember the -- I couldn't be quoted that part back.
18       But essentially what about this product and
19   that company that makes the product, would you review
20   these documents, give an opinion, at which time I said,
21   well, I'll give you an electronic review of each
22   document and then I'll render an opinion.
23   Q   When you say an opinion about the status
24   of this product, do you mean the regulatory compliance
25   status of that product?  What do you mean by that?

Page 135

1    A   Did I use the word status?
2    Q   You did.
3    A   I didn't mean to use the word status.
4    About my evaluation of what this product is like and
5    what the company is like.
6    Q   Okay.  So your evaluation of what the
7    product is like and what the company is like with
8    respect to what?
9    A   Are they in compliance with FDA
10   regulations.
11   Q   Generally?  Is that what you were asked to
12   do, evaluate whether they were in -- whether this
13   company, Actavis, is in compliance with FDA regulations
14   generally?
15   A   Most clients -- some clients will be very
16   specific with you.  Others will say generally and as
17   specific as you want or tell me what areas you feel you
18   should put -- you want to talk more about or whatever.
19   It's essentially since I hadn't seen any documents, read
20   these, give an evaluation to whatever depth you feel.
21   Q   Okay.
22   A   Those are my words.
23   Q   I understand.  And I need to have as clear
24   as I can understanding with respect to an evaluation of
25   what?  I mean, what are you evaluating?  What were you

Page 136

1    evaluating as you read and reviewed the documents you
2    were given?
3    A   I was evaluating at a very minimum a
4    product called Digitek and a company called Actavis --
5    Actavis U.S. I believe it's called -- with regard to how
6    well they can or cannot produce quality material.
7    Q   With respect to Digitek specifically what
8    were you evaluating?
9    A   We looked at that one particular lot where
10   we had the double thickness, but as time went on I
11   looked more into the systems and began to realize that I
12   wouldn't trust anything made by that company.  I might
13   have digressed a bit there.
14       But it was essentially, look it over and tell
15   me what you find.  I don't really have clients that --
16   they don't tell me the answers they want.  They tell me
17   to look it over and tell me what you find.  And then I
18   say, I'll send you individual reports, individual files
19   of each review.
20   Q   Okay.  But you were asked to look
21   specifically at a product, Digitek, right?
22   A   And the company.
23   Q   That's two things, right?
24   A   It was one project which involved a couple
25   of different things.

Page 137

1    Q   Two aspects of one project.
2    A   Yes.
3    Q   One of those aspects was evaluating
4    Digitek.
5    A   In my words can this company make Digitek
6    right and can this company make anything right, in my
7    words.
8    Q   Can this company make Digitek right or did
9    this company make Digitek right?  What were you
10   evaluating?
11   A   Both.
12   Q   So you evaluated whether the company
13   properly manufactured Digitek?
14   A   And whether I believe it is capable of
15   doing it.  I mean, it's more than one thing in the
16   process.
17   Q   I understand, Mr. Farley.  Is one of the
18   things that you evaluated whether Digitek was
19   manufactured properly?
20   A   Yes.
21   Q   Is that also something that was the
22   subject of your expert opinion, whether Digitek was
23   manufactured properly?
24   A   Yes.
25   Q   Let's talk about FDA 483s for a moment.

35 (Pages 134 to 137)

James J. Farley
June 28, 2010

Page 138

1  A  Yes.
2  Q  483s -- well, you tell me what a 483 is.
3  A  First I would like to define an
4  observation is a violation.
5  Q  Mr. Farley --
6  A  Yes.
7  Q  -- that wasn't close to the question I
8  asked.
9      MR. MILLER:  I disagree.
10  Q  I asked you what a 483 form is.
11     MR. MILLER:  But he's answering the
12  question.
13     Start again where you were.
14  A  I have to start with what an observation
15  is because it's part of it.
16  Q  I'm asking you what a form is.  I didn't
17  ask you what -- an observation is something that goes on
18  the form.
19  A  Oh.  All right.
20  Q  I asked you what the form is.
21     MR. MILLER:  Well, if he's explaining to
22  you what's on the form that's an answer.
23     Go ahead and answer just the way you were
24  going to answer.  Don't let him tell you how to
25  answer a question.

Page 139

1  A  Okay.  Continuing on, the 483 is so called
2  it because it's an FDA Form 483.  But that form is a
3  list of observations -- and I'm using that term
4  interchangeably with violations -- that an inspection --
5  an inspector or inspection team observes when they
6  inspect a facility.
7  Q  Your testimony is that an observation on a
8  483 reflects an actual violation of what?  Good
9  Manufacturing Practices?
10  A  Could be that.
11  Q  Could be what else?
12  A  A lot of times -- if it's a GMP inspection
13  it -- if it's a GMP inspection, then it will be a GMP
14  violation.  There are pre-approval inspections.  There
15  are for cause inspections when someone says, hey, I
16  think something is being done wrong at that plant.  But
17  if it's a GMP inspection then it will center on GMP
18  violations.
19  Q  But it's not an actual final determination
20  of violation of GMPs, is it?
21  A  It holds a lot of weight.  It's the
22  inspector's -- it's their jobs.  They turn it in to a
23  supervisory inspector.  It goes to district director.
24  Let me say it this way.  In almost eight years at FDA
25  I've never seen one changed.

Page 140

1  Q  You've never seen one changed?
2  A  I haven't, not in the Philadelphia
3  district, which is one of the busier districts.
4  Q  Did you review the revised warning letter
5  that was issued in this case?
6  A  I did.
7  Q  So revised means that it was changed,
8  right?
9  A  I should have reworded that and said I've
10  never seen one lessened.  But, no.  483 is a list of
11  observations.  Let's say that I'm walking through your
12  plant and I make observations.
13     Now, once I leave your plant, having told you
14  of these observations, there's absolutely no reason I'm
15  going to change anything.  They're observations.
16  They're facts.  They're not opinions.  They're facts.
17  Q  This is not a great -- well, but you keep
18  wanting to insist that there -- I think you testified a
19  moment ago that you use the term observation and
20  violation interchangeably.
21  A  I do.
22  Q  That's not correct, is it?
23     MR. MILLER:  Object to form.
24  A  Yes, it is correct.
25  Q  Well, I asked you and I don't think you

Page 141

1  answered it directly.
2  A  Okay.
3  Q  An observation is not a final agency
4  determination on whether the company has violated Good
5  Manufacturing Practices, is it?
6     MR. MILLER:  Objection, asked and
7  answered.
8     MR. ANDERTON:  It hasn't been asked and
9  answered.  He raised it unilaterally in responding
10  to the question.
11  A  Technically it's not.  They're all subject
12  to approval by the supervisory investigator.  But I've
13  never seen any supervisory investigator or district
14  director change one.
15  Q  But the answer to my question is an
16  observation on a Form 483 does not -- does not represent
17  the determination of the FDA as to whether GMPs have
18  been violated.
19  A  Yes, it does.  It represents the opinion
20  of that inspector or inspectional team who is
21  representing the FDA.
22  Q  Subject to review by several levels within
23  the FDA.
24  A  I think I maybe best say it if --
25  Q  Is that true or not, Mr. Farley, before

36 (Pages 138 to 141)

James J. Farley                                                                 June 28, 2010

Page 142

1  you -- you can answer that question.
2      A   Not several levels, no.  I wouldn't say
3  several levels.
4      Q   Two at least?
5      A   Sometimes -- sometimes it's one.
6      Q   FDA -- or observations on a Form 483 are
7  written up by the inspector, the investigator, correct?
8      A   Yes.
9      Q   Not subject to review before they're
10 issued?
11     A   Not subject to review.  Correct.
12     Q   So they don't have to submit them to the
13 compliance division, for example, before they're issued?
14     A   Correct.
15     Q   Mr. Farley, I'm going to hand you a
16 document that's marked as Defendants' Exhibit 57.  It's
17 difficult to read the sticker.
18     A   Yes.
19     Q   Depending on your vision status it may be
20 difficult to read some language we're going to ask you
21 to read real quickly.  But I'm going to give it a shot
22 nonetheless.
23     A   Okay.
24     Q   Do you see that this is an FDA 483 issued
25 to Actavis covering an inspection that occurred in

Page 143

1  September of 2007?
2      A   I see it.
3      Q   Is this one of the documents you reviewed
4  as part of your rendering an opinion in this litigation?
5      A   I believe it is.
6      Q   Okay.  I'm going to read the fine print,
7  if you will, right below the heading on the first page
8  there.  And I'll -- if you'll follow along.
9          This document lists observations made by the
10 FDA representative during the inspection of your
11 facility.  They are inspectional observations and do not
12 represent a final agency determination regarding your
13 compliance.
14         Did I read that correctly?
15     A   You read it correctly.
16     Q   That language is on all FDA 483 forms,
17 isn't it?
18     A   Standard.
19     Q   So on its face this document makes very
20 clear that observations on a 483 are not the final view
21 of the FDA with respect to whether a company has
22 complied or not complied with Good Manufacturing
23 Practices; is that correct?
24     A   My opinion is it's not the final view.
25 It's what they're going to do about the company.  Let it

Page 144

1  open, shut it down, ask them to recall.  But it's not
2  going to change their opinion about the company or
3  whether they're in or out of compliance.  What happens
4  here, this then gets classified as OAI, VAI or NAI.
5      Q   What's VAI mean?
6      A   Voluntary action indicated.
7      Q   That's a very positive outcome for an
8  inspection, isn't it?
9          MR. MILLER:  Object to form.
10     A   Not really.  NAI, no action indicated, is
11 a positive outcome for an inspection.  If you're a
12 pharmaceutical firm you want everything to be NAI, no
13 action indicated.
14         Voluntary action indicated means you're doing
15 something wrong and they told you to make it right.  But
16 like a recall, technically it's voluntary.  If you don't
17 do it they're going to shut you down.  But it's called
18 voluntary.
19         And an OAI is official action indicated, which
20 means if you don't do this we're really taking action
21 immediately.
22     Q   So, Mr. Farley, back to my question about
23 this language, this form on its face says whatever is
24 written on here is not final agency determination
25 regarding compliance, doesn't it?

Page 145

1      A   That's what it says to be polite, but why
2  would they send someone out to inspect and write this on
3  a form?  They're not going to say, by the way, don't
4  worry about it, we're not listening to what our
5  inspectors say.
6      Q   I understand that, Mr. Farley.
7      A   The inspector carries weight with their
8  opinions.
9      Q   I understand that.  But at the end of the
10 day it is the first step in a multi-step process that
11 ultimately determines compliance.
12     A   It's probably in time invested 99 or more
13 percent by weight right here in front of us right now,
14 because the supervisory inspector gets the inspector,
15 how is this, how -- now, the inspector has been talking
16 on the phone in the meantime.
17         So the supervisory inspector knows, how is it
18 going at such and such.  Hey, I'm finding a lot of
19 problems here, this is going to be a big one.  So the
20 supervisory inspector knows whether -- what to expect.
21         Then they come in.  They look.  Do you have it
22 written up okay?  Fine.  Okay.  Good.  I mean, it isn't
23 like you're going before a board of review that doubts
24 the inspector.
25     Q   I'm not suggesting that the --

37 (Pages 142 to 145)

PLAINTIFFS' EXHIBITS 008153

James J. Farley                                                                June 28, 2010

Page 146

1        A   Okay.  I mean, I just wanted --
2        Q   -- inspector won't have the support of the
3    people above him or her in the hierarchy at the FDA.
4    But it is not accurate to say that an observation is a
5    violation because the form itself says otherwise.
6            MR. MILLER:  Object to form.  It
7        misstates what the form says.
8        A   Well, I jump to Observation 2 only because
9    I can't read exactly Observation 1 because of the print.
10   Observation 2, the written stability testing program is
11   not followed.  There's a violation of GMPs right there.
12   I mean --
13       Q   If it's true it could be a violation of
14   GMPs.  There are -- the company is permitted to respond
15   to a 483, correct?
16       A   They are permitted to.
17       Q   And sometimes the company will submit
18   facts and circumstances in response to the 483 that will
19   result in an observation being withdrawn.
20       A   I've never seen it happen.
21       Q   Well, that just means that your experience
22   isn't broad enough to have run into that, correct?
23       A   That could be.  Logically that could be.
24   But I think that I have reasonable experience and it would
25   indicate that if it happens it's rare.

Page 147

1        Q   Well, it happened in -- with respect to
2    this company, didn't it?
3        A   Did it?
4        Q   Yes.
5        A   I haven't seen it.
6        Q   The revised warning letter that you read
7    removed an observation when compared to the initial
8    warning letter.
9        A   The revised warning letter was after they
10   responded and perhaps corrected -- I don't know --
11   perhaps corrected that.
12       Q   Well, all warning letters are after they
13   respond and correct.
14       A   But I mean, suppose somebody says you have
15   to straighten that out.  You say, okay, I'll have that
16   straightened out by next week.  You have a violation at
17   that time, but you straighten it out and you say, could
18   you knock this off the letter, it doesn't exist anymore.
19       Q   Mr. Farley, if it were that simple there
20   would never be a warning letter, because everybody
21   responds to a 483 and offers corrections in response to
22   a 483.  So why would a warning letter ever be issued if
23   it were just as simple as it doesn't exist anymore?
24       A   No.  I'll tell you why.
25           MR. MILLER:  Objection, misstates his

Page 148

1    testimony.
2        A   Because when you said everybody responds
3    in a positive way, no, they don't.  That's why some
4    places are shut down.  That's why there are consent
5    decrees.  That's why some people either don't know how
6    or don't care.  And so, no, not everybody responds to it
7    in a positive way.  They all like to think they do but
8    they don't.
9        Q   There are plenty of warning letters that
10   are issued even though companies have responded in a
11   positive way, correct?
12           MR. MILLER:  Object to form.
13       A   I'm not sure.  I don't know the answer to
14   that.
15       Q   You're an expert in regulatory compliance.
16   How can you not know the answer?
17       A   I haven't read all the warning letters
18   that were issued.  I'd have to --
19       Q   I'm not asking you to read all of them.
20   I'm asking you based on your experience in holding
21   yourself out as an expert in regulatory compliance,
22   isn't it true that, that warning letters are often
23   issued even though a company receives a 483, responds
24   positively to the 483 and corrects the situation?
25       A   I've never seen it happen and it should

Page 149

1    not happen.
2        Q   Never seen it happen?
3        A   I have never seen it happen.  I -- go
4    ahead.  Should I continue or --
5        Q   The warning letters essentially say
6    nothing more than what's in the 483, correct?
7        A   The warning letter -- yes, it does say
8    more.  The warning letter says, you must respond in 15
9    business days --
10       Q   Substantively --
11       A   -- or we're going to take further action.
12       Q   Okay.  But that's the threatening part of
13   the warning letter.  But with respect to the substance
14   of the warning letter and what it says about the facts
15   and circumstances or the alleged violations, it's
16   identical to what's in the 483, isn't it?
17       A   I wouldn't use the word identical.
18   It's -- a district director who looks over the 483 that
19   the inspector and supervisor inspector have presented to
20   him or her and determines if a warning letter is
21   appropriate, these people really have to shape up,
22   they're really not doing it good, I've got to have it
23   where they must respond to this in 15 business days or
24   we're going to take some other action like seizure or
25   we're going to adjoin them.

38 (Pages 146 to 149)

James J. Farley                                                                June 28, 2010

Page 150

1 And it gives you a deadline and it reaffirms
2 the importance of it. It's -- they're significant 483
3 items. And by significant I mean they can cause harm or
4 danger to the consumer, the patient.
5     Q  Are you familiar with the phrase Turbo --
6     A  It's a new --
7     Q  -- finding?
8     A  -- system for generating -- I'm familiar
9 with the phrase, but they did not use it when I was
10 there.
11     Q  So you don't have any experience with it?
12     A  Only in reading it and seeing it's a more
13 standardized format.
14     Q  So if you're familiar with it then you
15 know that all observations on FDA Form 483s are
16 pre-drafted and that FDA inspectors must select from a
17 pre-drafted -- what word do I want -- a pre-drafted
18 sentence or sentences, pre-drafted language, in order to
19 express an observation on a 483?
20         MR. MILLER:  Object to form. That only
21     pertains to a small portion of observation.
22         MR. ANDERTON:  That's simply not true,
23     Pete.
24     Q  Do you know that to be true, Mr. Farley?
25     A  That it has a particular format, pick one?

Page 151

1     Q  Yes.
2     A  I don't know all the details or all the
3 forms, but I know that to be true.
4     Q  Okay. So FDA inspectors go. They conduct
5 an inspection. They make observations of things that
6 they believe are not in compliance with Good
7 Manufacturing Practices if it's a GMP inspection.
8     A  Yes.
9     Q  And they go and as they're preparing their
10 483 and listing the observation they select from
11 essentially a menu of observations and they must use one
12 of those menu options; is that correct?
13     A  Yes, much like the policeman does if he
14 stops you for speeding. He's got to --
15     Q  Okay. So the inspector is on a 483
16 listing facts and circumstances that he or she believes
17 violate the Act.
18     A  Yes.
19     Q  Isn't that the opinion of the inspector
20 about whether there's a violation?
21     A  The inspectors do not put opinions in a
22 483. This is grilled into you your first week at the
23 agency. You put facts in there, not opinions.
24     Q  The facts you put there must in your
25 opinion violate the Act. You have to exercise some

Page 152

1 judgment, right, if you're an inspector and you're
2 creating a 483?
3     A  I feel like I'm getting into a play on
4 words here and at the same time I'm trying to answer
5 your question.
6     Q  Well, you used, Mr. Farley, the example of
7 a police officer.
8     A  Yes.
9     Q  If you're speeding -- if the speed limit
10 is 55 and the police officer clocks you --
11     A  Yes. 75.
12     Q  -- you're either above or you're not.
13     A  Yes.
14     Q  And with respect to an FDA inspector,
15 they're making judgment, exercise in judgment, in that
16 moment about whether something complies or doesn't
17 comply, right?
18     A  Yes.
19     Q  Judgment is very subjective, isn't it?
20     A  I wouldn't call it that. If -- I guess
21 one of the classic examples that I really had, someone
22 inspected a plant and saw a bird flying through. And he
23 said, this is unsanitary.
24         Well, technically in his opinion it was an
25 unsanitary situation with the bird flying through a

Page 153

1 pharmaceutical manufacturing plant. And nowhere in the
2 regulations does it say you shouldn't have a bird flying
3 through, but it says appropriate hygienic material
4 procedures must be there.
5         So an inspector goes in and looks, taking that
6 somewhat way out analogy and coming down now and looks
7 and says, this is the same initials of the analyst and
8 the reviewer, that's a violation.
9         Now, I'm not calling that an opinion. I'm
10 calling that a fact. But if you want to call it an
11 opinion you can call it an opinion. But it's right
12 there. It's right there in front of you. There's --
13 here's the initials, here's the initials. And that's
14 it.
15         I've seen a case where somebody turned a wrong
16 valve and ruined a 300,000-dollar batch of material.
17 Well, nobody said, well, in my opinion you might have
18 turned a wrong valve.
19         He did it. It's right there. It's all logged
20 in. It's a fact. You can't ship that material. You
21 ruined it. You know, I believe there are facts and I'm
22 very reluctant -- in fact I'm resisting using the term
23 opinion.
24     Q  You did -- when you talked about the bird
25 example you said that the inspector who saw the bird

39 (Pages 150 to 153)

PLAINTIFFS' EXHIBITS 008155

James J. Farley

June 28, 2010

Page 154

1   flying through the facility expressed his opinion that
2   that was unsanitary.
3       A   To show you that -- the fact is the bird
4   went through, but there's nothing in writing that says
5   the bird shouldn't go through.  But I used the opinion,
6   so --
7       Q   Likewise, there is not necessarily
8   anything in writing to suggest that somebody
9   shouldn't -- well, if somebody turns the wrong valve
10  there may not be something in writing to indicate that
11  they shouldn't turn the wrong valve.  They tell you
12  which valve to turn, but there's no regulation that says
13  don't turn the wrong valve.
14      A   But there's an SOP that says turn that
15  valve at that time, this valve at that time, that valve
16  at that time.  An SOP was violated.  Therefore, it's a
17  violation of GMPs.
18      Q   When you talked about -- as you counsel
19  clients in the industry do you tell them the Turbo
20  language FDA inspectors are required to use to express
21  an observation on a 483 don't always match up well with
22  the facts and circumstances that caused the FDA
23  inspector to write up that observation?
24      A   No, I don't.
25      Q   You've never told a client that?

Page 155

1       A   No.  I don't tell them that.  I just tell
2   them it's a violation and how they should keep things
3   right.
4       Q   So you don't discuss the process of 483s
5   and what's on them and how to respond to them.  Do you
6   counsel clients on those subject matters?
7       A   Oh, we discuss it.  Most of them know a
8   whole lot about it from having been in the industry for
9   years and years and years.
10      Q   When -- as I understand your testimony,
11  you said the use of Turbo observations -- Turbo language
12  on observations on 483s, that practice started after you
13  left the FDA?
14      A   Yes.
15      Q   How long after?
16      A   I left in '96.  It might have started
17  around 2000.  I'm not sure when it started.
18      Q   Okay.  So it's been in place -- it was not
19  in place up until three, four, perhaps five years after
20  you left?
21      A   Correct.
22      Q   And what have you done to educate yourself
23  about use of Turbo language as you hold yourself out as
24  a consultant in the industry?
25      A   I don't look at the Turbo program, per se.

Page 156

1   I look at what is written, if in fact the client had a
2   483 written.  In many cases my clients didn't have a 483
3   and they just want to make sure that everything is still
4   okay with them.
5       So the language of the Turbo program is not a
6   primary concern.  The content, the meaning of what an
7   inspection is, how you make a good product, that is.
8       Q   Do you counsel clients who have also
9   received 483s?
10      A   Sometimes.
11      Q   You have to look at the Turbo language
12  when you do that, don't you?
13      A   Yes, I do.
14      Q   You have to give your client guidance on
15  what it means, what to do about it in response, right?
16      A   Yes, I do.
17      Q   They pay you a couple hundred bucks an
18  hour to do that, right?
19      A   Yes.
20      Q   When you're giving that guidance you don't
21  ever say to a client, well, it's not really the Turbo
22  language you look at, it's the specific facts and
23  circumstances you have to deal with?
24      How do you deal with the fact that the Turbo
25  language doesn't always necessarily match up very well

Page 157

1   with the underlying facts and circumstances?
2       A   They give you examples.  Whenever they
3   give you an observation they give you examples.  And in
4   the case of a client that had a problem, problem being
5   non-compliance, a 483, I wouldn't do that over e-mail.
6       I'd say, when do I visit your plant, I want to
7   see where this occurred, I want to see what's happening,
8   I want to talk to the people that you have employed.
9   That's -- I want to see for myself in addition to this
10  so that I can match it up.  And invariably it does match
11  up.
12      Q   Invariably?
13      A   I haven't seen it where I saw something
14  that disagreed with the 483.
15      Q   Have you ever talked to FDA inspectors who
16  were unhappy about the fact that in fact their choice of
17  observation -- choices, I should say, of observation
18  language, that they really feel their hands are tied
19  because the facts and circumstances they observe aren't
20  always covered very well or very squarely by the choices
21  they have from the Turbo program?
22      A   I haven't talked to any like that.  I
23  wouldn't be surprised if some do complain about that.
24  There are people in workplaces complain about everything
25  wanting to do something.  But I haven't heard any of

40 (Pages 154 to 157)

James J. Farley                                                                                    June 28, 2010

Page 158

1  them.
2      Q   And your testimony is that you've never --
3  that it's always true that the Turbo language used by
4  FDA inspectors matches up with the facts and
5  circumstances they cite?
6          MR. MILLER:  Object to form, asked and
7      answered, misstates previous testimony.
8      A   It's -- my experience has been that it's
9  always true that for the language they use, wherever
10 they got it, Turbo or wherever or whenever, has always
11 matched up.
12     Q   Okay.  I've handed you, Mr. Farley, a
13 document that has been marked as Defendants' Exhibit 58.
14 Have you seen that document before?
15     A   I believe so.
16     Q   That is the 483 issued at the end of the
17 2008 inspection of Actavis Totowa?
18     A   Yes.
19     Q   Will you look at Observation 2, please?
20     A   On the first page?
21     Q   Yes.
22     A   I have it.
23     Q   It reads, Drug products failing to meet
24 established specifications and quality control criteria
25 are not rejected.  Did I read that correctly?

