# EXHIBIT 513

PLAINTIFFS' EXHIBITS 008680

Page 327

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT LIABILITY
        LITIGATION
                                    MDL NO. 1968

_____


VOLUME II


     The continued videotaped deposition of JAMES J.

FARLEY taken by counsel for the Defendants, Actavis

Totowa, LLC, Actavis, Inc., and Actavis Elizabeth, LLC,

pursuant to notice and by agreement of counsel, reported

by Angela S. Garrett, CSR, RPR, B-2407, at the Embassy

Suites, 145 Mulberry Boulevard, Savannah, Georgia, on

January 19, 2011, commencing at 9:03 a.m.

PLAINTIFFS' EXHIBITS 008681

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 328

```
 1                  APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFFS:

 4
                 MIKE KERENSKY, ESQUIRE
 5               WILLIAMSON & RUSNAK
                 4130 Yoakum Boulevard
 6               Houston, Texas  77056
                 (713) 223-3330
 7               mike@jimmywilliamson.com

 8               MEGHAN JOHNSON CARTER, ESQUIRE
                 MOTLEY RICE, LLC
 9               28 Bridgeside Boulevard
                 Mt. Pleasant, South Carolina  29464
10               (843) 216-9383
                 mjohnson@motleyrice.com
11
                 DON ERNST, ESQUIRE (Via telephone)
12               ERNST & MATTISON, ALC
                 1020 Palm Street
13               San Luis Obispo, California  93401-3284
                 (805) 541-0300
14
      FOR THE DEFENDANTS, ACTAVIS TOTOWA, LLC, ACTAVIS, INC.,
15    AND ACTAVIS ELIZABETH, LLC:

16
                 MATTHEW P. MORIARTY, ESQUIRE
17               TUCKER, ELLIS & WEST, LLP
                 1150 Huntington Building
18               925 Euclid Avenue
                 Cleveland, Ohio 44115-1475
19               (216) 592-5000
                 matthew.moriarty@tuckerellis.com
20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 008682

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 329

```
 1              APPEARANCES OF COUNSEL (Cont'd)

 2

 3       FOR THE DEFENDANTS, MYLAN PHARMACEUTICALS, INC.,
      MYLAN, INC., MYLAN BERTEK PHARMACEUTICALS, INC., AND UDL
 4    LABORATORIES, INC.:

 5
                  ALICIA J. DONAHUE, ESQUIRE
 6                SHOOK, HARDY & BACON, LLP
                  333 Bush Street, Suite 600
 7                San Francisco, California  94104-2828
                  (415) 544-1900
 8                adonahue@shb.com

 9    ALSO PRESENT:  Bill Kaska, Videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 008683

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 330

```
 1                    I N D E X
 2                                              PAGE
 3   DIRECT EXAMINATION
 4           By Mr. Moriarty                    333
 5   CROSS EXAMINATION
 6           By Ms. Donahue                     448
 7           By Mr. Kerensky                    450
 8           By Mr. Ernst                       452
 9   REDIRECT EXAMINATION
10           By Mr. Moriarty                    454
11   Certificate of Reporter                    457
12           (Reporter's Disclosure Statement
             attached to back of transcript.)
13
14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
15                E X H I B I T S
16   DEFENDANTS'
     EXHIBIT
17   NUMBER          DESCRIPTION                PAGE
18    23    Letter from Scott Talbot with final
            update for audit program            385
19
      24    Form 484 for Sample 377410          388
20
      25    Form 484 for Sample 448881          399
21
      26    Form 484 for Sample 448892          399
22
      27    Form 484 for Sample 453913          399
23
      28    Form 484 for Sample 454866          399
24
25
```

PLAINTIFFS' EXHIBITS 008684

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 331

```
 1              E X H I B I T S (Cont'd)

 2    DEFENDANTS'
      EXHIBIT
 3    NUMBER          DESCRIPTION                    PAGE

 4     29      Form 484 for Sample 462746           399

 5     30      Form 484 for Sample 462753           399

 6     31      Form 484 for Sample 157503           399

 7     32      Form 484 for Sample 157504           399

 8     33      Form 484 for Sample 178890           399

 9     34      Form 484 for Sample 178891           399

10     35      Celsis test results on three
               Digitek batches                      401
11
       63      Regulatory Procedures Manual,
12             Chapter 4, Advisory Actions          370

13     69      UDL Laboratories Receiving Form
               dated 4/10/08                        403
14
       70      UDL Laboratories Receiving Form
15             dated 2/28/08                        403

16     71      UDL Laboratories Receiving Form
               dated 1/21/08                        404
17
       72      UDL Laboratories Receiving Form
18             dated 6/21/07                        404

19    74C      Notice to Take Deposition            445

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 008685

James J. Farley            Volume II & Videotaped            January 19, 2011

Page 332

```
 1                    THE VIDEOGRAPHER:  Good morning.  We're
 2          on record.  It's 9:03 a.m.  This is the deposition
 3          of James J. Farley in the United States District
 4          Court for the Southern District of West Virginia,
 5          Charleston Division, the Digitek Product Liability
 6          Litigation, MDL No. 1968.
 7                    It is Wednesday, January 19th, 2011.  We
 8          are at Embassy Suites, 145 Mulberry Boulevard,
 9          Savannah, Georgia, 31322.
10                    Would the counsel present please
11          introduce yourself for the record, please.
12                    MR. KERENSKY:  Mike Kerensky and Meghan
13          Carter Johnson for the plaintiffs --
14                    MR. MORIARTY:  Matthew --
15                    MR. KERENSKY:  -- and also Don Ernst, who
16          is on speakerphone.
17                    MR. MORIARTY:  Matthew Moriarty for the
18          Actavis defendants.
19                    MS. DONAHUE:  I'm Alicia Donahue from
20          Shook, Hardy & Bacon for the Mylan defendants and
21          UDL Laboratories.
22                    THE VIDEOGRAPHER:  Thank you.
23                    Madam court reporter, would you swear the
24          witness, please.
25
```

PLAINTIFFS' EXHIBITS 008686

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 333

1                    JAMES J. FARLEY

2     having been first duly sworn testified as follows:

3                        EXAMINATION

4     BY MR. MORIARTY:

5          Q    Now, Mr. Farley, I know you've been

6     through depositions before.  So let's just go over the

7     rules very quickly.  If you don't understand my question

8     for whatever reason, you tell me and I'll make it clear

9     to you.  Okay?

10         A    Yes, sir.

11         Q    And if you need to take a break for

12    whatever reason let us know and we'll do that.

13    Typically we break every hour, hour and a half anyway.

14    Okay?

15         A    Yes, sir.

16         Q    And if you need to look at a document

17    we'll either give you one or you can get it out of your

18    own supply of documents that you've reviewed and brought

19    with you.  Okay?

20         A    Yes.

21         Q    All right.  Have you been -- have you had

22    your deposition taken in any other litigation since my

23    colleague, Mr. Anderton, took your deposition in June of

24    2010?

25         A    No, I have not.

PLAINTIFFS' EXHIBITS 008687

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 334

