# EXHIBIT 515

PLAINTIFFS' EXHIBITS 009521

Russell Somma, Ph.D.                                           July 1, 2010

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE:  DIGITEK PRODUCT LIABILITY LITIGATION

BOBBY R. MILLIGAN, et al.,          ) MDL Case No.
                                    ) 2:09-cv-121
                    Plaintiffs,     )
                                    )
       -vs-                         ) VIDEOTAPED
                                    ) DEPOSITION OF:
ACTAVIS GROUP HF, et al.,           ) RUSSELL F.
                                    ) SOMMA, PH.D.
                    Defendants.     )
                                    )
                                    )
_____    )




        TRANSCRIPT of testimony as taken by and

before MARK SCHAFFER, a Certified Shorthand Reporter

and Notary Public of the States of New Jersey and New

York, at the Marriott Hotel, Newark Liberty

International Airport, Newark, New Jersey, on

Thursday, July 1, 2010, commencing at 8:31 in the

forenoon.

PLAINTIFFS' EXHIBITS 009522

Russell Somma, Ph.D.                                July 1, 2010

```
                                                          Page 2
  1    A P P E A R A N C E S:

  2

  3       TUCKER, ELLIS & WEST, LLP
          BY:  MATTHEW P. MORIARTY, ESQ.
  4       1150 Huntington Building
          925 Euclid Avenue
  5       Cleveland, Ohio  44115
          216-592-5000
  6       matthew.moriarty@tuckerellis.com
          Attorneys for Actavis Totowa, LLC,
  7       Actavis, Inc., and Actavis Elizabeth, LLC

  8

  9       SHOOK, HARDY & BACON
          BY:  ERICKA L. DOWNIE, ESQ.
 10       2555 Grand Boulevard
          Kansas City, Missouri  64108
 11       816-474-6550
          edownie@shb.com
 12       Attorneys for the Mylan Defendants

 13

 14       THE MILLER FIRM, LLC
          BY: PETER A. MILLER
 15       The Sherman Building
          108 Railroad Avenue
 16       Orange, Virginia  22960
          540-672-4224
 17       pmiller@doctoratlaw.com
          Attorneys for the Plaintiffs

 18

 19

 20       MOTLEY, RICE, LLC
          BY:  MEGHAN JOHNSON CARTER, ESQ.
 21       28 Bridgeside Boulevard
          Mt. Pleasant, South Carolina  29464
 22       843-216-9383
          mjjohnson@motleyrice.com
 23       Attorneys for the Plaintiffs

 24

 25       ALSO PRESENT:  ADAM DICOLA, Videographer
```

Russell Somma, Ph.D.                                          July 1, 2010

Page 3

1                    I N D E X

2

3    Description                              Page

4      R U S S E L L   F.   S O M M A         5

5

6    DIRECT EXAMINATION BY MR. MORIARTY        6

7
     CONTINUED DIRECT EXAMINATION BY MR.       55
8    MORIARTY

9
     CONTINUED DIRECT EXAMINATION BY MR.       107
10   MORIARTY

11
     CONTINUED DIRECT EXAMINATION BY MR.       158
12   MORIARTY

13
     CONTINUED DIRECT EXAMINATION BY MR.       206
14   MORIARTY

15
     CONTINUED DIRECT EXAMINATION BY MR.       232
16   MORIARTY

17
     CROSS EXAMINATION BY MS. DOWNIE           241
18

19   REDIRECT EXAMINATION BY MR. MORIARTY      247

20
     RECROSS EXAMINATION BY MR. MILLER         249
21

22   RE-REDIRECT EXAMINATION BY MR. MORIARTY   250

23

24

25

Russell Somma, Ph.D.                                        July 1, 2010

```
                                                        Page 4
  1                    E X H I B I T S

  2

  3    Number              Description              Page

  4
       D-51A               White Box Containing Three    39
  5                        Thumb Drives

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

PLAINTIFFS' EXHIBITS 009525

Russell Somma, Ph.D.                                    July 1, 2010

Page 5

1           THE VIDEOGRAPHER: Good morning.  We are now on

2       the record at 8:31 a.m. The date today is July

3       1st, 2010.  This is the videotaped deposition of

4       Dr. Russell F. Somma in the matter of In Re:

5       Digitek Product Liability Litigation in the United

6       States District Court for the Southern District of

7       West Virginia, Charleston Division, MDL Case

8       Number 2:02-CV-121.

9           I am the videographer; my name is Adam Dicola

10      of Rennillo Court Reporting.  The court reporter

11      is Mark Schaffer, also with Rennillo Court

12      Reporting.

13          Will counsel please state their appearances

14      for the record?

15          MR. MILLER:  Pete Miller with the Miller firm

16      for plaintiffs.

17          MS. CARTER:  Meghan Carter with Motley, Rice

18      for the plaintiffs.

19          MS. DOWNIE:  Ericka Downie, Shook, Hardy &

20      Bacon, for the Mylan defendants.

21          MR. MORIARTY:  Mathew Moriarty, Tucker Ellis &

22      West, for the Actavis defendants.

23

24   R U S S E L L   F.   S O M M A,

25   Five Shady Lane, Sparta, New Jersey 07871,

PLAINTIFFS' EXHIBITS 009526

Russell Somma, Ph.D.                                     July 1, 2010

                                                              Page 6
1    having been duly sworn according to law by the

2    Officer, testified as follows:

3

4    DIRECT EXAMINATION BY MR. MORIARTY:

5           MR. MILLER:  Matt, before you get started, I

6       would like to point out something.  I spoke to the

7       doctor yesterday evening and he saw what he

8       believes to be something in error in his report

9       that he'd like to fix.  We can address it now or

10      wait until you discuss the report.

11          MR. MORIARTY:  Let's wait.

12          MR. MILLER:  Okay.

13   Q.   Let me know.

14   A.   Okay.

15   Q.   Good morning.

16   A.   Thanks. Thanks. Good morning to you.

17   Q.   How many times have you had your deposition

18   taken before?

19   A.   Never.

20   Q.   Other than the Digitek litigation, how many

21   times have you been consulted as an expert witness?

22   A.   Never.

23   Q.   I'm sure Mr. Miller or Ms. Carter has given

24   you some information about what's going to happen

25   today.  Okay?  Is that right?

PLAINTIFFS' EXHIBITS 009527

Russell Somma, Ph.D.                                    July 1, 2010

Page 7

1       A.   Yes, sir.

2       Q.   We are going to spend all day.  I'm going to

3   ask you a lot of questions.  And your function is to

4   just to answer my questions; okay?

5       A.   Yes, sir.

6       Q.   If you do not understand my question, please

7   tell me you don't understand my question.  Okay?

8       A.   Okay.

9       Q.   If you answer the question, I'm going to

10  understand -- I'm going to assume that you at least

11  understood it.  Is that okay?

12      A.   Okay.  I will ask.

13      Q.   Okay.

14      A.   No stretching.

15      Q.   And if you need to look at documents, please

16  look at documents.  I don't want you to guess at the

17  answers to any of my questions.  Okay?

18      A.   Okay.

19      Q.   And also sometimes witnesses want to talk and

20  talk and talk and lecture me about good manufacturing

21  practices and various other topics.  I'm going to try

22  to keep my questions quite specific.  Okay?

23      A.   Okay.

24      Q.   So if you can answer my questions, I would

25  appreciate that.  Okay?

PLAINTIFFS' EXHIBITS 009528

Russell Somma, Ph.D.                                    July 1, 2010

Page 8

1      A.   Okay.  So that would mean that there would

2    have to be some exchange between us, so I understand

3    exactly --

4      Q.   Yes.  I'll give you a chance to explain if I

5    need something explained, but I would like direct

6    answers to my questions.  Okay?

7      A.   Uh-huh, yes, sir.

8      Q.   This is Exhibit 51.

9           Is that your resume?

10     A.   Yes, it is.

11     Q.   All right. And while I'm at it, this is

12   Exhibit 52.

13     A.   That's my report, yes.

14     Q.   Is this your report --

15     A.   Yes.

16     Q.   -- in this litigation?

17     A.   Uh-huh, yes, it is.

18     Q.   And at the back of your report in Appendix A,

19   it says, "Materials reviewed."  Right?

20     A.   Yes, sir.

21     Q.   And I assume that at least before writing the

22   report, these are the things that you looked at.   Is

23   that correct?

24     A.   That's correct.

25     Q.   And when were you first consulted in this

Russell Somma, Ph.D.                                    July 1, 2010

Page 9

1   litigation?

2       A.   I was contacted in March.

3       Q.   Of 2010?

4       A.   Of 2010.

5       Q.   So I assume as you received material over

6   time, you have had an opportunity to read it?

7       A.   As I got the material I did read it, yes.

8       Q.   And you had plenty of time to draft this

9   report.  Is that correct?

10      A.   Yes, sir.

11      Q.   I assume that there were drafts to this

12  report?

13      A.   Yes, sir.

14      Q.   Did you save drafts?

15      A.   Yes, I did.

16      Q.   And then I assume that you had some time to

17  talk with members of the plaintiffs' side of this case

18  about those drafts leading to the final version.  Is

19  that right?

20      A.   That's correct, yes.

21      Q.   Okay.  And that's fine.  You have never done

22  this before.  You didn't know anything about it.  They

23  gave you some guidance on things that may need to be

24  in there or not; right?

25      A.   Well, Matt, actually what I did --

Russell Somma, Ph.D.                                      July 1, 2010

 1          MR. MILLER:  Object to form.
 2      Q.   One rule is you have to let me finish my
 3  questions --
 4      A.   Sorry, sorry.
 5      Q.   Because, Mark, the court reporter, can't take
 6  us both down at the same time.
 7      A.   I got you.
 8      Q.   Okay?
 9      A.   I got you.
10      Q.   Okay.
11      A.   Can I ask my question now?
12      Q.   Well, actually you don't get to ask
13  questions.
14      A.   Oh, okay.
15      Q.   I do.
16          MR. MILLER:  But there is a question pending.
17      You had asked him --
18          MR. MORIARTY:  I asked if he had time to talk
19      with the plaintiffs' side about the report.
20      A.   Right, and I agreed.
21      Q.   Okay.  And there -- there is a mistake in it
22  somewhere and we'll get to that later.
23      A.   Right.
24      Q.   Okay?
25      A.   Uh-huh.

Russell Somma, Ph.D.                                    July 1, 2010

                                                           Page 11
1        Q.   Did the plaintiffs' side of the case let you
2    know, the lawyers let you know, that the purpose of
3    this report is to put people like me on notice of what
4    your opinions were in the litigation?
5        A.   Yes, sir.
6        Q.   And you tried to put all your opinions in
7    there?
8        A.   That I came away with after I read what I
9    had, my opinions based on my experience, yes.
10       Q.   Have you read additional material since
11   writing this report?
12       A.   Yes, sir, I have.
13       Q.   We'll get to that later.
14            Okay.  So you were first contacted in March.
15   And who contacted you?
16       A.   An organization by the name of Spyglass.
17   They were looking for somebody to provide expert
18   input, with experience in tableting.
19       Q.   I assume you mean --
20            (A discussion is held off the record.)
21       A.   With experience in tableting. Compression.
22   Sorry.
23       Q.   I assume you mean Mark Kenny?
24       A.   That's correct, right.
25       Q.   And did he make direct contact with you?

PLAINTIFFS' EXHIBITS 009532

Russell Somma, Ph.D.                                    July 1, 2010

Page 12

```
 1      A.    Yes, he did.

 2      Q.    Have you ever met him before?

 3      A.    Not before then, no.

 4      Q.    How did he know about you?

 5      A.    A network of consultants; knows people, and

 6   they worked with another fellow that I worked with at

 7   Novartis.

 8      Q.    What's his name?

 9      A.    Alp Yaman.

10      Q.    I'm sorry?

11      A.    Alp Yaman.

12      Q.    Now, you have a company called Somma Tech

13   Consulting; do you not?

14      A.    That's correct.

15      Q.    Is it a corporation, a partnership?

16      A.    It's an LLC, and my partners are the parent

17   company, IPS.

18      Q.    IPS?

19      A.    Integrated Project Services.

20      Q.    How many employees does Somma Tech Consulting

21   have?

22      A.    We have two.

23      Q.    Who are they?

24      A.    Me and a ten -- excuse me -- I should correct

25   that.  1099 doesn't constitute an employee, so we have
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 13

1    me and a woman that does our transdermal work at the

2    present time.

3        Q.   What do you mean does your "transdermal work

4    at the present time"?

5        A.   She consults in an area of transdermal

6    delivery systems for another firm that we work for.

7        Q.   Okay.  What's her name?

8        A.   Amanda Gotto.

9        Q.   Say that again?

10       A.   Amanda Gotto.

11       Q.   Is Amanda Gotto consulting in any other

12   litigation?

13       A.   No.

14       Q.   Has Amanda Gotto had any input into your

15   analysis or report in the Digitek litigation?

16       A.   No.

17       Q.   And then who is IPS?

18       A.   IPS is a company that Somma Tech is a part

19   of.  It's an engineering project management -- project

20   management firm.

21       Q.   In fields other than pharmaceutical?

22       A.   They are predominantly in pharmaceutical, but

23   they have been known to do work in other areas on the

24   soft side; not heavy industry.

25       Q.   I assume that they are a consulting group?

PLAINTIFFS' EXHIBITS 009534

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 14

    1       A.    That's correct.

    2       Q.    Did anyone from IPS have any input into your

    3   analysis for the drafting of your report in the

    4   Digitek litigation?

    5       A.    No, they have not.

    6       Q.    I assume that you are charging the

    7   plaintiffs' lawyers for the time that you have spent

    8   reviewing material and writing your report?

