Russell Somma, Ph.D.                                    July 1, 2010

Page 101

1    out-of-spec results besides the three we just talked

2    about?

3         A.    Let me just check one location.

4               For clarity to answer your question, by

5    "repetitive," I think it's the same location failed

6    repeated -- but not repetitively.  I think I misstated

7    it.  It's the same location failed in several of these

8    batches.

9         Q.    Well, my question is:  Do you know of any

10   other batches --

11        A.    Other than these three, no.

12              MR. MILLER:  You have to wait.

13        Q.    And the three that the FDA is referring to

14   are 70148A; right?

15        A.    Uh-huh.

16        Q.    That's a yes?

17        A.    Yes, sir.

18        Q.    70207A?

19        A.    7070A (sic), yes, sir.  And 70207A, yes, sir.

20        Q.    So in the last paragraph of Page 10 of your

21   report, when you talk about the firm "struggling with

22   the procedure and repetitive failures," these are the

23   only three of which you are aware; correct?

24        A.    Those are the three that I'm aware; in

25   addition to my own experience in how difficult this

Russell Somma, Ph.D.                                    July 1, 2010

 1   task can be.

 2      Q.   And the last part of your statement says,

 3   "Blend sampling program was ineffective and not

 4   predictive of final product quality."

 5           What's the basis for that statement?

 6      A.   My basis for that statement is:  If you

 7   cannot isolate that the blend itself is uniform or

 8   non-uniform, this gets back to:  Is the sample

 9   reliable or not, you cannot assume that the blend is

10   indicative of anything downstream.  It gets back to

11   the continuum of the whole structure.

12           It really gets back to the heart of my first

13   comment, the comment we had about the blend.

14           On -- in balance, this stuff is -- everything

15   seems right.  But if you start to pull things out of

16   context and ask the questions in an investigation, it

17   starts to bring to light a systematic problem that,

18   again, is inferential at best at this stage, Matt, if

19   you know --

20      Q.   But you have to pull it out of context to do

21   that; right?

22      A.   And, again, someone skilled in the art like

23   myself would do that.

24      Q.   So I want to jump ahead just for a moment.

25      A.   Go ahead.

Russell Somma, Ph.D.                                    July 1, 2010

Page 103

 1      Q.   You have looked at all the annual reports
 2   which nicely condense and summarize the finished
 3   product test data for this product; correct?
 4      A.   No, I did not.
 5      Q.   You haven't looked at the annual reports?
 6      A.   No, sir.
 7      Q.   Do you know whether any batch of Digitek,
 8   just among the recalled batches, failed finished
 9   product testing?
10      A.   I believe one did, sir.
11      Q.   Which one?
12      A.   That I'd have to check.
13      Q.   Just so we are clear.  Do you know of a
14   single batch of Digitek that was submitted to the QC
15   testing for its USP testing that failed those tests?
16           MR. MILLER:  Object to form.
17      Q.   And if you know of one, tell me what batch
18   number it was?
19      A.   I can't tell you what batch number it is.  I
20   only have a picture of a rejected form.  I'd have to
21   go back and dig it out.  I know it's not in this pile.
22      Q.   Okay.  Well, do you know of any batch that
23   was actually sent to market that failed finished
24   product testing at Actavis?
25      A.   If all -- if all of the parts and pieces are

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 104

1    working together, that should never happen, sir.

2    Right?

3        Q.   Well, you know that each batch is tested;

4    correct?

5        A.   Right, right.

6        Q.   And that there is actual data available;

7    correct?

8        A.   Uh-huh.

9        Q.   So have you looked at the data to see whether

10   any batches failed finished product testing?

11       A.   In the batches I looked at, no.  Only the

12   batches I looked at.

13       Q.   Well, let's just start with the recall.  Out

14   of the 152 batches that were actually sent through

15   Mylan to pharmacies, did any of them fail final

16   product testing?

17       A.   Not to my knowledge, sir.

18       Q.   And if we tried to do the math, and I haven't

19   done it before today, if we just take the 152 recalled

20   batches, and say that there were 30 blend

21   uniformity -- I'm sorry.

22            MR. MORIARTY: Let me withdraw that question.

23       Q.   We just take the recalled batches and say

24   that there was one blend uniformity battery for the

25   whole batch, that would be ten samples per batch;

PLAINTIFFS' EXHIBITS 009625

Russell Somma, Ph.D.                                    July 1, 2010

Page 105

1    correct?

2        A.    Thirty.

3        Q.    Well, let's just take one set of them, not

4    three deep.  You are talking about 1,520 blend

5    samples; correct?

6        A.    For those batches.

7        Q.    Yes.  Right?

8        A.    Right, 152 times ten.

9        Q.    And there were three that were out of spec;

10   right?

11       A.    Uh-huh.

12       Q.    That's a yes?

13       A.    Yes, sir.

14       Q.    Each of the three that were out of spec

15   weren't confirmed on retesting; correct?

16       A.    That's correct.

17       Q.    And you think even if those batches were

18   included in the recall set, which we are not sure they

19   are, three out of 1,520 constitutes repeated failures

20   that are predicted -- mean that blend uniformity

21   aren't predictive of final product quality?

22       A.    Absolutely.  The reason is because of the

23   uncertainty in doing the sampling.

24       Q.    All right.  Did FDA ever actually say that

25   any Actavis batches of Digitek failed blend uniformity

PLAINTIFFS' EXHIBITS 009626

Russell Somma, Ph.D.                                          July 1, 2010

Page 106

1   testing?

2        A.   They called it out of specification.  They

3   didn't say it failed.

4        Q.   Okay.  Did they ever say that any batches of

5   Digitek failed blend uniformity testing?

6        A.   Not that I recall, other than what's here.

7        Q.   If somebody just colloquially -- colloquially

8   said that those three were blend uniformity failures,

9   that wouldn't technically be correct; would it?

10            MR. MILLER:  Object to form.

11       A.   I want to make sure I -- may I have the

12   question again, please?

13       Q.   If somebody colloquially --

14       A.   Okay.

15       Q.   -- said those three are blend uniformity

16   failures, that would not be technically correct?

17            MR. MILLER:  Object to form.

18       Q.   Am I right?

19       A.   If you do the repeat test and they pass, no.

20            To be clear, there is FDA guidance on doing

21   just that.

22       Q.   We have only got a couple of minutes left on

23   the tape, so we might as well take our break now.

24            THE VIDEOGRAPHER: Please stand by.

25            MR. MORIARTY:  And we're off the record?

PLAINTIFFS' EXHIBITS 009627

THE VIDEOGRAPHER: We are going off the record. The time is 11:02 a.m. This is the end of Tape Number 2.

(A recess is taken.)

CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

THE VIDEOGRAPHER: We are back on the record. The time is 11:12 a.m. This is the beginning of Tape Number 3.

Q. Now, Dr. Somma, I touched very briefly earlier on the concept of batch yields; correct?

A. Yes, sir.

Q. And would you agree with me that if you consistently put too much active pharmaceutical ingredient into your solid oral dose, it could be detected at a number of different places; and one might be the inventory of your active pharmaceutical ingredient; correct?

A. Absolutely.

Q. Another could be at the blend uniformity stage. Is that correct?

A. That is correct, assuming the sampling and the testing is good, sure, yeah.

Q. Another could be your finished product stage?

A. Absolutely. And at that stage it becomes

Russell Somma, Ph.D.                                    July 1, 2010

Page 108

 1    compounded by the blend part and the compression part.

 2         Q.    Okay.

 3         A.    You can still find it.  I agree with you.

 4         Q.    Sure.  And if there was testing done by an

 5    outside entity for whatever reason, it could

 6    theoretically be picked up there; correct?

 7         A.    Theoretically, yes.

 8         Q.    All right.  And if you were consistently

 9    putting too much adverse -- I mean active

10    pharmaceutical ingredient into your product and it had

11    the potential to harm patients, another potential

12    place to see a problem would be an increase in your

13    adverse event reporting.  Is that true?

14         A.    I would -- I would agree with that, yes.

15         Q.    Okay.

16         A.    It's a true statement.

17         Q.    Now, I think you told me earlier you are not

18    an expert in pharmacovigilance; right?

19         A.    No, sir.

20         Q.    Have you done any study in this case of

21    Actavis' pharmacovigilance or their adverse effect

22    reporting rates?

23         A.    No, sir.

24         Q.    And a pharmacovigilance expert for the

25    plaintiffs, a Dr. Frank, was deposed yesterday, and I

PLAINTIFFS' EXHIBITS 009629

Russell Somma, Ph.D.                                      July 1, 2010

Page 109

1    know you don't know anything about what she said, but

2    would you generally defer to an expert like her in

3    pharmacovigilance on the subject -- on that subject in

4    this case?

5            MR. MILLER:  Object to form.

6        A.    Absolutely, Matt.

7        Q.    Okay.  And to stick with this batch yield

8    concept, if a company consistently made double thick

9    tablets, there would be a number of places you might

10   catch that as well; correct?

11           MR. MILLER:  Object to form.

12       A.    You would expect to catch that at certain

13   places.  I would have to agree with that.

14       Q.    For example, even if we just worked

15   backwards, if you used the appropriate amount of

16   ingredients from the start but made double-thick

17   tablets, you wouldn't have as many tablets; right?

18       A.    If you made all of them double thick. Yeah.

19       Q.    Right.

20       A.    Occasionally one, Matt; really,

21   realistically, you couldn't detect it.

22       Q.    I understand that.  But I'm saying if you

23   made lots of them, you wouldn't have as many tablets;

24   right?

25       A.    You're correct.

PLAINTIFFS' EXHIBITS 009630

Russell Somma, Ph.D.                                July 1, 2010

Page 110

1      Q.    Okay.

2      A.    You're correct.

3      Q.    Hence, you wouldn't have as many bottles;

4    right?  To fill at the packaging station?

5      A.    You're correct, yeah.

6      Q.    And those sort of things are looked at by

7    companies as further quality checks to see if the

8    processes are following their validated methods;

9    right?

10     A.    Absolutely correct, Matt.  The problem would

11   have to be pretty extreme, though, to pick it up in

12   that manner.

13     Q.    Okay.  Well, it sounded to me like your

14   pharmaceutical consulting engagement where they had

15   extra-thick tablets was an instance where there were

16   just a few among either a batch or several batches;

17   correct?

18     A.    That's right.

19     Q.    Was it one batch?

20     A.    I looked at the batch that the sample was

21   returned from.

22     Q.    Did they only find them in one batch?

23     A.    I don't know what -- to be perfectly honest,

24   I don't know what else they found.  I did not find any

25   indication of them in the batches, before and after, I

Russell Somma, Ph.D.                                    July 1, 2010

Page 111

1   looked at; no, sir.  There were no complaints, no

2   returns, no nothing.

3        Q.   Okay.  And theoretically in order to actually

4   harm patients, for enough of these to get out into a

5   lot of bottles and out through the entire distribution

6   system over years and years, you would have to make a

7   lot of extra-thick tablets; wouldn't you?

8             MR. MILLER:  Object to form.

9        A.   I guess, but it only takes one bad tablet to

10  create a harm, and that's why this complaint was dealt

11  with like this particular company that I worked for,

12  yeah.

13       Q.   Well, I think we established that you are not

14  a pharmacokineticist, a pharmacologist; you are

15  certainly not a physician; correct?

16       A.   Definitely not.

17       Q.   You don't know whether one Digitek tablet

18  that was extra thick would harm a patient or not; do

19  you?

20       A.   No, sir.  And the fact is that we don't even

21  know what the composition of that thick tablet was.

22       Q.   There could be an extra-thick tablet that's

23  just bigger because it wasn't compacted appropriately;

24  right?

25       A.   So that would be -- that is certainly within

PLAINTIFFS' EXHIBITS 009632

Russell Somma, Ph.D.                                    July 1, 2010

Page 112

1    the realm of possibility, yes, sir.

2        Q.   All right.  So if you subjected that tablet

3    to a hardness testing, it might shatter like an egg;

4    correct?

5        A.   If it would survive packaging, yes, sir.

6    Which is what friability and hardness is supposed to

7    prevent, right.

8        Q.   Do you know how many people in the United

9    States were described digoxin between 2006 and 2008?

10       A.   No, sir.

11       Q.   Do you know how many prescriptions were

12   written for digoxin between 2006 and 2008?

13       A.   No.

14       Q.   Do you know how many people were taking

15   Digitek between 2006 and 2008?

16       A.   No, sir.

17       Q.   Do you know how many prescriptions were

18   written for Digitek between 2006 and 2008?

19       A.   No, sir.

20       Q.   Now, do you know the theoretical batch size

21   of a Digitek 125 microgram batch?

22       A.   4.8 million.

23       Q.   And the theoretical size for a 250 microgram

24   is what?

25       A.   I think it was 4.2 million, but that's by

PLAINTIFFS' EXHIBITS 009633

Russell Somma, Ph.D.                                          July 1, 2010

```
                                                          Page 113

 1    memory.

 2         Q.    Okay.

 3         A.    I don't know if that's correct.

 4         Q.    So if you do the math of 152 recalled

 5    batches, you're up in the 688.2 million range for

 6    tablets; are you not?

 7         A.    Yes.

 8         Q.    Depending on how many batches of each?

 9         A.    How many tablets are made; yes, sir.

10         Q.    All right.

11         A.    It's 152 times 4.8, right, okay.

12         Q.    Do you know how many were recalled in either

13    of the two dose strengths?

14         A.    No, sir.

15         Q.    Of the number of batches that were actually

16    recalled from the market, do you know how many of

17    those tablets never made it to consumers?

18         A.    No, sir.

19               MR. MILLER:   Object to form.

20         A.    No, sir.

21         Q.    You know that there was a recall; correct?

22         A.    From what you told me, 152 batches; yes, sir.

23         Q.    Well -- and tablets were supposed to be sent

24    from pharmacies and hospitals that still had them back

25    to a recall center; correct?
```

PLAINTIFFS' EXHIBITS 009634

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 114

1     A.    Right, I was aware of that, yes, sir.

2     Q.    Do you know how many tablets were returned?

3     A.    No, sir.

4     Q.    So I want you to assume that -- and I just

5    keep referring to the recall batches more for

6    convenience, but if you want to go back to 2004, we

7    can.

