# EXHIBIT 602

PLAINTIFFS' EXHIBITS 010180

Richard T. Mason, MD

```
        IN THE UNITED STATES DISTRICT COURT

      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

               CHARLESTON DIVISION




KATHY McCORNACK, an individual; )
DANIEL E. McCORNACK, JR., an    )
individual; and RALPH J.        )
McCORNACK, a minor by and       )
through his Guardian ad Litem,  )
                                )
                 Plaintiffs,    )
                                )
    vs.                         ) MDL No. 2:09-CV-0671
                                )
ACTAVIS TOTOWA, LLC, et al.,    )
                                )
                 Defendants.    )
_____)



         DEPOSITION OF RICHARD T. MASON, MD


     DATE:      Thursday, October 1, 2009


     TIME:      2:00 p.m.


     PLACE:     Atlantic Aviation
                1250 Aviation Avenue
                San Jose, California 95110


     REPORTER: ALLISON ASH-HOYMAN
               Certified Shorthand Reporter
               License No. 7412
```

PLAINTIFFS' EXHIBITS 010181

Richard T. Mason, MD

```
1                    A P P E A R A N C E S

2

3

4    For the Plaintiffs:      ERNST & MATTISON
                              BY:  DON A. ERNST
5                             1020 Palm Street
                              San Luis Obispo, California 93401
6                             (805) 541-0300

7

8

9    For Actavis             TUCKER, ELLIS & WEST
     Defendants:             BY:  MATTHEW P. MORIARTY
10                           925 Euclid Avenue
                             Suite 1150
11                           Cleveland, Ohio 44115
                             (216) 696-2137
12

13

14

15   For Mylan Defendants:   SHOOK, HARDY & BACON
                             BY:  ALICIA J. DONAHUE
                             333 Bush Street
16                           Suite 600
                             San Francisco, California 94104
17                           (415) 544-1900

18

19

20

21

22

23

24

25
```

Richard T. Mason, MD

```
 1            I N D E X   O F   E X A M I N A T I O N S

 2

 3    EXAMINATION BY:                                    PAGE

 4      MR. MORIARTY . . . . . . . . . . . . . . .         5
        MS. DONAHUE. . . . . . . . . . . . . . . .        74
 5      MR. ERNST. . . . . . . . . . . . . . . . .        76

 6

 7
      FURTHER EXAMINATION BY:
 8
        MR. MORIARTY . . . . . . . . . . . . . . .        76
 9                                                        85
        MS. DONAHUE. . . . . . . . . . . . . . . .        80
10

11

12

13            I N D E X   O F   E X H I B I T S

14
      Exhibit              Description               Page
15

16    1    Death Investigation Report                  5

17    2    Report of Autopsy Examination               5

18    3    One-page Certificate of Death               5

19    4    Two-page Certificate of Death               5

20    5    Report of Autopsy Examination               5

21    6    Curriculum Vitae                            7

22    7    Coroner's File re McCornack                 15

23    8    Medical Examiner/Coroner Requisition Form, 26
           also part of Exhibit 7
24
      9    Excerpt from Disposition of Toxic Drugs     50
25         and Chemicals in Man
```

4

Richard T. Mason, MD

| | Exhibit | Description | Page |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 10 | Excerpt from Unit IV/Maintenance of the Human Body | 50 |
| 4 | 11 | Excerpt from Heart Disease, A Textbook of Cardiovascular Medicine | 50 |
| 5 | | | |
| 6 | 12 | Excerpt from Medical Treatment of Heart Disease | 50 |
| 7 | 13 | Excerpt from Environmental and Occupational Hazards | 50 |
| 8 | | | |
| 9 | 14 | Letter dated 5/7/09, Ernst to Mason | 50 |
| | 15 | Letter dated 7/15/09, Ernst to Mason | 50 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Richard T. Mason, MD

```
 1              (Marked Deposition Exhibits 1 through 5.)
 2                   RICHARD T. MASON, MD,
 3      having been first duly sworn by the Certified
 4      Shorthand Reporter to tell the truth and nothing
 5      but the truth, was examined and testified as
 6      follows:
 7              EXAMINATION BY MR. MORIARTY
 8         Q.  State your full name for the record, please.
 9         A.  Richard Thomas Mason, MD.
10         Q.  Dr. Mason, you have given testimony in trials
11      before; is that correct?
12         A.  Many times.
13         Q.  And have you given depositions in civil
14      litigation?
15         A.  Yes.
16         Q.  Do you know how many times you have done that?
17         A.  Several hundred.
18         Q.  Okay.  And as you know, I'm going to be asking
19      you questions, there is a court reporter here.
20              You understand that; correct?
21         A.  Yes.
22         Q.  And if you don't understand my question, for
23      whatever reason, you just let me know and I will
24      rephrase it; okay?
25         A.  Yes.
```

Richard T. Mason, MD

1      Q.  If you need to take a break, just let us know
2  and we can do that, too; okay?
3      A.  Okay.
4      Q.  I assume that you have testified so many times
5  because you have for many years been the coroner of
6  Santa Cruz County; correct?
7      A.  Yes.  It's about 29 years now.  But that's the
8  routine in forensic medicine, forensic pathology, you do
9  autopsies and you do courtroom testimony.
10     Q.  Correct.
11     A.  Part and parcel.
12     Q.  I understand.  What -- I want to show you what
13  I've had marked as Exhibit --
14         Mark that as 6, please, let me withdraw that
15  previous question.
16         MR. ERNST:  Before we go forward I would
17  really, just as a point of clarification.
18         I'm Don Ernst, I represent the Plaintiff Kathy
19  McCornack.  Can I have the respective representations so
20  I know who is who.
21         MR. MORIARTY:  As you know, I'm Matthew
22  Moriarty, not Alicia Donahue, and I represent the
23  Actavis defendants.
24         MS. DONAHUE:  My name is Alicia Donahue from
25  Shook, Hardy and Bacon, and I represent the Mylan

Richard T. Mason, MD

1   defendants.

2          THE WITNESS:  Can I interject a little bit in

3   here?  My hearing, I'm 73 years old, my hearing is not

4   that great.  I notice you have a very soft voice.  When

5   you speak, look at me and speak up.

6          MS. DONAHUE:  Will do.

7          THE WITNESS:  Thank you.

8          (Marked Deposition Exhibit 6.)

9   BY MR. MORIARTY:

10       Q.  Exhibit 6, is this your curriculum vitae?

11       A.  It is.

12       Q.  Is it current?

13       A.  Yes, it is.  Maybe a few more autopsies in it,

14   but, you know, it's closer to 10,000 autopsies now.

15          MR. MORIARTY:  Here is an extra copy stuck

16   under there.

17       Q.  Have you published any articles in the medical

18   literature besides the three that are listed here?

19       A.  No.

20       Q.  Have you ever published anything about

21   post-mortem redistribution?

22       A.  No.

23       Q.  Have you ever published anything about digoxin

24   or digoxin toxicity?

25       A.  No.

PLAINTIFFS' EXHIBITS 010187

Richard T. Mason, MD

1    Q.   Do you have any estimate of the number of times

2  in your career in which you have been asked to render

3  opinions about whether digoxin was a cause of someone's

4  death?

5    A.   No, I don't.  They are not that common, I don't

6  recall any other cases that I've done.

7    Q.   All right.  So you may have never been called

8  upon to do that?

9    A.   We normally do toxicology on all the cases.  If

10  we think digoxin is a factor, we'll ask for analysis of

11  it.  But I don't recall an issue where it was the

12  subject of litigation.

13    Q.   Okay.  Can you recall an issue when it was a

14  cause of death?

15    A.   No.

16    Q.   This is Exhibit 1.  Have you ever seen this

17  before?

18    A.   Yes.  This is our investigation report executed

19  by the -- one of the three deputy sheriffs that are

20  assigned to the coroner's service, that's by Naomi

21  Silva.

22    Q.   Do you know Naomi Silva?

23    A.   Yes, I do.

24    Q.   Is she a physician?

25    A.   No, no, no.  She is a deputy sheriff.  A cop.

PLAINTIFFS' EXHIBITS 010188

Richard T. Mason, MD

1      Q.   All right.  And this is just the three-page
2  report of the call they received and the investigation
3  that they did on the scene; correct?
4      A.   Correct.
5      Q.   All right.  And what is the relationship
6  between your office and the office of the sheriff?
7      A.   The sheriff is the coroner.
8      Q.   Okay.  So are you the sheriff?
9      A.   No, I'm not the sheriff.  I'm sort of the de
10  facto coroner, actually I'm a private contractor.
11      Q.   All right.  So who is the sheriff?
12      A.   Phil Wowak is the sheriff now.  He is a -- he
13  was a lieutenant recently.
14          The coroner's service is in the criminal
15  investigation bureau of the Santa Cruz County Sheriff's
16  Department.  And he was in charge of the investigation
17  bureau, and the prior sheriff just retired and he was
18  appointed, Lieutenant Wowak was appointed, so he is now
19  the sheriff.  He is the boss of the whole operation.
20      Q.   Who carries the title of coroner in Santa Cruz
21  County?
22      A.   Well, the sheriff does.
23      Q.   Okay.
24      A.   I might add something here.  Of the 58 counties
25  in the State of California, the majority of them are

PLAINTIFFS' EXHIBITS 010189

Richard T. Mason, MD

1  sheriff coroner.  So the title and the authority of the
2  coroner resides with the sheriff.
3      Q.  All right.
4      A.  And there is maybe about five jurisdictions,
5  like Los Angeles, San Francisco, and Ventura County
6  where there is some other arrangement.
7      Q.  Okay.  So you said you are a contract, or
8  contractor employee?
9      A.  Yes.
10     Q.  What does that actually mean?
11     A.  Well, it means that they don't have to provide
12  any benefits, medical assistance or anything like that.
13  Just take your chances, you collect your money.
14     Q.  Okay.
15     A.  That's the way it works.
16     Q.  All right.  Are you still employed full time or
17  contracted full time?
18     A.  Yes, I have been for, it's going on 30 years
19  now I've worked for them exclusively.  They represent
20  maybe 90 percent of my time.  Because of our contractual
21  arrangement, I'm free to do other work.  But from a
22  practical point of view, it's a full-time job.
23     Q.  All right.  Can you tell, because of your
24  familiarity with these kinds of reports, when this
25  report, Exhibit 1, was finalized?

PLAINTIFFS' EXHIBITS 010190

Richard T. Mason, MD

1      A.   Well, it would have to be generated, you know,

2  at or about the time we received the body.  Because, you

3  know, I'm going to be dependent on this report for the

4  direction of my autopsy investigation.

5      Q.   Okay.

6      A.   So usually that report is in my hands before I

7  do the autopsy.

8      Q.   All right.  This is Exhibit 2.  This is the

9  autopsy of yours that I had in my briefcase when I flew

10 to California yesterday.

11         Can you please tell me what the date of that

12 autopsy report is?

13     A.   Well, the date of the autopsy is March 26,

14 2008, at 7:30 a.m.  That's the commencing time.

15     Q.   What's the date of the report?

16     A.   The date of the report is the same.

17     Q.   So you were able to perform the autopsy in one

18 day; correct?

19     A.   Yes.

20     Q.   And you dictate your notes contemporaneous with

21 either the performance of the autopsy or upon conclusion

22 of the autopsy; correct?

23     A.   Usually in two parts.  I'll dictate the

24 external examination of the body, then do the dissection

25 and then dictate the dissection immediately after.

PLAINTIFFS' EXHIBITS 010191

Richard T. Mason, MD

1    Q.  So would it be fair for me to say that in the

2  normal course of your business with the coroner's

3  office, that this report, Exhibit 2, would have been

4  typed and available within several days of the

5  performance of the autopsy?

6    A.  Yeah.  I just use a hand machine and a

7  conventional standard-sized tape cassette and it goes to

8  a transcriptionist.

9    Q.  Okay.  And did you do any microscopic analysis

10  of any of the specimens available to you from the

11  McCornack autopsy?

12    A.  No.  It can still be done because the tissue is

13  in storage, but I have not done so.

