# EXHIBIT 603

PLAINTIFFS' EXHIBITS 010383

Page 88

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


KATHY McCORNACK, an individual;  )
DANIEL E. McCORNACK, JR., an     )
individual; and RALPH J.         )
McCORNACK, a minor by and        )
through his Guardian ad Litem,   )
                                 )
                 Plaintiffs,     )
                                 )
      vs.                        )  MDL No. 2:09-CV-0671
                                 )
ACTAVIS TOTOWA, LLC, et al.,     )
                                 )
                 Defendants.     )
_____)


DEPOSITION OF RICHARD T. MASON, MD
Volume II

DATE:      Thursday, August 11, 2011


TIME:      10:39 a.m.


PLACE:     Pulone & Stromberg
           1550 The Alameda
           Suite 150
           San Jose, California  95126


REPORTER:  ALLISON ASH-HOYMAN
           Certified Shorthand Reporter
           License No. 7412

Page 89

```
 1                    A P P E A R A N C E S

 2

 3

 4   For the Plaintiffs:      ERNST & MATTISON
                              BY:  DON A. ERNST
 5                            1020 Palm Street
                              San Luis Obispo, California 93401
 6                            (805) 541-0300

 7

 8

 9   For Actavis             (Via videoconference)
     Defendants:             TUCKER, ELLIS & WEST
10                           BY:  MATTHEW P. MORIARTY
                             925 Euclid Avenue
11                           Suite 1150
                             Cleveland, Ohio 44115
12                           (216) 696-2137

13

14

15   For Mylan Defendants:   (Via telephone)
                             SHOOK, HARDY & BACON
16                           BY:  HUNTER AHERN
                             600 Travis Street
17                           Suite 1600
                             Houston, Texas 77002
18                           (713) 227-8008

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 010385

Page 90

1          I N D E X   O F   E X A M I N A T I O N S

2

3    EXAMINATION BY:                                    PAGE

4      MR. MORIARTY . . . . . . . . . . . . . . . .      92
       MR. ERNST. . . . . . . . . . . . . . . . . .     157
5

6

7    FURTHER EXAMINATION BY:

8      MR. MORIARTY . . . . . . . . . . . . . . . .     165
       MR. ERNST. . . . . . . . . . . . . . . . . .     171
9

10

11

12          I N D E X   O F   E X H I B I T S

13

     Exhibit              Description              Page
14

15    16   Correlation of Antemortem and           92
              Postmortem Digoxin Levels
16
      17   Interpretation of Excessive Serum       92
17            Concentrations of Digoxin in Children

18    18   Estimating Antemortem Drug              92
              Concentrations from Postmortem Blood
19            Samples: The Influence of Postmortem
              Redistribution
20
      19   Postmortem Clinical Pharmacology        92
21
      20   The Nightmare of Postmortem Drug        92
22            Changes

23    22   Mechanisms Underlying Postmortem        92
              Redistribution of Drugs: A Review
24
      23   Interpretation of Postmortem Drug       92
25            Levels

PLAINTIFFS' EXHIBITS 010386

| | Exhibit | Description | Page |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 24 | A Better Understanding of the Interpretation of Postmortem Blood Drug Concentrations | 92 |
| 4 | | | |
| 5 | 27 | Amended Notice to Take Deposition Duces Tecum | 92 |
| 6 | 28 | Santa Cruz County Board of Supervisors Index Sheet, w/attached letter dated 4/8/08, and Request for Approval of Agreement | 92 |
| 7 | | | |
| 8 | | | |
| | 29 | Diagram of veins | 92 |
| 9 | | | |
| | 30 | Diagrams of veins | 92 |
| 10 | | | |
| | 31 | Diagram of veins | 92 |
| 11 | | | |

PLAINTIFFS' EXHIBITS 010387

Page 92

1          (Deposition Exhibits 16, 17, 18, 19, 20, 22,

2          23, 24, 27, 28, 29, 30, 31, pre-marked by

3          Mr. Moriarty.)

4                    RICHARD T. MASON, MD,

5      having been first duly sworn by the Certified

6      Shorthand Reporter to tell the truth and nothing

7      but the truth, was examined and testified as

8      follows:

9                    EXAMINATION BY MR. MORIARTY

10         Q.  Dr. Mason, as you know, my name is Matt

11     Moriarty, my -- what I'm going to try to do today is

12     that I'm going to try very hard not to repeat things

13     that we went over in 2009; okay?

14         A.  Okay.  My hearing is not all that great, so I

15     would ask that you speak up just a little bit.

16         Q.  Okay.  Let me see if this moves.

17              What I was saying is that I'm going to try very

18     hard not to repeat things that we went over in 2009;

19     okay?

20         A.  Good.

21         Q.  So if I do repeat, I'm sorry, it's either

22     necessary or I have forgotten that I asked you that in

23     2009; okay?

24         A.  Okay.

25         Q.  All right.  If the title and the authority of

PLAINTIFFS' EXHIBITS 010388

1  coroner in Santa Cruz County is in the sheriff, what do

2  you have to do administratively to get them to sign off

3  on death certificates and autopsy reports?

4      A.  Basically I generate a half page document that

5  sort of duplicates the lines on the state death

6  certificate form, and I fill this out with the name of

7  the decedent, the time of the autopsy, the autopsy

8  number, the date, and then there is various lines, and I

9  fill those lines in, and then I just initial this form

10  and that is -- well, the system now is -- is on line, so

11  somebody puts it in right away.

12      Q.  Okay.

13      A.  The sign-off is done by -- usually by the

14  investigator, who is one of three cops that I work with,

15  and that is the coroner's investigator for this

16  particular case.

17      Q.  Okay.

18      A.  The coroner service is in the investigation

19  bureau of the Santa Cruz County Sheriff's Department.

20          The assignments are long term, it takes

21  probably more than a year to educate a police officer.

22  First off, you have to start with somebody that has some

23  brains, that's the major requirement, and then they

24  learn, or they have to learn how to interact with the

25  physicians, how to get medical records, how to ask

PLAINTIFFS' EXHIBITS 010389

1   questions of physicians and hospital personnel.

2           That information is put up in a preliminary

3   report.  I read that, I may ask for additional data.

4   They will have obtained medical records if it's local

5   and it's possible, and then I will do the autopsy, make

6   a determination as to what I think is the cause and

7   manner of death, fill out this form, and that's put into

8   the system, and that's it.

9       Q.  Okay.  So when -- in this case, when you

10  amended the autopsy and death certificate in 2009, did

11  you have to post this form to one of the sheriff's

12  investigators?

13      A.  Yes.

14      Q.  Did they ask for an explanation for why you

15  were changing the death certificate and the autopsy

16  conclusion?

17      A.  I believe I referred them to the NMS toxicology

18  report and the digoxin level.  That was my reason.

19      Q.  Is there any written correspondence to that

20  effect in your file?

21      A.  I don't know that there is, no.

22      Q.  All right.  So in our first session --

23          And by the way, Allison, I'm going to want the

24  pages numbered consecutively, don't start over.

25          THE REPORTER:  That's what I do.

PLAINTIFFS' EXHIBITS 010390

1          MR. MORIARTY:  Okay, good.

2      Q.  I know I asked you back then how many -- when

3  you last took care of living patients, and I know it was

4  in the '60s, so I want to ask you something related to

5  that; okay?

6          How many times in your career have you

7  diagnosed digoxin toxicity in living patients?

8          MR. ERNST:  Objection.

9          You can go ahead and answer the question.

10     A.  I can't ever remember doing that.

11  BY MR. MORIARTY:

12     Q.  What are your board certifications and by whom

13  are you certified?

14     A.  American Board of Pathology, Anatomic

15  Pathology, Clinical Pathology, Forensic Pathology.

16     Q.  And it's the American Board that does all three

17  of those?

18     A.  Yes.  Normally --

19     Q.  Do you have --

20     A.  -- the examinations for anatomic path and

21  clinical path are taken sort of simultaneously.  You

22  cannot be eligible to sit for examinations in forensic

23  path until you at least have certification in anatomic

24  pathology.

25     Q.  And when did you sit for the boards in forensic

PLAINTIFFS' EXHIBITS 010391

1   pathology?

2        A.  You know, I don't remember.  I think you have a

3   copy of my CV here somewhere.  It should be on there.

4        Q.  Well, did you have to sit for a board or were

5   you grandfathered in?

6        A.  No, no, I sat for the boards.  I took the

7   boards.  Passed the board.

8             The grandfather business was back many, many

9   years ago, people would get certified without

10  examination.  I took the -- I took and passed the

11  forensic path exam.

12            MR. MORIARTY:  Okay.  And I have -- your CV

13  was --

14            Madam Court Reporter, if you want to open the

15  packet with the exhibits.  Exhibits 1 through 15 are the

16  exhibits from the first deposition.

17            (Discussion off the record.)

18  BY MR. MORIARTY:

19       Q.  So No. 6 in that stack, Doctor, is your CV.

20            MR. ERNST:  Are there two copies there of the

21  same thing?

22            MR. MORIARTY:  I assumed you guys would have

23  these, so I think I only sent one.

24            It's way up towards the front, Doctor.

25            MR. ERNST:  (Indicating.)

```
 1        A.  Yes.

 2   BY MR. MORIARTY:

 3        Q.  Okay.  So first of all, have you updated your

 4   CV at all since --

 5        A.  No --

 6        Q.  Okay.

 7        A.  -- I haven't, no.

 8        Q.  So show me on here where it tells me when you

 9   took the forensic path board.

10        A.  Okay.  Down at the bottom of the first page it

11   says "certified in forensic pathology --

12        Q.  Got it.

13        A.  -- by --

14        Q.  Okay.

15        A.  -- American Board of Pathology May 1973."

16        Q.  All right.  Thank you.

17             Have you had any opportunity in the last two

18   years to go back and figure out how many times you may

19   have diagnosed digoxin toxicity as a cause of death?

