# EXHIBIT 604

PLAINTIFFS' EXHIBITS 010626

Page 1

```
           IN THE UNITED STATES DISTRICT COURT OF THE
                 SOUTHERN DISTRICT OF WEST VIRGINIA
                      CHARLESTON DIVISION

KATHY MCCORNACK, et al.,          )
                                  )
        Plaintiffs,               )
                                  )
v.                                )         CASE NO.
                                  )       2:09-CV-0671
ACTAVIS TOTOWA, LLC, et al,       )
                                  )
        Defendants.               )
_____   )
```


            VIDEOCONFERENCE AND TELEPHONIC

            DEPOSITION OF:

            AMY R. MCMASTER, M.D.

            Taken on Behalf of the Plaintiffs

            August 4, 2011

PLAINTIFFS' EXHIBITS 010627

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 2

```
 1    APPEARANCES:

 2    By Videoconference
      For the Plaintiffs:
 3
              DON ERNST, ESQ.
 4            Ernst Law Group
              1020 Palm Street
 5            San Luis Obispo, California  93401
              (805) 541-0300
 6            de@ernstlawgroup.com

 7            ~and~

 8            TERRY KILPATRICK, ESQ.
              Ernst Law Group
 9            1020 Palm Street
              San Luis Obispo, California  93401
10            (805) 541-0300
              tk@ernstlawgroup.com
11
12    For the Defendant Actavis:

13            MATTHEW P. MORIARTY, ESQ.
              Tucker, Ellis & West, LLP
14            1150 Huntington Building
              925 Euclid Avenue
15            Cleveland, Ohio  44115-1414
              (216) 696-2276
16            matthew.moriarty@tuckererellis.com

17
      By Phone
18    For the Defendant Mylan:

19            HUNTER K. AHERN, ESQ.
              Shook, Hardy & Bacon, LLP
20            JPMorgan Chace Tower
              600 Travis Street
21            Suite 1600
              Houston, Texas  77002
22            (713) 546-5636
              hahern@shb.com
23

24
                      Cont.'d
25
```

PLAINTIFFS' EXHIBITS 010628

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 3

1    APPEARANCES:

2    COURT REPORTER:

3            Deborah M. Fernau
             Cell:  (615) 812-6408
4            E-mail:  d_fernau@yahoo.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

McDANIEL SHORTHAND REPORTERS                          805-544-3363
PLAINTIFFS' EXHIBITS 010629

AMY R. McMASTER, M.D.                                    August 5, 2011

1                          I N D E X

2     Witness                                    Page

3     AMY R. MCMASTER, M.D.

4              Direct Examination Mr. Ernst       06

5              Cross-Examination by Mr. Moriarty  95

6              Redirect Examination Mr. Ernst     96

7

8                          EXHIBITS

9     Exhibit              Description            Page

10    1      CV of Amy Ralston McMaster, M.D.     14

11    2      Notice of Deposition                 14

12    3      Correspondence                       15
             To Dr. McMaster
13           From Mr. Moriarty
             11/10/2009
14
      4      Correspondence                       17
15
             To Mr. Moriarty
16           From Dr. McMaster
             05/17/2011
17
      5      Dr. Master's File                    26
18
      6      NMS Lab Report                       32
19
      7      Urgent:  Drug Recall                 78
20           04/28/2008

21
      Reporter's Certificate                      99
22
      Amendment Sheet                             100
23
      ** [sic] Exactly as Stated
24    ** (phonetic) As the Word Sounded

25                          ~*~

McDANIEL SHORTHAND REPORTERS                      805-544-3363
PLAINTIFFS' EXHIBITS 010630

AMY R. McMASTER, M.D.                                    August 5, 2011

 1              The Videoconference and Telephonic

 2     Deposition of AMY R. MCMASTER, M.D., taken on behalf

 3     of Plaintiffs on the 5th day of August, 2011,

 4     commencing at 10:00 a.m. in the offices of Vowell and

 5     Jennings, 214 Second Avenue, North, Nashville,

 6     Tennessee, for all purposes under the Federal Rules of

 7     Civil Procedure.

 8              The formalities as to notice, caption,

 9     certificate, et cetera, are waived.  All objections,

10     except as to the form of the questions, are reserved

11     to the hearing.

12              It is agreed that Deborah M. Fernau,

13     being a Notary Public and licensed Court Reporter for

14     the State of Tennessee, may swear the witness, and

15     that the reading and signing of the completed

16     deposition by the witness are reserved.

17

18

19

20

21                         * * *

22

23              AMY R. MCMASTER, M.D.,

24        was called as a witness, and after having been

25          first duly sworn, testified as follows:

McDANIEL SHORTHAND REPORTERS                         805-544-3363
PLAINTIFFS' EXHIBITS 010631

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                              Page 6

1                      DIRECT EXAMINATION

2    BY MR. ERNST:

3    Q.      Good morning, Doctor, how are you this

4    morning?

5    A.      Good morning, I'm fine.  How are you?

6    Q.      Would you state your full name and address for

7    the record, please.

8    A.      My name is Dr. Amy R. McMaster,

9    M-C-M-A-S-T-E-R.  Would you like my home address or

10   business address?

11   Q.      Your business address, please.

12   A.      850 R.S. Gass, G-A-S-S, Boulevard, Nashville,

13   Tennessee 37216.

14   Q.      And are you currently employed?

15   A.      I am.

16   Q.      By whom?

17   A.      Forensic Medical Management Services.

18   Q.      And what do you do for Forensic Medical

19   Management Services?

20   A.      I'm the chief medical officer.

21   Q.      What does Forensic Medical Services [sic] do?

22   A.      We are a private company who contracts our

23   services throughout Tennessee and other states to

24   provide forensic pathology and death investigation

25   services.

McDANIEL SHORTHAND REPORTERS                        805-544-3363
PLAINTIFFS' EXHIBITS 010632

1   Q.      And do you have specific contracts with

2   counties or states to perform autopsies?

3   A.      We have a specific contract with Davidson

4   County, which is Nashville, and Shelby County in

5   Memphis.  We also provide services to other counties

6   throughout Tennessee, but we don't have specific

7   contracts with them, it's done on a case-by-case

8   basis.

9   Q.      And you are called upon, on a case-by-case

10  basis, under what circumstances?

11  A.      Well, it depends.  As a medical examiner or

12  forensic pathology, to be consulted on a medical

13  examiner case, we investigate people who die under

14  suspicious, unnatural, or unusual circumstances.

15  Q.      So are you hired generally by the counties to

16  prosecute criminal cases or assist in the

17  determination of the cause of death for prosecution of

18  criminal cases?

19  A.      We do not prosecute anyone.  I'm a physician

20  who gives my medical opinion about cause of death and

21  manner of death.

22  Q.      Have you testified in court before?

23  A.      Yes.

24  Q.      On how many occasions?

25  A.      Many.  I don't keep a case list, so I can't

PLAINTIFFS' EXHIBITS 010633

AMY R. McMASTER, M.D.                                August 5, 2011

                                                              Page 8

 1   give you an exact number, but I testify in criminal

 2   court frequently.

 3   Q.      Have you ever testified in a civil case?

 4   A.      I have.

 5   Q.      On how many occasions?

 6   A.      In civil testimony, the cases I've been

 7   involved in, I've only testified in court once.

 8   Q.      Okay.  In the criminal field, can you give me

 9   an estimate or a ballpark number as to the number of

10   times you've testified in criminal cases?

11   A.      No, I can't.  I can semi-quantitate it as

12   frequent.  But as I previously testified to, I don't

13   keep a case list, so I can't give you an exact number.

14   Q.      I'm not asking for an exact number.  I mean,

15   is it over 500, over 100, over 50?  I just need a

16   ballpark.

17   A.      It's probably less than 500, more than 100.

18   Q.      So somewhere between 100 and 500 cases you've

19   testified in a criminal setting in a courtroom?

20   A.      I think that would be a rough estimate, yes.

21   Q.      And were these criminal prosecutions, as a

22   general rule, that you testified in?

23   A.      I am generally called as a witness by the

24   prosecution; rarely, I am called by the defense.  But

25   I do not consider myself a prosecution or defense

McDANIEL SHORTHAND REPORTERS                     805-544-3363

PLAINTIFFS' EXHIBITS 010634

AMY R. McMASTER, M.D.                                    August 5, 2011

1   expert or witness, I'm just responding to subpoenas.

2   Q.     Okay.  However, you do have contracts with

3   counties that have district attorney's offices; true?

4   A.     Yes.  The county has a district attorney's

5   office, but we do not work for the district attorney.

6   Q.     You work for the county?

7   A.     No, I work for --

8   Q.     I mean, do you have a contract with the

9   county?

10  A.     Correct.

11  Q.     Now, in the times that you do testify, this

12  100 to 500 times, I take it that you would be

13  testifying on the cause of death, as a general rule;

14  is that true?

15  A.     I generally testify to cause of death, manner

16  of death, injuries that relate to the cause of death,

17  and, also, any other natural disease that may be

18  present.

19  Q.     Have you ever testified in any poisoning

20  cases?

21  A.     I have.

22  Q.     And have you reached a conclusion that someone

23  died of poison before?

24  A.     I don't use the term "poisoning."  That is not

25  a cause of death.

PLAINTIFFS' EXHIBITS 010635

1    Q.       Well, what do you use as a term, Doctor?

2    A.       Well, it depends on what the cause of death is

3    and what agent played a role in their death.

4    Q.       If an excessive drug intake was used, what is

5    the terminology that you use when you testify?

6    A.       It could be, sometimes, acute drug toxicity,

7    acute drug overdose, acute combined drug toxicity, or

8    some variation thereof.

9    Q.       How do you conclude that a person died of

10   acute drug toxicity?

11   A.       During the process of a complete death

12   investigation, which will include review of the

13   medical history; review of the circumstances of their

14   death, including the scene; review of autopsy findings

15   if they are available; and interpretation of

16   toxicology.

17   Q.       Is it true that in the 100 to 500 cases that

18   you've testified in, do you have a -- strike that.

19           Do you have an estimate as to the number of

20   cases for drug toxicity that you've testified in

21   that's caused a death?

22   A.       I do not have a number; however, it is a very

23   common part of my practice to make the diagnosis or

24   exclude the diagnosis of acute drug toxicity.

25   Q.       In the 100 to 500 times that you have

PLAINTIFFS' EXHIBITS 010636

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 11

1    testified in a courtroom, how many of those is -- a

2    rough estimate, were results -- resulted in death from

3    drug toxicity?

4    A.      A minority.

5    Q.      50 to 100?  100 to 200?

6    A.      No, far less than that.

7    Q.      How many?

8    A.      I don't have an exact number, but it's -- I

9    would consider it -- the vast minority of cases that I

10   testify about in criminal court are about drug

11   toxicity cases.

12   Q.      You have concluded that people died of drug

13   toxicity; true?

14   A.      Yes.

15   Q.      And you have used postmortem blood tests as a

16   factor in that opinion; isn't that true?

17   A.      Yes.

18   Q.      Now, have you ever testified before about

19   death due to digoxin?

20   A.      No, I have not.

21   Q.      So this is the first time that you have ever

22   testified with regard to a death by -- relating to

23   digoxin toxicity; is that true?

24   A.      Correct.

25   Q.      Now, in the times that you have rendered

McDANIEL SHORTHAND REPORTERS                        805-544-3363

PLAINTIFFS' EXHIBITS 010637

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 12

1    opinions in criminal cases, you -- did you extrapolate

2    what the blood level was in order to determine

3    toxicity as a cause of death?

4                MR. MORIARTY:  Objection; form.

5                Go ahead.

6                THE WITNESS:  What do you mean by

7    "extrapolate"?

8    BY MR. ERNST:

9    Q.     In other words, you had a postmortem blood

10   sample that showed a particular drug; true?

11   A.     Yes.

12   Q.     Generally.  And you concluded that there was a

13   toxic level and the person died from the ingestion of

14   the drug; true?

15   A.     Yes.

16   Q.     And you were able to testify that the person

17   died from an excessive amount of that drug; true?

18   A.     Yes.

19   Q.     And you did that because you extrapolated from

20   the postmortem blood that was taken from an

21   individual; true?

22                MR. MORIARTY:  Objection.

23                MS. AHERN:  Objection.

24                MR. MORIARTY:  Go ahead.

25                THE WITNESS:  No, I do not use the term

McDANIEL SHORTHAND REPORTERS                         805-544-3363

PLAINTIFFS' EXHIBITS 010638

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 13

1    "extrapolation."  That's not part of my practice.

2    BY MR. ERNST:

3    Q.      Well, you concluded that they died of toxicity

4    in some way based upon a blood test taken postmortem;

5    true?

6    A.      Yes.

7    Q.      Now, what is your understanding of the burden

8    of proof in a criminal case?

9    A.      That's really outside of my area of expertise.

10   I'm here to testify about cause of death and manner of

11   death.

12   Q.      Well, in your own mind, when you testify as to

13   cause of death and manner of death, is it beyond a

14   reasonable doubt, in your own mind, before you

15   testify?

16                MR. MORIARTY:  Objection.

17                Go ahead.

18                THE WITNESS:  No, sir, cause of death is

19   a medical opinion that means more likely than not, in

20   my practice.

21   BY MR. ERNST:

22   Q.      Okay.  You have furnished us with a CV in this

23   case.  Do you have it in front of you, Doctor, your

24   CV?

25   A.      I do not.  And I don't believe I furnished it

PLAINTIFFS' EXHIBITS 010639

Page 14

1   to you.  I assume someone else did.

2              MR. ERNST:  Mr. Moriarty, do you have a

3   copy of her CV there, please?

4              MR. MORIARTY:  Yes, I do.

5              MR. ERNST:  Would you hand it to her?

6              MR. MORIARTY:  Yes, sir.

7   BY MR. ERNST:

8   Q.    Doctor, is this a true and accurate copy of

9   your CV?

10  A.    The copy that I was just handed does appear to

11  be an accurate copy.

12             MR. MORIARTY:  All right.  I'd like that

13  marked as Exhibit 1.

14             (Marked Exhibit No. 1.)

15  BY MR. ERNST:

16  Q.    And is everything in Exhibit 1, your CV, true

17  and accurate, as far as you know?

18  A.    Yes.

19  Q.    All right.  Now, did you receive a Notice of

20  Deposition for today, Friday, August 5th?

21  A.    I did.

22             MR. ERNST:  We'd like that marked as

23  Exhibit 2.

24             (Discussion off the record.)

25             (Marked Exhibit No. 2.)

PLAINTIFFS' EXHIBITS 010640

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 15

1    BY MR. ERNST:

2    Q.      Would you look at the deposition notice,

3    Dr. McMaster?

4    A.      (Complies.)  Okay.

5    Q.      Does it appear to be -- is that the depo

6    notice that you've seen before?

7    A.      Yes.

8    Q.      Did you bring all of those -- did you bring

9    your complete file with you today?

10   A.      I brought the complete file, yes.

11   Q.      Does your file have in it letters from

12   Mr. Moriarty in which your retention to testify was

13   discussed?

14   A.      Yes.

15   Q.      Can you pull those letters out for me?

16           MR. MORIARTY:  There's one, and over

17   objection, I'll give it to the court reporter.

18           MR. ERNST:  I would like that letter

19   marked as Exhibit 3.

20           (Marked Exhibit No. 3.)

21   BY MR. ERNST:

22   Q.      And, Doctor, without looking at Exhibit 3, can

23   you tell me what your understanding is of why you were

24   hired in this case?

25   A.      I was hired to provide an opinion for the

McDANIEL SHORTHAND REPORTERS                          805-544-3363

PLAINTIFFS' EXHIBITS 010641

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                                Page 16

1    cause of death and manner of death of Mr. McCornack.

2    Q.      When were you hired?

3    A.      November of 2009.

4    Q.      And on what terms were you hired?

5    A.      I don't understand your question.

6    Q.      How much are you being paid?

7    A.      I'm being paid $500 an hour.

8    Q.      And have you submitted a bill, to date, for

9    the time you have spent on this case?

10   A.      I have submitted a bill; however, it's not to

11   date.

12   Q.      How much was the bill that you submitted?

13   A.      $1,250.

14   Q.      And when did you submit that bill?

15   A.      December 17th, 2009.

16   Q.      And since December 17th, 2009, have you done

17   additional work in this case?

18   A.      Yes.

19   Q.      Can you quantify the number of hours you have

20   worked on this case for us, please?

21   A.      I don't have a total of the number of hours.

22   Q.      Can you give me your estimate, please?

23   A.      Prior to today, I would estimate it's

24   approximately ten hours or so.

25   Q.      Does that include your previous billing of

McDANIEL SHORTHAND REPORTERS                            805-544-3363
PLAINTIFFS' EXHIBITS 010642

AMY R. McMASTER, M.D.                                      August 5, 2011

Page 17

1    $1,200?

2    A.      No.

3    Q.      Now, you have prepared a report in this case;

4    true?

5    A.      Yes.

6    Q.      And it is a three-page report?

7    A.      Yes.

8    Q.      And was this report prepared by you?

9    A.      Yes.

10            MR. ERNST:  I would like that report

11   marked as Exhibit 4 to this deposition.

12            (Marked Exhibit No. 4.)

13   BY MR. ERNST:

14   Q.      Before you wrote this report, did you discuss

15   your findings or discuss what was going to be in the

16   report with Mr. Moriarty?

17            MR. MORIARTY:  Objection.

18            You can answer that.

19            THE WITNESS:  Yes.

20   BY MR. ERNST:

21   Q.      Did Mr. Moriarty suggest any changes that you

22   should include in your report?

23            MR. MORIARTY:  Objection.

24            You can answer that, too.

25            THE WITNESS:  Not to my knowledge.

McDANIEL SHORTHAND REPORTERS                         805-544-3363
PLAINTIFFS' EXHIBITS 010643

1    BY MR. ERNST:

2    Q.      Does your May 17th, 2011 report -- and that is

3    the date of Exhibit 4; true?

4    A.      Yes.

5    Q.      Does May 17th, 2011, contain the opinions and

6    conclusions that you intend to offer at the time of

7    trial?

8    A.      Yes.

9    Q.      Now, one of the reasons I want to take this

10   deposition is that I want to make sure there are no

11   surprises that are out there, and that you aren't

12   going to render any other opinions that are not

13   contained in this written document.  And it's your

14   testimony that this written document contains the

15   substance of the opinions you intend to offer at the

16   time of trial; true?

17   A.      Yes.

18   Q.      Now, circling back, if I were to ask you to

19   give us a number of the cases that you have testified

20   about death in courtrooms relating to drug toxicity,

21   would it be more than 25 times?

22           MR. MORIARTY:  Objection; asked and

23   answered.

24           Go ahead.

25           THE WITNESS:  Probably less than 25, yes.

PLAINTIFFS' EXHIBITS 010644

1    BY MR. ERNST:

2    Q.      Would it be more than 15 times?

3    A.      Again, at this point, without keeping a list,

4    it would be difficult for me to quantify it more than

5    that.  I would characterize it, however, that in my

6    court testimony, drug-related cases are a vast

7    minority of my case.

8    Q.      When you say "vast minority" of the number of

9    times that you have testified, do you believe it's

10   probably somewhere between 15 and 25 times?

11   A.      I think I've been --

12   Q.      Is that an accurate statement?

13   A.      I think I've been clear that I can't quantify

14   it any further than I already have.

15   Q.      But you haven't given me any estimate of

16   numbers, just a minority.  So can you give me the

17   number of times, within a range, that you think you've

18   testified with regard to drug toxicity as a cause of

19   death?

20           MR. MORIARTY:  Objection; asked and

21   answered.

22           Go ahead.

23           THE WITNESS:  I believe I've already

24   given you the best estimate, that it's somewhere

25   probably less than 25.

PLAINTIFFS' EXHIBITS 010645

Page 20

1    BY MR. ERNST:

2    Q.    Okay.  Would it be accurate to say that when

3    you say less than 25, does that mean 1, does that mean

4    10, does that mean 15?  So it could be an estimate of

5    15 to 25 is my point; is that an accurate statement?

6    A.    I think I've been clear that I can't further

7    quantify any more than I already have.

8    Q.    So it's someplace between 1 and 25 times; is

9    that accurate?

10   A.    Yes, sir.

11   Q.    And for each of those 1 to 25 times that

12   you've testified in a court of law, to your knowledge,

13   was it in criminal cases?

14   A.    Except for one civil case, yes.

15   Q.    And what was the civil case?

16   A.    The civil case was involving a woman who died

17   in the state of Alabama, and I was asked to provide an

18   opinion as to the cause of death and manner of death.

19   Her cause of death was initially called an acute

20   combined drug overdose, and it was my testimony that

21   she died of natural disease.

22   Q.    And were you hired by any person to render

23   that opinion?

24   A.    I was.

25   Q.    And by whom were you hired?

McDANIEL SHORTHAND REPORTERS                    805-544-3363

PLAINTIFFS' EXHIBITS 010646

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 21

1    A.      The attorney's name is Mike Florie,

2    F-L-O-R-I-E.  I don't remember the name of the law

3    firm.

4    Q.      Do you remember who Mike Florie was

5    representing?

6    A.      The defendant, the physician defendant.

7    Q.      It was a medical negligence case?

8    A.      A medical malpractice case.

9    Q.      Have you ever worked with Mr. Moriarty's firm

10   before?

11   A.      No, I have not.

12   Q.      Have you ever worked with Shook, Hardy & Bacon

13   before?

14   A.      No, I have not.

15   Q.      Do you have an understanding of how you were

16   contacted by Mr. Moriarty, and why?

17   A.      I was contacted by letter.  There may have

18   been a phone call, as well, but I don't recall.  It's

19   been several years ago.

20   Q.      Did you keep notes of the phone call?

21   A.      No.

22   Q.      Did Mr. Moriarty tell you about this case on

23   the phone?

24   A.      Again, I don't independently recall the

25   content of that conversation at this time.

