# EXHIBIT 606

PLAINTIFFS' EXHIBITS 011018

Page 1

UNITED STATES DISTRICT COURT OF THE

SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLES DIVISION

* * *

IN RE:  DIGITEK PRODUCT LIABILITY )
        LITIGATION                 )
                                   )
THIS DOCUMENT RELATES ONLY TO:     )
Kathy McCornack, an individual;    )
Daniel E. McCornack, Jr., an       )
individual; and Ralph J.           )
McCornack, a minor by and through  )
his guardian ad litem,             )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            ) Case No. 2:09-cv-06
                                   )
ACTAVIS TOTOWA, LLC, et al.,       )
                                   )
        Defendants.                )
_____)

DEPOSITION OF KEITH PATRICK GIBSON, Pharm.D., J.D.

San Luis Obispo, California

Tuesday, June 14, 2011

9:00 a.m. - 12:26 p.m.

REPORTED BY CINDY D. GRIFFITH
CSR #7281

PLAINTIFFS' EXHIBITS 011019

```
 1            UNITED STATES DISTRICT COURT OF THE

 2            SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    CHARLES DIVISION

 4                        * * *

 5  IN RE:  DIGITEK PRODUCT LIABILITY )
            LITIGATION                )
 6                                    )
    THIS DOCUMENT RELATES ONLY TO:    )
 7  Kathy McCornack, an individual;   )
    Daniel E. McCornack, Jr., an      )
 8  individual; and Ralph J.          )
    McCornack, a minor by and through )
 9  his guardian ad litem,            )
                                      )
10            Plaintiffs,             )
                                      )
11      vs.                           ) Case No. 2:09-cv-06
                                      )
12  ACTAVIS TOTOWA, LLC,et al.,       )
                                      )
13            Defendants.             )
    _____   )
14

15

16            Deposition of Keith Patrick Gibson, Pharm.D.,

17            J.D., produced, sworn and examined on the 14th

18            day of June, 2011 between the hours of

19            9:00 a.m. to 12:26 p.m. at the offices of

20            McDaniel Shorthand Reporters, in the County of

21            San Luis Obispo, State of California,

22            before Cindy D. Griffith,

23            Certified Shorthand Reporter, within the

24            State of California.

25
```

PLAINTIFFS' EXHIBITS 011020

Keith Patrick Gibson                                      June 14, 2011

```
                                                              Page 3

  1    APPEARANCES OF COUNSEL:

  2    FOR PLAINTIFF:
                         ERNST LAW GROUP
  3                      1020 Palm Street
                         San Luis Obispo, California  93401
  4                      BY:  DON A. ERNST
                         (805) 541-0300
  5                      sr@emlaw.us

  6    FOR DEFENDANT ACTAVIS INC., ACTAVIS ELIZABETH LLC, AND
       ACTAVIS TOTOWA LLC:
  7
                         TUCKER ELLIS & WEST LLP
  8                      Attorneys at Law
                         925 Euclid Avenue, Suite 1150
  9                      Cleveland, Ohio  44115
                         BY:  MATTHEW P. MORIARTY
 10                      (216) 696-2137
                         Matthew.Moriarty@tuckerellis.com
 11
       FOR DEFENDANT MYLAN PHARMACEUTICALS INC., MYLAN BERTEK
 12    PHARMACEUTICALS INC. AND UDL LABORATORIES, INC:

 13                      SHOOK, HARDY & BACON LLP
                         600 Travis Street, Suite 1600
 14                      Houston, Texas  77002-2911
                         BY:  HUNTER K. AHERN
 15                      (713) 227-8008
                         hahern@shb.com

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

PLAINTIFFS' EXHIBITS 011021

Keith Patrick Gibson                              June 14, 2011

Page 4

1

2                        I N D E X

3     WITNESS              EXAMINATION BY              PAGE

4     Keith Patrick Gibson, Pharm.D., J.D.

5                         Mr. Moriarty                    6

6                         Ms. Ahern                     187

7                         Mr. Ernst                     230

8                         Mr. Moriarty                  242

9                         Ms. Ahern                     249

10                        Mr. Moriarty                  253

11                     E X H I B I T S

12    FOR THE DEFENDANTS:                            PAGE

13    A  Report of Keith Patrick Gibson, Pharm.D., J.D.    9
         dated May 16, 2011

14

      B  Notice of Deposition

15

16    C  Global RPH.com document                      79

17    D  "Postmortem Redistribution of Digoxin in Rats"  97
         article by Koren and MacLeod

18

19    E  "Post-mortem Clinical Pharmacology"         104
         by R.E. Ferner

20

21    F  "Mechanisms Underlying Postmortem Redistribution
         of Drugs:  A Review" by Pelissier-Alicot     115

22

23    G  "Estimating Antemortem drug concentrations
         from postmortem blood samples:  The influence of
24       postmortem redistribution" by Cook and Braithwaite,
         Hale                                         127

25

Keith Patrick Gibson                                    June 14, 2011

Page 5

1                    INDEX (Continued)

2

3   H  "Correlation of Antemortem and Postmortem Digoxin
       Levels"                                         131
4
    I  "Interpretation of Excessive Serum Concentrations
5      of Digoxin in Children" by Koren and Parker     169

6   J  "Mechanisms, Manifestations, and Management of
       Digoxin Toxicity in the Modern Era"             248
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 011023

Keith Patrick Gibson                              June 14, 2011

                                                        Page 6

    1              KEITH PATRICK GIBSON, PHARM.D., J.D.,

    2                having been first duly sworn, was

    3                examined and testified as follows:

    4

    5                          EXAMINATION

    6

    7   BY MR. MORIARTY:

    8       Q     Tell us your full name.

    9       A     My full name is Keith Patrick Gibson;

   10   G-i-b-s-o-n.

   11       Q     And do you go by doctor or mister?

   12       A     Um, whichever you prefer.

   13       Q     Okay.  Have you given testimony before?

   14       A     I have.

   15       Q     How many times?

   16       A     Not very many.  Two, three.

   17       Q     Well, you've been a lawyer.

   18       A     I'm a lawyer.

   19       Q     You've been an administrative law judge.

   20   You've been a witness.  So you know the rules; correct?

   21       A     Thank you.

   22       Q     If you don't understand my question, let me

   23   know.  I will make it clear to you.  Okay?

   24              If you need to refer to a document, get that

   25   document and refer to it.

PLAINTIFFS' EXHIBITS 011024

Keith Patrick Gibson                                        June 14, 2011

 1      A    Okay.

 2      Q    In the medical-legal setting, do you know the

 3   difference between possibility and probability?

 4      A    More probable than not?  Is that what you're

 5   asking?

 6      Q    Yes.

 7      A    Yes.

 8      Q    You understand that?

 9      A    Preponderance of the evidence.

10      Q    So possible is 50-50 or less, something that's

11   speculative.

12           Now, I want you to assume that Dan McCornack

13   took no Digitek that was outside of its specifications.

14   Okay?

15           What, in your opinion, was the cause of his

16   death?

17           MR. ERNST:  Objection.

18           MR. MORIARTY:  That's all you're allowed to

19   say.  Thank you.

20      Q    What's your opinion?

21      A    Well, if he took no nonconforming tablet, then

22   I think it's the opinion of both the pathologist and his

23   treating physician that he died from Digoxin poisoning

24   is probably okay.  I would assume it probably was.

25           I have a problem with that sort of assumption

PLAINTIFFS' EXHIBITS 011025

Keith Patrick Gibson                                      June 14, 2011

1   because he's been on that drug regimen for such a long

2   time, and nothing particularly changed in his -- either

3   his drug regimen or his life.  I mean he's a 40-year-old

4   man.

5      Q    I understand your position.  I've read your

6   letter.

7      A    Fine.

8      Q    I'm just asking simple questions.  I just need

9   a simple answer to my simple question.

10          MR. ERNST:  Objection.  Objection.  There's no

11   question pending.  Argumentative.

12   BY MR. MORIARTY:

13      Q    So even assuming he took no

14   out-of-specification Digitek, you still believe to a

15   probability that Digoxin toxicity led to his death;

16   correct?

17          MR. ERNST:  Objection.

18          THE WITNESS:  I thought that's what you just

19   told me.

20          MR. ERNST:  Objection.  Compound.

21   BY MR. MORIARTY:

22      Q    Go on.

23      A    Do you want me to answer it?

24      Q    Yes.

25      A    I'm used to somebody making a ruling.  So

PLAINTIFFS' EXHIBITS 011026

Keith Patrick Gibson                                    June 14, 2011

 1   excuse me if I'm delaying.

 2          Well, not really.  I don't think he would have

 3   died if he hadn't had a nonconforming tablet.  I think

 4   he would have survived.  I don't see where the Dig level

 5   went up.  He does have multiple reasons for having

 6   elevated Dig level, though.

 7      Q   I'm asking a very simple question.  Assume he

 8   took no nonconforming Digitek; right?

 9      A   All right.

10      Q   That they were appropriately dosed, and he took

11   them according to his morning and evening schedule.  Do

12   you have an opinion as to the cause of his death?

13          MR. ERNST:  Objection.

14   BY MR. MORIARTY:

15      Q   To a reasonable degree of medical probability?

16          MR. ERNST:  Objection; multiples.

17   BY MR. MORIARTY:

18      Q   Go on.

19          MR. ERNST:  It's compound, vague.

20          THE WITNESS:  No.

21           (Defendants' Exhibit A was marked for

22           identification.)

23   BY MR. MORIARTY:

24      Q   Thank you.

25          In your report, which I have had marked as

Keith Patrick Gibson                                    June 14, 2011

1    Exhibit Gibson A, you have a lot of footnotes and

2    there's a lot of literature in there; right?

3        A    Correct.

4        Q    Have you read any additional literature about

5    Digoxin, Digitek or postmortem redistribution that you

6    didn't either footnote in the body of the report or list

7    on page 10?

8        A    Can I ask you if your question implies that at

9    the time I wrote the report, or since I wrote the

10   report?

11       Q    At any point.

12       A    Yes.

13       Q    What have you read since?

14       A    Well, I didn't really anticipate that you would

15   ask that question, but I'm constantly looking at books

16   and pulling up internet sites when I'm at the hospital,

17   all around.

18            Last night I spent some time on the internet

19   looking at different articles.  I found another article.

20   And so I --

21       Q    Well, the notice of deposition tells you to

22   bring everything you reviewed to form your opinions.

23   Okay?

24       A    But internet stuff I can't bring.

25       Q    Well, if you printed it, you did.

PLAINTIFFS' EXHIBITS 011028

Keith Patrick Gibson                                    June 14, 2011

 1      A     If I printed it, I have it.

 2      Q     I want to see everything you reviewed --

 3      A     This is --

 4      Q     -- since you wrote this report, Exhibit A.

 5      A     Well, since I wrote that report, Exhibit A,

 6   it's all been on the internet so I cannot bring it.

 7      Q     Tell me what websites.

 8      A     Oh.  That's a very difficult question.  Because

 9   I do a Google search, and last night I was just doing

10   random Google searches for symptoms of Digoxin toxicity,

11   and, you know, I got a list of page up in the Google

12   notes, and I was just clicking on them, going back and

13   forth.  A lot of them are Pub Med, for instance.

14   There's all kinds of different sites.

15      Q     So you didn't print any of it?

16      A     No, no.  I printed this.

17      Q     This is Dr. Gallenter's article about

18   "Mechanisms, Manifestations and Management of Digoxin

19   Toxicity"?

20      A     That's the only one I printed since I wrote

21   that report.

22      Q     Do you remember the name of anything else

23   specifically that you reviewed since writing the report?

24      A     No, I do not remember.

25      Q     Okay.  I'll get back to this later.

Keith Patrick Gibson                                June 14, 2011

1          Now, in all of the reading that you have done

2    to prepare for your opinions for this report and for

3    this deposition today, have you found a single piece of

4    peer-reviewed medical literature, toxicological

5    literature, that says that you can reliably predict an

6    antemortem serum Digoxin level based on a postmortem

7    whole blood draw?

8          MR. ERNST:  Objection.

9          You can go ahead and answer the question.

10         THE WITNESS:  Thank you.

11         Well --

12   BY MR. MORIARTY:

13     Q    First, yes or no?

14         MR. ERNST:  No.  He gets to answer his

15   question.

16         MR. MORIARTY:  I said first yes or no.  I want

17   to know where he's going with his answer, Don.

18         MR. ERNST:  Objection.

19         MR. MORIARTY:  I can tell he's going to make

20   speeches all day.  Okay?  I want to know yes or no, and

21   then you can explain.  I'm not cutting off your answer.

22         MR. ERNST:  You are not in control of this

23   deposition.  You ask the questions.  He gets to answer

24   appropriately.  You cannot dictate how he's going to

25   answer the question.

PLAINTIFFS' EXHIBITS 011030

Keith Patrick Gibson                                    June 14, 2011

 1              MR. MORIARTY:  Let him lecture for a while and
 2       then I'll call the judge.
 3              MR. ERNST:  You were lecturing first.
 4       BY MR. MORIARTY:
 5          Q    What's your answer?
 6              MR. ERNST:  I'll have the question reread.
 7              THE WITNESS:  No.
 8       BY MR. MORIARTY:
 9          Q    Your answer is "no"?
10              MR. ERNST:  I'll have the question reread.
11       BY MR. MORIARTY:
12          Q    Do you have any estimation?
13          A    Do we want to read the question?
14          Q    I know the question.  You said no.
15              Do you have any explanation that you want to
16       add to your answer about that?
17          A    Well, numbers do give you guidance in the
18       picture of what you are looking at when you look at a
19       patient with numbers.  You can't play the numbers
20       exactly because the pharmacokinetics don't devolve that
21       way.
22              In this particular case, you have one data
23       point, and you can't make a whole bunch of assumptions
24       based on one data point.  That's not real science.  To
25       extrapolate backwards, you can't do that with any

PLAINTIFFS' EXHIBITS 011031

Keith Patrick Gibson                                    June 14, 2011

Page 14

 1    reliability to get an exact number.  But postmortem Dig

 2    levels do tell you things, and those things are valuable

 3    things to know.

 4        Q    Okay.

 5             MR. ERNST:  He's not done answering your

 6    question.

 7    BY MR. MORIARTY:

 8        Q    Were you done?

 9        A    Well, I could keep going, but I'll let you ask.

10        Q    I'm asking one question at a time.

11             MR. ERNST:  You should feel free to answer that

12    question completely.

13             THE WITNESS:  Do you want me to continue?

14             MR. ERNST:  Please continue answering that

15    question.

16    BY MR. MORIARTY:

17        Q    My question was, did you find a piece of

18    literature, and he already answered it.

19        A    Well, I did --

20        Q    I'm going to be here for hours.  You'll get a

21    chance to explain everything in this report.  Okay?  And

22    at the end, I guarantee you --

23             MR. ERNST:  If you want to make speeches rather

24    than ask questions --

25             MR. MORIARTY:  Don.

PLAINTIFFS' EXHIBITS 011032

Keith Patrick Gibson                                    June 14, 2011

                                                         Page 15

 1           MR. ERNST:  -- I will call the judge.

 2           MR. MORIARTY:  Don, at the end you always ask

 3    questions.  You can clarify whatever you want.  Trust

 4    me.  You'll get his opinions on the record.  I'd like to

 5    do this in an orderly fashion according to the questions

 6    I ask.

 7           MR. ERNST:  Matt.

 8           MR. MORIARTY:  We've been through this with at

 9    least three medical depositions so far.

10           MR. ERNST:  Matt, if you wish to behave in this

11    manner, I will call the judge.

12           MR. MORIARTY:  Fine.

13           MR. ERNST:  You have given more speeches than

14    asked questions.

15           So, I will have the last question that he

16    answered reread.

17           If you have anything else to add, Mr. Gibson,

18    finish answering your question, please.

19           THE WITNESS:  And I should --

20                  (Record read.)

21           MR. MORIARTY:  The question was whether he

22    found a single piece of peer-reviewed medical

23    literature.  I'm just giving her reference, Don.

24                  (Record read.)

25           MR. ERNST:  The second part of that question

PLAINTIFFS' EXHIBITS 011033

Keith Patrick Gibson                                    June 14, 2011

1    was you have an explanation I want to add.  And then you

2    can continue.

3              THE WITNESS:  Well, I did make a mistake in

4    that I don't know if it's reliable or not, but Vorpaul

5    and Kohl, which is an article that I referenced in my

6    report, didn't try to make some correlation backwards.

7    Whether that's reliable or not, I don't think it is.  I

8    mean, I think Dig levels with postmortem redistribution

9    do tell you stuff, but I don't think you can extrapolate

10   backwards on one data point.

11   BY MR. MORIARTY:

12       Q    All right.  When were you retained as an expert

13   in this case?

14       A    It was a long time ago.

15       Q    Do you have --

16       A    I could --

17       Q    -- any correspondence from Mr. Ernst in your

18   box that indicates when he first sent you material or

19   when he called you on the phone or anything else?

20       A    I do have a bill I sent to him from 2009.  Will

21   that do?

22       Q    Sure.

23            Do you think this is the first invoice?

24       A    I believe that to be the first invoice, yes.

25       Q    It says, "Initial contact, August 26th, 2009."

Keith Patrick Gibson                                    June 14, 2011

 1    Correct?

 2        A    Correct.

 3        Q    And then review of materials, et cetera?

 4        A    Those are billing events.  I mean, Mr. Ernst

 5    probably saw me in the courthouse and asked me could I

 6    come by and --

 7        Q    I understand.

 8        A    But that's --

 9        Q    This is ballpark; right?

10        A    Yes.

11        Q    Thank you.

12        A    You're welcome.

13        Q    So in your report, which is Gibson Exhibit A,

14    in the first paragraph, it says, "At your request I'm

15    providing my opinion on the postmortem drug levels found

16    in Mr. McCornack's blood"; correct?

17        A    Correct.

18        Q    "The distribution of Digoxin and other drugs

19    postmortem"?

20        A    Correct.

21        Q    "The effect of differing formulations of

22    Digoxin on bioavailability" --

23        A    Correct.

24        Q    -- "and the resulting clinical picture that is

25    the likely cause of Mr. McCornack's death."

Keith Patrick Gibson                                        June 14, 2011

Page 18

1           Did I read that all correctly?

2      A    You read it correctly.

3      Q    Is that, essentially, what you were asked to do

4  in this case?

5      A    That's what I was essentially asked to do in

6  this case, correct.

7      Q    So, during your work on this case, did you

8  undertake to ascertain whether Dan McCornack suffered

9  from Digoxin toxicity before he died?

10     A    Okay.  I have a little bit of a hearing

11 problem, so can you kind of -- you had a soft word

12 there.

13          I think your question --

14     Q    I'll repeat it.

15     A    Okay.

16     Q    Did you undertake, as part of your work in this

17 case, to ascertain whether Dan McCornack suffered from

18 Digoxin toxicity --

19     A    Okay.

20     Q    -- before he died?

21     A    Yeah.  Well, what I was --

22     Q    Is that a "yes"?

23          MR. ERNST:  He's going to --

24          MR. MORIARTY:  I need to understand what he

25 said.  He said "yeah."

PLAINTIFFS' EXHIBITS 011036

Keith Patrick Gibson                                June 14, 2011

                                                        Page 19

   1              THE WITNESS:  Yes.

   2              MR. MORIARTY:  I need to understand.

   3       Q    Now you can explain.

   4       A    So what I reviewed was the depositions that I

   5    was given, which are of his wife, and I reviewed the

   6    deposition of the two doctors.  Um, I saw some medical

   7    charts and medical records.

   8       Q    Did you undertake to ascertain whether

   9    Dan McCornack died from Digoxin toxicity?

  10       A    I don't quite understand what you mean by did I

  11    try to ascertain that.

  12              The opinion of the pathologist was that he had

  13    died from digitoxicity.  The opinion of his treating

  14    physician was that.

  15              I thought my role was to determine whether or

  16    not there's enough science to back up their opinions as

  17    to whether or not this dose and this kind of clinical

  18    picture could substantiate their opinions.

  19       Q    Well, on page 9 of your report, it says,

  20    "Therefore it is my opinion that, judging from

  21    Mr. McCornack's clinical condition on the night of

  22    March 23rd, 2008, Digoxin poisoning was the cause of his

  23    death."

  24       A    That's correct.

  25       Q    You're rendering an opinion on that?

PLAINTIFFS' EXHIBITS 011037

Keith Patrick Gibson                                    June 14, 2011

 1      A    I'm rendering an opinion based on the opinion

 2   of the two physicians that I read the reports on.  I'm

 3   rendering that opinion based on the clinical picture,

 4   the drugs he took, and every other data point that I

 5   could ascertain.

 6      Q    So you undertook to ascertain whether

 7   Dan McCornack died from Digoxin toxicity?

 8      A    The reason I -- it was confusing to me was

 9   because I didn't go out physically and collect evidence.

10   I looked at --

11      Q    I understand.  But what --

12           MR. ERNST:  All right.  Would you please let

13   him finish answering his question.

14   BY MR. MORIARTY:

15      Q    With the information --

16           MR. ERNST:  Would you please let him finish

17   answering the question.

18   BY MR. MORIARTY:

19      Q    With the information available --

20           MR. ERNST:  Would you --

21           MR. MORIARTY:  He's not talking.

22           MR. ERNST:  He wasn't finished answering his

23   question and you are repeatedly asking another question.

24   BY MR. MORIARTY:

25      Q    Were you done with your answer?

PLAINTIFFS' EXHIBITS 011038

Keith Patrick Gibson                                    June 14, 2011

Page 21

1     A     Well, I am now.  That's okay.  It's okay.

2           MR. ERNST:  It's not okay.

3           MR. MORIARTY:   Okay.

4     Q     I'm going to ask this question again.

5     A     Please.

6     Q     All you have to do is say yes or no.

7     A     I will.

8     Q     Pause for a few seconds and then I'll move on.

9           MR. ERNST:  Or answer the question if it

10    doesn't call for a yes or no.

11    BY MR. MORIARTY:

12    Q     From the information that you had in your box

13    that Don Ernst sent to you, you undertook to ascertain

14    and then render an opinion about whether or not

15    Dan McCornack died from Digoxin toxicity; correct?

16    A     Yes.

17    Q     All right.  And that is a diagnosis, isn't it?

18    A     Well, my role here is not necessarily to make

19    that diagnosis so much as to support the diagnosis

20    already made by the pathologist and the treating

21    physicians.

22          So I was really asked -- and as you remember

23    from paragraph number 1, I was really asked to determine

24    whether or not there was postmortem drug, what the

25    effects of that would be in redistribution of Dig and

PLAINTIFFS' EXHIBITS 011039

Keith Patrick Gibson                              June 14, 2011

                                                        Page 22

1    other drugs postmortem, whether there's any drug

2    interactions that might have resulted in an increased

3    Dig level whether or not bioavailability.

4              Those are really the opinions that I was asked

5    to do.  I mean, I'm supporting, by my findings in every

6    other area, the clinical diagnosis made by the two

7    physicians.

8         Q    Okay.  Let me make sure I understand this.

9    Because the first paragraph of the letter where you're

10   repeating what your charge was, and the resulting

11   clinical picture that is the likely cause of

12   Mr. McCornack's death?

13        A    Correct.

14        Q    Right.  But --

15        A    But that physicians opined, and I was either

16   going to support or not support based on the scientific

17   evidence whether or not those opinions were valid and

18   plausible opinions.

19        Q    Does page 9, where you say what your three

20   bullet-pointed opinions are, indicate anywhere that what

21   you are doing is just agreeing with and supporting the

22   opinions of other doctors who have testified?

23        A    Well --

24             MR. ERNST:  Objection.

25             THE WITNESS:  You asked me a question that says

PLAINTIFFS' EXHIBITS 011040

Keith Patrick Gibson                                    June 14, 2011

                                                            Page 23

 1   does my exact words say exactly what you say.  No, they

 2   do not.  It is my intention to do that.

 3              MR. MORIARTY:  Okay.

 4              MR. ERNST:  You can answer that.  You can

 5   continue.

 6              THE WITNESS:  I mean my intention was to back

 7   up and substantiate the opinions of these two doctors.

 8   And quite frankly, I totally agree with their opinions.

 9   BY MR. MORIARTY:

10       Q    Which two doctors are those?

11       A    Well, three doctors.  There's Dr. Lemm who's

12   the treating physician, Dr. Von Dollen, which is the

13   cardiologist, then the -- boy, just skipped my mind.

14   The pathologist that I read.

15       Q    And it is your understanding that in the

16   depositions of Doctors Lemm and Von Dollen, they have

17   said to a reasonable degree of medical probability that

18   Digoxin toxicity caused the death of Mr. McCornack?

19       A    I specifically remember Dr. Von Dollen saying

20   that, yes.

21       Q    So how many times have you had your deposition

22   taken?

23       A    Two.  This will be two.

24       Q    What kind of case was the first one?

25       A    The first one was about a decade ago and it

                   PLAINTIFFS' EXHIBITS 011041

Keith Patrick Gibson                                    June 14, 2011

1    involved a very strange product known as Lipokinetics.

2    Mr. Mattison asked me to look into the chemistry of this

3    particular product, because his pat- -- his client -- I

4    sometimes call them patients, if you don't mind -- had a

5    liver transplant, and whether or not this drug or this

6    fat burner that was sold by a nutrition store for

7    weightlifters to cut, you know, if you know what to cut

8    means, was the source of her failing liver and her liver

9    transplant.

10        Q    When you refer to Mr. Mattison, you're talking

11   about the gentleman who was then the law partner of Don

12   Ernst; correct?

13        A    Yes.

14        Q    Is that the Mass versus Dexter case?

15        A    I don't think so.

16        Q    What's the Mass versus Dexter case?

17        A    I have no recollection of the Mass versus

18   Dexter case.

19        Q    Have you ever been a defendant in a lawsuit?

20        A    You know, I also did a depo once for

21   Mr. Mattison on a Vicodin case.  Yes.  I just remembered

22   that.

23        Q    All right.

24        A    But I don't know the name of that case any

25   longer, it was so long ago.

PLAINTIFFS' EXHIBITS 011042

Keith Patrick Gibson                                    June 14, 2011

1      Q     Okay.  Have you ever been a plaintiff for a

2    defense in a lawsuit?

3      A     Um.

4      Q     Plaintiff or defendant in a lawsuit?

5      A     Yes.  The answer to that is yes.

6      Q     Other than a divorce case?

7      A     I've never been divorced.

8            I was just recently sued for legal malpractice

9    by a gentleman who sued everybody from the Board of

10   Supervisors, the judges, and included everybody, and my

11   name was listed as a defendant.

12     Q     And what was your role?  Lawyer, administrative

13   law judge?

14     A     I was a lawyer.  I represented him for a period

15   of time.

16     Q     Where was the case filed?

17     A     I believe it was filed in the San Luis Obispo

18   Superior Court.

19     Q     And what is the plaintiff's name?

20     A     I can't remember right off the top of my head.

21   I could get that information for you.

22           This is a gentleman that had --

23           MR. ERNST:  You've answered the question.

24           THE WITNESS:  Okay.

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011043

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 26

     1        Q     Ever been sued in any other case?

     2        A     Not that I can think of.

     3        Q     I assume that the two prior cases for what was

     4    then the Ernst & Mattison firm were for the plaintiff;

     5    correct?

     6        A     Yes.

     7        Q     How many cases have you tried to verdict?

     8        A     As a public defender?

     9        Q     As a lawyer?

    10        A     As a lawyer.  Oh, I don't know.  I stopped

    11    counting at 100.  I don't know.

    12        Q     How many of them were criminal cases?

    13        A     All.

    14        Q     Do you still practice law?

    15        A     Yes.

    16        Q     What kind of law do you practice now?

    17        A     I'm on a panel that serves as the public

    18    defender.  The public defender -- two -- a law firm has

    19    a contract with the county for the service of public

    20    defender, and I subcontract with them.  I'm currently

    21    assigned to Departments 1 and 5 of the superior court

    22    for all misdemeanor matters.

    23        Q     Do you do any civil litigation?

    24        A     No.

    25        Q     Have you ever done civil litigation as a

PLAINTIFFS' EXHIBITS 011044

Keith Patrick Gibson                                    June 14, 2011

Page 27

1    lawyer?

2        A    For a year I tried to do some divorces.  And

3    periodically, I help people with their small claims

4    actions.  No, not as an advocation lawyer.

5        Q    So what is McGuire --

6        A    McGuire & Ashbaugh are the two -- the law firm

7    that has the contract with the public -- with the county

8    for the services of the public defender in San Luis

9    Obispo County, and I subcontract with them.

10       Q    Do you have your own business entity?

11       A    Yes.

12       Q    What's the name of your separate --

13       A    Just me.  Just --

14       Q    -- law firm?

15       A    -- Keith Patrick Gibson, Attorney at Law.

16       Q    It's not a professional corporation?

17       A    No.

18       Q    Limited Liability Company?

19       A    No.  Just me.

20       Q    So how much of -- are you still an

21   administrative law judge?

22       A    Yes.

23       Q    And are you still a pharmacist?

24       A    Oh, yes.

25       Q    Tell me how much of your time -- do you have

PLAINTIFFS' EXHIBITS 011045

Keith Patrick Gibson                              June 14, 2011

Page 28

1   any other professions currently?

2       A    No.

3       Q    How much of your time is spent on these three

4   distinct jobs?

5       A    I'll do the administrative law judge thing

6   first because that's the simplest.  I get about one or

7   two appointments every six weeks.  And they are for

8   about a day in which I have maybe anywhere from four to

9   16 cases, depending on what I'm hearing.

10          I'm currently rotating between the

11  California -- the California Men's Colony, the Salinas

12  Valley Prison, and then there's a group of prisons out

13  in Corcoran that I visit.  It's a valley town.

14          I'm a deputy public defender assigned to

15  Departments 1 and 5 with another gentleman, and I do

16  every -- I'm assigned to every misdemeanor, me and him,

17  so we kind of split that calendar up, every misdemeanor

18  that comes through Departments 1 and 5.  And I'm there

19  Monday through Friday from 9 to 12 every day except for

20  when I'm off doing something else, like this.

21          And then there's sporadic trials that I do.

22  Those usually last three, four days, because they are

23  misdemeanors.

24          I have in the past done felony, but currently

25  I'm in a misdemeanor position.

PLAINTIFFS' EXHIBITS 011046

Keith Patrick Gibson                                    June 14, 2011

Page 29

```
 1        Then I currently work at Marian Medical Center

 2   as a staff pharmacist.  And I do seven on, seven off,

 3   from seven or eight at night to six or seven in the

 4   morning.  And I start Thursday nights and work for seven

 5   days.  And I've been rotating that way for every five

 6   years now.

 7        Prior to that I worked, there's a lot of other

 8   hospitals, but that's what I'm currently doing.

 9   Q    So is there a way to divide that up just based

10   on simple percentages or fractions?  Is it a third, a

11   third, a third?

12   A    No.  The administrative law judge doesn't take

13   a lot of my time.

14   Q    All right.

15   A    I get to go there.  I don't read anything prior

16   to going there.  I make my ruling, and I leave and I'm

17   done.

18        The public defender, I'm there Monday through

19   Friday from nine to noon.  Then, of course, I've got to

20   answer questions, phones.  I've got motions to write and

21   all that kind of stuff.

22   Q    Is the ALJ position elected or appointed?

23   A    No, it's an assignment.  It's not an election.

24   Q    Who does the assignment?

25   A    It was done 20-some years ago, and I don't
```

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 30

 1    really remember who originally assigned me to that.

 2         Q    What would the process be?

 3         A    I don't even know what the process was.

 4              What happened was I happened to be hanging

 5    around when they -- the Keya -- it's for Keya hearings.

 6    It's for Keya hearings, which are involuntary medication

 7    hearings.

 8              I was interested in it because it involved

 9    drugs.  So it kind of drove me, like moths are alike.

10    So I was hanging around that sort of thing.  And somehow

11    some guys got appointed to be defense lawyers, and I got

12    appointed to be -- they asked me to do it, and I said

13    yes, and I was happy to do it, and I enjoy that.

14         Q    And then how long have you served as a forensic

15    pharmaceutical consultant?

16         A    Well, you know, from the very first day I

17    showed up in court, people found out I was a pharmacist,

18    they've been asking me questions, and so it was really

19    kind off the cuff, for the most part.

20              At some point about ten years ago, I decided

21    that I was no longer going to do that, because they

22    asked me to testify.  I felt somewhat conflicted by it.

23    And most of the time it would be public defenders would

24    ask me.  I felt somewhat conflicted being on the public

25    defender team and then trying to be a neutral expert, so

PLAINTIFFS' EXHIBITS 011048

Keith Patrick Gibson                                    June 14, 2011

Page 31

1    I cut that out, and now I try to redirect those people

2    to people I know that are anxious for that sort of work.

3            But the first ten years I did, you know, just

4    off-the-cuff stuff.  People would ask me questions just

5    walking down the hall.

6            I mean, I could tell you anecdotal stories if

7    you --

8    Q     No.

9            I want to know how much of your time is spent

10   as a forensic pharmaceutical consultant.

11   A     I try to do very little.  It's almost none.

12          This case I took on in 2009.  And, you know, I

13   will do cases that are interesting.  This was an

14   interesting scenario that I -- so I did take it on.

15   Q     So, in California, is there a license for

16   something called a forensic pharmaceutical consultant?

17   A     No, not that I know of.

18   Q     Is there a separate educational path for that?

19   A     Oh, I think there is a university in Florida

20   that has an educational path for that, but I don't -- I

21   didn't engage in that.  They have a master's degree or

22   something in that range.

23   Q     Is there a certification, or a certificate for

24   forensic pharmaceutical consultant?

25   A     No.

PLAINTIFFS' EXHIBITS 011049

Keith Patrick Gibson                          June 14, 2011

Page 32

1      Q    I assume that this is a title, just a title?

2      A    Just something I made up to put on the

3   letterhead.  I thought it was fairly descriptive,

4   though.  I've kind of stuck with it because it tells you

5   exactly what I do.

6      Q    Do you have any other forensic pharmaceutical

7   consultant projects going right now?

8      A    None.

9      Q    When was the last time, other than this case,

10  that you had one?

11     A    Oh, boy.  Quite a few years ago.  I don't know

12  if I could remember.

13          I mean, other than the questions I get down the

14  hallway, which are always happening, I try to at least,

15  for the last five years I have another gentleman who

16  takes a lot of these.  He's willing to do this work, and

17  so I refer them to him.

18     Q    Have you ever done any consulting work for a

19  pharmaceutical company?

20     A    No.

21     Q    Have you ever been an employee of a

22  pharmaceutical company?

23     A    Not that I know of.

24     Q    Do you advertise your services as a

25  pharmaceutical -- forensic pharmaceutical consultant?

PLAINTIFFS' EXHIBITS 011050

Keith Patrick Gibson                                    June 14, 2011

 1      A    I do not.

 2      Q    Have you ever been excluded as a witness from a

 3   case?

 4      A    I have not.

 5      Q    Now, I assume that since you've not worked for

 6   pharmaceutical companies, you have no hands-on

 7   experience in pharmaceutical manufacturing?

 8      A    Other than compounding the pharmacist does

 9   while at work.

10      Q    That's not manufacturing, is it?

11      A    That's correct.

12      Q    You don't have any hands-on experience in

13   pharmaceutical quality assurance?

14      A    I have no hands-on experience.

15      Q    Do you have any hands-on experience in

16   pharmaceutical regulatory matters?

17      A    No hands-on experience.

18      Q    What is the extent of your experience of the

19   contact with the FDA?

20      A    I've never contacted them.

21      Q    Do they contact you?

22      A    Never.

23      Q    Do you have to file reports to the FDA?

24      A    Well, there is an adverse drug reaction report

25   that I've filed a few times.  It's a form --

Keith Patrick Gibson                                    June 14, 2011

1        Q       NAER; correct?

2        A       I've done that a few times.  But the problem

3    with my life is that it's more of an outpatient type

4    thing and I suppose my type is inpatient.

5                So rather than fill out that form, a lot of

6    times you fill out adverse drug reaction forms in the

7    hospital in their own internal monitoring systems.  I've

8    done that more times than the opposite.

9        Q       Have you ever filed an adverse drug event form

10   for Digoxin?

11       A       No.

12       Q       Does your pharmacy dispense Digoxin?

13       A       It does.

14       Q       Did your pharmacy dispense Digitek?

15       A       The current pharmacy does not.

16       Q       Well --

17       A       To the best of my knowledge.

18       Q       Well --

19       A       Where I currently work.

20       Q       The drug has not been sold since it was

21   recalled in April of 2008.

22       A       Okay.

23       Q       I'm asking for pharmaceutical work that you did

24   prior to 2008, did you ever dispense Digitek?

25       A       I do not know.

PLAINTIFFS' EXHIBITS 011052

Keith Patrick Gibson                                    June 14, 2011

1      Q     Did you ever find, among any Digoxin solid oral

2   dose products that you did dispense, any extra thick

3   tablets?

4      A     Um, my experience in retail pharmacy is very

5   limited.

6            In the hospital they are already in a dose

7   packaged.  And currently, I touch very little product

8   because of the nature of my work now.

9      Q     When you say unit dose packaged, are you

10  talking about blister packs?

11     A     Yes.  Well, and some we make ourselves.  Most

12  hospitals today are either using Omnicell or some

13  product like that.  The product is all stuck into

14  shelves.  The nurse comes up, puts a patient's name in.

15  That drawer opens, that kind of thing.

16     Q     But just to clarify my question.  Either a

17  tablet that you and your staff handled --

18     A     I've never seen that.

19     Q     -- or something coming back from the floor,

20  Hey, Mr. Gibson, this looks funny?

21     A     Right.

22     Q     You've never seen a double-thick tablet in your

23  pharmacy experience?

24     A     No.

25     Q     Did you ever have occasion to send tablets to a

PLAINTIFFS' EXHIBITS 011053

Keith Patrick Gibson                                June 14, 2011

Page 36

1    laboratory for potency evaluations?

2        A    I never did, no.

3        Q    Anybody that you worked with ever did that?

4        A    Well, I don't know if Mr. Ernst did that or

5    not.  I think he did.  But I never personally, or any of

6    my roles as a pharmacist, we never did that.

7        Q    You've never done it in a nonlitigation

8    setting?

9        A    That's correct.  You're talking about Digitek?

10       Q    I'm talking about --

11       A    Digoxin?

12       Q    Yes, Digoxin.

13            Have you ever personally -- I'm sorry, let me

14   back up.

15       A    Okay.

16       Q    Do you have the qualifications and equipment to

17   perform chemical testing on solid oral dose

18   pharmaceutical products such as dissolution and assay?

19       A    No, I do not.

20       Q    Do you have to be licensed to be a pharmacist

21   in California?

22       A    I do.

23       Q    And are you licensed in any other states?

24       A    I was licensed in Nevada about 15 years ago.

25   But no, not currently.

PLAINTIFFS' EXHIBITS 011054

Keith Patrick Gibson                                    June 14, 2011

 1      Q      Ever had any action taken against your pharmacy

 2    license?

 3      A      Never.

 4      Q      Ever had any action taken against your law

 5    license?

 6      A      Never.

 7      Q      I know this is rather obvious, but I have to

 8    ask.

 9      A      Sure.

10      Q      I assume from your C.V. you are not licensed to

11    practice medicine in the State of California?

12      A      That's correct, I'm not licensed to practice

13    medicine.

14      Q      And is diagnosis part of the practice of

15    medicine in the State of California?

16      A      It is.

17      Q      And you know that if you were to render

18    diagnosis on patients that would be a violation of

19    California code; right?

20             MR. ERNST:  Objection.

21             THE WITNESS:  If I rendered a diagnosis for

22    treatment, yes, in some ways.

23             But you've got to remember my job involves drug

24    information, and so I cannot particularly divorce the

25    clinical situation, clinical settings or the patient

PLAINTIFFS' EXHIBITS 011055

Keith Patrick Gibson                                    June 14, 2011

1    pathologies from my advice that I give to physicians.

2    And quite -- pharmacists also do a lot of drug dosing.

3    You know, in the hospital we're responsible for dosing

4    vancomycin, for instance.  I won't go through the litany

5    of stuff that I do.  But those things all involve

6    understanding the clinical picture.

7           So I don't -- I don't invite patients to come

8    to see me to render a diagnosis.  If I believe that the

9    drug is inappropriately used for incorrect diagnosis, I

10   do point that out.  So I'm not totally devoid of any

11   ability to do anything when it comes to diagnosis.  But

12   I don't treat patients directly.

13     Q     (BY MR. MORIARTY) Are you allowed to recommend

14   vitamins after diagnosing a customer's ailment?

15     A     I don't diagnose patients directly.

16     Q     Okay.

17     A     So, and I don't work retail.  And so that

18   problem almost never comes up.

19     Q     Have you ever taken any courses, continuing

20   education courses, that involved postmortem

21   redistribution?

22     A     No.

23     Q     Have you ever taken any courses regarding

24   cardiovascular care?

25     A     Yes.

PLAINTIFFS' EXHIBITS 011056

Keith Patrick Gibson                                    June 14, 2011

Page 39

1      Q     What kind of courses?

2      A     Well, they were many moons ago.  Are you

3   talking about continuing education or as part of my

4   training?

5      Q     Let's first start as part of your training.

6      A     Yes.  I mean, in pharmacy school, we had

7   therapeutic classes all of the time.  So they covered

8   every disease and drug state that involved drugs.

9      Q     Have you taken continuing education regarding

10  cardiovascular care?

11     A     I have.  Although I couldn't recite to you

12  currently.  In the last four or five years, no, but

13  prior to that, probably.

14     Q     Okay.  The hospital where you were working in

15  2006, '7 and '8, do you know whether it even had Digitek

16  in its formulary?

17     A     That was General Hospital.  I left the county

18  hospital in 2004.  2005 I was at Marian Medical Center,

19  and I do not think they have Digitek.

20     Q     2005, '6, '7, and '8 you worked at the same

21  hospital?

22     A     I think from 2005 to the present, yes.

23     Q     They -- you don't think they ever carried

24  Digitek in their formulary?

25     A     I mean, I couldn't say absolutely.  But I don't

PLAINTIFFS' EXHIBITS 011057

Keith Patrick Gibson                                    June 14, 2011

Page 40

 1   think their formulary includes Digitek, but I don't

 2   really know.

 3          I just had a conversation with a purchasing

 4   person a couple days ago, and she told me that whenever

 5   Digitek would come in, she would send it back.  But

 6   she's now rotated on to be the computer person.  There's

 7   another person.  I didn't ask him.  I did ask her,

 8   though.  She said she sent Digitek back.

 9      Q    What --

10      A    I don't know.

11      Q    What brand of Digoxin did your hospital

12   formulary carry?

13      A    Most of them carry Lanoxin.

14      Q    No, I'm not asking most of them.  I'm asking

15   about the one for which you worked, where you were a

16   pharmacist.

17      A    I think it's Lanoxin, but I don't really know.

18   I didn't think to ask that question.

19      Q    So you don't know for sure?

20      A    No.

21      Q    And who was this purchasing person you talked

22   to?

23      A    Debbie.  You're going to ask me her last name.

24      Q    Who does she work for?

25      A    Marian Medical Center.

PLAINTIFFS' EXHIBITS 011058

Keith Patrick Gibson                                    June 14, 2011

Page 41

1      Q      Where did she work in 2005, '6, '7, '8?

2      A      Marian Medical Center.  She's been there for 30

3   years.

4      Q      Are you still a member of the Cuesta Society of

5   Hospital Pharmacists?

6      A      That is defunct now.  So Cuesta Society of

7   Hospital Pharmacists was a subgroup of the California

8   Society of Hospital Pharmacists.

9      Q      How many times have you performed an autopsy?

10     A      None.  I've only been to one.

11     Q      How many times have you signed an autopsy?

12     A      None.

13     Q      How many times have you been consulted by a

14   doctor who was performing an autopsy --

15     A      None.

16     Q      -- about a cause of death?

17     A      None.

18     Q      How many times have you signed a death

19   certificate?

20     A      None.

21     Q      Have you ever made a formal diagnosis of a

22   cause of death in any kind of medical record?

23     A      Never.

24     Q      Have you ever rendered a diagnosis of a

25   patient's illness in any kind of medical record?

PLAINTIFFS' EXHIBITS 011059

Keith Patrick Gibson                                    June 14, 2011

Page 42

     1      A     No.

     2      Q     Do you consider yourself to be an expert in

     3   sudden cardiac death?

     4      A     No.

     5      Q     Do you know anything about the rates at which

     6   people with Dan McCornack's risk portfolio experience

     7   arrhythmias?

     8            MR. ERNST:  Objection.  And for the record,

     9   under PTO 22, apparently that's all I'm allowed to do,

    10   is say "objection."  I can't say why the question is

    11   inappropriate.  So I just want to clarify when I make an

    12   objection, it's for a court to decide later if it's

    13   appropriate.

    14            THE WITNESS:  I did --

    15            MR. ERNST:  You can go ahead and answer the

    16   question after my objection.

    17            THE WITNESS:  Thank you.

    18            I'm not that familiar with it, no.

    19   BY MR. MORIARTY:

    20      Q     The last two pages of Exhibit A are resumes?

    21      A     That's correct.

    22      Q     Why do you have two?

    23      A     Well, a resume is really sort of an

    24   advertisement for your services.  So when I applied at

    25   Marian Medical Center, I didn't think that my primary

PLAINTIFFS' EXHIBITS 011060

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 43

1    resume was that much on point, because they didn't

2    really care if I did all of these other jobs.  What they

3    wanted to know is whether or not I was a good pharmacist

4    or not, and who they could check and talk to about

5    whether or not I was an appropriate candidate for

6    employment.

7            So I construct one resume for each -- I haven't

8    really used this primary resume for a long time,

9    although I keep updating it, because I haven't applied

10   for any job in a long time.  Should I ever want to be a

11   lawyer somewhere else, I'll probably use my primary

12   resume.  And if I want to change pharmacy jobs, I'll use

13   the secondary resume.  That's the reason.

14   Q    When did the Cuesta Society of Hospital

15   Pharmacists become defunct?

16   A    About two or three years after I left.

17   Q    When did you leave?

18   A    Well, I was the president in '91.  When I --

19   when I said "left," I meant stopped being an officer in

20   the organization.  So about '93, I think.

21   Q    So the places, the society has been defunct --

22   okay.  Never mind.

23           Are you still a member of the American

24   Association for the Advancement of Science?

25   A    Yes.

PLAINTIFFS' EXHIBITS 011061

Keith Patrick Gibson                                    June 14, 2011

Page 44

```
 1      Q      And the California Attorneys for Criminal

 2    Justice?

 3      A      Yes.

 4      Q      ACLU?

 5      A      Yes.

 6      Q      San Luis Obispo County Bar Association?

 7      A      Yeah.  They pronounce it "Lewis," but, yeah.

 8    It's sort of like saying Frisco and San Francisco.

 9      Q      Whatever.

10             Are you still a member of the SLO County Bar

11    Association?

12      A      Yes.

13      Q      Have you had any teaching positions?

14      A      Um, yeah, I taught a course at Cal Poly once.

15      Q      What?

16      A      It was a business law course.  It was not the

17    first-year business law course, which is general

18    business, but it was kind of an eclectic course about

19    everything that wouldn't normally be covered the first

20    year.  So I taught sort of nonregulatory agencies and

21    stuff like that.

22      Q      Have you ever taught any science courses?

23      A      Other than the continuing lectures, or whatever

24    I do as a pharmacist, no.

25      Q      Have you published any peer-review articles?
```

PLAINTIFFS' EXHIBITS 011062

Keith Patrick Gibson                                      June 14, 2011

                                                              Page 45

    1      A    No.

    2      Q    Have you presented at national pharmacy

    3   conferences?

    4      A    No.

    5      Q    Have you presented at statewide pharmacy

    6   conferences?

    7      A    No.

    8      Q    Have you presented at local pharmacy

    9   conferences?

   10      A    No.

   11      Q    If there is such a thing?

   12      A    When I was president of the Cuesta Society I

   13   did a couple.

   14      Q    Were any of your presentations about Digoxin

   15   toxicity or postmortem redistribution?

   16      A    No.

   17      Q    What is the -- do you have privileges at the

   18   hospital?

   19      A    In the sense of privileges are meant to be a

   20   physician, no.

   21      Q    Okay.  Well, Marian Medical Center, what is

   22   your --

   23      A    Designation.

   24      Q    -- privilege there, or your designation there?

   25      A    You get two.  One is a staff pharmacist, the

PLAINTIFFS' EXHIBITS 011063

Keith Patrick Gibson                               June 14, 2011

Page 46

1    other is a clinical pharmacist.

2        Q     What are you?

3        A     Both.  At Marian Medical Center we serve both

4    functions.  And especially at night when everybody goes

5    home, then all jobs are left to me.

6        Q     How often are you called to the floor to

7    consult on a pharmacy issue with a patient?

8        A     Do I have to go to the floor to answer that

9    question?

10             The reason I say that is, because my work en --

11   kind of strapped me to my machine, so...  But I get

12   questions all night long.  So I'm constantly asking

13   questions -- or answering questions.

14       Q     Are you telling me --

15       A     From either nurses or doctors.

16       Q     Are you telling me that you do not go to the

17   floor, but you consult over the telephone on certain

18   things?

19       A     Over the last couple years, my getting to the

20   floor has not been very good.

21       Q     What is the machine to which you are strapped,

22   so to speak?

23       A     Well, what happens is when a doctor writes an

24   order, that order is sent to me and a scan shows up on

25   one of my two screens.  And then I review that scan for

PLAINTIFFS' EXHIBITS 011064

Keith Patrick Gibson                                    June 14, 2011

1    appropriateness and enter those orders into the computer

2    system.  Or if they are not appropriate, then I, you

3    know, call doctors or whoever and try to work that out.

4    It's hard to do at night because I don't want to wake

5    anybody up.  But once it gets into the computer system,

6    then that series of events occurs that releases the

7    drawers on the floor for the nurses to get the

8    appropriate drugs at the appropriate time.

9        Q    Okay.

10       A    Now, I have to keep up with my queue, and so

11   they are constantly coming down.  And if I wander off,

12   then my queue will jump real high.

13       Q    How many patient beds are there at Marian

14   Medical Center?

15       A    Marian Medical Center has just redownsized to

16   80, but they've been running at 120 for the last six

17   months.  When I first went there there was about 180.

18   So it's a variable population.  But somewhere around

19   100.

20       Q    So you're talking about -- it's got at least

21   180 beds, but only about 100 are filled on average?

22       A    Yeah.

23       Q    Is that what you're saying?

24       A    Something happened where we went from a pretty

25   average census of around 160 down to about 100.  More

PLAINTIFFS' EXHIBITS 011065

Keith Patrick Gibson                                June 14, 2011

Page 48

1    healthy population.

2           I have theories on why that is.  I think it's a

3    pneumo vac issue, but anyways.

4    Q    Do you live in San Luis Obispo County?

5    A    Yes, I do.

6    Q    So I assume, outside the litigation setting,

7    you've never diagnosed anybody as having Digoxin

8    toxicity while they were alive; correct?

9    A    That's correct.

10   Q    Outside the litigation setting, you've never

11   rendered a diagnosis that somebody died as a result of

12   Digoxin toxicity?

13   A    That's correct.

14   Q    And so based on what you've told me before

15   about your prior consulting experience, this is the

16   first and only time that you've rendered a professional

17   opinion about the cause of death; correct?

18   A    Other than supporting.  So a doctor would call

19   me and say, I have the following symptoms.  I think I've

20   got this, that.  Is this consistent?  I mean that sort

21   of thing I do.  I don't know if you call that diagnosing

22   or not.  Could be, as far as the specificity of that

23   word.

24          But other than that, no, I don't invite

25   patients to come for the purpose of a diagnosis.

Keith Patrick Gibson                                    June 14, 2011

Page 49

1      Q      Have you ever helped a doctor diagnose his or
2   her patient with Digoxin toxicity?
3      A      Never.
4      Q      Are you allowed to prescribe drugs?
5      A      Well, it depends upon the definition of
6   prescribe.  But I do change doses a lot.  If that's
7   prescribing, yes.  If it's not prescribing, then no.
8      Q      Are you able -- I'm sorry.
9             Are you licensed and able under California law
10  to actually prescribe a specific drug?
11     A      So --
12            MR. ERNST:  Objection.
13            You can go ahead and answer.
14  BY MR. MORIARTY:
15     Q      Not a dose change, but prescribe a drug?
16     A      Okay.  Can I answer this way?
17            MR. ERNST:  Object as vague.
18            You can answer the question.
19            THE WITNESS:  There are formulary changes that
20  we make.  And so let's say a person comes to the
21  hospital and the doctor orders Omeprazole, we don't
22  particularly want to stock that.  So I will change it to
23  Protonix.  Now, if that's prescribing, yes.  If it's not
24  prescribing, then, no.
25  BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011067

Keith Patrick Gibson                                    June 14, 2011

1      Q    Well, I'm not familiar with those two drugs.

2      A    So what I'm doing --

3      Q    Is one the generic substitute for the first

4  one?

5      A    No, it's a totally changed drug.  So I'm

6  changing a drug that's not on the formulary to one that

7  is on the formulary.

8      Q    What are those drugs for --

9      A    GERD.

10     Q    -- the ones you just mentioned?

11     A    GERD.  They are proton inhibitors, like Nexium.

12  Are you familiar with that?  The purple pill?  That

13  commerical went around for a while.

14     Q    Yeah, I know what they are.

15     A    In fact, Omeprazole was originally Nexium.

16     Q    When you do those -- when there is a

17  circumstance where there is a formulary change, do you

18  tell the doctor about it?

19     A    No, I print out an order and set it up.  I look

20  at the profile to make sure it's appropriate.  I mean,

21  it's not done in a vacuum.

22     Q    Okay.  But so far as actually prescribing a

23  drug, other than the circumstances you've described for

24  me, you can't do that?

25          MR. ERNST:  Objection.

PLAINTIFFS' EXHIBITS 011068

Keith Patrick Gibson                                    June 14, 2011

Page 51

```
 1           THE WITNESS:  No, I don't invite patients to
 2    come to see me for the purpose of treatment.
 3    BY MR. MORIARTY:
 4        Q    Well, whether you invite them or not --
 5        A    Well, okay.  There's no patient comes to me.
 6        Q    Okay.
 7        A    I mean, we're not talking about
 8    over-the-counter stuff, because people always ask me
 9    what to do when they've got a cold.  But, yeah.
10        Q    I'm talking about prescription medications.
11        A    Good.
12        Q    Did Mr. Ernst ask you to look at and measure
13    any of the Digitek that he's got in his office of the
14    McCornack family's?
15        A    I'm not sure what you mean by that.  Did I look
16    at the tablets, yes.
17        Q    Do you have a micrometer?
18        A    No.
19        Q    So you didn't measure any of them?
20        A    No, I did not.
21        Q    When you -- how long ago did you look at them?
22        A    2009.
23        Q    As part of your job --
24        A    Can I explain?
25        Q    As part of your job --
```

PLAINTIFFS' EXHIBITS 011069

Keith Patrick Gibson                                    June 14, 2011

Page 52

    1            MR. ERNST:  He said can he explain.

    2            MR. MORIARTY:  What's there to explain?  When

    3    did you look at them?  2009.  What's to explain about

    4    that?  It's a year.  It's a month.

    5            MR. ERNST:  Objection.

    6    BY MR. MORIARTY:

    7       Q    As part of your job --

    8            MR. ERNST:  Objection.

    9    BY MR. MORIARTY:

   10       Q    -- do you ever dispense solid oral dose by hand

   11    where you're looking at them, counting them?

   12       A    Not anymore.

   13       Q    When was the last time you did that?

   14       A    When I worked at Community Health Centers,

   15    which is on my resume.

   16       Q    So when you looked at the McCornack tablets --

   17            MR. ERNST:  He's referring to -- he's going to

   18    give you that.

   19            THE WITNESS:  Do you want that date?

   20            MR. MORIARTY:  No, he told me where it was.  I

   21    can look it up.

   22            MR. ERNST:  You asked him when it was, and he

   23    was looking.  If you want the answer, he will give you

   24    the answer.

   25    BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011070

Keith Patrick Gibson                                June 14, 2011

Page 53

1      Q    When you looked at the McCornack tablets, what
2   did you do?

3      A    I tried to identify them by the numbers and
4   shapes and sizes, make sure that they were Digitek
5   product.  I think the question was initially, you know,
6   did Mr. McCornack get Digitek as opposed to some other
7   version of Digoxin.  And is this an appropriate case to
8   bring, was the initial question.

9           And so my recollection is, although it's very
10  faint now, 2009, I identified those as -- with a pill
11  identifier.  You know, there's lots of programs and
12  books that you can use to tell which product you have.

13     Q    Do you believe you did that before this lawsuit
14  was filed?

15     A    I don't know if it was before or after.

16     Q    Okay.  So what else did you do other than
17  identify them as Digitek?

18     A    That's all I did.

19     Q    Well, did you look at them --

20     A    Oh, yeah.

21     Q    -- for uniformity of size, shape --

22     A    No.

23     Q    -- color?

24     A    Not really.

25     Q    At that point did you know that the drug had

PLAINTIFFS' EXHIBITS 011071

Keith Patrick Gibson                                    June 14, 2011

Page 54

1    been recalled?

2        A    I think it was just starting to happen, but I

3    don't -- it's hard for me to recollect exactly.  I don't

4    remember.

5        Q    Well, according to that bill you showed me

6    before, the initial consult was in August of 2009?

7        A    Correct.

8        Q    The recall had happened a year and a quarter

9    before that.

10       A    Okay.

11       Q    Did you know at the time --

12       A    I might not have known.  But -- and I might

13   have known.  I don't -- I can't really recall.

14       Q    Well, if you did know --

15       A    I would be lying if I told you an answer.

16       Q    -- did you know what the FDA-approved recall

17   notice said about the purpose of the recall?

18       A    Well, when Mr. Ernst asked me to consult on

19   this case, I did go and look on the internet to see if

20   Dig had been recalled.  I saw the FDA, but I didn't -- I

21   don't remember if I read the whole notice, but I read

22   some of it.

23       Q    Did you ever look on the FDA's website to see

24   what they said about Digitek?

25       A    I don't remember if I did or not.

PLAINTIFFS' EXHIBITS 011072

Keith Patrick Gibson                                    June 14, 2011

Page 55

```
 1      Q     Okay.  This is MDL Exhibit 38.  It's from the

 2  FDA's website called "The Facts and Myths about Generic

 3  Drugs."

 4            Have you ever seen this before?

 5      A     No, I have not.

 6      Q     I want you to go to the second page.

 7            First myth says, "There are quality problems

 8  with generic drug manufacturing.  A recent recall of

 9  generic Digoxin, paren, called Digitek, close paren,

10  shows the generic drugs put patients at risk."

11            Do you see that?

12      A     I do.

13      Q     Did I read it correctly?

14      A     You read it correctly.

15      Q     All right.  In the first bullet point --

16            MR. ERNST:  What's the date of this?

17            MR. MORIARTY:  It was first posted in July of

18  2009.  Before he was consulted.

19            MR. ERNST:  Is this on --

20            MS. AHERN:  It's on the website.

21            MR. ERNST:  Pardon me?

22            MS. AHERN:  You can still find that on the

23  website.

24            MR. ERNST:  But is there a date on this

25  document?
```

PLAINTIFFS' EXHIBITS 011073

Keith Patrick Gibson                                   June 14, 2011

Page 56

 1            MR. MORIARTY:  Not on this one.

 2            THE WITNESS:  Nope, that was --

 3            THE REPORTER:  I'm sorry, what did you say?

 4            THE WITNESS:  I was mumbling.

 5     BY MR. MORIARTY:

 6       Q    There is no date other than the date we printed

 7     this.

 8       A    Right.

 9            MS. AHERN:  If you go to the actual website it

10     will have a date that it was first posted.

11            MR. ERNST:  Did you print the website date?

12            MR. MORIARTY:  No.  This was printed June 15th,

13     2010, the week before I went to depose your

14     pharmaceutical experts in New Jersey and elsewhere.

15     This was posted in July of 2009.  Okay?

16            MR. ERNST:  And you know it was posted in July

17     of 2009 because of?

18            MR. MORIARTY:  Because I've looked at this

19     repeatedly on the FDA's website.  Okay.

20            MR. ERNST:  I'd like to take a short break.

21            MR. MORIARTY:  Well, wait a minute.  I need to

22     ask him about this.

23            MR. ERNST:  I'd like to take a short break.

24            MR. MORIARTY:  Okay.

25                      (Recess.)

PLAINTIFFS' EXHIBITS 011074

Keith Patrick Gibson                                          June 14, 2011

Page 57

1    BY MR. MORIARTY:

2         Q    So, Mr. Gibson, I was in the middle of

3    questioning you about Exhibit 38.  Did you talk to

4    Mr. Ernst at all about Exhibit 38 on the break?

5         A    Did we talk?  I don't think we did.

6         Q    You can't ask him.

7         A    I'm sorry.  I don't -- not exactly, no, I don't

8    think we did.

9              I think we talked about -- well, I posed the

10   question, I'm not quite sure why you're asking me the

11   stuff you're asking me.  I don't know what the context

12   of this is.  So I'm kind of confused.

13             We talked about whether or not --

14             MR. ERNST:  There's no question pending.

15             MR. MORIARTY:  Yes, I did.  I asked him what

16   did you talk about?

17             MR. ERNST:  No, you asked him if you talked

18   about Exhibit 38.

19   BY MR. MORIARTY:

20        Q    So what did you talk about?

21        A    I might be in error exactly when our first

22   initial consultations might have been.  Unfortunately, I

23   don't do this regularly, so I don't keep real good

24   records about --

25        Q    All I'm asking is what you talked about in the

PLAINTIFFS' EXHIBITS 011075

Keith Patrick Gibson                                    June 14, 2011

Page 58

1    hall --

2        A    That's what we talked about.

3        Q    -- in the middle of my questioning about an

4    exhibit.

5        A    That's what we talked about.

6        Q    Let's get back to Exhibit 38, and I wanted to

7    ask you about the first bullet point.  It starts to talk

8    about a March 2008 FDA inspection.  Do you see that?

9        A    Uh-huh.

10       Q    It says, "Included in this list of products was

11   one particular lot of Digitek."  Do you see that?

12            MR. ERNST:  Thank you.

13   BY MR. MORIARTY:

14       Q    Do you see that?

15       A    I do.

16       Q    And then it says, "Actavis detected a very

17   small number of oversized tablets in this lot,

18   specifically 20 double-sized tablets in a sample of

19   approximately 4.8 million tablets."

20            Do you see that?

21       A    I see that.

22       Q    Did I read it correctly?

23       A    You read it correctly.

24       Q    The third bullet talks about the Actavis

25   attempts to remove the tablets and GMP and things like

PLAINTIFFS' EXHIBITS 011076

Keith Patrick Gibson                          June 14, 2011

 1   that; correct?

 2        A    Correct.

 3        Q    All right.  Go to the fourth bullet point.

 4        A    One, two, three, four.  "Since the detection"?

 5        Q    Yes.  Second sentence.  "In our best judgment,

 6   given the very small number of defective tablets that

 7   may have reached the market and the lack of reported

 8   adverse events before the recall, harm to patients was

 9   very unlikely."

10             Did I read that correctly?

11        A    Yes.

12        Q    Do you have any reason to disagree with the

13   Food and Drug Administration's web statement about this

14   topic?

15        A    I think -- yes.

16        Q    You do?

17        A    Yeah.

18        Q    Tell me about it.

19        A    Well, this is something that I from the very

20   beginning, whenever you have tablets sticking to a

21   press, one can look at that as a mechanical problem,

22   which I think is the way Actavis has looked at it.  Has

23   to do with dyes and stuff like that.

24             But another way of looking at it is that it

25   might be a part of the formulary variabilities that were

PLAINTIFFS' EXHIBITS 011077

Keith Patrick Gibson                                    June 14, 2011

1    occurring within the product.  The formulary

2    variabilities is sort of the crux of the issue here, in

3    that if there were formulary -- formulation

4    variabilities, that that would change bioavailability --

5    changes in bioavailability would change the Digoxin

6    levels.

7              So when tablets stick to a press, is that a

8    symptom or is that -- I mean, it could be a symptom of a

9    greater problem.

10   Q     Who said that tablets were sticking to a press?

11   A     I read that somewhere in something I reviewed.

12   Q     Well, actually, have you read any FDA documents

13   in this case?

14   A     I've read what Mr. Ernst has provided me.

15   Q     Well, does that include 483s and warning

16   letters?

17   A     I don't think so.

18   Q     Does it include -- did he send you any batch

19   records from the manufacturing process?

20   A     No.

21   Q     Have you read the depositions of Mr. Bliesner,

22   Soma, Kenney, or Farley?

23   A     No.  But I did review --

24   Q     Okay.

25         MR. ERNST:  He --

PLAINTIFFS' EXHIBITS 011078

Keith Patrick Gibson                                    June 14, 2011

Page 61

1              THE WITNESS:  Just to be accurate, I did

2    review -- yes, I did review this from Bliesner.

3    BY MR. MORIARTY:

4        Q    That's his report?

5        A    Okay.  That's his report.

6        Q    You didn't review his deposition.

7        A    Okay.

8        Q    Right.

9              MR. ERNST:  Well, you're making a statement.

10   He's reviewed --

11   BY MR. MORIARTY:

12       Q    Did you review David Bliesner's deposition?

13       A    I'll answer your question.  Yes -- no, I did

14   not.

15       Q    Thank you.  That's all I'm asking you.

16             So what I'm asking you, though, is not whether

17   you think this is a formulary issue.  I'm asking whether

18   you have some basis to disagree with the specific

19   statement that I read from the FDA's website.

20             MR. ERNST:  Objection.

21             THE WITNESS:  Am I supposed to accept the FDA

22   as -- I don't accept the FDA as all-knowing.  I mean, I

23   read this just now.  It's what it is.  I don't know if

24   it's true.  I don't know if it's not true.

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011079

Keith Patrick Gibson                                    June 14, 2011

Page 62

1      Q     Well, do you think that --

2      A     I don't think that it is true.

3      Q     Do you think that the FDA knows the difference

4   between a formulary issue and a --

5      A     Yes.

6      Q     -- manufacturing problem?

7      A     I don't -- I don't want to pass judgment on the

8   FDA on whether or not they'd be giving out patient

9   information to calm fears.  I don't know if they lied or

10  didn't tell the truth in this.  I don't know.  It's

11  beyond my --

12     Q     I'm asking you --

13           MR. ERNST:  He needs to finish answering his

14  question.

15           MR. MORIARTY:  Go on.

16           MR. ERNST:  You're continually interrupting

17  him.

18           THE WITNESS:  I'm just saying it's just beyond

19  my purview to judge this document.

20  BY MR. MORIARTY:

21     Q     So you have no basis to agree or disagree;

22  correct?

23           MR. ERNST:  Objection; misstates his testimony.

24           THE WITNESS:  Prior to today I've never read

25  it.

PLAINTIFFS' EXHIBITS 011080

Keith Patrick Gibson                                    June 14, 2011

Page 63

1    BY MR. MORIARTY:

2        Q    Okay.  Mr. Gibson, you're here as a science

3    witness, not a lawyer.

4        A    Correct.  I understand that.

5        Q    Do you have some scientific basis today to

6    agree or not agree?

7        A    I don't particularly agree with it, no.

8        Q    What's your scientific basis for not agreeing

9    with this statement by the FDA?

10       A    When we were in pharmacy school, there were a

11   small group of drugs that we were cautioned never to

12   substitute generic for the innovated product, and Dig

13   was one of them.  And the reason that was true was

14   because changes in formulation can make changes in

15   bioavailability, which can change Dig levels.

16           And so it has always, since the first time I

17   saw a Digitek tablet, been a question in my mind, should

18   we be doing this?  Should anybody be doing this?  Can

19   you assure me that this Digitek product has the same

20   exact same bioavailability innovated product.  So that's

21   the questions that I have.

22           Now, the difference in cost is not that great.

23   I don't understand why people were substituting.

24   Whether or not this document is written for -- to calm

25   the populous or whether it's politically motivated, I

Keith Patrick Gibson                                    June 14, 2011

Page 64

 1   don't know.  There's no footnotes.  It's just not my

 2   kind of thing to look at.

 3       Q    Okay.  That's fine.  If it's not your kind of

 4   thing to look at, you just tell me that.

 5            You got your pharmacy degree in 1980; is that

 6   correct?

 7       A    That's correct.

 8       Q    Have you ever read anything about the history

 9   of bioavailability of Digoxin products since that time?

10       A    Periodically.

11       Q    Have you read the bioavailability study for

12   Digitek?

13       A    No.

14       Q    Did you know there was a bioavailability study?

15       A    I absolutely assumed there was a

16   bioavailability study done.

17       Q    As part of their ANDA?

18       A    That's correct.

19       Q    So you have no reason to question the

20   availability of Digitek, in general, against Lanoxin, do

21   you?

22            MR. ERNST:  Objection.

23            THE WITNESS:  Well, you're making -- that

24   question makes the assumption that the production

25   techniques used for the tablets that were tested were

PLAINTIFFS' EXHIBITS 011082

Keith Patrick Gibson                                    June 14, 2011

Page 65

1   exactly the same as the production techniques used for

2   the tablet that was distributed.

3   BY MR. MORIARTY:

4       Q    But you have not seen manufacturing records,

5   quality assurance records, any records from my client's

6   company; correct?

7       A    Except for Mr. Bliesner's reports.

8       Q    He's a plaintiff's expert.

9            You haven't seen the records; correct?

10      A    That's correct.  You are absolutely correct.

11      Q    What pharmacy publications do you subscribe to

12  or read on a regular basis?

13      A    On a regular basis, you know, there's what we

14  call throw-aways.  I look at all of those.  I'm -- I get

15  a ton of mail.

16           You know what I mean by throw-aways?

17      Q    Yes.

18      A    Pharmacy Times, Drug topics, those sort of

19  things.

20           In the pharmacy, we have -- we have -- well,

21  when I was at General we regularly got the Medical

22  Letter and the Pharmacist's Letter.

23           I generally don't review peer-review articles

24  unless something drives me to try to solve a problem.

25      Q    Okay.  Do you keep any toxicology texts in the

PLAINTIFFS' EXHIBITS 011083

Keith Patrick Gibson                                              June 14, 2011

Page 66

 1    lab or the pharmacy department --

 2         A     Yes.

 3         Q     -- at your hospital?

 4               Which ones?

 5         A     This is a truncated version of the one that we

 6    have in the pharmacy.

 7         Q     Gerald Leikin's book?

 8         A     Leikin and Paloucek, yes.

 9         Q     Do you have any others?

10         A     I have others in my library.  We regularly --

11         Q     Such as?

12         A     I have "Medical Toxicology."

13               Do you want me to pull all of my books out?

14         Q     The one you just put on the table is by

15    Ellenkohm and Barceloux.  B-a-r-c-e-l-o-u-x; correct?

16         A     Yes.

17         Q     You have a Goodman and Gilman's there?

18         A     I have Goodman and Gilman.  I keep a copy of

19    the Washington manual.  I have Evans and Schentag's book

20    on Pharmacokinetics.  Here's a very ancient text that I

21    like a lot.  Then, of course, I keep the Merck manual.

22    And this is just from my private library.

23         Q     This one is called --

24               MR. ERNST:  He's --

25               MR. MORIARTY:  He's put a bunch of books on the

PLAINTIFFS' EXHIBITS 011084

Keith Patrick Gibson                                June 14, 2011

Page 67

 1    table.  Can I read the title of one so we can keep this
 2    straight?
 3              MR. ERNST:  Yes, but he --
 4    BY MR. MORIARTY:
 5        Q    Textbook of Biopharmaceutics and Clinical
 6    Pharmacokinetics by N-i-z-a-i; correct?
 7        A    Correct.
 8              Every one of these represents a footnote in my
 9    report.
10        Q    Okay.
11        A    Can I put them away?
12        Q    Yes.
13        A    Thank you.
14        Q    Have you ever ordered a serum Digoxin
15    concentration level on a patient?
16        A    We do that for patients in hospitals.  It's one
17    of the new Jayco recommendations for patients' safety.
18    If a person is on Dig, when he enters the hospital, the
19    pharmacists are required to order Dig levels for them.
20        Q    When was that put in?
21        A    I can't tell you that exactly.  I know I've
22    been mandated by my employer to do so and so I do.
23        Q    How many times have you done it?
24        A    I work at nights.  It's not that common.
25    Most -- I don't get that many admits that are -- that

PLAINTIFFS' EXHIBITS 011085

Keith Patrick Gibson                                    June 14, 2011

Page 68

 1   have Dig at night.

 2       Q    Have you ever, on your own discretion, ordered

 3   a serum Digoxin concentration level on a patient?

 4       A    Yes.  Whenever I'm entering drugs and I see

 5   abnormalities, like a high serum creatin, and I know

 6   there's a person on Dig, I've done that.

 7       Q    So you, at your hospital, have the authority as

 8   a pharmacist to order lab studies?

 9       A    Some, yeah.

10       Q    Okay.

11       A    Can I make this perfectly clear?  The majority

12   of it is done by the clinical pharmacist who works the

13   eight-to-whatever shift.

14       Q    Have you ever worked in a lab that tested

15   pharmaceutical products?

16       A    No.

17       Q    Do you have any military service?

18       A    Three months and seven days.  I was a cadet at

19   the United States Air Force Academy.

20       Q    Did you voluntarily withdraw from that

21   institution?

22       A    I did.

23       Q    Outside the litigation setting, how often do

24   you review full medical records?

25       A    In my current job, I have for the last five

PLAINTIFFS' EXHIBITS 011086

Keith Patrick Gibson                                    June 14, 2011

Page 69

1   years.  When I worked at General Hospital, um, I was --

2   I did some QA that involved reviewing full medical

3   records.

4       Q    Okay.  So how many times do you think you've

5   done that in your career?

6       A    Oh, it comes up periodically.  So, geez, I

7   wouldn't know.  Not -- it's not that often.  Ten, 15

8   maybe.

9            I mean, usually what happens is you show up

10  with -- in the old days before it was all electronic,

11  you'd show up with medical records, and there would be a

12  large stack of medical records, and you would do what

13  you needed to do as part of the QA and pass them along.

14      Q    Now, in this -- I'm going to ask you some

15  questions about your report, which is Exhibit A.

16      A    Sure.

17      Q    You can use this version or --

18      A    I have a copy.

19      Q    -- or your version.

20           Do you need a copy, Don?

21           MR. ERNST:  I'm fine.  Sure.  I'll take that.

22  No reason to waste paper.

23  BY MR. MORIARTY:

24      Q    In this collection of footnotes, there are a

25  number of articles specifically about Digoxin?

Keith Patrick Gibson                                    June 14, 2011

Page 70

 1      A     That's correct.

 2      Q     And postmortem redistribution of Digoxin.

 3   Okay?

 4      A     Uh-huh.

 5      Q     How many of those had you read before you were

 6   consulted as a part of this litigation?

 7      A     None.

 8      Q     All right.  So I assume that you footnoted the

 9   items that you did here because you were relying on them

10   for the various propositions that you talk about in this

11   report; correct?

12      A     That is one of two reasons I did it.

13            The other one is, is my method of note taking,

14   and I do that so that I can, you know, between the time

15   you write the report and some other time you become cold

16   on a topic, and this way I can pull up the material.  If

17   I have a question as to where the -- I might have got

18   something, I have a footnote that directs me.

19      Q     Sure.  But you put them in here because you

20   considered them to be reasonably reliable pieces of

21   authority for whatever proposition you were citing them

22   for?

23      A     Correct.

24      Q     Now, getting back to this first paragraph, one

25   of your charges was to provide an opinion about the

Keith Patrick Gibson                                June 14, 2011

Page 71

1    postmortem drug levels for Mr. McCornack's blood?

2         A    Correct.

3         Q    How many times in a nonlitigation setting have

4    you been asked to render opinions about postmortem drug

5    levels?

6         A    This is a novel event for me.

7         Q    First time?

8         A    Yes.

9         Q    So, obviously, this is the first time you've

10   been ever asked to look at postmortem Digoxin levels?

11        A    Correct.

12        Q    In a nonlitigation setting have you ever been

13   asked to render opinions about the distribution of

14   Digoxin and other drugs postmortem?

15        A    Not postmortem, no.

16        Q    Before this piece of litigation, have you ever

17   been asked to render opinions about the effect of

18   different formulations of Digoxin on bioavailability?

19        A    It has been a continuing discussion that occurs

20   regularly, yes.

21             I mean, pharmacists are capable, or do

22   substitute generic drugs.  And so there are continuing

23   discussions about whether or not you're going to bring

24   this into a pharmacy or not.

25             I mean, my opinion has always been not to, but

PLAINTIFFS' EXHIBITS 011089

Keith Patrick Gibson                                    June 14, 2011

Page 72

 1    I'm an old-fashioned-type guy.  Because in 1980, I mean,

 2    we were severely warned, and I believe it still to be

 3    true, that changes in variation in formulation can be --

 4    have disastrous effects.

 5         Q    Do you know whether FDA ever cited or warned

 6    Actavis about changes in formulation of Digitek --

 7         A    The only time --

 8         Q    -- between 2005 and 2008?

 9         A    The only things I know is in the report by

10    Dr. Bliesner.  I don't have it memorized every bit

11    that's in here.  But that's what I know.

12         Q    So you don't independently know --

13         A    That's correct.

14         Q    -- anything about that?

15              Do you know whether FDA ever cited or warned

16    Actavis about changes in bioavailability at any point

17    regarding Digitek?

18         A    I don't know if they did or not.

19         Q    So let me get back to my question.

20              Have you ever rendered a professional opinion

21    that is documented anywhere about the effect of

22    differing formulations of Digoxin on bioavailability?

23         A    No.

24         Q    Go to the second page of your report, please.

25         A    Sure.

Keith Patrick Gibson                                      June 14, 2011

Page 73

1      Q    Second full paragraph.

2      A    Yes.

3      Q    At the end you're talking about when

4  Mr. McCornack consumed his medications?

5      A    Correct.

6      Q    Do you see that?

7      A    Yes.

8      Q    It does make a big difference -- well, let me

9  step back.

10         If a doctor was going to draw a serum Digoxin

11  concentration on Mr. McCornack at approximately

12  midnight, would you agree that it would be very

13  important to know whether he took his last dose at

14  6 p.m. or 8 p.m.?

15         MR. ERNST:  Objection.

16         THE WITNESS:  Well, peaks are generally drawn

17  anywhere from four to six.  And so it's not that

18  specific.  I mean, it is a number.  It's just a number.

19         You do -- you do generally discuss peaks,

20  though.  You don't discuss troughs.

21  BY MR. MORIARTY:

22     Q    What do you mean, peaks are drawn at four to

23  six?

24     A    Well, for instance, if I wanted to find out

25  what your Digoxin level is, I need to do so in a

Rennillo Deposition & Discovery
(216) 523-1313          A Veritext Company          (888) 391-3376
PLAINTIFFS' EXHIBITS 011091

Keith Patrick Gibson                                    June 14, 2011

Page 74

1   consistent part of the time curve so that I can

2   constantly be referencing that consistent part of the

3   time curve.

4        The generally accepted idea is to draw it at

5   the peak time, which is somewhere between four to six

6   hours after the administration of the dose.

7    Q    Where do you get that?  What's the cite for

8   that proposition?

9    A    Everywhere.  I mean every textbook.  They all

10  say that.

11   Q    Don't they say six to eight?

12   A    Well, what did I reference?

13   Q    Yeah, I'm not asking about a peak.  I'm

14  asking -- this is a very specific question.

15   A    Correct.

16   Q    If somebody was going to draw a serum Digoxin

17  concentration on Mr. McCornack at midnight, would it be

18  important to know whether he took his last dose at

19  6 p.m.?

20   A    Or 8 p.m.

21   Q    Or 8 p.m.?

22   A    It could be.

23   Q    Okay.  What does the FDA-approved product label

24  say about the optimal time to draw serum level?

25   A    That I don't know.

PLAINTIFFS' EXHIBITS 011092

Keith Patrick Gibson                                    June 14, 2011

Page 75

 1        Q    When you are going to draw serum levels as part

 2    of clinical practice, are you looking for the peak or

 3    are you looking for steady state?

 4             MR. ERNST:  Objection; compound.

 5             THE WITNESS:  Actually, that doesn't really

 6    make sense, the question.

 7             Um, the peaks will be consistent at steady

 8    state.  Steady state is defined as the time in which the

 9    intake of the drugs sort of equal the outtake of the

10    drugs.  So steady state defines five to seven times.  A

11    halflife, you're about 90 percent of steady state.  At

12    steady state, the peaks will be consistent, and that's

13    what you're looking for.

14    BY MR. MORIARTY:

15        Q    Okay.

16        A    So you don't want to --

17        Q    So it's your understanding that clinicians draw

18    serum levels in order to look for peaks?

19        A    Uh-huh.

20        Q    Okay.  Do you have a citation at that?

21        A    No, not right off the top of my head.

22             I can tell you, though, that Digoxin is one of

23    those drugs in which there are pharmaceutical protocols

24    in which doctors ask us to dose their drugs, and in

25    every pharmacy protocol I've worked under that involve

PLAINTIFFS' EXHIBITS 011093

Keith Patrick Gibson                                    June 14, 2011

Page 76

 1   Digoxin peaks were desired as a reference point because

 2   they are the most consistent.

 3       Q    Okay.

 4       A    Easy to obtain.

 5       Q    Let's go after your first little chart here.

 6       A    So the first little chart?

 7       Q    Wait a minute.  Actually, let's stick with the

 8   chart.

 9       A    Okay.

10       Q    That's his last serum level; correct?

11       A    That I could find.

12       Q    Okay.  Do you know what time he took his dose

13   that day?

14       A    I do not know exactly.

15       Q    Well, if Mr. McCornack typically took his dose

16   at breakfast and dinner --

17       A    Then he would have taken it at the time this

18   level was drawn.

19       Q    Yeah.  Too close in time to the dose; right?

20       A    Right.

21       Q    But we don't know whether he skipped his

22   morning dose because he was going to the doctor; right?

23       A    We don't know that.

24            Can I say, though, that it appears to me to be

25   a nadir or a trough more than a peak.  And I assume that

Keith Patrick Gibson                                    June 14, 2011

Page 77

1    he didn't wake up at four in the morning to take his

2    dose.  So this is more the kind of level that, if I was

3    doing the protocol, I would want redone.

4        Q    Well, if -- I know this involves a lot of

5    variables, but if a patient's trough level is 1.6, what

6    do you expect his daily peak would be?

7        A    Well, it depends a lot on those other

8    variables.  So it's hard for me to say.

9             You know, I thought about trying to calculate

10   that before I came today, but I did not get around to

11   doing that.  So I --

12       Q    After the first chart, there's a little

13   paragraph about postmortem drug levels were obtained.

14   Do you see that?

15       A    Yes.

16       Q    Then it says those levels were obtained from a

17   peripheral site.  Do you see that?

18       A    That's correct.

19       Q    What's the basis for that statement?

20       A    The testimony or the deposition of the -- I

21   believe it comes from the deposition of the --

22       Q    Coroner.

23       A    -- coroner.  Thank you.

24       Q    Do you independently know whether the axillary

25   vein is considered central or peripheral?

PLAINTIFFS' EXHIBITS 011095

Keith Patrick Gibson                                    June 14, 2011

```
                                                        Page 78
   1              MR. ERNST:  Objection.

   2              THE WITNESS:  I'm not too sure those words

   3    have that specific a meaning.  So, no.

   4    BY MR. MORIARTY:

   5       Q    Do you have any opinion to a reasonable degree

   6    of scientific probability where the trace level of

   7    quinidine came from in Dan McCornack's postmortem blood?

   8              MR. ERNST:  Objection.

   9              THE WITNESS:  Total puzzle.  It could be

  10    something he drank that day.

  11    BY MR. MORIARTY:

  12       Q    All I asked is whether you had an opinion --

  13       A    I do not.

  14       Q    -- to a reasonable probability.

  15              Okay.  Let's go to the next page, at the top.

  16    It says, "The distribution of the Digoxin is minimal to

  17    body fat.  High concentrations to myocardium, skeletal

  18    muscles and kidney."

  19              Do you see that?

  20       A    Uh-huh.

  21       Q    Name several of the skeletal muscles to which

  22    there would be high concentrations distributed.

  23       A    Well, skeletal muscles are like biceps,

  24    triceps, thigh muscles, calves.  I mean, those are all

  25    skeletal muscles.  Skeletal muscles differ from
```

PLAINTIFFS' EXHIBITS 011096

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 79

 1    myocardial muscle.

 2         Q     I understand that.  I just asked you to name a

 3    couple.

 4               Pectoral muscles?

 5         A     Pectoral muscles.

 6         Q     Okay.  Let's go to -- you have this citation to

 7    G-L-O-B-A-L R-P-H?

 8         A     What page?  I'm sorry.

 9         Q     The next page after where we were.  Sorry.

10    Page 4.

11         A     Global RPH.

12         Q     Yes.

13         A     That's a website.  I didn't -- given the time

14    constraints in writing this report, I didn't do these

15    calculations by hand, so I used Global RPH.

16               Are you familiar with that website?

17               MR. ERNST:  Did we mark the report yet as an

18    attachment to this deposition?  "A."  Thank you.

19               And is there anything else that's been marked

20    other than this?

21               MR. MORIARTY:  Yes, the notice is "B."

22               MR. ERNST:  Okay.

23               (Defendants' Exhibit C was marked for

24               identification.)

25    BY MR. MORIARTY:

Keith Patrick Gibson                              June 14, 2011

 1      Q    This I'm not going to mark yet completely, but

 2   the first part that I'm holding in my right hand is

 3   marked C.  Do you see that?

 4      A    I see that.

 5      Q    Is what I'm holding in both hands part of the

 6   Global RPH website?

 7      A    I believe it is.

 8           MR. ERNST:  Do you have a copy of that for me?

 9           MR. MORIARTY:  I have a copy of this part.  I

10   don't think I have a copy of the second part.  But I'll

11   get it.

12           THE WITNESS:  The first part, if I could

13   describe it, the first part is the calculator, Digoxin

14   dosage calculator, which I used as trying to demonstrate

15   the difference in steady levels with the change of

16   bioavailability.

17           The second, I believe, is a description of

18   calculations in which the program engaged in.

19   BY MR. MORIARTY:

20      Q    Let me ask about this.  In the Digoxin

21   calculator, which is Gibson Exhibit C --

22      A    Uh-huh.

23      Q    -- and there's all kinds of advertising around

24   the peripheral --

25      A    Yes, it is.

Keith Patrick Gibson                                        June 14, 2011

Page 81

1      Q      -- of this; correct?

2      A      Yes.

3      Q      And then on the second page, if you go to that,

4   there's a disclaimer.  Do you see that?

5      A      Yes.

6      Q      And it says, "The authors make no claims of the

7   accuracy of the information contained herein.  And these

8   suggested doses are not a substitute for clinical

9   judgment."

10     A      That's correct.

11     Q      Did I read that correctly?

12     A      That is correct.

13     Q      Have you ever used this website before this

14   litigation setting?

15     A      Oh, yes.

16     Q      Do you know the extent to which doctors use

17   this website in making any sort of dosing decisions?

18     A      I don't think they do.  I don't know, though.

19     Q      Do you know the people who are behind this

20   website?

21     A      No.

22     Q      Do you know anything about their

23   qualifications?

24     A      They've been around for a long time.  Um, they

25   seem to have quoted all of the appropriate documents.  I

PLAINTIFFS' EXHIBITS 011099

Keith Patrick Gibson                                    June 14, 2011

Page 82

1    assumed they did the calculations correctly.  I did not

2    hand out calculations myself.

3        Q    Okay.

4        A    You know what I mean.  I did not do the

5    calculations myself.

6        Q    And I assume that this is -- obviously, this is

7    designed for dosing calculations on living patients;

8    right?

9        A    That's correct.

10       Q    Okay.

11       A    Do you want that back?  I'll get it.

12            MR. MORIARTY:  Do you want the second page of

13   that?  You can have mine.

14            MR. ERNST:  I want to make sure they are both

15   marked as Exhibit C.

16            MR. MORIARTY:  I'm going to clip them together

17   or have her clip them together.

18            MR. ERNST:  Thank you.

19   BY MR. MORIARTY:

20       Q    Have you ever specifically used this site

21   before this case for any Digoxin calculations?

22       A    Yes.

23       Q    And that was in -- was that in assisting some

24   doctor in making dosing decisions?

25       A    Yes.

PLAINTIFFS' EXHIBITS 011100

Keith Patrick Gibson                                   June 14, 2011

1      Q    Do you have any opinion to a reasonable

2   scientific probability about the bioavailability of the

3   tablets that Mr. McCornack was taking prior to his

4   death?  Digitek tablets?

5            MR. MORIARTY:  Objection.  The standard.

6            You can go ahead and answer the question.

7            THE WITNESS:  Do I know what the

8   bioavailability is?  You're asking for very specific

9   things all morning.  So the question --

10  BY MR. MORIARTY:

11     Q    Let me withdraw the question that I asked.  I

12  want to ask it a different way.

13            Do you have an opinion to a reasonable

14  scientific probability whether the bioavailability of

15  Mr. McCornack's tablets was any different from the

16  FDA-approved formula for Digitek?

17            MR. ERNST:  Objection.

18            THE WITNESS:  So, I kind of didn't see my role

19  as to go into that part of it, so I didn't -- I just --

20  part of my report makes the assumption that if Mr. Ernst

21  can prove that there's formulation issues, is it

22  possible that those formulation issues can result in a

23  toxic dose of Digoxin.  That was my point here.

24  BY MR. MORIARTY:

25     Q    Okay.  But just so I'm clear, when I walk out

PLAINTIFFS' EXHIBITS 011101

Keith Patrick Gibson                              June 14, 2011

```
 1   of here --

 2       A    Right.

 3       Q    -- I need to know, you don't today currently

 4   have an opinion to a reasonable scientific probability

 5   about whether his tablets did or did not deviate from

 6   the FDA approval?

 7       A    I have not tested them nor followed through on

 8   that.

 9       Q    Thank you.

10            Let's go to the next page.  The first sentence

11   says, "Life-threatening arrhythmias are the most

12   important toxic effect of Digoxin."

13            Do you see that?

14       A    Yes.

15       Q    Do you know whether life-threatening

16   arrhythmias are the most common toxic side effect of

17   Digoxin?

18       A    Well, that's a difficult issue, and I don't

19   think anybody knows whether it's the most common or not.

20   There has been some discussion about nausea and vomiting

21   being one of the most common issue with Digitoxicity.

22   I'm not quite so sure this -- I think there are a number

23   of people who can be Dig toxic and not be -- not have

24   nausea and vomiting.  They show up with other

25   arrhythmias.
```

PLAINTIFFS' EXHIBITS 011102

Keith Patrick Gibson                                    June 14, 2011

1           There's always the comorbid disease states,

2   they can confuse the clinical pictures.  So is the

3   nausea and vomiting because they have other illnesses?

4           So the answer to your question is, I don't

5   know -- I don't know if anybody knows.

6       Q    Okay.  So then you've got this chart here,

7   which comes from Goodman and Gilman?

8       A    Correct.

9       Q    Right?

10      A    Yes.

11      Q    Now --

12      A    Now, it comes from the 11th edition.

13      Q    Correct.

14          Does Goodman and Gilman provide citations for

15  this?

16      A    I assume they do.

17      Q    Can you find them for me, please?

18      A    Are you ready?  Tell me when you're ready.

19          MR. ERNST:  Just read them into the record.

20          THE WITNESS:  Read them into the record?

21          MR. ERNST:  Sure.

22          MR. MORIARTY:  No, I want to see them.

23          MR. ERNST:  Well, that's fine.

24          THE WITNESS:  Okay.  This is a copy of this

25  section of Goodman and Gilman.

PLAINTIFFS' EXHIBITS 011103

Keith Patrick Gibson                                    June 14, 2011

Page 86

BY MR. MORIARTY:

1   BY MR. MORIARTY:

2        Q    Okay.

3        A    It's the front page.  Then I don't know what

4   you would call this page.  I looked at this page to find

5   out.

6        Q    All I need is the cite.

7        A    And you'll notice right there, there's little

8   numbers that I cited and here's the references here.

9        Q    So your reading of this is that the Meridian

10  paper in Clinical Pharmacokinetics in 1988, and the

11  Smith and Hobber paper in the Journal of Clinical

12  Investigations in 1970 are the sources for these --

13       A    Numbers.

14       Q    -- numbers?

15       A    Correct.

16       Q    Have you read those papers?

17       A    Have not.

18       Q    And certainly -- you can take that back.

19       A    Okay.

20       Q    Certainly, the Digoxin concentration that is

21  listed in the left side of your chart here on Page 5 is

22  a serum level taken from a living patient?

23       A    Correct.

24       Q    So do you have any independent information

25  about the degree to which other peer-reviewed medical

Keith Patrick Gibson                                    June 14, 2011

1   articles support these percentages?

2           MR. ERNST:  Objection.

3           THE WITNESS:  Well, the problem with Goodman

4   and Gilman -- and they are probably the most respected

5   textbook in the field.  I would imagine it's been more

6   than anybody could be vetted.  I couldn't imagine that

7   they would make an error.

8           You know, and the point is not to play the

9   numbers exactly.  They are just trying to demonstrate a

10  point.  And the point being, that as you rise in the

11  serum Dig level, the probability of having an arrhythmia

12  arises and they're giving a demonstration.

13          So at 1.7 your chances are 10 percent.  2.5.

14  But that's not an exact number.  It's just a patient

15  population they study, and they are just trying to

16  demonstrate this concept.

17  Q    Okay.  Do you know in any of the papers that

18  support these numbers what the percentages was -- what

19  the percentage were of fatal arrhythmias?

20  A    You know, not exactly.  But you know, people

21  have interesting new charts that --

22  Q    So in the papers --

23          MR. ERNST:  Would you just --

24          MR. MORIARTY:  No, because he's going to a

25  different paper and he's not answering my question.

Keith Patrick Gibson                                    June 14, 2011

Page 88

 1          MR. ERNST:  He --

 2          MR. MORIARTY:  I will give him a chance to

 3   answer this, Don.

 4          MR. ERNST:  You are continually interrupting

 5   him.

 6          MR. MORIARTY:  I am not.

 7          MR. ERNST:  You are interrupting his answers

 8   when you don't like what he has to say.

 9   BY MR. MORIARTY:

10     Q    I'm going to ask you a simple question and then

11   you can explain it in this paper.

12          MR. ERNST:  He was not done answering the last

13   question.  What you want you to do is limit his answers.

14   This --

15          MR. MORIARTY:  Fine.  I'll move to strike his

16   last answer as nonresponsive.

17          MR. ERNST:  And I would ask --

18   BY MR. MORIARTY:

19     Q    I'm going to ask you answer this --

20          MR. ERNST:  Let's read it again.  Let's read

21   the question again.

22   BY MR. MORIARTY:

23     Q    I'm going to ask you this question:  Do you

24   know in the two papers cited in Goodman and Gilman that

25   form the basis of this chart, how many of these were for

Keith Patrick Gibson                              June 14, 2011

Page 89

1    fatal arrhythmias?

2         A    I do not know.

3         Q    Okay.  Now, do you believe that the Leiken

4    paper that you brought with you today --

5         A    Which --

6         Q    -- answers that question?

7         A    I don't know.  I just got it last night.  I

8    have not had an opportunity to study it.

9              But I didn't put this document -- this stuff in

10   there to absolutely prove the truth of the assertion so

11   much as to show the concept that the rise in a serum Dig

12   level can cause a rise in the propensity for

13   arrhythmias.

14        Q    Okay.

15        A    That's all I was trying to do.

16             How many of those are fatal -- or not fatal, I

17   mean, is Mr. McCornack the 10 percent?  90 percent do

18   not have fatal.  I mean, I don't know that exactly.

19   It's just another data point to consider when looking at

20   the clinical picture of Mr. McCornack's demise.

21        Q    Thank you.

22             Now, after the chart, you talk about noncardiac

23   symptoms; correct?

24        A    Yes.

25        Q    Did he have any of the ones that you describe

PLAINTIFFS' EXHIBITS 011107

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 90

1    here the day or night of March 22nd, 2008?

2        A    I did not find a reference to any of those.

3             Now, I reviewed the deposition of his wife.  I

4    did not review the deposition, although I was given it

5    just recently, I haven't had time to study that, of the

6    two boys.

7             And I did not find that he had nausea and

8    vomiting or visual disturbances, or what's the other

9    one?

10       Q    Okay.  Now, underneath that, you are talking

11   about the factors influencing the likelihood of toxicity

12   from the Goodman and Gilman text; correct?

13       A    Correct.  I use that as sort of a framework for

14   my discussion in the paper.

15       Q    Right.

16       A    So what are the possibilities that might cause

17   an abnormally high Dig level.

18       Q    All right.  So let's look at number 3.  Can you

19   rule out to a certainty that Mr. McCornack accidentally

20   took too many Digitek at some point in the days leading

21   to his death?

22            MR. ERNST:  Objection.

23            THE WITNESS:  I considered that and thought

24   about it a lot.  That's why I have a paragraph about his

25   use of a pill dispenser.

PLAINTIFFS' EXHIBITS 011108

Keith Patrick Gibson                                    June 14, 2011

 1          And the reason, because I was concerned, not a

 2   question that you had here, but with the alcohol use he

 3   might have miscalculated the number of tablets.  So I

 4   was trying to see if there was any particular evidence

 5   that would make it look like he might have taken an

 6   incorrect number of tablets.  All I have is that he used

 7   a pill dispenser, and it's somewhat inconsistent to

 8   think that with a pill dispenser you would take an

 9   incorrect number of tablets.

10      Q    So, in your opinion, it is unlikely; correct?

11      A    Yeah.

12      Q    But you can't rule it out to a certainty?

13      A    To a reasonable doubt, no.

14      Q    Now, number 6 talks about -- or I'm sorry,

15   number 5, decrease in renal function; correct?

16      A    Correct.

17      Q    Now, renal function can be measured in lab

18   tests; right?

19      A    Yeah.  Estimations.

20      Q    Estimations?

21      A    It's incorrect to say you can measure.  The

22   only way you can really measure it is to do a 24-hour

23   urine collection.  It can be estimated.

24      Q    To the best of your knowledge, no lab studies

25   have been taken to check his renal function since

Keith Patrick Gibson                                    June 14, 2011

Page 92

 1    months, maybe almost a year --

 2         A    Almost a year.

 3         Q    -- before his death?

 4         A    That's right, yeah.

 5         Q    So do you have any scientific data available

 6    which allows you to rule out the possibility of

 7    number 5, a decrease in renal function in this case?

 8         A    Well, there was no evidence that he had any

 9    symptoms of.  So based on that, I ruled it out.

10         Q    My question was, did you have any scientific

11    data, lab data?  Do you have any --

12         A    Okay.  You want lab data.  No, I don't have any

13    lab data.

14         Q    Electrolyte abnormalities are typically

15    assessed using laboratory data?

16         A    That's absolutely correct.

17         Q    So number 6, do you have any lab data to rule

18    out the possibility that Mr. McCornack had electrolyte

19    abnormalities?

20         A    I don't have any lab data from that.

21         Q    Okay.  And number 8 is other pharmacological

22    agents; correct?

23         A    Correct.

24         Q    And we know that Mr. McCornack was taking

25    Diltiazem; correct?

PLAINTIFFS' EXHIBITS 011110

Keith Patrick Gibson                                    June 14, 2011

Page 93

1       A     Correct.

2       Q     Have you read the FDA-approved product label

3   for Diltiazem?

4       A     I'm afraid I haven't.

5       Q     You've read something about Diltiazem --

6       A     I've read about Diltiazem at length.

7       Q     In your many books?

8       A     Correct.

9       Q     Okay.

10      A     And I've cited --

11      Q     Mr. Gibson -- Mr. Ernst keeps telling me that

12  I'm interrupting you.  You do have to wait for me to

13  finish my question.

14      A     I thought you asked me --

15            MR. ERNST:  He wasn't finished with his answer.

16            THE WITNESS:  I just didn't want to be

17  inaccurate.

18            MR. MORIARTY:  Don, it's always my fault.

19            THE WITNESS:  I just didn't want to be

20  inaccurate.  That's all.  You asked me if I reviewed any

21  documents, and I have the -- amongst all of my textbooks

22  and stuff, I also reviewed the one that I cited, the

23  consensus.

24  BY MR. MORIARTY:

25      Q     I'm well aware of that.  You've read about

PLAINTIFFS' EXHIBITS 011111

Keith Patrick Gibson                                    June 14, 2011

Page 94

1    Diltiazem.  You've cited it here.  I ask one question at

2    time.

3              One had to do with the label.

4       A    Right.

5       Q    Then the books.  But you've read about

6    Diltiazem; right?

7       A    I'm sorry, books, articles, they all kind of

8    fuzz in my mind being the same sort of reading.

9       Q    Do you know, based on your reading, that

10   Diltiazem has the risk of arrhythmias?

11      A    Yes.

12      Q    Have you done any reading that indicates to you

13   the risk of arrhythmias at increased Diltiazem levels?

14      A    Yes.

15      Q    Okay.

16      A    Have I -- you asked me have I read, right?

17      Q    Yes.

18      A    Yes.

19      Q    Now, on page 5 of your report, you have this

20   little chart about the risk of arrhythmias at higher

21   Digoxin levels.  Do you have a little chart for the

22   Diltiazem?

23      A    I could not find, in my literature research,

24   any correlations that made any sense that I thought I

25   could cite.

PLAINTIFFS' EXHIBITS 011112

Keith Patrick Gibson                                June 14, 2011

Page 95

```
 1      Q     Okay.  So you don't know what the increased
 2  risk of arrhythmia, if any, is with a 25-percent
 3  increase in the Diltiazem level?
 4      A     That's correct.
 5      Q     Over therapeutic?
 6      A     That's correct.  I don't know if anybody knows
 7  a numerical correlation between the vitreous and
 8  Diltiazem level.  Most of them are very confusing
 9  whether Diltiazem level should or shouldn't be.
10      Q     Let's go to page 6 of your report.
11      A     Okay.
12      Q     At the end of your bullet points you've got the
13  maximum dose of Diltiazem as 540 milligrams per day?
14      A     Correct.
15      Q     Based on what you said on the first page of
16  your report, Mr. McCornack was on the maximum daily dose
17  of Diltiazem, was he not?
18      A     He was.
19      Q     Was he also -- withdraw that.
20            Two paragraphs down, you're talking about the
21  question of whether we can determine the level of
22  Digoxin in the blood at the time of death arises in this
23  case.
24            Do you see that sentence?
25      A     Yes.
```

PLAINTIFFS' EXHIBITS 011113

Keith Patrick Gibson                                    June 14, 2011

Page 96

1      Q      And then you talk about hair?

2      A      Right.

3      Q      There was no hair sample in this case, was

4    there?

5      A      No.

6      Q      Dr. Mason did not draw any vitreous sample, did

7    he?

8      A      Not that I know of.

9      Q      From your reading in the area to prepare for

10   your opinions in this case, you did see that vitreous

11   was a type of sample that could be drawn for comparison;

12   right?

13     A      It could be drawn.

14     Q      Right.

15     A      Its value, I have a different opinion about.  I

16   don't know if it's that valuable.

17     Q      I'm asking you whether it's another data point.

18     A      It is another data point.

19     Q      You know that Dr. Mason only drew one blood

20   sample; correct?

21     A      That I know about.

22     Q      So down a couple paragraphs from that, you're

23   talking about postmortem redistribution refers to one

24   subset of those changes; correct?

25     A      Correct.

PLAINTIFFS' EXHIBITS 011114

Keith Patrick Gibson                                    June 14, 2011

Page 97

```
 1     Q    You cite the Koren article; is that right?

 2     A    I believe so.

 3     Q    Okay.  Do you have your copy of the Koren

 4   article there?

 5     A    I hope so.  It will take me something to find

 6   it, but --

 7     Q    It's Koren and MacLeod, 1985.  Journal of

 8   Forensic Sciences; correct?

 9     A    That's the rat study, yes.

10          MR. MORIARTY:  That can be "D."

11            (Defendants' Exhibit D was marked for

12            identification.)

13   BY MR. MORIARTY:

14     Q    That is the study that you cite in footnote 34

15   on page 6; correct?

16     A    That's correct.

17     Q    All right.  I want to ask you a couple

18   questions about this.

19          This -- in the abstract, a couple sentences

20   from the end, it says, "Therefore antemortem Digoxin

21   intoxication cannot be reliably inferred on the basis of

22   high postmortem levels of the drug."

23          Did I read that correctly?

24     A    You read that correctly.

25     Q    Do you agree with that?
```

Keith Patrick Gibson                                June 14, 2011

Page 98

```
 1     A    Not totally.

 2     Q    Let's go to the discussion section at page 94

 3  of the article.

 4     A    Can I use this one?

 5     Q    Sure.  The first sentence says, "In common with

 6  earlier reported human studies, the first part of our

 7  experiment indicates that in the rat, low antemortem

 8  serum levels during life tend to increase significantly

 9  after death."

10          Did I read it correctly?

11     A    You read it correctly.

12     Q    Do you agree with it?

13     A    I agree with it.

14     Q    And one of the articles to which they refer to

15  is the Vorpahl and Coe article?

16     A    Correct.  Yes.  I guess I should look before I

17  say yes.  I assume that's what I did.  Yeah.

18     Q    And page 95 of this article --

19          MR. ERNST:  Did you finish reading that

20  paragraph?

21          MR. MORIARTY:  I'm sorry, he answered the

22  question I asked him.  If you want to ask him about it

23  later, you can.

24          MR. ERNST:  Well, if you only read part of the

25  paragraph.
```

Keith Patrick Gibson                                    June 14, 2011

Page 99

    1            MR. MORIARTY:  I asked him about a sentence.

    2       Q    Let's go to page 95.

    3            MR. ERNST:  But I would just ask him to read

    4    the second sentence.

    5    BY MR. MORIARTY:

    6       Q    You don't have to do that because it's in my

    7    part of the examination.

    8       A    Sure.

    9       Q    When he gets to his part, he can do what he

   10    wants.

   11            MR. ERNST:  Not that he doesn't have to, he can

   12    to make it clear so it's at one location of the

   13    deposition.

   14    BY MR. MORIARTY:

   15       Q    First full sentence, "After death it appears

   16    that cessation of the active modulating accumulation

   17    process takes place, and as a result Digoxin is

   18    redistributed passively from tissues containing Digoxin

   19    in high concentration into areas of lower concentration

   20    such as the blood."

   21            Did I read it correctly?

   22            MR. ERNST:  Objection.

   23            THE WITNESS:  I believe -- I believe you read

   24    it correctly.

   25    BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011117

Keith Patrick Gibson                                    June 14, 2011

Page 100

1      Q     Do you agree with it?

2      A     I do.

3            MR. ERNST:  Objection.

4   BY MR. MORIARTY:

5      Q     Then at the -- towards the bottom, in sort of a

6   conclusion section, they say, "Our findings have several

7   implications for the interpretation of postmortem

8   Digoxin levels in serum as well as various tissue."

9      A     Uh-huh.

10     Q     Number two in that section says, "Antemortem

11  Digoxin intoxication cannot be reliably inferred on the

12  basis of high postmortem levels of the drug alone."

13           MR. ERNST:  Objection.

14  BY MR. MORIARTY:

15     Q     Did I read it correctly?

16     A     Can I have a moment to read it, please.

17           MR. ERNST:  Sure.

18           THE WITNESS:  Is the bullet point 1?  No.

19  BY MR. MORIARTY:

20     Q     Two.

21     A     Two, I'm sorry.  You've read it correctly.

22     Q     Do you agree with it?

23     A     Well, in total, if you are assuming that

24  sentence means it cannot be used for any purpose, then I

25  disagree.

PLAINTIFFS' EXHIBITS 011118

Keith Patrick Gibson                                    June 14, 2011

```
 1      Q     Okay.

 2      A     If you are saying that I can extrapolate

 3 backwards with a certain precision, then I agree.

 4      Q     Okay.  So down further in your report on page

 5 6 --

 6      A     Do you want this back?

 7      Q     -- you say, Digoxin was identified by these

 8 authors as a candidate for PMR?

 9      A     Correct.

10      Q     And you're citing the Yarema and Becker

11 article; correct?

12      A     Correct.

13      Q     Do you have Yarema and Becker in your material?

14      A     I may have, but just the abstract of that.  I

15 don't think I copied the whole.  I have so much stuff

16 here, I didn't put it in order of -- I thought of

17 putting it in order of the cite so I can -- but my time

18 restraints prohibited me from -- I believe I do have the

19 abstract.  I don't know if I have the full article.

20      Q     Okay.  Well, let me read you from the abstract.

21      A     Sure.

22      Q     And ask you whether you agree with this

23 statement.

24            MR. ERNST:  And --

25            MR. MORIARTY:  Unfortunately, I only brought
```

PLAINTIFFS' EXHIBITS 011119

Keith Patrick Gibson                                    June 14, 2011

Page 102

1    one copy of this one.  I thought he'd have it.

2              MR. ERNST:  Well, stand by.

3              MR. MORIARTY:  Okay.

4              MR. ERNST:  Can I review what you're going to

5    ask him, please?

6              MR. MORIARTY:  Well, I'm going to read him a

7    statement and ask him if he agrees with it.  Then you

8    can read the article if you want.

9              THE WITNESS:  Here's the article.

10   BY MR. MORIARTY:

11       Q    Do you have the article?

12       A    I do.

13       Q    Okay.  Could you move it a little closer to

14   Mr. Ernst so he can follow along.

15       A    Sure, be happy to.

16       Q    If he wants to.

17            At the end of the abstract, it says, "Medical

18   toxicologists participating in forensic cases involving

19   drugs likely to undergo PMR must be aware of its

20   potential contribution to the postmortem drug

21   concentration.  Correlation with laboratory data and any

22   available antemortem or perimortem clinical information

23   is necessary to render an appropriate opinion on the

24   cause of death."

25            Did I read that correctly?

PLAINTIFFS' EXHIBITS 011120

 1      A     I believe you did.

 2      Q     Do you agree with that?

 3      A     Absolutely.

 4      Q     Let's go to page 237.

 5            Is Digoxin listed as one of the drugs known to

 6   undergo PMR?

 7      A     In this article?

 8      Q     Yes.

 9            MR. ERNST:  Where are you?

10            MR. MORIARTY:  Page 237, left column.

11            THE WITNESS:  It says, "Examples of drugs known

12   to undergo PMR," and they have tricyclic antidepressants

13   and then the second one is Dig.

14   BY MR. MORIARTY:

15      Q     Okay.  So let's go to page 238.  There's a

16   section called sampling location.  Do you see that?

17      A     I do.

18      Q     It says, "Peripheral blood is less likely to be

19   subject to the postmortem elevations in drug

20   concentrations seen in central blood sources such as the

21   heart."

22      A     Absolutely.

23      Q     Do you agree with that?

24      A     I agree.

25      Q     And it says "less likely."  It doesn't say

PLAINTIFFS' EXHIBITS 011121

Keith Patrick Gibson                                    June 14, 2011

 1    there is no PMR in peripheral specimens, does it?

 2         A    No, you're right.  There is PMR in peripheral

 3    samples.  It depends on concentration in time because

 4    it's a passive event.

 5         Q    So on the second column, where it says time of

 6    sampling, after the cite to article 55, it says, "As

 7    previously discussed, the variation in time from death

 8    to blood sampling may account for the differences

 9    between studies and concentrations of morphine and other

10    drugs."  Right?

11         A    Sure.

12         Q    I'm done asking you about Yarema and Becker.

13         A    Thank you.

14         Q    Page 7 of your report, you refer to Ferner, do

15    you not?

16         A    I do.

17         Q    And when you refer to Ferner, you are referring

18    to this article?

19         A    I don't know if you have it in color, but it's

20    got a blue square at the top, from the British Journal

21    of Pharmacol.

22              MR. MORIARTY:  Exhibit E.

23              (Defendants' Exhibit E was marked for

24              identification.)

25              MR. ERNST:  Thank you.

PLAINTIFFS' EXHIBITS 011122

Keith Patrick Gibson                                    June 14, 2011

 1    BY MR. MORIARTY:

 2        Q     I'm going to ask you about this.

 3              Okay.  Do you have it in front of you?

 4        A     I do.

 5        Q     In the abstract, the second sentence says,

 6    "Postmortem changes render the assumptions of clinical

 7    pharmacology largely invalid, and make the

 8    interpretation of concentrations measured in postmortem

 9    samples difficult or impossible."

10              MR. ERNST:  Objection.

11    BY MR. MORIARTY:

12        Q     Did I read it correctly?

13        A     You read it correctly.

14        Q     Do you agree?

15        A     To an extent.

16        Q     Okay.

17        A     Not totally.

18        Q     What do you disagree with that?

19        A     Well, there are things you can say about

20    postmortem drug level that is high.  For instance, you

21    can say they did take Digoxin.  You can also say he has

22    substantial store of Digoxin.  You can also say there

23    was a concentration gradient enough to make it want to

24    spread in that direction.  Because you're really going

25    from high concentration to low concentrations in a very

PLAINTIFFS' EXHIBITS 011123

Keith Patrick Gibson                                    June 14, 2011

Page 106

1   passive sort of way.

2           Sometimes I think that is even more damaging to

3   say that in a peripheral sample you have a very high Dig

4   concentration, because that means -- not damaging.  It's

5   more probative that what you're looking at is a very

6   high Dig score.  Dig scores correlate somewhat with Dig

7   levels at the time of demise.  So you can't totally

8   discount the Dig level that's postmortem.  But you

9   can't -- I don't know if you can extrapolate backwards.

10  You know, you remember geometry, it takes two points to

11  make a line.  I don't have any way to make a slope.  Can

12  I with any measurable amount of accuracy extrapolate

13  backwards?  Probably not.  But I can make certain

14  statements about the patient's capacity to have Dig

15  aboard that would do this distribution.

16      Q    Okay.  Let's go to page 433.

17      A    433.

18      Q    Of Exhibit E.

19      A    432, 433, got it.

20      Q    Left column.

21      A    Left column.

22      Q    First full paragraph is talking about for most

23  fatalities.

24      A    Yes.

25      Q    "For most fatalities assumptions of steady

PLAINTIFFS' EXHIBITS 011124

Keith Patrick Gibson                                    June 14, 2011

1    state before death are invalid.  So that greater

2    allowance needs to be made for variability within and

3    between subjects."

4           Do you agree with that?

5      A    Partially.

6      Q    Okay.  Further down, it says, "After death, and

7    in the most favorable circumstances, it is possible to

8    take samples of whole blood flowing from femoral veins.

9    This sample is thought to be least susceptible to

10   postmortem change."

11          Do you see that?

12     A    Yes.

13     Q    Do you agree with that?

14     A    The greater the distance from the heart, the

15   less likely it's going to be to exhibit postmortem

16   distribution, yes.

17          Now, your question assumes femoral vein.  I

18   mean, it stems all of the way from the hip on down.  So

19   I mean what part do you draw from?

20          But the distance from the heart, based on this

21   passive redistribution, it's going to be less the

22   farther down.

23     Q    Where was Mr. McCornack's sample drawn from?

24     A    Well, I read the deposition, and it sounded

25   like -- I can't remember right off the top of my head.

PLAINTIFFS' EXHIBITS 011125

Keith Patrick Gibson                                    June 14, 2011

Page 108

```
 1    But I assumed it to be somewhat peripheral.  The exact
 2    location I didn't think was all that important, so I
 3    didn't spend much time thinking about it.
 4         Q    Well, if the farther from the heart the
 5    least -- the less PMR there's going to be, wouldn't it
 6    be important to know which vessel was accessed so you
 7    would know?
 8         A    Well, yes, in some ways you're right.  I should
 9    have probably pursued that.  But he had an extreme -- he
10    had a really high Dig level, which meant there was a
11    good storage of Digoxin on board.
12              And I agreed completely with his statement back
13    here that you can't always assume that they're in steady
14    state.  I think he was in a steady state and that there
15    was a change that was causing his Dig levels to rise.
16         Q    What do you mean, he had a high store of
17    Digoxin or a really high Dig level?
18         A    Well, the 3.2 is a high level.
19         Q    Well, it was 3.6.
20         A    I'm sorry, 3.6 is a high Dig level to have.
21         Q    At your hospital, do you have any knowledge of
22    inpatients who have a 3.6, whether the cardiologist or
23    internist would even order Digibind?
24         A    They would.
25         Q    How do you know that?
```

PLAINTIFFS' EXHIBITS 011126

Keith Patrick Gibson                                    June 14, 2011

1       A    They do.  I've observed it.

2       Q    Just based on the 3.6, or is it based on

3    something else?

4       A    Well, the problem with Dig in a lot of people's

5    minds is, you know, you can't play with numbers.  So

6    it's really a clinical picture.  There are, on record,

7    people that have extremely high Dig levels who don't

8    seem to have any adverse effects, or not a lot of stated

9    toxicity.

10           It in some ways depends on how long they've

11   been on the Dig.  If you've been on the Dig for a long

12   period of time, there's -- there's a greater propensity

13   to lock that drug up into -- into the third compartment,

14   if you will.  That may be a little inaccurate

15   pharmacokinetic reference, if you will.

16           But the heart is going to take up the Dig.  So

17   that level is more probative of what -- if he's a

18   chronic user.  If it's just a suicide attempt, that

19   level is not so indicative of what might be in the

20   heart, because the longer you take the drug, the more

21   absorption, the more reuptake the heart will take, the

22   larger the scores will be.

23      Q    Are you done with your answer?

24      A    Yes.

25      Q    You said something about you just can't play by

PLAINTIFFS' EXHIBITS 011127

Keith Patrick Gibson                                    June 14, 2011

1    the numbers.  I assume by that you mean in trying to

2    figure out whether the patient is toxic, you're trying

3    to look at all data available, optimally an EKG,

4    history, serum level?

5        A    If you have one.

6        Q    BUN, creatine, GFR?

7        A    If you have all that stuff, it's optimal.

8        Q    Yeah, optimally.

9        A    Yeah, optimally.

10       Q    So I think what you're saying is you don't make

11   a diagnosis of toxicity based on a number alone;

12   correct?

13            MR. ERNST:  Objection.

14            THE WITNESS:  In some ways, what you are saying

15   is absolutely true, although a 3.2 would make me --

16            MR. MORIARTY:  3.6.

17            THE WITNESS:  3.6 --

18            Why do I keep saying 3.2?  I'm sorry.  I

19   apologize.

20            -- would make me seriously consider how much

21   Dig storage was on board.

22            MR. MORIARTY:  Okay.

23            MR. ERNST:  We've been going another hour, if

24   we can take a break.

25            MR. MORIARTY:  Let me just finish this article

PLAINTIFFS' EXHIBITS 011128

Keith Patrick Gibson                                    June 14, 2011

Page 111

1   and then we can.

2          MR. ERNST:  That's fine.

3   BY MR. MORIARTY:

4      Q    Let's just go to the conclusion of the Ferner

5   article.

6      A    Sure.

7      Q    Skip all of the stuff in between.  Are you

8   there?

9      A    I am there.

10     Q    It says, "There is no reliable or obvious

11  connection between concentrations measured in life and

12  subsequent to death."

13     A    I see that.

14     Q    "Consequently, concentrations measured after

15  death cannot generally be interpreted to yield

16  concentrations present before death."

17         Do you agree with that?

18         MR. ERNST:  Objection.

19         THE WITNESS:  I do not agree with that.

20  BY MR. MORIARTY:

21     Q    Why?

22     A    Well, because you can't just discount a data

23  point.  He had a level of Dig that was 3.6 at the time

24  of death.  That's a significant number.  You can't just

25  say, well, because you can't reliably extrapolate

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 112

1    backwards, that I have to totally discard my data.  Do

2    you see what I'm saying?  It's not the same sort of

3    analysis.

4            What he's trying to say here is that you can't

5    really extrapolate backwards and determine exactly what

6    the Dig level was at the time of death.  And I agree

7    with that.  There's too many other variables.  You don't

8    know how fast the passive distribution went.  You don't

9    have measures of that sort of thing.  But you do know

10   that this patient took a substantial amount of Dig to

11   even get a PMR of 3.2.

12   BY MR. MORIARTY:

13       Q    3.6?

14       A    Six.

15       Q    Every time you say 3.2, I'm asking the court

16   reporter to put in 3.6.

17       A    Please.  I'm so sorry.

18       Q    I assume you've never independently run

19   experiments on PMR of Digoxin or any other drug?

20       A    You assume correctly.

21       Q    Okay.

22            MR. MORIARTY:  Take that break now.

23                    (Recess.)

24   BY MR. MORIARTY:

25       Q    We are plodding through your report, and we are

Keith Patrick Gibson                                    June 14, 2011

 1    on page 7.

 2        A    Okay.  I'm there.

 3        Q    I want you to go to the second paragraph after

 4    your indented Ferner quote.

 5             It says, "Digoxin may exhibit a passive

 6    redistribution after death."

 7             Do you see that statement?

 8        A    I do.

 9        Q    In paper after paper that you've read, hasn't

10    that been proven to be the case?

11        A    I believe it to be true.

12        Q    And it's the consensus in the scientific

13    community that Digoxin can passively redistribute after

14    death?

15        A    Some redistribution does occur after death.

16        Q    The next sentence says, "It has been suggested

17    that the ideal site," those words being in quote, "to

18    obtain blood is a ligated or clamped femoral vein."

19             Do you see that?

20        A    Yes.

21        Q    And why ligated?

22        A    I think they meant, you know, so it would be

23    separated physically from any blood that may come down

24    from the heart in a passive redistribution way.

25        Q    So, for example, in a femoral vein you would be

Keith Patrick Gibson                                    June 14, 2011

 1    concerned that blood would come down from the heart

 2    through --

 3         A    Other veins.

 4         Q    -- other veins to that site?

 5         A    Yes.

 6         Q    Correct.  So, in an axillary vein, for example,

 7    the concern would be that you would be getting

 8    subclavian or even heart blood; right?

 9              MR. ERNST:  Objection.

10              THE WITNESS:  So I agreed with that rather

11    quickly.  I do want to make the point that it is a

12    matter of distance from the heart to the site which you

13    collect blood.  Even though it could be very proximal to

14    the heart, it might not be -- it may be as close as the

15    crow flies, but close in terms of veins.  So that's a

16    point that needs to be made.  The farther you are away

17    from the heart, the more ideal the site would be.

18    BY MR. MORIARTY:

19         Q    Well, isn't it also a matter of the size of the

20    specimen?

21         A    Well, they tend to test very small portions of

22    the specimen nowadays.  I mean, I don't know what you

23    mean by that.

24         Q    Well, if you draw enough blood from a femoral

25    vein that is nonligated, eventually you're going to get

PLAINTIFFS' EXHIBITS 011132

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 115

 1    blood from somewhere --

 2        A    That's correct.

 3        Q    -- other than a femoral vein; correct?

 4        A    That's absolutely correct.

 5        Q    Again, in the last sentence of the last

 6    paragraph on page 7, you're talking about femoral vein

 7    is less than redistribution into central vessels;

 8    correct?

 9        A    Correct.

10        Q    Less, not none; right?

11        A    Oh, yeah.

12        Q    Now, on this page, you've got cites to two

13    other articles.  Number 43 is the, I call it French

14    paper.  It's Pelissier-Alicot; right?

15        A    Uh-huh.  Yeah, I just threw that in there as

16    another example of redistribution acknowledged in the

17    literature.

18        Q    And that article is what I'm marking as

19    Exhibit F; correct?  You have this in your binder?

20             (Defendants' Exhibit F was marked for

21             identification.)

22             THE WITNESS:  I don't know if I do or not.

23    BY MR. MORIARTY:

24        Q    Well, if you don't, you can use the version --

25        A    Thank you.

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 116

1       Q    -- I have right there.  But it is footnote 43

2    to your --

3       A    Yes.

4       Q    -- report; correct?

5       A    Correct.

6       Q    So the first sentence in the abstract of that

7    article says, "Postmortem drug concentrations do not

8    necessarily reflect concentrations at the time of death

9    as drug levels may vary according to the sampling site

10   and the interval between death and specimen collection."

11           Do you agree with that?

12      A    Yes.

13      Q    And is that the consensus in the scientific

14   community?

15      A    Well, it's a consensus that it's going to flow

16   from high concentration to low concentration, and it's a

17   passive redistribution, which means that it's an osmotic

18   type of effect, that, you know, it's not going to flow

19   in a postmortem way to the femoral veins if that's going

20   up in concentration gradient.  So it has to go down in

21   concentration.

22      Q    But it's also a consensus of the scientific

23   community that sampling site and the interval between

24   death and specimen collection are important?

25           MR. ERNST:  Objection.

PLAINTIFFS' EXHIBITS 011134

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 117

 1    BY MR. MORIARTY:

 2        Q     Right?

 3        A     Yes.

 4        Q     In other words, time matters?

 5        A     Time matters.

 6        Q     In all of the scientific papers that you read

 7    to prepare for your opinion in this case, did you make

 8    note of the longest time period between death and

 9    sampling?

10        A     No.  I didn't think it was all that relevant.

11        Q     How long was it between Mr. McCornack's death

12    and when his blood was sampled?

13        A     Right off the top of my head, I can't remember.

14        Q     Would you agree that it was between 75 and 80

15    hours?

16        A     Something like that.  I don't remember exactly.

17        Q     Does that exceed the longest postmortem draw

18    interval that you've seen in the literature by a

19    magnitude of at least three times?

20        A     I didn't pay attention to that particular

21    aspect, because I didn't think that that sort of

22    extrapolation was the best method to get at this

23    underlying question that I was asked.

24        Q     But if time matters, why didn't you account for

25    time?

PLAINTIFFS' EXHIBITS 011135

Keith Patrick Gibson                                    June 14, 2011

 1     A     Time matters to the level, but that level

 2  doesn't necessarily -- I can't extrapolate from that

 3  level back to the time of his death with any accuracy.

 4  I don't care what time it is.  Thirty hours, 25 hours.

 5  You know, if you did it contemporaneous with death,

 6  maybe.

 7          MR. ERNST:  You're talking about the specific

 8  level?

 9          THE WITNESS:  Right, a specific level.

10  BY MR. MORIARTY:

11     Q     Okay.

12     A     But there are definitely things you can say

13  about the postmortem level.  So I didn't follow through

14  to examine that issue.

15     Q     Let's go to page 541 of this Exhibit F.  On the

16  left side, this section called "Practical Consequences

17  in Forensic Toxicology"?

18     A     Right.

19     Q     Before I ask you about that, you're not a

20  toxicologist; correct?

21     A     I don't know what you mean by "toxicology."

22  Toxicologist.  There is no profession --

23     Q     Do you have a degree in toxicology?

24          MR. ERNST:  You've interrupted him.

25          MR. MORIARTY:  Fine, finish.

PLAINTIFFS' EXHIBITS 011136

Keith Patrick Gibson                                June 14, 2011

 1              MR. ERNST:  Let him finish his answer.
 2     BY MR. MORIARTY:
 3         Q    Go on.
 4         A    I am a pharmacist.  I've had training in
 5     toxicology, yes.  Pharmacology, toxicology is an issue
 6     that we deal with at work, yes.  I mean, you can't do
 7     pharmacology without worrying about toxicology.  It's
 8     not a fine line to separate it.
 9         Q    Do you have a degree in toxicology?
10         A    I have a degree in pharmacy.
11         Q    That's not what I asked.  It's about as simple
12     a question I can ask.
13              MR. ERNST:  Objection.
14     BY MR. MORIARTY:
15         Q    Do you have --
16              MR. ERNST:  Argumentative.
17     BY MR. MORIARTY:
18         Q    -- a degree in toxicology?
19         A    I don't even know what degree that would be.
20     I'm sorry.
21         Q    Okay.
22         A    You could have --
23         Q    Can you have a Ph.D. in toxicology?
24              MR. ERNST:  Objection.  You've interrupted him
25     again.

PLAINTIFFS' EXHIBITS 011137

Keith Patrick Gibson                                June 14, 2011

 1    BY MR. MORIARTY:

 2        Q    Can you have a degree in toxicology?

 3             MR. ERNST:  Objection.  You've interrupted him

 4    again.

 5             MR. MORIARTY:  Why are you interrupting me?

 6             MR. ERNST:  Because you won't let him finish

 7    answering the question.

 8    BY MR. MORIARTY:

 9        Q    Finish answering my question.

10        A    I don't even know where we are.  I'm sorry.

11    What was the question?

12        Q    Can you have a Ph.D. in toxicology?

13        A    You can have a Ph.D., and you can have a Ph.D.

14    in a department that calls itself either pharmacology or

15    toxicology.  They are all very much the same, in that

16    it's the topic matter may change some.  A lot of the

17    departments that deal in toxicology tend to deal with

18    environmental toxins or industrial toxins.  Pharmacology

19    is the study of pharmaceutical toxins, if you will.  Dig

20    is a well-known toxic agent.

21        Q    Do you even bill yourself as a toxicological

22    consultant?

23        A    I never thought that toxicology can be

24    separated from the issue.

25        Q    Okay.  Is there anything in your C.V. about a

PLAINTIFFS' EXHIBITS 011138

Keith Patrick Gibson                                June 14, 2011

1    degree in toxicology, a Ph.D. in toxicology, or a board

2    certification in toxicology?

3         A     Okay, no.

4         Q     So let me ask you about this.  Second sentence

5    in this section.

6              MR. ERNST:  Where are you reading?

7    BY MR. MORIARTY:

8         Q     "Practical consequences in forensic

9    toxicology."

10             MR. ERNST:  This is --

11   BY MR. MORIARTY:

12        Q     In Exhibit F, the French article.

13             "It is very important in postmortem testing to

14   be able to compare concentrations in several blood and

15   tissue samples, even if reference values for drug

16   concentrations in tissues are often missing."

17             Do you agree with that?

18             MR. ERNST:  Objection.

19             THE WITNESS:  If you have the time and the

20   ability, sure, I guess.

21   BY MR. MORIARTY:

22        Q     Is there anything that you can see from

23   Dr. Mason's autopsy process that indicated he had

24   neither the time nor the ability to draw vitreous sample

25   or a second blood sample?

Keith Patrick Gibson                                    June 14, 2011

 1      A     I can't answer that question --

 2            MR. ERNST:  Objection.

 3            THE WITNESS:  -- for you.

 4   BY MR. MORIARTY:

 5      Q     Second paragraph in that section, "As for the

 6   peripheral blood sampling sites, all the authors

 7   recommend collecting blood from the femoral vein.

 8   Femoral blood appears to be the specimen of choice for

 9   postmortem toxicological analysis as it is the least

10   subject PMR, which in this case can only come from the

11   local tissues such as muscles and fat."

12            Do you agree with that?

13            MR. ERNST:  Objection.

14            THE WITNESS:  It's fairly accurate, yeah.

15   BY MR. MORIARTY:

16      Q     Okay.

17      A     It's just a data point, though.  I don't know

18   what you're getting to.  I'm missing the point.  I'm

19   sorry.

20      Q     Mr. Gibson, I'm not here to make points.  I'm

21   here to ask you questions about the points you've made.

22   Okay?

23      A     Okay.

24      Q     Just so we're clear on the process.

25            MR. ERNST:  Objection.  Move to strike.

PLAINTIFFS' EXHIBITS 011140

Keith Patrick Gibson                                    June 14, 2011

Page 123

 1   BY MR. MORIARTY:

 2       Q    Also, on page 7 of your report, your footnote

 3   of the Cook and Braithwaite article.  It's number 45 in

 4   your citations; correct?

 5       A    Uh-huh.

 6            MR. MORIARTY:  I only have one extra of these.

 7   Do you have --

 8            MR. ERNST:  Did you mark this?

 9   BY MR. MORIARTY:

10       Q    Do you have a copy of --

11       A    Can I see?

12       Q    -- of your Cook and Braithwaite from your

13   binder?

14       A    I don't know.

15       Q    So you have your binder copy so Mr. Ernst can

16   look at the --

17            Don, I brought an extra.  Sorry, I didn't think

18   I had it.

19            MR. ERNST:  Thank you.

20   BY MR. MORIARTY:

21       Q    Okay.  I want to ask you some questions about

22   this.

23       A    Okay.

24       Q    Now, by the way, I've been asking you about

25   these articles.

PLAINTIFFS' EXHIBITS 011141

Keith Patrick Gibson                                    June 14, 2011

Page 124

```
1            Now, earlier I asked you sort of a broad

2    question about how many of these you had in your library

3    and had read before this consultation in this case, and

4    I think your answer was none; correct?  Of the articles?

5            MR. ERNST:  Well, I'm going to object.

6            THE WITNESS:  I have these that I have here.

7    BY MR. MORIARTY:

8        Q    Okay.

9        A    I don't understand your question.

10       Q    I guess I'll just have to get specific.

11       A    Ask your question again.

12       Q    The French article, Exhibit F --

13       A    I have it.

14       Q    -- did you have this article and you had read

15   it before you were consulted in this case?

16       A    I don't know if I had that article.  I've read

17   it.

18       Q    Before you were consulted in this case?

19       A    Oh, I'm sorry, before.  No.  I did not have it

20   before.

21       Q    Cook and Braithwaite, had you read this before

22   you were consulted?

23       A    No, I have not.

24       Q    What about Yarema and Becker or Ferner?

25       A    I have not read any of them.  I'm sorry, I
```

Keith Patrick Gibson                                June 14, 2011

                                                        Page 125

1    misunderstood your question.  The preface was before I

2    was asked to consult in this case.  I had not read these

3    articles.

4        Q     So Cook and Braithwaite -- I don't know what I

5    just did with my copy of it.

6        A     There's this copy.

7        Q     Here it is.  Let's go to the conclusion in the

8    abstract.

9        A     Okay.

10       Q     "A large degree of error can arise from

11   attempting to estimate antemortem drug concentrations in

12   the ingested dose from postmortem measurement"?

13            MR. ERNST:  Objection.

14            MR. MORIARTY:  Why do you keep interrupting me?

15       Q     "The chosen site and technique for postmortem

16   blood sampling can greatly influence the concentration

17   of drug measured."

18            Do you agree with that statement?

19            MR. ERNST:  Objection.

20            THE WITNESS:  To a degree, yes.

21   BY MR. MORIARTY:

22       Q     Okay.  Okay.  In the second column, the first

23   full paragraph, it says, "Often pathologists or

24   toxicologists are requested to estimate the amount of

25   drug present at the time of death or the number of

PLAINTIFFS' EXHIBITS 011143

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 126

1    tablets consumed.  This assumes that the drug

2    concentration found at postmortem examination is a

3    reliable estimate of that present at the time of death.

4    There's a lack of evidence such an extrapolation is

5    possible."

6          Do you agree with that statement?

7          MR. ERNST:  Objection.  That doesn't finish the

8    sentence.

9    BY MR. MORIARTY:

10   Q    Do you agree with what I've read so far?

11         MR. ERNST:  Objection.

12         THE WITNESS:  I'm kind of fatigued, but --

13   generally, but not -- if you are implying that you can't

14   get anything out of the level, then I would disagree

15   with it.

16   BY MR. MORIARTY:

17   Q    Okay.

18   A    But his wording is very explicit here,

19   extrapolation.  I don't think you can extrapolate.

20   Q    Okay.

21   A    You can do some extrapolation, though.  I don't

22   think he means that.

23   Q    The remainder of the sentence is, "In only a

24   few cases reported in the literature are antemortem

25   blood concentrations available for comparison with

PLAINTIFFS' EXHIBITS 011144

Keith Patrick Gibson                                    June 14, 2011

Page 127

1    values from a variety of sites at postmortem exam."

2           Do you see that?

3    A    Yes.

4    Q    Now, in this case we do not have an antemortem

5    comparative, do we?

6           MR. ERNST:  Objection.

7           THE WITNESS:  No.

8           MR. MORIARTY:  What could you possibly object

9    to that for?  Unless you have an antemortem blood level

10   that I don't know about.

11          MR. ERNST:  Well, under --

12          THE WITNESS:  The assumption that --

13          MR. MORIARTY:  Go on.  Never mind.

14          MR. ERNST:  No, he gets to answer the question.

15          MR. MORIARTY:  My question wasn't to him.  It

16   was a lawyer by-play.

17          THE WITNESS:  I know.

18   BY MR. MORIARTY:

19   Q    Do you have something to add to your previous

20   answer?

21   A    Yes, your assumption was do we have an

22   immediate antemortem that's contemporaneous with his

23   death, and we don't.

24   Q    We don't have one for ten months, do we?

25   A    For ten months, though.  We do have that one.

PLAINTIFFS' EXHIBITS 011145

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 128

 1              (Defendants' Exhibit G was marked for
 2              identification.)
 3    BY MR. MORIARTY:
 4       Q    Let's go to 284 of Exhibit G.  Are you there?
 5       A    I am.
 6       Q    Last full paragraph in the left column, "It is
 7    often necessary to determine whether the drug
 8    concentration found at postmortem examination should be
 9    attributed to either therapeutic ingestion or overdose.
10    This is very difficult to determine because of the
11    influences of postmortem change."
12              Do you agree with that so far?
13              MR. ERNST:  Objection.
14              THE WITNESS:  It can be.
15    BY MR. MORIARTY:
16       Q    "The use of PM/AM ratios or back extrapolation
17    from a postmortem concentration is not recommended."
18              Do you agree with that?
19       A    If you're asking for precision, that's right.
20       Q    The last full paragraph of this article starts
21    with, "Our study shows that a high degree of error can
22    arise from attempting to predict antemortem
23    concentrations from postmortem concentrations and
24    emphasizes the need for continued research into this
25    area of pathology practice.  The absence of such data,

Keith Patrick Gibson                                    June 14, 2011

```
 1    estimates of circulating drug concentrations during life

 2    should not be made."

 3              Do you agree with that?

 4              MR. ERNST:  Objection.

 5              THE WITNESS:  With precision, that's correct.

 6    BY MR. MORIARTY:

 7         Q    Okay.  In your work on the science part of your

 8    professions --

 9         A    Yes.

10         Q    -- the pharmacy part of your profession, is

11    precision important?

12         A    It is.

13         Q    So, for example, if the question about whether

14    somebody died of a drug overdose or not is an important

15    and serious issue, isn't it?

16         A    It is very.

17         Q    So, for example, in a criminal case -- and you

18    handle criminal cases as a lawyer -- it's very important

19    for your client and possibly your client's liberty

20    whether it was a drug -- the person who died died of a

21    drug overdose that supposedly your client gave them --

22         A    Uh-huh.

23         Q    -- or for just some other reason; right?

24         A    Right.

25              MR. ERNST:  Objection.  Objection.  Move to
```

PLAINTIFFS' EXHIBITS 011147

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 130

 1    strike.

 2    BY MR. MORIARTY:

 3        Q     If you were the lawyer in a case like that

 4    where the question in the trial was whether your client

 5    had committed murder or whether the person had died of a

 6    heart attack, you would want some scientific precision

 7    from the prosecuting experts, wouldn't you?

 8              MR. ERNST:  Objection.  Multiple objections.

 9    Under PTO 22 I can't state.  I'm not supposed to state

10    it, but...

11              THE WITNESS:  You know, if I was a lawyer, yes,

12    I would want to get as precise a picture as possible.

13    BY MR. MORIARTY:

14        Q     If you have been sued in a pharmaceutical case

15    as opposed to a legal malpractice case like you have

16    been recently, you would want the opposing expert to be

17    scientific and precise, wouldn't you?

18              MR. ERNST:  Objection.  Multiple objections.

19              THE WITNESS:  Do you want me to answer that?

20    BY MR. MORIARTY:

21        Q     Yes.

22        A     Okay.  Sure.

23              I have no idea.

24        Q     Let's go to page 8 of your report.

25        A     Okay.

Keith Patrick Gibson                                    June 14, 2011

Page 131

1      Q     You're referring to the Vorpahl and Coe

2   article; correct?

3      A     Somewhere in there I'm sure I did.

4      Q     At the top, first line.

5      A     Okay.

6            (Defendants' Exhibit H was marked for

7            identification.)

8            MR. ERNST:  You marked this as?

9            MR. MORIARTY:  "H."

10     Q     You can either use the version in your binder

11  or you can use what I've just put in front of you as

12  Exhibit H.

13     A     Thank you.

14     Q     What was the longest postmortem interval in the

15  Vorpahl and Coe?

16     A     Do you want me to look it up?

17     Q     Well, I know it was 22-point some odd hours,

18  but if you want to look it up, go ahead.

19     A     Okay.  22-point some odd hours.

20     Q     Okay.  So let's go to the discussion section on

21  page 333.

22     A     Got it.

23     Q     First sentence, "It is clear from this

24  investigation that postmortem Digoxin levels taken from

25  cardiac blood, venous blood or vitreous humor do not

PLAINTIFFS' EXHIBITS 011149

Keith Patrick Gibson                                    June 14, 2011

Page 132

1   mirror the antemortem levels.  Substantial increases in

2   serum levels occur following death irrespective of the

3   source of the sample."

4           First of all, do you agree with Vorpahl and Coe

5   that that's what they found in their investigation?

6           MR. ERNST:  Objection.

7           THE WITNESS:  That's a more complicated

8   question.

9           You did read it correctly, if you want to ask

10  that question.

11  BY MR. MORIARTY:

12      Q    I'm not asking whether you agree with it,

13  because what they are saying here is they are commenting

14  on their own investigation.

15      A    Right, they are.  And they are saying it's

16  clear that postmortem Dig levels taken from cardiac

17  blood, venous blood, vitreous humor do not mirror the

18  antemortem levels.

19          When you say "mirror," I interpret that to mean

20  that there's some linear relationship or correlation

21  that can be ascertained.

22      Q    Or that they are the same?

23      A    Or that they are the same, right.

24      Q    Okay.  Well, do you agree that that's at least

25  what they found?

PLAINTIFFS' EXHIBITS 011150

Keith Patrick Gibson                                    June 14, 2011

Page 133

1       A    That's their conclusion.

2       Q    Okay.  And this paper is cited in many of the

3   other papers that you read; correct?

4       A    Probably every one of them.

5       Q    Well, do you agree with -- do you agree that

6   their finding has been consistently reaffirmed by many

7   other investigators?

8            MR. ERNST:  Objection.

9            THE WITNESS:  I don't think everybody else did

10  a study quite like this one.

11  BY MR. MORIARTY:

12      Q    Okay.

13      A    So I don't know if it's been reaffirmed.  I

14  wouldn't, for instance, if this is a drug study, I

15  wouldn't say it was adequate enough or complete enough

16  or had enough subject matters or have enough controls.

17  It was not really meant to be any of those things,

18  though.  You're making it out to be what it isn't.

19      Q    Well, you cited it in your report, so that's

20  why I'm asking you about it.

21           Do you agree that substantial increases in

22  serum levels occur following death ir- -- I'm sorry, let

23  me rephrase that.  It's badly phrased.

24           The second sentence of their discussion

25  sentence says, "Substantial increases in serum levels

PLAINTIFFS' EXHIBITS 011151

Keith Patrick Gibson                                June 14, 2011

                                                        Page 134

1    occur following death irrespective of the source of the

2    sample."

3           Do you agree that that has been consistently

4    found --

5           MR. ERNST:  Objection.

6    BY MR. MORIARTY:

7      Q    -- in these other peer-review scientific papers

8    that I've been asking you about?

9           MR. ERNST:  I apologize.  I thought you were

10   finished.

11          Objection.

12          THE WITNESS:  I am not really sure what they

13   mean by that.  I think they are just -- I kind of get

14   the gist of what they are trying to say.  I don't know

15   if it's as tight of a relationship as you want it to be.

16   I don't know who's the proponent of the idea

17   extrapolating this Dig level back.  I'm certainly not.

18   I was just trying to show that there's a general concept

19   here in which we can rely upon, which is postmortem

20   redistribution, and that's all I was trying to

21   demonstrate.  I wasn't trying to create any

22   extrapolation backwards to an exact number.

23     Q    Okay.  Let me -- are you done with your answer?

24     A    Yes, please.

25     Q    I thought I asked you this question before.

PLAINTIFFS' EXHIBITS 011152

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 135

1    Maybe I didn't.

2         A    I've been trying to answer your questions very

3    specifically --

4         Q    I'm asking you --

5         A    -- without elaborating, so...

6         Q    I think I asked you this question that I'm

7    about to ask you, before, maybe I didn't, so let me ask

8    you this now.  Okay?

9              I want you to assume that hypothetically, at

10   the campground, for some reason, somebody had been able

11   to draw a serum Digoxin level on Dan McCornack at

12   midnight.

13        A    At midnight.

14        Q    Okay?  Fifteen minutes before he arrested.

15        A    Correct.

16        Q    All right?  Do you have an opinion to a

17   reasonable degree of probability, scientific

18   probability, as to what his serum Digoxin concentration

19   would have been?

20             MR. ERNST:  Objection.  Multiple objections.

21             THE WITNESS:  With what kind of precision?

22   BY MR. MORIARTY:

23        Q    Reasonable degree of scientific certainty?

24             MR. ERNST:  Same objection.

25             THE WITNESS:  If you are saying it's more

PLAINTIFFS' EXHIBITS 011153

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 136

1    probable than not that he had a toxic level at the time

2    of his demise, I would probably say yes.

3    BY MR. MORIARTY:

4        Q    Do you have an opinion to a reasonable degree

5    of probability as to a number for his serum Digoxin

6    concentration?

7        A    I'm not too sure that a number is all that

8    important.  It doesn't make any sense to me.  Toxic

9    effects occur on a broad range.  They are not all that

10   number driven.  The human body is not a mechanical

11   machine, per se.  It's got a lot of different variables.

12           I believe Mr. McCornack had elevated Dig level

13   irrespective of whatever might have happened with the

14   Dig attack.  And I think the reason for that is because

15   of previous blood levels, his Diltiazem and some other

16   issues that I believe put him in a situation where he

17   was maintaining it probably the highest level of Dig

18   that he could maintain.  And something that particular

19   night pushed him over into a Dig level that caused him

20   to have these arrhythmias.

21       Q    Let me ask this --

22           MR. ERNST:  He's not finished yet.

23           MR. MORIARTY:  Yes, he is.

24           THE WITNESS:  Yeah, I was.

25           MR. ERNST:  Okay.  Thank you.

PLAINTIFFS' EXHIBITS 011154

Keith Patrick Gibson                                    June 14, 2011

Page 137

```
 1   BY MR. MORIARTY:

 2       Q    Let me ask this a different way.  Do you have

 3   an opinion to a reasonable degree of scientific

 4   probability as to whether Dan McCornack's serum Digoxin

 5   level, if drawn 15 minutes before he arrested, was

 6   greater than two nanograms per milliliter?

 7            MR. ERNST:  I'm going to object.  Multiple

 8   objections.  You are not using a right standard.

 9            THE WITNESS:  If numbers really matter to you,

10   yes, I would think so.  I do think there's -- there was

11   some, and the reason I have that opinion is because his

12   earlier level was --

13            THE REPORTER:  I'm sorry?

14            THE WITNESS:  -- a trough.

15        (Interruption by the reporter)

16            THE WITNESS:  Substitute that for nadir.  I

17   don't know why I like that word.  It was a trough.  It

18   wasn't a peak.

19            I think that he was surviving on a maximum dose

20   of Diltiazem which probably raised his Dig level some,

21   and I think that at the time of his death something was

22   different that was unusual from the previous year.

23   Forty-five-year-old men don't change in health that

24   much, like other age groups are accelerating, like the

25   elderly or geriatric population.  So something was
```

PLAINTIFFS' EXHIBITS 011155

Keith Patrick Gibson                                    June 14, 2011

1    different that particular night that caused this

2    particular situation.

3            And as evidence of that, I have a postmortem

4    Dig level that's extremely high.  And I think I am using

5    the postmortem Dig level to say that I believe that his

6    Dig level at the time of his demise was in excess of

7    what was toxic for Mr. McCornack.

8    BY MR. MORIARTY:

9        Q    What was toxic for Mr. McCornack?

10       A    Well, see, this is the whole point of my ten --

11   what is it?  My little graph of the different

12   probabilities, arrhythmias.  It's a sliding scale.  It

13   goes from 1.7 to 3.3 from 10 percent to 90 percent.  So

14   there's a sliding scale of probability of arrhythmias

15   that may occur with a rising blood -- Dig level.  Serum

16   Dig level.  So can you tell exactly what Dig level

17   causes toxicity?

18           I mean, people come in the hospital all of the

19   time asymptomatic on 2.4 or 2.6, 2.8.  Others come in

20   terribly toxic at any level over 2.  There's a lot of

21   people in the literature, even advocating trying to

22   maintain levels less than 1.5 to try to abate this

23   situation.  That's where the postmortem Dig level comes

24   into play.  Because it's something he gives a data point

25   to tell us that this gentleman was not necessarily in

PLAINTIFFS' EXHIBITS 011156

Keith Patrick Gibson                                    June 14, 2011

1    the low therapeutic range, otherwise this redistribution

2    wouldn't have occurred quite so greatly.

3            In fact, you're talking about going down a

4    concentration gradient.  So he had to have substantial

5    Dig stored in order to cause this distribution.

6            And you know, passive -- passive is not like

7    active.  A dead person doesn't have any blood flowing

8    around.  I don't know if you've ever done this

9    experiment where you put a little piece of colored solid

10   in liquid and wait how long it's going to passively

11   distribute.  These are long-term events.  They are

12   not -- it always goes up -- down gradient or up

13   gradient.

14           THE REPORTER:  "Down gradient"?

15           THE WITNESS:  The passive distribution always

16   goes down the gradient.

17   BY MR. MORIARTY:

18      Q    Let me ask you a couple questions here.

19           Do you know whether patients can be Dig toxic

20   at levels less than two?

21      A    Yes.

22      Q    Okay.

23      A    I mean --

24      Q    They can; right?

25      A    They can.

Keith Patrick Gibson                                    June 14, 2011

Page 140

 1      Q     All right.  And there's an overlap, patients
 2   can be toxic at less than therapeutic or the high range
 3   of the therapeutic and they can be toxic outside the
 4   therapeutic range; right?
 5      A     Absolutely.
 6      Q     And there are patients who can be outside the
 7   therapeutic range and not toxic; right?
 8      A     That's absolutely true.
 9      Q     So the therapeutic range in the living in most
10   labs is .8 to 2.0 nanograms per milliliter; is that
11   right?
12      A     Well, now, that's a little bit --
13      Q     Let's make this simple.
14            Can you show me any medical record in this case
15   for a serum Dig level where the lab did not use .8 to
16   2.0 nanograms per milliliter as the therapeutic range in
17   its lab.
18            MR. ERNST:  Which lab are you talking about?
19   Objection.
20            MR. MORIARTY:  Any lab in his box.
21            MR. ERNST:  Objection.
22            THE WITNESS:  I don't know.  Most
23   recommendations are for congestive heart failure to be
24   from 0.8 to 1.5.
25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011158

Keith Patrick Gibson                                    June 14, 2011

Page 141

1        Q     He didn't have CH.  He had A-fib.

2        A     That's absolutely correct.  And for -- to

3   control an atrial fibrillation, there's some debate as

4   to what particular levels you should maintain.  These

5   doctors have been driven by the idea that a high Dig

6   level was the most appropriate way to treat this

7   patient.

8        Q     Perhaps you misunderstand my question.

9        A     Maybe I did.

10       Q     I'm not talking about the therapeutic goal that

11  the doctors had.  The lab slips, when the blood is

12  drawn, all have a therapeutic range on them against

13  which the patient's level is measured.  Okay?

14       A     Okay.

15       Q     Do you know that?

16       A     I know that.

17       Q     And in every lab in this case, it's .8 to 2.0

18  nanograms per milliliter; correct?

19             MR. ERNST:  Objection.

20             THE WITNESS:  I think the -- I think you're

21  misinterpreting that, but, okay.  I mean, they generally

22  describe toxic events to occur at 2.0 or greater.

23  Sometimes some labs even report 2.5 or greater.

24  BY MR. MORIARTY:

25       Q     Mr. Gibson, you are reading way more into my

PLAINTIFFS' EXHIBITS 011159

Keith Patrick Gibson                                June 14, 2011

Page 142

1    question.  Don't interpret my question.  In a lab

2    slip --

3              MR. ERNST:  I --

4    BY MR. MORIARTY:

5        Q    In a lab slip, whether it's a BUN, a

6    creatinine, a red blood cell count or a Dig level,

7    there's a therapeutic range on the slip; correct?

8        A    Correct.

9        Q    And then the patient's result is compared with

10   that lab's therapeutic range of those various measures;

11   correct?

12       A    Right.  And I see --

13       Q    In this case, have you seen any lab slips for

14   serum Digoxin concentrations on which the therapeutic

15   range on the lab slip is something other than .8 to 2

16   nanograms per milliliter?

17       A    Okay.  You are just talking about the one lab

18   that we have in this case done by NMS labs.  Is that

19   what you're talking about?

20       Q    Well, what about the one that you have in your

21   own report?

22       A    Well, not all labs report 0.8 to 2.0.  Some --

23       Q    I'm asking about the ones in this case.

24            MR. ERNST:  We're --

25            THE WITNESS:  I'm sorry.

PLAINTIFFS' EXHIBITS 011160

Keith Patrick Gibson                                    June 14, 2011

Page 143

1          MR. ERNST:  Objection.  You're being

2     argumentative.

3     BY MR. MORIARTY:

4          Q    I've asked the same question ten times.  I'm

5     asking about the labs in this case.  I don't want to

6     debate with you about the thousands I've read in the

7     Digitek litigation or Alabama or Alaska or what they do

8     in any other hospital.  I'm talking about in this case.

9          A    Okay.  So the lab that I reviewed in Dr. -- the

10    doctor's medical records, is that where I got the 1.6?

11    Is that the lab you're talking about?

12         Q    I would assume so.

13         A    Okay.  I don't remember what that lab slip

14    said.

15         Q    Did you only see one?

16         A    No, I saw about three.  That was the last one.

17         Q    You don't remember what the therapeutic range

18    was?

19         A    No, I really don't.

20         MR. ERNST:  I --

21    BY MR. MORIARTY:

22         Q    Let's just -- let's assume that the therapeutic

23    range on the lab slip is .8 to 2.

24         A    Okay.

25         Q    3.6 isn't even double; correct?

PLAINTIFFS' EXHIBITS 011161

Keith Patrick Gibson                                    June 14, 2011

Page 144

 1          MR. ERNST:  Objection.

 2          THE WITNESS:  No, it's not double.

 3    BY MR. MORIARTY:

 4      Q    In all of the literature you reviewed to

 5    prepare for your opinions in this case, what were the

 6    magnitudes of increase following death of the Dig

 7    levels?

 8          MR. ERNST:  Objection.

 9    BY MR. MORIARTY:

10      Q    What was the highest?

11      A    You know, there was a report of a child that

12    did not die that had a very high level.  Could you give

13    me a second?

14      Q    Well, if they didn't die, that's not an issue.

15    I'm talking about postmortem redistribution.

16          MR. ERNST:  You are arguing.  I think we should

17    take a break.

18          MR. MORIARTY:  I'm not arguing.

19          MR. ERNST:  I'm going to place this on the

20    record.  You're becoming argumentative.  I think I'd

21    like to take a break for five to ten minutes.

22          MR. MORIARTY:  We can take a break, but, Don,

23    he's not listening to my questions.

24          MR. ERNST:  Like I say --

25          THE REPORTER:  On the record?

PLAINTIFFS' EXHIBITS 011162

Keith Patrick Gibson                                    June 14, 2011

 1          MR. MORIARTY:  Yes.

 2          MR. ERNST:  We're arguing.

 3          You may not like his answers and you interrupt

 4   him when he's answering.  So let's cool down.  Let's

 5   have a five-minute to ten-minute break.  Let's see if

 6   some food is here.  It's 12:09.  We've been going for

 7   three hours.  Let's see if we can get some food and cool

 8   down just a little bit.

 9          MR. MORIARTY:  That's fine, but he's not

10   listening to my question.

11          MR. ERNST:  You know what, that's an argument.

12          MR. MORIARTY:  Fine.

13          MR. ERNST:  You're arguing again.

14                 (Recess.)

15   BY MR. MORIARTY:

16     Q    Let's assume that we had data available,

17   whether it was part of a study or in a case like this --

18     A    Sure.

19     Q    -- where a predeath level had been drawn and we

20   knew it was 1.5, and a postmortem level had been drawn,

21   and we know that it was three.  Okay?

22     A    Okay.

23     Q    So the order of magnitude of the redistribution

24   would be a simple --

25     A    Two.

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 146

 1      Q     -- doubling; correct?

 2      A     Sure.

 3            MR. ERNST:  Are you going to add times to that

 4   or just --

 5            MR. MORIARTY:  I'm trying to keep it simple.

 6   Thanks for your help.

 7      Q     Okay.  Now, in the material that you reviewed

 8   to formulate opinions in this case, did you see comments

 9   by the authors based on their data what sort of orders

10   of magnitude there were in the postmortem results?

11            MR. ERNST:  I'm going to object.

12            THE WITNESS:  Well, I think I kind of tried to

13   answer that with my little graph that I have on page 8

14   showing the orders of magnitude.  I mean farther away

15   you are from the central depository which would be

16   myocardium, given the length of time between the

17   distance to, you know, that drug level has a higher

18   multiplier.

19      Q     Okay.

20      A     Well, so if you had a femoral artery, a femoral

21   stick that was a three, you know, the farther away it is

22   from that repository, you're going to have a bigger --

23   and it's high, it's going to be a bigger.  So how could

24   I phrase this?  I'm trying to make it exactly correct.

25   These Vorpahl and et al., did -- they put their

PLAINTIFFS' EXHIBITS 011164

Keith Patrick Gibson                           June 14, 2011

Page 147

1   multipliers for femoral vein at 1.42.  So they were

2   saying in about one and a half times the femoral would

3   be the expected serum blood level at the time of death.

4   But you know, there's a lot of variability in that.

5        Q    Sure.  And the maximum draw time there was 22.4

6   hours; right?

7        A    Correct.

8        Q    So but, for example, from --

9        A    Can I just ask a question about the assumption

10  of that question?  The assumption in that question is

11  the length of time has a greater -- greater effect?

12  Because you can only go towards the concentration

13  gradient.  At some point, let's say you took a blood

14  level two years -- well, an infinite amount of time, it

15  would all be the same all over the body, theoretically;

16  correct?  Sort of?

17       Q    I'm not sure who's deposing who now.

18       A    Okay.

19       Q    So I'll ask the question.

20       A    Okay.  Go ahead.

21       Q    Nowhere in any scientific literature that

22  you've ever seen is there a statement about when it

23  reaches equillibrium in postmortem redistribution?

24       A    Well, that's true.

25       Q    Okay.

PLAINTIFFS' EXHIBITS 011165

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 148

 1        So --

 2        MR. ERNST:  He wasn't finished answering your

 3   question.  You said okay.

 4        THE WITNESS:  It's true, because I didn't see

 5   anybody even ask the question.

 6   BY MR. MORIARTY:

 7    Q    Okay.  In order to study that you would have to

 8   have an antemortem level and then a sequential number of

 9   postmortem levels drawn over who knows what amount of

10   time until that equilibrium is reached?

11    A    That's correct.

12    Q    And nobody has ever done that?

13    A    Nobody has ever done that.

14    Q    But in the literature I've read to you, time

15   matters so that a draw at one hour is going to be

16   different than a draw at ten hours?

17    A    Correct.

18    Q    So I want to get back to quantification.  In

19   the Cook and Braithwaite article that we marked earlier

20   in here --

21        MR. ERNST:  Exhibit Number?

22        MR. MORIARTY:  Don't know.

23        THE WITNESS:  Hold on a second.

24        MR. MORIARTY:  It's sitting right there.

25        THE WITNESS:  "G."

PLAINTIFFS' EXHIBITS 011166

Keith Patrick Gibson                                        June 14, 2011

Page 149

```
 1   BY MR. MORIARTY:

 2       Q    Page 284, first paragraph about halfway down,

 3   it says, "In several cases, the difference between the

 4   two concentrations was immense."

 5            Do you see that?

 6       A    Uh-huh.

 7       Q    It's not very mathematically precise?

 8       A    No.

 9       Q    So in the Vorpahl article, it says that

10   "Substantial increases in the serum levels occur

11   following death."

12            Did you see that?  That's at page 333 of the

13   Vorpahl article.

14       A    333.

15       Q    Second sentence.

16       A    At the top?  Substantially increases.  Sure.

17       Q    And then did you find in your research that

18   generally people believe that the heart tissue to heart

19   blood ratio in the liver is 30 to 1?

20            MR. ERNST:  Objection.

21   BY MR. MORIARTY:

22       Q    I'm sorry?

23       A    It's some number like that.  Thirty to 40 is

24   what I recollect.

25       Q    And does that give some frame of reference
```

PLAINTIFFS' EXHIBITS 011167

Keith Patrick Gibson                                    June 14, 2011

1    mathematically to the potential of redistribution?

2        A    Yes, because that essential repository in which

3    this passive redistribution will occur.

4        Q    So do you -- have you done any calculations or

5    do you have an opinion to a reasonable scientific

6    probability about what the tissue concentrations for

7    Dan McCornack would be given the fact that he was taking

8    .5 milligrams of Digoxin per day?

9            MR. ERNST:  Objection.

10           THE WITNESS:  So .5 is a pretty substantial

11   dose.  Yeah.  It's not the normal 1.25 or .25 daily that

12   we see so commonly.  So I would anticipate that his

13   myocardium would contain a substantial amount of

14   Digoxin, yes.  If that's your question.  I can't

15   mathematically go anywhere with that.

16   BY MR. MORIARTY:

17       Q    You can't quantify it?

18       A    No.

19       Q    But substantial?

20       A    Yes.

21       Q    And I don't want to get too far off on the

22   clinical cardiology path, but would you assume that he

23   was given those doses because that's what doctors Lemm

24   and Von Dollen believed was necessary for his control of

25   his atrial fibrillation?

PLAINTIFFS' EXHIBITS 011168

Keith Patrick Gibson                                    June 14, 2011

Page 151

1       A     Yes.  I mean, I looked at that issue, and I

2    think it kind of came up earlier about blood levels.

3    There is some literature indicating that the high

4    normal, the 1.5 to 2.0 is the range you want to put a

5    person in who has this disease state.  And these doctors

6    were very aggressive.  I mean, even in their Diltiazem

7    choice they pushed it to the max.

8       Q     Are you familiar with any literature in which

9    the magnitude of postmortem redistribution was up to ten

10   or more times the antemortem level?

11             MR. ERNST:  Objection.

12             THE WITNESS:  I didn't see that, no.

13   BY MR. MORIARTY:

14      Q     Do you have a second article by Dr. Koren here,

15   not the rat article, but another one?

16      A     I do not.  Is there one?

17      Q     Yes.  I thought I understood this, maybe not,

18   go back to page 2 of your report.

19      A     There.

20      Q     You've said a couple times, I believe, that

21   this Digoxin level of 1.6 you believed was a trough

22   level?

23      A     I believe it is, yes.

24      Q     What's the basis for that statement?

25      A     The timing of the day, and the -- the time of

Keith Patrick Gibson                                    June 14, 2011

Page 152

```
 1    the day.  I don't think he -- I don't think it's -- even
 2    if he took his dose at 8 o'clock, this would still be
 3    close to trough level.  I mean, the peak -- the peak
 4    occurs at, what, two to four hours or four to six hours.
 5    I forget what I --
 6         Q    Well --
 7         A    There's a lot of dispute as to that, but it
 8    seems to me --
 9         Q    If -- are you done?
10         A    No, go ahead, please.
11         Q    If you assume, according to Kathy McCornack's
12    testimony, that Dan faithfully took his Digitek after
13    breakfast every morning, and you assume he had breakfast
14    that morning, he would have taken his Digitek within a
15    couple hours of this draw; correct?
16         A    Yes.
17         Q    In which case at least some of it would be
18    metabolized and it would not be a trough level?
19         A    Correct.  But a lot of times these samples,
20    these kind of blood draws -- um, first of all, I think
21    if he was asked to go do this he was probably asked not
22    to take his dose that day, but it's -- I'm not sure
23    about that.  A lot of these kind of lab tests are done
24    fasting.  And there are other levels that the doctors
25    were looking at, like triglycerides that you need to
```

PLAINTIFFS' EXHIBITS 011170

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 153

1    take fasting.  And so I would suspect, in fact, I think
2    he was fasting at the time he took this, and that's the
3    assumption I made.
4         Q     But that's an assumption you made; correct?
5         A     Well, and I wasn't there, so I really don't
6    know if he took the tablets.
7         Q     Okay.  That's fine.
8               Let's go to page 9 of your report.  What you've
9    done here, is at the end of page 8 you are talking about
10   that he wasn't on -- you're going through the Goodman
11   and Gilman factors and trying to eliminate things;
12   right?
13        A     Correct.
14        Q     Is there anywhere on page 8 or 9 of your report
15   where you account for the possibility of an arrhythmia
16   from his underlying disease?
17        A     It's in my report, no.
18        Q     Okay.  So you say here the last factors to
19   consider are an incorrect administration of the evening
20   dose or abnormality in the tablet ingested; right?
21        A     Correct.
22        Q     So have you formulated an opinion to a
23   reasonable probability as to what the dose of Dan's
24   tablet was the evening of the 22nd of March?
25        A     Well, I assumed that he took one tablet.  And I

PLAINTIFFS' EXHIBITS 011171

Keith Patrick Gibson                              June 14, 2011

                                                    Page 154

1    make that assumption because he used a tablet dispenser.

2    He filled that tablet dispenser when he was sober.  He

3    was on a trip.  That was the only supply of drugs.  I

4    didn't think he would take more than one.  So that led

5    me to believe that his dose that evening would be the

6    one tablet of 0.25.

7         Q    Well, his prescription was for .250, twice a

8    day.  Okay?

9         A    .25.

10        Q    Yes.

11        A    Yeah.

12        Q    So what I'm asking you is, do you have an

13   opinion to a scientific probability what the dose of his

14   medication was that he took the evening of the 22nd?

15             MR. ERNST:  Objection.

16   BY MR. MORIARTY:

17        Q    Was it what he was prescribed or was it higher

18   or was it lower?

19        A    I think he took what he was prescribed.

20        Q    Okay.  So .250?

21             MR. ERNST:  Well, I'm going to object.  I think

22   it's --

23   BY MR. MORIARTY:

24        Q    Do you have an opinion to a reasonable

25   scientific certainty as to the dose of the tablet he

PLAINTIFFS' EXHIBITS 011172

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 155

 1   took on the morning of the 22nd?

 2       A    I think he took a .25.

 3       Q    Do you have an opinion to a reasonable degree

 4   of scientific probability as to the dose of any tablets

 5   he took on the 21st?

 6       A    You mean like a --

 7            MR. ERNST:  I'm going to object.

 8   BY MR. MORIARTY:

 9       Q    The day before he died?

10            MR. ERNST:  Are you talking about a different

11   tablet?  I'm not clear what you're asking.

12            THE WITNESS:  Yeah, I'm not clear either.  Let

13   me answer this way.

14   BY MR. MORIARTY:

15       Q    I thought my question was crystal clear.

16       A    It's not.

17            I believe he took his prescribed medication as

18   directed, and he took one tablet in the morning and one

19   tablet in the evening as dispensed by the pharmacy.

20       Q    That wasn't my question.

21       A    Dang it.

22       Q    My question was, what's the dose?  Dose.

23   What's the dose?  We know what he was prescribed.

24            MR. ERNST:  Well --

25   BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 011173

Keith Patrick Gibson                                    June 14, 2011

Page 156

1     Q     And we know what he took.  You're assuming he

2   took one?

3     A     Right.

4     Q     Okay.

5     A     And the dose would be 0.25 if that's one.

6     Q     Thank you.  That was my opinion, okay.

7     A     Okay.

8     Q     Or my question.

9           Do you have an opinion as to the dose of the

10  tablets he took on the 21st, which is the full 24-hour

11  period the day before he died?

12    A     I believe he took the exact same.

13    Q     So it's your opinion, according to what you

14  have at the bottom in your bullet points, that

15  Mr. McCornack became toxic on Digoxin taken as

16  prescribed as to timing and dose; correct?

17    A     Yes.

18    Q     And then he got essentially .5 on the 21st, and

19  .5 on the 22nd, and he became Dig toxic on those doses;

20  correct?

21          MR. ERNST:  Objection.  Objection.  That was

22  the prescribed dose.

23  BY MR. MORIARTY:

24    Q     Well, go on.

25    A     Well, I mean, I know you are trying to corral

PLAINTIFFS' EXHIBITS 011174

Keith Patrick Gibson                                    June 14, 2011

Page 157

1   me into a little corner here, and I don't know where the
2   corner is so it's hard for me to answer.
3          Did he take a tablet labeled 2.5?  Yes.  He
4   took them twice a day religiously, consistently.  That
5   was probably -- there might have been an earlier time
6   where there was some issue that I read about.  But I
7   believe he took these tablets in the morning and evening
8   that were put into his pill dispenser and they were
9   labeled 0.25.
10      Q    Well, Mr. Gibson, I never asked you if any of
11  the last five minutes of my questions about this very
12  topic about labeled or unlabeled.  I asked you what the
13  dose was, whether you had an opinion to a probability
14  what the dose was --
15      A    Okay.
16      Q    -- and you've said .25, .25, .25?
17      A    Correct.
18      Q    Four doses over two days?
19      A    Correct.
20      Q    So if I were to walk out of here right now,
21  your opinion is that he got those doses, not that his
22  tablets were defective and he got some other doses?
23         Now are you going to tell me that you
24  misunderstood my question and you believe he got some
25  other dose than what you just testified to?

PLAINTIFFS' EXHIBITS 011175

Keith Patrick Gibson                                    June 14, 2011

```
 1      A    Your definition of dose is probably different
 2  than mine.
 3      Q    Oh.  It's a Clinton thing?
 4      A    No.
 5      Q    Go on.
 6           MR. ERNST:  No.
 7           MR. MORIARTY:  I'm going to be clear with my
 8  question.
 9           MR. ERNST:  Let him answer his question.
10  BY MR. MORIARTY:
11      Q    I'm going to be clear with my question.
12           I don't want to know what you think the labeled
13  dose was.  I want to know if you have an opinion to a
14  reasonable scientific probability what the dose of his
15  Digitek was that he took the evening of the 22nd, the
16  morning of the 22nd, and the two doses on the 21st, the
17  actual dose ingested.  Okay?  Which is what I've already
18  asked you.
19      A    Now, I know you get real mad at this, but the
20  term dose means what you pass through your mouth.  Not
21  what you absorb.  I think what you're really asking is,
22  was there a change in the bioavailability of that
23  particular dose.
24      Q    That's not what I'm asking you.  Okay?
25      A    If you're asking me what the dose was --
```

Keith Patrick Gibson                                    June 14, 2011

Page 159

1          MR. ERNST:  You've interrupted his answer
2     again.
3          MR. MORIARTY:  He's telling me --
4          THE WITNESS:  If you mean, did he take -- if he
5     took those tablets exactly as prescribed, then I would
6     say that's what I believe to be true.
7     BY MR. MORIARTY:
8          Q    Okay.  I'm not asking you about the
9     bioavailability of the tablets.  Okay?  I'm asking you
10    about the dose of Digoxin.
11         A    Correct.
12         Q    The active pharmaceutical ingredient in those
13    four tablets.
14         A    Dose means what passes the lips and goes down.
15         Q    Yes.
16         A    Yes.
17         MR. ERNST:  I think it is still unclear on the
18    record.  You guys are ships --
19         MS. AHERN:  Can you ask him one more time now
20    that we've cleared it up?
21         MR. MORIARTY:  I think --
22         THE WITNESS:  I think I've answered it three
23    times.
24         MR. ERNST:  He's thinking one thing --
25         MR. MORIARTY:  No, we are thinking the same

PLAINTIFFS' EXHIBITS 011177

Keith Patrick Gibson                                    June 14, 2011

Page 160

 1    thing.

 2            MR. ERNST:  I disagree.

 3    BY MR. MORIARTY:

 4        Q    Here's my next question.  Is it your opinion

 5    that the bioavailability of the .250 Digitek that he

 6    ingested over the course of those two days was different

 7    from its FDA-approved formulation?

 8        A    I believe it could -- yes.

 9        Q    I want to know everything that is the basis of

10    your opinion to a reasonable degree of scientific

11    probability that that is the case.

12        A    Okay.  Mr. McCornack had been on this drug

13    regimen for a long period of time.  Over a year.  He had

14    a very substantial dose of Digoxin.  This is not a

15    person taking a minor dose.  He's taking a substantial

16    dose of Digoxin.

17            He's also taking Diltiazem, which may have

18    raised his Dig levels a little bit.  But if the

19    Diltiazem would have caused Digoxin toxicity, it would

20    have occurred at some point five to seven times the

21    steady state, somewhere around there, at that point.  He

22    had been living with a consistent Dig level based on

23    this drug regimen that somehow got changed on the day of

24    his death.  And one of the possibilities is that the

25    formulation was in error.  If there's an error in the

PLAINTIFFS' EXHIBITS 011178

Keith Patrick Gibson                                    June 14, 2011

Page 161

1    formulation, the bioavailability goes up, if he was

2    absorbing 60 percent.  Most bioavailability described

3    for Digoxin is somewhere between 60 and 40 percent --

4    sixty and 80 percent, I'm sorry.  Sixty and 80 percent.

5    I'm terrible at numbers today.  Sixty and 80 percent.

6    If these tablets were made in a way that would have

7    resulted in 100-percent absorption, that would have

8    changed his Dig levels.

9            I think Mr. McCornack was right on the verge of

10   having a toxic level of Digoxin except for, I think this

11   is consistent with his history, that he was -- he was on

12   this dose, it was very high, the doctors intended it to

13   be high to treat the arrhythmias.  And something

14   occurred in that particular night that made it go into a

15   level that made him toxic.

16           One of the answers to that question is that the

17   tablets had a formulation that changed the

18   bioavailability.

19      Q    Are you done with your answer?

20      A    I am.

21      Q    So that's a possibility?

22      A    Probability.

23      Q    Okay.  So have you seen any dissolution testing

24   to indicate that there was a problem with the

25   bioavailability of Digitek?

PLAINTIFFS' EXHIBITS 011179

Keith Patrick Gibson                                    June 14, 2011

Page 162

```
 1      A     Dissolution tests are not the same as

 2   bioavailability tests.

 3      Q     I'm asking -- let me ask it a different way.

 4            Have you seen any indications that dissolution

 5   testing for Digitek was outside of its specifications?

 6      A     No, I have not.

 7      Q     Have you seen any testing results to indicate

 8   that assay for Digitek was outside of its

 9   specifications?

10      A     No, I haven't.

11      Q     Have you seen any --

12      A     I might be wrong in a minute.

13      Q     -- test results to indicate the content

14   conformity tests for Digitek were outside of its

15   specifications?

16      A     Yes.  It looks like there was some issues as to

17   formulation.

18      Q     I'm asking content uniformity testing.  A very

19   specific time of testing.

20      A     When I prepared this result, I -- this report,

21   I'm sorry.  I didn't think that was my job to try to

22   determine whether or not.  He has an expert for that.

23      Q     Then let me get to that.

24            Are you relying, for your opinion about

25   bioavailability, on David Bliesner's report?
```

PLAINTIFFS' EXHIBITS 011180

Keith Patrick Gibson                                    June 14, 2011

Page 163

1          MR. ERNST:  Objection.  Did you include the
2     exhibits in his deposition?
3          MR. MORIARTY:  He hasn't read Bliesner's
4     deposition.
5     Q    Are you -- that's what he testified to a couple
6     hours ago.
7          Are you relying, for your opinion on this
8     bioavailability issue, on the report of
9     David Bliesner --
10    A    Yes.  In his report.
11    Q    -- and any exhibits to Mr. Bliesner's report?
12    A    I'm sorry.  In his report, it's pretty clear
13    they were having production problems, and that
14    formulations was one of the issues.
15    Q    I would like you to show me somewhere in that
16    report where it says that there were bioavailability
17    issues with Digitek?
18    A    I don't know if they did any bioavailability
19    tests.
20    Q    What's the basis for your opinion in that
21    report that there was a bioavailability --
22         MR. ERNST:  Take your time.
23    BY MR. MORIARTY:
24    Q    -- issue with Digitek?
25         MR. ERNST:  Do you have your chart?  This is

PLAINTIFFS' EXHIBITS 011181

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 164

 1   his.  This is yours, right?

 2            MR. MORIARTY:  It's not mine.

 3            THE WITNESS:  It's mine.

 4            MR. ERNST:  Okay.

 5            THE WITNESS:  Thank you.

 6            MR. ERNST:  Take as much time as you need.

 7            MR. MORIARTY:  Found it yet?

 8            MR. ERNST:  He's got time.

 9            MR. MORIARTY:  All I asked is if he found it

10   yet.  He can take all of the time he wants.  If he

11   hasn't found it, he can tell me he hasn't found it.

12       Q    Have you found it yet?

13       A    I found some stuff.

14       Q    Okay.  Tell me what in there --

15       A    So on item number 35 in Dr. Bliesner's report,

16   he indicates that Actavis annual review for 17 adverse

17   effects, and then the very following one, which is 36,

18   which is a blended.

19       Q    Well, first of all, do you know what the 17

20   adverse events were that he's describing?

21       A    Not specifically.

22       Q    Do you know whether the FDA ever was concerned

23   about any of those 17 adverse events?

24       A    Is that relevant?  I don't know it would have

25   crossed my mind.

PLAINTIFFS' EXHIBITS 011182

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 165

 1              When I reviewed the report, I was just looking

 2      for abnormalities in production and whether or not some

 3      other experts going to come in and testify that there

 4      was a problem with formulation of this drug that might

 5      cause -- that's the one I showed him.  36.

 6         Q    So you're referring to 36, this paragraph about

 7      blend uniformity fillers?

 8         A    Right.  That's just one of them.

 9         Q    Are you an expert in blend uniformity sampling?

10         A    No.

11         Q    Have you ever done it?

12         A    No.

13         Q    Have you ever read anything about it?

14         A    I've read about formulation changes and how

15      they affect the absorption of Digoxin, but that's all.

16         Q    My question was whether you have ever read

17      anything about blend uniformity failures, or blend

18      uniformity at all?

19         A    Well, you know, there's a change in the

20      formulation of the drug, I have read about issues with

21      Dig in the past where there was formulation changes.

22         Q    Do you know anything about whether these blend

23      failures had to do with technical testing issues or

24      actual blend failures?

25         A    There's where I was going to rely on the other

Keith Patrick Gibson                                    June 14, 2011

Page 166

1    expert for that sort of thing.

2        Q    So you would defer to Mr. Bliesner?

3        A    I would refer to Mr. --

4        Q    Dr. Bliesner?

5        A    Dr. Bliesner, yes.

6        Q    As to whether or not he's indicated any sort of

7    actual change in the formulation?

8        A    Right.

9        Q    Did you see in the Mason, Von Dollen

10   depositions their opinions that they did not see any

11   clinical signs or symptoms of Digoxin toxicity in

12   Mr. McCornack the night he died, or the day he died?

13            MR. ERNST:  I'm going to object.

14            THE WITNESS:  So the doctor --

15            MR. ERNST:  They didn't see him the day he

16   died.

17            THE WITNESS:  They didn't see him the day he

18   died or any time soon.

19   BY MR. MORIARTY:

20       Q    I asked if he saw in their depositions where

21   they testified that they didn't see any evidence of

22   Digoxin tox -- clinical signs of Digoxin toxicity the

23   day he died?

24       A    They didn't see him the day he died.

25       Q    Let me go back to square one.  We have to drag

PLAINTIFFS' EXHIBITS 011184

Keith Patrick Gibson                                    June 14, 2011

 1    it out.

 2            MR. ERNST:  No.  You're --

 3    BY MR. MORIARTY:

 4        Q     You know that Dr. Von Dollen had some

 5    descriptions of what happened to Dan McCornack the day

 6    he died; correct?

 7        A     Oh, sure.  Okay.

 8        Q     And Dr. Mason had the sheriff's department do

 9    an investigation; correct?

10        A     Okay.

11        Q     And Kathy McCornack has testified and has

12    spoken to Dr. Von Dollen about what happened the day Dan

13    died; correct?

14        A     Uh-huh.

15        Q     So that when I was in California in the fall of

16    2009 taking the depositions of Mason, Von Dollen and

17    even Lemm, they had information about Dan's clinical

18    condition the day he died.  Do you know that?

19            MR. ERNST:  Objection.

20    BY MR. MORIARTY:

21        Q     Do you know that?

22        A     I think -- from reading their depositions I

23    think I knew that.  I didn't zero in on that part.  I

24    believe that to be true.

25        Q     Did -- were you done with your answer?

Keith Patrick Gibson                                June 14, 2011

                                                    Page 168

 1      A    I mean, I didn't zero in on it, so I'm not as

 2   sure as I should be.

 3      Q    Did Doctors Mason and Von Dollen both testify

 4   in their depositions that they had not seen any evidence

 5   that Dan had Digoxin toxicity on the days before he

 6   died?

 7           MR. ERNST:  Objection.

 8           THE WITNESS:  And I do not remember.

 9   BY MR. MORIARTY:

10      Q    Okay.  Thank you.

11           Just so we're clear, this level of 3.6 was

12   based on a 78-hour-after-death blood draw; correct?

13      A    Correct.

14      Q    3.6 is not the level of Dan's Digoxin at the

15   time he died; correct?

16           MR. ERNST:  Objection.

17           THE WITNESS:  Correct.

18   BY MR. MORIARTY:

19      Q    So, in your last bullet point on Page 9, what

20   are you talking about when you refer to clinical

21   conditions?

22      A    Well, I mean, there's a gentleman that was

23   taking Digoxin.  His postmortem blood Digoxin serum

24   level is high.  He was on a very -- fairly high dose as

25   a routine.  He was also on Diltiazem.  I think -- and

PLAINTIFFS' EXHIBITS 011186

Keith Patrick Gibson                                June 14, 2011

1    had an arrhythmia that killed him.  I think that's the

2    clinical condition.

3        Q    Are you done with your answer?

4        A    Uh-huh.

5        Q    So you're not talking about clinical conditions

6    as in blurred vision, nausea, vomiting, or --

7        A    Correct.

8        Q    -- anything like that?

9             Okay.  Okay.  I haven't had a chance to reread

10   this, but let me mark it as an exhibit.

11            This is another article by Dr. Koren, the same

12   Dr. Koren, the same Dr. Koren who authored the article

13   that you reviewed and quoted in your paper.  Okay?  This

14   was also published, I believe, in 1985.

15            Have you seen this article before?

16            MR. ERNST:  I'm going to --

17            MR. MORIARTY:  I've marked it Exhibit I.

18             (Defendants' Exhibit I was marked for

19              identification.)

20            MR. ERNST:  I'm going to object.  He's

21   testified he hasn't.  I think this line of questioning,

22   I'm going to object to.  If you want to give me a

23   continuing objection on this issue?

24            MR. MORIARTY:  Sure.

25        Q    Have you seen the article?  That's my first

PLAINTIFFS' EXHIBITS 011187

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 170

 1   question.

 2           MR. ERNST:  Do you have a copy for me?

 3           MR. MORIARTY:  That's all I have.  We'll make a

 4   copy when we're done.

 5           THE WITNESS:  No, I can say that I probably

 6   didn't see this article.

 7           MR. MORIARTY:  All right.

 8           MR. ERNST:  May I look at it?

 9           MR. MORIARTY:  What?

10           MR. ERNST:  Are you done?  May I look at it if

11   you --

12   BY MR. MORIARTY:

13       Q    The only sentence I want to ask you about on

14   this, it says, "An attempt to prove Digoxin intoxication

15   as a cause of death may be hampered by the fact that

16   postmortem levels may be 1.5 to ten times higher than

17   antemortem levels."

18           Do you agree or disagree with that statement?

19           MR. ERNST:  I would object.

20           THE WITNESS:  I don't know if I can agree or

21   disagree.  I would have to spend some time and try to --

22   seems awfully high.  I don't know.

23   BY MR. MORIARTY:

24       Q    Well, have you done any independent research

25   about the degree to which Digoxin levels can increase?

Keith Patrick Gibson                                    June 14, 2011

```
 1      A     Well, when I --

 2      Q     -- postmortem?

 3      A     When I started looking at the literature, I

 4  didn't really think that you would be asking me

 5  questions to extrapolate backwards on this Dig level.

 6  The Dig level is what it is, and it's just a data point.

 7  It could be ten times greater.  It could be half as

 8  much.  I don't know.  There's a lot of factors involved

 9  here.

10      Q     Well, does it matter?

11      A     Does it -- does it matter?

12      Q     Yeah.

13      A     What his Dig level is?  Yes.  But Dig toxicity

14  is a clinical condition that you, you know, there's

15  people with Dig levels all over the board, some with

16  symptoms, some without.

17      Q     So, if, for example, the degree of magnitude

18  was just double in the postmortem period in this case,

19  even if there was some mathematical way to extrapolate

20  back, you would simply say that it was what, 1.8?

21            MR. ERNST:  Objection.

22            THE WITNESS:  Yeah, but you're just -- you're

23  starting to treat numbers now.  I mean, it could be that

24  he was at a 1.8 and the change of formulation drove him

25  to 1.9, and that was enough to put him into the
```

PLAINTIFFS' EXHIBITS 011189

Keith Patrick Gibson                                June 14, 2011

Page 172

1    arrhythmia.

2    BY MR. MORIARTY:

3        Q     Okay.

4        A     So it's not mathematical.

5        Q     Okay.  All right.

6              MR. ERNST:  How much longer do you expect to

7    be?

8              MR. MORIARTY:  I don't know.

9              THE WITNESS:  Do you have a maximum time you

10   can type?

11             MR. MORIARTY:  Yes, and it's long.  Longer than

12   I will take.  It's essentially like two days' worth.

13             THE WITNESS:  I'm sorry, I meant the hands.

14   Not what's allowed by the law.

15   BY MR. MORIARTY:

16       Q     What I'm doing here, Mr. Gibson, is looking

17   through things that you cited in your report to make

18   sure that I've asked you about them.

19       A     Okay.

20       Q     Okay?  And just going through this quickly, is

21   a quick way to make sure that's happening.  So if you

22   want to take -- well, I prefer you just sit here.

23       A     I'll just sit here.

24       Q     Okay.

25       A     I'm getting paid.

PLAINTIFFS' EXHIBITS 011190

Keith Patrick Gibson                                      June 14, 2011

Page 173

1       Q     Go to -- I think it's your cite 10.  I tried to
2    do my binder according to your footnotes.  It should
3    be --
4       A     Ellenhorn and Barceloux.
5       Q     Got me.  Ellenhorn and Barceloux.  That's it.
6    Page 204.
7       A     I'm impressed you found a copy of the book.
8    What page again?
9       Q     204.  I hope we have the same edition.
10      A     I don't think there were any other editions.  I
11   might be wrong.  Okay.  I'm there.
12      Q     Says, "Laboratory serum Digoxin levels"?
13      A     Yes.
14      Q     "Therapeutic Digoxin levels are .8 to 2
15   nanograms per milliliter.  Do you see that?
16      A     Yes.
17      Q     Do you agree or disagree?
18      A     I think there's some literature to indicate
19   differently, but I'll agree with that.
20      Q     Okay.  "Serum levels four hours after I.V.
21   administration and six hours after oral ingestion
22   correlate best with the effect of therapeutic setting."
23            Do you see that?
24      A     Yes.
25      Q     Do you agree with it?

PLAINTIFFS' EXHIBITS 011191

Keith Patrick Gibson                                    June 14, 2011

Page 174

```
 1      A    Yes.

 2      Q    It says here, "Acute overdoses usually involve

 3   toxic serum levels exceeding two nanograms per

 4   milliliter"?

 5      A    Correct.

 6      Q    "Levels over 15 nanograms per milliliter

 7   indicate serious intoxication."

 8           Do you agree with that?

 9      A    That's serious, yes.

10      Q    I didn't ask you this before, but when we were

11   talking about this bioavailability issue, can you tell

12   me whether the -- let me try to make this question as

13   simple as I can.

14      A    Okay.

15      Q    Working backwards from the dose he took at

16   dinnertime on the 22nd of March of 2008, when did the

17   tablets have a different bioavailability than the

18   FDA-approved specifications?

19           MR. ERNST:  Objection; compound.

20           THE WITNESS:  There's no way for me to tell.

21   BY MR. MORIARTY:

22      Q    All right.  Well, you know that -- well, okay.

23           You don't have an opinion to a reasonable

24   scientific probability on that issue?

25      A    When the tablets became nonconforming?
```

Keith Patrick Gibson                                    June 14, 2011

Page 175

1      Q     Yes.

2      A     No.

3      Q     So how many nonconforming doses of .250 Digitek

4    did Dan McCornack ingest?

5      A     Well, see, one of the problems with this case,

6    it could be that some were nonconforming and some were

7    conforming, I don't really know.  That could make a big

8    difference if every other one was nonconforming or there

9    was some plethora of those kind of combinations.

10           But what would have come -- if all things being

11   equal, would have come to steady state at approximately

12   five to seven times the halflife.  So when that drew him

13   over the level that was toxic for him, he could have

14   been on the ascending part of that when he had his

15   arrhythmia.  There's no way to tell.

16     Q     I need to leave here and make sure I understand

17   what you just said.

18     A     Okay.

19     Q     Do you have an opinion to a reasonable

20   scientific probability as to how many doses of

21   nonconforming Digitek Dan McCornack ingested?

22     A     I do not.

23     Q     Now, I did not ask you about your cite 36,

24   which is the Pounder and Jones article called

25   "Postmortem Drug Redistribution, a Toxicological

PLAINTIFFS' EXHIBITS 011193

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 176

 1    Nightmare"?

 2        A    Yeah.

 3        Q    But that is one of the things that you cited

 4    and relied upon as an authority in your report; correct?

 5        A    Correct.

 6        Q    I didn't ask you about Dr. Leikin's paper cite

 7    37, but that is one of the things you cited and relied

 8    upon for purposes of your report; correct?

 9        A    Yes.

10        Q    Cite 38 is the Hilberg article; correct?

11        A    Yes.

12        Q    And in that article it says, "The phenomenon of

13    postmortem drug redistribution makes interpretation of

14    drug concentrations found in postmortem blood samples

15    difficult.  Ignorance of this phenomenon may well lead

16    to erroneous interpretations."

17             Do you agree with that?

18        A    Yes.

19        Q    I don't think I asked you any questions about

20    41, which is the Holt and Benstead article.  Was that

21    something that you read and relied on for purposes of

22    your report?

23        A    Partially, yes.

24        Q    All right.  And 48 is the Shepherd.  And the

25    48, the Shepherd article, is something you cited and

Keith Patrick Gibson                                    June 14, 2011

```
 1    relied upon in drafting your report; is that right?

 2        A     Partially, yes.

 3        Q     And lastly, on this line of questions, tab 49

 4    from your report or cite 49 is a Kennedy article;

 5    correct?

 6        A     Yes.

 7        Q     And can you pull that up for me, please, in

 8    your stack?

 9        A     I'm sure it's in here somewhere, but --

10        Q     I'm going to read to you from page 185 of that

11    article.

12        A     Thank you.  That will save me.  It's a simple

13    sentence.

14              MR. ERNST:  Do you have a copy for him?

15              MR. MORIARTY:  He has his own copy.

16              MR. ERNST:  I'm not sure he does with him.

17    BY MR. MORIARTY:

18        Q     Okay.  I'm going to read this, and then I'll

19    hand it to you and make sure I read it correctly.

20              "With the possible exception of paracetamol, it

21    is difficult to find any drug concentration range that

22    has been reliably associated with toxicity and death."

23              Do you agree with that?

24              MR. ERNST:  Objection.

25              THE WITNESS:  Any drug concentration?  I mean,
```

Keith Patrick Gibson                                    June 14, 2011

                                                            Page 178

1   taken out of context, no.  There's lots of paracetamol

2   for just Tylenol poisonings all of the time.

3          We have a little chart at the pharmacy that you

4   can see how much acetylcysteine to be given based on the

5   ingestion in the blood levels.

6   BY MR. MORIARTY:

7      Q    Okay.  Just wanted to know if you agreed or

8   disagreed with what you cited in your report?

9      A    It's kind of taken out of context, though.

10     Q    At page 186 of the Kennedy article, your cite

11  49, it says, "Back calculation of drug doses from a

12  single sample is virtually impossible."

13         Do you agree with that?

14     A    Yeah.  I've been saying that.

15         MR. ERNST:  Objection.

16  BY MR. MORIARTY:

17     Q    Those blend uniformity tests that Dr. Bliesner

18  referred to in paragraph 36 of that report, did you look

19  at those blend uniformity tests?

20     A    No, I left -- I left that part of the analysis

21  to Mr. Ernst and his other experts.

22     Q    Did you look at any poison control -- I'm

23  sorry.

24         Did you look at any poison center data to see

25  whether there had been spikes in Digoxin toxicity

Keith Patrick Gibson                                June 14, 2011

1    anywhere in the United States --

2        A    No, I did not.

3        Q    -- in 2006 through 2008?

4        A    I did not.

5        Q    Are you familiar with the statistics on which

6    drugs lead to the highest rate of adverse drug events?

7        A    I'm familiar that such a list does exist.  I

8    saw one about a year ago.  Didn't particularly remember

9    the drugs on the list.

10       Q    Do you know where Digoxin falls on the list?

11       A    No.

12       Q    Can patients develop Digoxin toxicity taking

13   normal prescribed doses of a drug?

14            MR. ERNST:  Objection.

15            THE WITNESS:  If there's a change in the

16   metabolism, like, let's say, for instance, they develop

17   kidney disease or -- I listed factors in here that I

18   gained from Goodman and Gilman, for instance, if they

19   were taking an antibiotic it could change in absorption

20   or --

21   BY MR. MORIARTY:

22       Q    So the answer is yes?

23       A    Yes.  Thank you.

24       Q    Have you read the reports of any of the defense

25   experts in this case?

PLAINTIFFS' EXHIBITS 011197

Keith Patrick Gibson                                    June 14, 2011

Page 180

1      A     I have.

2      Q     Whose reports have you read?

3      A     Could I state that I've read parts of theirs
4    and parts of some not.

5      Q     First, why have you only read parts?

6      A     I just received them and haven't had time to go
7    over them.

8      Q     When did you get them?

9      A     Was it yesterday or the day before?

10     Q     Okay.  So whose reports have you read parts of?

11     A     Um, I don't remember the names, so...

12           Looks like I read a little bit of
13   Matthew Moriarty.

14     Q     That's me.

15     A     Oh.

16     Q     I didn't write a report.

17     A     I'm so sorry.  I am getting tired now.

18           Amy McMaster.

19     Q     Okay.

20     A     And --

21           MR. ERNST:  For the record, all four that
22   you -- withdraw that statement.

23           THE WITNESS:  Did you give me all four that
24   he had?

25           MR. ERNST:  I did.

PLAINTIFFS' EXHIBITS 011198

Keith Patrick Gibson                                    June 14, 2011

Page 181

1          THE WITNESS:  I do remember looking at briefly

2     four different.

3     BY MR. MORIARTY:

4          Q     So McMaster, Heard, Gallanter and Brown?

5          A     I believe that's correct.  Gallanter.  Here's

6     Gallanter, McMaster, Brown, and Heard.

7          Q     Do you have a specific opinion to a scientific

8     probability about what the change in the Digitek

9     formulation was?  In other words, was it particle size?

10    Was it they left out an ingredient?  They added

11    something they shouldn't have?  What was the -- do you

12    have an opinion on that or are you deferring to --

13         A     I'm going to defer, but I have an opinion about

14    everything.  I kind of left that in my report with the

15    idea that some other expert was going to conclude that.

16         Q     That's fine.

17         MR. ERNST:  You can tell him what you think,

18    but --

19    BY MR. MORIARTY:

20         Q     I want to know -- I don't want to know

21    everything you think.  I want to know if you have

22    opinions to a reasonable scientific probability.  If you

23    want to defer to another expert, you can.

24         A     That's what I am.

25         Q     If you have an opinion, I'm entitled to know

PLAINTIFFS' EXHIBITS 011199

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 182

 1    what it is.  Okay?

 2              So do you know anything about the reliability

 3    of that Global --

 4       A    RPH.

 5       Q    -- RPH website?

 6       A    Have I ever manually calculated the same

 7    calculations to see if their calculations -- I have not.

 8       Q    And you don't know whether cardiologists or

 9    internists actually use it in practice in making

10    clinical dosing decisions?

11       A    I have no idea.

12       Q    Do you know anything about the potential

13    sources of error associated with that computer program?

14    What are its error rates?

15       A    Well, generally, I know what the equations it

16    supposedly uses.  I know what the data from which it

17    came.

18              In pharmacy school I actually spent some time

19    with Dr. Gella (phonetic).  I'll spell it for you later.

20    Um, he's one of the people that sort of was leading the

21    charge on developing these equations.

22              Other than that, I -- you know, none of those

23    equations are all that accurate.  Have you ever seen a

24    splatter of the data and how it -- and a linear

25    regression, for instance, of that data?  I mean,

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 183

1    sometimes there's quite a bit of variability.  And you

2    don't use those calculations as exactness.  They are

3    just directors of clinical decisions.  Something to

4    consider, something to guide your next move.

5              MR. MORIARTY:  Okay.  I want to take a

6    five-minute break, look through my notes, talk to my

7    colleague here, and then decide whether I have any more

8    questions or whether I'm going to turn it over to her.

9         Q    But before we break, that's Exhibit B; correct?

10        A    It says Exhibit B, yes.

11        Q    And every other day.

12             That's the notice for this depo; right?

13        A    Okay.

14        Q    Have you seen it before?

15        A    I probably did.  I think it was attached to the

16   subpoena.

17        Q    Yes.

18             Did you bring all of the things that you were

19   asked to bring?

20        A    It's in the box right here.

21        Q    Okay.

22        A    Do you want to look at them?

23        Q    Can I see the box, please.

24             So there's a bunch of books in here; right?

25        A    Yes, there's a bunch of books.

PLAINTIFFS' EXHIBITS 011201

Keith Patrick Gibson                                    June 14, 2011

Page 184

1      Q      Are any of these boxes [sic] not cited in the

2    report itself?

3      A      All of those books are cited in the report.

4    There's one book that is cited in the report that I do

5    not have a copy in that box.  I don't know where it is.

6    But I do have pages.  I have this funny feeling I left

7    it on the copy machine, or I made copies of this

8    chapter, that was the Goodman and Gilman 11th Edition.

9      Q      The deposition of the two McCornack boys is in

10   your box.  Did you read those?

11     A      Not yet.

12     Q      Deposition of Von Dollen is in here.  Did you

13   read that?

14     A      Most of it, yes.

15     Q      Did you read Lemm's?

16     A      Most of it, yes.

17     Q      And Kathy's?

18     A      Most of it, yes.

19     Q      You have a copy of Federal Rule 26 in here?

20     A      That was given to me, yes.

21     Q      And you have Dr. Mason's depo in here?

22     A      Yes.

23     Q      Have you read that?

24     A      Parts of it, yes.

25     Q      Did you --

PLAINTIFFS' EXHIBITS 011202

Keith Patrick Gibson                          June 14, 2011

Page 185

1     A     That's his bind paper.

2     Q     You have the report of Martha Bennett in here;

3  did you read it?

4     A     I can't remember.  Can I look at it for a

5  minute to refresh my recollection?  I skimmed this

6  document.  I don't think I looked at it too much when it

7  was given to me.

8     Q     And obviously, you have the infamous lab report

9  regarding Mr. McCornack's postmortem blood sample;

10  correct?

11     A     Correct.

12     Q     And the Diltiazem level was some three times

13  outside what they considered the therapeutic range; is

14  that right?

15     A     For those people that do report therapeutic

16  range.

17     Q     Well, they did report a therapeutic range.  Is

18  it three times outside their range?

19     A     It's outside what they say on the report, yes.

20          MR. ERNST:  Objection.

21  BY MR. MORIARTY:

22     Q     Is it likely that there was postmortem

23  redistribution of his Diltiazem?

24     A     Yes.

25     Q     Then you have Dr. Mason's stuff.

PLAINTIFFS' EXHIBITS 011203

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 186

 1            You have a report from Dr. Kernin; correct?

 2      A     I'm sorry, I don't remember these names.  Yes,

 3   I remember looking at this.

 4      Q     But you don't have his deposition?

 5      A     No, I don't think I have his deposition.

 6      Q     Did you bring anything else?

 7      A     Everything else was in that box, except this

 8   binder, if you want to look at this.

 9      Q     Did you bring all your billing data on this

10   case?

11      A     It's in this binder.

12            MR. MORIARTY:  That you can have.

13            Don, did you separately disclose the billing

14   data, because I don't remember seeing that?

15            THE WITNESS:  I'm bad at billing and I think --

16            MR. ERNST:  I probably disclosed his billing

17   rate, if you ask him.  But he hadn't prepared his bills

18   yet.

19   BY MR. MORIARTY:

20      Q     Do you know how many bills are in here?

21      A     Two.

22      Q     How many bills have you done?

23      A     Two.

24      Q     Okay.  So the first one is September 30th,

25   2009, for $875; correct?

PLAINTIFFS' EXHIBITS 011204

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 187

 1       A     That's correct.

 2       Q     And the second one is June 13th, 2011, for

 3  $10,500; correct?

 4       A     Correct.

 5       Q     And that's all you've billed to date?

 6       A     To date.

 7             MR. MORIARTY:  Let's take that break now.

 8                    (Recess.)

 9  BY MR. MORIARTY:

10       Q     Mr. Gibson --

11       A     Yes, sir.

12       Q     -- I have no other questions for you right now.

13  But Ms. Ahern probably does.

14

15                    EXAMINATION

16

17  BY MS. AHERN:

18       Q     Hi, Mr. Gibson.  I do have some questions,

19  mostly just for my own sake to clear up some things.

20             In looking at your report, I just want to make

21  sure that we're clear on what your role was in this

22  case.

23             You know this is the only opportunity we have

24  to ask you about your report and about the opinions that

25  are in your report; right?

PLAINTIFFS' EXHIBITS 011205

Keith Patrick Gibson                                    June 14, 2011

Page 188

 1        A     Uh-huh.

 2        Q     So I'm just trying to understand as best I can

 3   before we leave here, because I won't get another

 4   opportunity to do that.

 5        A     All right.

 6        Q     So your role, what I've heard you say here is

 7   that it wasn't your job to ascertain whether or not

 8   Dan McCornack actually suffered from clinical toxicity

 9   before his death; is that correct?

10        A     No, I think the question was did he exhibit any

11   symptoms of clinical toxicity before his death.

12        Q     Okay.  I thought you said that it wasn't your

13   job to ascertain whether or not he suffered from

14   clinical toxicity before his death, that you relied

15   instead on the opinions of the treating physicians as

16   expressed in their deposition testimony?

17        A     No.

18        Q     Could you explain to me, then, what your role

19   was with regard to determining whether or not

20   Dan McCornack had clinical toxicity prior to his death?

21        A     Okay.  I think in relation to that one

22   question, the question was whether or not he suffered

23   from any prodromal symptoms like nausea that comes

24   before toxicity could be diagnosed.

25               (Interruption by the reporter.)

PLAINTIFFS' EXHIBITS 011206

Keith Patrick Gibson                                    June 14, 2011

Page 189

```
 1          MR. MORIARTY:  He said prodromal.
 2          THE WITNESS:  I'll try not to use words that --
 3    anyway.
 4          So a lot of -- I think the experts in this case
 5    especially have relied upon the idea that nausea and
 6    vomiting had to precede Dig toxicity.  I don't think
 7    that's true.
 8    BY MS. AHERN:
 9       Q    What do you think?
10       A    I think there are some people that can be Dig
11    toxic without those particular symptoms.
12       Q    How do you define Digoxin toxicity from a
13    clinical standpoint?
14       A    From a clinical standpoint it would be the
15    existence of some set of arrhythmias caused by the
16    Digoxin itself.
17       Q    Is it your opinion or your testimony here that
18    Digoxin toxicity is not defined by nonarrhythmic
19    symptoms?
20          MR. ERNST:  Objection.
21    BY MS. AHERN:
22       Q    It's a bad question, I apologize, and I'll
23    withdraw that one.
24          Is it your opinion that nausea and vomiting,
25    G.I. issues, those sorts of symptoms, visual
```

PLAINTIFFS' EXHIBITS 011207

Keith Patrick Gibson                                    June 14, 2011

 1   disturbances, are not clinical signs of toxicity?

 2       A    No, they are clinical signs, but they are not

 3   necessary.  They are not always present.

 4       Q    So you believe that you could -- a patient can

 5   exhibit toxicity, skip through all those symptoms and go

 6   right to life-threatening arhythmias?

 7       A    Yes.

 8       Q    What do you base that opinion on?

 9       A    Well, I didn't really think about it, because

10   when I read all of this literature, and they talk about

11   the most common symptoms of toxicity, or any adverse

12   effect, they don't always mean that they are mandatory,

13   they have to show up before something occurs.  The human

14   body is not that predictable.

15            And so in the last couple days I've been doing

16   a lot of research on this area.  This is one of the

17   reasons I copied this article, because the statements

18   out of this article, and I need to follow up to make

19   sure what we're talking about, the gastrointestinal

20   symptoms occurred 30 to 70 percent of the time.

21            THE REPORTER:  The symptoms occurred?

22            THE WITNESS:  Let me start over again.

23            This article has a section of manifestations of

24   toxicity, and it describes nausea, vomiting, anorexia

25   and fatigue is probably the most consistent and most

PLAINTIFFS' EXHIBITS 011208

Keith Patrick Gibson                                    June 14, 2011

Page 191

1    frequently observed, extracardiac symptoms of toxicity.

2    But it goes on to say that it's, first of all, these

3    people are sick from many comorbid diseases.  So a lot

4    of this can be confused in the mix.

5    BY MR. MORIARTY:

6        Q    Masked?

7        A    Masked.  They cite, in articles that I have not

8    had a chance to follow through on that, the

9    gastrointestinal symptoms occurred in 30 to 70 percent

10   of patients with reported Dig toxicity.

11       Q    Which article is this?  I'm sorry.

12       A    I just passed it away so I can't answer that.

13       Q    This is "Mechanisms, Manifestations and

14   Management of Digoxin Toxicity in the Modern Era" by

15   Bauman, B-a-u-m-a-n?

16       A    Yes.

17       Q    In 2006.  "Similar congenital cardiovascular

18   drugs"?

19       A    So I just received your expert's opinions in

20   the last couple of days.  I was -- that assertion was --

21   impressed me, and so I set about trying to find an

22   answer.  Now --

23       Q    So this is not information that you relied on

24   when you drafted your report?

25       A    That's absolutely correct.  I didn't consider

Rennillo Deposition & Discovery
(216) 523-1313              A Veritext Company              (888) 391-3376
PLAINTIFFS' EXHIBITS 011209

Keith Patrick Gibson                                    June 14, 2011

Page 192

1    that there would be a necessity for those sorts of

2    symptoms prior to exhibiting toxicity.

3        Q    Okay.  And were you informed when you drafted

4    your report that all of the opinions that you had in

5    this litigation needed to be contained within your

6    report so that we come here today and ask you about

7    those?

8        A    Well, yes.  The problem with, you know, once I

9    read your doctors broadened my inquiry, because I hadn't

10   thought of it that way.  I don't think, and will say

11   that I still do not think, that nausea and vomiting are

12   necessary in the diagnosis of Dig toxicity.

13       Q    Okay.  And this is, just to be clear, I'm

14   asking you specifically about what you knew and what you

15   relied on when you drafted your report which is dated

16   May 16th, 2011?

17       A    When I --

18       Q    This article that you just cited is not

19   something that you relied on, was it?

20           MR. ERNST:  Let me clarify the record.  The

21   defense has propounded four experts.  Out of an

22   abundance of caution, I gave him those reports.

23   BY MS. AHERN:

24       Q    That's fine.  I'm not saying that there's not a

25   problem of you reviewing those reports --

Keith Patrick Gibson                                    June 14, 2011

Page 193

1          MR. ERNST:  It's the time for your deposition

2     today.  I'm just presenting this witness to be as

3     complete as I can.

4          Many plaintiffs don't ever give their potential

5     experts their reports, and say they'll do it later.  I'm

6     giving them to you, and gave it to him early so you'd

7     have the opportunity to ask him any questions you wanted

8     about that, and to make him as prepared as I possibly

9     could for this deposition.

10          MS. AHERN:  And I do appreciate that, Don.

11          MR. ERNST:  He's given you a report.

12          MS. AHERN:  However, my questions right now are

13     very specific to the information that he relied on when

14     he actually drafted the report you submitted to the

15     defendants.  We can get to that, but right now my

16     questions are about what he relied on prior to drafting

17     his report on May 16th, 2011.

18          MR. ERNST:  I'm going to object.

19          THE WITNESS:  Prior to drafting my report, I

20     did not think that it was a necessity that nausea, or

21     what do they call them, extracardiac symptoms related

22     were necessary in the diagnosis of Dig tox and toxicity.

23     BY MR. MORIARTY:

24     Q    What information did you have at that time to

25     base that opinion on?

Keith Patrick Gibson                                    June 14, 2011

Page 194

```
 1     A     Well, I've been at this -- I went to school in
 2   the seventies.  I graduated in 1980.  I've been reading
 3   these books and articles all along.
 4          When they list adverse effects, they don't mean
 5   that they are mandatory or necessary or absolutely will
 6   show up.
 7          In fact, some of the newer drugs that have come
 8   on the market will actually have spreads of percentages
 9   showing percentages of these side effects that appear in
10   patients.  I couldn't find that in the last couple days
11   except in this article.
12          But my background assumptions were not the same
13   as the assertions by your experts.  And so that's why I
14   went to look to see if they are right or I'm right.
15     Q     Okay.  And you believe that based on this
16   article that your assumption is correct, that Digoxin
17   toxicity does not progress along a continuum of
18   symptoms, but rather can skip ahead to life-threatening
19   arrhythmias prior to observing any other manifestations?
20     A     Not exactly, because you've taken that one step
21   farther than I would have taken it.
22          It can be dose dependent, and I can guarantee
23   you that I could give you enough Dig to make you
24   nauseated.
25     Q     In a situation where we're talking --
```

PLAINTIFFS' EXHIBITS 011212

Keith Patrick Gibson                                    June 14, 2011

Page 195

1          MR. ERNST:  Let him finish answering his

2     question.

3          THE WITNESS:  Whether you show up with an

4     arrhythmia because of that prior to or after the nausea,

5     I'm not too sure if the nausea needs to precede the

6     Digitalis's toxicity.

7          So the way I read your experts' reports is he

8     didn't suffer from Digitalis toxicity because there was

9     no nausea or vomiting reported.  I'm oversimplifying, of

10    course.  But I didn't think that was a necessary

11    predicate leading symptom.

12    Q    Okay.  And you mentioned dose dependent, that

13    you believe that this is dose dependent, your theory

14    that it can just progress to an arrhythmia rather than

15    having these noncardiac manifestations first; correct?

16    A    It could.  I haven't vetted this idea, because

17    it never came up in my mind when I wrote the report.

18    Q    Okay.

19    A    I still need to vet that in my mind.

20    Q    But your thinking is that if you're given a

21    high enough dose of Digoxin, a patient can immediately

22    present symptoms of arrhythmia rather than all of these

23    other symptoms of nausea and vomiting and noncardiac

24    symptoms?

25    A    It could happen is what I'm saying.

PLAINTIFFS' EXHIBITS 011213

Keith Patrick Gibson                                      June 14, 2011

Page 196

 1      Q    Do you have any opinion to a reasonable
 2   probability what sort of dose a patient would have to
 3   take for that to happen?
 4      A    No.  I don't even know how you answer those
 5   kinds of questions.
 6      Q    So it's your thought that you don't have
 7   anything to support that yet?
 8           MR. ERNST:  Objection.  That's not what he
 9   said.
10           THE WITNESS:  I'm not sure that that's the kind
11   of thing they do.  I mean, they might have done, once
12   upon a time with rats, all of the symptoms showed up.  I
13   don't know how you would tell if a rat was nauseated or
14   not.  But there is -- I'm certain with almost all drugs
15   that I can give you enough to create a situation where a
16   lot of those adverse reactions will start to appear.
17   Now, whether or not they are going to appear in the same
18   order or certain doses or what, I don't know if that's
19   possible.
20   BY MS. AHERN:
21      Q    Is it your opinion that Dan McCornack got a
22   massive overdose of Digoxin on the day that he died?
23      A    A massive?  No.  I don't know what massive
24   means, though, so...
25      Q    How much Digoxin do you think Dan McCornack

Keith Patrick Gibson                                June 14, 2011

1    would had to have taken the day that he died in order to

2    exhibit --

3        A    That's one of the reasons I put --

4        Q    I just want to finish.

5            -- in order to exhibit a life-threatening

6    arrhythmia, and not all of these other noncardiac

7    symptoms?

8        A    Because of the interpatient variability, it's

9    very difficult to make that assessment.  So...

10       Q    Would twice the amount of --

11           MR. ERNST:  He's not done --

12   BY MR. MORIARTY:

13       Q    -- of his normal dose?

14           MR. ERNST:  -- answering the question.

15           THE WITNESS:  The problem -- your question, I

16   mean, the problem is he's got Diltiazem on board and

17   some other antiarrhythmics, and the mix is just

18   unquantifiable.

19   BY MR. MORIARTY:

20       Q    But I thought you said earlier that he was on

21   Diltiazem for a long enough period of time that whatever

22   effect Diltiazem had on the Dig levels would have been

23   stable for that period of time?

24       A    It would have been.  That's my assessment.

25       Q    Right now we're only talking about the dose of

PLAINTIFFS' EXHIBITS 011215

Keith Patrick Gibson                                    June 14, 2011

Page 198

 1    Digoxin altering that particular dose.

 2           Would twice the dose, the daily dose, would

 3    that have potentially put him at risk for a

 4    life-threatening arrhythmia?

 5    A    I don't know if you can know that answer.  See,

 6    because these toxicities occur in all different kinds of

 7    levels and concentrations, different settings or

 8    sequences.

 9    Q    So, if Dan McCornack, for instance, had taken

10    1 milligram that day instead of .5, you can't tell me

11    whether or not that would have put him at risk for a

12    life-threatening arrhythmia?

13    A    If he would have taken twice the daily amount I

14    would say, yeah, he would be in trouble.

15    Q    Are you aware that in the past Dan had taken

16    1 milligram, he tolerated that?

17    A    Yes.

18    Q    Is there anything in the medical record of

19    you -- first of all, have you reviewed medical records?

20    A    Yes, I have.  Some.

21    Q    Which medical records?

22    A    The ones I've got --

23    Q    I didn't notice it in your report, so I don't

24    know which ones you reviewed, and that was another one

25    of my questions, so we may as well hit it now.

PLAINTIFFS' EXHIBITS 011216

Keith Patrick Gibson                                    June 14, 2011

1      A    I think I cited them real early.  No, I didn't.

2    I cite -- see, like I found the refill tracking form out

3    of one medical record.  That's at cite number 3.

4           MR. ERNST:  I think they are contained in the

5    depositions.

6    BY MS. AHERN:

7      Q    Is it safe, then, to say that the only medical

8    records you reviewed were the medical records that may

9    have been attached as exhibits to the depositions that

10   you reviewed?

11     A    I think that's probably true, yes.

12     Q    So that's a fairly limited set of medical

13   records; correct?

14     A    Yes.

15          MR. ERNST:  Well, objection.

16          If you know.

17   BY MS. AHERN:

18     Q    Do you know how many medical records --

19     A    I know I looked at some medical records.  Do I

20   know if they were complete or full?  Yeah, I don't know

21   that.  But I know I looked at some medical records.

22     Q    Okay.  And so it's from those medical records

23   you believe you are aware that Mr. McCornack had taken

24   up to 1 milligram per day of Digoxin in the past?

25     A    I remember that being talked about.

PLAINTIFFS' EXHIBITS 011217

Keith Patrick Gibson                                    June 14, 2011

```
 1      Q     That's twice the amount that he was taking when
 2   he died; is that correct?
 3      A     Well --
 4            MR. ERNST:  Objection; vague as to time.
 5            THE WITNESS:  You're not assuming that he took
 6   1 milligram for a sequence of doses, are you?
 7   BY MS. AHERN:
 8      Q     I know that he took it for a couple of days.
 9            MR. ERNST:  Well, objection.
10   BY MS. AHERN:
11      Q     So I'm asking would that put him at risk --
12            MR. ERNST:  Objection.  You're testifying.
13            THE WITNESS:  Can I just --
14   BY MS. AHERN:
15      Q     I'll ask you to assume that he took it.  The
16   records say he took it for a couple of days.
17      A     See, I thought the records said he only took it
18   for a couple doses, which would have been one day.  Now
19   I didn't really zero in on that --
20      Q     That's an interesting -- how many days do you
21   think a double the dose would have put him at risk for
22   life-threatening arrhythmia?
23            MR. ERNST:  Objection; compound.
24            THE WITNESS:  It's so patient specific, I don't
25   know if I can give you that answer exactly.
```

PLAINTIFFS' EXHIBITS 011218

Keith Patrick Gibson                                      June 14, 2011

                                                              Page 201

 1          I would not, for instance, if he would have

 2    called me and asked me, I would have said, Geez, please

 3    don't do that, because any -- I mean, going over the

 4    toxic level is somewhat more problematic for a person

 5    taking it chronically, because they have large digitors,

 6    and at some point it's dose dependent, true, and at some

 7    point those arrhythmias are going to exhibit themselves.

 8          I don't know if anybody can correlate when

 9    those happen.  You can't test humans, so nobody does it.

10    So I don't think that evidence is out there.

11    BY MS. AHERN:

12      Q    Okay.  You just testified, though, that you

13    thought that taking 1 milligram instead of .5 on the day

14    that he died might have put him at risk for

15    life-threatening arrhythmia?

16      A    It might have, yes.

17      Q    One day?

18      A    Yes.

19      Q    Any reason why it would not have put him at

20    risk for a life-threatening arrhythmia the year before

21    that?

22      A    You know, I really didn't zero in on this.

23          MR. ERNST:  Objection; vague as to time.

24          THE WITNESS:  Was he on Diltiazem at the time?

25    See, maybe I misread that.  I went over it very quickly,

PLAINTIFFS' EXHIBITS 011219

Keith Patrick Gibson                              June 14, 2011

Page 202

1    but I thought he was not on Diltiazem at the time.

2    BY MR. MORIARTY:

3        Q    So you think that the Diltiazem would have made

4    the difference --

5        A    Yeah.

6        Q    -- in your opinion?

7        A    Oh, yeah.

8        Q    Getting back to what your role was then, when

9    you wrote this report, was your role to determine

10   whether or not he had Digoxin toxicity prior to his

11   death?

12       A    Mr. Ernst asked me to determine if there's

13   sufficient science to back up the opinions that the two

14   physicians that have opined that he suffered from

15   digitalis toxicity, and how that might come about.  So

16   you have lots of factors that he didn't understand, and

17   postmortem redistribution.  He told me about an article

18   or two, and so I'm trying -- I tried to work out all of

19   the different elements and factors that might have been

20   at play here on the night of this man's demise.

21       Q    Do you recall from the depositions of the

22   physicians what they based their clinical, or what they

23   base their testimony that Dan McCornack might have

24   exhibited or might have had Digoxin toxicity at the time

25   that he died?

PLAINTIFFS' EXHIBITS 011220

Keith Patrick Gibson                                    June 14, 2011

                                                           Page 203

```
 1      A      I just don't remember.  I'm sorry.

 2      Q      Those were clinical opinions, though; right?

 3      A      Those are their clinical opinions.

 4      Q      You were asked to find scientific support for

 5 their clinical opinions?

 6      A      Yes.

 7      Q      What type of sciential opinions were you

 8 asked to look for to support the clinical --

 9      A      The meaning of the 3.6 Dig level.  If Mr. Ernst

10 is going to go to trial on this matter, he needs to be

11 able to know what that means and how it's going to be

12 used and what data it has in this case.  Correct?

13      Q      Okay.  So your scientific support, what you

14 were looking at specifically is the postmortem Dig

15 level?

16      A      Postmortem Dig level was a factor that I put

17 into the matrix to describe what might happen to

18 Mr. McCornack.

19      Q      What were the other things that you put in the

20 matrix?

21      A      Well, one of the things I thought was important

22 was the fact that he had 1.6 Dig level a year before

23 that was not a peak.  The fact that he was on the

24 maximum dose of Diltiazem, and that he had been on this

25 rather consistently without a lot of other side effects,
```

PLAINTIFFS' EXHIBITS 011221

Keith Patrick Gibson                                    June 14, 2011

Page 204

1    if you will.

2       Q    Did you review the records for Mr. McCornack

3    between the date that his 1.6 level was measured and the

4    date of his death?

5       A    I don't think he went to the doctor a whole

6    bunch in those times.

7       Q    So we don't have any medical records of what

8    was going on with his blood level at that time, do we?

9       A    No.

10      Q    So a lot could happen in ten months; right?

11      A    Well, you know, a 40-year-old man doesn't

12   change in his physiology that greatly over a one-year

13   period.

14      Q    Do you have the understanding of his underlying

15   medical conditions?

16      A    Yes.

17      Q    Do you have an understanding of the underlying

18   risks associated with those medical conditions?

19      A    Oh, yeah.  Like, for instance, he would take an

20   anticoagulant.

21      Q    What were his underlying medical conditions?

22      A    He had atrial arrhythmia.  He also had some

23   other conditions, you know, from your experts they

24   describe him as obese.  Off the top of my head, I can't

25   even remember.  But those were all stated conditions,

PLAINTIFFS' EXHIBITS 011222

Keith Patrick Gibson                                    June 14, 2011

 1    not particularly stuff that I would think would be

 2    transgressing or progressing.  I don't know how to

 3    explain or describe it best.

 4            But I thought he was stable at the time that

 5    the 1.6 was taken, and I thought he remained stable all

 6    that year.

 7     Q    Do you have any understanding of the medical

 8    progression of a chronic symptom like atrial

 9    fibrillation in a young man?

10            MR. ERNST:  Objection.

11            THE WITNESS:  Some.

12    BY MS. AHERN:

13     Q    What is the clinical significance of a

14    22-year-old man being diagnosed with atrial

15    fibrillation?

16     A    The long-term effects, you know, the heart,

17    when it beats, tries to throw out all of the blood

18    without a lot of eddies and currents.  So if the blood

19    eddies and currents, a clot can develop.  So there's

20    this very nice symphony between the heart where it

21    almost leaves no blood in the ventricle.  The atriums

22    are important in filling of those ventricles when this

23    whole process occurs.

24            One of the main problems, he should have been

25    on an anticoagulant.  Even if he was to take an

PLAINTIFFS' EXHIBITS 011223

Keith Patrick Gibson                                    June 14, 2011

 1    anticoagulant -- he was taking an aspirin dose, but I

 2    think that was the limit to which he was willing to

 3    participate in that.

 4        Q    And the reason he should have been on an

 5    anticoagulant, in your opinion, is because a person with

 6    atrial fibrillation can throw a clot?

 7        A    Yes.

 8        Q    Is that fatal?

 9        A    It can be.

10        Q    I have a few more questions about this.

11            You also mentioned earlier that it wasn't

12    really your job or your role here to determine whether

13    or not the tablets that Mr. McCornack took were actually

14    defective; is that correct?

15        A    That's correct.

16        Q    So your job is, basically, to determine if

17    there were formulation problems, if they actually

18    existed --

19        A    Correct, somebody else --

20        Q    -- could have caused Digoxin toxicity?

21        A    Right.  Somebody else is going to have to prove

22    they were defective.

23        Q    If they are unable to prove that or if it is

24    shown that Dan McCornack's tablets were within

25    specification for bioavailability and everything else,

PLAINTIFFS' EXHIBITS 011224

Keith Patrick Gibson                              June 14, 2011

                                                    Page 207

 1   are your opinions valid anymore?

 2            MR. ERNST:  Objection.

 3            THE WITNESS:  My opinion would not be valid

 4   probably.

 5   BY MS. AHERN:

 6       Q    Okay.  We've already talked, you're not a

 7   medical doctor?

 8       A    No.

 9       Q    Not a cardiologist?

10       A    No.

11       Q    You're not a clinical pharmacologist?

12       A    What's a clinical pharmacologist?

13       Q    A clinical pharmacologist is actually a

14   specialty.  Clinical speciality in pharmacology.

15       A    That's a medical specialty.  There is a group

16   of pharmacists known as clinical pharmacists.

17       Q    Are you a clinical pharmacist?

18       A    I served that role in the clinical pharmacist

19   school.

20       Q    Are you a clinical toxicologist?

21       A    Like I described, I'm not sure where that comes

22   in.  I don't understand -- there's no profession for

23   toxicology.  People have Ph.D.s with emphasis in

24   toxicology.  People in pharmacy school study toxicology

25   and go into industry roles that involve toxicology.

PLAINTIFFS' EXHIBITS 011225

Keith Patrick Gibson                                    June 14, 2011

Page 208

```
 1     Q     You haven't done those?

 2     A     Toxicology is a part of the study of drugs.

 3     Q     You haven't done the specialties?  You're not a

 4  specialist in that area?

 5     A     No, I've not taken any additional training

 6  other than pharmacy school and whatever continuing

 7  education I might have had.

 8     Q     Do you consider yourself to be an expert in the

 9  pharmacokinetics and pharmacodynamics of Digoxin?

10     A     Well, it is part of the role of being a

11  pharmacist in a hospital today.  If I couldn't say yes

12  to that, I'd probably be out of a job.  Yes.

13     Q     Okay.  Thank you.

14           Have you published on pharmacokinetics or

15  pharmacodynamics of Digoxin?

16     A     I've not published on it.

17     Q     Have you done any further study on those topics

18  other than for the purpose of this case?

19     A     No.  I'm not the kind of -- when you use the

20  word "expert," what are you talking about?  Am I a

21  university professor?  No.  Do I have a separate

22  research institute in which I deal with this subject?

23  No.  What I am is a pharmacist that works in a community

24  hospital, and I do dosage estimates all of the time.

25  And I used what expertise I had to write this report.
```

PLAINTIFFS' EXHIBITS 011226

Keith Patrick Gibson                                    June 14, 2011

1      Q     Okay.  Do you have any evidence at all that the

2   bioavailability of the Digitek that was recalled in 2008

3   was anything but what it was supposed to be according to

4   the FDA specifications?

5           MR. ERNST:  Objection.

6           THE WITNESS:  I'll have to defer on that.

7   BY MR. MORIARTY:

8      Q     Do you have any evidence?

9      A     I don't have any on me.

10     Q     Have you seen any evidence that the

11  bioavailability of the Digitek that was recalled in 2008

12  was anything other than what the specifications said it

13  should be?

14     A     I do not think I saw a bioavailability test.  I

15  did not see a bioavailability test.

16     Q     To some extent, is your opinion based on the

17  theory that bioavailability of Digoxin that

18  Mr. McCornack took was not within specification?

19     A     Yes.  I mean, Dig was -- is one of the drugs

20  with a narrow therapeutic index.  And small changes can

21  result in changes in the therapeutic level.  And it's

22  not an unknown equation, and it's been written about a

23  lot, and I've read it, that material.

24     Q     Do you know when the last article on Digoxin

25  bioavailability studies was published?

PLAINTIFFS' EXHIBITS 011227

Keith Patrick Gibson                                    June 14, 2011

Page 210

1      A    It was probably a long time ago.

2      Q    Do you know whether or not improvements were

3   made to bioavailability of all the Digoxin formulations

4   on the market or that they were standardized between the

5   time you read that last article and today?

6      A    The problem is not so much whether or not you

7   can include the bioavailabilities.  It's whether or not

8   the bioavailability changed.  If there was a change in

9   the bioavailability, that would change the Dig level.

10  So let's say, for instance, there's a product out on the

11  market, for example, Phenytoin, has terrible

12  bioavailability and it's not a very good capsule, and

13  they've even renamed it as extended-release capsule.

14  Nobody will substitute generic Phenytoin for the

15  innovated product, because nobody wants to take the

16  chance that there's going to be a lack of levels or

17  increase in levels where a person has a seizure.  So you

18  don't substitute those sorts of things.

19          It's the same thing with Digoxin.  Normally the

20  first 15 years of my practice, I don't think I've ever

21  seen a pharmacist ever substitute Dig for a generic

22  medication, until Digitek came out on the market, which

23  surprised me, and people started substituting it, which

24  surprised me.

25     Q    No offense, I'm going to move to strike the

Keith Patrick Gibson                                    June 14, 2011

Page 211

 1    nonresponsive portion of that question.

 2          How many different versions of Digoxin are on

 3    the market?

 4      A    That, I don't know.

 5      Q    Are you aware that there are more than one

 6    generic version of Digoxin on the market?

 7      A    I believe there is.

 8      Q    Ballpark figure, do you know how many?

 9      A    No.  I work in a hospital.  So I don't know.

10      Q    To what extent do you think your opinions on

11    the subject of bioavailability of Digitek are influenced

12    by your training in pharmacy school?

13      A    Heavily.  I mean, bioavailability is an issue

14    whenever pharmacists decide to substitute.  And

15    substitution in California is something that pharmacists

16    do.

17      Q    But you haven't done any independent research

18    on that particular issue as far as it pertains to

19    Digoxin since pharmacy school?

20      A    Correct.

21      Q    And I have a couple of other questions.

22      A    Your last question excludes this endeavor on my

23    part?

24      Q    Excluding the litigation, yes.

25      A    Okay.

Keith Patrick Gibson                                    June 14, 2011

```
 1      Q     When we're talking about pharmacokinetics of a
 2   drug you define steady state, so does Gilman and
 3   Goodman, as the time at which the amount of drug put
 4   into the body is equal to the amount being secreted by
 5   the body?
 6      A     Right.
 7      Q     So we have an equilibrium?
 8      A     Approximately.  You understand it's really an
 9   osmotic thing.  So five to seven times a halflife,
10   you're at about 90 percent.  So, you know, when you
11   start to look at other factors, when you start to get
12   tests, there's errors in the tests and there's all sorts
13   of other factors.  So 90 percent is usually described as
14   a steady state.  The assumptions are kind of sort of
15   made that it's not going to go up anymore.
16      Q     What's not going to go up?
17      A     Well, because osmotically approach is 100
18   percent, some theoretical maximum; right?  So what --
19   the math is that at five to seven times a halflife,
20   you're 90 percent there.
21      Q     I'm just asking about steady state in lay terms
22   so the jury can understand this concept.
23      A     In lay terms they would be the intake equals
24   the out.
25      Q     Gotcha.
```

Keith Patrick Gibson                                    June 14, 2011

1            We're not talking about it, but what's defined

2    is that there's a store of Digoxin in the body that

3    remains theoretically equal or steady as more is being

4    added and as the drug is being excreted?

5        A    Correct.  So you don't go down to zero.

6        Q    Correct.

7        A    You start at some higher level.

8        Q    The point is to maintain a certain level in the

9    active site; correct?

10       A    Hopefully.

11       Q    It takes about seven to ten days to reach

12   steady state with Digoxin, doesn't it?

13           MR. ERNST:  Objection.

14           MS. AHERN:  Excuse me?

15           THE WITNESS:  The question was, does it take

16   seven to ten days to reach steady state?

17           MR. ERNST:  Objection.

18   BY MS. AHERN:

19       Q    For a normal person receiving Digoxin it takes

20   approximately seven to ten days to reach steady state;

21   correct?

22       A    I am so tired that I thought that the halflife

23   of Digoxin was 24, 30 hours, something like that.  So

24   five to seven times, yeah.

25       Q    Okay.  Seven to ten?

PLAINTIFFS' EXHIBITS 011231

Keith Patrick Gibson                                    June 14, 2011

 1      A     That's just in the label, I believe.  Right.

 2      Q     Do you agree that it would take seven to ten

 3   days for a patient to achieve a new steady state level

 4   if their dose was changed?

 5      A     A new steady state level, yes.  Not a momentary

 6   passing.

 7      Q     Right.  A single double dose in one day, which

 8   patients sometimes will take, is not going to affect

 9   your overall steady state level?

10      A     It won't affect your steady state level, but it

11   will produce a peak and will result in the next trough

12   to be higher than the previous troughs.

13      Q     Is that more or less important with drugs that

14   have a long halflife?

15      A     Well, a long halflife, it is probably not as

16   important, yeah.

17      Q     Okay.

18      A     I mean...

19      Q     Digoxin has a relatively long halflife, doesn't

20   it?

21      A     The problem that you're not putting in that

22   equation is the therapeutic index.  So, if you have say

23   Ampicillin, which has a large therapy index, there's a

24   huge margin for error there.  So if you're off by

25   different percentages, it's just not going to be of any

PLAINTIFFS' EXHIBITS 011232

Keith Patrick Gibson                                    June 14, 2011

Page 215

1    moment.  But when you have a narrow therapeutic index,

2    it's kind of like threading a needle through a hole.  So

3    it takes a lot less to move in that very specific small

4    area.

5        Q    Do you have an opinion to a reasonable degree

6    of probability as to how much defective tablets

7    Daniel McCornack would have to ingest and over what

8    period of time in order to actually change his steady

9    state level?

10             MR. ERNST:  Objection; asked and answered.

11             Go ahead and answer the question.

12             THE WITNESS:  Well, a steady state for him

13   would have probably been achieved in seven to ten days.

14   So, you know, if you are asking me did he get a steady

15   state level, then it would be five to seven times the

16   halflife.  You're asking me if his blood levels were

17   encroached or pass over that area of which he would

18   start to exhibit toxic effects, it depends upon the

19   starting position he's at, where that line is that I --

20   where the line is that you can't cross to start the

21   toxic effects, could be, and it is not all that uncommon

22   to find patients start to exhibit toxic symptoms on the

23   upslope as those peaks and troughs start to increase.

24   BY MS. AHERN:

25       Q    Have you done any calculations in this case to

PLAINTIFFS' EXHIBITS 011233

Keith Patrick Gibson                                    June 14, 2011

Page 216

```
 1   determine what effect --
 2       A    I have not done physical calculations.
 3       Q    To determine how many tablets --
 4       A    Right.
 5       Q    -- Mr. McCornack would have taken and how
 6   many --
 7       A    Given the time --
 8       Q    -- days?
 9       A    -- time restraints that I was given to write
10   this report, I did not think it was particularly
11   fruitful nor all that probative.  So I elected just to
12   use Global RPH to essentially demonstrate the concept.
13       Q    The Global RPH is this table we have --
14       A    Correct.
15       Q    -- on -- this is the table on page 4?
16       A    I believe so.  Yes.
17       Q    Okay.  So on here we have increase in
18   bioavailability of up to 50 percent?
19       A    Correct.
20       Q    Okay.  And we know that he's taken at least up
21   to 100 percent on occasion?
22            MR. ERNST:  Well, objection.  Objection as to
23   time.
24            THE WITNESS:  Well, once in the past I think I
25   read that he reported that he had taken a double tablet.
```

Keith Patrick Gibson                              June 14, 2011

                                                      Page 217

 1    And I don't -- see, my recollection of it is that it was
 2    a sporadic thing, not a consistent thing and that he
 3    reported that he felt bad he took a double tablet in
 4    those days and he was counseled against it.  That's
 5    very, very long ago.  And I -- so that's all I know
 6    about that.
 7    BY MS. AHERN:
 8        Q     Okay.
 9        A     It was really deep in the medical record, as I
10    remember.
11        Q     Just looking at your table here, I'm sure you
12    can probably do it in your head; if not, I can
13    understand, I can't do in my head anymore.
14              If you increased the bioavailability or if you
15    doubled the dose in this case, so you have 100-percent
16    increase in bioavailability, what would his steady state
17    level be?
18        A     I guess you could do like we used to do in
19    school before we had computers.  I mean, if 50 percent
20    took you from 2.4 to 1.6, is that a .6 difference?  No.
21              MR. ERNST:  .8.
22              THE WITNESS:  .8 difference.  Thank you very
23    much.
24    BY MS. AHERN:
25        Q     So we would be up to, what, 3.2?

PLAINTIFFS' EXHIBITS 011235

Keith Patrick Gibson                                    June 14, 2011

Page 218

1      A     Is it linear?  I don't know if it's linear.

2    We're assuming it's linear.  You ever do that --

3    probably too young.  The biorhythmic tables --

4      Q     I remember those.

5      A     -- where you tried to extrapolate on two.  That

6    was based on the idea that the error, you were doing it

7    linear and you're not on the curve, the error was so

8    minute that it was not important.

9      Q     Is there any reason you didn't go ahead and

10   have Global RPH calculate increased bioavailability all

11   of the way up to 100 percent in terms of determining

12   steady state level?

13     A     I wasn't trying to say that it increased the

14   bioavailability.  I was just trying to give the lay of

15   the land.  Whether you're trying to determine what's the

16   magnitude of these effects, I was kind of using this as

17   the -- to show what you might expect if that was to

18   happen.

19           Now, the reason I picked zero to 50 was

20   because, in my mind, I kind of used 80 percent as the

21   benchmark for Dig.  And if a new formulation comes

22   along, it would be an increase of about 20 percent.  If

23   some of the literature says it's 60 to 80, so 40 to 140.

24   So I was trying to get in those ranges to give you a

25   feel for what the increases might be looking like.

PLAINTIFFS' EXHIBITS 011236

Keith Patrick Gibson                                    June 14, 2011

1      Q      Okay.  You can never have more than 100 percent
2   bioavailability; right?
3      A      I hope not.
4      Q      If we have a tablet that's absorbed up to
5   80 percent, 80-percent bioavailability, we're really
6   looking at this 20-percent increase in bioavailability?
7      A      Well --
8      Q      To get to 100 percent?
9      A      Yes.  So these are increases.  So we're
10  talking --
11     Q      So at 100 percent bioavailablity in a tablet,
12  am I correct in looking at your table here, starting at
13  with the level of 1.6 with Dan McCornack?
14     A      My thinking process was that if it was 60 plus
15  40 it would 100.  Then I just included one data point
16  past.
17     Q      Okay.  I'm just -- maybe I'm looking at this
18  differently now.  But am I correct that you started with
19  1.6 because that's a level that we had on Mr. McCornack
20  ten months prior to his death; correct?
21     A      Right.  What I did was set it in the Global RPH
22  to get the coefficient and the constants so I could make
23  these changes.  Then I went through the program and
24  started changing the dose.  And I wanted to include a
25  20-percent increase and a 40-percent increase, and I put

PLAINTIFFS' EXHIBITS 011237

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 220

 1    one past that for reference frame.

 2         Q    Okay.

 3         A    Just for the insight.

 4         Q    We assume, then, that for Mr. McCornack, his

 5    tablets, you know, were 60-percent bioavailable for

 6    Digoxin?

 7         A    Somewhere around 60 to 80 is what I would --

 8         Q    He had a level of 1.6.  If we increase that to

 9    100 percent, his maximum level would be somewhere around

10    2.24?

11         A    Correct.

12              MR. ERNST:  Objection.

13              MS. AHERN:  You've made your objection.

14         Q    If we've assumed -- you've answered the

15    question; right?  That's what this is basically getting

16    at?

17         A    Right, but you're playing numbers now.

18         Q    I am, because you have numbers in here.  I'm

19    asking you about the numbers in your report.

20         A    Right.  And I didn't give these numbers to be

21    exact numbers --

22         Q    I understand.

23         A    -- so you can extrapolate --

24         Q    I totally understand.  And I am exploring --

25              MR. ERNST:  Let him finish answering his

                   PLAINTIFFS' EXHIBITS 011238

Keith Patrick Gibson                                    June 14, 2011

1    question.

2    BY MS. AHERN:

3         Q     -- how this works.

4         A     I'm trying to show you what the lay of the land

5    would be.

6         Q     Okay.

7         A     The problem is that you don't really know with

8    just one data point if you have the correct coefficient

9    or not.

10        Q     I agree.  One doesn't tell me much.

11        A     No.  And the 1.6, you know, assuming in an

12   all-perfect world that it was, he is the one person who

13   sits directly on the line and is not one of the

14   outliers, and this is what it would be.

15        Q     Okay.

16        A     But he could potentially be one of the

17   outliers.  So that's the clinical decisions that makes

18   it difficult when you're adjusting doses.  You can't

19   just play with numbers.

20        Q     I understand.

21              I'm going to follow through with my questions

22   on this table so that we can understand exactly what.  I

23   know this is theoretical.  Right?  It's a theoretical

24   calculation?

25        A     It's based on the perfect person that fits the

PLAINTIFFS' EXHIBITS 011239

Keith Patrick Gibson                                        June 14, 2011

Page 222

 1   equation.

 2       Q     Right.  And we don't know if McCornack was the

 3   perfect person.

 4             So theoretically then, if we --

 5             MR. ERNST:  I would like to take a short break.

 6   You are talking as quickly as an auctioneer, and that's

 7   a compliment, okay.

 8             MS. AHERN:  We're going to finish my question

 9   before and then we can take a break.

10             MR. ERNST:  Actually, we can take a break at

11   any time.

12             MS. AHERN:  There's a question pending, and it

13   is highly inappropriate for you to go out --

14             (Interruption by the reporter.)

15             MR. ERNST:  Is there a question pending?

16             (Interruption by the reporter.)

17             THE WITNESS:  If there's a partial question, it

18   is proper to have that question answered before we take

19   a break, so go ahead.

20             MS. AHERN:  I believe there was a proper

21   question pending as well.

22                     (Record read.)

23             MS. AHERN:  We've already acknowledged on the

24   record that this is theoretical.

25             MR. ERNST:  I just --

PLAINTIFFS' EXHIBITS 011240

Keith Patrick Gibson                                    June 14, 2011

Page 223

 1        MS. AHERN:  I can talk very slowly if you would

 2   like.  If that's the problem, I can speak very slowly.

 3        THE REPORTER:  I do need you to slow down.

 4        MR. ERNST:  What I would like to do is to take

 5   literally a three-minute break.  Three-minute break is

 6   all I request.  If you'd like to finish asking this

 7   question I thought it was partitioned in any way, that's

 8   fine, if you want to take a shot at it.  If not, I'd

 9   like a three-minute break.

10        MS. AHERN:  I would like to finish my question.

11   I only have one on this.  We've already asked the first

12   part of it.

13        MR. MORIARTY:  Let's stop debating and ask the

14   question.

15   BY MS. AHERN:

16   Q    The question is, we have already assumed that

17   if we had a bioavailability in the tablet that

18   Mr. McCornack took of 60 percent --

19   A    Uh-huh.

20   Q    -- if we go up to 100-percent bioavailability,

21   we have a level of about 2.24 for his steady state

22   level?  Understanding this is theoretical level.

23        MR. ERNST:  Objection.  Multiple objections.

24        Go ahead.

25        MS. AHERN:  I will give you a standing

Keith Patrick Gibson                              June 14, 2011

Page 224

1    objection on this line of questioning if you'd like, if

2    you just stop interrupting me so we can get through

3    this.

4         Q    The next question I had was, if the

5    bioavailability was 80 percent for the tablet he took,

6    and we added 20 to get to 100-percent bioavailability,

7    that puts him at a steady state zero Digoxin

8    concentration of about 1.92; correct?

9              MR. ERNST:  Objection.

10             THE WITNESS:  If he's the perfect man.

11   BY MS. AHERN:

12        Q    If he's the perfect man.

13             And 1.92 is within the therapeutic range;

14   correct?

15        A    It's lower than the toxic range.

16             MS. AHERN:  Now if you want to take your

17   three-minute break before I finish up, we can do that.

18             MR. ERNST:  That would be great.

19                  (Recess.)

20   BY MS. AHERN:

21        Q    Mr. Gibson, we've been talking about blood

22   levels all day; right?

23        A    We have.

24        Q    Or serum levels?

25        A    Or serum levels, yes.

PLAINTIFFS' EXHIBITS 011242

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 225

1       Q    I wanted to ask, where is Digoxin

2   pharmacological activity?  Is it in blood or is it in

3   tissue?

4       A    It's in tissue.

5       Q    So are you aware that there are calculations

6   that you can perform to determine the approximate tissue

7   concentrations of Digoxin of a person taking that drug?

8       A    From the tissue?

9       Q    Uh-huh.  There are calculations you can perform

10  to determine the tissue concentrations of Digoxin?

11      A    From blood levels?

12      Q    From the dose and from other parameters?

13      A    Yes.  No.

14      Q    Okay.  So you're not aware of any calculations?

15      A    I'm not familiar with that.

16      Q    Okay.  You're not aware of any software

17  available that would allow a person to calculate both

18  blood concentration and tissue concentrations in an

19  individual based on their own physiological parameters

20  and the dose they are taking?

21      A    There are pharmacokinetic programs where you

22  can put in all of those variables, and they will give

23  you expected.  I never saw tissues though.  But I don't

24  know anybody that would ask that Dig levels in heart

25  blood cells.  I've never seen that.  But we do have

Keith Patrick Gibson                                    June 14, 2011

Page 226

1   programs that I use regularly for both vancomycin and

2   gentamicin to do just what you're asking.

3        Q    Okay.

4        A    But --

5        Q    I'll represent to you that there are programs

6   and there are algorithms that one could use to calculate

7   the different compartments, the different concentrations

8   of Digoxin the various body compartments?

9        A    I'm not aware.  Now I will go look for them.

10       Q    Do you think that it would be important with a

11  drug like Digoxin which has effect on cardiac tissue to

12  know what the actual tissue concentrations of the drug

13  are at any point in time?

14            MR. ERNST:  Objection.

15            THE WITNESS:  I didn't even think that it was

16  all that valuable to calculate them in this particular

17  case just to get serum levels, because there are too

18  many variables that could occur in a person.  I mean, I

19  think the clinical picture is probably the telling

20  aspect of this.  So, no, I didn't.

21  BY MS. AHERN:

22       Q    Okay.

23       A    It didn't cross my mind.  I don't know what I

24  want to say.  I didn't think it was all that

25  appropriate.

Keith Patrick Gibson                                    June 14, 2011

Page 227

```
 1      Q    Okay.  And we talked a little bit today about

 2   we have some articles discussing this passive diffusion

 3   of the Digoxin from tissues into the blood postmortem.

 4   Would it be important or relevant to know what a tissue

 5   concentration was so you could have an understanding of

 6   the gradient and where that gradient --

 7      A    Yes.  Yes.  I didn't mean to imply that not

 8   knowing that there are these uptake mechanisms or that

 9   you do have certain tissues with concentrations of Dig

10   that are varying in the blood.  I didn't mean to imply

11   that I didn't know that or those didn't exist.  I just,

12   what I think was focusing was on the ability to

13   calculate that.  That's the part that I was --

14      Q    Okay.

15      A    -- not too sure.  I've never seen anybody

16   calculate those kind of things.

17      Q    You've cited in here an article -- I don't know

18   if it was Goodman or not?  Sorry.  I think it was

19   Gilman.

20      A    Goodman and Gilman.

21      Q    42, cite 42.  That at steady state the

22   concentration of Digoxin in cardiac tissue is about 15

23   to 30 times higher than that of plasma?

24      A    Correct.

25      Q    So we know the tissue concentration of the drug
```

PLAINTIFFS' EXHIBITS 011245

Keith Patrick Gibson                                      June 14, 2011

Page 228

1    is significantly higher than that we find in blood?

2        A    Correct.

3        Q    That would be important to know in terms of

4    what your gradient is postmortem for passive diffusion?

5        A    That's kind of been the assumption all morning.

6    That we're talking about a gradient from the blood

7    that's closest to the heart to what would be in the

8    distal parts of the body.

9        Q    But knowing the value of that would give you a

10   better idea of where you are in that gradient, in that

11   process of diffusion; correct?

12       A    Correct.

13       Q    Also knowing the timing of his last dose would

14   also be very important.  Obviously, you know where you

15   are in that process?

16       A    Have you ever timed passive distributions for

17   an osmotic effect?

18       Q    Have you?

19       A    I've done it in an in-vitro situation.

20       Q    In-vitro?

21       A    It's very slow.

22       Q    Yes, it is.  But we're talking about tissue and

23   human blood.

24            Do you have any frame of reference for the time

25   on that?

PLAINTIFFS' EXHIBITS 011246

Keith Patrick Gibson                          June 14, 2011

1      A    Well, the difference in tissue and blood is

2   once a person dies, all the active processes -- well,

3   some of the active processes die and the other active

4   processes die slowly as the patient dies.

5           Then you have to wait for the breakdown to

6   occur.  So there's a breakdown of the cells before they

7   can release the contents.  So it's not just passive

8   redistribution straight up like in-vitro, for instance.

9   But it's not very fast.

10          MS. AHERN:  I think that's all I have right

11  now.

12          MR. MORIARTY:  I've got about five minutes'

13  worth of questions.

14          MR. ERNST:  Well, I'll have some more

15  questions.  I think it's my turn.

16          MR. MORIARTY:  I think you actually get to go

17  last.  But if you want to ask your questions, you go

18  ahead and then I'll go last.

19          MR. ERNST:  I'll tell you what, if you want to

20  ask your questions and you won't ask other questions

21  after I ask my questions, that will be fine.

22          MR. MORIARTY:  Can't promise that.

23          MR. ERNST:  Then it's my turn.

24          MR. MORIARTY:  Go ahead.

25          Note a continuing line of objection to any

PLAINTIFFS' EXHIBITS 011247

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 230

 1   questions he asks at a discovery deposition of his own

 2   expert.

 3              Go ahead.

 4              MR. ERNST:  Not to be in violation of pretrial

 5   order 22, why would you object to my asking an expert

 6   questions at his own deposition?

 7              MR. MORIARTY:  That isn't a PTO 22 objection.

 8

 9                      EXAMINATION

10

11   BY MR. ERNST:

12      Q    Good afternoon, Mr. Gibson.

13      A    Good afternoon.

14      Q    We've been in your deposition for approximately

15   five hours at this point?

16      A    Yes, we have.

17      Q    And you've indicated you are a little tired?

18      A    I -- yes.

19      Q    But we will try and speak slowly and cover some

20   ground here.

21              In your report dated May 16th, 2011, you put in

22   50 footnotes and 12 other references for a total of 62

23   specific references in your report?

24      A    That's correct.

25      Q    And you reviewed all of this material to give

Keith Patrick Gibson                                June 14, 2011

                                                    Page 231

1    your best testimony as to the Digoxin issues that have

2    been presented in this case as they related to

3    Mr. McCornack?

4         A    Yes.

5         Q    Now, there have been a number of questions

6    asked about all of the articles that have been presented

7    to you.  And many of them, the questions were selected

8    with a specific quote to a specific sentence in a 10- or

9    15- or 20-page article; true?

10        A    True.

11        Q    And have any of the questions changed any

12   opinion that you have related in your report dated

13   May 16th, 2011?

14        A    No, they have not.

15        Q    For instance, in Exhibit D, you were asked --

16             MR. MORIARTY:  Which one is that?

17             MR. ERNST:  The Koren report, spelled

18   K-o-r-e-n.  "Postmortem Redistribution of Digoxin in

19   Rats."

20        Q    Mr. Moriarty asked you if a specific sentence

21   were true, but he didn't read all of the sentences or

22   the paragraph; true?

23        A    As I remember.

24        Q    For instance, one of the questions was, quote,

25   "In common with early reported human studies, the first

PLAINTIFFS' EXHIBITS 011249

Keith Patrick Gibson                                    June 14, 2011

1    part of our experiment indicates that in the rat low

2    antemortem serum levels during life tend to increase

3    significantly after death."

4         He asked you if that were true.  And you stated

5    that he read it correctly.

6         But he did not read you the next sentence,

7    which is, "On the other hand, this phenomenon was not

8    observed following exposure of test animals to higher

9    Digoxin dosage."  Is that also true?

10        A    That is true.

11        Q    For instance, he went to the conclusion and

12   picked up the one item, item two, where he talked about

13   antemortem Digoxin intoxication cannot be reliably

14   inferred on the basis of high-dose mortem levels on the

15   drug alone.

16        But he did say that Digoxin -- or item 3 also

17   reads, "Digoxin intoxication can be ruled out when

18   postmortem serum concentrations remain within the

19   therapeutic range."  Do you see that?

20        A    Yes.

21        Q    In this particular case, the test of

22   Mr. McCornack came back at 3.6; true?

23        A    Yes.

24        Q    And that is not in the therapeutic range?

25        A    That is not in the therapeutic range.

PLAINTIFFS' EXHIBITS 011250

Keith Patrick Gibson                                    June 14, 2011

```
 1      Q    And therefore you cannot rule out Digoxin

 2  intoxication?

 3      A    You cannot rule out Digoxin intoxication.

 4      Q    And he left out item one, which reads, quote,

 5  "After death passive redistribution of Digoxin may take

 6  place when the serum concentrations are within the

 7  therapeutic or toxic range it appears likely that

 8  Digoxin will reenter the blood," period.

 9           But he left off "High antemortem serum

10  concentrations of Digoxin may prevent such a passive

11  redistribution"; true?

12      A    True.

13      Q    Now, as an example, is this whole series of

14  quotes that would appear to you to be taken in isolation

15  and in many cases out of context?

16      A    Yeah.  There's some out of context, yeah.

17      Q    Now, I --

18      A    I mean the problem with out-of-context things

19  is that they can be true statements.  True statements as

20  to the context in which they were given and related to

21  the case study that they are talking about.  For

22  instance, I think at one point I was asked -- or about

23  some statements said you just cannot consider postmortem

24  Dig levels at all for anything.  I don't think that's

25  true.  I think you can consider them for some stuff.  I
```

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 234

 1    think they do tell you and they do give you some data.

 2    But what you do with that, though, I don't think you can

 3    extrapolate back based on one point.  But they do tell

 4    you that he had consumed Dig and that he consumed a

 5    fairly large amount of Dig.

 6        Q    So going back to your report, which I believe

 7    has been marked as Exhibit A --

 8        A    I believe so.

 9        Q    -- in this deposition.  Is everything in that

10    report true and accurate to your knowledge?

11        A    Yes, I believe everything in there is --

12        Q    And --

13        A    -- true.

14        Q    And if there were someone saying that you were

15    not qualified to testify at an OFAIR hearing, would you

16    have said in your report is sum and substance of what

17    you intend to testify at the time of trial?

18        A    That's correct.

19        Q    And I have a couple of more specific questions.

20             Does the pharmaceutical evidence that you have

21    in this case, together with all of the reading, support

22    the opinions and conclusions of Dr. Mason that

23    Dan McCornack died of Digoxin toxicity?

24        A    They do.

25        Q    And is that your opinion?

Keith Patrick Gibson                                      June 14, 2011

Page 235

1      A      That's my opinion.

2      Q      Tell us why you believe that Dan McCornack died

3   of Digoxin toxicity.

4      A      Well, I believe that he was taking a

5   substantial dose, .25 twice a day.  He was taking it in

6   the morning and evening.  He was also on Diltiazem,

7   which has been known to raise the Dig levels.  I believe

8   his doctor had every intention of treating this as

9   aggressively as possible.  They wanted his levels to be

10  high.  The postmortem level is one data point, but the

11  other more important data point, I believe, is the 1.6

12  that was taken a year before, and what I believe to be a

13  fasting level.  So that would be a trough and not a

14  peak.  And so I think when you talk about these levels

15  always being most consistently related to the peaks, I

16  believe that he was at the very edge of Dig toxicity and

17  that's what the doctors wanted him to be.  They believed

18  that was the appropriate treatment for him, for his

19  arrhythmias.

20          Then something came along that changed the

21  amount of Dig that Mr. McCornack -- one of the

22  possibilities is -- well, I mean there's lots of

23  possibilities.  But if this company produced

24  nonconforming tablets, it's a very strong possibility

25  that Mr. McCornack, if he were to consume those, would

PLAINTIFFS' EXHIBITS 011253

Keith Patrick Gibson                                    June 14, 2011

Page 236

1    have had a new Dig level which might have pushed him

2    over the -- conditional words are difficult for

3    nonscientists.  Scientists always use conditional terms

4    and I'm trying not to be conditional -- but would push

5    him over that level in which he went into toxic

6    morbidity.

7         Q    Is it your opinion that more likely than not,

8    after the review of all of the material that you have

9    reviewed in this case, that the elevated Digoxin level

10   in Mr. McCornack caused his arrhythmia and his death?

11        A    That's what I think happened.

12        Q    And based upon a number of items that you have

13   reviewed, including defendants' Exhibit 92, which is

14   Mr. Bliesner's report?

15        A    Yes.

16        Q    Now, in that report, although you didn't

17   read -- well, in that report, looking at item 22, which

18   I think you pointed out, it notes in that June of 2004,

19   there was a complaint from a pharmacist in Bellingham,

20   Washington regarding a thick Digoxin tablet.  And

21   confirms double thickness, and no definitive root of

22   cause found.  Compression occurred on tablet pressed

23   number 67 or 71.  Tablet manufacture occurred six,

24   seven, ten November, 2003.  No chemical testing

25   conducted on the product.  And this is the first

PLAINTIFFS' EXHIBITS 011254

Keith Patrick Gibson                              June 14, 2011

1    instance of a double-thick Digoxin tablet reportedly

2    confirmed in the marketplace.  Do you recall reading

3    that?

4         A    Yes.

5         Q    Is that an anomaly?

6         A    That's an anomaly.  One of the reasons I

7    pointed it out to you, I read a case study where the

8    problem was a change or a variation in the lubricant

9    that was put into the Dig tablet and that resulted in

10   tablets sticking to the presses.  So I pointed that out

11   to you in order to alert you to the idea that there

12   might have been a formulary issue, formulation issue

13   with these Digoxin tablets.

14        Q    And there's also a reference, item 39 -- sorry,

15   strike my previous question.

16             Item 39 in Dr. Glide's report indicates on the

17   30th of November, 2007 double-thick tablets discovered

18   during the manufacture of Digoxin 0.125 milligram

19   tablets.  Although initially halted, production

20   continued following only visual inspection.  Detailed

21   investigation conducted within a very short period of

22   time.  The product is released to market without

23   conclusive evidence of what caused the double-thick

24   problems on 5 December, 2007.  No chemical testing of

25   tablets was conducted.

PLAINTIFFS' EXHIBITS 011255

Keith Patrick Gibson                                    June 14, 2011

1          Do you recall reading that?

2      A    I recall reading that, pointing it out to you,

3   yes.

4      Q    Why did you point that out to me and why did

5   does it bother you?

6      A    Well, it bothers me because it tends to

7   indicate that there was a formulation issue at this

8   manufacturer.  I mean, it kind of looks like when you

9   review that report that these people had very poor

10  quality control.  And if they are having tablets that

11  are double pressed, I don't see how you can just reject

12  them as anomalies and release that product.  I think you

13  need to examine and discern why the double pressing

14  occurred other than why it was sticking in the machine.

15  I think bioavailability of the test needed to be done.

16  I didn't see any of that done by the manufacturer.

17     Q    Do you see a note from the FDA dated 18th of

18  March to 20th of May, 2008, wherein they actually

19  comment on the complete lack of the quality control

20  system in the production of Digitek?

21     A    I did see that in the report, yes.

22     Q    And that bothered you, as well, as a

23  pharmacist?

24     A    It sure did.  If there's anything that a

25  pharmacist or doctor relies on is the absolute certainty

Keith Patrick Gibson                                    June 14, 2011

Page 239

1    that the product they are dispensing meets certain

2    standards for which they can make their clinical

3    judgments therefrom.

4         Q     And I take it that this is the kind of

5    nonconforming tablet that has been demonstrated in the

6    reports by Actavis itself and confirmed by the FDA that

7    you believe were more likely true than not the reason

8    for Mr. McCornack's --

9         A     Demise.

10        Q     -- demise?

11              MR. MORIARTY:  Objection.

12              MS. AHERN:  Objection.

13   BY MR. ERNST:

14        Q     Is that true?

15        A     Yeah.  I -- his clinical picture is absolutely

16   stable.  Something new happened on this particular date.

17   You can look for sort of reasons that are sort of out

18   there, but I mean, when you combine that with the known

19   data that he had a high Dig level postmortem, I mean, he

20   was taking quite a bit of Dig.  But something was

21   different about that time for Mr. McCornack.

22        Q     And in all of the things that you reviewed, all

23   of the things, is it your opinion it's more likely true

24   or not it was a nonconforming Digitek tablet or tablets?

25        A     I believe so.

PLAINTIFFS' EXHIBITS 011257

Keith Patrick Gibson                                    June 14, 2011

                                                              Page 240

1       Q    And for the record, I believe you testified to

2   this, but if there is a Digitek tablet that is a double

3   strength -- double-strength dose, that is possible to

4   cause toxicity in an individual like Dan McCornack?

5       A    Depends upon where my starting position is and

6   how close I am to the toxic level, yes, it could be.

7       Q    Now, you recall that his wife on the -- at the

8   time on the day of his death reported that he was

9   fatigued and felt bloated?

10      A    I do you recall that.

11      Q    What does that mean to you?

12      A    Well, fatigue is --

13           MR. MORIARTY:  Objection.

14           MS. AHERN:  Objection.

15           THE WITNESS:  Fatigue is one of the symptoms of

16  Dig toxicity.  But the problem with it is it's going to

17  be masked by so many other people.  People who have

18  atrial fib can just be fatigued as a natural course of

19  illness.

20  BY MR. ERNST:

21      Q    And I think you've answered this question, but

22  is it necessary that there be nausea or vomiting before

23  Digoxin toxicity manifests itself in the heart?

24      A    I do not -- at this point in my research I did

25  not, when I wrote the report, believe that was a

                    PLAINTIFFS' EXHIBITS 011258

Keith Patrick Gibson                                    June 14, 2011

Page 241

1    necessary symptom that would precede cardiac arrest.

2         Q    And the Digitek level that was taken on

3    Mr. McCornack after his death was 3.6; true?

4         A    Yes.

5         Q    And in light of all of the other information

6    that you had in this case, all of the articles that

7    you've read, what does that 3.6 level mean to you?

8         A    To me it means that he had a substantial amount

9    of Digoxin on board and that there probably is some

10   redistribution occurring, because of that it's a data

11   point that I think needs to be considered in looking at

12   the final clinical picture of Mr. McCornack.

13        Q    Now, is it safe to say that you can't

14   extrapolate back to the exact number at the time of his

15   death as to what the Digitek level would have been?

16        A    I cannot extrapolate back to the exact numbers,

17   correct.

18        Q    But it is your opinion that the 3.6 postmortem

19   level of Digitek --

20        A    Digoxin.

21        Q    -- Digoxin in his blood serum level is an

22   indication of a toxic level in his body at the time of

23   his death?

24        A    I think that is correct.

25        Q    And in Dr. Bliesner's report, item 38 referred

PLAINTIFFS' EXHIBITS 011259

Keith Patrick Gibson                          June 14, 2011

                                                Page 242

1    to an October 1st, 2007, internal e-mail with Actavis

2    indicating that Digoxin .25 milligram is the top product

3    where adverse drug effects were associated with death or

4    permanent injury.

5              Do you recall pointing that out to me?

6       A    I do, but -- yes.

7              MR. ERNST:  All right.  Thank you.  I don't

8    have any other questions at this time.

9

10                      FURTHER EXAMINATION

11

12   BY MR. MORIARTY:

13      Q    In the course of your work as a pharmacist,

14   have you ever read an Establishment Inspection Report?

15      A    No.

16      Q    Have you ever read a warning letter?

17      A    No.

18      Q    Have you ever read an FDA form 483?

19      A    No.

20      Q    In your work as a consultant in this case, did

21   you read any 483s, warning letters or EIRs?

22      A    If I did, I wouldn't know they were 483s or

23   EIRs.

24      Q    Okay.

25      A    If I read them, I just read them, I didn't pay

PLAINTIFFS' EXHIBITS 011260

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 243

1    much attention to form.

2        Q    So when Mr. Ernst was pointing out something in

3    David Bliesner's report about a lack of quality control,

4    do you know whether the underlying document actually

5    says that about Digitek production?

6        A    All I know is what was in that report.

7        Q    Do you know whether the batch that Mr. Ernst

8    was talking about in November of 2007 was of the same

9    dose strength as prescribed to Mr. McCornack?

10       A    All I know is what's in that report.

11       Q    Do you know whether that was the batch that was

12   referred to in Exhibit F -- the MDL Exhibit 38, the FDA

13   statement I read to you before?

14       A    No, I don't.

15       Q    Do you know anything at all about the 2004

16   single double-thick tablet incident that Mr. Ernst asked

17   you about?

18       A    No.  My role was --

19       Q    Do you know what the FDA's reaction was when

20   Actavis reported that to them?

21       A    I don't know what FDA's reaction was.

22       Q    Outside this litigation consultation, have you

23   ever been asked to address a scientific value of a

24   postmortem blood concentration?

25       A    No.

PLAINTIFFS' EXHIBITS 011261

Keith Patrick Gibson                                    June 14, 2011

Page 244

1      Q    Do you have that Dr. Gallanter's article that
2   you pulled a couple days ago?
3      A    You want my copy?
4      Q    Yep.  It's the only copy in the room.
5      A    Do you know what it looks like?  Would it be
6   quicker for you to find it than me?
7      Q    The Beauman Gallanter article.
8      A    Can you recognize it from the front?
9           MS. AHERN:  Here.  Maybe -- I'll take a look if
10  you don't mind.
11          MR. MORIARTY:  Why doesn't Hunter look at it
12  while I finish asking you some questions.
13     Q    When you read the actual reports of
14  Dr. McMaster, Gallanter, Heard and Brown, I know you may
15  disagree with their opinions, but did you find any
16  particular scientific flaws in their reasoning?
17          MR. ERNST:  Objection.
18          THE WITNESS:  They all -- they all didn't
19  address -- if I was to summarize what I got from those,
20  was that they were assessing different causes of death
21  other than Dig toxicity, and none of them seemed to
22  address the issue of whether or not the tablet was
23  conforming or nonconforming.  Is that what you're
24  asking?  Did I?
25          ///

PLAINTIFFS' EXHIBITS 011262

Keith Patrick Gibson                                    June 14, 2011

Page 245

1    BY MR. MORIARTY:

2        Q    Well, you're inviting editorial comment, so I

3    will skip it.

4        A    All right.

5             Did you find it?

6             MS. AHERN:  I didn't.  It may be in your other

7    ones.

8             THE WITNESS:  Okay.

9    BY MR. MORIARTY:

10       Q    What percentage of --

11       A    I know I had it.

12       Q    -- of patients -- what percentage of patients

13   will skip the prodromal symptoms and go straight to

14   life-threatening emergencies?

15       A    See, I cannot --

16       Q    I'm sorry, life-threatening arrhythmias?

17       A    I can't answer that right at this point.

18       Q    Do you know whether it's more than 50 percent?

19       A    I don't know.

20       Q    Is it more likely than not that patients will

21   have prodromal symptoms before going to life-threatening

22   arrhythmias?

23       A    The majority of patients do report nausea and

24   vomiting.  That is the most common report.

25       Q    Okay.  How long have you known Don Ernst?

PLAINTIFFS' EXHIBITS 011263

Keith Patrick Gibson                                    June 14, 2011

Page 246

```
 1      A      Twenty years.  I mean he's --

 2      Q      You have to answer.  You can't --

 3      A      Oh, sorry.

 4      Q      -- ask him for confirmation.

 5             Are you -- do you see him at San Luis Obispo

 6      Bar Association meetings?

 7      A      I don't typically go to the standard bar

 8      meetings.  I go to criminal defense bar section

 9      meetings.  So I don't see him there.

10      Q      Okay.

11      A      And he has been a fixture in and out of the San

12      Luis Obispo court as long as I can remember.

13      Q      Has he ever tried a case against you?

14      A      Oh, no.

15      Q      Have you ever tried a case together where he

16      had one defendant and you had another?

17      A      Oh, no.

18      Q      Have you ever referred him a case?

19      A      Um, I referred cases to the law firm of Ernst &

20      Mattison.

21      Q      Okay.  And have you -- has he ever referred any

22      case to you?

23      A      I doubt it because my legal practice is limited

24      to my practice as a public defender, and except for that

25      one year in which I tried to do some family law I
```

PLAINTIFFS' EXHIBITS 011264

Keith Patrick Gibson                                    June 14, 2011

```
 1   generally do not take any cases.

 2       Q    Have you and Mr. Ernst ever socialized

 3   together?

 4       A    Oh, no.

 5       Q    Never had a drink together, never had lunch

 6   together?

 7       A    Other than in prep for this, like today and

 8   stuff, no.

 9       Q    Okay.  Related by blood or marriage to

10   Mr. Ernst?

11       A    No.

12       Q    And how have you known him for 20 years?

13       A    Well, I mean, he's had a law firm in this town,

14   and when you are in court as often as I am, which is

15   almost daily, he comes to court.  And I see him in the

16   hallway.  We've talked casually.  I don't have a

17   relationship with Mr. Ernst that would be one in which I

18   go to his house, he hasn't come to my house, that kind

19   of thing.  I've never seen him socially anywhere.  But

20   he is one of the prominent lawyers in the community.

21   I've never referred a case to him as a referral fee or

22   anything like that.  It's just the casual, Who do you

23   know that does that?  There's a guy across the street.

24       Q    Did you find the article in your materials?

25       A    No.
```

PLAINTIFFS' EXHIBITS 011265

Keith Patrick Gibson                                June 14, 2011

Page 248

1      Q    It's an article by Beauman, so-and-so and

2   Gallanter.  You gave it to him because it was written by

3   one of my experts?

4           MS. AHERN:  He is one I asked you about.  The

5   one you got last night.

6           THE WITNESS:  The one I got last night?

7           MS. AHERN:  I believe.

8           MR. MORIARTY:  There it is.

9           (Defendants' Exhibit J was marked for

10          identification.)

11  BY MR. MORIARTY:

12     Q    So I've marked Exhibit J.  This is the article

13  you got last night; right?

14     A    Yes.

15     Q    And you read it?

16     A    Most of it, yes.

17     Q    Did you find it reasonable?

18     A    Yeah.

19     Q    Is it the kind of material you would have

20  footnoted had you read it prior to writing your report?

21     A    I probably would have checked a few of the

22  references before I -- but, yes.

23     Q    Okay.

24     A    I mean there's nothing wrong with the article.

25  I had very little time with it last night.  And I found

PLAINTIFFS' EXHIBITS 011266

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 249

 1    it to be something that I needed to follow through on.

 2       Q    And so far as the meaning of a postmortem level

 3    of 3.6 as was drawn under these circumstances, for that

 4    would you defer to the opinion of a Ph.D. toxicologist

 5    who has prior experience in that area?

 6            MR. ERNST:  As opposed to?

 7            THE WITNESS:  Having my own opinion.

 8    BY MR. MORIARTY:

 9       Q    As opposed to you having absolutely no prior

10    experience in it?

11       A    I mean, I don't think I need to defer.

12            MR. MORIARTY:  Okay.  That's all I have.

13            THE WITNESS:  You've been typing like crazy so.

14            MR. ERNST:  Okay.

15

16                   FURTHER EXAMINATION

17

18    BY MS. AHERN:

19       Q    I just have a couple questions and they are not

20    big ones.  I just wanted to ask some specifics about

21    that.

22            You mentioned a case study where there were

23    tablets sticking to presses because of the change of

24    lubricant used in formulation?

25       A    Yeah.  You know, I've been trying to find that.

PLAINTIFFS' EXHIBITS 011267

Keith Patrick Gibson                                    June 14, 2011

                                                        Page 250

 1    I read somewhere in the past, and I haven't been able --
 2    I've been looking for it for a while.
 3         Q    Is it something that you knew maybe since
 4    pharmacy school?
 5         A    I thought it was in an old textbook, so I've
 6    been trying to find it to get the exact case and
 7    description and stuff.
 8         Q    Do you remember what drug it was at issue?
 9         A    It was Dig.
10         Q    It was Dig?
11         A    And --
12         Q    We're talking --
13         A    I didn't include it in the report because I
14    couldn't refind it, but I did mention it to Mr. Ernst
15    when he asked me about manufacture whether I reviewed
16    that report that he was going over, and so I -- I
17    mentioned it at that time.  Here's some things that you
18    need to look at and consider.
19         Q    Okay.  Did you have any information from
20    Mr. Ernst or anybody that there were issues with tablets
21    sticking to presses with the Digitek that was recalled?
22         A    What I was trying to tell Mr. Ernst is that
23    tablets sticking sometimes is a symptom of change in
24    formulary.
25         Q    Did you understand at the time that there was

PLAINTIFFS' EXHIBITS 011268

Keith Patrick Gibson                                    June 14, 2011

Page 251

1    issues with tablets sticking?

2        A    I heard that.

3        Q    With Digitek?

4        A    I heard that.  It would probably be

5    double-pressed tablets.  When the press comes down and

6    presses them, the tablet doesn't pop out.  And

7    essentially that's the function of the lubricant in

8    there, to keep it from sticking to the metal pieces.  So

9    when the next tablet comes it compresses.  So I

10   mentioned to him that this is an area of inquiry that

11   you can follow through on.

12       Q    Where did you get information about tablets

13   being double pressed?  Why was it your understanding

14   that that was the issue in this litigation?

15       A    I think it was in that -- who is that doctor?

16       Q    Bliesner's report?

17       A    Yes.  I could be wrong.

18       Q    So your understanding --

19       A    Plus there was discussion between lawyers with

20   me about just generalities when I started.  And that's

21   where I heard it.

22       Q    Okay.  And so to some extent did that form your

23   opinions or how you approached this project?

24       A    Yes.  I mean, essentially, maybe I'm wrong

25   here, but if there is a malfunctioning tablet, in my

PLAINTIFFS' EXHIBITS 011269

Keith Patrick Gibson                                    June 14, 2011

Page 252

1    mind, in other words, if Mr. McCornack died from

2    digitalis toxicity and no malfunctioning tablet, it's --

3    there's no case, right?

4        Q    Well, I'm just asking about how you got

5    information about the particular defect here that you're

6    describing, this double-compressed tablet.  I just don't

7    know where you found that information.

8        A    When they charged me to do this, I'm asking

9    things like, Why would you charge me to do this?  What

10   is the sorts of stuff that you've heard?  And what are

11   you thinking and why are you going in this direction?

12   To me, that would -- pressed tablets is the symptom of

13   the formulation having some difficulties.

14       Q    Did you see any double-thick tablets or double

15   pressed --

16       A    I've never seen double-thick tablets.

17       Q    I want to finish so she doesn't get mad at us.

18            Have you ever seen double-thick tablets,

19   double-thick Digitek tablets in your career?

20       A    No.

21       Q    Did you see any double-thick tablets in

22   Daniel McCornack's remaining unused tablets?

23       A    I didn't look at all of them.  I at the time --

24   you'll have to excuse me.  Allergies.

25       Q    Do you need some water?

Keith Patrick Gibson                                    June 14, 2011

Page 253

1      A     At the time I didn't know what the case was

2    about.  When I looked at the tablet, the idea was are

3    these Digitek and do I have a case?  Do I have a Digitek

4    case?

5      Q     So you were just asked in terms of product

6    identify issue?

7      A     When I looked at the tablets.

8      Q     You weren't inspecting them at all for their

9    appearance, thickness?

10      A     I was not.

11            MR. ERNST:  I should tell you for the record, I

12    think he might have been consulted in 2008.  There may

13    be an e-mail out there that I've been looking for.  So

14    if I find it, I will ship it to you guys.

15            THE WITNESS:  Sorry.

16            MS. AHERN:  Okay.  That's all.

17            MR. MORIARTY:  I'm sorry.  Now I have one more.

18            MR. ERNST:  Matt Moriarty, you would not be

19    Matt Moriarty if you just didn't have one more question.

20

21                    FURTHER EXAMINATION

22

23    BY MR. MORIARTY:

24      Q     When do you believe you first told Mr. Ernst

25    that this bioavailability issue was something you were

PLAINTIFFS' EXHIBITS 011271

Keith Patrick Gibson                                    June 14, 2011

Page 254

1    thinking about?  2008, 2009, 2010?  Recently?

2        A    Probably more recently.  There was a long

3    period that I didn't hear anything from Mr. Ernst, so...

4        Q    Okay.

5        A    I didn't know the case was proceeding.

6            MR. MORIARTY:  Okay.

7            THE WITNESS:  I knew they called me in, said

8    this is the next step, and they'd like to proceed in

9    this direction.

10           MR. MORIARTY:  I'm done.

11           You know about signature?  You have the right

12   to either read and sign this and correct it for errors

13   or you can waive that.  It's up to you.

14           MR. ERNST:  Have it sent to you.

15           THE WITNESS:  Okay.

16           MR. ERNST:  And sent to him personally.

17           Did you guys bring a check for him today?

18           MR. MORIARTY:  Nobody asked me to.

19           MR. ERNST:  Come on, Matt.

20           MR. MORIARTY:  Nobody asked me to.

21           MR. ERNST:  It is the custom to bring a check

22   at the time of the expert's deposition.

23           MR. MORIARTY:  That may be the custom here, but

24   not where I live or where -- how I practice in this

25   business.  So he's more than welcome to send a bill

Keith Patrick Gibson                                    June 14, 2011

Page 255

 1  directly to me and I will submit it for payment.

 2          MR. ERNST:  And the time you would expect to be

 3  paid?

 4          MR. MORIARTY:  From 9:00 a.m. to --

 5          MR. ERNST:  No, I mean, oftentimes, different

 6  people pay bills differently.  I would like the bill

 7  paid promptly.  Will you assure me the bill will be paid

 8  promptly?

 9          MR. MORIARTY:  I will submit it, and if it

10  isn't prompt enough for Mr. Gibson, he can call my

11  office or you can call me.

12          MR. ERNST:  Fine.

13          MR. MORIARTY:  What you're essentially asking

14  me to do is pay his bill out of the law firm as opposed

15  to submitting it to the client for payment?

16          MR. ERNST:  It is our habit and custom to do

17  that.  I realize you're from Cleveland so we will do

18  this.  We will submit a bill.

19          Do we have an agreement as to the time?

20          MR. MORIARTY:  It's 3:12 in the afternoon.  Is

21  that what you're asking me?

22          MR. ERNST:  I am.  Six and a quarter hours are

23  acceptable to you?

24          MR. MORIARTY:  Sure.

25          MR. ERNST:  Okay.

PLAINTIFFS' EXHIBITS 011273

Keith Patrick Gibson                                    June 14, 2011

Page 256

```
 1          MR. MORIARTY:  I'm ordering this transcript
 2    rough -- I mean rush.  If -- when I get it, I'm sending
 3    it to my experts.  If he hasn't read and signed it by
 4    then, sobeit.  You can quiz my experts all you want on
 5    whether there's a mistake on the transcript.  I don't
 6    really care how long he takes to read and sign it.
 7          MR. ERNST:  Okay.  Historically what we do here
 8    is that we ship it out and give the deponent 30 days to
 9    read and sign it.  But whatever you choose to do is
10    okay.  You have every right to have a rush transcript or
11    even a rush transcript and submit it to your experts.
12          MR. MORIARTY:  He can have 30 days to read and
13    sign it.
14          MS. AHERN:  One thing, Mr. Gibson's e-mail has
15    changed.  Do you want to attach it as an exhibit or do
16    you want to put it on the record?
17          THE WITNESS:  My e-mail's on the report.
18          MS. AHERN:  It's no big deal.
19          MR. MORIARTY:  I don't intend to e-mail you so
20    I don't care what your e-mail is.
21          MS. AHERN:  That's what I was thinking.
22          MR. ERNST:  Are we clear we can sign this under
23    penalty of perjury?  Is that agreeable with you,
24    Counsel?
25          MS. AHERN:  Yeah.
```

Keith Patrick Gibson                                    June 14, 2011

                                                          Page 257

 1          MR. ERNST:  He can sign this deposition

 2     transcript under penalty of perjury.

 3          MR. MORIARTY:  He was sworn.  He knows what the

 4     law is.  If he's committed perjury, he's already

 5     committed perjury.  His signature has nothing to do with

 6     that.

 7          MR. ERNST:  Well, actually in California, what

 8     happens is he has to come to the court reporter's

 9     offices unless we agree that it can be sent to his

10     residence for him to read it and sign it in the confines

11     of his residence.

12          MR. MORIARTY:  He can read it in and sign it in

13     the confines of his residence, his law office, his

14     pharmacy office, his ALJ office.  I don't care where he

15     reads and signs it.  He doesn't have to come here to

16     this court reporter's office.

17          MR. ERNST:  Thank you, Counsel.

18          (Deposition concluded at 3:15 p.m.)

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 011275

Keith Patrick Gibson                                June 14, 2011

                                                          Page 258

1                    REPORTER'S CERTIFICATE

2

3          I, Cindy D. Griffith, a Certified Shorthand

4    Reporter in and for the State of California, do hereby

5    certify:

6          That, prior to being examined, the witness

7    named in the foregoing proceeding was by me sworn to

8    tell the truth, the whole truth and nothing but the

9    truth.

10         That said deposition was taken before me at the

11   time and place therein set forth and was taken down by

12   me in shorthand and thereafter reduced to computerized

13   transcription.  I hereby certify that the foregoing

14   deposition is a full, true and correct transcript of my

15   shorthand notes so taken.

16         Dated at San Luis Obispo, California, this 16th

17   day of June, 2011.

18

19

20

21         _____

           CINDY D. GRIFFITH
22         CERTIFIED SHORTHAND REPORTER

23

24

25

PLAINTIFFS' EXHIBITS 011276

Keith Patrick Gibson                                    June 14, 2011

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
       ASSIGNMENT NO. 36073
 3      CASE NAME: Digitek Products Liability Litigation
       DATE OF DEPOSITION: June 14, 2011
 4      WITNESS' NAME: Keith Patrick Gibson

 5   In accordance with the Rules of Civil Procedure,
        I have read the entire transcript of my testimony or it
 6       has been read to me.

 7          I have made no changes to the testimony as
       transcribed by the court reporter.
 8

 9
      _____ _____
10     Date Keith Patrick Gibson

11
          Sworn to and subscribed before me, a Notary Public in
12     and for the State and County, the referenced witness did
       personally appear and acknowledge that:
13
     They have read the transcript;
14   They signed the foregoing sworn Statement; and
     Their execution of this Statement is of their free
15     act and deed.

16
          I have affixed my name and official seal this _____
17
      day of _____, 20_____.
18

19
     _____
20   Notary Public

21
     _____
22   Commission Expiration Date

23

24

25
```

Rennillo Deposition & Discovery
(216) 523-1313          A Veritext Company          (888) 391-3376

PLAINTIFFS' EXHIBITS 011277

Keith Patrick Gibson                                      June 14, 2011

```
 1   DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
      ASSIGNMENT NO. 36073
 3     CASE NAME: Digitek Products Liability Litigation
      DATE OF DEPOSITION: June 14, 2011
 4     WITNESS' NAME: Keith Patrick Gibson

 5   In accordance with the Rules of Civil Procedure,
      I have read the entire transcript of my testimony or it
 6     has been read to me.

 7   I have listed my changes on the attached Errata
      Sheet, listing page and line numbers as well as the reason(s)
 8     for the change(s).

 9   I request that these changes be entered as part of the
      record of my testimony.

10
     I have executed the Errata Sheet, as well as this
11    Certificate, and request and authorize that both be appended
      to the transcript of my testimony and be incorporated therein.

12

13   _____ _____
      Date Keith Patrick Gibson

14
         Sworn to and subscribed before me, a Notary Public in
15   and for the State and County, the referenced witness did
     personally appear and acknowledge that:

16
          They have read the transcript;
17     They have listed all of their corrections in the
     appended Errata Sheet

18   They signed the foregoing sworn Statement; and
          Their execution of this Statement is of their free
19    act and deed.

20      I have affixed my name and official seal this _____

21     day of _____, 20_____.

22   _____
      Notary Public

23

24   _____
      Commission Expiration Date

25
```

PLAINTIFFS' EXHIBITS 011278

Keith Patrick Gibson                                    June 14, 2011

```
 1    ERRATA SHEET
           RENNILLO DEPOSITION & DISCOVERY - A VERITEXT COMPANY
 2
                  ASSIGNMENT NO. 36073
 3                 CASE NAME: Digitek Products Liability Litigation v.
                  DATE OF DEPOSITION: June 14, 2011
 4                 WITNESS' NAME: Keith Patrick Gibson
 5
           PAGE/LINE(S)/   CHANGE            REASON
 6         _____/_____/_____/_____
           _____/_____/_____/_____
 7         _____/_____/_____/_____
           _____/_____/_____/_____
 8         _____/_____/_____/_____
           _____/_____/_____/_____
 9         _____/_____/_____/_____
           _____/_____/_____/_____
10         _____/_____/_____/_____
           _____/_____/_____/_____
11         _____/_____/_____/_____
           _____/_____/_____/_____
12         _____/_____/_____/_____
           _____/_____/_____/_____
13         _____/_____/_____/_____
           _____/_____/_____/_____
14         _____/_____/_____/_____
           _____/_____/_____/_____
15         _____/_____/_____/_____
           _____/_____/_____/_____
16         _____/_____/_____/_____
           _____/_____/_____/_____
17         _____/_____/_____/_____
           _____/_____/_____/_____
18         _____/_____/_____/_____
19                        _____
                          Keith Patrick Gibson
20
           SUBSCRIBED AND SWORN TO BEFORE ME THIS_____
21
           DAY OF_____, 20_____.
22
23         _____
                NOTARY PUBLIC
24
25         MY COMMISSION EXPIRES_____
```

                       PLAINTIFFS' EXHIBITS 011279

**A**

abate 138:22
ability 38:11
   121:20,24 227:12
able 49:8,9 121:14
   135:10 203:11
   250:1
abnormalities 68:5
   92:14,19 165:2
abnormality
   153:20
abnormally 90:17
aboard 106:15
absence 128:25
absolute 238:25
absolutely 39:25
   64:15 65:10 89:10
   92:16 103:3,22
   110:15 115:4
   140:5,8 141:2
   191:25 194:5
   239:15 249:9
absorb 158:21
absorbed 219:4
absorbing 161:2
absorption 109:21
   161:7 165:15
   179:19
abstract 97:19
   101:14,19,20
   102:17 105:5
   116:6 125:8
abundance 192:22
Academy 68:19
accelerating
   137:24
accept 61:21,22
acceptable 255:23
accepted 74:4
accessed 108:6
accidentally 90:19
account 104:8
   117:24 153:15
accumulation
   99:16

accuracy 81:7
   106:12 118:3
accurate 61:1
   122:14 182:23
   234:10
acetylcysteine
   178:4
achieve 214:3
achieved 215:13
acknowledge
   259:12 260:15
acknowledged
   115:16 222:23
ACLU 44:4
act 259:15 260:19
Actavis 1:12 2:12
   3:6,6,6 58:16,24
   59:22 72:6,16
   164:16 239:6
   242:1 243:20
action 37:1,4
actions 27:4
active 99:16 139:7
   159:12 213:9
   229:2,3,3
activity 225:2
actual 56:9 158:17
   165:24 166:7
   226:12 244:13
Acute 174:2
ad 1:9 2:9
add 13:16 15:17
   16:1 127:19 146:3
added 181:10
   213:4 224:6
additional 10:4
   208:5
address 243:23
   244:19,22
adequate 133:15
adjusting 221:18
administration
   74:6 153:19
   173:21
Administration's
   59:13

administrative
   6:19 25:12 27:21
   28:5 29:12
admits 67:25
Advancement
   43:24
adverse 33:24 34:6
   34:9 59:8 109:8
   164:16,20,23
   179:6 190:11
   194:4 196:16
   242:3
advertise 32:24
advertisement
   42:24
advertising 80:23
advice 38:1
advocating 138:21
advocation 27:4
affect 165:15 214:8
   214:10
affixed 259:16
   260:20
afraid 93:4
afternoon 230:12
   230:13 255:20
age 137:24
agencies 44:20
agent 120:20
agents 92:22
aggressive 151:6
aggressively 235:9
ago 16:14 23:25
   24:25 29:25 30:20
   32:11 36:24 39:2
   40:4 51:21 163:6
   179:8 210:1 217:5
   244:2
agree 23:8 62:21
   63:6,6,7 73:12
   97:25 98:12,13
   100:1,22 101:3,22
   103:2,23,24
   105:14 107:4,13
   111:17,19 112:6
   116:11 117:14

121:17 122:12
   125:18 126:6,10
   128:12,18 129:3
   132:4,12,24 133:5
   133:5,21 134:3
   170:18,20 173:17
   173:19,25 174:8
   176:17 177:23
   178:13 214:2
   221:10 257:9
agreeable 256:23
agreed 108:12
   114:10 178:7
agreeing 22:21
   63:8
agreement 255:19
agrees 102:7
ahead 12:9 42:15
   49:13 83:6 131:18
   147:20 152:10
   194:18 215:11
   218:9 222:19
   223:24 229:18,24
   230:3
Ahern 3:14 4:6,9
   55:20,22 56:9
   159:19 187:13,17
   189:8,21 192:23
   193:10,12 196:20
   199:6,17 200:7,10
   200:14 201:11
   205:12 207:5
   213:14,18 215:24
   217:7,24 220:13
   221:2 222:8,12,20
   222:23 223:11,10
   223:15,25 224:11
   224:16,20 226:21
   229:10 239:12
   240:14 244:9
   245:6 248:4,7
   249:18 253:16
   256:14,18,21,25
ailment 38:14
Air 68:19
al 1:12 2:12 146:25

Alabama 143:7
Alaska 143:7
alcohol 91:2
alert 237:11
algorithms 226:6
alike 30:9
alive 48:8
ALJ 29:22 257:14
Allergies 252:24
allow 225:17
allowance 107:2
allowed 7:18 38:13
   42:9 49:4 172:14
allows 92:6
all-knowing 61:22
all-perfect 221:12
altering 198:1
American 43:23
amount 106:12
   112:10 125:24
   147:14 148:9
   150:13 197:10
   198:13 200:1
   212:3,4 234:5
   235:21 241:8
Ampicillin 214:23
Amy 180:18
analysis 112:3
   122:9 178:20
ancient 66:20
ANDA 64:17
anecdotal 31:6
animals 232:8
annual 164:16
anomalies 238:12
anomaly 237:5,6
anorexia 190:24
answer 8:9,23 12:9
   12:14,17,21,23,25
   13:5,9,16 14:11
   20:25 21:9 23:4
   25:5 29:20 42:15
   46:8 49:13,16,18
   52:23,24 54:15
   61:13 83:6 85:4
   88:3,16,19 93:15

Keith Patrick Gibson                                          June 14, 2011

109:23 119:1
122:1 124:4
127:14,20 130:19
134:23 135:2
146:13 155:13
157:2 158:9 159:1
161:19 167:25
169:3 179:22
191:12,22 196:4
198:5 200:25
215:11 245:17
246:2
**answered** 14:18
15:16 25:23 98:21
159:22 215:10
220:14 222:18
240:21
**answering** 14:5,14
15:18 20:13,17,22
46:13 62:13 87:25
88:12 120:7,9
145:4 148:2 195:1
197:14 220:25
**answers** 88:7,13
89:6 145:3 161:16
**antemortem** 4:23
5:3 12:6 97:20
98:7 100:10
102:22 125:11
126:24 127:4,9,22
128:22 132:1,18
148:8 151:10
170:17 232:2,13
233:9
**antiarrhythmics**
197:17
**antibiotic** 179:19
**anticipate** 10:14
150:12
**anticoagulant**
204:20 205:25
206:1,5
**antidepressants**
103:12
**anxious** 31:2
**anybody** 36:3 47:5

48:7 63:18 84:19
85:5 87:6 95:6
148:5 201:8
225:24 227:15
250:20
**anymore** 52:12
207:1 212:15
217:13
**anyway** 189:3
**anyways** 48:3
**apologize** 110:19
134:9 189:22
**apparently** 42:9
**appear** 194:9
196:16,17 233:14
259:12 260:15
**appearance** 253:9
**APPEARANCES**
3:1
**appears** 76:24
99:15 122:8 233:7
**appended** 260:11
260:17
**applied** 42:24 43:9
**appointed** 29:22
30:11,12
**appointments** 28:7
**appreciate** 193:10
**approach** 212:17
**approached** 251:23
**appropriate** 42:13
43:5 47:2,8,8
50:20 53:7 81:25
102:23 141:6
226:25 235:18
**appropriately** 9:10
12:24
**appropriateness**
47:1
**approval** 84:6
**approximate** 225:6
**approximately**
58:19 73:11
175:11 212:8
213:20 230:14
**April** 34:21

**area** 22:6 96:9
128:25 190:16
208:4 215:4,17
249:5 251:10
**areas** 99:19
**arguing** 144:16,18
145:2,13
**argument** 145:11
**argumentative**
8:11 119:16 143:2
144:20
**arhythmias** 190:6
**arises** 87:12 95:22
**arrest** 241:1
**arrested** 135:14
137:5
**arrhythmia** 87:11
95:2 153:15 169:1
172:1 175:15
195:4,14,22 197:6
198:4,12 200:22
201:15,20 204:22
236:10
**arrhythmias** 42:7
84:11,16,25 87:19
89:1,13 94:10,13
94:20 136:20
138:12,14 161:13
189:15 194:19
201:7 235:19
245:16,22
**artery** 146:20
**article** 4:17 10:19
11:17 16:5 97:1,4
98:3,15,18 101:11
101:19 102:8,9,11
103:7 104:6,18
110:25 111:5
115:18 116:7
121:12 123:3
124:12,14,16
128:20 131:2
148:19 149:9,13
151:14,15 169:11
169:12,15,25
170:6 175:24

176:10,12,20,25
177:4,11 178:10
190:17,18,23
191:11 192:18
194:11,16 202:17
209:24 210:5
227:17 231:9
244:1,7 247:24
248:1,12,24
**articles** 10:19
44:25 65:23 69:25
87:1 94:7 98:14
115:13 123:25
124:4 125:3 191:7
194:3 227:2 231:6
241:6
**ascending** 175:14
**ascertain** 18:8,17
19:8,11 20:5,6
21:13 188:7,13
**ascertained** 132:21
**Ashbaugh** 27:6
**asked** 15:14 17:5
18:3,5 21:22,23
22:4,25 24:2
30:12,22 52:22
54:18 57:15,17
71:4,10,13,17
78:12 79:2 83:11
93:14,20 94:16
98:22 99:1 117:23
119:11 124:1
125:2 134:25
135:6 143:4
152:21,21 157:10
157:12 158:18
164:9 166:20
172:18 176:19
183:19 201:2
202:12 203:4,8
215:10 223:11
231:6,15,20 232:4
233:22 243:16,23
248:4 250:15
253:5 254:18,20
**asking** 7:5 8:8 9:7

14:10 20:23 30:18
34:23 40:14,14
46:12 57:10,11,25
61:15,16,17 62:12
74:13,14 83:8
96:17 104:12
112:15 123:24
128:19 132:12
133:20 134:8
135:4 142:23
143:5 154:12
155:11 158:21,24
158:25 159:8,9
162:3,18 171:4
192:14 200:11
212:21 215:14,16
220:19 223:6
226:2 230:5
244:12,24 252:4,8
255:13,21
**asks** 230:1
**aspect** 117:21
226:20
**aspirin** 206:1
**assay** 36:18 162:8
**assertion** 89:10
191:20
**assertions** 194:13
**assessed** 92:15
**assessing** 244:20
**assessment** 197:9
197:24
**assigned** 26:21
28:14,16 30:1
**assignment** 29:23
29:24 259:2 260:2
261:2
**assisting** 82:23
**associated** 177:22
182:13 204:18
242:3
**Association** 43:24
44:6,11 246:6
**assume** 7:12,24 9:7
26:3 32:1 33:5
37:10 48:6 70:8

PLAINTIFFS' EXHIBITS 011281

76:25 82:6 85:16
98:17 108:13
110:1 112:18,20
135:9 143:12,22
145:16 150:22
152:11,13 200:15
220:4
**assumed** 64:15
82:1 108:1 153:25
220:14 223:16
**assumes** 107:17
126:1
**assuming** 8:13
100:23 156:1
200:5 218:2
221:11
**assumption** 7:25
64:24 83:20
127:12,21 147:9
147:10 153:3,4
154:1 194:16
228:5
**assumptions** 13:23
105:6 106:25
194:12 212:14
**assurance** 33:13
65:5
**assure** 63:19 255:7
**asymptomatic**
138:19
**atrial** 141:3 150:25
204:22 205:8,14
206:6 240:18
**atriums** 205:21
**attach** 256:15
**attached** 183:15
199:9 260:7
**attachment** 79:18
**attack** 130:6
136:14
**attempt** 109:18
170:14
**attempting** 125:11
128:22
**attempts** 58:25
**attention** 117:20

243:1
**Attorney** 27:15
**Attorneys** 3:8 44:1
**attributed** 128:9
**auctioneer** 222:6
**August** 16:25 54:6
**authored** 169:12
**authority** 68:7
70:21 176:4
**authorize** 260:11
**authors** 81:6 101:8
122:6 146:9
**autopsy** 41:9,11,14
121:23
**availability** 64:20
**available** 20:19
92:5 102:22 110:3
126:25 145:16
225:17
**Avenue** 3:8
**average** 47:21,25
**aware** 93:25 102:19
198:15 199:23
211:5 225:5,14,16
226:9
**awfully** 170:22
**axillary** 77:24
114:6
**A-fib** 141:1
**a.m** 1:18 2:19
255:4

─────────────
**B**

**B** 4:11,14 79:21
183:9,10
**back** 11:12,25
19:16 23:6 35:19
36:14 40:5,8 58:6
70:24 72:19 73:9
82:11 86:18 101:6
108:12 118:3
128:16 134:17
148:18 151:18
166:25 171:20
178:11 202:8,13
232:22 234:3,6

241:14,16
**background**
194:12
**backwards** 13:25
16:6,10 101:3
106:9,13 112:1,5
134:22 171:5
174:15
**BACON** 3:13
**bad** 186:15 189:22
217:3
**badly** 133:23
**ballpark** 17:9
211:8
**bar** 44:6,10 246:6,7
246:8
**Barceloux** 66:15
173:4,5
**base** 190:8 193:25
202:23
**based** 12:6 13:24
20:1,3 22:16 29:9
48:14 92:9 94:9
95:15 107:20
109:2,2 110:11
146:9 160:22
168:12 178:4
194:15 202:22
209:16 218:6
221:25 225:19
234:3 236:12
**basically** 206:16
220:15
**basis** 61:18 62:21
63:5,8 65:12,13
77:19 88:25 97:21
100:12 151:24
160:9 163:20
232:14
**batch** 60:18 243:7
243:11
**Bauman** 191:15
**beats** 205:17
**Beauman** 244:7
248:1
**Becker** 101:10,13

104:12 124:24
**becoming** 144:20
**beds** 47:13,21
**beginning** 59:20
**behave** 15:10
**believe** 8:14 16:24
25:17 38:8 53:13
72:2 77:21 80:7
80:17 89:3 97:2
99:23,23 101:18
103:1 113:11
136:12,16 138:5
149:18 151:20,23
154:5 155:17
156:12 157:7,24
159:6 160:8
167:24 169:14
181:5 190:4
194:15 195:13
199:23 211:7
214:1 216:16
222:20 234:6,8,11
235:2,4,7,11,12
235:16 239:7,25
240:1,25 248:7
253:24
**believed** 150:24
151:21 235:17
**Bellingham** 236:19
**benchmark** 218:21
**Bennett** 185:2
**Benstead** 176:20
**BERTEK** 3:11
**best** 34:17 59:5
91:24 117:22
173:22 188:2
205:3 231:1
**better** 228:10
**beyond** 62:11,18
**biceps** 78:23
**big** 73:8 175:7
249:20 256:18
**bigger** 146:22,23
**bill** 16:20 54:5
120:21 254:25
255:6,7,14,18

**billed** 187:5
**billing** 17:4 186:9
186:13,15,16
**bills** 186:17,20,22
255:6
**bind** 185:1
**binder** 115:19
123:13,15 131:10
173:2 186:8,11
**bioavailabilities**
210:7
**bioavailability**
17:22 22:3 60:4,5
63:15,20 64:9,11
64:14,16 71:18
72:16,22 80:16
83:2,8,14 158:22
159:9 160:5 161:1
161:2,18,25 162:2
162:25 163:8,16
163:18,21 174:11
174:17 206:25
209:2,11,14,15,17
209:25 210:3,8,9
210:12 211:11,13
216:18 217:14,16
218:10,14 219:2,5
219:6 223:17,20
224:5,6 238:15
253:25
**bioavailable** 220:5
**bioavailablity**
219:11
**Biopharmaceutics**
67:5
**biorhythmic** 218:3
**bit** 18:10 72:10
140:12 145:8
160:18 180:12
183:1 227:1
239:20
**blend** 165:7,9,17
165:17,22,24
178:17,19
**blended** 164:18
**Bliesner** 60:21 61:2

Keith Patrick Gibson                                            June 14, 2011

72:10 163:9 166:2
166:4,5 178:17
**Bliesner's** 61:12
65:7 162:25 163:3
163:11 164:15
236:14 241:25
243:3 251:16
**blister** 35:10
**bloated** 240:9
**blood** 4:23 12:7
17:16 71:1 78:7
95:22 96:19 99:20
103:18,20 104:8
107:8 113:18,23
114:1,8,13,24
115:1 117:12
121:14,25 122:6,7
122:8 125:16
126:25 127:9
131:25,25 132:17
132:17 136:15
138:15 139:7
141:11 142:6
147:3,13 149:19
151:2 152:20
168:12,23 176:14
178:5 185:9 204:8
205:17,18,21
215:16 224:21
225:2,11,18,25
227:3,10 228:1,6
228:23 229:1
233:8 241:21
243:24 247:9
**blue** 104:20
**blurred** 169:6
**board** 25:9 108:11
110:21 121:1
171:15 197:16
241:9
**body** 10:6 78:17
136:10 147:15
190:14 212:4,5
213:2 226:8 228:8
241:22
**book** 66:7,19 173:7

184:4
**books** 10:15 53:12
66:13,25 93:7
94:5,7 183:24,25
184:3 194:3
**bother** 238:5
**bothered** 238:22
**bothers** 238:6
**bottom** 100:5
156:14
**box** 16:18 21:12
140:20 183:20,23
184:5,10 186:7
**boxes** 184:1
**boy** 23:13 32:11
**boys** 90:6 184:9
**Braithwaite** 4:24
123:3,12 124:21
125:4 148:19
**brand** 40:11
**break** 56:20,23
57:4 110:24
112:22 144:17,21
144:22 145:5
183:6,9 187:7
222:5,9,10,19
223:5,5,9 224:17
**breakdown** 229:5,6
**breakfast** 76:16
152:13,13
**briefly** 181:1
**bring** 10:22,24 11:6
53:8 71:23 183:18
183:19 186:6,9
254:17,21
**British** 104:20
**broad** 124:1 136:9
**broadened** 192:9
**brought** 89:4
101:25 123:17
**Brown** 181:4,6
244:14
**bullet** 55:15 58:7
58:24 59:3 95:12
100:18 156:14
168:19

**bullet-pointed**
22:20
**BUN** 110:6 142:5
**bunch** 13:23 66:25
183:24,25 204:6
**burner** 24:6
**business** 27:10
44:16,17,18
254:25
**by-play** 127:16
**B-a-r-c-e-l-o-u-x**
66:15
**B-a-u-m-a-n**
191:15

---

## C

**C** 4:16 79:23 80:3
80:21 82:15
**cadet** 68:18
**Cal** 44:14
**calculate** 77:9
218:10 225:17
226:6,16 227:13
227:16
**calculated** 182:6
**calculation** 178:11
221:24
**calculations** 79:15
80:18 82:1,2,5,7
82:21 150:4 182:7
182:7 183:2
215:25 216:2
225:5,9,14
**calculator** 80:13,14
80:21
**calendar** 28:17
**California** 1:16
2:21,24 3:3 28:11
28:11 31:15 36:21
37:11,15,19 41:7
44:1 49:9 167:15
211:15 257:7
258:4,16
**call** 13:2 15:1,11
21:10 24:4 47:3
48:18,21 65:14

86:4 115:13
193:21 255:10,11
**called** 16:19 31:16
46:6 55:2,9 66:23
103:16 118:16
175:24 201:2
254:7
**calls** 120:14
**calm** 62:9 63:24
**calves** 78:24
**campground**
135:10
**candidate** 43:5
101:8
**capable** 71:21
**capacity** 106:14
**capsule** 210:12,13
**cardiac** 42:3
131:25 132:16
226:11 227:22
241:1
**cardiologist** 23:13
108:22 207:9
**cardiologists** 182:8
**cardiology** 150:22
**cardiovascular**
38:24 39:10
191:17
**care** 38:24 39:10
43:2 118:4 256:6
256:20 257:14
**career** 69:5 252:19
**carried** 39:23
**carry** 40:12,13
**case** 1:11 2:11
13:22 16:13 18:4
18:6,7,17 23:24
24:14,16,18,21,24
25:6,16 26:1
31:12 32:9 33:3
53:7 54:19 60:13
82:21 92:7 95:23
96:3,10 113:10
117:7 122:10
124:3,15,18 125:2
127:4 129:17

130:3,14,15
140:14 141:17
142:13,18,23
143:5,8 144:5
145:17 146:8
152:17 160:11
171:18 175:5
179:25 186:10
187:22 189:4
203:12 208:18
215:25 217:15
226:17 231:2
232:21 233:21
234:21 236:9
237:7 241:6
242:20 246:13,15
246:18,22 247:21
249:22 250:6
252:3 253:1,3,4
254:5 259:3 260:3
261:3
**cases** 26:3,7,12
28:9 31:13 102:18
126:24 129:18
149:3 233:15
246:19 247:1
**casual** 247:22
**casually** 247:16
**cause** 7:15 9:12
17:25 19:22 22:11
41:16,22 48:17
89:12 90:16
102:24 139:5
165:5 170:15
236:22 240:4
**caused** 23:18
136:19 138:1
160:19 189:15
206:20 236:10
237:23
**causes** 138:17
244:20
**causing** 108:15
**caution** 192:22
**cautioned** 63:11
**cell** 142:6

PLAINTIFFS' EXHIBITS 011283

cells 225:25 229:6
census 47:25
center 29:1 39:18
 40:25 41:2 42:25
 45:21 46:3 47:14
 47:15 178:24
Centers 52:14
central 77:25
 103:20 115:7
 146:15
certain 46:17 101:3
 106:13 196:14,18
 213:8 227:9 239:1
certainly 86:18,20
 134:17
certainty 90:19
 91:12 135:23
 154:25 238:25
certificate 31:23
 41:19 258:1
 260:11
certification 31:23
 121:2 259:1 260:1
Certified 2:23
 258:3,22
certify 258:5,13
cessation 99:16
cetera 17:3
CH 141:1
chance 14:21 88:2
 169:9 191:8
 210:16
chances 87:13
change 43:12 49:6
 49:15,22 50:17
 60:4,5 63:15
 80:15 107:10
 108:15 120:16
 128:11 137:23
 158:22 165:19
 166:7 171:24
 179:15,19 181:8
 204:12 210:8,9
 215:8 237:8
 249:23 250:23
 261:5

changed 8:2 50:5
 160:23 161:8,17
 210:8 214:4
 231:11 235:20
 256:15
changes 49:19 60:5
 63:14,14 72:3,6
 72:16 96:24 105:6
 165:14,21 209:20
 209:21 219:23
 259:7 260:7,9
change(s) 260:8
changing 50:6
 219:24
chapter 184:8
charge 22:10
 182:21 252:9
charged 252:8
charges 70:25
CHARLES 1:3 2:3
chart 76:5,6,8
 77:12 85:6 86:21
 88:25 89:22 94:20
 94:21 163:25
 178:3
charts 19:7 87:21
check 43:4 91:25
 254:17,21
checked 248:21
chemical 36:17
 236:24 237:24
chemistry 24:2
child 144:11
Children 5:5
choice 122:8 151:7
choose 256:9
chosen 125:15
chronic 109:18
 205:8
chronically 201:5
Cindy 1:22 2:22
 258:3,21
circulating 129:1
circumstance
 50:17
circumstances

50:23 107:7 249:3
citation 75:20 79:6
citations 85:14
 123:4
cite 74:7 86:6 94:25
 97:1,14 101:17
 104:6 173:1
 175:23 176:6,10
 177:4 178:10
 191:7 199:2,3
 227:21
cited 72:5,15 86:8
 88:24 93:10,22
 94:1 133:2,19
 172:17 176:3,7,25
 178:8 184:1,3,4
 192:18 199:1
 227:17
cites 115:12
citing 70:21 101:10
civil 26:23,25 259:5
 260:5
claims 27:3 81:6
clamped 113:18
clarify 15:3 35:16
 42:11 192:20
classes 39:7
clear 6:23 68:11
 83:25 99:12
 122:24 131:23
 132:16 155:11,12
 155:15 158:7,11
 163:12 168:11
 187:19,21 192:13
 256:22
cleared 159:20
Cleveland 3:9
 255:17
clicking 11:12
client 24:3 129:19
 129:21 130:4
 255:15
client's 65:5 129:19
clinical 4:19 17:24
 19:17,21 20:3
 22:6,11 37:25,25

38:6 46:1 67:5
 68:12 75:2 81:8
 85:2 86:10,11
 89:20 102:22
 105:6 109:6
 150:22 166:11,22
 167:17 168:20
 169:2,5 171:14
 182:10 183:3
 188:8,11,14,20
 189:13,14 190:1,2
 202:22 203:2,3,5
 203:8 205:13
 207:11,12,13,14
 207:16,17,18,20
 221:17 226:19
 239:2,15 241:12
clinicians 75:17
Clinton 158:3
clip 82:16,17
close 55:9 76:19
 114:14,15 152:3
 240:6
closer 102:13
closest 228:7
clot 205:19 206:6
code 37:19
Coe 98:15 131:1,15
 132:4
coefficient 219:22
 221:8
cold 51:9 70:15
colleague 183:7
collect 20:9 114:13
collecting 122:7
collection 69:24
 91:23 116:10,24
Colony 28:11
color 53:23 104:19
colored 139:9
column 103:10
 104:5 106:20,21
 125:22 128:6
combinations
 175:9
combine 239:18

come 17:6 38:7
 40:5 48:25 51:2
 113:23 114:1
 122:10 138:18,19
 165:3 175:10,11
 192:6 194:7
 202:15 247:18
 254:19 257:8,15
comes 28:18 35:14
 38:11,18 49:20
 51:5 69:6 77:21
 85:7,12 138:23
 188:23 207:21
 218:21 247:15
 251:5,9
coming 35:19
 47:11
comment 238:19
 245:2
commenting
 132:13
comments 146:8
commerical 50:13
Commission
 259:22 260:24
 261:25
committed 130:5
 257:4,5
common 67:24
 84:16,19,21 98:5
 190:11 231:25
 245:24
commonly 150:12
community 52:14
 113:13 116:14,23
 208:23 247:20
comorbid 85:1
 191:3
companies 33:6
company 27:18
 32:19,22 65:6
 235:23 261:1
comparative 127:5
compare 121:14
compared 142:9
comparison 96:11

Keith Patrick Gibson

June 14, 2011

126:25
**compartment**
109:13
**compartments**
226:7,8
**complaint** 236:19
**complete** 133:15
193:3 199:20
238:19
**completely** 14:12
80:1 108:12
**complicated** 132:7
**compliment** 222:7
**compound** 8:20
9:19 75:4 174:19
200:23
**compounding** 33:8
**compresses** 251:9
**Compression**
236:22
**computer** 40:6
47:1,5 182:13
**computerized**
258:12
**computers** 217:19
**concentration**
67:15 68:3 73:11
74:17 86:20 99:19
99:19 102:21
104:3 105:23,25
106:4 116:16,16
116:20,21 125:16
126:2 128:8,17
135:18 136:6
139:4 147:12
177:21,25 224:8
225:18 227:5,22
227:25 243:24
**concentrations**
4:23 5:4 78:17,22
103:20 104:9
105:8,25 111:11
111:14,16 116:7,8
121:14,16 125:11
126:25 128:23,23
129:1 142:14

149:4 150:6
176:14 198:7
225:7,10,18 226:7
226:12 227:9
232:18 233:6,10
**concept** 87:16
89:11 134:18
212:22 216:12
**concern** 114:7
**concerned** 91:1
114:1 164:22
**conclude** 181:15
**concluded** 257:18
**conclusion** 100:6
111:4 125:7 133:1
232:11
**conclusions** 234:22
**conclusive** 237:23
**condition** 19:21
167:18 169:2
171:14
**conditional** 236:2,3
236:4
**conditions** 168:21
169:5 204:15,18
204:21,23,25
**conducted** 236:25
237:21,25
**conferences** 45:3,6
45:9
**confines** 257:10,13
**confirmation** 246:4
**confirmed** 237:2
239:6
**confirms** 236:21
**conflicted** 30:22,24
**conforming** 175:7
244:23
**conformity** 162:14
**confuse** 85:2
**confused** 57:12
191:4
**confusing** 20:8
95:8
**congenital** 191:17
**congestive** 140:23

**connection** 111:11
**consensus** 93:23
113:12 116:13,15
116:22
**consequences**
118:16 121:8
**Consequently**
111:14
**consider** 42:2
89:19 110:20
153:19 183:4
191:25 208:8
233:23,25 250:18
**considered** 70:20
77:25 90:23
185:13 241:11
**consistent** 48:20
74:1,2 75:7,12
76:2 160:22
161:11 190:25
217:2
**consistently** 133:6
134:3 157:4
203:25 235:15
**constantly** 10:15
46:12 47:11 74:2
**constants** 219:22
**constraints** 79:14
**construct** 43:7
**consult** 46:7,17
54:6,18 125:2
**consultant** 30:15
31:10,16,24 32:7
32:25 120:22
242:20
**consultation** 124:3
243:22
**consultations** 57:22
**consulted** 41:13
55:18 70:6 124:15
124:18,22 253:12
**consulting** 32:18
48:15
**consume** 235:25
**consumed** 73:4
126:1 234:4,4

**contact** 16:25
33:19,21
**contacted** 33:20
**contain** 150:13
**contained** 81:7
192:5 199:4
**containing** 99:18
**contemporaneous**
118:5 127:22
**content** 162:13,18
**contents** 229:7
**context** 57:11
178:1,9 233:15,16
233:20
**continually** 62:16
88:4
**continue** 14:13,14
16:2 23:5
**continued** 5:1
128:24 237:20
**continuing** 38:19
39:3,9 44:23
71:19,22 169:23
208:6 229:25
**continuum** 194:17
**contract** 26:19 27:7
**contribution**
102:20
**control** 12:22 141:3
150:24 178:22
238:10,19 243:3
**controls** 133:16
**conversation** 40:3
**Cook** 4:24 123:3,12
124:21 125:4
148:19
**cool** 145:4,7
**copied** 101:15
190:17
**copies** 184:7
**copy** 66:18 69:18
69:20 80:8,9,10
85:24 97:3 102:1
123:10,15 125:5,6
170:2,4 173:7
177:14,15 184:5,7

184:19 244:3,4
**Corcoran** 28:13
**corner** 157:1,2
**coroner** 77:22,23
**corporation** 27:16
**corral** 156:25
**correct** 6:20 8:16
10:3 17:1,2,16,17
17:20,23 18:6
19:24 21:15 22:13
24:12 26:5 33:11
34:1 36:9 37:12
42:21 48:8,9,13
48:17 54:7 59:1,2
62:22 63:4 64:6,7
64:18 65:6,9,10
65:10 66:15 67:6
67:7 70:1,11,23
71:2,11 72:13
73:5 74:15 76:10
77:18 81:1,10,12
82:9 85:8,13
86:15,23 89:23
90:12,13 91:10,15
91:16 92:16,22,23
92:25 93:1,8 95:4
95:6,14 96:20,24
96:25 97:8,15,16
98:16 101:9,11,12
110:12 114:6
115:2,3,4,8,9,19
116:4,5 118:20
123:4 124:4 129:5
131:2 133:3
135:15 141:2,18
142:7,8,11 143:25
146:1,24 147:7,16
148:11,17 152:15
152:19 153:4,13
153:21 156:16,20
157:17,19 159:11
167:6,9,13 168:12
168:13,15,17
169:7 174:5 176:4
176:5,8,10 177:5
181:5 183:9

PLAINTIFFS' EXHIBITS 011285

185:10,11 186:1
186:25 187:1,3,4
188:9 191:25
194:16 195:15
199:13 200:2
203:12 206:14,15
206:19 211:20
213:5,6,9,21
216:14,19 219:12
219:18,20 220:11
221:8 224:8,14
227:24 228:2,11
228:12 230:24
234:18 241:17,24
254:12 258:14
**corrections** 260:17
**correctly** 18:1,2
55:13,14 58:22,23
59:10 81:11 82:1
97:23,24 98:10,11
99:21,24 100:15
100:21 102:25
105:12,13 112:20
132:9 177:19
232:5
**correlate** 106:6
173:22 201:8
**correlation** 5:3
16:6 95:7 102:21
132:20
**correlations** 94:24
**correspondence**
16:17
**cost** 63:22
**Counsel** 3:1 256:24
257:17
**counseled** 217:4
**count** 142:6
**counting** 26:11
52:11
**county** 2:20 26:19
27:7,9 39:17 44:6
44:10 48:4 259:12
260:15
**couple** 40:4 45:13
46:19 79:3 96:22

97:17,19 139:18
151:20 152:15
163:5 190:15
191:20 194:10
200:8,16,18
211:21 234:19
244:2 249:19
**course** 29:19 44:14
44:16,17,18 66:21
160:6 195:10
240:18 242:13
**courses** 38:19,20
38:23 39:1 44:22
**court** 1:1 2:1 25:18
26:21 30:17 42:12
112:15 246:12
247:14,15 257:8
257:16 259:7
**courthouse** 17:5
**cover** 230:19
**covered** 39:7 44:19
**crazy** 249:13
**create** 134:21
196:15
**creatin** 68:5
**creatine** 110:6
**creatinine** 142:6
**criminal** 26:12
44:1 129:17,18
246:8
**cross** 215:20
226:23
**crossed** 164:25
**crow** 114:15
**crux** 60:2
**crystal** 155:15
**CSR** 1:22
**Cuesta** 41:4,6
43:14 45:12
**cuff** 30:19
**current** 34:15
68:25
**currently** 26:20
28:1,10,24 29:1,8
34:19 35:7 36:25
39:12 84:3

**currents** 205:18,19
**curve** 74:1,3 218:7
**custom** 254:21,23
255:16
**customer's** 38:14
**cut** 24:7,7 31:1
**cutting** 12:21
**C.V** 37:10 120:25

---

### D

**D** 1:22 2:22 4:2,17
97:10,11 231:15
258:3,21
**daily** 77:6 95:16
150:11 198:2,13
247:15
**damaging** 106:2,4
**Dan** 7:12 18:8,17
19:9 20:7 21:15
42:6 78:7 135:11
137:4 150:7
152:12 167:5,12
168:5 175:4,21
188:8,20 196:21
196:25 198:9,15
202:23 206:24
219:13 234:23
235:2 240:4
**Dang** 155:21
**Daniel** 1:7 2:7
215:7 252:22
**Dan's** 153:23
167:17 168:14
**data** 13:22,24
16:10 20:4 89:19
92:5,11,11,12,13
92:15,17,20 96:17
96:18 102:21
110:3 111:22
112:1 122:17
128:25 138:24
145:16 146:9
171:6 178:24
182:16,24,25
186:9,14 203:12
219:15 221:8

234:1 235:10,11
239:19 241:10
**date** 52:19 55:16,24
56:6,6,10,11
187:5,6 204:3,4
239:16 259:3,10
259:22 260:3,13
260:24 261:3
**dated** 4:13 192:15
230:21 231:12
238:17 258:16
**David** 61:12 162:25
163:9 243:3
**day** 2:18 12:20 28:8
28:19 30:16 76:13
78:10 90:1 95:13
150:8 151:25
152:1,22 154:8
155:9 156:11
157:4 160:23
166:12,15,17,23
166:24 167:5,12
167:18 180:9
183:11 196:22
197:1 198:10
199:24 200:18
201:13,17 214:7
224:22 235:5
240:8 258:17
259:17 260:21
261:21
**days** 28:22 29:5
40:4 68:18 69:10
90:20 157:18
160:6 168:5
172:12 190:15
191:20 194:10
200:8,16,20
213:11,16,20
214:3 215:13
216:8 217:4 244:2
256:8,12
**dead** 139:7
**deal** 119:6 120:17
120:17 208:22
256:18

**death** 7:16 8:15
9:12 17:25 19:23
22:12 23:18 41:16
41:18,22 42:3
48:17 83:4 90:21
92:3 95:22 98:9
99:15 102:24
104:7 107:1,6
111:12,15,16,24
112:6 113:6,14,15
116:8,10,24 117:8
117:11 118:3,5
125:25 126:3
127:23 132:2
133:22 134:1
137:21 144:6
147:3 149:11
160:24 170:15
177:22 188:9,11
188:14,20 202:11
204:4 219:20
232:3 233:5
236:10 240:8
241:3,15,23 242:3
244:20
**debate** 141:3 143:6
**debating** 223:13
**Debbie** 40:23
**decade** 23:25
**December** 237:24
**decide** 42:12 183:7
211:14
**decided** 30:20
**decisions** 81:17
82:24 182:10
183:3 221:17
**decrease** 91:15
92:7
**deed** 259:15 260:19
**deep** 217:9
**defect** 252:5
**defective** 59:6
157:22 206:14,22
215:6
**defendant** 3:6,11
24:19 25:4,11

PLAINTIFFS' EXHIBITS 011286

Keith Patrick Gibson

June 14, 2011

Page 8

246:16
**defendants** 1:13
2:13 4:12 9:21
79:23 97:11
104:23 115:20
128:1 131:6
169:18 193:15
236:13 248:9
**defender** 26:8,18
26:18,20 27:8
28:14 29:18 30:25
246:24
**defenders** 30:23
**defense** 25:2 30:11
179:24 192:21
246:8
**defer** 166:2 181:13
181:23 209:6
249:4,11
**deferring** 181:12
**define** 189:12
212:2
**defined** 75:8
189:18 213:1
**defines** 75:10
**definitely** 118:12
**definition** 49:5
158:1
**definitive** 236:21
**defunct** 41:6 43:15
43:21
**degree** 9:15 23:17
31:21 64:5 78:5
86:25 118:23
119:9,10,18,19
120:2 121:1
125:10,20 128:21
135:17,23 136:4
137:3 155:3
160:10 170:25
171:17 215:5
**delaying** 9:1
**demise** 89:20 106:7
136:2 138:6
202:20 239:9,10
**demonstrate** 80:14

87:9,16 134:21
216:12
**demonstrated**
239:5
**demonstration**
87:12
**department** 66:1
120:14 167:8
**departments** 26:21
28:15,18 120:17
**dependent** 194:22
195:12,13 201:6
**depending** 28:9
**depends** 49:5 77:7
104:3 109:10
215:18 240:5
**depo** 24:20 183:12
184:21
**deponent** 256:8
**depose** 56:13
**deposing** 147:17
**deposition** 1:15
2:16 4:14 10:21
12:3,23 19:6
23:21 61:6,12
77:20,21 79:18
90:3,4 99:13
107:24 163:2,4
184:9,12 186:4,5
188:16 193:1,9
230:1,6,14 234:9
254:22 257:1,18
258:10,14 259:1,3
260:1,3 261:1,3
**depositions** 15:9
19:4 23:16 60:21
166:10,20 167:16
167:22 168:4
199:5,9 202:21
**depository** 146:15
**deputy** 28:14
**describe** 80:13
89:25 141:22
203:17 204:24
205:3
**described** 50:23

161:2 207:21
212:13
**describes** 190:24
**describing** 164:20
252:6
**description** 80:17
250:7
**descriptions** 167:5
**descriptive** 32:3
**designation** 45:23
45:24
**designed** 82:7
**desired** 76:1
**Detailed** 237:20
**detected** 58:16
**detection** 59:4
**determine** 19:15
21:23 95:21 112:5
128:7,10 162:22
202:9,12 206:12
206:16 216:1,3
218:15 225:6,10
**determining**
188:19 218:11
**develop** 179:12,16
205:19
**developing** 182:21
**deviate** 84:5
**devoid** 38:10
**devolve** 13:20
**Dexter** 24:14,16,18
**diagnose** 38:15
49:1
**diagnosed** 48:7
188:24 205:14
**diagnosing** 38:14
48:21
**diagnosis** 21:17,19
21:19 22:6 37:14
37:18,21 38:8,9
38:11 41:21,24
48:11,25 110:11
192:12 193:22
**dictate** 12:24
**die** 144:12,14 229:3
229:4

**died** 7:23 9:3 18:9
18:20 19:9,13
20:7 21:15 48:11
129:14,20,20
130:5 155:9
156:11 166:12,12
166:16,18,23,24
167:6,13,18 168:6
168:15 196:22
197:1 200:2
201:14 202:25
234:23 235:2
252:1
**dies** 229:2,4
**differ** 78:25
**difference** 7:3 62:3
63:22 73:8 80:15
149:3 175:8 202:4
217:20,22 229:1
**differences** 104:8
**different** 10:19
11:14 71:18 83:12
83:15 87:25 96:15
136:11 137:2,22
138:1,11 148:16
155:10 158:1
160:6 162:3
174:17 181:2
198:6,7 202:19
211:2 214:25
226:7,7 239:21
244:20 255:5
**differently** 173:19
219:18 255:6
**differing** 17:21
72:22
**difficult** 11:8 84:18
105:9 128:10
176:15 177:21
197:9 221:18
236:2
**difficulties** 252:13
**diffusion** 227:2
228:4,11
**Dig** 9:4,6 14:1 16:8
21:25 22:3 54:20

63:12,15 67:18,19
68:1,6 84:23
87:11 89:11 90:17
103:13 106:3,6,6
106:6,8,14 108:10
108:15,17,20
109:4,7,11,11,16
110:21 111:23
112:6,10 120:19
132:16 134:17
136:12,14,17,19
137:20 138:4,5,6
138:15,16,16,23
139:5,19 140:15
141:5 142:6 144:6
156:19 160:18,22
161:8 165:21
171:5,6,13,13,15
189:6,10 191:10
192:12 193:22
194:23 197:22
203:9,14,16,22
209:19 210:9,21
218:21 225:24
227:9 233:24
234:4,5 235:7,16
235:21 236:1
237:9 239:19,20
240:16 244:21
250:9,10
**Digibind** 108:23
**digitalis** 195:8
202:15 252:2
**Digitalis's** 195:6
**Digitek** 1:5 2:5
7:13 8:14 9:8
10:5 34:14,24
36:9 39:15,19,24
40:1,5,8 51:13
53:4,6,17 54:24
55:9 58:11 63:17
63:19 64:12,20
72:6,17 83:4,16
90:20 143:7
152:12,14 158:15
160:5 161:25

PLAINTIFFS' EXHIBITS 011287

162:5,8,14 163:17
163:24 175:3,21
181:8 209:2,11
210:22 211:11
238:20 239:24
240:2 241:2,15,19
243:5 250:21
251:3 252:19
253:3,3 259:3
260:3 261:3
**digitors** 201:5
**digitoxicity** 19:13
84:21
**Digoxin** 4:17 5:3,5
5:6 7:23 8:15
10:5 11:10,18
12:6 17:18,22
18:9,18 19:9,22
20:7 21:15 23:18
34:10,12 35:1
36:11,12 40:11
45:14 48:7,12
49:2 53:7 55:9
60:5 64:9 67:14
68:3 69:25 70:2
71:10,14,18 72:22
73:10,25 74:16
75:22 76:1 78:16
80:13,20 82:21
83:23 84:12,17
86:20 94:21 95:22
97:20 99:17,18
100:8,11 101:7
103:5 105:21,22
108:11,17 112:19
113:5,13 131:24
135:11,18 136:5
137:4 142:14
150:8,14 151:21
156:15 159:10
160:14,16,19
161:3,10 165:15
166:11,22,22
168:5,14,23,23
170:14,25 173:12
173:14 178:25

179:10,12 189:12
189:16,18 191:14
194:16 195:21
196:22,25 198:1
199:24 202:10,24
206:20 208:9,15
209:17,24 210:3
210:19 211:2,6,19
213:2,12,19,23
214:19 220:6
224:7 225:1,7,10
226:8,11 227:3,22
231:1,18 232:9,13
232:16,17 233:1,3
233:5,8,10 234:23
235:3 236:9,20
237:1,13,18
240:23 241:9,20
241:21 242:2
**Diltiazem** 92:25
93:3,5,6 94:1,6,10
94:13,22 95:3,8,9
95:13,17 136:15
137:20 151:6
160:17,19 168:25
185:12,23 197:16
197:21,22 201:24
202:1,3 203:24
235:6
**dinner** 76:16
**dinnertime** 174:16
**directed** 155:18
**direction** 105:24
252:11 254:9
**directly** 38:12,15
221:13 255:1
**directors** 183:3
**directs** 70:18
**disagree** 59:12
61:18 62:21
100:25 105:18
126:14 160:2
170:18,21 173:17
244:15
**disagreed** 178:8
**disastrous** 72:4

**discard** 112:1
**discern** 238:13
**disclaimer** 81:4
**disclose** 186:13
**disclosed** 186:16
**discount** 106:8
111:22
**discovered** 237:17
**discovery** 230:1
261:1
**discretion** 68:2
**discuss** 73:19,20
**discussed** 104:7
**discussing** 227:2
**discussion** 71:19
84:20 90:14 98:2
131:20 133:24
251:19
**discussions** 71:23
**disease** 39:8 85:1
151:5 153:16
179:17
**diseases** 191:3
**dispense** 34:12,14
34:24 35:2 52:10
**dispensed** 155:19
**dispenser** 90:25
91:7,8 154:1,2
157:8
**dispensing** 239:1
**dispute** 152:7
**dissolution** 36:18
161:23 162:1,4
**distal** 228:8
**distance** 107:14,20
114:12 146:17
**distinct** 28:4
**distribute** 139:11
**distributed** 65:2
78:22
**distribution** 17:18
71:13 78:16
106:15 107:16
112:8 139:5,15
**distributions**
228:16

**DISTRICT** 1:1,2
2:1,2
**disturbances** 90:8
190:1
**divide** 29:9
**DIVISION** 1:3 2:3
**divorce** 25:6 37:24
**divorced** 25:7
**divorces** 27:2
**doctor** 6:11 41:14
46:23 48:18 49:1
49:21 50:18 73:10
76:22 82:24
166:14 204:5
207:7 235:8
238:25 251:15
**doctors** 19:6 22:22
23:7,10,11,16
46:15 47:3 75:24
81:16 141:5,11
150:23 151:5
152:24 161:12
168:3 192:9
235:17
**doctor's** 143:10
**document** 1:6 2:6
4:16 6:24,25
55:25 62:19 63:24
89:9 185:6 243:4
**documented** 72:21
**documents** 60:12
81:25 93:21
**doing** 11:9 22:21
28:20 29:8 50:2
63:18,18 77:3,11
172:16 190:15
218:6
**Dollen** 23:12,16,19
150:24 166:9
167:4,12,16 168:3
184:12
**Don** 3:4 12:17
14:25 15:2,23
21:13 24:11 69:20
88:3 93:18 123:17
144:22 186:13

193:10 245:25
**dosage** 80:14
208:24 232:9
**dose** 19:17 35:2,6,9
36:17 49:15 52:10
73:13 74:6,18
75:24 76:12,15,19
76:22 77:2 83:23
95:13,16 125:12
137:19 150:11
152:2,22 153:20
153:23 154:5,13
154:25 155:4,22
155:22,23 156:5,9
156:16,22 157:13
157:14,25 158:1
158:13,14,17,20
158:23,25 159:10
159:14 160:14,15
160:16 161:12
168:24 174:15
194:22 195:12,13
195:21 196:2
197:13,25 198:1,2
198:2 200:21
201:6 203:24
206:1 214:4,7
217:15 219:24
225:12,20 228:13
235:5 240:3 243:9
**dosed** 9:10
**doses** 49:6 81:8
150:23 156:19
157:18,21,22
158:16 175:3,20
178:11 179:13
196:18 200:6,18
221:18
**dosing** 38:2,3 81:17
82:7,24 182:10
**double** 143:25
144:2 171:18
200:21 214:7
216:25 217:3
236:21 238:11,13
240:2 251:13

PLAINTIFFS' EXHIBITS 011288

252:14
doubled 217:15
double-compress...
   252:6
double-pressed
   251:5
double-sized 58:18
double-strength
   240:3
double-thick 35:22
   237:1,17,23
   243:16 252:14,16
   252:18,19,21
doubling 146:1
doubt 91:13 246:23
Dr 11:17 23:11,12
   23:19 72:10 96:6
   96:19 121:23
   143:9 151:14
   164:15 166:4,5
   167:4,8,12 169:11
   169:12,12 176:6
   178:17 182:19
   184:21 185:25
   186:1 234:22
   237:16 241:25
   244:1,14
drafted 191:24
   192:3,15 193:14
drafting 177:1
   193:16,19
drag 166:25
drank 78:10
draw 12:7 73:10
   74:4,16,24 75:1
   75:17 96:6 107:19
   114:24 117:17
   121:24 135:11
   147:5 148:15,16
   152:15 168:12
drawer 35:15
drawers 47:7
drawn 73:16,22
   76:18 96:11,13
   107:23 137:5
   141:12 145:19,20

148:9 249:3
draws 152:20
drew 96:19 175:12
drink 247:5
driven 136:10
   141:5
drives 65:24
drove 30:9 171:24
drug 4:23 8:1,3
   17:15 21:24 22:1
   24:5 33:24 34:6,9
   34:20 37:23 38:2
   38:9 39:8 49:10
   49:15 50:5,6,23
   53:25 55:8 59:13
   65:18 71:1,4
   77:13 97:22
   100:12 102:20
   103:19 105:20
   109:13,20 112:19
   116:7,9 121:15
   125:11,17,25
   126:1 128:7 129:1
   129:14,20,21
   133:14 146:17
   160:12,23 165:4
   165:20 175:25
   176:13,14 177:21
   177:25 178:11
   179:6,13 212:2,3
   213:4 225:7
   226:11,12 227:25
   232:15 242:3
   250:8
drugs 4:21 17:18
   20:4 22:1 30:9
   39:8 47:8 49:4
   50:1,8 55:3,10
   63:11 68:4 71:14
   71:22 75:9,10,23
   75:24 102:19
   103:5,11 104:10
   154:3 179:6,9
   191:18 194:7
   196:14 208:2
   209:19 214:13

duly 6:2
dyes 59:23

## E

E 1:7 2:7 4:2,11,19
   104:22,23 106:18
earlier 98:6 124:1
   137:12 148:19
   151:2 157:5
   197:20 206:11
early 193:6 199:1
   231:25
Easy 76:4
eclectic 44:18
eddies 205:18,19
edge 235:16
edition 85:12 173:9
   184:8
editions 173:10
editorial 245:2
education 38:20
   39:3,9 208:7
educational 31:18
   31:20
effect 17:21 71:17
   72:21 84:12,16
   116:18 147:11
   173:22 190:12
   197:22 216:1
   226:11 228:17
effects 21:25 72:4
   109:8 136:9
   164:17 194:4,9
   203:25 205:16
   215:18,21 218:16
   242:3
eight 29:3 74:11
eight-to-whatever
   68:13
EIRs 242:21,23
either 8:2 10:6
   22:15 35:12,16
   46:15 120:14
   128:9 131:10
   155:12 254:12
EKG 110:3

elaborating 135:5
elderly 137:25
elected 29:22
   216:11
election 29:23
electrolyte 92:14
   92:18
electronic 69:10
elements 202:19
elevated 9:6 136:12
   236:9
elevations 103:19
eliminate 153:11
ELIZABETH 3:6
Ellenhorn 173:4,5
Ellenkohm 66:15
ELLIS 3:7
emergencies
   245:14
emphasis 207:23
emphasizes 128:24
employee 32:21
employer 67:22
employment 43:6
en 46:10
encroached 215:17
endeavor 211:22
engage 31:21
engaged 80:18
enjoy 30:13
enter 47:1
entered 260:9
entering 68:4
enters 67:18
entire 259:5 260:5
entitled 181:25
entity 27:10
environmental
   120:18
equal 75:9 175:11
   212:4 213:3
equals 212:23
equation 209:22
   214:22 222:1
equations 182:15
   182:21,23

equilibrium 148:10
   212:7
equillibrium
   147:23
equipment 36:16
Era 5:6 191:14
Ernst 3:2,4 4:7
   7:17 8:10,17,20
   9:13,16,19 12:8
   12:14,18,22 13:3
   13:6,10 14:5,11
   14:14,23 15:1,7
   15:10,13,25 16:17
   17:4 18:23 20:12
   20:16,20,22 21:2
   21:9,13 22:24
   23:4 24:12 25:23
   26:4 36:4 37:20
   42:8,15 49:12,17
   50:25 51:12 52:1
   52:5,8,17,22
   54:18 55:16,19,21
   55:24 56:11,16,20
   56:23 57:4,14,17
   58:12 60:14,25
   61:9,20 62:13,16
   62:23 64:22 66:24
   67:3 69:21 73:15
   75:4 78:1,8 79:17
   79:22 80:8 82:14
   82:18 83:17,20
   85:19,21,23 87:2
   87:23 88:1,4,7,12
   88:17,20 90:22
   93:11,15 98:19,24
   99:3,11,22 100:3
   100:13,17 101:24
   102:2,4,14 103:9
   104:25 105:10
   110:13,23 111:2
   111:18 114:9
   116:25 118:7,25
   119:1,13,16,24
   120:3,6 121:6,10
   121:18 122:2,13
   122:25 123:8,15

PLAINTIFFS' EXHIBITS 011289

Keith Patrick Gibson

June 14, 2011

123:19 124:5
125:13,19 126:7
126:11 127:6,11
127:14 128:13
129:4,25 130:8,18
131:8 132:6 133:8
134:5,9 135:20,24
136:22,25 137:7
140:18,21 141:19
142:3,24 143:1,20
144:1,8,16,19,24
145:2,11,13 146:3
146:11 148:2,21
149:20 150:9
151:11 154:15,21
155:7,10,24
156:21 158:6,9
159:1,17,24 160:2
163:1,22,25 164:4
164:6,8 166:13,15
167:2,19 168:7,16
169:16,20 170:2,8
170:10,19 171:21
172:6 174:19
177:14,16,24
178:15,21 179:14
180:21,25 181:17
185:20 186:16
189:20 192:20
193:1,11,18 195:1
196:8 197:11,14
199:4,15 200:4,9
200:12,23 201:23
202:12 203:9
205:10 207:2
209:5 213:13,17
215:10 216:22
217:21 220:12,25
222:5,10,15,25
223:4,23 224:9,18
226:14 229:14,19
229:23 230:4,11
231:17 239:13
240:20 242:7
243:2,7,16 244:17
245:25 246:19

247:2,10,17 249:6
249:14 250:14,20
250:22 253:11,18
253:24 254:3,14
254:16,19,21
255:2,5,12,16,22
255:25 256:7,22
257:1,7,17
**Errata** 260:7,10,17
261:1
**erroneous** 176:16
**error** 57:21 87:7
125:10 128:21
160:25,25 182:13
182:14 214:24
218:6,7
**errors** 212:12
254:12
**especially** 46:4
189:5
**essential** 150:2
**essentially** 18:3,5
156:18 172:12
216:12 251:7,24
255:13
**Establishment**
242:14
**estimate** 125:11,24
126:3
**estimated** 91:23
**estimates** 129:1
208:24
**Estimating** 4:23
**estimation** 13:12
**Estimations** 91:19
91:20
**et** 1:12 17:3 146:25
**Euclid** 3:8
**evaluations** 36:1
**Evans** 66:19
**evening** 9:11
153:19,24 154:5
154:14 155:19
157:7 158:15
235:6
**event** 34:9 71:6

104:4
**events** 17:4 47:6
59:8 139:11
141:22 164:20,23
179:6
**eventually** 114:25
**everybody** 25:9,10
46:4 133:9
**evidence** 7:9 20:9
22:17 91:4 92:8
126:4 138:3
166:21 168:4
201:10 209:1,8,10
234:20 237:23
**exact** 14:1 23:1
63:20 87:14 108:1
134:22 156:12
220:21 241:14,16
250:6
**exactly** 13:20 23:1
32:5 54:3 57:7,21
65:1 67:21 76:14
87:9,20 89:18
112:5 117:16
138:16 146:24
159:5 194:20
200:25 221:22
**exactness** 183:2
**exam** 127:1
**examination** 4:3
6:5 99:7 126:2
128:8 187:15
230:9 242:10
249:16 253:21
**examine** 118:14
238:13
**examined** 2:17 6:3
258:6
**example** 113:25
114:6 115:16
129:13,17 147:8
171:17 210:11
233:13
**Examples** 103:11
**exceed** 117:17
**exceeding** 174:3

**exception** 177:20
**excess** 138:6
**Excessive** 5:4
**excluded** 33:2
**excludes** 211:22
**Excluding** 211:24
**excreted** 213:4
**excuse** 9:1 213:14
252:24
**executed** 260:10
**execution** 259:14
260:18
**exhibit** 9:21 10:1
11:4,5 17:13
42:20 55:1 57:3,4
57:18 58:4,6
69:15 79:23 80:21
82:15 97:11
104:22,23 106:18
107:15 113:5
115:19,20 118:15
121:12 124:12
128:1,4 131:6,12
148:21 169:10,17
169:18 183:9,10
188:10 190:5
197:2,5 201:7
215:18,22 231:15
234:7 236:13
243:12,12 248:9
248:12 256:15
**exhibited** 202:24
**exhibiting** 192:2
**exhibits** 163:2,11
199:9
**exist** 179:7 227:11
**existed** 206:18
**existence** 189:15
**expect** 77:6 172:6
218:17 255:2
**expected** 147:3
225:23
**experience** 33:7,12
33:14,15,17,18
35:4,23 42:6
48:15 249:5,10

**experiment** 98:7
139:9 232:1
**experiments**
112:19
**expert** 16:12 30:25
42:2 65:8 130:16
162:22 165:9
166:1 181:15,23
208:8,20 230:2,5
**expertise** 208:25
**experts** 56:14
130:7 165:3
178:21 179:25
189:4 192:21
193:5 194:13
195:7 204:23
248:3 256:3,4,11
**expert's** 191:19
254:22
**Expiration** 259:22
260:24
**EXPIRES** 261:25
**explain** 12:21
14:21 19:3 51:24
52:1,2,3 88:11
188:18 205:3
**explanation** 13:15
16:1
**explicit** 126:18
**exploring** 220:24
**exposure** 232:8
**expressed** 188:16
**extended-release**
210:13
**extent** 33:18 81:16
105:15 209:16
211:10 251:22
**extra** 35:2 123:6,17
**extracardiac** 191:1
193:21
**extrapolate** 13:25
16:9 101:2 106:9
106:12 111:25
112:5 118:2
126:19 171:5,19
218:5 220:23

Keith Patrick Gibson

June 14, 2011

234:3 241:14,16
**extrapolating**
  134:17
**extrapolation**
  117:22 126:4,19
  126:21 128:16
  134:22
**extreme** 108:9
**extremely** 109:7
  138:4
**e-mail** 242:1
  253:13 256:14,19
  256:20
**e-mail's** 256:17

**F**
**F** 4:21 115:19,20
  118:15 121:12
  124:12 243:12
**fact** 50:15 139:3
  150:7 153:1
  170:15 194:7
  203:22,23
**factor** 203:16
**factors** 90:11
  153:11,18 171:8
  179:17 202:16,19
  212:11,13
**Facts** 55:2
**failing** 24:8
**failure** 140:23
**failures** 165:17,23
  165:24
**faint** 53:10
**fairly** 32:3 122:14
  168:24 199:12
  234:5
**faithfully** 152:12
**fall** 167:15
**falls** 179:10
**familiar** 42:18 50:1
  50:12 79:16 151:8
  179:5,7 225:15
**family** 246:25
**family's** 51:14
**far** 15:9 48:22

50:22 126:10
128:12 150:21
211:18 249:2
**Farley** 60:22
**farther** 107:22
  108:4 114:16
  146:14,21 194:21
**fashion** 15:5
**fast** 112:8 229:9
**fasting** 152:24
  153:1,2 235:13
**fat** 24:6 78:17
  122:11
**fatal** 87:19 89:1,16
  89:16,18 206:8
**fatalities** 106:23,25
**fatigue** 190:25
  240:12,15
**fatigued** 126:12
  240:9,18
**fault** 93:18
**favorable** 107:7
**FDA** 33:19,23
  54:20 58:8 60:12
  61:21,22 62:3,8
  63:9 72:5,15 84:6
  164:22 209:4
  238:17 239:6
  242:18 243:12
**FDA's** 54:23 55:2
  56:19 61:19
  243:19,21
**FDA-approved**
  54:16 74:23 83:16
  93:2 160:7 174:18
**fears** 62:9
**Federal** 184:19
**fee** 247:21
**feel** 14:11 218:25
**feeling** 184:6
**felony** 28:24
**felt** 30:22,24 217:3
  240:9
**femoral** 107:8,17
  113:18,25 114:24
  115:3,6 116:19

122:7,8 146:20,20
147:1,2
**Ferner** 4:19 104:14
  104:17 111:4
  113:4 124:24
**fib** 240:18
**fibrillation** 141:3
  150:25 205:9,15
  206:6
**field** 87:5
**Fifteen** 135:14
**figure** 110:2 211:8
**file** 33:23
**filed** 25:16,17
  33:25 34:9 53:14
**fill** 34:5,6
**filled** 47:21 154:2
**fillers** 165:7
**filling** 205:22
**final** 241:12
**find** 14:17 35:1
  55:22 73:24 76:11
  85:17 86:4 90:2,7
  94:23 97:5 149:17
  177:21 191:21
  194:10 203:4
  215:22 228:1
  244:6,15 245:5
  247:24 248:17
  249:25 250:6
  253:14
**finding** 133:6
**findings** 22:5 100:6
**fine** 8:7 15:12 64:3
  69:21 85:23 88:15
  111:2 118:25
  119:8 145:9,12
  153:7 181:16
  192:24 223:8
  229:21 255:12
**finish** 15:18 20:13
  20:16 62:13 93:13
  98:19 110:25
  118:25 119:1
  120:6,9 126:7
  195:1 197:4

220:25 222:8
223:6,10 224:17
244:12 252:17
**finished** 20:22
  93:15 134:10
  136:22 148:2
**firm** 26:4,18 27:6
  27:14 246:19
  247:13 255:14
**first** 6:2 12:13,16
  13:3 16:18,23,24
  17:14 22:9 23:24
  23:25 28:6 30:16
  31:3 39:5 44:19
  47:17 48:16 50:3
  55:7,15,17 56:10
  57:21 58:7 63:16
  70:24 71:7,9 76:5
  76:6 77:12 80:2
  80:12,13 84:10
  95:15 98:5,6
  99:15 106:22
  116:6 125:22
  131:4,23 132:4
  149:2 152:20
  164:19 169:25
  180:5 186:24
  191:2 195:15
  198:19 210:20
  223:11 231:25
  236:25 253:24
**first-year** 44:17
**fits** 221:25
**five** 29:5 32:15
  39:12 68:25 75:10
  144:21 157:11
  160:20 175:12
  212:9,19 213:24
  215:15 229:12
  230:15
**five-minute** 145:5
  183:6
**fixture** 246:11
**flaws** 244:16
**flies** 114:15
**floor** 35:19 46:6,8

46:17,20 47:7
**Florida** 31:19
**flow** 116:15,18
**flowing** 107:8
  139:7
**focusing** 227:12
**follow** 102:14
  118:13 190:18
  191:8 221:21
  249:1 251:11
**followed** 84:7
**following** 48:19
  132:2 133:22
  134:1 144:6
  149:11 164:17
  232:8 237:20
**follows** 6:3
**food** 59:13 145:6,7
**footnote** 10:6 67:8
  70:18 97:14 116:1
  123:2
**footnoted** 70:8
  248:20
**footnotes** 10:1 64:1
  69:24 173:2
  230:22
**Force** 68:19
**foregoing** 258:7,13
  259:14 260:18
**forensic** 30:14
  31:10,16,24 32:6
  32:25 97:8 102:18
  118:17 121:8
**forget** 152:5
**form** 10:22 33:25
  34:5,9 88:25
  199:2 242:18
  243:1 251:22
**formal** 41:21
**forms** 34:6
**formula** 83:16
**formulary** 39:16
  39:24 40:1,12
  49:19 50:6,7,17
  59:25 60:1,3
  61:17 62:4 237:12

250:24
**formulate** 146:8
**formulated** 153:22
**formulation** 60:3
  63:14 72:3,6
  83:21,22 160:7,25
  161:1,17 162:17
  165:4,14,20,21
  166:7 171:24
  181:9 206:17
  218:21 237:12
  238:7 249:24
  252:13
**formulations** 17:21
  71:18 72:22
  163:14 210:3
**forth** 11:13 258:11
**Forty-five-year-o...**
  137:23
**found** 10:19 12:3
  15:22 17:15 30:17
  126:2 128:8 132:5
  132:25 134:4
  164:7,9,11,11,12
  164:13 173:7
  176:14 199:2
  236:22 248:25
  252:7
**four** 28:8,22 39:12
  59:4 73:17,22
  74:5 77:1 152:4,4
  157:18 159:13
  173:20 180:21,23
  181:2 192:21
**fourth** 59:3
**fractions** 29:10
**frame** 149:25 220:1
  228:24
**framework** 90:13
**Francisco** 44:8
**frankly** 23:8
**free** 14:11 259:14
  260:18
**French** 115:13
  121:12 124:12
**frequently** 191:1

**Friday** 28:19 29:19
**Frisco** 44:8
**front** 86:3 105:3
  131:11 244:8
**fruitful** 216:11
**full** 6:8,9 68:24
  69:2 73:1 99:15
  101:19 106:22
  125:23 128:6,20
  156:10 199:20
  258:14
**function** 91:15,17
  91:25 92:7 251:7
**functions** 46:4
**funny** 35:20 184:6
**further** 101:4
  107:6 208:17
  242:10 249:16
  253:21
**fuzz** 94:8

### G

**G** 4:23 128:1,4
  148:25
**gained** 179:18
**Gallanter** 181:4,5,6
  244:7,14 248:2
**Gallanter's** 244:1
**Gallenter's** 11:17
**gastrointestinal**
  190:19 191:9
**geez** 69:6 201:2
**Gella** 182:19
**general** 39:17
  44:17 64:20 65:21
  69:1 134:18
**generalities** 251:20
**generally** 65:23
  73:16,19 74:4
  111:15 126:13
  141:21 149:18
  182:15 247:1
**generic** 50:3 55:2,8
  55:9,10 63:12
  71:22 210:14,21
  211:6

**gentamicin** 226:2
**gentleman** 24:11
  25:9,22 28:15
  32:15 138:25
  168:22
**geometry** 106:10
**Gerald** 66:7
**GERD** 50:9,11
**geriatric** 137:25
**getting** 46:19 70:24
  114:7 122:18
  172:25 180:17
  202:8 220:15
**GFR** 110:6
**Gibson** 1:15 2:16
  4:4,13 6:1,9 10:1
  15:17 17:13 27:15
  35:20 57:2 63:2
  80:21 93:11
  122:20 141:25
  157:10 172:16
  187:10,18 224:21
  230:12 255:10
  259:4,10 260:4,13
  261:4,19
**Gibson's** 256:14
**Gilman** 66:18 85:7
  85:14,25 87:4
  88:24 90:12
  153:11 179:18
  184:8 212:2
  227:19,20
**Gilman's** 66:17
**gist** 134:14
**give** 13:17 38:1
  52:18,23 88:2
  144:12 149:25
  169:22 180:23
  193:4 194:23
  196:15 200:25
  218:14,24 220:20
  223:25 225:22
  228:9 230:25
  234:1 256:8
**given** 6:13 15:13
  19:5 59:6 79:13

90:4 146:16 150:7
  150:23 178:4
  184:20 185:7
  193:11 195:20
  216:7,9 233:20
**gives** 138:24
**giving** 15:23 62:8
  87:12 193:6
**Glide's** 237:16
**Global** 4:16 79:11
  79:15 80:6 182:3
  216:12,13 218:10
  219:21
**GMP** 58:25
**go** 6:11 8:22 9:18
  12:9 20:9 29:15
  38:4 42:15 46:8
  46:16 49:13 54:19
  55:6 56:9 59:3
  62:15 72:24 76:5
  78:15 79:6 81:3
  83:6,19 84:10
  95:10 98:2 99:2
  103:4,15 106:16
  111:4 113:3
  116:20 118:15
  119:3 125:7
  127:13 128:4
  130:24 131:18,20
  147:12,20 150:15
  151:18 152:10,21
  153:8 156:24
  158:5 161:14
  166:25 173:1
  180:6 190:5
  203:10 207:25
  212:15,16 213:5
  215:11 218:9
  222:13,19 223:20
  223:24 226:9
  229:16,17,18,24
  230:3 245:13
  246:7,8 247:18
**goal** 141:10
**goes** 46:4 138:13
  139:12,16 159:14

161:1 191:2
**going** 11:12 12:17
  12:19,24 14:9,20
  18:23 21:4 22:16
  29:16 30:21 32:7
  40:23 52:17 69:14
  71:23 73:10 74:16
  75:1 76:22 80:1
  82:16 87:24 88:10
  88:19,23 102:4,6
  105:2,24 107:15
  107:21 108:5
  109:16 110:23
  114:25 116:15,18
  116:19 124:5
  137:7 139:3,10
  144:19 145:6
  146:3,11,22,23
  148:15 153:10
  154:21 155:7
  157:23 158:7,11
  165:3,25 166:13
  169:16,20,22
  172:20 177:10,18
  181:13,15 183:8
  193:18 196:17
  201:3,7 203:10,11
  204:8 206:21
  210:16,25 212:15
  212:16 214:8,25
  221:21 222:8
  234:6 240:16
  245:21 250:16
  252:11
**good** 43:3 46:20
  51:11 57:23
  108:11 210:12
  230:12,13
**Goodman** 66:17,18
  85:7,14,25 87:3
  88:24 90:12
  153:10 179:18
  184:8 212:3
  227:18,20
**Google** 11:9,10,11
**Gotcha** 212:25

PLAINTIFFS' EXHIBITS 011292

Keith Patrick Gibson

June 14, 2011

**gradient** 105:23
  116:20 139:4,12
  139:13,14,16
  147:13 227:6,6
  228:4,6,10
**graduated** 194:2
**graph** 138:11
  146:13
**great** 63:22 224:18
**greater** 60:9 107:1
  107:14 109:12
  137:6 141:22,23
  147:11,11 171:7
**greatly** 125:16
  139:2 204:12
**Griffith** 1:22 2:22
  258:3,21
**ground** 230:20
**group** 3:2 28:12
  63:11 207:15
**groups** 137:24
**guarantee** 14:22
  194:22
**guardian** 1:9 2:9
**guess** 98:16 121:20
  124:10 217:18
**guidance** 13:17
**guide** 183:4
**guy** 72:1 247:23
**guys** 30:11 159:18
  253:14 254:17
**G-i-b-s-o-n** 6:10
**G-L-O-B-A-L** 79:7
**G.I** 189:25

---

**H**
**H** 4:11 5:3 131:6,9
  131:12
**habit** 255:16
**hahern@shb.com**
  3:15
**hair** 96:1,3
**Hale** 4:24
**half** 147:2 171:7
**halflife** 75:11
  175:12 212:9,19

213:22 214:14,15
  214:19 215:16
**halfway** 149:2
**hall** 31:5 58:1
**hallway** 32:14
  247:16
**halted** 237:19
**hampered** 170:15
**hand** 52:10 79:15
  80:2 82:2 177:19
  232:7
**handle** 129:18
**handled** 35:17
**hands** 80:5 172:13
**hands-on** 33:6,12
  33:14,15,17
**hanging** 30:4,10
**happen** 54:2
  195:25 196:3
  201:9 203:17
  204:10 218:18
**happened** 30:4,4
  47:24 54:8 136:13
  167:5,12 236:11
  239:16
**happening** 32:14
  172:21
**happens** 46:23 69:9
  257:8
**happy** 30:13
  102:15
**hard** 47:4 54:3 77:8
  157:2
**HARDY** 3:13
**harm** 59:8
**head** 25:20 75:21
  107:25 117:13
  204:24 217:12,13
**health** 52:14
  137:23
**healthy** 48:1
**hear** 254:3
**heard** 181:4,6
  188:6 244:14
  251:2,4,21 252:10
**hearing** 18:10 28:9

234:15
**hearings** 30:5,6,7
**heart** 103:21
  107:14,20 108:4
  109:16,20,21
  113:24 114:1,8,12
  114:14,17 130:6
  140:23 149:18,18
  205:16,20 225:24
  228:7 240:23
**Heavily** 211:13
**help** 27:3 146:6
**helped** 49:1
**Hey** 35:20
**Hi** 187:18
**high** 47:12 68:5
  78:17,22 90:17
  97:22 99:19
  100:12 105:20,25
  106:3,6 108:10,16
  108:17,18,20
  109:7 116:16
  128:21 138:4
  140:2 141:5
  144:12 146:23
  151:3 161:12,13
  168:24,24 170:22
  195:21 233:9
  235:10 239:19
**higher** 94:20
  146:17 154:17
  170:16 213:7
  214:12 227:23
  228:1 232:8
**highest** 136:17
  144:10 179:6
**highly** 222:13
**high-dose** 232:14
**Hilberg** 176:10
**hip** 107:18
**Historically** 256:7
**history** 64:8 110:4
  161:11
**hit** 198:25
**Hobber** 86:11
**Hold** 148:23

**holding** 80:2,5
**hole** 215:2
**Holt** 176:20
**home** 46:5
**hope** 97:5 173:9
  219:3
**Hopefully** 213:10
**hospital** 10:16 34:7
  35:6 38:3 39:14
  39:17,18,21 40:11
  41:5,7,8 43:14
  45:18 49:21 66:3
  67:18 68:7 69:1
  108:21 138:18
  143:8 208:11,24
  211:9
**hospitals** 29:8
  35:12 67:16
**hour** 110:23 148:15
**hours** 2:18 14:20
  74:6 117:15 118:4
  118:4 131:17,19
  145:7 147:6
  148:16 152:4,4,15
  163:6 173:20,21
  213:23 230:15
  255:22
**house** 247:18,18
**Houston** 3:14
**huge** 214:24
**human** 98:6 136:10
  190:13 228:23
  231:25
**humans** 201:9
**humor** 131:25
  132:17
**Hunter** 3:14
  244:11
**hypothetically**
  135:9

---

**I**
**idea** 74:4 130:23
  134:16 141:5
  181:15 182:11
  189:5 195:16

218:6 228:10
  237:11 253:2
**ideal** 113:17 114:17
**identification** 9:22
  79:24 97:12
  104:24 115:21
  128:2 131:7
  169:19 248:10
**identified** 53:10
  101:7
**identifier** 53:11
**identify** 53:3,17
  253:6
**Ignorance** 176:15
**illness** 41:25
  240:19
**illnesses** 85:3
**imagine** 87:5,6
**immediate** 127:22
**immediately**
  195:21
**immense** 149:4
**implications** 100:7
**implies** 10:8
**imply** 227:7,10
**implying** 126:13
**important** 73:13
  74:18 84:12 108:2
  108:6 116:24
  121:13 129:11,14
  129:18 136:8
  203:21 205:22
  214:13,16 218:8
  226:10 227:4
  228:3,14 235:11
**impossible** 105:9
  178:12
**impressed** 173:7
  191:21
**improvements**
  210:2
**inaccurate** 93:17
  93:20 109:14
**inappropriate**
  42:11 222:13
**inappropriately**

PLAINTIFFS' EXHIBITS 011293

38:9
incident 243:16
include 60:15,18
 163:1 210:7
 219:24 250:13
included 25:10
 58:10 219:15
includes 40:1
including 236:13
inconsistent 91:7
incorporated
 260:11
incorrect 38:9 91:6
 91:9,21 153:19
increase 95:3 98:8
 144:6 170:25
 210:17 215:23
 216:17 217:16
 218:22 219:6,25
 219:25 220:8
 232:2
increased 22:2
 94:13 95:1 217:14
 218:10,13
increases 132:1
 133:21,25 149:10
 149:16 218:25
 219:9
indented 113:4
independent 86:24
 170:24 211:17
independently
 72:12 77:24
 112:18
index 5:1 209:20
 214:22,23 215:1
indicate 22:20
 161:24 162:7,13
 173:18 174:7
 238:7
indicated 121:23
 166:6 230:17
indicates 16:18
 94:12 98:7 164:16
 232:1 237:16
indicating 151:3

242:2
indication 241:22
indications 162:4
indicative 109:19
individual 1:7,8 2:7
 2:8 225:19 240:4
industrial 120:18
industry 207:25
infamous 185:8
inferred 97:21
 100:11 232:14
infinite 147:14
influence 4:23
 125:16
influenced 211:11
influences 128:11
influencing 90:11
information 20:15
 20:19 21:12 25:21
 37:24 62:9 81:7
 86:24 102:22
 167:17 191:23
 193:13,24 241:5
 250:19 251:12
 252:5,7
informed 192:3
ingest 175:4 215:7
ingested 125:12
 153:20 158:17
 160:6 175:21
ingestion 128:9
 173:21 178:5
ingredient 159:12
 181:10
inhibitors 50:11
initial 16:25 53:8
 54:6 57:22
initially 53:5
 237:19
injury 242:4
innovated 63:12,20
 210:15
inpatient 34:4
inpatients 108:22
inquiry 192:9
 251:10

insight 220:3
inspecting 253:8
inspection 58:8
 237:20 242:14
instance 11:13 38:4
 73:24 105:20
 133:14 179:16,18
 182:25 198:9
 201:1 204:19
 210:10 229:8
 231:15,24 232:11
 233:22 237:1
institute 208:22
institution 68:21
intake 75:9 212:23
intend 234:17
 256:19
intended 161:12
intention 23:2,6
 235:8
interactions 22:2
interested 30:8
interesting 31:13
 31:14 87:21
 200:20
internal 34:7 242:1
internet 10:16,18
 10:24 11:6 54:19
internist 108:23
internists 182:9
interpatient 197:8
interpret 132:19
 142:1
interpretation 5:4
 100:7 105:8
 176:13
interpretations
 176:16
interpreted 111:15
interrupt 145:3
interrupted 118:24
 119:24 120:3
 159:1
interrupting 62:16
 88:4,7 93:12
 120:5 125:14

224:2
Interruption
 137:15 188:25
 222:14,16
interval 116:10,23
 117:18 131:14
intoxication 97:21
 100:11 170:14
 174:7 232:13,17
 233:2,3
invalid 105:7 107:1
investigation
 131:24 132:5,14
 167:9 237:21
Investigations
 86:12
investigators 133:7
invite 38:7 48:24
 51:1,4
inviting 245:2
invoice 16:23,24
involuntary 30:6
involve 38:5 75:25
 174:2 207:25
involved 24:1 30:8
 38:20 39:8 69:2
 171:8
involves 37:23 77:4
involving 102:18
in-vitro 228:19,20
 229:8
ir 133:22
irrespective 132:2
 134:1 136:13
isolation 233:14
issue 46:7 48:3 60:2
 61:17 62:4 84:18
 84:21 118:14
 119:5 120:24
 129:15 144:14
 151:1 157:6 163:8
 163:24 169:23
 174:11,24 211:13
 211:18 237:12,12
 238:7 244:22
 250:8 251:14

253:6,25
issues 83:21,22
 136:16 162:16
 163:14,17 165:20
 165:23 189:25
 231:1 250:20
 251:1
item 164:15 232:12
 232:12,16 233:4
 236:17 237:14,16
 241:25
items 70:9 236:12
I.V 173:20

                J
J 1:8 2:8 5:6 248:9
 248:12
Jayco 67:17
Jersey 56:14
job 37:23 43:10
 51:23,25 52:7
 68:25 162:21
 188:7,13 206:12
 206:16 208:12
jobs 28:4 43:2,12
 46:5
Jones 175:24
Journal 86:11 97:7
 104:20
Jr 1:7 2:7
judge 6:19 13:2
 15:1,11 25:13
 27:21 28:5 29:12
 62:19
judges 25:10
judging 19:20
judgment 59:5
 62:7 81:9
judgments 239:3
July 55:17 56:15,16
jump 47:12
June 1:17 2:18
 56:12 187:2
 236:18 258:17
 259:3 260:3 261:3
jury 212:22

**Justice** 44:2
**J.D** 1:15 2:17 4:4
    4:13 6:1

### K

**K** 3:14
**Kathy** 1:7 2:7
    152:11 167:11
**Kathy's** 184:17
**keep** 14:9 43:9
    47:10 57:23 65:25
    66:18,21 67:1
    110:18 125:14
    146:5 251:8
**keeps** 93:11
**Keith** 1:15 2:16 4:4
    4:13 6:1,9 27:15
    259:4,10 260:4,13
    261:4,19
**Kennedy** 177:4
    178:10
**Kenney** 60:22
**Kernin** 186:1
**Keya** 30:5,5,6
**kidney** 78:18
    179:17
**killed** 169:1
**kind** 18:11 19:17
    23:24 26:16 28:17
    29:21 30:9,19
    32:4 35:15 39:1
    41:22,25 44:18
    46:11 57:12 64:2
    64:3 77:2 83:18
    94:7 126:12
    134:13 135:21
    146:12 151:2
    152:20,23 175:9
    178:9 181:14
    196:10 208:19
    212:14 215:2
    218:16,20 227:16
    228:5 238:8 239:4
    247:18 248:19
**kinds** 11:14 80:23
    196:5 198:6

**knew** 145:20
    167:23 192:14
    250:3 254:7
**know** 6:20,23 7:2
    11:11 12:17,20
    13:14 14:3 16:4
    24:7,7,20,24
    26:10,11 30:3,16
    31:2,3,9,12,17
    32:11,23 34:25
    36:4 37:7,17 38:3
    39:15 40:2,10,17
    40:19 42:5 43:3
    47:3 48:21 50:14
    53:5,11,15,25
    54:11,14,16 56:16
    57:11 61:23,24
    62:9,10 64:1,14
    65:13,16 67:21
    68:5 69:7 70:14
    72:5,9,11,12,15
    72:18 73:13 74:18
    74:25 76:12,14,21
    76:23 77:4,9,24
    81:16,18,19,22
    82:4 83:7 84:3,15
    85:5,5 86:3 87:8
    87:17,20,20 88:24
    89:2,7,18 92:24
    94:9 95:1,6 96:8
    96:16,19,21
    101:19 104:19
    106:9,10 108:6,7
    108:25 109:5
    112:8,9 113:22
    114:22 115:22
    116:18 118:5,21
    119:19 120:10
    122:17 123:14
    124:16 125:4
    127:10,17 130:11
    131:17 133:13
    134:14,16 137:17
    139:6,8,19 140:22
    141:15,16 144:11
    145:11,21 146:17

146:21 147:4
148:22 153:6
155:23 156:1,25
157:1 158:12,13
158:19 160:9
163:18 164:19,22
164:24 165:19,22
167:4,18,21
170:20,22 171:8
171:14 172:8
174:22 175:7
178:7 179:10
181:20,20,21,25
182:2,8,12,15,16
182:22 184:5
186:20 187:23
192:8 196:4,13,18
196:23 198:5,5,24
199:16,18,19,20
199:20,21 200:8
200:25 201:8,22
203:11 204:11,23
205:2,16 209:24
210:2 211:4,8,9
212:10 215:14
216:20 217:5
218:1 220:5 221:7
221:11,23 222:7
225:24 226:12,23
227:4,11,17,25
228:3,14 242:22
243:4,6,7,10,11
243:15,19,21
244:5,14 245:11
245:18,19 247:23
249:25 252:7
253:1 254:5,11
**knowing** 227:8
    228:9,13
**knowledge** 34:17
    91:24 108:21
    234:10
**known** 24:1 54:12
    54:13 103:5,11
    207:16 235:7
    239:18 245:25

247:12
**knows** 62:3 84:19
    85:5 95:6 148:9
    257:3
**Kohl** 16:5
**Koren** 4:17 5:5
    97:1,3,7 151:14
    169:11,12,12
    231:17
**K-o-r-e-n** 231:18

### L

**lab** 66:1 68:8,14
    91:17,24 92:11,12
    92:13,17,20
    140:15,17,18,20
    141:11,17 142:1,5
    142:13,15,17
    143:9,11,13,23
    152:23 185:8
**label** 74:23 93:2
    94:3 214:1
**labeled** 157:3,9,12
    158:12
**LABORATORIES**
    3:12
**laboratory** 36:1
    92:15 102:21
    173:12
**labs** 140:10 141:23
    142:18,22 143:5
**lab's** 142:10
**lack** 59:7 126:4
    210:16 238:19
    243:3
**land** 218:15 221:4
**Lanoxin** 40:13,17
    64:20
**large** 69:12 125:10
    201:5 214:23
    234:5
**largely** 105:7
**larger** 109:22
**lastly** 177:3
**law** 3:2,8 6:19
    24:11 25:13 26:14

26:16,18 27:6,14
27:15,21 28:5
29:12 37:4 44:16
44:17 49:9 172:14
246:19,25 247:13
255:14 257:4,13
**lawsuit** 24:19 25:2
    25:4 53:13
**lawyer** 6:17,18
    25:12,14 26:9,10
    27:1,4 43:11 63:3
    127:16 129:18
    130:3,11
**lawyers** 30:11
    247:20 251:19
**lay** 212:21,23
    218:14 221:4
**lead** 176:15 179:6
**leading** 90:20
    182:20 195:11
**leave** 29:16 43:17
    175:16 188:3
**leaves** 205:21
**lecture** 13:1
**lectures** 44:23
**lecturing** 13:3
**led** 8:15 154:4
**left** 39:17 43:16,19
    46:5 86:21 103:10
    106:20,21 118:16
    128:6 178:20,20
    181:10,14 184:6
    233:4,9
**legal** 25:8 130:15
    246:23
**Leiken** 89:3
**Leikin** 66:8
**Leikin's** 66:7 176:6
**Lemm** 23:11,16
    150:23 167:17
**Lemm's** 184:15
**length** 93:6 146:16
    147:11
**letter** 8:6 22:9
    65:22,22 242:16
**letterhead** 32:3

**letters** 60:16
242:21
**let's** 39:5 49:20
58:6 76:5,7 78:15
79:6 84:10 88:20
88:20 90:18 95:10
98:2 99:2 103:4
103:15 106:16
111:4 118:15
125:7 128:4
130:24 131:20
140:13 143:22,22
145:4,4,5,7,16
147:13 153:8
179:16 187:7
210:10 223:13
**level** 9:4,6 12:6
22:3 67:15 68:3
73:25 74:24 76:10
76:18 77:2,5 78:6
86:22 87:11 89:12
90:17 95:3,8,9,21
105:20 106:8
108:10,17,18,20
109:17,19 110:4
111:23 112:6
118:1,1,3,8,9,13
126:14 127:9
134:17 135:11
136:1,12,17,19
137:5,12,20 138:4
138:5,6,15,16,16
138:20,23 140:15
141:6,13 142:6
144:12 145:19,20
146:17 147:3,14
148:8 151:10,21
151:22 152:3,18
160:22 161:10,15
168:11,14,24
171:5,6,13 175:13
185:12 201:4
203:9,15,16,22
204:3,8 209:21
210:9 213:7,8
214:3,5,9,10

215:9,15 217:17
218:12 219:13,19
220:8,9 223:21,22
223:22 235:10,13
236:1,5,9 239:19
240:6 241:2,7,15
241:19,21,22
249:2
**levels** 5:3 14:2 16:8
17:15 60:6 63:15
67:19 71:1,5,10
75:1,18 77:13,16
80:15 94:13,21
97:22 98:8 100:8
100:12 106:7
108:15 109:7
116:9 131:24
132:1,2,16,18
133:22,25 136:15
138:22 139:20
141:4 144:7 148:9
149:10 151:2
152:24 160:18
161:8 170:16,17
170:25 171:15
173:12,14,20
174:3,6 178:5
197:22 198:7
210:16,17 215:16
224:22,24,25
225:11,24 226:17
232:2,14 233:24
235:7,9,14
**Lewis** 44:7
**Liability** 1:5 2:5
27:18 259:3 260:3
261:3
**liberty** 129:19
**library** 66:10,22
124:2
**license** 31:15 37:2,5
**licensed** 36:20,23
36:24 37:10,12
49:9
**lied** 62:9
**life** 8:3 34:3 98:8

111:11 129:1
232:2
**life-threatening**
84:11,15 190:6
194:18 197:5
198:4,12 200:22
201:15,20 245:14
245:16,21
**ligated** 113:18,21
**light** 241:5
**likelihood** 90:11
**limit** 88:13 206:2
**limited** 27:18 35:5
199:12 246:23
**line** 106:11 119:8
131:4 169:21
177:3 215:19,20
221:13 224:1
229:25 260:7
**linear** 132:20
182:24 218:1,1,2
218:7
**Lipokinetics** 24:1
**lips** 159:14
**liquid** 139:10
**list** 10:6 11:11
58:10 179:7,9,10
194:4
**listed** 25:11 86:21
103:5 179:17
260:7,17
**listening** 144:23
145:10
**listing** 260:7
**litany** 38:4
**litem** 1:9 2:9
**literally** 223:5
**literature** 10:2,4
12:4,5 14:18
15:23 94:23
115:17 117:18
126:24 138:21
144:4 147:21
148:14 151:3,8
171:3 173:18
190:10 218:23

**litigation** 1:5 2:5
26:23,25 48:6,10
68:23 70:6 71:16
81:14 143:7 192:5
211:24 243:22
251:14 259:3
260:3 261:3
**little** 18:10 31:11
35:7 76:5,6 77:12
86:7 94:20,21
102:13 109:14
138:11 139:9
140:12 145:8
146:13 157:1
160:18 178:3
180:12 227:1
230:17 248:25
**live** 48:4 254:24
**liver** 24:5,8,8
149:19
**living** 82:7 86:22
140:9 160:22
**LLC** 1:12 3:6,6
**LLC,et** 2:12
**LLP** 3:7,13
**local** 45:8 122:11
**location** 99:12
103:16 108:2
**lock** 109:13
**long** 8:1 16:14
24:25 30:14 43:8
43:10 46:12 51:21
81:24 109:10,11
117:11 139:10
160:13 172:11
197:21 210:1
214:14,15,19
217:5 245:25
246:12 254:2
256:6
**longer** 24:25 30:21
109:20 172:6,11
**longest** 117:8,17
131:14
**long-term** 139:11
205:16

**look** 13:18 24:2
50:19 51:12,15,21
52:3,21 53:19
54:19,23 59:21
64:2,4 65:14
71:10 75:18 90:18
91:5 98:16 110:3
123:16 131:16,18
170:8,10 178:18
178:22,24 183:6
183:22 185:4
186:8 194:14
203:8 212:11
226:9 239:17
244:9,11 250:18
252:23
**looked** 20:10 52:16
53:1 56:18 59:22
86:4 151:1 185:6
199:19,21 253:2,7
**looking** 10:15,19
13:18 52:11,23
59:24 75:2,3,13
89:19 106:5
152:25 165:1
171:3 172:16
181:1 186:3
187:20 203:14
217:11 218:25
219:6,12,17
236:17 241:11
250:2 253:13
**looks** 35:20 162:16
180:12 238:8
244:5
**lot** 10:1,2 11:13
29:7,13 32:16
34:5 38:2 49:6
58:11,17 66:21
77:4,7 90:24
109:4,8 120:16
136:11 138:20
147:4 152:7,19,23
171:8 189:4
190:16 191:3
196:16 203:25

Keith Patrick Gibson

June 14, 2011

204:10 205:18 209:23 215:3
**lots** 53:11 178:1 202:16 235:22
**low** 98:7 105:25 116:16 139:1 232:1
**lower** 99:19 154:18 224:15
**lubricant** 237:8 249:24 251:7
**Luis** 1:16 2:21 3:3 25:17 27:8 44:6 48:4 246:5,12 258:16
**lunch** 247:5
**lying** 54:15

---

**M**

**machine** 46:11,21 136:11 184:7 238:14
**MacLeod** 4:17 97:7
**mad** 158:19 252:17
**magnitude** 117:19 145:23 146:10,14 151:9 171:17 218:16
**magnitudes** 144:6
**mail** 65:15
**main** 205:24
**maintain** 136:18 138:22 141:4 213:8
**maintaining** 136:17
**majority** 68:11 245:23
**making** 8:25 61:9 64:23 81:17 82:24 133:18 182:9
**malfunctioning** 251:25 252:2
**malpractice** 25:8 130:15
**man** 8:4 204:11

205:9,14 224:10 224:12
**Management** 5:6 11:18 191:14
**mandated** 67:22
**mandatory** 190:12 194:5
**manifestations** 5:6 11:18 190:23 191:13 194:19 195:15
**manifests** 240:23
**manner** 15:11
**manual** 66:19,21
**manually** 182:6
**manufacture** 236:23 237:18 250:15
**manufacturer** 238:8,16
**manufacturing** 33:7,10 55:8 60:19 62:6 65:4
**man's** 202:20
**March** 19:22 58:8 90:1 153:24 174:16 238:18
**margin** 214:24
**Marian** 29:1 39:18 40:25 41:2 42:25 45:21 46:3 47:13 47:15
**mark** 79:17 80:1 123:8 169:10
**marked** 9:21,25 79:19,23 80:3 82:15 97:11 104:23 115:20 128:1 131:6,8 148:19 169:17,18 234:7 248:9,12
**market** 59:7 194:8 210:4,11,22 211:3 211:6 237:22
**marketplace** 237:2
**marking** 115:18

**marriage** 247:9
**Martha** 185:2
**masked** 191:6,7 240:17
**Mason** 96:6,19 166:9 167:8,16 168:3 234:22
**Mason's** 121:23 184:21 185:25
**Mass** 24:14,16,17
**massive** 196:22,23 196:23
**master's** 31:21
**material** 16:18 70:16 101:13 146:7 209:23 230:25 236:8 248:19
**materials** 17:3 247:24
**math** 212:19
**mathematical** 171:19 172:4
**mathematically** 149:7 150:1,15
**matrix** 203:17,20
**Matt** 15:7,10 253:18,19 254:19
**matter** 114:12,19 120:16 137:9 171:10,11 203:10
**matters** 26:22 33:16 117:4,5,24 118:1 133:16 148:15
**Matthew** 3:9 180:13
**Matthew.Moriar...** 3:10
**Mattison** 24:2,10 24:21 26:4 246:20
**max** 151:7
**maximum** 95:13,16 137:19 147:5 172:9 203:24 212:18 220:9

**McCornack** 1:7,7,8 2:7,7,8 7:12 18:8 18:17 19:9 20:7 21:15 23:18 51:14 52:16 53:1,6 73:4 73:11 74:17 76:15 83:3 89:17 90:19 92:18,24 95:16 135:11 136:12 138:7,9 150:7 156:15 160:12 161:9 166:12 167:5,11 175:4,21 184:9 188:8,20 196:21,25 198:9 199:23 202:23 203:18 204:2 206:13 209:18 215:7 216:5 219:13,19 220:4 222:2 223:18 231:3 232:22 234:23 235:2,21 235:25 236:10 239:21 240:4 241:3,12 243:9 252:1
**McCornack's** 17:16,25 19:21 22:12 42:6 71:1 78:7 83:15 89:20 107:23 117:11 137:4 152:11 185:9 206:24 239:8 252:22
**McDaniel** 2:20
**McGuire** 27:5,6
**McMaster** 180:18 181:4,6 244:14
**MDL** 55:1 243:12
**mean** 8:3 16:8 17:4 19:10 22:5 23:6 31:6 32:13 39:6 39:25 48:20 50:20 51:7,15 60:8 61:22 65:16 69:9

71:21,25 72:1 73:18,22 74:9 78:24 82:4 89:17 89:18 107:18,19 108:16 110:1 114:22,23 118:21 119:6 132:19 134:13 138:18 139:23 141:21 146:14 151:1,6 152:3 155:6 156:25 159:4 168:1,22 171:23 177:25 182:25 190:12 194:4 196:11 197:16 201:3 209:19 211:13 214:18 217:19 226:18 227:7,10 233:18 235:22 238:8 239:18,19 240:11 241:7 246:1 247:13 248:24 249:11 251:24 255:5 256:2
**meaning** 78:3 203:9 249:2
**means** 24:8 100:24 106:4 116:17 126:22 158:20 159:14 196:24 203:11 241:8
**meant** 43:19 45:19 108:10 113:22 133:17 172:13
**measurable** 106:12
**measure** 51:12,19 91:21,22
**measured** 91:17 105:8 111:11,14 125:17 141:13 204:3
**measurement** 125:12
**measures** 112:9

PLAINTIFFS' EXHIBITS 011297

142:10
**mechanical** 59:21
  136:10
**mechanisms** 4:21
  5:6 11:18 191:13
  227:8
**Med** 11:13
**medical** 9:15 12:4
  15:9,22 19:6,7
  23:17 29:1 39:18
  40:25 41:2,22,25
  42:25 45:21 46:3
  47:14,15 65:21
  66:12 68:24 69:2
  69:11,12 86:25
  102:17 140:14
  143:10 198:18,19
  198:21 199:3,7,8
  199:12,18,19,21
  199:22 204:7,15
  204:18,21 205:7
  207:7,15 217:9
**medical-legal** 7:2
**medication** 30:6
  154:14 155:17
  210:22
**medications** 51:10
  73:4
**medicine** 37:11,13
  37:15
**meetings** 246:6,8,9
**meets** 239:1
**member** 41:4 43:23
  44:10
**memorized** 72:10
**men** 137:23
**mention** 250:14
**mentioned** 50:10
  195:12 206:11
  249:22 250:17
  251:10
**Men's** 28:11
**Merck** 66:21
**Meridian** 86:9
**metabolism** 179:16
**metabolized**

152:18
**metal** 251:8
**method** 70:13
  117:22
**micrometer** 51:17
**middle** 57:2 58:3
**midnight** 73:12
  74:17 135:12,13
**military** 68:17
**milligram** 198:10
  198:16 199:24
  200:6 201:13
  237:18 242:2
**milligrams** 95:13
  150:8
**milliliter** 137:6
  140:10,16 141:18
  142:16 173:15
  174:4,6
**million** 58:19
**mind** 23:13 24:4
  43:22 63:17 94:8
  127:13 164:25
  195:17,19 218:20
  226:23 244:10
  252:1
**minds** 109:5
**mine** 82:13 158:2
  164:2,3
**minimal** 78:16
**minor** 1:8 2:8
  160:15
**minute** 56:21 76:7
  162:12 185:5
  218:8
**minutes** 135:14
  137:5 144:21
  157:11 229:12
**mirror** 132:1,17,19
**miscalculated** 91:3
**misdemeanor**
  26:22 28:16,17,25
**misdemeanors**
  28:23
**misinterpreting**
  141:21

**misread** 201:25
**missing** 121:16
  122:18
**misstates** 62:23
**mistake** 16:3 256:5
**mister** 6:11
**misunderstand**
  141:8
**misunderstood**
  125:1 157:24
**mix** 191:4 197:17
**Modern** 5:6 191:14
**modulating** 99:16
**moment** 100:16
  215:1
**momentary** 214:5
**Monday** 28:19
  29:18
**monitoring** 34:7
**month** 52:4
**months** 47:17
  68:18 92:1 127:24
  127:25 204:10
  219:20
**moons** 39:2
**morbidity** 236:6
**Moriarty** 3:9 4:5,8
  4:10 6:7 7:18
  8:12,21 9:14,17
  9:23 12:12,16,19
  13:1,4,8,11 14:7
  14:16,25 15:2,8
  15:12,21 16:11
  18:24 19:2 20:14
  20:18,21,24 21:3
  21:11 23:3,9
  25:25 38:13 42:19
  49:14,25 51:3
  52:2,6,9,20,25
  55:17 56:1,5,12
  56:18,21,24 57:1
  57:15,19 58:13
  61:3,11,25 62:15
  62:20 63:1 65:3
  66:25 67:4 69:23
  73:21 75:14 78:4

78:11 79:21,25
  80:9,19 82:12,16
  82:19 83:5,10,24
  85:22 86:1 87:24
  88:2,6,9,15,18,22
  93:18,24 97:10,13
  98:21 99:1,5,14
  99:25 100:4,14,19
  101:25 102:3,6,10
  103:10,14 104:22
  105:1,11 110:16
  110:22,25 111:3
  111:20 112:12,22
  112:24 114:18
  115:23 117:1
  118:10,25 119:2
  119:14,17 120:1,5
  120:8 121:7,11,21
  122:4,15 123:1,6
  123:9,20 124:7
  125:14,21 126:9
  126:16 127:8,13
  127:15,18 128:3
  128:15 129:6
  130:2,13,20 131:9
  132:11 133:11
  134:6 135:22
  136:3,23 137:1
  138:8 139:17
  140:20,25 141:24
  142:4 143:3,21
  144:3,9,18,22
  145:1,9,12,15
  146:5 148:6,22,24
  149:1,21 150:16
  151:13 154:16,23
  155:8,14,25
  156:23 158:7,10
  159:3,7,21,25
  160:3 163:3,23
  164:2,7,9 166:19
  167:3,20 168:9,18
  169:17,24 170:3,7
  170:9,12,23 172:2
  172:8,11,15
  174:21 177:15,17

178:6,16 179:21
  180:13 181:3,19
  183:5 185:21
  186:12,19 187:7,9
  189:1 191:5
  193:23 197:12,19
  202:2 209:7
  223:13 229:12,16
  229:22,24 230:7
  231:16,20 239:11
  240:13 242:12
  244:11 245:1,9
  248:8,11 249:8,12
  253:17,18,19,23
  254:6,10,18,20,23
  255:4,9,13,20,24
  256:1,12,19 257:3
  257:12
**morning** 9:11 29:4
  76:22 77:1 83:9
  152:13,14 155:1
  155:18 157:7
  158:16 228:5
  235:6
**morphine** 104:9
**mortem** 232:14
**moths** 30:9
**motions** 29:20
**motivated** 63:25
**mouth** 158:20
**move** 21:8 88:15
  102:13 122:25
  129:25 183:4
  210:25 215:3
**multiple** 9:5 130:8
  130:18 135:20
  137:7 223:23
**multiples** 9:16
**multiplier** 146:18
**multipliers** 147:1
**mumbling** 56:4
**murder** 130:5
**muscle** 79:1
**muscles** 78:18,21
  78:23,24,25,25
  79:4,5 122:11

PLAINTIFFS' EXHIBITS 011298

**MYLAN** 3:11,11
**myocardial** 79:1
**myocardium** 78:17
  146:16 150:13
**myth** 55:7
**Myths** 55:2

**N**

**N** 4:2
**nadir** 76:25 137:16
**NAER** 34:1
**name** 6:8,9 11:22
  24:24 25:11,19
  27:12 35:14 40:23
  78:21 79:2 259:3
  259:4,16 260:3,4
  260:20 261:3,4
**named** 258:7
**names** 180:11
  186:2
**nanograms** 137:6
  140:10,16 141:18
  142:16 173:15
  174:3,6
**narrow** 209:20
  215:1
**national** 45:2
**natural** 240:18
**nature** 35:8
**nausea** 84:20,24
  85:3 90:7 169:6
  188:23 189:5,24
  190:24 192:11
  193:20 195:4,5,9
  195:23 240:22
  245:23
**nauseated** 194:24
  196:13
**necessarily** 21:18
  116:8 118:2
  138:25
**necessary** 102:23
  128:7 150:24
  190:3 192:12
  193:22 194:5
  195:10 240:22

241:1
**necessity** 192:1
  193:20
**need** 6:24 8:8 18:24
  19:2 56:21 69:20
  73:25 84:3 86:6
  128:24 152:25
  164:6 175:16
  190:18 195:19
  223:3 238:13
  249:11 250:18
  252:25
**needed** 69:13 192:5
  238:15 249:1
**needle** 215:2
**needs** 62:13 107:2
  114:16 195:5
  203:10 241:11
**neither** 121:24
**neutral** 30:25
**Nevada** 36:24
**never** 25:7 33:20
  33:22 35:18,22
  36:2,5,6,7 37:3,6
  38:18 41:23 43:22
  48:7,10 49:3
  62:24 63:11
  112:18 120:23
  127:13 157:10
  195:17 219:1
  225:23,25 227:15
  247:5,5,19,21
  252:16
**new** 56:14 67:17
  87:21 214:3,5
  218:21 236:1
  239:16
**newer** 194:7
**Nexium** 50:11,15
**nice** 205:20
**night** 10:18 11:9
  19:21 29:3 46:4
  46:12 47:4 68:1
  89:7 90:1 136:19
  138:1 161:14
  166:12 202:20

248:5,6,13,25
**Nightmare** 176:1
**nights** 29:4 67:24
**nine** 29:19
**NMS** 142:18
**nonarrhythmic** 189:18
**noncardiac** 89:22
  195:15,23 197:6
**nonconforming**
  7:21 9:3,8 174:25
  175:3,6,8,21
  235:24 239:5,24
  244:23
**nonligated** 114:25
**nonlitigation** 36:7
  71:3,12
**nonregulatory**
  44:20
**nonresponsive**
  88:16 211:1
**nonscientists** 236:3
**noon** 29:19
**Nope** 56:2
**normal** 150:11
  151:4 179:13
  197:13 213:19
**normally** 44:19
  210:19
**Notary** 259:11,20
  260:14,22 261:23
**note** 70:13 117:8
  229:25 238:17
**notes** 11:12 183:6
  236:18 258:15
**notice** 4:14 10:21
  54:17,21 79:21
  86:7 183:12
  198:23
**novel** 71:6
**November** 236:24
  237:17 243:8
**nowadays** 114:22
**number** 14:1 21:23
  58:17 59:6 69:25
  73:18,18 84:22

87:14 90:18 91:3
  91:6,9,14,15 92:7
  92:17,21 100:10
  110:11 111:24
  115:13 123:3
  125:25 134:22
  136:5,7,10 148:8
  148:21 149:23
  164:15 199:3
  231:5 236:12,23
  241:14
**numbers** 13:17,19
  13:19 53:3 86:8
  86:13,14 87:9,18
  109:5 110:1 137:9
  161:5 171:23
  220:17,18,19,20
  220:21 221:19
  241:16 260:7
**numerical** 95:7
**nurse** 35:14
**nurses** 46:15 47:7
**nutrition** 24:6
**N-i-z-a-i** 67:6

**O**

**obese** 204:24
**Obispo** 1:16 2:21
  3:3 25:17 27:9
  44:6 48:4 246:5
  246:12 258:16
**object** 49:17 124:5
  127:8 137:7
  146:11 154:21
  155:7 166:13
  169:20,22 170:19
  193:18 230:5
**objection** 7:17 8:10
  8:10,17,20 9:13
  9:16 12:8,18
  22:24 37:20 42:8
  42:10,12,16 49:12
  50:25 52:5,8
  61:20 62:23 64:22
  73:15 75:4 78:1,8
  83:5,17 87:2

90:22 99:22 100:3
  100:13 105:10
  110:13 111:18
  114:9 116:25
  119:13,24 120:3
  121:18 122:2,13
  122:25 125:13,19
  126:7,11 127:6
  128:13 129:4,25
  129:25 130:8,18
  132:6 133:8 134:5
  134:11 135:20,24
  140:19,21 141:19
  143:1 144:1,8
  149:20 150:9
  151:11 154:15
  156:21,21 163:1
  167:19 168:7,16
  169:23 171:21
  174:19 177:24
  178:15 179:14
  185:20 189:20
  196:8 199:15
  200:4,9,12,23
  201:23 205:10
  207:2 209:5
  213:13,17 215:10
  216:22,22 220:12
  220:13 223:23
  224:1,9 226:14
  229:25 230:7
  239:11,12 240:13
  240:14 244:17
**objections** 130:8,18
  135:20 137:8
  223:23
**observed** 109:1
  191:1 232:8
**observing** 194:19
**obtain** 76:4 113:18
**obtained** 77:13,16
**obvious** 37:7
  111:10
**obviously** 71:9 82:6
  185:8 228:14
**occasion** 35:25

PLAINTIFFS' EXHIBITS 011299

Keith Patrick Gibson                                    June 14, 2011

Page 21

| | | | | |
|---|---|---|---|---|
| 216:21 | 51:6 53:16 54:10 | 186:24 188:12,21 | 153:22 154:13,24 | 196:18 197:1,5 |
| **occur** 113:15 132:2 | 55:1 56:15,19,24 | 192:3,13 194:15 | 155:3 156:6,9,13 | 215:8 230:5 |
| 133:22 134:1 | 60:24 61:5,7 63:2 | 195:12,18 199:22 | 157:13,21 158:13 | 237:11 |
| 136:9 138:15 | 64:3 65:25 67:10 | 201:12 203:13 | 160:4,10 162:24 | **ordered** 67:14 68:2 |
| 141:22 149:10 | 68:10 69:4 70:3 | 207:6 208:13 | 163:7,20 174:23 | **ordering** 256:1 |
| 150:3 198:6 | 74:23 75:15,20 | 209:1 211:25 | 175:19 181:7,12 | **orderly** 15:5 |
| 226:18 229:6 | 76:3,9,12 78:15 | 213:25 214:17 | 181:13,25 189:17 | **orders** 47:1 49:21 |
| **occurred** 139:2 | 79:6,22 82:3,10 | 216:17,20 217:8 | 189:24 190:8 | 146:9,14 |
| 160:20 161:14 | 83:25 85:6,24 | 219:1,17 220:2 | 193:25 196:1,21 | **organization** 43:20 |
| 190:20,21 191:9 | 86:2,19 87:17 | 221:6,15 222:7 | 202:6 206:5 207:3 | **originally** 30:1 |
| 236:22,23 238:14 | 89:3,14 90:10 | 225:14,16 226:3 | 209:16 215:5 | 50:15 |
| **occurring** 60:1 | 92:12,21 93:9 | 226:22 227:1,14 | 231:12 234:25 | **osmotic** 116:17 |
| 241:10 | 94:15 95:1,11 | 242:24 245:8,25 | 235:1 236:7 | 212:9 228:17 |
| **occurs** 47:6 71:19 | 97:3 101:1,4,20 | 246:10,21 247:9 | 239:23 241:18 | **osmotically** 212:17 |
| 152:4 190:13 | 102:3,13 103:15 | 248:23 249:12,14 | 249:4,7 | **outliers** 221:14,17 |
| 205:23 | 105:3,16 106:16 | 250:19 251:22 | **opinions** 10:22 | **outpatient** 34:3 |
| **October** 242:1 | 107:6 110:22 | 253:16 254:4,6,15 | 12:2 15:4 19:16 | **outside** 7:13 48:6 |
| **odd** 131:17,19 | 112:21 113:2 | 255:25 256:7,10 | 19:18 22:4,17,18 | 48:10 68:23 140:3 |
| **OFAIR** 234:15 | 118:11 119:21 | **old** 69:10 250:5 | 22:20,22 23:7,8 | 140:6 162:5,8,14 |
| **offense** 210:25 | 120:25 121:3 | **old-fashioned-type** | 71:4,13,17 96:10 | 185:13,18,19 |
| **office** 51:13 255:11 | 122:16,22,23 | 72:1 | 144:5 146:8 | 243:22 |
| 257:13,14,14,16 | 123:21,23 124:8 | **Omeprazole** 49:21 | 166:10 181:22 | **outtake** 75:9 |
| **officer** 43:19 | 125:9,22,22 | 50:15 | 187:24 188:15 | **out-of-context** |
| **offices** 2:19 257:9 | 126:17,20 129:7 | **Omnicell** 35:12 | 191:19 192:4 | 233:18 |
| **official** 259:16 | 130:22,25 131:5 | **once** 24:20 44:14 | 202:13 203:2,3,5 | **out-of-specificati...** |
| 260:20 | 131:19,20 132:24 | 47:5 192:8 196:11 | 203:7 207:1 | 8:14 |
| **off-the-cuff** 31:4 | 133:2,12 134:23 | 216:24 229:2 | 211:10 234:22 | **overall** 214:9 |
| **oftentimes** 255:5 | 135:8,14 136:25 | **ones** 50:10 66:4 | 244:15 251:23 | **overdose** 128:9 |
| **Oh** 11:8 26:10 | 139:22 141:13,14 | 89:25 142:23 | **opportunity** 89:8 | 129:14,21 196:22 |
| 27:24 31:19 32:11 | 141:21 142:17 | 198:22,24 245:7 | 187:23 188:4 | **overdoses** 174:2 |
| 53:20 69:6 81:15 | 143:9,13,24 | 249:20 | 193:7 | **overlap** 140:1 |
| 115:11 124:19 | 145:21,22 146:7 | **one-year** 204:12 | **opposed** 53:6 | **oversimplifying** |
| 158:3 167:7 | 146:19 147:18,20 | **opens** 35:15 | 130:15 249:6,9 | 195:9 |
| 180:15 202:7 | 147:25 148:3,7 | **opined** 22:15 | 255:14 | **oversized** 58:17 |
| 204:19 246:3,14 | 153:7,18 154:8,20 | 202:14 | **opposing** 130:16 | **over-the-counter** |
| 246:17 247:4 | 156:4,6,7 157:15 | **opinion** 7:15,20,22 | **opposite** 34:8 | 51:8 |
| **Ohio** 3:9 | 158:17,24 159:8,9 | 9:12 17:15 19:12 | **optimal** 74:24 | **o'clock** 152:2 |
| **okay** 6:13,23 7:1,14 | 160:12 161:23 | 19:13,20,25 20:1 | 110:7 | |
| 7:24 10:23 11:25 | 164:4,14 167:7,10 | 20:1,3 21:14 | **optimally** 110:3,8,9 | |
| 12:20 14:4,21 | 168:10 169:9,9,13 | 48:17 70:25 71:25 | **oral** 35:1 36:17 | |
| 18:10,15,19 21:1 | 172:3,5,19,20,24 | 72:20 78:5,12 | 52:10 173:21 | |
| 21:1,2,3 22:8 23:3 | 173:11,20 174:14 | 83:1,13 84:4 | **order** 46:24,24 | |
| 25:1,24 34:22 | 174:22 175:18 | 91:10 96:15 | 50:19 67:19 68:8 | |
| 36:15 38:16 39:14 | 177:18 178:7 | 102:23 117:7 | 75:18 101:16,17 | |
| 43:22 45:21 47:9 | 180:10,19 182:1 | 135:16 136:4 | 108:23 139:5 | |
| 49:16 50:22 51:5 | 183:5,13,21 | 137:3,11 150:5 | 145:23 148:7 | |

| |
|---|
| **P** |
| **P** 3:9 |
| **packaged** 35:7,9 |
| **packs** 35:10 |
| **page** 4:3,12 10:7 |
| 11:11 19:19 22:19 |
| 55:6 72:24 78:15 |
| 79:8,9,10 81:3 |

PLAINTIFFS' EXHIBITS 011300

82:12 84:10 86:3
86:4,4,21 94:19
95:10,15 97:15
98:2,18 99:2
101:4 103:4,10,15
104:14 106:16
113:1 115:6,12
118:15 123:2
130:24 131:21
146:13 149:2,12
151:18 153:8,9,14
168:19 173:6,8
177:10 178:10
216:15 260:7
**pages** 42:20 184:6
**PAGE/LINE(S)**
261:5
**paid** 172:25 255:3
255:7,7
**Palm** 3:3
**Paloucek** 66:8
**panel** 26:17
**paper** 69:22 86:10
86:11 87:25 88:11
89:4 90:14 113:9
113:9 115:14
133:2 169:13
176:6 185:1
**papers** 86:16 87:17
87:22 88:24 117:6
133:3 134:7
**paracetamol**
177:20 178:1
**paragraph** 17:14
21:23 22:9 70:24
73:1 77:13 90:24
98:20,25 106:22
113:3 115:6 122:5
125:23 128:6,20
149:2 165:6
178:18 231:22
**paragraphs** 95:20
96:22
**parameters** 225:12
225:19
**Pardon** 55:21

**paren** 55:9,9
**Parker** 5:5
**part** 15:25 18:16
30:19 37:14 39:3
39:5 51:23,25
52:7 59:25 64:17
69:13 70:6 74:1,2
75:1 80:2,5,9,10
80:12,13 83:19,20
98:6,24 99:7,9
107:19 129:7,10
145:17 167:23
175:14 178:20
208:2,10 211:23
223:12 227:13
232:1 260:9
**partial** 222:17
**Partially** 107:5
176:23 177:2
**participate** 206:3
**participating**
102:18
**particle** 181:9
**particular** 13:22
24:3 58:11 91:4
117:20 136:18
138:1,2 141:4
158:23 161:14
189:11 198:1
211:18 226:16
232:21 239:16
244:16 252:5
**particularly** 8:2
37:24 49:22 63:7
179:8 205:1
216:10
**partitioned** 223:7
**partner** 24:11
**parts** 180:3,4,5,10
184:24 228:8
**pass** 62:7 69:13
158:20 215:17
**passed** 191:12
**passes** 159:14
**passing** 214:6
**passive** 104:4 106:1

107:21 112:8
113:5,24 116:17
139:6,6,15 150:3
227:2 228:4,16
229:7 233:5,10
**passively** 99:18
113:13 139:10
**pat** 24:3
**path** 31:18,20
150:22
**pathologies** 38:1
**pathologist** 7:22
19:12 21:20 23:14
**pathologists** 125:23
**pathology** 128:25
**patient** 13:19 37:25
46:7 47:13 49:2
51:5 62:8 67:15
68:3 86:22 87:14
110:2 112:10
141:7 190:4
195:21 196:2
200:24 214:3
229:4
**patients** 24:4 37:18
38:7,12,15 48:25
51:1 55:10 59:8
67:16,17 82:7
139:19 140:1,6
179:12 191:10
194:10 214:8
215:22 245:12,12
245:20,23
**patient's** 35:14
41:25 77:5 106:14
141:13 142:9
**Patrick** 1:15 2:16
4:4,13 6:1,9 27:15
259:4,10 260:4,13
261:4,19
**Pause** 21:8
**pay** 117:20 242:25
255:6,14
**payment** 255:1,15
**peak** 74:5,13 75:2
76:25 77:6 137:18

152:3,3 203:23
214:11 235:14
**peaks** 73:16,19,22
75:7,12,18 76:1
215:23 235:15
**Pectoral** 79:4,5
**peer-review** 44:25
65:23 134:7
**peer-reviewed** 12:4
15:22 86:25
**Pelissier-Alicot**
4:21 115:14
**penalty** 256:23
257:2
**pending** 8:11 57:14
222:12,15,21
**people** 27:3 30:17
31:1,2,4 42:6 51:8
63:23 81:19 84:23
87:20 109:7
138:18,21 149:18
171:15 182:20
185:15 189:10
191:3 207:23,24
210:23 238:9
240:17,17 255:6
**people's** 109:4
**percent** 75:11
87:13 89:17,17
138:13,13 161:2,3
161:4,4,5 190:20
191:9 212:10,13
212:18,20 216:18
216:21 217:19
218:11,20,22
219:1,5,8,11
220:9 223:18
224:5 245:18
**percentage** 87:19
245:10,12
**percentages** 29:10
87:1,18 194:8,9
214:25
**perfect** 221:25
222:3 224:10,12
**perfectly** 68:11

**perform** 36:17
225:6,9
**performed** 41:9
**performing** 41:14
**perimortem** 102:22
**period** 25:14
109:12 117:8
156:11 160:13
171:18 197:21,23
204:13 215:8
233:8 237:21
254:3
**periodically** 27:3
64:10 69:6
**peripheral** 77:17
77:25 80:24
103:18 104:1,2
106:3 108:1 122:6
**perjury** 256:23
257:2,4,5
**permanent** 242:4
**person** 40:4,6,7,21
49:20 67:18 68:6
129:20 130:5
139:7 151:5
160:15 201:4
206:5 210:17
213:19 221:12,25
222:3 225:7,17
226:18 229:2
**personally** 36:5,13
254:16 259:12
260:15
**pertains** 211:18
**pharmaceutical**
30:15 31:10,16,24
32:6,19,22,25,25
33:6,7,13,16
34:23 36:18 56:14
68:15 75:23
120:19 130:14
159:12 234:20
**PHARMACEUT...**
3:11,12
**pharmacist** 27:23
29:2 30:17 33:8

PLAINTIFFS' EXHIBITS 011301

Keith Patrick Gibson

June 14, 2011

Page 23

36:6,20 40:16
43:3 44:24 45:25
46:1 68:8,12
119:4 207:17,18
208:11,23 210:21
236:19 238:23,25
242:13
**pharmacists** 38:2
41:5,7,8 43:15
67:19 71:21
207:16,16 211:14
211:15
**Pharmacist's** 65:22
**pharmacodynam...**
208:9,15
**pharmacokinetic**
109:15 225:21
**pharmacokinetics**
13:20 66:20 67:6
86:10 208:9,14
212:1
**Pharmacol** 104:21
**pharmacological**
92:21 225:2
**pharmacologist**
207:11,12,13
**pharmacology** 4:19
105:7 119:5,7
120:14,18 207:14
**pharmacy** 34:12,14
34:15 35:4,23
37:1 39:6 43:12
45:2,5,8 46:7
63:10 64:5 65:11
65:18,20 66:1,6
71:24 75:25
119:10 129:10
155:19 178:3
182:18 207:24
208:6 211:12,19
250:4 257:14
**Pharm.D** 1:15 2:16
4:4,13 6:1
**phenomenon**
176:12,15 232:7
**Phenytoin** 210:11

210:14
**phone** 16:19
**phones** 29:20
**phonetic** 182:19
**phrase** 146:24
**phrased** 133:23
**physical** 216:2
**physically** 20:9
113:23
**physician** 7:23
19:14 23:12 45:20
**physicians** 20:2
21:21 22:7,15
38:1 188:15
202:14,22
**physiological**
225:19
**physiology** 204:12
**Ph.D** 119:23
120:12,13,13
121:1 249:4
**Ph.D.s** 207:23
**picked** 218:19
232:12
**picture** 13:18 17:24
19:18 20:3 22:11
38:6 89:20 109:6
130:12 226:19
239:15 241:12
**pictures** 85:2
**piece** 12:3 14:17
15:22 71:16 139:9
**pieces** 70:20 251:8
**pill** 50:12 53:10
90:25 91:7,8
157:8
**place** 99:17 144:19
233:6 258:11
**places** 43:21
**plaintiff** 3:2 25:1,4
26:4
**plaintiffs** 1:10 2:10
193:4
**plaintiff's** 25:19
65:8
**plasma** 227:23

**plausible** 22:18
**play** 13:19 87:8
109:5,25 138:24
202:20 221:19
**playing** 220:17
**please** 14:14 15:18
20:12,16 21:5
72:24 85:17
100:16 102:5
112:17 134:24
152:10 177:7
183:23 201:2
**plethora** 175:9
**plodding** 112:25
**plus** 219:14 251:19
**PMR** 101:8 102:19
103:6,12 104:1,2
108:5 112:11,19
122:10
**PM/AM** 128:16
**pneumo** 48:3
**point** 10:11 13:23
13:24 16:10 20:4
30:20 38:10 43:1
53:25 55:15 58:7
59:3 72:16 76:1
83:23 87:8,10,10
89:19 90:20 96:17
96:18 100:18
111:23 114:11,16
122:17,18 138:10
138:24 147:13
160:20,21 168:19
171:6 201:6,7
213:8 219:15
221:8 226:13
230:15 233:22
234:3 235:10,11
238:4 240:24
241:11 245:17
**pointed** 236:18
237:7,10
**pointing** 238:2
242:5 243:2
**points** 95:12
106:10 122:20,21

156:14
**poison** 178:22,24
**poisoning** 7:23
19:22
**poisonings** 178:2
**politically** 63:25
**Poly** 44:14
**poor** 238:9
**pop** 251:6
**population** 47:18
48:1 87:15 137:25
**populous** 63:25
**portfolio** 42:6
**portion** 211:1
**portions** 114:21
**posed** 57:9
**position** 8:5 28:25
29:22 215:19
240:5
**positions** 44:13
**possibilities** 90:16
160:24 235:22,23
**possibility** 7:3 92:6
92:18 153:15
161:21 235:24
**possible** 7:10 83:22
107:7 126:5
130:12 177:20
196:19 235:9
240:3
**possibly** 127:8
129:19 193:8
**posted** 55:17 56:10
56:15,16
**postmortem** 4:17
4:21,23,24 5:3
10:5 12:6 14:1
16:8 17:15,19
21:24 22:1 38:20
45:15 70:2 71:1,4
71:10,14,15 77:13
78:7 96:23 97:22
100:7,12 102:20
103:19 105:6,8,20
106:8 107:10,15
116:7,19 117:17

118:13 121:13
122:9 125:12,15
126:2 127:1 128:8
128:11,17,23
131:14,24 132:16
134:19 138:3,5,23
144:15 145:20
146:10 147:23
148:9 151:9
168:23 170:16
171:2,18 175:25
176:13,14 185:9
185:22 202:17
203:14,16 227:3
228:4 231:18
232:18 233:23
235:10 239:19
241:18 243:24
249:2
**Post-mortem** 4:19
**potency** 36:1
**potential** 102:20
150:1 182:12
193:4
**potentially** 198:3
221:16
**Pounder** 175:24
**Practical** 118:16
121:8
**practice** 26:14,16
37:11,12,14 75:2
128:25 182:9
210:20 246:23,24
254:24
**precede** 189:6
195:5 241:1
**precise** 130:12,17
149:7
**precision** 101:3
128:19 129:5,11
130:6 135:21
**predeath** 145:19
**predicate** 195:11
**predict** 12:5 128:22
**predictable** 190:14
**preface** 125:1

PLAINTIFFS' EXHIBITS 011302

Keith Patrick Gibson

June 14, 2011

prefer 6:12 172:22
prep 247:7
prepare 12:2 96:9
117:7 144:5
prepared 162:20
186:17 193:8
Preponderance 7:9
prescribe 49:4,6,10
49:15
prescribed 154:17
154:19 155:17,23
156:16,22 159:5
179:13 243:9
prescribing 49:7,7
49:23,24 50:22
prescription 51:10
154:7
present 39:22
111:16 125:25
126:3 190:3
195:22
presentations
45:14
presented 45:2,5,8
231:2,6
presenting 193:2
president 43:18
45:12
press 59:21 60:7,10
251:5
pressed 236:22
238:11 251:13
252:12,15
presses 237:10
249:23 250:21
251:6
pressing 238:13
pretrial 230:4
pretty 47:24
150:10 163:12
prevent 233:10
previous 127:19
136:15 137:22
214:12 237:15
previously 104:7
primary 42:25 43:8

43:11
print 11:15 50:19
56:11
printed 10:25 11:1
11:16,20 56:6,12
prior 26:3 29:7,15
34:24 39:13 48:15
62:24 83:3 188:20
192:2 193:16,19
194:19 195:4
202:10 219:20
248:20 249:5,9
258:6
Prison 28:12
prisons 28:12
private 66:22
privilege 45:24
privileges 45:17,19
probabilities
138:12
probability 7:3
8:15 9:15 23:17
78:6,14 83:2,14
84:4 87:11 135:17
135:18 136:5
137:4 138:14
150:6 153:23
154:13 155:4
157:13 158:14
160:11 161:22
174:24 175:20
181:8,22 196:2
215:6
probable 7:4 136:1
probably 7:24,24
17:5 39:13 43:11
87:4 106:13 108:9
133:4 136:2,17
137:20 152:21
157:5 158:1 170:5
183:15 186:16
187:13 190:25
199:11 207:4
208:12 210:1
214:15 215:13
217:12 218:3

226:19 241:9
248:21 251:4
254:2
probative 106:5
109:17 216:11
problem 7:25
18:11 34:2 38:18
59:21 60:9 62:6
65:24 87:3 109:4
161:24 165:4
192:8,25 197:15
197:16 210:6
214:21 221:7
223:2 233:18
237:8 240:16
problematic 201:4
problems 55:7
163:13 175:5
205:24 206:17
237:24
Procedure 259:5
260:5
proceed 254:8
proceeding 254:5
258:7
process 30:2,3
60:19 99:17
121:23 122:24
205:23 219:14
228:11,15
processes 229:2,3,4
prodromal 188:23
189:1 245:13,21
produce 214:11
produced 2:17
235:23
product 1:5 2:5
24:1,3 35:7,13,13
53:5,12 60:1
63:12,19,20 74:23
93:2 210:10,15
236:25 237:22
238:12 239:1
242:2 253:5
production 64:24
65:1 163:13 165:2

237:19 238:20
243:5
products 35:2
36:18 58:10 64:9
68:15 259:3 260:3
261:3
profession 118:22
129:10 207:22
professional 27:16
48:16 72:20
professions 28:1
129:8
professor 208:21
profile 50:20
program 80:18
182:13 219:23
programs 53:11
225:21 226:1,5
progress 194:17
195:14
progressing 205:2
progression 205:8
prohibited 101:18
project 251:23
projects 32:7
prominent 247:20
promise 229:22
prompt 255:10
promptly 255:7,8
pronounce 44:7
propensity 89:12
109:12
proper 222:18,20
proponent 134:16
proposition 70:21
74:8
propositions 70:10
propounded
192:21
prosecuting 130:7
protocol 75:25 77:3
protocols 75:23
proton 50:11
Protonix 49:23
prove 83:21 89:10
170:14 206:21,23

proven 113:10
provide 70:25
85:14
provided 60:14
providing 17:15
proximal 114:13
PTO 42:9 130:9
230:7
Pub 11:13
public 26:8,17,18
26:19 27:7,8
28:14 29:18 30:23
30:24 246:24
259:11,20 260:14
260:22 261:23
publications 65:11
published 44:25
169:14 208:14,16
209:25
pull 66:13 70:16
177:7
pulled 244:2
pulling 10:16
purchasing 40:3,21
purple 50:12
purpose 48:25 51:2
54:17 100:24
208:18
purposes 176:8,21
pursued 108:9
purview 62:19
push 236:4
pushed 136:19
151:7 236:1
put 32:2 55:10
66:14,25 67:11,20
70:19 89:9 101:11
112:16 131:11
136:16 139:9
146:25 151:4
157:8 171:25
197:3 198:3,11
200:11,21 201:14
201:19 203:16,19
212:3 219:25
225:22 230:21

PLAINTIFFS' EXHIBITS 011303

Keith Patrick Gibson

June 14, 2011

Page 25

237:9 256:16
**puts** 35:14 224:7
**putting** 101:17
214:21
**puzzle** 78:9
**p.m** 1:18 2:19
73:14,14 74:19,20
74:21 257:18

**Q**

**QA** 69:2,13
**qualifications**
36:16 81:23
**qualified** 234:15
**quality** 33:13 55:7
65:5 238:10,19
243:3
**quantification**
148:18
**quantify** 150:17
**quarter** 54:8
255:22
**question** 6:22 8:9
8:11 9:7 10:8,15
11:8 12:9,15,25
13:6,10,13,14
14:6,10,12,15,17
15:15,18,21,25
18:13 20:13,17,23
20:23 21:4,9
22:25 25:23 35:16
40:18 42:10,16
46:9 49:18 53:5,8
57:10,14 61:13
62:14 63:17 64:19
64:24 70:17 72:19
74:14 75:6 83:6,9
83:11 85:4 87:25
88:10,13,21,23
89:6 91:2 92:10
93:13 94:1 95:21
98:22 107:17
117:23 119:12
120:7,9,11 122:1
124:2,9,11 125:1
127:14,15 129:13

130:4 132:8,10
134:25 135:6
141:8 142:1,1
143:4 145:10
147:9,10,10,19
148:3,5 150:14
155:15,20,22
156:8 157:24
158:8,9,11 160:4
161:16 165:16
170:1 174:12
188:10,22,22
189:22 195:2
197:14,15 211:1
211:22 213:15
215:11 220:15
221:1 222:8,12,15
222:17,18,21
223:7,10,14,16
224:4 237:15
240:21 253:19
**questioning** 57:3
58:3 169:21 224:1
**questions** 8:12 23
14:24 15:3,5,14
29:20 30:18 31:4
32:13 46:12,13,13
63:21 69:15 97:18
122:21 123:21
135:2 139:18
144:23 157:11
171:5 176:19
177:3 183:8
187:12,18 193:7
193:12,16 196:5
198:25 206:10
211:21 221:21
229:13,15,17,20
229:20,21 230:1,6
231:5,7,11,24
234:19 242:8
244:12 249:19
**queue** 47:10,12
**quick** 172:21
**quicker** 244:6
**quickly** 114:11

172:20 201:25
222:6
**quinidine** 78:7
**quite** 19:10 23:8
32:11 38:2 57:10
84:22 133:10
139:2 183:1
239:20
**quiz** 256:4
**quote** 113:4,17
231:8,24 233:4
**quoted** 81:25
169:13
**quotes** 233:14

**R**

**raise** 235:7
**raised** 137:20
160:18
**Ralph** 1:8 2:8
**random** 11:10
**range** 31:22 136:9
139:1 140:2,4,7,9
140:16 141:12
142:7,10,15
143:17,23 151:4
177:21 185:13,16
185:17,18 224:13
224:15 232:19,24
232:25 233:7
**ranges** 218:24
**rat** 97:9 98:7
151:15 196:13
232:1
**rate** 179:6 186:17
**rates** 42:5 182:14
**ratio** 149:19
**ratios** 128:16
**rats** 4:17 196:12
231:19
**reach** 213:11,16,20
**reached** 59:7
148:10
**reaches** 147:23
**reaction** 33:24 34:6
243:19,21

**reactions** 196:16
**read** 8:5 10:4,13
13:13 15:20,24
18:1,2 20:2 23:14
29:15 54:21,21
55:13,14 58:22,23
59:10 60:11,12,14
60:21 61:19,23
62:24 64:8,11
65:12 67:1 70:5
81:11 85:19,20
86:16 88:20,20
93:2,5,6,25 94:5
94:16 97:23,24
98:10,11,24 99:3
99:21,23 100:15
100:16,21 101:20
102:6,8,25 105:12
105:13 107:24
113:9 117:6 124:3
124:14,16,21,25
125:2 126:10
132:9 133:3 143:6
148:14 157:6
163:3 165:13,14
165:16,20 176:21
177:10,18,19
179:24 180:2,3,5
180:10,12 184:10
184:13,15,23
185:3 190:10
192:9 195:7
209:23 210:5
216:25 222:22
231:21 232:5,6
236:17 237:7
241:7 242:14,16
242:18,21,25,25
243:13 244:13
248:15,20 250:1
254:12 256:3,6,9
256:12 257:10,12
259:5,6,13 260:5
260:6,16
**reading** 12:1 86:9
94:8,9,12 96:9

98:19 121:6
141:25 167:22
194:2 234:21
237:2 238:1,2
**reads** 232:17 233:4
257:15
**ready** 85:18,18
**reaffirmed** 133:6
133:13
**real** 13:24 47:12
57:23 158:19
199:1
**realize** 255:17
**really** 9:2 10:14
21:22,23 22:4
30:1,18 40:2,17
42:23 43:2,8
53:24 54:13 75:5
91:22 105:24
108:10,17 109:6
112:5 133:17
134:12 137:9
143:19 153:5
158:21 171:4
175:7 190:9
200:19 201:22
206:12 212:8
217:9 219:5 221:7
256:6
**reason** 20:8 43:13
46:10 59:12 63:13
64:19 69:22 91:1
129:23 135:10
136:14 137:11
201:19 206:4
218:9,19 239:7
261:5
**reasonable** 9:15
23:17 78:5,14
83:1,13 84:4
91:13 135:17,23
136:4 137:3 150:5
153:23 154:24
155:3 158:14
160:10 174:23
175:19 181:22

PLAINTIFFS' EXHIBITS 011304

Keith Patrick Gibson

June 14, 2011

196:1 215:5
248:17
**reasonably** 70:20
**reasoning** 244:16
**reasons** 9:5 70:12
190:17 197:3
237:6 239:17
**reason(s)** 260:7
**recall** 54:8,13,16
54:17 55:8 59:8
202:21 237:2
238:1,2 240:7,10
242:5
**recalled** 34:21 54:1
54:20 209:2,11
250:21
**received** 180:6
191:19
**receiving** 213:19
**Recess** 56:25
112:23 145:14
187:8 224:19
**recite** 39:11
**recognize** 244:8
**recollect** 54:3
149:24
**recollection** 24:17
53:9 185:5 217:1
**recommend** 38:13
122:7
**recommendations**
67:17 140:23
**recommended**
128:17
**record** 15:4,20,24
41:22,25 42:8
85:19,20 109:6
140:14 144:20,25
159:18 180:21
192:20 198:18
199:3 217:9
222:22,24 240:1
253:11 256:16
260:9
**records** 19:7 57:24
60:19 65:4,5,9

68:24 69:3,11,12
143:10 198:19,21
199:8,8,13,18,19
199:21,22 200:16
200:17 204:2,7
**red** 142:6
**redirect** 31:1
**redistribute** 113:13
**redistributed** 99:18
**redistribution** 4:17
4:21,24 10:5 16:8
21:25 38:21 45:15
70:2 96:23 107:21
113:6,15,24 115:7
115:16 116:17
134:20 139:1
144:15 145:23
147:23 150:1,3
151:9 175:25
176:13 185:23
202:17 229:8
231:18 233:5,11
241:10
**redone** 77:3
**redownsized** 47:15
**reduced** 258:12
**reenter** 233:8
**refer** 6:24,25 24:10
32:17 98:14
104:14,17 166:3
168:20
**reference** 15:23
74:12 76:1 90:2
109:15 121:15
149:25 220:1
228:24 237:14
**referenced** 16:5
259:12 260:15
**references** 86:8
230:22,23 248:22
**referencing** 74:2
**referral** 247:21
**referred** 178:18
241:25 243:12
246:18,19,21
247:21

**referring** 52:17
104:17 131:1
165:6
**refers** 96:23
**refill** 199:2
**refind** 250:14
**reflect** 116:8
**refresh** 185:5
**regard** 188:19
**regarding** 38:23
39:9 72:17 185:9
236:20
**regimen** 8:1,3
160:13,23
**regression** 182:25
**regular** 65:12,13
**regularly** 57:23
65:21 66:10 71:20
226:1
**regulatory** 33:16
**reject** 238:11
**related** 193:21
231:2,12 233:20
235:15 247:9
**RELATES** 1:6 2:6
**relation** 188:21
**relationship** 132:20
134:15 247:17
**relatively** 214:19
**release** 229:7
238:12
**released** 237:22
**releases** 47:6
**relevant** 117:10
164:24 227:4
**reliability** 14:1
182:2
**reliable** 16:4,7
70:20 111:10
126:3
**reliably** 12:5 97:21
100:11 111:25
177:22 232:13
**relied** 176:4,7,21
177:1 188:14
189:5 191:23

192:15,19 193:13
193:16
**relies** 238:25
**religiously** 157:4
**rely** 134:19 165:25
**relying** 70:9 162:24
163:7
**remain** 232:18
**remainder** 126:23
**remained** 205:5
**remaining** 252:22
**remains** 213:3
**remember** 11:22
11:24 21:22 23:19
25:20 30:1 32:12
37:23 54:4,21,25
106:10 107:25
117:13,16 143:13
143:17 168:8
179:8 180:11
181:1 185:4 186:2
186:3,14 199:25
203:1 204:25
217:10 218:4
231:23 246:12
250:8
**remembered** 24:21
**remove** 58:25
**renal** 91:15,17,25
92:7
**renamed** 210:13
**render** 21:14 37:17
38:8 71:4,13,17
102:23 105:6
**rendered** 37:21
41:24 48:11,16
72:20
**rendering** 19:25
20:1,3
**RENNILLO** 261:1
**repeat** 18:14
**repeatedly** 20:23
56:19
**repeating** 22:10
**rephrase** 133:23
**report** 4:13 9:25

10:6,9,10 11:4,5
11:21,23 12:2
14:21 16:6 17:13
19:19 33:24 61:4
61:5 67:9 69:15
70:11,15 72:9,24
79:14,17 83:20
94:19 95:10,16
101:4 104:14
112:25 116:4
123:2 130:24
133:19 141:23
142:21,22 144:11
151:18 153:8,14
153:17 162:20,25
163:8,10,11,12,16
163:21 164:15
165:1 172:17
176:4,8,22 177:1
177:4 178:8,18
180:16 181:14
184:2,3,4 185:2,8
185:15,17,19
186:1 187:20,24
187:25 191:24
192:4,6,15 193:11
193:14,17,19
195:17 198:23
202:9 208:25
216:10 220:19
230:21,23 231:12
231:17 234:6,10
234:16 236:14,16
236:17 237:16
238:9,21 240:25
241:25 242:14
243:3,6,10 245:23
245:24 248:20
250:13,16 251:16
256:17
**reported** 1:22 59:7
98:6 126:24
191:10 195:9
216:25 217:3
231:25 240:8
243:20

PLAINTIFFS' EXHIBITS 011305

Keith Patrick Gibson

June 14, 2011

reportedly 237:1
reporter 2:23 56:3
112:16 137:13,15
139:14 144:25
188:25 190:21
222:14,16 223:3
258:4,22 259:7
Reporters 2:20
reporter's 257:8,16
258:1
reports 20:2 33:23
65:7 179:24 180:2
180:10 192:22,25
193:5 195:7 239:6
244:13
repository 146:22
150:2
represent 226:5
represented 25:14
represents 67:8
request 17:14
223:6 260:9,11
requested 125:24
required 67:19
reread 13:6,10
15:16 169:9
research 94:23
128:24 149:17
170:24 190:16
208:22 211:17
240:24
residence 257:10
257:11,13
respected 87:4
responsible 38:3
restraints 101:18
216:9
result 48:11 83:22
99:17 142:9
162:20 209:21
214:11
resulted 22:2 161:7
237:9
resulting 17:24
22:10
results 146:10

162:7,13
resume 42:23 43:1
43:7,8,12,13
52:15
resumes 42:20
retail 35:4 38:17
retained 16:12
reuptake 109:21
review 4:21 17:3
46:25 60:23 61:2
61:2,6,12 65:23
68:24 90:4 102:4
164:16 204:2
236:8 238:9 259:1
260:1
reviewed 10:22
11:2,23 19:4,5
60:11 61:10 90:3
93:20,22 143:9
144:4 146:7 165:1
169:13 198:19,24
199:8,10 230:25
236:9,13 239:22
250:15
reviewing 69:2
192:25
right 9:8,9 10:2
16:12 17:9 20:12
21:17 22:14 24:23
25:20 29:14 32:7
35:21 37:19 55:15
56:8 59:3 61:8
70:8 75:21 76:19
76:20,22 80:2
82:8 84:2 85:9
86:7 90:15,18
91:18 92:4 94:4,6
94:16 96:2,12,14
97:1,17 104:2,10
107:25 108:8
114:8 115:10,14
116:1 117:2,13
118:9,18 128:19
129:23,24 132:15
132:23 135:16
137:8 139:24

140:1,4,7,11
142:12 147:6
148:24 153:12,20
156:3 157:20
161:9 164:1 165:8
166:8 170:7 172:5
174:22 176:24
177:1 183:12,20
183:24 185:14
187:12,25 188:5
190:6 193:12,15
194:14,14 197:25
203:2 204:10
206:21 212:6,18
214:1,7 216:4
219:2,21 220:15
220:17,20 221:23
222:2 224:22
229:10 242:7
245:4,17 248:13
252:3 254:11
256:10
rise 87:10 89:11,12
108:15
rising 138:15
risk 42:6 55:10
94:10,13,20 95:2
198:3,11 200:11
200:21 201:14,20
risks 204:18
role 19:15 21:18
25:12 83:18
187:21 188:6,18
202:8,9 206:12
207:18 208:10
243:18
roles 36:6 207:25
room 244:4
root 236:21
rotated 40:6
rotating 28:10 29:5
rough 256:2
routine 168:25
RPH 79:11,15 80:6
182:4,5 216:12,13
218:10 219:21

RPH.com 4:16
rule 90:19 91:12
92:6,17 184:19
233:1,3
ruled 92:9 232:17
rules 6:20 259:5
260:5
ruling 8:25 29:16
run 112:18
running 47:16
rush 256:2,10,11
R-P-H 79:7
R.E 4:19

_____

S

S 4:11
safe 199:7 241:13
safety 67:17
sake 187:19
Salinas 28:11
sample 58:18 96:3
96:6,11,20 106:3
107:9,23 121:24
121:25 132:3
134:2 178:12
185:9
sampled 117:12
samples 4:23 104:3
105:9 107:8
121:15 152:19
176:14
sampling 103:16
104:6,8 116:9,23
117:9 122:6
125:16 165:9
San 1:16 2:21 3:3
25:17 27:8 44:6,8
48:4 246:5,11
258:16
save 177:12
saw 17:5 19:6
54:20 63:17
143:16 166:20
179:8 209:14
225:23
saying 23:19 44:8

47:23 62:18 101:2
110:10,14,18
112:2 132:13,15
135:25 147:2
178:14 192:24
195:25 234:14
says 12:5 16:25
17:14 19:19 22:25
55:7 58:10,16
77:16 78:16 81:6
84:11 97:20 98:5
100:10 102:17
103:11,18,25
104:5,6 105:5
107:6 111:10
113:5,16 116:7
125:23 133:25
149:3,9 163:16
170:14 173:12
174:2 176:12
178:11 183:10
218:23 243:5
scale 138:12,14
scan 46:24,25
scenario 31:14
schedule 9:11
Schentag's 66:19
school 39:6 63:10
182:18 194:1
207:19,24 208:6
211:12,19 217:19
250:4
science 13:24 19:16
43:24 44:22 63:2
129:7 202:13
Sciences 97:8
scientific 22:16
63:5,8 78:6 83:2
83:14 84:4 92:5
92:10 113:12
116:13,22 117:6
130:6,17 134:7
135:17,23 137:3
147:21 150:5
154:13,25 155:4
158:14 160:10

Keith Patrick Gibson

June 14, 2011

Page 28

174:24 175:20
181:7,22 203:4,13
243:23 244:16
**sciential** 203:7
**Scientists** 236:3
**score** 106:6
**scores** 106:6
109:22
**screens** 46:25
**se** 136:11
**seal** 259:16 260:20
**search** 11:9
**searches** 11:10
**second** 15:25 55:6
59:5 72:24 73:1
80:10,17 81:3
82:12 99:4 103:13
104:5 105:5 113:3
121:4,25 122:5
125:22 133:24
144:13 148:23
149:15 151:14
187:2
**secondary** 43:13
**seconds** 21:8
**secreted** 212:4
**section** 85:25 98:2
100:6,10 103:16
118:16 121:5
122:5 131:20
190:23 246:8
**see** 9:4 11:22 38:2
51:2 54:19,23
55:11 58:8,11,14
58:20,21 68:4
73:6 77:14,17
78:19 80:3,4 81:4
83:18 84:13 85:22
91:4 95:24 96:10
103:16 107:11
111:13 112:2
113:7,19 121:22
123:11 127:2
138:10 142:12
143:15 145:5,7
146:8 148:4 149:5

149:12 150:12
151:12 166:9,10
166:15,17,21,24
170:6 173:15,23
175:5 178:4,24
182:7 183:23
194:14 198:5
199:2 200:17
201:25 209:15
217:1 232:19
238:11,16,17,21
245:15 246:5,9
247:15 252:14,21
**seeing** 186:14
**seen** 35:18,22 55:4
65:4,9 103:20
117:18 142:13
147:22 161:23
162:4,7,11 168:4
169:15,25 182:23
183:14 209:10
210:21 225:25
227:15 247:19
252:16,18
**seizure** 210:17
**selected** 231:7
**send** 35:25 40:5
60:18 254:25
**sending** 256:2
**sense** 45:19 75:6
94:24 136:8
**sent** 16:18,20 21:13
40:8 46:24 254:14
254:16 257:9
**sentence** 59:5
84:10 95:24 98:5
99:1,4,15 100:24
105:5 113:16
115:5 116:6 121:4
126:8,23 131:23
133:24,25 149:15
170:13 177:13
231:8,20 232:6
**sentences** 97:19
231:21
**separate** 27:12

31:18 119:8
208:21
**separated** 113:23
120:24
**separately** 186:13
**September** 186:24
**sequence** 200:6
**sequences** 198:8
**sequential** 148:8
**series** 47:6 233:13
**serious** 129:15
174:7,9
**seriously** 110:20
**serum** 5:4 12:6
67:14 68:3,5
73:10 74:16,24
75:1,18 76:10
86:22 87:11 89:11
98:8 100:8 110:4
132:2 133:22,25
135:11,18 136:5
137:4 138:15
140:15 142:14
147:3 149:10
168:23 173:12,20
174:3 224:24,25
226:17 232:2,18
233:6,9 241:21
**serve** 46:3
**served** 30:14
207:18
**serves** 26:17
**service** 26:19 68:17
**services** 27:8 32:24
42:24
**set** 16:18,20 189:15
191:21 199:12
219:21 258:11
**setting** 7:2 36:8
48:6,10 68:23
71:3,12 81:14
173:22
**settings** 37:25
198:7
**seven** 29:2,2,3,3,4
68:18 75:10

160:20 175:12
212:9,19 213:11
213:16,20,24,25
214:2 215:13,15
236:24
**seventies** 194:2
**severely** 72:2
**shape** 53:21
**shapes** 53:4
**Sheet** 260:7,10,17
261:1
**shelves** 35:14
**Shepherd** 176:24
176:25
**sheriff's** 167:8
**shift** 68:13
**ship** 253:14 256:8
**ships** 159:18
**SHOOK** 3:13
**short** 56:20,23
222:5 237:21
**shorthand** 2:20,23
258:3,12,15,22
**shot** 223:8
**show** 69:9,11 84:24
89:11 134:18
140:14 163:15
190:13 194:6
195:3 218:17
221:4
**showed** 30:17 54:5
165:5 196:12
**showing** 146:14
194:9
**shown** 206:24
**shows** 46:24 55:10
128:21
**sic** 184:1
**sick** 191:3
**side** 84:16 86:21
118:16 194:9
203:25
**sign** 254:12 256:6,9
256:13,22 257:1
257:10,12
**signature** 254:11

257:5
**signed** 41:11,18
256:3 259:14
260:18
**significance** 205:13
**significant** 111:24
**significantly** 98:8
228:1 232:3
**signs** 166:11,22
190:1,2 257:15
**Similar** 191:17
**simple** 8:8,9,9 9:7
29:10 88:10
119:11 140:13
145:24 146:5
174:13 177:12
**simplest** 28:6
**simply** 171:20
**single** 12:3 15:22
178:12 214:7
243:16
**sir** 187:11
**sit** 172:22,23
**site** 77:17 82:20
113:17 114:4,12
114:17 116:9,23
125:15 213:9
**sites** 10:16 11:14
122:6 127:1
**sits** 221:13
**sitting** 148:24
**situation** 37:25
136:16 138:2,23
194:25 196:15
228:19
**six** 28:7 29:3 47:16
73:17,23 74:5,11
112:14 152:4
173:21 236:23
255:22
**sixty** 161:4,4,5
**size** 53:21 114:19
181:9
**sizes** 53:4
**skeletal** 78:17,21
78:23,25,25

PLAINTIFFS' EXHIBITS 011307

skimmed 185:5
skip 111:7 190:5
194:18 245:3,13
skipped 23:13
76:21
sliding 138:12,14
slip 142:2,5,7,15
143:13,23
slips 141:11 142:13
SLO 44:10
slope 106:11
slow 223:3 228:21
slowly 223:1,2
229:4 230:19
small 27:3 58:17
59:6 63:11 114:21
209:20 215:3
Smith 86:11
sobeit 256:4
sober 154:2
socialized 247:2
socially 247:19
society 41:4,6,8
43:14,21 45:12
soft 18:11
software 225:16
sold 24:6 34:20
solid 35:1 36:17
52:10 139:9
solve 65:24
Soma 60:22
somebody 8:25
48:11 74:16
129:14 135:10
206:19,21
somewhat 30:22,24
91:7 106:6 108:1
201:4
soon 166:18
sorry 36:13 49:8
56:3 57:7 79:8,9
91:14 94:7 98:21
100:21 108:20
110:18 112:17
119:20 120:10
122:19 123:17

124:19,25 133:22
137:13 142:25
149:22 161:4
162:21 163:12
172:13 178:23
180:17 186:2
191:11 203:1
227:18 237:14
245:16 246:3
253:15,17
sort 7:25 30:10
31:2 42:23 44:8
44:20 48:20 60:2
65:18 75:9 81:17
90:13 94:8 100:5
106:1 112:2,9
117:21 124:1
146:9 147:16
166:1,6 182:20
196:2 212:14
239:17,17
sorts 189:25 192:1
210:18 212:12
252:10
sounded 107:24
source 24:8 132:3
134:1
sources 86:12
103:20 182:13
SOUTHERN 1:2
2:2
so-and-so 248:1
speak 46:22 223:2
230:19
specialist 208:4
speciality 207:14
specialties 208:3
specialty 207:14,15
specific 49:10
61:18 73:18 74:14
78:3 83:8 118:7,9
124:10 162:19
181:7 193:13
200:24 215:3
230:23 231:8,8,20
234:19

specifically 11:23
23:19 58:18 69:25
82:20 135:3
164:21 192:14
203:14
specification
206:25 209:18
specifications 7:13
162:5,9,15 174:18
209:4,12
specificity 48:22
specifics 249:20
specimen 114:20
114:22 116:10,24
122:8
specimens 104:1
speculative 7:11
speeches 12:20
14:23 15:13
spell 182:19
spelled 231:17
spend 108:3 170:21
spent 10:18 28:3
31:9 182:18
spikes 178:25
splatter 182:24
split 28:17
spoken 167:12
sporadic 28:21
217:2
spread 105:24
spreads 194:8
square 104:20
166:25
sr@emlaw.us 3:5
stable 197:23 205:4
205:5 239:16
stack 69:12 177:8
staff 29:2 35:17
45:25
stand 102:2
standard 83:5
137:8 246:7
standardized 210:4
standards 239:2
standing 223:25

standpoint 189:13
189:14
start 29:4 39:5
190:22 196:16
212:11,11 213:7
215:18,20,22,23
started 171:3
210:23 219:18,24
251:20
starting 54:2
171:23 215:19
219:12 240:5
starts 58:7 128:20
state 2:21,24 37:11
37:15 39:8 75:3,8
75:8,10,11,12
107:1 108:14,14
130:9,9 151:5
160:21 175:11
180:3 212:2,14,21
213:12,16,20
214:3,5,9,10
215:9,12,15
217:16 218:12
223:21 224:7
227:21 258:4
259:12 260:15
stated 109:8 204:25
232:4
statement 59:13
61:9,19 63:9
77:19 101:23
102:7 108:12
113:7 125:18
126:6 147:22
151:24 170:18
180:22 243:13
259:14,14 260:18
260:18
statements 106:14
190:17 233:19,19
233:23
states 1:1 2:1 36:23
68:19 85:1 179:1
statewide 45:5
statistics 179:5

steady 75:3,7,8,10
75:11,12 80:15
106:25 108:13,14
160:21 175:11
212:2,14,21 213:3
213:12,16,20
214:3,5,9,10
215:8,12,14
217:16 218:12
223:21 224:7
227:21
stems 107:18
step 73:9 194:20
254:8
stick 60:7 76:7
146:21
sticking 59:20
60:10 237:10
238:14 249:23
250:21,23 251:1,8
stock 49:22
stop 223:13 224:2
stopped 26:10
43:19
storage 108:11
110:21
store 24:6 105:22
108:16 213:2
stored 139:5
stories 31:6
straight 67:2 229:8
245:13
strange 24:1
strapped 46:11,21
street 3:3,13
247:23
strength 240:3
243:9
strike 88:15 122:25
130:1 210:25
237:15
strong 235:24
stuck 32:4 35:13
studies 68:8 91:24
98:6 104:9 209:25
231:25

PLAINTIFFS' EXHIBITS 011308

Keith Patrick Gibson

June 14, 2011

**study** 64:11,14,16
87:15 89:8 90:5
97:9,14 120:19
128:21 133:10,14
145:17 148:7
207:24 208:2,17
233:21 237:7
249:22
**stuff** 10:24 16:9
29:21 31:4 38:5
44:21 51:8 57:11
59:23 89:9 93:22
101:15 110:7
111:7 164:13
185:25 205:1
233:25 247:8
250:7 252:10
**subclavian** 114:8
**subcontract** 26:20
27:9
**subgroup** 41:7
**subject** 103:19
122:10 133:16
208:22 211:11
**subjects** 107:3
**submit** 255:1,9,18
256:11
**submitted** 193:14
**submitting** 255:15
**subpoena** 183:16
**subscribe** 65:11
**subscribed** 259:11
260:14 261:20
**subsequent** 111:12
**subset** 96:24
**substance** 234:16
**substantial** 105:22
112:10 132:1
133:21,25 139:4
149:10 150:10,13
150:19 160:14,15
235:5 241:8
**Substantially**
149:16
**substantiate** 19:18
23:7

**substitute** 50:3
63:12 71:22 81:8
137:16 210:14,18
210:21 211:14
**substituting** 63:23
210:23
**substitution** 211:15
**sudden** 42:3
**sued** 25:8,9 26:1
130:14
**suffer** 195:8
**suffered** 18:8,17
188:8,13,22
202:14
**sufficient** 202:13
**suggested** 81:8
113:16
**suicide** 109:18
**Suite** 3:8,13
**sum** 234:16
**summarize** 244:19
**superior** 25:18
26:21
**Supervisors** 25:10
**supply** 154:3
**support** 21:19
22:16,16 87:1,18
196:7 203:4,8,13
234:21
**supporting** 22:5,21
48:18
**suppose** 34:4
**supposed** 61:21
130:9 209:3
**supposedly** 129:21
182:16
**sure** 16:22 22:8
37:9 40:19 50:20
51:15 53:4 57:10
69:16,21 70:19
72:25 78:2 82:14
84:22 85:21 98:5
99:8 100:17
101:21 102:15
104:11 111:6
121:20 130:22

131:3 134:12
136:7 145:18
146:2 147:5,17
149:16 152:22
167:7 168:2
169:24 172:18,21
175:16 177:9,16
177:19 187:21
190:19 195:5
196:10 207:21
217:11 227:15
238:24 255:24
**surprised** 210:23
210:24
**survived** 9:4
**surviving** 137:19
**susceptible** 107:9
**suspect** 153:1
**sworn** 2:17 6:2
257:3 258:7
259:11,14 260:14
260:18 261:20
**symphony** 205:20
**symptom** 60:8,8
195:11 205:8
241:1 250:23
252:12
**symptoms** 11:10
48:19 89:23 92:9
166:11 171:16
188:11,23 189:11
189:19,25 190:5
190:11,20,21
191:1,9 192:2
193:21 194:18
195:22,23,24
196:12 197:7
215:22 240:15
245:13,21
**system** 47:2,5
238:20
**systems** 34:7

|  |  |  |  |
| --- | --- | --- | --- |
| **T** | | | |

**T** 4:11
**tab** 177:3

**table** 66:14 67:1
216:13,15 217:11
219:12 221:22
**tables** 218:3
**tablet** 7:21 9:3
35:17,22 63:17
65:2 153:20,24,25
154:1,2,6,25
155:11,18,19
157:3 216:25
217:3 219:4,11
223:17 224:5
236:20,22,23
237:1,9 239:5,24
240:2 243:16
244:22 251:6,9,25
252:2,6 253:2
**tablets** 35:3,25
51:16 52:16 53:1
58:17,18,19,25
59:6,20 60:7,10
64:25 83:3,4,15
84:5 91:3,6,9
126:1 153:6 155:4
156:10 157:7,22
159:5,9,13 161:6
161:17 174:17,25
206:13,24 215:6
216:3 220:5
235:24 237:10,13
237:17,19,25
238:10 239:24
249:23 250:20,23
251:1,5,12 252:12
252:14,16,18,19
252:21,22 253:7
**take** 29:12 31:14
56:20,23 69:21
77:1 86:18 91:8
97:5 105:21 107:8
109:16,20,21
110:24 112:22
144:17,21,22
152:22 153:1
154:4 157:3 159:4
163:22 164:6,10

172:12,22 183:5
187:7 196:3
204:19 205:25
210:15 213:15
214:2,8 222:5,9
222:10,18 223:4,8
224:16 233:5
239:4 244:9 247:1
**taken** 23:22 37:1,4
38:19,23 39:9
76:17 86:22 91:5
91:25 131:24
132:16 152:14
156:15 178:1,9
194:20,21 197:1
198:9,13,15
199:23 205:5
208:5 216:5,20,25
233:14 235:12
241:2 258:10,11
258:15
**takes** 32:16 99:17
106:10 213:11,19
215:3 256:6
**talk** 43:4 57:3,5,16
57:20 58:7 70:10
89:22 96:1 183:6
190:10 223:1
235:14
**talked** 40:21 57:9
57:13,17,25 58:2
58:5 199:25 207:6
227:1 232:12
247:16
**talking** 20:21 24:10
35:10 36:9,10
39:3 47:20 51:7
51:10 73:3 90:10
95:20 96:23
106:22 115:6
118:7 139:3
140:18 141:10
142:17,19 143:8
143:11 144:15
153:9 155:10
168:20 169:5

PLAINTIFFS' EXHIBITS 011309

Keith Patrick Gibson                                          June 14, 2011

Page 31

174:11 190:19
194:25 197:25
208:20 212:1
213:1 219:10
222:6 224:21
228:6,22 233:21
243:8 250:12
**talks** 58:24 91:14
**taught** 44:14,20,22
**teaching** 44:13
**team** 30:25
**technical** 165:23
**technique** 125:15
**techniques** 64:25
65:1
**telephone** 46:17
**tell** 6:8 11:7 12:19
14:2 16:9 27:25
31:6 50:18 53:12
59:18 62:10 64:4
67:21 75:22 85:18
138:16,25 157:23
164:11,14 174:11
174:20 175:15
181:17 196:13
198:10 221:10
229:19 234:1,3
235:2 250:22
253:11 258:8
**telling** 46:14,16
93:11 159:3
226:19
**tells** 10:21 32:4
**ten** 30:20 31:3 69:7
127:24,25 138:10
143:4 144:21
148:16 151:9
170:16 171:7
204:10 213:11,16
213:20,25 214:2
215:13 219:20
236:24
**tend** 98:8 114:21
120:17 232:2
**tends** 238:6
**ten-minute** 145:5

**term** 158:20
**terms** 114:15
212:21,23 218:11
228:3 236:3 253:5
**terrible** 161:5
210:11
**terribly** 138:20
**test** 114:21 162:13
201:9 209:14,15
232:8,21 238:15
**tested** 64:25 68:14
84:7
**testified** 6:3 22:22
157:25 163:5
166:21 167:11
169:21 201:12
240:1
**testify** 30:22 165:3
168:3 234:15,17
**testifying** 200:12
**testimony** 6:13
62:23 77:20
152:12 188:16
189:17 202:23
231:1 259:5,7
260:5,9,11
**testing** 36:17
121:13 161:23
162:5,7,18,19
165:23 236:24
237:24
**tests** 91:18 152:23
162:1,2,14 163:19
178:17,19 212:12
212:12
**Texas** 3:14
**text** 66:20 90:12
**textbook** 67:5 74:9
87:5 250:5
**textbooks** 93:21
**texts** 65:25
**Thank** 6:21 7:19
9:24 12:10 17:11
42:17 58:12 61:15
67:13 77:23 79:18
82:18 84:9 89:21

104:13,25 115:25
123:19 131:13
136:25 156:6
164:5 168:10
177:12 179:23
208:13 217:22
242:7 257:17
**Thanks** 146:6
**theirs** 180:3
**theoretical** 212:18
221:23,23 222:24
223:22
**theoretically**
147:15 213:3
222:4
**theories** 48:2
**theory** 195:13
209:17
**therapeutic** 39:7
95:5 128:9 139:1
140:2,3,4,7,9,16
141:10,12 142:7
142:10,14 143:17
143:22 173:14,22
185:13,15,17
209:20,21 214:22
215:1 224:13
232:19,24,25
233:7
**therapy** 214:23
**therefrom** 239:3
**they'd** 62:8 254:8
**thick** 35:2 236:20
**thickness** 236:21
253:9
**thigh** 78:24
**thing** 28:5 30:10
34:4 35:15 45:11
48:21 64:2,4
112:9 158:3
159:24 160:1
166:1 196:11
210:19 212:9
217:2,2 247:19
256:14
**things** 14:2,2,3

38:5 46:18 58:25
65:19 72:9 83:9
105:19 118:12
133:17 153:11
172:17 175:10
176:3,7 183:18
187:19 203:19,21
210:18 227:16
233:18 239:22,23
250:17 252:9
**think** 7:22 9:2,3
16:7,8,9,23 18:13
24:15 26:2 31:19
36:5 39:19,22,23
40:1,17,18 42:25
43:20 48:2,19
53:5 54:2 57:5,8,9
59:15,22 60:17
61:17 62:1,2,3
69:4 80:10 81:18
84:19,22 91:8
101:15 106:2
108:2,14 110:10
113:22 117:10,21
123:17 124:4
126:19,22 133:9
134:13 135:6
136:14 137:10,10
137:19,21 138:4
141:20,20 144:16
144:20 146:12
151:2 152:1,1,20
153:1 154:4,19,21
155:2 158:12,21
159:17,21,22
161:9,10 162:21
167:22,23 168:25
169:1,21 171:4
173:1,10,18
176:19 181:17,21
183:15 185:6
186:5,15 188:10
188:21 189:4,6,9
189:10 190:9
192:10,11 193:20
195:10 196:25

199:1,4,11 200:21
201:10 202:3
204:5 205:1 206:2
209:14 210:20
211:10 216:10,24
226:10,15,19,24
227:12,18 229:10
229:15,16 233:22
233:24,25 234:1,2
235:14 236:11,18
238:12,15 240:21
241:11,24 249:11
251:15 253:12
**thinking** 108:3
159:24,25 195:20
219:14 252:11
254:1 256:21
**third** 29:10,11,11
58:24 109:13
**Thirty** 118:4
149:23
**thought** 8:18 19:15
32:3 77:9 90:23
93:14 94:24
101:16 102:1
107:9 120:23
134:9,25 151:17
155:15 188:12
192:10 196:6
197:20 200:17
201:13 202:1
203:21 205:4,5
213:22 223:7
250:5
**thousands** 143:6
**threading** 215:2
**three** 6:16 15:9
22:19 23:11 28:3
28:22 43:16 59:4
68:18 117:19
143:16 145:7,21
146:21 159:22
185:12,18
**three-minute** 223:5
223:5,9 224:17
**threw** 115:15

PLAINTIFFS' EXHIBITS 011310

Keith Patrick Gibson

June 14, 2011

Page 32

throw 205:17 206:6
throw-aways 65:14
  65:16
Thursday 29:4
tight 134:15
time 8:2 10:9,18
  14:10 16:14 25:15
  27:25 28:3 29:13
  30:23 31:9 32:9
  39:7 43:8,10 47:8
  48:16 52:13 54:11
  63:16 64:9 70:14
  70:15 71:7,9 72:7
  74:1,3,5,24 75:8
  76:12,17,19 79:13
  81:24 90:5 94:2
  95:22 101:17
  104:3,5,7 106:7
  108:3 109:12
  111:23 112:6,15
  116:8 117:4,5,8
  117:24,25 118:1,3
  118:4 121:19,24
  125:25 126:3
  136:1 137:21
  138:6,19 146:16
  147:3,5,11,14
  148:10,14 151:25
  153:2 157:5
  159:19 160:13
  162:19 163:22
  164:6,8,10 166:18
  168:15 170:21
  172:9 178:2 180:6
  182:18 190:20
  193:1,24 196:12
  197:21,23 200:4
  201:23,24 202:1
  202:24 204:8
  205:4 208:24
  210:1,5 212:3
  215:8 216:7,9,23
  222:11 226:13
  228:24 234:17
  237:22 239:21
  240:8 241:14,22

242:8 248:25
250:17,25 252:23
253:1 254:22
255:2,19 258:11
timed 228:16
times 6:15 23:21
  33:25 34:2,6,8
  41:9,11,13,18
  65:18 67:23 69:4
  71:3 75:10 117:19
  143:4 146:3 147:2
  151:10,20 152:19
  159:23 160:20
  170:16 171:7
  175:12 185:12,18
  204:6 212:9,19
  213:24 215:15
  227:23
timing 151:25
  156:16 228:13
tired 180:17 213:22
  230:17
tissue 100:8 121:15
  149:18 150:6
  225:3,4,6,8,10,18
  226:11,12 227:4
  227:22,25 228:22
  229:1
tissues 99:18
  121:16 122:11
  225:23 227:3,9
title 32:1,1 67:1
today 12:3 35:12
  62:24 63:5 77:10
  84:3 89:4 161:5
  192:6 193:2
  208:11 210:5
  227:1 247:7
  254:17
told 8:19 40:4
  48:14 52:20 54:15
  202:17 253:24
tolerated 198:16
ton 65:15
top 25:20 75:21
  78:15 104:20

107:25 117:13
131:4 149:16
204:24 242:2
topic 59:14 70:16
  120:16 157:12
topics 65:18 208:17
total 78:9 100:23
  230:22
totally 23:8 38:10
  50:5 98:1 105:17
  106:7 112:1
  220:24
TOTOWA 1:12
  2:12 3:6
touch 35:7
town 28:13 247:13
tox 166:22 193:22
toxic 83:23 84:12
  84:16,23 110:2
  120:20 136:1,8
  138:7,9,20 139:19
  140:2,3,7 141:22
  156:15,19 161:10
  161:15 174:3
  175:13 189:11
  201:4 215:18,21
  215:22 224:15
  233:7 236:5 240:6
  241:22
toxicities 198:6
toxicity 5:6 8:15
  11:10,19 18:9,18
  19:9 20:7 21:15
  23:18 45:15 48:8
  48:12 49:2 90:11
  109:9 110:11
  138:17 160:19
  166:11,22 168:5
  171:13 177:22
  178:25 179:12
  188:8,11,14,20,24
  189:6,12,18 190:1
  190:5,11,24 191:1
  191:10,14 192:2
  192:12 193:22
  194:17 195:6,8

202:10,15,24
206:20 234:23
235:3,16 240:4,16
240:23 244:21
252:2
toxicological 12:4
  120:21 122:9
  175:25
toxicologist 118:20
  118:22 207:20
  249:4
toxicologists
  102:18 125:24
toxicology 65:25
  66:12 118:17,21
  118:23 119:5,5,7
  119:9,18,23 120:2
  120:12,15,17,23
  121:1,1,2,9
  207:23,24,24,25
  208:2
toxins 120:18,18,19
trace 78:6
tracking 199:2
training 39:4,5
  119:4 208:5
  211:12
transcribed 259:7
transcript 256:1,5
  256:10,11 257:2
  258:14 259:5,13
  260:5,11,16
transcription
  258:13
transgressing
  205:2
transplant 24:5,9
Travis 3:13
treat 38:12 141:6
  161:13 171:23
treating 7:23 19:13
  21:20 23:12
  188:15 235:8
treatment 37:22
  51:2 235:18
trial 130:4 203:10

234:17
trials 28:21
triceps 78:24
tricyclic 103:12
tried 26:7 27:2 53:3
  146:12 173:1
  202:18 218:5
  246:13,15,25
tries 205:17
triglycerides
  152:25
trip 154:3
trouble 198:14
trough 76:25 77:5
  137:14,17 151:21
  152:3,18 214:11
  235:13
troughs 73:20
  214:12 215:23
true 61:24,24 62:2
  63:13 72:3 110:15
  113:11 140:8
  147:24 148:4
  159:6 167:24
  189:7 199:11
  201:6 231:9,10,21
  231:22 232:4,9,10
  232:22 233:11,12
  233:19,19,25
  234:10,13 239:7
  239:14,23 241:3
  258:14
truncated 66:5
Trust 15:3
truth 62:10 89:10
  258:8,8,9
try 16:6 19:11 31:1
  31:11 32:14 47:3
  65:24 138:22
  162:21 170:21
  174:12 189:2
  230:19
trying 30:25 77:9
  80:14 87:9,15
  89:15 91:4 110:1
  110:2 112:4

134:14,18,20,21
135:2 138:21
146:5,24 153:11
156:25 188:2
191:21 202:18
218:13,14,15,24
221:4 236:4
249:25 250:6,22
**TUCKER** 3:7
**Tuesday** 1:17
**turn** 183:8 229:15
229:23
**Twenty** 246:1
**twice** 154:7 157:4
197:10 198:2,13
200:1 235:5
**two** 6:16 19:6 20:2
22:6 23:7,10,23
23:23 26:3,18
27:6 28:7 42:20
42:22 43:16 45:25
46:25 50:1 59:4
70:12 88:24 90:6
95:20 100:10,20
100:21 106:10
115:12 137:6
139:20 145:25
147:14 149:4
152:4 157:18
158:16 160:6
172:12 174:3
184:9 186:21,23
202:13,18 218:5
232:12
**Tylenol** 178:2
**type** 34:3,4 96:11
116:18 172:10
203:7
**typically** 76:15
92:14 246:7
**typing** 249:13

---

**U**

**UDL** 3:12
**Uh-huh** 58:9 70:4
75:19 78:20 80:22

100:9 115:15
123:5 129:22
149:6 167:14
169:4 188:1
223:19 225:9
**um** 6:12 19:6 25:3
35:4 44:14 69:1
75:7 81:24 152:20
180:11 182:20
246:19
**unable** 206:23
**unclear** 159:17
**uncommon** 215:21
**undergo** 102:19
103:6,12
**underlying** 4:21
117:23 153:16
204:14,17,21
243:4
**underneath** 90:10
**understand** 6:22
7:8 8:5 17:7
18:24 19:2,10
20:11 22:8 63:4
63:23 79:2 124:9
175:16 188:2
202:16 207:22
212:8,22 217:13
220:22,24 221:20
221:22 250:25
**understanding**
23:15 38:6 75:17
204:14,17 205:7
223:22 227:5
251:13,18
**understood** 151:17
**undertake** 18:8,16
19:8
**undertook** 20:6
21:13
**Unfortunately**
57:22 101:25
**uniformity** 53:21
162:18 165:7,9,17
165:18 178:17,19
**unit** 35:9

**United** 1:1 2:1
68:19 179:1
**university** 31:19
208:21
**unknown** 209:22
**unlabeled** 157:12
**unquantifiable**
197:18
**unused** 252:22
**unusual** 137:22
**updating** 43:9
**upslope** 215:23
**uptake** 227:8
**urine** 91:23
**use** 43:11,12 53:12
69:17 81:16 90:13
90:25 91:2 98:4
115:24 128:16
131:10,11 140:15
182:9 183:2 189:2
208:19 216:12
226:1,6 236:3
**user** 109:18
**uses** 182:16
**usually** 28:22 69:9
174:2 212:13

---

**V**

**v** 261:3
**vac** 48:3
**vacuum** 50:21
**vague** 9:19 49:17
200:4 201:23
**valid** 22:17 207:1,3
**valley** 28:12,13
**valuable** 14:2
96:16 226:16
**value** 96:15 228:9
243:23
**values** 121:15
127:1
**vancomycin** 38:4
226:1
**variabilities** 59:25
60:2,4
**variability** 107:2

147:4 183:1 197:8
**variable** 47:18
**variables** 77:5,8
112:7 136:11
225:22 226:18
**variation** 72:3
104:7 237:8
**variety** 127:1
**various** 70:10
100:8 142:10
226:8
**vary** 116:9
**varying** 227:10
**vein** 77:25 107:17
113:18,25 114:6
114:25 115:3,6
122:7 147:1
**veins** 107:8 114:3,4
114:15 116:19
**venous** 131:25
132:17
**ventricle** 205:21
**ventricles** 205:22
**verdict** 26:7
**verge** 161:9
**VERITEXT** 261:1
**version** 53:7 66:5
69:17,19 115:24
131:10 211:6
**versions** 211:2
**versus** 24:14,16,17
**vessel** 108:6
**vessels** 115:7
**vet** 195:19
**vetted** 87:6 195:16
**Vicodin** 24:21
**violation** 37:18
230:4
**VIRGINIA** 1:2 2:2
**virtually** 178:12
**vision** 169:6
**visit** 28:13
**visual** 90:8 189:25
237:20
**vitamins** 38:14
**vitreous** 95:7 96:6

96:10 121:24
131:25 132:17
**voluntarily** 68:20
**vomiting** 84:20,24
85:3 90:8 169:6
189:6,24 190:24
192:11 195:9,23
240:22 245:24
**Von** 23:12,16,19
150:24 166:9
167:4,12,16 168:3
184:12
**Vorpahl** 98:15
131:1,15 132:4
146:25 149:9,13
**Vorpaul** 16:4
**vs** 1:11 2:11

---

**W**

**wait** 56:21 76:7
93:12 139:10
229:5
**waive** 254:13
**wake** 47:4 77:1
**walk** 83:25 157:20
**walking** 31:5
**wander** 47:11
**want** 7:12 8:23
11:2 12:16,20
13:13,15 14:13,23
15:3 16:1 31:9
42:11 43:10,12
47:4 49:22 52:19
52:23 55:6 62:7
66:13 75:16 77:3
82:11,12,14 83:12
85:22 88:13 92:12
93:16,19 97:17
98:22 101:6 102:8
105:23 113:3
114:11 123:21
130:6,12,16,19
131:16,18 132:9
134:15 135:9
143:5 148:18
150:21 151:4

PLAINTIFFS' EXHIBITS 011312

158:12,13 160:9
169:22 170:13
172:22 181:20,20
181:21,23 183:5
183:22 186:8
187:20 197:4
223:8 224:16
226:24 229:17,19
244:3 252:17
256:4,15,16
**wanted** 43:3 58:6
73:24 178:7 193:7
219:24 225:1
235:9,17 249:20
**wants** 99:10 102:16
164:10 210:15
**warned** 72:2,5,15
**warning** 60:15
242:16,21
**Washington** 66:19
236:20
**wasn't** 20:22 93:15
127:15 134:21
137:18 148:2
153:5,10 155:20
188:7,12 206:11
218:13
**waste** 69:22
**water** 252:25
**way** 13:21 29:5,9
49:16 59:22,24
70:16 83:12 91:22
106:1,11 107:18
113:24 116:19
123:24 137:2
141:6,25 155:13
161:6 162:3
171:19 172:21
174:20 175:15
192:10 195:7
218:11 223:7
**ways** 37:22 108:8
109:10 110:14
**web** 59:13
**website** 54:23 55:2
55:20,23 56:9,11

56:19 61:19 79:13
79:16 80:6 81:13
81:17,20 182:5
**websites** 11:7
**week** 56:13
**weeks** 28:7
**weightlifters** 24:7
**welcome** 17:12
254:25
**well-known** 120:20
**went** 9:5 47:17,24
50:13 56:13 112:8
194:1,14 201:25
204:5 219:23
232:11 236:5
**weren't** 253:8
**WEST** 1:2 2:2 3:7
**We'll** 170:3
**we're** 38:3 51:7
122:24 142:24
145:2 168:11
170:4 187:21
190:19 194:25
197:25 212:1
213:1 218:2 219:5
219:9 222:8 228:6
228:22 250:12
**we've** 15:8 110:23
145:6 159:20
207:6 220:14
222:23 223:11
224:21 230:14
247:16
**whichever** 6:12
**wife** 19:5 90:3
240:7
**willing** 32:16 206:2
**wish** 15:10
**withdraw** 68:20
83:11 95:19
180:22 189:23
**witness** 4:3 6:20
8:18 9:20 12:10
13:7 14:13 15:19
16:3 19:1 22:25
23:6 25:24 33:2

37:21 42:14,17
49:19 51:1 52:19
56:2,4 61:1,21
62:18,24 63:3
64:23 73:16 75:5
78:2,9 80:12 83:7
83:18 85:20,24
87:3 90:23 93:16
93:19 99:23
100:18 102:9
103:11 110:14,17
111:19 114:10
115:22 118:9
121:19 122:3,14
124:6 125:20
126:12 127:7,12
127:17 128:14
129:5 130:11,19
132:7 133:9
134:12 135:21,25
136:24 137:9,14
137:16 139:15
140:22 141:20
142:25 144:2
146:12 148:4,23
148:25 150:10
151:12 155:12
159:4,22 164:3,5
166:14,17 168:8
168:17 170:5,20
171:22 172:9,13
174:20 177:25
179:15 180:23
181:1 186:15
189:2 190:22
193:2,19 195:3
196:10 197:15
200:5,13,24
201:24 205:11
207:3 209:6
213:15 215:12
216:24 217:22
222:17 224:10
226:15 240:15
244:18 245:8
248:6 249:7,13

253:15 254:7,15
256:17 258:6
259:1,4,12 260:1
260:4,15 261:4
**word** 18:11 48:23
137:17 208:20
**wording** 126:18
**words** 23:1 78:2
113:17 117:4
181:9 189:2 236:2
252:1
**work** 18:7,16 29:1
29:4 31:2 32:16
32:18 33:9 34:19
34:23 35:8 38:17
40:24 41:1 46:10
47:3 67:24 119:6
129:7 202:18
211:9 242:13,20
**worked** 29:7 33:5
36:3 39:20 40:15
52:14 68:14 69:1
75:25
**working** 39:14
174:15
**works** 68:12
208:23 221:3
**world** 221:12
**worrying** 119:7
**worth** 172:12
229:13
**wouldn't** 44:19
69:7 108:5 130:7
130:17 133:14,15
139:2 242:22
**write** 29:20 70:15
180:16 208:25
216:9
**writes** 46:23
**writing** 11:23
79:14 248:20
**written** 63:24
209:22 248:2
**wrong** 162:12
173:11 248:24
251:17,24

**wrote** 10:9,9 11:4,5
11:20 195:17
202:9 240:25

_____
**X**
**X** 4:2,11

_____
**Y**
**Yarema** 101:10,13
104:12 124:24
**yeah** 18:21,25 44:7
44:7,14 47:22
50:14 51:9 53:20
59:17 68:9 74:13
76:19 91:11,19
92:4 98:17 110:8
110:9 115:11,15
122:14 136:24
150:11 154:11
155:12 171:12,22
176:2 178:14
198:14 199:20
202:5,7 204:19
213:24 214:16
233:16,16 239:15
248:18 249:25
256:25
**year** 27:2 44:20
52:4 54:8 92:1,2
137:22 160:13
179:8 201:20
203:22 205:6
235:12 246:25
**years** 29:6,25 30:20
31:3 32:11,15
36:24 39:12 41:3
43:16 46:19 69:1
147:14 210:20
246:1 247:12
**Yep** 244:4
**yesterday** 180:9
**yield** 111:15
**young** 205:9 218:3

_____
**Z**
**zero** 167:23 168:1

PLAINTIFFS' EXHIBITS 011313

Keith Patrick Gibson

June 14, 2011

Page 35

200:19 201:22
213:5 218:19
224:7

**$**

**$10,500** 187:3
**$875** 186:25

**#**

**#7281** 1:22

**0**

**0.125** 237:18
**0.25** 154:6 156:5
157:9
**0.8** 140:24 142:22

**1**

**1** 21:23 26:21 28:15
28:18 100:18
149:19 198:10,16
199:24 200:6
201:13
**1st** 242:1
**1.25** 150:11
**1.42** 147:1
**1.5** 138:22 140:24
145:20 151:4
170:16
**1.6** 77:5 143:10
151:21 203:22
204:3 205:5
217:20 219:13,19
220:8 221:11
235:11
**1.7** 87:13 138:13
**1.8** 171:20,24
**1.9** 171:25
**1.92** 224:8,13
**10** 10:7 87:13 89:17
138:13 173:1
231:8
**100** 26:11 47:19,21
47:25 212:17
216:21 218:11
219:1,8,11,15

220:9
**100-percent** 161:7
217:15 223:20
224:6
**1020** 3:3
**104** 4:19
**11th** 85:12 184:8
**115** 4:21
**1150** 3:8
**12** 28:19 230:22
**12:09** 145:6
**12:26** 1:18 2:19
**120** 47:16
**127** 4:24
**13th** 187:2
**131** 5:3
**14** 1:17 259:3 260:3
261:3
**14th** 2:17
**140** 218:23
**15** 36:24 69:7 137:5
174:6 210:20
227:22 231:9
**15th** 56:12
**16** 4:13 28:9
**16th** 192:16 193:17
230:21 231:13
258:16
**160** 47:25
**1600** 3:13
**169** 5:5
**17** 164:16,19,23
**18th** 238:17
**180** 47:17,21
**185** 177:10
**186** 178:10
**187** 4:6
**1970** 86:12
**1980** 64:5 72:1
194:2
**1985** 97:7 169:14
**1988** 86:10

**2**

**2** 138:20 142:15
143:23 151:18

173:14
**2.0** 140:10,16
141:17,22 142:22
151:4
**2.24** 220:10 223:21
**2.4** 138:19 217:20
**2.5** 87:13 141:23
157:3
**2.6** 138:19
**2.8** 138:19
**2:09-cv-06** 1:11
2:11
**20** 58:18 218:22
224:6 247:12
259:17 260:21
261:21
**20th** 238:18
**20-page** 231:9
**20-percent** 219:6
219:25
**20-some** 29:25
**2003** 236:24
**2004** 39:18 236:18
243:15
**2005** 39:18,20,22
41:1 72:8
**2006** 39:15 179:3
191:17
**2007** 237:17,24
242:1 243:8
**2008** 19:22 34:21
34:24 58:8 72:8
90:1 174:16 179:3
209:2,11 238:18
253:12 254:1
**2009** 16:20,25
31:12 51:22 52:3
53:10 54:6 55:18
56:15,17 167:16
186:25 254:1
**2010** 56:13 254:1
**2011** 1:17 2:18 4:13
187:2 192:16
193:17 230:21
231:13 258:17
259:3 260:3 261:3

**204** 173:6,9
**21st** 155:5 156:10
156:18 158:16
**216** 3:10
**22** 42:9 130:9 230:5
230:7 236:17
**22nd** 90:1 153:24
154:14 155:1
156:19 158:15,16
174:16
**22-point** 131:17,19
**22-year-old** 205:14
**22.4** 147:5
**227-8008** 3:15
**23rd** 19:22
**230** 4:7
**237** 103:4,10
**238** 103:15
**24** 213:23
**24-hour** 91:22
156:10
**242** 4:8
**248** 5:6
**249** 4:9
**25** 118:4 150:11
154:9 155:2
157:16,16,16
235:5 242:2
**25-percent** 95:2
**250** 154:7,20 160:5
175:3
**253** 4:10
**26** 184:19
**26th** 16:25
**284** 128:4 149:2

**3**

**3** 90:18 199:3
232:16
**3.2** 108:18 110:15
110:18 112:11,15
217:25
**3.3** 138:13
**3.6** 108:19,20,22
109:2 110:16,17
111:23 112:13,16

143:25 168:11,14
203:9 232:22
241:3,7,18 249:3
**3:12** 255:20
**3:15** 257:18
**30** 41:2 149:19
190:20 191:9
213:23 227:23
256:8,12
**30th** 186:24 237:17
**333** 131:21 149:12
149:14
**34** 97:14
**35** 164:15
**36** 164:17 165:5,6
175:23 178:18
**36073** 259:2 260:2
261:2
**37** 176:7
**38** 55:1 57:3,4,18
58:6 176:10
241:25 243:12
**39** 237:14,16

**4**

**4** 79:10 216:15
**4.8** 58:19
**40** 149:23 161:3
218:23 219:15
**40-percent** 219:25
**40-year-old** 8:3
204:11
**41** 176:20
**42** 227:21,21
**43** 115:13 116:1
**432** 106:19
**433** 106:16,17,19
**44115** 3:9
**45** 123:3
**48** 176:24,25
**483** 242:18
**483s** 60:15 242:21
242:22
**49** 177:3,4 178:11

**5**

PLAINTIFFS' EXHIBITS 011314

Keith Patrick Gibson                    June 14, 2011

**5** 26:21 28:15,18
 86:21 91:15 92:7
 94:19 150:8,10
 156:18,19 198:10
 201:13 237:24
**50** 216:18 217:19
 218:19 230:22
 245:18
**50-50** 7:10
**540** 95:13
**541** 118:15
**541-0300** 3:4
**55** 104:6

---

### 6

**6** 4:5 39:20 41:1
 73:14 74:19 91:14
 92:17 95:10 97:15
 101:5 217:20
**60** 161:2,3 218:23
 219:14 220:7
 223:18
**60-percent** 220:5
**600** 3:13
**62** 230:22
**67** 236:23
**696-2137** 3:10

---

### 7

**7** 39:15,20 41:1
 104:14 113:1
 115:6 123:2
**70** 190:20 191:9
**71** 236:23
**713** 3:15
**75** 117:14
**77002-2911** 3:14
**78-hour-after-de...**
 168:12
**79** 4:16

---

### 8

**8** 39:15,20 41:1
 73:14 74:20,21
 92:21 130:24
 140:10,15 141:17

142:15 143:23
 146:13 152:2
 153:9,14 173:14
 217:21,22
**80** 47:16 117:14
 161:4,4,5 218:20
 218:23 219:5
 220:7 224:5
**80-percent** 219:5
**805** 3:4

---

### 9

**9** 4:13 19:19 22:19
 28:19 153:8,14
 168:19
**9:00** 1:18 2:19
 255:4
**90** 75:11 89:17
 138:13 212:10,13
 212:20
**91** 43:18
**92** 236:13
**925** 3:8
**93** 43:20
**93401** 3:3
**94** 98:2
**95** 98:18 99:2
**97** 4:17

PLAINTIFFS' EXHIBITS 011315