# EXHIBIT 609

PLAINTIFFS' EXHIBITS 011602

```
                UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

                    CHARLESTON DIVISION



IN RE:  DIGITEK PRODUCT LIABILITY

        LITIGATION

THIS DOCUMENT RELATES ONLY TO:

Kathy McCornack, an individual; ) MDL No. 2:09-CV-0671
Daniel E. McCornack, Jr., an    )
individual; and Ralph J.        )
McCornack, a minor by and       )
through his guardian ad litem,  )
                                )
          Plaintiffs,           )
                                )
      v.                        )
                                )
Actavis Totowa, LLC, et al.,    )
                                )
          Defendants.           )
_____)



               DEPOSITION OF KATHY McCORNACK

                  Monday, October 5, 2009

                San Luis Obispo, California

                  9:35 a.m. - 1:24 p.m.



               REPORTED BY CINDY D. GRIFFITH
                      CSR #7281
```

```
 1            THE DEPOSITION OF KATHY McCORNACK,

 2   was taken at the offices of McDaniel Shorthand

 3   Reporters, 1302 Osos Street, San Luis Obispo,

 4   California, before Cindy D. Griffith, a Certified

 5   Shorthand Reporter in and for the State of California,

 6   on Monday, October 5, 2009, commencing at the hour of

 7   9:55 a.m.

 8

 9   APPEARANCES OF COUNSEL:

10   FOR PLAINTIFFS:
                        ERNST & MATTISON
11                      Attorneys at Law
                        1020 Palm Street
12                      San Luis Obispo, Ca  93401
                        BY:  DON A. ERNST
13                      (805) 541-0300
                        dae@emlaw.us
14
     FOR DEFENDANT ACTAVIS INC., ACTAVIS ELIZABETH LLC, AND
15   ACTAVIS TOTOWA LLC:

16                      TUCKER ELLIS & WEST LLP
                        Attorneys at Law
17                      925 Euclid Avenue, Suite 1150
                        Cleveland, OH  44115-1414
18                      BY:  MATTHEW P. MORIARTY
                        (216) 592-5000
19                      matthew.moriarty@tuckerellis.com

20
     FOR DEFENDANT MYLAN PHARMACEUTICALS INC., MYLAN BERTEK
21   PHARMACEUTICALS INC. AND UDL LABORATORIES, INC:

22                      SHOOK, HARDY & BACON LLP
                        Attorneys at Law
23                      2555 Grand Boulevard
                        San Francisco, CA 94104-2828
24                      BY:  ALICIA J. DONAHUE
                        (415) 544-1900
25                      adonahue@shb.com
```

3

1                            I N D E X

2    WITNESS                EXAMINATION BY            PAGE

3    Kathy McCornack     Ms. Donahue                    4

4                        Mr. Moriarty                  138

5

6                        E X H I B I T S

7    FOR THE DEFENDANTS:                              PAGE

8    1  Notice of Deposition                            9

9    2  Plaintiff Amended Digitek Fact Sheet           31

10   3  Three copies of containers                     35

11   4  Receipts from Caremark                         46

12   5  Receipts from Caremark                         46

13   6  May 6th, 2008, letter to Daniel McCornack      72

14   8  Letter dated May 20, 2008                      78

15   9  Coroner's Report                              129

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 011605

```
 1                         KATHY McCORNACK,

 2                having been first duly sworn, was

 3                examined and testified as follows:

 4

 5                         EXAMINATION

 6

 7  BY MS. DONAHUE:

 8      Q    Good morning, Ms. McCornack.

 9      A    Morning.

10      Q    I introduced myself off the record, but let me

11  do it again.  My name is Alicia Donahue.  I'm an

12  attorney with the law firm of Shook, Hardy & Bacon, and

13  I work in their San Francisco office.

14           I represent Mylan defendants in the lawsuit

15  that you filed --

16      A    Uh-huh.

17      Q    -- against them, and other defendants as well.

18           Here in the room today also we have

19  Mr. Moriarty, whom I'm going to let him introduce

20  himself for the record.

21           MR. MORIARTY:  I'm Matt Moriarty .

22  BY MS. DONAHUE:

23      Q    We have your own counsel, of course, Don Ernst.

24           Thank you for coming today for your deposition.

25           Would you state your full name for the record,
```

1  please.

2      A      Kathleen Marie McCornack.

3      Q      And your date of birth?

4      A      9-7-1966.

5      Q      And your social security number?

6      A      (Number redacted).

7      Q      Your present address, please.

8      A      6255 Peachy Canyon Road, Paso Robles,

9  California, 93446.

10         MR. ERNST:  For the record, we often give

11  Social Security numbers, but because of the way this is

12  being disseminated, I would respectfully request that

13  now that I have given it to you, that you can keep it in

14  your notes, and I would like it redacted from the

15  deposition transcript if it's going to be disseminated,

16  if that's okay with you guys.

17         MS. DONAHUE:  How about if we redact it if the

18  depo transcripts are disseminated outside of our

19  offices?  I'd like it to be in the transcript for

20  purposes of our office use.

21         MR. ERNST:  Well, aren't they going to be

22  available to individuals outside your offices?

23         MS. DONAHUE:  Well, what I'm saying is, we'll

24  redact it before we send the deposition out to somebody.

25  But it's kind of difficult --

1           MR. ERNST:  Place it in a repository.

2           MR. MORIARTY:  You know what, I don't mean to

3  disagree with you, but I probably will not remember to

4  redact it if I send it to an expert or something, so

5  having it redacted is fine, but you'll have to read me

6  the number again so I can write it down.

7           THE WITNESS:  (Number redacted).

8           MR. MORIARTY:  (Number redacted)

9           MR. ERNST:  And --

10          MR. MORIARTY:  That's fine.

11          MR. ERNST:  If that's agreeable with you, it's

12  just I've become much more possessive of those numbers,

13  and they tend to float out there.

14          MS. DONAHUE:  That's fine.

15          MR. ERNST:  Thank you.

16  BY MS. DONAHUE:

17     Q    Okay.  Mrs. McCornack, have you ever had your

18  deposition taken before?

19     A    No.

20     Q    Have ever you ever been involved in litigation

21  prior to this case --

22     A    No.

23     Q    -- that you filed?

24     A    No.

25     Q    We just had a little slipup in terms of

1  question and answer, and that's good timing because now

2  is when I'm going to go over a few of the ground rules

3  of the deposition process so that we both understand the

4  best way to get a clear record today, and also the

5  importance of the deposition today.

6       So you understand that you're here under oath

7  and you have sworn an oath to tell the truth and the

8  whole truth.  Do you understand that?

9       A    Yes.

10      Q    Although we're here at the court reporter's

11  office in an informal setting, your testimony does have

12  the same weight and effect as if we were in a courtroom

13  due to the oath you've taken.  Do you understand that?

14      A    Yes.

15      Q    The court reporter is going to take down my

16  questions, your answers, any objections that might be

17  made, or comments that might be made by the other

18  counsel in the room, and she's going to put those into a

19  booklet, and you'll have an opportunity to review the

20  questions and answers and any other commentary after the

21  deposition is over today.  Do you understand that?

22      A    Yes.

23      Q    You will also have an opportunity to make

24  changes in your testimony should you feel that it was

25  incorrectly recorded or that the answer is incorrect for

PLAINTIFFS' EXHIBITS 011609

1  any reason.  Do you understand that?

2     A    Yes.

3     Q    However, if you do change your testimony in the

4  booklet after we leave today, myself or Mr. Moriarty or

5  any of the other attorneys that might be at the trial of

6  this case on the defense side will be able to comment on

7  the fact that the testimony was changed if they feel

8  that they want to do that.  And sometimes those kind of

9  comments can affect a witness's credibility.

10        So, that being said, I only say that so we make

11  sure we get the best testimony today, and you let me

12  know if you don't understand my question, or, you know,

13  if it wasn't clear to you in any way, or if you just

14  can't answer it.  Just let me know so that we have -- so

15  that your testimony here today's the best testimony you

16  can give.  Is that fair?

17     A    Yes.

18     Q    Okay.  I'm trying to think.

19        The other thing that we kind of ran into

20  already is I tend to speak pretty quickly.  I tend to

21  probably oftentimes anticipate what I think your answer

22  is going to be, so I am a very bad questioner in terms

23  of talking over the witness, and I'm going to do my best

24  to try to slow down for the court reporter and for you,

25  and try to make sure that you have finished your answer

PLAINTIFFS' EXHIBITS 011610

1  before I ask my question.  But what I need to ask you to

2  do is to do the same for me.

3          So many, many times you're going to feel like

4  my question is fairly predictable and you're going to be

5  ready with your answer, because the tendency for

6  witnesses is to want to get this over as quickly as

7  possible, but we need to go slow so we have a clear

8  record.  Can you do that for me?

9     A     Yes.

10    Q     Is there any reason today why you can't give

11  full and accurate and truthful testimony today in this

12  deposition?

13    A     No.

14    Q     Are you on any medication today?

15    A     No.

16    Q     Do you understand everything that I've told

17  you?  You feel ready to begin the deposition?

18    A     Yes.

19          MS. DONAHUE:  Now I'm going to mark the notice

20  of deposition as Exhibit 1.  I think the court reporter

21  already knows that.

22              (Defendants' Exhibit 1 marked for

23               identification.)

24  BY MS. DONAHUE:

25    Q     Okay.  Mrs. McCornack, I've handed you what's

10

1  been marked as Exhibit 1, and that's the notice for your

2  deposition in this case.

3        If you would turn to the second page of that

4  notice, you will see that we have requested that you

5  produce certain things today.  There's three categories.

6  Did you bring -- let's start with category number one.

7  Did you bring any and all Digitek tablets in your

8  possession with you today?

9      A    Yes.

10     Q    Right.  And your attorney is holding up for me

11  a plastic bag with one tablet in it.  Is this currently

12  the only Digitek tablet in your possession?

13     A    Yes.

14         MS. DONAHUE:  Let's go off for a minute.

15         MR. ERNST:  If you're going to open it, we

16  ought to be on the record.  Tell us what you're doing.

17         MS. DONAHUE:  Let me see if I can.  We're on

18  the record.

19         I'm going to open the bag.

20         MR. ERNST:  Perfect.

21         MS. DONAHUE:  I'm opening it now.  And I'm

22  going to take out the tablet with my hand, and examine

23  it by the window so I can hopefully see.

24         MR. MORIARTY:  Let me look at it here.

25         I'm done looking at it.  Won't take me long.

1           MS. DONAHUE:  All right.  Let the record

2  reflect that I have examined the tablet.  It is a white

3  tablet with a center indentation line marked B14 --

4           MR. MORIARTY:  6.

5           MS. DONAHUE:  6.  Thank you.

6      Q    Let me see.  In response to Exhibit 2, what did

7  you -- I mean the Request Number 2, what did you bring

8  with you today?

9      A    Nothing.

10     Q    Do you keep any diaries -- did you keep any

11 diaries at the time --

12     A    No.

13     Q    -- of your husband's death?

14          Did your husband keep any diaries within the

15 last five years of his death?

16     A    No.

17     Q    Did you have a family calendar in your house at

18 the time of your husband's death?

19     A    Um, yes.

20     Q    And did your husband -- did your husband make

21 entries on --

22     A    No.

23     Q    -- that calendar from time to time?

24     A    No.

25     Q    Did you make entries on the calendar in your

1    home?

2        A    Yes.

3        Q    Had you kept a calendar in regard to your

4    family schedule for the year preceding your husband's

5    death?

6        A    No.

7        Q    What did you use the calendar in your home for?

8        A    Well, for appointments, but my husband kept

9    his -- he did his own.  I mean, he had a calendar at

10   work, I'm sure.

11           My eye keeps watering.

12       Q    So let me just see if I understand.  Let me ask

13   the question again.

14           Do you -- is it your normal custom and practice

15   at your home to maintain a calendar of various family

16   members' appointments?

17       A    Yes.

18       Q    And what's on that calendar, would appointments

19   in regard to your husband -- your husband's medical

20   issues be included?

21       A    No.

22       Q    Would there be any appointments on those

23   calendars regarding your husband's --

24       A    No.

25       Q    -- schedule?

PLAINTIFFS' EXHIBITS 011614

13

```
1    A    No.

2    Q    None whatsoever?

3    A    None.

4    Q    Would there be references to you and your

5  husband's social schedule on that calendar?

6    A    At times.

7    Q    Has it been -- was it your custom and practice

8  to keep such a calendar during the year preceding your

9  husband's death?

10   A    Yes.

11   Q    And did you also keep such a calendar within

12 five years preceding your husband's death?

13   A    Yes.

14   Q    Your husband's death occurred on March 23rd,

15 2008?

16   A    Yes.

17   Q    Do you still have the calendar that you kept in

18 your home in regard to your family members' appointments

19 for the year 2008?

20   A    No.

21   Q    And when did you not --

22   A    I have --

23   Q    -- no longer have possession of that calendar?

24   A    I have one of those calendars where month by

25 month, I rip it off.  It's one of those big desk
```

1  calendars.  So at the end of the month, I rip if off and

2  throw it away.  It's nothing that I keep.

3      Q    So you presently have no calendar in your

4  possession that reflects your family's appointments,

5  schedule, anything like that during the year preceding

6  your husband's death?

7      A    No.

8      Q    Now, you also mentioned that your husband kept

9  a calendar at his office?

10     A    Yes.

11     Q    Did you ever take possession of your husband's

12 office calendar after his death?

13     A    No.

14     Q    Do you know what became of it?

15     A    No.

16     Q    Did you ever inquire at his office as to what

17 happened to his calendar?

18     A    No.

19     Q    After your husband's death, did you go to his

20 office and clear some things out?

21     A    No.

22     Q    Who did that?

23     A    An office person brought me his stuff.

24     Q    And there wasn't a calendar --

25     A    No.

PLAINTIFFS' EXHIBITS 011616

1    Q    -- in there?

2         What office person brought you his stuff?

3    A    Oh, shoot.  I don't recall.

4    Q    Do you recall what -- go ahead.  You look like

5  you had something else to say.  No?

6    A    (Witness shakes head from side to side.)

7    Q    Do you recall if it was a man or a woman?

8    A    I think someone cleaned it out and then someone

9  brought it to me.  So it was two different people,

10  probably.  So I don't recall.  Honestly, I couldn't say.

11   Q    Who was your husband -- did your husband have a

12  secretary at his job?

13   A    Yes.

14   Q    And who was that?

15   A    She was fairly new.  I want to say her first

16  name was Lisa.

17   Q    Do you know her last name?

18   A    No, I don't.

19   Q    When you received your husband's possessions

20  from his office, was there -- why don't you tell me what

21  you recall receiving.

22   A    Personal items.  My kids pictures he's had for

23  years.  Pictures.  Um, just stuff like that.  No -- no

24  work-related items.  Um, most of the stuff was done on

25  his computer, I believe.  Just that kind of personal

PLAINTIFFS' EXHIBITS 011617

1   stuff.

2      Q    Any pill containers or anything relating to his

3   prescriptions, medication of any kind?

4      A    No.

5      Q    So you produced nothing today in response to

6   Item Number 2 to our request for production.

7           What about Number 3, federal tax returns?

8           MR. ERNST:  Item Number 3, we have a host of

9   tax returns.  We have already furnished to you the W-2s.

10          We are furnishing you these tax returns and we

11  are claiming any and all privileges that are applicable.

12          We're giving these to you for discovery

13  purposes, but we are maintaining and preserving any and

14  all objections we may have about the confidentiality of

15  tax returns.  But --

16          MS. DONAHUE:  Thank you.

17          MR. ERNST:  -- the record should reflect we're

18  giving you those tax returns.

19          MS. DONAHUE:  Okay.  Thank you.

20          May we go off the record for a minute?  Agreed?

21          MR. ERNST:  Yes.

22             (Discussion held off the record.)

23          MR. ERNST:  Let's go back on the record.

24          We have furnished the tax returns as requested,

25  and it's agreed that if they choose to copy them, they

PLAINTIFFS' EXHIBITS 011618

1  may do so.

2          It's stipulated that all objections are

3  preserved, and that the returns and the confidential

4  information in them will be maintained in the offices by

5  counsel and not disseminated to any person other than

6  financial experts; that your offices also respectfully

7  agrees to solicit privacy requirements from the experts

8  that you retain; that they will not disseminate the

9  information that they have in any way, shape or form,

10 without further notice or contact with my office.

11          In other words, I don't want the expert sending

12 them any other place or disseminating them anyplace else

13 other than specifically to you.

14          MS. DONAHUE:  We will so instruct our experts,

15 but I don't think we will have a written agreement with

16 them.

17          MR. ERNST:  I would request that the agreement

18 to keep these confidential be extended to the experts.

19          MS. DONAHUE:  Agreed.  But there won't be a

20 separate agreement between us.  It's an informal fashion

21 between us and our experts.  We will so agree and

22 instruct them.  We will do our best to make sure they

23 abide by that agreement, which I'm sure they will.  So

24 with that stipulation so agreed we will have the court

25 reporter copy the records and forward them to our

PLAINTIFFS' EXHIBITS 011619

1    offices and give you back your originals.

2            THE WITNESS:  Thank you.

3            MS. DONAHUE:  And just --

4            MR. MORIARTY:  Just so we know what's here, on

5    the record, we have a 2002 federal return; a 2003

6    federal return; 2004 federal return; and in these red

7    folders from the accounting office there's also a

8    California income tax information.  But the cover

9    letters are what I'm going off of.

10           A 2005 federal return; 2006 federal return;

11   2007 federal return; and a 2008 federal return.

12           And with some of these returns there are

13   attachments such as W-2s, Social Security benefit

14   statements, et cetera.  Okay?

15           MS. DONAHUE:  Thank you, Mr. Moriarty.

16   Q     Now we can continue.

17           According to the records that I reviewed, you

18   married Dan McCornack on October 6th, 1990; is that

19   correct?

