# EXHIBIT 612

PLAINTIFFS' EXHIBITS 011921

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1              UNITED STATES DISTRICT COURT OF THE
                SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       CHARLESTON DIVISION

 3

 4
    KATHY MC CORNACK, et al.,        )
 5                                   )
                 Plaintiffs,         )
 6                                   )
      vs.                            ) No. 2:09-cv-0671
 7                                   )
    ACTAVIS TOTOWA, LLC, et al.,     )
 8                                   )
                 Defendants.         )
 9   _____ )

10

11              The deposition of WILLIAM L. GALANTER, M.D.,

12   Ph.D., called by the Plaintiffs for examination,

13   pursuant to notice and pursuant to the Federal Rules

14   of Civil Procedure for the United States District

15   Courts pertaining to the taking of depositions, taken

16   before HEATHER M. PERKINS-REIVA, Certified Shorthand

17   Reporter and Notary Public within and for the County

18   of McHenry and State of Illinois, at 10 N. Martingale

19   Road, Suite 400, Schaumburg, Illinois, commencing at

20   the hour of 10:05 a.m. on the 3rd day of August 2011.

21

22

23

24
```

```
 1 │ A P P E A R A N C E S:
   │
 2 │ ERNST LAW GROUP
   │ BY:  MR. DON ERNST
 3 │      MR. TERRY KILPATRICK
   │ 1020 Palm Street
 4 │ San Luis Obispo, California  93401
   │ (800) 941-9930
 5 │ (Appeared via videoconference.)
   │
 6 │       On behalf of the Plaintiffs;
   │
 7 │
   │ SHOOK HARDY & BACON LLP
 8 │ BY:  MS. HUNTER K. AHERN
   │ 600 Travis Street
 9 │ Suite 1600
   │ Houston, Texas  77002
10 │ (713) 227-8008
   │ (Appeared via telephone.)
11 │
   │       On behalf of the Defendant Mylan;
12 │
   │
13 │ TUCKER ELLIS & WEST LLP
   │ BY:  MR. EDWARD E. TABER
14 │ 1150 Huntington Building
   │ 925 Euclid Avenue
15 │ Cleveland, Ohio  44115
   │ (216) 696-2365
16 │
   │       On behalf of the Defendant Actavis Totowa, LLC.
17 │
   │
18 │                   *     *     *
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
```

PLAINTIFFS' EXHIBITS 011923

WIIIAM L. GALANTER, M.D.                                    August 3, 2011

```
1                          I N D E X

2    WITNESS                                      PAGE

3    WILLIAM L. GALANTER, M.D., Ph.D.

4      By Mr. Ernst

5           Examination                     04, 135

6      By Mr. Taber

7           Examination                         133

8

9    EXHIBITS                            MARKED FOR ID

10   Deposition Exhibit
```

```
11   No. 1  Dr. Galanter's CV                     04

12   No. 2  Dr. Galanter's Report                 05

13   No. 3  Articles                              08

14   No. 4  Vorpahl and Coe Article               10

15   No. 5  Amended Notice to Take Deposition     24

16   No. 6  NMS Labs Report                       30

17   No. 7  CVS Caremark Letter                   68
```

```
18

19

20

21

22

23

24
```

PLAINTIFFS' EXHIBITS 011924

```
 1                    (Witness duly sworn.)
 2              WILLIAM L. GALANTER, M.D., Ph.D.,
 3   having been first duly sworn, was called as a witness
 4   herein, was examined and testified as follows:
 5                 E X A M I N A T I O N
 6   BY MR. ERNST:
 7        Q    Would you state your full name for the
 8   record, please?
 9        A    William Galanter.
10        Q    And you are a licensed physician in the
11   State of Illinois?
12        A    Yes.
13        Q    And you have furnished to us a CV, and that
14   CV doesn't have a date on it, but, to your knowledge,
15   is your CV up to date?
16        A    Yes.  The date of the CV is the date of the
17   opinion.  So it was up to date as of that time.
18             MR. ERNST:  All right.  Let's mark your CV.
19   You know, we will just shorthand this.  Let's mark
20   this CV as Exhibit 1.
21             (Document marked as Exhibit 1 for
22             identification.)
23   BY MR. ERNST:
24        Q    And it is your testimony that everything in
```

PLAINTIFFS' EXHIBITS 011925

```
 1 | here is true and accurate?
 2 |     A    Correct.  There is a very minor change of
 3 | one of the in-press articles got published, but minor.
 4 | Other than that, it is up to date.
 5 |     Q    Okay.  That's great.
 6 |          And you did a report for Mr. Moriarty, true?
 7 |     A    Yes.
 8 |          MR. ERNST:  And we are going to mark that
 9 | report as Exhibit 2.
10 |          (Document marked as Exhibit 2 for
11 |          identification.)
12 | BY MR. ERNST:
13 |     Q    And I have a copy of what was furnished to
14 | us.  Can you hold up a copy of your report for me,
15 | please?
16 |     A    (Indicating).
17 |     Q    And is the top left corner dated 5/23/11?
18 |     A    Yes.
19 |     Q    All right.  Exhibit 2, to your knowledge, is
20 | true and accurate?
21 |     A    Yes.
22 |     Q    And does it contain all the opinions that
23 | you intend to offer at the time of trial?
24 |          MR. TABER:  Objection.
```

PLAINTIFFS' EXHIBITS 011926

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1           THE WITNESS:  I haven't really thought about
 2  a trial.
 3  BY MR. ERNST:
 4     Q    All right.  One of the reasons for this
 5  deposition today is to make sure that I have all of
 6  your opinions that you intend to render at the time of
 7  trial, and, to your knowledge, do you have any
 8  opinions outside this report, Exhibit 2, that you
 9  intend to render at the time of trial as you sit here
10  today?
11           MR. TABER:  Objection, overbroad.
12           Go ahead.
13           THE WITNESS:  As of this moment, no, but I
14  assume, if this goes to trial, there might be
15  additional information that I would read.  So I
16  couldn't venture as to what else I might want to say
17  at that time depending on what other information
18  becomes available.
19  BY MR. ERNST:
20     Q    I understand that you may want to review
21  other stuff.
22           Have you had an opportunity to review the
23  deposition of Keith Gibson?
24     A    Yes.
```

PLAINTIFFS' EXHIBITS 011927

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1        Q     And you have reviewed his report?
 2        A     Yes.
 3        Q     And has it changed any of your opinions in
 4   your report that you have marked here as Exhibit 2?
 5        A     No.
 6        Q     All right.  So as far as you know, as you
 7   sit here today, Exhibit 2 contains the opinions that
 8   you intend to offer at the time of trial?
 9              MR. TABER:  Objection, asked and answered.
10              THE WITNESS:  As of this moment, yes.
11              MR. ERNST:  All right.  Thank you.
12              THE WITNESS:  But I can't mention anything
13   in the future.
14   BY MR. ERNST:
15        Q     All right.  What I would like to do is ask
16   you what publications that you have brought with you,
17   and in your report you listed 16 of them?
18        A     Yes.
19        Q     Did you bring all of those with you?
20        A     Yes.
21        Q     Are they in a stack with you there?
22        A     Yes.  That's all these here (indicating).
23              MR. ERNST:  All right.  What I would like to
24   do is to mark all of those, that stack of documents,
```

PLAINTIFFS' EXHIBITS 011928

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  and for each article, we are going to, for the

 2  literature reference material, we are going to mark

 3  that stack as Exhibit 3 if that's okay with you.

 4              (Documents marked as Exhibit 3 for

 5              identification.)

 6  BY MR. ERNST:

 7      Q    By the way, what I would like to do is to

 8  have the court reporter copy them so you have your

 9  original file back.  Is that all right with you,

10  Doctor?

11      A    Yes.  I actually have them on-line.  She can

12  have them if she wants them.  I guess it is up to you.

13      Q    That would be fine.  That would be fine.

14              Why don't we just mark that stack as

15  Exhibit 3, and do you have each of the articles broken

16  out by number in that stack, Doctor?

17      A    No, I don't.

18      Q    Do you have them broken out by title?

19      A    They are not broken out.  They were

20  separately printed.  So it is just the title and name.

21  They are not alphabetized or anything.

22      Q    All right.  We will mark that stack as

23  Exhibit 3.

24              So if I asked you to find a specific report
```

PLAINTIFFS' EXHIBITS 011929

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  in that stack, you could do that?
 2      A    Yes.
 3      Q    All right.  Let's mark that as Exhibit 3.
 4           And what other documentation did you bring
 5  with you to your deposition today?
 6      A    Well, I have my opinion, and then I have the
 7  documents shown in my opinion, but then I have
 8  additional documents that I looked at after my opinion
 9  was written.
10      Q    And what documents are those?
11      A    I have the deposition from Dr. Gibson and
12  Barbieri.
13      Q    Okay.
14      A    I have the opinions from Dr. Gibson,
15  Dr. Brown, and Dr. Heard or Henin, who is an ED
16  toxicologist.
17           MR. TABER:  Heard.
18           THE WITNESS:  I don't remember.
19           Heard.
20           And then I have one additional paper, which
21  was referred to by Dr. Gibson, and I got it and read
22  it, which was Correlation of Antemortem and Postmortem
23  Digoxin Levels.  That wasn't on my initial list.
24
```

PLAINTIFFS' EXHIBITS 011930

WIILIAM L. GALANTER, M.D.                              August 3, 2011

```
 1  BY MR. ERNST:

 2       Q    And who is the author there?

 3       A    Vorpahl and Coe.

 4       Q    Do you agree or disagree with the

 5  conclusions that Vorpahl and Coe published in that

 6  article?

 7            MR. TABER:  Objection, overbroad.

 8            THE WITNESS:  I disagree with them in terms

 9  of in their scope of generalities, but I don't suspect

10  that they did anything immoral in their ethics.  Their

11  science, though, I think are probably the results of

12  their study in their patient population.

13            MR. ERNST:  All right.  Let's mark that

14  Vorpahl and Coe article as Exhibit 4, okay?  Can we do

15  that?

16            THE WITNESS:  Is that a question to me?

17            MR. TABER:  That's fine.  Sure.

18            MR. ERNST:  That's for the court reporter.

19            (Document marked as Exhibit 4 for

20            identification.)

21  BY MR. ERNST:

22       Q    So let's go to exhibit -- what other

23  materials have you read following your report, Doctor?

24       A    Just what I gave you just now, the list that
```

PLAINTIFFS' EXHIBITS 011931

```
 1   you asked me; the two depositions, the three opinions,
 2   and the one paper.
 3       Q    All right.  Have you had a chance to review
 4   the deposition of Dr. Lemm?
 5       A    Yes.
 6       Q    And Dr. Mason?
 7       A    Yes.
 8       Q    And Dr. Von Dollen?
 9       A    Yes.
10       Q    Dr. Lemm concluded that Mr. McCornack died
11   of digoxin toxicity.  Are you aware of that?
12            MR. TABER:  Objection.  Could you give us a
13   page cite?
14            THE WITNESS:  Yes, let me look at his
15   deposition.
16            MR. TABER:  What page?
17            MR. ERNST:  Well, if you don't remember, you
18   don't remember.
19   BY MR. ERNST:
20       Q    I guess a better question is:  Do you
21   disagree with the opinion of Dr. Lemm about the cause
22   of death?
23       A    If you tell me where the opinion is, I can
24   look at it.
```

PLAINTIFFS' EXHIBITS 011932

WIILIAM L. GALANTER, M.D.                                  August 3, 2011

```
 1      Q    No.  Actually, I get to ask the questions,
 2 and one of the questions that I have is:  Are you
 3 aware that Dr. Lemm concluded that Mr. McCornack died
 4 of digoxin toxicity?
 5      A    No.  I actually don't remember which doctor
 6 said which.
 7      Q    Are you aware that -- well, if Dr. Lemm said
 8 that, do you disagree with that?
 9           MR. TABER:  Objection.  If you would like to
10 refer to the document, I would respectfully ask
11 counsel to tell us what page you are citing; or, if
12 you are not citing, fine, please rephrase your
13 question.
14           MR. ERNST:  My question stands.
15           MR. TABER:  We do have his deposition here.
16           MR. ERNST:  You know, I know you do.
17 BY MR. ERNST:
18      Q    But the question that I have is:  Do you
19 disagree with Dr. Lemm's statement that Mr. McCornack
20 died of digoxin toxicity?
21           MR. TABER:  Objection.
22           THE WITNESS:  I disagree with the statement
23 that he died of digoxin toxicity.  I would only
24 disagree with Dr. Lemm if I was a hundred percent sure
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  that that's what Dr. Lemm said.

 2  BY MR. ERNST:

 3       Q    And you are aware that Dr. Mason concluded

 4  that Mr. McCornack died of digoxin toxicity?

 5            MR. TABER:  Objection.  Same basis.

 6            THE WITNESS:  Yes, that's my recollection on

 7  his second opinion, on his amended opinion.

 8  BY MR. ERNST:

 9       Q    And you disagree with that?

10       A    Yes.

11       Q    Now, do you perform autopsies?

12       A    No.

13       Q    What are the job duties of the coroner?

14       A    I don't know all the job duties.  I'm not in

15  pathology.  I know that they perform autopsies on

16  certain patients based on laws in the particular area

17  if they have suspicion that it wasn't something

18  natural, if there is no doctor that can give a cause

19  of death, or if the patient or family wants an

20  autopsy.  I have asked families if they want to get an

21  autopsy in the hospital.

22            I assume that part of what they do is to do

23  autopsies, and describe their findings, and give

24  opinions as to the cause of death as part of their
```

PLAINTIFFS' EXHIBITS 011934

WIILIAM L. GALANTER, M.D.                          August 3, 2011

1  job.

2      Q    Have you ever performed an autopsy?

3      A    No.  I have been in the room and watched

4  when I was a student, but, no, I haven't performed an

5  autopsy.

6      Q    You are aware that the physician that

7  performs the autopsy has the duty to determine the

8  cause of death after examination of the body during an

9  autopsy?

10     A    That is what I assume.  I have never read

11 that law or anything, but I assume that that's their

12 job.

13     Q    And you are a professor of internal

14 medicine?

15     A    Not a full professor.  I'm an assistant

16 professor.

17     Q    Let's circle back, and I want to ask you

18 what your roles -- strike that.

19          Please state for me what your understanding

20 is of why you were retained.

21     A    I think I was retained because I had a

22 variety of different bits of expertise as relating to

23 this case as it was germane to digoxin, which is

24 something I know a lot about.  I'm also a practicing

PLAINTIFFS' EXHIBITS 011935

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  clinician, and I also do research on medication

2  safety, and I use the drug. So I think there were

3  multiple things about me that made me of interest to

4  Mr. Taber and his firm.

5      Q    Please state for me what you understand what

6  your purpose is as an expert.

7      A    What's my purpose? It is to look at all the

8  information and to make an opinion of what I think

9  happened.

10     Q    Did you have a physician/patient

11 relationship with Mr. McCornack?

12     A    No.

13     Q    And, to date, can you tell us how much you

14 have billed Mr. Moriarty's firm; Tucker, Ellis & West?

15     A    I actually just gave it yesterday. I don't

16 know if Mr. Taber sent that to you, but I think it is

17 around $12,000. There is an exact amount. I

18 apologize. I didn't bring it.

19            THE WITNESS: You probably have it, right?

20            MR. TABER: Yes.

21            THE WITNESS: I e-mailed it yesterday to

22 Mr. Taber. I apologize. I didn't print it and bring

23 it. It is something in that number.

24

PLAINTIFFS' EXHIBITS 011936

WIILIAM L. GALANTER, M.D.                                         August 3, 2011

```
 1  BY MR. ERNST:

 2       Q    Around that number?

 3       A    Yes.

 4       Q    All right.  In that report that is dated

 5  5/23/11, marked as Exhibit 2, did you discuss this

 6  report with anyone before you drafted it?

 7       A    I guess it depends on what you mean by

 8  draft.  The initial draft, no, I didn't discuss with

 9  anyone.

10       Q    And you sent the draft to Mr. Moriarty?

11       A    I believe so.  I'm not a hundred percent

12  sure, but I believe so.

13       Q    And then Mr. Moriarty suggested changes in

14  your report?

15            MR. TABER:  All right.  Hold on.  Objection.

16            MS. AHERN:  Objection.

17            MR. TABER:  That's work product.  As you

18  know, under the new federal rule, you can't get into

19  that.  There is no discovery permitted on drafts and

20  discussions about drafts.  So let's not waste any time

21  today.  We will not permit inquiry into something the

22  rules do not permit.

23  BY MR. ERNST:

24       Q    What I would like to do is look at
```

PLAINTIFFS' EXHIBITS 011937

```
 1  Exhibit 2, and I just want to make our record clear
 2  here.
 3            Please state for me, looking at Exhibit 2,
 4  what suggestions Mr. Moriarty made in your report.
 5            MS. AHERN:  Objection.
 6            MR. TABER:  Objection.  I'm going to let him
 7  answer --
 8            THE WITNESS:  Is that true of my opinion?
 9            MR. TABER:  Yes.  Your letter.  That's
10  right.
11            THE WITNESS:  I wouldn't actually know.
12  This is my final opinion.
13  BY MR. ERNST:
14      Q   So it is your testimony that your final
15  opinion was discussed with Mr. Moriarty and
16  suggestions were made by Mr. Moriarty before your
17  final opinions were rendered, true?
18            MR. TABER:  Objection, and that is not an
19  appropriate subject of inquiry as you know.  Please
20  ask your next question because we are not going to
21  permit inquiry, as I just stated, into issues that are
22  not permissible under the rules.  This is the same
23  position that I believe all counsel have taken with
24  experts.  So we will be consistent.
```

PLAINTIFFS' EXHIBITS 011938

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1              THE WITNESS:  Answer or not answer?
 2              MR. TABER:  You do not need to answer that
 3  question because he is not allowed to ask you that
 4  question, which he knows.
 5  BY MR. ERNST:
 6     Q    Well, I guess the question that I have is:
 7  In your final report, Exhibit 2, without telling me
 8  what they were, suggested changes were made by
 9  Mr. Moriarty, true?
10              MR. TABER:  Objection, same basis.  Maybe if
11  you could just tune up your question a little bit,
12  Don, and ask him if it is his authorship or did
13  someone else write the report for him, I think that
14  would be appropriate and fine.
15              MR. ERNST:  No.  I will have my last
16  question reread, which I do think is appropriate under
17  the rules, and I will just ask him to answer the
18  question.
19              Can I have the last question reread, please?
20              (Record read.)
21              MS. AHERN:  Objection.
22              MR. TABER:  Objection.
23              You can answer.
24              THE WITNESS:  Yes, he looked at it.  He
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  | suggested parts that he wanted to make me sure that

2  | that's what I really meant or didn't mean, some

3  | grammatical errors that I made, and things that he

4  | wanted to verify if that's the way that I really

5  | wanted to say them, and what implications that might

6  | make about the way that people would interpret the

7  | report.  He didn't suggest specific sentences to put

8  | in or anything like that.

9  | BY MR. ERNST:

10 |    Q    Well, what areas was he concerned with?

11 |         MR. TABER:  Okay.  We are not going to

12 | permit any further inquiry on this.  As you know, Don,

13 | your questions are inappropriate.  There was a federal

14 | rule change over a year ago that specifically says we

15 | are not to do discovery on this issue.  We have

16 | respected that rule when we have deposed your experts.

17 | I would ask you to do the same.  You are wasting

18 | everyone's time now.

19 |         MR. ERNST:  Actually, that's not accurate.

20 | Those questions were asked of my expert, and I

21 | permitted them to be answered.

22 |         MR. TABER:  Which depo?

23 |         MR. ERNST:  Gibson.

24 |         MR. TABER:  I respectfully disagree.

PLAINTIFFS' EXHIBITS 011940

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
1            MS. AHERN:  I do as well.

2            THE WITNESS:  Answer or not answer?

3            MR. TABER:  You do not need to answer that

4    because he is not allowed to ask you that.  He knows

5    that.

6    BY MR. ERNST:

7         Q    Do you have correspondence from Mr. Moriarty

8    to you, Dr. Galanter?

9         A    No, I don't.

10        Q    Can you describe for me the circumstances

11   under which you were hired; in other words, who called

12   you?

13        A    It was actually quite a long time ago.  My

14   recollection was that I was asked to review a

15   different case from a different lawyer, and then after

16   that, after I started reviewing that, then I was asked

17   to get involved with this case.  That's my

18   recollection.  It was, actually, probably

19   two-and-a-half years ago or so, but I think there was

20   a different case first that I was looking at, and then

21   that lawyer asked me to talk to another lawyer about

22   this case, and that was Mr. Moriarty, and that was

23   sometime in 2009.

24        Q    And what did Mr. Moriarty tell you about the
```

PLAINTIFFS' EXHIBITS 011941

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  reason he wanted you to testify?

