# EXHIBIT 613

1

```
1              UNITED STATES DISTRICT COURT OF THE
               SOUTHERN DISTRICT OF WEST VIRGINIA
2                       CHARLESTON DIVISION
          (Pursuant to Colorado Rules of Civil Procedure,
3                        C.R.C.P. Rule 30)


4
     KATHY McCORNACK, et al.        )
5          Plaintiffs,             )   Deposition of:
                                   )   KENNON JAMES HEARD, M.D.
6    vs.                           )
                                   )
7    ACTAVIS TOTOWA, LLC, et al,   )   Case No. 2:09-cv-0671
          Defendants.              )
8    _____    )

9

10
          Transcript of testimony as taken by and before
11   VALORI D. WEBER, a Certified Digital Reporter and
     Notary Public of the State of Colorado, at the
12   offices of the Tucker Ellis & West, Metropoint 1,
     Suite 1325, 4600 South Ulster Street, Denver,
13   Colorado, on Thursday, July 14, 2011.

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 012254

```
 1   APPEARANCES:

 2
     For the Plaintiffs:
 3
                 DON A. ERNST, Esq.
 4               ERNST LAW GROUP
                 1020 Palm Street
 5               San Luis Obispo, California  93401
                 Telephone No.  805.541.0300
 6               Fax No.  805.541.5168

 7
     For the Actavis Defendants:
 8
                 MATTHEW P. MORIARTY, Esq.
 9               TUCKER ELLIS & WEST, LLP
                 1150 Huntington Building
10               925 Euclid Avenue
                 Cleveland, Ohio  44115-1414
11               Telephone No.  216.696.2276
                 Fax No.  216.592.5009
12               E-mail:  matthew.moriarty@tuckerellis.com

13
     For the Mylan Defendants (via telephone):
14
                 HUNTER K. AHERN, Esq.
15               SHOOK, HARDY & BACON, LLP
                 2555 Grand Boulevard
16               Kansas City, Missouri  64108
                 Telephone No.  713.548.5636
17               Fax No.  713.227.9508
                 E-mail:  hahern@shb.com
18

19

20

21

22

23

24

25
```

PLAINTIFFS' EXHIBITS 012255

I N D E X
Examination by Mr. Ernst ..........................5

```
 1              I N D E X

 2

 3   Examination by Mr. Ernest............... .......5

 4   Examination by Mr. Moriarty...................78

 5   Examination by Mr. Ernst.....................79

 6

 7

 8   EXHIBITS                             ADMITTED

 9

10   1 - CV of Kennon James Heard, MD..............7

11   2 - Documents prepared by Dr. Heard  ....... 20
            dated 5/20/11
12   3 - Letter to Dr. Heard from Mr. Moriarty... 21
            dated 11/10/09
13   4 - Letter to Dr. Heard from Mr. Moriarty... 21
            dated 6/2/11
14   5 - Black binder............................ 23

15   6 - Various medical records................. 25

16   7 - NMS Labs report dated 6/24/08........... 26

17   8 - Letter to Daniel McCornack from......... 28
            Dr. Berger dated 5/2/08
18   9 - Articles reviewed by Dr. Heard.......... 35

19

20

21

22

23

24

25
```

```
 1              DENVER, COLORADO; THURSDAY, JULY 14, 2011

 2                              -o0o-

 3

 4              COURT REPORTER:  Today is Thursday, July 14,

 5    2011.  It is 9:16 a.m.  We are in the office Tucker

 6    Ellis & West at Metropoint 1, Suite 1325 at 4600 South

 7    Ulster Street in Denver, Colorado.

 8              This is regarding the matter of Kathy McCornack

 9    vs. Actavis Totowa, LLC, case number 2:09-cv-0671.

10              The deponent today is Kenneth (sic) Heard.

11              Counsel, if you would please state your

12    appearance.

13              (Conference call being connected with Hunter

14    Ahern.)

15              MR. MORIARTY:  Hello.

16              MS. AHERN:  Hey.

17              MR. MORIARTY:  Hi, Hunter.

18              MR. ERNST:  Good morning, Hunter.

19              MS. AHERN:  Is everybody there?

20              MR. ERNST:  Yes.  Good morning, Hunter.

21              MS. AHERN:  Good morning.  How are you?

22              MR. ERNST:  Fine.

23              MR. MORIARTY:  Okay, we're just starting.

24              MS. AHERN:  Okay.  I'm going to put you on

25    mute.
```

PLAINTIFFS' EXHIBITS 012257

1          COURT REPORTER:  Okay.  Mr. Heard, if you'll

2    raise your right hand, I'll -- or, wait.  I'm sorry.

3    Before we get started, Counsel, will you state your

4    appearances.

5          MR. ERNEST:  Don Ernst of the Ernst Law Group

6    representing the Plaintiffs.

7          MR. MORIARTY:  Matt Moriarty for the Actavis

8    Defendants.

9          MS. AHERN:  Hunter Ahern for the Mylan

10   Defendant.

11         COURT REPORTER:  Okay.  Mr. Heard, if you'll

12   raise your right hand, I'll swear you in.

13         Do you swear under the penalty of perjury the

14   testimony you're about to give in this matter is the

15   truth, the whole truth, and nothing but the truth so

16   help you God?

17         THE DEPONENT:  I do.

18         COURT REPORTER:  Okay.  Thank you.

19         Counsel, you may proceed.

20

21                      EXAMINATION

22   BY MR. ERNEST:

23     Q   Would you state your full and complete name for

24   the record?

25     A   Kennon James Heard.

1      Q   And you are a licensed medical doctor?

2      A   Correct.

3      Q   And you hold licenses in the State of

4  California and Colorado?

5      A   Just Colorado.

6      Q   And, Dr. Heard, have you had your deposition

7  taken before?

8      A   No.

9      Q   You've never been deposed before in your life?

10     A   No.

11     Q   Have you ever testified as an expert before?

12     A   Yes.

13     Q   And how many times have you testified as an

14  expert?

15     A   Around ten times.

16     Q   And is this in the courts of Colorado?

17     A   Yes.

18     Q   Have you ever worked with Mr. Moriarty or his

19  firm before?

20     A   No.

21     Q   And please state for me the types of cases on

22  which you have testified.

23     A   Those were mainly criminal cases involving

24  patients that I treated in the emergency department.

25     Q   And were you called by the prosecutor or the

1   defense?

2        A    Generally the prosecutor.

3        Q    And the topic of those times when you've

4   testified, was it drug or alcohol related?

5        A    Occasionally.  It was primarily bodily --

6   testifying to whether or not there was serious bodily

7   injury in criminal cases.

8        Q    I take it in Colorado, there's some Penal Code

9   provision about serious bodily injury and you would be

10  the determining the factor from the medical standpoint

11  as to whether it was serious bodily or not?

12       A    That's correct.

13       Q    That's the purpose of your testimony?

14       A    That's correct.

15       Q    Have you ever testified as a toxicologist

16  before in your life?

17       A    No.

18       Q    All right.  Doctor, I have been furnished with

19  a CV and I requested today that you bring an updated

20  CV.  And if I could take the Notice that you have.  And

21  our court reporter will mark it as Exhibit 1 to this

22  deposition.  And I'm told that you have an updated CV

23  that is somewhat different -- or, different from what

24  was served on us at the time of your expert disclosure.

25       A    Yes.

1            (Exhibit 1 was entered into evidence.)

2      Q    Can you basically tell me what changes have

3   been made in the last three months.

4      A    I've added a couple -- I've had a couple of

5   publications accepted and they've been added to the

6   list.  And I think I may have updated -- my medical

7   license updated in -- at the end of May.

8      Q    What publications have been added to the list?

9      A    I'd have to look.  I don't remember exactly.  I

10  update it every two to three weeks with publications.

11     Q    Were they having to do with Digoxin?

12     A    No.

13     Q    Any toxicology?

14     A    Yes.

15     Q    General topics were what?

16     A    Acetaminophen poisoning.  There was a case -- a

17  patient that had an acetylcysteine overdose.  I think

18  there was a couple of -- I think there was a patient

19  that tried to commit suicide by lighting themselves on

20  fire and taking acetaminophen.

21     Q    All right.  Doctor, because you've never been

22  deposed before, you're aware that even though we're in

23  informal surroundings of Mr. Moriarty's law office,

24  that you've been placed under oath and that oath has

25  the same force and effect as if you're testifying in

1  courtroom?

2      A    Yes.

3      Q    The court reporter will type into a booklet my

4  questions, your answers, and you'll be given an

5  opportunity to review and make changes.  If you make

6  changes, I or any person can ask you why you made those

7  changes and can prove embarrassing.  Do you understand

8  that?

9      A    Yes.

10     Q    If I ask a question you don't understand, or I

11 use a term that's not clear to you, please stop me and

12 I will rephrase it, okay?

13     A    Okay.

14     Q    It is not my intent to ask you any trick

15 questions.  I just want to know what you think, what

16 you know, and what -- what some of your opinions are,

17 okay?

18     A    Okay.

19     Q    All right.  So you have agreed to furnish us

20 with an updated CV.  And I have just a couple questions

21 on your current CV.

22          I understand that you are an Associate

23 Professor of Surgery in the Division of Emergency

24 Medicine at the University of Colorado Denver School of

25 Medicine; is that accurate?

1        A    So one of the other things that would have been

2   updated is that it is -- our department is now a

3   Department of Emergency Medicine.  We're no longer

4   under the Department of Surgery.

5        Q    So you are a Professor over Emergency Medicine?

6        A    Associate Professor of Emergency Medicine.

7        Q    And you have been so been involved in emergency

8   medicine since 1997?

9        A    That's correct.

10       Q    And that is your -- primarily what you teach at

11   the medical school?

12       A    It's fairly evenly split between toxicology and

13   emergency medicine.

14       Q    And the courses you teach are what?

15       A    I'm course director for the rotation, I guess

16   if you will, for medical students at the Poison Center.

17   And I participate in lecture in clinical pharmacology

18   course where we talk about medication selection.  And I

19   am responsible, or I direct the emergency medicine

20   student group.

21       Q    Do you give your students reading list?

22       A    Yeah.

23       Q    And do you have a particular book in your

24   course of study that you give them that relates

25   directly to Digoxin?

PLAINTIFFS' EXHIBITS 012263

1      A    I'm sorry, I don't understand.  Do you mean an
2   article or a book?
3      Q    A book that you use as a textbook to teach your
4   medical students about digoxin?
5      A    Not a single textbook, no.
6      Q    What are the textbooks that you use in teaching
7   the proper dosage treatment of patients with digoxin?
8      A    So our approach is that because the textbooks
9   are so expensive and toxicology's a relatively limited
10  field, that I recommend they use one of the major
11  emergency medicine or toxicology textbooks that are
12  available usually through the library online, and I'm
13  not sure exactly which textbook that is right now.
14     Q    So if I were to ask you what textbook you would
15  tell me if I were a medical student and I wanted to
16  know something about Digoxin, what book would you tell
17  me to look at?
18     A    I would say that any of the major toxicology
19  textbooks has good -- are good for Digoxin.
20     Q    And name those for me, please.
21     A    Goldfrank's.  Marsha Ford has a textbook.  Jeff
22  Brent has a textbook that we use.  We obviously use
23  Medical Toxicology, the one that's from Dr. -- Dr. Dart
24  edited.  Those are probably the ones that we rely on
25  the most.

PLAINTIFFS' EXHIBITS 012264

1       Q    All right.  Dr. Brent's textbook is called

2    what?

3       A    Critical Care Toxicology.

4       Q    And Dr. Ford's textbook is?

5       A    I think it's called Clinical Toxicology.

6       Q    And what is your understanding of the

7    therapeutic level of a person that would appear in an

8    emergency room for digoxin?  What would you expect it

9    to be?

10      A    Well, in an appropriately timed sample in a

11   patient taking therapeutic doses of digoxin, the range

12   is usually -- the range that's defined as normal for

13   the laboratory is usually .5 to 2 nanograms per ml.

14      Q    And anything outside that range would give you

15   cause for concern as an emergency room physician?

16      A    It -- well, there are a lot of reasons it could

17   be outside the range and the patient would still be --

18   would not be -- get sick from that.  And certainly, you

19   know, it's -- the diagnosis of digoxin toxicity is not

20   based on a serum concentration.  It's based on patient

21   symptoms and other clinical findings.

22           MR. ERNST:  Let's go off the record.

23           COURT REPORTER:  Okay.

24           (Off the record)

25      Q    (By Mr. Ernst)  If you had an individual tested

1   and the digoxin level was outside the range of .5 to

2   2.0, it would appear as an aberration on a lab reading,

3   true?

4       A    It would be marked as an abnormal result.

5       Q    Now, do you teach any specific classes with

6   regard to toxicology?

7       A    Well, again, the Poison Center rotation is a

8   clinical rotation for fourth year medical students

9   where we teach them toxicology.  It's not a class in

10  the traditional classroom sense.  It's teaching medical

11  students while we're taking care of patients.

12      Q    Have you personally treated any patients for

13  digoxin toxicity?

14      A    Yes.

15      Q    On how many occasions?

16      A    Probably 20.

17      Q    If I were to ask you to list the affects of

18  digoxin toxicity to an individual, can you list the

19  symptomatology or the affects that would take place

20  with digoxin toxicity?

21          MR. MORIARTY:  Objection; form.

22          Go ahead.

23          THE DEPONENT:  So patients who are suffering

24  from digoxin toxicity generally, the symptoms can vary.

25  It depends somewhat on whether it is a single one-time

1   ingestion or whether it's someone who develops toxicity

2   while taking multiple doses over time.

3          There are some similarities.  Patients

4   generally have nausea and vomiting.  They can have

5   changes to their vision.  They generally feel weak.

6   And then they can have -- develop cardiac

7   irregularities like usually a slow heart rate, but

8   sometimes -- well, slow or fast heart rate.  Those

9   would be the primary symptoms that we'd see.

10     Q   And these symptomatologies don't all occur at

11  the same time or in sequence, do they?

12     A   They can occur -- I mean, generally, patients

13  will feel poorly.  When we see patients, especially with

14  chronic toxicity, we generally -- they have more general

15  malaise, not feeling well -- nausea and vomiting --

16  before they have significant cardiac affects.

17     Q   Right.  But in an emergency room setting,

18  that's why people would come to you is because they

19  feel ill, true?

20     A   Yes, that's the most common reason.

21     Q   But it is true that sudden death can occur with

22  digoxin toxicity, true?

23     A   Yes.

24     Q   Now, Doctor, when a person has sudden death,

25  please describe for me how a person dies from sudden

1   death -- from a cardiac ventricular arrhythmia.

2        A    Well, as it sounds, a patient would -- their

3   first symptom -- well, the -- then -- these are the

4   people who pass out and essentially become

5   unresponsive.  Their heart stops suddenly.  And so

6   there's no blood flow to their brain, so they pass out

7   and generally -- may take one or two breaths or -- but

8   go from a living to, you know, sudden death, just like

9   it sounds.

10       Q    Now, I just want to talk about that.  There's a

11  terminology that you as a physician use when a person

12  dies of sudden death, a cardiac event.  What do you

13  call it shorthand?

14       A    I'm not sure what you're asking.

15       Q    Well, you mentioned in your report dysrhythmia.

16       A    Dysrhythmia, yes.

17       Q    Now, what is dysrhythmia?

18       A    It means the heart's not beating normally.

19       Q    And when the heart's not beating normally, is

20  the top half of the heart just called the --

21       A    The atria.

22       Q    -- the atria.  It's not beating normally.  Does

23  that lead to sudden death?

24       A    Not universally, no.

25       Q    But if the bottom half of the heart which is

PLAINTIFFS' EXHIBITS 012268

