# EXHIBIT 614

PLAINTIFFS' EXHIBITS 012724

Edward John Barbieri                                     November 19, 2010

```
 1        IN THE DISTRICT COURT OF OKLAHOMA COUNTY
                     STATE OF OKLAHOMA
 2

 3    SAM JOHNSON, as Personal
      Representative of the
 4    Estate of Martha Bea
      Johnson, deceased,
 5                            Case No. CJ-2009-5292
          Plaintiff,
 6                            Honorable Daniel L. Owens
            vs.
 7
      ACTAVIS TOTOWA, LLC,
 8    formerly known as
      Amide Pharmaceuticals,
 9    Inc.; MYLAN BERTEK
      PHARMACEUTICALS, INC.,
10    UDL LABORATORIES, INC.,
      WAL-MART, INC.;
11    McBRIDE CLINIC ORTHOPEDIC
      HOSPITAL, INC.,
12
          Defendants.
13

14              Oral deposition of EDWARD JOHN BARBIERI,

15    Ph.D., taken at the office of NMS Labs, 3701 Welsh

16    Road, Willow Grove, Pennsylvania, on Friday, November

17    19, 2010, commencing at approximately 9:01 a.m.,

18    before JANICE D. BURNESS, a Registered Professional

19    Reporter, New Jersey Certified Court Reporter, and

20    Notary Public, pursuant to notice.

21

22

23

24

25
```

Edward John Barbieri                                    November 19, 2010

```
 1   APPEARANCES:

 2   BRAD MILLER, ESQUIRE
     bmiller@dlb.net
 3   DURBIN, LARIMORE & BIALICK, P.C.
     920 North Harvey
 4   Oklahoma City, Oklahoma  73102-2610
     405-235-9584
 5   Appearing on behalf of Plaintiffs

 6

 7   MATTHEW P. MORIARTY, ESQUIRE
     matthew.moriarty@tuckerellis.com
 8   TUCKER ELLIS & WEST
     925 Euclid Avenue, Suite 1150
 9   Cleveland, Ohio  44115
     216-592-5000
10   Appearing on behalf of Defendant
     Actavis Totowa, LLC, formerly known as Amide
11   Pharmaceuticals

12

13   HUNTER K. AHERN, ESQUIRE
     hahern@shb.com
14   SHOOK, HARDY & BACON, LLP
     JPMorgan Chase Tower
15   600 Travis Street, Suite 1600
     Houston, Texas  77002-2911
16   713-227-8008
     Appearing on behalf of Defendants
17   Mylan Bertek Pharmaceuticals, Inc., and UDL
     Laboratories, Inc. and Wal-Mart, Inc.
18

19

20   THOMAS E. STEICHEN, ESQUIRE
     ELDRIDGE COOPER STEICHEN & LEACH, PLLC
21   tsteichen@ecslok.com
     110 West Seventh Street, Suite 200
22   Tulsa, Oklahoma  74119
     918-388-5562
23   Appearing on behalf of Defendant
     Actavis Totowa, LLC, formerly known as Amide
24   Pharmaceuticals

25
```

Edward John Barbieri                                    November 19, 2010

```
 1  APPEARANCES (continued):

 2  DAVID K. McPHAIL, ESQUIRE
    FOLIART, HUFF, OTTAWAY & BOTTOM
 3  davidmcphail@oklahomacounsel.com
    201 Robert S. Kerr Avenue
 4  12th Floor
    Oklahoma City, Oklahoma  73102
 5  405-232-4633
    Appearing on behalf of Defendant
 6  McBride Clinic Orthopedic Hospital

 7


 8

 9                  EXAMINATION INDEX

10
    EDWARD JOHN BARBIERI, Ph.D.
11       BY MR. MORIARTY  . . . . . . . .    5
         BY MR. McPHAIL . . . . . . . . . 103
12       BY MS. AHERN . . . . . . . . . . 143
         BY MR. MORIARTY . . . . . . . . 153
13       BY MR. McPHAIL . . . . . . . . . 166

14


15                    EXHIBIT INDEX

16                                          MARKED
    Barbieri
17
     1      Curriculum Vitae of Edward John      8
18          Barbieri, Ph.D.

19   2      Litigation Packet                   18

20   3      Additional Data                     20

21   4      Sample History Report               24

22   5      Sample History Report               24

23   6      Listing of Courtroom Testimony and  43
            Testimony via Depositions, 2001 to
24          the Present

25
```

Edward John Barbieri                                          November 19, 2010

1 | EXHIBIT INDEX CONTINUED

2 |                                                    MARKED

3 | 7     Comparative Kinetics of Serum and           76
      Vitreous Humor Digoxin Concentrations
4 |     in a Guinea Pig Model.  Part I:
      Intravenous Administration of Digoxin
5 |
   8     Post-mortem Clinical Pharmacology            77
6 |
   9     Postmortem Drug Analysis:  Analytical        77
7 |     and Toxicological Aspects

8 | 10    Digoxin in the optic tract in digoxin       79
      intoxication
9 |
   11    Measurement of Digitalis-Glycoside           79
10 |    Levels in Ocular Tissues:  A way to
      improve postmortem diagnosis of
11 |    lethal digitalis-glycoside poisoning?

12 | 12    Comparative Kinetics of Digoxin in          81
      Serum and Vitreous Humor in a Guinea
13 |    Pig Model.  II.  Single Oral Dose
      Administration
14 |
   13    Litigation Support Package, WO#             172
15 |    08232082

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 012728

Edward John Barbieri                                    November 19, 2010

```
 1                    (It is agreed by and among counsel that
 2   all objections, except as to the form of the question,
 3   are reserved until the time of trial.)
 4                    EDWARD JOHN BARBIERI, Ph.D., having been
 5   duly sworn, was examined and testified as follows:
 6                         EXAMINATION
 7   BY MR. MORIARTY:
 8        Q.      Tell us all your full name, please.
 9        A.      Edward John Barbieri, and it's spelled
10   B-A-R-B-I-E-R-I.
11        Q.      And do you go by Dr. Barbieri or
12   Professor Barbieri?
13        A.      Usually Dr. or just Ed.
14        Q.      Dr. Barbieri, you have had your
15   deposition taken before on several occasions, have you
16   not?
17        A.      I have.
18        Q.      So you know that if you do not
19   understand my question, you will let me know and I'll
20   make it clear to you, okay?
21        A.      Yes, I understand.
22        Q.      If you need to take a break for whatever
23   reason, you will let me know, okay?
24        A.      Yes.
25        Q.      And we can do that.
```

PLAINTIFFS' EXHIBITS 012729

Edward John Barbieri                                    November 19, 2010

```
 1              And I don't want you to guess at the
 2    answer to any of my questions.  If you need to refer
 3    to the material that you brought with you, please feel
 4    free to do so, okay?
 5         A.      I understand.
 6         Q.      All right.  Now, the last CV that I had
 7    available for you was January 9th of 2009.
 8                 Have you brought a more recent version
 9    of your CV?
10         A.      Yes.  I have one that I revised January
11    12, 2010.
12         Q.      All right.  And I'm sure you don't have
13    these two versions memorized.
14         A.      No.
15         Q.      But in general, what has been added to
16    this CV to bring it current?  Is it publications or --
17         A.      No.  Maybe a couple of presentations
18    over the year, and more testimony that were included
19    in that list.
20         Q.      Okay.  Do you still have all the
21    licensures that are listed in this CV?
22         A.      Yes.
23         Q.      And on page 7 is a list of your
24    professional societies and activities.
25                 Are you still involved with the
```

PLAINTIFFS' EXHIBITS 012730

Edward John Barbieri                                    November 19, 2010

1   organizations that indicate through to the present?

