Edward John Barbieri                                    November 19, 2010

1      A.       There's an animal study I have here that

2   was three days.  There's a dog study that I have,

3   there was a sample drawn three days.

4      Q.       For blood?

5      A.       No.  Well, I know vitreous was involved,

6   but I don't know if blood was involved.

7      Q.       While you are looking for that, is three

8   days a really long time to wait to draw postmortem

9   samples?

10     A.       Yes.

11     Q.       Is two days a really long time to wait?

12     A.       Well, it's long the way I look at it,

13  but it happens.

14              No, I'm sorry, this -- the three days in

15  the dog study was only for eye tissue, it was not for

16  blood.

17     Q.       Okay.

18     A.       I mean, there are autopsies that we have

19  seen that have been done two days after death.  So, I

20  mean, obviously the sooner you get a sample, the

21  better it is.  But we see them.

22     Q.       All right.  I know you see it, but would

23  you agree with me that the level of postmortem

24  redistribution in heart blood of digoxin is likely to

25  be substantially more at 24 hours than it would be at

Edward John Barbieri                                    November 19, 2010

1    five hours?

2        A.      Absolutely.

3        Q.      Would you agree that it would likely be

4    substantially more at 44 hours than it even would be

5    at 24 hours?

6        A.      Probably.

7        Q.      The sample here, was it frozen when NMS

8    received it?

9        A.      No.

10       Q.      And it was whole blood, correct, not

11   serum?

12       A.      It was not serum, no.  It was whole

13   blood.

14       Q.      Are digoxin concentrations in whole

15   blood typically higher than in serum?

16       A.      The literature says the ratio between

17   serum and -- or blood to plasma ratio, for example, is

18   about 1 to 1.1.  So they are pretty close.

19       Q.      By the way, in the literature that you

20   reviewed, is there any -- did you see any estimate of

21   the amount of digoxin concentration in heart tissue

22   versus blood?

23       A.      Yeah.  There's one study that has --

24   Baselt lists some general information about heart

25   tissue versus blood.

Edward John Barbieri                                November 19, 2010

```
 1      Q.      Is it 30 to one?
 2      A.      That's a close estimate.
 3      Q.      What does that tell you as a forensic
 4  toxicologist about the potential for postmortem
 5  redistribution of that drug between heart tissue and
 6  the blood?
 7      A.      Well, the potential is very good it's
 8  going to have PMR.
 9      Q.      But does it tell you anything about the
10  magnitude of PMR?
11      A.      No.
12      Q.      So could it be as high as 30 times?  Is
13  that potential?
14      A.      Well, I guess on a theoretical basis if
15  you have two compartments where one concentration is
16  30 times greater than the other, you have to come to
17  some equilibrium.
18              There's a theoretical potential of
19  that.  I don't know if I have ever seen anything like
20  that occur.
21      Q.      Okay.
22      A.      I mean, even with the most -- like
23  tricyclic antidepressants, which are the classic group
24  of compounds for PMR, I think the highest number I've
25  ever seen is 15, which is rare.  Certainly not an
```

Edward John Barbieri                                    November 19, 2010

1   average.

2       Q.      All right.  Certainly a postmortem blood

3   specimen drawn 44 hours after death could very likely

4   redistribute on a magnitude of ten times, correct?

5       A.      I don't know that.

6       Q.      All right.

7       A.      I haven't seen any papers that describe

8   the kinetics of redistribution in humans like that.

9               So I don't know when the final

10  equilibrium would be reached, and whether 44 hours is

11  -- you know, it's still redistributing and whether it

12  goes up to ten times.  I just don't know.

13      Q.      You don't have an opinion either way?

14      A.      I don't.  I mean, I could talk about

15  averages, but I don't know what the ranges would be.

16      Q.      Just so I'm clear, the longer you wait

17  after death to draw the blood sample, the more likely

18  it is that there will be postmortem redistribution,

19  correct?

20      A.      That's fair.

21      Q.      Including for digoxin?

22      A.      That's fair.  Again, eventually you are

23  going to reach an equilibrium, and there will be no

24  change after that.  But, yeah.

25      Q.      But you don't know where that

PLAINTIFFS' EXHIBITS 012785

Edward John Barbieri                                      November 19, 2010

1  equilibrium point is?

2       A.      No, I don't.

3       Q.      Could it be higher than ten times?

4       A.      The PMR distribution?

5       Q.      Yes.

6               In other words, a magnitude of ten

7  times.

8       A.      Well, I mean, the average is around

9  two.  I mean, the literature average is around two.

10              But I'm sure there are cases that it

11 could go that high.  Again, I don't know.

12      Q.      Okay.  Well, I asked you earlier about

13 that Clarke reference, and you agreed that

14 concentrations of some drugs could increase by as much

15 as two to tenfold after death in postmortem blood.

16      A.      Well, I know that that's true for

17 trtricyclicsicylics, so some drugs including

18 tricyclics.  Digoxin specifically, I don't know.

19      Q.      Have you seen any literature

20 specifically on digoxin which discusses the magnitude

21 of the PMR?

22      A.      No.

23      Q.      Bear with me a minute here.

24      A.      Yes, of course.

25      Q.      Okay.  In your own stack I believe you

PLAINTIFFS' EXHIBITS 012786

Edward John Barbieri                                          November 19, 2010

1    have Vorpahl's article?

2         A.      Yes, I do.

3         Q.      Go to page 333 of that article.

4         A.      Okay.

5         Q.      Actually go to page 332, first of all.

6    Second paragraph on 332.  Third paragraph, I'm sorry,

7    on 332.  It starts with Although.

8         A.      Um-hum.

9         Q.      Although the vitreous concentrations

10   also differed markedly from true antemortem

11   concentrations, they were more accurate indicators of

12   toxicity.

13               Do you have any experience that leads

14   you to conclude whether you agree or disagree with

15   that statement?

16        A.      No.  That's just a statement that they

17   made.

18        Q.      Okay.  Let's go to 333, please.

19               First sentence under Discussion.  It

20   says:  It is clear from this investigation that

21   postmortem digoxin levels taken from cardiac blood,

22   venous blood or vitreous humor do not mirror the

23   antemortem levels.

24               Do you agree with that?

25        A.      Yes.

Edward John Barbieri                               November 19, 2010

```
 1        Q.        Substantial increases in the serum
 2   levels occur following death irrespective of the
 3   source of the sample.
 4               Do you agree with that?
 5        A.        Yes.
 6        Q.        Now, do you know who Dr. Koren is?
 7        A.        Gideon Koren?
 8        Q.        Yes.
 9        A.        Yes, I've heard of him.
10        Q.        Is he a reputable toxicologist?
11        A.        I think he's a clinical toxicologist.
12   He's up in Toronto, I believe.
13        Q.        Yes.
14        A.        I'm familiar with his work on cocaine
15   and alcohol abuse in pregnant women.
16        Q.        Have you ever read any of his work on
17   digoxin?
18        A.        No.
19        Q.        I would like you to go to -- can I see
20   that article?
21        A.        (Handing article.)
22        Q.        Okay.  You can chuck those, because it's
23   the wrong article.
24               And I'm going to read to you from
25   another Koren article.  It says here -- this is an
```

PLAINTIFFS' EXHIBITS 012788

1  article by Koren in the American Journal of Cardiology

2  published in April of 1985.

3            It says:  An attempt to prove digoxin

4  intoxication as a cause of death may be hampered by

5  the fact that the postmortem levels may be 1.5 to ten

6  times higher than antemortem levels.

7            Consequently, one cannot readily use

8  these postmortem data to predict antemortem

9  concentrations.

10            Do you agree with that?

11     A.     I can't agree or disagree.  That's a

12  statement he's making based on that research or it's

13  just discussion, I don't know.

