1  from the time of death to the autopsy, then we would

2  have an 18.  But we know that's not true --

3      Q.      Okay.

4      A.      -- because of postmortem

5  redistribution.

6              So what I'm trying to say is we take

7  that level of 18 in the blood, and I'll say it's three

8  times too high based on PMR and it's heart blood and

9  whatever, and that's the figure I would say.

10             That's an average.  It's above an

11 average.  And if we do that, we are going to cut it to

12 six.

13             So that means at the time of death we

14 have a value of six.

15             See how I'm quantifying based on the

16 actual number that I have?

17             And that six, then, would be a target

18 value that I would assume would be sometime around

19 that time of death.

20             Now we have the kinetics of digoxin

21 while she was alive.  And the half-life of the drug is

22 30 hours, as -- 24 to 30 hours.

23             So if we go back to the time she started

24 getting sick, we are dealing with a half-life, so this

25 value has to be higher.

PLAINTIFFS' EXHIBITS 012840

Edward John Barbieri                                    November 19, 2010

 1              How much higher?  Well, if we take it as
 2    one half-life, then it's 12.  Is that greater than any
 3    therapeutic range in the published literature?  Yes.
 4    Can I be certain that's that 12?  No.
 5              But that's the work-up that I did, and
 6    that would be what I would testify to.
 7              And there are assumptions in there and
 8    there are caveats, and I would present that.
 9         Q.      But making those assumptions, and with
10    the caveats that you are going to tell me about in
11    just a minute, do you feel comfortable that that is a
12    reasonably probable opinion?
13         A.      I do.
14         Q.      I guess one of the primary assumptions
15    you are making is this PMR rate of what, two or three?
16         A.      I'm using three, as I explained.  I'm
17    using -- I would use three.
18         Q.      What if it was ten?
19         A.      Then all of these calculations would
20    change.  If you were to be questioning me in that and
21    saying to me, Can you redo the calculations based on
22    ten, I would do the same work-up for you, and I would
23    come up with another number.
24              And I would say, Based on that
25    hypothetical, using the same -- the same information

Edward John Barbieri                                    November 19, 2010

1  that I have, here's what the number that I would come

2  up to be.

3        Q.      Okay.  Where did you come up with the

4  two or the three?

5        A.      Again, based upon the reference in

6  Baselt; and it comes from the Vorpahl and Coe article,

7  is what he cites.

8        Q.      And the two and the three that you are

9  talking about, that's nothing that you have come up

10  with; that is a number and assumption that you are

11  taking from someone else's study or literature and

12  putting that into the equation.

13        A.      Yes.

14        Q.      How do you make a determination whether

15  an article that concludes a twofold number is more

16  accurate than an article that concludes a tenfold

17  number in relation to the PMR?

18        A.      You read -- as a scientist, you read the

19  article, you evaluate the way that the research was

20  conducted and the conclusions that were drawn, and you

21  come up with an assessment of that article in light of

22  all the other information that you have about that

23  particular topic.

24        Q.      And how many articles did you read from

25  the vast array of literature out there to come to the

PLAINTIFFS' EXHIBITS 012842

Edward John Barbieri                                    November 19, 2010

```
 1   two or three assumption that you're plugging into your
 2   calculation?
 3         A.      It's a small number.
 4         Q.      How many?
 5         A.      Well, I don't know what I actually have
 6   here.  I'll count them for you.  Nine.
 7         Q.      And do all -- do each of those nine
 8   articles have discussions in them about the PMR?
 9         A.      No.
10         Q.      So how many of the nine really relate to
11   this two or three number?
12         A.      I mean, you are really getting specific
13   now.  You want me to say half of them, three, four?
14         Q.      I don't want you to ballpark me on this.
15                 Give me an actual number of articles
16   that -- because, I mean, isn't this the linchpin in
17   your calculation, this two or three number?
18         A.      No.
19         Q.      Well, let me ask you this question.
20         A.      Can I answer?
21         Q.      Sure, go ahead, go ahead.
22         A.      Let me answer.
23                 Let me take -- and I mentioned this
24   before, and even Mr. Moriarty brought it up in one of
25   the articles he presented to me.
```

PLAINTIFFS' EXHIBITS 012843

Edward John Barbieri                                    November 19, 2010

```
 1              Tricyclic antidepressants are the poster
 2    child for postmortem redistribution.
 3              You can have levels of PMR in articles
 4    or studies done on amitriptyline, for example, that go
 5    from .6 to 15.  But what is the average?  The average
 6    is three.
 7              Now, that means that if we say digoxin
 8    is very similar to tricyclic antidepressants, which I
 9    don't think they really have a PMR as significant as
10    that; and the one reference from the Coe article says
11    about two, and I'm saying let's make it like a
12    tricyclic and let's make an average of three.
13              Are there situations where we can get up
14    to ten, as you are describing and others have?
15    Absolutely.  Are they common?  No.
16              And just as common we can have
17    situations where PMR is not affected to any
18    significant degree, and there's articles that will
19    come down to one or less than one.  So I'm taking the
20    average.
21              There's a big range here.  And I'm not
22    saying that the ranges that are published are wrong.
23    I'm just saying I'm using the average value for the
24    most common type of situations.
25              Is there a possibility that in this
```

Edward John Barbieri                                      November 19, 2010

1  particular case the PMR could have been ten?  I will

2  admit to that.  Certainly.  I have no problem with

3  that.

4            And so, you know, we can parse it out

5  into how many articles say this and how many articles

6  say that, but that's how I do my job; looking at the

7  bulk of what I know and come up with a conclusion.

8       Q.     Before Mr. Miller hired you in this

9  case, did you know anything about the PMR of digoxin?

10      A.     Yes.

11      Q.     But you have never testified in a

12  digoxin case?  You have never -- am I correct?

13      A.     That's correct.

14      Q.     Okay.  And you hadn't analyzed digoxin

15  before this case?

16      A.     I do no analysis.

17      Q.     Okay.

18      A.     I've seen reports that we have done for

19  digoxin at NMS.  We do about 1200 different

20  compounds.

21            My job as a toxicologist here is to know

22  as much as I can about as many of those compounds as

23  possible.  And for my teaching experience, I taught

24  digoxin for 23 years, so I'm familiar with digoxin.

25            I'm familiar with the pharmacology of

PLAINTIFFS' EXHIBITS 012845

Edward John Barbieri                                    November 19, 2010

```
 1   it, I'm familiar with the toxicology of it.

 2              And when I got into forensic toxicology,

 3   I learned about PMR, and certainly I learned about

 4   digoxin's PMR as one of the compounds that I've known

 5   about.

 6              Do I know everything about it?  No way.

 7   Do I know everything about every compound we do here?

 8   No way.

 9              But I do have knowledge about the

10   subject.

11        Q.    Before I forget to ask you, have you

12   ever been to Oklahoma University?

13        A.    No.

14        Q.    Have you ever worked in Oklahoma?

15        A.    No.

16        Q.    Are you aware of another Barbieri that's

17   worked in Oklahoma?

18        A.    No.

19        Q.    Have you asked to see this patient's

20   medical records?

21        A.    No, I haven't.

22        Q.    Do you need to see them to be able to

23   testify in this case?

24        A.    It depends what I'm asked.

25        Q.    Are you qualified to render any kind of
```