Page 159

1      A   You read it correctly.
2      Q   The first example they give relates to
3  Digitek and specifically to Lot 70924.  Do you see that?
4      A   The first line, A?
5      Q   Yes, the first example, Example A.
6      A   I'm with you.
7      Q   Okay.  Why don't you take a moment.  You
8  don't have to read it out loud.  But go ahead and read
9  through just to refresh -- if you've seen this before
10 I'm sure you read that.  But refresh your memory and
11 read the contents of Paragraph A, please.
12     A   Just A?
13     Q   Yes, just A.
14     A   I read it.
15     Q   Can you tell me in there where it says
16 products that don't meet established specifications and
17 quality control criteria were not rejected?
18     A   The observation is drug products failing
19 to meet --
20     Q   I'm talking where in Paragraph A.
21         MR. MILLER:  Well, he's stating what the
22     observation is.  So allow him to answer your
23     question, Mike.
24     Q   Go ahead, Mr. Farley.
25     A   I'm more or less setting a flow to my

Page 160

1  answer.  Can I still do that?
2      Q   I apologize.
3      A   The observation is drug products failing
4  to meet established specifications and quality control
5  criteria are not rejected.  Now, I look at the bottom,
6  no additional thickness testing or analytical evaluation
7  of the double thick tablets.  They didn't analyze it.
8          And no root cause was determined for the
9  defect.  However, the lot was released to the market by
10 the quality unit in January of '08 following visual
11 inspection.  That's shoddy.  That is really lousy for a
12 pharmaceutical --
13     Q   Mr. Farley --
14     A   Oh, that's my opinion.
15     Q   -- I asked you where in Paragraph A it
16 indicates that a product that didn't meet established
17 specifications was not rejected.
18         MR. MILLER:  Asked and answered.  He just
19     told you.
20         MR. ANDERTON:  No, Pete.  He didn't come
21     close to answering that question.
22         MR. MILLER:  I disagree.
23     A   I thought I did.
24         MR. MILLER:  He gave you a perfect
25     answer.

Page 161

1      A   I thought I did.  They didn't do
2  additional testing and they didn't do a root cause
3  analysis under the CAPA, Corrective Action/Preventive
4  Action portion of the GMPs.
5      Q   Wait.  They didn't do a root cause
6  analysis or they didn't determine a root cause?
7      A   It says no root cause analysis and none
8  was determined.
9      Q   Okay.  So it doesn't say -- wait, wait.
10 Mr. Farley, I don't want you to get in a hurry here
11 because this has to be precise.
12     A   Yes.
13     Q   It does not say no root cause analysis was
14 conducted, does it?
15     A   It does not say that.
16     Q   It says --
17     A   It says no root cause was determined.
18     Q   So a root cause analysis was conducted;
19 they just were unable to determine the root cause.  And
20 as you testified earlier, that happens, correct?
21         MR. MILLER:  Object to form, misstates
22     previous testimony.
23     A   On occasion but they didn't do an analysis
24 of the material.  This is a powerful, dangerous -- they
25 didn't analyze it.

41 (Pages 158 to 161)

PLAINTIFFS' EXHIBITS 008157

James J. Farley                                                                                      June 28, 2010

Page 162

1    Q   They didn't analyze what?  The double
2  thick tablet?
3    A   Yes.
4    Q   They analyzed them to tell that they were
5  too thick and they rejected them.
6    A   That's measurement.
7    Q   Did those tablets go to market?
8    A   No, but any responsible manufacturer would
9  want to know is this double dose or is it the same dose
10  disbursed.  You want to know information about that to
11  prevent it from happening.
12    Q   Mr. Farley, I understand that.  Did those
13  double thick tablets go to market?
14    A   To my knowledge, no.
15    Q   They were rejected.
16    A   But I don't know how many may have made it
17  to the market that are not accounted for.  That's what I
18  wonder.  That's --
19    Q   That's --
20    A   -- what they caught.
21    Q   -- what you wonder?
22    A   I wonder, yeah.
23        MR. MILLER:  Well, that's what they
24  caught.  That's what he said.
25        MR. ANDERTON:  It's not what they caught.

Page 163

1  Pete --
2        MR. MILLER:  That's what he said.  Read
3  it back.
4        MR. ANDERTON:  He said it's what they
5  wonder.
6        MR. MILLER:  And then he says -- well,
7  please read back his last answer.
8        MR. ANDERTON:  He never used the term
9  caught.
10        MR. MILLER:  Please read it back.
11  (The record was read back as requested.)
12        MR. ANDERTON:  Because there was nothing
13  about caught.
14        MR. MILLER:  There was a word caught in
15  there actually.  But it's on the record like she
16  said.  Let's keep going.
17  BY MR. ANDERTON:
18    Q   Mr. Farley, we're going to walk through
19  this.  Okay?
20    A   Okay.  There was one out in the market.  A
21  lady, a nurse or somebody in one of the documents found
22  it.
23    Q   From this batch?
24    A   I don't know at this instant what batch it
25  was from, but it was an oversized Digitek that she was

Page 164

1  distributing to patients in I'm going to say an old
2  person's home, an aged home, aged facility.  And she
3  found it.  And she contacted them.
4    Q   What's the basis for that testimony?  What
5  is your basis for that testimony?
6    A   The document I read.
7    Q   Okay.
8    A   It's in the documents that we copied.
9    Q   Mr. Farley, so your -- well, let's focus
10  on this for a moment.  Okay?  And I'd like you to stay
11  focused on my question without interjecting your own
12  testimony.  Okay?
13        MR. MILLER:  Objection, argumentative.
14    Q   Mr. Farley, the first sentence, During the
15  packaging of Digoxin tablets 70924 five double thick
16  tablets were observed.  That doesn't say anything about
17  out of specification tablets not being rejected, does
18  it?
19    A   That one doesn't.
20    Q   Quality assurance approved a 100 percent
21  visual inspection of the 4.8 million tablet lot which
22  resulted in an additional 15 double thick tablets.
23        Again, 100 hundred percent of the batch was
24  inspected and they found 15 more tablets.  That doesn't
25  say anything about out of specification tablets not

Page 165

1  being rejected, does it?
2    A   That as you worded it does not.
3    Q   I just read the sentence, Mr. Farley.  I
4  didn't -- it wasn't my wording.  That's the wording of
5  the FDA, right?
6    A   Yes.
7    Q   So that doesn't say anything about out of
8  specification tablets not being rejected, does it?
9    A   Yes.
10    Q   Am I correct about that?
11    A   You're correct.
12    Q   Okay.  Although quality assurance was
13  aware of double thick tablet findings, the batch was
14  then released based on AQL sampling which included
15  visual inspection of 1,330 tablets.
16        Again, it does not say out of specification
17  tablets were released to market, does it?
18    A   It does not say that.
19    Q   No additional thickness testing or
20  analytical evaluation of the double thick tablets was
21  conducted.  Focusing on the double thick tablets, which
22  you already said were rejected, that sentence doesn't
23  say anything about out of specification tablets going to
24  market, does it?
25        MR. MILLER:  Objection, asked and

                                    42 (Pages 162 to 165)

PLAINTIFFS' EXHIBITS 008158

James J. Farley                                                                          June 28, 2010

Page 166

1    answered.
2        A   It does not say anything about going to
3    market.
4        Q   Next sentence, no root -- well, or not
5    being rejected, does it?
6        A   Say that again.
7        Q   Well, I -- never mind.  We'll go to the
8    next sentence.  No root cause was determined for the
9    defect; however, the lot was released to the market by
10   the quality unit on January 28, 2008, following the
11   visual inspection.
12       Again, it does not say out of specification
13   tablets were released to market, does it?
14       A   It does not.
15       Q   Next sentence, No documented evaluation of
16   the 89 -- approximately 89 lots that remained on the
17   market at the time of the inspection.  It doesn't say
18   anything about out of specification tablets going to
19   market.
20       A   No, but it does in that sentence right
21   there say they didn't bother checking the ones that are
22   on the market to see if any got out.
23       Q   It doesn't say defective tablets -- out of
24   specification tablets were released to market, does it?
25       MR. MILLER:  Object to form.

Page 167

1        A   The way you have it worded it does not say
2    that.
3        Q   Okay.  It's not my wording, Mr. Farley.
4        A   I know.
5        Q   It's the FDA's.
6        A   I know.
7        MR. MILLER:  Your last statement was your
8    wording.  It was -- you were not reading.
9        Q   I'm talking about the sentence.  That
10   doesn't say out of specification tablets were released
11   to market, does it?
12       A   Correct.
13       Q   So no sentence in that observation that
14   relates to Digitek says out of specification tablets
15   were released to marketing; yet the observation, the
16   Turbo language, says drug products failing to meet the
17   established specifications and quality control criteria
18   are not rejected.
19       A   I see it.
20       MR. MILLER:  Hold on.  He's reading it.
21       Q   There's no question.
22       A   There was no question.
23       Q   Give me one second.  Mr. Farley, I'm going
24   to hand you a document that has been marked as
25   Plaintiffs' Exhibit 158.  We decided to leave some of

Page 168

1    the numbering on some of the -- some, not all, of the
2    prior exhibits.
3        Have you seen that document before?
4        A   I believe so.
5        Q   Okay.  This is an EIR, Establishment
6    Inspection Report, relating to a 2007 inspection of
7    Actavis, correct?
8        A   Yes.
9        Q   And Actavis Totowa, I should say.
10       A   Yes.
11       Q   Tell me what an EIR is.
12       A   EIR means, as you just said, Establishment
13   Inspection Report.  It would be analogous to industry
14   when you have a trip report.  When there is an
15   inspection and there are no observations or violations
16   there's always a report, Establishment Inspection
17   Report.
18       And in many cases, many that I've seen where
19   there was a detailed inspection and the Establishment
20   Inspection Report is the inspector as the head of the
21   inspection team telling this is what we did, this is
22   where we visited, this is what we looked at.
23       And if there's an EIR and there's no
24   observations, that's as far as it goes.  If there are
25   observations then they are in effect excerpted from

Page 169

1    there and put into a 483.  But that's -- before I
2    digress too much, that's an EIR.
3        Q   Well, that's actually not true, is it?
4    Isn't the 483 issued at the close of the inspection?
5        A   Yes.
6        Q   At the close-out meeting?
7        A   The typed-out version is not prepared at
8    the close-out meeting.  They are aware of what they're
9    going to receive, but they may come back.
10       Q   Is it your testimony really that the
11   typed-out version of the 483 is not delivered at the
12   close-out meeting?
13       A   Not at the -- not in my experience, not at
14   the very end of it.  They -- the word is, we're having
15   this typed up, it will be delivered to you.  Now --
16       Q   That makes me question your experience
17   significantly, Mr. Farley.
18       MR. MILLER:  Object to form.
19       A   You're welcome to do that, but what I have
20   seen is they say, we found this, we found this, they
21   show the handwritten one, this is going back to get
22   typed.  That's my experience.  And you're certainly
23   welcome to question it, but I'll hold with it.
24       Q   Can you turn to page 3 of Plaintiffs'
25   Exhibit 158?

43 (Pages 166 to 169)

James J. Farley                                                      June 28, 2010

Page 170

1    A  I have it.
2    Q  While you have it, do you see the -- why
3  don't you hold Defendants' Exhibit 57, which is the 483
4  that relates to this 2007 inspection, another document
5  that I had given you previously.
6    A  That one?
7    Q  That's the one.
8    A  All right.
9    Q  Now, back to page 3 of the EIR, at the
10  bottom, the second to last paragraph.  It's not
11  redacted.  It begins, On 9/28/07 an FDA 483,
12  inspectional observations, was issued to Mr. Apurva
13  Patel, managing director.
14    A  Yes.
15    Q  So this indicates the 483 was issued at
16  the close-out meeting.
17    A  Then she did it in that case that day.  I
18  mean --
19    Q  Will you look at -- well, she did the same
20  thing for the 2008 inspection, didn't she?
21    A  Could be district policy.  District
22  directors can choose their policy.
23    Q  Okay.
24    A  What I have seen is when they're shown
25  written, they say we're going to come back.  Now, when

Page 171

1  they come back you may call that a close-out meeting or
2  others have just said we're coming to deliver the 483.
3  But I don't view that as any contradiction of what I
4  said.  It just makes it non-universal.  But you're
5  getting the 483 either way.
6    Q  What you said and what you said in your
7  report is that observations from the EIR end up in the
8  483.  It's actually the other way around.  It's the EIR
9  that's not issued until long after the inspection; isn't
10  that right?
11    MR. MILLER:  Object to form.
12    A  No.  It's not needed until after.  If you
13  have an inspection and you observed some good things and
14  some bad things, you want to get the bad things out
15  first to get them corrected and then you'll get the good
16  things that are things they were doing well.
17    Q  The good things would be an EIR, not the
18  483, right?
19    MR. MILLER:  Object to form.
20    A  Good and bad things are in the EIR, if
21  there are any bad things.
22    Q  Mr. Farley, turn in the Establishment --
23  in the EIR from the 2007 inspection.  And again staying
24  on page 3, do you see the first full paragraph?
25    A  Which one?

Page 172

1    Q  On page 3 the first full paragraph.  It
2  begins on 9/5/07.
3    A  I see it.
4    Q  Okay.  And it describes the purpose of the
5  inspection.  And the third sentence reads, I explained
6  that the purpose of my visit was to provide follow-up
7  coverage to Warning Letter No. 07-NWJ-06.
8    And then it goes on to say also
9  pre-inspectional -- pre-approval inspectional
10  coverage -- there's some redacted language that the FDA
11  redacted -- as well as GMP inspectional coverage.
12    Do you see that?  Did I read that correctly?
13    A  I see it.
14    Q  Did I read that correctly?
15    A  Yes, you did.
16    Q  Okay.  So the purpose of this visit --
17  this inspection, I should say, was to follow up on a
18  prior warning letter; is that right?
19    A  That's what it seems to be.
20    Q  I'm going to hand you a document that's
21  been marked as Plaintiffs' Exhibit 25.  You see that
22  this is a revised warning letter?
23    A  Yes.
24    Q  You see the number, the file number, on
25  the face of the warning letter, 07-NWJ-06?

Page 173

1    A  Yes.
2    Q  Is that the same warning letter referenced
3  in this EIR --
4    A  Yes.
5    Q  -- that is Exhibit 58?
6    A  Yes.
7    Q  So this inspection was to follow up on
8  this one?
9    MR. MILLER:  Object to form, misstates
10    previous testimony.  You read it in there, as well
11    as GMP inspectional coverage.  You seem to be
12    forgetting half the sentence.
13    Q  One of the purposes of this inspection was
14  to follow up on this warning letter; is that correct?
15    A  Yes.
16    Q  You said you've seen the EIR that's marked
17  Exhibit 158, right?
18    A  This one?
19    Q  Yes, that's the one.
20    A  I've seen it.  I reviewed it.  I don't
21  remember everything at this moment, but please ask me
22  any questions you like.
23    Q  By reviewed it do you mean to say that you
24  reviewed it in the course of -- is it one of the
25  documents you received from the Miller Firm?

44 (Pages 170 to 173)

PLAINTIFFS' EXHIBITS 008160

James J. Farley                                                                                    June 28, 2010

Page 174

1    A   Yes.
2    Q   Is it something you reviewed in preparing
3  your expert report in this case?
4    A   Yes.
5    Q   Give me one second.  All right.  Will you
6  turn, Mr. Farley, to page 25 of Exhibit 158.
7    A   Page 25?
8    Q   Yes.
9    A   I have it.
10    Q   Will you read the first heading on that --
11  well, the first heading on that page reads Voluntary
12  Corrections, right?
13    A   Yes.
14    Q   It goes on to read in the body of the
15  paragraph under that, Corrections to the previous FDA
16  483 were reviewed with Ms. Wanda Eng, senior director
17  corporate compliance for Actavis.  The previous 483
18  observations in the associated corrections appear below.
19    A   I see it.
20    Q   So the FDA here is saying as part of this
21  inspection we reviewed prior 483 observations and the
22  corrective actions taken by the company, right?
23    Q   And then they set forth pages of -- well,
24  let's kind of go through some of this.
25

Page 175

1    A   All right.
2    Q   On page 25 the first observation relates
3  to the quality control unit and the authority of the
4  quality control unit.
5    Do you see that?
6    A   I see it.
7    Q   And then under corrections it first
8  indicates that a number of individuals have been hired.
9  It lists several -- it looks like the better part of 15
10  to 20 new hires.  Do you see that?
11    A   I see it.
12    Q   On the next page, page 26, the first
13  paragraph indicates that since the previous inspection
14  the number of individuals in the quality assurance
15  department has increased.  It goes on to give the number
16  but it's redacted.  Do you see that?
17    A   I see it.
18    Q   And the rest of that page sets forth
19  several paragraphs of additional corrective action,
20  doesn't it?
21    A   Seems to be.
22    Q   Well, what do you mean seems to be?  This
23  is an FDA document, right?
24    A   I have to read what we're correcting.  I
25  mean, the details.  We said the quality control unit

Page 176

1  lacks authority to fully investigate.  Then we jumped
2  over to details of what was observed and we went right
3  to the corrections.  So I -- before I answer your
4  question I've got to know more of what we're correcting.
5    Q   Please read the details.
6    A   You or me?
7    Q   You.  You don't have to read them out
8  loud.  You can just go ahead and read the paragraph of
9  Observation 1 on page 25.
10    A   You want me read out loud or --
11    Q   No, you don't have to read it out loud.
12  Just read it and let me know when you're ready to answer
13  questions.
14    A   It will just be a minute.
15    Q   Take your time.
16    THE VIDEOGRAPHER:  Mr. Mike, while he's
17  reading that I'm going to go off the record and
18  change tape.
19    MR. ANDERTON:  Okay.
20    THE VIDEOGRAPHER:  It is 2:15 p.m.
21    (A brief recess was taken.)
22    THE VIDEOGRAPHER:  All right.  We're back
23  on record.  It's 12 -- pardon me.  It's 2:22 p.m.
24  This is the beginning of Tape No. 5.
25  BY MR. ANDERTON:

Page 177

1    Q   All right.  Mr. Farley, we were talking
2  when we left about Exhibit 1 -- what has previously been
3  marked as Plaintiffs' Exhibit 158, the 2007 EIR.  And we
4  were talking about information on pages 25 and 26 of
5  that document.
6    Have you had the opportunity to read the
7  observation language that you were reviewing on page 25?
8    A   Yes, I did.
9    Q   And so then after that observation
10  language is a page and a half of actions that the
11  company took in order to correct deficiencies that might
12  have been reflected in that observation language; isn't
13  that right?
14    A   I just pause.  You said it might have been
15  reflected.  They're jumping out at me.  That -- you're
16  saying that might have been reflected.  I'm looking at
17  batches of drug products that have initially failed.
18    Q   Mr. Farley --
19    A   I mean --
20    Q   -- we're going to be here a long time if
21  you don't start answering my questions.  My question
22  was, is there a page and a half of corrective actions
23  set forth on pages 25 and 26?
24    A   Yes, there is.
25    Q   Okay.  Documented by the FDA in this EIR?

45 (Pages 174 to 177)

James J. Farley                                                                                      June 28, 2010

Page 178

1    A   Yes, there is.
2    Q   Okay.  And accepted by the FDA?
3        MR. MILLER:  Object to form.
4    A   Implicit acception (sic) by the FDA since
5   they wrote it.
6    Q   Yes.
7    A   Yes.
8    Q   Next, page 27 -- well, let me ask you
9   this, in the eyes of the FDA any deficiency that was set
10  forth in Observation 1 is resolved by these corrective
11  actions, right?
12       MR. MILLER:  Object.  It misstates the
13       document.
14   A   If they agree that it is resolved they
15  could say -- and I'd have to refresh myself on the
16  complete detail -- that here's your correction that you
17  apply.  They might say more is needed.
18   Q   Do they say that with respect to
19  Observation 1?
20   A   I don't see it.
21   Q   Okay.  So in the eyes of the FDA any
22  deficiencies that are reflected in Observation 1 have
23  been corrected.
24       MR. MILLER:  Object to form.
25   A   An attempt has been made.

Page 179

1    Q   I'm asking you about --
2        MR. MILLER:  Object.  He answered.
3    A   I wouldn't know if they were corrected
4   until I saw the subsequent batches that were
5   manufactured and if these people performed their jobs
6   properly.
7    Q   Mr. Farley, I'm talking about in the eyes
8   of the FDA -- well --
9        MR. MILLER:  Object, asked and answered.
10       He said it's been attempted.  That's what's been
11       done.  He gave you an answer.  You're badgering
12       him.
13       MR. ANDERTON:  Pete, you're not going to
14       just shout me down and allow him to avoid
15       answering the questions I ask him.
16       MR. MILLER:  I'm trying to shout over
17       you, Mike.  And you've already asked and answered.
18       He gave you an answer.
19       MR. ANDERTON:  He has not given me an
20       answer --
21       MR. MILLER:  He has.
22       MR. ANDERTON:  -- to the question and
23       we're going to stay here until he does.
24   BY MR. ANDERTON:
25   Q   So, Mr. Farley, I asked you a question.

Page 180

1   You've acknowledged that there's a page and a half worth
2   of corrective actions that the FDA indicates were
3   taken --
4    A   Yes.
5        MR. MILLER:  Objection, misstates
6        previous testimony.
7    Q   -- right?
8    A   That there appear they're taking some
9   corrective action.
10   Q   Okay.  And the FDA wrote this document,
11  correct?
12   A   Yes.
13   Q   So the FDA wouldn't write this if it
14  didn't believe these things hadn't happened, right?
15   A   Correct.
16   Q   And that's based on the inspection that is
17  reflected in this EIR, right?
18   A   Correct.
19   Q   So the FDA comes in, they review
20  circumstances related to a prior observation to see
21  whether corrective actions have been taken.
22   A   Yes.
23   Q   And they issue this document which sets
24  forth all of these corrective actions, right?
25   A   Yes.

Page 181

1    Q   And there's nothing in there indicating
2   further action -- further corrective action is necessary
3   for that observation, is there?
4        MR. MILLER:  Objection.
5    A   Nothing that I see.
6    Q   Okay.  Observation 2, page 27, do you see
7   that language?
8    A   Starting with laboratory records?
9    Q   Yes.
10   A   I'm reading it.
11   Q   I don't want you to read it, but the
12  observation is set forth and there are examples that go
13  (a) through (g).  Do you see that?
14   A   Yes.
15   Q   Again, that's language from a prior
16  observation, right?
17   A   Yes.
18   Q   And on page 28 the FDA lists corrections.
19  Do you see that?
20   A   Top of 28?
21   Q   Yes, sir.
22   A   Yes.
23   Q   So corrective actions were taken by the
24  company in response to that observation, right?
25   A   Yes.