```
 1            Q    Have you given any trial testimony since
 2   June of 2010?
 3            A    No, I have not.
 4            Q    Have you been sued as a plaintiff or
 5   defendant in any lawsuit?
 6            A    No, I have not.
 7            Q    All right.  Since June 2010 have you met
 8   with any of the plaintiffs' lawyers in the Digitek
 9   litigation?
10            A    Just last night, Meghan and Mike --
11            Q    Okay.
12            A    -- here.  But other than e-mails and phone
13   calls from Meghan in the past couple of weeks telling me
14   that I would be called upon, no.
15            Q    All right.  So the only in-person meeting
16   you've had with any plaintiffs' lawyers in the Digitek
17   litigation was last night to prepare for today's
18   deposition, correct?
19            A    Yes.
20            Q    All right.  And other than Mike Kerensky
21   and Meghan Johnson Carter was anyone present?
22            A    No.
23            Q    Did you take any notes of that meeting
24   last night?
25            A    Yes.
```

PLAINTIFFS' EXHIBITS 008688

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 335

1          Q    Do you have those notes with you?

2          A    Yes.

3          Q    Where are they?

4          A    They're in my folder that I put on the

5     chair.

6          Q    Okay.  Can I see those?

7          A    Yes.  I'll get up.

8          Q    Sure.  Don't forget to take your

9     microphone off.

10         A    Thanks for reminding me.

11              MR. MORIARTY:  Don, can you hear?

12              MR. ERNST:  Yes.  Although, Matt, I'm

13         going to call in and see if we can have a

14         speakerphone brought down to the room.  So that

15         may happen in the next half hour.  But you're fine

16         now.  Thank you.  I appreciate it.

17              MS. CARTER:  I've already talked to them.

18         They'll have it here in 45 minutes.

19              MR. MORIARTY:  Meghan talked to the

20         management.  They're bringing one.

21    BY MR. MORIARTY:

22         Q    Okay.  Can I see the notes that you took

23    from the meeting yesterday?

24         A    This is what Meghan drew to assure

25    everyone that --

PLAINTIFFS' EXHIBITS 008689

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 336

1                MR. KERENSKY:  Go ahead.

2        A    This is what Meghan drew to differentiate

3   between the Little Falls and the Riverview facilities to

4   make sure that the three of us all were on the same

5   page, so to speak.  And we were.

6        Q    Okay.  Can I tear this off the tablet, the

7   rest of which seems to be blank?

8        A    Yes, sir.

9        Q    What other notes did you take?

10       A    Here's a sheet.  I wrote less than a mile

11  apart when Meghan and Mike were on speaker talking to a

12  gentleman about the difference between Little Falls and

13  the Riverview facilities.  I wrote less than a mile

14  apart.

15       Q    Okay.

16       A    And then later on in the evening Mike told

17  me his phone number in case I needed to reach him.

18       Q    Do you know who the other gentleman on the

19  phone was?

20       A    I was introduced to him and I don't

21  remember his name.  I'm sorry.

22       Q    Was it Mr. Ernst from California?

23       A    I don't know.  I would have to ask Mike

24  for that.  I should know.  I just don't remember his

25  name.  I didn't take any notes.

PLAINTIFFS' EXHIBITS 008690

James J. Farley            Volume II & Videotaped            January 19, 2011

                                                        Page 337

1            Q    Did you take any other notes?

2            A    Tucker, Ellis.

3            Q    Important to know who am, I guess.  You've

4    handed me another sheet that says EIR, July 10th, 2006,

5    Exhibit 90.  Review the 483s and EIR.  Put in --

6            A    Chronological.

7            Q    -- chronological order.

8            A    Chronological order.

9            Q    Anything else?

10           A    These are notes I made to myself.  I don't

11   even know whose phone number that is at the top.  But

12   they're little notes I made to myself that don't seem to

13   be connected even to me at this moment.

14           Q    Okay.  So the phone number at the top of

15   this page of notes is 805-441-0988.  Have you talked to

16   any lawyers from California regarding the Digitek

17   litigation?

18           A    No, I have not.

19           Q    What does the shoddy, S-H-O-D-D-Y, refer

20   to?

21           A    I believe to put it in the context we were

22   talking about my opinion of Actavis and I was making my

23   notes.  I was not yet speaking, but I wrote shoddy.  And

24   then when Meghan and Mike finished and looked my way I

25   used that term.  Something like that.

PLAINTIFFS' EXHIBITS 008691

Page 338

1              Q    All right.  Do you have any other notes

2        from the meeting?

3              A    No, sir.

4              Q    All right.  How much time have you spent

5        reviewing materials and talking to lawyers since your

6        last deposition in June of 2010?

7              A    Since then -- I heard the question.  I'm

8        pausing to try to give you an accurate answer.  24 hours

9        last week and whatever time we spent here yesterday.

10             Q    Okay.  So essentially you did almost no

11       work on Digitek between your last deposition and last

12       week, correct?

13             A    Correct.

14             Q    All right.  And you spent 24 hours last

15       week, right?

16             A    Yes.

17             Q    What are you charging me and my law firm

18       for the time we spend today in this deposition?

19             A    I don't know the answer to that and the

20       reason I don't is because I'm doing this for Smart

21       Consulting Group, which is Dr. Nigel Smart and his wife,

22       Denise Smart.  They're doing the billing.  I know

23       they're paying me 150 dollars an hour.  I really don't

24       know what they bill any attorneys.

25             Q    Do you know what the total amount to date

PLAINTIFFS' EXHIBITS 008692

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 339

1  that you have been paid on the Digitek litigation

2  including 2009, 2010 and this year?

3          A    Around 36,000 dollars, give or take 3,000

4  on that.

5          Q    Okay.  Now, since your last deposition

6  have you reviewed additional materials?  I don't want to

7  talk about the re-review of old materials.  I want to

8  talk about new materials.

9          A    I'm pausing to give you an accurate

10 answer.  No, sir.

11         Q    So we took the depositions -- the same

12 week that you were deposed here we took the depositions

13 of Karen Frank, Russ Soma and Mark Kinney in

14 Philadelphia and New Jersey respectively.

15         Have you read any of their deposition

16 testimony?

17         A    No.

18         Q    Have you reviewed the reports of Soma,

19 Kinney, Frank or Bliesner?

20         A    No.

21         Q    Have you seen the reports of any defense

22 experts in this case?

23         A    No.

24         Q    Some names would be Ron Snee, Lou M. Sell,

25 Martha Bennett.  Those would be three examples.  Have

PLAINTIFFS' EXHIBITS 008693

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 340

1   you seen their reports?

2          A    None of them.  I haven't heard of them.

3          Q    Have you requested any additional

4   materials since June 2010?

5          A    No.

6          Q    All right.  Let's go into a couple of

7   background things that weren't covered the last time.

8          A    Yes.

9          Q    Have you updated your resume' since June

10  2010?

11         A    No.

12         Q    And remind me where you went to college.

13         A    My primary degree is from La Salle College

14  in Philadelphia.  It's now La Salle University.  And

15  then my master's degree in physical chemistry was at

16  St. Joseph's College, which is now St. Joseph's

17  University.  And my MBA in marketing and finance was at

18  Temple University.

19         Q    And St. Joseph's and Temple are the ones

20  in Philadelphia?

21         A    Oh, all my schools were in Philadelphia.

22  Yes, sir.

23         Q    Are you a member of any societies or

24  professional associations?

25         A    The American Chemical Society.

PLAINTIFFS' EXHIBITS 008694

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 341

1          Q    Is that it?

2          A    I'm thinking.  One other organization is

3     called AOPA.  It's Aircraft Owners and Pilots

4     Association.  And it's a rather well-known organization

5     for pilots.

6          Q    All right.  But as far as your profession,

7     it's really the American Chemical Society?

8          A    Just the American Chemical Society.

9          Q    And do you hold any certifications or

10    licenses?

11         A    No.

12         Q    Do you have any special training in

13    quality assurance as opposed to quality control?

14         A    I'm thinking.  Do I have special training

15    in it.  I've taught it, but within what I think of as

16    special training, no.

17         Q    Do you consider yourself an expert in

18    quality assurance in the pharmaceutical industry?

19         A    That's tough to answer yes or no because

20    it lies within the definition of an expert.  I believe

21    I'm very knowledgeable about it.  I have consulted

22    people on it and I believe I have helped them in the

23    consultation.  I would have used the term expert,

24    although there are various definitions of what an expert

25    is.

PLAINTIFFS' EXHIBITS 008695

James J. Farley            Volume II & Videotaped            January 19, 2011

Page 342

1          Q    Well, is your core expertise in quality

2     control chemistry?

3          A    It is -- it overlaps.  It's like a Venn

4     diagram.  It's tough to pick one thing.  It's analytical

5     chemistry.  It's physical chemistry.  It's quality

6     control, which is part of quality assurance.

7               It's most recently manufacturing in the last

8     dozen years.  I can't answer that directly yes or no.  I

9     hope that I -- with that little dissertation I put it in

10    the proper perspective.

11         Q    Do you have expertise in regulatory

12    affairs?

13         A    Yes.

14         Q    So what year did you graduate from

15    La Salle?

16         A    1957.

17         Q    And did you go straight for your master's

18    after that?

19         A    I enrolled at St. Joseph's University at

20    night and then since I had four years of ROTC my work

21    time was interrupted with military.  And after getting

22    out of the Army I went back to what was then Smith,

23    Kline and French and continued my studies at night at

24    St. Joseph's, receiving my degree in 1961.

25         Q    When were you in the Army?

PLAINTIFFS' EXHIBITS 008696

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                         Page 343

1           A    1958.

2           Q    Just the one year?

3           A    Yes.

4           Q    And what was your rank on discharge?

5           A    Final discharge from Reserves was captain,

6      but discharge from active duty was second lieutenant.

7           Q    So once you finished the Army what was

8      your employment for the first few years after?

9           A    At what was then Smith, Kline and French

10     Laboratories in Philadelphia.

11          Q    What did you do for them?

12          A    I was the research analytical chemist,

13     developing analytical procedures for new compounds.

14          Q    Did that involve validation of methods?

15          A    That was before the GMPs came into play

16     and validation was not a term that was used.  In effect

17     you did that, but you didn't say we'll validate it,

18     because the GMPs came into play around 1964, '65, '66.

19          Q    All right.  And how long did you work at

20     Smith, Kline?

21          A    I'm pausing to give you accurate

22     information.  In 1961 I left to go to SKF, no connection

23     to Smith, Kline and French.  It's called The Ball

24     Bearing Place, metals and lubricants.  I simply wanted

25     to see what else was around in the field.

PLAINTIFFS' EXHIBITS 008697

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 344

1          Q    In the field of chemistry?

2          A    Yes.

3          Q    So SKF was not a pharmaceutical company?

4          A    Was not.

5          Q    How long did you work there?

6          A    Two years.  And then while I liked what I

7    did as a research chemist there, I decided I liked

8    pharmaceuticals and wanted to get back to the

9    pharmaceutical industry.

10         Q    Where did you go?

11         A    What was then Wyeth Laboratories.

12         Q    What did you do for Wyeth?

13         A    Senior analytical chemist, developing new

14   methods that would be used for testing raw materials,

15   compounds and submissions to the FDA.

16         Q    And did you do validation when you were at

17   Wyeth?

18         A    I want to say I did, but it was still just

19   coming into play.  The term wasn't used as it is today.

20   But the equivalent of a validation, making sure that

21   this method will work for the intended use.

22              So I'm going to say yes, but at the same time

23   say the term validation, it was verify, validate, make

24   sure it's right.  These are the terms that were used

25   then.

PLAINTIFFS' EXHIBITS 008698

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 345

1        Q    For either Smith, Kline or Wyeth did you

2   work in pharmacovigilance?

3        A    No.

4        Q    Did you work in regulatory affairs?

5        A    No.

6        Q    Did you work in quality assurance?

7        A    Not directly.

8        Q    All right.

9        A    I interacted with them, but I was not in

10  quality assurance.  I was research.

11       Q    How long did you work at Wyeth?

12       A    Until 1966.

13       Q    Then where did you go?

14       A    The West Company, now called West

15  Pharmaceutical Services.

16       Q    How long did you work at West?

17       A    Until 1982.

18       Q    All right.  Now, did you leave Smith,

19  Kline voluntarily?

20       A    Yes.

21       Q    Did you leave SKF voluntarily?

22       A    Yes.

23       Q    Did you leave Wyeth voluntarily?

24       A    Yes.

25       Q    All right.  What did you do for The West

PLAINTIFFS' EXHIBITS 008699

Page 346

1    Company?

2           A    A variety of things.  I started out

3    supervising their quality control department.  That was

4    one of the reasons I left, because it was a supervisory

5    position.

6           As the company grew, the department expanded

7    and they did more research, I mentioned that we might

8    have a separate research function since now I had

9    quality control background and the research background.

10   And they let me form a research and development group

11   more officially than they had before.

12          Then -- and I'm a little vague on this because

13   so many years.  But I ended up as assistant director of

14   laboratories as the company expanded and was involved in

15   talking to the customers, all of whom were

16   pharmaceutical firms who wanted to bring their products

17   to the market, because they bought the rubber stoppers

18   from us.

19          And I interacted highly with various people,

20   various firms that got more involved in the regulatory

21   aspect in that our products, which were components of

22   their final product, had to meet regulations.

23          Q    All right.  Did The West Company

24   manufacture solid oral dose pharmaceuticals when you

25   worked for them between '66 and '82?

PLAINTIFFS' EXHIBITS 008700

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 347