    9       A.    Yes, I have. Yes.

   10       Q.    Is that right?

   11       A.    Yes.

   12       Q.    How much are you charging for that?

   13       A.    $350 an hour, Matt.

   14       Q.    I assume you are charging me for the time we

   15   spend all day today with me questioning you about your

   16   report.  Is that right?

   17       A.    If you would like, yes.

   18       Q.    Well, I prefer not, but I assume you are

   19   going to.  So why don't you tell me how much I am

   20   going to be charged.

   21       A.    $350 an hour.

   22       Q.    Thank you.

   23             Do you have any idea how many bills you have

   24   already sent the plaintiffs' lawyers for your review

   25   to date?

Russell Somma, Ph.D.                                    July 1, 2010

Page 15

```
 1      A.    Three.

 2      Q.    What's the total of those bills?

 3      A.    $40,000.

 4      Q.    How much do you have in unbilled time up to

 5   today?

 6      A.    I would say about 30,000.

 7      Q.    So, just so I'm clear, you think that the

 8   total amount of time that you have put into this

 9   review and writing to date is about $70,000?

10      A.    No, no.  In other words, as I can tell -- I

11   have a time management system that we put in our time

12   for.  Based on that time, there is about $40,000 in

13   billing.  Okay?

14      Q.    Okay.

15      A.    And those invoices, we have been paid the

16   first invoice, which was the initial retainer; but

17   since then we have not provided -- we haven't provided

18   the invoices on a more timely basis.

19      Q.    So you believe that the total amount of time,

20   the value of the time you have put into this is about

21   $40,000?

22      A.    That's correct, Matt, yes.  Sorry.

23            Was that too long of an answer, Matt, just so

24   we know going forward?

25      Q.    No.  "Yes" is good.  I really like that.
```

PLAINTIFFS' EXHIBITS 009536

Russell Somma, Ph.D.                                    July 1, 2010

Page 16

1          You have a Ph.D. in pharmaceutical science
2      from Rutgers; do you not?
3          A.   Yes.
4          Q.   Now in your day-to-day wanderings about the
5      world including your consulting work, are you called
6      "Mister" or "Doctor"?
7          A.   Well, I never really paid much attention to
8      it, but most of my clients refer to me as "Doctor,"
9      you know.
10         Q.   Okay.  Dr. Somma, have you ever --
11         A.   That doesn't include you, by the way.
12         Q.   Okay.  So I can call you Mister?
13         A.   No, "Russ" is good.  But go ahead.
14         Q.   In your industry experience, and I understand
15     that that was primarily at Novartis.  Is that correct?
16         A.   That's right, yes.
17         Q.   Did you ever work on a digoxin product?
18         A.   I worked on a cardiac glycoside, yes, sir.  I
19     worked on Serpasil.  Serpasil is in the same general
20     class.  Is it digoxin?  No, sir.
21         Q.   Is it digitalis?
22         A.   No, sir, it's reserpine.
23         Q.   Is it derived from the "something-lanata"
24     plants that --
25         A.   It's a natural alkaloid.  I can't tell you if

PLAINTIFFS' EXHIBITS 009537

Russell Somma, Ph.D.                                    July 1, 2010

Page 17

1    it's from the same plant, no, sir.

2        Q.    And is Novartis' cardiac glycoside product an

3    IV or a solid oral base?

4        A.    Solid oral dosage form.

5        Q.    And what was your involvement with that?

6        A.    Production support and troubleshooting.

7        Q.    Okay.

8        A.    Just for clarity, it was Ciba at the time.

9        Q.    How did you -- How long did your duties

10   involve that product?

11       A.    These things came up periodically, so your

12   responsibility was the product line.  So reserpine or

13   Serpasil in this case was the hot topic for six, eight

14   months, and then it would go -- you would go onto the

15   next product or problem.  Is that clear?

16       Q.    Yes.  When you were working on -- was it a

17   product that was in full commercial production?

18       A.    Yes, sir, it was.

19       Q.    Did you have any role at all in adverse event

20   reporting analysis for that product?

21       A.    No, sir.

22       Q.    Were you at least aware that the drug is

23   known to have a narrow toxic therapeutic window?

24       A.    When I worked on the drug, the term "narrow

25   therapeutic window" wasn't commonly used.  It was just

PLAINTIFFS' EXHIBITS 009538

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 18

1    a low dose drug for us, and to me that was the issue

2    in that case.

3        Q.   When you say "low dose drug," are you talking

4    about the actual amount of the active pharmaceutical

5    ingredient in the tablet?

6        A.   That's correct.

7             (A discussion is held off the record.)

8        A.   The amount of active ingredient in the dosage

9    form.  In this case, less than a milligram.

10       Q.   And do you know what the dose strengths were

11   of reserpine when it was -- when you were dealing with

12   it at Ciba?

13       A.   I would have to guess, but point-one as I

14   recall is one of them.

15       Q.   Do you know if they made a 0.5 milligram

16   dose?

17       A.   That I can reasonably say with assurance, no.

18       Q.   When were you involved with reserpine?

19       A.   Reserpine was back in 1976.

20       Q.   Okay.  This is long before the FDA's digoxin

21   regulations?

22       A.   It was around the same time, because I

23   remember a lot of digoxin noise when I was in pharmacy

24   school about, you know, different products; but

25   primarily that wasn't on my radar screen at all.

PLAINTIFFS' EXHIBITS 009539

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 19

1       Q.    Did they ever put in an NDA for reserpine?

2       A.    Yes, it was; it was an NDA.

3       Q.    When?

4       A.    That I don't know, sir.

5       Q.    Did you ever have anything to do with the

6    quality control chemistry testing of reserpine?

7       A.    Chemistry testing, no, sir.

8       Q.    Do you know what kind of tablet presses they

9    used?

10      A.    Yes, sir.

11      Q.    What?

12      A.    Manesty Mark II.

13            (A discussion is held off the record.)

14      Q.    The difficulty that Mark, the court reporter,

15   is having is that you are looking at me and it just

16   makes it a little harder for him.  And that's

17   unfortunately the way this room is set up and kind of

18   the way it has to be.  Okay?

19      A.    All right.

20      Q.    Did Manesty Mark II tablet presses have

21   weight control equipment on them?

22      A.    They did, sir, yes.

23      Q.    When they had weight control on them, did

24   they weigh all produced tablets or just random

25   samples?

PLAINTIFFS' EXHIBITS 009540

Page 20

1       A.    Let me -- let me -- let me -- If I may, Matt.
2    Matt, Manesty Mk II's have weight control on them.  If
3    your question is -- if your question is:  Did we use
4    those to make reserpine?  Is that -- or am I jumping
5    ahead here?
6       Q.    Well, I asked you what kind of tablet
7    presses --
8       A.    Manesty Mark II's.
9       Q.    -- presses Ciba used to make reserpine?
10      A.    That's right.
11      Q.    Did the Manesty Mark II's that were used to
12   make reserpine have weight controls?
13      A.    The ones that we owned that made reserpine,
14   no, sir.  Okay? Sorry.  I was thinking of it in a
15   global sense.
16            The answer is:  They do have them.  We didn't
17   have it on that machine.
18            MR. MILLER:  No, that's fine.  You are doing
19       fine.
20      Q.    So the -- So whatever in-process weighing,
21   measuring and hardness testing was done, was done
22   either by a QA employee or -- and/or a press operator.
23   Is that right?
24      A.    That's correct.
25      Q.    Do you have any memory of how often the QA

PLAINTIFFS' EXHIBITS 009541

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 21

1   person came in to check thickness, hardness and

2   weight?

3        A.    The QA person, I don't recall, sir, no.

4        Q.    Do you know how often the tablet press

5   operator was expected to check samples of thickness,

6   hardness or weight?

7        A.    Every half hour is our custom.

8        Q.    How much of your work in your industry

9   experience was solid oral dose?

10       A.    I would say 98 percent of it, sir.

11       Q.    And you worked essentially from the

12  conclusion of your bachelor's in pharmacy until you

13  left private industry at Novartis or its predecessor

14  companies.  Is that right?

15       A.    That's correct.

16       Q.    Almost 30 years?

17       A.    Almost, sir.

18       Q.    Why did you leave Novartis in June of 2004?

19       A.    I retired -- not retired.  Excuse me.  I

20  resigned.  Sorry about that.  To be clear, I resigned.

21  I resigned.

22            The opportunity came up with people I've

23  worked with at various associations and different

24  professional groups that it seemed to me that owning

25  my own company was going to be an opportunity to

PLAINTIFFS' EXHIBITS 009542

Russell Somma, Ph.D.                                      July 1, 2010

Page 22

1   explore and expand and share my background.  I had

2   gotten quite a lot of airplay from work we had done.

3   Bottom line was:  I capitalized on things I had in

4   place, left, and started my own company.  That is why

5   IPS is my partner.

6       Q.   And what are you, about 58 years old?

7       A.   Fifty-nine.

8       Q.   Now, in your industry experience at Novartis

9   and its predecessors, did you have any experience in

10  dealing with the FDA in inspections?

11      A.   Yes, sir.

12      Q.   And I assume that happened over the years,

13  FDA would come in and conduct inspections?

14      A.   Yes, sir, primarily pre-approval inspections

15  for drugs.

16      Q.   Did you ever have any experience in

17  remediating 483s or warning letters that were given to

18  your employer?

19      A.   483s, sir; warning letters, no.

20      Q.   What about establishment inspection reports?

21      A.   I was aware of their existence.

22      Q.   Did you ever have any experience with product

23  recalls when you were in your industry experience?