8           Do you know whether each batch of Digitek

9    that was made between 2004 and 2008 was subjected to

10   quality control, USP method, finished product testing?

11          MR. MILLER:   Object to form.

12    A.    Based on what I've seen, every batch was

13   tested, yes, sir.

14    Q.    Right.  And you don't know of any that failed

15   that testing; do you?

16    A.    To my knowledge, no, sir.

17    Q.    And you don't have any question or criticism

18   of the sample size or the method they used; correct?

19    A.    No, sir.

20    Q.    Or the integrity of the data?

21    A.    No, sir.

22    Q.    So what I want to ask you is about testing

23   that was done by other people.

24    A.    Okay.

25    Q.    Do you know what the batch certification

PLAINTIFFS' EXHIBITS 009635

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 115

 1   program was?

 2       A.   That they -- as I recall, based on what I've

 3   read, it was samples had to be provided to FDA for

 4   them to confirm at their laboratory that these met

 5   requirements.

 6       Q.   Right.  Was that going on when you worked at

 7   Novartis in the '90s?

 8       A.   I wouldn't know that, sir.  I wouldn't.

 9       Q.   All right.  I want to hand you what actually

10   should be in the stack, Exhibit 4?

11       A.   It was right on the top, yes.

12       Q.   It should be near the top.  I had them in

13   order.

14       A.   It was right here.  I remember looking at it.

15       Q.   Okay.  Do you have Exhibit 4?

16       A.   That's it.

17       Q.   That's a letter to Amide at the time from

18   FDA, is it not?

19       A.   Yes, sir.

20       Q.   Certifying nine batches of Digitek; correct?

21       A.   Uh-huh, yes, sir.

22       Q.   Presumably all tested by FDA itself.  Is that

23   right?

24       A.   That's how I understand that, yes.  And they

25   all met requirements.

PLAINTIFFS' EXHIBITS 009636

Russell Somma, Ph.D.                                    July 1, 2010

Page 116

1      Q.   And Exhibit 5 is in that stack?

2      A.   Yes, it is.

3      Q.   Is that a July, 1995 letter from FDA to Amide

4   exempting them from the batch certification process?

5      A.   Yes, it is.

6      Q.   Presumably at that point FDA was confident

7   that Amide was making the product within its

8   specifications consistently; correct?

9           MR. MILLER:  Object to form.

10     A.   As far as I read this, yes.  Everything was

11   as they anticipated it would be.

12     Q.   Do you know what Quantic Regulatory Services

13   is?

14     A.   It's a consulting firm as far as I know, sir.

15     Q.   Do you know anything about them?

16     A.   Other than that their specialty is consent

17   decree remediation.  That's the only thing I know

18   about them.

19     Q.   Do you know if they are reliable?

20     A.   I couldn't say that one way or the other,

21   sir.

22     Q.   Are they well-regarded by FDA?

23          MR. MILLER:  Object to form.

24     A.   I think that they are on the list of people

25   that FDA says to use in consent decree remediation.  I

PLAINTIFFS' EXHIBITS 009637

Russell Somma, Ph.D.                                    July 1, 2010

Page 117

1   would think that says it right there.

2       Q.   Okay.  And I'd like you to look in the

3   exhibit stack for Exhibit 22 and 23.  Do you have 22

4   and 23?

5       A.   Yes, I do, Matt.

6       Q.   All right.  I'm going to have to do this from

7   memory because I can't find my copies of those two

8   exhibits, but 22 should be a warning letter from the

9   FDA.  Is that right?

10      A.   That's what it says, yes, sir.

11      Q.   And -- oh, I found it.

12           At the back, second-to-last page, last

13  paragraph.  They say, "We feel that to provide such

14  assurance, your firm should promptly initiate an audit

15  program by a third party having appropriate cGMP

16  experience to provide assurance that all marketed lots

17  of drug products that remain within expiration have

18  their appropriate identity, strength, quality and

19  purity."

20           Did I read that correctly?

21      A.   Yes, you did.

22      Q.   This is an invitation by the FDA in a warning

23  letter to hire a consultant; correct?

24           MR. MILLER:  Object to form.

25      A.   As I understand it, yes, sir.

PLAINTIFFS' EXHIBITS 009638

Russell Somma, Ph.D.                                    July 1, 2010

Page 118

1           MR. MORIARTY:  All right.  What's wrong with

2       the form of that question?

3           MR. MILLER:  I object to the term

4       "invitation."

5           MR. MORIARTY:  Okay.

6       Q.    Let's get back to the basic definition of a

7    warning letter.  A warning letter is not a "you must"

8    in the eyes of the FDA; correct?

9       A.    Yes, Matt.  I recall we discussed it and it

10   was informal.

11      Q.    Right.  And it is urging voluntary compliance

12   with the regs; is it not?

13      A.    Yes, sir.  It's -- you don't ignore them,

14   Matt.  Let's put it that way.

15      Q.    I understand from a company perspective you

16   wouldn't want to ignore them, but --

17      A.    Gun to your head?

18      Q.    "Invitation" isn't an inappropriate word

19   when -- in your mind, when I asked you that question;

20   is it?

21      A.    To be honest, I was thinking what -- what

22   they were asking here/ and to me, yeah, well, that

23   means you better get yourself a consultant, period,

24   end of story.

25      Q.    Okay.

PLAINTIFFS' EXHIBITS 009639

Russell Somma, Ph.D.                                    July 1, 2010

Page 119

1       A.    You know.

2       Q.    All right.

3       A.    What you call it, whatever.

4       Q.    All right.  Let's go to Exhibit 23.

5             Have you ever seen Exhibit 23 before?

6       A.    No, sir.

7       Q.    All right.  Exhibit 23, do you know --

8             MR. MORIARTY: Let me withdraw and start over.

9       Q.    Do you know that in response to Exhibit 22,

10   Actavis went out and hired Quantic Regulatory Services

11   to do the remediation of that warning letter?

12      A.    I did not know that as fact.

13      Q.    Okay.  Well, I want you to assume that my

14   client hired Quantic, and that Quantic looked at

15   batch -- batch records.  Okay?

16            Now, if you look, if you flip through here

17   you will see that obviously pages are redacted with

18   the names of other products, but at Bates Page

19   1867202, 1867202, you see that there are Digitek

20   batches there?

21      A.    Yes, sir.

22      Q.    And then if you flip further back to Bates

23   Page 1867214, and spilling over onto the next page,

24   there are a number of other Digitek batches; correct?

25      A.    Yes, sir.

PLAINTIFFS' EXHIBITS 009640

Russell Somma, Ph.D.                                    July 1, 2010

Page 120

1      Q.   Do you know what kind of batch record review

2    they performed?

3      A.   No, sir.

4      Q.   You don't know anything about the protocol

5    they used to analyze the batch records?

6      A.   No, Matt, I don't know.

7      Q.   All right.  Do you know how many of these

8    batches wound up being in the recall --

9      A.   No, sir.

10     Q.   -- batches?

11     A.   No, sir.

12     Q.   Let's go back to the cover page.

13     A.   This?

14     Q.   Yes.  It says, "On December 21st, 2007,

15   Quantic provided Actavis with a statement indicating

16   the audit was complete and the manufacturing and

17   laboratory records have reliably confirmed the

18   identity, strength, quality and purity of the marketed

19   products."

20          Do you see that statement?

21     A.   Yes, sir.

22     Q.   If that is in fact was Quantic concluded, do

23   you have any reason to disagree with them?

24     A.   No, sir, I don't, based on what I know and

25   what I've read.

PLAINTIFFS' EXHIBITS 009641

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 121

```
 1        Q.   Do you know whether or not FDA accepted
 2   Quantic's analysis and this letter from my client in
 3   remediation of the warning letter, or whether they
 4   rejected it?
 5             MR. MILLER:  Object to form.
 6        A.   No, sir.
 7        Q.   Okay.  I'm going to go through a number of
 8   exhibits in this stack, so --
 9        A.   Okay.
10        Q.   Let's go to Exhibit 24.  Do you have 24?
11        A.   Yes, Matt, I do.
12        Q.   Have you ever seen it before?
13        A.   No, sir.
14        Q.   I'm sorry?
15        A.   No, sir.
16        Q.   You didn't see it yesterday when you met with
17   Pete and Meghan?
18        A.   No, sir.
19        Q.   Do you know what a 484 sample is?
20        A.   Yes, sir.  It's a sample collection, sir.
21        Q.   Did FDA ever come to Novartis and collect 484
22   samples of drug products?
23        A.   Yes, sir, but I was not involved.  I just
24   knew of it, sir.
25        Q.   So if you go to the first page of Exhibit 24,
```

Russell Somma, Ph.D.                                    July 1, 2010

Page 122

1   and you and I might have to get a lot closer because I

2   can run you through these quickly.

3           But if you look here --

4   A.    Okay.

5   Q.    -- this is Sample 377410.

6   A.    Yes, sir.

7   Q.    Do you see that?

8   A.    Yes, sir.

9   Q.    Down to the left, it was collected February

10  9th of 2007.  Do you see that?

11  A.    Oh, yeah, great.  Right here.  February 26.

12  Q.    I'm pointing to these over here if you want

13  some guidance.  I've highlighted them.

14  A.    I'm sorry.  Okay.  Yeah.  February 9th,

15  right.

16  Q.    And in the middle where I'm pointing with my

17  pinky, it has the manufacturer's batch number as

18  70078A1.  Do you see that?

19  A.    Yes, sir.

20  Q.    Down here it describes the sample, 200 count

21  bottles of digoxin, .125.  Is that correct?

22  A.    Right.

23  Q.    And if you want to flip through all this you

24  can, but I will represent to you that they subjected

25  this to USP method, assay, content uniformity --

PLAINTIFFS' EXHIBITS 009643

Russell Somma, Ph.D.                                    July 1, 2010

Page 123

```
 1      A.   Right.
 2      Q.   -- testing, and all the backup data from the
 3   chromatographs is attached to this.  Okay?
 4           Do you have any reason to disagree with any
 5   of what I just said?
 6      A.   Absolutely not.  Just for clarity, Matt,
 7   these are -- this was done by the FDA laboratory or
 8   somebody; correct?
 9      Q.   They tested it; right?
10      A.   Yeah, fine.
11      Q.   To your knowledge, FDA does have labs that do
12   this; correct?
13      A.   Yes, sir, they do, forensic laboratories.
14      Q.   And if you go to this page, if you can see
15   this page, in the upper right-hand corner where it
16   says, "District or lab," it says, "DEN/DO."
17           They have a lab in Denver; don't they?
18      A.   Uh-huh.
19      Q.   Yes?
20      A.   Yes.
21      Q.   I'm sorry to say that, but Mark needs to hear
22   it.
23      A.   I understand, sir.  It's a bad habit of
24   mine.
25           (A discussion is held off the record.)
```

PLAINTIFFS' EXHIBITS 009644

Russell Somma, Ph.D.                                    July 1, 2010

Page 124

 1      Q.    And to your knowledge, did this sample pass
 2   all of the tests to which the FDA subjected it?
 3            MR. MILLER:  Object to form.
 4      A.    Well, I haven't read through, but my -- based
 5   on what's here, meets, yes.
 6      Q.    All right.
 7      A.    There is no reason to think that it doesn't.
 8      Q.    Let's go to Exhibit --
 9            Well, do you have any -- have you seen any
10   evidence to indicate that this batch did not meet all
11   of its specifications?
12      A.    Absolutely not.
13      Q.    Let's go to Exhibit 25.  Is this another 484
14   sample report?
15      A.    It's similar format of sample collection,
16   yes.
17      Q.    Up here it says Sample 44881; does it not?
18      A.    Yes, sir.
19      Q.    And down here if you flip through this, you
20   can see that they collected -- if you go to the second
21   page, on December 3rd, 2007 they collected from a
22   Wal-Mart Pharmacy warehouse 200 count bottles of
23   Digitek; right?
24      A.    Uh-huh, yes, sir.
25      Q.    Batch 70298A1; right?

Russell Somma, Ph.D.                                    July 1, 2010

Page 125

1       A.    70298A1, yes, sir.

2       Q.    And on the first page, if you flip back, they

3   have a Lab Conclusion near the bottom.  It says, "The

4   product meets specifications for identification,

5   dissolution and content uniformity." Is that right?

6       A.    Yes, it does say that.

7       Q.    Now, have you seen any evidence in any

8   documents that you've reviewed that shows that any of

9   the tablets from this batch were out of specification?

10      A.    No, sir.  But where does it say the product

11  meets specifications on this one?  Did I miss that?

12  I'm sorry.  I don't --

13      Q.    Are you talking about Exhibit 24?

14      A.    I'm sorry.  24, yeah.

15      Q.    Do you want to dig through it?

16      A.    Well, I just -- it's not a headline like this

17  one is.  I can see that.

18      Q.    If you want to review it, go ahead.  If you

19  find that that batch when tested by FDA was out of

20  specs --

21      A.    No.

22      Q.    -- let me know.

23      A.    I'm agreeing it's in spec.  I'm just

24  wondering how come they don't put it in the front on

25  this one.  Go ahead.

PLAINTIFFS' EXHIBITS 009646

Russell Somma, Ph.D.                                      July 1, 2010

Page 126

1      Q.   Let's go to Exhibit 26.  Look at the second

2   page of that one.  I don't know why it got marked that

3   way.

4      A.   Yes, Matt.

5      Q.   Do you have it?

6      A.   Yes, sir.

7      Q.   It's Sample Number -- the shading is so bad.

8   Oh, Sample 448892.

9      A.   Yes, sir.  And that meets requirements.

10     Q.   And it was collected in December of 2007 from

11   a Wal-Mart Pharmacy?