14    Q.  Was there any particular reason why you did not

15  do any microscopic analysis at the time you did the

16  autopsy?

17    A.  You know, there is a pressure to get the

18  reports out, get the cases done.  If you did -- I do

19  about 150 autopsies, if you did histologic examinations

20  on all of those, the cost and the time would be

21  significant.

22        So we normally sign out on the basis of gross

23  examination.

24    Q.  Okay.

25    A.  And then follow up with toxicology.  If

Richard T. Mason, MD

1  toxicology comes back, something aberrant, and end up

2  changing the diagnosis, or if it's obvious at the outset

3  that it's some kind of suicidal ingestion of drugs or

4  whatever, then the cause of death is pended awaiting the

5  toxicology results.

6      Q.  When you did the autopsy, and before you

7  dictated the report, did you have the medications that

8  he was on available to you, or a list of them?

9      A.  I believe that I did, yes.

10     Q.  Do you have an actual autopsy file on this

11  case?

12     A.  Yes.

13     Q.  Is it here?

14     A.  Yes.

15     Q.  May I see it, please?

16     A.  (Handing document to counsel.)

17     Q.  Is this an extra copy?

18     A.  Well, that is not the original -- those are

19  copies of the sheriff's file.

20         I know in your subpoena you asked to have the

21  original file.  I can't do that because it belongs to

22  the sheriff.  So those are the significant documents in

23  the sheriff's file that I have copied, so those are

24  copies.

25         MR. MORIARTY:  All right.  I will mark this as

PLAINTIFFS' EXHIBITS 010193

Richard T. Mason, MD

1   Exhibit 7 in just a second, but while I've got these
2   pages open --
3          MR. ERNST:  What are you calling Exhibit 7?
4          MR. MORIARTY:  It's the file that he produced
5   in response to my subpoena for the -- I call it the
6   autopsy file.
7      Q.  What do you call it?
8      A.  I call it the coroner's file.  It's a coroner's
9   file, really.
10     Q.  Okay.  There are some medical records in here
11  from Dr. Lemm's office that appear to have been faxed
12  March 24, 2008.
13         Did you have these available to you at the time
14  you performed the autopsy or when you dictated the
15  autopsy report?
16     A.  I believe so.
17     Q.  Did you review these records before you
18  dictated the autopsy report that is Exhibit 2?
19     A.  I usually review any available medical records
20  before the autopsy.  One of the functions of the
21  investigators is to gather medical records.
22     Q.  Sure.  So you would have had some idea, based
23  on these records, what his medications were, including
24  Diltiazem, A digoxin product, Allopurinol, et cetera;
25  correct?

Richard T. Mason, MD

```
 1      A.   Yes.
 2      Q.   Do you know who initiated the process of
 3  getting Dr. Lemm's records sent to the coroner's office?
 4      A.   The investigators would have done that.
 5      Q.   And is that common practice?
 6      A.   It's a standard operating procedure, yes, to
 7  find out who the decedent's physicians are and to obtain
 8  copies of their records.
 9      Q.   All right.  And so also in here faxed the same
10  day it appears are records, some records at least, from
11  Coastal Cardiology.
12           Do you believe you had those available to you
13  at the time you did the autopsy and the report?
14      A.   Yes.
15           MR. MORIARTY:  Could you mark this, please.
16           (Marked Deposition Exhibit 7.)
17  BY MR. MORIARTY:
18      Q.   Getting back to Exhibit 2, on the first page
19  there is a section that says Cause of Death.
20           Do you see this?
21      A.   Yes.
22      Q.   Is this, at least at the time you dictate it,
23  your opinion to a probability as to what the cause of
24  death is?
25      A.   Yes.
```

PLAINTIFFS' EXHIBITS 010195

Richard T. Mason, MD

1      Q.   So in this case, at the time you dictated it

2    back in March of 2008, the causes were ventricular

3    arrhythmia; is that correct?

4      A.   Yes.

5      Q.   Atrial fibrillation -- well, due to atrial

6    fibrillation; correct?

7           Due to hypertensive and arteriosclerotic

8    cardiovascular disease.

9           Did I read those correctly?

10     A.   Yes.

11     Q.   What, if you recall, was the basis for your

12   opinion that this was a ventricular arrhythmia?

13     A.   Well, obviously I can't see arrhythmias with a

14   dissecting knife.  In a normal course of a demise due to

15   cardiovascular disease, that's what happens.  You get

16   ventricular arrhythmia that is -- could be detected by

17   electrocardiographic means.

18          You know, at the point that I'm looking at the

19   patient, he is dead.  So I am physically looking at his

20   heart, at his heart muscle, I'm looking at his coronary

21   arteries, and I see that he has cerebral edema and

22   pulmonary edema, which are sort of the end points of

23   acute heart failure, and I see that he has an enlarged,

24   heavy heart.

25          He has a cardiomegaly, his heart weighs 500

PLAINTIFFS' EXHIBITS 010196

Richard T. Mason, MD

1   grams, and there is -- there is some arteriosclerotic

2   plaque in his coronary arteries, and essentially, you

3   know, there is no way of knowing for a certainty unless

4   of course you had the patient hooked up to an EKG at the

5   time that he died.  But this is by inference, I find no

6   other major illnesses or signs of illness in the

7   dissection of all of his internal organs, including

8   brain and all of the chest and all the abdominal organs,

9   so that's the conclusion you come to based on the

10  pathology that you see.

11      Q.  To some extent it's a diagnosis of exclusion.

12      A.  Yeah.  Sure.

13      Q.  All right.  Then Exhibit 3 was a death

14  certificate; correct?

15      A.  Correct.

16      Q.  And it's not a very good copy, but showing you

17  a page in Exhibit 7, does what you are holding in your

18  hand as Exhibit 3 appear to mirror the contents of what

19  was the death certificate here that's in Exhibit 7?

20      A.  Yes.

21      Q.  All right.  And the causes of death in the

22  death certificate are essentially the same as those in

23  the original autopsy report, which is Exhibit 2;

24  correct?

25      A.  Correct.

PLAINTIFFS' EXHIBITS 010197

Richard T. Mason, MD

1    Q.  Now, these recent changed certificates of death

2  and autopsy reports, Exhibits 4 and 5, are they in

3  Exhibit 7, which is the coroner's file?

4    A.  They are now.

5    Q.  Well, the Exhibit 7 that I have does not

6  contain them; is that true?

7    A.  No.  But they are in the coroner's file at the

8  present time.  This is an earlier copy of the coroner's

9  file, so they are not there.

10    Q.  When were the Exhibits 4 and 5 reports added to

11  the coroner's file?

12    A.  Yesterday.

13    Q.  When was Exhibit 4 prepared?

14    A.  It was prepared at the conclusion of the

15  autopsy.  Probably on the same day that the autopsy was

16  concluded.

17    Q.  You are talking about the new autopsy report?

18    A.  You are asking when Exhibit 4 was prepared.

19    Q.  Yes, that's a new death certificate.  It has

20  different causes of death than those listed in the

21  original death certificate, which is Exhibit 3.

22    A.  No, no.  This is a copy of the old death

23  certificate.  It's the way -- and on the second page is

24  a copy of the amendments to the death certificate.  That

25  was prepared yesterday.

Richard T. Mason, MD

```
 1       Q.   Okay.
 2       A.   On the first page is the --
 3       Q.   I got it.
 4       A.   -- original death certificate.
 5       Q.   So just for clarity of the record, Exhibit 4 is
 6   a two-page exhibit; correct?
 7       A.   It is, yes.
 8       Q.   So the first page of Exhibit 4 is essentially
 9   the same as Exhibit 3; correct?
10       A.   Yes.
11       Q.   The second page of Exhibit 4 is an amendment,
12   as you call it; correct?
13       A.   Correct.
14       Q.   When was it prepared?
15       A.   Yesterday.
16       Q.   Exhibit 5 is an autopsy report with new
17   conclusions on the first page.
18            Do you agree with me?
19       A.   Yes.
20       Q.   When was it prepared?
21       A.   Yesterday.
22       Q.   Please, at any time in answering my questions
23   you are more than welcome to refer to any of these;
24   okay?
25       A.   Yes.
```

PLAINTIFFS' EXHIBITS 010199

Richard T. Mason, MD

```
1        Q.  My memory of the investigation reports is that

2   Mr. McCornack was pronounced dead at 12:52 a.m. on March

3   23rd, 2007; is that correct?

4        A.  Yes.

5            MR. ERNST:  I don't believe that's correct.  I

6   believe you misstated the year.

7            MR. MORIARTY:  I'm sorry.

8            THE WITNESS:  '09?

9            MR. MORIARTY:  '08.

10           MR. ERNST:  Oh, I'm sorry.  '08.  I think we

11  have got three different dates here, and all of us --

12           MR. MORIARTY:  I'm good at fixing my own

13  mistakes.

14           MR. ERNST:  Fine.

15  BY MR. MORIARTY:

16       Q.  But Mr. Ernst is correct, I made a mistake.

17           According to the materials, Mr. McCornack was

18  pronounced dead at 12:52 a.m. March 23rd, 2008; am I

19  correct?

20       A.  Yes.

21       Q.  And that is reflected in Exhibit 1, the Summary

22  of Investigation by the sheriff's office; correct?

23       A.  Correct.

24       Q.  And as far as I can tell from Exhibit 2, the

25  original autopsy report, this autopsy was started on
```

PLAINTIFFS' EXHIBITS 010200

Richard T. Mason, MD

1   March 26th at 7:30 a.m.; is that correct?

2        A.   Correct.

3        Q.   Some 78 to 79 hours post pronouncement of

4   death; correct?

5        A.   Correct.

6        Q.   During the autopsy on March 26, 2008, according

7   to Exhibit 2 -- let me withdraw that.  I have to find

8   what I'm looking for.

9        A.   Perhaps I could help you.

10           MR. ERNST:  Are you looking for something?  I

11   will help you, if you wish.

12           MR. MORIARTY:  I'll find it or die trying.

13           THE WITNESS:  That's what I like about old

14   farts, they never give up.

15           MR. MORIARTY:  Takes one to know one.

16           THE WITNESS:  Exactly.

17           MR. ERNST:  Eureka.

18           Can you go to where you are referring to?

19           MR. MORIARTY:  Yes.

20        Q.   Exhibit 1, the sheriff's report.

21           First of all, it says here on the third page --

22   sorry, second page, I'm having a lot of trouble with my

23   math today.

24           Let me withdraw my question and start over;

25   okay?

Richard T. Mason, MD

```
1            I'd like you to look at Exhibit 1; okay?  It's
2    the sheriff's investigation report.  Do you have it
3    there?
4        A.  Yes.
5        Q.  All right.  On the second page, the last
6    paragraph, it begins Dr. Richard T. Mason, a forensic
7    pathologist, performed an autopsy on March 26, 2008 at
8    approximately 7:30 a.m.; correct?
9        A.  Correct.
10       Q.  Now, did you have a discussion with Naomi Silva
11   or some other investigator about your autopsy findings
12   after you were done?
13       A.  Normally we have got a half-page form that
14   contains the lines and the arrangement for the
15   investigator.  Again in a sheriff coroner service, they
16   don't want a physician signing the death certificate.
17   This usurps their authority.  The death certificates are
18   signed by direct police officers, sheriff's deputies,
19   who are under the command of the sheriff, who is the
20   coroner.
21           So I fill out this form and represent to them
22   what should be put on the death certificate, and that's
23   what I do.  It's about a half-page form and it shows the
24   lines.  And I fill out what I want to see on the death
25   certificate.  And that's the way it's done.
```

Richard T. Mason, MD

1       Q.   I presume you followed your practice in this

2   instance?

3       A.   I did.

4       Q.   Do you know whether you also had a discussion

5   with the investigator?

6       A.   No, I don't recall there was any discussion

7   with the investigator.