20        A.  No.  I don't know.

21        Q.  Okay.

22             What's going on, Don?

23             MR. ERNST:  Nothing.

24   BY MR. MORIARTY:

25        Q.  How many times have you testified in a civil
```

PLAINTIFFS' EXHIBITS 010393

1    case that a drug either caused or did not cause a death?

2              MR. ERNST:  A drug?  Objection.

3              You can go ahead and answer the question.

4              MR. MORIARTY:  Yes.

5         A.  I don't know.

6    BY MR. MORIARTY:

7         Q.  Have you ever done it in a civil case?

8              MR. ERNST:  Objection.

9              You can go ahead and answer the question.

10        A.  You know, I think I have.  But I couldn't give

11   you a time and date or tell you what the drug was.

12   BY MR. MORIARTY:

13        Q.  All right.  In how many criminal cases do you

14   believe you have testified that a drug either caused or

15   did not cause a death?  Criminal case.

16        A.  That's sort of a rare occurrence.  It usually

17   is in regard to opiates administered by a second party.

18   It's a rare phenomenon.  You know, it may have happened

19   three to five times.  Again, I can't remember any

20   specifics.

21        Q.  Okay.  In those rare times when that has

22   happened, was there also a toxicologist who testified?

23   Excuse me.

24        A.  You know, I don't recall whether the

25   toxicologist testified.  It may very well be that I

PLAINTIFFS' EXHIBITS 010394

1   testified about the results reported in a toxicology

2   report.

3        Q.  All right.  Now, when you say "opiates," I

4   don't know the answer to this, is cocaine considered an

5   opiate or not?

6        A.  It is not.  We are talking about -- mostly we

7   are talking about morphine base from heroin.  Heroin --

8        Q.  Have you ever --

9        A.  -- being diacetylmorphine.

10       Q.  Have you ever testified that cocaine was a

11  cause of death?

12       A.  Yes.

13       Q.  Okay.  Do you know how many times you have done

14  that?

15       A.  In a criminal case?

16       Q.  Yes, sir.

17       A.  Again, I think that would be a rare occurrence.

18       Q.  Okay.  In your practice as a pathologist, do

19  you ever consult with hospital pharmacists about drug

20  issues?

21            MR. ERNST:  Objection.

22            You can go ahead and answer the question.

23       A.  No.

24  BY MR. MORIARTY:

25       Q.  These investigators that you deal with who work

PLAINTIFFS' EXHIBITS 010395

Page 100

1    in the sheriff's department, are they trained to ask

2    families sort of what happened the day of the death and

3    questions about, you know, were there any unusual

4    medical conditions, things of that nature?

5         A.  Yes.

6         Q.  Do you rely on those investigators as part of

7    your conclusion about cause of death?

8         A.  Yes.

9         Q.  Obviously among other things, but that's

10   something that you do rely on; correct?

11        A.  Yes.

12        Q.  In this case, and whether you use Exhibit 1 in

13   your stack, or Exhibit 7, both of which are copies of

14   the sheriff's investigation --

15             MR. ERNST:  What is it that you want?  You want

16   Exhibit 1 or Exhibit 7?

17             MR. MORIARTY:  Either one.  I think they are

18   the same.  It's the Sheriff's Summary of Investigation.

19             THE WITNESS:  Yes.

20   BY MR. MORIARTY:

21        Q.  Did any of your investigators elicit history

22   from the McCornack family about visual or

23   gastrointestinal problems within a day or two of Mr.

24   McCornack's death?

25             MR. ERNST:  Objection.  The document speaks for

PLAINTIFFS' EXHIBITS 010396

Page 101

1   itself.

2        A.  To my memory, there was some reporting of a

3   bloating which, you know, sounded like some sort of

4   gastrointestinal stress.

5   BY MR. MORIARTY:

6        Q.  Can you show me that in Exhibit 1, please?

7            MR. ERNST:  Objection.  He didn't say it came

8   specifically from Exhibit 1.

9            MR. MORIARTY:  Well, I asked if his

10  investigators elicited it, so it should be in Exhibit 1.

11  That's what I'm asking about.

12           MR. ERNST:  Objection, argumentative.

13       A.  You know, I don't see it there.

14  BY MR. MORIARTY:

15       Q.  Okay.

16       A.  I'm not sure where it came from, but I

17  recall --

18       Q.  Have you -- since October of 2009 when I took

19  your deposition, have you read the deposition testimony

20  of Kathy McCornack?

21       A.  No.  No, I haven't.

22       Q.  All right.  Now I believe at the last session

23  of your deposition you had some books with you.  One of

24  them is marked Exhibit 12.

25       A.  Yes.

PLAINTIFFS' EXHIBITS 010397

1          Q.  And if you look at Exhibit 12, on page 1066 --

2     the numbers are in the upper left-hand corner, Doctor.

3          A.  Yeah, I've got it.

4          Q.  In the second column --

5          A.  Yes.

6          Q.  -- first full paragraph it says "anorexia,

7     nausea, and vomiting, which are among the earliest signs

8     of digitalis intoxication, are caused by direct

9     stimulation of centers in the medulla and are not of

10    gastrointestinal origin."

11             Do you see that statement?

12         A.  Yes.

13         Q.  Do you have any reason to disagree with it?

14         A.  No.

15         Q.  And then further towards the end of that

16    paragraph it says "chronic digitalis intoxication may be

17    insidious in onset and characterized by exacerbations of

18    heart failure, weight loss, cachexia, neuralgias,

19    gynecomastia, yellow vision, and delirium."

20             Did I read that correctly?

21         A.  I'm trying to find it.

22         Q.  It's toward the end of that paragraph.

23         A.  Yeah.

24             MR. ERNST:  On what page?

25             MR. MORIARTY:  1066.

1             THE WITNESS:  It's on page 1066.

2             MR. ERNST:  Okay.

3             THE WITNESS:  And it's --

4    BY MR. MORIARTY:

5        Q.  Do you have any reason --

6        A.  Yeah, it sounds reasonable to me, yeah.

7        Q.  Okay.  And the investigators in this case did

8    not elicit a history of anorexia, nausea, vomiting,

9    yellow vision, weight loss, et cetera, did they?

10       A.  No.

11            MR. ERNST:  Objection.  No foundation.

12            You are asking whether or not the investigators

13   did.  It's a speculative issue.  I'll object.

14   BY MR. MORIARTY:

15       Q.  Is it in their report that they provided to

16   you, Dr. Mason, that they did elicit such a history?

17            MR. ERNST:  Objection, no foundation.

18            You can go ahead and answer the question.

19       A.  No.

20            In response to your question, you might want to

21   read the next sentence on that paragraph.

22   BY MR. MORIARTY:

23       Q.  You are talking about at 1066?

24       A.  Yeah.  The next sentence says "digitalis-toxic

25   cardiac arrhythmias precede extracardiac

PLAINTIFFS' EXHIBITS 010399

1   (gastrointestinal or central nervous system) toxicity in

2   about one half of cases."  So --

3       Q.  Does --

4           MR. ERNST:  He is not done yet.

5           MR. MORIARTY:  Okay, I'm waiting.

6       A.  So, you could very well have a digoxin caused

7   arrhythmia and not have the symptoms that you have

8   spoken of.

9   BY MR. MORIARTY:

10      Q.  Does the book say lethal cardiac arrhythmias?

11      A.  Well, it doesn't say "lethal," but it says

12  toxicity, so toxicity is something that could be

13  associated with a fatal result.

14      Q.  Do you have any clinical experience in the

15  number of times in which fatal cardiac arrhythmias

16  precede all of the prodromal symptoms described in this

17  book?

18      A.  No, I don't have any such experience.

19      Q.  Would you defer to a cardiologist on that

20  subject?

21          MR. ERNST:  Objection.

22      A.  Yes.

23          MR. ERNST:  For what purpose?  But objection.

24          You can go ahead and answer the question.

25      A.  Yeah, I'd defer to a treating cardiologist,

1    sure.

2    BY MR. MORIARTY:

3         Q.   Okay.  Is there a toxicologist on staff at

4    Santa Cruz County?

5         A.   No.

6         Q.   How often do you consult with toxicologists as

7    part of your practice?

8         A.   Extraordinarily infrequently.

9         Q.   And when you do, who are they?

10        A.   Usually they would be somebody at NMS.

11        Q.   Okay.  So you would not pick a toxicologist

12   practicing in central California, you would pick a

13   toxicologist associated with a laboratory who had done

14   work for you?

15        A.   Yes.  Prior --

16        Q.   Okay.

17        A.   -- to my use of NMS Laboratories there was a

18   group in Alameda County that had their own toxicology

19   service.  And the name of the toxicologist escapes me

20   now, but he was someone I knew.  He had either done or

21   supervised the tests that we had sent to him on our

22   specimens, and I used to talk to him.

23        Q.   Okay.  Have you ever testified about postmortem

24   redistribution of any drug?

25        A.   No.

1      Q.  Not even on cross-examination?

2      A.  Well, in this case I think it's come up

3  significantly, but I don't recall another case where

4  there was some significant issue regarding postmortem

5  redistribution.

6      Q.  All right.  Have you been to any seminars that

7  you can recall in the past five years at which

8  postmortem toxicology was a subject, including PMR?

9      A.  No.

10     Q.  Have you ever taught about PMR?

11     A.  No.

12     Q.  Have you ever been asked to?

13     A.  No.

14     Q.  Can you identify a single piece of peer

15  reviewed medical literature that says that digoxin in

16  peripheral blood specimens does not undergo any

17  postmortem redistribution?

18         MR. ERNST:  Objection.

19         But you can go ahead and answer the question.

20     A.  No.  I don't know of any such article.

21  BY MR. MORIARTY:

22     Q.  All right.  Are you aware of any peer reviewed

23  medical literature which indicates a scientifically

24  reliable calculation to back-calculate from a postmortem

25  digoxin level to an antemortem digoxin level?

PLAINTIFFS' EXHIBITS 010402

1           MR. ERNST:  Objection.

2           You can go ahead and answer the question.

3       A.  Yes.  I have seen such literature, yes.

4   BY MR. MORIARTY:

5       Q.  Can you identify any of it for me?

6       A.  I don't recall.

7       Q.  In the course of your practice, have you had

8   cases where cocaine was the cause of death?

9       A.  Yes.

10      Q.  Was cocaine identified in postmortem blood

11  sample?

12      A.  Yes.

13      Q.  Is there any therapeutic level in man for

14  cocaine?

15      A.  I'm sure there is.  It's only used in

16  anesthesia.  There is no parenteral administration of

17  cocaine that I'm aware of that's in medical practice.

18      Q.  Okay.  So in a postmortem specimen, if the

19  question was whether cocaine played a role in the death,

20  would it be necessary to quantify the cocaine level?

21          MR. ERNST:  Objection on the issue of cocaine.

22          Can I have a continuing objection on this

23  issue?  It's not -- so I don't have to continually

24  interrupt you, Mr. Moriarty.

25          MR. MORIARTY:  Yes.

1          MR. ERNST:  Thank you.

2     A.  Yes.  It would be necessary to quantify the

3  cocaine if one were going to attribute death to a

4  cocaine level, yes.

5  BY MR. MORIARTY:

6     Q.  Okay.  Do you have a copy of your first

7  deposition in this case?

8     A.  Yes.

9     Q.  Have you reviewed it before today?

10    A.  Yes.

11    Q.  Okay.  Could you turn for me to page 54.

12    A.  Okay.

13    Q.  And if you go down to line 16, and you can read

14  as much of this page as you want after I ask you this

15  question.

16          We were talking about postmortem

17  redistribution, and you said, at line 16 through like

18  19, "as I said before several times, I think it would be

19  more of a prominent factor with heart blood and less

20  with peripheral blood."

21          Do you see that?

22    A.  I see it.

23    Q.  Okay.  What I want to find out from you right

24  now is whether, in your opinion, peripheral blood

25  undergoes no postmortem redistribution with digoxin or

PLAINTIFFS' EXHIBITS 010404

1   whether it's just less than heart blood.

2        A.  I would think --

3            MR. ERNST:  Go ahead.  There is an objection to

4   the form of the question, but go ahead.

5        A.  I would think it would be less.

6   BY MR. MORIARTY:

7        Q.  Okay.  And do you have any peer reviewed

8   medical literature that tells you how to quantify it in

9   terms of how much less?

10       A.  No, I don't have any.

11       Q.  All right.  Do you have an opinion from your

12  own experience as to how much less a peripheral blood

13  specimen of digoxin would redistribute versus a central

14  blood or a heart blood sample?

15           MR. ERNST:  Objection.

16           You can go ahead and answer the question, if

17  you can.

18       A.  I don't know how much less.  It's just the

19  biological situation where you have aliquots of blood in

20  the heart chambers and there is ready access to the

21  chambers of the heart, which with the particular drug --

22  we are talking about digoxin here, are we?

23  BY MR. MORIARTY:

24       Q.  Yes, sir, yes, sir.

25       A.  With digoxin bound to the cardiac muscle, so I

1   -- from a common sense point of view, I would think a

2   heart chamber specimen would be a less reliable measure

3   of an antemortem level than peripheral blood.

4        Q.  Okay.  Is there any reason why you did not draw

5   a vitreous sample in this case?

6        A.  You know, from my reading I recall that

7   vitreous samples were very difficult to interpret as

8   regarding -- in regard to digoxin.

9        Q.  Are you done with your answer?

10       A.  Yes.

11       Q.  Okay.  Well, when you were doing the samples in

12   this case, at the time you didn't even know you were

13   going to be looking for digoxin, so let me ask the

14   question a different way; okay?

15            Do you routinely draw vitreous samples?

16       A.  No, I don't.

17       Q.  Do you ever?

18       A.  Sometimes I do, yes.

19       Q.  Had you done any research regarding vitreous

20   levels of digoxin prior to the performance of this

21   autopsy in March 2008?

22       A.  No.

23       Q.  How often do you draw more than one blood

24   sample when you do an autopsy?

25       A.  I usually take at least 20 ML of blood.  And

1    that's what I take.  In addition I take urine and liver.

2         Q.  Do you believe you took 20 ML in this case?

3         A.  I think so.

4         Q.  Okay.  So my question is -- well, I'll ask it a

5    different way:  Do you ever take more than one sample?

6    In other words, a certain amount from, say, a femoral

7    vein and a certain amount from the heart?

8         A.  No, not usually.

9         Q.  Is your -- is your routine to draw your

10   specimen from the axillary vein?

11        A.  Yes, it is.

12             You know, if -- it may be because of postmortem

13   changes that you can't get an adequate sample from an

14   axillary vein, in which case I might very well go to the

15   aorta.

16        Q.  Okay.  Do you know, from a forensic point of

17   view, what the difference is between a serum sample and

18   a whole blood sample taken after death, from a

19   quantification standpoint?

20        A.  With regard to what drug?

21        Q.  It's a very bad question, let me ask it again.

22             When a patient is alive, when you draw levels

23   of, say digoxin, you are drawing serum levels; correct?

24        A.  Correct.

25        Q.  When somebody is dead all you can draw is

PLAINTIFFS' EXHIBITS 010407

1    what's known as a whole blood sample; correct?

2        A.  Correct.

3        Q.  And I'm not asking you about timing or anything

4    like that, but is there a difference between serum and

5    blood in the assessment of the quantification of a drug

6    level of digoxin?

7            MR. ERNST:  Objection.

8            You can go ahead and answer the question.

9        A.  Yes, I would think there would be.

10   BY MR. MORIARTY:

11       Q.  And what is your understanding of what the

12   difference would be?

13       A.  I don't know.

14       Q.  Would the level typically be higher in a whole

15   blood specimen than it would in a serum specimen?

16       A.  I think it probably would be, yeah.

17           MR. MORIARTY:  All right.  All right.  I was

18   asking you about the axillary vein.

19           Ms. Court Reporter, there is a folder called

20   Pictures, Exhibits 29, 30 and 31.  There is an extra

21   copy for Don.  Could you give them to Don and the

22   witness, please.

23           THE REPORTER:  Of course.

24   BY MR. MORIARTY:

25       Q.  Do you have those in front of you, Doctor?

1      A.  Not yet.

2          MR. ERNST:  Oh --

3   BY MR. MORIARTY:

4      Q.  Do you have them now?

5          MR. ERNST:  I'm sorry.  I thought they were all

6   supposed to be -- the court reporter was going to give

7   him copies.  I'm sorry, I misunderstood.

8          MR. MORIARTY:  Don, there should have been one

9   for you and one for the doctor.

10         MR. ERNST:  Right.  But the court reporter gave

11  them to me and I've now given them to witness, Exhibits

12  29, 30, 31.

13  BY MR. MORIARTY:

14     Q.  Do you see these, Doctor?

15     A.  Yes, I see them.

16     Q.  All right.  These are three -- just for the

17  record, these are three different anatomical drawings of

18  the area of the axillary vein; correct?

19     A.  Yes.

20     Q.  From your many years of experience, is any one

21  of these three more accurate than the others?

22     A.  No. 2, I think, is a little bit more

23  physiologic.

24         No. 30, I'm sorry.

25  BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 010409

1      Q.  30?

2          MR. ERNST:  30.

3      A.  Yes.

4  BY MR. MORIARTY:

5      Q.  So let's look at 30.

6          Would it be fair for me to say that the

7  axillary vein begins, or branches, at the terminus, so

8  to speak, of the right subclavian vein in this drawing?

9      A.  Yes.

10     Q.  And that that right subclavian branches to

11 become the axillary and the cephalic; correct?

12     A.  Yes.

13     Q.  And then further towards the arm in this

14 drawing the axillary branches to become the brachial and

15 the basilic veins; correct?

16     A.  Basilic, yeah.

17     Q.  All right.  So in your experience, how long is

18 the axillary vein?

19     A.  Could be six -- something like six inches.  It

20 would depend on the anatomy of the person, how big a

21 person they were.  You know, if you are looking at a

22 small person, it would be less.

23     Q.  The size of these veins is variable depending

24 on the person; is that correct?

25     A.  Yes, to some degree, sure.

Page 115

1      Q.  And does the precise location of these
2  branchings vary from person to person?
3      A.  It can vary somewhat.  Venous anatomy is a
4  little bit more variable than arterial anatomy.
5      Q.  All right.  So tell me where -- what dissection
6  you would do and where you would access the axillary
7  vein for purposes of your postmortem blood draw?
8      A.  It would be probably pretty close to its
9  bifurcation point.
10     Q.  The proximal or distal bifurcation point?
11     A.  The proximal.
12     Q.  All right.  So --
13     A.  No, you know, somewhere in between, you know,
14  the -- it would sort of be on a level with the shoulder
15  joint.  If you draw a line down through the shoulder
16  joint, you know, that's what you are going to get.
17     Q.  Okay.  All right.
18         So if the patient, you know, the decedent on
19  your mortuary slab or your autopsy table, if you were
20  going to do the dissection, you would be going into the
21  shoulder?
22     A.  Into the armpit.  The axilla.
23     Q.  Okay.  All right.
24         And then you are going to up towards the
25  shoulder, or are you going in towards the chest?

Page 116

1        A.   You make a cut up towards the shoulder joint.

2        Q.   Okay.  How much time have you spent meeting

3   with Mr. Ernst since your deposition in October of 2009?

4        A.   Today was the first time I've seen him since

5   the deposition.

6        Q.   How many times have you spoken on the phone?

7        A.   In the past week, twice maybe.

8        Q.   Okay.  Since your deposition in October of

9   2009, what additional material have you reviewed

10  regarding this case?

11       A.   I looked at a pharmacology book to refresh my

12  memory of the physiology of digoxin.

13       Q.   What book was that?

14       A.   It's a Lange publication, Katzung and Trevor's

15  Pharmacology Examination and Board Review.  Publication

16  date is -- the latest edition is 2005.

17       Q.   Okay.  Is there anything else that you have

18  reviewed since your deposition in October of 2009?

19       A.   I looked at some statements of various

20  witnesses, and I just had an opportunity to sort of scan

21  the depositions of Dr. Amy McMaster and Keith Gibson.

22       Q.   Their depositions or their written reports?

23       A.   Both.

24       Q.   Okay.  Have you seen the deposition of Dr. Lemm

25  or Dr. Von Dollen?

PLAINTIFFS' EXHIBITS 010412

1        A.   No, I haven't seen those.

2        Q.   What about Dr. Barbieri from NMS Labs?

3        A.   No, I haven't seen that.

4        Q.   What about Matthew McMullen from NMS labs?

5        A.   No.

6        Q.   Have you seen any testimony or report from a

7   toxicologist in Denver named Kennon Heard?

8        A.   Repeat that name, please.

9        Q.   Kennon Heard, H-e-a-r-d.

10       A.   No, I have not.

11       Q.   Have you seen any reports or testimony from an

12  internist in Illinois named Bill Galanter,

13  G-a-l-a-n-t-e-r?

14       A.   No.

15       Q.   Have you reviewed any medical literature other

16  than the pharmacology book you identified?

17       A.   No, not really.

18       Q.   All right.  So let's get back to the first

19  stack of exhibits.  Exhibit -- let's go to Exhibit 5.

20            Are you at Exhibit 5?

21       A.   What is it?

22       Q.   It's the amended autopsy report.

23            MR. ERNST:  They are not marked real well, Mr.

24  Moriarty.

25       A.   Okay, in my own --

1  BY MR. MORIARTY:

2      Q.  It should have an exhibit sticker in the lower

3  right-hand corner.

4      A.  Yeah, I've got it.

5      Q.  Okay.  Flip back to the NMS reports, please.

6      A.  (Witness complying.)

7          Yes.

8      Q.  The first of these is dated April 16, 2008; is

9  it not?  The first NMS report.

10     A.  Yeah, I believe so.  Yes.

11     Q.  Okay.  Do you have that there?

12     A.  Yes.

13     Q.  All right.  And in this specimen diltiazem was

14  identified at 630 nanograms per milliliter; is that