PLAINTIFFS' EXHIBITS 010647

Page 22

 1    Q.      When you agreed to testify in this case, did
 2    you do so in 2009?
 3    A.      Yes.
 4    Q.      And what was your understanding of the facts
 5    of the case in 2009 when you agreed to testify for
 6    Actavis?
 7                    MR. MORIARTY:  Objection.
 8                    Go ahead.
 9                    THE WITNESS:  My understanding was that
10    Mr. McCornack was a gentleman who had died while on a
11    camping trip with his family.  An autopsy had been
12    performed and an investigation conducted by a
13    coroner's office in California.  Mr. McCornack was
14    taking a drug that was -- that had been recalled, and
15    the question that I was asked was to review the
16    material and provide the cause of death and manner of
17    death of Mr. McCornack.
18    BY MR. ERNST:
19    Q.      What material were you given in 2009?
20    A.      I was given a notebook of material that
21    contained the initial letter that's previously been
22    admitted to evidence; I was provided with medical
23    records, handwritten medical records; I was provided
24    with radiology, also, for Mr. McCornack; I was
25    provided with various pathology reports from biopsies

PLAINTIFFS' EXHIBITS 010648

1   that had been taken; I was provided with

2   electrocardiograph leads; I was also given medical

3   records from Dr. Von Dollen; I was given additional

4   lab material for Mr. McCornack; I was given

5   cardiovascular -- or cardiology consultant notes; I

6   was given the death certificate; I was given the

7   autopsy report; I was given toxicology results from

8   NMS Lab; I was given an --

9   Q.     Was that -- pardon me.  Was that the

10  toxicology result that had 3.6 nanograms per

11  milliliter of digoxin in his postmortem blood.

12  A.     Including other determinations, as well.

13         I was also given a recall letter from CVS

14  Caremark.  I was given --

15  Q.     Now, can you date that -- the date of the

16  recall letter was what?

17         MR. MORIARTY:  Don, this is really the

18  same binder that Dr. Heard (phonetic) had and that you

19  copied.

20         So you can tell him the date if it's

21  dated.

22         THE WITNESS:  May of 2008.

23  BY MR. ERNST:

24  Q.     Okay.

25  A.     I was also given a press release of a recall

PLAINTIFFS' EXHIBITS 010649

Page 24

1    from the U.S. Food and Drug Administration, dated

2    April 25th, 2008.

3    Q.     And after reviewing that material -- were you

4    given any depositions at that point?

5    A.     I don't remember what date I was provided

6    depositions.

7    Q.     You agreed to testify shortly after you got

8    the binder?

9    A.     I agreed to give my opinion, yes.

10   Q.     And what did you tell Mr. Moriarty your

11   opinion was?

12   A.     That based on the initial review of the

13   material, that Mr. McCornack died of natural disease,

14   not from an overdose or toxicity of digoxin.

15   Q.     At the time that you told Mr. Moriarty this,

16   had you been given the amended death certificate of

17   Mr. McCornack?

18   A.     Yes.

19   Q.     And had you been given the amended autopsy

20   findings of prepared by Dr. Mason?

21   A.     Yes.

22   Q.     Had you been given his deposition transcript?

23   A.     Again, I don't remember what date I was

24   provided with his transcript.

25   Q.     What I would like to do is, this folder that

PLAINTIFFS' EXHIBITS 010650

1   you have in front of you, Doctor, is this the folder

2   that you received or the binder that you received in

3   2009 from Mr. Moriarty?

4   A.      Yes.

5   Q.      Had you added anything to it?

6   A.      I'm sorry?

7   Q.      Since -- have you added any documents to it

8   since 2009?

9   A.      Have I added anything to it, or --

10  Q.      Right.

11  A.      No.  I haven't added anything to it, no.

12  Q.      And has it been in your possession since 2009?

13  A.      It has.

14  Q.      I would like your binder, in its entirety as

15  it currently sits, marked as Exhibit 5.

16              MR. ERNST:  And for the court reporter's

17  issue, what I'd like to do is to just have her copy it

18  and put it in a binder just as it is and then furnish

19  it to me.

20              Now, Matt, you just took a document out

21  of the binder.  What document did you take out?

22              MR. MORIARTY:  The report -- or the

23  letter I sent her, which is here, was stuck with

24  static electricity to the front of the binder, the

25  original letter of which has been copied and marked as

PLAINTIFFS' EXHIBITS 010651

Page 26

 1    an exhibit.  But I am going to pull documents from the

 2    binder, because she has placed things subsequently

 3    received into the pockets.  So if you want Exhibit --

 4    let me finish.  If you want Exhibit 5 to be the

 5    original binder, you're going to get it as the

 6    original binder, and then you can ask her about

 7    whatever else she subsequently received.

 8                MR. ERNST:  Well, what I'd like is -- I

 9    can see it in front of her, and what I would like to

10    do is to have the binder -- and you just -- did you

11    take back your letter again, Mr. Moriarty?

12                MR. MORIARTY:  It's sitting right here,

13    Don (indicating).

14                MR. ERNST:  Well, thank you, I can't see

15    it.  What I would like is to have the binder, as it

16    currently exists, marked as Exhibit 5, with all the

17    documents that currently you have in it, Dr. McMaster.

18                (Marked Exhibit No. 5.)

19    BY MR. ERNST:

20    Q.    And then my question is:  What documents do

21    you have in the binder now that weren't received in

22    2009?

23                MR. ERNST:  And I would like to have her

24    have it in front of her, Matt, so that she can answer

25    that question.

PLAINTIFFS' EXHIBITS 010652

                                                                Page 27
 1                   MR. MORIARTY:  That's fine, Don, but I'm
 2      going to look at it first to make sure there's nothing
 3      beyond the Rule 26 requirements that might be in here.
 4                   MR. ERNST:  Well, I can't see you do
 5      that, Matt.
 6                   MR. MORIARTY:  The court reporter is here
 7      watching me, Don.
 8                   MR. ERNST:  Thank you, Matt.
 9                   MR. MORIARTY:  So you can ask her if I do
10      anything nefarious.
11                   MR. ERNST:  I'm not suggesting you would
12      do anything nefarious.
13                   MR. MORIARTY:  Now, there's a group of
14      materials in here that I'm removing, and I am
15      replacing them with copies, which I prepared for you
16      knowing you were going to ask this question; okay?
17                   MR. ERNST:  Why are you removing them,
18      Matt?
19                   MR. MORIARTY:  Because I'm replacing them
20      with copies and their originals.
21                   MR. ERNST:  Why -- she's going to get
22      this document back.  I want it copied in the original
23      form.
24                   MR. MORIARTY:  I guess you don't trust
25      me.  Fine, they're back in there.

PLAINTIFFS' EXHIBITS 010653

1            MR. ERNST:  There's no reason to change

2   or -- make any changes.  I want the binder marked in

3   its entirety as Exhibit 5, I want the court reporter

4   to copy it, and then all of the documents will be

5   returned to the doctor for her file.

6            MR. MORIARTY:  It's done.

7   BY MR. ERNST:

8   Q.     Now, Doctor, is there anything in that binder

9   that you have that we've now marked as Exhibit 5 that

10  you did not receive in 2009?

11  A.     Yes.

12  Q.     Please state for us what that is.

13  A.     I have a --

14  Q.     And identify it.

15  A.     I have a CV from Keith Patrick Gibson.

16  Q.     Okay.

17  A.     I have an expert opinion of Mr. Keith Patrick

18  Gibson -- or, I'm sorry, Dr. Keith Patrick Gibson.

19  Q.     Okay.

20  A.     I have a request for professional billing that

21  I have already previously testified about regarding my

22  initial billing of this case.

23  Q.     Okay.

24  A.     I have an abstract from PubMed.

25  Q.     What is the abstract of?

PLAINTIFFS' EXHIBITS 010654

Page 29

1   A.      The "Digoxin concentrations in postmortem

2   human tissues."

3   Q.      By whom?

4   A.      The first author's last name is McKercher,

5   M-C-K-E-R-C-H-E-R.

6   Q.      Okay.  Anything else?

7   A.      Uh-huh, an abstract from the archives of

8   pathology and laboratory medicine, "Interpretation of

9   elevated postmortem serum concentrations of the

10  digoxin in infants and children."

11  Q.      And where did you get that?

12  A.      From PubMed.

13  Q.      No, but where did you get the site to look at

14  PubMed?  Was that given to you by Mr. Moriarty?

15  A.      No, it was on my own.

16  Q.      Okay.  Go ahead.

17  A.      I have a newsletter from "Clinical & Forensic

18  Toxicology News," dated March of 2004.

19  Q.      Okay.

20  A.      I have an article from the "British Journal of

21  Clinical Pharmacology" by Ferner, F-E-R-N-E-R.

22  Q.      Now, all of these documents are in a folder in

23  the front or back of the binder; is that true?

24  A.      They're in the back.

25  Q.      They're in a pocket?

PLAINTIFFS' EXHIBITS 010655

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 30

1   A.      They are.

2   Q.      And are these all things that you placed in

3   this binder after 2009?

4   A.      Yes.

5   Q.      Well, how many more documents do we have

6   there?

7   A.      I have a faxed copy where I faxed the initial

8   billing that I've previously testified to.

9   Q.      Okay.

10  A.      That's everything.

11  Q.      And that's in the pocket of the binder; true?

12  A.      Yes, sir.

13  Q.      All right.  Now, I want to go back to your

14  report on Exhibit 4.  Can you get to your report,

15  please?

16  A.      I can.

17  Q.      There's a couple of things in your report that

18  I want to review and I want to ask you about.  In your

19  review of the records of Dr. Gordon Lemm, did you see

20  that Mr. McCornack was compliant in taking his

21  medication?

22  A.      I don't remember that specifically, no.

23  Q.      Do you have any information that he was or was

24  not compliant?

25          MR. MORIARTY:  Objection.

McDANIEL SHORTHAND REPORTERS                            805-544-3363

PLAINTIFFS' EXHIBITS 010656

Page 31

1               THE WITNESS:  I would have to go back and

2    review the specific records from Dr. Lemm specifically

3    addressing whether or not he was compliant with his

4    medicine.

5    BY MR. ERNST:

6    Q.     As we sit here today, do you have an opinion

7    as to whether he was compliant or noncompliant with

8    taking his medication, specifically digoxin?

9    A.     Well, since it was in his postmortem

10   toxicology, I assume he was taking it, yes.

11   Q.     I know that you can assume that he was taking

12   it based upon the toxicological report, but my

13   question is:  Do you have an opinion as to whether or

14   not he followed the directions of his physician and

15   took it in an appropriate and regular fashion?

16   A.     I have no way to form that opinion based on

17   what I've been given.

18   Q.     So you do not have an opinion about whether or

19   not he was compliant in taking his medication on a

20   regular basis or not; true?

21   A.     Well, I know that he was taking it at the time

22   of his death, because it's present in his postmortem

23   blood.

24               MR. ERNST:  I will have my last question

25   read back, please.

PLAINTIFFS' EXHIBITS 010657

1                    (The requested portion was read back.)

2                    THE WITNESS:  I'm sorry, I've already

3    answered it.  Is there another part to the question?

4    BY MR. ERNST:

5    Q.      Doctor, you do not have an opinion as to

6    whether or not he took his medication regularly, do

7    you?

8    A.      No.

9    Q.      You don't have any information that he did not

10   take his medication regularly and properly, do you?

11   A.      No.  I would defer to his clinical treating

12   physicians to make that assessment.

13   Q.      Thank you, Doctor.

14           Now, there is the NMS Lab report that was

15   taken of the blood of Mr. McCornack following his

16   death.  Do you have that?

17   A.      I do.

18                   MR. ERNST:  Let's mark that as Exhibit 6.

19                   (Marked Exhibit No. 6.)

20   BY MR. ERNST:

21   Q.      And I understand that it's contained in your

22   book of Exhibit 5, but we're going to make a copy of

23   it so that we will have it separate so we can easily

24   find it and discuss it.

25           Do you have any issues with the methodology

PLAINTIFFS' EXHIBITS 010658

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 33

1   that was utilized in testing the blood of

2   Mr. McCornack where it was determined that he had 3.6

3   nanograms per milliliter of digoxin in his blood

4   postmortem?

5   A.      No.

6                  MS. AHERN:  Objection.

7   BY MR. ERNST:

8   Q.      Now, Doctor, from your training and experience

9   as a forensic pathologist -- and that's what you

10  consider yourself to be, right, a forensic

11  pathologist?

12  A.      Yes.  I'm also considered to be that by the

13  American Board of Pathology.

14  Q.      All right.  Please state for the record what

15  your understanding is of the therapeutic values of

16  digoxin in a living person?

17  A.      I think the therapeutic value in a living

18  person is variable, and it will vary from patient to

19  patient.

20  Q.      Is it generally understood that the

21  therapeutic value is .5 to 2.0 for digoxin?

22  A.      I think it's fair that there are

23  recommendations for the level of digoxin; however,

24  certain patients may need a higher level and be

25  maintained on a higher or lower level.

PLAINTIFFS' EXHIBITS 010659

Page 34

1    Q.      Please state for me what the recommendations

2    are for therapeutic values of digoxin in a living

3    person as you understand them to be?

4    A.      Well, as I've previously testified to, it's

5    variable from person to person, and the patients are

6    titrated to effect, as opposed to a specific number

7    for a blood level.

8    Q.      Isn't it true that the generally accepted

9    recommendations for therapeutic values of digoxin in

10   the bloodstream of a living person is .5 to 2.0?

11             MR. MORIARTY:  Objection.

12             Go ahead.

13             THE WITNESS:  Yeah, I think I've answered

14   that twice already and would be happy to provide you

15   with the same answer again.

16   BY MR. ERNST:

17   Q.      I want to know what the numbers are for the

18   recommendation of digoxin, Doctor.

19             MR. MORIARTY:  Objection; asked and

20   answered.

21   BY MR. ERNST:

22   Q.      As your understanding.

23             MR. MORIARTY:  Objection; asked and

24   answered three or four times now.

25             MR. ERNST:  She has not given me any

PLAINTIFFS' EXHIBITS 010660

Page 35

1    numbers, and I will re-ask the question, Mr. Moriarty.

2               MR. MORIARTY:  She's not required to give

3    you numbers.  She's answered the question medically.

4    BY MR. ERNST:

5    Q.     Please state for me what your understanding is

6    of a toxic level of digoxin in a person's bloodstream

7    when they are living?

8               MR. MORIARTY:  Objection.

9               MS. AHERN:  Objection.

10              MR. MORIARTY:  Go ahead.

11              THE WITNESS:  It depends on the patient.

12   BY MR. ERNST:

13   Q.     As far as the literature is concerned, isn't

14   it accurate to state that the level for digoxin

15   therapeutic values in a living person is .5 to 2.0?

16              MS. AHERN:  Objection.

17              MR. MORIARTY:  Objection.

18              Go ahead.

19              THE WITNESS:  Again, my answer remains

20   that it depends on the clinical circumstance of the

21   patient and not one individual level of digoxin in the

22   blood.

23   BY MR. ERNST:

24   Q.     So is it your testimony that a person could

25   have a digoxin level of 3.6 in a living tissue and you

PLAINTIFFS' EXHIBITS 010661

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 36

1    think that would be just fine, Doctor?

2                MR. MORIARTY:  Objection; form.

3                Go ahead.

4                THE WITNESS:  It depends on the symptoms

5    and the clinical picture of the patient and how they

6    present.

7    BY MR. ERNST:

8    Q.    Okay.  Look, I just want to try and get an

9    answer out of you as to what your understanding is of

10   the therapeutic range that is generally medically

11   accepted for digoxin in a living person.  I know that

12   you say it "depends," but my question is:

13   Numerically, as a physician, a trained scientist,

14   please state for the record what your understanding is

15   of the therapeutic levels that is generally medically

16   accepted to be therapeutic for digoxin?

17               MR. MORIARTY:  Objection; form and

18   otherwise.

19               Go ahead and answer.

20               THE WITNESS:  My previous answer remains,

21   that it depends on the clinical symptoms and the

22   clinical presentation of the patient.

23   BY MR. ERNST:

24   Q.    All right.  It depends on the clinical

25   presentation of the patient, I understand that,

PLAINTIFFS' EXHIBITS 010662

AMY R. McMASTER, M.D.                                   August 5, 2011

Page 37

1    Doctor, and you have just said that.  So in your

2    opinion, what is the range that you would find

3    acceptable for digoxin in a living patient, the low

4    and the high, please?

5                MR. MORIARTY:  Objection.

6                MS. AHERN:  Objection.

7                MR. MORIARTY:  Asked and answered.

8                THE WITNESS:  It depends on the clinical

9    presentation of the patient.

10   BY MR. ERNST:

11   Q.    All right, I understand that for the clinical

12   presentation of the patient.  My question is:  In the

13   range of human experience, please state for me what

14   your opinion is of the low range of digoxin levels in

15   a bloodstream for treatment purposes and the high

16   range, whatever those numbers are?

17               MR. MORIARTY:  Objection.

18               Don't answer that.

19               You've asked the same question at least

20   eight times.  Ask a different question.

21               MR. ERNST:  Mr. Moriarty --

22               MR. MORIARTY:  Yes, sir.

23               MR. ERNST:  -- I don't believe that's an

24   appropriate objection, and I will have my last

25   question read back.

McDANIEL SHORTHAND REPORTERS                          805-544-3363
PLAINTIFFS' EXHIBITS 010663

1            MR. MORIARTY:  Don --

2    BY MR. ERNST:

3    Q.     And, Doctor, I would ask you to answer the

4    question.

5            MR. MORIARTY:  Don, you've asked the same

6    question eight times.  You've tried a couple times at

7    a different angle and I didn't object.  If you want to

8    know what the lab slips say, ask her that; if you want

9    to know what the literature says on the product label,

10   ask her that.  But that's not what you're asking.  So

11   please ask a different question.

12           MR. ERNST:  All right, Mr. Moriarty,

13   we'll just continue on this line of questioning.

14   BY MR. ERNST:

15   Q.     Doctor, what's on the product label for

16   digoxin for therapeutic values?

17   A.     I don't know.

18   Q.     What is on the lab slips for digoxin -- for

19   the acceptable range of therapeutic value for digoxin?

20   A.     According to the Twin Cities Community

21   Hospital, on a report dated August 2nd of 2001, their

22   reported reference range is between 0.8 and 2.0.

23   Q.     Do you agree with that, Doctor?

24   A.     I would defer to their expertise in that.

25   Q.     So you would acknowledge that the therapeutic

PLAINTIFFS' EXHIBITS 010664

1    range is from .8 to 2.0?

2    A.      I would acknowledge that that is a

3    recommendation; however, my previous answer stands,

4    that it depends on the patient's presentation and

5    their symptoms at any one particular level.

6    Q.      Going back to that August 2nd, 2001 lab slip,

7    what was the level that Mr. McCornack had in his blood

8    of digoxin?

9    A.      1.7 nanograms per milliliter.

10   Q.      And do you -- as you sit here today, under

11   oath, do you have knowledge of what the test ranges

12   were for Mr. McCornack for all the years that he was

13   tested for digoxin?

14   A.      Not without looking at each particular one,

15   no.

16   Q.      You have them in front of you, don't you?

17   A.      Yes.

18   Q.      Isn't it accurate to state that they range

19   from 1.6 to 1.8 for all the years that he was tested?

20   A.      I didn't memorize each particular level, but,

21   again, I have the labs in front of me, if you'd like

22   for me to flip through and look?

23   Q.      Well, sure, just give us the numbers that he

24   had in his bloodstream, Doctor.

25              MR. MORIARTY:  Can you give us the dates

PLAINTIFFS' EXHIBITS 010665

AMY R. McMASTER, M.D.                                    August 5, 2011

 1  so she doesn't have to look through every page?

 2              MR. ERNST:  Well, I thought -- she's got

 3  her book there and she's got the lab reports.

 4              MR. MORIARTY:  That's fine.  I thought it

 5  would be more efficient since you know when they all

 6  were.

 7  BY MR. ERNST:

 8  Q.      Is it important for you, Doctor -- while

 9  you're looking, is it important for you to know what

10  his blood level was during his lifetime to render your

11  opinions?

12              MR. MORIARTY:  Objection.

13              Go ahead.

14  BY MR. ERNST:

15  Q.      Blood level of digoxin?

16  A.      Any of his clinical indicators or any of his

17  clinical history is helpful for me to know, yes.

18  Q.      Well, as you sit here today rendering your

19  opinion, please state for me what your understanding

20  is of his digoxin blood levels during his lifetime for

21  the multiple times that he was tested during his

22  lifetime, before his death.

23  A.      I don't have any independent recollection that

24  he had a problem with the digoxin toxicity during his

25  lifetime.

McDANIEL SHORTHAND REPORTERS                         805-544-3363

PLAINTIFFS' EXHIBITS 010666

AMY R. McMASTER, M.D.                                      August 5, 2011

Page 41

 1   Q.     Well, in looking at the tests, is it safe to

 2   say that they're somewhere between 1.6 and 1.8,

 3   Doctor?

 4   A.     Well, I've just reached another digoxin

 5   reading that is dated from -- February 20th, 2004,

 6   that's 1.8 nanograms per milliliter.

 7            MR. MORIARTY:  So I found a list of them,

 8   Don.  Do you want me to go through them, or do you

 9   want to watch her flip through her book?

10            MR. ERNST:  Sure, let's save some time.

11   Give her the list, Matthew.

12            MR. MORIARTY:  March of 1995 was 1.4;

13   August 1st, 2001, 1.7; November 2002, 1.5;

14   February 2004, 1.8; July 2006, 1.5; May 2007, 1.6.

15   BY MR. ERNST:

16   Q.     Now, Doctor, do you agree that those are

17   accurate numbers given by Mr. Moriarty, because while

18   he's saying that, I want your testimony.  Do you agree

19   with that, Doctor?

20   A.     I have not, so far, been provided with any

21   information that his digoxin level is above 2.0.

22   Q.     Well, in fact, you haven't had any provided

23   information to say digoxin was ever above 1.8, have

24   you?

25   A.     Okay, fine, 1.8.

McDANIEL SHORTHAND REPORTERS                          805-544-3363

PLAINTIFFS' EXHIBITS 010667

1    Q.      Now, under oath, do you adopt those numbers

2    that Mr. Moriarty has just testified to as being

3    accurate, based on your training, experience, and

4    knowledge and review of the records?

5    A.      Sure, I have no reason to disbelieve them.

6    Q.      All right.  Now, postmortem, looking at

7    Exhibit 6, his blood level was 3.6 nanograms per

8    milliliter; true?

9    A.      That's what the reading was in his postmortem

10   blood, yes.

11   Q.      And that is above the therapeutic level; true?

12              MR. MORIARTY:  Objection.

13              Go ahead.

14              THE WITNESS:  By numbers alone, it is,

15   yes; however, that number is not a true reflection of

16   what the antemortem level of digoxin was.

17   BY MR. ERNST:

18   Q.      And the reason you believe it's not a true

19   reflection is because of the scientific item that you

20   call "postmortem redistribution"; true?

21   A.      Yes, I would call postmortem redistribution a

22   well and generally accepted principle in forensic

23   pathology.