20   A     Yes.

21   Q     And at that time you were 24 years old?

22   A     Yes.

23   Q     And Dan's date of birth was 2- -- I'm sorry,

24   February 15th, 1963?

25   A     Yes.

PLAINTIFFS' EXHIBITS 011620

```
 1      Q    I'm not very good at math, but I think I got
 2   this right.  He was 27 years old at the time of your
 3   wedding?
 4      A    Yes.
 5      Q    How long had you and Dan dated before you got
 6   married?
 7      A    A year.
 8      Q    Had you lived together before the time of your
 9   marriage?
10      A    Yes.
11      Q    How long had you lived together before you got
12   married?
13      A    About a year.
14      Q    How long did you date before you moved in
15   together?
16      A    A few months.  That's why I'm saying a year.
17   Yeah.
18      Q    Do you remember the anniversary of your first
19   date?
20      A    November 4th.  I guess that would be '89,
21   maybe.  '88.  I can't remember.  I just know it was
22   November 4th because it was his parents anniversary was
23   our first date.
24      Q    If you married in October of '90 --
25      A    No, it had to have been '89.
```

```
 1     Q    So November 4th would have been about 11 months

 2  before your wedding.

 3     A    Yeah.

 4     Q    So you think it was November 4th, 1989?

 5     A    Yeah.

 6     Q    And do you happen to recall the anniversary of

 7  the date that you formally moved in together?

 8     A    No.

 9     Q    But it was --

10     A    A couple months, yeah, after we were dating.

11  Yes.

12     Q    Had you ever been married -- had you been

13  married before you married Dan McCornack?

14     A    No.

15     Q    Had he been married before?

16     A    No.

17     Q    You and Dan had two children?

18     A    Yes.

19     Q    And can you give me their names and ages,

20  please?

21     A    Daniel Elwin McCornack, Junior.  He's 18.  And

22  then Ralph Jared McCornack, and he's 16.

23     Q    And are there less formal names than Dan and

24  Ralph?

25     A    D.J. is what Daniel goes by, and Ralph goes by
```

PLAINTIFFS' EXHIBITS 011622

```
 1  Ralph.
 2       Q    Let's talk about D.J. first.  Is D.J. currently
 3  enrolled in school?
 4       A    At Cuesta.
 5       Q    Is he in his first year there?
 6       A    Yes.
 7       Q    And does he work, as well?
 8       A    Yes.
 9       Q    Where does he work?
10       A    You know, something at Parties Unlimited or
11  something.  He just got the job.
12       Q    He's a retail person?
13       A    No, they set up for weddings.
14       Q    Does he live at home with you?
15       A    Yes, he does.
16       Q    Has he lived at home with you continuously
17  since his father's death?
18       A    Yes.
19       Q    And Ralph, where is Ralph enrolled in school?
20       A    Yes, Templeton High School.
21       Q    And is he a junior?
22       A    Yes.
23       Q    And does he have any part-time employment?
24       A    No.
25       Q    Mrs. McCornack, did you graduate from high
```

```
 1   school?
 2       A    Yes.
 3       Q    What high school did you graduate from?
 4       A    Granada High School in Livermoore.
 5       Q    Granada?
 6       A    Granada.
 7       Q    What year did you graduate?
 8       A    1984.
 9       Q    Did you attend college?
10       A    No.  Well, some.  Some college.
11       Q    What college?
12       A    Junior college.  Um, Chabot College.
13       Q    Did you go to Chabot right after high school
14   graduation?
15       A    Yes.
16       Q    How long did you attend Chabot?
17       A    Oh, not very long.
18       Q    Did you get an A.S. degree?
19       A    No.
20       Q    Do you have any kind of -- do you have any
21   degree at all --
22       A    No.
23       Q    Let me finish my question.
24            Any degree at all post high school diploma?
25       A    No.
```

PLAINTIFFS' EXHIBITS 011624

1    Q    Can you just kind of describe for me what

2  you've done, employmentwise, since graduating from high

3  school.  And give me the years, if you could, to the

4  best of your recollection.

5    A    Round Table Pizza in Livermoore from probably

6  '84 or '85 to, I think I worked there four years.  So --

7  three years.  '88, because then I moved here and I

8  worked at McMahan's Furniture probably from '88 until my

9  son was born.  So '91.

10   Q    Okay.  And then after McMahan's Furniture?

11   A    Stay-at-home mom.

12   Q    Are you currently employed?

13   A    No.

14   Q    Have you been employed at any point in time

15 since your husband passed away?

16   A    Um, not since, no.

17   Q    And between 1991 and 2008, were you employed?

18   A    Yes.  Tidwell Bookkeeping.

19   Q    T-I-D?

20   A    Uh-huh.

21   Q    When were you employed with them?

22   A    Oh, geez.  I don't know.  I can't remember when

23 I first started working there, but I worked there a

24 couple years just part-time, just very limited, just to

25 get out of the house.

PLAINTIFFS' EXHIBITS 011625

24

```
 1      Q    Were you employed at the time of your husband's
 2  death?
 3      A    Yes.
 4      Q    And who were you employed with?
 5      A    Tidwell Bookkeeping.
 6      Q    And did you -- at what point after your
 7  husband's death did you stop working at Tidwell
 8  Bookkeeping?
 9      A    I think I went back one day and that was it.
10      Q    Did you have regular hours at Tidwell?
11      A    No.  Just when they needed me.
12      Q    So you were kind of on call?
13      A    Yeah.
14      Q    Okay.  Were you a bookkeeper?
15      A    No.
16      Q    What were you?
17      A    Office assistant.
18      Q    Who was your supervisor at Tidwell?
19      A    Um, Candace Tidwell.
20      Q    And where is Tidwell Bookkeeping located?
21      A    In Atascadero.
22      Q    Are they still in business?
23      A    Yes.
24      Q    What about McMahan's Furniture?  Where are they
25  located?
```

PLAINTIFFS' EXHIBITS 011626

```
 1    A    They are out of business, but they were in
 2 San Luis Obispo.
 3    Q    And what did you do for them?
 4    A    Office work.
 5    Q    Okay.  Now, if I could ask you a few questions
 6 about your husband's educational background.  He
 7 graduated from high school?
 8    A    Yes.
 9    Q    Do you know what high school?
10    A    Atascadero High.
11    Q    What year?
12    A    Um, 1981.
13    Q    Did he go on to college from there?
14    A    No.
15    Q    Did he at some point in time attend a junior
16 college?
17    A    No.
18    Q    Did he receive any degree other than his high
19 school graduation diploma?
20    A    Um, I don't know.  I can't say for sure, but I
21 know through work they would send him to school and he
22 would get -- I'm sure he got degrees or something,
23 because he had a -- for chemicals or whatever he was
24 doing at work.
25    Q    So his employer sent him to various seminars --
```

1      A      Uh-huh.

2      Q      -- and other training?

3      A      Right.

4      Q      And he received certifications?

5      A      Yes.

6      Q      Okay.

7      A      Yes.

8      Q      But you don't know what those are?

9      A      No.

10     Q      Other than those certifications that he

11   received through his employment, did he obtain any other

12   degrees after attending high school?

13     A      No.

14     Q      Where was your husband employed at the time of

15   his death?

16     A      Lubrizol.

17     Q      And what is Lubrizol's address, if you know it?

18     A      Propeller Road.  I don't know the number.  In

19   Paso Robles.

20     Q      At the time of his death he was a plant

21   manager?

22     A      Uh-huh.

23     Q      How long had he had the title of plant manager?

24     A      I can't recall.  I don't know.

25     Q      When he started -- how long had he been working

PLAINTIFFS' EXHIBITS 011628

```
 1  for Lubrizol?
 2      A    Over 20 years.
 3      Q    So he was working there at the time you met
 4  him?
 5      A    Yes.
 6      Q    And what was his title at the time you met him?
 7      A    He -- supervisor, I believe.
 8      Q    And did he get a promotion at some point in
 9  time --
10      A    Uh-huh.
11      Q    -- after you married him?
12      A    Yes.
13      Q    From supervisor to something else?
14      A    Like safety manager or something.  Safety, and
15  then after that was plant manager.
16      Q    I saw a reference in some medical records and
17  also on your marriage certificate to a ranch that your
18  husband worked?
19      A    Uh-huh.
20      Q    Can you tell me about the ranch?
21      A    It's his grand -- it's ours now.  It's our
22  family ranch.  It's a walnut ranch.  And we would
23  harvest.  He would take his vacation time and use that
24  to harvest in October.  And so, after his -- well, he
25  got the ranch after his grandpa died.  So we moved out
```

PLAINTIFFS' EXHIBITS 011629

1  there so he could run it for his grandma.

2      Q    When did he inherit the ranch?

3      A    When he had actually got the ranch deeded to

4  him?

5      Q    Uh-huh.

6      A    I can't recall.  I don't know.  I could

7  probably find out, but I don't recall exact date, or

8  what.  It was after we'd been living out there for a

9  while.  It wasn't something that happened right when

10 grandpa died.

11     Q    Let me back up and see if I can get this clear.

12          What was the name of your husband's grandfather

13 who originally owned the ranch?

14     A    Elwin McCornack.

15     Q    And he was your husband's paternal grandfather?

16     A    Well, he's -- he was -- he -- no.

17     Q    No.  How was he related to your husband?

18     A    He is -- when you say paternal, that's -- it's

19 his stepfather, I guess.  It's not grandma's original

20 husband.

21     Q    Thank you for clarifying that.  It's important.

22          So Dan McCornack, Senior -- your husband's

23 maternal grandmother, married --

24     A    Remarried.

25     Q    -- Elwin McCornack?

1    A    Yes.

2    Q    He is the stepfather of your husband, Dan's,

3  father?

4    A    Yes.

5    Q    And when did he pass away?  Meaning

6  Elwin McCornack, the owner of the ranch.

7    A    It was in February of -- it was just after I

8  met them.  '89.

9    Q    Okay.

10   A    Or '90.  Yeah, I honestly -- he wasn't at our

11 wedding, so '89, I believe.

12   Q    And when you and your husband -- prior to you

13 and your husband's wedding, did you two live on the

14 ranch?

15   A    No.

16   Q    At some point, did you two move there?

17   A    Yes.

18   Q    When was that?

19   A    Maybe a year after grandpa died.

20   Q    So at some point after you got married?

21   A    After we got married.

22   Q    Within the first year of your marriage?

23   A    I want to say '91, because I think my son was

24 just born.

25   Q    And at some point in time after moving there,

```
 1  the ranch was deeded to you?
 2     A    Years after, but I cannot recall the date.
 3     Q    Is the title to the ranch held in your and your
 4  husband's name, or was it at the time of his death?
 5     A    It was in my husband's.
 6     Q    Let me back up because I screwed up that
 7  question.
 8          At the time of your husband's death, who held
 9  title to the ranch?
10     A    My husband.
11     Q    Who currently holds title to the ranch?
12     A    It's in trust for the boys.
13     Q    What is the address of the ranch?
14     A    6625 Peachy Canyon Road.
15     Q    So it's your residence?
16     A    Yes.
17     Q    It's 400 acres?
18     A    210.
19     Q    And throughout the time that you and your
20  husband have lived on the ranch, have you had -- have
21  you had employees who work the ranch with you?
22     A    We had one employee, Larry, for a year, for a
23  few years.  Then we let him go when we stopped working
24  the ranch.
25     Q    What is Larry's last name?
```

1     A     I can't remember.

2     Q     When did you let him go?

3     A     I can't remember.

4     Q     You said when you stopped working the ranch?

5     A     Yes.

6     Q     What does that mean?

7     A     We decided it wasn't worth the money to

8   harvest.  The labor was too expensive so we decided not

9   to do it anymore.

10    Q     How long before your husband's death had you

11  stopped working the ranch?

12    A     Maybe ten years.

13    Q     And I take it you're currently not harvesting?

14    A     Personally, no, we are not.

15    Q     And you don't employ people to harvest for you?

16    A     We don't employ anyone.

17    Q     Let's mark as Exhibit 2 the Plaintiff Amended

18  Digitek Fact Sheet for Plaintiff Kathy McCornack,

19  Daniel McCornack, Junior, and Ralph McCornack, from the

20  U.S. District Court, Southern District of West Virginia,

21  and D.L. Number 1968.

22              (Defendants' Exhibit 2 was marked

23              for identification.)

24         MS. DONAHUE:  You can give me the Exhibit 1.

25  Thanks.

1    Q    Okay.  Mrs. McCornack, you've been handed

2  what's been marked as Exhibit 2, and you might -- if you

3  could turn to Page 20, which is the last page, and that

4  page contains a verification that is dated 5-26-09, and

5  signed by Kathy McCornack.  Is that your signature?

6    A    Yes.

7    Q    Did you date and sign this document?

8    A    Yes.

9    Q    Now, Exhibit 2 is a 20-page document with

10  various information completed on it in response to

11  various requests.  Did you fill the information out for

12  this fact sheet yourself, or did you do so with the

13  assistance of your counsel?

14    A    Myself --

15        MR. ERNST:  Well, Terry Kilpatrick from my

16  office helped her, assisted her.

17        MS. DONAHUE:  I'll go through it.

18    Q    Let me preface this line of questioning by

19  telling you something I'm sure your attorney has told

20  you before, and that is that you and your counsel and

21  the other attorneys and their employees that work in his

22  office have an attorney-client privilege.  Okay?  And I

23  do not want to know nor am I entitled to know anything

24  about any conversations you had with Mr. Ernst or have

25  had with Mr. Ernst or the people in his office.  At the

1  same time, I'm entitled to know how this document was

2  filled out.

3      A    Uh-huh.

4      Q    So, I'm going to try to be careful and not ask

5  for specific conversations or information that went on

6  in your conversations or that was shared in your

7  conversations, but I do want to just kind of get the

8  logistics of the way the document was filled out.  So

9  Mr. Ernst is here and I'm sure he'll be very careful to

10 make sure we don't tread on confidential territory, but

11 I want to make sure we had that agreement before getting

12 started.  Okay.

13     A    Uh-huh.

14     Q    So with that being said, the amended Digitek

15 Plaintiff Fact Sheet marked as Exhibit 2 was provided to

16 you by someone in Mr. Ernst's office, I suppose; is that

17 correct?

18     A    Yes.

19     Q    And did you receive it by mail?

20     A    I don't recall.

21     Q    Okay.  And when you first received it, it was

22 blank, right?

23     A    Yes.

24     Q    Did you then fill it out yourself and return it

25 to Mr. Ernst's office for a first round?

1          How did it come about that this document was

2    completed, I guess is the easiest way to answer --

3    answer it.

4      A    I honestly don't remember.  I want to say it

5    was in the office that we did this.

6      Q    Okay.  So your best recollection is that you

7    went in to the office --

8      A    Yes.

9      Q    -- and met with someone, and filled it out

10   together?

11     A    Yes.

12     Q    Did you go in to the office just one time to

13   fill it out?

14     A    I don't recall.  I'm not sure.  We might have

15   went over it again.

16     Q    Okay.

17     A    But I filled it out once.

18     Q    Okay.  With the assistance of someone in the

19   office?

20     A    Yes.

21     Q    When you dated and signed it on May 26th, 2009,

22   did you review it to make sure that the information

23   contained in it was accurate --

24     A    Yes.

25     Q    -- and truthful?

PLAINTIFFS' EXHIBITS 011636

```
 1      A     Yes.

 2      Q     And then you signed it under penalty of

 3 perjury?

 4      A     Yes.

 5      Q     And you did that -- did you do that at

 6 Mr. Ernst's office?

 7      A     Yes.

 8      Q     And have you seen it again since the time that

 9 you signed it?

10      A     No.

11      Q     So today is the first time you're seeing it

12 since signing it on May 26th, 2009?

13      A     Yes.

14      Q     Okay.  We can put that aside for a minute.

15 We'll come back to it.

16            I'd like to have marked as Exhibit 3 --

17 Ms. McCornack, I marked as Exhibit 3 a three-page

18 document that records -- it's actually three photographs

19 of various Digitek tablet containers, prescription

20 containers.  Can you take a look at that for me.

21            Have you seen those photographs before today?

22      A     No.

23                 (Defendants' Exhibit 3 was marked

24                 for identification.)

25 \\
```

```
 1  BY MS. DONAHUE:
 2     Q    Do you know who took them?
 3     A    No.
 4     Q    Have you seen those pill containers --
 5     A    Yes.
 6     Q    -- that are depicted in those photographs
 7  before today?
 8     A    Yes.
 9     Q    Were those the pill containers belonging to
10  your husband?
11     A    Yes.
12     Q    And did you provide those containers to
13  Mr. Ernst's office?
14     A    Yes.
15     Q    And have you -- when did you give them to him,
16  or to the office?
17     A    When he requested them.  I don't recall the
18  date.
19     Q    Sometime after you retained him?
20     A    Yes.
21     Q    Was it within the last two months?
22     A    No.
23     Q    Within the last year?
24     A    Yes.
25     Q    Have you received them back since you provided
```

1  them to him?

2      A    No.

3      Q    Do you know where they are now?

4      A    In his office, I assume.

5      Q    Okay.  Is it your understanding that these

6  photos depict three separate pill containers taken --

7  photos taken from different sides of three pill

8  containers?

9      A    Yes.

10      Q    There's three pages with three bottles on each

11  page, but in sum, there is a photo, group photo of three

12  separate containers; right?

13      A    Yes.

14      Q    Okay.  Other than the three containers depicted

15  in these photographs, did you have any Digitek pill

16  containers, prescription containers, in your possession

17  at the time of your husband's death?

18      A    At the time of his death, yes.

19      Q    What else did you have in your possession?

20      A    We had the Digitek.  We had his other

21  medications.

22      Q    Okay.  But I'm just interested in Digitek at

23  the time.

24      A    Okay.

25      Q    So other than the three Digitek prescription

1  containers --

2     A    Okay.

3     Q    -- that are depicted in Exhibit 3 --

4     A    Uh-huh.

5     Q    -- at the time of your husband's death, did you

6  have any other Digitek containers in your possession?

7     A    No.

8     Q    All right.  Thanks.

9          So, let me come back to -- are you okay?

10    A    Uh-huh.

11    Q    You mentioned some other medication containers

12 just recently.  So -- and you don't need to think about

13 it, but you need to think about the answer to the

14 question, which is this:  What medications were your

15 husband taking on a daily basis at the time of his

16 death?

17    A    Allopurinol.  Um, Cartia something, XT or

18 something.  He had two of those with two amounts,

19 different strengths.

20         He was on a cholesterol medication.  I don't

21 recall the name.  Um, and I don't recall if there was

22 any more.  Those are just what stick out right now.

23    Q    Do you recall whether or not your husband was

24 taking a medication called Lovastatin at the time of his

25 death?

```
 1      A    I don't recall if that's the name of the

 2   cholesterol medicine he was taking.

 3      Q    What about Prevacid?

 4      A    I do recall Prevacid, yes.

 5      Q    You do recall --

 6      A    Yes.

 7      Q    -- that he was taking that at the time of his

 8   death?

 9      A    Yes, I believe.

10      Q    Was he taking Dilacor at the time of his death?

11      A    I don't recall that name.

12      Q    Was he taking Lanoxin at the time of his death?

13      A    He was taking Digitek.

14      Q    I'm sorry, he was taking -- he was taking

15   Digitek?

16      A    Yes.

17      Q    Which is the generic name for Lanoxin?

18      A    Yes.

19      Q    What about Protonix?

20      A    I don't recall that name either.

21      Q    In regard to fulfilling your husband's

22   prescriptions --

23      A    Uh-huh.

24      Q    -- my understanding is that you filled those

25   online?
```

PLAINTIFFS' EXHIBITS 011641

1      A      Um, sometimes on the phone, sometimes online.

2    Mostly I called it in.

3      Q      But they were sent to you from an online

4    pharmacy service; is that correct?

5      A      Yes.

6      Q      The name of that service was Caremark?

7      A      Yes.

8      Q      Were you the person in the family who was in

9    charge of getting prescriptions, getting your husband's

10   prescriptions filled?

11     A      Yes, he would tell me when, and I would order

12   them for him.

13     Q      What was your -- did you have a normal custom

14   and practice in terms of when you would order his

15   prescriptions?

16     A      Yes.  Whenever -- well, when he told me to, I

17   would order them.  Sometimes I also did it through mail

18   where I would just fill out the form and send them a

19   check.  So we did it three different ways.

20     Q      Three different ways.  Was each way -- was each

21   of those three different ways instigated by your husband

22   asking you to get his prescription?

23     A      Yeah.  He would let me know it was time.

24     Q      He'd let you know when he was running low --

25     A      Yeah.

PLAINTIFFS' EXHIBITS 011642

```
 1     Q     -- and you'd fill the prescriptions?

 2     A     Right.

 3     Q     Was it your normal custom and practice to fill

 4   all of his medicine at the same time?

 5     A     Yes.

 6     Q     In terms of the digoxin -- I'm sorry, the

 7   Digitek, you normally received a two-month supply at the

 8   time; is that right?

 9     A     Ninety days, I believe.

10     Q     So a three-month supply?

11     A     Yes.

12     Q     Which was how many pills?

13     A     I don't know.

14     Q     How many pills -- how many Digitek tabs did he

15   take per day?

16     A     Two.

17     Q     So if it was 90 days, would it be 180 pills?

18     A     Yes.

19           MR. ERNST:  You're doing some mathematical

20   calculations.  You asked her if she knows, and then

21   you're asking her to figure it out.  So objection.

22   BY MS. DONAHUE:

23     Q     All right.  Does the --

24           MR. MORIARTY:  Old habits are hard to break.

25           MR. ERNST:  It is.
```

PLAINTIFFS' EXHIBITS 011643

1  BY MS. DONAHUE:

2      Q    Would you take a look, Ms. McCornack, for me,

3  at Page 3 of Exhibit 3.  The last container depicted has

4  a notation at the bottom that says, "Filled 1-26-08."