2       A    I actually, quite honestly, don't entirely

3  remember, but it was more he asked me about my

4  qualifications, and if I would review some material

5  form, and he started to send me some medical records.

6  I think I reviewed medical records first and the death

7  certificate in one big folder, and I didn't have any

8  depositions.  I want to apologize:  I just don't have

9  a clear memory.  That was quite a while ago.

10      Q    Okay.  Let's go back.

11           Were you asked to render an opinion on the

12  cause of death?  Is that the reason, your

13  understanding, of why you were hired?

14      A    I don't know why I was hired, but later,

15  when I wanted to put my opinion together, I am

16  not -- I don't do expert witnessing as a business.  So

17  I did talk to Mr. Moriarty about what needed to be in

18  my opinions.

19      Q    And I just want to try and be clear:  What

20  is your understanding of what you were hired to do?

21      A    I think I was hired to read all the

22  materials and to provide an expert opinion about my

23  beliefs on the materials; cause of death, medical

24  illness, a variety of different things.  They were

PLAINTIFFS' EXHIBITS 011942

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  looking for my expertise and my opinion of what

2  actually happened in the case.

3       Q    All right.  Let's go look at some of those

4  opinions, okay, Doctor?

5       A    Sure.

6       Q    Now, let's go through, first, a couple of

7  things.  I want to make sure that you have furnished

8  to me all of the materials that you have received, and

9  you don't have any retention letters from Mr. Moriarty

10 or his firm?

11      A    I wasn't hired on a retainer.

12      Q    I'm sorry?

13      A    I wasn't hired on a retainer.

14      Q    Did he send you a letter saying he wanted

15 you to look at materials?

16      A    Sure, something like that.

17      Q    Do you have that letter with you?

18      A    No, I didn't bring those letters.  I

19 apologize if I was supposed to.  I was advised I was

20 supposed to bring information related to my opinion,

21 and those letters didn't have anything clinical on

22 them.  They were just he sent a letter saying:  "I'm

23 about to send you a big package.  I just wanted to let

24 you know" or "I have more stuff coming," things like

PLAINTIFFS' EXHIBITS 011943

WIILIAM L.  GALANTER, M.D.                              August 3, 2011

```
 1  that.  So I apologize.  I actually didn't even save
 2  them.  There wasn't anything clinical on them.  There
 3  wasn't information on the letters.
 4      Q    Wasn't there a list of the material that he
 5  was going to send you?
 6      A    Yes, and then after I got the material, I
 7  threw them out.  Sorry.
 8      Q    So you threw out the correspondence from
 9  Mr. Moriarty?
10      A    Except those that were e-mailed.
11      Q    Do you have those e-mails printed out?
12      A    No, I don't.  I apologize.  Again, I was
13  advised that I need to bring information germane to my
14  opinion.
15      Q    Have you reviewed the deposition notice that
16  was forwarded to you?
17           And let's mark that as next in order, which
18  I think is 5.
19      A    Yes.  I'm not a hundred percent sure I
20  brought it.
21           MR. TABER:  Don, I have a copy if you want
22  me to hand him my copy.  It is a little marked up.
23           MR. ERNST:  That would be great.  Thank you.
24           MR. TABER:  Sure.
```

```
 1              This is the amended one that was just sent
 2    out on Friday?
 3              MR. ERNST:  Yes.
 4              (Document marked as Exhibit 5 for
 5              identification.)
 6              MR. TABER:  And he and I both went through
 7    that last night.  If you want me to address anything,
 8    I would be happy to as well.
 9              MR. ERNST:  Well, I think Item 3 is
10    important.  It says:  "All other documents prepared by
11    the attorneys for the Defendants and sent to the
12    witness."
13              MR. TABER:  And everything that is
14    discoverable has been either identified for you both
15    or produced, and to the extent that the enclosure
16    letter is saying "Please find enclosed X, Y, Z" have
17    not been produced, if you really want them, that's
18    fine, but it is my understanding that the civil rule
19    says that only those things that are relied upon by
20    the expert in forming their opinions are discoverable,
21    and you have all that.  So that's why we have not
22    given you the "Please find enclosed" letters.
23              If it is a big deal, I don't have a problem
24    with that, as long as it is even-handedly done for all
```

PLAINTIFFS' EXHIBITS 011945

WIILIAM L.  GALANTER, M.D.                                          August 3, 2011

```
 1  experts, but whatever.
 2            MR. ERNST:  Well, we asked for all
 3  correspondence and communication between the witness
 4  or anyone acting on the witness's behalf, the
 5  attorneys representing the Defendants in this
 6  MDL/Digitek litigation under Item 2.  I have never had
 7  letters from the lawyers not be disclosed.
 8            So here is what I would propose:  There may
 9  be questions that I wish to ask, but I can't say
10  without looking at the correspondence, but we received
11  no objection, and I believe that we are entitled to
12  have the letters that were sent from Mr. Moriarty or
13  his firm and the e-mails that were sent from
14  Mr. Moriarty or his firm to this witness.
15            MR. TABER:  And have you produced all of
16  those from all of your witnesses to us?
17            MR. ERNST:  Yes, we did.
18            MR. TABER:  Are you sure about that?
19            MR. ERNST:  Yes.
20            MR. TABER:  Okay.  If you believe that there
21  is something that is discoverable that you are
22  entitled to, say whatever you want, but just because
23  you asked for something doesn't mean you are entitled
24  to it if the rules say you are not entitled to it.
```

PLAINTIFFS' EXHIBITS 011946

WIILIAM L. GALANTER, M.D.                                August 3, 2011

```
 1          Again, ask him about it.  Ask him if he
 2  relied upon anything in those letters if you want.
 3  This is your opportunity.  So let's go ahead and get
 4  into the case and stop wasting time on enclosure
 5  letters.  The list in his report tells you what he
 6  reviewed and what he relied on.
 7          MR. ERNST:  We are not wasting time.  The
 8  issue is I want to know what Moriarty said about the
 9  case in the original letter, and we have other letters
10  that he sent to Dr. Heard, for example, that contain
11  detailed facts, and I suspect that these letters do as
12  well.  Without having seen them, and just by not
13  producing them, we are behind the eight ball as to
14  what was communicated by Mr. Moriarty initially.
15          Here is what I would propose:  I would
16  propose that you have copies of the retention letters,
17  that those retention letters be furnished to us via
18  e-mail today.  If you have them, and you can have your
19  office e-mail them to us, we will question this
20  witness before the close of this deposition if that is
21  possible for you to do.
22          Perhaps you can call your office and just
23  have them e-mailed.
24          MR. TABER:  I'm not going to stop the depo
```

PLAINTIFFS' EXHIBITS 011947

```
 1  to do that.  Why don't we press on, and I will make a
 2  call and inquire as to whether that is an arrangement
 3  that is suitable and that Plaintiffs have honored as
 4  well.
 5          Based on your word that you have produced
 6  all this stuff for all of your experts, I will make a
 7  call at the next break, but let's push on and get
 8  moving with the depo, instead of holding it up for
 9  something that's not going to make any difference
10  today.
11          MR. ERNST:  Well, we are moving with this
12  depo, then.
13          MR. TABER:  Let's go then.  Let's talk about
14  the case.
15  BY MR. ERNST:
16      Q    What else is contained in your file,
17  Dr. Galanter, that you brought with you today that we
18  have not already discussed?
19      A    Nothing.  It is the materials reviewed, plus
20  the additional materials reviewed that I went over at
21  the beginning; the two depositions, the three
22  opinions, and the one additional paper.
23      Q    All right.  Let's ask you some questions
24  about Mr. McCornack.  In your opinions, you write that
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1   his medication consumption was reliable; is that
 2   accurate?
 3        A     What page are you at?
 4        Q     It is on Page 3, under opinions regarding
 5   the cause of death.
 6        A     Yes, I said it was likely reliable, and the
 7   answer is, yes, I think from looking at his digoxin
 8   levels over the years from his visits and the
 9   stability of his medications, compared to the average
10   patient, my guess is that he was, most likely, a
11   reliable patient in terms of his medication use.
12        Q     What do you mean by "reliable patient"?
13        A     Well, roughly -- I don't know on the
14   average, but somewhere between 5 and 15 percent of
15   medications prescribed to patients are not taken on
16   the average, and no one takes a hundred percent of
17   their medicines.  So when I'm saying reliable, I don't
18   think there is a standard for it, but I'm saying he
19   probably took 90 to 95 percent of the medicines given
20   to him in a manner, and that's a guess, and that's why
21   I used the word "likely".  I don't think, from reading
22   the record, he was a person that blew off his
23   medications all the time.
24        Q     So what you mean is that he was compliant in
```

PLAINTIFFS' EXHIBITS 011949

WIIIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  taking his medication?
 2      A    Reasonably compliant.  I don't think there
 3  is such a thing as a patient that is a hundred percent
 4  compliant.  That's what the literature suggests.
 5      Q    What you mean is that in review of the
 6  records, it came across that he took his medication on
 7  a regular basis, and took it as directed by his
 8  physician, true?
 9      A    Yes.
10      Q    And there is no evidence that he, in the
11  weeks or days or hours before his death, took any
12  double doses or anything of that nature, true?
13      A    There is no evidence in the records given to
14  me of that.
15      Q    Okay.  There is some Diltiazem that was
16  mentioned in the toxicological report taken after his
17  death?
18           By the way, do you have that report from NMS
19  Labs?
20      A    Yes, I do.
21           MR. ERNST:  Let's mark that as Exhibit 6.
22           THE WITNESS:  Sorry.  If you could give me a
23  minute to grab it?
24           Okay.  I got it.
```

PLAINTIFFS' EXHIBITS 011950

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1                  (Document marked as Exhibit 6 for

 2                  identification.)

 3    BY MR. ERNST:

 4        Q    And looking at Exhibit 6, there was

 5    diltiazem and digoxin present in his bloodstream after

 6    death, true?

 7        A    Yes.

 8        Q    But you concluded that his diltiazem was

 9    within the normal range for what you would expect?

10        A    No, I don't know what to expect postmortem

11    at that time.

12             What page are you referring to of my

13    opinion?

14        Q    I believe that you concluded on Page 4 that

15    he was not toxic from diltiazem.

16        A    I'm reading through that paragraph.  One

17    moment.

18             I'm not sure that I quite said that in that

19    paragraph.  I do believe that, though, but I don't

20    think I said that in the paragraph there.

21        Q    All right.  Let's go through it.

22             You believe he was on a stable dose of both

23    digoxin and diltiazem, true?

24        A    Yes.
```

PLAINTIFFS' EXHIBITS 011951

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1      Q    And you do not believe that the diltiazem

 2   had any causative factor on his death, true?

 3      A    That's nowhere in there.

 4      Q    Well, I'm asking you if that's your opinion.

 5      A    Well, since his autopsy did not show an

 6   absolutely conclusive cause of his sudden death, there

 7   is a lot of different possibilities.  So it depends on

 8   what you mean when you say do I believe with a hundred

 9   percent or 99 percent.  He didn't have an absolute.

10   Like if somebody has a big MI on their autopsy, then

11   you know it is a big, fresh MI, and his autopsy did

12   not show a completely definite foolproof diagnosis.

13      Q    When you said "MI" you are talking about

14   myocardial infarction?

15      A    Yes.  Sorry.

16      Q    And for a layperson, that means a heart

17   attack?

18      A    Yes.

19      Q    Now, I guess I'm asking your opinion today,

20   which is do you believe that the diltiazem had any

21   part in the cause of the death of Mr. McCornack?

22      A    Within a reasonable certainty, no.

23      Q    Now, Mr. McCornack's digoxin level, when

24   tested by NMS Labs, was 3.6.  Do you see that?
```

PLAINTIFFS' EXHIBITS 011952

```
1        A     Yes.
2        Q     And from a clinical standpoint, you have
3   experience in prescribing and monitoring patients
4   taking digoxin medication, true?
5        A     Yes.
6        Q     And from a clinical standpoint, the level
7   that digoxin is acceptable in the literature is from
8   .5 to 2.0 nanograms per milliliter?
9              MR. TABER:  Objection.
10             THE WITNESS:  I would say generally
11  different labs have different normal ranges and
12  different levels have come in and out of vogue.  So I
13  would say, roughly, what you are saying is true, but
14  some labs say 2.2, some say 2.4, some say 1.8.  So,
15  roughly, I agree with you, but it really depends on
16  the lab.
17  BY MR. ERNST:
18       Q     So based on your testimony, what I hear you
19  saying is that the therapeutic levels are from .5 to a
20  range of 1.8 to 2.2; is that true?
21             MR. TABER:  Objection.
22             THE WITNESS:  Yes.
23  BY MR. ERNST:
24       Q     Now, the digoxin level of Mr. McCornack,
```

PLAINTIFFS' EXHIBITS 011953

1  when tested, was 3.6, true?

2       A    Yes.

3       Q    Now, one of the articles that you read and

4  reviewed actually traced back a postmortem blood level

5  to a blood level at the time of death.  Do you recall

6  reading those articles in your list of literature?

7       A    Yes.

8       Q    And, as you sit here today, as a physician,

9  when a blood sample is taken postmortem and a digoxin

10 level is determined, that is information that you, as

11 a physician, want to know, true?

12          MR. TABER:  Objection.

13          THE WITNESS:  No, I'm not a coroner.  So as

14 a clinician, no.  I don't think I have ever recalled

15 looking at postmortem digoxin levels in treating

16 patients.  So the answer is no.

17 BY MR. ERNST:

18      Q    So from your standpoint, as a treater of

19 live patients, digoxin level after death doesn't mean

20 anything to you because you don't treat patients after

21 they die?

22      A    Right.

23      Q    However, from a scientist's point of

24 view -- and you are trained as a scientist, true?

WIILIAM L. GALANTER, M.D.                                      August 3, 2011

1      A      Yes.

2      Q      -- a blood level of 3.6 nanograms per

3  milliliter of digoxin after death means something;

4  doesn't it?

5           MS. AHERN:  Objection.

6           THE WITNESS:  What I found is it means

7  something when it is low because the literature says

8  it goes up after death.  So if it is low after death,

9  that would mean, with almost clear certainty, that it

10 would be low before death.  So I think the value does

11 have meaning when it is low because it would very

12 conclusively predict low levels before death.

13          What the literature says when it is high is

14 there is a whole range of how high it gets based on

15 how long you waited, what part of the body.  So when

16 it is high, I guess all I can say is he was taking

17 at least some of his digoxin, and I can't prove that

18 it was low, that his level was low during life, and

19 that's probably all I can make of the value.

20 BY MR. ERNST:

21     Q      What you can state is that 3.6 nanograms per

22 milliliter is above the therapeutic level, true?

23     A      In a live patient, yes.

24     Q      And following death, do you have an opinion

PLAINTIFFS' EXHIBITS 011955

WIILIAM L. GALANTER, M.D.                                                    August 3, 2011

```
 1  as to whether or not, with a 3.6 nanograms per
 2  milliliter digoxin post death, do you have an opinion
 3  as to whether or not that's toxic or not toxic before
 4  death?
 5       A    No, because the literature, some papers say
 6  it could be ten times higher after death, some papers
 7  say it is two times higher.  It depends how long you
 8  wait.  It depends on where you pull it from.
 9       Q    Right.
10       A    So the literature, it is very complicated.
11  There is more variables than is in the literature.
12       Q    So what I hear you saying is that this is
13  not something that you usually look at, render
14  opinions about, or work with, true?
15            MR. TABER:  Objection.
16            MS. AHERN:  Objection.
17            THE WITNESS:  Usually, no.
18  BY MR. ERNST:
19       Q    And this is something that you would defer
20  to a coroner to look at because that is what they
21  usually do?  They determine cause of death, true?
22            MR. TABER:  Objection.
23            THE WITNESS:  I don't look at cause of
24  death.  I don't look at the coroner's report in my
```

PLAINTIFFS' EXHIBITS 011956

WIILIAM L. GALANTER, M.D.                          August 3, 2011

```
 1   typical work.  I was asked to give an opinion.  So I
 2   looked at it because it was a piece of data in the
 3   material that I was asked to give an opinion about.
 4   BY MR. ERNST:
 5       Q    Now, this piece of data does have meaning to
 6   you; doesn't it?
 7       A    Yes, it does, because it has good
 8   negative -- I don't know if you are familiar with the
 9   term negative predictive value, but what is true is
10   every article says it goes up after death.  So if his
11   digoxin level was 1 after death, then I would be
12   pretty sure it was less than 1 before death, which
13   would have told me that he wasn't compliant with his
14   medicines.  So it has good negative predictive value
15   for compliance.
16       Q    Doctor, do you know what the burden of proof
17   is in a civil case?
18       A    No.
19       Q    It is more likely true than not true.
20       A    Okay.
21       Q    Are you aware of that?
22       A    No.  I mean, I am now after you told me,
23   yes.
24       Q    Now, looking at one of the articles that you
```

```
 1  have, and I think we have marked it as Exhibit 6, the
 2  Vorpahl article, can you pull that out?
 3       A    Yes.  Sure.  One moment.
 4            I got it.
 5            MR. TABER:  I thought that was Exhibit 4.
 6  BY MR. ERNST:
 7       Q    Now, you have reviewed that, true?
 8       A    Yes.
 9       Q    And this article was attached to a number of
10  other depositions that you reviewed, true?
11       A    Correct.
12       Q    Now, one of the things in the --
13       A    Well, let me go back on that.  I don't
14  remember if it was attached to more than one
15  deposition.  I know it was attached to at least one
16  deposition.
17       Q    All right.  If you go to Page 333 of the
18  Vorpahl and Coe digoxin level --
19       A    Give me one second.  I have got to put my
20  glasses on.
21       Q    And you go to the summary?
22       A    Okay.
23       Q    Do you see that there was a mean postmortem
24  value given to pre-death levels of digoxin?
```

PLAINTIFFS' EXHIBITS 011958

WIILIAM L. GALANTER, M.D.                                      August 3, 2011

```
 1      A    A ratio, yes, I see.