```
 1   called what?
 2        A    The ventricle.
 3        Q    The ventricle.  If the ventricle is not -- is
 4   in dysrhythmia, it can lead to sudden death, true?
 5        A    True.
 6        Q    Now, have you ever performed an autopsy
 7   yourself?
 8        A    I participated in an autopsy as a medical
 9   student.
10        Q    I understand.  But have you ever performed an
11   autopsy yourself?
12        A    No.
13        Q    Do you sign death certificates?
14        A    Yes.
15        Q    And you sign death certificates of people that
16   show up in the emergency room?
17        A    Correct.
18        Q    You have signed death certificates of a person
19   -- of individuals who have died of dysrhythmia, true?
20        A    Correct.
21        Q    And dysrhythmia can lead to what is called
22   cardiac sudden death or sudden cardiac death?
23        A    Correct.
24        Q    And sudden cardiac death, there's an acronym
25   for it.  Is it called SCD or SDC?
```

PLAINTIFFS' EXHIBITS 012269

1       A    Usually SCD.

2       Q    So when we use the term SCD, we're talking

3    about sudden cardiac death.

4       A    Okay.

5       Q    Now, when a person dies from SCD, please state

6    for me what you would see in an autopsy.

7       A    Generally, it would depend on the cause of the

8    sudden cardiac death.

9       Q    Okay.  If the cause is dysrhythmia, what would

10   you see?

11      A    It would again depend on the cause of the

12   dysrhythmia.  There are some cases where a primary

13   dysrhythmia or a secondary dysrhythmia and it would

14   depend on what those -- or the precipitant was.  You

15   may see different things I guess with the autopsy -- on

16   the autopsy.

17      Q    If a person has dysrhythmia caused by digoxin

18   toxicity, that could lead to sudden cardiac death;

19   isn't that true?

20      A    Yes.

21      Q    And there would be no other symptoms other than

22   the person would just go unconscious, true?

23      A    That's very unlikely.

24      Q    Would they feel tired, not feeling well?

25      A    Generally would have some -- yes, we would

1    expect that they would have some what we would call

2    non-specific symptoms.  Usually, significant non-

3    specific symptoms.

4        Q    Well, I'm asking from a standpoint from changes

5    in the body.  If you looked at the body after death,

6    would you be able to tell what caused the sudden

7    cardiac death?

8        A    Are you talking about it in the autopsy?

9        Q    Yes.

10       A    You wouldn't see necessarily structural

11   abnormalities in the heart or in the body in the case

12   of digoxin poisoning.

13       Q    And digoxin toxicity is consistent with sudden

14   cardiac death, isn't it?

15           MR. MORIARTY:  Objection; form and otherwise.

16           Go ahead.

17           THE DEPONENT:  Well --

18           MR. ERNST:  He's made an objection.  That's for

19   a court to decide later.

20           THE DEPONENT:  Sure.

21       Q    (By Mr. Ernest)  And the question is out there.

22   I'll have the question re-read and then I want you to

23   answer the question.

24       A    Okay.

25           MR. ERNST:  Would you repeat the question?

PLAINTIFFS' EXHIBITS 012271

1           COURT REPORTER:  Uh-huh.

2           (The last question was played back by the court

3      reporter.)

4           THE DEPONENT:  So I'm -- well, the way the

5      question's phrased is difficult for me to answer.  I

6      would say that a patient who has digoxin poisoning

7      could have sudden cardiac death.

8      Q    (By Mr. Ernst)  Okay.  Now, let's go back and

9      go through a number of items that I just want to make

10     we've covered and then we're going to come back to that

11     issue.

12     A    Okay.

13     Q    You have read and reviewed material in

14     preparation for rendering opinions in this case, true?

15     A    Yes.

16     Q    And have you produced your entire file here for

17     me today?

18     A    Yes.

19     Q    Now, one of the things that you produced was a

20     six-page document -- five-page document, it's double

21     sided.

22           When it's copied, I'd like you to make it into

23     single pages --

24           COURT REPORTER:  Okay.

25           MR. ERNST:  -- so that it's easily readable.

```
 1        Q    (By Mr. Ernest)  In looking at your -- this
 2   document, we're going to mark this as Exhibit 2.  Does
 3   Exhibit 2 contain your thoughts and opinions?
 4        A    Yes.
 5             (Exhibit 2 was entered into evidence.)
 6             MR. MORIARTY:  Objection.
 7        Q    (By Mr. Ernst)  Doctor, did anyone assist you
 8   in writing that?
 9             MR. MORIARTY:  Objection.  You don't have to
10   answer that under new Rule 26, you don't get into
11   drafts.
12        Q    (By Mr. Ernest)  Did you discuss with
13   Mr. Moriarty the contents of Exhibit 2 before it
14   reached its final point?
15        A    Yes.
16        Q    Did Mr. Moriarty suggest any changes?
17             MR. MORIARTY:  Objection.
18             I'll let you answer that.
19             THE DEPONENT:  Yes.
20        Q    (By Mr. Ernst)  What changes did he suggest?
21             MR. MORIARTY:  Objection.
22             You don't have to answer that.
23             MR. ERNST:  I believe that he does.
24             MR. MORIARTY:  No, he doesn't.  Rule 26
25   specifically says you have nothing -- you have no
```

1  access to drafts.  You can't ask him about drafts.

2    Q  (By Mr. Ernest)  I'm not asking about a draft;

3  I'm asking what suggestions Mr. Moriarty's made or gave

4  you in Exhibit 2.

5       MR. MORIARTY:  Objection.

6       You do not have to answer that question.

7    Q  (By Mr. Ernst)  All right.  Please state for me

8  what your understanding is of why you were retained in

9  this case.

10   A  So my understanding, I was retained to review

11 the case and to determine if there was any evidence

12 that Mr. McCornack had digoxin toxicity and if that was

13 likely the cause of his death.

14   Q  And I'm going to show you what's been marked as

15 Exhibit 3 and 4.  Are these letters that you received

16 from Mr. Moriarty in that regard?

17   A  Yes.

18      (Exhibits 3 and 4 were entered into evidence.)

19   Q  Now, please state for me what you reviewed -- I

20 don't see a list of what you reviewed in the

21 formulating of your opinions as they are listed on

22 Exhibit 2.

23   A  So you're asking what the material that's in

24 the room that I reviewed for the --

25   Q  Yes.

PLAINTIFFS' EXHIBITS 012274

1      A    Okay.  So I reviewed the provided medical

2  records, the depositions, the -- and then the

3  literature that I provided for you.

4      Q    Let me go back here.  Mr. Moriarty has opened a

5  letter that has been marked as Exhibit 3.  And they

6  include the office records of Dr. Lemm; the office

7  records of Dr. VonDollen; the original autopsy and

8  death certificate; the "amended" autopsy and death

9  certificate; reports from the NMS Laboratories

10 regarding Mr. McCornack's blood and Digitek® tablet

11 tests; the deposition transcripts of Drs. Mason, Lemm

12 and VonDollen; the deposition of Matthew McMullin.  Is

13 there anything else that you reviewed?

14     A    I think the deposition of his wife.

15     Q    Kathy McCornack?

16     A    Yeah.  And the deposition of Mr. -- or, the

17 pharmacist.

18     Q    Mr. Gibson -- Dr. Gibson?

19     A    Yeah, Dr. Gibson.

20     Q    Now --

21          MR. MORIARTY:  And for completeness, if you

22 want me to chime in, there are a couple things at the

23 back of this that are not -- that may be referred to in

24 the letter somewhere else, such as a letter from CVS to

25 the McCornack family.

PLAINTIFFS' EXHIBITS 012275