2       A.      Yes.

3       Q.      Does the Society of Forensic Toxicology

4   have ethical guidelines for people who are acting as

5   expert witnesses?

6       A.      Yes.

7       Q.      Have you read them?

8       A.      Yes.

9       Q.      Does the Society of Forensic Toxicology

10  also have guidelines for the way forensic

11  investigations are supposed to be performed in a

12  laboratory?

13      A.      Well, there's guidelines for conducting

14  laboratory testing, not necessarily investigations,

15  per se.  But, yes, it's combined with the American

16  Association of Forensic Science.  So it's a joint

17  venture between the two organizations.

18      Q.      Okay.  And within the Society of

19  Forensic Toxicology the standards or guidelines for

20  conducting laboratory tests, are they considered

21  aspirational or mandatory?  How do you look at them?

22      A.      They are not considered mandatory, they

23  are considered good science.  And NMS follows the --

24  all the recommendations that they propose in those

25  guidelines, and we exceed many of those

PLAINTIFFS' EXHIBITS 012731

1   recommendations.

2       Q.      Okay.  When you say good science, good

3   science is designed to be careful.  Is that correct?

4       A.      Yes.

5       Q.      As accurate as possible given the

6   limitations of the equipment?

7       A.      Yes.

8       Q.      And good documentation of methods,

9   correct?

10      A.      Yes.

11      Q.      And a good documentation of methods is

12  done so that people coming in later to examine the lab

13  tests can see what was done, how it was done, things

14  of that nature, correct?

15      A.      That's correct.

16      Q.      All right.  I'm going to go ahead and

17  mark this CV.

18              I assume this is a copy we can keep?

19      A.      Yes, it is.

20      Q.      I'm just going to put BAR -- no, I'll

21  put Barbieri No. 1, okay?

22              (Exhibit No. Barbieri 1, Curriculum

23  Vitae of Edward John Barbieri, Ph.D., marked for

24  identification.)

25  BY MR. MORIARTY:

PLAINTIFFS' EXHIBITS 012732

Edward John Barbieri                                   November 19, 2010

```
 1       Q.       All right.  That's your CV, Barbieri No.
 2  1.
 3       A.       Okay.
 4       Q.       How much of your time currently do you
 5  spend acting as a forensic toxicologist as opposed to
 6  administering here at NMS?
 7       A.       About 90 percent of my time.
 8       Q.       Is?
 9       A.       Forensic.
10       Q.       Is there now Board certification in
11  forensic toxicology?
12       A.       There is a diplomate certification.
13       Q.       For how long has that been in existence?
14       A.       I don't know that.  It goes back many
15  years.
16       Q.       Do you have your diplomate --
17       A.       I do not.
18       Q.       -- Board certification?
19       A.       No.
20       Q.       Is there any particular reason why?
21       A.       Yeah.
22       Q.       And what's the reason?
23       A.       Basically in order get that you have to
24  have -- you have to be practicing in the field for at
25  least three years, which I have that.  And you have to
```

Edward John Barbieri                                      November 19, 2010

1    sit for an exam.

2              And because of my age and my situation

3    in terms of I may be retiring, I decided not to sit

4    for the exam, and the company said that's fine.

5         Q.     Okay.

6         A.     They accepted that.

7         Q.     Do you have -- currently have any

8    teaching positions?

9         A.     I'm, I guess you can say, an adjunct

10   professor of Arcadia University.

11             I do teaching in a forensic science

12   course that the -- it's not the company -- it's an

13   association.  Dr. Rieders, who started the company,

14   started a foundation for forensic sciences, it's at

15   another building.

16                  And that foundation has made

17   an association with Arcadia University in Glenside.

18        So I teach for that program.

19                  So it's not part of NMS, it's

20   sort of an outside; but an adjunct association.

21        Q.     What do you teach?

22        A.     Forensic science and pharmacology.

23        Q.     How much time per semester or year does

24   that involve?

25        A.     This year was the most so far.  I've

Edward John Barbieri                                    November 19, 2010

 1  given five lectures, and I have one more session.  So

 2  each lecture is about an hour and half.

 3      Q.      And when you say this year, are you

 4  talking about this calendar year or this academic

 5  year?

 6      A.      It would be this academic year, in this

 7  fall semester.

 8      Q.      All right.  In general, in your position

 9  here at NMS labs, you don't determine causes of death,

10  do you?

11      A.      No, we do not.

12      Q.      And you don't generally render opinions

13  about product defect?

14      A.      In our criminalistics lab, which is in

15  the other facility down the road, we do product

16  integrity work.  But we really don't do product defect

17  work.

18              We have procedures that can measure

19  quantitatively the amount of a drug that's in a

20  product and we do that, but I don't know if we really

21  render an opinion for that.  I don't do that.

22      Q.      Okay.  Tell me your personal experience

23  with postmortem blood testing.  Is that a big part of

24  your practice over the years?

25      A.      Well, it is.  Most of our forensic work

Edward John Barbieri                                    November 19, 2010

1  here at the company is either antemortem toxicology,

2  which is really police work -- DUI type of work,

3  sexual assaults -- and postmortem work.

4           I'd say the number of cases that I see

5  every day, it's about a 50/50 mix of the two.  And

6  that's been pretty consistent over the years.

7       Q.       When you say "cases I see a day," how

8  many cases do you see a day?

9       A.       When I'm sitting doing cases, which I

10  try to do most days, I can do between 30 and 40 cases.

11  That basically means that I'm taking the laboratory

12  data, getting a composite, producing a report, and

13  authoring that report to the client.

14       Q.       Okay.  How much experience do you have

15  in postmortem vitreous fluid analysis?

16       A.       Well, it's a matrix just like any other

17  matrix.  We do some vitreous work here.  And so

18  whatever experience I have, I mean it's pretty hard to

19  quantify that.  We see it.  We don't do a lot in

20  comparison to postmortem blood.

21       Q.       Okay.

22       A.       Or tissue work.  But we do see vitreous

23  samples.

24       Q.       How much of your own practice is solid

25  oral dose analysis?

PLAINTIFFS' EXHIBITS 012736

Edward John Barbieri                                    November 19, 2010

```
 1       A.       Very little.

 2       Q.       Are there other people here at NMS who

 3  do that?

 4       A.       Again, the people in the criminalistics

 5  lab.

 6       Q.       What section is Dr. McMullin in?

 7       A.       He's not a doctor.

 8       Q.       Okay.

 9       A.       Mr.

10       Q.       Mr. Matthew McMullin.

11                What section is he in?

12       A.       He's the director of research and

13  development at the present time.

14       Q.       How much experience do you have --

15  you personally -- postmortem analysis of digoxin in

16  blood?

17       A.       Very little.  And the reason for that

18  is, first of all, digoxin is not a common compound

19  that we get here.

20                We do, I'd say, on average a thousand

21  tests a day, chemical tests a day as a ballpark

22  number.  And we may do, you know, a dozen every week

23  of digoxin.

24                So in the global scheme of things that

25  we see, and because it's not a primary drug anymore in
```