14     Q.     Okay.  Have you ever seen any articles

15  published in the peer-reviewed medical literature to

16  indicate that digoxin does not redistribute postmortem

17  as high as ten times?

18     A.     I haven't seen articles that say either

19  way.

20     Q.     Okay.  I'm going to hand you this

21  article.

22            (Discussion off the record.)

23  BY MR. MORIARTY:

24     Q.     Have you ever read this article?

25     A.     Yes, many years ago.

PLAINTIFFS' EXHIBITS 012789

Edward John Barbieri                                          November 19, 2010

```
 1      Q.      By Drummer?

 2      A.      Um-hum.

 3      Q.      It's published in the Therapeutic Drug

 4 Monitoring.

 5              Do you see that?

 6      A.      2002.

 7      Q.      Is that a publication you subscribe to

 8 or review?

 9      A.      Well, I read articles, but I don't have

10 a personal copy of it.  We get it here.

11      Q.      Okay.  Let's go to page 206.  Second

12 column under Redistribution, towards the end of the

13 first paragraph.

14              It says:  Changes in concentration up to

15 tenfold in cardiac blood are known when compared with

16 specimens taken antemortem or shortly after death.

17      A.      I'm sorry.  Can I stop you?

18      Q.      Sure.

19      A.      Page 206?

20      Q.      Yeah.  I'm sorry, 205.

21      A.      Thank you.

22      Q.      205 under Redistribution.

23      A.      We are on the same page now, okay.

24      Q.      It says:  Changes in concentration up to

25 tenfold in cardiac blood are known when compared with
```

PLAINTIFFS' EXHIBITS 012790

 1   specimens taken antemortem or shortly after death.
 2   The drugs most affected include digoxin.
 3              And then it goes on to others, including
 4   the tricyclics that you referred to earlier.
 5              Do you agree with that?
 6      A.      I trust that Dr. Drummer is producing
 7   this accurately.
 8      Q.      Okay.  And then on 206, second column,
 9   right here.
10      A.      Okay, I see it.
11      Q.      Do you see that?
12              It says:  Cardiac blood is not in
13   general a suitable sample for quantitative analysis.
14              Do you agree with that?
15      A.      Yes.  In terms of producing drug
16   concentrations that are circulating, yes.
17              I mean, we can use concentrations in
18   cardiac blood to tell us something, but not for
19   certain purposes.
20      Q.      And those purposes would be for back
21   calculating either the antemortem serum digoxin level
22   or the dose taken before death?
23      A.      Well, or to give an estimate of what --
24   to the medical examiner or the coroner as to what the
25   circulating level might be.

PLAINTIFFS' EXHIBITS 012791

Edward John Barbieri                                    November 19, 2010

```
 1      Q.      Do you ever read the British Journal of
 2  Clinical Pharmacology?
 3      A.      Rarely.  At present, I should say.
 4  Years ago I did.
 5      Q.      Have you ever read this article?
 6      A.      No, I have never seen this.
 7      Q.      By Ferner?
 8      A.      No, I haven't seen it.
 9      Q.      I would like you to go to page 430.
10      A.      The first page?
11      Q.      Yes, sir.
12              In the abstract itself, the second
13  sentence:  Postmortem changes render the assumptions
14  of clinical pharmacology largely invalid and make the
15  interpretation of concentrations measured in
16  postmortem samples difficult or impossible.
17              Do you agree with that?
18      A.      Not necessarily.  That's his opinion.
19      Q.      Okay.  Let's go to page 440, under
20  Conclusion.
21              It says:  There is no reliable or
22  obvious connection between concentrations measured in
23  life and subsequent to death.
24              Consequently, concentrations measured
25  after death cannot generally be interpreted to yield
```

```
 1   concentrations present before death.
 2               Do you agree with that?
 3      A.       That's a very broad statement.  And
 4   there are times when you can make those conclusions,
 5   and there are times when you cannot.
 6      Q.       Okay.
 7      A.       So I would say I can disagree in certain
 8   circumstances and others I would not.
 9      Q.       All right.  Would you agree that that is
10   true in digoxin generally?
11      A.       Again, there's a timing issue here.
12      Q.       All right.
13      A.       So the answer to your question is I'm
14   not sure.
15      Q.       Would you agree in a digoxin case in
16   which the postmortem sample was heart blood drawn 44
17   hours after death?
18      A.       I think it certainly would be a less
19   reliable indicator, absolutely.
20      Q.       All right.  Now, in a living patient do
21   you know the optimum time for drawing a serum digoxin
22   concentration?
23      A.       The recommendation is six hours.
24      Q.       In this case do you know when
25   Mrs. Johnson took her last dose in regard to her
```

PLAINTIFFS' EXHIBITS 012793

Edward John Barbieri                                    November 19, 2010

1   death?

2        A.      I don't have specific information, no.

3        Q.      Is that a variable you would need to

4   know if you were going to render an opinion about

5   whether a postmortem specimen was meaningful or not?

6        A.      That would certainly be helpful

7   information, absolutely.

8                Well, can I go back?  When you say "a

9   postmortem specimen was meaningful," you mean the

10  concentration found in this?

11       Q.   Yes.

12       A.   Yes.

13       Q.      Do you have an opinion to a probability

14  in this case whether this postmortem blood level of 18

15  nanograms per milliliter can be used to reliably back

16  calculate her antemortem serum digoxin concentration?

17       A.      Not with the facts I have presently.

18       Q.      All right.  Do you have an opinion to a

19  reasonable degree of probability as to whether this

20  postmortem blood specimen of 18 nanograms per

21  milliliter can be used to reliably back calculate her

22  predeath dose?

23       A.      I would say that would be a very

24  tentative assumption.  It would probably not be that

25  reliable.

PLAINTIFFS' EXHIBITS 012794

Edward John Barbieri                                    November 19, 2010

```
 1        Q.      Let's talk about vitreous samples for a
 2   second.  This is page 96 of Clarke's text.  By the
 3   way, this is from the third edition, all right.
 4             In that section it says:  Vitreous humor
 5   has also been used increasingly for the measurement of
 6   drugs.
 7             You agree with that, correct?
 8        A.      Yes.
 9        Q.      For example, digoxin concentrations
10   increase markedly in postmortem cardiac blood, but do
11   not increase significantly in vitreous humor.
12             Did I read that correctly?
13        A.      You did.
14        Q.      And they refer there to the Vorpahl and
15   Coe article in 1978 that you actually have here today,
16   correct?
17        A.      Yes.
18        Q.      Now, do you agree with that statement?
19        A.      Well, that's based upon that original
20   work by Vorpahl and Coe, but they use vitreous at one
21   point in time.  They didn't do any measurement over a
22   period of time.
23        Q.      Understood.
24        A.      So, I mean, there's nothing wrong with
25   that statement as he cites that reference.
```

PLAINTIFFS' EXHIBITS 012795

Edward John Barbieri                                    November 19, 2010

1      Q.      I'm asking whether you agree with that

2  statement as of today, not just in relationship to

3  Vorpahl and Coe.

4      A.      Well, no.  Vitreous levels do increase

5  over time in postmortem situations.

6      Q.      Their statement is:  Therefore, vitreous

7  digoxin concentrations give a better indication of

8  perimortem concentrations than does heart blood.

9              Do you agree with that?

10     A.      Not necessarily.  There are people who

11 ascribe to that.  But I think as we're learning more

12 we see that there are problems with vitreous levels as

13 well as heart blood levels or any other peripheral

14 sample level.

15     Q.      All right.  So, based on -- now the

16 vitreous level for Mrs. Johnson's sample was what,

17 1.5, right?

18     A.      That's what was reported, yes.

19     Q.      And the common therapeutic range of

20 digoxin in antemortem specimens is .8 to 2 nanograms

21 per milliliter?