Edward John Barbieri                                    November 19, 2010

```
 1   opinion about whether clinical signs or symptoms of
 2   toxicity were present in a patient?
 3        A.      I would not go there.
 4        Q.      In other words, you would not offer an
 5   opinion on that subject?
 6        A.      If the medical records show signs and
 7   symptoms of toxicity, I would be -- I could render an
 8   opinion that that drug has a capacity to produce those
 9   toxicities; they are consistent with that compound.
10             But I would not render an opinion, for
11   example, that that drug in this particular case caused
12   that particular toxicity.  That's not what I do and
13   that's not my background.  I'm not a medical doctor.
14        Q.      Right.
15        A.      I'm not a clinical toxicologist.
16        Q.      What's the -- I'm sorry.
17        A.      So I have training in that -- I paused,
18   I'm sorry.
19             I have training in clinical toxicology
20   because I've taught clinical toxicology when I was in
21   medical school, but that's not my job.
22        Q.      For purposes of our discussion, what's
23   the difference between a forensic toxicologist such as
24   yourself and a clinical toxicologist?
25        A.      A clinical toxicologist rarely works
```

PLAINTIFFS' EXHIBITS 012847

Edward John Barbieri                                November 19, 2010

1  with postmortem sampling.  They are less interested in

2  postmortem levels of compounds and various body

3  tissues and fluid.  That's for forensic

4  toxicologists.  It's different.

5           The clinical toxicologist is more about

6  what happens to the living individual and how that

7  relates to the therapy in that individual and other

8  drug interactions.

9      Q.     So hypothetically, for example, if

10 Ms. Johnson's surgeon, Dr. German, who performed the

11 surgery that she was in McBride Hospital for,

12 testifies that clinically she was not exhibiting any

13 signs or symptoms of toxicity, you would not dispute

14 that or have any basis to dispute that.

15     A.     That's absolutely correct.

16     Q.     If testimony like that was available

17 from health care providers that were taking care of

18 Ms. Johnson, for example, say from like April the 15th

19 and during her hospitalization on like April the 25th,

20 April the 26th, would health care provider opinions

21 that were privy to or observing her and not seeing any

22 signs or symptoms of toxicity, would testimony like

23 that in any way impact your ballpark opinion?

24           MR. MORIARTY:  Objection to form.

25           THE WITNESS:  I certainly would not

Edward John Barbieri                                    November 19, 2010

1   dispute any of those things.  That's all important

2   information that there was no consistency in terms of

3   what the signs and symptoms observed at a particular

4   time.

5             Now, how would it impact my opinion?  My

6   opinion is, again, based upon a postmortem level with

7   some assumptions of retrograde calculations.

8             So there may be a conflict in what I

9   would end up saying based upon the signs and symptoms

10  observed when she was alive.

11            But I'm not going to -- I would not

12  change my opinion of the calculations that I described

13  just because someone else has different observations.

14  That's all part of the information of the case.

15            And I would not refute that.  I would

16  not refute in any way what a medical professional

17  observed for a patient.

18  BY MR. McPHAIL:

19     Q.     Is there any way to factor clinical

20  information into this back calculating that you do?

21     A.     No.

22     Q.     So although there are assumptions and

23  caveats in your back calculation, it doesn't in any

24  way take into account the in-the-trenches clinical

25  information that the nurses and doctors and folks

PLAINTIFFS' EXHIBITS 012849

Edward John Barbieri                                November 19, 2010

```
 1  taking care of Ms. Johnson have available or had
 2  available to them.
 3       A.     No.  The calculations I described would
 4  not impact on that.  But in the end, in terms of
 5  evaluating what I came up with versus what they see,
 6  then obviously there is an issue.
 7              But I would not opine to, you know, any
 8  kind of discrepancy between those issues.
 9              If asked, I would say, well, it's not
10  consistent then; their observations are not consistent
11  with my calculations.
12              And let the trier evaluate that, let the
13  jury evaluate that.
14       Q.     Would a clinical toxicologist be in a
15  better position than you to render this -- or to
16  address this issue in this particular case?
17       A.     Which issue are you speaking of?
18       Q.     Well, we have been talking about how
19  clinical signs and symptoms exist in relation to
20  toxicity cases, or they can.
21              You understand that to be correct?
22       A.     Yes.
23       Q.     Okay.  If this is going to boil down to
24  an issue of was she toxic or not, then you are not
25  equipped to in any way evaluate the clinical side of
```

Edward John Barbieri                                  November 19, 2010

1   that, and, in fact, the clinical issue; that doesn't

2   in any way even enter into the foundation for your

3   opinion, correct?

4               MR. MILLER:  Object to form.

5               THE WITNESS:  In a way you are correct.

6               As long as a patient is alive and being

7   treated in any circumstances, and I've always done

8   this in the past, if there's any issue in terms of

9   patient treatment, observations by medical

10  professionals, I always refer them to either a

11  clinical toxicologist or the treating M.D.

12              I would never opine to those issues.

13              And so you are right; my calculations

14  are based upon a postmortem test result and going back

15  to postmortem, and then making assumptions in terms of

16  half-life and et cetera in this particular patient.

17              So, yes, it's a long way of saying I

18  tend to agree with you.

19  BY MR. McPHAIL:

20      Q.     This is -- the issue of toxicity, it's

21  the elephant in the room, isn't it?  I mean, that's

22  what this case is about as you understand it.  Is that

23  correct?

24              MR. MILLER:  Object to form.

25              THE WITNESS:  From what I'm gathering,

PLAINTIFFS' EXHIBITS 012851

Edward John Barbieri                                    November 19, 2010

1   yes.

2   BY MR. McPHAIL:

3       Q.      Okay.  And you weren't in the room at

4   the time that she was at McBride Hospital, obviously,

5   correct?

6       A.      Obviously not.

7       Q.      And essentially what you have got is a

8   blood sample and a vitreous sample that you have

9   analyzed, and are now trying to back calculate into

10  what was going on in the room that you were not in.

11  Is that correct?

12      A.      I didn't get into the hospital here.

13              I mean, I'm trying to back calculate in

14  terms of theory based upon the kinetics of the drug,

15  some postmortem issues, to try to give some kind of a

16  picture to where we might be or where she might have

17  been in terms of that.

18      Q.      Do you understand when she was in

19  McBride Hospital?

20      A.      I don't have that, no.

21              My understanding, if I could just add,

22  that this all happened after she left the hospital.

23  That was -- this last dose -- my understanding from

24  discussion was this last dose was taken, you know, and

25  then she was at home.

PLAINTIFFS' EXHIBITS 012852

Edward John Barbieri                                    November 19, 2010

```
 1              That's what I was made to understand.
 2    And if that's incorrect, that's incorrect.
 3              But that still doesn't impact on the
 4    estimates that I'm trying draw here, again, based upon
 5    a postmortem value that's taken after, during
 6    autopsy.
 7       Q.     You said something in one of your
 8    responses to one of Mr. Moriarty's question about
 9    "Someone more versed in digoxin testing than I am"?
10       A.     Well, I think the question was asked
11    would any forensic toxicologist come to the same
12    conclusions or do the same thing, I think that was the
13    question.
14              And I said certainly I'm not the world's
15    expert on digoxin or postmortem redistribution; and
16    someone who is more versed in that would, you know,
17    may be in a better position or come up with different
18    conclusions.
19              I'm willing to admit to that.
20       Q.     How many times have you in your
21    professional experience done what you are doing today,
22    which is look at data and back calculate with regard
23    to a digoxin level?
24       A.     This is the first case that I had to do
25    an estimate like this.
```