46 (Pages 178 to 181)

James J. Farley                                                                                      June 28, 2010

Page 182

1    Q   Does the FDA indicate any further action
2  is necessary?
3    A   Not at that point.
4    Q   Observation 3, do you see that on page 28?
5    A   I see it.
6    Q   And do you see that it sets forth five,
7  (a) through (e), five examples that support that prior
8  observation?
9    A   Yes.
10   Q   Do you see there are corrective actions
11 indicated at the bottom of page 28 and continuing on to
12 page 29?
13   A   Yes.
14   Q   Does the FDA indicate any further action
15 is necessary to correct that observation?
16   A   They do not.
17   Q   Observation 4 on page 29, and you see that
18 there are again five, (a) through (e), five examples,
19 supporting Observation 4?
20   A   I see it.
21   Q   Do you see at the top of page 30
22 corrective actions taken by the company?
23   A   I see it.
24   Q   Do you see -- does the FDA indicate any
25 further action is necessary to correct that observation?

Page 183

1    A   It does not.
2    Q   Okay.  Observation 6, still on page 30, do
3  you see the observation?
4    A   6, bottom of 30?
5    Q   I'm sorry.  I misspoke, Mr. Farley.  I
6  jumped ahead and I apologize for that.  Observation 5 in
7  the middle of page 30.
8    A   I see it.
9    Q   Do you see that?
10   A   Yes.
11   Q   Do you see the corrective actions
12 indicated by the FDA?
13   A   I see it.
14   Q   Does the FDA indicate any further action
15 is necessary to correct that observation?
16   A   They do not.
17   Q   Observation 6 -- this time I mean it --
18 starting on the top of page 30, continuing on to page
19 31, and there are four specific examples, (a) through
20 (d), supporting Observation 6.
21   Do you see that language?
22   A   I see.
23   Q   And do you see the corrections that the
24 company took as indicated by the FDA in the EIR?
25   A   I see it.

Page 184

1    Q   Does the FDA indicate any additional
2  actions are necessary to correct that observation?
3    A   They do not.
4    Q   I wish there was a way to make this
5  shorter, Mr. Farley, but there is not.  So I apologize.
6    A   That's all right.
7    Q   Mr. Farley, Observation 7 beginning on
8  page 31, do you see that?
9    A   I see it.
10   Q   It carries over very briefly to page 32
11 and then there are three paragraphs relating to the
12 corrective -- or reflecting, I should say, the
13 corrective actions taken.
14   Do you see that?
15   A   Where are we here?
16   Q   Now we're on page 32.
17   A   I see it.
18   Q   And do you see -- and, for example,
19 Mr. Farley, do you see the very first sentence of the
20 second paragraph of the corrections on page 32?
21   A   Beginning with, Corrections to the
22 stability program?
23   Q   Yeah.  Read that sentence out loud,
24 please.
25   A   Corrections to the stability program have

Page 185

1  been verified during the current inspection.
2    Q   So that's the FDA saying, we looked at
3  this issue and we verified that the corrective actions
4  have been taken, right?
5    A   At that inspection, yes.
6    Q   Okay.  So does the FDA indicate any
7  further actions necessary to correct the items set forth
8  in Observation 7?
9    A   No.
10   Q   Observation 8, beginning on page 32.
11   A   I have it.
12   Q   Do you see that?
13   A   I see it.
14   Q   It carries over onto page 33 with -- again
15 with five examples.
16   A   I see it.
17   Q   And then there are corrective actions
18 indicated.  Do you see that?
19   A   I do.
20   Q   Does the FDA indicate that there are any
21 additional corrective actions necessary with respect to
22 Observation 8?
23   A   No.
24   Q   Observation 9, beginning on page 33 and
25 carrying over onto page 34 with three examples.

47 (Pages 182 to 185)

PLAINTIFFS' EXHIBITS 008163

James J. Farley                                                      June 28, 2010

Page 186

1          Do you see that?
2     A   Yes.
3     Q   And again, corrective actions indicated in
4  a paragraph about one-third of the way down on
5  Paragraph -- or excuse me -- on page 34.
6          Do you see that?
7     A   I see it.
8     Q   Does the FDA indicate that any further
9  actions are necessary to correct Observation 9?
10    A   They do not.
11    Q   Observation 10, beginning on page 34
12 actually and concluding on page 34.  Do you see that
13 observation?
14    A   I do.
15    Q   And there are corrective actions indicated
16 on page 34 as well?
17    A   Yes.
18    Q   Any further actions necessary according to
19 the FDA to correct that observation?
20    A   No.
21    Q   Observation 11, page 35.
22    A   I'm with you.
23    Q   Do you see any corrective actions
24 indicated for Observation 11?
25    A   I'm reading Observation 11.

Page 187

1     Q   Take your time.
2     A   Now I'm reading the corrections.
3     Q   Take your time.
4     A   And the question was?
5     Q   Do you see any further actions necessary
6  according to the FDA to correct Observation 11?
7     A   No.
8     Q   Observation 12 on page 36, do you see that
9  observation?
10    A   I see it.
11    Q   And do you see the corrective actions
12 indicated?
13    A   I see it.  I just want to read this one.
14    Q   Take your time, Mr. Farley, whatever you
15 feel is appropriate.
16    A   I see it.
17    Q   According to the FDA is that -- the items
18 in Observation 12 corrected with no further action
19 necessary?
20    A   It appears to be.
21    Q   Well, do they indicate any further action
22 necessary to correct that?
23    A   They do not.
24    Q   And you said earlier that if there were
25 further actions necessary they'd say that, right?

Page 188

1     A   They would.
2     Q   Observation 13, starting on page 36,
3  continuing on to page 37, do you see that observation?
4     A   I see it.
5     Q   Do you see the corrective actions on page
6  37?
7     A   Yes.
8     Q   Does the FDA indicate any further actions
9  are necessary to correct Observation 13?
10    A   No.
11    Q   Observation 14, do you see that?
12    A   Yes.
13    Q   Do you see the corrective actions?
14    A   I'm reading.
15    Q   Take your time.
16    A   I see them.
17    Q   Does the FDA indicate any further action
18 necessary to correct Observation 14?
19    A   They do not.
20    Q   And finally, Mr. Farley, Observation 15.
21    A   Yes.
22    Q   Do you see that beginning on page 37 and
23 continuing over briefly onto page 38?
24    A   Yes, I do.
25    Q   Do you see the corrective actions

Page 189

1  indicated?
2     A   Yes, I do.
3     Q   Does the FDA indicate any further actions
4  are necessary to correct Observation 15?
5     A   They do not.
6     Q   So according to the FDA, corrective
7  actions were taken in response to every single
8  observation from the prior inspection.
9     A   Taken or proposed?  They hired new people,
10 but you haven't seen them perform.
11    Q   Were taken -- Mr. Farley, let's talk about
12 you going down your own paths like that.
13    A   Okay.
14    Q   Taken means hiring.  If you tell the
15 FDA -- if the FDA cites you for not having enough
16 personnel and you hire additional personnel you've taken
17 a corrective action by hiring additional personnel.
18    A   Right.
19    Q   You don't need to see them perform to have
20 taken the first step of the corrective action.
21          MR. MILLER:  That's a different question.
22 Why don't you ask him the question --
23          MR. ANDERTON:  I didn't ask him that
24 question.  That's my point.  He keeps interjecting
25 his own thoughts.

48 (Pages 186 to 189)

PLAINTIFFS' EXHIBITS 008164

James J. Farley                                                                          June 28, 2010

Page 190

1          MR. MILLER:  He keeps interjecting an
2    answer and you keep stepping on him.  Why don't
3    you try asking a question and he'll answer the
4    question.
5          MR. ANDERTON:  I did ask him a question.
6          MR. MILLER:  Well, ask him again.
7          MR. ANDERTON:  Can you read the question
8    that I asked before that back, please?
9    (The record was read back as requested.)
10         MR. MILLER:  Can you read what the answer
11   was, please?
12   (The record was read back as requested.)
13         MR. MILLER:  And he was cut off.  Would
14   you like him to continue with his answer?
15         MR. ANDERTON:  No, because he starts
16   talking about them performing.  That's not part of
17   the corrective action.  If the FDA --
18         MR. MILLER:  Hiring somebody and their
19   performance isn't part of a corrective action?
20   Well, if you're asking if they just simply did
21   something and didn't care what the outcome was
22   then he's answering your question.
23         MR. ANDERTON:  Well, there's a very
24   precise reason why I'm asking that, Pete.
25         MR. MILLER:  Well, ask it and he'll

Page 191

1    answer it.
2          MR. ANDERTON:  I'm trying to get him to
3    answer my --
4          MR. MILLER:  You're trying to get the
5    answer you want to get.
6          MR. ANDERTON:  I'm trying to get him to
7    answer my narrowly focused question.
8    BY MR. ANDERTON:
9          Q   Did -- in the eyes of the FDA -- well, let
10   me start that question over.  According to the FDA
11   corrective actions were taken in response to each
12   single one of the prior 483 observations, correct?
13         A   Yes.
14         Q   And the FDA didn't indicate any further
15   corrective actions necessary in response to any of those
16   483 observations --
17         A   They did not.
18         Q   -- did they?
19         A   They did not.  Could I explain my
20   seemingly roundabout --
21         Q   I don't think that's -- I mean no
22   disrespect, Mr. Farley, but I'll ask the questions and
23   then --
24         A   Okay.
25         Q   -- you go ahead and respond.

Page 192

1          A   I just felt there was something important
2    that -- but we'll go with the flow here.
3          Q   When is the last time you were hired and
4    retained by a pharmaceutical company to consult about
5    GMP compliance?
6          A   Probably last year sometime.
7          Q   2009, is that what you mean?
8          A   Probably.  I just don't remember.  I'd
9    have to go to their files.
10         Q   Could it have been before 2009?
11         A   Definitely it was before 2009.  I think it
12   might have been in 2009.
13         Q   Okay.  I mean the last time.  When is the
14   most recent?
15         A   I don't remember that one offhand.  I just
16   don't, because I took a little time off to write the
17   book and I did some other things.  And I turned down a
18   few.  I really honestly don't know.
19         Q   Okay.  And just so that we're clear, you
20   understand what final agency determination is, right?
21         A   Yes.
22         Q   A 483 is not final agency determination on
23   GMP compliance, correct?
24         A   Correct.
25         Q   Nor is an EIR; is that right?

Page 193

1          A   Correct.
2          Q   In fact, a warning letter is not final
3    agency determination, is it?
4          A   Correct.
5          Q   The FDA's perspective is to err on the
6    side of caution as they engage in their regulatory
7    activities, correct?
8          A   I haven't heard it in those terms.  If
9    you're telling me that I would say that as a patient, a
10   consumer, I would hope they would.
11         Q   I'm asking you that as a regulatory
12   consultant.  Does the FDA approach its regulatory duties
13   from the perspective of erring on the side of caution?
14         A   The FDA as I have always seen its
15   approaches is it don't err at all.  They never
16   mentioned -- if you're asking my perspective --
17         Q   I'm not talking about err in the context
18   of manufacturing pharmaceutical products.  I'm talking
19   about the FDA in performing its job.
20         For example, the FDA will ask a company to
21   recall a product -- well, the FDA doesn't have to
22   believe there is defective product in the market to ask
23   a company to recall a product, correct?
24         A   Do they have to?  They don't have to.
25         Q   They will ask a company to recall a

Rennillo Deposition & Discovery
216.523.1313                    www.rennillo.com                    888.391.3376 (Depo)
PLAINTIFFS' EXHIBITS 008165

James J. Farley                                                                June 28, 2010

Page 194

1  product if they believe there's a possibility a
2  defective product is in the market.
3      A  If they believe there's a finite
4  reasonable possibility that people can get hurt.
5      Q  Well, that's not the question I asked,
6  Mr. Farley.
7      A  I'm really trying to answer it. I really
8  am.
9      Q  They'll ask a company to recall a product
10 if they believe there's the possibility that there is
11 defective product in the market.
12         MR. MILLER:  Object to form.
13     A  Yes.
14     Q  You've seen that in your experience?
15     A  Yes.
16     Q  Mr. Farley, I'm handing you a document
17 that has been marked as Defendants' Exhibit 39. And I
18 will represent to you that it is a print-out of a
19 posting on the FDA Web site. And you can see on the
20 bottom right corner that it was accessed and printed on
21 June 14th of this year.
22     A  I see it.
23     Q  Have you seen that posting on the FDA Web
24 site previously?
25     A  I don't believe so. I've seen a lot of

Page 195

1  them, but I don't believe I've seen this.
2      Q  I understand. So you're not -- you don't
3  think you have?
4      A  Correct.
5      Q  Will you read -- give me one second. Will
6  you read the -- do you see the heading that says, If a
7  Manufacturer is not Following cGMPs are Drug Products
8  Safe for Use? It's about two-thirds of the way down the
9  page, the first page. Do you see that?
10     A  I'm pointing to it.
11     Q  Okay.
12     A  I found it. I see it.
13     Q  I'm going to read the first paragraph
14 under that heading. If a company is not complying with
15 cGMP regulations any drug it makes is considered
16 adulterated under the law. This kind of adulteration
17 means that the drug was not manufactured under
18 conditions that comply with cGMP. It does not mean that
19 there is necessarily something wrong with the drug.
20         Did I read that correctly?
21     A  You read it correctly.
22     Q  Do you agree with that?
23     A  Skeptically.
24     Q  Skeptically yes?
25     A  Let me think about that. It does not mean

Page 196

1  that there is necessarily something wrong. If I were
2  writing that I would say -- this is if I were writing it
3  and then -- that necessarily that there is something
4  wrong but it may not be harmful.
5         There's something wrong because you didn't
6  make it right; therefore something's wrong. That's what
7  I would say. I disagree with the way this is worded.
8      Q  So you would say it does not necessarily
9  mean the product is unsafe.
10     A  Or harmful, yes.
11     Q  Or harmful.
12     A  That's the way I would word that.
13     Q  Okay. What's your understanding of why
14 Digitek was recalled?
15     A  Of why what?
16     Q  Digitek was recalled.
17     A  I believe that a lady died. I believe
18 that there were numerous violations of GMPs and that
19 there's no assurance that the product on the market
20 wouldn't do harm. That's my opinion from what I've
21 read.
22     Q  You read that a lady died from Digitek,
23 from taking Digitek?
24     A  Somewhere I read it.
25     Q  You read -- Mr. Farley, you read an

Page 197

1  adverse event reflecting an event that was reported from
2  the market in sometime around 2000 and you believe that
3  had something to do with a product recall that occurred
4  in 2008?
5         MR. MILLER:  Objection. You're putting
6      words in his mouth. That has nothing to -- it's
7      not even closely related. You've grossly
8      misrepresented what he said.
9      A  Go back to your question. Why do I think
10 it was recalled?
11     Q  Yeah.
12     A  Somebody died from it years before.
13     Q  How many years?
14     A  Eight or ten.
15     Q  And you think that had -- that related to
16 the recall?
17     A  No, no. It wasn't the end of my sentence.
18 And in reading inspections and warning letters and
19 looking not just at Digitek but at the company itself, I
20 really question whether they can make anything right the
21 way they were set up.
22         I didn't -- I agree with the consent decree.
23 They're not capable -- were not capable of making a good
24 product themselves. No guarantee of it.
25     Q  Well, let's talk about operating under a

50 (Pages 194 to 197)

PLAINTIFFS' EXHIBITS 008166

James J. Farley                                                                      June 28, 2010

Page 198

1  consent decree. When you operate under a consent decree
2  you're under incredibly close scrutiny, right?
3      A  Yes. I have assisted firms operating
4  under a consent decree.
5      Q  Okay. Would you do me a favor and just
6  close that laptop up? I don't need you distracted and
7  there's no reason for it to be open anymore.
8      A  Okay. I just --
9      Q  I apologize.
10     A  No, that's fine. It was distracting me,
11 too. I just thought you wanted it on.
12     Q  I don't need it on anymore.
13     A  We're going to shut it down then.
14     Q  Okay. Now -- all set?
15     A  All set.
16     Q  You say you've consulted for firms that
17 have been operating under a consent decree.
18     A  Yes.
19     Q  Very close scrutiny when that happens,
20 right?
21     A  Yes.
22     Q  Everything they do is watched.
23     A  Yes.
24     Q  If a company operating under a consent
25 decree doesn't comply with GMPs, they're going to have

Page 199

1  big problems, aren't they?
2      A  That's right.
3      Q  They're not going to be able to release
4  product, are they?
5      A  They can't release it themselves. They
6  need a third party approval. They're determined to be
7  incapable of releasing it themselves when they're under
8  a consent decree.
9      Q  Well -- so if they're releasing product
10 under a consent decree then they are complying with Good
11 Manufacturing Practices.
12     A  I hope so.
13     Q  Well, they either are or aren't, right,
14 Mr. Farley?
15     A  That's right.
16     Q  So they are?
17         MR. MILLER: Object to form.
18     A  They should be.
19     Q  If they're not they're not releasing
20 product.
21     A  I wouldn't doubt that some firms have
22 released product when they shouldn't have.
23     Q  But the third party has to approve.
24     A  Oh, with the third party. Yes. The third
25 party is the consulting function, usually a group of

Page 200

1  many consultants, who will determine whether the
2  material is good enough to be released to the market.
3      Q  Well, and you indicated a few moments ago
4  that when you're operating under a consent decree you're
5  operating with a third party looking over your shoulder
6  checking everything you do, right?
7      A  Yes.
8      Q  So if you're releasing product while
9  operating under a consent decree with that third party,
10 you're complying with GMPs, aren't you?
11     A  For those batches of that product.
12     Q  For the batches that get released.
13     A  Yes.
14     Q  Any batch that gets released while you're
15 operating under a consent decree is GMP compliant.
16     A  If it went through the third party, if you
17 didn't do it on your own and sneak it out, which some
18 firms have been known to do.
19     Q  Assuming you didn't sneak product out the
20 back door --
21     A  You did everything right, then the answer
22 is, yes, it should be good.
23     Q  So when you're operating under a consent
24 decree for a long period of time you're actually
25 engaging in sustained GMP compliance, aren't you?

Page 201

1      A  While you're still trying to repair all
2  your systems and get them in shape to do it yourself.
3      Q  The answer to my question is yes.
4      A  Yes.
5      Q  You're operating under sustained GMP
6  compliance, right?
7      A  Yes.
8      Q  Let's go back to the Digitek recall. You
9  made -- when I asked you why Digitek was recalled you
10 insisted on referring to somebody dying eight or ten
11 years before the 2008 recall.
12     Do you believe that is one of the factors that
13 resulted in Digitek being recalled?
14     A  For the current recall?
15     Q  Yeah.
16     A  I believe it may have been in the minds of
17 FDA when they asked Digitek to recall, but I don't know
18 that. I have no way of knowing what was in FDA's mind
19 other than the fact that they felt the product was
20 unsafe.
21     Q  Well, let's see if we can figure out
22 what's in FDA's mind on that issue.
23     A  Okay. I mean yes.
24     Q  Mr. Farley, I have handed you a document
25 that has been marked Defendants' Exhibit 38 and it is

51 (Pages 198 to 201)

James J. Farley                                                                                    June 28, 2010

Page 202

1  again a print-out of a posting from the FDA Web site.
2  The date it was accessed and printed is June 15, 2010.
3  And the title of the posting is "Facts and Myths about
4  Generic Drugs".
5       A   I see it.
6       Q   Have you seen this posting before?
7       A   No.
8       Q   You have not?
9       A   No.
10      Q   Okay.  Why don't you turn to page 2 of
11  that print-out.  And I'm going to read the first myth.
12  This is a sheet, Mr. Farley, that -- it's kind of a
13  publication put out by the FDA where they set forth
14  something that might be part of public perception and
15  then they set forth facts that the FDA believes kind of
16  prove that perception incorrect.
17      A   Yes.
18          MR. MILLER:  Object to form.
19      Q   Do you agree with that?
20      A   I hear what you're saying.
21      Q   Do you agree with that?
22      A   That the FDA is putting this out to
23  educate the consumer?
24      Q   Yes.
25      A   Sure.

Page 203

1       Q   Okay.  So -- and the education that's
2  occurring is the FDA making an effort to correct
3  misconceptions that might be out there.
4          MR. MILLER:  Object to form.
5       Q   Do you agree with that?
6       A   That's what it says.
7       Q   Okay.  So let's look at page 2.  Here is
8  the myth the FDA is addressing in this instance.  There
9  are quality problems with generic drug manufacturing.  A
10  recent recall of generic Digoxin, paren, called Digitek,
11  closed paren, shows that generic drugs put patients at
12  risk.
13          Did I read that correctly?
14      A   You read it correctly.
15      Q   All right.  That's the myth according to
16  the FDA.  The fact according to the FDA is, quote, FDA's
17  aggressive action in this case demonstrates the high
18  standards to which all prescription drugs, generic and
19  brand name, are held, closed quote.
20          Did I read that correctly?
21      A   You read it correctly.
22      Q   I'm going to go on and there are four
23  bullet points under that fact that the FDA set forth.
24  And the first one reads, In March 2008 FDA performed a
25  scheduled inspection of the Actavis production facility

Page 204

1  and identified products that were not manufactured to
2  required specification over a period of time extending
3  back to the year 2006.  Included in this list of
4  products was one particular lot of Digitek.
5          Did I read that correctly?
6       A   You did.
7       Q   Does that give you some insight into why
8  the FDA started thinking about asking to recall that
9  product?
10      A   I'm not relating it yet.
11      Q   Okay.  Well, so far they're only talking
12  about one lot, right?
13      A   Yes.
14      Q   And according to the FDA they encountered
15  products not manufactured to required specifications and
16  only one lot of Digitek fell under that description,
17  right?
18      A   Yes.
19      Q   Okay.  It goes on in Bullet Point 2 to
20  read, Actavis detected a very small number of oversized
21  tablets in this lot, paren, specifically, comma, 20
22  double sized tablets in a sample of approximately 4.8
23  million tablets, closed paren, period.
24          Did I read that bullet point correctly?
25      A   Yes.