```
 1          A    No.
 2          Q    Did you work on the manufacture of solid
 3   oral dose products when you were at Wyeth?
 4          A    Do you mean making them, putting them
 5   together --
 6          Q    Yes, sir.
 7          A    -- or if -- not putting them together.  I
 8   analyzed them.
 9          Q    Okay.  I'm asking whether you helped
10   manufacture them.
11          A    No.
12          Q    Did you help in any way manufacturing when
13   you were at Smith, Kline?
14          A    In testing materials at points along the
15   way to make sure a process was working well, but I
16   myself was not in manufacturing.
17          Q    All right.  Did you go to the FDA in 1982?
18          A    No.
19          Q    Where did you go after The West Company?
20          A    I formed my own training business.
21          Q    What was it called?
22          A    James Farley Seminars.
23          Q    And how long did you run James Farley
24   Seminars?
25          A    That was off and on until 1987.  I say off
```

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 348

1    and on.  The business was on, but I realized at that

2    point that I wasn't running my own business as well as I

3    thought I could and I wanted to get back to the more

4    steady income.

5            Q    All right.  So in 1987 did you go to the

6    FDA?

7            A    No, sir.

8            Q    Where did you go in '87?

9            A    Federal Government, Department of Defense

10   in Philadelphia.

11           Q    What did do you do for the Department of

12   Defense?

13           A    I was working with -- some parts were

14   fabrics, but other parts were testing drugs that the

15   Department of Defense would use.  They were usually

16   drugs beyond the expiration date that the DOD,

17   Department of Defense, wanted to use for the military.

18   And we would analyze them to verify that they were still

19   good even though beyond expiration date.

20           Q    Okay.  So those years from '82 through --

21   how long were you with the Department of Defense?

22           A    I was with the Department of Defense

23   approximately one and a half years.

24           Q    So sometime in '88 or '89?

25           A    June of '89, to be precise.

PLAINTIFFS' EXHIBITS 008702

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 349

1          Q    All right.  And so the years '82 when you
2     were with West, you had your training business and then
3     Department of Defense, you were not involved in the
4     manufacture of solid oral dose pharmaceutical products?
5          A    Not involved in the manufacture directly.
6          Q    All right.  And then what did you do in
7     '89?
8          A    I realized that while I now had steady
9     income coming in, which is what I wanted, that I really
10    wanted to get back to pharmaceuticals.  And transferring
11    from one federal organization to another was relatively
12    easy.  And the FDA was not even across town in
13    Philadelphia.  I applied there and they accepted me and
14    I started working there.
15         Q    Okay.  So in your career have you ever
16    done blend uniformity testing for solid oral dose?
17         A    Testing?
18         Q    Yeah, blend uniformity testing.
19         A    I believe I have tested it; although I'm
20    at a loss to say when and where.
21         Q    Have you been involved in content
22    uniformity testing of solid --
23         A    Yes.
24         Q    -- oral dose --
25         A    Yeah.

PLAINTIFFS' EXHIBITS 008703

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 350

1              Q    Where?

2              A    At Smith, Kline and at Wyeth.  I'm trying

3    to think, but definitely there.

4              Q    When you were at -- when you did content

5    uniformity testing did you use United States

6    Pharmacopeia methods?

7              A    I don't remember if we did or not.  You

8    don't have to use a USP method.  You use the method that

9    is most appropriate and is approved by the FDA.  So

10   while I don't remember which one, it could have been a

11   USP method.  It could have been a validated company

12   method.

13             Q    Would you agree with me that if a company

14   is not going to use USP methods to test its

15   pharmaceutical finished products, then it has to use a

16   method validated and approved by the FDA?

17             A    Yes, for materials that are to be released

18   to the consumer.

19             Q    All right.  Did you have law and evidence

20   training at FDA?

21             A    Yes.

22             Q    And I assume that was so you would have

23   some understanding not only of what the regulations said

24   but how FDA interpreted them; is that correct?

25             A    Yes.

PLAINTIFFS' EXHIBITS 008704

Page 351

1      Q    How many times did you actually go out on

2    an inspection when you were with FDA?

3          A    I'm trying to give you an accurate answer.

4    I would say approximately quarterly.

5          Q    Quarterly?

6          A    Quarterly, which would be four times a

7    year.  Is that -- that's the best I can zero in on that.

8          Q    All right.  If I were to go back somehow

9    and be able to study the records of FDA and look at

10   warning letters and 483s from that period of time, how

11   many would have your signature on them?

12         A    One warning letter would have my signature

13   on it.  The 483s, I don't remember but I wouldn't be

14   surprised if none of them did because the investigator's

15   signature is on them.  Oh, the analytical chemist does

16   sign.  Yes.  There would -- a couple.  I really don't

17   want to mislead you or myself with a number.

18         Q    The warning letter that would have your

19   signature, if I recall correctly from your earlier

20   testimony, is that the one you did not draft, you signed

21   because somebody was out of the office that day?

22         A    My boss was out and he said, you're in

23   charge of the district the whole week.  And a warning

24   letter came in.  That typically is signed by the

25   district director.

PLAINTIFFS' EXHIBITS 008705

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 352

1          And it is drafted by someone else, but it is a

2     document that you, the person who signs it, read every

3     word on and verify before doing it.  So that's a -- is

4     that a qualified yes?

5          Q    I'm just asking if that's the instance.

6          A    Yes.

7          Q    Thank you.  Have you ever done assay or

8     content uniformity on Digoxin?

9          A    I myself?

10         Q    Yeah.

11         A    No.

12         Q    Have you supervised people doing assay or

13    content uniformity on Digoxin?

14         A    No.

15         Q    Do you have any association whatever with

16    assay or content uniformity on Digoxin?

17         A    No.

18         Q    When you did assay or content uniformity

19    for any solid oral dose pharmaceutical product, did you

20    ever use only single point UV testing?

21         A    Would you tell me what you mean by single

22    point UV?

23         Q    Well, I'm not an analytical chemist, but

24    I've had somebody tell me that that's how they analyzed

25    a particular product.  Okay?  Not HPLC or any of those

PLAINTIFFS' EXHIBITS 008706

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 353

1    things.  They used the single point UV.  Okay?

2             Do you know what that is?

3             A    I would be speculating.  If I could

4    explain what is normally done -- would you like me to do

5    that?

6             Q    Nope.  So you're not familiar with single

7    point UV testing --

8             A    If it's the single point -- oh, I'm sorry.

9             Q    -- as the sole method for content

10   uniformity of a pharmaceutical product?

11            A    I know people have done single point UV.

12   My personal opinion is you should do the complete scan

13   and measure a couple of points to look for the shape of

14   the curve to give you a better instance.  So what I'm

15   saying is I didn't do it -- excuse me -- because I don't

16   feel that's the real accurate method.

17            Q    It's not reliable, in other words?

18            A    I would say you don't know the reliability

19   of it and certainly the complete spectrum and taking

20   readings at different points I believe would be more

21   reliable.

22            Q    Okay.  In your -- in your -- in the last

23   session of your deposition we marked an exhibit, 46.  It

24   was an article that you co-authored with a lawyer here

25   in Savannah.

PLAINTIFFS' EXHIBITS 008707

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 354

1          Do you remember that?

2          A    With Gene Brooks?

3          Q    Yes, sir.

4          A    The article with Gene Brooks?

5          Q    Yes.

6          A    I co-authored that article with him.

7          Q    All right.  In that article you say that a

8     laboratory must analyze the drug and test for its active

9     pharmaceutical ingredient and for strength and purity.

10    We'll get back to that in a little bit.

11          But it says here gas chromatography, liquid

12    chromatography and microbiological tests are the three

13    most common testing methods used for analysis, correct?

14          A    Yes.

15          Q    Single point UV is not one you would list,

16    right?

17          A    It's used but I probably would not list

18    it.  And I don't remember if I did or not there.

19          Q    I read you the sentence.  Do you want to

20    see your own article?

21          A    Yes, please.

22          Q    Right there where the highlighting is.

23          A    I read the highlighted part.

24          Q    Okay.  And single point UV is not a test

25    method that you listed in your article, right?

PLAINTIFFS' EXHIBITS 008708

Page 355

1          A    Correct, it is not what I listed in our
2    article.
3          Q    Okay.  Now, is it now universally accepted
4    that a method used in forensic work has to undergo
5    validation?
6          A    All methods have to undergo validation.
7          Q    All right.  So when you were actively
8    doing chemistry, analytical chemistry, how many times
9    did you run a method before you considered it validated?
10         A    Validation of a method is not just a
11   matter of how many times you run it.
12         Q    I understand that.  But overall how many
13   times do you think you went through the process before
14   you and your company considered it validated?
15         A    Assuming the results came out as
16   anticipated, a rule of thumb number is three.  But that
17   could be more or less, because there are -- there's a
18   retrospective validation.  There's other things we could
19   bring in.  But just keeping my question confined to what
20   I'm considering now our area, rule of thumb would be
21   three.
22         Q    All right.  So let me make sure I
23   understand.  Let's assume you in your work as a chemist
24   are going to perform an analysis on a product that
25   you've never analyzed before, ever, okay, and you're

PLAINTIFFS' EXHIBITS 008709

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 356

1    going to start to figure out how to analyze this.  So

2    you're going to create the method and you're going to

3    run the method and you're going to validate it from

4    scratch essentially.  Okay?

5              How long in terms of time, in hours, days,

6    weeks, months, would that typically take?

7         A    I have to ask you a couple of questions

8    before I answer that.

9         Q    Well, I'll let you even though it's my job

10   to ask.  But go ahead.

11        A    In order for the purpose of accuracy,

12   we're talking about a chemical method, not a

13   microbiological?

14        Q    Chemical method on solid oral dose

15   pharmaceutical products.

16        A    A completed product like a tablet --

17        Q    Yes.

18        A    -- that has the active pharmaceutical

19   ingredient?

20        Q    Yes.

21        A    And the excipients in it?

22        Q    Yes.

23        A    How long would it take me to validate it?

24        Q    Yeah.

25        A    If you're working straight through on

PLAINTIFFS' EXHIBITS 008710

Page 357

1    nothing else, it could range anywhere from two days to

2    two weeks.

3            Q    Okay.  So if I told you that a lab ran

4    content testing on a solid oral dose product, in the

5    total time from scratch through validation, running the

6    standards, running the blanks and the ultimate sample

7    took a total of two hours, that would be inconsistent

8    with your experience, wouldn't it?

9            A    To validate the method?

10           Q    To start from scratch --

11           A    From scratch.

12           Q    -- on a product that they had never tested

13   before, to create the method, validate it, run the

14   standards, run blanks and run a sample for forensic

15   reporting purposes, total of two hours, that would be

16   inconsistent with your experience, wouldn't it?

17           A    I would use the word inconsistent as

18   opposed to impossible, inconsistent, surprising.

19           Q    Okay.

20               MR. MORIARTY:  Don, did you say

21       something?

22               MR. ERNST:  Yeah, I did.  I thought it

23       was a compound question.

24               MR. MORIARTY:  Okay.

25               MR. ERNST:  I objected.

PLAINTIFFS' EXHIBITS 008711

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 358

 1                    MR. MORIARTY:  Okay.

 2      BY MR. MORIARTY:

 3           Q    In your work either at FDA or a

 4      pharmaceutical company did you use the Regulatory and

 5      Procedures Manual in the FDA?

 6           A    Yes.

 7           Q    Did you use the Investigation Operations

 8      Manual?

 9           A    Yes.

10           Q    In your opinions in this case are you

11      relying on FDA Form 483s?

12           A    Among other things, yes.

13           Q    And some of those other things would be

14      warning letters?

15           A    Warning letters.

16           Q    And EIRs?

17           A    That's Establishment Inspection Report,

18      yes.

19           Q    And so when you are looking at those FDA

20      documents you believe they're reliable?

21           A    Yes.

22           Q    And how often do you look at the FDA's Web

23      site?

24           A    I go to the FDA's Web site a couple times

25      a week for different purposes each time.

PLAINTIFFS' EXHIBITS 008712

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                              Page 359

1           Q    All right.  Do you consider it reliable?

2           A    Most of the time.  I've seen cases where I

3      believe it hasn't been.

4           Q    Can you identify any instances where you

5      question the reliability of the FDA's Web site so far as

6      it applies to this litigation?

7           A    Could you give me that question again?

8                MR. MORIARTY:  Can you read it back,

9           Angela, please?

10          (The record was read back as requested.)

11               THE WITNESS:  Not that I saw on the Web

12          site, no.

13     BY MR. MORIARTY:

14          Q    Okay.  Do you have any teaching duties

15     now?

16          A    Now?  No.

17          Q    When was the last time you had teaching

18     responsibilities?

19          A    The year 2000 in the Philadelphia area.

20          Q    Doing what?

21          A    I was teaching in the Graduate School of

22     Pharmacy at Temple University, teaching -- excuse me --

23     process validation and another course was NDA

24     submissions.  I believe I was also teaching at a Penn

25     State Philadelphia area campus management.

PLAINTIFFS' EXHIBITS 008713

James J. Farley            Volume II & Videotaped          January 19, 2011

Page 360

1             Q    Okay.  In your career as a consultant have

2       you ever consulted for Actavis, Mylan, UDL or Amide?

3             A    No.

4             Q    Do you know the difference between

5       possibility and probability?

6             A    I believe I do.

7             Q    All right.  Probability would be more

8       likely than not?

9             A    Yes.

10            Q    Possibility would be speculation,

11      generally less than 50 percent chance of occurring?

12            A    I haven't equated possibility with the

13      word speculation, but I agree with the probability.

14            Q    Okay.  Now, before you drafted your

15      original report in this case, which I believe was

16      Exhibit 45 -- I'd have to make sure; hang on a second

17      here -- yeah, Exhibit 45, I assume you read all of the

18      material that had been supplied to you, correct?

19            A    Yes.

20            Q    And at that point did you know that the

21      purpose of the report was essentially to put lawyers

22      like me for the pharmaceutical defendants on notice of

23      what your opinions were so that we had some idea what

24      you were going to say when we came and questioned you?

25            A    My answer is yes, but I would word it as

PLAINTIFFS' EXHIBITS 008714

Page 361

1    the purpose of the report was to render my opinion for

2    anyone who cared to read it.

3              Q    All right.  And when was the last time you

4    read your original report?

5              A    Last week.

6              Q    All right.  And would you agree with me

7    that nowhere in your original report, Exhibit 45, do you

8    say that Digitek was in fact defective?

9              A    I did not use those words.

10             Q    All right.  Now, this article, Exhibit 46,

11   what was your role in writing this article as opposed to

12   Mr. Brooks' role?

13             A    I would like to take a minute to go back

14   in the relationship.  Gene Brooks is a person that we

15   met on a vacation here in Savannah and he sort of clued

16   us in on Savannah when we said we might consider moving

17   here, it's a nice place.

18             And then Gene -- when we moved here Gene

19   became a friend.  And we meet periodically for lunch.

20   Just talk about Savannah.  And I don't even remember

21   which one of us, but one of us at one time said, you

22   know, we ought to put an article in some journal, let's

23   get together and write something.

24             Whether he's the one that said with your

25   background, Jim, and my law or whether I said with your

PLAINTIFFS' EXHIBITS 008715

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 362

1   law and my background, I really don't remember.  But we

2   thought it would be a nice article to publish.

3           And (ck0 Jim Shepherd, he had just passed the

4   Bar right around that time.  So it's -- that was how

5   that evolved, so to speak.  That's the best answer I can

6   give you on that.

7           Q   Well, that gives me the evolution.  But

8   what was your role in the writing?  I'm sure you two sat

9   down and said you're going to do X and you're going to

10  do Y.  What was your role?

11          A   In effect, Gene, you do the law stuff, Jim

12  Farley, you do the pharmaceutical stuff.

13          Q   Okay.  So the statement, A laboratory must

14  analyze the drug and test for its active pharmaceutical

15  ingredient and for strength and purity, is that a

16  statement that you wrote or that Gene Brooks wrote?

17          A   I don't remember offhand, but it might

18  have been Gene put it together and ran it by me and I

19  might have agreed as is or modified it in some way.

20  That's probably how it happened.

21          Q   All right.  So why did you or you and Gene

22  say the laboratory must analyze the drug and test it for

23  its API?

24          A   So that you know that you have the proper

25  drug.  Am I answering your question properly?

PLAINTIFFS' EXHIBITS 008716

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 363

1          Q    Just answer it and I'll follow up.  Why

2     did you say that?

3          A    Why did we say that?

4          Q    A lab must analyze the drug and test it

5     for its API and for strength and purity.  Why?

6          A    To be sure that it is what it is supposed

7     to be.

8          Q    Okay.

9          A    Yeah.

10         Q    So in other parts of this article you do

11    talk about adulteration, correct?

12         A    Yes.

13         Q    So what you're advocating is to go beyond

14    the regulatory definition of adulteration to testing to

15    find out whether it is what it purports to be, correct?

16         A    Yes.

17         Q    Did you tell Mr. Brooks or did you

18    contribute in any way to an analysis of the impact, if

19    you will, or the meaning of GMP violations or recalls?

20         A    In any way?

21         Q    Yeah.

22         A    We discussed it.  I just am at a loss as

23    to the exact nature of the conversation.  But we

24    discussed GMPs and what is a GMP violation.  Yes, we

25    did.

PLAINTIFFS' EXHIBITS 008717

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 364

1          Q    Okay.  But did you discuss and did you
2     contribute to writing about the actual impact, what does
3     it mean when there is a GMP violation?
4          A    I don't remember if we put that in there
5     or not.
6          Q    Do you consider yourself an expert on the
7     legal ramifications of a violation of GMP?
8          A    I'm not a lawyer.  So I --
9          Q    That's not what I asked.
10         A    Well, that wasn't the whole sentence.  It
11    was I'm not a lawyer, therefore I don't consider myself
12    an expert on legal ramifications.
13         Q    All right.  So when you were with these
14    pharmaceutical companies in the years before you went to
15    FDA, how much experience did you have with
16    pharmaceutical recalls?
17         A    Not much.
18         Q    In your consulting work have you been
19    asked to participate with your clients in working on
20    recall issues?
21         A    In some cases -- I'm pausing because I'm
22    thinking of confidentiality.
23         Q    I didn't ask for the name of a company.
24         A    Okay.
25         Q    I just right now I've asked --

PLAINTIFFS' EXHIBITS 008718

James J. Farley            Volume II & Videotaped            January 19, 2011

                                                              Page 365

1              A    Yes, sir.

2              Q    -- whether you've had experience in

3    consulting with recalls.

4              A    To a degree, yes.

5              Q    All right.  To your knowledge can FDA ask

6    a pharmaceutical company to recall a product for

7    virtually any reason?

8              A    For virtually any reason?  For -- I would

9    say for a reason where they think there is potential for

10   harm to the consumer.  For any valid reason.  I guess

11   I'm getting a little tied up on that for any reason part

12   of your question.

13             Q    That's fine.  That's fine.  The FDA can

14   ask a company to recall a product because of the

15   potential for harm to consumers, correct?

16             A    Yes.

17             Q    They don't -- there does not have to be

18   some proof before the recall that there's likely to be

19   harm to consumers; is that right?

20             A    Yes.

21             Q    So in other words, neither FDA nor the

22   pharmaceutical company have to come up with some proof

23   that there is in fact out-of-specification and dangerous

24   drug product in the marketplace and in the hands of

25   consumers, right?

PLAINTIFFS' EXHIBITS 008719

Page 366

1          A    Before I say right, you're saying proof
2     and I would use the term they have a valid reason,
3     somehow, somewhere they have a valid reason for asking
4     for a recall, would you recall such and such from the
5     market.  It's a very expensive thing to do and it hurts
6     the company's reputation.
7               So you use the word proof.  I'm saying the FDA
8     has a valid reason to believe there's a possibility or
9     probability that a consumer or some consumers will be
10    injured, harmed and they say, we want you to recall
11    that.  I had to extend that to put my answer in the
12    proper context.
13         Q    Okay.  But you didn't answer my question.
14              MR. MORIARTY:  Angela, can you read my
15         question back, please?
16         (The record was read back as requested.)
17              MR. ERNST:  I'm going to object.  It's
18         been asked and answered.  He's answered the
19         question.  It's also compound.
20         A    I --
21         Q    Go on.
22         A    I hear it again and it's still -- I'm
23    getting -- the difference between proof and valid reason
24    to believe that there's a probability that something can
25    happen.  And --

PLAINTIFFS' EXHIBITS 008720

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 367