24      A.   Yes, sir.

25      Q.   What was the product that was recalled?

Russell Somma, Ph.D.                                      July 1, 2010

Page 23

```
 1            How many recalls were you involved with?
 2    Let's put it that way.
 3        A.    I would say two, sir.
 4        Q.    Were they solid, oral dose?
 5        A.    Yes, sir.
 6        Q.    What were the reasons for the -- and can you
 7    tell me what the products were?  I assume it's public
 8    knowledge?
 9        A.    Well, I think -- well, one of them was a -- a
10    field action for a carbamazepine.
11        Q.    Okay.
12        A.    Carbamazepine I believe is Tegretol.
13        Q.    Why was carbamazepine recalled?
14        A.    It was I believe -- and, again, the recall
15    was the key; I don't recall if it was a voluntary
16    recall.  The key was that we had found anomalies in
17    the tableting operation.
18        Q.    Okay.
19        A.    And these were in hardness dose
20    specifications.
21        Q.    Was the recall a precautionary recall?
22        A.    Yes, sir.
23        Q.    Was it to the consumer level?
24        A.    That I don't remember, sir.
25        Q.    To the best of your memory, did you ever find
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 24

1    any car --

2         A.    Carbamazepine.

3         Q.    -- carbamazepine tablets actually in the

4    field that failed your specifications?

5         A.    From the best of my memory, I don't recall

6    bringing them back.  Because we primarily would depend

7    upon our retained samples to assess what's in the

8    field.

9         Q.    Okay.

10        A.    Understanding, of course, that what's in the

11   field you have no control where it's been, so we went

12   by retains.

13        Q.    Okay.

14        A.    But when they came back, we tested them.

15        Q.    All right.

16        A.    Right.

17        Q.    What do you mean, "when they came back"?

18        A.    When the samples came back from -- a

19   complaint sample would come back, we would test those.

20        Q.    Yes.  Okay.  And the ones that were tested,

21   were they out of spec?

22        A.    That I don't recall, sir, right now

23   specifically, to be honest.

24        Q.    Well, sometimes in the pharmaceutical

25   industry you do a recall even though the product in

PLAINTIFFS' EXHIBITS 009545

Russell Somma, Ph.D.                                          July 1, 2010

Page 25

 1    the field may not actually be out of spec; correct?

 2         A.    That's right.  Out of precaution, correct.

 3         Q.    Okay.  So what was the second recall that you

 4    had anything to do with?

 5               (A discussion is held off the record.)

 6         Q.    And, again, I told you in the beginning, that

 7    if you don't know the answer to my question, I don't

 8    want you to guess.

 9         A.    No.  I think in that particular case it would

10    take -- it would be a stretch for me to answer the

11    second recall question.

12         Q.    Was it a solid oral dose?

13         A.    Yes, it was.

14         Q.    Do you remember what the problem was?  Or why

15    the --

16         A.    I believe -- I believe it was dissolution, as

17    I recall.  That was -- and I think that's about as

18    best I can do.  I think -- We used to monitor levels,

19    S1, S2 levels.

20         Q.    Okay.  When you were at Novartis and its

21    predecessors, did you ever have -- did you ever reject

22    batches that didn't meet the specifications?

23         A.    I was not in that position, no, sir.

24         Q.    Do you know whether it happened?

25         A.    Rejection of batches?  Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 26

1      Q.   Okay.  And certainly out-of-spec
2   investigations occurred from time to time?
3      A.   Absolutely.
4      Q.   Is that right?
5      A.   Absolutely.
6      Q.   Now, what -- Were you in the Manufacturing
7   Division, the Quality Department --
8      A.   Research and Development.
9      Q.   Research and Development.  Did you ever get
10   involved in products that were in full-scale
11   commercial development?
12      A.   Yes, sir.
13      Q.   I'm sorry.  Full-scale commercial production?
14      A.   Yes, sir.
15      Q.   And did you spend most of your career in
16   Research and Development?
17      A.   I was all -- my entire career was in research
18   and development, which included product production at
19   some point.
20      Q.   And I assume that's one of the reasons why
21   one of your particular interests in pharmaceuticals is
22   what's known as scale-up.  Is that correct, sir?
23      A.   That's correct, sir.
24      Q.   And technology transfer?
25      A.   That's correct.

PLAINTIFFS' EXHIBITS 009547

Russell Somma, Ph.D.                                     July 1, 2010

Page 27

1      Q.   And in my plain English, the -- the science
2   of going from research and development small batch
3   sizes to full commercial production scale
4   pharmaceutical manufacturing; correct?
5      A.   That's correct.  And even in simpler terms,
6   it's simply moving it from Place A to Place B.
7      Q.   Place A little and Place B big?
8      A.   Or Place A little to Place B little, to
9   minimize problems.  Okay?
10     Q.   At Page 4 of your resume, you have
11  Publications and Presentations.
12     A.   Uh-huh.
13     Q.   Do any of them involve digoxin?
14     A.   No, sir.
15     Q.   Do any of them involve troubleshooting of
16  oversized tablets?
17     A.   To the best of my knowledge no, sir.  I'm
18  checking as we're going, just to make sure I'm giving
19  you the right --
20          MR. MILLER:  That's fine.  If you need to
21     check, go ahead and check.
22     A.   I doubt specifically oversize.
23     Q.   You wrote them.  I didn't.
24     A.   Yeah.
25     Q.   Do any of them have anything to do with the

PLAINTIFFS' EXHIBITS 009548

Russell Somma, Ph.D.                                    July 1, 2010

Page 28

1   appropriate ways to get to a root cause analysis?

2        A.   While none of them speaks to that topic by

3   inference, I think that these types of things are

4   tools that would be used in a root cause analysis, but

5   they are not titled such.

6        Q.   Okay.

7        A.   Okay?

8        Q.   When was the first time you met in person

9   with somebody from the plaintiffs' lawyers group in

10  this case?

11       A.   I think -- I'm guessing -- No, I'm not going

12  to guess.

13            Well, not to waste time, I'm thinking mid --

14  late May, mid May, something like that.

15       Q.   Who has been your primary contact?

16       A.   Meghan Johnson.

17       Q.   I assume you spent some time with plaintiffs'

18  lawyers either this morning or yesterday preparing for

19  your deposition today?

20       A.   Yes, sir.

21       Q.   Who did you meet with with?

22       A.   I met with Meghan and Pete Miller.

23       Q.   And did they tell you anything about the

24  deposition testimony of a Mr. Farley that took place

25  in Savannah, Georgia on Monday?

PLAINTIFFS' EXHIBITS 009549

Russell Somma, Ph.D.                                    July 1, 2010

Page 29

1        A.    No, sir.

2        Q.    Did they tell you anything at all about the

3   deposition testimony of Mark Kenny that took place in

4   this room on Tuesday?

5        A.    No, sir.

6        Q.    Did they tell you anything about the

7   deposition testimony of a Dr. Frank that took place in

8   Philadelphia yesterday?

9        A.    No, sir.

10        Q.    Have you read the reports of any other

11   experts in this case?

12        A.    No, sir.

13        Q.    No Dr. Semigran, no Dr. Nelson?

14        A.    No, sir.

15        Q.    Not Farley, Frank?

16        A.    No.

17        Q.    Etc., etc.?

18        A.    No.  If I had a guide, I probably wouldn't

19   have made the mistake I told you about.  Do you know

20   what I mean?

21        Q.    I --

22        A.    Okay.

23        Q.    Other than Pete Miller and Meghan, who have

24   you talked with about this litigation?

25             (A discussion is held off the record.)

Russell Somma, Ph.D.                                      July 1, 2010

Page 30

1      A.    That would be the guy at Spyglass, Mark
2    Kenny.
3      Q.    Did you talk to him about substance or just
4    logistics?
5      A.    I think part of it was -- when you say
6    "logistics," who is going to do what?
7      Q.    Who is going to do what, here's who to call,
8    things like that?
9      A.    That was partly, partly --
10      Q.    Did you talk about the substance of the
11    litigation, what the claims were?
12      A.    When we first met with them.  Because like I
13    said, we had been contacted and they explained to me
14    what this was about.  So I think in that particular
15    case, there was a substantive amount of discussion,
16    yes, sir.
17      Q.    Did you meet with Mark Kenny in person?
18      A.    Yes, sir.
19      Q.    Where did you meet?
20      A.    In Chester, New Jersey.
21      Q.    Was there anybody else present?
22      A.    As I recall, Sal Romano was present as well.
23      Q.    All right. Did you keep any notes from that
24    meeting?
25      A.    Those I did not sir, no.

PLAINTIFFS' EXHIBITS 009551

Russell Somma, Ph.D.                                    July 1, 2010

Page 31

1      Q.   And I see you have a spiral bound notebook in
2   front of you.  Is that correct?
3      A.   That's right.
4      Q.   Is that notes about substance, or just your
5   ongoing logistical work in the matter?
6      A.   Because -- actually, it's everything that
7   I've done.  If -- in other words, if I've read -- if
8   I've read a lot of material, I'll make notes in here
9   rather than try to make a paper copy.  Or if I have a
10  meeting, I'll put the notes in here.
11          I did not start this, because when I talked
12  to the guys at Spyglass -- excuse me -- Mark Kenny, I
13  hadn't been selected to do the job.
14     Q.   All right.  Did you bring a photocopy of
15  your notebook today?
16     A.   No, sir, I did not.
17          MR. MORIARTY: At some point today we will have
18      to mark the notebook and make sure we get copies
19      of the notes.
20          MR. MILLER:  Okay.
21     Q.   So other than Pete and Meghan and Sal and
22  Mark Kenny, have you talked to anybody else about this
23  litigation?
24     A.   Well, we visited Actavis and I talked to
25  Michael Anderton, right?  So I guess that counts too.

Russell Somma, Ph.D.                                    July 1, 2010

Page 32

1      Q.    Right.  And whoever else was along that day?
2      A.    Was there -- I forget.  There was a -- well,
3   there was Michael and the guys from Actavis.  I didn't
4   talk to them obviously, but --
5      Q.    What I really want to know is:  Did you talk
6   to anybody else about the substance of the litigation?
7      A.    No, sir.
8      Q.    Do you have any military service?
9      A.    No, sir.
10     Q.    Have you ever been a professor at any school?
11     A.    My teaching assignment was limited to my
12   residency for my doctorate.
13     Q.    Do you consider yourself to be an expert in
14   pharmacokinetics?
15     A.    No, sir.
16     Q.    Pharmacology?
17     A.    No, sir.
18     Q.    Pharmacovigilance?
19     A.    No, sir.
20     Q.    Do you consider yourself to be an expert in
21   the regulatory aspect of the pharmaceutical industry?
22     A.    I'm familiar with the regulatory aspect in
23   the amount that it requires me when I do my job,
24   because it's a regulated industry.  Am I an expert?
25   No, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 33

 1      Q.    Are you an expert in quality assurance?
 2      A.    No, sir.  And, again, where it overlaps into
 3  what I do:
 4      Q.    Okay.  And I asked you I think a little bit
 5  before:  You don't consider yourself to be an expert
 6  in quality control chemistry?
 7      A.    No, sir.
 8      Q.    Have you ever looked at the Digitek detailed
 9  patient labeling?
10      A.    Yes, sir.
11      Q.    Have you ever looked at the United States
12  Pharmacopeia monograph regarding digoxin?
13      A.    Yes, sir.
14      Q.    Did you ever look at the USP monograph about
15  digoxin as part of your work in industry?
16      A.    No.
17      Q.    Have you ever looked at at the USP monograph
18  on digoxin before your litigation consulting in this
19  case?
20      A.    There was no reason to.  No, I did not.
21      Q.    Now, let's get back to your report.
22            Exhibit 52, I believe it is, Appendix A.
23  Would it be safe for me to say that a lot of what you
24  relied on for your analysis in this case was FDA Form
25  483s and warning letters?

Russell Somma, Ph.D.                                        July 1, 2010

                                                            Page 34

1      A.   I wouldn't say predominantly, no.  I think I
2  looked for more content in technical information,
3  batch records, investigations, internal documents.
4  That's my -- my -- what I -- customarily how I do
5  that.
6      Q.   All right.  In Appendix A, the only batch
7  record I see listed is seven -- it should be 70924A.
8  You actually have a typo here.
9      A.   Yes.
10     Q.   It's the second item from the end.
11     A.   Yeah.
12     Q.   Is that the only batch record you reviewed?
13     A.   No, sir.
14     Q.   What other batch records did you review?
15          And while you are looking for those, are
16  these batch records that you received subsequent to
17  drafting your report?
18     A.   No.
19     Q.   So you reviewed other batch records, but did
20  not put them in Appendix A?
21     A.   That's correct.  I think because -- Well, let
22  me find it first so I understand what you are talking
23  about.
24          71005A.
25     Q.   71005A?

Russell Somma, Ph.D.                                    July 1, 2010

Page 35

```
 1      A.    5A.

 2      Q.    Okay.  What else?

 3            I'm sorry.  I have a question about that.

 4            Is that the complete batch record?

 5      A.    That I couldn't say.

 6      Q.    Does it have the mixing information?

 7      A.    It has the procedures necessary to make the

 8   blend and the tablets.  The M -- M --

 9      Q.    Well, wait a minute.  Just answer my

10   question.

11      A.    Yeah.

12      Q.    Does it having mixing information with the

13   weighing and measuring of the excipients and the

14   active pharmaceutical ingredient?

15      A.    Yes, sir.

16      Q.    It has the blending information?

17      A.    Yes, sir.

18      Q.    Does it have the chromatography for the blend

19   uniformity samples?

20      A.    It has the results.  It doesn't have the raw

21   data.

22      Q.    All right.  Does it have the in-process

23   tableting data, such as the QA and the operator

24   checks?

25      A.    Yes, it does, sir.
```

Russell Somma, Ph.D.                                      July 1, 2010

                                                              Page 36

1        Q.   Does it have the results of the quality

2    control testing, such as assay and content uniformity?

3        A.   Yes, it does.

4        Q.   Does it have the packaging information?

5        A.   It looks like it does, sir, yes.

6        Q.   Okay.  What other batch records did you

7    review besides 70924A and 71005A?

8        A.   Those are the only two I looked at before I

9    wrote the report.

10       Q.   Do you know how many batches were included in

11   the recall?

12       A.   I don't recall, sir.

13       Q.   Do you know that we have produced at least

14   152 batch records to the plaintiffs' lawyers in this

15   case?

16       A.   I didn't know that number.  I would imagine

17   the product has a lot of batch records, yeah.

18       Q.   Did you ask to look at any more batch

19   records?

20       A.   Yes, I did.

21       Q.   And what happened with that?

22       A.   I -- subsequent to my request, they put more

23   on the site for me to look at, yes.

24       Q.   They put more on the site?

25       A.   We have a -- there is a database that some of

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 37

1    this information be placed on for me to access.  And I
2    was able to go in there and take a look.
3        Q.   Did you?
4        A.   Yes, sir.
5        Q.   Okay.  My question was:  What other batch
6    records did you look at besides 70924 and 71005.
7             So what batch records did you look at on this
8    site?
9        A.   I don't remember the numbers, to be honest
10   with you, sir.
11       Q.   How many batch records did you look at?
12       A.   It must have been at least three.
13       Q.   Were 152 batch records available on the site?
14       A.   That I don't know, sir.
15       Q.   What's the web address for the site?
16       A.   It's Crivella.com, the W -- the web address.
17       Q.   That's good.  Is this a website for which you
18   needed a password?
19       A.   Yes, it is.
20       Q.   Did you make note anywhere in your notebook
21   of what other batch records you reviewed on line?
22       A.   No, sir.  You will find these two that we
23   just talked about.
24       Q.   All right.  Other than what's on Exhibit --
25   I'm sorry -- Appendix A, what else have you reviewed?

PLAINTIFFS' EXHIBITS 009558

Russell Somma, Ph.D.                                    July 1, 2010

Page 38