12     A.   Yes it was.

13     Q.   And it's Batch 70664A.  Is that right?

14     A.   Yes, it is.

15     Q.   And on the first page of Exhibit 26, "The

16   product meets specifications for identification,

17   dissolution and content uniformity."

18          Do you see that?

19     A.   Yes, sir.

20     Q.   Have you seen any evidence the tablets from

21   this batch were out of specification?

22     A.   Not in anything I reviewed.

23     Q.   Let's go to Exhibit 27.

24     A.   Okay.

25     Q.   Before I ask you about Exhibit 27, when you

PLAINTIFFS' EXHIBITS 009647

Russell Somma, Ph.D.                                    July 1, 2010

Page 127

1   worked for Novartis, were you ever made aware after

2   the fact that FDA had done a 484 sample and passed

3   your company's products?

4        A.   Not customarily, Matt, no.

5        Q.   Okay.  As a consultant when you are doing an

6   investigation about the integrity of the product in

7   the field --

8        A.   Yeah.

9        Q.   -- would you inquire about 484 samples that

10  may have been tested by FDA itself?

11       A.   In -- when we would interview the client,

12  just to get a sense of what the level of involvement

13  was, yes, sir.

14       Q.   Okay.  Is it interesting and helpful

15  information to know?

16       A.   It's another set of eyes looking at the

17  information in an independent laboratory; always good

18  to have as a backup validation, Matt.

19       Q.   It's -- is it more than a set of eyes?

20  It's -- it's scientific testing of tablets; right?

21       A.   It's scientific testing of tablets.  I

22  apologize for denigrating it to "eyes," but that's

23  what I mean; it's another set of expertise looking at

24  it.  Independent, if it's regulatory or somebody else.

25       Q.   Okay.  And FDA, when they take the samples,

Russell Somma, Ph.D.                                    July 1, 2010

Page 128

1    can take as many as they want; correct?

2         A.    That I don't know, sir.

3         Q.    Can they test as many as they want?

4         A.    Again, I'm ignorant of that fact.  I don't

5    know.

6         Q.    Do you assume that FDA chooses a sample size

7    that they think is statistically significant?

8         A.    Based on uniform --

9               MR. MILLER:  Object to form.

10        A.    I guess that's a reasonable estimate based on

11   batch size.  I would also think that FDA could take

12   whatever they want.

13        Q.    Okay.  So let's go to Exhibit 27.

14        A.    Okay.

15        Q.    This is FDA Sample 453913; correct?

16        A.    453913?

17        Q.    Yes?

18        A.    Yes, sir, it is.

19        Q.    Okay.  Collected February 15, 2008; right?

20              It's up here in the left-hand corner.

21        A.    Sorry.  Yes, sir.

22        Q.    Batch 70737A; correct?

23        A.    Yes, sir, yes, sir.

24        Q.    And it was collected from a warehouse -- I'm

25   not sure where.  But if you go to the third page,

PLAINTIFFS' EXHIBITS 009649

Russell Somma, Ph.D.                                July 1, 2010

Page 129

1    there's a Lab Conclusion; right?

2        A.    Yes.

3        Q.    Did it pass all the tests to which FDA

4    subjected it?

5        A.    It says that it meets USP requirements for

6    identification, CU and dissolution; yes, sir.

7        Q.    Let's go to Exhibit 28.

8              Now, I know before today you hadn't seen

9    these exhibits, but did you know generally that FDA

10   had repeatedly tested Digitek in the field?

11       A.    No, sir.

12       Q.    Do you think for your analysis in this case,

13   it would have been important for you to know that?

14       A.    No, sir.

15       Q.    You don't think statistically significant

16   testing by FDA itself corroborating my client's QC

17   results is significant information?

18             MR. MILLER:   Object to form.

19       A.    I would say based on balance, if a firm comes

20   to me and offers a batch record which they say is

21   approved, I don't need any outside corroboration.   To

22   answer your question specifically, that would have

23   been nice, but I take it at face value what the client

24   has done.

25       Q.    All right.  So Exhibit 28 is FDA Sample

PLAINTIFFS' EXHIBITS 009650

Russell Somma, Ph.D.                                        July 1, 2010

Page 130

1    454866; is it not?

2        A.    454866, yes.

3        Q.    And it's another sample of a Digitek batch;

4    correct?

5        A.    Yes, sir.

6        Q.    And if you look way at the back, the third

7    from the last page, you will see it was collected

8    February 15th, 2008.  Upper left corner.

9        A.    Okay, yes, sir.

10       Q.    And it's Batch 70811A; correct?

11       A.    Yes, sir.

12       Q.    It was collected from a McKesson warehouse.

13   Is that right?

14       A.    In Duluth, yes, sir.

15       Q.    And let's go all the way to the front.

16             Is there a Lab Conclusion?  First page.

17       A.    Same as before, Matt:  Meets requirements for

18   dissolution and content uniformity.

19       Q.    Let's go to Exhibit 29, please.  Do you have

20   it?

21       A.    Yes, sir.

22       Q.    Do you see that it is FDA Sample 462746?

23       A.    Correct; yes, sir.

24       Q.    And if you go to the third page, you can see

25   that it's another Digitek sample; correct? Very top in

PLAINTIFFS' EXHIBITS 009651

Russell Somma, Ph.D.                              July 1, 2010

                                                    Page 131

1    the center?

2        A.   Right.

3        Q.   And just below that, they received this

4    sample in April of 2008; right?

5        A.   4/3/08; yes, sir.

6        Q.   And if you go back to the second page -- I'm

7    sorry.  Well, let's just go to the Lab Conclusion.

8        A.   Uh-huh.

9        Q.   Second page.  Did it pass all the tests to

10   which FDA subjected it?

11       A.   Lab Conclusion, it meets specifications; yes,

12   sir.

13       Q.   Was this in a blister pack?

14       A.   I'll have to read it, Matt.

15       Q.   Third page, halfway down in the big "Summary

16   of Analysis" box.  Do you see that?

17       A.   Yeah, I guess I do.

18       Q.   All right.  And I want you to assume that

19   this is Actavis batch 70300A.   Okay?

20       A.   Yes, sir.

21       Q.   Have you seen any information to indicate

22   that that Actavis batch had out-of-specification

23   tablets?

24       A.   No, I did not.  Matt, and to confirm your

25   first question, it is in a blister, based on this

Russell Somma, Ph.D.                                    July 1, 2010

Page 132

1   description.

2       Q.   And I didn't ask you that last question on

3   several of these batch exhibits; but have you seen any

4   evidence to indicate that any of the batches I've

5   asked you about with these FDA samples were out of

6   specification?

7       A.   Nothing that would -- nothing that would

8   bring me to that conclusion.

9       Q.   All right.  So let's go to Exhibit 30.

10           Is it FDA Sample 462753?

11      A.   Yes, it is.

12      Q.   Was it collected in March of 2008?

13      A.   March 21st, 2008; yes, sir.

14      Q.   From a Wal-Mart in California?

15      A.   Right; yes, sir.

16      Q.   And the batch says, "8A 332."

17           Do you see that?

18      A.   Yes, sir.

19      Q.   And that is a UDL batch number, which

20   corresponds to --

21      A.   UDL is?

22      Q.   That's Batch 70834A.

23      A.   I'm sorry.  What is UDL?

24      Q.   You don't know what UDL is?

25      A.   No.

PLAINTIFFS' EXHIBITS 009653

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 133

1        Q.    Okay.  We'll get to that.

2        A.    Okay.

3        Q.    This is a Digitek sample, is it not?  Exhibit

4    30?  It's right --

5        A.    Digitek, right.  Got it.

6        Q.    And I'd like you to go to the third page of

7    the exhibit.

8        A.    Got it.

9        Q.    Is there a Lab Conclusion?

10       A.    There sure is.

11       Q.    What's the conclusion?

12       A.    That they meet specifications for identity --

13   identification, dissolution and content uniformity.

14       Q.    Do you have any evidence from anything in

15   front of you to indicate that any tablets from this

16   batch were out of specification?

17       A.    No.

18       Q.    Let's go to Exhibit 31, please.

19             And I'll represent to you when you get back

20   to 2002, their records get a lot thinner.

21             Is this another 484 sample?

22       A.    It looks to be.

23       Q.    From March of 2002?

24       A.    Yes.

25       Q.    And the -- for Digitek?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 134

 1     A.    Product description; yes, it is.

 2     Q.    Is there a Lab Conclusion in the center of

 3   the page?

 4     A.    It meets USP's uniformity of dosage unit

 5   specifications, but it says nothing about dissolution.

 6     Q.    Well, why don't you go to the very last test

 7   on the page?

 8     A.    There it is.

 9     Q.    What it does it say about dissolution?

10     A.    There it is.  Meets dissolution on -- I

11   didn't read that far.

12     Q.    You don't have any evidence that any of these

13   tablets from that batch were out of spec; do you?

14     A.    No, sir.

15     Q.    Are you aware that at least this testing

16   exceeds the recall parameter dates?

17     A.    Well, this is -- is that based on this date,

18   Matt, '02?

19     Q.    Well, do you know when the recalled batches

20   were first manufactured?

21     A.    I don't know that date, to be honest with

22   you.

23     Q.    All right.  Let's go to Exhibit 32, please.

24           Is this another FDA Form 484 sample?

25     A.    Yes, sir.

PLAINTIFFS' EXHIBITS 009655

Russell Somma, Ph.D.                              July 1, 2010

Page 135

1      Q.   Sample 157504?

2      A.   Yes, sir.

3      Q.   For Digitek?

4      A.   Yes, sir.

5      Q.   Center of the page, what was the Lab

6   Conclusion?

7      A.   USP uniformity of dosage units.  It looks

8   like it meets.  It also meets USP requirements for

9   dissolution.

10     Q.   All right.  Exhibit 33, please.

11          Is this another FDA 484 Digitek sample?

12     A.   Yes, it is.

13     Q.   Sample 178890?

14     A.   Correct.

15     Q.   Now, in the Lab section, does it say anything

16  other than "in compliance"?

17          Do you see where I'm talking about?

18     A.   Yeah, yeah, right in the middle there, "in

19  compliance."  I don't see any other comment.  It says

20  that in two places.

21     Q.   Okay.  Would you assume that that's -- that

22  it passed both content uniformity and dissolution?

23     A.   I would, simply because this is the same

24  laboratory that did the prior, and it uses the "in

25  compliance," and it does note that it meets.

PLAINTIFFS' EXHIBITS 009656

Russell Somma, Ph.D.                                    July 1, 2010

Page 136

1    Q.   Okay.

2    A.   Even though it's absent here.

3    Q.   All right.

4    A.   Okay?

5    Q.   So look at Exhibit 34, please.

6         Is that another FDA Form 484 sample report?

7    A.   178891, yes, it is.

8    Q.   And -- for Digitek?

9    A.   Correct.

10   Q.   And halfway down the page, does it indicate

11   in two different places that the product was in

12   compliance?

13   A.   That's correct.

14   Q.   Now, have you read anything in any of the

15   material that you have seen to indicate to you who UDL

16   was?

17   A.   I have to admit that I cannot remember UDL.

18   Q.   All right.

19   A.   To be perfectly honest, I think I've asked

20   the question.  I just do not remember the answer.

21   Q.   From all the material that you reviewed from

22   Actavis, did Actavis always package its product in

23   bottles?

24   A.   Everything I looked at went into bottles,

25   yes, sir.

PLAINTIFFS' EXHIBITS 009657

Russell Somma, Ph.D.                                    July 1, 2010

Page 137

1      Q.   All right.  You know the manufacturing of --
2   and packaging of pharmaceuticals, so at some point
3   what would -- what assumption would you make about how
4   Digitek got into blister packs?
5      A.   They would have had to have gone with a third
6   party contractor to do that, if they didn't have the
7   capability themselves.
8      Q.   Okay.  I want you to assume that that
9   third-party contractor is UDL.  Okay?
10     A.   I got it.
11     Q.   Did Novartis make any product in blister
12  packs?
13     A.   We were a European-based company, Matt. Every
14  product was offered in blisters.
15     Q.   Okay. What did Novartis do --
16          (A discussion is held off the record.)
17     A.   Every product we made was made in blisters.
18  We distributed in Europe.
19     Q.   What did Novartis do to make sure that
20  tablets would fit into blisters?
21          MR. MILLER:  Object to form.
22     A.   We would -- we would design the blisters such
23  that it would fit within a normal range.  What that
24  means, Matt, was:  We didn't custom-make blister
25  tools.  We made sure that our tablets were made to

PLAINTIFFS' EXHIBITS 009658

Russell Somma, Ph.D.                                      July 1, 2010

Page 138

1    engage, that would accommodate blister tooling

2    downstream.

3         Q.   Well, what would happen if by accident,

4    Novartis made some double-thick tablets?  Would they

5    fit into your blisters?

6         A.   This would be more of an opinion, I think,

7    for me.  I would think based on what I've seen in the

8    past, some would, some wouldn't.  I'm not trying to be

9    evasive here.

10        Q.   In pharmaceutical packaging, you want the

11   blister to be relatively tight to the tablet; don't

12   you?

13             And I'll give you two reasons why.  Do you

14   agree with me it should be tight to the tablet,

15   relatively speaking?

16             MS. CARTER:  Object to form.

17        A.   In general I agree with you, Matt.  I'm

18   trying to think -- from my experience, I'm trying to

19   picture some of it.

20        Q.   Well, you don't want a lot of space --

21        A.   No.

22        Q.   -- because the tablet could bounce around and

23   break; right?

24        A.   We both agree to that.  It's not going to

25   rattle like a kid's toy.  Okay?

PLAINTIFFS' EXHIBITS 009659

Russell Somma, Ph.D.                                    July 1, 2010

Page 139

1       Q.    And if you use too much packaging, you are

2    kind of wasting resources; aren't you?

3       A.    Precisely.

4       Q.    All right.

5       A.    We are in agreement there.

6       Q.    All right.  Do you know anything about what

7    UDL did to check tablet thickness of Digitek before it

8    put it in blister packs?