8       Q.   Would you typically have one?

9       A.   You know, if there was other ancillary

10  investigative, you know, investigative findings, or if

11  it was something to do with police activity, they were

12  going to arrest somebody or weapons or something of

13  that, I normally would.  But on a natural -- what was

14  apparently a natural death with medical causes, I

15  probably wouldn't.

16      Q.   Okay.  It also says here, beginning at the

17  middle of the fourth line, "during the examination, Dr.

18  Mason collected post-mortem cardiac blood, urine and

19  liver tissue specimens for toxicological testing at the

20  National Medical Services Laboratory."

21           Do you see that statement?

22      A.   I do.  It's incorrect.

23      Q.   What would be the basis for this investigator

24  writing that in his or her report?

25      A.   She is making an assumption.  She didn't ask

PLAINTIFFS' EXHIBITS 010203

Richard T. Mason, MD

```
 1   me.
 2        Q.   What -- how do you label the specimens once you
 3   have drawn them?
 4        A.   Well, there is essentially a test tube rack,
 5   and so I'm collecting -- in virtually every case I
 6   collect blood, urine, liver tissue.  And at the
 7   conclusion of the autopsy I fill out the requisition
 8   form and I mark the source of the blood.
 9        Q.   Is that requisition form in Exhibit 7?
10        A.   Yes, I think it is.  I saw it in there.
11        Q.   Can you find it for me, please.
12        A.   Okay.  This is a copy of a National Medical
13   Services form which they give to us.  It's a multi-page
14   carbon copy form, and on that form I check the source of
15   the blood, as to whether it's cardiac or peripheral.
16        Q.   Okay.
17        A.   And then in that particular case I checked
18   peripheral, so that's what it is.  And normally the
19   collection -- post-mortem blood clots, first off, and
20   then it re-liquefies.
21             So my usual source of peripheral blood are the
22   axillary veins, you know, I'm taking a five-inch
23   skinning knife and I'm essentially removing all soft
24   tissue from the chest going down into the axillary area,
25   and I deliberately cut across the axillary vein, and
```

PLAINTIFFS' EXHIBITS 010204

Richard T. Mason, MD

1  just pick the blood up in a measuring cup as it flows
2  from that vessel.
3        And then I put it in the containers myself and
4  make sure it gets mixed with the anti-coagulant myself.
5  Then I just put it in my test tube rack and I label them
6  at the conclusion of the autopsy.
7     Q.  Okay?
8        MR. ERNST:  Before we go any further, there was
9  a form that was used that was in Exhibit 7.  I would
10 like that marked, identified, so that we can
11 specifically refer to it later.  And if you want to mark
12 it --
13       MR. MORIARTY:  It won't be hard for him to find
14 it later.
15       MR. ERNST:  No, I want it marked now so --
16       MR. MORIARTY:  You got a Post-It note?
17       MR. ERNST:  I don't, but I'm sure the court
18 reporter does.
19       MR. MORIARTY:  Do you have a Post-It note?
20       THE REPORTER:  No.
21       MR. ERNST:  Well, let's use one of those, mark
22 it 7 sub A, if you wish.
23       MR. MORIARTY:  We can mark it as an exhibit
24 later, I don't want to stop.
25       MR. ERNST:  Why don't we just mark it next in

PLAINTIFFS' EXHIBITS 010205

Richard T. Mason, MD

1 order and reflect it as contained in Exhibit 7.  I think

2 that would be the most appropriate thing to do.

3       THE WITNESS:  Some Post-It notes, fluorescent

4 ones.

5       MR. MORIARTY:  Perfect.

6       THE WITNESS:  It's smaller.

7       MR. MORIARTY:  I am flagging with a Post-It

8 note the requisition form that Mr. Ernst is referring to

9 and we will later mark this as a separate Exhibit 7A.

10      MR. ERNST:  You want to mark it 7A, or next in

11 order and reflect that it's contained in 7?

12      MR. MORIARTY:  Okay, we will mark it No. 8

13 later and get a separate copy of it.

14      MR. ERNST:  Just so the record is clear,

15 Exhibit 8 is the requisition form -- what did you call

16 it?

17      THE WITNESS:  It's the National Medical

18 Services form which they provide us.

19      MR. MORIARTY:  You don't have to take that

20 apart, Doctor.  We will mark it later.

21      MR. ERNST:  Thank you.

22      (Marked Deposition Exhibit 8.)

23 BY MR. MORIARTY:

24   Q.  Now, do you ligate any section of that vessel

25 before you do the specimen draw for the blood?

PLAINTIFFS' EXHIBITS 010206

Richard T. Mason, MD

1    A.  No.

2    Q.  Your routine, when you say it's peripheral, is

3  to draw from an axillary vein; correct?

4    A.  Yeah.  Normally you grab the arm by the wrist

5  and run your hand down the arm, squeeze that juice out

6  of there.  It doesn't -- sometimes it doesn't flow quite

7  readily and you get a big puddle of it in the axilla and

8  pick it up.

9    Q.  So that many hours after death, what is the

10 relative quality of an axillary specimen of blood versus

11 a cardiac specimen of blood?

12   A.  Well, what do you mean by "quality"?  Do you

13 want to transfuse it or drink it or what?  We

14 refrigerate our bodies so they don't go bad.  You know.

15 Just like any sort of meat.

16       And you -- after you have done this work for

17 about 40 years you can tell the quality of the remains,

18 whether there is any decomposition change or not.  And

19 our refrigerators are the same temperature as your home

20 refrigerators, it's about 40 degrees Fahrenheit.

21   Q.  So I take it you believe that the quality of

22 the specimen for purposes of a forensic analysis between

23 a heart and an axillary vein is comparable; is that what

24 you are telling me?

25   A.  Yeah.  In fact if you talk to the

Richard T. Mason, MD

1    toxicologists, they prefer peripheral blood, if you can

2    get it.  Sometimes you can't, in which case you use the

3    heart blood, mostly from the venous side, but the

4    toxicologists prefer the peripheral blood as a more

5    representative sample.

6         Q.  Okay.  Who chose National Medical Services lab?

7         A.  Fate.  They are virtually the only halfway

8    decent lab in existence that does coroner's toxicology.

9    We had a very good lab in Northern California associated

10   with a private group that did The Alameda County

11   coroner's work and they went out of business.  And I

12   think there is one other lab in Northern California.

13        This laboratory has a pretty heavyweight

14   reputation and they are noted to do good work in

15   forensic analysis.  So we use them.

16        Q.  Have you ever talked to anyone at NMS labs

17   about anything about the McCornack case or the McCornack

18   specimens?

19        A.  No, I haven't.

20        Q.  Now, the Exhibit 7 contains -- somewhere in

21   here -- Exhibit 7 contains a June 24, 2008 report from

22   NMS labs, does it not?

23        A.  It does, yeah.

24        Q.  And this particular report is three pages long;

25   correct?

Richard T. Mason, MD

```
 1        A.   Correct.

 2        Q.   And this report June 24, 2008, contains the 3.6

 3   nanograms per milliliter digoxin post-mortem blood

 4   result, does it not?

 5        A.   It does.

 6        Q.   When was the first time you ever looked at this

 7   June 24, 2008 NMS lab report?

 8        A.   That's a very good question.  I don't remember.

 9   Someone called it to my attention.

10        Q.   But certainly you never changed the death

11   certificate or the autopsy report or made any amendments

12   to it before yesterday; correct?

13        A.   Correct.

14        Q.   Do you know whether there is a signed version

15   of exhibit --

16             We are missing an exhibit here, I think you

17   have it, Tom.

18             MR. ERNST:  No.  This one is mine.  It's my

19   copy of Exhibit 1.

20             MR. MORIARTY:  The death certificate is

21   missing.

22             I'm going to blame you for everything today and

23   it's going to be my mistake every time.

24             MR. ERNST:  The record should reflect the death

25   certificate was under Mr. Moriarty's left elbow.
```

PLAINTIFFS' EXHIBITS 010209

Richard T. Mason, MD

1          MR. MORIARTY:  And it's not even Exhibit 1,

2    it's Exhibit 3.

3          Q.  Do you know if there is a signed version of

4    Exhibit 3?

5          A.  There should be.  Obviously it requires a

6    signature.  Naomi Silva would have signed it.  It was

7    her case.

8          Q.  I notice that there is not a signed version in

9    Exhibit 7, either.  If there is a signed version, where

10   would that be?

11         A.  You know, it would be on file with the state

12   vital statistics office.  Everything is done by computer

13   now.  You could call it up.

14         Q.  Is -- to the best of your knowledge, is there a

15   particular time period in which the coroner or the

16   sheriff is supposed to have a signed death certificate

17   on file?  If you know.

18         A.  It's not designated in the code, I don't think.

19   In the government -- in the State of California

20   Government Code or Health and Safety Code.  Usually it's

21   done as expeditiously as possible.

22         And, you know, when the body is released there

23   used to be a document that went along with it.  They

24   file everything electronically now, and the process is

25   more complicated, and being computer illiterate I'm not

PLAINTIFFS' EXHIBITS 010210

Richard T. Mason, MD

```
 1  that familiar with it.
 2       Q.  Certainly because of the circumstances
 3  surrounding Mr. McCornack's death we didn't have any
 4  electrocardiographic printouts.
 5       A.  That's correct.
 6       Q.  At least close in time to his death; correct?
 7       A.  Correct.
 8       Q.  There are some in Exhibit 7 which were from his
 9  remote past in the records of Dr. Lemm and/or Dr. Von
10  Dollen; correct?
11       A.  Correct.
12       Q.  Was NMS labs under instructions to analyze or
13  not analyze the liver and urine samples that were sent
14  to them?
15       A.  The preferred analysis is blood.  So unless I
16  gave them specific instructions, which I did not, to
17  analyze liver or blood, they would not do so.
18       Q.  Well, the specimens were sent to them, I'm just
19  wondering why they didn't --
20       A.  This is a routine --
21       Q.  -- analyze them?
22       A.  -- that I adhere to in virtually all the cases
23  in case something untoward comes up and you want other
24  analyses, so I routinely send blood, urine, liver.
25  Doesn't mean that they are going to analyze all of them.
```

PLAINTIFFS' EXHIBITS 010211

Richard T. Mason, MD

```
 1      Q.  All right.  At any point before today's
 2 deposition have you seen any NMS lab results of potency
 3 testing of any of Mr. McCornack's digoxin tablets?
 4      A.  No.
 5      Q.  Has Mr. Ernst told you what the results of any
 6 of the NMS lab testing of the potency of his digoxin
 7 tablets was?
 8      A.  He mentioned that he was going to have some
 9 specimens analyzed, or he has had them, but I haven't
10 seen them and I didn't know NMS did the analysis.
11      Q.  Do you know how many times you have met with
12 Mr. Ernst before today's deposition regarding Mr.
13 McCornack?
14      A.  I met with him once before today, and then
15 today.
16      Q.  All right.  When did you meet with him before
17 today?
18      A.  Wednesday, May 27, 1:00 p.m., at the jet center
19 here.
20      Q.  In the year of our Lord 2009?
21      A.  Yes.
22      Q.  Okay.  Do you have any notes of what that
23 discussion was about?
24      A.  No.
25      Q.  Did you say May 29?
```

PLAINTIFFS' EXHIBITS 010212

Richard T. Mason, MD

```
1      A.  May 27 of '09.
2      Q.  Okay.  Have you worked with Mr. Ernst on any
3  other cases besides the McCornack case?
4      A.  No.
5      Q.  And then the only other time was meeting him
6  today; correct?
7      A.  Correct.
8      Q.  How long did you meet with him today before the
9  2:00 deposition started?
10     A.  We met about noon.
11     Q.  Tell me the circumstances which led you to
12 amend exhibit -- I'm sorry, amend Exhibit 3 into what is
13 now Exhibit 4.
14     A.  Well, you know, looking at the level of digoxin
15 I had concluded it was a significant factor in the
16 demise of Mr. McCornack, and I had intentions of
17 amending it for quite some time, but since I've done oh,
18 about 180 cases, it's hard to backtrack, and something
19 was always getting in the way, some other emergent
20 things to do with other cases.
21          So I wanted to get it done before we had this
22 seance and wanted to get it done, so I did it yesterday.
23     Q.  Okay.  And I assume if I asked you the same
24 question about the changes that caused Exhibit 2 to be
25 amended into Exhibit 5, would you give me essentially
```

Richard T. Mason, MD

```
 1   the same answer?
 2        A.  Correct.
 3        Q.  And I don't want to pore through this in every
 4   great detail, but as far as I can tell, the differences
 5   between Exhibit 5 and Exhibit 2 are all on the first two
 6   pages, so far as your report is concerned; is that
 7   correct?
 8        A.  Correct.
 9        Q.  And then what Exhibit 5 has that Exhibit 2 did
10   not is the NMS April 16th, 2008 report, and the NMS June
11   24th, 2008 report; is that correct?
12        A.  Correct.
13        Q.  You've heard the phrase post-mortem
14   redistribution before, have you not?
15        A.  Yes.
16        Q.  And the April 16, 2008 NMS report, which is
17   contained in Exhibit 5, discusses, or at least refers to
18   post-mortem redistribution in reference to a drug called
19   Diltiazem, does it not?
20        A.  Yes.
21        Q.  And Diltiazem, let's talk about that a little
22   bit, is for hypertension, is it not?
23        A.  Correct.
24        Q.  And it's a calcium -- in the family of calcium
25   channel blockers?
```

PLAINTIFFS' EXHIBITS 010214

Richard T. Mason, MD

1      A.   Correct.

2      Q.   Have you ever heard calcium channel blockers

3  referred to as a basic drug?