15  correct?

16     A.  That's correct.

17     Q.  At no point in either your first autopsy or

18  your amended autopsy, did you ever identify diltiazem as

19  a potential cause of death; is that correct?

20     A.  Correct.

21     Q.  Have you amended the autopsy or death

22  certificate since early October 2009?

23     A.  No.

24     Q.  All right.  In the second NMS toxicology

25  report, which is a couple pages after the one I just

PLAINTIFFS' EXHIBITS 010414

1    asked you about, is June 24, 2008; correct?

2         A.   Correct.

3         Q.   And this is the one that has digoxin in it; is

4    that right?

5         A.   Yes.

6         Q.   Now, if you go back to Exhibit 1, the Summary

7    of Investigation by the sheriff's office.

8         A.   Yes.

9         Q.   To the best of your knowledge, this document

10   has not been changed since the time you changed the

11   autopsy and death certificate, has it?

12        A.   I don't think so, no.

13        Q.   All right.  In the lower left-hand column it

14   looks -- I'm sorry, the lower left-hand corner it looks

15   like there is a date of August 26, 2008.

16             Do you see that?

17        A.   No.  Are you referring to the investigation

18   report?

19        Q.   Yes, sir.  First page of Exhibit 1, lower

20   left-hand corner.  Looks like an initial and then the

21   date 8/26/08.

22             Do you see that?

23        A.   Yeah, yeah.

24        Q.   Okay.  Now by 8/26/08 the investigator had both

25   toxicology results and your autopsy report; correct?

1      A.  Yeah.

2           MR. ERNST:  Matt, before you go -- Matt, before

3      you go, we have been going about an hour and I have been

4      drinking coffee and I would like to take a short

5      five-minute comfort break.

6           MR. MORIARTY:  Can I just ask one more

7      question?  Or is it urgent?

8           MR. ERNST:  Well, at my age it's urgent.

9           MR. MORIARTY:  Okay.  That's fine.

10          MR. ERNST:  Thank you.

11          MR. MORIARTY:  Five minutes?

12          MR. ERNST:  Five minutes.

13          (Break taken.)

14     BY MR. MORIARTY:

15     Q.  So, Dr. Mason, what I was trying to figure out

16     is when you did your first autopsy report, which is

17     Exhibit 2, did you have either of the two toxicology

18     reports?

19     A.  No.  Obviously the toxicology report comes

20     after the autopsy report.  The toxicology specimens are

21     obtained during the course of the autopsy.

22     Q.  Yes, but I don't know whether you, as a matter

23     of practice, hold on the final version of this till you

24     have received some toxicology.

25     A.  I can't remember.

PLAINTIFFS' EXHIBITS 010416

1      Q.  All right.

2      A.  I might very well have signed that out prior to

3  the toxicology report.  I sometimes do that.

4      Q.  Okay.  Okay.  And just so I'm correct, there is

5  no change in the autopsy report itself between Exhibits

6  2 and 5 --

7      A.  No.

8      Q.  -- other than the first page; correct?

9      A.  Correct.

10         MR. MORIARTY:  I'm getting a lot of

11  interference.

12         THE REPORTER:  It's the coffee maker, it just

13  stopped.

14         MR. ERNST:  I don't know why it's going, Matt,

15  forgive me.

16         MR. MORIARTY:  Okay.

17         MR. ERNST:  The interference was not

18  intentional.

19         MR. MORIARTY:  That's fine.

20      Q.  Have you ever spoken with Kathy McCornack, Dr.

21  Mason?

22      A.  No.

23      Q.  Have you ever spoken with either Dr. Lemm or

24  Dr. Von Dollen?

25      A.  No.

PLAINTIFFS' EXHIBITS 010417

1      Q.  Have you ever consulted with a toxicologist

2  about this case since you did the autopsy?

3      A.  No.

4      Q.  Would it be fair for me to say that the only

5  person that you discussed the substance of this autopsy

6  with, other than when you and I have been on the record,

7  has been Mr. Ernst?

8      A.  Yes.

9      Q.  Do you know that Mr. McCornack was taking a

10  drug called Prilosec?

11      A.  I don't recall that I know it -- that I knew

12  that at the time.  You know, usually I would look at any

13  medications that were in the possession of the patient

14  at the time of death.  And the investigators usually

15  make out a list of medications.

16          I don't recall whether I knew that he had

17  Prilosec or not.

18      Q.  And I may have misspoken, he may have been on

19  Prevacid, which could be a different -- slightly

20  different medication.

21          But what is Prevacid for?

22      A.  I believe they are H2 inhibitors.  I use

23  Prilosec.

24      Q.  But what are they for, commonly?

25      A.  Hyperacidity of the stomach.

1       Q.   It's like gastroesophageal reflux or --

2       A.   Gastroesophageal reflux can occur during sleep

3    if you have got hyperacidity, yeah.

4       Q.   Okay.  Does hyperacidity ever cause bloating?

5       A.   You know, speaking personally, and having the

6    problem, I can't recall that it ever does, no.

7       Q.   Does it cause GI distress?

8       A.   Oh, yes.

9       Q.   Okay.  If somebody is not a smoker, and they

10   smoke a cigar, can they get nauseous or get an upset

11   stomach?

12          MR. ERNST:  Objection.

13          You can go ahead and answer the question.

14      A.   Yes, they could.

15   BY MR. MORIARTY:

16      Q.   All right.  What's the -- if you know, what's

17   the mechanism by which that can occur?

18      A.   You inhale, or raise your blood level of carbon

19   monoxide, for one.  You are inhaling combustion

20   products.

21          And then nicotine is a potent vasoconstrictor,

22   to my memory, so, you know, some combination of those

23   effects, perhaps.

24      Q.   Okay.  Do you know whether or not Dan McCornack

25   smoked a cigar on the 22nd of March 2008?

PLAINTIFFS' EXHIBITS 010419

Page 124

1      A.   I have no information on that.

2      Q.   All right.  If he did, assuming he did, is that

3    a possible explanation for any GI upset that he may have

4    had?

5      A.   It could be, it could be a contributing factor,

6    yeah.

7      Q.   Okay.  Can -- can the consumption of beer cause

8    gastrointestinal symptoms?

9      A.   It could, yes.

10     Q.   Including bloating?

11     A.   Yes.  It certainly has a certain amount of

12   carbon dioxide in it, it could cause some bloating

13   effect, sure.

14     Q.   All right.  What is myocardial fibrosis?

15     A.   It's fibrous tissue noted within the

16   myocardium.

17     Q.   All right.  What can cause it?

18     A.   Anoxia, chronic anoxia could cause it.

19          If it's focal, if you have got a major scar,

20   then that would be an indication of myocardial -- prior

21   myocardial infarction that has healed.

22     Q.   Well, in this autopsy you describe mild

23   diffusely distributed myocardial fibrosis.

24     A.   Yes.

25     Q.   What is the most likely cause of that?

PLAINTIFFS' EXHIBITS 010420

1      A.   Probably anoxia.

2      Q.   Which means reduced oxygen to the heart muscle?

3      A.   Yes.

4      Q.   Which could be from an MI, or what?

5           MR. ERNST:  Objection.

6           But go ahead.

7      A.   Well, you know, he has got an enlarged heart.

8  It's a 500 gram heart.  He has got coronary arteries

9  that supply blood to that increased muscle mass, so

10 there can be some overall, you know, lack of optimal

11 oxygen levels in the myocardium.  And I think I recorded

12 it as mild.

13 BY MR. MORIARTY:

14     Q.   I believe I read directly it says mild

15 diffusely distributed myocardial fibrosis.

16     A.   Yes.

17     Q.   So can myocardial fibrosis be arrhythmogenic?

18     A.   Yes.  Yes, it could.

19     Q.   Can left ventricular hypertrophy be

20 arrhythmogenic?

21     A.   Yes.

22     Q.   Is atrial fibrillation itself an arrhythmia?

23     A.   Yes.

24     Q.   Can coronary arthrosclerosis, mild to moderate,

25 cause arrhythmias?

PLAINTIFFS' EXHIBITS 010421

1      A.  Yes.

2      Q.  Without an actual microscopic section, what is

3  your confidence level in ruling out a myocardial

4  infarction in this case?

5      A.  You know, after doing this work for about -- at

6  that time, I don't know, now it's 30 years, it's fairly

7  high.

8      Q.  Okay.  Do you know what HLA 27 is?

9      A.  It's a genetic disorder.  I don't specifically

10  know what it is, no.

11      Q.  Do you know anything about it and whether it

12  can cause arrhythmias and sudden cardiac death?

13      A.  No, not specifically.

14      Q.  Who is -- this guy's name -- I'm looking for

15  something in the autopsy.  Excuse me a minute while I

16  look for something here.

17          I think it's in Exhibit 4.  Yes, Exhibit 4.

18      A.  Yes.

19      Q.  Lower left-hand corner, who is Alan Burt?

20      A.  He is one of my three cops.  I've got a

21  sergeant and two deputies that are semi-permanent

22  coroner investigators.  It's a voluntary assignment.

23          They are afraid to arbitrarily assign people

24  that do not ask for the job because of psychological

25  trauma or what have you.  So Alan Burt is someone I've

1    worked with for about 25 years.  He originally was an

2    investigator, he made sergeant, and now he is in charge

3    of the coroner's section.

4         Q.  Is he a doctor?

5         A.  No, no.  He is a cop.

6         Q.  All right.  I would like you to turn to Exhibit

7    7 --

8         A.  (Witness complying.)

9         Q.  -- and go about two-thirds of the way back,

10   there is a report, letter report, from a Dr. Winkle on

11   the letterhead of Cardiovascular Medicine and Cardiac

12   Arrhythmias.  Single-spaced, typed, three-page report.

13           Can you let me know when you have found that?

14        A.  I will.

15           MR. ERNST:  I haven't found it yet, either.

16   BY MR. MORIARTY:

17        Q.  In my Exhibit 7 it's really about two-thirds of

18   the way back.  It's among the records that were faxed to

19   your office from Dr. Von Dollen.

20        A.  Yeah, I have it.

21        Q.  Okay.  Have you read this?

22        A.  Yes.

23        Q.  When was the last time you read this?

24        A.  I don't recall.

25        Q.  All right.  Were you aware from reading this

Page 128

1    that Mr. McCornack complained of chronic fatigue?

2         MR. ERNST:  Objection, vague as to time.

3    BY MR. MORIARTY:

4         Q.  Well, you can answer my question.

5              And if you don't remember, Doctor, and you want

6    me to point you to the places in this that say something

7    about fatigue, I would be happy to do that to save time.

8         A.  Yeah, go ahead.

9         Q.  All right.  So about two-thirds of the way

10   through that paragraph on the first page he is talking

11   about how he can feel when he has an irregular

12   heartbeat.

13             Do you see that?

14        A.  Yeah.

15        Q.  And then it says "he does feel that he is" --

16   it says "tried" but I assume it means "tired and

17   fatigued and not really a hundred percent."

18             Do you see that?

19        A.  Yeah.

20        Q.  And then under Impression on page 2, halfway

21   through No. 1, says "he has a lot of fatigue and lack of

22   energy, which he attributes to his atrial fibrillation."

23             Do you see that?

24        A.  Yes.

25        Q.  Do you know whether or not atrial fibrillation

PLAINTIFFS' EXHIBITS 010424

1    can cause chronic fatigue?

2        A.   I would think it could, yes.

3        Q.   All right.  Let's go back to page 1, about five

4    lines after where I was reading to you about the

5    fatigue.  It says "he pops his head up with a pillow at

6    night because he breathes better and has some

7    heartburn."

8            Do you see that?

9        A.   I see it.

10       Q.   And when patients prop their head up with

11   pillows and wear Breathe Right nasal strips and still

12   snore, is that a possible sign or symptom of -- I'm

13   blanking on the disease.

14       A.   You mean sleep apnea?

15       Q.   Obstructive sleep apnea.  Thank you.

16           MR. ERNST:  I'm going to object.

17           But go ahead.

18       A.   Yes.

19   BY MR. MORIARTY:

20       Q.   I mean, if you don't -- go ahead.

21       A.   It could be, yeah.

22       Q.   Okay.  All right.

23           And on the next page, do you see under

24   Medications it talks about -- Prevacid is item No. 4;

25   correct?

PLAINTIFFS' EXHIBITS 010425

Page 130

1      A.   Yes.

2      Q.   Under Social History it says "he uses

3   Copenhagen chewing tobacco."

4           Do you see that?

5      A.   I see it.

6      Q.   And then it says "quitting four months ago."

7           Do you see that?

8      A.   Yes.

9      Q.   "He has two to four beers daily.  He has three

10   cups of coffee daily."

11          Do you see that?

12     A.   Yes.

13     Q.   All right.  And then on the last page of this,

14   if you look at the paragraph numbered 2, it refers to

15   the "HLA 27 gene positive with relatively few symptoms

16   related to this."

17          Do you see this?

18     A.   Yes.

19     Q.   And are these all things that you would have

20   been aware of at the time you did your autopsy report?

21     A.   Yes, I think so.  I don't know exactly when we

22   got these records, whether they were available at the

23   time of the autopsy or not.

24          MR. MORIARTY:  Okay.  Could you please hand the

25   doctor and Mr. Ernst Exhibit 28.

1            THE REPORTER:  Okay.

2    BY MR. MORIARTY:

3         Q.  Have you ever seen this before?

4         A.  Yeah, I think so.

5         Q.  All right.  On the second page of the exhibit,

6    it's a letter from Susan Mauriello to the members of the

7    Board of Supervisors; correct?

8         A.  Correct.

9         Q.  And at the end of the second paragraph it says

10   "Dr. Mason is nationally and internationally recognized

11   for his expertise, particularly in the area of gunshot

12   wounds and firearm ballistics, blunt and sharp

13   instrument trauma and biomechanics."

14            Do you see that?

15        A.  Yes.

16        Q.  What is your national and international

17   recognition in these matters?

18            MR. ERNST:  Objection.

19            But you can go ahead.

20        A.  I participated with some people that I knew

21   from my Vietnam experience evaluating the lethality of

22   the M-16 rifle, which came into question.

23   BY MR. MORIARTY:

24        Q.  Okay.

25        A.  So, you know, it was a federal project and that

1    was the essence of the reputation.

2            Actually, I'm a firearms collector, shooter,

3    and I've done some casual experimentation.  That's it.

4        Q.  With ballistics gelatin, or something else?

5        A.  You know, when I participated in the federal

6    project, in the military project, we had ballistic

7    gelatin.  It's a very expensive material to deal with,

8    it's cumbersome, but yeah, we used it then.

9            MR. MORIARTY:  Okay.  Could you please hand Dr.

10   Mason and Mr. Ernst Exhibit 16.

11           THE REPORTER:  (Complying.)

12   BY MR. MORIARTY:

13       Q.  Dr. Mason, have you ever read this Vorpahl and

14   Coe article?

15       A.  I think I have at some remote time.  I knew Dr.

16   Coe.

17       Q.  Was he a pathologist or a toxicologist?

18       A.  No, he was a forensic pathologist.

19       Q.  All right.  At the bottom of the first page --

20   I'm sorry, on the second page, under Results, do you see

21   the Results section?

22       A.  Yes.

23       Q.  It says "postmortem intervals ranged from 1.0

24   to 22.4 hours, with a mean of 10.8 hours."

25           Do you see that?

Page 133

1      A.   Yes.

2      Q.   Was the postmortem interval in this case 78 or

3   79 hours?

4      A.   Yes, I believe it was.

5      Q.   All right.  The next sentence says, "compared

6   to antemortem levels, average postmortem serum digoxin

7   levels were significantly higher in samples taken from

8   the heart, subclavian vein, and femoral vein."

9           Do you see that?

10     A.   Yes.

11     Q.   All right.  And just so we are clear, in this

12  case the axillary vein from which you drew the blood

13  specimen is not one of the three locations that Vorpahl

14  and Coe used in their particular work; correct?

15     A.   Yes, that's true.

16     Q.   All right.  So I'd like you to go to page 333,

17  under Discussion.

18     A.   Yeah.

19     Q.   "It is clear from this investigation that

20  postmortem digoxin levels taken from cardiac blood,

21  venous blood or vitreous humour do not mirror the

22  antemortem levels.  Substantial increases in serum

23  levels occur following death, irrespective of the source

24  of the sample."

25           Did I read that correctly?

1        A.   Yes.

2        Q.   Do you agree with it?

3        A.   I don't know.  You know, I would like to see

4   their data, their numbers.

5        Q.   Well, if you go back one page --

6        A.   Page, yeah, I'm looking.

7        Q.   -- on table 2, that's the data within the

8   article.  Now, whether that's all the data, obviously we

9   don't know, but that's the data from which they drew

10  that conclusion.

11       A.   Yes.

12       Q.   So do you agree with their statement on page

13  333, that that's what their data showed?

14       A.   That's what their data showed, yes.

15            MR. MORIARTY:  All right.  Could you please

16  hand Dr. Mason and Mr. Ernst Exhibit 17.

17            THE REPORTER:  (Complying.)

18            MR. ERNST:  This has to do with interpretation

19  of excessive serum concentration in children?

20            MR. MORIARTY:  That's the article.

21            MR. ERNST:  You are maintaining that's relevant

22  to a 44-year-old man?

23            MR. MORIARTY:  It's a piece of literature, I'm

24  going to ask him about it.

25            MR. ERNST:  I'm going to object.  He hasn't --

1  unless he has considered it, I'm going to object to this

2  line of questioning.

3         Will you give me a continuing objection?

4         MR. MORIARTY:  Yes, sir.

5         MS. AHERN:  I'm going to object to speeches on

6  the record.

7         MR. ERNST:  She wants me to object, so I'm

8  going to object unless he's reviewed this before.  You

9  can ask him questions but I don't believe it's proper

10  subject for cross-examination.

11  BY MR. MORIARTY:

12     Q.  Okay.  Doctor, I want you to go -- first of

13  all, have you ever seen this before?

14     A.  No, I haven't read this before.

15     Q.  Do you know who Gideon Koren is?

16     A.  No.

17     Q.  I'd like you to go to the Discussion section.

18         MR. ERNST:  Mr. Moriarty, this is a three-page

19  article.  If you are going to ask him specific questions

20  I'm going to object unless he has got a chance to read

21  the entire article.

22         If you want to take that much time, you can,

23  but I'm going to object to the line of questioning.

24  It's an improper cross-examination.

25         MR. MORIARTY:  I've given you a continuing line

PLAINTIFFS' EXHIBITS 010431

1   of objections.

2          MR. ERNST:  Your co-counsel would not do that.

3   That's Ms. -- she would not agree to that.

4          MS. AHERN:  I didn't object to the continuing

5   objection.

6          MR. ERNST:  You told me you wanted my

7   objections on the record.

8          MS. AHERN:  No, just to the speech on the

9   record, that's all.

10  BY MR. MORIARTY:

11      Q.  In the Discussion section, halfway down there

12  is a sentence that begins "postmortem levels were

13  significantly."  I would like you to find that sentence.

14      A.  I've got it.

15      Q.  "Postmortem levels were significantly higher

16  than antemortem levels in all children studied.  These

17  results are consistent with previous reports, suggesting

18  that after death redistribution of digoxin takes place."

19          Do you agree with that statement?

20      A.  Well, that's their data.  That's what they

21  found.

22      Q.  Do these -- then the next sentence says, "these

23  results are consistent with previous reports, suggesting

24  that after death redistribution of digoxin takes place."

25          Do you agree with that?

Page 137

1           MR. ERNST:  I'm going to object.

2           You can go ahead and answer the question,

3    Doctor.

4       A.  Do I agree with it?  Is that your question?

5    BY MR. MORIARTY:

6       Q.  Yes, sir.

7       A.  It's their data, that's what they found.  I

8    would agree with them, yes.

9       Q.  Okay.  The last line says, "an attempt to prove

10   digoxin intoxication as a cause of death may be hampered

11   by the fact that postmortem levels may be 1.5 to 10

12   times higher than antemortem levels.  Consequently, one

13   cannot readily use these postmortem data to predict

14   antemortem concentrations."

15          Do you agree with that?

16          MR. ERNST:  I'm going to object.

17      A.  Well, in their data, and in children, they are

18   talking about a four-month-old child, I think that's a

19   little bit different from the 40-year-old man.  That's

20   what they found.

21   BY MR. MORIARTY:

22          MR. MORIARTY:  Okay.  Let's go to -- please

23   hand the doctor and Mr. Ernst Exhibit 18.

24          THE REPORTER:  (Complying.)

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 010433

1       Q.   Have you ever seen this before?

2       A.   I think you mentioned it in the prior depo.

3       Q.   Okay.  I didn't have the actual article with

4   me, though, so I'm going to ask you about it now.

5            On the first page, the second column, the first

6   full paragraph.

7            MR. ERNST:  Where are you?

8   BY MR. MORIARTY:

9       Q.   Second column, first full paragraph.

10           MR. ERNST:  I'm going to object to you

11   selecting particular items out of an article and asking

12   whether you agree or disagree.  It's out of context,

13   it's an improper line of cross-examination.

14           I'm placing my objection on the record so that

15   you know my reasons for objecting.

16   BY MR. MORIARTY:

17      Q.   It says, Doctor, "often, pathologists or

18   toxicologists are requested to estimate the amount of

19   drug present at the time of death, or the number of

20   tablets consumed."

21           Would you agree that pathologists or

22   toxicologists are sometimes asked to do that?

23      A.   Are we referring to a specific drug, or what?

24      Q.   I'm not right now, no.

25      A.   I wouldn't attempt to estimate the number of

1    tablets consumed from a level, no.

2         Q.  Okay.  Well, the sentence says pathologists or

3    toxicologists are requested to estimate the amount of

4    drug present or the number of tablets.  Do you agree

5    that sometimes pathologists and toxicologists are asked

6    to estimate -- excuse me -- the amount of drug present

7    at the time of death?

8              MR. ERNST:  Objection.  It's vague.

9              Go ahead and answer the question.

10        A.  I'm not sure what they mean.  You know, if you