24   Q.      And, in fact, Doctor, in your report on

25   page 2, at the bottom of the page, you have cited a

PLAINTIFFS' EXHIBITS 010668

AMY R. McMASTER, M.D.                                    August 5, 2011

 1   textbook.  It's Baselt, Eighth Edition, "Disposition
 2   of Toxic Drugs and Chemicals in Man," from 2008; true?
 3   A.      True.
 4   Q.      Now, tell me about that textbook.  Is that
 5   used in medical schools, Doctor?
 6   A.      I did not use it in medical school.
 7   Q.      Well, you've cited it in your report.  I know
 8   you graduated long before 2008, forgive me, but the
 9   Baselt book is a textbook; true?
10   A.      It is.
11   Q.      And where is it utilized?
12   A.      Well, I use it on -- in my daily practice as a
13   forensic pathologist.
14   Q.      How do you use it in your daily practice as a
15   forensic pathologist?  Describe it generally.
16   A.      I use it for several reasons:  one, general
17   information about drugs; two, general information
18   about the pharmacology of drugs; three, for general
19   guidelines for reference ranges for possible toxic and
20   therapeutic and potentially lethal levels of drugs;
21   and for information regarding the issue of postmortem
22   redistribution.
23   Q.      Postmortem redistribution is very important to
24   you as a forensic pathologist because it can affect
25   your opinions as to cause of death; true?

McDANIEL SHORTHAND REPORTERS                        805-544-3363
PLAINTIFFS' EXHIBITS 010669

Page 44

 1    A.      Yes.

 2    Q.      Now, this Baselt book is peer reviewed; true?

 3            MR. MORIARTY:  Objection.

 4            Go ahead.

 5            THE WITNESS:  Most of the material that's

 6    in it is derived from peer-reviewed sources.

 7    BY MR. ERNST:

 8    Q.      And you trust it and rely upon it?

 9    A.      I do rely on it, yes.

10    Q.      And you trust it?

11    A.      I believe that the information contained in it

12    is accurate.

13    Q.      And looking at your report on page 2, in the

14    last full sentence, I want to read it to you and see

15    if it's accurate:  "In fact," comma, "it has been

16    determined that serum digoxin levels nearly always

17    increase after death due to leaking from the muscle,

18    with an average antemortem," slash, "postmortem ratio

19    ranging from 1.42 for femoral," or femoral (phonetic),

20    "vein blood specimens to 1.96 for heart blood

21    specimens," and open parens, "'Disposition of Toxic

22    Drugs and Chemicals in Man,' Eighth Edition, Baselt

23    2008."  Is that an accurate statement?

24    A.      Yes.

25    Q.      And that is something that you have relied on

PLAINTIFFS' EXHIBITS 010670

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 45

1    in rendering your opinions; true?

2                   MR. MORIARTY:  Objection.

3                   Go ahead.

4                   THE WITNESS:  Yes.

5    BY MR. ERNST:

6    Q.      Now, Doctor, that is a scientific basis for

7    some of your opinions; true?

8                   MR. MORIARTY:  Objection.

9                   Go ahead.

10                  MS. AHERN:  Objection.

11                  THE WITNESS:  Yes.

12   BY MR. ERNST:

13   Q.      And you believe that it's scientifically sound

14   and peer reviewed; true?

15                  MR. MORIARTY:  Objection.

16                  THE WITNESS:  As I previously testified

17   to, the material contained in the book is pulled from

18   peer-reviewed sources, generally.

19   BY MR. ERNST:

20   Q.      Now, this sentence that you have cited I want

21   to talk about specifically.  You have reviewed the

22   autopsy report of Dr. Mason; true?

23   A.      Right.

24   Q.      Did you review his deposition?

25   A.      I did.

McDANIEL SHORTHAND REPORTERS                        805-544-3363

PLAINTIFFS' EXHIBITS 010671

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                              Page 46

1    Q.      And were you aware that the blood drawn from

2    Mr. McCornack by Dr. Mason was peripheral blood?

3                MR. MORIARTY:  Objection.

4                Go ahead.

5                THE WITNESS:  No.  It's my understanding

6    that it was axillary blood, which I do not necessarily

7    consider a peripheral source.

8    BY MR. ERNST:

9    Q.      You're aware that Dr. Mason testified that it

10   was a peripheral source and checked the box when he

11   sent the specimen off to NMS Labs?  Do you recall

12   that?

13   A.      I do.  I believe that it was Dr. Mason's

14   opinion.

15   Q.      Now, as you sit here today, do you know how

16   Dr. Mason got the blood out of the axial vein?

17   A.      Yes.

18   Q.      Isn't it true that he sliced the vein and then

19   press-lifted the wrist and pressed the blood out of

20   the vein all the way down the arm and collected it for

21   his sample?

22               MR. MORIARTY:  Objection.

23               Go ahead.

24               THE WITNESS:  That was his description of

25   how he obtained the specimen, yes.

McDANIEL SHORTHAND REPORTERS                      805-544-3363
PLAINTIFFS' EXHIBITS 010672

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 47

1    BY MR. ERNST:

2    Q.      Now, that would be considered peripheral

3    blood; isn't that true?

4    A.      Again, as I previously testified to, in this

5    case, axillary blood is not a true peripheral

6    specimen.

7    Q.      That's your opinion; right?

8    A.      Based on my training and experience, yes, it's

9    my opinion.

10   Q.      You're aware that Dr. Mason has concluded that

11   it was peripheral blood; true?

12   A.      I've answered that, yes.

13   Q.      And he took the sample; true?

14   A.      Yes, it's my understanding that Dr. Mason drew

15   the sample.

16   Q.      And that is a reasonable difference of

17   opinions between forensic pathologists, isn't it?

18               MR. MORIARTY:  Objection.

19               MS. AHERN:  Objection.

20               THE WITNESS:  Again, I've stated my

21   opinion that it is not a true peripheral specimen.

22   BY MR. ERNST:

23   Q.      Doctor, it's reasonable for Dr. Mason to have

24   the opinion that it's peripheral blood because he took

25   it from the arm from the wrist down; isn't that true?

McDANIEL SHORTHAND REPORTERS                          805-544-3363

PLAINTIFFS' EXHIBITS 010673

Page 48

1            MR. MORIARTY:  Objection.  You're trying

2   to argue.  She's answered that question already.

3            Go ahead.

4            THE WITNESS:  I think it's reasonable,

5   obviously, for Dr. Mason to have his own opinion; I

6   disagree with it on a scientific basis.

7   BY MR. ERNST:

8   Q.    Okay.  Now, Doctor, the "Disposition of Toxic

9   Drugs and Man" article that you cite, if it's

10  peripheral blood and you factor back the 1.42

11  antemortem, slash, postmortem ratio, and you compute

12  the numbers, isn't it true that the blood sample for

13  Mr. McCornack turns out to be over 2.4?

14            MR. MORIARTY:  Objection.

15            Go ahead.

16            THE WITNESS:  Well, (a), I don't agree

17  that it's a peripheral specimen, and I don't agree

18  that you necessarily can use the 1.42 number for back

19  extrapolation.

20  BY MR. ERNST:

21  Q.    What number would you use for back

22  extrapolation, Doctor?

23  A.    Well, I would not back extrapolate.

24  Q.    Well, you're aware that the Baselt textbook

25  says that you can back extrapolate based on the

PLAINTIFFS' EXHIBITS 010674

1    numbers that you've included in your report; true?

2                MR. MORIARTY:  Objection.

3                THE WITNESS:  Well, no, that's not what

4    the Baselt information states.

5    BY MR. ERNST:

6    Q.    Doesn't the -- in your own report state that

7    an average antemortem, slash, postmortem ratio ranging

8    from 1.42 for femoral blood -- vein blood, isn't that

9    what that means?

10                MR. MORIARTY:  Objection.

11                Go ahead.

12                THE WITNESS:  Yes, I agree that the

13   average antemortem/postmortem ratio was 1.42 for

14   femoral blood specimen.

15   BY MR. ERNST:

16   Q.    Doctor, if you assume that the blood specimen

17   taken from Mr. McCornack was peripheral -- I want you

18   to assume that -- then wouldn't it be accurate to

19   state that, computing back from the postmortem blood

20   level to the antemortem blood level would produce a

21   digoxin level in Mr. McCornack's blood of over 2.4?

22                MR. MORIARTY:  Objection.

23                Go ahead.

24                THE WITNESS:  No.  As I've previously

25   stated, it's not a true peripheral specimen, and 1.42

PLAINTIFFS' EXHIBITS 010675

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 50

1    is simply an average.  Some of the values are much

2    higher, and some could be much lower.

3    BY MR. ERNST:

4    Q.     So, in fact, the range of Mr. McCornack's

5    blood before his death could be as high as 3.0; true?

6              MR. MORIARTY:  Objection.

7              MS. AHERN:  Objection.

8              MR. MORIARTY:  Go ahead.

9    BY MR. ERNST:

10   Q.     Using -- using the Baselt textbook

11   methodology?

12             MR. MORIARTY:  Objection; form.

13             Go ahead.

14             THE WITNESS:  I think, scientifically,

15   the point is that the level that was drawn in his

16   postmortem blood is not an indicator of what the

17   antemortem blood level of digoxin was.

18   BY MR. ERNST:

19   Q.     Well, you certainly have to agree that he had

20   digoxin in his system; true?

21   A.     Yes, I agree with that.

22   Q.     And the 3.6 number means something; right?

23   A.     It means that he had 3.6 nanograms per

24   milliliter of digoxin in his postmortem blood

25   specimen.

PLAINTIFFS' EXHIBITS 010676

AMY R. McMASTER, M.D.                                August 5, 2011

Page 51

1   Q.      If you take that 3.6-nanograms-per-milliliter

2   blood specimen after his death and apply the Baselt

3   textbook ratio of antemortem to postmortem for

4   peripheral blood of 1.42, you come up with a level

5   that exceeds the recommended therapeutic value for

6   digoxin; isn't that true?

7              MR. MORIARTY:  Objection.  There is

8   nowhere in that sentence that they talk about

9   peripheral, so -- and you have asked this question and

10  she's answered it.

11             Go ahead and tell him again.

12             THE WITNESS:  Again, this is not a

13  peripheral blood specimen.  And the point of this

14  blood level means that the antemortem level cannot be

15  inferred simply from the postmortem digoxin level

16  alone.

17  BY MR. ERNST:

18  Q.      Would you agree that the average

19  antemortem/postmortem ratio ranging from 1.42 for

20  femoral vein blood is accurate?

21             MR. MORIARTY:  Objection.

22             Go ahead.

23             THE WITNESS:  I would agree that that's

24  the information that's provided in the Baselt textbook

25  that I have quoted in my report.

PLAINTIFFS' EXHIBITS 010677

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 52

1    BY MR. ERNST:

2    Q.      And would you agree that the

3    antemortem/postmortem ratio for heart blood is 1.96?

4              MR. MORIARTY:  Objection.

5              Go ahead.

6              THE WITNESS:  Yes, I would agree that

7    that's the information that's provided in my report.

8    BY MR. ERNST:

9    Q.      So do you have an opinion as to what the

10   axillary blood value would be, someplace between 1.42

11   and 1.96; right?

12   A.      No, not necessarily.

13   Q.      Well, what do you think it is for an axillary

14   blood --

15             MR. MORIARTY:  Objection.

16             Go ahead.

17   BY MR. ERNST:

18   Q.      What do you think the ratio is, Doctor?

19             MR. MORIARTY:  Objection.

20             Go ahead.

21             THE WITNESS:  There's no scientific basis

22   to make an estimate.

23   BY MR. ERNST:

24   Q.      Well, would you agree that, as a peripheral

25   blood sample, that it's someplace between 1.42 and

McDANIEL SHORTHAND REPORTERS                          805-544-3363

PLAINTIFFS' EXHIBITS 010678

 1    1.96?

 2                MR. MORIARTY:  Objection; asked and

 3    answered.

 4                Go ahead.

 5                THE WITNESS:  As I previously testified

 6    to, no, that inference cannot be made.

 7    BY MR. ERNST:

 8    Q.    Would you acknowledge that the blood from the

 9    axillary vein would be -- as far as

10    antemortem/postmortem ratio, would be less than for

11    heart blood?

12                MR. MORIARTY:  Objection.

13                Go ahead.

14                MS. AHERN:  Objection.

15                THE WITNESS:  No.  I think I've answered

16    that probably at least twice now, that a scientific

17    inference about the level of postmortem redistribution

18    and axillary vein cannot be inferred from the

19    information that's provided.

20    BY MR. ERNST:

21    Q.    So you disagree with the Baselt textbook --

22    this sentence in the Baselt textbook; true?

23    A.    I don't know on what basis you're making that

24    inference.

25    Q.    Well, the Baselt textbook just states, as it

PLAINTIFFS' EXHIBITS 010679

Page 54

1    does in your report, that you can compute the average

2    antemortem/postmortem ratio from a postmortem sample;

3    isn't that true?

4                MR. MORIARTY:  Objection.  That is not

5    what that says.  Represent this accurately.

6                Go ahead, answer his question.

7                THE WITNESS:  No.

8    BY MR. ERNST:

9    Q.     Now, do you believe that Mr. McCornack died of

10   sudden cardiac death?

11   A.     Sudden cardiac death is not a diagnosis.

12   Q.     Well, how do you believe that Mr. McCornack

13   died?

14   A.     I believe he died from hypertensive

15   cardiovascular disease.

16   Q.     Right, but how did he die?  What caused --

17   what was the -- from your point of view, did his heart

18   stop beating?

19   A.     Well, obviously, everyone who dies, their

20   heart stops beating.

21   Q.     Right.  Well, tell me what you think happened

22   to Mr. McCornack's heart.

23   A.     I don't believe I understand your question.

24   Q.     Well, you mention in your report, in the

25   second paragraph on page 2, that Mr. McCornack had a

PLAINTIFFS' EXHIBITS 010680

1   number of cardiac findings capable of causing sudden

2   cardiac death.  Do you see that?

3   A.       I do, in the first paragraph.

4   Q.       Now, you used the term "sudden cardiac death,"

5   what did you mean by that?

6   A.       In my terminology, sudden cardiac death means

7   someone who dies from a cardiac-related problem,

8   cardiac-related disease, that typically has an acute

9   onset.

10  Q.       Do you believe that happened to Mr. McCornack?

11  A.       I do.

12  Q.       All right.  So you believe that Mr. McCornack

13  had a sudden cardiac death event?

14  A.       Yes.

15  Q.       All right.  Now, isn't it true that digoxin

16  toxicity can cause a sudden cardiac death event?

17               MR. MORIARTY:  Objection; form.

18               Go ahead.

19               THE WITNESS:  I think it's true that in

20  the differential of sudden cardiac death, you have to

21  include certain toxicology causes, one of which may be

22  digoxin toxicity.

23  BY MR. ERNST:

24  Q.       Now, in your report, you don't state that

25  digoxin can cause sudden cardiac death, do you?

PLAINTIFFS' EXHIBITS 010681

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 56

1    A.       No, nor do I list the other hundreds of things

2    that can cause sudden cardiac death, as well.

3    Q.       Now, Doctor, were you aware that the drug that

4    was being taken, digoxin, by Mr. McCornack, in the

5    form of Digitek« produced by Actavis, was recalled?

6    A.       I was aware that a recall had been issued and

7    he potentially had received some of that medication.

8    Q.       Were you aware that he had, in fact, received

9    the recalled medication?

10   A.       Yes.

11   Q.       Were you aware that he had received a letter

12   addressed to him about the recalled medication?

13   A.       Well, the letter from CVS Caremark is

14   addressed "Dear Planned Participate," it doesn't have

15   a particular name on it.

16   Q.       Right.  Well, were you aware that Mr. -- in

17   your documents there, were you aware that

18   Mr. McCornack had been given a specifically addressed

19   letter to him?

20   A.       I don't have that independent recollection,

21   no.

22   Q.       So would it be important to you in rendering

23   your opinions that, in fact, Mr. McCornack would have

24   been sent this letter, specifically addressed to him,

25   that the medication he was taking was recalled?

PLAINTIFFS' EXHIBITS 010682

Page 57

1   A.      Sure.  Any clinical information regarding a

2   drug a patient is taking would be important for me to

3   know about.

4   Q.      But that letter specifically addressed to

5   Mr. McCornack is not in your material, is it?

6   A.      I don't have an independent recollection of a

7   letter that was addressed specifically to

8   Mr. McCornack; however, I do have one that indicates

9   that, potentially, the drug that he was taking was

10  involved in the recall.

11  Q.      Right.  Now, what's the date of that letter?

12  A.      May of 2008.

13  Q.      May what?  May what?

14  A.      May of 2008, is all it states on the letter.

15  Q.      All right.  And when did Mr. McCornack die?

16  A.      March 23rd of 2008.

17  Q.      So would it be important for you to know that

18  Mr. McCornack died, and then some five weeks after his

19  death he gets a recall notice for the medication he

20  was taking?

21              MS. AHERN:  Objection; argumentative.

22              THE WITNESS:  In my practice, if any

23  additional information comes to light after I have

24  ruled on the cause of death and the manner of death, I

25  am certainly willing to consider that information.

PLAINTIFFS' EXHIBITS 010683

Page 58

1    BY MR. ERNST:

2    Q.      Right, and as a pathologist, you want to do

3    the right thing, don't you?

4                  MR. MORIARTY:  Objection.

5                  Go ahead.

6                  MS. AHERN:  Objection.

7                  THE WITNESS:  What do you mean by "do the

8    right thing"?  That's a rather general term.

9    BY MR. ERNST:

10   Q.      Well, if you've come across information

11   following an additional report that you've rendered a

12   cause-of-death opinion that might change that opinion,

13   you would change your mind, wouldn't you?

14   A.      What I previously testified to, that I would

15   consider all information that was provided to me after

16   I had already ruled on the cause of death and manner

17   of death.  I will consider it, it doesn't necessarily

18   mean it will change my opinion.

19   Q.      Are you aware that when Dr. Mason first

20   rendered his opinion about the death of Mr. McCornack,

21   that he did not have the recall notice from Actavis

22   because it hadn't been issued yet?

23   A.      Correct.  However, he did have the toxicology

24   results from the digoxin, so I felt like he had enough

25   information to make a cause-and-manner-of-death

PLAINTIFFS' EXHIBITS 010684

Page 59

1    diagnosis.

2    Q.      Well, when was the toxicology report from the

3    digoxin rendered?  What's that date?

4    A.      June 24th of 2008.

5    Q.      Right.  And isn't the initial report of

6    Dr. Mason, in March of 2008, before the recall notice

7    and before he had knowledge of the digoxin level of

8    3.6?

9    A.      Well, the -- March 26th, 2008, is the date of

10   autopsy.  I don't see a date that Dr. Mason signed the

11   autopsy report.

12   Q.      Would you acknowledge that after Dr. Mason

13   originally rendered his opinion, that there was a

14   recall notice and there was a digoxin test level that

15   was done that came back 3.6?

16             MR. MORIARTY:  Objection.  She just

17   answered that question, Don.

18             THE WITNESS:  Yes, I would agree with

19   that.

20   BY MR. ERNST:

21   Q.      And that those are factors that you, as a

22   pathologist, would want to consider in formulating an

23   opinion as to the cause of death?

24   A.      Yes.

25   Q.      Those are reasonable factors to consider;

PLAINTIFFS' EXHIBITS 010685

Page 60

1    wouldn't you agree?

2    A.     Yes.

3    Q.     And we've already established that sudden

4    cardiac death, as you've described it, can be caused

5    by digoxin toxicity; true?

6              MR. MORIARTY:  Objection; form.

7              Go ahead.

8              THE WITNESS:  That is one of many causes

9    of sudden cardiac death.

10   BY MR. ERNST:

11   Q.     And isn't it true that if you assume that you

12   can take an antemortem/postmortem ratio of blood, that

13   if you factor back the 3.6 postmortem blood level of

14   digoxin, then it's reasonable for Dr. Mason to look at

15   what his opinion would be for a antemortem or

16   pre-death digoxin level?

17   A.     I don't believe I understand your question.

18   Q.     Well, wouldn't a doctor like yourself, as a

19   forensic pathologist, want to look at the literature

20   and see if you can compute what the antemortem level

21   of digoxin was from a postmortem test?

22   A.     Yes, I did.  And as I've previously testified

23   to, it's not scientifically valid to do that.

24   Q.     Well, that's not what the Baselt textbook

25   says, though, is it?

PLAINTIFFS' EXHIBITS 010686

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 61

1              MR. MORIARTY:  Objection.

2   BY MR. ERNST:

3   Q.     It says that you can compute it?

4              MR. MORIARTY:  Objection; asked and

5   answered, and that's not what it says.  If you want to

6   say that that's what it says, you better read it to

7   her.

8              MR. ERNST:  I'm reading from her report.

9              MR. MORIARTY:  That's not what it says in

10  her report either.

11             MR. ERNST:  I'll have my last question

12  re-read, please.

13             (The requested portion was read back.)

14             THE WITNESS:  So my answer is, yes, I

15  would look at that, and the answer is also, no, it

16  cannot be reliably scientifically estimated.

17  BY MR. ERNST:

18  Q.     Are you aware of the War/Paul (phonetic)

19  article conducted in the '70s, where they actually

20  come up with the numbers of 1.42 per peripheral blood

21  samples?

22             MR. MORIARTY:  Objection.

23             Go ahead.

24             THE WITNESS:  I'm aware of the article,

25  yes.

PLAINTIFFS' EXHIBITS 010687

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 62

1    BY MR. ERNST:

2    Q.      That article was peer reviewed, wasn't it?

3    A.      I would have to -- I don't have the article in

4    front of me.  I'm aware of the article.  I don't know

5    any of the other specifics about whether or not it was

6    peer reviewed.

7    Q.      Well, there's an article that's out there that

8    says you can compute antemortem blood levels from

9    postmortem testing; isn't that true?

10           MR. MORIARTY:  Objection.  That is not

11   what it says and you know it.

12           You go ahead and answer that question.

13           Stop being dishonest with these

14   witnesses, Don.

15           Go ahead.

16           THE WITNESS:  No, that's not --

17           MR. ERNST:  Mr. Moriarty, if you persist

18   in this line of diatribe, I will adjourn this

19   deposition.  I have never made such statements to you

20   in a deposition, I find it offensive, and I resent it,

21   and I think it's unprofessional and inappropriate.  If

22   you have an objection to place on the record, you

23   should do so, but I will not accept a malignment of my

24   questioning to this witness.  It is offensive, Matt,

25   and it is beneath you.

McDANIEL SHORTHAND REPORTERS                        805-544-3363

PLAINTIFFS' EXHIBITS 010688

Page 63

1                  I think we should take a break for

2      five minutes.  Let's go off the record.