5      A    Uh-huh.

6      Q    All right.  Do you know whether or not the

7  pills that -- in that container, the pills that were

8  filled, the prescription that was filled on 1-26-08 is

9  the prescription -- I'm sorry, is this the container

10 from which the pills that your husband took on the day

11 before his death, did they come from this container?

12     A    Yes.

13     Q    And how do you know that?

14     A    Because those were the pills we had at the

15 time.

16     Q    Okay.  According to the records that we have

17 from your pharmacy company, Caremark, a prescription was

18 filled, the last prescription before this one, before

19 the 1-26-08 prescription, the one prior to that was

20 dated 11-17-07.  Does that sound right to you?

21          Let me ask a better question.  Do you recall

22 having that prescription filled?

23     A    I don't recall.

24     Q    In terms of your husband telling you to refill

25 his prescription, do you know how low he would get on

1  his pills before he would tell you to go ahead and fill

2  it?

3      A    I don't remember -- I don't know.  I know

4  there's a certain date you have to order after,

5  otherwise they don't let you order it, so it was after

6  that date.  But I don't know.  You can't order them too

7  early.  You have to order them...

8      Q    How long between the time you order and the

9  time that prescriptions were received by mail in your

10  home, normally?

11      A    About a week.

12      Q    So usually a week lag time?

13      A    Yeah, I'd say.

14      Q    Do you recall how you ordered the pills that

15  were contained in the container dated 1-26-08?

16      A    Huh-uh.

17      Q    Do you recall if you ordered them by phone or

18  online?

19      A    I don't recall how I ordered those, no.

20      Q    Was the time, the one-week time period between

21  ordering and receipt, did it vary depending on how you

22  placed the order, or was that generally how long it

23  took?

24      A    Yes.  Probably, yeah.  If I sent them a check,

25  it would take longer than if I did by phone, obviously.

PLAINTIFFS' EXHIBITS 011645

1    Q    So is the one-week estimate of time between

2  order and receipt that you're giving me, is that for an

3  online order or a phone order?

4    A    Phone.

5    Q    When you did it by phone, did you give them

6  your credit card number --

7    A    Yes.

8    Q    -- or did you send a check?

9    A    Credit card.

10   Q    If you did it online, you did it by credit

11  card?

12   A    Yes.

13   Q    Those two ways of ordering, as long as you gave

14  them a credit card it would normally be a week lag time

15  between order and getting the prescription?

16   A    Right.

17   Q    Do you recall for the January 26th, '08, order,

18  whether you paid by credit card or by check?

19   A    I don't recall.

20   Q    Did you more frequently than not pay by credit

21  card?

22   A    It just depended.  I don't know.  I don't

23  recall.  It's -- it depended.  If I sent it in a check,

24  obviously, I had more time to get the pills, but I don't

25  know.  It just depended on how I ordered it.

PLAINTIFFS' EXHIBITS 011646

 1     Q    Okay.

 2          MR. ERNST:  We've been going an hour.  Why

 3   don't we take a five-minute break.

 4                    (Recess.)

 5   BY MS. DONAHUE:

 6     Q    Ms. McCornack, we're back on the record.  Do

 7   you feel ready to start again?

 8     A    Yes.

 9     Q    I'm going to show -- actually, let's

10   have something marked.  Where are we?  Number 4?

11          THE REPORTER:  Yes.

12          MS. DONAHUE:  You might as well give me 5, too.

13   I've marked as Exhibits 4 and 5 receipts from Caremark

14   that were produced by your attorney to us earlier in

15   this litigation, and I'm going to show you first

16   Exhibit 4.  I'm going to ask you to take a look at that.

17          And that particular exhibit is dated, has an

18   order date of 11-16-2007, and it's a summary of various

19   medications, prescriptions of which were filled on that

20   date.  Do you see that?

21               (Defendants' Exhibits 4 and 5 were

22               marked for identification.)

23          THE WITNESS:  Yes.

24   BY MS. DONAHUE:

25     Q    And do you see that down at the bottom,

PLAINTIFFS' EXHIBITS 011647

1    Mrs. McCornack, that it says "Order Paid by Check"?

2        A    Yes.

3        Q    And then it has a notation in someone's

4    handwriting that I take it is not yours, or is it?

5        A    Yes.

6        Q    It is your handwriting?

7        A    Yes.

8        Q    So you circled that, and stated paid 11-16-07?

9        A    Yes.

10       Q    When you make a notation such as that, does

11   that reflect that you wrote the check on that date?

12       A    Yes.

13       Q    Would this be an order, or can you tell if this

14   is an order you filled by phone or by mail or online?

15   Can you tell how you filled it, how you made the order,

16   how you placed the order?  Excuse me.

17       A    By mail, but it -- yeah, if I paid by check, I

18   usually sent it in the mail.

19       Q    Okay.  And normally if you sent an order with a

20   check in by mail --

21       A    Uh-huh.

22       Q    -- to Caremak, how long of a time period would

23   lapse between sending the order in and receiving the

24   medication?

25       A    A week.  I don't know.  I don't recall.  Twelve

```
 1 | days.
 2 |          MR. ERNST:  If you don't know --
 3 |          THE WITNESS:  I don't recall.
 4 |          MR. ERNST:  -- don't guess.
 5 | BY MS. DONAHUE:
 6 |    Q    Okay.  So you don't have any recollection about
 7 | the time period that you would be giving yourself to
 8 | place these orders?
 9 |    A    Whenever he told me to order, I'd order.  So I
10 | would just order them.  So, no.  He was...
11 |    Q    Okay.  How, in your mind, did you make the
12 | determination when to place an order by mail and send in
13 | a check, which I think you've told me took a little
14 | longer to get the meds back --
15 |    A    Uh-huh.
16 |    Q    -- versus doing it on phone or online and using
17 | your credit card?
18 |    A    Probably just depending on -- I don't know.  I
19 | just -- I don't recall.  I just -- sometimes it was by
20 | check, sometimes it was by credit card.  It was just
21 | maybe whatever was in the checking account balance.  I
22 | don't recall.
23 |    Q    Did your husband generally tell you one way or
24 | another which would be the better way to place the
25 | order?
```

PLAINTIFFS' EXHIBITS 011649

1    A    No.

2    Q    Was it his normal custom and practice to let

3  you know how many pills he had left, or how long he had

4  left to go on a prescription before he placed an order?

5    A    No.  He would just say, "Can you order my

6  medications?"

7    Q    All right.  Let's show you what's been marked

8  Exhibit 5, which is the second Caremark receipt, and it

9  is a summary for order dated 1-25-2008.  That again

10  lists four, five different medications, prescriptions

11  for which were filled on that date.

12        If you could take a look at that for me.  Let

13  me know when you're done.

14    A    Okay.

15    Q    Okay.  Again, do you see, Mrs. McCornack, down

16  at the bottom of Exhibit 5 that this says "Payment

17  received with this order by Visa"?

18    A    Yes.

19    Q    And I think you've told me before that when you

20  paid by Visa you normally received the medication within

21  about seven days of placing the order?

22    A    Yes.

23    Q    And this reflects that you placed the order on

24  1-25-08; correct?

25    A    Uh-huh.

1    Q    It includes an order for Digitek, 90-day

2  supply?

3    A    Uh-huh.

4    Q    And I think you told me that this was the order

5  that you placed on 1 -- the order for Digitek that was

6  filled on January 25th, 2008, which is reflected in the

7  bottle marked -- a photograph of what we marked as

8  Exhibit 3 is the Digitek that your husband was taking at

9  the time of his death?

10   A    Yes.

11   Q    Okay.  Do you recall, at the time of your

12 husband's death, how many tablets were left in the

13 bottle of photo -- the photo of which is marked

14 Exhibit 3 and it's dated, "Order Filled 1-26-08"?

15   A    No.

16   Q    And you've told me previously in general about

17 the medications that you recall your husband taking at

18 the time of his death on a daily basis; am I right?

19   A    Yes.

20   Q    And those medications are reflected on both

21 Exhibit 4 and Exhibit 5?

22   A    Yes.

23   Q    Are there any medications other than those

24 reflected on Exhibits 4 and 5 -- and I'll name them so

25 that the record is clear.  Prevacid; Cartia XT;

PLAINTIFFS' EXHIBITS 011651

1    Allopurinol; Digitek and again Cartia XT in a different

2    dosage.

3            Are there any medications other than those five

4    that you recall your husband taking on a daily basis?

5    And I'll stipulate that he probably was taking a Cardio,

6    one or the other, not both, on a daily basis.

7            Are there any other medications that you recall

8    your husband taking?

9            MR. ERNST:  Objection.  You can go ahead and

10   answer the question.  Just because I made an objection

11   doesn't mean you can't answer.  I did it for a number of

12   legal reasons, but you can go ahead and answer it if you

13   can.  If you can't, it's okay.

14           THE WITNESS:  He was on a cholesterol

15   medication, but I do not recall the name of it.

16   BY MS. DONAHUE:

17     Q    Okay.  Did your husband have a certain, you

18   know, practice that he followed in regard to taking his

19   medications?

20           In other words, did he take them at the same

21   time every day?  Did he take them at different times?

22   Do you know how he took his medications?

23     A    Yes.

24     Q    Did he have a schedule?

25     A    Yes.

PLAINTIFFS' EXHIBITS 011652

1    Q    What was his schedule?

2    A    In the mornings, it was after breakfast.  In

3  the evenings, it was after dinner.

4    Q    Did he keep his medications in the containers

5  in which they were delivered or did he put them in some

6  other kind of container to keep them and to keep track

7  of them?

8    A    In the containers that they were delivered in.

9    Q    Were his med -- did he keep his medications in

10  the bathroom, kitchen, or where in your house?

11   A    In the kitchen.

12   Q    What time did your husband normally have

13  breakfast?  You should probably cut it down between

14  weekdays and weekends.

15        On a weekday, what would his normal time be for

16  breakfast?

17   A    7:15.

18   Q    And on weekends?

19   A    Um, 8 o'clock.

20   Q    And how long after breakfast, after finishing

21  his breakfast, would he normally take medications?

22   A    Right after.

23   Q    And on weekdays, what time did you normally

24  have dinner?

25   A    Um, let's see.  He got home -- about seven.

PLAINTIFFS' EXHIBITS 011653

```
 1      Q    And what about on weekends?
 2      A    Depending.  Seven, depending on what's going
 3   on.
 4      Q    And how long after dinner would he normally
 5   take his medications?
 6      A    Right after.
 7      Q    And I've been using the term "medications" in
 8   general, but I'm going to ask you, did that same
 9   schedule, taking his medication immediately after
10   breakfast and immediately after dinner, apply to Digitek
11   as well?
12      A    Yes.
13      Q    Was your husband pretty good about remembering
14   to take his medication?
15      A    Yes.
16      Q    In other words, did you have to remind him, you
17   know, after dinner or after breakfast, "Hey, don't
18   forget to take your medicines," or is that something he
19   did on his own?
20      A    He did that on his own.
21      Q    Okay.  Had your husband been taking Digitek
22   since the time that you met him?
23      A    Um, no.
24      Q    What's your recollection of when he began
25   taking Digitek --
```

```
1     A     I don't know.

2     Q     -- once you knew him?

3     A     I don't recall.  I don't recall.

4     Q     When was the first time that you became aware

5   that your husband had atrial fibrillation?

6     A     I don't recall.

7     Q     Was your husband on any medication for any

8   cardiac condition when you married him?

9           MR. ERNST:  If you know.

10          THE WITNESS:  I don't recall.

11  BY MS. DONAHUE:

12    Q     The medical records that we have reflect that

13  he was first diagnosed with atrial fibrillation at age

14  22.  If that's what the medical records say, do you have

15  any reason to disagree with that?

16    A     No.

17    Q     And they also indicate that, at that time, he

18  was placed on Lanoxin for a period of time.  Do you have

19  any reason to disagree with that?

20    A     No.

21    Q     And if I was to represent to you that the

22  medical records reflect that your husband was placed on

23  digoxin consistently since -- I'm sorry, was prescribed

24  digoxin fairly consistently since December of 1994,

25  would you have any reason to disagree with that?
```

PLAINTIFFS' EXHIBITS 011655

1    A    No.

2    Q    Do you know, Mrs. McCornack, if at the time you

3    or your husband received the prescription that was

4    ordered -- I'm sorry, yeah, that was filled on

5    January -- I'm sorry, the order which was placed on

6    January 25th, 2008, and the prescription that was filled

7    on January 26th, 2008, for Exhibit 3, okay --

8    A    Uh-huh.

9    Q    -- do you know if your husband began taking the

10   pills in that prescription immediately upon receiving

11   them in your home?

12   A    I do not know.

13   Q    So, in other words, you don't know whether or

14   not that bottle was in the house being unused for a

15   period of time after it was received?

16   A    After it was received?  Yeah, I don't recall.

17   Q    It may be that your husband had some tablets

18   left over from the 11-17 prescription, the reference of

19   which we've marked as Exhibit 4, before he started

20   taking the January prescription?

21   A    I don't recall, but --

22   Q    That's possible?

23   A    Yeah.  I guess.  I don't know.

24   Q    I don't want you to guess.  I don't want you to

25   guess.

PLAINTIFFS' EXHIBITS 011656

 1      A    I don't know.

 2           MR. ERNST:  You've answered the question.

 3           THE WITNESS:  Yeah, I don't know.

 4  BY MS. DONAHUE:

 5      Q    All right.  If I could turn you back to the

 6  Plaintiff Fact Sheet, which I think you have, Counsel.

 7           MR. ERNST:  Take another short break.

 8                    (Recess.)

 9  BY MS. DONAHUE:

10      Q    Before we turn to -- actually, I have a couple

11  more questions about these containers, and then we

12  should be able to move on.

13           We've talked about the 11-17 prescription and

14  January '08 prescription, and I'm just trying to get

15  a -- you know, make sure that we don't miss anything in

16  terms of the 11-17 prescription.

17           So with that in mind, can you tell me what was

18  your husband's or your normal custom and practice in

19  regard to the container for the Digitek, the

20  prescription container?  In other words, when you got

21  the new prescription in, what did you do with the old

22  container?

23      A    I don't know.

24      Q    It would be something he did?

25      A    Uh-huh.  Yes.

PLAINTIFFS' EXHIBITS 011657

1    Q    Do you know whether or not he would, you know,

2  take the old container, the previous prescription

3  container, and combine it with the new one, or did he

4  keep them separate?

5    A    I don't know.

6    Q    Do you know when he would generally discard the

7  prior prescription container of Digitek?

8    A    I don't know.  It was something he did.

9    Q    Okay.  And just so I'm sure, because I want to

10  make sure I didn't miss anything, it's your testimony

11  that there was no normal custom and practice for you and

12  your husband regarding how low he would let the prior

13  prescription of Digitek get before he would tell you to

14  order a new one?

15    A    I don't know.  I don't know what -- how he did

16  that.  He just told me.

17    Q    Okay.  So now if you can turn to the Plaintiff

18  Fact Sheet that's been marked as Exhibit 2 and take a

19  look at Page 6, please.

20    A    All right.

21    Q    And if I could refer you to Question 6, and

22  look at 6B, please.  And the question reads, "Do you

23  have in your possession or does your attorney have the

24  packaging from the Digitek you allegedly purchased or

25  purchased and used, and, slash, or any Digitek tablets?"

1          And you have checked "Yes" there.  Do you see

2  that?

3      A     Uh-huh.

4      Q     And then "A" says "Yes."

5          "Who currently has custody of the Digitek

6  packaging and/or tablets?"  And typed in there "Ernst &

7  Mattison," your counsel; correct?

8      A     Yes.

9      Q     And then Item B says, if you or your attorney

10  is in possession of tablets, how many do you have?

11  Okay.  Do you see that?

12      A     Yes.

13      Q     All right.  And that answer reads, "97 tablets

14  from the bottle he was taking at the time of his death,

15  plus six pills sent out for testing, one pill in the

16  safe of decedent's father, one pill in the custody of

17  Kathy McCornack, plus a week supply of Digitek believed

18  to be 10 to 12 pills in a pill container that was taken

19  by the coroner at the time of Mr. McCornack's death.

20  There are also two additional bottles containing a

21  combined total of 270 tablets that arrived after his

22  death."

23          Is that what that says?

24      A     Yes.

25      Q     Did I read that accurately?

1    A    Yes.

2         MR. ERNST:  You get an A.

3         MS. DONAHUE:  Thank you.  I was always a very

4    good reader.

5    Q    So let's go back and add that up.  All right?

6    We have 97 tablets from the bottle he was taking at the

7    time of his death; right?  So that's 97.  Plus 6 pills

8    sent out for testing.

9         Is it your understanding, Mrs. McCornack, that

10   the six pills sent out for testing also came from the

11   bottle that your husband was taking at the time of his

12   death?

13   A    Yes.

14   Q    One pill in the safe of decedent's father.

15        Did that one pill in the safe of

16   Mr. McCornack's father also come from the bottle he was

17   taking at the time of his death?

18   A    Yes.

19   Q    All right.  And a week's supply of Digitek

20   believed to be 10 to 12 pills in a container that was

21   taken by the coroner at the time of Mr. McCornack's

22   death?

23   A    Yes.

24   Q    Did the 10 to 12 pills in a pill container

25   taken by the coroner at the time of Mr. McCornack's

```
1  death also come from the bottle referenced in the
2  beginning of this answer?  It says "The bottle he was
3  taking at the time of his death."
4      A    I don't know.  I'm -- he took care of his
5  pills.  So, yes.
6      Q    Okay.  How -- what does the pill --
7      A    Yes.
8      Q    -- container --
9           MR. ERNST:  Let's put it this way --
10          MS. DONAHUE:  What --
11          MR. ERNST:  If you -- you believe so?
12          THE WITNESS:  I believe so, yes.
13 BY MS. DONAHUE:
14     Q    You believe so, but you don't know for sure; is
15 that correct?
16     A    I believe so, yes.
17     Q    But you don't know for sure?
18          MR. ERNST:  Well --
19          THE WITNESS:  He took care of --
20          MR. ERNST:  Objection.  Objection.  He took
21 care of the pills.
22          MS. DONAHUE:  Right.  So I'm entitled to an
23 answer to my question.
24     Q    Do you know for sure or not whether the 10 to
25 12 pills in the container taken by the coroner at the
```

PLAINTIFFS' EXHIBITS 011661

1  time of Mr. McCornack's death came from the container

2  that has been photographed and depicted in Exhibit 3

3  that is dated 1-26-08?

4          MR. ERNST:  Objection.  Asked and answered.

5  You can go ahead and answer the question.

6  BY MS. DONAHUE:

7      Q    Do you want it read back?

8      A    I believe so, yes.

9      Q    What is the pill container that was taken by

10 the coroner at the time of Mrs. McCornack's death?  What

11 is that?

12     A    It's the travel pill container that you can put

13 up to seven days worth of medication, I believe.

14     Q    Do you know who presently has possession of

15 that?

16     A    The coroner was the last.

17     Q    Have you ever requested it from the coroner?

18     A    I personally have not.

19     Q    Do you know if your counsel has?

20     A    I don't know.

21     Q    Do you know if it's in the possession of your

22 counsel presently?