 2      Q    A ratio?

 3      A    Yes, in the second sentence.

 4      Q    And, in fact, this was a study done of 27

 5  people where they knew the pre-death levels of digoxin

 6  and post-death levels of digoxin, true?

 7      A    True.

 8      Q    So they were able to actually measure what

 9  the digoxin level was before death and then after

10  death, true?

11      A    No.  They actually didn't measure before

12  death.  They calculated using the Jelliffe equation.

13           I'm sorry, they measured sometime before

14  death, and then they presumed the time immediately

15  premortem based on a calculation.

16      Q    And what calculation did they use, Doctor?

17      A    I think it was a Jelliffe equation.  I'm not

18  sure.

19      Q    Have you ever used that equation?

20      A    It is referenced by Jelliffe, No. 13.

21           No, I haven't used that equation in my

22  clinical work.  I know of it through research and

23  through writing, but I haven't used it.

24      Q    And it is commonly relied upon?
```

PLAINTIFFS' EXHIBITS 011959

```
 1      A    I actually don't know clinically if it is or
 2  it isn't because I'm not a pharmacist.
 3      Q    So when Dr. Mason, the coroner, took blood
 4  from Mr. McCornack, he took it from an extremity,
 5  true?
 6           MR. TABER:  Objection.
 7           THE WITNESS:  That's questionable, because
 8  in the literature there is some classic locations, and
 9  he didn't take it from one of the classic locations.
10  So it is probably some mix of an extremity and the
11  heart because I don't think there is any -- give me
12  one second.
13           Yes, they didn't look at axillary draws in
14  this study.  So I would assume that some combination,
15  some average between subclavian and femoral, because
16  the subclavian is more proximal.
17  BY MR. ERNST:
18      Q    If you assume it is an average between
19  subclavian -- just for the record, "subclavian" means
20  what to you, Doctor?
21      A    Subclavian vein under the clavicle, right
22  here (indicating).
23      Q    And the femoral vein means out of the leg,
24  true?
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1       A     Actually, I don't know what the femoral vein

2  means because the femoral vein is extremely long.  So

3  maybe there is a standard draw in autopsies that I'm

4  not familiar with.  The femoral vein is very long.

5       Q     You are aware that Dr. Mason, when he did

6  the autopsy, he cut the vein in the shoulder and then

7  pressed the blood out from the wrist down.  Do you

8  recall that?

9       A     That's what he said, yes.

10      Q     So that's why you think that, for purposes

11 of this study, it would be an average between the

12 subclavian vein and the femoral vein, true?

13      A     Yes.

14      Q     So if you --

15      A     It is in their study, not necessarily in our

16 patients.  In their study, I would assume, if they did

17 axillaries, it would probably be some average between

18 subclavian and femoral in their study.

19      Q     Well, wouldn't that turn out to be probably

20 1.5, 2.5 if you did the average?

21      A     Sure.  Their error is much, much larger than

22 that, but that's close enough.  They have a very large

23 error there.

24      Q     All right.  So if you took the average, if

PLAINTIFFS' EXHIBITS 011961

1  you took the 3.6 nanograms per milliliter, and you

2  factored in for 1.5, using the Vorpahl article as a

3  basis, what would be the pre-death level of digoxin in

4  Mr. McCornack?

5          MR. TABER:  Objection.

6          THE WITNESS:  I didn't do that because

7  Mr. McCornack wouldn't qualify for that study because

8  his sample was drawn three days after, and that study

9  was done on patients with an average of ten hours

10  after, and the literature says the amount of time

11  matters.  So I don't think Mr. McCornack's premortem

12  level can be calculated using this paper because, this

13  paper, no one in this paper was remotely close to that

14  time.

15  BY MR. ERNST:

16      Q   Do you have any literature studies that say

17  that 72 hours is different than 10 hours post death?

18      A    Definitely not.  I didn't find any study

19  that specifically mentioned the two times.

20      Q   All right.  Well, I want you to compute,

21  because you are a physician that would do something

22  like this, please tell me if you assume a 3.6

23  nanograms per milliliter post death, and you used a

24  factor of 1.52 as an average between the subclavian

PLAINTIFFS' EXHIBITS 011962

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  vein and the femoral vein, please state for me what

2  the level would be for Mr. McCornack using the numbers

3  in the Vorpahl study.

4          MR. TABER:  And I'm going to object because

5  he just told you that that would not make any sense.

6  So you are asking him to make three assumptions, none

7  of which he agrees with.  So I object and ask you to

8  rephrase your question based on his prior answers.

9          MS. AHERN:  Join.

10          MR. ERNST:  You know, under Pretrial Order

11  22, that's what we call a speaking objection, and I

12  have tried to refrain from doing that.  If you want to

13  make an objection, you can.  I'm asking him to do the

14  computation.

15          MR. TABER:  That's fine.  You can do it,

16  too.  If you want to pull out a calculator, go ahead,

17  but he just told you that doing what you are asking

18  him to do would make no sense.  So if you want us to

19  divide two numbers, that's fine.

20  BY MR. ERNST:

21      Q    Look at the Vorpahl study, and assuming that

22  it is accurate for Mr. McCornack's blood sample, if

23  you compute it back to the antemortem or pre-death

24  level, wouldn't it be 2.5 or greater?

```
 1            MR. TABER:  And I object because the
 2   assumption, he just told you, is completely false.
 3            Go ahead.
 4            THE WITNESS:  I can try to get into detail
 5   on this.
 6            So there is a couple of issues.  If you look
 7   at their end for femoral, they actually have about 12
 8   points.  So for funsies, I kind of looked at the
 9   numbers and looked at the range, and I can guarantee
10   you that the standard deviation on those ratios is
11   extremely large.
12   BY MR. ERNST:
13       Q    I'm asking you for the number --
14       A    You are asking me to do something that I
15   don't think is true and I told you is not true.  So I
16   cannot put Mr. McCornack into the Vorpahl study.
17            So if you ask me a math question that has
18   nothing to do with this deposition, I would say
19   150 percent of 2.4 is 3.6, as a math problem, but I
20   don't think it has anything to do with the particular
21   patient we are talking about.
22       Q    If you use the Vorpahl numbers that are
23   contained in the study, and you compute it back to
24   pre-death levels, even though you may not agree with
```

PLAINTIFFS' EXHIBITS 011964

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  it, Doctor, the level comes out to be 2.4, true?

2              MR. TABER:  Objection, same basis.  He

3  already answered that.

4              THE WITNESS:  And the answer is, yes, if I

5  do a math problem that I don't agree with, I come up

6  to the same conclusion every time of 2.4.

7  BY MR. ERNST:

8     Q    And you already testified that 2.4 is above

9  any level that any lab considers to be acceptable,

10  true?

11             MR. TABER:  Objection.

12             THE WITNESS:  No, I didn't say that.  I

13  would venture a guess and say it is probably true, but

14  I haven't done a review of all labs.

15  BY MR. ERNST:

16     Q    Didn't you specifically state that the

17  therapeutic level is between .5 and generally 2.0, and

18  once in a while it goes as high as 2.2?

19             MR. TABER:  Objection.

20             THE WITNESS:  The answer is, yes, I said

21  that, and that was an effort to try to get around the

22  fact that you were giving an exact number, and I

23  couldn't give you an exact number.

24             But now if you ask me to say that I

PLAINTIFFS' EXHIBITS 011965

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  specifically know that no lab goes up to 2.4, I really

2  haven't done a review of lab ranges to say that.

3  BY MR. ERNST:

4      Q    Will you acknowledge that 2.4 from a

5  clinical standpoint would give you cause that it could

6  be toxic?

7           MR. TABER:  Objection.

8           THE WITNESS:  The answer is, yes, in the

9  live patient, I could be concerned with 2.4 if the

10  patient had other symptoms.

11  BY MR. ERNST:

12      Q    All right.  So, in summary, if you use the

13  Vorpahl study, and you average the subclavian vein

14  with the femoral vein numbers, and you backtrack from

15  the post-death level of 3.6, you will come up with

16  2.4.  Whether or not you agree or disagree with that,

17  that is the number, true?

18           MR. TABER:  Objection.

19           MS. AHERN:  Objection.

20           MR. TABER:  Multiple levels.

21           THE WITNESS:  I would agree, in a patient

22  who had blood drawn in the time frame of their study,

23  that would fall into their result.

24           MR. ERNST:  All right.

PLAINTIFFS' EXHIBITS 011966

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1  BY MR. ERNST:

 2     Q    So from your point of view, as an expert in

 3  this case, a digoxin blood level of 3.6 nanograms per

 4  milliliter after death does have meaning, true?

 5          MR. TABER:  Objection.  He answered that

 6  same question, Don, if you will recall, about 30

 7  minutes ago at least three times.

 8          THE WITNESS:  The answer is yes, and I will

 9  break it into a couple of pieces.

10          The fact that he had digoxin in his blood

11  postmortem meant that he was taking digoxin.  So it

12  excludes the possibility that he wasn't taking his

13  medicine at all, and because it wasn't extremely low,

14  it suggests that he wasn't completely non-compliant

15  with his medicine.  So the answer is yes with those

16  specific examples.

17  BY MR. ERNST:

18     Q    Will you acknowledge that there have been a

19  number of studies that have computed to be pre-death

20  levels of digoxin from postmortem samples of blood?

21     A    The answer is I don't know.  I have seen

22  this one study.  The reason I looked at this study is

23  because it was referenced by Dr. Gibson.  Most of the

24  studies I looked at said that you can't predict, that
```

PLAINTIFFS' EXHIBITS 011967

1   it is too unreliable.

2          I couldn't say that I did a complete and

3   thorough literature search.  So I couldn't guarantee

4   that I might not have missed a study in rats or

5   something.  So I guess I'm not comfortable saying

6   absolutely not, but the literature that I looked at,

7   with the exception of this paper, suggested that you

8   can't guess a premortem level based on an antemortem

9   level because it is unreliable and it is always

10  higher.

11     Q    Looking at your report, Footnote 13, do you

12  see that, Doctor?

13     A    Yes.  One moment.

14          Yes.

15     Q    That's the Koren article; do you see that?

16     A    Yes.

17     Q    And let's go down to Item 15.  That's the

18  O'Sullivan article?

19     A    Yes.

20     Q    And, in fact, you quote an article here, and

21  the title of it is Differences in Digoxin

22  Concentrations Between Antemortem Serum and Femoral

23  Postmortem Blood.  Do you see that?

24     A    What number is that?

PLAINTIFFS' EXHIBITS 011968

```
 1      Q     Item 15.
 2      A     Oh, differences in those four, yes,
 3  amiodarone, digoxin, flecainide and sotalol?
 4      Q     Right.
 5      A     Yes.
 6      Q     And you are aware that that is a study of
 7  one patient?
 8      A     Can you hold on a second?  I want to get the
 9  article.
10      Q     Sure.
11      A     Too many articles.
12            Okay.
13      Q     And, in fact, that article specifically
14  works out a level of digoxin from a postmortem sample
15  and concludes what it was before death; isn't that
16  true?
17      A     I actually only have the abstract with me.
18      Q     You know, I see that you have listed it as
19  Item 15.  Is it your testimony that you just read the
20  abstract and not the entire article?
21      A     No.  It is my testimony that I couldn't find
22  the article now to print out again.
23      Q     Well, doesn't the abstract state that, in
24  fact, you can compute pre-death serum levels from
```

```
 1  postmortem blood?
 2      A    They are claiming that in this one patient.
 3      Q    Right.
 4           They are claiming that, but that's an
 5  article that you cited, true?
 6      A    Okay.  Yes.
 7      Q    And in that article, they say that you can
 8  conclude what pre-death levels were of digoxin from
 9  postmortem blood; isn't that true?
10      A    They said that the high level would have
11  suggested that it could have resulted from.
12      Q    So there is a bunch of literature out there
13  that says that you can conclude, from your own list of
14  materials here, that, in fact, you can conclude what
15  pre-death levels of digoxin were from a postmortem
16  test, true?
17           MR. TABER:  Can you repeat the question?
18           Or do you want to read it back?
19           (Record read.)
20           MR. TABER:  Objection.
21           THE WITNESS:  The answer is absolutely
22  Vorpahl and Coe claim that they can predict a
23  premortem level of digoxin before death.  That's the
24  point of their article.
```

PLAINTIFFS' EXHIBITS 011970

WIILIAM L. GALANTER, M.D.                              August 3, 2011

```
 1  BY MR. ERNST:
 2      Q    Well, doesn't the article that you cite as
 3  Item 15, the O'Sullivan article, also claim that?
 4      A    Well, but that was a case study.
 5      Q    Right.
 6           But the case study concluded that; didn't
 7  it?
 8           MR. TABER:  Objection.
 9           THE WITNESS:  They concluded that a
10  postmortem level could suggest that the drug was
11  associated with the death, with premortem.
12  BY MR. ERNST:
13      Q    Let's go back and talk about the death of
14  Mr. McCornack.
15      A    Okay.
16      Q    Now, you have concluded that Mr. McCornack
17  died of -- I think what you called -- sudden cardiac
18  death; is that true, or sudden cardiac arrest?
19      A    Yes.
20      Q    Why don't you explain sudden cardiac arrest
21  to me as if I were a layperson.
22      A    Let me get a paper.  If you could give me
23  one moment?  Too many papers.
24           MR. TABER:  Take your time, Doctor.  We are
```

PLAINTIFFS' EXHIBITS 011971

1  in no rush here.

2  BY MR. ERNST:

3      Q    I am looking at your report that you have

4  opined, and on Page 3 you state:  "The cause of his

5  death was" --

6      A    Do you want that answer?

7      Q    I'm sorry?

8      A    Is this another question or would you like

9  an answer to the first question?

10     Q    I would like an answer to the first

11 question.

12     A    So this is from something called Up-to-Date,

13 which is an on-line referential material.  It is

14 No. 5.

15     Q    Okay.

16     A    And it says:  "Sudden cardiac arrest and

17 sudden cardiac death refer to the sudden cessation of

18 cardiac activity with hemodynamic collapse typically

19 due to sustained ventricular tachycardia/ventricular

20 fibrillation."  So that's the definition of sudden

21 cardiac arrest.

22     Q    So ventricular fibrillation to a layperson

23 means that the lower half of the heart stops beating?

24     A    It means it is vibrating and it can't

 1  sustain.  It is not pumping.  It is beating, but it is
 2  beating so fast that it can't pump.
 3      Q    And it is your opinion that he died of
 4  sudden cardiac arrest, true?
 5      A    Yes.
 6      Q    Now, let's talk about digoxin toxicity.  Can
 7  digoxin toxicity cause sudden cardiac arrest?
 8      A    Yes.  It is one of the side effects.
 9      Q    So when your opinion has concluded that
10  Mr. McCornack died of sudden cardiac arrest, one of
11  the things that could have caused the sudden cardiac
12  arrest was digoxin toxicity, true?
13          MR. TABER:  Are you asking him if that's his
14  opinion?
15          MR. ERNST:  I'm asking him generically --
16          MR. TABER:  All right.  Objection.
17          MR. ERNST:  -- if digoxin toxicity can cause
18  sudden cardiac arrest.
19          THE WITNESS:  I thought that was the last
20  question.
21          MR. TABER:  Can or in this case?  Which are
22  we talking about?
23          MR. ERNST:  I'm asking if it can.
24          THE WITNESS:  That, as I recall, was two

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  questions ago, and the answer is I said, yes, digoxin
 2  toxicity can cause sudden cardiac arrest.
 3            MR. ERNST:  All right.
 4  BY MR. ERNST:
 5       Q    Now, one of the things that you have
 6  testified to is that digoxin can cause atrial
 7  fibrillation, true?
 8       A    No.  Typically, digoxin is used to treat
 9  atrial fibrillation.
10       Q    And if there is an excessive amount of
11  digoxin, what happens to the fibrillation?
12       A    Well, the atrium still fibrillates, so it is
13  a little bit confusing.  Digoxin doesn't actually
14  affect atrial fibrillation.  It affects the ventricles
15  response to the atrial fibrillation.
16       Q    Okay.  Now, would you agree that digoxin
17  toxicity causes bradycardia?
18            MR. TABER:  Objection, overbroad.
19            THE WITNESS:  Bradycardia is one of the side
20  effects of digoxin toxicity.
21  BY MR. ERNST:
22       Q    And, for the record, bradycardia is a
23  slowing of the heart rate, true?
24       A    Actually, it is a little bit confusing
```

PLAINTIFFS' EXHIBITS 011974

1  because bradycardia is typically defined as an

2  abnormal slowing of the heart rate.  So if you

3  exercised, and your heart rate was high, and then you

4  rested and it went down, people wouldn't call that

5  bradycardia.  So bradycardia is typically defined as a

6  heart rate under 60.

7      Q    It is an abnormally slow --

8      A    Right.  It is not a slowing of.  It is an

9  abnormally slow.

10     Q    Now, Mr. McCornack, on the day of his death,

11 complained of fatigue; do you recall that?

12     A    No, I don't.

13          Could you tell me where that is?

14     Q    Do you recall that Mr. McCornack complained

15 of bloating?

16     A    I recall that that was in his wife's

17 deposition, yes.

18     Q    Do you recall in his wife's deposition that

19 he was tired?

20     A    I don't.

21     Q    Isn't it true that fatigue and

22 gastrointestinal distress are symptomatologies of

23 digoxin toxicity?