```
 1              MR. ERNST:  Can I look at that, please?
 2              MR. MORIARTY:  You may.  And then the 2009 FDA
 3    web statement.  The CVS thing's the tab before.
 4         Q   (By Mr. Ernst)  All right.  Now, this black
 5    binder, was this prepared by you, Doctor?
 6         A   No.
 7         Q   So this was given to you?
 8         A   Yes.
 9         Q   I'm going to mark this entire black binder as
10    next in order, 5.  So Exhibit 5 was given to you by
11    Mr. Moriarty?
12         A   Yes.
13              (Exhibit 5 was entered into evidence.)
14         Q   Is this, as far as you know, a true and
15    accurate -- you haven't made any changes or taken
16    anything out of that folder, have you?
17         A   No.
18         Q   I would like you to go to the yellow tabs.
19         A   Okay.
20         Q   What are the yellow tabs?
21         A   The first one is a serum digoxin concentration
22    measured in March of 1995.
23         Q   What was that serum digoxin level?
24         A   1.4 NG/ML.
25         Q   Okay.  What's the next -- I'll let you have
```

1    that.

2         A    Serum digoxin concentration measured on

3    August 1, 2001.

4         Q    And what was that level?

5         A    1.7.

6         Q    And what's the next yellow marker?

7         A    Well, it's serum chemistry and digoxin

8    concentration measured November 2002.

9         Q    And what is that level?

10        A    1.5.

11        Q    What's the next yellow marker that you have

12   there?

13        A    Serum cholesterol, digoxin concentration, and

14   thyroid studies.

15        Q    And what's the date of that?

16        A    February 2004.

17        Q    And what's the digoxin level?

18        A    1.8 NG/ML.

19        Q    What's the next marker?

20        A    It's blood CBC and metabolic panel, digoxin

21   concentration, and a PSA from it looks like July 2006.

22        Q    And what is that level?

23        A    1.5.

24        Q    And what's the last yellow tab that you have

25   there?

1      A    So metabolic panel, TSH, lipid panel, and

2    digoxin concentration from May 2007.

3      Q    And what is that level?

4      A    1.6 grams per milliliter.

5      Q    Now, I'm going to mark as Exhibit 6 these

6    sheets that I think are copies of all of those yellow

7    sheets.  They're sort of in order for easy reference.

8    Let's mark those as Exhibit 6.  I just want to make

9    sure that you take a look at them and agree that I

10   pulled those out of Exhibit 5 just for ease of review.

11     A    One, two -- yeah.

12          (Exhibit 6 was entered into evidence.)

13     Q    Are they accurate?

14     A    Yes.

15     Q    Now, did you do a -- did you see the post-

16   mortem or after-death blood sample taken from NMS Labs?

17     A    Yes, I have.

18     Q    And can you go to that place for me?  That's in

19   the Exhibit 5 as well.  And that sample was drawn after

20   death?

21     A    Yes.

22     Q    It was drawn in -- March 23, 2008?

23          MR. MORIARTY:  Objection.

24     Q    (By Mr. Ernst)  Sorry.  March 27, 2008.

25     A    I have the date on here as received on

PLAINTIFFS' EXHIBITS 012278

1  March 28, so I --

2      Q   We'll just go with received on March 28.  And

3  what's that digoxin level?

4      A   3.6 nanog/mL.

5      Q   I'm going to mark next in order -- now, Doctor,

6  were you aware that after Mr. McCornack died there was

7  a recall?

8      A   Yes.

9          (Exhibit 7 was entered into evidence.)

10     Q   And how did you become aware of that?

11     A   Well, I recall the recall when I was -- as a

12  part of my job, I received a letter, and as part of --

13  at the Poison Center, we had -- we were aware of it.

14     Q   At the Poison Center, did anyone call in about

15  digoxin toxicity that you're aware of?

16         MR. MORIARTY:  Objection.

17         Go ahead.

18         THE DEPONENT:  I'm sure there were people that

19  called in about digoxin toxicity.  We routinely get

20  those calls.

21     Q   (By Mr. Ernst)  Do you keep a log of those

22  calls at the Center?

23     A   Uh-huh.

24     Q   Is that a yes?

25     A   Yes.  I'm sorry, yes.

PLAINTIFFS' EXHIBITS 012279

1    Q    If I were to go to the Center and ask for the

2    log of the calls, would I be able to get them if I

3    issued a subpoena?

4            MR. MORIARTY:  Objection.

5            THE DEPONENT:  I don't know.

6    Q    (By Mr. Ernst)  Did you ever do a review of the

7    number of calls that came in about digoxin toxicity

8    after the recall?

9    A    I did not.

10   Q    Have you bothered to look about -- at that at

11   all, the number of people at the Poison Center that had

12   -- were concerned about digoxin toxicity after the

13   recall?

14           MR. MORIARTY:  Objection.

15           Go ahead.

16           MS. AHERN:  Objection.

17           THE DEPONENT:  Not -- at our Poison Center, no.

18   I don't have any -- I don't recall.  Someone may have

19   looked at it, but I did not.

20   Q    (By Mr. Ernst)  It's been represented that you

21   got a copy of the letter that was sent to Mr. McCornack

22   in part of Exhibit 5 that's in the CVS Caremark Recall

23   Letter.  Do you see that?

24   A    Yes.

25   Q    And have you been shown any other document

PLAINTIFFS' EXHIBITS 012280

```
1    other than this one labeled "Dear Plan Participant"?

2           MR. MORIARTY:  Objection.  About what?

3           MR. ERNST:  About the recall.

4           MR. MORIARTY:  Oh, okay.

5           THE DEPONENT:  I'd have to -- I don't recall it

6    off -- there may be one in the rest of the records, but

7    I don't recall.

8       Q   (By Mr. Ernst)  But this was furnished to you

9    by Mr. Moriarty?

10      A   Correct.

11      Q   So I'm going to mark next in order, number 8.

12   Why don't you look at number 8, which is a letter

13   directly addressed to Mr. Daniel McCornack.  Have you

14   ever seen that letter before?

15      A   I don't recall.

16          (Exhibit 8 was entered into evidence.)

17      Q   So the answer is no; you don't remember seeing

18   that, do you?

19      A   I don't remember seeing that.

20      Q   That letter is addressed directly to

21   Mr. McCornack, isn't it?

22      A   Yes.

23      Q   It talks about double strength tablets, doesn't

24   it?