Edward John Barbieri                                    November 19, 2010

```
 1   congestive heart failure, we don't see a lot of that
 2   in terms of our testing work.
 3        Q.      And how much of that, let's just say a
 4   dozen a week, is antemortem and how much is
 5   postmortem?
 6        A.      We don't do any antemortem digoxin.
 7        Q.      All right.  How much postmortem digoxin
 8   vitreous analysis do you do?
 9        A.      I've had two cases, this one and one
10   other, over the years.
11        Q.      I didn't see any publications in your CV
12   about postmortem redistribution.
13        A.      That's correct.
14        Q.      You have never published about PMR?
15        A.      No.
16        Q.      And other than a blurb in the Handbook
17   of Commonly Prescribed Drugs, I don't see that you've
18   actually published on digoxin either.
19        A.      That's correct.  Well, there is a
20   pharmacology text that I edited, and one of the
21   chapters was on digoxin, so I was involved in editing
22   that chapter.  But I didn't write that chapter.
23        Q.      What text was that?
24        A.      This was a book called Basic
25   Pharmacology in Medicine.
```

Edward John Barbieri                                    November 19, 2010

```
 1      Q.      By whom?
 2      A.      Well, it was four editors.  It was
 3  myself, John DiGregorio, Andy Ferko and Joseph
 4  DiPalma.  This was done when I was at Hahnemann.  And
 5  we had a couple editions of that.
 6      Q.      In that Handbook of Commonly Prescribed
 7  Drugs the doses of .375 milligrams and .50 milligrams
 8  are listed.  Is that correct?
 9      A.      I believe so.
10      Q.      And is it your understanding that those
11  drugs are sometimes prescribed or used to be commonly
12  prescribed at those doses?
13      A.      Digoxin you are speaking of?
14      Q.      Yes.
15      A.      Yes.
16      Q.      All right.  And certainly even people
17  who were prescribed .50, or who still are prescribed
18  .50 milligrams per day, don't all become digoxin
19  toxic.  Is that true?
20      A.      That's true.
21      Q.      Have you ever published anything about
22  postmortem vitreous analysis?
23      A.      No.
24      Q.      Have you published anything about solid
25  oral dose testing?
```

PLAINTIFFS' EXHIBITS 012739

Edward John Barbieri                                    November 19, 2010

```
 1      A.      No.
 2      Q.      You have testified before in various
 3  settings about postmortem redistribution of other
 4  drugs.
 5      A.      Yes, I have.
 6      Q.      Have you ever testified about PMR of
 7  digoxin?
 8      A.      No.  None of my cases and testimony have
 9  involved digoxin.
10      Q.      Have you ever testified about postmortem
11  vitreous analysis?
12      A.      No.
13      Q.      When I say "vitreous," we are talking
14  about vitreous fluid, correct?
15      A.      I understand, yes.
16      Q.      Have you ever testified about solid oral
17  dose testing?
18      A.      I don't believe so, no.
19      Q.      To try to capture what forensic
20  toxicologists do, first of all, what you are trying to
21  do is use reliable scientific methods to analyze data
22  available to you, correct?
23      A.      Yes.
24      Q.      In order to reach certain conclusions
25  from the data.  Is that right?
```

Edward John Barbieri                                    November 19, 2010

```
 1       A.       That's correct.
 2       Q.       And sometimes what you are trying to do
 3  is either talk about what the human reaction would be
 4  to a dose.  Is that correct?
 5       A.       If we are talking about an active
 6  product, yes.
 7       Q.       All right.  Or sometimes you are trying
 8  to use reliable methods to analyze bodily fluids to go
 9  back in time and figure out what drug is on board,
10  correct?
11       A.       That's true.
12       Q.       Or what the dose might have been?
13       A.       That's more speculative, I guess we
14  could say, because we are dealing with, you know,
15  postmortem levels versus antemortem dosing.
16       Q.       We will get into that a little more
17  later.
18       A.       Okay.
19       Q.       But that's, in general, some of the
20  things that you try to do in forensic toxicology?
21       A.       It can be done, yes.
22       Q.       Now, the material that we were given
23  that compromised, or comprised, I'm sorry, your
24  litigation packet was what I'm marking here as
25  Barbieri Exhibit 2.
```

Edward John Barbieri                                    November 19, 2010

```
 1              And this is marked with Bates Nos.
 2  Johnson 201 through Johnson 259.  Okay?
 3              (Exhibit No. Barbieri 2, Litigation
 4  Packet, marked for identification.)
 5  BY MR. MORIARTY:
 6      Q.      I'm handing you Barbieri Exhibit 2.
 7              Could you just flip through that and let
 8  me know if that appears to you to be the NMS
 9  litigation packet for the Martha Bea Johnson blood and
10  vitreous specimens.
11      A.      Well, we had two packages that we had
12  produced, so let me see how this is combined.
13      Q.      Well, before you answer that, did you
14  produce litigation packages separately for the blood
15  and then the vitreous?
16      A.      Yes.
17      Q.      Okay.
18      A.      We had these under two different work
19  order numbers.
20      Q.      I think Exhibit 2 is both together, but
21  you let me know.
22      A.      I just want to be sure that we are
23  speaking about the same thing.
24              Okay, it looks to me, without going
25  through each page, that this document, Exhibit 2,
```

Edward John Barbieri                                    November 19, 2010

```
 1   represents the litigation package under this Work
 2   Order 08275619.
 3          Q.      Okay.
 4          A.      I don't think it includes the previous
 5   litigation package, which was the blood.  I think this
 6   is only the vitreous portion of that.
 7          Q.      There is blood information in Exhibit 2,
 8   just so you know.  It's some information closer to the
 9   front.  It may not have the chromatographs, but it
10   does have the result.
11          A.      Yeah.  It may include some materials
12   that we had in the forensic file in which there was
13   reference to blood results.
14                  For example, if I could just show you,
15   on page 6 there is a test requisition that was sent
16   in.  This came in for the vitreous, but they put some
17   blood information in here --
18          Q.      Okay.
19          A.      -- for the previous work order.
20          Q.      Okay.
21          A.      So I just looked at the number of pages
22   here, which kind of matches what we have here.
23          Q.      Okay.
24          A.      Okay.  Now, if I could add to that if
25   you don't mind, if I could interrupt you.
```

PLAINTIFFS' EXHIBITS 012743

Edward John Barbieri                                    November 19, 2010

```
 1              When I was reviewing the data this week
 2    again, I found that there were some pages that were
 3    omitted when we submitted this litigation package.
 4              And we -- how this happened we don't
 5    know, but we found the data.  It was not really
 6    analytical data.
 7              I have a copy for you.  We put this into
 8    an additional data package and we recertified those
 9    packages, and we continued the numbering for this pack
10    so that would be part of this.  I have a copy of that
11    for you.
12              And, again, it's not the data, per se.
13    It is really batch work lists, and it's the sequence
14    file and some batch information as I say was omitted.
15        Q.      What you just handed me I'm marking as
16    Barbieri Exhibit 3.
17        A.      Okay.
18              (Exhibit No. Barbieri 3, Additional
19    Data, marked for identification.)
20    BY MR. MORIARTY:
21        Q.      And if I understood what you just said
22    correctly, what I've now marked as Barbieri Exhibit
23    No. 3 should be part of Barbieri Exhibit 2.
24        A.      That's correct.
25        Q.      Okay.  And then there is still a
```

Edward John Barbieri                                    November 19, 2010

1   separate work order litigation package for the blood

2   specimen, correct?

3        A.      Yes.  And this was -- just for

4   everyone's -- this was labeled with this work order,

5   which came previous to the vitreous, 08232082.

6                And as I showed you on page 6, this was

7   referred to in the test requisition form that was

8   submitted with the vitreous.

9        Q.      May I see the blood sample litigation

10  package, please?