22     A.      Serum levels, yes.

23     Q.      Serum levels.

24     A.      Yes, that's correct.

25     Q.      So based on this vitreous sample, are

PLAINTIFFS' EXHIBITS 012796

Edward John Barbieri                          November 19, 2010

1   you going to render any opinion to a probability as to

2   what Mrs. Johnson's antemortem serum digoxin level

3   was?

4        A.       No.

5        Q.       What about her antemortem dose?

6        A.       No.  Not with the information that I

7   have right now.  There's no way.

8        Q.       Just based on the information that you

9   have here, where you have got cardiac blood at 18

10  nanograms per milliliter and vitreous at 1.5 nanograms

11  per milliliter, isn't it more likely than not that the

12  antemortem SDC, if drawn, would have been under two?

13       A.       Why would you say that?

14       Q.       I'm asking you.

15       A.       No.  I don't see the connection.

16       Q.       Okay.  Is there any published scientific

17  literature to indicate that postmortem vitreous

18  samples of digoxin decrease in their levels after

19  death?

20       A.       We're talking human now.  No.  I don't

21  believe I've seen any literature that suggests that.

22       Q.       Is there any in animal models?

23       A.       There's a guinea pig model which shows

24  that over a period of time the vitreous level will

25  change.

Edward John Barbieri                                    November 19, 2010

```
 1      Q.      Change up or down?

 2      A.      Decreasing.

 3      Q.      Decreasing.

 4      A.      Decreasing.

 5      Q.      How many tests did they run?  I guess,

 6  how many guinea pigs did they use?

 7      A.      It was a small number.

 8      Q.      Did they say how much it decreased?

 9      A.      No.  They gave some parameters.  And

10  this has to do with an intravenous administration, so

11  we could be talking about a redistribution issue too.

12              For example, this is an article that I

13  have in my package, Journal of Toxicology, 1991, by

14  Donnelly, et al.  I'm going to hand this to you in a

15  minute to mark.

16              And they had administered IV digoxin to

17  guinea pigs and measured levels of serum and vitreous

18  over time.  And the levels decreased -- this is in

19  minutes -- the first sampling at 15 minutes was over

20  10 nanograms per mil.

21              MS. AHERN:  I'm sorry.  Was that

22  vitreous?

23              THE WITNESS:  This is vitreous.

24              MS. AHERN:  Okay, thank you.

25              THE WITNESS:  Ten nan -- over 10, it
```

PLAINTIFFS' EXHIBITS 012798

Edward John Barbieri                              November 19, 2010

```
 1  looks like about 15, and at 480 minutes it was down
 2  around a little bit over one.  So it decreased about
 3  ten times.
 4             But, of course, that could be a
 5  distribution.
 6             But to answer your question, that would
 7  be an article that could answer the question you just
 8  asked.
 9  BY MR. MORIARTY:
10     Q.     And when you say it might have been a
11  distribution, I don't know what you mean by that.
12     A.     Well, digoxin -- because you asked me
13  before about drawing serum levels.  It takes about six
14  hours for the recommendation of drawing the serum
15  level.
16             This is because digoxin does have a slow
17  distribution.  It takes many hours for it to
18  redistribute.
19             So the kinetics in a living individual
20  show that you have a distribution phase that you want
21  to get to a steady state, and have the elimination
22  phase before you're doing anything.
23             And so this is certainly an acute
24  administration of the compound, but the levels would
25  decrease.  And so that just could be a matter of
```

PLAINTIFFS' EXHIBITS 012799

Edward John Barbieri                          November 19, 2010

```
 1  distribution.
 2              They don't specifically talk about that
 3  because it's a very different kind of model.
 4       Q.     If I understand what I think you are
 5  saying the, IV administration of digoxin to the guinea
 6  pig was close in time to when they were then
 7  sacrificed and the vitreous sampled?
 8       A.     Exactly.  I mean, basically at times
 9  zero they administered the drug, and then they
10  measured starting at 15 minutes out to 480 minutes.
11       Q.     That's not a study that you would
12  necessarily -- I mean, that's a different
13  circumstance.
14       A.     Oh, absolutely.  I was just trying to
15  answer your question --
16       Q.     Sure.
17       A.     -- with what you had asked.
18              (Exhibit No. Barbieri 7, Comparative
19  Kinetics of Serum and Vitreous Humor Digoxin
20  Concentrations in a Guinea Pig Model.  Part I:
21  Intravenous Administration of Digoxin, marked for
22  identification.)
23  BY MR. MORIARTY:
24       Q.     And the article that you just mentioned
25  I've marked as Barbieri No. 7.  Is that correct?
```

PLAINTIFFS' EXHIBITS 012800

Edward John Barbieri                                     November 19, 2010

```
 1      A.      That's fine, yes.
 2      Q.      So, if I understand what you are telling
 3  me in general, based on the information you have
 4  today, you are not going to be rendering any
 5  interpretation to a reasonable degree of scientific
 6  probability or certainty regarding Mrs. Johnson's
 7  predeath dose or serum levels based on the vitreous
 8  and/or the blood analysis done by NMS, correct?
 9      A.      That's correct.
10      Q.      Can I see the other articles that you
11  brought?  Because I want to clean this up.
12      A.      These were yours that you gave to me,
13  the ones that were over here.
14              (Exhibit No. Barbieri 8, Post-mortem
15  Clinical Pharmacology, marked for identification.)
16              (Exhibit No. Barbieri 9, Postmortem Drug
17  Analysis:  Analytical and Toxicological Aspects,
18  marked for identification.)
19  BY MR. MORIARTY:
20      Q.      The British Journal of Clinical
21  Pharmacology article I asked you about I've had marked
22  as Exhibit 8.  Is that correct?
23      A.      Yes, I see that.
24      Q.      And the Therapeutic Drug Monitoring
25  article from 2002 that I asked you about is Barbieri
```

Edward John Barbieri                                  November 19, 2010

1   No. 9.  Is that correct?

2       A.      I see that, yes.

3       Q.      Now I'm in the stack that you handed me

4   from your own file.

5               This one on top, is this from Goodman

6   and Gilman's?

7       A.      No.  That's from Baselt.  That's the 8th

8   edition of Baselt.  I'm sorry, I should have printed

9   the front page.

10      Q.      This article that you pulled by Holmgren

11  in the Journal of Forensic Sciences, was this only

12  about the stability of samples?

13      A.      Yes.  When I went in to the Internet, it

14  indicated that that was -- that had some information

15  on digoxin.  It does not.

16      Q.      Okay.

17      A.      So I read through it anyway, so I just

18  included it.

19      Q.      All right.  And just for the record,

20  that's July of 2004, correct?

21      A.      Yes.

22      Q.      And then you have Dr. DiMaio's article

23  from the Journal of Forensic Sciences in April of

24  1975.  Is that correct?

25      A.      Yes.

PLAINTIFFS' EXHIBITS 012802

Edward John Barbieri                                    November 19, 2010

1       Q.      Then this is a Journal of Cardiovascular

2   Pharmacology from 1980:  Digoxin in the optic tract in

3   digoxin intoxication.

4       A.      Yes.  Binnion and Frazer.  This is the

5   dog study that I referred to earlier.

6               MR. MORIARTY:  I'm going to mark this

7   one.  I'm up to 10, right?

8               (Exhibit No. Barbieri 10, Digoxin in the

9   Optic Tract in Digoxin Intoxication, marked for

10  identification.)

11  BY MR. MORIARTY:

12      Q.      I marked that one Exhibit 10, correct?

13      A.      Yes.

14              MR. MORIARTY:  And then let's see if I

15  could do this one.