Edward John Barbieri                                    November 19, 2010

```
 1        Q.       So this would be the only time you have
 2   ever done it in your professional career.
 3        A.       Right.  I had another digoxin case that
 4   I worked on an expert report, or in the preparation of
 5   a report where we talked about some of these kind of
 6   issues, but no final report was done.  So I worked on
 7   the case.
 8               So this is the second digoxin case, but
 9   this is the first time that I have done this type of
10   calculation based on the data that I have.
11        Q.       Well, so if we went to someone that had
12   even looked at this issue twice, we would be finding
13   somebody that was more versed in digoxin testing than
14   you are.
15        A.       How would you know that?
16        Q.       From what you are just telling me.
17        A.       All I'm saying is, you know, I have had
18   experience with teaching digoxin, knowing about the
19   compound for my whole career, 35 years.
20        Q.       Okay.
21        A.       And just because someone has taken --
22   you know, has done two cases, you know, they may not
23   have the knowledge base that I have.  So I can't
24   answer that question.
25               All I'm saying if someone knows more
```

PLAINTIFFS' EXHIBITS 012854

Edward John Barbieri                                      November 19, 2010

 1   about the compound and knows more about the issues,
 2   then certainly I would be willing to say, you know,
 3   listen to them, don't listen to me.
 4        Q.      Okay.  It's just the back calculation
 5   formulas that you are doing in this case that you have
 6   never done before, correct?
 7        A.      Well, for this compound.
 8        Q.      Right.
 9        A.      I've done back calculations for many
10   other compounds.
11        Q.      For digoxin.
12        A.      Yes, of course.  But the principles are
13   the same.
14        Q.      Let me rephrase my question just so --
15   it's kind of jumbled up there.
16               It's just the back calculation in
17   relation to digoxin in this particular case that you
18   have never done before.  Is that correct?
19        A.      Agreed, correct.
20        Q.      Is there anything that you can look at
21   in your litigation packet, or in any of the data that
22   NMS has produced, for you to be able to comment
23   whether there was an acute process going on or a
24   chronic process going on in Ms. Johnson?
25        A.      No.  We just have analytical data, and I

1  have no supplemental background data about the case in

2  the files that I reviewed.

3       Q.      Okay.  But, I mean, you understand my

4  question?

5       A.      I do.

6       Q.      And that's something that you comment on

7  in a lot of cases, in terms of whether you have an

8  acute ingestion of something or a chronic ingestion of

9  some drug?  That's a common issue for you to deal with

10  in a lot of cases, isn't it?

11      A.      It's a common issue.  And sometimes you

12  can answer that question if you have a metabolite that

13  you can measure.

14             For example, knowing that a certain

15  compound produced a certain level of metabolism, okay,

16  on an either acute dosing and chronic dosing, and the

17  levels of those two compound are completely of whack,

18  you can make an opinion that this was an acute

19  situation versus a chronic.

20             Here we have one compound, there's no

21  metabolite to look at.  There's no way to know this.

22             All I can tell you is, you know, we know

23  that this individual in two of her samples had digoxin

24  in certain concentrations, and then you can work back

25  the way it did.

PLAINTIFFS' EXHIBITS 012856

Edward John Barbieri                                    November 19, 2010

1     Q.      Do you know anything about Ms. Johnson's

2  prescription or the pills that she was taking?

3     A.      No, not at all.

4     Q.      Is there anything that Dr. Kevin Ballard

5  can tell us about the blood sample or any of the data

6  in that litigation pack that you couldn't tell us?

7     A.      Well, at the present time, no.

8  Dr. Ballard passed away shortly after.

9     Q.      I'm sorry, I didn't know that.  I was

10 not aware of that.

11    A.      That's okay.  He would have been very

12 helpful in terms of the analytical data.

13    Q.      Well, the only reason I ask is I think

14 you indicated he was the final reviewer of that

15 sample.  And that's why I was wondering if he would

16 have had an additional or a different insight than you

17 would have had.

18    A.      I understand, he did the final.

19            Actually, he developed both of these

20 methods, or the methods for both these cases for

21 digoxin measurement by NMS.  And he did review the

22 blood work prior to the report going out.

23    Q.      Are you familiar with NMS's Website,

24 Doctor?

25    A.      Somewhat.  I don't look at it on a

Edward John Barbieri                                        November 19, 2010

```
 1  routine basis.
 2       Q.      Are you familiar with NMS's advertising
 3  of their expert witness services?
 4       A.      I have read it one time.
 5       Q.      Have you ever seen this ad?
 6       A.      No, I haven't.
 7               MR. MILLER:  It doesn't look like you.
 8  BY MR. McPHAIL:
 9       Q.      Have you ever seen this ad?
10       A.      Yes.
11       Q.      It's, I guess, similar to the one that's
12  on the wall up there in our room here, isn't it?
13       A.      That's one of the things that our
14  marketing department came up with.
15       Q.      Other than the Website, where do these
16  ads like this one, where do they get printed?  What
17  trade journals do they go out in, do you have any
18  idea?
19       A.      I don't.  I don't have any.  So that
20  would be for our marketing department to answer that.
21       Q.      Would that be something that Shelly
22  Carolan, your marketing and business development vice
23  president, would know about?
24       A.      Yes, she would.
25       Q.      Why does NMS have a sales and marketing
```

PLAINTIFFS' EXHIBITS 012858

Edward John Barbieri                                     November 19, 2010

```
 1   vice president?
 2        A.      That's the way the executives of the
 3   company decided to set up the company.
 4                We're a for-profit organization, we are
 5   a privately owned company.  We need profit in order to
 6   continue to hire new people, support new equipment and
 7   technologies.  So we have to, you know, sell our
 8   services.
 9        Q.      Are you offering Mr. Miller your basic,
10   expanded or expert services?
11        A.      Those are lab designations for testing.
12   There are different panels of autopsy panels:  basic,
13   expanded and expert.
14        Q.      So that doesn't apply to this --
15        A.      No.
16        Q.      -- Ms. Johnson's testing or this
17   lawsuit?
18        A.      No.  This is part of our expert services
19   division, totally different.
20                And those services are different levels
21   of sophistication and complexity in terms of the work
22   that we do analytically.
23        Q.      What is TNH Enterprises?
24        A.      I don't know.  Can you help me with what
25   TNH would stand for?  Can you show me a document that
```

Edward John Barbieri                                    November 19, 2010

```
 1   may help me?
 2        Q.       (Handing document.)
 3        A.       I've never seen this.  I have no idea.
 4   I see my name is on there, the bio, but I have no
 5   idea.  I have never contacted and I have never spoken
 6   to anybody from that organization.
 7        Q.       Just real quickly, do you recognize any
 8   of these names?
 9        A.       John DiGregorio is the medical director,
10   I have known John for 35 years.  Of course, there's my
11   name here.  I don't know him, don't know him.  No,
12   just John.
13        Q.       Okay.  Mr. Moriarty asked you some
14   questions about the September 22nd telephone call that
15   you had with Mr. Miller and Mr. Deligans?
16        A.       Yes.
17        Q.       One of the things that I think you told
18   me you said that from out of that telephone call you
19   received, I think your words were two charges:  one to
20   proceed with the investigation of digoxin, and the
21   second one was to see if you could find a vitreous
22   what?
23        A.       Some correlation between the vitreous
24   digoxin level and some blood level, whether it be
25   postmortem blood, antemortem serum, something like
```

PLAINTIFFS' EXHIBITS 012860

```
 1   that.
 2                Some kind of an association that I could
 3   say there's a factor that the person might use for
 4   that.  And I could not.
 5        Q.     All right.  How much time did you spend
 6   proceeding with the investigation of digoxin?
 7        A.     For this case?
 8        Q.     Yeah.  I'm talking about what you
 9   understood your charge to be from the September 22nd
10   telephone conference with Mr. Deligans and
11   Mr. Miller.
12        A.     Up to and not including yesterday's
13   meeting, I put in about six and a half hours on the
14   investigation.
15        Q.     Can you describe -- I'm sorry.  I keep
16   cutting you off.
17        A.     I was saying the investigation in terms
18   of what I was asked to do.
19        Q.     Okay.  Did you say six and a half hours?
20        A.     Yes.
21        Q.     Can you tell me or break down the six
22   and a half hours in terms of what you did to
23   investigate digoxin?
24        A.     Sure.  The first 30 minutes was our
25   telephone discussion.  I spent two and a half hours
```

Edward John Barbieri                                    November 19, 2010

1   doing literature research and review.