Page 205

1       Q   So the FDA is still talking about only a
2  single lot, correct?
3       A   Yes.
4       Q   20 tablets out of 4.8 million.  Is that a
5  lot?
6       A   Is it a lot?  Numerically it's not a lot.
7       Q   Statistically is it a --
8       A   But I wouldn't want to be the one to take
9  the oversized tablet.
10      Q   Understood.  But statistically is it a
11  statistically significant number, 20 out of 4.8 million?
12      A   A statistician -- and I'm not a
13  statistician -- would probably say, no, it's not
14  statistically relevant.  But as a person in the
15  pharmaceutical industry I look at a drug like this and I
16  say everything counts.
17          It's like saying, well, some of the parachutes
18  won't work.  Well, I want one that works.  I mean, I --
19  your question to me is very serious.  And it is
20  relevant.  To a statistician it may not be.
21      Q   Understood.  Next bullet point -- and I
22  misspoke.  I said four.  There's actually five.  Next
23  bullet point, quote, Although Actavis attempted to
24  remove the affected Digitek tablets through visual
25  inspection FDA determined that this method of removal

52 (Pages 202 to 205)

PLAINTIFFS' EXHIBITS 008168

James J. Farley                                                                                    June 28, 2010

Page 206

1   was inadequate to assure the product's quality and
2   consistency in accordance with the current Good
3   Manufacturing Practice, and then cGMP in parentheses,
4   regulations, closed quote.
5        Did I read that correctly?
6        A   Yes.
7        Q   So the FDA is focusing on the inspection
8   method with respect to the double thick tablets for that
9   single batch, right?
10       A   Yes.
11       Q   Having read those three bullet points,
12  does that give you a better sense of why the FDA asked
13  Actavis to recall this product?
14       A   No, it doesn't really -- what it does, the
15  first thing I see was shocked that they mentioned
16  company names in here in what's supposed to be a public
17  document.
18       Q   Mr. Farley --
19       A   They shouldn't do that.  Yes.
20       Q   -- that wasn't even remotely close to
21  answering my question.  Now, I would ask that you
22  please --
23       A   Okay.
24       Q   -- answer my question.
25       A   I will try.  Please answer it -- I mean --

Page 207

1            MR. ANDERTON:  Would you read that back,
2        please?
3        (The record was read back as requested.)
4        A   Does it give me a better sense than I
5   have?  No.
6        Q   It gives a pretty detailed explanation of
7   why the FDA -- what the FDA encountered and why they
8   asked Actavis to recall Digitek.  You're a consultant in
9   this industry and those -- that doesn't tell you --
10       A   Your question was does it give me any
11  better sense than I had and my answer is no.
12       Q   Well, you talked about a woman dying ten
13  years before this recall and you talked about all kinds
14  of other things.
15       The FDA is actually explaining why it asked
16  Actavis to recall this product, isn't it?
17           MR. MILLER:  Object to form.
18       A   They're not telling the whole story.  I
19  believe the recall was based on systems not functioning,
20  quality systems not functioning and quality assurance.
21  Does this give me any better -- no, it does not.
22       Q   Well, that's what you believe.  This is
23  the FDA telling the world why it asked for a recall on
24  this product, right?
25       A   But your question was does it give me any

Page 208

1   clearer understanding.  My answer is no.
2        Q   When I asked you that question earlier you
3   said, I don't know why the FDA asked for that.  And my
4   question now is, does it give you a better sense of why
5   the FDA asked for it?  I'm not asking you your opinion
6   any longer.  I'm still trying to get you to answer why
7   the FDA asked for a recall on this product.
8        I asked you that question about five minutes
9   ago before we started reading this document and you said
10  you didn't know.  Now having read these three bullet
11  points I repeat my question.
12       Does it give you a better sense of why the FDA
13  asked for a recall on this product?
14       A   It does not give me a better sense than
15  what I had, that previous sense being that all the
16  systems were not functioning properly.
17       Q   Mr. Farley, that was the reason you gave
18  why you thought the product was recalled.  When I asked
19  you earlier why the FDA asked for it to be recalled you
20  said you didn't know.
21       A   If that's what I said then that's what I
22  said.
23       Q   Okay.  You definitely said that.  So this
24  doesn't help you?  I mean, are you now telling me that
25  you think your reason and the FDA's reason are the same?

Page 209

1        A   They would be similar, identical overlap
2   or whatever.
3        Q   Why wouldn't the FDA say that?  Why would
4   the FDA make reference to a single lot and double thick
5   tablets and the inspection protocol and the concern
6   about the inspection protocol?
7        Why wouldn't they -- why would they fool the
8   entire world with a public posting on its Web site
9   available to anyone in the world and say, these things
10  are the reason we asked for a Digitek recall, if in fact
11  it was all of the things you believe?
12           MR. MILLER:  Object to form, misstates
13       previous testimony.
14           MR. ANDERTON:  It doesn't misstate his
15       previous testimony.
16  BY MR. ANDERTON:
17       Q   You may answer, Mr. Farley.
18       A   My answer is I don't know why they would
19  do that.
20       Q   Well, you worked for the FDA.  They're not
21  in the business of disseminating bad information, are
22  they?
23       A   They're not supposed to be, but this is
24  surprising to me, this --
25       Q   Would you have liked to have seen this as

53 (Pages 206 to 209)

PLAINTIFFS' EXHIBITS 008169

James J. Farley                                                                 June 28, 2010

Page 210

1  you were doing -- preparing your report in this case?
2       A  If it's relevant information.  And it
3  seems to be.  But I don't know that I'd change my
4  statement to you.
5       Q  Well, it's relevant information, though,
6  right?
7       A  Yes.
8       Q  And it gives the FDA's position on this
9  recall, doesn't it?
10      A  Yes.
11      Q  Bullet Point 4, Since the detection of
12 the -- and I'm reading quoting now -- Since the
13 detection of the manufacturing problem FDA has been
14 actively engaged with this company to ensure that all
15 potentially affected lots of Digitek have been recalled.
16 In our best judgment, given the very small number of
17 defective tablets that may have reached the market and
18 the lack of reported adverse events before the recall,
19 harm to patients was very unlikely, closed quote.
20      Did I read that correctly?
21      A  You read it correctly.
22      Q  So did you consider adverse events -- the
23 historical pattern of adverse events as you prepared
24 your report in this case?
25      A  I reviewed files relating to adverse

Page 211

1  events.
2       Q  You reviewed FDA 483s.  Do you know how
3  many adverse events for Digitek were received in, say,
4  the five years before the recall?
5       A  I don't know the exact number.
6       Q  Because you didn't ask and you didn't
7  review that information, did you?
8          MR. MILLER:  Object to form.
9       A  I didn't ask and review.
10      Q  Would you have liked to have known as you
11 were preparing your report that the FDA thought that
12 harm to patients was very unlikely?
13      A  I would like to know -- if I was talking
14 to someone at the FDA I would like to say, how come you
15 say it's very unlikely and you tell them to do a Class 1
16 recall, which means that it's very likely?  The Class 1
17 recall means harm to patients is likely and you put
18 on your Web site, FDA.  Who did you hire to put this
19 out?
20      Q  Harm to the --
21      A  That's a contradiction.
22      Q  A Class 1 recall means harm to the patient
23 is likely if they get a defective tablet.  You've got to
24 put that step in there, right, Mr. Farley?
25      A  And if you buy or use the product you have

Page 212

1  a possibility of getting a defective tablet.
2       Q  I understand.  But you must first have
3  defective tablets, right?
4       A  Defective in any a number of ways --
5       Q  Okay.
6       A  -- not just oversized.
7       Q  What other defect are we talking about?
8       A  It could be over-strength, under-strength.
9  I don't trust their results.
10      Q  Don't trust whose results?
11      A  Digitek -- or Actavis.
12      Q  Does the FDA say anything about anything
13 other than double thick tablets?
14      A  No, they do not.
15      Q  So the FDA was on site conducting an
16 inspection and asked the company to recall that product,
17 right?
18      A  They asked them to do a Class 1 recall,
19 which means that harm is likely.  And whoever --
20      Q  Harm because --
21      A  -- does this says it's unlikely and it's a
22 contradiction.
23      Q  Okay.  But, Mr. Farley, you didn't answer
24 my question.  The FDA was on site conducting an
25 inspection and asked the company to recall this product,

Page 213

1  correct?
2       A  Yes.
3       Q  Asked them to recall all lots, right?
4       A  Yes.
5       Q  Here they are explaining the reason why
6  they did that, referring only to double thick tablets in
7  a single lot.  Do you see that?
8       A  Yes.
9       Q  And yet you don't think that's the real
10 reason the FDA asked for this recall?
11      A  No.  I see a contradiction between this --
12 I read -- I see it.  You showed it to me.  It's right
13 here.  I see this and I see what I read and I see a
14 contradiction.  If it's unlikely why do a Class 1
15 recall?
16      Q  It's unlikely because it's unlikely any
17 defective tablets made it to market, Mr. Farley.
18      A  Then why would they do a Class 1 recall?
19         MR. MILLER:  Wait.  That's not a
20 question.  Wait for a question.
21      Q  Mr. Farley --
22      A  Yes.
23      Q  -- you understand what a Class 1 recall
24 is.
25      A  Yes.

54 (Pages 210 to 213)

PLAINTIFFS' EXHIBITS 008170

James J. Farley                                                          June 28, 2010

Page 214

1    Q   I mean, you're a consultant in this
2  industry, right?
3    A   Yes.
4    Q   It's based more on the nature of the
5  product --
6    A   Yes.
7    Q   -- than on the likelihood of there being
8  defective product.  If there's any -- we established
9  earlier that if there's any possibility that defective
10 product made it to market the FDA will aggressively ask
11 for a recall, right?
12   A   Yes.
13   Q   And if you have a product that has -- that
14 is of the right nature and characteristics and there is
15 any possibility that defective product made it to
16 market, then that becomes a Class 1 recall, right?
17   A   If there's possibility of harm to the
18 patients.
19   Q   Right.
20   A   There's Class 1, Class 2 and Class 3.
21   Q   I understand.  So this drug, the nature of
22 it is such that if you get a defective tablet -- I don't
23 think anybody disputes -- you could potentially be
24 harmed.
25       Do you agree with that?

Page 215

1    A   Yes.
2    Q   But the FDA is making very clear, again,
3  in a public announcement regarding this recall, it made
4  the request for a recall because there were 20 double
5  sized tablets in a single lot.
6    A   Uh-huh.
7    Q   Do you see that?
8    A   Yes.
9    Q   So we now have a lot more insight into why
10 the FDA -- when you first said I don't know and I
11 introduced this document, we now know why the FDA asked
12 for this recall, don't we?
13   A   This contradicts what I read.
14   Q   What you read was a recall announcement
15 and combined with the general standards for a Class 1
16 recall.
17   A   Uh-huh.
18   Q   I don't think the FDA is saying here if
19 you've got a defective tablet there's no possibility
20 you'll be harmed.  But they're very clearly saying, we
21 don't think you -- there's a likelihood that you got a
22 defective tablet, aren't they?
23       MR. MILLER:  Object to form.  The
24     document speaks for itself.
25   A   That looks to be what they're saying.  Who

Page 216

1  signed it?  Who wrote it?
2    Q   It's posted on the FDA Web site.  Do you
3  think a computer hacker got in and --
4    A   Not necessarily a hacker.
5        MR. MILLER:  Objection, argumentative.
6    A   But I would wonder really because the way
7  that's written.
8        MR. ANDERTON:  What time did we start
9     this session?
10       THE VIDEOGRAPHER:  This session was
11     started at 2:22, sir.
12 BY MR. ANDERTON:
13   Q   Mr. Farley, I've handed you a document
14 that was marked in a prior deposition as Plaintiffs'
15 Exhibit 106.
16   A   Yes.
17   Q   Do you see that?
18   A   Yes.
19   Q   You've seen that before?
20   A   Yes.
21   Q   It was a pretty significant document to
22 you, wasn't it?
23       MR. MILLER:  Object to form.
24   A   Every document is significant to me.
25   Q   Well, you gave this one a lot of weight

Page 217

1  when you prepared your report, didn't you, Mr. Farley?
2    A   Let me glance through it.
3    Q   Take your time.
4    A   I'm reading -- one of my questions when I
5  reviewed this was who wrote it.  There's no signature.
6  But I just mentioned that.  I'm prepared to answer your
7  question.
8    Q   My question is, you gave this a lot of
9  weight when you wrote your report, didn't you?
10   A   I gave them all a lot of weight.
11   Q   You gave this one particular weight.
12   A   If you say so.
13       MR. MILLER:  No, don't let him say so.
14   A   I mean, I -- to my knowledge I looked and
15 felt what I thought was important and I tried to look at
16 everything as best I could.  I'm not sure -- did I give
17 it a lot of weight?  I gave them all a lot of weight.
18       MR. ANDERTON:  Did somebody take my copy?
19     Oh, there it is.
20   Q   Your report contains an explicit analysis
21 of this document in particular, doesn't it?
22   A   Yes.
23   Q   Okay.  So I actually like your question,
24 Mr. Farley.  Who wrote this?  Do you know?
25   A   Are you asking me or are you agreeing --

55 (Pages 214 to 217)

PLAINTIFFS' EXHIBITS 008171

James J. Farley                                                                                    June 28, 2010

Page 218

1      Q   I'm asking you.
2      A   -- that's a good question?  It's on
3   Actavis' letterhead.
4      Q   Do you know who wrote it?
5      A   I do not know who wrote it.
6      Q   You describe it in your report as
7   correspondence.  Do you know that it's correspondence?
8      A   A memo, correspondence.  I mean, it's from
9   someone at Actavis reporting on a close-out meeting.
10     Q   A close-out meeting is a meeting that
11   occurs at the end of an FDA inspection.
12     A   Yes.
13     Q   And on page 20 -- I'm sorry.  On page 17
14   of your report you have an entire paragraph devoted to
15   commenting about this.  And in particular you focus on
16   the term "total failure" that appears in the third full
17   paragraph on page 1 of Plaintiffs' Exhibit 106.
18        Do you see that?
19     A   Yes.
20     Q   Your comment is, To have a total failure
21   such as this indicates that there is no product of this
22   company at that location that can be relied upon to be
23   of the proper identity, strength, quality and purity
24   acceptable to the FDA as being safe for the consumer.
25     A   Yes.

Page 219

1      Q   You've said multiple times during this
2   deposition that you believe -- that you didn't believe
3   in anything that this company released, right?
4      A   I wouldn't trust anything that company
5   produced as being safe.
6      Q   Is that because this document suggests
7   there was a total failure of the quality system?
8      A   That and -- well, pretty much all the
9   documents contributed in one way or another to what I
10   wrote.  This one I quoted from.
11     Q   What does total failure mean in the
12   context of this document?
13     A   No reliability on any of the steps in
14   their production system.
15     Q   Were you at this meeting?
16     A   No.
17     Q   Did you talk to anybody who attended it?
18     A   No.  That's why I quoted from it.
19     Q   Well, you quoted --
20     A   I wasn't there.
21     Q   I understand.  But do you know what the
22   person who prepared these notes meant?
23     A   I assume a total failure means total
24   failure.
25     Q   With respect to what?

Page 220

1          MR. MILLER:  Objection.  The document
2   speaks for itself.
3      A   The production of pharmaceutical products.
4      Q   That's not what this document says.
5          MR. MILLER:  Take your time and read the
6   paragraph.
7      A   From the quality systems standpoint.
8      Q   But total failure of what aspect of the
9   quality systems?  Does this document say that?
10         MR. MILLER:  Object to form.
11     A   Total failure means --
12         MR. ANDERTON:  Pete, what's your --
13     A   -- total failure.
14         MR. ANDERTON:  -- objection on that
15   question?
16         MR. MILLER:  My objection is you're
17   taking it out of context.  You need to read the
18   whole sentence.  It's vague, asked and answered,
19   argumentative.  Let's take it from there.
20         MR. ANDERTON:  Would you read my question
21   back, please?
22   (The record was read back as requested.)
23         MR. ANDERTON:  All those objections to
24   that question, Pete?  Really?
25         MR. MILLER:  Yeah, leave them on there.

Page 221

1          What the heck.  You can keep asking.
2   BY MR. ANDERTON:
3      Q   So notwithstanding Mr. Miller's frivolous
4   objections, I repeat -- I ask you to answer my question,
5   Mr. Farley.
6          MR. MILLER:  And he did.
7      A   Would you repeat the question, please?
8          MR. ANDERTON:  Would you read it back,
9   please?
10   (The record was read back as requested.)
11     A   I read total failure as total failure,
12   meaning there's nothing you can rely on as doing what
13   it's supposed to do.  Now, if you say of what aspect,
14   well, then we're talking about partial failure.
15     Q   But that's your read of this document.
16     A   That's my reading of this document.  Total
17   failure, I mean, you look at that and you say, this
18   company isn't doing anything right.
19     Q   What context was this in?  Were you there?
20         MR. MILLER:  Objection, asked and
21   answered.
22     A   I was not there.
23     Q   So you place -- to reach that conclusion
24   you're placing heavy reliance on the words in this
25   document?

56 (Pages 218 to 221)

PLAINTIFFS' EXHIBITS 008172

James J. Farley                                                                                    June 28, 2010

Page 222

1     A   I place heavy reliance on words of any
2  document that comes to -- that's given to me to review
3  and it's an exhibit.  So, yes, I do, but not because of
4  one thing or another, because it was there or anywhere
5  else.
6     Q   We can agree, Mr. Farley, that your
7  comments in at least Paragraph A on page 17 are based
8  entirely on this document.  Take your time.
9     A   I wrote it but I want to review it to be
10 sure.
11    Q   Please take as much time as you think is
12 necessary.
13    A   Section A was based on this document.
14    Q   Entirely?
15    A   Yes.
16    Q   In order to have a true understanding of
17 the total failure comment in this -- that this document
18 reflects was made in this meeting you have to be at the
19 meeting and hear the context in which it was made,
20 wouldn't you?
21    A   I believe that helps anywhere if you're
22 present and you feel the full context.  So I'll give an
23 agreement, not just on this but any situation.
24    Q   So the answer to my question is yes.
25    A   Yes.

Page 223

1        THE VIDEOGRAPHER:  I'm going to go ahead
2  and change tapes, sir.
3        MR. ANDERTON:  Okay.
4        THE VIDEOGRAPHER:  We're off record at
5  3:20.
6        (A brief recess was taken.)
7        THE VIDEOGRAPHER:  All right.  We're back
8  on record.  It's 3:24 p.m. and this is the
9  beginning of Tape No. 6.
10 BY MR. ANDERTON:
11    Q   Mr. Farley, I'm going to hand you a
12 document that has been marked as Defendants' Exhibit 20.
13 I don't know whether you've seen that document before,
14 but take a moment to look at it and let me know when
15 you're ready to answer some questions about it.  And I
16 will let you read sections necessary to answer any
17 questions I might ask.
18    A   It doesn't look familiar, so --
19    Q   Okay.
20    A   Thank you.
21    Q   Are you ready to -- you want to -- are you
22 ready to talk about it or do you want to --
23    A   I'd like to glance through it.
24    Q   Take your time.
25    A   This should be fast enough?

Page 224

1     Q   What's that?
2     Q   Am I going fast enough?
3     Q   Are you ready to answer some questions
4  about it?
5     A   As you see I've not read it, but I think
6  that I can -- if you'll grant me if I'm stuck I'll go to
7  a section.
8     Q   You may take, as Mr. Miller says and I
9  agree with, you may take as much time as you think is
10 necessary to answer any specific question.
11    A   Then I say let's start when you're ready.
12    Q   All right.  So you say you don't think
13 you've seen that before.  Does your review change that,
14 that opinion?  Do you think you've seen this document
15 before?
16    A   I'm vague.  I saw so many.  I saw 93 of
17 them.  Some of them I could say definitely yes, maybe a
18 few definitely no.  I just don't know.  I'd have to --
19        MR. MILLER:  And if I could add something
20    to that.  This was just sent to me.  I saw it for
21    the first time last week.  And I believe I brought
22    a copy and there's probably a copy in Mr. Farley's
23    file.  But I just received it.
24        MR. ANDERTON:  I understand that.  I know
25    that to be true.  So that doesn't surprise me.

Page 225

1        MR. MILLER:  So I think he has a copy,
2    but I don't think he's gotten a chance to actually
3    read it.
4        MR. ANDERTON:  Understood.
5  BY MR. ANDERTON:
6     Q   And whether you've seen it before is more
7  formal or substance than anything, Mr. Farley.
8     A   Thank you.
9     Q   Do you see and based on your experience in
10 the industry and as a consultant in the pharmaceutical
11 industry that this is an EIR relating to a 2004
12 inspection of Amide Pharmaceutical?
13    A   I see.
14    Q   You agree with that, right?
15    A   Yes.
16    Q   Okay.  And you know from your involvement
17 in this case that Amide Pharmaceutical is -- was the
18 predecessor to Actavis Totowa?
19    A   Yes.
20    Q   And they are the original holder of the
21 NDA -- excuse me; I misspoke -- the ANDA for Digitek?
22    A   Yes.
23    Q   Will you turn to page 4 of this EIR,
24 please.
25    A   I'm there.

57 (Pages 222 to 225)

PLAINTIFFS' EXHIBITS 008173

James J. Farley                                                                              June 28, 2010

Page 226

1      Q   And I'm going to read from the -- there's
2   a heading, History of Business, slash, Operations.  I'm
3   going to read some of that paragraph.  Amide
4   Pharmaceutical, comma, Inc., is a privately held family
5   owned organization which has been in operation since
6   1983.
7      Divya Patel, comma, President, comma, stated
8   that the company has undergone significant changes,
9   especially following the consent decree of permanent
10  injunction in 1992.  The site was shut down for one year
11  in 1992.  The consent decree was lifted in 2001
12  following successful demonstration of sustained cGMP
13  compliance.
14     Did I read those several sentences, correctly?
15     A   Yes.
16     Q   In your report on page -- well, on page
17  19, the fourth -- I'm sorry -- the third conclusion on
18  page 19 that you offer reads, To be under a consent
19  decree for more that -- and that's a typo I suppose --
20  that should be than --
21     A   That's a typo.
22     Q   -- ten consecutive years is an indication
23  of continuing serious problems with FDA regulations.
24     Do you see that sentence?
25     A   I see it.

Page 227

1      Q   Did I read that correctly?
2      A   Yes.
3      Q   Well, they weren't under a consent decree
4   for more than ten consecutive years, were they?
5      A   I believe it was nearly ten consecutive
6   years.  So more than would not be correct.
7      Q   Okay.  So that's inaccurate and you got
8   bad information apparently.
9      A   Apparently on that one.
10     Q   Okay.  And we talked earlier about what it
11  means to be under a consent decree and you agreed that
12  if you're under a consent decree you're actually
13  engaging in sustained compliance with cGMPs, aren't you,
14  with current Good Manufacturing Practices?
15         MR. MILLER:  Objection, misstates
16     previous testimony.
17     A   You are obligated to have third party
18  review and release any product you make.
19     Q   You're ultimately performing all of the
20  activities to put those products in the position where
21  you offer them for that review and release, right?
22     A   Through the third party.  They're actually
23  doing some of the work for you.
24     Q   They're not running machines for you.
25  They're not --

Page 228

1      A   They can.
2      Q   -- testing products for you.
3      A   They can.
4      Q   The product is being manufactured and
5   offered for release under your name, correct?
6      A   Yes.
7      Q   You're ultimately responsible for that
8   product.
9      A   Yes.
10     Q   The third party doesn't have any
11  responsibility.
12     A   The third party has responsibility to you
13  the pharmaceutical company.  I wouldn't say they don't
14  have any responsibility.
15     Q   Your testimony -- I didn't say they had no
16  responsibility.  They're not ultimately responsible for
17  the product in the market, for the quality of the
18  product in the market.  That responsibility always rely
19  with you the manufacturer, correct?
20     A   Ultimately, yes.
21     Q   And your testimony -- and the record will
22  reflect what you said earlier.  But you said that if
23  you're operating under a consent decree with that third
24  party oversight your -- you must comply with Good
25  Manufacturing Practices.

Page 229

1          MR. MILLER:  Object to form, misstates
2      his testimony.
3   BY MR. ANDERTON:
4      Q   Because otherwise -- if you're releasing
5   product you must comply with Good Manufacturing
6   Practices because you can't release it without
7   compliance, right?
8      A   That's correct.
9      Q   And this EIR indicates that the reason the
10  FDA agreed to lift the prior consent decree that wasn't
11  ten years -- wasn't more than ten years as you indicate
12  in your report, because of successful demonstration of
13  sustained cGMP compliance.
14     Is that accurate?
15     A   Yes.
16     Q   So when you say if you're under a consent
17  decree for more than ten years -- forget the fact that
18  the time is wrong -- and that that's an indication of
19  continuing serious problems, the FDA apparently
20  indicates that you -- that this company actually was
21  successfully demonstrating sustained cGMP compliance,
22  right?
23     A   Yes.  However, my experience in assisting
24  firms to work their way out of a consent decree is that
25  it normally takes one to two years to do it.  And even

58 (Pages 226 to 229)

James J. Farley                                                                June 28, 2010

Page 230

1  though I said more than ten and it's nine plus, just
2  under ten, that's still three or four times the normal
3  amount.
4        So while the third party is putting the
5  approval on the product it leads me to wonder why does
6  it take them so long, admittedly not over ten but just
7  under ten, why does it take them so long to work their
8  way out?  That's what I'm wondering.
9        Q  Well, and so that we're clear, you're
10 offering a conclusion that there are continuing serious
11 problems with FDA regulations in your report, but now
12 here today you're wondering whether they had serious
13 problems with FDA regulations?  You're wondering why it
14 took so long?
15       A  Wondering is a term I'm using in this
16 discussion.  I am very sure it had serious problems.
17 They had trouble fixing them.  And why does it take a
18 firm more than eight years, more than nine years to
19 repair something that other firms repair in one or two?
20       Q  What documents did you review that relate
21 to Amide's manufacturing operations during the period
22 1992 to 2002?
23       A  I would have to go through the whole list
24 of the 93 to answer that question.
25       Q  Did you review any?