```
 1          Q    Let me ask it a different way.  There
 2    doesn't have to be actual scientific evidence before a
 3    recall that there is likely out-of-specification and
 4    dangerous drug product in the marketplace, correct?
 5               MR. ERNST:  Objection, vague, ambiguous
 6          speculative.  Those are not terms that -- you're
 7          making those terms.  It's also compound.
 8               MR. MORIARTY:  And I'm going to just say
 9          that we don't have speaking objections in this MDL
10          and those aren't PTO 22 objections.  So if we're
11          going to do this let's do it right.
12    BY MR. MORIARTY:
13          Q    Can you answer my question?
14          A    Could you tell me one more time, please?
15               MR. MORIARTY:  You better read it back,
16          Angela.
17          (The record was read back as requested.)
18          A    Yes, correct.
19          Q    Okay.  Thank you.
20               MR. ERNST:  Objection, vague, ambiguous.
21          Q    Has any company that you either worked for
22    or have consulted with been subject to a consent decree?
23          A    Yes.
24          Q    How about a seizure?
25          A    No.
```

PLAINTIFFS' EXHIBITS 008721

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 368

1          Q    How about 483s?

2          A    Yes.

3          Q    Warning letters?

4          A    Yes.

5          Q    Recalls?

6          A    Yes.

7          Q    Have you seen any -- have you -- I'm

8     sorry.  Let me rephrase that.

9               Have you been provided with any scientific

10    information whatsoever that there was a spike in Digoxin

11    toxicity at hospitals, nursing homes, poison control

12    centers or outpatient facilities in -- at any point

13    between 2005 and 2008?

14          A    I'm not sure what you mean by Digoxin

15    toxicity.

16          Q    Do you have any idea what that means?

17          A    You mean OD, overdosing, or too much

18    strength?  I mean, Digoxin when used properly is not

19    toxic.  And to say Digoxin toxicity, if you mean

20    over-strength tablets -- I'm not -- let me not put

21    words -- please tell me again.

22          Q    Digoxin toxicity simply for the purpose of

23    my question is somebody who has a toxic reaction to

24    Digoxin, whether the -- regardless of what the dose is.

25    Okay?

PLAINTIFFS' EXHIBITS 008722

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 369