```
 1      A.    I've looked at everything that's on these
 2   drives.
 3      Q.    You are pointing to a little white box that
 4   presumably has a thumb drive in it?
 5      A.    Several thumb drives, sir.
 6      Q.    Are they -- is there different material on
 7   those two thumb drives?
 8      A.    Actually, yeah, there's three.
 9            MR. MILLER:   Three.
10      A.    And there is documents that were pulled from
11   the site and -- on two of them, which are these two.
12            And I'm not clairvoyant.  I have them written
13   on the back.  I see you looking at me.
14            And the third one is e-mails that you have
15   asked to see.
16      Q.    All right.  Now, are those thumb drives
17   duplicates that I can take, or do they have to be
18   duplicated?
19      A.    No, sir, these are -- you requested these and
20   these are for you.
21      Q.    Okay.  Thanks for the little white box, too.
22   I appreciate it.
23      A.    Well, I realize you wanted yes or no, but the
24   answer is:  You'll lose them, believe me.  So I put
25   them in a box.  Sorry.
```

PLAINTIFFS' EXHIBITS 009559

Russell Somma, Ph.D.                                    July 1, 2010

Page 39

1      Q.    Could you give them to Mark, please?

2      A.    Sure.  Mark.

3      Q.    That Mark.

4      A.    There you go.

5            MR. MORIARTY:  Mark, mark it.

6            (D-51A, White Box Containing Three Thumb

7      Drives marked for identification.)

8      Q.    Dr. Somma, is 51 -- Exhibit 51A the little

9   white box with the three thumb drives on it that we

10  just discussed?

11     A.    Yes, sir.

12     Q.    Okay.  Can I have that?

13     A.    Sure thing.

14     Q.    And just so I make sure I understand what is

15  on it, on those thumb drives, is that material in

16  addition to Appendix A?

17     A.    Yes, sir.  And the drafts.

18     Q.    Drafts of your report?

19     A.    And -- yes.

20     Q.    You are very organized.  I appreciate that.

21     A.    Well, you made a pretty good list, Matt,

22  so...

23     Q.    I see at the end of Exhibit A that you

24  reviewed the depositions of Richard Dowling, Phyllis

25  Lambridis, Dan Bitler and Scott Talbot.  Is that

PLAINTIFFS' EXHIBITS 009560

Russell Somma, Ph.D.                                    July 1, 2010

Page 40

1    correct?

2         A.    Yes, sir.

3         Q.    Did you read the whole deposition?  They're

4    kind of long?

5         A.    They're really long.  I went through them

6    and I got a -- I started skimming stuff, looking for

7    pieces.

8         Q.    Did you make notes anywhere of things that

9    any of those four witnesses said --

10        A.    Yes.

11        Q.    -- that you disagreed with?

12        A.    Disagreed?

13        Q.    Disagreed.

14        A.    I would have to actually look at all my

15   notes.  I made notes about things they said.  Whether

16   I disagreed or agreed, I can't say yes or no.

17        Q.    Okay.  We'll look at your notes later.  If I

18   have time for that, I'll go back to it.

19        A.    Okay.

20        Q.    Did you ever look at the ANDA?

21        A.    Yes, sir, I did.

22        Q.    Is that on Appendix A or --

23        A.    That's on the jump drives.  Excuse me.  Thumb

24   drives.

25        Q.    Now, when you are -- what kind of things is

PLAINTIFFS' EXHIBITS 009561

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 41

1   SommaTech asked to do in your consulting practice?

2       A.   Like I -- just to make the connection, when I

3   left Novartis, my reputation was for scale-up and

4   fixing production problems.

5       Q.   Okay.

6       A.   So as soon as we put the shingle out, we

7   started fixing people's problems.  My expertise in

8   several areas, that was people -- the network knew I

9   was out about; I got contacted.

10      Q.   All right.  Have you ever been consulted as

11  part of SommaTech for an over-thick or overweight

12  tableting problem?

13      A.   Yes, sir.

14      Q.   Go back to your industry experience.  And I'm

15  sorry for jumping around.

16      A.   That's okay.

17      Q.   Did you ever have overweight or over-thick

18  tableting problems at Novartis?

19      A.   Not that I recall.

20      Q.   Are you -- is the identity of your consulting

21  client with the double -- or the overweight or

22  over-thick tableting problem, are you able to discuss

23  that consulting?

24      A.   To be honest, just so -- the way consulting

25  works in our business, because we sign CEAs.

PLAINTIFFS' EXHIBITS 009562

Russell Somma, Ph.D.                                    July 1, 2010

```
 1      Q.    Okay.

 2      A.    Yeah, so I --

 3      Q.    All you have to do is say "No, I can't

 4   discuss it."

 5      A.    Okay.  I want to try to make sure you know:

 6   We are not a mom and pop operation, so --

 7      Q.    I understand.  So what was the specific

 8   tableting problem that this consulting client had?

 9      A.    That tablets which were oversized essentially

10   got into distribution.

11      Q.    All right.  Did you ever figure out how many

12   --

13      A.    No.

14      Q.    -- oversized tablets had gotten into

15   distribution?

16      A.    No, sir.

17      Q.    Is that consulting engagement closed?

18      A.    Absolutely, sir.  In fact, in that particular

19   case, for clarity, we were consulting on a different

20   issue, on a different product, and this came about and

21   we were asked.  Okay?

22      Q.    Okay.  What did you look at once they said,

23   "We have this oversized tableting problem;" what did

24   you do, what documents did you look at, who did you

25   talk with to try to figure out what the problem was?
```

PLAINTIFFS' EXHIBITS 009563

Russell Somma, Ph.D.                                July 1, 2010

                                                        Page 43

1       A.    We did a -- again, to be clear, our
2    involvement in this was not heavy.
3            They asked us to look.  We looked at the
4    batch records in this particular case, which are
5    similar to what we looked at in this situation.
6       Q.    Okay.
7       A.    And we did not see any anomalous behavior.
8       Q.    How many -- go ahead.
9       A.    Excuse me.  I'm fine.
10      Q.    How many batch records did you look at as
11   part of that consulting engagement?
12      A.    In that particular case, I looked at the
13   batch in question or the batch they said they had the
14   problem with, and a previous batch, you know, what was
15   the batch before that and what was the batch after
16   that.  Only because that's my -- my approach to
17   things.
18      Q.    Okay.  And, you know, I don't remember off
19   the top of my head what Batch 71005A was.  Do you
20   remember when it was --
21      A.    I'd have to look.
22      Q.    -- compressed?  I mean, maybe you remember
23   off the top of your head that it was a preceding --
24            (A discussion is held off the record.)
25      Q.    -- or following 70924?

Russell Somma, Ph.D.                                    July 1, 2010

Page 44

1         A.    I could probably give you a better sense of

2    that as soon as I look at the date.   My --

3         Q.    If you just tell me the date, that's fine?

4         A.    The date on this is December 17th, '07.   This

5    is during the compression sheet.

6         Q.    Okay.  So it was close in time to 70924?

7         A.    Yeah, but I wouldn't say that it was like

8    right next to each other.

9         Q.    That's fine.  So for that consulting client,

10   they had produced some extra-thick tablets.   Is that

11   right?

12        A.    That's correct.

13        Q.    And some of them, were they verified to have

14   made it out into the marketplace?

15        A.    Yes, sir.

16        Q.    Was there a recall involved?

17        A.    Yes, sir.  Again, as that started to -- just

18   so you got a full disclosure, as that started to

19   gather and evolve, they were aware of it, they were

20   going to take action, and voluntary subsequent to that

21   the thing really took on a life of its own.  Okay?

22        Q.    Okay.

23        A.    We were not involved in that aspect.   Just

24   want to give you a sense of it, so you don't assume I

25   was sitting there at the helm.  Okay?

PLAINTIFFS' EXHIBITS 009565

Russell Somma, Ph.D.                                    July 1, 2010

                                                            Page 45

 1              Sorry to babble on, but I didn't want you to

 2     waste your time going down that street, you know.

 3        Q.    But when you looked --

 4        A.    Right.

 5        Q.    -- at the batch records --

 6        A.    Right.

 7        Q.    -- you didn't see a problem?

 8        A.    No, sir.

 9        Q.    You didn't see anything like a validated

10     process that was out of control?

11        A.    You see, your first step is:  You look at the

12     batch record.  I didn't see anything.  Customarily the

13     next thing you would do is look at the validation.  I

14     didn't do that.  Okay?  So I don't make that

15     assumption, I don't make that leap until I look at it.

16     Okay?

17        Q.    All right.  I'd like you to look at Exhibit

18     52?

19        A.    Yes, sir.

20        Q.    Third full paragraph.

21        A.    Yes, sir.

22        Q.    Oh, I'm sorry.  The very end of the first

23     full paragraph.  You were an "invited investigator

24     trainer and liaison for the FDA on various projects

25     and initiatives"?

Russell Somma, Ph.D.                                    July 1, 2010

Page 46

1      A.   Yes, sir.

2      Q.   What projects and initiatives were those?

3      A.   They had a project to train their field

4   investigators who were not that knowledgeable in

5   industry -- common industry practices.

6           So at the time, it was customary for the

7   field officers or people in the Compliance branch to

8   identify people in industry to come in and teach.

9      Q.   Okay.  And what did you teach?

10     A.   On matrix tablets.

11     Q.   What are matrix tablets?

12     A.   Matrix tablets is a term that's used in the

13  industry to define a timed-release tablet, a sustained

14  release.

15     Q.   Third full paragraph.  You refer to yourself

16  as a "recognized industry subject matter expert."

17          What do you mean, "recognized"?

18     A.   That people come to me and employ my services

19  in technology transfer.

20     Q.   Next full paragraph, you're talking about

21  some publications.  Are you sure that those

22  publications are peer reviewed?

23     A.   Yes, sir.

24     Q.   Okay.

25     A.   I have to change glasses.  Excuse me.

PLAINTIFFS' EXHIBITS 009567

Russell Somma, Ph.D.                                    July 1, 2010

Page 47

```
 1      Q.   Go to Page 2, please.  In the Introduction
 2  sentence -- I'm sorry.  In the Introduction section,
 3  the first sentence and the last sentence refer to "our
 4  review."
 5      A.   Right.
 6      Q.   Who is "our"?
 7      A.   I have to note that when I write things in
 8  general, it's my habit to write in the "we, our."
 9  Simply because as a firm, I write that.  It should
10  be -- I hope I'm making sense.  It's SommaTech's
11  opinion, the answer is that's how I write things.
12           If it's a mistake -- in this case -- I would
13  say it's a -- it's a grammatical mistake.
14      Q.   That's fine.  This is all your work?
15      A.   This is my work, sir.
16           (A discussion is held off the record.)
17      Q.   Second full paragraph, the last sentence, you
18  are talking about "the final distribution of a batch
19  within which a pharmacist who was dispensing the
20  product in the field reported "double-thick" tablets."
21           Do you see that sentence?
22      A.   Yes, sir.
23      Q.   The next paragraph starts with the reference
24  to Batch 70924.  Do you see that?
25      A.   Yes, sir.
```

PLAINTIFFS' EXHIBITS 009568

Page 48

1     Q.    Are you talking about two different batches?

2     A.    No, sir.  I'm not.

3     Q.    So do you believe that a pharmacist somewhere

4  in the United States found a double-thick tablet that

5  was made as part of Batch 70924 in November of 2007?

6     A.    That's -- That's my understanding, yes, sir.

7     Q.    I would like you to dig through whatever

8  documents you need to dig through to find that for me,

9  because that would be a revelation.

10          MR. MORIARTY: And, Pete, if you know what he

11     is referring to, by all means help him to speed

12     this up.

13          MR. MILLER: All right, I will.

14          (A discussion is held off the record.)

15     A.    I realize I'm wasting your time.  It's going

16  to take me a bit.  I thought I had it here.

17     Q.    Do you remember what the content of that

18  exhibit is?

19     A.    It was a -- as I recall, it was --

20     Q.    No, wait.  Yes or no.  Do you remember it

21  enough to answer questions about it?

22          Because I know what you are talking about.

23     A.    Okay.

24          MR. MILLER:  I would object to him answering

25     off of memory.

PLAINTIFFS' EXHIBITS 009569

Russell Somma, Ph.D.                                    July 1, 2010

Page 49