9       A.    No, sir.

10      Q.    Okay.  Could you look in the stack for

11   Exhibit 35?  It's right there.

12      A.    Sure.  It's right here.

13      Q.    All right.  Look at the first page.  First of

14   all, is this on Celsis Analytical Services letterhead?

15      A.    Yes, Matt, that's what it says.

16      Q.    Do you know who Celsis Analytical Service is?

17      A.    I would just assume is a third-party

18   analytical laboratory.  That's all I can say.  I have

19   not heard of them myself.

20      Q.    In the center, do you see the names of the

21   three samples?

22      A.    Digitek, yes, sir.

23      Q.    Three different batches?

24      A.    Yes, sir.

25      Q.    And at the very bottom, the date is January

Russell Somma, Ph.D.                                    July 1, 2010

Page 140

1    29th, 2007?

2         A.   Yes, sir.

3         Q.   I want you to flip back to Bates Page

4    UDL011685.  I skipped a few zeros.  It's not very far

5    back.

6         A.   Yeah.  Got it.

7         Q.   Do you see that?  Does it appear to you that

8    this is the certificate of analysis for this product

9    by Actavis?

10        A.   That's what it says; yes, sir.

11        Q.   All right.  And then if you flip back to --

12   further, do you see that Celsis did some independent

13   testing of this?

14        A.   Yes, sir.

15             MR. MILLER:  Now, when you say flip back a

16        little bit further, do you have a specific page?

17             MR. MORIARTY:  There's lots of pages, Pete.

18        Q.   I would start at UDL11687.

19        A.   Yes, sir.

20        Q.   And go back.  All right?

21             Does it appear to you from 11687 that this

22   product passed the tests to which Celsis submitted it?

23             I'm sorry.  That was a bad question.

24             From Page 11687, does it appear to you

25   that -- that the product passed the tests to which

PLAINTIFFS' EXHIBITS 009661

Russell Somma, Ph.D.                                    July 1, 2010

Page 141

1    Celsis subjected it?

2        A.    Based on these numbers, yes, Matt, it did --

3        Q.    All right.

4        A.    -- pass.

5        Q.    Now let's go back to 11717.

6        A.    Okay.

7        Q.    Is that the certificate of analysis for a

8    different batch than we just discussed?

9        A.    Sorry, Matt.  I went to the wrong page.  Can

10   we have that page number again, Matt?

11             MR. MILLER:  11717.

12             (A discussion is held off the record.)

13       Q.    11685.  It's Batch 61100.

14             The one I'm now asking you about at 11717 is

15   Batch 61097.  Okay?

16       A.    I got you.

17       Q.    So we're up to a different batch; correct?

18       A.    I got it now, yes, sir.

19       Q.    All right.  And if you go two pages more to

20   11719, does it appear to you that the product passed

21   the tests to which Celsis subjected it?

22       A.    Yes, it does.

23       Q.    Let's go all the way back to 11746.

24       A.    Okay.

25       Q.    Is this the Actavis certificate of analysis

PLAINTIFFS' EXHIBITS 009662

Russell Somma, Ph.D.                                    July 1, 2010

Page 142

1   for yet a third batch, 60992A?

2       A.   Yes, it is, Matt.

3       Q.   And if you go two more pages, does it appear

4   that the product passed all the tests to which Celsis

5   subjected it?

6       A.   Based on the information here, it met every

7   requirement.

8       Q.   Have you seen any evidence in any material

9   that you reviewed to indicate that any of these three

10  batches had out-of-specification testing by anyone?

11      A.   These three batches, no Matt.  I do not.

12      Q.   Let's go to Exhibit 69.  Is 69 in the stack?

13           (A discussion is held off the record.)

14      A.   69, got it.

15      Q.   All right.   Is this a UDL Lab document?

16      A.   Yes, it is.

17      Q.   And if you look a little bit way down, this

18  is regarding Actavis Batch 80111A; correct?

19      A.   Yes, it is.

20      Q.   And if you go to the -- about the middle.

21  It's UDL7655.

22      A.   Yes, sir.

23      Q.   Did they measure Digitek tablets in two

24  dimensions?

25      A.   Yes, they did.

PLAINTIFFS' EXHIBITS 009663

Russell Somma, Ph.D.                                    July 1, 2010

Page 143

1      Q.   Were any of them out of spec?

2      A.   I don't recall the spec off the top.  Is it

3   written here?  I have to go back and look.

4      Q.   It's at the very bottom.

5      A.   There it is, I see it.

6      Q.   Actually, that's not correct.  That may be

7   the range they found.

8      A.   But just for our both's sake, I'll look at

9   the batch record.  Okay?

10     Q.   Sure.

11     A.   Is that okay?

12     Q.   Oh, it's fine.  Oh, yeah. If you think it's

13  in there.

14     A.   It's in the compression sheets.

15          (A discussion is held off the record.)

16     Q.   Okay.  The thickness range for 250 micrograms

17  is 2.7 to 3.7 millimeters.

18     A.   2.7 to 3.7?  So based on that, these fall

19  well within mid range.  Okay?

20     Q.   All right.

21     A.   And just for clarity, Matt, what I was --

22  this was -- I just put down a bunch of numbers because

23  I have trouble remembering specifications.  I just

24  wrote them down on here.  Okay?  It's no big --

25     Q.   Sure.

PLAINTIFFS' EXHIBITS 009664

Russell Somma, Ph.D.                                    July 1, 2010

Page 144

 1      A.   And I didn't have that either, just to be
 2   clear.
 3      Q.   Okay.  Let's go to Exhibit 70, which I did
 4   not mark the other day.  Here it is.
 5           Is this another UDL Laboratories sheet?
 6      A.   Yes, it is.
 7      Q.   Regarding Digitek Batch 71034A?
 8      A.   Yes, it is.
 9      Q.   And if you go to a similar spot in this
10   document, it's the last one, do you see the product
11   dimension records?
12      A.   Right.
13      Q.   And this is for another 250 microgram batch?
14      A.   I know all fall well within the mid range.
15      Q.   All within spec?
16      A.   All within spec, yes.
17      Q.   Let's go to Exhibit 71.  Here you go.
18      A.   Thanks.
19      Q.   And is this a UDL Laboratories sheet?
20      A.   Yes, it is.
21      Q.   Regarding Actavis Batch 71004A?
22      A.   Yes, it is.
23      Q.   And this is a 125-microgram lot; correct?
24      A.   Correct.
25      Q.   And if you assume that the thickness specs

Russell Somma, Ph.D.                                July 1, 2010

Page 145

1    for that product are two to three millimeters, did all

2    these pass?

3         A.    You pulled that right off the batch record,

4    Matt?

5         Q.    I guess you'll just have to trust me.

6         A.    I'm good.

7         Q.    It's in the ANDA.

8         A.    And it's also right here, too.

9         Q.    So --

10        A.    The answer is -- the exhibit here shows that

11   this result of thickness falls within the mid range of

12   their specification thickness.

13        Q.    Okay.  Let's go to Exhibit 72.

14              Is this another UDL document?

15        A.    Yes, it is.

16        Q.    Regarding Batch 70175A?

17        A.    Right.

18        Q.    Please go to the same place. This is a 250

19   microgram batch.

20        A.    Got it.

21        Q.    Did all the 20 tablets that they measured

22   meet the specs?

23        A.    The specs being 2.7 millimeters to 3.7

24   millimeters; this batch falls right in the middle of

25   the range.

PLAINTIFFS' EXHIBITS 009666

Russell Somma, Ph.D.                                    July 1, 2010

Page 146

1      Q.    Okay.  Let's go to Exhibit 73.

2            Have you ever seen this document before?

3      A.    No, sir.

4      Q.    Had you ever seen any of those UDL documents

5   I just showed you?

6      A.    No, Matt, I did not.

7      Q.    Does this say, "UDL Internal Investigation

8   Record"?

9      A.    It sure does; yes, sir.

10     Q.    Do you see that this was in -- let me find

11  the date.  On the last page, May of 2008.

12     A.    Right.

13     Q.    And can you tell from the first page of

14  the -- this, that this investigation was done because

15  there was a recall going on?

16     A.    Just give me a minute, Matt.

17           Okay.  "Class 1 drug recall nationwide," got

18  it.  "Is being recalled."

19           (A discussion is held off the record.)

20     A.    Product recall is obvious based on this

21  statement, yes, sir.

22     Q.    And UDL investigated -- at the third page,

23  you can see a complaint history with this product.  Do

24  you see that?

25     A.    Just give me a sec.

PLAINTIFFS' EXHIBITS 009667

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 147

 1       Q.    Well, I'll tell you what.

 2             MR. MORIARTY: Let me withdraw that question.

 3       Q.    Let's go to the second page.  Do you see that

 4    under "Investigation Summary," they have a section on

 5    receiving inspection records?

 6       A.    Yes.

 7             MR. MILLER:  Wait a minute.  I'm not with you.

 8             MR. MORIARTY:  Second page, top.

 9             MR. MILLER:  Okay.  Got it.

10       Q.    And then there's a section called "Batch

11    Record Documentation"?  Do you see that?

12       A.    Yes, I see it, Matt.

13       Q.    Is there a section called "Examination of

14    Retained Samples"?

15       A.    Right.  The copy starts to get a little fuzzy

16    down there, but I can see that, yes.

17       Q.    And then on the next page at the top,

18    "Complaint History"?  Do you see that?

19       A.    Right.

20       Q.    Now, if you were going to do -- I'm sorry.

21    I'm not --

22             On the last page, it says "Stability records

23    history."  Do you see that?

24       A.    Yes, I do.

25       Q.    If you were going to do an investigation, are

Russell Somma, Ph.D.                                    July 1, 2010

Page 148

1    these the kind of things that you would look at?

2        A.   If I was aware that this was one of the

3    put-ups that I had that was problematic.  I think this

4    would be a substantive piece of information.  It would

5    certainly give me a sense to  -- of the tablet gauge.

6        Q.   Okay.

7        A.   Because certainly downstream packaging,

8    especially in something as -- as punitive as a

9    blister, it's important to know.

10       Q.   Okay.  And go to the last page.  Do you see

11   they have a "Conclusion"?  Just above the signature?

12       A.   Right.

13       Q.   Do you see that?

14       A.   "UDL is continuing a voluntary --"

15       Q.   No, no.  Above that.

16       A.   I'm sorry.

17       Q.   It says, "Conclusion."  Do you see that?

18       A.   Yes.

19       Q.   It says, "Records reviewed, retained sample

20   examination and complaint history for products and

21   lots in question demonstrate no evidence of unusual

22   events that could be related to the packaging of

23   double the thickness tablets in unit dose blisters."

24            Do you see that?

25       A.   I see it; yes, sir.

PLAINTIFFS' EXHIBITS 009669

Russell Somma, Ph.D.                                    July 1, 2010

Page 149

1      Q.    Okay.  Let's go to number -- Exhibit 83.

2            Good luck with this one.  I want you to take

3    a minute to look through that.

4            First of all, have you ever seen it before?

5      A.    No, sir.

6      Q.    All right.  I'm going to walk you through

7    this.

8      A.    All right.

9      Q.    Do you see that this is on UDL Labs

10   letterhead?

11     A.    Yes.

12     Q.    From your own knowledge of the pharmaceutical

13   industry, would a repackager have an obligation to do

14   dissolution testing in order to assess whether their

15   repackaging of the product had any effect on shelf

16   life or stability?

17     A.    That would depend on the product.

18   Customarily you want to make sure that the environment

19   in which you package the product doesn't affect it.

20   In other words, it going to be there in bulk.

21     Q.    Okay.

22     A.    So in that case, you'd want to do everything

23   necessary to assure that.  Okay?

24     Q.    So let's go back to -- let's go back to the

25   first page, I guess.  Is this a transmittal form?

PLAINTIFFS' EXHIBITS 009670

Russell Somma, Ph.D.                                    July 1, 2010

Page 150

1        A.    Yes, that's what it says.

2        Q.    And essentially what it is telling us is that

3    on January 29th, 2007, UDL shipped Celsis Laboratories

4    three Digitek samples.  Is that right?

5        A.    Yes, it is.

6        Q.    And if we flip through the remaining pages,

7    you see that on various other dates, UDL sent RD

8    Laboratories in Missouri various other Digitek

9    samples; is that right?

10       A.    Right, yes.  It looks like these are

11   stability samples.

12       Q.    Okay.  So let's go back to the actual Results

13   sections.

14             Now, I can tell you, Dr. Somma, that I have

15   read this document and I think there are 33 batches of

16   Digitek over the years that UDL sent to either Celsis

17   or RD.  Okay?  You are welcome to count them if you'd

18   like, but I just want to go through a few of them.

19       A.    Okay.

20             MR. MILLER:  What page are you on?

21       Q.    Not all 33 of them.

22             MR. MORIARTY:  I am on UDL11369.

23             MR. MILLER: Okay.

24       Q.    Do you see that this is a stability test

25   result?

PLAINTIFFS' EXHIBITS 009671

Russell Somma, Ph.D.                                July 1, 2010

                                                        Page 151

1       A.    Yeah, yes, sir.

2       Q.    For, on the right-hand side in the corner,

3    Actavis Lot 70834A?  Upper right-hand corner.

4       A.    The other right.  703 -- 70834A, yes, sir.

5       Q.    And the initial testing in October of 2007

6    showed an assay of 97.3 percent; correct?

7       A.    Yeah, yes, sir.

8       Q.    Are you familiar with this kind of stability

9    test reporting?

10      A.    Yes, sir.

11      Q.    Would you assume that the initial October of

12   2007 was what Actavis tested at the time of finished

13   product testing?

14      A.    That -- is this a confirmation -- is this

15   aligned with their results?

16      Q.    I don't know.  I'm just asking what you know

17   about this.  If you don't know, I don't want you to

18   guess.