4      A.   Vaguely, yeah, uh-huh.

5      Q.   Do you have any idea what they mean in the

6  literature when they call it a basic drug?

7      A.   You know, I don't know whether they mean it's

8  -- its pH, whether it's basic or, I don't know.  I don't

9  prescribe cardiologic drugs, obviously.

10     Q.   I understand.

11     A.   I don't treat live people.

12          Usually, if you are referring to something as a

13  base, it means it's alkaline.

14     Q.   When was the last time you did treat a live

15  person?  Back in your residency?

16     A.   No.  End of '67, early days of '68, Vietnam.

17     Q.   Do you know whether digoxin is also considered

18  a basic drug?

19          MR. ERNST:  Objection, vague.

20     A.   I think it is.  You know, I don't know, you

21  know it has hydroxy groups on it, so I think it is,

22  yeah.

23  BY MR. MORIARTY:

24     Q.   All right.  Have you ever read the package

25  insert or the label for Diltiazem?

PLAINTIFFS' EXHIBITS 010215

Richard T. Mason, MD

1      A.   No.   It's reproduced in the PDR, so I think
2  I've looked at it a few times.
3      Q.   You keep the PDR as a reference --
4      A.   Always.
5      Q.   -- source?
6      A.   Yes.
7      Q.   Do you keep Baselt toxicology texts?
8      A.   Yes, I do.
9      Q.   Do you keep Dart's toxicology text?
10     A.   Dart?
11     Q.   Dart, D-a-r-t.
12     A.   No.
13     Q.   To the best of your knowledge, does the
14  Diltiazem label indicate -- let me withdraw that.
15          Let's not be vague.  My version of the
16  Diltiazem label that I have indicates the concomitant
17  use of Diltiazem with beta blocker or digitalis may
18  result in additive effects on cardiac conduction.
19          Would you agree with that?
20     A.   Sounds pretty reasonable, yeah.
21     Q.   In the drug interaction section of the
22  Diltiazem label it indicates that pharmacologic studies
23  indicate that there may be additive effects in
24  prolonging AV conduction when using beta blockers or
25  digitalis concomitantly with Diltiazem.

PLAINTIFFS' EXHIBITS 010216

Richard T. Mason, MD

```
 1              Would you agree with that?
 2         A.   Yeah.
 3              MR. ERNST:  Do you want to mark that label as
 4    an exhibit?
 5              MR. MORIARTY:  I don't, actually.
 6              MR. ERNST:  Just checking.
 7    BY MR. MORIARTY:
 8         Q.   Are you familiar with studies that have -- in
 9    the toxicological literature or textbooks which indicate
10    that Diltiazem increases serum digoxin concentrations
11    when the drugs are used concomitantly?
12         A.   No.  I'm not familiar with that.
13         Q.   What, to your knowledge, are the potential
14    adverse reactions that can occur with Diltiazem?
15         A.   I don't know.  I haven't -- I don't recall.
16         Q.   All right.  The product label for Diltiazem
17    indicates that bradycardia is one of the possible side
18    effects.
19              Is that consistent with your knowledge?
20         A.   Yes.
21         Q.   And first degree atrioventricular block --
22         A.   Block.
23         Q.   -- is a potential complication?
24         A.   Yeah.
25         Q.   Am I correct about that?
```

PLAINTIFFS' EXHIBITS 010217

Richard T. Mason, MD

```
 1      A.  Yes.
 2      Q.  Can bradycardia and first degree AV block cause
 3 sudden cardiac death?
 4      A.  Yes.
 5      Q.  It also indicates here, lists kind of a laundry
 6 list, angina, arrhythmia, AV block second or third
 7 degree, bundle branch block, congestive heart failure,
 8 electrocardiographic abnormalities, hypotension,
 9 palpitation, syncope, tachycardia and ventricular
10 extrasystole.
11      A.  Are those potential complications consistent
12 with your knowledge and experience?
13          MR. ERNST:  Objection, compound.
14          And if you are going to persist in asking
15 questions from the label, I would ask that it be marked
16 as an exhibit and let him review the label.  You are
17 reading it and he is being questioned.
18          MR. MORIARTY:  That's fine.
19      A.  Yeah.  Sounds reasonable.
20 BY MR. MORIARTY:
21      Q.  Okay.  The NMS report in Exhibit 7, both the
22 one April 16 and the one June 24th, in reference to
23 Diltiazem say in addition, Diltiazem is reported to
24 undergo post-mortem redistribution with an average heart
25 blood/femoral blood ratio of 2.6.
```

Richard T. Mason, MD

1          Do you agree that Diltiazem undergoes
2    post-mortem redistribution?
3          A.   Yes.
4          Q.   Did you ever -- I'm sorry, did you ever look up
5    whether the 630 nanograms per milliliter was a level, a
6    Diltiazem level that was within the normal laboratory
7    range or outside the normal laboratory range?
8          A.   It's a little bit high.
9          Q.   It's a lot a bit high, isn't it?
10         A.   I think 400, 450 is the normal upper level that
11   one would prefer.
12         Q.   Well, the NMS report says the therapeutic blood
13   levels of Diltiazem appear to be in the range of 50 to
14   200 nanograms per milliliter.
15          I'm just going based on their report.
16         A.   Yes, okay.
17         Q.   So this is some three times the upper level of
18   normal; correct?
19         A.   Yes.
20         Q.   Did you ever put in either Exhibit 5 or the
21   amendments to -- which turned into Exhibit 4, that
22   Diltiazem was a possible cause of his death?
23         A.   No.
24         Q.   Why not?
25         A.   I just thought the digoxin was more

Richard T. Mason, MD

1  significant.

2      Q.   Let's talk about digoxin.

3          Do you have any clinical experience to indicate

4  whether a digoxin level of 3.6 standing alone indicates

5  that the patient is digoxin toxic?

6      A.   Well, I don't have any clinical experience,

7  since everybody that I treat is dead.

8      Q.   Okay.

9      A.   So, you know, I go by the major textbooks and

10 what they have to say about it.  Harrison's Principles

11 of Internal Medicine is my primary reference.

12     Q.   Well, does Harrison's indicate that a serum

13 digoxin concentration of 3.6 standing alone means that

14 the patient has digoxin toxicity?

15     A.   Well, they indicate that, you know, the upper

16 level efficacy, and the level at which you begin to see

17 untoward effects, is something like two nanograms per

18 mil.

19     Q.   Untoward effects in digoxin toxicity at a level

20 of 3.6 don't include death, usually, do they?

21          MR. ERNST:   Objection.

22          Go ahead.  You can answer the question.

23     A.   If you get a ventricular arrhythmia they do.

24 BY MR. MORIARTY:

25     Q.   Do you know of any study to indicate that

Richard T. Mason, MD

1  patients are likely to get a ventricular arrhythmia and

2  die with a serum digoxin concentration of 3.6?

3      A.  All I can tell you is it is a toxic level.  No,

4  I haven't --

5      Q.  In fact, actually all you are able to tell us

6  is that it is an elevated level; is that correct?

7      A.  Well, according to what I read it's a toxic

8  level.

9      Q.  "Toxic" does not mean death in all cases, does

10  it?

11          MR. ERNST:  Objection.  He has explained that.

12      A.  No.  It doesn't necessarily mean death in all

13  cases, no.

14  BY MR. MORIARTY:

15      Q.  All right.  Did -- in the last day or so, as

16  you were preparing Exhibits 4 and 5, did Mr. Ernst tell

17  you anything about what the NMS laboratory forensic

18  toxicologist had to say about the 3.6 post-mortem dig-

19  level that they reported and are contained in your

20  Exhibit 7?

21      A.  No.  I assumed since they didn't tell me

22  anything and -- you know, they won't tell him anything

23  because they didn't have anything to say about it.

24      Q.  Did Mr. Ernst tell you that I took the NMS

25  forensic toxicologist's deposition Tuesday in

Richard T. Mason, MD

1  Philadelphia and examined him extensively about the PMR,

2  or the post-mortem digoxin level of 3.6?

3      A.  He mentioned that there had been a deposition,

4  but I didn't -- he didn't say anything about what the

5  deponent had to say.

6      Q.  Would it be of any interest to you to know what

7  a forensic toxicologist said about the post-mortem

8  digoxin level of 3.6 that their own lab performed?

9      A.  Yeah, it would, because the asshole didn't put

10 anything in his report and I would hope he would convey

11 something to me.  That's what we pay them for.  But they

12 are very noncommittal, so I would be really anxious to

13 hear what he had to say.

14     Q.  Did you ever pick up the phone and call him?

15     A.  No, I didn't.

16     Q.  Did you e-mail him?

17     A.  No, I didn't.

18     Q.  Have you done any research about post-mortem

19 redistribution with digoxin?

20     A.  No, I haven't.

21     Q.  Do you keep any literature file regarding

22 post-mortem redistribution of drugs in general?

23     A.  You know, if you are taking blood from a

24 peripheral blood, I don't think it's a major problem.

25 Certainly if you are taking heart blood and you have

PLAINTIFFS' EXHIBITS 010222

43

Richard T. Mason, MD

1  tissue like myocardium, which is going to have some

2  digoxin in it, and the blood is sitting in there and

3  then you are taking a sample of that blood, I think

4  post-mortem redistribution would be significant.

5         But if it's out on the periphery, I'm not sure

6  that it comes into play here.

7      Q.  Is it the consensus of the forensic toxicology

8  community that you cannot calculate with scientific

9  probability someone's predeath drug level based on a

10 post-mortem finding?

11        MR. ERNST:  Objection, that calls for

12 speculation and asks his opinion about -- calls for

13 speculation.

14 BY MR. MORIARTY:

15     Q.  Go ahead.

16     A.  I would like to hear that question again.

17        MR. MORIARTY:  Read it back, please.

18        (Record read as requested.)

19        MR. ERNST:  I object.  What basis does he have

20 for the consensus of the toxicology community?

21        MR. MORIARTY:  If he doesn't have a basis, he

22 can tell me.  I think he said before this he was a

23 professional witness, so I'm sure he can tell me if he

24 has no basis to answer that question.