11   are looking at a drug level in blood, the thing speaks

12   for itself.

13             If you are also -- one type of thing that we do

14   is to look at gastric contents, and you may see

15   identifiable residua of large amounts of drug capsules.

16   So, you know, that would tell you something.

17             If you decant gastric contents, in suicide

18   cases you can sometimes see, when you let the material

19   settle, a level of drug substance in the gastric fluid.

20   So we look for those things.

21        Q.  Did you do any analysis of the stomach residua

22   in this case?

23        A.  No.

24        Q.  All right.  The statement goes on to say that

25   "this assumes that the drug concentration found" --

PLAINTIFFS' EXHIBITS 010435

Page 140

1    excuse me -- "at postmortem examination is a reliable

2    estimate of that present at the time of death.  There is

3    a lack of evidence that such an extrapolation is

4    possible."

5            Do you agree with that statement?

6            MR. ERNST:  Objection.

7        A.  No, not really.

8    BY MR. MORIARTY:

9        Q.  Okay.  Let's go to page 284, which is the last

10   page of the text of the article.

11           The first sentence under Discussion says "these

12   six cases illustrate that it can be dangerous to attempt

13   to relate a drug concentration found at postmortem

14   examination to the antemortem circulating concentration

15   or to the antemortem dose received."

16           Do you agree with that?

17       A.  Yeah --

18           MR. ERNST:  I object.

19       A.  -- I'd have to read the paper.  You know, I

20   don't know what their data show or what the cases are

21   about.

22   BY MR. MORIARTY:

23       Q.  Okay.  Down further in that same column, the

24   last full paragraph in column one says "it is often

25   necessary to determine whether the drug concentration

PLAINTIFFS' EXHIBITS 010436

1   found at postmortem examination should be attributed to

2   either therapeutic ingestion or overdose.  This is very

3   difficult to determine because of the influences of

4   postmortem change."

5          Do you agree with that?

6          MR. ERNST:  I'm going to object.  This article

7   is about drugs in general.  It's irrelevant to the

8   particular issue.

9          You are asking him about excerpts from an

10  article that he has not completely read.

11  BY MR. MORIARTY:

12     Q.  Do you agree with it or not, Dr. Mason?

13     A.  I wouldn't agree with it.

14     Q.  That says "the use of postmortem/antemortem

15  ratios, or back extrapolation from a postmortem

16  concentration, is not recommended."

17          Do you agree or disagree?

18          MR. ERNST:  Same objections.

19     A.  You know, I don't know particularly what drug

20  they are referring to, and I have no way of evaluating

21  that sentence without at least reading the total

22  article.

23  BY MR. MORIARTY:

24     Q.  What -- what bench research or literature

25  research have you done regarding the reliability of

Page 142

1    postmortem blood samples of digoxin in predicting

2    antemortem levels?

3           MR. ERNST:  Are we talking about in his

4    lifetime?  In medical school?  In the last year, two

5    years?  And it calls for --

6           MR. MORIARTY:  My question --

7           MR. ERNST:  Calls for speculation and a

8    reciting of what he has learned over 50 years.

9           MR. MORIARTY:  My question was quite clear.

10    Q.  You can answer it, Doctor.

11           MR. ERNST:  Same objections.

12    A.  You know, I can't point to anything specific.

13    You know, I have seen some articles, I don't recall the

14    titles and authors.

15           MR. MORIARTY:  Okay.  Could you please hand the

16    doctor and Mr. Ernst Exhibit 19.

17           THE REPORTER:  (Complying.)

18    BY MR. MORIARTY:

19    Q.  You know, before I ask you about this article,

20    Doctor, can you pull out your deposition for me?

21    A.  Yeah.

22    Q.  At page 44, line 8, I asked "have you been

23    asked by Mr. Ernst or anyone else to attempt a

24    calculation of what Mr. McCornack's serum digoxin level

25    was at the time of or just before he died?"  And your

1   answer was "no."

2           Do you see that?

3       A.  Yes.

4       Q.  Have you since been asked by Mr. Ernst or

5   anyone else in his office to attempt a calculation of

6   Mr. McCornack's serum level, what it was at the time of

7   or just before he died?

8       A.  No.

9       Q.  All right.  Let's get back to Exhibit 19.

10          Have you ever seen this article before --

11      A.  No.

12      Q.  -- from the British Journal of Clinical

13  Pharmacology?

14      A.  No.

15      Q.  All right.  Let's go to -- let's just go to the

16  Conclusion, make this faster.

17          MR. ERNST:  I'm going to object.  The question

18  is asking about a conclusion of a 15-page or 17-page

19  article that he hasn't read, he is not familiar with,

20  and you are going to ask him questions about the

21  conclusions.  It's an improper use of literature in a

22  cross-examination setting.

23          MR. MORIARTY:  Okay.

24          MR. ERNST:  And objection.

25  BY MR. MORIARTY:

1      Q.   Doctor, it says "there is no reliable or

2   obvious connection between concentrations measured in

3   life and subsequent to death.  Consequently,

4   concentrations measured after death cannot generally be

5   interpreted to yield concentrations present before

6   death."

7           Do you agree with that statement?

8           MR. ERNST:  Objection.

9      A.   No.

10   BY MR. MORIARTY:

11      Q.   And what is the basis for your disagreement?

12      A.   You know, this is sort of stupid, this thing.

13   Most of our work, we are looking at antidepressants and

14   narcoleptic -- narcotic drugs that are used, and when

15   you have a sufficiently high level you attribute death

16   to that, especially when the rest of the autopsy shows

17   you nothing but brain swelling and pulmonary edema.

18           This is a bunch of shit.  You know, this is

19   contrary to the practice of most forensic pathologists,

20   it's absolute bullshit.

21      Q.   The -- in the rare occasions when you have had

22   to testify about opiates, for example, do you know

23   whether opiates undergo postmortem redistribution?

24      A.   Yes, I think they do.

25      Q.   Do you know who Derrick Pounder is?

1      A.  Who?

2      Q.  Derrick Pounder.

3      A.  I've seen his name in the literature rather

4  abundantly in regard to PMR.

5      Q.  Okay.  Do you know whether he is a reliable

6  authority on the subject?

7      A.  You know, I don't know the man at all.  I don't

8  know where he practices, or what kind of specialty he

9  has.  I don't know.

10     Q.  Okay.  Do you know who Cyril Wecht is?

11     A.  Yes, I know Cyril Wecht.

12     Q.  Is he considered to be a reliable authority in

13  your field?

14     A.  He is suspicious because he is also a JD.

15     Q.  Okay.  Does having a law degree make him any

16  less reliable an authority in pathology?

17     A.  I've met the man and talked to him.  Anything

18  he said, I'd want to see the quotes in the literature.

19     Q.  Okay.  Do you have his book from -- his 1983

20  book?

21     A.  Yeah, I think I do.  Yeah.

22         MR. MORIARTY:  All right.  Could you please

23  hand the doctor Exhibit 20.

24         THE REPORTER:  (Complying.)

25  BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 010441

1      Q.   This is Dr. Pounder's chapter from Dr. Wecht's

2   book.  It's called The Nightmare of Postmortem Drug

3   Changes.

4           Have you ever read this chapter?

5      A.   What's the title of Dr. Wecht's book?

6      Q.   I think it's Legal Medicine, or something like

7   that.

8      A.   I think I have the book.  I don't recall this

9   chapter.

10     Q.   Okay.

11     A.   I think essentially Pounder's thesis is that

12  you can't tell much of anything from doing postmortem

13  toxicology.

14     Q.   And do you disagree with Pounder on that point?

15     A.    It's not the mode of practice of most forensic

16  pathologists.  We depend on postmortem toxicology, along

17  with autopsy findings.

18     Q.   Well, certainly as you have gone through your

19  career you would want to stay current with the

20  literature and your colleagues to know the reliability

21  of various aspects of postmortem toxicology; is that

22  true?

23     A.    Yeah, and I think Pounder is out on the

24  periphery as far as his impression of the reliability of

25  postmortem toxicology, or the usefulness of postmortem

PLAINTIFFS' EXHIBITS 010442

1    toxicology in certifying a death.

2            You would want to know what kind of a practice

3    Dr. Pounder does.  Does he certify deaths?  I don't even

4    know if he is a forensic pathologist.

5            MR. MORIARTY:  Okay.  Let's -- could you please

6    hand the doctor and Mr. Ernst Exhibit 22.

7            THE REPORTER:  (Complying.)

8    BY MR. MORIARTY:

9        Q.  Have you ever seen this article by these series

10   of French authors?

11       A.  Yes, I've seen it.

12       Q.  Okay.  And in what circumstances have you seen

13   this?

14       A.  I don't recall.  I saw it -- I probably have a

15   copy of it in a file somewhere.

16       Q.  When you received Keith Gibson's deposition,

17   did the exhibits come with it?

18       A.  No, I don't think so.

19       Q.  Okay.  So the -- in the very beginning, in the

20   Abstract it says "post" -- the very first sentence in

21   the Abstract says "postmortem drug concentrations do not

22   necessarily reflect concentrations at the time of death,

23   as drug levels may vary according to the sampling site

24   and the interval between death and specimen collection."

25           Do you agree with that?

PLAINTIFFS' EXHIBITS 010443

1          MR. ERNST:  Objection.  You are asking a

2    specific question about a line in an article without

3    reference that he has read and reviewed the entire

4    article.  It's out of context.

5          With that objection, you can go ahead and

6    answer the question.

7      A.  You know, there is some validity to the

8    statement, you know, you would have to look at it in

9    reference to a particular case.  I don't know what to

10   say about it other than that.

11   BY MR. MORIARTY:

12     Q.  Okay.  Well, digoxin is known to redistribute

13   in the postmortem period; is it not?

14     A.  Yes.

15         MR. ERNST:  Objection, asked and answered.

16     A.  Yes, it is.

17   BY MR. MORIARTY:

18     Q.  All right.  Let's go to page 541, left column,

19   there is a section that says -- there is a section that

20   says Practical Consequences in Forensic Toxicology.

21         Do you see that?

22     A.  Yes.

23     Q.  The second sentence says, "it is very important

24   in postmortem testing to be able to compare

25   concentrations in several blood and tissue samples, even

1    if reference values for drug concentrations in tissues

2    are often missing."

3            Do you agree with that?

4        A.  You know, that would be ideal if you are doing

5    a research project.  If you are moving, say 200 corpses

6    down the chute in the course of a year, you cannot

7    afford to do that, and you don't have time to do it.

8        Q.  Okay.  Do you know Graham Jones from the

9    medical examiner's office in Edmonton?

10       A.  No.

11       Q.  Do you know whether he is a reliable authority

12   in forensic pathology?

13       A.  I don't know the man at all.  I don't know

14   anything about him.

15       Q.  Do you have Steven Karch's Postmortem

16   Toxicology of Abused Drugs book?

17       A.  Yes, I do.

18       Q.  All right.  And why do you have that book?

19       A.  I know Karch, and he has done some interesting

20   work.  I bought the book.

21           MR. MORIARTY:  Okay.  Well, let me ask you

22   about Exhibit 23, please.

23           THE REPORTER:  (Handing document to witness and

24   counsel.)

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 010445

1      Q.  Do you have that?

2      A.  Yes.

3      Q.  Okay.  On the first page of the text, second --

4   the last sentence of the second paragraph.

5           MR. ERNST:  What page?

6           THE WITNESS:  114.

7           MR. MORIARTY:  It's 114.

8           MR. ERNST:  Okay.

9   BY MR. MORIARTY:

10      Q.  Last sentence of the second paragraph.  It says

11   "many processes occur after death that can change drug

12   and alcohol concentrations, sometimes to a very large

13   extent."

14           Do you agree with that generally?

15           MR. ERNST:  I'm going to object that that is

16   referring to a number of different drugs, alcohol, not

17   necessarily digoxin.  I'm going to object.

18           You can go ahead and answer the question.

19   BY MR. MORIARTY:

20      Q.  Do you agree generally, Doctor?

21      A.  Without reading the whole section, I don't know

22   what he is talking about, you know.  "Many processes,"

23   like what processes?  Adding drug to a specimen?  You

24   know, what does he mean?

25      Q.  Let's go to page 123.  There is a section

PLAINTIFFS' EXHIBITS 010446

1    called Estimation of Amount Ingested from Blood Levels.

2         It says there, "given" -- are you there?

3    A.  I'm here.

4    Q.  "Given the foregoing discussion, it should go

5    without saying that using pharmacokinetic calculations

6    to try to estimate dosage, given a postmortem blood

7    concentration, is of virtually no value and can be

8    extremely misleading."

9         Do you agree or disagree?

10   A.  I don't know what he means.  "Estimate dosage."

11   Q.  In other words, trying to estimate what the

12   person ingested before they died.

13        MR. ERNST:  Objection.  You are interpreting

14   what this article said.

15        MR. MORIARTY:  Okay, that's fine.

16        MR. ERNST:  Objection.

17   A.  I -- you know, I would be more interested in

18   what the postmortem level was, and if it's of an

19   appropriate magnitude, one might use that in attributing

20   death to that particular drug, which is what most

21   forensic pathologists do, and any -- and the

22   accompanying autopsy findings.  So.

23   BY MR. MORIARTY:

24   Q.  Okay.

25   A.  So I'm not quite sure what he means here.

PLAINTIFFS' EXHIBITS 010447

1      Q.  All right.  So let's go to 6.4, which is the

2   next section.

3           "One question should be asked before attempting

4   to interpret postmortem drug concentrations.  Is the

5   concentration found likely to represent, at least

6   approximately, that present at the time of death?

7   Unfortunately, the answer is often a flat no, or at

8   least not necessarily."

9           Do you agree with that?

10          MR. ERNST:  I'm going to object.

11     A.  No -- without reading this, I'm not going to

12  make a comment on that.  Again, I would say it is

13  contrary to the usual practice in forensic pathology.

14          You know, again, if you can't come to any

15  conclusions, why is he with the office of the chief

16  medical examiner, and I see from his DABFT that he is a

17  certified forensic toxicologist?  What he is he doing up

18  there?  I mean, why is he doing the tests?

19  BY MR. MORIARTY:

20     Q.  Well, Doctor, there is a difference, certainly,

21  between identification and quantification in your

22  business; isn't that true?

23     A.  Yes.

24     Q.  Do you know Dr. Fred Apple?

25     A.  No.

1      Q.   At the Minnesota Department of Lab Medicine and

2   Pathology in Minneapolis?

3      A.   No.

4      Q.   Do you know anything about his reputation?

5      A.   No.

6           MR. MORIARTY:   Could you please hand Dr. Mason

7   Exhibit 24.

8           THE REPORTER:   (Complying.)

9   BY MR. MORIARTY:

10     Q.   It says here in the second paragraph, "the

11  scientific fact is that PMR occurs in both central

12  (heart) blood as well as in peripheral (femoral) blood,

13  as shown for numerous drugs in Table I."

14          Do you agree with that?

15          MR. ERNST:   I'm going to object.   This is a

16  letter to the editor of the Journal of Analytical

17  Toxicology.

18  BY MR. MORIARTY:

19     Q.   Do you agree with that, Doctor?

20          MR. ERNST:   And it is an improper use of

21  cross-examination based on literature that this doctor

22  has not read or reviewed.

23          With that objection, you may answer the

24  question.

25     A.   I don't know.   You know, I would have to read

PLAINTIFFS' EXHIBITS 010449

1    it.  I would like to read his accompanying references

2    and see what he is talking about.

3    BY MR. MORIARTY:

4        Q.  Okay.  Let me ask you just one more quote, then

5    I will stop asking you about literature.

6            On the next page, at the end of that paragraph

7    that spills over from the previous page, it says "when

8    heart or peripheral blood is drawn, it more likely than

9    not does not reflect the blood concentration at the time

10   of death, but reflects the combination of tissue-bound

11   drug that has been released into the blood/fluid that is

12   drawn at autopsy hours after death."

13           Do you agree with that?

14       A.  It's possible.

15       Q.  It's possible you agree?

16           MR. ERNST:  Objection --

17       A.  It's possible that it's true.

18   BY MR. MORIARTY:

19       Q.  Okay.  Well, the sentence says "when heart or

20   peripheral blood is drawn, it more likely than not does

21   not reflect the blood concentration," they are talking

22   about probability.

23           Do you agree or disagree?

24           MR. ERNST:  I object, no foundation.  You are

25   asking him to agree to an article that he hasn't read,

1    nor has he reviewed the data, nor is there any

2    indication this is peer reviewed.  This is a letter to

3    the editor.

4         A.  You know I --

5             MR. MORIARTY:  You have stated your --

6         A.  I don't know.  I would have to read the article

7    and maybe read some of the references that he is

8    referring to.

9             MR. MORIARTY:  Okay.

10        Q.  Well, Exhibit 27 should be the amended notice

11   to take your deposition, and I believe that was served

12   on you.  I hope it was.

13        A.  Yes, it was.

14        Q.  Did you bring your file?

15        A.  Yeah.

16        Q.  And in the file that you brought is there any

17   medical literature other than the pharmacology text that

18   you described for me before?

19        A.  No.

20        Q.  All right.  And to be fair, obviously in our

21   first session you brought some literature that is

22   included in Exhibits 1 through 15, I think; correct?

23        A.  Yes.

24        Q.  Other than that have you brought any medical

25   literature to your deposition?

1     A.   No.

2     Q.   Are you relying on any other medical literature

3   other than that which you brought to your deposition?

4     A.   No.

5     Q.   Now I asked you what additional material you

6   have reviewed since October 2009, and you mentioned some

7   reports and depositions, and I think that pharmacology

8   text.

9         Is there anything else in your file today that

10  was not in your file when we were together in San Jose

11  almost two years ago?

12    A.   No.

13    Q.   Have you sent Mr. Ernst any billings for work

14  performed between the beginning of October 2009 and

15  today?

16    A.   No.

17    Q.   Do you know how many hours you have worked on

18  this case in the last six months?

19    A.   No.  It's been fairly recent.  I think I've put

20  in about eight, eight and a half hours in the past few

21  days to reacquaint myself with the case.

22        I'm doing other service work, you know, this is

23  not my sole occupation.  This case.

24    Q.   I understand that.  And excuse me if I asked

25  you this before, did you read the deposition of Dr.

Page 157

1    Barbieri in this case?

2         A.   No, I haven't seen it.

3         Q.   Has Mr. Ernst paraphrased what Dr. Barbieri

4    said?

5         A.   Yes, I think he has.

6         Q.   All right.  And you know that Mr. Ernst

7    identified Dr. Barbieri from NMS as an expert in this

8    case; right?

9         A.   Yes.

10             MR. MORIARTY:  I don't have any other

11   questions.

12             Hunter?

13             MS. AHERN:  I don't, either.

14             MR. MORIARTY:  Don, do you have questions?

15             MR. ERNST:  I do.

16                  EXAMINATION BY MR. ERNST

17        Q.   Doctor, before this deposition began there was

18   a package here with the documents, all these articles

19   that he has questioned you about, and we asked to see

20   those documents before your deposition; is that true?

21        A.   Yes.

22        Q.   And Mr. Moriarty --

23             MR. MORIARTY:  Objection.

24   BY MR. ERNST:

25        Q.   Mr. Moriarty refused to let you look at any of

PLAINTIFFS' EXHIBITS 010453

Page 158

1   these documents before this deposition; true?

2        A.  Yes.

3            MR. MORIARTY:  Objection.

4   BY MR. ERNST:

5        Q.  And in fact the court reporter told you that

6   she had been instructed by Mr. Moriarty that she was not

7   to let you look at any of the documents that he was

8   going to ask you about during the deposition; true?

9        A.  Yes.

10           MR. MORIARTY:  Objection.

11  BY MR. ERNST:

12       Q.  So you asked to review this material, to give

13  you time to read it and review it, and you were never

14  given an opportunity to do that; is that an accurate

15  statement?

16       A.  Yes.

17           MR. MORIARTY:  Objection.

18           MS. AHERN:  Objection.

19  BY MR. ERNST:

20       Q.  Now, you were asked in your deposition about

21  this Vorpahl article, it's been marked as Exhibit 16;

22  true?

23       A.  Yes.

24       Q.  And you indicated that this is one of the

25  articles that you have seen in your past; true?

1        A.   Yes.

2        Q.   Now there is a whole host of literature and

3    articles that you have read over your many, many years

4    of being a forensic pathologist that you don't keep

5    track of that you read, review and just throw into the

6    hopper of some of the bases for your opinions; is that

7    accurate?

8             MS. AHERN:  Objection, leading.

9        A.   Yes.

10   BY MR. ERNST:

11       Q.   All right.  Now, looking at Exhibit 16, page

12   329, on the first page, 329.

13       A.   Yes.

14       Q.   The last full paragraph there above Materials

15   and Methods it says "the purpose of the present study is

16   fourfold."

17            Do you see that?

18       A.   Yes.

19       Q.   And the last purpose, and I quote, is to

20   "finally to establish the most accurate way of

21   estimating digoxin toxicity from postmortem specimens."

22            Do you see that?

23       A.   Yes.

24       Q.   So this article is an effort to establish the

25   most accurate way of estimating digoxin toxicity from