3                  (Brief recess was observed.)

4                  MR. ERNST:  Would you read back the last

5      question, please.

6                  (The requested portion was read back.)

7                  MR. MORIARTY:  Objection.

8                  Go ahead.

9                  THE WITNESS:  No, that's not my

10     understanding of the conclusions of the article.

11     BY MR. ERNST:

12     Q.      Doctor, you have testified, from 1 to 25

13     times, in criminal cases in which people are being

14     prosecuted for crimes about drug overdose causing

15     death; true?

16     A.      That's correct.

17     Q.      And you have used postmortem drug tests to

18     reach those conclusions; isn't that true?

19     A.      Yes.

20     Q.      And, Doctor, it is not uncommon for forensic

21     pathologists to use postmortem drug levels to reach

22     conclusions about drugs that were taken and levels of

23     the drug in a bloodstream before death, is it?

24                 MR. MORIARTY:  Objection; compound.

25                 Go ahead.

PLAINTIFFS' EXHIBITS 010689

AMY R. McMASTER, M.D.                                    August 5, 2011

1              THE WITNESS:  I would agree with that.

2     BY MR. ERNST:

3     Q.     Now, Doctor, do you have an opinion about the

4     length of time that redistribution takes to reach an

5     equilibrium in the blood following death?

6     A.     No.

7     Q.     Do you have an opinion about the length of

8     time that a postmortem blood sample is taken that can

9     affect redistribution levels?

10    A.     Yes.

11    Q.     And what is that opinion?

12    A.     That, with some drugs, the longer the

13    postmortem interval, the more the level of postmortem

14    redistribution.

15    Q.     And do you have an opinion about digoxin?

16    A.     In regards to what?

17    Q.     Postmortem redistribution and the equilibrium

18    reached in the bloodstream?

19              MR. MORIARTY:  Objection.

20              Go ahead.

21              THE WITNESS:  You're going to have to

22    repeat your question, I don't really understand what

23    you're asking me.

24    BY MR. ERNST:

25    Q.     Sure.  I want to know if you have an opinion

McDANIEL SHORTHAND REPORTERS                              805-544-3363

PLAINTIFFS' EXHIBITS 010690

Page 65

1   about the length of time that can affect

2   redistribution levels of digoxin.  Is it one hour, ten

3   hours, a hundred hours, what is it?

4   A.      No, there's not any one particular time.  I

5   think what I've previously testified to, that

6   postmortem redistribution is a significant factor in

7   interpretation of postmortem blood levels of digoxin,

8   and that the postmortem digoxin level alone cannot be

9   used to diagnose digoxin toxicity as a cause of death.

10  Q.      And your -- well, "alone," but it should be --

11  let's go through that.  What factors should be

12  considered by a coroner to determine if digoxin was a

13  factor in a cause of death?  Let's go through the

14  factors; okay?

15  A.      Well, I'm not testifying as a coroner.  To be

16  clear, I'm testifying as a forensic pathologist, and

17  there's a vast difference between the two.  So would

18  you like my answer as a forensic pathologist?

19  Q.      Sure, let's go through it.  Would you agree

20  that as a forensic pathologist that you would consider

21  a postmortem blood sample test for digoxin, as a

22  factor?

23  A.      Of course I would consider it.

24  Q.      Would you consider the autopsy itself and the

25  examination of the heart?

PLAINTIFFS' EXHIBITS 010691

Page 66

1   A.      Of course.

2   Q.      Would you consider a blood sample taken from

3   what you consider to be a peripheral vein?

4   A.      I don't think that I consider it to be a

5   peripheral vein.

6   Q.      I know, but you can -- if it was a peripheral

7   vein, that's where you would normally take a blood

8   sample to be tested; isn't that true?

9   A.      I take peripheral blood from the femoral

10  vessels, not from axillary.

11  Q.      All right.  That's your methodology; right?

12  A.      It's my methodology, it's also the methodology

13  of all the physicians I practice with and physicians

14  in which I've trained as a forensic pathologist.

15  Q.      Well, let's just assume that you would take

16  blood from what you considered to be a peripheral

17  vein; is that true?

18  A.      Yes.

19  Q.      And you would take the postmortem blood test,

20  that's a factor; true?

21  A.      Yes.

22  Q.      And you would review the medical records of

23  the patient before his death; true?

24  A.      If they're available, yes.

25  Q.      And you would talk to the witnesses about the

PLAINTIFFS' EXHIBITS 010692

Page 67

1  behavior of the -- or have information about what the

2  witnesses said about the behavior of the witness

3  before his death; true?

4  A.      Yes.  I would gain information.  I may not

5  talk to the witnesses myself.  It may be done under my

6  direction or another investigative agency.  But I

7  certainly would consider their behavior and their

8  physical condition and the scene of their death as

9  part of the final determination.

10 Q.      Is there anything else that you would

11 consider, Doctor?  Would you do research and look at

12 articles and paperwork, or articles about, perhaps,

13 redistribution?

14 A.      If I deem it necessary, yes.

15 Q.      Is there anything else that you would look at

16 that you can think of generically that you would

17 render an opinion about -- or that you would want

18 before you rendered your opinion about a cause of

19 death?

20 A.      Sure.  Any other information that might be

21 considered pertinent regarding the circumstances of

22 one's death, so, yes, there are other factors I would

23 consider.

24 Q.      Recall notices, for instance --

25 A.      Yes.

PLAINTIFFS' EXHIBITS 010693

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 68

1    Q.      -- for drugs that he was taking at the time?

2    A.      Yes, I've previously testified to that.

3    Q.      You've read Dr. Mason's deposition; true?

4    A.      Yes.

5    Q.      Is there anything that you believe he should

6    have considered in rendering his opinion and didn't?

7                    MR. MORIARTY:  Objection.

8                    Go ahead.

9                    THE WITNESS:  Yes.  I think he should

10   have considered postmortem redistribution of digoxin,

11   and he should have considered that that level alone

12   cannot be used to diagnose digoxin toxicity as the

13   cause of death.

14   BY MR. ERNST:

15   Q.      That's a difference of opinion that you have

16   with Dr. Mason; true?

17   A.      It is, and I'm simply answering your question

18   to other things that he should have considered.

19   Q.      All right.  Well, I'm asking about factual

20   things that he should have considered, such as, he

21   had, you know, autopsy findings, he had interviews, he

22   had investigation at the scene, any of those objective

23   factors, is there anything else that you think

24   Dr. Mason should have done and didn't do?

25                   MR. MORIARTY:  Objection.

PLAINTIFFS' EXHIBITS 010694

Page 69

```
 1                Go ahead.

 2                THE WITNESS:  Well, I consider postmortem

 3      redistribution factual.  So, yes, I believe he should

 4      have considered that.

 5      BY MR. ERNST:

 6      Q.    Okay.  Assuming that, other than that

 7      postmortem redistribution, is there anything else that

 8      you think he should have considered and didn't?

 9                THE WITNESS:  I'm sorry, was there an

10      objection?

11                MR. MORIARTY:  I did not object to that

12      question.

13                THE WITNESS:  I'm sorry, could you repeat

14      your question?

15                MR. ERNST:  I'll have it re-read.

16                (The requested portion was read back.)

17                THE WITNESS:  I don't recall

18      specifically, from his deposition, if he considered

19      Mr. McCornack's clinical presentation on the day of

20      his death or any symptoms he might have presented.  I

21      don't recall specifically if he considered that, but

22      if he didn't, he should have.

23      BY MR. ERNST:

24      Q.    So just generically, as a forensic

25      pathologist, you would consider postmortem blood
```

PLAINTIFFS' EXHIBITS 010695

Page 70

1    testing, a clinical picture before his death, the

2    investigation before his death, medical records before

3    his death, and autopsy findings; true?

4    A.       I think that's a good generic description,

5    yes.

6    Q.       Okay.  And Dr. Mason did all of those, didn't

7    he?

8    A.       Again, I can't recall specifically from his

9    deposition if he had information about

10   Mr. McCornack's -- any signs and symptoms he may have

11   had on the day of his death.

12   Q.       On page 3 of your report, you note that

13   there's a 3.6 nanogram per milliliter of digoxin, as

14   reported by NMS in postmortem blood, and you further

15   note it's not an accurate reflection of the antemortem

16   digoxin level in Mr. McCornack, and that the

17   antemortem level was lower than the postmortem level.

18   Do you see that?

19   A.       It's on page 2, but, yes, I see it.

20   Q.       It's on my page 3, but okay.

21            So, Doctor -- actually, I want you to go to

22   page 3, top paragraph, do you see that?

23                MR. MORIARTY:  Yeah, the one she's

24   looking at, Don, was printed not on letterhead, so the

25   pagination is a little different.  Do you want me to

PLAINTIFFS' EXHIBITS 010696

AMY R. McMASTER, M.D.                                          August 5, 2011

Page 71

1    give her the exhibit version, which is printed on

2    letterhead?

3                    MR. ERNST:  I just want to make sure

4    we're on the same page, pun intended.

5                    MR. MORIARTY:  (Tenders document to

6    witness.)

7                    Where do you want her to look, page 3?

8                    MR. ERNST:  It says a 3.6 nanograms per

9    milliliter of digoxin is reported by NMS, and

10   postmortem blood is not an accurate reflection of the

11   antemortem digoxin level --

12                   THE COURT REPORTER:  I'm sorry, you need

13   to slow down just a little bit, please.

14   BY MR. ERNST:

15   Q.    All right.  Therefore --

16                   MR. ERNST:  Do you have the sentence

17   there?  It's the second sentence on page 3 of Exhibit

18   4.

19                   THE COURT REPORTER:  I don't have it, but

20   it's present on the table.

21                   MR. ERNST:  Who said that?

22                   MR. MORIARTY:  The court reporter is

23   telling you that she has it but is not reading it.  So

24   she wanted you to just slow down if you're going to

25   read the sentence.

McDANIEL SHORTHAND REPORTERS                          805-544-3363

PLAINTIFFS' EXHIBITS 010697

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 72

1                MR. ERNST:  Okay.

2   BY MR. ERNST:

3   Q.      "Therefore," comma, the 3.6 nanograms per

4   milliliter "of digoxin as reported by NMS and

5   postmortem blood is not an accurate reflection of the

6   antemortem digoxin level in Mr. McCornack, and the

7   antemortem level was lower than the postmortem level,"

8   period.  Do you see that, Doctor?

9   A.      Yes, I do.

10  Q.      Now, you will say that because of the

11  postmortem redistribution; true?

12  A.      Yes.

13  Q.      Now, based upon your -- or do you have an

14  opinion as to what the number was in Mr. McCornack

15  before he died, the level of digoxin?

16               MR. MORIARTY:  Objection; form.

17               Go ahead.

18               THE WITNESS:  With a general --

19  BY MR. ERNST:

20  Q.      I will rephrase -- go ahead if you understand

21  my question.

22  A.      No, sir, please rephrase it.

23  Q.      Do you have an opinion as to what his blood

24  level was, of digoxin, before he died?

25               MR. MORIARTY:  Objection; form.

PLAINTIFFS' EXHIBITS 010698

1           Go ahead.

2           THE WITNESS:  With the understanding that

3   the principle of postmortem redistribution is that the

4   postmortem drug level goes up, not down, other than

5   that general caveat, no, you cannot scientifically

6   infer that -- any one particular number of his digoxin

7   level prior to his death.

8   BY MR. ERNST:

9   Q.    Right.  It could be a range, would you agree

10  with that?

11  A.    I don't think I understand what you're asking

12  me.

13  Q.    Well, what your testimony is is that the

14  pre-death level of digoxin in Mr. McCornack in the

15  hours before he died, in your opinion, was less than

16  3.6; true?

17  A.    Yes.

18  Q.    But it's your testimony that you can't give a

19  specific number as to what your opinion is about his

20  digoxin level in the hours before his death; true?

21  A.    What I'm saying is that there's no

22  scientifically valid way to assign a specific number

23  to what his antemortem blood level was simply based

24  alone on the postmortem blood level.

25  Q.    You're aware that the War/Paul (phonetic) uses

PLAINTIFFS' EXHIBITS 010699

1    ranges to compute pre-death levels of digoxin; true?

2                MR. MORIARTY:  Objection.

3                THE WITNESS:  I think I've made my answer

4    perfectly clear that it is impossible, with any

5    scientific validity -- that you cannot assign a

6    specific level of antemortem digoxin based on the

7    postmortem level alone.

8    BY MR. ERNST:

9    Q.     And you're aware that that is contrary to your

10   sentence on page 2 of your report, where there's an

11   actual ratio that's discussed, antemortem/postmortem,

12   from femoral blood vein and for heart blood specimens

13   as reflected in the Baselt textbook?

14               MR. MORIARTY:  Objection.

15               THE WITNESS:  No, it's absolutely not

16   contradictory.

17   BY MR. ERNST:

18   Q.     Now, are you aware that Actavis issued a

19   recall letter on its letterhead, Doctor?

20   A.     I do not have a copy of that letter, no.

21   Q.     Doctor, would you agree that digoxin toxicity

22   can cause cardiac instability?

23   A.     Yes.

24   Q.     Would you agree that digoxin toxicity can

25   cause bradycardia, or a slowing of the heart?

PLAINTIFFS' EXHIBITS 010700

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 75

1    A.       Yes.

2    Q.       Would you agree that digoxin toxicity can

3    cause ventricular arrhythmia?

4                    MR. MORIARTY:  Objection; form.

5                    Go ahead.

6                    THE WITNESS:  Yes.

7    BY MR. ERNST:

8    Q.       Would you agree that digoxin toxicity can

9    cause sudden cardiac death?

10                   MR. MORIARTY:  Objection; form.

11                   Go ahead.

12                   THE WITNESS:  Yes.

13   BY MR. ERNST:

14   Q.       Would you agree that digoxin toxicity can

15   sometimes cause nausea, cardiac instability, death,

16   low blood pressure, dizziness, and bradycardia?

17                   MR. MORIARTY:  Objection.

18                   Go ahead.

19                   THE WITNESS:  Yes.

20   BY MR. ERNST:

21   Q.       And some of those symptoms appear with digoxin

22   toxicity, and some of them don't; isn't that true?

23                   MR. MORIARTY:  Objection.

24                   Go ahead.

25                   THE WITNESS:  Yes.

PLAINTIFFS' EXHIBITS 010701

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 76

1    BY MR. ERNST:

2    Q.      So a person could have vomiting or dizziness

3    as a reflection of digoxin toxicity; true?

4    A.      Yes.

5    Q.      And a person could have a sudden cardiac death

6    as a result of digoxin toxicity?

7               MR. MORIARTY:  Objection.

8    BY MR. ERNST:

9    Q.      Without dizziness -- without dizziness; isn't

10   that true?

11              MR. MORIARTY:  Objection.

12              Go ahead.

13              THE WITNESS:  Yes, it's true.

14   BY MR. ERNST:

15   Q.      And a person could have sudden cardiac death

16   without vomiting; isn't that true?

17              MR. MORIARTY:  Objection.

18              Go ahead.

19              THE WITNESS:  It's true, yes.

20   BY MR. ERNST:

21   Q.      And it's true that a person could have sudden

22   cardiac death without any symptoms at all, except the

23   death itself, from digoxin toxicity; isn't that true?

24              MR. MORIARTY:  Objection.

25              Go ahead.

McDANIEL SHORTHAND REPORTERS                            805-544-3363

PLAINTIFFS' EXHIBITS 010702

1              THE WITNESS:  I think it's unlikely for a

2    patient -- very unlikely for a patient to die from

3    acute digoxin toxicity without exhibiting any symptoms

4    whatsoever.

5    BY MR. ERNST:

6    Q.      Is fatigue a symptom of digoxin toxicity?

7    A.      It's a very nonspecific generic that may be

8    associated with digoxin toxicity.

9    Q.      And, Doctor, would you agree that digoxin has

10   a narrow therapeutic range?

11   A.      Well, as I've previously testified to in the

12   previous line of questioning, that it's described that

13   way, yes, in the literature; however, that the

14   specific level, in any one particular patient, is

15   based on the clinical response and their symptoms, not

16   necessarily to a number alone.

17   Q.      Doctor, in all the times you've ever testified

18   in criminal cases, have you ever rendered an opinion

19   about a cause of death due to a drug overdose without

20   having actually done the autopsy itself?

21   A.      Yes.

22   Q.      And did you do a review of records when you

23   rendered that opinion?

24   A.      I did a review of records, I did a review of

25   the autopsy report, of the autopsy photographs, of the

PLAINTIFFS' EXHIBITS 010703

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                              Page 78

1    toxicology, and the medical history.

2    Q.      In this particular case, did you ever review

3    the photographs of the autopsy of Mr. McCornack?

4                MR. MORIARTY:  Objection.

5                THE WITNESS:  I did not.

6    BY MR. ERNST:

7    Q.      Now, Doctor, I have faxed back to the court

8    reporter a document that I would like marked -- I

9    believe next in order -- is it Exhibit 7?

10               THE COURT REPORTER:  Yes.  We'll have to

11   obtain that.  It's probably arrived, but we don't have

12   it in our room.

13               MR. MORIARTY:  I'll be right back.

14               MR. ERNST:  It has been faxed, so if we

15   could --

16               THE WITNESS:  Mr. Moriarty has stepped

17   out of the room, so if we could just wait for a

18   second.  He went to get the fax.

19               MR. ERNST:  Sure.

20               (Brief recess was observed.)

21               MR. MORIARTY:  There's a three-page

22   document here.

23               MR. ERNST:  Okay, let's mark it as

24   Exhibit 7.

25               (Marked Exhibit No. 7.)

PLAINTIFFS' EXHIBITS 010704

Page 79

1    BY MR. ERNST:

2    Q.      Doctor, do you have an understanding of why

3    Actavis recalled Digitek« tablets?

4    A.      I do.

5    Q.      What is that understanding?

6    A.      My understanding is that there was a

7    possibility that there may have been some what --

8    terminology used is "double-thick tablets" that were

9    produced.

10   Q.      Well, when you rendered your opinions in 2009

11   and you wrote your report, did you know that

12   Mr. McCornack had been sent a specific recall notice

13   with a lot of medication that he was taking and did

14   not receive it until after his death?

15                  MR. MORIARTY:  Objection.

16                  Go ahead.

17                  THE WITNESS:  I don't know that I

18   specifically recall that it was received after his

19   death for that specific lot number.

20   BY MR. ERNST:

21   Q.      Would that have been an important factor for

22   you to know?

23   A.      It's a fact I would have considered; however,

24   based on the information I've been provided, it would

25   not have changed the cause of death.

PLAINTIFFS' EXHIBITS 010705

Page 80

1    Q.      Now, let's look at the Actavis letter marked
2    as Exhibit 7.
3            By the way, you've been retained by
4    Mr. Moriarty, but do you know who Mr. Moriarty
5    represents?
6    A.      Yes, I do.
7    Q.      And who is that?
8    A.      He represents Actavis Totowa, L.L.C.,
9    manufacturer of Digitek«.
10   Q.      Right.  Okay, so what's Exhibit 7?
11   A.      Exhibit 7 is an "Urgent:  Drug Recall" from
12   Actavis for "Digitek (digoxin tablets USP)."
13   Q.      And you've been asked to testify that
14   Mr. Moriarty [sic] didn't die of digoxin toxicity;
15   right?
16              MR. MORIARTY:  Thank God I didn't die of
17   digoxin toxicity.
18   BY MR. ERNST:
19   Q.      I'm sorry --
20              MR. MORIARTY:  Can you rephrase that?
21   BY MR. ERNST:
22   Q.      -- you've been asked to testify that
23   Mr. McCornack didn't die of digoxin toxicity; right?
24              MR. MORIARTY:  Thank you for rephrasing
25   that.

PLAINTIFFS' EXHIBITS 010706

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 81

1     BY MR. ERNST:

2     Q.      I appreciate the --

3     A.      No, I was not asked to provide that testimony.

4     I was asked to provide my expert opinion as to why

5     Mr. McCornack died.

6     Q.      Right.  But here you have a recall --

7     Exhibit 7 is a recall notice from Actavis itself;

8     right?

9     A.      Yes, it is a drug recall from Actavis.

10    Q.      And have you ever seen this document before?

11    A.      I have not.  I've seen two other recall

12    statements but not this particular one.

13    Q.      The two other recall statements that you have,

14    do they have Actavis's name on them?

15    A.      Yes.

16    Q.      Now, this Actavis "Urgent:  Drug Recall"

17    document, let's go through it.  What's the first

18    sentence state, for the record?

19    A.      "Dear Valued Customer."

20    Q.      Go down to the first full paragraph that

21    starts, "This recall," do you see that?

22    A.      Yes.

23    Q.      Read that sentence for us, please.

24    A.      "This recall has been initiated due to

25    overweight tablets.

McDANIEL SHORTHAND REPORTERS                            805-544-3363

PLAINTIFFS' EXHIBITS 010707

AMY R. McMASTER, M.D.                                          August 5, 2011

                                                                    Page 82

1    Q.      And the second sentence?

2    A.      "Potential risk to the patient depend on the

3    constituency of the tablets."

4    Q.      And the next sentence?

5    A.      "Depending on the constituency of the tablets,

6    double the dose is taken, it can be expected that

7    digitalis toxicity can occur in individuals taking

8    daily doses or in patients with renal insufficiency."

9    Q.      Do you agree with that statement, Doctor?

10   A.      Yes.

11   Q.      Read the next sentence.

12   A.      "Toxicity can cause nausea, vomiting,

13   dizziness, low blood pressure, cardiac instability,

14   and bradycardia."

15   Q.      Do you agree with that statement?

16   A.      Yes.

17   Q.      Then the next sentence, it says, "Death can

18   result from excessive digitalis intake."  Do you see

19   that?

20   A.      I do see it.

21   Q.      Do you agree with that?

22   A.      Yes.

23   Q.      Is there anything in this paragraph that talks

24   about anything other than overweight tablets?

25   A.      I'm sorry?

McDANIEL SHORTHAND REPORTERS                              805-544-3363
PLAINTIFFS' EXHIBITS 010708

                                                            Page 83

1   Q.      Is there anything in this paragraph that talks

2   about double-thick tablets?

3   A.      "Overweight tablets," it says, but not

4   specifically double thickness.

5   Q.      Have you ever been informed that the recall

6   was for overweight tablets?

7               MR. MORIARTY:  Objection.

8               Go ahead.

9               MS. AHERN:  Objection.

10              THE WITNESS:  No.  The terminology that's

11  used in the FDA recall is "double the appropriate

12  thickness may have been commercially released."