23     A    No.

24     Q    No, you don't know?

25     A    I don't know.

PLAINTIFFS' EXHIBITS 011662

```
 1      Q    Do you know what became of the 10 to 12 pills
 2   in the pill container that was taken by the coroner?
 3      A    No.
 4      Q    Do you know if those are in the possession of
 5   your counsel?
 6      A    No.
 7      Q    You've not had them back in your possession --
 8      A    No.
 9      Q    -- since the coroner took them?
10           I'll ask a better question.
11           Have you had them in your possession since the
12   coroner took them?
13      A    No.
14      Q    The last sentence in the answer references two
15   additional bottles containing a combined total of 270
16   tablets that arrived after your husband's death.  Do you
17   see that?
18           Are those bottles the other two bottles that
19   are depicted in Exhibit 3?
20           You can look at these.
21      A    What was the question?
22      Q    Are the two additional bottles that arrived
23   after your husband's death and that are referenced in
24   answer 6D on Page 6 of the Plaintiff Fact Sheet, are
25   those bottles also depicted in Exhibit 3?
```

PLAINTIFFS' EXHIBITS 011663

1     A     The ones that came after?

2     Q     Uh-huh.  I'll help you here.

3           MR. ERNST:  May I speak?  If I could help here.

4  Here's the issue.  Okay.  There are three bottles here.

5           MS. DONAHUE:  Right.

6           MR. ERNST:  I think two are recalled.  One was

7  not.

8           These are the bottles that were photographed.

9  She doesn't know that they were photographed.  Our

10 office did it.

11          So you are asking her if these are photographs

12 that you took.

13          MS. DONAHUE:  I'm only asking her --

14          MR. ERNST:  I'm only clarifying here.  They are

15 what they are.  So, I'm trying to help you here.

16          MS. DONAHUE:  Okay.

17    Q     What I'm really trying to find out -- thank you

18 for that clarification -- is we have photographs of

19 bottles that are dated 5-9-08 and 3-25-08 as being

20 filled on those dates.  We have photographs of those two

21 bottles in Exhibit 3.

22    A     Okay.  But that's not the photograph I'm

23 looking at; right?  This is -- oh, I see.

24    Q     The other two.

25    A     Yes, yes.

PLAINTIFFS' EXHIBITS 011664

```
 1     Q     We've been focusing on the one --
 2     A     Yes.
 3     Q     -- dated 1-26-08.
 4     A     Yes.
 5     Q     Now I'm referencing you to the other two.
 6     A     Yes, those came after.
 7           Does that say 1-3-29?  Where's the date on
 8   that?
 9     Q     Let me ask it this way:  Do you recall getting
10   two bottles of --
11           MR. ERNST:  Digitek.
12           MS. DONAHUE:  I know.
13     Q     -- Digitek after your husband's death?
14     A     Yes.  One was Digitek, one was digoxin.
15     Q     Okay.  And what did you do with those?
16     A     Gave them to my attorney.
17     Q     Okay.  And have you seen them since?
18     A     No.
19     Q     Did you open them, look at the pills, do
20   anything with them before giving them to your attorney?
21     A     Um, not the digoxin.  No.  No.
22     Q     What about the Digitek?
23     A     I might have opened them.  I don't recall.
24   Honestly, I don't recall.  It was kind of not a good
25   time.
```

PLAINTIFFS' EXHIBITS 011665

1           MR. ERNST:  Just answer the question.

2           THE WITNESS:  I know.  Sorry.

3   BY MS. DONAHUE:

4       Q    Let's talk a little bit about the travel pill

5   container that you've referenced that you gave -- that

6   the coroner took after your husband's death.

7       A    Uh-huh.

8           MR. ERNST:  The coroner took it.  I'm not sure

9   she gave it to him.

10          MS. DONAHUE:  I said "took."  Didn't I say

11  "took"?  You can read it back if you'd like.

12          MR. ERNST:  Forgive me.

13  BY MS. DONAHUE:

14      Q    Was your husband's normal -- normal custom and

15  practice to bring a travel container when he went away

16  on trips?

17      A    Um, sometimes he did and sometimes he didn't.

18      Q    What did the travel container look like?

19      A    It was green and it had seven -- I believe

20  seven compartments dated Sunday, Monday to Saturday, or

21  Saturday or Sunday.  However that works.

22      Q    Did you look at the travel container, or look

23  inside of it before the coroner took it?

24      A    No.

25      Q    So in regard to the part of 6B, the answer to

1  6B where it says, "Plus a week's supply of Digitek

2  believed to be 10 to 12 pills in a pill container that

3  was taken by the coroner at the time of Mr. McCornack's

4  death," how did you arrive at that number?

5       A    We were going to be gone seven days.

6       Q    So you assumed that he put that --

7       A    Yes.

8       Q    -- amount, but you didn't inspect it yourself?

9       A    No, I did not.

10      Q    You don't know that to be true from your own

11 inspection?

12      A    Correct.

13      Q    If you could flip backwards a couple of pages

14 to Page 4, and if you look at this Item 2, at the top of

15 the page there, and I should be complete, let me read

16 the question.  We are on Question 3(i)2 of the Plaintiff

17 Fact Sheet, and it reads, "Do you claim that your injury

18 was caused by ingesting defective Digitek medication?"

19           You've checked, "Yes."  Correct?

20      A    Yes.

21      Q    And then if we go down to Number 2, it says,

22 "How much of the defective product did you ingest?"

23           We will agree "you" is referring to your

24 husband, Dan McCornack; correct?

25      A    Yes.

PLAINTIFFS' EXHIBITS 011667

1    Q    The answer is, "I believe my husband took 74

2  pills from the pill container of defectively

3  manufactured and labeled pills."

4        Then for completeness, the rest of the answer

5  reads, "His prescription was for 1 0.25 milligram tablet

6  twice per day."

7        Is that correct?

8    A    Yes.

9    Q    All right.  I read that accurately; right?

10   A    Yes.

11   Q    And how is it, Mrs. McCornack, that you arrived

12  at the figure that your husband took 74 pills from the

13  container?

14       MR. ERNST:  If I can.  This was filled out by

15  Terry Kilpatrick from our office, and I think we did a

16  simple math computation of the pills that were in the

17  container, less the pills that we mentioned on the

18  previous page.

19       I'm trying to help here, not speak for her.

20  But that is the methodology that we imposed.

21       MS. DONAHUE:  Thank you.

22       MR. ERNST:  Does that make sense?  If it's bad

23  math --

24       MS. DONAHUE:  It would if your math added up.

25       MR. ERNST:  Well, my math may not add up.

PLAINTIFFS' EXHIBITS 011668

```
 1  BY MS. DONAHUE:

 2      Q    Do you have anything to add to your counsel's

 3  answer?

 4      A    No.

 5      Q    Is it your understanding that your counsel or

 6  someone in your counsel's office answered question

 7  Number 3(i)2?

 8      A    Yes.

 9      Q    Did you do anything to verify that number

10  before signing this under penalty of perjury?

11      A    No.

12           MR. ERNST:  She relied on us.

13  BY MS. DONAHUE:

14      Q    Prior to your -- let me strike that.

15           During the many years that your husband was

16  taking Digitek medication, did you ever know him to miss

17  a dose?

18      A    No.

19      Q    Did you ever know him to take a double dose?

20      A    Never.

21      Q    If there is a medical record from

22  Dr. Von Dollen in our records that indicates that he --

23  your husband had been doubling up on his Digitek, would

24  you disagree with that record?

25      A    Doubling up?  Yes.  Well, he took it twice a
```

PLAINTIFFS' EXHIBITS 011669

1  day, so was that --

2      Q    No.

3      A    -- would that be the double?

4      Q    The question is, if there's a reference that

5  says he has been doubling up on his Digitek, do you

6  disagree that he ever did that?

7      A    I don't recall.  If his doctor told him to, he

8  would have, but I do not recall, no, ever.  Never.

9      Q    Did you send any Digitek pills back to -- let

10  me back up.

11          Do you recall receiving a letter from Caremark

12  in regard to a recall of the Digitek product?

13      A    Yes.

14      Q    Do you recall that that letter requested that

15  you send the -- any remaining Digitek that you might

16  have in your possession back to them?

17      A    Yes.

18      Q    Did you do that?

19      A    No.

20      Q    Why not?

21      A    Because I gave -- I don't know.  I just didn't.

22      Q    Do you remember receiving that recall letter on

23  May 2nd, 1998 (sic)?

24      A    Um, I don't know the exact date, but, yes, I

25  remember receiving --

1    Q    Early May?

2    A    Yes.

3    Q    How long after receiving the letter did you

4    retain counsel in this case?

5    A    I don't recall.

6    Q    Within a week?

7    A    I don't recall.

8    Q    If there -- if your counsel has produced a

9    letter dated May 7th, 1998, wherein they reference

10   you -- his office references you as their client, would

11   you disagree that you were their client by May 7, 1998?

12            MR. ERNST:  Objection.  Misstates the

13   testimony.

14            MS. DONAHUE:  Misstates the testimony?

15            MR. ERNST:  Yeah, misstates.  Do you have a

16   letter there?

17            MS. DONAHUE:  Yes.  First, I'd like an answer

18   to that question.

19            THE WITNESS:  Can I go back to your other

20   question of when you said I received the letter?

21   BY MS. DONAHUE:

22   Q    Yes.

23   A    What date did you say?

24   Q    Did you receive it on May 2nd, 2008?

25   A    I recall receiving it in April.  My husband

```
 1 │ passed away in March.  And a month later I recall
 2 │ receiving the letter in April.
 3 │         MS. DONAHUE:  Go off the record for a minute.
 4 │             (Discussion held off the record.)
 5 │         MS. DONAHUE:  We can go back on.
 6 │    Q    Do you want to take a break?
 7 │    A    No, I'm okay.
 8 │    Q    Let's -- Mrs. McCornack, we've marked as
 9 │ Exhibit 6 a May 2nd, 2008, letter from DVS Caremark to
10 │ Daniel McCornack from Dan Berger M.D., Chief Medical
11 │ Officer of Medical Affairs CVS Caremark.
12 │         I'm going to hand that to you and ask you to
13 │ take a look at it, please.
14 │    A    Okay.
15 │    Q    Exhibit 7.
16 │    A    I see where I got April.  Never mind.
17 │             (Defendants' Exhibits 6 and 7 were
18 │             marked for identification.).
19 │ BY MS. DONAHUE:
20 │    Q    Exhibit 7 is another letter from CVS Caremark
21 │ dated May, without an exact date, 2008.  Hand you that
22 │ as well.
23 │         MR. ERNST:  Take a short break.
24 │         MR. MORIARTY:  There's a question pending, I
25 │ think.
```

1          MR. ERNST:  Is there a question pending?

2          MS. DONAHUE:  Yeah.

3          MR. ERNST:  What is the question pending?

4          MS. DONAHUE:  Go back in the record.

5                    (Record read.)

6                    (Recess.)

7    BY MS. DONAHUE:

8      Q    Ms. McCornack, before we took the break, we

9    were discussing Exhibits 6 and 7.  All right.  And

10   they've been identified for the record.

11         And I think -- I'm using Exhibit 6 dated -- the

12   letter dated May 2nd, 2008, to refresh your

13   recollection.

14         Does seeing -- you've had a chance to look at

15   it now, haven't you?

16     A    Yes.

17     Q    Does seeing the letter addressed to your

18   deceased husband, dated May 2nd, 2008, from Caremark

19   refresh your recollection that is indeed the date you

20   received the letter about the recall of Digitek?

21     A    Yes.

22     Q    And in regard to Exhibit 7, that is the May --

23   just May 2008, without a specific day on that letter, is

24   that -- did you receive that letter with a supply of

25   Digitek -- I'm sorry, a supply of digoxin?

1    A    Yes.

2    Q    All right.  Now, after receiving the recall

3  letter dated May 2nd, 2008 -- let me back up.  Sorry.

4  Strike that.

5         Was the recall letter dated May 2nd, 2008,

6  that's been marked as Exhibit 6, your first knowledge

7  that there had been a recall of Digitek?

8    A    Yes.

9    Q    And what did you do in regard to the dig -- in

10  regard to the recall once you got the letter?

11    A    What did I do?

12    Q    Uh-huh.

13    A    Nothing.  I mean, I don't recall.  I didn't --

14  I just --

15         MR. ERNST:  You've answered the question.

16  BY MS. DONAHUE:

17    Q    Okay.  Do you see -- let's see, one, two,

18  three, four, five, six paragraphs down in the letter

19  that's been marked as Exhibit 6, it says, "If you have

20  product on hand from an order before January 6th, 2008,

21  please contact our customer care department."

22         And it gives you a toll free number there.  Do

23  you see that?

24    A    Yes.

25    Q    I read that accurately?

PLAINTIFFS' EXHIBITS 011674

1    A    Yes.

2    Q    Did you contact the customer care department?

3    A    Yes, I did.

4    Q    Who did you speak to?

5    A    I do not recall.

6    Q    Was it a man or a woman?

7    A    A woman, I believe.

8    Q    How long after receiving the letter did you

9 call?

10   A    I believe I called the same day.

11   Q    What did you ask them?

12   A    I asked about the recall.

13   Q    What specifically did you ask?

14   A    I asked what it was regarding and what

15 happened, and, um, she had asked me to send the pills

16 back.

17   Q    When you say you asked what it was regarding --

18   A    Yes.  Well, I asked her to explain the recall

19 to me.

20   Q    What information did you receive in response to

21 the question?

22   A    It was very vague.  I don't recall it being --

23 I don't recall what she said.

24   Q    Did you receive information over and above the

25 information contained in the letter?

PLAINTIFFS' EXHIBITS 011675

1   A    No.

2   Q    So, basically, your recollection is that

3   whatever you were told by the representative on the

4   phone was nothing additional to what you've been told in

5   the letter?

6   A    Nothing additional, correct.

7   Q    And she had asked -- he or she had asked you to

8   send what you had left of the product back?

9   A    Yes.

10   Q    To Caremark?

11   A    Yes.

12   Q    Did you do that?

13   A    No, I did not.

14   Q    Why not?

15   A    Because my husband was dead.

16   Q    Can you -- what does that mean?

17   A    He died, and it was a heart thing, and it was

18   Digitek.  It was a heart medication, and it was telling

19   me that it could have been double the strength.  So

20   whatever.

21   Q    So at that point, after receiving the letter --

22   A    Yes.

23   Q    -- and talking to the representative, you, in

24   your mind, made a determination that you were going to

25   do your own investigation?

PLAINTIFFS' EXHIBITS 011676

```
 1      A      My own investigation.  Um --

 2      Q      Well, I don't want to put words in your mouth.

 3   Let me ask you, you decided you'd hold on to the pills?

 4      A      Yes.

 5      Q      What were you going to do with them?

 6      A      I talked to my family.

 7      Q      Okay.  Did you do that?

 8      A      Yes.  Or his family.

 9      Q      Who did you talk to?

10      A      My father-in-law and my brother-in-law.

11      Q      Go ahead.  Anyone else?  Your father-in-law,

12   your brother-in-law.

13      A      I don't recall who else I talked to.

14      Q      What is your father-in-law's name?

15      A      Ralph.

16      Q      McCornack?

17      A      Yes.

18      Q      Your brother-in-law's name?

19      A      Eric McCornack.

20      Q      And is Eric Dan's brother?

21      A      Yes.

22      Q      Do you recall talking to anyone else after

23   receiving the recall letter and before you made the

24   decision to file a lawsuit?

25      A      I don't recall.
```

PLAINTIFFS' EXHIBITS 011677

1    Q    At some point in time after having these

2  conversations, you decided not to send the product back;

3  is that correct?

4    A    Yes.

5    Q    What did you decide -- why did you make that

6  decision?

7    A    We talked to family.  We got together and we

8  decided to investigate further and see if it's possible

9  that that's the reason my husband died.

10   Q    And what steps did you take to investigate

11 further?

12   A    Um, I went online a little bit to research.

13 And then my brother-in-law and I decided just, you know,

14 that we needed to get more help.

15   Q    All right.

16   A    So we decided to hire an attorney.

17   Q    When you say you went online a little bit and

18 researched, where did you go online?

19   A    I don't recall.  I just put in Digitek and

20 stuff came up, and I just researched what was going on.

21   Q    What information do you remember seeing when

22 you did that research?

23   A    Just that it was possible that it was double

24 the strength and just information on the company and

25 stuff like that.

```
 1     Q    You don't recall the name of any sites that you

 2   went to?

 3     A    I do not.

 4     Q    How much time did you spend doing that

 5   research?

 6     A    I don't know.

 7     Q    More than four hours?

 8     A    Um, I don't recall.

 9     Q    You can't give me any estimate at all?

10     A    No.

11     Q    How many days did you take doing that research?

12   Over what period of time?

13     A    I don't recall.

14     Q    Do you still have the computer in your

15   possession that you were doing that research on?

16     A    Yes.

17     Q    Is it your home computer?

18     A    Yes.

19     Q    Do you want to take a break?

20     A    No, I'm okay.

21     Q    And then you made a reference to your

22   brother-in-law again, and that you decided together that

23   you needed more help; is that right?

24     A    Right.

25     Q    Is that when you went to hire a lawyer?
```

PLAINTIFFS' EXHIBITS 011679

78

1     A    Yes.

2     Q    And you hired Mr. Ernst?

3     A    Yes.

4     Q    And do you recall that that occurred within

5  less than 30 days after you received the recall notice?

6     A    I don't recall.  I guess.

7          MR. ERNST:  If you don't recall, you don't

8  recall.

9          MS. DONAHUE:  I'll mark the next in order

10  Exhibit 8.

11               (Defendants' Exhibit 8 was marked

12               for identification.)

13  BY MS. DONAHUE:

14     Q    Ms. McCornack, I'm showing you what's marked

15  Exhibit 8, which is a letter dated May 20th.  There's a

16  Page 2 here somewhere.  May 20th, 2008.

17     A    Yes.

18     Q    And -- and it's a letter to NMS Labs, signed by

19  Don Ernst.  The first paragraph of that letter says,

20  "This office represents Kathy N. McCornack with regard

21  to the death of her husband, Daniel E. McCornack,

22  Senior."

23          Have I read that accurately?

24     A    Yes.

25     Q    Does this refresh your recollection that you

```
 1   had retained Mr. Ernst within 30 days of receiving the
 2   recall letter?
 3        A    Yes.
 4        Q    Do you recall how long before May 20th you
 5   first retained Mr. Ernst?
 6        A    No.
 7        Q    How did you come to find Mr. Ernst to be your
 8   lawyer?
 9        A    Um, recommendations.
10        Q    Who recommended him?
11        A    I don't remember.  My brother-in-law took care
12   of most of that.  But a few people did.
13        Q    Do you recall having a phone conversation with
14   Dr. Lemm after receiving the May 2nd letter from
15   Caremark?
16        A    I do recall calling him, yes.
17        Q    Do you remember if that conversation occurred
18   before or after you retained Mr. Ernst as your lawyer?
19        A    I don't recall.
20        Q    What did you ask Dr. Lemm and what did he tell
21   you?
22        A    I don't recall the exact conversation, but I
23   know I was asking about the Digitek, if it was possible.
24        Q    Do you recall what Dr. Lemm said?
25        A    I don't recall.
```

PLAINTIFFS' EXHIBITS 011681

1    Q    Mrs. McCornack, I'm going to ask you some

2    questions now about the date of your husband's death and

3    the circumstances leading up to it, and the incident

4    itself.

5    A    Okay.

6    Q    So this is going to be, I'm sure, very painful.

7    Let me know if you want to take a break, okay?  We can

8    take a break before we begin.