24          MR. TABER:  Objection, overbroad.

PLAINTIFFS' EXHIBITS 011975

WIILIAM L. GALANTER, M.D.                            August 3, 2011

```
 1            THE WITNESS:  The answer is yes.  Digoxin
 2   toxicity has a whole variety of symptoms, cardiac and
 3   extracardiac, and fatigue and GI side effects are
 4   common symptoms of digoxin toxicity.  Not always
 5   present.  Sometimes present.
 6            MR. ERNST:  Right.
 7   BY MR. ERNST:
 8       Q    Sometimes they are there and sometimes they
 9   are not?
10       A    Right.
11       Q    Now, as a treater -- and you do treat
12   patients, true?
13       A    Yes.
14       Q    When a person claims they are bloated, is
15   that sometimes referred to as gastrointestinal
16   distress?
17            MR. TABER:  Objection.
18            THE WITNESS:  The answer is no.  Medically,
19   "distress" has a connotation of something that is
20   relatively severe; respiratory distress,
21   gastrointestinal distress.  So I don't hear people
22   using distress for something like bloating.
23   BY MR. ERNST:
24       Q    All right.  When a person says they are
```

PLAINTIFFS' EXHIBITS 011976

WIILIAM L. GALANTER, M.D.                    August 3, 2011

1  bloated, what does it mean to you as a clinician?

2      A    They have an uncomfortable feeling in their

3  stomach that they are associating with a feeling of

4  being overfull from gas or food or something like

5  that.

6      Q    All right.  Would you consider bloating a

7  symptom of digoxin toxicity?

8      A    The answer is I don't know because it is not

9  typically described in the literature as bloating.  So

10 I actually don't know.  That is not the way it is

11 typically described.  Typically it is described as

12 anorexia, abdominal discomfort, nausea, but those are

13 fairly vague terms.

14         Go ahead.  I'm sorry?

15     Q    I'm sorry.  I didn't mean to interrupt you.

16     A    That's okay.

17     Q    Fatigue is a symptom of digoxin toxicity,

18 true?

19         MR. TABER:  Objection.

20         THE WITNESS:  It can be, yes.

21 BY MR. ERNST:

22     Q    Now, would you agree that the first signs of

23 toxicity from digoxin are typically an abnormal

24 slowing of the heart rate?

PLAINTIFFS' EXHIBITS 011977

1           MR. TABER:  Objection, overbroad.

2           THE WITNESS:  That is a very broad question

3   because there is multiple indications for digoxin.  So

4   there is multiple goals for heart rate.  So, for

5   instance, if someone had a heart attack, and they were

6   on a beta blocker and digoxin, and they were in atrial

7   fibrillation, and their heart rate was attempted to be

8   60, the first thing that would happen if they got

9   digoxin toxic is the heart rate would get under 60.

10          If they have congestive heart failure and

11  their heart rate naturally was 90, then it would take

12  a lot of digoxin before it got under 60.  So a lot

13  would depend on the indication for the digoxin, the

14  patient's medical conditions, and other medicines.

15  BY MR. ERNST:

16     Q    What happens, Doctor, if you have an

17  abnormally slow heart rate and your heart just slows

18  to the point that it doesn't furnish enough blood to

19  your brain?  Does that, then, cause dizziness?

20     A    That is also a broad question because people

21  with very strong hearts, they can actually have a

22  complete dissociation between their atrium and

23  ventricle and go into what's called a ventricular

24  escape, which is 40 beats a minute, and some of them

PLAINTIFFS' EXHIBITS 011978

```
 1  actually feel fine.  People with a very bad heart,
 2  they can actually die from a heart rate of 40.
 3          So some people would be symptomatic.  Some
 4  people could die.  It really depends on the patient.
 5          If you stand up real fast, you are going to
 6  get dizzy.  So people that have bradycardia that is
 7  drug induced or toxin induced, they would certainly be
 8  dizzy when they stand up quickly or when they are
 9  moving around.
10     Q    What if a person goes to bed and has
11  bradycardia at night?
12     A    It depends.  A lot of people actually have
13  bradycardia at night.  When you are relaxed, your
14  heart rate sometimes goes down.  So it really depends.
15     Q    Isn't it true that digoxin toxicity can lead
16  to bradycardia?
17     A    Yes, it can lead to bradycardia.
18     Q    And if you assume that Mr. McCornack had
19  bradycardia after he went to bed, his heart rate could
20  have slowed, and he would have died of sudden cardiac
21  arrest; isn't that true?
22          MR. TABER:  Objection, speculation.
23          THE WITNESS:  No.  Actually, even making
24  your assumptions, I wouldn't assume that because there
```

PLAINTIFFS' EXHIBITS 011979

 1  was no evidence that his left ventricle didn't pump

 2  well.  So I think a guy at his age, with a normally

 3  pumping left ventricle, could handle -- what happens

 4  is when your heart gets really slow, the ventricle

 5  takes over the pacemaker.  So people's heart rates

 6  don't go down to zero.

 7            All of a sudden the ventricle takes over,

 8  and it usually pumps around 35, 40, 45, and I think

 9  Mr. McCornack laying down, doing nothing, a heart rate

10  of 40 or 35 or 45, he probably wouldn't have woke up.

11  It wouldn't have bothered him.

12            So I actually don't think that bradycardia

13  would have caused him to die in his sleep.  In him.

14  I'm not saying it couldn't be possible in some

15  patients, but in him specifically.

16  BY MR. ERNST:

17       Q    Well, what patients would it be possible in?

18  What patients are we talking where you have

19  bradycardia, and your heart slows to an extent, and

20  you go unconscious and you die?

21       A    Well, you assume --

22       Q    Why can't that occur?

23       A    -- you assume that you are going

24  unconscious, and that's the part that doesn't

PLAINTIFFS' EXHIBITS 011980

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1   necessarily happen.  So the cardiac output that goes
2   to the brain is the heart rate times the amount of
3   blood that is pumped each beat.  So if you have a
4   heart that pumps a lot for each beat, some people can
5   have more cardiac output at a heart rate of 40 than
6   other people have at 80.

7          Like I used to play tennis.  Bjorn Borg, his
8   resting heart rate was in the 40s.  When he was
9   standing, walking around, his heart rate was in the
10  40s because his heart was so strong that 40 times a
11  good ejection fraction was more than enough blood
12  flow.

13         The patient that could die is someone who
14  has congestive heart failure, who is only pumping a
15  small amount of blood each beat, and then when the
16  beats go down, then they are in trouble and they could
17  die.  So it really depends on the patient.

18     Q    So you would want to look at the patient's
19  history and actually have seen the patient before
20  their death in order to reach those conclusions, true?

21     A    Well, you can get some of that from the
22  autopsy because people that have like ischemic
23  cardiomyopathy, they have very thin ventricles, and
24  you can see heart attacks, prior heart attacks.  So

PLAINTIFFS' EXHIBITS 011981

```
 1   from an autopsy, you can actually get an idea about
 2   healthy function, but ideally --
 3       Q    But isn't it true --
 4       A    Go ahead.
 5       Q    Isn't it true that sudden cardiac arrest
 6   oftentimes shows no symptomatology in the heart itself
 7   upon autopsy?
 8       A    No signs in the heart, you mean, not
 9   symptoms?  No findings; is that what you mean?
10       Q    Right.
11       A    Yes.  Sometimes in sudden cardiac death,
12   they do an autopsy, and they don't find anything.
13       Q    Right.
14            And with digoxin toxicity that causes sudden
15   cardiac arrest, they would not find anything; would
16   they?
17       A    It depends on what happened when the patient
18   became digoxin toxic.  If they had ischemic heart
19   disease, and the heart rate got low, then they could
20   have a heart attack, and you can see the heart attack,
21   even though I still could blame that on digoxin.  If
22   they had a ventricular tach arrythmia and died
23   suddenly, then no.  So it actually depends on what did
24   the digoxin do premortem that caused the person to
```

PLAINTIFFS' EXHIBITS 011982

1  have sudden cardiac death.

2       Q    Right.

3            And digoxin does cause ventricular

4  tachycardia, true?

5       A    It can, yes.

6       Q    And if digoxin causes ventricular

7  tachycardia, that ventricular tachycardia can occur

8  after the bradycardia, true?

9       A    Yes, it is possible.

10      Q    And if that occurs where a person is toxic

11 with digoxin, they have bradycardia or slowing of the

12 heart rate, then they have ventricular tachycardia

13 leading to sudden death, at the time of the autopsy

14 there would be no findings in the heart, true?

15      A    No, I wouldn't say there would be none, but

16 there could be none, yes.  I don't know if there

17 wouldn't.  It depends on the patient.

18      Q    Now, in the autopsy of Mr. McCornack, were

19 there findings?

20      A    Yes.

21      Q    And were there findings consistent with

22 sudden cardiac arrest?

23      A    What do you mean by "consistent" exactly?

24      Q    Were they consistent with sudden cardiac

PLAINTIFFS' EXHIBITS 011983

```
 1  arrest?
 2          MR. TABER:  He has asked you to define the
 3  word.  I think if you would be so kind as to define
 4  what you mean by "consistent with", Don.
 5          THE WITNESS:  Do you mean that like
 6  medically or legally?
 7          MR. ERNST:  Medically.
 8          THE WITNESS:  Well, medically consistent
 9  means is something possible, and the answer is yes;
10  but legally, I thought it was the
11  more-than-a-50-percent thing.
12          MR. ERNST:  Oh, you are going to the
13  more-than-50-percent thing?
14  BY MR. ERNST:
15     Q    So my next question is, Doctor, do you have
16  an opinion as to whether or not Mr. McCornack had
17  ventricular tachycardia?
18     A    My opinion is that is my best reasonable
19  guess.
20     Q    All right.  Now, just for the record, if you
21  were to explain to a layperson what ventricular
22  tachycardia is, what would you say?
23     A    Ventricular tachycardia is when -- well,
24  ventricular tachycardia is, by definition, when a beat
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  comes from the ventricle.  Normally, a beat comes from
 2  the atrium.  It is when beats come from the ventricle,
 3  and they are coming fast, and the rate could be 150,
 4  200, something like that, and the ventricle actually
 5  cannot pump at that rate; and because it can't pump at
 6  that rate, although it is trying to beat, and there is
 7  impulses at that rate, it can't pump, and therefore
 8  there is no blood flow, and that could kill someone,
 9  and that's different than ventricular fibrillation
10  where it is trying to beat so fast that it is just
11  vibrating.
12      Q    So we have already established that
13  ventricular tachycardia can be used by digoxin
14  toxicity, true?
15      A    True.
16      Q    And digoxin toxicity can also cause
17  bradycardia, true?
18      A    Yes.
19      Q    And so in Mr. McCornack it is your opinion
20  that ventricular tachycardia led to sudden cardiac
21  arrest, true?
22      A    That's my best guess, yes.
23      Q    And that is entirely consistent with digoxin
24  toxicity; isn't it, Doctor?
```

PLAINTIFFS' EXHIBITS 011985

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1            MR. TABER:  Objection.

 2            THE WITNESS:  There are a number of things

 3  that can cause -- the reason I'm not saying that is

 4  because we are talking about Mr. McCornack, and I

 5  don't think Mr. McCornack had digoxin toxicity.

 6            So in Mr. McCornack the answer is no because

 7  I don't think he had digoxin toxicity.  In a patient

 8  who is digoxin toxic, the answer is yes.  I don't

 9  think he had digoxin toxicity.

10            So in a generality, the answer is yes.  In

11  him, the answer is no because I don't think he had

12  digoxin toxicity.

13  BY MR. ERNST:

14     Q    So let's just get right to it, Doctor:  You

15  don't think he had digoxin toxicity because of what?

16     A    Because he didn't have anorexia.  He seemed

17  to not -- well, there is a couple of assumed things.

18  Because the depositions tell me that he ate a couple

19  good meals and was drinking, people who have anorexia

20  and stomach discomfort tend not to drink alcohol.

21  They can get it after they drink alcohol, but people

22  tend not to drink alcohol when they have stomach

23  discomfort and anorexia by definition.

24            He ate a good meal.  He had a full day.  He
```

PLAINTIFFS' EXHIBITS 011986

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  wasn't complaining of anything other than bloating per

2  his wife.  So that's one piece of evidence.

3          The second piece of evidence is I have no

4  lab data to suggest that his digoxin level was high.

5  He takes diltiazem and digoxin all the time together.

6  So although diltiazem has been known to increase

7  digoxin levels, he was on that for a long time with

8  reasonable digoxin levels.  His diltiazem level was

9  extremely high, and I don't believe that he was

10  diltiazem toxic at the time of his death, and his

11  digoxin level was extremely high.

12          So if I thought that he was digoxin toxic, I

13  would have to believe he was diltiazem toxic if I

14  would believe those three-day postmortem lab values.

15          So I have no laboratory tests that suggest

16  his level was high, I don't have any symptomatology

17  that suggest his level was high, and therefore I don't

18  believe he was toxic.

19          The last thing is I don't have any pills,

20  according to the NMS, I don't have any pills that had

21  a high level, and I consider him a fairly compliant

22  patient.  I don't think, from anything that I could

23  see, that he was the kind of guy that would

24  deliberately overdose or anything like that.

PLAINTIFFS' EXHIBITS 011987

```
 1          So I have no reason to believe that he took
 2  too much digoxin.  All his prior levels were okay.  He
 3  didn't have symptomatology.  So I don't think he was
 4  toxic.
 5      Q    You are aware that there was a re-call for
 6  the digoxin that Mr. McCornack was taking, true?
 7          MR. TABER:  Objection.
 8          MS. AHERN:  Objection.
 9          THE WITNESS:  I actually recall that there
10  was a re-call -- I'm actually assuming that he must
11  have gotten some batch or lot or whatever associated
12  with that or else we wouldn't be in court now, but
13  that wasn't discussed with me.  That's my assumption
14  or else I don't think we would be here now.
15  BY MR. ERNST:
16      Q    Well, in fact, under other documents that
17  you reviewed, didn't you review the CVS/Caremark
18  letter to patients regarding the Digitek re-call of
19  May 2008?
20      A    I believe so.
21      Q    All right.  Let's pull that letter out,
22  Doctor.  Do you have that letter with you?
23      A    Yes.
24      Q    All right.  Let's pull that out.
```

PLAINTIFFS' EXHIBITS 011988

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1              Now, what is in that black book there,
 2    Doctor?
 3       A    This one here is medical records of
 4    Mr. McCornack from Lemm, Von Dollen, the two
 5    certificates of death, NMS Labs, the Caremark re-call
 6    letter, and the FDA statement.
 7              MR. ERNST:  All right.  Let's look at the
 8    Caremark letter that you have reviewed there, and if
 9    you have a copy there, let's mark that as next in
10    order, and I think that is No. 7.
11              MR. TABER:  Let's take a break, first,
12    though.  We have been going an hour-and-a-half.
13              Five minutes?
14              MR. ERNST:  Yes.
15              Doctor, if we take a break, I'm going to be
16    asking you what you talked with the lawyer about
17    during the break.
18              THE WITNESS:  Okay.  If he tells me I'm
19    allowed to talk about it, then I will tell you what we
20    said.
21              (Recess taken.)
22              (Document marked as Exhibit 7 for
23              identification.)
24              MR. ERNST:  Back on the record.
```

PLAINTIFFS' EXHIBITS 011989

WIILIAM L. GALANTER, M.D.                                   August 3, 2011

1  BY MR. ERNST:

2      Q    Now, Doctor, did you talk with your lawyer

3  during the break?

4      A    Yes.

5      Q    What did you talk about?

6          MR. TABER:  Objection, work product.

7          Don, you know you can't ask that.

8          MR. ERNST:  I just did.

9          MR. TABER:  Well, he can't answer that

10 because it is work product.

11 BY MR. ERNST:

12     Q    Did the lawyer give you any advice on how to

13 answer questions, Doctor?

14         MR. TABER:  Objection.

15         THE WITNESS:  No.

16 BY MR. ERNST:

17     Q    All right.  If a patient comes into your

18 office as a treating physician, and claims that they

19 are fatigued and bloated, would that give you cause to

20 believe that they would have a gastrointestinal issue?

21     A    Yes and no.  The fatigue is a very

22 non-specific complaint.  So I wouldn't necessarily tie

23 fatigue in as a gastrointestinal complaint, but

24 bloating is, by definition, a gastrointestinal

PLAINTIFFS' EXHIBITS 011990

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  symptom.  So yes on that part.
 2      Q    A gastrointestinal symptom is an indication
 3  of digoxin toxicity; isn't it?
 4           MR. TABER:  Sorry.  Objection.
 5           THE WITNESS:  I would go backwards on that
 6  and say some of them are.
 7  BY MR. ERNST:
 8      Q    So some gastrointestinal issues are digoxin
 9  related, true?
10           MR. TABER:  Objection.
11           THE WITNESS:  Can be digoxin related, yes.
12  BY MR. ERNST:
13      Q    And therefore, by definition, bloating can
14  be a gastrointestinal issue and caused by digoxin
15  toxicity, true?
16           MR. TABER:  Objection.
17           MS. AHERN:  Objection.
18           THE WITNESS:  I actually have not read about
19  it specifically, bloating per se.
20  BY MR. ERNST:
21      Q    I'm not asking about the literature.  I'm
22  asking about you as a clinician.
23           If a person said they were bloated, that's a
24  factor that you would consider as a gastrointestinal
```

PLAINTIFFS' EXHIBITS 011991

WIILIAM L. GALANTER, M.D.                                      August 3, 2011

1  issue; isn't that true?

2      A    The answer is, yes, I would consider

3  bloating a gastrointestinal issue.

4      Q    And gastrointestinal issues, as we have

5  already talked about, can be caused by digoxin

6  toxicity, true?

7           MR. TABER:  Objection, overbroad.

8           THE WITNESS:  Yes, gastrointestinal issues

9  can be caused by digoxin toxicity.

10 BY MR. ERNST:

11     Q    Now, let's go back and look at Exhibit 7.

12 There is a re-call here of the digoxin; do you see

13 that?

14     A    Yes.

15     Q    And that re-call was specifically sent to

16 Mr. McCornack; do you see that?

17     A    No.

18          Am I being stupid?

19          MR. TABER:  Objection.

20          MR. ERNST:  No.

21 BY MR. ERNST:

22     Q    There was a letter that was specifically

23 sent to Mr. McCornack, and I thought that was

24 Exhibit 7.  The letter was specifically addressed to

PLAINTIFFS' EXHIBITS 011992

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  Mr. McCornack saying that his medication had been
 2  re-called.
 3       A    No, I have a letter that says "Dear Plan
 4  Participant," and I wasn't advised that this was or
 5  wasn't sent to Mr. McCornack.  I just thought it was a
 6  standard letter.
 7       Q    So, Doctor, are you telling me that, in all
 8  your opinions here that you have rendered, you didn't
 9  know that Mr. McCornack was sent a re-call letter that
10  his medication may have contained twice the amount of
11  active digoxin?
12            MR. TABER:  Objection.  And are you quoting
13  something, Don?  Because I don't --
14            THE WITNESS:  Answer or not answer?
15            MR. TABER:  -- because I don't see that
16  here.
17            If you want him to look at the letter again,
18  feel free, but I object to that characterization.
19            THE WITNESS:  My answer is I assume that
20  they received some type of notification of it or else
21  we wouldn't be here in court, but all I had was this
22  letter in front of me that wasn't specifically to him.
23  But, yes, I assume that he got a letter, or his family
24  did, whatever.
```