25          MR. MORIARTY:  Objection.
```

1          MS. AHERN:  Objection.

2          THE DEPONENT:  It talk -- it says "double

3    thickness and could contain twice the approved level of

4    active ingredient."

5      Q    (By Mr. Ernst)  Doctor, as a toxicologist,

6    having sworn and being under oath, you will acknowledge

7    that digoxin has a very narrow therapeutic value, true?

8      A    I'm not familiar with that term.  Is the term

9    you're looking for a therapeutic window?

10     Q    Therapeutic window's a better term.

11     A    Digoxin is considered a drug with a narrow

12   therapeutic window or therapeutic index.

13     Q    And if a person that was taking .25 milligrams

14   of digoxin was suddenly to take a double dose pill, it

15   could result in the symptomatology that you've listed,

16   including --

17         MR. MORIARTY:  Objection.

18         MR. ERNST:  -- including nausea, change in

19   vision, unconsciousness, and sudden death, or any of

20   those, true?

21         MR. MORIARTY:  Objection; form.

22         Go ahead.

23         THE DEPONENT:  Are you asking if a person took

24   one additional dose of -- for example, a person taking

25   .125 milligrams took a .25 milligram dose?

PLAINTIFFS' EXHIBITS 012282

1      Q    (By Mr. Ernst)   No.   A person is taking .25

2    milligrams --

3      A    Okay.

4      Q    -- morning and evening.

5      A    Okay.

6      Q    Have you ever heard of anyone being recommended

7    any more than that, .25 in the morning and evening?

8      A    No.

9      Q    That's the maximum dosage, true?

10     A    I think that may be even higher than most

11   recommend.

12     Q    So if a person ingested a double strength

13   tablet, it could lead to digoxin toxicity, true?

14          MR. MORIARTY:   Objection; form.

15          MS. AHERN:   Objection.

16          MR. MORIARTY:   Go ahead.

17          THE DEPONENT:   If you're -- are you asking a

18   single person on a steady dose took a single double

19   dose, would they get sick?   Is that what you're asking

20   me?

21     Q    (By Mr. Ernst)   Would any of the

22   symptomatologies that you have mentioned as occurring,

23   whether it's nausea, feeling poorly, feeling tired,

24   feeling bloated, or an arrhythmia take place?

25          MS. AHERN:   Objection.

PLAINTIFFS' EXHIBITS 012283

1      MR. MORIARTY:  Objection.

2      Go ahead.

3      THE DEPONENT:  It is unlikely that a single

4   double-dose tablet would cause symptoms in a patient

5   taking chronic digoxin poisoning.

6      Q   (By Mr. Ernst)  When you say it's unlikely,

7   that means you're not willing to rule it out, are you?

8      A   It's very unlikely.

9      MR. MORIARTY:  Objection; form.

10     Q   (By Mr. Ernst)  You're not willing to rule it

11  out, are you?

12     MR. MORIARTY:  Objection; form.

13     Go ahead.

14     THE DEPONENT:  Completely, no.

15     Q   (By Mr. Ernst)  Now, this document is addressed

16  to Mr. McCornack, and it basically states that he

17  received the material -- the recalled batches of

18  Digitek.  Do you see that?

19     A   Yes.

20     Q   And have you ever been advised that

21  Mr. McCornack had received the recalled batches of

22  Digitek?

23     A   That was in the documents that I received, yes.

24     Q   You were aware of that?

25     A   Yes.

1      Q    Now, can you state what tablets -- well, strike

2   that.

3           The tablets that Mr. McCornack took, he

4   ingested and were dissolved in his body, true?

5      A    Yes.

6      Q    So as we sit here today, you can't say what

7   tablets he took before he died, can you?

8      A    No.

9      Q    So you don't know what tablets he took before

10  he died, do you?

11     A    No.

12     Q    And you don't know if they were double

13  strength, do you?

14          MR. MORIARTY:  Objection; form.

15          Go ahead.

16          THE DEPONENT:  No.

17     Q    (By Mr. Ernst)  And as you sit here today, they

18  could have been double strength based on this

19  literature that you received notice that that's

20  possible; isn't that true?

21          MR. MORIARTY:  Objection; form.

22          Go ahead.

23          THE DEPONENT:  Yes.

24     Q    (By Mr. Ernst)  Now, one of the things that

25  this deposition is designed to do, Doctor, is to make

1  sure that at the time of trial, you don't come up with

2  any outlandish opinions and you don't say anything that

3  you haven't -- that you haven't told us about, okay.

4          So we've marked as Exhibit 2 your opinions and

5  conclusions.  And have you reviewed those with

6  Mr. Moriarty today?

7      A    Yes.

8      Q    Got any changes for me, or are those basically

9  the opinions that you expect to render at the time of

10 trial in this case?

11     A    These are the opinions I would render at trial.

12     Q    Now, I want you to list for me the articles

13 that are here.  Now, did you -- this stack of articles,

14 are these the ones that you have read and reviewed in

15 preparation for your deposition here today?

16     A    Uh-huh, yes.

17     Q    Yes.  And where did you get these documents?

18     A    These are articles that I reviewed and some of

19 them I reviewed for when I wrote the book chapter,

20 others I had reviewed in the course of teaching the

21 toxicology fellows.

22     Q    What book chapter did you write?

23     A    I wrote the chapter on digoxin poisoning in

24 Dart's Medical Toxicology.

25     Q    Have you ever studied what happens to the blood

1    level of digoxin after a person dies?

2         A    Can you clarify what you mean by studied?

3         Q    Sure.  Have you ever done any studies yourself?

4         A    No.

5         Q    Have you reviewed any articles that talk about

6    redistribution of digoxin after death?

7         A    Yes.

8         Q    And are those articles included in your list of

9    materials there?

10        A    Yes.

11        Q    So let's point out the ones for me.  Let's just

12   take these out.  Are these all the articles that you've

13   pulled off the Internet, or pulled out of books?

14        A    Yeah.

15             MR. MORIARTY:  Objection.

16        Q    (By Mr. Ernst)  All right.  Can you just list

17   them for me?

18        A    How do you want them listed?

19        Q    Just list the title and the author.

20        A    Estimating antemortem drug concentrations from

21   postmortem samples: the influence of postmortem

22   redistribution.  Cook is the first author.

23        Q    In that article, did they have pre-death blood

24   levels?

25        A    In some cases.

PLAINTIFFS' EXHIBITS 012287

1      Q    Okay.  Let's mark this entire stack as the next

2    exhibit, which is 9, okay.  Just have the entire stack

3    marked.  Well, we'll just save ourselves some time.

4              (Exhibit 9 was entered into evidence.)

5              This entire stack of Exhibit 9 are the articles

6    that you have read and reviewed --

7      A    Yes.

8      Q    -- true?  Now, Doctor, have you reviewed

9    Vorphal's article with Coe?

10     A    Yes.

11     Q    Is that included in that list?

12     A    It should --

13             MR. MORIARTY:  Is it included in that stack?

14             MR. ERNST:  Yeah, Exhibit 9.

15             THE DEPONENT:  Yes.

16             MR. ERNST:  I want to --

17             MR. MORIARTY:  Buy you a stapler for Christmas.

18             MR. ERNST:  All right.  I'll take this so we

19    won't --

20     Q    (By Mr. Ernst)  Now, if you go to the

21    conclusion of that article -- do you see it there?

22     A    Uh-huh.

23     Q    It actually talks about postmortem serum

24    digoxin levels and being able to compute antemortem

25    ratio of what blood sample is.  Do you see that?

PLAINTIFFS' EXHIBITS 012288

36

1      A    Yes.

2      Q    All right.  Now, Doctor, the blood sample that

3  was taken on Mr. McCormack, was it a peripheral sample?

4      A    It was -- the subclavian vein is difficult to

5  categorize this peripheral central.  I don't think

6  there's a clear definition for that.

7      Q    Well, were you aware that -- you read

8  Dr. Mason's deposition?

9      A    (Deponent nods head)

10     Q    You're aware that he -- is that a yes?

11     A    Yes, sorry.

12     Q    Are you aware that he cut the vein and then

13  pushed the blood out from the wrist down the arm and

14  collected that blood?

15          MR. MORIARTY:  Objection.

16          THE DEPONENT:  That's how -- yeah, that's how

17  he reported doing it.

18     Q    (By Mr. Ernst)  That would be a peripheral

19  blood sample, true?

20     A    My concern would be that it's very difficult to

21  be certain that there -- the amount of blood that he

22  took, that it all came from the arm forward and there

23  was no contamination with blood from the subclavian or

24  with blood from the superior vena cava.

25     Q    Have you ever called and asked him about it?

PLAINTIFFS' EXHIBITS 012289

1      A    No.

2      Q    Now, Doctor, if you assume that it's a

3  peripheral view -- peripheral blood to assume that, and

4  you take the 3.6 level -- by the way, a 3.6 would be

5  considered toxic if the person were alive, true?

6           MR. MORIARTY:  Objection.

7           MS. AHERN:  Objection.

8           THE DEPONENT:  Its toxicity is a clinical

9  diagnosis.  It's considered supratherapeutic.

10     Q    (By Mr. Ernst)  It would give you concern as an

11  emergency room physician if you saw a digoxin level of

12  3.6.

13          MS. AHERN:  Objection.

14          THE DEPONENT:  It would depend on the patient.

15  I would go and see if the patient had symptoms of

16  digoxin poisoning.

17     Q    (By Mr. Ernst)  You would absolutely go check

18  that patient, true?

19     A    Yes.

20     Q    And you would be looking for that array of

21  symptomatology talked about, whether it's change in

22  vision, or nausea, tiredness.  What about bloating?

23     A    Bloating is a non-specific term.  If they had

24  GI distress, that -- that's a symptom of digoxin

25  poisoning.

PLAINTIFFS' EXHIBITS 012290

1    Q   Have you ever heard GI distress termed as

2    bloating?

3           MR. MORIARTY:  Objection.

4           Go ahead.

5           THE DEPONENT:  Sure, yes.

6    Q   (By Mr. Ernst)  All right.  Were you aware that

7    Mr. McCornack complained of that on the day of his

8    death?

9    A   Yes, he noted that.

10   Q   And if you assume that there's a 3.6 after

11   death serum digoxin level, using the study that Vorphal

12   and Coe did, you can compute the blood level before

13   death of Mr. McCornack, and it would be above 2.0,

14   wouldn't it?

15   A   I wouldn't do that calculation.

16   Q   Well, I'm not asking if you would do the

17   calculation, I'm asking if you followed the study that

18   was done by Vorphal and Coe in 1978 that if you did

19   that, it would be -- it would come out with a pre-death

20   level well above 2.0.  Isn't that true?

21          MR. MORIARTY:  Objection.

22          Go ahead.

23          MS. AHERN:  Objection.

24          THE DEPONENT:  The calculated concentration

25   using the point estimate that they provide is higher,

PLAINTIFFS' EXHIBITS 012291

1    the range when you look at the other samples that they

2    had, the 3.6 is well within the range of other values.

3         Q    (By Mr. Ernst)  Doctor, if you compute using

4    the formula given by Vorpo (ph) -- Vorphal and Coe in

5    the 1978 study, if you take that 3.6 level and you

6    compute it back to the studies and the documented chart

7    that they provide you with, Mr. McCornack's blood level

8    would be above 2.0 for serum digoxin.  Isn't that true?

9              MR. MORIARTY:  Objection.

10             THE DEPONENT:  What chart are you referring to?

11        Q    (By Mr. Ernst)  I'm referring to the summary of

12   Vorphal and Coe where there's a ratio postmortem to

13   antemortem.

14             MR. MORIARTY:  Don, all he's asking is are you

15   referring to the graphs in the article or the very end,

16   the summary?

17             MR. ERNST:  I'm referring to the summary.

18             MR. MORIARTY:  Okay.  Thank you.

19             Objection.

20             Go ahead.

21             THE DEPONENT:  So I would refer to Table 2

22   where the 1.63 plus or minus .48 is noted.  And if you

23   include the variation in the 1.63 plus or minus 1.48 as

24   they do in the table, there's a wide range of values.

25   1.63 is one value, but there's a range where you would

1  expect potentially their reported values to be.

2         Now, I would also point out that there -- they

3  have no information on someone on a sample obtained 72

4  hours postmortem, so I'm not sure that these results

5  would even be applicable.

6     Q   (By Mr. Ernst)  Do you have an opinion on blood

7  sample taken 72 hours in the normal course of an

8  autopsy about the affect of postmortem redistribution

9  of digoxin?

10    A   There's no available information that I'm aware

11 of about the affects of -- or what we would expect it

12 to be.

13    Q   All right.  In summary, coming back,

14 ventricular fibrillation can be caused by digoxin

15 toxicity, true?

16    A   Yes.

17    Q   And that is a cause of sudden death, true?

18    A   Yes.

19    Q   And that is consistent with digoxin toxicity,

20 true?

21        MR. MORIARTY:  Objection; form and otherwise.

22        Go ahead.

23        THE DEPONENT:  Yes.

24    Q   (By Mr. Ernst)  And, in fact, if a person had a

25 blood level of 3.6 after death using the Vorphal and

PLAINTIFFS' EXHIBITS 012293

1   Coe article, it is reasonable that Mr. McCornack's

2   blood level before death was well above 2.0; is that

3   true?

4          MR. MORIARTY:  Objection.

5          MS. AHERN:  Objection.

6          THE DEPONENT:  Are you asking if it's probable?

7          MR. ERNST:  I'll have my question re-read.

8          (The last question was played back by the court

9   reporter.)

10          MR. MORIARTY:  Objection.

11          Go ahead.

12          THE DEPONENT:  It's possible that his blood

13   level was.

14      Q   (By Mr. Ernst)  Now, one of the medical

15   opinions that you have that's on Exhibit 2, and I

16   welcome you to go ahead and feel free to review any of

17   these.

18      A   Okay.  Hang on a second.  This is all mixed up.

19      Q   First of all, item one, your medical opinion

20   is:  "There is no evidence that Mr. McCornack was

21   exposed to excessive doses of digoxin either acutely or

22   chronically."  Do you see that?

23      A   Yes.

24      Q   Now, at the time that you wrote that, you did

25   not have access to the letter written specifically to

1    Mr. McCornack pointing out that the -- the Digitek that

2    he received could be double strength.  You didn't have

3    that, did you?

4        A    I did not.

5            MS. AHERN:  Objection.

6        Q    (By Mr. Ernst)  Now, in truth in fact, that

7    letter, Exhibit 8, is evidence that Mr. McCornack was

8    exposed to excessive doses of digoxin, isn't it?

9            MR. MORIARTY:  Objection.

10           THE DEPONENT:  No.

11       Q    (By Mr. Ernst)  It's evidence that he could

12   have been exposed, wouldn't you agree?

13           MR. MORIARTY:  Objection.

14           Go ahead.

15           MS. AHERN:  Objection.

16           THE DEPONENT:  Yes.

17       Q    (By Mr. Ernst)  All right.  And, in fact, the

18   blood level after death and having a blood level

19   greater than .20 is consistent with being exposed to an

20   excessive dose of digoxin, isn't it?

21           MR. MORIARTY:  Objection.

22           THE DEPONENT:  Do you mean 2.0?

23       Q    (By Mr. Ernst)  Above 2.0.

24       A    I'm sorry.  Can you restate the question?

25       Q    Sure.  Looking at the evidence that we have of