11       A.      Certainly.

12       Q.      Now, at the end of the deposition, just

13  so you know, what we'll probably do is give this whole

14  file to the court reporter, so you can copy the things

15  and make sure we have got everything.  But I just want

16  to flip to something on this right now.

17               Now, this is paginated in pencil.

18               Is that done in advance of a deposition

19  to keep the pages straight?

20       A.      That's really our copy.  We do it that

21  way in case we find something that we have to add.

22  And of course in the one that we submitted the

23  pagination was printed on the pages.

24       Q.      Okay.

25       A.      And they should be identical numbers,

Edward John Barbieri                                    November 19, 2010

```
 1   and they are certified with the numbers of pages that
 2   we have supplied.
 3        Q.      Okay.
 4        A.      Now, since we are speaking of these two
 5   litigation packages, can I go one step further?
 6        Q.      Sure.
 7        A.      For everybody's understanding, these
 8   litigation packages were requested to be produced,
 9   which we did, and they were sent out.
10               And then following the submission of
11   this material, the specimens were returned to the
12   submitting agency, okay?
13               So we made copies of -- for both of
14   these of the sample history report, which is now more
15   complete, that has the return information on it, the
16   FedEx number, et cetera, et cetera, and also the chain
17   of custody with the signatures and the dates of the
18   individual who packaged that material.
19               So this is information for you.  This is
20   the one -- these two pages would be for -- this is the
21   litigation package that would -- you marked as Exhibit
22   2, and Part 3, that would be these pages.
23               And then these two pages would be for
24   the previous one that we were just speaking about.
25               MS. AHERN:  The vitreous sample or blood
```

PLAINTIFFS' EXHIBITS 012746

Edward John Barbieri                                    November 19, 2010

```
 1  sample?
 2            THE WITNESS:  This is the blood sample,
 3  that's correct.
 4            So this now, as we sit here today, is a
 5  more complete history of the sample history report and
 6  the chain of custody of materials.
 7  BY MR. MORIARTY:
 8      Q.      So if I've got this correct, Barbieri
 9  Exhibit 4, which is two pages, is the data that you
10  just described which pertains to the litigation
11  package which is Exhibits 2 and 3?
12      A.      That's correct.
13      Q.      Okay.  And then Barbieri Exhibit 5,
14  which I'm marking now, is the transmittal data for the
15  litigation package that I don't have a copy of,
16  correct?
17      A.      Well, I don't know if you don't have a
18  copy.
19      Q.      Well, I don't.
20      A.      Is this the one we referred to in the
21  blood work?
22      Q.      But Exhibit 5 is two pages, correct?
23      A.      Correct.
24      Q.      And it's the transmittal data for the
25  litigation package for the blood sampling?
```

PLAINTIFFS' EXHIBITS 012747

Edward John Barbieri                                    November 19, 2010

```
 1      A.      Yes, that's correct.

 2              (Exhibit No. Barbieri 4, Sample History

 3  Report, marked for identification.)

 4              (Exhibit No. Barbieri 5, Sample History

 5  Report, marked for identification.)

 6  BY MR. MORIARTY:

 7      Q.      Okay.  Now, when I reviewed this, I

 8  think the only time I saw your name on it may have

 9  been on a bill.

10              What was your active involvement, if

11  any, regarding the blood analysis or the vitreous

12  analysis?

13      A.      Okay.  When the blood analysis was done

14  and the report was sent, I was not involved in any

15  way.

16      Q.      Okay.

17      A.      The vitreous sample came to me in one of

18  the cases I described as I picked up batches of

19  cases.  And I reviewed the data, and I initialed the

20  inside of the forensic folder that I really reviewed

21  that data prior to the report going out.

22              So my involvement was I saw the data for

23  the vitreous, and I basically was the final reviewer

24  for that set of data.

25      Q.      Okay.
```

Edward John Barbieri                                    November 19, 2010

```
 1        A.        Then when the litigation packages -- the

 2   litigation package was requested for that sample, I

 3   reviewed the lit packs for both samples.

 4                  So I did see them at the time that these

 5   went out, so my name was on it.

 6        Q.        Who was the final reviewer of the blood

 7   sample?

 8        A.        It was Dr. Kevin Ballard.

 9        Q.        And when you reviewed the vitreous

10   sampling, did you have available to you and did you

11   review the blood sampling data?

12        A.        It was available to me, but I did not

13   review it.

14        Q.        Okay.

15        A.        At that time.

16        Q.        All right.  Have you been asked to

17   prepare any other reports other than the material that

18   you did for the analysis of the samples?

19        A.        No.

20        Q.        You know what reasonable degree of

21   scientific probability or certainty means?

22        A.        Yes.

23        Q.        And that is different from speculation?

24        A.        Yes.

25        Q.        Are you familiar with what other NMS
```

Edward John Barbieri                                    November 19, 2010

```
 1   employees have testified to about postmortem

 2   redistribution?

 3        A.      Not specifically.  I know all of our

 4   toxicologists that we presently have have testified on

 5   that subject.

 6        Q.      Are you familiar with what any of the

 7   NMS toxicologists have testified to about PMR of

 8   digoxin?

 9        A.      No, I'm not.

10        Q.      Do you periodically here at NMS have

11   meetings of the toxicologists to discuss scientific

12   issues?

13        A.      Yes.

14        Q.      Do you remember having any meetings

15   about postmortem redistribution of digoxin?

16        A.      I don't remember a meeting like that,

17   no.

18        Q.      Have you had any meetings about the

19   reliability of postmortem vitreous samples?

20        A.      Not that I can remember.

21        Q.      As far as the references that you keep

22   and use in your general practice, you keep and use

23   Goodman and Gilman.  Is that true?

24        A.      I have that on my shelf, yes.

25        Q.      And Clarke's, C-L-A-R-K-E, apostrophe S?
```

Edward John Barbieri                                            November 19, 2010

```
 1       A.      Yes.

 2       Q.      Baselt's?

 3       A.      Yes.

 4       Q.      Flanagan's?

 5       A.      No.

 6       Q.      What about Dart's?

 7       A.      No, I'm not familiar with that one.

 8       Q.      And you are a reviewer, I believe, for

 9   the Journal of Analytical Toxicology?

10       A.      I am.

11       Q.      Do you receive or regularly review the

12   Journal of Forensic Science?

13       A.      I receive it and I do read it.

14       Q.      Is it a reliable journal?

15       A.      Yes, it is.

16       Q.      Do you, yourself, keep a specific

17   research folder regarding postmortem redistribution in

18   general?

19       A.      I have some papers about postmortem

20   redistribution in general.  We also have an electronic

21   file with some papers to that extent.

22       Q.      Does NMS have a librarian?

23       A.      Yes, we do.

24       Q.      Do you have a personal research file

25   regarding postmortem redistribution of digoxin?
```

Edward John Barbieri                                    November 19, 2010

```
 1       A.      No.
 2       Q.      Does NMS have a file about that?
 3       A.      As I remember, there are -- there may be
 4  a paper or two that I think I referred to and I have
 5  in my list, was an electronic file of digoxin itself
 6  which had some information, of course, in the article
 7  about PMR.
 8       Q.      Do you know how many articles there are
 9  in the NMS archive about postmortem redistribution of
10  digoxin?
11       A.      A handful.  Probably less than a dozen.
12       Q.      Do you know how many are actually
13  published?
14       A.      They would all be published papers.
15       Q.      No.
16               Do you know how many have been published
17  that may not be in your NMS library?
18       A.      No, I have no idea.
19       Q.      Did you do any independent research
20  other than what might have been archived in the NMS
21  library regarding PMR of digoxin?
22       A.      I didn't focus on PMR of digoxin.  I
23  focused on digoxin vitreous levels, blood levels.  And
24  of course anything that came up in the articles that I
25  read and I have today would be articles that involve
```

PLAINTIFFS' EXHIBITS 012752

Edward John Barbieri                                    November 19, 2010

1    PMR.

2         Q.       Okay.  Have you ever seen any published

3    literature that talks about the digoxin level in

4    vitreous samples from living patients?