16              (Exhibit No. Barbieri 11, Measurement of

17  Digitalis-Glycoside Levels in Ocular Tissues:  A Way

18  to Improve Postmortem Diagnosis of Lethal Digitalis-

19  Glycoside Poisoning marked for identification.)

20  BY MR. MORIARTY:

21      Q.      I marked as No. 11 Measurement of

22  Digitalis-Glycoside Levels in Ocular Tissue, and then

23  there is an Article No. 1 and Article No. 2, correct?

24      A.      Yes.

25      Q.      By the same authors?

Edward John Barbieri                                        November 19, 2010

```
 1      A.      Yes.  The first is for digoxin, the
 2   second is digitoxin, which is a different --
 3      Q.      Different compound.
 4      A.      Totally different kinetics, different
 5   drug.
 6      Q.      I'm going to put these in and count them
 7   all as Exhibit 11, fair?
 8      A.      Fair.
 9      Q.      And the last one that was in your file
10   is Comparative Kinetics of Digoxin and Serum and
11   Vitreous Humor in a Guinea Pig Model, correct?
12      A.      Is this Part 1 or 2?  I think Part 1, we
13   had talked about the intravenous already, and that
14   should be oral dose.  Is that the one you have?
15      Q.      Where is that exhibit?
16              MR. MORIARTY:  Hunter, do you have that?
17              MS. AHERN:  No.
18              MR. MORIARTY:  Oh, here we go.
19   BY MR. MORIARTY:
20      Q.      So we talked about Exhibit 7 earlier,
21   correct?
22      A.      Yes, that's correct.
23      Q.      And then what is this article?
24      A.      That's a related article, but that's an
25   oral dosing study, also in guinea pigs.
```

Edward John Barbieri                                    November 19, 2010

```
 1              MR. MORIARTY:  All right.  Then I'm

 2   going to mark this one separately as No. 12.

 3              (Exhibit No. Barbieri 12, Comparative

 4   Kinetics of Digoxin in Serum and Vitreous Humor in a

 5   Guinea Pig Model.  II.  Single Oral Dose

 6   Administration, marked for identification.)

 7   BY MR. MORIARTY:

 8      Q.      And do you know whether the oral dosing

 9   study reached any conclusions different than the IV

10   dosing study about PMR of digoxin either in the heart

11   or the ocular tissues?

12      A.      Well, it doesn't show that there's a

13   significant decrease over time as the intravenous one

14   did in the ocular tissues.

15      Q.      And of course in humans in an outpatient

16   situation it's oral dosing, correct?

17      A.      In an outpatient situation, yes.  I

18   mean, I'm sure occasionally there's an intravenous

19   given, but it's not common.

20              MR. MORIARTY:  Why don't we take a five-

21   minute break.  I want to get all of this stuff

22   together and confer with my colleagues.

23              THE WITNESS:  Okay.

24              (A recess is held.)

25   BY MR. MORIARTY:
```

Edward John Barbieri                                    November 19, 2010

```
 1      Q.        Now, when you had your meetings with
 2  Mr. Miller and Mr. Deligans back some time in
 3  September, I think you said it was over the telephone,
 4  did you tell them at that time that you could not to a
 5  probability extrapolate back to calculate her
 6  predeath -- Mrs. Johnson's predeath dose or serum
 7  digoxin concentration?
 8      A.        I don't think we talked about that.
 9      Q.        Did you tell Mr. Miller that when you
10  met with him yesterday?
11      A.        That I could not get any kind of exact
12  within a reasonable degree of scientific certainty,
13  yes.
14      Q.        Okay.  Do you have interpretative
15  opinions regarding either the vitreous sample of 1.5
16  or the blood level of 18 to a reasonable degree of
17  scientific probability or certainty?
18      A.        I do have some opinions about them, yes.
19      Q.        Tell me what your opinions are.
20      A.        Let's take the blood data, because I
21  think that's the most significant.
22                Factoring in the postmortem
23  redistribution and taking the value of two, or even a
24  value of three and dividing that 18 by three, let's
25  say, it would appear to me that at the -- that the
```

PLAINTIFFS' EXHIBITS 012806

Edward John Barbieri                              November 19, 2010

1  postmortem level factoring in postmortem

2  redistribution was high.

3                Now, can I say that that was the level

4  that occurred at any point in time?  No.  That's based

5  upon the measurement that was taken when the blood was

6  drawn.

7                But obviously knowing a little bit about

8  what I was told yesterday, about the history of the

9  case in terms of her last dose, and trying to

10  calculate going backwards in time from that projected

11  blood level of six, let's say, and the half-life of

12  the compound, which is 30-some hours, you could say

13  that it had to be higher when at least she started

14  getting sick.

15                So the specifics, no, I can't render any

16  kind of scientific opinion about what her antemortem

17  level was.

18                But it's obvious to me that it's

19  certainly higher than one would expect after we take

20  postmortem redistribution out of the picture.

21       Q.     What's the basis for that opinion?

22       A.     The basis for that opinion is basically

23  my knowledge of what I know about digoxin's kinetics,

24  PMR; and, again, using average values for postmortem

25  distribution, not using a value of ten, which would

PLAINTIFFS' EXHIBITS 012807

Edward John Barbieri                                  November 19, 2010

```
 1   be, you know, exceedingly high and certainly would not
 2   be an average value.
 3              Could it occur at that high level?
 4   There's always a possibility.
 5              And at the same time there could be a
 6   possibility that it could be lower than even two in
 7   any particular individual.
 8        Q.    Okay.  Let me ask you this.
 9              What literature do you use to determine
10   the average PMR levels?
11        A.    Well, the average PMR levels as stated
12   in Baselt's reference.
13        Q.    Which is what?
14        A.    Which says 1.96.
15        Q.    What article was that based on?
16        A.    Let's take a look.  Vorpahl and Coe,
17   1978.
18        Q.    How long was the longest blood draw
19   postdeath in Vorpahl and Coe's article?
20        A.    I think he -- they state 10.8 hours.
21        Q.    Why don't you look at the article,
22   because I thought I saw 22.4 hours.
23        A.    If you could show me that.
24        Q.    I wouldn't be able to find that that
25   quickly.
```

PLAINTIFFS' EXHIBITS 012808

Edward John Barbieri                                    November 19, 2010

```
 1              MS. AHERN:  It's the second page, right
 2   under results section.
 3              THE WITNESS:  Oh, I'm sorry, I was
 4   looking at the mean.  Yes, thank you for the
 5   clarification.  Twenty-two hours, 22.4 hours.
 6   BY MR. MORIARTY:
 7        Q.    So the mean was what?
 8        A.    The mean was 10.8.
 9        Q.    All right.  So they didn't have any
10   samples 44 hours, did they?
11        A.    No, they did not.
12        Q.    All right.  And Baselt's only citing one
13   reference, correct?
14        A.    Yes, that's true.
15        Q.    And that one reference doesn't have any
16   draws as long after death as this one was, correct?
17        A.    Agreed.
18        Q.    All right.  So do you know when
19   Mrs. Johnson took her last dose before she died?
20        A.    Based on what I heard --
21        Q.    Yeah.
22        A.    -- about the case?
23        Q.    Yeah.
24        A.    Here's my understanding.  I'm not clear
25   on exactly the times, but here's my understanding.
```

PLAINTIFFS' EXHIBITS 012809

1              The autopsy was done.  She got -- she

2     died approximately 24 hours prior (sic) to her

3     starting to get sick; nausea, vomiting, et cetera,

4     that her husband described.

5              My understanding is it goes back

6     about -- her last dose was about six hours prior to

7     that.  So it would have been -- the time that she died

8     would have been a 30-hour window.  Now, the autopsy

9     was done after that, obviously.

10             That's the information that I was given

11    yesterday, and I believe those numbers are correct.

12        Q.      Well, are you making any assumption of

13    what the dose was?

14        A.      No, none whatsoever.

15        Q.      And your assumption is she took some

16    dose on the morning of the 26th and died on the

17    afternoon of the 27th, correct?