2            I spent about two hours reading the

3   papers that I've gotten and rereading the papers and

4   making notes, highlighting notes in the papers.  And

5   then I spent another hour and a half going through the

6   litigation package.

7            After I got that down, I went back and

8   looked at the papers again to try to get some kind of

9   an estimate of levels based upon the vitreous number

10  that we have.

11           So that's the breakdown that I have on

12  my notation sheet.

13      Q.      And the two and a half hours of medical

14  literature research that you did produced the nine

15  papers here in front of us?

16      A.      Yeah.  It's not complete.  There were a

17  lot of papers that the titles didn't impress me, it

18  was not what I was looking for.

19           So I tried to kind of boil it down into

20  some reasonable small group so I didn't have an

21  extensive volume of literature that I felt was

22  unnecessary.

23      Q.      During your medical research, did you

24  locate any articles that didn't necessarily support

25  your position?

PLAINTIFFS' EXHIBITS 012862

Edward John Barbieri                                   November 19, 2010

```
 1        A.        No, I did not.

 2        Q.        Did you consult the NMS electronic

 3   library that you referenced earlier to see what was

 4   saved there in relation to digoxin?

 5        A.        I did, and the postmortem papers -- this

 6   was in the postmortem end.

 7        Q.        The Vorpahl article?

 8        A.        The Vorpahl and Coe article, which was

 9   there.  And there was also a general article about

10   postmortem distribution that did not have anything to

11   do with digoxin, although it was included in the

12   digoxin file.

13              So there was nothing other than this

14   paper and it was the same.  Everything else came off

15   of the Internet search that I did.

16        Q.        And then you said you had a paper file

17   of your own?

18        A.        Yes.  And there were two papers.  It was

19   the Vorpahl and Coe article that I had in my paper

20   file.  I had an old copy of the Baselt from a previous

21   edition.

22              And I had the Holmgren article that, you

23   know, talked about -- I had it in the digoxin file,

24   but it doesn't even talk about digoxin.  It was just

25   there for general postmortem information.
```

PLAINTIFFS' EXHIBITS 012863

Edward John Barbieri                                    November 19, 2010

```
 1        Q.        What do you charge for your time,
 2   Doctor?
 3        A.        I don't charge.  The company sets a fee
 4   of 350 an hour for me.
 5        Q.        What does the for-profit company that
 6   you work for charge for your time?
 7        A.        $350 an hour.
 8        Q.        Okay.  Is this -- the testifying, the
 9   expert testimony or the expert services part of this,
10   is this something that you do by -- simply because of
11   your employment here at NMS?
12        A.        Yes.  That's part of my job, to support
13   that part of the company.
14        Q.        How many other persons within NMS have
15   as part of their job to offer expert testimony and
16   give depositions like this?
17        A.        Well, there's all the toxicologists.
18   There are seven of us in the toxicology group who have
19   testified and will support this.  Some do it more than
20   others.
21               We have our client -- our expert
22   services folks, our records custodians that do testify
23   on records, for example, certifying records and
24   things.
25               Occasionally lab people are asked to
```

Edward John Barbieri                                    November 19, 2010

1  testify about what they did in a particular case.  For

2  example, if you wanted somebody who did this work to

3  testify, they would do that.

4           So the main bulk is the toxicology

5  group, but other people in the company have been

6  involved in the expert services as well.

7           And then, of course, the people in the

8  criminalistics lab, you know, do their things in terms

9  of either DNA or product integrity work or pills,

10 patterns and potions from police searches and things.

11    Q.     How much did the vitreous and blood

12 sample testing that was done back in 2008, how much

13 did that cost?

14    A.     I don't have the figures.  I don't do

15 any billing, and we don't put that in here.

16           If you wanted that information, we could

17 provide that to you.  But I have no knowledge of what

18 it costs.

19    Q.     In terms of the analysis that was done,

20 you don't even know a ballpark of what that would

21 cost?

22    A.     Again, if you were to say how much does

23 cocaine in blood cost, I can tell you that because I

24 see it every day.

25           This is not a common analysis, so it's

Edward John Barbieri                                    November 19, 2010

1    not something that I would focus on.  Again, we have
2    2500 tests.
3         Q.     Okay.  It might be different because
4    it's digoxin that's involved.
5              Is that what you are telling me?
6         A.     Yes.
7         Q.     Okay.  Do you pre -- this is kind of my
8    final kitchen-sink wrap-up question.
9              You have heard many of those if you have
10   testified, haven't you?
11        A.     This is the one before the next one and
12   the next one and the next one.
13        Q.     Well, it depends on what your answer
14   is.
15             All I want to know is if you have any
16   other ballpark opinions, or opinions you consider to
17   have enough reliability that you would offer to the
18   jury in this case, other than your back calculation
19   opinion that we have already discussed?
20        A.     No.  I think -- I mean, through the
21   questioning and the answering I have had today, I
22   think I have expressed everything that I would say to
23   a jury if asked to attend.
24             Unless there was a different question
25   that came up, and if I could provide the answer, I

PLAINTIFFS' EXHIBITS 012866

Edward John Barbieri                                    November 19, 2010

```
 1  would, and if I couldn't, I would say so.
 2              So as I sit here today, I think I've
 3  covered everything that I would testify to.
 4       Q.    Well, if you come up with another
 5  opinion or medical literature or some other support
 6  outside your litigation packet that in any way
 7  supports your opinion, would you please advise
 8  Mr. Miller or one of us so that we could ask you
 9  questions about that before trial?
10       A.    I will certainly do that.
11              MR. McPHAIL:  Thank you, Doctor.
12              THE WITNESS:  You're welcome.
13              MS. AHERN:  I do have some questions,
14  but if you wouldn't mind, I'd like to take a break
15  real quick.
16              (A recess is held.)
17                   EXAMINATION
18  BY MS. AHERN:
19       Q.    Hi.
20       A.    Hello.
21       Q.    Dr. Barbieri, we met before.  I'm Hunter
22  Ahern, and I have a few more questions for you.
23       A.    Sure.
24       Q.    I just want to sort of clarify a little
25  bit what your role is, what your role has been in the
```

PLAINTIFFS' EXHIBITS 012867

Edward John Barbieri                                    November 19, 2010

1   testing of these samples that were given to you.

2              My understanding is that NMS Laboratory

3   provides a number of services to people, a number of

4   forensic services, including toxicology services,

5   correct?

6       A.      Yes.

7       Q.      And you have a number of packages that

8   you also provide, you have a basic, an expanded and an

9   expert panel of toxicology testing that you can

10  provide to people.  Is that correct?