Page 231

1        A  I quite likely did.  It's all in the list
2  in the report.
3        Q  Let's take a look at that.  Starting on
4  page 8 of 27.
5        A  Yes.
6        Q  Mr. Farley, would you walk -- or work your
7  way through the documents in that list -- and you
8  testified earlier that this is the entire list of
9  documents you reviewed to prepare this report, correct?
10       A  Yes.
11       Q  Will you work your way through that list
12 and identify all documents that relate to or reflect
13 manufacturing operations of Amide during 1992 to 2002?
14       A  Of Amide.
15       Q  Correct.
16       A  I'm going to skip --
17       Q  I want you to work your way through it and
18 you can identify them.  You can do it however you like.
19 But I want to know about every single one.
20       A  All right.  In order to identify them as I
21 present them to you, should I point or name them or --
22       Q  You can name them.  You can simply name
23 them.
24       A  I'm looking now for the name Amide as my
25 key to answer your question.  I see the distributing

Page 232

1  agreement, Mylan/Amide distributing agreement.  I'm on
2  the second page halfway down and I'm looking for
3  complaint for permanent injunction and consent decree
4  for permanent injunction.  And I'm saying I believe that
5  would be part of the answer, but I'd have to pull it up.
6        Q  Well, I can represent to you that those
7  two documents relate to Actavis in 2008 and not the
8  Amide consent decree that we've talked about.
9        A  I'll move right on.
10       MR. MILLER:  I object to that.
11       A  I'm on page 11, the second line or area
12 of -- Amide's FDA inspectional history, March 23rd, 1992
13 to March 31st of 2004.
14       Q  Okay.
15       MR. MILLER:  What was the number of that
16    document?
17       THE WITNESS:  Plaintiffs' 235.
18       A  On page 13 near the top, Plaintiffs' 241,
19 a letter from Jasmine Shah, Amide.  Do you see where I'm
20 pointing?
21       Q  Yes.  Is that -- is that during 1992 to
22 2002?
23       A  2004 is later than 2002.
24       Q  Okay.
25       A  I was going to say the one immediately

Page 233

1  following Plaintiffs' 128, but that's 2004, which is
2  later than 2002.  And the following one is 2004.  Those
3  three in a row relate to someone questioning Jasmine
4  Shah and him answering them.  But they're all after
5  2002.  I've done the table.
6        MR. MILLER:  You indicated you were
7     looking for the word Amide.  You jumped over the
8     word Amide in Tab No. 6.
9        MR. ANDERTON:  Pete.
10       MR. MILLER:  He indicated he was doing a
11    word search.
12       MR. ANDERTON:  Pete, do you want to let
13    him testify?
14       MR. MILLER:  I'm helping him with his
15    word search.
16       MR. ANDERTON:  You're helping him with
17    his testimony.
18       MR. MILLER:  No, I don't believe so.  He
19    was very clear, I'm going to go down the list and
20    tell you every time I see the word Amide.  He
21    missed it.  All right.  Do you want facts or do
22    you want --
23       MR. ANDERTON:  Pete, I want you to not
24    testify for him.
25       MR. MILLER:  I'm not going to testify.

59 (Pages 230 to 233)

James J. Farley                                                                    June 28, 2010

Page 234

1     You can go ahead.
2          MR. ANDERTON:  We can give you an oath
3     and have you sit in that chair if you like.
4          THE WITNESS:  I didn't flip to that page
5     because I'm not sure if I should or should not.
6          MR. MILLER:  That's fine.
7          MR. ANDERTON:  Which page?
8          THE WITNESS:  Whatever he said that I --
9          MR. ANDERTON:  You may flip to whatever
10    page you like, Mr. Farley.  I --
11         THE WITNESS:  Apparently I skipped a
12    Plaintiffs' something; although I thought I went
13    down the whole list.
14         MR. MILLER:  You indicated you were
15    looking for the word Amide.  And, Mr. Farley, you
16    passed over the word Amide on Tab No. 6.
17         MS. DOWNIE:  Of course, it's the wrong
18    time frame.
19         MR. MILLER:  I have no idea what time
20    frame.
21         THE WITNESS:  I passed over it.  I passed
22    over that because it was January of '07.
23         MR. MILLER:  I have no idea of the time
24    frame.
25         THE WITNESS:  So I'm going to hold with

Page 235

1     what I finished --
2     BY MR. ANDERTON:
3          Q   What you've identified?
4          A   Yes.
5          Q   There were four or five documents.
6          A   I lost count but, yes, there were a
7     couple.
8          Q   Okay.  And so let's look at those
9     documents.  The first one you identified is the very
10    first one on page 8, the Mylan/Amide distributing
11    agreement.
12         A   Yes.
13         Q   Well, will that give you any insight into
14    where Amide was complying or having difficulty complying
15    with FDA regulations?
16         A   That would not.
17         Q   The next ones you identified were 20 and
18    21.  And I will tell you that those have nothing to do
19    with Amide but are instead the complaint and the consent
20    decree for Actavis.
21         MR. MILLER:  And I'll object.  The
22    documents speak for themselves.
23         MR. ANDERTON:  Yeah, and what they say,
24    Pete, is that they relate to Actavis in 2008, not
25    Amide in 1992.

Page 236

1          MR. MILLER:  And I believe there's a
2     little bit of repertory history in those
3     documents.  I don't have them in front of me, but
4     I think the simple answer is the documents speak
5     for themselves, Mike.
6          MR. ANDERTON:  Okay.
7     BY MR. ANDERTON:
8          Q   And the next one you identified was on
9     page 11, Mr. Farley, Plaintiff's Exhibit 235.  What is
10    that document?  Do you know?
11         A   Amide's inspectional history.
12         Q   Do you know what that is?
13         MR. MILLER:  Why don't you allow him to
14    get the document.  He brought it for you.
15         Q   As we sit here -- I mean, I have it if I
16    want to ask you questions about it specifically.  Do you
17    know from looking at this document what it is?
18         A   It says it's an inspectional history and
19    it is quite likely an inspectional history.  But to take
20    that one out of 93 documents and answer specific
21    questions would not be fair to give you an honest
22    answer.
23         Q   I understand.  What is the next
24    document -- well, is it accurate to say -- if you turn
25    back to page 19 and that third conclusion, is there any

Page 237

1     source of information other than the documents you just
2     identified which would have allowed you to form the
3     opinion reflected in that conclusion?
4          MR. MILLER:  I'll object.  In all
5     fairness I think he ought to see that document
6     before he's asked a question about it.
7          MR. ANDERTON:  I'm asking him if there
8     are any additional documents besides the ones
9     you've identified.
10         A   Not a document but the fact that it was
11    just under ten years and such a long, long time to be
12    under a consent decree, which is very expensive and
13    embarrassing, that opens your eyes as soon as you see
14    that.
15         Q   It opens your eyes in as a consultant, an
16    expert consultant in this industry, it would prompt you
17    to want to see more information, wouldn't it?
18         A   Yes.
19         Q   And so before, as you said earlier, before
20    you could opine about compliance issues for that period
21    or any period, while the consent decree might open your
22    eyes you'd say, I'd want to see more information, right?
23         A   Yes.
24         Q   Are you familiar with the FDA surveillance
25    program?

60 (Pages 234 to 237)

PLAINTIFFS' EXHIBITS 008176

James J. Farley                                                                    June 28, 2010

Page 238

1        A   I've heard of it.  And honestly at
2   different times it's had different meanings over the
3   years.  So if you could tell me which surveillance
4   program --
5        Q   Are you familiar with the fact that the
6   FDA -- do you know what an FDA 484 is?
7        A   484?
8        Q   Yeah.
9        A   I'm not familiar with a 484.
10       Q   You're not familiar with a 484?
11       A   I'm not familiar with a 484.  I may know
12  it not as a 484.  Sample request.  Is that the sample
13  request form?
14       Q   Yes.
15       A   I just didn't call it the 484.  That's a
16  sample request where they come in and take samples
17  periodically and then analyze it.
18       Q   And test the product --
19       A   I just blanked out on the 484 number and
20  in a matter of seconds it came to me.
21       Q   Okay.
22       A   I'm not one to memorize 4 numbers too
23  much.
24       Q   That's okay.
25       A   But it did come to me.

Page 239

1        Q   Did Plaintiffs' lawyers tell you that
2   Digitek was routinely tested by the FDA as part of its
3   surveillance program?
4        A   No, but it's not surprising that they
5   would be.
6        Q   Okay.  But you didn't know that as you
7   formed your expert opinion in this litigation?
8        A   I would have assumed it.  I mean, we did
9   surveillance in Philadelphia.  They went out to
10  SmithKline and Merck, brought them in.  That
11  surveillance program apparently is the same surveillance
12  program we're talking about.  And the 483 is the sample.
13  So, yes.
14       Q   And your understanding -- well, do you
15  have an understanding of the surveillance program that's
16  conducted under the auspices of the 484s that allow you
17  to take a sample?  What is your understanding?
18       A   There are periodic checks of samples as
19  they would be going to the marketplace.
20       Q   Samples taken from the market.
21       A   In effect, random.  We could use the term
22  random.
23       Q   Well --
24       A   But I mean -- okay.
25       Q   Are they ever taken from the market,

Page 240

1   from --
2        A   Yes.
3        Q   -- a pharmacist?
4        A   Sometimes from a pharmacist and
5   sometimes -- and I'm pausing because there are imaginary
6   people who will get a prescription.  In other words, it
7   will be John Jones.  And there is no John Jones, but
8   they may order it over the Internet and have a post
9   office box.
10       And they'll take this prescription for John
11  Jones, who is a non-existent person, but it represents a
12  prescription that was obtained over the Internet or
13  through other means and analyze it.
14       Q   Alternatively, the FDA can just show up at
15  a pharmacist and issue a 484 and take a sample, can't
16  they?
17       A   They can.
18       Q   Okay.  And they do.
19       A   They can.
20       Q   And they do.
21       A   They do.
22       Q   Okay.  And they did that while you were
23  employed by the FDA from time to time.
24       A   They did.
25       Q   And it sounds like your lab was involved

Page 241

1   in testing some of those samples.
2        A   That's part of what we did.
3        Q   Okay.  And so if you thought Digitek might
4   be part of the surveillance program as you were
5   undertaking your responsibilities in this engagement for
6   this litigation, why didn't you ask to see documents
7   related to that to see how Digitek had performed?
8        A   It didn't occur to me.  It didn't occur to
9   me.
10       Q   You were evaluating Digitek.  Wasn't one
11  of the things you might want to know, how the FDA came
12  down in its surveillance -- or what the results of the
13  FDA surveillance program relating to this product were?
14       A   In retrospect any additional information
15  could have been helpful, but I didn't feel it necessary.
16       Q   So you had formed an opinion based on your
17  review of a FDA document.  You didn't actually want to
18  be bothered with the facts of the product in the market.
19  You just wanted to look at FDA documents.
20       MR. MILLER:  Object to form.
21       A   No.  I would not put it that way.
22       Q   How would you put it?
23       A   I wouldn't be bothered to do it.  I'm not
24  in agreement with that choice of words.  I was
25  evaluating a situation.  And I believe I had, after

61 (Pages 238 to 241)

James J. Farley                                                                          June 28, 2010

Page 242

1  asking for more and getting more, sufficient documents
2  to do my evaluation.  And I wrote it.  Right here.
3       Q   To formulate a thorough opinion, if you
4  knew Digitek was part of the surveillance program and
5  consciously chose not to ask for that information, do
6  you feel you've given a thorough evaluation -- if one of
7  your pharmaceutical clients asked you to evaluate one of
8  its products and you thought about whether it was part
9  of the 484, the surveillance program, wouldn't you ask
10  them to see that information?
11       A   Yes, I would.
12       Q   But you didn't here?
13       A   I didn't.  I didn't know the surveillance
14  program as it related to them.  And I don't work for the
15  FDA anymore.  I would not have ready access to that
16  information.
17       Q   You can get it through FOIA.
18       A   I can get what?
19       Q   You can get it through FOIA.
20       A   We come back to the fact that I thought I
21  had sufficient information here.
22       Q   But if you were counseling a client you
23  wouldn't think you had sufficient information.  You said
24  you would want to see and ask for the surveillance
25  program results, right?

Page 243

1       A   Probably that would be my viewpoint if I
2  were counseling a client, yes.
3       Q   Okay.  So your analysis here is narrower
4  because of the perspective you're taking.
5       MR. MILLER:  Object to form.
6       A   If you're saying -- if you're Plaintiff
7  versus Defendant and which one, you might -- I would
8  probably think of other things in carrying out my
9  assignment.
10       Q   Well, but I want to make clear, you said
11  your analysis here is narrower and you don't -- there's
12  information out there that you didn't consider and don't
13  feel you need to consider because you're working for
14  plaintiffs, correct?
15       MR. MILLER:  Object to form.
16       A   I didn't say my analysis was --
17       MR. MILLER:  It misstates previous
18  testimony.  While I'm objecting you've got to hold
19  on until I'm done --
20       THE WITNESS:  Oh, I'm sorry.
21       MR. MILLER:  -- and then you can answer.
22  I'm going to object.  It misstates previous
23  testimony.  Now it's okay to answer.
24       A   I mean, I didn't say it was narrower.  I
25  think you said it was narrower.

Page 244

1       Q   Well, you said that there's information in
2  the surveillance program that you would consider if you
3  were evaluating a product -- well, let me back this out
4  a little bit.
5       You'd consider the surveillance information --
6  surveillance program information if you were consulting
7  for a client in the pharmaceutical industry that said
8  evaluate this product, right?
9       A   I might.
10       Q   You said earlier that you would want to
11  see it and that you might.
12       A   I would -- I might --
13       Q   Are you changing your testimony now?
14       MR. MILLER:  Object to form.
15       A   I'm not changing my testimony.  If I said
16  I would I would.
17       Q   Okay.  And you would also want to see all
18  of the regulatory documents that you reviewed in this
19  case, right?
20       A   Yes.
21       Q   But if you were counseling plaintiffs in
22  the context of this litigation you don't want to see the
23  484 information because you thought about it and chose
24  not to ask for it.
25       MR. MILLER:  Object to form.

Page 245

1       A   The reason to look -- to have one sample
2  taken and analyzed and be found good doesn't tell me
3  after reading all of this that the firm is not making
4  unsafe material out there to have one sample.  So it
5  wasn't anything that would have any statistical
6  relevance to me.
7       Q   What if it was more than one sample?  What
8  if it was part of the surveillance program year after
9  year?
10       A   It's tough to pick a finite number, but
11  the answer would be yes.  If it got to the point where
12  it was a statistically representative number, then, yes.
13       Q   Out of 152 what would be a statistically
14  representative number?
15       MR. MILLER:  Object to form.
16       A   152 what?
17       Q   Batches.
18       A   We would be looking at -- I'd rely on a
19  statistician's answer for that.  If you're asking for my
20  opinion, my opinion would be I'd want a sample from
21  every batch.
22       Q   That's not a statistically representative
23  number.  Your term, Mr. Farley, not mine.
24       A   Okay.
25       Q   So when you -- what would be a

62 (Pages 242 to 245)

James J. Farley
June 28, 2010

---

Page 246

1 representative sample sufficient to allow you to credit
2 that?
3          MR. MILLER:  Object to form, asked and
4     answered.
5          MR. ANDERTON:  It hasn't been asked.  It
6     hasn't been answered.
7          MR. MILLER:  It has been asked and it has
8     been answered.
9 BY MR. ANDERTON:
10     Q   You may answer it.
11     A   I believe I would not make that
12 determination myself.  I would ask a statistician,
13 because the answer, I'm sure, would depend on whether it
14 was one campaign making 150 lots straight on through one
15 after another or whether they made 10 lots and then
16 changed the equipment over and made something else and a
17 few weeks later started making this material again and
18 then stopped and start again.  And that number would
19 vary.  And I would rely on the statistician for that.
20     Q   And if it was a single campaign of 152
21 straight batches, according to you would the number be
22 higher or lower than if it was multiple campaigns of
23 four batches and five batches and then three batches?
24     A   If it was a single campaign right on
25 through, same equipment, same everything, I would

---

Page 247

1 believe the number would be lower --
2     Q   Okay.
3     A   -- than if they were disassembling the
4 equipment, making something else, cleaning it,
5 re-assembling for that.
6     Q   Did you ask about any external testing of
7 the recalled Digitek?
8     A   Did I ask about any external testing?
9     Q   Yes.
10     A   External testing.
11     Q   Yes.
12     A   I did not.  I looked for analytical
13 results on the double thicks, but I did not ask about
14 external testing.
15     Q   Explain to me the significance of the
16 analytical results on the double thick tablets.  The 20
17 tablets out of 4.8 million, what significance would that
18 have?
19     A   If, and especially this with a low
20 therefore dangerous therapeutic index where a patient
21 can overdose very readily, if it's double thick and
22 double weight, is it the same amount of active
23 ingredient and twice the excipients or is it a double
24 strength tablet, because a double strength tablet could
25 kill someone.

---

Page 248

1     Q   Okay.  So your analysis would be intended
2 to determine the potentially harmful effects of those 20
3 tablets?
4          MR. MILLER:  Object to form.
5     A   Yes.  I would do that in any case as good
6 practice because knowing the analytical results helps
7 you determine where along the line something went wrong.
8     Q   I understand.  But the point is it would
9 help you determine the potentially harmful effects of
10 those 20 tablets and perhaps allow you better insight
11 into determining the root cause.
12     A   Yes.
13     Q   But it doesn't affect the potency of the
14 other -- let's call it 4.8 million tablets, because 20
15 out of 4.8 million leaves almost still 4.8 million.
16     A   In theory it does and if the analytical
17 results were all within specification by their sampling
18 procedures, then theoretically they're all in the proper
19 strength.
20     Q   And those batch records you reviewed.  But
21 the double thick batch are the records you reviewed.
22     A   Batch record, yes.
23     Q   And no others.
24     A   Did not see them.
25     Q   Didn't ask for them.  Didn't ask for any

---

Page 249

1 additional batches, did you?
2     A   I asked for a batch before and a batch
3 after.
4     Q   Did you get it?
5     A   No.
6     Q   Did you ask for any batches other than the
7 batch before and the batch after?
8     A   I said if we can't get the one immediately
9 before and immediately after, get me one that was
10 sometime before, the closer the better, and sometime
11 after, the closer the better.
12     Q   Didn't get those.
13     A   Didn't get them.
14     Q   Why not?
15     A   I don't know.
16     Q   How many times did you ask?
17     A   Twice.
18     Q   What were you told when you asked and
19 didn't get them?
20     A   We'll get them.
21     A   Didn't.
22     A   Didn't.
23     Q   Did that affect your opinion at all?
24     A   Of what?
25     Q   Well, of anything in this case.  I mean,

---

63 (Pages 246 to 249)

PLAINTIFFS' EXHIBITS 008179

James J. Farley                                                    June 28, 2010

Page 250

1  you're giving expert testimony in the form of an
2  opinion.  You asked for information that you obviously
3  thought might be relevant, or you wouldn't have asked
4  for it, and didn't get it.
5       A  I had less to work with, but I still had
6  what I felt was a sufficient amount.  I had a batch
7  record, the batch that had the double thick tablets.
8       And there's -- when you do a project there's
9  also it'd be nice to have this, nice to have this, this
10 will be good.  And some things if you don't have them
11 you say, I can't go on without this.  Others you say,
12 I'll evaluate what I have.
13      Q  The batch before and the batch after, if
14 they had come in, if the records for those batches show
15 everything within specifications how does that affect
16 your opinion in this case?
17      A  If that came in I will look to picture
18 that whatever it was that went wrong that made that
19 occurred at that particular point in time.
20      Q  It was an isolated incident.
21      A  I would tend to look that way, yes.
22      Q  Okay.
23      MR. ANDERTON:  How much time we got?
24      THE VIDEOGRAPHER:  25 minutes.
25      MR. ANDERTON:  Okay.

Page 251

1  BY MR. ANDERTON:
2       Q  What discussions have you had with
3  Mr. Miller or other Plaintiffs' counsel about the theory
4  being pursued by Plaintiffs in this litigation?
5       A  I'm not sure what you mean by the theory.
6       Q  Well, when you sue somebody alleging
7  you've been injured by their product, you have to have a
8  reason for suing them.  You understand that, right?
9       A  Yes.
10      Q  And, you know, I suppose it's lawyer speak
11 a little bit, but when you bring a lawsuit, until it's
12 been proven or proved you're pursuing a theory.
13      You understand now what I mean when I use the
14 term theory?
15      A  Yes.
16      Q  All right.  So what conversations have you
17 had with Mr. Miller or any other lawyer for the
18 plaintiffs in this litigation about the theory of
19 liability being pursued by the plaintiffs in this
20 litigation and specifically as it relates to what they
21 think was defective about the Digitek?
22      A  I can't recall the exact words of any
23 discussions I had, but Pete Miller would say, what did
24 you find, what are you coming up with, and, of course,
25 when can I expect the report or the results; although I

Page 252

1  try to get them promptly.
2       But I believe what I said to Pete Miller,
3  Pete, this place is really fouled up at this time, I
4  wouldn't trust anything coming out of it.  And Pete
5  would say, well, we're looking at that aspect of it, or
6  something to that effect.
7       But I believe that I brought the subject up to
8  him that you're talking about Digitek, but I wouldn't
9  trust anything made in this company by these people at
10 that time.
11      Q  And the basis for that statement is your
12 review of FDA regulatory documents, correct?
13      A  Documents, the various things, a lot of
14 different things that were -- it wasn't one violation
15 over and over.  It was different violations.
16      Q  But all of those are set forth in FDA
17 regulatory documents, right?
18      A  Yes.
19      Q  Because you didn't review any
20 manufacturing documents for any product to reach your
21 conclusion that this place is really fouled up, right?
22      A  Other than that one batch record.  And my
23 conclusion was based on the various observations of the
24 various 483s.
25      Q  So your contention is based entirely on

Page 253

1  comments set forth in FDA in the 483s and FDA regulatory
2  documents.
3       MR. MILLER:  Object to form.
4       A  Mostly.  There are some of the other
5  things we discussed, I'm sure played a role, but
6  predominantly the FDA documents, the inspection results.
7       Q  This industry as we talked about earlier
8  is based on sampling of finished product, right?
9       A  The industry is based on it?
10      Q  Or --
11      A  I don't know if I would use that word.
12      Q  That's a poorly-phrased question and I
13 apologize.
14      A  You said it.
15      Q  The release of product into the market in
16 this industry is based on sampling of finished product,
17 right?
18      A  Yes.
19      Q  How do you assure -- how can you be sure
20 that all product released into the market is within
21 specification?  Is there any real way to do that?
22      A  Is there any real way to be sure that
23 every individual tablet and the batches?  To be sure you
24 would have to test every tablet.
25      Q  Right.