```
 1              What I'm asking you is whether you've been
 2      provided with any scientific proof that there was a
 3      spike in Digoxin toxicity at any sort of medical
 4      facility in the United States between 2005 and 2008.
 5              A    No.
 6                   MR. ERNST:  I'm going to object, vague,
 7          ambiguous, calls for speculation.
 8                   MR. KERENSKY:  When you get to a breaking
 9          point I'd like to take a break.
10                   MR. ERNST:  Scientific proof is not a
11          standard.
12                   MR. MORIARTY:  Now is fine.
13                   THE VIDEOGRAPHER:  Okay.  We're going off
14          the --
15                   MR. MORIARTY:  Mike wants to take a
16          break, Don.  So we're going to do that.
17                   THE VIDEOGRAPHER:  Going off record.
18          This is the end of Tape No. 1.  9:55.
19              (A brief recess was taken.)
20                   THE VIDEOGRAPHER:  Okay.  We're back on
21          record.  It's 10:11 and this is the beginning of
22          Media Unit No. 2.
23      BY MR. MORIARTY:
24              Q    Mr. Farley, this is Exhibit 57 from your
25      first deposition.  This is a Form 483, is it not?
```

PLAINTIFFS' EXHIBITS 008723

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 370

1            A    May I?  Yes.

2            Q    Okay.  And the Form 483 itself says, The

3    document lists observations made by the FDA

4    representatives during the inspection of your facility.

5    They are inspectional observations and do not represent

6    a final agency determination regarding your compliance.

7            Is that what it says right at the top of the

8    document itself?

9            A    It should.  It's standard procedure.

10           Q    Okay.  And to your knowledge does the

11    Regulatory Procedures Manual say essentially the same

12    thing?

13           A    As I recall, yes.

14           Q    All right.  So Exhibit 63, which is

15    Chapter 4 of the Regulatory Procedures Manual, in

16    Section 4-1-1 on the second page of this document,

17    fourth full paragraph, A warning letter is informal and

18    advisory.  It communicates the agency's position on a

19    matter, but it does not commit FDA to take any

20    enforcement action.

21           Did I read that correctly so far?

22           A    Yes.

23           Q    For these reasons FDA does not consider

24    warning letters to be final agency action on which it

25    can be sued.

PLAINTIFFS' EXHIBITS 008724

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 371

1           Did I read that correctly?

2           A    Yes.

3           Q    Now, I want to ask you some questions

4    about your report.  Do you have a copy of it there?

5           A    Yes.

6           Q    All right.  And that was Exhibit 45 in the

7    last deposition, correct?

8           A    If you say so.  I don't remember the

9    exhibit number of my report.

10          Q    All right.  Well, I have the original

11   exhibits here if you need to look at them.

12               MS. CARTER:  I think there was a 45A, B

13         and C.

14               MR. MORIARTY:  I think this was 45.

15          Q    This one where it says, yes, 1 of 27.  You

16   got that in front of you?

17          A    Yes.

18          Q    Okay.  Let's go to page 2 -- I'm sorry --

19   page 3.  And when I say page 3, you've got these pages

20   numbered, right?

21          A    Yes.

22          Q    So on page 3 the -- one, two -- third

23   statement under your experience with FDA it's talking

24   about your directing the activities of the 30-member lab

25   staff, correct?

PLAINTIFFS' EXHIBITS 008725

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 372

```
 1          A    Yes.
 2          Q    Now, did your work in that regard include
 3    processing 484 samples?
 4          A    Yes.
 5          Q    You know what 484 --
 6          A    Yes.
 7          Q    -- samples are, correct?
 8          A    Surveillance samples.
 9          Q    FDA collects samples from companies or
10    pharmacy shelves and tests them, correct?
11          A    Yes.
12          Q    Using USP or comparable methods, correct?
13          A    Yes.
14          Q    And they're running things like assay and
15    content uniformity on them, right?
16          A    Yes.
17          Q    And do they typically do surveillance
18    samples on products that have narrow therapeutic
19    indexes?
20          A    Yes.
21          Q    Do you know if Digitek is one such
22    product?
23          A    I do.
24          Q    Do you know whether your lab in
25    Philadelphia ever did 484 samples on any Digoxin
```

Page 373

1    products when you were there?

2              A    I don't remember.

3              Q    All right.  Let's go to page 4.  At the

4    very bottom the last sentence refers to ineffective or

5    unsafe product.  Do you see that?

6              A    Yes, I do.

7              Q    All right.  First let's talk about

8    ineffective product.  What do you mean by that?

9              A    A product that does not do what it is

10   supposed to do would be an ineffective product.

11             Q    So, for example, a product that had too

12   little of the active pharmaceutical ingredient might be

13   ineffective, right?

14             A    Might be.

15             Q    All right.  And then what do you mean by

16   unsafe product?

17             A    I want to read the whole context.  Can I

18   do that?

19             Q    Sure.  I just want to know what you mean

20   by unsafe product.

21             A    Unsafe would be something that would do

22   harm to the consumer.

23             Q    Okay.  So theoretically a product that had

24   too much of its active pharmaceutical ingredient could

25   potentially be harmful to a consumer, correct?

PLAINTIFFS' EXHIBITS 008727

Page 374

```
 1              A    That's one of the ways it could do harm to

 2    a consumer, yes.

 3              Q    All right.  Let's go out to page 17.  Now,

 4    under comments in Section 5 in Paragraph A you use the

 5    term "total failure" several times.

 6                   Do you see that?

 7              A    I see it.

 8              Q    To your knowledge was there ever a final

 9    agency determination by FDA that there was a total

10    failure of quality systems at Actavis?

11              A    Not using the terms total failure, but the

12    consent decree told me that the FDA and the Court deemed

13    they were incapable of making a quality product on their

14    own.