```
 1     A.   Yeah, I think --
 2          MR. MORIARTY:  Maybe he has enough memory to
 3     answer it.  That's what I asked him.
 4     A.   Right.
 5          MR. MILLER:  That's what I objected to.
 6     Q.   He objects to your memory.
 7          MR. MILLER:  No.  I object to your question.
 8     Q.   Do you have enough memory of that exhibit to
 9     answer questions about it?
10     A.   Why don't you ask me the question.
11     Q.   Sure.
12     A.   And then you know what?  If I can't
13     accurately answer it, I'll answer yes or no.
14     Q.   Do you know whether that was found by a
15     pharmacist or somebody at a nursing home?
16     A.   As I recall it was a pharmacist.  Whether he
17     was at a nursing home, I don't recall.
18     Q.   Do you know if it was in a blister pack or in
19     a bottle?
20     A.   That I don't recall.
21     Q.   Do you know if it was weighed?
22     A.   That I don't recall either.
23     Q.   Do you know if it was measured?
24     A.   No.
25     Q.   Do you know if it was ever returned to Mylan
```

Russell Somma, Ph.D.                                          July 1, 2010

                                                                  Page 50

1    or Actavis?

2         A.   I believe it was part of a complaint.

3         Q.   Was it ever returned to Mylan or Actavis?

4         A.   Not to my knowledge.

5         Q.   Was the e-mail that you looked at an internal

6    Mylan e-mail?

7         A.   I don't remember the format.

8         Q.   Was there actually correspondence from the

9    person who supposedly saw this directly to Mylan or

10   Actavis?

11        A.   The person who found it?

12        Q.   Yeah.

13        A.   No, sir.  That's -- that I do remember.

14        Q.   Okay.  Would you agree with me -- you know

15   what a blister pack is; right?

16        A.   Absolutely, sir.

17        Q.   Would you agree with me -- I'm sorry.  Let me

18   ask another question first.

19             Let's assume it was in a blister pack.  Do

20   you know whether the blister pack was ever opened so

21   that they could actually inspect the tablet?

22        A.   I couldn't answer that, because I don't

23   remember it being in a blister pack either.

24        Q.   But if -- if it was in a blister pack and

25   they didn't remove it to weigh or measure it, would

Russell Somma, Ph.D.                                    July 1, 2010

Page 51

1    you agree with me it would be extremely difficult to

2    see through the pack as to what the actual size was?

3              MR. MILLER:  Objection.

4        A.   If you are asking me -- if I was asked to

5    measure the tablet that was inside of a blister pack,

6    my answer to that would be that's impossible to do

7    accurately.

8        Q.   Okay.  If you were asked to do an

9    investigation of an incident where somebody reported

10   that there was a double-thick tablet, wouldn't you try

11   to have some communication with the person who

12   supposedly saw it?

13             Let me go back and ask a different question.

14       A.   Okay.

15       Q.   Okay.  I'll withdraw that question.

16             Let's assume that one of your consulting

17   clients calls you and says, We think we may have

18   released some extra-thick tablets.  We have a report,

19   a third-hand report, of somebody in Massachusetts at a

20   nursing home who may have one.  We want you to look

21   into it."  Okay?  Now, let's go from that premise.

22             Would you try to communicate with the nursing

23   home person in Massachusetts who supposedly saw it?

24             MR. MILLER:  Object to form.

25       Q.   Yes or no?

PLAINTIFFS' EXHIBITS 009572

Russell Somma, Ph.D.                                            July 1, 2010

Page 52

1      A.    I would ask to see the sample first.

2      Q.    Okay.  You'd ask to see the sample?

3      A.    Yes, sir.

4      Q.    And if it was in a blister pack, would you

5   open the blister pack?

6      A.    Yes, sir.

7      Q.    Would you weigh it?  The tablet.

8      A.    Yes, sir.

9      Q.    Would you measure it?

10     A.    Yes, sir.

11     Q.    Would you consider submitting it to a lab for

12  testing for its active pharmaceutical ingredient

13  content?

14     A.    Customarily I would, because that was how I

15  did things, yes, sir.

16           We didn't -- I wouldn't call the guy at the

17  nursing home.  We didn't get that far.

18     Q.    Well, if you couldn't return the sample,

19  would you call the person at the nursing home to find

20  out what they actually did to analyze it?

21     A.    I think, if I understand -- maybe I'm having

22  trouble with understanding the question.  I'm not

23  trying to be stupid.

24           They found it.  They reported it, but they

25  didn't send it back.  Did I get that?  Is that the

PLAINTIFFS' EXHIBITS 009573

Russell Somma, Ph.D.                                    July 1, 2010

Page 53

1   question?

2        Q.   Yeah.   But if it wasn't weighed, wasn't

3   measured, wasn't taken out of the blister pack, we

4   don't even know who this person was, what their

5   qualifications were, whether they're a pharmacist, a

6   nurse or ward secretary, that isn't a very reliable

7   report for you to go on as a pharmaceutical

8   investigator; is it?

9             MR. MILLER:  Object to form.

10       A.   You would have to determine that person's

11  credentials in the building, yes.

12       Q.   Would you agree with my statement that's not

13  a very reliable report if none of that was done?

14            MR. MILLER:  Objection.

15       A.   I would say yes, that you would have to have

16  more reliability.

17       Q.   Dr. Somma, since we are going to be going all

18  day, we do take periodic breaks.  I'm willing to keep

19  going.  But if you need a break now, I'm about to

20  change subjects.  Okay?

21       A.   Okay.  Can I stand up, then?

22       Q.   Sure, you can stand up.

23            MR. MILLER:  All right.  We'll take a break.

24  Is that what we're doing?

25       A.   Is that okay?

Russell Somma, Ph.D.                                    July 1, 2010

Page 54

1      Q.   I don't need a break.  Do you want to just

2   stretch your legs and sit right back down, or do you

3   want a general break?

4      A.   I was going to hit --

5      Q.   Then let's take a break.

6           THE VIDEOGRAPHER: Stand by.  We are going off

7       the record.  The time is 9:37 a.m.  This is the

8       end of Tape 1.

9           (A discussion is held off the record.)

10          MR. MORIARTY:  This is the first witness that

11      I've deposed who's said that he has seen that

12      document.  If you sent that to your other experts,

13      I need to know.  Because no one else has mentioned

14      that document.

15          I don't need to know today.

16          MR. MILLER:  Right.  Okay.

17          MR. MORIARTY:  I don't want you to guess.

18          MR. MILLER:  Yes.  I need to confirm and get

19      back to you.

20          MR. MORIARTY:  I just need to know before we

21      take any more depositions.

22          MR. MILLER:  Fair enough.  I will get back to

23      you.

24          (A recess is taken.)

25

PLAINTIFFS' EXHIBITS 009575

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 55

 1    CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

 2            THE VIDEOGRAPHER: We are back on the record.

 3        The time is 9:45 a.m. This is the beginning of

 4        Tape Number 2.

 5        Q.   Dr. Somma, I'd like you to go to Page 7 of

 6    your report, Exhibit 52, please.

 7        A.   Okay.

 8        Q.   The first full paragraph is referring to

 9    dedusters and metal detectors.  Is that right?

10            (A discussion is held off the record.)

11        A.   I'm sorry, Matt.  May I have the question

12    again?

13        Q.   All I asked is:  Are you talking about

14    dedusters and metal detectors --

15        A.   Yes.

16        Q.   -- in that paragraph?

17            Is it routine in the pharmaceutical tableting

18    process to have dedusters and metal detectors?

19        A.   Yes, sir, very common.

20        Q.   Why?

21        A.   The deduster -- the first -- the deduster is

22    to take off, you know, loose powdered material, makes

23    it easier to go through, make a cleaner product in the

24    packaging, less contamination of bottles, cleaner

25    operation.

PLAINTIFFS' EXHIBITS 009576

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 56

 1            Metal detectors are to pick up any metallic
 2    material which may come off as a piece of a machine,
 3    broken part, small things.  And a metal detector is to
 4    assure that that does not happen.
 5        Q.   Did they use metal detectors at Novartis in
 6    the tableting process?
 7        A.   Yes.
 8        Q.   Okay.  Now I'd like you to go to the next
 9    paragraph.  You're talking about sample frequency.
10            Do you see that?
11        A.   Yes, sir.
12        Q.   I want to ask you about that.
13            Would you agree with me that you cannot
14    chemically test every tablet in a production line,
15    because you would have nothing to sell to the
16    consumers?
17        A.   That's correct, sir.
18        Q.   So it is routine in the pharmacy industry to
19    do a couple of things.  One is in-process sampling of
20    weight, thickness and hardness and appearance.  Is
21    that right?
22        A.   That's right.
23        Q.   And then when you have finished tablets, a
24    certain sample of them are sent to the Quality Control
25    lab for assay and content uniformity testing?

PLAINTIFFS' EXHIBITS 009577

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 57

 1      A.   That's correct.

 2      Q.   Is that right?

 3      A.   That's correct.

 4      Q.   Now -- And typically does the ANDA contain

 5   information about how many times per half hour, hour,

 6   whatever the sequence is going to be, for the

 7   in-process testing?

 8      A.   Yes, the ANDA does, yes.

 9      Q.   And the ANDA would contain information about

10   the size of the samples of finished tablets that would

11   be sent to QC for assay and content uniformity?

12      A.   Yes, sir.

13           (A discussion is held off the record.)

14      Q.   So the FDA approved the ANDA for this

15   product; did they not?

16      A.   Yes, sir.

17      Q.   As a matter of fact, I hand you Exhibit 6,

18   tell me if you have seen that before?

19      A.   Yes.

20      Q.   First, have you seen it before?

21      A.   Yes, I recall seeing it.

22      Q.   It's the FDA's letter to Amide, the

23   predecessor to Actavis, approving the ANDA; correct?

24      A.   Yes, sir.

25      Q.   And presumably FDA was fully aware from the

PLAINTIFFS' EXHIBITS 009578

Russell Somma, Ph.D.                                    July 1, 2010

Page 58

1    contents of the ANDA as to what the sampling plans

2    were?

3             MR. MILLER:  Object to form.

4        A.   The sampling plans were in the ANDA, correct.

5        Q.   All right.  Are you familiar with current

6    Federal Regulations 211.110C about sampling?

7        A.   No, sir.

8        Q.   All right. Do you know of any regulation in

9    the CFR that's part of the pharmaceutical

10   manufacturing guidelines which specifies either the

11   frequency of in-process testing or the number of

12   tablets that are analyzed during production runs?

13       A.   As I recall, I am not an expert in that area,

14   but as -- as I recall, you look to things like the USP

15   for guidance on sampling and testing.

16       Q.   Okay.  Were the Amide and Actavis in-process

17   sampling plans in the batch records?

18       A.   As I recall they were, sir.

19       Q.   Did the FDA have every opportunity to look at

20   those and comment upon them if they wished between

21   2004 and 2008 when they did their inspections?

22       A.   Yes, sir.

23       Q.   And have you seen any warning, observation or

24   other comment by FDA in the 483s or the warning

25   letters to the effect that Actavis' in-process

PLAINTIFFS' EXHIBITS 009579

Russell Somma, Ph.D.                                    July 1, 2010

Page 59

1    sampling plans were inadequate?

2        A.    Can I just refer to one of these?

3              MR. MILLER:  Certainly.

4        A.    What I wanted to check back, to answer your

5    question now, is you asked specifically to FDA input,

6    and I double checked; and to my knowledge -- to my

7    recollection, they had no problem with the sampling

8    frequency.

9        Q.    Okay.  And I skipped.  I didn't ask you about

10   this.  But, you know, certainly the blend uniformity

11   sampling plan:  The number of samples, the type of

12   sampling they used, the locations in the blender,

13   that's all in the ANDA; is it not?

14       A.    That information was in the ANDA.  What I --

15   and it looks like these things have continued to be

16   worked on and progressed at Actavis.

17       Q.    Okay.  And they are in the batch records; are

18   they not?

19       A.    They sure are, as planned deviations, which

20   means it is over and above what they had indicated

21   they wanted to do.

22       Q.    Okay.  All right.  And I don't want to talk

23   about blend uniformity investigations right now.  But

24   as far as the sampling plans are concerned, did you

25   ever see any FDA observation warning letter or 483

PLAINTIFFS' EXHIBITS 009580

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 60

1    criticism of the actual blend uniformity sampling plan

2    itself?

3         A.   Looking, again, at what I just looked at, I

4    just -- my -- my answer would be no.

5         Q.   And then the finished product testing; the

6    number of finished products they sent for assay or

7    content uniformity, that was in the ANDA and in all

8    the batch records.  Is that correct?

9         A.   That's correct.

10        Q.   And have you seen any FDA warning,

11   observation, criticism, regarding the finished product

12   testing sampling plan?

13        A.   I have not, simply because Actavis very

14   diligently followed USP requirements, which are a

15   minimum standard here.

16        Q.   Now let's go back to your report.

17        A.   Uh-huh.

18             Excuse me, Matt.  Do I need to hand you back

19   these things?

20             MR. MILLER:  No.

21        Q.   No.  Actually, put them on that bigger stack

22   there.

23        A.   Oh, okay.

24        Q.   I'd like you to look at -- What I did is I

25   took your references in your Appendix A of your report

Russell Somma, Ph.D.                                    July 1, 2010

                                                            Page 61

1    and I created a binder.  And I did them by the numbers

2    in order of your appendix.  Okay?

3         A.   Okay.

4         Q.   So I'd like you to look at your Reference

5    Number 4.

6         A.   Which would be Methods For Drug Substance and

7    Drug Products From the ANDA?

8         Q.   Yes.  Was this validated?

9         A.   All of their methods were validated.

10        Q.   All right.

11        A.   Yeah.

12        Q.   I don't see anything -- Do you see anything

13   in the FDA regulations that indicates that there is a

14   mandatory time period in which you need to re validate

15   a particular process?

16        A.   That really depends on the firm's approach to

17   things.  And, again, I'm not trying to be vague.  FDA

18   gives a firm the ability to operate their business in

19   their own best interests.  And that has to be done by

20   an internal review.

21             So basically I'm answering the question:  FDA

22   doesn't say you have to do this every year or every

23   six months.

24        Q.   Okay.

25        A.   That's been my experience.

PLAINTIFFS' EXHIBITS 009582

Russell Somma, Ph.D.                                    July 1, 2010

Page 62

 1      Q.   I didn't see anything in your report to
 2    indicate that the test methods contained in Reference
 3    4 of your report were no longer valid in 2006, 2007 or
 4    2008.
 5      A.   No.
 6      Q.   Is there anything in your report about that?
 7      A.   No, sir.
 8      Q.   So I assume you have no opinion to a
 9    probability to the effect that these were somehow not
10    valid in 2006, '07 or '08.  Is that right?
11      A.   My opinion in that case is that they were
12    valid, yes, sir.
13      Q.   All right. So let's go back to your report.
14      A.   Yes, sir.
15      Q.   Page 5.  You have a comment here.
16      A.   Yes, sir.
17      Q.   -- in the last paragraph before Packaging, it
18    says, "We did not consider the sample frequency (every
19    hour) used during the compression phase of the
20    manufacturer to be adequate."
21           Do you see that?
22      A.   Yes, sir, and that is the error that I wanted
23    to bring up.
24      Q.   All right.  Well, I'll get there.
25      A.   Okay. You know, Matt, because I know I'm not

PLAINTIFFS' EXHIBITS 009583

Russell Somma, Ph.D.                                    July 1, 2010

Page 63

```
 1    supposed to ask you questions, but what page are you

 2    on again?

 3        Q.   Seven.

 4        A.   Oh, I'm looking at Five.

 5             MR. MILLER:  You said Five.

 6        Q.   Sorry.  Well, wait a minute.  Wait a minute.

 7    I'll -- I'll fix this.

 8             Let's go back to Five.

 9        A.   Okay.

10        Q.   At the end of the first paragraph on that

11    page, you refer to "These tests are conducted on an

12    hourly basis."

13             Do you see that?  On Page 5.  Last sentence,

14    first paragraph.