19      A.    That I couldn't answer, then.

20      Q.    Okay.

21      A.    If they are both working with the same spec

22   and the same method and it's been transferred, it

23   should be right within -- right within experimental

24   error.

25      Q.    Okay.  So let's go to the next page, UDL

PLAINTIFFS' EXHIBITS 009672

Russell Somma, Ph.D.                                July 1, 2010

Page 152

1    11370, and in the upper right, this is Batch 70386A.

2         A.    Right.

3         Q.    Correct?

4         A.    Uh-huh.

5         Q.    And on this page in May of '07, the assay

6    result was 97.1.  Is that correct?

7         A.    97.1, yes, sir.

8         Q.    Percent?

9         A.    Percent.  Okay.

10        Q.    And if you look at the bottom on the left, it

11   says the manufacturing date of May of '07.

12              Do you see that?

13        A.    Uh-huh.

14        Q.    That's yes?

15        A.    Yes, sir.  And I see --

16        Q.    And a manufacturer's assay of 97.1 percent;

17   correct?

18        A.    Right.

19        Q.    Is it reasonable to conclude, therefore, that

20   this top part where the initial -- it lists the

21   initial assay, is the original Actavis assay when it

22   made the batch?

23              MR. MILLER:  Object to form.

24        A.    In my experience, what happens is your Time

25   Zero is usually not repeated.  That would be -- it

PLAINTIFFS' EXHIBITS 009673

Russell Somma, Ph.D.                                  July 1, 2010

Page 153

1    could have been data that was there, and they just

2    used that as Time Zero.

3        Q.    Okay.

4        A.    Okay?  So Matt, that would be why they're the

5    same.

6        Q.    Right.

7        A.    But, again, I wouldn't know that for a fact.

8    That's my experience.

9        Q.    When UDL gets the certificate of analysis

10   from Actavis, it has the assay results with it?

11       A.    Right.  So that would be Time Zero.

12       Q.    Okay.  So the next section says, "Shelf life

13   testing, three months, assay result 97.2."

14             Do you see that?

15       A.    Yes, sir.

16       Q.    And that's within the specifications.  Is

17   that right?

18       A.    It sure is, yes, sir.

19       Q.    Now, if we flip back through every one of

20   these pages, is the format essentially the same, where

21   the Actavis lot is in the upper right-hand corner?

22       A.    Yes.

23       Q.    And the assay results to which either Celsis

24   or RD tested the Digitek are contained in these grid

25   charts.  Is that right?

Russell Somma, Ph.D.                                    July 1, 2010

Page 154

1      A.   Yes, sir.

2      Q.   All right.   I would like you to flip through

3   all those pages and tell me if there was ever a

4   stability failure of Digitek when tested at the

5   request of UDL?

6           MS. CARTER:   Object to the form.

7      A.   On several occasions, Matt, these are

8   dissolution results at the S2 level.  My experience,

9   those would precipitate an investigation.  But did

10  they fail?  No.

11          I'm looking at specifically Page 11373.  It

12  notes it as an S2.  That just means that you increase

13  the sampling.

14     Q.   Okay.

15     A.   But, again, not knowing that part of it, that

16  usually precipitates an evaluation.  It is not per se

17  a failure.  Okay?

18          MR. MILLER:   If we're going to leave this

19      document, it might be a good time for lunch.

20          MR. MORIARTY:   Let me finish up.

21     A.   When I'm done --

22          MR. MORIARTY:   Let me finish up my section.   I

23      have another exhibit.  And maybe one or two more

24      questions.

25          MR. MILLER:   Okay.

PLAINTIFFS' EXHIBITS 009675

Russell Somma, Ph.D.                                    July 1, 2010

Page 155

1            (A discussion is held off the record.)

2       Q.   Do you see any stability failures?

3       A.   Other than those comments I made about S2,

4  there are no stability failures in here.

5       Q.   And stability testing is doing assay of the

6  product over time; is it not?

7       A.   Yes, it is.

8       Q.   Okay.  I want to hand you what I had marked

9  as Exhibit 84.  This is another UDL document.

10           Have you ever seen this before?

11      A.   No, sir.

12      Q.   Had you ever seen all that stability testing

13  before?

14      A.   This?  I never looked at that.

15      Q.   All right.  This is a memo, is it not, dated

16  May 5th, 2008?

17      A.   That's correct.

18      Q.   And if you go to the second paragraph, third

19  line down, it says, "UDL tests the product for

20  potential and dissolution.  In reviewing the data for

21  both strengths of Digitek, the potency showed no

22  apparent trending."

23           Let me stop there.  Have you seen anything in

24  the documents that I have given you so far to indicate

25  there was any adverse trending to the Digitek data?

PLAINTIFFS' EXHIBITS 009676

Russell Somma, Ph.D.                                    July 1, 2010

Page 156

1           MR. MILLER:  Object to form.

2      A.    To answer it accurately, Matt, I would have

3   to look at all of that information together.  My sense

4   is:  Based on those numbers I looked at, they were all

5   within the mid to high 90s.

6      Q.    All right.  Do you have any reason to

7   disagree with the person from UDL --

8      A.    Absolutely not.

9      Q.    -- who did this?

10     A.    Absolutely not.

11     Q.    The last sentence says, "Overall both

12  strengths of this product have shown no remarkable

13  stability data through the assigned expiration date in

14  the unit dose package."

15          Do you have any reason to disagree with that?

16     A.    Not at all.

17     Q.    Now, I've shown you -- We know that Actavis

18  tested all this and it was within spec when they

19  tested it.  And I've now shown you Quantic batch

20  record review materials.  I've shown you FDA testing

21  of the product.  I've shown you testing done at the

22  request of UDL; correct?

23     A.    Uh-huh; yes, sir.

24     Q.    We've spent about an hour just going over

25  testing of Digitek; right?

PLAINTIFFS' EXHIBITS 009677

Russell Somma, Ph.D.                                    July 1, 2010

Page 157

1      A.   Yes, sir.

2      Q.   Do you have any evidence, any documents, any

3  test results to indicate that there was Digitek in the

4  hands of consumers that was outside its labeled

5  specifications?

6           MR. MILLER:  Object to form.

7      A.   Nothing other than the Batch 70924A.

8      Q.   All right.  Do you have any evidence that any

9  tablets from --

10          MR. MORIARTY:  Let me withdraw that.

11     Q.   Do you have any evidence that

12 out-of-specification tablets from Batch 70924A made it

13 to the hands of consumers?

14     A.   The batch was tested according to the C of A.

15 According to the certificate of analysis, the batch

16 met requirements.  So the answer is:  That batch met

17 requirements, yes.

18     Q.   Okay.  Well, that batch was -- the

19 investigation of that batch was for double-thick

20 tablets; correct?

21     A.   That's correct, sir.

22     Q.   Not for tablets of normal size with varying

23 potency; right?

24     A.   That's correct.

25     Q.   Do you have any evidence from any document

PLAINTIFFS' EXHIBITS 009678

Russell Somma, Ph.D.                                    July 1, 2010

Page 158

1    you have seen, any deposition testimony you have seen,

2    that an oversized tablet from Batch 70924A made it to

3    the hands of a consumer?

4         A.    I would have to say no.

5         Q.    All right.

6              MR. MORIARTY: That's a good time for a lunch

7         break.

8              THE VIDEOGRAPHER: Please stand by.  We are

9         going off the record.  The time is 12:29 p.m. This

10         is the end of Tape Number 3.

11              (The luncheon recess is taken.)

12

13    CONTINUED DIRECT EXAMINATION BY MR. MORIARTY:

14              THE VIDEOGRAPHER: We are back on the record.

15         The time is 1:38 p.m. This is the beginning of

16         Tape Number 4.

17         Q.    Dr. Somma, have you ever consulted with my

18    client, Actavis?

19         A.    No, sir.

20         Q.    Have you ever consulted with Mylan?

21         A.    No, sir.

22         Q.    Now, earlier I went through all that 484

23    testing from the FDA, and by my count, seven of the

24    batches that they tested are what wound up being the

25    recall batches.  Okay?  Which is about 4.6 percent.

Page 159

1      A.   Yes, sir.

2      Q.   Do you have an opinion as to whether that is

3   a statistically significant number?

4           MR. MILLER:  Object to form.

5      A.   Is that statistically significant, the

6   batches that were recalled; correct, Matt?

7      Q.   Yes.  Seven out of 152?

8      A.   Whether it is statistically significant or

9   not, it's hard for me to say.  Is it representative of

10  what was made?  I don't think so.

11     Q.   Why isn't it representative of what was made?

12     A.   Well, to get back to what I had said before,

13  bottom line on all of this was:  I have not seen an

14  investigation which resolved the root cause of the

15  things I observed in these other batches, such as some

16  of the blend uniformity issues, things like that.

17          Other than that, based on the merit and the

18  information in front of me, those are -- those batches

19  passed, yes.  And they were confirmed by two -- two

20  sources.

21     Q.   And by my count Celsis, one way or another,

22  tested 11 out of 152 batches, which is about 7.2

23  percent.  Is that statistically significant?

24          MR. MILLER:  Object to form.

25     A.   I would say the same answer again, you know.

PLAINTIFFS' EXHIBITS 009680

Russell Somma, Ph.D.                              July 1, 2010

Page 160

1      Q.    And if you add those two together and take
2  out any duplicates that may have been tested by both
3  Celsis and FDA, it's 16 out of the 152, which is ten
4  and a half percent.
5            Is that statistically significant?
6            MR. MILLER:  Object to form.
7      A.    It's hard for me to answer that question yes
8  or no.
9      Q.    Do you think that FDA's testing seven out of
10 152 recall batches provides a high degree of
11 assurance --
12     A.    No more than any -- I'm sorry.
13     Q.    --  that those seven batches at least met
14 their specifications for identity, purity, and
15 potency?
16           MR. MILLER:  Object to form. .
17     A.    No.  Again, those seven batches -- no more
18 does that testing or Celsis's testing represent the
19 fact that all of the batches in question don't have
20 some problem.  It meant that that sample using those
21 specifications at that time met requirements.
22           It gets back to the point I made earlier:
23 That this is a totality, it's a continuum, it's not
24 just a speck in the results.
25     Q.    All right.  Well, have you seen any FDA

PLAINTIFFS' EXHIBITS 009681

Russell Somma, Ph.D.                                    July 1, 2010

Page 161

1    documents that someone said that there was a total

2    failure of the quality system?

3         A.    I believe in this Exhibit 26, Matt, there is

4    a statement.  I don't know if it says "total failure."

5              (A discussion is held off the record.)

6         A.    I'm referring to Exhibit Number 26 in

7    response to Matt's question.  That was the only --

8    this is the point that I had seen.  That was a comment

9    from the FDA, as far as their quality system goes.

10        Q.    Well, if somebody else were to have said

11   there was a total failure of Quality, do you think

12   that's an overstatement, given the fact that UDL and

13   Celsis have independently confirmed that at least

14   those batches, when tested, met the specifications?

15             MR. MILLER:  Object to form.

16        A.    Again, my -- my --

17        Q.    That one's a yes or no.  Do you think it's an

18   overstatement?

19        A.    No.

20        Q.    Explain your answer.

21        A.    I think that statement is based upon what I

22   say the whole picture, not just a series of

23   specifications -- a series of batch results.  This

24   speaks to things in total, and that gets back to my

25   comments about investigations and analysis of other

PLAINTIFFS' EXHIBITS 009682

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 162

1    mitigating circumstances.

2        Q.    Well, you know there was an all-products

3    recall a month or two after the Digitek recall;

4    correct? Do you know that?

5        A.    All products were recalled, yes, sir.

6        Q.    And do you know those were not to the

7    consumer level?

8        A.    That I didn't know, sir.

9        Q.    Did you think when you got here today that

10   all the products were recalled to the consumer level?

11       A.    No, no, sir.

12       Q.    You didn't give it any thought one way or

13   another?

14            MR. MILLER:  Object to form.

15       A.    Not that it was pertinent to what I was

16   looking at in this particular case.

17       Q.    Okay.  Did the FDA ever make a specific

18   finding in any document that you've ever seen that

19   Digitek was adulterated?

20            MR. MILLER:  Object to form.

21       A.    Well, getting back to the question -- to the

22   definition of "adulterated," I would say, based on the

23   broad-based comment in Citation 1, that based on their

24   definition, those -- Digitek would be adulterated by

25   their definition.

Russell Somma, Ph.D.                                July 1, 2010

Page 163

1      Q.   That's not what I asked you.

2      A.   Okay.  Then please ask again.

3      Q.   Did they make an explicit statement anywhere

4  that Digitek was adulterated?

5      A.   And, again, I just think if it is

6  noncompliance, by their definition it is adulterated.

7      Q.   I want you to find me a statement in any of

8  the paper in front of you that says -- from the FDA,

9  that Digitek was adulterated.  Explicit statement.

10  Not you inferring or --

11      A.   Understood.

12          MR. MILLER:  I'm going to object to form.

13      A.   I'm looking at this Exhibit 91, Matt.  And to

14  answer your question point on about they say it's

15  adulterated, this is -- in this particular statement

16  here, it doesn't come right out and say that,

17  "adulterated," it does not say that.  Okay?

18      Q.   Okay.  Have you seen any FDA statement at all

19  specifically finding that there was

20  out-of-specification Digitek in the hands of a

21  consumer between 2004 and 2008?

22      A.   I think the field action that recalled the

23  batches speak to that point, or not?  Did I

24  misunderstand that?  By recalling of batches, isn't

25  that what that means, that they thought that that

Russell Somma, Ph.D.                                    July 1, 2010

                                                           Page 164

1    happened?

2        Q.   Sir, I thought you told me a number of hours

3    ago that you could recall batches of pharmaceutical

4    product for a number of different reasons; correct?

5        A.   Yes, you can, right.

6        Q.   And defective, actual out-of-spec tablets in

7    the hands of consumers may or not be the case; right?

8            MR. MILLER: Object to form.

9        A.   May or may not be the case, correct.

10       Q.   FDA could recall pharmaceutical products

11   because the label was on crooked?