25     A.  If your toxicologist or my toxicologist

Richard T. Mason, MD

1  actually made that statement, I would like to see it in
2  print in that deposition, because it surely doesn't make
3  too much sense.
4        Why are we doing these analyses if the results
5  have absolutely no significance?  It sounds like the
6  purest form of bullshit I have ever heard.
7  BY MR. MORIARTY:
8     Q.  Have you been asked by Mr. Ernst or anyone else
9  to attempt a calculation of what Mr. McCornack's serum
10 digoxin level was at the time of or just before he died?
11    A.  No.
12    Q.  In your opinion in general, does digoxin
13 redistribute post-mortem?
14    A.  I would think it would, or it could in a heart
15 blood specimen.  In a peripheral specimen I would not
16 expect that to be a problem.
17    Q.  I want to read you a quotation from Baselt's
18 toxicology text, the one you keep in your office.
19 Page --
20        MR. ERNST:  Do you have a reference?
21        MR. MORIARTY:  Page 462.
22    Q.  "It has been determined that serum digoxin
23 levels nearly always increase after death due to
24 leaching from muscle, with an average
25 post-mortem/antemortem ratio ranging from 1.42 for

Richard T. Mason, MD

1  femoral vein blood specimens, to 1.96 for heart blood

2  specimens."

3          Do you agree with that statement?

4      A.  I've seen it.

5          MR. ERNST:  Would you like to attach that sheet

6  as an exhibit as well?

7          MR. MORIARTY:  No.

8      Q.  Do you agree with it?

9      A.  I'm sorry, what page was that from?

10     Q.  462.

11     A.  What book is this?

12     Q.  Baselt's Eighth Edition, Disposition of Toxic

13  Drugs and Chemicals In Man.

14         He is looking at a different edition is all I

15  know.  Do you have a different edition?

16     A.  Seventh.

17     Q.  My question is:  Do you agree with the

18  statement that I read?

19     A.  No.  I don't even really consider it.  I'm

20  looking at the levels of drug that I got out of a

21  peripheral blood sample.  It's well into a toxic level

22  and I don't know what to say about your question.

23     Q.  Was the McCornack blood specimen frozen before

24  it was sent to NMS labs?

25     A.  No.

PLAINTIFFS' EXHIBITS 010225

Richard T. Mason, MD

1      Q.   Was it centrifuged?

2      A.   No.

3      Q.   Does moving a body after death affect

4  post-mortem redistribution?

5      A.   I wouldn't think so, unless you are doing

6  something that approximates cardiac massage.  I don't --

7  I've never heard that.

8      Q.   Is it well known that the time between death

9  and the draw of the blood specimen is a significant

10  factor to consider in whether the post-mortem specimen

11  would accurately reflect antemortem levels?

12      A.   I think, you know, refrigeration comes into

13  that.  Certainly if you are -- you know, allowing a

14  significant period of time, say at room temperature, you

15  are going to have some decomposition change.  You know,

16  we do the best we can.  We refrigerate immediately upon

17  receipt of the body, and that's our practice.  And

18  that's the specimens we get to derive our blood samples

19  from.

20      Q.   Okay.  Well, that may be the practice, and it

21  may be state of the art, my only question is:  Isn't it

22  well known that the longer the time between the

23  post-mortem draw and the time of death, the more likely

24  it is to be post-mortem redistribution?

25          MR. ERNST:  Objection, vague as to time.

PLAINTIFFS' EXHIBITS 010226

Richard T. Mason, MD

```
 1        A.   I don't know that that's true.
 2   BY MR. MORIARTY:
 3        Q.   It says here in this Baselt chapter, again at
 4   the same page, 462, Fletcher, et al., 1979, suggested
 5   that post-mortem blood samples for digoxin assay be
 6   taken from the peripheral circulation within a few hours
 7   after death.  That they be completely hemolyzed by
 8   freezing and thawing several times and centrifuged
 9   before analysis.  The analytical value may then be
10   multiplied by 1.3 to estimate the serum digoxin
11   concentration at the moment of death.
12             Have you ever heard that?
13        A.   Yes, I've heard that.
14        Q.   Do you agree with it?
15        A.   Sounds great.
16        Q.   But of course the time of draw in this case was
17   some 70 plus hours between Mr. McCornack's death and the
18   blood draw; right?
19        A.   That's true.
20        Q.   Do you know whether the Dart toxicology text is
21   a well-respected authority in the field of toxicology?
22        A.   I've heard of it.  You know, I haven't had much
23   interaction with it.
24        Q.   What has Mr. Ernst told you about when Mr.
25   McCornack took his last digoxin dose prior to his death?
```

PLAINTIFFS' EXHIBITS 010227

Richard T. Mason, MD

1      A.   Nothing.

2      Q.   So you don't know anything about that issue?

3      A.   No.

4      Q.   Do you know anything about the optimal timing

5  of digoxin sampling, serum digoxin sampling in relation

6  to dose in the living?

7      A.   No.

8      Q.   Have you ever read the Lanoxin or the Digitek

9  label, whether it was in the PDR or in a package insert?

10     A.   I think I've looked at it in the PDR, yeah.

11     Q.   Does the -- do the labels for both of those

12  products, Lanoxin and Digitek, indicate that the optimal

13  time for sampling is six to eight hours after last dose?

14     A.   I don't know.  It sounds reasonable, yeah.

15     Q.   Do you know what the volume of distribution for

16  digoxin is?

17     A.   No.

18     Q.   Do you have an opinion in this case as to

19  whether Mr. McCornack's digoxin redistributed after he

20  died?

21     A.   You know, if this was a cardiac sample, you

22  know, I would feel that it would be a very strong

23  possibility.  Peripheral blood sample I'm not concerned

24  about.

25     Q.   Okay.  What literature did you bring with you

PLAINTIFFS' EXHIBITS 010228

Richard T. Mason, MD

1  today?

2      A.  Oh, I've got the seventh edition of Baselt's

3  book.  I've got like -- all my books are old, 14th

4  edition of Harrison's textbook of medicine on clinical

5  toxicity of digoxin.  I've got something from the 9th

6  edition of Harrison.

7          And a few pages from Braunwald's Heart Disease,

8  Textbook of Cardiovascular Medicine that mentions a

9  variety of arrhythmias can be due to digitalis.

10     Q.  Okay.  These are -- other than the Baselt

11 seventh edition chapter that you have, these are

12 otherwise clinical references, are they not?

13     A.  Yeah.  I have to keep that stuff, because I'm

14 looking at clinical records sometimes from clinical

15 physicians and have some standards by which to, you

16 know, judge them by.

17     Q.  Okay.  But you didn't look at other toxicology

18 references to do any checking on the current literature

19 on post-mortem redistribution of digoxin; is that

20 correct?

21     A.  That's correct.

22         MR. ERNST:  We have been going about an hour

23 and 15 minutes, I'd like to use the restroom.

24         MR. MORIARTY:  You are more than welcome to do

25 that.  I will even stop questioning while you go.

PLAINTIFFS' EXHIBITS 010229

Richard T. Mason, MD

```
 1            MR. ERNST:  Thank you.  Take a ten-minute
 2   break?
 3            (Break taken.)
 4            (Marked Deposition Exhibits 9 through 15.)
 5            MR. MORIARTY:  First may I have Exhibit 7?
 6            MS. DONAHUE:  (Handing document to counsel.)
 7            MR. MORIARTY:  Thank you.
 8       Q.  This page that we put the Post-It on, that is
 9   going to be Exhibit 8 later, a separate Exhibit 8, is
10   this the half-page sheet that you fill out and give to
11   the deputy investigator for her to then fill out her
12   report?
13       A.  No.  That's a carbon copy of NMS's toxicology
14   request form.
15       Q.  Okay.  Is the half-page sheet that you fill out
16   and give to the investigator part of Exhibit 7?
17       A.  You know, I don't see it here.  It should be.
18   It should be.
19       Q.  Have you looked in here for it?  In Exhibit 7?
20       A.  I recall looking in Exhibit 7 and I didn't see
21   it.
22       Q.  Okay.
23       A.  It's not here.
24       Q.  All right.  In the NMS lab report it gives an
25   alcohol, blood alcohol level.
```

Richard T. Mason, MD

1          Do you remember that?

2     A.   Yeah.

3     Q.   Did you try to compute how many drinks that

4  would be for a man of Mr. McCornack's size?

5     A.   I think it's .048 or something.  I think you

6  could call it a .05.  You know, that probably represents

7  about two and a half drinks, you know, for a 150 pound

8  man, it would probably be a little bit more for a 220

9  pound man.

10    Q.   Well, I happen to have the DMV from

11 California's chart regarding this.

12         Have you ever seen this chart?

13    A.   Yeah, I've seen it.  Yeah.

14    Q.   What did you say his level was?

15    A.   Isn't it .048 or something?  Yeah.  .048.  So

16 call it a .05.

17    Q.   All right.  So .05 would be in the gray zone,

18 and in a man 210 pounds and up --

19         MR. ERNST:  What are we looking at here?

20         MR. MORIARTY:  This is the printout from the

21 California DMV, it's a chart.

22    Q.   Just according to the California chart, what

23 would -- how many drinks would that equate to in a man

24 210 pounds or more?

25         MR. ERNST:  Well, the chart speaks for itself,

Richard T. Mason, MD

```
 1  so you are asking him to interpret the chart.
 2          MR. MORIARTY:  I am, because it's hard to
 3  interpret.
 4          MR. ERNST:  It's a DMV chart and it's not
 5  something that I think he normally does.  I object there
 6  is no foundation.
 7          MR. MORIARTY:  All right.  And actually --
 8          MR. ERNST:  It's beyond -- there is no
 9  foundation, it's not authenticated, there is no basis
10  for it, but he can go ahead and answer the question for
11  discovery purposes.
12          MR. MORIARTY:  Don, I think you just need to
13  say the word objection, because that's what PTO 22
14  contemplates.  I've let it go, but I'm not going to let
15  it go anymore.
16      A.  You know, this is a strange looking chart.  I
17  don't see the numbers for the --
18  BY MR. MORIARTY:
19      Q.  Well, at least you and I agree on that.  It's a
20  strange looking chart.
21          Look on the next page.  I think that's where
22  they tell you what the blood alcohol equates to a
23  shading?
24      A.  Yeah, the gray, okay.  Okay.
25      Q.  So the gray --
```

PLAINTIFFS' EXHIBITS 010232

Richard T. Mason, MD

```
1        A.   The gray --
2        Q.   -- is .05?
3        A.   The gray is .05 to .07.
4             MR. ERNST:  May I have a continuing objection
5    to this line of questioning on my former basis, Counsel?
6             MR. MORIARTY:  You certainly may.
7             MR. ERNST:  Thank you.
8             THE WITNESS:  I have no idea when he stopped
9    drinking, though.
10   BY MR. MORIARTY:
11       Q.   If you can't interpret the chart, just tell me
12   you can't interpret the chart.
13       A.   I'm trying to make you happy, Moriarty.
14       Q.   I don't think so.
15       A.   I'm having difficulties here.  I don't know
16   what to say about this chart.
17       Q.   Okay.  Then that's fine.
18            Would you agree with me that if you were trying
19   to assess whether a drug was a cause of death, you would
20   want to know the level of the drug in the body before
21   death?  If you could.
22       A.   Yeah.  Yeah.  Uh-huh.
23       Q.   And you would want to know the level after?
24       A.   Yeah.  If you could do that, yeah.
25       Q.   And would you also want to know whether the
```

PLAINTIFFS' EXHIBITS 010233

Richard T. Mason, MD

1  body and the drug are known to undergo post-mortem

2  changes which would affect the drug level in the body?

3          MR. ERNST:  Objection, compound.

4     A.   You know, there are all sort of unknowables

5  that one accepts in this business.  You know, obviously

6  I can't get drug levels before somebody dies and I'm

7  restricted to examining their body and body fluids after

8  death.  So that's what I've got.

9     Q.   All right.  I understand your answer, but

10  wouldn't you want to know, as a scientist, whether the

11  body and the drug undergo post-mortem changes so that

12  you could interpret the post-mortem level?

13          Yes or no.

14     A.   What changes are you speaking of?

15     Q.   Well, post-mortem redistribution, for one.

16     A.   Whatever it is, you know, I can't tell.  As I

17  said before several times, I think it would be more of a

18  prominent factor with heart blood and less with

19  peripheral blood, and I've got peripheral blood there,

20  so that's what I've got.