```
 1   postmortem specimens.

 2            MS. AHERN:  Objection, leading.

 3   BY MR. ERNST:

 4        Q.  Is that accurate?

 5        A.  Yes.

 6        Q.  All right, now, in fact, in the conclusion, or

 7   in the Summary at page 333 there is -- part of the

 8   conclusion is that there is a postmortem to antemortem

 9   ratio that is given for subclavian veins and femoral

10   vein samples; true?

11        A.  Yes.

12            MS. AHERN:  Objection.

13   BY MR. ERNST:

14        Q.  Now, are those peripheral samples, Doctor?

15            MR. MORIARTY:  Objection.

16        A.  Subclavian vein and femoral vein would be

17   peripheral, yes.

18   BY MR. ERNST:

19        Q.  And in fact this is part of the literature that

20   you've thrown in to your hopper, if you will?

21        A.  Yes.

22            MS. AHERN:  Objection.

23   BY MR. ERNST:

24        Q.  Now, Doctor, at the time that you rendered your

25   opinion that's on Exhibit 5 --
```

PLAINTIFFS' EXHIBITS 010456

1      A.   Yes.

2      Q.   -- to your original deposition --

3      A.   Yes.

4      Q.   -- you established and concluded that the cause

5  of death to Mr. McCornack was due to ventricular

6  arrhythmia due to digoxin toxicity due to digoxin

7  poisoning; is that accurate?

8      A.   Yes.

9      Q.   Doctor, after a review of all the material, all

10  the information, all the information that you have,

11  including -- is that still your opinion today?

12      A.   Yes.

13      Q.   Now, I was going to ask, and that includes, you

14  were aware that there was a digoxin recall from

15  Actavis --

16      A.   Totowa.

17      Q.   -- Actavis Totowa?

18      A.   And Mylan.

19      Q.   Mylan?

20      A.   Yes.

21          MS. AHERN:   Objection.

22  BY MR. ERNST:

23      Q.   And did you see, or were you aware of the

24  reason for the recall?

25      A.   Yes.

Page 162

1      Q.  And the reason for the recall was what, as you

2  recall?

3      A.  That something had occurred in the manufacture

4  of the tablets and some of them were thicker and may

5  contain twice as much drug as they were supposed to

6  contain.

7      Q.  Now this recall notice occurred in May of 2008?

8      A.  Yes.

9      Q.  And the death of Mr. McCornack occurred in

10  March of 2008?

11      A.  Yes.

12      Q.  So the recall notice came after his death.

13      A.  Yes.

14          MS. AHERN:  (Inaudible.)

15          THE REPORTER:  Excuse me, did you object?

16          MS. AHERN:  I did.  Objection.

17          MR. ERNST:  And the basis for your objection is

18  what?

19          MS. AHERN:  I didn't realize that your theory

20  was double thick.  I thought you had a completely

21  different theory and that the recall notice is

22  irrelevant.

23          MR. ERNST:  I don't think the recall notice is

24  irrelevant.

25          MS. AHERN:  If your theory isn't double thick.

1          MR. ERNST:  You know, it's interesting that you

2     are putting on the record what you perceive my theory

3     is.  We are not going to go there.

4          MS. AHERN:  I'm just making my objection.

5          MR. ERNST:  You make your objection, that's

6     fine.

7     Q.  Doctor, did you factor into your whole scenario

8     the fact that there was a recall for the drug that Mr.

9     McCornack was taking at the time of his death?

10    A.  Yes.

11         MR. MORIARTY:  Objection.

12    BY MR. ERNST:

13    Q.  And the -- Doctor, in rendering your opinion as

14    to the cause of death of Mr. McCornack, did you and do

15    you include all of the information that is out there for

16    you available to consider of which you were aware at the

17    time?

18    A.  Yes.

19         MR. MORIARTY:  Objection.

20    BY MR. ERNST:

21    Q.  And a listing of those items in Mr. McCornack's

22    case, would that include the history of Mr. McCornack on

23    the day of his death?

24    A.  Yes.

25    Q.  Would it include the medical records of his

PLAINTIFFS' EXHIBITS 010459

1    treating physician, Dr. Lemm?

2         A.   Yes.

3         Q.   Would it include the medical records of his

4    cardiologist, Dr. Von Dollen?

5         A.   Yes.

6         Q.   Would it include any information given to you

7    from any source about how he was taking his drugs on the

8    date of his death?

9         A.   Yes.

10        Q.   Would it include the fact that there was a drug

11   recall for digoxin?

12        A.   Yes.

13        Q.   Would it include --

14             MR. MORIARTY:  Objection.

15   BY MR. ERNST:

16        Q.   Would it include the fact that the postmortem

17   test for digoxin came back at 3.6?

18        A.   Yes.

19             MR. MORIARTY:  Objection.

20   BY MR. ERNST:

21        Q.   And it would include all of the literature of

22   which you were aware and have been asked about today and

23   actually a lot of literature that you are aware of but

24   that you can't specifically name today, based on what

25   you read over 50 years?

1         MR. MORIARTY:  Objection.

2    A.  Yes.

3         MS. AHERN:  Objection.

4    BY MR. ERNST:

5    Q.  Doctor, the opinion that you have on Exhibit 5

6    -- in fact I should just ask you, Doctor, if you can

7    look at Exhibit 5.

8         Can you tell us the opinion that you have today

9    on the cause of death of Mr. McCornack?

10   A.  Cardiac arrest due to ventricular arrhythmia

11   due to digoxin toxicity due to digoxin poisoning.

12        MR. ERNST:  Thank you very much, Doctor, I

13   don't have any other questions.

14        MR. MORIARTY:  I have a few.

15        MS. AHERN:  Thank you, Doctor.

16         FURTHER EXAMINATION BY MR. MORIARTY

17   Q.  Dr. Mason, did you and I personally speak

18   before this deposition started?

19   A.  No.

20   Q.  Did you ask me directly whether you could

21   review anything in the exhibit envelope?

22   A.  No.

23   Q.  Okay.  The discussion that was had about

24   whether you and Mr. Ernst were going to see the exhibits

25   was between me and Don Ernst off the record on the

PLAINTIFFS' EXHIBITS 010461

1    telephone; isn't that correct?

2         A.   Yes.

3         Q.   Okay.  I'd like you to look at Exhibit 16.

4         A.   Yes.

5         Q.   The -- the data for these ratios that are

6    contained in this article are based on information in

7    Tables 1 and 2; correct?

8         A.   Yeah, I believe so.  Yeah.

9         Q.   All right.  And so the ratios are averages

10   based on those tables; is that right?

11        A.   You know, I don't know.  I am really reluctant

12   to make comments on something that I haven't read, you

13   know.

14        Q.   Okay.  That's fine.

15             To your memory, is there anything in this

16   article that says that you can reliably use those ratios

17   to back-calculate from a postmortem to an antemortem

18   level?

19        A.   I don't know.  Since I haven't read it

20   recently, I don't know.

21        Q.   Okay.  Do you -- are you aware of any

22   scientific data which actually compares subclavian

23   specimens with femoral specimens and heart specimens?

24             MR. ERNST:  Objection.  As to what?  Specimens

25   of what?

1        MR. MORIARTY:  Postmortem redistribution.

2        MR. ERNST:  Of what?  Objection.

3        MR. MORIARTY:  Drugs.  Drugs.

4        MR. ERNST:  Objection.  Vague.

5    A.  You know, in my memory there are some such

6  articles, but I don't particularly remember any details

7  about them.

8  BY MR. MORIARTY:

9    Q.  Can you cite any article that specifically says

10 that a subclavian specimen is a peripheral specimen?

11   A.  You know, from a common sense point of view,

12 from an anatomist point of view, somebody that's using a

13 dissecting knife on the human body, it would make more

14 sense that the subclavian vein was peripheral than the

15 femoral vein, which is coming right off the aorta, which

16 is about a three-quarter inch diameter vessel that comes

17 off the heart.

18        So, you know, I would think if someone is going

19 to talk about a peripheral vessel, that a subclavian

20 vein is more peripheral than a femoral vein.

21   Q.  Okay.  But you don't know of any data that

22 actually compares specimens to know which redistributes

23 more or less than a heart specimen?

24   A.  No, I don't.  No.

25   Q.  I think based on what I asked you before you

Page 168

1    haven't reviewed anything about the manufacture of

2    Digitek; is that true?

3         A.  I'm sorry, could you repeat that?

4         Q.  Sure.  You haven't reviewed anything at all

5    about the manufacture of Digitek, have you?

6         A.  No.

7         Q.  Okay.  And you don't know if in fact

8    out-of-specification pills made it to consumers or not,

9    do you?

10        A.  I don't know that, no.

11        Q.  All right.  And if any did, you don't know how

12   many or what their defect was; right?

13        A.  That's true.

14        Q.  Okay.  Do you know that NMS Labs tested for

15   content six of Mr. McCornack's prescription?

16        A.  No, I don't know that.

17        Q.  Do you think that would be important for you to

18   know?

19        A.  It would be very interesting to know, yeah.

20        Q.  And --

21        A.  Who commissioned this, by the way?

22        Q.  Mr. Ernst did.

23        A.  Okay.

24        Q.  If those six tablets were within the

25   specifications by their chemical content, what effect

PLAINTIFFS' EXHIBITS 010464

1  would that have on your opinion, if any?

2        MR. ERNST:  Objection.  Asked and answered in

3  the first deposition transcript.

4      A.  You know, I don't know.  If there is variation,

5  I don't know.

6  BY MR. MORIARTY:

7      Q.  Okay.  Do you know how many of Mr. McCornack's

8  left-over tablets Mr. Ernst has in his possession that

9  he could weigh or measure if given the appropriate

10  equipment?

11     A.  No, I don't.

12     Q.  Do you know if any of them were found to be out

13  of specification by their size or weight?  Those in Mr.

14  Ernst's possession.

15     A.  I don't know that.

16     Q.  Is that significant to you at all in forming

17  opinions in this case?

18        MR. ERNST:  Objection.

19        You can go ahead and answer the question.

20     A.  It would be interesting.  Again, my focus would

21  be on the postmortem level of digoxin.

22  BY MR. MORIARTY:

23     Q.  Okay.  That's really what you based your

24  opinion on in this case; isn't that true?

25        MR. ERNST:  Objection, misstates the witness,

PLAINTIFFS' EXHIBITS 010465

Page 170

1   along with all the other items that he considered.

2       A.  You know, that and his history and the autopsy

3   findings, yeah.

4   BY MR. MORIARTY:

5       Q.  The only piece of new data that you looked at

6   before your last deposition when you changed your

7   autopsy report was the toxicology; correct?

8           MR. ERNST:  Objection.  Misstates his

9   testimony.  Included the recall, there was a bunch of

10  other information.  You are misstating the witness's

11  testimony.

12          MR. MORIARTY:  Hey, Don, now you are coaching

13  and you have gone over the line.

14      Q.  Doctor, the only data on which you based the

15  change in your autopsy report when I came to California

16  in 2009 was the toxicology; isn't that correct?

17          MR. ERNST:  Same objections.

18      A.  That was the major factor, plus the, you know,

19  the story that there was some -- perhaps there was

20  something wrong with the Digitek tablets.

21  BY MR. MORIARTY:

22      Q.  Perhaps there was something wrong?

23      A.  Yeah.

24      Q.  Is that what you said?

25      A.  Perhaps some of the drug that he had gotten in

1  his possession was other than the level it was supposed

2  to be.

3      Q.  Do you have any evidence, to a reasonable

4  degree of probability, that any Digitek that Dan

5  McCornack received was in fact outside any of its

6  manufacturing specifications?

7          MR. ERNST:  Objection.  Besides the recall

8  itself?

9          MR. MORIARTY:  Thanks for coaching.  Move to

10  strike your comments, Don.

11      A.  No.

12  BY MR. MORIARTY:

13      Q.  You can answer my question.

14      A.  I don't, no.

15          MR. MORIARTY:  Thank you.  Nothing further.

16          MR. ERNST:  Can I see the box that all these

17  exhibits came in, please, Madam Reporter.

18          MR. MORIARTY:  No, you can't, because I didn't

19  show them all to the witness.  So there are exhibits in

20  there that are my work product.

21          MR. ERNST:  Okay.  That's fine.

22              FURTHER EXAMINATION BY MR. ERNST

23      Q.  Doctor, did the -- did we ask to see the

24  documents in the court reporter's presence?

25      A.  Yes.

PLAINTIFFS' EXHIBITS 010467

1     Q.   Did the court reporter state to you that she

2    had been given instructions by Mr. Moriarty to not open

3    the box until the video camera -- or the video was on

4    and the deposition was ongoing?

5         A.   Yes.

6              MR. ERNST:  No other questions.

7              MR. MORIARTY:  We are done.

8              MR. ERNST:  Thank you.

9              MR. MORIARTY:  He can -- Doctor, you know your

10   rights regarding reading and signing?

11             THE WITNESS:  Yes.

12             MR. MORIARTY:  Hunter?

13             MS. AHERN:  Yes.

14             MR. MORIARTY:  I'll be back in my office in

15   about five minutes, if you want to give me a call.

16             MS. AHERN:  Okay.

17             MR. ERNST:  Thank you, Mr. Moriarty.

18             MR. MORIARTY:  Doctor, thank you for going to

19   the video center, I appreciate your consideration.

20             You too, Don.

21             MR. ERNST:  Matt, speaking of which I don't

22   think he has been paid for the first portion of his

23   depo.

24             MR. MORIARTY:  Did he ever bill me?  That's the

25   first question.

PLAINTIFFS' EXHIBITS 010468

Page 173

1           MR. ERNST:  There is some billing also that you

2      said that you just sent out to us.  I will check on that

3      and we will see that the appropriate bills to the

4      appropriate experts are paid.

5           By the way, there is some issue with regard to

6      the PFC and part of the experts and hopefully we will

7      iron that out and I will get back to you on that.

8           MR. MORIARTY:  I appreciate that.

9           But Dr. Mason, I don't know if you can see me,

10     you need to bill me either directly or through Don for

11     me to get you paid for the sessions where we spend time.

12          THE WITNESS:  I understand that, and I say that

13     it was my fault that I haven't been paid because, as you

14     pointed out, I had not billed you.

15          MR. MORIARTY:  Okay.  I feel better.

16          MR. ERNST:  Thank you, Mr. Moriarty.

17          MR. MORIARTY:  Bill me for time, I will get you

18     paid.  Put it in one bill for 2009, which I remember was

19     three plus hours, and today was close to that.

20          THE WITNESS:  Okay.

21          MR. MORIARTY:  Two and a half.

22          MR. ERNST:  Thank you.

23          MR. MORIARTY:  All right.  Take care.

24          MR. ERNST:  He is going to read and sign this;

25     okay?

PLAINTIFFS' EXHIBITS 010469

Page 174

1          THE REPORTER:  Okay.

2          (Time Noted:  12:55 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 010470

1              REPORTER'S CERTIFICATE

2          The undersigned Certified Shorthand Reporter
   licensed in the State of California does hereby certify:
3          I am authorized to administer oaths or
   affirmations pursuant to Code of Civil Procedure,
4  Section 2093(b), and prior to being examined, the
   witness was duly administered an oath by me.
5          I am not a relative or employee or attorney or
   counsel of any of the parties, nor am I a relative or
6  employee of such attorney or counsel, nor am I
   financially interested in the outcome of this action.
7          I am the deposition officer who
   stenographically recorded the testimony in the foregoing
8  deposition, and the foregoing transcript is a true
   record of the testimony given by the witness.
9          Before completion of the deposition, review of
   the transcript [x] was [ ] was not requested.  If
10 requested, any changes made by the deponent (and
   provided to the reporter) during the period allowed are
11 appended hereto.
           In witness whereof, I have subscribed my name
12 this 19th day of August, 2011.

13

14     _____

           Allison Ash-Hoyman, CSR No. 7412
15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 010471

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
            ASSIGNMENT NO. 39073
3            CASE NAME: Digitek Products Liability Litigation v.
            DATE OF DEPOSITION: August 11, 2011
4            WITNESS' NAME: Richard T. Mason, M.D.

5   In accordance with the Rules of Civil Procedure,
       I have read the entire transcript of my testimony or it
6       has been read to me.

7           I have made no changes to the testimony as
       transcribed by the court reporter.

8

9

    _____ _____
10    Date Richard T. Mason, M.D.

11

         Sworn to and subscribed before me, a Notary Public in
12     and for the State and County, the referenced witness did
       personally appear and acknowledge that:
13
    They have read the transcript;
14  They signed the foregoing sworn Statement; and
    Their execution of this Statement is of their free
15       act and deed.

16
         I have affixed my name and official seal this _____
17
     day of _____ , 20_____ .
18

19

    _____
20  Notary Public

21

    _____
22  Commission Expiration Date

23

24

25
```

PLAINTIFFS' EXHIBITS 010472

```
1   DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
             ASSIGNMENT NO. 39073
3             CASE NAME: Digitek Products Liability Litigation
             DATE OF DEPOSITION: August 11, 2011
4             WITNESS' NAME: Richard T. Mason, M.D.

5   In accordance with the Rules of Civil Procedure,
     I have read the entire transcript of my testimony or it
6    has been read to me.

7   I have listed my changes on the attached Errata
     Sheet, listing page and line numbers as well as the reason(s)
8    for the change(s).

9   I request that these changes be entered as part of the
     record of my testimony.
10
    I have executed the Errata Sheet, as well as this
11   Certificate, and request and authorize that both be appended
     to the transcript of my testimony and be incorporated therein.
12

13  _____  _____
     Date Richard T. Mason, M.D.
14
         Sworn to and subscribed before me, a Notary Public in
15   and for the State and County, the referenced witness did
     personally appear and acknowledge that:
16
          They have read the transcript;
17     They have listed all of their corrections in the
    appended Errata Sheet
18  They signed the foregoing sworn Statement; and
          Their execution of this Statement is of their free
19        act and deed.

20      I have affixed my name and official seal this _____

21     day of _____, 20_____.

22  _____
     Notary Public
23

24  _____
     Commission Expiration Date
25
```

PLAINTIFFS' EXHIBITS 010473

```
1   ERRATA SHEET
          RENNILLO DEPOSITION & DISCOVERY - A VERITEXT COMPANY
2
               ASSIGNMENT NO. 39073
3               CASE NAME: Digitek Products Liability Litigation
               DATE OF DEPOSITION: August 11, 2011
4               WITNESS' NAME: Richard T. Mason, M.D.
5
          PAGE/LINE(S)/    CHANGE              REASON
6          ____/_____/_____/_____
           ____/_____/_____/_____
7          ____/_____/_____/_____
           ____/_____/_____/_____
8          ____/_____/_____/_____
           ____/_____/_____/_____
9          ____/_____/_____/_____
           ____/_____/_____/_____
10         ____/_____/_____/_____
           ____/_____/_____/_____
11         ____/_____/_____/_____
           ____/_____/_____/_____
12         ____/_____/_____/_____
           ____/_____/_____/_____
13         ____/_____/_____/_____
           ____/_____/_____/_____
14         ____/_____/_____/_____
           ____/_____/_____/_____
15         ____/_____/_____/_____
           ____/_____/_____/_____
16         ____/_____/_____/_____
           ____/_____/_____/_____
17         ____/_____/_____/_____
           ____/_____/_____/_____
18         ____/_____/_____/_____
19                  _____
                     Richard T. Mason, M.D.
20
          SUBSCRIBED AND SWORN TO BEFORE ME THIS_____
21
          DAY OF_____, 20____.
22
23         _____
             NOTARY PUBLIC
24
25      MY COMMISSION EXPIRES_____
```

PLAINTIFFS' EXHIBITS 010474

## A

able 148:24
absolute 144:20
Abstract 147:20
  147:21
abundantly 145:4
Abused 149:16
access 109:20
  115:6
accompanying
  151:22 154:1
accurate 113:21
  158:14 159:7,20
  159:25 160:4
  161:7
acknowledge
  176:12 177:15
act 176:15 177:19
Actavis 88:11
  89:9 161:15,17
action 175:6
actual 126:2
  138:3
ad 88:8
Adding 150:23
addition 111:1
additional 94:3
  116:9 156:5
adequate 111:13
administer 175:3
administered
  98:17 175:4
administration
  107:16
administratively
  93:2
affirmations
  175:3
affixed 176:16
  177:20
afford 149:7
afraid 126:23
age 120:8
ago 96:9 130:6
  156:11
agree 134:2,12
  136:3,19,25
  137:4,8,15
  138:12,21 139:4
  140:5,16 141:5

141:12,13,17
144:7 147:25
149:3 150:14,20
151:9 152:9
153:14,19 154:13
154:15,23,25
Agreement 91:7
ahead 95:9 98:3,9
  99:22 103:18
  104:24 106:19
  107:2 109:3,4,16
  112:8 123:13
  125:6 128:8
  129:17,20 131:19
  137:2 139:9
  148:5 150:18
  169:19
AHERN 89:16 135:5
  136:4,8 157:13
  158:18 159:8
  160:2,12,22
  161:21 162:14,16
  162:19,25 163:4
  165:3,15 172:13
  172:16
al 88:11
Alameda 88:19
  105:18
Alan 126:19,25
alcohol 150:12,16
aliquots 109:19
alive 111:22
Allison 88:22
  94:23 175:14
allowed 175:10
amended 91:4
  94:10 117:22
  118:18,21 155:10
American 95:14,16
  97:15
amount 111:6,7
  124:11 138:18
  139:3,6 151:1
amounts 139:15
Amy 116:21
analysis 139:21
Analytical 153:16
anatomic 95:14,20
  95:23
anatomical 113:17

anatomist 167:12
anatomy 114:20
  115:3,4
anesthesia 107:16
anorexia 102:6
  103:8
anoxia 124:18,18
  125:1
answer 95:9 98:3
  98:9 99:4,22
  103:18 104:24
  106:19 107:2
  109:16 110:9
  112:8 123:13
  128:4 137:2
  139:9 142:10
  143:1 148:6
  150:18 152:7
  153:23 169:19
  171:13
answered 148:15
  169:2
antemortem 90:15
  90:18 106:25
  110:3 133:6,22
  136:16 137:12,14
  140:14,15 142:2
  160:8 166:17
antidepressants
  144:13
aorta 111:15
  167:15
apnea 129:14,15
appear 176:12
  177:15
appended 175:11
  177:11,17
Apple 152:24
appreciate 172:19
  173:8
appropriate
  151:19 169:9
  173:3,4
Approval 91:7
approximately
  152:6
April 118:8
arbitrarily
  126:23
area 113:18

131:11
argumentative
  101:12
arm 114:13
armpit 115:22
arrest 165:10
arrhythmia 104:7
  125:22 161:6
  165:10
arrhythmias
  103:25 104:10,15
  125:25 126:12
  127:12
arrhythmogenic
  125:17,20
arterial 115:4
arteries 125:8
arthrosclerosis
  125:24
article 106:20
  132:14 134:8,20
  135:19,21 138:3
  138:11 140:10
  141:6,10,22
  142:19 143:10,19
  147:9 148:2,4
  151:14 154:25
  155:6 158:21
  159:24 166:6,16
  167:9
articles 142:13
  157:18 158:25
  159:3 167:6
Ash-Hoyman 88:22
  175:14
asked 92:22 95:2
  101:9 106:12
  119:1 138:22
  139:5 142:22,23
  143:4 148:15
  152:3 156:5,24
  157:19 158:12,20
  164:22 167:25
  169:2
asking 101:11
  103:12 112:3,18
  138:11 141:9
  143:18 148:1
  154:5,25
aspects 146:21

PLAINTIFFS' EXHIBITS 010475

assessment 112:5
assign 126:23
assignment 126:22
  176:2 177:2
  178:2
assignments 93:20
associated 104:13
  105:13
assume 128:16
assumed 96:22
assumes 139:25
assuming 124:2
atrial 125:22
  128:22,25
attached 177:7
attempt 137:9
  138:25 140:12
  142:23 143:5
attempting 152:3
attorney 175:5,6
attribute 108:3
  144:15
attributed 141:1
attributes 128:22
attributing
  151:19
August 88:16
  119:15 175:12
  176:3 177:3
  178:3
authority 92:25
  145:6,12,16
  149:11
authorize 177:11
authorized 175:3
authors 142:14
  147:10
autopsy 93:3,7,7
  94:5,10,15
  110:21,24 115:19
  117:22 118:17,18
  118:21 119:11,25
  120:16,20,21
  121:5 122:2,5
  124:22 126:15
  130:20,23 144:16
  146:17 151:22
  154:12 170:2,7
  170:15
available 130:22

  163:16
Avenue 89:10
average 133:6
averages 166:9
aware 106:22
  107:17 127:25
  130:20 161:14,23
  163:16 164:22,23
  166:21
axilla 115:22
axillary 111:10
  111:14 112:18
  113:18 114:7,11
  114:14,18 115:6
  133:12
a.m 88:17

——————————
            B
——————————
B 90:12
back 95:2 96:8
  97:18 117:18
  118:5 119:6
  127:9,18 129:3
  134:5 141:15
  143:9 164:17
  172:14 173:7
back-calculate
  106:24 166:17
BACON 89:15
bad 111:21
ballistic 132:6
ballistics 131:12
  132:4
Barbieri 117:2
  157:1,3,7
base 99:7
based 153:21
  164:24 166:6,10
  167:25 169:23
  170:14
bases 159:6
Basically 93:4
basilic 114:15,16
basis 144:11
  162:17
beer 124:7
beers 130:9
began 157:17
beginning 147:19
  156:14

begins 114:7
  136:12
believe 94:17
  98:14 101:22
  111:2 118:10
  122:22 125:14
  133:4 135:9
  155:11 166:8
bench 141:24
best 119:9
better 91:2 129:6
  173:15
bifurcation 115:9
  115:10
big 114:20
bill 117:12
  172:24 173:10,17
  173:18
billed 173:14
billing 173:1
billings 156:13
bills 173:3
biological 109:19
biomechanics
  131:13
bit 92:15 113:22
  115:4 137:19
blanking 129:13
bloating 101:3
  123:4 124:10,12
blood 90:18 91:3
  106:16 107:10
  108:19,20,24
  109:1,12,14,14
  109:19 110:3,23
  110:25 111:18
  112:1,5,15 115:7
  123:18 125:9
  133:12,20,21
  139:11 142:1
  148:25 151:1,6
  153:12,12 154:8
  154:9,20,21
blood/fluid
  154:11
blunt 131:12
board 91:6 95:12
  95:14,16 96:4,7
  97:9,15 116:15
  131:7

boards 95:25 96:6
  96:7
body 167:13
book 104:10,17
  116:11,13 117:16
  145:19,20 146:2
  146:5,8 149:16
  149:18,20
books 101:23
bottom 97:10
  132:19
bought 149:20
bound 109:25
box 171:16 172:3
brachial 114:14
brain 144:17
brains 93:23
branches 114:7,10
  114:14
branchings 115:2
break 120:5,13
Breathe 129:11
breathes 129:6
bring 155:14
British 143:12
brought 155:16,21
  155:24 156:3
bullshit 144:20
bunch 144:18
  170:9
bureau 93:19
Burt 126:19,25
business 96:8
  152:22

——————————
            C
——————————
C 89:1
cachexia 102:18
calculation
  106:24 142:24
  143:5
calculations
  151:5
California 88:20
  89:5 105:12
  170:15 175:2
call 172:15
called 112:19
  122:10 146:2
  151:1