13  BY MR. ERNST:

14  Q.      Right.  Now, let's go to that paragraph in

15  Exhibit 7 again.  And the last sentence is:  "If the

16  increased thickness is due to clinically inert

17  substances, then a decreased amount of digitalis may

18  be absorbed."  Do you see that?

19  A.      I do see it.

20  Q.      Did you factor that into your opinion?

21  A.      Of course.

22  Q.      Do you have an opinion that, perhaps,

23  Mr. McCornack didn't get enough Digitek« in his system

24  that caused his death?

25              MR. MORIARTY:  Objection.

PLAINTIFFS' EXHIBITS 010709

1              Go ahead.

2              THE WITNESS:  There's no evidence to

3     support that, no.

4     BY MR. ERNST:

5     Q.     Do you have any evidence to dispute that?

6              MR. MORIARTY:  Objection.

7              Go ahead.

8              THE WITNESS:  No, but there's no evidence

9     to support it.

10    BY MR. ERNST:

11    Q.     It's true, isn't it, that digoxin toxicity can

12    lead to sudden cardiac death?  True?

13    A.     Yes, you've asked me that several times now,

14    and I've answered it.

15    Q.     And it's also true that a lack of digoxin in

16    the system can lead to sudden cardiac death, if a

17    person doesn't take enough digoxin; isn't that true?

18              MR. MORIARTY:  Objection.

19              Go ahead.

20              THE WITNESS:  It's true that if one does

21    not get the appropriate amount of a particular drug,

22    it may exacerbate their underlying cardiac disease,

23    correct.

24    BY MR. ERNST:

25    Q.     Exhibit 7 contains some information about the

PLAINTIFFS' EXHIBITS 010710

Page 85

1    recall, doesn't it?

2    A.      Yes, it does.

3    Q.      And don't you think that that would be an

4    important factor for you to have considered in

5    rendering the opinions that you've rendered here

6    today?

7              MR. MORIARTY:  Objection.

8              Go ahead.

9              THE WITNESS:  Again, and as I've

10   previously testified to, any information I'm willing

11   to consider in determining the cause of death.

12   BY MR. ERNST:

13   Q.      Now, you have testified in courts of law in

14   criminal cases about drug overdoses or drug toxicity

15   causing death; true?

16   A.      Yes, sir, I have.

17   Q.      And people have been convicted based upon your

18   testimony; true?

19             MR. MORIARTY:  Objection.

20             Go ahead.

21             THE WITNESS:  I wouldn't quite

22   characterize it that they were convicted based on my

23   testimony.  Again, I provide an independent medical

24   opinion as to the cause of death and manner of death,

25   and what's done in the judiciary after that is

PLAINTIFFS' EXHIBITS 010711

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 86

1    certainly beyond my control.

2    BY MR. ERNST:

3    Q.      Does postmortem redistribution occur with all

4    drugs?

5    A.      To some degree, yes, but certainly more so in

6    some than others.

7    Q.      And are you aware of literature out there that

8    says that you can't ever reliably testify to what a

9    pre-death drug level is based on a postmortem test?

10   A.      I think that the literature says that to try

11   to come up with a specific antemortem level based on

12   the postmortem level is fraught with error and not

13   scientifically valid.

14   Q.      But you've testified as [sic] the cause of

15   death on multiple occasions in criminal cases when

16   people have been convicted; isn't that true?

17           MR. MORIARTY:  Objection; you've asked

18   that six times.

19           Go ahead, tell him again.

20           THE WITNESS:  Yes, that's correct.

21   BY MR. ERNST:

22   Q.      So, Doctor, there is a reason that people

23   do -- forensic pathologists such as yourself order a

24   postmortem test for digoxin, isn't it [sic]?

25   A.      Yes.

PLAINTIFFS' EXHIBITS 010712

Page 87

1  Q.      There's a reason you do the test; right?

2  A.      Yes.

3  Q.      And it's important to know, postmortem, what

4  the level of digoxin is in a person who has died of a

5  cardiac event; isn't that true?

6              MS. AHERN:  Objection.

7              MR. MORIARTY:  Objection.

8              Go ahead.

9              THE WITNESS:  Yes, I would agree.

10 BY MR. ERNST:

11 Q.      And it's important to know because it's a

12 factor that you would consider in a cause of death;

13 isn't that true?

14 A.      Yes.  And in this particular case, it was not

15 a factor in Mr. McCornack's death.

16             MR. ERNST:  Objection; reserve a motion

17 to strike.  It's an added argumentative factor by the

18 witness.

19 BY MR. ERNST:

20 Q.      Doctor, would you acknowledge that you have a

21 different opinion as to the cause of death than does

22 Dr. Mason?

23 A.      Yes.

24 Q.      And would you acknowledge that Dr. Mason

25 actually performed the autopsy on Mr. McCornack, and

PLAINTIFFS' EXHIBITS 010713

Page 88

1   you did not?

2   A.      Well, of course.

3   Q.      And would you acknowledge that it is the job

4   and duty of Dr. Mason, as the forensic pathology

5   examiner in Sante Cruz, to determine the cause of

6   death?

7   A.      Yes.

8            MR. ERNST:  I would like to review my

9   notes.  I think I'm just about done.

10           MR. MORIARTY:  Okay.  We'll take three,

11  four, five minutes?

12           MR. ERNST:  Yeah, three, four, five,

13  that's all.

14           (Brief recess was observed.)

15  BY MR. ERNST:

16  Q.      Doctor, you have listed a number of articles

17  in the book, but in your report you didn't mention any

18  articles.  Did you go to these articles after you did

19  your report, or you just left them out of the report

20  that you wrote, Exhibit 4?

21  A.      I'm sorry, when you refer to the "book," what

22  are you referring to?

23  Q.      Your black book there that you -- you know,

24  you have a bunch of articles, research articles that

25  you looked up; right?

PLAINTIFFS' EXHIBITS 010714

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                          Page 89

1    A.      Right.

2    Q.      Like the Baselt article and the other

3    articles?

4    A.      Uh-huh.

5    Q.      You don't mention those in your report.  Did

6    you look at those articles before you wrote your

7    report or after?

8               MR. MORIARTY:  Objection.

9               Go ahead.

10              THE WITNESS:  Well, there is another

11   article that's listed in here, the Journal from

12   British Pharmacology -- or "British Journal of

13   Pharmacology," I should say, so, yes, that was

14   included in here.  The other two were just for

15   information.  But, no, I looked them up prior to my

16   report.

17   BY MR. ERNST:

18   Q.      Did Mr. Moriarty already give you any

19   articles?

20   A.      No.

21   Q.      Now, you talked to Mr. Moriarty before your

22   deposition today; true?

23   A.      Yes, I did.

24   Q.      For how long?

25   A.      We started our meeting this morning at

PLAINTIFFS' EXHIBITS 010715

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 90

1   approximately 7:45 and ended it at approximately 9:00.

2   Q.      Did you discuss specific questions and answers

3   that I would go over -- that I was expected to ask?

4                   MR. MORIARTY:  Objection.

5                   Go ahead, you can answer that.

6                   THE WITNESS:  Yes.  He covered areas that

7   may have been potential lines of questioning, yes.

8   BY MR. ERNST:

9   Q.      You also rendered an opinion about Mr. Keith

10  Gibson in your report.  Do you see that?

11  A.      Point me specifically to where it is in the

12  report.

13  Q.      Well, do you have an opinion about Mr. Keith

14  Gibson's report?

15                  MR. MORIARTY:  Objection; form.

16                  THE WITNESS:  Yes, sir, I see it.  Yes,

17  it said I "disagree with and find no medical basis for

18  the final opinions as expressed by Keith Patrick

19  Gibson, Pharm.D, J.D."

20  BY MR. ERNST:

21  Q.      Do you know how many footnotes were to

22  Mr. Gibson's report?

23  A.      No.

24  Q.      Did you read all the referenced materials that

25  Mr. Gibson mentioned in his report?

McDANIEL SHORTHAND REPORTERS                            805-544-3363

PLAINTIFFS' EXHIBITS 010716

AMY R. McMASTER, M.D.                                   August 5, 2011

Page 91

1    A.      Not all of it, no.

2    Q.      Well, how many did you read of Mr. Gibson's

3    footnoted literature that he reviewed?

4    A.      I don't remember.

5    Q.      Less than five?

6    A.      I don't remember.

7    Q.      Do you recall reading when Ms. McCornack found

8    Mr. McCornack nonresponsive the night of his death?

9    A.      I recall reading a description of that from a

10   coroner's report, yes.

11   Q.      And he was turning blue?

12   A.      Yes, I remember that.

13   Q.      And he couldn't breathe?

14   A.      Yes.

15   Q.      That is consistent with digoxin toxicity,

16   isn't it?

17             MR. MORIARTY:  Objection; form.

18             Go ahead.

19             MS. AHERN:  Objection.

20             THE WITNESS:  No, it's not.

21   BY MR. ERNST:

22   Q.      Is it consistent with sudden cardiac death?

23   A.      It's consistent with someone having some type

24   of terminal event, but you cannot make any type of

25   diagnosis to the etiology of the event without more

PLAINTIFFS' EXHIBITS 010717

AMY R. McMASTER, M.D.                                      August 5, 2011

Page 92

1    information.

2    Q.     Would you agree that turning blue and being

3    unable to breathe is consistent with a terminal

4    cardiac event, also known as sudden cardiac death?

5                 MR. MORIARTY:  Objection; form.

6                 Go ahead.

7                 THE WITNESS:  I think it is certainly one

8    possibility in a long list of diagnoses that could

9    cause someone to turn blue and have difficulty

10   breathing.

11   BY MR. ERNST:

12   Q.     Are you a pharmacist?

13   A.     Of course not.

14   Q.     Are you a toxicologist?

15   A.     Of course not.

16   Q.     I take it that you're not rendering an opinion

17   about Mr. Gibson's toxicological opinion, are you?

18                 MR. MORIARTY:  Objection.

19                 THE WITNESS:  I'm rendering an opinion

20   that I disagree with his final statement.

21   BY MR. ERNST:

22   Q.     And that's the cause of death?

23   A.     Correct.

24   Q.     Is that the only thing you disagree with?

25   A.     No.  I also disagree with the fact that

McDANIEL SHORTHAND REPORTERS                              805-544-3363
PLAINTIFFS' EXHIBITS 010718

1    Mr. Gibson states the elevated digoxin level was

2    probably the result of a change in formulation of the

3    Digitek« tablet or a nonconforming tablet.

4    Q.      But you've already testified that you're not a

5    pharmacist or a toxicologist; true?

6    A.      Right.

7    Q.      Wouldn't that be in the realm of toxicology

8    and pharmacology?

9                    MR. MORIARTY:  Objection.

10                   MS. AHERN:  Objection.

11                   THE WITNESS:  I think it's in the realm

12   of a statement that has no valid basis for it.  I

13   think it's a [sic] realm of a speculative statement at

14   best.

15   BY MR. ERNST:

16   Q.      Wouldn't you agree that --

17                   MR. MORIARTY:  Can I just interject?  If

18   this --

19                   MR. ERNST:  No.

20                   MR. MORIARTY:  -- if this --

21                   MR. ERNST:  No, if you --

22                   MR. MORIARTY:  -- if this case --

23                   MR. ERNST:  If you have an objection --

24   if you have an objection, you can place it on the

25   record.

PLAINTIFFS' EXHIBITS 010719

Page 94

1           MR. MORIARTY:  I'm trying to help you.

2  You refuse to be helped.

3           MR. ERNST:  You know what, Matthew, I

4  really appreciate the fact that you'd like to help me,

5  but, frankly . . .

6           MR. MORIARTY:  Fine, go ahead, ask your

7  question.

8  BY MR. ERNST:

9  Q.     Looking at Exhibit 7, are you aware of where

10  all of the recalled Digitek« went, Doctor?

11  A.     No, I'm not.

12  Q.     Looking at Exhibit 7, do you see that it was

13  sent to Stericycle?

14  A.     I see that now, yes.

15  Q.     Has Mr. Moriarty or anyone from Actavis given

16  you any information about testing done at Stericycle

17  on all of the recalled drugs --

18           MR. MORIARTY:  Objection.

19  BY MR. ERNST:

20  Q.     -- of the Digitek«?

21           MR. MORIARTY:  Objection.  There was no

22  testing done at Stericycle.

23  BY MR. ERNST:

24  Q.     Were you aware there was no testing done at

25  Stericycle, Doctor?

PLAINTIFFS' EXHIBITS 010720

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 95

1    A.      Well, if this Stericycle is the same as the

2    Stericycle that's here in Tennessee, they don't do any

3    testing, that I know of.  It's a hazardous waste

4    removal service.

5    Q.      Right.  Were you aware if any testing was done

6    of all the recall drugs at Stericycle by Actavis?

7                 MR. MORIARTY:  Objection.

8                 THE WITNESS:  No, I'm not aware of any

9    other testing that was done.

10   BY MR. ERNST:

11   Q.      Thank you, Doctor.

12           Would it have been important to you to know if

13   any testing was done with all of these recalled drugs?

14   Wouldn't it be a factor for you to think about and

15   consider?

16   A.      No, it would not have any bearing on the cause

17   of death of Mr. McCornack.

18   Q.      Even though Mr. McCornack's drugs were in the

19   recalled batch, you don't think it would have been

20   important to know about that?

21   A.      No, because I was already aware of that.

22   Q.      All right, Doctor, thank you very much.  I

23   don't have any further questions.

24                 MR. MORIARTY:  I have, maybe, three.

25                 CROSS-EXAMINATION

PLAINTIFFS' EXHIBITS 010721

AMY R. McMASTER, M.D.                                          August 5, 2011

Page 96

1    BY MR. MORIARTY:

2    Q.      Did you have toxicology training in med

3    school, your residency, and your fellowship?

4    A.      Yes.

5    Q.      When you've testified in criminal cases, is

6    one of the issues the mere presence of the drug in

7    someone's system?

8                 MR. ERNST:  Objection.

9                 THE WITNESS:  Yes.  One of the factors is

10   just a mere presence.

11   BY MR. MORIARTY:

12   Q.      Give me an example.

13                MR. ERNST:  Objection.

14   BY MR. MORIARTY:

15   Q.      Go ahead.

16   A.      For example, the most recent criminal case

17   that I testified in was a young child, below the age

18   of two, who had oxycodone and Alprazolam in her

19   system.  So obviously, irrespective of levels, just

20   the presence of those drugs in a small child in which

21   they were not prescribed is important.

22   Q.      In your career as a forensic pathologist, have

23   you ever used a postmortem blood level of a drug to

24   back calculate to an antemortem level of that drug?

25   A.      No.

PLAINTIFFS' EXHIBITS 010722

Page 97

1              MR. ERNST:  Objection.

2              MR. MORIARTY:  I'm done.  Thank you.

3                   REDIRECT EXAMINATION

4    BY MR. ERNST:

5    Q.     Doctor, isn't it true that you've used a

6    postmortem level of a drug to determine a range of

7    antemortem blood levels?

8    A.     No, I do not give a range.  I take a

9    postmortem drug level in consideration of the

10   postmortem redistribution to determine whether or not

11   that drug was a factor in someone's death.

12   Q.     So it's very important for to you look at the

13   postmortem level, factor in what the redistribution

14   status is of that particular drug, and then render an

15   opinion, and you have done so in courts of law; true?

16   A.     Yes.

17   Q.     Thank you very much.  I don't have any other

18   questions.

19              MR. MORIARTY:  Hunter, do you have any

20   questions?

21              MS. AHERN:  I do not.

22              Thank you, Doctor.

23              MR. MORIARTY:  Thank you.  She will read

24   and sign.  Thank you.

25              MR. ERNST:  Thank you.

PLAINTIFFS' EXHIBITS 010723

AMY R. McMASTER, M.D.                                    August 5, 2011

                                                              Page 98

 1                  THE COURT REPORTER:  Mr. Ernst, would you

 2      like to order a copy today?

 3                  MR. ERNST:  Yes, I would.  And I need

 4      it -- how soon can you have an electronic copy of the

 5      deposition?

 6                  (Discussion off the record.)

 7                  MR. ERNST:  Tuesday would be okay.

 8                  THE COURT REPORTER:  And would you like a

 9      copy of the exhibits?

10                  MR. ERNST:  Yes.  Those can come via hard

11      copy.  I'm really interested in the deposition

12      transcript.  And if you could give me a rough.

13                  Doctor, thank you very much for coming.

14                  THE WITNESS:  You're welcome.  Thank you.

15                  (Proceedings adjourned at 12:30 p.m.)

16                  FURTHER DEPONENT SAITH NOT.

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 010724

1                    REPORTER'S CERTIFICATE

2            I certify that the witness in the foregoing

3   deposition AMY R. MCMASTER, M.D., was by me duly sworn

4   to testify in the within-entitled cause; that the said

5   deposition was taken at the time and place therein

6   named; that the testimony of said witness was reported

7   by me, a Shorthand Reporter and Notary Public of the

8   State of Tennessee authorized to administer oaths and

9   affirmations, and said testimony, pages 6 through 98

10  was thereafter transcribed into typewriting.

11           I further certify that I am not counsel or

12  attorney for either or any of the parties to said

13  deposition, nor in any way interested in the outcome

14  of the cause named in said deposition.

15               IN WITNESS WHEREOF, I have hereunto set

16  my hand the 9th day of August, 2011.