9    A    That's okay.

10   Q    We can take a break anytime during it, okay?

11   A    Okay.

12   Q    So I want to take you back to March 22nd, 2008,

13   which would be the day you left for the camping trip.

14   A    Right.

15   Q    That was a Saturday.  What time of day was it?

16   A    Saturday morning.

17   Q    And you were -- you and your husband and your

18   two sons had a plan to go to a camping trip?

19   A    Yes.

20   Q    Where were you going?

21   A    Felton.

22   Q    What's the name of the campground?

23   A    Smith Woods, I believe.

24   Q    And who was going to be camping with you?

25   A    His parents, which are Ralph and Linda

PLAINTIFFS' EXHIBITS 011682

1    McCornack; his brother, sister-in-law, Eric McCornack;

2    and Rochelle, his sister and husband.  So Eileen and

3    Alex Morines.  His best friend, so Sean and

4    Linda Koehler and their family.

5        Q    How do you spell Koehler?

6        A    K-O-E-H-L-E-R.

7        Q    Okay.

8        A    And there was another family.  Um, Sean and

9    Michelle Fosio.

10       Q    And who are they?

11       A    They are friends.  They were more friends of

12   Eric.

13       Q    Rather than asking you to provide me with all

14   of their contact information, can we have an agreement

15   that you will provide that to us upon request?

16            MR. ERNST:  Yes.

17   BY MS. DONAHUE:

18       Q    All right.  And just for completeness, can you

19   tell me what, were there children there --

20       A    Yes.

21       Q    -- in addition to the adults listed?

22       A    Yes.

23       Q    Can you tell me the names and ages and who they

24   belonged to?

25       A    Let's see.  Eric and Michelle don't have kids.

PLAINTIFFS' EXHIBITS 011683

```
1   So the Koehlers have Kelsey.  She's -- you want their
2   age now or at the time of the death?
3       Q    Time of death.
4       A    So --
5       Q    Whatever is easier.
6       A    I'll give you now.  Kelsey is 18.
7       Q    Okay.
8       A    Katy Koehler is 16.  Chase Koehler is 13.
9       Q    Chase?
10      A    Yes.
11      Q    Okay.
12      A    And then I think the other kids were the
13  Fosios.  No, wait.  Did Eileen bring her kids?  Yes,
14  Eileen had my nephew.  Just Blake was there.  So
15  Blake Bandy.
16      Q    How old is he now?
17      A    Blake is 16 -- wait.  He's 15.  He's going to
18  be 16 on October 15th.
19           Okay.  And then the Fosios.  I'm not sure how
20  old their son is, but their daughter is Ralph's age, so
21  probably 16.  Chelsea is 16.
22      Q    The name is Chelsea?
23      A    Yeah.  I think the son is Tommy, but I don't
24  recall.  I don't know what age he is.
25      Q    Younger than 16?
```

PLAINTIFFS' EXHIBITS 011684

83

```
 1      A     Yes.

 2      Q     What time did your husband wake up on

 3  March 22nd?

 4      A     The morning to go camping?

 5      Q     The morning.

 6      A     I don't recall.

 7      Q     Do you recall whether he woke up early in order

 8  to get ready for the trip, or did he wake up at his

 9  normal time on Saturday morning?

10      A     I don't recall.  We were supposed to meet dad,

11  but I don't recall what time.  Probably seven.

12      Q     And was 7 o'clock -- I think you told me on

13  weekends he usually had breakfast about eight?  So was

14  seven o'clock --

15      A     Yeah, but since we were going camping.

16      Q     I know.  So let me ask the question.  Was

17  7 o'clock a little early for him to wake up on a

18  weekend?

19      A     Yes.

20      Q     And do you recall that he had break -- whether

21  or not he had breakfast that morning?

22      A     No.

23      Q     No, you don't recall, or, no, he didn't?

24      A     No, he didn't have breakfast at that time.

25      Q     So, let's go back.
```

84

```
 1            He didn't have breakfast before you left the
 2   house?
 3      A    Right.
 4      Q    What time did you leave the house?
 5      A    Um, shoot.  I don't recall what time we left.
 6      Q    Did you leave within -- did you leave before
 7   10 a.m.?
 8      A    Yes.
 9      Q    Let me tell you something here that I'm sure
10   your counsel has told you as well, but I want to make
11   sure you don't get upset with me.  That is that saying
12   you don't recall is a perfectly acceptable answer.  On
13   the other hand, my duty to my client --
14      A    Sure is.
15      Q    -- is to make sure I've gone through all of the
16   different ways of perhaps refreshing your recollection.
17   I'm not doing it to annoy you.  I'm not doing it because
18   I don't believe you.  And I'm not doing it to make it
19   any more painful.  But it's my duty to do it and I need
20   to do it.
21      A    I understand.
22      Q    So, we have you leaving the house before ten?
23      A    Uh-huh.
24      Q    Is that the best estimate you can give me?
25      A    Yeah.
```

85

```
1    Q    So your husband was up from seven to sometime,

2  ten or before, and then you left the house?

3    A    Uh-huh.

4    Q    In that time period, he didn't have breakfast?

5    A    No.

6    Q    Did he take his medication during that time

7  period?

8    A    Yes.

9    Q    And did you see him do that?

10    A    Yes, that morning, I did see him.

11    Q    Where was he when he took it?

12    A    In the kitchen.

13    Q    Did he have a cup of coffee or anything --

14    A    Yes.

15    Q    -- before taking it?

16    A    He always -- yes.

17    Q    So, yes, he had a cup of coffee?

18    A    Yes.

19    Q    Did he have anything with the coffee?

20    A    No.

21    Q    Why didn't he have breakfast that morning?

22    A    Because we were stopping for breakfast.

23    Q    Did you see your husband pack up his pills and

24  put them in the plastic container that we've talked

25  about earlier?
```

```
 1      A    No.
 2      Q    Between the time your husband woke up and the
 3 time that you left the house, other than having a cup of
 4 coffee and taking his medication, what else did your
 5 husband do?
 6      A    He packed and got ready to go.  Just did all of
 7 the last minute stuff we had to do to leave.
 8      Q    My understanding from something I saw is that
 9 you drove an R.V. to the campsite?
10      A    A trailer.  Travel trailer.
11      Q    Travel trailer.  Okay.
12           Did that travel trailer belong to you and your
13 husband?
14      A    Yes.
15      Q    Do you still have it?
16      A    No.
17      Q    I'm not an R.V. person, so can you tell me the
18 difference between a travel trailer and R.V.  Just
19 describe the travel trailer.
20      A    The travel trailer you pull behind a truck.  So
21 we were pulling it behind his truck.
22      Q    What does it have in it?
23      A    It has a full kitchen, beds, bathroom, dining
24 area.
25      Q    How long had you owned that before March of
```

```
 1   2008?

 2       A    I want to say two years.

 3       Q    When did you sell it?

 4       A    I gave it back.  Um.  I don't recall.  Two

 5   months ago.

 6       Q    When you say you gave it back, did you give it

 7   back to the dealer?

 8       A    I gave it back to the bank.

 9       Q    What bank?

10       A    Is it Bank of USA or First USA?  Something like

11   that.

12       Q    Why did you give it back?

13       A    Um, because I couldn't sell it and he died in

14   it, and I didn't want it anymore.

15       Q    How long had you been trying to sell it?

16       A    I really hadn't done anything with it.  I just

17   decided to give it back, and then we came to an

18   agreement.

19       Q    So, in other words, you were making payments --

20       A    Yeah.  I continued.

21       Q    -- to First USA on it?

22       A    Yes.

23       Q    And rather than continue the payments you gave

24   it back to them?

25       A    Yes.
```

PLAINTIFFS' EXHIBITS 011689

```
 1     Q    And they agreed to call it a day with that?
 2     A    Yes.
 3     Q    Do you have documentation of that agreement?
 4     A    I believe so, yes.  We agreed on a balance.
 5  There was still a balance due, but we agreed.
 6     Q    Okay.  So you and your husband packed to get
 7  ready to go together?
 8     A    He did his thing and I did my thing.
 9     Q    What -- again, not being a camping person,
10  you're going to have to help me here.  What were your
11  duties and what were his?
12     A    His were just making sure everything was
13  secure, and everything that he needed was packed.  And
14  mine was making sure all of the food and everything was
15  in there and ready to go.  Clothes for me and the kids.
16  He did his own packing.
17     Q    He packed his own suitcase?
18     A    Yeah, he put his own clothes in the trailer.
19     Q    Did you bring bikes or any kind of recreational
20  stuff with you?
21     A    No.  Huh-uh.
22     Q    No bikes, no surfboards?
23     A    No, huh-uh.
24     Q    All right.  And you told me you stopped for
25  breakfast?
```

PLAINTIFFS' EXHIBITS 011690

```
 1      A      Uh-huh.

 2      Q      Did you meet up with any members of the party?

 3      A      Yeah, we all met up.

 4      Q      For breakfast?

 5      A      Yes.

 6      Q      Where was that?

 7      A      It's that truck stop off of 101.  I don't

 8   recall the name of it.  It's over just before King City.

 9   I don't recall the name.  They have a good breakfast

10   there, so we stopped there.

11      Q      This camping trip was going to be how long?

12      A      I can't recall, but I want to say -- it was

13   spring break.  So I think it was about a week.  Maybe

14   five days.  I don't recall.  I honestly don't.

15      Q      It was over -- so would it have been five to

16   seven days?

17      A      Yeah.

18      Q      Do you recall if everyone was staying that long

19   or if different people were --

20      A      Um, I don't recall.

21      Q      It was over spring break.  Was it also the

22   Easter holiday?

23      A      Easter, yes.

24      Q      And was this something, you know, a camping

25   trip over spring break, was that kind of a family
```

```
 1  tradition?

 2      A    It was our second year doing it.

 3      Q    Okay.  Was it the same group the year before?

 4      A    No.

 5      Q    How about the year before?

 6      A    Um --

 7      Q    You don't need to give me specifics.

 8           Did his parents go the year before?

 9      A    Yes.

10      Q    And his brother?

11      A    Yes.

12      Q    But then there may have been additional people?

13      A    Yeah.

14      Q    Okay.  Did the entire group that you've listed

15  for me meet for breakfast?

16      A    Um, yes.

17      Q    Do you recall what your husband had for

18  breakfast that morning?

19      A    I don't recall.

20      Q    And after breakfast, did the group drive to the

21  campsite?

22      A    Yes.

23      Q    Any other stops along the way?

24      A    I don't recall.  Maybe for gas, but I don't

25  recall.
```

PLAINTIFFS' EXHIBITS 011692

1    Q    Did you all, meaning everyone in the party that

2    you've told me about, arrive at the campsite around the

3    same time?

4    A    Yes.

5    Q    What time is that?

6    A    I don't recall.  A few hours away.

7    Q    Yeah.  Well, give me your best estimate.  How

8    far is it from Paso Robles to the campsite?

9    A    In pulling a trailer, um, I want to say it took

10   three hours, three-and-a-half hours maybe.

11   Q    Including the stop?

12   A    Yeah.

13   Q    Did you stop for about an hour --

14   A    Probably.

15   Q    -- for breakfast?

16   A    Yes.

17   Q    Did your husband drive the truck that was

18   pulling the trailer, to breakfast?

19   A    Yes.

20   Q    Then did he drive it from breakfast to the

21   campsite?

22   A    Yes.

23   Q    And were your sons in your car with you?

24   A    Yes.

25   Q    And so once you got to the campsite, what did

PLAINTIFFS' EXHIBITS 011693

1  your husband do?

2      A    We set up the trailer.  He and the boys set up

3  the trailer on the outside, getting our things settled.

4      Q    And setting up the trailer involved unhooking

5  it from the truck?

6      A    Yes.  Putting blocks down, unpacking chairs,

7  making sure it's level.  That kind of stuff.

8      Q    How long did that take?

9      A    Um, maybe an hour at the most.

10     Q    So it sounds as though he -- you probably had

11  gotten settled by the early afternoon; is that about

12  right?

13     A    Yeah.

14     Q    And do you remember what your husband did after

15  that, after he got -- after he got the trailer set up?

16     A    I don't recall.  Everybody kind of helps each

17  other, gets everything settled.  You have the whole

18  campsite.  We're all in one big campsite.

19     Q    Did your husband have a meal before dinner that

20  night?

21     A    No.

22     Q    Do you remember him having any snacks or

23  anything before dinner that night?

24     A    I don't recall.

25     Q    Do you recall whether your husband did any kind

```
 1   of hiking or walking or anything that afternoon before

 2   dinner?

 3       A    No --

 4       Q    Do you --

 5       A    -- he didn't.

 6       Q    So basically that afternoon your husband, your

 7   sons and you pretty much hung around the campsite?

 8       A    Yes.

 9       Q    Got settled?

10       A    Yes.

11       Q    Anything else in particular that stands out in

12   your mind that happened that afternoon?

13       A    No.

14       Q    What time was dinner that night?

15       A    I don't recall the time.

16       Q    Was it before the sun set?

17       A    Yes.

18       Q    Was the sun still up while you were eating

19   dinner?

20       A    Yes.

21       Q    Did the entire group eat dinner together?

22       A    Yes.

23       Q    And who prepared the dinner?

24       A    Um, we all did.

25       Q    Did you cook it in your trailer?
```

1     A     Oh, it was barbecue.

2     Q     When you say you all did, did everybody have a

3  part of the dinner they contributed?

4     A     Yes.

5     Q     How did that work?

6     A     Danny barbecued the hamburgers.

7     Q     When you say "Danny," you mean your husband?

8     A     Yes.  And then other people had salads, or I

9  think we had french fries Sean did in a deep fryer.

10         Um, I don't recall what else was there that

11  night.

12     Q     And did your husband eat dinner?

13     A     Yes.

14     Q     And he ate hamburger and french fries?

15     A     Yes.

16     Q     Anything else you remember that he ate?

17     A     Somebody from another campground brought crab

18  legs or something, I think he had, something like that.

19  But that's about it.

20     Q     Prior to having dinner, did your husband have

21  any cocktails?

22     A     Yes.

23     Q     What did he have?

24     A     A beer.

25     Q     What time that day did he have his first beer?

1      A      I don't recall.

2      Q      Do you recall him having a beer that afternoon?

3      A      I don't recall.

4      Q      What was his normal custom in regard to when

5  you'd go camping?  When would he have his first beer of

6  the day?

7      A      Probably when he was done setting up.  As long

8  as it was afternoon, he'd have a beer.

9      Q      Did he have anything to drink other than beer

10  before dinner?

11     A      I don't recall.

12     Q      Do you recall -- let me ask:  Do you recall him

13  having any kind of mixed drink before dinner that day?

14     A      No.

15     Q      Did your husband like gin and tonic?

16     A      No.

17     Q      Did he like any kind of mixed drink that

18  contained tonic?

19     A      Not that I'm aware of, no.  That wasn't

20  something he normally drank.

21     Q      Okay.  All right.  So you recall that he had a

22  beer at some point that afternoon?

23     A      Uh-huh.

24     Q      And then did he have a couple more before

25  dinner?

1    A    I'm sure he did.

2    Q    Do you have any estimate as to how many beers

3  he had --

4    A    No.

5    Q    -- before dinner?

6    A    Huh-uh.

7    Q    Was he at all intoxicated before dinner?

8    A    No.

9    Q    Would it be unusual -- or would it be unusual

10  for your husband to have had, in this situation, camping

11  and such, to have had more than six beers before dinner?

12    A    Would it be unusual?

13    Q    Would it be unusual for him to have more than

14  six before dinner?

15    A    Yes.

16    Q    Well --

17    A    Would -- we were camping, so it's different

18  when you're out with your friends.  I mean, it's

19  possible, I guess, but I don't know.  I didn't see.  I

20  didn't count how many beers he had that night.

21    Q    I understand that.  So I'm just kind of

22  asking --

23    A    Yeah, and I honestly couldn't give you an

24  honest answer.

25    Q    And I understand that.  So my question is, is

PLAINTIFFS' EXHIBITS 011698

1  your best estimate that he would have had anywhere

2  between one -- we know he had one.

3     A    Uh-huh.

4     Q    We know he had more than one?

5     A    Uh-huh.

6     Q    But probably less than six?

7     A    Yes.

8     Q    Okay.  Now, what did he drink with dinner?

9     A    I don't know.

10    Q    Did he have wine?

11    A    I did not see him drink wine.

12    Q    Did the group have wine with dinner?

13    A    Yeah, we did have wine there.

14    Q    Okay.  Did you have wine with dinner?

15    A    No.

16    Q    What did you drink before dinner?

17    A    I think I had a beer.

18    Q    During the cocktail hour, was the group

19 together?

20    A    Yes.

21    Q    And where were you all hanging out?  By the

22 barbecue?

23    A    Yeah.  We were all outside there.  Everything

24 is kind of close.

25    Q    Was most everybody that you told me in the

PLAINTIFFS' EXHIBITS 011699

1  group, with the exception of some children, were all of

2  the adults there --

3      A    Yes.

4      Q    -- for the cocktail hour?

5      A    Yeah.

6      Q    And then you all sat down to dinner together?

7      A    Yes.

8      Q    And you don't recall what your husband drank

9  with dinner?

10     A    I don't recall.

11     Q    After dinner, what happened?

12     A    We cleaned up.  They -- the guys went in, and I

13 think they watched a game, or they were watching

14 something in somebody's R.V.

15          I did my thing, cleaning and all that stuff.

16 Then we sat around the campfire.

17     Q    Okay.  Was your husband with the group that was

18 watching the game --

19     A    Yes.

20     Q    -- with the R.V.?

21          Did you go in there while he was watching?

22     A    No.

23     Q    Do you know if, between the end of dinner and

24 the time that you saw your husband go in to watch the

25 game, did he have any more beer?

1    A    I don't know.

2    Q    What about around the campfire?  Did he drink

3  beer around the campfire?

4    A    No, I don't recall him having a beer.

5    Q    Did he drink any alcohol around the campfire?

6    A    I don't know.  I don't know.

7    Q    How often did you and your husband go camping?

8    A    We tried to go once a year, at least.

9    Q    Again, normally on camping trips that you have

10 gone on before, did your husband generally continue to

11 have a beer or two after dinner?

12   A    Sure.

13   Q    And around the campfire?

14   A    Uh-huh.

15   Q    And was the -- was the -- again, the group of

16 adults that you named for me, were they all around the

17 campfire for a period of time?

18   A    Some of them were.  I can't say that they all

19 were.

20   Q    Do you remember who was there and who wasn't?

21   A    Linda and I and Danny.  Maybe a couple of the

22 kids.  I -- honestly, I -- I can't.

23   Q    Do you remember your two sons being there?

24   A    Um, I don't recall them, if they were sitting

25 around the campfire or not.

1          They also brought that game Rock Star, so they

2   were doing that with the TV outside.

3      Q    In the great outdoors?

4      A    Yes.

5      Q    Okay.  What about your husband's brother, Eric?

6      A    Uh-huh.

7      Q    Was he around the campfire?

8      A    I don't recall.

9      Q    And his dad and mom?

10     A    Yeah.  We were all out there, but I don't

11  recall where everybody was.  I mean, it's a big area.

12  People were all around the campfire.

13     Q    I'm being too specific because I'm showing my

14  lack of camping experience, but I guess you can never

15  tell I'm not a camper.

16         At any rate, people were still, I guess what

17  I'm trying to establish is people were still up --

18     A    Yeah.

19     Q    -- and around?

20     A    Yeah.

21     Q    What time did the party kind of break up?

22     A    I'd say ten.  Everybody kind of went off to

23  their own.

24     Q    And that's what time you and your husband went

25  to bed?