PLAINTIFFS' EXHIBITS 011993

WIILIAM L. GALANTER, M.D.                                      August 3, 2011

```
 1  BY MR. ERNST:
 2      Q    So this is very important, Doctor:  Were you
 3  given a letter, a copy of a letter, that was addressed
 4  to Mr. McCornack saying that his medication had been
 5  re-called because it may have contained twice the
 6  normal strength?
 7           MS. AHERN:  Objection.
 8           MR. TABER:  Objection.
 9           By the way, I object to your colloquy before
10  your question, and I would ask you to rephrase and
11  take out your own personal comments about what is
12  important and what is not and stick to just asking
13  questions.
14           MR. ERNST:  That is a violation of Pretrial
15  Order 22.
16           I will have my last question reread, and I
17  would ask that you answer the question, Doctor.
18           THE WITNESS:  The answer is, no, I wasn't
19  given a letter that was specifically addressed to
20  Mr. McCornack.
21  BY MR. ERNST:
22      Q    That would be an important piece of
23  information to you to know that his medication had
24  actually been re-called; wouldn't it?
```

PLAINTIFFS' EXHIBITS 011994

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
1            MR. TABER:  Objection.
2            THE WITNESS:  It turns out no because I
3    assumed that he was in that group or else there
4    wouldn't be this lawsuit.  I assumed that he was one
5    of those people or else we wouldn't be here.
6    BY MR. ERNST:
7       Q    But were you aware that his specific
8    medication that he had in his household, that he was
9    taking, was re-called?
10            MR. TABER:  Objection.
11            MS. AHERN:  Objection, asked and answered.
12            THE WITNESS:  The answer is no.  I assumed
13   that, but I wasn't given direct information.
14   BY MR. ERNST:
15      Q    Now, Doctor, digoxin has a narrow
16   therapeutic range, true?
17      A    Yes.
18      Q    And for a layperson, that means that if the
19   digoxin level is increased or decreased, it can have
20   very significant health effects on the person taking
21   the digoxin, true?
22            MR. TABER:  Objection, overbroad.
23            THE WITNESS:  It depends on what you mean by
24   "very", but I think, yes, it has a narrow therapeutic
```

PLAINTIFFS' EXHIBITS 011995

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  index, which means that there is a more-than-typical,

2  more-than-average variation by level in risk/benefit.

3  BY MR. ERNST:

4       Q    Now, if Mr. McCornack had taken a pill at

5  6:00 to 7:00 p.m. at night, with his evening meal, of

6  digoxin, and it had been a double-strength pill, how

7  long would it take for that pill to be absorbed into

8  the body?

9            MR. TABER:  Objection.

10           THE WITNESS:  I'm not a hundred percent sure

11  to be honest with you.  I'm not a pharmacist.  My

12  recollection is a matter of hours by the way that it

13  is dosed orally during loading.

14  BY MR. ERNST:

15      Q    So four hours, five hours would be something

16  that you would expect that that dosage, whatever it

17  was, would be absorbed into the bloodstream, true?

18      A    Something like that, yes, but I'm admitting

19  that I'm not a pharmacist.

20      Q    Right.

21           But you are a doctor that works with this

22  drug all the time, true?

23      A    Yes.

24      Q    And you are -- okay.

PLAINTIFFS' EXHIBITS 011996

WIILIAM L. GALANTER, M.D.                              August 3, 2011

1      A    We dose the medication daily.  So a lot of
2  meds are dosed daily with a broad range of half lives
3  and absorptions.
4      Q    By the way, when you give digoxin, do you
5  give the generic type or do you give Lanoxin?
6      A    When I did give outpatient, I give generic.
7  When I give inpatient, the pharmacy gives whatever
8  they want to give.
9      Q    So circling back, Doctor, if Mr. McCornack
10  had ingested a pill at 6:30, and it was double the
11  strength of the normal dose -- and, by the way, his
12  dose was .25?
13      A    Yes, .25 twice a day.
14      Q    So in the evening, if he had taken a .5
15  pill, isn't it consistent that Mr. McCornack could
16  have suffered bradycardia four to five hours after
17  ingesting that pill?
18          MR. TABER:  Just object.  Don, I'm sorry to
19  interrupt, but you did say a .5 pill just now.  Do you
20  want to change that?
21          MR. ERNST:  If I did, I misspoke.
22          Assume that he took -- no, I did say .5
23  because his normal dose was .25.  The re-call was for
24  .5.

PLAINTIFFS' EXHIBITS 011997

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1              I will have my last question re-read.
 2              MR. TABER:  Right, but you said .5 in the
 3   evening, that's how he took it.  He took two .25 twice
 4   a day.
 5              MR. ERNST:  You are right.  It would be .5.
 6   Okay.
 7              MR. TABER:  Okay.  Sorry.
 8   BY MR. ERNST:
 9      Q    Assume that Mr. McCornack took a
10   double-strength pill in the evening, okay, Doctor?
11      A    Yes.
12      Q    Now, it is consistent that he would have
13   suffered from bradycardia four to five hours after
14   ingesting the pill?  It is consistent; isn't that
15   true?
16              MR. TABER:  Objection.
17              THE WITNESS:  It could be possible.  We
18   could actually try to figure it out from the -- I
19   don't actually recall his heart rates during his
20   medical visits, and I apologize.
21              If he was run on the borderline -- my
22   recollection is he was very hard to control his heart
23   rate, but if he was being run at borderline
24   bradycardia, 65, 70, 62, then I think that that could
```

PLAINTIFFS' EXHIBITS 011998

```
 1  be very possible.  If he was running at 80 or 90, then
 2  I don't think it would be very possible.
 3            So it really depends on his heart -- we
 4  could actually do better than guess a little bit, I
 5  think, by looking at his heart rate.
 6  BY MR. ERNST:
 7      Q    And you look at his heart rate that he was
 8  at the last doctor visit, right?
 9      A    Yes, just to get an idea of -- not the last,
10  just overall, was he very tightly controlled or was he
11  not tightly controlled in terms of his heart rate.
12      Q    Well, if, in fact, he suffered from
13  bradycardia four hours after taking a double-strength
14  pill, that bradycardia could lead to ventricular
15  tachycardia; isn't that true?
16            MR. TABER:  Objection.
17            MS. AHERN:  Objection.
18            MR. TABER:  Move to strike all the causation
19  questions that are possibilities and therefore not
20  admissible, rather than probabilities.
21            THE WITNESS:  Answer?
22            MR. TABER:  Yes.
23            THE WITNESS:  I think you might be, and I
24  might be wrong, and I apologize, Mr. Ernst, but you
```

PLAINTIFFS' EXHIBITS 011999

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  might be misconstruing one of my earlier comments.

2          I think you are putting the scheme together,

3  bradycardia -- I don't mean it in a bad way, a scheme,

4  but you are trying to sequence bradycardia and

5  ventricular tach arrythmia, which you put together.  I

6  didn't necessarily put it together.

7          I don't think bradycardia in the setting of

8  digoxin toxicity makes you more prone to ventricular

9  tachycardia than tachycardia in the setting of digoxin

10  toxicity.  So I'm not putting it together the same way

11  you are.  Is that okay?

12  BY MR. ERNST:

13     Q   Would you acknowledge that, with the narrow

14  therapeutic range of digoxin, that if Mr. McCornack

15  ingested a double-strength pill that it could lead to

16  ventricular tachycardia?

17          MR. TABER:  Objection to the possibilities

18  questions.

19          Go ahead.

20          MS. AHERN:  Objection.

21          THE WITNESS:  I would say that in terms of

22  is it possible, anything is possible.  Is it probable?

23  One dose on a twice-a-day dosing, I think it takes

24  four or five half lives of digoxin.  Again, I would

PLAINTIFFS' EXHIBITS 012000

1  like to qualify that I'm not a pharmacist because you

2  might get some pharmacists that say it takes three or

3  seven, but it takes a lot of half lives to get to a

4  steady state, and his digoxin levels weren't very

5  high.

6        So I think one dose of a double, just like

7  missing one dose or taking one dose of a double on a

8  BID dosing schedule, doesn't do much to the level.

9  BY MR. ERNST:

10    Q    Wasn't his digoxin level varied between 1.6

11  and 1.8?

12    A    My recollection is yes.  If you want, I can

13  look at all the medical reports if you are going to

14  hold me to an exact number, but that's my recollection

15  also.

16    Q    Now, if, in fact -- well, let's go back and

17  talk about bradycardia.  Is it your opinion that the

18  double dose of digoxin would cause bradycardia?

19        MR. TABER:  Objection.

20        THE WITNESS:  My opinion is in a patient who

21  was borderline bradycardic to begin with, that if they

22  took a double dose, they could get transiently

23  bradycardic.  So it really depends on what was the

24  heart rate on the normal schedule.

PLAINTIFFS' EXHIBITS 012001

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1          If the patient had a heart rate of 90, the

2    answer would be no.  If the patient had a heart rate

3    of 64, 65, the answer would be very possibly.

4    BY MR. ERNST:

5      Q    So, Doctor, if a person suffers from

6    bradycardia, the heart rate can actually slow enough

7    to where they become unconscious; isn't that true?

8      A     The answer is bradycardia in general, yes,

9    but in this setting typically not because this is a

10   ventricular response to atrial fibrillation.  So the

11   heart rate doesn't jump from 60 to 30.  It goes from

12   60 to 55 to 50.  Drugs that cause a complete heart

13   block, you can jump from 70 to 40 or 35 just in one

14   jump.

15          If he was suffering from bradycardia due to

16   an overdosing of digoxin or high-digoxin level, his

17   heart rate would just gradually go down, and people

18   don't pass out from a heart rate of 50 or 55 or 48.

19     Q    Well --

20     A    Some settings, bradycardia could cause you

21   to pass out.

22     Q    Isn't it true that Dr. Lemm opined that if

23   he is sleeping, he would just go to sleep, his heart

24   rate would slow, and he would eventually die?

WIILIAM L. GALANTER, M.D.                              August 3, 2011

```
 1              MR. TABER:  Counsel, what page are you
 2   citing?  Because we have his depo right here.
 3              MR. ERNST:  No, I'm asking you if you agree
 4   or disagree with that.
 5              THE WITNESS:  With that comment?
 6              MR. TABER:  All right.  So if you are asking
 7   the witness if he agrees or disagrees with the
 8   document, you are required to show it to him.  I'm
 9   invoking that requirement at this point.
10              If you want to rephrase your question,
11   exclude the whole reference to the deposition, that's
12   fine.  Either way you want to go.
13              MR. ERNST:  I will have my last question
14   reread.
15              (Record read.)
16              MR. TABER:  Objection, same basis, and if
17   you are refusing to fulfill your obligation to give
18   the witness the documents you are referencing, he is
19   under no obligation to answer it.
20              MS. AHERN:  Join.
21              MR. ERNST:  Well, we are halfway across the
22   country.  So --
23              THE WITNESS:  I would be happy to answer if
24   we can find the quote from Dr. Lemm.
```

PLAINTIFFS' EXHIBITS 012003

1           MR. TABER:  We have his deposition right

2    here.  If you simply have a page reference, we would

3    be happy to direct the doctor to the page.  I have got

4    the transcript right here.

5           MR. ERNST:  Well --

6           MR. TABER:  By the way --

7           MR. ERNST:  You know, he read the

8    deposition, and I want you to assume that Dr. Lemm has

9    testified to that, okay?

10           MR. TABER:  All right --

11           MR. ERNST:  I want you to just assume that

12   he did.

13           Do you agree or disagree with it?

14           MR. TABER:  No, we are not going to assume

15   that you are quoting his testimony accurately, and we

16   are not required to.  The rules are there for a

17   reason, and we are invoking our right to see the

18   document you are referencing.

19           If you want to take out the reference to

20   Dr. Lemm and rephrase your question as a hypothetical,

21   fine, but you can't quote a document and pretend you

22   are not quoting it.  It is up to you.

23           MR. ERNST:  No, it is up to you.  Are you

24   instructing him not to answer the question?

PLAINTIFFS' EXHIBITS 012004

WIILIAM L.  GALANTER, M.D.                          August 3, 2011

1          MR. TABER:  I'm instructing you that you are

2    under an obligation to show us the document if you are

3    going to quote it and ask him if he agrees or

4    disagrees with it.

5          So it is up to you to either rephrase or you

6    are not going to get an answer to the question because

7    he is under no obligation to answer it.

8          MR. ERNST:  No, I tell you what:  We are

9    going to go off the record for five minutes, okay?

10         MR. TABER:  Okay.

11         MR. ERNST:  We are going to go off the

12   record for five minutes.

13         MR. TABER:  Sure.

14         (Recess taken.)

15         MR. ERNST:  Back on the record.

16         I disagree with that.  Do you have a

17   specific authority that I have to cite a page and

18   number?  And if you do, please give it to me on the

19   record.

20         MR. TABER:  Yes, it is in the Federal Rules

21   of Evidence.

22         MR. ERNST:  Where?

23         MR. TABER:  I didn't bring my rule book with

24   me, but if you really want to stop the deposition --

```
 1          MR. ERNST:  Let me tell you that you are
 2   violating Rule 22 consistently giving speaking
 3   objections and instructing the witness.  So we are
 4   either going to call the magistrate or you are going
 5   to stick to the objection and that's it.  What is it
 6   going to be?
 7          MR. TABER:  I'm sticking to my objection.
 8          MR. ERNST:  If you are going to stick to the
 9   objection, then you may say the word "objection", and
10   any other speaking objections that you make, if the
11   next one happens, I'm going to adjourn the deposition
12   and were are going to call the magistrate; am I clear?
13          MR. TABER:  You are coming through clear.  I
14   respectfully disagree with your elevated tone and
15   threats that you are sending now, but it is your
16   deposition.  Please go forward, but I am going to hold
17   you to the rules.
18          MR. ERNST:  No, I'm going to hold you to the
19   rules.
20          MR. TABER:  I'm fine with that, and if I
21   have interrupted, I do apologize.
22   BY MR. ERNST:
23      Q    Doctor, I want you to assume that Dr. Lemm
24   testified that Mr. McCornack, if he had a double dose
```

PLAINTIFFS' EXHIBITS 012006

```
 1  of digoxin, would simply go to sleep, his heart rate
 2  would slow, he would not get enough oxygen to his
 3  brain, and he would die.  Do you disagree with that?
 4          MR. TABER:  No.  Objection, and we are not
 5  going to answer that.  It is the third time you asked
 6  it.  The objection stands.
 7  BY MR. ERNST:
 8      Q    I want you to assume that Mr. McCornack's
 9  heart rate -- or he took a double dose of digoxin at
10  6:00 p.m.  At midnight, or 11:30, 12:00 o'clock, he
11  went to sleep.  His heart rate slowed and he died.
12      A    Okay.
13      Q    Do you disagree with that?
14          MR. TABER:  Objection.  Go ahead.
15          THE WITNESS:  The answer is I disagree with
16  that.
17  BY MR. ERNST:
18      Q    Do you disagree with that?  That can be
19  answered yes or no.
20      A    Yes, I disagree with it because what would
21  happen is his heart rate would go down, eventually his
22  ventricle would take over, and he would either have a
23  junctional or a ventricular escape rhythm that would
24  maintain blood flow, and because on autopsy it looked
```

PLAINTIFFS' EXHIBITS 012007

WIILIAM L. GALANTER, M.D.                                          August 3, 2011

1  like his heart probably pumped okay, I think that

2  lower heart rate, with a normal pump, would have been

3  sufficient to keep him alive, especially while he was

4  doing nothing in bed.

5          So my understanding of digoxin toxicity is

6  the heart rate just doesn't go down from 80 to zero.

7  There is other mechanisms that come into play.

8      Q    So please state for me how many autopsies

9  you have performed.

10     A    Zero.

11     Q    And please state for me how many causes of

12 death you have determined from a person dying of a

13 cardiac issue.

14     A    I actually don't recall because I have to

15 give cause of death on my patients when they die if

16 the coroner doesn't want to take them.  So it actually

17 happens relatively infrequently, but I don't know the

18 exact number.  When the case doesn't go to the

19 coroner, they ask the primary care doctor or the

20 service doctor to give the cause of death.  So it

21 actually doesn't happen frequently.

22     Q    When the case does go to the coroner, would

23 you acknowledge that the coroner has additional

24 information that you, as a person reviewing the

PLAINTIFFS' EXHIBITS 012008

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  records, does not have?

2       A    Yes.  They have the autopsy.

3       Q    Right.

4            And the autopsy gives them additional

5  information that you, as a clinician, and as you sit

6  here today, reviewing the records, reviewing the

7  materials, simply does not have because you didn't see

8  the body and the heart?

9            MR. TABER:  Objection.

10            THE WITNESS:  It depends on if I got to read

11  their report or not and how well they read -- at the

12  time that I'm asked to give a cause of death, the

13  autopsies are not done.  So I don't have the body, nor

14  the findings.  So the answer is, yes, once they do the

15  autopsy, they know a lot more than I do.

16  BY MR. ERNST:

17       Q    And, in fact, following an autopsy, in your

18  career, Doctor, have you ever disagreed with the

19  coroner's cause of death?

20       A    No, not a coroner's -- well, you asked a

21  double question because a lot of the autopsies are

22  done by our pathologist because we are a teaching

23  hospital.  So I don't know if you want to state that

24  how you want to state that, but I often disagree with

PLAINTIFFS' EXHIBITS 012009

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  the cause of death from our pathologist, but when a

2  case goes to the coroner, once my patient's dead, I

3  have nothing to do with it.  So I wouldn't agree or

4  disagree.  But I do disagree with our pathologist's

5  cause of death sometimes.

6       Q    So you disagree with the pathology cause of

7  death on a number of occasions?

8       A    On a number of occasions --

9       Q    On autopsy?

10      A    -- that died in my hospital where the

11  autopsy was done in my hospital.

12      Q    Did any of those involve digoxin toxicity?

13      A    I actually don't recall.

14      Q    You mention in your report that

15  Mr. McCornack had multiple risk factors for sudden

16  cardiac death, true?

17      A    Yes.

18      Q    And is it accurate to state that one of the

19  risk factors that Mr. McCornack had for sudden cardiac

20  death was digoxin toxicity?

21      A    Yes, that's on my list.

22           MR. TABER:  Hold on.  Read that back.

23           (Record read.)

24           THE WITNESS:  No.  The answer is no.  I

PLAINTIFFS' EXHIBITS 012010

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  apologize.  I misunderstood.

2          I did say that digoxin, period, was a risk

3  factor.  I missed the toxicity.  Just the fact that he

4  was on digoxin itself is known as a risk factor.