```
1  a postmortem blood sample of 3.6 after death, blood
2  sample of 3.6, looking at the articles that you've
3  read, working backwards, it is certainly within reason
4  that Mr. McCornack, if he had been exposed to an
5  excessive dose of digoxin, the blood levels that are
6  exhibited after death would be consistent with that,
7  true?
8          MS. AHERN:  Objection.
9          MR. MORIARTY:  Objection.
10         THE DEPONENT:  The blood levels are consistent
11 with a wide range of antemortem digoxin concentrations.
12 I cannot say that the level of 3.6 is consistent with
13 excessive dosing.
14     Q   (By Mr. Ernst)  You can't say it isn't.
15         MR. MORIARTY:  Objection.
16         MS. AHERN:  Objection.
17         MR. MORIARTY:  Form.
18         Go ahead.
19         THE DEPONENT:  I can't say that it is not.
20     Q   (By Mr. Ernst)  And, in fact, looking at
21 Exhibit 7, which are all the lists of the blood samples
22 for Mr. McCornack -- I'm sorry, Exhibit 6 -- over a
23 ten-year period, they were all between 1.4 and 1.8.
24 Isn't that true?
25     A   Yes.
```

```
 1         Q    He never had a level bigger than 2.0, did he?

 2         A    Not that I'm aware of.

 3         Q    Item number two, as you state, "Mr. McCornack

 4    had no symptoms of digoxin toxicity prior to his

 5    cardiac arrest."  Do you see that?

 6         A    Yes.

 7         Q    We've already established that -- well, strike

 8    that.

 9              Were you aware that he reported to his wife

10    that he was tired on the day that he died?

11         A    I don't recall that in her deposition.

12         Q    Do you recall that he said he was bloated on

13    the day before he died -- evening that he died?

14         A    I recall her mentioning that he said she was

15    bloated.

16         Q    We've already established that bloating is a

17    lower GI tract term that some people use for distress,

18    true?

19         A    For a type of distress.

20         Q    And a lower GI tract distress is consistent

21    with digoxin toxicity, isn't it?

22              MR. MORIARTY:  Objection.

23              THE DEPONENT:  Digoxin toxicity generally is

24    more nausea and vomiting.  Bloating is not commonly

25    associated.  I mean, GI distress can range from
```

1    abdominal pain to nausea to vomiting to heartburn.  And

2    I would -- so I would say in terms of the symptoms that

3    I would expect with digoxin poisoning, bloating would

4    not be one of the symptoms that commonly is used to

5    describe a patient with digoxin toxicity.

6         Q    What about fatigue?

7         A    Fatigue can be.

8         Q    Now, you make your statement that Mr. McCornack

9    had no symptoms, and in truth in fact, in the

10   deposition of Kathy McCornack, she stated that he was

11   fatigued.  Do you recall that?

12             MR. MORIARTY:  Objection.

13             MS. AHERN:  Objection.

14             MR. MORIARTY:  Form.

15             Go ahead.

16             THE DEPONENT:  Mr. McCornack had a very active

17   day the day that he died.  I don't look at that and see

18   any symptoms that suggest that he was -- had malaise,

19   had nausea, had symptoms of digoxin poisoning.

20        Q    (By Mr. Ernst)  Let's look at Kathy McCornack's

21   deposition in your materials here.  I pulled that out

22   of your materials, right?  Looking at page 108, do you

23   see it said, "Did your husband often feel tired

24   recently?"

25             "Yes."

1           "When you say recently, I mean recently just

2    prior to his death?"

3           "Yeah."

4           "There's references in the medical record to

5    him feeling consistently."

6           "Yeah."

7           "Over a pretty long period of time," by

8    Mr. Moriarty.

9           The answer is, "Yeah, but it was more than

10   usual."

11          Do you see that?

12      A    Okay.

13      Q    Now, that is consistent with a person that's

14   experiencing digoxin toxicity; isn't that true?

15          MR. MORIARTY:  Objection; form.

16          Go ahead.

17          THE DEPONENT:  It's a non-specific symptom that

18   seems very vague to me.

19      Q    (By Mr. Ernst)  It's consistent.

20          MR. MORIARTY:  Objection; form.

21          MS. AHERN:  Objection.

22          MS. ERNST:  I'll rephrase it.

23      Q    (By Mr. Ernst)  When you state that there's no

24   symptoms of digoxin toxicity, that's not entirely

25   accurate based upon the deposition that I just read to

1  you.  Isn't that true?

2       A    I would not interpret that as suggestive of

3  digoxin toxicity.

4       Q    Well, how would you interpret it?

5       A    Well, looking back on the record, she's

6  complained fatigue many other times when he'd gone to

7  visit people.  Generally, when we talk about someone

8  with digoxin toxicity, we're looking at people who are,

9  you know, fatigued, malaised, they're laying around the

10 house.  They're someone who's clinically feeling

11 poorly, not someone who's out setting up a camp, being

12 active throughout the day.

13      Q    What about vision?  Did you ever mention -- do

14 you remember him saying something about vision?

15      A    Not specifically color vision.  I'd have to go

16 back again and look, but I don't remember that being

17 prominently mentioned.

18      Q    Now, page 111 --

19           MR. MORIARTY:  Oh, I'm sorry, I thought you

20 were done.

21      Q    -- specifically talks about his vision.  Do you

22 see that?

23           MR. MORIARTY:  Are you referring to Kathy's

24 deposition?

25           MR. ERNST:  Yes.

PLAINTIFFS' EXHIBITS 012300

1            MR. MORIARTY:  Thank you.

2       Q    (By Mr. Ernst)  He had changes in his vision.

3   Do you see that?

4       A    Uh-huh.

5       Q    It's page 111?

6       A    Uh-huh.

7       Q    Now, changes in vision are consistent with

8   digoxin toxicity, aren't they?

9            MR. MORIARTY:  Objection.

10           Go ahead.

11           THE DEPONENT:  As I note in my report, changes

12  in color vision are a symptom of digoxin poisoning.

13      Q    (By Mr. Ernst)  He said his vision was

14  different.  Do you recall that?

15      A    In the -- he said there's something -- yeah,

16  something with his eyes in the deposition, yes.

17      Q    Now, let's talk about a lethal arrhythmia.  The

18  truth, in fact, a lethal arrhythmia can be caused by

19  digoxin toxicity, true?

20      A    True.

21      Q    And there are occasions that you are aware of

22  in the medical literature where a person who's

23  suffering from digoxin toxicity begins irregular

24  heartbeat, feels tired, passes out, and dies, true?

25      A    That would happen with other symptoms.  I

PLAINTIFFS' EXHIBITS 012301

1  wouldn't expect that to be someone who was well and

2  then suddenly developed arrhythmia.  The course of

3  chronic digoxin poising is --

4      Q   Well, you mentioned two types:  one is chronic

5  digoxin toxicity poisoning and the other is acute

6  poisoning, right?

7      A   Right.

8      Q   If a person takes more than the dose that one

9  would expect, they could suffer acute digoxin poisoning,

10 right?

11         MR. MORIARTY:  Objection.

12         THE DEPONENT:  If they took a single large dose

13 or if they took a large dose, they could develop acute

14 digoxin poisoning.  The range that we're talking about

15 in this case would not be expected to cause acute

16 digoxin poisoning.

17     Q   (By Mr. Ernst)  Do you have a physician/patient

18 relationship with Mr. McCornack?

19     A   No.

20     Q   You were hired by whom?

21     A   Mr. Moriarty.

22     Q   And the purpose that you were hired was to

23 render opinions about whether or not Mr. McCornack had

24 digoxin toxicity?

25     A   Correct.

1       Q    How often do you think a person should be

2    checked -- have their blood checking for digoxin,

3    assuming they're taking it on a regular basis?

4       A    I don't have an opinion on that.

5       Q    Once a year?

6       A    I don't have an opinion.

7       Q    You're aware that postmortem tests can be done

8    for digoxin?

9       A    Yes.

10      Q    What's the purpose of those tests?

11      A    As a toxicologist, I would use that test to

12   identify digoxin as whether there was a digoxin

13   exposure or not.  It would be very useful to know

14   someone were supposed to be taking digoxin and there

15   were no digoxin present.

16      Q    It's also useful to note if the digoxin level's

17   above 2.0; isn't that true?

18           MR. MORIARTY:  Objection.

19           THE DEPONENT:  I would not interpret a

20   postmortem digoxin concentration in that way.  There's

21   not, that I'm aware of, a therapeutic range for

22   postmortem digoxin concentrations.

23      Q    (By Mr. Ernst)  The literature says you can

24   work backwards, true?

25           MR. MORIARTY:  Objection.

1          THE DEPONENT:  I'm -- actually, the literature

2     says specifically that you shouldn't, and I would not

3     -- based on my understanding of the literature and my

4     review of it, I would not attempt to work backwards

5     from a postmortem concentration.  And in particular,

6     with this case, 72 hours is outside of the range of

7     what is reported in that study.

8          Q    (By Mr. Ernst)  Now -- reserve a motion to

9     strike -- looking at the -- well, do you believe

10    there's postmortem redistribution of digoxin?

11         A    Yes.

12         Q    What about diltiazem?

13         A    The evidence is less strong, but I believe it's

14    very likely.

15         Q    So do you have an opinion of whether or not

16    there's a postmortem redistribution of diltiazem or do

17    you just want to defer on that?

18         A    Yes.  I believe there is postmortem

19    redistribution.

20         Q    To what degree?

21         A    I don't believe that the exact -- the degree

22    for -- well, for -- really for either of these is at

23    the level where it can be quantified.  I think we can

24    say that it increases in most cases, diltiazem.

25         Q    What risk factors did Mr. McCornack have from a

52

1    cardiac standpoint?  You're an ER doc, tell me what his

2    risk factors were.

3            MR. MORIARTY:  Objection.  Risk factors for

4    what?

5            MR. ERNST:  For a heart event -- cardiac event.

6            THE DEPONENT:  So the main risk factors that we

7    would consider in someone, for example, presenting with

8    chest pain, which would be a little bit different, but

9    we usually talk about events, or risk factors such as

10   high blood pressure, previous coronary artery disease,

11   tobacco use, male age greater than 40, family history,

12   diabetes.

13           And then are you asking in his specific case

14   or?

15       Q   (By Mr. Ernst)  Sure, yeah.

16       A   So he also had -- he was overweight and he had

17   -- I mean, he had an abnormal heart.  He had atrial

18   fibrillation.

19       Q   Now, those are all risk factors that he had,

20   true?

21       A   I don't recall family history or diabetes

22   and --

23       Q   Let's go through them.

24       A   Okay.

25       Q   Did he have chest pain the day he died?

PLAINTIFFS' EXHIBITS 012305

1      A     None reported.

2      Q     Did he have high blood pressure?

3      A     He's characterized as having high blood

4    pressure by two of his treating physicians and had

5    several high blood pressure -- or blood pressure

6    measurements that were elevated.

7      Q     What about primary artery disease?

8      A     He had some coronary artery disease.

9      Q     Not major, but some?

10     A     Well, he had coronary artery disease.  And, in

11   fact, coronary artery disease in and of itself is -- I

12   mean, he had coronary artery disease.

13     Q     What about tobacco use?

14     A     He chewed tobacco.

15     Q     What about family history?  Was chewing

16   tobacco, will that create the risk?

17     A     It is considered a risk factor.

18     Q     What about family history?

19     A     I don't recall that being documented.

20     Q     What about diabetes?

21     A     No.

22     Q     What about any renal or kidney issues?

23     A     Well, we had hadn't seen any kidney tests on

24   him for a year, but he had none at the last -- time of

25   his last visit.

PLAINTIFFS' EXHIBITS 012306

1    Q    So concerning those factors, wouldn't it be

2    consistent that if a person were exposed to a double

3    dose of digoxin that his risk of a sudden cardiac death

4    event would increase?

5              MR. MORIARTY:  Objection.

6              MS. AHERN:  Objection.

7              THE DEPONENT:  I don't think you can -- I can't

8    say that, no.

9    Q    (By Mr. Ernst)  You can't say that he didn't.

10             MR. MORIARTY:  Objection.

11             MS. AHERN:  Objection.

12    Q    (By Mr. Ernst)  Is that true?

13    A    I'm sorry, I can't say that it didn't.

14    Q    You can't say that it didn't.

15             MR. MORIARTY:  Objection; form.

16             THE DEPONENT:  I have no -- no.

17    Q    (By Mr. Ernst)  Now, one of the things that you

18   did mention is that in item six, you mention that in

19   your opinion to a reasonable degree of medical

20   probability, Mr. McCornack died of dysrhythmia.  Is

21   that true?

22    A    Dysrhythmia caused by myocardial fibrosis,

23   atrial fibrillation, yes.

24    Q    Yes.  Now, if you just take that sentence, that

25   sentence is consistent with digoxin toxicity, isn't it?