5         A.       No.

6         Q.       There is, however, a significant amount

7    of published literature about digoxin serum levels in

8    living patients, correct?

9         A.       Yes.

10        Q.       So did you receive these samples and

11   specimens from another laboratory?

12        A.       We received the samples from -- well,

13   the client, called Analytical Research Laboratories.

14   Both samples came from ARL.

15        Q.       And how much business do you do with

16   ARL?

17        A.       I don't think we do a lot.  I'm not, you

18   know, privy to all the number of samples and the work

19   that we get from each.  But this is not a company that

20   I see often as I'm reviewing data.

21        Q.       Do you either know or can you surmise

22   from your files why ARL sent the specimens here for

23   analysis?

24        A.       No.

25        Q.       Could you look at Exhibit 2, please.

Edward John Barbieri                                November 19, 2010

```
 1      A.       Sure.

 2      Q.       Page 203.

 3      A.       Okay, I have it.

 4      Q.       That's a chain of custody document?

 5      A.       Yes.

 6      Q.       And on 203, in the sort of large box up

 7   there, you see this description, it says Vitreous and

 8   heart blood, does it not?

 9      A.       Yes.

10      Q.       And then down further, where the

11   signatures and the data are about transmittals, under

12   reason for transfer in line three, does it say:  Send

13   heart blood for analysis to NMS laboratories for

14   digoxin?

15      A.       It does.

16      Q.       Is that in the handwriting of somebody

17   from NMS?

18      A.       No.

19      Q.       That's from ARL?

20      A.       My understanding, that would be from

21   ARL.

22      Q.       And those specimens would have been sent

23   somewhere around July 31, 2008.  Is that right?

24      A.       Yes, that's right.

25      Q.       And then line five, the reason --
```

PLAINTIFFS' EXHIBITS 012754

Edward John Barbieri                                    November 19, 2010

```
 1      A.       I'm sorry, I'm sorry.  Can I back up a
 2   minute?
 3      Q.       Yes, sir.
 4      A.       That's the blood specimen that we
 5   received.
 6      Q.       Correct.
 7      A.       About that.  You said specimens,
 8   plural.
 9               Even though this sheet says vitreous and
10   heart, for the first sample we received only blood.
11      Q.       Okay.
12      A.       So that specimen was received at that
13   time.
14      Q.       All right.
15      A.       Okay.
16      Q.       And then line five, is line five with
17   all that data, is that in the handwriting of somebody
18   from NMS Labs?
19      A.       No, it is not.
20      Q.       And the reason for transfer there was:
21   Send vitreous fluid for analysis to NMS laboratories
22   for digoxin, correct?
23      A.       Yes, that's correct.
24      Q.       And that was sent somewhere right around
25   September 16, 2008.  Is that right?
```

Edward John Barbieri                                    November 19, 2010

```
 1      A.      Yes.  And we received that on September
 2  17, 2008.
 3      Q.      Do you know anything about why the
 4  vitreous sample was sent a month and a half after the
 5  blood sample?
 6      A.      I do not.
 7      Q.      Do you know if there were any
 8  discussions between ARL and NMS about the advisability
 9  of sending additional samples?
10      A.      We have nothing in the notes that I
11  could find for the case.
12              So, for example, if we had the
13  blood sample already, we would have had notes put in
14  the file that they were going to send a vitreous
15  sample.
16              But I don't know if there was any other
17  communication prior to us receiving any sample from
18  them.
19      Q.      Well, typically at NMS, if there is a
20  phone call between people at a client and NMS about
21  why certain specimens are going to be sent, is that
22  documented?
23      A.      Yes.  We have -- the client service
24  representatives have a notebook file for every call
25  that they take.  And that notebook file is kept for a
```

PLAINTIFFS' EXHIBITS 012756

Edward John Barbieri                                November 19, 2010

1    few months, and then it's discarded.

2         Q.      Okay.

3         A.      So after we receive a specimen and we

4    have it logged into our system, then all notes that we

5    get, whether it's with client services or toxicologist

6    or a lab person, document it in the phone log notes

7    under that work order number.

8              But prior testimony -- I shouldn't say

9    testimony -- prior discussions, we don't have a work

10   order in order to log it into.  So they keep those

11   separately.

12        Q.      Okay.  Do you know whether there is a

13   separate phone log regarding any discussions between

14   ARL or anyone else and NMS regarding these specimens?

15        A.      They would be the -- after these are

16   logged in, they would be in this lit pack.

17        Q.      All right.  So from your review, there's

18   nothing that tells you whose idea it was to send the

19   vitreous.

20        A.      That's correct.

21        Q.      Does NMS ever suggest to clients, Hey,

22   we have analyzed this blood.  Do you have any other

23   specimens we can look at?

24        A.      It happens occasionally.

25        Q.      And then did NMS's billing go to ARL?

PLAINTIFFS' EXHIBITS 012757

Edward John Barbieri                                     November 19, 2010

```
 1      A.      I don't know that.

 2      Q.      Do you know who paid the bill?

 3      A.      No, I do not.

 4      Q.      Did you ever have any communication at

 5   all with an organization called Private Autopsy

 6   Services in Oklahoma City?

 7      A.      Me personally?

 8      Q.      Yes.

 9      A.      No, I did not.

10      Q.      Do you know if NMS did?

11      A.      I do not.

12      Q.      Did you see anything in the file that

13   reflected communication between NMS and Private

14   Autopsy Services?

15      A.      No, I did not.

16      Q.      Now, did Mr. Miller or anyone from his

17   firm supply you with anything specifically about the

18   Johnson case?

19      A.      No.

20      Q.      Have you -- now, you met with Mr. Miller

21   yesterday, I believe, correct?

22      A.      Yes, I did.

23      Q.      Did he show you any medical records?

24      A.      No, he did not.

25      Q.      Did he bring you any specific medical or
```

PLAINTIFFS' EXHIBITS 012758

Edward John Barbieri                                November 19, 2010

1   toxicological literature?

2        A.        No, he did not.  He had some in his

3   files, but he did not share them with me.

4        Q.        He didn't show you any FDA documents or

5   things of that nature?

6        A.        No, sir, he did not.

7        Q.        How long did that meeting last

8   yesterday?

9        A.        We talked about the case for about two

10  and a half hours.

11       Q.        Is that the only time that you have met

12  with and spoken with Mr. Miller or somebody from his

13  office?

14       A.        No.  We had communication before this

15  got started, back in -- on September 22nd, we spoke

16  for about a half an hour.  It was myself, Mr. Miller

17  and Ryan Deligans.

18       Q.        And was that substantive or logistical?

19       A.        I think it was more logistical.  I think

20  he was trying to see how we could help him, if we

21  could help him, or if I could help him.

22                 And we talked a little bit about, you

23  know, my background in terms of digoxin and what I

24  knew about it, and vitreous samples.

25                 And we talked about the receipt of each

PLAINTIFFS' EXHIBITS 012759

Edward John Barbieri                                    November 19, 2010

1   of these samples for the case.