18        A.      Well, again, the specific dates I don't

19    have.

20        Q.      I'm telling you what the dates are.

21        A.      Then I'll take that as a representation,

22    yes.

23        Q.      So it's your understanding she did not

24    take a digoxin dose on the 27th?

25        A.      That's my understanding.

PLAINTIFFS' EXHIBITS 012810

Edward John Barbieri                              November 19, 2010

```
 1      Q.      Okay.  And I think we covered this
 2  earlier, but you don't know her renal status.
 3      A.      No.
 4      Q.      Don't know her hydration status.
 5      A.      I do not, no.
 6      Q.      Do you know what other medications she
 7  was taking?
 8      A.      I do not know that.
 9      Q.      Did NMS run the blood specimen or the
10  vitreous for any other drugs besides digoxin?
11      A.      No, we did not.
12      Q.      Were they asked to?
13      A.      We were not asked to do that.
14      Q.      And you are not rendering any opinion
15  about why she had diarrhea on the 26th or 27th,
16  correct?
17      A.      No.  I mean, diarrhea can be a toxicity
18  of digoxin.  It could also be a pathology from some
19  other cause, or it could be from some other drugs.  So
20  I'm not rendering an opinion that that was definitely
21  caused by digoxin.
22      Q.      All right.  And there is certainly
23  published literature, excerpts of which I read to you,
24  to indicate the PMR of digoxin can be up to ten times,
25  correct?
```

Edward John Barbieri                                    November 19, 2010

1        A.       You read that and people have stated

2    that.

3        Q.       Okay.

4        A.       And certainly that's in the literature.

5        Q.       All right.  So what are the other bases

6    of your opinion -- let me withdraw that question.

7                 Are you testifying to a reasonable

8    degree of probability or certainty as to what a range

9    of her antemortem serum digoxin concentration would

10   have been?

11       A.       No, I didn't say that.

12                As I described to you, what I said was

13   that based upon the level that we measured at the time

14   of collection, and taking postmortem redistribution

15   out of the picture and reducing that number by a

16   factor of three as an example, and then taking the

17   kinetics of the drug, that she's alive over a period

18   of time, that the level had to be higher if she did

19   not take another dose of digoxin as I was told.

20       Q.       Okay.

21       A.       And that's it.

22       Q.       Got it.

23                And when you say you took PMR into

24   account, you took it as an average?

25       A.       Well, more than the average.  I mean,

PLAINTIFFS' EXHIBITS 012812

Edward John Barbieri                                      November 19, 2010

1   the average number that I worked with and I've seen is

2   two, and I'm even going to three.

3        Q.      Okay.  And there are certainly other

4   published peer-reviewed articles with other numbers of

5   magnitude of PMR?

6        A.      Certainly.

7        Q.      All right.  As I understand it, you have

8   no opinion as to what the dose would have been on the

9   26th that she ingested under the assumptions that you

10  have given me.

11       A.      No.  Without having any kind of medical

12  records or medication history I could not opine to

13  that.

14       Q.      All right.  Do you know anything about

15  the percentage of cases in which patients have

16  diarrhea as a sign or symptom of digoxin toxicity?

17       A.      I don't have the specifics on that, no.

18       Q.      Do you know whether in Goodman and

19  Gilman's they even mention diarrhea as a sign or

20  symptom of digoxin toxicity?

21       A.      They probably do not; because it's such

22  a common toxicity for drugs, they may not specifically

23  list all the side effects of digoxin.

24       Q.      Well, do you think Goodman and Gilman's,

25  which you keep in your office, would list the more

PLAINTIFFS' EXHIBITS 012813

Edward John Barbieri                                    November 19, 2010

1  common side effects?

2        A.       I would say that they would.

3        Q.       Such as arrhythmias, nausea,

4  disturbances of cognitive function and blurred or

5  yellow vision?

6        A.       Yes, that's all true.

7        Q.       Do you know if she had arrhythmias,

8  disturbances of cognitive function or blurred vision?

9        A.       I do not know that, because I have not

10  seen any medical records for her.

11        Q.       Now, let's assume that Mrs. Johnson took

12  her last digoxin dose on the morning of the 26th,

13  okay?

14        A.       Okay.

15        Q.       And she then died, and I think it was at

16  9:00 in the morning.

17                 Let's just make that assumption, okay?

18        A.       That's when she died?

19        Q.       No.  She took her last digoxin somewhere

20  around 9:00 in the morning on the 26th.

21        A.       Okay.

22        Q.       Okay?

23                 From a typical pharmacokinetics

24  standpoint, when would her digoxin level have peaked,

25  serum digoxin level have peaked?

PLAINTIFFS' EXHIBITS 012814

Edward John Barbieri                                    November 19, 2010

```
 1      A.       From that dose?

 2      Q.       Yes.

 3      A.       About six hours afterward.

 4      Q.       Okay.  And then typically what would

 5 happen after that?

 6      A.       Then the drug -- the distribution would

 7 be completed, and so only elimination would take over,

 8 and the drug levels would start to fall.

 9      Q.       And how much would it fall in -- so if

10 you say six to eight hours after 9:00 a.m., we are out

11 at you know 3:00, 4:00, 5:00 in the afternoon,

12 correct?

13      A.       About 3:00 p.m. is six hours.

14      Q.       Okay.  And then let's assume that she

15 died at about 4:00 p.m. the 27th, so there's 24 more

16 hours, correct?

17      A.       Okay.

18      Q.       Isn't it more likely than not that

19 somebody who has a high digoxin level would have their

20 complications around the time when that digoxin level

21 peaked as opposed to 24 hours later?

22      A.       Not necessarily.  In most cases you

23 would assume that to be true, but digoxin has a

24 cumulative effect on the heart.

25               And as the sodium potassium pump is
```

PLAINTIFFS' EXHIBITS 012815

Edward John Barbieri                                    November 19, 2010

1   being inhibited, she could start having, you know,

2   cardiac side effects or cardiac toxicities that are

3   not manifesting itself that she could feel.

4            And so over a period of time even if her

5   levels start to drop, she could have an arrhythmia at

6   any time; ventricular tachycardia, leading to

7   ventricular fibrillation, leading to sudden death.

8            That doesn't have to occur at the peak.

9   It could occur at any time during digoxin therapy.

10      Q.      Okay.  But typically, in more cases than

11  not, it would occur near the peak?

12      A.      You would expect that a typical dose

13  response would occur.

14      Q.      Okay, sure.

15      A.      But because of the very long half-life

16  of this compound it doesn't have to be.

17      Q.      All right.  Have you read any testimony

18  from Dr. Woodson, the treating physician in this case?

19      A.      No, I don't know him, and I have not

20  read anything from him.

21      Q.      Have you been told anything about his

22  opinions?

23      A.      No, I have not.

24      Q.      Do you think that any other forensic

25  toxicologist, based on the data available, could

Edward John Barbieri                                      November 19, 2010

1  predict with any more reliable scientific certainty

2  than you have what happened on the 26th and the 27th?

3       A.       I'm sure there's someone who is more

4  versed in digoxin toxicity than I am, or digoxin

5  kinetics than I am, that may be able to do that.  I

6  can't answer for everyone.

7       Q.       Okay.  Now, when you do testing, you get

8  a specimen, you do testing on it, and then much later

9  down the road you are asked to produce your litigation

10 packets.

11              NMS typically has all the data on that

12 testing, correct?

13      A.       Yes.

14      Q.       And if NMS did not have the backup data

15 on that testing, what would you tell -- I mean, other

16 than the result page, if you had nothing other than

17 the result page, what would you tell your client about

18 the reliability of that material?

19      A.       Okay, let's take a scenario.  We're

20 required to keep all records for a minimum of five

21 years.