11      A.      Yes.  Those are autopsy panels of

12  various complexities.

13      Q.      Okay.  You were the expert -- I was just

14  looking at your Website.

15              Under the expert panel, it says it's the

16  largest current library of the most relevant drugs,

17  metabolites, poisons and toxins for comprehensive

18  death investigation, correct?

19      A.      Yes.

20      Q.      You were not asked to do a comprehensive

21  death investigation, correct?

22      A.      No.  These were focused tests for one

23  compound.

24      Q.      How often are you asked to do tests for

25  a single compound?

PLAINTIFFS' EXHIBITS 012868

Edward John Barbieri                                      November 19, 2010

```
 1      A.      Quite often.
 2      Q.      And for what purpose usually?
 3      A.      We don't know that.
 4      Q.      In this case would it be litigation?
 5      A.      Well, when we received the sample, we
 6 didn't know that.  We know that now.  But at the time
 7 we received the samples, we didn't know that.
 8              We have a client who contacted us and
 9 sent us a specimen, and we did what we were asked to
10 do.
11      Q.      Okay.  So the only thing that you can
12 opine on in this particular case are digoxin levels,
13 correct?
14      A.      Yes.
15      Q.      You testified that you were not a
16 medical doctor?
17      A.      That's correct.
18      Q.      You are not a clinical pathologist or a
19 clinical toxicologist?
20      A.      That's correct.
21      Q.      You have never treated patients,
22 correct?
23      A.      As a pharmacist, but not as an M.D.
24      Q.      Have you ever treated patients or
25 diagnosed patients with digoxin toxicity?
```

Edward John Barbieri                                      November 19, 2010

```
 1        A.        No.
 2        Q.        So is it fair to say that your
 3   experience with digoxin as a medication is that of a
 4   laboratory researcher?
 5        A.        And as a pharmacologist and teaching.
 6        Q.        Teaching?
 7        A.        Yes.
 8        Q.        But not in patient care.
 9        A.        Not in patient care, no.
10        Q.        And not in diagnosing clinical signs and
11   symptoms of digoxin toxicity.
12        A.        No.
13        Q.        And this number that we calculated back,
14   this 12 nanogram per mL that you are estimating based
15   on the postmortem blood sample that was taken for
16   Ms. Johnson, can you tell me -- I'm going to go
17   through the assumptions that you are making for this
18   particular level, correct?
19                  Sorry, strike that.
20                  Is it correct that you have made a
21   number of assumptions in order to get to 12 nanograms
22   per mL?
23        A.        I did.
24        Q.        The first assumption would be that her
25   last dose was taken on April 26 of 2008, correct?
```

PLAINTIFFS' EXHIBITS 012870

Edward John Barbieri                                    November 19, 2010

```
 1        A.        Yes.
 2        Q.        And that's a significant assumption,
 3   isn't it?
 4        A.        Well, that's what was represented to
 5   me.  So I'm really not assuming that; I was told that.
 6        Q.        And I understand that.
 7                  But it would be -- your estimate would
 8   be significantly different or it could be
 9   significantly different if you were to find out that
10   her last dose was actually taken on April 27th?
11        A.        It would make a difference, yes.
12        Q.        So the information that you were given
13   by plaintiff's counsel, that her last dose was taken
14   on April 26th, is a significant basis for your
15   12-nanogram-per-ML estimate, correct?
16        A.        Yes.
17        Q.        Another assumption that you are making
18   is that she had normal renal function?
19        A.        Yes.
20        Q.        Pharmacokinetics of digoxin are greatly
21   affected by the status of renal function in an
22   individual, correct?
23        A.        They are.
24        Q.        And why is that?
25        A.        Because digoxin is mainly secreted
```

 1  unchanged primarily in the body through the kidney.

 2       Q.     So even low levels of renal

 3  insufficiency can greatly affect serum digoxin

 4  concentrations in an individual, correct?

 5       A.     Well, I don't know significantly and

 6  greatly.  I know they will affect.  How high, I can't

 7  answer that.

 8       Q.     And you testified that you were not

 9  given any medical records to review for Martha Bea

10  Johnson?

11       A.     That's correct.

12       Q.     And you did not ask to review any

13  medical records for Martha Bea Johnson?

14       A.     That's correct.

15       Q.     So you have no information about what

16  other drugs Martha was taking?

17       A.     That is correct.

18       Q.     Or how many other drugs she was taking?

19       A.     That's correct.

20       Q.     And you are aware that digoxin is a drug

21  that interacts with a number of other drugs, correct?

22       A.     Yes.

23       Q.     And that a number of other drugs can

24  affect levels of digoxin in the serum?

25       A.     There are certain drugs, yes.

PLAINTIFFS' EXHIBITS 012872

Edward John Barbieri                                    November 19, 2010

1     Q.      Would that be both ante and postmortem
2  potentially?
3     A.      Well, the drug interactions in terms of
4  digoxin would be antemortem in terms of either
5  metabolism or effective secretion.  It would not
6  change postmortem levels.
7     Q.      Sorry, I meant -- it was a bad
8  question.
9             What I meant was, the interactions
10  antemortem would affect what you see postmortem
11  potentially.
12     A.      Yes, of course.
13     Q.      We are also making the assumption that
14  the postmortem to antemortem ratio was three and not
15  something higher like ten, that she was not an
16  outlier.
17     A.      I made that assumption, yes.
18     Q.      And if she, for instance, was an
19  outlier, was on the extreme end of that, and the
20  postmortem to antemortem ratio was something like ten,
21  that would significantly affect the calculation that
22  you made antemortem, correct?
23     A.      Yes.  And as I stated, I would
24  recalculate based upon that information given to me.
25     Q.      So, so far the assumptions we are making

Edward John Barbieri                                      November 19, 2010

 1   are based on the information you have.

 2              We are assuming that her last dose was

 3   take on the 26th of April, 2008.

 4       A.     Yes.

 5       Q.     We are assuming that there were no other

 6   significant drug interactions antemortem that might

 7   have affected her serum digoxin concentration?

 8       A.     Yes.

 9       Q.     We are assuming that she had normal

10   renal function.

11       A.     Yes.

12       Q.     We are assuming that the postmortem to

13   antemortem ratio was somewhere around three, not

14   higher.

15       A.     Yes.

16       Q.     We are also assuming that her symptoms

17   of diarrhea and stomach cramps were not -- were

18   attributed to high levels of digoxin.

19       A.     No, I didn't make that assumption.

20       Q.     So I just want to make sure, though,

21   that you had mentioned that what you could say is that

22   you believe her antemortem levels on the 26th would

23   have been high, right around the same time she was

24   exhibiting symptoms of diarrhea and stomach cramps.

25       A.     Yes.  And the one assumption that you

PLAINTIFFS' EXHIBITS 012874

Edward John Barbieri                          November 19, 2010

1  didn't include was I assumed a half-life of about 24

2  hours, which would fit into the pattern here of the

3  drug; which came about when we estimated the peak

4  level based upon that dosing.

5       Q.      Correct.

6       A.      Not the symptomatolgy necessarily.

7       Q.      And thank you.

8               And the half-life, of course, would be

9  affected by her renal function and a number of other

10 things as well.

11      A.      It would.

12      Q.      Okay.  So in other words, if her renal

13 function, if she was -- if she had some renal

14 insufficiency due to dehydration or something else,

15 that would have prolonged the period of time that it

16 took to clear digoxin.