64 (Pages 250 to 253)

James J. Farley                                                                                    June 28, 2010

Page 254

1      A   You do statistically representative
2  sampling.  And you have statisticians who know where the
3  statistical tables are.  When you're making this much
4  take a sample, take it from here, take it from there.
5  And you do your -- we call it representative sampling.
6  You analyze that.
7      Q   So if somebody says, assure me every
8  tablet in the market is within specification, is that
9  possible?
10     A   Not without testing every sample.  Now,
11 when you say specification, specification for weight?
12 For size?  For analysis?  For everything?  For
13 everything?  The right excipients?  The right active
14 ingredient?  The right strength?  You would test
15 everything and you would have nothing left to sell.
16     Q   So if somebody says, assure me that every
17 product that you've already released into the market is
18 within specification, that's not possible.
19     A   In an absolute sense, no.  You would base
20 it on your sampling and your test results.
21     Q   You'd go back to your batch records.
22     A   Uh-huh.
23     Q   You'd review the batch records and there
24 would be nothing else you could do at that point, right?
25     A   Nothing else you could do with regard to

Page 255

1  the answer for the person?
2      Q   Yes.
3      A   You say, here's our batch, here's the
4  results, it all tested well.
5      Q   Right.  Nothing else you can do, right?
6      A   According to your procedures nothing else
7  you would do.
8      Q   Nothing else you could do other than --
9  other than go test it all.
10     A   Or test some more to any degree.  But you
11 likely wouldn't do that.  You likely would say, here's
12 the results that we had and this is statistical
13 sampling; therefore the batch is released.  That's what
14 you would do.
15     Q   Okay.
16     A   Uh-huh.
17         MR. ANDERTON:  Let's take a brief break.
18         THE VIDEOGRAPHER:  We're off the record
19     at 4:07.
20         (A brief recess was taken.)
21                 - - - - -
22         THE VIDEOGRAPHER:  We're back on record.
23     The time is 4:19.
24                 - - - - -
25             CROSS EXAMINATION

Page 256

1  BY MS. DOWNIE:
2      Q   Mr. Farley, my name is Ericka Downie.  I'm
3  going to ask you a few questions today, this afternoon.
4  I was looking through the records that you brought with
5  you today and I understood that you brought with you
6  documents that you reviewed in preparation for your --
7  in preparing your report as well as in preparing for
8  your deposition today related to this litigation; is
9  that correct?
10     A   Yes.
11     Q   Okay.  In going through those documents I
12 found some e-mails and some documents I wanted to
13 question you about.  Who is Hua, H-U-A?
14     A   Hua.
15     Q   Hua.  Fair enough.
16     A   Hua is Dr. Hua Zhao.  He is a chemistry
17 teacher at Savannah State University and I asked -- he's
18 a friend, a fellow chemist and a neighbor.  And I asked
19 him to weigh a couple of tablets for me in the
20 laboratory.
21     Q   Why?
22     A   I wanted to look at the various
23 medications, the ratio of active ingredient, API, active
24 pharmaceutical ingredient, to the total tablet weight
25 and get those ratios.

Page 257

1      Q   Why was that important information for
2  you?
3      A   It was important to me because when I
4  looked at .125 milligram strength of Digoxin, the
5  Digitek product that is .125 strength, and then I saw
6  that the tablet weight was 105 milligrams, I calculated
7  that out on a -- first on a percentage basis -- I see
8  you have the chart in front of you -- on a percentage
9  basis and then I converted to a parts per thousand,
10 parts of active ingredient per thousand parts total
11 tablet weight.
12         And I'm saying this off the top of my head.  I
13 just asked Hua to do the tablet weights of the others,
14 the Benadryl, the Advil.  I did not have the tablet
15 weight of Digitek, but I got the tablet weight from the
16 records.  And then I calculated that for the .125
17 strength Digitek.
18         That is just over one part of active
19 ingredient, 1.2 parts perhaps of active ingredient, to a
20 thousand parts of total blend.  And that's difficult to
21 mix, I would believe, such a dilute mixture.
22         So he weighed a Benadryl, he weighed a
23 Lipitor -- and that was right out of my prescription
24 bottle, the Lipitor -- and an Advil.  And I think you
25 have the --

                                                              65 (Pages 254 to 257)

James J. Farley                                                                    June 28, 2010

Page 258

1        Q    And it appears -- I'm sorry -- also
2   Diovan.
3        A    Diovan.
4        Q    Right.  Okay.  So he did these weights for
5   you?
6        A    He just did the tablet weights.
7        Q    Right.
8        A    The strengths are the claimed strengths on
9   the labels.
10       Q    Okay.
11       A    And I just looked -- and I'm looking at
12  the data upside down as you have it there --
13       Q    Right.
14       A    -- that when I looked and I said to
15  myself, wow, this is 1.2 parts per million mixture of
16  the active ingredient in the Digitek product at the.125
17  milligram strength, that really has to have a lot of
18  care taken to mix it pretty thoroughly.  And while the
19  others had -- I forget.  One was well over 100 --
20       Q    Well, we have one that's 56, another
21  that's 65, another that's 99.  So three of them are
22  under 100.
23       A    Under?  And what's the one that's --
24       Q    Then there are two that are well over 100,
25  the Advil and the Diovan.

Page 259

1        A    And while you want blend uniformity in
2   anything you mix it's, quote, unquote, it's easier to
3   get in the Diovan or the other ingredients and it would
4   be tougher to get in the more dilute product.
5        Q    Did you review -- did you conduct this
6   examination at Plaintiffs' counsel's request?
7        A    No.  In fact --
8        Q    And did you actually have any Digitek
9   tablets to weigh?
10       A    No.  I got that from the batch record.
11       Q    So there weren't any Digitek tablets that
12  were actually weighed as part of this analysis that you
13  conducted?
14           MR. MILLER:  Object to form.
15       A    There weren't.
16       Q    So, Dr. -- I'm sorry.
17       A    Dr. Hua Zhao.
18       Q    Dr. Zhao, he didn't weigh any Digitek; he
19  weighed other medications for you.
20       A    The others that you have in the bag there.
21       Q    And you haven't reviewed any other batch
22  records with respect to Digitek to determine anything
23  regarding blend uniformity or content or anything of
24  that nature for a product that was actually released and
25  distributed on the market?

Page 260

1        A    Did not, only that one lot in question.
2        Q    And do you -- this looks like this
3   analysis was done on June 11th, 2010?
4        A    That's probably when Hua gave me the data
5   or sometime there and I just entered it and did my
6   calculations on the Excel spreadsheet there.
7        Q    Approximately how many hours have you
8   spent on this litigation?
9        A    On the litigation total?
10       Q    Yeah.
11       A    I'm pausing because I'm thinking back to
12  the billable hours.
13       Q    If you can just give me an estimate.
14       A    About 175.
15       Q    And are you currently engaged by any other
16  entities or facilities with respect to consulting?  Any
17  other consulting engagements currently?
18       A    I just finished one.  I have another
19  pending but not actually doing it right now.
20       Q    Okay.
21           MS. DOWNIE:  All right.  I'm going to
22  turn the questioning back to Mr. Anderton.
23           MR. ANDERTON:  Okay.  Thank you.
24           - - - - -
25           DIRECT EXAMINATION (Cont'd)

Page 261

1   BY MR. ANDERTON:
2        Q    Mr. Farley, I started to ask you some
3   questions about this earlier and then I changed course
4   and I never finished my thoughts on this issue.  So I
5   want to follow up.
6            We looked at the FDA document from the Web
7   site which indicates the FDA's thoughts that the recall
8   of this product is -- flows from the double thick
9   tablets found in one lot.
10           Would it bother you -- or does it bother you
11  to know as you form your opinion in this case that
12  Plaintiffs have changed their theory -- we started
13  talking about theory earlier -- and that initially they
14  brought claims that they were taking and had taken
15  double thick tablets and that since then they've changed
16  their theory to now being pursuing this notion of
17  varying degrees of active pharmaceutical ingredients,
18  whether the tablet is double thick or not?
19           MR. MILLER:  Objection.  Object to form,
20  overbroad and it's facts not in evidence.
21       Q    You may answer.
22       A    Well, I didn't know it.  Since I didn't
23  know it it doesn't bother me.
24       Q    Hearing it now does it bother you?
25       A    No.  My work was look at these documents,

66 (Pages 258 to 261)

James J. Farley                                                              June 28, 2010

Page 262

1  provide an evaluation.  And I -- it would bother me if I
2  thought people were dying taking medication, I mean, as
3  a fellow human being.  But speaking of the case, no.
4        Q  Do you know how many lots were subject to
5  this recall?
6        A  The number 33 comes up and a number of 85
7  comes up.
8        Q  Okay.  If I told you it was 152, would you
9  have any reason to doubt that?
10       A  I would not have any reason to doubt that.
11  In fact, I would relate it to the number that you
12  mentioned earlier.
13       Q  Okay.  And if I tell you that the .125 --
14  the theoretical batch size of .125 is 4.8 million and
15  the theoretical batch size of .25 is 4.2 million, do you
16  have any reason to doubt those numbers?
17       A  No reason to doubt them.
18       Q  So if there's 152 batches that were
19  subject to recall in this case, those numbers mean we're
20  looking at north of 680 million tablets.
21       Does that sound about right?
22       A  Quick calculation, sounds about right.
23       Q  Okay.  Not a single double thick tablet
24  has been presented to Defendants in this case.  Do
25  you -- are you aware of that?

Page 263

1        A  I was not aware of that.
2        Q  Is that something you would have liked to
3  have known as you formulated your opinion, as you put
4  it, as you evaluated Digitek?
5        A  It would have been helpful but not
6  necessary.  When I read those 483s and I saw the
7  observations on the 483s and I read the warning letters
8  to -- now to answer with that knowledge after reading
9  that to answer your question, oh, it wouldn't matter.
10       Q  The 483s would do nothing but prompt you
11  to look further, right?
12       A  It would prompt me to look further because
13  I see violations and I want to know why don't they
14  correct them, are they going to correct them, which is
15  what FDA wants to know.
16       Q  Okay.  And they would prompt you to -- if
17  you're evaluating Digitek and if you're doing it
18  properly, you'd take the information you learned in the
19  483 and you'd evaluate information reflecting the
20  manufacturer of Digitek, right?
21       A  Yes, but I'm taking the FDA's word for
22  what they put in the 483.  I'm not --
23       Q  You still have to connect --
24       MR. MILLER:  Hang on.  He's answering.
25       You're cutting him off.

Page 264

1        Q  Go ahead and answer.
2        A  I'm not looking for supplemental
3  information because I doubt the FDA's content of the 483
4  or the warning letter.  But any supplemental information
5  is always helpful.
6        Q  Well, you still have to connect the
7  information on the FDA's documents to Digitek, right?
8        A  Oh, yes.  In some cases they mention it
9  and other cases they mention other products.
10       Q  And in the cases where they don't mention
11  Digitek, as you said earlier, you have to connect that
12  specific citation to Digitek --
13       MR. MILLER:  Object to form.
14       Q  -- somehow.
15       MR. MILLER:  Misstates previous
16  testimony.
17       A  I'm looking to evaluate the whole firm and
18  Digitek, but I'm not looking to say how can I get this
19  to make it look bad for Digitek.  No, I'm not.  Maybe
20  I'm not getting the question right.
21       Q  Yeah.  Let me try to say it differently.
22  Let's separate your evaluation of the firm from your
23  evaluation of Digitek.  All right?
24       MR. MILLER:  Object to form.
25       Q  So I don't want to hear in my response to

Page 265

1  this question about your evaluation of the firm.  As
2  you're evaluating Digitek and forming an opinion about
3  Digitek, if you find a reference on a FDA form to a --
4  what the inspector believes is a GMP deficiency, in
5  order to evaluate Digitek, as you testified earlier, you
6  have to go look for information about Digitek, right?
7        MR. MILLER:  Object to form.
8        A  Yes, but I would also look for more
9  information about how they're making other things if
10  it's in the same plant by the same people.  I would do
11  what you say first, but not only, because although you
12  said to me separate Digitek from the firm, I can try to
13  do it but there's overlap.  There's overlap.
14       It's the firm that makes the Digitek.  It's
15  the same firm that made these products that's making the
16  Digitek.  So I know you said to me separate it, but I
17  can't completely separate it.
18       Q  Is it your opinion that if a firm makes
19  one product defectively they make all products
20  defectively?
21       A  No.  It's my opinion that there is a
22  possibility that some other products are being made
23  defectively.
24       Q  But you can't confirm unless you look at
25  records, right?

67 (Pages 262 to 265)

PLAINTIFFS' EXHIBITS 008183

James J. Farley                                                              June 28, 2010

Page 266

1      A   That's right.
2      Q   You know about batch yields, right?
3      A   Yes.
4      Q   Are you -- a theoretical yield is the
5  number of tablets that should be produced in a typical
6  batch if tablets are manufactured within specification,
7  correct?
8      A   Yes.
9      Q   If batches contained double thick tablets,
10 that would potentially impact the yield of the batch,
11 right?
12     A   Of the number of tablets, yes.
13     Q   Something you could examine as part of
14 your evaluation of Digitek?
15     A   Yes.
16     Q   You didn't do that, did you?
17     A   For the number of tablets, 15 out of 4.8
18 million, the yield would not have given me an indication
19 either way.
20     Q   It wouldn't be because 15 or even 20 is in
21 fact I think the real number, 20 out of 4.8 million
22 would not have affected the yield.
23     A   The yield as in the specifications.  I
24 forget the number offhand, but if it's so many kilograms
25 put in and 98 to 102 percent and it came out, you

Page 267

1  wouldn't see it by looking in that area.
2      Q   Okay.  But you didn't look at any yield
3  for any batches other than the double thick batch?
4      A   And that was in reviewing the whole batch
5  record I saw you go through.
6      Q   So as I understand that comment, you saw
7  the yield but not because you were looking for the
8  yield.  You just were reviewing the batch record and it
9  was in there.
10     A   It's one of those things where you're
11 looking at an aspect of something and you want to look
12 at other parameters.  Which parameters do you look at
13 that will give you information that will help you
14 explain this situation?  And I don't think that would
15 give me any information.
16     Q   Are you familiar with Quantic Regulatory
17 Services, Quantic?
18     A   Am I familiar with it.  I've done work for
19 them.
20     Q   You have done work for them?
21     A   Sure.
22     Q   Are you aware that they -- at the request
23 of the FDA that Actavis hired Quantic to undertake a
24 review of various batch records and documents?
25     A   Quantic is good on that.  I've done batch

Page 268

1  reviews for them on other projects, other clients.
2      Q   You trust their results?
3      A   I trust Quantic's results.
4          THE VIDEOGRAPHER:  I have to change tape
5  now.
6          MR. ANDERTON:  Okay.
7          THE VIDEOGRAPHER:  Off at 4:35.  One
8  moment, please.
9          (Off the record.)
10         THE VIDEOGRAPHER:  Okay.  This is the
11 beginning of Tape No. 7.  It is 4:36 p.m.
12 BY MR. ANDERTON:
13     Q   Mr. Farley, before we changed tapes I
14 asked you a question about Quantic Regulatory Services.
15 You indicated that -- there were several questions.  You
16 indicated you're familiar with them, you've worked with
17 them and for them and that you trust them.
18         Is that a fair characterization?
19     A   Yes, to all.
20     Q   Okay.  But you didn't answer the question
21 I asked you originally which was, were you aware that
22 Actavis hired Quantic to undertake an audit review of
23 batch records at the request of the FDA in 2007?
24     A   Not the way you say it.  I saw Claudio
25 Pincus' name and Owen Richards' name.  And Claudio

Page 269

1  Pincus and Owen Richards are Quantic.  They own it.  And
2  so I knew they were involved because I saw their name on
3  correspondence or they were cc'd on some e-mail.  So I
4  realized that.  And I also saw PAREXEL, which is a
5  competing firm.  So that's how I knew.
6      Q   Did you ask for any documents relating to
7  Quantic's involvement?
8      A   No, I did not.
9      Q   You trust them.  You knew they were
10 involved.  You didn't ask to see what they had done or
11 what the results were?
12     A   I didn't need to.  If Claudio has a team
13 in there doing a job, they're doing a good job.  I did
14 that type of work for him on various projects.
15     Q   I'm not asking if you asked to see
16 Quantic's documents because I'm asking you to second
17 guess their results.  I'm asking you whether you thought
18 that was potentially relevant to your evaluation of the
19 firm.
20         If Quantic did a good job, as you've now said
21 multiple times --
22     A   Yes.
23     Q   -- wouldn't you want to see their outcome
24 as part of your evaluation of the company?
25         MR. MILLER:  Object to form.

68 (Pages 266 to 269)

PLAINTIFFS' EXHIBITS 008184

James J. Farley                                                                                      June 28, 2010

Page 270

1    A  I want to see the immediate FDA inspection
2   that follows Claudio's implementation of the results to
3   verify that what he did, and which I have explicit
4   trust, has been put to use satisfactory.
5       So I don't need to see what Claudio's doing --
6   or I should say Quantic was doing.  I want to see the
7   FDA inspection, because they're the ones that are going
8   to say you can now market it or you can't market it.  So
9   that's why I didn't ask to see it.  And this moment I
10  still don't care to see it.
11      Q  What's a compliance hold?  Do you know?
12      A  You're holding something until something
13  else is done and then you will release it when that
14  something else is done.  That's obviously not the FDA
15  definition.
16      Q  What's the FDA definition of a compliance
17  hold?
18      A  I gave you mine because I was vague on
19  their words.  That's why I gave you mine.
20      Q  Okay.  Let me ask it a different way.
21  When a company has been issued a warning letter -- and
22  I'll characterize that as being under or subject to a
23  warning letter -- is the company -- is the FDA going to
24  grant new product approvals while that is the case?
25      A  In a warning letter?

Page 271

1       Q  Yes.
2       A  That would depend on the content of the
3   warning letter, the scope of the warning letter and what
4   else was needed.  If it all centered in one location --
5   I mean same company, one location, and there was never
6   any problem with another location of the same company
7   and the warning letter applied here, they may let them
8   produce here.
9       Q  At the other location.
10      A  Yes.
11      Q  What if it's all one location?
12      A  Here again we get into that it is quite
13  likely not, but in certain instances of a product that
14  is needed in the market, when you have someone who is
15  primary supplier and the shortage of that product on the
16  market would be harmful to people who need the
17  medication, they will -- I don't know how to put -- work
18  with the company, but put that in quotes, work with the
19  company in trying to help them get the product to
20  market.  So it will be a warning letter --
21      Q  Are you talking about a product that's
22  already been approved?
23      A  Yes.
24      Q  Okay.  I asked you about new approvals.
25      A  New approvals.

Page 272

1       Q  Yes.  Will the FDA grant new product
2   approvals while a company is under a warning letter?
3       A  Quite likely not but in theory they could.
4       Q  In your experience have you ever seen that
5   happen?
6       A  No.
7       Q  You were -- were you told by Plaintiffs'
8   lawyers in this -- as you were preparing your report for
9   this litigation that after the 2007 inspection that we
10  talked about earlier eight to ten new product approvals
11  were granted by the FDA to Actavis Totowa within two
12  months after that?
13      A  No, I don't recall that.
14      Q  Were you told by the plaintiffs' lawyers
15  that the outcome of that inspection is that the warning
16  letter that had been in effect since early 2007 was
17  lifted?
18      A  I wasn't told.  I have information that
19  I've been reviewing.
20      Q  And you saw the outcome of that 2007
21  inspection was VAI, correct --
22      A  Yes.
23      Q  -- voluntary actions indicated?
24      A  Yes.
25      Q  So if Quantic did a review of Digitek

Page 273

1   batch records as part of a project for which they were
2   hired by Actavis in 2007 and that review included
3   recalled batches, that's of no interest to you in
4   evaluating Digitek?
5       A  It's of interest to me, but what is more
6   interest is what the FDA says.  Quantic is coming in to
7   fix it and if someone comes in and says, hey, that's
8   great, they can market it, I want to see what the FDA
9   says, because the FDA is the regulatory body.  Quantic
10  isn't.
11      Q  Quantic is not coming in to fix it.
12  They're coming in to review what had already been
13  released.
14      A  They do both and I wasn't sure what they
15  did here.
16      Q  Well, what they did here was review what
17  had already been released.  So let me start that over a
18  little bit.
19      If Quantic came in and reviewed batch records
20  for Digitek that had been released to market to
21  determine compliance, is that something you'd want to
22  see as you evaluate Digitek?
23      MR. MILLER:  Objection, asked and
24  answered.
25      A  It would be helpful to see, but I want to

69 (Pages 270 to 273)

James J. Farley                                                                                          June 28, 2010

Page 274

1  see what the FDA says.  We keep coming back to this.
2      Q   But Quantic was hired at the request of
3  the FDA and the results were submitted to the FDA.
4          Would that be of significance to you?
5          MR. MILLER:  Objection, asked and
6  answered.
7          MR. ANDERTON:  It hasn't been asked and
8  answered, Pete.  Not close to asked and answered.
9      A   I thought it was.  So I guess I better --
10  let me think.  It would be of interest to me, but it
11  wouldn't be absolutely necessary.  I read a series of
12  483s and a couple of warning letters and I have a very
13  low opinion of the capabilities of the company.
14      Q   Based on that review of those 483s --
15      A   Those several 483s --
16      Q   -- and the warning letter.
17      A   -- and the various EIRs.  And if a company
18  like Quantic is coming in to review the batch records, I
19  say fine.  And if you say what's the company look like,
20  let me see the latest thing from FDA that says they're
21  good again.
22          But -- so that's why I don't think that I miss
23  what they -- I know they're good.  I know what they do.
24  And they do in some cases help prepare, actually put
25  people in position.

Page 275

1          And -- but I didn't have to see that.  It
2  won't change my judgment of what was and what needs to
3  be to have a quality product on the market.
4      Q   Let's turn to your report.  Again my copy
5  has disappeared.  Will you turn to page 17, Mr. Farley?
6      A   I am at 17.
7      Q   What is the purpose of the comments
8  section of this report?
9      A   My comments -- I didn't know who all was
10  going to read this, how familiar the people would be
11  with the pharmaceutical industry.
12          And in this regard I do remember I asked Peter
13  Miller, I said, in doing my report I don't know the
14  whole readership of this and I would like to put in a
15  comments section that's going to maybe make it a little
16  more worthy, but I feel it will explain things.
17          And the reply was something to the effect of,
18  whatever tells the story when in doubt.  So I requested
19  the okay to put a comments section in for the reason I
20  just mentioned.
21      Q   Okay.  So those aren't part of your
22  official expert opinions in this case.  They're
23  background information that you feel helps tell the
24  story and allows the reader who might not have FDA
25  experience to have a better understanding of the

Page 276

1  opinions you've offered which are in the conclusion
2  section.
3          MR. MILLER:  Object to form, misstates
4      previous testimony.
5      A   I got lost somewhere in that question.
6          MR. ANDERTON:  Will you please read that
7      back and read it relatively slow so that I can
8      understand it as well.  I need it slow.
9      (The record was read back as requested.)
10      A   There are facts and opinions in here.  I
11  do some quotes, which, of course, are facts.  And then
12  I'm looking to see where -- well, just statements.
13  Recalls are actions taken by a firm.  I'm reading D.
14  What I am doing is exploring that are these my opinions.
15  I'm looking to see if I have opinions in here.
16      Q   So I think your testimony is that you do
17  have opinions in your comments section.
18      A   I'm looking here where I have that total
19  failure thing again.  When I say to have a total failure
20  such as this indicates there's no product of this
21  company at that location that can be relied on, that's
22  my opinion.  I'm sure it's shared by many, many, many
23  people that I work with.  But you could classify that as
24  an opinion.
25      Q   Okay.  So let's work our way through these

Page 277

1  then.  That Paragraph A on page 17, it's accurate to say
2  that that's based entirely on that -- the notes of that
3  close-out meeting, correct?
4          MR. MILLER:  Objection, asked and
5      answered.
6      A   Based on that three- or four-page --
7      Q   Yes.
8      A   -- correspondence that we saw?  I saw
9  somewhere else somewhere Robert Wessman and agreement.
10  Other than that I just can't remember it now, so --
11      Q   Well, you've indicated here that you're
12  quoting Plaintiffs' Exhibit 106.
13      A   I am.
14      Q   And you're not referring to any other
15  document and you're using quotes.
16      A   I did in there, right.  Yes.  Everything
17  you said is correct.
18      Q   So this paragraph refers exclusively to
19  Plaintiffs' Exhibit 106?
20      A   But I saw Wessman's name somewhere else
21  and I'm just not clicking whether I relate it to this.
22  But predominantly that three- or four-page
23  correspondence, unsigned and undated on Actavis
24  letterhead.
25      Q   Well, how can -- Mr. Farley, let's not

70 (Pages 274 to 277)

PLAINTIFFS' EXHIBITS 008186

James J. Farley                                                                                                  June 28, 2010

Page 278

1  throw common sense out the window.  Okay?
2         A  Right.
3             MR. MILLER:  Object to form.
4         Q  In the first sentence here you refer
5  exclusively to Plaintiffs' Exhibit 106.  And the rest of
6  the text until your opinion is in quotes.
7             MR. MILLER:  Is that a question?
8         A  What is -- I don't understand the
9  question.
10        Q  So how can it not be true that that
11 paragraph and that opinion is based entirely instead of
12 just predominantly on Plaintiffs' Exhibit 106 when you
13 refer to it and then quote exclusively from it?
14        A  It quite likely is exclusively from it,
15 but I remember reading the name Wessman somewhere else.
16 And I may have incorporated some of that in there, if in
17 fact I'm correct.
18        Q  So you may have incorporated some of that
19 in there even though you refer to a document and then go
20 on to quote from it twice.  So the reader is supposed to
21 understand that the next comment actually incorporate --
22 and then in the next sentence you go back and quote from
23 it again, to have a total failure.
24        Do you see that?
25        A  Yes.