15              Q    What consent decree?

16              A    The consent decree that Actavis received.

17    I forget the date.

18              Q    The one that ended in 2002?

19              A    There was another one after that.

20              Q    When?

21              A    I'd have to look through.

22              Q    What I'm asking is to your knowledge is

23    there some final agency determination that says in these

24    words that you've used here there was a total failure of

25    Actavis' quality systems?
```

PLAINTIFFS' EXHIBITS 008728

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 375

1          A    Not the agency.  The agency did not use

2    that term.

3          Q    All right.  Now, is it your opinion that

4    Actavis made no products in 2006, '7 or '8 that were

5    within their specifications?

6                    MR. ERNST:  Object.

7          A    I can't answer that if they made no

8    products that were within their specifications.  No.  I

9    would have to see the date on every single product they

10   made in order to answer that.

11         Q    Okay.  Did FDA ever say in any document

12   that there was a total failure of quality regarding

13   Digitek?

14         A    I did not see that from the FDA about

15   Digitek.

16         Q    Okay.  Let's go to page 18.  Go down to

17   your Paragraph F on page 18.

18         A    I'm there.

19         Q    The end of your sentence says, All

20   products, including Digitek, were adulterated.  Do you

21   see that?

22         A    At the end.

23         Q    Yes.

24         A    Yes.

25         Q    Can you show me a 483 or a warning letter

PLAINTIFFS' EXHIBITS 008729

James J. Farley            Volume II & Videotaped          January 19, 2011

Page 376

1    or any other FDA document that specifically says that

2    Digitek was adulterated?

3           A    That uses the term Digitek was

4    adulterated?

5           Q    Or something like that.

6           A    I did not see it worded that way.

7           Q    Okay.  What was your understanding of why

8    Digitek was recalled?

9           A    My understanding was that there -- a

10   combination of things.  There were some adverse events

11   reported from persons taking it.  And upon FDA

12   inspection some double thick or extra thick tablets were

13   found.  And at least one double thick tablet was found

14   by a nurse or attendant person in a nursing home.

15          Q    What is -- when was that -- well, let me

16   break that down then in pieces.  Okay?  Let's get to the

17   last thing you talked about first, this nursing home

18   incident.

19          Was that tablet measured?

20          A    Measured physically?

21          Q    Yes.

22          A    I believe but I am not sure.  It went back

23   to the company and they measured it and verified double

24   thickness, but they did not analyze it.

25          Q    What year was this?

PLAINTIFFS' EXHIBITS 008730

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 377

```
 1              A    I forget offhand.  I'd have to check the
 2      records.
 3              Q    Well, was it years before the recall or
 4      was it after the recall?  Which the recall occurred in
 5      April of 2008.
 6              A    I believe it was before the recall.
 7              Q    You're talking about years before, the
 8      incident that was reported to the FDA, correct?
 9              A    I'm associating with 2006, but I'd have to
10      go through the files to verify that date.
11              Q    Well, let's just assume that it happened
12      in 2005 or 2006.  Did FDA order a recall when that
13      occurred?
14              A    Based on the one incident?
15              Q    Yeah.
16              A    No.
17              Q    Did Actavis, or at the time Amide, report
18      that incident to FDA in both a field alert and in its
19      annual reporting?
20              A    I believe they did.
21              Q    And FDA was satisfied with the explanation
22      given by Actavis in that it was an isolated incident,
23      correct?
24                   MR. ERNST:  Objection to form.
25              A    Yes.
```

PLAINTIFFS' EXHIBITS 008731

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 378

```
1          Q   All right.  So can you show me a single
2    document in all the documents that you reviewed to
3    indicate that adverse event reporting had any influence
4    on the Digitek recall?
5               MR. ERNST:  Objection to form.
6          A   In the 483s there's indicated that there's
7    an inadequate adverse event reporting system at Actavis
8    and that some events that should have been reported were
9    not.  So I would call that inadequate.
10         Q   Didn't that happen in 2006 or 2007?
11         A   Yes.
12         Q   Didn't Actavis remediate that 483?
13              MR. ERNST:  Objection to form.
14         A   I don't believe it was satisfactory.  They
15   made some attempts, but they didn't do it well.
16         Q   What does FDA do to a company when it is
17   not satisfied with the remediation of a 483?
18         A   They will go to a warning letter or they
19   could just go to injunction procedure.
20         Q   And if they -- if the company doesn't
21   adequately remediate a warning letter what does the FDA
22   do?
23         A   They can -- they'll usually go to a
24   consent -- they may go to a consent decree or they may
25   shut them down.
```

PLAINTIFFS' EXHIBITS 008732

James J. Farley          Volume II & Videotaped          January 19, 2011

                                                        Page 379

1              Q    Can you show me any evidence whatsoever

2    that the FDA was not satisfied with the remediation of

3    the adverse event reporting 483 that occurred in 2006 or

4    2007?

5                   MR. ERNST:  Objection to form.

6              A    Could you repeat that, please?

7              Q    Okay.  You've got a whole pile of

8    documents here that you reviewed to prepare your report

9    and your opinions.  Show me somewhere in all that

10   material anywhere that you can that the FDA was

11   dissatisfied with Amide's remediation or Actavis'

12   remediation of the 483 regarding adverse event

13   reporting.

14                  MR. ERNST:  Objection to form, compound.

15             A    I see a series of 483s, then a warning

16   letter, then a consent decree.  To me that says they're

17   not pleased with it.  Otherwise they wouldn't have done

18   that.

19             Q    Okay.  I'm talking about one issue,

20   adverse event reporting, pharmacovigilance.  Okay?

21             A    Yes.

22             Q    Not some mountain of events.  I want to

23   isolate AERs.  Is there anything in the FDA's

24   documentation in 2008 when Digitek was recalled that

25   refers to adverse event reporting for Digitek?

PLAINTIFFS' EXHIBITS 008733

Page 380