15        A.   Yes, sir; yes, sir.

16        Q.   And then at Page 7, you were critical of the

17    sample frequency because it was only every hour;

18    correct?

19        A.   Correct.

20        Q.   All right.  Have you looked back at the

21    records?

22        A.   Yes, sir.

23        Q.   And you recognized that its QA comes in every

24    hour.  Is that right?

25        A.   That's correct, sir.
```

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                          Page 64
 1      Q.   And the tablet press operator checks every 30
 2   minutes?
 3      A.   Yes, sir.
 4      Q.   Correct?
 5      A.   Correct.
 6      Q.   So within the space of an hour, there are
 7   actually three checks.  Is that right?
 8      A.   With counting the QA, yes, sir.
 9      Q.   Yes.  All right.  So if we were to dig back
10   into Mr. Bitler's report, that is Plaintiff's Exhibit
11   16, we would find --
12           MR. MILLER:  I don't believe you have handed
13       him that.
14           THE WITNESS:  Oh, okay.
15           MR. MORIARTY:  I haven't.  He has it in his
16       material.
17      Q.   Would you like your own copy of it, or can we
18   refer to --
19      A.   Just to be clear, that's the deposition?
20      Q.   No.   Your Reference 15 -- I'll just hand
21   this to you.
22      A.   Thanks, Matt.
23      Q.   I've even flagged the pages.
24           Your Reference 15 is Dan Bitler's report,
25   which is Plaintiff's Exhibit 16; correct?
```

PLAINTIFFS' EXHIBITS 009585

Russell Somma, Ph.D.                                    July 1, 2010

Page 65

1      A.    Yes, sir.  Okay.

2      Q.    And if you go to Page 12, and the page

3  numbers are handwritten, and I flagged one of them for

4  you.

5      A.    Oh, I got you.  Yes, sir.  Go ahead.

6      Q.    The operator checks for Press 67 are at 7:45,

7  8:15 and 8:45; correct?

8      A.    Yeah, I'm still looking for the press number.

9      Q.    It's on the preceding page, actually.  You

10  see this is Page 2 of 5?

11      A.    Got it.

12      Q.    The press number is on Page 1 of 5.

13      A.    Okay.  I got it.  Okay.

14      Q.    Yes.

15      A.    And yes, 7:45 and 8:15, yes.

16      Q.    Okay.  And then if you go to Page 20, which

17  I've also flagged for you, these are the QA checks,

18  same press, 7:20 and 8:20; right?

19      A.    One hour, at one hour.

20      Q.    So what is the correction that you want to

21  make to your report?

22      A.    Well, the correction is what I had -- my

23  comment was that every half hour I thought was the

24  operator -- every hour was the operator testing.  So

25  it should be every half hour.

PLAINTIFFS' EXHIBITS 009586

Russell Somma, Ph.D.                                      July 1, 2010

                                                              Page 66

 1       Q.   All right.  So with a sampling frequency of
 2   three times in an hour, you'd agree with me that that
 3   is adequate in-process sampling; correct?
 4       A.   Three times in an hour is a good level of
 5   sampling, yes.
 6       Q.   Do you know what the application integrity
 7   policy is?
 8       A.   No, sir.
 9       Q.   Are you generally familiar with any
10   regulations promulgated by FDA regarding what they
11   expect in the way of accuracy and honesty in
12   pharmaceutical records, pharmaceutical manufacturing
13   records?
14       A.   No, sir.  I was -- I always assumed that it
15   was accurate based on our requirements internally.  I
16   didn't realize it was a regulation, no, sir.
17       Q.   Well, what do you think FDA would have done
18   to Novartis, for example, if it found falsified data
19   in a batch record?
20       A.   Falsified?
21       Q.   Falsified.
22       A.   Well, my only experience there was, you know,
23   a contractor we had used.  The answer to your
24   question:  It's severe.
25       Q.   It's severe.  Okay.  In other words, you --

PLAINTIFFS' EXHIBITS 009587

Page 67

1   you assume that these records are supposed to be

2   accurate and reliable and honestly done; correct?

3       A.   Yes, sir.

4       Q.   In all of your review of this material, did

5   you see any FDA Form 483, any FDA warning letter or

6   any comment in the establishment inspection reports

7   that found that the company had falsified any

8   documents or data?

9       A.   No, sir, I did not see anything as far as

10  falsification.

11      Q.   All right.  So I assume that as you reviewed

12  the material, you did not have any reason to question

13  the accuracy of, for example, a batch record --

14      A.   No, sir.

15      Q.   -- or an annual report?

16           THE WITNESS:  Sorry, Mark.

17      A.   No, sir.  When I read this, my understanding

18  was that this was accurate and true.

19      Q.   All right.  Now, in that stack in front of

20  you --

21      A.   Yes, sir?

22      Q.   -- those exhibits were marked the other day,

23  and they are actually in their numeric order.  So if

24  you go towards the bottom of the stack.  I want you to

25  look for Exhibits 63 and 64.  Okay?

PLAINTIFFS' EXHIBITS 009588

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 68

 1            (A discussion is held off the record.)

 2      A.    Sixty-three, is this correct?

 3      Q.    Yes.  And 64 would be right behind it?

 4      A.    All right. Chapter 10.

 5      Q.    I want you to look at 64 first.

 6      A.    That's Chapter -- I'm sorry?  Correct.

 7      Q.    Yes.  Have you ever seen this before?

 8      A.    Regulatory Procedures Manual, no.  I'm aware

 9   of its existence.  Have I looked at this?  No, sir.

10      Q.    Do you know that this is a document of FDA's?

11      A.    Yes, sir.

12      Q.    I would like you to turn in Exhibit 64 to

13   Page 10-7.

14      A.    Okay.

15      Q.    Section 10-2-4, Procedures.  All right?

16      A.    Yes.

17      Q.    The first sentence there says, "Warning

18   Letters are the principal means by which the agency

19   provides prior notice of violations and of achieving

20   voluntary compliance."

21            Do you see that?

22      A.    Yes, sir.

23      Q.    Do you agree with it?

24      A.    Yes, sir.

25      Q.    Later in that -- in that opening, it says,

Russell Somma, Ph.D.                                      July 1, 2010

Page 69

1    "Prior Notice may be provided by means of a civil

2    suit, administrative action or other less-formal ways,

3    including the following."

4              Number 2 is the issuance of a 483.  Is that

5    right?

6         A.    That's what -- yes.

7         Q.    And Number 3 is "Discussion with management

8    by an FDA investigator, documented in the EIR"?

9         A.    Yes, sir.

10        Q.    Is that right?

11        A.    Right.

12        Q.    So if I'm reading this correctly, and you

13   tell me if you agree, according to FDA's own manual,

14   they consider a 483 and an EIR less formal than a

15   warning letter.  Is that right?

16        A.    My personal -- my personal opinion, yes.  I

17   would agree with that.

18        Q.    All right.  So let's now turn to Exhibit 63.

19        A.    Okay. Chapter 4.

20        Q.    I want to go to the second page, Page 4-2.

21        A.    Okay.

22        Q.    Fourth full paragraph.

23        A.    "FDA is under no," is that it?

24        Q.    Fourth full paragraph.  So it's the next one.

25        A.    Okay.

PLAINTIFFS' EXHIBITS 009590

Russell Somma, Ph.D.                                    July 1, 2010

Page 70

1      Q.   "A warning Letter is informal and advisory."

2           Do you agree with that?

3      A.   Well, I never -- we never dealt with them as

4    an informal thing.  To me it's pretty serious stuff.

5    But if that's their opinion, fine.

6      Q.   Okay.  "It communicates the agency's position

7    on a matter, but it does not commit the FDA to take

8    enforcement action."

9           Do you agree with that?

10     A.   That has been my experience, yes, sir.

11     Q.   All right.  And the last sentence says, "For

12   these reasons, FDA does not consider Warning Letters

13   to be final agency action on which it can be sued."

14          Do you have any reason to disagree with FDA's

15   comment on that?

16     A.   There is no reason for me to disagree, no,

17   sir.

18     Q.   Do you have an expertise on what a "final

19   agency action" means?

20     A.   Only in a limited sense on a particular

21   client that we have now; okay?

22     Q.   You can put those back in the stack.  I'm

23   done asking you about those.

24     A.   Okay. Okay.

25     Q.   I'd like you to go to your Reference 18,

PLAINTIFFS' EXHIBITS 009591

Russell Somma, Ph.D.                                    July 1, 2010

                                                            Page 71

1    which is a 483 from the inspection of March 18 through

2    May 20, 2008.

3             MR. MILLER: That's the EIR.  I think he's

4        asking about the 483.

5             (A discussion is held off the record.)

6    A.   3/18/2008 to 5/20/2008; correct, Matt?

7    Q.   Yes, sir.

8    A.   Okay.

9    Q.   Go to Observation 2.

10            Do you know what the FDA's Turbo software is?

11   A.   No, sir, I don't.

12   Q.   If you look at Observation 2, the first thing

13   that it says is "Drug products failing to meet

14   established specifications and quality control

15   criteria are not rejected."

16            Do you see that statement?

17   A.   Yeah, I do, yes, sir.

18   Q.   Is that a restatement of a regulation?

19            MR. MILLER:  Object to form.

20   A.   I don't think that's a restatement.  It

21   sounds like it's an opinion.  But, again, I'm not --

22   I'm not an expert in the verbiage of the regs.  I'm

23   not -- it seems like it's an opinion.

24   Q.   Did you ever read the deposition of a Quality

25   Assurance person in this case by the name of Chuck

PLAINTIFFS' EXHIBITS 009592

Russell Somma, Ph.D.                              July 1, 2010

                                                    Page 72

 1   Koon?

 2        A.   No, sir.

 3        Q.   Well, what Mr. Koon said is that the

 4   statement I just read to you is essentially spit out

 5   of something called the FDA's Turbo software as a

 6   regurgitation of a regulation, and that what follows

 7   under the phrase specifically is the actual factual

 8   observation made by FDA at the time of their

 9   inspection.

10             Do you have any reason to disagree with him

11   on that?

12             MR. MILLER:  Object to form.

13        A.   No, sir.

14        Q.   Have you ever looked at the FDA's definition

15   of the term "adulteration"?

16        A.   Yes, sir.

17        Q.   Is it something that you reviewed in your

18   preparations for opinions in this case?

19        A.   I looked at it because -- you know, like I

20   said, I'm not an expert in regulatory stuff, so I made

21   sure at least I had an understanding of it, yes, sir.

22        Q.   All right.  I would like you to look in that

23   stack and see if Exhibit 39 is in it.

24             (A discussion is held off the record.)

25        Q.   Is it there?

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 73
1        A.   Yes, sir.
2             MR. MORIARTY: Pete, do you still have your own
3        or do you need an extra?
4             MR. MILLER:  I've got my own.
5        Q.   Okay.  Dr. Somma, have you seen this Exhibit
6    39 before?
7        A.   I don't -- I don't recall seeing it like
8    this, sir.  Was this part of something else?
9        Q.   I'm just asking if you have seen it.
10       A.   Not -- no, sir.
11       Q.   All right.  This is a printout from the FDA's
12   web -- website in a section called "Facts About
13   Current Good Manufacturing Practices."
14            Do you see that at the top?
15       A.   Yes, sir.
16       Q.   All right.  I first want you to go under
17   "What are cGMPs" and go to the second full paragraph.
18       A.   Okay.
19       Q.   It says there "The cGMP requirements were
20   established to be flexible in order to allow each
21   manufacturer to decide individually how to best
22   implement the necessary controls by using
23   scientifically sound design, processing methods and
24   testing procedures."
25            Do you see that?

PLAINTIFFS' EXHIBITS 009594

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 74

1      A.   Yes, sir.

2      Q.   Do you agree with that?

3      A.   Yes, sir.

4           MR. MILLER:  Objection to form.

5           I'm sorry.

6           MR. MORIARTY:  I'm not sure how that can be

7      objectionable to form, when I say "did you agree

8      with it."

9           And by the way, Mark, the court reporter,

10     when I say cPMG the C is small, the G-M-P are all

11     capitalized.

12          THE REPORTER: Thank you.

13     Q.   Let's go to the second section, which says,

14     "Why are cPMG's so important?"  The second  -- I'm

15     sorry. The third sentence says, "In most instances,

16     testing is done on a small sample of a batch (for

17     example, a drug manufacturer may test 100 tablets from

18     a batch that contains 2 million tablets), so that most

19     of the batch can be used by patients rather than be

20     destroyed by testing."

21          Do you agree with that?

22     A.   Absolutely.

23     Q.   Now, let's go down to the fourth section,

24     entitled "If a manufacturer is not following CGMPs,

25     are drug products safe for use?"  And the first two

PLAINTIFFS' EXHIBITS 009595

Russell Somma, Ph.D.                                    July 1, 2010

                                                             Page 75

 1    sentences there talk about what adulteration means.
 2    Is that right?
 3         A.   Yes, it does.
 4         Q.   And then the third sentence says, "It does
 5    not mean that there is necessarily something wrong
 6    with the drug."
 7              Did I read it correctly?
 8         A.   Yes, you did.
 9         Q.   Do you agree with it?
10         A.   I think -- in this particular case, I think
11    everything has to be taken in balance, unfortunately.
12    I think you have to look at the whole subject.  This
13    is true on balance if everything else is correct.
14    That's all I'm saying.
15         Q.   So in general, and I'm not referring
16    specifically to Digitek right now.  I'm saying, in
17    general, you agree with the FDA's statement about
18    that?
19         A.   If everything else is in place, yes, sir.
20         Q.   All right.  Go to the next paragraph.  About
21    two-thirds of the way down it says, "The impact of
22    cGMP violations depends on the nature of those
23    violations and on the specific drug involved.  A drug
24    manufactured in violation of cGMP may still meet its
25    labeled specifications and the risk that the drug is

Russell Somma, Ph.D.                                    July 1, 2010

Page 76

1    unsafe or ineffective could be minimal."