12       A.   That's correct.

13       Q.   Or they didn't like the way the plumbing in

14   the plant was; correct?

15       A.   That's correct.

16       Q.   All right.  So what I'm asking you:  In all

17   the ocean of material that you have reviewed, do you

18   find any explicit statement by the FDA that there was

19   out-of-specification Digitek in the hands of consumers

20   between 2004 and the spring of 2008?

21           MR. MILLER:  Object.

22       A.   And, again, to that, Matt, what I would have

23   to answer is that they found noncompliance to

24   procedures, they found information about blend

25   uniformity.  Nothing that specifically speaks to

PLAINTIFFS' EXHIBITS 009685

Page 165

1   defective tablets being distributed.

2       Q.   And just because there were some blend

3   uniformity out of specs that were the subject of an

4   FDA 483 because of the investigation technique, does

5   not mean there was out-of-spec Digitek in the hands of

6   consumers; does there?

7            MR. MILLER:  Object to form.

8       A.   That's hard to say, Matt, because they never

9   did the investigation as I would have understood it,

10  to be perfectly honest.

11      Q.   All right.  But you have all this information

12  available, and you haven't seen any evidence of

13  out-of-spec Digitek in the hands of a consumer; have

14  you?

15           MR. MILLER:  Object to form.

16      Q.   You told me that before lunch?

17      A.   Right, right.

18      Q.   Every piece of evidence you have seen

19  regarding testing of Digitek has been within

20  compliance?

21      A.   Testing -- Absolutely.

22      Q.   Do you have any idea of what percentage of

23  pharmacies in the United States still count out

24  tablets by hand?

25      A.   Oh, I practiced pharmacy for awhile and every

PLAINTIFFS' EXHIBITS 009686

Page 166

1    one that I worked in, we counted by hand.  So my guess

2    would be -- the big box stores, whatever percentage

3    they are, counting automatically.  That would be my

4    guess.

5        Q.   How does a big box store go from a

6    thousand-count bottle of tablets on a shelf into a

7    vial with an automatic counter?  Or are you talking

8    about mail order pharmacies?

9        A.   No, sir.  They would fill a tablet counter up

10   with a thousand tablets, type in the number they

11   need --

12            (A discussion is held off the record.)

13       A.   Set the counter and then the machine counts

14   the tablets.

15       Q.   And what percentage of pharmacies in the

16   United States use automated versus hand counting?

17            MR. MILLER:  Object to form.

18       A.   That would be a complete guess on my part.

19   It's got to be a small percentage.

20       Q.   You mean it's a small percentage that use

21   automatic?

22       A.   Yes, sir.

23       Q.   So if tablets were out of specification by

24   size, that's what's known in the industry as a visible

25   defect; is it not?

PLAINTIFFS' EXHIBITS 009687

Russell Somma, Ph.D.                                    July 1, 2010

Page 167

1       A.   Visible -- visual defect, yes.

2       Q.   And it is at least theoretically possible

3    that the pharmacy level, when tablets are hand

4    counted, is a point at which tablets that were extra

5    thick could be detected; correct?

6            MR. MILLER:  Object to form.

7       A.   I would have to agree to an extent; but

8    saying, based on my pharmacist's background, I was not

9    looking for thick tablets.  My objective was to make

10   sure that the prescription was filled adequately, that

11   the all -- that all of the paperwork was filled out,

12   and that the clinical profile of the patient was done.

13   And a lot of cases nowadays, it is done by a

14   technician.

15      Q.   All right. Well, some human being was used to

16   counting out tablets; right?

17      A.   Right.

18      Q.   Have you ever actually seen and touched a

19   Digitek tablet?

20      A.   No, sir.

21      Q.   I'm sorry?

22      A.   No, sir.

23      Q.   If a tablet that was supposed to be between

24   two and three millimeters was double thick, so it was

25   somewhere between four and six, is that a visual

PLAINTIFFS' EXHIBITS 009688

Russell Somma, Ph.D.                                        July 1, 2010

Page 168

1   defect that a reasonable technician or pharmacist

2   would be able to detect when counting out a

3   prescription of 30 to 100 tablets?

4           MR. MILLER:  Object to form.

5       A.   I don't think so, because when you put these

6   into a counting tray, they all lay down flat.  How

7   would you able to determine -- determining height of

8   tablets, Matt, across a bed of tablets is very

9   difficult.  You would actually have -- it would have

10  to be on your side.

11          So my guess is that that's pretty tough to

12  do, just from having done it myself.

13      Q.   Well, if there was one double-thick tablet in

14  there, it would be sticking out like a skyscraper,

15  right?

16      A.   Like a skyscraper, yeah.  That you -- Unless

17  you -- in that case, if it was that thick.   But

18  again, three millimeters, double, six; my guess is you

19  probably would see that.

20      Q.   All right.

21      A.   I'm not saying I would see that.

22      Q.   Did you say earlier you had not reviewed any

23  adverse event reporting data in this case?

24      A.   That's correct.

25      Q.   Do you have any opinions about adverse events

PLAINTIFFS' EXHIBITS 009689

Russell Somma, Ph.D.                                    July 1, 2010

Page 169

1   with Digitek?

2       A.    No, sir.

3       Q.    Did you ask Mr. Miller or Ms. Carter how many

4   of the plaintiffs in this litigation had had their

5   tablets weighed or measured?

6       A.    No, sir.  I looked for the information in the

7   information provided.

8       Q.    All right.  You didn't see any plaintiffs who

9   had double-thick tablets; did you?  Or even

10  extra-thick tablets?

11      A.    I didn't see -- I didn't see any information

12  that said that at all.  Okay?

13      Q.    In a piece of litigation like this, and I

14  know you are new to this process, but if they had

15  evidence that their clients had extra-thick tablets

16  that were outside the specifications, do you think

17  it's the kind of material that they would give you to

18  review?

19      A.    I would think so.

20      Q.    Have you seen any reliable reports that an

21  extra-thick tablet was detected by a pharmacist in

22  2005, 2006, 2007 or 2008?

23      A.    We had discussed that before, as I recall.  I

24  thought I did, but I was not able to recover it.

25      Q.    Well, I said reliable report by a pharmacist

PLAINTIFFS' EXHIBITS 009690

Russell Somma, Ph.D.                                    July 1, 2010

Page 170

 1   of an extra-thick tablet in 2005, '06, '07 or '08.

 2          MR. MILLER:  I'll object to form.

 3      A.   We just -- I'm going to look again.

 4          I read it, Matt, and I cannot find it.

 5      Q.   You believe you have a report, a reliable

 6   report from a pharmacist that indicates that they

 7   found a double-thick tablet in the years I just

 8   mentioned, '05 through '08?

 9      A.   As I recall, the report was about a

10   pharmacist finding a tablet, and the year I believe

11   was '04.

12      Q.   Is that the one -- Well, wait a minute.  I

13   said '05 through '08 three times.

14          Do you have such a report?

15      A.   That's -- as I'm trying to think through it,

16   I cannot locate it here.

17      Q.   Do you think there is one?  Now, we discussed

18   one this morning about this nursing home, and you told

19   me that it wouldn't be reliable given everything I

20   asked you about it.

21      A.   Right, right.

22      Q.   I'm asking about a different question.  A

23   reliable report from a pharmacist in 2005, '06, '07 or

24   '08 indicating that they had an extra-thick Digitek

25   tablet.

PLAINTIFFS' EXHIBITS 009691

Russell Somma, Ph.D.                                    July 1, 2010

Page 171

1            MR. MILLER:  Object to form.

2       A.    Nothing that I can produce, no, sir.

3       Q.    Can you look for Exhibit 21 in the stack,

4  also known as Plaintiff's Exhibit 128?

5            Have you seen this document before?

6       A.    Yes, sir.

7       Q.    This is the extra-thick tablet investigation.

8  The investigation was conducted in 2004; correct?

9       A.    Yes, sir.

10      Q.    And you see in here that somehow Actavis or

11  Amide at the time was able to figure out that that

12  came from a batch made in 2003; correct?

13      A.    Yes, sir.

14      Q.    Did the company alert the FDA to this event

15  through what's known as a field alert report?

16      A.    I don't know, Matt.

17      Q.    Okay.  I'd like you to look at Exhibit 20.

18  It should be in that stack.

19            Have you seen that document before?

20      A.    I believe so.

21      Q.    It's an EIR from 2004.  Is that correct?

22      A.    Yes, sir.

23      Q.    I'd like you to go to Page 4, please.

24      A.    Uh-huh.

25      Q.    Now, first of all, in order to be operating

PLAINTIFFS' EXHIBITS 009692

Russell Somma, Ph.D.                                          July 1, 2010

```
                                                        Page 172
 1   under a consent degree -- decree, do you have to be in

 2   compliance with cGMPs?

 3       A.   Absolutely.  You have to be in compliance

 4   with cPMG's if you make a product that's subject to

 5   human consumption.

 6       Q.   All right.  So in the first paragraph, under

 7   "History of Business Operations" --

 8       A.   Right.

 9       Q.   -- four lines down, there is a sentence that

10   says, "The consent decree was lifted in 2001 following

11   successful demonstration of sustained cGMP

12   compliance."

13            Do you see that?

14       A.   Yes, sir.

15       Q.   Do you have any reason to disagree with the

16   FDA about that?

17       A.   No, sir.

18       Q.   Let's go to Page 6.  Under the Field Alert

19   Reporting section.

20       A.   Uh-huh.

21       Q.   It says, "A final field alert report for NDA

22   40-282, digoxin tablets .25 milligrams was filed

23   during the reporting period."

24            Do you see that?

25       A.   Yes, sir.
```

PLAINTIFFS' EXHIBITS 009693

Russell Somma, Ph.D.                                    July 1, 2010

                                                       Page 173

 1        Q.   And if you read on, what they're referring to

 2   is the investigation contained in Exhibit 21.  Is that

 3   right?

 4             MR. MILLER:  Take your time and read it.

 5        A.   Got it.  Okay.

 6        Q.   Am I right?

 7        A.   Yes, sir.

 8        Q.   So go down ten lines from the top of that

 9   paragraph.  It says, "No additional complaints or

10   reports of thick tablets have been received for this

11   high volume product."

12             Do you have any reason to disagree with the

13   FDA about that?

14        A.   I don't see why, no.

15        Q.   Okay.  "The event was considered an isolated

16   incident and corrective actions were put in place to

17   prevent its reoccurrence."

18             Do you agree with that?

19        A.   Uh-huh, yes, sir.

20        Q.   Now let's go to Page 9.  In the section

21   called Complaints, the second paragraph.

22             It says, "A larger number of complaints was

23   also noted for digoxin tablets; however, it is the

24   highest volume product according to the list of

25   batches produced per year."

PLAINTIFFS' EXHIBITS 009694

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 174

 1              Do you have any reason to disagree with that?

 2        A.    No, sir.

 3        Q.    "There were also no trends observed for the

 4   types of complaints."

 5              Any reason to disagree with that?

 6        A.    No, not at all.

 7        Q.    Was FDA satisfied with the investigation of

 8   Exhibit -- that's embodied in Exhibit 21?

 9              MR. MILLER:  Object to form.

10        A.    Let me just change my glasses.

11              Based on the data I have in front of me,

12   they're satisfied, yeah.

13        Q.    There was never a 483 or a warning letter

14   about that incident or its investigation; is that

15   correct?

16        A.    I'm just making sure this 483 is not it.

17   This one, I'm just looking at one from May back.  No.

18   The answer is:  There is nothing as a result of this.

19        Q.    All right.  Now, before the lunch break you

20   told me you didn't have any evidence of out-of-spec

21   tablets getting in the hands of consumers.  I want to

22   talk a little bit more about that.  Okay?

23        A.    Yes, sir.

24        Q.    Do you have an opinion --

25              MR. MORIARTY: Withdraw that.

Russell Somma, Ph.D.                                    July 1, 2010

Page 175

1      Q.   Let me start over.  Let's just talk about the

2  recalled batches, and let's assume there were 688.2

3  million tablets in that grouping; okay?

4      A.   Okay.

5      Q.   Do you have an opinion to a probability as to

6  how many of them were outside their specifications?

7      A.   I think when we discussed, we said that none

8  of those that were released were out of specification,

9  as I recall.  The probability of -- of them being out

10  of specification, which means tablets which were not

11  tested, in other words a batch is made of two million,

12  you test 100.  So the probability of one that is not

13  tested sneaking out is within the realm of

14  possibility, yes.

15     Q.   Okay.  Do you know that -- in your work at

16  Novartis, I assume you talked to scientists, people

17  all the time; right?

18     A.   Right, okay.

19     Q.   You are familiar with the terms "probability"

20  and "possibility;" right?

21     A.   Right, everything is possible, correct.

22     Q.   And probability is more likely than not;

23  correct?

24     A.   It's probable, it's likely.

25     Q.   Okay.  So what I'm trying to find out, and my

PLAINTIFFS' EXHIBITS 009696

Page 176

1   clients are entitled to know, is whether you have an

2   opinion to a reasonable probability as to how many of

3   the 688 million tablets among the recalled group were

4   outside their specifications?  Do you have such an

5   opinion?

6       A.   I have an opinion based on a review of the

7   information I've seen.

8       Q.   Is it an opinion to a probability?

9       A.   To a probability?  Based on the information

10  I've seen, and the lack of investigation and rigor

11  that addressed the problem, that it is highly probable

12  that something was distributed and not caught; caught

13  in the testing sense.

14      Q.   Okay.  How many of the 688 million tablets in

15  the recall group were likely outside their

16  specifications?

17      A.   That's very difficult to say.

18      Q.   You have no opinion to a probability as to a

19  number?

20      A.   I think it's hard to put a number on it, to

21  be perfectly honest, because what we are talking about

22  in this particular case, my opinion is they did not do

23  a rigorous enough evaluation of things to assess that

24  they even had a problem.  In that case, the

25  probability could be as high as 100 percent and could

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 177

1    be as low as zero.  Without the analysis and the

2    information to make that assessment, Matt, I can't say

3    for sure.