21          Would I want to know how exactly it worked, how

22  it was quantified?  Yeah, if I could, but I can't.

23  There is no way for me to know these things.

24     Q.   All right.  But -- there is no way to know with

25  certainty, but there is published literature from

PLAINTIFFS' EXHIBITS 010234

Richard T. Mason, MD

1  scientists who have tried to evaluate post-mortem
2  redistribution of digoxin, isn't there?
3       A.  Yeah, there is some.
4       Q.  And you have changed an autopsy and a death
5  certificate cause of death based on a post-mortem whole
6  blood digoxin level, haven't you?
7       A.  I have.
8       Q.  Okay.  So apparently the post-mortem level of
9  3.6 was compelling information to you.
10      A.  It sure is.
11      Q.  All right.  And in trying to figure out how
12 compelling that information is scientifically, we would
13 want to know how reliable that 3.6 is, wouldn't we, in
14 predicting what his level was before he died?
15      A.  Well, again, it's what I've got, it's what I
16 normally use, and that's what I've got.
17      Q.  It can't be what you normally use --
18      A.  If you want, it would be some esoteric fudge
19 factor for me to say how much was redistributed.  I
20 don't know.  I don't know that somebody could tell you
21 well, maybe it occurs this much in somebody, and it may
22 be this much in somebody else.  I don't know.
23      Q.  And you can't say to a reasonable medical
24 probability; right?
25           MR. ERNST:  Objection, he has --

PLAINTIFFS' EXHIBITS 010235

Richard T. Mason, MD

```
 1        A.   I think --
 2             MR. ERNST:   Objection.
 3   BY MR. MORIARTY:
 4        Q.   Go on.
 5        A.   I think 3.6 represents a toxic level.  And even
 6   if there is some added on by post-mortem redistribution,
 7   it's far above a level where you are not going to have
 8   toxic effects.  So I think it represents a true toxic
 9   agent in this particular case.
10        Q.   Okay.  Has Mr. Ernst asked you to render any
11   opinion about how the level reached 3.6, even if it's an
12   accurate level?
13        A.   No.
14        Q.   So you are not going to express opinions about
15   whether Diltiazem drove a level up or renal issues drove
16   the level of that or any other cause; correct?
17        A.   Correct.
18        Q.   Do you read, or subscribe to, any medical
19   journals and review them on a regular basis?
20        A.   Yeah.  Yeah.
21        Q.   Which ones?
22        A.   American Journal of Pathology, the -- I forget
23   the title now, it's a forensic medicine journal, and I
24   look at the New England Journal, read it in the library.
25        Q.   What about the Journal of Clinical Pathology?
```

Richard T. Mason, MD

1    A.  I used to.  I don't subscribe to that anymore.

2    Q.  When did you stop subscribing to it?

3    A.  A number of years ago.

4    Q.  Do you review it on line, even if you don't

5   subscribe to it?

6    A.  If there is some specific reference that I --

7   I'm interested in, I will go to the medical library and

8   find it.

9    Q.  Did you look for any articles about digoxin in

10  the Journal of Clinical Pathology as part of your work

11  in this case?

12   A.  No, I didn't.

13   Q.  Can you tell me whether you've done any

14  research yourself on post-mortem redistribution of any

15  drug?

16   A.  No, I haven't.

17   Q.  Do you have a -- any teaching appointments

18  currently?

19   A.  Yes, one.

20   Q.  What is it?

21   A.  I teach homicide investigation of police

22  officers, San Jose State University, Department of

23  Administration of Justice.

24   Q.  I want to read you something from a year 2000

25  article from the Journal of Clinical Pathology and ask

PLAINTIFFS' EXHIBITS 010237

Richard T. Mason, MD

1  you whether you agree with it.

2          MR. ERNST:  Uhm --

3          MR. MORIARTY:  No, is the answer to your next

4  question.  I don't even have the article to mark it as

5  an exhibit if you asked.

6          MR. ERNST:  I want the page and line number and

7  title of the article.

8          MR. MORIARTY:  Well, I can only tell you the

9  authors were Cook and Braithwaite.

10     Q.  It is often necessary to determine whether the

11  drug concentration found at the post-mortem examination

12  should be attributed to either therapeutic ingestion or

13  overdose.  This is very difficult to determine because

14  of the influence of post-mortem change.  The use of

15  post-mortem/antemortem ratios, or back extrapolation

16  from a post-mortem concentration is not recommended.

17          Do you agree or disagree?

18          MR. ERNST:  Objection, compound.  No

19  foundation.  Assumes facts not in evidence.  It's an

20  incomplete hypothetical.

21     A.  That is a quote that you --

22          MR. MORIARTY:  Objection under PTO 22.

23          MR. ERNST:  You know what?  Pardon me.  It was

24  a force of habit.  Please forgive me.  As long as we are

25  here I will continue with just objection.

PLAINTIFFS' EXHIBITS 010238

Richard T. Mason, MD

```
 1          MR. MORIARTY:  That's fine.  That's really all
 2  you have to say.
 3          THE WITNESS:  Could I read that paragraph?
 4          MR. MORIARTY:  No, because it's in something I
 5  wrote.  It's a memo.
 6          THE WITNESS:  You wrote it yourself?
 7  BY MR. MORIARTY:
 8      Q.  No.  Cook and Braithwaite wrote it.
 9      A.  And you are interpreting Cook and Braithwaite.
10      Q.  No, I'm reading you a quote and just asking if
11  you agree or disagree.  It's out of the Journal of
12  Clinical Pathology.
13          Do you agree with that statement or disagree
14  with it?
15          MR. ERNST:  Objection.
16      A.  What was the point of the paragraph?  Read --
17  making an evaluation of whether the -- an apparent
18  overdose is deliberate or accidental, is that what you
19  are saying?
20  BY MR. MORIARTY:
21      Q.  This is a study done in which they analyzed
22  whether drug concentrations post-mortem were reliable
23  indicators of antemortem levels, and the quote is, it is
24  often necessary to determine whether the drug
25  concentration found at the post-mortem examination
```

PLAINTIFFS' EXHIBITS 010239

Richard T. Mason, MD

1   should be attributed to either therapeutic ingestion or

2   overdose.  This is very difficult to determine because

3   of the influence of post-mortem change.  The use of

4   PM/AM, which I assume means post-mortem/antemortem,

5   ratios or back extrapolation from a post-mortem

6   concentration is not recommended.

7          Do you agree or disagree?

8          MR. ERNST:  Objection.

9       A.  It's awfully vague.  This is something where we

10  are sort of asked to do all the time, to look at a

11  post-mortem level of drug and give an opinion as to

12  whether it's significant or not.  And in relation to

13  cause of death, all I can tell you is you look at the

14  numbers, and you look at the drug, and come to some

15  conclusion.  That's all.  That's what we are required to

16  do under the law.

17  BY MR. MORIARTY:

18      Q.  I understand that, but not all drugs are the

19  same post-mortem; correct?  I mean, some redistribute

20  and some don't; right?

21         MR. ERNST:  Objection.

22  BY MR. MORIARTY:

23      Q.  Some have affinities for different tissue and

24  some don't?

25      A.  Yes, some have affinity for redistribution and

PLAINTIFFS' EXHIBITS 010240

Richard T. Mason, MD

1  some don't, sure.

2      Q.  And digoxin has an affinity for muscle tissue,

3  skeletal and cardiac; correct?

4      A.  Yes, it does.

5      Q.  When somebody dies there is changes in pressure

6  and metabolism and fluid shifts that cause things to

7  leach out of skeletal muscle into blood; correct?

8      A.  Yes.

9      Q.  So something that may not be in the blood or

10  serum at the time somebody is alive may be in the blood

11  or serum after they are dead; correct?

12     A.  It's possible, sure.

13     Q.  Have you been shown any information at all to

14  indicate that Mr. McCornack took Digitek tablets that

15  were outside of their labeled specification range?

16         MR. ERNST:  Objection.

17     A.  No.

18  BY MR. MORIARTY:

19     Q.  Okay.  I'm sort of in the home stretch, I

20  think.  It may be a long stretch, but a home stretch.

21     A.  Take your time.  You are paying for it.

22     Q.  This 3.6 level, the post-mortem digoxin level

23  from the NMS blood specimen, am I correct that that

24  level standing alone does not prove the cause of Mr.

25  McCornack's death?

PLAINTIFFS' EXHIBITS 010241

Richard T. Mason, MD

```
1              MR. ERNST:  Objection.
2         A.  It's a toxic level.  My inference is that it
3    caused some sort of adverse reaction to his heart and
4    caused his death.  It's -- you know, given just the
5    number, it's a toxic level.
6    BY MR. MORIARTY:
7         Q.  Well, the Diltiazem level is three times the
8    level and it causes sudden cardiac death as an adverse
9    reaction, too.  How come Diltiazem is not a cause of
10   death?
11        A.  You've got a good point there.  Maybe I should
12   have listed both of them.
13        Q.  Since I've suggested it, are you going to
14   revise Exhibits 4 and 5 tomorrow so that when I come
15   back next week we will have more exhibits?
16             MR. ERNST:  Objection.
17             MR. MORIARTY:  I'll withdraw that question.
18        A.  I'll probably have to think about it for a
19   couple of months.
20   BY MR. MORIARTY:
21        Q.  When you were doing the autopsy and dictated
22   your initial report, which was Exhibit 2, based on the
23   evidence you had before you, including the medical
24   records you had from Drs. Von Dollen and Lemm, I assume
25   there were plausible explanations for his sudden death
```

PLAINTIFFS' EXHIBITS 010242

Richard T. Mason, MD

```
 1  that had nothing to do with digoxin; is that correct?
 2       A.  Yeah.  In this business you take what you get.
 3  He had some hypertensive heart disease, he had some
 4  myocardial fibrosis, he had some coronary
 5  arteriosclerosis.
 6            If you don't find anything better, then you use
 7  those.  That's the way it works.
 8       Q.  And in the Lemm and Von Dollen records, did you
 9  find any serum digoxin concentrations that were anywhere
10  close to even the day he died?
11       A.  I don't recall that I did, no.
12       Q.  Would you like to look?  I can assure you there
13  are none for almost a year or more.
14       A.  You look like an honest Irishman to me, I'll
15  take your word for it.
16       Q.  So there weren't any, to your knowledge?
17       A.  I don't think there were.
18       Q.  Did you see any medical records close to the
19  time of his death indicating that he had signs or
20  symptoms of digoxin toxicity?
21       A.  No, I don't recall seeing that.
22       Q.  And I think I asked you before, there were no
23  EKGs so we can't evaluate whether he had any arrhythmias
24  consistent with digoxin toxicity; is that correct?
25       A.  That's correct.
```

PLAINTIFFS' EXHIBITS 010243

Richard T. Mason, MD

```
 1        Q.   Let me make sure I understand your opinion.
 2             Is it your opinion, to a probability, that the
 3   level of 3.6 is higher than it was just before he died?
 4             And then we will go on to examine
 5   quantification of that.
 6        A.   I don't know.  I'm taking the 3.6 as a
 7   representative number for his digoxin level at or about
 8   the time that he died.
 9        Q.   Why?
10        A.   Because it's what I've got.  And that's the way
11   I'm doing it.
12        Q.   Okay.  But what you have got was drawn over 70
13   hours after his death, and I'm just wondering what's the
14   scientific basis beyond "it's what I've got" for your
15   accepting that that is what it was at the time of death?
16             MR. ERNST:   Objection.
17        A.   The body was refrigerated for the post-mortem
18   interval.  I'm not saying that it couldn't be a little
19   bit higher than it was at the time of death.  I'm saying
20   it's a good enough representation of what his digoxin
21   level was at the time of death, and it's the basis for
22   the diagnosis of arrhythmia due to digitalis toxicity.
23   BY MR. MORIARTY:
24        Q.   Or Diltiazem?
25        A.   Or Diltiazem.
```

PLAINTIFFS' EXHIBITS 010244

Richard T. Mason, MD

```
 1            MR. ERNST:  Well --
 2       A.  Or both.
 3            MR. ERNST:  Objection.
 4  BY MR. MORIARTY:
 5       Q.  Now, in the studies --
 6            MR. ERNST:  You want to take a break?
 7            MR. MORIARTY:  No, I don't.
 8       Q.  In the studies regarding post-mortem
 9  redistribution of digoxin, do you know whether or not
10  those dead bodies had been refrigerated or not
11  refrigerated?
12       A.  I don't know.
13       Q.  What is the -- the mere fact of refrigeration
14  for 60 to 65 hours, whatever the number happened to be
15  by the time they got Mr. McCornack to the morgue, what's
16  the scientific principle that makes that blood specimen
17  scientifically reflective?
18       A.  It's pretty basic.  Everything moves slower
19  when it gets cold.  Biologic processes, decomp,
20  whatever.
21       Q.  Do you have any idea how long after his death
22  he made it to the refrigeration equipment in your
23  facility?
24       A.  Within an hour or two of being reported to us.
25       Q.  Well, somebody had go to the scene and
```

PLAINTIFFS' EXHIBITS 010245

Richard T. Mason, MD

1   pronounce him dead; correct?