PLAINTIFFS' EXHIBITS 010476

calls 142:5,7
camera 172:3
capsules 139:15
carbon 123:18
 124:12
cardiac 103:25
 104:10,15 109:25
 126:12 127:11
 133:20 165:10
cardiologist
 104:19,25 164:4
Cardiovascular
 127:11
care 95:3 173:23
career 95:6
 146:19
case 93:16 94:9
 98:1,7,15 99:15
 100:12 103:7
 106:2,3 108:7
 110:5,12 111:2
 111:14 116:10
 122:2 126:4
 133:2,12 139:22
 148:9 156:18,21
 156:23 157:1,8
 163:22 169:17,24
 176:3 177:3
 178:3
cases 98:13 104:2
 107:8 139:18
 140:12,20
casual 132:3
cause 94:6 97:19
 98:1,15 99:11
 100:7 107:8
 118:19 123:4,7
 124:7,12,17,18
 124:25 125:25
 126:12 129:1
 137:10 161:4
 163:14 165:9
caused 98:1,14
 102:8 104:6
center 172:19
centers 102:9
central 104:1
 105:12 109:13
 153:11
cephalic 114:11

certain 111:6,7
 124:11
certainly 124:11
 146:18 152:20
certificate 93:6
 94:10,15 118:22
 119:11 175:1
 177:11
certificates 93:3
certification
 95:23 176:1
 177:1
certifications
 95:12
certified 88:22
 92:5 95:13 96:9
 97:11 152:17
 175:2
certify 147:3
 175:2
certifying 147:1
cetera 103:9
chamber 110:2
chambers 109:20
 109:21
chance 135:20
change 121:5
 141:4 150:11
 170:15 178:5
changed 119:10,10
 170:6
changes 90:22
 111:13 146:3
 175:10 176:7
 177:7,9
change(s) 177:8
changing 94:15
chapter 146:1,4,9
characterized
 102:17
charge 127:2
CHARLESTON 88:3
check 173:2
chemical 168:25
chest 115:25
chewing 130:3
chief 152:15
child 137:18
children 90:17
 134:19 136:16

137:17
chronic 102:16
 124:18 128:1
 129:1
chute 149:6
cigar 123:10,25
circulating
 140:14
circumstances
 147:12
cite 167:9
civil 97:25 98:7
 175:3 176:5
 177:5
clear 133:11,19
 142:9
Cleveland 89:11
clinical 90:20
 95:15,21 104:14
 143:12
close 115:8
 173:19
coaching 170:12
 171:9
cocaine 99:4,10
 107:8,10,14,17
 107:19,20,21
 108:3,4
Code 175:3
Coe 132:14,16
 133:14
coffee 120:4
 121:12 130:10
colleagues 146:20
collection 147:24
collector 132:2
column 102:4
 119:13 138:5,9
 140:23,24 148:18
combination
 123:22 154:10
combustion 123:19
come 106:2 147:17
 152:14
comes 120:19
 167:16
comfort 120:5
coming 167:15
comment 152:12
comments 166:12

171:10
Commission 176:22
 177:24 178:25
commissioned
 168:21
common 110:1
 167:11
commonly 122:24
COMPANY 178:1
compare 148:24
compared 133:5
compares 166:22
 167:22
complained 128:1
completely 141:10
 162:20
completion 175:9
complying 118:6
 127:8 132:11
 134:17 137:24
 142:17 145:24
 147:7 153:8
concentration
 134:19 139:25
 140:13,14,25
 141:16 151:7
 152:5 154:9,21
concentrations
 90:17,18 91:3
 137:14 144:2,4,5
 147:21,22 148:25
 149:1 150:12
 152:4
concluded 161:4
conclusion 94:16
 100:7 134:10
 143:16,18 160:6
 160:8
conclusions
 143:21 152:15
conditions 100:4
confidence 126:3
connection 144:2
consecutively
 94:24
Consequences
 148:20
Consequently
 137:12 144:3
consider 163:16

consideration 172:19
considered 99:4 135:1 145:12 170:1
consistent 136:17 136:23
consult 99:19 105:6
consulted 122:1
consumed 138:20 139:1
consumers 168:8
consumption 124:7
contain 162:5,6
contained 166:6
content 168:15,25
contents 139:14 139:17
context 138:12 148:4
continually 107:23
continuing 107:22 135:3,25 136:4
contrary 144:19 152:13
contributing 124:5
cop 127:5
Copenhagen 130:3
copies 96:20 100:13 113:7
cops 93:14 126:20
copy 96:3 108:6 112:21 147:15
corner 102:2 118:3 119:14,20 126:19
coronary 125:8,24
coroner 93:1,18 126:22
coroner's 93:15 127:3
corpses 149:5
correct 100:10 111:23,24 112:1 112:2 113:18 114:11,15,24 118:15,16,19,20

119:1,2,25 121:4 121:8,9 129:25 131:7,8 133:14 155:22 166:1,7 170:7,16
corrections 177:17
correctly 102:20 133:25
Correlation 90:15
correspondence 94:19
counsel 149:24 175:5,6
County 91:6 93:1 93:19 105:4,18 176:12 177:15
couple 118:25
course 107:7 112:23 120:21 149:6
court 88:1 96:14 112:19 113:6,10 158:5 171:24 172:1 176:7
co-counsel 136:2
criminal 98:13,15 99:15
cross-examination 106:1 135:10,24 138:13 143:22 153:21
Cruz 91:6 93:1,19 105:4
CSR 175:14
cumbersome 132:8
cups 130:10
current 146:19
cut 116:1
CV 96:3,12,19 97:4
Cyril 145:10,11

_____ D _____
D 90:1,12
DABFT 152:16
daily 130:9,10
Dan 123:24 171:4
dangerous 140:12
DANIEL 88:6

data 94:3 134:4,7 134:8,9,13,14 136:20 137:7,13 137:17 140:20 155:1 166:5,22 167:21 170:5,14
date 88:16 93:8 98:11 116:16 119:15,21 164:8 176:3,10,22 177:3,13,24 178:3
dated 91:6 118:8
day 100:2,23 163:23 175:12 176:17 177:21 178:21
days 156:21
dead 111:25
deal 99:25 132:7
death 93:3,5 94:7 94:10,15 97:19 98:1,15 99:11 100:2,7,24 107:8 107:19 108:3 111:18 118:19,21 119:11 122:14 126:12 133:23 136:18,24 137:10 138:19 139:7 140:2 144:3,4,6 144:15 147:1,22 147:24 150:11 151:20 152:6 154:10,12 161:5 162:9,12 163:9 163:14,23 164:8 165:9
deaths 147:3
decant 139:17
decedent 93:7 115:18
deed 176:15 177:19
defect 168:12
Defendants 88:12 89:9,15
defer 104:19,25
degree 114:25 145:15 171:4

delirium 102:19
Denver 117:7
department 93:19 100:1 153:1
depend 114:20 146:16
depending 114:23
depo 138:2 172:23
deponent 175:10
deposition 88:14 91:4 92:1 96:16 101:19,19,23 108:7 116:3,5,8 116:18,24 142:20 147:16 155:11,25 156:3,25 157:17 157:20 158:1,8 158:20 161:2 165:18 169:3 170:6 172:4 175:7,8,9 176:1 176:3 177:1,3 178:1,3
depositions 116:21,22 156:7
deputies 126:21
Derrick 144:25 145:2
describe 124:22
described 104:16 155:18
Description 90:13 91:1
details 167:6
determination 94:6
determine 140:25 141:3
diacetylmorphine 99:9
diagnosed 95:7 97:19
Diagram 91:8,10
Diagrams 91:9
diameter 167:16
died 142:25 143:7 151:12
difference 111:17 112:4,12 152:20
different 110:14

111:5 113:17
122:19,20 137:19
150:16 162:21
difficult 110:7
141:3
diffusely 124:23
125:15
digitalis 102:8
102:16
digitalis-toxic
103:24
Digitek 168:2,5
170:20 171:4
176:3 177:3
178:3
digoxin 90:15,17
94:18 95:7 97:19
104:6 106:15,25
106:25 108:25
109:13,22,25
110:8,13,20
111:23 112:6
116:12 119:3
133:6,20 136:18
136:24 137:10
142:1,24 148:12
150:17 159:21,25
161:6,6,14
164:11,17 165:11
165:11 169:21
diltiazem 118:13
118:18
dioxide 124:12
direct 102:8
directly 125:14
165:20 173:10
disagree 102:13
138:12 141:17
146:14 151:9
154:23
disagreement
144:11
DISCOVERY 178:1
discussed 122:5
discussion 96:17
133:17 135:17
136:11 140:11
151:4 165:23
disease 129:13
disorder 126:9

dissecting 167:13
dissection 115:5
115:20
distal 115:10
distress 123:7
distributed
124:23 125:15
DISTRICT 88:1,2
DIVISION 88:3
doctor 96:19,24
102:2 112:25
113:9,14 127:4
128:5 130:25
135:12 137:3,23
138:17 142:10,16
142:20 144:1
145:23 147:6
150:20 152:20
153:19,21 157:17
160:14,24 161:9
163:7,13 165:5,6
165:12,15 170:14
171:23 172:9,18
document 93:4
100:25 119:9
149:23
documents 157:18
157:20 158:1,7
171:24
doing 95:10
110:11 126:5
146:12 149:4
152:17,18 156:22
Dollen 116:25
121:24 127:19
164:4
Don 89:4 97:22
112:21,21 113:8
157:14 165:25
170:12 171:10
172:20 173:10
dosage 151:6,10
dose 140:15
double 162:20,25
Dr 92:10 103:16
116:21,24,25
117:2 120:15
121:20,23,24
127:10,19 131:10
132:9,13,15

134:16 141:12
146:1,1,5 147:3
152:24 153:6
156:25 157:3,7
164:1,4 165:17
173:9
draw 110:4,15,23
111:9,22,25
115:7,15
drawing 111:23
114:8,14
drawings 113:17
drawn 154:8,12,20
drew 133:12 134:9
drinking 120:4
drug 90:18,21,24
91:3 98:1,2,11
98:14 99:19
105:24 109:21
111:20 112:5
122:10 138:19,23
139:4,6,11,15,19
139:25 140:13,25
141:19 146:2
147:21,23 149:1
150:11,23 151:20
152:4 154:11
162:5 163:8
164:10 170:25
drugs 90:23 141:7
144:14 149:16
150:16 153:13
164:7 167:3,3
Duces 91:5
due 161:5,6,6
165:10,11,11
duly 92:5 175:4
duplicates 93:5

---

**E**

E 88:6 89:1,1
90:1,1,12,12
earliest 102:7
early 118:22
edema 144:17
edition 116:16
editor 153:16
155:3
Edmonton 149:9
educate 93:21

effect 94:20
124:13 168:25
effects 123:23
effort 159:24
eight 156:20,20
either 92:21 98:1
98:14 100:17
105:20 118:17
120:17 121:23
127:15 141:2
157:13 173:10
elicit 100:21
103:8,16
elicited 101:10
eligible 95:22
ELLIS 89:9
employee 175:5,6
energy 128:22
enlarged 125:7
entered 177:9
entire 135:21
148:3 176:5
177:5
envelope 165:21
equipment 169:10
Ernst 89:4,4 90:4
90:8 95:8 96:20
96:25 97:23 98:2
98:8 99:21
100:15,25 101:7
101:12 102:24
103:2,11,17
104:4,21,23
106:18 107:1,21
108:1 109:3,15
112:7 113:2,5,10
114:2 116:3
117:23 120:2,8
120:10,12 121:14
121:17 122:7
123:12 125:5
127:15 128:2
129:16 130:25
131:18 132:10
134:16,18,21,25
135:7,18 136:2,6
137:1,16,23
138:7,10 139:8
140:6,18 141:6
141:18 142:3,7

PLAINTIFFS' EXHIBITS 010479

142:11,16,23
143:4,17,24
144:8  147:6
148:1,15  150:5,8
150:15  151:13,16
152:10  153:15,20
154:16,24  156:13
157:3,6,15,16,24
158:4,11,19
159:10  160:3,13
160:18,23  161:22
162:17,23  163:1
163:5,12,20
164:15,20  165:4
165:12,24,25
166:24  167:2,4
168:22  169:2,8
169:18,25  170:8
170:17  171:7,16
171:21,22  172:6
172:8,17,21
173:1,16,22,24
**Ernst's** 169:14
**Errata** 177:7,10
177:17  178:1
**escapes** 105:19
**especially** 144:16
**essence** 132:1
**essentially**
146:11
**establish** 159:20
159:24
**established** 161:4
**estimate** 138:18
138:25  139:3,6
140:2  151:6,10
151:11
**estimating** 90:18
159:21,25
**Estimation** 151:1
**et** 88:11  103:9
**Euclid** 89:10
**evaluating** 131:21
141:20
**evidence** 140:3
171:3
**exacerbations**
102:17
**exactly** 130:21
**exam** 96:11

**examination** 90:3
90:7  92:9  96:10
116:15  140:1,14
141:1  157:16
165:16  171:22
**examinations**
95:20,22
**examined** 92:7
175:4
**examiner** 152:16
**examiner's** 149:9
**example** 144:22
**excerpts** 141:9
**excessive** 90:16
134:19
**excuse** 98:23
126:15  139:6
140:1  156:24
162:15
**executed** 177:10
**execution** 176:14
177:18
**exhibit** 90:13
91:1  100:12,13
100:16,16  101:6
101:8,10,24
102:1  117:19,19
117:20  118:2
119:6,19  120:17
126:17,17  127:6
127:17  130:25
131:5  132:10
134:16  137:23
142:16  143:9
145:23  147:6
149:22  153:7
155:10  158:21
159:11  160:25
165:5,7,21  166:3
**exhibits** 92:1
96:15,15,16
112:20  113:11
117:19  121:5
147:17  155:22
165:24  171:17,19
**expensive** 132:7
**experience** 104:14
104:18  109:12
113:20  114:17
131:21

**experimentation**
132:3
**expert** 157:7
**expertise** 131:11
**experts** 173:4,6
**Expiration** 176:22
177:24
**EXPIRES** 178:25
**explanation** 94:14
124:3
**extent** 150:13
**extra** 112:20
**extracardiac**
103:25
**Extraordinarily**
105:8
**extrapolation**
140:3  141:15
**extremely** 151:8

## F

**F** 90:1,12
**fact** 137:11
153:11  158:5
160:6,19  163:8
164:10,16  165:6
168:7  171:5
**factor** 108:19
124:5  163:7
170:18
**failure** 102:18
**fair** 114:6  122:4
155:20
**fairly** 126:6
156:19
**familiar** 143:19
**families** 100:2
**family** 100:22
**far** 146:24
**faster** 143:16
**fatal** 104:13,15
**fatigue** 128:1,7
128:21  129:1,5
**fatigued** 128:17
**fault** 173:13
**faxed** 127:18
**federal** 131:25
132:5
**feel** 128:11,15
173:15

**femoral** 111:6
133:8  153:12
160:9,16  166:23
167:15,20
**fibrillation**
125:22  128:22,25
**fibrosis** 124:14
124:23  125:15,17
**fibrous** 124:15
**field** 145:13
**figure** 97:18
120:15
**file** 94:20  147:15
155:14,16  156:9
156:10
**fill** 93:6,9  94:7
**final** 120:23
**finally** 159:20
**financially** 175:6
**find** 102:21
108:23  136:13
**findings** 146:17
151:22  170:3
**fine** 120:9  121:19
151:15  163:6
166:14  171:21
**firearm** 131:12
**firearms** 132:2
**first** 92:5  93:22
94:22  96:16  97:3
97:10  102:6
108:6  116:4
117:18  118:8,9
118:17  119:19
120:16  121:8
128:10  132:19
135:12  138:5,5,9
140:11  147:20
150:3  155:21
159:12  169:3
172:22,25
**five** 98:19  106:7
120:11,12  129:3
172:15
**five-minute** 120:5
**flat** 152:7
**Flip** 118:5
**fluid** 139:19
**focal** 124:19
**focus** 169:20

PLAINTIFFS' EXHIBITS 010480

folder 112:19
following 133:23
follows 92:8
foregoing 151:4
  175:7,8  176:14
  177:18
forensic 95:15,22
  95:25  96:11  97:9
  97:11  111:16
  132:18  144:19
  146:15  147:4
  148:20  149:12
  151:21  152:13,17
  159:4
forgive 121:15
forgotten 92:22
form 93:6,9  94:7
  94:11  109:4
forming 169:16
found 127:13,15
  136:21  137:7,20
  139:25  140:13
  141:1  152:5
  169:12
foundation 103:11
  103:17  154:24
four 130:6,9
fourfold 159:16
four-month-old
  137:18
Fred 152:24
free 176:14
  177:18
French 147:10
front 96:24
  112:25
full 102:6  138:6
  138:9  140:24
  159:14
further 90:7
  102:15  114:13
  140:23  165:16
  171:15,22

G

Galanter 117:12
gastric 139:14,17
  139:19
gastroesophageal
  123:1,2

gastrointestinal
  100:23  101:4
  102:10  104:1
  124:8
gelatin 132:4,7
gene 130:15
general 141:7
generally 144:4
  150:14,20
generate 93:4
genetic 126:9
getting 121:10
GI 123:7  124:3
Gibson 116:21
Gibson's 147:16
Gideon 135:15
give 98:10  112:21
  113:6  135:3
  158:12  172:15
given 113:11
  135:25  151:2,4,6
  158:14  160:9
  164:6  169:9
  172:2  175:8
go 95:9  97:18
  98:3,9  99:22
  103:18  104:24
  106:19  107:2
  108:13  109:3,4
  109:16  111:14
  112:8  117:19
  119:6  120:2,3
  123:13  125:6
  127:9  128:8
  129:3,17,20
  131:19  133:16
  134:5  135:12,17
  137:2,22  139:9
  140:9  143:15,15
  148:5,18  150:18
  150:25  151:4
  152:1  163:3
  169:19
goes 139:24
going 92:11,12,17
  94:23  97:22
  108:3  110:13
  113:6  115:16,20
  115:20,24,25
  120:3  121:14

129:16  134:24,25
  135:1,5,8,19,20
  135:23  137:1,16
  138:4,10  141:6
  143:17,20  150:15
  150:17  152:10,11
  153:15  158:8
  161:13  163:3
  165:24  167:18
  172:18  173:24
good 92:20  95:1
gotten 170:25
Graham 149:8
gram 125:8
grandfather 96:8
grandfathered
  96:5
great 92:14
group 105:18
Guardian 88:8
gunshot 131:11
guys 96:22
guy's 126:14
gynecomastia
  102:19
G-a-l-a-n-t-e-r
  117:13

H

H 90:12
half 93:4  104:2
  156:20  173:21
halfway 128:20
  136:11
hampered 137:10
hand 130:24  132:9
  134:16  137:23
  142:15  145:23
  147:6  153:6
Handing 149:23
happened 98:18,22
  100:2
happy 128:7
hard 92:12,18
HARDY 89:15
head 129:5,10
healed 124:21
Heard 117:7,9
hearing 92:14
heart 102:18

108:19  109:1,14
  109:20,21  110:2
  111:7  125:2,7,8
  133:8  153:12
  154:8,19  166:23
  167:17,23
heartbeat 128:12
heartburn 129:7
hereto 175:11
heroin 99:7,7
Hey 170:12
high 126:7  144:15
higher 112:14
  133:7  136:15
  137:12
history 100:21
  103:8,16  130:2
  163:22  170:2
HLA 126:8  130:15
hold 120:23
hope 155:12
hopefully 173:6
hopper 159:6
  160:20
hospital 94:1
  99:19
host 159:2
hour 120:3
hours 132:24,24
  133:3  154:12
  156:17,20  173:19
Houston 89:17
human 167:13
humour 133:21
hundred 128:17
Hunter 89:16
  157:12  172:12
hyperacidity
  122:25  123:3,4
hypertrophy
  125:19
H-e-a-r-d 117:9
H2 122:22