17

18

19

20

21

22

23

24

            Deborah M. Fernau, TLCR No. 306
25          My commission expires:  07/06/2015

PLAINTIFFS' EXHIBITS 010725

AMY R. McMASTER, M.D.                                    August 5, 2011

Page 100

```
 1                    E R R A T A

 2          I, AMY R. MCMASTER, M.D., having read the
      foregoing deposition, pages 6 through 98, taken
 3    August 4, 2011, do hereby certify said testimony is a
      true and accurate transcript, with the following
 4    changes, if any:

 5    PAGE      LINE      SHOULD HAVE BEEN

 6    ____      ____      _____

 7    ____      ____      _____

 8    ____      ____      _____

 9    ____      ____      _____

10    ____      ____      _____

11    ____      ____      _____

12    ____      ____      _____

13    ____      ____      _____

14

15
                        _____
16                      AMY R. MCMASTER, M.D.

17

18
      _____
19          Notary Public
      My commission expires: _____
20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 010726

AMY R. McMASTER, M.D.

August 5, 2011

Page 1

## A

**able** 12:16
**absolutely** 74:15
**absorbed** 83:18
**abstract** 28:24,25 29:7
**accept** 62:23
**acceptable** 37:3 38:19
**accepted** 34:8 36:11,16
  42:22
**accurate** 14:8,11,17
  19:12 20:2,5,9 35:14
  39:18 41:17 42:3 44:12
  44:15,23 49:18 51:20
  70:15 71:10 72:5 100:3
**accurately** 54:5
**acknowledge** 38:25 39:2
  53:8 59:12 87:20,24
  88:3
**Actavis** 1:6 2:12 22:6
  56:5 58:21 74:18 79:3
  80:1,8,12 81:7,9,16
  94:15 95:6
**Actavis's** 81:14
**actual** 74:11
**acute** 10:6,7,7,10,24
  20:19 55:8 77:3
**added** 25:5,7,9,11 87:17
**additional** 16:17 23:3
  57:23 58:11
**address** 6:6,9,10,11
**addressed** 56:12,14,18,24
  57:4,7
**addressing** 31:3
**adjourn** 62:18
**adjourned** 98:15
**administer** 99:8
**Administration** 24:1
**admitted** 22:22
**adopt** 42:1
**affect** 43:24 64:9 65:1
**affirmations** 99:9
**age** 96:17
**agency** 67:6
**agent** 10:3
**ago** 21:19
**agree** 38:23 41:16,18

48:16,17 49:12 50:19
  50:21 51:18,23 52:2,6
  52:24 59:18 60:1 64:1
  65:19 73:9 74:21,24
  75:2,8,14 77:9 82:9,15
  82:21 87:9 92:2 93:16
**agreed** 5:12 22:1,5 24:7,9
**ahead** 12:5,24 13:17
  18:24 19:22 22:8 29:16
  34:12 35:10,18 36:3,19
  40:13 42:13 44:4 45:3,9
  46:4,23 48:3,15 49:11
  49:23 50:8,13 51:11,22
  52:5,16,20 53:4,13 54:6
  55:18 58:5 60:7 61:23
  62:12,15 63:8,25 64:20
  68:8 69:1 72:17,20 73:1
  75:5,11,18,24 76:12,18
  76:25 79:16 83:8 84:1,7
  84:19 85:8,20 86:19
  87:8 89:9 90:5 91:18
  92:6 94:6 96:15
**AHERN** 2:19 12:23 33:6
  35:9,16 37:6 45:10
  47:19 50:7 53:14 57:21
  58:6 83:9 87:6 91:19
  93:10 97:21
**al** 1:3,6
**Alabama** 20:17
**Alprazolam** 96:18
**amended** 24:16,19
**Amendment** 4:22
**American** 33:13
**amount** 12:17 83:17
  84:21
**Amy** 1:14 4:3,10 5:2,23
  6:8 99:3 100:2,16
**angle** 38:7
**answer** 17:18,24 26:24
  34:15 35:19 36:9,19,20
  37:18 38:3 39:3 54:6
  61:14,15 62:12 65:18
  74:3 90:5
**answered** 18:23 19:21
  32:3 34:13,20,24 35:3
  37:7 47:12 48:2 51:10
  53:3,15 59:17 61:5

84:14
**answering** 68:17
**answers** 90:2
**antemortem** 42:16 44:18
  48:11 49:7,20 50:17
  51:3,14 60:15,20 62:8
  70:15,17 71:11 72:6,7
  73:23 74:6 86:11 96:24
  97:7
**antemortem/postmort...**
  49:13 51:19 52:3 53:10
  54:2 60:12 74:11
**appear** 14:10 15:5 75:21
**APPEARANCES** 2:1 3:1
**apply** 51:2
**appreciate** 81:2 94:4
**appropriate** 31:15 37:24
  83:11 84:21
**approximately** 16:24
  90:1,1
**April** 24:2
**archives** 29:7
**area** 13:9
**areas** 90:6
**argue** 48:2
**argumentative** 57:21
  87:17
**arm** 46:20 47:25
**arrhythmia** 75:3
**arrived** 78:11
**article** 29:20 48:9 61:19
  61:24 62:2,3,4,7 63:10
  89:2,11
**articles** 67:12,12 88:16
  88:18,18,24,24 89:3,6
  89:19
**asked** 18:22 19:20 20:17
  22:15 34:19,23 37:7,19
  38:5 51:9 53:2 61:4
  80:13,22 81:3,4 84:13
  86:17
**asking** 8:14 38:10 64:23
  68:19 73:11
**assessment** 32:12
**assign** 73:22 74:5
**assist** 7:16
**associated** 77:8

84:14
**assume** 14:1 31:10,11
  49:16,18 60:11 66:15
**Assuming** 69:6
**attorney** 9:5 99:12
**attorney's** 9:3,4 21:1
**August** 1:16 5:3 14:20
  38:21 39:6 41:13 99:16
  100:3
**authorized** 99:8
**author's** 29:4
**autopsies** 7:2
**autopsy** 10:14 22:11 23:7
  24:19 45:22 59:10,11
  65:24 68:21 70:3 77:20
  77:25,25 78:3 87:25
**available** 10:15 66:24
**Avenue** 2:14 5:5
**average** 44:18 49:7,13
  50:1 51:18 54:1
**aware** 46:1,9 47:10 48:24
  56:3,6,8,11,16,17 58:19
  61:18,24 62:4 73:25
  74:9,18 86:7 94:9,24
  95:5,8,21
**axial** 46:16
**axillary** 46:6 47:5 52:10
  52:13 53:9,18 66:10
**a.m** 5:4

## B

**back** 18:18 26:11 27:22
  27:25 29:23,24 30:13
  31:1,25 32:1 37:25 39:6
  48:10,18,21,23,25
  49:19 59:15 60:13
  61:13 63:4,6 69:16 78:7
  78:13 96:24
**Bacon** 2:19 21:12
**ballpark** 8:9,16
**based** 13:4 24:12 31:12
  31:16 42:3 47:8 48:25
  72:13 73:23 74:6 77:15
  79:24 85:17,22 86:9,11
**Baselt** 43:1,9 44:2,22
  48:24 49:4 50:10 51:2
  51:24 53:21,22,25
  60:24 74:13 89:2

PLAINTIFFS' EXHIBITS 010727

AMY R. McMASTER, M.D.

**basis** 7:8,10 31:20 45:6
48:6 52:21 53:23 90:17
93:12
**batch** 95:19
**bearing** 95:16
**beating** 54:18,20
**behalf** 1:15 5:2
**behavior** 67:1,2,7
**believe** 13:25 19:9,23
37:23 42:18 44:11
45:13 46:13 54:9,12,14
54:23 55:10,12 60:17
68:5 69:3 78:9
**beneath** 62:25
**best** 19:24 93:14
**better** 61:6
**beyond** 13:13 27:3 86:1
**bill** 16:8,10,12,14
**billing** 16:25 28:20,22
30:8
**binder** 23:18 24:8 25:2
25:14,18,21,24 26:2,5,6
26:10,15,21 28:2,8
29:23 30:3,11
**biopsies** 22:25
**bit** 71:13
**black** 88:23
**blood** 11:15 12:2,9,20
13:4 23:11 31:23 32:15
33:1,3 34:7 35:22 39:7
40:10,15,20 42:7,10
44:20,20 46:1,2,6,16,19
47:3,5,11,24 48:10,12
49:8,8,14,16,19,20,21
50:5,16,17,24 51:2,4,13
51:14,20 52:3,10,14,25
53:8,11 60:12,13 61:20
62:8 64:5,8 65:7,21
66:2,7,9,16,19 69:25
70:14 71:10 72:5,23
73:23,24 74:12,12
75:16 82:13 96:23 97:7
**bloodstream** 34:10 35:6
37:15 39:24 63:23
64:18
**blue** 91:11 92:2,9
**Board** 33:13

**book** 32:22 40:3 41:9
43:9 44:2 45:17 88:17
88:21,23
**bottom** 42:25
**Boulevard** 6:12
**box** 46:10
**bradycardia** 74:25 75:16
82:14
**break** 63:1
**breathe** 91:13 92:3
**breathing** 92:10
**Brief** 63:3 78:20 88:14
**bring** 15:8,8
**British** 29:20 89:12,12
**brought** 15:10
**Building** 2:14
**bunch** 88:24
**burden** 13:7
**business** 6:10,11

**C**

**calculate** 96:24
**California** 2:5,9 22:13
**call** 21:18,20 42:20,21
20:19
**called** 5:24 7:9 8:23,24
20:19
**camping** 22:11
**capable** 55:1
**caption** 5:8
**cardiac** 54:10,11 55:1,2,4
55:6,13,16,20,25 56:2
60:4,9 74:22 75:9,15
76:5,15,22 82:13 84:12
84:16,22 87:5 91:22
92:4,4
**cardiac-related** 55:7,8
**cardiology** 23:5
**cardiovascular** 23:5
54:15
**career** 96:22
**Caremark** 23:14 56:13
**case** 1:5 7:13,25 8:3,13
13:8,23 15:24 16:9,17
16:20 17:3 19:7 20:14
20:15,16 21:7,8,22 22:1
22:5 28:22 47:5 78:2
87:14 93:22 96:16

**cases** 7:16,18 8:6,10,18
9:20 10:17,20 11:9,11
12:1 18:19 19:6 20:13
63:13 77:18 85:14
86:15 96:5
**case-by-case** 7:7,9
**cause** 7:17,20 9:13,15,16
9:25 10:2 12:3 13:10,13
13:18 16:1 19:18 20:18
20:19 22:16 43:25
55:16,25 56:2 57:24
58:16 59:23 65:9,13
67:18 68:13 74:22,25
75:3,9,15 77:19 79:25
82:12 85:11,24 86:14
87:12,21 88:5 92:9,22
95:16 99:4,14
**caused** 10:21 54:16 60:4
83:24
**causes** 55:21 60:8
**cause-and-manner-of-...**
58:25
**cause-of-death** 58:12
**causing** 55:1 63:14 85:15
**caveat** 73:5
**Cell** 3:3
**certain** 33:24 55:21
**certainly** 50:19 57:25
67:7 86:1,5 92:7
**certificate** 4:21 5:9 23:6
24:16 99:1
**certify** 99:2,11 100:3
**cetera** 5:9
**Chace** 2:20
**change** 28:1 58:12,13,18
93:2
**changed** 79:25
**changes** 17:21 28:2 100:4
**characterize** 19:5 85:22
**CHARLESTON** 1:2
**checked** 46:10
**Chemicals** 43:2 44:2
**chief** 6:20
**child** 96:17,20
**children** 29:10
**circling** 18:18
**circumstance** 35:20

**circumstances** 7:10,14
10:13 67:21
**cite** 48:9
**cited** 42:25 43:7 45:20
**Cities** 38:20
**civil** 5:7 8:3,6 20:14,15
20:16
**clear** 19:13 20:6 65:16
74:4
**Cleveland** 2:15
**clinical** 29:17,21 32:11
35:20 36:5,21,22,24
37:8,11 40:16,17 57:1
69:19 70:1 77:15
**clinically** 83:16
**collected** 46:20
**combined** 10:7 20:20
**come** 51:4 58:10 61:20
86:11 98:10
**comes** 57:23
**coming** 98:13
**comma** 44:15 72:3
**commencing** 5:4
**commercially** 83:12
**commission** 99:25 100:19
**common** 10:23
**Community** 38:20
**company** 6:22
**complete** 10:11 15:9,10
**completed** 5:15
**compliant** 30:20,24 31:3
31:7,19
**Complies** 15:4
**compound** 63:24
**compute** 48:11 54:1
60:20 61:3 62:8 74:1
**computing** 49:19
**concentrations** 29:1,9
**concerned** 35:13
**conclude** 10:9
**concluded** 11:12 12:12
13:3 47:10
**conclusion** 9:22
**conclusions** 18:6 63:10
63:18,22
**condition** 67:8
**conducted** 22:12 61:19

PLAINTIFFS' EXHIBITS 010728

AMY R. McMASTER, M.D.

August 5, 2011

Page 3

consider 8:25 11:9 33:10
46:7 57:25 58:15,17
59:22,25 65:20,23,24
66:2,3,4 67:7,11,23
69:2,25 85:11 87:12
95:15
consideration 97:9
considered 33:12 47:2
65:12 66:16 67:21 68:6
68:10,11,18,20 69:4,8
69:18,21 79:23 85:4
consistent 91:15,22,23
92:3
constituency 82:3,5
consultant 23:5
consulted 7:12
Cont 2:24
contacted 21:16,17
contain 18:5
contained 18:13 22:21
32:11 44:11 45:17
contains 18:14 84:25
content 21:25
continue 38:13
contract 7:3 9:8
contracts 6:22 7:1,7 9:2
contradictory 74:16
contrary 74:9
control 86:1
conversation 21:25
convicted 85:17,22 86:16
copied 23:19 25:25 27:22
copies 27:15,20
copy 14:3,8,10,11 25:17
28:4 30:7 32:22 74:20
98:2,4,9,11
coroner 65:12,15
coroner's 22:13 91:10
correct 9:10 11:24 58:23
63:16 84:23 86:20
92:23
Correspondence 4:12,14
counsel 99:11
counties 7:2,5,15 9:3
county 7:4,4 9:4,6,9
couple 30:17 38:6
course 65:23 66:1 83:21

88:2 92:13,15
court 1:1 3:2 5:13 7:22
8:2,7 11:10 15:17 19:6
20:12 25:16 27:6 28:3
71:12,19,22 78:7,10
98:1,8
courtroom 8:19 11:1
courtrooms 18:20
courts 85:13 97:15
covered 90:6
crimes 63:14
criminal 7:16,18 8:1,8,10
8:19,21 11:10 12:1 13:8
20:13 63:13 77:18
85:14 86:15 96:5,16
Cross-Examination 4:5
95:25
Cruz 88:5
currently 6:14 25:15
26:16,17
Customer 81:19
CV 4:10 13:22,24 14:3,9
14:16 28:15
CVS 23:13 56:13

**D**

d 2:24 4:1
daily 43:12,14 82:8
date 16:8,11 18:3 23:15
23:15,20 24:5,23 57:11
59:3,9,10
dated 23:21 24:1 29:18
38:21 41:5
dates 39:25
Davidson 7:3
day 5:3 69:19 70:11
99:16
Dear 56:14 81:19
death 6:24 7:17,20,21
9:13,15,16,16,25 10:2,3
10:11,14,21 11:2,19,22
12:3 13:10,11,13,13,18
16:1,1 18:20 19:19
20:18,18,19 22:16,17
23:6 24:16 31:22 32:16
40:22 43:25 44:17 50:5
51:2 54:10,11 55:2,4,6

55:13,16,20,25 56:2
57:19,24,24 58:16,17
58:20 59:23 60:4,9
63:15,23 64:5 65:9,13
66:23 67:3,8,19,22
68:13 69:20 70:1,2,3,11
73:7,20 75:9,15 76:5,15
76:22,23 77:19 79:14
79:19,25 82:17 83:24
84:12,16 85:11,15,24
85:24 86:15 87:12,15
87:21 88:6 91:8,22 92:4
92:22 95:17 97:11
Deborah 3:3 5:12 99:24
December 16:15,16
decreased 83:17
deem 67:14
defendant 2:12,18 21:6,6
Defendants 1:7
defense 8:24,25
defer 32:11 38:24
degree 86:5
depend 82:2
Depending 82:5
depends 7:11 10:2 35:11
35:20 36:4,12,21,24
37:8 39:4
depo 15:5
DEPONENT 98:16
deposition 1:13 4:11 5:2
5:16 14:20 15:2 17:11
18:10 24:22 45:24
62:19,20 68:3 69:18
70:9 89:22 98:5,11 99:3
99:5,13,14 100:2
depositions 24:4,6
derived 44:6
Describe 43:15
described 60:4 77:12
description 4:9 46:24
70:4 91:9
determination 7:17 67:9
determinations 23:12
determine 12:2 65:12
88:5 97:6,10
determined 33:2 44:16
determining 85:11

de@ernstlawgroup.com
2:6
diagnose 65:9 68:12
diagnoses 92:8
diagnosis 10:23,24 54:11
59:1 91:25
diatribe 62:18
die 7:13 54:16 57:15 77:2
80:14,16,23
died 9:23 10:9 11:12
12:13,17 13:3 20:16,21
22:10 24:13 54:9,13,14
57:18 72:15,24 73:15
81:5 87:4
dies 54:19 55:7
difference 47:16 65:17
68:15
different 37:20 38:7,11
70:25 87:21
differential 55:20
difficult 19:4
difficulty 92:9
digitalis 82:7,18 83:17
Digitek 56:5 79:3 80:9,12
83:23 93:3 94:10,20
digoxin 11:19,23 23:11
24:14 29:1,10 31:8 33:3
33:16,21,23 34:2,9,18
35:6,14,21,25 36:11,16
37:3,14 38:16,18,19
39:8,13 40:15,20,24
41:4,21,23 42:16 44:16
49:21 50:17,20,24 51:6
51:15 55:15,22,25 56:4
58:24 59:3,7,14 60:5,14
60:16,21 64:15 65:2,7,8
65:9,12,21 68:10,12
70:13,16 71:9,11 72:4,6
72:15,24 73:6,14,20
74:1,6,21,24 75:2,8,14
75:21 76:3,6,23 77:3,6
77:8,9 80:12,14,17,23
84:11,15,17 86:24 87:4
91:15 93:1
Direct 4:4 6:1
direction 67:6
directions 31:14

PLAINTIFFS' EXHIBITS 010729

AMY R. McMASTER, M.D.

disagree 48:6 53:21
 90:17 92:20,24,25
disbelieve 42:5
discuss 17:14,15 32:24
 90:2
discussed 15:13 74:11
Discussion 14:24 98:6
disease 9:17 20:21 24:13
 54:15 55:8 84:22
dishonest 62:13
Disposition 43:1 44:21
 48:8
dispute 84:5
district 1:1,1 9:3,4,5
DIVISION 1:2
dizziness 75:16 76:2,9,9
 82:13
doctor 6:3 10:1 13:23
 14:8 15:22 25:1 28:5,8
 32:5,13 33:8 34:18 36:1
 37:1 38:13,15,23 39:24
 40:8 41:3,16,19 42:24
 43:5 45:6 47:23 48:8,22
 49:16 52:18 56:3 60:18
 63:12,20 64:3 67:11
 70:21 72:8 74:19,21
 77:9,17 78:7 79:2 82:9
 86:22 87:20 88:16
 94:10,25 95:11,22 97:5
 97:22 98:13
document 18:13,14 25:20
 25:21 27:22 71:5 78:8
 78:22 81:10,17
documents 25:7 26:1,17
 26:20 28:4 29:22 30:5
 56:17
Dollen 23:3
Don 2:3 23:17 26:13 27:1
 27:7 38:1,5 41:8 59:17
 62:14 70:24
dose 82:6
doses 82:8
double 82:6 83:4,11
double-thick 79:8 83:2
doubt 13:14
Dr 4:12,16,17 6:8 15:3
 23:3,18 24:20 26:17

28:18 30:19 31:2 45:22
 46:2,9,13,16 47:10,14
 47:23 48:5 58:19 59:6
 59:10,12 60:14 68:3,16
 68:24 70:6 87:22,24
 88:4
drawn 46:1 50:15
drew 47:14
drug 4:19 10:4,6,7,7,10
 10:20,24 11:3,10,12
 12:10,14,17 18:20
 19:18 20:20 22:14 24:1
 56:3 57:2,9 63:14,17,21
 63:23 73:4 77:19 80:11
 81:9,16 84:21 85:14,14
 86:9 96:6,23,24 97:6,9
 97:11,14
drugs 43:2,17,18,20
 44:22 48:9 63:22 64:12
 68:1 86:4 94:17 95:6,13
 95:18 96:20
drug-related 19:6
due 11:19 44:17 77:19
 81:24 83:16
duly 5:25 99:3
duty 88:4
d_fernau@yahoo.com
 3:4

**E**

E 4:1 100:1
easily 32:23
Edition 43:1 44:22
effect 34:6
efficient 40:5
eight 37:20 38:6
Eighth 43:1 44:22
either 61:10 99:12
electricity 25:24
electrocardiograph 23:2
electronic 98:4
elevated 29:9 93:1
Ellis 2:13
employed 6:14
ended 90:1
entirety 25:14 28:3
equilibrium 64:5,17

Ernst 2:3,4,8 4:4,6 6:2
 12:8 13:2,21 14:2,5,7
 14:15,22 15:1,18,21
 17:10,13,20 18:1 19:1
 20:1 22:18 23:23 25:16
 26:8,14,19,23 27:4,8,11
 27:17,21 28:1,7 31:5,24
 32:4,18,20 33:7 34:16
 34:21,25 35:4,12,23
 36:7,23 37:10,21,23
 38:2,12,14 40:2,7,14
 41:10,15 42:17 44:7
 45:5,12,19 46:8 47:1,22
 48:7,20 49:5,15 50:3,9
 50:18 51:17 52:1,8,17
 52:23 53:7,20 54:8
 55:23 58:1,9 59:20
 60:10 61:2,8,11,17 62:1
 62:17 63:4,11 64:2,24
 68:14 69:5,15,23 71:3,8
 71:14,16,21 72:1,2,19
 73:8 74:8,17 75:7,13,20
 76:1,8,14,20 77:5 78:6
 78:14,19,23 79:1,20
 80:18,21 81:1 83:13
 84:4,10,24 85:12 86:2
 86:21 87:10,16,19 88:8
 88:12,15 89:17 90:8,20
 91:21 92:11,21 93:15
 93:19,21,23 94:3,8,19
 94:23 95:10 96:8,13
 97:1,4,25 98:1,3,7,10
error 86:12
ESQ 2:3,8,13,19
established 60:3
estimate 8:9,20 10:19
 11:2 16:22,23 19:15,24
 20:4 52:22
estimated 61:16
et 1:3,6 5:9
etiology 91:25
Euclid 2:14
event 55:13,16 87:5
 91:24,25 92:4
evidence 22:22 84:2,5,8
exacerbate 84:22
exact 8:1,13,14 11:8

Exactly 4:23
examination 4:4,6 6:1
 65:25 97:3
examiner 7:11,13 88:5
example 96:12,16
exceeds 51:5
excessive 10:4 12:17
 82:18
exclude 10:24
exhibit 4:9 14:13,14,16
 14:23,25 15:19,20,22
 17:11,12 18:3 25:15
 26:1,3,4,16,18 28:3,9
 30:14 32:18,19,22 42:7
 71:1,17 78:9,24,25 80:2
 80:10,11 81:7 83:15
 84:25 88:20 94:9,12
exhibiting 77:3
exhibits 4:8 98:9
exists 26:16
expected 82:6 90:3
experience 33:8 37:13
 42:3 47:8
expert 9:1 28:17 81:4
expertise 13:9 38:24
expires 99:25 100:19
expressed 90:18
extrapolate 12:1,7 48:23
 48:25
extrapolated 12:19
extrapolation 13:1 48:19
 48:22
E-mail 3:4

**F**

fact 41:22 42:24 44:15
 50:4 56:8,23 79:23
 92:25 94:4