1    A    Yeah.  I went in probably at 9:30, because I

2  heard him out singing with the boys.  They were singing,

3  doing that Rock Star thing.  And then he came in and we

4  were in bed by ten, because he let the boys stay out

5  until 10:30, and then they had to come in.

6    Q    So you left your husband at the campfire?

7    A    Uh-huh.  Or around the music thing.

8    Q    The music.

9    A    Yeah.

10    Q    Were you playing Rock Star, too?

11    A    No.  I was listening from the trailer.  I could

12  hear them.

13    Q    You came in around 9:30?

14    A    Uh-huh.

15    Q    You heard him singing with the boys for a

16  while, and he was in the trailer by ten?

17    A    Yeah.

18    Q    When you went in to -- when he got to the

19  trailer, were you already in bed?

20    A    Yeah.

21    Q    He climbed in with you?

22    A    Yeah.

23    Q    Did he do anything between going to bed --

24    A    Brushed his teeth.

25    Q    -- and getting into the trailer and going to

```
 1   bed?
 2       A    Did his stuff in the bathroom, brushed his
 3   teeth.
 4       Q    Did he take his medication before he came to
 5   bed?
 6       A    No, he took it after dinner.
 7       Q    And did you see him take his medication after
 8   dinner?
 9       A    No.
10       Q    And why do you know that he took his
11   medication?
12       A    Because the boys saw him take his medication.
13       Q    Which boys?
14       A    My boys.
15       Q    Both of them?
16       A    Yeah.  I -- I don't know.  I know one of them
17   said that they saw him take it that night.  It might
18   have been both of them.  I don't recall that part.
19       Q    You don't know which one, or both of them?
20       A    No, because I haven't talked to them about it,
21   so I don't recall.
22       Q    Well, you talked about --
23       A    Then.  Not lately.
24       Q    Let's get back so we get a clear record.
25       A    I'm doing it again.
```

1       MR. ERNST:  Just relax.  Just listen to her

2  question.

3       MR. MORIARTY:  While we're pausing, is this

4  light bothering you?

5       THE WITNESS:  A little bit.

6  BY MS. DONAHUE:

7     Q   One of your sons has told you that he saw your

8  husband take his medication that evening?

9     A   Yes.

10    Q   And you don't know which one of the sons it

11 was?

12    A   I don't recall.

13    Q   Okay.  But when did they -- when did one of

14 your sons tell you that?

15    A   It would -- I don't recall.  I don't know

16 why -- I don't recall.  When he told me that?  I don't

17 recall.

18    Q   How is it that it came up?

19    A   I think we were just talking about when daddy

20 took his medication that night, because I didn't see

21 him.  And they said, "Well, we did because we were in

22 the trailer when he took it."

23       So I don't know why.  I don't recall why it

24 came up, but we were talking about it.

25    Q   Was it something you were talking about pretty

PLAINTIFFS' EXHIBITS 011705

```
 1  close to the time of his death?  In other words, were
 2  you --
 3      A    After?
 4      Q    Yes.
 5      A    Yes.
 6      Q    So, was this conversation after his death, but
 7  before you received the letter from Caremark that's been
 8  marked as an exhibit --
 9      A    Oh, I don't recall.
10      Q    -- from May 2008?
11      A    I don't recall.
12      Q    After your husband's death, were you concerned
13  that his death might have been caused by a failure to
14  take his medication?
15      A    A failure?  No.
16      Q    No?
17      A    No.
18      Q    So that's not how the conversation came up?
19      A    No.
20      Q    At what point in time did you become -- at what
21  point in time were you told that your husband's death
22  was caused by a heart attack?
23      A    When we got the coroner -- it was cardiac
24  arrest.
25      Q    I'm sorry, cardiac arrest.
```

```
 1      A     When we got the coroner's report, which was, I
 2   can't recall if it was before his funeral or after.  We
 3   were waiting for the results of that --
 4      Q     And --
 5      A     -- because --
 6      Q     Go ahead.  Do you want to finish?
 7      A     No.
 8      Q     Okay.  I'll get to that.  We'll go back to
 9   that.  I just wanted to make sure.
10            At the time that you received the coroner's
11   report --
12      A     Uh-huh.
13      Q     -- shortly after your husband's funeral, is
14   that your best estimate of when you got that?
15      A     The report in the mail, yes.
16      Q     Okay.  Was there any concern on your part, at
17   that time, that his death -- I'm sorry, that he may not
18   have taken his medication that evening?
19      A     No.
20      Q     Why did you have a conversation with your son
21   as to when or if he took his medication?
22      A     I don't recall if it just came up.  They
23   were -- we were just talking.  I don't recall how that
24   conversation came up.  I don't recall why.  It was
25   just -- we were just talking.
```

PLAINTIFFS' EXHIBITS 011707

```
 1      Q    So you don't recall why you had the
 2   conversation --
 3      A    No.
 4      Q    -- with your son?
 5      A    No.
 6      Q    You don't recall when you had the conversation
 7   with your son?
 8      A    No, no.
 9      Q    But you do recall that your son told you that
10   your husband took his medication --
11      A    Yes.
12      Q    -- that evening?
13      A    I think -- yes.
14      Q    Did he tell you what time that evening?
15      A    No.
16      Q    Did he tell you -- did he take it before or
17   after dinner?
18      A    It was after dinner.
19      Q    Did he tell you how long after dinner?
20      A    No.
21      Q    Did he tell you where they were when he saw him
22   take it?
23      A    In the trailer.
24      Q    In your trailer?
25      A    Yes.
```

1    Q    Do you recall seeing your husband and your son

2  going into the trailer between dinner and when you went

3  to bed?

4    A    No.

5         MR. ERNST:  Can I get you some water?

6         While you're looking, can I take a minute to go

7  to the little boys room?

8         MS. DONAHUE:  Sure.

9              (Recess.)

10         MS. DONAHUE:  Back on the record.

11    Q    Ms. McCornack, we're back on the record.  I

12  think when we stopped we had your husband coming into

13  the trailer to go to bed about ten?

14    A    Uh-huh.

15    Q    And he did his stuff in the bathroom.  He got

16  into bed with you.  Same bed?

17    A    Yes.

18    Q    And your boys came in around 10:30 you said?

19    A    Yes.

20    Q    Did you and your husband have sex that night?

21    A    No.

22    Q    Did you talk -- have a conversation with your

23  husband before he got -- before you all went to sleep?

24    A    No.  Just said good night.

25    Q    At any point during that day had your husband

1  complained of any kind of physical discomfort at all?

2      A    At the campground?

3      Q    Uh-huh.

4      A    Being tired.  Um, around the campfire he had

5  mentioned something about feeling bloated or swollen, or

6  I can't recall exactly what he said.  Um, but that's

7  about it.

8      Q    When did he tell you he felt tired?

9      A    Um, just during the day at some point.  He just

10 said, "I feel really tired."

11     Q    Your husband -- did your husband often feel

12 tired?

13     A    Recently, yes.

14     Q    When you say "recently"?

15     A    I mean recently, just prior to his death, yeah.

16     Q    There's references in the medical record to him

17 feeling tired consistently --

18     A    Yeah.

19     Q    -- over a pretty long period of time?

20     A    Yeah, but it was more than usual.

21     Q    Let me ask the question.  There's references in

22 the medical record to him feeling tired over a long

23 period of years.

24     A    Yes.

25     Q    Is that accurate?

PLAINTIFFS' EXHIBITS 011710

1    A    Yes.

2    Q    Is it accurate that he felt tired over a long

3    period of years?

4    A    Yes.

5    Q    Then I think you said, but recent, prior to his

6    death, he had become increasingly tired; is that right?

7    A    Yes.

8    Q    And then you told me he complained around the

9    campfire of feeling a little bloated?

10   A    Yes.

11   Q    Is that -- was that something he had complained

12   of before?

13   A    Um, yes.

14   Q    Other than telling you he was tired at some

15   point that day, and then telling you he felt bloated

16   around the campfire, any other physical complaints that

17   day that you remember?

18   A    Not that I recall.

19   Q    What about the day before?

20   A    Not that I recall.

21   Q    At some point during the day of March 22nd, did

22   your husband tell you that he felt dizzy?

23   A    No.

24   Q    Did he tell you that he felt nauseous?

25   A    Not that I recall.

```
 1    Q    When he told you he felt bloated, did he tell
 2   you where he felt bloated?
 3    A    Um, I don't recall where -- what.  I don't
 4   recall if the word was bloated or swelling.  Swelled.  I
 5   don't recall.  I just know that he had mentioned
 6   something around the campfire.  I honestly don't recall
 7   the conversation.
 8    Q    Given the fact that you guys had just had a big
 9   barbecue meal, did that strike you as unusual that he
10   felt bloated?
11    A    Yes.
12    Q    Why?
13    A    Because it just did.  I don't know.  He's never
14   said after dinner that he felt bloated before.
15    Q    But he had told you that he felt bloated
16   before?
17    A    Uh-huh.
18    Q    When was the last time before that evening that
19   he had told you he felt bloated?
20    A    I don't recall.
21    Q    Did he have -- did your husband seem to have
22   any less of an appetite during dinner that night --
23    A    No.
24    Q    -- than he usually had?
25         Did he complain of any nausea?
```

PLAINTIFFS' EXHIBITS 011712

1    A    No.

2    Q    Vomiting?  He didn't vomit before?

3    A    No.

4    Q    Did he tell you he had any changes in his

5  vision?

6    A    Yes.

7    Q    When did he tell you that?

8    A    Um, prior to his death.  Yeah.  He said it

9  multiple times prior to his death.  So I don't know.  He

10  just said there was -- something with his eyes were

11  different.

12    Q    During --

13    A    Not during that day.  I'm sorry.

14    Q    So on the day of his --

15    A    No.

16    Q    The day before his death, March 22nd, he did

17  not complain to you of any changes in vision?

18    A    No.

19    Q    Did he complain on that date to you of any

20  irregular heart beat?

21    A    No.

22    Q    Had he done -- had he told you he was feeling

23  any irregular heartbeat before?

24    A    He always felt it.

25    Q    Sometimes did he let you know?

PLAINTIFFS' EXHIBITS 011713

```
 1      A     Sometimes if it was a little bit of a cough,

 2   yeah, he would tell me.

 3      Q     But he didn't do that that day?

 4      A     No.

 5      Q     So your sons came in at 10:30 and they went to

 6   bed?

 7      A     Yes.

 8      Q     Were you awake when they came in?

 9      A     Yes.

10      Q     Was your husband awake when they came in?

11      A     Yes.

12      Q     Did you say good night to them?

13      A     Yes.

14      Q     Did your husband say good night to them?

15      A     Yes.

16      Q     Did they sleep in -- is the bedroom that they

17   were in separate from the one you and your husband were

18   in?

19      A     Yeah, they were on the other side of the

20   trailer.  It's a 30-foot trailer.  So they're on the

21   other end, and we have just like those curtain things

22   that close.  So they were on the end, but they were both

23   open.  They have a curtain and we have more like a blind

24   that will close.  But it was open.

25      Q     Okay.  So, your --
```

PLAINTIFFS' EXHIBITS 011714

```
 1      A      It's like a vertical.

 2      Q      It's made of plastic?

 3      A      Yes.

 4      Q      And it's harder than just a material curtain?

 5      A      Right.

 6      Q      On their side they had the material curtain?

 7      A      Yes.

 8      Q      But it doesn't matter because both of them were

 9 open?

10      A      Yes.

11      Q      You could see them from your bed and they could

12 see you?

13      A      Yes.

14      Q      Was the trailer -- was there sufficient light

15 in the trailer that you could actually see your sons'

16 shapes in their beds?

17      A      No.  It was dark.

18      Q      Were they in the same bed or different beds,

19 your sons?

20      A      They were in twin.  They were bunk beds.

21      Q      Okay.  So, boys came in.  You said good night.

22 Your husband said good night, and you all went to sleep?

23      A      Yes.

24      Q      What happened next?

25      A      Um, I heard what I thought was snoring, and so
```

1  if I heard him snoring I would just nudge him and then

2  he would roll over or stop, but he didn't move.

3          Then the noise was kind of different so I

4  turned the light on, and I thought he was gasping for

5  air.  So I told the boys.  The boys got up immediately

6  because they heard him.  And one went to get help, and

7  the other one called 9-1-1.

8      Q    When you heard your husband -- when you heard

9  your husband what you thought was snoring --

10     A    Uh-huh.

11     Q    -- was that something that you had heard him do

12  before?

13     A    No, not that noise.  But I did hear him.  He

14  was a snorer.

15     Q    He was commonly a snorer?

16     A    Yeah.

17     Q    I saw in the medical records that your husband

18  reported to one of his doctors that he had been propping

19  himself up with pillows to sleep.  Does that -- is that

20  accurate?

21     A    I don't recall.  I guess so, yeah.

22          MR. ERNST:  If you don't know --

23          THE WITNESS:  I don't know.

24          MR. ERNST:  If you don't know, don't guess.

25  \\

PLAINTIFFS' EXHIBITS 011716

1  BY MS. DONAHUE:

2      Q    And I'm not talking about the night of the

3  incident.

4      A    Okay.

5      Q    I'm just talking about in the past.

6          Had you been with your husband sleeping when he

7  had put his head and chest up on pillows while he slept?

8      A    Yes.

9      Q    Was that something that he did that night at in

10 the R.V.?

11     A    No.

12     Q    I'm sorry, in the trailer.

13         When -- how often would your husband do that,

14 prop himself up to sleep?

15     A    I don't recall that he had done that in the

16 past.  I mean, I recall at one point maybe he did, but

17 not recently before his death he hadn't done that.

18     Q    You had gone to see Dr. -- Dr. Winkle at

19 Stanford with your husband in June of '07; correct?

20     A    Uh-huh.

21     Q    And were you present when your husband was

22 giving Dr. Winkle his history?

23     A    Yes, I believe I was.

24     Q    Do you have a recollection of your husband

25 telling Dr. Winkle that for the past several years he

1   had been propping his head up with a pillow at night to

2   help him breathe better?

3       A    I don't recall that.

4       Q    If that's what Dr. Winkle's record reflects, do

5   you disagree that your husband said that?

6       A    No.

7       Q    Had anyone -- prior to the night of your

8   husband's death, had he been diagnosed with sleep apnea?

9       A    No.

10      Q    Did his snoring prior to the night of his

11  death -- excuse me, prior to the night of his death, did

12  his snoring wake you up how often in a week?

13      A    Um, I don't recall.  I don't -- it never woke

14  me up.  He would fall asleep before me, so it was me

15  getting to sleep.

16      Q    How often -- how often were you -- how often

17  did you have to nudge him and tell him to stop?  I mean,

18  try to get him to stop snoring in a given week?

19      A    Maybe twice.

20      Q    Twice?

21      A    Yeah.  I'd have to nudge him.

22      Q    Two separate nights?

23      A    Yeah.

24      Q    You said that the boys -- I'm sorry, did you

25  see what time it was when you turned on the lights?

PLAINTIFFS' EXHIBITS 011718

```
 1      A    No.
 2      Q    When was the first time that you saw a -- saw a
 3   time in reference to the circumstances of your husband's
 4   death?
 5      A    I don't recall that night.
 6      Q    You said that the boys woke up, too?
 7      A    Uh-huh.
 8      Q    Did you have to call to wake them or how did
 9   that --
10      A    I think it was because I started screaming my
11   husband's name.
12      Q    Which son called 9-1-1?
13      A    My oldest, D.J.
14      Q    Did he call from a cell phone?
15      A    Yes.
16      Q    Inside the trailer?
17      A    Yes.
18      Q    Your other son, Ralph, went to go get help?
19      A    Yes.
20      Q    At some point in time before the paramedics
21   arrived, were you able to tell that your husband had
22   passed away?
23      A    I guess.  Yes.
24      Q    Were you able to tell that he had stopped
25   breathing?
```

PLAINTIFFS' EXHIBITS 011719

1    A    Yes.

2    Q    And how long -- how much time had transpired

3  between -- between your waking up, finding him, and

4  seeing that he was, you know, struggling, and then

5  feeling that he stopped breathing?

6    A    I don't know.  Because I -- he was doing the

7  gasping.  Then we did CPR.  We did what 9-1-1 told us to

8  do.  So...

9    Q    At -- so your son called 9-1-1?

10    A    Uh-huh.

11    Q    Did you get on the phone with them?

12    A    I eventually had to, yes.

13    Q    What happened when you called 9-1-1?

14    A    He called 9-1-1, and my husband was still on

15  the bed.  So I took the phone and they said to take him

16  off the bed and then start CPR.  So I did the breathing

17  and his best friend Sean did the chest compression.

18    Q    Back up.

19    A    Okay.

20    Q    Who arrived at the trailer?

21    A    My brother-in-law Eric first did.

22    Q    And your son was on the phone with 9-1-1 when

23  he had arrived?

24    A    (Witness nods head up and down.)

25    Q    So Eric got there?

```
 1        A     Uh-huh.

 2        Q     Then did other people get there, too?

 3        A     It's not a very big trailer.  So it was Eric

 4   and me and I think somebody else helped us get Danny off

 5   the bed.  Then the boys, I told them to leave.

 6        Q     So, at one point Eric --

 7        A     Yes.

 8        Q     -- you and Sean?

 9        A     Yes.  And grandpa was in there.  Dad was in

10   there, too.

11        Q     Okay.  You moved -- you were part of the group

12   that moved him off the bed?

13        A     Yeah.  Eric -- yeah.  Then we put him on the

14   floor.

15        Q     Did you put -- so did you take him from the bed

16   and put him right next to the bed?

17        A     Yeah.  We had to just drag him off.  We had to

18   do CPR.

19        Q     When you were doing that, did he appear to

20   still be breathing?

21        A     (Witness shakes head back and forth.)

22        Q     No?  You're shaking your head, but I need an

23   answer.

24        A     I'm sorry.  No.

25        Q     And I'm sorry to go over this again, but I want
```

PLAINTIFFS' EXHIBITS 011721

1  to make sure I had it straight.

2         You tried to help your husband start breathing

3  again by blowing air in his mouth; is that right?

4     A    (Witness nods head up and down.)

5     Q    And Sean massaged his chest?

6     A    Did the compressions.

7     Q    Did the compressions.  Does Sean know CPR?

8     A    I believe so.

9     Q    Did he have his certificate?

10    A    I don't know.

11    Q    Was there any resuscitation from your husband

12 from that CPR administration --

13    A    (Witness shakes head back and forth.)

14    Q    -- administering?

15    A    No.  I'm sorry.

16    Q    Did the paramedics -- did the 9-1-1 call tell

17 you to do anything else?

18    A    (Witness shakes head back and forth.)  They

19 just -- they just, whatever the CPR was.

20    Q    Okay.

21    A    The breathing and the compressions.

22    Q    For about how long were you --

23    A    The Sheriff --

24    Q    -- giving CPR?

25    A    -- arrived first.  We had to continue.  I don't

1    know.  It seemed like forever.  But I don't recall how

2    long it was.

3        Q    The next -- I'm sorry, the first public officer

4    to arrive at the scene was Deputy Ryan; is that right?

5        A    I guess.  Yes.

6        Q    The paramedics arrived?

7        A    The Sheriffs arrived first.

8        Q    The Sheriffs arrived first?

9        A    Yes.

10       Q    And did the paramedics ever come?

11       A    Yes.

12       Q    Sheriffs got there first?

13       A    Yes.

14       Q    And are you still in the trailer --

15       A    Yes.

16       Q    -- when the Sheriffs got there?

17       A    We had to continue CPR.

18       Q    So you continued CPR until the time the

19   Sheriffs got there?

20       A    And until the paramedics got there.

21       Q    How long after the Sheriff arriving did the

22   paramedics arrive?