5          MR. TABER:  And just let me interject for a

6  minute here:  Whether it be because of the delay on

7  the video conferencing or whatever, the witness and

8  the questioner are talking over each other, and I

9  would ask both Dr. Galanter and Mr. Ernst if you would

10  please not interrupt each other so that we get a clean

11  record, because there is a delay, because I can see

12  your lips move, and you're both talking over each

13  other, and that's going to make a bad record.

14          THE WITNESS:  Sorry.

15          MR. TABER:  It is all right.

16  BY MR. ERNST:

17     Q    Digoxin is a risk factor in sudden cardiac

18  death, true?

19     A    Yes.

20     Q    And digoxin toxicity is a risk factor in

21  sudden cardiac death, true?

22          MR. TABER:  In this case or in general?

23          MR. ERNST:  You know, I'm done here.  I

24  think that we should call the magistrate.  You are

PLAINTIFFS' EXHIBITS 012011

WIILIAM L. GALANTER, M.D.                              August 3, 2011

```
 1  making speaking objections.  So I recommend that we do

 2  a conference call to the magistrate now.  Are you

 3  willing to do that?

 4            MR. TABER:  It is up to you.  It is fine

 5  with me.

 6            MR. ERNST:  I would like to have my last

 7  question reread.

 8            (Record read.)

 9            THE WITNESS:  Yes.

10  BY MR. ERNST:

11     Q    Now, in this case, you are aware that

12  Mr. McCornack received a re-call notice for a

13  double-strength medication of digoxin, true?

14            MR. TABER:  Objection.

15            THE WITNESS:  The re-call notice, let me

16  look at it again.  It just said that it was a batch or

17  something.  I'm sorry, Mr. Ernst.  Let me look at the

18  letter again.

19            Where did I put that?

20            Oh, sorry.  This letter that I have, which

21  is Exhibit 7, it actually refers to a prior letter.

22  It says:  "You recently received a letter from CVS

23  Caremark about the Digitek."  So I don't, as we

24  discussed before, I actually don't have a letter that
```

PLAINTIFFS' EXHIBITS 012012

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

```
 1   was to him.
 2   BY MR. ERNST:
 3        Q    Have you reviewed Dr. Heard's deposition?
 4        A    Yes.
 5        Q    And do you have that deposition with you
 6   there?
 7        A    Yes, I do.
 8        Q    I want you to go to Dr. Heard's deposition.
 9        A    Okay.  Just give me one moment.
10        Q    And go to the exhibits.  Do you have the
11   exhibits?
12        A    I don't have it yet, Mr. Ernst.
13             MR. TABER:  And I think, Don, I think you
14   are talking about the --
15             THE WITNESS:  Yes, I apologize.  I don't
16   have his deposition.  It is not available yet.  I have
17   his opinion.
18   BY MR. ERNST:
19        Q    Do you have Dr. Mason's deposition with
20   exhibits?
21        A    I don't know what "with exhibits" means, but
22   I do have his deposition, and I can get it.
23        Q    Why don't you pull his deposition and see if
24   there are exhibits attached.
```

```
 1              THE WITNESS:  Is this the exhibits or no?
 2              MR. TABER:  Yes, I think it is.
 3              THE WITNESS:  Yes, I have it.
 4   BY MR. ERNST:
 5       Q    All right.  I want you to look at the
 6   exhibits to Dr. Mason's deposition, and there is a
 7   letter from Caremark in there.
 8       A    Do you know which --
 9       Q    If you look at --
10       A    Do you know which one that is?
11       Q    I think it is Exhibit 14, but I'm not sure.
12       A    Okay.  Thank you.
13              MR. TABER:  There should be an index to the
14   exhibits as well.
15              MR. ERNST:  Yes.  If you will check the
16   index, you can get the actual -- I apologize that I'm
17   not there.  We are doing video conferencing here.
18              THE WITNESS:  That's okay.  I'm just
19   apologizing for being slow.
20              Is that the last page or the beginning?
21              MR. TABER:  The index is in the very
22   beginning of the transcript.
23              THE WITNESS:  Letter.  Letter.
24              I actually don't see it in the index.  14
```

PLAINTIFFS' EXHIBITS 012014

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1   was a letter from you.

2            Do you see it?

3            MR. TABER:  No.

4            THE WITNESS:  You know what, Mr. Ernst?  I

5   don't see it, and I apologize.  I checked 14, and that

6   was from you, and 15 was from you.  13 says

7   environmental.  Maybe that's the FDA.

8            MR. ERNST:  That's all right.

9            Let's go off the record a minute.

10           (Recess taken.)

11  BY MR. ERNST:

12       Q    Do you have the Lemm deposition there?

13       A    I'm sure I do, yes.

14       Q    I want you to look at, I think it is,

15  Exhibit 6-14.

16       A    Got it.

17       Q    It is a letter addressed to Daniel

18  McCornack; isn't it?

19       A    Yes, it is.

20       Q    You don't recall reading this; do you?

21       A    No.  This is one of the first pieces that I

22  got probably two-and-a-half years ago.

23       Q    So, in fact, when you wrote your report, you

24  didn't know that Mr. McCornack had received a letter

PLAINTIFFS' EXHIBITS 012015

1  stating that there might be twice the approved level

2  of active ingredient in the pill; did you?

3          MR. TABER:  Objection.

4          THE WITNESS:  I think I answered this

5  before.  I assume so because I assumed that's why this

6  was a legal issue.

7  BY MR. ERNST:

8      Q    You did not know at the time; did you?

9      A    I did not know for a fact that he had

10  received this letter.  I assumed that he had received

11  the letter because I had the other letter that was

12  just general "Dear Participant".  So I would assume

13  that he was a participant.  I'm talking about No. 7.

14     Q    Now, would you agree with me that, in fact,

15  looking at this letter, that, in fact, double-strength

16  pills could induce digoxin toxicity?

17         MR. TABER:  Objection.

18         MS. AHERN:  Objection.

19         THE WITNESS:  I have to -- it was old.  So

20  if you give me a moment, I will look at it, and then

21  answer your question.

22         My answer would be no because it doesn't

23  talk anything about his indication or his present

24  dosage.  So if he had CHF, his dose would have been

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  low, and doubling it wouldn't have put him into toxic

 2  range; and if he was high in his dosing, it could have

 3  put him into toxic range.  So I don't think his letter

 4  specifically addresses his dosing or indications.

 5  BY MR. ERNST:

 6      Q    Go to Exhibit 7.

 7      A    Okay.

 8           Oh, sorry, that is a different thing.

 9           MR. TABER:  Take your time.

10  BY MR. ERNST:

11      Q    Does Exhibit 7 define the risks, Doctor?

12      A    Give me one second.  I'm just moving to a

13  different paper.

14           I don't see anything about risks here.  Am I

15  missing something?

16      Q    In truth and fact, double-strength pills can

17  lead to digoxin toxicity and death; isn't that true?

18           MR. TABER:  Objection.

19           THE WITNESS:  In Exhibit 7?

20           MR. ERNST:  I'm just asking generically.

21           I will have my last question reread.

22           THE WITNESS:  I'm sorry.  Sorry about that.

23           (Record read.)

24           MR. TABER:  Objection, false hypothesis.
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1          Go ahead.

2          THE WITNESS:  The answer is, yes, if a

3  person were to persistently take double-strength

4  pills, it could lead to toxicity and death.

5  BY MR. ERNST:

6     Q    Going to Page 93 of the Lemm deposition,

7  Line 7 --

8          MR. TABER:  Did you say 83?

9          THE WITNESS:  93 I think he said.

10         MR. ERNST:  93.

11         MR. TABER:  Okay.  Thanks.

12         THE WITNESS:  And what line, Mr. Ernst?

13         MR. ERNST:  Line 7 through 13.

14         THE WITNESS:  Okay.  Give me a moment.

15 BY MR. ERNST:

16    Q    Dr. Lemm concludes -- Dr. Lemm is the

17 treating practitioner; you are aware of that?

18    A    One of them, yes.

19    Q    And Dr. Lemm states that:

20         "Sometimes, if one is asleep and suffering

21  from digoxin toxicity, their heart could just slow

22  to a level where this would become -- they would

23  pass out and eventually die?"

24         And the answer is:

PLAINTIFFS' EXHIBITS 012018

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1              "A.   Yes.

 2              "Q.   Do you believe that's what happened

 3     here?

 4              "A.   I think so."

 5      A     So what's the question?

 6      Q     Do you disagree with that?

 7      A     Well, I agree that that's there accurately,

 8  but I disagree with his conclusion.

 9      Q     Right.

10              You believe that Dr. Lemm, as a treating

11  physician, has a reasonable basis for concluding that;

12  don't you?

13      A     I disagree with his conclusion.  So I'm not

14  sure if his basis or his logic is wrong, but I can't

15  tell which.

16      Q     Right.

17              So you are aware that the treating physician

18  of Mr. McCornack, the cardiologist, and the coroner

19  all concluded that Mr. McCornack died of digoxin

20  toxicity?  You are aware of that, right?

21              MR. TABER:  Objection, same basis as before.

22              MS. AHERN:  Objection.

23              THE WITNESS:  Actually, in this sentence, I

24  agree that Dr. Lemm is saying that this could happen,
```

PLAINTIFFS' EXHIBITS 012019

```
 1   and I know Dr. Mason and I agree that was his
 2   conclusion on his amended thing.  I don't recall what
 3   the cardiologist said because I don't think they were
 4   asked -- I don't recall that they made a final
 5   statement.
 6   BY MR. ERNST:
 7       Q   Is it significant to you that every person
 8   that has actually seen Mr. McCornack or seen his body
 9   has concluded that he died of digoxin toxicity?
10           MR. TABER:  Objection.
11           MR. ERNST:  Is that important to you?
12           MR. TABER:  Objection.
13           THE WITNESS:  I think you are saying
14   "everyone" as multiple people.  I think Dr. Mason was
15   the only one that saw his body, and it is somewhat
16   disturbing to me that Dr. Mason changed his mind very
17   far apart.  So I somewhat discount Dr. Mason's opinion
18   because I don't think he was very confident about his
19   opinion.
20   BY MR. ERNST:
21       Q   All right.  Doctor, let's go back and
22   summarize some of the things that you have said.
23           You have acknowledged that digoxin toxicity
24   can cause sudden cardiac death, true?
```

PLAINTIFFS' EXHIBITS 012020

1           MR. TABER:  Okay.  Hold on.

2           MS. AHERN:  Objection.

3           MR. TABER:  You can't repeat your questions.

4    When you say "summarize", if you are going to ask new

5    questions, please go ahead; but if you are going to

6    ask the same questions you already asked, I object,

7    and I would respectfully ask you not to repeat because

8    we will not summarize the same questions we have asked

9    already.

10          MR. ERNST:  If you have an objection, you

11   can place it on the record.

12          MR. TABER:  I just did.

13          MR. ERNST:  I will have my last question

14   reread.

15          (Record read.)

16          THE WITNESS:  That's a two-part question.

17   One is do I remember saying it and one is is it true.

18   So do I remember saying it?  I'm not a hundred percent

19   sure, but the answer is, yes, I do say that digoxin

20   toxicity can cause sudden cardiac arrest.

21   BY MR. ERNST:

22       Q    You are aware --

23          MR. TABER:  He is not done.

24          MR. ERNST:  I'm going to ask another

PLAINTIFFS' EXHIBITS 012021

WIILIAM L.  GALANTER, M.D.                              August 3, 2011

1   question.

2           MR. TABER:  No, you cut him off, and we both

3   agreed not to do that.  So let him, please, finish his

4   answer, and he will let you finish your question.  I

5   apologize for interrupting.

6           Go ahead.

7           MR. ERNST:  I thought he was finished.

8           THE WITNESS:  It is okay.

9           My only statement was that I don't have the

10  transcript in front of me, and I don't want to be

11  caught on did I/didn't I say anything.  So I will

12  restate my opinion, I guess, if my counsel lets me,

13  but I don't want to have to say whether or not I said

14  something or not, because if it has to be accurate,

15  then I have to wait for the court reporter to go back

16  and look at it, and it will be very time consuming.

17          So the answer is, yes, I agree that digoxin

18  toxicity can cause sudden cardiac arrest.  What I'm

19  not so sure about is whether I said that or not

20  before, and if I have to know exactly, that means I am

21  going to have to ask her to go back and look at

22  everything I have said.  I'm not trying to be

23  difficult.  Does that make sense?

24          MR. ERNST:  Sure.

PLAINTIFFS' EXHIBITS 012022

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  BY MR. ERNST:
 2     Q    So one of the things that I want to make
 3  sure is just make sure we have a clean record.  There
 4  is no trick questions here.
 5          I just want it clear, in a question and
 6  answer, that digoxin toxicity can cause sudden cardiac
 7  arrest.
 8          MR. TABER:  Objection, asked and answered
 9  at least five times.  Please ask a new question,
10  something that we haven't already covered in the last
11  three hours.
12          MR. ERNST:  Actually, it has been two hours
13  and 15 minutes.
14          MR. TABER:  Sorry.
15          MR. ERNST:  Not counting breaks.
16  BY MR. ERNST:
17     Q    Now, you mentioned that there was pulmonary
18  edema that was a finding on autopsy.  Do you see that?
19     A    Actually, I didn't mention that.  That I
20  know that we didn't talk about.  So I did not mention
21  that he had pulmonary edema.
22     Q    What significance is pulmonary edema to you?
23     A    It really depends if it is a -- pulmonary
24  edema to me, as a doctor clinically, there is a lot of
```

PLAINTIFFS' EXHIBITS 012023

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  causes to pulmonary edema, and it helps to make a

2  differential diagnosis for a lot of different things,

3  and I don't want to get into that.

4          Postmortem, and I'm not an expert, it seems

5  like other people were claiming that this is a finding

6  that just occurs sometimes, and you find it after

7  people die.  So it is not something that I read about,

8  but I can talk a long time about pulmonary edema in

9  the live patient.

10     Q    Here is my question:  Is pulmonary edema a

11  factor in your opinions?

12     A    No.

13     Q    It is true; isn't it, that pulmonary edema

14  can be related to sudden death, sudden cardiac arrest?

15     A    The answer is I'm not sure, but I don't

16  think so because I think that the person dies

17  immediately, and the pulmonary edema is a hemodynamic

18  mechanical thing that would take a little while to

19  occur.  So I think the pulmonary edema would come

20  after death.  So death is defined when the brain -- I

21  think the brain would cease to get oxygen prior to the

22  development of the pulmonary edema.  If someone has

23  near death, then they might develop pulmonary edema

24  after the near-death episode.

PLAINTIFFS' EXHIBITS 012024

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1      Q     Can pulmonary edema be caused by digoxin
2   toxicity?
3      A     It could be caused by certain parts of
4   digoxin toxicity.
5      Q     And if you look at Page 3 of your report,
6   the second paragraph from the end, you state, and I
7   quote:  "His autopsy did show pulmonary edema, but
8   this may have been related to his sudden cardiac
9   arrest or developed postmortem."
10     A     Yes.
11     Q     So is it your testimony now that pulmonary
12  edema is related to sudden cardiac arrest?
13     A     I think I'm having a hard time.  It depends
14  on if it is a live patient or it is in a dead patient.
15  So my answer was you might develop pulmonary edema
16  after you die of sudden cardiac arrest.  So it really
17  depends on if you are talking about in the live
18  patient or in the dead patient.  So my answer is in
19  the dead patient, on autopsy, you could find pulmonary
20  edema because of pump failure from ventricular
21  arrythmia.
22     Q     Doctor, you have rendered opinions here
23  today about the cause of death, and my question to you
24  is that sudden cardiac arrest, and the autopsy that

PLAINTIFFS' EXHIBITS 012025

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  was performed, and the evidence and information that
 2  you have, based upon the findings at death by the
 3  coroner, are consistent with a number of things, true?
 4            MR. TABER:  Objection.
 5            THE WITNESS:  On a medical definition of
 6  consistent, yes.  I can't say with a high probability
 7  of those things, but by the medical definition of
 8  consistent.
 9  BY MR. ERNST:
10     Q    And using the medical definition of
11  consistent, one of those things that the autopsy
12  findings are consistent with is digoxin toxicity;
13  isn't that true?
14            MR. TABER:  Objection.
15            MS. AHERN:  Objection.
16            THE WITNESS:  The answer is the autopsy
17  findings without information premortem that was in the
18  rest of the record.  So if I was just doing the
19  autopsy, and didn't have any other information about
20  the patient, I would say, yes, but in this particular
21  patient, based on their history premortem from the
22  depositions and record, I would say no.
23  BY MR. ERNST:
24     Q    So did you give any weight at all to the
```

PLAINTIFFS' EXHIBITS 012026

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1   fact that the medication that Mr. McCornack took on

2   the day of his death was re-called because it may have

3   been a double dose?

4           MR. TABER:  Objection.

5           THE WITNESS:  The answer is no because it

6   was tested, because his pills were tested, and none of

7   them were double dose.

8   BY MR. ERNST:

9       Q    Well, you are aware that the double dose

10  wasn't consistent throughout the pills that were

11  produced by Actavis; aren't you?

12      A    Not in the factory, but since I don't know

13  what actually got into his bottle -- I don't know if

14  it actually got out of the factory.  I don't know how

15  it would have come in the bottle, like all of them

16  together or half of them.  I don't know.  I haven't

17  read anything about it.

18      Q    Well, you are aware -- I'm sorry.

19           You are aware that the re-call was because

20  there were random pills out there that might have been

21  double dose; aren't you?

22           MR. TABER:  Wait.  Don, you know ethically,

23  as a lawyer, that that is absolutely false.  So please

24  rephrase the question.  You have no basis to say that,

PLAINTIFFS' EXHIBITS 012027

```
 1  and do not try to trick this doctor with something

 2  like that.

 3           MR. ERNST:  All right.  We are adjourning

 4  the deposition.  I'm calling the magistrate.  You have

 5  violated Rule 22 consistently, and I'm adjourning this

 6  deposition.  I reserve the right to reset it.  I'm

 7  going to make a motion against the kind of

 8  interruptions that you have made.

 9           Do you want to make the call right now

10  jointly?  I'm just going to adjourn the deposition at

11  this particular point in time, and I will make the

12  appropriate motion.

13           I'm tired of this.

14           Doctor, we have been going for two hours and

15  20 minutes.  I have been consistently interrupted with

16  violations of Rule 22, and it is a violation.  I'm

17  going to adjourn this deposition.  I'm going to ask

18  that the portion of the deposition be typed up.

19           You will be given an opportunity to read and

20  correct any portion of the deposition that you have at

21  this time, and I'm going to be making a motion to the

22  Court to take another session of your deposition,

23  okay?