```
 1              MR. MORIARTY:  Objection; form.

 2              MS. AHERN:  Objection.

 3              THE DEPONENT:  The fact that he died?

 4         Q    (By Mr. Ernst)  The fact that he died of

 5    dysrhythmia caused by myocardial fibrosis and atrial

 6    fibrillation.  That --

 7         A    Can you restate the question?

 8         Q    Sure.  I want you to assume that Mr. McCornack

 9    had digoxin toxicity, okay?  Just assume it.

10         A    Okay.

11         Q    And he died.  Okay?

12         A    Okay.

13         Q    And he died of dysrhythmia caused by myocardial

14    fibrosis and atrial fibrillation.  Do you see that?

15         A    Uh-huh.  Okay, yes.

16         Q    Well, let's just --

17         A    Yes.

18         Q    -- let's just rephrase it.  Let's just -- he

19    had digoxin toxicity and he died of dysrhythmia.

20         A    Okay.

21         Q    Death caused by dysrhythmia as a result of

22    digoxin toxicity is a known risk factor, true?

23              MR. MORIARTY:  Objection.

24              Go ahead.

25              THE DEPONENT:  I'm sorry, that's --
```

PLAINTIFFS' EXHIBITS 012308

56

```
 1        Q    (By Mr. Ernst)  I'll go back.  Let's start
 2   over.  Can you state for me what you believe when you
 3   say there's no convincing evidence that Mr. McCornack
 4   received excessive doses of digoxin?  What do you me by
 5   that?
 6        A    I mean that he took -- there's no evidence that
 7   he took extra pills.  There's no history that suggests
 8   that.  That he had no symptoms prior to his death that
 9   would suggest to me that he was digoxin toxic.
10        Q    In fact, his wife said he was fatigued?
11             MR. MORIARTY:  Objection.
12             MR. ERNST:  That is not -- it doesn't bother
13   you?
14             MR. MORIARTY:  Objection.
15             THE DEPONENT:  He had been fatigued.
16             MR. MORIARTY:  Asked and answered.
17             Go ahead.
18             THE DEPONENT:  He had been fatigued for a long
19   time leading up to this and I didn't see anything in
20   his behavior that suggested -- again, with digoxin
21   toxicity, I would expect someone to be quite fatigued,
22   not out doing the activities that he was doing
23   throughout the day.  I would expect him to be
24   nauseated, not eating a large meal, having some beer in
25   the afternoon, that kind of thing.
```

PLAINTIFFS' EXHIBITS 012309

1     Q    (By Mr. Ernst)  What if he took a double dose

2    table at dinner that night?

3     A    I wouldn't expect that to be a problem.

4     Q    You wouldn't expect it to be a problem, but you

5    can't rule out the fact that that could cause digoxin

6    toxicity leading to dysrhythmia, can you?

7          MR. MORIARTY:  Objection; form.

8          THE DEPONENT:  A single double dose is not

9    going to produce toxicity.

10    Q    (By Mr. Ernst)  That's your testimony?

11    A    It's -- it's -- I mean, it's within -- I mean,

12   again, it's very, very, very unlikely.  That's not what

13   we -- it's not a medical probability that a single dose

14   is going to cause toxicity in someone.  It's outside of

15   what is a reasonable medical opinion.

16    Q    Now --

17          MR. MORIARTY:  I'm ready for a break, so

18   whenever it's convenient.

19          MR. ERNST:  A couple more questions and we'll

20   take a break.

21    Q    (By Mr. Ernst)  Doctor, would you acknowledge

22   that the risk factors that you mentioned for

23   Mr. McCornack also increase his risk of digoxin

24   toxicity?

25    A    Structural heart disease -- yes, structural

PLAINTIFFS' EXHIBITS 012310

1  heart disease.  Not -- I mean, not all of them, but
2  certainly structural heart disease is a risk factor for
3  digoxin toxicity.
4      Q   In other words, Mr. McCornack was at greater
5  risk for digoxin toxicity?
6      A   Yes.
7      Q   And the pathological findings that one would
8  expect for sudden cardiac death are the same as for
9  sudden cardiac death as a result of Digitek poisoning,
10 true?
11          MR. MORIARTY:  Objection.
12          Go ahead.
13          THE DEPONENT:  I'm sorry.  Can you -- so you're
14 ask -- can you clarify that?
15     Q   (By Mr. Ernst)  Sure.
16     A   You mean --
17     Q   In sudden cardiac death, ventricular
18 tachycardia is generally the reason that someone dies,
19 agreed?
20     A   Yes.
21     Q   Now, ventricular tachycardia can be caused by
22 Digitek poisoning, isn't that true?
23     A   Yes.
24          MR. ERNST:  We will respect Mr. Moriarty's
25 request for a break.

1        COURT REPORTER:  We're off the record.

2            (Off the record)

3        Q    (By Mr. Ernst)  Doctor, one of the reasons I'm

4    taking your deposition is to make sure that I have the

5    opinion that you expect to render at the time of trial.

6    There are no surprises.

7        A    Okay.

8        Q    So is it your testimony that on Exhibit 2 --

9    this is the report that was drafted by you --

10       A    Uh-huh.

11       Q    -- with Mr. Moriarty's help is -- contains

12   everything that you're going to testify about at the

13   time of trial.

14           MR. MORIARTY:  Objection.

15       Q    (By Mr. Ernst)  Your opinions, true?

16       A    Yes.

17       Q    Do you have any opinions that are not contained

18   in Exhibit 2 that you expect to render?

19       A    Not that I expect to render.

20       Q    Well, now is the time because I want to make

21   sure that when you get on the witness stand that you

22   don't have some other opinion that's not reflected in

23   this document, okay?

24       A    Okay.

25       Q    Now, you mentioned that the coroner amended the

1   death certificate to list digoxin poisoning as a cause

2   of death based upon digoxin concentration.  Do you see

3   that?

4        A   Yes.

5        Q   Diltiazem was not listed as a cause of death.

6   Do you see that?

7            MR. MORIARTY:  Objection.  Where?

8            MR. ERNST:  It's in your opinions, item 4.

9            MR. MORIARTY:  Oh, okay.

10       Q   (By Mr. Ernst)  Now, looking at Exhibit 7, if

11   you'd take a look at that.

12       A   Uh-huh, yes.

13       Q   Do you see that?

14       A   Yes.

15       Q   There's a note in here about diltiazem.  Do you

16   see that?

17       A   Yes.

18       Q   And it says that for diltiazem to be related to

19   death must -- the blood concentrations postmortem must

20   range from 6,700 to 33,000.  Do you see that?

21           MR. MORIARTY:  Objection.

22           THE DEPONENT:  It doesn't say must range.

23       Q   (By Mr. Ernst)  It says in a separate --

24   there's a quote from the NMS Labs.  It says, "In a

25   separate, small series of diltiazem related fatalities,

PLAINTIFFS' EXHIBITS 012313

1    the postmortem blood concentrations range from 6,700 to

2    33,000 nanog/mL."  Do you see that?

3         A    Yes.

4         Q    Now, that is a huge increase in what is

5    reported in Mr. McCornack after death.  Do you see

6    that?

7         A    Yes.

8         Q    Now, do you have an opinion as to whether

9    diltiazem was a cause and a factor of Mr. McCornack's

10   death?

11        A    I --

12             MR. MORIARTY:  Objection; form.

13             Go ahead.

14             THE DEPONENT:  I do not.

15        Q    (By Mr. Ernst)  Speaking of causative factors,

16   would you ever render an opinion on a patient unless

17   you'd seen him?

18             MR. MORIARTY:  Objection.

19             MS. AHERN:  Objection.

20             THE DEPONENT:  I don't understand what you're

21   asking.

22        Q    (By Mr. Ernst)  With regard to a treatment,

23   would you render opinions on particular patients

24   without seeing them or having any clinical analysis?

25             MR. MORIARTY:  Objection.

1          THE DEPONENT:  If you're asking if I'd treat a

2     patient with no information, the answer is no.

3          Q    (By Mr. Ernst)  Now, the coroner has the duty

4     to determine the cause of death, true?

5          A    Yes.

6          Q    And in this particular case, the coroner

7     amended the death certificate to list digoxin poisoning

8     as a cause of death.

9          A    Yes.

10         Q    You're aware of that.  Now, you didn't perform

11    the autopsy, did you?

12         A    No.

13         Q    You didn't look at the heart, did you?

14         A    No.

15         Q    You didn't take the blood sample, did you?

16         A    No.

17         Q    And you didn't review the medical records at

18    the time -- well, you didn't review all of his medical

19    records either, did you -- Mr. McCornack?

20         A    I reviewed the provided --

21              MR. MORIARTY:  Objection.

22              MS. AHERN:  Objection.

23              THE DEPONENT:  -- the medical records that were

24    provided.  I don't know if that's all of his medical

25    records.

63

1    Q    (By Mr. Ernst)  With regard to a cause of

2  death, you would defer to the coroner in a legal sense,

3  wouldn't you?

4            MR. MORIARTY:  Objection.

5            THE DEPONENT:  I would advise the coroner if

6  there is a toxicological issue, but I would -- but I

7  don't -- you know, I wouldn't -- well, I would advise

8  them if there was a toxicological cause of death.

9    Q    (By Mr. Ernst)  In truth in fact, in this

10  particular case, you didn't do the autopsy and it

11  wasn't your job to determine the cause of death, was

12  it?

13    A    No.

14    Q    And in this particular case, are you going to

15  testify about the cause of death?

16    A    In my opinion, there's no evidence that digoxin

17  toxicity was the cause of his death.

18    Q    That's your opinion; there's no evidence?

19    A    In my opinion, the reasonable degree of medical

20  probability, there's no convincing evidence that

21  Mr. McCormack suffered from digoxin toxicity prior to

22  this death.

23    Q    You know what the burden of proof is in a civil

24  case, Doctor?

25            MR. MORIARTY:  Objection.

PLAINTIFFS' EXHIBITS 012316

1          Go ahead.

2          MS. AHERN:  Objection.

3          THE DEPONENT:  No.  I mean, it's -- I believe

4     it's preponderance of evidence, but I'm not --

5      Q   (By Mr. Ernst)  More likely true than not

6     trued?

7      A   Right.

8      Q   Now, Doctor, my question was, do you intend to

9     render an opinion as to the cause of death?

10         MR. MORIARTY:  Objection.

11         MR. ERNST:  And --

12         MR. MORIARTY:  It's in his report.

13     Q   (By Mr. Ernst)  And I want to -- I want you to

14    say either you intend to render an opinion as to

15    Mr. McCormack's cause of death or you don't.  Do you

16    intend to render an opinion as to his cause of death?

17     A   Yes.

18     Q   And for the record, you believe Mr. McCornack

19    died from what?

20     A   I believe he died from a dysrhythmia caused by

21    his underlying structural cardiac disease.

22     Q   And please state for me what evidence you have.

23     A   That in -- well, in reviewing the autopsy,

24    there's no evidence of a clear other cause.  He had no

25    symptoms of digoxin poisoning that would lead me to

PLAINTIFFS' EXHIBITS 012317

1   believe he died from digoxin poisoning.  And in a

2   patient of this age, the most likely cause of death is

3   a primary cardiac arrhythmia when someone with this

4   type of underlying structural heart disease.

5   Essentially, I would say the autopsy excludes the other