2        Q.      Okay.

3        A.      And then he asked me to proceed with

4   investigations of digoxin in terms of postmortem

5   redistribution issues, and if I could find some kind

6   of association between a vitreous level and a blood

7   level.

8        Q.      All right.

9        A.      They were the two charges that I had for

10  him.

11       Q.      But you haven't written any separate

12  reports about that?

13       A.      No, I have not.

14       Q.      And did you then conduct the research

15  that you agreed to do?

16       A.      I did.

17       Q.      And did you bring it all with you today?

18       A.      I did.

19       Q.      Is there something called an NMS legal

20  database report?

21       A.      I'm not sure if that's the title we use,

22  and I'm not sure specifically what you are asking.  If

23  you could help me a little bit.

24       Q.      I think one of your colleagues testified

25  and used that phrase, and I'm just wondering if it's

Edward John Barbieri                                    November 19, 2010

1  something familiar to you.

2       A.      No, I'm not sure about that title.  I

3  mean, it could go under various other names.  If you

4  could describe, maybe I could help.

5       Q.      Can't do it.

6       A.      I'm sorry.

7       Q.      Can't help you.

8       A.      I mean, let me just assume for a moment,

9  which I don't like to do but I will.

10             It could be a report that goes to a

11  client based upon research that we do.  For example,

12  if Mr. Miller's office had asked me to write a written

13  report, that may be what the other person was

14  referring to.

15      Q.      Okay.  Now, when there is an analysis

16  done like this of the blood specimen, does the -- is

17  it significant to know the patient's hydration level?

18      A.      Any information that a client can

19  provide is always helpful if we have to interpret what

20  we find.

21             Sometimes we get very detailed

22  information about a case prior to us doing analytical

23  work, and it may never go anywhere.  The client just

24  routinely submits it.

25             Other times we get nothing.  We just get

PLAINTIFFS' EXHIBITS 012761

Edward John Barbieri                                    November 19, 2010

```
 1   a blood sample and say go for it.
 2        Q.      All right.  So if you were going to
 3   interpret this blood level of 18 nanograms per
 4   milliliter, would you want to know the patient's level
 5   of hydration prior to death?
 6        A.      That would be an important
 7   consideration, yes.
 8        Q.      Would you want to know their renal
 9   status?
10        A.      That would be very helpful as well.
11        Q.      Would you want to know the site of the
12   postmortem blood draw?
13        A.      Without question.
14        Q.      Would you want to know when it was drawn
15   in relation to death?
16        A.      Yes.
17        Q.      And of course you would want to know how
18   the samples were stored, things of that nature?
19        A.      Yes.
20        Q.      Would you also want to know when the
21   patient took his or her last dose of a drug?
22        A.      If the interpretation involved dosing
23   issues and the levels, absolutely.
24        Q.      All right.  In this case do you know
25   anything about Mrs. Johnson's level of hydration prior
```

Edward John Barbieri                                    November 19, 2010

1    to her death?

2        A.       No, I do not.

3        Q.       Do you know anything about her renal

4    status?

5        A.       No, I do not.

6        Q.       Do you know anything about when she took

7    her last dose of digoxin prior to her death?

8        A.       Not specifically, no.

9        Q.       Do you know what digoxin-like

10   immunoreactive substances are?

11       A.       Yes.

12       Q.       Is there a way for a lab like NMS to

13   rule out DLIS as a component of a postmortem blood

14   sample?

15       A.       Interesting question.  The method we use

16   for these cases involves a very specific method, LC

17   tandem aspect.

18              Based on the ion fragmentation of true

19   digoxin, its molecular weight and its mass after

20   fragmentation, these immunoreactive substances would

21   probably not show up in the analyses because they

22   would have different molecular weights and different

23   fragmentation.

24              So I guess if we were to compare an

25   immunoassay procedure, levels of digoxin in an

PLAINTIFFS' EXHIBITS 012763

Edward John Barbieri                                    November 19, 2010

1    immunoassay procedure, which could pick up these

2    compounds versus an LC tandem MS, we could sort out

3    some differences.

4        Q.      So in this case, when the level is 18

5    nanograms per milliliter, in general is there an error

6    rate associated with that number?

7        A.      Well, every assay has an error rate, so

8    yes.  We typically use, for even these very technical

9    type of analyses, plus or minus 20 percent as an

10   acceptable range.

11       Q.      Okay.  And as part of projecting the

12   error rate, is the DLIS part of that, or is that not

13   part of what you're thinking when you pitch that error

14   rate?

15       A.      DLIS.  Could you specify?

16       Q.      The digoxin-like immunoreactive

17   substances.

18       A.      No.  We are looking at digoxin itself.

19       Q.      All right.  In your file there was a

20   subpoena and a notice of deposition for today,

21   correct?

22       A.      Yes.

23       Q.      And that was served on you last Friday,

24   I think, right?

25       A.      Yes.

PLAINTIFFS' EXHIBITS 012764

Edward John Barbieri                                    November 19, 2010

```
 1      Q.      I want to go over the duces tecum and
 2   see what you brought and what you didn't bring, okay?
 3      A.      Okay.
 4      Q.      It's kind of long.
 5      A.      This is a copy that I have?
 6      Q.      Yes.  Somewhere in there is the duces
 7   tecum.  It's actually 19 items long with subparts.
 8   I'll try to get through it quickly.
 9      A.      Yes, I have it here.
10      Q.      All right.  Documents that refer to and
11   reflect communications between you, other NMS Labs
12   employees, plaintiff's attorneys, ARL, et cetera.
13              Is that all here?
14      A.      We think we have everything here.
15      Q.      Okay.  Complete file regarding the
16   Johnson specimens.
17              Is that here?
18      A.      Yes.
19      Q.      Everything you used to form opinions
20   regarding the Johnson specimens.
21              Is that all here?
22      A.      Yes.
23      Q.      Books, treatises, journals which you or
24   other NMS employees referred to to formulate opinions
25   about this.
```

PLAINTIFFS' EXHIBITS 012765

Edward John Barbieri                                    November 19, 2010

```
 1                    Did you bring those?
 2         A.        I don't know if any other employees were
 3     involved in this case.
 4         Q.        Okay.
 5         A.        If they were not, then obviously there's
 6     no information.
 7         Q.        Okay.
 8         A.        But everything that I have is specific
 9     for this case, and I brought everything with me.
10         Q.        All right.  Any other documents that you
11     referred to?  Is there anything other than what you
12     brought that you referred to?
13         A.        No.
14         Q.        Do you have any demonstrative exhibits?
15         A.        No.
16         Q.        Like charts, graphs, photographs, things
17     like that?
18         A.        No, nothing like that.
19         Q.        Other than the chromatographs that are
20     actually in your file, right?
21         A.        Right, of course.
22         Q.        Item 7 asks for your deposition list.
23     Deposition list, I saw that in your file somewhere.
24                    Is that in there?
25         A.        I have this, yes.
```

PLAINTIFFS' EXHIBITS 012766

Edward John Barbieri                                         November 19, 2010

```
 1       Q.      Okay.

 2       A.      Would you like that now?

 3       Q.      Sure.

 4       A.      This is trials and depositions.  In the

 5  back the depositions are not complete, there are some

 6  documents, some old documents we could not get ahold

 7  of.  But the trial transcript list is complete.

 8              And as we spoke earlier, there's nothing

 9  there in which I have testified about digoxin in a

10  court of law or deposition.

11       Q.      And the testimony list is Exhibit 6,

12  correct?

13       A.      Okay.

14              (Exhibit No. Barbieri 6, Listing of

15  Courtroom Testimony and Testimony via Depositions,

16  2001 to the Present, marked for identification.)

17  BY MR. MORIARTY:

18       Q.      I think we can skip eight.

19              Nine was your CV.

20              You brought that, we marked it, correct?

21       A.      Yes.

22       Q.      Ten I think was covered by an earlier

23  one, so we'll skip that.

24              Number 11:  Any documents that reflect

25  the number of digoxin tablets that NMS has tested
```

 1  since April 25, 2008.