22              So let's say after the fact a case came

23 to trial, and someone was asked to produce a

24 litigation package and all we had was the report.

25              The report was published, and all we

Edward John Barbieri                                    November 19, 2010

1   could say is at the time that this report was

2   generated, all the data were verified by the analysts

3   in the laboratory, the senior scientists or anyone who

4   reviewed that.

5              And, therefore, we have to stand by the

6   reliability of that data, but we don't have the data

7   because it was destroyed after the five-year period.

8       Q.      Okay.

9       A.      So at the time that it was produced, we

10  feel that all of our data are correct and accurate as

11  produced, unless something comes up afterward and we

12  find an error.  If we find an error, we correct that

13  error.

14      Q.      All right.  Well, let's just assume it

15  was a year and a half, and for some reason the

16  computer with the data on it, you know, was in a flood

17  or something like that, and that data wasn't

18  available.

19              Same answer?

20      A.      We would do the same thing.

21      Q.      All right.  Certainly the SOFT

22  guidelines contemplate the data be kept and available

23  for analysis, right?

24      A.      Absolutely.

25      Q.      Now, I think earlier in your testimony

PLAINTIFFS' EXHIBITS 012818

Edward John Barbieri                          November 19, 2010

```
 1   you used the word validation several times.
 2            You know what that means, correct?
 3      A.      Yes.
 4      Q.      And it's universally accepted that
 5   methods used in forensic work must undergo validation,
 6   correct?
 7      A.      In most cases.  There are some cases
 8   that come up where you have a particular variable or
 9   something very specific where you cannot use a
10   validated method.
11            We will use in generalized scientific
12   principles such as standard addition within the sample
13   itself or other ways in order to verify that the
14   results are accurate and true without having a fully
15   validated procedure.
16      Q.      Okay.
17      A.      But in most of our testing we have
18   validated procedures for the results that we produce.
19      Q.      Before you run tests for an actual
20   client, how long do you typically take to validate a
21   method?
22      A.      It can take anywhere from a couple of
23   weeks to several months.
24      Q.      So how many times would you run and
25   refine a system before you considered it validated?
```

Edward John Barbieri                                                November 19, 2010

```
 1      A.      We have a protocol for different things
 2   that we do in the validation of an assay.  Some things
 3   are done quickly.
 4              For example, we can do reporting limits
 5   within three runs, let's say, which we normally do,
 6   and it may only take three days.  We can generate
 7   standard curves in that period of time.
 8              If we are doing stability of the
 9   analysis in various matrices, we may go out.  In fact,
10   right now we go out for 30 days; room temperature,
11   refrigerated, frozen, light protected, non-light
12   protected.
13              And in some cases we started doing
14   stability studies out to six months or a year.
15      Q.      Okay.
16      A.      Now, we would not hold the validation
17   that long.  We would, you know, publish the test and
18   be available after 30 days, let's say; but then we
19   would add to that as we accumulate data over that
20   period of time.  So it's quite variable.
21      Q.      All right.  For a lab that almost never
22   runs a particular type of test, okay, let's just
23   assume you are running an assay on a solid oral dose
24   form, and it's just not something that your lab
25   typically does or rarely does it.
```

PLAINTIFFS' EXHIBITS 012820

```
 1                And the total time from so-called
 2   validation to running the standards, the blanks, and
 3   the actual sample to be tested was about two to two
 4   and a half hours.
 5                Does that sound like a reasonable
 6   scientific validated method?
 7        A.      That's a difficult question to answer,
 8   because I don't know the specifics of what -- you
 9   know, what was done.
10                It seems -- you know, on first blush it
11   seems very short, and it would not be something the
12   way we do it.  But it depends upon the resources that
13   were available to that lab.
14                I'm tending to say it doesn't sound
15   reasonable, but I can't say that with any kind of
16   certainty.
17        Q.      Okay.  Let me just ask you a couple more
18   lab-type questions, and then I'll turn this over to
19   some of these other lawyers.
20                If when you run a blank the intercept is
21   19,000, what does it do to the reliability of the
22   analysis of the sample?
23        A.      I don't know what that means.
24        Q.      Well --
25        A.      If you are saying a response on the Y
```

PLAINTIFFS' EXHIBITS 012821

Edward John Barbieri                                    November 19, 2010

1   axis would be 19,000 at zero --

2        Q.        Yes, sir.

3        A.        -- so it doesn't go through zero?

4        Q.        Yes, sir.

5        A.        You may have a high noise level that's

6   producing that.

7        Q.        Okay.

8        A.        Or possibly the standard curve is not

9   done appropriately so you don't have a good R-squared

10  value.  You may have to use a quadratic fit for that

11  curve.

12              So there's various reasons for that, but

13  I don't -- it's hard to answer without seeing data.

14       Q.        If the R-squared value is less than .99,

15  how sensitive and specific is the test likely to be?

16       A.        .99 is -- for us it's not great.  I

17  don't know how I can answer sensitivity and

18  specificity.  I don't know how to answer that

19  question.

20       Q.        What are your R-squares typically here?

21       A.        Minimum three nines.  Sometimes four to

22  five nines.

23       Q.        How important is it for the sample to be

24  within the range of the calibrators?

25       A.        Oh, it has to be.

Edward John Barbieri                                    November 19, 2010

1              You cannot -- you cannot report a value

2    -- I mean, good science says you cannot a report a

3    value that is over your highest calibrator, or report

4    a value with any certainty that is lower than your

5    lowest positive calibrator; though some people will do

6    that.

7              They will start at zero and use that as

8    a positive number.

9              And the reason is because you don't know

10   what happens to the -- you asked the Y in terms of the

11   upper level.  You don't know what happens to the curve

12   once you passed your upper calibrator.

13             Does it flatten out?  Does it go

14   exponentially higher?  Does it continue to be linear?

15             So without knowing that, you can't

16   reliably report that elevated value unless you dilute

17   the sample when you run.

18        Q.      Okay.  So NMS wouldn't report a result

19   that was higher than the highest calibrator?

20        A.      That's against our SOPs.  We do not do

21   that.

22        Q.      Is it against SOFT guidelines?

23        A.      I believe it is in the SOFT guidelines.

24        Q.      SOFT guidelines aren't limited to

25   biological specimens, are they?

PLAINTIFFS' EXHIBITS 012823

Edward John Barbieri                                      November 19, 2010

 1      A.      You know, I haven't read the latest

 2 version, and I don't know that.  I think probably it's

 3 general information, but I don't think it's limited to

 4 biologics, no.

 5      Q.      Now, you know about LC-MS equipment,

 6 don't you?

 7      A.      Yes.

 8      Q.      All right.  In, say, 2009 was commonly

 9 used LC-MS equipment capable of calculating down to

10 the 1000th in the decimal system?

11      A.      It depends on the compound we are

12 talking about.

13      Q.      Well, for digoxin, for example.

14              Could you calculate down to three

15 digits, or would you have to round?

16      A.      You are talking subnanogram per mL?

17 What units are we talking about?

18      Q.      Let's just stick with nanograms per

19 milliliter.

20      A.      Okay.  I would be guessing.

21      Q.      That's fine.

22              Does NMS, when it's doing a solid oral

23 dose testing, typically weigh and/or measure the

24 specimen before it is assayed?