17      A.      It would.

18      Q.      Doctor, I just want to make sure that

19 when you said that you could testify that her levels

20 on the 26th were, in your opinion, high or elevated

21 beyond the normal therapeutic range, you are not also

22 going to testify that that somehow correlated with any

23 clinical symptoms that you could attribute to

24 toxicity.

25      A.      No.

PLAINTIFFS' EXHIBITS 012875

152

Edward John Barbieri                                      November 19, 2010

1      Q.      Because you are not a medical doctor.

2      A.      Right.

3      Q.      And you would defer to a medical doctor,

4   a cardiologist, and treating physicians to make that

5   determination.

6      A.      I would.

7      Q.      Can I ask you, are you aware of a

8   particular serum digoxin concentration that you would

9   expect to see cardiac symptoms with?

10     A.      Cardiac symptoms can occur even at low

11  therapeutic levels, down, let's say, one nanogram per

12  mL; there's certain patients who would exhibit

13  toxicity at that low therapeutic level.

14     Q.      And what sorts of cardiac symptoms would

15  you expect to see in a patient exhibiting toxicity?

16     A.      You would see an increase in heart

17  rate.  You would see occasionally a premature

18  ventricular contraction or more than the normal

19  premature ventricular contraction.  Things that

20  digoxin would cause.

21     Q.      And would those sorts of things usually

22  be picked up by a treating physician, especially in

23  this situation where the patient is actually

24  hospitalized for surgery?

25     A.      On the electrocardiogram?

Edward John Barbieri                                    November 19, 2010

```
 1        Q.      Yes.

 2        A.      It would be.

 3        Q.      Okay.  And would you expect to see

 4   cardiac symptoms in a patient exhibiting a

 5   12-nanogram-per-mL blood level?

 6        A.      I'm sorry.  Would I expect to see those

 7   symptoms?

 8        Q.      Yes, sir.

 9        A.      I would.

10        Q.      Okay.  Do you have any evidence to

11   suggest that these symptoms -- that Martha Bea Johnson

12   had any cardiac symptoms on the 26th of April, 2008?

13        A.      I have no information of that.

14              MS. AHERN:  I think, sir, that is all

15   that I have at this time.  I think that Mr. Moriarty

16   may have a few follow-up questions.  Thank you very

17   much.

18              THE WITNESS:  Thank you.

19              (Discussion off the record.)

20                   EXAMINATION

21   BY MR. MORIARTY:

22        Q.      I just need to spend a few minutes

23   mopping up a few loose ends, okay?

24        A.      Sure.

25        Q.      If I understand what you are saying, you
```

Edward John Barbieri                                    November 19, 2010

1    can't testify to a reasonable degree of probability or

2    certainty that the SDC that the time Mrs. Johnson

3    actually died was three or four or 2.5 or 1.5, or any

4    other specific number, correct?

5         A.      You're correct.

6         Q.      At the time she died her serum digoxin

7    concentration would be speculative, correct?

8         A.      Yes, it would be.

9         Q.      And in this back calculation that you

10   have done with your estimates, essentially you are not

11   saying to a reasonable probability that the number on

12   the afternoon of the 26th was 10, 11, 12, correct?

13        A.      That's right, I said that.

14        Q.      Okay.  And you are speculating about

15   what the number would be the afternoon of the 26th,

16   correct?

17        A.      Well --

18        Q.      The day supposedly of her last dose.

19        A.      I don't like the word "speculating."

20   I'm trying to estimate from the factual data that I

21   have.

22               So if you want to call it speculation,

23   that's your word.  I wouldn't use that word.

24        Q.      So the estimate is a range, correct?

25        A.      It could be a range, yes.

Edward John Barbieri                                November 19, 2010

1      Q.      And then that estimate is based on the

2  assumptions that Ms. Ahern just went through, correct?

3      A.      Yes, that's correct.

4      Q.      And among the assumptions, when you say

5  a PMR of only three, you are sort of assuming a PMR of

6  three because it's based on one article that you

7  looked at, which is based on another article that they

8  looked at and then cited, correct?

9      A.      Yes.

10     Q.      And so there are number of assumptions

11  in those articles that lead to the average of two or

12  three that you then assumed, right?

13     A.      Well, I don't think they are really

14  assumptions.  I mean, the article, that Vorpahl and

15  Coe article has objective data, and the authors used

16  that objective data to come to a conclusion.

17            And so by the mathematical calculation

18  they came up with a number.

19     Q.      Sure.

20            But just, for example, I think we

21  pointed out earlier that there are no reports in the

22  Vorpahl article of blood draws after 22.5 hours,

23  correct?

24     A.      That's correct.

25     Q.      All right.  So when they reached their

Edward John Barbieri                                    November 19, 2010

```
 1   average and their mean, they didn't include blood
 2   draws out at 44 hours like we have here.
 3        A.      You're absolutely correct.
 4        Q.      So that is in some way an assumption
 5   upon which your assumptions are built.
 6        A.      I understand your point, yes.
 7        Q.      Okay, good.
 8                And you only -- in your back calculation
 9   you only took into account the heart blood sample,
10   correct?
11        A.      That's right.
12        Q.      All right.  What are we doing with the
13   vitreous sample?
14        A.      What are we doing with it?  It's -- the
15   compound is present in the vitreous sample.
16        Q.      So she was obviously taking the drug.
17        A.      Okay.
18        Q.      Because she was prescribed the drug.
19        A.      And what would anybody want me to do
20   with it.  I was asked to try to do a calculation of
21   the blood concentration based on that.
22                And I said the variability was too
23   great, and I could not come up with any conclusion
24   about that.
25                Now, again, we can speculate about that,
```

PLAINTIFFS' EXHIBITS 012880

Edward John Barbieri                                November 19, 2010

1   but I chose not to do that.

2        Q.      But why didn't you use the vitreous

3   level which was within the therapeutic range to do

4   your calculations as opposed to the blood level that

5   was nine times the therapeutic range?

6        A.      First of all, the vitreous is not a

7   therapeutic range.  The number is within a serum

8   therapeutic range certainly.

9               But knowing that the vitreous levels

10  change over time, and, again, without having, you

11  know, hard factual data about, you know, what happened

12  with her treatment and et cetera, there were even more

13  assumptions if I try to do that calculation.

14              So I thought that was even more

15  speculative than anything I would do with the blood.

16  At least I had the same matrix that I'm working with

17  rather than trying to cross tissue lines.

18       Q.      But at least there was some peer-

19  reviewed literature saying that vitreous is more

20  accurate than postmortem blood, correct?

21       A.      There is.  And I came up with, again,

22  based upon what's cited again from Vorpahl in terms of

23  average numbers of the vitreous levels that they had.