Page 279

1         Q  Okay.  That's another quote from
2  Plaintiffs' Exhibit 106.
3         A  From Plaintiffs' 106.
4         Q  So the reader is supposed to be able to
5  understand that you've actually, perhaps implicitly, but
6  without giving anything that would indicate such worked
7  information from another document into that comment?
8             MR. MILLER:  Object to form.
9         A  I did not work information from another
10 document into that.
11        Q  Okay.  Then my question stands.  Is it
12 accurate to say that the comment in Paragraph A is based
13 entirely on Plaintiffs' Exhibit 106?
14        A  To the best of my knowledge, yes.
15        Q  Okay.  Now, this total failure comment
16 that is in the Plaintiffs' Exhibit 106 which we talked
17 about earlier, it doesn't appear in an EIR, does it?
18        A  It appears in -- well, the Actavis
19 document is quoting from what, the lady's name, Erin,
20 the inspector, either wrote or said.
21        Q  My question is, does it appear in an EIR?
22        A  I don't remember if it's written or said.
23        Q  Wouldn't you have cited and quoted that if
24 it appeared in an EIR?  I mean, that's a little more
25 official than scribed notes, right?

Page 280

1             MR. MILLER:  Object to form.
2         A  I may or may not have.
3         Q  Total failure would be the opinion of the
4  investigator, right?
5         A  Since Actavis -- go ahead.
6         Q  Total failure would be the opinion of the
7  investigator, right?
8         A  Yes.  And I think I read that somewhere.
9         Q  You did, in Plaintiffs' Exhibit 106 to the
10 extent it's accurate.
11        A  I believe that whoever wrote that was
12 referring to what Erin, the inspector, said to him or
13 her.
14        Q  Okay.  But I'm now -- I'm simply trying to
15 ask you, Mr. Farley, and if you just pay very close
16 attention --
17        A  I'm trying.
18        Q  -- I'm trying to ask you whether it
19 appears in another document.  That's not that difficult
20 a question, yet you're so intent on not conceding this
21 that you're just ignoring my question and answering
22 whatever question you want.
23        A  Can I see Plaintiffs' 106?
24        Q  Can you see it?
25        A  Yeah.

Page 281

1         Q  You absolutely may.  You absolutely may.
2         A  I can't find Plaintiffs' 106.  I've got a
3  big pile here.  Let me look through my pile.  106,
4  page 1, whoever the author was is referring to Erin
5  McCaffery and seems to be quoting -- she puts total
6  failure in quotes -- leading me to believe that Erin
7  McCaffery said or wrote it.
8         Q  Now, my question is, that total failure
9  comment doesn't appear in an EIR, does it?
10        A  I don't remember if it's in an EIR.
11        Q  Well, the document will speak for itself.
12        A  Yes.
13        Q  But it either does or it doesn't, right?
14        A  It either does or doesn't.
15        Q  And that would be the opinion of the
16 investigator, right?
17        A  She would be reflecting an opinion based
18 on facts that she observed.
19        Q  So it wouldn't belong in an EIR if it's
20 there, right?
21        A  They're not supposed to put opinions.
22 You're not supposed to put opinions on 483s.  You're
23 supposed to put facts on 483s and you're only supposed
24 to put facts on EIRs also.
25        Q  So it doesn't belong in either an EIR or a

71 (Pages 278 to 281)

PLAINTIFFS' EXHIBITS 008187

1  483.
2              MR. MILLER:  Object to form.
3       A  That is correct.
4       Q  And in fact, it doesn't appear in either
5  the EIR or the 483, does it?
6       A  I don't -- apparently Erin McCaffery
7  either wrote it or said it, because she's being quoted.
8  That's why I put the single quotes in there.
9       Q  Okay.  In Comment A you refer to products
10  with no impurity profile.  Do you see that?
11      A  48 products with no impurity profile.
12      Q  Was Digitek one of those products?
13      A  Don't know.
14      Q  You didn't review any batch records to
15  find out, did you?
16      A  Did not have to.
17      Q  You didn't review any batch records to
18  find out, did you?
19      A  Correct.
20             MR. MILLER:  Objection.
21      Q  Paragraph B --
22      A  Yes.
23      Q  -- you quote from a complaint for
24  permanent injunction and then you offer a comment.  Now,
25  you authored an article with lawyers.  I assume you've

1  been around enough to know, and you worked for FDA for
2  eight years, you know a complaint is nothing but
3  allegations, right?
4              MR. MILLER:  Object to form, calls for a
5  legal conclusion.
6       A  I'm thinking of that.  The way you have it
7  worded I'd say it's an allegation.
8       Q  Allegations are -- statements in a
9  complaint are allegations, right?
10      A  Yes.
11      Q  Untested, unproved.
12             MR. MILLER:  Object to form.
13      A  Yes.
14      Q  Your comment in Paragraph B, this leads
15  any responsible person to ask why didn't they fix what
16  was broken.
17      A  Yes.
18      Q  Did one of Plaintiffs' lawyers suggest
19  that things were broken at Actavis to you?
20      A  No.
21      Q  Did you ever talk to a gentleman named Ed
22  Blizzard?
23      A  No.  I've read that name in depositions.
24      Q  Okay.
25      A  He's an attorney?

1       Q  He is an attorney.
2       A  I've never spoken to or met the gentleman.
3       Q  Okay.  We spent a lot of time going
4  through the EIR for the 2007 inspection.  Do you
5  remember that?
6       A  Yes.
7       Q  Fifteen observations.  Every one Actavis
8  proposed and implemented corrective actions in response
9  to every one.  Do you remember that?
10      A  I don't remember implementing them.  What
11  I saw was, here's what we're going to do, here's what
12  we're going to do here, here's what we're going to do,
13  we hire this many people.
14             And then I was trying to say time will tell if
15  it works out if they really do it.  But at that instant
16  in time that's what they proposed.
17      Q  Okay.  Mr. Farley --
18      A  We had a difference there.
19      Q  Mr. Farley, it isn't what they proposed;
20  it's what they did.  There's a difference between doing
21  and your notion of time will tell whether it is the
22  absolute effective solution.
23             You understand that, right?
24             MR. MILLER:  Object to form,
25  argumentative.

1       A  State your two points, now.
2       Q  You understand that, right, that there's a
3  difference --
4       A  Yes, I do.
5       Q  Okay.  And if we have to go back through
6  that again and convene for another day of deposition,
7  I'm happy to do that.
8       A  Fine.
9       Q  The record will show what it shows.
10      A  Yes.
11      Q  But in fact, the EIR shows 15
12  observations, 15 sets of corrective actions actually
13  taken by Actavis, doesn't it?
14      A  Taken, started at that time.
15      Q  Yes.
16      A  Yes.
17      Q  None of them indicated by -- nowhere does
18  the FDA indicate that additional corrective actions are
19  necessary.
20      A  Not if they work out.
21      Q  Well, but the FDA is saying no corrective
22  actions are necessary.  You gave that testimony in
23  response to all 15.  You're not going to go back on
24  that, are you?
25             MR. MILLER:  Object to form.

72 (Pages 282 to 285)

PLAINTIFFS' EXHIBITS 008188

James J. Farley                                                          June 28, 2010

Page 286

1     A  I'm not.
2         MR. MILLER:  Misstates previous
3     testimony.
4         A  But the FDA is also saying back at their
5  district office, let's get the calendar and look when
6  we're going to inspect them to make sure those
7  corrections work out.
8     Q  Okay.
9     A  That's the point that I'm trying to make.
10    Q  And I'm not suggesting that they are
11 absolved of compliance on all those issues forever.
12    A  Yes.
13    Q  I merely want to explore the notion of
14 whether corrective actions were taken.
15    A  They were.
16    Q  Absolutely were.
17    A  We agreed on that step by step, every one.
18    Q  All the way through.
19    A  Sure.
20    Q  Go to Paragraph C.
21    A  I'm there.
22    Q  It's not true that companies hire third
23 parties only when they can't achieve compliance by
24 themselves, is it?
25    A  You say it's not true?

Page 287

1     Q  Yeah.
2     A  Correct.  It is not true.  They hire third
3  parties to help them out whenever they feel they need
4  them, not necessarily when they have a problem.
5     Q  Okay.  And sometimes they hire them just
6  because maybe they want to expedite something and they
7  don't necessarily have the resources themselves to do it
8  and they want some assistance making sure something
9  happens within a time frame that they need to
10 accomplish, correct?
11    A  Yes.
12    Q  Have you ever been hired for that purpose?
13    A  Yes.
14    Q  How many times?
15    A  A few times every year for a variety of
16 things, reviewing internal documents, evaluating a
17 contract manufacturer or contract packager.  It varies
18 as to what they need you for.
19    Q  Okay.  And you also can hire a GMP expert
20 to evaluate your methods and facilities and controls
21 just because you want to conduct some sort of
22 evaluation, correct?
23    A  Yes.
24    Q  And that happens?
25    A  Yes.

Page 288

1     Q  So it's not true that that happens only in
2  the context of a consent decree.
3     A  Correct.
4     Q  You're aware that all of the other
5  products made by Actavis Totowa other than Digitek were
6  recalled at some point during 2008, right?
7     A  Yes.
8     Q  Are you aware that was not a consumer
9  level recall?
10    A  Yes.
11    Q  Patients were instructed to continue
12 taking those products?
13    A  Yes.
14    Q  By the FDA.
15    A  Yes.
16    Q  Why would the FDA do that?
17    A  Were permitted to by the FDA, I would say.
18    Q  Well --
19    A  If you want to say instructed, I'm saying
20 permitted.
21    Q  Press releases announcing recalls are
22 submitted and approved by the FDA, correct?
23    A  You're not talking about these unsigned
24 things that you saw on the Web that you showed me?
25    Q  No.  I'm talking about the official press

Page 289

1  release --
2     A  Official press release?
3     Q  -- where a recall is announced.
4     A  Yes.
5     Q  Submitted to and approved by the FDA,
6  right?
7     A  Yes.
8     Q  So the press release -- the press release
9  that announced the recall of the products other than
10 Digitek was submitted to and approved by the FDA?
11    A  Yes.
12    Q  Had to be.
13    A  Oh, yes.
14    Q  So it told consumers to continue taking
15 all those products submitted to and approved by the FDA,
16 right?
17    A  Yes.  That took a minute, but then it
18 kicked in to my memory.
19    Q  Okay.  Let's go back to this comment
20 about -- you keep wanting to say that sometimes the FDA
21 will let a product go to market if it's necessary.
22       What's the basis for that statement?
23    A  Let's say that a particular firm, Firm A,
24 makes a product and it has 80 percent of the market of
25 that product.  But Firm A now encounters a problem with

73 (Pages 286 to 289)

PLAINTIFFS' EXHIBITS 008189

James J. Farley                                                                        June 28, 2010

Page 290

1   that.
2        But if Firm A were to be shut down there would
3   be patients who couldn't get the product because the
4   only other firm that makes it doesn't make enough of it
5   and can't get gear's up to do it.
6        So the FDA will then come.  And remember I
7   said put work with in quotes.  They'll work with them in
8   giving them more guidance in how can we approve things
9   to get them out to the people who need it.  That's what
10  I was referring to.  They're rare cases indeed, but they
11  do happen.
12       Q   Well -- and ultimately the only thing that
13  really matters is GMP compliance, right?
14       A   That's right.
15       Q   So it doesn't matter whether the product
16  is important or not.  If you don't have GMP compliance
17  it's not going to market.
18       A   That's correct.
19       Q   Now, you keep -- or you've referred
20  several times and I believe earlier you actually said an
21  observation you use interchangeably with a violation on
22  a 483.
23       A   In conversation I use it interchangeably.
24       Q   Okay.  I guess that's a qualification on
25  your earlier testimony then.  So I need to make clear.

Page 291

1   And we talked about this a little bit earlier.
2        An observation on a 483 is not -- is not even
3   intended to reflect an actual violation.  It's just the
4   observation of the inspector about some condition that
5   they want to see changed.
6        A   That they want to see changed because it's
7   violative.
8        Q   Well, will you look at your report on page
9   18, Mr. Farley.
10       A   Page 18?
11       Q   Yeah.
12       A   I'm there.
13       Q   And you, in Paragraph E on the Fact versus
14  Opinion --
15       A   Yes.
16       Q   -- you quote the Investigations Operations
17  Manual, Section 5.2.3.3 as reading, Do not -- quote, Do
18  not report opinions, conclusions or characterize
19  conditions as violative.  The determination of whether
20  any condition is violative is an agency decision made
21  after considering all circumstances, facts and evidence.
22       Do you see that?
23       A   I see it.
24       Q   Did I read that correctly?
25       A   You read it correctly.

Page 292

1        Q   I have the section here as an exhibit, but
2   do you believe you accurately quoted that --
3        A   I believe I accurately quoted that.
4        Q   -- operations manual?  So the operations
5   manual tells inspectors, whatever you write don't
6   indicate it as a violation, we'll do that after the --
7   somewhere down the line, right?
8        A   Say that again.
9        Q   The operations manual is saying here to
10  inspectors, whatever you write don't indicate it as a
11  violation, we'll figure out whether it's a violation
12  later.
13       A   I have to explain what that means.
14       Q   What what means?
15       A   What that means, they determine as
16  violative.
17       Q   It means that they haven't made a
18  determination as to whether it's a violation.
19       MR. MILLER:  Are you testifying for him?
20       A   It's, it's the way the system is set up.
21  The inspectors come back from an inspection along with
22  the scientists.  The scientists go to the lab visiting
23  the inspectors periodically to help with the report.
24       The compliance division, which is -- exists as
25  another division within the district, their

Page 293

1   responsibility is to determine the classification.  Is
2   it NAI, no action indicated; is it VAI; is it OAI,
3   official action indicated?  It's their area.
4        So in not treading into their work area it's
5   essentially, you do the inspection, you make your
6   observations.  They don't doubt them.  They just say,
7   make your observations.  But then it comes to this area
8   to look at it and determine whether it's a NAI, VAI or
9   OAI.
10       Q   This doesn't say anything about NAI, VAI
11  or OAI, does it?
12       A   But the violative status that -- it's just
13  a matter of responsibilities.  We will over here
14  determine if it's violative.  You wrote it, you know it,
15  anybody that reads it knows it, but over here we are the
16  ones who officially make it violative.
17       Q   And until you get over here where you make
18  that official determination it's not violative.
19       A   And over here is right across the hall.
20  It would be like right over there.
21       Q   I understand, but that happens after the
22  483 is issued.
23       A   Legally that's the process.  In the
24  regulatory system that's the process.
25       Q   So yes.  The answer is yes.

74 (Pages 290 to 293)

James J. Farley                                                                        June 28, 2010

Page 294

1    A   Yes.
2    Q   It happens after the 483 is issued.
3    A   Yes.  Everybody knows it's going to be,
4  but it isn't official until it goes across the hall and
5  they do it.
6    Q   Paragraph F.
7    A   Yes.
8    Q   When you use the term systemic -- well,
9  when you say in the last sentence there all products,
10 including Digitek, were adulterated -- you see that --
11   A   Yes.
12   Q   -- did you -- you didn't review any
13 Digitek batch records to reach that conclusion.
14   A   I reviewed one Digitek batch record, but
15 that did not come into this conclusion.
16   Q   Well, this conclusion flows exclusively
17 from FDA documents.
18   A   Yes.  In fact, it's not in the conclusion
19 section.  It's in the comments section.
20   Q   This comment flows exclusively from your
21 review of FDA documents.  You took the FDA at their
22 word.
23   A   Yes.
24   Q   You didn't do anything to follow up and
25 specifically determine whether Digitek was adulterated.

Page 295

1    A   Looking at failure to -- when you're not
2  manufacturing in compliance with GMPs, by definition in
3  the Act it's adulterated.
4    Q   You didn't do anything to follow up and
5  find out whether Digitek other than Batch 70924 --
6         MR. MILLER:  Object to form.
7    Q   -- had not been -- had been manufactured
8  not in compliance with GMPs.
9         MR. MILLER:  Object to form, misstates
10    previous testimony.
11   A   I didn't do anything beyond all the other
12 483 -- reading the 483s and -- well, I was looking for
13 everything in there, not just for Digitek.
14   Q   I understand that.  But we talked earlier
15 about what you do when you find that situation and you
16 want to associate it with a specific product, you go
17 look at the records for that product.  You didn't do
18 that.
19   A   The way you have worded the question, no,
20 I didn't do that.  I looked at the batch record for that
21 one lot.
22   Q   Blend Uniformity, Paragraph G.
23   A   Yes.
24   Q   You talk about the products that were
25 temporarily discontinued due to blend uniformity and/or

Page 296

1  content uniformity issues.
2    Q   Do you see that?
3    A   I see it.
4    Q   Was Digitek one of those products?
5    A   I just don't recall offhand.  Perhaps I
6  should, but I just don't recall offhand.
7    Q   Okay.  Well, don't you think you would
8  have said that if it was in your comment?
9    A   I may or may not.
10   Q   Did you see any Digitek batch records that
11 indicated out of specification results for content
12 uniformity for Digitek?
13   A   I don't believe I saw any of them, but I
14 do believe I saw someone questioning blend uniformity.
15 And it was correspondence between two individuals, but
16 with 93 documents I'm at a loss to tell you.
17   Q   So the answer to my content uniformity
18 question is, no, you didn't see any documents
19 questioning the -- or indicating out of specification
20 results for content uniformity for Digitek.
21   A   Not indicating.  There was someone
22 questioned it.
23   Q   Content uniformity or blend uniformity?
24   A   Content.  There was content uniformity and
25 blend uniformity somewhere in all those documents.  But

Page 297

1  I -- your question was did I see any.  No.
2    Q   Blend uniformity actually isn't required
3  for all products in the market, is it?
4    A   Could you explain that answer, blend
5  uniformity determination?
6    Q   What?
7    A   Blend uniformity determination -- blend
8  uniformity is required.
9    Q   Blend uniformity testing isn't required
10 for all products in the market, is it?
11   A   You would not need it for a liquid
12 injectable.  Your sampling procedure would take care of
13 that.
14   Q   The FDA will allow companies to not test
15 for blend uniformity in certain circumstances; isn't
16 that correct?
17   A   They won't allow them to not test for it,
18 but your question is blend uniformity is the way I heard
19 it.
20   Q   I said -- I revised my question,
21 Mr. Farley, to ask --
22   A   Oh.  You revised the question.
23   Q   -- blend uniformity testing is not
24 required for all products in this market, correct?
25   A   Correct.

75 (Pages 294 to 297)

James J. Farley                                                               June 28, 2010

Page 298

1      Q   Including things other than liquids,
2  correct?
3      A   Correct.
4      Q   So there are solid oral dose tablets that
5  are dry blends --
6      A   Yes.
7      Q   -- where the FDA allows companies to not
8  test for blend uniformity, correct?
9      A   Yes.
10      Q   And will you look at Defendants'
11  Exhibit 58?  It is the 2008 483.
12      A   I'm looking through.  Didn't get it yet.
13      Q   Perhaps Mr. Miller can lend some
14  assistance.
15          MR. MILLER:  You're getting hotter.
16          THE WITNESS:  What's the exhibit number?
17          MR. MILLER:  It's in that pile right
18  here.
19          THE WITNESS:  Which exhibit number is it?
20          MR. ANDERTON:  58.
21          MR. MILLER:  No, the next one.  It should
22  be this one here.  Is that 2008?
23          THE WITNESS:  May of 2008, Erin
24  McCaffery?
25          MR. ANDERTON:  Yes.

Page 299

1          THE WITNESS:  I've got it.
2  BY MR. ANDERTON:
3      Q   Turn to page -- well, I can't read the
4  number myself.  Let's call it 6.  And the number down in
5  the bottom right corner should be 28230.
6          Do you see that?  It's cut off.  The zero is
7  cut off.
8      A   Yes.  The zero is cut off.  It contains
9  primarily Observation 4 --
10      Q   Correct.
11      A   -- and part of Observation 3.
12      Q   Correct.
13      A   I've got it.
14      Q   Do you see Observation 4a refers to blend
15  uniformity and particularly Digitek?
16      A   Yes.
17      Q   And I'm going to read that out loud.  It
18  says, Although three out of specification results -- and
19  I'm going to skip the batch numbers, but -- Although
20  three out of specification results were obtained for
21  blend uniformity at the right top sample location for
22  Digoxin tablets .125 milligrams -- and then it has the
23  lots which I'm skipping -- on February 20, March 14 --
24  February 20, 2007, March 14, 2007, and September 29,
25  2007, no manufacturing investigations were conducted.

Page 300

1      Q   Did I read that correctly?
2      A   Yes.
3      Q   So the issue the FDA has here is not that
4  there were out of specification results for blend
5  uniformity, it's that there were no manufacturing
6  investigations conducted.
7          MR. MILLER:  Object to form.  The
8  document speaks for itself.
9      A   It says three out of specification -- the
10  very first line.
11      Q   That's what happened.  But the reason the
12  FDA cites this fact, or these facts, is not because
13  there happen to be three out of specification results.
14  It's because they didn't conduct manufacturing
15  investigations.
16          MR. MILLER:  Object to form.
17      A   The way this is written they didn't
18  perform under the Corrective Action/Preventive Action
19  program and investigate these results as they should
20  have.
21      Q   Right.  So the problem, if you want to
22  call it a problem, that resulted in this observation is
23  not the mere fact that there were out of specification
24  results, correct?
25          MR. MILLER:  Object to form.  The

Page 301

1  document speaks for itself.
2      A   It says although they were obtained you
3  didn't look at them.
4      Q   Okay.  So the FDA is not taking any issue
5  with -- I'm trying to establish something, Mr. Farley.
6  And you're an expert in this field.  You counsel clients
7  on reading these documents.
8      A   Yes.
9      Q   And you charge them a nice handsome fee to
10  do that.
11      A   Comfortable.
12      Q   The issue that resulted in this
13  observation is not the mere fact that there was an out
14  of specification result three times in blending Digoxin,
15  correct?
16      A   Yes, yes.
17      Q   All right.  And this next sentence,
18  Additional samples were used to retest the blend and
19  were reported.
20          Do you know whether that's called for by the
21  relevant SOP?
22      A   I would think it would have to be where in
23  the blend you were doing it, what time of the blend you
24  were doing it.  If you were nearly ready to take the
25  blend and press out the tablets that's one thing.