```
 1                    MR. ERNST:  Objection to form.
 2          A    That refers only to the adverse event
 3   reporting and not to not using the proper methods and
 4   not investigating deviations or out of spec, only the
 5   adverse event reporting?
 6          Q    Adverse reporting.
 7          A    No.
 8          Q    And can you find me any documents in all
 9   the material you reviewed to indicate that the FDA was
10   not satisfied with the remediation of the adverse event
11   reporting --
12                    MR. ERNST:  Same objection.
13          Q    -- adverse event reporting 483 back in '06
14   or '07?
15                    MR. ERNST:  Objection to form.
16          A    My indications was it was a combination of
17   violations.  But with regard to that one area, adverse
18   event reporting, no, I did not.
19          Q    Does the recall notice that was FDA
20   approved say anything about adverse event reporting?
21          A    No.
22                    MR. MORIARTY:  I happened to look at the
23          transcript that is rolling up on the court
24          reporter's computer screen and she has your name
25          wrong, Don.
```

PLAINTIFFS' EXHIBITS 008734

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 381

1              THE COURT REPORTING:  No, I don't.  I
2         don't.
3              MR. MORIARTY:  So we're going to correct
4         that.  Okay?  I just want to make sure everybody
5         knows.  That should be Don Ernst, E-R-N-S-T.
6              THE COURT REPORTING:  I know.  That's
7         coming up from the last deposition.
8              MR. MORIARTY:  All right.  And I'm not
9         Mr. Anderton either.
10             THE COURT REPORTING:  I know.
11             MR. ERNST:  Thank you, Matt.
12             MR. MORIARTY:  I was looking out for your
13        interest, Don.
14   BY MR. MORIARTY:
15        Q    Okay.  Page 19 of your report, when a
16   company is under consent decree don't they have to be in
17   compliance with GMPs?
18        A    You're asking me a question?  You're
19   not --
20        Q    Well, at page 19 of your report under
21   conclusions, Section 6, the fourth paragraph refers to
22   the consent decree for ten consecutive years.
23        A    Yes.
24        Q    I assume you mean the one that expired in
25   2002, correct?

PLAINTIFFS' EXHIBITS 008735

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 382

1          A    Yes.

2          Q    And I'm asking you a question about that.

3    To be under consent decree with the FDA don't you have

4    to be in compliance with GMPs?

5          A    The consultants that are brought in assure

6    that the product leaving the facility is in compliance.

7          Q    So is that a yes?

8               MR. KERENSKY:  Wait, wait.  You can't do

9       that.

10         Q    Okay.  You go ahead.

11              MR. KERENSKY:  Thanks.

12         A    I just want to make sure that I put this

13   in the proper perspective.  The material is in

14   compliance because the consultants are there making it

15   in compliance.

16         Q    Okay.  So in other words, for these ten

17   years that you're referring to at page 19 of your

18   report, Amide was within -- acting within the GMPs?

19         A    In whatever areas the consultants were

20   functioning in helping them to do so they were.

21         Q    Okay.  And ultimately when they came off

22   consent decree in 2002 it was because of sustained

23   compliance with GMPs, correct?

24         A    It is when the Court decides that they are

25   capable of making a quality product themselves, yes.

PLAINTIFFS' EXHIBITS 008736

1          Q    Let's go to the very end of page 19.

2    Okay?

3          A    Yes.

4          Q    And you're talking about since the

5    non-compliance problem was systemic all products,

6    including Digitek, were adulterated as defined in

7    Section 501 of the Food, Drug and Cosmetic Act.

8               Do you see that?

9          A    Yes.

10         Q    Okay.  Is it your understanding that this

11   litigation is about whether Digitek and other products

12   at Actavis were considered adulterated under its

13   regulatory definition?

14         A    That's part of it.  It's my understanding

15   that there was a probability that some material produced

16   by Digitek could harm a consumer.

17         Q    Okay.  Is there some statement in any FDA

18   document that there is a probability that

19   out-of-specification Digitek was shipped to the

20   marketplace?

21         A    Specifically as you worded that, no.

22              MR. ERNST:  Objection to form.

23         Q    To your knowledge did FDA say anywhere in

24   a 483 or a warning letter that double thick tablets had

25   in fact made it to the marketplace?

PLAINTIFFS' EXHIBITS 008737

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 384

1          A    In a 483?

2          Q    Or a warning letter.

3          A    Warning letter?  No, they did not say it

4    the way you just worded it.

5          Q    Did the FDA anywhere in a 483 or warning

6    letter say that out-of-specification Digitek tablets had

7    made it to the marketplace or in the hands of consumers?

8               MR. ERNST:  Objection to form.

9          A    I'm pausing because they're not going to

10   say that in a 483.  The 483 is going to say what you're

11   doing in the plant, the facility that's being inspected.

12   It's not in the range of a 483 to say whether it's on

13   the marketplace or not.

14              So that's why I'm looking surprised at the

15   wording of the question, because the answer is not --

16   it's like, of course, not, it won't in a 483.

17         Q    Okay.  Were you aware that FDA in the

18   latter half of 2006 asked Actavis to bring in a

19   consultant for some batch record reviews?

20         A    Yes.

21         Q    And the purpose of that in essence was to

22   see according to the batch record reviews whether

23   products were being made in accordance with GMPs,

24   correct?

25         A    Currently or before?

PLAINTIFFS' EXHIBITS 008738

James J. Farley            Volume II & Videotaped            January 19, 2011

Page 385

1          Q    At the time.

2          A    The previous batch review or the current

3    batch record review?  Because they do both.

4          Q    Whatever.  That was what FDA wanted

5    Actavis to do, correct?

6          A    Yes.

7          Q    All right.  This is Exhibit 23.  Have you

8    ever seen this before?

9          A    Yes.  I think.  Yes.

10         Q    The top sheet is a letter December --

11              MR. ERNST:  To clarify, when you say have

12         you seen this before can you identify that for me.

13              MR. MORIARTY:  Exhibit 23.

14              MR. ERNST:  Thank you.

15         Q    The top sheet is a letter dated

16    December 24th, 2007, to FDA from Scott Talbot at

17    Actavis, correct?

18         A    Oh.  Yes.

19         Q    All right.  And attached is reports from

20    Quantic Regulatory Services, correct?

21         A    Yes.

22         Q    Do you know anything about the reputation

23    of Quantic Regulatory Services?

24         A    I have done work for Claudio Pincus, who

25    owns Quantic.  I've done work for --

PLAINTIFFS' EXHIBITS 008739

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 386

1                    MR. KERENSKY:  That's not the question.

2          A    So, yes.  They have a very good

3    reputation.

4          Q    Have you -- when you had Exhibit 23 did

5    you look through the attachments that actually came from

6    Quantic Regulatory Services?

7          A    Much was redacted.  But, yes, I did.

8          Q    And do you know that they looked at a

9    number of Digitek batches?

10         A    I'd have to go back to the text.  Because

11   of all the redactions I can't see what they did or

12   didn't do.  Oh.  I see some Digitek.

13         Q    Well, did you ever count how many Digitek

14   batches there were?

15         A    I probably did at that time and I'm at a

16   loss to tell you what that number is at this moment.

17         Q    Okay.  If I told you that 19 of the batch

18   records that they looked at were ultimately amongst the

19   recalled batches, would you have any reason to dispute

20   that?

21         A    I would not have any reason to dispute

22   that.

23         Q    And I think they looked at a total of 23

24   Digitek batch records.  Have you looked at any batch

25   records of Digitek other than Batch 70924?

PLAINTIFFS' EXHIBITS 008740

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 387

1          A    Other than that batch, no.

2          Q    It says on the first page of this exhibit

3    in the letter from Mr. Talbot to FDA, On December 21st,

4    2007, Quantic provided Actavis with a statement

5    indicating the audit was complete and the manufacturing

6    and the lab records will reliably confirm the identity,

7    strength, quality and purity of the marketed products.

8               Do you see that?

9          A    I see it.

10         Q    Do you have any basis to disagree with

11   Quantic Regulatory Services' conclusions regarding the

12   batch record -- or the batch records that they reviewed?

13         A    In one sense I do not have any reason to

14   disagree with what Quantic said and found.  But based on

15   what I read in the 483s about the way they were

16   manufacturing, it is surprising to me.

17         Q    Okay.  Now, this phrase that they use in

18   this sentence, reliably confirm identity, strength,

19   quality and purity, that mirrors the definition

20   contained in the Food, Drug and Cosmetic Act regarding

21   adulteration, correct?

22         A    Yes.

23         Q    So if you were to assume that Quantic was

24   correct in reliably confirming identity, strength,

25   quality and purity of at least the batches they

PLAINTIFFS' EXHIBITS 008741

Page 388

1   reviewed, assuming they were correct, those wouldn't

2   even be considered adulterated.  Isn't that true?

3           A   If they confirm identity, strength,

4   quality and purity they are normally not considered

5   adulterated.

6           Q   I'm handing you what's been marked as

7   Exhibit 24, do you recognize that as a Form 484 from

8   FDA?

9           A   I don't.

10          Q   Have you ever seen that document before?

11          A   I'm taking a look in here.  I'm having

12   trouble reading the top where it's dark.

13          Q   Well, let's go slowly -- let's go slowly

14   through it.  Okay?  It's Sample 377410, correct?  Up

15   here.

16          A   Oh.  Sample No. 377 -- I'm just having

17   trouble reading it because of the Xerox copy of it.  But

18   you're reading right here where I'm pointing in the dark

19   area?

20          Q   I have my own notes.

21          A   Oh, okay.  For Sample No. 377410.

22          Q   Okay.  And in the document, if you look at

23   the first page, on February 9th, 2007, FDA secured two

24   bottles of hundred count .125 milligram Digitek from

25   Actavis.  Do you see that?

PLAINTIFFS' EXHIBITS 008742

Page 389

```
 1            A    I'm looking for -- I'm looking for where
 2    it says two bottles.  It's either in small print or my
 3    eyes are getting weak.
 4            Q    I apologize.  I used to have highlighted
 5    versions of these so I could point right to the part of
 6    this document that you need to see.
 7                 MR. KERENSKY:  It's under description of
 8            sample two-thirds of the way down.
 9                 THE WITNESS:  Thank you.  I wasn't that
10            far down.  I was still way up here.
11                 MR. KERENSKY:  You want me to find it for
12            you?
13                 THE WITNESS:  I see it now.
14    BY MR. MORIARTY:
15            Q    Okay.  And then in the middle in the same
16    area where Mr. Kerensky just pointed out, you see
17    manufacturing code?  Right here.
18            A    Yes.
19            Q    That's Actavis Batch 70078A.  Do you see
20    that?
21            A    Yes.
22            Q    Okay.  And you can look at this as
23    thoroughly as you would like, but wouldn't I be correct
24    in saying that after running thorough quality control
25    chemistry testing on these tablets using USP methods,
```

PLAINTIFFS' EXHIBITS 008743

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 390

1    FDA found them to be in compliance with their stated
2    specifications?
3              A    I'm looking to read this.  I want to see
4    where it says they used the USP method.
5              Q    You take your time and look at the whole
6    thing.
7              A    Okay.
8              Q    These are exhibits I've covered with other
9    experts.  If you doubt that I'm representing these to
10   you accurately, you take all the time you want, because
11   I've got about ten of these to go through.
12             A    I'm not doubting your presentation.  It's
13   I want to make sure what I'm reading.
14                  MR. KERENSKY:  Let's take a little break.
15                  MR. MORIARTY:  We have 15 minutes on the
16        tape and there's a pending question.  As soon as
17        he answers this question we can take a break.
18                  MR. KERENSKY:  Well, for the purpose of
19        review I'm just saying let's stop the tape and
20        just give him time.  I'm not saying so I can talk
21        to him.  I'm saying let's go off the tape and see
22        if we can find a sane way to go through that stack
23        of documents.
24                  MR. MORIARTY:  That's fine.
25                  MR. KERENSKY:  Okay?

PLAINTIFFS' EXHIBITS 008744

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 391

1               THE VIDEOGRAPHER:  We're off record --

2               MR. MORIARTY:  Oh, wait.  Before we go

3         off record -- you still on?

4               THE VIDEOGRAPHER:  Yes, sir.

5    BY MR. MORIARTY:

6         Q    I'm ultimately going to ask you about

7    Exhibits 25, 26, 27, 28, 29, 30, 31, 32, 33 and 34.  And

8    I'm going to ask you essentially the same questions

9    about --

10        A    Yes.

11        Q    -- all of them.  Okay?

12        A    Yes.

13        Q    So if you want to look at all of them

14   while we're on break I'll put the whole stack right

15   here.  Okay?

16        A    Actually I forgot that question already.

17              MR. KERENSKY:  The question -- are we

18        still on record?

19              THE VIDEOGRAPHER:  We are still on the

20        record, yes.

21              MR. KERENSKY:  The question as I

22        understand that you want to ask is whether or not

23        these documents show that the FDA tested the

24        samples that they took and found them to be in

25        compliance with their specifications.

PLAINTIFFS' EXHIBITS 008745

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 392

```
 1                 Is that right?

 2                 MR. MORIARTY:  Yes, sir.

 3                 MR. KERENSKY:  Okay.  All right.  Let's

 4         go off the record.

 5                 THE VIDEOGRAPHER:  We're off the record,

 6         10:47 a.m.

 7             (A brief recess was taken.)

 8                 THE VIDEOGRAPHER:  All right.  We're back

 9         on record.  Back on record.  It's 11:05 a.m.

10                 MR. KERENSKY:  We took a break.  And we

11         are stipulating for the purposes of this

12         deposition that Exhibits 24 through 34 -- is that

13         the range, is that the correct range --

14                 MR. MORIARTY:  Yes, sir.

15                 MR. KERENSKY:  -- represent testing done

16         by the FDA on Digitek tablets wherein the FDA

17         found that the Digitek tablets were within

18         specification.

19                 MR. MORIARTY:  Okay.

20                 MR. KERENSKY:  Okay.  So no need to go

21         through each and every one.  We're -- and you

22         can -- he's going to assume that to be true and

23         you can ask him questions from there.