2              Do you agree with that?

3        A.    It has been my experience, sir.  That doesn't

4    negate the firm -- or the firm in this case being

5    subject to regulatory scrutiny.  That's also my

6    experience, yeah.  Okay?

7        Q.    So if I understand what the FDA is saying on

8    their own website, essentially "adulteration" does not

9    mean necessarily that the end product that gets to the

10   consumer is defective.  Is that true?

11             MR. MILLER:  Objection to form.

12       A.    That adulteration is a correct statement when

13   all of the other moving parts making a product are

14   correct, yes.

15       Q.    I need you to answer my question.

16       A.    I got you.  Okay.

17       Q.    If I understand what FDA is saying in this

18   website, "adulteration" does not necessarily mean that

19   the end product in the hands of the consumer is

20   defective or out of its specification.  Is that

21   correct?

22       A.    That would be my experience, yes, sir.

23   Sorry.

24             MR. MILLER:  You're fine.

25       Q.    Okay.

PLAINTIFFS' EXHIBITS 009597

Russell Somma, Ph.D.                                    July 1, 2010

```
 1      A.   Are you done?
 2      Q.   If you could just put it back on the stack or
 3  in the stack.  We'll clean up in a few minutes.
 4           I'm handing you what's been marked as Exhibit
 5  1.  Have you ever seen this process validation report
 6  before?
 7      A.   I have seen a process validation report, but
 8  not for this strength.
 9           (A discussion is held off the record.)
10      Q.   All right.  Exhibit 1 is the process
11  validation for the 125 microgram product; correct?
12      A.   Correct.
13      Q.   Do you know which process validation report
14  you saw?
15      A.   0.5 milligram, or 500 microgram.
16      Q.   Do you have any memory of when that ceased to
17  become a commercially produced dose by any
18  manufacturer?
19      A.   No, sir.
20      Q.   Okay.  Here's Exhibit 2.
21      A.   Okay.
22      Q.   This is a process validation report for the
23  250 microgram product.  Have you ever seen this
24  before?
25      A.   No, sir.
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 78

1       Q.   Do you have any -- and these would have been
2    the kind of things done in advance of submitting the
3    ANDA to the FDA for approval of the product; correct?
4       A.   No, sir.  Customarily validation is done once
5    submission is made.  Depends on company policy.  There
6    is no requirements.
7       Q.   Okay.
8       A.   My experience.
9       Q.   But these are the validate -- what is
10   validation?
11      A.   Validation is to confirm that everything that
12   has been put in place:  Specifications, systems,
13   quality approach, is going to work once you -- once
14   you make the product, and reliably so.  Customarily
15   validation is done three times.  The current practice
16   is it's through the entire product life cycle.  Okay?
17      Q.   All right.  Would you agree that "Validation
18   is establishing documented evidence which provides a
19   high degree of assurance that a specific process will
20   consistently produce a product meeting its
21   predetermined specifications and quality attributes"?
22      A.   I will agree with that, and further --
23           MR. MILLER:  Go ahead.
24      A.   And further, that today it's assumed that it
25   meets these requirements through its entire product

PLAINTIFFS' EXHIBITS 009599

Page 79

1   life cycle.

2           MR. MILLER:  And Matt, to keep the record

3       complete:  You were reading from a document.  Can

4       I ask what document you were reading from?

5           MR. MORIARTY:  It's my own research document.

6       A.   Right.  I've heard that statement before.

7           MR. MORIARTY:  If it was a published source I

8       would be happy to tell you, but I don't know where

9       it's from.

10          MR. MILLER:  Got it.

11      A.   Vaguely familiar, though, Matt.  Very good.

12      Q.   Can you see if Exhibit 46 is in that stack?

13      A.   I sure can.

14           (A discussion is held off the record.)

15      A.   Okay.

16      Q.   This is an article coauthored by one of the

17   other plaintiffs' witnesses in this case, Mr. Farley.

18           Have you ever seen this article before?

19      A.   No, sir.

20      Q.   And just so you know, one of the co- -- the

21   coauthor, Mr. Brooks, is a lawyer; okay?

22           Go to the last sentence of the first page,

23   please.

24      A.   Okay.

25      Q.   It says, "The FDA's acceptance of submitted

PLAINTIFFS' EXHIBITS 009600

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                        Page 80
 1   procedures is evidence, not conclusive proof, of the
 2   reasonableness of the company's manufacturing
 3   practices and procedures."
 4       A.   I'm sorry, Matt.
 5       Q.   Do you see that?
 6       A.   I'm sorry, Matt.
 7       Q.   I'd like you to go to the very bottom.  Let
 8   me have it back.  It's possible it didn't copy this.
 9            Yeah, right there, the last sentence on that
10   page.
11       A.   Okay. The FDA's regulation?
12       Q.   No.  I'm going to start over.  The last
13   sentence on the page.
14            "The FDA's acceptance of submitted procedures
15   is evidence, not inclusive proof, of the
16   reasonableness of the company's manufacturing
17   practices and procedures."
18            Have I read that clause accurately?
19       A.   Yes, sir.
20       Q.   Do you agree with it?
21       A.   I think, yes, sir; because it aligns with
22   what I said before. In the end, the owner of the
23   product is the custodian of the product.  That's what
24   this says.
25       Q.   Go to Page 3, please.  While I've got this, I
```

Russell Somma, Ph.D.                                        July 1, 2010

Page 81

1    may as well ask you everything I need to about it.

2         A.   Yes, sir.

3         Q.   There is a caption called "Pre Filing

4    Investigation."  Do you see that?

5         A.   Yeah.

6         Q.   And it says, "When a client comes to you

7    suspecting that he or she has taken an adulterated

8    drug, you should tell the client to save the drug, the

9    container, and all labeling and packaging

10   information."

11             Do you see that?

12        A.   Yes, sir.

13        Q.   The next sentence says, "A laboratory must

14   analyze the drug to test for its active pharmaceutical

15   ingredient and for strength and purity."

16             Do you see that?

17        A.   Yes.

18             MR. MILLER:  Object to form.

19        Q.   Do you agree with it?

20        A.   Well, actually, I agree with him.  It's what

21   I had said it before, Matt.

22        Q.   Okay.  Go to Page 4.  At the very bottom it

23   should say, "Training records" in bold.

24        A.   Okay.

25        Q.   Have you looked at any training records in

PLAINTIFFS' EXHIBITS 009602

Russell Somma, Ph.D.                                  July 1, 2010

Page 82

1    this case?

2         A.    No, sir.

3         Q.    Go to Page 5, please.  The second bolded

4    section is called "Standard Operating Procedures."

5         A.    Yes, sir.

6         Q.    Have you looked at any SOPs of Actavis or

7    Amide?

8         A.    Yes, sir.

9         Q.    How many of them?

10        A.    I looked at -- my guess would be three or

11   four around the specifics that I was looking at,

12   compression.

13        Q.    Do you know, either by number or topic, what

14   those SOPs were?

15        A.    One was compression, using the Stokes

16   machine, and the other was the blending of powders.  I

17   don't remember the numbers.

18        Q.    Okay.

19        A.    I'm sorry.

20        Q.    All right.  I don't have any questions about

21   that.  You can put that back on the stack.

22        A.    Is this -- what is this?  I'm sorry.

23        Q.    All right.  I want to ask you some questions

24   about manufacturing processes for solid oral dose --

25        A.    Yes.

PLAINTIFFS' EXHIBITS 009603

Russell Somma, Ph.D.                                    July 1, 2010

Page 83

1     Q.    -- pharmaceutical products; okay?

2           In the ANDA and in the batch records, is the

3    formula for the product there?

4     A.    Yes, sir.

5     Q.    And the formula has the ingredient and the

6    amount of the ingredient that is supposed to go in;

7    correct?

8     A.    Yes, sir.  It has the dosage form amount as

9    well as the amount that goes into the batch to make

10   the product, yes, sir.

11    Q.    And presumably those ingredients need to be

12   mixed in the appropriate proportions in order to

13   comply with the formula.  Is that right?

14    A.    That's correct.

15    Q.    And typically when the actual mixing is done,

16   one person mixes it and a second person verifies by

17   watching that that is done appropriately.  Is that

18   right?

19    A.    Customarily, yes, in all cGMP environments,

20   one guy does, one guy verifies.

21    Q.    All right. And if we were going to do an

22   investigation of tablets that were normal in size, but

23   somehow out of their finished product specifications

24   and just, for example, let's say on the high side, one

25   place you might look is whether the batch was mixed

PLAINTIFFS' EXHIBITS 009604

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 84
1    appropriately from the start; correct?
2         A.    Yes, sir, that's the standard review, batch
3    record review.
4         Q.    You would want to know whether they put too
5    much active pharmaceutical ingredient into that batch
6    or other batches; right?
7         A.    Right.  We check by the weight sheets.
8         Q.    Have you seen any FDA citations or warnings
9    in any FDA 483 or warning letter to the effect that
10   Actavis improperly mixed Digitek?
11        A.    No, sir.  Everything that I've reviewed
12   suggests that the process was done according to the
13   way it's written.
14        Q.    Once the ingredients are mixed, do they weigh
15   it?
16        A.    There are steps that they confirm that the
17   material has been put in and removed.  That's
18   customary when you do a process transfer from a
19   blender to a drum to a blender.  Yes, sir, they do do
20   that.
21        Q.    Okay.  Why do they do that?
22        A.    That's to confirm that they haven't had any
23   untoward losses during the manufacturing, okay?  A
24   drop on their shoes.
25        Q.    I guess theoretically you don't want any

Russell Somma, Ph.D.                                    July 1, 2010

Page 85

1   untoward gains either.  Is that right?

2        A.   Right.  Gains is much worse than loss,

3   correct.

4        Q.   And this sort of weighing --

5        A.   Yes.

6        Q.   -- at each stage of the process is sort of a

7   quality check to see whether you have untoward gain or

8   loss; right?

9        A.   Absolutely.

10       Q.   And also, if you have validated the process,

11  it gives you a benchmark so you know whether you're

12  meeting targets from your validated processes;

13  correct?

14       A.   Correct.

15       Q.   Do you know what yield calculations are?

16       A.   Yes, sir.

17       Q.   Are you familiar with doing that yourself --

18       A.   Yes.

19       Q.   -- at Novartis?

20       A.   Yes, sir.

21       Q.   In any of the batch records you reviewed, did

22  you see any inappropriate yield calculations?

23       A.   Absolutely not, sir; they were done

24  correctly.

25       Q.   Did you see -- I'm sorry.

PLAINTIFFS' EXHIBITS 009606

Russell Somma, Ph.D.                                July 1, 2010

Page 86

1              Did you see any FDA warnings or 483 citations

2       to the effect that the yield calculations were somehow

3       trending inappropriately?

4          A.    That I did not see, sir.

5          Q.    Let's talk about blenders.

6          A.    Okay.

7          Q.    Tell me about your actual experience in

8       operating blenders or conducting blend uniformity

9       sampling.

10         A.    I established the SUPAC equipment guidance of

11      similarity for FDA, the formal industry guides; so my

12      -- my understanding of the blending aspect was key in

13      that case.  Our objective was to determine like versus

14      like.

15              As far as blend uniformity, it's expected in

16      all products prior to launch.  And I've done 21 NDAs.

17         Q.    Okay.

18         A.    Okay.  You asked for background.  Sorry.

19         Q.    At Page 10 of your report --

20         A.    Yeah.

21         Q.    -- you are talking about how at Actavis the

22      final step blender is of a different geometry?