4        Q.   All right.  So you would be speculating to

5    put a number; right?

6        A.   I think that would be a safe bet, yeah.

7        Q.   Okay.  So -- And I can keep -- I'm going to

8    keep asking you these questions, because I need to

9    know, not because I'm trying to be a pain in the neck.

10           But if a tablet was outside its

11   specifications, there are only two possibilities

12   there; one is it's high outside the specs or low

13   outside the specs; correct?

14           MR. MILLER:  Object to form.

15       A.   Correct.  Okay.

16       Q.   Are there any other possibilities besides --

17   if they're outside the specs, are there any other

18   possibilities besides high or low?

19           MR. MILLER:  Object to form.

20       Q.   Answer me as a scientist.

21       A.   As a -- if there were -- they're either

22   outside the spec, high, or low outside the spec,

23   correct, correct.  There's a range.

24       Q.   Okay.  All right.

25           Ignore the man outside the curtain for right

PLAINTIFFS' EXHIBITS 009698

Russell Somma, Ph.D.                                July 1, 2010

Page 178

1    now.

2          MR. MILLER:  Do not ignore the man outside the

3      curtain.  Disregard that.

4          MR. MORIARTY:  Behind the curtain, I should

5      say.

6      Q.   So do you have any opinion to a probability

7    as to how many of the recalled Digitek tablets were

8    outside the specifications, low?

9      A.   I would have --

10          MR. MILLER:  Excuse me.  I'm going to object

11      to the form.

12      Q.   On the low side?

13      A.   I would -- it's -- again, I'm not trying to

14    be evasive.  It's just difficult to answer that as if

15    on the high side.  The question is -- I can't -- I

16    can't assign a number to that.

17      Q.   All right.  My first question was:  Did you

18    have an opinion as to whether they were outside the

19    specs as all, and we covered that.

20      A.   Yes, we did.

21      Q.   Now I'm getting into the two possibilities.

22      A.   Right.

23      Q.   And if you don't have an opinion to a

24    reasonable probability, that's all you have to tell

25    me.

PLAINTIFFS' EXHIBITS 009699

Russell Somma, Ph.D.                                    July 1, 2010

Page 179

```
 1     A.    Okay.

 2     Q.    So you don't have an opinion to a probability

 3   of how many were outside the specifications on the low

 4   side; correct?

 5     A.    No, sir.

 6           MR. MILLER:  Object to form.

 7     Q.    Do you have an opinion to a reasonable

 8   probability how many were outside the specifications

 9   on the high side?

10     A.    No, sir.

11     Q.    And it matters how low or how high; correct?

12           MR. MILLER:  Object to form.

13     A.    With --

14     Q.    I'll rephrase my question.

15           If you were doing an investigation for a

16   pharmaceutical company --

17     A.    Right.

18     Q.    -- whether it was Novartis or one of your

19   consulting clients, and they had been releasing

20   product that was outside the specifications, would you

21   as a scientist want to know how far outside the specs

22   they were?

23           MR. MILLER:  Object to form.

24     A.    Well, I think -- let me make sure I --

25     Q.    Yes or no.  Would you want to know that?
```

PLAINTIFFS' EXHIBITS 009700

Russell Somma, Ph.D.                                      July 1, 2010

                                                         Page 180

 1      A.    I wouldn't expect them to release anything
 2   outside of spec.
 3      Q.    That's not what I'm asking.  You were called
 4   in as a consultant and somebody says, "We accidentally
 5   made some tablets that were outside the specs."
 6      A.    Oh, okay.
 7      Q.    It's a done deal; okay?
 8      A.    Right.
 9      Q.    You are called in as the consultant to do an
10   investigation.  Do you as a professional want to know
11   how far outside the specs they were?
12      A.    You have to do an analysis for trend, is it
13   high, or is it low, yes.
14      Q.    So do you have an opinion -- if there were by
15   chance any tablets outside the specifications low, do
16   you have any opinion as to how low outside the specs
17   they were?
18            MR. MILLER:  Object to form.
19      Q.    To a probability?
20      A.    Not until I see the information, I guess.
21   It's hard to say, you know.
22      Q.    Okay.  But you haven't seen any such
23   information about tablets outside the specs at all;
24   correct?
25            MR. MILLER:  Object to form.

PLAINTIFFS' EXHIBITS 009701

Russell Somma, Ph.D.                                    July 1, 2010

Page 181

1       A.   In this particular case, no.  They have -- in

2    other words, I have asked for the information.  I

3    haven't seen any of that information, right.

4       Q.   On the other side, do you have any opinion to

5    a probability as to how far outside the specs high any

6    Digitek tablets might have been, if there were any?

7            MR. MILLER:  Object to form.

8       A.   No, for the same reason I couldn't understand

9    on the low side.

10           MR. MORIARTY:  What's the basis for your form

11       objection?  I want the chance to cure it.

12           MR. MILLER:  It's vague and misleading.

13       Perhaps the expert does, but I don't know what

14       specifications you were asking about.

15      Q.   Outside any specification:  Weight,

16   thickness, active pharmaceutical ingredient.  Did you

17   understand my questions?

18      A.   Yes.

19      Q.   Okay.

20      A.   To be real -- I want to-- that's my -- I

21   understand what you are talking about.  It doesn't

22   matter -- A spec is a spec.  I apologize.

23           Am I supposed to have clarified that?

24      Q.   No.   You and I understood one another

25   perfectly.  Okay.

PLAINTIFFS' EXHIBITS 009702

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 182

1              Now, I assume, Dr. Somma, from reading your

2       report and listening to what you are saying today that

3       because of some cGMP violations, you have concerns

4       about Digitek production.  Am I correct about that?

5              MR. MILLER:  Object to form.

6       A.     There are -- the concerns I have are the --

7       Q.     Yes or no?

8       A.     Yes.

9       Q.     Do you have concerns?

10      A.     Yes, I do.  Oh, I'm sorry.  Yes, I do.

11      Q.     And from a regulatory standpoint, when you

12      are looking from the cGMP standpoint, there are

13      findings in the FDA -- these FDA documents that lead

14      you to conclude, and led the FDA to conclude, that

15      Digitek may have been adulterated.  Is that correct?

16             MR. MILLER:  Object to form.

17      A.     Yes.

18      Q.     All right.  But as we covered before,

19      "adulterated" does not necessarily mean that the

20      tablets were, in fact, outside their manufacturing

21      specifications.  Is that right?

22             MR. MILLER:  Object to form.

23      A.     "Adulterated" means -- could mean things that

24      are major-major or minor, yes; not outside the

25      specifications.

PLAINTIFFS' EXHIBITS 009703

Russell Somma, Ph.D.                                    July 1, 2010

Page 183

1       Q.    So when we get specifically to Digitek, and
2    I'll talk about the recall in more detail in a minute;
3    FDA would have every right to ask Actavis to recall
4    the Digitek within the expiration date just because
5    they believed the investigation of 70924 was
6    substandard.  Is that right?
7             MR. MILLER:  Object to form.
8       A.    That's certainly within their right, yes.
9       Q.    Even if there was no proof whatsoever that
10   actually out-of-spec tablets made it to pharmacies and
11   consumers.  Is that right?
12            MR. MILLER:  Object to form.
13      A.    Could we go through that one more time, Matt?
14   I'm not trying to be stupid.
15            THE WITNESS:  Can I have that question again,
16       Mark?
17            MR. MORIARTY:  Mark, you are going to have to
18       read that last one back.
19            (The question is read.)
20      A.    Yes.
21      Q.    So if I ask you a different way, do you have
22   an opinion to a reasonable probability how many
23   Digitek prescriptions were filled which contained as
24   low as one out-of-specification tablet?  Do you have
25   an opinion to a probability on that subject?

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 184

1        A.    That would fall -- that falls back into:  Is

2    it going to be low or is it going to be high.  I guess

3    my opinion is it's likely that something could be

4    there.  As far as a percentage, Matt, no.

5        Q.    Now, wait.

6        A.    Run it by me again.

7        Q.    All along you have told me you have no

8    opinion to a probability, this is what I'm hearing

9    from you.  Okay?

10       A.    Right.

11       Q.    Maybe Peter hears it differently.

12       A.    Right.

13       Q.    I'm hearing you have no opinion to a

14   probability, a likelihood, that there were defective

15   tablets in the hands of consumers at all?

16       A.    Right.

17            MR. MILLER:  Object to form.  Misstates

18       previous testimony.

19       Q.    So I'm asking it from a different angle to

20   make sure I have it all straight.

21            Do you have an opinion to a probability about

22   how many people received any prescriptions with any

23   defective, outside-of-specification Digitek tablets in

24   them?

25            (A discussion is held off the record.)

PLAINTIFFS' EXHIBITS 009705

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 185

1      A.    No.  I was still thinking about the spec

2    thing, sorry.

3      Q.    If there were tablets outside the

4    specifications -- Okay? -- and let's just assume for

5    right now that they were extra thick, and that because

6    they were extra thick, they were outside the API specs

7    on the high side.  Okay?  Let's just make that

8    assumption for right now.

9      A.    Okay.

10     Q.    All right?  If that were true and they went

11   out into the marketplace, wouldn't it be likely at

12   some point that collectively a pharmacist, a consumer,

13   UDL, Actavis, FDA, Celsis Labs, a doctor or a hospital

14   would notice something?

15     A.    That's --

16           MR. MILLER:  Object to form.

17           Sorry. Go ahead.

18     A.    That's assuming that those systems are not

19   set up to be challenged to find defects.  Your system

20   itself is supposed to be self-limiting, and your

21   supply chain and distribution aspects are not meant to

22   catch problems.  Pharmacists and professionals in the

23   distribution chain, if you are lucky, they are going

24   to be vigilant and catch it.  Have they been

25   calibrated or are they checked?

PLAINTIFFS' EXHIBITS 009706

Russell Somma, Ph.D.                                    July 1, 2010

Page 186

1           You can't rely on that, is my opinion.

2       Q.   I'm not asking you, Doctor -- or Dr. Somma,

3    if you rely on that prospectively.

4       A.   Right.

5       Q.   I'm asking:  After the fact; okay?  Again,

6    let's get back in.  You are at Novartis and you have

7    been called in --

8       A.   Right.

9       Q.   -- to one of your pharmaceutical clients.

10   And somebody says, "I think we may have released

11   tablets that are too thick, and if they are too thick

12   they may have been outside the API specs;" okay?

13      A.   Right.

14      Q.   There are things to look at once the tablets

15   leave your facility to see if, in fact, there were

16   out-of-specification tablets; right?

17      A.   These are --

18      Q.   Yes or no?  Things you can look at.

19      A.   Things that you can look at, yes.

20      Q.   All right.  So one thing you might look at

21   is:  Did a repackager find any.  Right?

22      A.   Right.

23      Q.   That's one thing you might look at.

24      A.   Right, yes.

25      Q.   And FDA tested tablets.  Did they find any?

PLAINTIFFS' EXHIBITS 009707

Russell Somma, Ph.D.                                    July 1, 2010

                                                          Page 187

1       A.    Right.

2             MR. MILLER:   Object to form.

3       Q.    And pharmacists would be counting these out

4    and distributing them; did they find any?  Correct?

5       A.    Correct.

6       Q.    You are continuing your investigation; right?

7       A.    Right.

8       Q.    You are nodding yes?

9       A.    Yes, I'm hearing you.  Sorry.

10      Q.    And then, of course, consumers get them; and

11   they could either notice it because it looked

12   different than other tablets --

13      A.    Yes.

14      Q.    -- or they might get sick; right?

15      A.    Well, we have assumed they would get sick,

16   yes.

17      Q.    But these are things that a reasonable

18   investigator would look at; right?

19      A.    Uh-huh.

20      Q.    Is that yes?

21      A.    I would ask the questions, and to be

22   perfectly honest, I probably wouldn't go beyond asking

23   this Celsis and the packager.  I mean, I'm -- in my

24   opinion -- my personal opinion, that's reaching when

25   you try to rely on pharmacists as I had mentioned

PLAINTIFFS' EXHIBITS 009708

Russell Somma, Ph.D.                                    July 1, 2010

                                                      Page 188

1    before.  But I'm okay with you right out into the

2    packaging part, yeah.

3         Q.   But if you are desperately seeking

4    information, any shred of proof, you would want to go

5    all the way to the consumers; wouldn't you?

6         A.   Yes, sir.

7         Q.   You might look at Poison Center statistics to

8    see if they'd noticed a spike in digoxin toxicity?

9              MR. MILLER:  Objection to form.

10        Q.   Would you do that?

11        A.   It sounds like a great idea.  I would not

12   have thought to do that, yes.

13             MR. MORIARTY:  What was the matter with the

14        form on that?

15             MR. MILLER:  Scope.  Excuse me.  Objection,

16        scope.

17        Q.   Could you look for Exhibit 37, please?

18             Now, I am missing an exhibit, I think.

19   Somewhere in this should be the recall press release.

20             Have you ever seen the recall press release

21   of Digitek?

22             MR. MILLER:  It's not that document.  He

23        pointed that document out, but that's not the

24        document.

25        Q.   I'll get to this one in a minute.

PLAINTIFFS' EXHIBITS 009709

Russell Somma, Ph.D.                                    July 1, 2010

Page 189

1          But have you seen the recall press recess of

2    Digitek?

3        A.   I don't recall reading it, Matt, no.

4        Q.   What is your understanding of why Digitek --

5             I'm sorry.  Let me rephrase that.

6             What is your understanding of what the FDA

7    approved recall notice says about why Digitek was

8    recalled?

9             MR. MILLER:  Object to form.

10            THE WITNESS: Mark, read that question to me

11       again, would you?  If you don't mind.

12            Is it okay? I'm sorry.

13            (A discussion is held off the record.)

14            (The question is read.)

15            MR. MILLER:  Again, object.

16       A.   I haven't seen it, so I don't -- I can't

17   really say.