2       A.   Yes.

3       Q.   And then I don't know how far this campground

4   is from your facility.

5            Do you know the answer to that?

6       A.   It's about 20, 25 minutes, maybe.  Late at

7   night.

8       Q.   I'm just trying to find out, since this may be

9   my one and only chance to ask you about this, all the

10  scientific reasons that you can express to me why you

11  believe that 3.6 in the NMS lab report is reflective and

12  does not represent a substantial post-mortem

13  redistribution.

14           MR. ERNST:  Objection.

15      A.   You know, I think I iterated them a number of

16  times already.

17  BY MR. MORIARTY:

18      Q.   Okay.  So you have nothing to add to what I've

19  already asked you?

20      A.   No.

21      Q.   Okay.  All right.  Just so I'm clear, because I

22  got off track where I was, I had asked you about

23  clinical evidence of digoxin toxicity in any of the

24  medical records, and you said you didn't have any

25  available to you to indicate that; correct?

Richard T. Mason, MD

```
 1        A.   Correct.
 2        Q.   Is there anything from Exhibit 1, the -- your
 3   investigator's report, that gives you clinical evidence
 4   of digoxin toxicity?
 5        A.   No.
 6        Q.   And then there was no electrocardiographic and
 7   no antemortem lab levels; correct?
 8        A.   Correct.
 9        Q.   So the only piece of evidence that you have to
10   support what you have said in Exhibits 4 and 5 about the
11   new cause of death is the post-mortem lab level of 3.6;
12   correct?
13        A.   Correct.
14        Q.   In the State of California, does a -- is a
15   clinician asked to sign death certificates or is it
16   always the coroner or the coroner's investigation?
17        A.   We do everything but kiss their rosy red
18   bottoms to get them to sign death certificates.  We
19   would be very happy.  Now if something is due -- the
20   primary type of case in which they can sign death
21   certificates, it has to be a natural death.
22             Anything where death is due to trauma, even
23   relatively minor trauma, the code prevents them from
24   signing the death certificate.  But if it's a natural
25   death and they are familiar with the medical history of
```

PLAINTIFFS' EXHIBITS 010247

Richard T. Mason, MD

1  the patient, the code states that they should have seen

2  the patient within 20 days, but there are amendments to

3  that, and if they have seen the patient for, you know,

4  up to six, nine months, and they feel confident that

5  they are familiar with the patient's medical condition,

6  they prescribed for the patient, they can sign and we

7  encourage them to do so.

8         What we find most the time is that they are

9  very reluctant to sign death certificates.

10     Q.  Do you know whether your office ever asked

11  either Dr. Lemm or Dr. Von Dollen to sign the original

12  death certificate, Exhibit 3?

13     A.  You know, I can't tell you for a fact that they

14  did.  I'm assuming that they made inquiry as to whether

15  they would.

16     Q.  And when you say "they," are you talking about

17  the sheriff's investigators?

18     A.  I'm talking the investigators.  I've only got

19  three.

20     Q.  Do you know if any of the investigators have

21  asked either Dr. Von Dollen or Dr. Lemm to sign the new

22  death certificate, Exhibit 4?

23     A.  It's the coroner's case, they couldn't.  It's

24  an accidental death.

25     Q.  Well, up until yesterday it was a natural

Richard T. Mason, MD

1   death.

2       A.   Yes, but it's not any longer, it's an

3   accidental death.

4       Q.   So they will no longer be asked to sign the

5   death certificate for Mr. McCornack; correct?

6       A.   Correct.

7       Q.   Do you -- I assume, based on what you have told

8   me so far, you do not prescribe cardiac glycocides?

9       A.   No.

10      Q.   You don't prescribe calcium channel blockers?

11      A.   No.

12      Q.   Do you have any clinical experience with serum

13  digoxin concentration levels in the living?

14      A.   No.

15      Q.   When you were practicing back in the late '60s,

16  were serum digoxin concentration assays even

17  commercially available?

18      A.   I don't believe so, no.

19      Q.   How often do you believe you are called upon to

20  render opinions that a drug was a cause of death or

21  contributed to cause of death?

22      A.   It's fairly frequent.  We get a fair number of

23  overdose cases per year.

24      Q.   Is it fair to say that the more medications a

25  person is on, the higher the risk that they may interact

Richard T. Mason, MD

```
 1  in some way?
 2          MR. ERNST:  Objection.
 3      A.  Yes, that sounds reasonable, sure.
 4  BY MR. MORIARTY:
 5      Q.  Do you know anything about Mr. McCornack's
 6  renal status?
 7      A.  No.  They were fairly normal-looking kidneys,
 8  and I've got no history of any renal problems.
 9      Q.  Do you know whether diminished excretion of
10  digoxin from the kidneys because of renal insufficiency
11  can elevate serum digoxin concentrations?
12      A.  Yes, it can.
13      Q.  Do you have any opinion in this case as to
14  whether Mr. McCornack had any renal insufficiency that
15  would have elevated his digoxin levels --
16      A.  I don't recall --
17      Q.  -- antemortem?
18      A.  I don't recall seeing anything in the medical
19  records that I have that he has any renal insufficiency.
20      Q.  Okay.
21          MR. MORIARTY:  I'm missing a bunch of exhibits
22  and they are not under my elbows.
23          MR. ERNST:  (Handing documents to counsel.)
24          MR. MORIARTY:  Thank you.
25      Q.  Do you know what lab studies in the living are
```

PLAINTIFFS' EXHIBITS 010250

Richard T. Mason, MD

```
 1   typically referred to when trying to analyze whether
 2   somebody has renal insufficiency or not?
 3        A.  You could, you know, you could look at
 4   creatinine, creatinine clearance, things of that nature.
 5        Q.  "Things of that nature" being BUN?
 6        A.  BUN elevated.
 7        Q.  And estimated glomerular filtration rate?
 8        A.  Filtration rate.
 9        Q.  All right.  When we took our last break I had
10   been asking you about literature, and during the break
11   we went through and marked some of the literature that
12   you brought.
13            Exhibit 9 is the seventh edition of Baselt's
14   text, the chapter on digoxin; is that correct?
15        A.  Correct.
16        Q.  And you brought that with you?
17        A.  Yes.
18        Q.  And Exhibit 10, do you know if -- this kind of
19   looks like Harrison's.  Is that what this is?
20        A.  Yes.
21        Q.  No, actually --
22        A.  Wait a minute.
23        Q.  I'm sorry.  It's actually Tortora and -- it's
24   Tortora's anatomy and physiology text.
25        A.  Yes.
```

PLAINTIFFS' EXHIBITS 010251

Richard T. Mason, MD

```
 1        Q.  I should know that, I have that book.
 2             11 is something from the second edition of
 3   Braunwald's text?
 4        A.  Yes.
 5        Q.  Pretty old edition, isn't it?
 6        A.  Yeah.
 7        Q.  12, Exhibit 12, is from -- some information you
 8   pulled from Harrison's; correct?
 9        A.  Correct.
10        Q.  Do you know what Exhibit 13 is from?  Looks
11   like Harrison's again --
12        A.  Yes.
13        Q.  -- right?
14             And then 14 and 15 are letters that I assume
15   you received from Don Ernst; is that correct?
16        A.  Correct.
17        Q.  It says here in the May 7, 2009 letter that he
18   would like to retain your services as an expert and
19   consultant in this case.
20             Have you agreed to do that for him?
21        A.  Yes.
22        Q.  Have you billed him to date for any services in
23   this case?
24        A.  I billed him $500 for this meeting that we had
25   at the jet center here on May 27, '09.
```

Richard T. Mason, MD

```
 1        Q.  For consulting with lawyers on civil cases do
 2   you charge by the hour?
 3        A.  $500 an hour, yes.
 4        Q.  Am I being charged the same thing --
 5        A.  You are.
 6        Q.  -- for the time spent in this questioning;
 7   right?
 8        A.  Correct.
 9        Q.  At the time Mr. Ernst wrote you this letter on
10   May 7th, 2009, the then existing autopsy and death
11   certificate were Exhibits 2, the autopsy, and 3, the
12   death certificate; correct?
13        A.  Correct.
14        Q.  And then later, sometime in the middle of the
15   summer, Mr. Ernst sent you Exhibit 15 with certain
16   materials; correct?
17        A.  Yes.
18        Q.  And he resent the NMS labs report that in fact
19   your office had had for over a year at that point;
20   correct?
21        A.  Yes.
22            MR. MORIARTY:  All right.  Let me just talk to
23   Alicia, and then I'll be done with questioning and the
24   two of you can have whatever fun you want.
25            Is that okay?
```

PLAINTIFFS' EXHIBITS 010253

74

Richard T. Mason, MD

```
 1          MR. ERNST:  Sure.
 2          (Break taken.)
 3               EXAMINATION BY MS. DONAHUE
 4     Q.  Good afternoon, Doctor, we met before the
 5  deposition.  I'm Alicia Donahue --
 6     A.  Yes.
 7     Q.  -- representing the Mylan defendants in this
 8  case.  I have just a few questions for you.  Probably
 9  more of a general nature.
10          We have talked a little bit, quite a bit in
11  your deposition about this changed -- addendum to the
12  death certificate and changes to your original report
13  that you made yesterday; correct?
14     A.  Yes.
15     Q.  And yesterday is approximately six months, give
16  or take a few days, post the original report?
17     A.  Yes.
18     Q.  Okay.  In the normal scope of your general
19  practice as the coroner of the County of Santa Cruz, or
20  the, quote unquote, coroner, is it unusual for you to
21  amend a report so far after your original report?
22     A.  Could be as much as a year.
23     Q.  In the past year how often have you changed
24  your original report six months post the time that you
25  wrote it?
```

PLAINTIFFS' EXHIBITS 010254

Richard T. Mason, MD

```
 1        A.   There may have been two or three other cases.
 2        Q.   Okay.  And if you think back, you know, five
 3   years past in your career, how often has that happened?
 4        A.   You know, I don't know.  Again, it wouldn't
 5   surprise me if it could occur two or three times a year.
 6        Q.   So you wouldn't describe it as something
 7   unusual.
 8        A.   No.  No.
 9        Q.   You testified in response to Mr. Moriarty's
10   questioning that -- let me look at my notes so I will
11   get it right.
12             He asked you about the circumstances of the
13   change in your report, the circumstances leading up to
14   them, and you said I had decided to do it, to make the
15   change, after getting the NMS results but I just didn't
16   get around to it because I had 180 cases that came in
17   between, so I did it yesterday.
18             That's the kind of gist of your testimony.
19        A.   Yes.
20        Q.   Okay.  In regard to the meeting that you had
21   with Mr. Ernst back in May, had you made the decision to
22   change your report before going to that meeting?
23        A.   Yes.
24        Q.   Do you remember how long before?
25        A.   No.
```