I

ideal 149:4
identifiable
  139:15
identification
  152:21

PLAINTIFFS' EXHIBITS 010481

identified 107:10
  117:16 118:14
  157:7
identify 106:14
  107:5 118:18
II 88:15
Illinois 117:12
illustrate 140:12
important 148:23
  168:17
impression 128:20
  146:24
improper 135:24
  138:13 143:21
  153:20
Inaudible 162:14
inch 167:16
inches 114:19
include 163:15,22
  163:25 164:3,6
  164:10,13,16,21
included 155:22
  170:9
includes 161:13
including 106:8
  124:10 161:11
incorporated
  177:11
increased 125:9
increases 133:22
Index 91:6
indicated 158:24
indicates 106:23
Indicating 96:25
indication 124:20
  155:2
individual 88:6,7
infarction 124:21
  126:4
Influence 90:19
influences 141:3
information 94:2
  124:1 161:10,10
  163:15 164:6
  166:6 170:10
infrequently
  105:8
ingested 151:1,12
ingestion 141:2
inhale 123:18

inhaling 123:19
inhibitors 122:22
initial 93:9
  119:20
insidious 102:17
instructed 158:6
instructions
  172:2
instrument 131:13
intentional
  121:18
interact 93:24
interested 151:17
  175:6
interesting
  149:19 163:1
  168:19 169:20
interference
  121:11,17
international
  131:16
internationally
  131:10
internist 117:12
interpret 110:7
  152:4
interpretation
  90:16,24 91:3
  134:18
interpreted 144:5
interpreting
  151:13
interrupt 107:24
interval 133:2
  147:24
intervals 132:23
intoxication
  102:8,16 137:10
investigation
  93:18 100:14,18
  119:7,17 133:19
investigator
  93:14,15 119:24
  127:2
investigators
  94:12 99:25
  100:6,21 101:10
  103:7,12 122:14
  126:22
iron 173:7

irregular 128:11
irrelevant 141:7
  162:22,24
irrespective
  133:23
issue 103:13
  106:4 107:21,23
  141:8 173:5
issues 99:20
item 129:24
items 138:11
  163:21 170:1

─────────
J
─────────

J 88:7
JD 145:14
job 126:24
joint 115:15,16
  116:1
Jones 149:8
Jose 88:20 156:10
Journal 143:12
  153:16
JR 88:6
June 119:1

─────────
K
─────────

Karch 149:19
Karch's 149:15
Kathy 88:6 101:20
  121:20
Katzung 116:14
keep 159:4
Keith 116:21
  147:16
Kennon 117:7,9
kind 145:8 147:2
knew 105:20
  122:11,16 131:20
  132:15
knife 167:13
know 92:10 94:21
  95:2,3 96:2
  97:20 98:5,10,18
  98:24 99:4,13
  100:3 101:3,13
  106:20 109:18
  110:6,12 111:12
  111:16 112:13
  114:21 115:13,13
  115:16,18 120:22

121:14 122:9,11
  122:12 123:5,16
  123:22,24 125:7
  125:10 126:5,6,8
  126:10,11 127:13
  128:25 130:21
  131:25 132:5
  134:3,3,9 135:15
  138:15 139:10,16
  140:19,20 141:19
  141:19 142:12,13
  142:19 144:12,18
  144:22,25 145:5
  145:7,7,8,9,10
  145:11 146:20
  147:2,4 148:7,8
  148:9 149:4,8,11
  149:13,13,19
  150:21,22,24
  151:10,17 152:14
  152:24 153:4,25
  153:25 155:4,6
  156:17,22 157:6
  163:1 166:11,11
  166:13,19,20
  167:5,11,18,21
  167:22 168:7,10
  168:11,14,16,18
  168:19 169:4,4,5
  169:7,12,15
  170:2,18 172:9
  173:9
knowledge 119:9
known 112:1
  148:12
Koren 135:15

─────────
L
─────────

Lab 153:1
Laboratories
  105:17
laboratory 105:13
labs 117:2,4
  168:14
lack 125:10
  128:21 140:3
Lange 116:14
large 139:15
  150:12
latest 116:16

PLAINTIFFS' EXHIBITS 010482

law 145:15
leading 159:8
  160:2
learn 93:24,24
learned 142:8
left 125:19
  148:18
left-hand 102:2
  119:13,14,20
  126:19
left-over 169:8
Legal 146:6
Lemm 116:24
  121:23 164:1
lethal 104:10,11
lethality 131:21
letter 91:6
  127:10 131:6
  153:16 155:2
letterhead 127:11
let's 114:5
  117:18,19 129:3
  137:22 140:9
  143:9,15,15
  147:5 148:18
  150:25 152:1
level 94:18
  106:25,25 107:13
  107:20 108:4
  110:3 112:6,14
  115:14 123:18
  126:3 139:1,11
  139:19 142:24
  143:6 144:15
  151:18 166:18
  169:21 171:1
levels 90:15,25
  110:20 111:22,23
  125:11 133:6,7
  133:20,22,23
  136:12,15,16
  137:11,12 142:2
  147:23 151:1
Liability 176:3
  177:3 178:3
License 88:23
licensed 175:2
life 144:3
lifetime 142:4
line 93:10 108:13

108:17 115:15
  135:2,23,25
  137:9 138:13
  142:22 148:2
  170:13 177:7
lines 93:5,8,9
  129:4
list 122:15
listed 177:7,17
listing 163:21
  177:7
Litem 88:8
literature 106:15
  106:23 107:3
  109:8 117:15
  134:23 141:24
  143:21 145:3,18
  146:20 153:21
  154:5 155:17,21
  155:25 156:2
  159:2 160:19
  164:21,23
Litigation 176:3
  177:3 178:3
little 92:15
  113:22 115:4
  137:19
liver 111:1
living 95:3,7
LLC 88:11
local 94:4
location 115:1
locations 133:13
long 93:20 114:17
look 102:1 114:5
  122:12 126:16
  130:14 139:14,20
  148:8 157:25
  158:7 165:7
  166:3
looked 116:11,19
  170:5
looking 110:13
  114:21 126:14
  134:6 139:11
  144:13 159:11
looks 119:14,14
  119:20
loss 102:18 103:9
lot 121:10 128:21

164:23
lower 118:2
  119:13,14,19
  126:19
Luis 89:5

## M

M 90:1
Madam 96:14
  171:17
magnitude 151:19
maintaining
  134:21
major 93:23
  124:19 170:18
maker 121:12
making 163:4
man 107:13 134:22
  137:19 145:7,17
  149:13
manner 94:7
manufacture 162:3
  168:1,5
manufacturing
  171:6
March 110:21
  123:25 162:10
marked 101:24
  117:23 158:21
Mason 88:14 92:4
  92:10 103:16
  120:15 121:21
  131:10 132:10,13
  134:16 141:12
  153:6 165:17
  173:9 176:4,10
  177:4,13 178:4
  178:19
mass 125:9
material 116:9
  132:7 139:18
  156:5 158:12
  161:9
Materials 159:14
Matt 92:10 120:2
  120:2 121:14
  172:21
matter 120:22
matters 131:17
Matthew 89:10

117:4
MATTISON 89:4
Mauriello 131:6
McCORNACK 88:6,6
  88:7 100:22
  101:20 121:20
  122:9 123:24
  128:1 161:5
  162:9 163:9,14
  163:22 165:9
  171:5
McCornack's
  100:24 142:24
  143:6 163:21
  168:15 169:7
McMaster 116:21
McMullen 117:4
MD 88:14 92:4
MDL 88:10
mean 129:14,20
  132:24 139:10
  150:24 152:18
means 125:2
  128:16 151:10,25
measure 110:2
  169:9
measured 144:2,4
mechanism 123:17
Mechanisms 90:23
medical 93:25
  94:4 100:4
  106:15,23 107:17
  109:8 117:15
  142:4 149:9
  152:16 155:17,24
  156:2 163:25
  164:3
medication 122:20
medications
  122:13,15 129:24
Medicine 127:11
  146:6 153:1
medulla 102:9
meeting 116:2
members 131:6
memory 101:2
  116:12 123:22
  166:15 167:5
mentioned 138:2
  156:6

met 145:17
Methods 159:15
MI 125:4
microscopic 126:2
mild 124:22
  125:12,14,24
military 132:6
milliliter 118:14
Minneapolis 153:2
Minnesota 153:1
minor 88:7
minute 126:15
minutes 120:11,12
  172:15
mirror 133:21
misleading 151:8
missing 149:2
misspoken 122:18
misstates 169:25
  170:8
misstating 170:10
misunderstood
  113:7
ML 110:25 111:2
mode 146:15
moderate 125:24
monoxide 123:19
months 130:6
  156:18
Moriarty 89:10
  90:4,8 92:3,9,11
  95:1,11 96:12,18
  96:22 97:2,24
  98:4,6,12 99:24
  100:17,20 101:5
  101:9,14 102:25
  103:4,14,22
  104:5,9 105:2
  106:21 107:4,24
  107:25 108:5
  109:6,23 112:10
  112:17,24 113:3
  113:8,13,25
  114:4 117:24
  118:1 120:6,9,11
  120:14 121:10,16
  121:19 123:15
  125:13 127:16
  128:3 129:19
  130:24 131:2,23

132:9,12 134:15
134:20,23 135:4
135:11,18,25
136:10 137:5,21
137:22,25 138:8
138:16 140:8,22
141:11,23 142:6
142:9,15,18
143:23,25 144:10
145:22,25 147:5
147:8 148:11,17
149:21,25 150:7
150:9,19 151:15
151:23 152:19
153:6,9,18 154:3
154:18 155:5,9
157:10,14,22,23
157:25 158:3,6
158:10,17 160:15
163:11,19 164:14
164:19 165:1,14
165:16 167:1,3,8
169:6,22 170:4
170:12,21 171:9
171:12,15,18
172:2,7,9,12,14
172:17,18,24
173:8,15,16,17
173:21,23
morphine 99:7
mortuary 115:19
Move 171:9
moves 92:16
moving 149:5
muscle 109:25
  125:2,9
Mylan 89:15
  161:18,19
myocardial 124:14
  124:20,21,23
  125:15,17 126:3
myocardium 124:16
  125:11
M-16 131:22
M.D 176:4,10
  177:4,13 178:4
  178:19

─────── N ───────
N 89:1 90:1,1,1

90:12
name 92:10 93:6
  105:19 117:8
  126:14 145:3
  164:24 175:11
  176:3,4,16 177:3
  177:4,20 178:3,4
named 117:7,12
nanograms 118:14
narcoleptic
  144:14
narcotic 144:14
nasal 129:11
national 131:16
nationally 131:10
nature 100:4
nausea 102:7
  103:8
nauseous 123:10
necessarily
  147:22 150:17
  152:8
necessary 92:22
  107:20 108:2
  140:25
need 173:10
nervous 104:1
neuralgias 102:18
never 158:13
new 170:5
nicotine 123:21
night 129:6
Nightmare 90:21
  146:2
NMS 94:17 105:10
  105:17 117:2,4
  118:5,9,24 157:7
  168:14
Normally 95:18
Notary 176:11,20
  177:14,22 178:23
noted 124:15
  174:2
notice 91:4
  155:10 162:7,12
  162:21,23
number 93:8
  104:15 138:19,25
  139:4 150:16
numbered 94:24

130:14
numbers 102:2
  134:4 177:7
numerous 153:13

─────── O ───────
O 90:1,1,12
oath 175:4
oaths 175:3
Obispo 89:5
object 103:13
  129:16 134:25
  135:1,5,7,8,20
  135:23 136:4
  137:1,16 138:10
  140:18 141:6
  143:17 150:15,17
  152:10 153:15
  154:24 162:15
objecting 138:15
objection 95:8
  98:2,8 99:21
  100:25 101:7,12
  103:11,17 104:21
  104:23 106:18
  107:1,21,22
  109:3,15 112:7
  123:12 125:5
  128:2 131:18
  135:3 136:5
  138:14 139:8
  140:6 143:24
  144:8 148:1,5,15
  151:13,16 153:23
  154:16 157:23
  158:3,10,17,18
  159:8 160:2,12
  160:15,22 161:21
  162:16,17 163:4
  163:5,11,19
  164:14,19 165:1
  165:3 166:24
  167:2,4 169:2,18
  169:25 170:8
  171:7
objections 136:1
  136:7 141:18
  142:11 170:17
Obstructive
  129:15

obtained 94:4
  120:21
obvious 144:2
obviously 100:9
  120:19 134:8
  155:20
occasions 144:21
occupation 156:23
occur 123:2,17
  133:23 150:11
occurred 162:3,7
  162:9
occurrence 98:16
  99:17
occurs 153:11
October 101:18
  116:3,8,18
  118:22 156:6,14
office 119:7
  127:19 143:5
  149:9 152:15
  172:14
officer 93:21
  175:7
official 176:16
  177:20
Oh 113:2 123:8
Ohio 89:11
okay 92:13,14,16
  92:19,23,24
  93:12,17 94:9
  95:1,5 96:12
  97:3,6,10,14,21
  98:21 99:13,18
  101:15 103:2,7
  104:5 105:3,11
  105:16,23 107:18
  108:6,11,12,23
  109:7 110:4,11
  110:14 111:4,16
  115:17,23 116:2
  116:8,17,24
  117:25 118:5,11
  119:24 120:9
  121:4,4,16 123:4
  123:9,24 124:7
  126:8 127:21
  129:22 130:24
  131:1,24 132:9
  135:12 137:9,22

138:3 139:2
  140:9,23 142:15
  143:23 145:5,10
  145:15,19 146:10
  147:5,12,19
  148:12 149:8,21
  150:3,8 151:15
  151:24 154:4,19
  155:9 165:23
  166:3,14,21
  167:21 168:7,14
  168:23 169:7,23
  171:21 172:16
  173:15,20,25
  174:1
ongoing 172:4
onset 102:17
open 96:14 172:2
opiate 99:5
opiates 98:17
  99:3 144:22,23
opinion 108:24
  109:11 160:25
  161:11 163:13
  165:5,8 169:1,24
opinions 159:6
  169:17
opportunity 97:17
  116:20 158:14
optimal 125:10
origin 102:10
original 161:2
originally 127:1
outcome 175:6
outside 171:5
out-of-specifi...
  168:8
overall 125:10
overdose 141:2
oxygen 125:2,11

_____
          P
P 89:1,1,10
package 157:18
packet 96:15
page 90:3,13 91:1
  93:4 97:10 102:1
  102:24 103:1
  108:11,14 119:19
  121:8 128:10,20

129:3,23 130:13
  131:5 132:19,20
  133:16 134:5,6
  134:12 138:5
  140:9,10 142:22
  148:18 150:3,5
  150:25 154:6,7
  159:11,12 160:7
  177:7
pages 94:24
  118:25
PAGE/LINE(S)
  178:5
paid 172:22 173:4
  173:11,13,18
Palm 89:5
paper 140:19
paragraph 102:6
  102:16,22 103:21
  128:10 130:14
  131:9 138:6,9
  140:24 150:4,10
  153:10 154:6
  159:14
paraphrased 157:3
parenteral 107:16
part 100:6 105:7
  160:7,19 173:6
  177:9
participated
  131:20 132:5
particular 93:16
  109:21 133:14
  138:11 141:8
  148:9 151:20
particularly
  131:11 141:19
  167:6
parties 175:5
party 98:17
passed 96:7,10
path 95:20,21,23
  96:11 97:9
pathologist 99:18
  132:17,18 147:4
  159:4
pathologists
  138:17,21 139:2
  139:5 144:19
  146:16 151:21

pathology 95:14
  95:15,15,15,24
  96:1 97:11,15
  145:16 149:12
  152:13 153:2
patient 111:22
  115:18 122:13
patients 95:3,7
  129:10
peer 106:14,22
  109:7 155:2
people 96:9
  126:23 131:20
perceive 163:2
percent 128:17
performance
  110:20
performed 156:14
period 148:13
  175:10
peripheral 106:16
  108:20,24 109:12
  110:3 153:12
  154:8,20 160:14
  160:17 167:10,14
  167:19,20
periphery 146:24
person 114:20,21
  114:22,24 115:2
  115:2 122:5
  151:12
personally 123:5
  165:17 176:12
  177:15
personnel 94:1
PFC 173:6
pharmacists 99:19
pharmacokinetic
  151:5
pharmacology
  90:20 116:11,15
  117:16 143:13
  155:17 156:7
phenomenon 98:18
phone 116:6
physician 164:1
physicians 93:25
  94:1
physiologic
  113:23

physiology 116:12
pick 105:11,12
Pictures 112:20
piece 106:14
  134:23 170:5
pillow 129:5
pillows 129:11
pills 168:8
place 88:19
  136:18,24
places 128:6
placing 138:14
Plaintiffs 88:9
  89:4
played 107:19
please 101:6
  112:22 117:8
  118:5 130:24
  132:9 134:15
  137:22 142:15
  145:22 147:5
  149:22 153:6
  171:17
plus 170:18
  173:19
PMR 106:8,10
  145:4 153:11
point 110:1
  111:16 115:9,10
  118:17 128:6
  142:12 146:14
  167:11,12
pointed 173:14
poisoning 161:7
  165:11
police 93:21
pops 129:5
portion 172:22
positive 130:15
possession 122:13
  169:8,14 171:1
possible 94:5
  124:3 129:12
  140:4 154:14,15
  154:17
post 94:11 147:20
postmortem 90:15
  90:18,19,20,21
  90:23,24 91:3
  105:23 106:4,8

106:17,24 107:10
107:18 108:16,25
111:12 115:7
132:23 133:2,6
133:20 136:12,15
137:11,13 140:1
140:13 141:1,4
141:15 142:1
144:23 146:2,12
146:16,21,25,25
147:21 148:13,24
149:15 151:6,18
152:4 159:21
160:1,8 164:16
166:17 167:1
169:21
postmortem/ant...
  141:14
potent 123:21
potential 118:19
Pounder 144:25
  145:2 146:14,23
  147:3
Pounder's 146:1
  146:11
Practical 148:20
practice 99:18
  105:7 107:7,17
  120:23 144:19
  146:15 147:2
  152:13
practices 145:8
practicing 105:12
precede 103:25
  104:16
precise 115:1
predict 137:13
predicting 142:1
preliminary 94:2
prescription
  168:15
presence 171:24
present 138:19
  139:4,6 140:2
  144:5 152:6
  159:15
pretty 115:8
Prevacid 122:19
  122:21 129:24
previous 136:17

136:23 154:7
pre-marked 92:2
Prilosec 122:10
  122:17,23
prior 105:15
  110:20 121:2
  124:20 138:2
  175:4
probability
  154:22 171:4
probably 93:21
  112:16 115:8
  125:1 147:14
problem 123:6
problems 100:23
Procedure 175:3
  176:5 177:5
processes 150:11
  150:22,23
prodromal 104:16
product 171:20
products 123:20
  176:3 177:3
  178:3
project 131:25
  132:6,6 149:5
prominent 108:19
prop 129:10
proper 135:9
prove 137:9
provided 103:15
  175:10
proximal 115:10
  115:11
psychological
  126:24
Public 176:11,20
  177:14,22 178:23
publication
  116:14,15
pull 142:20
pulmonary 144:17
Pulone 88:19
purpose 104:23
  159:15,19
purposes 115:7
pursuant 175:3
put 94:2,7 156:19
  173:18
puts 93:11

putting 163:2
p.m 174:2

Q

quantification
  111:19 112:5
  152:21
quantify 107:20
  108:2 109:8
question 95:9
  98:3,9 99:22
  103:18,20 104:24
  106:19 107:2,19
  108:15 109:4,16
  110:14 111:4,21
  112:8 120:7
  123:13 128:4
  131:22 137:2,4
  139:9 142:6,9
  143:17 148:2,6
  150:18 152:3
  153:24 169:19
  171:13 172:25
questioned 157:19
questioning 135:2
  135:23
questions 94:1
  100:3 135:9,19
  143:20 157:11,14
  165:13 172:6
quite 142:9
  151:25
quitting 130:6
quote 154:4
  159:19
quotes 145:18

R

R 89:1
raise 123:18
RALPH 88:7
ranged 132:23
rare 98:16,18,21
  99:17 144:21
ratio 160:9
ratios 141:15
  166:5,9,16
reacquaint 156:21
read 94:3 101:19
  102:20 103:21
  108:13 125:14

PLAINTIFFS' EXHIBITS 010486

127:21,23 132:13
133:25 135:14,20
140:19 141:10
143:19 146:4
148:3 153:22,25
154:1,25 155:6,7
156:25 158:13
159:3,5 164:25
166:12,19 173:24
176:5,6,13 177:5
177:6,16
**readily** 137:13
**reading** 110:6
127:25 129:4
141:21 150:21
152:11 172:10
**ready** 109:20
**real** 117:23
**realize** 162:19
**really** 117:17
127:17 128:17
140:7 166:11
169:23
**reason** 94:18
102:13 103:5
110:4 161:24
162:1 178:5
**reasonable** 103:6
171:3
**reasons** 138:15
**reason(s)** 177:7
**recall** 98:24
101:17 106:3,7
107:6 110:6
122:11,16 123:6
127:24 142:13
146:8 147:14
161:14,24 162:1
162:2,7,12,21,23
163:8 164:11
170:9 171:7
**received** 120:24
140:15 147:16
171:5
**reciting** 142:8
**recognition**
131:17
**recognized** 131:10
**recommended**
141:16