factor 11:16 48:10 60:13
 65:6,13,22 66:20 79:21
 83:20 85:4 87:12,15,17
 95:14 97:11,13
factors 59:21,25 65:11,14
 67:22 68:23 96:9
facts 22:4
factual 68:19 69:3
fair 33:22

PLAINTIFFS' EXHIBITS 010730

AMY R. McMASTER, M.D.

August 5, 2011

Page 5

**family** 22:11
**far** 11:6 14:17 35:13
  41:20 53:9
**fashion** 31:15
**fatigue** 77:6
**fax** 78:18
**faxed** 30:7,7 78:7,14
**FDA** 83:11
**February** 41:5,14
**Federal** 5:6
**fellowship** 96:3
**felt** 58:24
**femoral** 44:19,19 49:8,14
  51:20 66:9 74:12
**Fernau** 3:3 5:12 99:24
**Ferner** 29:21
**field** 8:8
**file** 4:17 15:9,10,11 28:5
**final** 67:9 90:18 92:20
**find** 32:24 37:2 62:20
  90:17
**findings** 10:14 17:15
  24:20 55:1 68:21 70:3
**fine** 6:5 27:1,25 36:1 40:4
  41:25 94:6
**finish** 26:4
**firm** 21:3,9
**first** 5:25 11:21 27:2 29:4
  55:3 58:19 81:17,20
**five** 57:18 63:2 88:11,12
  91:5
**flip** 39:22 41:9
**Florie** 21:1,4
**folder** 24:25 25:1 29:22
**followed** 31:14
**following** 32:15 58:11
  64:5 100:3
**follows** 5:25
**Food** 24:1
**footnoted** 91:3
**footnotes** 90:21
**foregoing** 99:2 100:2
**forensic** 6:17,18,21,24
  7:12 29:17 33:9,10
  42:22 43:13,15,24
  47:17 60:19 63:20
  65:16,18,20 66:14

69:24 86:23 88:4 96:22
**forgive** 43:8
**form** 5:10 12:4 27:23
  31:16 36:2,17 50:12
  55:17 56:5 60:6 72:16
  72:25 75:4,10 90:15
  91:17 92:5
**formalities** 5:8
**formulating** 59:22
**formulation** 93:2
**found** 41:7 91:7
**four** 34:24 88:11,12
**frankly** 94:5
**fraught** 86:12
**frequent** 8:12
**frequently** 8:2
**Friday** 14:20
**front** 13:23 25:1,24 26:9
  26:24 29:23 39:16,21
  62:4
**full** 6:6 44:14 81:20
**furnish** 25:18
**furnished** 13:22,25
**further** 19:14 20:6 70:14
  95:23 98:16 99:11
**F-E-R-N-E-R** 29:21
**F-L-O-R-I-E** 21:2

---

**G**

**gain** 67:4
**Gass** 6:12
**general** 8:22 9:13 43:16
  43:17,18 58:8 72:18
  73:5
**generally** 7:15 8:23 9:15
  12:12 33:20 34:8 36:10
  36:15 42:22 43:15
  45:18
**generic** 70:4 77:7
**generically** 67:16 69:24
**gentleman** 22:10
**Gibson** 28:15,18,18
  90:10,19,25 93:1
**Gibson's** 90:14,22 91:2
  92:17
**give** 8:1,8,13 15:17 16:22
  18:19 19:16 24:9 35:2

39:23,25 41:11 71:1
  73:18 89:18 96:12 97:8
  98:12
**given** 19:15,24 22:19,20
  23:2,3,4,6,6,7,8,13,14
  23:25 24:4,16,19,22
  29:14 31:17 34:25
  41:17 56:18 94:15
**gives** 7:20
**go** 12:5,24 13:17 18:24
  19:22 22:8 29:16 30:13
  31:1 34:12 35:10,18
  36:3,19 40:13 41:8
  42:13 44:4 45:3,9 46:4
  46:23 48:3,15 49:11,23
  50:8,13 51:11,22 52:5
  52:16,20 53:4,13 54:6
  55:18 58:5 60:7 61:23
  62:12,15 63:2,8,25
  64:20 65:11,13,19 68:8
  69:1 70:21 72:17,20
  73:1 75:5,11,18,24
  76:12,18,25 79:16
  81:17,20 83:8,14 84:1,7
  84:19 85:8,20 86:19
  87:8 88:18 89:9 90:3,5
  91:18 92:6 94:6 96:15
**God** 80:16
**goes** 73:4
**going** 17:15 18:12 26:1,5
  27:2,16,21 32:22 39:6
  64:21 71:24
**good** 6:3,5 70:4
**Gordon** 30:19
**graduated** 43:8
**group** 2:4,8 27:13
**guess** 27:24
**guidelines** 43:19
**G-A-S-S** 6:12

---

**H**

**hahern@shb.com** 2:22
**hand** 14:5 99:16
**handed** 14:10
**handwritten** 22:23
**happened** 54:21 55:10
**happy** 34:14

**hard** 98:10
**Hardy** 2:19 21:12
**hazardous** 95:3
**Heard** 23:18
**hearing** 5:11
**heart** 44:20 52:3 53:11
  54:17,20,22 65:25
  74:12,25
**help** 94:1,4
**helped** 94:2
**helpful** 40:17
**hereunto** 99:15
**high** 37:4,15 50:5
**higher** 33:24,25 50:2
**hired** 7:15 15:24,25 16:2
  16:4 20:22,25
**history** 10:13 40:17 78:1
**home** 6:9
**Hospital** 38:21
**hour** 16:7 65:2
**hours** 16:19,21,24 65:3,3
  73:15,20
**Houston** 2:21
**human** 29:2 37:13
**hundred** 65:3
**hundreds** 56:1
**Hunter** 2:19 97:19
**Huntington** 2:14
**hypertensive** 54:14

---

**I**

**identify** 28:14
**important** 40:8,9 43:23
  56:22 57:2,17 79:21
  85:4 87:3,11 95:12,20
  96:21 97:12
**impossible** 74:4
**inappropriate** 62:21
**include** 10:12 16:25
  17:22 55:21
**included** 49:1 89:14
**including** 10:14 23:12
**increase** 44:17
**increased** 83:16
**independent** 40:23 56:20
  57:6 85:23
**independently** 21:24

PLAINTIFFS' EXHIBITS 010731

AMY R. McMASTER, M.D.

**indicates** 57:8
**indicating** 26:13
**indicator** 50:16
**indicators** 40:16
**individual** 12:21 35:21
**individuals** 82:7
**inert** 83:16
**infants** 29:10
**infer** 73:6
**inference** 53:6,17,24
**inferred** 51:15 53:18
**information** 30:23 32:9
   41:21,23 43:17,17,21
   44:11 49:4 51:24 52:7
   53:19 57:1,23,25 58:10
   58:15,25 67:1,4,20 70:9
   79:24 84:25 85:10
   89:15 92:1 94:16
**informed** 83:5
**ingestion** 12:13
**initial** 22:21 24:12 28:22
   30:7 59:5
**initially** 20:19
**initiated** 81:24
**injuries** 9:16
**instability** 74:22 75:15
   82:13
**instance** 67:24
**insufficiency** 82:8
**intake** 10:4 82:18
**intend** 18:6,15
**intended** 71:4
**interested** 98:11 99:13
**interject** 93:17
**interpretation** 10:15 29:8
   65:7
**interval** 64:13
**interviews** 68:21
**investigate** 7:13
**investigation** 6:24 10:12
   22:12 68:22 70:2
**investigative** 67:6
**involved** 8:7 57:10
**involving** 20:16
**irrespective** 96:19
**issue** 25:17 43:21
**issued** 56:6 58:22 74:18

**issues** 32:25 96:6
**item** 42:19

---
**J**
---
**Jennings** 5:5
**job** 88:3
**Journal** 29:20 89:11,12
**JPMorgan** 2:20
**judiciary** 85:25
**July** 41:14
**June** 59:4
**J.D** 90:19

---
**K**
---
**K** 2:19
**KATHY** 1:3
**keep** 7:25 8:13 21:20
**keeping** 19:3
**Keith** 28:15,17,18 90:9
   90:13,18
**KILPATRICK** 2:8
**know** 14:17 31:11,21
   34:17 36:11 38:8,9,17
   40:5,9,17 43:7 46:15
   53:23 57:3,17 62:4,11
   64:25 66:6 68:21 79:11
   79:17,22 80:4 87:3,11
   88:23 90:21 94:3 95:3
   95:12,20
**knowing** 27:16
**knowledge** 17:25 20:12
   39:11 42:4 59:7
**known** 92:4

---
**L**
---
**lab** 4:18 23:4,8 32:14
   38:8,18 39:6 40:3
**label** 38:9,15
**laboratory** 29:8
**labs** 39:21 46:11
**lack** 84:15
**law** 2:4,8 20:12 21:2
   85:13 97:15
**lead** 84:12,16
**leads** 23:2
**leaking** 44:17
**left** 88:19

**Lemm** 30:19 31:2
**length** 64:4,7 65:1
**lethal** 43:20
**letter** 15:18 21:17 22:21
   23:13,16 25:23,25
   26:11 56:11,13,19,24
   57:4,7,11,14 74:19,20
   80:1
**letterhead** 70:24 71:2
   74:19
**letters** 15:11,15
**let's** 32:18 41:10 63:2
   65:11,13,19 66:15
   78:23 80:1 81:17 83:14
**level** 12:2,13 33:23,24,25
   34:7 35:6,14,21,25 39:5
   39:7,20 40:10,15 41:21
   42:7,11,16 49:20,20,21
   50:15,17 51:4,14,14,15
   53:17 59:7,14 60:13,16
   60:20 64:13 65:8 68:11
   70:16,17,17 71:11 72:6
   72:7,7,15,24 73:4,7,14
   73:20,23,24 74:6,7
   77:14 86:9,11,12 87:4
   93:1 96:23,24 97:6,9,13
**levels** 36:15 37:14 40:20
   43:20 44:16 62:8 63:21
   63:22 64:9 65:2,7 74:1
   96:19 97:7
**licensed** 5:13
**lifetime** 40:10,20,22,25
**light** 57:23
**line** 38:13 62:18 77:12
   100:5
**lines** 90:7
**list** 7:25 8:13 19:3 41:7
   41:11 56:1 92:8
**listed** 88:16 89:11
**literature** 35:13 38:9
   60:19 77:13 86:7,10
   91:3
**little** 70:25 71:13
**living** 33:16,17 34:2,10
   35:7,15,25 36:11 37:3
**LLC** 1:6
**LLP** 2:13,19

**long** 43:8 89:24 92:8
**longer** 64:12
**look** 15:2 27:2 29:13 36:8
   39:22 40:1 60:14,19
   61:15 67:11,15 71:7
   80:1 89:6 97:12
**looked** 88:25 89:15
**looking** 15:22 39:14 40:9
   41:1 42:6 44:13 70:24
   94:9,12
**lot** 79:13,19
**low** 37:3,14 75:16 82:13
**lower** 33:25 50:2 70:17
   72:7
**Luis** 2:5,9
**L.L.C** 80:8

---
**M**
---
**M** 3:3 5:12 99:24
**maintained** 33:25
**making** 53:23
**malignment** 62:23
**malpractice** 21:8
**Man** 43:2 44:22 48:9
**Management** 6:17,19
**manner** 7:21 9:15 13:10
   13:13 16:1 20:18 22:16
   57:24 58:16 85:24
**manufacturer** 80:9
**March** 29:18 41:12 57:16
   59:6,9
**mark** 32:18 78:23
**marked** 14:13,14,22,25
   15:19,20 17:11,12
   25:15,25 26:16,18 28:2
   28:9 32:19 78:8,25 80:1
**Mason** 24:20 45:22 46:2
   46:9,16 47:10,14,23
   48:5 58:19 59:6,10,12
   60:14 68:16,24 70:6
   87:22,24 88:4
**Mason's** 46:13 68:3
**Master's** 4:17
**material** 22:16,19,20
   23:4 24:3,13 44:5 45:17
   57:5
**materials** 27:14 90:24

PLAINTIFFS' EXHIBITS 010732

**Matt** 25:20 26:24 27:5,8
27:18 62:24
**Matthew** 2:13 41:11 94:3
**matthew.moriarty@tu...**
2:16
**McCornack** 1:3 16:1
22:10,13,17,24 23:4
24:13,17 30:20 32:15
33:2 39:7,12 46:2 48:13
49:17 54:9,12,25 55:10
55:12 56:4,18,23 57:5,8
57:15,18 58:20 70:16
72:6,14 73:14 78:3
79:12 80:23 81:5 83:23
87:25 91:7,8 95:17
**McCornack's** 49:21 50:4
54:22 69:19 70:10
87:15 95:18
**McKercher** 29:4
**McMaster** 1:14 4:3,10,12
4:16 5:2,23 6:8 15:3
26:17 99:3 100:2,16
**mean** 8:14 9:8 12:6 20:3
20:3,4 55:5 58:7,18
**means** 13:19 49:9 50:22
50:23 51:14 55:6
**med** 96:2
**medical** 6:17,18,20,21
7:11,12,20 10:13 13:19
21:7,8 22:22,23 23:2
43:5,6 66:22 70:2 78:1
85:23 90:17
**medically** 35:3 36:10,15
**medication** 30:21 31:8,19
32:6,10 56:7,9,12,25
57:19 79:13
**medicine** 29:8 31:4
**meeting** 89:25
**memorize** 39:20
**Memphis** 7:5
**mention** 54:24 88:17
89:5
**mentioned** 90:25
**mere** 96:6,10
**methodology** 32:25 50:11
66:11,12,12
**Mike** 21:1,4

**milliliter** 23:11 33:3 39:9
41:6 42:8 50:24 70:13
71:9 72:4
**mind** 13:12,14 58:13
**minority** 11:4,9 19:7,8,16
**minutes** 63:2 88:11
**Moriarty** 2:13 4:5,13,15
12:4,22,24 13:16 14:2,4
14:6,12 15:12,16 17:16
17:17,21,23 18:22
19:20 21:16,22 22:7
23:17 24:10,15 25:3,22
26:11,12 27:1,6,9,13,19
27:24 28:6 29:14 30:25
34:11,19,23 35:1,2,8,10
35:17 36:2,17 37:5,7,17
37:21,22 38:1,5,12
39:25 40:4,12 41:7,12
41:17 42:2,12 44:3 45:2
45:8,15 46:3,22 47:18
48:1,14 49:2,10,22 50:6
50:8,12 51:7,21 52:4,15
52:19 53:2,12 54:4
55:17 58:4 59:16 60:6
61:1,4,9,22 62:10,17
63:7,24 64:19 68:7,25
69:11 70:23 71:5,22
72:16,25 74:2,14 75:4
75:10,17,23 76:7,11,17
76:24 78:4,13,16,21
79:15 80:4,4,14,16,20
80:24 83:7,25 84:6,18
85:7,19 86:17 87:7
88:10 89:8,18,21 90:4
90:15 91:17 92:5,18
93:9,17,20,22 94:1,6,15
94:18,21 95:7,24 96:1
96:11,14 97:2,19,23
**Moriarty's** 21:9
**morning** 6:3,4,5 89:25
**motion** 87:16
**multiple** 40:21 86:15
**muscle** 44:17
**Mylan** 2:18
**M-C-K-E-R-C-H-E-R**
29:5
**M-C-M-A-S-T-E-R** 6:9

**M.D** 1:14 4:3,10 5:2,23
99:3 100:2,16

**N**

**N** 4:1
**name** 6:6,8 21:1,2 29:4
56:15 81:14
**named** 99:6,14
**nanogram** 70:13
**nanograms** 23:10 33:3
39:9 41:6 42:7 50:23
71:8 72:3
**narrow** 77:10
**Nashville** 5:5 6:12 7:4
**natural** 9:17 20:21 24:13
**nausea** 75:15 82:12
**nearly** 44:16
**necessarily** 46:6 48:18
52:12 58:17 77:16
**necessary** 67:14
**need** 8:15 33:24 71:12
98:3
**nefarious** 27:10,12
**negligence** 21:7
**never** 62:19
**News** 29:18
**newsletter** 29:17
**night** 91:8
**NMS** 4:18 23:8 32:14
46:11 70:14 71:9 72:4
**noncompliant** 31:7
**nonconforming** 93:3
**nonresponsive** 91:8
**nonspecific** 77:7
**normally** 66:7
**North** 5:5
**Notary** 5:13 99:7 100:19
**note** 70:12,15
**notebook** 22:20
**notes** 21:20 23:5 88:9
**notice** 4:11 5:8 14:19
15:2,6 57:19 58:21 59:6
59:14 79:12 81:7
**notices** 67:24
**November** 16:3 41:13
**number** 8:1,9,9,13,14
10:19,22 11:8 16:19,21

18:19 19:8,17 34:6
42:15 48:18,21 50:22
55:1 72:14 73:6,19,22
77:16 79:19 88:16
**numbers** 19:16 34:17
35:1,3 37:16 39:23
41:17 42:1,14 48:12
49:1 61:20
**Numerically** 36:13

**O**

**oath** 39:11 42:1
**oaths** 99:8
**Obispo** 2:5,9
**object** 38:7 69:11
**objection** 12:4,22,23
13:16 15:17 17:17,23
18:22 19:20 22:7 30:25
33:6 34:11,19,23 35:8,9
35:16,17 36:2,17 37:5,6
37:17,24 40:12 42:12
44:3 45:2,8,10,15 46:3
46:22 47:18,19 48:1,14
49:2,10,22 50:6,7,12
51:7,21 52:4,15,19 53:2
53:12,14 54:4 55:17
57:21 58:4,6 59:16 60:6
61:1,4,22 62:10,22 63:7
63:24 64:19 68:7,25
69:10 72:16,25 74:2,14
75:4,10,17,23 76:7,11
76:17,24 78:4 79:15
83:7,9,25 84:6,18 85:7
85:19 86:17 87:6,7,16
89:8 90:4,15 91:17,19
92:5,18 93:9,10,23,24
94:18,21 95:7 96:8,13
97:1
**objections** 5:9
**objective** 68:22
**observed** 63:3 78:20
88:14
**obtain** 78:11
**obtained** 46:25
**obviously** 48:5 54:19
96:19
**occasions** 7:24 8:5 86:15

PLAINTIFFS' EXHIBITS 010733

AMY R. McMASTER, M.D.

August 5, 2011

Page 8

**occur** 82:7 86:3
**offensive** 62:20,24
**offer** 18:6,15
**office** 9:5 22:13
**officer** 6:20
**offices** 5:4 9:3
**Ohio** 2:15
**okay** 8:8 9:2 13:22 15:4
20:2 23:24 27:16 28:16
28:19,23 29:6,16,19
30:9 36:8 41:25 48:8
65:14 69:6 70:6,20 72:1
78:23 80:10 88:10 98:7
**once** 8:7
**one's** 67:22
**onset** 55:9
**open** 44:21
**opinion** 7:20 11:16 13:19
15:25 20:18,23 24:9,11
28:17 31:6,13,16,18
32:5 37:2,14 40:19
46:14 47:7,9,21,24 48:5
52:9 58:12,12,18,20
59:13,23 60:15 64:3,7
64:11,15,25 67:17,18
68:6,15 72:14,23 73:15
73:19 77:18,23 81:4
83:20,22 85:24 87:21
90:9,13 92:16,17,19
97:15
**opinions** 12:1 18:5,12,15
40:11 43:25 45:1,7
47:17 56:23 79:10 85:5
90:18
**opposed** 34:6
**order** 12:2 78:9 86:23
98:2
**original** 25:25 26:5,6
27:22
**originally** 59:13
**originals** 27:20
**outcome** 99:13
**outside** 13:9
**overdose** 10:7 20:20
24:14 63:14 77:19
**overdoses** 85:14
**overweight** 81:25 82:24

83:3,6
**oxycodone** 96:18

**P**

**P** 2:13
**page** 4:2,9 40:1 42:25,25
44:13 54:25 70:12,19
70:20,22 71:4,7,17
74:10 100:5
**pages** 99:9 100:2
**pagination** 70:25
**paid** 16:6,7
**Palm** 2:4,9
**paperwork** 67:12
**paragraph** 54:25 55:3
70:22 81:20 82:23 83:1
83:14
**pardon** 23:9
**parens** 44:21
**part** 10:23 13:1 32:3 67:9
**Participate** 56:14
**particular** 12:10 39:5,14
39:20 56:15 65:4 73:6
77:14 78:2 81:12 84:21
87:14 97:14
**parties** 99:12
**pathologist** 33:9,11 43:13
43:15,24 58:2 59:22
60:19 65:16,18,20
66:14 69:25 96:22
**pathologists** 47:17 63:21
86:23
**pathology** 6:24 7:12
22:25 29:8 33:13 42:23
88:4
**patient** 33:18,19 35:11
35:21 36:5,22,25 37:3,9
37:12 57:2 66:23 77:2,2
77:14 82:2
**patients** 33:24 34:5 82:8
**patient's** 39:4
**Patrick** 28:15,17,18
90:18
**peer** 44:2 45:14 62:2,6
**peer-reviewed** 44:6 45:18
**people** 7:13 11:12 63:13
85:17 86:16,22

**perfectly** 74:4
**perform** 7:2
**performed** 22:12 87:25
**period** 72:8
**peripheral** 46:2,7,10 47:2
47:5,11,21,24 48:10,17
49:17,25 51:4,9,13
52:24 61:20 66:3,5,6,9
66:16
**persist** 62:17
**person** 10:9 12:13,16
20:22 33:16,18 34:3,5,5
34:10 35:15,24 36:11
76:2,5,15,21 84:17 87:4
**person's** 35:6
**pertinent** 67:21
**pharmacist** 92:12 93:5
**pharmacology** 29:21
43:18 89:12,13 93:8
**Pharm.D** 90:19
**phone** 2:17 21:18,20,23
**phonetic** 4:24 23:18
44:19 61:18 73:25
**photographs** 77:25 78:3
**physical** 67:8
**physician** 7:19 21:6
31:14 36:13
**physicians** 32:12 66:13
66:13
**picture** 36:5 70:1
**place** 62:22 93:24 99:5
**placed** 26:2 30:2
**Plaintiffs** 1:4,15 2:2 5:3
**Planned** 56:14
**played** 10:3
**please** 6:7,11 14:3 16:20
16:22 28:12 30:15
31:25 33:14 34:1 35:5
36:14 37:4,13 38:11
40:19 61:12 63:5 71:13
72:22 81:23
**pocket** 29:25 30:11
**pockets** 26:3
**point** 19:3 20:5 24:4
50:15 51:13 54:17
90:11
**poison** 9:23

**poisoning** 9:19,24
**portion** 32:1 61:13 63:6
69:16
**possession** 25:12
**possibility** 79:7 92:8
**possible** 43:19
**postmortem** 11:15 12:9
12:20 13:4 23:11 29:1,9
31:9,22 33:4 42:6,9,20
42:21 43:21,23 44:18
48:11 49:7,19 50:16,24
51:3,15 53:17 54:2
60:13,21 62:9 63:17,21
64:8,13,13,17 65:6,7,8
65:21 66:19 68:10 69:2
69:7,25 70:14,17 71:10
72:5,7,11 73:3,4,24
74:7 86:3,9,12,24 87:3
96:23 97:6,9,10,13
**potential** 82:2 90:7
**potentially** 43:20 56:7
57:9
**practice** 10:23 13:1,20
43:12,14 57:22 66:13
**prepared** 17:3,8 24:20
27:15
**prescribed** 96:21
**presence** 96:6,10,20
**present** 9:18 31:22 36:6
71:20
**presentation** 36:22,25
37:9,12 39:4 69:19
**presented** 69:20
**press** 23:25
**pressed** 46:19
**pressure** 75:16 82:13
**press-lifted** 46:19
**previous** 16:25 36:20
39:3 77:12
**previously** 8:12 22:21
28:21 30:8 34:4 45:16
47:4 49:24 53:5 58:14
60:22 65:5 68:2 77:11
85:10
**pre-death** 60:16 73:14
74:1 86:9
**principle** 42:22 73:3

PLAINTIFFS' EXHIBITS 010734

AMY R. McMASTER, M.D.

August 5, 2011

Page 9

**printed** 70:24 71:1
**prior** 16:23 73:7 89:15
**private** 6:22
**probably** 8:17 18:25
   19:10,25 53:16 78:11