23       A    I don't recall.

24       Q    Once the paramedics arrived --

25       A    They took over.

PLAINTIFFS' EXHIBITS 011723

1    Q    -- they took over.

2         Did you stay in the trailer?

3    A    (Witness shakes head back and forth.)

4    Q    Who did?

5    A    They made us all leave.

6    Q    The Sheriff that got there first, was there

7  one, was there two?

8    A    I don't recall how many.

9    Q    Okay.  Do you recall one Sheriff or --

10   A    There was more.

11   Q    Another Sheriff arrived later?

12   A    There was more than two, yeah.

13   Q    Do you recall a Sheriff by the name of

14  Naomi Silva arriving after the paramedics?

15   A    I think she was the Coroner's Sheriff.  Yes.

16   Q    She's the one who removed your husband's body?

17   A    I don't recall.

18   Q    Do you recall how your husband was taken away

19  from the site?

20   A    I didn't watch.

21   Q    Do you recall how long between the time that

22  you found him and the time that he was -- his body was

23  removed --

24   A    I don't know.

25   Q    -- how much time passed?

PLAINTIFFS' EXHIBITS 011724

```
 1      A     No.
 2      Q     Did you talk to the paramedics that arrived at
 3   the scene?
 4      A     No.
 5      Q     Did you talk to the Sheriff's Deputies?
 6      A     Yes.
 7      Q     And you talked to --
 8      A     I'm sorry, go ahead.
 9      Q     No, you finish your answer.
10      A     Well, I went to my father-in-law's trailer
11   after they pronounced him dead.  Then they came over and
12   talked to me.
13      Q     So, you continued to administer CPR until the
14   paramedics got there?
15      A     Yes.
16      Q     And was the Sheriff, the first Sheriff that
17   arrived in the room with you while you were doing
18   that --
19      A     Yes.
20      Q     -- did he assist you in any way?
21      A     He said he couldn't.
22      Q     So he just stood there?
23      A     Yes.
24      Q     And then the paramedics got there and you were
25   told to leave?
```

PLAINTIFFS' EXHIBITS 011725

1    A    Yes.

2    Q    And then did you wait outside the trailer?

3    A    Yes.

4    Q    And then they came out and told you that your

5  husband had died?

6    A    Yes.

7    Q    Then you went to your father-in-law's trailer?

8    A    Yes.

9    Q    And that's where you talked to Officer Silva?

10   A    Yes.

11   Q    Other than -- do you recall anything else about

12 your conversation with the paramedics other than that

13 they pronounced your husband dead?

14   A    No.

15   Q    Do you recall anything about your conversation

16 with Naomi Silva?

17   A    Um, what do you want to know?

18   Q    Did she ask you what happened that day?

19   A    Yes.

20   Q    And she had asked you about your husband's

21 medications?

22   A    Um, I don't recall.

23   Q    Did she take the medications with her when she

24 left with your husband?

25   A    Yes.

1    Q    Did you have -- do you want some water?

2    A    Yes, please.

3         MS. DONAHUE:  She'd like some more water.

4    Q    Other than Deputy Silva from the coroner's

5    office, did you talk to anyone else from the coroner's

6    office about your husband's death?

7    A    That night?

8    Q    At all.

9    A    Um, yes.

10   Q    Who?

11   A    I don't recall their names.

12   Q    What did you talk to them about?

13   A    Well, I called to see what happened after he

14   died.

15   Q    Okay.  How is it that your husband -- did you

16   request that an autopsy be performed on your husband?

17   A    No, they said it had to be done.

18   Q    Why did they tell you it had to be done?

19   A    Um, I think it was because of where we were --

20   we were camping in another county.  I can't recall

21   exactly why.

22   Q    How -- what was your next contact with the

23   coroner's office after they took your husband's body

24   away?

25   A    My next was, I was calling for -- immediately

1  after he died, Sean would call just to see what the

2  causes were, because we didn't know what happened.  We

3  didn't know how he died.  And then after that is when I

4  called because I wanted to know what the results -- when

5  we were going to get the autopsy report.

6      Q    Okay.

7      A    And they said it would take three months.

8      Q    When you say "immediately after," do you mean

9  that Sean was calling them that night?

10     A    No, no.

11     Q    When?

12     A    When we got home and we were trying to -- it

13 was probably within the week after he died, because we

14 just wanted to know what the causes of his death were.

15     Q    Okay.

16     A    So he called just to see what the results of

17 that were.

18     Q    So between the time that -- I'm sorry, when did

19 you go back home?

20     A    The day after.  Easter.

21     Q    Did you -- at the time that you --

22     A    Or the morning of, actually.  Because he died

23 that morning.

24     Q    Okay.  I take it you didn't -- did you go back

25 to bed that night?

PLAINTIFFS' EXHIBITS 011728

```
 1      A     Yes.  Well, I didn't sleep, but I went back to
 2   bed.
 3      Q     You got back in bed.
 4            And what time did you pack up and leave the
 5   next morning?
 6      A     Early.  Six maybe we all got up.  We all wanted
 7   to go home.
 8      Q     Your understanding at that time was that the
 9   coroner was going to be keeping your husband's body at
10   his office?
11      A     (Witness nods head up and down.)
12      Q     And when was the first contact that you had in
13   regards to when the body would be released or an autopsy
14   report or anything at the coroner's office?
15      A     I don't recall.
16      Q     You don't remember?
17      A     Huh-uh.  I think the mortuary took care of all
18   of that for me.
19      Q     Okay.  When did you contact the mortuary?
20      A     Let's see.  I think Monday is when we had to
21   start making arrangements.  Monday or Tuesday, I can't
22   recall.
23      Q     Did you have to sign any kind of documents at
24   all authorizing the autopsy to be performed?
25      A     I don't recall signing any.
```

PLAINTIFFS' EXHIBITS 011729

1    Q    All right.  Have you seen a copy of the

2    coroner's report in regard to your husband's autopsy?

3    A    Yes.

4    Q    And did you see what he concluded in regard to

5    the cause of death?

6    A    Yes.

7    Q    And what's your recollection of what that

8    conclusion was?

9    A    Um, cardiac arrest, I believe.  I can't recall

10   what.  He had some stuff listed, and I can't recall.

11   Q    Okay.  We have recently been provided with an

12   amended coroner's report in this case.  Have you seen

13   that report?

14   A    I have not.

15   Q    Show you what we'll mark next in order, which

16   is number 9, the coroner's report.  Summary of autopsy

17   report dated March 26th, 2008, signed by

18   Richard T. Mason, M.D.

19          Ms. McCornack, I'm handing you what's been

20   marked as Exhibit 9.  Did you receive a copy of that

21   report from the coroner?

22   A    Yes.

23               (Defendants' Exhibit 9 was marked

24               for identification.)

25   \\

1  BY MS. DONAHUE:

2      Q    And when did you receive it?

3      A    A few months after.  I don't recall.  I think

4  it was three or four months.  It was a while.

5      Q    Did you receive it directly from the coroner's

6  office?

7      A    Yes.

8      Q    Did -- is it your best recollection that you

9  received it the -- after May of 2008?

10     A    Yes.

11     Q    That's it.  Thanks.

12          Just so the record is clear, you have not seen

13  an amended coroner's report in this case?

14     A    I have not.

15     Q    Have you been told -- let me back up.  Strike

16  that.

17          Have you been told by anybody other than your

18  attorney that the coroner has amended his report in this

19  case?

20     A    No.

21          MR. ERNST:  Objection.  That indicates that --

22          MS. DONAHUE:  Well, I didn't ask -- want to ask

23  in general, because I thought it might have come from

24  you.

25          MR. ERNST:  Right.  But there's an implication

PLAINTIFFS' EXHIBITS 011731

1 | there.  Objection.

2 | MS. DONAHUE:  The other part is privileged, so

3 | I wouldn't want to know anyway.

4 | Q   Ms. McCornack, I asked you earlier a little bit

5 | about a visit to Dr. Winkle at Stanford Medical Center

6 | with your husband.

7 | According to our records, he consulted with

8 | Dr. Winkle in June of 2007.  Does that sound right to

9 | you?

10 | A   Yes.

11 | Q   And you went to the visit with him?

12 | A   Yes.

13 | Q   And who referred him to Dr. Winkle?

14 | A   Um, I don't recall which doctor.

15 | Q   Was it either Dr. Von Dollen or Dr. Lemm?

16 | A   I would think Dr. Lemm.

17 | Q   And at the time that you went to consult -- met

18 | with him to consult with Dr. Winkle, what was the

19 | purpose of that consultation?

20 | A   Um, I think his back, mostly like arthritis, or

21 | he wasn't -- we weren't sure what was going on.

22 | Wait a minute.  Dr. Winkle.

23 | Q   Yeah, I think you've got --

24 | A   I don't -- Yeah.  I'm not recalling them.

25 | Q   Let me just refresh your recollection if I

PLAINTIFFS' EXHIBITS 011732

```
 1   might.
 2          MR. ERNST:  Objection.  You can ask her a
 3   question.
 4   BY MS. DONAHUE:
 5      Q    Do you remember your husband -- going with your
 6   husband to consult with a cardiologist at Stanford
 7   University?
 8      A    Yes.
 9      Q    Do you remember that that cardiologist was
10   named Dr. Winkle?
11      A    Yes.
12      Q    I'm sure he had a first name, too.
13          And do you remember that visit occurring in
14   June of 2007?
15      A    Yes.
16      Q    And what was the purpose of that consultation?
17      A    It was regarding a procedure, um, with his
18   heart, I believe.  Um, but I cannot recall the name.
19      Q    Okay.  Does the term ablation --
20      A    Yes.
21      Q    -- does that refresh your recollection what --
22      A    Yes, it does.
23      Q    -- you were consulting with Dr. Winkle about?
24      A    Yes.
25      Q    And you attended the visit with your husband?
```

1    A    Yes.

2    Q    And did you stay with your husband throughout

3  his consultation with Dr. Winkle?

4    A    Yes.

5    Q    And do you recall that, at that time, your

6  husband told Dr. Winkle that he felt tired, fatigued and

7  not 100 percent?

8    A    Yes.

9    Q    Before you went and saw Dr. Winkle with your

10  husband, did you have any understanding of what the term

11  "ablation" or what that procedure would entail?

12    A    He did.  He told me a little bit about it.

13    Q    What did he tell you?

14    A    Something that it would help his heart beat

15  regular, and he would not need medications possibly.

16    Q    And when you say he did not -- he would not

17  need medications, possibly, was there a possibility that

18  he would not need to take digoxin after the ablation

19  procedure?

20         MR. ERNST:  Objection.

21         MS. DONAHUE:  I'm asking her what he told her.

22         Did that include digoxin?

23         MR. ERNST:  Objection.  You can go ahead and

24  answer the question if you can.  If you can't --

25         THE WITNESS:  I don't know.

```
 1   BY MS. DONAHUE:
 2        Q    What was your understanding of when -- of what
 3   the medications were that he would not -- that he might
 4   not need if he had the ablation procedure?
 5        A    Um, they just -- see, I'd be speculating.  I'd
 6   be guessing.  Um --
 7             MR. ERNST:  You've answered the question.
 8             MS. DONAHUE:  Then we don't want you to do
 9   that.
10             MR. ERNST:  You've answered the question.
11   BY MS. DONAHUE:
12        Q    Was it your understanding that the medications
13   that he might not need after having the ablation
14   procedure were related to -- were medications relating
15   to his heart condition?
16             MR. ERNST:  Objection.
17   BY MS. DONAHUE:
18        Q    You can answer unless he instructs you not to.
19             MR. ERNST:  No, I'm just making an objection.
20             THE WITNESS:  Yes.
21             MR. ERNST:  I'd like to take a short break.
22                      (Recess.)
23             MS. DONAHUE:  Back on the record.
24        Q    We were talking about the 2007 June visit to
25   Dr. Winkle with your husband.  Do you recall what
```

1  Dr. Winkle recommended in terms of the ablation

2  procedure?

3       A    I don't recall what he recommended.

4       Q    Do you recall that your husband was wearing an

5  EKG monitor after seeing Dr. Winkle?

6       A    Yes.

7       Q    Did he send the results in to Dr. Winkle?

8       A    Yes, he did.

9       Q    Do you recall what he was told about the

10 results, or were you ever told anything?

11      A    I don't recall.

12      Q    Do you know why your husband didn't proceed

13 with the ablation procedure?

14      A    I -- I think it had to do with the Coumadin

15 that he had to take before he could do the procedure.

16 They had to put him on Coumadin.

17      Q    And he -- did he?

18      A    Not with his lifestyle.  He was afraid

19 something would happen and he would bleed out.

20      Q    When you say "bleed out," what do you mean?

21      A    Because Coumadin thins your blood so much, and

22 he was a hunter and all that.  I believe that's -- I

23 don't recall exactly what the results were from that.

24      Q    Prior to consulting with Dr. Winkle, had your

25 husband considered going -- going on Coumadin?  Prior to

1   seeing Dr. Winkle, had he considered going on Coumadin?

2       A    I don't recall.

3       Q    Had he ever discussed that with one of his

4   physicians?

5       A    I don't recall.

6       Q    And your best recollection is that his -- that

7   he did not proceed with the ablation procedure because

8   of something he was concerned about in regard to having

9   to take Coumadin?

10      A    I believe so.

11      Q    When you say "bleed out," what do you mean?

12      A    Well, he was just, because of his lifestyle, he

13  was worried if he fell and if he was on a hunting trip

14  that he would be bleeding so bad, because when they went

15  hunting, they went out in nowhere.

16      Q    Had he suffered injuries during hunting season

17  in the past?

18      A    Um, I don't recall.

19      Q    What is hunting season?  What months did that

20  span?

21      A    It depends on what state you're in.

22      Q    Okay.  What did your husband hunt?

23      A    Deer or elk.

24      Q    And did he hunt them here in California?

25      A    In California, yes.

1    Q    What is the deer, slash, elk hunting season in

2    California?

3    A    Well, the deer in California is from, I believe

4    the second weekend in August to like the end of

5    September or something like that.

6    Q    Okay.  What about elk?

7    A    I don't recall what it is in other states.  I

8    just know he'd go like in November or December

9    sometimes.  He'd go hunting with his friends --

10   Q    But he would --

11   A    -- but I don't recall.

12   Q    Would it be fair to say he was more of a

13   regular deer hunter and the elk hunting was more of an

14   unusual occurrence?

15   A    No, I think they were trying to go once a year.

16   Q    Once a year elk hunting after November?

17   A    Or white deer tail.  It was not necessarily

18   elk.  They are just hunting.  It just depended on what

19   he was doing.

20   Q    So once a year after November he would take an

21   out-of-state hunting trip?

22   A    Yes.

23   Q    Is that fair?

24   A    Yeah.

25   Q    And then, in terms of the hunting, deer hunting

1  season here in California, how often did he go deer

2  hunting?

3      A    Every year.  We have property.  We have

4  210 acres, so he would hunt on our property.

5      Q    How often during the season?

6      A    Um, two to three times a week.  Maybe more.

7  Kind of depended on his schedule.

8      Q    When he went deer hunting, did he walk the

9  property?  Drive the property?  How does it work?

10     A    Jeep, originally.  Then we got quads.

11     Q    Those are --

12     A    Four-wheel.

13     Q    -- all-terrain --

14     A    Yes.

15     Q    -- vehicles?

16     A    Yes.

17     Q    When did you get those?

18     A    I don't know.  I think maybe we've had them

19  four years.

20     Q    After your visiting Dr. Winkle with your

21  husband, did you have an understanding that he would

22  need to take Coumadin before having the ablation

23  procedure?

24     A    Yes.

25     Q    Did you have an understanding as to how long he

PLAINTIFFS' EXHIBITS 011739

1    would need to be on that?

2        A    I don't recall.

3        Q    Did you have an understanding whether or not he

4    would need to continue to be on it after the procedure

5    was --

6        A    That sounds familiar, yes.

7        Q    It sounds familiar that he would have to stay

8    on it?

9        A    Yeah, that he would have to go on it again, but

10   I don't recall for sure.

11       Q    At anytime before his death, did your husband

12   indicate to you that he had decided to go forward with

13   the ablation procedure?

14       A    No.

15       Q    Was there anything other than his concern about

16   Coumadin that you're aware of that caused him not to

17   have the ablation procedure?

18       A    I don't recall.

19       Q    Do you know, Mrs. McCornack, whether your

20   husband's doctors have instructed him to lose weight?

21       A    I don't know.

22       Q    No, you don't know?

23       A    Huh-uh.

24       Q    He never told you that?

25       A    No.

PLAINTIFFS' EXHIBITS 011740

```
 1    Q    Did your husband in -- in your opinion, did

 2   your husband need to lose weight?

 3    A    No.

 4    Q    Did he ever try to lose weight?

 5    A    "Ever" being when?

 6    Q    Ever that you knew him?

 7    A    Sure.

 8    Q    How often?

 9    A    I don't know.  I just remember him being on

10   that Atkins diet at one point.

11    Q    We have a reference to that in the medical

12   records.

13    A    Uh-huh.

14    Q    Other than going on the Atkins diet, did he go

15   on any other diets that you're aware of?

16    A    No.

17    Q    Do you know whether or not your husband's

18   doctors instructed him to exercise regularly?

19    A    No.

20    Q    Did he do any regular exercise?

21    A    Golf on Sundays.

22    Q    Where did he play golf?

23    A    Um, mostly at Chalk Mountain.

24    Q    And did he have a regular golfing group that he

25   went to?
```

```
 1      A     Usually his dad and his mom or his friends.

 2      Q     Did they -- how often did they play?

 3      A     Once a week.

 4      Q     So pretty much every Sunday?

 5      A     Yes.

 6      Q     Would they walk --

 7      A     And my son, too, actually, would play with

 8   them.

 9      Q     Did they walk or drive the course?

10      A     At first they did, but, no, they were taking a

11   cart.

12      Q     For how many years before they -- before your

13   husband's death did they ride in the cart rather than

14   walk the course?

15      A     Probably five years.

16      Q     Your husband was a chewer of tobacco for some

17   period of his life; right?

18      A     Yes.

19      Q     And was he still chewing tobacco at the time of

20   his death?

21      A     No.

22      Q     How long before his death had he quit?

23      A     A few years.

24      Q     Did -- to your knowledge, did he have an

25   understanding that there were risks associated with
```

PLAINTIFFS' EXHIBITS 011742

1   chewing tobacco?

2       A    Yes.

3       Q    What were those risks?

4       A    I don't know.

5       Q    Why did he stop chewing tobacco?

6       A    Um, I think just because of the kids, and

7   didn't want them to do it.

8       Q    Do you remember that he was concerned at some

9   point with some sores in his mouth that he thought might

10  be from chewing tobacco?

11      A    I kind of recall that, yes.

12      Q    Do you remember that he was concerned that

13  those sores could be cancerous or precancerous?

14      A    No, I don't recall that.

15      Q    If the medical records reflect that he had that

16  concern, do you have any reason to disagree with them?

17      A    No, I don't.

18      Q    When -- the autopsy report refers to a nasal

19  strip on your husband's nose at the time of his death.