24           MR. TABER:  No.  Let me say my piece.  May I
```

PLAINTIFFS' EXHIBITS 012028

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  now respond, since this is directed at me and not him?
 2          The Doctor is here --
 3          MR. ERNST:  The fact is I'm adjourning this
 4  deposition, and you may place anything on the record
 5  that you wish.
 6          MR. TABER:  Okay.  I will do that right now.
 7  It is 12:30 Central Time.  The Doctor, at your
 8  request, has set aside the entire day to answer
 9  questions.  He has done so.  If you adjourn this
10  deposition, it is your choice, but you do not get a
11  second crack at him.
12          He is here and ready, willing and able to
13  answer any appropriate questions that he is asked, and
14  we are not agreeing, by any means, to a second
15  deposition and will not produce him willingly for a
16  second deposition.
17          It is your call.  If you want to walk away,
18  it is your choice, but this is your chance.
19          MR. ERNST:  The point is that you
20  continually are interrupting, coaching, and making
21  statements that are inappropriate in violation of
22  Rule 22.  I'm adjourning this deposition.  I'm going
23  to be making a motion to the Court.
24          Doctor, I will pay you for your time.  If
```

PLAINTIFFS' EXHIBITS 012029

1  you submit a bill to your counsel, we will pay it
2  promptly, okay?  And we reserve the right to have this
3  deposition.
4          Again, I didn't expect it to go as long as
5  it did, but I refuse to continue with the kind of
6  interruptions that we have had.
7          Thank you very much.  Have a good day.
8          MR. TABER:  And before the deposition is off
9  the record, let me say that if you want to call the
10 magistrate right now, I'm absolutely comfortable with
11 that, ready, willing and able, and I'm very
12 comfortable with the appropriateness of the objections
13 that have been made.
14         If you disagree, it is at your own peril
15 because we have plenty of time, and we are ready to
16 continue, and if you choose not to, that's up to you.
17         If you have specific questions that you
18 believe he has not answered somehow because of my
19 interruptions, then I would suggest that you ask him
20 right now while he is here and able.
21         MR. ERNST:  Do you have the number for the
22 magistrate, counsel?
23         MR. TABER:  I don't, but if you want to call
24 her, go right ahead.  You have got a computer right in

PLAINTIFFS' EXHIBITS 012030

WIILIAM L.  GALANTER, M.D.                          August 3, 2011

1  front of you.  Just check the Southern District of

2  West Virginia, and I'm sure there is a number right

3  there.

4           I know that Judge Stanley has taken calls in

5  depositions before and has said that she would very

6  much be able to do that.

7           (Brief pause.)

8           MR. TABER:  Do you want the court reporter

9  to keep typing, which is fine with me, because she is

10 right now?

11          MR. ERNST:  It is fine.

12          MR. TABER:  Okay.  It is your transcript.

13          MR. ERNST:  And I'm going to be asking the

14 court reporter to read my last question and the

15 objection.

16          MR. TABER:  Sure.

17          (Brief pause.)

18          (Whereupon, a conference call was placed to

19          Judge Stanley's chambers.)

20          JUDGE STANLEY:  This is Judge Stanley.

21          MR. ERNST:  Judge Stanley, this is Don Ernst

22 calling, and we are in the middle of a deposition in

23 the McCornack versus Actavis Totowa case.  We are

24 taking the expert deposition of Dr. William Galanter.

1  We are doing it by video conference.

2            We have served a depo notice and Rule 22,

3  and I have made this call because the last question

4  and answer, and throughout this deposition, there have

5  been speaking objections in violation of Rule PTO 22,

6  and I have asked him to politely refrain.

7            As an example, I will give the last question

8  and answer that was -- or the last question and the

9  objection that was made, and I just ask the Court's

10  direction that counsel refrain from that so we can

11  finish this deposition.

12            JUDGE STANLEY:  Go ahead and read.

13            MR. ERNST:  Madam Court Reporter, can you

14  read the last question and then the objection by the

15  defense attorney, Mr. Ed Taber?

16            (Record read.)

17            JUDGE STANLEY:  I'm sorry, the court

18  reporter, I can't hear that.  What I propose is that

19  you put her on speaker.

20            MR. ERNST:  Go ahead.  I'm in front of the

21  camera at this point in time.  Can you reread that,

22  Madam Court Reporter?

23            (Record read.)

24            MR. TABER:  Your Honor, this is Ed Taber.

PLAINTIFFS' EXHIBITS 012032

 1 | May I be heard on the point?  And can you hear me?
 2 |          JUDGE STANLEY:  Yes, I can.
 3 |          MR. TABER:  Thank you, Judge.  I can barely
 4 | hear you, but I do want to thank you, first of all,
 5 | for taking Don's call.
 6 |          We are at the end of about a two-and-a-half
 7 | hour deposition, and I respectfully disagree with
 8 | counsel's assertion that I have been doing speaking
 9 | objections throughout.
10 |          However, now that we are at the very end,
11 | the particular question -- by the way, I have not made
12 | an objection like that once throughout this
13 | two-and-a-half hour deposition, but the reason I said
14 | what I did -- and I one-hundred percent agree with Don
15 | that we are bound by the court order, and I do not
16 | habitually make speaking objections.
17 |          However, this is a statement that has been a
18 | topic of great discussion, as your Honor knows,
19 | throughout the Digitek litigation.  We are now
20 | two-and-a-half years into this litigation.  There has
21 | never been a double-thick tablet that was actually
22 | found "out there" as Mr. Ernst just asked this Doctor
23 | to assume that there was.
24 |          So the reason that I made that objection,

PLAINTIFFS' EXHIBITS 012033

WIILIAM L.  GALANTER, M.D.                                    August 3, 2011

1  | which I consider to be a very unusual objection, which
2  | should only be made in an extremely unique situation,
3  | is that the question was absolutely, as I said, false,
4  | and is designed for one reason and one reason only,
5  | which is to trick this Doctor into believing that
6  | there were double-thick tablets "out there", meaning
7  | out in and among patients, when that exact issue has
8  | never occurred, and we have done discovery on that
9  | issue for two-and-a-half years, and that has shown
10 | that what Mr. Ernst asked, with all due respect, is
11 | directly false.
12 |         The quote in the question was "You are
13 | aware," which is designed to suggest that such a thing
14 | was true, and then Mr. Ernst said "that there were
15 | random pills out there."
16 |         So the only reason that I made that
17 | objection, which I almost never intervene in a manner
18 | like that, is that it was just absolutely blatantly
19 | false and designed to trick the witness.  That's all I
20 | can say at this point in time.
21 |         JUDGE STANLEY:  Mr. Ernst, did you wish to
22 | respond?
23 |         MR. ERNST:  Yes, your Honor, I will.
24 |         This witness had not been given -- well, was

```
 1  given the re-call notice, and the re-call notice

 2  itself states:  "Tablets may be double the appropriate

 3  thickness and could contain twice the approved level

 4  of active ingredient."

 5              I think it was an appropriate question to

 6  ask, and I would not have called the Court if this had

 7  not happened on many occasions, and my best estimate

 8  would be over ten in this deposition where speaking

 9  objections have been made.

10              That's the reason, and I just want the rules

11  to be followed, your Honor.  That's all.

12              JUDGE STANLEY:  Well, let me remind the

13  attorneys of Rule 30(c)(2), that objections ought to

14  be stated in a non-argumentative and non-suggestive

15  manner, and that, of course, underlying that is the

16  basic evidentiary requirement that questions have a

17  good faith foundation in fact.

18              Dr. Galanter by now has heard probably more

19  than he wanted to hear about these tablets, and I hope

20  that you will wind this up sufficiently so as not to

21  unnecessarily lengthen this deposition, and I assume

22  that I will not have to talk with you all again.

23              Is that a sufficient direction, Mr. Ernst?

24              MR. ERNST:  I believe that his objection was
```

PLAINTIFFS' EXHIBITS 012035

```
 1  a speaking objection.  I don't believe it was anything
 2  other than that.  It has repeatedly happened.  If the
 3  counsel wishes to make an objection, I would just ask
 4  that he make objection, that's the statement,
 5  everything is preserved, and we move on.  I would ask
 6  a Court directive on that issue.
 7          JUDGE STANLEY:  That's not the rule says.
 8  The objection is to be stated concisely, in a
 9  non-argumentative and non-suggestive manner.  That's
10  the extent of my ruling.
11          He obviously has the right to interpose a
12  variety of objections as the case moves along, and
13  then you can then take it up with the trial court, but
14  I am not going to tell him what he can say and not
15  say, but I can tell you both to follow the rules.
16          Is that clear?
17          MR. TABER:  Yes, your Honor.  On behalf of
18  the defense, thank you for your time, and that is
19  crystal clear, and we will do so.
20          MR. ERNST:  Oh, that is clear.  Thank you,
21  your Honor.
22          JUDGE STANLEY:  Thank you.  Bye-bye.
23          (Whereupon, the conference call was
24          concluded.)
```

PLAINTIFFS' EXHIBITS 012036

```
 1            MR. ERNST:  I will have my last question
 2   reread.
 3            (Record read.)
 4            MR. TABER:  Objection.
 5            THE WITNESS:  I'm answering?
 6            MR. TABER:  Go ahead.
 7            THE WITNESS:  The answer is no.  The
 8   information I had was from the CVS, and from the FDA,
 9   and from the generic myth thing from the FDA, was that
10   there was a risk that double-strength pills could get
11   to patients, and that's why there was a re-call.
12   BY MR. ERNST:
13      Q    Now, if there was a risk of double-strength
14   pills, it is accurate; isn't it, that Mr. McCornack
15   could have ingested those pills the night of his
16   death, true?
17            MR. TABER:  Objection.
18            THE WITNESS:  It depends on how large the
19   risk was, and my opinion is, since they tested a bunch
20   of pills in his box, I think it was very unlikely.
21            So I guess the question is do you want a
22   legal definition of likelihood?
23            MR. ERNST:  I will have my question reread.
24            (Record read.)
```

PLAINTIFFS' EXHIBITS 012037

WIILIAM L. GALANTER, M.D.                              August 3, 2011

```
 1            MR. TABER:  Same objection.

 2            MS. AHERN:  Objection.

 3            THE WITNESS:  I think, no, it is not likely

 4  within a reasonable doubt.

 5  BY MR. ERNST:

 6     Q    Why do you say that with regard to a

 7  reasonable -- I mean, why do you say it is not likely?

 8     A    Because there was nothing that came out that

 9  said that any of those pills actually came out, and

10  they re-called all of them, and Mr. McCornack was not,

11  in my opinion -- again, my opinion -- suffering from

12  digoxin toxicity.  So that would mean that there was

13  maybe one pill in a whole bottle of pills, and he

14  would have to have been the rare patient.  There is a

15  lot of people on digoxin.

16            So I'm giving the legal definition of what

17  is likely.  Is it theoretically conceivable that he

18  had a single double-strength pill in his bottle?  The

19  answer is of course.  I didn't look at every single

20  one of those pills.  It is theoretically possible.

21  That's why I was trying to ask you are you talking

22  about a likelihood or is it conceivable.  There is no

23  way to say --

24     Q    Wouldn't you agree that taking -- I'm sorry?
```

PLAINTIFFS' EXHIBITS 012038

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1      A     There is no way that I could say that it is
 2   not conceivable because I don't have the whole bottle
 3   in front of me, and I couldn't look at the pill that
 4   he took that day.  So I can't say that it is not
 5   conceivable.
 6      Q     Well, if, in fact, there were a
 7   double-strength pill, and he took it, it would be
 8   ingested into his body, true?
 9      A     Yes.
10      Q     And by ingesting it into his body, and then
11   having a postmortem blood sample of 3.6, that is
12   consistent with a double-strength pill; isn't it?
13           MR. TABER:  Objection.  We have been over
14   this already.
15           THE WITNESS:  I have no idea because I can't
16   make a premortem level in this guy based on a
17   three-day postmortem and an axillary.  There is not
18   enough in the literature.
19   BY MR. ERNST:
20      Q     And you would defer to a coroner on that
21   issue anyway because that's his job, true?
22           MR. TABER:  Objection.
23           MS. AHERN:  Objection.
24           THE WITNESS:  In this particular case, no, I
```

PLAINTIFFS' EXHIBITS 012039

```
 1  wouldn't defer to this coroner.
 2  BY MR. ERNST:
 3      Q    And you disagree with the Vorpahl article?
 4      A    No, not at all.  I think in their
 5  sample -- I don't know about anything personally.  So
 6  I would have to think that their findings are what
 7  they found in their sample, but Mr. McCornack doesn't
 8  fit into their sample.
 9      Q    You are aware that the opinions of the
10  treating physicians of Mr. McCornack factored into
11  their point of view that 3.6 nanogram per milliliter
12  level of digoxin, true?
13             MR. TABER:  Objection.
14             THE WITNESS:  I actually don't recall -- I
15  don't recall the entire deposition of the treating
16  doctors to be honest.  I certainly agree with your
17  comment about Dr. Lemm because you showed it to me,
18  but I don't recall the entire deposition of Dr. Lemm.
19  BY MR. ERNST:
20      Q    Now, you are not saying that the opinion of
21  Dr. Lemm is unreasonable; are you?
22             MR. TABER:  Objection.  Which opinion?
23             MR. ERNST:  The opinion that his death was
24  caused by digoxin toxicity.
```

PLAINTIFFS' EXHIBITS 012040

```
 1              MR. TABER:  Objection.
 2              THE WITNESS:  I'm only saying the part that
 3   you showed me.  If you want me to go back to it, that
 4   he fell asleep, that part?  That was on Page 93.
 5              MR. ERNST:  I will have my question reread.
 6              THE WITNESS:  Okay.  Sorry.
 7              (Record read.)
 8              MR. TABER:  Same basis.
 9              THE WITNESS:  I don't know what opinion you
10   are talking about, but I will say that I disagree with
11   his assumptions on Line 7.
12   BY MR. ERNST:
13      Q   You know, it is okay to disagree.  My point
14   is you are not saying that his opinion is
15   unreasonable; are you?
16              MR. TABER:  Okay.  Objection.  Same basis.
17              MS. AHERN:  Objection.
18              THE WITNESS:  At Page 93, he says:  "I think
19   so," and it says:  "If one is asleep."  So I think he
20   is more asking a theoretical question because he
21   didn't say "My patient."  He said:  "If one is
22   asleep," and then he said:  "I think so."  So I don't
23   think he is saying something very strongly.
24              MR. ERNST:  I will have my last question
```

PLAINTIFFS' EXHIBITS 012041

```
 1  reread, and I will ask you to answer it yes or no,
 2  Doctor.
 3            MR. TABER:  And, for the record, he is not
 4  required to answer yes or no.  He can answer it any
 5  way he wants as long as his answer is responsive.
 6            You understand that?
 7            THE WITNESS:  Yes.  I'm just waiting.
 8            MR. TABER:  Go ahead.
 9            (Record read.)
10            THE WITNESS:  I would like to answer your
11  question clearly, if you could just clarify one thing:
12  Are you specifically talking about his opinion on
13  Page 93, starting at Line 7?  Because there are lots
14  of his opinions in this deposition, I'm assuming.
15            MR. ERNST:  Yes.
16            THE WITNESS:  Okay.  In my opinion, yes, I
17  think it is unreasonable.
18  BY MR. ERNST:
19      Q    And the basis for that is what?
20      A    I don't think the patient had digoxin
21  toxicity.
22      Q    Okay.  You've disagreed with your own
23  pathologists in your own hospital multiple times,
24  true?
```

PLAINTIFFS' EXHIBITS 012042

1     A     Yes.

2     Q     And when you disagree with them, do you

3 think their opinions are unreasonable?

4     A     Sometimes yes and sometimes no.  The reason

5 I tend to disagree with them is because they don't

6 have the premortem information.  So I have the luxury

7 of seeing the postmortem results, and I have the

8 luxury of seeing the premortem data, and they are

9 supposed to look at the premortem data, but they don't

10 tend to look at it well.  So that tends to be why I

11 disagree with them.  There is something that they

12 don't know.  It is not that they are not responsible.

13     Q     Actually seeing the patient and seeing

14 premortem data is important to you; isn't it?

15     A     I would say seeing the patient depends on

16 the disease, but seeing the data and the patient, if

17 there is something relevant in seeing the patient, is

18 important when you are trying to figure out what

19 happened.

20     Q     And the difference between you and Dr. Lemm

21 and Dr. Von Dollen, one of them is that they actually

22 saw the patient alive, being treated with digoxin, and

23 you never did; isn't that true?

24     A     Yes, that is one of the differences.  That's

1   true.

2              MR. ERNST:  I would like to go off the

3   record for a couple of minutes and review my notes.

4              (Recess taken.)

5              MR. ERNST:  Let's go back on the record a

6   moment.

7   BY MR. ERNST:

8        Q    Have you produced your entire file today?

9        A    What do you mean by my entire file?

10       Q    The entire file on this case, the McCornack

11  case.

12       A    As discussed before, no.  There were some

13  e-mails from Mr. Moriarty and Mr. Taber.  Like

14  Mr. Taber sent me e-mails on where to come for the

15  deposition, things like that.  I didn't print all

16  those things.

17       Q    What --

18       A    Go ahead, I'm sorry.  We are talking over

19  each other.

20       Q    What about the e-mails from Mr. Moriarty?

21       A    No, I don't have them here, as I discussed.

22       Q    Is there anything else that you didn't bring

23  with you today?

24       A    Yes.  There was some papers sent to me, I

PLAINTIFFS' EXHIBITS 012044

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  assume by Mr. Moriarty, not Mr. Taber.  I didn't bring
 2  them if I didn't consider them interesting and include
 3  them in my opinion.
 4      Q    What papers did he send to you that you
 5  didn't include?
 6      A    I don't know because I didn't put them on
 7  the list.  Again, my assumption was that my job was to
 8  include all the things that I used to make my opinion.
 9      Q    All right.  So outside of the e-mails --
10      A    I'm sorry, Mr. Ernst.  Mr. Ernst, let me
11  finish the last question.  I wasn't quite done.  I
12  apologize.  I just want to be completely full.
13           I spend a lot of time surfing the Web when
14  I'm looking for things.  So there were a lot of little
15  abstracts and things that I looked at when I was
16  trying to review information, as you can assume when
17  you do legal research.
18           So there is lots of articles and things that
19  I found that looked interesting from the title, and I
20  read it and said "This really has nothing to do with
21  anything."  So there is also articles that I found,
22  that I didn't include, because I found them, and I
23  looked at them, and thought that they had nothing to
24  do with anything.  So I didn't include them in my
```

PLAINTIFFS' EXHIBITS 012045

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  opinion.  I just want to be complete on your question.

2       Q    But if you are surfing the Web, and you

3  found something important, you would have either

4  printed it out or saved it electronically, true?

5       A    Yes.  I tend not to print things out, and I

6  save a lot of stuff electronically.  So I suspect that

7  I have electronic papers on my computer that I didn't

8  use in my opinion, that I didn't bring, again under

9  the assumption that I was only supposed to bring

10  things that informed my opinion.  I'm trying to be as

11  open about this as possible so you have a total idea.