6   causes.  I don't find evidence of digoxin poisoning.

7   Therefore, the most likely cause is primary arrhythmia

8   from his structural heart disease.

9        Q    Primary cardiac arrhythmia is what you believe

10  he died from?

11       A    Yes.

12       Q    And you have already testified that primary

13  cardiac arrhythmia is a result of digoxin toxicity,

14  true?

15            MR. MORIARTY:  Objection.

16            MS. AHERN:  Objection.

17            MR. MORIARTY:  Go ahead.

18            THE DEPONENT:  Digoxin toxicity may cause a

19  secondary arrhythmia because the digoxin poisoning

20  would be the primary -- or, would be the -- primary

21  arrhythmia implies an arrhythmia caused within the

22  heart.  What you're describing would be digoxin

23  poisoning causing an arrhythmia, which would be a

24  secondary arrhythmia.

25       Q    (By Mr. Ernst)  And from a clinical standpoint,

PLAINTIFFS' EXHIBITS 012318

1  can you look at a heart and tell if it's a primary or

2  secondary arrhythmia that caused the death on an

3  autopsy?

4       A    Well, it's certainly an abnormal heart with

5  lymph ventricular hypertrophy or myocardial fibrosis

6  would be suggestive of a primary arrhythmia.

7       Q    Isn't it true that a secondary primary

8  arrhythmia can lead to a primary cardiac arrhythmia?

9            MR. MORIARTY:  Objection.

10           MS. AHERN:  Objection.

11           THE DEPONENT:  Can you restate that, please?

12      Q    (By Mr. Ernst)  I'll rephrase it.

13      A    Yeah.

14      Q    Isn't it true, according to your terminology,

15  that a secondary primary arrhythmia can lead -- strike

16  that -- a secondary arrhythmia can lead to a primary

17  cardiac arrhythmia?

18           MR. MORIARTY:  Objection.

19           THE DEPONENT:  Maybe a -- let me see if I can

20  -- so a primary arrhythmia is an arrhythmia that

21  arrives in the heart due to an abnormality in the

22  heart.  A secondary arrhythmia is an arrhythmia that

23  arises from an estrogenic cause such as a poisoning.

24      Q    (By Mr. Ernst)  All right.  Let's clarify the

25  record then seeing as you've clarified it now.

1          Isn't it true that when you look at a person
2    that has died of a sudden cardiac event, that the
3    person performing the autopsy may not have a reason to
4    differentiate between a secondary arrhythmia and a
5    primary arrhythmia?
6        A    I don't really have an opinion on that.
7        Q    It's true, isn't it, that the death caused --
8    or, the death that occurred to Mr. McCornack is
9    consistent with digoxin toxicity?
10          MR. MORIARTY:  Objection; form.
11          Go ahead.
12          THE DEPONENT:  A -- a person who died of
13   digoxin poisoning would die of a dysrhythmia and would
14   have a -- but would have symptoms of digoxin poisoning
15   prior to their death.
16       Q    (By Mr. Ernst)  So the only reason that you're
17   saying that Mr. McCornack didn't die of digoxin
18   toxicity is the lack of symptomatology that you see
19   before death, true?
20       A    So the diagnosis of digoxin poisoning is a
21   clinical diagnosis, and he did not have the clinical
22   diagnosis.  He did not have the symptoms -- the
23   constellation of symptoms that constitute digoxin
24   poisoning prior to his death.
25       Q    Does nausea occur every time there's digoxin

1  toxicity?

2      A   It occurs in the majority of cases.  Does it

3  occur -- does anything occur every time?  That's -- I

4  mean, the vast majority of patients will complain of

5  nausea.

6      Q   Nausea doesn't occur every time in digoxin

7  toxicity, does it, Doctor?

8          MR. MORIARTY:  Objection; asked and answered.

9          Tell him again.

10         THE COURT:  The vast majority of patients that

11  have digoxin poisoning will have nausea and will feel

12  fatigued.  The diagnosis is based on -- is based on

13  those symptoms.

14     Q   (By Mr. Ernst)  Did any doctor see

15  Mr. McCornack before he died on the day that he died?

16     A   No.

17     Q   Will a patient know if they have an irregular

18  heartbeat, Doctor?

19     A   Mr. McCornack had noted previously when his

20  heartbeat was irregular.

21     Q   I will re-ask the question.  It's true that a

22  person can have an irregular heartbeat and not know it,

23  true?

24     A   Some people can have an irregular heartbeat and

25  not know it.

PLAINTIFFS' EXHIBITS 012321

1    Q    And, in fact, you don't know if Mr. McCornack

2    had an irregular heartbeat on the day that he died, do

3    you?

4    A    I do not.

5    Q    Are you just ignoring the fact that there was a

6    possibility that Mr. McCornack was exposed to a digoxin

7    excessive dose on the day that he died?

8           MS. AHERN:  Objection.

9           MR. MORIARTY:  Objection; form.

10          THE DEPONENT:  I look for the -- look at the

11   clinical evidence.  And I don't see any evidence -- or

12   anything that suggests that he was exposed to an

13   excessive dose of digoxin.  So I am not ignoring it;

14   I've evaluated the information that's been provided

15   that I've told you -- or that I've provided here, and I

16   see no evidence that he was -- that suggests that he

17   was exposed to an excessive dose.

18   Q    (By Mr. Ernst)  You don't think 3 -- a Dig

19   level of 3.6 postmortem is consistent with an excessive

20   dose?

21   A    I don't think it suggests an excessive dose.

22   Q    Is consistent with an excessive dose?

23          MR. MORIARTY:  Objection; form.

24          THE DEPONENT:  It's consistent with a range of

25   doses from therapeutic to supratherapeutic.

PLAINTIFFS' EXHIBITS 012322

1      Q    (By Mr. Ernst)  And by supratherapeutic, you

2   mean an excessive dose, don't you?

3            MR. MORIARTY:  Objection.

4            MS. AHERN:  Objection.

5            THE DEPONENT:  It's consistent -- I'm sorry, I

6   wasn't clear.  It's consistent with therapeutic dosing.

7   It is consistent with supratherapeutic dosing.

8      Q    (By Mr. Ernst)  By supratherapeutic dosing,

9   you're talking about an excessive dose.  Isn't that

10   true, Doctor?

11     A    Yes.

12            MR. MORIARTY:  Objection.

13            MS. AHERN:  Objection.

14            THE DEPONENT:  Yes.

15     Q    (By Mr. Ernst)  Now, do you intend to do any

16   additional work, Doctor --

17            MR. MORIARTY:  Objection.

18     Q    -- in this case with regard to -- if you have

19   anything that you've been assigned to do in this

20   particular case?

21     A    Nothing that I've been assigned to do.

22     Q    Do you know what the margin of error is in the

23   test that was performed postmortem rendering a 3.6

24   nanog/mL digoxin?

25     A    That precision of the test?

PLAINTIFFS' EXHIBITS 012323

1      Q    Yes.

2      A    Not offhand.

3      Q    Do you know how long Mr. McCornack took

4   diltiazem before he died?

5      A    No.

6      Q    Do you acknowledge that if a person took a

7   maximum dose of digoxin presents a greater risk for

8   digoxin toxicity?

9      A    Yes.

10     Q    And the closer they are to the digoxin toxicity

11  line, the less that it would take in the form of an

12  additional dose of digoxin to push him into toxic

13  range?

14     A    Can you clarify what you mean by the line?

15     Q    Sure.  Would you acknowledge that if a person

16  is being managed with maximum doses of digoxin and that

17  in order to control the arrhythmia of their heart they

18  have a rather high level of digoxin in their system,

19  you'd agree that that's the case in Mr. McCornack's

20  case, wouldn't you?

21          MR. MORIARTY:  Objection.

22          Go ahead.

23          THE DEPONENT:  His serum testing previously was

24  in the therapeutic range and not even at the upper --

25  well, at least the last five I believe was 1.6, the

PLAINTIFFS' EXHIBITS 012324

1   last tested value.  So he's in the therapeutic range --

2   well within the therapeutic range.

3        Q    (By Mr. Ernst)  Right.  But, it's the higher

4   therapeutic range?

5             MR. MORIARTY:  Objection.

6             Go ahead.

7             MS. AHERN:  Objection.

8             THE DEPONENT:  It's in the therapeutic range.

9        Q    (By Mr. Ernst)  All right.  And would you

10  acknowledge that if there's an additional dose of

11  digoxin that -- to which Mr. McCornack would be

12  exposed, that -- withdraw that.

13            When Digitek is tested in one's bloodstream, do

14  you know if they're testing peaks or troughs?

15       A    It depends on when the sample is drawn.

16       Q    And what is your understanding of when the

17  sample should be drawn after ingestion of it?

18       A    The ideal sample is a trough sample which would

19  be obtained immediately prior to taking the next dose.

20  So, for example, in a hospital if we were drawing it,

21  we would -- and they took it at 8:00 a.m., we would try

22  to draw the blood at 7:50.

23       Q    The literature basically says it should be

24  taken at least four hours -- a test for blood should be

25  taken at least four hours, sometimes six hours after

1    ingestion.  Do you agree with that?

2              MR. MORIARTY:  Objection.

3              THE DEPONENT:  I would recommend at least six

4    hours.  That's the standard recommendation.

5         Q   (By Mr. Ernst)  And do you know when

6    Mr. McCornack took his dose of digoxin on the day that

7    he died -- or the evening that he died?

8         A   My understanding is he took it after dinner.

9         Q   Do you know when dinner was?

10        A   I don't.  I was told in conversations with

11   Mr. Moriarty that it was approximately 7:00 p.m. based

12   on when the family reported he took his meds.

13        Q   The family reported 6:00 to 8:00 p.m.  Were you

14   aware of that?

15        A   Okay.  I mean, I -- sure.

16        Q   Now, do you acknowledge that men with a Digitek

17   digoxin level of 1.2 nanog/mL or higher have a higher

18   mortality rate?

19             MR. MORIARTY:  Objection.

20             MS. AHERN:  Objection.

21             MR. MORIARTY:  Go ahead.

22             THE DEPONENT:  Higher than elevated over -- I

23   mean, you have to have a comparative group.

24        Q   (By Mr. Ernst)  Okay.  Is it accurate to state

25   that when you render the opinions marked in Exhibit 2

1  that you did not know that the batch of digoxin was --

2  Mr. McCornack was taking at the time of his death had

3  been recalled?

4          MR. MORIARTY:  Objection.

5          THE DEPONENT:  I was aware that his digoxin had

6  been recalled.  Yes, I was aware of that.

7      Q   (By Mr. Ernst)  Were you aware that the batch

8  that he specifically taken had been recalled at the

9  time of his death?

10          MR. MORIARTY:  Objection.

11          Go ahead.

12          THE DEPONENT:  That was my -- my impression was

13  that, yes, he was taking tablets that were in the

14  recall.

15      Q   (By Mr. Ernst)  Do you factor that into any of

16  your opinions?

17      A   My -- I mean, my opinion is based on his

18  clinical symptoms and the symptoms that he, you know,

19  exhibited.  I did not -- the fact that there are

20  potentially -- well, that he was taking a recalled

21  batch would not affect my opinion as to whether he

22  suffered digoxin poisoning.  I'm not concerned whether

23  it was recall; I'm concerned whether he got an

24  excessive dose.  And I don't see any evidence that he

25  got an excessive dose.