 2              Did you bring any of that?

 3      A.      I have no knowledge of that.  We'd have

 4  to get that from some records, but that may create a

 5  problem because of confidentiality.

 6      Q.      Well, they can be redacted.

 7              But is anybody at NMS looking for that

 8  information?

 9      A.      We have not done that, no.

10      Q.      Okay.

11      A.      There's certain pieces that we contacted

12  Mr. Miller's office and said when we received this --

13  I mean, our warehouse is huge, and we didn't have time

14  to get some of these documents.

15              So if you want that, we will search for

16  that.  We have no problem searching after the fact for

17  these things.

18      Q.      I will let you know on that.

19      A.      Okay.

20      Q.      Twelve is the documents and files

21  regarding the testing of the Johnson samples.

22              I assume that's all here, correct?

23      A.      That's all here.

24      Q.      Same with 13, which is chain of custody

25  and shipping.

PLAINTIFFS' EXHIBITS 012768

Edward John Barbieri                                    November 19, 2010

```
 1                 That's here, right?
 2        A.       Yes.
 3        Q.       Fourteen is documents describing the
 4   nature and condition of those samples.
 5                 That's here in your file, correct?
 6        A.       Yes.
 7        Q.       Fifteen, chain of custody, that's here?
 8        A.       Yes.
 9        Q.       Sixteen, your standard operating
10   procedures for analyzing dig in blood serum or
11   vitreous.
12        A.       We do not have that.  And since we are a
13   private lab and that's proprietary, we will produce
14   that if we have a court order for that.
15        Q.       Okay.  Those documents do exist, though?
16        A.       They do exist, yes.
17        Q.       We will let you know whether we need you
18   to do that.
19        A.       Okay.
20        Q.       And obviously we'll jump through
21   whatever hoops are necessary.
22        A.       All right.
23        Q.       Seventeen, QA/QC procedures for
24   analyzing digoxin in blood serum or vitreous.
25        A.       I don't have those.  That would be part
```

PLAINTIFFS' EXHIBITS 012769

Edward John Barbieri                          November 19, 2010

1   of the validation package.

2        Q.       Okay.  So that would be essentially part

3   of 16?

4        A.       Yes.  It would be in the method itself.

5        Q.       Eighteen, the certificates of analysis

6   for the standards used in the analysis here?

7        A.       I do not have that.  That would be part

8   of the initial validation when the procedures were

9   developed.

10       Q.       Okay.  So they are probably available,

11  but you don't have them here.

12       A.       They are available.

13       Q.       Nineteen has to do with prep and

14  analysis of standards, calibrators, quality controls,

15  blanks, etc., regarding this specimen.

16               First of all, is this sort of data

17  available?

18       A.       Yes.

19       Q.       And is it here?

20       A.       Yes.

21       Q.       In the file?

22       A.       No, no, no, not personally in the file,

23  no.  This would be from our QC lab who prepares those

24  samples.

25               So that documentation, again, is

Edward John Barbieri                                    November 19, 2010

1    available.  We have to search it and find it for you.

2         Q.      All right.  And you didn't get the

3    subpoena in time to actually do that before today,

4    correct?

5         A.      That's correct.

6         Q.      So we'll let you know about that.

7         A.      Okay.

8         Q.      All right.  Let's talk about digoxin a

9    little bit.

10               With digoxin do some people benefit from

11   concentrations over the therapeutic range?

12        A.      Yes.  You have individuals who are

13   resistant to certain drugs, and so in a normal

14   distribution of concentrations versus effect you will

15   have some people who are the upper end of the curve.

16        Q.      All right.  And there are some who

17   suffer significant toxicity at much lower levels,

18   correct?

19        A.      Yes.  Even low therapeutic levels.

20        Q.      Can electrolyte disturbances alter a

21   patient's susceptibility to the toxic manifestations

22   of digoxin?

23        A.      Yes.

24        Q.      And predispose those people to

25   arrhythmias?

PLAINTIFFS' EXHIBITS 012771

Edward John Barbieri                                    November 19, 2010

```
 1      A.      Yes.

 2      Q.      Would you agree that people can become

 3 digoxin toxic for a number of reasons?

 4      A.      Yes.

 5      Q.      And excessive dose is not the only one

 6 of those by any means?

 7      A.      No.  Other medical conditions certainly

 8 will play a part as well.

 9      Q.      Okay.  Now, so far as the

10 pharmacokinetics of digoxin are concerned, does it

11 bind?  Does digoxin bind to tissues like the heart

12 much more than it binds to blood?

13      A.      Plasma proteins in blood I guess you

14 really mean.  Yes, it does.

15      Q.      So when somebody dies, the -- whatever

16 equilibrium has been created by the system stops,

17 correct?

18      A.      The equilibrium that occurs during the

19 living individual will change after death.

20      Q.      And does digoxin, as a drug, then

21 diffuse from locations of higher concentration to

22 locations of lower concentration?

23      A.      Yes, it does.

24      Q.      In other words, from tissues of the

25 heart, for example, to blood pooled in the heart?
```

PLAINTIFFS' EXHIBITS 012772

Edward John Barbieri                                    November 19, 2010

```
 1      A.      Yes, it will.
 2      Q.      Now, let me jump ahead a little bit to
 3 something.
 4              As you can see from the results of the
 5 samples that were analyzed here, the blood and the
 6 vitreous results were substantially different,
 7 correct?
 8      A.      In terms of numerical value, absolutely
 9 they were.
10      Q.      And could you tell us all, please,
11 possible causes of that disparity.
12      A.      Okay.  One possible cause would be that
13 the drug has not formed an equilibrium throughout the
14 body, since the vitreous sample or the vitreous area
15 has a lower blood flow than other organs in the body
16 and may not have received enough drug to transfer.
17      Q.      You are talking about antemortem?
18      A.      This is all antemortem, yeah.
19      Q.      Okay.  Well, I don't mean to cut you
20 off.
21      A.      That's okay.
22      Q.      But let me make sure that you and I are
23 on the same wavelength.
24      A.      Sure.
25      Q.      I'm not trying to find out what are the
```

PLAINTIFFS' EXHIBITS 012773

Edward John Barbieri                                    November 19, 2010

1   possible reasons that could occur in the living.

2              I'm trying to find out what are the

3   possible reasons why there's such a difference here in

4   these postmortem samples.

5       A.      That I can't answer.  We have basically

6   the same type of procedure that's being used.  So we

7   are measuring the concentration of the compound in the

8   sample that we received.

9              So analytically that's what we have.

10  There should be no necessarily reason why one sample

11  is different than the other analytically.

12      Q.      Okay.  Well, would one possibility to

13  account for the difference be that digoxin

14  redistributes postmortem substantially more in heart

15  blood than it does in vitreous?

16      A.      That could be a possibility, okay.

17      Q.      Are there any other possible

18  explanations that you can think of?

19      A.      I'm eliminating the collection time and

20  date, because I think they're equal in this case.  So

21  I can't think of any others.

22      Q.      All right.  So let's talk about

23  postmortem toxicology in general a little bit.