25      A.      We do.

Edward John Barbieri                                    November 19, 2010

```
 1      Q.      Why?

 2      A.      Because that's part of the specimen

 3  description that we have.

 4      Q.      Do you document the weight and

 5  thickness?

 6      A.      Well, if we get a tablet, for example,

 7  we will weigh that tablet, the single tablet.  If we

 8  have multiple, we weigh each one.

 9              We'll usually take a photograph of it

10  with a ruler next to it.

11              So we don't actually document weighing

12  it, but we do things like that.

13      Q.      And then you keep that information

14  available, correct?

15      A.      That's part of the file, sure.

16      Q.      Does NMS sometimes freeze samples?

17      A.      Yes.

18      Q.      Does NMS sometimes thaw samples and

19  retest them?

20      A.      Yes, we have.  And we do freeze-thaw

21  experiments in terms of our validation as well.

22      Q.      That's what I was about to ask you.

23              You validate that process so you know

24  whether the freezing and thawing has an effect on the

25  compound, correct?
```

PLAINTIFFS' EXHIBITS 012825

Edward John Barbieri                                    November 19, 2010

```
 1       A.      Yes.  Our current validation does three
 2  freeze-thaw cycles.
 3       Q.      Are those stability studies?
 4       A.      They are part of the stability studies.
 5       Q.      Is that important to do?
 6       A.      Yes.  Because we don't know if we were
 7  to receive a sample that had been frozen and then
 8  thawed; or alternately, we have a sample that we had
 9  frozen and then somebody comes back and asks us to do
10  something about it and retest something, we have to
11  thaw it.
12              So, yes, we need that information.
13       Q.      Did Mr. Miller or Mr. Deligans show you
14  any information about testing done by a lab called
15  ExperTox in this case?
16       A.      No, they did not.
17       Q.      Have you ever heard of ExperTox?
18       A.      I have not.
19       Q.      Do you know anything about their
20  reputation?
21       A.      I do not.
22       Q.      Do you know who Professor or Dr. Ernest
23  Lykissa is?
24       A.      I never heard the name.
25       Q.      So you don't know anything about his
```

PLAINTIFFS' EXHIBITS 012826

Edward John Barbieri                                    November 19, 2010

```
 1   reputation?

 2       A.       No, I do not.

 3               MR. MORIARTY:  All right.  I'm going to

 4   let these other lawyers ask you some questions, and

 5   then I'll ask you some more at the end if I need to.

 6                       EXAMINATION

 7   BY MR. McPHAIL:

 8       Q.       Good morning, Doctor.

 9       A.       Good morning.

10       Q.       Do we need to take a break or are you

11   ready to keep on going?

12       A.       No, I'm fine, let's do it.

13       Q.       I'm David McPhail.  I introduced myself

14   to you before we started.  I represent McBride

15   Hospital.

16               Do you understand that?

17       A.       I know the name McBride Hospital from

18   the notes, but now I know you represent them.

19       Q.       Okay.  All right.  There are several

20   defendants in this case, but I represent the hospital,

21   and that's the only health care provider that I

22   represent.

23       A.       Okay.

24       Q.       Do you know why McBride Hospital has

25   been sued in this case?
```

Edward John Barbieri                                    November 19, 2010

```
 1        A.        No, I do not.
 2        Q.        What information do you have related to
 3   McBride Hospital?
 4        A.        None at all.
 5        Q.        You said you saw them in the notes.
 6                  What do you mean?
 7        A.        On the deposition notes and the listings
 8   I saw McBride's hospital name here.  That's all.
 9        Q.        You have seen the name, but you have no
10   understanding whatsoever about why the hospital has
11   been sued in this case?
12        A.        That's correct.
13        Q.        You testify a lot, don't you?
14        A.        Well, it's a relative term, but --
15        Q.        Have you testified more than three
16   times?
17        A.        Yes.
18        Q.        More than 30 times?
19        A.        More than 100 times.
20        Q.        More than 100 times?
21        A.        Yes.
22        Q.        Okay.  So would that be inclusive of
23   depositions and trial testimony, or one or the other?
24        A.        Both.
25        Q.        Okay.  So how many times have you
```

PLAINTIFFS' EXHIBITS 012828

Edward John Barbieri                                    November 19, 2010

1   testified in front of a jury?

2        A.      I think the information that I

3   provided --

4        Q.      You may have it in detail for me, but

5   just for purposes of our discussion.  Just roughly.

6               More than 50 times?

7        A.      Yes.  Let me be specific.

8               I have listed I think it's about 75

9   times in a court setting; that may be in front of a

10  jury or bench trial only.  And then there were

11  hearings that would not be formal trials again.

12              And so it's hard for me to sort out.

13  But in total I would say, you know, more than 50

14  times.

15       Q.      Well, I'll look at your -- the details

16  that you have provided us, and that's fine.  But I'm

17  just -- for purposes of our discussion I'm trying to

18  get an understanding.

19              This is something that you are -- this

20  venue, testifying, providing expert testimony, it's

21  something you are very familiar with, isn't it?

22       A.      Yes.

23       Q.      I take it that you understand that, you

24  know, the purpose of you providing the testimony is to

25  give specialized information about really complicated

PLAINTIFFS' EXHIBITS 012829

Edward John Barbieri                                      November 19, 2010

1   subjects to either a judge or a hearing panel or a

2   jury to make a decision in a lawsuit.

3       A.      Yes.

4       Q.      What specialized information do you have

5   that you are, to a reasonable scientific probability,

6   going to be able to offer our jury in this case?

7               And what I mean by that is, what

8   significant information can you offer this jury that

9   you feel is in any way relevant to this lawsuit?

10      A.      Well, I don't know the specifics of the

11  lawsuit, so that's pretty hard for me to answer the

12  question specifically.

13      Q.      Okay.

14      A.      But basically, I mean, I could testify

15  to what NMS did in terms of testing the samples, the

16  results that we published, the papers that I've read

17  in terms of what digoxin is about, my experience in

18  terms of digoxin as a drug, my teaching experience, et

19  cetera.

20              Specific to the lawsuit, again there's a

21  lot of information that I don't have, so that's where

22  I'm having difficulty trying to answer your question.

23      Q.      Okay.  Let me ask a little more

24  specifically.

25              At one point during Mr. Moriarty's

PLAINTIFFS' EXHIBITS 012830

Edward John Barbieri                                    November 19, 2010

1  questioning -- I tried to write it down pretty closely

2  what it was that he was asking you and you were

3  responding with.

4           But I thought I heard him say that you

5  were not going to render an opinion as to any

6  antemortem or predeath serum levels or dosing based on

7  any of the information in your litigation packet or

8  any of the testing that NMS did.

9           MR. MILLER:  Objection to form.

10          THE WITNESS:  In terms of being

11 specific, I have tried to do that.

12          Now later on, as we just came back from

13 the break, I think I tried to explain that I'm not

14 doing anything first in terms of dosing, no, I'm not.

15 In terms of an antemortem level, I can't do that.

16 BY MR. McPHAIL:

17     Q.      Because nobody can do it accurately?

18     A.      Nobody, right.

19          Now, as I tried to explain to

20 Mr. Moriarty, what I can say is based upon the

21 concentration I measured, I can make an estimate of

22 saying it's my opinion that the level at the time she

23 started to be sick was high.