24              I could come up with a number, as I did

25  with the blood sample, but I think that that is less

Edward John Barbieri                                    November 19, 2010

```
 1   reliable than blood itself.
 2        Q.       I may have missed this one, Ms. Ahern
 3   was questioning you.
 4               But was one of your assumptions that
 5   Mrs. Johnson's electrolytes were normal?
 6        A.       That would be a part of it.
 7        Q.       Did Mr. Miller or Mr. Deligans ask you
 8   to assume that her electrolytes were normal?
 9        A.       They asked me to do no assumptions at
10   all.
11        Q.       Did they tell you what her illness was
12   on the day of the 26th?
13        A.       No.
14        Q.       So whatever that illness was, you don't
15   have any idea of how often she may have had that
16   illness or condition prior to the 26th.
17        A.       That's correct.
18        Q.       Do you know anything from the reported
19   medical literature about what the majority of people's
20   response would be to a serum digoxin concentration of
21   12?
22        A.       Literature value or literature
23   information?
24        Q.       Yes, sir.
25        A.       Most people would die from a serum
```

Edward John Barbieri                              November 19, 2010

```
 1  concentration of 12.
 2       Q.      Okay.  Close in time to when it was 12,
 3  right?
 4       A.      Yes.
 5       Q.      Not close in time to when it had dropped
 6  to six, five, four, three, two, one, right?
 7       A.      Yes.
 8       Q.      Do you know any literature that supports
 9  the conclusion that you just mentioned?
10       A.      Well, I'm sure -- I don't know of any
11  specific things I can cite.  Again, it's general
12  knowledge that I've obtained over the years from
13  reading about the compound and as I taught about the
14  compound.
15       Q.      So the vast majority of people who had a
16  serum digoxin concentration of 12 would have a lot
17  more signs and symptoms than diarrhea or nausea,
18  correct?
19       A.      I would say that would be absolutely
20  correct.
21       Q.      And if a patient is significantly
22  bradycardic or significantly tachycardic, they can
23  generally sense that in one way or another or exhibit
24  signs or symptoms consistent with that, correct?
25       A.      People have described feeling that their
```

PLAINTIFFS' EXHIBITS 012883

Edward John Barbieri                                    November 19, 2010

1  heart has changed in some way.

2       Q.      In tachycardia they might say my heart

3  is racing or it's palpitating or something, right?

4       A.      Yes.

5       Q.      Are you familiar with a compound called

6  Senokot?

7       A.      Yes.  Senokot is a laxative.

8       Q.      It could cause diarrhea or GI upset?

9       A.      It could.

10      Q.      Did you ever discuss this case and your

11  opinions with anyone else at NMS?

12      A.      No.

13      Q.      And your calculation under these

14  circumstances and assumptions is a theory, correct?

15      A.      Well, it's theoretical.

16      Q.      Other than the assumed PMR level of two

17  or three, is there anything in the published peer-

18  reviewed medical literature that supports your back

19  calculation?

20      A.      The only other part of the back

21  calculation that really is included is the elimination

22  half-life, the average elimination half-life that I've

23  used for the case, as the time line was presented.

24      Q.      Okay.  Well, if you assumed a different

25  number, such as nine or ten, what would the serum

Edward John Barbieri                                    November 19, 2010

1   digoxin concentration have been under your back

2   calculation?

3        A.      I'm sorry.  Nine or ten what?

4        Q.      A PMR level of nine or ten instead of

5   two or three.

6        A.      Okay, let me walk this through with

7   you.

8               Let's say we had -- we have a postmortem

9   measured value of 18 in her blood.  We take a PMR

10  value of ten, so that reduces it to 1.8 at

11  approximately the time of death.

12              And, again, taking one half-life, the

13  estimated calculation would be double that or 3.6

14  nanograms per mL.

15       Q.      Are you talking about a time of death or

16  at this --

17       A.      At approximately 3:00 p.m.

18       Q.      On the 26th?

19       A.      On the 26th.

20       Q.      I just have to ask you about a couple of

21  articles, and then I'll be done.

22              Okay, this is an article by Cook and

23  Braithwaite in the Journal of Clinical Pathology in

24  the year 2000.

25              First of all, do you ever read or review

Edward John Barbieri                                    November 19, 2010

1   articles from the Journal of Clinical Pathology?

2        A.       No, very rarely.

3        Q.       All right.  Have you ever read this

4   article?

5        A.       I have not seen this, no.

6        Q.       At page 282, in the right-hand column,

7   first full paragraph, it says:  Often pathologists or

8   toxicologists are requested to estimate the amount of

9   drug present at the time of death or the number of

10  tablets consumed.

11             Did I read that correctly?

12       A.       Yes.

13       Q.       This assumes that the drug concentration

14  found at postmortem examination is a reliable estimate

15  of that present at the time of death.

16             Did I read that correctly?

17       A.       You did.

18       Q.       Then it say:  There is a lack of

19  evidence that such an extrapolation is possible.

20             Do you agree with that statement?

21       A.       In general, yes.

22       Q.       All right.  And let's go to 284, two

23  pages later.

24             Under Discussion:  These six cases

25  illustrate that it can be dangerous to attempt to

1  relate a drug concentration found at postmortem

2  examination to the antemortem circulating

3  concentration or to the antemortem dose received.

4           Do you agree with that?

5      A.    I can't agree or disagree, because I

6  haven't read all the article and the information that

7  they provided.  So they are making a conclusion based

8  on something I haven't looked at.

9      Q.    Okay.  Next column -- I'm sorry, same

10 column, last full paragraph.  It says in the second --

11 third sentence:  The use of premortem/antemortem

12 ratios or back extrapolation from a postmortem

13 concentration is not recommended.

14          Do you agree with that?

15     A.    Again, in general.  We have talked about

16 this before.  I said I agree with that, but there are

17 certain situations, as I explained, that I would not

18 agree with that.

19     Q.    All right.

20     A.    Okay.

21     Q.    Next column, last paragraph:  Our study

22 shows that a high degree of error can arise from

23 attempting to predict antemortem concentrations from

24 postmortem concentrations, and emphasizes the need for

25 continued research into the area of pathology

PLAINTIFFS' EXHIBITS 012887

Edward John Barbieri                           November 19, 2010

```
 1   practice.
 2              Did I read that correctly?
 3        A.     You did.
 4        Q.     The next sentence says:  In the absence
 5   of such data, estimates of circulating drug
 6   concentrations during life should not be made.
 7              Do you agree with that?
 8        A.     No, I don't.
 9        Q.     This is an article in 2003 from the
10   Journal of Analytical Toxicology.
11              Do you see that?
12        A.     Yes.
13        Q.     In 2003 were you a reviewer for the
14   Journal of Analytical Toxicology?
15        A.     Yes, I was.
16        Q.     Do you know if you were a reviewer for
17   this specific article?
18        A.     I was not.
19        Q.     Have you read this article?
20        A.     I have.
21        Q.     Do you know anything about these
22   authors?
23        A.     No, not specifically.
24        Q.     You have published articles in the
25   Journal of Analytical Toxicology, haven't you?
```

Edward John Barbieri                                    November 19, 2010

```
 1        A.      I have.

 2        Q.      So I assume you consider it to be a

 3   reliable source?

 4        A.      It's a very good journal.

 5        Q.      At page 533, under Introduction, they

 6   are talking about evaluating blood concentrations in

 7   the living based on various pharmacokinetic

 8   characteristics, aren't they?

 9        A.      Yes.

10        Q.      Then it says:  This evaluation is

11   generally not possible in the postmortem period.

12              The main reason for this is that the

13   concentrations obtained from postmortem samples do not

14   necessarily reflect the blood concentrations at the

15   time of death due to variations in the concentrations

16   according to sampling site and the interval between

17   death and sampling.

18              Do you agree with that?

19        A.      Yes, I do.

20        Q.      And then let's go to page 535, second

21   column.  It says:  Redistribution from the

22   myocardium.  In the living many cardiac drugs are

23   concentrated in the myocardium.

24              One of the best examples is digoxin with

25   an in vivo myocardic concentrations 30 times higher
```

PLAINTIFFS' EXHIBITS 012889

Edward John Barbieri                                November 19, 2010

```
 1  than that in heart blood.
 2              Do you see that?
 3      A.      Yes.
 4      Q.      Do you agree with that?
 5      A.      Yes.  There's data to support that.
 6  That means the myocardial tissue has concentrations 30
 7  times higher than blood in the heart.
 8      Q.      Right.  And then skipping one sentence,
 9  it says:  Rapidly these drugs are redistributed into
10  cardiac blood in which concentrations rise
11  dramatically.
12              Do you agree with that?
13      A.      Again, in general.  It's a little bit
14  flowery in terms of what it's saying, but -- you know,
15  dramatically and -- yes, but certainly concentrations
16  rise.  We know that.
17              MR. MORIARTY:  That's all I have for
18  you, sir.  Thank you.
19              THE WITNESS:  You're welcome.
20                  EXAMINATION
21  BY MR. McPHAIL:
22      Q.      Doctor.
23      A.      Yes, sir.
24      Q.      In your litigation packet.
25      A.      Yes.  Is there a page number that I can
```

PLAINTIFFS' EXHIBITS 012890

Edward John Barbieri                                    November 19, 2010

 1  refer to?