76 (Pages 298 to 301)

James J. Farley                                                          June 28, 2010

Page 302

1    If it's an intermediate sample, like just say
2 a 30-minute mix, take one sample after 15 minutes and
3 you should be in this range, then you'd have to write
4 your specifications, your SOPs in accordance with that
5 part of the process.
6       Q   Mr. Farley, please --
7       A   I'm trying.
8       Q   Do you know whether the SOP for blend
9 uniformity testing allows retesting of sample -- of
10 extra samples taken?
11      A   I do not know what their SOP says.
12      Q   Did you review their SOP?
13      A   I do not remember seeing it.
14      Q   Did you see any SOPs from Actavis?
15      A   I don't -- if I did it's only a few, but I
16 don't remember any.
17      Q   Okay.  So you rendered an expert opinion
18 about the GMP compliance status of Actavis and didn't
19 review a single SOP.
20      A   To my knowledge I didn't review the SOPs.
21      Q   Didn't ask for them either.
22      A   I relied on what the FDA said.  The FDA
23 said you're not in compliance with your SOPs, the ones
24 you have.
25      Q   How was Digitek adulterated?

Page 303

1       A   By not being manufactured in accordance
2 with GMPs.
3       Q   Which GMPs?
4       A   Which?  21 CFR 211.
5       Q   All of them.
6       A   No.  That's the set.
7       Q   Which of those was Digitek not
8 manufactured in compliance with?
9       MR. MILLER:  Take your time.  If you need
10   to go through all the documents we'll get all the
11   documents.
12      Q   Absolutely right.
13      A   This is --
14      MR. MILLER:  If you need help with the
15   documents, like he just said, I'll help with the
16   documents.  We'll get them all out and you can go
17   right down the list.
18      A   I mean, I know I can come up with the
19 answer.  I'm just trying to think and give you the
20 answer of the correct one, of course.
21      MR. MILLER:  Well, it's not a memory
22   test.  We can go through each and every --
23      A   The primary one, the one that jumps to
24 mind, is the Corrective Action/Preventive Action, not
25 looking at out of specification results as thoroughly --

Page 304

1       MR. ANDERTON:  Pete, what are you doing?
2       MR. MILLER:  I'm helping him.  You asked
3 me a minute ago to help him with documents.  I'm
4 helping him with documents.
5       MR. ANDERTON:  Pete, we work with
6 exhibits in this context.  You don't just sit down
7 in front of a witness and start randomly putting
8 documents --
9       MR. MILLER:  I'm not randomly doing
10 anything.  He brought documents at your request
11 today.  These are documents that he brought at
12 your request today and now he's trying to answer
13 your question.
14      MR. ANDERTON:  I asked him a question.
15 He's trying to answer it.  If he wants to review
16 documents he'll let me know, Pete.
17      MR. MILLER:  Well, I'm objecting --
18      MR. ANDERTON:  Put the binder away.
19      MR. MILLER:  It requires --
20      MR. ANDERTON:  Put the binder away.
21      MR. MILLER:  I'm not putting the binder
22 away.  If the man wants to look at the binder --
23      MR. ANDERTON:  I'm going to reach across
24 the table -- Pete.
25      MR. MILLER:  He's going to reach over and

Page 305

1 grab it and if you need it to answer the question
2 you ask for it and he'll give it right back to
3 you.  Watch how this works.
4 BY MR. ANDERTON:
5       Q   Mr. Farley --
6       MR. MILLER:  Would you like to see the
7 binder, Mr. Farley, to answer the question to be
8 fair?
9       THE WITNESS:  I'm not sure, but I didn't
10 touch the binder.
11      MR. MILLER:  Well, it doesn't matter who
12 touches the binder.  You just answer the question.
13      THE WITNESS:  I want to think about it
14 for a minute.  I want to hear the question again
15 and I want to think about my answer and then maybe
16 I'll ask to see some documents.
17 BY MR. ANDERTON:
18      Q   Okay.  How was Digitek adulterated?
19      A   And my answer was generally not being
20 manufactured in compliance with GMPs.  And then I think
21 you said specifically point out the instances.
22      Q   Well, let me ask it a different way, or
23 another question.  Never mind.  You use -- if you'll
24 turn to page 19 of your report, first conclusion.
25      A   I'm on 19.

77 (Pages 302 to 305)

PLAINTIFFS' EXHIBITS 008193

James J. Farley                                                                June 28, 2010

Page 306

1    Q   And you -- the last sentence you talk
2  about deviation -- or I'm sorry -- you talk about
3  violations and then you go on to say in the last
4  sentence, All of these are shown to recur, thereby
5  indicating that no corrective actions were made.
6        Did I read that last sentence correctly?
7    A  I'm looking for where --
8        MR. MILLER:  Which paragraph?
9    Q  Page 19, the first conclusion.
10       MR. MILLER:  Thank you.
11   A  I apologize.
12   A  I'm going to read the paragraph to myself.
13   Q  Take your time.
14   A  I've read it.
15   Q  Okay.  The last sentence -- in the first
16 sentence you talk about -- I'm sorry.  In the second
17 sentence you talk about violations.  And then in the end
18 of the paragraph you say all of these, all of these, are
19 shown to recur, thereby indicating that no corrective
20 actions were made.
21       Did I read that last sentence correctly?
22   A  Yes.
23   Q  So it's your testimony that every single
24 violation recurred.
25   A  That is what I concluded after reading

Page 307

1  District Director Douglas Ellsworth's warning letter.
2    Q  Every single one?
3    A  He says -- I conclude that from it.  He
4  says these -- he mentions in the warning letter such and
5  such and these continue to recur, you have made no
6  effort to -- I forget the exact wording, but we can get
7  it and I can tell you.  But he says they're recurring.
8    Q  What warning letter are you referring to?
9  There's no warning letter after the 2008 inspection.
10   A  No.  Douglas Ellsworth's warning letter.
11 98 documents, I just --
12       MR. MILLER:  This paragraph doesn't
13    mention the 2008 inspection.
14   A  This paragraph refers to my overall
15 conclusion --
16   Q  Okay.
17   A  -- of the company itself.  I'm not
18 directing that to any inspection.  But the recurrence is
19 what I read plus what -- and I don't know Douglas
20 Ellsworth.  I'm just mentioning his name because he's
21 the district director.
22   Q  Okay.  The last sentence where you say, no
23 corrective actions were made, our discussion of the 2007
24 inspection and EIR shows that that's simply not
25 accurate, doesn't it?

Page 308

1    A  It -- my interpretation, if the corrective
2  actions worked you wouldn't have a recurrence of the
3  problem.  So therefore, they didn't work.
4    Q  So we are talking about 2008.
5        MR. MILLER:  Object to form, misstating
6    previous testimony.
7        MR. ANDERTON:  No, Pete.  This is in
8    forward.  It's the calendar.
9    Q  If you are assessing whether the
10 corrections in the 2007 inspection worked you've got to
11 go forward, right?
12   A  Yes.
13   Q  That would lead us into 2008.
14   A  Yes.
15   Q  So there was no warning letter after the
16 2008 inspection.
17   A  I'm trying to think of the date of the
18 last warning letter.  And your question was?
19   Q  So we're talking about 2008.  If your --
20 your use of the term recur means you're talking about
21 2008, right?
22   A  Yes.
23   Q  That was three minutes of too much work.
24   A  I just want to make sure that I'm giving
25 you the right answer --

Page 309

1    Q  I understand.
2    A  -- for everyone's sake.
3    Q  And if it's recurred -- you understand the
4  difference between recur and continue?
5    A  Yes.
6    Q  So if it's recurred that means it's
7  happening again, not --
8    A  Yes.
9    Q  -- continued to happen since the last
10 time.
11   A  Yes.
12   Q  So it isn't true to say that something
13 that recurs means no corrective action was made.  I can
14 correct something and if it happens again it happens
15 again.
16   A  You try corrective actions and at some
17 point in time they didn't work.
18   Q  At some point in time it happened again.
19   A  Yes.
20   Q  That doesn't mean no corrective actions
21 were made, does it?
22   A  They weren't effective.  They didn't last.
23 I'm --
24   Q  How do you know -- how do you know that
25 the violation or the circumstance didn't occur for a

78 (Pages 306 to 309)

PLAINTIFFS' EXHIBITS 008194

James J. Farley                                                              June 28, 2010

Page 310

1    different reason?
2          MR. MILLER:  Object to form, asked and
3    answered.
4          A   Some of them are the same.  They're almost
5    word for word the same infraction, the same reasoning.
6          Q   All based on your review of the FDA
7    documents?
8          A   Of the whole 93 documents, many of which
9    were --
10         Q   None of which were production records for
11   any product manufactured by Actavis, correct?
12         A   One was the batch record.
13         Q   The single batch record of one lot.
14         A   That exception.
15         Q   Okay.  With that exception of that single
16   batch, none of which were production records, correct?
17         A   Correct.
18         Q   Do you know when Digitek was recalled?
19         A   I read it in the data.  I'm at a loss
20   offhand for the exact date.
21         Q   If I say April 28th -- I'm sorry --
22   April 25, 2008, do you have any reason to dispute that?
23         A   I have no reason to dispute that.
24         Q   Does that sound about right, April 25?
25         A   Sounds about right.

Page 311

1          Q   Okay.  Do you know when the inspection
2    ended?
3          A   May of '08.  Is that the one you're
4    referring to?
5          Q   Yes, May 20 of '08.
6          A   Yes.
7          Q   Turn to the last conclusion in your
8    report.
9          A   The very top of page 20 above my
10   signature?
11         Q   Correct.
12         A   I have it.
13         Q   It reads, Patients have no assurance of
14   the proper quality of the Actavis products since they
15   were produced under non-compliant conditions in
16   violation of FDA regulation.
17         A   Yes.
18         MR. MILLER:  You left out the word many.
19         Q   I apologize.  Since many were produced
20   under non-compliant conditions in violation of FDA
21   regulations.
22         With that correction did I read that
23   correctly?
24         A   Yes, you did.
25         Q   Which many?

Page 312

1          A   Which many?
2          Q   Yeah.  Which products?
3          A   Whatever were produced in that plant
4    during that time period.  And I don't know all the
5    production records as to what was made during that time.
6    They were in a period of being non-compliant.
7          And I'm saying whatever they made during that
8    time when their quality system was not functioning --
9    Erin McCaffery said total failure; I'm saying not
10   functioning well -- that you can't trust the quality of
11   any product that was made during that time.
12         Q   Why did you say many and not all?
13         A   All would have been a very, very inclusive
14   term and I didn't really know that it was all.
15         Q   You just --
16         A   So I put many.
17         Q   So you don't really know that it's all.
18         A   I don't know that it's all.  That's why I
19   didn't write all.
20         THE VIDEOGRAPHER:  I'm going to go off
21   the record to change tapes, sir.  It's 5:35.  One
22   moment.
23         (Off the record.)
24         THE VIDEOGRAPHER:  This is the beginning
25   of Tape No. 8.  It's 5:36 p.m.

Page 313

1          MR. ANDERTON:  Mr. Farley, subject to my
2    review of the documents that were produced today,
3    the draft reports and such, at the moment I don't
4    believe I have any further questions.  I'm going
5    to leave the record -- Pete -- Mr. Miller is going
6    to make a responsive comment.  So don't get up and
7    leave just yet.
8          THE WITNESS:  I'm here.
9          MR. ANDERTON:  So I reserve the right to
10   reconvene this session on behalf of Defendants in
11   the event our review of those documents suggests
12   further examination based on those documents as
13   necessary.
14         THE WITNESS:  Yes.  I understand.
15         MR. MILLER:  To the extent your review of
16   documents you -- if you believe from that review
17   that you need to come back then I would say that
18   we restrict it obviously only to his documents.
19         But my position would be that I offered
20   up a vast majority of those documents before lunch
21   and certainly we could have gone over the rest of
22   them during lunch.
23         I think you've had ample opportunity to
24   review them.  But we'll look at this more as we go
25   forward and decide.

79 (Pages 310 to 313)

James J. Farley                                                          June 28, 2010

Page 314

1     MR. ANDERTON:  Well, actually -- before I
2 close the record -- I almost -- let's not mess
3 this up.  I don't have copies of those.
4     MR. MILLER:  You do.  It's on the thumb
5 drive.
6     MR. ANDERTON:  I need hard copies if I'm
7 going to introduce them as exhibits.  If you want
8 to minimize the -- I'm going to mark them and
9 introduce them.
10     MR. MILLER:  All right.  But you asked
11 for the thumb drive and we gave them to you on the
12 thumb drive.
13     MR. ANDERTON:  I understand.  I don't
14 have --
15     MR. MILLER:  I mean, there's not a
16 requirement to give you multiple copies.  You've
17 got copies.  And if --
18     MR. ANDERTON:  Can I take that and get
19 copies made, Pete?
20     MR. MILLER:  Yes.
21     MR. ANDERTON:  Okay.
22     MR. MILLER:  Well, I've got questions
23 before we close this.
24     MR. ANDERTON:  Well, I don't have time.
25 This --

Page 315

1     MR. MILLER:  I've got five minutes of
2 questions.
3     MR. ANDERTON:  Pete --
4     MR. MILLER:  You can sit here or not sit
5 here.  I've got five minutes of questions.
6     MR. ANDERTON:  We're past 5:30.  We've
7 got a PTL that says we cut off at 5:30.
8     MR. MILLER:  Well, I mean, I've got five
9 minutes.
10     MR. ANDERTON:  So it sounds -- no, Pete.
11 I'm not missing my flight.  I don't have --
12     MR. MILLER:  You're not going to miss
13 your flight.  I'm going to ask four questions.
14     MR. ANDERTON:  I don't have the ability
15 to --
16     MR. MILLER:  I'm going to ask these
17 questions.  So you do have the ability.  Just pack
18 up while I'm -- I'll be done before you get
19 everything packed up.  Okay?  Allow me to ask
20 these questions.
21     MR. ANDERTON:  Okay.
22     MR. MILLER:  Thank you.
23 Mr. Farley --
24     MR. ANDERTON:  Wait.  Before you do that,
25 we're going to mark these documents.  So if you

Page 316

1 want to -- I mean, she's got to mark these
2 exhibits.
3     I suggest actually we just allow her to
4 mark those.  She'll take them.  I'll get copies
5 from her and you can print new copies.
6     MR. MILLER:  I'll get copies from her as
7 well.  That's fine.  I have no problem with that.
8     MR. ANDERTON:  Okay.
9     MR. MILLER:  But let's mark them after I
10 get done with my time.
11     MR. ANDERTON:  Well, you can mark those
12 after we leave.
13     THE COURT REPORTER:  I can.
14     MR. ANDERTON:  Okay.
15     MR. MILLER:  Perfect.
16            - - - - -
17        CROSS EXAMINATION
18 BY MR. MILLER:
19     Q   Mr. Farley, you were asked extensively
20 about the EIR with the September 2007 FDA inspection.
21     Do you recall that?
22     A   Yes.
23     Q   And you were asked several times about the
24 corrections, voluntary corrections, that were put in
25 place from the 15 observations that were made on the

Page 317

1 previous inspection, correct?
2     A   Yes.
3     Q   And because observation -- or correction.
4 Because corrections have been proposed and implemented
5 as noted by the FDA, that doesn't mean that they are
6 successful; is that correct?
7     A   That's correct.
8     Q   Okay.  And ultimately following regulatory
9 investigations will determine if they were successful or
10 not; is that correct?
11     A   That's correct.  And that's the point I
12 was trying to make.
13     Q   Thank you.  And on your conclusions, sir,
14 looking at that first paragraph of conclusions -- and I
15 won't read them all.  But that first sentence of the
16 first conclusion, Based on the review of the documents
17 listed in this report I conclude that Actavis had
18 essentially no quality control over the products it
19 produced and shipped.
20     Did I read that correctly, sir?
21     A   Yes.
22     Q   And you base that opinion on all the
23 documents that you reviewed, correct?
24     A   Yes.
25     MR. ANDERTON:  Peter, are you leading --

80 (Pages 314 to 317)

James J. Farley                                                                                          June 28, 2010

Page 318

1    wait.
2          MR. MILLER:  You can object.
3          MR. ANDERTON:  I am objecting.  You've
4    got to give me a chance.
5          MR. MILLER:  All right.  I didn't hear
6    the word objection.  I'm sorry.
7          MR. ANDERTON:  Objection.  You're leading
8    the witness.
9    BY MR. MILLER:
10         Q   Was speculation required in any way in
11   determining your opinions?
12         A   My speculation?
13         Q   Yes.
14         A   No.  It was based on opinions from my
15   experience.
16         Q   Fair enough.  And that's true with all the
17   opinions that you have in this report; is that correct,
18   sir?
19         MR. ANDERTON:  Objection.  Again, are
20   you -- is this cross-examination?  Direct
21   examination?  What --
22         MR. MILLER:  I didn't hear objection.
23         MR. ANDERTON:  Objection, leading.
24         MR. MILLER:  Thank you.
25   BY MR. MILLER:

Page 319

1          Q   Did you have to speculate in any way on
2    all the opinions in this report?
3          A   I didn't speculate on anything.  I used my
4    opinion based on my best judgment and my years of
5    experience and knowledge.
6          Q   Did you feel you had a satisfactory amount
7    of information to make the opinions that you've rendered
8    in this report?
9          A   Yes, I do.
10         Q   Okay.  Was anything said today that
11   affected any of your opinions?
12         A   No.  While various other documents that I
13   had not seen were mentioned they, I believe, would not
14   affect my opinions.
15         Q   Okay.  And were all these opinions given
16   to a reasonable degree of scientific certainty?
17         A   Yes.
18         MR. MILLER:  That's all the questions I
19   have.
20              - - - - -
21         REDIRECT EXAMINATION
22   BY MR. ANDERTON:
23         Q   Okay.  I have a couple follow-up
24   questions, Mr. Farley.
25         A   I'm here.

Page 320

1          Q   Is GMP compliance evaluation a science?
2          A   It's not considered a science.  It's a
3    system like total quality management is a system.  It's
4    the FDA's equivalent of total quality management.
5          Q   So when you were asked a moment ago
6    whether they were rendered with a reasonable degree of
7    scientific certainty, what did you mean when you said
8    yes?
9          A   I interpreted that as Peter Miller was
10   asking me about my scientific knowledge, my work
11   experience.  That's how I interpreted that when I said
12   yes.  It's my scientific certainty.
13         Q   Yeah, but in the area of GMP compliance
14   it's not scientific knowledge.  It's, as you said,
15   specialized perhaps but not scientific.
16         A   Well, chemists, physicists and some other
17   scientists have what we call the scientific way of
18   thinking, the logical way of thinking.  And we're rather
19   proud of it, in fact.  And when I was asked if it's
20   scientific or whatever deduction, I said yes, meaning my
21   scientific way of thinking.
22         MR. ANDERTON:  Thank you.  I have no
23   further questions.  And again, I reserve the right
24   to reconvene based on --
25         THE WITNESS:  Yes.

Page 321

1          MR. ANDERTON:  But we're going to mark --
2          THE VIDEOGRAPHER:  Read and sign?
3          MR. MILLER:  Yes.
4          MR. ANDERTON:  We're going to mark the
5    documents in this binder -- how many are there?
6          MR. MILLER:  How many?  Several.  You
7    want to go by tab?  Each one of these is an
8    individual file on that thumb drive.  Like you're
9    going to see these are several documents.  But
10   each one of those is going to be --
11         MR. ANDERTON:  Okay.
12         MR. MILLER:  -- a document on the thumb
13   drive.  We'll just go by tabs.  We're going to
14   group each one in tabs.
15         MR. ANDERTON:  Okay.  So you can mark
16   the -- each tab in that white binder as an
17   individual document.  And those can be -- well,
18   let's call it Defendants' Exhibit 100, just to be
19   safe.  And start with 100 and go up.
20         And then the draft reports is, what I'll
21   call them -- I'm not sure they're actually drafts
22   according to Mr. Farley.  There are three.  You
23   can make those 45A, 45B and 45C.
24         THE COURT REPORTER:  Okay.
25         MR. ANDERTON:  Okay?  And then if you

81 (Pages 318 to 321)

PLAINTIFFS' EXHIBITS 008197

James J. Farley                                                                                    June 28, 2010

**Page 322**

1    will -- we'll contact you to get copies.
2         THE COURT REPORTER:  Okay.
3         MR. ANDERTON:  Okay?  Thank you very
4    much.
5         THE VIDEOGRAPHER:  All right.  The
6    deposition is concluded and it is 5:44 p.m.
7    (Defendants' Exhibit Nos. 45A, 45B, 45C, 100, 101,
8    102, 103, 104 and 105 were marked.)
9    (The proceedings were concluded at 5:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 323**

1              ERRATA SHEET
2
3         I, the undersigned, JAMES J. FARLEY, do hereby
4    certify that I have read the foregoing deposition and
5    find it to be a true and accurate transcription of my
6    testimony, with the following corrections, if any:
7
8    PAGE  LINE        CHANGE        REASON
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22
23         _____
            JAMES J. FARLEY        Date
24
25                   ASG

**Page 324**

1                 CERTIFICATE
2
3    GEORGIA:
4    CHATHAM COUNTY:
5
6         I, Angela S. Garrett, Certified Shorthand
7    Reporter for the State of Georgia, do hereby certify:
8         That the foregoing deposition was taken before
9    me on the date and at the time and location stated on
10   Page 1 of this transcript; that the witness was duly
11   sworn to testify to the truth, the whole truth, and
12   nothing but the truth; that the testimony of the witness
13   and all objections made at the time of the examination
14   were recorded stenographically by me and were thereafter
15   transcribed by computer-aided transcription; that the
16   foregoing deposition, as typed, is a true, accurate, and
17   complete record of the testimony of the witness and of
18   all objections made at the time of the examination.
19        I further certify that I am neither related to
20   nor counsel for any party to the cause pending or
21   interested in the events thereof.
22
23
24
25

**Page 325**

1         Witness my hand, I have hereunto affixed my
2    official seal this 6th day of July, 2010, at Savannah,
3    Chatham County, Georgia.
4
5         _____
            Angela S. Garrett, CSR, RPR
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82 (Pages 322 to 325)

James J. Farley                                                    June 28, 2010

```
 1        D I S C L O S U R E
 2      Pursuant to Article 8.B. of the Rules and
 3    Regulations of the Board of Court Reporting of the
 4    Judicial Council of Georgia, I make the following
 5    disclosure:
 6      I am a Georgia Certified Court Reporter.  I was
 7    contacted by my office of McKee Court Reporting, Inc.,
 8    to provide court reporting services for this deposition.
 9      I will not be taking this deposition under any
10    contract that is prohibited by O.C.G.A. 15-14-37(a) and
11    (b).
12      I have no contract/agreement to provide reporting
13    services with any party to the case, any counsel in the
14    case or any reporter or reporting agency from whom a
15    referral might have been made to cover the deposition.
16      I will charge its usual and customary rates to all
17    parties in the case, and a financial discount will not
18    be given to any party to this litigation.
19
20
21
22
23    _____    Date:  July 6, 2010
      Angela S. Garrett
24    RPR, CCR-B2407
25
```

PLAINTIFFS' EXHIBITS 008199