24                 MR. MORIARTY:  Okay.

25      BY MR. MORIARTY:
```

PLAINTIFFS' EXHIBITS 008746

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 393

1          Q    From the two exhibits that you did review,

2     which were 24 and 25, that is correct, isn't it --

3          A    Yes.

4          Q    -- that FDA did 484 sampling, tested them

5     and they complied with the specs, correct?

6          A    Yes.

7          Q    All right.  Now, when FDA runs tests under

8     the 484 program they can test assay, content uniformity,

9     dissolution and impurity, correct?

10         A    Yes.

11         Q    They may not necessarily run all those

12    tests on every sample, right?

13         A    Correct.

14         Q    Okay.  Have you ever seen a 484 sample

15    from FDA of Digitek which found that the product was not

16    within specifications?

17         A    I did not.

18         Q    Do you know if any exist?

19         A    I do not.

20         Q    Do you know if the plaintiffs' lawyers who

21    retained you as an expert in this case ever ran a

22    Freedom of Information Act request to find out that kind

23    of information?

24         A    I know that there were I believe 1,880

25    samples taken over a period of time.  And my --

PLAINTIFFS' EXHIBITS 008747

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 394

1                    MR. KERENSKY:  No, no.  The question is
2         whether or not you know if the lawyers
3         representing the plaintiffs --
4                    MR. ERNST:  Objection, vague.  Objection
5         to form.
6                    MR. KERENSKY:  -- made a Freedom of
7         Information Act -- listen to the question.
8                    MR. MORIARTY:  This is great.  Don,
9         you're objecting to your own side's question.  I
10        love it.
11                   MR. KERENSKY:  No.  I'm just trying to
12        help him.
13                   He's asking you do you know did the
14        lawyers make a Freedom of Information request, yes
15        or no.  That's what he asked you.
16                   THE WITNESS:  Is that what you asked me?
17  BY MR. MORIARTY:
18        Q   Yes, that's what I asked you.
19        A   That did the lawyers for the plaintiffs
20  ever -- say again, please.
21        Q   Do you know whether the lawyers for the
22  plaintiffs, the lawyers who hired you as an expert in
23  this case, made a Freedom of Information Act request to
24  get 484 sampled?
25        A   I do not know that.

PLAINTIFFS' EXHIBITS 008748

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 395

1              Q    Okay.  So to the best of your knowledge

2    FDA never found any out-of-spec Digitek in the field in

3    its 484 program testing?

4              A    To the best -- I don't know the answer.  I

5    don't know if they did or didn't.  I believe that --

6    that's all for that answer.

7              Q    Would it be important for you to know

8    that?

9              A    It would be important for me to know if

10   they sampled a couple hundred thousand and found every

11   one in specification.  That would be important for me to

12   know and to change the opinion that I have formed.

13             These samples don't tell me statistical

14   representation that there is not a likelihood of harm

15   from Digitek -- was not a likelihood of harm from

16   Digitek out there.

17             Q    Okay.  Let's talk about scientific data

18   available to you.  Okay?

19             A    Yes.

20             Q    FDA is your former employer, correct?

21             A    Yes.

22             Q    You're relying on their 483s and their

23   warning letters for your opinions in this case about

24   adulteration, aren't you?

25             A    Yes.

PLAINTIFFS' EXHIBITS 008749

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 396

1          Q    FDA chooses the sample size for their 484

2    program, don't they?

3          A    Yes.

4          Q    They can take as many samples as they

5    want, couldn't they?

6          A    Yes.

7          Q    So do you have any data anywhere, any

8    scientific data, that shows out-of-specification Digitek

9    in the hands of pharmacists or consumers?

10         A    I don't have scientific data.  However,

11   the purpose of a surveillance, also known as survey

12   sample, is to take a sample not indicative of everything

13   that was produced, but a sample to determine if that

14   sample is good or not.  It does not tell me that there

15   isn't any harmful Digitek out there.  All of this is

16   small.

17         Q    That's nice.  What I'm asking you,

18   Mr. Farley, what data do you have that there is in fact

19   harmful out-of-specification Digitek out there in the

20   hands of consumers?  Okay?  This is what I've got plus

21   more.

22         A    Yes.

23         Q    What have you got?

24         A    If you mean other than the 483s saying it

25   was not made right, you mean analytical data showing

PLAINTIFFS' EXHIBITS 008750

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 397

1   that something was double strength?

2          Q   Let's start there.  Do you have any

3   analytical data?

4          A   I do not have analytical data indicating

5   that.

6          Q   Do you have physical measurements from

7   pharmacists or any reliable scientific person?

8              MR. ERNST:  Objection to form.

9          A   Of a tablet?

10         Q   Of any tablets that were out of spec.

11         A   What I read in here that there were at

12  least 20 of them that were double thickness and they

13  never analyzed them to see if they were double strength.

14  But not from a pharmacist I contacted.

15         Q   Did any of those 20 double strength

16  tablets or double thick tablets, whatever you want to

17  call them, even leave the Actavis facility?

18         A   The one that was found by someone at a

19  nursing home obviously did.

20         Q   In 2006?

21         A   I believe that's the year.

22         Q   I'm asking about the 20 in Batch 70924.

23  They were removed and destroyed, weren't they?

24         A   They were, but it leads me to wonder how

25  many weren't caught and got out to the consumer.

PLAINTIFFS' EXHIBITS 008751

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 398

1          Q    You can --

2          A    It doesn't tell me it never happened, that

3     nothing got out.

4          Q    You can wonder about that.  I'm asking for

5     your data that it happened.  Do you have any data?

6          A    No concrete data that it happened.

7          Q    All right.  So of all the lawsuits and all

8     the lawyers in the Digitek litigation, did any of them

9     send you either a double thick tablet or a report that

10    there was a double thick tablet?

11             MR. ERNST:  Objection.

12         A    The data that I received from Pete Miller

13    and all the documents had contained in it the finding of

14    the double thick tablets.  So is that what you -- so my

15    answer would be yes based on that.

16         Q    Okay.  I want you to go in the corner and

17    get your material and I want you to find any piece of

18    paper in there that says that there was a double thick

19    tablet in the hands of a consumer in 2006, '7 or '8.

20         A    No, not in the hands of a consumer.

21         Q    How about in the hands of a pharmacist in

22    2006, '7 or '8, can you find a piece of paper that says

23    that?

24         A    I cannot find a -- I do not have a paper

25    that says that.

PLAINTIFFS' EXHIBITS 008752

James J. Farley        Volume II & Videotaped        January 19, 2011

Page 399

1          Q   Had you ever seen Exhibit 25 before?

2          A   I believe not.

3          Q   Had you ever seen Exhibit 26 before?

4          A   I'd have to check my list of exhibits, but

5   I believe I did not see these.

6          Q   How about 27?

7          A   And so on right through the list.

8          Q   What about 27?

9          A   No.

10         Q   What about 28?

11         A   No.

12         Q   29?

13         A   No.

14         Q   30?

15         A   No.

16         Q   31?

17         A   No.

18         Q   32?

19         A   No.

20         Q   33?

21         A   No.

22         Q   Or 34?

23         A   No.

24         Q   In your consultation work is this the kind

25   of data that you rely on, these 484s, is this the kind

PLAINTIFFS' EXHIBITS 008753

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 400

1   of data that you rely on in your consulting work?

2              A    To do what?

3              Q    To talk to your own clients.

4              A    To advise them on how to make good

5   material?

6              Q    Okay.  Let me go back, because my question

7   was bad.  Have you ever been consulted by a

8   pharmaceutical company that the question posed to you

9   was, do we have any out-of-specification product in the

10  marketplace?

11             A    In the marketplace?

12             Q    Yeah.

13             A    No, not worded that way.

14             Q    Okay.  If a client consulted you and

15  wanted help from you in regard to figuring out whether

16  there was out-of-specification product in the

17  marketplace, okay --

18             A    Yes.

19             Q    -- is the 484 results something that would

20  be important for you to look at?

21             A    They would be part of the picture, not

22  all.

23             Q    Do you know who or what Celsis

24  Laboratories is?

25             A    Could you spell that, please?

PLAINTIFFS' EXHIBITS 008754

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 401

1          Q    I believe it's C-E-L-S-I-S.

2          A    No, not offhand.  It might be, but it's

3    not ringing a bell offhand.

4          Q    All right.  Are you aware that Actavis

5    sold all the Digitek it made to distributors, not

6    directly to pharmacists, in other words?

7          A    That's what is normally done.  So it

8    doesn't surprise me.

9          Q    And do you know for a fact whether the

10   distributors like Mylan or UDL commissioned any testing

11   on the Digitek that it bought from Actavis?

12         A    Do I know that they did?  I know -- I

13   would recommend that they should in any case from

14   anybody.  But whether they did, I am not sure offhand.

15         Q    Okay.  I'm going to hand you Exhibit 35.

16   First of all, have you ever seen that document before?

17         A    I have not.

18         Q    Why don't you take a quick look through

19   it.  I'll represent to you that this document contains

20   information on three Digitek batches made in 2006.

21   These tests were commissioned by Mylan or UDL and the

22   testing was done by Celsis Analytical Services.  Okay?

23         A    I see.

24         Q    And I believe they did assay and

25   dissolution testing on these three Digitek batches and

PLAINTIFFS' EXHIBITS 008755

James J. Farley          Volume II & Videotaped          January 19, 2011

Page 402

1    found them all to be within the specs.  Okay?  So take
2    your time, take a look at that stuff if you'd like and
3    tell me if I am incorrect in the way I've represented
4    this exhibit to you.
5            A    I hear what you said, but I'm just looking
6    through it.
7            Q    Have you had a chance to go through that?
8            A    I'm glancing through some of it.  I'm
9    showing you how far I am.  Do you want me to go through
10   the whole thing?
11           Q    All I want you to -- I mean, is that
12   Celsis Labs results from testing three batches of
13   Digitek and did they all conform with the specs?  That's
14   the question.
15               MR. KERENSKY:  Object to the form of the
16        question.  They didn't test three batches.  They
17        tested three bottles, one bottle each from each
18        batch.
19           Q    Mr. Kerensky is correct.
20           A    I heard two questions.  Is there
21   analytical data from Celsis Labs?  Yes.  Did they test
22   three --
23           Q    Three samples.
24           A    Samples.
25           Q    Or samples from three batches of Digitek.

PLAINTIFFS' EXHIBITS 008756