23         A.    Correct.

24         Q.    Do you see that?

25         A.    Yes, sir.

Russell Somma, Ph.D.                                    July 1, 2010

Page 87

```
 1     Q.    Okay.  Was this change of geometry -- I'm
 2   sorry.
 3          MR. MORIARTY: Let me withdraw that question.
 4     Q.    Was the blender configuration in the ANDA --
 5     A.    Absolutely, sir.
 6     Q.    -- approved by the FDA?
 7     A.    Yes, sir, it was in there.
 8     Q.    It's in all the batch records?
 9     A.    Yes, sir.
10     Q.    Has FDA ever made a citation or warning or
11   criticism of Actavis or Amide for its blender
12   configuration with Digitek?
13     A.    No, sir.  This is simply my opinion.
14     Q.    Now, you referred at various points in your
15   report to a book called "Pharmaceutical Process
16   Scale-Up."
17     A.    Uh-huh.
18     Q.    Did you not?
19     A.    Yeah.
20     Q.    You brought it with you?
21     A.    I didn't know if you would have a copy.
22     Q.    I just happen to.
23          What edition do you have?
24     A.    It was only the one, Matt, but let me check.
25     Q.    That's okay.  That's fine.  I don't see an
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 88

1    edition on mine either.

2         A.   It wasn't exactly a best seller.

3              I've got a copyright of 2002.  Okay?

4         Q.   Okay.  So at least two of us have looked at

5    this book?

6         A.   Yes, sir.

7         Q.   And the focus of this book, if you go to the

8    preface, the first sentence of the book says,

9    "Pharmaceutical process scale-up deals with a subject

10   both fascinating and vitally important for the

11   pharmaceutical industry, the process of transferring

12   the results of R&D obtained on the laboratory scale to

13   the pilot plant and finally to production scale."

14             Did I read that right?

15        A.   You did.

16        Q.   And essentially that's what this whole book

17   is about; right?

18        A.   That's what it's supposed to be about, yeah.

19        Q.   And if you go to the next page, in the

20   Introduction to the book, it says, "Scale-up is

21   generally defined as the process of increasing the

22   batch size."  Do you see that?

23        A.   Uh-huh, yeah.

24        Q.   Do you agree?

25        A.   Yeah.  Because that's when you talk about

PLAINTIFFS' EXHIBITS 009609

Russell Somma, Ph.D.                                    July 1, 2010

Page 89

1   scale-up, right.

2        Q.   Okay.

3        A.   Since this book has been published, just as a

4   point, you refer to scale-up.  People prefer to just

5   scale-out.  In other words, they don't change the

6   scale any more, Matt.  They try to just make more of

7   it.

8             (A discussion is held off the record.)

9        A.   They don't scale up.  They scale out.

10            I'm sorry, Matt, that's that that PhD. ...

11       Q.   What does "scale out" mean?

12       A.   "Scale out" means if you were making it --

13  say you were making 50 kilograms in a process.

14  Independent of what the process is.  Rather than take

15  that and try to make 500 kilograms, you make multiple

16  50 kilogram processes.

17            So rather than take the risk of the scale,

18  you remain small and you leverage your knowledge

19  without taking the risk of scale-up.

20       Q.   Okay.

21       A.   I'm sorry.

22       Q.   Go to Appendix C of the book, Page 415.

23            And while you are looking for that, this is

24  "Pharmaceutical Process Scale-up" edited by Levin,

25  L-e-v-i-n.  Is that right?

Russell Somma, Ph.D.                                    July 1, 2010

Page 90

    1       A.    Uh-huh.

    2       Q.    Go to 415, Appendix C.

    3       A.    Yeah.

    4       Q.    Is this called "Guidance For Industry,

    5    SUPAC," dash, "IR/MR, Immediate Release and Modified

    6    Release, Solid Oral Dosage Forms, Manufacturing

    7    Equipment Addendum"?

    8       A.    That's right.

    9       Q.    I would like you to go to Page 422.

   10       A.    Uh-huh.

   11       Q.    Do you know what kind of blenders Actavis

   12    used --

   13       A.     Yes, sir.

   14       Q.    -- for blending Digitek?

   15       A.    Yes, sir.  A V blender and a double cone

   16    blender.

   17       Q.    Well, they were made by Paterson Kelly;

   18    correct?

   19       A.    That's correct.

   20       Q.    And if you look at Page 422 --

   21       A.    Right.

   22       Q.    -- Table 3 under diffusion blenders --

   23       A.    Right.

   24       Q.    -- both V and double cone, Paterson Kelly,

   25    are listed there; right?

PLAINTIFFS' EXHIBITS 009611

Russell Somma, Ph.D.                                    July 1, 2010

Page 91

1      A.    That's right.  That's how we did that.

2      Q.    And while I got this book out, go to Page

3    435.

4      A.    Uh-huh.

5      Q.    Which is Table 6?

6      A.    Okay.   We got it.

7      Q.    This is tablet presses; right?

8      A.    Right.

9      Q.    Gravity feed tablet presses, Stokes is on the

10   list; right?

11     A.    Yes, sir; yes, sir.  It's right here.  I

12   wasn't -- I'm sorry.

13     Q.    So at Page 10 of your report, you

14   specifically refer to Pages 115 to 132, which is

15   Chapter 5, called "Batch Size Increase in Dry Blending

16   and Mixing."  Do you see that?

17     A.    That's right.

18     Q.    And this is about scale-up, so you are going

19   from one batch size to a bigger batch size.

20           Is that right?

21     A.    That's right.

22     Q.    And this whole chapter's about blender

23   configuration in that situation; right?

24     A.    Correct.

25     Q.    Now, when Digitek was being manufactured in

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 92
1    2004, '5, '6, '7 or '8, they didn't change the size of
2    the batches; did they?
3        A.   They did scale it up from their bio pilot
4    logs, yes, sir.
5        Q.   Well, not in 2004, '5, '6, '7 or '8; correct?
6        A.   Oh, I'm sorry.  Yes, sir.  No, sir.
7        Q.   And the process for the manufacture of
8    Digitek in those years was a validated process; was it
9    not?
10       A.   Based on the three batches, yes, sir.
11       Q.   Okay.  So is there anything in this chapter
12   of the book to which you refer that says that the
13   Paterson Kelly blending configuration used for Digitek
14   was somehow against an industry standard or
15   inappropriate?
16       A.   When we put the SUPAC guidance on --
17       Q.   Wait.  Yes or no.
18       A.   Sorry.
19       Q.   Start with yes or no?
20       A.   May I have the question again, please?
21   Sorry.
22       Q.   Is there anything in this chapter of the book
23   to which you refer that says that something like the
24   Paterson Kelly blender configuration used for Digitek
25   was inappropriate or against an industry standard?

Russell Somma, Ph.D.                          July 1, 2010

                                                     Page 93
1       A.    Yes.

2       Q.    Show me where in this chapter it says that?

3       A.    Page 119, bottom.

4       Q.    Exactly where?

5       A.    "Common violations," the last paragraph,

6    Matt. Right here.

7       Q.    I'll get there.  Okay.

8             "Common violations of this approach can

9    immediately cause problems, include (sic) the attempt

10   to scale from one geometry to another."  Did I read

11   that right?

12      A.    That's correct.

13      Q.    And if I understand scaling in the context of

14   this book, you are talking about going from one batch

15   size to another; right?

16      A.    That's correct.

17      Q.    Which didn't happen in 2004 through '8;

18   correct?

19      A.    I think -- that's correct.  I think my

20   comment is in retrospect.

21      Q.    And the FDA, I believe I may have asked you

22   this before, never had any problems with the blender

23   configuration?

24      A.    No, sir, they did not.

25      Q.    In this paragraph in your report at Page 10,

Russell Somma, Ph.D.                                    July 1, 2010

Page 94

1    when you are talking about these blenders, you don't

2    use the word "negligent;" do you?

3         A.    Absolutely not.

4         Q.    You don't use the words "against industry

5    standards:"  Do you?

6               MR. MILLER:  Object to form.

7         A.    Can I read it?  I don't recall using those

8    words, but let me double-check.

9               I do not see that word here.

10        Q.    Let's go to the next paragraph of Page 10.

11        A.    The evaluation?

12        Q.    "The evaluation of blend uniformity is a

13   difficult task."

14              What does that mean?

15        A.    "Difficult task" means that it requires a --

16   again, what I had indicated, a very rigidly

17   established plan that has to be followed:  How the

18   product is going to be withdrawn, how big the product

19   is going to be, how the samples have to be handled and

20   recovered.

21        Q.    I want to know what you mean by "difficult

22   task"?

23        A.    Because there are so many different things

24   that can contribute to a false positive or a

25   negative -- or a positive false input.

Russell Somma, Ph.D.                                    July 1, 2010

Page 95

1      Q.    Do many companies struggle with blend
2    uniformity?
3      A.    I can't speak for all the companies I've
4    worked for; however, I can tell you that many of the
5    products I worked on, it was a struggle, yes, sir.
6      Q.    All right.  And actually -- companies
7    actually don't have that much problem with blend
8    uniformity?  Companies have problems with blend
9    uniformity sampling; right?
10            MR. MILLER:  Object to form.
11      A.    Good point, Matt.  The point is -- the key
12    is:  If you have two wristwatches, what time is it?
13    So is your sample defective or is your blend
14    defective?  That's where the difficulty in task comes
15    in:  Illucidating which is wrong and which is right.
16      Q.    All right.  Now, I can't remember whose
17    principle or law this is; but when you test blend, you
18    change the nature of the blend in the process of
19    testing; do you not?
20      A.    That comes back to sample handling.  Okay?
21    In the correct world, if you are trying -- your point
22    is in a static bed, when you pull the sample, you have
23    disrupted the bed; therefore, the bed is different.
24      Q.    Okay.
25      A.    Right?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 96

1       Q.    So am I correct that various pharmaceutical

2    companies have tried to obtain exemption from blend

3    uniformity sampling because it is such a variable and

4    difficult problem?

5       A.    That is correct.

6       Q.    Are there industry groups in the

7    pharmaceutical companies that have petitioned the FDA

8    to do away with blend uniformity sampling because of

9    its difficulty?

10      A.    There has been a great deal of information

11   transmitted on that point, yes.  And I can point to

12   that FDA does give some latitude on high-dose

13   composition.

14      Q.    Now, did FDA ever say in a 483 or warning

15   letter that the process by which we test blend

16   uniformity was inappropriate?

17            I asked you earlier about the sampling plan

18   itself, where and how many, and you said no.  Now I'm

19   asking you about anything else about the actual test

20   process.

21      A.    Matt, I'm just looking here to make sure.

22            MR. MILLER:  Take your time.

23      A.    I've looked at these things.  Let me just

24   look at one more thing, Matt.

25            I dot not recall FDA having a problem with

PLAINTIFFS' EXHIBITS 009617

Russell Somma, Ph.D.                                July 1, 2010

```
                                                      Page 97
 1   the way they tested their samples.
 2       Q.   Okay.  Did you review the SOP for blend
 3   uniformity sample?  Actavis' blend uniformity sampling
 4   SOP for Digitek?
 5       A.   I've read all of the procedures.  I don't
 6   recall if I actually read that SOP, to be perfectly
 7   honest.
 8       Q.   Now, you are aware that there is an FDA 483
 9   about some blend uniformity investigations.  Is that
10   right?
11       A.   Due to out-of-specifications observations,
12   yes, I am.
13       Q.   Now, how many batches were affected?  How
14   many batches were involved in that 483 citation?
15            MS. CARTER:  Object to form.
16       A.   I don't recall.
17            MR. MORIARTY:  Did you just object?
18            MS. CARTER:  I did.
19       A.   I don't recall, Matt.
20       Q.   Do you know what -- Well, you can look at the
21   483.  My memory is it's three batches.
22       A.   Okay.  Let me look.
23       Q.   I believe it's the May, 2008 483.
24            Am I wrong about that?  I thought it was
25   Observation 3, but --
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 98

1              MR. MILLER:  Maybe it's 4.

2         Q.   Do you see it there?

3         A.   Okay.  Three batches, Matt.  Thank you, yes.

4         Q.   So if we go by the number of recall batches,

5    that's three out-of-spec --

6              Let me start from scratch.

7              Those three investigations had to do with an

8    out-of-spec result in one out of ten samples for each

9    batch; correct?

10             MR. MILLER:  Object to form.

11        A.   As I recall, yeah.  That was -- it was the

12   same location every time.

13        Q.   Okay.

14        A.   Right.

15        Q.   And on retesting, they didn't confirm the

16   out-of-spec result; correct?

17        A.   They ran the replicate samples and did not

18   see the failing result, correct.

19        Q.   When you say "replicate samples," at the time

20   you sample a dry blend like this, you take two or

21   three samples from each site; correct?

22        A.   Absolutely.

23        Q.   So if it calls for ten sites, you are taking

24   20 or 30 samples?

25        A.   Customarily 30, yes.

PLAINTIFFS' EXHIBITS 009619

Russell Somma, Ph.D.                                      July 1, 2010

Page 99

1      Q.   So if the first sample at the right top
2    fails, there are backup samples taken at the same time
3    that you can test; correct?
4      A.   That's correct.
5      Q.   Is it your memory that in each of those three
6    instances, a backup sample passed?
7           MR. MILLER:  Object to form.
8      A.   As I recall, yes.  As I recall, they passed.
9    Because I don't think they had to go much beyond two
10   in one case, yeah.
11     Q.   If you read the -- Well, did you read the
12   actual Actavis investigations of those blend
13   uniformity --
14     A.   Of these particular batches?
15     Q.   Yes, sir.
16     A.   Honestly, I can't say that I read the ones
17   specific to these batch numbers; no, sir.
18     Q.   All right.  Are you aware that in general
19   with those three batches, they increased the sample
20   size for the finished product testing?
21     A.   To 30 tablets, yeah.  That I am aware of.
22     Q.   And all three of those batches actually
23   passed finished product testing; correct?
24     A.   Yes, as I recall.
25     Q.   All right.  Now, do you know how many of

PLAINTIFFS' EXHIBITS 009620

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 100

 1    those three batches were actually released and sent to

 2    the market?

 3        A.    No, sir, I don't recall that.

 4        Q.    And in that 483, isn't the FDA's real focus

 5    of their observation that Actavis did not, in addition

 6    to the QC investigation, conduct a manufacturing

 7    investigation?

 8            MS. CARTER:  Object to form.

 9        A.    Matt, I'm just reading it again.   May I

10    please have the question again?

11        Q.    Yes, sir.  Are you ready for the question

12    again?

13        A.    Yes, I'm going to pay attention this time.

14            MR. MORIARTY:  Mark, can you read that one

15        back, please?

16        A.    Sorry.

17            (The question is read.)

18        A.    Yes.

19        Q.    So let's go back to Page 10 of your report,

20    the second -- well, actually it's the last paragraph.

21        A.    Uh-huh.  The reliability.

22        Q.    Your second sentence starts with the word

23    "Repetitive failures at the same blender location."

24        A.    Uh-huh.

25        Q.    Do you have any other instances of

PLAINTIFFS' EXHIBITS 009621