18       Q.   Okay.  Here's Exhibit 36.  It's the recall

19   press release.  I want you to take a look at that, and

20   then if you don't mind, hand it back to me.

21       A.   Sure thing.

22       Q.   Because I seem to have coughed up all my

23   copies of it.

24            Are you done reading it?

25       A.   Yes, sir.

PLAINTIFFS' EXHIBITS 009710

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                      Page 190
 1      Q.    May I have that back, please?

 2      A.    Sure.   Here you go.

 3      Q.    It says here, "The voluntary all-lot recall

 4  is due to the --"

 5            MR. MILLER:   I was trying to have a copy in

 6      front of him so he can read along with you.

 7            MR. MORIARTY:   Oh, that's fine.   I appreciate

 8      it.

 9      Q.    "The voluntary all-lot recall is due to the

10  possibility that tablets with double the appropriate

11  thickness may have been commercially released."

12            Do you see that?

13      A.    Yes, sir.

14      Q.    Do you have any reason to disagree with that

15  FDA-approved press release?

16      A.    No, sir.

17      Q.    And twice in that sentence that I just read,

18  they use words connoting some degree of speculation.

19  Is that right?

20            MR. MILLER:   Object to form.

21      A.    Yeah.   "Possibility," "may have," yeah.

22      Q.    Now, you can take a look at Exhibit 37.

23      A.    Okay.

24      Q.    Go to the third page.   This is the recall

25  package.   Do you know what a recall package is?
```

PLAINTIFFS' EXHIBITS 009711

Russell Somma, Ph.D.                                    July 1, 2010

Page 191

1       A.    I'm not familiar with all its content.  I've
2   heard of it.
3       Q.    Have you ever seen this document before,
4   Exhibit 37?
5       A.    In the -- In the spirit of what I
6   investigated, Matt, I didn't look at stuff -- this
7   stuff, like the recall package.  I didn't look at
8   that.
9       Q.    Did you look at Exhibit 36, the recall press
10  release?
11      A.    No, sir.
12      Q.    If you go down to "Reason For Recall" in
13  Roman numeral III, it says, "Digoxin tablets exceeded
14  the thickness specifications."
15            Do you see that?
16      A.    Okay.  Yeah.  I got it.
17      Q.    Now, have you seen anywhere at all any
18  indication from FDA or from my client, Actavis, that
19  this recall of Digitek in April of 2008 was for
20  normal-sized tablets with varying amounts of the
21  active pharmaceutical ingredient?
22      A.    This clearly notes "tablet thickness."
23      Q.    Now, I'm done asking you about that.
24            If you were called in as you were with one of
25  your private consulting clients to analyze a thick

PLAINTIFFS' EXHIBITS 009712

Russell Somma, Ph.D.                                    July 1, 2010

Page 192

1    tablet situation --

2         A.    Yes, sir.

3         Q.    --  typically you would think that that would

4    be a tablet press issue.  Is that right?

5         A.    You'd want to -- you'd want to start at that

6    point.    It's the most likely.

7         Q.    Okay.

8         A.    Yes.

9         Q.    And when you are looking for the cause of the

10   extra-thick tablets, what you hope to get to is what

11   you in the business call a root cause; right?

12        A.    That's correct.

13        Q.    So for a wild example, it could be a die set

14   inappropriately calibrated; right?

15        A.    Agreed.

16        Q.    Okay.  And that is --

17              Now, a normal-sized tablet with varying

18   active pharmaceutical ingredient is a different or

19   potentially different problem; isn't it?

20        A.    Absolutely.

21        Q.    So when you start looking for a root cause to

22   that kind of problem, you have to go back to the

23   mixing, the blending, the tabletting?  You have to go

24   back to all of it; correct?

25        A.    The non-homogeneity in a tablet, yes, Matt.

PLAINTIFFS' EXHIBITS 009713

Case 2:08-md-01968   Document 577-33   Filed 09/08/11   Page 93 of 101 PageID #: 21622

Russell Somma, Ph.D.                                    July 1, 2010

Page 193

```
 1      Q.   And extra thick tablets and tablets of normal
 2   size with varying potency are really, when you get
 3   down to it, from a professional's end, different kinds
 4   of defects.  Is that right?
 5      A.   I see them -- this is why -- it's not going
 6   to be yes or no.
 7           If the thing was uniform, the thick tablet
 8   and non-uniform tablet, that problem is one and the
 9   same, because that thickness is going to be more
10   potent, let potent.  We don't know that in this
11   particular case.  In this particular case that is
12   thick, but we don't know why or how much.
13           So the answer is -- to answer your question
14   specifically, there are two different cases here.
15      Q.   Okay.  And the FDA would know the difference
16   between those kind of problems; right?
17      A.   You would hope.
18      Q.   You would hope.
19      A.   Okay.
20      Q.   And so when the FDA approved the recall press
21   release and the recall package announcing that this
22   recall was for the possibility that double-thick
23   tablets may have been commercially released, it has a
24   little bit more meaning just beyond those simple
25   words; correct?
```

PLAINTIFFS' EXHIBITS 009714

Russell Somma, Ph.D.                                July 1, 2010

Page 194

1         A.    Presumably --

2               MR. MILLER:  Object to the form.

3               MS. CARTER:  Object to the form.

4         A.    To me it does, yes.

5         Q.    Okay.  To you as a professional in the

6    pharmaceutical industry, it does?

7         A.    Right.  That's what I'm saying.

8         Q.    And as far as you can tell from all the

9    material here, FDA did not cite or warn Actavis about

10   Digitek that was normal in size, but outside its

11   active pharmaceutical ingredients specifications.  Is

12   that right?

13              MR. MILLER:  Object to form.

14        A.    Yeah, Digitek tablets, no.  The only thing

15   was blend stuff that we talked about before.

16        Q.    All right.  Did the FDA ever ask Actavis to

17   recall Digitek for blend uniformity issues?

18        A.    Not to my knowledge, no.

19        Q.    I want to show you what's been marked as

20   Exhibit 38.

21        A.    Okay.

22        Q.    Have you ever seen this before?

23        A.    It doesn't look familiar.

24        Q.    It's a printout from the FDA's website.

25        A.    Okay. I'm not a -- I don't customarily go

PLAINTIFFS' EXHIBITS 009715

Russell Somma, Ph.D.                                    July 1, 2010

                                                        Page 195

1    there and read stuff like this.  I'm sorry.  Okay?

2         Q.   Okay.

3         A.   Yeah.

4         Q.   Well, once you were engaged in the Digitek

5    litigation --

6              (A discussion is held off the record.)

7         Q.   Once you were engaged in the Digitek

8    litigation, even though you didn't customarily go to

9    the FDA's website, did you do so to see what they said

10   about the Digitek --

11        A.   No, sir.

12        Q.   -- recall?

13        A.   No, sir.  I went there to make sure that I

14   had as much information as I needed about guidances in

15   the area of uniformity.

16        Q.   Okay.  This is from a section of the FDA

17   website that talks about facts and myths about generic

18   drugs.  Do you see that at the top?

19        A.   Yes, sir.

20        Q.   And then generally it has a fact --

21             MR. MORIARTY: I'm sorry.  I'm going to

22        withdraw that question.

23        Q.   And if you look about halfway down, what FDA

24   does here is they put a myth, and then they follow it

25   up with a fact; correct?

PLAINTIFFS' EXHIBITS 009716

Russell Somma, Ph.D.                                    July 1, 2010

                                                              Page 196

1      A.   Right.

2      Q.   Go to the second page, please.  The first

3  bolded myth at the top says, "There are quality

4  problems with generic drug manufacturing.  A recent

5  recall of generic digoxin called Digitek shows that

6  generic drugs put patients at risk."

7           Do you see that?

8      A.   Uh-huh.

9      Q.   And then the FDA follows up with the fact.

10          "FDA's aggressive action in this case

11  demonstrates the high standards to which all

12  prescription drugs, generic and brand name, are held."

13          Do you see that?

14     A.   Yeah.

15     Q.   Now, let's go down to Bullet Point 4.

16     A.   Right.

17     Q.   The second sentence says, "In our best

18  judgement, given the very small number of defective

19  tablets that may have reached the market and the lack

20  of reported adverse events before the recall, harm to

21  patients was very unlikely."

22          Do you see that?

23     A.   Uh-huh.

24     Q.   That's a yes?

25     A.   Yes, I see it.

PLAINTIFFS' EXHIBITS 009717

Russell Somma, Ph.D.                                    July 1, 2010

Page 197

1       Q.    Do you have any reason to disagree with FDA's

2    statement about this situation?

3       A.    I don't think so.

4             MR. MILLER:  Objection.  Scope.

5             Go ahead.

6       A.    Yeah, I think so.  Otherwise why would we be

7    having this discussion here?

8       Q.    Well, that's a really good question.

9             Did you do a more thorough investigation than

10   the FDA?

11            MS. CARTER:  Object to form.

12      A.    I did an investigation based on the

13   information provided to me for this product, yes.  Did

14   I do more than FDA?  No.

15      Q.    All right.  Well, what's the basis for your

16   disagreement with the FDA's statement on its own

17   website regarding this very situation?

18      A.    Well, I don't think the necessary

19   investigation into the manufacturing -- in the

20   manufacturing area was conducted.  That is still my

21   opinion.

22      Q.    I understand that.

23      A.    Oh, okay.

24      Q.    But FDA doesn't say anything about the

25   investigation of 70924; does it?

PLAINTIFFS' EXHIBITS 009718

Russell Somma, Ph.D.                                    July 1, 2010

```
                                                    Page 198
 1              MR. MILLER:  Object to form.

 2         Q.    In this document?

 3         A.    No, sir, it doesn't.

 4         Q.    Okay.  It's commenting on the situation

 5    overall?

 6         A.    Uh-huh.

 7         Q.    And clearly, FDA knew about the investigation

 8    of 70924 because they put it in -- in a 483; right?

 9         A.    Right.

10         Q.    So let me get back to this and make sure I

11    understand.  It says, "In our best judgement given the

12    very small number of defective tablets that may have

13    reached the market and the lack of reported adverse

14    events before the recall, harm to patients was very

15    unlikely."

16              Do you have any reason to disagree with FDA

17    in that statement?

18              MR. MILLER:  Object to form.  Asked and

19         answered.

20         A.    No.  There is no reason to disagree with

21    this.

22         Q.    Okay.  Is it your opinion that the

23    investigation conducted by Actavis of the double-thick

24    tablets in Batch 70924 was a cGMP failure?

25              MR. MILLER:  I'll object to form.
```

PLAINTIFFS' EXHIBITS 009719

Russell Somma, Ph.D.                                    July 1, 2010

Page 199

1           MR. MORIARTY: Even when I ask you questions in
2      your favor, you object.
3      Q.   Go ahead.
4      A.   I think that it was conducted in a way that
5      it was aligned with cGMP.  Was it conducted to what I
6      would consider an adequate level?  No.
7      Q.   Was it negligent?
8           MR. MILLER:  Object to form.
9           MS. CARTER:  Object to form.
10     A.   Was it negligent?  Insofar as all the
11     information wasn't there that I was looking for, I
12     don't think it's negligence, but it certainly was not
13     with the rigor that I would have expected.
14     Q.   And that's your opinion?
15     A.   That is my opinion, yes.
16     Q.   Okay.  Is there any specific FDA reg that
17     says you need to -- you are required to analyze the
18     batch before and the batch after in the course of an
19     investigation like this?
20          MR. MILLER:  Object to form.
21     A.   I think it comes -- what it does, Matt, is
22     it's customarily done.  Is there a regulation that
23     says you must do that?  That's where business, science
24     and regulations cross paths.
25     Q.   All right.  And the answer is?

Russell Somma, Ph.D.                                        July 1, 2010

Page 200

1        A.   I don't think -- I could sit here and look it

2    up.  I don't think you would ever find something that

3    says that specifically.

4        Q.   All right.  In the course of your

5    investigation in this litigation, did you look at the

6    last Digitek batch which precedes -- batch record for

7    the batch which preceded 70924?

8        A.   I got a batch record that was close.  That

9    was the one I had mentioned earlier.  That was the

10   best I could do.

11       Q.   And did you also look at one following close

12   after 70924?

13       A.   Not to date, no, sir.

14       Q.   Have you asked for one?

15       A.   Yes, sir.  I haven't read it.

16       Q.   Okay.  Did you find any problems in the batch

17   record for the batch that preceded 70924?

18       A.   Preceded?  Based on that one?

19       Q.   Yeah.

20       A.   Batch record?  No, no, sir.

21       Q.   So if Actavis would have looked at the batch

22   record for the batch preceding 70924 in the course of

23   the actual investigation, it wouldn't have found

24   anything either; right?

25            MS. CARTER:  Object to form.

PLAINTIFFS' EXHIBITS 009721

Russell Somma, Ph.D.                                    July 1, 2010

Page 201

```
 1        A.   My -- my guess, no.  Because that's all part
 2   of rounding up the information.  That's the first
 3   step.
 4        Q.   I'd like you to go to your report, please,
 5   which is --
 6             MR. MORIARTY:  Is it Exhibit 52?
 7             MR. MILLER:  Yes, it is.
 8        Q.   Your report is 14 pages long; right?
 9        A.   Yeah, yes, it is.
10        Q.   Does the word "negligent" appear anywhere in
11   these 14 pages?
12        A.   Negligent?  No, sir, I don't recall using
13   that.
14        Q.   Does the word "adulterated" appear anywhere
15   in these 14 pages?
16        A.   No, sir.
17        Q.   Does the word "defective" appear anywhere in
18   these 14 pages?
19        A.   I don't recall.
20        Q.   Okay.  Let's go to Page 2.  You comment under
21   "Blending" that this is a dry blend direct compression
22   process; correct?
23        A.   That's right.
24        Q.   Relatively speaking, is that a rather simple,
25   solid oral dose formulation?
```

PLAINTIFFS' EXHIBITS 009722