PLAINTIFFS' EXHIBITS 010255

Richard T. Mason, MD

```
 1        Q.  Do you remember how long before that report you
 2   had seen -- before that meeting with Mr. Ernst you had
 3   seen the NMS report?
 4        A.  I don't recall.
 5            MS. DONAHUE:  That's all the questions I have.
 6   Thank you.
 7            THE WITNESS:  Thank you.
 8            MR. ERNST:  I have no questions.
 9            MR. MORIARTY:  Okay.
10            MR. ERNST:  Just clarification, though.
11            Exhibit 5, may I look at Exhibit 5?
12            MR. MORIARTY:  They are in order now.  You are
13   not going to mess up my stack, are you?
14            MR. ERNST:  Well --
15                     EXAMINATION BY MR. ERNST
16        Q.  Exhibit 5, the cover sheet, ventricular
17   arrhythmia, digoxin toxicity, digoxin poisoning,
18   accidental death is your opinion today; true?
19        A.  Yes.
20            MR. ERNST:  Thank you.  That's all.
21            FURTHER EXAMINATION BY MR. MORIARTY
22        Q.  Do you have any other opinions that are not
23   contained in Exhibits 4 or 5 and that we have not yet
24   asked you about today?
25        A.  No.
```

PLAINTIFFS' EXHIBITS 010256

Richard T. Mason, MD

```
 1           MR. ERNST:  Objection.
 2      A.  No.
 3           MR. MORIARTY:  What's the basis for that
 4  objection?  I want the ability to cure that one.
 5           MR. ERNST:  There may be information that will
 6  derive from later depositions and information that will
 7  be distributed amongst all experts he may have other
 8  opinions for.
 9  BY MR. MORIARTY:
10      Q.  I'm just asking you today do you have any other
11  opinions that are A, not contained in Exhibits 4 or 5;
12  and B, that I have not asked you about yet?
13      A.  No.
14           MR. MORIARTY:  Okay.
15           MS. DONAHUE:  One last question from me.
16           MR. MORIARTY:  I'm not done.
17           MS. DONAHUE:  Sorry.
18  BY MR. MORIARTY:
19      Q.  If you do develop new opinions would you please
20  let Mr. Ernst know so under the rules of the court he
21  can let me know?
22      A.  Yes, I will.
23      Q.  All right.  I will be asked at some point, I
24  assume, to send you payment for the time we spent here
25  today; correct?
```

PLAINTIFFS' EXHIBITS 010257

Richard T. Mason, MD

```
 1      A.   Correct.

 2      Q.   And you know that I will need probably a W-9;

 3  correct?

 4      A.   Yeah, okay.

 5      Q.   And I'll need to know to whom to make out the

 6  check; okay?  And would that be you as an individual, or

 7  the coroner's office, or do you have a like a

 8  corporation?

 9      A.   Yeah, it's Richard T. Mason, MD, Inc.

10      Q.   All right.

11      A.   And I will need your business card to know

12  where to send it.

13      Q.   You will get that.

14           MR. ERNST:  Do you have that card?

15           MR. MORIARTY:  I might give it to him several

16  months from now.  Yeah, I'll give it to you.

17      Q.   And what percent of your time is spent in

18  private consulting work such as this case, now, as

19  opposed to your official capacity as the coroner?

20      A.   Less than 10 percent.

21      Q.   Okay.  Is there -- when you do change or amend

22  a report, as Ms. Donahue was asking you about, is there

23  any procedure that you have to go through within the

24  system of the coroner's office?

25      A.   Yeah.  I have to let the sergeant, who is the
```

PLAINTIFFS' EXHIBITS 010258

Richard T. Mason, MD

1  section chief, know about it and then I have to execute

2  those forms and it has to be entered into this new

3  computerized system.  And that's been done.  It was done

4  yesterday.

5       Q.  All right.

6       A.  Better late than never.

7       Q.  Okay.  Is there anything else about that

8  process?

9       A.  No.

10          MR. MORIARTY:  Okay.  All right.  I don't have

11 any other questions.

12          You are familiar with the reading and signing

13 process?

14          THE WITNESS:  Yeah.

15          MR. MORIARTY:  She will send you a transcript.

16          THE WITNESS:  Sure.

17          MR. MORIARTY:  You need to check it for

18 accuracy.

19          THE WITNESS:  Okay, I can do that.

20          MR. MORIARTY:  Okay?

21          Now I'm going to have the court reporter take

22 all these and instead of pulling this apart and trying

23 to find a copy machine today, she will make this flagged

24 page Exhibit 8; okay?

25          MR. ERNST:  Yes.

PLAINTIFFS' EXHIBITS 010259

Richard T. Mason, MD

```
 1              MR. MORIARTY:  And then you have --
 2              There are no originals in here that you need
 3  back; correct?
 4              THE WITNESS:  No, those are all copies.
 5              MR. MORIARTY:  Then we don't have to worry --
 6              THE WITNESS:  Those copies or some copies I
 7  would like to get back.
 8              MR. MORIARTY:  Okay.  You can have a set of
 9  exhibits when you get your transcript, keep them.
10              THE WITNESS:  That's a good idea.
11              MR. ERNST:  Can I request when the court
12  reporter makes a copy she adds additional copies of
13  exhibits for the doctor's file so that they will be
14  complete as he presented them here today.
15              MR. MORIARTY:  Okay.  We can do that.
16              MS. DONAHUE:  Okay.  I get to ask my question?
17              A couple.
18              MR. ERNST:  I thought you were done.
19              MS. DONAHUE:  A couple more.
20              FURTHER EXAMINATION BY MS. DONAHUE
21      Q.  This may be -- I'm not a forensic specialist,
22  so this may be a naive question.  I'm curious, why was
23  an autopsy performed on Mr. McCornack?
24      A.  Well, you know, I think an autopsy was done
25  because the clinical physicians taking care of his
```

PLAINTIFFS' EXHIBITS 010260

Richard T. Mason, MD

1  care -- first off, he is an out-of-town patient, so the
2  requirement for a civilian physician to sign the death
3  certificate, he has to have a California medical
4  license, so if his doctor was in San Luis Obispo he
5  could very well have signed if he was willing to do so.
6          As I alluded to before, you get a lot of
7  reluctance on the part of the clinical physicians to
8  sign death certificates, you know, if they haven't seen
9  the patient within a very short period of time or the
10  patient is out of town somewhere or they have the
11  feeling that they are not in control of the situation.
12          So the case would be referred to us then.
13      Q.  So between the time that Mr. McCornack's body
14  was picked up by the sheriff and brought to your
15  facility, between that time and the time that you
16  performed the autopsy, someone, either one of his
17  physicians or perhaps his wife, someone requested that
18  an autopsy be performed?
19      A.  No, no, no.
20      Q.  No?
21      A.  No.  It's done without permission.  Under the
22  code, Government Code, Health and Safety Code, State of
23  California, I have a right to autopsy people without the
24  permission of the family.  Some jurisdictions are more
25  casual.  I always have in mind that I'm going to be

Richard T. Mason, MD

1  sitting in the witness chair at some point in time and

2  somebody is going to say well, you didn't do something

3  or you didn't take adequate care to make a

4  determination.  So we -- we are pretty cautious and we

5  have about -- in our county about an 80 percent autopsy

6  rate.

7          You know, it was just the circumstances, he is

8  at a campground with his family, you know, perhaps they

9  were drinking or, you know, perhaps he was using some

10 other kind of medication or recreational drugs or

11 whatever.  So the autopsy sort of rules out all these

12 things.

13         Or somebody with hypertension might have a

14 sudden intercranial hemorrhage or a stroke, something of

15 that nature.

16     Q.  I'm glad you clarified that for me.

17         So based on the circumstances of his death, as

18 reported to you by the sheriff, you made the

19 determination that an autopsy should be performed in

20 this case?

21     A.  Yes.  That this is my, you know, my influence

22 in the procedure.  They usually leave it up to me as to

23 whether do we really need an autopsy here or not.  And

24 as I said, we probably do a higher percentage than maybe

25 some other jurisdictions.

PLAINTIFFS' EXHIBITS 010262

Richard T. Mason, MD

1     Q.   Okay.  All right.  Thank you.  And one last

2  question.

3          I think Exhibit 14 is the March 7 letter from

4  Mr. Ernst retaining you as an expert.

5     A.   Yes.

6     Q.   And again same -- similar question as I asked

7  before, had you made a decision to change the cause of

8  death, your cause of death opinion in regard to Mr.

9  McCornack before Mr. Ernst retained you as an expert?

10     A.   Yes.

11     Q.   So you know you had made that decision before

12  he retained you, but you don't know at what point

13  before?

14     A.   No.

15     Q.   You can't even give me an estimate?

16     A.   You know, at whatever point I became aware --

17  the cases have to go through at a fairly rapid rate.

18  And, you know, there is always new ones coming down the

19  chute, and at some time I became aware of the NMS report

20  and at that point I made the decision.

21     Q.   Last question, even though it's not mine.

22          MR. MORIARTY:  It would have made it easier if

23  I asked him.  I thought you would get mad at me and, you

24  know, I don't want that.  I have to spend a lot of time

25  with you.

PLAINTIFFS' EXHIBITS 010263

Richard T. Mason, MD

1  BY MS. DONAHUE:

2      Q.  Can you tell if someone has had a true

3  myocardial infraction [sic] without a microscopic

4  examination of the heart?

5          MR. MORIARTY:  Infarction.

6  BY MS. DONAHUE:

7      Q.  Infarction.

8      A.  Infarction.

9          Even if they don't survive a period of at least

10  24 hours, changes are quite difficult to interpret.

11  Normally you look for an influx of white blood cells

12  into an area essentially of dead tissue.  That's what an

13  infarction is.  You have interrupted the blood supply

14  and muscular tissue has died, essentially, and it's

15  going to have to be broken down by the white cells of

16  the body and taken away and replaced by fibrous tissue.

17          In the early stages, under 24 hours, all you

18  see is some very, very subtle changes in the myocardium,

19  and it can be very difficult to interpret.  You may not

20  be able to interpret it.

21          A lot of the cases, because of that, get signed

22  out as arrhythmias, probable arrhythmias.  And again, I

23  can't see arrhythmias with my dissecting knife, but I

24  see other changes, and you know, I'm assuming that there

25  has been an arrhythmia and consequent cardiac arrest.

PLAINTIFFS' EXHIBITS 010264

Richard T. Mason, MD

```
 1              FURTHER EXAMINATION BY MR. MORIARTY
 2        Q.   If I understand everything you just said, true
 3    MI was a possibility here.
 4             MR. ERNST:   Objection.
 5    BY MR. MORIARTY:
 6        Q.   Right?
 7        A.   It's a possibility, yes.
 8             MR. MORIARTY:   That's it.   I promise that's it.
 9             (Time Noted:   4:22 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PLAINTIFFS' EXHIBITS 010265

Richard T. Mason, MD

```
1          I hereby certify that I have read my

2     deposition, made those changes and corrections I

3     deem necessary, and approve the same as now

4     written.

5        Dated this_____ day of _____,

6   2009.

7

8

9

10

11                    _____

12                    Under Penalty of Perjury

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 010266

Richard T. Mason, MD

```
1                    REPORTER'S CERTIFICATE

2            The undersigned Certified Shorthand Reporter
   licensed in the State of California does hereby certify:
3            I am authorized to administer oaths or
   affirmations pursuant to Code of Civil Procedure,
4  Section 2093(b), and prior to being examined, the
   witness was duly administered an oath by me.
5            I am not a relative or employee or attorney or
   counsel of any of the parties, nor am I a relative or
6  employee of such attorney or counsel, nor am I
   financially interested in the outcome of this action.
7            I am the deposition officer who
   stenographically recorded the testimony in the foregoing
8  deposition, and the foregoing transcript is a true
   record of the testimony given by the witness.
9            Before completion of the deposition, review of
   the transcript [x] was [ ] was not requested.  If
10 requested, any changes made by the deponent (and
   provided to the reporter) during the period allowed are
11 appended hereto.
             In witness whereof, I have subscribed my name
12 this 6th day of October, 2009.

13

14            _____
                 Allison Ash-Hoyman, CSR No. 7412
15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 010267