**record** 96:17
113:17 122:6
135:6 136:7,9
138:14 163:2
165:25 175:8
177:9
**recorded** 125:11
175:7
**records** 93:25
94:4 127:18
130:22 163:25
164:3
**redistribute**
109:13 148:12
**redistributes**
167:22
**redistribution**
90:19,23 105:24
106:5,17 108:17
108:25 136:18,24
144:23 167:1
**reduced** 125:2
**reference** 148:3,9
149:1
**referenced** 176:12
177:15
**references** 154:1
155:7
**referred** 94:17
**referring** 119:17
138:23 141:20
150:16 155:8
**refers** 130:14
**reflect** 147:22
154:9,21
**reflects** 154:10
**reflux** 123:1,2
**refresh** 116:11
**refused** 157:25
**regard** 98:17
110:8 111:20
145:4 173:5
**regarding** 106:4
110:8,19 116:10
141:25 172:10
**relate** 140:13
**related** 95:4
130:16
**relative** 175:5,5
**relatively** 130:15

**released** 154:11
**relevant** 134:21
**reliability**
141:25 146:20,24
**reliable** 106:24
110:2 140:1
144:1 145:5,12
145:16 149:11
**reliably** 166:16
**reluctant** 166:11
**rely** 100:6,10
**relying** 156:2
**remember** 95:10
96:2 98:19
120:25 128:5
167:6 173:18
**remote** 132:15
**rendered** 160:24
**rendering** 163:13
**RENNILLO** 178:1
**repeat** 92:12,18
92:21 117:8
168:3
**report** 94:3,18
99:2 103:15
117:6,22 118:9
118:25 119:18,25
120:16,19,20
121:3,5 127:10
127:10,12 130:20
170:7,15
**reported** 99:1
**reporter** 88:22,22
92:6 94:25 96:14
112:19,23 113:6
113:10 121:12
131:1 132:11
134:17 137:24
142:17 145:24
147:7 149:23
153:8 158:5
162:15 171:17
172:1 174:1
175:2,10 176:7
**reporter's** 171:24
175:1
**reporting** 101:2
**reports** 93:3
116:22 117:11
118:5 120:18

136:17,23 156:7
**represent** 152:5
**reputation** 132:1
153:4
**request** 91:7
177:9,11
**requested** 138:18
139:3 175:9,10
**requirement** 93:23
**research** 110:19
141:24,25 149:5
**residua** 139:15,21
**response** 103:20
**rest** 144:16
**result** 104:13
**results** 99:1
119:25 132:20,21
136:17,23
**review** 90:23
116:15 158:12,13
159:5 161:9
165:21 175:9
176:1 177:1
**reviewed** 106:15
106:22 108:9
109:7 116:9,18
117:15 135:8
148:3 153:22
155:1,2 156:6
168:1,4
**Richard** 88:14
92:4 176:4,10
177:4,13 178:4
178:19
**rifle** 131:22
**right** 92:25 93:11
94:22 97:16
98:13 99:3
101:22 106:6,22
108:23 109:11
112:17,17 113:10
113:16 114:8,10
114:17 115:5,12
115:17,23 117:18
118:13,24 119:4
119:13 121:1
123:16 124:2,14
124:17 127:6,25
128:9 129:3,11
129:22 130:13

PLAINTIFFS' EXHIBITS 010487

131:5 132:19
133:5,11,16
134:15 138:24
139:24 143:9,15
145:22 148:18
149:18 152:1
155:20 157:6,8
159:11 160:6
166:9,10 167:15
168:11,12 173:23
rights 172:10
right-hand 118:3
role 107:19
routine 111:9
routinely 110:15
Rules 176:5 177:5
ruling 126:3

**S**

S 89:1 90:1,12
sample 107:11
109:14 110:5,24
111:5,13,17,18
112:1 133:24
samples 90:19
110:7,11,15
133:7 142:1
148:25 160:10,14
sampling 147:23
San 88:20 89:5
156:10
Santa 91:6 93:1
93:19 105:4
sat 96:6
save 128:7
saw 147:14
saying 92:17
151:5
says 97:11 102:6
102:16 103:24
104:11 106:15
125:14 128:15,16
128:21 129:5
130:2,6 131:9
132:23 133:5
136:22 137:9
138:17 139:2
140:11,24 141:14
144:1 147:20,21
148:19,20,23

150:10 151:2
153:10 154:7,19
159:15 166:16
167:9
scan 116:20
scar 124:19
scenario 163:7
school 142:4
scientific 153:11
166:22
scientifically
106:23
seal 176:16
177:20
second 98:17
102:4 118:24
131:5,9 132:20
138:5,9 148:23
150:3,4,10
153:10
section 126:2
127:3 132:21
135:17 136:11
148:19,19 150:21
150:25 152:2
175:4
see 92:16 101:13
102:11 108:21,22
113:14,15 119:16
119:22 128:13,18
128:23 129:8,9
129:23 130:4,5,7
130:11,17 131:14
132:20,25 133:9
134:3 139:14,18
143:2 145:18
148:21 152:16
154:2 157:19
159:17,22 161:23
165:24 171:16,23
173:3,9
seen 107:3 116:4
116:24 117:1,3,6
117:11 131:3
135:13 138:1
142:13 143:10
145:3 147:9,11
147:12 157:2
158:25
selecting 138:11

seminars 106:6
semi-permanent
126:21
sense 110:1
167:11,14
sent 96:23 105:21
156:13 173:2
sentence 103:21
103:24 133:5
136:12,13,22
139:2 140:11
141:21 147:20
148:23 150:4,10
154:19
sergeant 126:21
127:2
series 147:9
serum 90:16
111:17,23 112:4
112:15 133:6,22
134:19 142:24
143:6
served 155:11
service 93:18
105:19 156:22
session 94:22
101:22 155:21
sessions 173:11
setting 143:22
settle 139:19
sharp 131:12
Sheet 91:6 177:7
177:10,17 178:1
sheriff 93:1
sheriff's 93:19
94:11 100:1,14
100:18 119:7
shit 144:18
SHOOK 89:15
shooter 132:2
short 120:4
Shorthand 88:22
92:6 175:2
shoulder 115:14
115:15,21,25
116:1
show 97:8 101:6
140:20 171:19
showed 134:13,14
shown 153:13

shows 144:16
sign 93:2 129:12
173:24
signed 121:2
176:14 177:18
significant 106:4
169:16
significantly
106:3 133:7
136:13,15
signing 172:10
signs 102:7
sign-off 93:13
simultaneously
95:21
single 106:14
Single-spaced
127:12
sir 99:16 109:24
109:24 119:19
135:4 137:6
sit 95:22,25 96:4
site 147:23
situation 109:19
six 114:19,19
140:12 156:18
168:15,24
size 114:23
169:13
slab 115:19
sleep 123:2
129:14,15
slightly 122:19
small 114:22
smoke 123:10
smoked 123:25
smoker 123:9
snore 129:12
Social 130:2
sole 156:23
somebody 93:11,22
105:10 111:25
123:9 167:12
somewhat 115:3
sorry 92:21 113:5
113:7,24 119:14
132:20 168:3
sort 93:5 95:21
98:16 100:2
101:3 115:14

PLAINTIFFS' EXHIBITS 010488

116:20 144:12
sounded 101:3
sounds 103:6
source 133:23
  164:7
SOUTHERN 88:2
speak 92:15 114:8
  165:17
speaking 123:5
  172:21
speaks 100:25
  139:11
specialty 145:8
specific 135:19
  138:23 142:12
  148:2
specifically
  101:8 126:9,13
  164:24 167:9
specification
  169:13
specifications
  168:25 171:6
specifics 98:20
specimen 107:18
  109:13 110:2
  111:10 112:15,15
  118:13 133:13
  147:24 150:23
  167:10,10,23
specimens 105:22
  106:16 120:20
  159:21 160:1
  166:23,23,23,24
  167:22
speculation 142:7
speculative
  103:13
speech 136:8
speeches 135:5
spend 173:11
spent 116:2
spills 154:7
spoken 104:8
  116:6 121:20,23
stack 96:19
  100:13 117:19
staff 105:3
standpoint 111:19
start 93:22 94:24

started 165:18
state 93:5 172:1
  175:2 176:12
  177:15
stated 155:5
statement 102:11
  134:12 136:19
  139:24 140:5
  144:7 148:8
  158:15 176:14,14
  177:18,18
statements 116:19
STATES 88:1
stay 146:19
stenographically
  175:7
Steven 149:15
sticker 118:2
stimulation 102:9
stomach 122:25
  123:11 139:21
stop 154:5
stopped 121:13
story 170:19
Street 89:5,16
stress 101:4
strike 171:10
strips 129:11
Stromberg 88:19
studied 136:16
study 159:15
stupid 144:12
subclavian 114:8
  114:10 133:8
  160:9,16 166:22
  167:10,14,19
subject 104:20
  106:8 135:10
  145:6
subscribed 175:11
  176:11 177:14
  178:20
subsequent 144:3
substance 122:5
  139:19
Substantial
  133:22
sudden 126:12
sufficiently
  144:15

suggesting 136:17
  136:23
suicide 139:17
Suite 88:20 89:11
  89:17
Summary 100:18
  119:6 160:7
supervised 105:21
Supervisors 91:6
  131:7
supply 125:9
supposed 113:6
  162:5 171:1
sure 101:16 105:1
  107:15 114:25
  124:13 139:10
  151:25 168:4
Susan 131:6
suspicious 145:14
swelling 144:17
sworn 92:5 176:11
  176:14 177:14,18
  178:20
symptom 129:12
symptoms 104:7,16
  124:8 130:15
system 93:10 94:8
  104:1

---

**T**

T 88:14 90:1,12
  92:4 176:4,10
  177:4,13 178:4
  178:19
table 115:19
  134:7 153:13
tables 166:7,10
tablets 138:20
  139:1,4 162:4
  168:24 169:8
  170:20
take 91:4 110:25
  111:1,1,5 120:4
  135:22 155:11
  173:23
taken 95:21
  111:18 120:13
  133:7,20
takes 93:20
  136:18,24

talk 105:22
  167:19
talked 145:17
talking 99:6,7
  103:23 108:16
  109:22 128:10
  137:18 142:3
  150:22 154:2,21
talks 129:24
taught 106:10
Tecum 91:5
telephone 89:15
  166:1
tell 92:6 98:11
  115:5 139:16
  146:12 165:8
tells 97:8 109:8
term 93:20
terminus 114:7
terms 109:9
test 164:17
tested 168:14
testified 92:7
  97:25 98:14,22
  98:25 99:1,10
  105:23
testify 144:22
testimony 101:19
  117:6,11 170:9
  170:11 175:7,8
  176:5,7 177:5,9
  177:11
testing 148:24
tests 105:21
  152:18
Texas 89:17
text 140:10 150:3
  155:17 156:8
thank 97:16 108:1
  120:10 129:15
  165:12,15 171:15
  172:8,17,18
  173:16,22
Thanks 171:9
theory 162:19,21
  162:25 163:2
therapeutic
  107:13 141:2
thesis 146:11
thick 162:20,25

PLAINTIFFS' EXHIBITS 010489

thicker 162:4
thing 96:21
  139:11,13 144:12
things 92:12,18
  100:4,9 130:19
  139:20
think 94:6 96:2
  96:23 98:10
  99:17 100:17
  106:2 108:18
  109:2,5 110:1
  111:3 112:9,16
  113:22 119:12
  125:11 126:17
  129:2 130:21
  131:4 132:15
  137:18 138:2
  144:24 145:21
  146:6,8,11,23
  147:18 155:22
  156:7,19 157:5
  162:23 167:18,25
  168:17 172:22
thought 113:5
  162:20
three 93:14 95:16
  98:19 113:16,17
  113:21 126:20
  130:9 133:13
  173:19
three-page 127:12
  135:18
three-quarter
  167:16
throw 159:5
thrown 160:20
Thursday 88:16
till 120:23
time 88:17 93:7
  98:11 110:12
  116:2,4 119:10
  122:12,14 126:6
  127:23 128:2,7
  130:20,23 132:15
  135:22 138:19
  139:7 140:2
  142:25 143:6
  147:22 149:7
  152:6 154:9
  158:13 160:24

163:9,17 173:11
  173:17 174:2
times 95:6 97:18
  97:25 98:19,21
  99:13 104:15
  108:18 116:6
  137:12
timing 112:3
tired 128:16
tissue 124:15
  148:25
tissues 149:1
tissue-bound
  154:10
title 92:25 146:5
titles 142:14
tobacco 130:3
today 92:11 108:9
  116:4 156:9,15
  161:11 164:22,24
  165:8 173:19
told 136:6 158:5
total 141:21
Totowa 88:11
  161:16,17
toxicity 95:7
  97:19 104:1,12
  104:12 159:21,25
  161:6 165:11
toxicologist
  98:22,25 105:3
  105:11,13,19
  117:7 122:1
  132:17 152:17
toxicologists
  105:6 138:18,22
  139:3,5
toxicology 94:17
  99:1 105:18
  106:8 118:24
  119:25 120:17,19
  120:20,24 121:3
  146:13,16,21,25
  147:1 148:20
  149:16 153:17
  170:7,16
track 159:5
trained 100:1
transcribed 176:7
transcript 169:3

175:8,9 176:5,13
  177:5,11,16
trauma 126:25
  131:13
Travis 89:16
treating 104:25
  164:1
Trevor's 116:14
tried 128:16
true 133:15
  146:22 152:22
  154:17 157:20
  158:1,8,22,25
  160:10 168:2,13
  169:24 175:8
truth 92:6,7
try 92:11,12,17
  151:6
trying 102:21
  120:15 151:11
TUCKER 89:9
turn 108:11 127:6
twice 116:7 162:5
two 96:20 97:17
  100:23 120:17
  126:21 130:9
  142:4 156:11
  173:21
two-thirds 127:9
  127:17 128:9
type 139:13
typed 127:12
typically 112:14

                U
undergo 106:16
  144:23
undergoes 108:25
Underlying 90:23
undersigned 175:2
understand 156:24
  173:12
understanding
  91:2 112:11
Unfortunately
  152:7
UNITED 88:1
unusual 100:3
updated 97:3
upper 102:2

upset 123:10
  124:3
urgent 120:7,8
urine 111:1
use 100:12 105:17
  122:22 137:13
  141:14 143:21
  151:19 153:20
  166:16
usefulness 146:25
uses 130:2
usual 152:13
usually 93:13
  98:16 105:10
  110:25 111:8
  122:12,14

                V
v 176:3
vague 128:2 139:8
  167:4
validity 148:7
value 151:7
values 149:1
variable 114:23
  115:4
variation 169:4
various 93:8
  116:19 146:21
vary 115:2,3
  147:23
vasoconstrictor
  123:21
vein 111:7,10,14
  112:18 113:18
  114:7,8,18 115:7
  133:8,8,12
  160:10,16,16
  167:14,15,20,20
veins 91:8,9,10
  114:15,23 160:9
venous 115:3
  133:21
ventricular
  125:19 161:5
  165:10
VERITEXT 178:1
version 120:23
versus 109:13
vessel 167:16,19

PLAINTIFFS' EXHIBITS 010490

video 172:3,3,19
videoconference 89:9
Vietnam 131:21
view 110:1 111:17
  167:11,12
VIRGINIA 88:2
virtually 151:7
vision 102:19
  103:9
visual 100:22
vitreous 110:5,7
  110:15,19 133:21
Volume 88:15
voluntary 126:22
vomiting 102:7
  103:8
Von 116:25 121:24
  127:19 164:4
Vorpahl 132:13
  133:13 158:21
vs 88:10

**W**

waiting 104:5
want 94:23 95:4
  96:14 100:15,15
  103:20 108:14,23
  128:5 135:12,22
  145:18 146:19
  147:2 172:15
wanted 136:6
wants 135:7
way 94:23 96:24
  110:14 111:5
  127:9,18 128:9
  141:20 159:20,25
  168:21 173:5
wear 129:11
Wecht 145:10,11
Wecht's 146:1,5
week 116:7
weigh 169:9
weight 102:18
  103:9 169:13
went 92:13,18
WEST 88:2 89:9
whereof 175:11
Winkle 127:10
witness 100:19

103:1,3 112:22
  113:11 118:6
  127:8 149:23
  150:6 169:25
  171:19 172:11
  173:12,20 175:4
  175:8,11 176:1,4
  176:12 177:1,4
  177:15 178:4
witnesses 116:20
witness's 170:10
words 111:6
  151:11
work 93:14 99:25
  105:14 126:5
  133:14 144:13
  149:20 156:13,22
  171:20
worked 127:1
  156:17
wouldn't 138:25
  141:13
wounds 131:12
written 94:19
  116:22
wrong 170:20,22
w/attached 91:6

**X**

x 90:1,1,12,12
  175:9

**Y**

yeah 102:3,23
  103:6,6,24
  104:25 112:16
  114:16 118:4,10
  119:23,23 120:1
  123:3 124:6
  127:20 128:8,14
  128:19 129:21
  131:4 132:8
  133:18 134:6
  140:17 142:21
  145:21,21 146:23
  155:15 166:8,8
  168:19 170:3,23
year 93:21 142:4
  149:6
years 96:9 97:18
  106:7 113:20

126:6 127:1
  142:5,8 156:11
  159:3 164:25
yellow 102:19
  103:9
yield 144:5

**1**

1 96:15 100:12,16
  101:6,8,10 119:6
  119:19 128:21
  129:3 155:22
  166:7
1.0 132:23
1.5 137:11
10 137:11
10.8 132:24
10:39 88:17
1020 89:5
1066 102:1,25
  103:1,23
11 88:16 176:3
  177:3 178:3
114 150:6,7
1150 89:11
12 101:24 102:1
12:55 174:2
123 150:25
15 96:15 155:22
15-page 143:18
150 88:20
1550 88:19
157 90:4
16 90:15 92:1
  108:13,17 118:8
  132:10 158:21
  159:11 166:3
1600 89:17
165 90:8
17 90:16 92:1
  134:16
17-page 143:18
171 90:8
18 90:18 92:1
  137:23
19 90:20 92:1
  108:18 142:16
  143:9
19th 175:12
1973 97:15

1983 145:19

**2**

2 113:22 120:17
  121:6 128:20
  130:14 134:7
  166:7
2:09-CV-0671 88:10
20 90:21 92:1
  110:25 111:2
  145:23 176:17
  177:21 178:21
200 149:5
2005 116:16
2008 110:21 118:8
  119:1,15 123:25
  162:7,10
2009 92:13,18,23
  94:10 101:18
  116:3,9,18
  118:22 156:6,14
  170:16 173:18
2011 88:16 175:12
  176:3 177:3
  178:3
2093(b) 175:4
216 89:12
22 90:23 92:1
  147:6
22nd 123:25
22.4 132:24
227-8008 89:18
23 90:24 92:2
  149:22
24 91:2 92:2
  119:1 153:7
25 127:1
26 119:15
27 91:4 92:2
  126:8 130:15
  155:10
28 91:6 92:2
  130:25
284 140:9
29 91:8 92:2
  112:20 113:12

**3**

3.6 164:17
30 91:9 92:2

PLAINTIFFS' EXHIBITS 010491

| | |
|---|---|
| 112:20 113:12,24 | **9** |
| 114:1,2,5 126:6 | **92** 90:4,15,16,18 |
| **31** 91:10 92:2 | 90:20,21,23,24 |
| 112:20 113:12 | 91:2,4,6,8,9,10 |
| **329** 159:12,12 | **925** 89:10 |
| **333** 133:16 134:13 | **93401** 89:5 |
| 160:7 | **95126** 88:20 |
| **39073** 176:2 177:2 | |
| 178:2 | |

**4**

4 126:17,17
 129:24
4/8/08 91:7
40-year-old
 137:19
44 142:22
44-year-old
 134:22
44115 89:11

**5**

5 117:19,20 121:6
 160:25 165:5,7
50 142:8 164:25
500 125:8
54 108:11
541 148:18
541-0300 89:6

**6**

6 96:19
6.4 152:1
60s 95:4
600 89:16
630 118:14
696-2137 89:12

**7**

7 100:13,16 127:7
 127:17
713 89:18
7412 88:23 175:14
77002 89:17
78 133:2
79 133:3

**8**

8 142:22
8/26/08 119:21,24
805 89:6

PLAINTIFFS' EXHIBITS 010492