   93:2
**problem** 40:24 55:7
**Procedure** 5:7
**Proceedings** 98:15
**process** 10:11
**produce** 49:20
**produced** 56:5 79:9
**product** 38:9,15
**professional** 28:20
**proof** 13:8
**properly** 32:10
**prosecute** 7:16,19
**prosecuted** 63:14
**prosecution** 7:17 8:24,25
**prosecutions** 8:21
**provide** 6:24 7:5 15:25
   20:17 22:16 34:14 81:3
   81:4 85:23
**provided** 22:22,23,25
   23:1 24:5,24 41:20,22
   51:24 52:7 53:19 58:15
   79:24
**Public** 5:13 99:7 100:19
**PubMed** 28:24 29:12,14
**pull** 15:15 26:1
**pulled** 45:17
**pun** 71:4
**purposes** 5:6 37:15
**put** 25:18
**p.m** 98:15

**Q**

**quantify** 16:19 19:4,13
   20:7
**question** 16:5 22:15
   26:20,25 27:16 31:13
   31:24 32:3 35:1,3 36:12
   37:12,19,20,25 38:4,6
   38:11 48:2 51:9 54:6,23
   59:17 60:17 61:11
   62:12 63:5 64:22 68:17
   69:12,14 72:21 94:7

**questioning** 38:13 62:24
   77:12 90:7
**questions** 5:10 90:2
   95:23 97:18,20
**quite** 85:21
**quoted** 51:25

**R**

**R** 1:14 4:3 5:2,23 6:8
   99:3 100:1,1,2,16
**radiology** 22:24
**Ralston** 4:10
**range** 19:17 36:10 37:2
   37:13,14,16 38:19,22
   39:1,18 50:4 73:9 77:10
   97:6,8
**ranges** 39:11 43:19 74:1
**ranging** 44:19 49:7 51:19
**rarely** 8:24
**ratio** 44:18 48:11 49:7,13
   51:3,19 52:3,18 53:10
   54:2 60:12 74:11
**reach** 63:18,21 64:4
**reached** 9:22 41:4 64:18
**read** 31:25 32:1 37:25
   44:14 61:6,13 63:4,6
   68:3 69:16 71:25 81:23
   82:11 90:24 91:2 97:23
   100:2
**reading** 5:15 41:5 42:9
   61:8 71:23 91:7,9
**really** 13:9 23:17 64:22
   94:4 98:11
**realm** 93:7,11,13
**reason** 28:1 42:5,18
   86:22 87:1
**reasonable** 13:14 47:16
   47:23 48:4 59:25 60:14
**reasons** 18:9 43:16
**recall** 4:19 21:18,24
   23:13,16,25 46:11 56:6
   57:10,19 58:21 59:6,14
   67:24 69:17,21 70:8
   74:19 79:12,18 80:11
   81:6,7,9,11,13,16,21,24
   83:5,11 85:1 91:7,9
   95:6

**recalled** 22:14 56:5,9,12
   56:25 79:3 94:10,17
   95:13,19
**receive** 14:19 28:10 79:14
**received** 25:2,2 26:3,7,21
   56:7,8,11 79:18
**recess** 63:3 78:20 88:14
**recollection** 40:23 56:20
   57:6
**recommendation** 34:18
   39:3
**recommendations** 33:23
   34:1,9
**recommended** 51:5
**record** 6:7 14:24 33:14
   36:14 62:22 63:2 81:18
   93:25 98:6
**records** 22:23,23 23:3
   30:19 31:2 42:4 66:22
   70:2 77:22,24
**Redirect** 4:6 97:3
**redistribution** 42:20,21
   43:22,23 53:17 64:4,9
   64:14,17 65:2,6 67:13
   68:10 69:3,7 72:11 73:3
   86:3 97:10,13
**refer** 88:21
**reference** 38:22 43:19
**referenced** 90:24
**referring** 88:22
**reflected** 74:13
**reflection** 42:15,19 70:15
   71:10 72:5 76:3
**refuse** 94:2
**regard** 11:22 19:18
**regarding** 28:21 43:21
   57:1 67:21
**regards** 64:16
**regular** 31:15,20
**regularly** 32:6,10
**relate** 9:16
**relating** 11:22 18:20
**release** 23:25
**released** 83:12
**reliably** 61:16 86:8
**relied** 44:25
**rely** 44:8,9

**remains** 35:19 36:20
**remember** 21:2,4 24:5,23
   30:22 91:4,6,12
**removal** 95:4
**removing** 27:14,17
**renal** 82:8
**render** 18:12 20:22 40:10
   67:17 97:14
**rendered** 11:25 58:11,20
   59:3,13 67:18 77:18,23
   79:10 85:5 90:9
**rendering** 40:18 45:1
   56:22 68:6 85:5 92:16
   92:19
**repeat** 64:22 69:13
**rephrase** 72:20,22 80:20
**rephrasing** 80:24
**replacing** 27:15,19
**report** 4:18 17:3,6,8,10
   17:14,16,22 18:2 23:7
   25:22 30:14,14,17
   31:12 32:14 38:21
   42:24 43:7 44:13 45:22
   49:1,6 51:25 52:7 54:1
   54:24 55:24 58:11 59:2
   59:5,11 61:8,10 70:12
   74:10 77:25 79:11
   88:17,19,19 89:5,7,16
   90:10,12,14,22,25
   91:10
**reported** 38:22 70:14
   71:9 72:4 99:6
**reporter** 3:2 5:13 15:17
   27:6 28:3 71:12,19,22
   78:8,10 98:1,8 99:7
**reporter's** 4:21 25:16
   99:1
**reports** 22:25 40:3
**Represent** 54:5
**representing** 21:5
**represents** 80:5,8
**request** 28:20
**requested** 32:1 61:13
   63:6 69:16
**required** 35:2
**requirements** 27:3
**research** 67:11 88:24

PLAINTIFFS' EXHIBITS 010735

AMY R. McMASTER, M.D.

resent 62:20
reserve 87:16
reserved 5:10,16
residency 96:3
responding 9:1
response 77:15
result 23:10 76:6 82:18
  93:2
resulted 11:2
results 11:2 23:7 58:24
retained 80:3
retention 15:12
returned 28:5
review 10:12,13,14 22:15
  24:12 30:18,19 31:2
  42:4 45:24 66:22 77:22
  77:24,24 78:2 88:8
reviewed 44:2 45:14,21
  62:2,6 91:3
reviewing 24:3
re-ask 35:1
re-read 61:12 69:15
right 14:12,19 25:10
  26:12 30:13 33:10,14
  36:24 37:11 38:12 42:6
  45:23 47:7 50:22 52:11
  54:16,21 55:12,15
  56:16 57:11,15 58:2,3,8
  59:5 66:11,11 68:19
  71:15 73:9 78:13 80:10
  80:15,23 81:6,8 83:14
  87:1 88:25 89:1 93:6
  95:5,22
risk 82:2
role 10:3
room 78:12,17
rough 8:20 11:2 98:12
rule 8:22 9:13 27:3
ruled 57:24 58:16
Rules 5:6
R.S 6:12

S

safe 41:1
SAITH 98:16
sample 12:10 46:21 47:13
  47:15 48:12 52:25 54:2

  64:8 65:21 66:2,8
samples 61:21
San 2:5,9
Sante 88:5
save 41:10
saying 41:18 73:21
says 38:9 48:25 54:5
  60:25 61:3,5,6,9 62:8
  62:11 71:8 82:17 83:3
  86:8,10
scene 10:14 67:8 68:22
school 43:6 96:3
schools 43:5
scientific 42:19 45:6 48:6
  52:21 53:16 74:5
scientifically 45:13 50:14
  60:23 61:16 73:5,22
  86:13
scientist 36:13
second 5:5 54:25 71:17
  78:18 82:1
see 26:9,14 27:4 30:19
  44:14 55:2 59:10 60:20
  70:18,19,22 72:8 81:21
  82:18,20 83:18,19
  90:10,16 94:12,14
seen 15:6 81:10,11
semi-quantitate 8:11
sent 25:23 46:11 56:24
  79:12 94:13
sentence 44:14 45:20
  51:8 53:22 71:16,17,25
  74:10 81:18,23 82:1,4
  82:11,17 83:15
separate 32:23
serum 29:9 44:16
service 95:4
services 6:17,19,21,23,25
  7:5
set 99:15
setting 8:19
Sheet 4:22
Shelby 7:4
Shook 2:19 21:12
Shorthand 99:7
shortly 24:7
showed 12:10

sic 4:23 6:21 80:14 86:14
  86:24 93:13
sign 97:24
signed 59:10
significant 65:6
signing 5:15
signs 70:10
simply 50:1 51:15 68:17
  73:23
sir 13:18 14:6 20:10
  30:12 37:22 72:22
  85:16 90:16
sit 31:6 39:10 40:18
  46:15
site 29:13
sits 25:15
sitting 26:12
six 86:18
slash 44:18 48:11 49:7
sliced 46:18
slip 39:6
slips 38:8,18
slow 71:13,24
slowing 74:25
small 96:20
someone's 96:7 97:11
someplace 20:8 52:10,25
soon 98:4
sorry 25:6 28:18 32:2
  69:9,13 71:12 80:19
  82:25 88:21
sound 45:13
Sounded 4:24
source 46:7,10
sources 44:6 45:18
SOUTHERN 1:1
specific 7:1,3,6 31:2 34:6
  73:19,22 74:6 77:14
  79:12,19 86:11 90:2
specifically 30:22 31:2,8
  45:21 56:18,24 57:4,7
  69:18,21 70:8 79:18
  83:4 90:11
specifics 62:5
specimen 46:11,25 47:6
  47:21 48:17 49:14,16
  49:25 50:25 51:2,13

specimens 44:20,21
  74:12
speculative 93:13
spent 16:9
stands 39:3
started 89:25
starts 81:21
state 5:14 6:6 20:17
  28:12 33:14 34:1 35:5
  35:14 36:14 37:13
  39:18 40:19 49:6,19
  55:24 81:18 99:8
stated 4:23 47:20 49:25
statement 19:12 20:5
  44:23 82:9,15 92:20
  93:12,13
statements 62:19 81:12
  81:13
states 1:1 6:23 7:2 49:4
  53:25 57:14 93:1
static 25:24
status 97:14
stepped 78:16
Stericycle 94:13,16,22,25
  95:1,2,6
stop 54:18 62:13
stops 54:20
Street 2:4,9,20
strike 10:18 87:17
stuck 25:23
submit 16:14
submitted 16:8,10,12
subpoenas 9:1
subsequently 26:2,7
substance 18:15
substances 83:17
sudden 54:10,11 55:1,4,6
  55:13,16,20,25 56:2
  60:3,9 75:9 76:5,15,21
  84:12,16 91:22 92:4
suggest 17:21
suggesting 27:11
Suite 2:21
support 84:3,9
sure 18:10 27:2 39:23
  41:10 42:5 57:1 64:25
  65:19 67:20 71:3 78:19

PLAINTIFFS' EXHIBITS 010736

AMY R. McMASTER, M.D.

August 5, 2011

Page 11

**surprises** 18:11
**suspicious** 7:14
**swear** 5:14
**sworn** 5:25 99:3
**symptom** 77:6
**symptoms** 36:4,21 39:5
  69:20 70:10 75:21
  76:22 77:3,15
**system** 50:20 83:23 84:16
  96:7,19

**T**

**T** 100:1
**table** 71:20
**tablet** 93:3,3
**tablets** 79:3,8 80:12
  81:25 82:3,5,24 83:2,3
  83:6
**take** 9:12 18:9 25:21
  26:11 32:10 51:1 60:12
  63:1 66:7,9,15,19 84:17
  88:10 92:16 97:8
**taken** 1:15 5:2 12:20 13:4
  23:1 32:15 49:17 56:4
  63:22 64:8 66:2 82:6
  99:5 100:2
**takes** 64:4
**talk** 45:21 51:8 66:25
  67:5
**talked** 89:21
**talks** 82:23 83:1
**Telephonic** 1:12 5:1
**tell** 15:23 21:22 23:20
  24:10 43:4 51:11 54:21
  86:19
**telling** 71:23
**ten** 16:24 65:2
**Tenders** 71:5
**Tennessee** 5:6,14 6:13,23
  7:6 95:2 99:8
**term** 9:24 10:1 12:25
  55:4 58:8
**terminal** 91:24 92:3
**terminology** 10:5 55:6
  79:8 83:10
**terms** 16:4
**TERRY** 2:8

**test** 13:4 39:11 59:14
  60:21 65:21 66:19 86:9
  86:24 87:1
**tested** 39:13,19 40:21
  66:8
**testified** 5:25 7:22 8:3,7
  8:10,12,19,22 9:19
  10:18,20 11:1,18,22
  18:19 19:9,18 20:12
  28:21 30:8 34:4 42:2
  45:16 46:9 47:4 53:5
  58:14 60:22 63:12 65:5
  68:2 77:11,17 85:10,13
  86:14 93:4 96:5,17
**testify** 8:1 9:11,15 10:5
  11:10 12:16 13:10,12
  13:15 15:12 22:1,5 24:7
  80:13,22 86:8 99:4
**testifying** 9:13 65:15,16
**testimony** 8:6 18:14 19:6
  20:20 35:24 41:18
  73:13,18 81:3 85:18,23
  99:6,9 100:3
**testing** 33:1 62:9 70:1
  94:16,22,24 95:3,5,9,13
**tests** 11:15 41:1 63:17
**Texas** 2:21
**textbook** 43:1,4,9 48:24
  50:10 51:3,24 53:21,22
  53:25 60:24 74:13
**thank** 26:14 27:8 32:13
  80:16,24 95:11,22 97:2
  97:17,22,23,24,25
  98:13,14
**therapeutic** 33:15,17,21
  34:2,9 35:15 36:10,15
  36:16 38:16,19,25
  42:11 43:20 51:5 77:10
**thereof** 10:8
**thickness** 83:4,12,16
**thing** 58:3,8 92:24
**things** 26:2 30:2,17 56:1
  68:18,20
**think** 8:20 19:11,13,17
  20:6 33:17,22 34:13
  36:1 48:4 50:14 52:13
  52:18 53:15 54:21

55:19 62:21 63:1 65:5
  66:4 67:16 68:9,23 69:8
  70:4 73:11 74:3 77:1
  85:3 86:10 88:9 92:7
  93:11,13 95:14,19
**thought** 40:2,4
**three** 34:24 43:18 88:10
  88:12 95:24
**three-page** 17:6 78:21
**time** 11:21 16:9 18:6,16
  21:25 24:15 31:21
  41:10 64:4,8 65:1,4
  68:1 99:5
**times** 8:10 9:11,12 10:25
  11:25 18:21 19:2,9,10
  19:17 20:8,11 34:24
  37:20 38:6,6 40:21
  63:13 77:17 84:13
  86:18
**tissue** 35:25
**tissues** 29:2
**titrated** 34:6
**tk@ernstlawgroup.com**
  2:10
**TLCR** 99:24
**today** 14:20 15:9 16:23
  31:6 39:10 40:18 46:15
  85:6 89:22 98:2
**told** 24:15
**top** 70:22
**total** 16:21
**Totowa** 1:6 80:8
**Tower** 2:20
**toxic** 12:13 35:6 43:2,19
  44:21 48:8
**toxicity** 10:6,7,10,20,24
  11:3,11,13,23 12:3 13:3
  18:20 19:18 24:14
  40:24 55:16,22 60:5
  65:9 68:12 74:21,24
  75:2,8,14,22 76:3,6,23
  77:3,6,8 80:14,17,23
  82:7,12 84:11 85:14
  91:15
**toxicological** 31:12 92:17
**toxicologist** 92:14 93:5
**toxicology** 10:16 23:7,10

29:18 31:10 55:21
  58:23 59:2 78:1 93:7
  96:2
**trained** 36:13 66:14
**training** 33:8 42:3 47:8
  96:2
**transcribed** 99:10
**transcript** 24:22,24 98:12
  100:3
**Travis** 2:20
**treating** 32:11
**treatment** 37:15
**trial** 18:7,16
**tried** 38:6
**trip** 22:11
**true** 9:3,14 10:17 11:13
  11:16,23 12:10,14,17
  12:21 13:5 14:8,16 17:4
  18:3,16 29:23 30:11
  31:20 34:8 42:8,11,15
  42:18,20 43:2,3,9,25
  44:2 45:1,7,14,22 46:18
  47:3,5,11,13,21,25
  48:12 49:1,25 50:5,20
  51:6 53:22 54:3 55:15
  55:19 60:5,11 62:9
  63:15,18 66:8,17,20,23
  67:3 68:3,16 70:3 72:11
  73:16,20 74:1 75:22
  76:3,10,13,16,19,21,23
  84:11,12,15,17,20
  85:15,18 86:16 87:5,13
  89:22 93:5 97:5,15
  100:3
**trust** 27:24 44:8,10
**try** 36:8 86:10
**trying** 48:1 94:1
**Tucker** 2:13
**Tuesday** 98:7
**turn** 92:9
**turning** 91:11 92:2
**turns** 48:13
**twice** 34:14 53:16
**Twin** 38:20
**two** 43:17 65:17 81:11,13
  89:14 96:18
**type** 91:23,24

PLAINTIFFS' EXHIBITS 010737

AMY R. McMASTER, M.D.

typewriting 99:10
typically 55:8

## U

Uh-huh 29:7 89:4
unable 92:3
uncommon 63:20
underlying 84:22
understand 16:5 32:21
    34:3 36:25 37:11 54:23
    60:17 64:22 72:20
    73:11
understanding 13:7
    15:23 21:15 22:4,9
    33:15 34:22 35:5 36:9
    36:14 40:19 46:5 47:14
    63:10 73:2 79:2,5,6
understood 33:20
UNITED 1:1
unnatural 7:14
unprofessional 62:21
unusual 7:14
Urgent 4:19 80:11 81:16
use 9:24 10:1,5 12:25
    43:6,12,14,16 48:18,21
    63:21
uses 73:25
USP 80:12
utilized 33:1 43:11
U.S 24:1

## V

v 1:5
valid 60:23 73:22 86:13
    93:12
validity 74:5
value 33:17,21 38:19
    51:5 52:10
Valued 81:19
values 33:15 34:2,9 35:15
    38:16 50:1
variable 33:18 34:5
variation 10:8
various 22:25
vary 33:18
vast 11:9 19:6,8 65:17
vein 44:20 46:16,18,20

49:8 51:20 53:9,18 66:3
    66:5,7,17 74:12
ventricular 75:3
version 71:1
vessels 66:10
Videoconference 1:12
    2:2 5:1
view 54:17
VIRGINIA 1:1
vomiting 76:2,16 82:12
Von 23:3
Vowell 5:4

## W

wait 78:17
waived 5:9
want 18:9,10 26:3,4
    27:22 28:2,3 30:13,18
    30:18 34:17 36:8 38:7,8
    41:8,9,18 44:14 45:20
    49:17 58:2 59:22 60:19
    61:5 64:25 67:17 70:21
    70:25 71:3,7
wanted 71:24
War/Paul 61:18 73:25
wasn't 62:2
waste 95:3
watch 41:9
watching 27:7
way 13:4 31:16 46:20
    73:22 77:13 80:3 99:13
weeks 57:18
welcome 98:14
went 78:18 94:10
weren't 26:21
West 1:1 2:13
we'll 38:13 78:10 88:10
we're 32:22 71:4
we've 28:9 60:3
whatsoever 77:4
WHEREOF 99:15
willing 57:25 85:10
within-entitled 99:4
witness 4:2 5:14,16,24
    8:23 9:1 12:6,25 13:18
    17:19,25 18:25 19:23
    22:9 23:22 31:1 32:2

34:13 35:11,19 36:4,20
    37:8 42:14 44:5 45:4,11
    45:16 46:5,24 47:20
    48:4,16 49:3,12,24
    50:14 51:12,23 52:6,21
    53:5,15 54:7 55:19
    57:22 58:7 59:18 60:8
    61:14,24 62:16,24 63:9
    64:1,21 67:2 68:9 69:2
    69:9,13,17 71:6 72:18
    73:2 74:3,15 75:6,12,19
    75:25 76:13,19 77:1
    78:5,16 79:17 83:10
    84:2,8,20 85:9,21 86:20
    87:9,18 89:10 90:6,16
    91:20 92:7,19 93:11
    95:8 96:9 98:14 99:2,6
    99:15
witnesses 62:14 66:25
    67:2,5
woman 20:16
Word 4:24
words 12:9
work 9:5,6,7 16:17
worked 16:20 21:9,12
wouldn't 49:18 58:13
    60:1,18 85:21 93:7,16
    95:14
wrist 46:19 47:25
written 18:13,14
wrote 17:14 79:11 88:20
    89:6

## X

X 4:1

## Y

Yeah 34:13 70:23 88:12
years 21:19 39:12,19
young 96:17

## $

$1,200 17:1
$1,250 16:13
$500 16:7

## 0

0.8 38:22
04/28/2008 4:20
05/17/2011 4:16
06 4:4
07/06/2015 99:25

## 1

1 4:10 14:13,14,16 20:3,8
    20:11 63:12
1st 41:13
1.4 41:12
1.42 44:19 48:10,18 49:8
    49:13,25 51:4,19 52:10
    52:25 61:20
1.5 41:13,14
1.6 39:19 41:2,14
1.7 39:9 41:13
1.8 39:19 41:2,6,14,23,25
1.96 44:20 52:3,11 53:1
10 20:4
10:00 5:4
100 4:22 8:15,17,18 9:12
    10:17,25 11:5,5
1020 2:4,9
11/10/2009 4:13
1150 2:14
12:30 98:15
14 4:10,11
15 4:12 19:2,10 20:4,5
1600 2:21
17 4:14
17th 16:15,16 18:2,5
1995 41:12

## 2

2 4:11 14:23,25 42:25
    44:13 54:25 70:19
    74:10
2nd 38:21 39:6
2.0 33:21 34:10 35:15
    38:22 39:1 41:21
2.4 48:13 49:21
2:09-CV-0671 1:5
20th 41:5
200 11:5
2001 38:21 39:6 41:13
2002 41:13

PLAINTIFFS' EXHIBITS 010738

AMY R. McMASTER, M.D.

August 5, 2011

Page 13

**2004** 29:18 41:5,14
**2006** 41:14
**2007** 41:14
**2008** 23:22 24:2 43:2,8
  44:23 57:12,14,16 59:4
  59:6,9
**2009** 16:3,15,16 22:2,5
  22:19 25:3,8,12 26:22
  28:10 30:3 79:10
**2011** 1:16 5:3 18:2,5
  99:16 100:3
**214** 5:5
**216** 2:15
**23rd** 57:16
**24th** 59:4
**25** 18:21,25 19:10,25
  20:3,5,8,11 63:12
**25th** 24:2
**26** 4:17 27:3
**26th** 59:9

---
**3**
---

**3** 4:12 15:19,20,22 70:12
  70:20,22 71:7,17
**3.0** 50:5
**3.6** 23:10 33:2 35:25 42:7
  50:22,23 59:8,15 60:13
  70:13 71:8 72:3 73:16
**3.6-nanograms-per-mi...**
  51:1
**306** 99:24
**32** 4:18
**37216** 6:13

---
**4**
---

**4** 1:16 4:14 17:11,12 18:3
  30:14 71:18 88:20
  100:3
**44115-1414** 2:15

---
**5**
---

**5** 4:17 25:15 26:4,16,18
  28:3,9 32:22 33:21
  34:10 35:15
**5th** 5:3 14:20
**50** 8:15 11:5
**500** 8:15,17,18 9:12

10:17,25
**541-0300** 2:5,10
**546-5636** 2:22

---
**6**
---

**6** 4:18 32:18,19 42:7 99:9
  100:2
**600** 2:20
**615** 3:3
**696-2276** 2:15

---
**7**
---

**7** 4:19 78:9,24,25 80:2,10
  80:11 81:7 83:15 84:25
  94:9,12
**7:45** 90:1
**70s** 61:19
**713** 2:22
**77002** 2:21
**78** 4:19

---
**8**
---

**8** 39:1
**805** 2:5,10
**812-6408** 3:3
**850** 6:12

---
**9**
---

**9th** 99:16
**9:00** 90:1
**925** 2:14
**93401** 2:5,9
**95** 4:5
**96** 4:6
**98** 99:9 100:2
**99** 4:21

PLAINTIFFS' EXHIBITS 010739