20      A    Yes.

21      Q    What was that there for?

22      A    Snoring.

23      Q    Okay.  What kind of nasal strip was it?

24      A    Breathe Right.

25      Q    Is that something you can buy over the counter?

PLAINTIFFS' EXHIBITS 011743

```
 1    A    Yes.
 2    Q    And how long had your husband been purchasing
 3  Breathe Right?
 4    A    Oh, geez.  Maybe a year.
 5    Q    Is that something that he did at your request?
 6    A    No.  The doctor or somebody told him that it
 7  would help him breathe better, too, I think.  Or he's
 8  always congested.
 9    Q    Okay.  And did he use the nasal strips
10  consistently --
11    A    Uh-huh.
12    Q    -- the year before his death?
13    A    Yes, every night.
14    Q    Did they help him -- help his snoring?
15    A    Yes, it did help his snoring.
16    Q    Do you know whether they helped him breathe
17  better?
18    A    I don't know.
19    Q    When you say he breathed better, do you mean
20  that --
21    A    He was --
22    Q    Let me ask the question.
23         Do you mean that he had trouble breathing
24  through his nose?
25    A    No.
```

PLAINTIFFS' EXHIBITS 011744

```
 1      Q     What do you mean?

 2      A     He was always -- he's just one of those people

 3  who's congested a lot, so he thought it would help.  But

 4  he didn't have trouble breathing through his nose.  But

 5  then the congestion and snoring and stuff.

 6      Q     And I think you said someone told him.  You're

 7  not sure who?

 8      A     I don't recall who, no.

 9            MS. DONAHUE:  Off the record for a minute.

10               (Pause in the proceedings.)

11            MS. DONAHUE:  Okay.  Mrs. McCornack, that's all

12  of the questions I have.  Thank you for answering them.

13  I'm going to turn it over to Mr. Moriarty now.

14            THE WITNESS:  Okay.

15

16

17

18  BY MR. MORIARTY:

19      Q     Mrs. McCornack, my main job is to not ask you

20  things that have been asked already.  Okay?

21      A     Okay.

22      Q     Alicia was asking you about this number of

23  tablets that were remaining, and I was just a little bit

24  confused about that.

25            The PFS says that there was 74 consumed before
```

```
 1   Dan died; right?  Remember that one page in the
 2   Plaintiff Fact Sheet that said he consumed 74?  I think
 3   it's on Page 6.  Five or six.  Do you remember that?
 4        A    Right here.
 5        Q    Do you see that?  It's -- it's on Page 4.  Was
 6   it on Page 4?  Yeah.  Page 4 up in Item 2, it says, "I
 7   believe my husband took 74 pills; right"?
 8        A    Yes.
 9        Q    And I'm not going to get real precise about the
10   math.  But if Dan got a 90-day supply, that would be
11   because he took two a day, that would be 180 tablets in
12   a vial when he got them; correct?
13        A    Yes.
14        Q    So, theoretically, in the shipment that he got
15   somewhere around January of 2008, there should have been
16   180, less 74 available; correct?
17        A    Yes.
18        Q    Okay.  And you've accounted by Mr. Ernst having
19   some tested, and Dan's dad has one, and you brought one
20   today, and there were 12 or so that the coroner took;
21   right?
22        A    Yes.
23        Q    Where are the rest of them?  I just want to
24   know if you know.
25        A    I don't know.
```

1    Q    Okay.  To the best of your knowledge, does your

2   lawyer have them?

3    A    I don't know.

4    Q    All right.  Did you or Dan order more digoxin

5   or Digitek prior to going on the camping trip for the

6   Easter break?

7    A    He got a phone call from Caremark that day.  I

8   didn't speak to them so I don't recall the conversation.

9   But he did reorder his medication the day -- I don't

10   know if it was the day before we left or the day that --

11   the morning that we left.

12    Q    Well --

13    A    It was either Thursday or Friday.  Somebody

14   from Caremark called him regarding something.

15    Q    Okay.  Well, if he ordered a 90-day supply in

16   January, do you have any idea why Caremark would be

17   calling after only about 60 days?

18    A    No, I do not.

19         MR. ERNST:  You know, for the record, I think

20   we should clarify things, because it's in everyone's

21   interest to know about the numbers.

22         As far as I know, we have all of the pills that

23   were given to our office.  And if our math is incorrect,

24   then it's incorrect, but it's our understanding that the

25   coroner has 10 to 12 pills, assuming two a day in the

```
 1  package.  We don't know that; one that Kathy has; one
 2  that her father has; and the six that were sent out for
 3  testing of which we've informed you of.
 4          MR. MORIARTY:  I understand.
 5          MR. ERNST:  Now, those are the -- are the
 6  remaining pills that we have that are there.  So, those
 7  are -- those are the numbers.  And I think that that's a
 8  reflection of the number that you come up with on Page
 9  4, but I can tell you that our office assisted her with
10  this because of this specificity of the question.  I'm
11  saying that for clarification of the record so that you
12  know.
13          MR. MORIARTY:  That's fine.  I'd like your
14  office to count the number left in the vials that you
15  have, and just give me a number.
16          MR. ERNST:  I'll be happy to do that.
17          MR. MORIARTY:  Okay.
18          MR. ERNST:  By the way, it's open.  It would
19  be -- we'd be happy to do that.
20  BY MR. MORIARTY:
21      Q    Now, Kathy, before you went on the camping
22  trip, do you know for a fact that Dan filled the entire
23  week's worth of his medications?
24      A    For a fact?
25      Q    Yes.
```

1    A    I did not see him fill it, so, no.

2    Q    And you didn't inspect it afterwards?

3    A    No, I did not.

4    Q    So you'd have to see what the coroner has in

5 that regard?

6    A    Yes.

7         MR. ERNST:  Objection.

8 BY MR. MORIARTY:

9    Q    Did Dan ever drink just plain tonic water?

10   A    No.

11   Q    Do you know whether your husband ever told any

12 doctor that he was putting off a decision on the

13 ablation procedure until hunting season was over?

14   A    No.

15   Q    Let me make sure I understand what happened

16 after the Sheriffs and the EMS squad left that

17 campground.  Okay?

18   A    Okay.

19   Q    Did any -- did anybody in the family go with

20 the Sheriffs or the EMS squad up to the coroner's office

21 in San Jose?

22   A    No, I don't believe so.

23   Q    Okay.  So the family stayed there and at least

24 tried to settle down for a few hours; correct?

25   A    Yes.

PLAINTIFFS' EXHIBITS 011749

1    Q    And then the entire family packed up and left

2  early in the morning on Sunday, the 23rd?

3    A    The family did, and Sean, but the Fosios I

4  believe stayed one more night.

5    Q    Did you ever have more than the 210 acres of

6  ranch when you were married to Dan and involved?

7    A    Um, no.  We had the 200 -- no.

8    Q    Did you and Dan ever sell off any of the ranch?

9         MR. ERNST:  Objection.

10        You can answer the question.

11        THE WITNESS:  No.

12        MR. ERNST:  I've given great leeway with regard

13 to financial issues.

14        MR. MORIARTY:  Good, because we're entitled to

15 them.

16   Q    You were talking about stopping harvesting the

17 walnuts, I think you said it was somewhere around 1997;

18 is that correct?

19   A    Yeah, I don't recall the actual date.

20   Q    Is there any harvesting going on at the ranch

21 in the last few years?

22   A    Not by us.

23   Q    By someone else?

24   A    We let a man come in and he does it.  He -- we

25 let him harvest it just so the ranch looks nice, because

```
 1  he'll disk the property for me.  And he gets to keep
 2  whatever profits he makes on the nuts.
 3      Q    All right.
 4      A    So I get no monetary from it.
 5      Q    So there's no sublease or something like that?
 6      A    No, it's kind of an arrangement we have.
 7      Q    Did you have -- did you and Dan have any other
 8  rental properties or other investment properties?
 9      A    On our ranch we have grandma's old house that
10  we rent out that helps pay for the property taxes out
11  there.  So there's another home which we rent out on our
12  property.
13      Q    And does that also have an address on Peachy
14  Canyon?
15      A    It's 6255 Peachy Canyon.  It's the same as
16  ours.
17      Q    How long has the tenant been in that premises?
18      A    Oh, geez.  Um, maybe four years.
19      Q    Who is the tenant?
20      A    Fatakis.  Ben and Sareni Fataki.
21      Q    Any other properties?
22      A    No.
23      Q    Let's talk about family.  Are your parents
24  alive?
25      A    Yes.
```

PLAINTIFFS' EXHIBITS 011751

```
 1    Q    Where do they live?

 2    A    Klamath Falls.

 3    Q    How far away is that?

 4    A    About ten hours driving.

 5    Q    What are their names?

 6    A    Rudy and Maria Esparza.

 7    Q    Do you have siblings?

 8    A    I do.

 9    Q    How many?

10    A    I have three.

11    Q    What are they?  Brothers, sisters?

12    A    I have a sister and she lives in Atascadero.

13  And I have a brother who lives in Klamath Falls, and

14  another brother who lives in Nevada.

15    Q    How close are you to your parents and your

16  siblings?

17    A    Very.

18    Q    The sister who lives in Atascadero, do you see

19  her often?

20    A    Yes.

21    Q    What's her first name?

22    A    Joanne.

23    Q    What's her last name?

24    A    Morkowski.

25    Q    And then Dan's parents are still living;
```

1    correct?

2        A    Yes.

3        Q    And did Dan only just have the one sibling?

4        A    He has Eric, the brother.

5        Q    I'm sorry, and a sister?

6        A    And a sister.

7        Q    And that's it?

8        A    Yes.

9        Q    And I assume, since you were over camping with

10   them, that you were pretty close to your in-laws and --

11   I mean Dan's parents and his siblings --

12       A    Yes.

13       Q    -- and their spouses?

14       A    Yes.

15       Q    Do any of your siblings or Dan's siblings or

16   their spouses have medical or legal training?

17       A    No.  Well, one's a vet assistant.  I don't know

18   if you would count that.

19       Q    Was Dan ever in the military?

20       A    No.

21       Q    Have you ever been involved in any other

22   lawsuits besides this one?

23       A    No.

24       Q    Do you know whether Dan was ever involved in

25   any lawsuits?

1    A    Not that I recall.

2    Q    And had you or Dan ever been convicted of a

3  felony?

4    A    No.

5    Q    As far as -- was -- had Dan applied for any

6  sort of disability benefits before he died?

7    A    No.

8    Q    Since Dan died, have you applied for social

9  security benefits, death benefits of any type?

10   A    Yes.

11   Q    And you received those?

12   A    Yes.

13   Q    So, the tax returns will show us whatever

14 income you, as a family, had before Dan died?

15   A    Yes.

16   Q    Obviously, you no longer have whatever salary

17 and benefits he had at Lubrizol; correct?

18   A    Correct.

19   Q    What income do you have since Dan died?

20   A    Um, I have --

21        MR. ERNST:  Objection.

22        You can go ahead and answer the question.

23        THE WITNESS:  Um, I -- right now or right after

24 he died?  Because it's changed.

25 \\

1   BY MR. MORIARTY:

2       Q    Let's say now.

3       A    Now I have social security --

4            MR. ERNST:  Objection.

5            You can go ahead and answer the question.

6            THE WITNESS:  -- for my youngest son, Ralph.

7   And that's it.  Then I have life insurance.

8   BY MR. MORIARTY:

9       Q    Okay.  So you don't yourself get Social

10  Security death benefits?

11      A    You get it for a year.

12      Q    All right.  Have you sought employment since

13  Dan's death?

14      A    No.

15      Q    Are you engaged to be remarried?

16      A    No.

17      Q    And if I remember correctly from what you said

18  earlier, in the months leading up to Dan's death you

19  were not working outside the home?

20      A    (Witness shakes head back and forth.)

21      Q    That's a "No"?

22      A    I worked at Tidwell Bookkeeping for a short

23  time.

24      Q    Part-time?

25      A    Very part-time.

```
 1     Q    Have you done that part-time since Dan died?
 2     A    I think I worked one or two days, and that was
 3  it.
 4     Q    So, in general, what do you do now?
 5     A    I'm a mom.
 6     Q    Besides that?
 7     A    Um, that's it.
 8     Q    Did Dan ever smoke?
 9     A    No.
10     Q    And other than hunting, what sort of thing did
11  Dan do in his leisure time?
12     A    Hunting, golf, um, just hanging out with
13  family, barbecuing.
14     Q    Anything else?
15     A    Oh, softball.
16          MS. DONAHUE:  Let the record reflect that her
17  counsel just mouthed that word to her.
18  BY MR. MORIARTY:
19     Q    Anything else?
20          MR. ERNST:  It's true.  He played softball.
21  And I --
22  BY MR. MORIARTY:
23     Q    Anything else that he did?
24     A    No.
25          MR. ERNST:  You want to interfere with that,
```

1   that's fine.

2   BY MR. MORIARTY:

3       Q    Was Dan involved in any community

4   organizations, clubs, charitable organizations, things

5   of that nature?

6       A    Atascadero Golf Club, if that's what -- then,

7   no.  Not that I recall.

8       Q    Was Atascadero --

9       A    Oh, the golf club.  He was a member of

10  Atascadero Golf Club.

11      Q    Is that a private course?

12      A    No.  It's public.  It's just so you can keep

13  your scores.

14      Q    Okay.

15      A    Yeah.

16      Q    Anything else?

17      A    No.

18      Q    After Dan's death, did either of your sons

19  receive any counseling or psychological care?

20      A    Yes.

21      Q    I was starting to ask about counseling and I

22  didn't hear the answer to my question.

23          Did either of your sons?

24      A    Yes.

25      Q    Which son?

1    A    Both of them.

2    Q    For how long did they get counseling?

3    A    Um, ten -- we had ten sessions, I believe, with

4  Hospice.

5    Q    What was the interval between the sessions?

6    A    Oh, um, a week.

7    Q    So for approximately ten weeks after Dan's

8  death both the boys got some counseling?

9    A    Approximately.  I mean, there were times we

10 were out of town.

11   Q    Sure.

12   A    But, yes.

13   Q    And beyond those ten weeks, have either of them

14 had any counseling?

15   A    No.

16   Q    And what's the name of the Hospice

17 organization?

18   A    Um, I believe it's the San Luis Obispo office.

19 But it was in Paso Robles where we actually had our

20 counseling sessions.

21   Q    Did you have any counseling?

22   A    Yes.

23   Q    Same organization?

24   A    Yes.

25   Q    Was this like a group therapy?

1    A    Yes.  And then --

2    Q    Family therapy?

3    A    We did the three of us, and then they would go

4  in and do -- she just wanted to see them alone without

5  me because that way they would be more honest.

6    Q    Sure.  Did you have your own separate sessions?

7    A    No.

8    Q    Have you had any therapy or counseling since

9  the ten weeks of that Hospice program?

10   A    No.

11   Q    Were you ever put on any sort of medication

12  because of the grieving process that you went through

13  after Dan's death?

14   A    Yes.  Ambien, just to help me sleep.

15   Q    Do you still take that?

16   A    No.

17   Q    For how long did you take it?

18   A    On and off for a few months.  I don't know,

19  maybe six months.

20   Q    And, in general, if you can describe it to me,

21  how are the boys holding up through all this?

22   A    They are doing okay.

23   Q    They have their moments?

24   A    Uh-huh.

25   Q    "Yes"?

PLAINTIFFS' EXHIBITS 011759

1    A    Yes.

2    Q    I assume they miss your husband quite a bit?

3    A    Yes.

4    Q    How are you holding up through all this?

5    A    It's day by day.

6    Q    You have good days and you have bad days?

7    A    Yes.

8    Q    Do you have a lot of support from your parents,

9  your sister and Dan's family?

10   A    I do.  And friends.

11   Q    Do you know whether before Dan died he took any

12  medication for anxiety, stress or depression?

13   A    I don't recall.

14   Q    When Caremark sent out the prescription

15  medications, did they come with little package inserts,

16  small print that described what the medication was, what

17  it was for --

18   A    Yes.

19   Q    -- things of that nature?

20   A    Yes.

21   Q    Did you save any of those package inserts?

22   A    No.

23   Q    Did you ever read any of the package inserts

24  for either Digitek or a product he was taking called

25  diltiazem?

PLAINTIFFS' EXHIBITS 011760

1    A    No.

2    Q    Did any doctor ever explain to you any of the

3  potential risks of taking either digoxin products or

4  diltiazem products?

5    A    No.

6    Q    Do you know whether -- I'm sorry, let me

7  rephrase that.

8         Did any doctor ever tell you what sort of signs

9  and symptoms your husband could have that should spur a

10  call to the doctor about his medications?

11   A    No.

12   Q    Did you ever look at any of the Digitek tablets

13  in that vial that was delivered in January?

14   A    No.

15   Q    You didn't spread them out and inspect them or

16  anything like that?

17   A    You mean before he -- after he passed away?

18   Q    Before he died?

19   A    No.

20   Q    What about after he died?

21   A    Not that I recall.  I -- I might have looked at

22  them just to see what the lot number was or whatever.  I

23  don't know.  I was probably just looking at them after I

24  found out about the recall.

25   Q    But you didn't spread them out on a piece of

 1 | paper?

 2 |    A    No, I did not.

 3 |    Q    But just so I'm clear, before Dan died, did you

 4 | ever see any of his medications that looked out of place

 5 | or unusual?

 6 |    A    No.

 7 |         MR. ERNST:  Objection.  Whatever, unusual, out

 8 | of place.

 9 | BY MR. MORIARTY:

10 |    Q    Did you and Dan ever live apart after you were

11 | married?

12 |    A    No.

13 |         MR. MORIARTY:  I don't think I've got anything

14 | else.  Thanks.

15 |         THE WITNESS:  Thanks.

16 |         MR. ERNST:  Thank you.

17 |         (Discussion held off the record.)

18 |         MR. ERNST:  Yeah, I want this one.

19 |         MR. MORIARTY:  You want what?  The original of

20 | this transcript?

21 |             (Discussion held off the record.)

22 |         MR. ERNST:  I want all exhibits attached except

23 | the tax returns separate, and those are going to go to

24 | your office.  Agreed?

25 |         MS. DONAHUE:  They are not even referenced.

1            MR. ERNST:  When you make a copy of the tax

2    returns, I want a copy of those.

3            MS. DONAHUE:  We've stipulated off the record

4    that the original deposition transcript -- actually, let

5    me back up.

6            First off, a copy of the deposition will be

7    sent -- within the statutory period, will be sent to

8    Mr. Ernst for his client to review.

9            After the review, an errata sheet is completed,

10   or if not within the expiration of the statutory period.

11   I will retain the original and counsel will order

12   copies.

13            Off the record.

14            (Deposition concluded at 1:24 p.m.)

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 011763

162

1  STATE OF CALIFORNIA          )
                                )ss.
2  COUNTY OF SAN LUIS OBISPO  )

3

4                  WITNESS'S CERTIFICATE

5

6       I, KATHY McCORMACK, declare that the answers to

7  the foregoing deposition are true to the best of my

8  knowledge and belief.

9

10  Dated this        day of                    , 2009.

11

12

13

14                  -------------------------
                    KATHY McCORMACK
15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 011764

```
 1   STATE OF CALIFORNIA          )
                                  )ss.
 2   COUNTY OF SAN LUIS OBISPO    )

 3

 4                   REPORTER'S CERTIFICATE

 5

 6        I, Cindy D. Griffith, a Certified Shorthand

 7   Reporter in and for the State of California, do hereby

 8   certify:

 9        That, prior to being examined, the witness

10   named in the foregoing proceeding was by me sworn to

11   tell the truth, the whole truth and nothing but the

12   truth.

13        That said deposition was taken before me at the

14   time and place therein set forth and was taken down by

15   me in shorthand and thereafter reduced to computerized

16   transcription.

17        I hereby certify that the foregoing deposition

18   is a full, true and correct transcript of my shorthand

19   notes so taken.

20        Dated at San Luis Obispo, California, this 13th

21   day of October, 2009.

22

23                        _____
                          CINDY D. GRIFFITH
24                        CERTIFIED SHORTHAND REPORTER

25
```

PLAINTIFFS' EXHIBITS 011765



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25