12       Q    Surprisingly, it is important that I get the

13  e-mails and the letters from Mr. Moriarty, and it is

14  also important that I have the materials that were

15  sent to you by Mr. Moriarty.

16            Now, as far as surfing the Web goes, if you

17  looked at an article, and you didn't think it was

18  applicable to you, that's okay.

19       A    Okay.

20       Q    But I really am interested in what was sent

21  to you by Mr. Moriarty.

22       A    Okay.

23            MR. ERNST:  So what I would like to do is

24  this:  Ed, how about you agree to forward the letters

PLAINTIFFS' EXHIBITS 012046

 1  and e-mails from Mr. Moriarty to me, together with the

 2  papers that were sent to Dr. Galanter, and I don't

 3  think I will have additional questions, but, if I do,

 4  I will call you and address those issues.  Is that

 5  agreeable with you?

 6          MR. TABER:  Not entirely.  Just so we are

 7  clear, we are not agreeing to produce the witness

 8  again under any circumstances.  We think we have given

 9  you everything you are entitled to under the new rule.

10          In terms of the correspondence, he has

11  already testified that you have access to everything

12  that he relied upon, which is the standard under the

13  new Rule 26.  So if we have, for some reason, not

14  brought, assuming they were irrelevant, letters that

15  say:  "I will see you next week at 6:00" or "Here is

16  the Dr. Lemm transcript which is listed," I don't see

17  how that makes any difference; but I will, Don, pass

18  on your request to my co-counsel, and we will then

19  decide whether there are some things that you should

20  be entitled to that you don't have yet.

21          I don't think there are.  I think we brought

22  everything.  We went through, at your request, the

23  document duces tecum multiple times in order to make

24  sure we brought everything responsive.  So I thought

1  we did a pretty good faith job of doing that, but I

2  will definitely pass on your request to Matt and

3  company, and if we take a second look and think there

4  is something else, you will have it, but I doubt

5  that --

6          MR. ERNST:  You know, it is interesting:

7  You don't get to decide, unilaterally, what you

8  produce and not produce in his file.  Item 8 that we

9  specifically requested states:  "All documents,

10 including additional materials received or reviewed,

11 tangible things, data or writings that were relied

12 upon, examined, considered or rejected in preparing

13 reports in the MDL Digitek litigation."

14          Now, if, in fact, Moriarty sent him

15 materials that he didn't consider, I really want to

16 know what that is, and rather than terminate this

17 deposition, I'm going to adjourn it because Items 2,

18 3, 4, 5 and 8 have not been produced.

19          So we may agree to disagree, and I'm going

20 to want that material, and I'm being generous in

21 saying, if you send it to me, I may or may not wish to

22 take further deposition, but I want to have it to look

23 at, and it is my and my client's right.

24          So I'm going to adjourn this deposition.  We

PLAINTIFFS' EXHIBITS 012048

```
 1  are going to type up this portion of the transcript,
 2  and then you can discuss this with Mr. Moriarty, and
 3  we will meet and confer either later today or tomorrow
 4  or Friday if that's agreeable with you.
 5          Do you want to meet and confer Friday at
 6  11:00?
 7          MR. TABER:  No, I'm actually not back into
 8  town until after Friday, but I just respectfully
 9  disagree that we have not produced everything that we
10  are obliged to.  Your discovery request is still
11  subject to the rules, whether you ask for something or
12  not, and I do not agree to adjourn the depo.  Our
13  position is you get one crack at the witness.  This is
14  your opportunity, and if you adjourn it, we do not
15  agree to produce him again.
16          If you have any more questions --
17          MR. ERNST:  I want the documents to question
18  him with, and I may not have questions.  So I'm
19  adjourning the depo.  So let's be done, and,
20  adjourning it, we reserve our rights on these issues,
21  including your speaking objections.  So why don't we
22  type this up into a booklet.
23          Doctor, you have a chance to read and
24  review.  Do you want to waive signature?  You don't
```

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1  have to review it if you don't want to.
 2           MR. TABER:  We have talked about it, and he
 3  does not wish to waive.  He will review the
 4  transcript.
 5           MR. ERNST:  That's fine.  I would like to
 6  have this transcript --
 7           MR. TABER:  Are we still on the record?
 8           MR. ERNST:  Yes, we are still on the record.
 9           That's fine.  How do you wish to handle the
10  transcript being sent to him?
11           MR. TABER:  We will do whatever the court
12  reporter normally does.
13           MR. ERNST:  Well, for the court reporter,
14  I'm going to want his transcript, and I'm going to
15  want it to use in opposition to the motions that are
16  going to be filed today.
17           So, Madam Reporter, how soon can we have
18  this transcript?  Can you have it to me by next
19  Monday?
20           THE REPORTER:  Monday morning.
21           MR. ERNST:  Perfect.
22           MR. TABER:  Hunter, any questions on your
23  end?
24           MS. AHERN:  No.
```

PLAINTIFFS' EXHIBITS 012050

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

```
 1          MR. TABER:  Any more questions on your end,
 2   counsel, for Plaintiff?
 3          MR. ERNST:  Hold on one second.
 4          (Brief pause.)
 5          MR. ERNST:  Okay.  We got a couple more
 6   questions here.  See, this is what happens.
 7          MR. TABER:  Okay.  Fire away.
 8   BY MR. ERNST:
 9      Q    Doctor, do you have any issues with the test
10   that was performed by NMS showing the digoxin level of
11   3.6 nanograms per milliliter?
12          MR. TABER:  Objection.
13          THE WITNESS:  No, I don't know the company.
14   I assume that they are reliable.  I have to assume it
15   is okay.
16   BY MR. ERNST:
17      Q    All right.  The next couple of questions:
18   If bloating or nausea is a clinical sign of digoxin
19   poisoning, if McCornack was asleep, would he have
20   reported nausea?
21          MR. TABER:  Objection, compound.
22          THE WITNESS:  Yes, there is actually three
23   questions there.  So I would say the first question is
24   bloating is not typically described, but nausea is
```

PLAINTIFFS' EXHIBITS 012051

1  typically described.  That's the answer to the first
2  question.

3              MR. ERNST:  Okay.

4              THE WITNESS:  To the second question, it
5  would be to the degree.  Many people wake up from
6  their sleep to throw up when they have food poisoning
7  or something like that.  So I would say the degree of
8  the nausea would decide whether it is bad enough to
9  wake someone up in the middle of their sleep.  So
10 sometimes nausea wouldn't wake people up and sometimes
11 it would.

12 BY MR. ERNST:

13    Q    And if Mr. McCornack had nausea as a result
14 of digoxin toxicity, it never would have been
15 reported; would it?

16             MR. TABER:  Objection.

17             THE WITNESS:  It would be hard to say if it
18 was mild nausea.  Only after he went to bed, his wife
19 wouldn't have been able to report it.  If it was more
20 than mild nausea, he probably would have gotten up
21 from bed to throw up, and I'm just assuming his wife
22 would probably know about it.  If it occurred before
23 he went to bed, his wife would probably know about it.
24

PLAINTIFFS' EXHIBITS 012052

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  BY MR. ERNST:

2      Q    But we don't know because he was asleep when

3  he passed, true?

4      A    Well, we don't know about the after falling

5  asleep.  If he had nausea before falling asleep, he

6  might have told his wife, he might not have.  If he

7  threw up, his wife would probably know.  So the answer

8  is it depends.  The answer is, yes, it could not have

9  been known by his wife and in some instances it could

10 have been known by his wife.

11     Q    Now, the same question with regard to vision

12 problems:  If he had digoxin toxicity the night that

13 he died, his vision problems may have occurred after

14 he went to bed or the vision problems stemming from

15 the bradycardia could have occurred after he was

16 asleep; isn't that true?

17          MR. TABER:  Objection.

18          THE WITNESS:  By definition, no, because

19 vision is a perception.  So when you are asleep, you

20 don't see.  So I don't think he would have a vision

21 problem.

22 BY MR. ERNST:

23     Q    So if a person has dizziness or vision while

24 they are in bed asleep, they would be unable to

PLAINTIFFS' EXHIBITS 012053

 1  self-report it; isn't that true?
 2      A    I don't know if it really even exists
 3  because you don't see when you are asleep.  You know
 4  what I'm saying?  I don't know if there is -- I don't
 5  know what it means to have a vision problem when you
 6  are not looking at something.
 7      Q    Right.
 8           You are aware that digoxin toxicity can
 9  present a host of symptoms, and sometimes it just
10  presents with nausea, sometimes it presents with
11  dizziness, and sometimes it just presents with sudden
12  cardiac death; isn't that true?
13           MR. TABER:  Objection.
14           THE WITNESS:  In general, not specific to
15  this patient, but, yes, I agree with that.
16           MR. ERNST:  Okay.  Thank you very much,
17  Doctor.  We don't have anything else.
18           THE WITNESS:  Okay.  Thank you.
19           MR. TABER:  I have just one set of questions
20  to respond to that last inquiry, Doctor.
21                 E X A M I N A T I O N
22  BY MR. TABER:
23      Q    How common in your experience is death from
24  digoxin toxicity?

PLAINTIFFS' EXHIBITS 012054

WIILIAM L. GALANTER, M.D.                           August 3, 2011

```
 1              MR. ERNST:  Objection.

 2              THE WITNESS:  Well, in the paper we

 3  published, they found that it was about .1 percent of

 4  hospital admissions were for digoxin toxicity.

 5              MR. TABER:  Death is my question.

 6              THE WITNESS:  And I will get to that.

 7              And the majority of the patients don't die.

 8  So as a discharge diagnosis in the hospital, it would

 9  be a very, very rare occurrence.  That's the

10  statistics.

11              Me personally, I have never seen a patient

12  die from digoxin toxicity.  So I don't really have an

13  experience to put any number on it because I have

14  never seen a patient die from digoxin toxicity.

15       Q    How many years have you been practicing

16  medicine?

17              MR. ERNST:  Objection.

18              THE WITNESS:  As a licensed attending, 15

19  years.

20              MR. TABER:  No further questions.

21              MS. AHERN:  No questions here.

22              MR. TABER:  Any more questions from the

23  Plaintiff?

24              MR. ERNST:  Just a moment.
```

PLAINTIFFS' EXHIBITS 012055

 1            F U R T H E R   E X A M I N A T I O N
 2   BY MR. ERNST:
 3        Q    Would you agree that postmortem
 4   redistribution of digoxin, that there is disagreement
 5   among experts in the field?
 6             MR. TABER:  Objection, overbroad.
 7             THE WITNESS:  I would say -- I don't know
 8   who an expert is, but I would say the papers I looked
 9   at had disagreement.  Some of the papers said you
10   really cannot determine levels premortem, and
11   certainly that one paper, which we have been talking
12   about, suggested you can determine premortem.
13             I think it has to do with how well you read
14   the statements and what conclusions you draw.  So you
15   can always infer things in one cohort of patients and
16   one experiment.  The question is whether you can
17   transpose that onto other patients I think is the
18   difficulty.
19   BY MR. ERNST:
20        Q    You would acknowledge there is disagreement
21   amongst experts as to whether or not you can compute
22   pre-death levels of digoxin from postmortem testing?
23        A    Assuming that the papers I read are from
24   experts, the answer is, yes, I think there is some

PLAINTIFFS' EXHIBITS 012056

 1  disagreement.
 2       Q    And none of that, in your
 3  opinion -- disagreements are common among experts, but
 4  that doesn't give rise to the level of
 5  unreasonableness; does it?
 6       A    Say it again?  The level of
 7  unreasonableness?
 8       Q    Yes.
 9            You don't think somebody is unreasonable
10  because they say:  "Well, I think it is premortem
11  blood levels in particular," right, based upon the
12  literature out there; do you?
13            MR. TABER:  Objection.
14            THE WITNESS:  In this particular case, I do,
15  because there is no literature on patients who have
16  been dead for three days and drawing their blood
17  levels.  I don't know what to make of it because it is
18  three days' old.  So even if you believe that paper,
19  it would only apply to patients whose blood had been
20  drawn within a day or ten hours as a mean.
21            So I'm going to finish my statement:  So I
22  think it is scientifically unreasonable to assume that
23  you can --
24            MR. ERNST:  Objection.  There is no question

PLAINTIFFS' EXHIBITS 012057

```
 1  pending.
 2            THE WITNESS:  I'm finishing my answer.
 3            MR. ERNST:  It is unresponsive.
 4            MR. TABER:  He is finishing his answer.
 5            THE WITNESS:  I'm finishing my answer
 6  because you guys started talking to each other.
 7            MR. ERNST:  Well, there is no question
 8  pending.
 9            Before you are going to answer your
10  question, why don't you have the last question reread,
11  because it is non-responsive.
12            MR. TABER:  Go ahead and finish your answer.
13            THE WITNESS:  You are asking me if it was
14  unreasonable -- that was the question, as I recall
15  it -- and I think it is unreasonable because the
16  patient, in our case, didn't match the patients in any
17  of the studies that looked at this.  So I don't think
18  it is reasonable to make guesses about something that
19  you can't find in the literature.
20            MR. ERNST:  Objection.  Preserve a motion to
21  strike.
22  BY MR. ERNST:
23       Q    It is reasonable that Mr. McCornack, in your
24  opinion, died of sudden cardiac death, though; isn't
```

PLAINTIFFS' EXHIBITS 012058

Case 2:08-md-01968  Document 580-20  Filed 09/08/11  Page 139 of 143 PageID #: 23941

```
 1  it?
 2       A     Yes.
 3       Q     And it is reasonable that digoxin toxicity
 4  causes sudden cardiac death; isn't it?
 5             MR. TABER:  Objection.
 6             THE WITNESS:  That was answered before, but
 7  the answer is, yes, digoxin toxicity can cause sudden
 8  cardiac arrest.
 9  BY MR. ERNST:
10       Q     And it is reasonable to assume that
11  Mr. McCornack was exposed to pills that could have
12  been double strength; isn't that true?
13             MR. TABER:  Objection, speculative.
14             MS. AHERN:  Objection.
15             THE WITNESS:  It seems that the number of
16  pills was -- again, is it conceivable?  The answer is
17  yes.  If it is legal likelihood, they found like some
18  handful of pills out of millions of pills.  So if you
19  are looking at a number, like in some legal
20  definition, the answer is no because it is very, very
21  unlikely.
22  BY MR. ERNST:
23       Q     Well, do you know how many pills they found?
24  Did you know that they tested all the pills when they
```

PLAINTIFFS' EXHIBITS 012059

1  were returned?  Do you know if there were any testing
2  program done?
3      A    I have no idea.  I only know what the FDA's
4  letters said.
5      Q    Do you know if Actavis conducted a study of
6  all the returned pills to see if there had been any
7  additional pills out there that had been double
8  strength or weren't double strength?
9      A    No, I have not seen such evidence.
10          MR. TABER:  Objection.  Hold on.
11  BY MR. ERNST:
12      Q    So you really don't have a foundational
13  basis to make any opinions with regard to whether or
14  not double-strength pills were applicable in this
15  particular case; do you?
16          MS. AHERN:  Objection, argumentative.
17          MR. TABER:  Objection.
18          THE WITNESS:  I do have a basis:  The FDA
19  said were 20 double-sized tablets in a sample of
20  approximately 4.8 million tablets.  That's from the
21  Facts and Myths About Generic Drugs.  So that is the
22  basis of my opinion because that's about all I have.
23  BY MR. ERNST:
24      Q    Are you aware that Mr. McCornack got the

PLAINTIFFS' EXHIBITS 012060

WIILIAM L. GALANTER, M.D.                                    August 3, 2011

1  re-call notice after he was dead?
2      A    I actually didn't -- I didn't see the
3  re-call notice.  So the answer is I don't recall it.
4  I can find out because it is in Lemm's deposition.
5      Q    Right.
6          And, in fact, you formulated the opinions
7  you have before you knew about the re-call notice of
8  the double-strength tablets; isn't that true?
9          MR. TABER:  Objection.  We have been over
10 this.
11         THE WITNESS:  No, that's actually not true.
12 I saw the re-call letter, but I didn't see the one
13 specifically to McCornack.  I don't recall it.  It is
14 in my packet.
15         MR. ERNST:  That's all I have.  That's all I
16 have.  That's all I have.
17         MR. TABER:  We will not waive signature.
18         Anything else, Hunter?
19         MS. AHERN:  No.
20         MR. ERNST:  I would like my e-mail
21 transcript by Monday morning if I can get it.
22         Thank you.
23         Thank you, Doctor.
24         (Ending Time:  1:10 p.m.)

PLAINTIFFS' EXHIBITS 012061

```
 1             UNITED STATES DISTRICT COURT OF THE
               SOUTHERN DISTRICT OF WEST VIRGINIA
 2                      CHARLESTON DIVISION

 3

 4
     KATHY MC CORNACK, et al.,        )
 5                                    )
                 Plaintiffs,          )
 6                                    )
       vs.                            ) No. 2:09-cv-0671
 7                                    )
     ACTAVIS TOTOWA, LLC, et al.,     )
 8                                    )
                 Defendants.          )
 9   _____ )

10

11          I hereby certify that I have read the foregoing

12   transcript of my deposition given at the time and

13   place aforesaid, and I do again subscribe and make

14   oath that the same is a true, correct and complete

15   transcript of my deposition given as aforesaid, with

16   corrections, if any, appearing on the attached

17   correction sheet(s).

18              ____correction sheets attached.

19          _____

20              WILLIAM L. GALANTER, M.D., Ph.D.

21
     SUBSCRIBED AND SWORN TO
22   before me this _____day
     of_____A.D., 20__.
23
     _____.
24
```

PLAINTIFFS' EXHIBITS 012062

```
 1  STATE OF ILLINOIS    )
 2                       )  SS.
 3  COUNTY OF MCHENRY    )
 4
 5   I, HEATHER PERKINS-REIVA, Certified Shorthand
 6  Reporter in and for the County of McHenry and State of
 7  Illinois, do hereby certify that WILLIAM L. GALANTER,
 8  M.D., Ph.D. was first duly sworn to testify the whole
 9  truth and that the above deposition was recorded
10  stenographically by me, and was reduced to typewriting
11  under my personal direction.
12   I further certify that the said deposition was taken
13  at the time and place specified.
14   I further certify that I am not a relative or
15  employee or attorney or counsel of any of the parties,
16  nor a relative or employee of such attorney or counsel
17  or financially interested directly or indirectly in
18  this action.
19   In witness whereof, I have hereunto set my hand and
20  affixed my seal of office at Algonquin, Illinois, this
21  8th day of August, A.D., 2011.
22  _____
23  Heather Perkins-Reiva, C.S.R. No. 084-003714
24
```

PLAINTIFFS' EXHIBITS 012063