```
 1        Q    Right.  But you obviously didn't talk to
 2   Mr. McCornack before his death?
 3        A    No.
 4        Q    And you've never spoken to his wife or
 5   children?
 6        A    No.
 7        Q    And the only deposition that you've read about
 8   that was his wife's?  You haven't read the children's
 9   deposition, have you?
10        A    No.
11        Q    And, in fact, his wife reported fatigue, some
12   changes in vision, and bloating, true?
13        A    She -- yes.
14        Q    And you discounted those?
15             MR. MORIARTY:  Objection; form.
16             THE DEPONENT:  The symptoms -- the behavior
17   that he exhibited and the symptoms that she reported do
18   not suggest digoxin toxicity.
19        Q    (By Mr. Ernst)  That's the only reason that
20   you're saying it wasn't digoxin toxicity, true?
21        A    The diagnosis --
22             MS. AHERN:  Objection.
23        A    The diagnosis of digoxin toxicity is a clinical
24   diagnosis and so it must be made on the symptoms,
25   examination, and the information that's provided to me
```

1   doesn't suggest it.

2       Q   Doctor, isn't it true that there are people

3   have reports of digoxin toxicity where people just pass

4   out and die?

5           MR. MORIARTY:  Objection; form.

6           Go ahead.

7           THE DEPONENT:  The course of chronic digoxin

8   poisoning --

9       Q   (By Mr. Ernst)  You can answer that question

10  yes or no, Doctor.

11          MR. MORIARTY:  Objection.

12      Q   (By Mr. Ernst)  I don't want a -- I don't want

13  a paragraph.  It can be answered yes or no.

14          MR. MORIARTY:  You don't?  You kind of sound

15  like me when I'm up against your Mr. Gibson.  Are you

16  cutting him off?

17          MR. ERNST:  I am asking him to answer the

18  question.

19          MR. MORIARTY:  Well, I just wondered.  I'm just

20  making sure.

21          I objected to the question because of its form.

22  You may answer his question.

23          THE DEPONENT:  There are reports of patients

24  who allegedly had digoxin poisoning and the report --

25  first report was that they collapsed and there's not

```
 1   necessarily documentation that they had symptoms.
 2        Q   (By Mr. Ernst)  You didn't put that in your
 3   report, did you?
 4        A   I was asked to comment on the probability, the
 5   most probable more likely than not, and it is more
 6   likely than not that a patient with digoxin poisoning.
 7        Q   You didn't put that in your report, did you?
 8            MR. MORIARTY:  Oh, wait, that's a classic
 9   cutoff.  You didn't even let him finish that answer.
10   So you want to ask -- you want to let him finish his
11   answer?
12            MR. ERNST:  I want him to answer the question.
13        Q   (By Mr. Ernst)  You didn't put that back in
14   your report, did you, the fact that the person can
15   suffer sudden cardiac death as a result of digoxin
16   toxicity with no other symptomatology.
17            MS. AHERN:  Object.
18        Q   (By Mr. Ernst)  It's not in your report, is it,
19   Doctor?
20        A   No.
21            MS. AHERN:  Objection.
22            MR. ERNST:  I don't have any other questions.
23            MR. MORIARTY:  Okay.  I just have one.  And I
24   believe it's about Exhibit 9, the stack of articles,
25   okay.
```

PLAINTIFFS' EXHIBITS 012330

```
 1
 2    ///
 3                        EXAMINATION
 4    BY MR. MORIARTY:
 5        Q    In addition to the stack of articles that
 6    Mr. Ernst marked as Exhibit 9, Dr. Heard, did you also
 7    bring these books in response to his duces tecum?
 8        A    I did.
 9        Q    And I'm referring to books that are on the
10    table.  One is Baselt's Text, and the other one I
11    believe is Goodman & Gilman, correct?
12        A    Correct.
13        Q    Was there also medical literature attached to
14    some of the depositions that you read as exhibits?
15        A    Yes.
16        Q    Did you read those?
17        A    Yes.
18        Q    And in the course of your career and writing
19    your book chapter and accumulating things on drug
20    toxicity, are there other articles that you have read
21    besides Exhibit 9 about the analysis of postmortem
22    blood samples?
23        A    Yes.
24        Q    That's all I have.
25             MR. ERNST:  Doctor --
```

PLAINTIFFS' EXHIBITS 012331

```
1              MR. MORIARTY:  Wait.  Hunter gets a turn.

2              Hunter, do you have any questions.

3              MS. AHERN:  No.

4              MR. MORIARTY:  Okay.

5              Don, it's your turn again.

6                              EXAMINATION

7    BY MR. ERNST:

8         Q    The two books that you've brought are

9    Disposition of Toxic Drugs and Chemicals in Man, 4th

10   edition by Baselt and Cravey; and Goodman & Gilman's,

11   The Pharmacological Basis of Therapeutics.  Is that

12   true?

13        A    Yes.

14        Q    And you referred to these books in your course

15   and scope of your opinion here?

16        A    Yes.

17        Q    Did you write any of the chapters in these

18   books?

19        A    No.

20        Q    That's all I have.  Thank you.

21             MR. MORIARTY:  He's going to read and sign.

22             COURT REPORTER:  Okay.  Do I send --

23             MR. MORIARTY:  You can send it directly to him,

24   if you wish, with a copy of your cover letter.

25             COURT REPORTER:  Okay.
```

PLAINTIFFS' EXHIBITS 012332

1           MR. MORIARTY:  You're going to get a transcript

2    and a separate sheet of paper.  You read the

3    transcript.  And if there are -- if she made a mistake

4    or you made a mistake -- and I know you made two -- you

5    will make the changes on the sheet.  Okay?

6           MR. ERNST:  Have you sent Mr. Moriarty a bill

7    for your time?

8           MR. MORIARTY:  Wait, the deposition's over.

9           COURT REPORTER:  Are we off --

10          MR. ERNST:  Yeah, we're off the record.

11          (Deposition concluded at 11:06 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25    ///

```
 1        I, KENNON JAMES HEARD, do hereby certify that I

 2   have read the foregoing transcript and that the same

 3   and accompanying amendment sheets, if any, constitute a

 4   true and complete record of my testimony.

 5

 6

 7                         _____

 8                         Signature of Deponent

 9                         ( ) no amendments

10                         ( ) amendments attached

11

12        Subscribed and sworn to before me this ____ day of

13   _____, 2011.

14

15                         Notary Public: _____

16                         Address: _____

17                                  _____

18

19                         My commission expires:_____

20

21                         Seal:

22

23

24

25
```

1              REPORTER'S CERTIFICATE

2

3        I, Valori D. Weber, reporter, hereby certify that

4    the foregoing transcript consisting of 81 pages is a

5    complete, true, and accurate transcript of the

6    testimony indicated, held on July 14, 2011.

7        I further certify that this proceeding was recorded

8    by me, and the foregoing transcript has been prepared

9    under my direction.

10

11

12

13

14

15    _____    August 2, 2011

16          Valori D. Weber

17          Western Deposition and Transcription, LLC

18          1400 16th Street, Suite 400

19          Denver, CO  80202

20          303.292.9400

21

22

23

24

25

PLAINTIFFS' EXHIBITS 012335