24      A.      Okay.

25      Q.      Does postmortem toxicology differ

PLAINTIFFS' EXHIBITS 012774

Edward John Barbieri                          November 19, 2010

1   fundamentally from clinical toxicology?

2        A.      Yes.

3        Q.      Do different drugs have different

4   extents of postmortem redistribution?

5        A.      Absolutely.

6        Q.      Some reports from NMS regarding other

7   drugs contain information about postmortem

8   redistribution, and I believe that is referred to as

9   auto text.

10              Do you know what I'm talking about?

11       A.      Well, I know about auto text, but I'm

12  not sure I understand what you mean about reports.

13              Let me just -- if these were expert

14  reports about a particular compound in a particular

15  case, then, yes, there would be references to that.

16              So you are going to have to help me as

17  far as what you are thinking.

18       Q.      From an analytical sample of diltiazem

19  in another case there was an auto text regarding the

20  postmortem redistribution of diltiazem.

21       A.      So we are talking about some reference

22  comment that may be on a report.  That's the auto text

23  system basically.

24       Q.      Right.

25       A.      Okay.

PLAINTIFFS' EXHIBITS 012775

Edward John Barbieri                                    November 19, 2010

1      Q.      Do you have any explanation for why

2  there is no auto text about PMR of digoxin in NMS

3  blood reports?

4      A.      Not a specific explanation of that.

5              When we write these reference comments,

6  the purpose of the reference comment is to give the

7  reader some information about the drug, about the

8  concentration of the drug in a biological sampling,

9  okay?

10             A little bit about the toxicity of the

11 drug.  Maybe there is information about how the drug

12 is used; is it orally administered, is it an

13 injectable, whatever.

14             There's no set pattern in terms of what

15 we put into that.  It's really a toxicologist will

16 have developed that information, and it's modified

17 over the years.

18             So in one case there may be postmortem

19 information, in another there may not be.

20     Q.      Okay.

21     A.      I mean, all drugs have the possibility

22 of PMR, and certainly not all of our reference

23 comments even talk about that.

24     Q.      Okay.  Are toxicologists sometimes asked

25 to project what a blood level should be if a person

Edward John Barbieri                                November 19, 2010

```
 1   takes a particular dose of a drug?
 2       A.      We are asked that.
 3       Q.      All right.  And in the reverse, are
 4   toxicologists sometimes asked to use a blood level to
 5   predict what dose would have led to that blood level?
 6       A.      We, again, are asked that occasionally,
 7   yes.
 8       Q.      And would you agree with me that you can
 9   try to do that, but there are a lot of assumptions
10   that have to be made?
11       A.      Yes.
12       Q.      And it's not a clean calculation?
13       A.      It's certainly not a clean calculation.
14       Q.      And it's -- well, we'll get into that in
15   more detail.
16               Is it the consensus in the forensic
17   toxicological community that you cannot calculate with
18   scientific probability somebody's predeath drug level
19   based on postmortem findings?
20       A.      Yes.
21       Q.      Can you make estimates?
22       A.      Yes, we can.
23       Q.      Would you agree that they are not
24   necessarily accurate?
25       A.      Well, they are not necessarily
```

Edward John Barbieri                                November 19, 2010

```
 1   accurate.  Accuracy depends upon how precise you want
 2   the measurements to be.
 3              But there's possibilities that they may
 4   not be accurate, certainly.
 5        Q.      Okay.  Is it the consensus in the
 6   forensic toxicologic community that you can't
 7   calculate the scientific probability somebody's
 8   predeath dose based on postmortem blood findings?
 9        A.      Not an exact calculation.  Again, we can
10   give a range, and oftentimes that range is quite wide.
11        Q.      Okay.  And the bottom line is that
12   digoxin does redistribute after death?
13        A.      It does.
14              (Discussion off the record.)
15              (A recess is held.)
16   BY MR. MORIARTY:
17        Q.      Does NMS prefer peripheral drug -- blood
18   draws when it does post postmortem forensic work?
19        A.      Well, we don't prefer.  We recommend to
20   have peripheral blood for quantitation.
21              We actually recommend that because of
22   limited volume of peripheral blood in many cases, that
23   if we do any screening, we'll do it on heart blood.
24   And then we like to quantify on a peripheral sample.
25        Q.      All right.  If you had your choice for
```

PLAINTIFFS' EXHIBITS 012778

Edward John Barbieri                                  November 19, 2010

1  quantification, you'd take femoral blood every time

2  over heart blood, wouldn't you?

3       A.       Yes, we would.

4       Q.       Does your Website advocate that?

5       A.       Yes.

6       Q.       Does your Website indicate that one of

7  the reasons that you want to do that is because

8  postmortem redistribution can cause falsely elevated

9  blood concentrations?

10      A.       I haven't read that in the Website in a

11 while, but I'm assuming -- that would be the purpose

12 of it.

13      Q.       Now, would you agree with Professor

14 Clarke's book that when attempting to interpret drug

15 concentrations, forensic toxicologists traditionally

16 have placed a great deal of faith in the assumption

17 that postmortem concentration of the substance at

18 least approximates that present at the moment of

19 death; but over the years we have learned that such

20 faith is often misplaced.

21      A.       A good statement.

22      Q.       Would you agree with Clarke's text that

23 one of the most important factors affecting the

24 interpretation of postmortem drug concentrations is

25 the phenomenon of postmortem redistribution?

Edward John Barbieri                                November 19, 2010

 1      A.      Yes.

 2      Q.      Would you agree with Clarke's text that

 3 concentration of some drugs can increase by as much as

 4 two to tenfold after death in postmortem blood?

 5      A.      There are drugs like that, yes.

 6      Q.      Do you agree with Clarke's text that

 7 rarely can pharmacokinetics be applied successfully to

 8 postmortem toxicology?

 9      A.      Yes.

10      Q.      Do you agree with Clarke's text that for

11 living people to determine the dose from a single

12 plasma or blood concentration is fraught with

13 uncertainty, and the problem is even more complex for

14 postmortem cases?

15      A.      Yes.

16      Q.      Do you agree with Clarke's text that in

17 most instances pharmacokinetic calculations using

18 postmortem blood measurements are rarely defensible

19 forensically?

20      A.      I don't know if I agree to that.

21              I think if you are defending something

22 like that and you put caveats on it and you list the

23 assumptions that you make, or if you are looking at

24 ranges of levels rather than specific numbers, then I

25 would agree.

Edward John Barbieri                                    November 19, 2010

```
 1              But possibly I wouldn't agree.
 2      Q.      Okay.  Can you name a single peer-
 3  reviewed publication that indicates that you as a
 4  forensic toxicologist can reliably use postmortem
 5  heart blood samples to calculate antemortem serum
 6  digoxin concentrations?
 7      A.      I'm sure there's an article out there.
 8  I could not -- I would not accept that thesis.  And if
 9  the article said that, I would not agree with it.
10      Q.      Okay.  Can you name any peer-reviewed
11  publications that say you can -- you as a forensic
12  toxicologist can reliably use postmortem heart blood
13  specimens to calculate predeath doses of digoxin?
14      A.      No.
15      Q.      In your review of any postmortem digoxin
16  blood literature, what was the longest time postdeath
17  that the samples were drawn?
18      A.      We are talking human now, right?
19      Q.      Human.
20      A.      I'm thinking in the papers that I saw
21  they were 24 hours.
22      Q.      Okay.  Do you know what the -- all
23  right.
24              Do you know what the longest draw times
25  were in animals?
```