24          But the specific number that we are

25 going to put in terms of therapeutics or not

Edward John Barbieri                                    November 19, 2010

```
 1   therapeutics, I'm not -- I can't do that; in terms of
 2   especially for an antemortem level at that time.
 3              So I hope I'm being clear there.  It's a
 4   general ballpark kind of a level.  That's all I can
 5   do.
 6        Q.    Are you finished?
 7        A.    I'm finished.
 8        Q.    If I step on one of your answers or jump
 9   in, hold your hand up or -- I want you to finish, I
10   want you to complete an answer.
11              Sometimes I get a little bit energized
12   in the discussion here, and I get in a hurry and I
13   don't want to cut you off.
14        A.    That's okay.  We all do that, I
15   understand.
16        Q.    The court reporter is staring daggers at
17   me, though, because we are talking on top of each
18   other.  And I don't mean to do it, but I'm doing it,
19   and I know I am.
20              Well, we're in a building.
21              Do you know how many square feet is in
22   this building?
23        A.    About 65,000.
24        Q.    Okay.  And it's got dozens of people in
25   it?
```

PLAINTIFFS' EXHIBITS 012832

Edward John Barbieri                                November 19, 2010

```
 1       A.       Yeah.
 2       Q.       And bunches of computers and all kind of
 3  high-tech machinery?
 4       A.       Yes.
 5       Q.       And I think you have said earlier in
 6  your deposition that this place, NMS, runs a 1,000
 7  tests a day?
 8       A.       That's a ballpark number, yes.
 9       Q.       Okay.  Well, with all of these people
10  and all of the technology and all of the validation
11  processes and all of the things that we have been
12  talking about, how often do you come in to court and
13  testify in front of a jury based on just some ballpark
14  estimate that you are coming up with in the end?
15       A.       It happen on occasion.  Not as common
16  as, you know, you may think.  But it does happen on
17  occasion.
18       Q.       Okay.  So in the 50-plus times that you
19  have testified in front of a jury that we mentioned
20  earlier, how many of those times are you just giving
21  ballpark opinions as opposed to actually testifying to
22  a number that NMS tested and came up with?
23       A.       Well, in terms of opinions on a case,
24  knowing as much as I can about that case, it happens a
25  handful of times.
```

PLAINTIFFS' EXHIBITS 012833

Edward John Barbieri                          November 19, 2010

1       Q.      Do you feel comfortable doing that,

2   giving just a ballpark opinion, when you have got all

3   the people here and the resources to test all of these

4   samples?  I mean, is that something you feel

5   comfortable doing?

6       A.      Well, you are asking me two different

7   things now.

8       Q.      Well, separate it out for me.  I don't

9   want to do that.

10      A.      I will.  The data that we produce is

11  objective data with a finite number, and so that I

12  testify in terms of what we measured and what we

13  reported, so that's an absolute number.  Now, I have

14  absolute confidence in what I do there.

15              But to give an opinion about retrograde

16  calculations for a simple thing like ethanol, for

17  example, which I do often, that is a ballpark.

18      Q.      And for the understanding of your

19  answer, that's like in a DUI case or some kind of an

20  intoxication case?

21      A.      That would be.

22      Q.      Go ahead, keep going.

23      A.      Retrograde calculations.  Or a

24  conversion of a serum alcohol to a blood alcohol,

25  which is what, you know, district attorneys like to

Edward John Barbieri                              November 19, 2010

 1  see.  I mean, that's the statutes.  There are
 2  estimates that are being given there.
 3              And I can say within a range, and that's
 4  a ballpark, here's what the level would be two hours
 5  prior to when the accident occurred, as just as a
 6  simple example.  So it does happen.
 7              But there's two different things.
 8  That's an opinion based upon all the facts of the case
 9  that I have, reviewing the data, and coming up with
10  some conclusion and opinion, as opposed to the
11  objective data that NMS produces.
12      Q.      Okay.  Have you been asked or do you
13  intend to testify to our jury in this case?
14      A.      I have not been asked to do that.
15      Q.      Would you be willing to do that?
16      A.      Yes, I would.
17      Q.      Would you have to tell our jury in this
18  case that although you are confident in the objective
19  data that NMS has produced from the vitreous and blood
20  sample, that you can't -- you can't use the
21  conclusions reached to reliably tell us anything about
22  her serum levels before she died?
23      A.      If I'm giving testimony, and I have
24  solid objective data that I can be 95 percent
25  confident within a reasonable degree of scientific

PLAINTIFFS' EXHIBITS 012835

Edward John Barbieri                                    November 19, 2010

1   certainty, I will state that.

2              If I'm ballparking or I'm ranging data

3   and I'm unsure of what that means, I will state that.

4              So in any case, you know, I'm here to

5   produce facts.  I'm not here to be an advocate for any

6   side of the case.

7              Even if somebody hires me.  There are

8   many times where I'll tell somebody who hires me, You

9   don't have a case, so I can't help you.

10             That's my job.  So I try to be as honest

11  as possible to the people that I'm speaking to.

12             I don't know if that answered your

13  question specifically or not.

14      Q.     Well, your litigation packet, and the

15  litigation packet is something that NMS produces in

16  every single instance that it gets involved in cases

17  like this, right?

18      A.     Well, whenever we are requested.  We do

19  this quite often.  We do this almost every day.

20      Q.     Right.  And what I think I hear you

21  telling me is that the information in the data in your

22  litigation packet, you are confident it's accurate.

23      A.     Yes.

24      Q.     Because you are confident in what NMS

25  has done in this case and the information that NMS has

1   produced in this case.

2         A.      Yes.

3         Q.      But what you're ballparking is how that

4   information should be interpreted.

5         A.      Yes.  Within the parameters of the case

6   and the type of questions that you asked about that.

7         Q.      Okay.  So how would you describe your

8   comfort level in taking the data that you are

9   confident in and coming in and offering the ballpark

10  opinion that you're, I guess, anticipating offering?

11        A.      Well, based on the hypotheticals that

12  Mr. Moriarty and I spoke about in terms of the time

13  line, I'm comfortable to say, as I've said today, that

14  it's my belief that at the time that Mrs. Johnson got

15  sick, that her digoxin levels were elevated above what

16  one may consider in the literature typical therapeutic

17  levels.

18              That's as far as I'm comfortable with.

19              I'm not going to say -- give a specific

20  number and say it was five times too high, it was two

21  times too high.  I can't do that.

22              I can just -- again, that's where I'm

23  saying I'm ranging it and I'm ballparking it.  But I'm

24  comfortable with that statement.

25        Q.      Okay.  So we won't hear you offer an

Edward John Barbieri                                    November 19, 2010

```
 1  opinion at trial to our jury other than, Ladies and
 2  gentlemen, it's my opinion that the digoxin was
 3  elevated, but I can't tell you how much it was
 4  elevated, I can't quantify it any better than that for
 5  you.  Is that correct?
 6       A.       I may produce a number based on my
 7  calculations.
 8               MR. MILLER:  I just object to the form.
 9  I'm sorry to interrupt.
10               THE COURT REPORTER:  Can you start your
11  answer again?  I'm sorry.
12               THE WITNESS:  I'll state it again.
13               THE COURT REPORTER:  Thank you.
14               THE WITNESS:  I may quantify that based
15  on the numbers and doing the rough calculations.
16               But I will offer an opinion and state
17  that, you know, I can't be -- with any degree of
18  reasonable scientific certainty that this number is a
19  true number.  Again, as I stated before.
20               That's why I'm saying I'm ranging and
21  ballparking it.
22               Because we have an objective number that
23  we're starting with in terms of the analytical data,
24  and so we have some basis for doing some opinion.
25               Just like we would do in a DUI alcohol
```

Edward John Barbieri                                November 19, 2010

1   case; we have a basis of a number and an opinion, and

2   calculate back based on the facts of the case.

3           And that's what I would do.

4   BY MR. McPHAIL:

5       Q.      So can you show me the rough

6   calculations that you are going to show the jury on a

7   piece of paper right there in front of you?

8       A.      Well, sure.  I mean, as I spoke, I would

9   say, and we have -- this is what I've drawn based on

10  Mr. Moriarty's and my discussion about the timing of

11  the last dose being at 9:00 a.m. on the 26th, and

12  about six hours later a peaking occurred about

13  3:00 p.m., and then she died about 24 hours at

14  4:00 p.m. on the 27th.

15          This was a hypothetical that we talked

16  about.

17          So it's about 30 hours or so from the

18  last dose to the death.

19          Now, the autopsy was taken out here, and

20  of course the collection was out here sometime.

21      Q.      Okay.

22      A.      So what I would say is that we measure

23  the value out here, okay.

24          And if we were to take -- make the

25  assumption that there were no changes that occurred

PLAINTIFFS' EXHIBITS 012839