 2       Q.      Just let me hand it to you.

 3               MR. McPHAIL:  Brad, will you pass that

 4  to him?

 5  BY MR. McPHAIL:

 6       Q.      That looks to me to be like a bill for

 7  at least part of the NMS services provided, but I

 8  didn't see anything else in the lit packet that was

 9  produced.  Well, that's the copy that we got, and

10  maybe it is in your complete set.

11               But should all of the billing

12  information, all of that be in the litigation packet

13  that relates to one or two -- one or the other two of

14  these work orders that you processed?

15       A.      Let me explain that and then answer your

16  question, if I may.

17               This is the bill for the production of

18  the lit pack materials itself from expert services.

19  My review, as you see, spending time at no charge.

20  And so this is the copying, the shipping of the expert

21  services work.

22               Should the bill for the testing?  We

23  don't normally do that, to put it in the lit pack,

24  because that's maybe confidentiality in terms of

25  different clients or whatever.

Edward John Barbieri                                November 19, 2010

```
 1              But, again, if you were to request that,
 2    we have no problem producing that for you.
 3         Q.     Okay.
 4         A.     And if you do wish that, just let us
 5    know, and we will search out the records and produce
 6    that for you.
 7         Q.     Is there anything else that NMS creates
 8    in the way of documentation that is not in the lit
 9    pack?
10         A.     Well, as we started earlier when we were
11    going through the request for documents, there were
12    things like the preparation of -- let me finish --
13    preparation of the standards, certification analysis.
14              Instrument maintenance records, which we
15    have and are produced for any inspector who comes in
16    to look.
17              These are all things that -- QC charts,
18    which were brought up.
19              These are all things that we don't
20    normally put in, but we can.  If anybody wants them,
21    we can provide all that information.
22         Q.     Let me narrow my question.
23         A.     Please.
24         Q.     Is there anything in this lit pack
25    related to the Martha Johnson samples, the work done
```

169
Edward John Barbieri                                          November 19, 2010

1   on the Martha Johnson case, any documents related to

2   Martha Johnson that's not in the Martha Johnson lit

3   pack?

4        A.       No.

5        Q.       That's what I was getting at.

6        A.       No, there's not.

7        Q.       Okay.

8        A.       And I supplement it, as I gave today,

9   the things that I found when I did the review, because

10  we realized we had missed that.

11       Q.       That's fine.

12       A.       So, yes, there's nothing that I know of

13  specific to this case that we did not provide to you.

14       Q.       Okay.  You also mentioned to Ms. Ahern

15  that you were a pharmacist?

16       A.       I have a pharmacy degree.

17       Q.       You are not going to be offering any

18  pharmacy opinions in this case, are you?

19       A.       None whatsoever.  I haven't practiced

20  pharmacy in years, and I would not go there, no.

21       Q.       In fact, you are not going to be

22  offering any opinions at trial that any of the

23  defendants did anything wrong here, are you?

24       A.       No, sir, not at all.

25                MR. McPHAIL:  Thank you.

Edward John Barbieri                                    November 19, 2010

```
 1              MR. MORIARTY:  I'm done.
 2              You have been through this enough to
 3   know your rights to read and sign the transcript or to
 4   waive that right.
 5              I actually prefer with all this
 6   technical terminology and how fast I read those
 7   article excerpts that you read and sign, okay?
 8              THE WITNESS:  Boy, that will be dull
 9   reading.
10              MR. MILLER:  Doctor, you can do what you
11   want.
12              THE WITNESS:  To be honest, it's going
13   to be a lot of time.
14              MR. MORIARTY:  If you don't want to read
15   and sign.  It's your right, not mine.
16              THE WITNESS:  No.  If we find an issue,
17   I will correct it later, but I'm going to waive it.
18              MR. MORIARTY:  Stay on the record,
19   because the only thing we still need to get copied and
20   made into an exhibit is the lit pack for the blood
21   specimen.
22              THE WITNESS:  Okay.  This lit pack was
23   sent to -- was sent to the requesting agency, that
24   would be the Analytical Research Lab.  So we can
25   produce another copy for you, not a problem.
```

Edward John Barbieri                                    November 19, 2010

```
 1              MR. MORIARTY:  That's fine.

 2              THE WITNESS:  Okay.

 3              MR. MORIARTY:  I have Exhibit 2, which

 4  is apparently not a complete lit pack of both

 5  specimens.  So I just need the lit pack for --

 6              THE WITNESS:  So that's for the blood

 7  work, okay, so you need a copy of that.

 8              MR. MORIARTY:  And I would just suggest

 9  that that be made Exhibit 13 once it gets produced.

10  Is that okay with you?

11              MR. MILLER:  I don't care, that's fine.

12              THE WITNESS:  As long as everybody's

13  okay, we are going -- because this is going to be

14  copied, it's going to be paginated with the

15  handwritten material on it.

16              MR. MORIARTY:  Sure.

17              THE WITNESS:  Written numbers.

18              And there are 50-some pages, and I think

19  there's a certification with that.

20              MR. MORIARTY:  Fifty-seven pages.

21              THE WITNESS:  Right.  And I do have a

22  certification, so I'll make a copy of that as well.

23              MR. MORIARTY:  Okay.

24              (Exhibit No. Barbieri 13, Litigation

25  Support Package, WO# 08232082, marked for
```

172

Edward John Barbieri                                      November 19, 2010

1    identification.)

2              (Deposition concluded at 1:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' EXHIBITS 012896

Edward John Barbieri                                    November 19, 2010

```
 1                    CERTIFICATION

 2

 3

 4         I, JANICE D. BURNESS, Registered

 5  Professional Reporter, Certified Shorthand Reporter,

 6  certify that the foregoing is a true and accurate

 7  transcript of the foregoing deposition, that the

 8  witness was first sworn by me at the time, place and

 9  on the date herein before set forth.

10         I further certify that I am neither attorney

11  nor counsel for, not related to nor employed by any of

12  the parties to the action in which this deposition was

13  taken; further, that I am not a relative or employee

14  of any attorney or counsel employed in this case, nor

15  am I financially interested in this action.

16

17

18
    _____
19  JANICE D. BURNESS
    REGISTERED PROFESSIONAL REPORTER
20  CERTIFIED SHORTHAND REPORTER
    (NJ) XI00225900
21  NOTARY PUBLIC

22

23

24

25
```

PLAINTIFFS' EXHIBITS 012897